Pages 1-52

1                       UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF CALIFORNIA
2                           SAN JOSE DIVISION

3

4   UNITED STATES OF AMERICA,      )  Case No.  18-cr-00258-EJD
                                   )
5              Plaintiff,          )  San Jose, California
                                   )  Friday, October 12, 2018
6       vs.                        )
                                   )
7   ELIZABETH A. HOLMES and        )
    RAMESH "SUNNY" BALWANI,        )
8                                  )
               Defendants.         )
9   _____)

10

11                   TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE SUSAN VAN KEULEN
12                 UNITED STATES MAGISTRATE JUDGE

13  APPEARANCES:

14  For Plaintiff:              JOHN C. BOSTIC, ESQ.
                                JEFF B. SCHENK, ESQ.
15                              United States Attorney's Office
                                150 Almaden Boulevard, Suite 900
16                              San Jose, California 95113
                                (408) 535-2695
17
                                ROBERT S. LEACH, ESQ.
18                              United States Attorney's Office
                                450 Golden Gate Avenue, Box 36055
19                              San Francisco, California 94102
                                (415) 436-7200
20
    For Defendant Holmes:       KEVIN M. DOWNEY, ESQ.
21                              SEEMA M. ROPER, ESQ.
                                Williams and Connolly LLP
22                              725 12th Street, N.W.
                                Washington, D.C. 20016
23                              (202) 434-5460

24

25  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.

```
 1   APPEARANCES:  (Cont'd.)

 2   For Defendant Balwani:        JEFF B. COOPERSMITH, ESQ.
                                   AMANDA M. McDOWELL, ESQ.
 3                                 Davis Wright Tremaine LLP
                                   1201 Third Avenue, Suite 2200
 4                                 Seattle, Washington 98101-3045
                                   (206) 757-8020
 5
                                   KELLY M. GORTON, ESQ.
 6                                 Davis Wright Tremaine LLP
                                   505 Montgomery Street, Suite 800
 7                                 San Francisco, California 94111
                                   (415) 276-6584
 8
     Transcription Service:        Peggy Schuerger
 9                                 Ad Hoc Reporting
                                   2220 Otay Lakes Road
10                                 Suite 502-85
                                   Chula Vista, California 91915
11                                 (619) 236-9325

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SAN JOSE, CALIFORNIA  FRIDAY, OCTOBER 12, 2018  10:07 A.M.

2                            --oOo--

3            THE CLERK:  Calling the matter of United States v.

4    Elizabeth A. Holmes, Case Number 18-cr-00258.

5            THE COURT:  All right.  We're on today for Defendants'

6    motion for a cease and desist order.  So if I can get Counsels'

7    appearances, please.

8            MR. BOSTIC:  Good morning, Your Honor.  John Bostic for

9    the United States.

10           THE COURT:  Mr. Bostic.

11           MR. LEACH:  Good morning, Your Honor.  Robert Leach for

12   the United States.

13           THE COURT:  Mr. Leach, good morning.

14           MR. SCHENK:  And Jeff Schenk.  Good morning again, Your

15   Honor.

16           THE COURT:  Mr. Schenk.

17           MR. DOWNEY:  Good morning, Your Honor.  Kevin Downey for

18   Elizabeth Holmes and my colleague, Seema Roper Mittal, is with me.

19           THE COURT:  Good morning.

20           MR. COOPERSMITH:  Good morning, Your Honor.  Jeff

21   Coopersmith for Defendant Ramesh Balwani and with me are my

22   colleagues Amanda McDowell and Kelly Gorton.

23           THE COURT:  Good morning.  Good morning.  Thank you all

24   for being here.  I appreciate that.  All right.  It's Defendants'

25   motion, so we'll start with them.  I do have some background

1    questions, a few general questions, so let me ask those and I'll

2    have Mr. Coopersmith respond and then, Mr. Bostic, if you want to

3    -- you can concur in those.   I don't think these are

4    controversial, but if you have any comments to add, then you may.

5                MR. COOPERSMITH:  Your Honor, would you prefer that I

6    remain at the podium or would you like me --

7                THE COURT:  Why don't you have a seat.  I think that's

8    a little easier.  We don't have a lot of room.

9                MR. COOPERSMITH:  Thank you, Your Honor.  Oh, I should

10   have said for the record that Mr. Balwani is present in the

11   courtroom as well.

12               THE COURT:  All right.  Thank you.

13               MR. DOWNEY:  As is Ms. Holmes, Your Honor.

14               THE COURT:  All right.  Thank you.  Good morning.

15               MS. HOLMES:  Good morning.

16               THE COURT:  All right.  A couple of questions first.  So

17   the documents at issue in this most recent production, they're

18   just the documents from the September 14 production; is that

19   right?

20               MR. COOPERSMITH:  Yes, Your Honor.  What occurred as I

21   understand it -- and Mr. Bostic doesn't really disagree with it --

22   is that there was a subpoena in September 2017.

23               THE COURT:  Right.

24               MR. COOPERSMITH:  And some of those were produced, even

25   before the indictment in June.

1          THE COURT:  Right.

2          MR. COOPERSMITH:  At this point, there were, I believe

3  it's in the hundreds of thousands of documents and the pages may

4  be even higher than that -- in the millions.  And in -- more

5  recently, when Theranos was on the verge and now is in this sort

6  of --

7          THE COURT:  Right.

8          MR. COOPERSMITH:  -- receivership proceeding, the

9  Government asked for these documents, these hundreds of thousands

10  of pages.  That's what's directly at issue in the case, as I

11  understand it, Your Honor, and at this point --

12          THE COURT:  Well, what's at issue right now is -- I

13  mean, the object of your cease and desist order is -- is a

14  specific production that was produced on September 14th --

15          MR. COOPERSMITH:  Yes, Your Honor, and any -- and any

16  further production that they might try to get under that subpoena.

17          THE COURT:  I understand.

18          MR. COOPERSMITH:  And one clarification.  So the

19  Government actually has those documents in their possession.

20          THE COURT:  I understand.

21          MR. COOPERSMITH:  We don't agree with that.  But Mr.

22  Bostic and his team have agreed not to review them --

23          THE COURT:  Right.

24          MR. COOPERSMITH:  -- pending the Court's ruling.

25          THE COURT:  Right.  I just wanted to be sure we were

6

1 talking about -- we're not here about anything that's already been

2 produced.  We're focused on these documents that were turned over

3 on the 14th.  And I appreciate that your order -- or your order --

4 my order, your motion -- would extend to any further production.

5        MR. COOPERSMITH:  Yes, Your Honor.  And for that matter,

6 there might be, depending on how the Court rules, something in

7 this that affects the Government's ability to use the grand jury

8 process, you know, more generally.

9    But -- but you're right that today we're speaking about the

10 specific production of these three hundred- -- we'll call it

11 300,000 documents.  There may be something like that.

12        THE COURT:  And do you know, Mr. Coopersmith -- and I

13 appreciate that Mr. Bostic may be in a better position to respond

14 to this -- but it was also -- what I gleaned from the papers was

15 that this production from September 14 is a specific date range;

16 that is, it picks up -- these documents are from October 2016 to

17 October 2017.

18        MR. COOPERSMITH:   I think it's October 2016 through

19 September 2017.

20        THE COURT:  Okay.

21        MR. COOPERSMITH:   And as -- when I get into the

22 substance, I think that's going to become an important fact.

23 But --

24        THE COURT:  I understand.

25        MR. COOPERSMITH:   -- yeah, that's my understanding of

1  the time period.

2         THE COURT:  That's why I asked the question.

3         MR. COOPERSMITH:  Yes, Your Honor.

4         THE COURT:  All right.  And in this production, do you

5  know how many pages or files or -- do you have some volume that

6  you're using?

7         MR. COOPERSMITH:  My understanding, it was like --

8  something like 300,000 but, again, I think Mr. Bostic's in a

9  better position since -- he hasn't reviewed the documents, but he

10 probably has an idea of the volume.  I think it's something like

11 300,000 documents which might translate to a lot more page.

