JEFFREY B. COOPERSMITH (SBN 252819)
WALTER F. BROWN (SBN 130248)
MELINDA HAAG (SBN 132612)
RANDALL S. LUSKEY (SBN 240915)
STEPHEN A. CAZARES (SBN 201864)

ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1-415-773-5700
Facsimile: +1-415-773-5759

Email: jcoopersmith@orrick.com; wbrown@orrick.com; mhaag@orrick.com; rluskey@orrick.com; scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

FILED
JAN 21 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

HOLMES, et al.,

Defendants.

Case No. 18-CR-00258-EJD

**DECLARATION OF JEFFREY B. COOPERSMITH IN SUPPORT OF DEFENDANT RAMESH "SUNNY" BALWANI'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO SEVER AND ADMINISTRATIVE MOTION TO SEAL**

Judge: Honorable Edward J. Davila

# **PROVISIONALLY FILED UNDER SEAL PURSUANT TO COURT ORDER OF JANUARY 13, 2020**



**DECLARATION OF JEFFREY B. COOPERSMITH**

I, Jeffrey B. Coopersmith, declare as follows:

1. I am lead counsel for defendant Ramesh "Sunny" Balwani in this case, an attorney admitted to practice in the State of California, and a partner at Orrick, Herrington & Sutcliffe LLP, counsel of record for Mr. Balwani. I submit this declaration in support of Mr. Balwani's supplemental memorandum in support of Motion to Sever and Administrative Motion to Seal. I have personal knowledge of the facts stated herein, and I could and would testify competently to those facts if called as a witness.

2. In our combined many decades of criminal law practice, my colleagues at Orrick and I have never seen defense counsel announce his or her client's likelihood of testifying in her own defense more clearly than Ms. Holmes' counsel has in this case.

3. Attached hereto as Exhibit A is a true and correct copy of Christine L. Ruva, *From the Headlines to the Jury Room: An Examination of the Impact of Pretrial Publicity on Jurors and Juries*, *in* 3 Advances in Psychology and Law 5 (M. Miller ed. 2018).

I declare under penalty of perjury that the foregoing is true and correct.

Executed January 20, 2020 at Seattle, Washington.

Dated: January 20, 2020

JEFFREY B. COOPERSMITH

# EXHIBIT A

# From the Headlines to the Jury Room: An Examination of the Impact of Pretrial Publicity on Jurors and Juries




**Christine L. Ruva**

Pretrial publicity (PTP) encompasses all media coverage of a case occurring prior to trial (Greene & Wade, 1988; Studebaker & Penrod, 1997). There is great variance in the amount and type of pretrial coverage that cases receive (Bruschke & Loges, 1999). More serious crimes are likely to receive greater amounts of PTP, and this PTP is likely to be anti-defendant (Lieberman & Sales, 2007; Simon & Eimermann, 1971) and contain information that the American Bar Association (ABA, 2016; see ABA Standards, Rule 3.6) regards as potentially prejudicial (Imrich, Mullin, & Linz, 1995; Tankard, Middleton, & Rimmer, 1978). Importantly, substantial PTP that is prejudicial and anti-defendant in nature can bias jurors' opinions of the defendant's character and increase the likelihood of a guilty verdict (see Steblay, Besirevic, Fulero, & Jimenez-Lorente, 1999 for review).

Over the past decade there have been dramatic changes in how the media covers, and the public follows, criminal and civil cases. Coverage of cases by nontraditional media sources (e.g., blogs, Facebook, Twitter, Netflix, YouTube, and Internet news sources) has increased the public's access to case information and removed geographical boundaries. The public's interest in, and the media coverage of, some high-profile cases have resulted in these cases being treated similar to popular TV dramas—with both traditional and social media following them from time of arrest, through the trial process, and beyond (e.g., *Arizona v. Arias*, 2013; *Florida v. Anthony*, 2011; *Florida v. Zimmerman*, 2013; and *Wisconsin v. Avery*, 2007). In such high-profile cases, the clash between citizens' First Amendment right of freedom of speech/press and a defendant's constitutional Sixth Amendment right to a fair trial is highlighted. All of these factors present new challenges for the courts that might not be resolved by traditional court remedies (Brickman, Blackman, Futterman, & Dinnerstein, 2008; Mastromauro, 2010).

C. L. Ruva (✉)
Department of Psychology, University of South Florida Sarasota-Manatee, Sarasota, FL, USA
e-mail: ruva@usf.edu

© Springer International Publishing AG, part of Springer Nature 2018

M. K. Miller, B. H. Bornstein (eds.), *Advances in Psychology and Law*, Advances in Psychology and Law 3,
https://doi.org/10.1007/978-3-319-75859-6_1

In consideration of the above, this chapter begins by providing a summary of important court decisions involving PTP, as well as the American Bar Association's ethical rules for the dissemination of pretrial information by litigating attorneys (see ABA Standards, Rule 3.6). The second section of this chapter explores the amount and type/slant of PTP (negative-defendant, positive-defendant, and negative-victim) found in various media sources. This section also covers the changing media landscape resulting from the birth of Internet and social media coverage of cases.

The chapter then turns to reviewing the social science research. The third section of the chapter examines methods used by social scientists to explore PTP's effects on juror and jury decisions, summarizing their benefits, limitations, and general findings. The chapter's fourth section explores mechanisms through which PTP influences jurors' decisions, given that in order to make educated decisions regarding how to address PTP bias, researchers must understand the mechanisms that underlie it. In the fifth section of the chapter, the current remedies available to address PTP bias are examined. These remedies are examined in regard to the following: past research, mechanisms responsible for PTP's biasing effects on juror/jury decisions, and the increasing accessibility of pretrial information. Finally, the chapter concludes with future directions for PTP research and policy implications.

## The Courts and Pretrial Publicity

This section of the chapter begins by reviewing important Supreme Court decisions involving PTP. It then examines the American Bar Association's ethical rules for the dissemination of pretrial information (see ABA Standards, Rule 3.6). The Supreme Court's decisions, and the ABA's ethical rules, focus on the prejudicial influence PTP can have on a defendant's right to a fair trial.

### *Important Court Decisions Involving Pretrial Publicity*

In criminal cases, a defendant's right to a fair trial is guaranteed under the Sixth Amendment of the US Constitution, and the Fifth Amendment's Due Process Clause. The First Amendment of the US Constitution guarantees freedom of press/speech and the public's right to be informed of criminal proceedings. In high-profile trials containing large amounts of anti-defendant pretrial publicity (PTP), these constitutional amendments are likely to clash. The courts in such cases must decide how to balance these conflicting rights. These attempts to balance defendants' right to a fair trial with the public's right to free speech have, at times, made it to the Supreme Court, which during the 1960s and 1970s made several significant decisions regarding PTP. These decisions spoke to the problems arising from pervasive prejudicial PTP, guidelines for applying remedies for PTP bias, and who has the burden of demonstrating harm from pretrial information.

The first significant Supreme Court decision in the 1960s that dealt with PTP was *Irvin v. Dowd* (1961). The defendant, Leslie Irvin, was granted a change of venue, but then claimed that the widespread inflammatory PTP had also adversely impacted the jury pool in the new venue. The defense requested a second change of venue, which was denied. The Court in *Irvin v. Dowd* (1961) ruled that if a defendant's right to a fair trial would be threatened as a result of adverse effects of PTP, then a defendant's motion for a change of venue should be granted. In addition, the Court ruled that a trial by jury is not fair unless the jury members are impartial. The Court voided the conviction of Leslie Irvin and remanded the case back to District Court for further proceedings. The second major Court ruling in the 1960s was in *Rideau v. Louisiana* (1963), which concluded that when highly prejudicial PTP, as determined by its content and pervasiveness, creates a prejudicial environment, then a change of venue is required to protect a defendant's due process rights.

Following the *Rideau v. Louisiana* (1963) ruling, the Court reversed two lower court convictions due to substantial, pervasive, and prejudicial publicity surrounding the trials. In the first of these cases, *Estes v. Texas* (1965), the Court reversed the swindling conviction of Billy Sol Estes, stating that Mr. Estes' right to a fair trial was violated—mostly due to the large amount of publicity surrounding a televised two-day pretrial hearing. In this decision the Court expressed that "[T]he freedom granted to the press under the First Amendment must be subject to the maintenance of absolute fairness in the judicial process, and, in the present state of television techniques such freedom does not confer the right to use equipment in the courtroom which might jeopardize a fair trial, the atmosphere for which must be preserved at all costs" (U.S. 539-540, p. 381). Then, in *Shepard v. Maxwell* (1966), the Court reversed the murder conviction of Dr. Samuel Shepard, stating that it was impossible for Dr. Shepard to receive a fair trial given the pervasive and massive amount of prejudicial publicity surrounding his trial.

In *Murphey v. Florida* (1975) the court found that defendants could challenge a court's denial of change of venue, but to be successful this challenge must pass the "totality of the circumstances" test. Specifically, the defense has the obligation at voir dire of proving that potential jurors hold "actual" or "inherent prejudice" that makes the granting of a fair trial impossible.

Since the 1970s, there has been only one significant Supreme Court decision in reference to prejudicial PTP, and it was in *Mu'Min v. Virginia* (1991). Mu'Min had been convicted of murder and sentenced to death for killing a woman while out of prison on work detail. Extensive pretrial publicity surrounded the case, and eight of the 12 jurors on his jury admitted, during voir dire, to having seen or heard something about the case. Mu'Min asserted that his right to a fair trial had been violated because the trial judge refused to question prospective jurors as to the specific pretrial information they had been exposed to. The Supreme Court held that the Fourteenth Amendment's due process clause does not mandate that prospective jurors be queried about specific case information they have seen or heard. Further, the Sixth Amendment's impartial jury requirement is satisfied when prospective jurors refrain from stating that they have been prejudiced by pretrial publicity. This

ruling clarified the extent to which the voir dire need delve into specific PTP information and juror bias.

### *American Bar Association and Pretrial Information*

Along with the Supreme Court's decisions in regard to PTP's potential to impede a defendant's right to a fair trial, the American Bar Association has formulated ethical rules for the dissemination of pretrial information by litigating attorneys (ABA, 2016; see ABA Standards, Rule 3.6). These ethical rules indicate categories of information considered prejudicial, and that should therefore not be disseminated to the press (Rule 3.6—Comment). These categories include: (1) character, credibility, reputation, or criminal record of the accused; (2) possibility of guilty pleas, existence of a confession, admission, or statement or refusal to make statement; (3) performance/results on or refusal of any tests (e.g., DNA, polygraph); (4) opinions of guilt or innocence of defendant; (5) information that is likely inadmissible as evidence in courts; and (6) statement that the defendant is accused of crime, unless accompanied by statements that this is merely an accusation and defendant is innocent until proven guilty. Under Rule 3.8 (ABA, 2016), prosecutors have the additional obligation to refrain from making statements that are likely to increase condemnation of the defendant.

The ABA Standards (2016) also include a "Right to Reply" (Rule 3.6)—a lawyer may "make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client." This right of reply, however, is limited only to "such information as is necessary to mitigate the recent adverse publicity." This right has come into question in recent high-profile cases (e.g., see Mosteller, 2007 for a review of the 2006 Duke Lacrosse Case; *FL v. Zimmerman*, 2013), and will be discussed further below.

## Amount and Types of Pretrial Publicity in High-profile Cases

Cases making their way towards trial vary widely in the amount and type of pretrial media coverage they receive (Bruschke & Loges, 1999). This section of the chapter explores how the amount and type/slant of PTP (negative-defendant, positive-defendant, and negative-victim) affects juror bias. It also examines how the changing media landscape is influencing the amount and type of pretrial information disseminated to the public (Mastromauro, 2010).

Although the Supreme Court and the ABA have provided strong statements as to the threats that prejudicial publicity imposes on a defendant's right to a fair trial, there are ample examples of recent cases in which the pervasiveness of highly prejudicial PTP call into question the violation of this fundamental right (e.g., Scott

Peterson's 2004 first-degree murder conviction and subsequent death sentence, Phil Spector's 2009 conviction for second-degree murder at his second trial, Rod Blagojevich's 2011 convictions on 17 corruption charges, and Jodi Arias' 2013 first-degree murder conviction and subsequent life sentence without possibility of parole). Also of concern, content analyses of media sources have found that more serious crimes are likely to receive greater media coverage than less serious crimes, and news stories about crime are likely to contain information that the ABA (2016) has indicated impedes a defendant's right to a fair trial (i.e., negative statements about the defendant's character, reference to the defendant's guilt, reports of confessions, and prior criminal record of the accused; Imrich et al., 1995; Simon & Eimermann, 1971; Tankard, Middleton, & Rimmer 1978).

## *How the Amount of Publicity Affects Juror Bias*

Shaffer (1986) suggests there might be a cumulative effect of PTP on jurors' attitudes and decisions, which is supported by the small amount of research exploring the influence of PTP quantity on juror bias. For example, DeLuca (1979) found that mock-jurors exposed to three pieces of anti-defendant information were more likely to render guilty verdicts than jurors exposed to only one or two pieces of this information. In a more recent study, Daftary-Kapur, Penrod, O'Connor, and Wallace (2014) exposed jurors to either five (low amount condition) or ten (high amount condition) pretrial news stories that were either anti-defendant, pro-defendant, or unrelated to the case. They found that, for jurors exposed to anti-defendant articles, those receiving high amounts of PTP were more likely to vote guilty than those receiving low amounts of PTP. For the pro-defendant PTP, jurors exposed to high amounts were less likely to vote guilty than those exposed to low amounts of PTP.

Surveys of potential jurors also indicate that as the amount of PTP exposure increases, so does potential juror bias. For example, surveys of jury eligible adults conducted by Costantini and King (1980/1981; three murder cases) and Moran and Cutler (1991; two drug cases) found that, as potential jurors' reported knowledge of a case increased, so did bias against the defendant. Importantly, Moran and Cutler found that potential jurors' knowledge about a case was not related to their self-reported ability to be impartial. Finally, Shaffer (1986) found that, for the five murder cases explored, the number of PTP articles appearing in a newspaper, as well as respondents' estimates of their amount of PTP exposure, were predictors of attributions of guilt.

