ADAM A. REEVES (NYBN 2363877)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5589
    Fax: (408) 535-5066
    john.bostic@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, <br><br> Defendants. | Case No. 18-CR-00258 EJD <br><br> UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS IN PART COUNTS TWO AND NINE THROUGH ELEVEN OF THE SECOND SUPERSEDING INDICTMENT AND COUNTS TWO AND NINE THROUGH TWELVE OF THE THIRD SUPERSEDING INDICTMENT; MOTION TO STRIKE <br> (DKT. 499 & 504) <br><br> Date: October 6, 2020 <br> Time: 10:00 a.m. <br> Court: Hon Edward J. Davila |

GOVT. OPP'N TO MOT. TO DISMISS COUNTS
18-CR-00258 EJD

**INTRODUCTION**

This case involves two related but independent schemes to defraud, carried out over several years by the defendants in this case, Elizabeth Holmes and Ramesh Balwani. One scheme targeted Theranos's investors, while the other targeted its customers, deploying false and misleading claims about the accuracy of Theranos's blood tests in order to deceive patients into paying for tests that Defendants knew were unreliable. The Court has held that, in order for an individual to be a victim of that fraud targeting customers, the customer must have paid for a test from Theranos. The Third Superseding Indictment ("the operative Indictment") is consistent with that ruling, focusing its allegations on investors and paying patients. Because Defendants' scheme to defraud patients also involved the doctors treating those patients, however, the operative Indictment contains references to doctors who were deceived into recommending Theranos to their patients, who received their patients' blood test results from the company, and who discussed those results with Theranos. These allegations do not violate the Ninth Circuit's holdings that a fraud defendant must intend to obtain property held by the deceived victim. To the contrary, the relevant case law shows that a defendant cannot escape responsibility for false and misleading statements transmitted through intermediaries. Similarly, a defendant is accountable for all fraudulent conduct committed in furtherance of a broad scheme to defraud, even where that conduct does not involve a specific false statement made directly to a victim.

Although the Indictment does not allege that Defendants defrauded doctors, the evidence at trial will show that Defendants used doctors as tools in furtherance of their scheme to defraud *patients*. Accordingly, the Indictment's references to doctors provide important notice to Defendants and are in compliance with the Court's previous Orders. The Court should reject Defendants' attempt to line edit the Indictment to remove those details, and should deny the pending motion in its entirety.

**BACKGROUND**

The Court is familiar with the facts of this case. In June 2018, the Grand Jury returned the original Indictment against Holmes and Balwani, including the allegation that Defendants engaged in a scheme to defraud patients who came to Theranos for blood testing services. (Dkt. 1, ¶¶ 14-18, 21-22, 25-26). The Third Superseding Indictment—the operative Indictment in this case—similarly alleges that Defendants set out to defraud potential customers of Theranos, inducing them to use the company's

blood testing services through misrepresentations designed to convince victims that Theranos technology produced reliable and accurate test results. (Third Superseding Indictment, Dkt. 469, ¶¶ 14-18, 22). In reality, Defendants knew that Theranos's technology was *not* capable of consistently producing accurate and reliable results—especially with respect to certain key assays including hCG, PSA, potassium, and others identified in the Indictment. (*Id.* ¶ 16). Because Theranos tests suffered from accuracy problems and were thus unreliable, they were not suitable for clinical use or as the basis for medical decisions. As such, Theranos's tests lacked the value Defendants claimed they had, and the patients who paid for those tests were defrauded. These allegations form the core of the patient-focused charges in this case, and Defendants have been on notice of this theory since the case's inception.

The original Indictment and First Superseding Indictment alleged that Defendants scheme was to defraud *doctors as well as patients*. (Dkt. 1; Dkt. 39). In December of last year, Defendants moved to dismiss the four counts in the First Superseding Indictment that related to Defendants' scheme to defraud patients, arguing in part that the Indictment failed to allege specific intent to obtain money from the alleged victims except for patients who paid Theranos directly for their tests. (Dkt. 206). The Court partially agreed with the defense, ruling that the Superseding Indictment did not allege that Defendants intended to deprive doctors of money or property. (ECF No. 330 at 34). Relying on *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989), the Court concluded that doctors thus were not victims of the alleged fraud, and dismissed the patient counts in the Indictment "to the extent they depend on doctor-victims." (Id. at 33-35).[1]

