# EXHIBIT D

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

LANCE WADE
(202) 434-5755
lwade@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

March 21, 2019

<u>Via Email</u>

Mr. Jeffrey Schenk, Esquire
Assistant United States Attorney
United States Attorney's Office
Northern District of California
150 Almaden Blvd. Suite 900
San Jose, CA 95113

Re:     <u>United States v. Elizabeth Holmes and Ramesh "Sunny" Balwani, No. CR-18-00258-EJD (N.D. Cal.)</u>

Dear Jeff:

This responds to your March 1, 2019 letter.  Your letter essentially ignored the issues raised in my February 14, 2019 letter, in which I expressed concerns that Ms. Holmes's counsel may have violated their legal obligations to Ms. Holmes by disclosing privileged and confidential information to the government.  Indeed, we have grown even more concerned about counsel's conduct in light of the fact that counsel for Boies, Schiller & Flexner LLP ("Boies Schiller") advised us on March 18, 2019, that Boies Schiller is of the view that it never represented Ms. Holmes personally.  See Attachment A.  That assertion is demonstrably false, based on, among many other things, public pleadings Boies Schiller submitted on Ms. Holmes' behalf.  See, e.g., Attachment B.  Either Boies Schiller has taken this plainly erroneous position because it is aware that it has already violated ethical and legal obligations it owes to Ms. Holmes, or because it shows a fundamental lack of care regarding its recognition and protection of the interests of its former clients.  In either event, the firm's position underscores the need for the information I requested in my February 14 letter so that we can assess whether Boies Schiller has similarly failed to recognize its various other representations of Ms. Holmes regarding Theranos-related matters during the time period covered by your investigation.  Please provide the requested materials promptly, or advise us of your refusal to do so – in which case we will raise the issue with the Court.  Finally, we reiterate our request that you cease review of the potentially privileged materials we identified in my February 14 letter while we work to resolve these issues.

WILLIAMS & CONNOLLY LLP
Jeff Schenk
March 21, 2019
Page 2

Very truly yours,

Lance A. Wade

cc: Mr. John Bostic and Mr. Bob Leach (counsel for the United States)

# ATTACHMENT A

## Wade, Lance

| | |
|---|---|
| **From:** | Ilana Miller <imiller@bsfllp.com> |
| **Sent:** | Monday, March 18, 2019 2:02 PM |
| **To:** | Wade, Lance |
| **Subject:** | RE: Elizabeth Holmes |

Lance,

Per my email below, our firm represented the company and did not represent Ms. Holmes personally.

Regards,
Ilana

---

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Sunday, March 17, 2019 9:34 PM
**To:** Ilana Miller
**Cc:** Wade, Lance
**Subject:** RE: Elizabeth Holmes

Illana,

Could I get a response to this please.  My client has been trying to access her client files for months, and the delays on this are interfering with her ability to prepare her defense.

Thanks.

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com  |  www.wc.com/lwade

---

**From:** Wade, Lance
**Sent:** Tuesday, March 05, 2019 2:34 PM
**To:** Ilana Miller <imiller@bsfllp.com>
**Subject:** RE: Elizabeth Holmes

Ilana,

I am slightly confused by your response.  Are you saying that Boies Schiller never represented Elizabeth Holmes?

--Lance

**Lance Wade**
**Williams & Connolly LLP**
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029

lwade@wc.com | www.wc.com/lwade

**From:** Ilana Miller [mailto:imiller@bsfllp.com]
**Sent:** Monday, March 04, 2019 2:07 PM
**To:** Wade, Lance <LWade@wc.com>
**Subject:** RE: Elizabeth Holmes

Lance,

You will recall that I acknowledged that your letter requested Ms. Holmes' files, but at no time did I acknowledge that she was a client of our firm.  As I stated during our call, our firm represented Theranos on numerous matters.

We have every intention of being as cooperative as we can to your client's request.  However, as noted below, we are required to honor our obligations to our former client unless and until instructed otherwise.

Regards,
Ilana

**From:** Wade, Lance [mailto:LWade@wc.com]
**Sent:** Friday, March 1, 2019 2:07 AM
**To:** Ilana Miller
**Cc:** Wade, Lance
**Subject:** RE: Elizabeth Holmes

Ilana,

Your understanding is mistaken. Ms. Holmes was a client of your firm on numerous matters, as we discussed and you acknowledged in our prior call. She has a right to access those files, regardless of Theranos's position. I will nevertheless contact counsel for the Theranos assignee to discuss authority to access Theranos materials. But in the meantime, please send us (or tell us when and where we can review in person) Elizabeth Holmes's complete client file.

Many thanks.

—Lance

From: Ilana Miller <imiller@bsfllp.com<mailto:imiller@bsfllp.com>>
Date: Friday, Mar 01, 2019, 4:19 AM
To: Wade, Lance <LWade@wc.com<mailto:LWade@wc.com>>
Subject: RE: Elizabeth Holmes

Lance,

We have received a response from current counsel for Theranos. Counsel for Theranos objects to the production of any of Theranos's files to your client. As we understand our obligations, we are required to follow the instructions of our former client.

Regards,
Ilana

From: Wade, Lance [mailto:LWade@wc.com]
Sent: Thursday, February 28, 2019 5:59 PM
To: Ilana Miller
Subject: RE: Elizabeth Holmes

Ileana,

Any update? I am happy to get on a call with them to move this along.

Thanks.

