STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

   150 Almaden Boulevard, Suite 900
   San Jose, California 95113
   Telephone: (408) 535-5061
   Fax: (408) 535-5066
   Kelly.Volkar@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' RESPONSE TO MEDIA COALITION'S MOTION TO INTERVENE FOR LIMITED PURPOSE OF UNSEALING OF COMPLETED QUESTIONNAIRES OF SEATED JURORS AND ALTERNATES |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | |
| Defendants. | Date: September 30, 2021<br>Time: 11:30 a.m.<br>Court: Hon. Edward J. Davila |

On September 16, 2021, ten companies affiliated with different media groups (collectively titled "the Media Coalition") filed a Motion to Intervene for the Limited Purpose of Unsealing the Completed Questionnaires of the Twelve Jurors and Five Alternate Jurors who have been selected and sworn to render the verdict in this case. ECF No. 1026 ("Mot.").[1] The government respectfully requests that the Court maintain the questionnaires under seal for the duration of the trial to avoid any potential outside influence on the seated jurors and alternates, and publicly file versions once the trial is complete that are redacted to protect the jurors' privacy as detailed below. At a minimum, the government submits that the Court should not release the completed questionnaires without allowing the jurors an opportunity to raise any privacy concerns related to their answers in the questionnaires for the Court to consider.

## I. The First Amendment's Presumption of Public Access Can Be Overcome by a Conflicting Compelling Interest

The Supreme Court has held that the First and Sixth Amendment give rise to a "presumption of openness" during the jury selection process to protect the right to a fair trial. *Press-Enter. Co. v. Super. Ct. of Cal., Riverside Cty.*, 464 U.S. 501, 510 (1984) (quotation omitted); *see also Presley v. Georgia*, 558 U.S. 209, 212–13 (2010). This presumption is premised on the "view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." *Waller v. Georgia*, 467 U.S. 39, 46 n.4 (1984) (quotation omitted).

The Supreme Court, however, has also "made clear that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Id.* at 45. Thus, "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enter. Co*, 464 U.S. at 510. For example, a trial judge may "impose reasonable limitations on access to a trial" if it finds that, rather than promoting a fair trial, the specific circumstances of the case mean that open proceedings would in fact interfere with the responsible performance of respective duties by the judge,

---

[1] The government notes that one juror has since been excused for financial hardship. 09/14/2021 Hearing Transcript ("9/14 Tr.") at 665:16–666:13.

court staff, counsel, and jurors in a criminal trial.  *See id.* at 511 n.10 (quotation omitted).  Additionally, the Supreme Court has not decided—and there is no federal consensus—on whether the presumption of openness extends to juror names or juror questionnaires.  *See*, *e.g.*, *Jensen v. Obenland*, No. C15-1094 JCC, 2016 WL 2930440, at *5 (W.D. Wash. May 19, 2016) (denying habeas relief where petitioner could not establish violation of well-established federal law in part because "the Supreme Court has never held that the sealing of juror questionnaires violates the public trial right"), *aff'd*, 705 F. App'x 657 (9th Cir. 2017).

## II. Compelling Interests Warrant Certain Limitations on the Public's Access to Completed Questionnaires for the Seated Jurors and Alternates

The government submits that, even assuming the public right of access extends to juror questionnaires, the facts of this case thus far present compelling reasons to maintain the completed questionnaires under seal until the completion of the trial, at which point redacted versions may be published, a procedure which is narrowly tailored to serve the compelling interests.

### A. Avoiding the Potential for Undue Influence on the Jury Is a Compelling Interest

First and foremost, the need to avoid any potential undue influence on a juror (or alternate)—or on the jury's ultimate deliberations and verdict—is a compelling reason that warrants imposing limitations on the public's right of access to additional identifying information about the empaneled members through their written juror questionnaires.  While the Supreme Court has noted that the public's First Amendment right of open access may sometimes align with the Sixth Amendment right to a fair trial, the Court also unequivocally held that "[n]o right ranks higher than the right of the accused to a fair trial." *Press-Enter. Co*, 464 U.S. at 508.  And "the right of an accused to fundamental fairness in the jury selection process is a compelling interest." *Id.* at 510.  Thus, in some circumstances—such as here—the right to a fair trial is a compelling interest that can outweigh the public's right of access.  Indeed, in providing guidance for when such circumstances may arise, the Supreme Court has distinguished between cases presenting a "generic risk of jurors overhearing prejudicial remarks, unsubstantiated by any specific threat or incident," and those "concrete enough to warrant" limiting the public's access. *Presley*, 558 U.S. at 215.

