ADAM A. REEVES (NYBN 2363877)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

 150 Almaden Boulevard, Suite 900
 San Jose, California 95113
 Telephone: (408) 535-5061
 Fax: (408) 535-5066
 Vanessa.Baehr-Jones@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
|   Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT RAMESH "SUNNY" BALWANI'S MOTION TO SEVER |
|  v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | Date: February 10, 2020<br>Time: 10 a.m.<br>Courtroom: 4, 5th Floor |
|   Defendant. | **[FILED PROVISIONALLY UNDER SEAL PURSUANT TO COURT ORDER OF JANUARY 13, 2020]** |

FILED

JAN 31 2020

SUSAN Y SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

SEALED BY ORDER OF COURT

313  J

313

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

PROCEDURAL BACKGROUND AND RELEVANT FACTS ........................................................2

I.    Holmes's Potential Rule 12.2(b) Defense Prompts Balwani's Severance Motion........................2

II.    Holmes's Severance Motion and Rule 12.2(b) Notice ...........................................................3

III.    Court Orders Holmes to Supplement the Mechanic Declaration to Address Her Rule 12.2(b) Defense During January 13, 2020, Hearing ...........................................................4

IV.    Holmes's Amended Mechanic Declaration and Supplemental Rule 12.2(b) Notice.....................5

V.    Dr. Renee Binder's Declaration ........................................................................................5

ARGUMENT ...........................................................................................................................6

I.    Legal Standard for Severance ...........................................................................................6

II.    Holmes Does Not Present a Viable Rule 12.2(b) Defense Requiring Severance .........................6

    A.    The Limited Admissibility of Psychiatric Evidence to Negate *Mens Rea*...........................7

    B.    Psychiatric Evidence Must Be Directly Linked to the *Mens Rea* at Issue in a Particular Case to Be Admissible ...........................................................................9

    C.    There Is No Evidence Showing Holmes Had a Severe Mental Disease or Defect That Undermined Her Ability to Form the Intent to Commit Wire Fraud ...........................................................................................................12

    D.    Holmes's Self-Serving Statements Are Inadmissible Under Federal Rules of Evidence 401, 402, 403, and 702.......................................................................17

    E.    To The Extent There Are Facts and Evidence in Dispute, the Government Requests the Court Set a *Daubert* Hearing .......................................................18

III.    Even Assuming the Rule 12.2(b) Defense Is Admissible, Defendants Have Failed To Demonstrate That Their Defenses are Irreconcilably Antagonistic................................................19

IV.    "Expensive Pretrial Investigation" Is Not a Basis for Severance ............................................21

V.    The Court Can Ensure a Fair Trial for Balwani by Empaneling Dual Juries .............................22

VI.    Balwani Has Failed to Demonstrate Prejudice and Should Not Proceed to Trial First ................23

CONCLUSION.......................................................................................................................25

1

<u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3

*Beam v. Paskett,*
    3 F.3d 1301 (9th Cir. 1993) ............................................................................ 23

4

*Daubert v. Merrell Dow Pharm.,*
    43 F.3d 1311 (9th Cir. 1995) ............................................................................ 7

5

6

*In re Tsarnaev,*
    780 F.3d 14 (1st Cir. 2015) ............................................................................ 24

7

*Lambright v. Stewart,*
    191 F.3d 1181 (9th Cir. 1999) ............................................................. 2, 5, 6, 23

8

9

*Mack v. Peters,*
    80 F.3d 230 (7th Cir. 1996) ............................................................................ 23

10

*Reay v. Scribner,*
    369 F. App'x 847 (9th Cir. 2010) ...................................................................... 21

11

12

*Seattle Times Co. v. U.S. Dist. Court,*
    845 F.2d 1513 (9th Cir. 1988) .......................................................................... 24

13

*Skilling v. United States,*
    561 U.S. 358 (2010) ................................................................................... 24, 25

14

15

*United States v. Agnello,*
    158 F. Supp. 2d 285 (E.D.N.Y. 2001) ..................................................... 8, 9, 10, 11

16

*United States v. Angwin,*
    271 F.3d 786 (9th Cir. 2001) .......................................................................... 19

17

18

*United States v. Barton,*
    992 F.2d 66 (5th Cir. 1993) ............................................................................ 16

19

*United States v. Baxt,*
    74 F. Supp. 2d 436 (D.N.J. 1999) .............................................................. 7, 9, 10

20

21

*United States v. Bennett,*
    161 F.3d 171 (3d Cir. 1998) ............................................................................ 10

22

*United States v. Boykoff,*
    186 F. Supp. 2d 347 (S.D.N.Y. 2002) ............................................................ 9, 10

23

24

*United States v. Breinig,*
    70 F.3d 850 (6th Cir. 1995) ............................................................................ 20

25

*United States v. Broussard,*
    80 F.3d 1025 (5th Cir. 1996) .......................................................................... 23

26

27

*United States v. Burnette,*
    698 F.2d 1038 (9th Cir. 1983) ........................................................................ 23

28

*United States v. Byers,*
  730 F.2d 568 (9th Cir. 1984) .................................................................................... 13

*United States v. Cameron,*
  907 F.2d 1051 (11th Cir. 1990) ........................................................................ 8, 9, 11

*United States v. Cohen,*
  510 F.3d 1114 (9th Cir. 2007) ............................................................................. 8, 13

*United States v. Cruz-Ramirez,*
  No. CR 08-0730 WHA, 2011 WL 2446278 (N.D. Cal. June 17, 2011)................ 13, 18

*United States v. Doe,*
  655 F.2d 920 (9th Cir. 1980) ...................................................................................... 1

*United States v. Escalante,*
  637 F.2d 1197 (9th Cir. 1980) ..................................................................................... 6

*United States v. Fernandez,*
  388 F.3d 1199 (9th Cir. 2004) .......................................................................... 1, 6, 21

*United States v. Freeman,*
  804 F.2d 1574 (11th Cir. 1986) ................................................................................. 16

*United States v. Gay,*
  567 F.2d 916 (9th Cir. 1978) ....................................................................................... 6

*United States v. Griffin,*
  No. (S6) 94 CR. (AGS), 1996 WL 140073 (S.D.N.Y. Mar. 27, 1996) .................. 10, 11

*United States v. Guerrero,*
  693 F.3d 990 (9th Cir. 2012) ..................................................................................... 24

*United States v. Haischer,*
  780 F.3d 1277 (9th Cir. 2015) ............................................................................. 17, 18

*United States v. Hanley,*
  190 F.3d 1017 (9th Cir. 1999) .................................................................................. 6, 7

*United States v. Hiebert,*
  30 F.3d 1005 (8th Cir. 1994) ..................................................................................... 16

*United States v. Joetzki,*
  952 F.2d 1090 (9th Cir. 1991) ................................................................................... 21

*United States v. Johnson,*
  297 F.3d 845 (9th Cir. 2002) ....................................................................................... 6

*United States v. Mezvinsky,*
  206 F. Supp. 2d 661 (E.D. Pa. 2002) ......................................................... 8, 9, 10, 12

*United States v. Noriega,*
  746 F. Supp. 1548 (S.D. Fla. 1990) ..................................................................... 24, 25

*United States v. Pendergraft,*
  120 F. Supp. 2d 1339 (M.D. Fla. 2000).................................................................... 10

*United States v. Piper*,
No. CR 08-82 RSL, 2008 WL 2230747 (W.D. Wash. May 29, 2008)...............................................21

*United States v. Pirro*,
76 F. Supp. 2d 478 (S.D.N.Y. 1999) ...................................................................................................9

*United States v. Pohlot*,
827 F.2d 889 (3d Cir. 1987) ........................................................................................................8, 11

*United States v. Richards*,
9 F. Supp. 2d 455 (D.N.J. 1998)...............................................................................................8, 9, 12

*United States v. Sandoval-Mendoza*,
472 F.3d 645 (9th Cir. 2006) ...........................................................................................................13

*United States v. Schneider*,
111 F.3d 197 (1st Cir. 1997)........................................................................................................9, 11

*United States v. Scholl*,
166 F.3d 964 (9th Cir. 1999) ......................................................................................................10, 11

*United States v. Shayota*,
2016 WL 2730230 (N.D. Cal. May 10, 2016)..................................................................................21

*United States v. Shields*,
673 F. App'x 625 (9th Cir. 2016) .....................................................................................................19

*United States v. Sidman*,
470 F.2d 1158 (9th Cir. 1972) ..........................................................................................................23

*United States v. Son Van Nguyen*,
No. CR. S-99-0433 WBS, 2002 WL 32103063 (E.D. Cal. Nov. 7, 2002) ........................................20

*United States v. Starzecpyzel*,
880 F. Supp. 1027 (S.D.N.Y. 1995) ...................................................................................................7

*United States v. Thevis*,
474 F. Supp. 117 (N.D. Ga. 1979)....................................................................................................24

*United States v. Throckmorton*,
87 F.3d 1069 (9th Cir. 1996) ................................................................................................2, 19, 20

*United States v. Tootick*,
952 F.2d 1078 (9th Cir. 1991) ..........................................................................................................19

*United States v. Towns*,
19 F. Supp. 2d 67 (W.D.N.Y. 1998) .................................................................................................10

*United States v. Twine*,
853 F.2d 676 (9th Cir. 1988) .............................................................................................................8

*United States v. Vinieris*,
611 F. Supp. 1046 (S.D.N.Y. 1985) .............................................................................................11, 12

*United States v. Wescott*,
83 F.3d 1354 (11th Cir. 1996) ...........................................................................................................9

*United States v. Whitehead,*
  896 F.2d 432 (9th Cir. 1990) ................................................................................ 8

*United States v. Williams,*
  95 F.3d 723 (8th Cir. 1996) ............................................................................ 7, 10

*Zafiro v. United States,*
  506 U.S. 534 (1993) ................................................................................ 6, 19, 21

Statutes

18 U.S.C. § 17(a) .................................................................................................... 7

18 U.S.C. § 17(b) .................................................................................................... 7

28 U.S.C. § 515 ................................................................................................. 1, 25

Rules

Fed. R. Evid. 402 .................................................................................................. 17

Fed. R. Evid. 403 .................................................................................................. 18

Fed. R. Evid. 704(b) ............................................................................................... 8

Federal Rule of Criminal Procedure 14 .................................................................. 6

Federal Rules of Evidence 401 ............................................................................. 17

**INTRODUCTION**

Defendant Ramesh Balwani's motion to sever is premature and unsupported, and should be denied. "Co-defendants jointly charged are, *prima facie*, to be jointly tried." *United States v. Doe*, 655 F.2d 920, 926 (9th Cir. 1980). This is particularly true in conspiracy cases. A defendant seeking severance "must demonstrate that a joint trial is so manifestly prejudicial that it outweighs the dominant concern with judicial economy and compels the exercise of the court's discretion to sever." *Id.* at 926 (quotation omitted).

Balwani's motion is based on the false premise the Court will admit expert and other evidence that Holmes suffered from mental conditions caused by his alleged abuse. Based on the limited record, the Court should not do so. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Nor does the evidence support Dr. Mechanic's conclusions that Balwani controlled, manipulated, and abused Holmes. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The Court should not decide to sever the trial based on this record. To the extent the Court has questions regarding Dr. Mechanic's potential testimony, the government requests the Court set a *Daubert* hearing.

Even assuming arguendo that some portion of Dr. Mechanic's testimony were admitted after a *Daubert* hearing, Balwani fails to show this will manifestly prejudice him. The Court may elect to limit portions of Dr. Mechanic's testimony because of Rule 403 considerations. And this Court's "careful and frequent limiting instructions to the jury, explaining how and against whom certain evidence may be considered, can reduce or eliminate any possibility of prejudice arising from a joint trial." *United States v. Fernandez*, 388 F.3d 1199, 1243 (9th Cir. 2004).

1   Balwani's additional arguments for severance fail. A desire not to investigate a co-defendant's

2   allegation is not a cognizable basis for severance. Balwani also has not shown that Holmes's defense is

3   "so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by

4   the jury precludes acquittal of the defendant," *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th

5   Cir. 1996), or that his confrontation rights will be compromised.

6   Even if Balwani could show the manifest prejudice required, he ignores an appropriate remedy

7   short of severance: empaneling dual juries, a practice which is widely used and accepted in the Ninth

8   Circuit. *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) (en banc).

9   Finally, if the Court is inclined to grant severance, the Court should try Holmes first. Balwani

10   has failed to show that this would prejudice him. His claim that Holmes's defense will incurably taint

11   the jury pool (and thus he must go first) is not supported by the record. He makes no showing that

12   current publicity is so pervasive and negative that the Court will be unable to select a fair and impartial

13   jury in this large, metropolitan venue, or that Holmes's allegations would significantly alter that reality.

14   Even if he could, the remedy is voir dire and, if necessary, a change of venue, not censorship. Holmes is

15   the lead defendant in this case and the face of Theranos. The victims, the public, and the interests of

16   justice would be disserved by an indefinite delay in resolving her guilt or innocence.

## PROCEDURAL BACKGROUND AND RELEVANT FACTS

### I.   Holmes's Potential Rule 12.2(b) Defense Prompts Balwani's Severance Motion

19   On September 18, 2019, Holmes's counsel advised counsel Balwani's counsel that she would

20   introduce testimony about the "psychological, emotional, and ▮▮▮▮▮▮▮ she "suffered . . . at the

21   hands of Mr. Balwani." (*See* Dec. 3, 2019, Decl. of Jeffrey Coopersmith, Exh. A.) In the letter,

22   Holmes's counsel suggested the main argument in favor of severance for Balwani: "because your client

23   has a Sixth Amendment right to a trial in front of a jury free from bias that arises from issues that do not

24   directly relate to *his* guilt or innocence of the offenses alleged." (*Id.* (emphasis in original).)[1]

25

26   ───────────
    [1] From the context, it is apparent that the Defendants' coordination was part of a joint strategy to
    obtain severance. Severance would, of course, serve strategic ends for both: Holmes would have the
27   benefit of previewing the government's entire case-in-chief and having trial transcripts for all the
    government witnesses should her case proceed second. Balwani would have the strategic benefit of not
28   being tried with the number one defendant in the case—the founder and public face of the company—
    should he proceed to trial first.

1    Relying entirely on this letter, Balwani moved to sever on December 3, 2019. His first—and
2  main—argument was exactly the one advanced by Holmes's counsel: "a joint trial would prevent the
3  jury from making a reliable judgment about [his] guilt or innocence." (Balwani Mot. to Sever at 7–8
4  (internal quotations omitted).)

5  **II.    Holmes's Severance Motion and Rule 12.2(b) Notice**

6    On December 16, 2019, Holmes moved to sever, asserting that she would be unable to
7  participate and present her defense due to the "likely physical, psychological, and emotional effects" of
8  being in Balwani's presence during trial, and submitting the unsworn declaration of her expert Dr.
9  Mindy B. Mechanic. (Holmes Mot. to Sever at 4.) She also filed notice under Rule 12.2(b), stating that
10  she "may introduce expert evidence at trial related to a mental condition bearing on guilt."

11    In her unsworn declaration, Dr. Mechanic stated that her opinions were based on approximately
12  14 hours of in-person interviews and psychological testing with Holmes, conducted at the law offices of
13  Williams and Connolly in Washington, D.C., as well as interviews of approximately one to two hours
14  each with Holmes's parents, also at Williams and Connolly, and an approximately 90-minute interview
15  with Holmes's brother in San Francisco. (Mechanic Decl. at 3.)

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8         It does not appear that Holmes provided any materials documenting prior

9   mental health treatment or diagnoses to Dr. Mechanic. (*See* Mechanic Decl. at 3.)

10        Notably, Dr. Mechanic's declaration did not address the basis for a Rule 12.2(b) defense, nor did

11  Dr. Mechanic opine that Holmes's prior experience of PTSD during the time of the offense would have

12  negated her ability to form the requisite *mens rea* to commit wire fraud. (*See generally* Mechanic Decl.)

13  **III.    Court Orders Holmes to Supplement the Mechanic Declaration to Address Her Rule
         12.2(b) Defense During January 13, 2020, Hearing**

14        In its December 30, 2019, administrative motion, the government requested the Court set a

15  schedule for the Rule 12.2 procedures and litigation that would permit the Court to rule on the severance

16  motions after deciding the threshold issue of the admissibility of the Rule 12.2(b) defense and related

17  testimony. During the January 13, 2020, hearing, the government alternatively urged the Court to order

18  Holmes to provide additional support for her Rule 12.2(b) defense before making a final ruling on

19  severance. (Transcript of Jan. 13, 2020, hearing ("Tr.") at 31–32, 37–38, 72–74.) The government

20  noted that the severance motions assumed that the Rule 12.2(b) defense and Holmes's statements

21  detailing her allegations against Balwani would be admitted at trial even though this was not a definite—

22  or even probable—outcome. (*Id.* at 47–48.) The government further highlighted that Holmes had not

23  yet submitted *any* statement from an expert opining that her mental condition at the time of the offense

24  had any bearing on her guilt to commit the charged crime—a prerequisite to establishing the relevance

25  of the allegations against Balwani. (*Id.* at 47.)

26        At the conclusion of the hearing, the Court ordered Holmes to supplement the Mechanic

27  Declaration by adding "a page or two" to provide "some foundation[]" for the Rule 12.2(b) defense. (*Id.*

28

1 | at 71.)  The Court further granted leave to Balwani to supplement his motion to sever to address this

2 | amended declaration from Dr. Mechanic.  (*Id.* at 50–51, 65.)

