STEVEN D. ZANSBERG (SBN 177528)

Law Office of Steven D. Zansberg, LLC
100 Fillmore Street, Suite 500
Denver, Colorado 80206
Phone Number (303) 385-8698
Fax Number: (720) 650-4763
Email: steve@zansberglaw.com

Attorney for Proposed Intervenor Media Coalition

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH HOLMES and<br>RAMESH "SUNNY" BALWANI,<br><br>Defendants. | Case No. 18-cr-00258-EJD<br><br>**MEDIA COALITION'S SUPPLEMENTAL REPLY IN SUPPORT OF ITS OF MOTION TO UNSEAL COMPLETED QUESTIONNAIRES OF SEATED JURORS AND ALTERNATES**<br><br>Courtroom: 4, 5th Floor<br>Hon. Edward J. Davila |

*** UNDER SEAL ***

# INTRODUCTION

The jurors submitted their completed questionnaires, under oath, on August 30, 2021. Those questionnaires were used *in lieu of oral examination in open court*, to select the jury. *See* 10/13 tr. 3312:17–23 (Court stating that "we used a questionnaire for many of the questions that would otherwise be asked in public"). Thus, the public has effectively been denied access to a significant portion of the *voir dire* since that time.[1]

On October 12 and 13, the Court allowed all the panelists to discuss in private what concerns, if any, they had with respect to the Motion being granted. 10/12 Tr. at 3097-3101. Not surprisingly, several of them expressed generalized, non-specific concerns with unsealing the entirety of their questionnaires, particularly because the Court had promised confidentiality. Nevertheless, two jurors stated they had no concerns, whatsoever, with the immediate release of the entirety of their questionnaires, including their names and other identifying information. 10/12 Tr. 3097-3101; *Id.* at 3225 - 3226. Several others stated only that they wished not be contacted by members of the media, but otherwise they expressed no concerns with all their answers being publicly disclosed immediately. No panelist described any specific factual basis or personal experience that prompted a concern for his or her safety. *See infra* at 7. All the panelists affirmatively indicated that if their questionnaires were publicly disclosed, as of that date, with *none* of the redactions they'd requested being honored, they would still be able to serve as fair and impartial jurors.

Both the Government and Ms. Holmes now urge the Court to disregard the panelists' specific statements and to withhold from the public *the entirety* of those questionnaires until the verdict is returned. Both Parties have ignored the Court's on-the-record declaration that it is going to take a "juror-by-juror" approach to the unsealing question. 10/12 Tr. 3263:19; *Id.* at 3264: 6-17 (Court stating it "ha[s] to look at each juror's situation . . . separate[ly] . . . because you're all different."). Instead, the Parties urge the Court to adopt a blanket "all or none" approach, premised on speculative

---

[1] The response to the Parties' rhetorical question "why does the public 'need' this information *now*?" is "the public was *entitled* to this information *back then*."

prognostications of jury tampering and "distraction," notwithstanding the panelists' statements to the contrary. The Supreme Court has rejected a blanket approach to closure of *voir dire*. *See Press-Enterprise*, 464 U.S. at 512 (holding that the First Amendment requires that each potential juror be given the opportunity to indicate, by affirmative act, his/her desire to keep certain *highly-personal information* out of the public record).

The Court's careful and thorough questioning of every panelist should be respected and honored: **all portions of the completed questionnaires to which no objection has been raised by any juror or alternate should be unsealed immediately**. With respect to the small set of particular answers to which individual panelists voiced any concern, the Court should promptly determine, on a case by case basis, whether the binding standard for closure has been satisfied; if it has not, those additional portions of the questionnaires should be unsealed as well.

## REPLY ARGUMENT

### I. THE *PRESS-ENTERPRISE* STANDARD FOR CLOSING THE COURTROOM DURING VOIR DIRE APPLIES TO THE PRESENT MOTION TO UNSEAL

Ms. Holmes asserts that the First Amendment provides no presumptive right of public access to juror questionnaires or the identities of the jurors, Def.'s Supp. Resp. at 6 – 7, in part because she maintains "there is no historical right of access to juror names." *Id.* at 7:2. *But see* Media Coalition's Reply (Doc. 1036) at 8 n. 6 (citing multiple authorities recognizing that historical right); *United States v. Burr*, C.C.D. Va., 25 F.Cas. 55, 87 (No. 14,693) (1807) (Marshall, J.) (publishing the names of the twelve seated jurors); *U.S. v. Wecht*, 537 F.3d 222, 236 (3d Cir. 2008) ("public knowledge of jurors' names is a well-established part of American judicial tradition.").[2]

As both the Media Coalition and the Government agree, continued sealing of the juror

---

[2] History aside, the last names of all jurors and alternates *in this case* were announced in open court and are therefore a matter of public record. 9/2 Tr. at 479:18 - 482:24 (setting forth last names of the original twelve jurors and five alternates). Notwithstanding that fact, not one of them has notified the Court of any contact by any member of the press or the public. This demonstrates rather persuasively that the Parties' predictions of jury interference are, in fact, baseless.

questionnaires is "proper," (i.e., consistent with the First Amendment[3]) only if:

> the Court (1) makes "specific findings" that demonstrate that there is a "substantial probability" that compelling interests. . . "will be prejudiced by publicity" and that closure would prevent such prejudice, and (2) considers "reasonable alternatives to closure" and determines that they cannot adequately protect those interests.

