1   STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

2

3   HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

4   JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)

5   ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)

6   Assistant United States Attorneys

7        150 Almaden Boulevard, Suite 900
San Jose, California 95113

8        Telephone: (408) 535-5061
Fax: (408) 535-5066

9        Robert.Leach@usdoj.gov

10  Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,            )   Case No. 18-CR-00258 EJD
                                         )
16          Plaintiff,                   )   UNITED STATES' MOTIONS *IN LIMINE*
                                         )
17     v.                                )   Date:   December 16, 2021
                                         )   Time:   9:00 a.m.
18  RAMESH "SUNNY" BALWANI,              )   Court:  Hon. Edward J. Davila
                                         )
19          Defendant.                   )
                                         )
20  _____)

21

22

23

24

25

26

27

28

U.S. MOTIONS *IN LIMINE*,
CASE NO. 18-258 EJD                    1

1

TABLE OF CONTENTS

2

3    MEMORANDUM OF POINTS AND AUTHORITIES…………………………………………………1

4    I.    MOTION *IN LIMINE* NO. 1: THE COURT SHOULD PRECLUDE DEFENDANT FROM
           OFFERING AN IMPROPER DEFENSE OF BLAMING HIS VICTIMS…………………...1
5

6    II.   MOTION *IN LIMINE* NO. 2: THE COURT SHOULD PRECLUDE THE DEFENSE FROM
           REFERENCING PUNISHMENT IN FRONT OF THE JURY……………………….......3
7
     III.  MOTION *IN LIMINE* NO. 3: THE COURT SHOULD PRECLUDE AN IMPROPER
8          ADVICE OF COUNSEL DEFENSE……………………………………………………………4

9    IV.   MOTION *IN LIMINE* NO. 4: THE COURT SHOULD PRECLUDE A DEFENSE
           ARGUMENT THAT THE GOVERNMENT'S CHARGING DECISIONS WERE
10         INFLUENCED BY COORDINATION WITH JOURNALISTS OR COMPETITORS……..5

11   V.    MOTION *IN LIMINE* NO. 5: THE COURT SHOULD PRECLUDE A DEFENDANT
           FROM PRESENTING AN IMPROPER GOOD FAITH DEFENSE………………………...5
12

13   VI.   MOTION *IN LIMINE* NO. 6: THE COURT SHOULD PRECLUDE DEFENDANT FROM
           OFFERING EVIDENCE OF ACTIONS TAKEN BY THERANOS AFTER DEFENDANT
14         LEFT THE COMPANY…………………………………………………………………………6

15   VII.  MOTION *IN LIMINE* NO. 7: THE COURT SHOULD ADMIT TRIAL EXHIBIT 4621
           (CMS LETTER AND THE ACCOMPANYING JANUARY 26, 2016 FORM CMS-2567,
16         STATEMENT OF DEFICIENCIES)……………………………………………………………7

17         A. Factual Background…………………………………………………………………………8

18         B. Argument…………………………………………………………………………...10

19   VIII. MOTION *IN LIMINE* NO. 8: THE COURT SHOULD ADMIT TEXT MESSAGES
           BETWEEN HOLMES AND BALWANI OFFERED BY THE GOVERNMENT…………12
20

21   IX.   MOTION *IN LIMINE* NO. 9: THE COURT SHOULD ADMIT THERANOS EMAILS AS
           BUSINESS RECORDS…………………………………………………………………...14
22

23   X.    MOTION *IN LIMINE* NO. 10:  THE COURT SHOULD ADMIT STATEMENTS BY
           THERANOS AND THERANOS EMPLOYEES AND AGENTS OFFERED BY THE
24         GOVERNMENT…………………………………………………………………………..16

25   XI.   MOTION *IN LIMINE* NO. 11: THE COURT SHOULD EXCLUDE SELF-SERVING
           HEARSAY STATEMENTS BY DEFENDANT IN INTERVIEWS/SEC TESTIMONY….18
26

27   XII.  MOTION *IN LIMINE* NO. 12: THE COURT SHOULD PRECLUDE DEFENDANT FROM
           OFFERING EVIDENCE THAT HIS MOTHER RECEIVED A BLOOD TEST FROM
28         THERANOS WITHOUT THE NECESSARY FOUNDATION……………………………....19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

XIII.   MOTION *IN LIMINE* NO. 13: THE COURT SHOULD ADMIT TESTIMONY FROM "NON-PAYING" PATIENTS……………………………………………………………….20

XIV.   MOTION *IN LIMINE* NO. 14: THE COURT SHOULD ORDER DEFENDANT TO PRODUCE REVERSE *JENCKS* INCLUDING ANY DOCUMENTS THAT HAVE NEVER BEEN PRODUCED TO THE GOVERNMENT OR DOCUMENTS THAT WERE PRODUCED BY CO-DEFENDANT HOLMES TO THE GOVERNMENT………………22

XV.   MOTION *IN LIMINE* NO. 15: THE COURT SHOULD EXCLUDE DEFENDANT'S THREE PURPORTED EXPERTS DUE TO INSUFFICIENT DISCLOSURE……………23

1

# TABLE OF AUTHORITIES

2

Cases

3

4
*Huddleston v. United States*,
  485 U.S. 681 (1988) .................................................................................................. 6, 9
*Hunt v. Blackburn*,
  128 U.S. 464 (1888) ........................................................................................................ 5
*Ionian Corp. v. Country Mut. Ins. Co.*,
  836 F. Supp. 2d 1173 (D. Or. 2011) .......................................................................... 16
*Monotype Corp. PLC v. Int'l Typeface Corp.*,
  43 F.3d 443 (9th Cir. 1994) ........................................................................................ 16
*Neder v. United States*,
  527 U.S. 1 (1999) .................................................................................................. passim
*Shannon v. United States*,
  512 U.S. 573 (1994) ...................................................................................................... 4
*United States v. Alvarez*,
  580 F. App'x 571 (9th Cir. 2014) .............................................................................. 20
*United States v. Benny*,
  786 F.2d 1410 (9th Cir. 1986) ..................................................................................... 6
*United States v. Blixt*,
  548 F.3d 882 (9th Cir. 2008) ....................................................................................... 1
*United States v. Bush*,
  626 F.3d 527 (9th Cir. 2010) ....................................................................................... 5
*United States v. Cerna*,
  No. 08-CR-730-WHA 2010 WL 2347406 (N.D. Cal. June 8, 2010) ........................ 24
*United States v. Ciccone*,
  219 F.3d 1078 (9th Cir. 2000) ..................................................................................... 2
*United States v. Colton*,
  231 F.3d 890 (4th Cir. 2000) ....................................................................................... 2
*United States v. DiStefano*,
  129 F. Supp. 2d 342 (S.D.N.Y. 2001) ......................................................................... 3
*United States v. Frank*,
  956 F.2d 872 (9th Cir. 1992) ....................................................................................... 4
*United States v. Fryberg*,
  854 F.3d 1126 (9th Cir. 2017) .............................................................................. 11, 12
*United States v. Gibson*,
  690 F.2d 697 (9th Cir. 1982) ..................................................................................... 18
*United States v. Hickey*,
  580 F.3d 922 (9th Cir. 2009) ....................................................................................... 6
*United States v. Kail*,
  No. 18-CR-00172-BLF-1, 2021 WL 261135 (N.D. Cal. Jan. 26, 2021) .............. 23, 24
*United States v. King*,
  No. CR-08-002, 2009 U.S. Dist. LEXIS 32935, at *7-8 (D. Idaho Apr. 17, 2009) ............ 3
*United States v. Kirk*,
  844 F.2d 660 (9th Cir. 1988) ..................................................................................... 17

*United States v. Lindsey,*
   850 F.3d 1009 (9th Cir. 2017) ............................................................................. 1, 2

*United States v. Lischewski,*
   860 F. App'x 512 (9th Cir. 2021) ............................................................................. 15

*United States v. Loftis,*
   843 F.3d 1173 (9th Cir. 2016) ................................................................................. 22

*United States v. Olano,*
   62 F.3d 1180 (9th Cir. 1995) ..................................................................................... 4

*United States v. Ortega,*
   203 F.3d 675 (9th Cir. 2000) ................................................................................... 19

*United States v. Pelisamen,*
   641 F.3d 399 (9th Cir. 2011) ............................................................................. 18, 19

*United States v. Perez,*
   662 F. App'x 495 (9th Cir. 2016) ............................................................................... 6

*United States v. Thomas,*
   377 F.3d 232 (2d Cir. 2004) ...................................................................................... 3

*United States v. Utz,*
   886 F.2d 1148 (9th Cir. 1989) ................................................................................. 22

*United States v. Valdez,*
   No. 18-CR-608, 2019 WL 539074 (N.D. Cal. Feb. 11, 2019) .................................. 24

*United States v. Warren,*
   25 F.3d 890 (9th Cir. 1994) ..................................................................................... 22

*United States v. Whitworth,*
   856 F.2d 1268 (9th Cir. 1988) ........................................................................... 13, 15

*United States v. Winkle,*
   477 F.3d 407 (6th Cir. 2003) ..................................................................................... 2

*Volterra Semiconductor Corp. v. Primarion, Inc.,*
   No. 08-CV-5129, 2011 WL 4079223 (N.D. Cal. Sept. 12, 2011) ....................... 16, 17

