JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:   (415) 773-5700
Facsimile:    (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**RAMESH "SUNNY" BALWANI'S MOTION TO ADMIT TRIAL EXHIBITS 20279 AND 20498**<br><br>Date: April 6, 2022<br>Time: 8:30 a.m.<br>CTRM.: 4, 5th Floor<br><br>Hon. Edward J. Davila |

**NOTICE OF MOTION AND MOTION TO ADMIT TRIAL EXHIBITS 20498 AND 20279**

PLEASE TAKE NOTICE that on April 6, 2022, at 8:30 a.m. or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, located at 280 South First Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Ramesh "Sunny" Balwani will and hereby does respectfully move the Court under Rules 401, 607, 613, and 901 of the Federal Rules of Evidence to admit Trial Exhibits 20279 and 20498. The Motion is based on the below Memorandum of Points and Authorities, the concurrently filed Declaration of Jeffrey B. Coopersmith and attached exhibits, the record in this case, and any other matters that the Court deems appropriate.

DATED: April 4, 2022                    Respectfully submitted,

                                        ORRICK HERRINGTON & SUTCLIFFE LLP

                                        By:  */s/ Jeffrey B. Coopersmith*
                                             Jeffrey B. Coopersmith

                                             Attorney for Defendant
                                             RAMESH "SUNNY" BALWANI

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Former Theranos laboratory director Mark Pandori claims to have communicated grave concerns about the capability of Theranos' technology to Mr. Balwani, and to have recommended that Theranos stop using its Edison device. A memo he sent on his last day at work to co-laboratory director Adam Rosendorff—and to Mr. Balwani—tells a different story: Theranos should build *more* Edisons to increase its patient testing capacity.

Despite Dr. Pandori's convenient claim not to have authored the transition memo, the government now concedes the memo's authenticity—and could not do otherwise. The law mandates admitting it.

The proffered exhibits containing the memo are admissible to impeach Dr. Pandori. They conflict with his testimony about his concerns with the Edison, and they undermine his claim denying authorship of the memo. The exhibits also paint an alternative picture of Dr. Pandori's state of mind upon leaving Theranos—an issue the government put squarely at issue. Finally, the memo sent to Mr. Balwani is relevant to Mr. Balwani's state of mind regarding the Edison and Dr. Pandori's views about the Edison when he left Theranos.

Admitting these exhibits (20279 and 20498) is necessary to allow Mr. Balwani to meaningfully cross-examine a key government witness, as required by the Federal Rules of Evidence and the Sixth Amendment.

## II. BACKGROUND

### A. Factual Background

Dr. Mark Pandori worked at Theranos as a laboratory director from December 2013 through May 2014. 3/30/22 Trial Tr. at 1590:18. Dr. Pandori had the title "lab director," but Dr. Adam Rosendorff was the lab director on Theranos' regulatory license. *Id.* at 1610–11. Dr. Pandori testified that he read a *Wall Street Journal* article by Joe Rago before starting work at Theranos, which "increased [his] excitement for the company." 3/30/22 Trial Tr. at 1598:9-23. Over a hearsay objection by the defense, the Court admitted the article for Dr. Pandori's state of mind in deciding to seek employment at Theranos. 3/30/22 Trial Tr. at 1599; *see id.* at 1600.

Dr. Pandori testified that during his tenure at Theranos the Edison devices performed "extremely poorly" and that he "didn't have a very positive feeling with regard to their function at all." 3/30/22 Trial Tr. at 1623; *id.* at 1669. He testified that he recommended to both Laboratory Director Adam Rosendorff and Mr. Balwani that the company should "just run predicate methods while we concentrate on getting the Theranos technologies working better." *Id.* at 1669–72; *id.* at 1670 ("In my recommendation, what I'm saying is that the Edison should be considered research equipment and that they should be worked on until accuracy and precision can be improved, and only when that's achieved would we start to use them on patient testing."). And Dr. Pandori further testified that around his birthday on May 19, 2014, he raised concerns to Mr. Balwani and Ms. Holmes and suggested having regular meetings between the teams at Theranos so that the lab directors could share their knowledge about the technology with other teams. 4/1/22 Trial Tr. at 1740; 1741–42.

