JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:      (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
|---|---|
| Plaintiff, | **RAMESH "SUNNY" BALWANI'S MOTION FOR CURATIVE INSTRUCTION ON THERANOS DEVICES SENT TO WALGREENS** |
| v. | |
| RAMESH "SUNNY" BALWANI, | Date:  April 19, 2022
Time:  8:30 a.m.
CTRM.: 4, 5th Floor |
| Defendant. | |
| | Hon. Edward J. Davila |

# NOTICE OF MOTION AND MOTION FOR CURATIVE INSTRUCTION ON THERANOS DEVICES SENT TO WALGREENS

PLEASE TAKE NOTICE that on April 19, 2022, at 8:30 a.m., or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, located at 280 South First Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Ramesh "Sunny" Balwani will and hereby does move the Court for a curative instruction about Theranos devices sent to Walgreens. The Motion is based on the below Memorandum of Points and Authorities, the concurrently filed Declaration of Jeffrey B. Coopersmith and attached exhibits, the record, and any other matters that the Court deems appropriate.

DATED: April 18, 2022                    Respectfully submitted,

                                         ORRICK HERRINGTON & SUTCLIFFE LLP

                                         By:  */s/ Jeffrey B. Coopersmith*
                                              Jeffrey B. Coopersmith

                                              Attorney for Defendant
                                              RAMESH "SUNNY" BALWANI

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

The government improperly asked Daniel Edlin questions on redirect examination about Theranos devices in Walgreens' possession, which implied that those devices were not able to conduct blood testing. This line of questioning was without a good-faith factual basis and was contrary to what the government knows is true—that, before the retail launch, Walgreens did have Theranos devices that Walgreens used to conduct blood testing as part of its due diligence.

Specifically, after Theranos and Walgreens executed their first agreement in July 2010, Theranos sent Walgreens several of its proprietary blood-testing devices, along with the cartridges needed to run tests on those devices. Several went to Walgreens headquarters in Deerfield, Illinois, and at least one sat in Dr. Jay Rosan's office in Philadelphia. Walgreens personnel ran blood tests on the Theranos devices, and received cartridges to run more on request. Dr. Rosan and others tested the devices on themselves and on Walgreens executives and other employees with no one present from Theranos.

These facts are not in dispute. Contemporaneous emails produced in discovery reflect them. So too does Dr. Rosan's unrebutted deposition testimony—also produced in discovery. Moreover, Dr. Rosan told the government that he had a device and that Walgreens tested its personnel on Theranos devices. No evidence suggests that Walgreens had a non-working device from Theranos or that Walgreens did not have the cartridges needed for testing on the devices it had.

The government therefore had no justification or basis on Friday when it asked Daniel Edlin whether a Theranos device sent to Walgreens included the cartridges and reagents needed to run blood tests or was otherwise capable of running such tests. Mr. Edlin did not know the answer. But the government did. The only possible reason to ask these unfounded questions was to raise doubts in the minds of the jurors about whether Walgreens could run tests with the devices that Theranos sent or had the cartridges to do so. That purpose is improper given the clear contrary evidence in the government's possession, and the lack of any evidence to support the inference the government was trying to draw with Mr. Edlin. The questions lacked a good-faith

basis and, worse, effectively shifted the burden to the defense to counter a suggestion with no factual support to begin with. To cure this error, the Court should instruct the jury that the Theranos devices sent to Walgreens included cartridges and could run blood tests.

## II. BACKGROUND

### A. Theranos Sends Devices and Cartridges to Walgreens for Walgreens to Test

At the request of Dr. Rosan—who spearheaded Walgreens' due diligence efforts in the Theranos relationship—Theranos sent its proprietary devices to Walgreens for testing. Declaration of Jeffrey B. Coopersmith Ex. 1 (Rosan Dep.) at 234–35. By September 2010, Theranos confirmed that it was successfully receiving data from three devices on which Walgreens was running demonstrations. *See id.*, Ex. 2. As Dr. Rosan explained, Theranos provided the devices and the cartridges, which contained the reagents for performing blood tests. *Id.*, Ex. 1 at 105, 235–36. The devices were simple enough to operate that Dr. Rosan and others could use them to test themselves. *See id.*, Ex. 1 at 105, 237–38, 245; *id.*, Ex. 4. One device in fact sat in Dr. Rosan's office for around a year, and he tested himself more than once. *Id.*, Ex. 1 at 106, 236.

When Walgreens ran out of cartridges, it asked Theranos for more. Theranos never restricted how many tests Walgreens could run or how often it could run them. *Id.*, Ex. 1 at 239, 242.

Theranos sent results for the Walgreens tests—performed with no Theranos employee present—to Dr. Rosan. *Id.*, Ex. 1 at 241, 243–44; *id.*, Ex. 3. These results enhanced Walgreens' view of the viability of Theranos' technology. *See id.*, Ex. 1 at 241–43, 247–48.

