# EXHIBITS 1–6
# TO DECLARATION OF JEFFREY B. COOPERSMITH

# EXHIBIT 1

In re Arizona Theranos, Inc. Litigation

Videotaped Deposition of

DR. JAY ROSAN

May 16, 2019

***CONFIDENTIAL***



www.aptusCR.com / 866.999.8310

US-REPORTS-0011256

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF ARIZONA
 3              CIVIL ACTION NO. 2:16-cv-2138-HRH
 4                        -  -  -
 5
                                    :
 6   IN RE ARIZONA THERANOS, INC.,
     LITIGATION                     :
 7
                        -  -  -
 8              ***CONFIDENTIAL***
 9         Videotaped deposition of DR. JAY ROSAN,
10   taken pursuant to notice, held in the LAW OFFICES
11   OF DUANE MORRIS, LLP, 30 South 17th Street,
12   Philadelphia, Pennsylvania, on Thursday, May 16,
13   2019, beginning at approximately 10:20 a.m.,
14   before Robin A. Vance, a Certified Court Reporter
15   and Notary Public for the states of New Jersey,
16   Pennsylvania and Delaware.
17                        -  -  -
18
19
20
21
22   Reported By:
23   Robin A. Vance, CCR
24   CCR-NJ License No. XI 02131
25   Job No. 10054876
```

**Page 2**

```
 1   A P P E A R A N C E S :
 2
 3      LIEFF CABRASER HEIMANN & BERNSTEIN
        BY: MELISSA A. GARDNER, ESQUIRE
 4          275 Battery Street, 29th Floor
            San Francisco, CA 94111-3339
 5          415-956-1000
            Mgardner@lchb.com
 6          Attorneys for Consumer Plaintiffs
 7
        KELLER ROHRBACK, LLP
 8      BY: TANYA KORKHOV, ESQUIRE
            1140 Avenue of the Americas
 9          Ninth Floor
            New York, NY 10036
10          646-380-6690
            TKorkhov@kellerrohrback.com
11          Attorneys for Consumer Plaintiffs
12
        DUANE MORRIS, LLP
13      BY: STEPHEN H. SUTRO, ESQUIRE
            Spear Tower
14          One Market Plaza, Suite 2200
            San Francisco, CA 94105-1127
15          415-957-3008
            Shsutro@duanemorris.com
16          Attorneys for Dr. Jay Rosan
17
        DAVIS WRIGHT TREMAINE, LLP
18      BY: STEPHEN M. RUMMAGE, ESQUIRE
            920 Fifth Avenue, Suite 3300
19          Seattle, Washington 98104-1610
            206-757-8136
20          Steverummage@dwt.com
            Attorneys for Ramesh Balwani
21
22      DAVIS WRIGHT TREMAINE, LLP
        BY: KELLY M. GORTON, ESQUIRE
23          505 Montgomery Street, Suite 800
            San Francisco, CA 94111-6533
24          415-276-6584
            Kellygorton@dwt.com
25          Attorneys for Ramesh Balwani
```

**Page 3**

