JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:     (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**RAMESH "SUNNY" BALWANI'S REPLY IN SUPPORT OF MOTION TO ALLOW CROSS-EXAMINATION RELATING TO DR. ADAM ROSENDORFF'S POST-THERANOS EMPLOYMENT**<br><br>**Date:  April 19, 2022**<br>**Time:  8:30 a.m.**<br>**CTRM.: 4, 5th Floor**<br><br>**Hon. Edward J. Davila** |

## I.      INTRODUCTION

While busy arguing about whether Dr. Rosendorff actually is biased, the government misses the issue before the Court: whether Mr. Balwani may probe Dr. Rosendorff's potential bias during cross examination in the first place. Whether Dr. Rosendorff is actually biased is a question for the jury.

The response also overlooks the multifaceted nature of Dr. Rosendorff's bias. It focuses on certain possible sources of bias—like fear of sanctions in any particular investigation—to the exclusion of others—like Dr. Rosendorff's desire to protect his reputation in the lab industry through blaming Mr. Balwani and others. The three investigations raised in Mr. Balwani's motion could reasonably motivate Dr. Rosendorff to deflect blame away from himself, and the jury should be permitted to consider that motive in evaluating his credibility.

## II.     ARGUMENT

### A.      The Government Misstates The Facts Bearing On Dr. Rosendorff's Bias.

The government's response presents a one-sided version of events that downplays the potential effects on Dr. Rosendorff's testimony. As described below, the jury should decide what weight to give the evidence of bias. But should this Court find it necessary to weigh that evidence itself, it should reject the government's skewed facts.

***Invitae.*** As Mr. Balwani's motion explained, Dr. Rosendorff presided over lab errors at Invitae that resulted in his departure and the retesting of 50,000 patients, and Invitae is now the subject of a federal investigation. Dkt. 1401 at 1–2. The government tries to cast doubt on these events as a source of witness bias, but its factual claims are conspicuously thin. For example, the government asserts that its investigation into Invitae "may not even be related" to Dr. Rosendorff's role, Dkt. 1405 at 5, but of course only the government knows the answer to that question. And the government claims that it "has no documents from the time period of

Dr. Rosendorff's employment at Invitae," Dkt. 1405 at 4 (quoting Dkt. 1401-3 at 271), but it has refused to produce the subpoena it served on Invitae, Dkt. 1401-3 at 271. Nor does the government's vague statement rule out the possibility that the subpoena covers the time of Dr. Rosendorff's employment—but that Invitae simply has yet to respond to the subpoena. Given how easily the government could clarify that the ongoing investigation into Invitae does not concern Dr. Rosendorff, its failure to do so is telling.

The government also tries to downplay the severity of the problems at Invitae. *See* Dkt. 1405 at 4–5. But the 50,000-patient headcount was "likely a record high for such an error" in the industry. Dkt. 1077-5 at 2 (Robert Michel, "50,000 Patients to Retest After Invitae Finds Errors," *The Dark Report* (Aug. 28, 2017)). Contemporaneous industry reports described it as "a significant event for the clinical laboratory profession"; explained that inspectors would view it as "extraordinary for any laboratory to have performed inaccurate tests on 50,000 patients over 11 months," and predicted that "[p]athologists and lab administrators will watch closely to see if officials inspect the Invitae lab." *Id.* at 3–4.

**uBiome.**  Federal scrutiny also turned to uBiome, where Dr. Rosendorff served as lab director under founders who have since been indicted for fraud. Dkt. 1401 at 2. The government's response on uBiome relies entirely on its characterization of the criminal charges there as cabined to a "health-care *billing*-related fraud scheme." Dkt. 1405 at 6. But no matter how emphatically the government says this was about "billing," *id.* at 3, 6, the Court can see for itself: the allegations in the uBiome case touch on fraud that came squarely within the lab director's purview, like performing tests on patient samples that "had not been validated under CLIA standards" and "manipulating the dates of service" on lab tests. Indictment at ¶ 38, *United States v. Apte*, No. 3:21-cr-00116-CRB (N.D. Cal. filed Mar. 18, 2021), ECF No. 1. The indictment also alleges that uBiome validated and launched allegedly fraudulent products during Dr. Rosendorff's

time there, *id.* at ¶¶ 20, 44, and uBiome marketed lab tests that were not "medically necessary," *id.* at ¶ 38. Indeed, uBiome's laboratory directors are expressly discussed in the indictment: The two directors in place after Dr. Rosendorff expressed concerns about the practices they encountered—and then "left their roles shortly thereafter." *Id.* at ¶ 41. The uBiome founders likely could not have pulled off their alleged fraud, including allegedly falsifying the dates of tests, without help from their lab.

