JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:	(415) 773-5700
Facsimile:	(415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**MR. BALWANI'S OPPOSITION TO THE GOVERNMENT'S MOTION TO EXCLUDE DEFENDANT'S LIS-RELATED TESTIMONY AND EVIDENCE BY RICHARD L. SONNIER, III**<br><br>Date:  May 20, 2022<br>Time:  8:15 a.m.<br>CTRM.: 4, 5th Floor<br><br>Hon. Edward J. Davila |

I.      INTRODUCTION

In the government's own words, Theranos' Laboratory Information System (LIS) was "the most comprehensive repository" of "all patient test results and all QC data" for "the three years that Theranos tested patients' blood." Dkt. 669 at 1–3. Yet the government failed to secure the LIS evidence before indicting Mr. Balwani based on the core allegation that Theranos' blood testing was systemically inaccurate and unreliable. The government claims that it was not at fault for failing to secure LIS. But Richard L. Sonnier III, Mr. Balwani's expert in SQL databases, data encryption, and data recovery, has concluded that the government could have secured the LIS evidence with little difficulty even long after Theranos disassembled the LIS architecture.

The government now asks the Court to exclude Mr. Sonnier's testimony and related LIS evidence as irrelevant and more prejudicial than probative. *See* Dkt. 1440. But controlling precedent holds that a defendant may challenge the quality and thoroughness of the government's criminal investigation. *See United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996) (abuse of discretion to exclude evidence that would enable defendant to "fully argue his sloppy investigation theory"); *see also Kyles v. Whitley*, 514 U.S. 419, 445–54 (1995); *United States v. Howell*, 231 F.3d 615, 624–27 (9th Cir. 2000). This evidence thus clears the low bar for relevance under Rule 401. *See United States v. Sager*, 227 F.3d 1138, 1145 (9th Cir. 2000) ("To tell the jury that it may assess the product of an investigation, but that it may not analyze the quality of the investigation that produced the product, illogically removes from the jury potentially relevant information.").

Any factual dispute over the government's fault for failing to secure the LIS evidence is for the jury to address. The Court's preliminary findings for the government when denying Mr. Balwani's motion to suppress, Dkt. 1326 at 34, do not control the admissibility of Mr. Balwani's evidence. *Compare United States v. Vasquez*, 858 F.2d 1387, 1391 (9th Cir. 1988) (trial court sits as finder of fact at suppression hearing and so can make credibility determinations) *with United States v. Evans*, 728 F.3d 953, 962–63 (9th Cir. 2013) (trial court cannot weigh credibility when assessing admissibility of evidence under Rules 104, 401, and 403). Nor do the government's other arguments undermine the relevance of Mr. Sonnier's

testimony. The government's litany of arguments—including that the LIS evidence is not independently exculpatory, that the government's investigatory communications are work product, and that Mr. Balwani could have obtained LIS himself—distracts from the simple logic that governs here: LIS contained reams of vital evidence, and Mr. Balwani has a good-faith basis to challenge the government's investigatory shortcomings in failing to procure it. To argue otherwise is like admitting that fingerprints blanketed a crime scene, but then insisting that *why* the government did not obtain those fingerprints—when its own agents advised it to—is irrelevant.

Mr. Sonnier's testimony and related evidence are relevant and admissible under Rules 104, 401, and 403. If Mr. Balwani presents a defense that opens the door to a rebuttal by the government, the Court should limit that rebuttal to evidence that actually rebuts Mr. Balwani's defense—not allow the government to reopen its case in chief. The Court should thus deny the government's motion to exclude LIS-related testimony and evidence offered by Mr. Sonnier.[1]

## II.   FACTS

The government's factual recitation is both incomplete and inaccurate. Nor does it bear on the admissibility of unrebutted expert testimony showing that the government could have accessed the LIS system, the LIS data, or both long after Theranos disassembled the system in August 2018. Mr. Balwani addresses key omissions and mistakes in the government's brief, however, to provide clarity for the Court.

**A.  Theranos' LIS System Houses a Comprehensive and Highly Functional Database of Patient Testing Data**

The government's case turns on the alleged systemic inaccuracy of Theranos' patient blood testing. So the central repository of all patient blood-testing data is necessarily crucial evidence.

---

[1] The parties have extensively briefed these issues, and Mr. Balwani incorporates those discussions, including all prior declarations, exhibits, and arguments, here. *See* Dkt. 1156 at 12–16, 62; Dkt. 1193 at 11–12; Mr. Balwani's April 28, 2021 Sealed Joinder to Ms. Holmes' Motion to Exclude Evidence of Anecdotal Test Results.

***The government's prior representations.*** Before Mr. Balwani put the loss of LIS before the jury, the government was not modest about the database's immense probative value:

> The LIS database "collected, among other things, *all patient test results and all QC data*. The database even flagged blood test results that might require immediate medical attention, and communicated this to the patient's physician. Laboratory specialists documented problems with blood tests in this database and updated the system when there were validation errors with a patient's test. For the three years that Theranos tested patients' blood, all of the data associated with these tests was stored in the LIS.

