1  STEPHANIE M. HINDS (CABN 154284)
   United States Attorney
2
   THOMAS A. COLTHURST (CABN 99493)
3  Chief, Criminal Division

4  JEFF SCHENK (CABN 234355)
   JOHN C. BOSTIC (CABN 264367)
5  ROBERT S. LEACH (CABN 196191)
   KELLY I. VOLKAR (CABN 301377)
6  Assistant United States Attorneys

7       150 Almaden Boulevard, Suite 900
        San Jose, California 95113
8       Telephone: (408) 535-5061
        Fax: (408) 535-5066
9       Email: Robert.Leach@usdoj.gov

10  Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                   SAN JOSE DIVISION

14  UNITED STATES OF AMERICA,          )  Case No. 18-CR-00258 EJD
                                       )
15            Plaintiff,               )  DECLARATION OF ROBERT S. LEACH IN
                                       )  SUPPORT OF UNITED STATES' MOTION TO
16       v.                            )  EXCLUDE TESTIMONY FROM SCOTT
                                       )  WEINGUST
17  RAMESH "SUNNY" BALWANI,            )
                                       )  Date:  May 27, 2022
18            Defendant.               )  Time:  8:30 a.m.
                                       )  Court: Hon. Edward J. Davila
19  _____   )

20

21

22

23

24

25

26

27

28

1      I, Robert S. Leach, declare:

2      1.      I am an Assistant United States Attorney representing the United States of America, the

3  plaintiff in this case.

4      2.      Attached as Exhibit A is a letter from the defense dated November 12, 2021.

5      3.      Attached as Exhibit B is a letter from the defense dated December 3, 2021.

6      4.      Attached as Exhibit C is Defense Exhibit 27141.

7      5.      Attached as Exhibit D is Defense Exhibit 27137.

8      6.      Attached as Exhibit E is Defense Exhibit 27139.

9      I declare under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.

11      Executed this 23rd day of May 2022 in the Northern District of California.

12

13      */s/ Robert S. Leach*
        ROBERT S, LEACH
14      Assistant United States Attorney

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



November 12, 2021

<u>Via Email</u>

**Orrick, Herrington & Sutcliffe LLP**
701 Fifth Avenue
Suite 5600
Seattle, WA 98104-7097

+1 206 839 4300
**orrick.com**

**Jeffrey B Coopersmith**

**E** jcoopersmith@orrick.com
**D** +1 206 839 4339
**F** +1 206 839 4301

John C. Bostic, Esq.
Robert S. Leach, Esq.
Jeffrey B. Schenk, Esq.
Kelly I. Volkar, Esq.
Assistant United States Attorneys
United States Attorney's Office
Northern District of California
150 Almaden Blvd. Suite 900
San Jose, CA 95113

      Re:    <u>United States v. Ramesh "Sunny" Balwani</u>
              <u>No. CR-18-00258-EJD (N.D. Cal.)</u>

Dear Counsel:

Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C), the defense discloses the following expert witnesses who may testify at trial.

**<u>Xavier Oustalniol</u>**

      Xavier Oustalniol is a Partner with StoneTurn, a global advisory firm. Mr. Oustalniol is a Certified Public Accountant, Certified in Financial Forensics, and a Certified Insolvency and Restructuring Advisor. He has over 30 years of combined experience as an auditor, forensic accountant, and testifying accounting expert. Mr. Oustalniol's curriculum vitae is attached hereto as Exhibit A.

      Mr. Oustalniol may testify as an expert or summary witness regarding certain aspects of Theranos' books and records and financial statements, including educating the jury generally on Theranos' receipt and use of funds, investments, operating costs, expenses, and cash flows and cash positions.

      Mr. Oustalniol's testimony is based on his experience, his education, his review of materials and information produced by the parties in this action, and his review of publicly available materials.



**Richard Sonnier**

Richard L. Sonnier, III is the Founder, President, and Senior Systems Analyst for Nimble Services, LLC. Mr. Sonnier has over 29 years of experience working with many and varied computer platforms and network technologies. He has extensive, hands-on experience with the implementation, administration, troubleshooting, and recovery of large database systems, including Microsoft SQL systems. Mr. Sonnier has extensive experience with large database construction and management with Fortune 500 and other companies and government agencies, including with database security and encryption issues. Mr. Sonnier began his career at Litton Industries supporting a U.S. Navy contract creating a large database of warship design and support data. He became responsible for all aspects of that system, including the database, data storage, high-speed networking, imaging and scanning, and data visualization. Mr. Sonnier's curriculum vitae is available at http://nimbleservices.com/about/richardcv/.

Mr. Sonnier may testify as an expert with regard to the hardware and software structure and functionality of Theranos' Laboratory Information System ("LIS") that used Microsoft SQL systems. Mr. Sonnier may also provide expert testimony regarding the feasibility of restoring and/or accessing the LIS system or database before or after Theranos disassembled the LIS system and placed its components in storage at the end of August 2018.

Mr. Sonnier's testimony is based on his experience, his review of materials and information produced by the parties in this action, and his review of publicly available materials.

**Scott Weingust**

Scott Weingust is a Managing Director at Stout Risius Ross, LLC ("Stout") and the leader of its Intellectual Property ("IP") Valuation practice. Stout is a global investment bank and advisory firm specializing in corporate finance, valuation, financial disputes, and investigations. Mr. Weingust is also an adjunct professor at the DePaul University College of Law where he teaches a class on IP valuation. He has valued patent portfolios and/or trade secrets on more than 200 individual projects. Mr. Weingust was the Chair of the Valuation and Pricing Committee of the Licensing Executives Society (U.S. and Canada) —one of the leading IP professional organizations in the United States. Mr. Weingust has experience advising companies on best practices associated with trade secret protection and management programs including business practices and policies. His trade secret valuation projects require that he assess the extent and quality of clients' trade secret protection and management efforts as one issue that may affect value. Mr. Weingust's curriculum vitae is attached hereto as Exhibit B.

Mr. Weingust may testify as an industry expert regarding the valuation of Theranos's IP portfolio and its trade secret protection practices. Mr. Weingust may provide testimony educating the jury generally on the topics of IP valuation and trade secret protection. The defense anticipates that Mr. Weingust may testify about the value of Theranos's IP portfolio based on his expert review of IP valuations and other



related analyses conducted by other organizations.  The defense also expects Mr. Weingust may testify about the actions taken at Theranos to protect trade secrets and other confidential information.

Mr. Weingust's testimony is based on his experience, his education, his review of materials and information produced by the parties in this action, and his review of publicly available materials.

In addition to the foregoing, each witness may offer testimony and opinions responsive to the Government's evidence in its case-in-chief.  The defense reserves its right to call rebuttal witnesses to any expert who testifies as part of the Government's case-in-chief.

Sincerely,

Jeffrey B. Coopersmith

# Exhibit A



# Xavier Oustalniol
**CPA (CA, NY), CFF, CIRA**

**Partner**

**San Francisco**
One Sansome Street, Suite 700
San Francisco, CA 94104
T:  +1 415 848 7680
M:  +1 415 488 3599
E: xoustalniol@stoneturn.com

**Palo Alto**
228 Hamilton Avenue,
3rd Floor
Palo Alto, CA 94301

Xavier Oustalniol is a Partner with StoneTurn in San Francisco. He focuses on complex forensic accounting issues, fraud investigations and prevention, and anti-corruption matters, and provides consulting services regarding damages analysis, securities class action litigations, arbitrations, accountant malpractice and purchase price disputes, including providing expert testimony. Xavier currently leads the team assisting the Trustee, Claims Administrator and Claims Processor of the PG&E Fire Victim Trust with a range of complex economic and financial analyses related to tort claims, arising from the 2015 Butte Fire, 2017 North Bay Fires, and 2018 Camp Fire.

With over 30 years of combined experience as an auditor, forensic accountant and litigation consultant, Xavier has worked with clients across a wide range of industries, including FinTech, banks (mortgage, retail, investment), insurance companies, investment companies, and other securities broker / dealers, as well as automotive, aviation, real estate, technology, energy, food, luxury apparel, chemicals, electronic components, gaming, telecom, broadcasting, professional services partnerships (including law firms), leasing, consumer products, agricultural business, manufacturing and transportation. Xavier has also assisted clients including the government and public defenders dealing with Ponzi scheme issues, False Claims Act and Qui Tam cases.

## Education

Université Paris IX "Dauphine," Paris, "Maîtrise" in financial and accounting techniques (MSTCF), B.A./Masters

Economic Sciences, Associate Degree (DEUG Sciences Economiques)

## Practice Areas

Litigation

Investigations

Anti-Corruption

Expert Testimony

## Languages

French (fluent)



Xavier has testified as an accounting expert on the application of Generally Accepted Accounting Principles (GAAP) and other financial issues at trial, deposition and in arbitrations. He has authored expert reports, declarations and assisted with the preparation of experts for deposition and testimony. He also assisted counsel with deposition preparation of opposing experts and fact witnesses, and responses to Wells submissions.

He has assisted clients (debtors, creditors, trustees) in a number of bankruptcy-related litigations (including Enron, Lehman, Washington Mutual) and other accounting investigations, including during settlement negotiations and mediation.

Xavier has directed complex forensic accounting investigations for boards where regulators such as the U.S. Securities and Exchange Commission (SEC), U.S. Department of Justice (DOJ) and the Financial Industry Regulatory Authority (FINRA) were involved. He consulted on other cross-border disputes before the International Centre for Settlement of Investment Disputes (ICSID), the American Arbitration Association (AAA) and the International Chamber of Commerce (ICC), involving companies in Europe, South and Central America and Japan.

Prior to joining StoneTurn, Xavier was with Alvarez & Marsal, where he served as a Managing Director in the firm's Global Forensic and Dispute Services practice in San Francisco. Previously, he was with two other global professional services firms. He began his career as an auditor with Deloitte.

Xavier is a Certified Public Accountant (licensed in California and New York), Certified in Financial Forensics and a Certified Insolvency and Restructuring Advisor. He is fluent in French.

## PUBLICATIONS / PRESENTATIONS / PODCAST

- "Why Robust Due Diligence is Critical to Assessing an Entity's Financial Health Post-COVID-19 and Bankruptcy Update: Mass Tort Cases" — Pocket MBA — Practising Law Institute, San Francisco (September 2021)

- *StoneTurn Podcast* - Leading the Way – The Fintech Disruptor: Varo Bank (August 31, 2021)

- "Evaluating the Financial Health of an Entity" — Pocket MBA — Practising Law Institute, San Francisco (September 21, 2020)

- "Financial Statements in Practice: A Case Study" — Pocket MBA — Practising Law Institute, San Francisco (September 21, 2020)

- *How the World's Largest Economies Are Addressing Insolvency in Wake of the Pandemic*, Practising Law Institute's Pocket MBA 2020 Coursebook (September 2020 — co-authored with E. Goodman)

- "Regulatory and Legal Compliance in International Business and Trade" - Pocket MBA – Practising Law Institute, San Francisco (September 24, 2019)

- "The Practical Who, What, When, Why and How's of Third Party Due Diligence & Monitoring' – Annual Compliance & Ethics Institute, National Harbor, MD (September 15, 2019)



- "Will DPAs travel across the Atlantic - What will they look like in Europe?" — Dow Jones Risk & Compliance Webinar (March 22, 2019)

- *Global Trends in Enforcement Actions*, PLI (October 2018 – co-authored with Catherine E. Moreno and Ziwei Xiao of Wilson Sonsini Goodrich & Rosati and Kimberly Ratto of StoneTurn)

- "Foreign Agents, Partners & Intermediaries: You Can't Live With Them, But You Can't Live Without Them" — 17th Annual Compliance & Ethics Institute, Las Vegas, NV (October 23, 2018)

- "Regulatory and Legal Compliance in International Business and Trade" — PLI Pocket MBA (October 2, 2018)

- *French Enforcement Actions Under Sapin II*, The FCPA Blog (March 2018)

- "One Year Later: French Anti-Corruption Law (Sapin II) Update" — Securities Docket Webinar (February 27, 2018)

- *Know Your Customer vs. Know Your Intermediary*, Compliance Week (December 2017 – co-authored with S. Neuman)

- "Foreign Agents, Partners & Intermediaries: You Can't Live with Them, but You Can't Live Without Them" — 16th Annual Compliance & Ethics Institute, Las Vegas, NV (October 15, 2017)

- *Comply Now: Six Regulatory Considerations for CUs and Fintechs*, Credit Union Times (June 2017 – co-authored with J. Ahmad)

- *First Look at the Whistleblower Provisions in the New French Anti-Corruption Law*, The FCPA Blog (November 2016)

- *Five Ways to Prepare for the New French Anti-Corruption Law*, The FCPA Blog (July 2016)

- "Doing Business Ethically in Africa: Success Stories and Challenges" — ABA Section of International Law, Montreal, Canada (October 21, 2015)

- "What You Should Know About Social Media and Digital Forensics, and Were Always Afraid to Ask" — Lycée Français de San Francisco (April 30, 2015)

- "Key Issues Facing Boards of Directors: Risks to Multinational Companies Arising from the U.S. Foreign Corrupt Practices Act" — Directors Roundtable, San Francisco and Menlo Park (July 16, 2013)

- "Continuous Control Monitoring to Increase FCPA Compliance Program Effectiveness" — MetricStream Webinar (May 14, 2013)

- "How to Work With / Against an Expert - an Expert Perspective" — Reed Smith LLP, San Francisco (November 5, 2012)

- "Unifying Compliance, Audit and Risk and Eliminating Silos" — Panel Discussion, Governance, Risk & Compliance Forums: Chicago (September 2012) and Dallas (October 2012)



- "Leveraging Your Existing Compliance Program to Address Specific Anti-Corruption and AML Requirements" — Governance, Risk & Compliance Forums: Chicago (September 2012) and Dallas (October 2012)

- "Fraud Risk Readiness in Financial Institutions – Designing a Risk Framework that Works and … Executing" — The Compliance Conversation: AML & Anti-Corruption Event: Thomson Reuters, San Francisco (June 2012)

- "What You Need to Know About FRCP 26 and the UK Bribery Act" — Nixon Peabody, San Francisco (May 2011)

## PROFESSIONAL AFFILIATIONS / OTHER

- Certified Public Accountant (CPA), Licensed in California and New York
- Certified in Financial Forensics (CFF)
- Certified Insolvency and Restructuring Advisor (CIRA)
- Member, American Institute of Certified Public Accountants (AICPA)
- Member, Association of Insolvency and Restructuring Advisors (AIRA)

## PREVIOUS EXPERIENCE

- Alvarez & Marsal Global Forensic and Dispute Services, LLC
- Aon Consulting
- Kroll Zolfo Cooper
- Deloitte & Touche



## EXPERT TESTIMONY EXPERIENCE

### Trial / Arbitration / Witness Statement

- Hope Solo v. United States Soccer Federation, Inc. – *March 2021*
- Certain Magnetic Data Storage Tapes and Cartridges Containing the Same (Fujifilm v. Sony) –– Investigation No. 337-TA-1012 – Witness Statement Submitted *February 2019* (*International Trade Commission*)
- Liberty Media Corporation, LMC Capital LLC, Liberty Programming Company LLC, LMC USA VI, Inc., LMC USA VII, Inc., LMC USA VIII, Inc., LMC USA X, Inc., Liberty HSN LLC Holdings, Inc., and Liberty Media International, Inc., Plaintiffs, v. Vivendi Universal, S.A., Jean-Marie Messier, Guillaume Hannezo, and Universal Studios, Inc., Defendants. (Case No. 03 Civ. 2175 (SAS)) – *May 2012 (Federal Court) – Jury trial – [designated expert in attendance]*
- Southlake Dodge v. Chrysler – *June 2010 (AAA Arbitration)*
- Larson Automotive Holdings v. Chrysler – *June 2010 [designated expert in attendance] (AAA Arbitration)*
- Livermore Auto Group v. Chrysler – *May 2010 (AAA Arbitration)*
- In re: Vivendi Universal, S.A. Securities litigation (Case No. 02 Civ. 5571 (RJH/HBP)) – *November 2009 (Federal Court - Jury trial)*

### Depositions

- Certain Magnetic Data Storage Tapes and Cartridges Containing the Same (Fujifilm v. Sony) –– Investigation No. 337-TA-1012 – *February 2019* (*International Trade Commission*)
- In re: Vivendi Universal, S.A. Securities litigation (Case No. 02 Civ. 5571 (RJH/HBP)) – *March 2008 – Report Submitted /* Liberty Media Corporation et al. v. Vivendi Universal, S.A. Jean-Marie Messier, Guillaume Hannezo, and Universal Studios, Inc. (Case No. 03 CV 2175 (RJH/HBP)) – *March 2008*

### Expert Designations / Declarations

- State of Nevada, Ex Rel. Commissioner of Insurance Barbara D. Richardson, in her capacity as Receiver for Nevada Health CO-OP v. Unite Here Health, Nevada Health Solutions et al. – *Designated Expert*
- Hope Solo v. United States Soccer Federation, Inc. – Declaration Filed (February 2021)
- PG&E and Pacific Gas and Electric Company – Chapter 11 (Bankruptcy Case No. 19-30088) – Declaration filed
- PriceWaterhouseCoopers LLP v. Burrill Life Sciences Capital Fund III, L.P. (Case No. CGC-15-546718) – Affidavit submitted – *May 2016*
- United States of America v. Doris E. Nelson (Case No. 11-CR-00159-RHW) – *Designated Expert – March 2014 (Criminal Action) – Report Submitted*
- Manning v. Parisis (Case No. 510186 – CA) – *Designated Expert – May 2013*



- BP Exploration & Production, Inc. and BP America Production Company v. *DEEPWATER HORIZON* Court Supervised Settlement Program et al. (Case 2:13-cv-00492) – *Declaration Submitted - 2013*
- William G. Stewart and Nancy Stewart v. BAC Home Loans Servicing, LP (Case No. CV 3:10-cv-01225-SI) Northern District of California – *Report Submitted - 2012*
- Liberty Media Corporation et al. v. Vivendi Universal, S.A. Jean-Marie Messier, Guillaume Hannezo, and Universal Studios, Inc. (Case No. 03 CV 2175 (RJH/HBP)) – *June 2012 – Report Submitted*
- In re: Alstom, S.A. Securities litigation (Case No. 03 CV 6595(VM)) – *Report Submitted - 2009*



# Exhibit B

# Scott Weingust
Managing Director
**Intellectual Property Valuation Expert**





**Chicago, IL USA**
**Office:** +1.312.752.3388
**Mobile:** +1.312.420.7288
sweingust@stout.com

## Education

B.A., Economics
University of Wisconsin - Madison

B.A., International Relations
University of Wisconsin – Madison

Certificate in International Business Studies
University of Wisconsin – Madison School of Business, Center for International Business Studies

## Industry Focus

Aerospace, Defense & Transportation
Automotive
Business Services
Consumer, Retail, Food & Beverage
Diversified Industrials
Energy & Utilities
Healthcare & Life Sciences
Pharmaceuticals & Biotechnology
Technology, Media & Telecommunications

## Practice Areas

Intellectual Property Valuation
Intellectual Property Transactions
Intellectual Property Disputes
Bankruptcy
Corporate Tax
Financial Reporting
Trusts & Estates
Complex Business Litigation

Scott Weingust is the leader of Stout's Intellectual Property Valuation practice. Mr. Weingust has approximately 25 years of experience providing consulting services to corporations, law firms, universities, and investment firms primarily in the areas of intellectual property (IP) valuation, damages, monetization, and management. His practice focuses on patents, trademarks, copyrights, trade secrets, the right of publicity, software, domain names, and other intangible assets.

Mr. Weingust has provided testimony as a damages and valuation expert in IP-related litigation including having offered opinions in Federal District Court. He has testified on a variety of dispute matters including those with claims associated with patent infringement, trade secret misappropriation, fraudulent transfer, breach of contract, and others. Mr. Weingust has also led project teams on a variety of pre-case and early-case assessments of IP-related damages to assist with decisions related to whether a case should be filed and/or financed, and to support dispute resolution efforts.

Mr. Weingust has performed due diligence and valued IP and other intangible assets for a variety of purposes including: transactions (licensing, purchase/sale, joint ventures, mergers and acquisitions), tax strategy and compliance (related-party transactions, trust & estate issues), corporate strategic decision-making, use of intellectual property to attract capital (debt and equity financing), financial reporting, regulatory compliance (Stark Law, Anti-Kickback Statute), and bankruptcy, among others. He has been directly involved in IP licensing negotiations and has developed many reusable IP pricing/valuation models for corporate licensing activities and investment decisions.

Mr. Weingust is currently an adjunct professor at DePaul University's College of Law where he teaches a course on IP valuation. He has also previously taught classes on IP valuation and related topics at the New York University School of Law, The John Marshall Law School, the University of Illinois at Chicago's College of Engineering, and the Illinois Institute of Technology's Chicago-Kent College of Law. Mr. Weingust has spoken at conferences or other events for many organizations including the Intellectual Property Owners Association (IPO), Licensing Executives Society (LES), American Bar Association (ABA), American Intellectual Property Law Association (AIPLA), and the Intellectual Property Law Association of Chicago (IPLAC), among others.

Prior to joining Stout, Mr. Weingust worked in the Intellectual Property groups at FTI Consulting and Deloitte.

### Recognition

- Recognized as one of the world's leading IP strategists as part of the *IAM Strategy 300* from 2017 to 2021
- Recognized as one of the world's leading patent professionals as part of the *IAM Patent 1000* from 2020 to 2021

### Professional Memberships

- Intellectual Property Owners Association (IPO) – Past Secretary of the Corporate IP Management Committee
- Licensing Executives Society (LES) – Past Chair of the Valuation & Pricing Committee
- National Association of Certified Valuators and Analysts (NACVA)
- American Intellectual Property Law Association (AIPLA)


## Trial Testimony Experience

Rodney D. Tow, Chapter 7 Trustee of AmeriSciences, L.P. v. Organo Gold Int'l, Inc., et al., U.S. District Court, Southern District of Texas, Houston Division, May 2018

Pearl Software, Inc. and Helios Software, LLC v. SpectorSoft Corporation, U.S. District Court, District of Delaware, June 2015

## Written and Deposition Testimony Experience

Timothy McTighe, LLC v. Signature Life Sciences, LLC and Signature Orthopaedics, Pty., Ltd., United States District Court, Northern District of Ohio, Eastern Division, 2021 (Expert Report and Deposition Testimony) (Breach of contract and fraudulent inducement; valuation of a patent holding company with assets related to hip implant technology)

In re: The Marriage of Janice LeVan and Kurtis LeVan, In the Lake Superior Court, State of Indiana, County of Lake, 2021 (Expert Reports) (Marriage dissolution; valuation of certain trademarks and patents used in the construction industry)

In re: The Marriage of Michael C. Callans and Judy A. Callans, In the Circuit Court of Cook County, Illinois, County Department – Domestic Relations Division, 2021 (Expert Report) (Marriage dissolution; valuation of a domain name)

In re: Media Operations Liquidating Company, LLC f/k/a Ebony Media Operations, LLC, et al., U.S. Bankruptcy Court, Southern District of Texas, Houston Division, 2021 (Expert Report) (Dispute regarding the value of certain collateral securing notes provided to the debtors; valuation of copyrights associated with issues of *Ebony* and *Jet* magazines)

In re: Amit Bhalla, China Central Television, et al., v. Amit Bhalla and Rena Mehta Bhalla, U.S. Bankruptcy Court, Middle District of Florida, Tampa Division, 2020 (Expert Report) (Fraudulent transfers and/or fraudulent asset conversions; valuation of trademark infringement and copyright infringement monetary remedies associated with certain Chinese-language television programming)

True Chemical Solutions, LLC v. Performance Chemical Company, U.S. District Court, Western District of Texas, Midland–Odessa Division, 2020 (Expert Report and Deposition Testimony) (Patent infringement; damages related to trailers used to pump chemicals used in fracking for the oil and gas industry)

(1) Surgicraft Limited (in Compulsory Liquidation), (2) Peter Saville, (3) Anne O'Keefe ((2) and (3) as Joint Liquidators of Surgicraft Limited) and (1) Centinel Spine Inc (2) John Viscogliosi (3) Anthony Viscogliosi, High Court of Justice of England, 2017 (Expert Response, Expert Reply Response, and Mediation Participation) (Undervalue transactions; valuation of U.S. and U.K. trademarks and patent applications related to spinal implant technology and products)

Cecci Gori Pictures and Cecchi Gori USA, Inc. v. G&G Productions, LLC, Gabriele Israilovici, Giovanni Nappi, Vittorio Cecchi Gori, et al., U.S. Bankruptcy Court, Northern District of California, San Jose Division, 2017 (Expert Report) (Fraudulent transfer; valuation of copyrighted movie scripts)

Rodney D. Tow, Chapter 7 Trustee of AmeriSciences, L.P. v. Organo Gold Int'l, Inc., et al., U.S. District Court, Southern District of Texas, Houston Division, 2017 (Expert Report and Rebuttal Expert Report) (Fraudulent transfer and trade secret misappropriation; valuation of a multi-level marketing distributor network)


Samson Lift Technologies LLC v. Jerr-Dan Corporation and Oshkosh Corporation, Supreme Court of the State of New York, New York County, 2014 (Rebuttal Expert Report and Deposition Testimony) (Breach of contract; valuation of alleged lost patent protections related to automotive towing vehicle technology)

Pearl Software, Inc. and Helios Software, LLC v. Awareness Technologies, Inc. and Remote Computer Observation & Monitoring, LLC d/b/a Remote.com, U.S. District Court, District of Delaware, 2013-2014 (Expert Report, Reply Expert Report, and Deposition Testimony) (Patent infringement; damages related to computer monitoring software)

Pearl Software, Inc. and Helios Software, LLC v. SpectorSoft Corporation, U.S. District Court, District of Delaware, 2013-2014 (Expert Report, Reply Expert Report, Supplemental Expert Report, and Deposition Testimony) (Patent infringement; damages related to computer monitoring software)

Climb Tech, LLC and K.E. Guthrie & J.D. Schwartz Designs, LLC v. Gene Verble, Darrell Hagler, Eric W. Reeves, and Valcor Industries, LLC, U.S. District Court, Western District of Texas, Austin Division, 2008 (Expert Report and Deposition Testimony) (Patent infringement, trade secret misappropriation, breach of contract, tortious interference, and unfair competition; damages related to fall protection equipment technology)

## Publications

"Diving Below the Surface: Challenges with Determining FRAND Royalty Terms for SEPs Using the 'Top-Down Method,'" Intellectual Property Magazine, July/August 2021

"Michael Jackson's Estate Moonwalks Past the IRS in Tax Court Battle," www.stout.com, May 20, 2021

"Insights from Intellectual Property Expert David Kappos," *The Journal*, Fall/Winter 2019

"Methods for Determining FRAND Licensing Terms for SEPs," *The Journal*, Spring/Summer 2019

"Selecting Discount Rates for Valuing Early-Stage Intellectual Property," *The Journal*, Spring/Summer 2018

"Takeaways from Ericsson v. D-Link, et al.," www.stout.com, April 17, 2018

"Chloe Kim's Right of Publicity: The Value of Gold," www.stout.com, February 21, 2018 and Law360, February 23, 2018

"Setting the Standard for Intellectual Property: Insights From Bill Elkington," *The Journal,* Fall/Winter 2017

"Tricks of the Trade(mark): An Introduction to Trademark Valuation," *The Journal*, Fall/Winter 2017

"Giving Up Control: Self-Driving Cars and Intellectual Property," www.stout.com, June 2017

"Artificial Intelligence: Does It Work for Patent Valuation?" *The Journal*, Spring/Summer 2017

"Where We've Come From and Where We're Going With Intellectual Property," an interview with Q. Todd Dickinson, *The Stout Journal*, Spring/Summer 2017

"Why Private Equity and Venture Capital Firms Should Care About Intellectual Property Assets," *The Journal*, Spring/Summer 2017

"When Imitation is Not a Form of Flattery: The Importance of Intellectual Property Registration in Cuba," www.stout.com, January 24, 2017


"IP Litigation Funding Smack Down: How Hogan v. Gawker Highlights Changes in Litigation Financing," www.stout.com, November 2016

"'Market Value' Damages: What Are the Implications of Aqua Shield?" *Stout Journal*, Spring 2016, reprinted in *LES Insights*, June 11, 2016

"Prince's death: How will his intellectual property and estate be handled?" *Stout Estate and Gift Tax Valuation Blog*, May 10, 2016

"Q&A: Creating value through IP asset management and valuation," *Financier Worldwide Magazine*, January 2016

"Valuing Intellectual Property for Estate-Planning Purposes," *Trusts & Estates*, December 21, 2015

"Common Errors Committed When Valuing Patents – Part 3: Focus on the Cost and Market Approaches," *Stout Journal*, Fall 2015

"The Attorney's Role in Assisting Clients with Patent Valuation," *Landslide®, a Publication of the ABA Section of Intellectual Property Law*, September/October 2015

"Common Errors Committed When Valuing Patents – Part 2: Focus on the Income Approach," *Stout Journal*, Spring 2015

"Exploring the Nondiscriminatory Aspect of RAND Licensing Terms," *Stout Journal*, Fall 2014, republished on Law360, January 29, 2015

"Valuing Intellectual Property in the Context of a Divorce Proceeding," *Stout Journal*, Fall 2014

"Use/Misuse of Patent Purchase Price in Patent Infringement Damages Analysis," www.stout.com, July 2014, republished on Law360, August 11-12, 2014.

"The Great Patent Troll Debate – Two Perspective," interviews with Bill Sorrell (Vermont Attorney General) and Tony Brown (Founder and CEO of Cascades Ventures), *Stout Journal*, Spring 2014 and Law360, May 13-15, 2014

"Common Errors Committed When Valuing Patents – Part I," *Stout Journal*, Spring 2014

"Intellectual Property Valuation," *Business and Litigation Issues Section of the IPO Law Journal*, a whitepaper authored by members of the Intellectual Property Owners Association (IPO) Corporate IP Management Committee, October 2013

"Have IP Assets, Need Money!  The Role of IP Valuation in Startup Investment," *Stout Journal,* Fall 2013 and *Preferred Returns*, the Newsletter of the Private Equity and Venture Capital Committee of the Business Law Section of the American Bar Association, September 2013

"Using the Monte Carlo Method to Value Early Stage, Technology-Based Intellectual Property Assets," *Stout Journal*, Spring 2013

"New ADR Process Facilitates Call for Refined Use of Damages Experts in Patent Litigation by Judges Rader and Posner In Order To Resolve Patent Conflicts," *Just Resolutions E-News*, Dispute Resolution Section of the American Bar Association, May 2013

"New ADR Process Facilitates Call by Judges Rader and Posner for Better Use of Damages Experts in Patent Litigation," *Stout Journal*, Fall 2012


"Why Private Equity and Venture Capital Firms Should Care About Intellectual Property Assets," *Preferred Returns*, the Newsletter of the Private Equity and Venture Capital Committee of the Business Law Section of the American Bar Association, March 2012 and *Stout Journal,* Fall 2012

"Maximizing the Value of Intellectual Property: Assessing and Improving Intellectual Property Management Practices Across the Entire Intellectual Property Lifecycle," *Global Intellectual Property Asset Management Report*, April 2008

"The Challenge of Creating Innovation Networks," Financial Aspects of Intellectual Property blog, March 2007

"Enhancing Technology Transfer Programs at Our Nation's Universities: Turning Government Funds into New Sources of Revenue," National Association of College and University Business Officers 2004 Annual meeting, July 2004

## Speeches and Seminars

"Intangible Assets and IP Rights: Do They Matter for Valuation and Success," IPWatchdog Live, 2021

"The Value of Michael Jackson's Intellectual Property After His Death," an interview/podcast by the Taxgirl, Kelly Phillips Erb, published on The Exchange by Bloomberg Tax, 2021

"NIL and NFT," panel discussion regarding name, image and likeness, and non-fungible tokens at Sports Philanthropy World conference, 2021

"Nonprofits as Brands," panel discussion at Sports Philanthropy World conference, 2021

"Intellectual Property Valuation for Entrepreneurs and Start-ups," an educational course for members of mHUB a Chicago-based innovation center for entrepreneurs and start-ups focused on physical product development and manufacturing, 2018, 2019, 2021

"Estate Planning and Intellectual Property Assets: Valuation, Transfers, Taxes, Strategies for Counsel," Stafford webinar, 2021

"Intellectual Property Valuations for Related Party Transactions," Tax Executives Institute (TEI), 2021

"Standard Essential Patent Licensing Strategies," World Intellectual Property Forum, 2021

"Patent Valuation," guest lecturer at New York University Law School's Patent Licensing class, 2015, 2017, 2019, 2020, and 2021

"Standard Essential Patent (SEP) Licensing Strategies," Stout IP Insights Webinar Series, 2021

"Masterclass: The art of pricing and valuing IP," panelist, IPBC Connect, 2020

"Valuation for Intellectual Property Licensing," a continuing education course presented to GE licensing professionals, 2020

"Show Me The Money! IP Valuation Considerations for the Media and Entertainment Industry," Stout IP Dialogue and Dinner Continuing Legal Education Event, 2020

"Practical Tips for Helping Companies Improve Their Intellectual Property Valuation Efforts and Outcomes," presentation to the Intellectual Property Owners Association (IPO) Corporate IP Management Committee, 2019



"Intellectual Property Valuation: Best Practices to Increase Quality and Decrease Risk," IP Law & Management Institute, 2019

"Valuing Intellectual Property: The Basics You Need to Know," a continuing legal education course presented to Marshall, Gerstein & Borun LLP, 2019

"Improving IP Valuation Outcomes Through the Use of Standards," moderator and panelist at the Licensing Executives Society's (LES) Leading Edge Series conference: "Driving Innovation: Standards in Licensing and Intellectual Capital Management," 2019

"Gray Market Goods," a continuing legal education presentation for attorneys at Toyota Motor North America, 2019

"IP is an Asset – Learn How to Value It," a full-day training session sponsored by the Toronto Chapter of the Licensing Executives Society (LES), 2019

"IP Valuation for Emerging Enterprises: The Why and The How," Licensing Executives Society (LES) webinar, 2018

"Introduction to Intellectual Property Valuation," presentation to members of the Intellectual Property Law Association of Chicago, 2018

"Intellectual Property Valuation," a full-day training session provided as part of the Licensing Executives Society's LES University "IP Licensing for Business Development" course, 2015, 2016, 2017, and 2018

"Intellectual Property Valuation 101," a continuing legal education course presented to Leydig, Voit & Mayer, Ltd., 2018

"Intellectual Property Value Extraction: Strategies and Tactics," North Shore Corporate IP Roundtable, 2018

"Economic Considerations for Patent Litigation Financing," moderator and panelist at the Licensing Executives Society International (LESI) Annual Meeting, 2018

"Overview of International Valuation Standards (IVS) 2017," presentation to the Aerospace Industries Association, 2017

"For What It's Worth: Fundamentals of IP Valuation," DePaul University College of Law, 2017

"Overview of the International Valuation Standards (IVS) 2017," presentation to the Licensing Executives Society (LES) Intellectual Property Valuation Standards committee, 2017

"Valuing Intellectual Property," a continuing legal education course presented to McAndrews, Held & Malloy, Ltd., 2017

"IP Valuation 101," a continuing legal education course presented to Neal, Gerber & Eisenberg LLP, 2017

"Intellectual Property Valuation," part of the Licensing Executives Society's LES University "Business Development in Life Sciences" course, 2015, 2016, and 2017

"An Introduction to Intellectual Property Valuation," a continuing legal education course presented to Clark Hill PLC, 2017

"When IP Valuation and Damages Collide!" 15th Annual Rocky Mountain Intellectual Property & Technology Institute, 2017


"Valuing the Right of Publicity," a continuing legal education course presented to Mandell Menkes LLC, 2017

"International Valuation Standards: How Do They Affect IP Valuation," presentation to the Licensing Executives Society's (LES) Valuation & Pricing Committee, 2017

"Trade Secrets and Know-How: Unique Valuation Issues," Licensing Executives Society (LES) webinar, 2017

"Valuation of Intellectual Property," Clear Law Institute webinar, 2017

"Advanced Intellectual Property Valuation and Negotiation," a training course delivered on behalf of the Licensing Executives Society (LES) to business development professionals from MedImmune and AstraZeneca, 2017

"Valuation of Patents, Trademarks, Copyrights, and Trade Secrets: An Orientation to Intellectual Property Appraisal," State Bar of Michigan Intellectual Property Law Spring Seminar, 2017

"Telehealth: Intellectual Property Valuation for Growth and Funding," DePaul University College of Law's Annual Health & IP Law Symposium, 2017

"Use/Misuse of Patent Purchase Price in Patent Infringement Damages Analysis," American Intellectual Property Law Association (AIPLA) Mid-Winter Institute, 2017

"Valuation for Intellectual Property Licensing," presentation to the Intellectual Property Owners Association's (IPO) Licensing Committee, 2017

"Outlining a Patent Policy for the New Administration," panel moderator at IAM's Patent Law and Policy 2016 conference, 2016

"Numbers Are Your Friends: Exploring the Intersection of IP Valuation and Damages," *Stout* 2016 Intellectual Property Boot Camp, 2016

"The Use of Valuation Concepts in Patent Damages: The Multimillion Dollar Question," presentation to the Intellectual Property Owners Association's (IPO) Damages and Injunctions Committee, 2016

"Internet of Things: Protecting and Profiting From Your Company's Knowledge Assets and IoT Innovations," Licensing Executives Society (LES) webinar, 2016

"Valuing the Right of Publicity," American Bar Association (ABA) Section of Litigation *Sound Advice*, 2016

"Insights into IP Issues Associated with Mergers & Acquisitions and Social Media," a continuing legal education course presented to Pattishall, McAuliffe, Newbury, Hilliard & Geraldson LLP, 2016

"Oil & Gas v. Life Sciences: A Comparison of IP Valuation and Licensing Best Practices Across Industries," Licensing Executives Society (LES) Spring PanAm Meeting, 2016

"Valuation of Trade Secrets and Know-How," presentation to the Intellectual Property Owners Association's (IPO) Corporate IP Management Committee, 2016

"Contemporary Issues Affecting Patent Value," presentation to the Limited Partners of a patent investment firm, 2015

"Let's Make a Deal! Strategy, Due Diligence, and Valuation Considerations for Patent Transactions," 2nd Annual *Stout* Intellectual Property Symposium, 2015


"Will My Patent Make Cents? How Courts and the USPTO Affect Patent Portfolio Value," American Bar Association (ABA) Landslide® Webinar Series, 2015

"Corporate IP Management Best Practices," Intellectual Property Owners Association (IPO) Annual Meeting, 2015

"IP in Bankruptcy," American Bar Association (ABA) IP Roundtable, addressing intellectual property valuation in the context of a bankruptcy, 2015

"Maximizing Tangible Benefits from Your Intangible Assets: An Intellectual Property Monetization Case Study," part three of a three-part workshop series for the University of Chicago's Chicago Innovation Exchange, 2015

"Determining the Value of Your Emerging Company's Intellectual Property," part two of a three-part workshop series for the University of Chicago's Chicago Innovation Exchange, 2015

"Patent Infringement Damages," a continuing legal education course presented to Godfrey & Kahn S.C., 2015

"Assessing and Incorporating Risk and Uncertainty in the Valuation of Early-Stage Intellectual Property," Licensing Executives Society (LES) Spring Meeting, 2015

"In the Trenches: How are Patent Plaintiffs Proving Their Damages?" DRI Intellectual Property Litigation Seminar, 2015

"Intellectual Property Valuation: A Primer for Determining the Value of Your Patents, Trademarks, Trade Secrets, and Copyrights," presentation to the Detroit Chapter of Financial Executives International (FEI), 2015

"Navigating the Patent Damages Minefield," addressing the use of patent purchase prices in patent infringement damages analysis, The John Marshall Law School 59th Annual Intellectual Property Law Conference, 2015

"Moving to the Next Level: Valuation & Financing Considerations and Employment Strategies for Start-Ups and Emerging Technology Companies," moderator and panelist at an event co-sponsored by Epstein Becker Green and Stout Risius Ross, 2015

"U.S. Case Law Overview and Relevant Issues for Determining FRAND Licensing Terms," presented to members of the Japan Institute of Intellectual Property and the University of Tokyo, 2014

"What Investors Need to Know About FRAND," IP Dealmakers Forum, 2014

"Intellectual Property Valuation – A Case Study: Insights into How a Company Should Approach IP Valuation Issues in Various Contexts," The Corporate IP Institute at Georgia State University, 2014

"Intellectual Property Valuation – A Case Study," Intellectual Property Owners Association (IPO) Annual Meeting, 2014

"Unlocking the Hidden Value (and Savings) in Your Intellectual Property Portfolio," First Chair Awards Conference, 2014

"How to Value Your Brand and Other 'Soft' Assets," Financial Poise webinar, 2014

"RAND Royalties for Standard Essential Patents," presented to the Midwest patent practice at Perkins Coie LLP, 2014

"Intellectual Property Issues in Merger and Acquisition Transactions," addressing intellectual property valuation, joint webinar with Locke Lord LLP, 2014


"Role of the Damages Expert in IP Litigation," addressing early case assessments and RAND royalty rates for standard essential patents, a continuing legal education course presented to Greenberg Traurig LLP, 2014

"The Billion Dollar Whiteboard & Other Cautionary Tales Regarding IP Valuation," a continuing legal education course presented separately to BP International and Baxter Healthcare, 2014

"Determining RAND Royalty Rates for Standard Essential Patents," presented to the Intellectual Property Owners Association's (IPO) Damages and Injunctions Committee, 2013

"Emerging Intellectual Property Issues in Business Transactions: What You Need to Know," addressing intellectual property valuation, The Knowledge Congress Webcast Series, 2013

"Valuing Intellectual Property Inside and Outside of a Divorce Proceeding," *Stout* Webinar, 2013

"Effective Use of Experts in Patent Infringement Cases," addressing emerging issues related to the use of damages experts, The Knowledge Congress Webcast Series, 2013

"Employing Federal Rules and Brandywine v. Cisco to Aggressively Reduce Cost of Using Damages Experts in Litigation and ADR," presented to the Intellectual Property Law Association of Chicago, 2013

"The Use of an Excess Earnings Approach for Trademark Valuation," guest lecturer at The John Marshall Law School "Intellectual Property Valuation" class, 2010, 2012, and 2013

"Practical Guidance and Illustrative Experiences Related to Current Patent Damages Issues," a continuing legal education course presented to Bartlit Beck Herman Palenchar & Scott LLP, 2012

"Recent Case Law Overview: A Look at Recent Opinions Affecting Damages in Patent Cases," a continuing legal education course presented to Dykema Gossett PLLC, 2012

"Recent Case Law Overview: A Look at Recent Opinions Affecting Damages Quantification in Patent Cases," a continuing legal education course presented to Leydig, Voit & Mayer, Ltd., 2012

"How much is your IP worth? Tools for properly assessing the value of IP," presented at a Intellectual Property Panel Discussion co-hosted by Stout Risius Ross and Venable LLP and titled "Intellectual Property: Increasing Your Return on Investment," 2012

"Patent Damages Overview," guest lecturer at the Chicago-Kent School of Law "Managing IP Portfolios" class, 2011

"Introduction to the Value and Importance of Intellectual Asset Management," presented as one class of the University of Illinois-Chicago's Engineering School's on-line Intellectual Property Management course, 2011

"License Agreement Comparability," presented to the China Appraisal Society, 2010

"Accounting for Risk in Intellectual Property Valuation," presented to the China Appraisal Society, 2010

"Monetization and Commercialization of IP," panelist and moderator at an FTI Consulting Insurance and Intellectual Property Conference, 2008

"Getting to the Deal (Part 2)," a discussion of intellectual property due diligence in mergers and acquisitions, panelist at a meeting of the New York Chapter of the Licensing Executives Society (LES), 2007

"Overview of Intellectual Asset Management," guest lecturer at the Chicago-Kent School of Law "Managing IP Portfolios" class, 2007


"Understanding the Role of University Technology Transfer," University of North Dakota's R&D Showcase IV conference, 2005

"The Question is Not: Who Moved the Cheese? But Rather: Can We Keep the Rest of the World from Eating Our Lunch?" a presentation regarding intellectual property and innovation in the U.S. and abroad, presented at the World Leadership in Innovation Conference at the FirstWave Annual Event, 2004

"The Emerging Role of Technology Transfer at U.S. Universities," presented at the Annual Meeting of the National Association of College and University Business Officers, 2004

"Technology Transfer in the University Environment," presented at the Annual Higher Education Forum, 2002

# EXHIBIT B



December 3, 2021

Orrick, Herrington & Sutcliffe LLP
701 Fifth Avenue
Suite 5600
Seattle, WA 98104-7097

+1 206 839 4300
orrick.com

<u>Via Email</u>

Jeffrey B Coopersmith

E jcoopersmith@orrick.com
D +1 206 839 4339
F +1 206 839 4301

John C. Bostic, Esq.
Robert S. Leach, Esq.
Jeffrey B. Schenk, Esq.
Kelly I. Volkar, Esq.
Assistant United States Attorneys
United States Attorney's Office
Northern District of California
150 Almaden Blvd. Suite 900
San Jose, CA 95113

Re:  United States v. Ramesh "Sunny" Balwani
        No. CR-18-00258-EJD (N.D. Cal.)

Dear Counsel:

We write in connection with your motion in limine No. 15 filed on November 19, 2021. We learned for the first time when you filed that motion that the government views our expert disclosures served on November 12, 2021 as inadequate. Had we heard from you between November 12 and November 19, we could have avoided burdening the Court with unnecessary motion practice. Nevertheless, notwithstanding your failure to meet and confer—and although we believe our initial disclosures met the requirements of Federal Rule of Criminal Procedure 16(b)(1)(C)—we provide the following supplemental information to avoid putting unnecessary disputes before the Court.

In addition to the information we provided on November 12, 2021, below is additional information summarizing the expected testimony of expert witnesses Mr. Balwani may call, and the bases for those experts' opinions:

**<u>Xavier Oustalniol</u>**

        With respect to Xavier Oustalniol, Mr. Balwani's initial disclosure informed the government that Mr. Oustalniol "may testify as an expert or summary witness." In addition to or instead of potential expert testimony, Mr. Oustalniol may present evidence pursuant to Federal Rule of Evidence 1006 on the topics below.

        If called as an expert, Mr. Oustalniol may testify regarding Theranos' receipt of funds and how Theranos used those funds. He may testify as to Theranos' expenses over time, including its operating



costs. Mr. Oustalniol may provide analyses of Theranos' books and records, including its cash flows and cash positions at various points throughout the company's life, how much the company spent in various expense/cost categories such as payroll, and other factors. Mr. Oustalniol may also testify regarding Theranos' cash position at various times, including at the time Mr. Balwani left Theranos in mid-2016.

In forming the opinions we currently believe he may testify to, Mr. Oustalniol reviewed and considered the materials listed in Exhibit A, in addition to relying on the information included in Mr. Balwani's November 12, 2021 disclosure.

**Richard Sonnier**

Mr. Balwani filed a declaration from Mr. Sonnier on November 19, 2021. Dkt. No. 1158. The declaration provides comprehensive detail regarding Mr. Sonnier's potential opinions, a complete listing of the specific materials he considered in forming those opinions, and several exhibits supporting the declaration. *Id.*

**Scott Weingust**

If called, Scott Weingust may testify as an expert in intellectual property ("IP") valuation based on his knowledge, skill, experience, training, and education in that area. *See* Fed. R. Evid. 702. Mr. Weingust may provide expert testimony on patents and the process for obtaining them. He may also explain how IP portfolios are generally valued and the process for calculating their value. Specific to Theranos, Mr. Weingust may testify about the value of Theranos' IP portfolio as of the time Mr. Balwani left Theranos in mid-2016. His testimony would be based on his review of IP valuations and related materials listed in Exhibit B.

Mr. Weingust may also testify generally regarding what constitutes a trade secret and indicators of a trade secret's value. He may testify regarding why companies must actively protect trade secrets and the consequences of failing to do so. Mr. Weingust may testify as to best practices and industry standards regarding how companies can best protect their trade secrets. He may further testify that steps Theranos took to protect its trade secrets and other confidential information (including Theranos policies and practices) were consistent with industry standards and were required in order for its trade secrets to remain protected.

In forming the opinions we currently believe he may testify to, Mr. Weingust reviewed and considered the materials listed in Exhibit B, in addition to relying on the information included in Mr. Balwani's November 12, 2021 disclosure.



As Mr. Balwani included in his November 12, 2021 disclosure, each witness described above may offer testimony and opinions responsive to evidence presented in the government's case-in-chief.  Mr. Balwani reserves his right to supplement these disclosures in the event the expert witnesses learn of or rely on additional information, including evidence the government presents in its case-in-chief.

We are also sending via secure FTP a production of documents Bates-labeled BALWANI000004 – BALWANI000086.  The password for that production is: **X8B9#ZLz=2**.  Mr. Balwani may use these documents in connection with the expert witnesses as part of his case-in-chief at trial, should he decide to present such a case.

Sincerely,

Jeffrey B. Coopersmith

# Exhibit A

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 1 | ABC00001 | ABC000327 | 2013- 2016 W-2s, Stock related spreadsheets |
| 2 | THE_ABC000094 | THE_ABC000095 | Theranos Waiver of Transfer Restrictions for Theranos Shares |
| 3 | THE_ABC000097 | THE_ABC000097 | Balwani expenses from corporate credit card - Amex (52022) |
| 4 | THE_ABC000187 | THE_ABC000187 | Balwani expenses from corporate credit card - Amex (52022) |
| 5 | THE_ABC000202 | THE_ABC000202 | Summary of balances for bank accounts |
| 6 | THE_ABC000203 | THE_ABC000203 | Balwani expenses from corporate credit card - Amex (52022) |
| 7 | THE_ABC000204 | THE_ABC000204 | Balwani expenses from corporate credit card - Amex (52022) |
| 8 | THE_ABC000205 | THE_ABC000205 | Balwani expenses from corporate credit card - Amex (52022) |
| 9 | THE_ABC000338 | THE_ABC000338 | Balwani expenses from corporate credit card - Amex (52022) |
| 10 | THE_ABC000381 | THE_ABC000381 | Balwani expenses from corporate credit card - Amex (52022) |
| 11 | THE_ABC000416 | THE_ABC000416 | Account records January 2015 |
| 12 | THE_ABC000475 | THE_ABC000476 | Theranos Waiver of Transfer Restrictions for Theranos Shares |
| 13 | THE_ABC000519 | THE_ABC000519 | Balwani expenses from corporate credit card - Amex (52022) |
| 14 | THE_ABC000539 | THE_ABC000539 | Balwani expenses from corporate credit card - Amex (52022) |
| 15 | THE_ABC000540 | THE_ABC000540 | Balwani expenses from corporate credit card - Amex (52022) |
| 16 | THE_ABC000583 | THE_ABC000583 | Balwani expenses from corporate credit card - Amex (52022) |
| 17 | THE_ABC000649 | THE_ABC000649 | Repurchased, Granted and Exercised stock summaries |
| 18 | THE_ABC000665 | THE_ABC000665 | Account records May 2015 |
| 19 | THE_ABC000666 | THE_ABC000666 | Paystub for Balwani for the period 6/30/2014 - 7/10/2014 |
| 20 | THE_ABC000744 | THE_ABC000746 | Theranos Balance Sheet, Operating Statement and Cash Flow Statement for YE 12/31/2012 |
| 21 | THE_ABC000747 | THE_ABC000747 | Theranos financials between 2012 and 2013 (Balance Sheet, Income Statement, Cash Flow, Trial Balance) |
| 22 | THE_ABC000748 | THE_ABC000750 | Theranos financials between 2010, 2011 and 2012 (Balance Sheet, Income Statement, Cash Flow, Trial Balance) |
| 23 | THE_ABC000754 | THE_ABC000754 | GL Excerpts of Cash accounts |
| 24 | THE_ABC000755 | THE_ABC000755 | Excerpts of Comerica transactions |
| 25 | THE_ABC000758 | THE_ABC000758 | GL Excerpts |
| 26 | THE_ABC000759 | THE_ABC000759 | GL Excerpts |
| 27 | THE_ABC000796 | THE_ABC000796 | Theranos Balance Sheet |
| 28 | THE_ABC000797 | THE_ABC000797 | GL Excerpts |
| 29 | THE_ABC000810 | THE_ABC000810 | Monthly Income Statements - Jan - Apr 2017 |
| 30 | THE_ABC000811 | THE_ABC000811 | Theranos Balance Sheet, Operating Statement and Cash Flow Statement for QE 3/31/2018 |
| 31 | THE_ABC000882 | THE_ABC000882 | Monthly Income Statements - Jan - June 2017 |
| 32 | THE_ABC000883 | THE_ABC000883 | Theranos Balance Sheets - Monthly Dec 2016 - May 2017 |
| 33 | THE_ABC000884 | THE_ABC000884 | Cash Flow Statements - Monthly Jan - May 2017 |
| 34 | THE_ABC000901 | THE_ABC000901 | Theranos Balance Sheet, Operating Statement and Cash Flow Statement - Monthly Dec 2016 - Aug 2017 |
| 35 | THE_ABC000902 | THE_ABC000902 | Theranos Balance Sheet, Operating Statement and Cash Flow Statement - Monthly Jan - Feb 2018 |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 36 | THE_ABC000905 | THE_ABC000905 | Theranos Balance sheet - Monthly Jan - Apr 2018 |
| 37 | THE_ABC000916 | THE_ABC000916 | Theranos B/S, CF and I/S - Oct - Dec 2017 |
| 38 | THE_ABC000945 | THE_ABC000945 | Theranos I/S - Jan - April 2018 |
| 39 | THE_ABC000968 | THE_ABC000968 | Theranos B/S, CF and I/S - Q1 and Q2 2018 |
| 40 | THE_ABC000991 | THE_ABC000991 | Theranos B/S - Monthly Jan - Sept 2017 |
| 41 | THE_ABC000996 | THE_ABC000996 | Balwani expenses from corporate credit card - Amex (52022) |
| 42 | THE_ABC000997 | THE_ABC000997 | Balwani expenses from corporate credit card - Amex (52022) |
| 43 | THE_ABC000998 | THE_ABC000998 | Theranos B/S, I/S - Monthly Jan - June 2018 |
| 44 | THE_ABC001093 | THE_ABC001093 | Balwani expenses from corporate credit card - Amex (52022) |
| 45 | THE_ABC001138 | THE_ABC001138 | Theranos B/S, I/S, C/F for Q1 and Q2 2011 |
| 46 | THE_ABC001139 | THE_ABC001139 | Comerica Commercial Card Statement for Balwani |
| 47 | THE_ABC001165 | THE_ABC001165 | Balwani expenses from corporate credit card - Amex (52022) |
| 48 | THE_ABC001166 | THE_ABC001166 | Balwani expenses from corporate credit card - Amex (52022) |
| 49 | THE_ABC001210 | THE_ABC001873 | Organization and Series A Preferred Stock Financing, December 17, 2004, January 21, 2004, February 7, 2005 |
| 50 | THE_ABC001874 | THE_ABC001885 | Amended and Restated Voting Agreement |
| 51 | THE_ABC001895 | THE_ABC001948 | Amended and Restated Investors' Rights Agreement |
| 52 | THE_ABC001968 | THE_ABC001975 | Telanos Partnership - 50,000 Shares |
| 53 | THE_ABC001976 | THE_ABC001976 | GL Excerpts |
| 54 | THE_ABC002025 | THE_ABC002045 | 2013 Stock Incentive Plan |
| 55 | THE_ABC002048 | THE_ABC002048 | Trial Balance as of 12/31/2013 |
| 56 | THE_ABC002049 | THE_ABC002049 | Theranos B/S, I/S and C/F - 2010 - 2012 |
| 57 | THE_ABC002050 | THE_ABC002050 | GL Excerpts |
| 58 | THE_ABC002051 | THE_ABC002051 | Wells Fargo Bank Transactions for September 2016 |
| 59 | THE_ABC002054 | THE_ABC002054 | GL Excerpts |
| 60 | THE_ABC002055 | THE_ABC002069 | Amended and Restated Right of First Refusal and Co-Sale Agreement |
| 61 | THE_ABC002070 | THE_ABC002070 | Summary of prepaids and deposits in July 2018 |
| 62 | THE_ABC002071 | THE_ABC002071 | Summary of prepaids and deposits in July 2018 |
| 63 | THE_ABC002072 | THE_ABC002072 | Summary of prepaids and deposits in July 2018 and Legal retainers |
| 64 | THE_ABC002073 | THE_ABC002073 | A/P Accruals |
| 65 | THE_ABC002074 | THE_ABC002074 | List of Deposits |
| 66 | THE_ABC002075 | THE_ABC002087 | Emails regarding outstanding invoices for Theranos |
| 67 | THE_ABC002088 | THE_ABC002088 | Summary of Capital Leases |
| 68 | THE_ABC002089 | THE_ABC002112 | Series C-3 Preferred Stock Purchase Agreement |
| 69 | THE_ABC002113 | THE_ABC002118 | List of Series C Investors |
| 70 | THE_ABC002119 | THE_ABC002133 | Amended and Restated Right of First Refusal and Co-Sale Agreement |
| 71 | THE_ABC002141 | THE_ABC002146 | Exchange Agreement between Theranos and Holmes |
| 72 | THE_ABC002147 | THE_ABC002147 | Theranos - B/S and I/S - Monthly Jan - July 2018 |
| 73 | THE_ABC002148 | THE_ABC002148 | Theranos - B/S and I/S - Monthly Jan - May 2018 |
| 74 | THE_ABC002149 | THE_ABC002149 | Theranos - B/S - Monthly Jan - July 2018 |
| 75 | THE_ABC002150 | THE_ABC002150 | Theranos - I/S - Monthly Jan - May 2018 |
| 76 | THE_ABC002151 | THE_ABC002151 | Theranos - B/S - Monthly Jan - Oct 2017 |
| 77 | THE_ABC002153 | THE_ABC002153 | Theranos I/S - Dec 2017 and Jan 2018 |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 78 | THE_ABC002191 | THE_ABC002191 | Balwani expenses from corporate credit card - Amex (52022) |
| 79 | THE_ABC002192 | THE_ABC002192 | Balwani expenses from corporate credit card - Amex (52022) |
| 80 | THE_ABC002320 | THE_ABC002320 | Stock Power & Assignment Separate from Certificate |
| 81 | THE_ABC002321 | THE_ABC002321 | Balwani expenses from corporate credit card - Amex (52022) |
| 82 | THE_ABC002334 | THE_ABC002334 | Balwani expenses from corporate credit card - Amex (52022) |
| 83 | THE_ABC002353 | THE_ABC002353 | Balwani expenses from corporate credit card - Amex (52022) |
| 84 | THE_ABC002484 | THE_ABC002484 | Balwani expenses from corporate credit card - Amex (52022) |
| 85 | THE_ABC002485 | THE_ABC002485 | Balwani expenses from corporate credit card - Amex (52022) |
| 86 | THE_ABC002486 | THE_ABC002486 | Balwani expenses from corporate credit card - Amex (52022) |
| 87 | THE_ABC002487 | THE_ABC002487 | Balwani expenses from corporate credit card - Amex (52022) |
| 88 | THE_ABC002498 | THE_ABC002498 | Balwani expenses from corporate credit card - Amex (52022) |
| 89 | THE_ABC002676 | THE_ABC002676 | Balwani expenses from corporate credit card - Amex (52022) |
| 90 | THE_ABC002890 | THE_ABC002890 | Transaction report for March 2015 |
| 91 | THE_ABC002914 | THE_ABC002921 | Telanos Partnership - 50,000 Shares |
| 92 | THE_ABC002922 | THE_ABC002929 | Telanos Partnership - 50,000 Shares |
| 93 | THE_ABC002973 | THE_ABC002974 | Waiver of Transfer Restrictions for Proposed Transfers |
| 94 | THE_ABC003066 | THE_ABC003077 | Theranos Amended and Restated Stock Agreement |
| 95 | THE_ABC003082 | THE_ABC003082 | Theranos B/S as of 9/30/15 |
| 96 | THE_ABC003086 | THE_ABC003086 | GL Excerpts |
| 97 | THE_ABC003087 | THE_ABC003087 | GL Excerpts |
| 98 | THE_ABC003088 | THE_ABC003088 | Account transactions for Wells Fargo for December 2016 |
| 99 | THE_ABC003089 | THE_ABC003089 | Balwani expenses from corporate credit card - Amex (52022) |
| 100 | THE_ABC003090 | THE_ABC003090 | GL Excerpts |
| 101 | THE_ABC003091 | THE_ABC003091 | GL Excerpts |
| 102 | THE_ABC003102 | THE_ABC003102 | GL Excerpts |
| 103 | THE_ABC003103 | THE_ABC003103 | Balwani expenses from corporate credit card - Amex (52022) |
| 104 | THE_ABC003111 | THE_ABC003111 | GL Excerpts |
| 105 | THE_ABC003112 | THE_ABC003112 | Consulting fees |
| 106 | THE_ABC003127 | THE_ABC003127 | Theranos I/S - Monthly Jan - Sept 2017 |
| 107 | THE_ABC003128 | THE_ABC003138 | Amended and Restated Voting Agreement |
| 108 | THE_ABC003147 | THE_ABC003147 | Theranos B/S - Monthly Jan - Aug 2017 |
| 109 | THE_ABC003148 | THE_ABC003148 | Theranos I/S - Monthly Jan - Oct 2017 |
| 110 | THE_ABC003149 | THE_ABC003149 | Theranos C/F - Monthly Jan - April 2017 |
| 111 | THE_ABC003150 | THE_ABC003150 | Theranos B/S as of 12/31/2014 |
| 112 | THE_ABC003181 | THE_ABC003181 | Theranos I/S - Monthly Jan - Dec 2016 |
| 113 | THE_ABC003182 | THE_ABC003235 | Amended and Restated Investors' Rights Agreement |
| 114 | THE_ABC003256 | THE_ABC003256 | Theranos B/S - Monthly Jan - Sept 2017 |
| 115 | THE_ABC003407 | THE_ABC003417 | Amended and Restated Voting Agreement |
| 116 | THE_ABC003432 | THE_ABC003432 | Theranos I/S - Jan - Sept 2017 |
| 117 | THE_ABC003445 | THE_ABC003445 | Theranos I/S - Jan - Dec 2017 |
| 118 | THE_ABC003466 | THE_ABC003466 | Summary of Accrued Expenses - Monthly Dec 2016 - June 2018 |
| 119 | THE_ABC003467 | THE_ABC003540 | Legal expenses |
| 120 | THE_ABC003550 | THE_ABC003550 | Theranos B/S - Monthly Jan - Mar 2018 |

| No. | Beginning Bates | Ending Bates | Description |
|-----|-----------------|--------------|-------------|
| 121 | THE_ABC003558 | THE_ABC003588 | Amended and Restated Voting Agreement |
| 122 | THE_ABC003657 | THE_ABC003657 | Balwani expenses from corporate credit card - Amex (52022) |
| 123 | THE_ABC003714 | THE_ABC003714 | Comerica Commercial Card Statement for Balwani |
| 124 | THE_ABC003749 | THE_ABC003750 | Theranos B/S as of 9/30/2015 |
| 125 | THE_ABC003751 | THE_ABC003751 | KPMG Company Financial Assessment 2/11/2013 |
| 126 | THE_ABC003764 | THE_ABC003764 | GL Excerpts |
| 127 | THE_ABC003796 | THE_ABC003796 | GL Excerpts |
| 128 | THE_ABC003797 | THE_ABC003826 | Amended and Restated Investors' Rights Agreement |
| 129 | THE_ABC003838 | THE_ABC003838 | GL Excerpts |
| 130 | THE_ABC003839 | THE_ABC003841 | Amendment to Certificate of Incorporation |
| 131 | THE_ABC003842 | THE_ABC003844 | Certificate of Increase of Series C-2 Preferred Stock of Theranos |
| 132 | THE_ABC003847 | THE_ABC003849 | Termination Certificate of the Amended and Restated Co-Sale Agreement dated 7/1/10 |
| 133 | THE_ABC003850 | THE_ABC003850 | Theranos B/S, I/S and C/F - Nov and Dec 2017 |
| 134 | THE_ABC003851 | THE_ABC003851 | Theranos B/S, I/S and C/F - Monthly Jan - June 2018 |
| 135 | THE_ABC003852 | THE_ABC003881 | Amended and Restated Investors' Rights Agreement |
| 136 | THE_ABC003882 | THE_ABC003891 | Amended and Restated Voting Agreement |
| 137 | THE_ABC003892 | THE_ABC003895 | Certificate of Designation of Series C-3 Preferred Stock |
| 138 | THE_ABC003896 | THE_ABC003900 | Series C Investors |
| 139 | THE_ABC003901 | THE_ABC004386 | Series C Preferred Stock Financing |
| 140 | THE_ABC004387 | THE_ABC004387 | List of transactions in Nov 2016 |
| 141 | THE_ABC004388 | THE_ABC004399 | Amended and Restated Voting Agreement |
| 142 | THE_ABC004400 | THE_ABC004403 | Certificate of Designation of Series C-3 Preferred Stock |
| 143 | THE_ABC004408 | THE_ABC004408 | Summary of Accrued Expenses - Monthly Jan - Jul 2018, Prepaids, Legal Expenses and Deposits |
| 144 | THE_ABC004409 | THE_ABC004409 | Prepaid Insurance detail as of July 2018 |
| 145 | THE_ABC004410 | THE_ABC004410 | Prepaid Insurance detail as of July 2018 |
| 146 | THE_ABC004411 | THE_ABC004411 | Summary of deposits in June 2016 |
| 147 | THE_ABC004412 | THE_ABC004412 | Theranos B/S - Monthly Jan - Dec 2016 |
| 148 | THE_ABC004413 | THE_ABC004413 | Theranos C/F - Monthly Jan - May 2017 |
| 149 | THE_ABC004414 | THE_ABC004414 | Theranos B/S - Monthly Jan - May 2017 |
| 150 | THE_ABC004415 | THE_ABC004415 | Theranos B/S, I/S and C/F - Monthly Dec 2016 - Oct 2017 |
| 151 | THE_ABC004417 | THE_ABC004417 | Theranos B/S, I/S - Monthly Jan - April 2018 |
| 152 | THE_ABC004418 | THE_ABC004418 | Theranos B/S, I/S - Monthly Jan - June 2018 |
| 153 | THE_ABC004419 | THE_ABC004419 | Stock Certificate Ledger |
| 154 | THE_ABC004421 | THE_ABC004421 | Chart of Accounts |
| 155 | THE_ABC004430 | THE_ABC004430 | Accrual of Balwani Expense Reports as of 12/31/2009 |
| 156 | THE_ABC004431 | THE_ABC004431 | Stock Certificate Ledger |
| 157 | THE_ABC004523 | THE_ABC004523 | Balwani expenses from corporate credit card - Amex (52022) |
| 158 | THE_ABC004585 | THE_ABC004585 | Balwani expenses from corporate credit card - Amex (52022) |
| 159 | THE_ABC004586 | THE_ABC004586 | Balwani expenses from corporate credit card - Amex (52022) |
| 160 | THE_ABC004691 | THE_ABC004691 | Balwani expenses from corporate credit card - Amex (52022) |
| 161 | THE_ABC004692 | THE_ABC004692 | Balwani expenses from corporate credit card - Amex (52022) |
| 162 | THE_ABC004703 | THE_ABC004703 | Balwani expenses from corporate credit card - Amex (52022) |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 163 | THE_ABC004704 | THE_ABC004704 | Balwani expenses from corporate credit card - Amex (52022) |
| 164 | THE_ABC004705 | THE_ABC004705 | Balwani expenses from corporate credit card - Amex (52022) |
| 165 | THE_ABC004706 | THE_ABC004706 | Balwani expenses from corporate credit card - Amex (52022) |
| 166 | THE_ABC004707 | THE_ABC004707 | Balwani expenses from corporate credit card - Amex (52022) |
| 167 | THE_ABC004708 | THE_ABC004708 | Balwani expenses from corporate credit card - Amex (52022) |
| 168 | THE_ABC004899 | THE_ABC004899 | Balwani expenses from corporate credit card - Amex (52022) |
| 169 | THE_ABC004927 | THE_ABC004927 | Account records in January 2015 |
| 170 | THE_ABC004970 | THE_ABC004975 | Subpoena to Produce Documents to Theranos Assignee |
| 171 | THE_ABC004976 | THE_ABC004976 | List of contacts info for vendors |
| 172 | THE_ABC004977 | THE_ABC004977 | Schedule of Stocks Exercised, Granted and Repurchased |
| 173 | THE_ABC004981 | THE_ABC004981 | Account records July 2015 |
| 174 | THE_ABC004985 | THE_ABC004992 | Investment Representation Statement |
| 175 | THE_ABC005063 | THE_ABC005086 | Summary of Deposits with invoice support |
| 176 | THE_ABC005087 | THE_ABC005103 | 2013 Stock Incentive Plan |
| 177 | THE_ABC005104 | THE_ABC005108 | 2004 Stock Plan - Stock Option Agreement |
| 178 | THE_ABC005109 | THE_ABC005109 | Theranos B/S, I/S, T/B, C/F - Dec 2012 and Jan 2013 |
| 179 | THE_ABC005110 | THE_ABC005110 | Theranos B/S and T/B as of 1/8/2014 |
| 180 | THE_ABC005111 | THE_ABC005118 | Wells Fargo Bank Transactions for August 2017 - Theranos Operating Account |
| 181 | THE_ABC005120 | THE_ABC005120 | GL Excerpts |
| 182 | THE_ABC005121 | THE_ABC005121 | Transactions from Theranos Operating and Payroll Accounts |
| 183 | THE_ABC005150 | THE_ABC005150 | GL Excerpts |
| 184 | THE_ABC005151 | THE_ABC005151 | Balwani expenses from corporate credit card - Amex (52022) |
| 185 | THE_ABC005156 | THE_ABC005156 | GL Excerpts |
| 186 | THE_ABC005160 | THE_ABC005160 | GL Excerpts |
| 187 | THE_ABC005180 | THE_ABC005180 | Theranos I/S - Monthly Jan - July 2017 |
| 188 | THE_ABC005200 | THE_ABC005200 | Theranos I/S - Monthly Jan - May 2017 |
| 189 | THE_ABC005213 | THE_ABC005213 | Theranos B/S - Monthly Jan - Dec 2016 |
| 190 | THE_ABC005214 | THE_ABC005214 | GL Excerpts |
| 191 | THE_ABC005251 | THE_ABC005275 | Series C-2 Preferred Stock Purchase Agreement |
| 192 | THE_ABC005276 | THE_ABC005285 | Amended and Restated Voting Agreement |
| 193 | THE_ABC005286 | THE_ABC005309 | Series C-3 Preferred Stock Purchase Agreement |
| 194 | THE_ABC005371 | THE_ABC005371 | Theranos B/S, I/S, C/F and D&A - Monthly Oct - Dec 2017 |
| 195 | THE_ABC005400 | THE_ABC005402 | Termination Certificate of the Amended and Restated Co-Sale Agreement dated 7/1/10 |
| 196 | THE_ABC005417 | THE_ABC005417 | Theranos I/S - Monthly Jan- March 2018 |
| 197 | THE_ABC005418 | THE_ABC005418 | Theranos B/S, I/S - Monthly Jan- March 2018 |
| 198 | THE_ABC005419 | THE_ABC005452 | Series C-1 Preferred Stock Purchase Agreement |
| 199 | THE_ABC005453 | THE_ABC005453 | Theranos B/S, I/S - Monthly Jan- June 2018 |
| 200 | THE_ABC005455 | THE_ABC005455 | Balwani expenses from corporate credit card - Amex (52022) |
| 201 | THE_ABC005457 | THE_ABC005457 | Balwani expenses from corporate credit card - Amex (52022) |
| 202 | THE_ABC005518 | THE_ABC005518 | Balwani expenses from corporate credit card - Amex (52022) |
| 203 | THE_ABC005541 | THE_ABC005541 | Comerica Commercial Card Statement |
| 204 | THE_ABC005545 | THE_ABC005545 | Account records for April 2015 |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 205 | THE_ABC005570 | THE_ABC005570 | Balwani expenses from corporate credit card - Amex (52022) |
| 206 | THE_ABC005571 | THE_ABC005571 | Balwani expenses from corporate credit card - Amex (52022) |
| 207 | THE_ABC005572 | THE_ABC005572 | Theranos I/S as of 9/30/2015 |
| 208 | THE_ABC005573 | THE_ABC005575 | Theranos B/S, Statement of Operations and C/F as of 12/31/2011 |
| 209 | THE_ABC005576 | THE_ABC005576 | Theranos I/S, B/S, C/F and T/B as of 12/31/2011 |
| 210 | THE_ABC005577 | THE_ABC005577 | Transactions from Theranos Operating and Payroll Accounts |
| 211 | THE_ABC005581 | THE_ABC005581 | Account records June 2015 |
| 212 | THE_ABC005595 | THE_ABC005595 | GL Excerpts |
| 213 | THE_ABC005596 | THE_ABC005596 | GL Excerpts |
| 214 | THE_ABC005613 | THE_ABC005617 | 2004 Stock Plan - Stock Option Agreement |
| 215 | THE_ABC006194 | THE_ABC006194 | GL Excerpts |
| 216 | THE_ABC006195 | THE_ABC006199 | Certificate of Designation of Series C-3 Preferred Stock |
| 217 | THE_ABC006200 | THE_ABC006205 | Exchange Agreement between Theranos and Holmes |
| 218 | THE_ABC006206 | THE_ABC006206 | Theranos B/S, I/S and C/F - Monthly Jan - Apr 2018 |
| 219 | THE_ABC006763 | THE_ABC006764 | Share assignments |
| 220 | THE_ABC006765 | THE_ABC006765 | Capital Lease Schedules |
| 221 | THE_ABC006770 | THE_ABC006770 | Theranos B/S and I/S - Monthly Jan - May 2018 |
| 222 | THE_ABC006771 | THE_ABC006772 | Theranos Cash Summary - Monthly Jan - Jul 2017 |
| 223 | THE_ABC006773 | THE_ABC006773 | Theranos I/S - Monthly Jan - Aug 2017 |
| 224 | THE_ABC006774 | THE_ABC006774 | Theranos B/S - Monthly Aug - Nov |
| 225 | THE_ABC006775 | THE_ABC006775 | Theranos B/S, C/F and I/S - Monthly Jan - Oct 2017 |
| 226 | THE_ABC006778 | THE_ABC006778 | Theranos B/S, I/S and C/F - Monthly Dec 2017 and Jan 2018 |
| 227 | THE_ABC006779 | THE_ABC006779 | Schedule of Stocks Exercised, Granted and Repurchased |
| 228 | THE_ABC006780 | THE_ABC006780 | Balwani's 2013 W-2 |
| 229 | THE_ABC006781 | THE_ABC006781 | Paystub for Balwani for the period 6/30/2016 - 7/8/2016 |
| 230 | THE_ABC006782 | THE_ABC006782 | Refundable Options Reconciliation as of 12/31/2012 |
| 231 | THE_ABC006783 | THE_ABC006783 | Theranos expense report for Ramesh Balwani |
| 232 | THE_ABC006784 | THE_ABC006784 | Balwani's 2010 W-2 |
| 233 | THE_ABC006785 | THE_ABC006785 | Paystub for Balwani for the period 6/30/2015 - 7/10/2015 |
| 234 | THE_ABC006884 | THE_ABC006885 | Cash rollforward - Week ended March 23 and March 30 |
| 235 | THE_ABC006886 | THE_ABC006887 | Cash rollforward - Week ended April 27 |
| 236 | THE_ABC007006 | THE_ABC007007 | Waiver of Transfer Restrictions for Proposed Transfers |
| 237 | THE_ABC007008 | THE_ABC007008 | Summary of Don Lucas stock transfers |
| 238 | THE_ABC007013 | THE_ABC007013 | Balwani expenses from corporate credit card - Amex (52022) |
| 239 | THE_ABC007018 | THE_ABC007018 | Balwani expenses from corporate credit card - Amex (52022) |
| 240 | THE_ABC007109 | THE_ABC007109 | Balwani expenses from corporate credit card - Amex (52022) |
| 241 | THE_ABC007110 | THE_ABC007110 | Balwani expenses from corporate credit card - Amex (52022) |
| 242 | THE_ABC007153 | THE_ABC007153 | Balwani expenses from corporate credit card - Amex (52022) |
| 243 | THE_ABC007154 | THE_ABC007154 | Balwani expenses from corporate credit card - Amex (52022) |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 244 | THE_ABC007155 | THE_ABC007155 | Balwani expenses from corporate credit card - Amex (52022) |
| 245 | THE_ABC007156 | THE_ABC007156 | Balwani expenses from corporate credit card - Amex (52022) |
| 246 | THE_ABC007233 | THE_ABC007233 | 1032 - Merchant Account |
| 247 | THE_ABC007246 | THE_ABC007246 | Bank reconciliation and cash balance per GL - monthly Jan - Dec 2016 |
| 248 | THE_ABC007252 | THE_ABC007252 | Bank reconciliation and cash balance per GL - monthly Dec 2014 - Dec 2016 |
| 249 | THE_ABC007329 | THE_ABC007329 | KPMG Company Financial Assessment 5/29/2012 |
| 250 | THE_ABC007330 | THE_ABC007332 | Theranos B/S, I/S and C/F - 2010 - 2011 |
| 251 | THE_ABC007354 | THE_ABC007354 | Balwani's 2014 W-2 |
| 252 | THE_ABC007373 | THE_ABC007373 | Paystub for Balwani for the period 1/15/2015 - 1/26/2015 |
| 253 | THE_ABC007374 | THE_ABC007449 | Theranos 2016 Tax return |
| 254 | THE_ABC007450 | THE_ABC007450 | Paystub for Balwani for the period 12/31/2015 - 1/8/2016 |
| 255 | THE_ABC007454 | THE_ABC007454 | Report to accrue Balwani's expense reports |
| 256 | THE_ABC007455 | THE_ABC007455 | Stock Power and Assignment Separate from Certificate |
| 257 | THE_ABC007540 | THE_ABC007540 | Theranos B/S as of 1/8/2014 |
| 258 | THE_ABC007542 | THE_ABC007542 | Theranos B/S, I/S, C/F and T/B - 2010, 2011, 2012 |
| 259 | THE_ABC007543 | THE_ABC007543 | Theranos B/S, I/S, C/F - 2010 |
| 260 | THE_ABC007544 | THE_ABC007544 | GL Excerpts |
| 261 | THE_ABC007545 | THE_ABC007545 | Wells Fargo and Theranos Operating account transactions |
| 262 | THE_ABC007546 | THE_ABC007546 | Balwani expenses from corporate credit card - Amex (52022) |
| 263 | THE_ABC007552 | THE_ABC007552 | GL Excerpts |
| 264 | THE_ABC007553 | THE_ABC007553 | GL Excerpts |
| 265 | THE_ABC007554 | THE_ABC007554 | Balwani expenses from corporate credit card - Amex (52022) |
| 266 | THE_ABC007556 | THE_ABC007556 | Balwani expenses from corporate credit card - Amex (52022) |
| 267 | THE_ABC007557 | THE_ABC007557 | GL Excerpts |
| 268 | THE_ABC007558 | THE_ABC007591 | Series C-1 Preferred Stock Purchase Agreement |
| 269 | THE_ABC007592 | THE_ABC007592 | Theranos B/S - Monthly Jan - Apr 2017 |
| 270 | THE_ABC007593 | THE_ABC007593 | GL Excerpts |
| 271 | THE_ABC007616 | THE_ABC007644 | Series C-1 Preferred Stock Purchase Agreement |
| 272 | THE_ABC007675 | THE_ABC007675 | Theranos Forecasted financials (B/S and I/S) - Oct - Dec 2017 |
| 273 | THE_ABC007676 | THE_ABC007676 | Theranos B/S, I/S and C/F - Monthly Dec 2016 - July 2017 |
| 274 | THE_ABC007677 | THE_ABC007677 | Theranos Forecasted financials (B/S and I/S) - Oct - Dec 2017 |
| 275 | THE_ABC007705 | THE_ABC007707 | Theranos B/S, I/S and C/F - Monthly Dec 2016 - July 2017 |
| 276 | THE_ABC007708 | THE_ABC007708 | Theranos B/S, I/S and C/F - Monthly Dec 2016 - June 2017 |
| 277 | THE_ABC007712 | THE_ABC007712 | Stock Power and Assignment Separate from Certificate |
| 278 | THE_ABC007745 | THE_ABC007745 | Theranos B/S, I/S  - Monthly Jan - Sept 2017 |
| 279 | THE_ABC007746 | THE_ABC007775 | Amended and Restated Investors' Rights Agreement |
| 280 | THE_ABC007788 | THE_ABC007788 | Theranos B/S, I/S  - Monthly Jan - July 2018 |
| 281 | THE_ABC007789 | THE_ABC007789 | Theranos B/S, I/S  - Monthly Jan - May 2018 |
| 282 | THE_ABC007790 | THE_ABC007790 | Capital Lease Schedules |

| No. | Beginning Bates | Ending Bates | Description |
|-----|-----------------|--------------|-------------|
| 283 | THE_ABC007809 | THE_ABC007809 | Balwani expenses from corporate credit card - Amex (52022) |
| 284 | THE_ABC007822 | THE_ABC007823 | Waiver of Transfer Restrictions for Proposed Transfers |
| 285 | THE_ABC007838 | THE_ABC007838 | Comerica Commercial Card Statement |
| 286 | THE_ABC007851 | THE_ABC007851 | Balwani expenses from corporate credit card - Amex (52022) |
| 287 | THE_ABC007852 | THE_ABC007852 | Balwani expenses from corporate credit card - Amex (52022) |
| 288 | THE_ABC007873 | THE_ABC007873 | Account records February 2015 |
| 289 | THE_ABC007888 | THE_ABC007888 | Balwani expenses from corporate credit card - Amex (52022) |
| 290 | THE_ABC007932 | THE_ABC007934 | Theranos B/S, I/S and C/F as of 12/31/2010 |
| 291 | THE_ABC007946 | THE_ABC007970 | Series C-2 Preferred Stock Purchase Agreement |
| 292 | THE_ABC007971 | THE_ABC008001 | Amended and Restated Voting Agreement |
| 293 | THE_ABC008002 | THE_ABC008002 | GL Excerpts |
| 294 | THE_ABC008003 | THE_ABC008010 | Telanos Partnership - 50,000 Shares |
| 295 | THE_ABC008011 | THE_ABC008018 | Telanos Partnership - 50,000 Shares |
| 296 | THE_ABC008019 | THE_ABC008047 | Amended and Restated Series C-1 Preferred Stock Purchase Agreement |
| 297 | THE_ABC008048 | THE_ABC008055 | Telanos Partnership - 50,000 Shares |
| 298 | THE_ABC008078 | THE_ABC008079 | Theranos B/S, I/S as of 12/31/2014 |
| 299 | THE_ABC008082 | THE_ABC008082 | Theranos I/S as of 12/31/2014 |
| 300 | THE_ABC008107 | THE_ABC008107 | Theranos B/S as of 1/8/2014 |
| 301 | THE_ABC008108 | THE_ABC008108 | Theranos B/S, I/S, C/F and T/B - 12/31/2012 |
| 302 | THE_ABC008109 | THE_ABC008129 | 2013 Stock Incentive Plan |
| 303 | THE_ABC008130 | THE_ABC008130 | GL Excerpts |
| 304 | THE_ABC008144 | THE_ABC008173 | Amended and Restated Investors' Rights Agreement |
| 305 | THE_ABC008174 | THE_ABC008176 | Amendment to Certificate of Incorporation |
| 306 | THE_ABC008177 | THE_ABC008183 | Amended and Restated Voting Agreement |
| 307 | THE_ABC008184 | THE_ABC008188 | Certificate of Designation of Series C-3 Preferred Stock |
| 308 | THE_ABC008189 | THE_ABC008202 | List of Series C Investors |
| 309 | THE_ABC008203 | THE_ABC008203 | Theranos B/S - Jan and Feb 2018 |
| 310 | THE_ABC008204 | THE_ABC008208 | List of Series C Investors |
| 311 | THE_ABC008209 | THE_ABC008209 | Theranos B/S, I/S, C/F - Monthly Jan - July 2018 |
| 312 | THE_ABC008210 | THE_ABC008215 | List of Series C Investors |
| 313 | THE_ABC008216 | THE_ABC008701 | Series C Preferred Stock Financing |
| 314 | THE_ABC008702 | THE_ABC008702 | Theranos B/S  - Monthly Jan - Oct 2017 |
| 315 | THE_ABC008703 | THE_ABC008727 | Amended and Restated Investors' Rights Agreement |
| 316 | THE_ABC008732 | THE_ABC008732 | Theranos B/S  - Monthly Jan - Apr 2018 |
| 317 | THE_ABC008733 | THE_ABC008762 | Amended and Restated Investors' Rights Agreement |
| 318 | THE_ABC008763 | THE_ABC008763 | Theranos B/S, I/S, C/F - Monthly Dec 2017, Jan 2018 |
| 319 | THE_ABC008764 | THE_ABC008765 | Waiver of Transfer Restrictions for Proposed Transfers |
| 320 | THE_ABC008766 | THE_ABC008766 | Theranos B/S, I/S - Monthly Jan - June 2018 |
| 321 | THE_ABC008767 | THE_ABC009430 | Series A Preferred Stock Financing |
| 322 | THE_ABC009431 | THE_ABC009455 | Amended and Restated Investors' Rights Agreement |
| 323 | THE_ABC009456 | THE_ABC009469 | List of Series C Investors |
| 324 | THE_ABC009470 | THE_ABC009476 | Amended and Restated Voting Agreement |
| 325 | THE_ABC009484 | THE_ABC009513 | Amended and Restated Investors' Rights Agreement |
| 326 | THE_ABC009514 | THE_ABC009516 | Certificate of Increase of Series C-2 Preferred Stock of Theranos |
| 327 | THE_ABC009517 | THE_ABC009517 | Theranos I/s - Monthly Jan - Feb 2018 |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 328 | THE_ABC009518 | THE_ABC009518 | Theranos B/S, I/S - Monthly Jan - May 2018 |
| 329 | THE_ABC009519 | THE_ABC009519 | Summary of accrued expenses - Dec 2016 - May 2018 |
| 330 | THE_ABC009520 | THE_ABC009563 | Financial reports as of May 2018 - including AP Accruals |
| 331 | THE_ABC009564 | THE_ABC009603 | June 5, 2018 email attaching open invoices |
| 332 | THE_ABC009604 | THE_ABC009604 | Invoice from IncRev Corporation |
| 333 | THE_ABC009605 | THE_ABC009607 | Theranos B/S, I/S and C/F - Monthly Jan - Jul 2017 |
| 334 | THE_ABC009608 | THE_ABC009608 | Theranos B/S - Monthly Jan - Jun 2017 |
| 335 | THE_ABC009609 | THE_ABC009609 | Theranos B/S, I/S and C/F - Monthly Jan - Nov 2017 |
| 336 | THE_ABC009610 | THE_ABC009610 | Theranos I/S - Monthly Jan - Oct 2017 |
| 337 | THE_ABC009612 | THE_ABC009612 | Theranos B/S - Monthly Dec 2016 - Dec 2017 |
| 338 | THE_ABC009613 | THE_ABC009613 | Capital Lease Schedules |
| 339 | MA - 00000142 | MA - 00000142 | Theranos 2014 Tax Return - AZ State |
| 340 | SEC-TX-000002604 | SEC-TX-000002719 | Theranos 2015 Tax Return - Federal |
| 341 | THPFM0005428896 | THPFM0005428970 | Theranos 2011 Tax Return - Federal |
| 342 | THPFM0005428971 | THPFM0005429047 | Theranos 2012 Tax Return - Federal |
| 343 | THPFM0005429151 | THPFM0005429257 | Theranos 2013 Tax Return - Federal |
| 344 | TS-0267088 | TS-0267088 | Annual General Ledger Detail |
| 345 | TS-0267089 | TS-0267089 | Annual General Ledger Detail |
| 346 | TS-0267090 | TS-0267090 | Annual General Ledger Detail |
| 347 | TS-0267091 | TS-0267091 | Annual General Ledger Detail |
| 348 | TS-0267092 | TS-0267092 | Annual General Ledger Detail |
| 349 | TS-0267093 | TS-0267093 | Annual General Ledger Detail |
| 350 | TS-0267094 | TS-0267094 | Annual General Ledger Detail |
| 351 | TS-0341386 | TS-0341500 | Theranos 2013 Tax Return - CA State |
| 352 | TS-0341501 | TS-0341521 | Theranos 2013 Tax Return - AZ State |
| 353 | THPFM0003023004 | THPFM0003023004 | Email from Danise Yam to Jeanne Gee at FTI |
| 354 | THPFM0003023008 | THPFM0003023008 | Financials as of 7/14/2016 |
| 355 | BALWANI009 | BALWANI010 | Email between Danise Yam, Balwani and Holmes regarding Theranos cash requirement April - June 2010 |
| 356 | BALWANI000011 | BALWANI000011 | Summary of cash requirement for April - June 2010 |
| 357 | THER-4476982 | THER-4476982 | Summary of cash burns for May - July 2010 |
| 358 | BALWANI000053 | BALWANI000053 | Email from Danise to Holmes and Balwani summarizing cash position as of 12/25/2011 |
| 359 | BALWANI000083 | BALWANI000083 | Email from Danise to Holmes and Balwani attaching cash reports and salary detail. |
| 360 | BALWANI000081 | BALWANI000081 | Email from Danise to Holmes and Balwani attaching cash reports and salary detail. |
| 361 | BALWANI000008 | BALWANI000008 | Email from Danise to Holmes and Balwani attaching cash reports and salary detail |
| 362 | BALWANI000056 | BALWANI000056 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani regarding cash transfer |
| 363 | BALWANI000085 | BALWANI000085 | Email from Danise to Holmes and Balwani attaching check payment, cash reports and salary detail. |
| 364 | BALWANI000012 | BALWANI000012 | Email from Danise to Holmes and Balwani attaching check payment, cash reports and salary detail. |
| 365 | BALWANI000060 | BALWANI000060 | Email from Danise to Holmes and Balwani re cash situation. |
| 366 | BALWANI000014 | BALWANI000014 | Email from Danise to Holmes and Balwani attaching check payment, cash reports and salary detail. |
| 367 | BALWANI000017 | BALWANI000017 | Mazak payment history |
| 368 | BALWANI000018 | BALWANI000018 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports and salary detail. |

| No. | Beginning Bates | Ending Bates | Description |
|-----|-----------------|--------------|-------------|
| 369 | BALWANI000020 | BALWANI000020 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching check schedule |
| 370 | BALWANI000079 | BALWANI000079 | Emails from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching check schedule |
| 371 | BALWANI000022 | BALWANI000022 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports and salary detail |
| 372 | BALWANI000031 | BALWANI000031 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports |
| 373 | BALWANI000028 | BALWANI000028 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports and salary detail. |
| 374 | BALWANI000076 | BALWANI000076 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports |
| 375 | BALWANI000025 | BALWANI000025 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports and salary detail. |
| 376 | BALWANI000006 | BALWANI000007 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani summarizing cash outlay |
| 377 | THPFM0004645095 | THPFM0004645095 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports |
| 378 | BALWANI000073 | BALWANI000073 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports |
| 379 | BALWANI000075 | BALWANI000075 | Summary of total cash balances weekly from 12/1/2014 - 2/8/2015 |
| 380 | THER-AZ-04780685 | THER-AZ-04780685 | Payment analysis YTD 021215 |
| 381 | BALWANI000072 | BALWANI000072 | Summary of total cash balances weekly from 12/1/2014 - 2/8/2015 |
| 382 | BALWANI000047 | BALWANI000048 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports |
| 383 | BALWANI000044 | BALWANI000045 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports a |
| 384 | BALWANI000040 | BALWANI000042 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports |
| 385 | BALWANI000038 | BALWANI000038 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports |
| 386 | BALWANI000033 | BALWANI000033 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports |
| 387 | BALWANI000065 | BALWANI000065 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching cash reports |
| 388 | THER-AZ-04730770 | THER-AZ-04730770 | Cash balance summary weekly from 1/3/2011 to 6/26/2016 |
| 389 | THER-4476981 | THER-4476982 | Email from Danise to Holmes and Balwani attaching a schedule of cash burns for May - July 2010 |
| 390 | BALWANI000063 | BALWANI000063 | Summary of AP payments for 5/21/12 - 6/1/12 |
| 391 | BALWANI000016 | BALWANI000016 | Summary of purchase orders |
| 392 | BALWANI000021 | BALWANI000021 | Summary of AP payments for 9/24/12 - 9/30/12 |
| 393 | BALWANI000080 | BALWANI000080 | Summary of AP payments for 9/24/12 - 9/30/12 |
| 394 | THER-AZ-04780682 | THER-AZ-04780684 | Email from Danise Yam to Elizabeth Holmes and Sunny Balwani with a report of payments by category to date |
| 395 | BALWANI000067 | BALWANI000070 | Emails between Danise Yam to Elizabeth Holmes and Sunny Balwani regarding cash reports |
| 396 | BALWANI000071 | BALWANI000071 | Vendor cash list |
| 397 | BALWANI000035 | BALWANI000036 | Email exchange between Danise Yam to Elizabeth Holmes and Sunny Balwani |
| 398 | BALWANI000037 | BALWANI000037 | Cash spend analysis June-August 2015 |
| 399 | THER-AZ-01661372 | THER-AZ-01661431 | Theranos Employee Handbook - updated June 2013 |

| No. | Beginning Bates | Ending Bates | Description |
|-----|-----------------|--------------|-------------|
| 400 | THER-AZ-06274852 | THER-AZ-06274867 | Theranos Travel and Expense Policy - December 2016 |
| 401 | THER-4627805 | THER-4627813 | Theranos Corporate Policy - Travel Expenses |
| 402 | THER-4646954 | THER-4646957 | Draft Theranos Travel and Expense Policy |
| 403 | THER-5824799 | THER-5824795 | December 2016 Travel and Expense Policy |
| 404 | THER-6460531 | THER-6460551 | Theranos Travel and Other Expense Reimbursement Policies - 11/4/2009 |
| 405 | THER-6465200 | THER-6465220 | Theranos Travel and Other Expense Reimbursement Policies - Updated 7/1/2010 |
| 406 | THER-AZ-04698017 | THER-AZ-04698017 | Trial Balance as of 12/31/2011 |
| 407 | THPFM0000690039 | THPFM0000690039 | Monthly 2009 Jan - Dec B/S, I/S and C/F |
| 408 | THPFM0001167616 | THPFM0001167618 | Annual B/S, I/S and C/F for 2010 - 2011 |
| 409 | PFM-DEPO-00008469 | PFM-DEPO-00008470 | Balance sheet for 1/8/14 |
| 410 | WS.00019 | WS.00019 | Balance sheet for 9/30/14 |
| 411 | WS.00107 | WS.00107 | Balance sheet for 7/31/15 |
| 412 | PFM-DEPO-00008515 | PFM-DEPO-00008516 | B/S and I/S for 9/30/2016 |
| 413 | KOVACEVICH_THERANOS_0000424 | KOVACEVICH_THERANOS_0000424 | Balance sheet for January 2015 |
| 414 | US-REPORTS-0002226 | US-REPORTS-0002231 | Summary capitalization - 2015-2016 and B/S at Dec 2014 |
| 415 | US-REPORTS-0002505 | US-REPORTS-0002505 | Annual B/S as of 12/31/2012 and 1/14/2013 |
| 416 | US-REPORTS-0002506 | US-REPORTS-0002507 | Annual B/S and C/F as of 12/31/2012 and 1/31/2013 |
| 417 | THPFM0001167615 | THPFM0001167615 | Company Financials Assessment as of 2010-2011 |
| 418 | THER-AZ-04713369 | THER-AZ-04713369 | R&D supplies 2013 |
| 419 | THER-AZ-04713365 | THER-AZ-04713365 | Asset rollforward for YE 12/31/2013 |
| 420 | THER-AZ-04713370 | THER-AZ-04713370 | Trial Balance for 2009-2013 |
| 421 | US-REPORTS-0002496 | US-REPORTS-0002499 | Trial Balance as of 12/31/2012 |
| 422 | SEC-USAO-EPROD-000371530 | SEC-USAO-EPROD-000371596 | Theranos Tax Return for 2010 by Mohler, Nixon & Williams |
| 423 | SEC-MOSSADAMS-E-0000018 | SEC-MOSSADAMS-E-0000020 | Acceptance of 2011 Theranos Tax Return |
| 424 | SEC-MOSSADAMS-E-0000008 | SEC-MOSSADAMS-E-0000010 | Acceptance of 2012 Theranos Tax Return - signed by the President - Signature hard to read |
| 425 | SEC-MOSSADAMS-E-0000583 | SEC-MOSSADAMS-E-0000702 | 2013 Moss Adams tax provision |
| 426 | TS-0273271 | TS-0273377 | Theranos Tax Return for 2014 by Moss Adams |
| 427 | TheranosABC00001558 | TheranosABC00001558 | 2018 Budget Workbook |
| 428 | TheranosABC00002249 | TheranosABC00002263 | Profit Sharing 401k Plan Audit Report for 2016 and 2017 |
| 429 | TheranosABC00002310 | TheranosABC00002310 | Theranos payroll report of employees with gross payroll greater than 200k |
| 430 | TheranosABC00034901 | TheranosABC00034915 | October 15, 2018 Profit Sharing Audit by Frank, Rimerman & Co. LLP |
| 431 | TheranosABC00035180 | TheranosABC00035180 | GL data entries for August 2016 |
| 432 | TheranosABC00037246 | TheranosABC00037246 | Payments Reimbursements YR 2013-2016 |
| 433 | THPFM0000651432 | THPFM0000651452 | 2013 - AZ Corp Income Tax Return |
| 434 | THPFM0000651208 | THPFM0000651315 | 2013 - IRS e-file Signature Authorization for Form 1120 |
| 435 | THPFM0000651316 | THPFM0000651431 | 2013 - CA Franchise/Income Tax Return |
| 436 | THPFM0000660887 | THPFM0000660953 | 2012 - CA e-file return authorization for corporations |
| 437 | THPFM0000660954 | THPFM0000661030 | 2012 - IRS e-file Signature Authorization for Form 1120 |
| 438 | THPFM0003011202 | THPFM0003011287 | ADP payroll register for Theranos |
| 439 | THPFM0003021396 | THPFM0003021456 | 2013 - Tax Provision workpapers |
| 440 | THPFM0003021752 | THPFM0003021809 | 2013 - Tax Provision workpapers |
| 441 | THER-0902735 | THER-0902809 | 2011 - IRS e-file Signature Authorization for Form 1120 |
| 442 | THER-0902813 | THER-0902887 | 2011 - IRS e-file Signature Authorization for Form 1120 |
| 443 | THPFM0004654891 | THPFM0004654965 | 2011 - IRS e-file Signature Authorization for Form 1120 |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 444 | KPMG_Theranos_000164 | KPMG_Theranos_000188 | 2007 and 2008 Consolidated Financials - E&Y |
| 445 | KPMG_Theranos_000164 | KPMG_Theranos_000164 | 2007 and 2008 Consolidated Financials - E&Y |
| 446 | KPMG_Theranos_001644 | KPMG_Theranos_001722 | 2009 - Tax Provision workpapers |
| 447 | KPMG_Theranos_003611 | KPMG_Theranos_003678 | 2008 - US Corporation Income Tax Return -1120 |
| 448 | KPMG_Theranos_003737 | KPMG_Theranos_003804 | 2009 - US Corporation Income Tax Return -1120 |
| 449 | KPMG_Theranos_004047 | KPMG_Theranos_004125 | 2009 - Tax Provision workpapers |
| 450 | KPMG_Theranos_006419 | KPMG_Theranos_006476 | 2013 - Tax Provision workpapers |
| 451 | KPMG_Theranos_011639 | KPMG_Theranos_011656 | 2004 & 2005 Financials for Theranos - E&Y |
| 452 | MA - 00000069 | MA - 00000069 | 2015 - US Corporation Income Tax Return -1120 |
| 453 | MA - 00000072 | MA - 00000072 | 2015 - AZ Corp Income Tax Return |
| 454 | MA - 00000073 | MA - 00000073 | 2015 - AZ Corp Income Tax Return |
| 455 | MA - 00000078 | MA - 00000078 | 2015 - IRS e-file Signature Authorization for Form 1120 |
| 456 | MA - 00000155 | MA - 00000155 | 2014 - US Corporation Income Tax Return -1120 |
| 457 | MA - 00000341 | MA - 00000341 | 2013 - IRS e-file Signature Authorization for Form 1120 |
| 458 | MA - 00000350 | MA - 00000350 | 2015 - IRS e-file Signature Authorization for Form 1120 |
| 459 | MA - 00000375 | MA - 00000375 | 2008 - US Corporation Income Tax Return -1120 |
| 460 | MA - 00000380 | MA - 00000380 | 2009 - US Corporation Income Tax Return -1120 |
| 461 | MA - 00000385 | MA - 00000385 | 2010 - IRS e-file Signature Authorization for Form 1120 |
| 462 | SEC-ARANCA-E-0002361 | SEC-ARANCA-E-0002380 | 2005 and 2006 Consolidated Financials - E&Y |
| 463 | SEC-MOSSADAMS-E-0000816 | SEC-MOSSADAMS-E-0000888 | 2007 - CA Franchise/Income Tax Return |
| 464 | SEC-MOSSADAMS-E-0000977 | SEC-MOSSADAMS-E-0000998 | 2014 - AZ Corp Income Tax Return |
| 465 | SEC-MOSSADAMS-E-0001154 | SEC-MOSSADAMS-E-0001207 | 2013 - Tax Provision workpapers |
| 466 | SEC-MOSSADAMS-E-0001283 | SEC-MOSSADAMS-E-0001373 | 2011 - Mohler, Nixon & Williams Tax supporting documents |
| 467 | SEC-MOSSADAMS-E-0001607 | SEC-MOSSADAMS-E-0001704 | 2009 - Mohler, Nixon & Williams Tax supporting documents |
| 468 | SEC-MOSSADAMS-E-0001820 | SEC-MOSSADAMS-E-0001896 | 2012 - IRS e-file Signature Authorization for Form 1120 |
| 469 | SEC-MOSSADAMS-E-0001897 | SEC-MOSSADAMS-E-0001966 | 2009 - Mohler, Nixon & Williams Tax supporting documents |
| 470 | SEC-MOSSADAMS-E-0002204 | SEC-MOSSADAMS-E-0002270 | 2010 - IRS e-file Signature Authorization for Form 1120 |
| 471 | SEC-MOSSADAMS-E-0002770 | SEC-MOSSADAMS-E-0002892 | 2013 - Moss Adams Tax supporting documents |
| 472 | THPFM0000403000 | THPFM0000403074 | 2011 - IRS e-file Signature Authorization for Form 1120 |
| 473 | SEC-EXHIBIT-00000171 | SEC-EXHIBIT-00000171 | 2015 - IRS e-file Signature Authorization for Form 1120 |
| 474 | THER-AZ-01148775 | THER-AZ-01148816 | 2012 - US Corporation Income Tax Return -1120 (For INCREV CORPORATION) |
| 475 | TS-0491330 | TS-0491397 | June 21, 2010 - Independent Appraisal Report - Common Stock FMV as of 12/31/2009 |
| 476 | THPFM0003012659 | THPFM0003012729 | January 13, 2011 - Independent Appraisal Report - Common Stock FMV as of 7/1/2010 |
| 477 | THPFM0003040271 | THPFM0003040348 | July 26, 2013 - Independent Appraisal Report - Common Stock FMV as of 7/1/2011 |
| 478 | THPFM0002342857 | THPFM0002342927 | September 26, 2013 - Independent Appraisal Report - Common Stock FMV as of 7/1/2012 |
| 479 | THPFM0001449932 | THPFM0001450000 | December 5, 2013 - Independent Appraisal Report - Common Stock FMV as of 9/30/2013 |
| 480 | THPFM0003104511 | THPFM0003104579 | December 6, 2013 - Independent Appraisal Report - Common Stock FMV as of 9/30/2013 |

| No. | Beginning Bates | Ending Bates | Description |
|-----|-----------------|--------------|-------------|
| 481 | SEC-ARANCA-E-0003170 | SEC-ARANCA-E-0003259 | October 20, 2014 - Independent Appraisal Report - Common Stock FMV as of 3/31/2014 |
| 482 | SEC-ARANCA-E-0002997 | SEC-ARANCA-E-0003084 | October 21, 2014 - Independent Appraisal Report - Common Stock FMV as of 9/30/2014 |
| 483 | TS-0886316 | TS-0886400 | 12/12/2014 Amended report to December 6, 2013 Independent Appraisal Report - Common Stock FMV as of 9/30/2013 |
| 484 | THPFM0002104423 | THPFM0002104518 | December 15, 2014 - Independent Appraisal Report - Common Stock FMV as of 12/31/2014 |
| 485 | SEC-ARANCA-E-0007058 | SEC-ARANCA-E-0007147 | April 6, 2015 - Independent Appraisal Report - Common Stock FMV as of 3/25/2015 |
| 486 | THPFM0005416268 | THPFM0005416355 | September 9, 2015 - Independent Appraisal Report - Common Stock FMV as of 5/1/2015 |
| 487 | THER-0895009 | THER-0895009 | Workbook with support for FMV as of 2/7/2014 |
| 488 | THPFM0001552495 | THPFM0001552495 | Email dated 9/18/2013 from Danise Yam to Elizabeth Holmes and Sunny Balwani attaching models |
| 489 | THPFM0001552496 | THPFM0001552496 | Workbook with support for FMV as of 7/1/2012 |
| 490 | THPFM0001552497 | THPFM0001552497 | Workbook with support for FMV as of 7/1/2013 |
| 491 | THPFM0001452100 | THPFM0001452102 | Theranos, Inc. and Subsidiary Balance Sheet as of 1/8/2014 |
| 492 | THPFM0003028864 | THPFM0003028866 | IS/BS/CF statements as of 6/30/2013 for Theranos, Inc. and Subsidiary |
| 493 | THPFM0000669012 | THPFM0000669017 | IS/BS/CF statements as of 10/4/2013 for Theranos, Inc. and Subsidiary |
| 494 | KPMG eAudit 0000001 | KPMG eAudit 0000001 | KPMG Audit File - 2009 |
| 495 | KPMG eAudit 0001016 | KPMG eAudit 0001016 | KPMG Audit File - 2010 |
| 496 | KPMG eAudit 0001950 | KPMG eAudit 0001950 | KPMG Audit File - 2011 |
| 497 | Balwani-2055 | Balwani-2055 | Email to Seth Bermel at Luminous Capital regarding $5M wire from Theranos to Sunny for repayment of $12M LOC |
| 498 | Balwani-2209 | Balwani-2209 | Email between Sunny Balwani and Set Bernal confirming 7/1/2010 wire receipt |
| 499 | Balwani-3073 | Balwani-3075 | Email chain between Sunny Balwani and Luminous Capital regarding Loan Documents |
| 500 | Balwani-3092 | Balwani-3093 | Email between Luminous Capital to Danise Yam regarding Loan Document |
| 501 | Balwani-3094 | Balwani-3095 | Statement of Purpose for an Extension of Credit by a Creditor (Federal Reserve Form T-4) |
| 502 | Balwani-4552 | Balwani-4553 | Email from Eric Ball at Oracle regarding Theranos' credit facilities associated with the IMSS contract |
| 503 | Balwani-3782 | Balwani-3783 | Email between Sunny Balwani and Luminous Capital regarding Asset Allocation |
| 504 | TS-0344921 | TS-0344923 | Non-Purpose Loan Customer Agreement with Fidelity |
| 505 | TS-0344918 | TS-0344920 | August 13, 2009 Loan Agreement signed by Sunny Balwani |
| 506 | TS-0344924 | TS-0344928 | Reaffirmation Agreement between Sunny Balwani and Theranos regarding guarantee on the Non-Purpose Loan taken out by Theranos |
| 507 | KPMG_Theranos_013263 | KPMG_Theranos_013263 | Statement of Purpose for an Extension of Credit by a Creditor (Federal Reserve Form T-4) |
| 508 | TS-0234359 | TS-0234382 | Fidelity Investment Report as of December 2010 |
| 509 | THPFM0002528189 | THPFM0002528198 | Exhibit 29 (PFM Deposition) for Mona Ramamurthy |
| 510 | THPFM0004806495 | THPFM0004806496 | July 6, 2016 Confidentiality Letter to Sunny Balwani |
| 511 | THPFM0004806497 | THPFM0004806497 | Notice to Terminating Employees from CA Department of Health Care Services - Health Insurance Premium Payment Program |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 512 | THPFM0004806498 | THPFM0004806498 | Termination Certification |
| 513 | THPFM0004806499 | THPFM0004806499 | July 6, 2016 Letter from Mona Ramamurthy to Sunny Balwani |
| 514 | THPFM0005579161 | THPFM0005579217 | Sunny Balwani's Employment Application for Theranos - dated 9/1/2009 |
| 515 | THPFM0005579166 | THPFM0005579177 | At Will Employment, Confidential Information, Invention Assignment, and Arbitrations Agreement |
| 516 | TS-0999608 | TS-0999613 | Board Minutes - July 19, 2016 |
| 517 | Balwani-2565 | Balwani-2565 | Check Image - from Sunny Balwani to Theranos for $566,500 on 12/16/2011 |
| 518 | THER-0933887 | THER-0933904 | Compensation Committee Minutes - May 18, 2009 |
| 519 | TS-0490281 | TS-0490331 | Compensation Committee Minutes - February 11, 2009<br>Compensation Committee Minutes - May 18, 2009<br>Compensation Committee Minutes - August 12, 2009 |
| 520 | THER-0335871 | THER-0335887 | Board Minutes - March 2, 2010 |
| 521 | THER-0933851 | THER-0933859 | Board Minutes - October 30, 2009 |
| 522 | THER-3116993 | THER-3116994 | Joinder Agreement 12/18/2013 |
| 523 | THPFM0000662676 | THPFM0000662683 | Common Stock Purchase Warrant dated 10/30/2009 (Executed) |
| 524 | THPFM0000667107 | THPFM0000667125 | Early Exercise Stock Option Agreement under the 2004 Stock Plan - 4/27/2011 (VCD 010111) |
| 525 | THPFM0000667127 | THPFM0000667146 | Early Exercise Stock Option Agreement under the 2004 Stock Plan - 8/10/2010 (VCD 010110) |
| 526 | THPFM0003014957 | THPFM0003014978 | Early Exercise Stock Option Agreement under the 2004 Stock Plan - 12/16/2011 (VCD 121611) |
| 527 | THPFM0005009889 | THPFM0005009911 | Early Exercise Stock Option Agreement under the 2004 Stock Plan - 12/13/2013 |
| 528 | THPFM0005244339 | THPFM0005244358 | Early Exercise Stock Option Agreement under the 2004 Stock Plan - 10/30/2009 (VCD 090109) |
| 529 | THPFM0005244359 | THPFM0005244378 | Early Exercise Stock Option Agreement under the 2004 Stock Plan - 10/30/2009 (VCD 090109) |
| 530 | MA - 00000083 | MA - 00000083 | Workbook detailing stock options and awards granted |
| 531 | MA - 00000084 | MA - 00000084 | Workbook detailing stock options and awards granted |
| 532 | MA - 00000085 | MA - 00000085 | Workbook detailing stock options and awards granted |
| 533 | MA - 00000087 | MA - 00000087 | Warrants Valuation |
| 534 | MA - 00000089 | MA - 00000089 | Workbook detailing stock options and awards granted |
| 535 | MA - 00000228 | MA - 00000228 | Workbook detailing stock options exercised |
| 536 | MA - 00000229 | MA - 00000229 | Workbook detailing stock options exercised |
| 537 | MA - 00000230 | MA - 00000230 | Workbook detailing stock options exercised |
| 538 | MA - 00000317 | MA - 00000317 | Theranos financial documents for year ending 12/31/2011 |
| 539 | MA - 00000358 | MA - 00000358 | 2009-2011 - Draft form of consolidated financials |
| 540 | MA - 00000397 | MA - 00000397 | 2012-2013 - Draft form of consolidated financials |
| 541 | MA - 00000461 | MA - 00000461 | Email chain regarding 2015 tax returns |
| 542 | MA - 00000463 | MA - 00000463 | Workbook with Adjustments |
| 543 | MA - 00000490 | MA - 00000490 | Email chain regarding tax treatment |
| 544 | MA - 00000595 | MA - 00000595 | Email chain regarding tax treatment |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 545 | MA - 00000809 | MA - 00000809 | 2014 Trial Balance provided by Danise Yam to Moss Adams on August 14, 2015 |
| 546 | MA - 00000837 | MA - 00000837 | Analysis of deferred rent and rent expense |
| 547 | SEC-MOSSADAMS-E-0002898 | SEC-MOSSADAMS-E-0002917 | Audited Consolidated Financial Statements for the Periods Ended 12/31/2008 and 12/31/2007 |
| 548 | MA - 00000183 | MA - 00000183 | EY Consolidated Financial Statements years ended 12/31/07, 12/31/08 |
| 549 | KPMG eAudit 0000938 | KPMG eAudit 0000938 | KPMG assessment of valuation of warrants granted to Ramesh Balwani per loan agreement with Fidelity. |
| 550 | KPMG eAudit 0001437 | KPMG eAudit 0001437 | KPMG summaries of 2010 Theranos Board of Directors meeting |
| 551 | KPMG eAudit 0001438 | KPMG eAudit 0001442 | Written Resolutions of the Board of Directors of the Company Passed on December 21, 2010 |
| 552 | KPMG eAudit 0001607 | KPMG eAudit 0001607 | AP Accrual Listing 12/31/2010 |
| 553 | KPMG eAudit 0001489 | KPMG eAudit 0001526 | Board of Directors Meeting Minutes - August 10, 2010 |
| 554 | KPMG eAudit 0001320 | KPMG eAudit 0001320 | KPMG FY'10 Account Summary |
| 555 | KPMG eAudit 0001648 | KPMG eAudit 0001648 | Equity Rollforward 2010 |
| 556 | KPMG eAudit 0001701 | KPMG eAudit 0001701 | Option Rollforward 2010 |
| 557 | KPMG eAudit 0001705 | KPMG eAudit 0001709 | KPMG Memo regarding share-based compensation |
| 558 | KPMG eAudit 0001811 | KPMG eAudit 0001811 | 2010 Final Analytics FY 10 |
| 559 | KPMG eAudit 0001944 | KPMG eAudit 0001944 | Details personnel expenses in general categories |
| 560 | KPMG eAudit 0001949 | KPMG eAudit 0001949 | Details other expenses in general categories |
| 561 | KPMG eAudit 0002353 | KPMG eAudit 0002354 | February 13, 2012 letter amending April 20, 2010 engagement letter |
| 562 | THPFM0005579161 | THPFM0005579217 | Sunny Balwani's Employment Application for Theranos - dated 9/1/2009 |
| 563 | KPMG eAudit 0002453 | KPMG eAudit 0002453 | 2011 Final Analytics/Planning Analytics FY 11 |
| 564 | KPMG eAudit 0002454 | KPMG eAudit 0002473 | Board minutes - April 27, 2011 |
| 565 | KPMG eAudit 0002627 | KPMG eAudit 0002627 | Accrued Compensation Lead sheet 2011 |
| 566 | KPMG eAudit 0002792 | KPMG eAudit 0002792 | Management's Calculation FY 2011 |
| 567 | KPMG eAudit 0002850 | KPMG eAudit 0002850 | Stock Option Grant Testwork 12/31/2011 |
| 568 | KPMG eAudit 0002851 | KPMG eAudit 0002851 | Stock Option Exercise Testwork 12/31/2011 |
| 569 | KPMG eAudit 0002922 | KPMG eAudit 0002922 | Refundable Options Reconciliation as of 12/31/2011 |
| 570 | KPMG eAudit 0002923 | KPMG eAudit 0002926 | Early Exercise Liability Memo 3/13/2012 |
| 571 | KPMG eAudit 0002927 | KPMG eAudit 0002927 | Early Exercise Liability Testwork 12/31/2011 |
| 572 | KPMG eAudit 0002928 | KPMG eAudit 0002928 | KPMG Sampling Plan 10/11 |
| 573 | KPMG eAudit 0002998 | KPMG eAudit 0002999 | Draft Independent Auditor's Report |
| 574 | KPMG eAudit 0000428 | KPMG eAudit 0000428 | 2009 Lead sheet - Account Summary |
| 575 | KPMG eAudit 0000429 | KPMG eAudit 0000435 | April 20, 2010 Engagement Letter |
| 576 | KPMG eAudit 0000466 | KPMG eAudit 0000466 | 2009 Lead sheet - PPE Net |
| 577 | KPMG eAudit 0000467 | KPMG eAudit 0000467 | 2009 Lead sheet - Investments |
| 578 | KPMG eAudit 0000468 | KPMG eAudit 0000468 | 2009 Lead sheet - Trade Receivables |
| 579 | KPMG eAudit 0000469 | KPMG eAudit 0000469 | 2009 Lead sheet - Cash |
| 580 | KPMG eAudit 0000474 | KPMG eAudit 0000476 | Theranos Risk Assessment Meeting Agenda |
| 581 | KPMG eAudit 0000477 | KPMG eAudit 0000477 | 12/31/2009 Planning analytics - Balance Sheet |
| 582 | KPMG eAudit 0000761 | KPMG eAudit 0000761 | Accrued Expense Schedule as of 12/31/2009 |
| 583 | KPMG eAudit 0000762 | KPMG eAudit 0000762 | 2009 Lead sheet - Accrued Compensation |
| 584 | KPMG eAudit 0000763 | KPMG eAudit 0000763 | 2009 Lead sheet - Deferred Rent - LT |
| 585 | KPMG eAudit 0000764 | KPMG eAudit 0000764 | 2009 Lead sheet - Long-Term Debt |
| 586 | KPMG eAudit 0000765 | KPMG eAudit 0000765 | 2009 Lead sheet - Short-Term Debt |
| 587 | KPMG eAudit 0000766 | KPMG eAudit 0000766 | 2009 Lead sheet - Accrued Expenses |
| 588 | KPMG eAudit 0000767 | KPMG eAudit 0000767 | 2009 Lead sheet - Deferred Revenue |
| 589 | KPMG eAudit 0000770 | KPMG eAudit 0000770 | Summary of Theranos Debt Agreement to which Sunny Balwani Guaranteed |
| 590 | KPMG eAudit 0000783 | KPMG eAudit 0000783 | 2009 Lead sheet - Trade Payables |
| 591 | KPMG eAudit 0000853 | KPMG eAudit 0000853 | 12/31/2009 Options Rollforward |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 592 | KPMG eAudit 0000862 | KPMG eAudit 0000862 | Summary by Quarter of expense related to options |
| 593 | KPMG_Theranos_002385 | KPMG_Theranos_002385 | Summary of Uncorrected Audit Differences 12/31/2009 |
| 594 | KPMG eAudit 0003592 | KPMG eAudit 0003592 | 2.5.2 Inquiries |
| 595 | KPMG_Theranos_003204 | KPMG_Theranos_003204 | Email regarding valuation reports |
| 596 | KPMG_Theranos_003207 | KPMG_Theranos_003207 | Draft financials for 2009 -2011 |
| 597 | KPMG_Theranos_003243 | KPMG_Theranos_003243 | Email chain regarding Safeway and Walgreens accounting |
| 598 | KPMG_Theranos_003249 | KPMG_Theranos_003249 | Trial balance and other financials |
| 599 | KPMG_Theranos_003252 | KPMG_Theranos_003258 | Draft March 31, 2012 Management Representation letter |
| 600 | KPMG_Theranos_003370 | KPMG_Theranos_003371 | Email thread regarding James Berdell |
| 601 | KPMG_Theranos_003393 | KPMG_Theranos_003394 | Client Risk Assessment Report Period End Date 12/31/2012 |
| 602 | KPMG_Theranos_003490 | KPMG_Theranos_003496 | Email thread regarding Theranos Audit |
| 603 | KPMG_Theranos_004462 | KPMG_Theranos_004468 | Email chain regarding Theranos Audit |
| 604 | KPMG_Theranos_003507 | KPMG_Theranos_003507 | Theranos Inc. Status Meeting April 6, 2012 |
| 605 | KPMG_Theranos_003526 | KPMG_Theranos_003527 | Email from Danise Yam regarding Theranos valuation |
| 606 | KPMG_Theranos_003546 | KPMG_Theranos_003553 | Email regarding 2010 Theranos Review |
| 607 | KPMG_Theranos_004549 | KPMG_Theranos_004549 | Additional Requests - Theranos 11/14/2014 |
| 608 | KPMG_Theranos_004559 | KPMG_Theranos_004559 | Excel spreadsheet with financials for 2009-2013 |
| 609 | KPMG_Theranos_004652 | KPMG_Theranos_004652 | Excel spreadsheet with financials for 2009-2013 |
| 610 | KPMG_Theranos_004880 | KPMG_Theranos_004882 | Draft version of a KPMG engagement letter for the 2012 and 2013 audits |
| 611 | KPMG_Theranos_005124 | KPMG_Theranos_005124 | Cash and investment schedule for 2013 |
| 612 | KPMG_Theranos_005134 | KPMG_Theranos_005134 | Operating expenses for 2013 provided by Danise to KPMG |
| 613 | KPMG_Theranos_005684 | KPMG_Theranos_005684 | Refundable Options Reconciliation as of 12/31/2012 |
| 614 | KPMG_Theranos_006187 | KPMG_Theranos_006187 | Rent expenses and lease detail for various lease agreements |
| 615 | KPMG_Theranos_005683 | KPMG_Theranos_005683 | Cash and investment schedule for 2012 |
| 616 | KPMG_Theranos_006188 | KPMG_Theranos_006192 | Email between Danise Yam and KPMG discussing 2012 and 2013 grants |
| 617 | KPMG_Theranos_006204 | KPMG_Theranos_006204 | SBC Expense Comparison |
| 618 | KPMG_Theranos_006330 | KPMG_Theranos_006331 | Client Risk Assessment Report Period End Date 12/31/2013 |
| 619 | KPMG_Theranos_006332 | KPMG_Theranos_006336 | Email chain regarding questions for Aranca |
| 620 | KPMG_Theranos_006482 | KPMG_Theranos_006483 | Common Stock Valuation Review as of September 30, 2013 ("Valuation Date") |
| 621 | KPMG_Theranos_006749 | KPMG_Theranos_006768 | Theranos, Inc. and Subsidiary Consolidated Financial Statements for 12/31/2007 and 2008 signed by KPMG in August 2011 |
| 622 | KPMG_Theranos_006769 | KPMG_Theranos_006769 | KPMG email regarding Theranos Review |
| 623 | KPMG_Theranos_006836 | KPMG_Theranos_006836 | Financials sent by Danise Yam to KPMG |
| 624 | KPMG_Theranos_006947 | KPMG_Theranos_006947 | Theranos Inc. Planning Meeting Agenda November 19, 2014 |
| 625 | KPMG_Theranos_006988 | KPMG_Theranos_006988 | Email chain regarding Theranos Engagement |
| 626 | KPMG_Theranos_007000 | KPMG_Theranos_007006 | Questions for Aranca and Theranos Inc. |
| 627 | KPMG_Theranos_007017 | KPMG_Theranos_007017 | Workbook with a summary of options exercised, granted, etc. From 2004 to 12/4/2014 |
| 628 | KPMG_Theranos_008688 | KPMG_Theranos_008692 | Revised draft engagement letter from audit to "review" of the 2012-2013 periods |
| 629 | KPMG_Theranos_007183 | KPMG_Theranos_007184 | Email regarding Theranos valuation |
| 630 | KPMG_Theranos_007674 | KPMG_Theranos_007674 | Theranos Inc. OPEX flux year ending 12/31/2012 |
| 631 | KPMG_Theranos_007765 | KPMG_Theranos_007765 | Expense analytic comparing expense accounts YoY from 2011-2013 |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 632 | KPMG_Theranos_008848 | KPMG_Theranos_008850 | Client Risk Assessment Report Period End Date 12/13/2014 |
| 633 | KPMG_Theranos_009013 | KPMG_Theranos_009014 | August 12, 2015 letter from KPMG to Theranos Inc. attaching Appendix II included with February 13, 2012 engagement letter |
| 634 | KPMG_Theranos_010592 | KPMG_Theranos_010608 | Email regarding Option Rollforward 2010 |
| 635 | KPMG_Theranos_010610 | KPMG_Theranos_010610 | Options Rollforward FYE 12/31/2010 |
| 636 | KPMG eAudit 0003977 | KPMG eAudit 0003977 | 2011 Lead Sheet - Investments |
| 637 | KPMG eAudit 0004123 | KPMG eAudit 0004123 | 2011 Lead Sheet - Prepaid Expenses |
| 638 | KPMG eAudit 0004135 | KPMG eAudit 0004135 | PPE Lead Sheet 2011 |
| 639 | KPMG eAudit 0004167 | KPMG eAudit 0004167 | A/P Lead sheet  2011 |
| 640 | KPMG eAudit 0004189 | KPMG eAudit 0004189 | Accrued Compensation Lead sheet 2011 |
| 641 | KPMG eAudit 0004191 | KPMG eAudit 0004191 | Personnel Expense Lead sheet 2011 |
| 642 | KPMG eAudit 0004328 | KPMG eAudit 0004328 | Stock Option Grant Testwork 12/31/2011 |
| 643 | KPMG eAudit 0004330 | KPMG eAudit 0004330 | Stock Option Exercise Testwork 12/31/2011 |
| 644 | KPMG eAudit 0004497 | KPMG eAudit 0004497 | Refundable options reconciliation 12/31/2011 |
| 645 | KPMG eAudit 0004499 | KPMG eAudit 0004502 | KPMG Early Exercise Liability Memo 3/13/12 |
| 646 | KPMG eAudit 0004504 | KPMG eAudit 0004504 | Early Exercise Liability Testwork 12/31/2011 |
| 647 | KPMG eAudit 0004508 | KPMG eAudit 0004510 | 300.5 Conclusion Summary |
| 648 | KPMG eAudit 0004515 | KPMG eAudit 0004515 | Personnel Expense Lead sheet 2011 |
| 649 | KPMG eAudit 0004925 | KPMG eAudit 0005264 | Collection of BOD minutes, templates for exercise agreements, 2013 Aranca report |
| 650 | KPMG eAudit 0005270 | KPMG eAudit 0005270 | 2011 Final Analytics |
| 651 | KPMG eAudit 0005273 | KPMG eAudit 0005274 | 4.5.1 Management bias |
| 652 | KPMG eAudit 0005301 | KPMG eAudit 0005301 | Summary of Corrected Audit Misstatements for FY ended 12/31/2011 |
| 653 | KPMG eAudit 0005894 | KPMG eAudit 0005904 | Amended and Restated 2004 Stock Plan |
| 654 | KPMG eAudit 0005906 | KPMG eAudit 0005906 | Details options by person including Balwani |
| 655 | KPMG eAudit 0005961 | KPMG eAudit 0005961 | SR-2 Equity -Accounting for equity instruments and share based payments |
| 656 | KPMG eAudit 0006004 | KPMG eAudit 0006004 | Trial Balance as of 12/31/13 |
| 657 | KPMG eAudit 0007606 | KPMG eAudit 0007606 | Cash Lead sheet Period End 12/31/12 and 12/31/13 |
| 658 | KPMG_Theranos_010809 | KPMG_Theranos_010833 | Exhibit A to the minutes is the 2011 Director and Management Compensation Matrix |
| 659 | KPMG eAudit 0007176 | KPMG eAudit 0007176 | 12/7/2014 Review Note |
| 660 | KPMG eAudit 0007609 | KPMG eAudit 0007609 | 2012 Lead Sheet - PPE |
| 661 | KPMG eAudit 0007617 | KPMG eAudit 0007617 | 2012 Lead Sheet - AP |
| 662 | KPMG eAudit 0007620 | KPMG eAudit 0007620 | 2012/2013 Lead Sheet - Other Current Liabilities |
| 663 | KPMG eAudit 0007750 | KPMG eAudit 0007750 | 2012/2013 Lead Sheet - Equity |
| 664 | KPMG eAudit 0008395 | KPMG eAudit 0008395 | SR-2 Equity -Accounting for Equity Instruments and Share Based Payments |
| 665 | KPMG eAudit 0009100 | KPMG eAudit 0009100 | EQU.3 Design and implementation of relevant controls |
| 666 | KPMG eAudit 0009140 | KPMG eAudit 0009140 | 2014 Lead Sheet - Cash |
| 667 | KPMG eAudit 0009196 | KPMG eAudit 0009196 | 2014 Lead Sheet - Investment |
| 668 | KPMG eAudit 0009242 | KPMG eAudit 0009242 | 2014 Lead Sheet - PPE |
| 669 | KPMG eAudit 0009263 | KPMG eAudit 0009263 | 2013/2014 Lead Sheet - AP |
| 670 | KPMG eAudit 0009278 | KPMG eAudit 0009278 | 2013/2014 Lead Sheet - Notes Payable |
| 671 | KPMG eAudit 0009290 | KPMG eAudit 0009290 | Lead Sheet - Accrued Compensation (Period End 12/31/2013) |
| 672 | KPMG eAudit 0009292 | KPMG eAudit 0009292 | Lead Sheet - Accrued Expenses (Period End 12/31/2012) |
| 673 | KPMG eAudit 0009294 | KPMG eAudit 0009294 | Lead Sheet - Personnel Expense (Period End 12/31/2012) |
| 674 | KPMG_Theranos_011561 | KPMG_Theranos_011561 | Options Rollforward (Post-split) FYE 12/31/2011 |
| 675 | KPMG_Theranos_011699 | KPMG_Theranos_011699 | AP Accrual Reconciliation 12/2011 |
| 676 | KPMG_Theranos_011698 | KPMG_Theranos_011698 | 2010 AP aging spreadsheet 2/10/12 |
| 677 | KPMG_Theranos_011803 | KPMG_Theranos_011806 | Email chain regarding Question Log |
| 678 | KPMG_Theranos_011807 | KPMG_Theranos_011812 | Email chain regarding Question Log |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 679 | KPMG_Theranos_011857 | KPMG_Theranos_011862 | Email chain regarding Question Log |
| 680 | KPMG_Theranos_011835 | KPMG_Theranos_011835 | Summary of Fair Market Value of options as of YE 2011 |
| 681 | KPMG_Theranos_011846 | KPMG_Theranos_011855 | Email chain regarding valuation report |
| 682 | KPMG_Theranos_011914 | KPMG_Theranos_011917 | September 11, 2015 KPMG Memo re: AS 73 Review of the Common Equity Valuation of Theranos, Inc. as of July 1, 2010 |
| 683 | KPMG_Theranos_011937 | KPMG_Theranos_011939 | Email between KPMG employees regarding 2014 valuation report |
| 684 | KPMG_Theranos_011940 | KPMG_Theranos_011941 | KPMG Preliminary Questions, Review of Theranos, Inc. Stock Valuation as of September 30, 2014 ("Valuation Date") |
| 685 | KPMG_Theranos_012017 | KPMG_Theranos_012020 | Email between KPMG employees regarding 2014 valuation report |
| 686 | KPMG_Theranos_012021 | KPMG_Theranos_012027 | Aranca/Management - Aranca Responses |
| 687 | KPMG_Theranos_012071 | KPMG_Theranos_012076 | Series C Preferred Stock Purchase Warrant Agreement between Theranos and The Board of Trustees of the Leland Stanford Junior University |
| 688 | KPMG_Theranos_012120 | KPMG_Theranos_012121 | Series C Preferred Stock Purchase Warrant Agreement between Theranos and The Board of Trustees of the Leland Stanford Junior University |
| 689 | KPMG_Theranos_012225 | KPMG_Theranos_012235 | Email between KPMG employees regarding common stock valuation as of July 2010 |
| 690 | KPMG_Theranos_012451 | KPMG_Theranos_012452 | Email chain regarding Theranos Audit |
| 691 | KPMG_Theranos_012453 | KPMG_Theranos_012455 | Email chain regarding Theranos Audit |
| 692 | KPMG_Theranos_012456 | KPMG_Theranos_012459 | Email chain regarding Wall Street Journal Article |
| 693 | KPMG_Theranos_012466 | KPMG_Theranos_012470 | Email chain regarding termination agreement |
| 694 | KPMG_Theranos_012750 | KPMG_Theranos_012755 | July 30, 2010 Option Agreement between Theranos and Safeway |
| 695 | KPMG_Theranos_012479 | KPMG_Theranos_012497 | Mutual Termination and Release Agreement draft 12/16/2015 |
| 696 | KPMG_Theranos_012646 | KPMG_Theranos_012652 | Draft KPMG Representation letter |
| 697 | KPMG_Theranos_012964 | KPMG_Theranos_012969 | Draft KPMG Representation letter |
| 698 | KPMG_Theranos_012661 | KPMG_Theranos_012672 | Email chain regarding 2007/2008 Financials |
| 699 | KPMG_Theranos_013010 | KPMG_Theranos_013010 | Email from KPMG attaching 2007/2008 financial statements |
| 700 | KPMG_Theranos_013011 | KPMG_Theranos_013030 | Theranos Consolidated Financial Statements December 31, 2008 and 2007 |
| 701 | KPMG_Theranos_011121 | KPMG_Theranos_011122 | Email chain regarding Theranos Audit |
| 702 | KPMG_Theranos_011158 | KPMG_Theranos_011158 | Question Log - FY09-11 audit |
| 703 | KPMG_Theranos_011157 | KPMG_Theranos_011157 | Warrants valuation - Series C warrant (Stanford lease) FYE 2011 |
| 704 | KPMG_Theranos_011165 | KPMG_Theranos_011165 | Email regarding stock warrant liability (Stanford lease) amounts |
| 705 | KPMG_Theranos_011172 | KPMG_Theranos_011172 | Options Rollforward FYE 12/31/2009 |
| 706 | KPMG_Theranos_011168 | KPMG_Theranos_011170 | Email chain regarding Option rollforward 2009 |
| 707 | KPMG_Theranos_011174 | KPMG_Theranos_011198 | Question Log - FY09-11 audit |
| 708 | KPMG_Theranos_011402 | KPMG_Theranos_011402 | Question Log - FY09-11 audit 8/25/2015 |
| 709 | KPMG_Theranos_011414 | KPMG_Theranos_011414 | Stock based compensation expense for 2011 details by option number |
| 710 | KPMG_Theranos_011463 | KPMG_Theranos_011463 | 2010 Option Rollforward (provided as part of wrap up review in 2015) |
| 711 | KPMG_Theranos_011462 | KPMG_Theranos_011462 | 2009 Option Rollforward (provided as part of wrap up review in 2015) |
| 712 | KPMG_Theranos_011465 | KPMG_Theranos_011465 | 2011 Option Rollforward (provided as part of wrap up review in 2015) |
| 713 | KPMG_Theranos_013208 | KPMG_Theranos_013208 | Trial Balance for 2009 and 2008 |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 714 | KPMG_Theranos_013267 | KPMG_Theranos_013267 | Summary Capitalization schedule for 12/31/2009 containing options and warrants for Sunny Balwani |
| 715 | KPMG_Theranos_013342 | KPMG_Theranos_013342 | FYE 2009 Expense Allocation Summary for options to employees |
| 716 | KPMG_Theranos_014517 | KPMG_Theranos_014519 | Email chain regarding loan agreement |
| 717 | KPMG_Theranos_014525 | KPMG_Theranos_014535 | Theranos Bank Statements for Comerica Commercial Checking Account No 1892535137 for the month of August 2009 |
| 718 | KPMG_Theranos_014537 | KPMG_Theranos_014537 | Account Reconciliation 12/2009 |
| 719 | KPMG_Theranos_014546 | KPMG_Theranos_014546 | 2010 Cash and Investment schedule |
| 720 | KPMG_Theranos_014551 | KPMG_Theranos_014551 | Trial Balance for 2010 |
| 721 | KPMG_Theranos_014600 | KPMG_Theranos_014602 | ADP Report of PTO hours |
| 722 | KPMG_Theranos_015027 | KPMG_Theranos_015027 | FYE 2010 Expense Allocation Summary for options to employees |
| 723 | KPMG_Theranos_015823 | KPMG_Theranos_015834 | 4/16/12 KPMG Memo re: Safeway and Walgreens Agreements |
| 724 | KPMG_Theranos_015875 | KPMG_Theranos_015877 | Email chain regarding status meeting with Theranos |
| 725 | KPMG_Theranos_015917 | KPMG_Theranos_015918 | Email chain regarding Financing |
| 726 | KPMG_Theranos_015923 | KPMG_Theranos_015926 | Email chain with Danise Yam regarding option pricing |
| 727 | KPMG_Theranos_015963 | KPMG_Theranos_015966 | KPMG email to Danise regarding status for completion of the 2009-2011 audits |
| 728 | KPMG_Theranos_015968 | KPMG_Theranos_015969 | KPMG email with Danise Yam regarding open tax questions |
| 729 | KPMG_Theranos_016258 | KPMG_Theranos_016259 | Email chain regarding 409A reports |
| 730 | KPMG_Theranos_016336 | KPMG_Theranos_016341 | Email from KPMG engagement partner |
| 731 | KPMG_Theranos_016333 | KPMG_Theranos_016335 | Email from KPMG audit partner |
| 732 | KPMG_Theranos_016414 | KPMG_Theranos_016414 | Email from KPMG audit partner |
| 733 | KPMG_Theranos_016678 | KPMG_Theranos_016678 | Email from KPMG Senior Manager |
| 734 | KPMG_Theranos_016789 | KPMG_Theranos_016789 | Grant comparison and stock expense allocation schedules for 2012 and 2013 |
| 735 | KPMG_Theranos_017333 | KPMG_Theranos_017333 | 2011 Trial balance |
| 736 | KPMG_Theranos_017341 | KPMG_Theranos_017341 | Email from KPMG Senior Manager |
| 737 | KPMG_Theranos_017417 | KPMG_Theranos_017417 | Cash analytic comparing 2011 - 2013 cash spend |
| 738 | KPMG_Theranos_017419 | KPMG_Theranos_017419 | PPE, Depreciation Lead sheet for 2013 and 2012 |
| 739 | KPMG_Theranos_017422 | KPMG_Theranos_017422 | Balance sheet analytic for 2011 - 2013 comparison YoY |
| 740 | KPMG_Theranos_017442 | KPMG_Theranos_017442 | Stock Based compensation workpaper for 2012 and 2013 |
| 741 | KPMG_Theranos_017445 | KPMG_Theranos_017451 | Theranos responses to certain audit queries |
| 742 | KPMG_Theranos_017472 | KPMG_Theranos_017472 | A/R Lead sheet for 2013 and 2012 |
| 743 | KPMG_Theranos_017499 | KPMG_Theranos_017499 | Deferred Revenue Lead sheet for 2013 and 2012 |
| 744 | KPMG_Theranos_017544 | KPMG_Theranos_017544 | KPMG email chain regarding 2014 trial balance |
| 745 | KPMG_Theranos_000196 | KPMG_Theranos_000198 | Letter from Ernst & Young regarding YE 2007 deficiencies and observations |
| 746 | KPMG_Theranos_000208 | KPMG_Theranos_000231 | Theranos Consolidated Financial Statements Years Ended December 31, 2007 and 2006 and for the period from April 13, 2004 (Inception) through December 31, 2007 from Ernst & Young |
| 747 | KPMG eAudit 0009189 | KPMG eAudit 0009189 | 2014 Lead Sheet - Cash |
| 748 | KPMG eAudit 0009300 | KPMG eAudit 0009300 | 2013 Lead Sheet - Personnel Expense |
| 749 | KPMG eAudit 0009322 | KPMG eAudit 0009322 | 2013 Lead Sheet - Equity |
| 750 | KPMG eAudit 0008442 | KPMG eAudit 0008442 | Trial Balance for Period End 12/31/2013 |

| No. | Beginning Bates | Ending Bates | Description |
|-----|-----------------|--------------|-------------|
| 751 | KPMG eAudit 0008448 | KPMG eAudit 0008448 | 2013 Planning Analytics 11/3/2015 |
| 752 | KPMG_Theranos_017497 | KPMG_Theranos_017497 | KPMG Financial Statement Review December 13, 2013 and 2012 |
| 753 | KPMG_Theranos_017779 | KPMG_Theranos_017781 | Email chain regarding valuation |
| 754 | KPMG_Theranos_018019 | KPMG_Theranos_018029 | Memo by KPMG on the treatment of the Amended and Restated Master Services Agreement with Walgreens |
| 755 | KPMG_Theranos_018073 | KPMG_Theranos_018073 | Deferred Revenue December 31, 2012 and 2013 |
| 756 | KPMG_Theranos_018074 | KPMG_Theranos_018075 | Email from KPMG Senior Manager regarding audit work |
| 757 | KPMG_Theranos_018140 | KPMG_Theranos_018141 | Email chain with KPMG and D. Yam regarding audit work |
| 758 | KPMG_Theranos_018197 | KPMG_Theranos_018197 | Calendar invitation regarding valuation report |
| 759 | KPMG_Theranos_018545 | KPMG_Theranos_018548 | Email chain with KPMG audit personnel regarding lease |
| 760 | KPMG_Theranos_018581 | KPMG_Theranos_018582 | Email chain with KPMG audit personnel regarding audit work. |
| 761 | KPMG_Theranos_018765 | KPMG_Theranos_018765 | Theranos fiscal year 2009 financial statement documents |
| 762 | KPMG_Theranos_018764 | KPMG_Theranos_018764 | Theranos fiscal year 2010 financial statement documents |
| 763 | KPMG_Theranos_018787 | KPMG_Theranos_018787 | Theranos pro forma financial documents for 2012-2013 and draft trial balances for 2009-2011 |
| 764 | KPMG_Theranos_019153 | KPMG_Theranos_019166 | KPMG workpaper memo |
| 765 | KPMG_Theranos_019191 | KPMG_Theranos_019192 | Email chain among KPMG personnel regarding audit work |
| 766 | KPMG_Theranos_020194 | KPMG_Theranos_020195 | Email chain among KPMG personnel regarding audit work |
| 767 | KPMG_Theranos_019353 | KPMG_Theranos_019354 | Email chain among KPMG personnel regarding audit work |
| 768 | KPMG_Theranos_019673 | KPMG_Theranos_019673 | Draft KPMG memorandum regarding treatment of stock options |
| 769 | KPMG_Theranos_019675 | KPMG_Theranos_019675 | Summary of audit differences for 2009-2011 |
| 770 | KPMG_Theranos_019689 | KPMG_Theranos_019691 | KPMG memorandum regarding cash and cash equivalents |
| 771 | KPMG_Theranos_019702 | KPMG_Theranos_019702 | 2010 Lead sheet - Account Summary |
| 772 | KPMG_Theranos_020137 | KPMG_Theranos_020138 | Email chain regarding Master Purchase Agreement with Safeway |
| 773 | KPMG_Theranos_020203 | KPMG_Theranos_020205 | Email chain among KPMG personnel regarding audit work |
| 774 | KPMG_Theranos_020349 | KPMG_Theranos_020352 | Email chain regarding referrals |
| 775 | KPMG_Theranos_020353 | KPMG_Theranos_020357 | Email chain regarding referrals |
| 776 | KPMG_Theranos_020723 | KPMG_Theranos_020724 | Email chain regarding referrals |
| 777 | KPMG_Theranos_021152 | KPMG_Theranos_021153 | Email chain regarding referrals |
| 778 | KPMG_Theranos_021205 | KPMG_Theranos_021208 | Email chain regarding referrals |
| 779 | KPMG_Theranos_021409 | KPMG_Theranos_021409 | Signed Management rep letter for the 2007-2008 audits |
| 780 | KPMG_Theranos_021960 | KPMG_Theranos_021963 | KPMG memorandum regarding non-GAAP accounting |
| 781 | KPMG_Theranos_022294 | KPMG_Theranos_022294 | Email regarding valuation firms |
| 782 | KPMG_Theranos_022587 | KPMG_Theranos_022587 | Email chain regarding debt testing |
| 783 | KPMG_Theranos_022687 | KPMG_Theranos_022690 | Email chain among KPMG personnel regarding audit work |
| 784 | KPMG_Theranos_022922 | KPMG_Theranos_022926 | Email chain regarding stock grants |
| 785 | KPMG_Theranos_023677 | KPMG_Theranos_023677 | Balance Sheet, Income Statement and TB as of 12/31/2009 |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 786 | KPMG_Theranos_023678 | KPMG_Theranos_023678 | Balance Sheet, Income Statement and TB as of 12/31/2009 |
| 787 | KPMG_Theranos_023680 | KPMG_Theranos_023680 | Balance Sheet, Income Statement and TB as of 12/31/2009 |
| 788 | KPMG_Theranos_024130 | KPMG_Theranos_024130 | Trail Balance as of 11/30/2014 |
| 789 | KPMG_Theranos_024152 | KPMG_Theranos_024152 | Consolidated B/S 2009-2013 |
| 790 | KPMG_Theranos_024576 | KPMG_Theranos_024576 | Email regarding audit work |
| 791 | KPMG_Theranos_024587 | KPMG_Theranos_024587 | Email regarding audit work |
| 792 | KPMG_Theranos_024802 | KPMG_Theranos_024806 | Draft KPMG engagement letter |
| 793 | KPMG_Theranos_024949 | KPMG_Theranos_024950 | Email chain regarding 2010 and 2013 valuations |
| 794 | KPMG_Theranos_024957 | KPMG_Theranos_025029 | Aranca valuation report |
| 795 | KPMG_Theranos_025106 | KPMG_Theranos_025106 | Listing of expenses for Theranos as of 12/31/2011 |
| 796 | KPMG_Theranos_025114 | KPMG_Theranos_025114 | TB, B/S and I/S for 2009-2011 |
| 797 | KPMG_Theranos_025145 | KPMG_Theranos_025146 | Email chain regarding prepaid expenses |
| 798 | KPMG_Theranos_026055 | KPMG_Theranos_026056 | 2010 audit risk assessment |
| 799 | KPMG_Theranos_026701 | KPMG_Theranos_026704 | Email chain regarding audit work and inquiries |
| 800 | KPMG_Theranos_026727 | KPMG_Theranos_026729 | KPMG memo on Stock based compensation expense analysis for 2009 and 2010 |
| 801 | KPMG_Theranos_026726 | KPMG_Theranos_026726 | KPMG memo on Stock based compensation expense analysis for 2009 and 2010 |
| 802 | KPMG_Theranos_026736 | KPMG_Theranos_026743 | Retail Agreements Memo for the accounting treatment of Safeway and Walgreens |
| 803 | KPMG_Theranos_026811 | KPMG_Theranos_026848 | August 10, 2010 Board of Director Meeting Minutes |
| 804 | KPMG_Theranos_026849 | KPMG_Theranos_026856 | December 7, 2010 Board of Director Meeting Minutes |
| 805 | KPMG_Theranos_026940 | KPMG_Theranos_026984 | Various Board of Director Meeting Materials |
| 806 | KPMG_Theranos_026985 | KPMG_Theranos_026986 | KPMG Summary of all Board of Directors Meeting Minutes for 2010 |
| 807 | KPMG_Theranos_027050 | KPMG_Theranos_027053 | Email chain regarding audit work and inquiries |
| 808 | KPMG_Theranos_027054 | KPMG_Theranos_027054 | Expense allocation as of December 31, 2010 |
| 809 | KPMG_Theranos_027183 | KPMG_Theranos_027183 | Trial Balances, B/S and I/S for 2008-2009 |
| 810 | KPMG_Theranos_027226 | KPMG_Theranos_027232 | Financials for 2009-2011 line draft form |
| 811 | KPMG_Theranos_027233 | KPMG_Theranos_027248 | Financials for 2009-2011 line draft form |
| 812 | KPMG_Theranos_000674 | KPMG_Theranos_000676 | March 11, 2011 letter amending April 20, 2010 engagement letter |
| 813 | KPMG_Theranos_001113 | KPMG_Theranos_001134 | Consolidated Financial Statements 2008,2009, 2010, and 2011 |
| 814 | KPMG_Theranos_000981 | KPMG_Theranos_000981 | 2010 AP aging spreadsheet |
| 815 | KPMG_Theranos_028572 | KPMG_Theranos_028576 | Email chain regarding audit work |
| 816 | KPMG_Theranos_029205 | KPMG_Theranos_029205 | 2012 / 2013 Lead Sheet - Notes Payable |
| 817 | KPMG_Theranos_029218 | KPMG_Theranos_029218 | 2012 / 2013 Lead Sheet - Equity |
| 818 | KPMG_Theranos_029462 | KPMG_Theranos_029462 | 2012 / 2013 Lead Sheet - Accounts Receivable |
| 819 | KPMG_Theranos_029464 | KPMG_Theranos_029464 | 2012 / 2013 Lead Sheet - Expenses |
| 820 | KPMG_Theranos_029466 | KPMG_Theranos_029466 | 2012 / 2013 Lead Sheet - Inventory |
| 821 | KPMG_Theranos_029742 | KPMG_Theranos_029742 | 2012 / 2013 Lead Sheet - Cash |
| 822 | KPMG_Theranos_029743 | KPMG_Theranos_029743 | 2012 / 2013 Lead Sheet - PPE |
| 823 | KPMG_Theranos_029748 | KPMG_Theranos_029748 | 2012 / 2013 Lead Sheet - Current Liabilities |
| 824 | PFM-00171758 | PFM-00171758 | Email dated 1/24/14 attaching Theranos Proforma Financials as of 1/8/2014 |
| 825 | PFM-00171759 | PFM-00171759 | Theranos Proforma Financials for 2014 and 2015 |
| 826 | THPFM0001449029 | THPFM0001449039 | Exhibit 434 to Yam (PFM): Email between Danise Yam and Aranca |
| 827 | TS-0393245 | TS-0393245 | Email dated 10/15/2014 between Balwani/Holmes and BDT Capital with attached proforma financials for Theranos for 2014-2016 |
| 828 | TS-0393246 | TS-0393246 | Theranos Proforma Financials for 2014 -2016 |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 829 | TS-0393235 | TS-0393237 | Email dated 10/16/2014 between Sunny Balwani and Elizabeth Holmes |
| 830 | TS-0393238 | TS-0393238 | Theranos Proforma Financials for 2014 -2016 |
| 831 | THPFM0002348848 | THPFM0002348865 | Emails between Danise Yam and Aranca |
| 832 | THPFM0002348866 | THPFM0002348953 | Aranca Valuation Report for 9/30/2014 |
| 833 | THPFM0001450740 | THPFM0001450742 | Emails between Danise Yam and Aranca |
| 834 | THPFM0001450743 | THPFM0001450743 | Theranos Proforma projections as of 3/31/2014 |
| 835 | KPMG_Theranos_002586 | KPMG_Theranos_002586 | Theranos Tax Provision Workbook for 2011 |
| 836 | KPMG_Theranos_001343 | KPMG_Theranos_001368 | To accrual for receivers cutoff 12/31/2011 |
| 837 | KPMG_Theranos_000738 | KPMG_Theranos_000738 | Theranos financials for 2009 -2010 including Trial Balance, I/S, B/S, C/F |
| 838 | THER-AZ-05622274 | THER-AZ-05622274 | Theranos Financials as of 6/30/2013 |
| 839 | H007R01_000135791 | H007R01_000135791 | Theranos quarterly financials from 2010 - 2012 (B/S, I/S, C/F) |
| 840 | TH-COL0003224745 | TH-COL0003224785 | Exhibit 80 to Yam (Colman) Depo: Presentation of a meeting of the BOD 9/14/2007 |
| 841 | BALWANI-SEC_005468 | BALWANI-SEC_005476 | Exhibit 179 to Yam (Colman) Depo: Subpoena to testify |
| 842 | TH-COL0003257325 | TH-COL0003257345 | Exhibit 180 to Yam (Colman) Depo: Aranca Appraisal Report April 2006 |
| 843 | TH-COL0003257322 | TH-COL0003257323 | Exhibit 181 to Yam (Colman) Depo: Email re: valuation reports in 2006 |
| 844 | TH-COL0003361472 | TH-COL0003361510 | Exhibit 182 to Yam (Colman) Depo: Aranca Appraisal Report as of 12/31/2007 |
| 845 | TH-COL0003361436 | TH-COL0003361471 | Exhibit 183 to Yam (Colman) Depo: email chain re: valuation reports 2007/2008 |
| 846 | TH-COL0002435258 | TH-COL0002435325 | Exhibit 184 to Yam (Colman) Depo: Aranca Appraisal Report as of 12/31/2009 |
| 847 | TH-COL0003489780 | TH-COL0003489850 | Exhibit 185 to Yam (Colman) Depo: Aranca Appraisal Report as of 7/1/2010 |
| 848 | TH-COL0000631732 | TH-COL0000631809 | Exhibit 186 to Yam (Colman) Depo: Aranca Appraisal Report as of 7/1/2011 |
| 849 | TH-COL0002448399 | TH-COL0002448475 | Exhibit 187 to Yam (Colman) Depo: Aranca Appraisal Report as of 7/1/2011 |
| 850 | TH-COL0000631661 | TH-COL0000631731 | Exhibit 188 to Yam (Colman) Depo: Aranca Appraisal Report as of 7/1/2012 |
| 851 | TH-COL0002447659 | TH-COL0002447729 | Exhibit 189 to Yam (Colman) Depo: Aranca Appraisal Report as of 7/1/2012 - DRAFT |
| 852 | TH-COL0002447656 | TH-COL0002447658 | Exhibit 190 to Yam (Colman) Depo: email between Danise and Aranca regarding the June/Sept 2013 valuation |
| 853 | TH-COL0000651703 | TH-COL0000651771 | Exhibit 191 to Yam (Colman) Depo: Aranca Appraisal Report as of 7/1/2013 |
| 854 | TH-COL0002448392 | TH-COL0002448398 | Exhibit 192 to Yam (Colman) Depo: email between Danise and Aranca regarding various valuation reports |
| 855 | TH-COL0002437831 | TH-COL0002437927 | Exhibit 193 to Yam (Colman) Depo: Aranca Appraisal Report as of 12/15/2014 |
| 856 | TH-COL0000622892 | TH-COL0000622910 | Exhibit 194 to Yam (Colman) Depo: Emails between Danise Yam and Aranca |
| 857 | TH-COL0000621280 | TH-COL0000621281 | Exhibit 195 to Yam (Colman) Depo: Emails between Danise and KPMG re: valuation |
| 858 | TH-COL0002434749 | TH-COL0002434834 | Exhibit 196 to Yam (Colman) Depo: Aranca Appraisal Report as of 5/1/2015 |
| 859 | TH-COL0000622911 | TH-COL0000622917 | Exhibit 197 to Yam (Colman) Depo: List of inquiries from KPMG for Aranca / Management re: valuation |
| 860 | TH-COL0002437745 | TH-COL0002437758 | Exhibit 198 to Yam (Colman) Depo: Emails between Danise and Aranca. Danise attaches trial balance as of 3/31/2014. |
| 861 | BALWANI-SEC_006334 | BALWANI-SEC_006340 | Exhibit 199 to Yam (Colman) Depo: Theranos Trial Balance as of 3/31/2014 |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 862 | BALWANI-SEC_006341 | BALWANI-SEC_006343 | Exhibit 200 to Yam (Colman) Depo: Theranos financials YE for 2011 - 2013 and Q1 2014 |
| 863 | TH-COL0000623930 | TH-COL0000623962 | Exhibit 201 to Yam (Colman) Depo: emails between Danise and Aranca |
| 864 | TH-COL0000623963 | TH-COL0000623964 | Exhibit 202 to Yam (Colman) Depo: Questions related to the valuation |
| 865 | TH-COL0000642146 | TH-COL0000642193 | Exhibit 203 to Yam (Colman) Depo: emails between Danise and Aranca re: Aranca's engagement and questions regarding the valuation |
| 866 | BALWANI-SEC_006430 | BALWANI-SEC_006434 | Exhibit 204 to Yam (Colman) Depo: Theranos financials as of 5/1/2015 |
| 867 | TH-COL0004030403 | TH-COL0004030415 | Exhibit 205 to Yam (Colman) Depo: Letter regarding sale of shares from John Levinson dated in August 2015 |
| 868 | BALWANI-SEC_006449 | BALWANI-SEC_006502 | Exhibit 206 to Yam (Colman) Depo: Theranos Capitalization Summary |
| 869 | BALWANI-SEC_006503 | BALWANI-SEC_006514 | Exhibit 207 to Yam (Colman) Depo: GL Excerpts |
| 870 | BALWANI-SEC_006515 | BALWANI-SEC_006519 | Exhibit 208 to Yam (Colman) Depo: Monthly expenses listed by vendor for 2015 - 2016 |
| 871 | PFM-DEPO-00008455 | PFM-DEPO-00008467 | Exhibit 430 to Yam (PFM): Subpoena |
| 872 | THPFM0001191045 | THPFM0001191045 | Exhibit 431 to Yam (PFM): Email attaching Theranos B/S as of 1/8/2014 |
| 873 | THPFM0001203098 | THPFM0001203099 | Exhibit 432 to Yam (PFM): Email attaching Theranos B/S as of 1/8/2014 |
| 874 | THPFM0000402196 | THPFM0000402196 | Exhibit 433 to Yam (PFM): Email between Danise Yam and Aranca |
| 875 | THPFM0000276887 | THPFM0000276891 | Exhibit 435 to Yam (PFM) Depo: Emails between Danise Yam, Sunny Balwani, and Elizabeth Holmes |
| 876 | THPFM0000675703 | THPFM0000675708 | Exhibit 436 to Yam (PFM) Depo: Emails between Danise Yam and Sunny Balwani |
| 877 | PFM-DEPO-00008511 | PFM-DEPO-00008514 | Exhibit 437 to Yam (PFM) Depo: Wall Street Journal Article |
| 878 | THPFM0005654458 | THPFM0005654459 | Exhibit 438 to Yam (PFM) Depo: Theranos financials 9/20/2016 |
| 879 | WBA-PFM-0000048 | WBA-PFM-0000084 | Exhibit 439 to Yam (PFM) Depo: Amended and Restated Theranos Master Services Agreement with Walgreens dated 6/5/2012 |
| 880 | Yam-PFM-000001 | Yam-PFM-000117 | Exhibit 440 to Yam (PFM) Depo: Employee transition materials |
| 881 | SEC-EXHIBIT-00000155 | SEC-EXHIBIT-00000155 | Exhibit 155 to Yam (SEC) Testimony: subpoena |
| 882 | SEC-ARANCA-E-0000943 | SEC-ARANCA-E-0000948 | Exhibit 156 to Yam (SEC) Testimony: Aranca valuation as of 5/1/2015 |
| 883 | THPFM0002120828 | THPFM0002120829 | Exhibit 157 to Yam (SEC) Testimony: Theranos projected /proforma financials 2014-2016 |
| 884 | THPFM0005204399 | THPFM0005204403 | Exhibit 158 to Yam (SEC) Testimony: emails between Danise Yam to Elizabeth Holmes and Sunny Balwani |
| 885 | SEC-ARANCA-E-0000435 | SEC-ARANCA-E-0000530 | Exhibit 159 to Yam (SEC) Testimony: Aranca Report as of 12/15/2014 |
| 886 | THPFM0000889870 | THPFM0000889871 | Exhibit 160 to Yam (SEC) Testimony: emails between Danise Yam and Elizabeth Holmes |
| 887 | THER-2550987 | THER-2550987 | Exhibit 161 to Yam (SEC) Testimony: Theranos projected /proforma financials 2014-2016 |
| 888 | THPFM0001791947 | THPFM0001791949 | Exhibit 162 to Yam (SEC) Testimony: emails Re: cash flow |
| 889 | THPFM0001462346 | THPFM0001462347 | Exhibit 163 to Yam (SEC) Testimony: emails between Danise Yam and Elizabeth Holmes |

| No. | Beginning Bates | Ending Bates | Description |
|---|---|---|---|
| 890 | THPFM0001792586 | THPFM0001792591 | Exhibit 164 to Yam (SEC) Testimony: Emails between Elizabeth Holmes and Danise Yam |
| 891 | THPFM0004652946 | THPFM0004652946 | Exhibit 165 to Yam (SEC) Testimony: Theranos trial balance 2014 |
| 892 | SEC-MOSSADAMS-E-0000703 | SEC-MOSSADAMS-E-0000704 | Exhibit 166 to Yam (SEC) Testimony: 2013 Theranos tax filing cover sheet |
| 893 | SEC-MOSSADAMS-E-0000999 | SEC-MOSSADAMS-E-0001024 | Exhibit 167 to Yam (SEC) Testimony: Theranos 2013 Tax Return |
| 894 | SEC-MOSSADAMS-E-0003297 | SEC-MOSSADAMS-E-0003297 | Exhibit 168 to Yam (SEC) Testimony: Theranos 2014 Tax Return cover sheet |
| 895 | SEC-MOSSADAMS-E-0000705 | SEC-MOSSADAMS-E-0000811 | Exhibit 169 to Yam (SEC) Testimony: Theranos 2014 Tax Return |
| 896 | MA-00000655 | MA-00000655 | Exhibit 170 to Yam (SEC) Testimony: Theranos 2015 Tax Return cover sheet |
| 897 | MA-00000079.0001 | MA-00000079.0116 | Exhibit 171 to Yam (SEC) Testimony: Theranos 2015 Tax Return |
| 898 | COLM-001167 | COLM-001309 | Danise Yam Deposition Transcript - Colman |
| 899 | PFM-DEPO-00008232 | PFM-DEPO-00008454 | Danise Yam Deposition Transcript - PFM |
| 900 | SEC-TX-000002181 | SEC-TX-000002244 | Danise Yam Testimony Transcript - SEC |

# Exhibit B

| Beginning Bates | Date | Description |
|---|---|---|
| n/a | 7/28/2020 | Third Superseding Indictment (Dkt. No. 469) |
| n/a | 11/20/2020 | Motion to Exclude Evidence of Theranos' Trade Secrets Practices (Dkt. No. 599) |
| n/a | 1/8/2021 | Opposition to Holmes' Motion to Exclude Theranos' Trade Secret Practices (Dkt. No. 672) |
| n/a | 2/16/2021 | Reply ISO Motion to Exclude Evidence of Theranos' Trade Secrets Practices (Dkt. No. 709) |
| n/a | 5/22/2021 | Order re: Motions in Limine (Dkt. No. 798) |
| THER-2579620 | 2/19/2009 | Email re: Prior studies and names |
| SHTHER00693 | 10/8/2014 | Email attaching Theranos patent US 2011/0093249 and Theranos Overview |
| BALWANI-USAO-000229 | 12/13/2017 | IEEE Valuation |
| US-REPORTS-0015631 | 5/25/2012 | Letter from Sunny Balwani to Diana Dupuy, Re: Termination of Employment |
| US-REPORTS-0015633 | 5/25/2012 | Letter from Dan Doyle to Diana Dupuy, Re: Your Continuing Obligations to Protect Theranos' Confidential and Proprietary Information and Trade Secrets and to Not Solicit Theranos' Employees |
| US-REPORTS-0015862 | 5/25/2012 | Email thread between Arnold Gelb and Diana Dupuy, Subject: RE: My belongings |
| US-REPORTS-0016077 | 5/25/2012 | Letter from Sunny Balwani to Diana Dupuy, Re: Termination of Employment and Attachments |
| US-REPORTS-0015822 | 5/26/2012 | Email thread between Diana Dupuy and Paul J, Subject: Saying Goodbye |
| US-REPORTS-0015809 | 5/27/2012 | Email thread between Sunny Balwani and Diana Dupuy, Subject: RE: Observations |
| US-REPORTS-0015825 | 5/27/2012 | Email thread between Sunny Balwani and Diana Dupuy, Subject: RE: Events |
| US-REPORTS-0015635 | 5/29/2012 | Letter from David Doyle to Diana Dupuy, Re: Final Demand for Compliance with Your Legal Obligations to Theranos |
| US-REPORTS-0015833 | 5/29/2012 | Email thread between Diana Dupuy, David Doyle and Gerard O'Shea, Subject: RE: Important notice from Theranos, and attached Declaration of Diana Dupuy |
| US-REPORTS-0015624 | 6/25/2012 | Confidential Settlement Communication |
| US-REPORTS-0015627 | 7/6/2012 | Letter from Gerard O'Shea, Wilson Sonsini Goodrich & Rosati to Jacob Sider, Law Office of Jacob Sider, Re: Former Theranos Employee Diana Dupuy |
| THPFM0001360951 | 7/22/2013 | Email from Sunny Balwani To Adam Rosendorff, Kerry Elenitoba-Johnson |
| NUGENT-010 | 8/25/2013 | Letter from Mona Ramamurthy to Tony Nugent, Re: Your Continuing Obligations to Protect Theranos' Confidential and Proprietary Information and Trade Secrets and to Not Solicit Theranos' Employees |
| ROSEN-0000067 | 12/3/2013 | Email from Sunny Balwani To Adam Rosendorff, Daniel Young, Hoda Alamdar, Kerry Elenitoba- Johnson, Subject: Normandy Lab |
| THER-0260648 | 1/14/2014 | Email from Sunny Balwani to Elizabeth Holmes |
| THPFM0000868711 | 1/22/2014 | Email from Sunny Balwani to Elizabeth Holmes |
| THER-1995692 | 5/5/2014 | Email thread from Brad Arington to Kellie Kelm (FDA), Elizabeth Holmes, Courtney Lias, Sally Hojvat, and Maria Chan, Subject: RE: Supplement to Pre-Submission Q140057 |

| Beginning Bates | Date | Description |
|---|---|---|
| WG012278 | 10/20/2014 | Email from Mahesh Raju to Casey Kozlowski and Nimesh Jhaveri, Patty Haworth & Ashley Samoila, Subject: RE: Theranos Intel re: Withdrawal from CAP Accreditation Process |
| SEC-ArendsenH-E-0000015 | 12/3/2013 | Email from Adam Rosendorff to his Gmail account, Subject: Normandy Lab |
| THPFM0001829250 | 11/19/2014 | Email from Maximillion Fosque to Christian Holmes, Sani Hadziahmetovic, Jeffrey Blickman, Subject: Fwd.: device info in LIS |
| THPFM0000153372 | 5/18/2015 | Email from Chinmay Pangarkar to Sunny Balwani, Elizabeth Holmes and Sharada Sivaraman |
| SHTHER00031 | 8/9/2015 | Exhibit 24: Email from Peter Anderson to Jeff Gerard and others, Subject: CONFIDENTIAL Theranos Update - to be shared on a need to know basis inside SH under NDA |
| PFM-DEPO-00000918 | 11/18/2016 | Theranos Whistleblower Shook the Company--and His Family |
| BALWANI000056 | 11/6/2014 | Email between Balwani, Paz, and Rivera regarding security in Newark CLIA lab |
| PFM-DEPO-00005078 | 6/26/2015 | Letter from David Boies to Erika Cheung |
| TS-0042709 | 12/30/2014 | Email from Mona Ramamurthy to Nancy Hersh and Lauren Diaz, Subject: RE: Adam Rosendorff |
| TS-0042716 | 12/31/2014 | Email from Mona Ramamurthy to Nancy Hersh and Lauren Diaz, Subject: RE: Adam Rosendorff |
| TS-1157052 | 1/29/2013 | Sample Theranos Confidential Information and Invention Assignment Agreement |
| FIG00000001 | | Diligence documents |
| FIG00000002 | | Diligence documents |
| FIG00000020 | | Diligence documents |
| FIG00000022 | | Diligence documents |
| FIG00000076 | | Diligence documents |
| FIG00000079 | | Diligence documents |
| FIG00000080 | | Diligence documents |
| FIG00000703 | | Diligence documents |
| FIG00000704 | | Diligence documents |
| FIG00000914 | | Diligence documents |
| FIG00000915 | | Diligence documents |
| FIG00000920 | | Diligence documents |
| FIG00000921 | | Diligence documents |
| FIG00001007 | | Diligence documents |
| FIG00001008 | | Diligence documents |
| FIG00001137 | | Diligence documents |
| FIG00001139 | | Diligence documents |
| FIG00001140 | | Diligence documents |
| FIG00001141 | | Diligence documents |
| FIG00001143 | | Diligence documents |
| FIG00001144 | | Diligence documents |
| FIG00001146 | | Diligence documents |
| FIG00001147 | | Diligence documents |
| FIG00001148 | | Diligence documents |
| FIG00001173 | | Diligence documents |

| Beginning Bates | Date | Description |
|---|---|---|
| FIG00001174 | | Diligence documents |
| FIG00001175 | | Diligence documents |
| FIG00001285 | | Diligence documents |
| FIG00001287 | | Diligence documents |
| FIG00001288 | | Diligence documents |
| FIG00001290 | | Diligence documents |
| FIG00001291 | | Diligence documents |
| FIG00001307 | | Diligence documents |
| FIG00001331 | | Diligence documents |
| FIG00001372 | | Diligence documents |
| FIG00001461 | | Diligence documents |
| FIG00001463 | | Diligence documents |
| FIG00001464 | | Diligence documents |
| FIG00001467 | | Diligence documents |
| FIG00001476 | | Diligence documents |
| FIG00001478 | | Diligence documents |
| FIG00001479 | | Diligence documents |
| FIG00001484 | | Diligence documents |
| FIG00001488 | | Diligence documents |
| FIG00001720 | | Diligence documents |
| FIG00001722 | | Diligence documents |
| FIG00001723 | | Diligence documents |
| FIG00001725 | | Diligence documents |
| FIG00001731 | | Diligence documents |
| FIG00001763 | | Diligence documents |
| FIG00001769 | | Diligence documents |
| FIG00001781 | | Diligence documents |
| FIG00001783 | | Diligence documents |
| FIG00001845 | | Diligence documents |
| FIG00001849 | | Diligence documents |
| FIG00001855 | | Diligence documents |
| FIG00001860 | | Diligence documents |
| FIG00002290 | | Diligence documents |
| FIG00002292 | | Diligence documents |
| FIG00002298 | | Diligence documents |
| FIG00002301 | | Diligence documents |
| FIG00002309 | | Diligence documents |
| FIG00002310 | | Diligence documents |
| FIG00003226 | | Diligence documents |
| FIG00003227 | | Diligence documents |
| FIG00003229 | | Diligence documents |
| FIG00006706 | | Interest from Other Companies |
| FIG00006707 | | Interest from Other Companies |
| FIG00006735 | | Interest from Other Companies |
| FIG00006736 | | Interest from Other Companies |
| FIG00006801 | | Interest from Other Companies |
| FIG00006805 | | Interest from Other Companies |

| Beginning Bates | Date | Description |
|---|---|---|
| FIG00007663 | | Interest from Other Companies |
| FIG00007680 | | Interest from Other Companies |
| FIG00007684 | | Interest from Other Companies |
| FIG00007685 | | Interest from Other Companies |
| FIG00007689 | | Interest from Other Companies |
| FIG00007690 | | Interest from Other Companies |
| FIG00007694 | | Interest from Other Companies |
| FIG00007705 | | Interest from Other Companies |
| FIG00007752 | | Interest from Other Companies |
| FIG00007765 | | Interest from Other Companies |
| FIG00007769 | | Interest from Other Companies |
| FIG00007774 | | Interest from Other Companies |
| FIG00007864 | | Interest from Other Companies |
| FIG00007872 | | Interest from Other Companies |
| FIG00008151 | | Interest from Other Companies |
| FIG00008152 | | Interest from Other Companies |
| FIG00008154 | | Interest from Other Companies |
| FIG00008156 | | Interest from Other Companies |
| FIG00008168 | | Interest from Other Companies |
| FIG00008169 | | Interest from Other Companies |
| FIG00008180 | | Interest from Other Companies |
| FIG00008227 | | Interest from Other Companies |
| FIG00008384 | | Interest from Other Companies |
| FIG00008385 | | Interest from Other Companies |
| FIG00008394 | | Interest from Other Companies |
| FIG00008396 | | Interest from Other Companies |
| FIG00008404 | | Interest from Other Companies |
| FIG00008409 | | Interest from Other Companies |
| FIG00008413 | | Interest from Other Companies |
| FIG00008421 | | Interest from Other Companies |
| FIG00008426 | | Interest from Other Companies |
| FIG00008431 | | Interest from Other Companies |
| FIG00008443 | | Interest from Other Companies |
| FIG00008451 | | Interest from Other Companies |
| FIG00002070 | | Board Materials |
| FIG00002072 | | Board Materials |
| FIG00002083 | | Board Materials |
| FIG00002298 | | Board Materials |
| FIG00002301 | | Board Materials |
| FIG00002309 | | Board Materials |
| FIG00002310 | | Board Materials |
| FIG00002315 | | Board Materials |
| FIG00002317 | | Board Materials |
| FIG00002321 | | Board Materials |
| FIG00002324 | | Board Materials |
| FIG00002377 | | Board Materials |
| FIG00002379 | | Board Materials |

| Beginning Bates | Date | Description |
|---|---|---|
| FIG00002394 | | Board Materials |
| FIG00002446 | | Board Materials |
| FIG00002447 | | Board Materials |
| FIG00002448 | | Board Materials |
| FIG00002449 | | Board Materials |
| FIG00002450 | | Board Materials |
| FIG00002451 | | Board Materials |
| FIG00002452 | | Board Materials |
| FIG00002453 | | Board Materials |
| FIG00002468 | | Board Materials |
| FIG00006419 | | Board Materials |
| FIG00006420 | | Board Materials |
| FIG00006538 | | Board Materials |
| FIG00006539 | | Board Materials |
| FIG00006543 | | Board Materials |
| FIG00006544 | | Board Materials |
| FIG00006548 | | Board Materials |
| MOS00000526 | 12/6/2017 | Shareholder Communications |
| MOS00000527 | 12/6/2017 | Shareholder Communications |
| MOS00000646 | 12/6/2017 | Shareholder Communications |
| MOS00000657 | 12/6/2017 | Shareholder Communications |
| MOS00001752 | 12/10/2017 | Shareholder Communications |
| MOS00001871 | 12/10/2017 | Shareholder Communications |
| MOS00001928 | 12/10/2017 | Shareholder Communications |
| MOS00001939 | 12/10/2017 | Shareholder Communications |
| MOS00001957 | 12/10/2017 | Shareholder Communications |
| MOS00001999 | 12/10/2017 | Shareholder Communications |
| MOS00002005 | 12/10/2017 | Shareholder Communications |
| MOS00002030 | 12/10/2017 | Shareholder Communications |
| MOS00002041 | 12/10/2017 | Shareholder Communications |
| MOS00002051 | 12/10/2017 | Shareholder Communications |
| CIH00003296 | 11/7/2017 | Term Sheet |
| TRANSCRIPTS-001962 | 9/24/2021 | Deposition of Erez Levy with Exhibits 190 - 198, SEC v. Balwani |
| PC0000048 | 5/12/2017 | Perkins Coie Theranos Evaluation |
| PC0000001 | 8/17/2017 | Perkins Coie Redacted Overview of Theranos' IP Assets |
| THPFM0005430214 | 3/17/2009 | Theranos Employee Handbook |
| THPFM0005007892 | 6/1/2013 | Theranos Employee Handbook |
| THPFM0005750176 | 11/1/2016 | Theranos Employee Handbook |
| N/A | 3/6/2020 | Letter to Defense re 404(b) Notice |
| N/A | 9/28/2020 | Letter to Defense re 404(b) Notice |

# EXHIBIT C

*Execution Version*

# CREDIT AGREEMENT

by and among

**THERANOS IP COMPANY, LLC,**
as Borrower,

**THERANOS, INC.,**
as Parent,

**THE LENDERS FROM TIME TO TIME PARTY HERETO**

and

**FORTRESS CREDIT CORP.,**
as Administrative Agent and Collateral Agent

**TOTAL COMMITMENTS - $100,000,000**

**December 11, 2017**

1

ActiveUS 165810955v.1
KE 50036055.42



# TABLE OF CONTENTS

**Page**

ARTICLE I. **DEFINITIONS AND ACCOUNTING TERMS** ....................................................1
    SECTION 1.01.  Defined Terms........................................................................1
    SECTION 1.02.  Accounting Terms...................................................................28
    SECTION 1.03.  Rounding................................................................................29

ARTICLE II. **LOANS AND TERMS OF PAYMENT**...........................................................**29**
    SECTION 2.01.  Term Loans............................................................................29
    SECTION 2.02.  Interest; Fees; Payments.......................................................36
    SECTION 2.03.  Taxes; Increased Costs.........................................................38
    SECTION 2.04.  Special LIBOR Provisions....................................................41

ARTICLE III. **CONDITIONS OF TERM LOANS**.................................................................**43**
    SECTION 3.01.  Tranche A Term Loans .........................................................43
    SECTION 3.02.  Tranche B Term Loans .........................................................45
    SECTION 3.03.  Tranche C Term Loans .........................................................46

ARTICLE IV. **WARRANT** .....................................................................................................**48**
    SECTION 4.01.  Warrant to Purchase Shares ..................................................48

ARTICLE V. **COLLATERAL**.................................................................................................**48**
    SECTION 5.01.  Security Interest in Collateral ...............................................48

ARTICLE VI. **REPRESENTATIONS AND WARRANTIES**................................................**48**
    SECTION 6.01.  Existence, Qualification and Power......................................48
    SECTION 6.02.  Authorization; No Contravention.........................................49
    SECTION 6.03.  Governmental Authorization; Other Consents......................49
    SECTION 6.04.  Binding Effect.......................................................................49
    SECTION 6.05.  Financial Statements; No Material Adverse Effect...............49
    SECTION 6.06.  Litigation...............................................................................49
    SECTION 6.07.  No Default..............................................................................50
    SECTION 6.08.  Ownership of Property; Liens...............................................50
    SECTION 6.09.  Environmental Compliance...................................................50
    SECTION 6.10.  Insurance ...............................................................................50
    SECTION 6.11.  Taxes .....................................................................................50
    SECTION 6.12.  ERISA Compliance...............................................................51
    SECTION 6.13.  Subsidiaries; Equity Interests...............................................51
    SECTION 6.14.  Margin Regulations; Investment Company Act....................52
    SECTION 6.15.  Disclosure.............................................................................52
    SECTION 6.16.  Compliance with Laws.........................................................52
    SECTION 6.17.  Intellectual Property .............................................................52
    SECTION 6.18.  Rights in Collateral; Priority of Liens...................................55
    SECTION 6.19.  Solvency................................................................................55
    SECTION 6.20.  Business Locations; Taxpayer Identification Number.........55

ii

SECTION 6.21. Collateral ...................................................................................55
SECTION 6.22. Patriot Act; Sanctions; Export Controls; FCPA.......................55
SECTION 6.23. Settlement Payment Obligations ...............................................57
SECTION 6.24. Healthcare Law Compliance .....................................................57

ARTICLE VII. **AFFIRMATIVE COVENANTS** ................................................................**58**
SECTION 7.01. Compliance with Laws...............................................................58
SECTION 7.02. Financial Statements ..................................................................58
SECTION 7.03. Certificates; Other Information ..................................................60
SECTION 7.04. Notices ........................................................................................61
SECTION 7.05. Payment of Obligations ..............................................................62
SECTION 7.06. Books and Records .....................................................................62
SECTION 7.07. Inspection Rights........................................................................62
SECTION 7.08. Litigation Cooperation ...............................................................63
SECTION 7.09. Use of Proceeds..........................................................................63
SECTION 7.10. Preservation of Existence, Etc ...................................................63
SECTION 7.11. Maintenance of Properties ..........................................................63
SECTION 7.12. Formation or Acquisition of Subsidiaries ..................................63
SECTION 7.13. Insurance .....................................................................................64
SECTION 7.14. Further Assurances......................................................................64
SECTION 7.15. SPE Compliance, Etc .................................................................65
SECTION 7.16. Post-Closing Obligations ...........................................................65
SECTION 7.17. Financial Covenants ...................................................................65
SECTION 7.18. Board Observation Rights...........................................................65
SECTION 7.19. Transferred Patents and Transferred Patent Rights.....................66
SECTION 7.20. Patent Development and Enhancement........................................67
SECTION 7.21. Health Regulatory Matters ..........................................................68

ARTICLE VIII. **NEGATIVE COVENANTS** .....................................................................**68**
SECTION 8.01. Dispositions.................................................................................68
SECTION 8.02. Changes in Business, Management, Ownership, or Business
Locations......................................................................................69
SECTION 8.03. Mergers or Acquisitions .............................................................69
SECTION 8.04. Liens............................................................................................69
SECTION 8.05. Distributions; Investments ..........................................................69
SECTION 8.06. Transactions with Affiliates ........................................................70
SECTION 8.07. Junior Obligations .......................................................................70
SECTION 8.08. Compliance ..................................................................................70
SECTION 8.09. Indebtedness ................................................................................70
SECTION 8.10. Amendments to Organization Documents, Patent Transfer
Agreement or Patent License Agreement .....................................70
SECTION 8.11. Sanctions......................................................................................71
SECTION 8.12. Transferred Patent Rights.............................................................71
SECTION 8.13. Settlements, Judgments, Etc........................................................71

ARTICLE IX. **EVENTS OF DEFAULT**............................................................................**71**
SECTION 9.01. Payment Default...........................................................................71

iii

SECTION 9.02.   Representations and Warranties ........................................... 71
SECTION 9.03.   Specific Covenants ............................................................ 72
SECTION 9.04.   Other Defaults ................................................................... 72
SECTION 9.05.   Cross-Default ..................................................................... 72
SECTION 9.06.   Asset Seizure ...................................................................... 72
SECTION 9.07.   Insolvency Proceedings ..................................................... 72
SECTION 9.08.   Inability to Pay Debts ........................................................ 73
SECTION 9.09.   Judgments .......................................................................... 73
SECTION 9.10.   Change of Control ............................................................. 73
SECTION 9.11.   ERISA ................................................................................ 73
SECTION 9.12.   Invalidity of Loan Documents ........................................... 73
SECTION 9.13.   Intellectual Property .......................................................... 74
SECTION 9.14.   Subordinated Debt ............................................................. 74
SECTION 9.15.   Indictment ......................................................................... 74

ARTICLE X. **AGENT AND LENDERS' RIGHTS AND REMEDIES** ................................... **74**
SECTION 10.01.   Rights and Remedies ....................................................... 74
SECTION 10.02.   Power of Attorney ........................................................... 78
SECTION 10.03.   Protective Payments ........................................................ 79
SECTION 10.04.   Application of Payments and Proceeds Upon Default ....... 79
SECTION 10.05.   No Waiver; Remedies Cumulative .................................. 80

ARTICLE XI. **NOTICES** ............................................................................................... **80**

ARTICLE XII. **AGENT** .................................................................................................. **81**
SECTION 12.01.   Appointment of Agent .................................................... 81
SECTION 12.02.   Binding Effect; Use of Discretion; E-Systems ................ 83
SECTION 12.03.   Agent's Reliance, Etc. ..................................................... 84
SECTION 12.04.   Agent Individually .......................................................... 85
SECTION 12.05.   Lender Credit Decision; Agent Report ............................ 85
SECTION 12.06.   Indemnification ............................................................... 86
SECTION 12.07.   Successor Agent .............................................................. 87
SECTION 12.08.   Release of Collateral ....................................................... 87
SECTION 12.09.   Sharing of Payments ....................................................... 88
SECTION 12.10.   Proofs of Claim ............................................................... 88
SECTION 12.11.   Advances; Payments; Actions in Concert ....................... 89

ARTICLE XIII. **GOVERNING LAW. SUBMISSION TO JURISDICTION. JURY
TRIAL WAIVER. AND JUDICIAL REFERENCE** .................................... **90**
SECTION 13.01.   Governing Law; Submission to Jurisdiction .................... 90
SECTION 13.02.   Jury Trial Waiver ............................................................ 90
SECTION 13.03.   Additional Waivers in the Event of Enforcement ............. 90

ARTICLE XIV. **GENERAL PROVISIONS** ................................................................... **91**
SECTION 14.01.   Successors and Assigns ................................................... 91
SECTION 14.02.   Costs and Expenses; Indemnification .............................. 91
SECTION 14.03.   Time of Essence .............................................................. 93

iv

SECTION 14.04.	Severability of Provisions ....................................................................93
SECTION 14.05.	Amendments in Writing; Waiver; Integration ...................................93
SECTION 14.06.	Counterparts .........................................................................................94
SECTION 14.07.	Survival; Termination ..........................................................................94
SECTION 14.08.	Confidentiality ......................................................................................94
SECTION 14.09.	Electronic Execution of Documents ...................................................95
SECTION 14.10.	Register .................................................................................................96
SECTION 14.11.	Participant Register ..............................................................................96
SECTION 14.12.	Captions ................................................................................................96
SECTION 14.13.	Construction of Agreement ..................................................................96
SECTION 14.14.	Relationship; Corporate Opportunities, Etc .......................................96
SECTION 14.15.	Third Parties .........................................................................................97
SECTION 14.16.	Payments Set Aside ..............................................................................97
SECTION 14.17.	Right of Setoff ......................................................................................97
SECTION 14.18.	Interest Rate Limitation .......................................................................98
SECTION 14.19.	Securitization of Loans ........................................................................98

ActiveUS 165810955v.1
KE 50036055.42

FORTRESS HIGHLY CONFIDENTIAL

FIG00003823

DISCLOSURE SCHEDULES

| | |
|---|---|
| Schedule 1.1: | Collateral |
| Schedule 1.1(a) | Material Patents |
| Schedule 1.1(b)(i): | Permitted Indebtedness |
| Schedule 1.1(b)(ii): | Permitted Investments |
| Schedule 1.1(b)(iii): | Permitted Liens |
| Schedule 1.1(c): | Term Loan Commitments |
| Schedule 6.03: | Governmental Authorization; Other Consents |
| Schedule 6.05: | Financial Statements; No Material Adverse Effect |
| Schedule 6.06: | Litigation |
| Schedule 6.11: | Tax Matters |
| Schedule 6.13(a): | Subsidiaries; Equity Interests |
| Schedule 6.13(b): | Subsidiary Assets and Liabilities |
| Schedule 6.17: | Intellectual Property |
| Schedule 6.20: | Business Locations; Taxpayer Identification Number |
| Schedule 6.23 | Settlement Payment Obligations |
| Schedule 6.24 | Healthcare Law Compliance |
| Schedule 7.02 | Accounting Firms |
| Schedule 7.16 | Post-Closing Obligations |
| Schedule 8.06: | Affiliate Transactions |


EXHIBITS

| | |
|---|---|
| Exhibit A: | Form of Compliance Certificate |
| Exhibit B: | Form of Guaranty |
| Exhibit C: | Form of Patent License Agreement |
| Exhibit D: | Form of Patent Transfer Agreement |
| Exhibit E: | Form of Perfection Certificate |
| Exhibit F: | Form of Warrant |
| Exhibit G: | Form of Security Agreement |
| Exhibit H: | Conduct of Business Provisions |
| Exhibit I: | Form of Assignment Agreement |
| Exhibit J: | Form of Board Observer Confidentiality Agreement |

ActiveUS 165810955v.1
KE 50036055.42

FORTRESS HIGHLY CONFIDENTIAL

FIG00003824

## CREDIT AGREEMENT

**THIS CREDIT AGREEMENT** (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**") entered into as of December , 2017, among Theranos, Inc., a Delaware corporation ("**Parent**"), Theranos IP Company, LLC, a Nevada limited liability company ("**Borrower**"), each party who is or hereafter becomes a party to this Agreement as a Lender (each, individually, a "**Lender**" and collectively, the "**Lenders**") and Fortress Credit Corp., a Delaware corporation ("**Fortress**"), as administrative agent and collateral agent for the Lenders (in such capacities, "**Agent**").

### WITNESSETH

**WHEREAS**, Borrower has requested that the Lenders extend credit in the form of the Term Loans (as defined herein) in an aggregate principal amount of $100,000,000, consisting of (x) a Term Loan in a principal amount of $65,000,000 to be made on the Closing Date (as defined herein) (the "**Tranche A Term Loan Commitments**"), (y) a Term Loan in a principal amount of $10,000,000 to be made on the Tranche B Funding Date (as defined herein) (the "**Tranche B Term Loan Commitments**") and (z) a Term Loan in a principal amount of $25,000,000 to be made on the Tranche C Funding Date (as defined herein) (the "**Tranche C Term Loan Commitments**");

**NOW THEREFORE**, in consideration of the premises and mutual agreements and subject to the terms and conditions set forth herein, and intending to be legally bound hereby, the parties agree as follows:

ARTICLE I. **DEFINITIONS AND ACCOUNTING TERMS**

**SECTION 1.01. Defined Terms.** As used in this Agreement, the following terms shall have the meanings set forth below:

"**Account**" is any "account" as defined in the Code with such additions to such term as may hereafter be made, and includes, without limitation, all accounts receivable and other sums owing to any Loan Party.

"**Affiliate**" means, as applied to any Person (the "**Specified Person**"), any other Person directly or indirectly controlling, controlled by, or under common control with, the Specified Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Specified Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agent**" is defined in the preamble.

"**Agent Account**" means the account of Agent identified in writing to Borrower and the Lenders from time to time.

"**Agent Expenses**" means all reasonable fees and costs and expenses (including attorneys' fees and audit fees and expenses) incurred by Agent for preparing, amending, negotiating, administering, defending and enforcing the Loan Documents and Transaction Documents (including those incurred in connection with appeals, workouts, restructuring or Insolvency Proceedings) or otherwise incurred by Agent in its capacity as such.

"**Agent Report**" is defined in <u>Section 12.05</u>.

"**Agreement**" is defined in the preamble.

"**Applicable Prepayment Premium**" means, as of any date of determination:

(a)  in the case of the Tranche A Term Loans, an amount equal to (i) during the period from and after the Closing Date up to and including the date that is the first anniversary of the Closing Date, 5.0% times the principal balance of the Tranche A Term Loans repaid (except pursuant to Section 2.01(b)(i) through (iv)), prepaid or accelerated (whether by operation of law or otherwise) on such date, (ii) during the period from and after the date that is the first day after the first anniversary of the Closing Date up to and including the date that is the second anniversary of the Closing Date, 3.5% times the amount of the principal balance of the Tranche A Term Loans repaid (except pursuant to Section 2.01(b)(i) through (iv)), prepaid or accelerated (whether by operation of law or otherwise) on such date, and (iii) during the period from and after the date that is the first day after the second anniversary of the Closing Date up to and including the Tranche A Maturity Date, 0% times the amount of the principal balance of the Tranche A Term Loans repaid, prepaid or accelerated (whether by operation of law or otherwise) on such date;

(b)  in the case of the Tranche B Term Loans, an amount equal to (i) during the period from and after the Tranche B Funding Date up to and including the date that is the first anniversary of the Tranche B Funding Date, 5.0% times the principal balance of the Tranche B Term Loans repaid (except pursuant to Section 2.01(b)(i) through (iv)), prepaid or accelerated (whether by operation or law or otherwise) on such date, (ii) during the period from and after the date that is the first day after the first anniversary of the Tranche B Funding Date up to and including the date that is the second anniversary of the Tranche B Funding Date, 3.5% times the amount of the principal balance of the Tranche B Term Loans repaid (except pursuant to Section 2.01(b)(i) through (iv)), prepaid or accelerated (whether by operation of law or otherwise) on such date, and (iii) during the period from and after the date that is the first day after the second anniversary of the Tranche B Funding Date up to and including the Tranche B Maturity Date, 0% times the amount of the principal balance of the Tranche B Term Loans repaid, prepaid or accelerated (whether by operation of law or otherwise) on such date;

(c)  in the case of the Tranche C Term Loans, an amount equal to (i) during the period from and after the Tranche C Funding Date up to and including the date that is the first anniversary of the Tranche C Funding Date, 5.0% times the principal balance of the Tranche C Term Loans repaid (except pursuant to Section 2.01(b)(i) through (iv)), prepaid or accelerated (whether by operation or law or otherwise) on such date,

2

ActiveUS 165810955v.1
KE 50036055.42

FIG00003826

(ii) during the period from and after the date that is the first day after the first anniversary of the Tranche C Funding Date up to and including the date that is the second anniversary of the Tranche C Funding Date, 3.5% times the amount of the principal balance of the Tranche C Term Loans repaid (except pursuant to Section 2.01(b)(i) through (iv)), prepaid or accelerated (whether by operation of law or otherwise) on such date, and (iii) during the period from and after the date that is the first day after the second anniversary of the Tranche C Funding Date up to and including the Tranche C Maturity Date, 0% times the amount of the principal balance of the Tranche C Term Loans repaid, prepaid or accelerated (whether by operation of law or otherwise) on such date; and

(d)     in the case of Protective Advances, an amount equal to 0% times the amount of the principal balance of the Protective Advances repaid, prepaid or accelerated (whether by operation of law or otherwise) on such date;

*provided*, in the case of each of paragraphs (a) through (c) of this definition, that if any such repayment or prepayment (other than as a result of acceleration) shall occur in connection with a Multiple Trigger Event, then for purposes of determining the Applicable Prepayment Premium applicable to such repayment or prepayment, the date of such repayment or prepayment shall be deemed to be the date on which the Event of Default relating to such Multiple Trigger Event occurred.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"**Asset Disposition**" means any Transfer pursuant to Section 8.01 (other than Section 8.01(b), (c), (d), (e), (f), (g) or (h)) or to the extent not permitted hereunder.

"**Assignment Agreement**" is defined in Section 14.01.

"**Base Rate Loan**" means any Term Loan at any time at which it bears interest at or by reference to the Base Rate in accordance with the term hereof.

"**Base Rate**" means for any day the sum of (a) 2.00% *plus* (b) the greatest of (i) the Federal Funds Rate plus 0.5%, (ii) the Prime Rate, (iii) the sum of LIBO Rate in effect immediately prior to the LIBO Rate becoming unavailable plus 1.00% and (iv) 3.00%.

"**Borrower**" is defined in the preamble.

"**Borrower Operating Agreement**" means the Operating Agreement of Borrower, a Nevada limited liability company, between Parent and DBFIP THER Holdings LLC, dated as of the date hereof.

"**Business Day**" is any day that is not a Saturday, Sunday or a day on which commercial banks are authorized to close under the Laws of the State of New York.

ActiveUS 165810955v.1
KE 50036055.42

                                                                                  FIG00003827

"**Business Combination**" means the merger, combination or consolidation of Parent or any of its Subsidiaries with or into any Person or the sale of all or substantially all of the assets, stock or other evidence of beneficial ownership of Parent or any of its Subsidiaries.

"**Capital Lease Obligations**" means, with respect to any Person for any period, all rental obligations of such Person which, under GAAP, are required to be capitalized on the books of such Person, in each case taken at the amount thereof accounted for as indebtedness in accordance with such principles. For the avoidance of doubt, "Capital Lease Obligations" shall not include obligations or liabilities of any Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations would be required to be classified and accounted for as an operating lease under GAAP as existing on the Closing Date.

"**Cash Equivalents**" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency or any State thereof having maturities of not more than one (1) year from the date of acquisition; (b) commercial paper maturing no more than one (1) year after its creation and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc.; (c) certificates of deposit maturing no more than one (1) year after issue; (d) money market funds at least ninety-five percent (95.0%) of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (c) of this definition; (e) investments in pooled deposit or "sweep" accounts subject to a standing instruction for a daily overnight sweep of all amounts in such accounts; and (f) any other investment approved by Agent in its reasonable discretion.

"**Cash Interest Rate**" means for any day the sum of (a) 3.00% per annum *plus* (b) the greater of (i) the LIBO Rate and (ii) 2.00%. Notwithstanding the foregoing, if any Term Loan becomes a Base Rate Loan, the Cash Interest Rate with respect to such Term Loan shall be calculated by reference to the Base Rate.

"**Change in Law**" means the occurrence of any of the following: (a) the adoption or introduction of, or any change in, any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect and whether or not applicable to any Lender on such date, (b) any change in interpretation, administration or implementation of any such law, treaty, rule or regulation by any Governmental Authority or (c) the issuance, making or implementation by any Governmental Authority of any interpretation, administration, request, regulation, guideline, or directive (whether or not having the force of law), including any risk-based capital guidelines; *provided*, *however*, that for purposes of this definition, (x) a change in law, treaty, rule, regulation, interpretation, administration or implementation shall include, without limitation, any change made or which becomes effective on the basis of a law, treaty, rule, regulation, interpretation administration or implementation then in force, the effective date of which change is delayed by the terms of such law, treaty, rule, regulation, interpretation, administration or implementation, (y) the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111-203, H.R. 4173) and all requests, rules, regulations, guidelines, interpretations or directives promulgated thereunder or issued in connection therewith shall be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued, implemented, or promulgated, whether before or after the date hereof and (z) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any

4

ActiveUS 165810955v.1
KE 50036055.42

FIG00003828

successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall each be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued, implemented, or promulgated, whether before or after the date hereof.

"**Change of Control**" means the occurrence of any of the following: (i) a majority of the individuals on the Board of Directors of Parent shall cease to consist of Continuing Directors, (ii) an acquisition by an individual, legal entity or "group" (as described in Rule 13d-5(b)(1) promulgated under the Exchange Act) (other than an existing shareholder or any Affiliate thereof) of effective control (whether through legal or beneficial ownership of capital stock of Parent, by contract or otherwise) of in excess of 35% of the Equity Interests of Parent, (iii) Parent shall sell or transfer all or any substantial portion of its assets to another Person (other than a Subsidiary or other Person who assumes the Obligations), (iv) any Loan Party other than Parent or Borrower ceases to be, directly or indirectly, a wholly-owned Subsidiary of Parent except as expressly permitted by this Agreement, or (v) the Chief Executive Officer of Parent as of the Closing Date shall resign or be removed from her position in the management of Parent as of the Closing Date or shall otherwise cease to be employed by Parent in such position, unless in each case the Board of Directors of Parent shall have appointed a permanent successor within 45 days after such resignation, removal or other change, which permanent successor either (x) shall be reasonably acceptable to Agent, or (y) shall have been proposed in writing to Agent at least 15 days prior to appointment by the Board of Directors of Parent and shall have been appointed after consultation with Agent and due consideration by the Board of Directors of Parent of any concerns raised by Agent in respect of such appointment.

"**Class B Member**" means each "Class B Member" under, and as defined in, the Borrower Operating Agreement.

"**Closing Date**" means December 11, 2017.

"**Code**" means the means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means (a) all of the Collateral as defined on "Schedule 1.1 - Collateral" attached hereto; (b) all products, proceeds, rents and profits of the foregoing; (c) all of each Loan Party's books and records related to any of the foregoing; and (d) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which any Loan Party now has or hereafter acquires any rights.

"**Common Stock**" means the common stock, $0.00 par value per share, of Parent as constituted on the date hereof and any capital stock into which such common stock shall be exchanged or any capital stock resulting from any reclassification of such common stock.

"**Compliance Certificate**" means a certificate in the form attached hereto as Exhibit A.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

ActiveUS 165810955v.1
KE 50036055.42

FIG00003829

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Continuing Directors**" means (a) (x) the four (4) members of the Board of Directors of Parent on the Closing Date and (y) any additional members of the Board of Directors appointed by Persons who are shareholders of Parent as of the Closing Date in accordance with the Organization Documents and Voting Agreement of Parent in effect on the Closing Date, and (b) each other member of the Board of Directors of Parent if such Person's nomination for election to the Board of Directors of Parent is recommended or approved by a majority of the members of the Board of Directors of Parent then constituting Continuing Directors; *provided* that at any time no more than seven (7) members of the Board of Directors of Parent shall be deemed to be Continuing Directors.

"**Copyrights**" means all of the following: (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise (including all copyrights in software), and (b) all registrations and applications for registration of copyright in the United States or any other country, including registrations, renewals and pending applications for registration.

"**Debtor Relief Law**" means (i) the Bankruptcy Code of the United States, and (ii) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, the making of a determination or any combination of the foregoing, would be an Event of Default.

"**Default Rate**" means the Cash Interest Rate plus the PIK Interest Rate plus 200 basis points.

"**Designated Jurisdiction**" is defined in Section 6.22.

"**Designated Patents**" is defined in Section 7.20.

"**Disclosed Matters**" is defined in Section 6.06.

"**Disclosure Schedules**" means the Disclosure Schedules attached hereto.

"**Disqualified Equity Interests**" means Equity Interests that by their terms (or by the terms of any security into which they are convertible or for which they are exchangeable) (a) require the payment of any cash dividends, (b) mature or are mandatorily redeemable or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof, in whole or in part and whether upon the occurrence of any event, pursuant to a sinking fund obligation, on a fixed date or otherwise, prior to the Permitted Junior Capital Maturity Date, except for provisions in a Person's organizational documents providing for payment or

6

FORTRESS HIGHLY CONFIDENTIAL

FIG00003830

distribution on such Equity Interests upon a liquidation, dissolution, liquidation event or deemed liquidation event, or (c) are convertible or exchangeable, automatically or at the option of any holder thereof, into any Indebtedness other than Permitted Indebtedness; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of employees of Parent or any Subsidiary or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by such entity in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"**Dollars**," "**dollars**" or use of the sign means only lawful money of the United States and not any other currency, regardless of whether that currency uses the "$" sign to denote its currency or may be readily converted into lawful money of the United States.

"**Domestic Subsidiary**" means a Subsidiary of Parent organized under the laws of the United States, any state thereof, or the District of Columbia; *provided* that no Person that is a direct or indirect Subsidiary of a Foreign Subsidiary shall be a Domestic Subsidiary.

"**End of Term Fee**" means (a) in the case of the Tranche A Term Loans, the Tranche A End of Term Fee, (b) in the case of the Tranche B Term Loans, the Tranche B End of Term Fee and (c) in the case of the Tranche C Term Loans, the Tranche C End of Term Fee, and "**End of Term Fees**" means the Tranche A End of Term Fee, the Tranche B End of Term Fee and the Tranche C End of Term Fee, collectively.

"**Environmental Laws**" means any and all current or future Laws, or any other requirements of Governmental Authorities relating to (a) environmental matters, or (b) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to Parent or any of its Subsidiaries or any facility owned, leased or operated by Parent or any of its Subsidiaries.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law; (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials; (c) exposure to any Hazardous Materials; (d) the release or threatened release of any Hazardous Materials into the environment; or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities (other than convertible debt) convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such securities (other than convertible debt) convertible into or exchangeable for shares of capital stock (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and

7

FIG00003831

whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and its regulations.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with Parent or Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code), other than Fortress, any Lender or any of their Affiliates.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by Parent, Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by Parent, Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon Parent, Borrower or any ERISA Affiliate.

"**E-System**" means any electronic system approved by Agent, including any Internet- or extranet-based site, whether such electronic system is owned, operated or hosted by Agent, any of its Related Persons or any other Person, providing for access to data protected by passcodes or other security system.

"**Event of Default**" is defined in Article IX.

"**Export Control Regulations**" means the Export Administration Act, the Arms Export Control Act, the Export Administration Regulations and the International Traffic in Arms Regulations, each as amended from time to time, and any similar law applicable to the operations or activities of Parent or any Subsidiary in any jurisdiction.

"**Exchange Act**" is the Securities Exchange Act of 1934, as amended.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to any Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office, or in the case of any Lender, its applicable lending office, located in, the jurisdiction imposing such Tax (or any political subdivision thereof), or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender (including any successor to the Lender

8

FIG00003832

or to the rights of the Lender under this Agreement) with respect to an applicable interest in a Term Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Term Loan or (ii) such Lender designates a new lending office, except, in each case, to the extent Lender was entitled as of the time of designation of a new lending office or Lender' assignor was entitled immediately before such Lender became a party hereto pursuant to assignment, to receive additional amounts under Section 2.03; (c) Taxes attributable to such Recipient's failure to comply with Section 2.03(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any U.S. or non-U.S. fiscal or regulatory legislation, rules, guidance, notes or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code.

"**FCPA**" means the Foreign Corrupt Practices Act of 1977 (as amended from time to time).

"**FDCA**" means the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 et seq.

"**FIG**" is defined in the definition of "Fortress Persons".

"**FIG Funds**" is defined in the definition of "Fortress Persons".

"**Foreign Lender**" means a Lender that is not a U.S. Person.

"**Foreign Subsidiary**" means a Subsidiary that is not a Domestic Subsidiary.

"**Fortress**" is defined in the preamble.

"**Fortress Persons**" means (a) Fortress Investment Group LLC ("**FIG**"), (b) any investment fund (including any managed accounts) managed directly or indirectly by FIG or its Affiliates (excluding any Parent Entities) (the "**FIG Funds**"), (c) any Affiliates of FIG or the FIG Funds (excluding any Parent Entities) and (d) any director, officer or employee of any of the entities set forth in clauses (a), (b) and (c), regardless of whether such persons are also directors, officers or employees of any Parent Entities.

"**GAAP**" means United States generally accepted accounting principles applied on a consistent basis.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

ActiveUS 165810955v.1
KE 50036055.42

FIG00003833

"**Guarantor**" means any Person that executes and delivers a Guaranty, or becomes a party to a Guaranty by joinder or otherwise.

"**Guaranty**" means a Guaranty and Suretyship Agreement by each Guarantor substantially in the form attached hereto as Exhibit B.

"**Hazardous Materials**" means all flammable explosives, radioactive materials, hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**Healthcare Law**" means any and all Laws of any Governmental Authority pertaining to healthcare regulatory matters applicable to the operations of Parent and its Subsidiaries, including but not limited (i) the FDCA, PHSA, and IVD Regulatory Laws; (ii) the Clinical Laboratory Improvement Amendments of 1988 (21 U.S.C. § 263a); (iii) all applicable laws concerning fraud and abuse, including but not limited to the Federal Fraud Statutes (42 U.S.C. §§ 1320a-7, 7a and 7b), the federal Bribery Statute (18 U.S.C. § 666), the federal Antikickback Statute (42 U.S.C. §§ 1320a through 7b(b)), the federal Health Care Fraud Statute (18 U.S.C. § 1347), the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812 and the federal False Claims Act (31 U.S.C. §§ 3729-3733); (iv) laws related to data privacy and security, including but not limited to the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. §§ 1320d through 1320d-8); (v) the Open Payments provisions of the Affordable Care Act, 42 U.S.C. § 1320a-7h; (vi) any law pertaining to Medicare, Medicaid, TRICARE and other federal healthcare programs as defined in 42 U.S.C. § 1320a-7b(f) (vii) any other Laws governing marketing, labeling, promotion, sale, advertising, or communication related to Parent's and Borrower's products and services, including but not limited to the Federal Trade Commission Act; (viii) all regulations promulgated under the aforementioned Laws (ix) all Laws similar to the foregoing within any other federal, state, local or foreign jurisdiction, and (x) FDA's "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities" Compliance Policy Guide, Section 120.100 (CPG 7150.09).

"**Hedging Contract**" means any rate or currency swap, cap or collar agreement or any other agreement designed to hedge risk with respect to interest rate or currency fluctuations, whether or not pursuant to a Master Agreement.

"**Holmes Notes**" mean those certain promissory notes made by Elizabeth Holmes to Parent described in items 1 through 3 of Schedule 1.1(b)(ii) of the Disclosure Schedules, as amended, supplemented, modified and in effect from time to time.

"**Holmes Notes Amendment**" means any amendment, compromise, settlement, exchange, release, discharge, forgiveness or other transaction with respect to the Holmes Notes; provided that no cash payment or other consideration (apart from debt forgiveness) is paid by Parent or its Subsidiaries to Elizabeth Holmes in connection with the foregoing.

"**Indebtedness**" means, as applied to any Person, (a) all indebtedness for borrowed money, (b) that portion of Capital Lease Obligations which is properly classified as a liability on

10

 FIG00003834

a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business (x) that are being contested in good faith or (y) as to which payment is not overdue by more than 90 days), (e) all indebtedness secured by any Lien on any property or asset owned or held by that Person or is nonrecourse to the credit of that Person, (f) obligations in respect of letters of credit or banker's acceptances, (g) obligations under Hedging Contracts (the amount of which shall be determined by reference to the termination cost on the date of determination) and (h) all guarantees of such Person in respect of Indebtedness of others of the kinds referred to in clauses (a) through (g) above. It is understood and agreed that Settlement Payment Obligations shall not constitute Indebtedness for purposes of the Loan Documents.

"**Indemnitee**" is defined in <u>Section 14.02(b)</u>.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Insolvency Proceeding**" means any proceeding under any Debtor Relief Law.

"**Intellectual Property**" means all Copyrights, Patents, Trademarks and Trade Secrets.

"**Intercompany Note**" means a term loan promissory note, dated as of the Closing Date and in form and substance reasonably satisfactory to Agent, made by Parent in favor of Borrower with respect to (x) the proceeds of the Tranche A Term Loans advanced by Borrower to Parent on the Closing Date, (y) the proceeds of the Tranche B Term Loans advanced by Borrower to Parent on the Tranche B Funding Date and (y) the proceeds of the Tranche C Term Loans advanced by Borrower to Parent on the Tranche C Funding Date.

"**Interest Period**" means any period commencing on the 1st day of a calendar month and ending on the 1st day of the following month; *provided* that the first Interest Period shall be from the Closing Date to January 1, 2018.

"**Inventory**" means all "inventory" as defined in the UCC in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of a Loan Party's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"**Investment**" means any beneficial ownership interest in any Person (including Equity Interests and other securities), and any loan, advance or capital contribution to any Person. For the avoidance of doubt, the payment by Parent of the fees, costs and expenses owed by Borrower and permitted or required to be incurred and paid pursuant to the Loan Documents shall not be deemed to be an Investment.

11

ActiveUS 165810955v.1
KE 50036055.42

FIG00003835

"**IP Asset Disposition**" means an Asset Disposition of Intellectual Property.

"**IRS**" means the United States Internal Revenue Service.

"**IVD**" includes *in vitro* diagnostic devices as defined at 21 C.F.R. § 809.3(a), and *in vitro* diagnostic medical devices as that term is used in the In Vitro Diagnostic Regulation (EU) 2017/746.

"**IVD Regulatory Law**" includes the (i) FDCA; (ii) PHSA; (iii) CLIA Categorization pursuant to 42 U.S.C. 263a; (iv) the implementing regulations of each such Law codified at Titles 21 or 42, Code of Federal Regulations; (v) any analogous applicable Laws of any applicable jurisdiction; (vi) all terms and conditions of, or Laws applicable to holders of, any pending or approved Regulatory Permit; and (vi) any other applicable Laws of any jurisdiction governing the research, investigation, manufacturing, labeling, storage, advertising, promotion, marketing, sale and distribution of IVDs, including but not limited to the In Vitro Diagnostics Regulation (EU) 2017/746 and the Medical Device Regulation (EU) 2017/745.

"**Junior Obligations**" means the Walgreens Note, any Settlement Payment Obligation and any Subordinated Debt.

"**Knowledge**" means, with respect to any Person, the actual knowledge of executive officers (as defined in Rule 405 under the Securities Act) of such Person, after due inquiry.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"**Lender**" is defined in the preamble.

"**Lender Expenses**" means all reasonable fees and costs and expenses (including reasonable attorneys' fees and audit fees and expenses) incurred by any Lender for preparing, amending, negotiating, administering, defending and enforcing the Loan Documents and Transaction Documents (including those incurred in connection with appeals, workouts, restructuring or Insolvency Proceedings) or otherwise incurred by any Lender in its capacity as such.

"**Liabilities**" is defined in <u>Section 14.19</u>.

"**LIBO Rate**" means for an Interest Period, (a) the LIBOR Index Rate for such Interest Period, if such rate is available, and (b) if the LIBOR Index Rate cannot be determined, the arithmetic average of the rates of interest per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) at which deposits in Dollars in immediately available funds are offered to Agent at 11:00 a.m. (London, England time) two (2) Business Days before the beginning of such Interest Period by three (3) or more major banks in the interbank eurodollar market selected by

12

Agent for delivery on the first day of and for a period equal to such Interest Period and in an amount equal or comparable to the principal amount of the Term Loans.

"**LIBO Rate Loan**" means any Term Loan at any time at which it bears interest at or by reference to the LIBO Rate in accordance with the term hereof.

"**LIBOR Index Rate**" means, for any Interest Period, the offered rate per annum (rounded upwards, if necessary, to the next higher one hundred-thousandth of a percentage point) for deposits in Dollars for a period equal to such Interest Period, which appears in the ICE Benchmark Administration (or any successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the LIBOR Index Rate) for deposits in Dollars (as set forth by any service selected by Agent that has been nominated by the ICE Benchmark Administration as an authorized vendor for the purpose of displaying such rates) as of 11:00 a.m. (London, England time) on the day two (2) Business Days before the commencement of such Interest Period.

"**Licenses**" means all licenses and any other agreement granting any right (or under which any Person agrees to refrain from exercising any right, including any covenant not to sue) with respect to any Intellectual Property (whether a Person is the grantor or grantee thereunder).

"**Lien**" means any lien, mortgage, deed of trust, pledge, security interest, license, covenant not to sue or assert, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest).

"**Loan Documents**" means this Agreement, the Notes, the Warrant, the Perfection Certificate, each Guaranty, the Security Documents, the Patent Transfer Agreement and any other present or future agreement by a Loan Party for the benefit of Agent or the Lenders in connection with this Agreement, but excluding the Loan Parties' Organizational Documents, all as amended, restated, or otherwise modified.

"**Loan Parties**" means, collectively, Borrower, Parent and each other Guarantor.

"**Material Adverse Effect**" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties or condition (financial or otherwise) of Borrower or of Parent and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under the Loan Document to which it is a party; (c) a material impairment in the perfection or priority of Agent's Lien for the benefit of the Lenders on any of the Collateral; or (d) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party (as represented in, and subject to the qualifications contained in, <u>Section 6.4</u>).

"**Material Intellectual Property**" means all (a) Intellectual Property owned by or exclusively licensed to Parent or any Subsidiary of Parent that is material to the business of Parent or any Subsidiary as such business is conducted as of the Closing Date or other such date as the applicable representation or warranty is made, and (b) Material Patents.

13

FORTRESS HIGHLY CONFIDENTIAL

FIG00003837

"**Material Patents**" means all Patents listed on Schedule 1.1(a) of the Disclosure Schedules and all Patents claiming priority directly or indirectly from any Patent from which any Patent disclosed on Schedule 1.1(a) of the Disclosure Schedules claims priority directly or indirectly.

"**Material License**" is defined in Section 6.17(a).

"**Maturity Date**" means (a) with respect to the Tranche A Term Loans, the Tranche A Maturity Date, (b) with respect to the Tranche B Term Loans, the Tranche B Maturity Date and (c) with respect to the Tranche C Term Loans, the Tranche C Maturity Date.

"**Maximum Rate**" is defined in Section 14.18.

"**Mortgage**" means a mortgage, deed of trust, deed to secure debt, debenture or similar security instrument.

"**Mortgaged Property**" means any Real Property owned by any Loan Party which is encumbered (or required to be encumbered) by a Mortgage pursuant to the terms hereof.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which Parent, Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Multiple Trigger Event**" has the meaning given to such term in the Borrower Operating Agreement as in effect on the Closing Date.

"**Net Cash Proceeds**" means:

(a)     with respect to any Asset Disposition or any insurance or condemnation award, the aggregate cash proceeds (including cash proceeds received pursuant to policies of insurance (including business interruption insurance) or condemnation awards or by way of deferred payment of principal pursuant to a note, installment receivable or otherwise (but expressly excluding the release to Parent or any Subsidiary of any cash deposit or other amount in connection with the termination, sublease or assignment of any real estate lease), but in each case only as and when received) received by Parent or any Subsidiary pursuant to any such Asset Disposition or insurance proceeds or condemnation award net of (i) the direct costs relating to such Asset Disposition (including sales commissions and legal, accounting and investment banking fees), (ii) taxes paid (or reasonably estimated to be payable) by Borrower or any other Loan Party as a result thereof (it being understood for the avoidance of doubt that such taxes shall include only those payable by the seller or its Affiliates in such Asset Disposition), and (iii) amounts required to be applied to the repayment of any Indebtedness secured by a Lien on the asset subject to any such Asset Disposition (other than the Term Loans) or required to be paid to parties having superior rights to the proceeds of any such Asset Disposition to the extent such superior rights are permitted hereunder; and

(b)     with respect to any issuance of Indebtedness (excluding Permitted Indebtedness), the aggregate cash proceeds received by Parent or any of its Subsidiaries pursuant to such

14

issuance, net of the direct costs of such issuance (including up-front, underwriters' and placement fees and any related tax, legal and accounting fees).

"**Non-IP Asset Disposition**" means an Asset Disposition that is not an IP Asset Disposition.

"**Note**" means a promissory note made by Borrower in favor of a Lender evidencing a Term Loan.

"**Obligations**" means all Indebtedness and other obligations (including Protective Advances, expense reimbursement and indemnification) of each Loan Party under the Loan Documents (other than the Warrant), whether for principal, interest, fees, expenses, prepayment premiums, any Applicable Prepayment Premium, any End of Term Fees or any Structuring Fees, in each case whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including all interest that accrues (a) in an Event of Default or (b) after the commencement of any Insolvency Proceeding, whether or not allowed or allowable in such Insolvency Proceeding. For the avoidance of doubt, "Obligations" excludes Distributions (as defined under the Borrower Operating Agreement).

"**Observer**" is defined in Section 7.18.

"**OFAC**" is defined in Section 6.22.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement ; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Connection Taxes**" means Taxes imposed as a result of a present or former connection between any Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any rights under any Loan Document, or sold or assigned an interest in any Term Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**Parent**" is defined in the Preamble.

"**Parent Entities**" means Parent and its direct or indirect Subsidiaries.

15

ActiveUS 165810955v.1
KE 50036055.42

FIG00003839

"**Participant Register**" is defined in Section 14.11.

"**Patent Law Firm**" is defined in Section 7.20.

"**Patent License Agreement**" means a non-exclusive license agreement by and between Parent, as licensee, and Borrower, as licensor, in the form attached hereto as Exhibit C.

"**Patents**" means all of the following: (a) all letters patent of the United States or the equivalent thereof in any other country, and all applications for letters patent of the United States or the equivalent thereof in any other country, including certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances, and the right to make application for any of the foregoing, and (b) all reissues, reexaminations, extensions, renewals continuations, continuations in part and divisionals thereof.

"**Patent Transfer Agreement**" means the agreement providing for the assignment of the Transferred Patent Rights by the Loan Parties (other than Borrower) in favor of Borrower, in the form attached hereto as Exhibit D.

"**Patriot Act**" means the USA PATRIOT Act, Pub. L. 107-56 (signed into law October 26, 2001), as amended by the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (signed into law March 9, 2006) (as amended from time to time).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**PDE Program**" is defined in Section 7.20.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by Parent, Borrower or any ERISA Affiliate or to which Parent, Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Perfection Certificate**" means the perfection certificate in the form attached hereto as Exhibit E.

"**Permitted Indebtedness**" means:

(i) the Obligations;

(ii) Indebtedness existing on the Closing Date disclosed to Agent in writing on Schedule 1.1(b)(i) of the Disclosure Schedules;

(iii) Subordinated Debt to the extent consented to by Agent in its sole discretion;

(iv) Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business;

16

(v) Indebtedness of Parent to any Loan Party (other than Borrower) and Indebtedness of Parent to Borrower arising pursuant to the intercompany loans made (w) on the Closing Date with the proceeds of the Tranche A Term Loans, (x) on the Tranche B Funding Date with the proceeds of the Tranche B Term Loans, (y) on the Tranche C Funding Date with the proceeds of the Tranche C Term Loans (which intercompany loans in the case of each of clauses (w), (x) and (y) shall be evidenced by the Intercompany Note) and (z) after an Event of Default with the proceeds of any Protective Advances;

(vi) Indebtedness owing to sureties arising from bid, performance or surety bonds or letters of credit supporting such bid, performance or surety obligations issued on behalf of Borrower as support for, among other things, contracts with customers;

(vii) Indebtedness of Foreign Subsidiaries in an aggregate principal amount outstanding not to exceed, at any time, $250,000;

(viii) Indebtedness of Parent and any of its Domestic Subsidiaries (other than Borrower) in an aggregate principal amount outstanding not to exceed, at any time, $250,000;

(ix) Indebtedness secured by the Liens described in clause (iv) of Permitted Liens;

(x) Indebtedness in respect of letters of credit issued for the benefit of customers, contractors and suppliers in the ordinary course of business in an aggregate principal amount outstanding not to exceed, at any time, $2,000,000;

(xi) Indebtedness in respect of corporate credit cards in the ordinary course of business in an aggregate principal amount outstanding not to exceed, at any time, $80,000;

(xii) to the extent permitted under Section 8.07, extensions, refinancings, modifications, amendments and restatements of any items of Permitted Indebtedness described in clauses (i) through (xi) above and (xiii) below, provided in each case that the principal amount thereof is not increased or the terms thereof are not modified to impose more burdensome terms upon Parent or its Subsidiary, as the case may be;

(xiii) Indebtedness under the Walgreens Note in a principal amount not to exceed $40,000,000, less the amount of any principal prepayments or repayments thereof; and

(xiv) Permitted Junior Indebtedness.

"**Permitted Investments**" means:

(i) Investments (including Investments in Subsidiaries) existing on the Closing Date and set forth on Schedule 1.1(b)(ii) of the Disclosure Schedules;

(ii) Investments consisting of Cash Equivalents;

(iii) Investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business for Parent or its Subsidiaries (other than Borrower);

17

FIG00003841

(iv) Investments consisting of deposit accounts and securities accounts, provided that Agent has a perfected security interest for the benefit of the Lenders therein to the extent required under the Security Agreement;

(v) Investments (i) in the form of common equity by Parent in Borrower, (ii) by Loan Parties in Subsidiaries that are not Guarantors not to exceed $250,000 in the aggregate at any one time; (iii) by Parent in Subsidiaries that are Guarantors; (iii) by Subsidiaries that are Guarantors in other Guarantors; and (iv) by Subsidiaries that are not Guarantors in other Subsidiaries;

(vi) Investments consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the ordinary course of business and (ii) cashless loans to employees, officers or directors relating to the purchase of equity securities of Parent pursuant to employee stock purchase plans or agreements approved by Parent's Board of Directors;

(vii) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers or in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business;

(viii) Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the ordinary course of business; *provided* that this paragraph (viii) shall not apply to Investments of any Loan Party in any Subsidiary; and

(ix) Investments in connection with the dissolution of Specified Subsidiaries in an aggregate amount not to exceed $25,000 during the term of this Agreement;

(x) Investments accepted in connection with or resulting from permitted dispositions of assets; and

(xi) Investments permitted under clause (v) of the definition of "Permitted Indebtedness".

"**Permitted Junior Capital**" means (a) any issuance of Equity Interests (other than Disqualified Equity Interests) of Parent and (b) any unsecured Indebtedness of Parent that (i) does not have a scheduled maturity, and is not otherwise payable, prior to the date that is one year and one day after the latest Maturity Date applicable to the Term Loans, which date shall, if an Event of Default occurs, automatically be extended to be no earlier than the achievement by the Class B Member (as defined in the Borrower Operating Agreement) of the 3.00x Hurdle (as defined in the Borrower Operating Agreement) (the date described in this clause (i), as it may be so extended, the "**Permitted Junior Capital Maturity Date**"), (ii) does not have amortization, does not require (or permit) any cash payment until repayment in full of all Obligations and, if an Event of Default occurs, achievement by the Class B Member of the 3.00x Hurdle, and does not have mandatory prepayment or redemption provisions, (iii) has no cash interest component until the Permitted Junior Capital Maturity Date, (iv) shall not be guaranteed by any Person that is not a Guarantor, it being understood and agreed that Borrower shall provide no guaranty or other credit support for any such Permitted Junior Indebtedness, (v) shall provide that it cannot be amended without the consent of the Required Lenders, (vi) shall be in form and substance reasonably satisfactory to the Required Lenders and (vii) shall be subject to a subordination

18

agreement in form and substance satisfactory to the Required Lenders in their sole discretion (any Indebtedness described in this clause (b), "**Permitted Junior Indebtedness**").

"**Permitted Junior Indebtedness**" is defined in the definition of "Permitted Junior Capital".

"**Permitted Junior Capital Maturity Date**" is defined in the definition of "Permitted Junior Capital".

"**Permitted Liens**" means:

(i) Liens granted to Agent for the benefit of the Lenders to secure the Obligations;

(ii) Liens existing on the Closing Date and set forth on Schedule 1.1(b)(iii) of the Disclosure Schedules;

(iii) Liens for taxes, fees, assessments or other government charges or levies, either (a) not due and payable or (b) being contested in good faith and for which Parent maintains adequate reserves on its books, provided that no notice of any such Lien has been filed or recorded under the Code;

(iv) capital leases or purchase money Liens (a) on equipment acquired or held by Parent or its Subsidiaries (other than Borrower) incurred for financing the acquisition of the equipment securing no more than $2,000,000 in the aggregate amount outstanding at any time, or (b) existing on equipment when acquired, if the Lien is confined to the property and improvements and the proceeds of the equipment;

(v) Liens of carriers, warehousemen, suppliers, or other Persons that are possessory in nature arising in the ordinary course of business so long as such Liens attach only to inventory, securing liabilities in the aggregate amount not to exceed $250,000 and which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings which proceedings have the effect of preventing the forfeiture or sale of the property subject thereto;

(vi) Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business;

(vii) Liens incurred in the extension, renewal or refinancing of the indebtedness secured by Liens described in clauses (i) through (v) above, but any extension, renewal or replacement Lien must be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness may not increase;

(viii) leases or subleases of real property granted in the ordinary course of Parent's business (or, if referring to another Person, in the ordinary course of such Person's business), and leases, subleases, non-exclusive licenses or sublicenses of personal property (other than intellectual property) granted in the ordinary course of Parent's business (or, if referring to another Person, in the ordinary course of such Person's business);

19

FORTRESS HIGHLY CONFIDENTIAL

FIG00003843

(ix) the Patent License Agreement including, for clarity, the grant of any licenses authorized therein that: (i) do not otherwise conflict with the requirements of <u>Section 8.04</u> and <u>Section 8.12</u>; or (ii) for which Agent has given its express written consent;

(x) Liens arising from attachments, judgments, orders, or decrees or similar processes in circumstances not constituting an Event of Default under <u>Section 9.09</u>;

(xi) Liens in favor of other financial institutions arising in connection with deposit and/or securities accounts held at such institutions;

(xii) deposits to secure the performance of bids, tenders, trade contracts (other than for borrowed money), leases, government contracts, statutory obligations, surety, stay, customs and appeal bonds, performance and return of money bonds and other obligations of a like nature incurred in the ordinary course of business;

(xiii) easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances or minor title deficiencies incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary course of business;

(xiv) any interest or title of a lessor under any (A) operating lease entered into by Parent or any of its Subsidiaries (other than Borrower) in the ordinary course of its business and covering only the assets so leased, or (B) real property lease pertaining to the lessor's interest in or title to any fixtures under such lease terms;

(xv) deposits made in the ordinary course of business to secure liability for premiums to insurance carriers;

(xvi) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties in connection with the importation of goods;

(xvii) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(xviii) Liens on assets of Foreign Subsidiaries securing Indebtedness otherwise permitted pursuant to clause (vii) of the definition of "Permitted Indebtedness";

(xix) the filing of UCC financing statements solely as a precautionary measure in connection with operating leases or consignment of goods;

(xx) Liens not otherwise permitted hereunder securing obligations other than borrowed money so long as neither (A) the aggregate outstanding principal amount of the obligations secured thereby nor (B) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds $250,000 at any one time;

(xxi) non-exclusive licenses under Intellectual Property (other than licenses of Material Patents) and non-exclusive licenses (including licenses of Material Patents) implied from

20

FORTRESS HIGHLY CONFIDENTIAL

FIG00003844

Parent's or any Subsidiary's sales, leases, or other provisions of a product or service, in each case, granted in the ordinary course of business;

(xxii) Liens securing Indebtedness permitted pursuant to clause (x) of the definition of "Permitted Indebtedness";

(xxiii) bankers' Liens and rights of setoff arising in connection with Indebtedness permitted pursuant to clause (xi) of the definition of "Permitted Indebtedness"; and

(xxiv) Liens securing Indebtedness under the Intercompany Note.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**PHSA**" means the Public Health Service Act, 42 U.S.C. ch. 6A, §§ 201, et seq.

"**PIK Interest**" is defined in Section 2.2(a)(ii).

"**PIK Interest Rate**" means 8.00% per annum.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by Parent, Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"**PPSA**" means the personal property security legislation of the applicable province of Canada, as the context requires, including, without limitation, the *Personal Property Security Act* (Ontario) and all regulations and Minister's orders made thereunder.

"**Prime Rate**" means the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by Agent) or any similar release by the Federal Reserve Board (as reasonably determined by Agent).

"**Pro Rata Share**" means (a) with respect to any Lender at any time, the percentage obtained by dividing (i) the aggregate amount of all outstanding Term Loans and Term Loan Commitments held by such Lender at such time by (ii) the aggregate amount of all Term Loans and Term Loan Commitments outstanding at such time, and (b) with respect to any Lender of any Tranche at any time, the percentage obtained by dividing (i) the aggregate amount of all outstanding Term Loans and Term Loan Commitments of such Tranche held by such Lender at such time by (ii) the aggregate amount of all Term Loans and Term Loan Commitments of such Tranche outstanding at such time.

"**Protective Advance**" means a term loan made to Borrower by Agent from time to time after an Event of Default under this Agreement that, in the sole discretion of Agent, is necessary

FIG00003845

or desirable (a) to maintain, protect or preserve the Collateral and/or Agents' and the Lenders' rights under the Loan Documents or is otherwise made for the benefit of Agent and the Lenders; (b) to enhance the likelihood of, or to maximize the amount of, the repayment of any Obligation;(c) to pay any other amount chargeable to any Loan Party hereunder or (d) to enhance the value of, or monetize, the Transferred Patent Rights.

"**Real Property**" means, with respect to any Person, all the right, title and interest of such Person in and to land, improvements and fixtures, including, but not limited to, fee interests, leaseholds and easements.

"**Recall**" is a repair, modification, adjustment, relabeling (including a field safety notice), destruction, or inspection (including patient monitoring) that is associated with any known or potential violation of applicable Healthcare Law, or risk to patient or operator health, all as relates to a product manufactured, marketed, sold or distributed under a Regulatory Permit.

"**Register**" is defined in <u>Section 14.10</u>.

"**Regulatory Permits**" means authorizations, applications, approvals, clearances, licenses, permits, certificates or exemptions issued or recognized by any Governmental Authority and required for the research, investigation, manufacturing, labeling, storage, advertising, promotion, marketing, sale and distribution of IVDs or other medical devices, or to offer diagnostic test services, including but not limited to establishment registration and product listing with FDA; any FDA marketing or investigational authorization pursuant to a 510(k)-exempt classification regulation, 510(k) notification, premarket application, *de novo* submission, biological license application, Emergency Use Authorization application, CLIA Waiver application, or investigational device exemption; CE marks; ISO 13485:2016 certification; state licenses required for manufacturing, storage, sale and distribution of IVDs; CLIA certification; and comparable laws of other applicable jurisdictions.

"**Recipient**" means (a) Agent or (b) any Lender, as applicable.

"**Related Parties**" means, with respect to any Person, each Affiliate of such Person and each member, manager, director, partner, financing source, investor, prospective investor, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor and other consultants and agents of or to such Person or any of its Affiliates.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"**Requisite Lenders**" means, at any time, (a) so long as Fortress and its Affiliates collectively hold a majority of the aggregate amount of Term Loans and Term Loan Commitments outstanding at such time, Agent and (b) if Fortress and its Affiliates do not collectively hold a majority of the aggregate amount of Term Loans and Term Loan Commitments at such time, Lenders collectively holding a majority of the aggregate amount of Term Loans and Term Loan Commitments outstanding at such time.

22

                                   FIG00003846

"**Responsible Officer**" means any of the Chief Executive Officer, President, Chief Financial Officer and General Counsel of Parent, Borrower or, as applicable, a Guarantor.

"**Reviewed Financial Statements**" means the Parent-prepared consolidated balance sheet of Parent and its Subsidiaries on a consolidated basis for the calendar months ended on the last day of January, February, March, April, May, June, July, August, September and October, 2017, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such calendar months of Parent and its Subsidiaries.

"**SEC**" means the Securities and Exchange Commission, any successor thereto, and any analogous Governmental Authority.

"**Securitization**" is defined in Section 14.19.

"**Securitization Parties**" is defined in Section 14.19.

"**Security Agreement**" means the Security Agreement dated as of the date hereof by and among Agent and the Loan Parties, in the form attached hereto as Exhibit G.

"**Security Documents**" means the Security Agreement, each Intellectual Property Security Agreement (as defined in the Security Agreement), each Mortgage and all other security documents hereafter delivered by the Loan Parties to Agent granting a Lien on their respective assets to secure any of the Obligations or to secure any guarantee of any such Obligations.

"**Settlement Payment Obligations**" shall mean (i) payment obligations (whether or not deferred) in connection with the settlement or satisfaction of any dispute, litigation, investigation or proceeding (whether brought by a Governmental Authority or any other Person, and including any such dispute, litigation, investigation or proceeding that is pending or threatened in writing and any fees, costs or expenses in connection therewith) and (ii) guarantees of, or similar obligations with respect to, any of the foregoing of any other Person.

"**Solvent**" means, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Specified Subsidiary**" is defined in Section 6.13.

"**Structuring Fees**" is defined in Section 2.01(g).

23

"**Subordinated Debt**" means Indebtedness incurred by Parent, non-recourse to Borrower and subordinated to the Obligations pursuant to an agreement in form and substance satisfactory to Agent.

"**Subsidiary**" means a corporation, partnership, trust, limited liability company or other business entity of which more than 50% of the shares of stock or other ownership interests having ordinary voting power (without regard to the occurrence of any contingency) to elect a majority of the board of directors or other managers of such entity are at the time owned, directly, or indirectly through one or more Subsidiaries, or both, by Parent. Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Parent. Notwithstanding anything herein or in any other Loan Document to the contrary, Borrower shall be deemed a Subsidiary of Parent.

"**Survey**" means, with respect to any Mortgaged Property, either (a) an existing as-built ALTA survey of the applicable Mortgaged Property reasonably acceptable to Agent and the Title Company and based upon which the Title Company will cause all standard survey and related exceptions to be deleted from the Title Policy and to enable the Title Company to issue all survey-related endorsements to the Title Policy requested by Agent, or (b) an as-built ALTA survey of the applicable Mortgaged Property (i) dated no earlier than 30 days prior to the date of the applicable Mortgage, (ii) prepared by a land surveyor duly licensed and registered in the jurisdiction in which such Mortgaged Property is located, (ii) in form, scope, and substance sufficient to cause all standard survey and related exceptions to be deleted from the Title Policy and to enable the Title Company to issue all survey-related endorsements to the Title Policy requested by Agent, (iv) certified to the Title Company and Agent by a form of certification reasonably acceptable to Agent, and (v) otherwise in accordance with the "2011 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys" jointly established and adopted by the American Land Title Association and the National Society of Professional Surveyors effective February 23, 2011 showing such additional matters as may be reasonably required by Agent.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loan**" means a Tranche A Term Loan, a Tranche B Term Loan or a Tranche C Term Loan or a Protective Advance, as the context may require, and "**Term Loans**" means the foregoing, collectively.

"**Term Loan Commitment**" means, as the context may require, any Tranche A Term Loan Commitment, any Tranche B Term Loan Commitment or any Tranche C Term Loan Commitment, individually, and "**Term Loan Commitments**" means the Tranche A Term Loan Commitments, the Tranche B Term Loan Commitments and the Tranche C Term Loan Commitments, collectively. The Term Loan Commitment of each Lender as of the Closing Date is set forth on Schedule 1.1(c) of the Disclosure Schedules.

"**Title Company**" means any title company reasonably acceptable to Agent.

24

ActiveUS 165810955v.1
KE 50036055.42

  FIG00003848

"**Title Policy**" means, with respect to any Mortgage, such form as is reasonably acceptable to Agent or a binding marked commitment to issue such policy dated as of the date of the applicable Mortgage and to be redated the date of recording of such Mortgage, issued by the Title Company, in an amount equal to 110% of the fair market value of the applicable Mortgaged Property or in another amount reasonably acceptable to Agent, insuring the Lien in favor of Agent for the benefit of the Lenders created by the applicable Mortgage, subject only to Permitted Liens or such other exceptions approved by Agent and containing such endorsements and affirmative assurances as Agent shall reasonably require and which are reasonably obtainable from title companies in the state in which such Mortgaged Property is located.

"**Trademarks**" means all of the following: all trademarks, service marks, corporate names, company names, business names, trade names, trade dress, logos, Internet domain names, other source or business identifiers, and all registrations and applications filed in connection therewith in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all renewals thereof, and (b) all goodwill associated therewith or symbolized thereby.

"**Trade Secrets**" means all of the following: trade secrets and other proprietary or confidential business information, which may include inventions, invention disclosures, discoveries, know how, systems, processes, methods, data, business and marketing plans, and customer and vendor lists.

"**Tranche**" means (a) with respect to any Term Loan, whether such Term Loan is a Tranche A Term Loan, a Tranche B Term Loan or a Tranche C Term Loan or a Protective Advance, (b) with respect to any Term Loan Commitment, whether such Term Loan Commitment is a Tranche A Term Loan Commitment, a Tranche B Term Loan Commitment or a Tranche C Term Loan Commitment and (c) with respect to any Lender, whether such Lender holds Tranche A Term Loans (or Tranche A Term Loan Commitments, as the case may be), Tranche B Term Loans (or Tranche B Term Loan Commitments, as the case may be) or Tranche C Term Loans (or Tranche C Term Loan Commitments, as the case may be).

"**Tranche A End of Term Fee**" means an end of term fee equal to 7.25% of the initial principal amount of the Tranche A Term Loans advanced on the Closing Date.

"**Tranche A Maturity Date**" means the date that is forty-two (42) months after the Closing Date.

"**Tranche A Term Loan**" means a loan made by a Lender pursuant to Section 2.01(a)(i).

"**Tranche A Term Loan Commitments**" is defined in the recitals hereto.

"**Tranche B Commitment Termination Date**" is defined in Section 2.01(h)(iii).

"**Tranche B End of Term Fee**" means an end of term fee equal to 7.25% of the initial principal amount of the Tranche B Term Loans advanced on the Tranche B Funding Date.

25

"**Tranche B Funding Conditions**" means the earliest to occur of the following in respect of Parent's Zika test for use with Parent's miniLab system: (i) FDA EUA approval; (ii) FDA 510(k) clearance; and (iii) CE marking.

"**Tranche B Funding Date**" means the date on which the conditions precedent set forth in Section 3.02 shall have been satisfied (or waived in accordance with the terms thereof) and the funding of the Tranche B Term Loans shall occur.

"**Tranche B Maturity Date**" means the earlier of (a) the date that is forty-two (42) months after the Tranche B Funding Date and (b) the date that is ninety-one (91) days prior to the scheduled maturity date of the Walgreens Note.

"**Tranche B Term Loan**" means a loan made by a Lender pursuant to Section 2.01(a)(ii).

"**Tranche B Term Loan Commitments**" is defined in the recitals hereto.

"**Tranche C Commitment Termination Date**" is defined in Section 2.01(h)(iv).

"**Tranche C End of Term Fee**" means an end of term fee equal to 7.25% of the initial principal amount of the Tranche C Term Loans advanced on the Tranche C Funding Date.

"**Tranche C Funding Conditions**" means each of (i) certification of Parent's quality system compliance to International Organization for Standardization (ISO) 13485:2016; (ii) Parent's evidence of (A) registration with FDA as a medical device establishment, and (B) establishment of an FDA-compliant quality system which may be provided by either (1) an FDA inspection of compliance with 21 CFR Part 820 which results in non-material FDA-483 observations, or (2) an audit by an agreed-upon auditor who attests to compliance with 21 CFR Part 820 requirement; (iii) execution and delivery of a certified copy by a Responsible Officer by Parent and one or more third-party investors of one or more bona fide term sheets for a financing or financings to Parent consisting of Permitted Junior Capital with cash proceeds in an aggregate amount of at least $40,000,000; and (iv) CE marking of a diagnostic test for use with Parent's miniLab system that includes at least one of the following assays: chlamydia, gonorrhea, HSV-2, or an antibiotic resistance test.

"**Tranche C Funding Date**" means the date on which the conditions precedent set forth in Section 3.03 shall have been satisfied (or waived in accordance with the terms thereof) and the funding of the Tranche C Term Loans shall occur.

"**Tranche C Maturity Date**" means the earlier of (a) the date that is forty-two (42) months after the Tranche C Funding Date and (b) the date that is ninety-one (91) days prior to the scheduled maturity date of the Walgreens Note.

"**Tranche C Term Loan**" means a loan made by a Lender pursuant to Section 2.01(a)(iii).

"**Tranche C Term Loan Commitments**" is defined in the recitals hereto.

26

FORTRESS HIGHLY CONFIDENTIAL

FIG00003850

"**Transaction Documents**" means the Compliance Certificate, the Patent License Agreement and the Borrower Operating Agreement.

"**Transfer**" means to sell, exchange, transfer, assign, license, hypothecate, pledge or make a gift, and shall include without limitation the termination or assignment of any lease or license.

"**Transferred Patent Rights**" has the meaning set forth in the Patent Transfer Agreement.

"**Transferred Patents**" has the meaning set forth in the Patent Transfer Agreement.

"**UCC**" means the Uniform Commercial Code in effect from time to time in the State of New York, except as such term may be used in connection with the perfection of a security interest in the Collateral, in which case, the applicable jurisdiction with respect to the affected Collateral shall apply.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**Voting Agreement**" means the Amended and Restated Voting Agreement of Parent dated as of May 15, 2017 as among Parent and the Investors and Founder (as such terms are defined therein).

"**Walgreens Note**" means that certain Convertible Promissory Note entered into on June 5, 2012 by Parent in favor of WVC Investments, LLC for a principal sum of $40,000,000, as amended by that certain Settlement Agreement and Release dated as of July 28, 2017 by and between Walgreens and Parent.

"**Warrant**" means a Warrant, in substantially the form attached hereto as <u>Exhibit F</u> executed by Parent in favor of Fortress or an Affiliate of Agent on the Closing Date, pursuant to which Fortress or its Affiliate, as applicable, shall be entitled to purchase shares of Parent's Equity Interests as set forth therein.

"**Withholding Agent**" means each of Borrower and Agent, as applicable.

**Other Interpretative Provisions.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "**include,**" "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation.**" The word "**will**" shall be construed to have the same meaning and effect as the word "**shall**". Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement,

27

ActiveUS 165810955v.1
KE 50036055.42

FIG00003851

instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document); (b) any reference herein to any Person shall be construed to include such Person's successors and assigns; (c) the words "**hereto**", "**herein**", "**hereof**" and "**hereunder**", and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof; (d) all references in a Loan Document to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear; (e) any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any Law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time; and (f) the words "**asset**" and "**property**" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible, real and personal, assets and properties, including cash, securities, accounts and contract rights.

In the computation of periods of time from a specified date to a later specified date, the word "**from**" means "from and including;" the words "**to**" and "**until**" each mean "to but excluding;" and the word "**through**" means "to and including."

Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

It is acknowledged and agreed that the proceedings described in the Disclosed Matters shall not constitute a Material Adverse Effect hereunder unless, with respect to such Disclosed Matters, information comes to light, or a change of circumstance or development occurs, after the Closing Date which, when taken together with the Disclosed Matters, results in a Material Adverse Effect.

### SECTION 1.02.  Accounting Terms.

(a)     **Generally.** All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein. Notwithstanding the foregoing, for purposes of determining compliance with any covenant contained herein, Indebtedness of the Loan Parties and their Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 on financial liabilities shall be disregarded.

(b)     **Changes in GAAP.** If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, at Agent's request, Agent and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; *provided* that, until so amended (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) Borrower and Parent shall provide to Agent financial statements and other documents required under this Agreement or as reasonably requested

ActiveUS 165810955v.1
KE 50036055.42

FIG00003852

hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**SECTION 1.03. Rounding.** Any financial ratios required to be maintained by Parent pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

ARTICLE II.**LOANS AND TERMS OF PAYMENT**

**SECTION 2.01. Term Loans**.

(a)     **Loans.** Subject to the terms and conditions of this Agreement, each Lender agrees, severally and not jointly:

(i)     on the Closing Date, to make a term loan to Borrower (the proceeds of which term loan shall be immediately transferred, as an intercompany loan made by Borrower to Parent and evidenced by the Intercompany Note, to a deposit account in the name of Parent subject to an "unblocked" control agreement in favor of Agent for the benefit of the Lenders) in an aggregate principal amount equal to the Tranche A Term Loan Commitment of such Lender as of such date;

(ii)     on the Tranche B Funding Date, to make a term loan to Borrower (the proceeds of which term loan shall be immediately transferred, as an intercompany loan made by Borrower to Parent and evidenced by the Intercompany Note, to a deposit account in the name of Parent subject to an "unblocked" control agreement in favor of Agent for the benefit of the Lenders) in an aggregate principal amount equal to the Tranche B Term Loan Commitment of such Lender as of such date; and

(iii)     on the Tranche C Funding Date, and irrespective of whether the Tranche B Term Loan Funding Date has occurred, to make a term loan to Borrower (the proceeds of which term loan shall be immediately transferred, as an intercompany loan made by Borrower to Parent and evidenced by the Intercompany Note, to a deposit account in the name of Parent subject to an "unblocked" control agreement in favor of Agent for the benefit of the Lenders) in an aggregate principal amount equal to the Tranche C Term Loan Commitment of such Lender as of such date.

Once repaid or prepaid, the repaid or prepaid portion of any Term Loan may not be re-borrowed.

(b)     **Principal Repayment**.

(i)     Commencing on the first day of the twenty-second (22nd) calendar month beginning after the Closing Date, Borrower shall make repayments of the outstanding principal amount of the Tranche A Term Loans (A) on the first day of such twenty-second (22nd) calendar month and on the first day of each calendar month thereafter through and including the twenty-fourth (24th) calendar month beginning after the

29

ActiveUS 165810955v.1
KE 50036055.42

 FIG00003853

Closing Date, in a monthly repayment amount equal to $325,000, (B) on the first day of the twenty-fifth (25th) calendar month beginning after the Closing Date and on the first day of each calendar month thereafter through and including the thirty-third (33rd) calendar month beginning after the Closing Date, in a monthly repayment amount equal to $1,300,000 and (C) on the first day of the thirty-fourth (34th) calendar month beginning after the Closing Date and on the first day of each calendar month thereafter through and including the forty-second (42nd) calendar month beginning after the Closing Date, in a monthly repayment amount equal to $3,250,000.

(ii)     Commencing on the first day of the twenty-second (22nd) calendar month beginning after the Tranche B Funding Date, Borrower shall make repayments of the outstanding principal amount of the Tranche B Term Loans (A) on the first day of such twenty-second (22nd) calendar month and on the first day of each calendar month thereafter through and including the twenty-fourth (24th) calendar month beginning after the Tranche B Funding Date, in a monthly repayment amount equal to $50,000, (B) on the first day of the twenty-fifth (25th) calendar month beginning after the Tranche B Funding Date and on the first day of each calendar month thereafter through and including the thirty-third (33rd) calendar month beginning after the Tranche B Funding Date, in a monthly repayment amount equal to $200,000 and (C) on the first day of the thirty-fourth (34th) calendar month beginning after the Tranche B Funding Date and on the first day of each calendar month thereafter through and including the forty-second (42nd) calendar month beginning after the Tranche B Funding Date, in a monthly repayment amount equal to $500,000.

(iii)     Commencing on the first day of the twenty-second (22nd) calendar month beginning after the Tranche C Funding Date, Borrower shall make repayments of the outstanding principal amount of the Tranche C Term Loans (A) on the first day of such twenty-second (22nd) calendar month and on the first day of each calendar month thereafter through and including the twenty-fourth (24th) calendar month beginning after the Tranche C Funding Date, in a monthly repayment amount equal to $125,000, (B) on the first day of the twenty-fifth (25th) calendar month beginning after the Tranche C Funding Date and on the first day of each calendar month thereafter through and including the thirty-third (33rd) calendar month beginning after the Tranche C Funding Date, in a monthly repayment amount equal to $500,000 and (C) on the first day of the thirty-fourth (34th) calendar month beginning after the Tranche C Funding Date and on the first day of each calendar month thereafter through and including the forty-second (42nd) calendar month beginning after the Tranche C Funding Date, in a monthly repayment amount equal to $1,250,000.

(iv)     All unpaid principal and accrued and unpaid interest (A) in respect of (1) the Tranche A Term Loans and (2) any Protective Advances shall be due and payable in full on the Tranche A Maturity Date unless earlier accelerated, (B) in respect of the Tranche B Term Loans shall be due and payable in full on the Tranche B Maturity Date unless earlier accelerated and (C) in respect of the Tranche C Term Loans shall be due and payable in full on the Tranche C Maturity Date unless earlier accelerated.

ActiveUS 165810955v.1
KE 50036055.42

FORTRESS HIGHLY CONFIDENTIAL

FIG00003854

(v)    Term Loans may be prepaid only in accordance with Sections 2.01(c), 2.01(d), and 2.01(e).

(c)    **Mandatory Prepayment Upon Acceleration.** If any Term Loan is accelerated (whether following the occurrence and during the continuation of an Event of Default, by operation of law or otherwise), Borrower shall immediately pay to Agent, for the account of the Lenders, an amount equal to the sum of (i) all outstanding principal plus accrued and unpaid interest in respect of such Term Loan, plus (ii) the End of Term Fee applicable to such Term Loan, as further described in Section 2.01(f) below; plus (iii) all other sums, if any, that shall have become due and payable in respect of such Term Loan, including interest at the Default Rate to the extent applicable.

(d)    **Permitted Prepayment of Loans.** Borrower shall have the option to prepay all or part of the Term Loans advanced by the Lenders under this Agreement; *provided* that Borrower (i) provides written notice to Agent of its election to prepay such Term Loans at least five (5) Business Days prior to such prepayment, and (ii) pays, on the date of such prepayment, (A) all outstanding principal plus accrued and unpaid interest for the portion of the Term Loans specified for prepayment in the written notice provided pursuant to clause (i); (B) any applicable End of Term Fee to the extent then due and payable pursuant to Section 2.10(f) below; and (C) all other sums, if any, that shall have become due and payable, including interest at the Default Rate with respect to any past due amounts and any Applicable Prepayment Premium, as further described in Section 2.01(f) below. Prepayments made pursuant to this Section 2.01(d) shall be allocated *first*, to the amount of any Protective Advances then outstanding, *second*, to the principal amount of the Tranche A Term Loans then outstanding, *third*, to the principal amount of the Tranche B Term Loans then outstanding and *fourth*, to the principal amount of the Tranche C Term Loans then outstanding. Each partial prepayment of a Tranche of Term Loans shall be applied to the remaining scheduled principal installments of such Tranche of Term Loans in inverse order of maturity.

(e)    **Mandatory Prepayment Upon Certain Events.**

(i)    Borrower shall make a prepayment of the Term Loans (in each case, without premium or penalty except as otherwise expressly provided in Section 2.01(f) or Section 2.02(f)) upon the occurrence of any of the following at the following times and in the following amounts:

(1)    Within two (2) Business Days after the receipt by Parent or any of its Subsidiaries of any Net Cash Proceeds from (x) any Non-IP Asset Disposition or (y) any insurance or condemnation award in respect of assets or property other than Intellectual Property (including, without limitation, Net Cash Proceeds of business interruption insurance but excluding any Net Cash Proceeds from an insurance award to the extent such Net Cash Proceeds are immediately payable to a Person that is not an Affiliate of Parent or any of its Subsidiaries or received by Parent or any of its Subsidiaries as reimbursement for any payment previously made by Parent or such Subsidiary), in the case of each of (x) and (y), in an amount equal to 100% of such Net Cash Proceeds; *provided* that no such prepayment shall be required pursuant to this Section

31

ActiveUS 165810955v.1
KE 50036055.42

    FIG00003855

2.01(e)(i)(1) unless and until the amount of all Net Cash Proceeds so received from such Non-IP Asset Dispositions and such insurance or condemnation awards after the Closing Date shall exceed $5,000,000 in the aggregate.

(2)     Within two (2) Business Days after the receipt by Parent or any of its Subsidiaries of any Net Cash Proceeds from (x) any IP Asset Disposition or (y) any insurance or condemnation award in respect of Intellectual Property (but excluding, for the avoidance of doubt, insurance proceeds in connection with the settlement of pending or threatened litigation or investigations), in each case, in an amount equal to 100% of such Net Cash Proceeds.

(3)     Substantially concurrently with the receipt by Parent or any of its Subsidiaries of any Net Cash Proceeds from any issuance of any Indebtedness of Parent or any of its Subsidiaries (excluding Permitted Indebtedness), in an amount equal to 100% of such Net Cash Proceeds.

(ii)     Prepayments pursuant to Section 2.01(e)(i) shall be apportioned *first*, to the principal amount of any Protective Advances then outstanding, *second*, to the principal amount of the Tranche A Term Loans then outstanding, *third*, to the principal amount of the Tranche B Term Loans then outstanding and *fourth*, to the principal amount of the Tranche C Term Loans then outstanding. Prepayments of any Tranche of Term Loans pursuant to Section 2.01(e)(i) shall be applied to the principal balance of such Tranche of Term Loans in inverse order of maturity.

(f)     **End of Term Fee; Applicable Prepayment Premium.**

(i)     Notwithstanding anything herein to the contrary, with respect to each Tranche of Term Loans, upon the earliest to occur of: (A) the Maturity Date with respect to such Tranche of Term Loans, (B) payment in full of the principal amount of such Tranche of Term Loans outstanding plus accrued but unpaid interest thereon plus any Applicable Prepayment Premium pursuant to Section 2.01(c), (d), (e) or otherwise, (C) any of the Obligations being accelerated (whether as a result of an Event of Default, by operation of law or otherwise), including as a result of the commencement of an Insolvency Proceeding or any Event of Default under Section 9.07, and (D) satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in any Insolvency Proceeding, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any Insolvency Proceeding to Agent or any Lender in full or partial satisfaction of the Obligations (the occurrence of any of the events set forth in the foregoing clauses (A) through (D), an "**End of Term Fee Event**"), Borrower shall pay Agent for the ratable account of the Lenders of such Tranche, as an inducement for making such Tranche of Term Loans (and not as a penalty), an amount equal to the End of Term Fee with respect to such Tranche of Term Loans, which End of Term Fee shall be fully earned, and due and payable on the date of such End of Term Fee Event, and non-refundable when made.

ActiveUS 165810955v.1
KE 50036055.42

(ii)     Notwithstanding anything herein to the contrary, with respect to each Tranche of Term Loans, if (A) all or any portion of such Tranche of Term Loans is paid or prepaid (or is required to be paid or prepaid) pursuant to Section 2.01(c), (d) or (e), (B) any Obligations are accelerated (whether as a result of an Event of Default, by operation of law or otherwise), including as a result of the commencement of an Insolvency Proceeding or any Event of Default under Section 9.07, or (C) there is a satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in any Insolvency Proceeding, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any Insolvency Proceeding to Agent or any Lender in full or partial satisfaction of the Obligations (the occurrence of any of the events set forth in the foregoing clauses (A) through (C), a "**Premium Event**"), Borrower shall pay Agent for the ratable account of the Lenders of such Tranche, as an inducement for making available such Tranche of Term Loans (and not as a penalty), an amount equal to the Applicable Prepayment Premium with respect to such Tranche of Term Loans, which Applicable Prepayment Premium shall be fully earned, and due and payable on the date of such Premium Event, and non-refundable when made.

(iii)     If any Tranche of Term Loans is accelerated for any reason under this Agreement pursuant to the terms herein or by operation of law, the End of Term Fee and any Applicable Prepayment Premium applicable thereto shall be calculated as if the date of acceleration of such Tranche of Term Loans was the date of repayment or prepayment of such Tranche of Term Loans. The parties hereto further acknowledge and agree that neither the End of Term Fee nor the Applicable Prepayment Premium is intended to act as a penalty or to punish the Loan Parties for any such repayment or prepayment. Any prepayment or repayment, whether voluntary or involuntary, of any Tranche of Term Loans upon the occurrence of any End of Term Fee Event or any Premium Event shall be accompanied by all accrued interest on the principal amount prepaid or repaid, together with the End of Term Fee and/or the Applicable Prepayment Premium, as applicable, with respect to such Tranche of Term Loans.  Without limiting the generality of the foregoing, and notwithstanding anything to the contrary in this Agreement or any Loan Document, it is understood and agreed that if any Obligations are accelerated (whether as a result of the occurrence and continuance of any Event of Default, by operation of law or otherwise), each End of Term Fee and each Applicable Prepayment Premium, if any, determined as of the date of acceleration, will also be due and payable and will be treated and deemed as though the applicable Tranche of Term Loans was prepaid as of such date and shall constitute part of the Obligations for all purposes herein.  Each End of Term Fee and each Applicable Prepayment Premium, if any, shall also be payable in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other similar means.  THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING FINAL PAYMENT FEE OR APPLICABLE PREPAYMENT PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. The Loan Parties expressly agree that (i) each End of Term Fee and each Applicable Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) each

33

End of Term Fee and each Applicable Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between the Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay each End of Term Fee and each Applicable Prepayment Premium, (iv) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this Section 2.01(f), (v) their agreement to pay each End of Term Fee and each Applicable Prepayment Premium is a material inducement to the Lenders to make the Term Loans, and (vi) each End of Term Fee and each Applicable Prepayment Premium represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to any Lender or profits lost by such Lender as a result of such End of Term Fee Event or such Premium Event.

(g) **Structuring Fees.** Borrower shall pay to Agent, for the account of each Lender of the applicable Tranche, the following structuring fees (collectively, the "**Structuring Fees**"):

(i) on the Closing Date, a structuring fee equal to 5.0% of the original principal amount of the Tranche A Term Loans advanced by such Lender, which amount shall be due and payable on the Closing Date and shall be netted out of the funding of the Tranche A Term Loans on the Closing Date;

(ii) on the Tranche B Funding Date, a structuring fee equal to 5.0% of the original principal amount of the Tranche B Term Loans advanced by such Lender, which amount shall be due and payable on the Tranche B Funding Date and shall be netted out of the funding of the Tranche B Term Loans on the Tranche B Funding Date; and

(iii) on the Tranche C Funding Date, a structuring fee equal to 5.0% of the original principal amount of the Tranche C Term Loans advanced by such Lender, which amount shall be due and payable on the Tranche C Funding Date and shall be netted out of the funding of the Tranche C Term Loans on the Tranche C Funding Date.

(h) **Termination of Term Loan Commitments.**

(i) The Tranche A Term Loan Commitment shall automatically terminate in full on the Closing Date immediately after giving effect to the making of the Tranche A Term Loans on such date.

(ii) Following the Closing Date, at its option, Borrower may at any time terminate the Tranche B Term Loan Commitments and/or the Tranche C Term Loan Commitments in full (and not in part); *provided* that Borrower shall provide written notice to Agent of any election to terminate any such Term Loan Commitment at least five (5) Business Days prior to the effective date of such termination.

(iii) Unless previously terminated pursuant to Section 2.01(h)(ii), the Tranche B Term Loan Commitment shall automatically terminate in full on the earliest to occur (the "**Tranche B Commitment Termination Date**") of (A) the Tranche B Funding Date immediately after giving effect to the making of the Tranche B Term Loans

34

  FIG00003858

on such date, (B) the acceleration of any of the Obligations (whether as a result of an Event of Default, by operation of law or otherwise), including as a result of the commencement of an Insolvency Proceeding or any Event of Default under Section 9.07, (C) the termination of this Agreement for any reason and (D) the date that is fifteen (15) months after the Closing Date.

(iv) Unless previously terminated pursuant to Section 2.01(h)(ii), the Tranche C Term Loan Commitment shall automatically terminate in full on the earliest to occur (the "**Tranche C Commitment Termination Date**") of (A) the Tranche C Funding Date immediately after giving effect to the making of the Tranche C Term Loans on such date, (B) the acceleration of any of the Obligations (whether as a result of an Event of Default, by operation of law or otherwise), including as a result of the commencement of an Insolvency Proceeding or any Event of Default under Section 9.07, (C) the termination of this Agreement for any reason and (D) the date that is twenty-four (24) months after the Closing Date.

(i) **Funding Procedures.** Upon Agent's receipt of a notice of borrowing pursuant to Section 3.02(a)(ii) or Section 3.03(a)(ii), Agent shall promptly notify each Lender and thereafter, upon the terms and subject to the conditions set forth herein, including satisfaction of each of the applicable conditions set forth in Section 3.02 or Section 3.03, as the case may be, each Lender, severally and not jointly, shall make available to Agent its Pro Rata Share of the requested Tranche of Term Loans in Dollars in immediately available funds, to the Agent Account prior to 3:00 p.m. (New York City time) on the requested borrowing date, and Agent shall promptly credit the amounts so received to an account as directed by Borrower in the applicable notice of borrowing or, if a borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(j) **Protective Advances.**

(i) Subject to the limitations set forth below (and notwithstanding anything to the contrary in Article III), Agent is authorized by Borrower and the Lenders (but shall have absolutely no obligation), at any time following an Event of Default and prior to the date on which all outstanding Term Loan Commitments have been terminated, all Obligations (including, without limitation, any End of Term Fee and any Applicable Prepayment Premium, but excluding any inchoate indemnity obligations and any obligations that by their terms survive the termination of this Agreement and the other Loan Documents) have been paid in full in cash and the 3.00x Hurdle (as defined in the Borrower Operating Agreement) has been achieved, to make additional term loans in the form of Protective Advances to Borrower, on behalf of all Lenders, in such principal amounts as Agent, in its sole discretion, deems necessary or desirable for the purposes specified in the definition of "Protective Advance". Protective Advances may be made even if one or more conditions precedent to extensions of Term Loans set forth in Article III have not been satisfied or waived. Immediately upon the making of any Protective Advance, such Protective Advance shall constitute a "Term Loan" for all purposes under this Agreement; *provided* that any Protective Advances made hereunder shall belong to a separate Tranche of Term Loans and that all Protective Advances (regardless of when

35

FIG00003859

made) shall belong to a single Tranche. Each Protective Advance shall be secured by the Liens on the Collateral in favor of Agent for the benefit of the Lenders and shall constitute Obligations hereunder and be entitled to all benefits of the Loan Documents. Agent's authorization to make Protective Advances may be revoked at any time by the Requisite Lenders. Any such revocation must be in writing and shall become effective prospectively upon Agent's receipt thereof. The making of a Protective Advance on any one occasion shall not obligate Agent to make any Protective Advance on any other occasion.

(ii)     Upon the making of any Protective Advance by Agent (whether before or after the occurrence of a Default or Event of Default), each Lender shall, unless otherwise agreed by Agent in its sole discretion, automatically be deemed, without further action by any party hereto, unconditionally and irrevocably to have purchased from Agent, without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Pro Rata Share. From and after the date, if any, on which any Lender is required to fund its participation in any Protective Advance purchased hereunder, Agent shall promptly distribute to such Lender such Lender's Pro Rata Share of all payments of principal and interest and all proceeds of Collateral received by Agent in respect of such Protective Advance.

(iii)     Protective Advances may be prepaid at any time from time to time without premium or penalty and shall not be subject to any mandatory amortization. For the avoidance of doubt, no End of Term Fee shall be applicable to any Protective Advances.

**SECTION 2.02.  Interest; Fees; Payments**.

(a)     **Interest.** Subject to Section 2.04, the outstanding principal balance of the Term Loans shall bear interest as set forth below, which interest shall be payable monthly in accordance with Section 2.02(a)(ii) below.

(i)     Default Rate. At all times during the continuation of an Event of Default, the outstanding principal balance of the Term Loans shall bear interest at the Default Rate. All fees, expenses and other Obligations not paid when due shall bear interest at the Default Rate from the date due until paid.

(ii)     Interest Computation. Interest shall be payable on the first day of each calendar month (or if such day is not a Business Day, the first Business Day thereafter), commencing on January 1, 2018, on the outstanding principal amount of each Tranche of Term Loans (in each case including any interest capitalized thereon) at a rate equal to (i) the Cash Interest Rate (which Cash Interest Rate shall be paid in immediately available funds), *plus* (ii) the PIK Interest Rate (which PIK Interest Rate amounts shall be paid in-kind, by capitalizing and adding such interest to the unpaid principal amount of such Tranche of Term Loans (including any interest capitalized thereof) (such capitalized interest, "**PIK Interest**")). All PIK Interest so added shall be capitalized monthly on each interest payment date and treated as principal amount of the applicable Term Loans for all purposes of this Agreement. Following any such increase in the principal amount of

36

ActiveUS 165810955v.1
KE 50036055.42

FIG00003860

any Term Loan, all interest (whether at the Cash Interest Rate or PIK Interest Rate) will accrue on such increased amount.

(b) **Fees.** Borrower shall pay Agent the fees set forth in this Agreement, including but not limited to the Structuring Fees, the End of Term Fees, any Applicable Prepayment Premium, the Agent Expenses and the Lender Expenses, in each case in the amounts and at the times provided herein.

(c) **Computation.** Interest shall be computed on the basis of a 360-day year, actual days elapsed.

(d) **Payments.** Interest shall be payable monthly, in arrears, on the first day of each month (or if such day is not a Business Day, the first Business Day thereafter) and on the applicable Maturity Date. All payments (including prepayments) to be made by Borrower under any Loan Document shall be made to Agent, for the ratable account of the Lenders, in immediately available funds in Dollars, without setoff or counterclaim, at or before 11:00 a.m. Pacific Time on the date when due. Payments received after 11:00 a.m. Pacific Time are considered received at the opening of business on the next Business Day. When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid. Each payment made by Borrower under a Loan Document is in addition to any payment or distribution to which any Class B Member may be entitled or may receive pursuant to Borrower's Organization Documents (*provided* that principal payments under this Agreement shall be credited against the 2.50% Hurdle and the 3.00% Hurdle, as applicable, under (and as defined in) the Borrower Operating Agreement), and nothing in any Loan Document shall be construed as limiting, reducing or in any way diminishing any payment or distribution to which any Class B Member may be entitled or may receive under or with respect to such Borrower's Organization Documents.

(e) **Application of Payments.** Borrower shall have no right to specify the order or the accounts to which Agent shall allocate or apply any payment required to be made by Borrower to Agent or otherwise received by Agent or any Lender under this Agreement when any such allocation or application is not specified elsewhere in this Agreement.

(f) **Break Funding Payments.** Notwithstanding anything herein to the contrary, in the event of the payment or prepayment by Borrower of any principal of any Term Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), then, in any such event, Borrower shall compensate the Lenders for the loss, cost and expense attributable to such event (other than loss of profit). Such loss, cost or expense to any Lender shall be deemed to include an amount reasonably determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Term Loan had such event not occurred, at the LIBO Rate that would have been applicable to such Term Loan, for the period from the date of such event to the last day of the then current Interest Period therefor, over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for deposits in the applicable currency of a comparable amount and period from other banks in the eurocurrency market. A certificate of any Lender setting

37

 FIG00003861

forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to Borrower and shall be conclusive absent manifest error. Borrower shall pay Agent, for the account of the applicable Lender, the amount shown as due on any such certificate upon receipt thereof.

### SECTION 2.03. Taxes; Increased Costs.

(a)     **Defined Terms.** For purposes of this Section 2.03, the term "applicable Law" includes FATCA.

(b)     **Payments Free of Taxes.** Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased as necessary so that after making such deduction or withholdings (including deductions applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deductions been made.

(c)     **Payment of Other Taxes by Borrower.** Without limiting the provisions of subsection (a) above, Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Laws, or at the option of Agent timely reimburse Agent for the payment of, any Other Taxes.

(d)     **Indemnification by Borrower.** Borrower shall, and does hereby indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A reasonably detailed certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to Agent), or by Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     **Indemnification by the Lenders.** Each Lender shall severally indemnify Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrower has not already indemnified Agent for such Indemnified Taxes and without limiting the obligation of Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 14.11 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were

38

ActiveUS 165810955v.1
KE 50036055.42

FIG00003862

correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to the Lender from any other source against any amount due to Agent under this paragraph (e).

(f) **Increased Costs.** If any Change in Law shall increase the costs or reduce the amount of any sum received or receivable for any Term Loan of any Recipient (except if such increase in costs or reduction suffered is due to Indemnified Taxes, Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and Connection Income Taxes), then Borrower shall upon written demand by such Recipient (with a copy of such demand to Agent) promptly pay to Agent for its own account or for the account of such Lender, as the case may be, the increase in cost or reduction in sum received or receivable. Such Recipient agrees that it shall allocate any such increased costs among its customers similarly affected in good faith and in a manner consistent with such Recipient's customary practice.

(g) **Evidence of Payments.** As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority as provided in this Section 2.03. Borrower shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to Agent.

(h) **Status of Lenders.**

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower and Agent, at the time or times reasonably requested by Borrower or Agent, such properly completed and executed documentation reasonably requested by Borrower or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrower or Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by Borrower or Agent as will enable Borrower or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.03(h)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing:

(A) any Lender that is a U.S. Person shall deliver to Borrower and Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of

39

FORTRESS HIGHLY CONFIDENTIAL

FIG00003863

Borrower or Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income Tax treaty to which the United States is a party, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable substitute or successor form);

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) properly completed and duly executed originals of IRS Form W-8BEN or W-8BEN-E (or applicable substitute or successor form); or

(4)    properly completed and duly executed originals of Internal Revenue Service Form W-8IMY and all required supporting documentation;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Agent), executed copies of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit Borrower or Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and Agent at the time or times

40

FORTRESS HIGHLY CONFIDENTIAL                                          FIG00003864

prescribed by Law and at such time or times reasonably requested by Borrower or Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or Agent as may be necessary for Borrower and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and Agent in writing of its legal inability to do so.

(i)     **Treatment of Certain Refunds.** If any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section 2.03. it shall pay to Agent, for delivery to Borrower, an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section 2.03 with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including Taxes) incurred by such Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that Borrower, upon any Lender's request, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Agent for the account of such Lender if such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection, in no event shall any Lender be required to pay any amount to Borrower (or to Agent for delivery to Borrower) pursuant to this subsection (i) the payment of which would place such Lender in a less favorable net after-Tax position than such Lender would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid or (ii) during the continuation of an Event of Default. This subsection shall not be construed to require such Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to Borrower or any other Person.

(j)     **Survival.** Each party's obligations under this Section 2.03 shall survive the resignation or replacement of Agent, any assignment of rights hereunder by any Lender, the termination of the Term Loan Commitments and the termination repayment, satisfaction or discharge of all Obligations.

## SECTION 2.04.   Special LIBOR Provisions.

(a)     Circumstances Affecting LIBO Rate Availability. If Agent shall determine in good faith that, by reason of circumstances affecting the foreign exchange and interbank markets generally, deposits in eurodollars in the applicable amounts are not being offered to Agent at the applicable LIBO Rate, then Agent shall forthwith give notice thereof to Borrower. Thereafter, until Agent notifies Borrower that such circumstances no longer exist, (i) the obligation of Agent to make any Term Loan as a LIBO Rate Loan, and the right of Borrower to convert any Term

41

FORTRESS HIGHLY CONFIDENTIAL                                                      FIG00003865

Loan to, or continue any Term Loan as, a LIBO Rate Loan shall be suspended, (ii) effective upon the last day of each Interest Period related to any existing LIBO Rate Loan, such LIBO Rate Loan shall automatically be converted into a Base Rate Loan (without regard to the satisfaction of any conditions to conversion contained elsewhere herein), and (iii) effective immediately following such notice, each LIBO Rate Loan shall automatically be converted into a Base Rate Loan (without regard to the satisfaction of any conditions to conversion contained elsewhere herein).

(b)     _Laws Affecting LIBO Rate Availability_.  If, after the date of this Agreement, the adoption or introduction of, or any change in, any applicable law, rule or regulation or in the interpretation or administration thereof by any governmental authority charged with the interpretation or administration thereof, or compliance by Agent or any Lender with any request or directive (whether or not having the force of law) of any such authority, shall make it unlawful or impossible for Agent or any Lender to honor its obligations hereunder to make or maintain any Term Loan as a LIBO Rate Loan, Agent shall forthwith give notice thereof to Borrower (or such Lender shall forthwith give notice thereof to Agent, which shall forthwith give notice thereof to Borrower).  Thereafter, (a) the obligations of Agent and the Lenders to make or maintain any Term Loan as a LIBO Rate Loan and the right of Borrower to convert any Term Loan into, or continue any Term Loan as, a LIBO Rate Loan shall be suspended and thereafter only the Base Rate shall be available, and (b) if Agent or any Lender may not lawfully continue to maintain any Term Loan as a LIBO Rate Loan, such Term Loan shall immediately be converted to a Base Rate Loan.

(c)     _Alternative Rate of Interest_.  If at any time (i) Agent determines (which determination shall be conclusive absent manifest error) that the circumstances set forth in Section 2.04(a) have arisen and such circumstances are unlikely to be temporary or (ii) Agent has determined or the Requisite Lenders have advised Agent that the circumstances set forth in Section 2.04(b) have not arisen but the supervisor for the administrator of the LIBO Rate or a Governmental Authority having jurisdiction over Agent has made a public statement identifying a specific date after which the LIBO Rate shall no longer be used for determining interest rates for loans, then Agent and Borrower shall endeavor to establish an alternative rate of interest to the LIBO Rate that gives due consideration to the then-prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternative rate of interest and such other related changes to this Agreement as may be applicable _provided_ that, if such alternative rate of interest shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.  Such amendment shall not become effective until signed by the Requisite Lenders (or by Agent with the consent of the Requisite Lenders).  If at any time Agent makes the determination pursuant to clause (i) of this Section 2.04(c) or the circumstances set forth in Section 2.04(b) have arisen, (x) all LIBO Rate Loans shall continue as Base Rate Loans and (y) if any notice of borrowing requests a borrowing of LIBO Rate Loans, such borrowing shall be made as a borrowing of Base Rate Loans, in each case of (x) and (y), until the earlier of (I) the date on which an alternative rate of interest shall have been determined in accordance with this Section 2.04(c), and (II) the date on which the circumstances set forth in 2.04(c)(i) or 2.04(b), as applicable, no longer exist.

42

                                                      FIG00003866

(d)     No Obligation to Purchase Eurodollar Deposits. Anything to the contrary contained herein notwithstanding, neither Agent nor any Lender shall be required actually to acquire Eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues based on the LIBO Rate.

(e)     Right of Lenders to Fund through Other Offices. Any Lender may, if it so elects, fulfill any of its Term Loan Commitments by causing a foreign branch or Affiliate of such Lender to make the applicable Term Loan or any portion thereof; *provided* that in such event for the purposes of this Agreement, such Term Loan (or such portion thereof) shall be deemed to have been made by such Lender and the obligation of Borrower to repay the Term Loan shall nevertheless be to such Lender and shall be deemed held by it, to the extent of such Term Loan (or such portion thereof), for the account of such branch or Affiliate.

(f)     Discretion of Lenders as to Manner of Funding. Notwithstanding any provision of this Agreement to the contrary, each Lender shall be entitled to fund and maintain its funding of all or any part of any Term Loan in any manner it sees fit, it being understood, however, that for the purposes of this Agreement all determinations hereunder shall be made as if such Lender had actually funded and maintained each LIBO Rate Loan during each Interest Period for such Term Loan through the purchase of deposits having a maturity corresponding to such Interest Period and bearing an interest rate equal to the LIBO Rate for such Interest Period.

(g)     Conclusiveness of Statements. Determinations and statements of Agent and the Lenders pursuant to this Section 2.04 shall be conclusive absent demonstrable error.

## ARTICLE III. CONDITIONS OF TERM LOANS

SECTION 3.01.    Tranche A Term Loans. Each Lender's obligation to fund Tranche A Term Loans is subject to its satisfactory completion of due diligence prior to Parent or Borrower entering into this Agreement with Agent and such Lender (including financial due diligence conducted by a service provider of Agent's choosing) and the satisfaction (or waiver by Agent in writing) of the following conditions precedent prior to or contemporaneously with the making of the Tranche A Term Loans:

(a)     Documentation. Agent shall have received, in form and substance satisfactory to it and its counsel, each of the following duly executed and delivered:

(i)     each of the Loan Documents, including the applicable Intellectual Property Security Agreements (in the case of the Notes, limited to each Note evidencing a Tranche A Term Loan);

(ii)     from each Loan Party, a certificate of its secretary or assistant secretary dated as of the Closing Date as to: (A) resolutions of its Board of Directors then in full force and effect authorizing the execution, delivery and performance of each Loan Document to be executed by it; (B) its bylaws or operating agreement, a copy of which is attached; and (C) the incumbency and signatures of those of its officers authorized to act with respect to the Loan Documents to be executed by it;

43

(iii)     with respect to each Loan Party: (A) from the Secretary of State (or other appropriate governmental official) of its jurisdiction of incorporation, a good standing certificate and certified copy of its certificate of incorporation, dated no earlier than five (5) Business Days prior to the Closing Date and (B) a certificate of good standing as a foreign corporation from the Secretary of State of each jurisdiction, if any, described in Section 6.01, dated no earlier than thirty (30) days prior to the Closing Date;

(iv)     subject to Section 7.16, evidence of the insurance coverage and endorsements required by Section 7.13;

(v)     formal approval of the transactions contemplated herein by such Lender's investment committee;

(vi)     an officer's certificate of Borrower, certifying that Borrower's Organizational Documents (A) include provisions concerning the conduct of business of Borrower in the form attached hereto as Exhibit H (the "**Conduct of Business Provisions**"); and (B) prohibit amendment of the Conduct of Business Provisions without Agent's consent;

(vii)     evidence of the third-party consents listed on Schedule 6.3 of the Disclosure Schedules;

(viii)     a customary legal opinion from New York, Delaware and Nevada counsel to the Loan Parties;

(ix)     no later than one (1) Business Day prior to the Closing Date, a customary notice of borrowing, which notice shall specify the amount and date of the proposed borrowing of the Tranche A Loan and shall otherwise be in form and substance reasonably satisfactory to Agent; and

(x)     such other documents and information as Agent and such Lender may reasonably require.

(b)     **Fees and Expenses**. Payment of all fees payable on the Closing Date and payment of the Agent Expenses and the Lender Expenses to the extent invoiced, plus such additional amounts of such fees, charges and disbursements as shall constitute Agent's and such Lender's reasonable estimate of such fees, charges and disbursements incurred or to be incurred by such Person through the Closing Date (*provided* that such estimate shall not thereafter preclude a final settling of accounts between Borrower and Agent or between Borrower and such Lender).

(c)     **Patent License Agreement**.  Agent shall have received a duly executed copy of the Patent License Agreement.

(d)     **Representations and Warranties.** The representations and warranties of each Loan Party contained in each Loan Document or in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the Closing Date, except to the extent that such representations and warranties specifically

44

ActiveUS 165810955v.1
KE 50036055.42

                                   FIG00003868

refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (*provided* that such materiality qualifiers shall not be applicable to those representations and warranties qualified or modified by materiality in the text thereof).

(e) **Absence of Default.** No Default or Event of Default shall exist or would result from the proposed extension of the Tranche A Term Loans or the application of the proceeds thereof.

(f) **No Material Adverse Effect.** Both immediately before and after giving effect to the receipt of Tranche A Term Loan proceeds, there shall not have occurred any event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect since December 31, 2016; *provided* that Parent's transfer of a portion of its assets to Borrower in accordance with the Patent Transfer Agreement shall not constitute a Material Adverse Effect.

(g) **Officer's Certificate.** Agent shall have received an officer's certificate signed by a Responsible Officer of Borrower and Parent, certifying that each of the conditions specified in Sections 3.01(d), (e) and (f) has been satisfied.

**SECTION 3.02. Tranche B Term Loans.** Each Lender's obligation to fund Tranche B Term Loans is subject to the satisfaction (or waiver by Agent in writing) of the following conditions precedent prior to or contemporaneously with the making of the Tranche B Term Loans:

(a) **Documentation.** Agent shall have received, in form and substance reasonably satisfactory to it and its counsel, each of the following duly executed and delivered:

(i) each Note evidencing a Tranche B Term Loan;

(ii) no later than three (3) Business Days prior to the Tranche B Funding Date, a customary notice of borrowing, which notice shall specify the amount and date of the proposed borrowing of the Tranche B Loan and shall otherwise be in form and substance reasonably satisfactory to Agent;

(iii) a supplement to Schedule 6.17(a)(i), Schedule 6.17(a)(ii), Schedule 6.17(b) and Schedule 6.17(h) of the Disclosure Schedules such that the representation in Section 6.17(a), the representations in the third and fifth sentences of Section 6.17(b) and the representations in Section 6.17(h) would be true and correct as of the Tranche B Funding Date; *provided, however*, that (x) any supplements to such Schedule 6.17(a)(i) may only contain issuances, registrations or applications for Intellectual Property acquired or filed after the Closing Date, (y) any supplements to such Schedule 6.17(a)(ii) may only contain Licenses entered into after the Closing Date, not in violation of any of the provisions of any Loan Document, and (z) any supplements to such Schedule 6.17(b) or such Schedule 6.17(h) may only contain proceedings or claims brought or threatened after the Closing Date that could not reasonably be expected to have a Material Adverse Effect; and

45

FORTRESS HIGHLY CONFIDENTIAL

FIG00003869

(iv)    such other documents and information as Agent and such Lender may reasonably require.

(b)    **Fees and Expenses**. Payment of all fees payable on the Tranche B Funding Date and payment of the Agent Expenses and the Lender Expenses to the extent invoiced, plus such additional amounts of such fees, charges and disbursements as shall constitute Agent's and such Lender's reasonable estimate of such fees, charges and disbursements incurred or to be incurred by such Person through the Tranche B Funding Date (*provided* that such estimate shall not thereafter preclude a final settling of accounts between Borrower and Agent or between Borrower and such Lender).

(c)    **Representations and Warranties.** The representations and warranties of each Loan Party contained in each Loan Document or in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the Tranche B Funding Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (*provided* that such materiality qualifiers shall not be applicable to those representations and warranties qualified or modified by materiality in the text thereof).

(d)    **Absence of Default.** No Default or Event of Default shall exist or would result from the proposed extension of the Tranche B Term Loans or the application of the proceeds thereof.

(e)    **No Material Adverse Effect.** Both immediately before and after giving effect to the receipt of Tranche B Term Loan proceeds, there shall not have occurred any event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect since December 31, 2016; provided that Parent's transfer of a portion of its assets to Borrower in accordance with the Patent Transfer Agreement shall not constitute a Material Adverse Effect.

(f)    **Tranche B Commitment Termination Date.** Immediately prior to giving effect to the making of the Tranche B Term Loans, the Tranche B Commitment Termination Date shall not have occurred.

(g)    **Tranche B Funding Conditions.** Each of the Tranche B Funding Conditions shall have occurred.

(h)    **Officer's Certificate.** Agent shall have received an officer's certificate signed by a Responsible Officer of Borrower and Parent, certifying that each of the conditions specified in Sections 3.02(c), (d), (e) and (g) has been satisfied.

SECTION 3.03.    **Tranche C Term Loans.** Each Lender's obligation to fund Tranche C Term Loans is subject to the satisfaction (or waiver by Agent in writing) of the following conditions precedent prior to or contemporaneously with the making of the Tranche C Term Loans:

(a)    **Documentation.** Agent shall have received, in form and substance reasonably satisfactory to it and its counsel, each of the following duly executed and delivered:

46

ActiveUS 165810955v.1
KE 50036055.42

      FIG00003870

(i)      each Note evidencing a Tranche C Term Loan;

(ii)      no later than three (3) Business Days prior to the Tranche C Funding Date, a customary notice of borrowing, which notice shall specify the amount and date of the proposed borrowing of the Tranche C Loan and shall otherwise be in form and substance reasonably satisfactory to Agent;

(iii)      a supplement to <u>Schedule 6.17(a)(i)</u>, <u>Schedule 6.17(a)(ii)</u>, <u>Schedule 6.17(b)</u> and <u>Schedule 6.17(h)</u> of the Disclosure Schedules such that the representation in <u>Section 6.17(a)</u>, the representations in the third and fifth sentences of <u>Section 6.17(b)</u> and the representations in <u>Section 6.17(h)</u> would be true and correct as of the Tranche C Funding Date; *provided, however,* that (x) any supplements to such <u>Schedule 6.17(a)(i)</u> may only contain issuances, registrations or applications for Intellectual Property acquired or filed after the Tranche B Funding Date (or, if the Tranche B Funding Date has not occurred, the Closing Date), (y) any supplements to such <u>Schedule 6.17(a)(ii)</u> may only contain Licenses entered into after the Tranche B Funding Date (or, if the Tranche B Funding Date has not occurred, the Closing Date), not in violation of any of the provisions of any Loan Document, and (z) any supplements to such <u>Schedule 6.17(b)</u> or such <u>Schedule 6.17(h)</u> may only contain proceedings or claims brought or threatened after the Tranche B Funding Date (or, if the Tranche B Funding Date has not occurred, the Closing Date) that could not reasonably be expected to have a Material Adverse Effect; and

(iv)      such other documents and information as Agent and such Lender may reasonably require.

(b)      **Fees and Expenses**. Payment of all fees payable on the Tranche C Funding Date and payment of the Agent Expenses and the Lender Expenses to the extent invoiced, plus such additional amounts of such fees, charges and disbursements as shall constitute Agent's and such Lender's reasonable estimate of such fees, charges and disbursements incurred or to be incurred by such Person through the Tranche C Funding Date (*provided* that such estimate shall not thereafter preclude a final settling of accounts between Borrower and Agent or between Borrower and such Lender).

(c)      **Representations and Warranties.** The representations and warranties of each Loan Party contained in each Loan Document or in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the Tranche C Funding Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (*provided* that such materiality qualifiers shall not be applicable to those representations and warranties qualified or modified by materiality in the text thereof).

(d)      **Absence of Default.** No Default or Event of Default shall exist or would result from the proposed extension of the Tranche C Term Loans or the application of the proceeds thereof.

ActiveUS 165810955v.1
KE 50036055.42

(e)     **No Material Adverse Effect.** Both immediately before and after giving effect to the receipt of Tranche C Term Loan proceeds, there shall not have occurred any event or circumstance that has had or could reasonably be expected to have a Material Adverse Effect since December 31, 2016; provided that Parent's transfer of a portion of its assets to Borrower in accordance with the Patent Transfer Agreement shall not constitute a Material Adverse Effect.

(f)     **Tranche C Commitment Termination Date.** Immediately prior to giving effect to the making of the Tranche C Term Loans, the Tranche C Commitment Termination Date shall not have occurred.

(g)     **Tranche C Funding Conditions.** Each of the Tranche C Funding Conditions shall have been satisfied.

(h)     **Officer's Certificate.** Agent shall have received an officer's certificate signed by a Responsible Officer of Borrower and Parent, certifying that each of the conditions specified in Sections 3.03(c), (d), (e) and (g) has been satisfied.

ARTICLE IV.**WARRANT**

SECTION 4.01.  **Warrant to Purchase Shares.** Pursuant to the terms and conditions of the Warrant, Parent grants the Lenders, or designated Affiliates of the Lenders, the right to purchase shares in Parent as more specifically set forth in the Warrant.

ARTICLE V.**COLLATERAL**

SECTION 5.01.  **Security Interest in Collateral.** As security for the full and prompt payment in cash and performance of the Obligations, Parent and Borrower shall, and shall cause each other Loan Party to, pledge to Agent, for the benefit of the Lenders, all of the Loan Parties' right, title and interest in and to the applicable Collateral on the terms and conditions set forth in applicable Security Documents.

ARTICLE VI.**REPRESENTATIONS AND WARRANTIES**

Each of Parent and Borrower represent and warrant to Agent and each Lender that the following representations are true and complete as of the Closing Date:

SECTION 6.01.  **Existence, Qualification and Power.** Each Loan Party and each Subsidiary thereof (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization; (b) has all requisite corporate power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business; and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party; and (c) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

48

**SECTION 6.02. Authorization; No Contravention.** The execution, delivery and performance by each Loan Party of each Loan Document to which it is a party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not contravene the terms of any of its Organization Documents or conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which it is a party or affecting it or its properties or any of its Subsidiaries; or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which it or its property is subject; or (c) violate any Law.

**SECTION 6.03. Governmental Authorization; Other Consents.** Except as set forth on Schedule 6.03 of the Disclosure Schedules and other than actions to perfect security interests, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document.

**SECTION 6.04. Binding Effect.** This Agreement has been, and each other Loan Document when delivered hereunder will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

**SECTION 6.05. Financial Statements; No Material Adverse Effect.** The Reviewed Financial Statements (a) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein and except that unaudited financial statements may not contain footnotes and are subject to year-end adjustments; (b) fairly present the financial condition of Parent and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein and except that unaudited financial statements may not contain footnotes and are subject to year-end adjustments; and (c) show all material indebtedness and other liabilities, direct or contingent, of Parent and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness. Since December 31, 2016, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect, except as disclosed on Schedule 6.05 of the Disclosure Schedules.

**SECTION 6.06. Litigation.** Except as set forth on Schedule 6.06 of the Disclosure Schedules (the "**Disclosed Matters**"), there are no actions, suits, proceedings, claims or disputes pending or, to the Knowledge of Borrower or Parent, threatened in writing, at Law, in equity, in arbitration or before any Governmental Authority, by or against Parent or any of its Subsidiaries or against any of their properties or revenues that purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a

49

ActiveUS 165810955v.1
KE 50036055.42

FIG00003873

Material Adverse Effect. Except for the Disclosed Matters, neither Parent nor any of its Subsidiaries, nor any director or officer thereof, is or since December 31, 2016 has been the subject of any action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. The SEC has not issued any stop order or other order suspending the effectiveness of any registration statement filed by Parent or any Subsidiary under the Securities Act and Exchange Act, as applicable.

**SECTION 6.07. No Default.** Neither any Loan Party nor any Subsidiary thereof is in default under or with respect to any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**SECTION 6.08. Ownership of Property; Liens.** Parent and its Subsidiaries each has, in all material respects, good, indefeasible and merchantable title to and ownership of its property free and clear of all Liens, except Permitted Liens.

**SECTION 6.09. Environmental Compliance.** Parent and its Subsidiaries conduct in the ordinary course of business a review of the effect of existing Environmental Laws and claims alleging potential liability or responsibility for violation of any Environmental Law on their respective businesses, operations and properties, and as a result thereof Parent has reasonably concluded that such Environmental Laws and claims could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**SECTION 6.10. Insurance.** The properties of Parent and its Subsidiaries are insured with insurance companies that are not Affiliates of the Loan Parties that, to their Knowledge, are financially sound and reputable, in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar business as Borrower or applicable Subsidiary), with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Parent or the applicable Subsidiary operates.

**SECTION 6.11. Taxes.** Except as set forth on Schedule 6.11 of the Disclosure Schedules, Parent and each Subsidiary has prepared and filed (or filed applicable extensions therefore) all federal income and all other material Tax returns required to have been filed by Parent or such Subsidiary with all appropriate governmental agencies and paid all material Taxes shown thereon or otherwise owed by it, other than any such Taxes which Parent or any Subsidiary are contesting in good faith and for which adequate reserves have been provided and reflected in Parent's financial statements. The charges, accruals and reserves on the books of Parent in respect of Taxes for all fiscal periods are adequate in all material respects, and there are no material unpaid assessments against Parent or any Subsidiary nor, to Parent's or Borrower's Knowledge, any basis for the assessment of any additional Taxes, penalties or interest for any fiscal period or audits by any Governmental Authority except for any assessment which could not reasonably be expected to have a Material Adverse Effect. All material Taxes and other assessments and levies that Parent or any Subsidiary is required to withhold or to collect for payment have been duly withheld and collected and paid to the proper Governmental Authority or third party when due, other than any such Taxes which Parent or any Subsidiary are

ActiveUS 165810955v.1
KE 50036055.42

FIG00003874

contesting in good faith and for which adequate reserves have been provided and reflected in Parent's financial statements. Except as set forth on Schedule 6.11 of the Disclosure Schedules, there are no Tax Liens or claims pending or, to Parent's or Borrower's Knowledge, threatened in writing against Parent or any Subsidiary or any of their respective assets or property except in connection with any such Taxes which Parent or any Subsidiary are contesting in good faith as provided in the immediately preceding sentence. There are no outstanding Tax sharing agreements or other such arrangements between Parent and any Subsidiary or other corporation or entity.

### SECTION 6.12. ERISA Compliance.

(a) Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the Knowledge of Borrower or Parent, nothing has occurred which would prevent, or cause the loss of, such qualification. Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b) There are no pending or, to the Knowledge of Borrower or Parent, threatened in writing claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c) (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

### SECTION 6.13. Subsidiaries; Equity Interests. (a) Parent has no
Subsidiaries as of the Closing Date other than those specifically disclosed on Schedule 6.13(a) of the Disclosure Schedules, (b) all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and nonassessable and are owned by a Loan Party in the amounts specified on Schedule 6.13(a) of the Disclosure Schedules, free and clear of all Liens other than Permitted Liens and (c) no shares of Series D-2A Preferred Stock of Parent are outstanding. Borrower has no equity investments in any other corporation or entity. All of the outstanding Equity Interests in Borrower have been validly issued and are fully paid and nonassessable. As of the Closing Date, none of the entities disclosed on Schedule 6.13(b) of the

51

ActiveUS 165810955v.1
KE 50036055.42

FIG00003875

Disclosure Schedules (each, a "**Specified Subsidiary**") is engaged in any business or activity other than maintaining its corporate or other entity existence. Such Schedule 6.13(b) fairly presents the assets and liabilities of the Specified Subsidiaries as of the Closing Date.

**SECTION 6.14. Margin Regulations; Investment Company Act.** Each of Parent and Borrower is not engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System of the United States), or extending credit for the purpose of purchasing or carrying margin stock. None of Parent, Borrower, any Person Controlling Borrower, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

**SECTION 6.15. Disclosure.** No representation or warranty of Parent or any of its Subsidiaries contained in any Loan Document and none of the statements contained in any other document, certificate, report, financial statement or written statement furnished to Agent or any Lender by or on behalf of Parent or any of its Subsidiaries pursuant to this Agreement, when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact (known to Borrower, in the case of any document not furnished by it) necessary in order to make the statements contained herein or therein not misleading in any material manner in light of the circumstances in which the same were made. Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Parent to be reasonable at the time made.

**SECTION 6.16. Compliance with Laws.** Except as described in the Disclosed Matters, each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties.

**SECTION 6.17. Intellectual Property.**

(a) Schedule 6.17(a)(i) of the Disclosure Schedules sets forth a complete and accurate list of all (x) registrations and applications for Intellectual Property (other than Patents) that constitute Material Intellectual Property and (y) issuances and applications for Patents, in each case, owned by or exclusively licensed to, issued to, or for which applications are pending in the name of Parent or a Subsidiary, indicating for each, as applicable, the title, jurisdiction, record owner, and application or registration number. Schedule 6.17(a)(ii) of the Disclosure Schedules sets forth a complete and accurate list of all Licenses granting any Person any right related to any Material Intellectual Property, to which Parent or any of its Subsidiaries is a party or otherwise bound, other than Licenses implied from Parent's or any Subsidiary's sales, leases, or other provisions of a product or service, in each case, granted in the ordinary course of business (each, a "**Material License**").

(b) Except as set forth on the Disclosure Schedules, Parent and each Subsidiary exclusively own all right, title and interest (free and clear of any Lien other than any Permitted Liens) in and to, or in the case of Intellectual Property exclusively licensed, have a valid and enforceable right to use, all Material Intellectual Property, *provided* that the foregoing shall not be construed to be a representation or warranty with respect to infringement, misappropriation,

52

dilution or other violation of the Intellectual Property of any third party, which is the subject of the third sentence of this Section 6.17(b). Parent and each Subsidiary exclusively own all right, title and interest (free and clear of any Lien other than any Permitted Liens) in and to all Material Patents. Except as set forth in the Disclosure Schedules, no claim has been brought or is pending against Parent or Borrower, or, to the Knowledge of Parent or Borrower, has been threatened in writing against Parent or Borrower, by any Person challenging or questioning the validity, enforceability, ownership, use or patentability of any Material Intellectual Property, other than official notices from patent offices in the course of Patent prosecution. The conduct of the business of Parent and each Subsidiary does not infringe, misappropriate, dilute, or otherwise violate the Intellectual Property of any third party, except where such infringement, misappropriation, dilution or other violation could not reasonably be expected to have a Material Adverse Effect. Except as set forth in the Disclosure Schedules, no claim has been brought in writing or is pending before any Governmental Authority, against Parent or Borrower, or, to the Knowledge of Borrower or Parent, has been threatened in writing against Parent or Borrower by any Person alleging that the conduct of the business of Parent or a Subsidiary infringes, misappropriates, dilutes or otherwise violates the Intellectual Property of any Person.

(c)     Except as set forth in the Disclosure Schedules, all Material Patents are: (i) as of the Closing Date, (A) subsisting and have never been found or adjudged invalid or unenforceable, in whole or part, by any Governmental Authority of competent jurisdiction, and (B) valid and (with respect to issued patents) enforceable, in each of the foregoing clauses (i)(A) and (i)(B), except as contended in official notices from patent offices in the course of Patent prosecution and (ii) with respect to any period after the Closing Date, (A) subsisting and have never been found or adjudged invalid or unenforceable, in whole or part, by any Governmental Authority of competent jurisdiction, and (B) valid and (with respect to issued patents) enforceable, in each of the foregoing clauses (ii)(A) and (ii)(B), (1) except as contended in official notices from patent offices in the course of Patent prosecution or (2) as would not be expected to have a material adverse effect on the value of the Collateral. For purposes of clarity, any invalidity or unenforceability of a Material Patent which manifests after the Closing Date is encompassed by the foregoing subsection (ii) and not the foregoing subsection (i).

(d)     Except as set forth in the Disclosure Schedules, each current and former employee, officer, founder, independent contractor, and consultant (each a "**Representative**") of Parent or any Subsidiary has executed an agreement with Parent or such Subsidiary with respect to Intellectual Property (each such agreement, an "**IP Assignment**") pursuant to which the Representative (i) agrees to protect the confidential information of Parent or such Subsidiary from unauthorized disclosure, (ii) if such Representative is or was involved in the authorship, conception, development, reduction to practice, modification or improvement of Material Intellectual Property (either alone or jointly with others) within the scope of his or her employment or engagement with Parent or any Subsidiary, (A) makes a present assignment to Parent or any Subsidiary of all right, title and interest in and to all such Material Intellectual Property without further consideration or any restrictions or obligations whatsoever (other than as required by Applicable Laws), and (B) waives all moral rights in such Intellectual Property to the fullest extent allowed under Applicable Law.  To the Knowledge of each Parent or Borrower, no Representative is in breach of any IP Assignment.

53

ActiveUS 165810955v.1
KE 50036055.42

                                      FIG00003877

(e)    Except as set forth in the Disclosure Schedules, Parent and its Subsidiaries have obtained and properly recorded previously executed assignments from inventors and all other Persons (including previous owners) for all issued Patents within the Material Patents as necessary to fully perfect their rights and title therein in accordance with governing Law in each respective jurisdiction; *provided* that if any lack of such assignment or recordation is cured within thirty (30) days of Parent's or Borrower's Knowledge thereof, neither Parent nor Borrower shall be in breach of this sentence of Section 6.17(e); *provided, further*, that if Borrower has used its commercially reasonable efforts to cure such lack of such assignment or recordation, such period shall be extended to sixty (60) days. Except as set forth in the Disclosure Schedules, all inventors named on the issued Patents within the Material Patents are true and correct; *provided* that if any inaccuracy is cured within thirty (30) days of Parent's or Borrower's Knowledge thereof, neither Parent nor Borrower shall be in breach of this sentence of Section 6.17(e); *provided, further*, that if Borrower has used its commercially reasonable efforts to cure such inaccuracy, such period shall be extended to sixty (60) days. There is no obligation imposed on Borrower by a standards-setting organization to license any of the Transferred Patents.

(f)    Patents covering inventions owned by Parent or any Subsidiary in which the U.S. Government has rights include a notice of the existence of such rights.

(g)    If any of the Transferred Patents are terminally disclaimed to another Patent or Patent application, all Patents and Patent applications subject to such terminal disclaimer are included in the Transferred Patents. To the extent "small entity" fees were paid to the United States Patent and Trademark Office for any Transferred Patent, such reduced fees were then appropriate because the payor qualified to pay "small entity" fees at the time of such payment and specifically had not licensed rights in any Transferred Patent to an entity that was not a "small entity".

(h)    Except as set forth in the Disclosure Schedules, none of the Transferred Patents has been or is currently involved in any reexamination, supplemental examination, reissue, interference proceeding, post-grant review, inter partes review, covered business method review, or any similar proceeding, and no such proceedings are pending or threatened.

(i)    Parent and each Subsidiary has taken actions reasonable under the circumstances to maintain, protect, and enforce (including to permit future enforcement of) all Trade Secrets owned by Parent or any Subsidiary.

(j)    As of the Closing Date, neither Parent nor any Subsidiary is in material breach of or material default under the provisions of any of the Material Licenses, or has received written notice of any such breach or default or the intention of the other party to terminate such Material License, nor is there, to the Knowledge of Parent or Borrower, any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a material breach or material default by Parent or any Subsidiary under any Material License, except in each case of the foregoing where such breach, default, or termination could not reasonably be expected to have a material adverse effect on the value of the Collateral. Solely with respect to any period after Closing, neither Parent nor any Subsidiary is in material breach of or material default under the provisions of any of the Material Licenses, or has received

54

written notice of any such breach or default or the intention of the other party to terminate such Material License, nor is there, to the Knowledge of Parent or Borrower, any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in a material breach or material default by Parent or any Subsidiary under any Material License, except in each case of the foregoing where such breach, default, or termination could not reasonably be expected to have a Material Adverse Effect.

**SECTION 6.18. Rights in Collateral; Priority of Liens.** Each Loan Party owns the property granted by it as Collateral under the Loan Documents, free and clear of any and all Liens in favor of third parties other than Permitted Liens. Upon the proper filing of the UCC financing statements or PPSA registrations, as applicable, the Liens in the Collateral granted to Agent for the benefit of the Lenders pursuant to the Loan Documents will constitute valid and enforceable first, prior and perfected Liens on the Collateral that can be perfected by filing UCC financing statements or PPSA registrations, as applicable, or other filings at a United States or Canadian Government Authority, subject only to Permitted Liens.

**SECTION 6.19. Solvency.** After giving effect to the transactions contemplated hereby occurring on the Closing Date and after giving effect to the transactions to occur on the Tranche B Funding Date and the Tranche C Funding Date, Borrower is Solvent and Parent and its Subsidiaries on a consolidated basis are Solvent.

**SECTION 6.20. Business Locations; Taxpayer Identification Number.** Set forth on Schedule 6.20 of the Disclosure Schedules are the list of all of each Loan Party's locations and all locations where any Collateral is kept and each Loan Party's chief executive office, exact legal name, U.S. taxpayer identification number and organizational identification number, in each case, as of the date hereof. Except as set forth on Schedule 6.20 of the Disclosure Schedules, no Loan Party has during the five (5) years preceding the Closing Date (i) changed its legal name; (ii) changed its state of formation; or (iii) been party to a merger, consolidation or other change in structure.

**SECTION 6.21. Collateral.** The Collateral includes, among other things, 0.2% of the Equity Interests of Borrower, 100% of the Equity Interests of each other Domestic Subsidiary of a Loan Party, 65% of the voting Equity Interests of each first-tier Foreign Subsidiary of a Loan Party and 100% of the non-voting Equity Interests of each first-tier Foreign Subsidiary of a Loan Party.

**SECTION 6.22. Patriot Act; Sanctions; Export Controls; FCPA.**

(a)     To the extent applicable, each of Parent and its Subsidiaries is in compliance, in all material respects, with the Patriot Act.

(b)     Parent represents that neither Parent nor any of its Subsidiaries nor any director, officer or employee thereof, nor, to its Knowledge, any agent, affiliate or representative of Parent or any Subsidiary, is an individual or entity that is, or is owned or controlled by a Person that is:

ActiveUS 165810955v.1
KE 50036055.42

FIG00003879

(i)     listed in the annex to, or otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing effective September 24, 2001 (the "Executive Order");

(ii)     prohibited from dealing or otherwise engaging in any transaction by any laws with respect to terrorism or money laundering;

(iii)     engaged in "terrorism" as defined in the Executive Order;

(iv)     the subject or target of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. Department of State, the United Nations Security Council, the European Union or Her Majesty's Treasury (collectively, "Sanctions"); or

(v)     located, organized or resident in a country or territory that is the subject of comprehensive Sanctions (including, without limitation, as of the date hereof, Cuba, Iran, North Korea, Sudan, Syria and the Crimea region of the Ukraine) (each a "**Designated Jurisdiction**").

(c)     Parent represents and covenants that it and its Subsidiaries will not, directly or, to its Knowledge, indirectly, use the proceeds of the Term Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person:

(i)     to fund or facilitate any activities or business (x) of or with any Person that, at the time of such funding or facilitation, is the subject or target of · Sanctions or (y) in any country or territory that, at the time of such funding or facilitation, is the subject of comprehensive Sanctions; or

(ii)     in any other manner that will result in a violation of Sanctions by any Person (including Agent, any Lender or any other party hereto).

(d)     To the extent applicable, each of Parent and its Subsidiaries is in compliance with the Export Control Regulations. Parent represents that neither Parent nor any of its Subsidiaries have engaged in transactions with, or exported any products, services or associated technical data: (i) into (or to a national or resident of) Cuba, Iran, North Korea, Sudan, Syria, the Crimea region of the Ukraine or any other country or territory to which the United States had embargoed exports or with which the United States had proscribed economic transactions as of the date of such export or transaction; or (ii) to any person or entity included on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC or the Denied Persons List maintained by the U.S. Department of Commerce as of the date of such transaction or export; or (iii) that would otherwise constitute or give rise to a violation of the Export Control Regulations.

(e)     Parent represents that neither Parent nor any of its Subsidiaries nor any director, officer or employee thereof, has taken any action, directly or indirectly, that would result in a violation by any of the foregoing of the FCPA and the rules and regulations thereunder or any other applicable anti-corruption law in any material respect.

56

     FIG00003880

Parent represents that to its Knowledge, no agent, affiliate or representative of Parent or any Subsidiary has taken any action, directly or indirectly, that would result in a violation by any of the foregoing of the FCPA and the rules and regulations thereunder or any other applicable anti-corruption law.

(f)     Parent represents that the proceeds of the Term Loans will not be used by Parent or any of its Subsidiaries for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage in violation of the FCPA or any other applicable anti-corruption law in any material respect.

**SECTION 6.23.   Settlement Payment Obligations.** As of the Closing Date, Schedule 6.23 of the Disclosure Schedules sets forth a complete and accurate list of all existing Settlement Payment Obligations and, in the case of each such Settlement Payment Obligation, the amount thereof and the date on which such Settlement Payment Obligation is required to be satisfied.

**SECTION 6.24.   Healthcare Law Compliance.**

(a)     Since December 31, 2016, the business of Parent and its Subsidiaries have been conducted in material compliance with all Healthcare Laws applicable thereto, and neither Parent nor any Subsidiary has received any notice from any Person or has otherwise become aware that Parent or a Subsidiary is subject to any Governmental or qui tam investigation, inquiry, or action relating to any actual or potential violation of any Healthcare Laws.  As of the Closing Date, Schedule 6.24(a) of the Disclosure Schedules sets forth a complete and accurate description of any such investigation or action relating to compliance with Healthcare Laws.

(b)     Neither Parent nor any Subsidiary, nor any of their respective directors, officers or employees, has (a) made an untrue statement of a material fact or a fraudulent statement or has failed to disclose a material fact in any regulatory submission or other interaction with FDA or any other Governmental Authority, (b) provided remuneration to an individual or entity in violation of applicable Healthcare Laws, or (c) is aware of any material breach of data privacy and security in violation of applicable Healthcare Laws.

(c)     All research, investigation, manufacturing, packaging, labeling, storage, advertising, promotion, marketing, sale and distribution activities with respect to Parent and its Subsidiaries' IVDs and other medical devices has been and is being done pursuant to valid Regulatory Permits to the extent required by any Healthcare Law.   All manufacturing, packaging, labeling, storage of said IVDs and other medical devices has been, and is being produced in accordance with design controls and other applicable requirements of 21 C.F.R. Part 820, and all IVDs and other medical devices are being investigated in accordance with applicable requirements of 21 C.F.R. Part 812.

(d)     Except as set forth on Schedule 6.24(d) of the Disclosure Schedules, Parent and its Subsidiaries do not engage in the research, investigation, manufacturing, packaging, labeling, storage, advertising, promotion, marketing, sale and distribution of any

57

ActiveUS 165810955v.1
KE 50036055.42

FIG00003881

drug, medical device, or biological product not meeting the definition of an IVD or research use-only product, and does not offer clinical laboratory testing services.

(e)     Parent and its Subsidiaries have disclosed to Lender all communications to and from FDA and other Governmental Authorities that may reasonably be considered related to its current development and investigation of an IVD for detection or related assessment of Zika Virus and other IVDs which are currently under development.

(f)     Except as set forth on Schedule 6.24(f) of the Disclosure Schedules, neither Parent nor any Subsidiary is currently conducting, or is aware of facts that would give rise to, a Recall related to its products or services.

(g)     Except as set forth on Schedule 6.24(g) of the Disclosure Schedules, neither Parent nor any Subsidiary is, with respect to any Governmental Authority: (i) party to any consent decree, judgment, order, or settlement that (A) requires the payment of money by any of Parent or its Subsidiaries to any Governmental Authority or third party, (B) requires any recoupment of money from Parent or any Subsidiaries by any Governmental Authority or third party or (C) prohibits any activity currently conducted by Parent or any Subsidiaries; or (ii) is subject to any actual or, to the Knowledge of Parent, potential settlement agreement, corporate integrity agreement or certification of compliance agreement with any Governmental Authority, in the case of each of clauses (i) and (ii), which relates to Healthcare Laws.  Neither Parent nor any of its Subsidiaries is a defendant or named party in any unsealed litigation under the False Claims Act.

## ARTICLE VII. **AFFIRMATIVE COVENANTS**

Until the Obligations have been fully satisfied in cash and the Term Loan Commitments have expired, each of Borrower and Parent shall, and shall (except in the case of the covenants set forth in Sections 7.02. 7.03 and 7.15) cause each of their Subsidiaries to:

**SECTION 7.01.  Compliance with Laws.** Comply in all material respects with all applicable laws, rules, regulations, orders and decrees of all Governmental Authorities. Notwithstanding the foregoing, it is acknowledged and agreed that the proceedings and occurrence of the potential outcomes described in the Disclosed Matters shall not violate this Section 7.01.

**SECTION 7.02.  Financial Statements.** Deliver to Agent (which shall thereafter deliver to the Lenders), in form and detail satisfactory to Agent:

(a)     as soon as available, but in any event within one hundred eighty (180) days after the end of each fiscal year of Parent, a consolidated balance sheet of Parent and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by a report and opinion of a "Big Four" accounting firm or another accounting firm selected by Parent's Board of Directors and acceptable to Agent in its sole discretion (it being understood

ActiveUS 165810955v.1
KE 50036055.42

FIG00003882

and agreed that (x) the accounting firms set forth on Schedule 7.02(a) of the Disclosure Schedules are acceptable to Agent, (y) solely in the event that none of the accounting firms set forth on such Schedule 7.02(a) can be engaged by Parent following Parent's use of reasonable best efforts to engage each such accounting firm, the accounting firms set forth on Schedule 7.02(b) of the Disclosure Schedules are acceptable to Agent and and (z) solely in the event that none of the accounting firms set forth on such Schedules 7.02(a) and (b) can be engaged by Parent following Parent's use of reasonable best efforts to engage each such accounting firm, Parent shall propose one or more alternative auditors in good faith, which engagement shall be subject to the approval of Agent in its reasonable discretion), which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any qualification or exception as to the scope of such audit; *provided* that to the extent GAAP does not permit Borrower to be included in the consolidated financial statements of Parent and its Subsidiaries described in this Section 7.02(a), Borrower and Parent shall be permitted to deliver separate financial statements with respect to Borrower only, which financial statements shall otherwise be required to satisfy all of the provisions of this Section 7.02(a);

(b)     as soon as available, but in any event within forty-five (45) days after the end of each fiscal quarter, a consolidated balance sheet of Parent and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal quarter and for the portion of Parent's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and corresponding portion of the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be certified by Parent's chief executive officer, chief financial officer, treasurer or other responsible financial officer as fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of Parent and its Subsidiaries in accordance with GAAP, subject only to normal year end audit adjustments and the absence of footnotes; *provided* that to the extent GAAP does not permit Borrower to be included in the consolidated financial statements of Parent and its Subsidiaries described in this Section 7.02(b), Borrower and Parent shall be permitted to deliver separate financial statements with respect to Borrower only, which financial statements shall otherwise be required to satisfy all of the provisions of this Section 7.02(b);

(c)     as soon as available, but in any event within sixty (60) days after the end of each fiscal year of Parent, annual operating and financial projections approved by Parent's Board of Directors and in a form of presentation reasonably acceptable to Agent;

(d)     as soon as available, but in any event within twenty (20) days after the end of each calendar month, a consolidated balance sheet of Parent and its Subsidiaries as at the end of such calendar month, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such calendar month and for the portion of Parent's fiscal year then ended, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be certified by Parent's chief executive officer, chief financial officer, treasurer or other responsible financial officer as fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of Parent and its Subsidiaries in accordance with GAAP, subject only to normal year end audit adjustments and

59

FORTRESS HIGHLY CONFIDENTIAL

FIG00003883

the absence of footnotes; *provided* that to the extent GAAP does not permit Borrower to be included in the consolidated financial statements of Parent and its Subsidiaries described in this Section 7.02(d), Borrower and Parent shall be permitted to deliver separate financial statements with respect to Borrower only, which financial statements shall otherwise be required to satisfy the provisions of this Section 7.02(d); and

(e)     on Friday of every other calendar week, commencing on December 22, 2017, a projected statement of sources and uses of cash for Parent and its Subsidiaries on a weekly basis for the following 13 calendar weeks, including the anticipated uses of the Term Loans for each week during such period, in each case, substantially in a form of presentation approved by Agent on or prior to the Closing Date.

Notwithstanding anything to the contrary contained in this Section 7.02 or in Section 7.03 or Section 7.04, effective immediately upon delivery of a written notice (an "**Information Declination Notice**") by Agent to Borrower that Agent no longer wishes to receive the items described in such sections (or any subclauses thereof), neither Parent nor Borrower shall deliver any such items to Agent, pursuant to the terms of this Agreement or otherwise. Agent may, in its sole discretion, rescind any Information Declination Notice by the delivery of written notice of such rescission to Borrower, at which time any obligations to comply with Section 7.02, Section 7.03 and/or Section 7.04 (or any subclauses thereof) shall be reinstated as of the date of delivery of such notice.

**SECTION 7.03.    Certificates; Other Information.** Deliver to Agent (which shall thereafter deliver to the Lenders), in form and detail reasonably satisfactory to Agent:

(a)     concurrently with the delivery of the financial statements referred to in Section 7.02(a), a certificate of independent certified public accountants certifying such financial statements;

(b)     concurrently with the delivery of the financial statements referred to in Sections 7.02(a), (b) and (d), a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or other responsible financial officer of Parent, which, in the case of a Compliance Certificate delivered in connection with the financial statements referred to in Sections 7.02(a) and (b), shall include such supplements to Schedule 6.17(a)(i), Schedule 6.17(a)(ii), Schedule 6.17(b) and Schedule 6.17(h) of the Disclosure Schedules delivered pursuant to Section 7.03(c);

(c)     within five (5) Business Days after the end of each fiscal quarter, supplements to Schedule 6.17(a)(i), Schedule 6.17(a)(ii), Schedule 6.17(b) and Schedule 6.17(h) of the Disclosure Schedules as are necessary such that, as supplemented, the relevant disclosures would be accurate and complete as of the end of such fiscal quarter; *provided, however,* that (x) any supplements to such Schedule 6.17(a)(i) may only contain issuances, registrations or applications for Intellectual Property acquired or filed during such fiscal quarter, (y) any supplements to such Schedule 6.17(a)(ii) may only contain Licenses entered into during such fiscal quarter, not in violation of any of the provisions of any Loan Document, and (z) any supplements to such Schedule 6.17(b) or such Schedule 6.17(h) may only contain proceedings

60

     FIG00003884

or claims brought or threatened during such fiscal quarter that could not reasonably be expected to have a Material Adverse Effect;

(d)     promptly after any request by Agent, copies of any detailed audit reports, management letters or recommendations submitted to Parent's Board of Directors (or the audit committee of the Board of Directors) by independent accountants in connection with the accounts or books of Parent or any Subsidiary, or any audit of any of them;

(e)     promptly after the furnishing thereof, copies of any material statement or report furnished to any holder of debt or equity securities of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to Agent pursuant hereto;

(f)     promptly, and in any event within five (5) Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each notice or other correspondence received from any Governmental Authority concerning any investigation or possible investigation or other inquiry by such Governmental Authority regarding the business, financial or corporate affairs of any Loan Party or any Subsidiary thereof; and

(g)     promptly, such additional information regarding the business, financial or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as Agent may from time to time reasonably request (which information shall include, without limitation, in such detail as Agent may reasonably request, reports on the status of, or developments in, any investigation or possible investigation or other inquiry by any Governmental Authority regarding the business, financial or corporate affairs of any Loan Party or any Subsidiary thereof).

Notwithstanding the foregoing or 7.04(c) below, no Loan Party shall be required to deliver any attorney-client privileged information or materials.

SECTION 7.04.  Notices.  Promptly after a Responsible Officer of Parent or Borrower obtains Knowledge thereof, notify Agent (which shall thereafter transmit such notification to the Lenders):

(a)     of the occurrence of any Default;

(b)     of the occurrence of any ERISA Event;

(c)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of Parent  or any Subsidiary; (ii) any dispute, litigation, investigation, proceeding or suspension between Parent or any Subsidiary and any Governmental Authority; and (iii) the commencement of, or any material development in, any litigation or proceeding affecting Parent or any Subsidiary, including pursuant to any applicable Environmental Laws;

(d)     of any material change in accounting policies or financial reporting practices by Parent or any Subsidiary;

ActiveUS 165810955v.1
KE 50036055.42

FORTRESS HIGHLY CONFIDENTIAL          FIG00003885

(e)    of the incurrence or payment of any Settlement Payment Obligations;

(f)    of the occurrence of any audit, investigation or inspection of Parent or any Subsidiary by, or the receipt of notice by Parent or Borrower of any allegation or observation of noncompliance with Healthcare Laws by Parent or any Subsidiary from, the U.S. Food and Drug Administration, a notified body, or other Governmental Authority which is responsible for administering Healthcare Laws. In such an instance, copies of all correspondence with the Governmental Authority and associated material records will be provided to the Lender and

(g)    of the occurrence of a Recall, premature termination or suspension of a clinical trial by an IRB, FDA or other Governmental Authority, or any material adverse safety findings related to an IVD or other medical device or any other product or service that is investigated, manufactured, labeled, stored, advertised, promoted, marketed, sold or distributed by Parent or any Subsidiary. In such an instance, copies of all correspondence with the Governmental Authority and associated material records will be provided to the Lender.

SECTION 7.05.  **Payment of Obligations.** Pay and discharge, as the same shall become due and payable, (a) all material tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by Parent or such Subsidiary, and all other lawful claims which, if unpaid, would by Law become a Lien upon its property other than Permitted Liens; (b) all Obligations, as and when due and payable subject to any applicable grace or cure periods, (c) all Settlement Payment Obligations as and when due and payable and (d) all other obligations and liabilities, except in the case of this clause (d) to the extent such failure would not reasonably be expected to have a Material Adverse Effect.

SECTION 7.06.  **Books and Records**. (a) Maintain proper books of record and account, in which full, true and correct entries in material conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of Parent or such Subsidiary, as the case may be and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over Parent or such Subsidiary, as the case may be.

SECTION 7.07.  **Inspection Rights.** Permit representatives and independent contractors of Agent or any Lender to visit and inspect any of its properties, to examine its corporate, financial and operating books and records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Loan Parties and at such reasonable times during normal business hours, upon reasonable advance notice to Borrower not more than two (2) times each calendar year (in the absence of an Event of Default); *provided, however,* that (a) when an Event of Default exists Agent or any Lender (or any of such Person's respective representatives or independent contractors) may do any of the foregoing as often as may be reasonably desired, at the expense of the Loan Parties, at any time during normal business hours and without advance notice; and (b) Borrower shall not be required to pay the reasonable expenses of more than two visits and inspection during any calendar year unless an Event of Default has occurred and is continuing.

ActiveUS 165810955v.1
KE 50036055.42

FORTRESS HIGHLY CONFIDENTIAL

FIG00003886

**SECTION 7.08. Litigation Cooperation.** Notify Agent promptly in writing of any actual or alleged infringement, misappropriation or other violation, to the Knowledge of Parent, by third parties of any of the Material Patents and (subject to applicable confidentiality obligations and preservation of attorney/client work product, and other privileges) make available to Agent (without expense to Agent or the Lenders) Parent, its Subsidiaries and their directors, officers and employees and its corporate, financial, operating or other books and records to the extent that Agent may deem them reasonably necessary for Agent to prosecute, assert or defend any suit or proceeding with respect to any Collateral (including the Transferred Patent Rights) or the Obligations.

**SECTION 7.09. Use of Proceeds.** Use the loan proceeds for working capital, capital expenditures and other general corporate purposes of Parent and its Subsidiaries, including the funding costs and expenses incurred in connection with this Agreement; *provided* that in no event shall the proceeds from any Term Loan be used in contravention of any Law or of any Loan Document.

**SECTION 7.10. Preservation of Existence, Etc**. (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization; (b) take all action to maintain all rights, privileges, permits, licenses and franchises reasonably necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**SECTION 7.11. Maintenance of Properties**. (a) Maintain or cause to be maintained in good repair, working order and condition (ordinary wear and tear excepted) all material properties used or useful in the business of Parent and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof, (b) maintain and defend all of the Material Patents, and diligently prosecute all Patent applications included in the Material Patents and (c) exercise reasonable business judgment with respect to maintaining and defending all of the Material Intellectual Property.

**SECTION 7.12. Formation or Acquisition of Subsidiaries.** In the event that any Loan Party forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the date hereof, Parent shall, no later than ten (10) Business Days following the formation or acquisition, as the case may be, of such new Subsidiary, (a) in the case of each such new Subsidiary that is a Domestic Subsidiary, cause such new Subsidiary to become a Guarantor hereunder and a "Grantor" under the Security Documents, and to execute and deliver such appropriate Intellectual Property Security Agreements (as defined in the Security Agreement), supplements to the Perfection Certificate (substantially in the form attached as an annex thereto) and financing statements, in each case in form and substance reasonably satisfactory to Agent, (b) pledge to Agent for the benefit of the Lenders all of the direct or beneficial ownership interest (except to the extent constituting Excluded Property (as defined in the Security Agreement)) in such new Subsidiary, in form and substance reasonably satisfactory to Agent, and (c) to the extent reasonably requested by Agent, provide to Agent all other documentation in form and substance reasonably satisfactory to Agent, including one or more opinions of counsel reasonably satisfactory to Agent, which in its opinion is customary with respect to the execution

63

ActiveUS 165810955v.1
KE 50036055.42

and delivery of the applicable documentation referred to above. Any document, agreement, or instrument executed or issued pursuant to this Section 7.12 shall be a Loan Document.

SECTION 7.13. **Insurance.** Keep its business insured for risks and in amounts standard for companies in Parent's and its Subsidiaries' industry and location. Insurance policies shall be in a form, with companies, and in amounts that are reasonably satisfactory to Agent. Subject to Section 7.16, (i) all property policies of Parent and its Subsidiaries shall have a lender's loss payable endorsement showing Agent (in its capacities as the administrative agent and collateral agent for the Lenders) as a lender loss payee and waive subrogation against Agent and the Lenders; (ii) all liability policies of Parent and its Subsidiaries shall show, or have endorsements showing, Agent (in its capacities as the administrative agent and collateral agent for the Lenders) as an additional insured; and (iii) all policies of Parent and its Subsidiaries (or their respective endorsements) shall provide that the insurer shall give Agent at least thirty (30) days' notice before canceling, amending, or declining to renew its policy (10 days' notice for cancellation due to non-payment). At Agent's request, Parent and its Subsidiaries shall deliver certified copies of policies and evidence of all premium payments. If Borrower fails to obtain insurance as required under this Section 7.13 or to pay any amount or furnish any required proof of payment to third persons and Agent, Agent may upon concurrent notice to Parent make all or part of such payment or obtain such insurance policies required in this Section 7.13, and take any action under the policies Agent reasonably deems prudent.

SECTION 7.14. **Further Assurances.**

(a)     The Loan Parties shall, at their own expense, execute any further instruments and take further action as Agent reasonably requests to perfect or continue Agent's Lien for the benefit of the Lenders in the Collateral or to effect the purposes of this Agreement and the Security Documents.

(b)     Without limiting the generality of Section 7.14(a), with respect to any Real Property having a fair market value (together with improvements thereof) of at least $100,000 acquired in fee after the Closing Date by any Loan Party, no later than 60 days after the acquisition or increase in the fair market value thereof, as may be extended by Agent in its reasonable discretion, such Loan Party shall (i) execute and deliver a Mortgage, in favor of Agent for the benefit of the Lenders, covering such interest in Real Property, along with a corresponding UCC fixture filing for filing in the applicable jurisdiction if required by Agent, each in form and substance reasonably satisfactory to Agent, as may be necessary to create a valid, perfected and subsisting Lien, subject only to Permitted Liens, against such Real Property, (ii) provide the Lenders with a Title Policy and a Survey for each Mortgaged Property, together with such affidavits, certificates, instruments of indemnification, legal opinions, either (A) a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination evidencing that the Mortgaged Property is not in a flood zone or (B) evidence of flood insurance as required by the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended and in effect, and such other information, documentation (including, but not limited to, appraisals, environmental reports, and to the extent applicable, using commercially reasonable efforts, subordination agreements) and certifications, in each case, as may be reasonably requested by Agent.

64

ActiveUS 165810955v.1
KE 50036055.42

FIG00003888

### SECTION 7.15. SPE Compliance, Etc.

(a)     Borrower shall comply with, and Parent shall use all commercially reasonable efforts, to the full extent of its power and obligations as the manager and an equity holder of Borrower, to cause Borrower to comply, with the Conduct of Business Provisions set forth in Exhibit H.

(b)     Parent shall ensure that none of the Specified Subsidiaries shall (i) engage in any business or activity other than maintaining its corporate or other entity existence or (ii) acquire any assets or incur any liabilities other than those disclosed on Schedule 6.13(b) of the Disclosure Schedules.

### SECTION 7.16. Post-Closing Obligations.

The Loan Parties shall (a) no later than sixty (60) days after the date hereof (or such later date as Agent may agree in its sole discretion), ensure that each of the Specified Subsidiaries has been dissolved; and (b) perform, or cause any applicable Subsidiaries to perform, each of the actions described on Schedule 7.16 of the Disclosure Schedules no later than the date prescribed therefor on such Schedule 7.16 (or such later date as Agent may agree in its sole discretion).

### SECTION 7.17. Financial Covenants.

(a)     **Minimum Liquidity.** The Loan Parties shall have a minimum of $3,000,000 of unrestricted cash on which Agent at all times has a perfected Lien for the benefit of the Lenders.

(b)     **Patent Prosecution and Maintenance.** For each period set forth in the table below, as of the last day of such period, Parent and its Subsidiaries shall have made cash expenditures during such period for patent prosecution and maintenance of the Transferred Patents (other than the Designated Patents) in an aggregate amount not to be less than the Dollar amount set forth opposite such period in the table below.

| Period | Minimum Cash Expenditures for Patent Prosecution and Maintenance |
|---|---|
| Closing Date through December 31, 2018 | $1,500,000 |
| Each fiscal year thereafter | $1,400,000 |

### SECTION 7.18. Board Observation Rights.

Agent shall have the right, upon written notice delivered to Borrower, to appoint one observer (the "**Observer**") to the Board of Directors of Parent who shall be entitled (i) to receive contemporaneously the same notice and other materials in respect of all meetings (both regular and special) or written consents of the Board of Directors of Parent and each committee thereof as furnished to members of such board(s) of directors or such committee(s), (ii) to attend all meetings (and review all written consents prior to execution thereof) of the Board of Directors of Parent and each committee thereof and (iii) to participate in all discussions conducted at meetings (or with respect to actions to be taken by written consent) of the Board of Directors of Parent and each committee thereof; *provided, however*, that the Observer shall not constitute a member of the Board of Directors of Parent or any committee thereof and shall not be entitled to vote on any matters presented to the

65

                                                                                                 FIG00003889

Board of Directors of Parent or any committee thereof; *provided, further*, that any appointment of the Observer pursuant to this Section 7.18 shall be conditioned on Observer's execution and delivery of a confidentiality agreement with Borrower in form and substance reasonably satisfactory to each of Agent, Borrower and the Observer (it being understood and agreed that the form of confidentiality agreement attached hereto as Exhibit J is reasonably satisfactory to Borrower, Agent and the Observer); and *provided further*, that the Board of Directors of Parent may withhold from Observer certain information or material furnished or made available to the Board of Directors or exclude Observer from certain confidential "closed sessions" of the Board of Directors if the furnishing or availability of such information or material or its presence at such "closed sessions" would jeopardize Parent's attorney-client privilege or create a conflict of interest.

### SECTION 7.19.  Transferred Patents and Transferred Patent Rights.

(a)     Borrower will be liable to Agent for (and shall pay Agent within fifteen (15) days (or such later date agreed by Agent) of the due date stated in any demand or invoice delivered by Agent to Borrower and Parent for) any reasonable expenditures by Agent in connection with (i) the maintenance and preservation of the Collateral, including, but not limited to, taxes, recording fees, appraisal fees, certificate of title charges, recording and filing fees (including UCC financing statement fees, PPSA registration fees, taxes (including documentary stamps) and search fees), fees arising out of or relating to the Transferred Patent Rights, the reasonable fees and disbursements of Agent's outside counsel, and (ii) in addition to damages for breach of warranty, misrepresentation, or breach of covenant by Borrower, the enforcement of this Agreement and the Loan Documents as a result of such breach or misrepresentation, including, but not limited to, the repossession, holding, preparation for sale, and the sale of the Collateral (including reasonable attorneys' and accountants' fees and expenses), and all such liabilities shall be included in the definition of Obligations, shall be secured by the security interest granted herein, and shall be payable upon demand.

(b)     Use their best efforts to ensure that no standards-setting organization of which Borrower or Parent is a member shall impose an obligation to license any of the Transferred Patents on particular terms or conditions.

(c)     File all applications to patent any Intellectual Property that is owned by Parent or any of its Subsidiaries in the name of Borrower, and (i) Parent shall, or shall cause any of its Subsidiaries to, file all documents and take such other actions as shall be necessary or reasonably requested by Agent to assign all right, title and interest in and to such Patent application, to Borrower, including the execution of, and recording with the relevant filing office of, a short form Patent assignment agreement with respect to such Patent application, and (ii) for clarity, such Patent application shall automatically constitute a Transferred Patent hereunder, and Parent and each of its Subsidiaries, as applicable, hereby assign to Borrower all right, title, and interest in and to such Patent applications, and Schedule 1 to the Patent License Agreement shall automatically be amended to include such Patent application.  Parent shall not be in breach of this Section 7.19(c) (1) for failing to take any action with respect to a non-U.S. Patent application which is legally impossible due to any reason other than an act or omission by Parent or any Subsidiary or a breach by Parent or any Subsidiary of this Agreement, or (2)

66

arising from the second matter disclosed under Section 6.17(e) of the Disclosure Schedule (and from no other act or omission by Parent or any Subsidiary).

(d)     Assign to and hold in the name of Borrower all Patents acquired by Borrower or Parent (or any of its Subsidiaries) from any other Person, or in which any ownership interest arises in Parent (or any of its Subsidiaries), and (i) file all documents and take such other actions as shall be necessary or reasonably requested by Agent to cause all right, title and interest in and to such Patents to vest in Borrower, including the execution of, and recording with the relevant filing office of, a short form Patent assignment agreement with respect to such Patents, and (ii) for clarity, such Patents shall automatically constitute Transferred Patents hereunder and shall be owned by Borrower together with any Transferred Patent Rights associated therewith which Parent or any of its Subsidiaries owns, and Parent and each of its Subsidiaries, as applicable, hereby assign to Borrower all right, title, and interest in and to such Transferred Patents, and Schedule 1 to the Patent License Agreement shall automatically be amended to include such Patent application.

(e)     Obtain Agent's approval (not to be unreasonably withheld, delayed or conditioned) of the selection of legal counsel in connection with any prosecution, defense, or enforcement of any Transferred Patent Rights.

(f)     Consult with Agent in good faith in connection with the prosecution, defense or enforcement of any Transferred Patent Rights, including prior to bringing actions, suits, proceedings, or claims, or making any filings, with respect to any such prosecution, defense, or enforcement, and shall make all such filings available to Agent for review and consider Agent's comments thereto in good faith.

(g)     Use good faith efforts to mark products made, used or sold under any U.S. Transferred Patent in a manner provided for, and in accordance with, 35 U.S.C. § 292.

(h)     Require each current and future Representative of Parent or any Subsidiary to execute an IP Assignment pursuant to which the Representative (i) agrees to protect the confidential information of Parent or such Subsidiary from unauthorized disclosure, and (ii) if such Representative is or was involved in the authorship, conception, development, reduction to practice, modification or improvement of any Material Intellectual Property (either alone or jointly with others) within the scope of his or her employment or engagement with Parent or any Subsidiary, makes a present assignment to Parent or any Subsidiary of all right, title and interest in and to all such Material Intellectual Property without further consideration or any restrictions or obligations whatsoever (other than as required by Applicable Laws).

(i)     Take actions reasonable under the circumstances to maintain, protect, and enforce all Trade Secrets owned by Parent or any Subsidiary.

**SECTION 7.20. Patent Development and Enhancement.** Parent and Borrower shall (a) transfer responsibility (for prosecution purposes) to a law firm chosen by Agent and reasonably acceptable to Parent (the "**Patent Law Firm**"), for certain Patent applications claiming priority directly or indirectly from one or more of the Material Patents (the "**Designated Patents**") and (b) cooperate, in good faith, with the Patent Law Firm and Agent to

67

ActiveUS 165810955v.1
KE 50036055.42

FIG00003891

implement a Patent development and enhancement program (including prosecution) in respect of the Designated Patents as has been provided in writing by Agent and Parent prior to the Closing Date (the "**PDE Program**"). Parent and Borrower will promptly satisfy all legal invoices delivered by the Patent Law Firm for prosecution of the Designated Patents that are not disputed in good faith; *provided* that the legal expenses associated with the PDE Program shall not be less than $500,000 in the aggregate for each 12-month period beginning on January 1, 2018, measured as of the end of each year; *provided, further*, that, without the consent of Borrower and Parent, the legal expenses associated with the PDE Program (x) for the 12-month period ending December 31, 2018 shall not exceed $1,000,000 in the aggregate and (y) for the period from the Closing Date to the Tranche A Maturity Date shall not exceed $2,500,000 in the aggregate. For clarity, in the event of any conflict between the PDE Program and any provisions of any Loan Document, the Loan Document shall govern.

### SECTION 7.21. Health Regulatory Matters.

(a) **Permits, Quality and Regulatory Systems.** Parent and its Subsidiaries shall establish and maintain (i) all required Regulatory Permits; (ii) quality systems which comply with 21 CFR Part 820, ISO 13485:2016, and other applicable Healthcare Laws; (iii) regulatory systems which comply with 21 C.F.R. Part 801, 803, 806, 807, 809, 812, Regulation (EU) 2017/745 and 2017/746, and other applicable Healthcare Laws; (iv) systems sufficient to meet privacy and security obligations under applicable Healthcare Laws; and (v) healthcare corporate compliance systems to detect and deter non-compliance with all applicable Healthcare Laws pertaining to government payor programs, fraud and abuse, and associated activities.

(b) **Products and Services.** Parent and Subsidiary products (*e.g.*, IVDs and other medical devices such as clinical decision support software) and services shall be researched, investigated, manufactured, labeled, stored, advertised, promoted, marketed, sold and distributed in accordance with applicable Healthcare Laws, and shall be neither adulterated nor misbranded under Federal Food, Drug, and Cosmetic Act Sections 501 and 502 or comparable laws of other jurisdictions.

(c) **Regulatory Submissions and Fraud.** Neither Parent nor its Subsidiaries, nor their officers, employees or agents shall (a) make an untrue statement of a material fact or fraudulent statement or fail to disclose a material fact in any regulatory submission or other interaction with a Governmental Authority, or (b) provide remuneration to an individual or entity and violation of applicable Healthcare Laws or other Laws.

## ARTICLE VIII.**NEGATIVE COVENANTS**

Until the Obligations have been fully satisfied in cash and the Term Loan Commitments have expired, Parent and Borrower shall not, nor shall they permit any Subsidiary to, directly or indirectly:

SECTION 8.01. **Dispositions.** Transfer, or permit any of its Subsidiaries to Transfer, in one transaction or a series of transactions, all or any part of their or their Subsidiary's business, property or assets except for Transfers (a) of worn-out or obsolete equipment in the ordinary course of business; (b) in connection with Permitted Liens,

68

investments, and any dividends or distributions not prohibited by this Agreement; (c) of nonexclusive licenses to customers for the use of the property of Parent or its Subsidiaries in the ordinary course of business; (d) consisting of the termination, sublease or assignment of real estate leases; (e) of cash or cash equivalents in a manner that is not prohibited by the terms of this Agreement; (f) pursuant to the Patent Transfer Agreement and the Patent License Agreement; (g) of inventory in the ordinary course of business; (h) constituting a Holmes Notes Amendment; and (i) of other property sold at fair market value not to exceed $250,000 in the aggregate in any fiscal year of Parent. Notwithstanding the foregoing or anything else herein to the contrary, Borrower shall not (except as expressly authorized under the Patent License Agreement) Transfer the Transferred Patent Rights and neither Parent nor any of its Subsidiaries shall Transfer its rights under the Patent License Agreement without Agent's prior written consent (in its sole and absolute discretion).

**SECTION 8.02. Changes in Business, Management, Ownership, or Business Locations**. (a) Engage in or permit any of its Subsidiaries to engage in any business other than the businesses currently engaged in by Parent and such Subsidiary, as applicable, and businesses related or incidental thereto; (b) liquidate or dissolve (*provided* that the Specified Subsidiaries may dissolve in accordance with Section 7.16); or (c) change Parent's chief executive officer where Parent's Board of Directors does not replace such officer with at least a Board- approved interim chief executive officer within ninety (90) days of such change and a Board-approved permanent replacement chief executive officer within two hundred forty (240) days of such change. No Loan Party shall (i) without at least thirty (30) days prior written notice to Agent (or such shorter period as Agent may agree), add any new offices or business locations (unless such new offices or business locations contain less than $250,000 of any Loan Party's property) or (ii) without at least ten (10) Business Days' prior written notice to Agent (or such shorter period as Agent may agree), (A) change its jurisdiction of organization; (B) change its organizational structure or type; (C) change its legal name; or (D) change any organizational number (if any) assigned by its jurisdiction of organization.**Mergers or Acquisitions.** Consummate any Business Combination (except for a Permitted Investment) without obtaining the written consent of Agent (in its sole and absolute discretion).

**SECTION 8.04. Liens.** Create, incur, assume or suffer to exist any Lien, except Permitted Liens, upon any of its property, assets or revenues, whether now owned or hereafter acquired. Without limiting the generality of the foregoing and notwithstanding anything else herein to the contrary, in no event shall any Settlement Payment Obligations be secured by any Lien.

**SECTION 8.05. Distributions; Investments.** (a) Pay any dividends or make any distribution or payment on account of or redeem, retire or purchase any of its capital stock; *provided* that (i) Parent may convert any of its convertible securities into other securities that do not constitute Disqualified Equity Interests pursuant to the terms of such convertible securities or otherwise in exchange thereof, (ii) Parent may pay dividends solely in common stock, (iii) Subsidiaries of Parent may make distributions to Parent, (iv) Borrower may distribute the proceeds of the Term Loans to Parent and (v) subject to Section 8.13, Parent may make cash payments to shareholders to settle Disclosed Matters; or (b) directly or indirectly make any Investment other than Permitted Investments, or permit any of its Subsidiaries to do so.

69

ActiveUS 165810955v.1
KE 50036055.42

  FIG00003893

**SECTION 8.06. Transactions with Affiliates.** Enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of a Loan Party on terms that are less favorable to Parent or that Subsidiary, as the case may be, than those that might be obtained at the time from Persons who are not such an Affiliate other than (a) any transactions between Parent and Borrower expressly permitted under the Loan Documents and the Transaction Documents; (b) any bona fide equity financing not constituting a Change of Control; (c) any transaction listed on Schedule 8.06 of the Disclosure Schedules; (d) any Holmes Notes Amendment; (e) the incurrence or issuance of any Permitted Junior Capital; (f) transactions permitted under Section 8.05 and (g) any transaction with a Lender or its Affiliates.

**SECTION 8.07. Junior Obligations.** (a) Make or permit any payment on any Junior Obligation, except (i) in the case of any Subordinated Debt, under the terms of the subordination, intercreditor, or other similar agreement to which such Subordinated Debt is subject and (ii) in the case of Settlement Payment Obligations, when the same shall become due and payable, or (b) amend any provision in any document relating to any Junior Obligation which would increase the amount thereof, add any Liens or guarantees with respect thereto, make earlier the scheduled maturity date thereof, make shorter the weighted average life to maturity thereof, adversely affect the subordination thereof to Obligations owed to Agent and the Lenders or otherwise be materially adverse to the interests of Agent and the Lenders.

**SECTION 8.08. Compliance.** Become an "investment company" or a company controlled by an "investment company" under the Investment Company Act of 1940, as amended, or undertake as one of its important activities extending credit to purchase or carry margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System), or use the proceeds of any Term Loan for that purpose; fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur; fail to comply with the Federal Fair Labor Standards Act or violate any other Law or regulation, if the violation could reasonably be expected to have a Material Adverse Effect on the business of Parent and its Subsidiaries, or permit any of its Subsidiaries to do so; withdraw or permit any Subsidiary to withdraw from participation in, permit partial or complete termination of, or permit the occurrence of any other event with respect to, any present pension, profit sharing and deferred compensation plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency. Solely for purposes of this Section 8.08, none of the "Anticipated Potential Outcomes" described on Schedule 6.06 of the Disclosure Schedules shall be deemed to have a Material Adverse Effect on the business of Parent and its Subsidiaries.

**SECTION 8.09. Indebtedness.** Create, suffer to exist or become obligated to pay any Indebtedness, other than Permitted Indebtedness.

**SECTION 8.10. Amendments to Organization Documents, Patent Transfer Agreement or Patent License Agreement.** Except as required to comply with the terms of this Agreement and the Transaction Documents and except for equity financings that do not constitute a Change of Control, amend, or permit the amendment of, any Loan Party's Organization Documents in a manner adverse to Agent or the Lenders or amend, or

70

FIG00003894

permit the amendment of, the Patent Transfer Agreement or the Patent License Agreement, in each case, without the consent of Agent (in its sole and absolute discretion).

**SECTION 8.11. Sanctions.** Use the proceeds of the Term Loan, or lend, contribute or otherwise make available proceeds of the Term Loan to any Subsidiary of Borrower or Parent, joint venture partner or other individual or entity, directly, or knowingly indirectly, (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation in any material respect of the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions to the extent applicable to the Loan Parties or (b) to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions in material violation thereof, or in any other manner that will result in a material violation by an individual or entity (including any individual or entity participating in the Transactions, whether Agent, a Lender or otherwise) of Sanctions.

**SECTION 8.12. Transferred Patent Rights.** Other than non-exclusive licenses implied from Parent's or any Subsidiary's sales, leases, or other provisions of a product or service, in each case, granted in the ordinary course of business (a) enter into any contract that limits or otherwise impairs any rights or interest of Parent or Borrower in or to the Material Patents without the express prior written consent of Agent (which consent shall not be unreasonably withheld), or (b) settle, compromise, or otherwise resolve any claim, suit, proceeding or dispute related to any Material Patent without the express prior written consent of Agent (which consent shall not be unreasonably withheld).

**SECTION 8.13. Settlements, Judgments, Etc.** (a) Incur, or otherwise agree to make any payments in respect of, any Settlement Payment Obligations if the aggregate amount of all such Settlement Payment Obligations since the Closing Date would exceed $40,000,000 or (b) make any payment in respect of any Settlement Payment Obligations if the aggregate amount of all such payments made since the Closing Date would exceed $40,000,000.

ARTICLE IX. **EVENTS OF DEFAULT**

Any one of the following shall constitute an event of default (an "**Event of Default**"):

**SECTION 9.01. Payment Default.** A Loan Party fails to (a) make any payment of principal on any Term Loan on its due date or (b) pay any payment of interest or any other payment Obligation and such default shall continue unremedied for a period of three (3) Business Days after the date when due and payable or when declared due and payable in accordance with this Agreement.

**SECTION 9.02. Representations and Warranties.** Any representation, warranty, certification or other statement made by Parent or any of its Subsidiaries in any Loan Document or in any statement or certificate at any time given by Parent or any of its Subsidiaries in pursuant hereto or thereto or in connection herewith or therewith shall have been false in any material respect on the date as of which made.

71

**SECTION 9.03. Specific Covenants**. (a) A Loan Party fails to deliver any item required in Sections 7.02 or 7.03 or fails to perform or observe any term, covenant or agreement contained in Sections 7.01, 7.04, 7.05, 7.07, 7.08, 7.09, 7.10, 7.15, 7.16, 7.17, 7.18 or 7.19 or Article VIII, (b) a Loan Party fails to perform observe any term, covenant or agreement contained in Section 7.20 and such failure continues for ten (10) days after such Loan Party's receipt of notice of such Default from Agent or (c) any Guarantor fails to perform or observe any term, covenant or agreement contained in its Guaranty (after giving effect to any applicable notice and cure periods contained in or incorporated into such Guaranty).

**SECTION 9.04. Other Defaults.** Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Sections 9.01, 9.02, or 9.03) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after such Loan Party's receipt of notice of such Default from Agent.

**SECTION 9.05. Cross-Default.**

(a) Parent or any of its Subsidiaries shall fail to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness in an individual principal amount of $250,000 or more or with an aggregate principal amount of $250,000 or more; or

(b) the breach or default by Parent or any of its Subsidiaries with respect to any other term of (i) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (a) above or (ii) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness referred to in clause (b)(i), if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders) to cause, that Indebtedness to become or be declared due and payable prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be (upon the giving or receiving of notice, lapse of time, both, or otherwise).

**SECTION 9.06. Asset Seizure.** (a) Any material portion of any Loan Party's assets is attached, seized, levied on, or comes into possession of a trustee or receiver; or (b) any court order enjoins, restrains, or prevents any Loan Party from conducting any material part of its business, in each case, as to each of clauses (a) and (b), which event continues in existence and is not remedied, dismissed or stayed for thirty (30) days after a Loan Party obtains Knowledge thereof.

**SECTION 9.07. Insolvency Proceedings**. (a) Parent or any of its Subsidiaries institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors, or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; (b) any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person; or (c) any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person or an order for relief is entered in any such proceeding, in each case with respect to clauses (b) and (c) above which event continues in existence and is not remedied, dismissed or

72

ActiveUS 165810955v.1
KE 50036055.42

FIG00003896

stayed for sixty (60) days after a Loan Party's receipt of actual or constructive notice of the occurrence thereof.

**SECTION 9.08. Inability to Pay Debts.** Parent or any of its Subsidiaries becomes unable or admits in writing its inability or fails generally to pay its debts as they become due and such circumstance, event or failure continues in existence and is not remedied for thirty (30) days after a Loan Party's receipt of actual or constructive notice of such circumstance, event or failure.

**SECTION 9.09. Judgments.** Any money judgment, writ or warrant of attachment or similar process involving (i) in any individual case an amount in excess of $250,000 over the amount covered by independent third-party insurance as to which the applicable insurance carrier has been notified of the claim and has not denied coverage or (ii) in the aggregate at any time an amount in excess of $250,000 over the amount covered by independent third-party insurance as to which l the applicable insurance carrier has been notified of the claim and has not denied coverage shall be entered or filed against Parent or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded, unstayed or unsatisfied (including satisfaction through entering into a deferred payment agreement, so long as any underlying judgment, writ or warrant of attachment is discharged upon entry into such deferred payment agreement and such Settlement Payment Obligations is otherwise permitted hereunder) for a period of sixty (60) days (or in any event later than five days prior to the date of any proposed sale thereunder).

**SECTION 9.10. Change of Control.** A Change of Control occurs.

**SECTION 9.11. ERISA.** (a) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of a Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $250,000 and such ERISA Event continues in existence and is not remedied for thirty (30) days after actual or constructive notice of the occurrence thereof, or (b) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $250,000 and such failure to pay continues in existence and is not remedied for thirty (30) days after the date when such payment was due.

**SECTION 9.12. Invalidity of Loan Documents.** (a) Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or prior to satisfaction in full of all the Obligations, ceases to be in full force and effect; (b) any Loan Party (i) contests in any manner the validity or enforceability of any Loan Document as a whole or (ii) unsuccessfully contests the asserted applicability by Agent of any specific provision of any Loan Document; or (c) any Loan Party wrongfully denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document, in each case, as to each of clauses (a), (b) and (c), which circumstance or event continues in existence and is not remedied or revoked for fifteen (15) Business Days after a Loan Party's receipt of actual or constructive notice thereof.

73

ActiveUS 165810955v.1
KE 50036055.42

 FIG00003897

**SECTION 9.13. Intellectual Property**. (a) Borrower fails to meet its obligations under Section 9.03 of the Borrower Operating Agreement (as in effect on the date hereof) for the timely payment of maintenance fees, annuities or the like for any Transferred Patent (for the avoidance of doubt, such "timely payment" means payment of any fees for which the fee is payable (*e.g.*, the fee payment window opens) by the final deadline for payment, where "final deadline" means the day past which a maintenance fee cannot be paid without payment of any late fees) or (b) any Transferred Patent is found invalid, unpatentable or unenforceable, or lapses or becomes abandoned, due to a future act or omission by Borrower that constitutes gross negligence or willful misconduct, in each case, as to each of clauses (a) and (b), which failure or event continues in existence and is not remedied within thirty (30) days after Borrower's receipt of actual or constructive notice thereof.

**SECTION 9.14. Subordinated Debt.** Any document, instrument, or agreement evidencing any Subordinated Debt shall for any reason cause such subordination (x) to be revoked or invalidated or (y) otherwise to cease to be in full force and effect (other than a termination in accordance with the terms of the payment in full of such Subordinated Debt so long as such payment is permitted under the terms of the subordination or other agreement between such Person and Agent or otherwise agreed by Agent in writing), or the Obligations shall for any reason be subordinated or shall not have the priority contemplated by this Agreement.

**SECTION 9.15. Indictment.** (a) Any Responsible Officer of any Loan Party or any of its Subsidiaries shall be indicted under any applicable Law and the crime alleged would constitute a felony under such applicable Law, unless, within 10 Business Days following such indictment, either (x) a deferred prosecution agreement or non-prosecution agreement is executed with respect to such indictment or (y) the Responsible Officer ceases serving in its respective role with such Loan Party or Subsidiary, or (b) any Loan Party or any of its Subsidiaries shall be indicted under any applicable Law and the crime alleged would constitute a felony under such applicable Law.

ARTICLE X. **AGENT AND LENDERS' RIGHTS AND REMEDIES**

**SECTION 10.01. Rights and Remedies.**

(a)  While an Event of Default occurs and continues Agent may, or upon the request of the Requisite Lenders shall, without notice or demand, and regardless of whether a Multiple Trigger Event shall have occurred, do any or all of the following, singularly, consecutively or cumulatively:

(i)  Declare all Obligations (including any Applicable Prepayment Premium and any End of Term Fee) immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower (but if an Event of Default described in Section 9.07 occurs, all Obligations (including any Applicable Prepayment Premium and any End of Term Fee) are immediately due and payable without any action by Agent or any Lender);

ActiveUS 165810955v.1
KE 50036055.42

FIG00003898

(ii)     Terminate any outstanding Term Loan Commitments and otherwise stop advancing money or extending credit for Borrower's benefit under this Agreement or under any other agreement between Borrower and Agent or any Lender;

(iii)     Make any payments and do any acts it considers necessary or reasonable to protect the Collateral or its security interest in the Collateral. Agent may pay, purchase, contest, or compromise any Lien, other than a Permitted Lien, which appears to be prior or superior to its security interest and in exercising any such powers, incur any liability, expend whatever amounts in its absolute discretion it may deem necessary therefor, including cost of evidence of title, employ counsel and pay reasonable attorneys' fees;

(iv)     Without notice to or demand upon Borrower and without releasing Borrower from any obligation hereof, reclaim, recover, maintain, prepare for sale, advertise for sale, and sell the Collateral and in exercising any such powers, incur any liability, expend whatever amounts in its absolute discretion it may deem necessary therefor, including cost of evidence of title, employ counsel and pay reasonable attorneys' fees. Effective upon the occurrence and during the continuance of an Event of Default, Agent is hereby granted, for the benefit of the Lenders, a non-exclusive, royalty-free license or other right to use, without charge, Borrower's labels, Patents, copyrights, mask works, rights of use of any name, trade secrets, trade names, trademarks, and advertising matter, or any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Agent's exercise of its rights under this <u>Section 10.01</u>. Borrower's rights under all licenses and all franchise agreements shall inure to Agent's benefit (for the benefit of the Lenders);

(v)     Transfer all or part of the Collateral into the name of Agent or its nominee;

(vi)     Demand and receive possession of Borrower's corporate, financial and operating books and records; and

(vii)     Exercise all rights and remedies available to Agent or the Lenders under the Loan Documents or at Law or equity, including all remedies provided under the UCC, all of which rights and remedies shall be cumulative and nonexclusive to the extent permitted by law, including, without limitation, the following:

(1)     Upon the occurrence and during the continuance of any Event of Default, Agent and the Lenders shall have all rights and remedies provided by Law, including but not limited to those of a lender under the UCC as in effect in the States of New York and Nevada on the date hereof and as amended hereafter, in addition to the rights and remedies provided herein or in the Loan Documents. Agent may, in its sole discretion, require Borrower to assemble the Collateral and make it available to Agent at a place to be designated by Agent that is reasonably convenient to Borrower and Agent, and without notice except as specified below, dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Agent

75

                    FIG00003899

may deem commercially reasonable. If notice of disposition of Collateral is required by Law, ten (10) days prior notice by Agent to Borrower designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made shall be deemed to be reasonable notice thereof, and Borrower waives any other notice. Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. Agent may adjourn any public or private sale from time to time by announcement at the time fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Upon the sale of Collateral at any public or private sale, Agent may credit bid and purchase (as determined by Agent in its sole discretion) all or any portion of the Collateral. In the event Agent institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy in an action against Borrower, Borrower waives the posting of any bond which might otherwise be required. All of Agent's and the Lenders' rights and remedies shall be cumulative and none are exclusive. Whether or not default has occurred, all payments made by or on behalf of Borrower and all credits due Borrower under this Agreement and under any other Loan Document between Borrower and Agent or the Lenders may be applied to the Obligations in the order set forth in <u>Section 10.04</u>.

(2)     All cash proceeds received by Agent in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of Agent, be held by Agent as collateral for, or then or at any time thereafter applied in whole or in part by Agent against, all or any part of the Obligations in the order set forth in <u>Section 10.04</u>. Any surplus of such cash or cash proceeds held by Agent and remaining after payment in full of all the Obligations shall be paid over to Borrower or to whomsoever may be lawfully entitled to receive such surplus.

(3)     Agent may exercise any and all rights and remedies of Borrower under or in respect of the Collateral.

(4)     All payments received by Borrower under or in respect of the Collateral shall be received in trust for the benefit of the Lenders, shall be segregated from other funds of Borrower and shall be forthwith paid over to Agent for the ratable account of the Lenders in the same form as so received (with any necessary endorsement).

(5)     Whether or not an Event of Default shall have occurred, if Borrower fails to perform any agreement contained herein, Agent may, in its sole discretion, itself perform, or cause performance of, such agreement, and the reasonable expenses of Agent incurred in connection therewith shall be payable by Borrower. The powers conferred upon Agent hereunder are solely for the protection of its interest in the Collateral for the benefit of the Lenders and shall not impose any duty upon it to exercise any such powers.

76

FORTRESS HIGHLY CONFIDENTIAL                                    FIG00003900

(6)     Except for the safe custody of any Collateral in its possession and the accounting for monies actually received by it hereunder, Agent shall have no duty as to any Collateral, whether or not Agent has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which Agent accords its own property.

(b)     Agent may cause the Collateral to remain on Borrower's premises, at Borrower's expense, pending sale or other disposition thereof. Agent shall have the right to conduct such sales on Borrower's premises or elsewhere, at Borrower's expense, on such occasions) as Agent may see fit, and Borrower, at Agent's request, will, at Borrower's expense, assemble the Collateral and make it available to Agent at such place(s) as Agent may reasonably designate from time to time. Any sale, lease or other disposition by Agent of the Collateral, or any part thereof, may be for cash or other value. Borrower shall execute and deliver, or cause to be executed and delivered, such instruments, documents, assignments, deeds, waivers, certificates and affidavits and take such further action as Agent shall reasonably require in connection with such sale, and Borrower hereby constitutes Agent as its attorney-in-fact to execute any such instrument, document, assignment, deed, waiver, certificate or affidavit on behalf of Borrower and in its name. At any sale of the Collateral, the Collateral to be sold may be sold in one lot as an entirety or in separate lots as Agent may determine. Agent shall not be obligated to make any sale of any Collateral if it determines not to do so, regardless of the fact that notice of sale was given. Agent may, without notice or publication, adjourn any public or private sale or cause the sale to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which it was so adjourned. In case any sale of Collateral is made on credit or for future delivery, the Collateral so sold may be retained by Agent until the sale price is paid, but Agent shall not incur any liability if any purchaser fails to pay for any Collateral so sold and, in case of any such failure, such Collateral may be sold again. At any public sale, Agent may (i) bid for or purchase the Collateral offered for sale, free (to the extent permitted by Law) from any rights of redemption, stay or appraisal on the part of Borrower with respect to the Collateral; (ii) make payment on account thereof by using any claim then due and payable to Agent or any Lender from Borrower as a credit against the purchase price; and (iii) upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to Borrower therefor. Borrower acknowledges that portions of the Collateral may be difficult to preserve and dispose of and may be subject to complex maintenance and management; accordingly, Agent shall have the widest possible latitude in the exercise of its rights and remedies hereunder.

(c)     Any notice required to be given by Agent with respect to any of the Collateral, which notice is given pursuant to Article XI and deemed received pursuant to Article XI at least ten (10) Business Days before a sale, lease, disposition or other intended action by Agent, shall constitute fair and reasonable notice to Borrower of any such action. A public sale in the following fashion shall be conclusively presumed to be reasonable if (i) the sale is held in a county where any part of the Collateral is located or in which Borrower has a place of business; (ii) the sale is conducted by auction, but it need not be by a professional auctioneer; (iii) any

77

Collateral is sold as is and without any preparation for sale; and (iv) Borrower is given notice of such public sale pursuant to the preceding sentence.

(d)     Neither Agent nor any Lender shall have any obligation (i) to preserve any rights to the Collateral against any Person; (ii) to make any demand upon or pursue or exhaust any rights or remedies against Borrower or others with respect to payment of the Obligations; (iii) to pursue or exhaust any rights or remedies with respect to any of the Collateral or any other security for the Obligations; or (iv) to marshal any assets in favor of Borrower or any other Person against or in payment of any or all of the Obligations.

(e)     Borrower recognizes that one or more Laws may limit the flexibility desired to achieve a more commercially reasonable disposition of Collateral, and it is intended that consideration of such Laws be taken into account in determining commercial reasonableness.

(f)     Borrower is aware that Section 9-610 of the UCC states that Agent is able to purchase the pledged Equity Interests of Borrower only if they are sold at a public sale. Borrower is also aware that SEC staff personnel have, over a period of years, issued various No Action Letters that describe procedures which, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Part 6 of Article 9 of the UCC, yet not public for purposes of Section 4(2) of the Securities Act of 1933 (as amended from time to time). Borrower is also aware that Agent may wish to purchase the pledged Equity Interests that are sold at a foreclosure sale, and Borrower believes that such purchase would be appropriate in circumstances in which the pledged Equity Interests are sold in conformity with the principles set forth in the aforementioned No Action Letters. Borrower specifically agrees that a foreclosure sale conducted in conformity with the principles set forth in the aforementioned No Action Letters (i) shall be considered to be a "public" sale for purposes of Section 9.610 of the UCC; (ii) will not be considered commercially unreasonable solely by virtue of the fact that Agent has not registered or sought to register the Equity Interests under the securities Laws; even if Borrower agrees to pay all costs of the registration process; and (iii) shall be considered to be commercially reasonable notwithstanding that Agent purchases the pledged Equity Interests at such a sale.

(g)     Borrower shall pay to Agent, for its own account or for the account of the applicable Lender, as the case may be, on demand and as part of the Obligations, all reasonable costs and expenses, including court costs and costs of sale, incurred by Agent or any Lender in exercising any of its rights or remedies hereunder.

**SECTION 10.02.  Power of Attorney.** Each of Borrower and Parent hereby irrevocably appoints Agent as its lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of Default, to (a) maintain, enforce and protect all of the Transferred Patents or Material Intellectual Property, (b) maintain and keep in full force and effect all issued or registered Transferred Patents or Material Intellectual Property and (c) continue to prosecute all applications for any Transferred Patents or Material Intellectual Property, in each case, in its sole and absolute discretion. Each of Borrower and Parent hereby further irrevocably appoints Agent as its lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of Default, to (i) endorse Borrower's or Parent's name on any checks or other forms of payment or security; (ii) make, settle, and adjust all claims under

78

ActiveUS 165810955v.1
KE 50036055.42

FIG00003902

Borrower's insurance policies; (iii) pay, contest or settle any Lien, charge, encumbrance, security interest, and adverse claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (iv) Transfer the Collateral into the name of Agent or a third party as the UCC permits; and (v) sign Borrower's name on any documents necessary to perfect or continue the perfection of Agent's security interest in the Collateral for the benefit of the Lenders. Agent's foregoing appointment as Borrower's attorney-in-fact, and all of Agent's rights and powers, coupled with an interest, are irrevocable until all Obligations have been fully repaid and performed and the Lenders' obligations to extend credit under the Loan Documents have terminated.

  **SECTION 10.03. Protective Payments.** If Borrower fails to obtain the insurance required hereunder or fails to pay any premium thereon or fails to pay any other amount which Borrower is obligated to pay under this Agreement or any other Loan Document, Agent may obtain such insurance or make such payment, and all amounts so paid by Agent shall be Agent Expenses and shall be immediately due and payable, bearing interest at the Default Rate and secured by the Collateral. Agent will make reasonable efforts to provide Borrower with notice of Agent's obtaining such insurance at the time it is obtained or within a reasonable time thereafter. No such payments by Agent shall be deemed an agreement to make similar payments in the future or Agent's or any Lender's waiver of any Event of Default.

  **SECTION 10.04. Application of Payments and Proceeds Upon Default.** If an Event of Default has occurred and is continuing, Agent shall apply any funds in its possession to the Obligations in the following order (*provided* that Borrower shall remain liable to the Lenders for any deficiency):

  (a) *first*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to Agent) payable to Agent in its capacity as such;

  (b) *second*, to payment of that portion of the Obligations constituting interest on the Protective Advances;

  (c) *third*, to payment of that portion of the Obligations constituting unpaid principal of the Protective Advances, including all PIK Interest thereon;

  (d) *fourth*, to payment of that portion of the Obligations constituting fees, indemnities, any Applicable Prepayment Premium and other amounts (other than principal and interest) payable to the Lenders, ratably among them in proportion to the respective amounts described in this clause *fourth* payable to them;

  (e) *fifth*, to payment of that portion of the Obligations constituting interest on the Term Loans (other than Protective Advances), ratably among the Lenders in proportion to the respective amounts described in this clause *fifth* payable to them;

  (f) *sixth*, to payment of that portion of the Obligations constituting unpaid principal of the Term Loans (other than Protective Advances), including all PIK Interest thereon, ratably

ActiveUS 165810955v.1
KE 50036055.42

among the Lenders in proportion to the respective amounts described in this clause *sixth* held by them; and

(g)     *last*, the balance, if any, after all of the Obligations have been paid in full, to Borrower or as otherwise required by applicable Law.

If Agent, in its good faith business judgment, directly or indirectly enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Agent shall have the option, exercisable at any time, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Agent of cash therefor.

**SECTION 10.05.   No Waiver; Remedies Cumulative.** Neither Agent's nor any Lender's failure, at any time or times, to require strict performance by Borrower of any provision of this Agreement or any other Loan Document shall waive, affect, or diminish any right of Agent or any Lender thereafter to demand strict performance and compliance herewith or therewith. No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for which it is given. Agent's and the Lenders' rights and remedies under this Agreement and the other Loan Documents and the Transaction Documents are cumulative. Each of Agent and the Lenders has all rights and remedies provided under the UCC, by Law, or in equity. Agent's or any Lender's exercise of one right or remedy is not an election and shall not preclude Agent or any Lender from exercising any other remedy under this Agreement or other remedy available at Law or in equity, and neither Agent's nor any Lender's waiver of any Event of Default shall be deemed a continuing waiver. Neither Agent's nor any Lender's delay in exercising any remedy shall be deemed a waiver, election, or acquiescence.

## ARTICLE XI.**NOTICES**

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by email or fax transmission (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient); (c) one Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand- delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below. Agent or Borrower may change its mailing or email address or facsimile number by giving the other party written notice thereof in accordance with the terms of this Article XI.

If to Borrower:     Theranos IP Company, LLC
7333 Gateway Boulevard
Newark, CA 94560
Attn: David Taylor, General Counsel
Phone: (650) 546-2205

80

                     FIG00003904

Fax: (650) 852-9594
Email: dtaylor@theranos.com

With a copy to:    Theranos, Inc.
7333 Gateway Boulevard
Newark, CA 94560
Attn: Philippe Poux, Interim CFO
Phone: (650) 470-6144
Email: ppoux@theranos.com

And to:    WilmerHale
7 World Trade Center
New York, NY 10007
Attention: George W. Shuster Jr.
Phone: (212) 937-7232
Email: george.shuster@wilmerhale.com

If to Agent:    Fortress Credit Corp.
c/o Fortress Investment Group
1345 Avenue of the Americas, 46th Floor
New York, NY 10105
Attention: General Counsel – Credit Funds
Fax No.: 917-639-9672
Email: gc.credit@fortress.com

With a copy to:    Kirkland & Ellis LLP
333 South Hope Street
Los Angeles, CA 90071
Attn: David M. Nemecek, P.C.; Brian Ford
Phone: (213) 680-8400
Fax: (213) 680-8500
Email: david.nemecek@kirkland.com;
    brian.ford@kirkland.com

If to a Lender:    At such address as such Lender may designate to Agent from time to time

## ARTICLE XII. **AGENT**

### SECTION 12.01.  Appointment of Agent.

(a)    Each Lender hereby appoints Fortress (together with any successor Agent pursuant to Section 12.07) as administrative agent and collateral agent under the Loan Documents and irrevocably authorizes Agent to (i) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Loan Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to

81

ActiveUS 165810955v.1
KE 50036055.42

Agent under such Loan Documents and (iii) exercise such powers as are reasonably incidental thereto. Each Lender that is an Affiliate of Fortress hereby authorizes Fortress to execute any document in connection with the Loan Documents on behalf of such Lender including, without limitation, any waivers, notices, consents, amendments, modifications or directions.

(b) Without limiting the generality of clause (a) above, and notwithstanding anything to the contrary in this Agreement or any other Loan Document, Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents (including in any Insolvency Proceeding or similar proceeding), and each Person making any payment in connection with any Loan Document to any Lender is hereby authorized to make such payment to Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of Agent and Lenders with respect to any Obligation in any Insolvency Proceeding or similar proceeding (but not to vote, consent or otherwise act on behalf of any such Lender), (iii) act as collateral agent for Agent and each Lender for purposes of the perfection of all Liens created by the Loan Documents and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to Agent and the other Lenders with respect to the Loan Parties and/or the Collateral, whether under the Loan Documents, applicable Law or otherwise, and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; *provided, however*, that Agent hereby appoints, authorizes and directs each Lender to act as collateral sub-agent for Agent and the Lenders for purposes of the perfection of all Liens with respect to the Collateral, including any Deposit Account (as defined in the UCC) maintained by a Loan Party with, and cash and Cash Equivalents held by, such Lender, and may further authorize and direct the Lenders to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the Collateral subject thereto to Agent, and each Lender hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed. Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Lender). Any such Person shall benefit from this Article XII to the extent provided by Agent.

(c) Under the Loan Documents, Agent (i) is acting solely on behalf of the Lenders, with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Loan Document to refer to Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Lender, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above. Except as expressly set

82

FIG00003906

forth in the Loan Documents, Agent shall not have any duty to disclose, and shall not be liable for failure to disclose, any information relating to any Loan Party or any of its Subsidiaries that is communicated to or obtained by Agent or any of its Affiliates in any capacity.

### SECTION 12.02.  Binding Effect; Use of Discretion; E-Systems.

(a)     Each Lender, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by Agent (acting at the direction of the Requisite Lenders) or Requisite Lenders (or, if expressly required in any Loan Document, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by Agent in reliance upon the instructions of the Requisite Lenders (or, where so required, such greater proportion) and (iii) the exercise by Agent (acting at the direction of the Requisite Lenders) or Requisite Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.

(b)     If Agent shall request instructions from Requisite Lenders or all affected Lenders with respect to any act or action (including failure to act) in connection with any Loan Document, then Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from Requisite Lenders or all affected Lenders, as the case may be, and Agent shall not incur liability to any Person by reason of so refraining. Agent shall be fully justified in failing or refusing to take any action under any Loan Document (i) if such action would, in the opinion of Agent, be contrary to any applicable Law or any Loan Document, (ii) if such action would, in the opinion of Agent, expose Agent to any potential liability under any applicable Law or (iii) if Agent shall not first be indemnified to its satisfaction against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent's acting or refraining from acting under any Loan Document in accordance with the instructions of Requisite Lenders or all affected Lenders, as applicable.

(c)     Agent is hereby authorized by each Loan Party and each Lender to establish procedures (and to amend such procedures from time to time) to facilitate the administration and servicing of the Term Loans and other matters incidental thereto. Without limiting the generality of the foregoing, Agent is hereby authorized to establish procedures to make available or deliver, or to accept, notices, documents  and similar items on, by posting to or submitting and/or completion, on E-Systems. Each Loan Party and each Lender acknowledges and agrees that the use of transmissions via an E-System or electronic mail is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse, and each Loan Party and each Lender assumes and accepts such risks by hereby authorizing the transmission via E-Systems or electronic mail. Each "e-signature" on any such posting shall be deemed sufficient to satisfy any requirement for a "signature", and each such posting shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to any Loan Document, any applicable provision of any UCC, the federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural Law governing such subject matter. All uses of an E-System shall be governed by and subject to, in addition to this Section, the separate

83

FORTRESS HIGHLY CONFIDENTIAL

FIG00003907

terms, conditions and privacy policy posted or referenced in such E-System (or such terms, conditions and privacy policy as may be updated from time to time, including on such E-System) and related contractual obligations executed by Agent, Loan Parties and/or Lenders in connection with the use of such E-System. ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE". NO REPRESENTATION OR WARRANTY OF ANY KIND IS MADE BY AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY E-SYSTEMS.

**SECTION 12.03. Agent's Reliance, Etc.** Agent may, without incurring any liability hereunder, (a) treat the payee of any Note as its holder until such Note has been assigned in accordance with Section 14.01, (b) consult with any of its Related Persons, (c) consult with, and rely upon advice and statements of, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Loan Party) and (d) rely and act upon any document and information (including those transmitted by electronic transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties. None of Agent and its Related Persons shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Lender and each Loan Party hereby waives and shall not assert (and each Loan Party shall cause its Subsidiaries to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment of a court of competent jurisdiction) in connection with the duties of Agent expressly set forth herein. Without limiting the foregoing, Agent: (i) shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Requisite Lenders or for the actions or omissions of any of its Related Persons, except to the extent that a court of competent jurisdiction determines in a final non-appealable judgment that Agent acted with gross negligence or willful misconduct in the selection of such Related Person; (ii) shall not be responsible to any Lender or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, or sufficiency of this Agreement or any other Loan Document; (iii) shall not be responsible for the state or condition of any properties of Loan Parties constituting Collateral; (iv) shall have no responsibility for the validity, warrant or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document; (v) makes no warranty or representation, and shall not be responsible, to any Lender or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Loan Party or any Related Person of any Loan Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Loan Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by Agent in connection with the Loan Documents; and (vi) shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Loan Party or as to the existence or continuation or possible occurrence or continuation of any

84

     FIG00003908

Default or Event of Default, and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a written notice from Borrower or any Lender describing such Default or Event of Default that is clearly labeled "notice of default" (in which case Agent shall promptly give notice of such receipt to all Lenders, *provided* that Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction); and, for each of the items set forth in clauses (i) through (vi) above, each Lender and each Loan Party hereby waives and agrees not to assert (and each Loan Party shall cause its Subsidiaries to waive and agree not to assert) any right, claim or cause of action it might have against Agent based thereon.

SECTION 12.04. **Agent Individually.** Agent and its Affiliates may make loans and other extensions of credit to, acquire Equity Interests of, engage in any kind of business with, any Loan Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor. To the extent Agent or any of its Affiliates makes any Term Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Requisite Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include, without limitation, Agent or such Affiliate, as the case may be, in its individual capacity as Lender, or as one of the Requisite Lenders.

SECTION 12.05. **Lender Credit Decision; Agent Report.** Each Lender acknowledges that it shall, independently and without reliance upon Agent, any Lender or any of their Related Persons or upon any document solely or in part because such document was transmitted by Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Loan Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate. Except for documents expressly required by any Loan Document to be transmitted by Agent to the Lenders, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, Property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of any Loan Party that may come in to the possession of Agent or any of its Related Persons. Each Lender agrees that it shall not rely on any field examination, audit or other report provided by Agent or its Related Persons (each, an "**Agent Report**"). Each Lender further acknowledges that any Agent Report (a) may be provided to the Lenders solely as a courtesy, without consideration, and based upon the understanding that such Lender will not rely on such Agent Report, (b) was prepared by Agent or its Related Persons based upon information provided by the Loan Parties solely for Agent's own internal use, and (c) may not be complete and may not reflect all information and findings obtained by Agent or its Related Persons regarding the operations and condition of the Loan Parties. Neither Agent nor any of its Related Persons makes any representations or warranties of any kind with respect to (i) any existing or proposed financing, (ii) the accuracy or completeness of the information contained in any Agent Report or in any related documentation, (iii) the scope or adequacy of Agent's and its Related Persons' due diligence, or the presence or absence of any errors or omissions contained in any Agent Report or in any

85

ActiveUS 165810955v.1
KE 50036055.42

related documentation, or (iv) any work performed by Agent or Agent's Related Persons in connection with or using any Agent Report or any related documentation. Neither Agent nor any of its Related Persons shall have any duties or obligations in connection with or as a result of any Lender receiving a copy of any Agent Report. Without limiting the generality of the forgoing, neither Agent nor any of its Related Persons shall have any responsibility for the accuracy or completeness of any Agent Report, or the appropriateness of any Agent Report for any Lender's purposes, and shall have no duty or responsibility to correct or update any Agent Report or any discussion or disclose to any Lender any other information not embodied in any Agent Report, including any supplemental information obtained after the date of any Agent Report. Each Lender releases, and agrees that it will not assert, any claim against Agent or its Related Persons that in any way relates to any Agent Report or arises out of any Lender having access to any Agent Report or any discussion of its contents, and agrees to indemnify and hold harmless Agent and its Related Persons from all claims, liabilities and expenses relating to a breach by any Lender arising out of such Lender's access to any Agent Report or any discussion of its contents.

**SECTION 12.06. Indemnification.** Each Lender agrees to reimburse Agent and each of its Related Persons (to the extent not timely reimbursed by any Loan Party) promptly upon demand for its Pro Rata Share of any out-of-pocket costs and expenses (including, without limitation, fees, charges and disbursements of financial, legal and other advisors and any taxes or insurance paid in the name of, or on behalf of, any Loan Party) incurred by Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, amendment, consent, waiver or enforcement of, or the taking of any other action (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding (including, without limitation, preparation for and/or response to any subpoena or request for document production relating thereto) or otherwise) in respect of, or legal advice with respect to, its rights or responsibilities under, any Loan Document. Each Lender further agrees to indemnify and hold harmless Agent and each of its Related Persons (to the extent not timely reimbursed by any Loan Party), ratably according to its Pro Rata Share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, to the extent not indemnified by the applicable Lender, taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to or for the account of any Lender) that may be imposed on, incurred by, or asserted against Agent or any of its Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by Agent or any of its Related Persons under or with respect to the foregoing; *provided* that no Lender shall be liable to Agent or any of its Related Persons under this Section 12.06 to the extent such liability has resulted from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Person, as determined by a final non-appealable judgment of a court of competent jurisdiction. To the extent required by any applicable Law, Agent may withhold from any payment to any Lender under a Loan Document an amount equal to any applicable withholding tax. If the IRS or any other Governmental Authority asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason, or if Agent reasonably determines that it was required to withhold taxes from a prior payment to or for the account of any Lender but failed to do so,

86

ActiveUS 165810955v.1
KE 50036055.42

FIG00003910

such Lender shall promptly indemnify Agent fully for all amounts paid, directly or indirectly, by Agent as tax or otherwise, including penalties and interest, and together with all expenses incurred by Agent. Agent may offset against any payment to any Lender under a Loan Document, any applicable withholding tax that was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which Agent is entitled to indemnification from such Lender under the immediately preceding sentence of this Section 12.06. This Section 12.06 shall survive the Tranche B Commitment Termination Date, the Tranche C Commitment Termination Date, each Maturity Date and any resignation of Agent.

SECTION 12.07.  Successor Agent.  Agent may resign at any time by delivering notice of such resignation to the Lenders and Borrower or may be replaced as Agent by the Lenders at the direction of the Requisite Lenders upon ten (10) Business Days' (or such longer time period as agreed to by the Requisite Lenders and Agent) prior written notice to Agent, the other Lenders and Borrower, in each case, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective, in accordance with the terms of this Section 12.07.  If Agent resigns or is replaced under this Agreement, the Requisite Lenders shall have the right to appoint a successor Agent.  If, after 30 days after the date of the retiring Agent's notice of resignation, no successor Agent has been appointed by the Requisite Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders.  Effective immediately upon its resignation or replacement, (a) the retiring or replaced Agent shall be discharged from its duties and obligations under the Loan Documents, (b) the Lenders shall assume and perform all of the duties of Agent until a successor Agent shall have accepted a valid appointment hereunder, (c) the retiring or replaced Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than the provisions of this Article XII and Section 13.02 shall continue in effect for the benefit of such retiring or replaced Agent and its Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or replaced Agent was acting as Agent hereunder, (d) the retiring or replaced Agent shall be paid any and all fees and expenses due and owing the retiring or replaced Agent, whether under the terms of this Agreement or any other Loan Document, and (e) subject to its rights under Section 12.02(b), the retiring or replaced Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents. Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring or replaced Agent under the Loan Documents.

SECTION 12.08.  Release of Collateral. Each Lender hereby consents to the release and hereby directs Agent to release (or in the case of clause (b)(ii) below, release or subordinate) the following:

(a)      any Guarantor if all of the Stock of such Subsidiary owned by any Loan Party is sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a valid waiver or consent), to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to any Loan Document; and

ActiveUS 165810955v.1
KE 50036055.42

FIG00003911

(b)    any Lien held by Agent for the benefit of the Lenders on (i) any Collateral that is sold or otherwise disposed of by a Loan Party in a transaction expressly permitted by the Loan Documents (including pursuant to a valid waiver or consent) and (ii) all of the Collateral when both (A) all outstanding Term Loan Commitments have been terminated and all of the Obligations (including, without limitation, any End of Term Fee and any Applicable Prepayment Premium, but excluding any inchoate indemnity obligations and any obligations that by their terms survive the termination of this Agreement and the other Loan Documents) have been paid in full in cash and (B) Agent and the Lenders have received liability releases from the Loan Parties in form and substance reasonably acceptable to Agent and the Requisite Lenders from their obligations under the Loan Documents.

Upon request by Agent at any time, the Requisite Lenders will confirm Agent's authority to release its interest in any particular item of Collateral pursuant to this <u>Section 12.08</u>.

**SECTION 12.09.  Sharing of Payments**. Any Lender exercising a right of setoff or otherwise receiving any payment on account of the Obligations of any Tranche in excess of its Pro Rata Share of such Tranche shall purchase for cash (and the other Lenders of such Tranche shall sell) such participations in each such other Lender's or holder's Pro Rata Share of the Obligations of such Tranche as would be necessary to cause such Lender to share the amount so offset or otherwise received with each other Lender of such Tranche in accordance with their respective Pro Rata Shares of the Obligations of such Tranche. Each Loan Party agrees, to the fullest extent permitted by applicable Law, that any Lender so purchasing a participation in the Term Loans made or other Obligations held by other Lenders of any Tranche may exercise all rights of setoff, bankers' lien, counterclaim or similar rights with respect to such participation as fully as if such Lender or holder were a direct holder of the Term Loans and the other Obligations of such Tranche in the amount of such participation. Notwithstanding the foregoing, if all or any portion of the offset amount or payment otherwise received is thereafter recovered from the Lender that has exercised the right of setoff, the purchase of participations by that Lender shall be rescinded and the purchase price restored without interest.

**SECTION 12.10.  Proofs of Claim.** The Lenders hereby agree that after the occurrence of an Event of Default pursuant to <u>Section 9.07</u> in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition, or other judicial proceeding relative to Lenders, Agent (irrespective of whether the principal of the Term Loans shall be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Agent shall have made any demand on Lenders) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Term Loans and any other Obligations that are owing and unpaid and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Lenders and Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, Agent, and their agents and counsel and all other amounts due to the Lenders and Agent) allowed in such judicial proceeding;

(b)    to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same; and

88

FIG00003912

(c)    and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Agent and, in the event that Agent shall consent to the making of such payments directly to Lenders, to pay to Agent any amount due for the compensation, expenses, disbursements and advances of Agent and their agents and counsel, and any other amounts due to Agent. Nothing herein contained shall be deemed to authorize Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize Agent to vote in respect of the claim of any Lender in any such proceeding. Further, nothing contained in this Section 12.10 shall affect or preclude the ability of any Lender to (i) file and prove such a claim in the event that Agent has not acted within ten (10) days prior to any applicable bar date and (ii) require an amendment of the proof of claim to accurately reflect such Lender's outstanding Obligations.

### SECTION 12.11.  Advances; Payments; Actions in Concert.

(a)    **Advances; Payments.** If Agent receives any payment with respect to a Term Loan of any Tranche for the account of the Lenders of such Tranche on or prior to 3:00 p.m. (New York City time) on any Business Day, Agent shall pay to each applicable Lender such Lender's Pro Rata Share (with respect to such Tranche) of such payment on such Business Day. If Agent receives any payment with respect to a Term Loan of any Tranche for the account of the Lenders of such Tranche after 3:00 p.m. (New York City time) on any Business Day, Agent shall pay to each applicable Lender such Lender's Pro Rata Share (with respect to such Tranche) of such payment on the next Business Day.

(b)    **Return of Payments.**

(i)    If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from a Loan Party and such related payment is not received by Agent, then Agent will be entitled to recover such amount (including interest accruing on such amount at the rate otherwise applicable to such Obligation) from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)    If Agent determines at any time that any amount received by Agent under any Loan Document must be returned to a Loan Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of any Loan Document, Agent will not be required to distribute any portion thereof to any Lender. In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to a Loan Party or such other Person, without setoff, counterclaim or deduction of any kind and Agent will be entitled to set off against future distributions to such Lender any such amounts (with interest) that are not repaid on demand.

(c)    **Actions in Concert.** Anything in this Agreement or any other Loan Document to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender

89

          FIG00003913

shall take any action to protect or enforce its rights arising out of any Loan Document (including exercising any rights of setoff) without first obtaining the prior written consent of the Requisite Lenders, it being the intent of Lenders that any such action to protect or enforce rights under any Loan Document shall be taken in concert and at the direction or with the consent of the Requisite Lenders.

## ARTICLE XIII. GOVERNING LAW. SUBMISSION TO JURISDICTION. JURY TRIAL WAIVER. AND JUDICIAL REFERENCE

**SECTION 13.01. Governing Law; Submission to Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its rules of conflict of law, except Section 5-1401 of the New York General Obligations Law. Borrower hereby irrevocably submits to the exclusive jurisdiction of any New York State or Federal court sitting in the County of New York over any suit, action or proceeding arising out of or relating to this Agreement or any Loan Document, and Borrower hereby agrees and consents that, in addition to any methods of service of process provided for under applicable Law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in the County of New York may be made by certified or registered mail, return receipt requested, or overnight mail with a reputable national carrier, directed to Borrower at the address indicated above, and service so made shall be complete five (5) days after the same shall have been so mailed (one day in the case of an overnight mail service).

**SECTION 13.02. Jury Trial Waiver.** EACH OF THE LOAN PARTIES, AGENT AND THE LENDERS HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS OR TRANSACTION DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH LOAN PARTY, AGENT AND EACH LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. THE LOAN PARTIES, AGENT AND THE LENDERS ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

**SECTION 13.03. Additional Waivers in the Event of Enforcement.** EACH LOAN PARTY HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY OR ON BEHALF OF AGENT OR ANY LENDER UNDER THIS AGREEMENT, ANY AND EVERY RIGHT SUCH LOAN PARTY MAY HAVE TO (A) INJUNCTIVE RELIEF; AND (B) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING. NOTHING HEREIN CONTAINED SHALL PREVENT OR PROHIBIT GUARANTOR FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST AGENT OR ANY LENDER WITH RESPECT TO ANY ASSERTED CLAIM.

90

ActiveUS 165810955v.1
KE 50036055.42

FIG00003914

ARTICLE XIV. **GENERAL PROVISIONS**

**SECTION 14.01. Successors and Assigns.** The Loan Documents shall be binding upon and inure to the benefit of the successors and assigns of the parties; *provided, however,* that no Loan Party may assign or transfer its interest hereunder or thereunder. Each Lender reserves the right to sell, assign, Transfer, negotiate or grant participations in all or any part of, or any interest in, such Lender's rights and benefits under each of the Loan Documents (the "**Applicable Loan Interests**") (other than the Warrant, as to which assignment, Transfer and other such actions are governed by the terms of the Warrant), in each case without any consent of, or notice to, Borrower; *provided* that, except in connection with an Affiliate Transfer, any such sale, assignment, Transfer, negotiation or participation of any Lender's Applicable Loan Interests shall also effect the sale, assignment, Transfer, negotiation or participation, as the case may be, of a proportional share of such Lender's, or if applicable any Lender Affiliate's or any successor of any Lender Affiliate's, Class B Member Interests (as defined in the Borrower Operating Agreement) in Borrower (the "**Applicable Class B Interests**"), subject to the terms and conditions of the Borrower Operating Agreement. For purposes hereof, an "**Affiliate Transfer**" means a sale, assignment, Transfer, negotiation or participation of any Lender's Applicable Loan Interests to an Affiliate of such Lender, provided that such Affiliate and such Lender have irrevocably agreed, as a condition to such sale, assignment, Transfer, negotiation or participation, that each of such Lender and such Affiliate may enter into a further sale, assignment, Transfer, negotiation or participation of such Applicable Loan Interests only if such further transaction is effective to vest such Applicable Loan Interests and the Applicable Class B Interests corresponding thereto in a single Person or in one or more Affiliates of such Person. Each such assignment shall (i) be accompanied by delivery to Agent of a duly executed assignment agreement substantially in the form attached hereto as Exhibit I (an "**Assignment Agreement**"), (ii) be accompanied by payment to Agent of an assignment fee of $3,500 (unless (x) such assignment is from a Lender to any of its Affiliates or an Approved Fund or (y) otherwise agreed by Agent in its sole discretion) and (iii) be recorded in the Register, and each such participation shall be recorded in the Participant Register. With respect to participations, Borrower agrees that each participant shall be entitled to the provisions of Section 2.03, subject to the requirements and limitations therein (it being understood that any documentation required under Section 2.03(e) shall be delivered to Agent), to the same extent as if it had acquired its interest by assignment. Notwithstanding anything herein or in any other Loan Document to the contrary, the failure of any Lender to execute an Assignment Agreement shall not render an assignment to such Lender invalid and such assignment shall be recorded in the Register.

**SECTION 14.02. Costs and Expenses; Indemnification.**

(a) **Agent Expenses; Lender Expenses.** Parent shall pay, or cause Borrower to pay, from time to time upon request by Agent, (i) to Agent, the Agent Expenses and (ii) to Agent for the account of each applicable Lender, the Lender Expenses.

(b) **Indemnification by Borrower.** Each Loan Party shall jointly and severally indemnify Agent, each Lender, the Observer and each of their respective Related Parties (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the Agent Expenses and the Lender Expenses), and shall indemnify and hold harmless each Indemnitee

91

FIG00003915

from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Loan Party) other than such Indemnitee and its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other Loan Documents; (ii) any Term Loan or other extension of credit or the use or proposed use of the proceeds therefrom; (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by Parent or any of its Subsidiaries, or any Environmental Liability related in any way to Parent or any of its Subsidiaries; or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee; or (y) result from a claim brought by any Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. Without limiting the provisions of Section 2.03(c), this Section 14.02(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)     **Waiver of Consequential Damages, Etc.** To the fullest extent permitted by applicable Law, each Loan Party agrees that it shall not assert, and each Loan Party hereby waives, and acknowledges that no other Person shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Term Loan or other extension of credit or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with any Loan Document or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction. No Loan Party shall have any liability for any special, punitive, indirect or consequential damages relating to the Loan Documents or arising out of its activities in connection with any Loan Document.

(d)     **Payments.** Except as otherwise provided in this Agreement, all amounts due under this Section shall be payable not later than ten (10) Business Days following demand therefor.

92

FORTRESS HIGHLY CONFIDENTIAL                                                      FIG00003916

(e)     **Survival.** The agreements and indemnity provisions in this Section shall survive the repayment, satisfaction or discharge of all the other Obligations.

**SECTION 14.03.  Time of Essence.** Time is of the essence for the performance of all Obligations in this Agreement.

**SECTION 14.04.  Severability of Provisions.** If any provision of any Loan Document is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of the Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**SECTION 14.05.  Amendments in Writing; Waiver; Integration.**

(a)     No purported amendment or modification of any Loan Document, or waiver, discharge or termination of any obligation under any Loan Document, shall be enforceable or admissible unless, and only to the extent, expressly set forth in a writing signed by Agent, the Requisite Lenders (or by Agent with the consent of the Requisite Lenders) and Borrower; *provided* that no such amendment, modification, waiver, discharge or termination shall, unless in writing and signed by all Lenders directly affected thereby (or by Agent with the consent of all Lenders directly affected thereby), in addition to Agent, the Requisite Lenders (or by Agent with the consent of Requisite Lenders) and Borrower, do any of the following: (i) increase the amount of, or extend the term of, any Term Loan Commitment of any Tranche (which increase or extension shall be deemed to directly affect all Lenders of such Tranche) (it being understood that a waiver of any condition precedent set forth in Article III or the making of any Protective Advance shall not constitute an extension or increase of any Term Loan Commitment of any Tranche), (ii) reduce the principal of or rate of interest on (other than waiving the imposition of the Default Rate) any Term Loan or reduce the amount of any fees (including any End of Term Fee), premiums (including any Applicable Prepayment Premium) or other amounts payable under any Loan Document, (iii) postpone the date fixed for or reduce or waive any scheduled installment of principal or any payment of interest, fees (including any End of Term Fee), premiums (including any Applicable Prepayment Premium) or other amounts due to any Lender under the Loan Documents, (iv) release or subordinate the Liens on all or substantially all of the Collateral, or consent to a transfer of all or substantially all of the property of the Loan Parties or their Subsidiaries, in each case, except as otherwise may be provided in any Loan Document (which shall be deemed to affect all Lenders), (v) release any Loan Party from, or consent to any Loan Party's assignment or delegation of, such Loan Party's obligations under the Loan Documents (which shall be deemed to affect all Lenders), except as otherwise may be provided in any Loan Document, (vi) amend, modify, terminate or waive any provision of Section 10.04, Section 12.09 or any other provision providing for the pro rata sharing of payments, or (vii) amend or modify any provision of this Section 14.05, the definition of "Requisite Lenders" or any other provision specifying the number or percentage of Lenders required to amend, waiver, or otherwise modify any rights hereunder or under any other Loan Documents, or any provision providing for the consent or other action or determination by all Lenders.

93

(b)     Notwithstanding any provision in this Section 14.05 to the contrary, (i) no amendment, modification, termination or waiver affecting or modifying the rights or obligations of Agent under any Loan Document shall be effective unless signed by Borrower, Agent and the Requisite Lenders (or by Agent with the consent of the Requisite Lenders) and (ii) Agent (acting at the direction of the Requisite Lenders), the Requisite Lenders and Borrower may amend or modify any Loan Document to (A) grant a new Lien, extend an existing Lien over additional property or join additional Persons as Loan Parties, in each case for the benefit of the Lenders, and (B) correct any obvious mistake, error, omission or ambiguity.

(c)     Without limiting the generality of the foregoing, no oral promise or statement, or any action, inaction, delay, failure to require performance or course of conduct shall operate as, or evidence, an amendment, supplement or waiver or have any other effect on any Loan Document. Any waiver granted shall be limited to the specific circumstance expressly described in it, and shall not apply to any subsequent or other circumstance, whether similar or dissimilar, or give rise to, or evidence, any obligation or commitment to grant any further waiver.

(d)     The Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of the Loan Documents merge into the Loan Documents.

**SECTION 14.06. Counterparts.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement.

**SECTION 14.07. Survival; Termination.** All covenants, representations and warranties made in this Agreement shall continue in full force until this Agreement has terminated.  Notwithstanding the provisions of Section 14.05(a) and (b), this Agreement shall terminate with respect to all Obligations (other than inchoate indemnity obligations and any other obligations which, by their terms, are to survive the termination of this Agreement and the other Loan Documents) when both (i) all outstanding Term Loan Commitments have been terminated and all of such Obligations (including, without limitation, any End of Term Fee and any Applicable Prepayment Premium) have been paid in full in cash and (ii) Agent and the Lenders have received liability releases from the Loan Parties in form and substance reasonably acceptable to Agent and the Requisite Lenders from their obligations under the Loan Documents.

**SECTION 14.08. Confidentiality.**

(a)     Each of Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or

94

ActiveUS 165810955v.1
KE 50036055.42

FIG00003918

under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or participant in, or any prospective assignee of or participant in, any of its rights and obligations under this Agreement; (g) on a confidential basis to (x) any rating agency in connection with rating any Loan Party or its Subsidiaries or the credit facilities provided hereunder; or (y) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder; (h) with the consent of Borrower; or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section; or (y) becomes available to such Person on a nonconfidential basis from a source other than Borrower. In addition to the foregoing, each of Agent and the Lenders agrees to comply with the confidentiality requirements of any license or other agreement relating to any Patents with respect to any such agreement set forth on the Disclosure Schedules, provided that Borrower shall deliver to Agent a true and correct copy of each such agreement and, in connection therewith, inform Agent of the confidentiality provisions thereof with which Agent and the Lenders shall comply.

For purposes of this Section, "**Information**" means all information received from Borrower, Parent or any of its Subsidiaries or Borrower's, Parent's or any such Subsidiary's directors, officers, employees, trustees, investment advisors or agents, including accountants and legal counsel relating to Borrower, Parent or any such Subsidiary or any of their respective businesses, other than any such information that is available to Agent or any Lender on a nonconfidential basis prior to disclosure by Borrower or any such Subsidiary. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information but in no event less than reasonable care.

(b)     Each of Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning Borrower or a Subsidiary of Borrower, as the case may be; (b) it has developed compliance procedures regarding the use of material non-public information; and (c) it will handle such material non-public information in accordance with applicable Laws, including all securities Laws.

(c)     Unless required under applicable Law, regulatory authority or legal process, Borrower shall not make any public announcement or similar publicity (including, for the avoidance of doubt, press releases) related to this Agreement or the transactions contemplated herein without the prior written consent of Agent.

**SECTION 14.09. Electronic Execution of Documents.** The words "**execution**," "**signed**," "**signature**" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable Law, including any state Law based on the Uniform Electronic Transactions Act.

95

**SECTION 14.10. Register.** Agent shall, acting solely for this purpose as a nonfiduciary agent of Borrower, maintain a copy of each Transfer of an interest in the Notes by a Lender delivered to Agent and a register for the recordation of the names and addresses of Lenders and principal amounts (and stated interest) of the Term Loans owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and each of Borrower, Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice provided to Agent. No assignment shall be effective unless recorded in the Register. This Section 14.10 and Section 14.11 shall be construed so that the Notes are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and the Notes shall be treated by the parties hereto as such.

**SECTION 14.11. Participant Register.** Each Lender that shall have granted a participation in all or any part of such Lender's rights and benefits under the Loan Documents shall, acting solely for this purpose as a nonfiduciary agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Notes (the "**Participant Register**"); *provided* that such Lender shall not have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in the Notes) to any Person except to the extent that such disclosure is necessary to establish in connection with a Tax audit that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations or, if different, under Sections 871(h) or 881(c) of the Code.

**SECTION 14.12. Captions.** The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

**SECTION 14.13. Construction of Agreement.** The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement. In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**SECTION 14.14. Relationship; Corporate Opportunities, Etc.**

(a)     The relationship between the parties to this Agreement is determined solely by the provisions of this Agreement. The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

(b)     Except as Agent and Parent may mutually agree in writing, if a Fortress Person (including but not limited to a Fortress Person that is a director, manager or officer of any Parent Entity) acquires knowledge of a potential transaction or matter that may be a corporate opportunity for any Fortress Person, none of the Parent Entities (or any member thereof, other than a Fortress Person) shall have an interest in, or expectation that, such corporate opportunity be offered to it or that it be offered an opportunity to participate therein, and any such interest,

96

ActiveUS 165810955v.1
KE 50036055.42

FIG00003920

expectation, offer or opportunity to participate, and any other interest or expectation otherwise due to the Parent Entities with respect to such corporate opportunity, is hereby renounced by Parent on its behalf and on behalf of the other Parent Entities (or any member thereof, other than a Fortress Person). Accordingly, except as any applicable Fortress Person may otherwise agree in writing, (i) none of the Fortress Persons will be under any obligation to present, communicate or offer any such corporate opportunity to the Parent Entities and (ii) the Fortress Persons shall have the right to hold any such corporate opportunity for their own or any other Fortress Person's account, or to direct, recommend, sell, assign or otherwise transfer such corporate opportunity to any Person or Persons other than the Parent Entities, and, to the fullest extent permitted by law, the Fortress Persons shall not have or be under any fiduciary duty, duty of loyalty or duty to act in good faith or in the best interests of any of the Parent Entities (or any member thereof, other than a Fortress Person) and shall not be liable to any Parent Entities (or any member thereof, other than a Fortress Person) for any breach or alleged breach thereof or for any derivation of personal economic gain by reason of the fact that any Fortress Person pursues or acquires the corporate opportunity for itself or any other Fortress Person, or directs, recommends, sells, assigns or otherwise transfers the corporate opportunity to another Person, or any Fortress Person does not present, offer or communicate information regarding the corporate opportunity to the Parent Entities or preserve such corporate opportunity for the Parent Entities. For purposes of this Section 14.14(b), the term "corporate opportunity" shall include, but not be limited to, business opportunities which any Parent Entity is financially able to undertake, which are, from their nature, in the line of such Parent Entity's business, are of practical advantage to it and are ones in which such Parent Entity has an interest or a reasonable expectancy, and in which, by embracing the opportunities, the self-interest of the Fortress Persons will be brought into conflict with that of such Parent Entity.

**SECTION 14.15. Third Parties.** Nothing in this Agreement, whether express or implied, is intended to (a) confer any benefits, rights or remedies under or by reason of this Agreement on any Persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any Person not an express party to this Agreement; or (c) give any Person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

**SECTION 14.16. Payments Set Aside.** To the extent that any payment applied to any Obligation (including any payment by way of setoff) is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the Obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**SECTION 14.17. Right of Setoff.** If an Event of Default has occurred and is continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any of its Affiliates to or for the credit or the account of Borrower against any and all of the Obligations, irrespective of whether Agent or such Lender has made demand under any Loan Document. Each Lender's

ActiveUS 165810955v.1
KE 50036055.42

FORTRESS HIGHLY CONFIDENTIAL

FIG00003921

rights under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have. Each Lender shall endeavor to notify Agent, and Agent shall endeavor to notify Borrower, promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

**SECTION 14.18. Interest Rate Limitation.** Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**") If Agent or any Lender receives interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the applicable Term Loan or, if it exceeds such unpaid principal, refunded to Borrower. In determining whether the interest contracted for, charged, or received by Agent or any Lender exceeds the Maximum Rate, Agent may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations.

**SECTION 14.19. Securitization of Loans.** Each of Borrower and Parent hereby acknowledges that any Lender and its Affiliates may sell or securitize any Term Loan (a "**Securitization**") through the pledge of such Term Loan as collateral security for loans to such Lender or its Affiliates or through the sale of such Term Loan or the issuance of direct or indirect interests in such Term Loan; *provided* that, except in connection with an Affiliate Transfer, any such pledge or sale of such Applicable Loan Interests by a Lender shall also effect the transfer of a proportional share of such Lender's Applicable Class B Interests. Each of Borrower and Parent shall cooperate with such Lender and its Affiliates to effect the Securitization including, without limitation, by (i) amending this Agreement and the other Loan Documents, and executing such additional documents, as reasonably requested by such Lender in connection with the Securitization; *provided* that (A) any such amendment or additional documentation shall not impose material additional costs on Borrower or Parent and (B) any such amendment or additional documentation shall not materially adversely affect the rights, or materially increase the obligations, of Borrower or Parent under the Loan Documents or change or affect in a manner adverse to Borrower and Parent the financial terms of the Term Loans; (ii) providing such information as may be reasonably requested by Agent on behalf of such Lender in connection with the rating of the Term Loans or the Securitization; and (iii) providing in connection with any rating of the Term Loans a certificate (A) agreeing to indemnify each of such Lender and its Affiliates, any Rating Agencies rating the Term Loans, or any party providing credit support or otherwise participating in the Securitization (collectively, the "**Securitization Parties**") for any losses, claims, damages or "liabilities" (the "**Liabilities**") to which such Lender, its Affiliates or such Securitization Parties may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact by Borrower or any Affiliate of Borrower contained in any Loan Document or in any writing delivered by or on behalf of Borrower or any Affiliate of Borrower to the Lenders in connection with any Loan Document or arise out of or are based upon the omission or alleged omission by Borrower or any Affiliate of Borrower to state therein a material fact required to be stated therein, or necessary in order to make the statements therein, in light of the circumstances

98

ActiveUS 165810955v.1
KE 50036055.42

FIG00003922

under which they were made, not misleading, and such indemnity shall survive any transfer by any Lender or its successors or assigns of the Term Loans and (B) agreeing to reimburse each Lender and its Affiliates for any legal or other expenses reasonably incurred by such Persons in connection with defending the Liabilities.

[This space intentionally left blank]

ActiveUS 165810955v.1
KE 50036055.42

FORTRESS HIGHLY CONFIDENTIAL

FIG00003923

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Closing Date.

BORROWER:

THERANOS IP COMPANY, LLC

By: THERANOS, INC., its Manager

By: _____

Name:  Philippe Poux

Title:  Interim CFO

PARENT:

THERANOS, INC.

By: _____

Name:  Philippe Poux

Title:  Interim CFO

*[Signature page to Credit Agreement]*

AGENT:

FORTRESS CREDIT CORP.

By:_____

Name:   Constantine M. Dakolias

Title:   President

*[Signature page to Credit Agreement]*

FIG00003925

LENDERS:

FORTRESS CREDIT CORP.

By: _____

Name: Constantine M. Dakolias

Title: President

*[Signature page to Credit Agreement]*

# EXHIBIT D

# FORTRESS CREDIT CORP

## INVESTMENT MEMORANDUM

| | |
|---|---|
| **To:** | Investment Committee |
| **From:** | Intellectual Property and Finance Group |
| **Date:** | December 2, 2017 |
| **Re:** | **Theranos, Inc. $100.0 million Delayed Draw Senior Secured Term Loan** |

---

| | |
|---|---|
| **Borrower:** | A newly created Special Purpose Vehicle (the "**Borrower**") formed for the purposes of acquiring all Patents and Patent Rights assigned or owned by Theranos, Inc. |
| **Lender and Agent:** | Fortress Credit Corp., for itself and/or as agent on behalf of one or more of its affiliates or assignees (the "**Lender**"). |
| **Guarantor:** | Theranos, Inc. (the "**Theranos**" or "**Company**") |
| **Term Loan:** | $100 million senior secured delayed draw term loan (the "**Term Loan**"). The Term Loan is broken up into three tranches (individually referred to as "**Loans**") that rank pari passu and are available as follows: |

- **Tranche A**: $65 million drawn on the Closing Date;
- **Tranche B**: $10 million available upon the earlier of (i) FDA EUA approval of Theranos's Zika application or (ii) FDA legal marketing authorization (i.e., 510(k), de novo, PMA, or BLA) for commercial distribution of Theranos's Zika IVD assay (expires 15 months after the Closing Date); and
- **Tranche C**: $25 million available subject to each of (i) certification of Theranos's quality system compliance to International Organization for Standardization (ISO) 13485:2016; (ii) Theranos's evidence of registration with FDA as a medical device establishment and successful establishment inspection of the Company's Quality System with no FDA Form 483 observations, if applicable; (iii) a term sheet executed with one or more investors for a financing of at least $50 million in equity of Theranos or convertible debt; and (iv) CE marking of an infectious disease, cardiac or diabetes-related (to be agreed) in vitro diagnostic test for use with Theranos's miniLab system (expires 24 months after the Closing Date).

In addition to Tranche A, B and C Loans, the definition of Term Loan includes Protective Advances. "**Protective Advance**" means a term loan made to Borrower from time to time after an Event of Default that, in the sole discretion of Agent, is necessary or desirable (a) to maintain, protect or preserve the Collateral and/or Agents' and the Lenders' rights under the Loan Documents or is otherwise made for the benefit of Agent and the Lenders; (b) to enhance the likelihood of, or to maximize the amount of, the repayment of any Obligation; (c) to pay any other amount chargeable to any Loan Party hereunder or (d) to enhance the value of, or monetize, the Borrower's Patents and Patent Rights.

| | |
|---|---|
| **Maturity Date:** | Each outstanding Loan shall become due and payable 42 months from the Funding Date of such Loan. |
| **Interest:** | 1-month LIBOR + 11.00% per annum, subject to a floor of 2.0% on 1-month LIBOR, of which 8.0% per annum will be paid in kind, accruing monthly, and the balance will be paid monthly in arrears. For any period when an Event of Default shall occur and be continuing, the interest |

1



FIG00003294

|  | rate shall be 1-month LIBOR + 13.0% per annum, subject to a floor of 2.0% on 1-month LIBOR. |
|---|---|

**Upfront Fee:** 5.0% of each Loan funded, provided that the Upfront Fee shall be due and payable at the time of each draw and only in an amount equal to 5.0% of the applicable draw. Lender may fund each Loan net of the applicable Upfront Fee.

**Final Payment Fee:** 7.5% of each Loan funded, provided that the Final Payment Fee shall be payable upon the repayment of the Term Loan in full (whether at maturity or otherwise).

**Scheduled Amortization:**

- <u>Tranche A</u>: Twenty-one (21) monthly amortizing payments starting twenty-one (21) months after the Funding Date. The first three (3) payments shall be $325,000 each, followed by nine (9) payments of $1.3 million each and then nine (9) remaining payments of $3.25 million each.
- <u>Tranche B</u>: Twenty-one (21) monthly amortizing payments starting twenty-one (21) months after the Funding Date. The first three (3) payments shall be $50,000 each, followed by nine (9) payments of $200,000 each and then nine (9) remaining payments of $500,000 each.
- <u>Tranche C</u>: Twenty-one (21) monthly amortizing payments starting twenty-one (21) months after the Funding Date. The first three (3) payments shall be $125,000 each, followed by nine (9) payments of $500,000 each and then nine (9) remaining payments of $1.25 million each.

**Collateral:** The Term Loan will be a senior secured debt obligation of the Borrower and will rank contractually senior to all current and future debt of the Borrower. The Lender will have a perfected first lien security interest on all assets of the Borrower and of each guarantor including, without limitation, patents and patent applications (see Special Purpose Vehicle Structure clause below) and the capital stock of all wholly-owned subsidiaries of the Borrower and each guarantor.

**Special Purpose Vehicle:** As part of the Transaction, all Patents and Patent Rights assigned or owned by the Company, shall be sold to a newly formed Special Purpose Vehicle (the "SPV") whose equity will initially be 99.8% owned by the Lender and 0.2% owned by the Company. Upon the repayment of the Term Loan, assuming no event of default has occurred and is continuing, the Company shall automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 99.8% by the Company and 0.2% owned by the Lender (and the operating agreement of the SPV shall permit and contemplate such equity issuance).

However, if an event of default has occurred and is continuing and the Lender elects to monetize the SPV's assets, any proceeds received by the SPV or the Company from the monetization of the SPV's assets, including its intellectual property (the "Gross Proceeds") shall be applied as follows:

- First, to repay all outstanding Term Loans and all other obligations under the Term Loan (including accrued and unpaid interest)
- Second, in accordance with the Lender's on the one hand, and the Company's on the other hand, share of the equity in the SPV, which shall automatically be adjusted as follows:
  - Lender will own 99.8% of the equity in the SPV until it receives a multiple of 2.50x on the Term Loan Amount (as defined below);
  - Once Lender has received a multiple of 2.50x on the Term Loan Amount, the SPV will automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 50.0% by the Company and 50.0% owned by the Lender; and
  - Once Lender has received a multiple of 3.00x on the Term Loan Amount, the SPV will automatically issue additional equity to the Company such that after giving

2

effect to such issuance, the SPV is owned 99.8% by the Company and 0.2% owned by the Lender.

"**Term Loan Amount**" shall mean aggregate amount of all advances made under the Term Loan (including any interest paid-in-kind) and any Protective Advances.

The Company will enter into an agreement with the SPV that shall grant the Company a non-exclusive license to use the Patents and Patent Rights.

For the avoidance of doubt, during the term of the Term Loan, provided no event of default has occurred and is continuing, any action to enforce, license or encumber the patents in the SPV and any bankruptcy filing can only be done by unanimous consent of the Company and the Lender (and after an event of default has occurred and is continuing, any such actions will be controlled and directed by the Lender).

| | |
|---|---|
| **Events of Default:** | The Term Loan documents will contain events of default customarily found in loan agreements for similar financings (with customary grace periods for certain events of default). |
| | Upon the occurrence and during the continuance of an event of default, the ownership structure of the SPV will not change; however, Fortress shall have sole control over the monetization of the SPV's assets. |
| **Permitted Uses:** | General working capital needs of the Company and its subsidiaries, including transaction-related expenses, settlement costs for legal matters open as of the Closing Date (not to exceed a cap of $40 million), $1.4 million allocated per year to patent prosecution and maintenance and $2.5 million allocated over the term of the Term Loan to patent development and enhancement (collectively, the "**Permitted Uses**"). |
| **Mandatory Amortization:** | Net cash proceeds from asset sales (other than the sale of Intellectual Property) in excess of $5 million in aggregate, shall, in each case, be used to reduce the outstanding amount of the Term Loan, first to retire Tranche A, then Tranche B and then the Tranche C. |
| | Net cash proceeds from the sale of Intellectual Property or the monetization of Intellectual Property, shall, in each case, be used to reduce the outstanding amount of the Term Loan, first to retire Tranche A, then Tranche B and then the Tranche C. |
| **Prepayment Premium:** | As a result of a prepayment (for any reason other than mandatory amortization, including as a result of acceleration of the Term Loans or a bankruptcy) by or on behalf of the Company of all or a portion of the outstanding Term Loan, the following premiums shall apply with respect to the payment of such Loans: 5% in months 1-12 after the Closing Date, 3.5% in months 13-24, and no premium thereafter. |
| **Warrants:** | Company to grant the Lender detachable penny warrants for the Company's next or last series of Preferred Stock in an amount equivalent to 4.0% of the Company's outstanding shares on a fully-diluted basis at the time of exercise. |
| **Board Observer:** | The Lender shall have the right to appoint a board observer during the term of the Term Loan, subject to such observer entering into a mutually agreeable confidentiality agreement with the Company. |
| **Covenants:** | Customary for this type of transaction, including, without limitation, limitation on asset sales, mergers, and future acquisitions, etc., in each case with the Lender's prior written consent. Company will provide Lender with customary financial reporting, as well as such other reports as Lender may reasonably require. |
| **Operational Covenants:** | Customary for this type of transaction, but including, without limitation the following: |
| | • <u>Minimum Liquidity</u>: The Company shall have a minimum of $3,000,000 of unrestricted cash on which Agent at all times has a perfected Lien for the benefit of the Lenders. |

3

**Theranos, Inc. Investment Memo**

| | |
|---|---|
| **Representations and Warranties:** | The Term Loan documents will contain representations and warranties customarily found in loan agreements for similar financings. |
| **Governing Law:** | All documentation in connection with the Term Loan will be governed by the laws of the State of New York. Venue for resolution of any disputes shall be in the Federal or State courts in the Borough of Manhattan. Parties will agree to waive jury trial in connection with any litigation arising from the Term Loan agreement. |

FIG00003297

## TRANSACTION OVERVIEW

### Executive Summary

Fortress has the opportunity to provide a $100 million ($65 million funded on the Closing Date) senior secured delayed draw term loan (the "Facility") to a newly-created Special Purpose Vehicle ("SPV") formed for the purposes of acquiring all Patents and Patent Rights assigned or owned by Theranos, Inc. ("Theranos" or the "Company"). The Facility would be a senior secured debt obligation of the SPV and have a perfected first lien security interest on all the assets of the SPV. In addition, the Facility would have a guarantee from the Company. The proceeds from the Facility would be used by the Company to fund general working capital, including transaction expenses, settlements costs of legal matters open as of the Closing Date (not to exceed a cap of $40 million) and patent prosecution, maintenance and development costs. The proposed Facility would be broken up into three tranches (individually referred to as "Loans") as follows:

- <u>Tranche A</u>: $65 million drawn on the Closing Date;
- <u>Tranche B</u>: $10 million available subject to FDA EUA approval or 510k clearance (whichever is earlier) of the Company's Zika application;
- <u>Tranche C</u>: $25 million available subject to certain commercial milestones (FDA registration, ISO certification and CE Marking) and fundraising milestones ($50 million in equity or convertible debt).

Each Loan would mature 42 months from the Funding Date and carry an interest rate of Libor +3.0% payable in cash (2.0% Libor floor) and 8.0% in PIK with an upfront fee of 5.0% and a final payment fee of 7.5%. In addition, Fortress would be provided with detachable penny warrants for the Company's next or last series of Preferred Stock in an amount equivalent to 4.0% of the Company's outstanding shares on a fully-diluted basis at the time of exercise. See Exhibit I – Term Sheet below for additional details on the proposed terms of the Facility.

The proposed transaction is effectively a sale and leaseback of what we believe is a strong patent portfolio. The proceeds from Tranche A and B of the Facility are expected to provide the Company with runway into early FY 2019 (see Financial Projections below), at which point the Company expects to have achieved commercial milestones that would attract additional investment capital from traditional venture capital and private equity sources and, thus, provide access to the Tranche C funds. The Fortress IP Group believes the following attributes make this an attractive investment:

- If the Company is successful in executing its strategy, the proposed transaction represents an opportunity to make an attractive return through interest and fees with potential upside in the form of warrants;
- Alternatively, in a default scenario, the proposed transaction represents an opportunity to make an attractive return based on the monetization of the Company's patent portfolio; and
- The proposed transaction structure is novel and attempts to achieve optimal security protection, economic return and tax treatment for Fortress while minimizing challenges from potential litigants.

### Company Overview

Founded in California in 2003 by Elizabeth Holmes, Theranos, Inc. is a privately-held biotech Company specializing in medical device development / manufacturing — specializing in developing miniaturized and accelerated diagnostic equipment that requires less blood from patients and quicker test results. The Company recently moved its headquarters to Newark, California from Palo Alto.

Holmes started the Company when she was 19 years of age, after dropping out of Stanford to pursue development of a patch-worn drug delivery system. This idea quickly pivoted to finger prick diagnostic technology. Around this time, Holmes's family friend and venture capitalist, Tim Draper, seeded the first million dollars in funding to back Theranos. Holmes then raised multiple subsequent rounds and, by 2014, investors valued the Company at $8 billion.

Theranos rose to prominence on the promise that it could detect health ailments at a low cost by testing blood drawn by the mere prick of a finger. Despite raising over one hundred million dollars from investors, the Company managed to keep a relatively low profile for nearly a decade without press releases or a company website until the Sep-2013 when Theranos announced a partnership with Walgreens to offer in-store blood sample collection centers. Media attention increased when Fortune put Holmes on its Jun-2014 front cover and said that the Company had raised over $400 million at a valuation of more than $9 billion. During this time, Holmes managed to assemble an "all-star" board that included directors with notable diplomatic and military backgrounds, including George Shultz (former Secretary of State), William Perry (former Secretary of Defense), Henry Kissinger (former Secretary of State), Sam Nunn (former U.S. Senator), Bill Frist (former U.S. Senator

and heart-transplant surgeon), Gary Roughead (Admiral, USN, retired), James Mattis (General, USMC), Richard Kovacevich (former Wells Fargo Chairman and CEO) and Riley Bechtel (chairman of the board and former CEO at Bechtel Group).

Over the subsequent 16 months, Holmes became a Silicon Valley darling, appearing on several more magazines, and was a regular on the tech industry conference circuit. Forbes recognized Holmes as the world's youngest self-made female billionaire and ranked her #110 on the Forbes 400 in 2014. The Company, which claimed to perform dozens of lab tests on just a few drops of drawn blood, seemed poised to revolutionize healthcare and was talked about as a 2016 IPO candidate.

In Oct-2015, a seminal turning point in the Company occurred when The Wall Street Journal published the first of a number of articles that called into question whether Theranos's technology actually worked, which resulted in scrutiny from the Company's main regulators, the FDA and the Centers for Medicare & Medicaid Services ("CMS"). Specifically, the articles noted that the Company's blood testing device, a machine called Edison, had been incapable of detecting enough molecules in blood samples to provide accurate readouts. This led Theranos to run their tests through blood devices manufactured by Siemens, the same type of equipment conventionally used by other blood testing companies. It was reported that Tyler Shultz, the grandson of then former Theranos director George Shultz and a former Theranos research engineer from September 2013 to April 2014, was the whistleblower to The Wall Street Journal.

While prior reports raised questions about a variety of Theranos's claims, The Wall Street Journal report opened the floodgates to numerous additional exposes and adverse coverage in leading publications, including: Forbes, The New York Times, The New Yorker, Inc., Fortune and The Economist.

During the remainder of 2015 and early 2016, other developments and disclosures came to light, which further called into question Theranos's business practices and technological capabilities, as well as its commercial viability:

- The FDA directed Theranos to cease use of nanotainers, as they were unapproved medical devices.
- The FDA released reports regarding substandard and unsafe laboratory practices at Theranos, including poor record keeping, failure to conduct quality audits, and insufficient validation processes, among other potential violations observed during inspections.
- Walgreens ceased building Theranos wellness centers, per their partnership agreement, pending independent validation of the Company's technology.
- The Cleveland Clinic announced that it would have to independently verify Theranos technology.
- Safeway completely exited the partnership, citing misrepresentations and a lack of confidence.
- The Centers for Medicare and Medicaid ("CMS") inspectors found serious lab issues, which were not rectified after prior CMS warnings, leading to the threat of potentially pulling Medicare patients and barring CEO Holmes and President and COO Balwani from owning/operating blood testing labs for two years.
- On-going deals with GSK and Pfizer, which Theranos referenced in interviews with the media, were proven to be non-existent.
- Media outlet, Fortune, found discrepancies in the amount of funding Theranos reportedly raised.

Legal and Regulatory Matters

Since 2007, Theranos Inc. has been named a party in more than 30 lawsuits filed in state and federal courts in California, Arizona, New York, Delaware, Maryland and Virginia. Despite this, Theranos has resolved many of its legal challenges, but remains party to two open cases, which are summarized as follows:

- In November 2016, Theranos shareholders, Robert Colman and Hilary Taubman-Dye, sued Theranos, Elizabeth Holmes, Ramesh ("Sunny") Balwani, and Lucas Venture Group XI LLC in a class action lawsuit filed in federal court in San Jose, California. Plaintiffs alleged violations of California Securities laws, California' Unfair Competition law, and other California state laws. Per the complaint, Colman had purchased shares in Theranos through his member interest in Lucas Venture Group XI LLC, an entity whose sole purpose was to purchase Theranos preferred shares. The plaintiffs alleged that Theranos made false and misleading statements about its technology, and sought media attention to build a "false narrative" about the Company in order to attract investors.
- In October 2016, four purported class actions, filed by various consumers against Theranos, Holmes and Walgreens Boots Alliance, Inc., were consolidated in federal court in Phoenix, Arizona. These actions alleged breach of contract, violation of Arizona's Consumer Fraud Act, and unjust enrichment, among other claims. The plaintiffs alleged that Theranos and Walgreens provided "misleading and false marketing" of a Theranos blood test, which was sold at Walgreens retail stores.

6

FIG00003299

## Theranos, Inc. Investment Memo

From 2015 through 2017, Theranos has undergone scrutiny and regulatory actions via federal and state agencies. Theranos has been addressed and/or investigated by the Arizona Attorney General, Centers for Medicare and Medicaid Services, Securities and Exchange Commission, and the U.S. Attorney's Office in San Francisco and has settled. While Theranos has settled most of these investigations, it remains under investigation by the SEC and the U.S. Attorney's Office for the Northern District of California.

As of this writing, the SEC is the primary agency running the investigation of both Theranos and Holmes (as well as others), with the DoJ/FBI appearing to play a secondary/less accelerated role to that of the SEC (DoJ is likely awaiting the eventual outcome of this SEC's case). Nonetheless, the DoJ has subpoenaed and made contact with a number of witnesses and is building a potential case. Both agencies have secured cooperating witnesses in their investigations—including various investors. Holmes has reportedly completed her testimony before the SEC without invoking her 5th Amendment right against self-incrimination.

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████ The following is a summary of the Company's active and resolved legal and regulatory matters (blue denotes open matters):

| Category | Counterparty | Status | Date of Agreement | Settlement Amount | Description |
|---|---|---|---|---|---|
| Walgreens Partnership | Walgreens | Settled | Jul-2017 | $30.0mm | Resolved all outstanding legal proceedings with Walgreens; $10mm paid, $15mm due Dec-17 and $5mm due Jun-18; settlement includes a $40mm note due to Walgreens that matures Jun-22. |
| Shareholder Matters | Rupert Murdoch | Settled | Dec-2016 | 10.0mm | Full release of claims in exchange for $5mm due May-18 and $5mm due May-19. |
| | PFM | Settled | Apr-2017 | 43.5mm | Full release of claims in exchange for $43.5mm payment; paid in full. |
| | Shareholder Recapitalization | Settled | May-2017 | N/A | In exchange for a full release of claims, Theranos offered to exchange existing C-1 and C-2 preferred shares into new preferred shares with an enhanced liquidation preference and a higher conversion rate; all but one holder participated or entered into separate release agreements described herein (see "Investor Sponsorship below for more details). |
| | Hall Black Diamond | Settled | Sep-2017 | 3.00mm | Full release of claims in exchange for $3mm payment; paid in full. |
| | Class Action Plaintiffs | Open | N/A | N/A | Litigation ongoing in US District Court for the N.D. of California on behalf of a putative class of indirect investors in Theranos securities. |
| Federal, State & Regulatory | CMS | Settled | Apr-2017 | 0.03mm | Resolved all outstanding legal and regulatory proceedings with CMS; pursuant to settlement involving CMS withdrawing its revocation sanction, Theranos paid $30,000 to CMS and affirmed that it will not own or operate clinical laboratories prior to 3/29/19. |
| | Arizona AG | Settled | Apr-2017 | 4.65mm | Resolved all outstanding legal proceedings with the AZAG related to Theranos blood-testing services in Arizona; returned $4.65mm to former customers residing in Arizona and agreed to refrain from owning or operating a CLIA-licensed laboratory in Arizona through 3/29/19; settlement included $200,000 in civil penalties and $25,000 in legal costs. |
| | Arkansas Securities Department | Resolved | Sep-2017 | N/A | Letter of Caution from Department (dated September 29, 2017) informed Theranos of the Department's decision not to pursue a formal enforcement action concerning any violation of the Arkansas Securities Act; Theranos had cooperated with information requests beginning in June 2017 related to its sale of securities to an Arkansas entity. |
| | SEC | Open | N/A | N/A | SEC conducting an investigation related to representations made to investors in Theranos securities; the Company is cooperating with the investigation and related information requests. |
| | DOJ | Open | N/A | N/A | DOJ conducting an investigation into, among other things, Theranos's past securities offerings, business arrangements and communications, and interactions with the FDA and CMS; the Company is cooperating with the investigation and related information requests. |
| Other | Class Action Plaintiffs | Open | N/A | N/A | Litigation ongoing in US District Court for Arizona on behalf of a putative class of consumers who purchased lab tests from Theranos. |

7

**Theranos, Inc. Investment Memo**

Theranos 2.0

In May-2016, the Company undertook a massive restructuring that included two major reductions in force ("RIFs") and an exit from the clinical lab business. The RIFs reduced Theranos's headcount from ~800 in May-2016 to ~156 in Oct-2017. In addition, the Company refocused its strategy away from clinical laboratories to miniLab, a diagnostic testing device that purports to offer rapid, cost-effective testing without requiring a physical clinical laboratory by employing a broad range of processing and detection methodologies within a single platform. The Company is moving forward on multiple fronts to return to its roots as an innovative product company. With respect to their efforts for obtaining FDA approval for their Zika detection product, Theranos has just concluded a trial with UCSF using the Theranos miniLab for a Lipid Panel. The results from the trial allowed a preliminary conclusion that the results had an excellent correlation (within 99%) to existing tests currently in use in the marketplace.

With the Company refocused on the development of miniLab, Holmes brought in a new management team with deep medical device industry experience to increase operational expertise and create redundant operational controls. Additionally, the Company changed the composition and structure of its Board of Directors, installed an expert technology and scientific advisory board (see Exhibits II and II for details on the Technology and Scientific Advisory Boards), and implemented a new quality and compliance program to revamp the business and align itself with its new strategy. Theranos 2.0 aims to replace traditional clinical laboratory testing services over time by:

- Distributing miniLab diagnostic testing platform technology across inpatient and outpatient settings; and
- Commercializing a broad test menu capable of processing complete lab orders that span multiple detection methodologies.

Theranos's strategic plan involves executing on a four-phase road map with the objective of becoming a market-leading technology company in the laboratory services market. Phase 1-Proof of Concept of the strategic plan represents the proof of concept for its Zika Nucleic-Acid Amplification ("NAA") assay on minilab 4.1 for FDA Emergency Use Authorization ("EUA"). The EUA authority allows the FDA to help strengthen the nation's public health protections against chemical, biological, radiological and nuclear defense threats by facilitating and expediting the availability and use of medical countermeasures needed during public health emergencies. Theranos started the submission to the FDA in Oct-2017 and expects to start clinical trials in Jan-2018. Based on this timeline, the Company could receive FDA EUA approval as early as May-2018.

The Company anticipates Phase 1 to demonstrate Theranos's ability to execute and represents a critical first step toward the broader commercialization of minilab in Phase 2 of the strategic plan, which focuses on products that address unmet needs for prevalent infectious diseases, beginning with Sexually Transmitted Infections ("STIs"). The Company believes Phase 2 will establish the minilab as a scalable platform technology with the ability to penetrate a broader customer base. The following is a summary of the Company's strategic plan:

| | Phase 1 | Phase 2 | Phase 3 | Phase 4 |
|---|---|---|---|---|
| **Description** | Proof of Concept | Expansion into Community Centers and P.O.s | Expansion into Hospitals | Expansion into Homes |
| **Guiding Strategy** | Execution | Commercialization | High Growth | Future Innovation |
| **Product Focus** | Zika | Infectious Disease | Routine Testing | Wearables / Ingestibles |
| **Commercial Goals** | Sell and distribute first commercial product on miniLab | Penetrate additional markets via expanded test portfolio | Fully decentralize routine lab testing services through miniLab | Next-gen consumer-focused technologies |
| **Target Launch** | H1 2018 | H2 2018 | H2 2020 | TBD |

The Company continues to reduce its monthly operational cash burn, which has decreased from ~$12.7 million in Oct-2016 to ~$6.2 million in Nov-2017. Future cost cutting activities include the Company terminating its Palo Alto lease (H1 2018) and subletting a significant portion of its new Newark, CA headquarters. The Company's forecast calls for further reducing its monthly operational cash burn to ~$2.5 million by Apr-2018, through further RIFs that would reduce its headcount to ~100 FTEs (156 FTEs today) and/or additional cost-cutting measures.

The Company has resolved most of its legal and regulatory matters, but the major unknown includes the potential settlement costs associated with the civil litigations and the Justice Department and SEC investigations ███████████ The proceeds from the Facility would be used to fund $30.1 million of scheduled settlement payments, which are summarized as follows:

8

 FIG00003301

**Theranos, Inc. Investment Memo**

| Counterparty | Amount | Timing | Category |
|---|---|---|---|
| Walgreens | $15.0 million | December 2017 | Walgreens Partnership |
| Arizona Attorney General | $0.1 million | December 2017 | Regulatory |
| Rupert Murdoch | $5.0 million | May 2018 | Shareholder |
| Walgreens | $5.0 million | June 2018 | Walgreens Partnership |
| Rupert Murdoch | $5.0 million | May 2019 | Shareholder |
| **Total** | **$30.1 million** | | |

The proceeds from Tranche A and B of the Facility are expected to fund the Company through FY 2018 (see Financial Projections below for additional detail), at which point the Company anticipates it would have achieved the following key objectives:

- Resolution of all of major legal matters (i.e., the DOJ and SEC investigations);
- Payment of the vast majorities of its settlement liabilities;
- Proof of concept of the Zika application through FDA EUA and/or FDA 510k clearance; and
- Progress towards Phase 2 of its strategic plan with the initiation of clinic trials for its STI application.

Theranos believes the achievements listed above would validate the Theranos 2.0 strategy and business model and put it on a path to raise additional equity from traditional venture capital and private equity sources, which could lead to the availability of the Tranche C funds.

**Patent Portfolio**

The Theranos patent portfolio consists of 1,175 worldwide patents and applications in over 151 families consisting of: 115 US granted patents and 134 open US applications; 25 EP grants and 55 open EP applications (EP, DK, AT, ES, PT, PL); 91 Asia grants (CN, JP, HK, KR, SG, TW) and 174 open Asia applications, with additional patents and applications in AR, AU, BR, CA, DK, ES, IL, IN, MX, NZ, PT and RU.

**Due Diligence**

As part of confirmatory due diligence, Fortress engaged numerous corporate, regulatory and patent law firms and consultants to identify and minimize potential risks associated with the proposed transaction. The following is a summary of the due diligence team utilized by Fortress:

9

FIG00003302

**Theranos, Inc. Investment Memo**

Corporate Counsel

- David Nemecek, Partner at Kirkland & Ellis
- Brian Ford, Partner at Kirkland & Ellis

Bankruptcy Counsel

- Mark McKane, Partner at Kirkland & Ellis

Regulatory Counsel (SEC / DoJ Investigations)

- Robert Khuzami, Partner at Kirkland & Ellis (former Director of Enforcement for the SEC)
- David Lawrence, Founder & Chief Collaborative Officer at Risk Assistance Network + Exchange ("RANE")

FDA Counsel / Expert

- James Bloiani, Member at Epstein Becker Green
- Elizabeth Malo, Regulatory Practice at Lachman Consultants (FDA expert)

Patent Counsel

- Perkins Coie, led by Tim Caroll (Partner); *note – Perkins was engaged by Theranos, not Fortress.*
- Sterne, Kessler, Goldstein & Fox, led by Eldora Ellision, PhD. (Partner)

**Transaction Structure**

The proposed transaction structure is novel and attempts to achieve optimal security protection, economic return and tax treatment for Fortress and minimize any challenges from potential litigants. We believe that the proposed structure mitigates those risks to the best of our abilities (please see Exhibit IV – Key Issues Summary for additional information).

Under the proposed terms of the transaction, the Borrower would be a newly created SPV that would be a subsidiary of the Company. The Borrower would also have a guarantee from the Company. Simultaneously with closing, all Patents and Patent Rights assigned or owned by the Company shall be sold to the SPV whose equity would initially be 99.8% owned by the Lender and 0.2% owned by the Company. The Company would enter into an agreement with the SPV that shall grant the Company a non-exclusive license to use the Patents and Patent Rights. The following is an overview of the steps of the proposed transaction (note: steps 1-4 happen simultaneously):

- Step 1: Theranos, Inc. contributes to the equity of SPV all assigned patent rights in exchange for the Class A Interests;
- Step 2: SPV licenses the assigned patent rights to Theranos, Inc., pursuant to a non-exclusive license;
- Step 3: SPV borrows from the Fortress Lenders the Tranche A Term Loan of $65 million and in exchange, the Fortress Lenders receive warrants in Theranos, Inc. and the Class B Equity Interests in SPV;
- Step 4: SPV uses the proceeds of the Tranche A Term Loan to make an intercompany loan on back-to-back terms with the Tranche A Term Loan; and
- Step 5: If applicable, SPV borrows from the Fortress Lenders the Tranche B Term Loans and the Tranche C Term Loans, and uses the proceeds of the Tranche B Term Loans and the Tranche C Term Loans to make an intercompany loan on back-to-back terms with the Tranche B Term Loans and the Tranche C Term Loans, as applicable.

Upon the repayment of the Facility, assuming no event of default has occurred and is continuing, the SPV shall automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 99.8% by the Company and 0.2% owned by the Lender (and the operating agreement of the SPV shall permit and contemplate such equity issuance). A summary of the transaction structure is shown below:

10

**Theranos, Inc. Investment Memo**

| Transaction Structure - Legend | |
|---|---|
| **Class A Equity Interests** | Held by Theranos, Inc. and initially represents 0.2% of interests in TheranosIP Co., LLC; prior to an EOD, has the right to appoint the Manager of Theranos IP Co., LLC; upon satisfaction of all loan obligations without occurrence of an EOD, automatic increase to represent 99.8% of interests in Theranos IP Co., LLC; if an EOD occurs, automatic increase to represent 50% of interests in Theranos IP Co., LLC only if Fortress achieves a 2.5x hurdle on the Term Loan Amount, and further automatic increase to represent 99.8% of interests in Theranos IPCo., LLC only if Fortress achieves a 3.0x hurdle on the Term Loan Amount. |
| **Class B Equity Interests** | Held by Fortress and initially represents 99.8% of economic interest in Theranos IP Co., LLC; if an EOD occurs, has the right to appoint the Manager of Theranos IP Co., LLC (in the case of an insolvency EOD, this happens automatically). |
| **Independent Manager** | To have consent rights to the filing of any voluntary insolvency proceeding. |



Transaction Structure – Overview

**Event of Default**

If an event of default has occurred and is continuing and the Lender elects to monetize the SPV's assets, any proceeds received by the SPV or the Company from the monetization of the SPV's assets, including its intellectual property (the "Gross Proceeds") shall be applied as follows:

- *First*, to repay all outstanding Loans and all other obligations under the Facility (including accrued and unpaid interest);
- *Second*, in accordance with the Lender's on the one hand, and the Company's on the hand, share of the equity in the SPV, which shall automatically be adjusted as follows:
  - Lender would own 99.8% of the equity in the SPV until it receives a multiple of 2.50x on the Term Loan Amount (as defined below);
  - Once Lender has received a multiple of 2.50x on the Term Loan Amount, the SPV would automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 50.0% by the Company and 50.0% owned by the Lender; and
  - Once Lender has received a multiple of 3.00x on the Term Loan Amount, the SPV will automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 99.8% by the Company and 0.2% owned by the Lender.

**Loan Description & Yield**

Each Loan would mature 42 months from the Funding Date and carry an interest rate of Libor +3.0% payable in cash (2.0% Libor floor) and 8.0% in PIK with an upfront fee of 5.0% and a final payment fee of 7.5%. Notwithstanding the aforementioned, for any period when an Event of Default shall be continuing, the interest rate shall be 1-month LIBOR + 13.0% per annum, subject to a floor of 2.0% on 1-month LIBOR. In addition, Fortress would be provided with detachable

11

**Theranos, Inc. Investment Memo**

penny warrants for the Company's next or last series of Preferred Stock in an amount equivalent to 4.0% of the Company's outstanding shares on a fully-diluted basis at the time of exercise. See Exhibit I – Term Sheet below for additional details on the proposed terms of the Facility.

The Loan may be called at any time prior to the 1st anniversary of the Closing Date at 105% of the outstanding principal balance at the time of prepayment. After the 1st anniversary of the Closing Date and prior to the 2nd anniversary of the Closing Date, the Loan may be called at 103.5% of the outstanding principal balance at the time of prepayment. After the 2nd anniversary of the Closing Date the Loan may be called at 100% of the outstanding principal balance at the time of prepayment.

The Fortress modeled returns assume Tranche A is drawn on the Closing Date and Tranche B is drawn in May-2018 following FDA EUA approval of its Zika application. For the purpose of projecting returns, we have assumed Tranche C is not drawn as the availability of these funds is subject to commercial and fundraising milestones with timeframes that are unknown at this time. Note that the commercial milestones associated with Tranche C are significant enterprise value enhancing milestone that would significantly de-risk the business and could result in us getting repaid.

Based on an estimate of a $68.6 million average Fortress outstanding balance over its contracted life and excluding projected warrant gains, the Facility is expected to generate unlevered returns as follows: cumulative profits of $45.8 million, representing a 17.9% unlevered yield and a MOIC 1.61x. Potential upside exists in the form of warrants. The proposed terms of the Facility include warrants for 4% of the Company's total capitalization in the form of the next or last series of Preferred Shares. The following is a summary of the unlevered returns for the Facility:

|  | Year 1 | Year 2 | Year 3 | Year 4 | Total |
|---|---|---|---|---|---|
| Average Facility Balance | $73,380,485 | $83,867,835 | $81,866,621 | $35,497,286 | $68,578,505 |
| Interest | $9,557,783 | $11,055,193 | $10,818,290 | $5,001,542 | $36,432,808 |
| Fees | $3,750,000 | $0 | $0 | $5,625,000 | $9,375,000 |
| PNL Unlevered | $13,307,783 | $11,055,193 | $10,818,290 | $10,626,542 | $45,807,808 |

| Unlevered Returns | | | |
|---|---|---|---|
|  | IRR | MOIC | Nominal |
| Interest and Fees | 17.91% | 1.61x | $ 45,807,808 |
| Interest, Fees, and MCO | 17.91% | 1.61x | $ 45,807,808 |

12

FIG00003305

**Theranos, Inc. Investment Memo**

## TRANSACTION STRENGTHS

- **Attractive Investment Opportunity:**  The Fortress IP Group believes the proposed transaction represents an attractive investment opportunity due to the structure of the collateral control.  Additionally, in a default scenario, the proposed transaction represents an opportunity to make an attractive return based on the monetization of the Company's patent portfolio.  Alternatively, if the Company is successful in executing on its strategy, the proposed transaction represents an opportunity to make an attractive return through interest and fees with potential upside in the form of warrants.

- **Transaction Structure Provides for Immediate Control of Collateral:**  As part of the transaction, all Patents and Patent Rights assigned or owned by the Company shall be sold to the SPV (the borrower) whose equity would initially be 99.8% owned by the Lender and 0.2% owned by the Company.  The transaction structure has been vetted by our corporate counsel at Kirkland & Ellis, including their bankruptcy team.  We believe that given our equity rights, the structure laid out above protects our collateral in bankruptcy and provides for the ability to garner an attractive return in a default scenario.

- **Robust Patent Portfolio with Potentially Significant Value:**  The Company's patent portfolio consists of 1,175 patent assets, including 249 US patents and applications in more than 151 families and over 800 international patents and applications.  The patent portfolio has open applications in virtually all patent families and early priority dates over competitors. ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
.

- **Patent Portfolio Covers Key Technology:** ███████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

13

Theranos, Inc. Investment Memo

## KEY RISKS & MITIGANTS

- **Collateral Risk**: the portfolio may be invalidated or held not to be infringed.

  *Mitigant*: There are over 115 US patents and 134 open US applications in 151 families.

  *Mitigant*: The patent portfolio is robust and there is excellent diversity in technology areas associated with all aspects of ██ and ██████ technology.

  *Mitigant*: ████████████████████████████████████████████████████

- **Re-examination Risk**: re-exam risk is different than litigation invalidation risk in that a re-exam is a USPTO tribunal as opposed to a court of law.

  *Mitigant*: The portfolio consists of a relatively high number of claims of various breadth and scope which minimizes the risk of adverse result (claim invalidation) on an individual patent basis, and gives us a high degree of confidence that the relevant assets in the portfolio would survive re-exam and perhaps even blunt an initial re-exam attack.

  *Mitigant*: The large number of families means that an invalidation of one patent will have no effect on the other patents.

- **Jury Trial Risk**: ████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████████

  *Mitigant*: We have diversity of potential defendants whose sales are not confined to the US. The scope of foreign patents enables us to use multiple foreign jurisdictions where there are no juries should the need arise.

- **Legal Matter Risk**: The risk of the SEC and DOJ investigations or other litigation impairing the priority of Fortress' lien in the collateral.

  *Mitigant*: If the SEC or DOJ were to seek monetary penalties against Theranos, a lien priority issue could arise if Theranos failed to make the required payments and the applicable agency obtained a judgment lien. Based on information available about the ongoing investigations, it is unlikely that either agency will so impose monetary penalties.

  In addition, it is possible that a court could impose restitution obligations as part of a judgment or that parties to a settlement could seek a judgment lien if Theranos failed to perform its obligations under a settlement agreement.

  In any of the above scenarios, we expect that any judgment would not be against the SPV, or give rise to a lien on the assets of the SPV. Please see Exhibit IV – Key Issues Summary for additional information.

- **Fraudulent Conveyance Risk**: The risk of a successful fraudulent conveyance challenge.

  *Mitigant*: First, we increased the likelihood that Theranos Inc. receives reasonably equivalent value for its IP contribution to the SPV and guarantee to the Fortress lenders by including the grant of reversionary equity interests (Class A) in addition to receipt of term loan proceeds through an intercompany loan and a non-exclusive license in the contributed IP. The Class A interests, which allow Theranos to own 99.8% of the interests in the SPV upon satisfaction of the loan obligations, should provide important additional value in any constructive fraudulent conveyance litigation.

  *Mitigant*: ████████████████████████████████████████████████████

  ████████████████████████████████████████

  *Mitigant*: Third, the Fortress lenders are receiving a Theranos secured guarantee for the loan. In the unlikely event that the IP contribution is disallowed, the Fortress lenders will still have a secured position at Theranos Inc. on which to recover its loan.

  *Mitigant*: ████████████████████████████████████████████████████

  ████████████████████████████████████████████████████

14

FIG00003307

**Theranos, Inc. Investment Memo**

████████████████████████████████████████ Please see Exhibit IV – Key Issues Summary for additional information.

- <u>Unwinding Settlement Risk</u>: The risk of parties that settled with Theranos seek to unwind settlements after the loan transaction is consummated.

  *Mitigant*: Any effort to unwind a settlement is highly unlikely to succeed. ████████████ ████████████████████████████████████████

  *Mitigant*: A change in Theranos's financial circumstances, including a subsequent increase in its ability to pay a larger settlement through proceeds of the Fortress transaction, should not satisfy that standard. There has been no suggestion that any of the parties were fraudulently induced to enter into the settlement, and it is difficult to envision a plausible scenario in which that claim could be successfully asserted here. The settling parties were represented by sophisticated counsel and disclaimed that they relied on any statements or representations by Theranos.

  *Mitigant*: ████████████████████████████████████████ ████████████████████████████████████████ ████████████ Please see Exhibit IV – Key Issues Summary for additional information.

- <u>Bankruptcy Risk</u>: The risk that Theranos can challenge the bankruptcy remote provisions in the LLC agreement and cause the SPV that owns the intellectual property to seek bankruptcy protection without Fortress' consent.

  *Mitigant*: First, the SPV will have an independent manager that must consent to the SPV voluntarily commencing an insolvency proceeding. The independent manager cannot be replaced without Fortress' consent and it is obligated to consider the interests of the SPV's creditors in determining whether to consent to an insolvency proceeding. The independent manager will initially be Global Securitization Services, LLC, a company that acts as the independent manager for numerous bankruptcy-remote entities, including for other Fortress financing transactions.

  *Mitigant*: ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

  *Mitigant*: Third, both the credit agreement and the LLC agreement will prohibit the SPV from having any other material creditors. This reduces the likelihood of an involuntary filing and also will be helpful to the independent manager in determining to not consent to a bankruptcy filing without Fortress' consent. Please see Exhibit IV – Key Issues Summary for additional information.

15

FIG00003308

Theranos, Inc. Investment Memo

## KEY DUE DILIGENCE AREAS

**Patent Diligence**



**Independent Board Member Calls**

As part of confirmatory due diligence, we spoke with the Theranos independent board members (Dan Warnhoven, Fabrizio Bonanni, and Bill Soege). These individuals represent retired men that previously held very senior roles at large companies (Dan Wanhoven, former CEO of NetApps and Fabrizio Bonanni, former executive at Baxter and Amgen) and government organizations (Bill Foege, former Director of the CDC) with experience that is complimentary to Theranos at its current stage (pre-commercialization). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Each of the independent board members confirmed they got involved because they were enamored with the technology and believe it can have a significant positive impact on global health. In addition, the independent board members believed they were at a stage in their lives and careers where the success or failure with Theranos wouldn't have an impact on their reputations. It was also very clear that the independent board members are extremely supportive of Elizabeth Holmes and believe she is essential in getting the Company through the next two to three years. This is further supported by the fact that the independent board members requested and met in person with the SEC on November 29, 2017 to convey the importance of Elizabeth's involvement with the Company as it moves towards commercialization, especially as it relates to maximizing shareholder's capital.

**Investor Calls**

As part of confirmatory diligence, we spoke with representatives from key preferred investors: ATA Ventures (Hatch Graham, founding Managing Director), Cox Enterprises (Alex Taylor, President and CEO as of January 1, 2018), and Madrone Capital Partners (Tom Patterson, founding Managing Director). In addition, a call is schedule with Tim Draper on December 2, 2017. In speaking with investors, the consistent message we received was as follows:

- <u>Improved Communication with the Company and Holmes</u>: Prior to 2016, it was very difficult to get in touch with Holmes. The investors believe that Holmes and the Company were previously under the influence of the board at the time (mostly military and government background), which led to secrecy and limited information provided by the Company to investors and outsiders. Most of the later investors (Series C-1 and C-2) completed limited due diligence as limited information was share with investors at the time. Since that time, Holmes and the Company has been more transparent and in more constant dialogue with the Company's investors. The investors we spoke speak to the Holmes and the Company as required, but at least once a month.
- <u>Improved Management Team and Board</u>: The investors we spoke with are very supportive of the new management team and board that Holmes has assembled since May-2016. In addition, the investors we spoke with appeared to be satisfied with the shift in focus to the minilab and progress achieved to date. The investors view Holmes as important to the development of the Company, but not an absolute necessity. She could add value in a role that doesn't include CEO and

16

in the case she is banned from the Company, the investors generally felt the technology was advanced enough that the board could find someone to replace her.

- <u>Milestones for Future Investment</u>: The majority of the investors we spoke with indicated they would consider future investment (ex. ATA Ventures – the fund that invested is 13 years old and has no additional capital to invest) if the Company was to achieve certain key milestones. Most investors believed those milestones generally include: (i) FDA approval of any federally regulated test and (ii) interest from a well-known healthcare investor to lead a round of financing.

**FDA Diligence**

As part of confirmatory due diligence, we engaged a consultant in the Regulatory Practice at Lachman Consultants, a provider of FDA regulatory submission and approval consulting services, to evaluate the Company's FDA EUA submission for its Zika application. Following a review of the communications with the FDA, the consultant advised that, despite the fact that communication with the FDA has been very productive, cooperative and positive; the Company's anticipated timeframe of EUA approval in Mar-2018 is aggressive as the Company's assay integration development is experiencing variability issues. While our consultant believes these issues are resolvable and not unusual for this type of device, the variability issues will likely push out the timing of FDA EUA approval by a few months. Hence, our consultant believes May-2018 is a more realistic expectation for FDA EUA approval. Note that we also engaged healthcare law firm, Epstein Becker Green to review certain legal provisions in the transaction documents, including funding provisions and certain reps and warranties.

**Enforcement Action Diligence**

FIG00003310

Theranos, Inc. Investment Memo

## COMPANY OVERVIEW

Founded in California in 2003 by Elizabeth Holmes, Theranos, Inc. is a privately-held biotech Company specializing in medical device development/manufacturing—specializing in developing miniaturized and accelerated diagnostic equipment that requires less blood from patients and quicker test results.

Holmes started the Company when she was 19 years of age, after dropping out of Stanford to pursue development of a patch-worn drug delivery system. This idea quickly pivoted to finger prick diagnostic technology. Around this time, Holmes's family friend and venture capitalist, Tim Draper, seeded the first million dollars in funding to back Theranos. Holmes then raised multiple subsequent rounds and, by 2014, investors valued the Company at $9Bn.[1]

In 2014, Holmes started a media blitz touting the Company's innovative technology, and in doing so, secured partnerships for Theranos with Capital Bluecross, which would make tests available to patients in Pennsylvania; and The Cleveland Clinic, which would implement Theranos's existing tests and pursue research studies, clinical trials and the development of new tests together. Additionally, the Company formed partnerships with Walgreens and Safeway, both of which agreed to set up Theranos testing centers.[2]

In spring 2015, the Company co-authored an Arizona bill that became law, making it legal for patients to get their blood tested without a doctor's note. That summer, the FDA announced that Theranos's nanotainers, the Company's proprietary fingerprick blood collectors, were safe for testing for herpes simplex-1.

In October 2015, a seminal turning point in the Company occurred when The Wall Street Journal began publishing investigative articles questioning Theranos's technology. Specifically, the articles noted that the Company's blood testing device, a machine called Edison, had been incapable of detecting enough molecules in blood samples to provide accurate readouts. This led Theranos to run their tests through blood devices manufactured by Siemens, the same type of equipment conventionally used by other blood testing companies. It was reported that Tyler Shultz, the grandson of then former Theranos director George Shultz and a former Theranos research engineer from September 2013 to April 2014, was the whistleblower to The Wall Street Journal.

While prior reports raised questions about a variety of Theranos's claims, The Wall Street Journal report opened the floodgates to numerous additional exposes and adverse coverage in leading publications, including: Forbes, The New York Times, The New Yorker, Inc., Fortune and The Economist.

During the remainder of 2015 and early 2016, other disclosures came to light, which further called into question Theranos's business practices and technological capabilities, as well as its commercial viability:

- The FDA directed Theranos to cease use of nanotainers, as they were unapproved medical devices.
- The FDA released reports regarding substandard and unsafe laboratory practices at Theranos, including poor record keeping, failure to conduct quality audits, and insufficient validation processes, among other potential violations observed during inspections.
- Walgreens ceased building Theranos wellness centers, per their partnership agreement, pending independent validation of the Company's technology.
- The Cleveland Clinic announced that it would have to independently verify Theranos technology.
- Safeway completely exited the partnership, citing misrepresentations and a lack of confidence.[3]
- The Centers for Medicare and Medicaid ("CMS") inspectors found serious lab issues, which were not rectified after prior CMS warnings, leading to the threat of potentially pulling Medicare patients and barring CEO Holmes and President and COO Balwani from owning/operating blood testing labs for two years.
- On-going deals with GSK and Pfizer, which Theranos referenced in interviews with the media, were proven to be non-existent.[4]
- Media outlet, Fortune, found discrepancies in the amount of funding Theranos reportedly raised.[5]

[1] https://www.wired.com/2016/05/everything-need-know-theranos-saga-far/
[2] https://www.wsj.com/articles/safeway-theranos-split-after-350-million-deal-fizzles-1447205796?alg=y
[3] http://news.walgreens.com/press-releases/general-news/walgreens-terminates-relationship-with-theranos-will-be-closing-operations-at-all-40-theranos-wellness-centers-in-arizona.htm; https://www.wsj.com/articles/safeway-theranos-split-after-350-million-deal-fizzles-1447205796?alg=y
[4] https://www.wired.com/2016/05/everything-need-know-theranos-saga-far/
[5] http://fortune.com/2015/10/28/theranos-is-seeking-to-raise-200-million-in-new-funding/

18

FIG00003311

**Theranos, Inc. Investment Memo**

### Legal Matters

Since 2007, Theranos Inc. has been named a party in more than 30 lawsuits filed in state and federal courts in California, Arizona, New York, Delaware, Maryland and Virginia. Below are summarized cases of note, specifically the open cases:

- In November 2016, Theranos shareholders, Robert Colman and Hilary Taubman-Dye, sued Theranos, Elizabeth Holmes, Ramesh ("Sunny") Balwani, and Lucas Venture Group XI LLC in a class action lawsuit filed in federal court in San Jose, California. Plaintiffs alleged violations of California Securities laws, California' Unfair Competition law, and other California state laws. Per the complaint, Colman had purchased shares in Theranos through his member interest in Lucas Venture Group XI LLC, an entity whose sole purpose was to purchase Series G Theranos shares. The plaintiffs alleged that Theranos made false and misleading statements about its technology, and sought media attention to build a "false narrative" about the Company in order to attract investors. This case is active.
- In October 2016, four purported class actions, filed by various consumers against Theranos, Holmes and Walgreens Boots Alliance, Inc., were consolidated in federal court in Phoenix, Arizona. These actions alleged breach of contract, violation of Arizona's Consumer Fraud Act, and unjust enrichment, among other claims. The plaintiffs alleged that Theranos and Walgreens provided "misleading and false marketing" of a Theranos blood test, which was sold at Walgreens retail stores. This consolidated case is active.
- Numerous closed proceedings, wherein Theranos was the defendant, including a November 2016 $30 million breach of contract settlement with Walgreens, which initially demanded $140 million; and an October 2016 suit by Partner Fund Management over a $96 million investment and alleged "misrepresentations" by Theranos, which ended in a confidential settlement.

From 2015 through 2017, Theranos has undergone scrutiny and regulatory actions via federal and state agencies. Theranos has been addressed and/or investigated by the Arizona Attorney General, Centers for Medicare and Medicaid Services, Securities and Exchange Commission, and the U.S. Attorney's Office in San Francisco, concerning the following:

- In April 2017, Theranos agreed to pay $4.65 million to settle an investigation by the Arizona Attorney's General, and reportedly pay for refunds to approximately 175,000 consumers who paid for Theranos blood tests. Starting in 2013, Theranos used Arizona as its "main testing ground" when it began its blood testing partnership with Walgreens by opening 40 wellness centers at Walgreens pharmacies around metropolitan Phoenix.
- April 2017, Theranos reached a settlement agreement with the Centers for Medicare and Medicaid Services, which is the government agency responsible for regulating blood testing labs. Under the terms of the settlement, Theranos agreed to pay $30,000 and will not be allowed to own or operate a clinical lab for two years, until 2019.
- In April 2016, Theranos disclosed that it was under investigation by the SEC and the U.S. Attorney's Office for the Northern District of California. As of November 2017, the SEC investigation remained ongoing, and was primarily focused on examining fraudulent and misleading statements made to investors.
- Note: The ongoing nature of the SEC and DoJ investigations, as well as the status of any potential settlement, was discussed directly and separately with counsel for Theranos and Holmes. The investigations of both the Company and Holmes (and any settlement) are likely to be dependent on a global resolution involving both her and the Company— with the resolution of the DoJ case unlikely to occur prior to any settlement involving the SEC. The resolution of these investigations is intertwined and highly unlikely before the end of 2017, and can involve a range of outcomes (e.g., penalties) for both the Company and Holmes. Leniency for the Company may well depend upon Holmes' willingness to accept a significant penalty—e.g., a settlement involving an admission of fraud.
- FDA inspections of Theranos sites between August 25 and September 16, 2015 resulted in the issuance of two Form 483s, which are issued when investigators observe potential violations of the Food Drug and Cosmetics Act. The reports listed the following issues: (a) Theranos's proprietary blood-collection vials, known as "nanotainers," were "uncleared medical devices," but nevertheless used and shipped across state lines; (b) Theranos maintained poor records, mishandled complaints, failed to conduct quality audits, and was unable to produce documented supplier qualifications; and (c) numerous design validation issues, design risk analysis, design requirements, and documentation.

### Enforcement Actions

As of this writing, the SEC is the primary agency running the investigation of both Theranos and Holmes (as well as others), with the DoJ/FBI appearing to play a secondary/less accelerated role to that of the SEC. (DoJ is likely awaiting the eventual outcome of this SEC's case).

19

FIG00003312

Nonetheless, the DoJ has subpoenaed and made contact with a number of witnesses and is building a potential case. Both agencies have secured cooperating witnesses in their investigations—including various investors. Holmes has reportedly completed her testimony before the SEC without invoking her 5th Amendment right against self-incrimination.



The investigations currently have no known timetable for completion, but the SEC has served Wells notices. The financing commitments would be required prior to any definitive outcome.

**Management Biographies**

Theranos has brought in a new and expanded management team that includes individuals with significant medical device experience and provides the Company with increased operational expertise, additional advisory capacity and redundant controls. The Company's management team is summarized as follows:

Elizabeth Holmes – Chief Executive Officer, Founder and Chairman of Board of Directors

Elizabeth Holmes, age 33, is the founder, chief executive and chairman of Theranos, Inc. Holmes founded the Company in 2003, while she was a student at Stanford University.

Daniel Guggenheim – Chief Compliance Officer

Daniel Guggenheim, age 51, has served as chief compliance officer at Theranos since July 2016. Prior to Theranos, he held several compliance and regulatory positions at McKesson Corporation, including assistant general counsel and business unit general counsel from April 2016 to July 2016; assistant general counsel of regulatory law from February 2011 to March 2016; chief regulatory and compliance counsel of McKesson Distribution Solutions from April 2009 to February 2011; and senior counsel at McKesson U.S. Pharmaceutical Distribution from March 2005 to March 2009. Previously, he worked as associate general counsel at Riverdeep, Inc.; as an associate at Sonnenschein; and as associate professor of law at Niigata University, among other positions.

Philippe Poux – Interim Chief Financial Officer

Philippe Andre Poux, age 51, joined as interim CFO at Theranos as recently as October 2017. Prior to that, Poux served as CFO of Younicos since January 2015. Previously, he served as general manager of operations and special projects and as COO at Areva Solar from March 2010 to December 2014 and as VP of mergers and acquisitions at the same company from February 2005 to August 2007; as a director and Ernst & Young Transaction Advisory Services; and as a principal at Booze & Co.

David Taylor – General Counsel

David Allen Taylor, age 40, has served as general counsel at Theranos since November 2016. Previously, from May 2016 and October 2016, he was Theranos's senior litigation counsel and acting general counsel. Prior to that, Taylor worked as an attorney at Munger, Tolles & Olson LLP from September 2012 to April 2016; as an attorney in the special litigation division at Public Defender Service from September 2010 to August 2012; and as an attorney at Williams & Connolly LLP from September 2006 to September 2010.

20

 FIG00003313

## Theranos, Inc. Investment Memo

### Dave Wurtz – SVP of Regulatory and Quality

David Wade Wurtz, age 44, has served as vice president of regulatory and quality at Theranos since July 2016, according to news articles and a company press release. Prior to that, he served as the senior director of regulatory, quality and compliance at Thermo Fisher Scientific from September 2011 to July 2016; as group manager at Beckman Coulter from October 2007 to September 2011; and as manager of regulatory and clinical affairs as Osmetech Molecular Diagnostics from 2003 to 2007.

### John McChesney – SVP of Operations

John McChesney has been Senior Vice President of Operations at Theranos, Inc. since December 12, 2016. McChesney joined Theranos with medical device manufacturing expertise, having served in roles of increasing responsibility at GenapSys, Inc.; Thermo Fisher Scientific; and Medtronic. He has extensive experience leading teams through periods of change, including acquisitions, quality system deployments, high growth, development of manufacturing centers of excellence and building global supply chains. McChesney earned a B.S. in Biochemistry from the University of California, San Diego.

### Board of Directors Biographies

The Company's Board of Directors is summarized as follows:

### William ("Bill") Foege

William Foege, who is now 81 years old, was appointed to Theranos's board of directors initially in August 2014, according to news articles and press releases. In October 2015, Theranos shrunk its board of directors from twelve to five members, and Foege left the board and joined the newly formed Board of Counselors and Scientific and Medical Advisory Board. In May 2016, Foege re-joined an expanded Theranos board of directors, according to a press release from Theranos. Foege is an epidemiologist and former director of the U.S. Center for Disease Control and Prevention who was credited with the successful campaign to eradicate smallpox in the 1970s, according to news articles. Bill received the Presidential Medal of Freedom in 2012 and was a senior medical advisor for the Bill and Melinda Gates Foundation from 1999 until his retirement in 2011.

### Fabrizio Bonanni

Bonanni, who is 70 years old, joined Theranos's board in May 2016, when the Company expanded its board (and re-appointed Foege). Bonanni is a retired Amgen executive that held several senior roles, including Executive Vice President of Operations, Senior Vice President, Quality and Compliance; Corporate Compliance Officer; Senior Vice President, Manufacturing; Former Corporate Vice President, Quality Systems; and Corporate Vice President, Regulatory and Clinical Affairs at Baxter International.

### Dan Warmenhoven

Dan Warmenhoven, age 66, was named a director of Theranos in December 2016, according to news articles. In addition to his role at Theranos, Warmenhoven is a director on the board of Bechtel Group Inc. Previously, he served as chief executive officer of NetApp from 1994 to 2009 and executive chairman of the board of NetApp from August 2009 through September 2014. He is also a director of Palo Alto Networks. Warmenhoven reportedly first met Holmes at a Stanford event, where she was being interviewed on stage by former Secretary of State George Shultz, who was previously a director at Theranos. Warmenhoven reportedly got to know Holmes through Riley Bechtel, chairman of the Bechtel Group, where Warmenhoven is also a director.

21

FIG00003314

**Theranos, Inc. Investment Memo**

## INTELLECTUAL PROPERTY OVERVIEW

The Theranos patent portfolio (the "Portfolio") consists of 1,175 worldwide patents and applications in over 151 families consisting of: 115 US granted patents and, 134 open US applications; 25 EP grants and 55 open EP applications (EP, DK, AT, ES, PT, PL); 91Asia Grants (CN, JP, HK, KR, SG, TW) and 174 open Asia applications, with additional patents and applications in: AR, AU, BR, CA, DK, ES, IL, IN, MX, NZ, PT and RU.

22

FIG00003315

**Theranos, Inc. Investment Memo**



## Industry Overview

Consistent with 'consumerism' trends, individuals are more involved today in managing their own health and many seek direct access to laboratory testing for both self-guided assessment or monitoring. The most prominent testing to date is probably direct-to-consumer

Consistent with 'consumerism' trends, individuals are more involved today in managing their own health and many seek direct access to laboratory testing for both self-guided assessment or monitoring. The most prominent testing to date is probably direct-to-consumer personal genomic testing, where saliva samples are sent to a specialized laboratory.[6] In addition to direct-to-consumer technologies, Theranos' technology is also focused on replacing large centralized laboratories by what is known as the Point-of-Care ("POC") diagnostics market. In Theranos' vision, the POC diagnostics market becomes decentralized and far more accessible to the consumer, both through diagnostics miniLabs right in doctor's offices but also in pharmacies and other appropriate locations. The direction of these new decentralized technologies is to make them 'better, faster and cheaper' and Theranos' promise is to greatly lower cost, save time and bring the technology closer to the consumer.

It is difficult to overstate the importance of clinical testing in modern health care; it is central to 'Evidence Based Medicine' ("EBM") which is the application of the scientific method to healthcare decision-making. While this may seem obvious to the general public now, it only became possible and scalable with the advent of readily available diagnostic testing. With the current scope of diagnostic tests, their accuracy and sensitivity has exponentially increased with the advent of Polymerase Chain Reaction ("PCR"). PCR amplifies even a single strand of DNA allowing extremely sensitive and accurate testing for bacteria, parasites and genetic diseases. The relatively recent discovery that fragments DNA from a fetus in maternal blood can be detected as well as the fact that various diseases can be diagnosed from RNA fragments has allowed EBM to proliferate more widely than ever before. It is thus easy to see that Theranos' vision of decentralized and highly automated miniLabs that provide accurate and repeatable clinical laboratory testing plays is central to furthering this ongoing revolution in modern health care.

Clinical laboratory tests are core to diagnosing and managing diseases. Prior to Theranos' founding, and still typical today, clinical testing is conducted by health care providers who take the blood or other biological samples and send them to centralized labs using a variety of analytical methods executed on large-scale analyzers. Thus, the current state-of-the-art requires relatively large blood samples (many milliliters in test tubes) and often involves complex pre-analytical and analytical processing that is subject to human error. Samples need to be transported from the collection site requiring a skilled phlebotomist to one or more laboratories which compromises sample stability and requires strict tracking procedures to avoid losing, mislabeling or mishandling of the samples.

By contrast, Theranos' blood testing system uses capillary tube collection that promises several advantages over traditional venipuncture (collection by test tube from an individual's vein). These include lower collection volumes, ≤150 μl versus ≥1.5 ml, convenience and reduced cost. In conjunction with the miniLab the testing can be done in local pharmacies or in a doctor's office with a 5-fold reduction in cost over large testing laboratories like Quest and LabCorp.[7]



| Collection Tube Filler | Housing | Activator | Collection Tube | SCU |

---

[6] "Evaluation of direct-to-consumer low-volume lab tests in healthy adults." https://www.jci.org/articles/view/86318

[7] Ioannidis JP. Stealth research: is biomedical innovation happening outside the peer-reviewed literature? JAMA. 2015;313(7):663–664.

23

**Theranos, Inc. Investment Memo**

The second major area of technology necessary to move to a state-of-the-art POC system is the laboratory itself. Theranos recognized that by exponentially decreasing the blood volume used, a much smaller more efficient highly automated miniature laboratory—the miniLab-- could be constructed and with the ability to connect via the Internet to Theranos's 'virtual analyzer' servers, they could move testing from centralized system that has existed until now to a decentralized/distributed one where any pharmacy or doctor's office could offer complete testing on the spot.

While other companies had been developing smaller and more efficient testing devices these were all designed to be highly specific (such as only for DNA testing), no other company was developing decentralized POC labs as early as Theranos, which started developing their technology in 2003. Instead their competitors focused on making these centralized labs more efficient.

**Technical Summary**

**Theranos, Inc. Investment Memo**



Theranos' system is designed to handle very small quantities of samples, potentially as small as a few drops of blood from a pinprick. Theranos' sample collection and transport devices collect small quantities of fluids for use by the cartridge. These technologies are also used within the miniLab which physically transports the small volumes of fluid from one location to another within the system.

The cartridges contain the consumable material used in the sample processing and the various components of the minilab processes and then perform detection and measurement of the analytes.

25

Analytes are specific substances, molecules or various micro-organisms or viruses whose concentration within the blood is being detected and measured. There are a variety of technologies uses in Medical Analyte detection. The Theranos minilab has various instruments for analyte detection.

Its Thermal cycling and isothermal fluorescence detection system includes a thermocycler, an isothermal system and a photodetector. These can be used to amplify and qualitatively detect the products of Nucleic Acid Amplification ("NAA") reactions. Thermal Cycling is used PCR a method that uses thermal cycling to amplify DNA. An isothermal (one temperature) system is for another NAA method known as Loop-mediated Isothermal Amplification ("LAMP"). Both methods exponentially copy vanishingly small quantities of DNA sequences, thus amplifying the DNA sequence enough so that it can be tagged and analyzed. The following patents focus on these techniques for use within a POC system.

Their general-purpose photodetector module contains optics and a high-sensitivity optical detector to measure fluorescence, a technique for detecting the presence of certain substances directly under an Ultraviolet light (UV), typically, or by labeling them with a dye that emits specific detectible frequencies of light under UV or other electromagnetic radiation. Additionally, the Photodetector module can detect Chemiluminescence, which is the emission of light as a result of a chemical reaction with a reagent, thus indicating that a particular substance is present.

Next, their Spectrophotometer module is a crossed Czerny-Turner spectrograph featuring a broadband pulsed-Xenon lamp. White light is used to pass through a sample and that light is then passed on to a spectrophotometer which breaks up visible light into its various frequencies at different angles, a detector then reads the strength of the light at each wavelength that has been absorbed by the sample. Different molecules absorb light at different wavelengths. The spectrum thus obtained can be read to indicate certain chemical constituents in the sample.

Finally, their microscope module detects cells and other components in samples by epifluorescence and dark-field microscopy. Epifluoresence microscopy focuses a specific frequency of light onto a specimen through a microscope, the fluorescence emitted by the specimen is then focused on a detector which then can detect that certain dyes, stains or antibodies have reacted with a specimen, thus indicating the presence of certain molecules.

26

**Theranos, Inc. Investment Memo**



FORTRESS HIGHLY CONFIDENTIAL

FIG00003320

**Theranos, Inc. Investment Memo**



28

**Theranos, Inc. Investment Memo**



**Patent Findings**

FORTRESS HIGHLY CONFIDENTIAL

FIG00003322

**Theranos, Inc. Investment Memo**



30

FIG00003323

**Theranos, Inc. Investment Memo**



FORTRESS HIGHLY CONFIDENTIAL

FIG00003324

**Theranos, Inc. Investment Memo**

## Damages



FIG00003325

Theranos, Inc. Investment Memo

**INVESTOR SPONSORSHIP**

Theranos has raised ~$858 million across five rounds of fundraising. The most recent Series C-2 preferred equity round closed in April-2015 and raised ~$686 million a post-money valuation of $8.9 billion. The following is a summary of the Company's capital raising history:

| Round | Dates | Price Per Share [1] | Capital Raised ($ in millions) [2] | Post-Money ($ in millions) |
|---|---|---|---|---|
| Series A Preferred | 12/17/2004 – 11/28/2005 | $0.05 - $0.15 | $5.9 | $20.0 |
| Series B Preferred | 2/3/2006 – 2/16/2006 | $0.18 | $10.0 | $34.7 |
| Series C Preferred | 10/13/2006 – 12/12/2006 | $0.56 | $33.2 | $140.6 |
| Series C-1 Preferred | 7/1/2010 – 1/14/2014 | $3.00 - $15.00 | $123.0 | $4,723.5 |
| Series C-2 Preferred | 2/7/2014 – 4/16/2015 | $17.00 | $685.6 | $8,920.2 |
| Total | | | $857.7 | |

1. All prices per share are listed as post-split prices. Theranos stock underwent a 1-to-5 split in roughly January 2014.
2. Some C-1 and C-2 shares were issued in exchange for services (e.g. directors' fees) and the Company did not receive cash for those shares.

**Exchange Offer**

The Company completed a recapitalization of its Series C-1 and C-2 investors. Beginning in August 2016, Theranos engaged in negotiations with representatives of some of the shareholders that had purchased stock in its Series C-1 and C-2 preferred equity rounds. On March 20, 2017, the culmination of these negotiations resulted in Theranos initiating an offer to exchange preferred stock" (the "Exchange Offer") to all holders of C-1 and C-2 Preferred Stock were eligible to participate.

Under the terms of the Exchange Offer, participating shareholders received new shares of Theranos Preferred stock with a more senior liquidation preference (C-1 participants were issued C-1A/B shares and C-2 participants were issued C-2A shares), a higher rate of conversion to Class A Common Stock, enhanced information rights, and other provisions. The enhanced rate of conversion-to-common effectively re-priced the participants at $5.00 per share of Class A common. Those who originally paid $15.00 per share of preferred stock received new shares that convert into common at 1:3, and those who originally paid $17.00 per share of preferred received new shares that convert at 1:3.4. In exchange for the enhanced conversion-to-common ratio, each Exchange Offer participant executed a blanket release of claims in favor of the Company and its officers and directors.

Of the shareholders who were eligible to participate in the Exchange Offer, all but two opted to exchange their shares. More than 99% of the eligible shares were exchanged. A third shareholder, Partner Fund Management ("PFM"), received the Exchange Offer, but settled separately while the Exchange Offer was still open and is no longer a shareholder of the Company. Of the two non-participants, one has since settled separately (Hall Black Diamond) with the Company and relinquished its shares, and the other (NFL receiver Larry Fitzgerald – received shares for free) chose not to participate for tax reasons (Fitzgerald is the sole holder of Series C-2 shares), but has indicated his support for the Company. The following table summarizes the Company's capitalization post the Exchange Offer, including key holders:

| Holder | Common Stock | | | Preferred Stock Series | | | | | | As Converted | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Class A | Class B | Options | A | B | C | C-2 | C-1 A/B | C-2A | Shares | % |
| Elizabeth Anne Holmes | - | 215.8 | - | 1.2 | - | - | - | - | - | 217.0 | 32.9% |
| Ramesh (Sunny) Balwani | 29.7 | - | - | - | - | - | - | - | - | 29.7 | 4.5% |
| ATA Ventures I, L.P. | - | - | - | - | 20.7 | 6.8 | - | - | - | 27.4 | 4.2% |
| Cox Investment Holdings, Inc | 1.0 | - | - | - | - | - | - | - | 5.9 | 21.0 | 3.2% |
| Dynasty Financial II, LLC | 1.0 | - | - | - | - | - | - | - | 5.9 | 21.0 | 3.2% |
| Madrone Partners, LP | 1.0 | - | - | - | - | - | - | - | 5.9 | 21.0 | 3.2% |
| Peer Ventures Group III, L.P. | 0.4 | - | - | - | - | - | - | 15.0 | - | 15.4 | 2.3% |
| Soda Springs Partners, LLC | 0.5 | - | - | - | - | - | - | - | 2.9 | 10.5 | 1.6% |
| Angela Chang | - | - | - | 6.7 | 1.1 | 2.7 | - | - | - | 10.4 | 1.6% |
| Michael Chang | - | - | - | 6.7 | 1.1 | 2.7 | - | - | - | 10.4 | 1.6% |
| Peer Ventures Group IV, L.P. | 0.5 | - | - | - | 0.0 | - | - | 2.3 | 0.8 | 10.2 | 1.5% |
| Draper Fisher Jurvetson Fund VII, L.P. | - | - | - | 10.0 | - | - | - | - | - | 10.0 | 1.5% |
| Subtotal | 34.0 | 215.8 | - | 24.5 | 22.9 | 12.1 | - | 17.3 | 21.4 | 404.0 | 61.2% |
| Others | 23.8 | - | 104.2 | 21.8 | 30.6 | 46.7 | 0.0 | 5.3 | 5.9 | 256.4 | 38.8% |
| Total | 57.8 | 215.8 | 104.2 | 46.3 | 53.5 | 58.8 | 0.0 | 22.7 | 27.3 | 660.4 | 100.0% |
| % of Total - As Converted | 8.8% | 32.7% | 15.8% | 7.0% | 8.1% | 8.9% | 0.0% | 4.7% | 14.1% | 100.0% | |
| FIG Warrants - 4% of Company | - | - | - | - | - | - | - | - | 8.1 | 27.5 | 4.0% |
| Total (inc. FIG Warrants) | 57.8 | 215.8 | 104.2 | 46.3 | 53.5 | 58.8 | 0.0 | 22.7 | 35.4 | 687.9 | 100.0% |
| % of Total - As Converted (inc. FIG) | 8.4% | 31.4% | 15.1% | 6.7% | 7.8% | 8.5% | 0.0% | 4.5% | 17.5% | 100.0% | |

33

**Theranos, Inc. Investment Memo**

## Liquidation Preferences (Preferred Equity)

The Company's preferred equity is structured as participating preferred. The total liquidation preference of Theranos's preferred shares is $632.7 million. In a liquidation scenario, the proceeds would flow in the following order of priority:

First Tranche ("Senior Preferred") – all *pari passu*

| Share Class | Issued Shares | Liquidation PPS | Liquidation Preference |
|---|---|---|---|
| Series C-1A | 18,508,335 | $3.00 | $55,525,005 |
| Series C-1B | 4,183,365 | $15.00 | $62,750,475 |
| Series C-2A | 27,297,049 | $17.00 | $464,049,833 |
| Total | | | $582,325,313 |

As mentioned above, as part of the proposed transaction, Fortress would be granted warrants equivalent to 4% of the Company's total capitalization on a fully diluted basis for the Company's next or last round of preferred equity, at the time of exercise. If Fortress were to exercise its warrants for the last round of preferred equity (Series C-2A) on the Closing Date, Fortress would hold 8.1 million Series C-2A preferred shares, which would have a liquidation preference of $137.6 million and represent ~19.1% of the most senior preferred liquidation preference (the Fortress total liquidation preference of ~$137.6 million of a $720 million total senior preference stack). The table below summarizes the first tranche liquidation preference assuming Fortress exercises its warrants for the last round of preferred equity (Series C-2A) on the Closing Date:

| Share Class | Issued Shares | Liquidation PPS | Liquidation Preference |
|---|---|---|---|
| Series C-1A | 18,508,335 | $3.00 | $55,525,005 |
| Series C-1B | 4,183,365 | $15.00 | $62,750,475 |
| Series C-2A – Existing | 27,297,049 | $17.00 | $464,049,833 |
| *Series C-2A – Fortress* | *8,092,751* | *$17.00* | *$137,576,767* |
| Total | | | $719,902,080 |

Second Tranche (Series C-2, C-1, C) – all *pari passu*

| Share Class | Issued Shares | Liquidation PPS | Liquidation Preference |
|---|---|---|---|
| Series C | 58,810,045 | $0.564 | $33,168,865.40 |
| Series C-1 | - | - | $- |
| Series C-2 | 23,529 | $17.00 | $399,993 |
| Total | | | $33,568,858.40 |

Third Tranche (Series B) – all *pari passu*

| Share Class | Issued Shares | Liquidation PPS | Liquidation Preference |
|---|---|---|---|
| Series B | 53,494,262 | $0.184628 | $9,876,538.60 |

Fourth Tranche (Series A) – all *pari passu*

| Share Class | Issued Shares | Liquidation PPS | Liquidation Preference |
|---|---|---|---|
| Series B | 46,320,045 | $0.15 | $6,948,006.75 |

34

FIG00003327

Theranos, Inc. Investment Memo

## HISTORICAL FINANCIAL ANALYSIS

| ($ in millions) | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | | | | | |
| Net Revenue | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Operating Expenses | (16.1) | (14.3) | (14.0) | (13.4) | (11.3) | (9.7) | (7.6) | (8.4) | (11.1) | (8.6) | (114.6) |
| **EBITDA** | $ (16.1) | $ (14.3) | $ (14.0) | $ (13.4) | $ (11.3) | $ (9.7) | $ (7.6) | $ (8.4) | $ (11.1) | $ (8.6) | $ (114.6) |
| | | | | | | | | | | | |
| **Balance Sheet** | | | | | | | | | | | |
| **Assets** | | | | | | | | | | | |
| Cash | $ 169.6 | $ 155.4 | $ 132.6 | $ 116.6 | $ 59.8 | $ 54.8 | $ 52.3 | $ 35.4 | $ 24.1 | $ 21.2 | |
| PPE | 55.5 | 54.6 | 52.9 | 52.0 | 50.8 | 49.9 | 49.0 | 48.2 | 47.3 | 45.0 | |
| Notes Receiveable | 25.9 | 25.9 | 25.9 | 25.9 | 25.9 | 25.9 | 25.9 | 25.9 | 25.9 | 25.9 | |
| Interest Receiveable | 2.2 | 2.2 | 2.2 | 2.3 | 2.3 | 2.4 | 2.4 | 2.4 | 2.5 | 2.4 | |
| Prepaid Assets | 3.4 | 3.6 | 6.6 | 3.7 | 3.5 | 3.9 | 3.9 | 6.7 | 5.7 | 5.2 | |
| Other | 0.4 | 0.4 | 0.5 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | |
| **Total Assets** | $ 257.0 | $ 242.0 | $ 220.7 | $ 200.9 | $ 142.6 | $ 137.1 | $ 133.7 | $ 118.8 | $ 105.8 | $ 99.9 | |
| **Liabilities** | | | | | | | | | | | |
| Accounts Payable | $ 14.5 | $ 12.9 | $ 8.9 | $ 11.7 | $ 8.4 | $ 6.2 | $ 7.3 | $ 6.3 | $ 4.8 | $ 7.3 | |
| Accrued Salaries & Benefits | 5.6 | 5.9 | 3.3 | 2.9 | 2.7 | 2.8 | 2.6 | 2.5 | 2.4 | 2.5 | |
| Other Accrued Expenses | 2.9 | 4.6 | 6.3 | 3.2 | 9.7 | 12.3 | 7.8 | 8.4 | 3.7 | 3.5 | |
| Walgreen's Note Payable | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | |
| Accrued Settlements - Existing | 10.0 | 10.0 | 10.0 | 10.0 | 5.0 | 5.0 | 5.0 | 5.0 | 30.0 | 30.1 | |
| Litigation Reserves - Future | 88.5 | 88.5 | 88.5 | 83.6 | 40.0 | 40.0 | 40.0 | 30.0 | 10.0 | 9.9 | |
| Deferred Rent | 27.4 | 27.3 | 26.7 | 26.6 | 26.5 | 26.2 | 26.1 | 26.0 | 25.9 | 25.8 | |
| Services Provided - In Lieu of Stock | 13.3 | 13.3 | 13.3 | 13.3 | 13.3 | 13.3 | 13.3 | 13.3 | 13.3 | 13.3 | |
| Capital Leases | 3.0 | 2.9 | 2.8 | 2.7 | 2.3 | 2.2 | 2.1 | 2.0 | 1.9 | 1.8 | |
| Accrued Interest | 1.5 | 1.5 | 1.5 | 1.5 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.7 | |
| **Total Liabilities** | $ 206.7 | $ 207.0 | $ 201.3 | $ 195.6 | $ 149.5 | $ 149.5 | $ 145.7 | $ 135.1 | $ 133.8 | $ 135.9 | |
| Stockholder's Equity | $ 50.3 | $ 35.0 | $ 19.4 | $ 5.3 | $ (6.8) | $ (12.4) | $ (12.0) | $ (16.3) | $ (28.0) | $ (36.1) | |
| **Total Liabilities & Equity** | $ 257.0 | $ 242.0 | $ 220.7 | $ 200.9 | $ 142.6 | $ 137.1 | $ 133.7 | $ 118.8 | $ 105.8 | $ 99.9 | |

Fiscal Year 2017

### Income Statement

Theranos's income statement is similar to that of a pre-revenue medical device company. To date, the Company has generated no revenue. Of the $114.6 million of the YTD FY 2017 operating expenses, approximately 52% of these related to professional fees, the majority of which represent legal expenses. It is expected that professional fees will reduce over time as the Company's resolves its remaining legal matters. Other notable expenses that comprise the total operating expense include salaries ($26.2 million or 23% of the YTD FY 2017 total operating expenses) and facility and maintenance costs ($13.8 million or 12% of the YTD FY 2017 total operating expenses).

### Balance Sheet

- *Walgreen's Note Payable*: $40 million unsecured note payable to Walgreens as part of settlement reached in July 2017 that matures in Jun-2022 and accrues interest at 0.79% per annum.

- *Accrued Settlements*: Oct-2017 balance of $30.1 million includes existing settlement payments of $30.1 million to Walgreens ($15 million in Dec-2017 and $5 million in Jun-2018), Arizona AG ($100k in Dec-2017) and Rupert Murdoch ($5 million in May-2018 and $5 million in May-2019).

- *Litigation Reserves*: The Oct-2017 legal reserve balance of $9.9 million covers an estimate of the settlement costs associated with the Arizona class action lawsuits.

- *Deferred Rent*: Theranos currently has two multi year lease agreements, one for 1701 Page Mill and one for the Newark location. Prices increase over time according to the lease agreements. Accounting rules require the Company to accrue the expense based on an annual average for the duration of the lease agreements. Deferred rent accruals reflect the fact that in the early year of the lease, the Company pays less than the annual average (i.e., a liability is accrued). In the late years of the lease, the accruals are reversed.

35

FIG00003328

**Theranos, Inc. Investment Memo**

- *Services Provided – In Lieu of Stock*:  This is a liability to the Company's previous corporate counsel (Boies Schiller & Flexner) for past services.  Payment in the form of equity was promised to this firm instead of cash, but could not be made due to the lack of proper equity valuation.  An estimated of the value of the services provided was made based on hours and accrued to reflect the existence of a liability.
- *Capital Leases*:  Represent leases associated with equipment leases.

36

FIG00003329

## Theranos, Inc. Investment Memo

### FINANCIAL PROJECTIONS

| $ in 000s | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Position** | | | | | | | | | | | | | | | | | |
| Beginning Total Cash | $17,603 | $59,518 | $53,525 | $47,267 | $41,249 | $36,711 | $36,822 | $26,532 | $22,440 | $18,682 | $15,300 | $12,221 | $8,838 | $5,839 | ($4,062) | ($16,891) | ($22,061) |
| Beginning Restricted Cash | 6,613 | 6,613 | 6,613 | 6,613 | 6,613 | 6,613 | 6,613 | 6,613 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 |
| Beginning Free Cash | $10,990 | $52,906 | $46,913 | $40,654 | $34,636 | $30,098 | $30,209 | $19,920 | $21,328 | $17,569 | $14,187 | $11,108 | $7,726 | $4,726 | ($5,175) | ($18,004) | ($23,174) |
| **Monthly Revenues** | | | | | | | | | | | | | | | | | |
| Zika Device Revenue | | | | | | $30 | $30 | $30 | $90 | $90 | $90 | $90 | $120 | $480 | $600 | $690 | $540 |
| CT/NG/TV Device Revenue | | | | | | | | | | 300 | 300 | 300 | 600 | 2,100 | 3,000 | 3,750 | 4,050 |
| Total Device Revenue | – | – | – | – | – | $30 | $30 | $30 | $90 | $390 | $390 | $390 | $720 | $2,580 | $3,600 | $4,440 | $4,590 |
| Zika reagent revenue | | | | | | $4 | $8 | $13 | $25 | $38 | $50 | $63 | $79 | $363 | $600 | $875 | $1,138 |
| CT/NG/TV reagent revenue | | | | | | | | | | 89 | 177 | 266 | 443 | 2,479 | 4,870 | 8,013 | 11,555 |
| Total Reagent revenue | – | – | – | – | – | $4 | $8 | $13 | $25 | $126 | $227 | $328 | $522 | $2,842 | $5,470 | $8,888 | $12,692 |
| Spin out revenue | | | | $6 | $6 | $7 | $7 | $7 | $8 | $8 | $8 | $9 | $9 | $31 | $36 | $41 | $48 |
| Excess equipment liquidation | 158 | 100 | | | | | | | | | | | | | | | |
| D&O Recovery | 5,000 | | | | | | | | | | | | | | | | |
| Licensing | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | |
| Total Other Revenue | $5,158 | $100 | – | $6 | $6 | $7 | $7 | $7 | $8 | $8 | $8 | $9 | $9 | $31 | $36 | $41 | $48 |
| Total Revenue | $5,158 | $100 | – | $6 | $6 | $41 | $45 | $50 | $123 | $524 | $626 | $727 | $1,251 | $5,452 | $9,105 | $13,369 | $17,330 |
| **Monthly Cash Expenses** | | | | | | | | | | | | | | | | | |
| Facilities Spend | $2,201 | $1,400 | $1,400 | $1,400 | $1,100 | $1,100 | $2,100 | $300 | $300 | $300 | $300 | $300 | $300 | $900 | $900 | $900 | $900 |
| Salary and Benefits | 2,226 | 1,964 | 1,964 | 1,964 | 1,677 | 1,593 | 1,514 | 1,514 | 1,514 | 1,514 | 1,514 | 1,514 | 1,514 | 4,541 | 4,541 | 4,541 | 4,541 |
| Consultants | 735 | 202 | 182 | 187 | 187 | 127 | 97 | 97 | 72 | 77 | 77 | 72 | 77 | 221 | 221 | 721 | 216 |
| Legal | 2,305 | 1,585 | 1,585 | 1,585 | 800 | 800 | 800 | 500 | 500 | 500 | 500 | 500 | 500 | 1,500 | 1,500 | 1,500 | 1,500 |
| Settlements | 15,100 | | | | | 5,000 | 5,000 | | | | | | | | | | |
| NRE | 400 | 100 | 100 | | | | 200 | 200 | | 200 | 200 | | | 300 | 300 | | |
| Reagent Inventory build costs | | | | | 1 | 1 | 2 | 3 | 15 | 27 | 39 | 62 | 85 | 430 | 773 | 1,200 | 1,601 |
| Instrument Inventory build costs | | | | | | | 36 | 36 | 108 | 468 | 468 | 468 | 864 | 3,528 | 4,716 | 5,544 | 5,400 |
| Other | 2,035 | 396 | 570 | 429 | 310 | 310 | 290 | 1,110 | 310 | 310 | 310 | 290 | 290 | 1,183 | 1,243 | 1,343 | 1,442 |
| Total Cash Expenses | $24,993 | $5,647 | $5,801 | $5,565 | $4,111 | $8,967 | $9,838 | $3,692 | $3,379 | $3,396 | $3,188 | $3,602 | $3,729 | $12,603 | $19,194 | $15,749 | $15,601 |
| Utilized Restricted Cash | | | | | | | | $5,500 | | | | | | | | | |
| **Cash Flow** | | | | | | | | | | | | | | | | | |
| (Less) Increase in NWC | | ($159) | ($159) | ($159) | ($159) | ($159) | ($159) | ($159) | ($159) | ($159) | ($159) | ($159) | ($159) | ($1,659) | ($1,659) | ($1,659) | ($1,659) |
| (Less) Capex | | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (17) | (50) | (50) | (50) | (50) |
| Net monthly cash flow | ($19,835) | ($5,722) | ($5,977) | ($5,735) | ($4,280) | ($9,102) | ($9,968) | ($3,757) | ($3,431) | ($3,047) | ($2,737) | ($3,050) | ($2,654) | ($8,859) | ($11,798) | ($4,089) | $20 |
| **Financing Cash Flows** | | | | | | | | | | | | | | | | | |
| Principal Advanced - Tranche A | $61,750 | | | | | | | | | | | | | | | | |
| Cash Interest Paid - Tranche A | | (271) | (282) | (284) | (258) | (287) | (280) | (291) | (284) | (295) | (297) | (290) | (301) | (907) | (895) | (944) | (959) |
| Amortization - Tranche A | | | | | | | | | | | | | | | | | (975) |
| Principal Advanced - Tranche B | | | | | | 9,500 | | | | | | | | | | | |
| Cash Interest Paid - Tranche B | | | | | | | (42) | (43) | (44) | (40) | (44) | (43) | (45) | (135) | (136) | (137) | (143) |
| Amortization - Tranche B | | | | | | | | | | | | | | | | | |
| Principal Advanced - Tranche C | | | | | | | | | | | | | | | | | |
| Cash Interest Paid - Tranche C | | | | | | | | | | | | | | | | | |
| Amortization - Tranche C | | | | | | | | | | | | | | | | | |
| Financing Cash Flows | $61,750 | ($271) | ($282) | ($284) | ($258) | $9,213 | ($322) | ($335) | ($327) | ($335) | ($342) | ($333) | ($346) | ($1,041) | ($1,031) | ($1,081) | ($2,077) |
| **Ending Cash Position** | | | | | | | | | | | | | | | | | |
| Ending Total Cash | $59,518 | $53,525 | $47,267 | $41,249 | $36,711 | $36,822 | $26,532 | $22,440 | $18,682 | $15,300 | $12,221 | $8,838 | $5,839 | ($4,062) | ($16,891) | ($22,061) | ($24,118) |
| Ending Restricted Cash | 6,613 | 6,613 | 6,613 | 6,613 | 6,613 | 6,613 | 6,613 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 | 1,113 |
| Ending Free Cash | $52,906 | $46,913 | $40,654 | $34,636 | $30,098 | $30,209 | $19,920 | $21,328 | $17,569 | $14,187 | $11,108 | $7,726 | $4,726 | ($5,175) | ($18,004) | ($23,174) | ($25,230) |

The financial projections shown above include represent the management's projections. The following is a summary of the key assumptions included in the projections above (items outlined in red around described below):

- **Zika Device Revenue:** the Company receives FDA EUA in May-2018, which results in small initial commercial revenues to government agencies, public health and research laboratories.

- **CT/NG/TV Reagent Revenue:** the Company receives CE Marking in Aug-2018 for its CT/NG/TV application for the treatment of STIs gets and initial commercial sales in Europe are generated in Sep-2018.

- **D&O Recovery:** the Company expects to receive its last D&O recovery payment under its D&O insurance policy in Dec-2017 (note - $5 million was received in Nov-2017).

- **Facilities Spend:** the Company recently relocated its headquarters to its Newark, CA facility and is in the process of subleasing a significant portion of that space. The Company was close to finalizing a termination of its Palo Alto lease in early Dec-2017 as the new tenant fell through at the last minute. The financial projections assume the Palo Alto lease is terminated in Jun-2018 and a significant portion of the Newark facility is sublet in Mar-2018.

- **Salary & Benefits:** the financial projections call for additional RIFs that would reduce headcount to ~100 FTEs (156 FTEs today) – one RIF in Jun-2018 and additional RIFs from April to June 2018.

37

FIG00003330

**Theranos, Inc. Investment Memo**

- Legal Costs:  the cash forecast calls for a reduction in legal spend as it expects to resolve the open legal matters over the next twelve months.
- Settlement Costs:  includes scheduled settlement costs described as follows:
  - Walgreens settlement payment of $15 million in Dec-2017 and $5 million in Jun-2018;
  - Arizona Attorney General settlement payment of $100k in Dec-2017;
  - Rupert Murdoch settlement payment of $5 million in May-2018 and $5 million in Jun 2019;
- Utilized Restricted Cash:  The vast majority of the restricted cash relates to LOCs relating to leases at the Palo Alto and Newark, CA facilities.  The financial projections assume the Palo Alto lease is terminated in Jun-2018, which would result in the release of $5 million held as collateral for the LOCs.

38

FIG00003331

**Theranos, Inc. Investment Memo**

## LIST OF EXHIBITS

**Exhibit I – Term Sheet**

**Exhibit II – Technology Advisory Board**

**Exhibit III – Scientific Advisory Board**

**Exhibit IV – Key Issues Summary**

**Exhibit V – Profiled Companies**

**Exhibit VI – Risk Assistance Network +Exchange Preliminary Due Diligence Report**

39

**Theranos, Inc. Investment Memo**

## Exhibit I – Term Sheet

| | |
|---|---|
| **Borrower:** | The SPV (as defined below) (the "**Borrower**"). |
| **Guarantor(s):** | Theranos, Inc. ("**Theranos**" or the "**Company**") and its subsidiaries. |
| **Lender and Agent:** | Fortress Credit Corp., for itself and/or as agent on behalf of one or more of its affiliates or assignees (the "**Lender**"). |
| **Term Loan:** | $100 million senior secured delayed draw term loan (the "**Term Loan**"). The Term Loan is broken up into three tranches (individually referred to as "**Loans**") that rank pari passu and are available as follows:<br>• **Tranche A**: $65 million drawn on the Closing Date;<br>• **Tranche B**: $10 million available subject to the FDA EUA authorization or 510(k) clearance (whichever is earlier) of the Company's Zika application;<br>• **Tranche C**: $25 million available subject to a milestone that is mutually agreed upon by Lender and the Company. |
| **Maturity Date:** | All outstanding Loans shall become due and payable 42 months from the Funding Date of each Loan. |
| **Interest:** | 1-month LIBOR + 11.00% per annum, subject to a floor of 2.0% on 1-month LIBOR, of which 8.0% per annum will be paid in kind, accruing monthly, and the balance will be paid monthly in arrears. For any period when an Event of Default shall occur and be continuing, the interest rate shall be 1-month LIBOR + 13.0% per annum, subject to a floor of 2.0% on 1-month LIBOR. |
| **Upfront Fee:** | 5.0% of each Loan funded, provided that the Upfront Fee shall be due and payable at the time of each draw and only in an amount equal to 5.0% of the applicable draw. Lender may fund each Loan net of the applicable Upfront Fee. |
| **Final Payment Fee:** | 7.5% of each Loan funded, provided that the Final Payment Fee shall be payable upon the repayment of the Term Loan in full (whether at maturity or otherwise). |
| **Scheduled Amortization:** | • <u>Tranche A</u>: Twenty-one (21) monthly amortizing payments starting twenty-one (21) months after the Funding Date. The first three (3) payments shall be $325,000 each, followed by nine (9) payments of $1.3 million each and then nine (9) remaining payments of $3.25 million each.<br>• <u>Tranche B</u>: Twenty-one (21) monthly amortizing payments starting twenty-one (21) months after the Funding Date. The first three (3) payments shall be $50,000 each, followed by nine (9) payments of $200,000 each and then nine (9) remaining payments of $500,000 each.<br>• <u>Tranche C</u>: Twenty-one (21) monthly amortizing payments starting twenty-one (21) months after the Funding Date. The first three (3) payments shall be $125,000 each, followed by nine (9) payments of $500,000 each and then nine (9) remaining payments of $1.25 million each. |
| **Collateral:** | The Term Loan will be a senior secured debt obligation of the Borrower and will rank contractually senior to all current and future debt of the Borrower. The Lender will have a perfected first lien security interest on all assets of the Borrower and of each guarantor including, without limitation, patents and patent applications (see Special Purpose Vehicle Structure clause below) and the capital stock of all wholly-owned subsidiaries of the Borrower and each guarantor. |
| **Special Purpose Vehicle** | As part of the Transaction, all Patents and Patent Rights assigned or owned by the Company, shall be sold to a newly formed Special Purpose Vehicle (the "**SPV**") whose equity will initially be 99.8% owned by the Lender and 0.2% owned by the Company. Upon the repayment of the Term Loan, assuming no event of default has occurred and is continuing, the Company shall automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 99.8% by the Company and 0.2% owned by the Lender (and the operating agreement of the SPV shall permit and contemplate such equity issuance). |

40

| | |
|---|---|
| | However, if an event of default has occurred and is continuing and the Lender elects to monetize the SPV's assets, any proceeds received by the SPV or the Company from the monetization of the SPV's assets, including its intellectual property (the "**Gross Proceeds**") shall be applied as follows: <br><br> • first, to repay all outstanding Term Loans and all other obligations under the Term Loan (including accrued and unpaid interest) <br><br> • second, in accordance with the Lender's on the one hand, and the Company's on the other hand, share of the equity in the SPV, which shall automatically be adjusted as follows: <br><br>     o Lender will own 99.8% of the equity in the SPV until it receives a multiple of 2.50x on the Term Loan Amount (as defined below); <br><br>     o Once Lender has received a multiple of 2.50x on the Term Loan Amount, the SPV will automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 50.0% by the Company and 50.0% owned by the Lender; and <br><br>     o Once Lender has received a multiple of 3.00x on the Term Loan Amount, the SPV will automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 99.8% by the Company and 0.2% owned by the Lender. <br><br> "**Term Loan Amount**" shall mean aggregate amount of all advances made under the Term Loan (including any interest paid-in-kind) and any amounts expended by Lender to monetize the SPV's intellectual property. <br><br> The Company will enter into an agreement with the SPV that shall grant the Company a non-exclusive license to use the Patents and Patent Rights. <br><br> For the avoidance of doubt, during the term of the Term Loan, provided no event of default has occurred and is continuing, any action to enforce, license or encumber the patents in the SPV and any bankruptcy filing can only be done by unanimous consent of the Company and the Lender (and after an event of default has occurred and is continuing, any such actions will be controlled and directed by the Lender). |
| **Events of Default:** | The Term Loan documents will contain events of default customarily found in loan agreements for similar financings (with customary grace periods for certain events of default). <br><br> Upon the occurrence and during the continuance of an event of default, the ownership structure of the SPV will not change; however, Fortress shall have sole control over the monetization of the SPV's assets. |
| **Permitted Uses:** | General working capital needs of the Company and its subsidiaries, including transaction-related expenses, settlement costs for legal matters open as of the Closing Date (not to exceed a cap of $40 million), $1.4 million allocated per year to patent prosecution and maintenance and $2.5 million allocated over the term of the Term Loan to patent development and enhancement (collectively, the "**Permitted Uses**"). |
| **Mandatory Amortization:** | Net cash proceeds from asset sales (other than the sale of Intellectual Property) in excess of $5 million in aggregate, shall, in each case, be used to reduce the outstanding amount of the Term Loan, first to retire Tranche A, then Tranche B and then the Tranche C. <br><br> Net cash proceeds from the sale of Intellectual Property or the monetization of Intellectual Property, shall, in each case, be used to reduce the outstanding amount of the Term Loan, first to retire Tranche A, then Tranche B and then the Tranche C. |
| **Prepayment Premium:** | As a result of a prepayment (for any reason other than mandatory amortization, including as a result of acceleration of the Term Loans or a bankruptcy) by or on behalf of the Company of all or a portion of the outstanding Term Loan, the following premiums shall apply with respect to the payment of such Loans: 5% in months 1-12 after the Closing Date, 3.5% in months 13-24, and no premium thereafter. |
| **Warrants:** | Company to grant the Lender detachable penny warrants for the Company's next or last series of Preferred Stock in an amount equivalent to 3.5% of the Company's outstanding shares on a fully-diluted basis at the time of exercise. |
| **Board Observer:** | The Lender shall have the right to appoint a board observer during the term of the Term Loan, subject to such observer entering into a mutually agreeable confidentiality agreement with the Company. |

41

Theranos, Inc. Investment Memo

| | |
|---|---|
| **Covenants:** | Customary for this type of transaction, including, without limitation, limitation on asset sales, mergers, and future acquisitions, etc., in each case with the Lender's prior written consent. Company will provide Lender with customary financial reporting, as well as such other reports as Lender may reasonably require. |
| **Operational Covenants:** | Customary for this type of transaction, but including, without limitation, light operational covenants to be mutually agreed upon with the Company. |
| **Due Diligence:** | The Company will promptly provide due diligence information per a due diligence checklist to be provided by Lender, including, but not limited to, organizational documents, copyrights and trademarks, inter-company and other agreements with affiliates, leases, licenses, supply agreements, and insurance policies. |
| **Conditions Precedent:** | Funding of the Term Loan will be made subject to the satisfaction of conditions precedent customary for similar financings. |
| **Representations and Warranties:** | The Term Loan documents will contain representations and warranties customarily found in loan agreements for similar financings. |
| **Governing Law:** | All documentation in connection with the Term Loan will be governed by the laws of the State of New York. Venue for resolution of any disputes shall be in the Federal or State courts in the Borough of Manhattan. Parties will agree to waive jury trial in connection with any litigation arising from the Term Loan agreement. |

42

 FIG00003335

## Theranos, Inc. Investment Memo

### Exhibit II – Technology Advisory Board

| | |
|---|---|
| **Harvey Blanch, Ph.D.** †† | Professor of chemical engineering at U.C. Berkeley and senior faculty scientist at the Lawrence Berkeley National Laboratory. Award-winning, published researcher and educator in biomechanical engineering. Served as a Chair of the Department of Chemical Engineering at U.C. Berkeley. |
| **John Moalli, Sc.D.** | Principal at Exponent. Nationally recognized expert and published author on polymeric materials. Academic appointment at Stanford University teaching a course in Engineering Design and serves as an academic advisor to undergrad students. |
| **Allen Northrup, Ph.D.** † | Co-founder of Cepheid and MicroFluidic Systems. His research work was conducted at the Lawrence Livermore National Laboratory, where he developed fiber-optic biosensors and micro-fluorescence imaging systems, among other analytical instruments. Cepheid's next-gen bio-analytical detection system, GenXpert — which Northrup co-invented — recently was approved by the World Health Organization for its tuberculosis test. |
| **Clint Ostrander, M.S.** | Former CEO and president of Kozio Inc., which provides in-system diagnostics and functional test software for electronic products. He worked as a scientific medical researcher at Stanford University and was founder and CEO of Trace Analytical, where he developed and patented the company's core technology, reduction gas detection. |
| **Norbert Pelc, Sc.D.** †† | Chair of Stanford University's Department of Bioengineering. Served on the first National Advisory Council of the National Institute of Biomedical Imaging and Bioengineering of the NIH. Fellow of the American Association of Physicists in Medicine, the International Society for Magnetic Resonance in Medicine and the American Institute of Medical and Biological Engineering. |
| **Mark Prausnitz, Ph.D.** ‡ | Professor and J. Erskine Love Chair in Chemical and Biomolecular Engineering at the Georgia Institute of Technology. In collaboration with Emory University, CDC and other organizations, Dr. Prausnitz's group is advancing microneedles from device design and fabrication through pharmaceutical formulation and pre-clinical animal studies and into studies in human subjects. |
| **Channing Robertson, Ph.D.** ‡ | Co-chair. Ruth G. and William K. Bowes Professor in the School of Engineering, Emeritus, at Stanford University. Served as Chair of the Department of Chemical Engineering and as Senior Associate Dean for Faculty and Academic Affairs. Founding Fellow of the American Institute for Medical and Biological Engineering. Senior Member of the Biomedical Engineering Society. |
| **Howie Rosen, M.B.A, M.S.** † | Co-chair. Serves on the Board of Directors of AcelRx Pharmaceuticals since 2008 and as CEO from 2015-17. Previously, he was VP, Commercial Strategy at Gilead Sciences. Prior to Gilead, Mr. Rosen was President of Alza Corp., which Johnson & Johnson acquired in 2001. He serves on the boards of Entrega, Kala Pharmaceuticals and ALCOBRA, where he has served as chairman since 2014. |

\* Established in 2017
† Member, National Academy of Engineering
‡ Current or past academic chair position

43

FIG00003336

**Theranos, Inc. Investment Memo**

**Exhibit III – Scientific Advisory Board**

| | |
|---|---|
| David Helfet, M.D. | Co-chair. Director of the Orthopedic Trauma Service, Hospital for Special Surgery and Professor of Orthopedic Surgery, Weill Cornell Medicine. Past President of the Orthopedic Trauma Association. Published extensively on orthopedic trauma topics including numerous articles and book chapters |
| Susan Evans, Ph.D. | Co-chair. Has significant experience in diagnostics and health technology companies. Served as President, Secretary and member of the Board of Directors for the American Association for Clinical Chemistry. Served as a member of the Board of Dir. and Pres. of National Academy of Clinical Biochemistry (NACB), now the Academy of the AACC. |
| William Foege, M.D. | Epidemiologist and former Director of the U.S. Centers for Disease Control and Prevention. Received the Presidential Medal of Freedom in 2012. Was a senior medical advisor to the Bill and Melinda Gates Foundation from 1999 until his retirement in 2011. |
| Ann Gronowski, Ph.D. | Professor in the Department of Pathology and Immunology and the Department of Obstetrics and Gynecology at the Washington University School of Medicine in St. Louis. Board certified in Clinical Chemistry. Co-Medical Director of the clinical chemistry, serology and immunology laboratories at Barnes-Jewish Hospital. Past President of the American Association of Clinical Chemistry and the American Board of Clinical Chemistry. |
| Larry Kricka, Ph.D. | Professor of Pathology and Laboratory Medicine at the University of Pennsylvania and was director of the General Chemistry Laboratory and the Endocrinology Laboratory at the Hospital of the University of Pennsylvania. Fellow of the Royal College of Pathologists. Member of the Editorial Board of Clinical Chemistry and Analytical Biochemistry. Past editor-in-chief of Luminescence. Holds more than 30 U.S. patents. |
| Jack Ladenson, Ph.D. | Oree M. Carroll and Lillian B. Ladenson Prof. of Clinical Chemistry at the Washington Univ. School of Medicine. Served as President of the AACC and the Academy of Clinical Laboratory Physicians and Scientists. Past chair of the Editorial Board of the journal Clinical Chemistry. Directs clinical pathology programs for Pathologists Overseas Inc. |
| Andy Miller, M.D. | Assistant Attending Physician in Infectious Diseases at the Hospital for Special Surgery and New York-Presbyterian Hospital. Assistant Professor of Clinical Medicine at Weill Cornell Medicine. Board certified in Infectious Diseases and Internal Medicine by the American Board of Internal Medicine. |
| Steven Spitalnik, M.D. [†] | Professor of Pathology and Cell Biology and the Vice Chairman of Laboratory Medicine at Columbia University Medical Center. Co-Director of the Laboratory of Transfusion Biology. Member of the Academy of Clinical Laboratory Physicians & Scientists. Member of the Editorial Boards of Transfusion, Transfusion Medicine Reviews and Current Opinion in Hematology. Lead author of Clinical Pathology Board Review. |
| Greg Tsongalis, Ph.D. | Director of an Ivy-League molecular pathology laboratory and co-director of the translational research program at the Norris Cotton Cancer Center. His lab was an early adopter of automation for high-volume molecular infectious disease testing and active in the development of molecular techniques for use with unconventional specimen types. His laboratory is currently applying state-of-the-art molecular techniques to improve patient management through precision medicine. |

* Scientific and Medical Advisors formalized into board in 2016
† Current or past academic chair position

| | |
|---|---|
| Carl Wittwer, M.D., Ph.D. | Professor of Pathology at the University of Utah Medical School. Dr. Wittwer has published more than 100 research articles and book chapters focusing on technique and instrument development in molecular diagnostics. He developed rapid-cycle PCR techniques for DNA amplification in 10-15 min and later adapted flow cytometry optics to thermal cycling for real-time monitoring of PCR. He introduced SYBR Green I, fluorescent hybridization probes and melting analysis to real-time PCR, techniques that are widely used in real-time instruments today. He received a Ph.D. from Utah State University and an M.D. from the University of Michigan. Dr. Wittwer was co-founder of BioFire (purchased by Roche) and primary inventor of the Roche LightCycler. |
| Alan Wu, Ph.D. | Professor of Laboratory Medicine at the University of California, San Francisco. Co-Director of Core Laboratory at the Zuckerberg San Francisco General Hospital. Served as Assistant Professor of Pathology and Laboratory Medicine at the University of Texas Health Science Center in Houston. Assoc. Clinical Chemistry Director at Hermann Hospital. |

44

Theranos, Inc. Investment Memo

**Exhibit IV – Key Issues Summary**



FIG00003338

**Theranos, Inc. Investment Memo**



FORTRESS HIGHLY CONFIDENTIAL

FIG00003339

**Theranos, Inc. Investment Memo**



FORTRESS HIGHLY CONFIDENTIAL

FIG00003340

**Theranos, Inc. Investment Memo**

**Exhibit V – Profiled Companies**

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  █████████████ ████████████████████████████ ██████████
  ████████████████████████████████████████████████

- ████████████████████████████████████ ████████████████
  ██████████████████████████████████████████

- ████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  █████████

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████████

- ████████████████████████████████████████████
  ████████████████████████████████████████████████████
  █████████████████████████████████

- ████████████████████████████████████████████████████
  ███████████████████████

- ████████████████████████████████████████
  ████████████████████████████████████████████████████

- █████████████████████ ██████████████████████████████
  █████████████

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████
  ████████████████████████████████

- █████████████████████████████████████████████
  ████████████████

FORTRESS HIGHLY CONFIDENTIAL

FIG00003341

**Theranos, Inc. Investment Memo**

**Exhibit VI – Risk Assistance Network +Exchange Preliminary Due Diligence Report**

[insert]

49

FIG00003342

# EXHIBIT E

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Robert Khuzami
(202) 879-5055
robert.khuzami@kirkland.com

David M. Nemecek, P.C.
(213) 680-8111
david.nemecek@kirkland.com

601 Lexington Avenue
New York, NY 10022

(212) 446-4800

www.kirkland.com

Facsimile:
(212) 446-4900

December 5, 2017

Erin Schneider
Associate Director

Jessica Chan
Assistant Director

Rahul Kolhatkar
Senior Counsel

United States Securities & Exchange
Commission
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

Robert Leach
Assistant United States Attorney

Northern District of California
Federal Courthouse
450 Golden Gate Avenue
San Francisco, California 94102

Re: Loan to Theranos, Inc.

Dear Ms. Schneider, Ms. Chan, Mr. Kolhatkar and Mr. Leach:

We submit this letter on behalf of Fortress Credit Corp. (on behalf of itself and/or as agent on behalf of one or more of its affiliates or assignees, "Fortress").

By way of brief overview, Fortress Credit Corp. is an affiliate of Fortress Investment Group LLC, a diversified global investment manager with more than $35 billion in assets under management for over 1,750 institutional clients and private investors around the world.

Fortress is in advanced discussions with Theranos, Inc. ("Theranos" or the "Company") regarding a loan transaction whereby a special purpose entity (the "Borrower"), owned jointly by Fortress and Theranos, will borrow up to $100 million from Fortress (the "Loan") and on-lend the proceeds to Theranos. As you may be aware, Theranos' financial situation is highly distressed, and the company has informed Fortress that the Loan must close by Friday, December 8, 2017 in order to fund ongoing operations.

Beijing   Boston   Chicago   Hong Kong   Houston   London   Los Angeles   Munich   Palo Alto   San Francisco   Shanghai   Washington, D.C.



EXHIBIT 193
E. LEVY
9/24/19
JOANNE ICHIKI
CSR No. 11660

US-REPORTS-0011593

# KIRKLAND & ELLIS LLP

In the course of negotiations and due diligence regarding the Loan, Fortress has learned that the Company, as well as current and former employees, including its founder and chief executive officer, Ms. Elizabeth Holmes, are under investigation by the Securities and Exchange Commission ("SEC") and the U.S. Department of Justice ("DOJ" and collectively with the SEC, the "Government"). While it is Fortress' obligation, of course, to assess the risk to the proposed Loan transaction of these Government investigations, Fortress appreciates the opportunity to submit a letter to the Government regarding the Loan terms and structure. That step is prudent, in Fortress' view, because of the critical nature of the Government's investigations, Fortress' own commitment to good corporate citizenship, and because Fortress does not know what the Government understands about the Loan, or how the Loan may be relevant to the investigations, if at all. We fully recognize that the Government has not requested any specific information about the Loan from Fortress, and may well have no comment or response to this letter. We further understand that the Government has not, directly or indirectly, taken a position one way or another on the Loan, and that it has every ability to seek information about the Loan should it choose to do so. While acknowledging all of these considerations, Fortress wishes to be as transparent as possible about the Loan, and to minimize the risk of any misunderstanding about the Loan terms, should that ever become relevant, for whatever reason. For these reasons, and in an abundance of caution, Fortress is submitting this letter.

As noted above, the Borrower, owned jointly by Fortress and Theranos, will borrow up to $100 million from Fortress and on-lend the proceeds to Theranos. As part of this transaction, Theranos will contribute its intellectual property to the Borrower and the Loan will be secured by such intellectual property. In addition, Theranos will guarantee the Loan and its guarantee will be secured by all of its assets. Initially, Fortress will own substantially all of the economic interests of the Borrower. Following the repayment of the Loan in accordance with its terms and subject, under certain conditions, to the satisfaction of additional economic milestones, Theranos will own substantially all of the economic interests of the Borrower.

The uses and proceeds of this Loan are to fund Theranos' daily operations and pay existing legal settlement obligations - they are not permitted to be distributed to shareholders, including Ms. Holmes in such capacity. The terms of the Loan will also require Theranos to pay future obligations as they come due - Fortress and Theranos believe that a recapitalized Theranos is more likely to be capable of satisfying such obligations.

Fortress has not yet entered into a binding commitment to advance the Loan. In fact, the closing and funding of the Loan remain subject to the satisfaction of certain conditions, including the execution of definitive documentation, completion of legal and business due diligence and the approval of Fortress' investment committee. If Fortress ultimately consummates the Loan transaction with Theranos, it will be in part because Fortress has determined that Theranos may play an important role in advancing our medical healthcare system.

US-REPORTS-0011594

# KIRKLAND & ELLIS LLP

If you have any questions, please do not hesitate to contact Robert Khuzami or David M. Nemecek, P.C. at the contact information set forth above.

Yours truly,

Robert Khuzami

David M. Nemecek, P.C.