12        THE COURT:  I understand.  Okay.  And I also understand

13 that before these documents were turned over to the Government,

14 that Theranos at the time -- there were some filters.  There was

15 some filtering of the documents, looks like maybe with attorney

16 names and law firm names.

17        MR. COOPERSMITH:  Yes.  I'm told that that is the case,

18 Your Honor.  But they didn't exclude -- there were some lawyers

19 that still there were documents relating to them.

20        THE COURT:  I understand.  I'm just trying to, again,

21 get a sense of --

22        MR. COOPERSMITH:  They did try to do, as I understand

23 it, a filter to weed out like the kind of core, privileged

24 documents between company counsel and the company, as I understand

25 it.

8

1           THE COURT:  And do you know how many documents were

2   withheld --

3           MR. COOPERSMITH:  I do not, Your Honor.

4           THE COURT:  -- as a result of those filters?

5           MR. COOPERSMITH:  I do not.

6           THE COURT:  Okay.  All right.  And now this hearing was

7   set with an eye towards the further proceedings before Judge

8   Davila which I understand are set for Monday.

9           MR. COOPERSMITH:  Yes, Your Honor.

10          THE COURT:  Okay.  And what's the agenda for the hearing

11  before Judge Davila?

12          MR. COOPERSMITH:  In this case, Your Honor, I understand

13  that Judge Davila wanted a status conference.  We haven't filed it

14  yet, but Judge Davila's chambers asked the parties to compile a

15  status report --

16          THE COURT:  Okay.

17          MR. COOPERSMITH:  -- which should be filed hopefully

18  today.  And basically he just wanted to know what was going on.

19  I think what's going to be discussed at that hearing are -- is

20  basically the status of discovery.  I think that, you know, this

21  motion, depending on what this Court does, will come up -- I'm

22  quite sure.

23      And then there may be some discussions about scheduling the

24  case, which there hasn't been a schedule set yet.  So that's what

25  I think the agenda is.

1          THE COURT:  Okay.  And that's -- that's what I needed to

2   know, sort of how whatever we do here today then may impact what

3   the discussion are on Monday.

4          MR. COOPERSMITH:  Yes, Your Honor.

5          THE COURT:  Okay.  All right.  That's very helpful.

6   Okay.  Before we move to the substance of the motion then, Mr.

7   Bostic, do you have anything to add on the -- like questions

8   around the production?

9          MR. BOSTIC:  Not much, Your Honor.  I'm happy to answer

10  any additional questions the Court might have, but I think the

11  information provided by Mr. Coopersmith was accurate.

12      Again, the Government has not reviewed the most recent

13  production, --

14          THE COURT:  I understand.

15          MR. BOSTIC:  -- so I don't know exactly what it consists

16  of.  I think it does involve approximately 270,000 documents.

17          THE COURT:  Okay.

18          MR. BOSTIC:  I'm informed by Theranos counsel that they

19  did conduct a privilege filter review and excluded -- I don't know

20  how many -- but I would imagine many documents from that set.  The

21  privilege filter was reviewed by the Government before it was

22  used.  It was a negotiated privilege filter and it included I

23  think upwards of a hundred entries for several law firms and

24  numerous lawyers that the company and the individual Defendants

25  have had dealings with.

1          THE COURT:  So I had a question as to whether there were

2     other filters, but it sounds like -- I think the filters were

3     generally described in the papers as law firms and lawyers' names.

4          MR. BOSTIC:  I believe that's right.  There was some

5     discussion of using terms like "confidential" and "privileged" in

6     that filter as well. I -- I don't know whether those terms ended

7     up being in the final filter that was used.

8          THE COURT:  Okay.

9          MR. BOSTIC:  But certainly it did include the vast

10    majority of the lawyers that the company and the individual

11    Defendants worked with, again with the exception of just one or

12    two in-house lawyers, I believe, who had dual roles and who

13    couldn't be excluded in that way.

14         THE COURT:  Okay.  And do you have any other information

15    regarding the proceedings before Judge Davila on Monday?

16         MR. BOSTIC:  No, Your Honor.  I think Mr. Coopersmith's

17    statement summed it up.

18         THE COURT:  Okay.

19         MR. BOSTIC:  The only thing I would add about the source

20    of the documents in the recent production, besides the privilege

21    filter, I should just point out that those documents were

22    collected based on a different set of search terms that were

23    subject-based.  So, in other words, to make sure that it was

24    capturing only relevant documents or to maximize relevant

25    documents and minimize irrelevant documents, topic-based search

1  terms were used that were generated by the company.

2         THE COURT:  And is it also your understanding that the

3  date frame on this latest production runs from October 2016

4  through -- whether it's September or up to October 2017?

5         MR. BOSTIC:  It would be through the date of the

6  subpoena in September 2017.  Yes, Your Honor.

7         THE COURT:  Okay.  Got it.  All right.  That's very

8  helpful.  Thank you.

9      All right.  Mr. Coopersmith.

10         MR. COOPERSMITH:  Thank you, Your Honor.

11         THE COURT:  I have, obviously, reviewed the papers and

12  all of the supporting declarations and documents, so I think I'm

13  familiar with the issues and the concerns.  But with that in

14  mind --

15         MR. COOPERSMITH:  Thank you, Your Honor, and I'll try

16  not to repeat what we wrote in the papers.  But I think what we've

17  got here is essentially a legal issue, and this is what I think

18  the core dispute before the Court is.

19      As I understand it from reading the Government's papers and

20  having discussions with Government counsel, their theory is that

21  so long as there's some possibility that something will come to

22  light that could lead them to get a superseding indictment or, in

23  this case, a second superseding indictment, that they can keep on

24  going with the grand jury until they rule out that possibility.

25      And I think that that is not the law.  Because, if it were

1    the law, there would be no limit to what the Government could do

2    with the grand jury post-indictment.  In other words, it's every

3    case, Your Honor, and it's -- I can say -- 100 percent of the

4    cases where it's always possible that you can find some other

5    witness or some other document or something that you can't rule

6    out, because you don't know what it is yet, that, Oh, maybe this

7    would be something that we would supersede with.  And that, again,

8    can't be the law because there would be no limit in principle.

9        And I think that's the reason, when you look at these cases

10   that have been cited in the briefs, why the courts came up with a

11   test that's not just, Oh, we have to prove the Government's intent

12   or we have to prove it's -- the sole purpose is to prepare for

13   trial.  The reality is the cases say it's the sole or dominant

14   purpose.

15       In other words, if the Government has -- clearly, if they

16   have a purpose only to prepare for trial and not to investigate,

17   then that would be improper.  But if that's the dominant purpose

18   or the primary purpose, that would also do it.

19       And I think --

20           THE COURT:  But that -- and that's the presumption;

21   right?  I mean, that's -- there's a presumption that it's -- that

22   they're moving forward appropriately, and there's a limit to it --

23   as you say -- sole and dominant -- what is the sole and dominant

24   purpose -- that's the question -- but demonstrating what that is

25   to overcome the presumption, that's your burden; right?

1          MR. COOPERSMITH:  Yeah.  Your Honor, I don't know that

2     I'd go so far as to call it a presumption.  I think there's a bit

3     of tension here between the branches of government; right?  You

4     have the government with investigatory power.  You've got the

5     court.  But the court and the cases make clear it has clear

6     supervisory power over the grand jury process.  And what this

7     really is -- and I think the cases bear this out -- it's a facts

8     and circumstances test.

9          THE COURT:  Uh-huh.

10          MR. COOPERSMITH:  And I'm going to go into that.  But

11     the timing and the circumstances -- this is really how you

12     determine what the dominant purpose is.  And it's not a matter of

13     inquiry into the mind or soul of, you know, John Bostic as to what

14     he really thinks.

15          You know, so, for example, a declaration from the Government,

16     which we have here, that just says, "We're still investigating,"

17     I mean, that's not really of much relevance because we're really

18     talking about all the facts and circumstances that are here, and

19     I want to talk about that.

20          But before I even do, I want to just briefly touch on the

21     issue of standing.  I don't think I have to spend long on that

22     because -- and I don't say this lightly, Your Honor -- but I think

23     it's essentially a frivolous argument.