The research above suggests that, as the quantity of PTP increases, so does its biasing effect on jurors' decisions, supporting both the Supreme Court's decisions and the ABA's ethical rules regarding the biasing influence of pervasive anti-defendant PTP. Importantly, the pervasiveness of PTP in high-profile cases is likely to increase in the future. This is due to changes in how high-profile cases are covered, especially the implementation of both Internet and social media, which the chapter now turns.

### *The Changing Media Landscape*

The Supreme Court's decisions regarding PTP, in the 1960s and 1970s, came at a time of dramatic change in the manner in which trials were covered by the press. The emergence of broadcast journalism—radio in the 1930s followed by television in the 1950s and 1960s (New York Film Academy, 2015)—not only allowed journalists to reach a much larger audience but also allowed for the broadcasting of pretrial hearings and entire trials. In recent history, the media landscape has once again dramatically changed—mostly resulting from the birth of the Internet and social media—allowing for new forms of communication and ways of broadcasting information surrounding trials (e.g., Facebook, Twitter, personal websites and blogs, YouTube, iTunes podcasts, and Netflix).

These new forms of pretrial coverage have increased the reach of prejudicial pretrial information, and in recent years have outpaced traditional news sources (Mastromauro, 2010). The Pew Research Center for Internet, Science, and Technology (2017a) found that today nearly 70% of Americans use some type of social media "to connect with one another, engage with news content, share information and entertain themselves," which is up from just 5% in 2005 when they began tracking social media use (see also, Greenwood, Perrin, & Duggan, 2016). Americans' Internet use has also increased dramatically over the past 16 years, from approximately 50% of all American adults being online in 2000 to 90% in 2016 (Pew Research Center, 2017b).

Not only do these nontraditional news sources have the potential of reaching greater numbers of people, experiencing no geographical bounds, but they also allow for the dissemination of pretrial information that is more prejudicial, gruesome, erroneous, and that makes direct accusations of the defendant (Mastromauro, 2010). Nontraditional Internet news sources do not have the same standards as traditional media sites and are often unchecked or uncensored (Mastromauro, 2010). In addition, online media sources often contain comment sections, which encourage viewers/readers to provide their opinions of the case and defendant. Therefore, these online sources contain opinions and information not found in traditional media sources (Ward, 2008). High-profile trials also provide the perfect fodder for bloggers, who can work for newspapers, be ordinary citizens, or legal professionals/attorneys (Duncan, 2009). The *American Bar Journal* coined the term "blawggers" to refer to law bloggers (McDonough, 2015) and has published articles informing attorneys on how to develop and promote legal blogging (Lear, 2015). The end result of these commentary pages and blogs is that ordinary citizens (potential jurors) and attorneys are not only consumers of the news but also reporters of it and commenters on it (Rainie, 2005; Ward, 2008).

Finally, neither traditional nor nontraditional media websites are confined to a specific moment in time. Instead, the Internet allows access to pretrial information days, weeks, or even years after the original posting, and allows for an individual to access the material over and over again. This makes it more complicated for the

courts, in high-profile cases, to seat a jury that has not been exposed to prejudicial media coverage.

In some high-profile cases, the social media coverage began in force prior to arrest, and might have played a role in securing an arrest. For example, on March 8th of 2012, the parents of 17-year-old Trayvon Martin, who was shot and killed in Sanford, Florida on February 26th 2012, created a petition on Change.org. This petition called for a full investigation of their son's death and the arrest of George Zimmerman, who was the acknowledged shooter. On March 17th 2012, after the release of the 911 call, the Zimmerman case became the first story of the year to have more traditional media coverage (19% of available newspaper and broadcast space) than the presidential race (14% of available newspaper and broadcast space; Pew Research Center, 2012). Also during this time, 21% of Twitter conversation expressed outrage at Zimmerman/calls for justice (Pew Research Center, 2012). By March 22, 2012 the Change.org petition had more than 2.2 million signatures that were presented to the Sanford City Commission by civil rights leader Jesse Jackson. Subsequently, a special prosecutor appointed by Florida Governor Rick Scott charged George Zimmerman with murder. Hence, this pre-arrest/pre-indictment publicity might have been influential in securing a murder charge in this case.

The anti-defendant media coverage of George Zimmerman followed the defendant throughout his trial and beyond. To counter the "avalanche of misinformation," George Zimmerman's attorney, Mark O'Mara, used the Internet and social media, setting up a Legal Defense website (http://gzlegalcase.com/), Twitter page, and Facebook account (Brook, 2012; Weis, 2012). The judge in the Zimmerman case refused the prosecution's request for a gag order that would prevent Mr. O'Mara from blogging. As mentioned above, the ABA Standards do provide litigating attorneys with the "Right to Reply" (Rule 3.6) to substantial prejudicial PTP in order to mitigate adverse effects caused by such PTP.

As the Zimmerman case demonstrates, the increasing use of the Internet and social media by the public and attorneys is likely to result in significant changes in the amount and types of pretrial information surrounding cases. How these new forms of pretrial coverage will affect juror bias, and the courts' ability to successfully protect defendants' right to a fair trial, are questions that the chapter will delve into below.

## *Types of Slants of PTP*

The prosecution typically has the advantage regarding media coverage in high-profile cases (Dexter, Cutler, & Moran, 1992), with most PTP being pro-prosecution or anti-defendant (Imrich et al., 1995; Lieberman & Sales, 2007). As the media coverage surrounding *FL v. Zimmerman* (2013) demonstrates, some media savvy defense attorneys and defendants are taking the initiative to counter the anti-defendant coverage, getting their version of the story out. For example, some defendants and/or defense attorneys have set up websites, used Facebook, Twitter, blogs,

YouTube or radio, and TV interviews (e.g., George Zimmerman, Casey Anthony, and Steven Avery) in an attempt to present themselves in a positive light, or portray the victim in a negative one. In their article on PTP's influence on the courtroom, Lofink and Mullaney (2013) suggest that defense attorneys deal with PTP by "framing the media narrative early in the process" through the use of blogs, social media, and the Internet. They also suggest that defense attorneys "challenge the prosecution's narrative and the public's presumption about facts" by using these forms of media, and in essence pushing the limits of the ABA's guidelines for contact with the media and right to reply. Therefore, these new forms of media, and attorneys' increasing knowledge and use of them, has resulted in multiple types or slants of prejudicial PTP (e.g., anti-defendant, anti-victim, or pro-defendant) in some high-profile cases. The chapter now examines the research exploring how these various types or slants of PTP can influence jurors' decisions and impressions.

## *Negativity Bias*

Research on the negativity bias has found that negative information has a greater effect than positive or neutral information on people's perceptions of others and impression formation (Kisley, Wood, & Burrows, 2007; Rozin & Royzman, 2001; Vaish, Grossmann, & Woodward, 2008). Ruva and McEvoy (2008) found some evidence for negativity bias, with negative-defendant PTP having a larger effect on guilt measures than positive-defendant PTP. In contrast, Daftary-Kapur et al. (2014) found that pro-defense PTP had a greater impact on guilt decisions than anti-defendant PTP. Also of interest, Bornstein, Whisenhunt, Nemeth, and Dunaway (2002) examined whether PTP could bias jurors against defendants or plaintiffs in a civil trial. They found that anti-defendant PTP had a stronger effect on liability judgments and perceptions of plaintiff sympathy, as compared to anti-plaintiff PTP. Therefore, the relative influence of different PTP slants might be case- or defendant-specific. Some defendants might benefit greatly from positive-defendant PTP or anti-plaintiff PTP, while others will not. The research discussed below suggests that all types or slants of PTP can significantly influence jurors' impressions of defendants and guilt decisions.

*Negative-defendant PTP*: Given that negative-defendant PTP is most prevalent and can threaten a defendant's right to a fair trial, especially in high-profile cases, it is not surprising that PTP researchers have focused most of their attention on negative-defendant PTP. Extensive research supports the contention that negative-defendant PTP can bias juror decision making by rendering a juror incapable of determining a verdict based solely on trial evidence (see Steblay et al., 1999 for review). Specifically, research has found that jurors who are exposed to negative-defendant PTP are more likely to find the defendant guilty and view the defendant as less credible than jurors who are not exposed to PTP (Kerr, Niedermeier, & Kaplan, 1999; Kramer, Kerr, & Carroll, 1990; Otto, Penrod, & Dexter, 1994; Ruva, McEvoy, & Bryant, 2007). Negative-defendant PTP also influences jurors'

interpretation of trial evidence (Hope, Memon, & McGeorge, 2004; Otto et al., 1994; Ruva, Guenther, & Yarbrough, 2011; Ruva, Mayes, Dickman, & McEvoy, 2012) and the way jurors discuss ambiguous trial evidence during jury deliberations (Ruva & Guenther, 2015; Ruva & LeVasseur, 2012), pushing both toward an anti-defendant slant. In addition, negative-defendant PTP elicits negative emotional responses in jurors (Kramer et al., 1990; Ruva et al., 2011). Finally, exposure to negative-defendant PTP can influence jurors' memory for trial evidence by making it difficult for jurors to distinguish information obtained prior to trial (PTP) from information obtained during trial (source memory errors; Ruva & Guenther, 2015; Ruva & McEvoy, 2008; Ruva et al., 2007).

*Positive-defendant PTP*: As compared to negative-defendant PTP, far less research has focused on the biasing effects of positive-defendant or pro-defendant PTP. Positive-defendant PTP paints the defendant in a positive light, and is most likely to exist in trials involving rape or murder, as well as those in which the defendant is a celebrity or police officer (Daftary-Kapur et al., 2014). Some of the research examining how positive-defendant PTP influences jurors' decisions and impressions has used general PTP (not case-specific; Greene & Wade, 1988; Kovera, 2002; Woody & Viney, 2007). Research using case-specific positive-defendant PTP has found that it too influences jurors' decisions, impressions, interpretation of trial evidence, and memories. Specifically, jurors exposed to pro-defendant PTP are more likely to vote *not* guilty and perceive the defendant as *more* credible when compared with no-PTP controls, thus resulting in a pro-defense bias (Daftary-Kapur et al., 2014; Ruva, Dickman, & Mayes, 2014; Ruva et al., 2011; Ruva & McEvoy, 2008). In addition, jurors exposed to pro-defendant PTP are more likely, compared to jurors exposed to negative-defendant PTP or no-PTP controls, to misattribute the source of this PTP information to the trial (Ruva & McEvoy, 2008) and interpret trial evidence in favor of the defendant (Ruva et al., 2011; Ruva et al., 2012).

*Negative-victim PTP*: Negative-victim PTP involves using negative language to describe victims and/or portraying their actions as contributing to their victimization. While it is common for the media to focus on the accused, in certain cases the media has focused on blaming the victim by portraying the victim, at some level, to be at fault for the alleged crime (Taylor, 2009). Negative-victim PTP is prevalent for certain types of crime (e.g., rape, sexual assault, and domestic violence), and has been found to have an effect on jurors' decisions (Franiuk, Seefelt, Cepress, & Vandello, 2008; Taylor, 2009). For example, Franiuk et al. (2008) found that when mock-jurors were presented with anti-victim stories, as opposed to pro-victim stories, they were more likely to believe that the defendant was *not* guilty and that the victim was lying. In addition, Daftary-Kapur et al. (2014) found that jurors in the pro-defense PTP condition (consisting of a mixture of pro-defendant and anti-victim PTP) were less likely to find the defendant guilty than the no-PTP controls. Similarly, Ruva and Guenther (2017) found that jurors exposed to anti-victim PTP were more likely to find the defendant *not* guilty, rate the defendant as more credible, and the trial evidence as being more supportive of the defendant than jurors not exposed to PTP. They also found that the effect of PTP on guilt ratings was mediated by jurors' ratings of trial evidence and defendant credibility. Specifically, PTP

imparted its biasing effects on jurors' guilt ratings by pushing their ratings of defendant credibility and trial evidence in the direction of the PTP bias (toward favoring the defendant if jurors were exposed to anti-victim PTP). Caution should be taken in interpreting the effect of negative-victim PTP on juror bias, given the small amount of research examining its influence on jurors' decisions.

*Mixed PTP exposure*: In their review of naturally occurring PTP, Daftary-Kapur et al. (2014) and Franiuk et al. (2008) discovered that, for some high-profile cases, multiple types of PTP (e.g., anti-defendant and anti-victim) are present. The prevalence of multiple types of PTP in high-profile case is only likely to increase as the accessibility to, and use of, nontraditional media outlets increases (e.g., Facebook, Twitter, and YouTube), as well as their implementation into the litigation process. Therefore, along with understanding how each type of PTP independently influences jurors' decisions and impressions, it is also important to understand how exposure to multiple PTP slants influences them.

Only two studies (Ruva et al., 2012, 2014) have explored how PTP effects on guilt decisions differ for jurors exposed to pure-PTP (e.g., exposure to only negative-defendant PTP) as opposed to jurors exposed to mixed-PTP (e.g., exposure to both negative-defendant and positive-defendant PTP). Ruva et al. (2012, 2014) exposed participants to either pure PTP or a mixture of pro-defendant and anti-defendant PTP over a period of 10–12 days. The mixed PTP exposure occurred either in an *alternating* (exposure episodes alternated between pro-defendant and anti-defendant) or *blocked* (jurors were exposed to all of the PTP articles of one slant before being exposed to the articles of the other slant) fashion. Both studies found that pure negative-defendant PTP jurors were more likely to vote guilty than pure positive-defendant PTP jurors. These studies also found that mixed PTP exposure presented in an alternating fashion resulted in a reduction of PTP bias (resembling no-PTP controls). However, Ruva et al. (2012) found that mock jurors who received a blocked mixture of negative-defendant PTP followed by positive-defendant PTP showed a primacy effect (i.e., negative-defendant PTP had the greatest impact), and their verdicts did not differ from pure negative-defendant PTP jurors. Interestingly, jurors in the blocked condition who received pro-defendant PTP first were most similar to jurors in the no-PTP control, suggesting a leveling of PTP bias. Ruva et al.'s (2014) findings differ from Ruva et al.'s (2012) in that the former found a reduction of PTP bias on verdicts for both the blocked and alternating groups. However, Ruva et al.'s (2014) guilt rating analyses (combination of guilt and confidence) suggested a recency effect, with those receiving negative-defendant PTP last closely resembling those in the pure negative-defendant PTP condition.