In March 2020, the government provided the defense with a Bill of Particulars identifying dozens of Defendants' false and fraudulent misrepresentations and misleading statements directed at patients. Those statements, uncovered by the government's investigation to date, were made by Defendants and their representatives in advertisements, interviews with journalists, conversations with

---

[1] In that same Order, the Court also ruled that patients whose insurance paid for their Theranos blood tests were not victims of the alleged fraud under *Lew*. (Dkt. 330 at 28-33). The Court, however, rejected Defendants' argument that the Indictment failed to allege that any patients were defrauded. (*Id.* at 35-38). The Court ruled that a patient is defrauded when he or she pays for a blood test that is held out as accurate and reliable when it is not. In particular, the Court noted the Indictment's allegations that Defendants knew about the problems with their technology but nonetheless misrepresented Theranos's ability to provide accurate and reliable results. When Defendants allegedly sent out inaccurate or unreliable test results, patients did not receive the benefit of the bargain. (*Id.* at 38).

doctors, and in other contexts—all in furtherance of the scheme to defraud the patients themselves.

In July, the Grand Jury returned a Second Superseding Indictment and a Third Superseding Indictment. (Dkt. 449, 469). Those Indictments include changes made in response to the Court's February 11 Order, as described below.

**ARGUMENT**

**I.     The Operative Indictment Is Consistent with the Court's Prior Ruling.**

The Court's February 2020 Order ruled that the Superseding Indictment failed to allege Defendants' intent to deprive doctors of money or property and, citing *United States v. Lew*, held that the counts in that Indictment needed to be dismissed to the extent they depended on doctor victims. (Dkt. 330 at 34-35). None of the counts in the First Superseding Indictment were based on doctor victims, though new counts appear in the Third Superseding Indictment in response to other aspects of the Court's Order. Although no counts were dismissed as a result of the Court's ruling addressing doctors as victims, the Indictment language describing the alleged schemes has been changed to comply with the Court's reading of *Lew* and its holding regarding the treatment of doctors in this case. A comparison of the operative Indictment against earlier versions shows the changes that have been made in light of the Court's Order. Those changes include the removal of all allegations that Defendants defrauded doctors:

- The First Superseding Indictment includes a section titled "The Scheme to Defraud Doctors and Patients." (Dkt. 39 at 7). In the Third Superseding Indictment, that section has been retitled simply as "The Scheme to Defraud Patients." (Dkt. 469 at 7).

- The First Superseding Indictment alleges that "Holmes and Balwani devised a scheme to defraud doctors and patients." (Dkt. 39 ¶ 15). The Third Superseding Indictment instead alleges that "Holmes and Balwani devised a scheme to defraud patients." (Dkt. 469 ¶ 15).

- The First Superseding Indictment alleges that hundreds of patients "paid, or caused their medical insurance companies to pay, Theranos, or Walgreens acting on behalf of Theranos, for blood tests and test results, sometimes following referrals from their *defrauded* doctors." (Dkt. 39 ¶ 15) (emphasis added). In contrast, the Third Superseding Indictment omits any reference to insurance payments, and alleges that patients paid Theranos or Walgreens for

blood tests and results, "sometimes following referrals from their *misled* doctors." (Dkt. 469 ¶ 15) (emphasis added).

- Count Two in the Superseding Indictment was entitled "Conspiracy to Commit Wire Fraud against Doctors and Theranos Patients." (Dkt. 39 at 9). In the Third Superseding Indictment, Count Two is identified simply as "Conspiracy to Commit Wire Fraud against Theranos Patients." (Dkt. 469 at 9).

- Counts Nine through Eleven in the Superseding Indictment alleged that Defendants transmitted or caused to be transmitted certain wires "for the purpose of executing the material scheme and artifice to defraud doctors and patients, and for obtaining money and property from patients, doctors, and insurance companies…." (Dkt. 39 ¶ 26). In Counts Nine through Twelve of the Third Superseding Indictment, the grand jury alleges instead that Defendants transmitted or caused the identified wires "for the purpose of executing the material scheme and artifice to defraud patients, and for obtaining money and property from patients…." (Dkt. 469 ¶ 26).