—Lance


From: Ilana Miller
<imiller@bsfllp.com<mailto:imiller@bsfllp.com<mailto:imiller@bsfllp.com%3cmailto:imiller@bsfllp.com>>
>
Date: Friday, Feb 15, 2019, 11:23 AM
To: Wade, Lance
<LWade@wc.com<mailto:LWade@wc.com<mailto:LWade@wc.com%3cmailto:LWade@wc.com>>>
Subject: RE: Elizabeth Holmes

Lance,

We have reached out to counsel for the entity that owns Theranos' assets to find out whether they consent to our production of documents to your client. I expect to hear back from them by early next week.

Regards,
Ilana

From: Wade, Lance [mailto:LWade@wc.com]
Sent: Thursday, February 14, 2019 1:08 PM
To: Ilana Miller
Subject: RE: Elizabeth Holmes

Illana:

Could I please get an update on the status of this?

Thanks.

--Lance

Lance Wade
Williams & Connolly LLP
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029

lwade@wc.com<mailto:lwade@wc.com<mailto:lwade@wc.com%3cmailto:lwade@wc.com>> |
www.wc.com/lwade<https://protect-us.mimecast.com/s/mwa2C82B3JsYDVwXtod9xB><https://protect-us.mimecast.com/s/6ArJCL95ZqcQBN8DcqjydY<https://protect-us.mimecast.com/s/kreKC9rL9Kc2LyYzC1ErLh>>


From: Ilana Miller [mailto:imiller@bsfllp.com]
Sent: Wednesday, January 30, 2019 10:02 AM
To: Wade, Lance
<LWade@wc.com<mailto:LWade@wc.com<mailto:LWade@wc.com%3cmailto:LWade@wc.com>>>
Subject: RE: Elizabeth Holmes


Talk to you then.

From: Wade, Lance [mailto:LWade@wc.com]
Sent: Tuesday, January 29, 2019 10:23 PM
To: Ilana Miller
Subject: RE: Elizabeth Holmes


Hi Ilana. How about 1:30 tomorrow?

Lance Wade
Williams & Connolly LLP
725 Twelfth Street, N.W., Washington DC 20005
(P) 202-434-5755 | (F) 202-434-5029
lwade@wc.com<mailto:lwade@wc.com<mailto:lwade@wc.com%3cmailto:lwade@wc.com>> |
www.wc.com/lwade<https://protect-us.mimecast.com/s/mwa2C82B3JsYDVwXtod9xB><https://protect-us.mimecast.com/s/6ArJCL95ZqcQBN8DcqjydY<https://protect-us.mimecast.com/s/kreKC9rL9Kc2LyYzC1ErLh>>


From: Ilana Miller [mailto:imiller@bsfllp.com]
Sent: Tuesday, January 29, 2019 3:42 PM
To: Wade, Lance
<LWade@wc.com<mailto:LWade@wc.com<mailto:LWade@wc.com%3cmailto:LWade@wc.com>>>
Subject: Elizabeth Holmes

Lance,

Thanks for your message earlier. I just tried you back and got your voicemail. Instead of calling back and forth, I figured it might be easier at this point to set up a time to speak. My schedule is fairly open tomorrow between 10:30am and 4:00pm, or on Thursday between 1:00pm and 4:30pm. Let me know what works for you and I'll try you then.

Thanks,
Ilana

Ilana Miller
Partner


BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue

New York, NY 10022
(t) +1 (212) 446-2367
(m) +1 (917) 912-3251
imiller@bsfllp.com<mailto:imiller@bsfllp.com<mailto:imiller@bsfllp.com%3cmailto:imiller@bsfllp.com>>
www.bsfllp.com<https://protect-us.mimecast.com/s/mxyZC0RX8xFmqOrkCLjB7J><https://protect-us.mimecast.com/s/C1yvCNk5OvSjkVyqSR2oqN<https://protect-us.mimecast.com/s/DqNZCgJQp3IGOXYqCKEDhD>>

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

# ATTACHMENT B

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

0009617-12

| | |
|---|---|
| THERANOS, INC. and ELIZABETH HOLMES, 1601 S California Avenue, Palo Alto, CA 94304, | CIVIL ACTION NO. _____ |
| Plaintiffs, | **COMPLAINT AND JURY DEMAND** |
| v. | |
| MCDERMOTT, WILL & EMERY, LLP, The McDermott Building, 500 North Capitol Street, N.W., Washington, DC 20001, | |
| Defendant. | |



RECEIVED
Civil Clerk's Office
DEC 2 9 2012
Superior Court of the
District of Columbia
Washington, D.C.

Plaintiffs Theranos, Inc. ("Theranos") and Elizabeth Holmes, by and through their

undersigned counsel, state, with knowledge of their own acts and status and acts taking place in

their presence, and upon information and belief as to all other matters, as follows:

<u>**Nature of the Action**</u>

1.      This is an action for damages and equitable relief arising from the wrongful

conduct of the law firm Defendant McDermott, Will & Emery LLP ("MWE" or "the Law

Firm"), which occurred while MWE, through its partners and associates, represented Plaintiffs.

Specifically, John Fuisz, who was during the relevant time period a partner at MWE, wrongfully

obtained Plaintiffs' confidential information, including proprietary data and intellectual property

("Theranos Confidential Information"), and provided that information to his father, Richard C.

Fuisz, and his brother, Joseph M. Fuisz.  John Fuisz's father and brother then used Theranos

Confidential Information in connection with filing for and eventually obtaining U.S. Patent No. 7,824,612 ("the '612 Patent"), falsely claiming to the Patent and Trademark Office ("PTO") that they, and not Elizabeth Holmes or anyone else at Theranos, were the sole inventors of the ideas therein.  The '612 Patent is attached hereto as Exhibit A.