1   Here, there have been demonstrated instances of outsiders attempting to discuss the case with members of the jury even while their identities are not widely known.  While the attempts thus far have failed, both parties have acknowledged the media attention surrounding this case and worked with the Court to employ a *voir dire* process that ensured a fair and impartial jury was selected.  *See*, *e.g.*, ECF Nos. 799, 813.  The Court is continuing to ensure that impartiality remains intact by regularly admonishing the jurors and alternates to avoid media and news reports that relate to this case, consistent with Ninth Circuit Model Jury Instruction 1.8, and jurors and even prospective jurors have shown that they take this admonition seriously.  *See*, *e.g.*, 09/01/2021 Hearing Transcript ("9/1 Tr.") at 329:10–330:12, 339:1–340:20; 9/14 Tr. at 671:20–673:10, 676:12–677:22.

Nevertheless, within mere weeks of starting this trial, there have also been attempts to influence the jury.  The Court acknowledged that a member of the public "shout[ed] as the jurors wait[ed] to go through security" and enter the courthouse:  "Don't forget the Me Too movement," prompting the Court to remind the courtroom that tampering with the jury could result in a criminal investigation.  9/14 Tr. at 668:3–669:1.  Even though the jurors did not report hearing this comment, that same day brought an example of a more targeted nature.  *Id.* at 671:20–673:10, 676:12–677:22, 682:21–683:11.  A friend of Juror 12 has deduced that she is serving as a juror in this case and called her in response to something he saw on the news.  *Id.* at 671:20–673:10.  Juror 12 interrupted him before he could expand further (*id.*), but this is a clear example of the potential for influence over the jurors by others if the information in their juror questionnaires is released publicly.  Members of the press and general public obviously are not bound by the limitations imposed on the jurors and may not be aware of the Court's admonitions that the jurors have been instructed to follow.  Indeed, Juror 12—or any other juror or alternate—could have been put in a more difficult position if a friend or family member learned through the *media*, and not from her directly, about her involvement in this case and caught Juror 12 by surprise by trying to talk about the case.  Indeed, even during *voir dire*, prospective jurors noted that their coworkers and family members similarly deduced that they were called for jury selection for Defendant Holmes's trial and expressed interest in discussing the case with the prospective juror.  *See*, *e.g.*, 9/1 Tr. at 329:10–330:12, 339:1–340:20.  The circumstances of this case are "concrete enough to warrant" certain limitations on the public's right of access.  *See Presley*, 558 U.S. at 215.

U.S.' RESPONSE TO MOT. TO UNSEAL JUROR QUESTIONNAIRES,
CASE NO. 18-CR-258 EJD                3

The government submits that maintaining under seal the completed questionnaires for seated jurors and alternates until after the trial is complete will reduce the ability for friends and family of the empaneled members to determine the identity of the jurors and attempt—even innocuously—to influence their deliberations or ultimate verdict.  The government acknowledges and commends the jurors, alternates, and even prospective jurors for taking the Court's admonitions seriously.  However, it would make life unnecessarily difficult for the seated jurors and alternates to continue following those admonitions if the press coverage were specifically about the juror—which may well catch the attention of friends or family members not presently following the media coverage of the trial but who may be interested in coverage of someone they know personally.  *See*, *e.g.*, *United States v. Black*, 483 F. Supp. 2d 618, 631 (N.D. Ill. 2007) ("[P]ublic reports discussing the jurors' specific identities (or other personal information about the jurors) also would undermine the jurors' ability to adhere to the Court's repeated instructions not to read, watch, or listen to any media coverage regarding this case.").  Furthermore, the possibility that the media or public will confront members of the jury if additional identifying information is released is more than theoretical, as this sampling of cases shows:

> 1)      Judge Posner, joined by three other Seventh Circuit judges, dissented from denial of rehearing *en banc* in *United States v. Blagojevich*, 614 F.3d 287, 288 (7th Cir. 2010), a case involving ex-governor of Illinois and celebrity Rod Blagojevich in which the panel decision required the district court to release the names of seated jurors and monitor what harassment, if any, they suffered.  In a subsequent, post-remand order, the district court collected that information from jurors, noting that media was waiting outside the homes of jurors and, while some requests to leave were honored, at least one reporter told a juror that "it was his job to attempt to get an interview [with the juror] and would knock every fifteen minutes whether she answered the door or not," ultimately knocking until almost midnight.  *United States v. Blagojevich*, No. 08 CR 888-1, 2011 WL 812116, at *1–2 (N.D. Ill. Feb. 28, 2011).  Another juror did not feel safe returning home and her family members were called by the media while at work.  *Id.* at *2.  Yet another juror received a threatening voicemail.  *Id.*
>
> 2)      In *United States v. Jackson*, 209 F.3d 1103, 1107–08, 1110 (9th Cir. 2000), the Ninth Circuit remanded for an evidentiary hearing on a habeas petition that allegedly uncovered jury tampering after the conclusion of the trial.  During jury deliberations, a juror received a threatening phone call from an unidentified person.  Although the juror initially denied that he believed the call was related to the trial, three years after the trial concluded he told the defendant's investigator that he believed the call may have been an attempt to hang the jury.  *Id.*