3 | **IV.    Holmes's Amended Mechanic Declaration and Supplemental Rule 12.2(b) Notice**

4 |       On January 17, 2020, Holmes filed an amended and sworn declaration of Dr. Mechanic.  This

5 | amended declaration provided scant support for her Rule 12.2(b) defense.  In her Notice of Submission

6 | to the Court, Holmes highlighted the one paragraph Dr. Mechanic added to address the Rule 12.2(b)

7 | defense:  the last paragraph of Section XIV on page 11.  This paragraph, however, does not address

8 | Holmes's mental state or how her mental conditions affected her *mens rea* at the time of the offense.

9 | Instead, the paragraph provides general conclusions about how "abusers assume a rein of control over

10 | their victims" and how victims of IPV "are likely to defer to the opinions of the abuser."  (Amended

11 | Mechanic Decl. at 11.)

12 |       At the request of the government, Holmes also provided additional notice of her Rule 12.2(b)

13 | defense.  (Baehr-Jones Decl., Exh. 2.)  Specifically, in a January 17, 2020, letter, Holmes listed Dr.

14 | Mechanic as the expert she had engaged for purposes of her Rule 12.2(b) notice.  (*Id.*)  The letter further

15 | stated that the Rule 12.2(b) forensic evaluation of Holmes "has consisted or will consist of semi-

16 | structured and structured interviews," as well as the "MMPI-2 test."  (*Id.*)

17 | **V.    Dr. Renee Binder's Declaration**

18 |       The government has retained Dr. Renee Binder to opine on Holmes's noticed Rule 12.2(b)

19 | defense.

28 | //

**ARGUMENT**

I. **Legal Standard for Severance**

The general rule is that defendants jointly charged are jointly tried. *See United States v. Gay*, 567 F.2d 916, 919 (9th Cir. 1978), *cert. denied*, 435 U.S. 999 (1978). This rule applies particularly in conspiracy cases such as this. *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir. 1980); *see also Fernandez*, 388 F.3d at 1242 (noting that "a joint trial is particularly appropriate where the co-defendants are charged with conspiracy"). Federal Rule of Criminal Procedure 14 provides that a district court, in its discretion, may grant a severance when it appears that a joint trial would prejudice a defendant. However, "[t]here is a preference in the federal system for joint trial of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Severance is to be granted only if there is a "serious risk that a joint trial would compromise a specific trial right of [a properly joined defendant] or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. Because severance is disfavored, "defendants bear a heavy burden when attempting to obtain reversal of a district court's denial of a motion to sever." *United States v. Johnson*, 297 F.3d 845, 858 (9th Cir. 2002). "Such decisions will be reversed only when 'the joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion [on the motion to sever] in just one way, by ordering a separate trial.'" *Id.* (quoting *United States v. Hanley*, 190 F.3d 1017, 1027 (9th Cir. 1999)).

II. **Holmes Does Not Present a Viable Rule 12.2(b) Defense Requiring Severance**

Balwani urges the Court to make a final decision on severance based on a potential defense of his co-defendant that is not viable. As set forth below, courts have permitted evidence to be admitted as part of a "*mens rea*" or Rule 12.2(b) defense in rare and narrowly defined circumstances. Contrary to

1    defense counsel's representation during the January 13, 2020, hearing, the "threshold for admitting such

2    evidence" is *not* "very low when the issue goes to *mens rea*." (Tr. at 29.)  And it is *not* "likely" that this

3    evidence will come in at trial. (*Id.* at 49.)  Quite the opposite: Holmes has not, as part of Defendants'

4    joint severance strategy, provided a basis for the admissibility of her Rule 12.2(b) defense.  Holmes's

5    own expert declaration provides no support for admitting this defense, nor does the evidence Holmes

6    submitted to her expert—presumably, the best evidence she can find to support the defense.  In contrast,

7    all the available evidence shows a defendant fully in command of her cognitive abilities and fully able to

8    understand the nature and consequences of her actions.  There is simply no basis at this juncture for

9    admitting evidence in support of this defense.

10          Because Holmes's *mens rea* defense is not admissible, neither are her allegations against

11   Balwani.  Absent expert testimony connecting these allegations to a mental disorder that tends to negate

12   Holmes's intent, the allegations are wholly irrelevant and should be excluded under Federal Rule of

13   Evidence 403.  Severance is unnecessary.

14          **A.     The Limited Admissibility of Psychiatric Evidence to Negate *Mens Rea***

15          A defendant's ability to present a *"mens rea"* defense derives from the Insanity Defense and

16   Reform Act (IDRA) of 1984.  The Act established an "affirmative defense" when the defendant "as a

17   result of a severe mental disease or defect, was unable to appreciate the nature and quality or the

18   wrongfulness of his [or her] acts." 18 U.S.C. § 17(a).  Congress limited the defense, however, stating

19   explicitly in the Act that a defendant's "[m]ental disease or defect does not otherwise constitute a

20   defense." *Id.*  The statute placed the burden on the defendant to prove the defense "by clear and

21   convincing evidence." 18 U.S.C. § 17(b).  Additionally, the burden "of showing that proffered

22   testimony is offered to negate the *mens rea* element of a crime and not in support of some improper

23   defense theory falls squarely on the defendant." *United States v. Baxt*, 74 F. Supp. 2d 436, 441 (D.N.J.

24   1999) (citing *United States v. Williams*, 95 F.3d 723, 729 (8th Cir. 1996)); *see also Daubert v. Merrell

25   Dow Pharm.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (on remand, holding that proponent of expert

26   testimony must show that evidence is admissible under standards set forth in the Supreme Court's

27   decision); *United States v. Starzecpyzel*, 880 F. Supp. 1027, 1031 (S.D.N.Y. 1995) (stating that the

28   proponent of expert evidence bears the burden of producing facts to establish admissibility).

1    As part of the same statute, Congress also enacted Federal Rule of Evidence 704(b), which

2  prohibits experts from stating an opinion or inference as to the ultimate issue of whether a defendant did

3  or did not have the mental state constituting an element of the charged crime. *See United States v.*

4  *Cohen*, 510 F.3d 1114, 1125 (9th Cir. 2007) ("Even if expert testimony would 'assist the trier of fact'

5  within the meaning of Rule 702, such testimony may be excluded under Rule 704(b) if the testimony

6  'state[s] an opinion or inference as to whether the defendant did or did not have the mental state or

7  condition constituting an element of the crime charged . . . .'") (quoting Fed. R. Evid. 704(b)).

8    Courts have consistently cautioned that under the IDRA, the admission of mental defect evidence

9  should be permitted only in rare and narrowly defined circumstances. As the Third Circuit observed in

10  *United States v. Pohlot*:

11       Only in the rare case, however, will even a legally insane defendant actually lack
         the requisite mens rea purely because of mental defect . . . . [A] man who commits
12       murder because he feels compelled by demons still possesses the mens rea required
         for murder.   The government's burden of proving mens rea is therefore
13       considerably less onerous than its previous burden of proving sanity.

14  827 F.2d 889, 900 (3d Cir. 1987) *cert. denied*, 484 U.S. 1011 (1988), (citations omitted); *United States*

15  *v. Twine*, 853 F.2d 676, 679 (9th Cir. 1988) (citing *Pohlot* and finding "a careful reading of the 1984 Act

16  and its history persuades us that Congress intended to restrict a defendant's ability to excuse guilt with

17  mental defect evidence, curtailing the insanity defense"); *see also United States v. Cameron*, 907 F.2d

18  1051, 1066 (11th Cir. 1990) (only rarely will defendant be able to show lack of *mens rea* due to mental

19  defect); *United States v. Whitehead*, 896 F.2d 432, 436 n.6 (9th Cir. 1990) ("Significantly, the 1984 Act

20  limits the insanity defense to those mental disorders that are 'severe.'") (quoting S. Rep. No. 98–225,

21  98th Cong. 2d Sess. 229); *United States v. Agnello*, 158 F. Supp. 2d 285, 287 (E.D.N.Y. 2001) (where

22  evidence of mental abnormality is offered in support of a legally unacceptable theory of lack of *mens*

23  *rea*, it must be excluded); *United States v. Mezvinsky*, 206 F. Supp. 2d 661, 664 (E.D. Pa. 2002)

24  (recognizing that the IDRA leaves only a "narrow ray of light" for the admission of psychiatric evidence

25  to negate intent).

26    Accordingly, "Congress has instructed courts to be extremely cautious" when confronted with an

27  effort to introduce psychiatric evidence to negate intent. *United States v. Richards*, 9 F. Supp. 2d 455,

28  457 (D.N.J. 1998); *see also Pohlot*, 827 F.2d at 905 (encouraging the careful examination of psychiatric

testimony purportedly offered to negate intent because of the "strong danger of misuse" in this area); *Mezvinsky*, 206 F. Supp. 2d at 665 (same). Such caution is warranted because of the high likelihood that the introduction of such evidence—even if characterized as strictly relevant to negate intent—will result in the resurrection of precisely the kinds of defenses that the IDRA was enacted to prohibit. *See, e.g.*, *Cameron*, 907 F.2d at 1066; *Agnello*, 158 F. Supp. 2d at 287; *Richards*, 9 F. Supp. 2d at 457. *See also United States v. Schneider*, 111 F.3d 197, 203 (1st Cir. 1997) (noting that psychiatric evidence offered to negate intent "tends to reintroduce the very concepts that Congress wanted to exclude and thereby to mislead the jury"); *United States v. Boykoff*, 186 F. Supp. 2d 347, 350 (S.D.N.Y. 2002) (same).

**B.      Psychiatric Evidence Must Be Directly Linked to the *Mens Rea* at Issue in a Particular Case to Be Admissible**

In light of the IDRA, a defendant may only present "psychiatric evidence which negates the *mens rea* element of a charged crime." *United States v. Wescott*, 83 F.3d 1354, 1358 (11th Cir. 1996). Accordingly, in determining whether evidence of a psychiatric impairment is admissible for this purpose, courts have required the defendant to demonstrate clearly, in advance of trial, that there is a direct link between such evidence and the specific *mens rea* that the government must prove. *Cameron*, 907 F.2d at 1067; *Boykoff*, 186 F. Supp. 2d at 349 (recognizing that courts have "refused to admit mental disease evidence where no direct link could be established between it and the issue of *mens rea*"); *United States v. Pirro*, 76 F. Supp. 2d 478, 485 (S.D.N.Y. 1999) ("Mental disease evidence is generally excluded where no link is demonstrated between the evidence and the defendant's *mens rea* or where the defendant could not demonstrate that he actually lacked *mens rea* at the time of the offense because of any psychological defect."); *Baxt*, 74 F. Supp. 2d at 440–41 (evidence of impaired judgment is not evidence of a lack of *mens rea*).

It is not enough for a defendant to show that her psychiatric condition adversely affected her state of mind during the relevant time. *See, e.g.*, *Mezvinsky*, 206 F. Supp. 2d at 672–73; *Richards*, 9 F. Supp. 2d at 459 (in embezzlement case, court excluded evidence defendant was suffering from extreme case of Major Depression Disorder which substantially impaired his judgment because no link was established between that evidence and lack of *mens rea*). The defendant must instead show that because of a mental defect at the time she committed the crimes alleged, she did not have the requisite intent to

1  be found guilty. *See, e.g.*, *Agnello*, 158 F. Supp. 2d at 287–88 (court excluded evidence defendant

2  suffered from bipolar disorder because defendant "failed to establish the necessary link or fit").

3  Significantly, "[c]onclusory statements by a defendant['s experts] about the link between

4  psychiatric evidence and the defendant's *mens rea* at the time the alleged crime was committed do not

5  render the evidence admissible." *Baxt*, 74 F. Supp. 2d at 440; *see also United States v. Bennett*, 161

6  F.3d 171, 181, 185 (3d Cir. 1998).  Courts determining whether to admit such evidence have instead

7  insisted on a reasoned explanation, based on the relevant facts and sound scientific principles,

8  demonstrating that a defendant lacked the requisite intent to commit the alleged offenses at the time of

9  those offenses. "This burden of showing that proffered testimony is offered to negate the *mens rea*

10  element of a crime and not in support of some improper defense theory falls squarely on the defendant."

11  *Baxt*, 74 F. Supp. 2d at 441 (citing *United States v. Williams*, 95 F.3d 723, 729 (8th Cir. 1996)).

12  In giving effect to the legislative judgments reflected in the IDRA, courts have relied on Rule

13  702 and the standards articulated by the Supreme Court in *Daubert* to exclude expert psychiatric

14  evidence that does not actually negate the particular form of *mens rea* that must be established in a given

15  case.  As the court explained in *United States v. Towns*:

16  > While the rules allow for expert testimony relating to *mens rea* under certain
circumstances, *Daubert* makes it clear that the proffered expert testimony must

17  > have some valid scientific connection to the facts of the case in order to be helpful
to the finder of fact, and therefore relevant.

18

19  19 F. Supp. 2d 67, 71 (W.D.N.Y. 1998) (internal citations omitted).  Where expert psychiatric testimony

20  does not demonstrate a lack of *mens rea* at the relevant time, but instead serves only to explain or justify

21  a defendant's conduct, courts have consistently excluded such evidence as failing to meet the

22  requirements of relevance and helpfulness under Rule 702 and *Daubert*. *See Mezvinsky*, 206 F. Supp. 2d

23  at 674; *United States v. Pendergraft*, 120 F. Supp. 2d 1339, 1344 (M.D. Fla. 2000); *Boykoff*, 186 F.

24  Supp. 2d at 349; *United States v. Griffin*, No. (S6) 94 CR. 631 (AGS), 1996 WL 140073, at *10–11

25  (S.D.N.Y. Mar. 27, 1996).

26  In *United States v. Scholl*, for example, the Ninth Circuit upheld limitations on expert testimony

27  under Rule 12.2(b) that did not explain how the disorder would undermine a defendant's intentional

28  criminal conduct. 166 F.3d 964, 970 (9th Cir. 1999).  There, the defendant, who was charged with filing

1   false tax returns, argued that the district court had erred in excluding under Rule 702 the testimony of an

2   expert on compulsive gambling who would have testified that pathological gamblers, like the defendant,

3   "have distortions in thinking and 'denial,' which impact their ability and emotional wherewithal to keep

4   records." *Id.* The Ninth Circuit affirmed, noting that there was no evidence presented at the *Daubert*

5   hearing that addicted gamblers were incapable of truthfully reporting their gambling income. *Id.*

6   "[E]vidence that compulsive gamblers are in denial . . . would not tend to show that Scholl did not

7   believe his tax return to be correct." *Id.* at 971.

8          Moreover, even where proffered psychiatric evidence has some relevance to the issue of *mens*

9   *rea*, it may be excluded for failing the test of admissibility under Rule 403. As discussed above, the

10  courts have often recognized that the use of mental disease evidence to negate specific intent "tends to

11  reintroduce the very concepts that Congress wanted to exclude [in enacting the IDRA] and thereby to

12  mislead the jury." *Schneider*, 111 F.3d at 203. Such evidence "presents an inherent danger that it will

13  distract the jury from focusing on the actual presence or absence of *mens rea*." *Cameron*, 907 F.2d at

14  1067. As the court cautioned in *Pohlot*:

15        Psychiatrists are capable of supplying elastic descriptions of mental states that
       appear to but do not truly negate the legal requirements of mens rea. Presenting
16     defense theories or psychiatric testimony to juries that do not truly negate mens rea
       may cause confusion about what the law requires.
17
18  827 F. 2d at 890. For these reasons, such evidence, even if relevant and helpful under Rules 401 and

19  702, is properly excluded under Rule 403 where its capacity to mislead and confuse the jury

20  substantially outweighs whatever limited probative value it may have. *See, e.g., Agnello*, 158 F. Supp.

21  2d at 289–90 (proffered testimony regarding defendant's bipolar disorder could mislead the jury into

22  thinking such evidence excused the offense); *Griffin*, 1996 WL 140073, at *10 ("expert psychiatric

23  testimony regarding inherently malleable psychological testimony can be misused at trial to mislead or

24  confuse the jury") (internal quotations omitted); *United States v. Vinieris*, 611 F. Supp. 1046, 1049

25  (S.D.N.Y. 1985) (excluding proffered psychiatric testimony under Rules 403 and 702 "upon the ground

26  that it would not assist the trier of fact to understand the evidence or to determine a fact in issue and that,

27  even if relevant, its probative value [was] substantially outweighed by the danger of confusion of the

28  issues or of misleading the jury").

C.   **There Is No Evidence Showing Holmes Had a Severe Mental Disease or Defect That Undermined Her Ability to Form the Intent to Commit Wire Fraud**

Holmes has failed to meet the standard set forth above for admitting evidence in support of a *mens rea* defense. In this case, Holmes is charged with conspiracy to commit wire fraud and wire fraud. The *mens rea* for wire fraud is that Holmes acted with the "intent to defraud." Ninth Cir. Model Crim. J. Instr. 8.124. This means that she must have acted "knowingly" and "with the intent to deceive or cheat." *Id.* Therefore, to be admissible under *Daubert* and *Pohlot*, Dr. Mechanic's testimony must address Holmes's psychological condition at the time of those schemes and how her mental condition then rendered her incapable of deceit. *See Mezvinsky*, 206 F. Supp. 2d at 668 ("Mezvinsky's mens rea defense, therefore, must be probative as to whether he had the mental capacity to form such an intention over the twelve-year course of his alleged two dozen schemes to defraud.").