Gov. Suppl. Resp. at 5:15 – 19 (citation omitted).

"The mere fact that the [prosecution] has been the subject of intense media coverage is not, however, sufficient to justify closure. To hold otherwise would render the First Amendment right of access meaningless; the very demand for openness would paradoxically defeat its availability." *ABC, Inc. v. Stewart*, 360 F.3d 90, 102 (2d Cir. 2004).[4] The same applies here.

## II. THE SPECIFIC CONCERNS RAISED BY A FEW OF THE PANELISTS ARE ADEQUATELY PROTECTED THROUGH LIMITED REDACTIONS

When questioned in chambers, only a handful of the panelists expressed concern about the press determining their identities and thereafter attempting to contact them (either mid-trial or post-verdict). Indeed, each and every panelist declared that if any (or all) of the information they had requested be redacted were to be publicly disclosed during trial they could nevertheless continue to serve as fair and impartial jurors.[5] *See* 10/13 Tr. 3344:11 -14.

Two jurors (Nos. 1 and 6) expressed no concerns whatsoever, with having their complete questionnaires, *including their names and cities of residence*, publicly disclosed. Three other jurors (Nos. 2, 4, and 9) and one alternate (No. 5) indicated they, too, had no concerns with any of their answers being publicly disclosed, so long as their names, cities of residence (and in one instance,

---

[3] As noted in the Motion (Doc. 1026) at 5-6, federal and state courts are in widespread agreement that juror questionnaires are subject to the same First Amendment presumption of openness that attaches to *voir dire* questioning in open court.

[4] The Second Circuit recognized that delayed provision of a transcript does not excuse the denial of contemporaneous access to *voir dire*. *Id.,* 360 F.3d at 100 ("The provision of a transcript, however, does not somehow allow for a more lenient balancing test.").

[5] *See* 10/12 Tr. 3216:2-5; 3222:5-14; 3245:2-7; 3249:20-24; 3261:4 -3262:9; 3273:3-12; 10/13 Tr. 3299:2-24; 3310:18-20; 3317:4-7; 3321-33:23; 3330:5-13; 3335:1-7.

employer's name) were redacted. One of those jurors made clear that, "[i]n terms of the specific questions that are identifiable, I'm fine with all of those [being disclosed]. *Nothing in there is that sensitive*, I would say." 10/13 Tr. 3295:3 -5 (emphasis added). A sixth juror (No. 8) expressed concern only with being contacted by the press; he indicated he only wanted his/her name, educational background (and that of the jurors' children) redacted. A seventh juror began the interview by stating he didn't "think there's anything particular in my questionnaire that I'm concerned about" being disclosed, (10/12 Tr. 3252: 18 – 19), but later indicated three answers he wished to have withheld, for privacy reasons. But he also reiterated that "there's not a lot that I'm super-concerned about as far as the information that you have" being disclosed. 10/12 Tr. 3262: 1-2.

     A couple of panelists stated they'd experience only "discomfort" or potential embarrassment from the public disclosure of their poor penmanship, their personal hobbies, or their not having obtained collegiate degrees. Such innocuous information is routinely discussed in open court during *voir dire* and does not satisfy the constitutional standard for closure. *See Press-Enterprise,* 464 U.S. at 511 (recognizing "a compelling [privacy] interest of a prospective juror [only] when interrogation touches on *deeply personal matters* that a person has legitimate reasons for keeping out of the public domain.") (emphasis added).[6] Quite plainly there is no factual record to support a "specific finding" that panelists' protectable privacy rights warrant the blanket sealing of their written responses in *voir dire*.[7]

---

[6] In contrast, a few of the panelists voiced concerns regarding disclosure of their children's school settings, their spouse's employer, and personal or family health issues. The Media Coalition recognizes that such concerns, in appropriate circumstances, may justify limited redactions.