*Zal v. Steppe,*
   968 F.2d 924 (9th Cir. 1992) ..................................................................................... 4

Rules

Fed. R. Crim. P. 16 ...................................................................................................... 24
Fed. R. Crim. P. 16(b) ................................................................................................. 23
Fed. R. Crim. P. 16(b)(1)(C) ....................................................................................... 24
Fed. R. Crim. P. 26.2 ................................................................................................... 23
Fed. R. Crim. P. 26.2(e) .............................................................................................. 23
Fed. R. Evid. 104(b) .................................................................................................... 19
Fed. R. Evid. 401–403 ................................................................................................... 3
Fed. R. Evid. 401(a) ...................................................................................................... 7
Fed. R. Evid. 403 .......................................................................................................... 7
Fed. R. Evid. 703 ........................................................................................................ 24
Fed. R. Evid. 801(d)(2) .......................................................................................... 13, 17
Fed. R. Evid. 801(d)(2)(A) .......................................................................................... 13
Fed. R. Evid. 801(d)(2)(D) .......................................................................................... 17
Fed. R. Evid. 801(d)(2)(E) .......................................................................................... 18
Fed. R. Evid. 803(6) .................................................................................................... 16

1

## NOTICE OF MOTIONS AND MOTIONS

2  **TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:**

3           PLEASE TAKE NOTICE that on December 16, 2021 at 9 a.m., or as soon thereafter as the

4  matter may be heard, in Courtroom 4, 5th Floor, of the United States District Court for the Northern

5  District of California, 280 South 1st Street, San Jose, CA 95113, the United States will and hereby does

6  move *in limine* to for the following evidentiary orders:

7        1.      Precluding Defendant Ramesh "Sunny" Balwani ("Defendant") from offering an
                 improper defense blaming his victims;
8

9        2.      Precluding the Defendant from referencing punishment in front of the jury;

10       3.      Precluding an improper advice-of-counsel defense;

11       4.      Precluding a defense argument that the government's charging decisions were influenced
                 by coordination with journalists or competitors;
12

13       5.      Precluding the Defendant from presenting an improper good faith defense;

14       6.      Precluding the Defendant from presenting evidence of actions taken by Theranos after
                 Defendant left the company;
15

16       7.      Admitting Trial Exhibit 4621 (CMS Letter and the accompanying January 25, 2016 Form
                 CMS-2567, Statement of Deficiencies);

17       8.      Admitting text messages between Defendant and co-Defendant Elizabeth Holmes offered
                 by the Government;
18

19       9.      Admitting Theranos emails as business records;

20       10.     Admitting statements by Theranos, Inc. and Theranos employees and agents offered by
                 the Government;
21

22       11.     Excluding self-serving hearsay statements by Defendant in interviews and SEC
                 testimony;
23

24       12.     Precluding Defendant from offering evidence that his mother was tested at Theranos
                 without necessary supporting foundation;
25

         13.     Admitting testimony from "non-paying" patients;
26

27       14.     Ordering the Defendant to produce reverse *Jencks* including any documents used during
                 the trial of co-Defendant Elizabeth Holmes that have not been produced to the
                 government or were produced by Holmes to the government;
28

         15.     Excluding Defendant's three experts due to his insufficient Rule 16 disclosure.

1   These motions are based upon the instant notice, the attached memorandum of points and authorities, the

2   records in this case, the course of related proceedings against co-Defendant Elizabeth Holmes, and upon

3   such argument as may be made at the hearing on the motions.

4
    DATED:  November 19, 2021                          Respectfully submitted,
5
                                                       STEPHANIE M. HINDS
6                                                      Acting United States Attorney

7
                                                        _/s/ Kelly I. Volkar_____
8                                                      ROBERT S. LEACH
                                                       JEFF SCHENK
9                                                      JOHN C. BOSTIC
                                                       KELLY I. VOLKAR
10                                                     Assistant United States Attorneys

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S. MOTIONS *IN LIMINE*,
CASE NO. 18-258 EJD                      2

## MEMORANDUM OF POINTS AND AUTHORITIES

The Court has ruled on several of the below motions *in limine* with respect to co-Defendant Elizabeth Holmes in its detailed Order re: Motions *in Limine*, ECF No. 798 ("MIL Order") in the related *United States v. Holmes* trial.  The trial against co-Defendant Holmes has demonstrated the necessity of these pretrial rulings.  The government respectfully requests the Court adopt its prior rulings to apply with respect to Defendant Balwani, as well.

## I.   MOTION *IN LIMINE* NO. 1:  THE COURT SHOULD PRECLUDE DEFENDANT FROM OFFERING AN IMPROPER DEFENSE OF BLAMING HIS VICTIMS

The government moved *in limine* in the related *Holmes* trial to preclude co-Defendant Holmes from blaming the victims in this case and the Court largely granted the government's motion.  ECF Nos. 588 at 8–10, 798 at 80–82.  Co-Defendant Holmes did, indeed, cross examine investor-witnesses along these lines, as the government anticipated.  *See United States v. Holmes*, 10/27/2021 & 11/03/2021 Trial Transcript at 4878:25–4883:20, 5369:25–5370:10.  The government requests the Court adopt its prior ruling in the *Holmes* MIL Order with respect to Defendant Balwani, as well.  At trial, the government anticipates that Defendant may also attempt to justify his conduct by arguing that the victims in this case—in particular, relatively sophisticated investor victims—could have or should have exercised more diligence or skepticism in their dealings with Theranos, Inc. ("Theranos").  Defendant also may attempt to argue that the victims did not in fact rely on the materially false and misleading statements made by him and his coconspirators.  Defendant should be precluded from pursuing this strategy, which would distract the jury from the central issues in this case:  Defendant's intent to defraud and the falsity and materiality of his statements.

The Indictment in this case charges Defendant with multiple counts of wire fraud as well as conspiracy to commit wire fraud under two distinct schemes to defraud.  As the Court previously held, "[i]t is well settled that a victim's negligence is not a defense to wire fraud."  MIL Order, ECF No. 798 at 81 (citing *United States v. Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017)).  Indeed, because reliance and damages are not elements of these crimes, it is no defense that the victim of the fraud was negligent or gullible.  *See, e.g.*, MIL Order, ECF No. 798 at 81 (citing *Neder v. United States*, 527 U.S. 1, 25 (1999)); *United States v. Blixt*, 548 F.3d 882, 889 (9th Cir. 2008) (In a mail fraud case, "[w]hat is

1    important is the intent of the person making the statement that it be in furtherance of some fraudulent

2    purpose." (quotation omitted)); *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000) ("It is

3    immaterial whether only the most gullible would have been deceived by the defendants' scheme....

4    [T]he wire fraud statute protects the naive as well as the worldly-wise." (quotation omitted)).

5          Consistent with these principles, the Ninth Circuit recently held in a wire fraud case that the

6    defendant could not rely on a bank's negligence in verifying loan application information and affirmed

7    the district court's preclusion of evidence and argument on that topic. *Lindsey*, 850 F.3d at 1012–15

8    (rejecting defendant's attempt to argue mortgage lending in 2006–2007 functioned like the "Wild West,"

9    with banks not really caring about the quality of their mortgage lending). The Ninth Circuit

10   acknowledged it was in good keeping with other circuits in holding "that a fraud victim's negligence is

11   not a defense to criminal charges under the federal fraud statutes." *Id.* at 1014–15 (collecting circuit

12   cases on the topic); *see also United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The

13   susceptibility of the victim of the fraud, in this case a financial institution, is irrelevant to the analysis:  If

14   a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons

15   the schemers intended to defraud are gullible or skeptical, dull or bright." (internal quotation marks

16   omitted)).

17         Similarly, the Supreme Court has confirmed that, while materiality is an element of the wire

18   fraud offense, "the government does not have to prove actual reliance upon the defendant's

19   misrepresentations." *Neder*, 527 U.S. at 25 (quotation omitted). Materiality "is an objective test." MIL

20   Order, ECF No. 798 at 81 (citation omitted); *see also Lindsey*, 850 F.3d at 1015 (materiality standard is

21   objective and "is not concerned with a statement's subjective effect on the victim, but only the intrinsic

22   capabilities of the false statement itself." (internal quotation omitted)). Since *Neder*, Courts of Appeal

23   have routinely affirmed district court rulings precluding testimony relating to the question of whether a

24   defendant's fraudulent statements actually misled the intended victim. *See* ECF No. 588 at 9–10

25   (collecting sister circuit cases). For example, it would be irrelevant if some bank or lender employee

26   had overlooked a "red flag" associated with a fraudulent loan application. *United States v. Winkle*, 477

27   F.3d 407, 414 n.3 (6th Cir. 2003) ("[T]he victim of a bank fraud is the bank, not the CEO of the bank,

28   and approval of a bank officer does not relieve a defendant of liability for bank fraud."). Similarly, in a

1    scheme to induce travel for a fraudulent purpose, the Second Circuit rejected the defendant's argument

2    that the "foolishness of the [victim] in [the defendant's] fraudulent scheme somehow vitiates [the

3    defendant's] fraudulent intent." *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (collecting

4    cases and upholding district court's exclusion of evidence and testimony relating to gullibility of

5    victim).  Under the case law above, the Court should preclude the defense from arguing that the victims

6    were negligent, were not actually misled, or were otherwise at fault in this case.