Dr. Pandori testified that he quit "five minutes" after the May 19 meeting. *Id.* at 1743. According to Dr. Pandori, he quit because "the technology wasn't anywhere near what [he] thought it was"—specifically, "the Edisons didn't work very well" and they "failed very, very often." *Id.* at 1743–44. Dr. Pandori testified that he did not "recall ever having a conversation with Mr. Balwani again" after this purported meeting on May 19. 4/1/22 Trial Tr. at 1745.

In fact, Dr. Pandori continued working at Theranos until May 30, 2014. Documents submitted with this motion show that Dr. Pandori worked at Theranos after May 19, including emailing the CLIA lab team about "one-on-one conversations" with all team members. And Theranos' Head of HR emailed Dr. Pandori on May 27, 2014, asking him to write a transition memo.[1]

On May 30, 2014, Dr. Pandori emailed the requested transition memo to the Head of HR and Mr. Balwani with a note:

> Attached, A document detailing the state of various projects or works in the CLIA/Bugs laboratories. It contains additional transitional information detailing the administrative functions which I have been performing as new employees arrive and on a daily basis. I was going to share this with Adam, with your permission.

---

[1] Declaration of Jeffrey B. Coopersmith, Exs. 1–5.

1   Coopersmith Decl, Ex. 6 (Trial Exhibit 20498).

2   Also on May 30, 2014, Dr. Pandori sent the transition memo to Dr. Rosendorff at his
3   Theranos email: ARosendorff@theranos.com. *Id.*, Ex. 7 (Trial Exhibit 20279). The transition
4   memo attached is dated May 29, 2014, with the name "M.W. Pandori" at the top. *Id.*

5   The transition memo addresses Dr. Pandori's work at Theranos, including notes about the
6   Edison devices: "The **primary concern** in this section **is the available number of devices**." *Id.*
7   (emphasis added). "For FT4, VitD, and TSH, at least a **doubling** of the number of units is
8   necessary, in my opinion." *Id.* (emphasis added). Contemporaneous documents also reflect that,
9   on his final day at Theranos, May 30, 2014, Dr. Pandori sent Mr. Balwani a final, separate email
10  memo on his "HCV small volume" project, had a final exit meeting with Mr. Balwani, and took
11  care of some administrative tasks.[2]

12  **B. Procedural History**

13  While cross-examining Dr. Pandori, the defense sought to admit Exhibit 20279, the email
14  to Dr. Rosendorff and the attached transition memo.

15  When asked if he drafted the transition memo, Dr. Pandori first denied that he sent the
16  memo to Dr. Rosendorff.  4/1/22 Trial Tr. 1863. Dr. Pandori later claimed: "No, I don't recall
17  this," "I don't recall authoring it," and "I've never seen this report before." *Id.* at 1863–66, 1872.
18  Dr. Pandori eventually conceded that it is "possible" he wrote the memo. *Id.* at 1873. The
19  government initially objected to the authenticity of Exhibit 20279 (bearing bates numbers
20  THPFM0001891214 through THPFM0001891221), even though the parties had previously
21  stipulated that emails "to or from email addresses with the domain @theranos.com that were sent
22  or received by Theranos personnel" and bearing certain bates prefixes (including THPFM and
23  THER-AZ) are "true and correct copies of emails stored, collected, and/or produced by
24  Theranos." Dkt. 1354 ¶ 2.

25  While the Court initially sustained the government's authenticity objection, the
26  government later stated it was not disputing authenticity and conceded that both the email and

---

[2] Coopersmith Decl., Exs. 8–10.

- 3 -

DEFENDANT'S MOTION TO ADMIT
TRIAL EXHIBITS 20279 AND 20498
Case No. CR-18-00258-EJD

attached memo were "stored, collected, and produced by Theranos." 4/1/22 Trial Tr. at 1899; *see also* Dkt. 1354 ¶ 2 (stipulating that emails to *or* from addresses with the domain @theranos.com sent or received by Theranos personnel with particular Bates prefixes are authentic).[3]

But the government maintained its objection to the admissibility of the transition memo attachment, arguing that the memo was "not relevant for state of mind if [Dr. Pandori] says he didn't compose it" and that the memo was inadmissible hearsay. *Id.* at 1899–1900. The Court ruled that page 1, the cover email to Exhibit 20279 "comes in," but deferred ruling on the attachment. *Id.* at 1905.