### B. The Government Asks Improper Questions Suggesting That Walgreens Could Not Run Tests on Theranos Devices It Had

No evidence contradicts these facts. And the evidence discussed above has all been exchanged in discovery. *See* Coopersmith Decl. ¶¶ 2–5. Dr. Rosan also confirmed in an interview with the government that he possessed Theranos devices and that Walgreens executives were tested on a Theranos device. *See id.*, Ex. 5. at US-REPORTS-0012957.

Yet despite knowing these facts, the government asked Daniel Edlin questions with no

factual basis:

> Q. Do you recall discussing with Mr. Balwani's counsel the Walgreens relationship and the fact that Walgreens apparently had a Theranos device in its possession?
> A. Yes.
> Q. Do you recall any of the details about when that device was provided to Walgreens or for what purpose?
> A. I don't.
> Q. Do you know, for example, whether that device was capable of running any assays?
> A. No.
> Q. Do you know whether Theranos provided the cartridges and reagents that would be necessary to actually use that device as an analyzer?
> A. I don't.

*Id.*, Ex. 6 (Balwani Tr.) at 2816–17.[1]

## III. ARGUMENT

The government's questions lacked a good-faith basis and were thus improper. This good-faith requirement is particularly salient for prosecutors. *See, e.g.*, *United States v. Ortiz*, 862 F.2d 318, at *6 (9th Cir. 1988) (unpublished) (noting that government's questions on cross-examination were improper); *see also United States v. Lucas*, 516 F.3d 316, 349 (9th Cir. 2008) (finding no error but criticizing prosecutors' "want of professionalism" in, among other things, asking prejudicial questions with no good-faith basis). "[I]t is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt …." *United States v. Blueford*, 312 F.3d 962, 969 (9th Cir. 2002) (vacating conviction for government's misconduct in asking the jury to draw unwarranted inferences at closing without a good-faith basis).

The government did not live up to its obligations here. The government asked Mr. Edlin questions plainly designed to suggest that Theranos devices in Walgreens' possession might have

---

[1] The government questioning highlighted in this motion is not an isolated occurrence. During the testimony of Dr. Mark Pandori, for instance, the government asked unfounded questions on re-direct designed to cast doubt on whether the link to the *Wired Magazine* article in Trial Exhibit 20458 was the same article that Dr. Pandori described in his testimony. *See* 4/6/22 Trial Tr. at 2285–86. This issue was important because Dr. Pandori claimed that this article was the final straw leading him to resign from Theranos, *see* 4/6/22 Trial Tr. at 2250, when in fact he had received the email (Trial Exhibit 20458) three months before departing. The parties resolved that issue with a stipulation. *See* Dkt. 1402. The government declined the defense's request for a stipulation on the facts underlying the instant motion.

been unable to run blood tests and that Theranos may not have even sent the cartridges needed for the tests. The evidence in the government's possession shows this to be wrong. No evidence supports the insinuation behind the government's questions.

Worse, the defense could not fully correct the issue on re-cross. When the defense asked Mr. Edlin whether he had a reason to think that the device sent to Walgreens lacked cartridges, he said that he did not know. Coopersmith Decl., Ex. 6 at 2838. While he had no reason to think that the device could not run tests, *see id.*, he could not dispel the government's insinuations. The government's improper questioning risks confusing the jury about what both parties know happened, and the defense could not resolve the confusion through cross-examination. The government's questioning thus improperly shifted the burden to Mr. Balwani to put on affirmative evidence to disprove the government's strong—yet unsupported—inference that Theranos sent Walgreens devices that could not run tests or that lacked the cartridges and reagents needed to do so. That was improper.

The Court should correct the misimpression with a curative instruction:

- Members of the Jury: There were questions from the government to Mr. Edlin on Friday about whether a Theranos device sent to Walgreens included cartridges and was able to run blood tests.
- I am instructing you that, for purposes of your ultimate decision, beginning in 2010, before the retail launch with Walgreens in the fall of 2013, Theranos sent proprietary devices to Walgreens. Theranos also sent Walgreens cartridges and reagents, which Walgreens was able to use with the devices to run blood tests.

Mr. Balwani asks the Court to give this instruction right after the jury reconvenes. *See United States v. Washington*, 462 F.3d 1124, 1136 (9th Cir. 2006) (explaining that a trial court's "prompt corrective action in response to improper comments" can cure the resulting prejudice). Anything less would not address the tendency of the government's questions to undermine the truth as both parties understand it. While the defense cannot force the government to present exculpatory evidence, it should be able to correct improper insinuations from questions with no good-faith basis and the resulting improper shift of the burden of proof to Mr. Balwani.

## IV. CONCLUSION

For these reasons, the Court should grant Mr. Balwani's motion and give the jury the requested instruction.

DATED: April 18, 2022                     Respectfully submitted,

ORRICK HERRINGTON & SUTCLIFFE LLP

By: */s/ Jeffrey B. Coopersmith*
    Jeffrey B. Coopersmith

Attorney for Defendant
RAMESH "SUNNY" BALWANI