```
 1   APPEARANCES CONTINUED:
 2
 3      SIDLEY AUSTIN, LLP
 4      BY:  KRISTEN R. SEEGER, ESQUIRE
             LAWRENCE P. FOGEL, ESQUIRE
 4           One South Dearborn
 5           Chicago, IL 60603
             312-853-7450
 6           312-853-6892
             Kseeger@sidley.com
 7           Lawrence.fogel@sidley.com
             Attorneys for Walgreens
 8
 9   Also Present:  Raymond Lerro, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                 I N D E X
 2   WITNESS                                    PAGE
 3   DR. JAY ROSAN
 4      Examination by
 5            MS. GARDNER                     8, 328
              MR. RUMMAGE                        228
 6
                        -  -  -
 7                    EXHIBITS
 8   No.           DESCRIPTION                  PAGE
 9   Exhibit 214   Subpoena                       9
10   Exhibit 215   Document - Bates WG006129     27
11   Exhibit 216   Document - Bates WG000368     60
12   Exhibit 217   Email Chain - Bates WG031043  80
13   Exhibit 218   Email Chain - Bates WG000572  90
14   Exhibit 219   Meeting and Agenda Minutes
                   Bates WG039882               112
15
     Exhibit 220   Email - Bates WG005122       125
16
     Exhibit 221   Email - Bates WG000058       129
17
     Exhibit 222   Theranos Meeting Minutes
18                 Bates WG000059               130
19   Exhibit 223   Email - Bates THER-AZ-06086006 147
20   Exhibit 224   Email Chain - Bates WG006181 168
21   Exhibit 225   Email/Executive Meeting Notes
                   Bates WG018950               178
22
     Exhibit 226   Email - Bates WG031844       189
23
     Exhibit 227   Email - Bates WG006173       191
24
     Exhibit 228   Email - Bates WGOo1117       196
25
```

US-REPORTS-0011257

Dr. Jay Rosan                                                      In re Arizona Theranos, Inc. Litigation

---

Page 105

1  When you say you had a machine, you don't know
2  what Theranos would have called it, right?
3     A.  No.
4     Q.  Okay.  And can you briefly describe
5  how you would use that machine?
6     A.  I would draw blood studies from a
7  finger-stick of a person, type that into the
8  cartridge, put the cartridge in the machine, and
9  push a button that said on.
10    Q.  And then test results would be
11 generated, and I think you earlier said sent to
12 you by e-mail?
13    A.  Yes, correct.
14    Q.  Okay.  Did you need to calibrate that
15 device at any time?
16    A.  I don't -- I don't believe so.
17    Q.  Did you get written procedures for
18 operating the device?
19    A.  Yes.  It wasn't that hard to operate.
20    Q.  How many cartridges did you have?
21    A.  I don't remember.
22    Q.  What tests did the device that you had
23 run?
24    A.  If I remember, it did sugar test, a
25 glucose test, influenza test, I think sodium,

---

Page 106

1  potassium.  I don't remember what else.
2     Q.  Did you need to perform any kind of
3  quality control procedures on the device?
4     A.  No.
5     Q.  How long did you have it?
6     A.  I don't remember.
7     Q.  Do you think it was more than a year?
8     A.  Around a year.
9     Q.  Did anybody service the device during
10 the time that you had it?
11    A.  No.
12    Q.  Did Miss Holmes make any
13 representations to you about pharmaceutical
14 companies and Theranos?
15    A.  I'm sorry, I couldn't hear what you
16 were saying.
17    Q.  Did Miss Holmes make any
18 representations to you about pharmaceutical
19 companies and Theranos?
20    A.  Yes.
21    Q.  And what were those representations?
22    A.  That the pharmaceutical -- 10 of the
23 15 biggest pharmaceutical companies were using
24 their technology.
25    Q.  Did you believe those representations?

---

Page 107

1     A.  Yes.
2     Q.  Do you believe them today?
3     A.  I'm not sure.
4     Q.  Did you take any steps to confirm
5  those representations?
6     A.  I asked for documentation and I got
7  letters from pharmaceutical companies showing
8  documentation.
9     Q.  Did you receive 10 letters?
10    A.  No.
11    Q.  Were the pharmaceutical -- did they --
12 did the letters make any reference to using
13 Theranos in a clinical setting?
14    A.  Yes.
15    Q.  What did they say?
16    A.  I think they're one of the
17 documents -- one of the forms here.  I don't
18 remember off the top of my head, but basically
19 saying they were using Theranos machines, devices
20 to run tests for clinical trials.
21    Q.  Did you speak with any of the authors
22 of the letters?
23    A.  No.
24    Q.  Do you know if anybody at Walgreens
25 spoke with the authors of the letters?

---

Page 108

1     A.  I don't really know.
2     Q.  Are you certain today that the letters
3  actually came from pharmaceutical companies?
4     A.  No.
5     Q.  I'm going to hand you an exhibit that
6  has previously been marked as 148.  Doctor,
7  you've seen this e-mail before, correct?
8     A.  Yes.
9     Q.  There's a reference in an e-mail
10 from -- so, it's Exhibit-148.  And in the second
11 sentence of the lowermost paragraph on the page,
12 there's a reference that says, "Sunny and he went
13 at it a little back in the early days."
14        And I'm going to ask, is Sunny
15 here, Sunny Balwani?
16    A.  Are you asking me a question?  I'm
17 sorry.
18    Q.  Yeah.
19    A.  Go ahead.
20    Q.  Is the reference to Sunny in this
21 e-mail, Sunny Balwani?
22    A.  Yes.
23    Q.  And is the reference to he in this
24 e-mail Kevin Hunter?
25    A.  Yes.

---

Dr. Jay Rosan                                                   In re Arizona Theranos, Inc. Litigation

Page 233

1  on like an official tour where you were being
2  pointed out specific things or were you just
3  walking around?
4       A.    Primarily walking around.
5       Q.    You said when you went into the lab
6  one time, you went with Mr. Finnegan; is that
7  right?
8       A.    I believe so, yes.
9       Q.    Do you know whether he went more than
10 once?
11      A.    I don't know.
12      Q.    And my recollection is that you
13 testified that Mr. Finnegan had worked for a
14 blood testing company; is that right?
15      A.    Yes.
16      Q.    What company was that?
17      A.    I think it was Quest, but I'm not
18 sure.
19      Q.    All right.  And as between the two of
20 you, did you have an understanding as to who was
21 more familiar with blood testing processes and
22 laboratory processes?
23      A.    Yes.
24      Q.    Who?
25      A.    He.

Page 234

1       Q.    He was more familiar?
2       A.    Yes.
3       Q.    Do you recall whether he asked
4  questions when you went through the lab?
5       A.    I don't recall.
6       Q.    Do you know where he is today?
7       A.    He's -- I forget.
8       Q.    Okay.  I also want to talk a little
9  bit about the devices that were provided to
10 Walgreens.  And I said that in plural, so maybe
11 I'm presupposing something.  Did Walgreens have
12 more than one device that it was able to run
13 cartridges on?
14      A.    Theranos devices?
15      Q.    Yes.
16      A.    Two.
17      Q.    Two.  And I believe you testified to
18 Ms. Gardner that you weren't sure when you got
19 those; is that right?