The government insists that Dr. Rosendorff was unaware of fraudulent practices at uBiome. Dkt. 1405 at 3–4. But a jury could easily disbelieve him. The laboratory director before Dr. Rosendorff knew, and he quit over it. *Id.* (citing 10/05/2021 Holmes Trial Tr. at 2566). The two laboratory directors in place after him knew, and they too left. *Apte* Indictment at 10–11. There is therefore good reason to believe that Dr. Rosendorff similarly knew of and oversaw those same concerning, allegedly fraudulent practices.

There is also good reason to believe that Dr. Rosendorff is concerned about the reputational effects of being tied to the investigations that plague his workplaces. The government points the Court to Dr. Rosendorff's LinkedIn page, Dkt. 1405 at 2 n.1, where he conspicuously makes no mention of uBiome, *see* https://www.linkedin.com/in/adam-rosendorff-5473a616.

**PerkinElmer.**  The government does not dispute that Dr. Rosendorff himself was served with three immediate-jeopardy notices pursuant to a Center for Medicare & Medicaid Services ("CMS") investigation into PerkinElmer. Dkt. 1401 at 2. Instead, it tries to downplay the investigation at PerkinElmer as "mostly related to 'document review and review of the L.I.S.' systems," and by explaining that CMS has "declined to impose sanctions" because PerkinElmer "corrected the identified deficiencies." Dkt. 1405 at 4 (quoting 10/05/2021 Holmes Trial Tr. at 2719). Dr. Rosendorff's description of the scope of the investigation is exceptionally vague; virtually all lab investigations involve document and database review. It also defies belief. As

1  Dr. Rosendorff well knows, the investigation looked specifically at whether *Dr. Rosendorff*

2  "failed to ensure quality assurance activities were established and maintained by the laboratory to

3  assure the quality of services provided, and to identify failures in quality as they occur" and

4  whether he "failed to ensure the laboratory staff demonstrated competency prior to reporting

5  patient test results." California Dep't of Pub. Health, *Statement of Deficiencies and Plan of*

6  *Correction* at 37 (Apr. 22, 2021).[1]

7         Despite the government's representations about the scope and conclusion of the

8  PerkinElmer investigation, the jury could conclude that Dr. Rosendorff is motivated to give

9  biased testimony to deflect attention and protect his professional reputation. Indeed, industry

10  reaction to the events at PerkinElmer was heightened in part *because* the government eventually

11  cleared the lab: "lab experts" described "clear[] contradict[ions]" between the investigation's

12  conclusions and the fact that PerkinElmer "failed to correct the deficiencies for at least nine

13  months … as they struggled to bring the lab into compliance while continuing to process patient

14  samples." *CBS13*, "Lab Experts Criticize State's Response to Risk of 'Serious Injury, Harm or

15  Death' at CA COVID Testing Lab" (Dec. 5, 2021).[2]

16      **B.  A Jury "Might Reasonably" Question Dr. Rosendorff's Bias.**

17         The foregoing evidence more than suffices to put these bias issues to the jury. In order to

18  do so, Mr. Balwani need only show that a potential source of bias "'might reasonably' lead a jury

19  to 'question[] the witness's reliability or credibility.'" *Gibbs v. Covello*, 996 F.3d 596, 601 (9th

20  Cir. 2021) (alteration in original) (quoting *Fowler v. Sacramento Cty. Sheriff's Dep't*, 421 F.3d

21  1027, 1036 (9th Cir. 2005)), *cert denied*, 142 S. Ct. 285 (2021), *and* 142 S. Ct. 453 (2021);

22

---

23  [1] https://www.cdph.ca.gov/Programs/OSPHLD/LFS/CDPH%20Document%20Library/VBL/
Complaint/State2567%20Complaint%20Investigation%20CDPH%20Branch%20Lab%20042220
21%20(002)_Redacted.pdf.