Dkt. 669 at 1 (emphasis added). The LIS provided the tools "to search for such *critical evidence* as all Theranos blood tests with validation errors." *Id.* (emphasis added). It also contained, according to the government, "*immense functionality*":

> The database was custom made and those who possessed 'backdoor' access to the SQL database could query the database to produce sophisticated results that explained what the data showed about Theranos's capabilities. For example, … it was possible to query the database in near-real time for any and all blood test results with validation errors.

*Id.* at 3 (emphasis added); *see also id.* at 2–3 (noting that the LIS contained "all patient tests results from approximately the time of Theranos's commercial launch in October 2013, through July 30, 2016" and stored all the "QC test results").

These are not Mr. Balwani's words—they are the government's.

The government's about-face in claiming now that the LIS "was not the critical piece of evidence Defendant asserts it to be," Dkt. 1440 at 4, is thus especially unconvincing. But the Court need not stop with the government's prior representations: it can also look to the government's own witness.

***Witness testimony.*** Dr. Adam Rosendorff, former lab director of Theranos, agreed that when inquiries came in from doctors or patients, he would "pull a whole lot of information from the LIS information system." 4/22/22 Trial Tr. at 3599. He "would see how the Theranos results had been trending, … how many are out of reference range … [and] do an investigation." *Id.* 3602–03. Through the LIS, he would confirm which type of device ran the test in question, the time and location of the blood draw, and substantial other information, including about quality control. *Id.* 3601–02.

When asked whether LIS was "at least one of the tools you used to resolve, when a

physician inquiry came in, what was going on and how you might respond to the physician," Dr. Rosendorff did not mince words: "Correct." *Id.* 3603. He gave the same answer when asked whether he used LIS data to help "determine whether you could tell the physician the test is valid or, you know, something else should be done or that sort of thing." *Id.*[2]

***Recent discovery.*** The government's efforts to downplay the significance of the LIS data also conflicts with information the government disclosed just this week. Former Theranos co-laboratory director Dr. Donald Tschirhart—who worked closely with Dr. Kingshuk Das—thought that Theranos' custom LIS database for its Edison data was "genius." Ex. 1 at 1. According to Dr. Tschirhart, assessing patient harm required assessing the patient and the testing data, as well as "quality control data." *Id.* That data was stored in Theranos' LIS. *Id.* at 2.

### B. Theranos Disassembles the LIS System Years After Mr. Balwani Leaves the Company

The government's chronology of the August 2018 decommissioning of the LIS servers does not affect Mr. Sonnier's bottom-line conclusion: the decommissioning made no difference to the government's ability to secure LIS.[3] But it also omits key details and twists others.

The parties agree that more than two years after Mr. Balwani left the company, Theranos' counsel gave the government a copy of the LIS database without an encryption key. Absent that key, the copy could not be opened. Four days later, on August 30, 2018, Theranos dismantled the architecture containing its LIS system. These facts are not in dispute.

But the defense strongly contests the government's unsupported theory that Mr. Balwani had some ability to halt this decision. *See* Dkt. 1440 at 13 (claiming that "Defendant through Mr. Chandrasekaran did not halt [LIS's] destruction."). The facts—long known to the

---

[2] The testimony of Ms. Cheung and Ms. Bennett cited in the government's motion does not affect Dr. Rosendorff's testimony. *See* Dkt. 1440 at 3. Ms. Cheung's testimony was that she was "uncertain" whether some information resided in LIS. And Ms. Bennett nowhere testified that she knew where Theranos personnel were pulling the information she requested from. In any event, none of this testimony affects the admissibility of evidence about the government's failure to secure key evidence.

[3] The government tries to implicate Mr. Balwani in the loss of LIS by noting that the SEC sent a preservation notice to Theranos while Mr. Balwani was still at the company in October 2015. *See, e.g.*, Dkt. 1440 at 4. But as the government knows, the disassembly happened in 2018, years after Mr. Balwani's departure. There is no evidence that Theranos took any steps affecting the ability to access LIS while Mr. Balwani was at the company.

government—show otherwise:

- Mr. Balwani's counsel emailed then-Theranos CEO David Taylor to note that Mr. Balwani would pay the costs for Mr. Chandrasekaran's time for obtaining "the LIS code" and that Mr. Chandrasekaran "may host the code and the database on a secured basis and … run reports as needed by us for the litigation." Ex. 2.

- Mr. Chandrasekaran testified under oath that he was engaged to "rebuild[] the entire application and the database and so on, so I said I will, and I reached out to [Theranos], and the initial conversation was, yeah, we'll actually start this process." Ex. 3 at 18:24–19:2. Mr. Chandrasekaran clarified that his goal was "not just rebuilding the database. It is rebuilding the entire system … all the applications and everything else." *Id.* at 20:14–19.