24          Basically, the Government says we don't have standing because

25     they issued the subpoena to Theranos and we're not Theranos and

1   we're the Defendants in the case.

2       But that can't be the law, first of all -- and I'll explain

3   why the cases don't even support that.   It can't be the law

4   because the whole principle here is that the Government is not

5   supposed to be able to use the grand jury process for trial

6   preparation purposes.   It can only use it for investigatory

7   purposes with the intent or purpose to return an indictment -- in

8   this case, a second superseding indictment.

9       And so there's no -- the standing issue -- if we didn't have

10  standing, then who would have standing to object to an abuse of

11  the grand jury process that is really for the purpose of trial

12  preparation?   If a defendant didn't have standing, no one would

13  have standing.   And you can imagine a situation -- let's just

14  posit a clear case where you had an email from the Government that

15  went to a third party witness that says, you know, Please find

16  enclosed this grand jury subpoena and our purpose is to prepare

17  you for trial.   And let's say it's, you know, a month before

18  trial.   Under the Government's position, you wouldn't have

19  standing even in that case -- and that can't be the law and, in

20  fact, it's not.

21      And when you look at the cases we cited -- and I want to

22  point out in particular the *Schmidt* case, which is --

23          THE COURT:   Well, before we -- before we go to the

24  cases, --

25          MR. COOPERSMITH:   Yes, Your Honor.

1          THE  COURT:    --  what  is  --  what's  your  basis  for

2    standing?   Because it's not -- it's not entirely clear from the

3    briefs.    Is  it  the  Defense  status;  that  is,  the  Defendants,

4    obviously,  are  subject  to  indictments  that  arise,  at  least  in

5    part, out of these productions?

6          MR.  COOPERSMITH:   First and foremost, Your Honor, our

7    standing rests on the fact that Mr. Balwani and Ms. Holmes are

8    criminal  defendants  who  have  a  right  to  have  this  case  proceed

9    under  the  Rules  of  Criminal  Procedure  and  not  through  some

10   extraordinary discovery process of the grand jury that's outside

11   of that.

12       And the abuse of the grand jury and our rights as criminal

13   defendants to the application of the correct rules and not having

14   abuse of the grand jury is exactly what our standing rests on.

15       There is -- and maybe this is the Court's statement about

16   some confusion -- there is another point, which I believe Ms.

17   Roper will address, primarily -- that there are, we think, quite

18   likely common interest privileged materials in this document set,

19   and we'd also have standing base on that.

20       But when you go -- I think --

21          THE COURT:  So it's both?

22          MR.  COOPERSMITH:   Yes, Your Honor, but primarily our

23   status as criminal defendants.

24          THE COURT:  Uh-huh.

25          MR. COOPERSMITH:  And -- and I think the cases allow for

1  both grounds of standing.  So, for example, in the *Schmidt* case

2  from the Third Circuit, the Government has the exact same

3  argument.  It has to depend on the privilege interest or property

4  interest, and the court said -- and this is quoting from page 1026

5  of the Third Circuit's opinion in *Schmidt*, the court says, "More

6  fundamentally, we think the Government's suggestion that the

7  courts limit standing to claims of abuse of the grand jury process

8  through persons whose property interest or privileges have been

9  invaded, is not a viable one."

10      And then, in addition, Your Honor, *Fernandez* from the First

11  Circuit says the same thing -- they go into this at length and the

12  court concludes -- they cite *Schmidt* and they say, Yeah, a

13  criminal defendant who's challenging an abuse of the grand jury

14  process because it's merely being used for trial preparation, has

15  standing.

16      Now, the Government spends a lot of time in their brief on

17  standing, but they cite no case that says we don't have standing.

18  What they do instead is they try to distinguish the cases we

19  cited.  And there's no case they say -- and there's case after

20  case where the courts don't even discuss standing -- they just

21  proceed to the merits because it's so clear.

22      So that's the standing issue, Your Honor.  I don't think

23  anyone needs to spend much time on that because the cases are so

24  clear that someone in Mr. Balwani's position and Ms. Holmes'

25  position do have standing to object to use of the grand jury

1  process for trial prep.

2      Now, Your Honor, I want to just move to what I think's really

3  going on here; okay?  So this subpoena, as the Court has said, was

4  issued in September 2017 to Theranos.  And there was, as is usual,

5  a kind of rolling production, as I understand it.

6      And the Government didn't insist, you know, before indictment

7  on getting all these documents if they really cared about them for

8  indictment.  They didn't insist on them before their superseding

9  indictment which they returned on September 7th.  Instead, what's

10  clear -- even from Mr. Bostic's own email -- and I don't know if

11  the Court's reviewed that.  It's maybe buried in the exhibits.

12  But there's an email from Mr. Bostic to Wilmer Hale --

13          THE COURT:  I've read all the exhibits.

14          MR. COOPERSMITH:  Thank you, Your Honor.  And in that

15  email, Mr. Bostic says, Well, we're running out of time because,

16  you know, Theranos is -- and that's a paraphrase, but that's what

17  he said -- we're running out of time because Theranos is about to

18  go into this assignee proceeding.  It's sort of like a

19  receivership, but it's noted as an assignment for the benefit of

20  the creditor.

21      So when you think about that, what it looks like they're

22  really doing here is they're concerned that when Theranos is no

23  longer in existence and there's some assignee who they have to

24  deal with, maybe it's going to be harder to get the documents.

25      And that's exactly like the case we cited from the Eastern

1  District of Michigan, the *Kovaleski* case.  Because here's what

2  happened there.

3      There was already an indictment in that case and there was a

4  witness the Government wanted to talk to -- his name was Maurice

5  -- and Maurice was a federal defendant in custody and he was about

6  to be released.  And the Government issued a grand jury subpoena

7  to this witness, Maurice, because they wanted to talk to him.  And

8  the Government said, you know, Look, once he's released from

9  federal custody, it's going to be a lot harder to find him and we

10  may not be able to -- and the court said, No, that's not correct.

11  And the court repeated the test -- the dominant or sole purpose.

12  They said, Under the facts and circumstances of this case, it

13  looks like they're just trying to get a hold of this witness for

14  trial preparation purposes and it's not really about the grand

15  jury.

16          THE COURT:  But I don't -- I did not read that case as

17  the court wasn't using the fact that there was already an

18  indictment as a dispositive point.  In fact, I didn't see that in

19  any of the cases which really seems to be the, you know, key point

20  in the defense argument here, which is that this production is

21  post-indictment, it's post the preceding indictment, but I just

22  don't see the cases as using that as a determinative --

23          MR. COOPERSMITH:  Well, as I said before, Your Honor,

24  these cases are all individual facts and circumstances.

25          THE COURT:  Yes.  They are.

1          MR. COOPERSMITH:   And the fact -- we wouldn't even

2    really be discussing this if we were pre-indictment, right? --

3    because pre-indictment, you know, the Government's allowed, I

4    think, to fish around all they want -- within some limits -- but

5    they can fish around until they satisfy themselves that they have

6    what they have to have.

7          After indictment, this is where this rule kicks in.   So I

8    think it's just part of the case law here that we're talking about

9    these cases in a post-indictment setting where the Government's

10   trying to continue to use the grand jury process.   And I think

11   that is an important point.

12         Here, of course, I do think it's important that we have not

13   only an indictment but we have a second -- we have a superseding

14   indictment.

15         And I understand that the Government theoretically could have

16   some mission, you know, to supersede.   But as I said in the first

17   instance, Your Honor, what we've got here is the Government isn't

18   articulating anything other than, Well, we could continue to

19   investigate.   Maybe -- some cases allow money laundering

20   investigations.   Some cases allow obstruction investigations.   You

21   know, who knows what we're -- I think it's really just they're

22   thinking they're allowed to continue to abuse the grand jury until

23   they rule out the possibility of superseding indictment.

24         And as I said before, that cannot be the law, Your Honor --

25   and it's not.