Although the results of these mixed PTP studies suggest that juror exposure to certain combinations of differing PTP slants might result in a reduction of bias, it should be noted that it is unlikely that equal amounts of negative-defendant and positive-defendant PTP would surround an actual case. Even more unlikely would be for traditional or social media to present these two types of PTP in an alternating fashion, and then for jurors to be exposed to this information in an alternating fashion. Therefore, much more research is needed before conclusions can be made on how various slants of PTP work in combination to bias jurors' decisions.

The research above suggests that all types or slants of PTP can influence jurors' guilt decisions, with negative-defendant PTP being especially problematic given its ability to bias the jury pool against the defendant–hence denying the defendant his/her right to a fair trial by an impartial jury. That being said, both positive-defendant and negative-victim PTP challenge the associated burden of proving guilt, which is placed on the prosecution. Therefore, understanding the influence of all PTP types/slants on juror bias is important. Social scientists have various methods they can employ to study these influences, with each having its benefits and limitations. These methods are the focus of the next section of this chapter.

## Research Methodologies Used to Explore Pretrial Publicity's Biasing Effects

The effect of PTP on juror bias has been examined using three main methods: (1) surveys of actual or potential jurors, (2) jury simulation research/experiments, and (3) meta-analysis. Given that most of the research using these various methods is presented elsewhere in this chapter, only a brief discussion of the methodology will be presented here.

### *Survey Research*

Survey studies exploring PTP's effects on prospective juror bias can be conducted solely for research purposes, but many have been conducted to assess the level of anti-defendant bias held by potential jurors in actual criminal cases (Studebaker & Penrod, 1997). Several of these survey studies have shown a strong relationship between the amounts of case information prospective jurors can report and their perceptions of defendant guilt (Costantini & King, 1980/1981; Moran & Cutler, 1991; Nietzel & Dillehay, 1983). For example, Moran and Cutler (1991) conducted surveys of prospective jurors in two high-profile cases and found a significant correlation between knowledge of case specifics and perceived culpability of the suspects. However, knowledge of case specifics was not correlated with prospective jurors' self-reported ability to be impartial. The authors concluded that negative-defendant PTP could prejudice potential jurors against a defendant and that self-reports of impartiality should not be taken at face value.

Surveys of prospective jurors benefit from high verisimilitude or realism, in that they query actual potential jurors about case relevant information. Realism is important given that judges might highly value it and some have dismissed scientific research due to a lack of it (e.g., *Ballew v. Georgia*, 1978; *Lockhart v. McCree*, 1986). Survey research also has several limitations. First, survey research does not clearly link exposure to PTP with biased jury decision making. The impact of PTP

could be attenuated by the presentation of evidence at trial and jury deliberations. Therefore, the relationship between exposure to negative-defendant PTP and jury decision making might not be as strong as would be expected from survey research (Otto et al., 1994). Second, survey research does not allow for exact measurement of types and amounts of PTP that prospective jurors are exposed to. Instead, survey research relies on self-reports or indirect measures (e.g., memory reports) of PTP exposure. Finally, surveys suffer from a lack of control over extraneous variables, and without this control, researchers cannot make causal inferences (e.g., that exposure to PTP causes bias). Properly conducted jury simulation research does not suffer from these limitations, and has consistently shown that trial evidence presentation alone cannot eliminate the biasing effects of PTP (see Steblay et al., 1999 for review). That being said, no research method is perfect and below we review both the benefits and limitations of jury simulations.

## *Jury Simulation Research*

Much of the research cited in this chapter consists of jury simulations or controlled experiments, which involve manipulations of variables under controlled conditions, resulting in increased internal validity over survey research. This control allows researchers to determine causal relationships between exposure to PTP and juror bias. One major advantage of jury simulations is that they allow researchers to systematically vary the amount and type of pretrial publicity that participants are exposed to, obviously something that is not possible with actual jurors. This systematic manipulation of amount and type of pretrial publicity makes it possible to determine their effects on juror decisions and impressions.

Another major advantage of jury simulation research is that it allows for the examination of the processes that influence jurors' and juries' decisions. As Bornstein et al. (2017) point out, it is important to explore not only the types of decisions jurors and juries make but also how they arrive at these decisions. At the juror-level these processes include, but are not limited to, how individual jurors' impressions, attitudes, memories, perceptions, and emotions influence their decisions. At the jury level the focus is on the deliberation process and how both individual and group-level mechanisms (e.g., group polarization, leniency shift, collaborative memory, and social decision schemes) influence jury decisions. As the review of mechanisms responsible for PTP's influence on guilt decisions will reveal, much has been learned about these processes through jury simulation research.

Experimental simulations do come with some costs. First, the systematic control over variables, which is the hallmark of experiments, results in lowered ecological validity and realism than field research (e.g., research on actual juries in a courtroom setting). That being said, most jury simulations attempt to create a realistic trial experience in a controlled experimental setting. These jury simulations differ

widely in the degree of ecological validity or realism. It is a balancing act in which researchers need to maintain control over variables studied (internal validity), in order to infer causation, while at the same time attempting to make their stimuli and procedures as close to the real world as possible (ecological validity). PTP researchers can increase the ecological validity of their jury simulations by using actual news stories surrounding an actual trial. Additionally, they can have jurors deliberate to attempt to come to a unanimous verdict. The ecological validity of the trial stimuli can vary from trial transcripts (e.g., Daftary-Kapur et al. 2014; Hope et al., 2004) to videotape footage of actual trials (e.g., Otto et al., 1994; Ruva et al., 2007) to simulated reenactments with the roles of judges and attorneys being played by actual judges and attorneys (e.g., Kramer et al., 1990). The modality of PTP presentations can also vary from several written news articles (e.g., Daftary-Kapur et al., 2014; Ruva & McEvoy, 2008) to audiotaped presentations (e.g., Kramer et al., 1990) to videotaped television broadcasts (e.g., Ogloff & Vidmar, 1994; Wilson & Bornstein, 1998).

A second limitation of simulation research is that much of it uses college students as mock-jurors, which brings up questions regarding the representativeness of these samples, and hence their generalizability to the population of interest (i.e., actual jurors). In a recent meta-analysis of 53 jury simulation studies (40 criminal and 13 civil: $N = 17{,}716$), Bornstein et al. (2017) examined whether type of sample (student vs. nonstudent) had an effect on various outcome measures for criminal (i.e., guilty verdicts, continuous guilt/culpability, and sentencing) and civil (i.e., liability verdicts, continuous liability, and damages) cases. Bornstein and colleagues found no significant differences between samples for guilty verdicts, culpability ratings, and damage awards. That is, students were not more likely to find the defendant guilty, rate the defendant as more culpable, or award more in damages than nonstudents. The only statistically significant differences found between sample types were for liability judgments (both dichotomous and continuous measures), which had contradictory effects and therefore make the results difficult to interpret. Specifically, when compared to nonstudents, students were more likely to find defendants liable (liability verdict $d = 0.19$), but rated defendants lower in liability ($d = -0.11$). As for moderator effects, the authors note that "with the exception of trial presentation medium, moderator effects were small and inconsistent" (Bornstein et al., 2017, p. 13). Trial presentation medium (written summaries vs. others) moderated the effect of sample type on both guilty verdicts and culpability ratings. Specifically, student samples were more likely to render guilty verdicts and rate the defendant as more culpable when written summaries were used; however, no differences between sample types were found when other types of trial stimuli were used. This finding suggests that trial stimuli having greater ecological validity (e.g., videotaped trials or live trial simulations) might eliminate sample differences in regard to verdicts and culpability ratings. Bornstein et al. suggest that their findings could help to lessen the concern associated with the use of student samples in jury simulation research.

## *Meta-Analysis*

Meta-analysis is a statistical procedure for combining the results from multiple studies in order to determine the overall effect of a variable (PTP) on a number of outcome variables (verdicts and impressions). To date, only one published meta-analysis on PTP effects has been conducted (Steblay et al., 1999). This meta-analysis included both jury simulation and survey research from 23 studies. These studies consisted of 44 empirical tests representing 5755 participants. Consistent with the research reviewed above, Steblay et al. found that mock-jurors exposed to negative-defendant PTP were significantly more likely to find that defendant guilty than those not exposed to PTP. Additionally, Steblay et al. found larger PTP effects in studies that included the following: nonstudents as opposed to students, actual PTP, multiple PTP components (e.g., crime details, arrest information, confession, prior record, and incriminating evidence), exposure to PTP at multiple points in time, a more serious charge (e.g., murder or sexual abuse), a greater delay between PTP exposure and decision, and surveys as opposed to jury simulations. They also observed that while PTP's effect was greatest prior to trial presentation, it persisted throughout pre- and post-deliberation verdict decisions.

In summary, all of the methods discussed above converge on a single conclusion—exposure to negative-defendant PTP biases jurors against the defendant. The chapter will now explore the important question of how PTP influences jurors' decision.

## Mechanisms Responsible for PTP's Influence on Jurors' Decisions

It has been well established that PTP can have powerful effects on jurors' decisions regarding a defendant's guilt. To inform the courts on the types of remedies that will be most effective in reducing PTP bias, social scientists must understand the mechanisms that are responsible for this bias. Research has found that PTP imparts its biasing effects on jurors' decisions by influencing jurors': interpretation of trial evidence (Carlson & Russo, 2001; Hope et al., 2004; Ruva et al., 2011), impressions of defendants and attorneys (Kramer et al., 1990, Otto et al., 1994; Ruva & Guenther, 2015), emotional responses (Kramer et al., 1990; Ruva et al., 2011), and ability to discriminate the source of case information (PTP vs. trial; Ruva et al., 2007; Ruva & McEvoy, 2008). Therefore, research suggests that multiple mechanisms are responsible for PTP's biasing effects. Each of these mechanisms is reviewed in the subsections below.

## *Evidence Interpretation*

It is a common assumption that people can be unbiased if they set their mind to it. Unfortunately, there is a wealth of social science research and theory that suggests otherwise (Kramer et al., 1990; Nisbett and Wilson 1977). Exposure to PTP biases jurors' processing of subsequent case information. Specifically, exposure to PTP influences what trial evidence jurors pay attention to, how much weight they give to this evidence, and whether they interpret this evidence as supporting the defense's or prosecution's case.

*Primacy effects*: Primacy effects have been found in a variety of situations and simply refer to early information being better remembered, or having greater influence on decisions and impressions, than later information (see Hurlstone, Hitch, & Baddeley, 2014 for review). Recency effects refer to situations in which information presented last has a greater influence on decisions and impressions than information presented earlier (Hurlstone et al., 2014 for review). Importantly for the discussion of PTP bias, research suggests that recency effects disappear with the institution of a delay, but primacy effects remain (Craik, 1970; Greene, 1986; Luchins & Luchins, 1970; Mayo & Crockett, 1964; Tan & Ward, 2000). The attention decrement hypothesis has been employed to explain how primacy effects occur. Specifically, when only a single judgment is required at the end of information presentation (e.g., verdict), primacy effects result from the reduced attention to information presented later, after an impression or decision is formed (Anderson, 1971). These primacy effects have also been explained via belief perseverance. Once an idea/belief is formed, it is resistant to change even after the basis for the belief has been refuted (Anderson, Lepper, & Ross, 1980; Anderson & Lindsay, 1998; Ross, Lepper, & Hubbard, 1975). All of this suggests that case information presented first (PTP) will have a greater influence on jurors' impressions and decisions than case information presented later at trial.

There is evidence of early case information having an influence on jurors' evaluation of later case information. For example, Schum (1993) found that 48% of his participants either ignored testimony that conflicted with prior evidence or interpreted it as agreeing with the earlier testimony. Schum attributed these findings to a type of primacy effect in which early information biases the interpretation and weight given to subsequent information. PTP is not trial evidence and therefore its effect on the jurors' interpretation of later case evidence might operate differently. That being said, Davis, Spitzer, Nagao, and Stassen (1978) found that jurors' pretrial biases (pro-prosecution or pro-defense) influenced the evaluation and weight given to the trial evidence. The results from both of these studies are consistent with Anderson's (1971) discounting explanation discussed above. Also consistent with the discounting explanation, Devine and Ostrom (1985) found that mock-jurors discounted inconsistent testimony in order to create a story that explained the trial events. This desire of jurors to create a coherent and complete trial story is explained by the story model, which the chapter now discusses.

*The story model*: The story model provides an explanation of how PTP influences jurors' decisions (Pennington & Hastie, 1986, 1993), which incorporates processes related to primacy effects discussed above. The story model posits that jurors use both information presented at trial and information that they come to trial with (e.g., PTP and knowledge about crime categories) to create cognitive frameworks through which all subsequent trial information is filtered and interpreted. Jurors have a desire to create a complete and coherent trial story. If jurors can create a complete story from early PTP information, later PTP or trial information that does not fit this story might be ignored or devalued, resulting in a primacy effect in which early information (PTP) has a greater effect on jurors' judgments than later information (Trial). Predecisional distortion theory also posits that early case information can bias jurors' interpretation of later case information.

*Predecisional distortion theory*: Predecisional distortion theory (Carlson & Russo, 2001) proposes that rather than weighing trial evidence according to its actual probative value, jurors will distort evidence to support their favored side (prosecution or defense). Research has shown that this distortion increases throughout the trial, as jurors' confidence that the favored side will win increases, and ultimately influences verdicts (Carlson & Russo, 2001; Russo, Meloy, & Medvec, 1998; Russo, Meloy, & Wilks, 2000). Jurors who are exposed to PTP are likely to come to trial with a favored side (e.g., negative-defendant PTP = prosecution favored), and might begin distorting trial evidence to support their favored side early during trial evidence presentation.

In order to examine whether PTP does result in predecisional distortion in the direction of the PTP bias, Hope et al. (2004) and Ruva et al. (2011) exposed mock-jurors to either negative-defendant PTP or unrelated news stories. Results from both studies found significantly higher levels of predecisional distortion (biased toward the prosecution) for jurors exposed to negative-defendant PTP, as well as an increase in the percentage of guilty verdicts. Both researchers suggested that primacy effects played a role. Specifically, when jurors are exposed to negative-defendant PTP and then early at trial favor the prosecution's case, it will be very difficult for mitigating evidence to be accurately weighed due to predecisional distortion. Additionally, Ruva et al. (2011) found that jurors exposed to positive-defendant PTP had significantly lower predecisional distortion scores (biased toward the defense), and were less likely to vote guilty than jurors in the no-PTP and negative-defendant PTP conditions. Importantly, both sets of researchers found that predecisional distortion of trial evidence mediated the effect of PTP on juror decisions. Therefore, exposure to PTP resulted in jurors interpreting trial evidence to favor the side that was favored in the PTP (prosecution or defense), and these biased interpretations influenced their guilt decisions. It should be noted that Ruva et al.'s findings suggest that both negative-defendant and positive-defendant PTP influence jurors' decisions through predecisional distortion.