The operative Indictment still references doctors, describing how they fit into Defendants' fraud targeting patients. Unlike the first two Indictments in this case, however, the Third Superseding Indictment does not allege that doctors were defrauded or that doctors were the ultimate targets of Defendants' scheme to defraud. As to the specific wire fraud counts in the operative Indictment, Counts Nine, Ten, and Eleven involve interstate wires relating to individual *patient victims*. (Dkt. 469 ¶ 26). And Count Twelve relates to a wire transfer for the purpose of funding Theranos's advertisements— containing statements targeting Theranos's entire base of potential customers as opposed to doctors specifically. (*Id.*). None of these counts is premised on a theory that treats doctors as fraud victims. Thus, on its face, the operative Indictment does not allege that Defendants intended to defraud doctors or that doctors are legally cognizable victims of Defendants' fraud. Nor will the government argue at trial that the jury should convict Defendants of wire fraud based on a scheme to defraud doctors.

In light of the above changes to the Indictment, Defendants' motion to dismiss boils down to a complaint over the mere mention of doctors in the charging instrument. But the Court's Order does not preclude such references, and the Indictment's allegations regarding doctors provide important details

regarding the nature of the case against Defendants, as described below.

## II. The Operative Indictment Alleges a Valid Theory of Wire Fraud.

The Court's February 11, 2020 Order held that doctors were not victims of the fraud alleged in the First Superseding Indictment, but concluded that the Indictment did sufficiently allege a scheme to defraud patients who paid for Theranos's blood testing services. (Dkt. 330 at 35-38). In response to that Order, the Third Superseding Indictment does away with any claim that doctors are fraud victims in this case, but preserves the valid allegations that Defendants engaged in a scheme to defraud paying patients. Those allegations include references to the ways in which Defendants used their communications with doctors in furtherance of their plan to deceive, cheat, and defraud those patients. For example, the operative Indictment alleges that Defendants used marketing materials and other means to defraud patients into paying for questionable blood test results, and specifies that some of those patients came to Theranos following referrals from their doctors who were similarly misled by representations that Theranos could provide accurate and reliable blood tests. (*Id.* ¶¶ 15, 16). The Indictment explains that some of Defendants' misleading information was distributed "to a broad audience including doctors and patients." (*Id.* ¶ 17). The Indictment alleges that Defendants knew the shortcomings of Theranos's tests partly because they were aware of complaints the company was receiving both from patients and from doctors. (*Id.* ¶ 16). When those shortcomings inevitably compromised the accuracy and reliability of Theranos's blood tests, Theranos transmitted to patient victims—directly or via their treating doctors—test results that were unreliable in a variety of ways. (*Id.* ¶ 17(C)).

None of these statements portrays doctors as independent victims of the alleged fraud, contrary to Defendants' claim. Rather, these allegations reflect the obvious fact that doctors advise their patients on laboratory selection when tests are needed, and act as representatives of their patients when communicating with labs about test results. Defendants knew, when devising their scheme to defraud patients, that it would be important for them to convince doctors of Theranos's merit. Thus, Defendants were sure to direct their false and misleading representations to doctors as well as to patients. To be clear, Defendants directed significant amounts of misleading information toward patients and toward the public at large, but deceiving doctors was a valuable intermediate step toward their goal of deceiving and ultimately defrauding patients.

Defendants are incorrect that the inclusion of these details in the Indictment violates the Ninth Circuit's convergence case law.  In *Lew*, the Ninth Circuit held that, in order to convict a defendant of mail fraud, the defendant must have intended "to obtain money or property from the one who is deceived."  *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989).  Here, the Indictment alleges that Defendants sought to obtain money not from doctors but from patients—the "victim[s] of the deceit" under *Lew*.  *Id.* at 222.  And Defendants have cited no authority for the proposition that wire fraud occur only when a defendant delivers misrepresentations *directly* to the intended victim.  Such a limitation would make it too easy for fraudsters to target victims by transmitting false and misleading information through victims' agents and representatives, through the press and the internet, or through other intermediaries.