2.    On or about October 26, 2011, Plaintiffs brought related claims against John Fuisz (along with Richard and Joseph Fuisz) in the United States District Court for the Northern District of California (the "California lawsuit").  On June 26, 2012, the California district court held that—because the lawsuit was pending in a California forum— California's one-year statute of limitations barred Plaintiffs' malpractice claims against John Fuisz, and dismissed the claims against Mr. Fuisz on that ground.  Plaintiffs asserted, and continue to assert, that the law of the District of Columbia, not of California, should apply to determine whether a claim against District of Columbia attorneys for conduct that occurred in the District of Columbia is timely.  Plaintiffs will appeal the dismissal of claims against Mr. Fuisz as soon as they are able to do so.  The California lawsuit is still pending against Richard and Joseph Fuisz, and an entity that they control, Fuisz Pharma, LLC, which purports to own the '612 Patent.[1]

3.    On or about October 25, 2011, Plaintiffs entered into an Agreement on Document Preservation and Tolling ("Tolling Agreement") with Defendant, which tolled the statute of limitations applicable to any claims against Defendant until April 30, 2012.  The Tolling Agreement is attached hereto as Exhibit B.  Plaintiff then entered into a First Amended Agreement on Document Preservation and Tolling ("Tolling Extension"), which extended the tolling period to December 31, 2012.  The Tolling Extension is attached hereto as Exhibit C.

4.    In December 2012, Plaintiffs asked Defendant to further extend the Tolling Agreement to avoid the necessity of bringing this lawsuit until issues concerning Mr. Fuisz had

---

[1] When the California Lawsuit was filed on October 26, 2011, Richard and Joseph Fuisz purported to own all right, title, and interest in and to the '612 Patent. On October 27, 2011, one day after Plaintiffs filed the California Lawsuit, Richard and Joseph Fuisz purported to assign all their right, title, and interest to the '612 Patent to Fuisz Pharma.

been finally resolved in the California lawsuit (including on appeal).  Defendant declined any further extensions of the Tolling Agreement.  As a result, Plaintiffs had no choice but to bring this lawsuit to avoid the potential running of the statute of limitations, which could occur if the decision of the California court were reversed on appeal or if this Court found that District of Columbia statute-of-limitations law applied, as Plaintiffs argued before the California court.

### The Parties

5.  Theranos is a corporation organized under the laws of the state of Delaware with its principal place of business in Palo Alto, California.  Theranos is a healthcare systems company that develops groundbreaking technologies used in the collection, analysis, and communication of health information.  Based on its highly valuable and highly praised inventions and intellectual property, Theranos has created integrated systems, methods, and processes for real-time testing, decision making, and individualized therapy that deliver faster, more accurate, and less expensive health care to physicians, patients, and consumers.

6.  Elizabeth Holmes is a resident of Palo Alto, California.  Ms. Holmes founded Theranos in 2003 and is a named inventor on several patents, including patents covering bodily fluid analyzers and systems.  Ms. Holmes is currently the CEO of Theranos.

7.  Defendant MWE is a limited liability partnership registered in, among other locations, the District of Columbia.  It maintains an office in the District of Columbia.  Its District of Columbia office is located at The McDermott Building, 500 North Capitol Street, N.W., Washington, DC 20001.

### Jurisdiction and Venue

8.  This Court has jurisdiction over the subject matter of this complaint pursuant to D.C. Code Ann. Section 11-921.

9.  Venue is proper in this Court because Defendant MWE maintains an office within the District of Columbia; wrongful events giving rise to this Complaint occurred within the District of Columbia; at the time John Fuisz was a partner at MWE he was resident in the District of Columbia office and admitted to practice law before the District of Columbia Bar; and

Defendant provided legal services to Plaintiffs from its office in the District of Columbia.

10.     This Court has personal jurisdiction over Defendant pursuant to D.C. Code Sections 13-422 and/or 13-423 because, among other reasons, Defendant maintains an office in the District of Columbia through which it transacts business in the District of Columbia, including certain of the facts underlying this action; and, on information and belief, Defendant is organized under the laws of the District of Columbia by virtue of the fact that Defendant is registered as a partnership in the District of Columbia.

### Statement of Facts and Claims

**A.      Ms. Holmes, Founder and CEO of Theranos, Is an Inventor of Revolutionary Health Care Technology.**

11.     Ms. Holmes conceived the technology upon which Theranos was founded while she was a chemical engineering and electrical engineering student at Stanford University. Determined to develop a means of providing accurate, cost-effective, real-time medical data to medical professionals and patients at the time of diagnosis and treatment, beginning in 2003 Ms. Holmes devoted herself to inventing the technology, methods, and systems to realize that vision. Accordingly, she dropped out of Stanford University at the age of 19 to found Theranos and invested the funds she had reserved for her college education into achieving her goal.

12.     The technology, methods, and systems Ms. Holmes envisioned, and has since worked to create, promise to revolutionize healthcare by making it possible to analyze a patient's blood and wirelessly transmit that analysis to a secure database, where additional analyses can take place and from which the patient's physician can access the results and data.  With tiny volumes of bodily fluid or one small prick of a finger, patients can transmit real-time medical data and receive real-time feedback from their health care provider.

13.     Plaintiffs' groundbreaking discoveries and inventions comprise significant and valuable advances not only with respect to the technology available for the healthcare, biotechnical, and pharmaceutical industries, but also, most importantly, with respect to improving medical research, point-of-care treatment, and the quality and cost of healthcare.

**B.      Plaintiffs Retained McDermott, Will & Emery LLP to Prosecute Patents.**

14.      In or about August 2003, Plaintiffs retained MWE to provide legal services to Plaintiffs in prosecuting patent applications covering Plaintiffs' inventions.  Between 2003 and approximately early 2006, MWE represented Plaintiffs in the preparation, filing, and prosecution of their domestic and international patent applications, and continued to represent Plaintiffs until around October 2008.  MWE also provided legal advice to Plaintiffs in other matters relating to Theranos's business, including regulatory filings and approval for Theranos's groundbreaking technology.