3)      In *United States v. Sylvester*, 143 F.3d 923, 931–32 (5th Cir. 1998), the Fifth Circuit ordered a limited remand to determine whether three instances of contact with jurors resulted in prejudice to the defendants. In the case, there were three separate instances of potential jury tampering, including phone calls to two jurors (one followed by an attempted delivery of a "mysterious package") and an in-person incident in which an individual told a juror to "take it easy" on the defendants. *Id.*

4)      In *United States v. Ruggiero*, 928 F.2d 1289, 1290, 1292–96 (2d Cir. 1991), the Second Circuit affirmed the district court's excusal of a juror during deliberations. Despite the anonymity of the jury names, a neighbor of a juror received a letter at his home address associating him with the trial and stating he should not serve on the jury for the trial and, the night before deliberations began, that same juror was confronted in his driveway late at night by two men who addressed him as being a juror on the trial. The juror became fearful for his family because his residential address was known, and he refused to vote during deliberations. The Court ultimately dismissed the juror from deliberations. *Id.*

5)      In *United States v. McAnderson*, 914 F.2d 934, 943–44 (7th Cir. 1990), the Seventh Circuit upheld the district court's dismissal of five jurors where four received threatening phone calls during the trial and a fifth juror had heard about the threatening calls, and all were genuinely fearful. *Id.*

6)      In *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988), several jurors were eating lunch at a diner the day they were deliberating the defendant's sentence in a capital case, when a member of the public asked about the progress of their deliberations and advised them to "fry the son of a bitch[.]"

7)      In a highly publicized case in New York court, the jurors' identities were published during deliberations, after which a juror received a letter pressuring her to convict, which led the judge to declare a mistrial. *See People v. Kozlowski*, New York, 2004, *discussed in* http://www.nytimes.com/2004/04/03/business/tyco-mistrial-overview-tyco-trial-ended-juror-cites-outside-pressure.html (Tyco Mistrial).

8)      In *Gannett Co., Inc. v. State*, 571 A.2d 735, 736–38 (Del. 1990), the Supreme Court of Delaware held there is no constitutional right of access to the names of jurors and upheld the trial judge's decision to keep confidential the names of prospective jurors in a highly publicized serial murder trial. The Court pointed to a recent murder case, where a local newspaper published an article in the midst of trial highlighting the names of jurors and giving unflattering, detailed profiles of the individual jurors, and a television crew followed some jurors to lunch and attempted to film them eating. *Id.*

The government submits that revealing juror names, or even additional information about the jurors and alternates from their written questionnaires that could aid in identifying them, could increase the chances of jury tampering in this case—particularly given the various forms of social media available in modern times. As but one example, counsel for the government have received several unsolicited emails from members of the public expressing views on the merits and underlying facts of the case. If the public were able to discern the identity of the jurors and contact them on social media with similar messages, it will become increasingly difficult for the jurors to follow the Court's admonitions to avoid outside information about the case. The Court has employed several measures to ensure the parties receive the full benefit of a fair trial by an impartial jury, and the government recommends that maintaining under seal additional information about the seated jurors and alternates while the trial is ongoing would continue to ensure the safeguards the Court has employed thus far.

### B. Protecting Jury Privacy and Candor Is a Compelling Interest

The Supreme Court has also acknowledged that privacy interests may be compelling interests at times, such as a prospective juror who is a rape survivor. *See Press-Enter. Co*, 464 U.S. at 512. The government submits that the questionnaires in this case include similarly sensitive topics, including whether the individual has experienced or knows someone who experienced intimate partner abuse or domestic violence. As stated by Justice Blackmun in his concurring opinion, "[c]ertainly, a juror has a valid interest in not being required to disclose to all the world highly personal or embarrassing information simply because he [or she] is called to do his [or her] public duty." *Id.* at 514 (Blackmun, J. concurring). The majority opinion even notes that privacy interests of the jurors may be accounted for by delaying disclosure for a reasonable amount of time—and may sometimes warrant permanent sealing. *Id.* at 512 (majority opinion).