1.   **Dr. Mechanic's Amended Declaration Does Not Support a Rule 12.2(b) Defense**

(Amended Mechanic Decl. at 14.) This is exactly the kind of opinion that courts have excluded for failing to address the *mens rea* for the offense. *See, e.g., Mezvinsky*, 206 F. Supp. 2d at 672–73 ("To be sure, [defendant's] experts are prepared to testify at length that [his] [bipolar disorder] resulted in 'poor judgment' and 'bad choices,' but none is in a position to state that, at the relevant time, [he] did not have the capacity to deceive."); *Richards*, 9 F. Supp. 2d at 459 (in embezzlement case, court excluded evidence defendant suffered extreme case of Major Depression Disorder which substantially impaired his judgment because no link was established between that evidence and supposed lack of *mens rea*).

1

2

3

4

5                                            See *United States v. Byers*, 730 F.2d 568, 571 (9th Cir. 1984) (affirming

6    the exclusion of "ambiguous" psychiatric testimony that would not "have materially assisted a jury in

7    determining whether Byers committed a voluntary, intentional violation of known legal duty").

8

9                    expert opinions the Ninth Circuit has held probative and admissible to a *mens rea* defense.

10   In *United States v. Cohen*, for instance, the Ninth Circuit held that the expert opinion directly connected

11   the defendant's disorder with his ability to form the "willfulness" necessary to commit tax fraud—a

12   higher level of intent than required for wire fraud.  510 F.3d at 1123.  There, the defense psychiatrist

13   described Cohen as "irrational to the point of dysfunction," and directly tied this condition to Cohen's

14   inability to have a criminal "will."  *Id.*; *see also United States v. Sandoval-Mendoza*, 472 F.3d 645 (9th

15   Cir. 2006) (both government and defense experts agreed that defendant suffered from an actual,

16   unusually large pituitary tumor that compressed defendant's frontal lobe, causing brain damage with

17   demonstrated impacts on his reasoning processes).

18                                                         those excluded by the district court in

19   *United States v. Cruz-Ramirez*, No. CR 08-0730 WHA, 2011 WL 2446278 (N.D. Cal. June 17, 2011).

20   There, the court held the proposed expert testimony had "quite minimal" probative value where one of

21   the defense experts admitted that he "did not purport to address a number of issues that might be raised

22   in a criminal case, such as mental state at the time of the crime, insanity, or competence to stand trial."

23   *Id.* at *5.  The expert further admitted that his testing/evaluation results were "not definitive" and "a

24   broader assessment would have been required" to examine issues like *mens rea* and insanity.  *Id.*  The

25   court ultimately excluded both proposed defense experts under Rule 403, finding the minimal probative

26   value would have been outweighed by the confusion generated from extensive examination and cross-

27   examination about vague diagnoses with little relevance to the charged conduct.  *Id.* at *6.

28

1

2

3

4

5

6

7

8                                                                              These are

9    materials the Court should have the opportunity to review before deciding severance.

10          Based on what is currently before the Court, Holmes has not provided any admissible expert

11   testimony in support of her potential Rule 12.2(b) defense.

12          2.      **Evidence Provided to Dr. Mechanic Does Not Support a Rule 12.2(b) Defense**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   [2] The government asked Dr. Binder to review only the evidence provided to Dr. Mechanic for
     purposes of responding to the severance motions.

3. **Evidence Holmes Failed to Provide to Dr. Mechanic Shows She Understood the Nature and Quality of Her Actions**

Holmes also failed to provide Dr. Mechanic with critical evidence that Holmes knew exactly what she was doing when she committed the fraud. For example, the government has produced numerous videos of media interviews Holmes gave during the time of the alleged fraud. In the videos,

---

[4] This text occurred on the same day Holmes said at a *Wall Street Journal* conference, "We have never used commercially available lab equipment for fingerstick-based tests." *See* https://www.wsj.com/video/full-interview-theranos-ceo-elizabeth-holmes/B3D6EAD3-02E9-4C0C-A230-297DE5ADECF3.html.

1   Holmes appears to understand the nature of her actions, the consequences of her mistakes, and even

2   shows remorse for Theranos's failures in lab safety.

3        For example, after *The Wall Street Journal* article broke on October 15, 2015, Holmes appeared

4   on CNBC *Mad Money* and, during a nearly ten-minute interview, defended Theranos, at one point

5   claiming falsely, "I was personally shocked to see that the *Journal* would publish something like this

6   when we had sent them over a thousand pages of documentation demonstrating that the statements in

7   their piece were false." (Baehr-Jones Decl., Exh. 3, *available at:* https://www.cnbc.com/ 2015/10/15/

8   theranos-ceo-fires-back-at-wsj-i-was-shocked.html.)  In an interview with Maria Shriver for the *Today*

9   *Show* on April 18, 2016, Holmes accepted responsibility for the failures in lab safety and accuracy that

10  prompted the CLIA shutdown.  (Baehr-Jones Decl., Exh. 4, *available at:* www.today.com/

11  video/theranos-ceo-elizabeth-holmes-i-m-devastated-about-blood-test-issues-668286019825.)  Holmes

12  stated to Ms. Shriver, "I feel devastated that we did not catch and fix these issues faster."  Ms. Shriver

13  then asked whether Holmes held herself responsible.  She responded, "I'm the founder and CEO of this

14  company, anything that happens in this company is my responsibility at the end of the day."

15       These videos reveal a person adeptly answering questions and articulating justifications for the

16  fraud.  This is precisely the kind of evidence that would be probative of her mental state and her intent at

17  the time of the crime. *See United States v. Hiebert*, 30 F.3d 1005, 1007 (8th Cir. 1994) ("A defendant's

18  attempt to conceal his commission of a crime suggests that he knows the action is wrongful, and the

19  defendant's knowledge that one crime was wrong evidences that he understood that other criminal acts

20  were inappropriate.") (citations omitted); *United States v. Barton*, 992 F.2d 66, 69 (5th Cir. 1993)

21  (defendant's apologies for his actions were indicative of his ability "to determine right from wrong");

22  *United States v. Freeman*, 804 F.2d 1574, 1577 (11th Cir. 1986) (defendant's efforts to avoid

23  apprehension demonstrated he "knew his conduct was wrongful").  Yet, Holmes showed none of these

24  videos to Dr. Mechanic.  This raises important questions about the reliability of Dr. Mechanic's

25  opinions.  Would her opinion change if she considered Holmes's presentation in these public media

26  appearances?  In her expert opinion, is this the type of evidence that would be useful to review in

27  assessing a defendant's ability to form the intent to deceive?  Again, the Court should have answers to

28  these threshold questions before deciding severance.

GOV. OPP. TO BALWANI MOT. TO SEVER
18-CR-00258-EJD

**D.** **Holmes's Self-Serving Statements Are Inadmissible Under Federal Rules of Evidence 401, 402, 403, and 702**

███████████████████████████████████████████████████ he only evidence Holmes has presented in support of her Rule 12.2(b) defense are her own, self-serving statements alleging that abuse by her co-conspirator undermined her ability to commit the conspiracy.[5] These statements, on their own, however, are inadmissible under Rules 401, 402, 403, and 702.

       1.   **Holmes's Allegations Against Balwani Are Not Relevant Absent Expert Testimony**

███████████████████████████████████████████████████████████████

███████████████████████████████

███████████████████████████ "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402.

A fact witness is not permitted to offer opinion testimony within the purview of an expert witness pursuant to Rule 702. Thus, absent Dr. Mechanic's testimony, no fact witness will be able to opine that Holmes's experience of PTSD, anxiety, and depression undermined her intent to deceive. Without this connection between Holmes's purported mental conditions and her ability to form the requisite intent, her allegations of abuse at the hands of Balwani are entirely irrelevant. These allegations are only arguably relevant—and even then, minimally so—if they tend to show that Holmes experienced IPV which triggered the mental conditions allegedly undermining her *mens rea*. Absent this chain of connections, which can only be explained through expert testimony, the allegations have no tie to the charged conduct or to any other defense.[6] Indeed, one of the most arguably prejudicial allegations, ██████████████████████—on which Balwani relies to request severance— ████████ ███████████████████████████████████████████████

This case is therefore not like *United States v. Haischer*, 780 F.3d 1277 (9th Cir. 2015), on which Holmes relies. (Holmes Opp. to Gov. Admin. Mot. to Set Deadlines at 3.) There, Haischer claimed,

---

[5] The government assumes that Holmes has submitted an *ex parte* proffer setting forth her potential trial testimony that includes the allegations summarized in Dr. Mechanic's declaration.

[6] Counsel for Holmes stated at the January 13, 2020, hearing that she was *not* advancing a duress defense.

1   initially as part of a duress defense and then later as part of a *mens rea* defense, that her co-defendant

2   Nunes had abused her. *Id.* at 1280. Haischer's sister testified that she heard Nunes yelling at Haischer

3   to sign some papers, which Haischer then testified were for the relevant fraudulent loan application. *Id.*

4   Haischer's sister further testified that Nunes refused to allow Haischer to be taken to see a doctor for a

5   badly swollen leg, which X-rays showed was badly broken, until she signed the papers. *Id.* The alleged

6   abuse was therefore connected directly and factually to the fraud.

7       Here, the alleged abuse is only tied to the fraud through Dr. Mechanic's testimony. Since Dr.

8   Mechanic's opinion—at least at this juncture—does not support the Rule 12.2(b) defense, Holmes's

9   allegations are also inadmissible.

10       2.    **Holmes's Allegations Are Minimally Relevant Even If Expert Testimony Is Admitted and Should Therefore be Excluded Under Rule 403**

11       Even if some form of expert testimony were admitted, however, Holmes's allegations are still

12   only minimally relevant. The allegations of abuse are one step removed from the material issues of

13   Holmes's *mens rea* defense: (1) whether she experienced PTSD, anxiety, and depression at the time of

14   the alleged offenses; and (2) whether these mental conditions affected her ability to form the requisite

15   intent. The allegations are also far removed from the relevant time period: ███████████████

16   ████████████████████   Thus, these allegations have a tangential connection, at best, to

17   Holmes's claims that her experience of PTSD in 2013–2016 undermined her *mens rea*.

18       Testimony about the causes of her mental condition—███████████and IPV—*may* be

19   minimally relevant to evaluating Dr. Mechanic's diagnoses, but this minimal relevance is far

20   outweighed by their potential prejudice and their likelihood to confuse and distract the jury from the

21   material issues of the case. *See* Fed. R. Evid. 403; *Cruz-Ramirez*, 2011 WL 2446278, at *6. It is also

22   possible that particular allegations, ████████████████████ are *not* relevant to the

23   diagnoses. The Court would only be able to determine these relevancy questions by conducting a

24   *Daubert* hearing, and hearing from both the defense and government experts.

25   E.    **To The Extent There Are Facts and Evidence in Dispute, the Government Requests the Court Set a *Daubert* Hearing**

26

27       If the Court still has questions about Dr. Mechanic's potential testimony and its admissibility, the

28   government urges the Court to hold a *Daubert* hearing before granting severance motion. On this

1  record, there is a manifest need for the Court to determine the bases and reasons for Dr. Mechanic's

2  opinion and to decide whether these opinions have a sufficient basis in analytical methodologies before

3  making a final—and likely irreversible—decision on severance.  At the very least, the case law,

4  evidence, and arguments set forth above raise serious questions about the viability of this defense—

5  questions which could be resolved as part of a *Daubert* hearing.

6  **III.    Even Assuming the Rule 12.2(b) Defense Is Admissible, Defendants Have Failed To Demonstrate That Their Defenses are Irreconcilably Antagonistic**

7          Even if Holmes's Rule 12.2(b) defense were viable in some form—which it is not at this

8  juncture—severance would still be unnecessary in this case because Balwani has not articulated how this

9  defense is irreconcilably antagonistic to his own.  "To warrant severance on the basis of antagonistic

10  defenses, codefendants must show that their defenses are irreconcilable and mutually exclusive." *United*

11  *States v. Angwin*, 271 F.3d 786, 795 (9th Cir. 2001).  Defenses are mutually exclusive when "acquittal

12  of one codefendant would *necessarily* call for the conviction of the other." *United States v. Tootick*, 952

13  F.2d 1078, 1081 (9th Cir. 1991) (emphasis added); *Throckmorton*, 87 F.3d at 1072 (noting that "a

14  defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his

15  own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the

16  defendant").  Even when defendants present antagonistic defenses, such defenses "are not prejudicial per

17  se." *Zafiro*, 506 U.S. at 538.

18          Holmes's defense does *not* require a jury to find Balwani guilty.  Instead, her defense focuses

19  entirely on whether she was capable of forming the requisite *mens rea* to commit the offense.  Her

20  allegations against Balwani, though unflattering to him, have no connection to the fraud and no

21  connection to his relative guilt or innocence.  In other words, Defendants can still both argue their

22  innocence, and the jury may believe both of them and return acquittals for both. *See, e.g., United States*

23  *v. Shields*, 673 F. App'x 625, 626–27 (9th Cir. 2016) ("Defendants' defenses were not mutually

24  exclusive because they both argued that they were innocent, and the jury could have believed that both

25  were acting in good faith, and acquitted them both.").  For example, both Defendants may argue that

26  there was no scheme to defraud and the statements made to investors and patients were entirely truthful.

27  And both Defendants may argue any false or deceptive statements were immaterial.

28

1    Additionally, Balwani has not yet articulated his defense and how this defense would be

2    antagonistic to Holmes's. The burden rests with Defendants to show that their defenses are

3    irreconcilably antagonistic. *Throckmorton*, 87 F.3d at 1072. Since they have not yet made this showing,

4    severance would be premature. *See, e.g., United States v. Son Van Nguyen*, No. CR. S-99-0433 WBS,

5    2002 WL 32103063, at *1 (E.D. Cal. Nov. 7, 2002) (holding severance based on a theory of mutually

6    antagonistic defenses was premature where both of defendants' defenses had not yet been disclosed).

7    Because it is not clear that Balwani's defense would be antagonistic to Holmes's, this case is

8    distinguishable from *United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995). (*See* Balwani Mot. to Sever

9    at 4–5; Balwani Supp. Memo. at 4.) There, Breinig claimed that "because [his wife and co-defendant]

10   kept all the books and an accounting firm prepared their taxes, he had no knowledge of the

11   underreporting." *Id.* at 852. In other words, Breinig presented a defense in which he pointed the finger

12   at his co-defendant wife and his innocence rested on her guilt. Thus, in *Breinig*, unlike here, the

13   defendants had met their initial burden of showing actually antagonistic defenses.[7]

14   Moreover, even if some form of the *mens rea* defense were admitted, it does not necessarily

15   follow that all allegations against Balwani—███████████████████—would also be

16   admitted. The point of Holmes's defense is not duress, *i.e.*, Balwani's abuse forced her to commit fraud.

17   The point of her defense is that she suffered from mental conditions that undermined her ability to form

18   the intent to deceive. As discussed above, the causes of those mental conditions have relatively limited

19   relevance to the ultimate issues that the jury must decide: whether she suffered from the mental

20   conditions at the time of the alleged fraud and whether these conditions undermined her *mens rea*.

21   Balanced against the minimal relevance of these allegations is the high likelihood that they would

22   mislead, confuse, and distract the jury. Thus, even if the Court admitted testimony from Dr. Mechanic

23

24   ――――――――――――――――――――――――――――――――――――――――

     [7] Of course, there, the Sixth Circuit reversed not merely because the defenses were antagonistic,

25   but because the testimony of Breinig's wife that he was an "adulterous, mentally abusive, and
     manipulating spouse" was so prejudicial that it denied Breinig the right to a fair trial. *Id.* at 852–53.

26   The court in *Breinig*, though, did not examine the content of the expert testimony in support of the
     wife's defense and therefore never considered how these facts were relevant and admissible as part of

27   her defense. In fact, it appears from the district court docket that the court did not conduct a *Daubert*
     hearing. *See United States v. Breinig*, 2:93-CR-80404 (E.D. Mich. 1993). Thus, the case is of limited

28   value in evaluating the threshold matters here: (1) whether Holmes's Rule 12.2(b) defense is viable; and
     (2) if so, whether certain allegations would be admissible as part of the defense.

     GOV. OPP. TO BALWANI MOT. TO SEVER
     18-CR-00258 EJD                                   20

1   about Holmes's mental condition, the Rule 403 balancing test would still weigh heavily against

2   admission of the "uniquely incendiary" allegations that Balwani describes.

3       And even if some limited testimony about the general nature of these allegations were admitted,

4   a limiting instruction could cure any potential prejudice. *See, e.g., Reay v. Scribner*, 369 F. App'x 847,

5   848–49 (9th Cir. 2010) (holding that denial of defendant's severance motion from his wife and

6   codefendant did not violate his due process rights where wife testified about defendant's domestic

7   violence because, among other reasons, any prejudice was lessened by the trial court's instructions to the

8   jury that it was to use the domestic violence evidence for proper purposes). *See also Fernandez*, 388

9   F.3d at 1241 ("[A] district court's careful and frequent limiting instructions to the jury, explaining how

10  and against whom certain evidence may be considered, can reduce or eliminate any possibility of

11  prejudice arising from a joint trial."); *United States v. Joetzki*, 952 F.2d 1090, 1094 (9th Cir. 1991) ("A

12  defendant seeking severance based on the 'spillover' effect of evidence admitted against a co-defendant

13  must also demonstrate the insufficiency of limiting instructions given by the judge.").

14      Because Holmes's Rule 12.2(b) defense is not irreconcilably antagonistic with Balwani's

15  potential defenses, and would not necessarily result in highly prejudicial allegations being admitted at a

16  joint trial, severance is unnecessary.