[7] All three of the Government's newly cited cases are easily distinguishable from the one at bar. In *U.S. v. Taveras*, 436 F. Supp. 2d 493 (E.D.N.Y. 2006), with no member of the public or press objecting, the questionnaires were permanently sealed, upon the court's finding that they contained "highly personal information," unlike the ones at issue here. In *United States v. Wecht*, the Third Circuit made clear "that Media-Intervenors were 'not seeking access to . . . the actual jury questionnaire,'" 537 F.3d 222, 227 n.9 (3d Cir. 2008), but had instead requested that all *voir dire* be conducted orally in open court. The Third Circuit also there recognized "a presumptive First Amendment right of access to obtain the names of both trial jurors and prospective jurors prior to empanelment of the jury." *Id.* 527 F.3d at 235. Finally, in *Matter of Daily News v. Wiley*, a New York appellate panel denied a writ of mandamus finding no abuse of discretion by the sealing of

The chart below depicts which panelists raised *any* concern with the immediate public disclosure of their answers:

| Juror or Alternate No. | Question Numbers Identified as Being of Any Concern | Transcript Pages |
|---|---|---|
| 1 | [None] | 3097-3101 |
| 2 | 11, 16b | 3295 |
| 3 | (17),[8] **19**,[9] 20, 22b, (24), (29), **30** | 3209-3215 |
| 4 | 11, 22b, 25 | 3308 |
| 5 | 22b, **32**, **50** | 3218-3222 |
| 6 | [None] | 3225 - 3226 |
| 7 | 11, 12, 16b, 20, 22a,b,c, **23** | 3232-3236 |
| 8 | 11, 20, 25 | 3241-3245 |
| 9 | 11,12 | 3314 |
| 10 | 11,16, **27,** (49) | 3319-3321 |
| 12 | **2**, 16b, **47**, **48**, p.24 | 3252 - 3255 |
| Alt. 3 | **8**, 11, 12, 16, 19, 20 | 3270-3273 |
| Alt. 4 | 11, 22, 25 | 3328 |
| Alt. 5 | 11, 16b | 3334 |

In sum, as of October 13, not a single panelist expressed any concern about the *immediate* public release[10] of their answers to the following questions:  1, 3-7, 9, 10, 13-15, 17, 18, 21, 23, 24,

---

completed questionnaires that contained highly "personal information such as the juror's experience with psychiatric care and mental illness."  6 N.Y.S.3d 19, 24 (N.Y. App. Div. 2015). Here, all panelists have been afforded the opportunity to identify any "highly personal information" in their completed questionnaires and very few discrete items have been so identified.

[8] Parentheses indicate the juror discussed these questions but indicated (s)he had no concern with disclosure of the answers thereto. Accordingly, they are not included in the paragraph below.

[9] Bold text indicates this is the only panelist who raised a concern regarding this question.

[10] No panelist asked the Court to delay the release of his/her questionnaire until the verdict has been rendered.

26-46, 51-68.[11]  Accordingly, there is no sound basis to withhold any of these answers from the public for even one more day.

### III. THE PARTIES' ARGUMENTS FOR COMPLETE DENIAL OF THE PUBLIC'S PRESUMPTIVE RIGHT TO OBSERVE VOIR DIRE ARE WITHOUT MERIT

Both Parties now urge the Court to withhold the entirety of the questionnaires until a verdict has been returned, arguing (without evidence) that public disclosure during trial poses the risk of jury tampering, juror distraction, and threats to the personal safety of the panelists and/or their loved ones. Ms. Holmes' counsel declares, emphatically, that "disclosure of the questionnaires *will* compromise [her] fair trial rights." Def.'s Supp. Resp. at 1: 4-5 (emphasis added). It bears repeating that "[t]he First Amendment *right* of access cannot be overcome by the *conclusory assertion* that publicity might deprive the defendant of [a fair trial]." *Press-Enterprise Co.*, 478 U.S. at 15 (emphasis added). Instead, there is a presumption of access to juror questionnaires, unless the Court makes "specific findings" that demonstrate that there is a "substantial" probability that a compelling interest will be harmed.

Ms. Holmes offers unfounded, conclusory predictions of future events: "if [jurors'] identities are disclosed during trial *it is inevitable* that *multiple* jurors *will be* exposed to prejudicial publicity about this case, *requiring a mistrial*. Def.'s Supp. Resp. at 7: 16 -18 (emphasis added).[12]  The accuracy of this prediction is belied by the fact that the jurors' last names were publicly disclosed on September 2, yet not a single such exposure has been reported. Ms. Holmes also points to "abusive" conduct by the media – in Illinois, more than a decade ago, in connection with the prosecution of that state's corrupt former Governor – to suggest that the jurors in this case "almost certainly" expect

---

[11] As the chart above indicates, only a single juror or alternate raised any concern regarding his or her answers to questions numbered 2, 8, 19, 23, 27, 30, 32, 47, 48, 50.  *See supra* n. 9.