7            The government also requests the Court adopt its prior ruling prohibiting any selective

8    prosecution claims.  *See* MIL Order, ECF No. 798 at 82–83.  Defendant might attempt to introduce an

9    improper defense focusing on the culture of Silicon Valley startups, arguing that founders in this area

10   frequently use exaggeration and dramatic promises to generate needed attention for their companies and

11   attract capital, and that Defendant was singled out for prosecution while other entrepreneurs were not.

12   This defense is simply a region-specific version of "other people committed the same crime."  To be

13   sure, Defendant was not the first person to commit fraud in connection with investments into a Bay Area

14   startup.  At trial, the defense may attempt to minimize Defendant's conduct by eliciting testimony

15   regarding other instances of similar fraudulent schemes, perhaps highlighting cases where no criminal

16   charges were brought.  Such testimony would be improper, as there is no "other people did it too"

17   defense to wire fraud or conspiracy.  Thus, reference to any wrongdoing committed by individuals other

18   than the Defendants or co-conspirators during *voir dire* or trial would be irrelevant and prejudicial.

19   Such evidence should be excluded pursuant to Federal Rules of Evidence 401–403.  *See United States v.*

20   *King*, No. CR-08-002, 2009 U.S. Dist. LEXIS 32935, at *7-8 (D. Idaho Apr. 17, 2009) ("Evidence of

21   selective prosecution . . . would be irrelevant and unfairly prejudicial to present to the jury."); *see United*

22   *States v. DiStefano*, 129 F. Supp. 2d 342, 348 (S.D.N.Y. 2001) (rejecting defendant's selective

23   enforcement claim regarding the existence of uncharged co-workers engaging in the same conduct).

24           For these reasons, the Court should preclude Defendant from offering an improper defense of

25   blaming his victims.

26   **II.    MOTION *IN LIMINE* NO. 2:  THE COURT SHOULD PRECLUDE THE DEFENSE**
     **FROM REFERENCING PUNISHMENT IN FRONT OF THE JURY.**

27

28           The government requests the Court adopt its prior ruling in the *Holmes* MIL Order precluding

1   any reference by the defense to the Defendant's alleged suffering or potential punishment during any

2   phase of the trial, including jury selection, opening statements, examination of witnesses (including the

3   Defendant, if he elects to testify), and summation.  ECF No. 798 at 83–84.  During the *Holmes* trial,

4   jurors expressed concerns about potential punishment of co-Defendant Holmes.  *See United States v.*

5   *Holmes*, 09/14/2021 & 10/06/2021 Trial Transcript at 670:16–684:16, 2790:12–2801:17.  Once the jury

6   hears anything about punishment or other consequences, the bell simply cannot be unrung or the damage

7   neutralized by a curative instruction.  As the Court previously recognized, "[i]t has long been the law

8   that it is inappropriate for a jury to consider or be informed of the consequences of their verdict."  MIL

9   Order, ECF No. 798 at 83 (quoting *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992)).  "The

10  jury's function is to find facts and to decide whether, on those facts, the defendant is guilty of the crime

11  charged."  *Shannon v. United States*, 512 U.S. 573, 579 (1994).  Information about penalty and

12  punishment "draw[s] the attention of the jury away from their chief function as the sole judges of the

13  facts, open[s] the door to compromise verdicts, and confuse[s] the issue[s] to be decided."  *United States*

14  *v. Olano*, 62 F.3d 1180, 1202 (9th Cir. 1995).  Other attempts at jury nullification are likewise improper.

15  *See* MIL Order, ECF No. 798 at 84 (citing *Zal v. Steppe*, 968 F.2d 924, 930 (9th Cir. 1992) (any verdict

16  "must be based on the law and the evidence, not on jury nullification as urged by either litigant")).

17  Accordingly, the defense should be precluded from making any reference to the Defendant's potential

18  punishment in the presence of the jury, whether in statements, questions, or argument.

19  **III.    MOTION *IN LIMINE* NO. 3:  THE COURT SHOULD PRECLUDE AN IMPROPER**
        **ADVICE-OF-COUNSEL DEFENSE**
20

21          The government requests the Court adopt its prior ruling in the *Holmes* MIL Order that

22  Defendant "must establish the foundational prerequisites for the advice-of-counsel defense, namely:

23  (1) waiver of the applicable attorney-client privilege, (2) demonstrating that there was a full disclosure

24  to [his] attorney of all material facts, (3) and that [he] relied in good faith on the specific course of

25  conduct the attorney recommended."  MIL Order, ECF No. 798 at 85–86.  Defendant has not yet waived

26  any applicable privileges related to his relationships with prior counsel and thus should be precluded

27  from soliciting testimony or making arguments suggesting that Defendant relied upon advice given to

28  him by attorneys as a defense to the charged offenses, as well as any associated jury instruction, unless

1  or until those prerequisites have been met.  *See, e.g., Hunt v. Blackburn*, 128 U.S. 464, 460–71 (1888)

2  (when defendant entered into a defense which relied upon what her lawyer told her, she waived her right

3  to object to him giving his own account); *United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010) (an

4  advice-of-counsel instruction requires the defendant to show he made a full disclosure of all material

5  facts to his attorney).

6  **IV.    MOTION *IN LIMINE* NO. 4:  THE COURT SHOULD PRECLUDE A DEFENSE
         ARGUMENT THAT THE GOVERNMENT'S CHARGING DECISIONS WERE**

7  **INFLUENCED BY COORDINATION WITH JOURNALISTS OR COMPETITORS**

8          The government requests the Court adopt its prior ruling in the *Holmes* MIL Order that precludes

9  the defense from making baseless assertions regarding coordination between the government's

10  investigation and third parties such as journalists or other lab testing companies.  MIL Order, ECF

11  No. 798 at 86–88.  While third-party testimony may be relevant when the journalist or lab company

12  employee was a percipient witness to relevant events, the defense should be precluded from arguing to

13  the jury that the government's investigation or charging decisions were unduly influenced by the input

14  of lab companies, such as Quest or LabCorp, or journalists, such as John Carreyrou.  Co-Defendant

15  Holmes tried twice to establish a connection between Mr. Carreyrou and the CMS investigation, to no

16  avail.  *See id.*; 10/14/2021 Hearing Transcript at 17:09–18:11, 27:15–30:24 (hearing before Judge

17  Cousins granting Carreyrou's motion despite co-Defendant Holmes's claim that Carreyrou influenced

18  CMS investigation).  Thus, any such defense argument would be contrary to the evidence—the

19  government did not coordinate with lab testing companies or journalists—and should be precluded.

20  **V.    MOTION *IN LIMINE* NO. 5:  THE COURT SHOULD PRECLUDE DEFENDANT
         FROM PRESENTING AN IMPROPER GOOD FAITH DEFENSE.**

21

22          The government requests the Court adopt its prior ruling in the *Holmes* MIL Order that precludes

23  the defense from arguing that Defendant had a good-faith belief that his victims would be repaid or

24  otherwise suffer no harm from his and his coconspirators knowing misrepresentations.  MIL Order, ECF

25  No. 798 at 88–90.  Defendant might attempt to present evidence or argument that he should be acquitted

26  because he acted in good faith.  Defendant might claim that he viewed the amounts he and his

27  coconspirators collected from victims of the investment fraud as genuine investments that he intended to

28  make profitable, such that the victims would suffer no loss when all was said and done.  That

1    argument—and any such argument along those lines—should be barred, as it does not constitute

2    recognized legal defenses to the charges and is therefore improper and irrelevant.  The Ninth Circuit has

3    recognized "[w]hile an honest, good-faith belief in the truth of the misrepresentations may negate intent

4    to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all."

5    *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) (actual loss is not an element of securities

6    fraud); *see also United States v. Hickey*, 580 F.3d 922, 931 (9th Cir. 2009) (finding that the trial court

7    properly excluded expert testimony on good faith).  In light of the above, the Court should exclude

8    evidence and arguments that Defendant believed in good faith that his investor-victims would be repaid

9    and would sustain no loss.

10   **VI.    MOTION *IN LIMINE* NO. 6:  THE COURT SHOULD PRECLUDE DEFENDANT
         FROM OFFERING EVIDENCE OF ACTIONS TAKEN BY THERANOS AFTER
11        DEFENDANT LEFT THE COMPANY**

12          The government moves to preclude, as irrelevant and prejudicial, any reference by the defense to

13   actions taken by Theranos after Defendant was fired from the company.  Co-Defendant Holmes fired

14   Defendant Balwani in May 2016 (*see*, *e.g.*, ECF No. 1150-1) and his last day with the company was

15   July 7, 2016.  After Defendant had left the company, Theranos continued its attempts to stave off public

16   criticism, including co-Defendant Holmes attending the American Association of Clinical Chemistry

17   ("AACC") conference in August 2016, changing its Board of Directors, and forming new technical and

18   medical advisory boards.  These actions were taken by Theranos under different corporate leadership

19   after Defendant was no longer associated with Theranos and are therefore not relevant to Defendant's

20   participation in the two schemes to defraud as alleged in the Third Superseding Indictment.  Indeed,

21   admitting this evidence will only confuse and mislead the jury.