### III. ARGUMENT

**A. Trial Exhibits 20279 and 20498 Are Authentic Under Rule 901.**

Both Exhibits 20279 and 20498 satisfy the standards for authentication under Federal Rule of Evidence 901.

First, despite its initial objection, the government ultimately conceded that Exhibit 20279 (both the email and attachment) is authentic. 4/1/22 Trial Tr. at 1899.

Second, both Exhibits 20279 and 20498 are also authentic under the parties' stipulation. *See* Dkt. 1354. Both are emails from an email address with the domain @theranos.com; Exhibit 20498 was sent and received by Theranos personnel and bears the Bates prefix THER-AZ-, while Exhibit 20279 was similarly sent and received by Theranos personnel and bears the Bates prefix THPFM-; and both were produced in discovery before February 18, 2022. Dkt. 1354 ¶ 2. The attached memos are also authentic. Each bears the same Bates prefix as its respective parent email and the Bates numbers in each proceed sequentially from the bates number of the parent email. *See* Coopersmith Decl., Ex. 6 at 1–2; *id.*, Ex. 7 at 1–2. The email from Dr. Pandori on the first page of both exhibits shows an attached document with the file name "transition_MWP_05_2014.docx." Coopersmith Decl., Exs. 6 & 7. And given the government's agreement that Exhibit 20279—both the email from Dr. Pandori to Dr. Rosendorff and the

---

[3] The government has produced several versions of Exhibit 20279, all of which fall under the parties' stipulation on authenticity. The defense attaches all such copies. Coopersmith Decl., Exs. 11–12.

attached memorandum—is authentic, 4/1/22 Trial Tr. at 1899, nothing supports questioning the authenticity of the same memo attached to another email—Exhibit 20498—authenticated by stipulation of the parties. *See United States v. Pang*, 362 F.3d 1187, 1192–93 (9th Cir. 2004) (authenticity of invoices established where, among other things, they "were identical to other [admitted] invoices" and "the numbers were in sequence with the numbers of other invoices that were in evidence").

Even absent a stipulation, the authenticity of both exhibits is well established. Rule 901 "is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Pang*, 362 F.3d at 1193; *see United States v. Blackwood*, 878 F.2d 1200, 1202 (9th Cir. 1989) (Rule 901 requires that proponent "make only a prima facie showing of authenticity."). Once "sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity," *Pang*, 362 F.3d at 1193 (internal quotation marks omitted), the evidence should be admitted, and the "probative force of the evidence" is "an issue for the jury," *Blackwood*, 878 F.2d at 1202 (alterations omitted); *United States v. Isiwele*, 635 F.3d 196, 200 (5th Cir. 2011) (once proponent of evidence makes sufficient preliminary showing, "the trial court should admit the exhibit … in spite of any issues the opponent has raised about flaws in the authentication," which "go to the weight of the evidence instead of its admissibility" (quoting 5 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE ¶ 901(a) [03] at 901–17)).

Here, the defense has made its prima facie showing. The email bears the same format as numerous other emails admitted and authenticated at trial.[4] The memo is dated May 29, 2014, is authored by "M.W. Pandori," and was emailed from Dr. Pandori's account. Coopersmith Decl., Ex. 6 at 1; *id.*, Ex. 7 at 1. That Dr. Pandori disclaimed having written or seen the memorandum does not undermine its authenticity. The "proponent need not establish a proper foundation through personal knowledge," *Pang*, 362 F.3d at 1193; *e.g.*, *Proctor v. Colonial Refrigerated Transp., Inc.*, 494 F.2d 89, 93 (4th Cir. 1974) (authenticity established even though witness

---

[4] Numerous emails admitted by the government likewise include the @theranos.com email address for the recipient(s) of the email, but not for the sender. *See, e.g.*, TX1227, TX1287, TX1323, TX1528, TX1595, TX1570.