20      A.    Correct.
21      Q.    Do you recall why you got those?
22      A.    To do samples.
23      Q.    Was that at your request?
24      A.    Yes.
25      Q.    And who did you make that request to?

Page 235

1       A.    Either Elizabeth or Sunny.
2       Q.    And they accommodated it?
3       A.    Yes.
4       Q.    And when you got the devices, were any
5  restrictions placed on you in what you could do
6  with them?
7       A.    Just the tests that I had cartridges
8  for.
9       Q.    All right.  And how did you get the
10 cartridges?
11      A.    From Theranos.
12      Q.    Did you -- what would happen when you
13 ran out?
14      A.    I would order more.
15      Q.    And did they give you more?
16      A.    Yes.
17      Q.    Okay.  Did you request specific
18 cartridges?
19      A.    No.
20      Q.    In other words -- okay.  So, you just
21 took whatever tests it was that they sent you?
22      A.    Yes.
23      Q.    And you understood that the cartridges
24 could only do specific assays, correct?
25      A.    Yes.

Page 236

1       Q.    And that would be limited by the
2  reagents that were on the cartridges?
3       A.    Correct.
4       Q.    Did you ever have any concerns about
5  the cartridges that were sent to you?
6       A.    No.
7       Q.    So, where exactly were the two
8  machines located, if you can recall?
9       A.    One was in my office and one was in
10 Deerfield.
11      Q.    And Deerfield is Walgreens
12 headquarters; is that right?
13      A.    Yes.
14      Q.    So, when you say your office, do you
15 mean physically the -- the four corners that you
16 sat within, or just generally within the same
17 office space that you shared with others?
18      A.    No, in my office, my physical office.
19      Q.    In your physical office.  And how
20 often did you use it?
21      A.    I don't remember.
22      Q.    Okay.  How often did you test
23 yourself?
24      A.    Occasionally.
25      Q.    And what does occasionally mean in

Dr. Jay Rosan                                                    In re Arizona Theranos, Inc. Litigation

Page 237

1   that context?
2       A.     In the beginning I -- probably every
3   couple weeks.
4       Q.     And when you say "in the beginning,"
5   define for me --
6       A.     When I first had it.
7       Q.     Okay.  Is that over a period of
8   several months that you did it every couple of
9   weeks?
10      A.     No.  In the beginning, first month or
11  so.
12      Q.     Okay.  And by the way, when they
13  arrived, how were they set up?
14      A.     I don't understand the question.
15      Q.     Well, let me kind of make it more
16  fundamental.  How did they arrive?
17      A.     They came by UPS.
18      Q.     In a box?
19      A.     In a box.
20      Q.     Who unpacked it?
21      A.     Me.
22      Q.     Who set it up?
23      A.     Me.
24      Q.     And what instructions did you have to
25  set it up?

Page 238

1       A.     I -- if I'm not mistaken, there was an
2   instruction sheet.
3       Q.     And so, just kind of like when you get
4   something from Ikea, you open the box and you
5   follow the instruction sheet and set it up?
6       A.     Easier than Ikea.
7       Q.     Easier than Ikea.  That's a low bar.
8       A.     I --
9              MR. SUTRO:  I don't know.
10             MS. SEEGER:  Ikea is hard.
11             MR. RUMMAGE:  I know, that's why I
12  said it.
13             THE WITNESS:  That's why he's
14  right.
15             MR. RUMMAGE:  It's a low bar.
16  BY MR. RUMMAGE:
17      Q.     Okay.  And do you know how the one
18  that went to Deerfield was delivered?
19      A.     Same.
20      Q.     Do you know who set that up?
21      A.     I think it was Kim Romanski.
22      Q.     Okay.  And do you know where it was in
23  Deerfield?
24      A.     In a cubicle.
25      Q.     Did you ever use that?

Page 239

1       A.     Yes.
2       Q.     And what did you use it for?
3       A.     Tests.
4       Q.     On who?
5       A.     Different people.
6       Q.     On yourself?
7       A.     No.
8       Q.     So, the one in Deerfield you never
9   tested yourself?
10      A.     Correct.
11      Q.     And were you responsible for ordering
12  cartridges when they ran out in the Deerfield
13  machine?
14      A.     No.
15      Q.     Who did that, do you know?
16      A.     Kim.
17      Q.     Kim.  By the way, did -- did they ever
18  turn you down when you asked for cartridges?
19      A.     No.
20      Q.     Do you recall what tests or assays you
21  ran?
22      A.     No.
23      Q.     Do you recall how many different types
24  of cartridges you ran over time?
25      A.     I think there were three.

Page 240

1       Q.     Three different types?
2       A.     (Indicating).
3       Q.     You're nodding your head yes?
4       A.     Yes.
5       Q.     Okay.
6       A.     Sorry.
7       Q.     Just as a reminder?
8       A.     Yes, sorry.
9       Q.     Okay.  And just for my information,
10  sometimes, as I understand it, blood tests
11  essentially are just a yes or no value, sometimes
12  they return numeric values.  You know what I
13  mean?
14      A.     Yes.
15      Q.     And did the tests that you ran on the
16  device, did some of them return numeric values?
17      A.     Yes.
18      Q.     And did some of them return yes or no
19  values?
20      A.     Yes.
21      Q.     All right.  And by the way, all of
22  these tests that you ran on this device, let's
23  start first with your device, the one that was in
24  your office, you did that without a Theranos
25  employee present?

US-REPORTS-0011316

Dr. Jay Rosan                                              In re Arizona Theranos, Inc. Litigation

Page 241

1    A.    Yes.
2    Q.    And did you ever have, in the course
3  of running those tests, anything occur that made
4  you doubt the viability of the technology?
5    A.    No.
6    Q.    And do you know whether the tests that
7  were run in Deerfield were run without a Theranos
8  employee present?
9    A.    There was no Theranos employee.
10   Q.    And did you ever get reports from your
11  colleagues in Deerfield that, in running the
12  tests on the device, they were concerned about
13  the viability of the technology?
14   A.    No.
15   Q.    So, can I sum up fairly and say that
16  the experience you had in running tests on the
17  devices that Walgreens had was a positive
18  experience?
19        MS. GARDNER:  Objection.
20        THE WITNESS:  There were -- there
21        were no problems.
22  BY MR. RUMMAGE:
23   A.    There were no problems.  Did it
24  reenforce your view of the viability of the
25  technology?

Page 242

1    A.    Yes.
2    Q.    And again, to stress, Theranos didn't
3  tell you that you couldn't run tests more
4  frequently than X number of times a week; is that
5  right?
6    A.    No.
7    Q.    They didn't put any limitation on
8  that?
9    A.    Except for the number of cartridges.
10   Q.    Exactly.  And I'm not sure I asked
11  this, but did you ever ask for cartridges for a
12  specific test or assay?
13   A.    No.
14   Q.    Is there any particular reason why