24  [2] https://gooddaysacramento.cbslocal.com/2021/12/05/experts-criticize-cdph-california-covid-
testing-lab-investigation/.

*accord Delaware v. Van Arsdall*, 475 U.S. 673, 679–80 (1986). And once that low "might reasonably" bar is met, the Ninth Circuit has held that further weighing of the evidence is the province of the jury. The jury gets to decide, for example, whether enough time has passed to quell any likely bias or whether incidents are similar enough to indicate witness fabrication. *See Fowler*, 421 F.3d at 1040–41 (reversing denial of habeas in light of "objectively unreasonable" exclusion of bias inquiry based on trial court's view of evidence that a "jury might reasonably have questioned"); *Greatreaks v. United States*, 211 F.2d 674, 676–77 (9th Cir. 1954) (reversing "unquestionably erro[neous]" exclusion of bias evidence based on passage of time, "a matter for the jury to weigh in performing their function of determining the credibility of the witnesses").

In practice, this standard is even lower than it sounds. In *United States v. Ray*, for example, the defendant alleged that a key witness was biased because that witness had an on-going drug business that would have colored his testimony in favor of the government. *United States v. Ray*, 731 F.2d 1361, 1363–64 (9th Cir. 1984). The Ninth Circuit reversed the district court's refusal of cross-examination into bias, rejecting government concerns about the supposedly insufficient evidence of bias offered by the defendant. *Id.* at 1364–65. As *Ray* explained, courts "can require the defendant to offer a threshold level of evidence," but that level is low: namely, whether the allegations of bias "have some grounding in reality." *Id.* at 1364. In *Ray*, that reality-grounding evidence took the form of a plane ticket from Lewiston, Idaho, to Boise, Idaho. *Id.* Based on that ticket alone, the defense should have been permitted to ask whether the witness traveled on to Florida to purchase cocaine—and it was reversible error to reject that questioning. *Id.* at 1364–65. "If the facts are material," the Court explained, and if there is "some grounding in reality," "the defendant has a right to present [those facts] to the jury." *Id.* at 1364.

Here, Mr. Balwani has offered far more than a connecting ticket stub. The evidence of

Dr. Rosendorff's bias is well documented and grounded in reality. Indeed, it is grounded largely

in the government's own documents and allegations. Because the jury might reasonably find

Dr. Rosendorff's testimony to be affected by that bias, the Court should allow cross-examination

aimed at eliciting that bias.

### C.      The Government Ignores Bias Arising From Reputational Concerns.

Nothing in the case law requires criminal exposure or a likelihood of prosecution in order

to inquire about bias. Mr. Balwani's motion offered prosecutorial pressure as just one of the

possible sources of witness bias. *See* Dkt. 1401 at 3–5. The government misquotes both the case

law and Mr. Balwani's brief, omitting the language underlined below to make it seem like a

looming prosecution is some kind of requirement:

| Balwani Motion, Dkt. 1401 at 4–5 | Government Response, Dkt. 1405 at 6 |
|---|---|
|  | Indeed, Defendant's own Motion acknowledges that |
| "The probative value of such evidence, however, depends in large measure on some showing that the government was contemplating prosecution, **or at least was aware, of the illegality**." | "[t]he probative value of such evidence [of a witness' bias], depends in large measure on some showing *that the government was contemplating prosecution*[.]" |

The case at issue, *United States v. Atherton*, was expressly dealing only with bias arising from

past criminal activity—not other reasons to curry favor with the government or other reputational

concerns. *See* 936 F.2d 728, 733–34 (2d Cir. 1991). And even then, the government misstates the

law. As the Supreme Court's canonical bias case *Abel* makes plain, potential sources of bias

include "fear of a party"—like fear of prosecution by the government here—but they also include

"the witness' self-interest." *United States v. Abel*, 469 U.S. 45, 52 (1984).

Here, Dr. Rosendorff has an obvious self-interest in protecting his reputation and in

deflecting attention to others, like Mr. Balwani. Unless he testifies that others were to blame,

Dr. Rosendorff and his reputation (in the lab industry he is still a part of) could reasonably be

1   questioned in these circumstances, where four different companies for which he served as lab

2   director were or are all under federal and state scrutiny. At the very least, a jury might reasonably

3   conclude as much. Accordingly, the jury should be permitted to evaluate that possible bias—"not

4   only the *fact* of bias but also … the *source* and *strength* of [his] bias." *Id.* at 54.