- Mr. Chandrasekaran told Mr. Caddenhead that he needed a copy of an LIS directory that housed the server binaries *before* Theranos disassembles the LIS architecture. Ex. 4.

- After an internal Theranos group asked Mr. Caddenhead and Mr. Chandrasekaran whether anything needed to be done with LIS before the system was taken offline, Mr. Caddenhead responded that he had "copied the directory. *All clear to shutdown*." Ex. 5 (emphasis added).

The government points to nothing showing that Mr. Balwani had any power to halt the disassembly of the LIS architecture, much less a legal duty to do so. Mr. Balwani tried to retain a consultant, Mr. Chandrasekaran, to obtain a working copy of the LIS, and when Mr. Chandrasekaran inquired of Theranos whether the LIS could be copied, he was told that it had been copied before the system was taken offline. Neither he nor Mr. Balwani had any reason to think the LIS database would be inaccessible thereafter.

**C. The Government Learns of Another Way to Secure the LIS Data But Fails to Pursue It**

Theranos' counsel warned the government in May 2018 that merely receiving a copy of the LIS data would not in and of itself be helpful, because the government "would not have the experience with the system to understand how to compile the data they wanted." Ex. 6. In October 2018, after Theranos had disassembled the LIS system, the government's own technical support personnel gave the government advice that closely tracks Mr. Sonnier's expert opinion:

> She suggested a possible route forward of pushing the producing party to see if the party could be persuaded to produce in a manner that can be viewed and processed in a standard way rather than an unspecified archive format the government could not access. She suggested encouraging the producing party to consider handing over its physical SQL server and setting it up in a workroom.

Dkt. 1158 at 49.[4] Mr. Sonnier agrees.

No matter the failures by Theranos to provide a working copy of LIS to the government, the government could have secured the critical evidence either before or long after the LIS architecture was disassembled. Had the government seized the servers and other hardware that housed the LIS system, or even the disk drives containing the databases, the "private encryption key *would not* have been necessary" to access the underlying data. Dkt. 1158 ¶ 11. The LIS hardware and disk drives were stored long after August 2018. *Id.* ¶ 20. Retrieving these items would have made it "a straightforward technical task to reassemble the LIS system, and no password for the private encryption key would have been needed." *Id.*

The government offers no contrary expert testimony. It claims instead that "Theranos' own employees at the time," with purportedly superior knowledge of LIS, have opined that reconstructing the system after its disassembly would be impracticable. Dkt. 1440 at 11. The government ignores, however, that the personnel it relies on—one employee and one consultant—nowhere claim to have the knowledge the government describes. Instead, Mr. Chung notes that he was a consultant hired in 2018 to help with shutting down Theranos and moving servers from the Newark facility. *See* Dkt. 1158 at 82. And Mr. Caddenhead described himself as "basically the last IT person at the company" and acknowledged that he was not part of the software group that managed the LIS system. *Id.* at 75, 78. Neither claims expertise or even deep familiarity with SQL databases or Theranos' LIS.

### III.     ARGUMENT

#### A.     Evidence of the Government's Failure to Procure LIS Is Relevant

Evidence of investigative shortcomings is relevant and admissible as a means of casting doubt on criminal allegations and the government's proof thereof. *E.g.*, Dkt. 1425 at 3–6; Dkt. 1431 at 1–5. Indeed, district courts in the Ninth Circuit abuse their discretion when they exclude evidence that would enable a defendant to "fully argue his sloppy investigation theory."

---

[4] She also suggested other alternatives not taken, including "checking with the FBI or other agencies to see if they have resources that can process large SQL database archives," and "identifying a vendor"—like Mr. Sonnier—"who could process the material." *Id.*

*United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996); *see also Kyles v. Whitley*, 514 U.S. 419, 445–54 (1995); *United States v. Howell*, 231 F.3d 615, 624–27 (9th Cir. 2000).

As the government has repeatedly proclaimed when convenient for its position, the LIS system and databases were "critical evidence" containing "all" patient test results and quality-control data. Dkt. 669 at 1. Under governing Ninth Circuit and Supreme Court case law, evidence that the government recklessly or negligently failed to obtain that critical evidence is admissible; it tends to cast doubt on the quality of the investigation as well as the quality of the government's proof. *See, e.g.*, *Kyles*, 514 U.S. at 445 (reversing conviction where withheld evidence "would have raised opportunities to attack not only the probative value of crucial physical evidence" but also the "thoroughness" of the investigation). And the evidence the government now seeks to exclude—Mr. Sonnier's testimony—cuts to the heart of these matters by helping to prove that the government could have obtained and reconstructed LIS even after it learned that its copy was unusable.