1       But --

2              THE COURT:  But here's -- in this case, again -- and I

3  agree facts and circumstances -- here, we have an indictment --

4  a subpoena issued and we have a long period of meet and confer and

5  rolling productions -- a lot of which are tied to other civil

6  litigation, which is not that unusual.  We've got productions

7  ready to go, documents that have been reviewed that are

8  responsive.  And we have this what appears to be a long process

9  over time of negotiating and production and rolling production and

10 rolling production and this is, arguably, yet another installment

11 in a long line of a rolling production that was negotiated with a

12 subpoena well in advance of the indictments and it's part of that

13 ongoing process.

14             MR. COOPERSMITH:  Your Honor, I don't think that matters

15 at all.  The fact that there was a preexisting subpoena or they

16 issue a new subpoena after indictment, the same principle is at

17 work -- that they are continuing to use the grand jury process.

18     They have no authority to force document productions under a

19 grand jury subpoena, witnesses to appear under a grand jury

20 subpoena, unless there's a purpose to indict and not to -- or, in

21 this case, second supersede the indictment -- and not just to fish

22 around till they rule around the possibility that they might find

23 something.

24       And, Your Honor, the facts and circumstances -- I mean --

25             THE COURT:  But haven't you flipped the standard on its

1    head then?  Isn't the test that the sole and dominant purpose has

2    to be an improper purpose?

3            MR. COOPERSMITH:  I think ultimately that is the test,

4    Your Honor, but I think the facts and circumstances really bear

5    that out.  And here's what we've got.

6        You're right that we have a September 2017 subpoena.  And

7    you're right that there were some rolling productions that the

8    Government was allowing on the sort of lenient schedule, you know,

9    until Theranos was going under.

10       I think we have the fact that they're really it looks like

11   just trying to storehouse documents 'cause it's like, you know,

12   saving up the acorns for winter or something.  You know, they

13   might find something.

14           THE COURT:  So on that point -- and I know you argued

15   this extensively in the briefing and you brought it up this

16   morning about near the end, that when it's clear that Theranos as

17   an entity is about to disappear or go into -- I think of it as

18   receivership, but you're right.  It's an assignee to creditors --

19   there's an email from the Government saying, Well, we're running

20   out of time.  We're getting close.

21           MR. COOPERSMITH:  Right.

22           THE COURT:  But that could have easily occurred pre-

23   indictment; I mean, that same discussion -- that the company is

24   winding up and time is running short and it is -- I mean, the

25   fact, whether the grand jury is pursuing documents for a proper or

1    improper purpose, the -- the reality, the fact is that when the

2    company's gone, it's harder to get those documents.

3             MR. COOPERSMITH:  And that's exactly --

4             THE COURT:  So -- so how does that -- the "we need this

5    before the company goes away" inform the question of whether or

6    not it's a proper or improper purpose?

7             MR. COOPERSMITH:  Because, Your Honor, first of all,

8    they could have had that discussion any time, you know, before

9    indictment, as the Court has pointed out.  And if they cared about

10   the documents, if they really needed this for an indictment, they

11   could have had that discussion.  They could have insisted that

12   Theranos, who had, you know, very experienced, well-staffed

13   counsel in Wilmer Hale, they could have said, You know what?  We

14   need these documents in March 2018 or any time they wanted.

15            THE COURT:  But prior to indictment, the company wasn't

16   -- the company wasn't going away.

17            MR. COOPERSMITH:  But that -- that makes the point that

18   I was trying to make, Your Honor, which is that the reason why

19   they all of a sudden cared about these documents is -- and this is

20   one factor.  I'm going to go into some others -- but the reason

21   why they all of a sudden cared about these documents so much is

22   because they were worried that they might have a harder time

23   getting them, not because they really needed it for some

24   investigatory purpose.  It was really just, We're gonna storehouse

25   some stuff so that maybe something will be in there that we'll

1  eventually look at that leads us to supersede or maybe it will

2  just be good for trial.

3      And I think that's one factor, but it's not the only one,

4  Your Honor.  Remember that the Government's investigated this case

5  -- I think it's in Mr. Bostic's declaration -- they started in

6  early 2016.   So we're talking about a two-and-a-half-year

7  investigation before the indictment.

8      So when you look at the subpoena, which is attached, it's

9  very broad.  It's exactly the same topics that they indicted on

10  and superseded on.  And so, by definition, at the time they issued

11  that subpoena in September 2017, they could not have had a purpose

12  for later superseding.   We were in communication with the

13  Government for a long time before this indictment.  You know, we

14  weren't in a hurry to get indicted.  Mr. Balwani wasn't going

15  anywhere.  Ms. Holmes wasn't going anywhere.  They could have

16  waited to indict, but they didn't.  They had enough to indict, and

17  now they're worried about storehousing documents.

18      But the fact that the subpoena's so broad, it's on the same

19  topics, is very strong evidence that this was not really a

20  subpoena issued for the purpose of superseding.  I think it would

21  be different if you had a subpoena issued -- the new one today

22  that was on some topic that, you know, had not been previously

23  indicted.  So I think the nature of the subpoena's important.

24      And also, as the Court pointed out, this time period is

25  crucially important.  So we've got a time period from October 2016

1    through September 2017.  That's what they want.  Well, by that

2    time period, Mr. Balwani had left the company months before.  Ms.

3    Holmes was still with the company.  But as we've shown, this

4    indictment is about lab operations and alleged investor fraud.

5    There were no investors during that time period.  No investors

6    came in to Theranos.  I think the Government will agree with that.

7    There was no lab operations during that time period.

8         You know, the Government doesn't say that they're

9    investigating obstruction or money laundering.  They just say,

10   well, you know, theoretically the Government in some cases could

11   do that.  And the reason they don't say it is because that's

12   preposterous.  You know, Mr. Balwani never made a dime from this

13   case.  Ms. Holmes never made a dime from this case.  They held

14   onto their stock, never sold even one share.  There's no money

15   laundering here and there's not a whiff of obstruction.

16        So that's not even something the Government's really arguing.

17        So this time period is very suspect, Your Honor, and it's one

18   of the factors that leads, I think, a reasonable finder here to

19   say, Well, this is really just storehousing documents when

20   preparing for trial.  The dominant purpose doesn't seem to really

21   be to investigate.

22        Your Honor, the timing and breadth of the subpoena here, the

23   fact that it's gone into exactly the same topics as the

24   indictment, the fact that they never wanted that, the storehousing

25   of documents, the time period involved -- all of these factors I

1  think are strong evidence that the dominant purpose -- and it
2  doesn't even matter if the Government, you know, as the *Kovaleski*
3  case points out -- if they have -- let's just give them the
4  benefit of the doubt from that.  Let's say they have a purpose
5  that they might want to still investigate.  That doesn't matter if
6  the facts and circumstances lead the Court to believe that the
7  dominant purpose is to prepare for trial or just to storehouse
8  documents because it's easier to use a grand jury subpoena.

9      As one of the cases pointed out, the grand jury process is
10  the most powerful discovery tool ever invented, and, you know, I
11  understand the tendency to want to use that power if you have it.
12  But at this point, Your Honor, we're already post-superseding
13  indictment.  I don't think that they have the ability to use a
14  grand jury.  The facts and circumstances just aren't there.

15      And if the Court hasn't any more questions, I think Ms. Roper
16  has additional points about the common interest issue.

17          THE COURT:  Okay.  Thank you, Mr. Coopersmith.  That's
18  helpful.  What I'd like to do, actually, is hear from the
19  Government just on the proper/improper purpose question and then
20  we'll turn to the privilege issue.

21          MR. COOPERSMITH:  Yes, Your Honor.

22          THE COURT:  Thank you.

23          MR. BOSTIC:  Thank you, Your Honor.

24          THE COURT:  Mr. Bostic.

25          MR. BOSTIC:  I also have some arguments about standing,

1    but I am happy to wait until later to address Mr. Coopersmith's

2    points on that.

3          THE COURT:  I think standing, at least as it relates to

4    the status issue, as opposed to the privilege issue, if you -- if

5    you want to break it out that way and address it now since that's

6    how it was presented by the Defense.