The research above focuses on juror-level decisions, but there is also jury-level research that suggests predecisional distortion (or similar primacy effects) can affect how jurors discuss trial evidence during deliberations. As part of their analyses for two large jury studies, Ruva and associates (Ruva & Guenther, 2015; Ruva &

LeVasseur, 2012) content analyzed the videotaped deliberations of 60 mock-juries (30 per study). Half of these juries consisted of mock-jurors who had been exposed to negative-defendant PTP and the other half were exposed to unrelated news stories. They found that during deliberations, jurors who were exposed to negative-defendant PTP were significantly more likely, compared to no-PTP controls, to discuss ambiguous trial evidence (which did not support either side or was neutral) as if it supported the prosecution. Additionally, Ruva and Guenther (2015) found that discussion of ambiguous trial information in a pro-prosecution manner significantly mediated the effect of PTP on juries' guilt decisions. Therefore, jurors exposed to negative-defendant PTP were more likely to discuss ambiguous evidence in a pro-prosecution manner, and this biased discussion of evidence influenced juries' guilt decisions.

The research and theory above suggests that, in cases having a lot of PTP, it is likely that trial information will be distorted in a way that favors this PTP, regardless of its true probative value. As the discussion below will reveal, predecisional distortion, belief perseverance, and similar primacy effects are some, but not all, of the hurdles that the defense would have to overcome when pervasive negative-defendant PTP exists.

## *Impression Formation*

The primacy effects described above are also important to this discussion of impression formation. Jurors who are exposed to PTP are likely to come to trial having already formed an impression of the defendant. Most of the research focusing on PTP's effects on jurors' perceptions of a defendant's credibility has focused on negative-defendant PTP. This research has found that jurors exposed to negative-defendant PTP rate the defendant as less credible, or have more negative impressions of the defendant, than jurors not exposed to PTP (Dexter et al., 1992; Kramer et al., 1990, Otto et al., 1994; Ruva et al., 2007). That being said, the small amount of research exploring the effect of positive-defendant PTP on jurors' impressions has found that exposure to pro-defendant PTP results in jurors rating the defendant as more credible than no-PTP controls (Ruva et al., 2011; Ruva & Hudak, 2013; Ruva & McEvoy, 2008). Importantly, these defendant credibility ratings have been found to mediate PTP's effect on jurors' guilt decisions (Ruva et al., 2011; Ruva & McEvoy, 2008). Thus, PTP influences jurors' impressions of the defendant and these impressions then influence jurors' guilt decisions.

In addition to influencing jurors' impressions of defendants, exposure to PTP influences jurors' impressions of litigating attorneys. Ruva and McEvoy (2008) found that jurors exposed to negative-defendant PTP rated the prosecuting attorney more favorably (higher in likability and ability), and the defense attorney less favorably (lower in likability and ability), than jurors exposed to positive-defendant PTP or no PTP. They also found that jurors exposed to positive-defendant PTP provided less favorable ratings of the prosecuting attorney than no-PTP controls. Similarly, Ruva and Guenther

(2015) found that jurors exposed to negative-defendant rated the prosecuting attorney as more favorable, and the defense attorney as less favorable, than the no-PTP controls. In both of these studies, jurors' ratings of the prosecuting attorney mediated the effect of PTP on guilt decisions. As with the defendant credibility ratings, exposure to PTP influenced jurors' impressions of key trial players (prosecuting attorney), and these biased impressions influenced their guilt decisions.

Ruva and associates suggest that Pennington and Hastie's (1988, 1993) story model can explain how jurors' impressions of defendants and attorney can mediate PTP's influence on jurors' decisions. Jurors exposed to PTP used this information as a framework for analyzing subsequent case information (i.e., trial evidence) in order to create a coherent story. Those jurors exposed to negative-defendant PTP come to court with a story that the defendant is not credible and is likely guilty. This results in subsequent trial evidence being encoded in a manner that agrees with this anti-defendant original story.

## *Emotional Responses*

Recently, researchers have begun to explore the influence of emotions on jurors' decisions and impressions (see Nunez, Estrada-Reynolds, Schweitzer, & Myers, 2016 for review). According to Feigenson and Park (2006), emotions can affect jurors' decisions by biasing information processing in the direction of the emotion and providing informational cues. Therefore, PTP could influence verdict outcomes by eliciting negative emotional responses (e.g., anger, hostility, disgust, and anxiety) that then influence jurors' processing of trial information and ultimately their verdicts (Salerno & Bottoms, 2009). Obviously, emotional responses elicited by PTP are extralegal in nature, and become problematic when they bias jurors' decisions.

Negative-defendant PTP elicits negative emotional responses in jurors and influences both juror (Kramer & Kerr, 1989) and jury (Kramer et al., 1990) decisions. Much of this research suggests that emotional PTP has a more damaging effect on jurors' decisions than factual PTP. For example, Kramer et al. (1990) found that during voir dire mock-jurors exposed to negative-defendant PTP reported more negative emotions and held a stronger bias against the defendant than jurors exposed to factual PTP. They also found that a time delay between exposure to PTP and voir dire was only able to reduce the effects of factual PTP, whereas the effects of emotional PTP did not diminish over time.

Honess, Charman, and Levi (2003) examined jurors who were naturally exposed to PTP by having them recall the PTP they were exposed to. They then evaluated the content of these recalls as either factual or affective/evaluative. Jurors were then exposed to a briefing by the trial judge, along with prosecution and defense opening statements. Jurors who recalled affective/evaluative PTP showed more bias against the defendant in their reasoning, evaluations of the defense's arguments, and

confidence in the defendant's guilt. Contrary to these findings, Wilson and Bornstein (1998) found that, when controlling for the information's diagnosticity, both factual and emotional PTP biased jurors' decisions, with no significant difference between them in regard to jurors' verdicts.

According to the Appraisal-Tendency Framework (Lerner & Keltner, 2000, 2001), not all negative emotions (e.g., anger, disgust, anxiety, and sadness) are equally influential on judgments and decisions (see Feigenson & Park, 2006, for review). Anger influences perceptions, beliefs, reasoning, choices, and punitiveness (Bodenhausen, Sheppard, & Kramer, 1994; Lerner, Goldberg, & Tetlock, 1998; Lerner & Tiedens, 2006). Importantly, anger can carry over to judgments and decisions regardless of whether the emotional state is related to the final decision (Loewenstein & Lerner, 2003; Zillmann, 1983).

Unfortunately, the research discussed above exploring the effects of emotional PTP on juror bias did not employ measures that could distinguish among different types of emotions. It only addressed whether the response was affective/emotional, and in some cases its valence (negative, neutral, or positive). Therefore, the specific emotions elicited by PTP in each study are unknown, and it is possible that the emotions elicited across the studies differed, resulting in conflicting findings. To rectify this, and explore whether anger acts as a unique emotional mechanism, Ruva et al. (2011) used two different emotional measures: (1) Spielberger's State-Trait Personality Inventory (STPI; Spielberger, 1983; Spielberger & Reheiser, 2003) and (2) a PTP recall and emotional response task. The STPI measures both the state and trait forms of anger, anxiety, depression, and curiosity, with Ruva and colleagues focusing on the state or transitory form (Spielberger & Reheiser, 2009). The emotion measure associated with the PTP recall task required participants to select emotion words, from an emotion word list (each word was part of a specific emotion category), that described their emotional responses to the PTP information they recalled. The jurors in Ruva et al.'s (2011) study were exposed to either negative-defendant PTP, positive-defendant PTP, or no PTP. Jurors exposed to negative-defendant PTP were angrier after viewing the trial than those in the positive-defendant or no PTP conditions. This anger acted as an emotional mechanism through which PTP influenced jurors' decision—with those exposed to negative-defendant PTP being angrier, which resulted in a greater propensity to vote guilty. In addition, jurors exposed to positive-defendant PTP were significantly more likely than jurors in the negative-defendant and no PTP conditions to use positive emotion words to describe their PTP recalls. The proportion of positive emotion words used to describe PTP recalls mediated guilt decisions. Positive emotional responses to PTP also acted as an emotional mechanism through which PTP influenced jurors' decision—with those exposed to positive-defendant PTP indicating more positive emotional responses, which resulted in a greater propensity to vote not guilty.

Dumas, Lepastourel, and Testé (2014) also explored whether anger mediated PTP's effect on jurors' decisions. They found that jurors were more likely to find the defendant guilty after reading negative-defendant PTP containing both incriminating (includes implicating evidence against the accused, such as results of a search warrant or admissions of guilt) and crime story information (details of the crime

committed). They also found that the amount of anger jurors expressed increased as the number of crime story elements increased, while the amount of incriminating evidence did not influence the level of anger. Mediation analyses showed that incriminating evidence had a direct effect on verdicts; crime story information indirectly affected verdicts by eliciting negative emotional responses. Therefore, consistent with Ruva et al. (2011), this study suggests negative-defendant PTP influences jurors' verdicts by increasing juror anger, which then increases the likelihood of voting guilty.

Why does anger result in such biased decisions? People who are made to feel angry are less cautious in their decision making than those who feel other forms of negative affect, such as sadness (Bodenhausen et al., 1994; Tiedens, 2001). When deciding guilt, angry people are more influenced by stereotypes than people who express neutral emotions or sadness (Bodenhausen, et al., 1994; Tiedens & Linton, 2001). Therefore, anger can lead to automatic, superficial, and heuristic processing which could result in jurors' feeling increased confidence in their preconceived judgments and less likely to consider further information (Feigenson & Park, 2006; Lerner & Keltner, 2001; Lerner & Tiedens, 2006).

## *Source Memory*

Memory might also be an important means by which PTP imparts its biasing effects on jurors' guilt decision. How information is encoded (brought into the memory system) has a significant effect on how strong and durable memory will be. In addition to the strength of the memory trace, the accuracy of people's source attributions (Johnson, Hashtroudi, & Lindsay, 1993) regarding where they learned particular facts about the case has important implications in regard to PTP's influence on juror bias, as well as jurors' ability to correct for this bias. Finally, as already discussed, cognitive biases such as predecisional distortion and belief perseverance can bias how jurors encode trial information. This section focuses on source memory, given that it is a mechanism through which PTP imparts its bias on jurors' decisions.

Otto et al. (1994, p. 457) discuss two methods by which PTP can bias jury decision making:

> Pretrial publicity may operate … by leading potential jurors to spontaneously form an impression of the defendant, which may then influence their judgments. … Jurors may not use the information received from the pretrial publicity in forming an impression, but might instead simply encode this information into long-term memory. Jurors would then be making memory-based judgments … in which they would have both the information gained from the pretrial publicity and the evidence actually presented in the trial to draw upon in making their judgments.

If in fact jurors do encode PTP and later retrieve it when making decisions about guilt, are they *aware* of the source of this information? This question pertains to the area of *source monitoring,* which "refers to a set of processes involved in making attributions about the origins of memories, knowledge, and beliefs" (Johnson et al.,

1993, p. 3). Memories are not tagged or labeled with specific sources, but instead contain informational clues that allow us to distinguish their source (Lindsay, 1994). At times, people consciously struggle to identify a source, but more often they are not conscious of this process (Lindsay, 1994). Source misattributions can arise because recollecting information about an event and the source of that information are believed to be two separate cognitive acts (Johnson et al., 1993), and memory performance for event information (e.g., PTP information) is generally better than memory for source information (Kelly, Carroll, & Mazzoni, 2002).

Ruva and associates have examined source monitoring in jurors exposed to PTP by using the *reverse suggestibility paradigm*. Research has demonstrated that people's memory for an event can be significantly influenced by *information presented before* (PTP) the to-be-remembered event (Trial), which is labeled the reverse suggestibility effect (Rantzen & Markham, 1992; Ruva et al., 2007). Ruva and associates have explored whether jurors exposed to PTP are more likely to misattribute information provided only in the PTP to trial, and refer to these errors as critical source memory errors. They have found that mock-jurors exposed to PTP are more likely than no-PTP controls to believe with a high level of confidence that information presented only in the PTP was presented at trial (Ruva & Guenther, 2015; Ruva & McEvoy, 2008; Ruva et al., 2007). In addition, jurors who deliberated made as many of these errors as the no-deliberation controls (Ruva & Guenther, 2015; Ruva et al., 2007). Also of interest, these source misinformation effects were found regardless of the slant/type of PTP exposure (i.e., negative-defendant or positive-defendant; Ruva & McEvoy, 2008). Importantly, these source misattributions were found to be a mechanism through which PTP biases juror decisions. That is, research suggests that mock-jurors do misattribute information presented in the PTP to the trial and these source misattributions influence guilt decisions.

Ruva and associates warn that source memory tasks of actual jurors, as compared to mock-jurors, are likely more difficult due to the increased delay between PTP exposure and trial testimony, as well as the increased delay between evidence presented early in trial and jury deliberations. A longer time delay between encoding and retrieval of information increases source misattributions (Frost, Ingraham, & Wilson, 2002; Hekkanen & McEvoy, 2005). To explore this using a mock-juror paradigm, Ruva and McEvoy (2008) manipulated the delay (no delay vs. 2 days) between trial exposure and completion of the source memory test. They found that jurors who experienced a delay made three times as many critical source-memory errors as those who did not experience a delay.

Also of interest, the jurors in Ruva and Guenther's (2015) study all experienced a 2-day delay between viewing the trial and jury deliberations, after which they completed the source memory test. Such a delay had not been instituted in prior jury deliberation studies exploring the effect of PTP on source-memory errors. Ruva and Guenther (2015) found that the PTP-exposed jurors made nearly three times the critical source-memory errors as jurors in previous research without a similar delay. In addition, the level of critical source memory errors was similar to those found in Ruva and McEvoy's (2008) delay condition. These findings are also interesting given that Steblay et al.'s (1999) meta-analysis found PTP effects increased as the

delay between PTP exposure and verdict decision increased. Thus, the increased effects of PTP with increased delays could be at least partially due to increases in source memory errors.