The case law wisely counsels against that overly narrow application of the convergence principle.  For example, in *United States v. Ciccone*, a defendant carried out a telemarketing scheme where his employees made misrepresentations to victims.  *United States v. Ciccone*, 219 F.3d 1078, 1083-85 (9th Cir. 2000).  The defendant in that case argued on appeal that he could not be convicted of fraud because he did not personally lie to the victims.  *Id.* at 1083.  The Ninth Circuit rejected that argument and upheld the conviction, declining to impose a requirement that a fraud defendant make misrepresentations directly to the victim.  *Id.* at 1084.  As the Court noted in its February 11 Order, the role of doctors in this case is similar to that of the employees who placed the calls in *Ciccone*, except that the doctors in this case were not agents of Defendants but were deceived themselves, making them unwilling tools in Defendants' scheme. (Dkt. 330 at 35).  Despite that difference, *Ciccone* shows that a fraudster cannot avoid accountability by passing his misrepresentations through an intermediary on the way to the intended victim.  Here, Defendants are responsible for the full scope of their fraudulent conduct, including their efforts to deceive patients through their doctor representatives.  The Court should reject Defendants' attempt to strike that aspect of their fraud from the Indictment.

While highlighting and complaining about every mention of doctors in the Indictment, Defendants simultaneously argue that the Indictment is deficient because it "does not allege that patients were 'deceived' by alleged misrepresentations to doctors." (Dkt. 499 at 6).  Their motion goes on to note that the Indictment never specifically alleges "that doctors repeated allegedly false statements to

their patients and thus unwittingly deceived patients." (*Id.*). Defendant's argument—that the Indictment must include specific allegations of patients being defrauded via statements passed along by their doctors—is contrary to Ninth Circuit case law. As an initial matter, this argument improperly focuses on the outcome of Defendant's fraudulent scheme rather than the scheme itself. Charging wire fraud requires the government to allege "either that the victim was actually deprived of money or property *or* that the defendant intended to defraud the victim of the same." *United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989) (emphasis in original). "A scheme to defraud, whether successful or not, remains within the purview of section 1341." *Id.*[2]

In fact, the government is not required to prove that patients were exposed to any particular misrepresentation in a case alleging a scheme to defraud. The Ninth Circuit has confirmed that fact by upholding wire fraud convictions without requiring false statements made directly to victims. *See, e.g.*, *United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010). In *Ali*, the defendants fraudulently obtained software from Microsoft, the victim of the fraud. *Id.* at 1064-65. On appeal, the defendants pointed out that their convictions were at least partly based on conduct that did not involve misrepresentations made directly to Microsoft. *Id.* at 1070. The Ninth Circuit upheld the conviction, explaining that, because the defendants' conduct was "part of a larger scheme to defraud Microsoft," the defendants "need not have made a misrepresentation directly to Microsoft in order to be guilty of mail and wire fraud." *Id.* at 1070-71. The court noted that "there are alternative routes to a mail fraud conviction, one being proof of a scheme or artifice to defraud, which may or may not involve any specific false statements." *Id.*[3]

---

[2] Other Circuits are in agreement with this established principle. "The gravamen of the offense is the scheme to defraud." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quotation omitted). The government "need not prove that the victims of the fraud were *actually* injured," "only that defendants *contemplated* some actual harm or injury to their victims." *Id.* at 305-06 (quotation omitted) (emphasis in original).

[3] Nor does the law require that a defendant have a specific, named victim in mind when executing a scheme to defraud. To the contrary, the Ninth Circuit has upheld fraud convictions involving schemes to defraud even where the identity of the ultimate victim was unproven. In *United States v. Crawford*, the Ninth Circuit upheld the conviction of a defendant who misappropriated a valuable piece of artwork. *United States v. Crawford*, 239 F.3d 1086, 1092-93 (9th Cir. 2001). The court in that case rejected the defendant's argument that she could not have had the intent to defraud someone because the owner of the artwork was not established. *Id.* Because the defendant knew that the artwork did not belong to her, she intended to deprive the owner of property despite not knowing the identity of that owner. *Id.* Similarly here, Defendants cast a wide net in making their misrepresentations and sought to defraud hundreds if not thousands of Theranos customers, generally without knowing the identities of those victims beforehand.