15.      As Plaintiffs' counsel, each of the partners at MWE, and MWE as an entity, owed Plaintiffs the strictest duties of loyalty, care, candor, confidentiality, and zealous advocacy.  In particular, MWE owed and owes Plaintiffs an enduring duty of confidentiality.  As stated in the District of Columbia's Rules of Professional Conduct, MWE attorneys were and are prohibited from revealing any of Plaintiffs' confidences or secrets, using those confidences or secrets to Plaintiffs' disadvantage, and/or using those confidences or secrets for the advantage of MWE lawyers or third parties.  In addition, MWE owed and continues to owe Plaintiffs a duty to exercise reasonable care to prevent its employees, associates, and others whose services are utilized by the lawyer from disclosing or using confidences or secrets of a client.  Similarly, MWE and its partners owed and continue to owe Plaintiffs a duty to make reasonable efforts to ensure that MWE has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct, including those rules that require the Law Firm to safeguard Plaintiffs' confidences and secrets.  MWE and John Fuisz knew or must have known of these and other duties, fiduciary and otherwise, that MWE owed to Plaintiffs.

16.      Additionally, Plaintiffs had an express or implied contract with MWE to provide those legal services in exchange for consideration, including legal fees.

17.      John Fuisz is a lawyer licensed to practice in the District of Columbia, and was a partner at MWE.  John Fuisz joined MWE's Washington, D.C. office in 1999 and mainly

COMPLAINT AND JURY DEMAND

practiced patent litigation during the relevant time period. John Fuisz left MWE in or about November or December 2009 and formed his own firm, the Fuisz-Kundu Group. John Fuisz was thus a lawyer working at MWE for the entire time period relevant to this action.

18.     Prior to working at MWE, in the early 1990s, John Fuisz had been accused of improperly acquiring another law firm's client's confidential information, and surreptitiously passing that information to his father apparently for the purpose of aiding his father in litigation against a third party. The facts underlying that accusation were made public in a lawsuit between Richard Fuisz and Terex, Inc., and were attested to in a sworn declaration. On information and belief, MWE must have failed to investigate these facts, hired John Fuisz despite them, and/or failed to take additional precautions to ensure that similar actions did not happen again.

19.     During the course of the Law Firm's representation of Plaintiffs, MWE provided legal services to Plaintiffs, including services related to the preparation, filing, and prosecution of Plaintiffs' patent applications, out of its office located in Washington, D.C., and in so doing reviewed the information and materials that Plaintiffs sent from California in order to prosecute such applications and communicated with Plaintiffs in California.

20.     During MWE's representation of Plaintiffs, its patent attorneys were divided into various groups, including the Intellectual Property ("IP") Litigation group and the Patent Prosecution group.

21.     Attorneys in the IP Litigation and the Patent Prosecution groups at MWE had available to them and were permitted to access the same set of documents and data electronically and in hard copy through file rooms or other areas to which access was not restricted.

22.     All attorneys, in both the IP Litigation group and the Patent Prosecution group, could access confidential information included in Plaintiffs' files.

23.     On information and belief, John Fuisz was able to have unfettered access to Plaintiffs' confidential information and files as a direct result of his employment and/or partnership relationship with MWE. On information and belief, the fact that John Fuisz and

other MWE attorneys had such unfettered access benefitted MWE.

24.     On information and belief, MWE did not prevent John Fuisz from accessing Theranos Confidential Information, nor did MWE take reasonable steps to prevent John Fuisz from sharing that information with third parties, and/or from using that information to the benefit of himself and/or third parties and the detriment of Theranos.

25.     On information and belief, MWE did not exercise reasonable care to prevent its employees, associates, and/or partners, including John Fuisz, from disclosing or using Plaintiffs' confidential information.

26.     On information and belief, John Fuisz would not have had access to Plaintiffs' confidential information had he not been employed at MWE, nor would he have had access to Plaintiffs' confidential information had MWE taken reasonable precautions to restrict access to its clients' confidential files.

27.     MWE benefitted from the representation of Plaintiffs by, among other things, receiving legal fees.

**C.     MWE Drafted and Filed Provisional Patent Applications with the U.S. Patent and Trademark Office on Plaintiffs' Behalf.**

28.     Between about August 2003 and early 2006, the work that Plaintiffs entrusted to MWE included preparing and filing various provisional patent applications on Plaintiffs' behalf.

29.     In 2005, as part of its work for Plaintiffs, MWE drafted and filed several provisional patent applications, including U.S. Provisional Patent Application No. 60/678,801, filed on May 9, 2005; U.S. Provisional Patent Application No. 60/705,489, filed on August 5, 2005; U.S. Provisional Patent Application No. 60/717,192, filed on September 16, 2005; and U.S. Provisional Patent Application No. 60/721,097, filed on September 28, 2005 (collectively, the "Theranos Provisionals"). The Theranos Provisionals are attached hereto as Exhibits D, E, F, and G.

30.     Provisional patent applications provide an applicant with an early filing date, while allowing the applicant to wait up to a year to file a non-provisional patent application with

specific claims.  The contents of provisional patent applications often contain confidential and proprietary information that ultimately will support the inventor's effort to demonstrate to the PTO that his or her application includes patentable (*e.g.* novel) subject matter.

31.     The Theranos Provisionals included information that is confidential and proprietary to Plaintiffs.

32.     In or about early 2006, another law firm took over the preparation, filing, and prosecution of subsequent patent applications for Plaintiffs.

33.     Plaintiffs filed several non-provisional patent applications on March 24, 2006 (the "March 24, 2006 Applications") that claim priority to the Theranos Provisionals.

34.     Neither the Theranos Provisionals nor the March 24, 2006 Applications were published—and, therefore, were not publicly available—until November 16, 2006, at the earliest.

35.     Prior to the November 2006 publication of the March 24, 2006 Applications, the research, technology, and materials disclosed in the Theranos Provisionals were closely guarded by Theranos and not publicly available.  Indeed, until the November 2006 publication of the March 24, 2006 Applications, the Theranos Provisionals and the March 24, 2006 Applications themselves were also confidential.

**D.     Richard and Joseph Fuisz Wrongfully Used Theranos Confidential Information to File Their Own Provisional Patent Application.**

36.     As a direct result of John Fuisz's and MWE's actions and omissions, Richard and Joseph Fuisz wrongfully used the valuable confidential and proprietary information that Plaintiffs had entrusted to MWE, including both the general knowledge of Plaintiffs' work and plans, and specific information set forth in the Theranos Provisionals and in other materials submitted in confidence by Plaintiffs to MWE.  They did so, at least in part, in order to describe a health care system that includes a body fluid analyzer that can provide information that can be used by others, such as physicians.

37.     On or about September 23, 2005, after Theranos had filed three of its four Provisionals, Richard Fuisz first contacted Alan Schiavelli, a patent attorney at Antonelli, Terry,

COMPLAINT AND JURY DEMAND

Stout & Kraus, LLP, and asked him to prepare a patent application.  Upon information and belief, this request is set forth in Exhibit H, a communication that Richard Fuisz disclosed to Theranos' Board of Directors.  When Richard Fuisz made his request to Mr. Schiavelli, MWE was simultaneously preparing the fourth Theranos Provisional, which was filed with the Patent Office on September 28, 2005.

38.     In April 2006, Richard and Joseph Fuisz filed a provisional patent application with serial number 60/794,117 (the "Fuisz Provisional Patent Application").  The Fuisz Provisional Patent Application is attached hereto as Exhibit E.  Upon information and belief, the patent application that Richard Fuisz asked Alan Schiavelli to begin preparing in Exhibit H ultimately matured into the Fuisz Provisional Patent Application.

39.     At the time, Richard Fuisz was a resident of Virginia and Joseph Fuisz was a resident of Washington, D.C.

40.     On April 24, 2007, Richard and Joseph Fuisz filed non-provisional patent application No. 11/790,131.  This non-provisional application was based on, and claimed the benefit of, the Fuisz Provisional Patent Application.  The non-provisional application ultimately matured into the '612 Patent.

41.     Upon information and belief, John Fuisz, while a partner at MWE, provided his father and brother with Theranos Confidential Information, which he accessed as a direct consequence of the access that MWE facilitated (and failed to prevent) to Theranos Confidential Information.  Richard and Joseph Fuisz used Theranos Confidential Information to prepare and file the Fuisz Provisional Patent Application in April 2006, and the '612 Patent claims.

42.     On information and belief, MWE failed to supervise or otherwise prevent John Fuisz from providing Theranos Confidential Information to his brother and father.  Moreover, on information and belief, MWE knew or should have known of this risk, due to the fact that public records showed that John Fuisz had previously been accused of providing a third party's confidential information to his father.

43.     Moreover, on information and belief, MWE did not exercise reasonable care to

prevent its employees, associates, and others from disclosing or using Theranos's confidences or secrets.

44.     On information and belief, John Fuisz was able to wrongfully provide information to his father and brother in violation of MWE's fiduciary, contractual, and professional duties as a direct result of the failure by MWE to safeguard Plaintiffs' secrets and confidences, to ensure compliance with applicable duties and rules, and to hire and employ only trustworthy attorneys.

45.     When Richard and Joseph Fuisz filed the Fuisz Provisional Patent Application in April 2006, Theranos Confidential Information, including as disclosed in the Theranos Provisionals, had not been published.  Thus, Richard and Joseph Fuisz should not have had access to the information, data, or materials in the Theranos Provisionals or any other Theranos Confidential Information that Plaintiffs provided to MWE, and that John Fuisz, an MWE partner, provided them.

46.     Nevertheless, they had such access.  The Fuisz Provisional Patent Application copied concepts and disclosures from the non-public Theranos Provisionals, as well as from other confidential information, documents, and data Plaintiffs provided to MWE in connection with the prosecution of Plaintiffs' patent applications.  The same concepts and disclosures are also found in the '612 Patent.

47.     The concepts and disclosures in Theranos Confidential Information, including in the Theranos Provisionals, were conceived of and developed by Ms. Holmes and others at Theranos.  Timothy Kemp, for example, began working at Theranos in January 2005.  Mr. Kemp received an undergraduate degree in Electrical Engineering and Computer Science from the University of California at Berkeley.  Mr. Kemp joined Theranos in software development management after a 30-year career at IBM, where he was IBM's Microelectronics' Storage Platform Architect, responsible for the integration of powerful microprocessors with storage drive interfaces.  At IBM, Mr. Kemp worked on a wide variety of hardware and software systems, including industrial process control, operating systems, network databases, compilers, electronic design automation, storage system design and processor design.

10

48.     Mr. Kemp researched and developed Theranos technologies, including in connection with the Theranos Provisionals and other Theranos Confidential Information. Mr. Kemp, in particular, developed concepts reflected in Theranos Confidential Information concerning the use of a bar code in connection with Theranos's inventions. Ms. Holmes and Mr. Kemp worked with one another in order to conceive and develop the Theranos inventions described in the Theranos Provisionals and other Theranos Confidential Information.

49.     The concepts and disclosures in the Fuisz Provisional Patent Application and in the '612 Patent closely track those in the Theranos Confidential Information, including the Theranos Provisionals. The '612 Patent claims also incorporate Theranos Confidential Information.

50.     For example, the Fuisz Provisional Patent Application and the '612 Patent state that the "invention" therein includes "a data reader unit for reading information from a data storage unit, the data storage unit containing stored information concerning a particular drug being or to be taken by the patient." All claims of the '612 Patent incorporate these concepts. For example, claim 9 of the '612 Patent provides "A system for monitoring a patient, comprising . . . a data reader unit for reading information from the data storage unit," which information includes "at least one analyte being associated with a particular drug being or to be taken by the patient . . . ."

51.     Ms. Holmes conceived of the above concepts, which were disclosed in Theranos Confidential Information, including in the Theranos Provisional Patent Applications. Upon information and belief, Richard and Joseph Fuisz improperly obtained these concepts by receiving them from John Fuisz, while John Fuisz worked as an attorney for MWE during the course of MWE's representation of Plaintiffs, and used them in the Fuisz Provisional Patent Application and in the '612 Patent claims.

52.     For example, Theranos Provisional Patent Application No. 60/678,801 specifically describes a reader device that "could transmit the results of the analysis to an external database and is also capable of receiving data from such databases." The same

11

Theranos Provisional Patent Application also states that "stored information" could be information from the patient's "previous treatment regiment," or "it could be pharmacogenomic data that are of relevance to a particular patient."[2] The '801 Theranos Provisional Patent Application also provided for a method to monitor "the pharmacokinetic and pharmacodynamic parameters of a drug in a patient."[3]

53.     The Fuisz Provisional Patent Application and the '612 Patent also discuss "processing the information concerning the analyte and for sending the processed information to the display, wherein the threshold value is associated with the particular drug being or to be taken by the patient or course or treatment by the patient, the threshold value being one beyond which the display will display an alert." In addition, claim 9 of the '612 Patent claims a system, among other things, "for processing the information concerning the analyte and configured for sending the processed information to the display, wherein the at least one threshold value is a value such that a sensed analyte level beyond the value will cause the display to display an alert."

54.     Claims 10 through 19 of the '612 Patent, which are dependent claims of Claim 9, incorporate by reference the same concept.

55.     The same concepts described in paragraph 53 above are also found in claim 1 of the '612 Patent, which describes a method comprising, among other things, "reading the stored information stored on the data storage unit into a data reader," where "at least one threshold value of the at least one analyte being associated with a particular drug being or to be taken by the patient," and "wherein the at least one threshold value is a value such that a sensed analyte level beyond the value will cause the display to display an alert."

56.     Claims 2 through 8 of the '612 Patent, being dependent claims of claim 1, incorporate by reference the same concepts.

---

[2] Pharmacogenomic data is information about the patient's response to a drug.

[3] Pharmakokinetic ("PK") and pharmacodynamic ("PD") data comprise information relating to analytes that are associated with a particular drug being or to be taken by the patient.

57.     Ms. Holmes conceived of these concepts, which were disclosed in Theranos Confidential Information, including in one or more of the Theranos Provisional Patent Applications.  Upon information and belief, Richard and Joseph Fuisz improperly obtained these concepts by receiving them from John Fuisz, while John Fuisz worked as an attorney for MWE during the course of MWE's representation of Plaintiffs, and used them in the Fuisz Provisional Patent Application and in the '612 Patent claims.

58.     For example, the Theranos Provisionals describe a bodily fluid analyzer that gathers data related to a patient of interest, compares the value with data retrieved from a database, and evaluates whether the comparison exceeded a predetermined threshold value.

59.     Theranos Provisional Patent Application No. 60/678,801, for example, describes a method through which "data can be compared with information stored in databases."  This Theranos Provisional Patent Application also described a "metabolic profiler" capable of collecting and hosting "PK and PD data of one or more drugs related to a particular patient" for purposes of analysis and comparison.

60.     Theranos Provisional Patent Application No. 60/717,192 further expands this concept to make it clear that an "action threshold value" could be used to "determine the optimum therapeutic index for that particular patient or patient class."  It further provides that if the "threshold value" were exceeded, "appropriate action" could be taken, such as generating "an alert," including to a healthcare provider.

61.     In addition, Theranos Provisional Patent Application No. 60/678,801, for example, explains "One kind of immediate action" that could be taken if a threshold value were exceeded "could be to provide an emergency alert to the patient's healthcare provider."

62.     Furthermore, Theranos Provisional Patent Application No. 60/717,192 describes "alerting the physician" among other steps that could be taken if a "threshold value" was exceeded.

63.     Theranos Provisional Patent Application No. 60/705,489 further describes displaying information reflective of a comparison of a sensed value with an expected value.

64.     Other disclosures in the Fuisz Provisional Patent Application and the '612 Patent claims are the same as concepts and information set forth in the Theranos Provisionals and other Theranos Confidential Information, including Theranos Confidential Information provided to MWE.

65.     The Fuisz Provisional Patent Application, for example, states that "the data storage unit can be a bar code and the data reader can be a bar code reader." That concept is also found in Claims 3, 10, and 15 of the '612 Patent, which claim that "the data reader is a bar code reader and the data storage unit is a bar code."

66.     Theranos Provisional Patent Application No. 60/705,489, which predates the Fuisz Provisional Patent Application, describes the concept of using a bar code to read and store information, including where "software allows reading of a barcode on the cartridge" and a "server" can then transmit "a preprogrammed reading based on each cartridge bar code" to a "read-out display."

67.     Mr. Kemp contributed to the conception of the use of a bar code in the Theranos system. This concept was disclosed or suggested in Theranos Confidential Information, including in one or more of the Theranos Provisional Patent Applications. Upon information and belief, Richard and Joseph Fuisz improperly obtained this concept by receiving them from John Fuisz, while John Fuisz worked as an attorney for MWE during the course of MWE's representation of Plaintiffs, and used it in the Fuisz Provisional Patent Application and in the '612 Patent claims.

68.     In addition to the Theranos Provisionals, additional Theranos Confidential Information that Plaintiffs provided to MWE also details novel concepts that later appeared in the Fuisz Provisional Patent Application. One such concept includes making "a diagnostic and therapeutic system" with the ability to serve as a sought-after application for "RFID technologies; capitalize on entry into wireless, microchip markets." The term "RFID" stands for "Radio Frequency Identification Device" and refers to the transmission of information by certain radio wave-based wireless technologies.

COMPLAINT AND JURY DEMAND

69.     Correspondingly, the later-filed Fuisz Provisional Patent Application and the '612 Patent state that "the data storage unit can be a radio frequency identification tag and the data reader a radio frequency receiver. . . ." This is an application of "RFID technologies." The concept of a "data reader" being a "radio frequency receiver" and a "data storage unit" being a "radio frequency identification tag" is recited in claims 4 and 16 of the '612 Patent. The concept of a "data reader unit" being a "radio frequency receiver" is also recited in claim 11 of the '612 Patent.

70.     Ms. Holmes and/or Mr. Kemp conceived of the concepts referenced in paragraphs 50–69, concepts recited and included in the claims of the '612 Patent. Upon information and belief, John Fuisz, while a partner at MWE, participated in providing those confidential concepts of Ms. Holmes and Mr. Kemp to Richard and Joseph Fuisz. Richard and Joseph Fuisz knew they were filing for a patent that included these concepts, and that these concepts came from, and were conceived and developed by, Theranos, and in particular Ms. Holmes and/or Mr. Kemp.

71.     But for Richard and Joseph Fuisz's access to Theranos Confidential Information by reason of the acts or omissions of MWE, they would not have been able to file the Fuisz Provisional Patent Application in the same form and with the same claims and specifications at the time that they filed it.

72.     But for Richard and Joseph Fuisz's access to Theranos Confidential Information by reason of the acts or omissions of MWE, they would not have been able to obtain the '612 Patent at the time that they did.

**E.      Plaintiffs Discovered the Fuisz Provisional Application and That John Fuisz Was a Partner in the IP Group of MWE.**

73.     Plaintiffs first became aware of the Fuisz Provisional Patent Application, which was similar to and based on Theranos Confidential Information (including disclosures made in the Theranos Provisionals), in May 2008. In part due to MWE's continued representation of Plaintiffs, and in reliance on their reasonable belief that MWE had carefully safeguarded Plaintiffs' confidential information and prevented unauthorized persons from accessing that

COMPLAINT AND JURY DEMAND

information, Theranos had no reason at that time to believe that Theranos Confidential Information had been used by Richard and Joseph Fuisz to file a patent application. Moreover, since the Fuisz Provisional Patent Application was not published until January 2008, Theranos could not reasonably have discovered the Application—and thus, Richard and Joseph Fuisz's use of Theranos Confidential Information—sooner.

74.     In or about May 2008 and August 2008, Plaintiffs were informed that John Fuisz was a partner at MWE.  In or about August 2008, Ms. Holmes attempted to set up a meeting with the MWE's partner whom she knew but a family health issue for one of the partners delayed the meeting.

75.     On September 22, 2008, Ms. Holmes met with Charles Work and Kenneth Cage, partners at MWE, and informed them that a Richard Fuisz and Joseph Fuisz had filed an application for a patent claiming priority to the Fuisz Provisional Patent Application, which contained concepts substantially similar to those disclosed in Theranos Confidential Information, including the Theranos Provisionals, furnished to MWE.

76.     Plaintiffs' attorneys at MWE responded that they would "look into" the issue, and later that day Ms. Holmes provided Mr. Cage with a copy of the Fuisz Patent Application.

77.     Though Mr. Work and Ms. Holmes tried to contact each other to follow up the issues raised in the September 22 meeting, they did not speak again until on or about October 28, 2008.

78.     On or about October 28, 2008, Elizabeth Holmes was informed that John Fuisz as a member of the Law Firm's Intellectual Property Litigation Group had access to Theranos Confidential Information that Theranos and Ms. Holmes had provided MWE, but at that point there was "nothing they could do."

79.     As stated above, John Fuisz is no longer affiliated with MWE.

80.     As stated above, until at least October 28, 2008, Plaintiffs reasonably believed that their confidences had been jealously guarded, as provided by the applicable standards of care, fiduciary duties, and/or express or implied contractual provisions. Moreover, Plaintiffs

reasonably believed from at least September 22, 2008 until October 28, 2008 that MWE might

represent Theranos in connection with any potential dispute with Richard Fuisz and Joseph

Fuisz relating to the '612 Patent.

      81.      Plaintiffs were clients of MWE until at least October 28, 2008.

**F.**      **Richard and Joseph Fuisz's Patent Was Issued on November 2, 2010, and the
Issuance of that Patent Harmed and Continues to Harm Plaintiffs.**

      82.      On November 2, 2010, the PTO issued the '612 Patent, on which Richard and

Joseph Fuisz are identified as inventors; the '612 Patent claims the priority date of the Fuisz

Provisional Patent Application. Issuance of the patent on November 2, 2010 was the first time

when Plaintiffs incurred any actual damages as a result of Richard and Joseph Fuisz's improper

conduct.

      83.      The wrongful disclosure of Theranos Confidential Information, and its proximate

result—the issuance of the '612 Patent—have harmed and continue to harm Plaintiffs.

      84.      Because the '612 Patent covers technology based on Theranos Confidential

Information, including disclosures in the Theranos Provisionals, Theranos's ability to enjoy

exclusively its Confidential Information, and inventions based thereon, has been significantly

damaged.

      85.      Plaintiffs have invested substantial resources, in time, talents, and capital, to

conceive of the valuable inventions described in the Theranos Provisionals. The value of that

investment and the value of Plaintiffs' inventions have been and continue to be diminished by

the disclosure and use of Theranos's confidential information. Further, for the reasons alleged

above, Theranos is the rightful owner of the '612 Patent, and should have the exclusive rights to

practice and/or license the claims of the '612 Patent. As a proximate result of Defendant's

breaches through act or omission, including the wrongful breach of the duty of confidentiality

that resulted in the disclosure of Theranos Confidential Information to Richard and Joseph Fuisz,

Richard and Joseph Fuisz have obtained specific property—-the '612 Patent and the rights of

inventorship associated with that patent—that rightfully belong to Plaintiffs. The disclosure of

Theranos Confidential Information thus benefitted third parties, and harmed Plaintiffs—MWE's clients.

86.     Additionally, Theranos is in the business of developing technology for health care systems; Fuisz Pharma purports to be in the same business.  By using the Theranos Confidential Information to deceive the United States Patent and Trademark Office, and fraudulently obtaining exclusive patent rights that rightfully belong to Plaintiffs, Richard and Joseph Fuisz wrongfully sought to obtain, and have obtained, an unfair competitive advantage over Plaintiffs. The disclosure of Theranos Confidential Information thus benefitted third parties, and harmed Plaintiffs—MWE's clients.

87.     A website called "Fuisz.com" currently identifies the '612 Patent among a list of "Fuisz invented United States patents and pending patents."

88.     In a press release dated July 2, 2010 concerning the '612 Patent, the "Fuisz.com" website set forth the following:

> First, FUISZ announced that it has received a notice of issuance from the United States Patent and Trademark Office for patent claims that cover a direct connection between prescribing physicians and blood analysis devices.  The invention allows for the health care provider to set the parameters of allowable analyte levels for each patient and enables simple notifications for any variance out of a pre-determined range.  Joseph Fuisz, managing member of FUISZ stated, "These patent claims represents [sic] a quantum leap in the use of portable blood analyzers to provide a higher level of care for patients while reducing burdens on health care providers. *We are in discussions with the blood analyzer industry for the licensing of this technology.*"

(Emphasis added).

89.     In addition, Richard and Joseph Fuisz's counsel, during the pendency of the California lawsuit, represented that at least one "Fortune 100" or "Fortune 500" company has expressed interest in licensing certain technology relating to the '612 Patent from Fuisz Pharma.

90.     On November 2, 2011, Theranos filed copied claims with the PTO, setting forth how all the claims in the '612 Patent are supported by Plaintiffs' specifications.

## CAUSES OF ACTION

### FIRST CLAIM

### Legal Malpractice

91.     Plaintiffs repeat and reallege all of the paragraphs above as though set forth in full herein.

92.     Attorneys at MWE represented Elizabeth Holmes and Theranos.  MWE, as a law firm, also represented Elizabeth Holmes and Theranos.

93.     As Plaintiffs' counsel, each of the attorneys at MWE, and MWE as an entity, owed Plaintiffs the strictest duties of loyalty, care, candor, confidentiality, and zealous advocacy.

94.     As detailed above, upon information and belief, MWE and its attorneys breached the applicable standard of care, including the duty of confidentiality, through the improper and willful actions of its partner, John Fuisz; through its failure to prevent those actions; through its failure to safeguard Plaintiffs' confidential information; and/or through its failure to make reasonable efforts to ensure that its partners' behavior conformed to applicable standards of care.

95.     As a direct and proximate result of these breaches, Plaintiffs have been injured.

### SECOND CLAIM

### Breach of Fiduciary Duty

96.     Plaintiffs repeat and reallege all of the paragraphs above as though set forth in full herein.

97.     Attorneys at MWE represented Elizabeth Holmes and Theranos.  MWE, as a law firm, also represented Elizabeth Holmes and Theranos.

98.     Pursuant to that representation, MWE, and each of MWE's attorneys, were fiduciaries to Plaintiffs and owed Plaintiffs fiduciary duties based on the Law Firm's representation of Plaintiffs, including the duties of care, loyalty, candor, disclosure, confidentiality, and zealous advocacy.

99.     As detailed above, upon information and belief, MWE and its attorneys each

19

herein.

107.    Through their representation of Plaintiffs, MWE had an express or implied contract, which included contractual duties to safeguard Plaintiffs' confidences and secrets.

108.    As alleged above, MWE breached that express or implied contract.

109.    As a direct and proximate result of these breaches, Plaintiffs have been injured.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek judgment as follows:

a.    For general damages in an amount according to proof at trial;

b.    For special damages in an amount according to proof at trial;

c.    For punitive damages in an amount according to proof at trial;

d.    For appropriate injunctive relief;

e.    For costs;

f.    For reasonable attorney's fees;

g.    For pre-judgment and post-judgment interest;

h.    For such other relief as the Court may deem appropriate.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

Dated: December 29, 2012

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

David Boies, Esq.
  (*pro hac* admission pending)
333 Main Street
Armonk, NY 10504
Telephone: 914 749 8200
Facsimile: 914 749 8300

Donald Flexner, Esq.
  D.C. Bar No. 343269
Tanya Chutkan, Esq.
  D.C. Bar. No. 420478
5301 Wisconsin Ave. NW
Washington, DC 20015
Telephone: 202 237 2727
Facsimile: 202 237 6131

*Attorneys for Plaintiffs*

COMPLAINT AND JURY DEMAND