Here, as the Media Coalition acknowledges in its Motion (ECF No. 1026 at 6), the Court expressly told the then-prospective jurors that their answers to the questionnaire would be kept confidential and that "the Court is sensitive to [the prospective juror's] privacy." ECF No. 928 at 2. The Court stated that the questionnaires would be "kept under seal and [would] only be disclosed, if at all, with names and other identifying information removed." *Id.* Disclosing information in the questionnaires of the seated jurors and alternates—without their input—may, as Judge Posner expressed,

"force[ the trial judge] to renege on his promise, the jurors may well be upset, concerned for their privacy, fearful of the prospect of harassment . . . , and angry at having been induced by false pretenses to agree to take months out of their life to perform jury service." *Blagojevich*, 614 F.3d at 288 (Posner, J., dissent from denial of rehearing *en banc*). Indeed, as at least one district court found, by "promis[ing] potential jurors that the information would be kept under seal, prospective jurors were remarkably candid and forthcoming" in the questionnaires. *United States v. Mitchell*, No. 2:08-CR-125 DAK, 2010 WL 4386915, at *4 (D. Utah Oct. 29, 2010).

The government submits that another compelling interest is protecting the seated jurors' and alternates' privacy, as well as encouraging juror candor in future cases. The government believes juror candor would be significantly inhibited by full and concurrent access to the empaneled members' completed questionnaires prior to the end of trial. Particularly given the ease, speed, and unlimited reach with which information can be disseminated in modern times via social media and other electronic means, there is a heightened risk that information about and opinions of the jurors and alternates expressed in their questionnaires will be publicly disseminated.[2] Members of the press or public may give unflattering, detailed profiles of the individual jurors, which could easily circulate or "go viral" on social media, and perversely the jurors would be bound by the Court's admonitions not to review or engage in such commentary. *See Gannett Co.*, 571 A.2d at 738 (in recent case local newspaper described jurors' expressions and demeanors, as well as physical characteristics such as "mostly bald," "short and round," or "stout"). Knowing that questionnaire answers—believed in the moment to remain confidential—would be unveiled could make the jurors and alternates feel exposed or vulnerable to cyber-bullying or other electronic contact, and could easily make a reasonable person shy away from jury service in the future. It could also have a chilling effect on future jury pools, who may feel less inclined to be candid after viewing stories of prior jurors thrust into national spotlight for his or her role as a juror in this case. It may skew the jury towards individuals who do not fear or even seek an association with a high-profile case rather than citizens simply performing their civic duty.[3]

---

[2] Even individuals less directly tied to this case than the jurors care about protecting their privacy. *See* https://www.npr.org/2021/09/14/1036835868/elizabeth-holmes-trial-hotelier-bill-evans-goes-incognito.

[3] *See generally* Kenneth J. Melilli, *Disclosure of Juror Identities to the Press: Who Will Speak for the Jurors?*, 8 Cardozo Pub. L. Pol'y & Ethics J. 1 (2009); David Weinstein, *Protecting a Juror's Right to*

U.S.' RESPONSE TO MOT. TO UNSEAL JUROR QUESTIONNAIRES,
CASE NO. 18-CR-258 EJD                              7

1    The government recommends the Court maintain the completed juror questionnaires for empaneled members under seal until a verdict is reached, at which time the jury will be free from the Court's admonition and more capable of defending themselves in the public arena.  More critically, the Court could ask the jurors to review their questionnaires for any information they would like to request be kept private, allowing them to voice any concrete privacy interests in the presence of the parties.  *See Mitchell*, 2010 WL 4386915, at *5 (notifying jurors of privacy rights during *voir dire* before releasing information in questionnaires and finding this approach served the goal of "balanc[ing] the rights of the individuals involved with the rights of the Defendant and the rights of the public"); *Copley Press, Inc. v. Super. Ct.*, 228 Cal. App. 3d 77, 85–86, 89–90 (1991) (noting that privacy interests may outweigh public right of access to juror questionnaires, but the jurors must be given the opportunity to raise legitimate privacy concerns with the Court *in camera*).

### C.    The Government's Recommendation Is Narrowly Tailored

The government submits that there are compelling reasons to maintain sealing of the completed juror questionnaires for a limited time in this case, and that its recommendation is narrowly tailored to serve the interests it seeks to protect.  The Court must craft a limitation that is no broader than necessary to protect the right to a fair trial—free of jury tampering—and to protect the jurors' right to privacy, and the Court must make explicit, supported findings to justify its order.  *Waller*, 467 U.S. at 48.  Furthermore, the Ninth Circuit has endorsed partial closures of even live *voir dire*, noting that the comparatively short length of the closure was "an important consideration[.]"  *United States v. Lee*, 290 F. App'x 977, 979 (9th Cir. 2008) (finding no plain error in *voir dire* format where for-cause challenges were outside presence of public but remainder was open to public).  While the Media Coalition cites *United States v. Bonds*, No. C 07-00732 SI, 2011 WL 902207, at *6 (N.D. Cal. Mar. 14, 2011) (ECF No. 1026 at 5), the *Bonds* case occurred more than a decade ago and before social media platforms became ubiquitous.  In addition, the Court in *Bonds* did not have concrete instances of

---

*Privacy: Constitutional Constraints and Policy Options*, 70 Temple L. Rev. 1, 1–3 (1997); Nancy J. King, *Nameless Justice: The Case for the Routine Use of Anonymous Juries in Criminal Trials*, 49 Vand. L. Rev. 123, 124–30, 151–59 (1996); Kenneth B. Nunn, *When Juries Meet the Press: Rethinking the Jury's Representative Function in Highly Publicized Cases*, 22 Hastings Const. L.Q. 405, 405–07, 429–34 (1995); Abraham S. Goldstein, *Jury Secrecy and the Media: The Problem of Postverdict Interviews*, 1993 U. Ill. L. Rev. 295 (1993).

1  attempted influencing of jurors already before it when reaching its ruling, as we have here, and this
2  Court provided a significantly more robust assurance of confidentiality in the questionnaire the jurors
3  completed than in *Bonds*. *See id.* at *1 (stating only that the questionnaires would be kept under seal).

4  The government recommends maintaining sealing until the conclusion of Defendant Holmes's
5  trial to reduce as much as possible the potential for members of the public to influence—innocuously or
6  not—empaneled members of the jury.  Once the jury has reached a verdict, then this driving need is all
7  but extinguished.  However, the seated jurors and alternates also have a right to privacy that they should
8  be given the opportunity to assert before any information they shared under the auspices of remaining
9  confidential is released publicly.  The government submits this approach is narrowly tailored to address
10 the compelling interests identified that may outweigh the public's First Amendment right of access to
11 the completed questionnaires of seated jurors and alternates.

**D.     Alternative Limitations Are More Burdensome for the Jury**

Finally, before maintaining sealing of the questionnaires in any manner, the Court "must consider reasonable alternatives to closing the proceeding[.]" *Waller*, 467 U.S. at 48; *Bonds*, 2011 WL 902207, at *7.  In considering whether to adopt the limitations suggested by the government, this Court should consider various alternatives and their ability to address the concerns of potential juror harassment / influence, juror privacy, future juror candor, and the ability for jurors to be able to follow instructions to shield themselves from extrajudicial opinions and information about this case.  Potential alternatives include:

- Sealing the entirety of the jury questionnaires permanently
- Sealing the entirety of the jury questionnaires until the verdict is rendered and the jury dismissed, and then releasing the questionnaires without redactions for privacy
- Sealing the entirety of the jury questionnaires until the verdict is rendered and the jury dismissed, and then releasing the questionnaires redacting only personally identifiable information and juror names
- Releasing juror questionnaires with juror names, residence information, and any other information the juror requests on legitimate privacy grounds redacted
- Releasing juror questionnaires with juror names and residence information redacted

- Requiring jurors to abstain from accessing computers or phones until they have been dismissed
- Sequestering the jury
- Ordering any party, counsel, representative of the media, or member of the public to refrain from publishing in any way the name or address of any juror, or the likeness of a juror, in a manner that may disclose the identity of that person prior to the end of trial and dismissal of the jury

The government submits that its recommendation strikes a more appropriate balance between the rights of the parties, the public, and the individuals involved—here the seated jurors and alternates—in a manner that renders the other proposed alternatives insufficient.

## III.    CONCLUSION

In sum, the government recommends the Court maintain the questionnaires under seal for the duration of the trial to avoid any potential outside influence on the seated jurors and alternates, and publicly file versions once the trial is complete that are redacted to protect the jurors' privacy, as requested by the individual jurors at the conclusion of the trial.

DATED:  September 23, 2021                          Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

  _/s/ Kelly I. Volkar_
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
KELLY I. VOLKAR
Assistant United States Attorneys