17  **IV.   "Expensive Pretrial Investigation" Is Not a Basis for Severance**

18      Severance remedies potential prejudice *at trial*. "[W]hen defendants properly have been joined

19  under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that

20  a joint trial would compromise a specific right of one of the defendants, or prevent the jury from making

21  a reliable judgment about guilt or innocence." *Zafrio*, 506 U.S. at 539. Nothing in Rule 14

22  contemplates severance as a remedy for a co-defendant's "expensive" pretrial investigation. Nor has

23  Balwani cited any authority supporting such a premature application of severance.[8]

24

25      [8] To the contrary, courts do not decide motions to sever until the record contains *all* relevant

26  facts necessary to decide the issue. *See, e.g., United States v. Shayota*, No. 15-CR-00264-LHK, 2016
    WL 2730230, at *3 (N.D. Cal. May 10, 2016) (motion for severance premature before government

27  provided co-defendant statements it sought to admit); *United States v. Piper*, No. CR 08-82 RSL, 2008
    WL 2230747, at *3–4 (W.D. Wash. May 29, 2008) (denying as premature motion to sever based in part

28  on the "possibility" of mutually exclusive and antagonistic defenses). This is because severance is a
    remedy that imposes significant burdens on the court and the government. *Zafrio*, 506 U.S. at 540.

**V.     The Court Can Ensure a Fair Trial for Balwani by Empaneling Dual Juries**

At the January 13, 2020, hearing, the Court expressed concern with delaying a decision on severance. The government recognizes this case presents unique scheduling difficulties. However, the Court need not sever the trial at this juncture. Another form of protection—empaneling dual juries—would ensure that a joint trial would not deny Balwani his right to a fair trial, even assuming all of the allegations were admitted during testimony from Dr. Mechanic and Holmes.

The procedures for empaneling dual juries are straightforward: the Court would seat a "Holmes Jury" and a "Balwani Jury." The juries would both be present for the government's opening statement, but only the "Holmes Jury" would be present for her opening statement, and only the "Balwani Jury" would be present for his. Similarly, only the "Holmes Jury" would be present for her affirmative defense, and for any government rebuttal case addressing her defense. During closing arguments, only the "Holmes Jury" would be present for her closing statement and for the government's rebuttal argument in response, and likewise for Balwani's closing statement. Although this would require some additional resources from the public and the Court, it would be much less resource-intensive than conducting two lengthy trials. It would also allow two properly joined co-conspirators to be tried together, which is what the rules and the case law support. Finally, this procedure would prevent the "Balwani Jury" from hearing any of the "uniquely incendiary" allegations of abuse that he claims could prejudice him and deny him a fair trial.

Defendants may argue that Holmes could still cross-examine government witnesses concerning her allegations of abuse. But simply asking questions about Balwani's behavior towards Holmes would not create such prejudice that Balwani would be denied a fair trial. Moreover, defense counsel would be required to have some foundation for asking government witnesses about allegations of abuse. The government is aware of *no* government witness who has knowledge of the allegations that Balwani sexually and physically abused Holmes. Thus, whatever testimony might be elicited on cross-examination would not prejudice Balwani to the point that he would be unable to receive a fair trial.

The use of dual juries is widely accepted in the Ninth Circuit. *Lambright*, 191 F.3d at 1185 ("[D]ual juries are in wide use and . . . they have worked out just fine."); *Beam v. Paskett*, 3 F.3d 1301, 1304 (9th Cir. 1993); *United States v. Burnette*, 698 F.2d 1038, 1042 n.2 (9th Cir. 1983); *United States*

1  *v. Sidman*, 470 F.2d 1158, 1167–70 (9th Cir. 1972).  In *Sidman*, for instance, the Ninth Circuit approved

2  the use of dual juries and articulated how the district court properly conducted the trial efficiently and

3  successfully protected each defendants' due process and trial rights.  470 F.2d at 1167–68.  There, the

4  district court explained the purpose of two juries where each jury would decide the guilt or innocence of

5  only one defendant, instructed each juror not to talk to each other about the case, and named one jury the

6  "Clifford jury" and the other the "Sidman jury."  One jury sat in the jury box and the other sat in chairs

7  in front of the jury box.  Counsel and the defendant would be present whenever testimony or evidence

8  was presented in their respective case.  The first verdict returned was not announced until the second one

9  was returned.  The Ninth Circuit held that the dual juries used did not violate either of the defendants'

10  trial and due process rights.[9]

11         Here, the government anticipates that all of the evidence in its case-in-chief will be admissible

12  against both Defendants.  Given that the Defendants are properly joined, using a dual-jury procedure

13  would not unduly complicate the trial process, and more importantly, would not result in any specific

14  and undue prejudice to either defendant.  Severance is an extraordinary remedy for a potential defense

15  that may not even be admitted.  In this case, empaneling dual juries would provide a much less

16  disruptive and ultimately more just outcome than severance.

17  **VI.    Balwani Has Failed to Demonstrate Prejudice and Should Not Proceed to Trial First**

18         Separate from the Court's decision on severance is Balwani's demand to proceed to trial first.

19  However, he has not established that he would be unable to receive a fair trial in this district should

20  Holmes be tried first, nor has he identified the proper remedy.  The Court should deny this request.

21         Balwani has no right to have the trials conducted in a particular order.  *See Mack v. Peters*, 80

22  F.3d 230, 235 (7th Cir. 1996) ("Severance . . . does not create a right to a particular trial sequence.").

23  "[C]o-conspirators should not be allowed to control the order in which they are tried."  *United States v.*

24  *Broussard*, 80 F.3d 1025, 1038 (5th Cir. 1996).  Rather, it is this Court's "prerogative to decide the order

25  in which defendants will be tried."  *Id.*

26

27         [9] In *Sidman*, the Ninth Circuit expressed some concern that the district court's local rules did not
describe specific guidelines for dual juries, but *Sidman* was decided in 1972 when the practice was

28  relatively novel.  470 F.2d at 1170.  By 1999, in its en banc decision in *Lambright*, the Ninth Circuit
stated that "dual juries are in wide use and . . . they have worked out just fine." 191 F.3d at 1185.

1    "The remedy for excessive pre-trial publicity is a motion for change of venue and voir dire of

2    prospective jurors.  Severance . . . is not a remedy to combat unfavorable pre-trial publicity . . . ."

3    *United States v. Thevis*, 474 F. Supp. 117, 132 (N.D. Ga. 1979) (footnote omitted); *see also United*

4    *States v. Noriega*, 746 F. Supp. 1548, 1556 (S.D. Fla. 1990) (rejecting pretrial publicity as a basis for

5    severance and stating "[i]f . . . careful voir dire is not enough to limit the prejudice flowing from pretrial

6    publicity, then the answer lies in locating a venue in which all the defendants receive a fair trial").

7        Just as pretrial publicity is not a basis for severance, it is not a basis to order the trials.  Even if it

8    were, Balwani's claim that Holmes's defense will incurably taint the jury pool (and thus he must go

9    first) is speculation.  The sole evidentiary support for this claim is his counsel's count of 150 stories

10   since October 2015, when John Carreyrou's article first ran in *The Wall Street Journal*, additional

11   national media attention, and unsworn, unverified news articles about #MeToo.

12       The Ninth Circuit, however, has "made clear that 'pervasive publicity, without more, does not

13   automatically result in an unfair trial.'"  *United States v. Guerrero*, 693 F.3d 990, 1002 (9th Cir. 2012)

14   (quoting *Seattle Times Co. v. U.S. Dist. Court*, 845 F.2d 1513, 1517 (9th Cir. 1988)); *see also In re*

15   *Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) ("[A]ny high-profile case will receive significant media

16   attention. . . . Knowledge, however, does not equate to disqualifying prejudice.").  Balwani does nothing

17   to demonstrate the nature of the coverage.  *Cf. Guerrero*, 693 F.3d at 1002 ("In assessing prejudicial

18   effect, we look to the publicity's capacity to inflame and prejudice the entire community." (quotations

19   omitted)).  He does not show the extent to which potential venire members noted the news coverage,

20   recall it today, and have developed negative views about Theranos, Holmes, or himself.  He presents no

21   polling data or expert testimony.  *Cf. Skilling v. United States*, 561 U.S. 358, 369-370 (2010) (affirming

22   denial of change of venue in Enron criminal case despite "affidavits from . . . experts [Skilling] engaged

23   portraying community attitudes in Houston").  He overlooks the fact that San Jose is "a large, diverse

24   metropolitan area" whose "residents obtain their news from a vast array of sources." *Tsarnaev*, 780

25   F.3d at 21; *see also Skilling*, 561 U.S. at 382 (noting Houston's large, diverse pool of potential jurors);

26   https://www.justice.gov/usao-ndca (noting more than 9 million people reside in Northern District of

27   California).  He gives no evidence—beyond unsworn news articles and citation to an unsworn social

28   science article—to support the claim that traditional tools like voir dire and, if necessary, change of

1  venue will protect against the prejudice he simply assumes. *See Skilling*, 561 U.S. at 395 (noting the

2  district court's "face-to-face opportunity to gauge demeanor and credibility, coupled with information

3  from the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the court a

4  sturdy foundation to assess fitness for jury service"). In sum, "it would be premature and speculative to

5  conclude at this point, without the benefit of a voir dire examination of prospective jurors, that the

6  publicity surrounding [the defendant] is so prejudicial and widespread that a fair and impartial jury

7  cannot be seated in this case." *Noriega*, 746 F. Supp. at 1556. Balwani's evidence falls far short of

8  showing that current publicity, or any that would result from disclosure of Holmes's defense, will

9  incurably taint the jury pool.[10]

10      If the Court elects to sever the case, Holmes must be tried first. Holmes, quite literally, was the

11  face of Theranos. She was its only CEO, she chaired its board, and she held the greatest equity stake in

12  the company. Her persona, not Balwani's, generated interest from investors, partners, and the media.

13  Delaying her trial for an indefinite time after Balwani's will unjustly frustrate the victim's and the

14  public's interest in adjudicating the allegations of the indictment against the most responsible party.

15                              **CONCLUSION**

16      For these reasons, the Court should deny severance. If severance is granted, Holmes should be

17  tried first.

18  DATED: January 31, 2020                           Respectfully submitted,

19                                                    ADAM A. REEVES
                                                      Attorney for the United States,
20                                                    Acting Under Authority Conferred
                                                      By 28 U.S.C. § 515
21

22

23                                                    JEFF SCHENK
                                                      JOHN C. BOSTIC
24                                                    ROBERT S. LEACH
                                                      VANESSA BAEHR-JONES
25                                                    Assistant United States Attorneys

26      ——— [10] For the reasons previously stated, the Court should unseal the filings relating to the Rule

27  12.2(b) defense and the motions to sever, or at a minimum require Defendants to file redacted versions
    that redact only matters ███████████████  Approximately 125 of the 312 filings in this case (40%) are now

28  sealed. The victims and the public have a right to know what is happening in this proceeding and why.

GOV. OPP. TO BALWANI MOT. TO SEVER

Declaration of Renée Binder, M.D.

I, Renée Binder, declare and state as follows:

1.  I am a physician who has been licensed to practice in the State of California since 1974. I am board certified in General Psychiatry since 1978 and in the subspecialty of Forensic Psychiatry since 1994. I have treated thousands of patients with depression, anxiety, posttraumatic stress disorder, and women who have suffered from interpersonal abuse and interpersonal violence.

2.  I have done forensic evaluations since 1980. I have served as President of the American Academy of Psychiatry and the Law as well as President of the American Psychiatric Association and served as interim Chair of the Department of Psychiatry and the Director of the Langley Porter Psychiatric Hospital and Clinics at the University of California San Francisco School of Medicine from 2008 to 2011. A copy of my C.V. is attached.

3.  I was asked to review the declaration of Mindy Mechanic, PhD, as well as the documents given to me by the Office of the U.S. Attorney, as detailed in Appendix A. ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as well as medical records from the University of Southern California Keck Hospital.

**Dr. Mechanic's Report**

4.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



**Interpersonal Abuse and Interpersonal Violence Definitions**

8. Interpersonal abuse refers to abusive relationships in which the abuse is physical, psychological, and/or sexually coercive and may include stalking. In such abusive relationships, the aggressor uses manipulative tactics and tries to exert control over the other person. Resistance or challenge can be met with an escalation of abuse. Attempts to

---

[1] In describing the text or chat communications, I describe the defendants using their first names.

leave are met with threats and intimidation. As stated in Dr. Mechanic's report, interpersonal abuse is fundamentally about control (page 8 of Dr. Mechanic's report).







- 
- 

12.

- 
- 
- 
- 

13.

## Posttraumatic Stress Disorder Diagnosis

14. Posttraumatic Stress Disorder can occur after exposure to actual or threatened death, serious injury, ███████████ Symptoms include intrusion symptoms such as recurring, involuntary and intrusive distressing memories of the event, recurrent nightmares, intense or prolonged psychological distress and/or marked physiological

reactions to reminders of the trauma. Symptoms also include avoidance symptoms where a person avoids memories and external reminders of the trauma. In addition, there can be the inability to remember aspects of the traumatic event not related to having been intoxicated with alcohol ███████████████████████████████████████

██████████████████████ negative cognitions about oneself, feelings of detachment from others and persistent inability to experience positive emotions. Other symptoms include feelings of arousal such as irritable behavior, hypervigilance and exaggerated startle responses. In order to make the diagnosis, there needs to be clinically significant distress or impairment in social, occupational, or other important areas of functioning. (DSM-5, 2013, pages 271–72.)

15. Although trauma is relatively ubiquitous, the projected lifetime risk for PTSD is 8.7%. The 12 month prevalence among US adults is 3.5%. That is, most people who suffer from trauma do not develop PTSD. In addition, there is a phenomenon of False PTSD, especially in the context of criminal evaluations when defendants may malinger their symptoms and there is also the phenomenon of misattributing symptoms due to other causes as PTSD. (Matto, McNiel, Binder, "A Systematic Approach to the Detection of False PTSD," Journal of American Academy of Psychiatry and the Law. August 2019.)



16.

17.



20.

21.

22.







27.



28.

29.



30.

31.

32.

//

//

//

33. My opinions are based on my education, training, experience, ███████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████ I reserve the right to modify my opinions if I am given additional records and the opportunity to interview Ms. Holmes and other relevant individuals.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  1/31/20

*Renée Binder M.D.*

Renee Binder, M.D.
Professor of Psychiatry
University of California, San Francisco

13

Appendix A

I was provided with the following materials by government counsel:

1. 

2. The following case filings and related materials: (1) the December 16, 2019, Fed. R. Crim. P. 12.2(b) Disclosure; (2) the December 16, 2019, Motion for Severance, filed by Defendant Holmes; (3) ████████████████████████████ (4) the January 17, 2020, Letter regarding Rule 12.2(b) Request; (5) ████ ████ (6) the December 5, 2019, Declaration of Dr. Mindy Mechanic; (7) Defendant Balwani's Motion to Sever; (8) the Declaration of Jeffrey Coopersmith in support of Motion to Sever; (9) Defendant Balwani's Supplemental Memorandum in support of Motion to Sever; and (10) the Declaration of Jeffrey Coopersmith in support of the Supplemental Memorandum.

**Prepared:**
**1/15/20**

## University of California, San Francisco

## CURRICULUM VITAE

| | |
|---|---|
| **Name:** | **Renée L. Binder, M.D.** |
| **Current Title:** | Distinguished Professor |
| **Department:** | Department of Psychiatry, School of Medicine <br> University of California, San Francisco |
| **Current Positions:** | Director, Psychiatry and the Law Program (as of 2/99) |
| | Associate Dean in the Office of Academic Affairs, School of Medicine (as of 10/04) |
| | President, American Psychiatric Association (May 2015-May 2016) |
| **Prior Positions (2008-11):** | Interim Chair of Department of Psychiatry |
| | Director of Langley Porter Psychiatric Hospital and Clinics |
| **Address:** | 401 Parnassus Avenue, San Francisco, CA  94143-0984 |
| **Phone:** | (415) 476-7304 |
| **Fax:** | (415) 502-2206 |
| **E-mail:** | Renee.Binder@ucsf.edu |

### EDUCATION:

| Dates | Institution Attended & Location | Degree or Status | Major Subjects |
|---|---|---|---|
| 1965-69 | Barnard College, New York, NY | 1969, B.A., cum laude | Art History & Pre-Medicine |
| 1969-73 | University of California, San Francisco School of Medicine | 1973, M.D. | Medicine |
| 1973-76 | Mt. Zion Hospital & Medical Center, San Francisco | Intern & Resident | Psychiatry |
| 2010 | Harvard School of Public Health | Program for Chiefs of Clinical Services | Health Policy and Management |
| 2018 | Stanford Graduate School of Business | Innovative Health Care | Leadership Program |

### LICENSES, CERTIFICATIONS:

| | |
|---|---|
| 1974 | Medical license, California G27505 |
| 1978 | Certified, American Board of Psychiatry & Neurology —Specialty of Psychiatry |
| 1993 | Certified, Administrative Psychiatry |

| 1994- 2004 | Certified, American Board of Psychiatry & Neurology—Subspecialty of Forensic Psychiatry |
|---|---|
| 2004-2014 | Recertified, American Board of Psychiatry & Neurology—Subspecialty of Forensic Psychiatry |
| 2013-2023 | Recertified, American Board of Psychiatry & Neurology—Subspecialty of Forensic Psychiatry |

## PRINCIPAL POSITIONS HELD:

| 1976-77 | UCSF | Clinical Instructor |
|---|---|---|
| 1977-85 | UCSF | Assistant Professor of Psychiatry |
| 1985-91 | UCSF | Associate Professor of Psychiatry |
| 1991-now | UCSF | Professor of Psychiatry |

## OTHER POSITIONS HELD CONCURRENTLY:

| 1974-77 | Menlo Park Veterans Hospital | Physician O.D. |
|---|---|---|
| 1976-86 | Langley Porter Psychiatric Institute | Director, Emergency Services |
| 1978-80 | Langley Porter Psychiatric Institute | Director, Rape Treatment Center |
| 1976-77 | Langley Porter Psychiatric Institute | Staff Psychiatrist, Crisis Intervention Unit |
| 1977-99 | Langley Porter Psychiatric Institute | Director, Adult Inpatient Service |
| 1976-now | Langley Porter Psychiatric Institute | Attending Physician, Medical Staff |

## HONORS, AWARDS, AND FELLOWSHIPS:

| 1974-76 | American Psychiatric Association Falk Fellowship. One of twenty residents selected throughout this country to become involved with the APA on a national level |
|---|---|
| 1984 | Women of Achievement Award by the Soroptomist International of the Americas given in recognition by peers of "outstanding abilities, talents and contributions to the profession" |
| 1986 | Interdisciplinary Achievement Award from the Langley Porter Psychiatric Institute Alumni-Faculty Association. Awarded for significant contribution to interdisciplinary work and understanding in the field of mental health |
| 1986 | World Health Organization Travel-Study Fellowship to Japan. Awarded to individuals "who show the greatest promise of benefiting health programs in the United States." |
| 1990 | Visiting Research Fellow, National Hospital for Nervous Diseases, Queen Square, London, UK: June-August, 1990 |
| 1998 | Northern California Psychiatric Society "President's Distinguished Service Award" for "skill in building consensus in a diverse organization and for efficient and responsible leadership style" |
| 2003 | American Psychiatric Association Congressional Health Policy Fellowship to work in the U.S. Senate and consult on health policy. |
| 2004 | California Psychiatric Association Award for Contributions and Service |
| 2005 | Distinguished Service on the Center for Judicial Education and Research Faculty presented by the Administrative Office of the Courts |
| 2006 | Dr. J. Elliott Royer Award for academic excellence and significant contributions to the field of academic psychiatry |

| | |
|---|---|
| 2006 | Plenary Speaker at UCSF Dean's Office Symposium for Mid-Career Faculty |
| 2006 | Psychiatry Residents Association Award for "Excellence in Teaching" |
| 2006 | American Academy of Psychiatry and the Law's "Seymour J. Pollack Distinguished Achievement Award" in recognition of distinguished contributions to the teaching and educational functions of forensic psychiatry |
| 2009 | Keynote speaker:Conference on Violence sponsored by the SF Department of Public Health |
| 2009 | UCSF "Champion of Diversity" for commitment and efforts toward achieving diversity in the category of leadership |
| 2010 | Distinguished Life Fellow of the American Psychiatric Association |
| 2014 | Selected as one of the "Best Doctors in America" (first selected in 1996) |
| 2014 | American Academy of Psychiatry and the Law's "Golden AAPL Award" in recognition of significant contributions to the field of forensic psychiatry |
| 2017 | Visiting Professor, Yale University |
| 2018 | Isaac Ray Award for "Outstanding Contributions to Forensic Psychiatry or the Psychiatric Aspects of Jurisprudence" |

## PROFESSIONAL ORGANIZATIONS:

<u>Memberships:</u>

| | |
|---|---|
| 1974-now | Northern California Psychiatric Society |
| 1974-now | American Psychiatric Association |
| 1985-now | American Academy of Psychiatry and the Law |

<u>Service To Professional Organizations:</u>

| | | |
|---|---|---|
| 1974-75 | Northern California Psychiatric Society | Committee on Women |
| 1974-75 | American Psychiatric Association | Committee of Medical Education |
| 1975-76 | Northern California Psychiatric Society | Resident Councilor to Executive Committee |
| 1975-76 1996, 1999, 2000 | Northern California Psychiatric Society | Nominating Committee |
| 1978-79 | Northern California Psychiatric Society | Medi-Cal Committee |
| 1979-80 | American Psychiatric Association | Task Force of Psychiatric Emergency Care Issues, Resource Person |
| 1983-89 | American Psychiatric Association | Committee on Women |
| 1987-89 | American Academy of Psychiatry and the Law | Public Information Committee |
| 1988-90 | American Academy of Psychiatry and the Law | Education Committee |
| 1989-03 | American Academy of Psychiatry and the Law | Journal Committee |
| 1990-94 | American Academy of Psychiatry and the Law | Fellowship Committee |
| 1990-97 | American Academy of Psychiatry and the Law | Program Committee |
| 1994-97 | American Academy of Psychiatry and the Law | Chair of Membership Committee |
| 1991-92 | American Academy of Psychiatry and the Law | Chair of Program Committee |
| 1991-94 | American Academy of Psychiatry and the Law | Councilor |
| 1997-00 | American Academy of Psychiatry and the Law | Nominating Committee |
| 1989-90 | Northern California Psychiatric Society | Fellowship Committee |
| 1989-90 | American Psychiatric Association | Committee on Confidentiality |
| 1995 | American Academy of Psychiatry and the Law | Ad Hoc Committee to Search for Medical Director |
| 1990-95 | American Psychiatric Association | Chair of Committee on Confidentiality |
| 1995-00 | American Psychiatric Association | Council on Psychiatry and the Law |

| | | |
|---|---|---|
| 1991-95 | American Psychiatric Association | Practice Guidelines Work Group on Developing Guidelines for Psychiatric Evaluation of Adults |
| 1989-93 | American Psychiatric Association | Task Force on Clinician Safety |
| 1989-90 | Association for Women Psychiatrists | Treasurer |
| 1989-now | Group for Advancement of Psychiatry | Committee on Psychiatry and the Law (Contributing status as of 4/92) |
| 1994-95 | American Academy of Psychiatry and the Law | Vice President |
| 1995-96 | Northern California Psychiatric Society | Vice President |
| 1995-97 | American Psychiatric Association | Chair of Subcommittee on Child Custody Issues |
| 1996-97 | California Psychiatric Association | Executive Council |
| 1996-97 | Northern California Psychiatric Society | President-Elect |
| 1997-98 | Northern California Psychiatric Society | President |
| 1997-00 | American Psychiatric Association | Chair of Council on Psychiatry and the Law |
| 1997-98 | American Academy of Psychiatry and the Law | President |
| 1998-99 | American Psychiatric Association | Task Force to Prepare APA Position Statement on Confidentiality |
| 2000-04 | American Psychiatric Association | Chair of Commission/Committee on Judicial Action |
| 2000-03 | American Psychiatric Association | Commission on Public Policy, Litigation and Advocacy |
| 2000-02 | California Psychiatric Association | President-elect |
| 2001-14 | American Academy of Psychiatry and the Law | Chair, Awards Committee |
| 2004-06 | American Academy of Psychiatry and the Law | President, Association of Directors of Forensic Psychiatry Fellowships |
| 2002-04 | California Psychiatric Association | President |
| 2005-12 | American Psychiatric Association | Isaac Ray Award Committee (Chair 2009-12) |
| 2004-07 | American Psychiatric Association | Trustee-at-large |
| 2004-05 | American Psychiatric Association | Work Group to revise 1995 *Practice Guideline for the Psychiatric Evaluation of Adults* |
| 2005- | American Psychiatric Association | Task Force to Update the Ethics Annotations |
| 2007-12 | American Psychiatric Association | Committee on Advocacy and Litigation |
| 2008-12 | American Psychiatric Association | Task Force on the Assessment of Violence Risk |
| 2011-now | American Psychiatric Association | Council on Psychiatry and the Law (corresponding member) |
| 2012-13 | American Psychiatric Association | Chair of Committee on Advocacy and Litigation Funding |
| 2014-16 | American Psychiatric Association | President-Elect and President |
| 2014-15 | American Psychiatric Association | Chair of Joint Reference Committee |
| 2014-now | American Psychiatric Association | Member Committee on Judicial Action |
| 2016-19 | American Psychiatric Association | Member of Board of Trustees |
| 2019-20 | American Psychiatric Association | Work group on Financial Strategic Planning |
| 2020-28 | American Board of Psychiatry and Neurology | Forensic Psychiatry Article Assessment Continuing Certification Pilot |

Other Professional Activities:

President, Association of Directors of Forensic Psychiatry Fellowship Programs, 2004-2006

American Board of Psychiatry and Neurology Committee on Recertification in Forensic Psychiatry: 2000-2008

American Board of Psychiatry and Neurology Forensic Psychiatry Subspecialty Steering Committee: 2001-2008

American Board of Psychiatry and Neurology: Examiner: 1979, 1981, 1982, 1983, 1984, 1985, 1988, 1992; Senior Examiner: 1999-2006

Keynote Speaker, "California Legislative Update", Central California Psychiatric Society Annual Meeting, March 15, 2003

Presidential Appointee to Committee on Added Qualifications in Forensic Psychiatry of the American Board of Psychiatry and Neurology: 1992-2001

Specialist Site Visitor in Forensic Psychiatry for Residency Review Committee of Accreditation Council for Graduate Medical Education: 1996-97

Organizer and Conference Director of "Workplace Violence: Assessment and Prevention (with participation of FBI): 1996

Organizer and invited speaker at "Faces of Forensics" conference in collaboration with University of California Hastings College of the Law: 2008

Organizer and participant in Congressional Briefings on increasing the number of psychiatric beds in the US and criminalization of persons with mental illness: 2015-2016

Invited Member of Technical Advisory Group of SAMHSA (Substance Abuse and Mental Health Services Administration) to evaluate Assisted Outpatient Programs in US with NIMH

Invitee to American Board of Psychiatry and Neurology Forum on Strategic Planning 2019

## SERVICE TO PROFESSIONAL PUBLICATIONS:

| | | |
|---|---|---|
| 1979-now | Psychiatric Services | Reviewer |
| 1986-now | American Journal of Psychiatry | Reviewer |
| 1986-now | Journal of American Medical Association | Reviewer |
| 1986-90 | Journal of Clinical Psychopharmacology | Reviewer |
| 1986-90 | Biological Psychiatry | Reviewer |
| 1987-now | Journal of the American Academy of Psychiatry and the Law | Reviewer |
| 1989-03 | Journal of the American Academy of Psychiatry and the Law | Associate Editor |

## INTERNATIONAL INVITED PAPERS AND LECTURES:

1986    Lecturer on "Psychiatric Emergency Services in the United States" at Teikyo University Medical School in Tokyo, Japan. (Invited by Professor Hajime Kazamatsuri)

1986    Lecturer on "Treatment for Rape Victims" at the Institute of Public Health in Tokyo, Japan. (Invited by Dr. Haruo Kuwabara)

1990    Lecturer on "Post-Traumatic Stress Disorder" at the National Hospital for Nervous Diseases, Queen Square, London, U.K. (Invited by Dr. Michael Trimble)

1995    Discussant for Case Conference on "Depression, Suicide Attempts and Management of Memories of Childhood Sexual Abuse" at National University of Singapore, Faculty of Medicine, Department of Psychological Medicine, Singapore. (Invited by Professor Kua Ee Heok) July 21, 1995

1995    Lecture on "Managing Psychiatric Emergencies in an Acute Inpatient Psychiatric Unit" at University of Malaya, Department of Psychological Medicine, Kuala Lumpur, Malaysia. (Invited by Professor M.P. Deva) July 28, 1995

1995    Discussant for Case Conference on "The Difficult to Manage Patient" at Institute of Mental Health/Woodbridge Hospital, Singapore. (Invited by Professor Teo Seng Hock and Department of General Psychiatry, Dr. Chee Kuan Tsee) July 31, 1995

| | |
|---|---|
| 1995 | Lecture on "Intensive Psychiatric Care Unit: The U.S. Experience" at Institute of Mental Health, Singapore. (Invited by Professor Teo Seng Hoek and Dr. Chang Yang How) July 31, 1995 |
| 1995 | Discussant for Case Conference on "The Violent Patient" and Lecture on "Assessment of Violence Risk" at Institute of Mental Health/Woodbridge Hospital, Singapore. (Invited by Professor Teo Seng Hock and Department of Forensic Psychiatry, Dr. Ang Ah Ling) August 1, 1995 |
| 1995 | Keynote Speaker on "Family Violence" and "Sexual Abuse" at Seminar on Family Violence and Sexual Abuse, Singapore (Invited by Dr. Wong Yip Chong and Professor Kua Ee Heok) August 6, 1995 |
| 2015 | Keynote Speaker on "Mental Illness and Violence" at Royal College of Psychiatrists, Birmingham, England June 29, 2015 |

**NATIONAL:**

<u>American Psychiatric Association Annual Meetings:</u>

| | |
|---|---|
| 1979 | Paper: "Setting up a Rape Treatment Center" |
| 1985 | Paper: "Sex Between Psychiatric Inpatients" |
| 1986 | New Research: "Evaluation of a Sexual Abuse Prevention Program" |
| 1987 | Paper: "Tardive Dyskinesia and Parkinsonism in Japan" |
| 1989 | Workshop: "Assaults Against Clinicians" |
| 1990 | Paper: "Violence and Decompensating Schizophrenic Patients" and Workshop: "Managing Dangerous Patients" |
| 1991 | New Research: "Cause of Psychological Symptoms After Lawsuits," Course: "Acute Management of Violent Patients," and Workshop: "Managing Aggressive Patients" |
| 1992 | Chair of Workshop: "Disclosure of Information about Famous Patients," and Workshop: "Managing the Aggressive Patient" |
| 1993 | Papers: "Resilience in Survivors of Childhood Sexual Abuse," and "Correlates of Accuracy in Assessing Violence Risk," New Research: "Impact of Banning Smoking on a Locked Unit" |
| 1994 | Chair and Organizer of Workshop: "Preserving Confidentiality" |
| 1995 | Workshop: "Psychiatrists' Role in Sexual Harassment" and Chair and Organizer of Workshop: "Confidentiality and Managed Care: Coping Strategies for Psychiatrists" |
| 1996 | Course on Sexual Harassment, and Chair and Organizer of Workshop: "Controversies in Child Custody" |
| 1997 | Discussant for Symposium: "Delayed Traumatic Recall in Psychiatry and the Law", Course on Sexual Harassment, Chair and Organizer of Symposium: "Child Custody – What We Do and Don't Know" |
| 1998 | Course on Sexual Harassment. Chair and Organizer of Workshop: "Fighting Managed Care: ERISA Limitations,  Paper in Symposium on Violence: "Pharmacologic Approaches to Violence" |
| 1999 | Course on Sexual Harassment-Legal Issues, Chair and Organizer of Workshop: Legal Update "Managed Care, Confidentiality, and Sex Offenders", Paper on "Violence Risk Management" |
| 2000 | Course on Sexual Harassment-Legal Issues, Chair and Organizer of Workshop: "Mandatory Outpatient Treatment ", Paper in Symposium on Emergency Psychiatry: "Involuntary Treatment", Presentation on "Malpractice" |
| 2001 | Paper in Symposium on Chemical Restraints: "Legal Trends and Civil Liberties in Forced Medications", Presenter in Workshop: "Prediction of Dangerousness", Course on "Sexual Harassment—Legal Issues" |
| 2002 | Chair and Organizer of Workshop: "Educating the Courts:  Recent APA Amicus Curiae Briefs" and Course on "Sexual Harassment – Legal Issues" |
| 2003 | Workshop: "What is the Ethical Stance?  Issues Related to World Psychiatry and Courts", Course on "Sexual Harassment", Discussant for Symposium: "Gay and Lesbian Parenting" |

| | |
|---|---|
| 2004 | Chair and Organizer of Workshop: "What's New in Psychiatry and the Law at the APA" |
| 2006 | Discussant for Symposium, "Same Sex Civil Marriage: Historical and Mental Health Research Perspectives" |
| 2007 | Presenter at Workshop: "Psychiatric Expert Testimony: Increased Scrutiny, Increased Liability",  Presenter at noon forum: "Violence and Mental Illness" |
| 2009 | Invited presentation for Forum: "Developing the next generation of clinical translational researchers: Innovations in an academic department of psychiatry" |
| 2009 | Organizer and Co-Chair: "Public Symposium on Mental Illness"- to raise public awareness about mental illness |
| 2009 | Presenter at Workshop: "Violence Risk Assessment in Acute Settings" |

American Academy of Psychiatry and the Law Annual Meetings:

| | |
|---|---|
| 1984 | Paper: "Patients' Rights Advocates in San Francisco" |
| 1985 | Paper: "Victims and Families of Violent Psychiatric Patients" |
| 1986 | Paper: "AIDS Antibody Tests on Inpatient Psychiatric Units" |
| 1987 | Paper: "Effects of Diagnosis and Context on Dangerousness" |
| 1988 | Papers: "The Relationship of Gender to Violence by Acute Psychiatric Patients" and "Violence in Geriatric Patients with Dementia" |
| 1989 | Paper: "Situational Influences on Symptoms Associated with Violence" |
| 1990 | Paper: "Women Clinicians and Patient Assaults" |
| 1991 | Papers: "The Impact of the Riese Decision on an Inpatient Unit", "Is Money a Cure: Follow-Up of Litigants in England", and Workshop: "Ethical Dilemmas in Forensic Practice" |
| 1992 | Paper: "Sexual Harassment: Issues for Forensic Psychiatrists" |
| 1993 | Papers: "Patterns of Recall of Childhood Sexual Abuse as Described by Adult Survivors", "Staff Gender and Risk of Assault on Doctors and Nurses", Workshops: "Perspectives on Sexual Harassment" and "Women in Forensic Psychiatry" |
| 1994 | Videotape Workshop: "Preserving Confidentiality", and Panel: "Violence Risk Assessment" |
| 1995 | Paper: "Impact of Hospitalization on Suicide Risk" and Panel: "Practical Evaluation of Competence to Consent" |
| 1996 | Paper: "Impact of Tarasoff Decision on Therapy and Victim", Workshop: "Violence Risk Assessment: The MacArthur Study" |
| 1998 | Presidential Address: "Are the Mentally Ill Violent?", Workshop: "Publishing in Forensic Psychiatry" |
| 1999 | Panel Presentation: "Psychiatry and the Law Issues at the American Psychiatric Association: An Update" |
| 2000 | Panel Presentation: "Gender Issues in the Practice of Forensic Psychiatry" |
| 2001 | Paper: "Threatening and Harassing Behavior by Psychiatric Patients toward Clinicians" |
| 2002 | Panel presentations: "Current Psychiatry and the Law Issues at the American Psychiatric Association", "Liability for the Forensic Psychiatrist" |
| 2003 | Panel presentations: "Choosing a Mentor", "Psychiatry and the Law in Organized Psychiatry" |
| 2004 | Panel presentation: " Sexual Harassment Evaluations in Employment Cases" |
| 2006 | Paper: "He Said-She Said":  The Role of the Forensic Evaluation in Determining Credibility and Damages |
| 2006 | Mock Trial Organizer & Participant:  "Medical Malpractice—Postpartum Psychosis and Suicide" |
| 2007 | Debate participant: Should mentally ill individuals who have been civilly committed be allowed to purchase guns?;  Panel presentations: "Ethics for the forensic psychiatrist;" "Organizing, accrediting, and funding forensic fellowships" |
| 2009 | Papers: Covert Emergency Medications: Are They Ever Ethically Permissible?; The Role of Mental Health Professionals in Political Asylum Processing |
| 2010 | Papers:  Zolpidem and the Courts; Fire Setting, Arson, Pyromania, and the Forensic Mental Health Expert |

| | |
|---|---|
| 2011 | Papers: Postpartum Psychosis and the Courts; PTSD as a Criminal Defense; A/V Session: Assessment of Causation and Damages Years after Sexual Abuse |
| 2012 | Papers: Transgendered and Incarcerated: A Review of the Literature,Currrent Policies and Laws, and Ethical Issues; Cyberstalking and Cyberharassment; Panel Presentaion: Problem-Solving Courts |

American Psychiatric Association Conference on Women's Studies in Psychiatric Education: 1983 (Presentation on Rape")

American Medical Women's Association. Annual Meeting: 1985 (Paper, "The Management of Rape Victims by the Primary Care Physician")

American Orthopsychiatric Association: Annual Meeting: 1988 (Discussant for panel on "The Dangerousness Standard for Commitment")

American Association of Medical Colleges: Faculty Affairs Meeting : 2009 (Co-author for poster, "UCSF Travel Awards—Faculty with Child, Elder, Dependent Care Needs")

**REGIONAL:**

California Psychiatric Association Annual Meeting:

| | |
|---|---|
| 1994 | Course, "Perspectives on Recovered Sexual Abuse Memories Through Therapy" |
| 1999 | Course, "Malpractice Issues" |
| 1999 | Presentation at Workshop, "Involuntary Commitment (LPS) Laws: Should They Be Reformed?" |
| 2003 | Panel on "New Liabilities related to Tarasoff Warnings" |

Northern California Psychiatric Society Annual Meeting:

| | |
|---|---|
| 1983 | Presentation, "The Medical Workup of Dementia" as part of a panel on Geriatric Psychiatry |
| 1989 | Presentation, "Clozapine: A New Neuroleptic" |
| 1996 | Presentation, "The Assaultive Patient and Tarasoff" as part of a panel on Medico-Legal Issues |
| 1999 | Presentations on Panels: "The Potentially Violent Patient: Assessment, Treatment and Legal Liability", "Psychiatrists and the Death Penalty: Bringing Neuroscience to the Law:, "Medicare and Psychiatry: Who, What, Where, When, Why?", "Organized Psychiatry: What Can You Do? What Can You Get?" |
| 2000 | Presentation, "Risk Management in Psychiatric Practice" |
| 2003 | Luncheon Speaker, "What's New at CPA?" |
| 2004 | Luncheon Speaker, "Politics in Washington D.C. and in California Organized Psychiatry" |
| 2005 | Presentation, "Psychiatry in the 21st Century" |
| 2006 | Presentation, "Negotiation Strategies" |
| 2009 | Presentation, "Violence and Mental Illness: Review of the Research Literature" |

California Association of LPS Hearing Officers Annual Conference:

| | |
|---|---|
| 1999 | Panel on LPS Reform |

Forensic Mental Health Association of California Annual Conference:

| | |
|---|---|
| 2001 | Presentation, "Outpatient Civil Commitment or Involuntary Outpatient Treatment" |

Central California Psychiatric Society

| | |
|---|---|
| 2006 | Keynote Speaker, "California Legislative Update" |

**INVITED PAPERS, LECTURES, PRESENTATIONS NOT LISTED ABOVE:**

| | |
|---|---|
| 1979 | Lecture to attending psychiatric staff of Sequoia Hospital on "Management of Assaultive and Violent Patients" |
| 1979 & 1980 | Program Coordinator, Chair, & Speaker at Conference on "Victims of Assault/Sexual Abuse" sponsored by the University of California, San Francisco |

| | |
|---|---|
| 1980 | Lecture to medical staff of Gladman Hospital on "Evaluation and Treatment of the Violent Patient" |
| 1981 | Lecture to attending psychiatric staff of Herrick Hospital on "The Problem of Rape and Establishing a Rape Treatment Center" |
| 1982 | Lecture to deputy district attorneys of San Mateo County on "Rape, Rape Trauma Syndrome, and Why Women Don't Report Rape" |
| 1982-1986 | Presentation on "Organic Mental Disorders" at annual "General Psychiatry Board Review & Update" sponsored by the University of California, San Francisco |
| 1986 | Workshop leader on "The Psychological Effects of Sexual Assault" at the San Francisco Psychoanalytic Institute Conference on "The Importance of Trauma in Psychic Development" |
| 1987 | Lecture to postal service employees on Schizophrenia at a symposium on postal service medicine sponsored by the U.S. Postal Service, Western Region |
| 1987 | Co-author on paper presented to 1987 Family Violence Research Conference on "Patterns of Family Violence Associated with Acute Mental Illness" |
| 1988 | Co-author on paper presented to 1988 annual meeting of American Psychological Association on "Relationships Between Threats and Violent Behavior by Acute Psychiatric Patients" |
| 1988 | Co-author on paper presented to American Psychology-Law Society on "Clinical Judgments of Dangerousness as Predictors of Inpatient Violence" |
| 1989 | Lecture at Symposium on Assessment of Violence Potential sponsored by Stanford University Department of Psychiatry/Behavioral Science and Palo Alto VA Hospital Department of Psychology/Psychiatry on "Situational Factors Affecting Violence by Psychiatric Patients" |
| 1990 | Lecture to attending staff and housestaff at Pacific Presbyterian Medical Center on "Violence by Psychiatric Patients" |
| 1991 | Lecture at meeting of San Francisco Psychiatric Society on "Does Money Heal All Wounds? The Course of Psychological Symptoms after Lawsuit Resolution" |
| 1992 | Presenter on panel about Sexual Harassment for Alumni Faculty Association of Langley Porter Psychiatric Institute, UCSF |
| 1992 | Presenter on panel about Sexual Harassment at USF Law School co-sponsored by the Labor/Employment Law Society and the Women's Law Association |
| 1993 | Presenter to Program on Conscious and Unconscious Mental Processes Clinical Research Seminar on "Resilience in Survivors of Childhood Sexual Abuse" |
| 1995 | Lecture to attending staff and housestaff at California Pacific Medical Center on "Sexual Harassment" |
| 1996 | Grand Rounds lecture to San Mateo Health Services Residency Training Program on "Sexual Harassment: Forensic Issues" |
| 1996 | Discussion Group Leader on "Developing Negotiation Skills" at Symposium on Developmental Issues for Women Professionals |
| 1997,99 | Lectures to medical staff and nursing staff of Department of Psychiatry at St. Francis Memorial Hospital on "Managing Aggressive Patients on Psychiatric Inpatient Units" |
| 1997 | Lecture to Santa Clara County Society of Psychiatric Physicians on "Malpractice: Update for Psychiatrists" |
| 2000 | Presenter at UCSF Women's Health 2000 Conference on "Learning to Negotiate: Why It's Important for Women" |
| 2001 | Lecture for California Pacific Medical Center Grand Rounds on "Civil Commitment in the Next Millenium" |
| 2001 | Grand Rounds lecture at San Francisco Veterans Administration Hospital on "Sexual Harassment and the Courts" |
| 2002 | Presenter at UCSF Women's Health Conference on "Principles of Negotiation: Getting What You Want" |
| 2003 | Lecture for the Greater Washington DC Chapter of American Academy of Psychiatry and the Law on "Forensic Psychiatrists' Role in Workplace Harassment and Discrimination Litigation" |

**CURRICULUM VITAE Renée Binder, M.D.**                                    **Page 10**

2003        Presenter on "Risk Management and Psychopharmacology" at The American Society of Clinical Psychopharmacology in New York

2004        Grand Rounds at UCSF and at San Francisco General Hospital , "Politics and Policy in Washington D.C."

2004        Presenter on "Legal Aspects of Prescribing Psychopharmacologic Drugs" at Conference on Psychiatry for Primary Care

2004        Closing Address on "Current Issues in Medical Malpractice" at Conference on Primary Care Medicine: Principles and Practice

2005        Speaker at University of California Leadership Institute on "Faculty and Staff Working Together" in San Diego

2005        Speaker at Plenary On "Psychiatry/Psychology and the Courts" and Facilitator at "Civil Court" Breakout Session at California Judicial Branch Conference

2006        Lecture to Santa Clara County Society of Psychiatric Physicians on "Sexual Harassment"

2006        Presenter on "Suicide" at Conference on "New Frontiers in Depression Research"

2006        Workshop Leader at UCSF Symposium on Mid-Career Challenges

2007        Workshop on "Negotiation in Academia" at Women's Global Health Scholars Program

2006,       Presentations for UCSF Medical Students and Hastings Law Students Joint Seminar on
2007        Involuntary Treatment and Homelessness

2008        Speaker to UCSF first and second year medical students in Brain Interest Group on Forensic Psychiatry

2008        Keynote Speaker at Stanford University Adjunct Clinical Faculty Committee Appreciation Day

2008        Presentation at Faces of Forensics: Identification and Behavior at Hastings College of the Law

2008        Grand Rounds at UCSF Fresno: Psychiatry and the Law

2012        Grand Rounds: Mass Murderers: The Role of Psychiatry

## POSTGRADUATE AND CONTINUING EDUCATION COURSES ATTENDED:

1978        Graduate Division Course on Research Methods
1979-90     Member of peer supervision group of women psychiatrists in Marin
1979-86     Participant in faculty supervision seminar with Dr. Robert Wallerstein
1999-00     Law School Classes at Hastings College of Law on "Science in the Law" and "Psychiatry and the Law"
2010        Harvard School of Public Health-Program for Chairs of Academic Clinical Departments
1976-now    Attended sufficient continuing education courses to maintain certification

## UNIVERSITY SERVICE:

### SYSTEM-WIDE:

1998-2000       Member of System-Wide Faculty Welfare Committee

1999-2000       Member of System-Wide Faculty/Staff Partnership Task Force

2000-2001       Vice-Chair of System-Wide Faculty Welfare Committee

2001-2002       Chair of University of California System-Wide (for ten campuses) Faculty Welfare Committee and member of Academic Council

2009            Ad Hoc committee to review hiring practices at UCSD School of Medicine

2012            Presenter at University of California Risk Summit Conference

### CAMPUS-WIDE:

| | |
|---|---|
| 1977 | Workshop for UC Hospital Social Workers on Rape Prevention and Treatment(Lecture and discussion leader) |
| 1980-81,86-87,95-98 | Member and chair of ad hoc review committee for appointments, advancements and promotions to the University of California |
| 1986,89,91,95 | Member of campus-wide committee to develop policy and procedures concerning sexual harassment |
| 1987, 1995 | Member of ad hoc Moffitt-Long Quality Assurance Committee to investigate alleged inappropriate faculty conduct |
| 1987-90 | Sexual harassment complaint advisor for the University of California, San Francisco |
| 1990-95 | Member of Chancellor's Advisory Committee on the Status of Women |
| 1990-95 | Member of the Faculty Subcommittee of the Chancellor's Advisory Committee on the Status of Women |
| 1995-1996 | Member of Credentials Committee of UCSF Medical Center |
| 1997-1998 | Member of Faculty Welfare Committee, Academic Senate |
| 1998-1999 | Vice-Chair of Faculty Welfare Committee |
| 1999-2001 | Chair of Faculty Welfare Committee |
| 1998-2001 | Member of Committee on Committees (elected) |
| 2002, 2004, 2006 | Member of University Stewardship Review Committees |
| 2006 | Presenter and Small Group Leader at Workshop for Junior Faculty Women sponsored by the Chancellor's Advisory Committee on the Status of Women |
| 2006-2011 | Presenter and Workshop Leader at Welcoming Week for new faculty at UCSF |
| 2007 | Presenter at Chancellor's Advisory Committee on the Status of Women Retreat |
| 2008, 2009 | Member of UCSF Lifetime Achievement in Mentoring Award Committee |
| 2009 | Member of Committee to Revise Research Misconduct Policy |
| 2010 | Presentation on Negotiation Strategies for First Academic Position to Division of General Medicine and Institute of Health Policy fellows and trainees |
| 2011 | Joint Administration-Academic Senate Task Force for Five Year Review |
| 2013 | Interactive CV Webinar on Managing your CV in ADVANCE |
| 2014 | Presenter at Workshop for Mid-Career Faculty |
| 2017 | Member of Workgroup on Conflict of Interest and Conflict of Commitment |
| 2017 | Presenter at Mentor Training Program for faculty |
| 2017 | Member of interview committee for Academic Employee Relations Manager |
| 2019 | Presenter Ad Hoc Committee Trainings for faculty misconduct investigations |
| 2019 | Presenter at UCSF Threat Management Conference |

**SCHOOL OF MEDICINE:**

| | |
|---|---|
| 1978, 1983, 1988, 1993, 1998, 2003 | Alumni-Faculty Association correspondent and class chairman for 5th year, 10th year, 15th year, 20th year, 25th year, and 30th year reunion |

| | |
|---|---|
| 1978-80 | Pathway advisor for University of California School of Medicine Behavioral Specialist Pathway |
| 1978-82 | Member of course committee for second year medical students, Introduction to Clinical Psychiatry (Psychiatry 131 A & B) |
| 1984 | Panelist for medical student forum on Careers in Psychiatry |
| 1992 | Chair of ad hoc faculty committee to investigate allegations of faculty misconduct |
| 1992-97 | Member of Student Welfare Committee |
| 1997-2000 | Chair, Student Welfare Committee |
| 1995,97 | Member of ad hoc faculty committees to investigate allegations of faculty misconduct |
| 1997-2000 | At large School of Medicine Representative to the Representative Assembly of the S.F. Division of the Academic Senate (elected) |
| 2006-2013 | Presenter at Pediatric Fellows College on "Dynamics of Negotiation" |
| 2007-2008 | Board of Directors of Northern California Institute for Research and Education |
| 2009 | Presenter to Faculty of Ob-Gyn and Orthopedics on Academic Advancement |
| 2010 | Organizer and Presenter at Division Chief School |
| 2011 | Presenter to Ob-Gyn Leadership on Appraisals |
| 2011 | Organizer and Presenter at Workshop for Mid-Career Faculty |
| 2014 | Presenter to Faculty of Radiation Oncology on Academic Advancement |
| 2014 | Presenter to Junior Women Faculty at SFGH on Negotiation |
| 2014 | Presenter to Faculty of Family Medicine on Negotiation |
| 2019 | Presenter to first year medical students on Talking to Patients about Guns. |
| 2019 | Co-Chair Committee for Professional Development for Charis and Directors |

**DEPARTMENT OF PSYCHIATRY:**

| | |
|---|---|
| 1977-80 | Residency Training Committee |
| 1977-85 | Clinical Services Advisory Committee |
| 1980-83, and | |
| 1988-92 | Appointments and Promotions Committee for Volunteer Clinical Faculty |
| 1981 | Committee to Study Faculty Participation in Governance |
| 1981-82 | Search Committee for Director of Adolescent and Young Adult Inpatient Unit |
| 1983-84 | Community Practice and Administration Track Subcommittee for the Residency Training Program (co-chair) |
| 1984 | Parental Leave Committee for the Residency Training Program |
| 1987 | Chairman of Search Committee for Psychiatrist for the Center for the Study of Neurosis |
| 1987-91 | Biomedical Research Support Grant Committee to determine the present distribution of BRSG funds following federal regulations and departmental guidelines |
| 1989-90 | Member of UCSF-Mt. Zion merger planning committee |
| 1989-90 | Member of Mt. Zion-UCSF inpatient psychiatric unit planning committee |
| 1988-89 | Member of UCSF Department of Psychiatry Grand Rounds Planning Committee |
| 1990-91 | Chairman of Search Committee for Assistant Director of Child and Adolescent Service |
| 1989-92 | Chairman of UCSF Department of Psychiatry Grand Rounds Planning Committee |
| 1989-91 | Member of Department of Psychiatry Compensation Plan Oversight Committee |
| 1991-92 | Chair of Department of Psychiatry Compensation Plan Oversight Committee |
| 1992-94 | Chairman of Appointments and Promotions Subcommittee on Clinician-Teacher Faculty Track |
| 1994 | Departmental Representative to "San Francisco Psychiatric Associates" to plan for managed care contracts in San Francisco |
| 1994-96 | Member of Planning Committee for the Program for Women |
| 1992-98 | Appointments and Promotions Committee for Paid Clinical Faculty |

| | |
|---|---|
| 1996-02 | Member of Department of Psychiatry Compensation Plan Oversight Committee |
| 1998-99 | Chair of Department of Psychiatry Compensation Plan Oversight Committee |
| 2004-07 | Integrated Residency Committee |

**LANGLEY PORTER PSYCHIATRIC INSTITUTE/HOSPITAL AND CLINICS:**

| | |
|---|---|
| 1977-78 | Environmental and Infection Control Committee (Chairman) |
| 1977-85 1988-89 1997-99 | Executive Medical Board/Executive Committee of the Medical Staff |
| 1978 | Ad Hoc Committee for By-Laws Revision |
| 1978-80 | Medical Records Committee: 1978-79 Vice-Chairman 1979-80 Chairman |
| 1979-82 | President-Elect, President, and Past President of Medical Staff |
| 1979-82 | Nominating Committee for Executive Medical Board |
| 1983 | Committee on Hospitalization of Private Patients (Chairman) |
| 1984-85 | Nominating Committee for Executive Medical Board |
| 1984-85 | Pharmacy & Therapeutics Committee: 1986-87 Vice-Chairman 1987-88 Chairman |
| 1988-89 | Executive Medical Board: Elected Member |
| 1989-90 | ECT Committee |
| 1991-94 | Executive Clinical Committee |
| 1994 | Chairman of Committee to Plan Clinical and Educational Programs on Adult Inpatient Services |
| 1994-95 | Member of Selection Committee for medical positions at Langley Porter Psychiatric Institute |
| 1994-99 | Quality Assurance Committee |
| 1997-98 | Quality Improvement Executive Committee |
| 1999-00 | Credentials Committee |
| 2002-03 | ECT Review Committee |
| 2008-11 | Langley Porter Psychiatric Hospital and Clinics Leadership Committee |
| 2008-11 | Executive Medical Staff Committee |
| 2012-present | Chair Morbidity and Mortality Conference |
| 2018-present | Chair Safety and Security Committee |

**PUBLIC SERVICE:**

| | |
|---|---|
| 1976-84 | Representative to Community Mental Health Center Clinical Council Meetings |
| 1978 | Representative to San Francisco Sexual Trauma Advisory Board (to Director of Public Health) |
| 1978 | Speaker at Pacific Heights Community Forum on Rape Prevention and Treatment |
| 1979-80 | Member of San Francisco Emergency Services Directors' Task Force |
| 1980-81 | Psychiatric consultant to study on "Sexual Assault of Patients in Psychiatric Hospitals" |
| 1981 | Consultant and Moderator for San Mateo County Mental Health Services Workshop on "Rape Awareness, Prevention and Intervention" |

| | |
|---|---|
| 1981-83 | Consultant to San Mateo County District Attorney's Office for prosecution of sexual assault cases |
| 1986 | Consultant to San Quentin Prison psychiatrists on "Crisis Intervention and Psychiatry Emergencies" |
| 1987 | Clinical consultant to San Quentin Prison psychiatrists |
| 1995-96 | Consultant to Santa Clara Office of County Counsel on Assessment of Violence Risk |
| 2000 | Consultant to Lanterman-Petris-Short Hearing Officers about proposed changes in California Civil Commitment Laws |
| 2006 | Presentation to High School Students at SF Public Arts and Technology School on "Politics in the federal government" |
| 2007 | Presentation to County Public Health Psychiatrists on Mental Health Courts |
| 2008 | Presentation to Hastings law students in employment and labor law student association on mental illness, stigma, and discrimination |
| 2012 | Presentation to Commonwealth Club on "Mind, Madness and Gun Violence" |
| 2013 | Presentation to California Mental Health Planning Council on Violence and Mental Illness |
| 2017 | Part of 6 member lobbying group representing 500,000 physicians and 6 medical organizations to US. Senate about Health Care Reform |

## ADMINISTRATIVE EXPERIENCE:

| | |
|---|---|
| 1976-86 | Director of Emergency Services at Langley Porter Psychiatric Institute<br>Administrative and clinical responsibility for delivery of services by psychiatric residents, medical students, nurses and psychology fellows in emergency walk-in clinic<br>Cost center manager and budget preparation for budget of $360,000.00 |
| 1977-90 | Director of Crisis Intervention Unit and Psychiatric Intensive Care Unit at Langley Porter Psychiatric Institute<br>Administrative and clinical responsibility for delivery of services by psychiatrists, psychiatric residents, medical students, nurses, social workers, psychologists and rehabilitation therapists<br>Cost center manager and budget preparation for budget of $1,400,000.00 |
| 1978-80 | Director of Rape Treatment Center at Langley Porter Psychiatric Institute<br>Organized and established the Rape Treatment Center involving coordination with the University of California's Department of Gynecology and Department of Psychiatry, San Francisco Police Department, San Francisco Community Mental Health, San Francisco Department of Public Health, San Francisco District Attorney, Moffitt Emergency Room, Langley Porter Psychiatric Institute and University of California Administration, and Queen's Bench Foundation. |
| 1991-99 | Director of Adult Inpatient Services (32-bed locked and unlocked units) at Langley Porter Psychiatric Institute<br>Administrative and clinical responsibility for delivery of services by psychiatrists, psychiatric residents, medical students, nurses, social workers, psychologists and rehabilitation therapists |
| 1999-now | Founder and Director of Psychiatry and the Law Program and Fellowship<br>Organized program, obtained contracts, developed liaison with law school, and obtained ACGME accreditation for forensic fellowship. |
| 2005-2009 | Organized Global Health Faculty Scholar Program for faculty in UCSF School of Medicine |
| 2008-2011 | Interim Chair of Department of Psychiatry and Director of Langley Porter Psychiatric Institute.<br>Administrative and academic responsibility for a budget of approximately $100 million and 176 paid faculty members.  Clinical and administrative responsibility for |

a hospital with 6000 inpatient days/year, 4000 partial hospitalization days and 30,0000 outpatient visits/year.

**TEACHING:**

**FORMAL SCHEDULED CLASSES FOR UCSF STUDENTS (during last 5 years)**

| Academic Year | Course | Nature of Contribution | Class Size |
|---|---|---|---|
| 2001- now | Supervision of senior psychiatric resident on the Psychiatry and the Law elective | Organize teaching elective and provide weekly individual supervision | 1-2 at a time |
| 2000-now | Preceptor for 4rd year elective medical students | Organize teaching elective and provide supervision | 1 at a time |
| 2000-now | Didactic Seminar on Psychiatry and the Law | Organize schedule and recruit speakers and teach course | 5 |
| 2000-now | Landmark Case Seminar | Organize schedule and discuss cases | 5 |
| 2000-now | Forensic Case Conference | Organize schedule and discuss cases | 5 |
| 2006-now | Seminars to PGY-2 residents on forensic psychiatry as part of professionalism block | Organize schedule and give lectures | 12 |
| 2000-now | Tutorial on Civil Litigation | Discussion and supervision of civil cases | 2 |
| 2000-now | Forensic Research Seminar | Discussion of research topics | 9 |
| 2006, 2007 | Psychiatry and the Law for 1st and 2nd year medical students | Lecture | 20 |

**UCSF DEPARTMENT OF PSYCHIATRY GRAND ROUNDS PRESENTATIONS:**

| | |
|---|---|
| 1977 | "Working Through of Patients' Suicides by Four Therapists in Training" |
| 1979 | "Rape" |
| 1985 | "New Research on Violence" |
| 1986 | "Treatment Dilemmas Following Neuroleptic Malignant Syndrome" |
| 1989 | "Use of Clozapine in Schizophrenia" |
| 1993 | "Sexual Harassment" -- Psychiatry Grand Rounds at San Francisco General Hospital |
| 1994 | "Confidentiality: Legal Issues for Mental Health Professionals" |
| 2002 | Coordinator of Forensic Series of Grand Rounds and Co-Presenter on "Serial Killers" |
| 2004 | Politics and Policy in Washington D.C. |
| 2006 | Covert medications: Legal and Ethical Issues-Grand Rounds at Veterans Hospital |
| 2006-12 | Workshops on Risk Assessment for Violence and Suicide |
| 2012 | After the Tucson and Aurora Shootings: The Role of Forensic Psychiatry |
| 2013 | Clinical and Legal Management of a Violent Threatening Patient with Psychosis |
| 2018 | Child Pornography: Clinical and Legal Issues |

**TEACHING AIDS PREPARED:**

1983-84     Wrote syllabus chapter for Psychiatry 131A & B

1987-94     Prepared syllabus for psychiatric section of Medicine 111
1996         Prepared syllabus for Workplace Violence conference

## FACULTY MENTORSHIP PROGRAM:

1991-present   Mentor in the departmental Faculty Mentorship Program and mentor for medical
                 school faculty in all departments
2014            Faculty Mentoring Lunchtime Session –Presenter on Advancement and Promotion

## TEACHING AWARDS:

2006         Psychiatry Residents Association Award for "Excellence in Teaching"

## RESEARCH AND CREATIVE ACTIVITIES:

## PEER REVIEWED ARTICLES:

1979     Binder RL: Use of Seclusion on an Inpatient Crisis Intervention Unit. Hospital and
            Community Psychiatry 30:266-269

1979     Kolodny S, Binder RL, Bronstein AA, and Friend RL: The Working Through of Patients'
            Suicides by Four Therapists. Suicide and Life Threatening Behavior 9:33-46

1980     Binder RL and Dickman WA: Psychiatric Manifestations of Neurosyphilis in Middle-Aged
            Patients. American Journal of Psychiatry 137:741-742

1980     Binder RL: Setting up a Rape Treatment Center. Journal of American Medical Women's
            Association 35:145-148

1981     Binder RL, Glick I, and Rice M: A Comparative Study of Parenteral Molindone and
            Haloperidol in the Acutely Psychotic Patient. Journal of Clinical Psychiatry 42:203-206

1981     Binder RL and Levy R: Extrapyramidal Reactions in Asians. American Journal of
            Psychiatry 138:1243-1244

1981     Binder RL: Difficulties in Follow-Up of Rape Victims. American Journal of Psychotherapy
            35:534-541

1981     Binder RL: Why Women Don't Report Sexual Assault. Journal of Clinical Psychiatry
            42:437-438

1983     Binder RL: Cultural Factors Complicating the Treatment of Psychosis Caused by $B_{12}$
            Deficiency. Hospital and Community Psychiatry 34:67-69

1983     Binder RL: Neurologically Silent Brain Tumors in Psychiatric Hospital Admissions: Three
            Cases and a Review. Journal of Clinical Psychiatry 44:94-97

1983     Binder RL and Jonelis FJ: Seborrheic Dermatitis in Neuroleptic-Induced Parkinsonism.
            Archives of Dermatology 119:473-475

1983     Binder RL and McCoy SM: A Study of Patients' Attitudes Toward Placement in Seclusion.
            Hospital and Community Psychiatry 34:1052-1054

1983     Binder RL, Callaway E, Levin AS, and Stites DP: Relationship Between Creatinine
            Phosphokinase and Immunoglobulins in Unmedicated Caucasian Schizophrenics.
            Biological Psychiatry 18:1493-1496

1984     Binder RL and Jonelis FJ: Seborrheic Dermatitis: A Newly Reported Side Effect of
            Neuroleptics. Journal of Clinical Psychiatry 45:125-126

1984     Victor BS, Link NA, Binder RL, and Bell IR: Use of Clonazepam in Mania and
            Schizoaffective Disorders. American Journal of Psychiatry 141:1111-1112

1985     Link N, Victor B, and Binder RL: Psychosis in Children of Holocaust Survivors. Journal of
            Nervous and Mental Disease 173:115-117

1985     Binder RL, Ormiston SM, and Goldberg FS: No Smoking: The Effect on Therapy Groups.
            American Journal of Nursing 2:129

1985     Binder RL, McNiel DE, and Fishman PS: Attitude Change Concerning the Right to Refuse
            Treatment: The Impact of Experience. American Journal of Psychiatry 142:1362-1365

**CURRICULUM VITAE Renée Binder, M.D.**                                    **Page 17**

1985    Binder RL: Patients' Rights Advocates in San Francisco. Bulletin of the American Academy of Psychiatry and the Law 13:325-336

1985    McNiel DE and Binder RL: Teaching Psychiatric Residents About Referring Inpatients for Psychological Testing. Journal of Psychiatric Education 9:240-247

1985    Binder RL: Sex Between Psychiatric Inpatients. Psychiatric Quarterly 57:121-126

1986    McNiel DE and Binder RL: Violence, Civil Commitment and Hospitalization. Journal of Nervous and Mental Diseases 174:107-111

1986    Binder RL and McNiel DE: Victims and Families of Violent Psychiatric Patients. Bulletin of the American Academy of Psychiatry and the Law 14:131-139

1986    McCulloch E, McNiel DE, Binder RL, and Hatcher C: Effects of a Weapon Screening Procedure in a Psychiatric Emergency Room. Hospital and Community Psychiatry 37:837-838

1987    McNiel D and Binder RL: Patients Who Bring Weapons to the Psychiatric Emergency Room. Journal of Clinical Psychiatry 48:230-233

1987    McNiel DE and Binder RL: Predictive Validity of Judgments of Dangerousness in Emergency Civil Commitment. American Journal of Psychiatry 144:197-200

1987    Binder RL: Three Case Reports of Behavioral Disinhibition with Clonazepam. General Hospital Psychiatry 9:45-47

1987    Binder RL: AIDS Antibody Tests on Inpatient Psychiatric Units. American Journal of Psychiatry 144:176-180

1987    Baer JW and Binder RL: Physical Complaints Without Organic Basis in Psychiatric Inpatients: Report of Two Cases. Psychiatric Quarterly 58:218-223

1987    Rosenberg JG, Binder RL, and Berlant J: Prediction of Lithium Dose: Comparison and Improvement on Current Methods. Journal of Clinical Psychiatry 48:284-286

1987    Binder RL, Kazamatsuri H, Nishimura T, and McNiel DE: Smoking and Tardive Dyskinesia. Biological Psychiatry 22:1280-1281

1987    Binder RL, Kazamatsuri H, Nishimura T, and McNiel DE: Tardive Dyskinesia and Neuroleptic-induced Parkinsonism in Japan. Am J of Psychiatry 144: 1494-96

1987    Hargreaves WA, Zachary R, LeGoullon, Binder RL, and Reus V: Neuroleptic Dose: A Statistical Model for Analyzing Historical Trends. Journal of Psychiatric Research 21:199-214

1987    Binder RL and McNiel DE: Evaluation of a School-Based Sexual Abuse Prevention Program: Cognitive and Emotional Effects. Child Abuse and Neglect 11:497-506

1988    Binder RL and McNiel DE: Effects of Diagnosis and Context on Dangerousness. American Journal of Psychiatry 145:728-732

1988    McNiel DE, Binder RL, and Greenfield TK: Predictors of Violence in Civilly Committed Acute Psychiatric Patients. American Journal of Psychiatry 145:965-970

1988    Goldberg FS, McNiel DE, and Binder RL: Therapeutic Factors in Two Forms of Inpatient Group Psychotherapy. Music Therapy and Verbal Therapy. Group 12:146-156

1989    McNiel DE, Greenfield T, Atkisson C, and Binder RL: Factor Structure of a Brief Symptom Checklist for Acute Psychiatric Inpatients. Journal of Clinical Psychology 45:66-72

1989    Ormiston S, Barrett N, Binder RL and Molyneux V: A Model for the Development of a Partially Computerized Treatment Plan. Hospital and Community Psychiatry 40:531-533

1989    McNiel DE and Binder RL: Relationship Between Preadmission Threats and Later Violent Behavior by Acute Psychiatric Inpatients. Hospital and Community Psychiatry 40:605-608

1989    Haller E, Binder RL, and McNiel DE: Violence in Geriatric Patients with Dementia. Bulletin of the American Academy of Psychiatry and the Law 17:183-188

1989    Greenfield TK, McNiel DE, and Binder RL: Violent Behavior and Length of Psychiatric Hospitalization. Hospital and Community Psychiatry 90:809-814

1990    Binder RL and McNiel DE: The Relationship of Gender to Violence by Acutely Disturbed Psychiatric Patients. Journal of Clinical Psychiatry 51:110-114

1990    Lowenstein M, Binder RL, and McNiel DE: The Relationship Between Admission Symptoms and Hospital Assaults. Hospital and Community Psychiatry 41:311-313

1990    Kalunian DA, Binder RL, and McNiel DE: Violence by Geriatric Patients Who Need Psychiatric Hospitalization. Journal of Clinical Psychiatry 51:340-343

1990    Haller E and Binder RL: Clozapine: A New and Different Neuroleptic. Western Journal of Medicine 153:62-64

1990    Haller E and Binder RL: Clozapine and Seizures. American Journal of Psychiatry 147:1069-1071

1991    McNiel DE and Binder RL: Clinical Assessment of the Risk of Violence Among Psychiatric Inpatients. American Journal of Psychiatry 148:1317-1321

1991    Binder RL, Trimble MR, and McNiel DE: The Course of Psychological Symptoms After Resolution of Lawsuits. American Journal of Psychiatry 148:1073-1075

1991    Binder RL, Trimble MR, and McNiel DE: Is Money a Cure? Follow-Up of Litigants in England. Bulletin of American Academy of Psychiatry and the Law 19:151-160

1991    Binder RL: Women Clinicians and Patient Assaults. Bulletin of American Academy of Psychiatry and the Law 19:291-296

1991    Binder RL and McNiel DE: Involuntary Patients' Right to Refuse Medication: Impact of the Riese Decision on a California Inpatient Unit. Bulletin of American Academy of Psychiatry and the Law 19:351-357

1992    McNiel DE, Rosales IB and Binder RL: Family Attitudes that Predict Home Placement of Hospitalized Psychiatric Patients. Hospital and Community Psychiatry 43:1035-1037

1992    Binder RL: Sexual Harassment: Issues for Forensic Psychiatrists. Bulletin of American Academy of Psychiatry and the Law 20:409-418

1993    Straznickas K, McNiel DE and Binder RL: Violence Toward Family Caregivers of the Mentally Ill. Hospital and Community Psychiatry 44:385-387

1994    McNiel DE, Binder RL: The Relationship Between Acute Psychiatric Symptoms, Diagnosis and Short-Term Risk of Violence. Hospital and Community Psychiatry 45:133-137

1994    McNiel DE and Binder RL: Screening for Risk of Inpatient Violence: Validation of an Actuarial Tool. Law and Human Behavior. 18:579-586

1994    Binder RL, McNiel DE, and Goldstone RL: Patterns of Recall of Childhood Sexual Abuse as Described by Adult Survivors. Bulletin of American Academy of Psychiatry & the Law 22:357-366

1994    Binder RL, McNiel DE: Staff Gender and Risk of Assault on Doctors and Nurses. Bulletin of American Academy of Psychiatry & the Law 22:545-550

1995    McNiel DE, Binder RL: Correlates of Accuracy in Assessing Violence Risk. American Journal of Psychiatry. 152:901-906

1996    Binder RL, McNiel DE, Goldstone RL: Adult Survivors of Childhood Sexual Abuse: Is Adaptive Coping Possible? Psychiatric Services. 47:186-188

1996    Haller E, McNiel DE, Binder RL: Impact of a Smoking Ban on a Locked Psychiatric Unit. Journal of Clinical Psychiatry. 57:329-332

1996    Binder RL, McNiel DE: Application of the Tarasoff Ruling and Its Effect on the Victim and the Therapeutic Relationship. Psychiatric Services. 47:1212-1215

1997    McNiel DE, Binder RL: The Impact of Hospitalization on Clinical Assessments of Suicide Risk. Psychiatric Services. 48:204-208

1997    Beauford JE, McNiel DE, Binder RL: Utility of the Initial Therapeutic Alliance in Evaluating Patients' Risk of Violence. American Journal of Psychiatry. 154:1272-1276

1998    Binder RL, McNiel DE, Sandberg DA: A Naturalistic Study of Clinical Use of Risperidone. Psychiatric Services. 49:524-526

| | |
|---|---|
| 1998 | Sandberg DA, McNiel DE, Binder RL: Characteristics of Psychiatric Inpatients Who Stalk, Threaten, and Harass Staff After Discharge. American Journal of Psychiatry, 155:1102-1105. |
| 1998 | McNiel DE, Binder RL, Fulton FM: Management of Threats of Violence Under California's 'Duty to Protect' Statute. American Journal of Psychiatry. 155:1097-1101 |
| 1998 | McNiel DE, Sandberg DA, Binder RL: The Relationship Between Confidence and Accuracy in Clinical Assessment of Patients' Potential for Violence. Law Hum Behav 22:655-669 |
| 1999 | Binder RL: Are the Mentally Ill Dangerous? Journal of the American Academy of Psychiary and the Law. 27:189-201 |
| 1999 | Binder RL, McNiel DE: Contemporary Practices in the Management of Acutely Violent Patients: A Survey of 20 Psychiatric Emergency Rooms. Psychiatric Services. 50:1553-1554 |
| 2000 | Gerbasi J, Bonnie R, Binder RL: Mandatory Outpatient Treatment. Journal of the American Academy of Psychiatry and the Law. 28:127-144 (SPECIAL ARTICLE with four commentaries and editorial) |
| 2000 | Lam JN, McNiel DE, Binder RL: The Relationship between Patients' Gender and Violence Leading to Staff Injuries. Psychiatric Services. 51:1167-1170 |
| 2000 | McNiel DE, Eisner JP, Binder RL: The Relationship between Command Hallucinations and Violence. Psychiatric Services. 51:1288-1292 |
| 2001 | McNiel DE, Lam JN, Binder RL: Relevance of Interrater Agreement to Violence Risk Assessment. Journal of Consulting and Clinical Psychology. 68:1111-1115 |
| 2002 | Sandberg DA, McNiel DE, Binder RL: Stalking, Threatening, and Harassing Behavior by Psychiatric Patients Toward Clinicians. Journal of the American Academy of Psychiatry and the Law. 30: 221-229 |
| 2002 | Binder RL: Liability for the Psychiatrist Expert Witness. American Journal of Psychiatry. 159: 1819-1825 *Note: This article was selected as one of the most "important and influential" papers in the field for re-publication by the International Library of Medicine, Ethics, and Law in the volume, Mental Illness, Medicine, and Law in January 2009.* |
| 2003 | McNiel DE, Eisner JP, Binder RL: The Relationship Between Aggressive Attributional Style and Violence by Psychiatric Patients. Journal of Consulting and Clinical Psychology. 71: 399-403 |
| 2003 | McNiel DE, Gregory AL, Lam JN, Binder RL, Sullivan GR: Utility of Decision Support Tools for Assessing Acute Risk of Violence. Journal of Consulting and Clinical Psychology. 71: 945-953 |
| 2004 | Binder RL: Reflections of a Forensic Psychiatrist in Washington: Politics and Policy. Journal of the American Academy of Psychiatry and the Law. 32: 324-328 |
| 2005 | McNiel DE, Binder RL: Psychiatric Emergency Service Use and Homelessness, Mental Disorder, and Violence. Psychiatric Services. 56: 699-704 |
| 2005 | McNiel DE, Binder RL, Robinson JC: Incarceration Associated with Homelessness, Mental Disorder, and Co-occurring Substance Abuse. Psychiatric Services. 56: 840-846 |
| 2007 | Binder RL, McNiel DE: "He Said-She Said": The Role of the Forensic Evaluator in Determining Credibility of Plaintiffs Who Allege Sexual Exploitation and Boundary Violations. Journal of the American Academy of Psychiatry and the Law. 35: 211-218 |
| 2007 | McNiel DE, Binder RL: Effectiveness of a Mental Health Court for Reducing Criminal Recidivism and Violence. American Journal of Psychiatry. 164: 1395-1403 *Note: This article was written up in Scientific American.com on 10/12/07; Also referenced as an "outstanding study" in "Californiacorrectionscrisis.blogspot.com".* |
| 2008 | McNiel DE, Chamberlain J, Hall S, Fordwood, S, Binder RL: Impact of Clinical Training on Violence Risk Assessment. American Journal of Psychiatry. 165: 195-200 *Note: This article was described in the Editor's note as "especially noteworthy because it describes both a teaching method and an evaluation of its effectiveness." In addition, this study was replicated in a sample of law enforcement professionals as reported in a 2011 paper by Storey, et al in "Criminal Justice and Behavior."* |
| 2008 | McNiel DE, Chamberlain J, Hall S, Fordwood, S, Binder RL: Impact of Clinical Training |

on Suicide Risk Assessment. Psychiatric Services. 59:1462-1465

2008    Binder RL, McNiel DE: Some Issues in Psychiatry, Psychology and the Law. Hastings Law Journal. 59:1191-1199

2010    Benitez C, McNiel DE, Binder RL: Do Protection Orders Protect? Journal of American Academy of Psychiatry and the Law. 38:376-385

2010    Meffert SM, Musalo K, McNiel DE, Binder RL: The Role of Mental Health Professionals in Political Asylum Processing. Journal of American Academy of Psychiatry and the Law. 38:479-489 Note: This article was described in Legal Studies Research Paper Series 11-04 Immigration Briefings 1 April 2011 "Mental Health Professions and Affirmative Applications for Immigration Benefits" as "an excellent review of the current state of the art"

2010    McNiel DE, Binder RL: Stakeholder Views of a Mental Health Court. International Journal of Law and Mental Health. 33: 227-235

2011    McNiel DE, Hung EK, Cramer RJ, Hall SE, Binder, RL: An Approach to Evaluating Competency in Assessment and Management of Violence Risk. Psychiatric Services. 62: 90-92 Note: This article was described in the "latest research" section of the international journal, "Intelligence: State of the Art Threat Assessment", as having made "important contributions to the field of risk assessment."

2011    Daley C, McNiel DE, Binder RL: Zolpidem and the Courts. Journal of American Academy of Psychiatry and the Law. 39:535-542

2012    Hung EK, Binder RL, Fordwood SR, Hall SE, McNiel DE: A Method for Evaluation of Competency in Suicide Risk Assessment and Management. Academic Psychiatry. 36:23-28

2012    Hung EK, Binder RL, McNiel DE: Covert Medication in Psychiatric Emergencies: Is It Ever Ethically Permissible? Journal of American Academy of Psychiatry and the Law. 40: 239-245

2012    Burton P, McNiel DE, Binder RL: Fire Setting, Arson, Pyromania, and the Forensic Mental Health Expert. Journal of American Academy of Psychiatry and the Law. 40: 355-365

2012    Nau M, McNiel DE, Binder RL: Postpartum Psychosis and the Courts. Journal of American Academy of Psychiatry and the Law. 40:312-325

2012    Berger O, McNiel DE, Binder RL: PTSD as a Criminal Defense. Journal of American Academy of Psychiatry and Law. 40: 509-521

2013    McNiel DE, Gormley B, Binder RL: Leverage, the Treatment Relationship, and Treatment Participation. Psychiatric Services. 64:431-436

2013    Glezer A, McNiel DE, Binder RL: Transgendered and Incarcerated: A review of the literature, current policies and laws, and ethical issues. Journal of American Academy of Psychiatry and Law. 41:551-559

2013    Sadeh N, Binder RL, McNiel DE: Recent Victimization Increases Risk for Violence in Justice-Involved Persons with Mental Illness. Law and Human Behavior. Advance online publication. Doi: 10.1037/lhb0000043

2015    Binder R, Friedli A, Fuentes-Afflick: Preventing and Managing Unprofessionalism in Medical School Faculties. Academic Medicine. 90:442-446

2015    McNiel DE, Sadeh N, DeLucchi, Binder, RL: Prospective Study of Violence Risk Reduction by a Mental Health Court. Psychiatric Services. 66:598-603 (Selected for the Editor's Choice Section of Psychiatric Services in December 2019 as one of the most important publications on Violence and Mental Illness)

2015    Korngold C, Ochoa K, Inlender T, McNiel DE, Binder RL: Mental Health and Immigrant Detainees in the United States: Competency and Self-Representation. Journal of American Academy of Psychiatry and Law.43:277-281

2016    Lorang MR, McNiel DE, Binder RL: Minors and Sexting: Legal Implications. Journal of American Academy of Psychiatry and Law. 44:73-81

2016    Binder R, Friedli A, Fuentes-Afflick: The New Academic Environment and Faculty Misconduct. Academic Medicine. February 2016

| | |
|---|---|
| 2016 | Costello C, McNiel DE, Binder RL: Adolescents and Social Media: Issues of Privacy, Brain Development and the Law. Journal of American Academy of Psychiatry and Law. 44:313-21 (Note: This article was accompanied by a commentary stating, "Costello and colleagues should be commended for calling attention to this problem and for proposing strategies to help mitigate the risks posed to adolescents by social media." |
| 2016 | Chan EJ, McNiel DE, Binder RL: Sex offenders in the Digital Age. Journal of American Academy of Psychiatry and Law. 44:368-375 |
| 2017 | Lacroix R, Shaughnessy R, McNiel DE, Binder RL: Public Safety or Public Reassurance? Controversies Concerning the Canadian Not Criminally Responsible Act. Journal American Academy of Psychiatry and Law. 45:44-51 |
| 2017 | Hirschtritt ME, Binder RL: Interrupting the mental illness-incarceration-recidivism Cycle. JAMA. 317:695-696 |
| 2018 | Armontrout J, Tourous J, Cohen, M, McNiel DE, Binder RL: Current Regulation of Mobile Mental Health Applications. Journal of American Academy of Psychiatry and Law. 46:204-211 |
| 2018 | Hirschtritt MR, Binder RL: A Reassessment of Blaming Mass Shootings on Mental Illness. JAMA Psychiatry. February 28, 2018 |
| 2018 | Binder RL, Garcia P, Johnson B, Fuentes-Affleck: Sexual Harassment in Medical Schools: The Challenge of Covert Retaliation as a Barrier to Reporting. Academic Medicine. 93: 1770-1773, 2018 |
| 2019 | Elizondo P, McNiel DE, Binder RL: A Review of Statutes and the Role of the Forensic Psychiatrist in Cyberstalking Involving Youth. Journal of American Academy of Psychiatry and the Law. 47:2019 |
| 2019 | Hirschtritt MR, Tucker D, Binder RL: Risk Assessment of Online Child Sexual Exploitation Offenders. Journal of American Academy of Psychiatry and Law. 47:2019 |
| 2019 | Matto M, McNiel DE, Binder RL: A Systematic Approach to the Detection of False PTSD. Journal of American Academy of Psychiatry and Law. 47:2019 |
| 2019 | Rogers MS, McNiel DE, Binder RL: Effectiveness of Police Crisis Intervention Training Programs. Journal of American Academy of Psychiatry and Law. 47:414-421 |

## NON-PEER REVIEWED PUBLICATIONS AND OTHER CREATIVE ACTIVITIES:

### Books and Chapters:

| | |
|---|---|
| 1984, 1988, 1992 | Binder RL: Organic Mental Disorders. Chapter in Review of General Psychiatry. Edited by H. Goldman.  Lange Medical Publications. (First, Second and Third Editions) |
| 1995 | Haller E and Binder RL: Delirium, Dementia, and Amnestic Disorders. Chapter in Review of General Psychiatry, Edited by H. Goldman, Lange Medical Publications (Fourth Edition) |
| 1991 | Binder RL: The Mental Health Professional and the Legal System. GAP Committee on Psychiatry and the Law. Brunner/Mazel, Inc. (Member of Committee authoring book) |
| 1995 | Binder RL: Women Clinicians and Patient Assaults. Chapter in Patient Violence and the Clinician (Clinical Practice Series #30). Edited by Burr Eichelman and Anne Hartwig. American Psychiatric Press pp.21-32 |

### Teaching Aids and Resource Documents:

| | |
|---|---|
| 1993-94 | American Psychiatric Association Videotape and Study Guide, "Preserving Confidentiality: A Videotaped Guide for Psychiatrists" (Organizer and coordinator of scriptwriting, producing and directing of videotape and preparing the study guide) |
| 1995 | American Psychiatric Association Practice Guideline for Psychiatric Evaluation of Adults. American Journal of Psychiatry Supplement: 66-80 (I was a member of work group that developed guidelines) |

| | |
|---|---|
| 1998 | Binder RL: American Psychiatric Association Resource Document on Controversies in Child Custody. J Am Acad Psychiatry Law. 26:267-276 (I was the chair of the work group that developed this resource document.) |
| 1999 | American Psychiatric Association Resource Document on Mandatory Outpatient Treatment [I was a co-author of the document.] |
| 2006 | American Psychiatric Association Practice Guideline for the Psychiatric Evaluation of Adults, Second Edition.  American Journal of Psychiatry Supplement 163  [I was a member of the work group that wrote the guidelines.] |

**Other Publications:**

| | |
|---|---|
| 1992 | American Psychiatric Association Task Force Report on Clinician Safety (Task Force Report 33) |
| 2006 | Binder RL: Commentary: The Importance of Professional Judgment in Evaluation of Stalking and Threatening Situations. J Am Acad Psychiatry Law. 34: 451-454 |
| 2007 | Freedman R, Ross R, Michels R, Appelbaum P, Siever L, Binder RL, Carpenter W, Friedman SH, Resnick P, and Rosenbaum J: Commentary: Psychiatrists, Mental Illness and Violence (by national experts in the field) Am J of Psychiatry 164:1315-1317 |
| 2012 | Buchanan A, Binder R., Norko M, Swartz M: Psychiatric Violence Risk Assessment. Am J of Psychiatry 169:340 |
| 2015 | Binder R.: True Parity in North American Psychiatry. Lancet Psychiatry. 370-371 |
| 2015 | Binder, R: Response to the Presidential Address. Claiming Our Future. Am J of Psychiatry 172: 717-718 |
| 2016 | Binder R: Claiming Our Future. Presidential Address. Am J of Psychiatry 173: 665-667 |
| 2017 | Binder R, Garcia P, Johnson B, Fuentes-Afflick. Identifying and Mitigating Risk of Violence in the Scientific Workplace. Editorial. Journal of American Academy of Psychiatry and Law. 45:400-3 |