[12] Ms. Holmes further speculates, with no evidentiary support, that "[i]f *any* information from the questionnaires is made public, even if identity information is redacted, [various unethical individuals] will likely deduce and publicize the jurors' identities." Def.'s Supp. Resp. at 2: 10 – 12 (emphasis in original). If such bald speculation were sufficient to overcome the public's presumptive right of access to judicial records or *voir dire*, that right would be rendered meaningless.

such reprisal if they were to vote to acquit. Def.'s Supp. Resp. at 4: 1 -10. Obviously, this is poppycock.

Neither Party has presented any actual evidentiary support for their speculative claims that disclosure of the questionnaires (whether in redacted form, or not) creates a "substantial probability" of jury tampering or any threat to the safety of the panelists. In fact, the Court's painstaking in-chambers interviews establish just the opposite. Not a single panelist voiced any *specific* concern for his/her personal safety, stemming from any prior interaction with any member of the public or the press. One juror, who voiced "safety" as a general concern, made clear that neither he, nor anyone he knew, had any experience with uninvited visitors or others approaching them. 10/13 Tr. 3320: 4 – 8. The same was true for another panelist who expressed concerns about potential interactions at his place of work. *Id.* 3329: 14 -18. Another panelist, who made clear she did not wish to be contacted by the press, was asked whether she had any personal security concerns or knew of anyone who had been subjected to such incidents; she stated "It hasn't happened to anyone I know, I can't name any specific stories in the public that I've read about. . . It just felt like something that would be easy to get out there and, you know, someone to use it in the wrong way." 10/12 Tr. 3244: 2- 16. Such amorphous statements are clearly an insufficient factual basis to premise a judicial finding that there is a "substantial probability" of any threat to the security or safety of any of the panelists.

Finally, Ms. Holmes asks the Court to find that such concerns are concretely supported by the fact that her counsel have received unsolicited emails, phone calls, and letters from members of the public. Def.'s Supp. Resp. at 3: 2-3. Notably, Ms. Holmes offers no description of the nature or substance of those entreaties, which are quite routine in high-profile cases. They might have said "She's the victim!," "She's innocent," or expressed any other sentiment. Merely because counsel for the parties in a high-profile case – not the jurors – have received unsolicited communications from the public proves absolutely nothing.

### IV. LESS RESTRICTIVE ALTERNATIVES ARE AVAILABLE TO ADEQUATELY PROTECT AGAINST THE PARTIES' SPECULATIVE CONCERNS

To the extent that the Court gives any credence to the Parties' speculative concerns of juror tampering or their physical safety – which enhanced security measures and different protocols for their entering and leaving the courthouse cannot adequately address – an additional "alternative means" of disclosure should be considered. In *United States v. Bonds*, Case No. C-07-00732-SI (N.D. Cal. Mar. 14, 2011) (Doc. 1026-1 herein), Judge Illston ordered that multiple copies of the completed questionnaires be made available for public inspection only (not photocopying) in the clerk's office. *Id*. at 5:20 - 6:3. Such a mechanism of public access would reduce the purported "risk" that irresponsible third parties might utilize the information to attempt to contact the jurors, for whatever purpose.

### CONCLUSION

The Court should *forthwith* enter an Order directing the Clerk to make available for public inspection copies of all answers to which no objection has been raised by any panelist. The Court should thereafter promptly issue its ruling regarding the requested redactions of individual panelists, including the requisite findings. A second hearing on the Motion[13] is not necessary. The Parties have already presented their oral arguments to the Court, 10/13 Tr. 3337-3343, and the Media Coalition will gladly submit this matter on the supplemental briefing. Further delay of the Court's resolving the Motion will only add to the rather minimal "distraction" it has caused some of the jurors to date;[14] as both Parties agree, the sooner the Court resolves the Motion, the sooner the jurors and alternates can put this brief interruption behind them.

---

[13] The Court informed the jury that it "anticipate[d]" convening a further hearing five weeks later. 10/13 Tr. 3422: 9 – 12. However, the Court also told the jurors that it would "keep [them] informed," if its plans were to change. *Id.*

[14] Based on its assessment of the panelists' demeanor, the Court concluded that the "distraction" caused by the Motion was nothing more than a "distraction like parking or something like that." 10/13 Tr. 3346: 8-11.

DATED: November 1, 2021

          /s/ Steven D. Zansberg
          STEVEN D. ZANSBERG
          Attorney for The Media Coalition

(American Broadcasting Companies, Inc. d/b/a ABC News, the Associated Press, Bloomberg L.P., The Daily Mail, Dow Jones and Company, Inc., NBCUniversal Media, LLC, The New York Times Company, Portfolio Media, Inc. – publisher of Law360, Three Uncanny Four LLC, and the Washington Post Company)

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2021, a copy of this filing was delivered via email to all counsel of record.

          /s/ Steven D. Zansberg
          STEVEN D. ZANSBERG