22          Given Defendant's departure from Theranos, he cannot meet the threshold Federal Rule of

23   Evidence 104(b) standard for admitting any of these post-employment actions taken by the company.

24   "In determining whether the [admitting party] has introduced sufficient evidence to meet Rule 104(b),

25   the trial court . . . examines all the evidence . . . and decides whether the jury could reasonably find the

26   conditional fact . . . by a preponderance of the evidence."  *United States v. Perez*, 662 F. App'x 495, 497

27   (9th Cir. 2016) (quoting *Huddleston v. United States*, 485 U.S. 681, 690 (1988)).  Theranos's actions

28   taken after Defendant's termination are only relevant if the defense can show a non-speculative

1  connection between those actions and directives made by Defendant while he was still COO.  There is

2  no proof that Defendant had any impact on decisions Theranos made after he was fired, so evidence of

3  the company's actions is not relevant.  If the defense fails to prove that Defendant's directives as COO

4  affected Theranos's actions after his firing, evidence of those actions is irrelevant and should be

5  precluded from evidence at his trial.  Evidence is only relevant if "it has any tendency to make a fact

6  more or less probable than it would be without the evidence."  Fed. R. Evid. 401(a).  Evidence of actions

7  Theranos took after Defendant was fired without his input do not make any facts alleged in the Third

8  Superseding Indictment regarding Defendant's participation in the two schemes to defraud and

9  substantive wire fraud counts any more or less probable, so the evidence is not relevant.

10        Even if the Court finds evidence of certain post-firing actions by Theranos to be relevant, it

11  should still exclude the evidence because the probative value is outweighed by potential prejudice.  Fed.

12  R. Evid. 403.  Admitting evidence about the company's actions after Defendant resigned allows the

13  defense to conflate actions taken by Theranos and co-Defendant Holmes without any showing that

14  Defendant provided input or otherwise influenced such actions.  Actions taken by other Theranos

15  executives after Defendant's termination should not be imputed to Defendant.  The Court should

16  preclude such evidence as irrelevant and unduly prejudicial.  In sum, the Court should exclude all

17  evidence of actions taken by Theranos or co-Defendant Holmes after Defendant left the company.

18  **VII.   MOTION *IN LIMINE* NO. 7:  THE COURT SHOULD ADMIT TRIAL EXHIBIT 4621
        (CMS LETTER AND THE ACCOMPANYING JANUARY 26, 2016 FORM CMS-2567,**
19      **STATEMENT OF DEFICIENCIES)**

20        The government requests the Court adopt its prior ruling in the *Holmes* MIL Order that deemed

21  admissible the Centers for Medicare and Medicaid Services' ("CMS") January 25, 2016 letter to

22  Theranos's former lab director, Dr. Sunil Dhawan, and the attached Form CMS-2567, Statement of

23  Deficiencies, for the Theranos Newark clinical laboratory (collectively, "January 2016 CMS Report"),

24  as captured in Trial Exhibit 4621 (*available at* ECF No. 898-3).  MIL Order, ECF No. 798 at 16–20, 90.

25  The January 2016 CMS Report has been the subject of several filings in the related *Holmes* trial to date.

26  ECF Nos. 574, 588, 659, 675, 717, 726, 798, 810, 846, 850, 887, 897, 906, 989, 1086, 1133, 1134.

27  The government initially moved *in limine* to seek admission of the January 2016 CMS Report, and co-

28  Defendant Holmes moved *in limine* to blanketly exclude "Evidence of CMS Survey Findings and

1  Sanctions," which included the January 2016 CMS Report (and letter).  ECF Nos. 574, 588 at 15–17,

2  659, 675, 717, 726.  The Court denied co-Defendant Holmes's motion and granted the government's

3  motion, finding the CMS survey findings and sanctions relevant, "more probative than prejudicial," and

4  not hearsay.  MIL Order, ECF No. 798 at 16–20.  The Court explicitly found that references to "CMS's

5  finding of 'immediate jeopardy'" did not raise unfair prejudice concerns.  *Id.* at 19.  A few weeks before

6  her trial began, co-Defendant Holmes moved the Court to reconsider its holding with respect to the

7  January 2016 CMS Report, and asserted that holding did not encompass the CMS letter accompanying

8  Form CMS-2567.  ECF Nos. 897, 906.  The Court disagreed, holding that "no new arguments have been

9  presented to justify the breadth of the redactions requested" by co-Defendant Holmes and "reject[ing]

10  Holmes's assertions that the cover letter is 'new' and not covered in the MIL Order."  ECF No. 989 at

11  7–8 & n.1.  The Court should adopt its prior rulings in this case with respect to Defendant Balwani, who

12  ran the CLIA laboratory and was even closer than co-Defendant Holmes to the issues raised therein.

13  **A.  Factual Background**

14      As the Court knows, beginning in September 2015, CMS conducted a CLIA recertification and

15  complaint survey of Theranos's Newark laboratory.  Sarah Bennett and Gary Yamamoto were among

16  the CMS surveyors and are included on the government's witness list.  Defendant met with the CMS

17  inspectors, and presented a PowerPoint touting the qualifications of senior lab staff, assertions which

18  formed the basis for statements from Theranos included in the CMS Report.  *See United States v.*

19  *Holmes*, 10/14/2021 & 10/15/2021 Trial Transcript at 3735:11–3739:15, 3795:10–3797:25, 3806:3–

20  3809:13, 3820:9–3825:1 (testimony of Dr. Sunil Dhawan discussing positions of Theranos lab staff

21  described in PowerPoint at Trial Exhibit 4528 that was presented to CMS).  Defendant Balwani had

22  hired Dr. Dhawan (Defendant's dermatologist) in November 2014, but Defendant Balwani asked then-

23  lab director Dr. Dhawan to sign approximately 300 Standard Operating Procedures ("SOPs") the week

24  before the CMS inspection began in September 2015.  *Id.* at 3727:21–3732:2.  In addition, text messages

25  between Defendant Balwani and co-Defendant Holmes at the time of the CMS inspection demonstrate

26  that both Defendants were focused on the CMS inspection and support the inference that Defendant,

27  with co-Defendant Holmes, chose these Theranos employees to speak with authority on behalf of them

28  and the company.  *See id.* at 3736:25–3739:15 (Defendant tells co-Defendant Holmes that the meeting

with CMS is "[v]ery hostile so far" and "[g]oing bad so far" and tells her to "[p]ray"); *see also* MIL Order, ECF No. 798 at 25–27 (finding co-Defendant Holmes sufficiently connected to Theranos's September 2015 communications with CMS).

Based on the survey, CMS found Theranos failed to comply with five conditions required for CLIA certification, as well as numerous other CLIA standards. *See* MIL Order, ECF No. 798 at 31–33. On January 25, 2016, CMS wrote Theranos a letter regarding "CONDITION LEVEL DEFICIENCIES – IMMEDIATE JEOPARDY." ECF No. 898-3 at 2. The letter also stated that, because Theranos failed to meet a condition-level requirement relating to hematology, "the deficient practices of the laboratory pose immediate jeopardy to health and safety." *Id.* Accompanying the letter, CMS provided Theranos with a listing of all deficiencies identified during the survey on Form CMS-2567, Statement of Deficiencies. Among other things, in the Form CMS-2567, CMS found Theranos failed to ensure that quality control ("QC") was acceptable for the Theranos Proprietary System (TPS/Edison 3.5) prior to the reporting of patient test results, failed to ensure that quality control for PT/INR was acceptable prior to reporting patient test results, and failed to verify the performance specifications and conduct of a third-party device it was using. *Id.* at 16, 27, 36–37, 41–49, 52–59, 70. CMS stated that as a result of its survey, it was determined that Theranos was not in compliance with all of the conditions required for certification in the CLIA program.

In response to these negative CMS findings, Defendants hired Dr. Kingshuk Das as Theranos's Newark Lab Director to respond to questions from CMS and realign the lab with relevant regulations. *See* ECF No. 727-2 (memorandum of interview of Dr. Das on February 1, 2021). Dr. Das was hired to investigate and report on CMS's findings presumably with the hope of finding a path forward but, by spring 2016, Dr. Das "concluded [CMS inspectors] were '100%' correct with their deficiency findings." ECF No. 846-2 (memorandum of interview of Dr. Das on June 7, 2021). Dr. Das told Defendants that Theranos was required by CLIA regulations to void all of the test results produced by Theranos's blood analyzer due to accuracy and reliability concerns—but senior management told Dr. Das this was "not a device issue[.]" *See* ECF Nos. 727-2, 846-2. By letter dated April 1, 2016, after additional communications between Theranos and CMS, Dr. Das informed CMS that Theranos had ceased use of its proprietary analyzer and "based on its dissatisfaction with prior [quality assurance] oversight, the

1    laboratory . . . voided all results reported for the assays run on the Theranos Proprietary System 3.5

2    (TPS) in 2014 and 2015 and all reported PT/INR test run on the Siemens Advia BCS XP instrument

3    [from] October 2014 through September of 2015."  MIL Order, ECF No. 798 at 32; *see also* ECF No.

4    588-4 (April 1, 2016 letter).  Balwani left the company in May 2016.  *See* ECF No. 1150-1.

5         After Defendant Balwani left Theranos, on October 24, 2016, co-Defendant Holmes caused

6    Theranos to relinquish its CLIA certificate, close the Newark laboratory, and cease laboratory

7    operations.  ECF No. 588-6.

8         **B.  Argument**

9         The Court should admit the January 2016 CMS Report because it is relevant, not unduly

10   prejudicial, and not hearsay, as the Court previously held in the *Holmes* MIL Order.  First, the CMS

11   findings are relevant to show Defendant Balwani's "state of mind, intent, and knowledge regarding the

12   alleged misrepresentations about the accuracy and reliability of Theranos' blood tests" as it did for co-

13   Defendant Holmes, particularly given that Defendant Balwani ran the day-to-day operations of

14   Theranos's California CLIA lab.  *See* MIL Order, ECF No. 798 at 18–19.  The CMS findings are clearly

15   relevant evidence that Theranos, despite the representations made by Defendant Balwani and co-

16   Defendant Holmes to investors, was not capable of consistently producing accurate and reliable blood

17   test results, and that Theranos's proprietary blood analyzer had accuracy and reliability problems, as the

18   Third Superseding Indictment alleges.  The January 2016 CMS Report also demonstrates that Theranos

19   had not met "[a] new standard in quality" with "[t]he highest levels of accuracy" as it boasted to

20   investor-victims, and that Theranos could not provide accurate and reliable blood tests to patients as it

21   promised.

22        Moreover, any probative value far outweighs any prejudice from admitting this document against

23   Defendant Balwani.  The CMS findings are direct evidence of the falsity of Defendants' statements to

24   investor-victims and patient-victims.  Its probative value is extremely high.  It is not improper

25   "propensity" evidence but evidence of falsity, knowledge, intent, plan, and preparation.  As the Court

26   previously held, "weigh[ing] the risk of unfair prejudice against the probative value of the evidence, . . .

27   the evidence is more probative than prejudicial."  MIL Order, ECF No. 798 at 19.  The government

28   submits this holding remains true and should be adopted in this case.

1    Finally, the January 2016 CMS Report falls within the hearsay exception for public records and,

2    to the extent it may contain hearsay-within-hearsay, those statements are non-hearsay statements of

3    agents.  In the *Holmes* case, the Court engaged in lengthy discussion at the MIL hearing on this issue

4    regarding whether statements of FDA and CMS (regulatory) inspectors would fall within the public

5    records exception under Federal Rule of Evidence 803(8)(A)(ii).  The Court's careful analysis concluded

6    that the CMS Report included statements of public officials—who are not law enforcement personnel—

7    observed while under a legal duty to report, akin to "city building inspectors, medical examiners, and

8    prison case managers."  MIL Order, ECF No. 798 at 13–16, 20; *see, e.g.*, *United States v. Fryberg*, 854

9    F.3d 1126, 1131 (9th Cir. 2017) (affirming that a legal duty to report may exist in the absence of a

10   statute or regulation expressly imposing duties to observe, report, and keep records and that the pertinent

11   question is whether the creation and maintenance of the record at issue is appropriate to the function of

12   the relevant government office given the nature of the responsibilities assigned to that office).  While the

13   Court found that some portions of the FDA reports went beyond mere observation, it did not have

14   similar qualms with the CMS Report.  *Compare* MIL Order, ECF No. 798 at 13–16, *with id.* at 20.  CMS

15   surveyors like Bennett and Yamamoto, who prepared the CMS Report, are not "law-enforcement

16   personnel."  Thus, the government submits the Court should reach the same conclusion here.

17          Furthermore, to the extent Defendant Balwani argues, as his co-Defendant Holmes argued

18   previously, that the CMS Report contains hearsay-within-hearsay, Defendant Balwani promoted senior

19   lab personnel during Theranos's presentation to CMS at the outset of the inspection, and CMS's

20   interview of those senior lab personnel formed the basis of the report's reliance on comments from

21   internal Theranos employees. *See* ECF No. 1133 at 7–8.  Therefore, any information communicated to

22   CMS by these senior lab employees was within the scope of their work relationship to Theranos while it

23   existed and non-hearsay under Federal Rule of Evidence 801(d)(2)(D).  In sum, there is nothing about

24   the source of the information for the CMS form nor the circumstances under which it was prepared

25   which indicate a lack of trustworthiness, and the Court should adopt its prior ruling in the MIL Order

26   that the CMS findings do not constitute hearsay.

27          For these reasons, the Court should admit the January 2016 Letter and Form CMS-2567,

28   Statement of Deficiencies, as well as Theranos's statements in response throughout spring 2016.

1

2

## VIII.   MOTION *IN LIMINE* NO. 8:  THE COURT SHOULD ADMIT TEXT MESSAGES BETWEEN HOLMES AND BALWANI OFFERED BY THE GOVERNMENT

3       The government requests the Court adopt its prior rulings in the *Holmes* MIL Order and at the

4   *Holmes* trial that excerpts of text messages between Defendant Balwani and co-Defendant Holmes are

5   relevant, non-hearsay, and authentic.  *See* MIL Order, ECF No. 798 at 90–94; *United States v. Holmes*,

6   09/22/2021 & 10/20/2021 Trial Transcript at 1454:8–1500:14, 1674:5–1676:10, 4107:9–4108:25,

7   4403:15–4404:10 (argument regarding admissibility of text messages, testimony of Justin Offen

8   regarding compilation of text messages, and admission of Trial Exhibits 5387B and 5387D, as well as

9   authenticated Trial Exhibit 5387A).  In particular, Justin Offen, a principal in PricewaterhouseCoopers

10  LLP ("PWC")'s investigations and forensics team, testified at the *Holmes* trial how he compiles

11  spreadsheets as part of data forensics in response to government investigations, and how he did so in this

12  case.  *United States v. Holmes*, 09/22/2021 Trial Transcript at 1454:8–1500:14.  PWC was hired by

13  Theranos's counsel (WilmerHale LLP) in 2016, collected electronic devices from co-Defendant Holmes

14  in 2017, culled the metadata related to text or Skype messages, and distilled that information to more

15  than 12,000 messages between co-Defendant Holmes and Defendant Balwani from 2011 to 2017.  *Id.*

16      After the government laid this foundation, the Court accepted the government's offered Trial

17  Exhibit 5387A (a subset of text messages relevant to charges in the Indictment) for authenticity

18  purposes, but only fully admitted Trial Exhibit 5387B at that time because co-Defendant Holmes had not

19  yet identified completeness additions.  *Id.* at 1454:8–1500:14, 1674:5–1676:10.  Trial Exhibit 5387B

20  represented all of the text exchanges the Court had previously deemed relevant during the *Holmes* MIL

21  stage.  MIL Order, ECF No. 798 at 90–94.  The Court ultimately admitted Trial Exhibit 5387D at the

22  government's request, which consisted of Trial Exhibit 5387A plus co-Defendant Holmes's Rule 106

23  additions.  *United States v. Holmes*, 10/20/2021 & 10/22/2021 Trial Transcript at 4107:9–4108:25,

24  4403:15–4404:10.

25      The government requests the Court admit—as relevant, authentic, and non-hearsay—the text

26  messages offered by the government in the *Holmes* trial captured in Trial Exhibit 5387A or, in the

27  alternative if Defendant Balwani wishes to assert the same Federal Rule of Evidence 106 suggestions as

28  his co-Defendant, then to admit Trial Exhibit 5387D.  The excerpts are authentic as shown by the

1   testimony of Justin Offen in the *Holmes* case.  *See* MIL Order, ECF No. 798 at 94 ("The Court

2   notes[ ]that the burden on the Government to produce [authenticity] evidence is slight." (citing *United*

3   *States v. Whitworth*, 856 F.2d 1268, 1282–83 (9th Cir. 1988))).  The text messages from Defendant

4   Balwani to co-Defendant Holmes are not hearsay when offered by the government as an opposing

5   party's statement.  *See* Fed. R. Evid. 801(d)(2)(A).  The text messages from co-Defendant Holmes to

6   Defendant Balwani are also not hearsay because they are adopted admissions, authorized admissions, or

7   statements by a coconspirator during and in furtherance of the conspiracy.  *See* Fed. R. Evid. 801(d)(2).

8   And to the extent any particular messages do not fall into one of the Rule 801(d)(2) categories, they are

9   admissible to demonstrate Defendant's knowledge and intent and the effect on the listener.

10          The text messages contained within Trial Exhibit 5387A are relevant for the reasons the Court

11   determined in the *Holmes* MIL Order and at the *Holmes* trial.  Specifically, the excerpts of text messages

12   are all correlated to key events at issue in this case, or else are on their face plainly relevant to

13   Defendant's knowledge.  One example the Court described at length in the MIL Order relates to

14   November 2014, when Theranos's former lab director, Dr. Adam Rosendorff, expressed his misgivings

15   about the lab and sought to resign rather than continue to attribute his name to patient results.  MIL

16   Order, ECF No. 798 at 92.  Defendant texted co-Defendant Holmes "a number of texts [ ] generally

17   relating to the 'lab' and leadership of the lab (e.g., 'Need to focus on op. Getting hurt in market'; 'Lab

18   . . . need[s] director level people'; 'We need[ t]he lab and call center fixed'; and 'New lab dirs., lab

19   manager like Tracy')."  *Id.*  Co-Defendant Holmes "expressed agreement (e.g., 'Fundamentally we need

20   to stop fighting fires by not creating them . . . Need to fix root cause here . . . Yes . . . Exactly')."  *Id.*

21   The Court further noted that "the November 28, 2014 texts (including Mr. Balwani's statement that the

22   'Normandy lab is a fucking disaster zone') were close in time to Dr. Rosendorff's departure."  *Id.*

23   Ultimately, the Court found these excerpts relevant "[g]iven the temporal proximity of the messages to

24   the events involving Dr. Rosendorff, and the centrality of those events to the Government's case[.]"  *Id.*

25   In another text message presented to the Court at the *Holmes* MIL stage and also during the *Holmes*

26   trial, Defendant Balwani wrote, as CMS was performing its survey in September 2015, "Our validation

27   reports are terrible.  Really painful going thru this process.  Same issues fda point out . . . .  Going bad so

28   far.  Pray.  Daniel has nothing ready.  Told me everything is in the binder.  Not there."  ECF No. 588 at

21.  Co-Defendant Holmes replied shortly after:  "Praying . . . . Praying continually."  *Id.*  In its resulting

order, the Court also found "[e]ach of the remaining excerpts [to be] similarly correlated to key events at

issue in this case," and thus "relevant to show, at a minimum, [Defendant's] knowledge."  MIL Order,

ECF No. 798 at 92.

For the foregoing reasons, the government requests the Court adopt its prior rulings regarding the

admissibility of excerpts of text messages between Defendants captured within Trial Exhibit 5387A (or

alternatively 5387D) as relevant, non-hearsay, and authentic.

## IX.    MOTION *IN LIMINE* NO. 9:  THE COURT SHOULD ADMIT THERANOS EMAILS AS BUSINESS RECORDS

The Court should admit internal Theranos emails as business records under Federal Rule of

Evidence 803(6), as the Court frequently did in the *Holmes* trial.  *See, e.g.*, ECF No. 1019 at 2–4; *United States v. Holmes*, 09/15/2021 Trial Transcript (admitting exhibits as business records during testimony

of Erika Cheung).  Specifically, the government requests the Court admit as authentic and as business

records emails to or from email addresses with the domain @theranos.com that were sent or received by

Theranos personnel and bear the Bates prefixes THER-, THERDOJ-, THPFM-, THER-AZ-, TS-, and

TS2-, all of which are true and correct copies of emails stored, collected, and/or produced by Theranos

in either this case or prior litigation.  *See* ECF No. 1029 (stipulation between the government and co-

Defendant Holmes as to authenticity of internal Theranos emails).

Multiple former Theranos employees testified during the *Holmes* trial that "email was used as the

primary method of communication at the company" and was the communication tool used to identify

and discuss problems within the laboratory, with respect to patient results, with respect to demos of the

technology, with respect to responding to media inquiries, and to otherwise carry out duties,

responsibilities, and instructions imposed by Defendant Balwani and co-Defendant Holmes.  *See, e.g.*,

*United States v. Holmes*, 09/14/2021, 09/15/2021, 09/17/2021, 09/24/2021, 10/15/2021, 10/19/2021,

11/10/2021 Trial Transcript at 837:4-839:9, 898:2-899:19, 915:3-22, 925:4-18, 936:2-937:9, 1734:1-11,

1785:21-1786:22, 3871:20-3872:16, 4010:23-4011:3, 5990:17-5991:16 (testimony of Erika Cheung,

Surekha Gangakhedkar, Dr. Adam Rosendorff, Daniel Edlin, and Dr. Kingshuk Das).  Both the

government and co-Defendant Holmes admitted dozens of such emails as business records during the

*Holmes* trial, and multiple former Theranos employees testified that they regularly used email to conduct their work and responsibilities at Theranos, that it was their regular practice to send emails at or near the time of the events described within the emails, that the people sending such messages had knowledge of the underlying events described within the emails, that it was important for Theranos employees to accurately convey information because other individuals in the company would rely on and take action based on the information conveyed, and that the information was memorialized in email in part so that employees could refer back to the information later.  *See id.*  These were emails generated pursuant to a company practice of sharing relevant information of the inner workings of Theranos's lab to ensure the systematic creation of reliable records upon which the company's executives—including Defendant— could act if necessary.  Examples include coordinating and executing demos (a regularly conducted activity at Theranos), reporting issues observed in the clinical lab (a regular occurrence at Theranos), providing updates regarding progress in readying assays for clinical use and the subsequent quality control efforts (a core part of Theranos's business).  *See id.*  Theranos employees were under a duty to report and memorialize those issues, and the evidence shows that email was the medium through which that occurred in the usual course of business for this company.

Certain Theranos employees also described how Theranos would create specific email groups to respond to challenges or certain aspects of its business, such as the "Normandy 911" distribution group, the "CLS" group, and the "Lab Reruns" group.  *See, e.g.*, *United States v. Holmes*, 09/14/2021 & 09/24/2021 Trial Transcript at 837:4-839:9, 1785:21-1786:22.  For example, Erika Cheung testified that the "Normandy 911" email group was created by the company for the purpose of "troubleshoot[ing] any problems that [ ] arose while we were working" and escalating quality control issues to Defendant for potential solutions.  *Id.* at 837:4-839:9, 845:23–850:10.  Both the quality control testing itself and the lab director's review of that data were essential components of the company's operation, and the fact that these functions took place over email does not prevent the resulting communications from qualifying as business records.  Thus, the government submits it has laid a sufficient foundation for internal Theranos emails to constitute business records under Federal Rule of Evidence 803(6).

The Ninth Circuit recently endorsed admitting emails as business records where they meet the factors of Rule 803(6), as the documents at issue here do.  *See United States v. Lischewski*, 860 F. App'x

512, 515–16 (9th Cir. 2021) ("The district court did not abuse its discretion in admitting [appellant's] email as a business record under Federal Rule of Evidence 803(6)."). Email has become the standard form of business communication in the modern age. Emails may qualify as business records under Rule 803(6) when (1) they are kept in the course of a regularly conducted business activity and made as a regular practice, (2) they are written at or near the time of the event, and (3) the opponent fails to show they are untrustworthy. Fed. R. Evid. 803(6); *see* Wright & Miller, 30B Fed. Prac. & Proc. § 6864 (2021 ed.) ("An email can qualify for admission under Rule 803(6) . . . [and the requisite] showing will often be possible."). The government has made that showing with respect to internal Theranos emails.

Although the Ninth Circuit expressed skepticism a quarter century ago about whether emails sent in the course of performing business duties were categorically a business activity, it did not hold that an email could *never* be a business record. *See Monotype Corp. PLC v. Int'l Typeface Corp.*, 43 F.3d 443, 450 (9th Cir. 1994) (finding that the emails in question containing "highly derogatory and offensive description" of an employee were properly excluded under Rule 403 and were less of a business activity than a monthly inventory printout). Since *Monotype*, district courts across the Ninth Circuit have recognized the change in business practice in recent decades, including the common and frequent use of emails in the daily course of business, and have held that emails are admissible under Rule 803(6) so long as the parties lay a proper foundation. *See*, *e.g.*, *Ionian Corp. v. Country Mut. Ins. Co.*, 836 F. Supp. 2d 1173, 1193 (D. Or. 2011) (admitting an email as a business record); *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. 08-CV-5129, 2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (admitting emails as business records). Thus, the mere fact that the business record is in the form of an email is no categorical bar to admissibility.

## X.   MOTION *IN LIMINE* NO. 10:  THE COURT SHOULD ADMIT STATEMENTS BY THERANOS AND THERANOS EMPLOYEES AND AGENTS OFFERED BY THE GOVERNMENT

In the *Holmes* matter, the Court addressed and declined to adopt a categorical rule regarding attributing Theranos employee statements to co-Defendant Holmes during the motions *in limine*. *See* MIL Order, ECF No. 798 at 94–97. But the Court indicated it was likely to permit such statements by Theranos employees as non-hearsay under Rule 801(d)(2)(D) where the scope of the relationship and subject matter were sufficiently tied to co-Defendant Holmes. *See id.* at 25, 27 (finding sufficient

1    connection to co-Defendant to permit statements of agents in responses to regulators).  The government

2    submits that additional evidence presented at the *Holmes* trial has shown the close connection between

3    Defendant Balwani and other Theranos employees within the lab such that their statements should be

4    permitted as non-hearsay under Federal Rule of Evidence 801(d)(2).

5         Rule 801(d)(2) excludes from the hearsay definition (and thus the rule against hearsay)

6    statements offered against an opposing party if such statement also:

7         (A)    was made by the party in an individual or representative capacity;

8         (B)    is one the party manifested that it adopted or believed to be true;

9         (C)    was made by a person whom the party authorized to make a statement on the subject;

10        (D)    was made by the party's agent or employee on a matter within the scope of that

11               relationship and while it existed; or

12        (E)    was made by the party's coconspirator during and in furtherance of the conspiracy.

13   Fed. R. Evid. 801(d)(2) & 802.  "The rule specifies five categories of statements for which the

14   responsibility of a party is considered sufficient to justify reception in evidence against him."  *Id.*

15   advisory comm. note.

16        Applying these rules, the Ninth Circuit has repeatedly affirmed admission of statements by

17   employees of private companies owned, controlled, and managed by an individual defendant.  For

18   example, in *United States v. Kirk*, 844 F.2d 660 (9th Cir. 1988), the government charged the founder of

19   a time share venture with conspiracy, wire fraud, and other offenses.  Kirk "ran the day-to-day

20   operations" and exercised "control over the time share scheme."  *Id.* at 661.  The Ninth Circuit affirmed

21   the conviction and admission of testimony from "Paradise Palms salespeople[] and co-defendants,"

22   holding that the statements "were admissible as nonhearsay statements of agents or employees under

23   Fed. R. Evid. 801(d)(2)(D)."  *Id.* at 663.  The Ninth Circuit further stated: "Many of the statements cited

24   by Kirk as instances of hearsay were made by agents or employees of Paradise Palms.  The statements

25   primarily described the nature and quality of the time share units, and the nature and extent of

26   contractual obligations to prospective time share customers, therefore clearly falling within the scope

27   of agency or employment."  *Id.*

28

1    Similarly, in *United States v. Gibson*, the government brought mail fraud, wire fraud, and other

2    charges against Gibson, who was the founder, sole shareholder, chairman, and president of Gibson

3    Marketing International, Inc. ("GMI"), which sold franchises and franchise distributorship rights.  690

4    F.2d 697, 697–99 (9th Cir. 1982).  At trial, the government introduced evidence of statements by GMI

5    employees and salesmen against Gibson.  *Id.* at 700–01.  The Ninth Circuit found no error in admitting

6    the statements, holding that testimony by investors as to statements made by GMI employees were not

7    hearsay but evidence of existence of the scheme.  *Id.*  The court added that "even if the testimony did

8    fall within the hearsay definition, it would be admissible under either Rule 801(d)(2)(D) (statements by

9    an agent) or Rule 801(d)(2)(E) (statements by a co-conspirator)."  *Id.* at 701.  The Court previously

10   found that "*Kirk* and *Gibson* support the Government's position[.]"  MIL Order, ECF No. 798 at 95.

11   Since the Court's prior MIL Order, significant trial evidence introduced in the *Holmes* case has

12   proven the close relationship between Defendant Balwani and employees within Theranos's clinical

13   laboratory.  Specifically, co-Defendant Holmes introduced a PowerPoint presentation that was presented

14   to CMS inspectors in September 2015 that included an organization chart, showing that Defendant

15   Balwani was the direct report of the Laboratory Director, to whom several senior lab employees

16   reported.  *United States v. Holmes*, 10/14/2021 & 10/15/2021 Trial Transcript at 3735:11–3739:15,

17   3795:10–3797:25, 3806:3–3809:13, 3820:9–3825:1 (testimony of Dr. Sunil Dhawan describing senior

18   lab personnel and Trial Exhibit 4528, *available at* ECF No. 1133-4).  Accordingly, the Court should

19   admit against Defendant relevant statements by Theranos agents and employees, particularly within the

20   clinical lab, on matters within the scope of that relationship and while it existed.

21   **XI.   MOTION *IN LIMINE* NO. 11:  THE COURT SHOULD EXCLUDE SELF-SERVING**
22   **HEARSAY STATEMENTS BY DEFENDANT IN INTERVIEWS/SEC TESTIMONY**

23   The government requests the Court adopt its prior ruling in the *Holmes* MIL Order that

24   Defendant Balwani "is not permitted to introduce exculpatory statements without testifying in court."

25   MIL Order, ECF No. 798 at 98.  The Court noted that the Ninth Circuit is clear that Federal Rule of

26   Evidence 801(d)(2)(A) permits out-of-court statements only if (1) made by the defendant and (2) offered

27   against the defendant.  *Id.* (citing *United States v. Pelisamen*, 641 F.3d 399, 410 (9th Cir. 2011)).  "It is

28   also well-settled that a defendant may not 'place [his] exculpatory statements before the jury without

1    subjecting [himself] to cross-examination.'" *Id.* (quoting *United States v. Ortega*, 203 F.3d 675, 682

2    (9th Cir. 2000)).  Nevertheless, during the *Holmes* trial, co-Defendant Holmes repeatedly sought (often

3    unsuccessfully) to introduce her own self-serving statements and responses in emails, text messages, and

4    video and audio recordings during cross examination in the government's case-in-chief.

5    The government seeks to exclude Defendant Balwani from pursuing a similar strategy.

6            During the course of its investigation, the government has collected extensive evidence of

7    previous statements by Defendant regarding Theranos's technology, business relationships, financial

8    health, regulatory status, and other key topics.  The government will make extensive use of Defendant's

9    previous statements in proving that he engaged in schemes to defraud investors and patients.  The Court,

10   however, should reject any attempt by Defendant to improperly admit his own prior statements.

11   Although Defendant may wish to introduce witness testimony or direct evidence of self-serving

12   statements he has made to the press, to victims, in prior depositions, or his testimony to the SEC, such

13   statements are inadmissible hearsay and must be excluded.

### XII.   MOTION *IN LIMINE* NO. 12:  THE COURT SHOULD PRECLUDE DEFENDANT
14         FROM OFFERING EVIDENCE THAT HIS MOTHER RECEIVED A BLOOD TEST
15         FROM THERANOS WITHOUT THE NECESSARY FOUNDATION

16           The government believes Defendant Balwani may seek to admit evidence during his trial that his

17   mother received a test from Theranos—the Court should preclude any such evidence or testimony as

18   lacking foundational relevance and hearsay under Federal Rules of Evidence 104(b), 401, 403, and 802.

19   "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient

20   to support a finding that the fact does exist."  Fed. R. Evid. 104(b); *see also* MIL Order, ECF No. 798 at

21   63–64.  Defendant Balwani has not provided basic foundational evidence demonstrating whether his

22   mother's blood test from Theranos would tend to prove the accuracy or reliability of Theranos's

23   proprietary blood analyzer.  Specifically, Defendant has not shown whether his mother received the test

24   from Theranos for a medical purpose rather than to, for example, support her son and test out the

25   Walgreens experience, in which case the actual results of the tests would be irrelevant.  Nor has

26   Defendant Balwani produced in discovery his mother's entire medical file, as he has received the benefit

27   of in discovery by the government with respect to Theranos's patient-victims, sometimes over their

28   objection.  *See* ECF Nos. 922, 940, 952, 998 (granting Rule 17 motion for patient-victim E.T.'s entire

1   medical file over her objection as lodged by the government on her behalf).  As a result, Defendant

2   Balwani has not provided basic foundational information such as whether his mother was requested by

3   her physician to get such a test, whether she provided the test results to her physician, whether she relied

4   on them for any medical judgments, and whether she had any other blood tests from competing lab

5   companies within a recent enough time to determine the accuracy or inaccuracy of such tests.  If

6   Defendant were to produce the relevant material and were to meet the Rule 104(b) threshold to show

7   relevance, he would then also face the hurdle of any medical reports from his mother or her physician

8   being inadmissible hearsay.

9        Furthermore, Defendant Balwani has not even provided evidence to show whether his mother

10  received a fingerstick test rather than a venous draw blood test, and/or whether the test was run on

11  Theranos proprietary blood analyzer or a regular FDA-approved machine.  The evidence in the *Holmes*

12  trial established that most people who received tests during the "friends and family launch" from

13  September to November 2013 did not have their blood tested on a Theranos Edison device.  *United*

14  *States v. Holmes*, 09/28/2021 Trial Transcript at 2006:15–2026:9 & Trial Exhibit 7338

15  (Dr. Adam Rosendorff testifying that two tests performed during time period were not perormed on

16  Edison device).  Relevance cannot be speculative.  *See United States v. Alvarez*, 580 F. App'x 571, 573

17  (9th Cir. 2014) (holding that evidence about the general ability to obtain a fake birth certificate was not

18  relevant to whether the party's certificate was real, and any relationship was speculative).  Defendant

19  Balwani cannot prove his mother's blood test at Theranos was relevant.  Accordingly, any evidence or

20  argument relating to Defendant's belief the tests were accurate and reliable because his mother received

21  a Theranos test should be precluded under Rules 401 and 403.  In sum, the Court should preclude

22  Defendant Balwani from offering evidence that his mother received a Theranos test given that he cannot

23  demonstrate foundational relevance to the charged conduct in the Third Superseding Indictment or

24  overcome the additional relevance or hearsay barriers.

25  **XIII.   MOTION *IN LIMINE* NO. 13:  THE COURT SHOULD ADMIT TESTIMONY FROM
     "NON-PAYING" PATIENTS**

26

27        The government requests the Court adopt its prior ruling in the *Holmes* MIL Order that

28  "[t]estimony from non-paying patient witnesses concerning their experience with Theranos testing is

1    relevant and admissible[.]"  MIL Order, ECF No. 798 at 47–50, 53, 99.  As in the *Holmes* matter, the

2    evidence at trial will show that Defendant devised and carried out two schemes to defraud: one targeting

3    investors who purchased Theranos securities based on misleading information from Defendants, and the

4    other targeting patients who purchased Theranos's testing services after being defrauded into believing

5    that the company's tests were accurate and reliable.  While the Court previously held that patients whose

6    insurance paid for the blood testing services received from Theranos are not victims of the charged fraud

7    (ECF No. 330 at 28–33; *see also id.* at 35–38), those non-paying patients may still present relevant

8    information. Specifically, non-paying patients have important knowledge that goes directly to key issues

9    in this case, including the misrepresentations and misleading information Defendant targeted toward all

10   patients, the materiality of that deceptive information, the accuracy (or lack thereof) of Theranos's blood

11   tests, Defendant's knowledge of the accuracy problems with Theranos's tests, and Defendant's overall

12   intent to defraud patient customers.  In light of the Court's prior ruling, the government will not argue to

13   the jury that they may convict based on a theory that treats non-paying patients as fraud victims, and the

14   Indictment is in compliance with the Court's order (*see* ECF No. 469).  However, patient customers with

15   relevant information should be permitted to testify at trial regardless of whether they paid out of pocket

16   for Theranos tests and became victims.  As the Court found in response to MILs in the *Holmes* case,

17   "[e]vidence of even one inaccurate result tends to show that Theranos was producing inaccurate results,

18   even if it does not fully prove the point."  MIL Order, ECF No. 798 at 48–49.

19        Non-paying patients may provide probative testimony related to the alleged scheme to defraud

20   patients as described in the Indictment, even if they did not ultimately become victims.  Defendant

21   pursued that scheme by, among other things: (1) distributing marketing materials for Theranos touting

22   the company's technology; (2) holding out Theranos's blood tests as suitable for clinical use;

23   (3) directing Theranos employees to give misleading answers to patients who received inaccurate results

24   from Theranos; and (4) continuing to offer blood testing services despite knowing that Theranos tests

25   were not sufficiently accurate and reliable.  Testimony from Theranos's patients will help establish that

26   conduct and show its significance, even if insurance ultimately covered their test cost.  *See*, *e.g.*, ECF

27   No. 588 at 28–30 (describing several examples of non-paying patients that still demonstrate relevant

28   information for the charged scheme to defraud patients).

Here, the facts offered by Theranos's patients—both paying and insured—are probative of Defendant's knowledge and intent.  Specifically, the expected testimony demonstrates that Defendant knew about the accuracy problems plaguing Theranos's tests—at least in part because patients or their physicians on their behalf often complained to Theranos about inaccurate tests—but continued to hold them out as accurate and reliable, thus tending to prove Defendant's intent to defraud patients.  The expected testimony of non-paying patients also shows Defendant's plan and preparation to the extent these patients were exposed to the same set of marketing materials and misleading misrepresentations as the patients who ended up giving money to Theranos.  Such evidence is relevant and inextricably intertwined with the charged conduct, and thus admissible.  *See*, *e.g.*, *United States v. Loftis*, 843 F.3d 1173, 1177–78 (9th Cir. 2016) ("other act" evidence is inextricably intertwined with the charged crime when it is: (1) "part of the transaction that serves as the basis for the criminal charge," and (2) necessary "in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime").

The Ninth Circuit has held the inextricably intertwined standard is satisfied when the evidence at issue and the crime charged are "part of a single course of action."  *United States v. Warren*, 25 F.3d 890, 895 (9th Cir. 1994).  In this case, Theranos's contacts with non-paying patient customers were part of the same course of action charged in the Indictment, even if those patients did not end up as victims.  *See*, *e.g.*, *United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989) ("A scheme to defraud, whether successful or not, remains within the purview of section 1341.").  Defendant's scheme to defraud patients and obtain their money was directed at *all* potential customers of Theranos—even if only a subset of the intended targets actually paid for testing thus becoming victims of the fraud.  The degree of success of Defendant's plans does not render irrelevant evidence related to the nature of the overall scheme.  Thus, the Court should admit, as it has before, testimony from patients who received inaccurate tests from Theranos, regardless of whether they paid Theranos for blood testing services.

## XIV.  MOTION *IN LIMINE* NO. 14:  THE COURT SHOULD ORDER DEFENDANT TO PRODUCE REVERSE *JENCKS* INCLUDING ANY DOCUMENTS THAT HAVE NEVER BEEN PRODUCED TO THE GOVERNMENT OR DOCUMENTS THAT WERE PRODUCED BY CO-DEFENDANT HOLMES TO THE GOVERNMENT

The government requests the Court issue an order precluding Defendant from introducing

evidence at trial that should have been produced under the reciprocal discovery obligations of Fed. R.

Crim. P. 16(b) and Fed. R. Crim. P. 26.2 (reverse *Jencks*).  Under the current pretrial schedule,

Defendant is required to complete Rule 16 and Rule 26.2 disclosures shortly before the parties' motions

*in limine* are due.  *See* ECF No. 1015.  The government has produced Rule 26.2 material to the defense

on a rolling basis throughout the pendency of the case.  Nevertheless, in the related *Holmes* matter, co-

Defendant Holmes sought to introduce at trial more than one document without a Bates stamp—

meaning the document had not been previously produced to the government.  The government seeks to

avoid similar surprise evidence or testimony at Defendant's trial.  Furthermore, Defendant should be

precluded from using documents stamped with the Bates prefix HOLMES-, unless Defendant informs

the government how Defendant received such documents from his co-Defendant.  Defendant should be

precluded from offering any such evidence that is not produced to the government under Rule 26.2.

Rule 26.2 itself provides the appropriate remedy in cases where a party ignores its obligations

under the Rule.  Subsection (e) of the rule states that "[i]f the party who called the witness disobeys an

order to produce or deliver a statement, the court must strike the witness's testimony from the record."

Fed. R. Crim. P. 26.2(e).

Accordingly, the Court should order Defendant to produce all 26.2 material in his possession

within ten days of the hearing on this motion.  This material should include any documents without

Bates stamps or with the Bates stamp prefix HOLMES- that Defendant intends to use at his trial.

Should Defendant fail to produce such material for any of his witnesses by that date, the Court should

exclude such documents and those witnesses' testimony at trial.  *See United States v. Kail*, No. 18-CR-

00172-BLF-1, 2021 WL 261135, at *1 (N.D. Cal. Jan. 26, 2021).

## XV.    MOTION *IN LIMINE* NO. 15:  THE COURT SHOULD EXCLUDE DEFENDANT'S THREE PURPORTED EXPERTS DUE TO INSUFFICIENT DISCLOSURE

The government hereby moves to exclude the three expert witnesses that Defendant identified in

its November 12, 2021 expert disclosure.  Declaration of Kelly I. Volkar, Exhibit 1.  Defendant Balwani

disclosed three proposed expert witnesses in a three-page letter: (1) Xavier Oustalniol, who may provide

opinions "regarding certain aspects of Theranos' books and records and financial statements";

(2) Richard L. Sonnier, III who may provide opinions regarding "the hardware and software structure

1   and functionality of Theranos' Laboratory Information System ("LIS")"); and (3) Scott Weingust, who

2   may provide opinions "regarding the valuation of Theranos's IP portfolio and its trade secret protection

3   practices." Exhibit 1. For each of the three witnesses, the basis for these broad opinions is described

4   only as: "based on his experience, his education, his review of materials and information produced by

5   the parties in this action, and his review of publicly available materials." *Id.* This expert disclosure falls

6   far short of the requirements of Federal Rule of Criminal Procedure 16(b)(1)(C). *See also* Fed. R. Evid.

7   703, 705.

8         As the Court noted in its MIL Order, the Rule 16 notice requirements are intended "to minimize

9   surprise that often results from unexpected expert testimony, [to] reduce the need for continuances, and

10  to provide the opponent with a fair opportunity to test the merit of the expert's testimony through

11  focused cross-examination." ECF No. 798 at 54–55 (quoting Fed. R. Crim. P. 16 advisory committee's

12  note to 1993 amendment). Defendant's current disclosure does not provide sufficient detail regarding

13  *what* the three experts' opinions will be—only the general topics—and does not even attempt to provide

14  information that the experts will rely upon. *See United States v. Cerna*, No. 08-CR-730-WHA, 2010

15  WL 2347406, at *4 (N.D. Cal. June 8, 2010) (finding government's summary of expert testimony on

16  topics of gang tattoos, symbols, codes, colors, and graffiti insufficient because it "provided no clue as to

17  *what* Detective Flores's opinions would be regarding" those items "or how they are used to

18  communicate"). Courts in this District have rejected expert disclosures with more detail than provided

19  by Defendant in this case. *See*, *e.g.*, *United States v. Valdez*, No. 18-CR-608, 2019 WL 539074, at *2–3

20  (N.D. Cal. Feb. 11, 2019) (finding government's one-page summary disclosure to contain "mere

21  generalities" and "barebones disclosures" to "fall short" under Rule 16).

22        Defendant has had years to retain experts and work with them to prepare their reports, and yet on

23  the eve of his trial, he has served the government with less than a dozen sentences per expert to describe

24  the expert's qualifications and their opinions as well as the bases and reasons for them. Exhibit 1. The

25  government has no basis to know what documents from the case or publicly available documents were

26  provided to each expert and cannot meaningfully file a *Daubert* challenge of each of their opinions with

27  the sparse disclosure.

28

1    For the foregoing reasons, the government respectfully requests the Court to exclude Defendant

2    Balwani's disclosed three experts.

3

4    DATED:  November 19, 2021                              Respectfully submitted,

5                                                           STEPHANIE M. HINDS
                                                            Acting United States Attorney
6

7                                                           _/s/ Kelly I. Volkar_____
                                                            ROBERT S. LEACH
8                                                           JEFF SCHENK
                                                            JOHN C. BOSTIC
9                                                           KELLY I. VOLKAR
                                                            Assistant United States Attorneys
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28