"testified at trial that he could not remember giving the statement and denied certain portions of it"). Rather, circumstantial evidence of reliability—such as "the fact that [the witness's] name and address were listed" on it—can satisfy Rule 901. *See, e.g.*, *Blackwood*, 878 F.2d at 1202. Both emails were produced by the government in discovery, which alone typically clears the discovery hurdle. *See, e.g.*, *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 777 n.20 (9th Cir. 2002); *United States v. Lawrence*, 934 F.2d 868, 871–72 (7th Cir. 1991).

If the rule were otherwise, any hostile witness could prevent the authentication of unfavorable evidence simply by disavowing it. But once a prima facie showing of authenticity is made, it is for the jury to weigh the reliability of the evidence against the witness's in-court denial. *See Isiwele*, 635 F.3d at 200–01 (trial court abused its discretion by refusing to admit documents "on the ground that they had not been properly authenticated because the witnesses did not absolutely adopt the substance of the documents"). Thus, based on the prima facie evidence reflected above, the Court need not definitively resolve any concerns over whether someone else wrote the memorandum and put Dr. Pandori's name on it, *see* 4/1/22 Trial Tr. at 1901, or about Dr. Pandori's credibility in denying authoring it, *see id.* at 1898 (Court commenting that "what was telling was that when it was first shown to the witness, he looked at it and he disowned it immediately"). Any "flaws in the authentication"—such as Dr. Pandori's disavowal—"go to the weight of the evidence instead of its admissibility." *Isiwele*, 635 F.3d at 200.

### B. The Court Should Admit Trial Exhibits 20279 and 20498 for Impeachment Because They Conflict With Dr. Pandori's Testimony, and His Disavowal of Them Is Highly Relevant to His Credibility.

Exhibits 20498 and 20279 are both admissible to impeach Dr. Pandori. In his direct examination, Dr. Pandori testified that he told Dr. Rosendorff and Mr. Balwani that Theranos should stop using its proprietary technology and "just run predicate methods" because Dr. Pandori "didn't have a very positive feeling" about Edison devices." 3/30/22 Trial Tr. at 1669–1672; *see also* 4/1/22 Trial Tr. at 1742–1745. Yet this concern appears nowhere in Dr. Pandori's transition memo. To the contrary, his "***primary concern***" about the Edison was "the ***available number of devices***." Coopersmith Decl., Ex. 6 at 6 (emphasis added); *id.*, Ex. 7 at 6

1  (emphasis added). In fact, for three assays—FT4, VitD, and TSH—he wrote that "***at least a***
2  ***doubling of the number of [Edisons] is necessary***." *Id.* (emphasis added). Dr. Pandori did not
3  mention his supposed concerns with the technology's "extremely poor" performance, "what the
4  technology could do" in terms of its "capability," or whether Theranos should stop using the
5  Edisons and instead "just use predicate methods." 3/30/22 Trial Tr. at 1623; 1669–1672; 4/1/22
6  Trial Tr. at 1730. Instead, on his very last day, he recommended the opposite: Get more Edisons.

7  A witness's prior inconsistent statement is admissible for impeachment. *See* Fed. R. Evid.
8  613(b); *e.g.*, *United States v. McLaughlin*, 663 F.2d 949, 953–54 (9th Cir. 1981) (reversing
9  conviction where trial court erroneously excluded evidence of prior inconsistent statement by key
10 government witness). The only foundational requirements are that the witness be "given an
11 opportunity to explain or deny the statement and [the government be] given an opportunity to
12 examine the witness about it." Fed. R. Evid. 613(b). Those requirements are met here:
13 Dr. Pandori can deny that he made the prior inconsistent statement (indeed he already has) and
14 the government can examine him about it on redirect if it wishes. *See United States v. Young*, 86
15 F.3d 944, 949 (9th Cir. 1996).

16 Dr. Pandori's earlier testimony conflicts with his recommendation in the memo, and the
17 jury should be able to see the memo to evaluate Dr. Pandori's credibility. If Dr. Pandori believed
18 that the Edison's performance was "extremely poor[]" and so unfit for patient testing that
19 Theranos should "just run predicate methods"—and if this belief was so strong that it drove him
20 to quit—then his "primary concern" about the Edison upon leaving the company would not have
21 been "the available number of devices," and his parting recommendation would not have been to
22 obtain more of them.[5] The prior inconsistent statements in the memo—and the memo itself—are

---

[5] In any event, statements need not be diametrically opposed to qualify as "inconsistent" for admissibility purposes. *See United States v. Morgan*, 555 F.2d 238, 242 (9th Cir. 1977) (admitting "the prior statement whenever a reasonable man could infer on comparing the whole effect of the two statements that they had been produced by inconsistent beliefs. In other words, the keystone for impeachment use is … would the prior statement of the witness help the trier of fact evaluate the credibility of the witness").

thus admissible to impeach Dr. Pandori.[6]

The impeachment value of these exhibits has only increased since Dr. Pandori testified under oath that he has never seen the memorandum. Elsewhere in his testimony, Dr. Pandori displayed an impressive memory for detail, despite the eight-plus years that have passed since he departed Theranos. *See, e.g.*, 3/30/22 Trial Tr. at 1619–20, 1631–32, 1635–36; 1654–55. But when presented with a seven-page memorandum, "detailing the state of various projects or works in the CLIA/Bugs laboratories" on his last day of work, Dr. Pandori claimed not to have written it or not to remember it. Indeed, as the Court recognized, Dr. Pandori "disowned" the memorandum "immediately" when it was first shown to him. 4/1/22 Trial Tr. at 1898. He did not take his time to review the document or try to refresh his recollection, as he did on other occasions. 3/30/22 Trial Tr. at 1639, 1642; 4/1/22 Trial Tr. at 1731–32, 1751. By disavowing the memorandum in this uncharacteristic manner, Dr. Pandori put his credibility front and center. *See United States v. Gilbert*, 57 F.3d 709, 712 (9th Cir. 1995) ("Because of their denials, the credibility of both witnesses became an important issue in the case[.]").

The jury could reasonably infer that Dr. Pandori's knee-jerk disavowal of the memo resulted from a sudden realization that his inconsistent statements about the Edison were about to be exposed. And the jury could further infer that to avoid being caught in *that* contradiction, Dr. Pandori falsely denied writing and recognizing the memo at all. Mr. Balwani must have the chance to confront Dr. Pandori with the inconsistent statements in the memo and to probe whether he was truthful about neither recognizing nor writing it. "It is axiomatic that jurors are entitled to see how the witness reacts when the cross-examiner catches him in a contradiction or exposes one of his falsehoods." *United States v. Giese*, 597 F.2d 1170, 1193 (9th Cir. 1979); *see also United States v. Watkins*, 591 F.3d 780, 787 (5th Cir. 2009) ("It is well established that after a witness denies making a statement during cross examination, evidence may be introduced to

---

[6] This impeachment is also authorized by Rule 607 and the principle of "impeachment by contradiction" on material facts, which is permitted specifically "to prevent witnesses from engaging in perjury." *United States v. Kincaid-Chauncey*, 556 F.3d 923, 932 n.8 (9th Cir. 2009), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010). Here, the facts at issue—Dr. Pandori's views of the Edison—are central.

prove the statement was made."). To deny Mr. Balwani the opportunity to undercut Dr. Pandori's claims with evidence that is authentic by stipulation of the parties—both about his authoring the memo and about its contents—would undermine Mr. Balwani's right to meaningfully cross-examine an important government witness.

### C. The Court Should Admit Trial Exhibits 20498 and 20279 Because They Are Admissible for the Non-Hearsay Purpose of Showing Dr. Pandori's Motivation and State of Mind.

The Court should also admit Exhibits 20498 and 20279 because they are relevant and admissible for another non-hearsay purpose—showing Dr. Pandori's motivation for leaving Theranos and his state of mind at the time.

*Relevance.* Exhibits 20498 and 20279 are both relevant to Dr. Pandori's motivation and state of mind when he resigned from Theranos. The government put Dr. Pandori's state of mind and motivation—both for joining and quitting Theranos—at issue. Dr. Pandori testified that he was excited to join Theranos because of a *Wall Street Journal* article by Joe Rago. 3/30/22 Trial Tr. at 1598; TX1106. The Court admitted this article for the limited purpose of showing "this witness's state of mind in regards to his … seeking employment at this company." 3/30/22 Trial Tr. at 1599; *id.* at 1600 (reiterating that the article is "limited for this witness's motivation … for seeking employment"). The government later questioned Dr. Pandori about his reasons for quitting Theranos. 4/1/22 Trial Tr. at 1743. He responded that "the technology wasn't anywhere near what I thought it was…. The Edisons didn't work very well, … they worked very, very poorly…. They failed very, very, very often." *Id.*

On cross examination, Mr. Balwani offered Exhibit 20279 to show that Dr. Pandori was not in fact motivated to quit Theranos because of concerns about the Edison. Dr. Pandori's transition memo instead suggested that his "primary concern" with the Edison was "the available number of devices," and he recommended "at least … doubling the number of units." Coopersmith Decl., Ex. 7 at 6. This evidence undermines Dr. Pandori's testimony about his motivation for resigning and state of mind on his last day at Theranos—facts that the government put squarely at issue. *See* 3/30/22 Trial Tr. at 1590–91; 4/1/22 Trial Tr. at 1743–45.

Exhibit 20498 is relevant for the same reason. The government cannot plausibly dispute the

1    relevance of Dr. Pandori's reasons for quitting and beliefs about the Edison when it spotlighted
2    these same issues throughout its direct examination.

3    ***Non-Hearsay***. When the government highlighted Dr. Pandori's motivation for joining
4    Theranos, the Court admitted an out-of-court statement—the *Wall Street Journal* article
5    (TX1106)—for a non-hearsay purpose of showing the "witness's state of mind" and
6    "motivation." 3/30/22 Trial Tr. at 1599–1600. When Mr. Balwani offered an out-of-court
7    statement for that same purpose at the tail-end of Dr. Pandori's tenure, the request was denied.
8    *See* 4/1/22 Trial Tr. at 1895–99. If the *Wall Street Journal* article is not hearsay when used to
9    show Dr. Pandori's motivation for joining Theranos, the witness's own transition memo cannot
10   be hearsay when used to show what he thought about the company and the Edison when he was
11   leaving.

12          In resisting the admission of Exhibit 20279, the government emphasized "that this is an
13   out-of-court statement that hasn't been adopted or owned by a witness on the stand." 4/1/22 Trial
14   Tr. at 1899–1900. But Dr. Pandori's disavowal of the memo does not render it unassailable
15   hearsay. If that were so, then any adverse witness could prevent their own unfavorable out-of-
16   court statement from being admitting simply by denying making it and invoking the hearsay bar.

17          The Ninth Circuit does not adopt this approach. In *United States v. Valdez-Soto*, 31 F.3d
18   1467, 1470, 1472 (9th Cir. 1994), a witness implicated the defendant before trial but then
19   "changed his tune and testified much differently" at trial, claiming that "he couldn't recall" some
20   his prior statements and "den[ying] one." The trial court admitted the statements over a hearsay
21   objection, and the Ninth Circuit affirmed. *Id.* at 1472. That court explained that "the degree of
22   reliability necessary for admission is greatly reduced where, as here, the declarant is testifying
23   and is available for cross-examination, thereby satisfying the central concern of the hearsay rule."
24   *Id.* (internal quotation marks omitted); *see id.* ("We agree with Judge Learned Hand's observation
25   that when the jury decides the truth is not what the witness says now but what he said before, they
26   are still deciding from what they see and hear in court." (quoting *United States v. Leslie*, 542 F.2d
27   285 (5th Cir. 1976)). Here, when Dr. Pandori is on the stand and able to deny or explain the
28   statements in the authenticated memo, the "central concern of the hearsay rule" does not apply.

*Id.*

The Court should admit Exhibits 20498 and 20279 as relevant and admissible to show Dr. Pandori's motivation for quitting—an issue that the government put squarely at issue.

### D. The Court Should Admit Trial Exhibit 20498 Because It Is Admissible for the Non-Hearsay Purpose of Its Effect on the Recipient, Mr. Balwani.

At the very least, the Court should admit Exhibit 20498, which includes the transition memo attached to a May 30, 2014 email from Mark Pandori to Mona Ramamurthy (Head of HR for Theranos) and Mr. Balwani. *See* Decl. Ex. 6. In the email, Dr. Pandori asks for Mr. Balwani's "permission" to "share [the memorandum] with Adam [Rosendorff]," which he ultimately did. *Id.*; *see also id.*, Ex. 7.[7] Exhibit 20498 is admissible for yet another relevant non-hearsay purpose: showing Mr. Balwani's state of mind regarding the capability and promise of Theranos technology.

*Relevance*. Exhibit 20498 is relevant to Mr. Balwani's state of mind about the capability and promise of Theranos technology. The central allegation is that Mr. Balwani defrauded patients and investors by knowingly misrepresenting that Theranos technology could produce accurate and reliable results. Correspondence from the departing lab director to Mr. Balwani, stating that his "primary concern" with the Edison "is the available number of devices"—not its accuracy, reliability, utility, or readiness for patient testing—is highly relevant evidence of Mr. Balwani's understanding of the capability of Theranos' technology at the time.

*Non-Hearsay.* Exhibit 20498 is not hearsay when offered by the defense for its effect on the recipient, Mr. Balwani, rather than for its truth.[8] "[A]n out-of-court statement is not hearsay if offered for any purpose other than the truth of whatever the statement asserts. One common application of this principle is admitting a declarant's out-of-court statement for the purpose of establishing what effect it had on the listener." *United States v. Lopez*, 913 F.3d 807, 826 (9th Cir.

---

[7] As another email shows, Mr. Balwani responded to Dr. Pandori giving him the greenlight to share the memo with Dr. Rosendorff. *See* Coopersmith Decl. Ex. 13.

[8] If there were any doubt about the non-hearsay use of the memorandum for its effect on the recipient, it is also not hearsay because it comprises Dr. Pandori's recommendations, including that Theranos double the number of Edisons. *See United States v. McLennan*, 563 F.2d 943, 947 (9th Cir. 1977) ("[W]ords which constitute … advice are classic examples of verbal acts, admissible because they were spoken, whether true or false. Such verbal acts are not hearsay.").

2019) (emphasis removed). Here, the jury could reasonably infer that, on reading Dr. Pandori's memorandum, Mr. Balwani took his departing lab director (who did not hide his negative attitude about Theranos) at face value when he suggested using *more Edisons*—not decreasing or stopping testing on the Edison altogether. The truth of Dr. Pandori's statements (i.e., whether in fact Theranos needed to double the number of its Edisons) is of no moment. What matters is their effect on the listener, Mr. Balwani. *Id.* at 826; *United States v. McLennan*, 563 F.2d 943, 947 (9th Cir. 1977) ("[W]ords which constitute … advice are classic examples of verbal acts, admissible because they were spoken, whether true or false. Such verbal acts are not hearsay.").

Because it is relevant and offered for a non-hearsay purpose, the Court should admit Exhibit 20498.

## IV.   CONCLUSION

For these reasons, the Court should grant Mr. Balwani's motion and: (1) admit Trial Exhibits 20279 and 20498 for the non-hearsay purpose of impeaching Dr. Pandori; (2) admit Exhibits 20279 and 20498 for the non-hearsay purpose of showing Dr. Pandori's state of mind; and (3) admit Exhibit 20498 for the non-hearsay purpose of showing Mr. Balwani's state of mind.

DATED: April 4, 2022               Respectfully submitted,

ORRICK HERRINGTON & SUTCLIFFE LLP

By:   */s/ Jeffrey B. Coopersmith*
      Jeffrey B. Coopersmith

Attorney for Defendant
RAMESH "SUNNY" BALWANI