15  not?
16   A.    Tests -- cartridges were given to me.
17  I didn't -- I didn't see the need for that
18  request.
19   Q.    They seemed satisfactory to you?
20   A.    Yes.
21   Q.    And do you know, did any other
22  Walgreens executives have tests run on these two
23  machines?
24   A.    Oh, yes.
25   Q.    Who else, if you can recall?

Page 243

1    A.    A whole series of people.  I don't
2  recall specifically who.
3    Q.    Well, let me just throw some names out
4  at you.  Did Mark Vainisi?
5    A.    I don't remember.
6    Q.    How about Wade Miquelon?
7    A.    Miquelon.
8    Q.    Miquelon, I'm sorry.
9    A.    Yes, I believe he did.
10   Q.    How about Brad Wasson?
11   A.    I believe he did.
12   Q.    How about Greg Wasson?
13   A.    I don't remember about Greg Wasson.
14   Q.    Okay.  Kim Romanski?
15   A.    Yes.
16   Q.    And did any of them express concerns
17  to you about the results that came back on the
18  tests?
19   A.    No.
20   Q.    And by the way, you mentioned earlier
21  that when you ran the tests, the results would
22  come to you.  I assume that was true for the unit
23  that was in your office; is that correct, that
24  the test results would come back to you?
25   A.    Yes.

Page 244

1    Q.    And what about the test results for
2  the Deerfield unit; who would those go to?
3    A.    Come back to me.
4    Q.    And they would come by e-mail.  Was it
5  just from an ordinary lab person at Theranos that
6  they came from or did they come from Sunny and
7  Elizabeth, who sent them?
8    A.    No, there was a person at Theranos.
9  There was a -- there was a password protected,
10  HIPAA compliant system that was set up that I
11  could access to get that.
12   Q.    Okay.  And so, I think you mentioned
13  in response to questions from Ms. Gardner that
14  you actually were pipetting blood into the
15  cartridge; is that right?
16   A.    In the beginning, yes.
17   Q.    Okay.  So, that actually anticipates
18  my question.  Was there a point in time when you
19  started using a nanotainer?
20   A.    Yes.
21   Q.    And did the nanotainers work
22  satisfactorily for you?
23   A.    They worked for me.
24   Q.    And so, physically how would this
25  work?  You prick your finger and collect the

US-REPORTS-0011317

Dr. Jay Rosan                                          In re Arizona Theranos, Inc. Litigation

Page 245

1  blood into the nanotainer, then what would you
2  do?
3      A.    Put it into the cartridge.
4      Q.    And is that just a simple matter of
5  inserting it into the cartridge?
6      A.    Yes.
7      Q.    And then what do you do with the
8  cartridge?
9      A.    Put it in the machine, push the
10 button.
11     Q.    And then it makes the whirring sound
12 and that's it; is that right?
13     A.    Yes.
14     Q.    And then what do you do with the
15 cartridge after that?
16     A.    Throw it in the trash.
17     Q.    And typically how long was it before
18 you got results back?
19     A.    Usually the next day.
20     Q.    Did you ever request it faster than
21 that?
22     A.    I don't remember.
23     Q.    Okay.  By the way, you told us that
24 you had examined upwards of, I think you may have
25 said as many as 200 different companies that were

Page 246

1  operating in this space.
2      A.    Yes.
3      Q.    Was anybody else doing the sort of
4  stuff that you saw that machine doing?
5          MS. KORKHOV:  Objection.
6          THE WITNESS:  Yes.
7  BY MR. RUMMAGE:
8      Q.    And who else was doing that sort of
9  thing?
10     A.    I don't remember the name of the
11 company, but there was a company that we visited
12 that was doing tests in a -- in a -- lab on a
13 chip test.  That's the technology.
14     Q.    Okay.  And what distinguished the two
15 in your mind?
16     A.    That company you're talking about?
17     Q.    Yes.
18     A.    And Theranos?
19     Q.    Yes.
20     A.    That company primarily did one test.
21     Q.    And what test was that?
22     A.    HIV.
23     Q.    And so, they didn't do general
24 chemistry tests?
25     A.    Correct.

Page 247

1      Q.    They didn't do immunity assays?
2      A.    Correct.
3      Q.    Okay.  And by the way, did you ever
4  get your test results -- strike that.
5          Did you ever draw your blood, put
6  it in the analyzer, send the stuff off to
7  Theranos, and then go across the street to
8  Labcorp or Quest and do the same test just to
9  see?
10     A.    No.
11     Q.    Why not?
12     A.    Because I got routine tests a lot at
13 those locations.  I didn't need to do that
14 because it was in a similar vein.
15     Q.    All right.  And did you -- did you
16 check the results that came back to you from
17 Theranos kind of mentally to see whether they
18 seemed consistent with your own health patterns?
19     A.    Yes.
20         MS. KORKHOV:  Objection.
21 BY MR. RUMMAGE:
22     Q.    And what did you conclude?
23     A.    That they were similar.
24     Q.    Okay.  Did you ever do any sort of
25 testing of your own to maybe test somebody that

Page 248

1  you knew was unhealthy, that might have an out of
2  range value on one of the tests you received?
3      A.    No.
4      Q.    Nothing prevented you from doing that,
5  though, right?
6      A.    Well, I wouldn't test it on anybody
7  except a Walgreens employee.  And as a medical
8  person, I don't know the medical history of most
9  of Walgreens employees because that was HIPAA
10 compliant.
11     Q.    Okay.  But nothing Theranos did
12 prevented you from doing something like that,
13 right?
14     A.    Correct.
15     Q.    And nothing Theranos did prevented you
16 from running comparative tests, right?
17     A.    Correct.
18     Q.    Okay.  And when you received results
19 back from Theranos, you never received any
20 indication that those results had somehow been
21 doctored or made up, did you?
22     A.    No.
23     Q.    Okay.  Let's -- I want to put a little
24 bit of framework around the time.
25         MR. RUMMAGE:  Do you have tab 7?

US-REPORTS-0011318

Dr. Jay Rosan                                                    In re Arizona Theranos, Inc. Litigation

1   advance at Walgreens stores?
2       A.    I -- I don't think they did.
3       Q.    So, to your knowledge, they were --
4   they were all walk-in patients?
5       A.    I can't remember.  I think there
6   was -- there was a big discussion around that, so
7   I just don't remember.
8       Q.    Did it happen, to your knowledge, that
9   somebody would walk into a Walgreens expecting a
10  finger-stick blood draw and then receive a venous
11  blood draw?
12      MS. SEEGER:  Object to form.
13      THE WITNESS:  I don't remember that
14  happening.
15  BY MS. GARDNER:
16      Q.    You don't remember hearing about that?
17      A.    No.
18      Q.    Is it possible that that happened?
19      MR. RUMMAGE:  Object to the form.
20      THE WITNESS:  I think anything is
21  possible.
22  BY MS. GARDNER:
23      Q.    Great.  I'm asking because earlier I
24  understood you to testify in response to
25  Mr. Rummage's questions that a patient was always

1   told before their blood draw what kind of blood
2   draw they would get, correct?
3       A.    Yes.
4       Q.    And I just want to confirm that the
5   telling of the kind of blood draw they would get
6   may have happened immediately before the blood
7   draw; is that right?  Like a patient could arrive
8   at Walgreens, be sitting with a phlebotomist or a
9   technician, and at that point when they're in the
10  chair ready for their blood draw, learn that the
11  draw would be different?
12      A.    I don't know when that occurred, when
13  that telling occurred.
14      Q.    All right.  I have no further
15  questions.  Thank you.
16      A.    Okay.
17      MR. SUTRO:  Thank you all.
18      VIDEOGRAPHER:  This concludes the
19  video deposition of Dr. Jay Rosan in the
20  matter of Arizona Theranos litigation.
21  The time is 6:24 p.m. and we are off the
22  record.
23          - - -
        (Witness excused.)
24      (Deposition concluded at approximately
    6:24 p.m.)
25

1           C E R T I F I C A T I O N
2
3           I hereby certify that the
4   proceedings, evidence, and objections noted
5   herein are contained fully and accurately in the
6   stenographic notes taken by me upon the foregoing
7   matter, and that this is a correct transcript of
8   the same.
9       Further, that if the foregoing pertains to
10  the original transcript of a deposition in a federal
11  case, before completion of the proceedings, review of
12  the transcript [ X ] was [ ] was not requested.
13
            _____
14      Robin A. Vance, CCR
        CCR-NJ License No. XI 02131
15      Notary Public
        City of Philadelphia, Philadelphia County
16      Commission Expires 8/25/22
17
18      (The foregoing certification of this
19  transcript does not apply to any reproduction of
20  the same by any means, unless under the direct
21  control and/or supervision of the certifying
22  reporter.)
23
24
25

1       DECLARATION UNDER PENALTY OF PERJURY
2   Case Name: In re Arizona Theranos, Inc. Litigation
3   Date of Deposition: 05/16/2019
4   Job No.: 10054876
5
6       I, DR. JAY ROSAN, hereby certify
7   under penalty of perjury under the laws of the State of
8   _____ that the foregoing is true and correct.
9       Executed this _____ day of
10  _____, 2019, at _____,
11
12
13          _____
14              DR. JAY ROSAN
15
16  NOTARIZATION (If Required)
17  State of _____
18  County of _____
19  Subscribed and sworn to (or affirmed) before me on
20  this _____ day of _____, 20__,
21  by_____,    proved to me on the
22  basis of satisfactory evidence to be the person
23  who appeared before me.
24  Signature: _____ (Seal)
25

US-REPORTS-0011339

**EXHIBIT 2**

**Message**

| | |
|---|---|
| **From**: | Wayne.Prince@Walgreens.com [Wayne.Prince@Walgreens.com] |
| **Sent**: | 9/29/2010 3:10:26 PM |
| **To**: | Daniel Young [/o=theranos organization/ou=first administrative group/cn=recipients/cn=dyoung] |
| **CC**: | Renaat.VanDenHooff@Walgreens.com; Sunny Balwani [/o=theranos organization/ou=first administrative group/cn=recipients/cn=sbalwani] |
| **Subject**: | RE: today's demo |

Sweet! Then all is well in the world.

Wayne Prince, PMP
Project Manager, Business Process Re-engineering
Corporate Innovation Team
847.964.8973 (w)
▮▮▮▮▮▮▮▮ (c)
http://www.linkedin.com/in/wayneprince

| | |
|---|---|
| "Daniel Young" <dyoung@theranos.com> | To  <Wayne.Prince@Walgreens.com> |
| 09/29/2010 10:09 AM | cc  "Sunny Balwani" <sbalwani@theranos.com>, |
| | <Renaat.VanDenHooff@Walgreens.com> |
| | Subject  RE: today's demo |

Yes, we have heartbeats for devices 347 and 342.

Thanks,
Daniel

_____

**From:** Wayne.Prince@Walgreens.com [mailto:Wayne.Prince@Walgreens.com]
**Sent:** Wednesday, September 29, 2010 7:57 AM
**To:** Daniel Young
**Cc:** Sunny Balwani; Renaat.VanDenHooff@Walgreens.com
**Subject:** RE: today's demo

Daniel,

Ok, I set up all the machines.

All have booted and assumed optimal operating temperature.

I removed the cartridge from 313. We made sure to transport it in the vertical position. I have since powered it down and boxed it up as that is the one we will ship back to you.

Do we have heartbeats on the other two?

Thanks,

**Trial Exh. 20441 Page 001**

FOIA Confidential Treatment Requested by Theranos                                                    TS-0974878

Wayne Prince, PMP
Project Manager, Business Process Re-engineering
Corporate Innovation Team
847.964.8973 (w)
███████████ (c)
http://www.linkedin.com/in/wayneprince

"Daniel Young" <dyoung@theranos.com>

09/29/2010 09:08 AM

To  <Wayne.Prince@Walgreens.com>

cc  "Sunny Balwani"  <sbalwani@theranos.com>

Subject  RE: today's demo

I'm glad it was a success.  Thanks for keeping us updated.

-Daniel

---

**From:** Wayne.Prince@Walgreens.com [mailto:Wayne.Prince@Walgreens.com]
**Sent:** Wednesday, September 29, 2010 7:04 AM
**To:** Daniel Young
**Cc:** Sunny Balwani
**Subject:** Re: today's demo

Daniel,

The kickoff was a success.

The demos went fine. We shut the machines down in the middle of the assay. We spoke to Sunny about this last night. We had to move the machines back to our building that night and we didn't want to wait for the assays to complete and the business day was over.

Our expectation is that we will not get any usable results from the assays that were started late yesterday afternoon.

I am going to set the machines back up now. I will contact you once they seem to be ready to confirm connectivity.

Thanks,

Wayne Prince, PMP
Project Manager, Business Process Re-engineering
Corporate Innovation Team
847.964.8973 (w)

**Trial Exh. 20441 Page 002**

████████ (c)
http://www.linkedin.com/in/wayneprince
"Daniel Young" <dyoung@theranos.com>

09/28/2010 06:08 PM

To <Wayne.Prince@Walgreens.com>
cc
Subject today's demo

Hi Wayne,

I hope the kickoff was a success and that the demo went smoothly for you.  We have noted that device 342 has had spotty reception since the change in location today and we are concerned that all the data may not get transferred from this afternoon.  Is it possible to power this device "on" again in the old location to ensure that all the data is transferred?  If so, please let me know when you plan to do this.

Thanks!

Daniel Young, PhD
Director, Theranos Operating System and Computational Biosciences
Theranos, Inc
3200 Hillview Avenue
Palo Alto, Ca  94304
650-470-6119

PRIVILEGED AND CONFIDENTIAL COMMUNICATION

IMPORTANT – This electronic transmission, and any files transmitted with it are confidential and/or legally privileged information. This information is intended solely for the use of the individual or entity to which it is addressed. Any disclosure, retransmission, reproduction, dissemination or other use of the contents of this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error, please contact us immediately and delete all copies. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments the recipient should check this email and any attachments for the presence of viruses. Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email. Our sole responsibility is limited to resupplying any affected attachments.
Theranos, Inc., 3200 Hillview Avenue, Palo Alto, CA, 94304
650-838-9292     www.theranos.com

**Trial Exh. 20441 Page 003**

FOIA Confidential Treatment Requested by Theranos                                                                 TS-0974880

# EXHIBIT 3

Message

| | |
|---|---|
| **From:** | Sunny Balwani [/O=THERANOS ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SBALWANI] |
| **Sent:** | 10/13/2010 3:39:29 PM |
| **To:** | Daniel Young [/o=theranos organization/ou=first administrative group/cn=recipients/cn=dyoung] |
| **Subject:** | Fwd: Hey, I just did a demo with a VIP and I need the results as soon as they are done. |

Fyi

Sent from my iPhone

Begin forwarded message:

> **From:** Jay.Rosan@Walgreens.com
> **Date:** October 13, 2010 5:49:07 AM PDT
> **To:** Sunny Balwani <sbalwani@theranos.com>
> **Subject: Re: Hey, I just did a demo with a VIP and I need the results as soon as they are done.**
>
> Sunny, that is great but there is still one that I have not received 347.101011.02
> Dr. Jay Rosan
> VP Health Innovation
> Walgreens
> 484-351-3020 o; ██████████
> jay.rosan@walgreens.com

| | |
|---|---|
| From: | Sunny Balwani <sbalwani@theranos.com> |
| To: | Jay Rosan <Jay.Rosan@Walgreens.com> |
| Date: | 10/12/2010 07:43 PM |
| Subject: | Re: Hey, I just did a demo with a VIP and I need the results as soon as they are done. |

---

Dr. jay.  We have automated this so now you don't need to send me emails for this.  Daniel gets automotified and once our CMO has looked over the results, you will get the results automatically.  If it doesn't work, you are always welcome to shoot me an email of course.

Thanks.

On 10/12/10 6:42 AM, "Jay Rosan" <Jay.Rosan@Walgreens.com> wrote:

Tx - how do we make this just automatic so that I don't have to bother you for results - I did another one later in the day.
Dr. Jay Rosan
VP Health Innovation
Walgreens
484-351-3020 o; ██████████c
jay.rosan@walgreens.com

FOIA Confidential Treatment Requested by Theranos
TS-1000250

From: Sunny Balwani <sbalwani@theranos.com>
To: Jay Rosan <Jay.Rosan@Walgreens.com>
Date: 10/11/2010 02:26 PM
Subject: RE: Hey, I just did a demo with a VIP and I need the results as soon as they are done.

Dr. Jay

Today's result was added to the attached summary.  PASSWORD unchanged.

Thanks.
SRB.

**From:** Sunny Balwani
**Sent:** Monday, October 11, 2010 10:42 AM
**To:** Daniel Young
**Cc:** Elizabeth Holmes
**Subject:** Fwd: Hey, I just did a demo with a VIP and I need the results as soon as they are done.

Daniel. Can u get the results and email  to me asap. Thanks

Sent from my iPhone

Begin forwarded message:

**From:** <mailto:Jay.Rosan@Walgreens.com <mailto:Jay.Rosan@Walgreens.com> >
Jay.Rosan@Walgreens.com <Jay.Rosan@Walgreens.com>
**Date:** October 11, 2010 7:22:35 AM PDT
**To:** Sunny Balwani <sbalwani@theranos.com <sbalwani@theranos.com> >
**Subject: Hey, I just did a demo with a VIP and I need the results as soon as they are done.**

I would tell you the name but that would not be right but it is one of the highest individuals in the company. He is
expecting me to walk in with the results within the hour.
J
Dr. Jay Rosan
VP Health Innovation
Walgreens
484-351-3020 o; ▮▮▮▮▮▮▮▮
jay.rosan@walgreens.com <jay.rosan@walgreens.com>


------ End of Forwarded Message[attachment "Demo Data 10-11-2010.pdf" deleted by Jay Rosan/Corp/Walgreens]

FOIA Confidential Treatment Requested by Theranos                                                                                          TS-1000251

# EXHIBIT 4

Message

| | |
|---|---|
| **From**: | Patty.Haworth@Walgreens.com [Patty.Haworth@Walgreens.com] |
| **Sent**: | 4/29/2011 6:41:34 PM |
| **To**: | Daniel Young [dyoung@theranos.com] |
| **CC**: | Jay.Rosan@Walgreens.com; Sunny Balwani [sbalwani@theranos.com] |
| **Subject**: | Re: Asthma Test - Patty Haworth |

No further questions.   Just wanted to make sure the device was working as expected.

Thank you for your quick response.

Patty

----- Original Message -----
From: Daniel Young [dyoung@theranos.com]
Sent: 04/29/2011 06:38 PM GMT
To: Patty Haworth
Cc: Jay Rosan; Sunny Balwani <sbalwani@theranos.com>
Subject: RE: Asthma Test - Patty Haworth

These data were sent to Dr. Jay on Tuesday.   Dr. Jay has confirmed that he received the data.

Please let me know if you have any further questions.

Thanks,
Daniel

-----Original Message-----
From: Patty.Haworth@Walgreens.com [mailto:Patty.Haworth@Walgreens.com]
Sent: Friday, April 29, 2011 11:37 AM
To: Daniel Young
Cc: Jay.Rosan@Walgreens.com; Sunny Balwani
Subject: Fw: Asthma Test - Patty Haworth

Hi Daniel.

Any news?  Thank you.

Patty

     ----- Original Message -----
     From: Jay Rosan
     Sent: 04/26/2011 10:24 PM EDT
     To: Daniel Young; PhD
     Cc: Patty Haworth
     Subject: Fw: Asthma Test - Patty Haworth Dan I did not get any results on this. Did you get this and
if not are you getting a heartbeat?

Dr. Jay Rosan
VP Health Innovation
Walgreens
484-351-3020 o;
jay.rosan@walgreens.com
----- Forwarded by Jay Rosan/Corp/Walgreens on 04/26/2011 10:23 PM -----

     From:       Patty Haworth/Corp/Walgreens

     To:         Jay Rosan/Corp/Walgreens@WALGREENS

     Cc:         Barbara Flohr/Corp/Walgreens@walgreens

**Trial Exh. 20442 Page 001**

Date:        04/22/2011 04:35 PM

Subject:     Asthma Test - Patty Haworth

Dr. Jay,

I just did a test on myself today to make sure the machine is still working.   The ID is 271.0422.01.   It
was the Asthma test.   My cell phone number is listed below.

Please let me know if you need additional information about this.

Thank you.

Patty Haworth
Program Manager, Corporate Innovation Team Walgreens
1415 Lake Cook Road MS L139
Deerfield, IL 60015
Phone: 847-964-8047

patty.haworth@walgreens.com

Consider the environment before printing this email.

**Trial Exh. 20442 Page 002**

FOIA Confidential Treatment Requested by Theranos                                                  TS-0969584

# EXHIBIT 5

FD-302 (Rev. 5-8-10)

- 1 of 11 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry      12/18/2019

 

DR. JAY ROSAN was interviewed at San Francisco United States Attorneys Office. United States Postal Inspection Service (USPIS) Postal Inspector Christopher McCollow was present for the interview. Additionally, Assistant United States Attorney (AUSA) Robert Leach was present in-person. AUSA Jeffrey Schenk was present via telephone.  Kristen Saywer and Stephen Sutro, Duane Morris, were present representing DR. ROSAN. After being advised of the identities of the interviewers and the nature of the interview, DR. ROSAN provided the following information:

DR. ROSAN graduated from Albright College for his undergraduate degree and the Philadelphia College of Medicine. DR. ROSAN was a Medical Doctor for family practice. DR. ROSAN practiced for about 15 years and then joined HMO Pennsylvania around 1982. DR. ROSAN worked there for 20 years. The company changed its name to US Healthcare. DR. ROSAN left when the company was purchased by Aetna. DR. ROSAN joined CHD Meridian Healthcare, a disease management company. Eventually the company began providing full healthcare centers for employees of companies. DR. ROSAN joined a new management team at the time.  The company was purchased by WALGREENS (WAG) in 2008 or 2009. DR. ROSAN became the Vice President of Health Innovation for WAG. DR. ROSAN worked on the innovation team with COLIN WATTS as the Chief of Innovation. WATTS worked at Campbells, Johnson and Johnson, and Weight Watchers either before or after WALGREENS. The innovation team was charged with looking at companies who were changing where healthcare was going in the future.

DR. ROSAN left WAG in 2014. He and the CEO of CHD formed Medovation to help startups primarily in the healthcare space. They were working with five companies.

DR. ROSAN's first engagement with THERANOS was in early 2010.

[Agent Note: *DR. ROSAN was shown documents Bates numbered THER-2436909 to*

---

Investigation on  09/20/2019  at  San Francisco, California, United States (In Person)

File #  318A-SF-7315857                          Date drafted  09/23/2019

by  CAMERON W W PURVES

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

US-REPORTS-0012950

318A-SF-7315857

Continuation of FD-302 of (U) Interview of Dr. Jay Rosan _____ , On 09/20/2019 , Page  8 of 11

[Agent Note: *DR. ROSAN was shown documents Bates numbered WAG-TH-DOJ-00006863 to WAG-TH_DOJ-00006864. This set of documents will be maintained in the 1A section of this case file.*]

DR. ROSAN wanted approval by the government before moving forward. DR. ROSAN did not think HOLMES was pushing back on this, but DR. ROSAN wanted to push forward. DR. ROSAN did not think HOLMES was saying government approval was not necessary. DR. ROSAN discussed lab developed tests (LDTs) with BALWANI and HOLMES. THERANOS was thinking of a rental model with SAFEWAY, but WALGREENS did not think that was a good idea.

[Agent Note: *DR. ROSAN was shown documents Bates numbered WAG-TH-DOJ-00000181 to WAG-TH_DOJ-00000210. This set of documents will be maintained in the 1A section of this case file.*]

Project Normandy was taking blood draws in store and testing them at a THERANOS location.

The slide on document Bates numbered WAG-TH-DOJ-00000189 was describing the process. The PSC was the patient side of the process. THERANOS was using their machines to run the tests. DR. ROSAN expected the tests were run on the THERANOS devices. The use of Siemens or similar machines would not have been in line with THERANOS' claims of more efficiency and higher quality machines.

WAG-TH-DOJ-00000209

DR. ROSAN had a THERANOS device in his office. Initially, DR. ROSAN had a prototype device and then received a second device to replace the first device. The second device seemed similar to the first device. DR. ROSAN never did comparison tests between the THERANOS device and competitors. The testing of WALGREENS executives was done on a THERANOS machine. DR. ROSAN never saw THERANOS financial statements. DR. ROSAN asked for them and saw other people ask for them, but he did not know if anybody from WALGREENS ever got them. HOLMES and BALWANI said they would provide the financial statements, but DR. ROSAN never got them.

[Agent Note: *DR. ROSAN was shown documents Bates numbered WAG-TH-DOJ-00000048 to WAG-TH_DOJ-00000085. This set of documents will be maintained in the 1A section of this case file.*]

# EXHIBIT 6

<pre>
 1                  UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4
     UNITED STATES OF AMERICA,      )
 5                                  )  CR-18-00258-EJD
                     PLAINTIFF,     )
 6                                  )  SAN JOSE, CALIFORNIA
                VS.                 )
 7                                  )  APRIL 15, 2022
     RAMESH "SUNNY" BALWANI,        )
 8                                  )  VOLUME 18
                     DEFENDANT.     )
 9   _____ )  PAGES 2725 - 2841

10

11               TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE EDWARD J. DAVILA
12                UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
15                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
16                         SAN JOSE, CALIFORNIA 95113

17                         BY:  ROBERT S. LEACH
                                KELLY VOLKAR
18                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
19
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
20
     OFFICIAL COURT REPORTER:
21                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
22

23      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER
24

25
</pre>

11:26AM 1     INTERVIEW WITH MS. WALSH A FEW MINUTES AGO?

11:26AM 2     A.   YES.

11:26AM 3     Q.   YOU TESTIFIED ON CROSS-EXAMINATION THAT, GENERALLY

11:26AM 4     SPEAKING, MS. HOLMES WAS THE FACE OF THE COMPANY; IS THAT

11:26AM 5     CORRECT?

11:26AM 6     A.   YES.

11:26AM 7     Q.   AND YOU WERE ALSO ASKED ABOUT WHETHER MR. BALWANI WAS

11:26AM 8     PRESENT FOR MS. HOLMES'S INTERVIEW FOR THIS ARTICLE.

11:27AM 9          DO YOU RECALL THAT?

11:27AM 10    A.   YES.

11:27AM 11    Q.   COULD I DIRECT YOUR ATTENTION TO PAGE 21 OF THAT ARTICLE,

11:27AM 12    THE TOP PARAGRAPH.  I'LL JUST ASK YOU TO LOOK IT OVER.  THE

11:27AM 13    PAGE NUMBERS ARE AT THE VERY BOTTOM.

11:27AM 14    A.   OKAY.  I SEE THAT.

11:27AM 15    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. BALWANI WAS

11:27AM 16    ALSO INTERVIEWED FOR THIS "FORTUNE" ARTICLE?

11:27AM 17    A.   YES.

11:27AM 18    Q.   OKAY.  YOU CAN PUT THAT ASIDE.  THANK YOU.

11:27AM 19         DO YOU RECALL DISCUSSING WITH MR. BALWANI'S COUNSEL THE

11:27AM 20    WALGREENS RELATIONSHIP AND THE FACT THAT WALGREENS APPARENTLY

11:27AM 21    HAD A THERANOS DEVICE IN ITS POSSESSION?

11:27AM 22    A.   YES.

11:27AM 23    Q.   DO YOU RECALL ANY OF THE DETAILS ABOUT WHEN THAT DEVICE

11:27AM 24    WAS PROVIDED TO WALGREENS OR FOR WHAT PURPOSE?

11:28AM 25    A.   I DON'T.

11:28AM 1    Q.   DO YOU KNOW, FOR EXAMPLE, WHETHER THAT DEVICE WAS CAPABLE

11:28AM 2    OF RUNNING ANY ASSAYS?

11:28AM 3    A.   NO.

11:28AM 4    Q.   DO YOU KNOW WHETHER THERANOS PROVIDED THE CARTRIDGES AND

11:28AM 5    REAGENTS THAT WOULD BE NECESSARY TO ACTUALLY USE THAT DEVICE AS

11:28AM 6    AN ANALYZER?

11:28AM 7    A.   I DON'T.

11:28AM 8    Q.   DO YOU KNOW WHETHER WALGREENS WAS PERMITTED TO EXAMINE THE

11:28AM 9    DEVICE, FOR EXAMPLE, TO OPEN IT UP AND LOOK AT THE COMPONENTS?

11:28AM 10   A.   I'M NOT AWARE OF THOSE SPECIFIC CONVERSATIONS, BUT I

11:28AM 11   ASSUME THAT THEY WOULD NOT BE ALLOWED TO DO THAT.

11:28AM 12   Q.   WHAT MAKES YOU ASSUME THAT THAT WOULDN'T BE PERMITTED?

11:28AM 13   A.   IN MY EXPERIENCE, NO ONE OUTSIDE OF THE COMPANY WAS

11:28AM 14   PERMITTED TO DO THAT.

11:28AM 15   Q.   SPEAKING OF THE COMPANY'S RELATIONSHIPS WITH OUTSIDE

11:29AM 16   PARTNERS, DO YOU RECALL DISCUSSING WITH MS. WALSH SOME OF THE

11:29AM 17   CONTACTS THAT THE COMPANY HAD WITH PHARMACEUTICAL COMPANIES?

11:29AM 18   A.   YES.

11:29AM 19   Q.   OKAY.  AND YOU WERE SHOWN SOME INSTANCES IN 2013 WHERE

11:29AM 20   THERE WERE EMAILS AND DISCUSSIONS ABOUT SOME POSSIBLE FUTURE

11:29AM 21   DEALINGS.

11:29AM 22       DO YOU RECALL THAT GENERALLY?

11:29AM 23   A.   YES.

11:29AM 24   Q.   SITTING HERE TODAY, DO YOU HAVE A RECOLLECTION OF ANY OF

11:29AM 25   THOSE CONTACTS ACTUALLY TURNING INTO REAL REVENUE GENERATING

```
11:57AM   1    Q.   AND SO TO THE EXTENT THAT HE WAS IN CHARGE OF THAT

11:57AM   2    CLINICAL LAB, IT WAS RELATED TO THE OPERATIONS; RIGHT?

11:57AM   3    A.   RIGHT.

11:57AM   4    Q.   THE GOVERNMENT ALSO ASKED YOU ABOUT THE DEVICE THAT WAS

11:57AM   5    SENT TO WALGREENS.

11:57AM   6         DO YOU REMEMBER THAT?

11:57AM   7    A.   YES.

11:57AM   8    Q.   AND WHETHER THE -- THAT DEVICE COULD RUN ASSAYS; RIGHT?

11:57AM   9    A.   RIGHT.

11:57AM   10   Q.   AND WHETHER WALGREENS HAD CARTRIDGES TO RUN THOSE ASSAYS;

11:57AM   11   RIGHT?

11:57AM   12   A.   RIGHT.

11:57AM   13   Q.   COULD WE PULL UP EXHIBIT 20550, WHICH IS IN EVIDENCE.

11:58AM   14        AND THIS IS AN EMAIL FROM YOU TO MR. BALWANI?

11:58AM   15   A.   RIGHT.

11:58AM   16   Q.   AND IN THE SECOND PARAGRAPH YOU SAY, "THERE ARE CURRENTLY

11:58AM   17   40 READERS IN THE FIELD FOR THE ABA TRIAL"; RIGHT?

11:58AM   18   A.   YES.

11:58AM   19   Q.   AND THIS IS THE EMAIL THAT CONTAINS THE STATEMENT ABOUT

11:58AM   20   WALGREENS HAVING ONE OF THOSE READERS; CORRECT?

11:58AM   21   A.   CORRECT.

11:58AM   22   Q.   AND A READER IS A DEVICE; RIGHT?

11:58AM   23   A.   RIGHT.

11:58AM   24   Q.   AND WITH REGARD TO THE 40 READERS IN THE FIELD FOR THE ABA

11:58AM   25   TRIAL, THEY ALL HAD CARTRIDGES; RIGHT?
```

```
11:58AM   1        A.   RIGHT.

11:58AM   2        Q.   AND THEY WERE ALL RUNNING TESTS; RIGHT?

11:58AM   3        A.   RIGHT.

11:58AM   4        Q.   AND SO DO YOU HAVE ANY REASON TO BELIEVE THAT THE DEVICE

11:58AM   5        THAT WALGREENS HAD, DID NOT HAVE CARTRIDGES?

11:58AM   6        A.   I DON'T KNOW.

11:58AM   7        Q.   AND DO YOU HAVE ANY REASON TO BELIEVE THAT IT COULD NOT

11:58AM   8        RUN TESTS?

11:58AM   9        A.   NO.

11:58AM  10        Q.   OKAY.

11:59AM  11                 MS. WALSH:  MAY I HAVE ONE MOMENT, YOUR HONOR?

11:59AM  12                 THE COURT:  YES.

11:59AM  13             (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

11:59AM  14                 MS. WALSH:  NO FURTHER QUESTIONS.

11:59AM  15                 THE COURT:  MR. BOSTIC?

11:59AM  16                 MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

11:59AM  17                 THE COURT:  MAY THIS WITNESS BE EXCUSED?

11:59AM  18                 MR. BOSTIC:  YES, YOUR HONOR.

11:59AM  19                 MS. WALSH:  YES, YOUR HONOR.

11:59AM  20                 THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU VERY

11:59AM  21        MUCH.

11:59AM  22                 THE WITNESS:  THANK YOU.

11:59AM  23                 THE COURT:  YOU CAN JUST LEAVE THE BINDERS THERE.

11:59AM  24        THEY'LL BE COLLECTED.

11:59AM  25                 LADIES AND GENTLEMEN, WE'LL TAKE OUR WEEKEND BREAK NOW.  I
```

1

2

3                        <u>CERTIFICATE OF REPORTER</u>

4

5

6

7         I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16                        _____
                         IRENE RODRIGUEZ, CSR, RMR, CRR

17                        CERTIFICATE NUMBER 8074

18

19                        DATED:  APRIL 15, 2022

20

21

22

23

24

25