5       This also explains why the government is wrong that Dr. Rosendorff's prior, supposedly

6   consistent deposition testimony should assuage any concerns about bias in his trial testimony. *See*

7   Dkt. 1405 at 7. Although that 2019 testimony predated the Invitae subpoena and uBiome

8   indictment in 2021, it long post-dated the actual events at those labs and the specter of

9   reputational damage to Dr. Rosendorff. Moreover, Dr. Rosendorff's testimony has been anything

10  but consistent: at the Holmes trial, he gave testimony that was flatly inconsistent with the

11  deposition the government now points to as evidence of his reliability. *See, e.g.*, 10/05/2021

12  Holmes Trial Tr. at 2644–46. A jury could reasonably reject the government's consistent-

13  testimony theory; indeed, they could instead conclude that Dr. Rosendorff's inconsistencies are

14  explained by his bias.

15      **D.      Rules 608 And 403 Pose No Obstacle To Cross-Examination On Bias.**

16      Federal Rule of Evidence 608 poses no obstacle to inquiring about Dr. Rosendorff's bias

17  as Mr. Balwani proposes. Mr. Balwani does not seek to offer this bias evidence to establish

18  anything about Dr. Rosendorff's character or propensities. And as the Supreme Court has

19  expressly held, "[i]t [i]s enough that such evidence could properly be found admissible to show

20  bias"—it need not separately be admissible under Rule 608. *Abel*, 469 U.S. at 56; *accord* Fed. R.

21  Evid. 608 advisory committee notes (excluding "[e]vidence of bias or interest" from scope of

22  rule); *Ray*, 731 F.2d at 1364 ("Rule 608(b) does not bar introduction of evidence to show that the

23  witness is biased.").

24      Finally, the motion should be granted notwithstanding any concerns about time,

complexity, or confusion. As Mr. Balwani's motion explained, the proposed cross-examination can be accomplished in an efficient and focused manner. Dkt. 1401 at 6. And the Ninth Circuit has repeatedly reminded district courts that "unwarranted fear" about these considerations should yield to a criminal defendant's interest in "a full and fair opportunity to question" about bias. *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir. 1993). Juries are "routinely" asked to deliberate over "exceedingly complex factual and legal issues," including "evaluating allegations regarding prior, unrelated incidents" that may bear on the case at hand. *Fowler*, 421 F.3d at 1040. Given those competencies, time and confusion should pose no obstacle to examination into bias. *See id.* at 1041 ("Nor were the trial court's concerns about waste of time, confusion and prejudice sufficiently well-founded to justify precluding rather than limiting the cross-examination."). The government's appeal to Rule 403 ignores this long line of cases and focuses almost exclusively on the evidence the *government* "would need to" introduce—not the limited cross-examination Mr. Balwani proposes. Dkt. 1405 at 8. For example, only the government—not Mr. Balwani—raises the prospect of "detailed evidence" of the PerkinElmer investigation. *Id.*

Mr. Balwani has no interest in "mini-trials."  He simply wants the latitude, mandated by his Confrontation Clause rights, to examine Dr. Rosendorff regarding the bias created by his involvement with four different companies that all ended up under federal and state investigations, as well as his resulting need to deflect blame elsewhere. The precise details of the non-Theranos investigations are not even the point—it is the mere existence of those investigations and Dr. Rosendorff's connection with the companies that really matters. Mr. Balwani has a Sixth Amendment right to inquire into witness bias. Whether the government will try to mount a distracting mini-trial in response is a separate matter and can be dealt with appropriately.

1    **III.    CONCLUSION**

2          The Court should grant Mr. Balwani's motion and allow cross-examination of

3    Dr. Rosendorff about his post-Theranos employment and the related federal regulatory and

4    criminal inquiries.

5

6

7    DATED: April 18, 2022                          Respectfully submitted,

8                                                   ORRICK HERRINGTON & SUTCLIFFE LLP

9                                                   By:   */s/ Jeffrey B. Coopersmith*

10                                                        Jeffrey B. Coopersmith

                                                         Attorney for Defendant
11                                                       RAMESH "SUNNY" BALWANI

12

13

14

15

16

17

18

19

20

21

22

23

24