### B. The Government's Claims of Irrelevance Are Misplaced

The government makes several unpersuasive arguments to undermine the relevance of Mr. Sonnier's testimony. Specifically, it argues that Mr. Balwani's evidence showing the government's fault in failing to procure the LIS is irrelevant because: (1) it is outside the period of the charged conduct; (2) it is not independently exculpatory; (3) it is rebutted by evidence of the government's thorough investigation; (iv) it is not necessary to undermine the patient-fraud counts; (4) it is preempted by the Court's pretrial factual findings; (5) it implicates privileged work product; and (6) it represents evidence the defendant could have obtained more easily than the government. Each of these arguments is fundamentally flawed. None should preclude Mr. Balwani from presenting evidence about the government's reckless failure to obtain crucial evidence that could have supported or undermined the core allegations.

***Time Period.*** First, the government suggests that Mr. Sonnier's testimony and related evidence should be excluded because it relates to events that occurred after the charged conduct. *See* Dkt. 1440 at 8–9 (citing parties' MILs). But evidence about the government's investigation of alleged crimes often post-dates the charged conduct. If that made the evidence irrelevant, then a

defense of this kind could almost never be offered. *Cf. United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000) (it is "common" for "defense lawyers … to discredit the caliber of the investigation or the decision to charge the defendant" (quoting *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986))).

***Independent Exculpatory Value.*** Next, the government contends that the LIS-related evidence Mr. Balwani seeks to present is not fully exculpatory on its own. *See* Dkt. 1440 at 2–3 ("information within the LIS database, *alone*, could not demonstrate whether any given Theranos test result was accurate or inaccurate" (emphasis added)); *id.* at 9 ("the database was missing large swaths of data"). But the government misunderstands Mr. Balwani's argument and the binding precedent on which it rests.

To start, the government itself has previously acknowledged the immense probative value of the LIS data. *See, e.g.*, Dkt. 669 at 1, 3. To now argue that LIS "was not the critical piece of evidence Defendant asserts it to be," Dkt. 1440 at 4, is a complete about-face.

As for the law, evidence is exculpatory even if it does not "alone" prove a defendant's innocence; it need only be enough to raise a reasonable doubt in jurors' minds. *See Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (noting relevance of "[a]ny evidence that would tend to call the government's case into doubt"); *Sager*, 227 F.3d at 1145 ("Details of the investigatory process potentially affect[] … the weight to be given to evidence produced by [the government's] investigation."). A fingerprint found on a murder weapon, for instance, is not independently probative of guilt or innocence. But that does not make it irrelevant. It is one piece of evidence that, when combined with other data (like a fingerprint database or a suspect with matching fingerprints), is highly probative. Likewise, an LIS test result might need to be compared with other data or with the patient's records and testimony, but that does not make the result irrelevant. *See, e.g.*, 4/22/22 Trial Tr. at 35999 (Dr. Rosendorff used LIS as "one of the tools … to resolve" physician inquiries; he would "pull a whole lot of information from" the LIS, including aggregate data about "how the Theranos results had been trending" and targeted information, like which type of device ran a given test and the time and location of the blood draw). To hold otherwise would mean that the test results of patient-witnesses B.G., M.E., and E.T. should be excluded

because their accuracy or inaccuracy was not self-evident.

The government also misstates Mr. Balwani's burden. He need not show by a preponderance of evidence, or by any standard, that "data in the LIS would have been exculpatory." Dkt. 1440 at 9. All he needs to show is that Mr. Sonnier's testimony "has a[] tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Fed. R. Evid. 401. Mr. Balwani has carried that burden. The quality and thoroughness—or lack thereof—of the government's investigation is relevant when it could raise a reasonable doubt in the mind of a juror about whether the government has satisfied its burden. *See Milke*, 711 F.3d at 1012; *Sager*, 227 F.3d at 1145 (plain error where trial court "limited [the defendant's] attorney from proceeding with an inquiry into the quantitative investigation" and "curtail[ed] as irrelevant further examination into the investigatory details" after the attorney uncovered potential flaws in the investigation).

Here, the government alleges that Theranos' blood testing services were systemically inaccurate and unreliable. Mr. Sonnier will explain that the government conducted its investigation in a reckless, or at least negligent, manner by failing to procure the LIS despite being able to do so. Given the missing LIS evidence, the jury will face the kind of uncertainty that exemplifies reasonable doubt: the comprehensive LIS data would have proven or disproven systemic error. And Mr. Sonnier's testimony underscores that this doubt cuts in Mr. Balwani's favor. It tends to show that the LIS evidence was more probably exculpatory, because had it likely been inculpatory, the government would have taken the reasonable steps needed to secure it—especially after being told to do so by its own support staff. Mr. Sonnier's testimony thus tends to make a fact of immense consequence more probable, and at any rate it undermines the allegations at the core of the government's case.

**Government's Investigation.** Next, the government details evidence that supposedly supports the thoroughness of its investigation. *See* Dkt. 1440 at 4–5, 10. This too does not bear on the threshold admissibility question here.

First, the government implies—with no support—that Mr. Balwani is somehow connected to the disassembly of LIS. Even the incomplete story the government tells in its motion makes

1   that insinuation implausible. And the facts Mr. Balwani adds above dispel it entirely.

2   Second, none of these disputes makes Mr. Sonnier's testimony irrelevant. Theranos' own role in the loss of LIS—years after Mr. Balwani left the company—is fair game for the government to introduce to rebut Mr. Balwani's evidence. But this evidence does not make Mr. Sonnier's testimony irrelevant; it just gives the government fodder for cross-examination. *See United States v. Candoli*, 870 F.2d 496, 509 (9th Cir. 1989) ("[A] conflict in the evidence goes to the weight of [the evidence], not to its admissibility.").

The government also misstates the relevant standards. It suggests that "negligence is insufficient under the law for the relief Balwani seeks." Dkt. 1440 at 11 n.3 (citing Dkt. 1326 at 37). But it cites the Court's denial of Mr. Balwani's motion to suppress, which turned on different procedural and substantive standards. *See infra* at 11–12. And even if Mr. Balwani had to prove more than negligence—which is not needed to clear the low bar for relevance—a reasonable juror could conclude that the government was reckless in its LIS-related investigation. Recklessness requires "an awareness and conscious disregard of the risk." *United States v. Mendoza-Padilla*, 833 F.3d 1156, 1159 (9th Cir. 2016) (quoting *Fernandez v. Gonzales*, 466 F.3d 1121, 1130 (9th Cir. 2006) (en banc)). It was no secret that Theranos was shutting down. The government knew of and chose to disregard the risk that the LIS would be lost if it followed its chosen investigatory approach; it did not fail to perceive that risk. *See* Dkt. 1426 at 8–9 (emphases added) (discussing "[t]he government's internal *decision-making* about which alternative method to follow in attempting to obtain a working copy of the LIS after *it learned* the copy it was given was not functional" (emphasis added)).[5]

***Necessity of LIS Evidence.*** The government also points out that Ms. Holmes was

---

[5] The government erroneously claims that a showing of government negligence is not enough to justify a jury instruction on lost or missing evidence. Dkt. 1440 at 11 n.3 (citing Ninth Circuit model instruction § 3.19). While the Court need not address jury instructions now, the Ninth Circuit rejected the government's position in *United States v. Sivilla*, 714 F.3d 1168, 1171–74 (9th Cir. 2013) (vacating conviction for failure to grant adverse inference instruction when government *negligently* failed to preserve evidence). *Sivilla* is cited in the comment to the same jury instruction that the government cites—along with the express statement that "a showing of bad faith … is not required for a remedial jury instruction." Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit § 3.19 Comment.

- 10 -

OPPOSITION TO MOTION TO EXCLUDE LIS-RELATED
TESTIMONY & EVIDENCE BY SONNIER
CASE NO. CR-18-00258-EJD

acquitted on the patient-related fraud counts "despite neither side having access to the LIS database." Dkt. 1440 at 10. In its view, this shows that the availability of LIS "does not directly affect the outcome of the case," *id.*, and so is not necessary to Mr. Balwani's defense. But the government's failure to satisfy its burden of proof on the patient counts in the Holmes trial does not prove anything about her jury's views on LIS, let alone prove that the *reason for its absence* is irrelevant. The jury could have acquitted Ms. Holmes for many reasons, including because the government did not present systemic data about the accuracy or inaccuracy of testing results. Ms. Holmes' acquittal on the patient-fraud counts—secured without raising the defense Mr. Balwani has articulated—cannot limit Mr. Balwani's right to present evidence of his choosing. That is especially obvious when the reason for her acquittal could have been the government's failure to obtain and present LIS data—the very issue on which Mr. Balwani seeks to paint a fuller picture.

**Court's Pretrial Findings.** Next, the government clings to the Court's pretrial findings that Mr. Sonnier's testimony is "unconvincing," Dkt. 1440 at 1, and so the government's conduct after August 31, 2018 is "irrelevant," *id.* at 10. *See also id.* at 11 (reiterating Court's factual observation that Mr. Sonnier "had not spoken with any Theranos employees/agents with personal knowledge of the LIS to confirm his understanding").[6] In the government's view, the Court should "exercise its gate-keeping function under Rule 104(a)" and apply those same findings here. *Id.* at 10.[7]

That invites error. When the Court decides a motion to suppress, it sits as a preliminary

---

[6] The government also recites the Court's earlier belief that Mr. Sonnier's opinion "does not account for the 'encryption key [that] was permanently lost with the dismantling of the 'physical LIS equipment in August 2018." Dkt. 1440 at 13 (citing Dkt. 1326 at 36–37). But Mr. Sonnier's expert opinion is that no encryption key was ever necessary to reconstruct LIS. Dkt. 1158 at ¶¶ 11–13 ("The government's conclusion and assertion that it would have needed an encryption key after Theranos disassembled the LIS system … is incorrect, and reflects fundamental misunderstandings of the system and encryption"). Mr. Sonnier need not account for the loss of a key that, according to his expert analysis, was never needed to begin with.

[7] The government does not identify the conditional fact that it believes the Court must determine to make Mr. Sonnier's testimony relevant. Mr. Balwani assumes that the government means the Court must credit Mr. Sonnier's declaration—and find that the LIS data could have been accessed without the missing encryption key—to make the rest of his opinions and related evidence relevant. But that is precisely the kind of credibility finding prohibited under Rule 104.

trier of fact and can, when appropriate, make credibility findings in that posture. *See, e.g.*, *United States v. Vasquez*, 858 F.2d 1387, 1391 (9th Cir. 1988) ("Credibility determinations … are matters left to the trier of fact," and the court fulfills that role at a suppression hearing.). But in deciding whether evidence passes the minimal threshold for relevance under Rules 104 and 401, courts may not usurp the jury's authority. *See United States v. Evans*, 728 F.3d 953, 962 (9th Cir. 2013) ("[W]hen determining whether the party introducing evidence has introduced sufficient evidence to meet Rule 104(b), *the trial court neither weighs credibility* nor makes a finding that the party has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact by a preponderance of the evidence." (emphasis in original) (alterations and citation omitted)); Dkt. 1326 at 20–21 ("The Ninth Circuit has observed that there is a low bar for relevancy under Federal Rule of Evidence 401."). Even if, "after all the evidence on the issue is in, pro and con, the jury *could* reasonably conclude that fulfillment of the condition is not established [under Rule 104], the evidence is admitted, because the issue is for the jury." *Evans*, 728 F.2d at 962 (internal quotation marks and alterations omitted). Any tension between Mr. Sonnier's expert opinion and the lay opinions of Theranos' agents are for the jury to resolve.

   ***Work-Product Protection.*** The government next revives an argument it advanced in opposing Mr. Balwani's motion to compel LIS-related evidence: that the government's internal communications about how to obtain the LIS data is work product. *See* Dkt. 1440 at 11; Dkt. 1426 at 6–9. But that is no reason to exclude Mr. Sonnier's expert testimony, which relies on nonprivileged facts the government has already disclosed in its *Brady* letter.[8] Second, as Mr. Balwani explained in his motion to compel, the communications he seeks do not reflect the kind of "attorney[] mental impressions or legal theories" that give rise to work-product protection. Dkt. 1431 at 5–6 (quoting *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006)). Even if

---

[8] Whether or not the Court grants the government's present motion to exclude Mr. Sonnier's testimony, Mr. Balwani urges the Court to grant his motion to compel the communications underlying the government's summary *Brady* disclosures to-date. *See* Dkts. 1425, 1431. The government's *Brady* obligations do not turn on whether the evidence in question might ultimately be admissible at trial.

they did, the government waived that protection by disclosing the substance of its internal communications, including passages drawn verbatim from the purportedly privileged materials. *Id.* at 6 (citing *United States v. Sanmina Corp.*, 968 F.3d 1107, 1121–22 (9th Cir. 2020)).

The government also repeats its argument that defendants can criticize investigative decisions by law enforcement personnel but not by prosecutors. *See* Dkt. 1440 at 11–12 (discussing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)); Dkt. 1426 at 7–8 (same). This police-prosecutor distinction, however, is unfounded. The cases the government cites distinguish investigative and prosecutorial *functions*, not actors. *See Armstrong*, 517 U.S. at 464–65 (denying discovery related to defendant's selective-prosecution claim because it was aimed at a quintessential prosecution "function"—deciding whom to charge—not because it was aimed at prosecutors); *United States v. York*, No. 20-cr-00479, 2021 WL 2253832, at *2 (N.D. Cal. June 1, 2021) (rejecting the government's *Armstrong* argument where the requested discovery of U.S. Attorney records was not an "inquiry into the exercise of prosecutorial discretion"). Indeed, the Ninth Circuit has made clear that "the holding of *Armstrong* applies to the narrow issue of discovery in selective-prosecution cases," *United States v. Soto-Zuniga*, 837 F.3d 992, 1000–01 (9th Cir. 2016); it does not govern here. Instead, when prosecutors and DOJ staff exercise investigative functions—like those described in the government's *Brady* letter—they subject those actions to the same scrutiny that applies to law-enforcement investigators. *See United States Sellers*, 906 F.3d 848, 853 (9th Cir. 2018) (distinguishing between a prosecutor's protected deliberative "function[]" and "aspects of law enforcement operations," the latter of which "allow[s]" discovery).[9] The government asks the Court to shield its investigation from scrutiny because it delegated critical investigative tasks to a paralegal rather than an agent, but that is unsupported by the case law and invites misuse. The Court should reject the government's form-over-function analysis.

---

[9] The Ninth Circuit has applied the same functional analysis in the context of prosecutorial immunity, which is absolute with respect to "conduct insofar as it is 'intimately associated' with the judicial phase of the criminal process" but is "only qualified immunity" "when prosecutors perform administrative or investigative functions." *Botello v. Gammick*, 413 F.3d 971, 975–76 (9th Cir. 2005) ("That is, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor.").

The government also tries to discount on-point case law explaining that the quality of the government's investigation is exculpatory, material, and relevant. *See Kyles v. Whitley*, 514 U.S. 419, 445–54 (1995); *United States v. Howell*, 231 F.3d 615, 624–27 (9th Cir. 2000); *United States v. Crosby*; 75 F.3d 1343, 1347–48 (9th Cir. 1996). The government claims that none of these cases allowed a defense of the kind Mr. Balwani contemplates after finding "no bad faith on the part of the government." Dkt. 1440 at 12. The government is wrong in suggesting that bad faith is even a factor in the relevance analysis. In *Kyles*, the Supreme Court indicated that evidence concerning the investigation should have been disclosed—and could have been brought out at trial—if it merely concerned the "thoroughness" of the investigation. 514 U.S. at 445. The evidence *might* have been probative of the government's good faith, but that was by no means necessary to the Court's analysis. *Id.* at 437–38, 445. And in *Crosby*, the defendant was permitted to introduce evidence of the investigation's shortcomings without any inquiry into bad faith. 75 F.3d at 1347–48. On appeal, the Ninth Circuit concluded that the exclusion of other potentially exculpatory evidence at trial was reversible error, without ever suggesting that a showing of bad faith was required or even relevant; the evidence was admissible merely because it tended to "undermine the prosecutor's claim that a more thorough investigation would have turned up nothing of value." *Id.* at 1348.[10]

**Defendant's Inability To Obtain LIS.** Finally, the government points the finger at Mr. Balwani for *his* failure to procure LIS. Dkt. 1440 at 12–13. But even ignoring the government's twisting of the facts, the government's assertion is beside the point. The government—not Mr. Balwani—"bore the burden of investigating whether potentially exculpatory evidence existed." *United States v. Bruce*, 984 F.3d 884, 896 (9th Cir. 2021). The government contends that Mr. Balwani "should not be permitted at trial to create the misleading impression that the government had some greater obligation than he did to collect or reconstruct the LIS," Dkt. 1440 at 12. But that impression is not misleading; it's true. The government *does* have a greater obligation to collect and maintain evidence relevant to the charges. Criminal

---

[10] Even if bad faith is required for suppression of evidence, there is no support for applying such a requirement in the distinct relevance analysis.

defendants are not required to put on a defense at all, let alone to gather and preserve evidence that the government failed to obtain. *See United States v. Gomez-Gallardo*, 915 F.2d 553, 556 (9th Cir. 1990).

\* \* \*

None of the government's arguments dilutes the probative value of Mr. Sonnier's testimony and related LIS evidence. It directly challenges the government's failure to procure LIS, which in the government's own words, represents "the most comprehensive repository of patient data," Dkt. 669 at 2, in "a wire fraud case *about blood testing* … not a wire fraud case about cars [or] mortgage backed securities," 5/13/22 Trial Tr. at 5744 (emphasis added). This evidence is relevant and should be admitted.

### C.   Mr. Sonnier's Testimony and Related LIS Evidence Is Not Substantially Outweighed by Any Undue Confusion, Delay, or Prejudice

The government argues that Mr. Sonnier's testimony and related LIS evidence, if admitted, will give rise to a substantial "danger of misleading the jury, confusing the issues, wasting time and creating a mini-trial about LIS." Dkt. 1440 at 13. The government threatens to present "a large swath of potential rebuttal evidence" should Mr. Balwani present this defense. *Id.* at 14; *see id.* at 14–15 (including testimony by Dr. Kingshuk Das, customer complaint spreadsheets, expert testimony by Dr. Stephen Master, evidence of "all the other lawsuits filed against Theranos," any joint defense agreement between Mr. Balwani and Ms. Holmes, and more). But the narrow slice of expert testimony at issue—about whether a database could have been reconstructed—need not, and should not, trigger the parade of horribles the government warns of.

First, the government dramatically overstates the scope of the issues raised by Mr. Balwani's LIS defense. Some of the proposed rebuttal evidence may be permissible—like a witness offered to rebut Mr. Sonnier's expert testimony that it would have been possible to reconstruct LIS. *See* Dkt. 1440 at 14. But the government overreaches when it suggests that Mr. Balwani would be opening the door to testimony by other witnesses, like Drs. Das and Master, about Theranos' "ultimate decision that every patient tested on Theranos' proprietary

- 15 -

OPPOSITION TO MOTION TO EXCLUDE LIS-RELATED
TESTIMONY & EVIDENCE BY SONNIER
CASE NO. CR-18-00258-EJD

1   blood analyzer was at risk of harm." *Id.* at 14 (emphasis omitted). Nothing in Mr. Sonnier's
2   testimony—about the government's technical options for securing the LIS evidence—would
3   invite (or make relevant) evidence about a decision regarding patient results made by Theranos
4   years earlier.

5         Second, the Court has tools to avoid the mini-trial the government threatens. For example,
6   to rebut Mr. Sonnier's testimony about reconstructing LIS, the government says it would call
7   "*inter alia*, Michael Chung, Eric Caddenhead, John McChesney, Shekar Chandrasekaran, and
8   attorneys from [Wilmer Hale]" to testify on that same point. *Id.* Rule 403 can and should bar the
9   government from presenting five cumulative witnesses—at least one of them a lawyer—to rebut
10  Mr. Sonnier.[11] Much of the rest of the government's proposed evidence would be similarly
11  inadmissible. For the reasons already discussed, the government's proposed evidence about
12  Mr. Balwani's purported "opportunity … to obtain" LIS is irrelevant under Rule 401. Dkt. 1440
13  at 15. And putting any joint-defense agreement between co-defendants in front of the jury would
14  be a grave due-process violation in a trial that has correctly strived to avoid prejudice arising from
15  the concurrent prosecution of and allegations by Ms. Holmes.

16        At bottom, the expansive rebuttal case envisioned by the government should not preclude
17  Mr. Balwani from presenting a defense that challenges the government's failure to obtain critical
18  evidence. Rule "403 favors admissibility, while concomitantly providing the means of keeping
19  distracting evidence out of the trial." *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir.
20  2000). Evidence that the government recklessly or negligently failed to procure LIS—which, in
21  the government's own words, is "where the metaphorical bodies were buried," Dkt. 669 at 3—is
22  anything but a distraction. Nor is it cumulative, as the government contends. *See* Dkt. 1440 at 13.
23  Mr. Sonnier's focused testimony about the government's ability to access LIS has not been
24  presented in any form by Mr. Balwani. *See United States v. Miller*, 874 F.2d 1255, 1266 (9th
25  Cir. 1989) (excluding cumulative evidence where defendant had already "extensively explored

---

[11] Even if the Court allows the government to call five witnesses to testify that the government bears no responsibility for failing to procure the LIS, that is no reason to deny Mr. Balwani the right to present a defense that goes to the core issues in this case.

the quality of the [government's] investigation"). Rule 403 does not justify its exclusion.[12]

### D. Mr. Sonnier's Testimony Is Admissible Under Rule 702

The government's objection under Rule 702 poses no obstacle to Mr. Sonnier's testimony. The government does not contest any of the elements of Rule 702 other than helpfulness, conceding that Mr. Sonnier's testimony is offered by a qualified expert, is based on sufficient facts and data, employs reliable principles and methods, and reliably applies those principles and methods to the facts of the case. *See* Dkt. 1440 at 15; Fed. R. Evid. 702(a)–(d).

The only remaining issue, then, is whether the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). But the government's argument on this point merely regurgitates its position on relevance. *See* Dkt. 1440 at 15 ("Here, for the reasons described above, the expected testimony … is entirely irrelevant to the charges at issue."). The arguments therefore stand or fall together, and, for all the reasons just discussed, Mr. Sonnier's testimony is relevant to whether the government recklessly failed to procure critical evidence. A jury could reasonably doubt a claim of systemic error where the government could have, yet failed, to procure that evidence, and Mr. Sonnier will assist the jury in understanding that premise—i.e., that the government in fact could have procured the LIS evidence.

### E. The Government's Arguments About Disclosure Lack Merit

The government's assertion that Mr. Balwani has disclosed no documents or statements by any defense witness was wrong when the government filed its motion. Mr. Balwani disclosed the materials on which his proffered experts based on their opinions in November and December 2021. *See* Ex. 7; Ex. 8; Dkt. 1158; Dkt. 1179-2 at 15–48. And Mr. Balwani expressly identified Mr. Sonnier's filed declaration as a statement under Federal Rule of Criminal Procedure 26.2. *See* Dkt. 1179 at 14. The Rules expressly exempt from disclosure statements "made to the defendant,

---

[12] Much like its analysis under Rules 104 and 401, the Court may not exclude evidence under Rule 403 because it does not find the evidence credible. *See Evans*, 728 F.3d at 963 ("Weighing probative value against unfair prejudice … means probative value with respect to a material fact *if the evidence is believed*, not the degree the court finds it believable." (quoting *Bowden v. McKenna*, 600 F.2d 282, 284–85 (1st Cir. 1979) (emphasis in original))).

or the defendant's attorney or agent" by witnesses or prospective witnesses. Fed. R. Crim. P. 16(b)(2)(B). Mr. Balwani has thus complied with his disclosure obligations.

## IV.   CONCLUSION

Mr. Balwani asks that the Court deny the government's motion.

DATED: May 19, 2022                    Respectfully submitted,

                                        ORRICK HERRINGTON & SUTCLIFFE LLP

                                        By:   */s/ Jeffrey B. Coopersmith*
                                              Jeffrey B. Coopersmith

                                              Attorney for Defendant
                                              RAMESH "SUNNY" BALWANI