7          MR.  BOSTIC:  Okay.  I think we should start by

8    recognizing the language in cases cited by the Government and by

9    the Defense acknowledging that this kind of charge is easy to make

10   but hard to prevail on.  This case proves that.  It's been easy

11   for the Defense to raise this issue with the Court, and require a

12   response from the Government, but ultimately their arguments fail

13   -- not for lack of good lawyering or effort, of course, but just

14   because the standards are stacked to prevent this kind of claim

15   from succeeding where it shouldn't.

16       When courts say that this kind of claim is difficult to

17   prevail on, they're not complaining about an injustice that needs

18   to be corrected.  They're acknowledging the way the system is

19   designed -- to preserve the integrity and the autonomy of the

20   grand jury.  So I think that's something that we need to keep in

21   mind.

22       Courts,  instead  of  trying  to  make  things  easier  for

23   defendants to bring these claims, they faithfully adhere to the

24   standards requiring them to have a presumption that the grand jury

25   is operating within its authority and that the burden is on the

1  defense to show otherwise.

2      Mr. Coopersmith said correctly that the grand jury is a very

3  powerful   discovery   device.     It   has   powerful   discovery

4  capabilities.  That's not an accident and it's not a gift that the

5  Government gave to itself.  It's built into the system.  It's how

6  it's supposed to work.

7          THE COURT:  But it's not unchecked.

8          MR. BOSTIC:  It's certainly not unchecked.

9          THE COURT:  It's not carte blanche and here we are.

10         MR. BOSTIC:  Exactly, and that's why we're here.   I

11 think on the question of whether the Government is using the grand

12 jury properly here, again, we should start with the presumption --

13 it's curious that defense counsel said that he wouldn't call it a

14 presumption of regularity because that's what the Supreme Court

15 calls it in the *R. Enterprises* case cited by the Defense and by

16 the Government.   That's precisely what it is.   There is a

17 presumption "absent a strong showing to the contrary" that the

18 grand jury is acting within the legitimate scope of its authority.

19     Justice O'Connor in a different case again recognized the

20 presumption of regularity and said that to upset it required

21 particularized -- excuse me -- particularized proof of

22 irregularities.  The burden of showing that rests squarely on the

23 Defense, and the Government's position is that they haven't

24 satisfied that burden here.

25     Addressing whether the Government is using the grand jury

1   subpoena properly, I think it would be helpful just to walk

2   through the timing of events here.  I think Mr. Coopersmith

3   addressed some of this.

4        As he said, the Government's investigation began in early

5   2016.  In September 2017, the Government served -- excuse me --

6   the grand jury served a subpoena on Theranos.  The scope of that

7   subpoena was informed, of course, by the investigation that came

8   before it.  By that point, it was already clear that the conduct

9   they investigated had permeated the story of Theranos.  That

10  necessitated the somewhat broad scope of the subpoena.  The scope

11  of the subpoena matched the scope of the grand jury's

12  investigation.

13       Shortly after serving that subpoena, the Government began a

14  series of conversations with Theranos counsel -- as the Court

15  said, negotiating a rolling production of those responsive

16  documents.

17       The Government in those negotiations prioritized receipt of

18  documents that it would need sooner in the investigation and de-

19  prioritized documents that it would not need until later in the

20  investigation.  That is not to say that there were some documents

21  that the Government requested that it didn't really need for the

22  grand jury's investigations.  If it was called for in the

23  subpoena, the reason is because it was needed in order to complete

24  that grand jury investigation.

25       Now, at some point -- obviously in June 2018 -- part of that

1   investigation became ripe for indictment and the Government did

2   seek an indictment and the grand jury indicted.   But as the

3   Government points out in its briefing, that indictment doesn't

4   capture the entire story of Theranos.   It doesn't capture all of

5   the potential criminal conduct here.   It has two defendants only,

6   whereas the story involves dozens of additional people.   I'm not

7   saying that they're targets of the investigation, but that's a

8   fact.

9       The indictment covers two theories of fraud only and just

10  specific counts within those two theories.   This story is bigger

11  than what is captured in the indictment, and the investigation of

12  that conduct beyond the indictment continued after June 2018.

13  That indictment was just an event in the ongoing investigation.

14          THE COURT:   I understood Mr. Coopersmith to argue that

15  in looking at the scope of the subpoena, that if you line up the

16  scope of what -- what was asked for under the subpoena with the

17  scope of the allegations in the indictments, that that -- that

18  those line up and that, therefore, now to be seeking additional

19  documents would be to bolster that, not to -- that is, to prepare

20  for trial, not investigating other -- other crimes or beyond the

21  indictment, which is the requirement; right?

22          MR. BOSTIC:   Correct.   I think two points in response to

23  that.   First, the fact that the subpoena targets the same subject

24  areas and topics as that -- as the ones that are addressed in the

25  indictment doesn't mean that, again, the indictment captures

everything that was out there.  The investigation is broader than the discreet counts in the indictment, and there is nothing in the case law suggesting that the Government can't continue to investigate similar offenses after a certain indictment is handed down against certain defendants.

There could be additional similar counts against those same defendants.  There could be additional similar counts against further individuals, and there's nothing that prevents the grand jury from continuing to investigate that, as long as it is outside the scope of the initial indictment.

The other point is that I think on this issue, the Defense actually argues against itself when it points out the division or the separation between the time period of documents received in this latest production and the time period captured by the conduct in the indictment.

The Defense is correct that -- and the Government points this out -- that the indictment's counts end in time before the time period covered by this batch of documents that we're talking about today.  That's actually in support of the Government's argument because it shows that there is a separation between what was already indicted and what the Government continues to investigate by obtaining these documents.  It seems that the Defense is making the argument for the Government that these new documents aren't strongly related enough to the indicted conduct, but that's the very reason why the Government is permitted to obtain these

1    documents by a grand jury subpoena -- because they do go beyond

2    what is captured in that initial indictment.

3        After the indictment, of course, the investigation continued,

4    as I mentioned.  The Government recently sought and obtained a

5    superseding indictment.  That had the same scope as the original

6    indictment.  I think in the Defense briefing, the Defense implies

7    that that superseding indictment had something to do with the

8    Defense's challenge to the subpoena.  Let me just assure the Court

9    that's not the case.  The timing of that indictment was locked in

10   I believe before Mr. Coopersmith raised his complaint about the

11   use of the subpoena and the two have nothing to do with each

12   other.

13       What the superseding indictment shows is that the

14   investigation is indeed ongoing, and it shows that the Defense, as

15   it should be, does not have perfect insight into the details of

16   that investigation.

17       Around that same time, around the same time of the

18   superseding indictment, the Government was wrapping up its

19   collection of documents from Theranos.  The Defense here complains

20   about the timing, arguing on the one hand that the Government

21   waited too long before obtaining the documents, and then on the

22   other hand that the Government rushed in obtaining them before

23   Theranos dissolved.

24       As to the second point, I think the Court correctly noted

25   that it's natural for the Government to want to obtain necessary

1  evidence before it might become unavailable.  That's consistent

2  with a proper or an improper purpose.  The Government's view was

3  that those documents were necessary to complete the grand jury's

4  investigation.  Of course we're going to do what we can to obtain

5  them before they head somewhere else.

6      That was the reason why the Government pushed to obtain those

7  documents before Theranos folded.  If Theranos had not been going

8  under at that time, we might have waited another month or so

9  before kind of issuing that ultimatum.  But the Defense is

10  incorrect if it's implying that, otherwise, the Government would

11  have waited until closer to the trial.  That's simply not the

12  case.

13      As far as why the Government didn't obtain those documents

14  sooner or try to, the answer is simply that the investigation

15  didn't require it until it did.  There was enough to keep the

16  investigation going during the months preceding that.

17      On the standing question -- and I'll hold off on addressing

18  privilege-based standing.  But I think the main point to recognize

19  there is that it's simply not as cut and dried as the Defense

20  makes it seem.  I think in its opening brief, it does try to rest

21  standing on the privilege question.  In the reply, it pivots and

22  the Defense says that they have standing by virtue of their status

23  as defendants.

24      Of course, if that were the case, any defendant would have

25  standing to challenge any grand jury subpoena, and I don't think

1   the case law is consistent with that.  That would be a very simple

2   rule to articulate, but the Defense doesn't cite a single Ninth

3   Circuit case holding that.

4        Instead, what we see in the case law is a mixed bag.  For

5   example, in the *Okun* case cited by the Government, that involved

6   an investigation into a company where the sole shareholder and CEO

7   was found not to have standing to quash a subpoena on in-house

8   counsel.  Now, because that individual was the sole shareholder

9   and CEO of that company, he was the putative defendant in that

10  case, but he still did not have standing to challenge that

11  subpoena.

12       In the *Punn* case, P-u-n-n, the district court said that "An

13  indictment defendant lacks standing to quash subpoenas on his

14  adult children," and the Appeals Court dismissed that due to a

15  lack of appealability.

16       So, again, if every defendant had standing just by virtue of

17  being a defendant, that district court decision would have come

18  out differently.

19            THE COURT:  That first case, though, I know I looked at

20  that carefully, but you really get caught up in the role of in-

21  house counsel.  I mean, here we have the Defendants who are

22  principals at the company which is the receiver in the subpoena

23  and it's their activities in those roles that then are the basis

24  for the -- for the indictment.

25       So I have a -- it seems that the Defendants stand to suffer

1    a direct and personal harm if this subpoena is improper because

2    they're so closely involved with the company.  They're not just

3    defendants and this is a third party subpoena.  I mean, this is --

4    it's much -- there's a much closer relationship than I saw in the

5    cases from either side.

6              MR. BOSTIC:   I guess I'm not sure then what the

7    particularized harm would be still, though, unless we're talking

8    about a potential violation of privilege -- and we'll both have

9    things to say about that.

10         I think the only --

11             THE COURT:  Well, as Defendants, if there's an improper

12   continuing reason, preparation for trial, using documents

13   improperly, the harm seems pretty obvious.

14             MR. BOSTIC:  And that were enough to confer standing,

15   again, I'm just saying I think several of these cases would have

16   turned out differently.  I hear your points about the *Okun* case,

17   of course, but I think the *Punn* case would have turned out

18   differently if defendants automatically had standing to issue

19   these kinds of challenges.

20             THE COURT:  I agree with both sides, that it's a facts

21   and circumstances test or a mixed bag, if you like.

22             MR. BOSTIC:  With that, let me just address a couple

23   more cases cited in their reply just because the Government hasn't

24   had a chance to address those in briefing.

25         The *Fernandez* case which the Defense cited and mentioned, the

1    Defendants  say  in  their  brief  that  that  court  found  that

2    defendants had standing but, actually, there were two defendants

3    in that case and that court only found standing as to one of the

4    defendants based on  the  strength  of  the  showing  made  by  that

5    defendant.   As  to  the  second  defendant,  the  court  expressed

6    "serious doubts about standing."

7         So, again, if Defendants automatically have standing, that

8    would have been a much simpler analysis and that language would

9    have been different.

10        And,  finally,  on page four  of  the  Defendants' reply, they

11   cite a treatise for the proposition that Defendants have standing

12   in these cases.  In fact, if you look at that treatise and look at

13   the entire sentence that that quote comes from, it's not saying

14   that that's the law.   It's actually expressing two competing

15   viewpoints.  The first part of that sentence says some courts hold

16   that defendants do not automatically have standing, and it cites

17   a case which is 32 FRD 175.  The authors of that treatise express

18   a preference for the permissive standing approach but, of course,

19   that is not binding on this Court.

20        So, again, the overall point is that this is not a cut and

21   dried issue.   There are serious questions about whether the

22   Defendants have standing to bring this challenge.  But it's even

23   more clear under the law that in light of the presumption and the

24   burden,  the  numerous  cases  saying  that  indictments  don't

25   invalidate subpoenas, the differences between the cases cited by

1    the Defense, where post-indictment subpoenas were invalidated, the

2    differences between that case -- excuse me -- those cases and this

3    case show that the Government is using the grand jury subpoena

4    correctly here.

5          For example, if you look at the *Leung* case, L-e-u-n-g, the

6    Second Circuit in that case rejected a similar argument about

7    post-indictment subpoenas.

8          The timing here is simply not enough to upset the presumption

9    of regularity that the Government enjoys.

10         I should also mention the *Kovaleski* case, which Mr.

11   Coopersmith referred to, that case -- first of all, it's an

12   Eastern District of Michigan District Court case that's not

13   binding in any way here.  But more than that, the timing of that

14   case is instructive.  In that case, the grand jury subpoena came

15   after a mistrial, so after a tried and failed jury trial where the

16   witness might become available before the retrial.  The connection

17   between that grand jury subpoena and the trial is a lot easier to

18   see in that case than it is in this case.  The most important

19   thing, though, about that opinion is that it applies the wrong

20   standard.  It completely flips the presumption on its head.  The

21   court approaches the question of presumption and burden as an

22   issue of first impression and decide to put the burden on the

23   Government to prove that it is using the grand jury subpoena

24   properly.

25         As shown by other cases cited by the Government, that's just

1   flat out the wrong approach.  That's the opposite of the approach

2   that the Court is required to use.

3       So I think the Court needs to disregard the *Kovaleski* opinion

4   It's just not instructive here.

5       And I'm happy to answer any additional questions the Court

6   might have.

7           THE COURT:  Thank you, Mr. Bostic.  I'd like to turn now

8   to the privilege question and I'll hear from the Defense and then

9   come back to Government.  I take the privilege arguments as

10  presented really in the standing discussion.  And if I don't grant

11  the order, then what do we do about it and how do we manage that?

12  So, please.

13          MS. ROPER:  Your Honor, if the Court is likely to -- or

14  if the Court is inclined to deny the Government -- the Defendants'

15  motions, the Defendants would request, at the very least, a taint

16  team or filter team be used.

17          THE COURT:  Uh-huh.

18          MS. ROPER:  Your Honor, the documents at issue contain

19  communications between both counsel for Mr. Balwani and Ms.

20  Holmes, but also counsel for Theranos that are protected by these

21  comments just in joint defense privileges.

22      Counsel or all three parties were engaged in a shared

23  litigation interest, and --

24          THE COURT:  By "all three parties," you're talking

25  about?

1          MS. ROPER:  Mr. Balwani, Ms. Holmes, and Theranos.

2          THE COURT:  Okay.

3          MS. ROPER:  Not the Government, Your Honor.  Were --

4    were shared in litigations in at least six separate matters.

5    There was a DOJ investigation.  There was an SEC investigation.

6    There was a CMS investigation.  And there were also three civil

7    litigations -- the Delaware PFM litigation, an Arizona class

8    action litigation, and a California (indiscernible) litigation.

9          In addition to those six different matters, Ms. Holmes and

10   Theranos shared a litigation interest raised in patent litigation;

11   for example, the Hughes (ph) litigation.

12         Outside counsel for Ms. Holmes and Mr. Balwani communicated

13   with inside counsel at Theranos; for example, with Ms. Heather

14   King and Brad Harrington.  Neither of those lawyers' names were

15   included in the limited privilege filter.  They did share a dual

16   role.  However, part of their role was general counsel; for

17   example, for Ms. King.  And as general counsel, she spoke with

18   outside counsel for the Defendants.

19         The privilege filter was also limited by the fact that it

20   used full names and email addresses.  By doing so, not all

21   communications would be captured by the filter.  For example, if

22   Ms. King was emailing about a discussion she had with outside

23   counsel, she could refer to counsel by their first name.  She

24   could have said "John" or "Steve" or "Jeff" rather than using last

25   names.  She could have referred to them by saying, "I spoke with

1   Elizabeth's lawyer" or "I spoke with Sunny's attorney."  It's my

2   understanding --

3          THE COURT:  Using filters with only first names, though,

4   renders --

5          MS. ROPER:  Which I would believe that eyes-on -- right

6   -- eyes-on review is important in a case like this --

7          THE COURT:  Uh-huh.

8          MS. ROPER:  -- where there were years and years and

9   years of litigation and hundreds -- I don't even know how many

10  times there were communications between outside counsel and --

11  before Ms. Holmes and Mr. Balwani and inside counsel.

12      Also, the fact is that it is our understanding that

13  confidential and privileged were not used as privileged terms in

14  this.

15      So, Your Honor, the only way, in Defendants' opinion, to

16  protect these privileged documents is by having an eyes-on review

17  to ensure that those documents aren't produced.

18          THE COURT:  All right.  Did you have anything with

19  regards to privilege and the rule of standing?

20          MS. ROPER:  Your Honor, our -- I think our main focus

21  was the status argument.

22          THE COURT:  Uh-huh.

23          MS. ROPER:  I would note that one of the reasons why

24  it's important for defendants to have this right to be able to

25  object when an abuse of the grand jury process is at issue is,

1    one, if in this case the Government is allowed to proceed, they're

2    basically getting custodial files on numerous people at the

3    company and they're able to do a fishing expedition to a

4    production.   Had they used the proper process and gotten --

5    weren't able to get the documents this time, they would have to

6    use Rule 17 subpoenas.   Rule 17 subpoenas are far more limited.

7    They're limited by the Nixon factors.   The documents have to be

8    admissible and they have to be relevant and they have to be --

9    they have to use specificity in requesting the documents.   It's

10   not just a free-for-all, We want these group of documents.

11        So the Defendants are actually harmed by now going to a trial

12   where all these documents are coming into play, or at least they

13   could be charged with further charges when they were not able to

14   do so previously.

15             THE COURT:   Let you just go back for a moment, Ms.

16   Roper.   The litigation matters that you referred to --

17             MS. ROPER:   Yes.

18             THE COURT:   -- in support of the argument that there are

19   shared privileges between Theranos and the Defendants.   Were all

20   of those ongoing through the same time frame of the subpoena?

21             MS. ROPER:   Your Honor, I believe the DOJ investigation

22   was, the SEC investigation was, CMS -- yes, all of them, except

23   the patent litigation, I'm not sure when that ended.   I believe it

24   was during the time of the full subpoena.

25             THE COURT:   But the other -- the six matters that you

1    have referred to, it's your understanding that those are

2    coexistent -- at least for this one, the time frame that's --

3            MS. ROPER:  And, Your Honor, if I may?

4            THE COURT:  Uh-huh.

5            MS. ROPER:  Yes, Your Honor.  I think with the exception

6    of the patent litigation, that's correct.

7            THE COURT:  Okay.  Thank you.

8            MS. ROPER:  Thank you.

9            THE COURT:  Mr. Bostic, with regards to privilege.

10            MR. BOSTIC:   Thank you, Your Honor.   With regards to

11    privilege, the Government cites in its brief cases establishing

12    that the burden is, again, clearly on the proponent of the

13    privilege to establish its existence and applicability.

14        We heard some additional detail just now, but the written

15    submissions from the Defense don't come close to meeting that

16    standard.   I think Mr. Coopersmith's declaration in the reply

17    contains one sentence addressing this fact, saying that between

18    October 2016 through September 2017, he was engaged in email

19    exchanges with Theranos' former counsel from Wilmer Hale that were

20    protected by the common interest privilege.  That's simply not

21    enough to establish that the privilege is actually at risk here.

22        Whether a communication is protected by that privilege is a

23    complex legal factual question.   There are no supporting facts

24    here establishing that those claims of privileged communications

25    would actually be included in the production that the Government

1    just received.

2        I understand that the Defense is not satisfied with the

3    filter that Theranos itself generated.  But if we're talking about

4    communications between the lawyers in the courtroom and in-house

5    lawyers at Theranos, it's no problem that the in-house lawyers'

6    names were not used as part of that filter because these lawyers'

7    names were used as part of that filter.

8        So --

9        THE COURT:  I think they're talking about between the

10   Defendants and in-house counsel -- that's my understanding of it,

11   that there may well be privileged discussions relating to some of

12   the matters that come under a common interest privilege.

13       MR. BOSTIC:  So I think -- I don't know that they've

14   given us any reason to think that there are communications between

15   the individual Defendants and their in-house counsel that relate

16   to their own personal privileges or the joint defense privilege.

17       I hear about communications between the lawyers themselves,

18   but there's been no even factual assertion that there was

19   privileged communications, other than corporate privileged

20   communications, internal at the company.

21       THE COURT:  Let's assume that the similar facts that --

22   the facts and circumstances in this case, given the role of the

23   Defendants at the company, the number of years we're looking at,

24   the many activities that are addressed in the grand jury subpoena

25   and some of which are reflected in the indictments, all of those

1  facts that would support a proper use of the subpoena in this case

2  arguably could also support legitimate and serious concerns about

3  privilege.

4       So let's assume for a moment that this September 14th

5  production that was turned over by Theranos more probable than not

6  has privileged documents in it.  What does a taint team look like?

7  How does the Government address that?  If I order a taint team,

8  what does that look like?

9            MR. BOSTIC:  So it varies from case to case, Your Honor.

10           THE COURT:  Of course.

11           MR. BOSTIC:  And the basic answer is that AUSAs who are

12  not part of the trial team are assigned to review some or all of

13  the documents and to make a determination as to whether they are

14  privileged before they come to the trial team.

15      Now, because I -- I mean, I did say that it varies from case

16  to case, and that brings us to one of the problems with the

17  Defendants' request that the Court order the Government to use a

18  taint team.  That approach really needs to be tailored to the

19  specific facts of the case.

20      There's also no showing in the Defendants' submissions as to

21  what the Court's authority is to order the Government to use a

22  taint team and what the standard is for issuing that order.  It

23  appears kind of as an afterthought in their reply.  And I don't

24  think it's really properly before the Court.

25      But in any case, the Government is already incentivized to

1    avoid that taint.  The Government has no desire to improperly view

2    privileged materials in this case.  We're already incentivized to

3    protect against that possibility.  So our position is that the

4    Court order simply isn't necessary.

5        As to Theranos's corporate privilege, I should point out that

6    because the company was relying on filters in producing documents

7    to us, it entered into an agreement with the Government whereby

8    the trial team would not be tainted by the inadvertent viewing of

9    any privileged material that happened to slip through those

10   filters.

11           THE COURT:  That's an agreement between Theranos and the

12   Government.

13           MR. BOSTIC:   Between Theranos and the Government.

14   Correct, Your Honor.  So that covers any corporate privilege of

15   the company itself.

16           THE COURT:  But it doesn't extend to the individual

17   Defendants.

18           MR. BOSTIC:  That's correct, Your Honor, and the -- what

19   the Government argues is the speculative risk that there may be

20   some documents implicating personal privileges of the Defendants

21   in that set.

22       But the Government is motivated to avoid viewing those

23   documents improperly

24           THE COURT:  All right.

25           MR. BOSTIC:  As to the issue of standing, I think -- I

1  think the Government's position needs to be that the Defendants

2  simply haven't met their burden to establish a sufficient and

3  particularized risk of the privilege being invaded to support

4  their standing arguments.  The burden has been on them and we just

5  don't have the factual showing necessary, despite the fact that I

6  understand they have access to the documents that -- or at least

7  had access to the documents that Theranos produced to the

8  Government over the course of the investigation.

9          THE COURT:  All right.  Thank you, Mr. Bostic.

10         MR. BOSTIC:  If I could just make one more point, too,

11  on Mr. Coopersmith's argument that --

12         THE COURT:  This is your last chance at the microphone,

13  so --

14         MR. BOSTIC:  Understood.

15         THE COURT:  -- you can make this additional point and

16  then Mr. Coopersmith does get the final word.

17         MR. BOSTIC:  I'll give it up gladly after this.  Mr.

18  Coopersmith suggested that the validity of the Government's

19  ongoing investigation might depend on whether there's going to be

20  a second superseding indictment.  I just want to push back against

21  that because that's a dangerous standard to push for.

22     The Government cites cases that make it clear that the

23  legitimacy of an investigation does not turn on whether it results

24  in charges at the end.  I don't think the Defendants really want

25  to incentivize the Government to search for charges in order to

1  legitimize its investigation -- not that we would, of course --

2  but that's the very reason why that's the rule -- so that the

3  Government can participate and the grand jury can continue its

4  investigations without being pressured.  The entire point is to

5  finish the investigation and then let the evidence dictate whether

6  there are additional charges after that.

7          THE COURT:  Understood.  Thank you, Mr. Bostic.

8          MR. BOSTIC:  Thank you, Your Honor.

9          THE COURT:  Mr. Coopersmith, closing remarks.

10          MR. COOPERSMITH:  Thank you, Your Honor.  So what I

11  heard Mr. Bostic say in one part of his remarks is he conceded

12  that the subpoena that was issued nine months before the June 2018

13  indictment in this case tracks the indictment -- that the topics

14  that they were investigating based on that subpoena are the topics

15  that are in the indictment.  And I think that's a very significant

16  point because, as I said before, now that Mr. Bostic's conceded

17  that, it by definition was not a subpoena designed for any

18  continuing investigation post-indictment.  They had two and a half

19  years, Your Honor, including the subpoena, to gather everything

20  they needed to gather and they indicted.

21      And now the other thing I wanted to say, Your Honor, is it's

22  -- if it was enough for an Assistant U.S. Attorney to stand up in

23  the court and say, "We're still investigating, Your Honor.  We may

24  have other people involved" -- although they're not targets,

25  apparently -- then every case would be automatically they can use

1  the grand jury for whatever they want.  And there's been no

2  showing by the Government whatsoever that they have any additional

3  targets, that they have any additional topics that they haven't

4  already covered.

5      And what the facts and circumstances I think strongly show

6  here, Your Honor, is that they are simply trying to -- and I think

7  this is basically the Government saying -- that they should be

8  allowed to gather whatever documents they want through the grand

9  jury process and review them to their hearts' content to rule out

10  the possibility there might be something else there.

11      And again, Your Honor, if that is allowed, that is going to

12  be every single case, and there is no limiting principle that

13  anyone could think of.

14      And I agree with Mr. Bostic -- it is hard to police this.

15  But as the *Fernandez* court said, it's nonetheless, you know, the

16  job of the court to do that, with the supervisory authority.

17      And, you know, what we have here is I think as clear a case

18  as we have in any of these other matters, other cases, that the

19  grand jury's being used for trial prep or at least just for the

20  purpose of storehousing documents.

21          THE COURT:  I didn't -- I did not hear the Government

22  make that argument.  The argument I heard, among others, was that

23  the time frame addressed in the indictments does not cover -- the

24  activity in the indictments does not arise out of the time frame

25  that's the subject of this subsequent production

1        MR. COOPERSMITH:  Yes, Your Honor.  That's an important

2   point.  So this is what I think the Government's saying there --

3   that that period of time, from September -- October '16 through

4   September '17, they don't know what's in those documents.  It's --

5        THE COURT:  Well, of course not.  They haven't seen

6   them.

7        MR. COOPERSMITH:  Right.  So what they're doing is --

8   and, remember, those documents were called for by a September 2017

9   subpoena.

10        THE COURT:  But why hasn't that been covered by the

11   investigative power of the grand jury?

12        MR. COOPERSMITH:  Because -- I understand, Your Honor,

13   but I think what they're saying is, There might be something

14   there.  You know what?  Let's pick another time period.  There

15   might be something in any time period.  What about after 2017?

16   Why don't they issue a new subpoena now and say, Well, maybe

17   something happened between then and 2018.  I mean, you can pick

18   any time period you want, and what they're really saying is, We

19   should be allowed to get whatever documents we want and, even if

20   it's a time period where the Defendants were no longer running a

21   lab or taking investors, and there might be something there.  We

22   can't rule it out.  So we should be allowed to peruse those

23   documents until we rule out the possibility that we might find

24   something.

25        And that's not what an investigation is, especially when you

1   have -- and it's very important.  When you have an indictment, you

2   have a superseding indictment, we have rules, including Rule 17.

3   We have trial prep mode now and they are still using the grand

4   jury because they want to, you know, see if they can rule out a

5   superseding indictment.

6       Again, Your Honor, I can't make --

7           THE COURT:  Why do you need trial prep when you don't

8   have the -- you've got a pre-indictment subpoena, you've got a

9   long-term rolling production.  You don't even have a schedule in

10  the case yet.  And there could be additional indictments; right?

11          MR. COOPERSMITH:  There always could be, Your Honor.

12  There's no case that we could ever think of that comes before the

13  court that that isn't a possibility.

14          THE COURT:  But the burden's on you -- the burden is on

15  the defense --

16          MR. COOPERSMITH:  Yes -- well --

17          THE COURT:  -- to demonstrate a dominant improper

18  purpose.

19          MR. COOPERSMITH:  I think the burden is on us.

20          THE COURT:  Uh-huh.

21          MR. COOPERSMITH:  But it's also relevant that the

22  Government hasn't come forward with a single thing that they're

23  actually really investigating with the grand jury process.  But

24  I'm happy to --

25          THE COURT:  Doesn't the Ninth Circuit make it clear that

1   they don't have to?

2          MR. COOPERSMITH:  Well, I don't think -- I think there

3   are cases where the Government does come forward with a lot more

4   than they've come forward with here.

5          THE COURT:  But I think the Ninth Circuit has said they

6   don't have to.

7          MR. COOPERSMITH:  Not necessarily -- you're right.  They

8   don't necessarily have to.  The Ninth Circuit has said that.  But

9   there's nothing that rules it out.  And I think it's, you know --

10   the silence does speak volumes.

11      You know, from our standpoint, Your Honor, we do think we

12   have a dominant purpose because you're right -- the trial -- the

13   subpoena was issued a long time ago.  But there's no difference

14   between trying to enforce a preexisting subpoena that already has

15   the same topics covered in the indictment and issuing a new

16   subpoena now.  It's the same thing.

17      And, again, I can't make this point, you know -- I know I've

18   said it before, but I'll just end with this.  I think the

19   Government is articulating that there is no limiting principle.

20   As long as they stand up here and say, We're still investigating

21   them, I believe Mr. Bostic is saying that in good faith because he

22   can't rule out that there could be something in those documents.

23      But that can't be the standard because I think we're going to

24   be doing that in every case.  Thank you.

25          THE COURT:  All right.  Thank you, Mr. Coopersmith.  All

1   right.  Matter's submitted?

2               MR. BOSTIC:  Yes.  Thank you, Your Honor.

3               THE COURT:  Submitted?

4               MR. COOPERSMITH:  Yes.

5               THE COURT:  Yes.  Thank you.  All right.  I appreciate

6   that time is somewhat of the essence.  I know that Judge Davila

7   wanted us particularly to have this hearing in advance of the

8   status conference.  So you will get an order from me on this this

9   afternoon.

10      I want to thank counsel for your preparation for today.  I

11  found argument very helpful.  As I said, I had spent time,

12  obviously, with the papers and the exhibits and the cases cited

13  therein.  So you will hear from me this afternoon.

14              MR. BOSTIC:  Thank you.

15              THE COURT:  All right.  Thank you.  We're adjourned.

16              THE CLERK:  Court's adjourned.

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

1        (Proceedings adjourned at 11:12 a.m.)

2

3            I, Peggy Schuerger, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    provided to me of the proceedings in the above-entitled matter.

6

7    _____/S/ Peggy Schuerger_____        October 19, 2018_____
     Signature of Approved Transcriber        Date
8
     Peggy Schuerger_____
9    Typed or Printed Name
     ***Ad Hoc Reporting***
10   Approved Transcription Provider
     for the U.S. District Court,
11   Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25