In summary, there are multiple mechanisms responsible for PTP's biasing effects on juror and jury guilt decisions. These mechanisms are likely to be outside of jurors' awareness and therefore outside of their control (Feigenson & Park, 2006; Johnson et al., 1993; Wilson & Brekke, 1994; Wilson, Centerbar, & Brekke, 2002). In order to effectively remedy the effects of PTP on juror and jury decisions, it is important for the courts to be aware of the mechanisms responsible for theses biasing effects. It is also important for the courts to realize that jurors are unlikely to be able to self-correct for the effects of PTP, and are likely unaware of how this bias will influence their impressions of the defendant and their interpretation and memory for trial evidence.

## Effectiveness of Court Remedies in Reducing or Ameliorating PTP Bias

Trial motions related to the effects of prejudicial PTP on defendants' right to a fair trial are prevalent and have increased over time (Minnow & Cate, 1991; Spano, Groscup, & Penrod, 2011). The courts have several remedies that can be used to combat the biasing effects of prejudicial PTP (e.g., continuance, voir dire, jury deliberations, judicial instruction, change of venue, and bench trial as opposed to jury trial). Many of these remedies are addressed, or alluded to in the significant decisions handed down by the Supreme Court. PTP researchers have examined the effectiveness of continuance, voir dire, deliberations, and judicial instruction. This section of the chapter focuses on this research and related theory. It also covers how the increasing Internet and social media coverage of cases making their way towards trial could impact the effectiveness of these remedies.

### *Continuance*

Common sense might suggest that the influence of PTP should diminish over time. That is, a delay or continuance of a trial might be enough to significantly reduce or eliminate the bias associated with PTP. This is the stance that some courts have taken by refusing to accept the notion that the biasing effects of PTP can persist over a long period of time (*Irvin v. Dowd*, 1961). Therefore, in some cases a continuance or delay has been instituted to remedy the effects of prejudicial PTP (*United States v. Dioguardi*, 1956). Although *Rideau v. Louisiana* (1963) does not directly speak to continuance, it does refer to the effect of a delay on PTP bias. It suggests that a delay should be expected to alleviate PTP bias, "[U]nless the adverse publicity is shown

by the record to have fatally infected the trial." This remedy of a delay is also thought to be effective, given that the majority of PTP surrounding a case occurs at the time of incident and arrest (*Sheppard v. Maxwell*, 1966).

Contrary to the courts' beliefs that a delay will diminish or eliminate the biasing effects of pervasive and prejudicial PTP, social science research suggests it is unlikely to be an effective remedy. In cases having large amounts of PTP, in which the exposure to the PTP is repeated over a long period of time, memory traces can be so strong that such memories could last over several years, if not a lifetime. The reasons for this are many. First, as already discussed above, emotional PTP is resistant to delay (Kramer et al., 1990). Second, research going back over a century has found that when learning episodes are spaced across time, rather than presented only once or over a short period of time, memory is enhanced, resulting in increased retention over longer periods of time (see Cepeda, Pashler, Vul, Wixted, & Rohrer, 2006 for review). The size of this distributed or spaced learning effect is often large (see Donovan & Radosevich, 1999 and Janiszewski, Noel, & Sawyer, 2003 for reviews), making these memory traces strong enough to withstand significant delays. Third, one problem with a continuance as a remedy for PTP bias is that, in the real world, the media typically reinstates the PTP at the time of pretrial hearings and just prior to trial (Dexter et al., 1992; Moran & Cutler, 1991).

Finally, given that the majority of American adults are now online (90%), and that the average Internet user accesses news through online media sources, blogs, and social media (Mastromauro, 2010; Pew Research Center, 2017b), the effectiveness of a continuance is questionable. This is because people can readily access stories and videos (e.g., YouTube, Netflix, iTunes podcasts) about a case from the distant past, and hence the influence of PTP might not fade with time due to continued exposure. Therefore, even if in the past the courts could count on the majority of PTP occurring at the time of the incident and arrest, nontraditional media sources could easily keep the PTP going throughout the delay or continuance.

### *Voir Dire*

In cases having pervasive prejudicial PTP, the voir dire is used to assess potential jurors' knowledge of the PTP surrounding the case and potential bias against the defendant. In high-profile cases it might be difficult, if not impossible, to find jurors who have not seen or heard anything about the case. In such cases, the courts may allow more extensive questioning of potential jurors and additional peremptory challenges (see *United States v. Meredith*, 1987). Such focused questioning is thought by the courts to be an effective remedy for PTP bias (Kramer et al., 1990). The use of voir dire to remedy PTP bias assumes that attorneys and judges are able to determine whether potential jurors can be impartial, and that potential jurors can assess their own bias and honestly report on it (Shahani, 2005). The latter is of great importance, given that a juror is often defined by the courts as being free from

prejudice if he/she reports the ability to set aside opinion and render a verdict based solely on the evidence presented at trial.

The social science research exploring the effectiveness of voir dire as a remedy for PTP bias suggests that it is unlikely that potential jurors can adequately assess their own bias. For example, Sue, Smith, and Pedroza (1975) found that jurors who were exposed to PTP and answered "yes" to the question, "Can you, in view of the publicity you have seen, judge the defendant in a fair and unbiased manner," were more likely to find the defendant guilty than jurors not exposed to PTP. Thus, despite the belief that they could put aside bias associated with exposure to PTP, these jurors could not and this was reflected in their verdicts. It should also be noted that jurors who answered "no" to this question, and hence believed that PTP had biased them, also were more likely to find the defendant guilty than the no-PTP controls.

Similarly, Kerr, Kramer, Carroll, and Alfini (1991), during voir dire, asked jurors exposed to PTP, "[C]an you put out of your mind any information you might have received from the newspapers or television and decide this case solely upon the evidence to be presented in court?" They found no relationship between jurors' responses to this question and their verdicts. That is, jurors who believed they could set aside bias associated with PTP exposure convicted the defendant at similar rates to those who doubted their ability to set aside PTP bias. It is not clear from this study, or Sue et al. (1975) above, whether jurors were unaware that PTP had influenced them, erroneously believed that they could correct for PTP bias, or were dishonest in their reporting of PTP's influence on them. Thus, jurors' assertions of being unbiased are clearly not enough.

Can attorneys and judges accurately assess potential juror bias associated with PTP exposure? Kramer et al. (1990) explored this question by having a sample of experienced defense attorneys, prosecutors, and judges evaluate videotapes of mock-jurors responding to questions during voir dire. These judges and attorneys also had access to background questionnaires and PTP summaries. They were to use all of this information to make decisions regarding which of the potential jurors they would excuse in their role as judge or attorney. Kramer and associates found that neither judges nor attorneys' exclusion decisions were related to juror verdicts. That is, jurors excused by judges and attorneys were no more likely to render guilty verdicts than those accepted, with jurors exposed to PTP being more likely to convict than no-PTP controls.

The effectiveness of voir dire as a remedy for PTP bias rests on a number of assumptions related to jurors' ability to identify and correct cognitive biases, many of which are also required for remedies of judicial instruction and deliberation. First, it presumes that potential jurors are aware that such bias exists. Second, potential jurors must understand how this bias can influence their decisions (size and direction of bias). Third, prospective jurors must be willing to report any bias they are aware of. Fourth, it presumes that once exposed to PTP, jurors are capable of disregarding it, and then encode trial information as if never exposed to PTP (see discussion on primacy effects, predecisional distortion theory, and story model above). Fifth, after being exposed to PTP and trial evidence, jurors would have to accurately identify the source of these two types of information (see discussion on

source memory above). The research presented in previous sections of this chapter suggests that jurors exposed to PTP will find it difficult, if not impossible, to meet any, let alone all of these assumptions (see also Wilson & Brekke, 1994; Wilson et al., 2002), suggesting that traditional voir dire is likely ineffective at alleviating PTP bias.

The question now turns to whether more elaborate probing of juror bias and/or attempts to educate jurors about potential bias are effective remedies. Dexter et al. (1992) examined the effectiveness of an extended voir dire as a remedy for jury bias caused by negative-defendant PTP. In the extended voir dire the defense attorney sought to educate prospective jurors about their potential biases rather than to eliminate those biases. The attorney warned jurors that it would take "conscious effort to monitor one's thinking and to censor oneself" (p. 824). In the minimal voir dire, superficial questions were asked of the mock juries and there was no attempt to educate jurors. Despite the juror education, the extended voir dire did not reduce the effect of negative-defendant PTP on verdict decisions, which again is expected given the cognitive biases discussed above.

Qualls (2015) suggests that the courts should use more "'well-developed' 'and' 'widely accepted'" assessment instruments to determine whether prospective jurors hold bias against the defendant, as well as the amount of juror bias. Qualls suggests that such survey instruments should use Likert-type scales or semantic differentials to assess prospective jurors' attitudes toward the defendant, case, and crime, which would be a dramatic improvement over questions requiring only a "'yes' 'or' 'no'" response. Whether this type of questioning would be better able to ferret out juror bias in cases involving pervasive and prejudicial PTP has not been thoroughly tested.

Others have suggested that Internet and social media research could help identify juror bias during voir dire. In addition to the Internet and social media being a source for pretrial information, both have been extensively employed to conduct research on prospective jurors (Browning, 2016). Although it cannot correct for cognitive biases that jurors are unaware of, some have called for the use of the Internet ("voir Google") and social media ("Facebooking the jury") to investigate juror dishonesty during voir dire (see Browning, 2016 for review). The courts have a variety of opinions in regard to litigating attorneys conducting online or social media research on prospective jurors. Some judges have banned online research during voir dire, fearing that it could have a "chilling effect on jury service," resulting in citizens being unwilling to participate for fear that their privacy would be violated (Browning, 2016). A survey of federal judges conducted in 2014 found that 26% of respondents indicated that they banned social media use by attorneys during voir dire (Dunn, 2014). The main reasons provided for these social media bans were protecting jurors' privacy, fear that its use would be distracting and prolong the voir dire process, and the belief that traditional voir dire would be sufficient to uncover juror bias.

Although 26% of judges ban Internet and social media research, the courts are increasingly recognizing the right of attorneys to use them when conducting juror research (Dunn, 2014), and in some jurisdictions (e.g., New Jersey, Missouri, and

Florida) have suggested an imposition of their use (Browning, 2016). For example, in *Carino v. Muenzen* (2011; medical malpractice case) the New Jersey appellate court indicated that the lower court acted unreasonably by prohibiting the use of the Internet by the plaintiff's counsel during voir dire. In *Johnson v. McCullough* (2010; medical malpractice case), the Missouri Supreme Court indicated that competent representation in the digital age implied a duty to conduct online juror research during voir dire. Specifically, the court stated that "a party *must* use reasonable efforts to examine the litigation history on Case.net of those jurors selected but not empaneled and present to the trial court any relevant information prior to trial" (p. 559).

In addition to legal decisions regarding the use of online research during voir dire (see Browning, 2016 for review), the ABA has provided guidance in Formal Opinion 14-466, "Lawyer Reviewing Jurors' Internet Presence" (ABA, 2014). The ABA opined that it is not unethical for litigating attorneys to conduct a review of prospective jurors, so long as they do not have direct or indirect contact with them, and the law or court order does not prohibit it. The ABA also noted that there is a strong public interest in identifying biased or tainted jurors.

Clearly, the use of the Internet and social media to conduct juror research is still in its infancy, and it is likely to see dramatic changes over the next several years. Given that much of the bias associated with PTP exposure is a result of cognitive mechanisms outside of conscious control, it is unlikely that such research will ferret out all, or even most, of the PTP bias in prospective jurors. That being said, it could provide insight into how much pretrial information jurors have been exposed to and whether they have posted biased comments about the case online or on social media. The question now turns to whether, given voir dire's likely ineffectiveness at eliminating PTP bias, PTP bias can be corrected by court remedies occurring after voir dire; specifically, jury deliberation and judicial instructions.

## *Jury Deliberations*

It is commonly assumed that jury deliberation enables jurors to correct errors, reject irrelevant information, and control biases. However, research suggests that this assumption is idealistic in that deliberation intensifies PTP bias (Kramer et al., 1990; Otto et al., 1994; Ruva et al., 2007; Studebaker & Penrod, 1997). This results in the responses of groups being more extreme than those of individuals, an effect which has been labeled group polarization (Moscovici & Zavalloni, 1969). Consistent with group polarization effects, Kerr et al. (1999) found that jurors exposed to PTP were more likely to vote guilty after deliberation than prior to it. In a similar study, Kramer et al. (1990) found that PTP's biasing effect was stronger in juries than jurors.

Other research has found that deliberation does not increase or reduce the PTP's biasing influence on verdicts. Across two large jury studies, Ruva and associates (Ruva & Guenther, 2015; Ruva et al., 2007) found that jurors who were exposed to PTP and then deliberated did not significantly differ in guilty verdicts from jurors

exposed to PTP who did not deliberate (nominal jurors). Similarly, Otto et al. (1994) found that deliberation did not significantly reduce PTP-induced biases. Although deliberation did not increase the number of guilty verdicts, Ruva et al. (2007) found that it did increase PTP bias, in that jurors who deliberated rated the defendant more negatively than those who did not deliberate.

Also of interest, Ruva and Guenther (2015) found that jurors who were not exposed to PTP were less likely to vote guilty after deliberation than prior to it, which has been referred to as a leniency shift (Kerr, 1993). This leniency shift was not found for jurors exposed to negative-defendant PTP. Instead, these PTP-exposed jurors were just as likely to vote guilty after deliberations as they were prior to them. One explanation for the leniency shift is that, during jury deliberations, the defendant protection norm and reasonable doubt standard are highlighted (Kerr, 1993; Waters & Hans, 2009). The defendant protection norm is the preference of erroring on the side of acquitting a guilty defendant, as opposed to convicting an innocent one (Davis, Stasser, Spitzer, & Holt, 1976). This norm is thought responsible for the finding that initial majorities favoring not guilty verdicts prevail more often than those favoring guilty verdicts (see MacCoun & Kerr, 1988 for review). Interestingly, Ruva and Guenther (2015) found that juries exposed to PTP spent significantly less time, compared to juries not exposed to PTP, discussing jury instructions and the fact that there was a lack of evidence to convict. This could explain why deliberation had no effect on PTP-exposed jurors' verdicts, but did affect the verdicts of jurors not exposed to PTP. These results, along with those mentioned above, suggest that the corrective effect of juries on their individual members might not occur when jurors had been exposed to PTP.

Why are deliberations ineffective at reducing PTP bias? First, as noted above, the bias associated with PTP influences how trial evidence is encoded. By the time jurors begin deliberations, they have formulated a trial story and have encoded trial evidence in a manner consistent with this story. Then, according to persuasive argument theory, during deliberations jurors will spend more time discussing, and making better arguments for, the side they prefer (e.g., prosecution; Vinokur & Burnstein, 1974), which could result in polarization effects. Such biased interpretation and discussion of trial evidence was supported by Ruva and associates' finding that, when compared to no-PTP controls, juries whose members were exposed to negative-defendant PTP were more likely to discuss ambiguous trial evidence as if it supported the prosecution and were less likely to discuss it as supporting the defense (Ruva & Guenther 2015; Ruva & LeVasseur, 2012).

Additionally, PTP's influence on jurors' decisions can persist after deliberations due to jurors mistaking PTP for trial information (source memory error), and then discussing PTP during deliberations as if it came from the trial. Ruva and associates (Ruva & Guenther, 2015; Ruva & LeVasseur, 2012) found that jurors do discuss PTP during deliberations, and often fail to identify it as PTP and thus treat it as trial evidence. Such discussion can also result in jurors who were not originally exposed to PTP being exposed to it during deliberations, or it could act as a memory cue for jurors who might have forgotten some of the PTP they were exposed to. A recent study by Ruva and Guenther (2017) demonstrated that, during deliberations, PTP

bias can be spread from PTP exposed jurors to those not previously exposed to PTP. Specifically, no-PTP jurors who deliberated with jurors exposed to negative-defendant PTP were more likely to vote guilty after deliberations, as compared to no-PTP jurors who deliberated on juries made up only of no-PTP jurors. Thus, instead of reducing PTP bias, deliberations can result in a spread of PTP bias. The discussion of PTP during deliberations and the spread of bias are further explored in the section on judicial instructions that follow.

## *Judicial Instructions*

The remedy of judicial instructions assumes that jurors are aware of any potential bias from PTP and are able and willing to correct for it. The discussion above has already provided evidence that this is unlikely due to a number of cognitive biases and errors. Research examining the effectiveness of judicial instructions to disregard PTP provides further evidence that such judicial admonishments are ineffective at combating PTP bias (see Lieberman & Arndt, 2000 and Steblay, Hosch, Culhane, & McWethy, 2006 for reviews). In fact, research has found that jurors are likely to discuss PTP during jury deliberations even when admonished not to (Kline & Jess, 1966; Kramer et al., 1990; Ruva & Guenther, 2015; Ruva & LeVasseur, 2012). Ruva and LeVasseur (2012) and Ruva and Guenther (2015) videotaped and content analyzed 60 mock-jury deliberations. Prior to deliberations, these juries were admonished not to discuss PTP or use it to make verdict decisions. Ruva and LeVasseur (2012) found that all 14 of their PTP-exposed juries discussed PTP during deliberations, and spent, on average, 6.53% of their total deliberation time discussing PTP. These PTP-exposed juries rarely corrected their members who discussed PTP (only 10% of the time). Instead of correction, a common reaction to the mention of PTP was for jury members to acknowledge that the information being discussed was PTP, and then continue to discuss it anyway (occurred 44% of the time). Similarly, Ruva and Guenther (2015) found that all 15 of their PTP-exposed juries discussed PTP during deliberations, spending, on average, 8% of their total deliberation time discussing PTP. These jurors offered some form of correction only 28% of the time, with this correction working (jurors stopped discussing the PTP) only 19% of the time. Thus, contrary to the courts' assumption that judicial instruction is an effective remedy, the majority of the time that PTP was discussed no correction was made.

Why would jurors discuss PTP during deliberations after being admonished not to? Jurors might unknowingly discuss PTP during deliberations due to source confusions. That is, they unknowingly discuss information they have been instructed not to use. Kramer et al. (1990), Ruva and LeVasseur (2012), and Ruva and Guenther (2015) all suggest that some instances of PTP discussion during mock-jury deliberations, as well as failure to correct discussion of PTP, might have been due to source errors (i.e., confusing PTP with trial evidence).

Jurors might knowingly discuss PTP because it corresponds with their initial assumption about the defendant's culpability (Story Model; Pennington & Hastie, 1988, 1993). In addition, jurors might knowingly discuss PTP and not correct fellow jurors because they consider PTP information to be vital to the trial and their decision-making process (Devine, Clayton, Dunford, Seying, & Pryce, 2001). For example, Sommers and Kassin (2001) found that mock-jurors are likely to selectively comply with judicial instructions to disregard inadmissible evidence due to their motivation to arrive at a "just" verdict. According to Sommers and Kassin (2001) a "just" verdict indicates accuracy regarding whether the defendant committed the crime and is deserving of punishment. They found that jurors were likely to disregard judicial instructions regarding inadmissible evidence they deemed reliable, but would adhere to instructions when this same evidence was considered unreliable. This same selective compliance might be used for PTP, with jurors using what they consider reliable PTP information during jury deliberations, even when admonished not to.

Interestingly, both Davis (1986) and Ruva and Guenther (2015) found that jurors exposed to negative-defendant PTP discussed judicial instructions at a significantly lower rate than jurors exposed to unrelated or neutral PTP. That is, discussion of judicial instructions varied as a function of PTP exposure. It is not clear why jurors exposed to PTP discussed judicial instructions less frequently than juries not exposed to PTP. Perhaps, the negative-defendant PTP exposed juries avoided discussion of judicial instructions because these juries believed the defendant to be guilty, and therefore wanted to avoid discussion of information that would favor a not guilty verdict (e.g., reasonable doubt) or prohibited the discussion of case information pointing toward guilt (PTP).

## *Change of Venue*

Although *Irvin v. Dowd* (1961), *Rideau v. Louisiana* (1963), *Murphy v. Florida* (1975), and *Sheppard v. Maxwell* (1966) all speak to change of venue in cases involving pervasive PTP, historically changes of venue are infrequently granted (Moran & Cutler, 1991). This could be partially due to the courts' use of the "totality of circumstances" test established by *Murphy v. Florida* (1975). This test places on the defense the burden of demonstrating that PTP resulted in juror bias that would make a fair trial impossible.

The effectiveness of change of venue has not been experimentally explored by social scientists. That being said, social scientists have explored, through field research involving actual trials, prospective juror bias as a function of whether these people resided inside or outside the trial venue. For example, Nietzel and Dillehay (1983) conducted venue survey studies for five murder trials. They found that respondents residing within the trial venues reported reading or hearing more about the case than those residing in other counties. Those residing within the venue counties also knew more case details (both admissible and inadmissible), and were more

likely to believe the defendant was guilty than those residing outside of the trial venues.

The small amount of research on change of venue, as well as research showing that, as PTP exposure increases so does bias against the defendant, suggests that change of venue might currently be the most promising remedy for reducing PTP bias. That being said, caution should be taken in regard to the general acceptance of any remedy's effectiveness. It is also important to consider the significant costs of a change of venue, relative to any potential benefit. Advances in technology have affected how civil and criminal cases are covered by both traditional and nontraditional media. These relatively new media outlets suggest that changes might be needed in how the courts protect a defendant's Sixth Amendment right to a fair trial in cases having substantial amounts of prejudicial PTP. As mentioned above, Internet and social media coverage of cases have removed geographical boundaries, and for those cases that capture the nation's attention, finding a venue where a defendant can receive a fair trial might prove extremely challenging.

## Conclusions and Future Directions

Given the present media culture, the threats of prejudicial PTP on defendants' right to a fair trial are only likely to increase. No longer are citizens passive participants of the news—through social media, media websites, and blogging they are now active agents in the news—they share, comment on, and in some cases report on cases making their way to trial. How might this more interactive form of news transmission affect the jury pool and jurors' ability to decide a verdict based solely on the evidence presented at trial? What can the courts practically do to remedy or reduce bias associated with PTP? Traditional and nontraditional media coverage are not going away—instead they are likely to increase and become more accessible. Therefore, the courts need to find a way to reduce, if not eliminate, PTP's influence on juror/jury decisions. All of this opens up new areas to be explored by PTP researchers, with questions unique to the changing media landscape surrounding how people are exposed to news, and the almost inescapable nature of PTP in high-profile cases.

For example, although social media coverage of both criminal and civil cases has increased over the past decade, PTP researchers have yet to explore whether exposure to PTP via social media has similar effects as exposure via traditional news outlets. Also of importance is whether PTP exposure via social media outlets affects jurors' decisions through the same mechanisms as traditional PTP exposure? In addition, content analyses of PTP surrounding actual trials, which include both traditional media and social media, are needed. The content analyses of media sources discussed in this chapter were conducted over 20 years ago (Imrich et al., 1995; Simon & Eimermann, 1971; Tankard et al., 1978), long before jurors could follow and comment on cases via social media. Along with a comparative analysis of the content of these different media sources, research should examine the relative

amount of PTP exposure jurors receive through the various media sources and the perceived influence of them on decisions and impressions. Finally, the multiple sources from which prospective jurors can receive pretrial information could result in juries being composed of jurors who are exposed to different types of PTP (e.g., negative defendant, negative victim, or pro-defendant). Ruva and Guenther (2017) explored differences between heterogeneous and homogeneous PTP exposure at the jury level and found evidence of both bias transfer and reduction. More research on heterogeneous PTP exposure at the jury level is needed. This research should explore outcomes and biases using different trials, in juries having different majority or minority biases (e.g., majority negative defendant vs. negative victim), and should then content analyze these jury deliberations to explore how bias is transferred or reduced.

Also of interest, is how the effect of PTP coverage outside of the courtroom differs from coverage inside the courtroom. For high-profile cases having several pretrial hearings, or multiple defendants whose trials are severed, prospective jurors have the opportunity to observe the defendant in a courtroom setting prior to trial. This could be especially problematic when the defendant acts out (verbally or physically), demonstrates low emotional involvement or is shown in restraints (Antonio, 2006; Pryor and Buchanan 1984) or a prison (jail) orange jumpsuit. How does exposure to pretrial hearings influence prospective jurors? Does the effect of these hearings vary as a function of whether cameras are inside or outside of the courtroom? How does exposure to a trial of a co-defendant affect juror bias? In addition to biasing impressions of defendants, these pretrial hearings (or coverage of co-defendant trials) could impact prospective jurors' memory for trial. Source memory research finds that the more similar two sources of information are, the more difficult it is for people to discriminate between these sources (Johnson et al., 1993). Therefore, any pretrial footage of court proceedings could be especially problematic for jurors discriminating between pretrial and trial information.

On a positive note, over the past decade a lot has been learned about the mechanisms responsible for PTP bias. Therefore, PTP researchers and the courts are armed with valuable information regarding how PTP influences the decisions of jurors and juries. Understanding these mechanisms is just the first step in combatting PTP bias. Researchers must now explore whether it is possible to reduce PTP bias in the tainted juror. This will be extremely challenging, given that multiple mechanisms are responsible for PTP's biasing effects on jurors, many of which are out of the conscious control of jurors.

In summary, in cases that attract a lot of publicity and public interest, the courts have their work cut out for them in regard to protecting defendants' Sixth Amendment right to a fair trial. The methods for informing the public of both criminal and civil cases have dramatically changed over the past decade and are likely to continue to evolve in the future. Therefore, both the courts and social scientists have much work ahead of them if they are to ensure that defendants are provided the fair trial they are guaranteed by the Constitution.

## References

American Bar Association. (2016). *Model rules of professional conduct.* Retrieved from http://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/model_rules_of_professional_conduct_table_of_contents.html

American Bar Association. (2014). Formal opinion 466: Lawyer reviewing jurors' Internet presence. Retrieved from http://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/formal_opinion_466_final_04_23_14.authcheckdam.pdf

Anderson, N. H. (1971). Integration theory and attitude change. *Psychological Review, 7*, 172–206. https://doi.org/10.1037/h0030834

Anderson, C. A., Lepper, M. R., & Ross, L. (1980). The perseverance of social theories: The role of explanation in the persistence of discredited information. *Journal of Personality and Social Psychology, 39*, 1037–1049. https://doi.org/10.1037/h0077720

Anderson, C. A., & Lindsay, J. J. (1998). The development, perseverance, and change of naive theories. *Social Cognition, 16*, 8–30. https://doi.org/10.1521/soco.1998.16.1.8

Antonio, M. E. (2006). Arbitrariness and the death penalty: How the defendant's appearance during trial influences capital jurors' punishment decisions. *Behavioral Sciences and the Law, 24*, 216–234. https://doi.org/10.1002/bsl.673

Ballew v. Georgia, 435 U.S. 223 (1978).

Bodenhausen, G. V., Sheppard, L. A., & Kramer, G. P. (1994). Negative affect and social judgment: The differential impact of anger and sadness. *European Journal of Social Psychology, 24*, 45–62. https://doi.org/10.1002/ejsp.2420240104

Bornstein, B. H., Golding, J. M., Neuschatz, J., Kimbrough, C., Reed, K., Magyaries, C., & Luecht, K. (2017). Mock juror sampling issues in jury simulation research: A meta-analysis. *Law and Human Behavior, 41*, 13–28. https://doi.org/10.1037/lhb0000223

Bornstein, B. H., Whisenhunt, B. L., Nemeth, R. J., & Dunaway, D. L. (2002). Pretrial publicity and civil cases: A two-way street? *Law and Human Behavior, 26*, 3–17. https://doi.org/10.1023/A:1013825124011

Brickman, E., Blackman, J., Futterman, R., & Dinnerstein, J. (2008). How juror Internet use has changed the American jury trial. *Journal of Court Innovation, 1*, 287–302. Retrieved from http://www.courtinnovation.org/sites/default/files/Brickman.pdf

Brook, J. (2012). Social media adds a new twist to pretrial publicity ethical issues. *Continuing education of the bar blog.* California: California University. Retrieved from https://blog.ceb.com/2012/05/02/social-media-adds-a-new-twist-to-pretrial-publicity-ethical-issues/

Browning, G. (2016). Voir dire becomes voir google: Ethical concerns of 21st century jury selection. *The Brief: Tort Trial & Insurance Practice Section, 45*(2). Retrieved from http://www.americanbar.org/publications/the_brief/2016_17/winter/voir_dire_becomes_voir_google_ethical_concerns_of_21st_century_jury_selection.html

Bruschke, J., & Loges, W. E. (1999). Relationship between pretrial publicity and trial outcomes. *Journal of Communication, 49*, 104–120. https://doi.org/10.1111/j.1460-2466.1999.tb02819.x

Carino v. Muenzen, 13 A.3d 363 (N.J. 2011).

Carlson, K. A., & Russo, J. E. (2001). Biased interpretation of evidence by mock jurors. *Journal of Experimental Psychology: Applied, 7*, 91–103. https://doi.org/10.1037//1076-898X.7.2.91

Cepeda, N. J., Pashler, H., Vul, E., Wixted, J. T., & Rohrer, D. (2006). Distributed practice in verbal recall tasks: A review and quantitative synthesis. *Psychological Bulletin, 132*, 354–380. https://doi.org/10.1037/0033-2909.132.3.354

Costantini, E., & King, J. (1980/1981). The partial juror: Correlates and causes of prejudgment. *Law and Society Review, 15*, 9–40. https://doi.org/10.2307/3053221

Craik, F. I. M. (1970). The fate of primary memory items in free recall. *Journal of Verbal Learning and Verbal Behavior, 9*, 143–148. https://doi.org/10.1016/S0022-5371(70)80042-1

Daftary-Kapur, T., Penrod, S. D., O'Connor, M., & Wallace, B. (2014). Examining pretrial publicity in a shadow jury paradigm: Issues of slant, quantity, persistence and generalizability. *Law and Human Behavior, 38*, 462–477. https://doi.org/10.1037/lhb0000081

Davis, J. H., Spitzer, C. E., Nagao, D. H., & Stassen, G. (1978). Bias in social decisions by individuals and groups: An example from mock juries. In H. Brandstatter, J. H. Davis, & H. Schuler (Eds.), *Dynamics of group decisions* (pp. 33–52). Beverly Hills, CA: Sage.

Davis, J. H., Stasser, G., Spitzer, C. E., & Holt, R. W. (1976). Changes in group members' decision preferences during discussion: An illustration with mock juries. *Journal of Personality and Social Psychology, 34*, 1177–1187. https://doi.org/10.1037/0022-3514.34.6.1177

Davis, R. W. (1986). Pretrial publicity, the timing of the trial, and mock jurors' decision processes. *Journal of Applied Social Psychology, 16*, 590–607. https://doi.org/10.1111/j.1559-1816.1986.tb01161.x

DeLuca, A. (1979). *Tipping the scales of justice: The effects of pretrial publicity*. (Unpublished master's thesis). Iowa State University, Ames.

Devine, D. J., Clayton, L. D., Dunford, B. B., Seying, R., & Pryce, J. (2001). Jury decision making: 45 years of empirical research on deliberating groups. *Psychology, Public Policy, & Law, 7*, 622–727. https://doi.org/10.1037//1076-8971.7.3.622

Devine, P. G., & Ostrom, T. M. (1985). Cognitive mediation of inconsistency discounting. *Journal of Personality and Social Psychology, 49*, 5–21. https://doi.org/10.1037/0022-3514.49.1.5

Dexter, H. R., Cutler, B. L., & Moran, G. (1992). A test of voir dire as a remedy for the prejudicial effects of pretrial publicity. *Journal of Applied Social Psychology, 22*, 819–832. https://doi.org/10.1111/j.1559-1816.1992.tb00926.x

Donovan, J. J., & Radosevich, D. J. (1999). A meta-analytic review of the distribution of practice effect: Now you see it, now you don't. *Journal of Applied Psychology, 84*, 795–805. https://doi.org/10.1037/0021-9010.84.5.795

Dumas, R., Lepastourel, N., & Testé, B. (2014). Press articles and influence processes: The different effects of incriminating information and crime story information on judgments of guilt. *Psychology, Crime & Law, 20*, 659–672. https://doi.org/10.1080/1068316X.2013.854790

Duncan, S. H. (2009). Pretrial publicity in high-profile trials: An integrated approach to protecting the right to a fair trial and right to privacy. *University of Louisville Law: Legal Studies Research Paper Series, 34*, 754–795. Retrieved from http://ssrn.com/abstract=1117864

Dunn, M. (2014). Jurors' and attorneys' use of social media during voir dire, trials, and deliberations: A report to the judicial conference committee on court administration and case management. *Federal Judicial Center, 13*, 1–52. Retrieved from https://www.nacdl.org/WorkArea/DownloadAsset.aspx?id=38031&libID=38001

Estes v. Texas, 382 U.S. 875 (1965).

Feigenson, N., & Park, J. (2006). Emotions and attributions of legal responsibility and blame: A research review. *Law and Human Behavior, 30*, 143–161. https://doi.org/10.1007/s10979-006-9026-z

Florida v. Anthony, 08-CF-15606-AO (FL. 2011).

Florida v. Zimmerman, 592012CF001083A (FL. 2013).

Franiuk, R., Seefelt, J. L., Cepress, S. L., & Vandello, J. A. (2008). Prevalence and effects of rape myths in print journalism: the Kobe Bryant case. *Violence Against Women, 14*, 287–309. https://doi.org/10.1177/1077801207313971

Frost, P., Ingraham, M., & Wilson, B. (2002). Why misinformation is more likely to be recognised over time: A source monitoring account. *Memory, 10*, 179–185. https://doi.org/10.1080/09658210143000317

Greene, R. L. (1986). A common basis for recency effects in immediate and delayed recall. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 12*, 413–418. https://doi.org/10.1037/0278-7393.12.3.413

Greene, E., & Wade, R. (1988). Of private talk and public print: General pretrial publicity and juror decision-making. *Applied Cognitive Psychology, 2*, 123–135. https://doi.org/10.1002/acp.2350020204

Greenwood, S., Perrin, A., & Duggan, M. (2016). Social media update 2016: Facebook usage and engagement is on the rise, while adoption of other platforms holds steady (Research Report No. 202.419.4372). Retrieved from Pew Research Center for Internet, Science & Technology website.: http://www.pewinternet.org/2016/11/11/social-media-update-2016/

Hekkanen, S. T., & McEvoy, C. (2005). Source monitoring in eyewitness memory: Implicit associations, suggestions, and episodic traces. *Memory and Cognition, 33*, 759–769. https://doi.org/10.3758/BF03193072

Honess, T. M., Charman, E. A., & Levi, M. (2003). Factual and affective/evaluative recall of pretrial publicity: Their relative influence on juror reasoning and verdict in a simulated fraud trial. *Journal of Applied Social Psychology, 33*, 1404–1416. https://doi.org/10.1111/j.1559-1816.2003.tb01955.x

Hope, L., Memon, A., & McGeorge, P. (2004). Understanding pretrial publicity: Predecisional distortion of evidence by mock jurors. *Journal of Experimental Psychology: Applied, 10*, 111–119. https://doi.org/10.1037/1076-898X.10.2.111

Hurlstone, M. J., Hitch, G. J., & Baddeley, A. D. (2014). Memory for serial order across domains: An overview of the literature and directions for future research. *Psychological Bulletin, 140*, 339–373. https://doi.org/10.1037/a0034221

Imrich, D. J., Mullin, C., & Linz, D. (1995). Measuring the extent of prejudicial pretrial publicity in major American newspapers: A content analysis. *Journal of Communication, 45*(3), 94–117. https://doi.org/10.1111/j.1460-2466.1995.tb00745.x

Irvin v. Dowd, 366 U.S. 717, 81 (1961).

Janiszewski, C., Noel, H., & Sawyer, A. G. (2003). A meta-analysis of the spacing effect in verbal learning: Implications for research on advertising repetition and consumer memory. *Journal of Consumer Research, 30*, 138–149. https://doi.org/10.1086/374692

Johnson, M. K., Hashtroudi, S., & Lindsay, D. S. (1993). Source monitoring. *Psychological Bulletin, 114*, 3–28. https://doi.org/10.1037/0033-2909.114.1.3

Johnson v. McCullough. 306 S. W. 3d 551 (Mo. 2010).

Kelly, A., Carroll, M., & Mazzoni, G. (2002). Metamemory and reality monitoring. *Applied Cognitive Psychology, 16*, 407–428. https://doi.org/10.1002/acp.803

Kerr, N. L. (1993). Stochastic models of juror decision making. In R. Hastie (Ed.), *Inside the juror: The psychology of jury decision making* (pp. 116–135). New York, NY: Cambridge University Press.

Kerr, N. L., Kramer, G. P., Carroll, J. S., & Alfini, J. J. (1991). On the effectiveness of voir dire in criminal cases with prejudicial pretrial publicity: An empirical study. *American University Law Review, 40*, 665–701. Retrieved from https://www.wcl.american.edu/journal/lawrev/40/kerr.pdf

Kerr, N. L., Niedermeier, K. E., & Kaplan, M. F. (1999). Bias in jurors vs. bias in juries: New evidence from the SDS perspective. *Organizational Behavior and Human Decision Processes, 80*, 70–86. https://doi.org/10.1006/obhd.1999.2855

Kisley, M. A., Wood, S., & Burrows, C. L. (2007). Looking at the sunny side of life: Age-related change in an event-related potential measure of the negativity bias. *Psychological Science, 18*, 838–843. https://doi.org/10.1111/j.1467_9280.2007.01988.x

Kline, F. G., & Jess, P. H. (1966). Prejudicial publicity: Its effect on law school mock juries. *Journalism Quarterly, 43*, 113–116. https://doi.org/10.1177/107769906604300115

Kovera, M. B. (2002). The effects of general pretrial publicity on juror decisions: An examination of moderators and mediating mechanisms. *Law and Human Behavior, 26*, 43–72. https://doi.org/10.1023/A:1013829224920

Kramer, G. P., & Kerr, N. L. (1989). Laboratory simulation and bias in the study of juror behavior: A methodological note. *Law and Human Behavior, 13*, 89–99. https://doi.org/10.1007/bf01056165

Kramer, G. P., Kerr, N. L., & Carroll, J. S. (1990). Pretrial publicity, judicial remedies, and jury bias. *Law and Human Behavior, 14*, 409–438. https://doi.org/10.1007/BF01044220

Lear, D. (2015). So you want to write a law blog. *American Bar Association Journal, 4*(8). Retrieved fromhttp://www.americanbar.org/publications/gpsolo_ereport/2015/march_2015/so_you_want_to_write_a_law_blog.html.

Lerner, J. S., Goldberg, J. H., & Tetlock, P. E. (1998). Sober second thought: The effects of accountability, anger and authoritarianism on attributions of responsibility. *Personality and Social Psychology Bulletin, 24*, 563–574. https://doi.org/10.1177/0146167298246001

Lerner, J. S., & Keltner, D. (2000). Beyond valence: Toward a model of emotion-specific influences on judgement and choice. *Cognition and Emotion, 14*, 473–493. https://doi.org/10.1080/026999300402763

Lerner, J. S., & Keltner, D. (2001). Fear, anger, and risk. *Journal of Personality and Social Psychology, 81*, 146–159. https://doi.org/10.1037//0022-3514.81.1.146

Lerner, J. S., & Tiedens, L. Z. (2006). Portrait of the angry decision maker: How appraisal tendencies shape anger's influence on cognition. *Journal of Behavioral Decision Making, 19*, 115–137. https://doi.org/10.1002/bdm.515

Lieberman, J. D., & Arndt, J. (2000). Understanding the limits of limiting instructions: Social psychological explanations for the failures of instructions to disregard pretrial publicity and other inadmissible evidence. *Psychology, Public Policy, and Law, 6*, 677–711. https://doi.org/10.1037//1076-8971.6.3.677

Lieberman, J. D., & Sales, B. D. (2007). *Scientific jury selection*. Washington, DC: American Psychological Association.

Lindsay, D. S. (1994). Memory, source monitoring, and eyewitness testimony. In D. F. Ross, D. J. Read, & M. P. Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (pp. 27–55). New York: Cambridge University Press.

Lockhart v. McCree 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986).

Loewenstein, G., & Lerner, J. (2003). The role of affect in decision making. In R. Davidson, K. Scherer, & H. Goldsmith (Eds.), *Handbook of affective sciences* (pp. 619–642). Oxford: Oxford University Press.

Lofink, C. R., & Mullaney, M. (2013). Pretrial publicity and the courtroom umami. *The Jury Expert: The Art of Science & Litigation, 25*(3), 1–7. Retrieved from http://www.thejuryexpert.com/wp-content/uploads//1305/JuryExpert_1305_Umami.pdf

Luchins, A. S., & Luchins, E. H. (1970). The effects of order presentation of information and explanatory models. *Journal of Social Psychology, 80*, 63–70. https://doi.org/10.1080/00224545.1970.9712520

MacCoun, R. J., & Kerr, N. L. (1988). Asymmetric influence in mock jury deliberation: Jurors' bias for leniency. *Journal of Personality and Social Psychology, 54*, 21–33. https://doi.org/10.1037/0022-3514.54.1.21

Mastromauro, M. (2010). Pre-trial prejudice 2.0: How YouTube generated news coverage is set to complicate the concepts of pre-trial prejudice doctrine and endanger Sixth Amendment Fair Trial Rights. *Journal of High Technology Law, 10*, 289–356. Retrieved from http://www.suffolk.es/documents/jhtl_publications/mastromauro.pdf

Mayo, C. W., & Crockett, W. H. (1964). Cognitive complexity and primacy-recency effects in impression formation. *Journal of Abnormal and Social Psychology, 68*, 335–338. https://doi.org/10.1037/h0041716

McDonough, M. (2015). What is the state of the legal blogosphere? *American Bar Association Journal, 4*(12) Retrieved from http://www.abajournal.com/magazine/article/the_state_of_the_legal_blogosphere.

Minnow, N. N., & Cate, F. H. (1991). Who is an impartial juror in an age of mass media? *The American University Law Review, 40*, 631–648. Retrieved from http://www.repository.law.indiana.edu/facpub/749

Moran, G., & Cutler, B. L. (1991). The prejudicial impact of pretrial publicity. *Journal of Applied Social Psychology, 21*, 345–367. https://doi.org/10.1111/j.1559-1816.1991.tb00524.x

Moscovici, S., & Zavalloni, M. (1969). The group as a polarizer of attitudes. *Journal of Personality and Social Psychology, 12*, 125–135. https://doi.org/10.1037/h0027568

Mosteller, R. P. (2007). The Duke Lacrosse case, innocence, and false identifications: A fundamental failure to do justice. *Fordham Law Review, 76*, 1337–1412. Retrieved from http://scholarship.law.duke.edu/faculty_scholarship/1668

Mu'Min v. Virginia, 500 U.S. 415 (1991).

Murphy v. Florida, 421 U.S. 794 (1975).

New York Film Academy. (2015). A brief look at the history of broadcast journalism. Retrieved from New York Film Academy website: https://www.nyfa.edu/student-resources/history-of-broadcast-journalism/

Nietzel, M. T., & Dillehay, R. C. (1983). Psychologists as consultants for changes of venue: The use of public opinion surveys. *Law and Human Behavior, 7*, 309–335. https://doi.org/10.1007/BF01044735

Nisbett, R. E., & Wilson, T. D. (1977). Telling more than we can know: Verbal reports on mental processes. *Psychological Review, 84*, 231–259. https://doi.org/10.1037/0033-295X.84.3.231

Nunez, N., Estrada-Reynolds, V., Schweitzer, K., & Myers, B. (2016). The impact of emotions on juror judgments and decision making. In B. H. Bornstein & M. K. Miller (Eds.), *Advances in psychology and law* (Vol. 2, pp. 55–92). Cham, Switzerland: Springer.

Ogloff, J. R. P., & Vidmar, N. (1994). The impact of pretrial publicity on jurors: A study to compare the relative effects of television and print media in a child sex abuse case. *Law and Human Behavior, 18*, 507–525. https://doi.org/10.1007/BF01499171

Otto, A. L., Penrod, S. D., & Dexter, H. R. (1994). The biasing impact of pretrial publicity on juror judgments. *Law and Human Behavior, 18*, 453–469. https://doi.org/10.1007/BF01499050

Pennington, N., & Hastie, R. (1986). Evidence evaluation in complex decision making. *Journal of Personality and Social Psychology, 51*(2), 242–258. https://doi.org/10.1037/0022-3514.51.2.242

Pennington, N., & Hastie, R. (1988). Explanation-based decision making: Effects of memory structure on judgment. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 14*, 521–533. https://doi.org/10.1037/0278-7393.14.3.521

Pennington, N., & Hastie, R. (1993). The story model for juror decision making. In R. Hastie (Ed.), *Inside the juror: The psychology of juror decision-making* (pp. 192–221). New York: Cambridge University Press.

Pew Research Center: Journalism & Media. (2012). *How blogs, Twitter and mainstream media have handled the Trayvon Martin case*. Retrieved from http://www.journalism.org/2012/03/30/special-report-how-blogs-twitter-and-mainstream-media-have-handled-trayvon-m/

Pew Research Center for Internet, Science & Technology. (2017a). *Social media fact sheet*. Retrieved from http://www.pewinternet.org/fact-sheet/social-media/

Pew Research Center for Internet, Science & Technology. (2017b). *Internet/broadband fact sheet*. Retrieved from http://www.pewinternet.org/fact-sheet/internet-broadband/

Pryor, B., & Buchanan, R. W. (1984). The effects of defendant's demeanor on juror perceptions of credibility and guilt. *Journal of Communication, 34*, 92–99. https://doi.org/10.1111/j.1460-2466.1984.tb02176.x

Qualls, K. F. (2015). The answer to trial publicity is a better question. *Journal of Criminal Justice and Legal Issues, 3*, 1–15. Retrieved from http://www.aabri.com/manuscripts/152308.pdf

Rainie, L. (2005). *The State of Blogging* (Research Report No. 202-419-4500). Retrieved from the Pew Internet & American Life Project website: http://www.pewinternet.org/files/old-media/Files/Reports/2005/PIP_blogging_data.pdf.pdf

Rantzen, A., & Markham, R. (1992). The reversed eyewitness testimony design: More evidence for source monitoring. *The Journal of General Psychology, 119*, 37–43. https://doi.org/10.1080/00221309.1992.9921156

Rideau v. Louisiana, 373 U.S. 723 (1963).

Ross, L., Lepper, M. R., & Hubbard, M. (1975). Perseverance in self-perception and social perception: Biased attributional processes in the debriefing paradigm. *Journal of Personality and Social Psychology, 32*, 880–892.

Rozin, P., & Royzman, E. B. (2001). Negativity bias, negativity dominance, and contagion. *Personality and Social Psychology Review, 5*, 296–320. https://doi.org/10.1207/S15327957PSPR0504_2

Russo, J. E., Meloy, M. G., & Medvec, V. H. (1998). Predecisional distortion of product information. *Journal of Marketing Research, 35*, 438–452.

Russo, J. E., Meloy, M. G., & Wilks, T. J. (2000). Predecisional distortion of information by auditors and salesperson. *Management Science, 46*, 13–27. https://doi.org/10.1287/mnsc.46.1.13.15127

Ruva, C. L., & Hudak, E. (2013). Pretrial publicity and juror age affect juror decision making. *Psychology, Crime, & Law, 19*, 179–202. https://doi.org/10.1080/1068316X.2011.616509

Ruva, C. L., Dickman, M. C., & Mayes, J. L. (2014). Exposure to both positive and negative pretrial publicity reduces or eliminates mock-juror bias. *International Journal of Psychology and Behavioral Sciences, 4*, 30–40. https://doi.org/10.5923/j.ijpbs.20140401.05

Ruva, C. L., & Guenther, C. C. (2015). From the shadows into the light: How pretrial publicity and deliberation affect mock jurors' decisions, impressions, and memory. *Law and Human Behavior, 39*, 294–310. https://doi.org/10.1037/lhb0000117

Ruva, C. L., & Guenther, C. C. (2017). Keep your bias to yourself: How deliberating with differently biased others affects mock-jurors' guilt decisions, perceptions of the defendant, memories, and evidence interpretation. *Law and Human Behavior, 41*, 478–493. https://doi.org/10.1037/lhb0000256

Ruva, C. L., Guenther, C. C., & Yarbrough, A. (2011). Positive and negative pretrial publicity: The roles of impression formation, emotion, and predecisional distortion. *Criminal Justice and Behavior, 38*, 511–534. https://doi.org/10.1177/0093854811400823

Ruva, C., & LeVasseur, M. (2012). Behind closed doors: The effect of pretrial publicity on jury deliberations. *Psychology, Crime and Law., 18*, 1–22. https://doi.org/10.1080/1068316X.2010.502120

Ruva, C. L., Mayes, J. L., Dickman, M. C., & McEvoy, C. (2012). Timing and type of pretrial publicity affect mock-jurors' decisions and predecisional distortion. *International Journal of Psychology and Behavioral Sciences, 2*, 108–119. https://doi.org/10.5923/j.ijpbs.20120204.06

Ruva, C. L., & McEvoy, C. (2008). Negative and positive pretrial publicity affect juror memory and decision making. *Journal of Experimental Psychology: Applied, 14*, 226–235. https://doi.org/10.1037/1076-898X.14.3.226

Ruva, C., McEvoy, C., & Bryant, J. D. (2007). Effects of pre-trial publicity and jury deliberation on juror bias and source memory errors. *Applied Cognitive Psychology, 21*, 45–67. https://doi.org/10.1002/acp.1254

Salerno, J. M., & Bottoms, B. L. (2009). Emotional evidence and jurors' judgments: The promise of neuroscience for informing psychology and law. *Behavioral Sciences and the Law, 27*, 273–296. https://doi.org/10.1002/bsl.861

Schum, D. A. (1993). Argument structuring and evidence evaluation. In R. Hastie (Ed.), *Inside the juror: The psychology of juror decision making* (pp. 175–191). New York, NY: Cambridge University Press.

Shaffer, R. A. (1986). Pretrial publicity: Media coverage and guilt attribution. *Communication Quarterly, 34*, 154–169. https://doi.org/10.1080/01463378609369630

Shahani, V. R. (2005). Change the motion, not the venue: A critical look at the change of venue motion. *American Criminal Law Review, 42*, 93–120.

Sheppard v. Maxwell, 384 U.S. 333 (1966).

Simon, R. J., & Eimermann, T. (1971). The jury finds not guilty: Another look at media influence on the jury. *Journalism Quarterly, 48*, 343–344. Retrieved from http://journals.sagepub.com.ezproxy.lib.usf.edu/doi/pdf/10.1177/107769907104800219

Sommers, S. R., & Kassin, S. M. (2001). On the many impacts of inadmissible testimony: Selective compliance, need for cognition, and the overcorrection bias. *Personality and Social Psychology Bulletin, 27*, 1368–1377. https://doi.org/10.1177/01461672012710012

Spano, L. M., Groscup, J. L., & Penrod, S. D. (2011). Pretrial publicity and the jury: Research and methods. In R. L. Wiener & B. H. Bornstein (Eds.), *Handbook of trial consulting* (pp. 217–244). New York: Springer.

Spielberger, C. D. (1983). *Manual for the State-Trait Anxiety Inventory (Form Y)*. Palo Alto, CA: Consulting Psychologists Press.

Spielberger, C. D., & Reheiser, E. C. (2003). Measuring anxiety, anger, depression, and curiosity as emotional states and personality traits with the STAI, STAXI, and STPI. In M. J. Hilsenroth, D. L. Segal, & M. Hersen (Eds.), *Comprehensive handbook of psychological assessment* (Vol. 2.: *Personality assessment*, pp. 70–86). Hoboken, NJ: John Wiley.

Spielberger, C. D., & Reheiser, E. C. (2009). Assessment of emotions: Anxiety, anger, depression, and curiosity. *Applied Psychology: Health and Well-Being, 1*, 271–302. https://doi.org/10.1111/j.1758-0854.2009.01017.x

Steblay, N. M., Besirevic, J., Fulero, S. M., & Jimenez-Lorente, B. (1999). The effects of pretrial publicity on juror verdicts: A meta-analytic review. *Law and Human Behavior, 23*, 219–235. https://doi.org/10.1023/A:1022325019080

Steblay, N. M., Hosch, H. M., Culhane, S. E., & McWethy, A. (2006). The impact on juror verdicts of judicial instruction to disregard inadmissible evidence: A meta-analysis. *Law and Human Behavior, 30*, 469–492. https://doi.org/10.1007/s10979-006-9039-7

Studebaker, C. A., & Penrod, S. D. (1997). Pretrial publicity: The media, the law, and common sense. *Psychology, Public Policy, and Law, 3*, 428–460. https://doi.org/10.1037/1076-8971.3.2-3.428

Sue, S., Smith, R. E., & Pedroza, G. (1975). Authoritarianism, pretrial publicity, and awareness of bias in simulated jurors. *Psychological Reports, 37*, 1299–1302. https://doi.org/10.2466/pr0.1975.37.3f.1299

Tan, L., & Ward, G. (2000). A recency-based account of the primacy effect in free recall. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 26*(6), 1589–1625. https://doi.org/10.1037/0278-7393.26.6.1589

Tankard, J. W., Jr., Middleton, K., & Rimmer, T. (1978). Compliance with American bar association fair trial-free press guidelines. *Journalism Quarterly, 56*, 464–468. https://doi.org/10.1177/107769907905600302

Taylor, R. (2009). Slain and slandered: A content analysis of the portrayal of femicide in crime news. *Homicide Studies: An Interdisciplinary & International Journal, 13*, 21–49. https://doi.org/10.1177/1088767908326679

Tiedens, L. Z. (2001). The effect of anger on the hostile inferences of aggressive and nonaggressive people: Specific emotions, cognitive processing, and chronic accessibility. *Motivation and Emotion, 25*, 233–251. https://doi.org/10.1023/A:1012224507488

Tiedens, L. Z., & Linton, S. (2001). Judgment under emotional certainty and uncertainty: The effects of specific emotions on information processing. *Journal of Personality & Social Psychology, 81*, 973–988. https://doi.org/10.1037//0022-3514.81.6.973

United States v. Dioguardi 147 F. Supp. 421 (S. D. N. Y. 1956).

United States v. Meredith, 824 F.2d 1418, 1423 (4th Cir. 1987).

Vaish, A., Grossmann, T., & Woodward, A. (2008). Not all emotions are created equal: The negativity bias in social-emotional development. *Psychological Bulletin, 134*, 383–403. https://doi.org/10.1037/0033-2909.134.3.383

Vinokur, A., & Burnstein, E. (1974). Effects of partially shared persuasive arguments on group-induced shifts: A group-problem-solving approach. *Journal of Personality and Social Psychology, 29*, 305–315. https://doi.org/10.1037/h0036010

Ward, S. F. (2008). Full court coverage what happens when defense counsel and ordinary citizens blog about high-profile trials? *American Bar Association Journal, 94*, 34–39. Retrieved from http://www.jstor.org/stable/pdf/27846654.pdf

Waters, N. L., & Hans, V. P. (2009). A jury of one: Opinion formation, conformity, and dissent on juries. *Journal of Empirical Legal Studies, 6*, 513–540. https://doi.org/10.1111/j.1740-1461.2009.01152.x

Weis, D. C. (2012). Judge in Trayvon Martin case refuses to ban defense lawyer's blog and comments. Retrieved from the American Bar Association Journal website: http://www.abajournal.com/news/article/judge_in_trayvon_martin_case_refuses_to_ban_defense_lawyers_blog_and_commen

Wilson, J. R., & Bornstein, B. H. (1998). Methodological considerations in pretrial publicity research: Is the medium the message? *Law and Human Behavior, 22*, 585–597. https://doi.org/10.1023/A:1025743614951

Wilson, T., & Brekke, N. (1994). Mental contamination and mental correction: Unwanted influences on judgments and evaluations. *Psychological Bulletin, 116*, 117–142. https://doi.org/10.1037/0033-2909.116.1.117

Wilson, T., Centerbar, D., & Brekke, N. (2002). Mental contamination and the debiasing problem. In T. Gilovich, D. Griffin, & D. Kahneman (Eds.), *Heuristics and biases: The psychology of intuitive judgment* (pp. 185–200). Cambridge: Cambridge University Press.

Wisconsin v. Avery, 2005CF381 (WI. 2007).

Woody, W. D., & Viney, W. (2007). General pretrial publicity in sexual assault trials. *Psychological Reports, 101*, 527–530. https://doi.org/10.2466/pr0.101.2.527-530

Zillmann, D. (1983). Transfer of excitation in emotional behavior. In J. Cacioppo & R. Petty (Eds.), *Social psychophysiology* (pp. 215–240). New York: Guilford.