Thus, the Indictment need only allege Defendants' scheme and their *intent* to defraud patients to satisfy the convergence requirement. And it is settled in the Ninth Circuit that intent to defraud "may be established by circumstantial evidence." *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003). *See also United States v. Lothian*, 976 F.2d 1257, 1267-68 (9th Cir. 1992) (intent to defraud may be inferred from misrepresentations made by defendant). In this case, Defendants' intent to defraud patients is shown by, among other things, the misleading information they directed toward patients by way of marketing materials and through those patients' treating physicians. That evidence will play an important role at trial but need not be previewed in the Indictment. *See United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982) (the government "need not allege its theory of the case or supporting evidence" in an indictment).

Defendants' demand for more detailed allegations regarding doctors also ignores the Ninth Circuit's guidance that an indictment should be "read as a whole," "read to include facts which are necessarily implied," and "construed according to common sense." *Buckley*, 689 F.2d at 899. Here, when the operative Indictment is read as a whole, its statements about doctors can be viewed properly in the context of Defendants' broader scheme to defraud patients. Construing those allegations according to common sense, it is plain that Defendants directed false and misleading statements to doctors as part of their efforts to deceive patients. The Indictment necessarily implies that Defendants wanted doctors to pass along false information to patients about Theranos's benefits, deceiving patients into giving Theranos their business.

Defendants' use of doctors in this way is analogous to their use of the media to spread false and misleading statements about Theranos's achievements. As alleged in the Indictment, Defendants also made fraudulent representations to journalists in an effort to deceive others into believing that Theranos was a reliable provider for the entire range of blood tests offered by conventional labs. For example, the Indictment alleges that Holmes made statements to the media "advertising the capabilities of Theranos's technology." (Third Superseding Indictment, Dkt. 469, ¶ 8). The Indictment further alleges that, as part of their scheme to defraud investors, Defendants deceived victims through false and misleading statements to the media on a variety of topics including the capabilities of Theranos's proprietary analyzer, Theranos's use of third-party analyzers, regulatory requirements applicable to Theranos's tests,

and Theranos's partnership with Walgreens. (*Id*. at ¶ 12). Defendants made similar use of the media in furtherance of their scheme to defraud patients. In the government's March 2020 Bill of Particulars, the government identified for the defense numerous false and misleading representations Defendants directed at patients. That group of misrepresentations included many examples of statements made to journalists. The allegation that Defendants used journalists to spread false information about Theranos does not make those journalists victims of the scheme to defraud. The same is true as to the doctors referenced in the Indictment.

Holmes does not contest that the doctors who represented and treated the patient victims of the alleged fraud comprise an important part of the story here. Indeed, at the February 10, 2020 hearing, counsel for Holmes clarified that their complaints about the Indictment were "not about why they [doctors] are relevant to the case." (Feb. 10, 2020 Transcript at 104:23-24). Counsel went on to concede that, if Holmes "were moving in limine to exclude all reference to doctors, we would, of course, lose that motion." (*Id*. at 104:24-105:1). Nevertheless, Defendants appear to be positioning themselves for just such a motion, aiming to curtail or exclude evidence of doctors' experiences with Theranos tests and their interactions with the company on their patients' behalf. Because Defendants' use of doctors in their fraud was an important part of their scheme to defraud patients, and because that theory does not violate the Ninth Circuit's convergence case law, the Court should deny the instant motion and leave the operative Indictment undisturbed.[4]

//

---

[4] The government's arguments apply with equal force to the Second Superseding Indictment (ECF No. 449), also targeted by Defendants' motion. The language in the two charging instruments is not materially different, except that paragraph 15 of the Second Superseding Indictment alleges that patient victims patronized Theranos following recommendations from their "defrauded" doctors. The isolated use of this term does not warrant dismissal of any part of the Second Superseding Indictment—especially in light of the fact that it has been superseded by a revised Indictment that removes that language.

**CONCLUSION**

Accordingly, the Court should deny Defendants' Motion to Dismiss in its entirety.

DATED: September 18, 2020

Respectfully submitted,

ADAM A. REEVES
Attorney for the United States
Acting Under Authority Conferred
by 28 U.S.C. § 515

 */s/ John C. Bostic*
JOHN C. BOSTIC
JEFF SCHENK
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys