UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | CR-18-00258-EJD |
| PLAINTIFF, | ) | |
| | ) | SAN JOSE, CALIFORNIA |
| VS. | ) | |
| | ) | APRIL 6, 2022 |
| RAMESH "SUNNY" BALWANI, | ) | |
| | ) | VOLUME 14 |
| DEFENDANT. | ) | |
| _____ | ) | PAGES 2177 - 2443 |


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                        BY:   JOHN C. BOSTIC
                              JEFFREY B. SCHENK
                        150 ALMADEN BOULEVARD, SUITE 900
                        SAN JOSE, CALIFORNIA 95113

                        BY:   ROBERT S. LEACH
                              KELLY VOLKAR
                        1301 CLAY STREET, SUITE 340S
                        OAKLAND, CALIFORNIA 94612

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074
                        LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER

```
 1        A P P E A R A N C E S:  (CONT'D)

 2     FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                  BY:  MOLLY MCCAFFERTY
 3                                     SHAWN ESTRADA
                                THE ORRICK BUILDING
 4                              405 HOWARD STREET
                                SAN FRANCISCO, CALIFORNIA 94105

 5
                                  BY:  JEFFREY COOPERSMITH
 6                                     AARON BRECHER
                                       AMANDA MCDOWELL
 7                              701 FIFTH AVENUE, SUITE 5600
                                SEATTLE, WASHINGTON 98104

 8
                                  BY:  STEPHEN CAZARES
 9                              77 SOUTH FIGUEROA STREET, SUITE 3200
                                LOS ANGELES, CALIFORNIA 90017

10
                                  BY:  AMY WALSH
11                              51 W 52ND STREET
                                NEW YORK, NEW YORK 10019

12

13     ALSO PRESENT:            OFFICE OF THE U.S. ATTORNEY
                                  BY:  MADDI WACHS, PARALEGAL
14                                     SARA SLATTERY, PARALEGAL

15                              ORRICK, HERRINGTON & SUTCLIFFE
                                JENNIFER CYGNOR, PARALEGAL
16
                                PROLUMINA
17                                BY:  COREY ALLEN
                                2200 SIXTH AVENUE, SUITE 425
18                              SEATTLE, WASHINGTON 98121

19                              UNITED STATES POSTAL INSPECTION SERVICE
                                  BY:  CHRISTOPHER MCCOLLOW
20
                                FEDERAL BUREAU OF INVESTIGATION
21                                BY:  MARIO C. SCUSSEL

22                              UNITED STATES FOOD & DRUG
                                ADMINISTRATION
23                                BY:  GEORGE SCAVDIS

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**MARK PANDORI**
CROSS-EXAM BY MR. CAZARES                P. 2200
REDIRECT EXAM BY MR. BOSTIC              P. 2269
RECROSS-EXAM BY MR. CAZARES              P. 2299


**CONSTANCE CULLEN**
DIRECT EXAM BY MR. SCHENK                P. 2306
CROSS-EXAM BY MS. WALSH                  P. 2338
REDIRECT EXAM BY MR. SCHENK              P. 2351


**DANIEL EDLIN**
DIRECT EXAM BY MR. BOSTIC                P. 2353

2180

INDEX OF EXHIBITS

                          IDENT.        EVIDENCE

GOVERNMENT'S

188                                     2309
200                                     2314
201                                     2316
192                                     2318
223                                     2321
259                                     2323
262                                     2326
291, TOP EMAIL AND ATTACHMENT           2330
277, TOP EMAIL AND ATTACHMENT           2334
959                                     2380
961                                     2391
860                                     2393
871                                     2403
966, EMAIL ONLY                         2407
957                                     2412
1014                                    2415
1157                                    2421
3070                                    2424
3965                                    2431
3981                                    2435

1

2                          INDEX OF EXHIBITS

3                           IDENT.         EVIDENCE

4      DEFENDANT'S

5      20279                               2204
       20498                               2213
6      20277                               2220
       20496                               2224
7      20501                               2228
       20255                               2233
8      20461                               2238
       20444                               2241
9      20460                               2245
       20456                               2247
10     20265                               2249
       20458                               2255
11     20490                               2257
       20521                               2264
12     10574                               2349

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1        SAN JOSE, CALIFORNIA                    APRIL 6, 2022

2                    P R O C E E D I N G S

3            (COURT CONVENED AT 8:50 A.M.)

4            (JURY OUT AT 8:50 A.M.)

5                 THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE ARE ON

6        THE RECORD OUTSIDE OF THE PRESENCE OF THE JURY.

7            ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

8            I JUST WANTED TO CHAT JUST A MOMENT ABOUT THIS ISSUE THAT

9        WE LEFT ON YESTERDAY THAT WE'RE GOING TO DISCUSS ABOUT THE

10       LETTERS AND WHETHER OR NOT AND HOW THOSE WOULD COME IN.

11           I KNOW MR. SCHENK MENTIONED THAT MIGHT BE AN ISSUE WITH AN

12       ADDITIONAL WITNESS THAT WAS GOING TO COME UP.

13           AND I KNOW MS. VOLKAR ARGUED THE MOTION.  I DON'T SEE HER

14       IN THE COURTROOM RIGHT NOW.  WE CAN GET HER IF WE NEED TO.

15           BUT I JUST WANTED TO SHARE SOME THOUGHTS AND ASK SOME

16       QUESTIONS.

17               MR. SCHENK, DID YOU WANT TO RETRIEVE HER OR COLLECT HER?

18               MR. SCHENK:  THANK YOU, YOUR HONOR.

19           MS. VOLKAR GAVE US PERMISSION TO SHARE WITH THE COURT, SHE

20       IS A LITTLE UNDER THE WEATHER AND HAS BEEN FOR A FEW DAYS.

21       SHE'S BEEN TESTING NEGATIVE, BUT TO BE SAFE, SHE WANTED TO STAY

22       OUT OF THE COURTHOUSE.

23               THE COURT:  SURE.  OKAY.  WELL, THANK YOU.

24           WELL, MR. BRECHER IS HERE, AND HE ARGUED THE MOTION, SO

25       THANK YOU FOR BEING HERE.
```

08:51AM 1          BUT THIS MORNING, AT SOME POINT, AS I UNDERSTAND IT,

08:51AM 2     MS. CULLEN WILL TESTIFY, AND SHE'S THE SCHERING-PLOUGH EMPLOYEE

08:51AM 3     AND MY SENSE IS THAT SHE WILL TESTIFY THAT SHE RECEIVED THESE

08:51AM 4     TWO DOCUMENTS, ONE ALTERED AND ONE UNALTERED, WE'LL JUST CALL

08:51AM 5     THEM FOR OUR DISCUSSION.

08:51AM 6          I'M INFORMED BY THE TRANSCRIPT FROM THE OTHER TRIAL AS TO

08:51AM 7     THAT LINE OF TESTIMONY, I THINK WE'RE ALL FAMILIAR WITH THAT.

08:51AM 8          SO I'M WONDERING IF -- LET'S TALK ABOUT THE UNALTERED

08:52AM 9     DOCUMENT, AND HELP ME OUT HERE.

08:52AM 10         THIS WAS A LETTER OR -- THAT WAS FOUND ON MR. BALWANI'S

08:52AM 11    COMPUTER AT WORK; IS THAT RIGHT?  IS THAT HOW THAT CAME TO BE?

08:52AM 12              MR. SCHENK:  SO EXHIBIT 259 IS A VERSION OF THE

08:52AM 13    VALIDATION REPORT THAT DOES NOT CONTAIN THE SCHERING-PLOUGH

08:52AM 14    LOGO THAT WAS SENT FROM THERANOS TO DR. CULLEN.  SHE RECEIVED

08:52AM 15    THAT ONE PERSONALLY AND WILL SAY THIS WAS CREATED BY THERANOS,

08:52AM 16    IT'S THERANOS'S CONCLUSIONS, AND THERE IS NO SCHERING-PLOUGH

08:52AM 17    LOGO AFFIXED TO THE DOCUMENT.

08:52AM 18              THE COURT:  AND THAT WAS RECEIVED BY HER FROM A

08:52AM 19    THERANOS EMPLOYEE.

08:52AM 20         WAS IT FRENZEL OR SOMETHING LIKE THAT?

08:52AM 21              MR. SCHENK:  GARY FRENZEL.

08:52AM 22              THE COURT:  YES, THAT'S RIGHT.

08:52AM 23         AND SHE'LL BE ASKED PRESUMABLY, DID YOU RECEIVE THIS?

08:53AM 24    YES.

08:53AM 25         RIGHT?

08:53AM 1          MR. SCHENK:  CORRECT.

08:53AM 2      AND THEN SEPARATELY, EXHIBIT 291 IS A VERSION THAT SHE DID

08:53AM 3  NOT RECEIVE.  291 IS A VERSION THAT WAS SENT BY MS. HOLMES TO

08:53AM 4  WALGREENS WITH MR. BALWANI ON THE CC LINE.

08:53AM 5      THAT HAS AS AN ATTACHMENT THE SCHERING-PLOUGH DOCUMENT,

08:53AM 6  BUT THAT DOCUMENT HAD BOTH A SCHERING-PLOUGH LOGO AND WHAT IN

08:53AM 7  THE HOLMES TRIAL WE CALLED AN ENHANCED CONCLUSION.

08:53AM 8      AND DURING THE HOLMES TRIAL, WE SHOWED THAT VERSION TO

08:53AM 9  DR. CULLEN AND SHE SAID, I DID NOT AUTHORIZE AFFIXING THE LOGO,

08:53AM 10  THIS IS NOT MY CONCLUSION, AND I'M NOT AWARE OF ANYBODY AT

08:53AM 11  SCHERING-PLOUGH WHO AUTHORIZED EITHER THE LOGO OR THE

08:53AM 12  CONCLUSION.

08:53AM 13          THE COURT:  AND WHAT IS WRONG WITH THAT,

08:53AM 14  MR. BRECHER?

08:53AM 15          MR. BRECHER:  THERE ARE TWO PROBLEMS WITH THAT,

08:53AM 16  YOUR HONOR, AND MS. WALSH IDENTIFIED BOTH YESTERDAY.

08:54AM 17      THE FIRST IS THE IDENTIFICATION ISSUE.

08:54AM 18      THE PROBLEM THAT MR. SCHENK IDENTIFIED IS THAT DR. CULLEN

08:54AM 19  NEVER IDENTIFIED -- NEVER RECEIVED WHAT MR. SCHENK CALLS THE

08:54AM 20  ENHANCED VERSION.

08:54AM 21      THE FIRST PROBLEM, THE BIGGER PROBLEMS ARE THE ONES THAT

08:54AM 22  WE IDENTIFIED IN OUR MOTION.  WE DON'T BELIEVE THAT, AS OF

08:54AM 23  MARCH 2010 AND APRIL 2010, WHICH IS WHEN THE ENHANCED VERSION

08:54AM 24  WAS SENT TO WALGREENS, THAT THERE WAS -- THAT THE GOVERNMENT

08:54AM 25  HAS MET ITS BURDEN, ITS INITIAL THRESHOLD BURDEN OF PROVING THE

08:54AM  1    EXISTENCE OF A CONSPIRACY BY A PREPONDERANCE OF THE EVIDENCE.

08:54AM  2              THE COURT:  IS THAT NECESSARY TO HAVE THAT

08:54AM  3    INTRODUCED?

08:54AM  4              MR. BRECHER:  IT IS, YOUR HONOR, TO THE EXTENT THAT

08:54AM  5    THE COURT INTENDS -- OR THE GOVERNMENT INTENDS TO PRESENT TO

08:54AM  6    THE JURY AND THE COURT ALLOWS THE GOVERNMENT TO PRESENT TO THE

08:54AM  7    JURY THE IDEA THAT THERE IS ANYTHING NEFARIOUS GOING ON WITH

08:54AM  8    THESE LOGOS.

08:55AM  9         AS WE POINTED OUT, YOUR HONOR, THERE IS NO EVIDENCE THAT

08:55AM 10    MR. BALWANI HAD ANY KNOWLEDGE THAT THE LOGOS WERE ADDED

08:55AM 11    IMPROPERLY OR WITHOUT AUTHORIZATION, NONE WHATSOEVER.

08:55AM 12         AND THERE'S ONLY ONE PIECE OF EVIDENCE THAT MR. BALWANI

08:55AM 13    WAS COPIED IN, I BELIEVE IT'S MARCH 19TH, 2010, WITH WHAT WE'LL

08:55AM 14    CALL THE ORIGINAL VERSION OF THE MEMO; THAT MR. BALWANI EVEN

08:55AM 15    SAW THE UNENHANCED VERSION.

08:55AM 16              THE COURT:  SO THAT WOULD BE ADMISSIBLE IF WERE

08:55AM 17    INTRODUCED?

08:55AM 18         IF AN I.T. TESTIFIED THAT WE SEARCHED THE COMPUTER OR

08:55AM 19    THERE'S A FOUNDATION THAT THIS IS ON MR. BALWANI'S COMPUTER,

08:55AM 20    THAT'S ADMISSIBLE.

08:55AM 21              MR. BRECHER:  IT COULD BE ADMISSIBLE, YOUR HONOR,

08:55AM 22    BUT NOT FOR THE REASONS THAT -- BUT THERE ARE SOME PROBLEMS FOR

08:55AM 23    THE REASONS THAT WE IDENTIFIED IN OUR MOTION; NAMELY, TO THE

08:55AM 24    EXTENT THAT THE GOVERNMENT INTENDS TO ARGUE THAT THERE WAS

08:55AM 25    SOMETHING WRONG OR UNAUTHORIZED ABOUT THE ADDING OF THE LOGOS

08:55AM 1    OR THE CHANGING OF THE CONCLUSION, THERE IS NO EVIDENCE THAT

08:56AM 2    MR. BALWANI KNEW THAT, NONE, ABOUT ANY UNAUTHORIZED ADDITIONS.

08:56AM 3    THERE SIMPLY ISN'T.

08:56AM 4        AND EVEN PUTTING THAT ASIDE, EVEN IF THE GOVERNMENT WERE

08:56AM 5    PROCEEDING UNDER A THEORY OF COCONSPIRATOR LIABILITY OR

08:56AM 6    COSCHEMER LIABILITY, THERE IS NOT THAT THRESHOLD SHOWING THAT A

08:56AM 7    CONSPIRACY TO DEFRAUD EXISTED IN MARCH OR APRIL OF 2010.

08:56AM 8        I DON'T KNOW HOW THE GOVERNMENT GETS THERE.  THE TEXT

08:56AM 9    MESSAGES THAT THEY POINT TO START IN 2012.

08:56AM 10       THE INVESTOR FUND RAISING THAT THEY CHARGE AND DISCUSS IS

08:56AM 11   IN 2013, THREE YEARS LATER.

08:56AM 12       AND EVEN WHEN IT COMES TO THE RETAIL PARTNERS, YOU'RE

08:56AM 13   DEALING WITH CONTRACTS THAT WERE NOT FINALIZED UNTIL JULY OF

08:56AM 14   2010.

08:56AM 15       MR. BALWANI DID NOT BECOME A SENIOR EXECUTIVE AT THE

08:56AM 16   COMPANY UNTIL JULY 2010.  NOT A DIME WAS RECEIVED FROM ANY

08:56AM 17   RETAILER UNTIL 2010.

08:56AM 18           THE COURT:  SO THE FACT THAT IT'S FOUND ON HIS

08:56AM 19   COMPUTER, DOES THAT GO TO SOME OTHER ISSUE?  DOES THAT GO TO

08:57AM 20   KNOWLEDGE?

08:57AM 21           MR. BRECHER:  YOUR HONOR, THE GOVERNMENT CONTENDS

08:57AM 22   THAT THE FACT THAT MR. BALWANI WAS COPIED ON MARCH 19TH ON AN

08:57AM 23   EMAIL THAT ATTACHES THE UNALTERED VERSION, AND THEN ALSO COPIED

08:57AM 24   ON APRIL 10TH, ABOUT A MONTH LATER, ON AN EMAIL WITH THE

08:57AM 25   ALTERED VERSION SHOWS THAT HE HAD PERSONAL KNOWLEDGE OF

08:57AM  1    UNAUTHORIZED CHANGES.

08:57AM  2         THERE ARE A LOT OF PROBLEMS WITH THAT.

08:57AM  3         FIRST OF ALL, THERE IS NO EVIDENCE -- AND AGAIN, I CANNOT

08:57AM  4    STRESS THIS ENOUGH -- THAT MR. BALWANI HAD ANY KNOWLEDGE OF

08:57AM  5    ANYTHING BEING DONE WITHOUT THE PERMISSION OF THE

08:57AM  6    PHARMACEUTICAL COMPANY; AND SECOND, THERE IS NO REASON, AND

08:57AM  7    THIS JUST GOES TO OUR COMMON SENSE UNDERSTANDING OF HOW WE

08:57AM  8    INTERACT WITH EMAILS, THERE'S NO REASON WHY ANY NORMAL HUMAN

08:57AM  9    WOULD HAVE NOTICED THE PRESENCE OR ABSENCE OF A LOGO AND PUT

08:57AM  10   TOGETHER, OH, SOMETHING UNTOWARD MUST HAVE HAPPENED HERE.

08:57AM  11        THE COURT:  WELL, ISN'T THAT WHAT YOU'LL ARGUE IN

08:57AM  12   CLOSING ARGUMENT?  IF THERE'S NO EVIDENCE PUT ON, THEN THAT'S

08:57AM  13   WHAT YOUR ARGUMENT WILL BE, THE GOVERNMENT ASKED YOU TO TAKE A

08:58AM  14   GIANT LEAP ACROSS THE GRAND CANYON AND YOU'RE NOT ABLE TO DO

08:58AM  15   THAT.

08:58AM  16        MR. BRECHER:  CERTAINLY, YOUR HONOR, THAT REMAINS AN

08:58AM  17   OPTION.

08:58AM  18        BUT THERE ARE OTHER THINGS TO CONSIDER.  ONE, FACTUALLY,

08:58AM  19   YOU HAVE TO UNDERSTAND THE CONTEXT BEHIND MR. BALWANI'S

08:58AM  20   UNDERSTANDING -- AND THE GOVERNMENT, BY THE WAY, HAS DONE

08:58AM  21   NOTHING TO DISPUTE THIS.

08:58AM  22        THESE RELATIONSHIPS WERE CONSUMMATED, THEY WERE DEVELOPED,

08:58AM  23   AND THEY LARGELY ENDED BEFORE MR. BALWANI EVEN JOINED THE

08:58AM  24   COMPANY, LONG BEFORE ANY OF THESE MEMOS WERE EXCHANGED WITH

08:58AM  25   THESE ENHANCED VERSIONS.

```
08:58AM    1          AND BEFORE HE JOINED THE COMPANY, HE RECEIVED -- AND

08:58AM    2     AGAIN, THIS IS UNDISPUTED -- THE SAME REPRESENTATIONS THAT WERE

08:58AM    3     LATER GIVEN TO INVESTORS THAT THERANOS'S TECHNOLOGY HAD BEEN --

08:58AM    4     I BELIEVE IT WAS ROBUSTLY VALIDATED IS WHAT MR. BALWANI WAS

08:58AM    5     TOLD, AND COMPREHENSIVELY VALIDATED IS WHAT INVESTORS WERE

08:58AM    6     TOLD.

08:58AM    7          I DON'T SEE ANY DAYLIGHT THERE, YOUR HONOR.

08:58AM    8              THE COURT:  BUT THAT --

08:58AM    9              MR. BRECHER:  OH, I APOLOGIZE, YOUR HONOR.

08:58AM   10              THE COURT:  BUT, AGAIN, THAT'S EXPLANATORY.  WHAT

08:59AM   11     DOES THAT HAVE TO DO WITH THE ADMISSIBILITY OF IT?

08:59AM   12              MR. BRECHER:  WELL, YOUR HONOR, IT HAS TO DO WITH

08:59AM   13     THE ADMISSIBILITY BECAUSE OF THE BOUJALY DECISION, I DON'T HAVE

08:59AM   14     IT IN FRONT OF ME, MS. RODRIGUEZ, BUT I BELIEVE IT'S

08:59AM   15     B-O-U-R-J-A-L-Y.  I'M SORRY ABOUT THAT.

08:59AM   16          IT REMAINS, UNDER RULE 104, YOUR HONOR, THE GOVERNMENT'S

08:59AM   17     BURDEN TO SHOW BY A PREPONDERANCE OF THE EVIDENCE THAT A

08:59AM   18     CONSPIRACY OR A SCHEME TO DEFRAUD EXISTED AT THE TIME OF THE

08:59AM   19     ALLEGED MISCONDUCT.

08:59AM   20              THE COURT:  SURE.  NO, I APPRECIATE THAT.  I

08:59AM   21     APPRECIATE THAT.

08:59AM   22          I'M JUST -- IF WE PUT THAT ASIDE, AND WE CAN'T FROM YOUR

08:59AM   23     PERSPECTIVE, IF THIS IS BEING INTRODUCED FOR, AND IF THE

08:59AM   24     GOVERNMENT INTENDS TO ARGUE, THEN I THINK YOUR ARGUMENT IS THAT

08:59AM   25     THERE'S NO THRESHOLD HERE.
```

08:59AM 1          BUT JUST IN AND OF ITSELF, ISN'T IT ADMISSIBLE THAT ON HIS

08:59AM 2     COMPUTER THIS WAS FOUND AND AT A LATER TIME HE SENT THIS?  ARE

09:00AM 3     THOSE TWO, THOSE TWO THINGS ADMISSIBLE?

09:00AM 4          MR. BRECHER:  I DON'T BELIEVE SO, YOUR HONOR.

09:00AM 5          FIRST OF ALL, THEY'RE CERTAINLY NOT ADMISSIBLE THROUGH

09:00AM 6     DR. CULLEN.  SHE CAN'T AUTHENTICATE ANY OF THIS.

09:00AM 7          THE COURT:  SURE.

09:00AM 8          MR. BRECHER:  SECOND -- AND I DON'T WANT TO FIGHT

09:00AM 9     THE COURT'S HYPOTHETICAL, THAT'S NOT MY --

09:00AM 10         THE COURT:  NO, NO.

09:00AM 11         MR. BRECHER:  BUT I JUST WANT TO PUSH BACK FOR A

09:00AM 12    MOMENT --

09:00AM 13         THE COURT:  YOU SHOULD, YEAH.

09:00AM 14         MR. BRECHER:  -- AND SAY, WELL, IF THE ANSWER IS SO

09:00AM 15    ATTENUATED THAT YOU CAN TELL THE JURY THAT IN CLOSING, THAT

09:00AM 16    WOULD READ OUT OF EXISTENCE ALMOST ALL OF THE RULES OF EVIDENCE

09:00AM 17    THAT I CAN THINK OF.

09:00AM 18         THE COURT:  NO, I UNDERSTAND.

09:00AM 19         MR. BRECHER:  THE POINT OF THE INQUIRY, AND I DON'T

09:00AM 20    THINK THIS IS DISPUTED EITHER, IS FOR THE COURT TO PLAY THAT

09:00AM 21    GATEKEEPING ROLE AND TO ENSURE THAT THERE BE SOME PREDICATE,

09:00AM 22    LEGAL AND FACTUAL, BEFORE POTENTIALLY PREJUDICIAL EVIDENCE IS

09:00AM 23    TURNED OVER TO THE JURY.

09:00AM 24         THE COURT:  OKAY.

09:00AM 25         MR. BRECHER:  AND PART OF THE REASON FOR THAT,

09:00AM  1   YOUR HONOR, IN THIS CASE IS BECAUSE THE GOVERNMENT'S THEORY IS

09:00AM  2   ONE OF COSCHEMER OR COCONSPIRATOR LIABILITY, IT'S THE EXCEPTION

09:01AM  3   AND NOT THE RULE THAT WE'RE CRIMINALLY RESPONSIBLE FOR THE ACTS

09:01AM  4   OF OTHERS.

09:01AM  5           THE COURT:  OKAY.

09:01AM  6           MR. BRECHER:  WE HAVE TO HAVE THOSE GUARDRAILS

09:01AM  7   ENFORCED.

09:01AM  8           THE COURT:  MR. SCHENK.

09:01AM  9           MR. SCHENK:  YOUR HONOR, FIRST, THE DEFENSE SAID

09:01AM 10   THERE ARE TWO HURDLES.

09:01AM 11      THE FIRST IS AUTHENTICATION.  THAT IS NOT A HURDLE IN THIS

09:01AM 12   CASE.  THERE'S A STIPULATION BETWEEN THE PARTIES THAT EMAILS,

09:01AM 13   SUCH AS 291, ARE AUTOMATIC.  291 IS THE DOCUMENT THAT CULLEN

09:01AM 14   DID NOT RECEIVE WAS SENT FROM HOLMES TO WALGREENS, CC'ING

09:01AM 15   BALWANI.

09:01AM 16      THAT DOCUMENT WE DO INTEND TO INTRODUCE THROUGH DR. CULLEN

09:01AM 17   TODAY.  IT IS NOT COMING IN FOR THE TRUTH.  IT'S FOR

09:01AM 18   MR. BALWANI'S STATE OF MIND.  THAT'S WHAT WE'RE TALKING ABOUT

09:01AM 19   RIGHT NOW, WHAT DID MR. BALWANI KNOW AND WHEN DID HE KNOW IT?

09:01AM 20      AND HE RECEIVED AN EMAIL THAT INCLUDED VERSIONS OF THREE

09:01AM 21   PHARMACEUTICAL REPORTS, ALL WITH THE PHARMACEUTICAL COMPANY'S

09:01AM 22   LOGO ON THEM.

09:01AM 23      IT'S RELEVANT TO HIS KNOWLEDGE AND INTENT VIS-À-VIS THE

09:01AM 24   RELATIONSHIP WITH WALGREENS, AND 291 SHOULD COME IN THROUGH

09:02AM 25   DR. CULLEN.  THERE'S NO AUTHENTICATION HURDLE.

09:02AM   1          LET'S NOW TURN TO THE QUESTION OF WHETHER THERE'S PROOF

09:02AM   2    SUFFICIENT TO PROVE A CONSPIRACY AT THE TIME.

09:02AM   3          THAT'S A HURDLE THAT THE GOVERNMENT COULD NOT, IN THEORY,

09:02AM   4    OVERCOME IN THE HOLMES CASE, AND YES, THAT DOCUMENT STILL CAME

09:02AM   5    IN, AND THE REASON THAT IT CAME IN IS BECAUSE IT'S A SUMMARY OF

09:02AM   6    PURE FACTS.

09:02AM   7          THE FACT IS THAT THE VERSION THAT WAS SENT TO

09:02AM   8    SCHERING-PLOUGH DID NOT HAVE A LOGO.

09:02AM   9          THE FACT IS THAT MS. HOLMES CC'D MR. BALWANI ON A VERSION

09:02AM  10    THAT WENT TO WALGREENS THAT DID HAVE A LOGO.

09:02AM  11          IT'S COMPLETELY APPROPRIATE TO ASK A WITNESS ON THE STAND,

09:02AM  12    WHO HAS PERSONAL KNOWLEDGE OF THE ATTACHMENT, THAT SHE DID NOT

09:02AM  13    AUTHORIZE AFFIXING THE LOGO ONTO THE DOCUMENT.

09:02AM  14          AND THOSE ARE, THOSE ARE JUST MERELY FACTS.

09:02AM  15          THE QUESTION THAT THE DEFENSE IS NOW RAISING IS, WHAT IS A

09:02AM  16    PROPER ARGUMENT TO MAKE BASED UPON THOSE FACTS?

09:02AM  17          AND THE TRUTH IS MR. BALWANI SAW BOTH VERSIONS.

09:02AM  18    MR. BALWANI SAW A VERSION WITHOUT THE LOGO AND A VERSION WITH

09:03AM  19    THE LOGO.

09:03AM  20          AND WHAT THE DEFENSE SAYS IS THAT, YOUR HONOR, COMMON

09:03AM  21    SENSE TELLS YOU THAT AN INDIVIDUAL DOESN'T COMB THROUGH THEIR

09:03AM  22    EMAIL IN A SUFFICIENT WAY TO DETERMINE THAT THOSE TWO WERE

09:03AM  23    DIFFERENT.

09:03AM  24          THAT'S AN ARGUMENT REGARDING WEIGHT.  THAT'S NOT AN

09:03AM  25    ARGUMENT REGARDING ADMISSIBILITY.  THAT'S THE KIND OF ARGUMENT

09:03AM 1      THAT A DEFENSE ATTORNEY MAKES IN CLOSING ARGUMENT.  IT'S NOT

09:03AM 2      THE KIND OF ARGUMENT THAT PRECLUDES THE ADMISSION OF THE

09:03AM 3      DOCUMENT.

09:03AM 4           AND I'LL NOTE, IN OPENING THE DEFENSE ACTUALLY OPENED THE

09:03AM 5      DOOR TO MUCH OF THIS.  THE DEFENSE SAID THAT MR. BALWANI DID

09:03AM 6      NOT GUARANTEE THE LOAN AND DID NOT JOIN THERANOS BECAUSE

09:03AM 7      ELIZABETH HOLMES WAS HIS GIRLFRIEND, BUT RATHER BECAUSE HE DID

09:03AM 8      HIS DUE DILIGENCE.

09:03AM 9           MR. BALWANI JOINED IN ABOUT SEPTEMBER OF 2009.  THAT DUE

09:03AM 10     DILIGENCE OCCURRED BEFORE THEN.

09:03AM 11          SO THEY'VE OPENED THE DOOR TO EVEN A PRE-SEPTEMBER 2009

09:03AM 12     INTERACTION BETWEEN THERANOS AND SOMEONE LIKE SCHERING-PLOUGH

09:03AM 13     BEING RELEVANT.

09:03AM 14          SO THE EXCHANGES BETWEEN DR. CULLEN AND ELIZABETH HOLMES

09:04AM 15     IN THE MONTHS IN 2009 PRECEDING SEPTEMBER ARE STILL RELEVANT

09:04AM 16     BECAUSE THE DEFENSE TOLD THIS JURY THAT MR. BALWANI BECAME

09:04AM 17     AWARE OF THE BUSINESS OF THERANOS BEFORE HE JOINED THERANOS.

09:04AM 18          SO IT IS NO LONGER THE CASE THAT SEPTEMBER 2009 IS OUR

09:04AM 19     MAGIC LINE IN THE SAND OF WHEN RELEVANT EVIDENCE CAN BE

09:04AM 20     ADMITTED IN THIS CASE BECAUSE THAT'S WHEN MR. BALWANI JOINED

09:04AM 21     THERANOS.

09:04AM 22          THAT IS NO LONGER THE CASE.

09:04AM 23          THEY'VE SCRATCHED THAT LINE OUT AND SAID THAT MR. BALWANI

09:04AM 24     PERFORMED DUE DILIGENCE ON FACTS THAT PREDATE HIS JOINING OF

09:04AM 25     THE COMPANY, SUCH AS IN THE MONTHS EARLIER IN THIS RELATIONSHIP

09:04AM 1    WITH, WITH SCHERING-PLOUGH THAT OCCURRED IN THE BEGINNING OF

09:04AM 2    2009 THROUGH A MEETING IN MAY OF 2009 THROUGH AN EXCHANGE OF

09:04AM 3    EMAILS IN LATER 2009.

09:04AM 4         THAT IS ALL OF THE BUCKET OF INFORMATION AVAILABLE TO

09:04AM 5    MR. BALWANI WHEN HE PERFORMS HIS DUE DILIGENCE, AND AS A RESULT

09:04AM 6    IT'S COMPLETELY APPROPRIATE FOR THE GOVERNMENT TO BE ALLOWED TO

09:04AM 7    INTRODUCE THIS EVIDENCE AND ASK THE JURY TO REACH CONCLUSIONS

09:05AM 8    THAT ARE BASED UPON THAT EVIDENCE, SOME DIRECT CONCLUSIONS WHEN

09:05AM 9    HE SEES TWO VERSIONS OF IT, AND SOME CIRCUMSTANTIAL.

09:05AM 10        IT'S IN HIS EMAIL, AND THE DEFENSE IS FREE TO SAY PEOPLE

09:05AM 11   DON'T READ THEIR EMAIL CLOSELY IF THAT'S THE ARGUMENT THEY WANT

09:05AM 12   TO MAKE TO THE JURY, BUT THAT ARGUMENT SHOULD NOT PRECLUDE THE

09:05AM 13   ADMISSION OF THIS EVIDENCE.

09:05AM 14            THE COURT:  I THINK WHAT I HEARD DEFENSE COUNSEL SAY

09:05AM 15   IS, WELL, YOU CAN'T LET IT IN BECAUSE 104, THERE'S NO

09:05AM 16   FOUNDATION TO SHOW A CONSPIRACY DURING THE TIME PERIOD OR, AS

09:05AM 17   MS. VOLKAR ARGUED, VICARIOUS LIABILITY.

09:05AM 18        AND I JUST, DO WE EVEN NEED TO GET THERE IS WHAT I'M

09:05AM 19   SAYING?  WHY ISN'T THIS JUST FACTS?

09:05AM 20            MR. BRECHER:  SO A COUPLE OF ISSUES, YOUR HONOR.

09:05AM 21        MR. SCHENK'S RESPONSE IS, I'M SORRY TO SAY, ENTIRELY

09:05AM 22   UNRESPONSIVE TO THE DEFENSE'S CONCERN.

09:05AM 23        I WANT TO START AT THE END WITH WHAT WE OPENED THE DOOR TO

09:05AM 24   IN OPENING.  AND I WOULD INVITE YOUR HONOR, INDEED, I WOULD

09:05AM 25   URGE THE COURT TO GO BACK TO THE TRANSCRIPT OF OUR MARCH 11TH

09:05AM  1    CONVERSATION WITH YOU AND WITH MS. VOLKAR WHERE I WAS CRYSTAL

09:06AM  2    CLEAR THAT BOTH SIDES HAD AN INTEREST IN USING THESE

09:06AM  3    PHARMACEUTICAL RELATIONSHIPS, THE DEFENSE TO SHOW MR. BALWANI'S

09:06AM  4    INTENT BECAUSE OF THOSE REPRESENTATIONS THAT MR. SCHENK JUST

09:06AM  5    REFERENCED, AND THE GOVERNMENT IN SHOWING FALSITY.

09:06AM  6         WE NEVER -- I'VE NEVER SUGGESTED THAT EVIDENCE BEFORE

09:06AM  7    SEPTEMBER 2009 IS IRRELEVANT.  IT'S THE QUESTION OF THE PURPOSE

09:06AM  8    FOR WHICH IT CAN BE USED.

09:06AM  9         AND I NOTE, YOUR HONOR, THAT MR. SCHENK COMPLETELY SKIPS

09:06AM  10   OVER THE THRESHOLD SHOWING OF CONSPIRACY.

09:06AM  11        I BELIEVE THERE'S A COMMENT, "THAT MAY HAVE BEEN AN ISSUE

09:06AM  12   IN THE HOLMES TRIAL, BUT THIS CAME IN."

09:06AM  13        I'M STUNNED BY THAT ARGUMENT FOR TWO REASONS.  ONE,

09:06AM  14   MR. SCHENK HAS PERSONALLY OBJECTED TO REFERENCES TO RULINGS IN

09:06AM  15   THE HOLMES TRIAL AND SOME SORT OF LAW OF THE CASE THEORY.

09:06AM  16        BUT THE SECOND PROBLEM IS THERE WAS NO SUCH RULING.

09:06AM  17   MS. HOLMES NEVER BOTHERED TO CHALLENGE THE ADMISSIBILITY OF

09:06AM  18   THIS EVIDENCE, PROBABLY BECAUSE -- AND I'M SPECULATING HERE --

09:06AM  19   SHE WAS INTIMATELY INVOLVED IN THE PHARMACEUTICAL RELATIONSHIPS

09:07AM  20   AND KNEW THAT SHE COULDN'T.

09:07AM  21        THAT IS NOT THE CASE FOR MR. BALWANI.  WE DID CHALLENGE

09:07AM  22   IT.  WE FILED A MOTION AND ARGUED IT AT LENGTH, AND YOUR HONOR

09:07AM  23   HAS APPARENTLY BEEN CONSIDERING IT AT SOME LENGTH.

09:07AM  24        SO WHAT HAPPENED AT THE HOLMES TRIAL IS COMPLETELY

09:07AM  25   IRRELEVANT.

09:07AM  1          THE COURT:  I UNDERSTAND.  THERE WERE NO OBJECTIONS

09:07AM  2   TO THAT AT THE HOLMES TRIAL.

09:07AM  3          MR. BRECHER:  EXACTLY.  SO THIS IS A BLANK SLATE.

09:07AM  4       AND THEN SECOND, YOUR HONOR, PUTTING ASIDE I DON'T THINK

09:07AM  5   WE CAN PUT THROUGH THE COCONSPIRATOR LIABILITY POINT BECAUSE

09:07AM  6   THE NATURAL INFERENCE THAT THE GOVERNMENT WANTS THE COURT --

09:07AM  7   WANTS THE JURY TO DRAW IS THAT THESE CHANGES WERE MADE WITHOUT

09:07AM  8   AUTHORIZATION.

09:07AM  9       THEY CAN'T DO THAT BECAUSE OF THE LACK OF A THRESHOLD

09:07AM  10  SHOWING, RIGHT?  YOU'RE NOT RESPONSIBLE FOR THE ACTS OF OTHERS

09:07AM  11  ABSENT SOME EXCEPTION UNDER THE LAW, HERE COSCHEMER LIABILITY

09:07AM  12  OR COCONSPIRATOR LIABILITY.

09:07AM  13      AND WE HAVEN'T EVEN TALKED ABOUT THE 403 ARGUMENT THAT WE

09:07AM  14  MADE AND THAT WE ARGUED EXTENSIVELY ON MARCH 11TH, AND THAT IS

09:07AM  15  EVERYONE IN THIS ROOM KNOWS THAT MS. HOLMES ADMITTED TO THIS

09:07AM  16  CONDUCT AND THERE IS NO ADMISSIBLE WAY, WITHOUT SACRIFICING

09:08AM  17  MR. BALWANI'S CONFRONTATION RIGHTS, TO PUT THAT ADDITIONAL

09:08AM  18  PIECE OF CRUCIAL CONTEXT IN FRONT OF THE JURY.

09:08AM  19      SO WE KNOW TWO THINGS, YOUR HONOR.  WE KNOW SOMEONE ELSE

09:08AM  20  DID THE ACT, AND WE KNOW THAT MR. BALWANI LACKED -- AND WE KNOW

09:08AM  21  THERE'S NO EVIDENCE, NO AFFIRMATIVE EVIDENCE THAT MR. BALWANI

09:08AM  22  HAD KNOWLEDGE OF THE IMPROPRIETY OF THE ACT.

09:08AM  23      AND THAT'S THE SORT OF SUBTLE NUANCE THAT IS BEING SKIPPED

09:08AM  24  OVER HERE IS EVEN IF THE COURT WERE TO BELIEVE -- AND I THINK,

09:08AM  25  FRANKLY, IT'S IMPLAUSIBLE -- THAT RECEIVING THIS ATTACHMENT ON

09:08AM 1    MARCH 19TH AND THEN RECEIVING A DIFFERENT VERSION ON

09:08AM 2    APRIL 10TH, AND THESE ARE LENGTHY ATTACHMENTS, YOUR HONOR, THAT

09:08AM 3    MR. BALWANI COULD HAVE PUT TWO AND TWO TOGETHER AND HAD

09:08AM 4    KNOWLEDGE OF THE ACT OF ALTERING THE REPORTS.

09:08AM 5        THERE'S NO EVIDENCE FROM WHICH ANYONE COULD INFER

09:08AM 6    KNOWLEDGE OF THE UNAUTHORIZED ALTERATION.

09:08AM 7        SO I JUST THINK IT'S A REAL PROBLEM.

09:08AM 8            THE COURT:  BUT SHOULDN'T THAT FACT COME IN, THOUGH?

09:08AM 9    I MEAN, THEY'RE FACTS.  HE RECEIVED BOTH OF THOSE THINGS AT THE

09:08AM 10   TIMES THAT YOU SAID, AND SHOULDN'T THE JURY HAVE THAT?

09:09AM 11           MR. BRECHER:  I DON'T THINK SO, YOUR HONOR, BECAUSE

09:09AM 12   THAT LAYS THE GROUNDWORK FOR THE GOVERNMENT TO MAKE AN

09:09AM 13   IMPERMISSIBLE ARGUMENT.

09:09AM 14       IF WE WERE TALKING ABOUT 2013, 2014, I WON'T CONCEDE THE

09:09AM 15   POINT, BUT I WILL AT LEAST ACKNOWLEDGE THAT WE WOULD NOT BE IN

09:09AM 16   AS STRONG AS A POSITION.

09:09AM 17       BUT WE'RE NOT TALKING ABOUT EVENTS OF 2013 AND 2014.  AND

09:09AM 18   DATES MATTER.  THEY MATTER VITALLY.

09:09AM 19       WE'RE TALKING ABOUT MARCH AND APRIL OF 2010.  THE

09:09AM 20   GOVERNMENT MUST MAKE THE REQUISITE SHOWING OF A CONSPIRACY OR

09:09AM 21   SCHEME TO DEFRAUD IN MARCH OR APRIL 2010, AND I DON'T THINK THE

09:09AM 22   FACTS BEAR THAT OUT.

09:09AM 23           THE COURT:  OKAY.

09:09AM 24       MR. SCHENK.

09:09AM 25           MR. SCHENK:  YOUR HONOR, THE DEFENSE IS ASKING THE

09:09AM 1    COURT TO BELIEVE MS. HOLMES'S TESTIMONY WHEN SHE TESTIFIED THAT

09:09AM 2    SHE MADE THE APPLICATION OF THE LOGOS.

09:09AM 3        MS. HOLMES DID NOT EXCULPATE MR. BALWANI IN THAT

09:09AM 4    TESTIMONY.  MS. HOLMES TOOK RESPONSIBILITY FOR IT, BUT SHE

09:09AM 5    DIDN'T SAY THAT MR. BALWANI KNEW NOTHING ABOUT IT OR

09:09AM 6    MR. BALWANI DIDN'T PLAY A ROLE IN IT.

09:09AM 7        SHE ALSO DIDN'T INCULPATE MR. BALWANI.

09:09AM 8        BUT IT'S RICH THAT THE DEFENSE WANTS TO ACCEPT CERTAIN

09:10AM 9    FACTS THAT MS. HOLMES TESTIFIED TO AND NOT OTHERS, AND THE

09:10AM 10   POINT OF THAT IS THAT THE GOVERNMENT IS NOT REQUIRED TO

09:10AM 11   ESTABLISH THE EXISTENCE OF A CONSPIRACY AS A PREREQUISITE TO

09:10AM 12   ADMITTING THESE FACTS.  THEY ARE FACTS THAT DR. CULLEN HAS

09:10AM 13   PRIMARY KNOWLEDGE OF.  SHE WAS A WITNESS TO THE EXCHANGE OF THE

09:10AM 14   FIRST VERSION, THE VERSION WITHOUT THE LOGOS, AND IT IS

09:10AM 15   THEREFORE APPROPRIATE TO ASK HER QUESTIONS ABOUT A SECOND

09:10AM 16   VERSION.

09:10AM 17       WELL, THE DEFENSE IS SAYING WHEN YOU MAKE ARGUMENTS ABOUT

09:10AM 18   THAT VIS-À-VIS MR. BALWANI, THERE ARE CERTAIN FACTS THAT ARE

09:10AM 19   ALSO RELEVANT, THAT IS, THE EXTENT TO WHICH MR. BALWANI HAD

09:10AM 20   KNOWLEDGE OF IT.

09:10AM 21       THAT IS ALL WEIGHT.  THAT IS NOT ADMISSIBILITY.

09:10AM 22           MR. BRECHER:  YOUR HONOR, IF I MAY JUST VERY

09:10AM 23   BRIEFLY?

09:10AM 24       FIRST, ANY RICHNESS IS ONE THAT WE SHARE WITH THE

09:10AM 25   GOVERNMENT.  THE GOVERNMENT ALSO BELIEVES CERTAIN THINGS THAT

09:10AM 1      MS. HOLMES SAID, AND DOESN'T BELIEVE CERTAIN THINGS THAT SHE

09:10AM 2   SAID, AND ONE OF THE THINGS THAT THEY DEFINITELY BELIEVED IS

09:11AM 3   HER ADMISSION THAT SHE USED THESE LOGOS.  THEY TRUMPETED THIS.

09:11AM 4      BUT SECOND, YOUR HONOR, THE POINT ABOUT MS. HOLMES NOT

09:11AM 5   EXCULPATING MR. BALWANI GOES PRECISELY TO THE ISSUE THAT WE

09:11AM 6   ARGUED ABOUT ON MARCH 11TH.  IT REALLY IS DÉJÀ VU OVER AGAIN.

09:11AM 7      WHEN I SAY WE CAN'T PUT THAT CONTEXT IN FRONT OF THE JURY

09:11AM 8   WITHOUT SACRIFICING MR. BALWANI'S CONFRONTATION RIGHTS, THAT'S

09:11AM 9   PRECISELY THE ISSUE THAT I'M HONING IN ON.  NO ONE ASKED THE

09:11AM 10  QUESTIONS.  MS. HOLMES'S LAWYERS DIDN'T FEEL LIKE IT, AND THE

09:11AM 11  GOVERNMENT DIDN'T HAVE AN INCENTIVE TO ASK, WELL, DID YOU

09:11AM 12  NOTE -- DID YOU TELL, MR. BALWANI?  DID HE KNOW ABOUT THIS?

09:11AM 13     SHE'S NOT ON THE STAND.  MR. BALWANI -- WE DON'T HAVE THE

09:11AM 14  OPPORTUNITY TO CROSS-EXAMINE.  WE KNOW THAT SHE MADE THIS

09:11AM 15  ADMISSION.  WE WOULD HAVE FOLLOWED UP ON WHETHER ON WHETHER SHE

09:11AM 16  SHARED THIS PLAN WITH MR. BALWANI, AND WE LACKED THE

09:11AM 17  OPPORTUNITY TO DO SO AND THE GOVERNMENT LACKED THE INCENTIVE TO

09:11AM 18  DO SO.

09:11AM 19     THAT'S ALL I HAVE, YOUR HONOR, UNLESS THE COURT HAS

09:11AM 20  FURTHER QUESTIONS.

09:11AM 21          THE COURT:  MR. SCHENK?

09:12AM 22          MR. SCHENK:  SUBMIT IT.

09:12AM 23          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

09:12AM 24     WE HAVE THE WITNESS HERE, IS IT DR. PANDORI?

09:12AM 25          MR. SCHENK:  YES, YOUR HONOR.

09:12AM 1          THE COURT:  ALL RIGHT.  WE'LL TAKE A BREAK AND BRING

09:12AM 2   DR. PANDORI ON AND COMPLETE HIS TESTIMONY THIS MORNING.

09:12AM 3       WHAT DO WE HAVE LEFT WITH HIM DO YOU THINK?  ANY IDEA?

09:12AM 4          MR. CAZARES:  1 TO 1.5.

09:12AM 5          THE COURT:  ALL RIGHT.  THANK YOU.

09:12AM 6          MR. BRECHER:  THANK YOU, YOUR HONOR.

09:12AM 7   (RECESS FROM 9:12 A.M. UNTIL 9:23 A.M.)

09:23AM 8   (JURY IN AT 9:23 A.M.)

09:23AM 9          THE COURT:  THANK YOU.  GOOD MORNING.

09:23AM 10  WE'RE BACK ON THE RECORD.  ALL COUNSEL ARE PRESENT.

09:23AM 11  MR. BALWANI IS PRESENT.

09:23AM 12  OUR JURY AND ALTERNATES ARE PRESENT.

09:23AM 13  GOOD MORNING, LADIES AND GENTLEMEN.

09:23AM 14  BEFORE WE BEGIN, LET ME ASK YOU THAT QUESTION AGAIN.

09:23AM 15  DURING THE BREAK DID ANY OF YOU HAVE CAUSE TO DO ANY

09:23AM 16  INVESTIGATION, DISCUSS OR COME UPON ANY INFORMATION REGARDING

09:24AM 17  THIS CASE?

09:24AM 18  IF SO, IF YOU WOULD PLEASE RAISE YOUR HAND.

09:24AM 19  I SEE NO HANDS.  THANK YOU.

09:24AM 20  WE ARE GOING TO RESUME, I BELIEVE, WITH DR. PANDORI,

09:24AM 21  MR. BOSTIC?

09:24AM 22          MR. BOSTIC:  YES, YOUR HONOR, THE WITNESS IS

09:24AM 23  AVAILABLE.

09:24AM 24          THE COURT:  GREAT.  LET'S CALL HIM, RECALL HIM.

09:24AM 25          SIR, IF YOU WOULD JUST RETURN TO THE STAND, PLEASE.

09:24AM   1      AGAIN, MAKE YOURSELF COMFORTABLE.

09:24AM   2              **(GOVERNMENT'S WITNESS, MARK PANDORI, WAS RESWORN.)**

09:24AM   3              THE COURT:  AND WHEN YOU ARE COMFORTABLE -- YES, YOU

09:24AM   4      CAN REMOVE YOUR MASK.

09:24AM   5          WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE JUST STATE YOUR

09:25AM   6      NAME AGAIN, PLEASE.

09:25AM   7              THE WITNESS:  MARK PANDORI.

09:25AM   8              THE COURT:  THANK YOU.

09:25AM   9          COUNSEL.

09:25AM   10             MR. CAZARES:  AND, YOUR HONOR, MAY I HAND UP A

09:25AM   11     BINDER TO THE COURT?

09:25AM   12             THE COURT:  YES.

09:25AM   13             MR. CAZARES:  THE DEFENSE ALREADY HAS A COPY,

09:25AM   14     YOUR HONOR.

09:25AM   15             THE COURT:  GREAT.

09:25AM   16             MR. CAZARES:  (HANDING.)

09:25AM   17         AND MAY I REMOVE MY MASK, YOUR HONOR?

09:25AM   18             THE COURT:  YES.

09:25AM   19                  **CROSS-EXAMINATION (RESUMED)**

09:25AM   20     BY MR. CAZARES:

09:25AM   21     Q.   GOOD MORNING, DR. PANDORI.

09:25AM   22     A.   GOOD MORNING.

09:25AM   23     Q.   I WANT TO PICK UP WHERE WE LEFT OFF ON FRIDAY.  AND WITHIN

09:25AM   24     THE BENCH THERE YOU HAVE SOME BINDERS, AND I BELIEVE IN YOUR

09:25AM   25     VOLUME 2 YOU SHOULD HAVE AN EXHIBIT MARKED NUMBER 20279.

09:25AM  1    20279.

09:25AM  2    A.   YES.

09:25AM  3    Q.   DO YOU HAVE 20279 IN FRONT OF YOU?

09:25AM  4    A.   YES.

09:25AM  5    Q.   OKAY.  AND DO YOU RECALL THAT WE WERE DISCUSSING THIS

09:25AM  6    EXHIBIT?  IT'S AN EMAIL DATED MAY 30, 2014.

09:26AM  7         DO YOU SEE THAT?

09:26AM  8    A.   YES.

09:26AM  9    Q.   AND THE COVER SHEET APPEARS TO BE ADDRESSED TO

09:26AM  10   DR. ADAM ROSENDORFF; CORRECT?

09:26AM  11   A.   YES.

09:26AM  12   Q.   AND ITS SUBJECT LINE IS TRANSITION REPORT.

09:26AM  13        DO YOU SEE THAT AS WELL?

09:26AM  14   A.   YES.

09:26AM  15   Q.   AND I ASKED YOU ON FRIDAY TO TAKE A LOOK AT THE

09:26AM  16   ATTACHMENT.

09:26AM  17        CAN YOU DO THAT AGAIN?

09:26AM  18        DO YOU SEE THERE IS A MULTI-PAGE MEMO ATTACHED TO THE

09:26AM  19   EMAIL?

09:26AM  20        DO YOU SEE THAT?

09:26AM  21   A.   YES.

09:26AM  22   Q.   AND AT THE TOP OF THE MEMO IT HAS A TYPE STAMPED 52930?

09:26AM  23   A.   IT HAS THE NUMBERS 5, 29, AND 30 ON THERE.

09:26AM  24   Q.   AND THE INITIALS M.W. PANDORI.

09:26AM  25        DO YOU SEE THAT?

PANDORI CROSS BY MR. CAZARES (RES.)                              2202

09:26AM 1    A.   YES.

09:26AM 2    Q.   AND THOSE ARE YOUR INITIALS?

09:26AM 3    A.   THOSE ARE MY INITIALS, AND MY LAST NAME.

09:26AM 4    Q.   OKAY.  AND WHEN I ASKED YOU ABOUT THE EMAIL AND THE MEMO,

09:26AM 5    THE TRANSITION REPORT REFLECTED IN 20279 ON FRIDAY, YOU

09:26AM 6    TESTIFIED THAT YOU HAD NEVER SEEN THE ATTACHED REPORT BEFORE;

09:27AM 7    CORRECT?

09:27AM 8    A.   NO.  I TESTIFIED THAT IT WAS UNFAMILIAR TO ME.

09:27AM 9    Q.   BUT YOU FIRST SAID THAT YOU HAD NEVER SEEN THE ATTACHED

09:27AM 10   REPORT BEFORE; CORRECT?

09:27AM 11   A.   I DON'T RECALL MY EXACT WORDS, BUT I RECALL NOT

09:27AM 12   RECOGNIZING THE DOCUMENT.

09:27AM 13   Q.   THERE SHOULD BE A BINDER THERE ON YOUR DESK WITH SOME

09:27AM 14   PRIOR STATEMENTS.  I'M LOOKING FOR EXHIBIT 28456, 28456.

09:27AM 15        DO YOU HAVE THAT?

09:27AM 16   A.   YES.

09:27AM 17   Q.   AT 28456, IT'S A TRANSCRIPT FROM FRIDAY.

09:27AM 18        DO YOU SEE THAT?

09:27AM 19   A.   YES.

09:27AM 20   Q.   APRIL 1, '22?

09:27AM 21   A.   YES.

09:27AM 22   Q.   AND IF YOU COULD TURN TO PAGE 1865.  ARE YOU AT 1865?

09:27AM 23   A.   NO.

09:27AM 24   Q.   OKAY.  SO LET ME KNOW WHEN YOU'RE THERE.

09:28AM 25   A.   I AM.

09:28AM   1    Q.   AND LOOK AT LINES 1 TO 3.  READ THAT TO YOURSELF.

09:28AM   2    A.   YES, I SEE THAT.

09:28AM   3    Q.   AND YOU TESTIFIED ON FRIDAY THAT YOU NEVER SAW THE REPORT

09:28AM   4    BEFORE; CORRECT?

09:28AM   5    A.   THAT'S WHAT IT SAYS.

09:28AM   6    Q.   OKAY.  WHEN I SHOWED YOU EXHIBIT 20279 ON FRIDAY, YOU ALSO

09:28AM   7    SAID THAT YOU DID NOT SEND THE EMAIL AND ATTACHED REPORT TO

09:28AM   8    DR. ROSENDORFF; CORRECT?

09:28AM   9    A.   WELL, NO.  I SAID THE EMAIL DOES NOT HAVE A FROM LINE, SO

09:28AM  10    I CAN'T TELL WHO SENT THAT EMAIL.

09:28AM  11    Q.   WITHIN THAT SAME EXHIBIT, 28456, THE TRANSCRIPT FROM

09:28AM  12    FRIDAY, PAGE 1863.

09:28AM  13    A.   YES, I'M THERE.

09:28AM  14    Q.   LINE 16 TO 17, READ THAT TO YOURSELF?

09:29AM  15    A.   YES.

09:29AM  16    Q.   YOU TESTIFIED ON FRIDAY THAT YOU DID NOT SEND THE EMAIL

09:29AM  17    AND REPORT TO DR. ROSENDORFF; CORRECT?

09:29AM  18    A.   THAT'S WHAT IT SAYS HERE.

09:29AM  19    Q.   OKAY.  AND THAT'S THE TRANSCRIPT FROM FRIDAY?

09:29AM  20    A.   I'D HAVE TO GO TO THE FRONT OF THE DOCUMENT TO CONFIRM

09:29AM  21    THAT.

09:29AM  22    Q.   BUT THE DOCUMENT THAT YOU'RE LOOKING AT, EXHIBIT 28456,

09:29AM  23    SAYS THAT YOU TOLD THIS JURY THAT YOU DID NOT SEND THIS EMAIL

09:29AM  24    AND REPORT TO DR. ROSENDORFF; CORRECT?

09:29AM  25            MR. BOSTIC:  OBJECTION.

09:29AM  1          THE COURT:  SUSTAINED.

09:29AM  2     BY MR. CAZARES:

09:29AM  3     Q.  WITH RESPECT TO EXHIBIT 20279, DR. PANDORI, UPON ALSO

09:29AM  4     SEEING THAT, YOU DID NOT RECALL AUTHORING THE REPORT; CORRECT?

09:29AM  5     A.  I DO NOT RECALL AUTHORING IT.

09:29AM  6          MR. CAZARES:  YOUR HONOR, PURSUANT TO THE FOUNDATION

09:29AM  7     WE LAID ON FRIDAY, MOVE TO ADMIT EXHIBIT 20279 AND THE

09:29AM  8     ATTACHMENT.

09:29AM  9          MR. BOSTIC:  NO OBJECTION.

09:29AM  10          THE COURT:  IT'S ADMITTED.

09:29AM  11     (DEFENDANT'S EXHIBIT 20279 WAS RECEIVED IN EVIDENCE.)

09:29AM  12          MR. CAZARES:  MAY WE PUT THE FIRST PAGE UP ON THE

09:30AM  13     SCREEN?

09:30AM  14          THE COURT:  IT MAY BE PUBLISHED.

09:30AM  15     BY MR. CAZARES:

09:30AM  16     Q.  AND YOU CAN LOOK AT THE HARD COPY DOCUMENT OR THE SCREEN,

09:30AM  17     DR. PANDORI, WHEN THAT COMES UP.

09:30AM  18          DO YOU SEE IT UP ON THE SCREEN, DR. PANDORI,

09:30AM  19     EXHIBIT 20279?

09:30AM  20     A.  YES.

09:30AM  21     Q.  OKAY.  AND AT THE TOP OF THE MESSAGE, IT APPEARS TO BE A

09:30AM  22     TRUNCATED EMAIL, IT SAYS TO ADAM_ROSENDORFF@THERANOS.COM.

09:30AM  23     DO YOU SEE THAT?

09:30AM  24     A.  YES, I SEE WHAT YOU'VE HIGHLIGHTED.

09:30AM  25     Q.  OKAY.  AND THE SUBJECT IS TRANSITION REPORT?

09:30AM   1       A.   YES.

09:30AM   2       Q.   5/30/2014, THAT'S MAY 30TH, 2014.

09:30AM   3            DO YOU SEE THAT?

09:30AM   4       A.   I SEE THAT.

09:30AM   5       Q.   AND THERE'S A REFERENCE DOCUMENT ATTACHED, IT SAYS

09:30AM   6       TRANSITION MWP 05 2014.DOCX.

09:31AM   7            DO YOU SEE THAT?

09:31AM   8       A.   YES.

09:31AM   9       Q.   AND THE EMAIL SAYS "ATTACHED.

09:31AM   10           "A TRANSITION REPORT.

09:31AM   11           "HOPE THIS HELPS.

09:31AM   12           MARK."

09:31AM   13           DO YOU SEE THAT?

09:31AM   14      A.   I SEE WHAT YOU'VE HIGHLIGHTED, YES.

09:31AM   15      Q.   THOSE ARE YOUR WORDS; CORRECT?

09:31AM   16      A.   THERE'S NO FROM LINE ON THE EMAIL.  I DON'T KNOW IF I --

09:31AM   17      Q.   I'M NOT ASKING YOU THAT.  THOSE ARE YOUR WORDS --

09:31AM   18              THE COURT:  LET HIM FINISH HIS ANSWER, PLEASE.

09:31AM   19           GO AHEAD.

09:31AM   20              THE WITNESS:  NORMALLY IF I'M ASKED THAT QUESTION

09:31AM   21      ABOUT AN EMAIL, I WOULD WANT TO SEE THE FROM LINE.

09:31AM   22      BY MR. CAZARES:

09:31AM   23      Q.   WE CAN GET THERE.  BUT I'M ASKING YOU, ARE THE TYPEWRITTEN

09:31AM   24      WORDS IN EXHIBIT 20279 UP ON THE SCREEN YOUR TYPEWRITTEN WORDS

09:31AM   25      TO DR. ROSENDORFF?

09:31AM  1     A.   I DON'T KNOW.

09:31AM  2     Q.   IF YOU CAN TURN TO THE NEXT PAGE, WE CAN PUT IT UP THE

09:31AM  3     SCREEN, THE ATTACHMENT REFERENCED IN THE EMAIL, AND YOU SEE AT

09:31AM  4     THE TOP THAT WE MENTIONED BEFORE, THERE'S THE NUMBER 5/29/30.

09:31AM  5          DO YOU SEE THAT?

09:31AM  6     A.   YES.

09:31AM  7     Q.   AND ON 5-29 OF 2014, MAY 29TH OF 2014, YOU WERE STILL

09:32AM  8     WORKING AT THERANOS; CORRECT?

09:32AM  9     A.   I DON'T KNOW.

09:32AM  10    Q.   IT'S A YES OR NO.

09:32AM  11    A.   I DON'T KNOW WHAT DATE.  DO YOU HAVE ANY DOCUMENTS THAT I

09:32AM  12    CAN REFRESH MY MEMORY ON WHAT DAY I LEFT?

09:32AM  13    Q.   SO IT'S YOUR TESTIMONY THAT YOU DON'T RECALL WHEN YOU LEFT

09:32AM  14    THERANOS PRECISELY?

09:32AM  15    A.   I DON'T REMEMBER THE EXACT DATE.  I TRIED TO DOUBLE-CHECK

09:32AM  16    MY MEMORY IN THAT REGARD WITH SOME DOCUMENTATION.  IT LOOKS

09:32AM  17    LIKE --

09:32AM  18    Q.   DR. PANDORI, THERE'S NO FURTHER QUESTION PENDING.

09:32AM  19              MR. BOSTIC:  I ASK THAT THE WITNESS BE ALLOWED TO

09:32AM  20    COMPLETE HIS ANSWER.

09:32AM  21         ALSO, OBJECTION.  ARGUMENTATIVE.

09:32AM  22              THE COURT:  LET ME LET YOU WAIT FOR HIS NEXT

09:32AM  23    QUESTION AND THEN YOU CAN ANSWER.

09:32AM  24    BY MR. CAZARES:

09:32AM  25    Q.   DR. PANDORI, THE ATTACHMENT TO EXHIBIT 20279, CONTINUING

09:32AM 1   ON THAT FIRST PAGE, THERE'S A HEADER AND YOU WILL SEE IT SAYS

09:32AM 2   TRANSITION INDEX.

09:32AM 3       DO YOU SEE THAT?

09:32AM 4   A.   YES.

09:32AM 5   Q.   AND THEN THERE ARE FOUR CATEGORIES:   SUBJECT A, HIV/HCV

09:32AM 6   SMALLER VOLUME PROJECT.

09:32AM 7       DO YOU SEE THAT?

09:32AM 8   A.   YES.

09:32AM 9   Q.   AND HIV AND HCV ARE INFECTIOUS DISEASE MATTERS THAT YOU

09:33AM 10  WORKED ON AT THERANOS; CORRECT?

09:33AM 11  A.   CORRECT.   HCV I RECALL.   HIV LESS SO.

09:33AM 12  Q.   AND THEN SUBJECT MATTER B, EMC/BUGS.

09:33AM 13      BUGS RELATES TO THE INFECTIOUS DISEASE LAB AT THERANOS;

09:33AM 14  CORRECT?

09:33AM 15  A.   THAT WAS MY UNDERSTANDING.

09:33AM 16  Q.   AND YOU DID SOME WORK IN RELATION TO THE INFECTIOUS

09:33AM 17  DISEASE LAB AT THERANOS; CORRECT?

09:33AM 18  A.   YES.

09:33AM 19  Q.   AND SUBJECT MATTER C SAYS, DAILY CLIA ADMIN ISSUES.

09:33AM 20      DO YOU SEE THAT?

09:33AM 21  A.   YES.

09:33AM 22  Q.   AND YOU DID SOME ADMINISTRATION ISSUES, MANAGERIAL MATTERS

09:33AM 23  THAT YOU HANDLED WITHIN THE CLIA LAB AT THERANOS; CORRECT?

09:33AM 24  A.   CORRECT.

09:33AM 25  Q.   AND THEN UNDER SUBJECT MATTER D, THERE'S AN OTHER, OTHER

09:33AM  1    NOTES.

09:33AM  2         DO YOU SEE THAT?

09:33AM  3    A.   YES.

09:33AM  4    Q.   AND YOU STILL DON'T RECALL AUTHORING THIS DOCUMENT?  IS

09:33AM  5    THAT YOUR TESTIMONY?

09:33AM  6    A.   I DON'T RECALL.

09:33AM  7    Q.   IF WE COULD TURN TO PAGE 006 OF THE DOCUMENT IN THE LOWER

09:33AM  8    QUARTILE, AND PUT THAT ON THE SCREEN?

09:33AM  9    A.   YES.

09:33AM  10   Q.   AND UNDER THE SUBJECT MATTER D, THE FOURTH OF THE ISSUES

09:34AM  11   IDENTIFIED ON THE FIRST PAGE, YOU SEE HERE IT SAYS, OTHER

09:34AM  12   NOTES.

09:34AM  13        DO YOU SEE THAT?

09:34AM  14   A.   YES.

09:34AM  15   Q.   AND THEN THE PARAGRAPH BEGINS, "EDISONS" COLON.

09:34AM  16        DO YOU SEE THAT?

09:34AM  17   A.   YES.

09:34AM  18   Q.   AND THOSE ARE YOUR WORDS; CORRECT?  THIS PARAGRAPH WAS

09:34AM  19   WRITTEN BY YOU?

09:34AM  20   A.   I DON'T RECALL.

09:34AM  21   Q.   THE PARAGRAPHS CONTINUES, "THE PRIMARY CONCERN IN THIS

09:34AM  22   SECTION IS THE AVAILABLE NUMBER OF DEVICES."

09:34AM  23        DO YOU SEE THAT?

09:34AM  24   A.   YES.

09:34AM  25   Q.   AND THAT'S EDISON DEVICES IS THE PRIMARY CONCERN REFLECTED

09:34AM  1    IN THIS DOCUMENT; CORRECT?

09:34AM  2    A.   I BELIEVE THAT WOULD BE THE ANTECEDENT, YEP.

09:34AM  3    Q.   THE NUMBER OF DEVICES RELATED -- THAT THIS IS RELATING TO

09:34AM  4    IS EDISONS; CORRECT?

09:34AM  5    A.   YES.

09:34AM  6    Q.   AND THEN THE PARAGRAPH CONTINUES, "FOR FT4, VIT D, AND

09:34AM  7    TSH," LET'S STOP THERE.

09:34AM  8         FT4 IS A TEST THAT WAS RUN ON THE EDISON DEVICE AT THAT

09:34AM  9    TIME; CORRECT?

09:34AM  10   A.   YES.

09:34AM  11   Q.   AND VIT D, VITAMIN D WAS ALSO A TEST RUN ON THE EDISON AT

09:35AM  12   THAT TIME; CORRECT?

09:35AM  13   A.   CORRECT.

09:35AM  14   Q.   AND THEN TSH WAS ALSO RUN ON EDISON?

09:35AM  15   A.   YES.

09:35AM  16   Q.   AND THAT WAS USED FOR PATIENT TESTING AT THE TIME;

09:35AM  17   CORRECT?

09:35AM  18   A.   CORRECT.

09:35AM  19   Q.   AND THEN THE PARAGRAPH CONTINUES.

09:35AM  20        "AT LEAST A DOUBLING OF THE NUMBER OF UNITS IS NECESSARY,

09:35AM  21   IN MY OPINION."

09:35AM  22        DO YOU SEE THAT?

09:35AM  23   A.   I SEE THAT.

09:35AM  24   Q.   AND THOSE ARE YOUR WORDS, CORRECT, "AT LEAST A DOUBLING OF

09:35AM  25   THE NUMBER OF UNITS," MEANING EDISONS, "IS NECESSARY IN MY

09:35AM 1    OPINION."

09:35AM 2         CORRECT?  THOSE ARE YOUR WORDS?

09:35AM 3    A.   I DON'T REMEMBER EVER WRITING THAT.

09:35AM 4    Q.   THIS IS MAY 30, 2014, AN EMAIL TO DR. ROSENDORFF THAT YOU

09:35AM 5    SENT; IS THAT RIGHT?

09:35AM 6              MR. BOSTIC:  OBJECTION.  ASKED AND ANSWERED.

09:35AM 7              THE COURT:  SUSTAINED.

09:35AM 8    BY MR. CAZARES:

09:35AM 9    Q.   MAY 30, 2014 IS MORE THAN A WEEK AFTER THE MAY 19TH, 2014,

09:35AM 10   CONVERSATION THAT YOU SAY YOU HAD WITH MS. HOLMES AND

09:35AM 11   MR. BALWANI THAT LED TO YOUR RESIGNATION; CORRECT?

09:35AM 12   A.   CAN YOU REPEAT THE QUESTION?

09:35AM 13   Q.   MAY 19TH, 2014, IS THE DATE THAT YOU TOLD THIS JURY THAT

09:35AM 14   YOU HAD A CONVERSATION WITH ELIZABETH HOLMES AND SUNNY BALWANI

09:36AM 15   THAT LED TO YOUR RESIGNATION?

09:36AM 16   A.   I THINK IT WAS ON OR AROUND THAT DATE.

09:36AM 17   Q.   YOU SAID WITHIN A DAY OR SO; CORRECT?

09:36AM 18   A.   RIGHT.

09:36AM 19   Q.   BECAUSE MAY 19TH IS YOUR BIRTHDAY AND THAT'S WHY YOU

09:36AM 20   REMEMBER IT; CORRECT?

09:36AM 21   A.   RIGHT.  BUT I STILL DON'T KNOW EXACTLY WHAT DAY I LEFT.

09:36AM 22   IF YOU HAVE A DOCUMENT WHICH CAN HELP ASSIST MY MEMORY IN THAT

09:36AM 23   REGARD, THAT WOULD BE VERY HELPFUL.

09:36AM 24   Q.   YOU'RE HAVING A TOUGH TIME REMEMBERING THINGS, YEAH?

09:36AM 25   A.   WHEN I LEFT, THE DATE THAT I LEFT THE COMPANY, WHICH

09:36AM   1    HAPPENED EIGHT YEARS AGO, YES.

09:36AM   2    Q.   THE DATE OF EXHIBIT 20279, WHICH IS MAY 30, 2014, IS

09:36AM   3    SUBSEQUENT TO YOUR BIRTHDAY; CORRECT?

09:36AM   4    A.   YES.

09:36AM   5    Q.   OKAY.  BACK TO PAGE 6 OF THE EXHIBIT.  THE DOCUMENT

09:36AM   6    CONTINUES, "THIS IS ONE OF THE SECTIONS WHERE MORE STAFF (LAB

09:36AM   7    TECHS) WOULD BENEFIT THE MOST."

09:36AM   8         DO YOU SEE THAT?

09:36AM   9    A.   TO WHERE ARE YOU REFERRING?

09:36AM   10   Q.   AGAIN UNDER OTHER NOTES?

09:36AM   11   A.   YES.

09:37AM   12   Q.   "EDISONS:  THE PRIMARY CONCERN IN THIS SECTION IS THE

09:37AM   13   AVAILABLE NUMBER OF DEVICES."

09:37AM   14        YOU SEE THAT?

09:37AM   15   A.   I DO.

09:37AM   16   Q.   AND THEN "FOR FT4, VIT D AND TSH, AT LEAST A DOUBLING OF

09:37AM   17   THE NUMBER OF UNITS IS NECESSARY, IN MY OPINION."

09:37AM   18        DO YOU SEE THAT?

09:37AM   19   A.   I DO.

09:37AM   20   Q.   AND THEN IT FOLLOWS, "THIS IS ONE OF THE SECTIONS WHERE

09:37AM   21   MORE STAFF (LAB TECHS) WOULD BENEFIT THE MOST."

09:37AM   22        DO YOU SEE THAT?

09:37AM   23   A.   YES.

09:37AM   24   Q.   AND AT THE TIME THERANOS WAS HIRING MORE STAFF IN THE LAB;

09:37AM   25   CORRECT?

09:37AM 1    A.   YES.

09:37AM 2    Q.   AND THEN THE MEMO CONTINUES.

09:37AM 3         "I HAVE BEEN INFORMED THAT THE UNITS REQUIRE SERVICE WITH

09:37AM 4    HIGH FREQUENCY, SO A CONTINUOUS MONITORING OF THIS SECTION IS

09:37AM 5    WARRANTED."

09:37AM 6         DO YOU SEE THAT?

09:37AM 7    A.   YES.

09:37AM 8    Q.   YOU WROTE THAT; CORRECT?

09:37AM 9    A.   I DON'T RECALL.

09:37AM 10   Q.   NOW, YOU HAD TESTIFIED BEFORE TO THIS JURY ON FRIDAY THAT

09:37AM 11   YOU TOLD DR. ROSENDORFF ON MANY OCCASIONS TO STOP USING THE

09:37AM 12   EDISONS.

09:37AM 13        THAT'S WHAT YOU TOLD THIS JURY; CORRECT?

09:37AM 14   A.   YES.

09:37AM 15   Q.   THE MEMO REFLECTED HERE AT 20279 SAYS TO DOUBLE THE NUMBER

09:38AM 16   OF EDISONS ON MAY 30, 2014; CORRECT?

09:38AM 17   A.   CORRECT.

09:38AM 18   Q.   IT DOESN'T SAY STOP USING THEM IN THIS MEMO, DOES IT?

09:38AM 19   A.   CORRECT.

09:38AM 20   Q.   DR. PANDORI, IF YOU COULD TAKE A LOOK WITHIN THE DOCUMENTS

09:38AM 21   THAT YOU HAVE FOR EXHIBIT 20498, 20498.  THAT WOULD BE IN THE

09:38AM 22   SMALL BINDER IN FRONT OF YOU THAT SAYS PANDORI, MARK PANDORI ON

09:39AM 23   THE FRONT.

09:39AM 24        20498.

09:39AM 25   A.   I'VE LOCATED IT.

PANDORI CROSS BY MR. CAZARES (RES.)

09:39AM   1    Q.   OKAY.  20498 IS ANOTHER EMAIL DATED MAY 30, 2014.

09:39AM   2         DO YOU SEE THAT?

09:39AM   3    A.   YES.

09:39AM   4    Q.   AND THAT EMAIL APPEARS TO BE FROM YOURSELF.

09:39AM   5         DO YOU SEE THAT?

09:39AM   6    A.   YES.

09:39AM   7    Q.   TO MONA RAMAMURTHY, THE HEAD OF HR; CORRECT?

09:39AM   8    A.   YES.

09:39AM   9    Q.   AND TO MR. BALWANI AT THEIR THERANOS EMAIL ADDRESSES?

09:39AM  10    A.   YES.

09:39AM  11    Q.   AND THE SUBJECT LINE, TRANSITION REPORT.

09:39AM  12         DO YOU SEE THAT AS WELL?

09:39AM  13    A.   YES.

09:39AM  14         MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT

09:39AM  15    EXHIBIT 20498.  THIS IS ALSO THE SUBJECT TO THE EMAIL

09:39AM  16    STIPULATION.

09:39AM  17         MR. BOSTIC:  NO OBJECTION.

09:39AM  18         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:39AM  19    (DEFENDANT'S EXHIBIT 20498 WAS RECEIVED IN EVIDENCE.)

09:39AM  20    BY MR. CAZARES:

09:39AM  21    Q.   SO YOU SEE, DR. PANDORI, UP ON THE SCREEN THE EMAIL

09:40AM  22    APPEARS TO BE FROM YOURSELF.

09:40AM  23         DO YOU SEE THAT?

09:40AM  24    A.   YES.

09:40AM  25    Q.   AND THEN TO MS. RAMAMURTHY AND MR. BALWANI.

09:40AM   1        DO YOU SEE THAT?

09:40AM   2   A.   YES.

09:40AM   3   Q.   AND SO YOU SENT THIS EMAIL; CORRECT?

09:40AM   4   A.   I DON'T RECALL.  ACCORDING TO THE HEADER, YES.

09:40AM   5   Q.   MAY 30, 2014.  SO YOU WERE STILL WORKING THAT DAY AT

09:40AM   6   THERANOS; CORRECT?

09:40AM   7   A.   I DON'T RECALL WHAT DAY I LEFT THERANOS.

09:40AM   8   Q.   AND THE ATTACHMENT TO THIS DOCUMENT, IT SAYS TRANSITION

09:40AM   9   MWP 05 2014.DOCX.

09:40AM   10       DO YOU SEE THAT?

09:40AM   11   A.   I DO.

09:40AM   12   Q.   AND THAT'S THE SAME DOCUMENT REFERENCED IN 20279 THAT WE

09:40AM   13   JUST LOOKED AT; CORRECT?

09:40AM   14   A.   I BELIEVE SO, YES.

09:40AM   15   Q.   AND AGAIN, THE SUBJECT LINE OF THIS EMAIL IS TRANSITION

09:40AM   16   REPORT.

09:40AM   17       DO YOU SEE THAT?

09:40AM   18   A.   YES.

09:40AM   19   Q.   AND THE EMAIL FROM YOURSELF READS, "ATTACHED.

09:40AM   20       "A DOCUMENT DETAILING THE STATE OF VARIOUS PROJECTS OR

09:40AM   21   WORKS IN THE CLIA/BUGS LABORATORIES.  IT CONTAINS ADDITIONAL

09:40AM   22   TRANSITIONAL INFORMATION DETAILING THE ADMINISTRATIVE FUNCTIONS

09:40AM   23   WHICH I HAVE BEEN PERFORMING AS NEW EMPLOYEES ARRIVE AND ON A

09:40AM   24   DAILY BASIS.

09:41AM   25       "I WAS GOING TO SHARE THIS WITH ADAM WITH YOUR PERMISSION.

09:41AM  1          MARK PANDORI."

09:41AM  2          DO YOU SEE THAT?

09:41AM  3    A.   I DO SEE THAT.

09:41AM  4    Q.   AND YOU SENT THAT?

09:41AM  5    A.   ACCORDING TO THE HEADER.

09:41AM  6    Q.   AND YOU SENT THE MEMO REFLECTED AND ATTACHED IN

09:41AM  7    EXHIBIT 20498 TO DR. ROSENDORFF AS WE'VE ALREADY SEEN; CORRECT?

09:41AM  8    A.   WELL, THAT EMAIL DOESN'T HAVE A FROM LINE ON IT, SO I

09:41AM  9    DON'T RECALL.

09:41AM  10   Q.   SO YOU DON'T -- YOU'RE TELLING THIS JURY YOU DID NOT SEND

09:41AM  11   THE TRANSITION REPORT TO DR. ROSENDORFF?

09:41AM  12          IS THAT WHAT YOU'RE SAYING?

09:41AM  13          MR. BOSTIC:  ASKED AND ANSWERED.

09:41AM  14          THE COURT:  SUSTAINED.

09:41AM  15   BY MR. CAZARES:

09:41AM  16   Q.   IF WE CAN TURN TO THE FRONT PAGE OF THE ATTACHMENT ON

09:41AM  17   20498?

09:41AM  18   A.   I'M THERE.

09:41AM  19   Q.   AND WE'LL PUT IT UP ON THE SCREEN FOR THE JURY.

09:42AM  20          AND YOU SEE IT APPEARS TO BE THE SAME MEMO THAT WAS

09:42AM  21   REFLECTED IN EXHIBIT 20279; CORRECT?

09:42AM  22   A.   IT DOES.

09:42AM  23   Q.   AND IF WE COULD FLIP BACK TO SUBJECT MATTER D ON PAGE 6,

09:42AM  24   THIS MEMO TO MR. BALWANI AND MS. RAMAMURTHY ALSO INCLUDES A

09:42AM  25   PASSAGE ABOUT THE EDISONS.

09:42AM   1          DO YOU SEE THAT?

09:42AM   2     A.   YES.

09:42AM   3     Q.   AND THIS SAME MEMO TO MS. RAMAMURTHY AND MR. BALWANI ALSO

09:42AM   4     READS, "THE PRIMARY CONCERN IN THIS SECTION IS THE AVAILABLE

09:42AM   5     NUMBER OF DEVICES."

09:42AM   6          DO YOU SEE THAT?

09:42AM   7     A.   YES, I DO.

09:42AM   8     Q.   AND THIS MEMO TO MR. BALWANI ALSO READS, "FOR FT4, VIT D,

09:42AM   9     AND TSH, AT LEAST A DOUBLING OF THE NUMBER OF UNITS IS

09:42AM  10     NECESSARY, IN MY OPINION."

09:42AM  11          DO YOU SEE THAT?

09:42AM  12     A.   YES.

09:42AM  13     Q.   AND THIS IS A DOCUMENT ATTACHED TO AN EMAIL FROM YOU TO

09:42AM  14     MR. BALWANI; CORRECT?

09:42AM  15     A.   TO MR. BALWANI, YES.

09:42AM  16     Q.   OKAY.  AND THIS IS MAY 30, 2014; CORRECT?

09:42AM  17     A.   THAT'S WHAT IS DATED ON THE EMAIL.

09:42AM  18     Q.   THIS WOULD HAVE BEEN AFTER YOUR DISCUSSION WITH MS. HOLMES

09:42AM  19     AND MR. BALWANI ON OR ABOUT YOUR BIRTHDAY, MAY 19TH, 2014;

09:43AM  20     CORRECT?

09:43AM  21     A.   I DON'T HAVE THE DATE STRAIGHT.  I NEED TO KNOW WHAT DAY

09:43AM  22     THAT HAPPENED.  IF YOU HAVE ANY DOCUMENTS, THAT MIGHT HELP ME.

09:43AM  23     Q.   YOU TOLD THIS JURY THAT YOU HAD THE DISCUSSION WITH

09:43AM  24     MR. BALWANI AND MS. HOLMES, TRIGGERED BY THE "WIRED" ARTICLE

09:43AM  25     THAT LED TO YOUR RESIGNATION WITHIN FIVE MINUTES, ON YOUR

09:43AM   1    BIRTHDAY, MAY 19TH, 2014, GIVE OR TAKE A DAY; CORRECT?

09:43AM   2    A.   CORRECT.

09:43AM   3    Q.   AND THIS MEMO THAT YOU'RE SENDING TO MR. BALWANI ON

09:43AM   4    MAY 30, 2014, IS SUBSEQUENT TO THAT DISCUSSION?

09:43AM   5    A.   IT IS, YES.

09:43AM   6    Q.   AND YOU ALSO TESTIFIED TO THIS JURY THAT YOU HAD TWO

09:43AM   7    DISCUSSIONS WITH MR. BALWANI ABOUT THE USE OF EDISONS; CORRECT?

09:43AM   8    A.   I DON'T REMEMBER IF I SAID TWO, BUT THERE WERE

09:43AM   9    DISCUSSIONS.

09:43AM  10    Q.   YOU SAID YOU HAD TWO DISCUSSIONS, ONE WITH MR. BALWANI

09:43AM  11    WHILE THE TWO OF YOU WERE MOVING DEVICES OR EQUIPMENT IN WHICH

09:43AM  12    YOU TOLD HIM THAT THE LAB SHOULD STOP USING THE EDISONS;

09:43AM  13    CORRECT?

09:43AM  14    A.   I DID LET HIM KNOW THAT.

09:43AM  15    Q.   AND THEN YOU SAID YOU HAD ANOTHER DISCUSSION WITH

09:44AM  16    MR. BALWANI ABOUT THE USE OF EDISONS WHERE YOU TOLD HIM TO STOP

09:44AM  17    USING THE EDISONS IN YOUR OFFICE WHERE MR. BALWANI WAS

09:44AM  18    ACCOMPANIED BY TWO PROJECT MANAGERS; CORRECT?

09:44AM  19    A.   WELL, AT THAT TIME I DIDN'T TELL HIM THAT.  I THINK THAT

09:44AM  20    WAS PART OF THE DISCUSSION.

09:44AM  21    Q.   AND YOU TESTIFIED ON FRIDAY THAT BOTH OF THOSE DISCUSSIONS

09:44AM  22    WITH MR. BALWANI ABOUT THE USE OF THE EDISONS TOOK PLACE IN

09:44AM  23    MARCH OR APRIL OF 2014; CORRECT?

09:44AM  24        THAT'S WHAT YOU TESTIFIED TO?

09:44AM  25    A.   CORRECT.

```
09:44AM   1    Q.   SO THIS EMAIL WITH THE ATTACHMENT AND THE REPORT TO

09:44AM   2    MR. BALWANI ON MAY 30, 2014, IS SUBSEQUENT TO THOSE DISCUSSIONS

09:44AM   3    YOU SAY YOU HAD WITH MR. BALWANI ABOUT THE USE OF EDISONS;

09:44AM   4    CORRECT?

09:44AM   5    A.   THEY'RE SUBSEQUENT.

09:44AM   6    Q.   OKAY.  AND HERE IN LOOKING AT 20498, THE MEMO THAT YOU

09:44AM   7    SENT TO MR. BALWANI, UNDER OTHER NOTES, EDISONS, YOU DID NOT

09:44AM   8    INCLUDE ANY LANGUAGE THERE ABOUT A CONCERN THAT YOU HAD WITH

09:44AM   9    THE ACCURACY OF EDISONS, DID YOU?

09:44AM  10    A.   NO.

09:44AM  11    Q.   IN 20498, IN THE MEMO TO MR. BALWANI, YOU DID NOT WRITE

09:45AM  12    THAT YOU HAD CONCERN ABOUT PATIENT HARM RELATING TO THE

09:45AM  13    ACCURACY OF EDISONS, DID YOU?

09:45AM  14    A.   NO, I DID NOT.

09:45AM  15    Q.   YOU CAN SET THAT ASIDE.

09:45AM  16         IN THE DOCUMENT BINDERS THAT YOU HAVE, IF YOU COULD PLEASE

09:45AM  17    LOOK FOR 20277.  20277.  IT SHOULD BE IN VOLUME 2.

09:46AM  18    A.   I'M THERE.

09:46AM  19    Q.   OKAY.  AND 20277 APPEARS TO BE AN EMAIL DATED MAY 21ST OF

09:46AM  20    2014.

09:46AM  21         DO YOU SEE THAT?

09:46AM  22    A.   YES.

09:46AM  23              MR. CAZARES:  I APOLOGIZE, YOUR HONOR.

09:46AM  24    Q.   AND THE EMAIL APPEARS TO BE A MESSAGE FROM YOURSELF TO

09:46AM  25    DR. ROSENDORFF?
```

09:46AM  1    A.   YES.

09:46AM  2    Q.   AND THE EMAIL REFERENCES MEETINGS BETWEEN YOURSELF AND

09:46AM  3    DR. ROSENDORFF AND THE CLIA STAFF?

09:47AM  4    A.   YES.

09:47AM  5    Q.   AND YOU'RE ESSENTIALLY WRITING A DRAFT MESSAGE TO

09:47AM  6    DR. ROSENDORFF BEFORE SENDING IT TO THE CLIA STAFF; CORRECT?

09:47AM  7    A.   CORRECT.

09:47AM  8    Q.   AND IT WAS YOUR REGULAR PRACTICE TO USE EMAIL TO

09:47AM  9    COMMUNICATE WITH DR. ROSENDORFF REGARDING CLIA MATTERS AT THAT

09:47AM  10   TIME; CORRECT?

09:47AM  11   A.   CORRECT.

09:47AM  12   Q.   AND YOU RECALL HAVING THOSE MEETINGS WITH THE CLIA STAFF

09:47AM  13   THAT ARE REFERENCED IN THE EMAIL?

09:47AM  14   A.   NOT AT THIS POINT I DON'T, BUT THEY ARE REFERRED TO HERE.

09:47AM  15   Q.   BUT YOU DID HAVE MEETINGS WITH CLIA STAFF ABOUT ISSUES

09:47AM  16   RELATING TO THE CLINICAL LAB REGULARLY, DIDN'T YOU?

09:47AM  17   A.   YES.

09:47AM  18   Q.   INCLUDING BEFORE YOU LEFT THERANOS IN MAY OF 2014;

09:47AM  19   CORRECT?

09:47AM  20   A.   CORRECT.

09:47AM  21   Q.   AND IT WAS YOUR UNDERSTANDING THAT THOSE EMAILS AND

09:47AM  22   COMMUNICATIONS THAT YOU HAD WITH DR. ROSENDORFF WERE MAINTAINED

09:47AM  23   AT THERANOS DURING THE REGULAR COURSE OF BUSINESS; CORRECT?

09:47AM  24   A.   I WOULD ASSUME SO.

09:47AM  25        MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT 20277.

09:48AM   1                MR. BOSTIC:  NO OBJECTION.

09:48AM   2                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:48AM   3           (DEFENDANT'S EXHIBIT 20277 WAS RECEIVED IN EVIDENCE.)

09:48AM   4                MR. CAZARES:  IF WE CAN PUT THAT UP ON THE SCREEN

09:48AM   5       AND JUST HIGHLIGHT THE TOP PORTION FIRST, THOUGH.

09:48AM   6       Q.   AND THE LATTER OF THE MESSAGES IN THE EXHIBIT 20277

09:48AM   7       APPEARS TO BE FROM DR. ROSENDORFF TO YOURSELF.

09:48AM   8           DO YOU SEE THAT?

09:48AM   9       A.   YES.

09:48AM   10      Q.   OKAY.  AND IT'S MAY 21, 2014.

09:48AM   11          DO YOU SEE THAT AS WELL?

09:48AM   12      A.   I DO.

09:48AM   13      Q.   AND MAY 21, 2014, THAT'S TWO DAYS AFTER YOUR BIRTHDAY THAT

09:48AM   14      YEAR; CORRECT?

09:48AM   15      A.   YES.

09:48AM   16      Q.   SO AFTER OR AROUND THE TIME OF THE PURPORTED CONVERSATIONS

09:48AM   17      THAT YOU HAD WITH MR. BALWANI AND MS. HOLMES THAT LED TO YOUR

09:48AM   18      RESIGNATION; CORRECT?

09:48AM   19      A.   WELL, AGAIN, I DON'T REMEMBER WHAT DATE THAT WAS EXACTLY.

09:48AM   20      Q.   AND IN THE MESSAGE AT 20277, DR. ROSENDORFF WRITES TO

09:48AM   21      YOURSELF, "MARK.

09:48AM   22          "I THINK THAT LOOKS JUST FINE.

09:48AM   23          "THANKS.

09:48AM   24          "ADAM."

09:49AM   25          DO YOU SEE THAT?

09:49AM  1    A.   YES.

09:49AM  2    Q.   AND IF WE CAN SCROLL DOWN TO THE LOWER PORTION OF THE

09:49AM  3    EMAIL.

09:49AM  4         AND THIS APPEARS TO BE A MESSAGE FROM YOURSELF TO

09:49AM  5    DR. ROSENDORFF, MAY 21, 2014.

09:49AM  6         DO YOU SEE THAT?

09:49AM  7    A.   CORRECT.

09:49AM  8    Q.   AND YOU SAY, "IS THIS OK," QUESTION MARK?

09:49AM  9    A.   THAT'S RIGHT.

09:49AM 10    Q.   AND IT APPEARS THAT YOU'RE ASKING FOR DR. ROSENDORFF'S

09:49AM 11    APPROVAL OF THE MESSAGE.

09:49AM 12         DO YOU SEE THAT?

09:49AM 13    A.   YES.

09:49AM 14    Q.   AND IN THE MESSAGE YOU WROTE IN THE DRAFT, "DEAR CLIA

09:49AM 15    LABORATORY MEMBERS,

09:49AM 16         "ADAM AND I WERE ABLE TO DISCUSS WITH ONE ANOTHER THE

09:49AM 17    RESULTS OF OUR ONE ON ONE CONVERSATIONS WITH EACH OF YOU, AND

09:49AM 18    ONE OF EVERYONE'S PRIMARY CONCERNS IS WORK HOURS."

09:49AM 19         DO YOU SEE THAT?

09:49AM 20    A.   YES.

09:49AM 21    Q.   AND THAT'S A REFERENCE TO CONCERNS OF THE CLIA STAFF THAT

09:49AM 22    YOU'RE REPORTING TO DR. ROSENDORFF; CORRECT?

09:49AM 23    A.   YES.

09:49AM 24    Q.   AND AS FAR AS CONCERNS BY THE CLIA STAFF, THERE IS NO

09:49AM 25    MENTION HERE IN THIS EMAIL ABOUT ACCURACY AND RELIABILITY OF

09:49AM   1    THE EDISON; CORRECT?

09:50AM   2    A.   THAT'S NOT DISCUSSED IN THIS EMAIL AS FAR AS I CAN TELL.

09:50AM   3    Q.   THE PRIMARY CONCERN HERE IS WORK HOURS; CORRECT?

09:50AM   4    A.   CORRECT.

09:50AM   5    Q.   AND AT THE BOTTOM OF THE MESSAGE YOU FINISH, "THANKS FOR

09:50AM   6    ALL OF THE CANDOR AND SUGGESTIONS YOU EACH PROVIDED IN THE

09:50AM   7    COURSE OF YOUR INDIVIDUAL MEETINGS.  STEP BY STEP, WE CAN

09:50AM   8    ADDRESS THESE ISSUES IN OUR AIM TO IMPROVE THE CLIA LABORATORY.

09:50AM   9         "SINCERELY,

09:50AM  10         "MARK PANDORI."

09:50AM  11         DO YOU SEE THAT?

09:50AM  12    A.   I DO.

09:50AM  13    Q.   AND YOU RECALL THE MEETINGS WITH THE CLIA STAFF?

09:50AM  14    A.   I REMEMBER MEETING WITH THEM IN GROUPS, AND OCCASIONALLY

09:50AM  15    SOME OF THEM INDIVIDUALLY.  BUT I DON'T REMEMBER MEETING WITH

09:50AM  16    THEM INDIVIDUALLY IN A SERIES LIKE THIS.

09:50AM  17    Q.   YOU CAN SET THAT ASIDE.  YOU CAN SET THAT EXHIBIT ASIDE.

09:50AM  18         AND IF YOU COULD TAKE A LOOK AT EXHIBIT 20496.  20496.

09:51AM  19    AND THAT SHOULD BE IN THE SMALLER BINDER THAT SAYS MARK PANDORI

09:51AM  20    ON THE FRONT.

09:51AM  21    A.   I'M THERE.

09:51AM  22    Q.   AND 20496, THE MESSAGE AT THE TOP APPEARS TO BE FROM

09:51AM  23    MS. RAMAMURTHY TO YOURSELF AT YOUR THERANOS ADDRESS.

09:51AM  24         DO YOU SEE THAT?

09:51AM  25    A.   YES.

09:51AM   1    Q.   AND DATED 5/27/2014.

09:51AM   2         DO YOU SEE THAT?

09:51AM   3    A.   I DO.

09:51AM   4    Q.   AND THE SUBJECT LINE IS TRANSITION.

09:51AM   5         DO YOU SEE THAT?

09:51AM   6    A.   YES.

09:51AM   7    Q.   AND MS. RAMAMURTHY WAS THE HEAD OF HR?

09:51AM   8    A.   THAT'S MY UNDERSTANDING.

09:51AM   9    Q.   AND YOU COMMUNICATED WITH HER RELATING TO YOUR EXIT

09:51AM  10    PROCESS FROM THERANOS; CORRECT?

09:51AM  11    A.   CORRECT.

09:51AM  12    Q.   AND THIS APPEARS TO BE A PART OF THAT PROCESS; CORRECT?

09:51AM  13    A.   I HAVE TO READ THE EMAIL.

09:51AM  14    Q.   WHY DON'T YOU TAKE A LOOK AT IT AND REFRESH YOUR

09:51AM  15    RECOLLECTION.

09:52AM  16    A.   I'VE READ THE EMAIL.

09:52AM  17    Q.   AND YOU SAID THAT YOU HAD COMMUNICATIONS WITH

09:52AM  18    MS. RAMAMURTHY RELATING TO YOUR EXIT PROCESS FROM THERANOS;

09:52AM  19    CORRECT?

09:52AM  20    A.   I DID.

09:52AM  21    Q.   AND THIS MESSAGE AT 20496 APPEARS TO BE A PART OF THAT

09:52AM  22    PROCESS; CORRECT?

09:52AM  23    A.   THE WORD "TRANSITION" IMPLIES IT.

09:52AM  24         MR. CAZARES:  MOVE TO ADMIT 20496, YOUR HONOR.

09:52AM  25         MR. BOSTIC:  NO OBJECTION.

| | | |
|---|---|---|
| 09:52AM | 1 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:52AM | 2 | (DEFENDANT'S EXHIBIT 20496 WAS RECEIVED IN EVIDENCE.) |
| 09:52AM | 3 | BY MR. CAZARES: |
| 09:52AM | 4 | Q.   AND JUST LOOKING AT THE HEADER OF THE MESSAGE, IT STARTS |
| 09:52AM | 5 | WITH -- AGAIN, IT APPEARS TO BE FROM YOURSELF -- FROM |
| 09:52AM | 6 | MS. RAMAMURTHY, I'M SORRY, TO YOURSELF, MAY 27, 2014. |
| 09:52AM | 7 | DO YOU SEE THAT? |
| 09:52AM | 8 | A.   I DO. |
| 09:52AM | 9 | Q.   AND THE SUBJECT MATTER IS TRANSITION. |
| 09:52AM | 10 | DO YOU SEE THAT? |
| 09:52AM | 11 | A.   YES. |
| 09:52AM | 12 | Q.   AND IN THE MESSAGE FROM MS. RAMAMURTHY SHE WRITES, "HI |
| 09:52AM | 13 | MARK, |
| 09:52AM | 14 | "SUNNY IS OUT TODAY SO HE WANTED ME TO CONNECT WITH YOU ON |
| 09:52AM | 15 | TRANSITION.  HE SAID THAT YOU CAN WORK FROM HOME TOMORROW AND |
| 09:53AM | 16 | THURSDAY TO FOCUS ON DOCUMENTING THE FOLLOWING:" |
| 09:53AM | 17 | AND THE FIRST BULLET IS "HIV AND HCV MICRO VOLUME |
| 09:53AM | 18 | PROJECT." |
| 09:53AM | 19 | DO YOU SEE THAT? |
| 09:53AM | 20 | A.   YES. |
| 09:53AM | 21 | Q.   AND THE SECOND BULLET IS, "PROCESS YOU WERE GOING TO SET |
| 09:53AM | 22 | UP IN EMC FOR THE BUGS LAB." |
| 09:53AM | 23 | DO YOU SEE THAT? |
| 09:53AM | 24 | A.   YES. |
| 09:53AM | 25 | Q.   AND THEN THAT BULLET CONTINUES, "PLEASE INCLUDE ALL |

09:53AM  1    CULTURE EQUIPMENT THAT YOU BOUGHT AND DETAILS ABOUT WHAT YOU

09:53AM  2    PLANNED ON DOING THERE. "

09:53AM  3        DO YOU SEE THAT?

09:53AM  4    A.   I DO, YES.

09:53AM  5    Q.   AND THERE'S A THIRD BULLET IN THE MESSAGE FROM

09:53AM  6    MS. RAMAMURTHY TO YOURSELF THAT SAYS, "ANYTHING ELSE THAT YOU

09:53AM  7    BELIEVE NEEDS TO BE DOCUMENTED FOR EFFECTIVE TRANSITION

09:53AM  8    PURPOSES."

09:53AM  9        DO YOU SEE THAT?

09:53AM  10   A.   I DO SEE THAT.

09:53AM  11   Q.   SO YOU WERE INVITED TO INCLUDE ANYTHING ELSE THAT YOU

09:53AM  12   BELIEVED NEEDED TO BE COMMUNICATED TO DR. ROSENDORFF IN THE

09:53AM  13   TRANSITION MEMO THAT WE HAVE ALREADY TAKEN A LOOK AT; CORRECT?

09:53AM  14   A.   IT APPEARS THAT I WAS INVITED TO SHARE INFORMATION WITH

09:53AM  15   THEM.

09:53AM  16   Q.   AND YOU DID SO; CORRECT?

09:53AM  17   A.   WE'VE SEEN THAT IN EMAILS TODAY.

09:53AM  18   Q.   AND THOSE WERE YOUR WORDS IN THE TRANSITION MEMO TO

09:54AM  19   DR. ROSENDORFF AND TO MR. BALWANI; CORRECT?

09:54AM  20   A.   WELL, THE TRANSITION MEMO I DON'T RECALL SENDING

09:54AM  21   DR. ROSENDORFF.  BUT OTHERWISE THE ONE SENT TO MR. BALWANI AND

09:54AM  22   MS. RAMAMURTHY, WE DID LOOK AT.

09:54AM  23   Q.   YOU DON'T DENY SENDING THE TRANSITION MEMO TO

09:54AM  24   DR. ROSENDORFF, DO YOU?

09:54AM  25   A.   I SAID I DON'T RECALL.

09:54AM  1    Q.   YOU CAN SAID THAT ASIDE.

09:54AM  2         IF YOU COULD TAKE A LOOK AT EXHIBIT 20501.  20501.

09:54AM  3         THAT SHOULD ALSO BE IN THAT SMALL BINDER.

09:54AM  4    A.   YES.

09:54AM  5    Q.   DO YOU HAVE 20501?

09:54AM  6    A.   YES.

09:54AM  7    Q.   NOW, 20501 APPEARS TO BE A MESSAGE FROM YOURSELF TO

09:54AM  8    MR. BALWANI DATED MAY 30, 2014.

09:54AM  9         DO YOU SEE THAT?

09:54AM 10    A.   YES.

09:54AM 11    Q.   AND THE SUBJECT MATTER IS HCV SMALL VOLUME THOUGHTS.

09:55AM 12         DO YOU SEE THAT?

09:55AM 13    A.   YES, I DO.

09:55AM 14    Q.   AND HCV WAS ONE OF THE ISSUES ADDRESSED IN THAT TRANSITION

09:55AM 15    MEMO; CORRECT?

09:55AM 16    A.   IT WAS IN THAT DOCUMENT.

09:55AM 17    Q.   BECAUSE HCV WAS AN INFECTIOUS DISEASE ISSUE THAT YOU DID

09:55AM 18    SOME WORK ON AT THERANOS; CORRECT?

09:55AM 19    A.   YES.

09:55AM 20         MR. CAZARES:  MOVE TO ADMIT 20501, YOUR HONOR.

09:55AM 21         MR. BOSTIC:  YOUR HONOR, HEARSAY.  ALSO

09:55AM 22    AUTHENTICATION.

09:55AM 23         I'LL NOTE THAT THE DOCUMENT DOESN'T HAVE A BATES NUMBER.

09:55AM 24         THE COURT:  DO YOU WANT TO LAY A FOUNDATION?

09:55AM 25         MR. CAZARES:  YES, YOUR HONOR.

09:55AM 1   Q.   DR. PANDORI, IN YOUR TIME AT THERANOS, YOU USED EMAIL TO

09:55AM 2   COMMUNICATE WITH BOTH THE CLIA LAB AS WELL AS MANAGEMENT;

09:55AM 3   CORRECT?

09:55AM 4   A.   CORRECT.

09:55AM 5   Q.   INCLUDING MR. BALWANI?

09:55AM 6   A.   OH, YEAH.

09:55AM 7   Q.   AND IN THOSE MESSAGES, YOU DID YOUR BEST TO TRY TO

09:55AM 8   COMMUNICATE MATTERS RELATING TO THE LAB ACCURATELY IN ORDER TO

09:55AM 9   PERFORM YOUR BUSINESS; CORRECT?

09:56AM 10  A.   YES.

09:56AM 11  Q.   AND IT'S YOUR UNDERSTANDING THAT THOSE MESSAGES WERE

09:56AM 12  MAINTAINED BY THERANOS IN THE REGULAR COURSE OF BUSINESS;

09:56AM 13  CORRECT?

09:56AM 14  A.   IT'S MY UNDERSTANDING.

09:56AM 15  Q.   AND THIS HCV PROJECT -- OR HCV WAS AN INFECTIOUS DISEASE

09:56AM 16  AND AN ISSUE THAT YOU DID SOME WORK ON DURING YOUR TIME AT

09:56AM 17  THERANOS; CORRECT?

09:56AM 18  A.   CORRECT.

09:56AM 19  Q.   AND AS WE SAW IN THE TRANSITION MEMO, YOU COMMUNICATED

09:56AM 20  UPDATES TO MR. BALWANI AND MS. RAMAMURTHY RELATED TO YOUR WORK

09:56AM 21  ON THE HCV PROJECT AS REFLECTED IN EXHIBIT 20501; CORRECT?

09:56AM 22  A.   HCV WAS A TOPIC IN THAT DOCUMENT.

09:56AM 23  Q.   AND THAT'S AN ISSUE THAT YOU WORKED ON; CORRECT?

09:56AM 24  A.   YES.

09:56AM 25          MR. CAZARES:  MOVE TO ADMIT 20501, YOUR HONOR.

09:56AM  1            MR. BOSTIC:  THE DEFENDANT'S STATEMENT IS STILL

09:56AM  2    HEARSAY, AND ALSO AUTHENTICATION.

09:57AM  3            MR. CAZARES:  THE ISSUE RELATES TO, YOUR HONOR,

09:57AM  4    PRIOR INCONSISTENT STATEMENTS ABOUT THE TIME OR TRANSITION, AS

09:57AM  5    WELL AS STATE OF MIND OF MR. BALWANI RELATING TO DR. PANDORI'S

09:57AM  6    EXIT.

09:57AM  7            THE COURT:  IS THAT AN ISSUE?

09:57AM  8            MR. CAZARES:  YEAH.

09:57AM  9            THE COURT:  YOUR CLIENT'S STATE OF MIND AS TO THE

09:57AM 10    EXIT?

09:57AM 11            MR. CAZARES:  THE BASIS, THE REASONS FOR THE EXIT.

09:57AM 12            THE COURT:  ALL RIGHT.  I'LL ADMIT THIS UNDER

09:57AM 13    803(6).

09:57AM 14        (DEFENDANT'S EXHIBIT 20501 WAS RECEIVED IN EVIDENCE.)

09:57AM 15            THE COURT:  AND IT MAY BE PUBLISHED.

09:57AM 16    BY MR. CAZARES:

09:57AM 17    Q.   WE HAVE 20501 UP ON THE SCREEN.

09:57AM 18         DO YOU SEE THAT, DR. PANDORI?

09:57AM 19    A.   YES.

09:57AM 20    Q.   AND AGAIN, THE LATTER OF THE MESSAGES IN THE CHAIN APPEARS

09:57AM 21    TO BE FROM YOURSELF TO MR. BALWANI?

09:57AM 22    A.   IT DOES.

09:57AM 23    Q.   MAY 30, 2014.  SUBJECT MATTER HCV SMALL VOLUME THOUGHTS.

09:58AM 24         DO YOU SEE THAT?

09:58AM 25    A.   I DO SEE IT.

09:58AM   1   Q.   AND FURTHER DOWN IN THE CHAIN, GOING TO THE BOTTOM OF THE

09:58AM   2   FIRST PAGE, IT APPEARS TO BE A MESSAGE FROM YOURSELF TO

09:58AM   3   MR. BALWANI, MAY 30, 2014, WHERE YOU WROTE, "SUNNY,

09:58AM   4        "WANTED TO MAKE SURE I GAVE YOU MY HCV THOUGHTS YOU ASKED

09:58AM   5   FOR, IN CASE THEY HELP."

09:58AM   6        DO YOU SEE THAT?

09:58AM   7   A.   I DO.

09:58AM   8   Q.   AND YOU WROTE THIS MESSAGE TO MR. BALWANI; CORRECT?

09:58AM   9   A.   YEAH, I DON'T RECALL, BUT IT'S INDICATED IN THE HEADER

09:58AM  10   THAT I DID.

09:58AM  11   Q.   NOW, ON FRIDAY YOU TESTIFIED IN RELATION TO THAT

09:58AM  12   CONVERSATION WITH MS. HOLMES AND MR. BALWANI ON OR ABOUT YOUR

09:58AM  13   BIRTHDAY, MAY 19TH, 2014, THAT AFTER THAT CONVERSATION, WITHIN

09:58AM  14   FIVE MINUTES YOU RESIGNED; CORRECT?

09:58AM  15   A.   YES.

09:58AM  16   Q.   AND YOU HAD NO FURTHER COMMUNICATIONS WITH MR. BALWANI

09:58AM  17   AFTER THAT MEETING.

09:58AM  18        THAT'S WHAT YOU TESTIFIED; CORRECT?

09:58AM  19   A.   YEAH, I DON'T REMEMBER TALKING WITH MR. BALWANI AFTER

09:58AM  20   THAT.

09:58AM  21   Q.   BUT YOU DID COMMUNICATE WITH HIM BY EMAIL APPARENTLY;

09:58AM  22   CORRECT?

09:58AM  23   A.   WELL, WE WOULD HAVE TO GET THE DATES STRAIGHTENED OUT FOR

09:59AM  24   ME TO ANSWER THAT WITH CONFIDENCE.

09:59AM  25   Q.   MAY 30, 2014, IS REFLECTED IN 20501; CORRECT?

09:59AM  1    A.   YES.

09:59AM  2    Q.   AND THAT'S AFTER YOUR BIRTHDAY, MAY 19TH, 2014; CORRECT?

09:59AM  3    A.   CORRECT.

09:59AM  4    Q.   IN THE MESSAGE YOU WRITE, AFTER YOU SAID YOU WANTED TO

09:59AM  5    GIVE MY HCV THOUGHTS YOU ASKED FOR IN CASE THEY HELP, YOU

09:59AM  6    PROVIDED SOME INFORMATION RELATING TO THE HCV SMALL VOLUME

09:59AM  7    PROJECT AT THE LAB; CORRECT?

09:59AM  8    A.   IT SAYS THAT THERE, YEP.

09:59AM  9    Q.   AND THEN MR. BALWANI RESPONDED BACK TO YOU, "THANKS FOR

09:59AM  10   THE SUMMARY.

09:59AM  11       "I AGREE.  THIS IS PRECISELY WHAT WE WERE EXPECTING AND

09:59AM  12   PLANNING TO DO SO THIS IS IN LINE WITH OUR ESTIMATES."

09:59AM  13       DO YOU SEE THAT?

09:59AM  14   A.   YES.

09:59AM  15   Q.   AND "AS YOU KNOW, THIS IS THERANOS'S TRADE SECRET AND

09:59AM  16   SOMETHING WE INTEND TO OFFER SOON."

09:59AM  17       DO YOU SEE THIS?

09:59AM  18   A.   YES.

09:59AM  19   Q.   AND THIS HCV SMALL PROJECT VOLUME RELATED TO TESTS OR A

10:00AM  20   TEST RUN ON THE EDISON DEVICE; CORRECT?

10:00AM  21   A.   NO, THAT'S NOT CORRECT.

10:00AM  22   Q.   IT WAS RELATING TO THERANOS'S FINGERSTICK SMALL SAMPLE

10:00AM  23   TESTING; CORRECT?

10:00AM  24   A.   WELL, THERE WERE TWO HCV TESTS THAT WERE DISCUSSED IN MY

10:00AM  25   TIME AT THERANOS.  ONE OF THEM IS WHAT IS KNOWN AS A VIRAL LOAD

10:00AM 1    TEST WHERE YOU'RE MEASURING AND COUNTING PARTICLES GENERALLY

10:00AM 2    USING THE VIRUS'S NUCLEIC ACID TO MAKE THAT COUNTING PROCESS

10:00AM 3    OCCUR.

10:00AM 4        THE OTHER IS AN ANTIBODY TEST WHICH MEASURES WHETHER OR

10:00AM 5    NOT SOMEBODY HAD BEEN EXPOSED TO HCV, AND THAT WOULD BE WHAT WE

10:00AM 6    CALL AN ANTIBODY TEST.

10:00AM 7        EDISONS ONLY RAN ANTIBODY TESTS.  THIS PRECISELY DESCRIBES

10:00AM 8    GENOTYPE AND LOAD IF YOU LOOK FURTHER DOWN ON THE EMAIL.

10:00AM 9        SO, NO, IT DOES NOT REFER TO EDISONS.

10:00AM 10   Q.  AND YOU SEE MR. BALWANI'S EMAIL TO YOU, HE VIEWED THE

10:00AM 11   TECHNOLOGY THAT YOU WERE DESCRIBING AND WORKING ON AT THERANOS

10:00AM 12   AS THERANOS TRADE SECRET; CORRECT?

10:00AM 13           MR. BOSTIC:  OBJECTION.  CALLS FOR SPECULATION.

10:01AM 14   LACKS FOUNDATION.

10:01AM 15           THE COURT:  YOU'RE ASKING JUST WHAT THIS SAYS?

10:01AM 16           MR. CAZARES:  YES.

10:01AM 17           THE WITNESS:  CAN YOU REPEAT THE QUESTION, PLEASE?

10:01AM 18   BY MR. CAZARES:

10:01AM 19   Q.  IN RESPONSE TO YOUR MESSAGE ON MAY 30, 2014, MR. BALWANI

10:01AM 20   WROTE TO YOU THAT "THIS HCV SMALL VOLUME PROJECT IS THERANOS

10:01AM 21   TRADE SECRET."

10:01AM 22       DO YOU SEE THAT?

10:01AM 23   A.  I SEE THAT.

10:01AM 24   Q.  SO WHATEVER THE PROJECT WAS YOU WERE WORKING ON,

10:01AM 25   MR. BALWANI VIEWED IT AS A THERANOS TRADE SECRET; CORRECT?

10:01AM  1              MR. BOSTIC:  SAME OBJECTION.

10:01AM  2              THE COURT:  SUSTAINED.

10:01AM  3      BY MR. CAZARES:

10:01AM  4      Q.   YOU CAN SET THAT ASIDE.

10:01AM  5           DR. PANDORI, ON FRIDAY THERE WAS SOME DISCUSSION IN YOUR

10:01AM  6      DIRECT EXAM RELATING TO THE VIP DEMOS AND THE HANDLING OF

10:01AM  7      SAMPLES FROM DEMOS.

10:02AM  8           DO YOU RECALL THAT?

10:02AM  9      A.   IT WAS FRIDAY?  I RECALL THE CONVERSATION.

10:02AM  10     Q.   AND YOU TESTIFIED RELATING TO THE HANDLING OF SAMPLES FROM

10:02AM  11     VIP DEMOS; CORRECT?

10:02AM  12     A.   CORRECT.

10:02AM  13     Q.   AND YOU TESTIFIED THAT MANAGEMENT, INCLUDING MR. BALWANI,

10:02AM  14     HAD INSTRUCTED THAT VIP SAMPLES WERE TO BE HANDLED QUICKLY;

10:02AM  15     CORRECT?

10:02AM  16     A.   CORRECT.

10:02AM  17     Q.   AND YOU TESTIFIED THAT THE PRACTICE RAISED SPIRITUAL

10:02AM  18     PROBLEMS FOR YOU BECAUSE TO EFFECT THAT, THE VIP SAMPLES WERE

10:02AM  19     KIND OF DROPPED TO THE FRONT OF THE LINE IN FRONT OF OTHER

10:02AM  20     PATIENT SAMPLES; CORRECT?

10:02AM  21     A.   YES.

10:02AM  22     Q.   IF YOU COULD TAKE A LOOK AT EXHIBIT 20255.  20555.  I'M

10:02AM  23     SORRY, 20255.  20255.  THAT'S IN VOLUME 1, THE ORIGINAL LARGE

10:02AM  24     VOLUME BINDER.

10:03AM  25     A.   OKAY.  I'VE FOUND IT.

10:03AM 1    Q.   20255 APPEARS TO BE A MESSAGE FROM MR. BALWANI TO YOURSELF

10:03AM 2    AND TWO OTHER INDIVIDUALS?

10:03AM 3    A.   YES.

10:03AM 4    Q.   AND THOSE INDIVIDUALS ARE KIND OF THE PRODUCT MANAGERS, IF

10:03AM 5    YOU WILL, AT THERANOS; CORRECT?

10:03AM 6    A.   YES.

10:03AM 7    Q.   AND THAT'S JANUARY 30, 2014?

10:03AM 8    A.   IT IS JANUARY 30TH, 2014.

10:03AM 9    Q.   AND THE SUBJECT LINE OF THE MESSAGE SAYS VIP SAMPLES.

10:03AM 10       DO YOU SEE THAT?

10:03AM 11   A.   YES.

10:03AM 12   Q.   AND THIS APPEARS TO BE RELATING TO THIS HANDLING OF

10:03AM 13   SAMPLES FROM VIP DEMOS THAT YOU DISCUSSED IN YOUR TESTIMONY;

10:03AM 14   CORRECT?

10:03AM 15   A.   IT'S REFERRING TO VIP SAMPLES, CORRECT.

10:03AM 16   Q.   OKAY.

10:03AM 17       YOUR HONOR, MOVE TO ADMIT 20255 SUBJECT TO THE PARTIES'

10:03AM 18   EMAIL STIPULATION.

10:03AM 19           MR. BOSTIC:  NO OBJECTION.

10:03AM 20           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:04AM 21       (DEFENDANT'S EXHIBIT 20255 WAS RECEIVED IN EVIDENCE.)

10:04AM 22   BY MR. CAZARES:

10:04AM 23   Q.   AS YOU CAN SEE UP ON THE SCREEN, DR. PANDORI, THE MESSAGE

10:04AM 24   IS FROM MR. BALWANI TO YOURSELF, MAX FOSQUE, AND

10:04AM 25   NICHOLAS MENCHEL.

PANDORI CROSS BY MR. CAZARES (RES.)

10:04AM 1        DO YOU SEE THAT?

10:04AM 2   A.   I DO.

10:04AM 3   Q.   AND SUBJECT LINE IS VIP SAMPLES.

10:04AM 4        DO YOU SEE THAT?

10:04AM 5   A.   YES.

10:04AM 6   Q.   AND IN THE MESSAGE TO YOU, MR. BALWANI WROTE, "PLEASE KNOW

10:04AM 7   THAT THERE IS A VERY HIGH LIKELIHOOD THAT WE HAD MORE VIP'S

10:04AM 8   YESTERDAY AND TODAY AND ALL WEEKEND AND MONDAY THAT WILL VISIT

10:04AM 9   OUR WAG PSC'S."

10:04AM 10       DO YOU SEE THAT?

10:04AM 11  A.   YES.

10:04AM 12  Q.   AND WAG PSC'S, THOSE ARE THE PATIENT SERVICE CENTERS WHERE

10:04AM 13  SAMPLES WERE COLLECTED; CORRECT?

10:04AM 14  A.   I THINK SO.

10:04AM 15  Q.   AND THEN THOSE SAMPLES WOULD BE TRANSPORTED OR SHIPPED TO

10:04AM 16  THE LAB IF NECESSARY; CORRECT?

10:04AM 17  A.   CORRECT.

10:04AM 18  Q.   AND MR. BALWANI WROTE IN THE MESSAGE TO YOURSELF, "THOUGH

10:04AM 19  ALL SAMPLES SHD RECEIVE SAME TREATMENT, GIVEN INCIDENTS OVER

10:05AM 20  LAST 2 DAYS, I WOULD LIKE EVERYONE PAYING SPECIAL ATTENTION FOR

10:05AM 21  NEXT WEEK UNTIL OUR PROCESS IS PERFECT."

10:05AM 22       DO YOU SEE THAT?

10:05AM 23  A.   YES.

10:05AM 24  Q.   SO MR. BALWANI IS TELLING YOU TO TREAT THE VIP SAMPLES THE

10:05AM 25  SAME AS OTHER SAMPLES; CORRECT?

10:05AM  1    A.   CORRECT.

10:05AM  2    Q.   BUT HE'S NOT ASKING FOR PREFERENTIAL TREATMENT IN THIS

10:05AM  3    MESSAGE FOR THE VIP'S; CORRECT?

10:05AM  4    A.   WELL, HE'S SAYING THAT ALL OF THE VIP SAMPLES SHOULD

10:05AM  5    RECEIVE THE SAME TREATMENT, SO THAT ALL OF THE -- WHAT IT SAYS

10:05AM  6    IS THAT ALL OF THE VIP SAMPLES, ASSUMING SHD MEANS SHOULD, ALL

10:05AM  7    SAMPLES SHOULD RECEIVE THE SAME TREATMENT.

10:05AM  8    Q.   THE WALGREENS PATIENT SERVICE CENTERS ARE WHERE ALL

10:05AM  9    PATIENT SAMPLES WERE COLLECTED; CORRECT?

10:05AM  10   A.   YES.

10:05AM  11   Q.   YOU CAN SET THAT ASIDE.

10:06AM  12       IN YOUR TESTIMONY IN RESPONSE TO QUESTIONS FROM THE

10:06AM  13   GOVERNMENT, YOU DISCUSSED AND MENTIONED THE FACT THAT YOU WERE

10:06AM  14   ASKED TO REVIEW VALIDATION REPORTS FOR OTHER TESTING DONE IN

10:06AM  15   THE RESEARCH AND DEVELOPMENT PORTION OF THERANOS; CORRECT?

10:06AM  16   A.   CORRECT.

10:06AM  17   Q.   AND THAT RELATED TO THIS NUCLEIC ACID AMPLIFICATION

10:06AM  18   DEVELOPMENT; CORRECT?

10:06AM  19   A.   CORRECT.

10:06AM  20   Q.   AND AS A PART OF THAT YOU HAD REGULAR COMMUNICATIONS, OR

10:06AM  21   COMMUNICATIONS WITH DR. PRANAV PATEL WHO WAS THE HEAD OF THE

10:06AM  22   NUCLEIC ACID AMPLIFICATION TEAM?

10:06AM  23   A.   I DID.

10:06AM  24   Q.   AND AS A PART OF THOSE DISCUSSION, DR. PATEL SHARED WITH

10:06AM  25   YOU VALIDATION REPORTS, OR DRAFT VALIDATION REPORTS; CORRECT?

10:06AM  1    A.   CORRECT.

10:06AM  2    Q.   AND IN ADDITION TO DR. PATEL, THERE WERE OTHER TEAMS AT

10:06AM  3    THERANOS DEVELOPING NEW TESTS; CORRECT?

10:06AM  4    A.   I BELIEVE SO.

10:06AM  5    Q.   YOU'RE FAMILIAR WITH AN INDIVIDUAL NAMED DR. PAUL PATEL?

10:06AM  6    A.   YES.

10:06AM  7    Q.   AND DR. PAUL PATEL, AGAIN, HEADED ANOTHER ONE OF THESE

10:07AM  8    TEAMS DEVELOPING TESTS WITHIN THE RESEARCH AND DEVELOPMENT

10:07AM  9    PORTION OF THE COMPANY; CORRECT?

10:07AM 10    A.   MY RECOLLECTION IS THAT PAUL PATEL WORKED IN A SECTION

10:07AM 11    CALLED CHEMISTRY.  I DON'T KNOW IF HE WAS DEVELOPING NEW TESTS

10:07AM 12    OR MANAGING EXISTING ONES.

10:07AM 13    Q.   GENERAL CHEMISTRY WAS HIS DEPARTMENT; CORRECT?

10:07AM 14    A.   I JUST CALLED IT CHEMISTRY.

10:07AM 15    Q.   AND YOU'RE FAMILIAR WITH ANOTHER INDIVIDUAL NAMED

10:07AM 16    DR. CHINMAY PANGARKAR AS WELL; CORRECT?

10:07AM 17    A.   I RECOGNIZE THE FIRST NAME.

10:07AM 18    Q.   AND THERE WAS A TEAM AT THERANOS DEVELOPING ASSAYS

10:07AM 19    RELATING TO CYTOMETRY TESTING; CORRECT?

10:07AM 20    A.   CORRECT.

10:07AM 21    Q.   AND YOU'RE FAMILIAR WITH DR. SHARADA SIVARAMAN; CORRECT?

10:07AM 22    A.   NO.

10:07AM 23    Q.   AND YOU'RE FAMILIAR WITH A TEAM IN THERANOS'S RESEARCH AND

10:07AM 24    DEVELOPMENT LAB THAT WERE DEVELOPING ADDITIONAL TESTS RELATING

10:07AM 25    TO THE IMMUNOASSAYS FOR THE EDISON AND OTHER DEVICES; CORRECT?

10:07AM   1    A.   I HAD A SENSE THAT WAS GOING ON, BUT I CAN'T RECALL

10:07AM   2    ANYONE'S NAME THAT PARTICIPATED IN THAT.

10:07AM   3    Q.   DR. PANDORI, IF YOU CAN TAKE A LOOK AT EXHIBIT 20461,

10:08AM   4    20461.  THAT SHOULD BE IN VOLUME 2.

10:08AM   5    A.   OKAY.  I'M THERE.

10:08AM   6    Q.   20461 APPEARS TO BE AN EMAIL DATED DECEMBER 11TH, 2013.

10:08AM   7         DO YOU SEE THAT?

10:08AM   8    A.   YES.

10:08AM   9    Q.   FROM DR. PATEL, PRANAV PATEL?

10:08AM   10   A.   YES.

10:08AM   11   Q.   TO YOURSELF?

10:08AM   12   A.   YES.

10:08AM   13   Q.   WITH A SUBJECT MATTER TNAA LDT VALIDATION REPORT.

10:08AM   14        DO YOU SEE THAT?

10:08AM   15   A.   YES.

10:08AM   16   Q.   AND THEN THERE ARE SOME ATTACHMENTS TO THE DOCUMENT?

10:09AM   17   A.   I'M LOOKING AT IT.

10:09AM   18   Q.   OKAY.  DRAFT VALIDATION REPORTS?

10:09AM   19   A.   THAT'S WHAT THE TITLE IS, YES.

10:09AM   20   Q.   AND YOU HAD COMMUNICATIONS WITH DR. PATEL RELATING TO YOUR

10:09AM   21   REVIEW OF DRAFT VALIDATION REPORTS; CORRECT?

10:09AM   22   A.   CORRECT.

10:09AM   23            MR. CAZARES:  MOVE TO ADMIT 20461.

10:09AM   24            MR. BOSTIC:  401.

10:09AM   25            THE COURT:  YOU'RE ASKING THAT THE ENTIRETY OF THE

10:09AM  1    EXHIBIT COME IN?

10:09AM  2              MR. CAZARES:  IT'S NOT MY INTENT TO REVIEW THE

10:09AM  3    ENTIRETY OF THE ATTACHMENTS, YOUR HONOR, BUT TO ASK A FEW

10:09AM  4    QUESTIONS.

10:09AM  5              THE COURT:  BUT YOU WANT THE JURY TO RECEIVE THIS

10:10AM  6    STACK?

10:10AM  7              MR. CAZARES:  YES, YOUR HONOR.

10:10AM  8              THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

10:10AM  9         (DEFENDANT'S EXHIBIT 20461 WAS RECEIVED IN EVIDENCE.)

10:10AM 10    BY MR. CAZARES:

10:10AM 11    Q.   REFERRING TO THE FIRST PAGE, IT'S EXHIBIT 20461, AND IT'S

10:10AM 12    AN EMAIL ON DECEMBER 11TH, 2013?

10:10AM 13         DO YOU SEE THAT?

10:10AM 14    A.   I DO.

10:10AM 15    Q.   AND AGAIN, THIS IS FROM DR. PATEL TO YOU?

10:10AM 16    A.   YES.

10:10AM 17    Q.   AND SUBJECT LINE IS TNAA LDT VALIDATION REPORTS.

10:10AM 18         DO YOU SEE THAT?

10:10AM 19    A.   I DO.

10:10AM 20    Q.   AND TNAA, FOR THE JURY, MEANS THERANOS'S NUCLEIC ACID

10:10AM 21    AMPLIFICATION TEST; CORRECT?

10:10AM 22    A.   I THINK SO.

10:10AM 23    Q.   AND LDT REFERS TO LAB DEVELOPED TESTS, MEANING THERANOS'S

10:10AM 24    PROPRIETARY TESTING; CORRECT?

10:10AM 25    A.   LDT IS A TERMINOLOGY MEANING LABORATORY DEVELOPED TESTS,

10:10AM   1    AND WHAT IT REFERS TO IS A SITUATION WHERE A LAB BUILDS THEIR

10:11AM   2    OWN LABORATORY TESTS BECAUSE OF A NEED EITHER BECAUSE THERE'S

10:11AM   3    NO FDA CLEARED OPTION OR THERE'S A VERY SPECIFIC REASON WHY

10:11AM   4    THEY CANNOT RUN A FDA CLEARED OPTION.

10:11AM   5        SO THE LAB DEVELOPS A TEST AND IT'S CALLED AN LDT.

10:11AM   6        BEFORE AN LDT CAN BE UTILIZED DIAGNOSTICALLY OR

10:11AM   7    MEDICALLY --

10:11AM   8             MR. CAZARES:  YOUR HONOR, MOVE TO STRIKE.  THERE'S

10:11AM   9    NO QUESTION PENDING AND I HAVEN'T ASKED ALL OF THIS

10:11AM  10    INFORMATION.

10:11AM  11             THE COURT:  I'M NOT GOING TO STRIKE IT.  BUT YOU CAN

10:11AM  12    ASK ANOTHER QUESTION NOW.

10:11AM  13             MR. CAZARES:  UNDERSTOOD, YOUR HONOR.

10:11AM  14    Q.   DR. PANDORI, IF YOU CAN TURN TO PAGE 3 OF THE EXHIBIT.

10:11AM  15    A.   PAGE 3, YES.

10:11AM  16    Q.   AND PAGE 3 APPEARS TO BE A DRAFT VALIDATION REPORT DATED

10:11AM  17    NOVEMBER 27, 2013.

10:11AM  18        DO YOU SEE THAT?

10:11AM  19    A.   YES.

10:11AM  20    Q.   AND THIS TEST IS TITLED BORDETELLA PARAPERTUSSIS TNAA

10:11AM  21    VALIDATION REPORT.

10:11AM  22        DO YOU SEE THAT?

10:11AM  23    A.   YES.

10:11AM  24    Q.   AND THIS IS AMONG THE DRAFT VALIDATION REPORTS THAT YOU

10:12AM  25    REVIEWED DURING YOUR TIME AT THERANOS?

10:12AM   1    A.   TO BE FRANK, I DON'T RECALL THIS ONE IN PARTICULAR, BUT

10:12AM   2    THERE WERE A FEW OF THEM, IF NOT MANY.

10:12AM   3    Q.   SO YOU DO RECALL DRAFTING VALIDATION REPORTS, YOU'RE NOT

10:12AM   4    JUST SURE IF THIS WAS ONE OF THEM?

10:12AM   5    A.   NO, I DIDN'T DRAFT THEM.  I REVIEWED THOSE THAT WERE

10:12AM   6    DRAFTED BY OTHERS.

10:12AM   7    Q.   AND YOU PROVIDED COMMENTS TO THE DRAFTERS?

10:12AM   8    A.   YES.

10:12AM   9    Q.   AND YOU VIEWED THE DRAFT VALIDATION REPORTS POSITIVELY;

10:12AM   10   CORRECT?

10:12AM   11   A.   I DON'T RECALL THE INDIVIDUAL REVIEW OF EVERY REPORT.

10:12AM   12   Q.   BUT YOU HAD POSITIVE THOUGHTS ABOUT MANY OF THEM; CORRECT?

10:12AM   13   A.   I RECALL THAT THERE WERE -- THAT IT LOOKED LIKE IT WAS ON

10:12AM   14   THE RIGHT TRACK AND IT WAS AN EXCITING LINE OF POSSIBLE

10:12AM   15   TECHNOLOGY.

10:12AM   16   Q.   AND THIS WAS POSSIBLE USE OF THERANOS'S TECHNOLOGY IN THE

10:12AM   17   FUTURE; CORRECT?

10:12AM   18   A.   CORRECT, IT WAS POSSIBLE.

10:12AM   19   Q.   IT WASN'T BEING USED IN THE CLINICAL LAB AT THE TIME?

10:12AM   20   A.   CORRECT.

10:12AM   21   Q.   YOU CAN SET THAT ASIDE.

10:12AM   22        IF YOU COULD TAKE A LOOK AT 20444.  IT SHOULD ALSO BE IN

10:13AM   23   THAT SMALLER BINDER AGAIN.

10:13AM   24   A.   I'M SORRY.  WHAT WAS THE NUMBER AGAIN?

10:13AM   25   Q.   20444.

10:13AM 1      A.   OH, YEAH, IT'S IN VOLUME 2.

10:13AM 2           ALL RIGHT.  I'M THERE.

10:13AM 3      Q.   20444 APPEARS TO BE AN EMAIL DATED 12/13/2013.

10:13AM 4           DO YOU SEE THAT?

10:13AM 5      A.   YES.

10:13AM 6      Q.   FROM YOURSELF TO DR. PATEL?

10:13AM 7      A.   YES.

10:13AM 8      Q.   AND THE SUBJECT LINE SAYS NAAT VALIDATION.

10:13AM 9           DO YOU SEE THAT?

10:13AM 10     A.   YES.

10:13AM 11          MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT 20444

10:13AM 12     PURSUANT TO THE PARTIES' STIPULATIONS REGARDING EMAILS.

10:14AM 13          MR. BOSTIC:  NO OBJECTION.

10:14AM 14          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:14AM 15     (DEFENDANT'S EXHIBIT 20444 WAS RECEIVED IN EVIDENCE.)

10:14AM 16     BY MR. CAZARES:

10:14AM 17     Q.   AGAIN TO ORIENT THE JURY, WE'RE LOOKING AT A

10:14AM 18     DECEMBER 13TH, 2013, EMAIL FROM YOURSELF TO DR. PATEL?

10:14AM 19     A.   IT IS.

10:14AM 20     Q.   AND THIS IS RELATING TO NAAT VALIDATIONS.

10:14AM 21          DO YOU SEE THAT?

10:14AM 22     A.   YES.

10:14AM 23     Q.   AND THAT'S THIS NUCLEIC ACID AMPLIFICATION VALIDATION

10:14AM 24     TESTS; CORRECT?

10:14AM 25     A.   VERY LIKELY.

10:14AM 1    Q.   AND CONTINUING WITH THE MESSAGE YOU START TO DR. PATEL,

10:14AM 2    "PRANAV, ADAM," BECAUSE DR. ROSENDORFF IS ALSO COPIED ON THE

10:14AM 3    MESSAGE, "I BELIEVE THAT WITH REGARD TO THE IDEA OF USING A

10:14AM 4    COMPARATOR METHOD, ONLY CERTAIN TESTS WILL REQUIRE THIS."

10:14AM 5        DO YOU SEE THAT?

10:14AM 6    A.   YES.

10:14AM 7    Q.   "FOR MANY OF THE ANALYTES, WE CAN ARGUE VERY WELL THAT

10:14AM 8    THERE IS NO FDA APPROVED MOLECULAR COMPARATOR METHOD."

10:14AM 9        DO YOU SEE THAT?

10:14AM 10   A.   YES.

10:14AM 11   Q.   AND THAT'S WHAT YOU WROTE?

10:15AM 12   A.   CORRECT.

10:15AM 13   Q.   AND THEN YOU FOLLOW, "AN INSPECTOR COULD ARGUE THAT WE

10:15AM 14   COULD HAVE USED CULTURE AS THE GOLD STANDARD.  HOWEVER, I

10:15AM 15   BELIEVE THAT STRONG ARGUMENTS COULD BE MADE THAT WHAT YOU DID

10:15AM 16   WITH PCR WAS A BETTER COMPARATOR FOR THE TEST, SINCE IT IS WELL

10:15AM 17   ESTABLISHED THAT PCR IS MORE SENSITIVE THAN CULTURE FOR THE

10:15AM 18   VAST MAJORITY OF CASES."

10:15AM 19       CORRECT?

10:15AM 20   A.   CORRECT.

10:15AM 21   Q.   SO ESSENTIALLY IN THIS MESSAGE YOU'RE PROVIDING COMMENTS

10:15AM 22   TO DR. PATEL RELATING TO THESE TNAA VALIDATION REPORTS;

10:15AM 23   CORRECT?

10:15AM 24   A.   CORRECT.

10:15AM 25   Q.   AND SO BY THIS TIME YOU HAD ALREADY REVIEWED AT LEAST SOME

10:15AM 1    REPORTS; CORRECT?

10:15AM 2    A.   CORRECT.

10:15AM 3    Q.   IF WE CAN TURN TO THE SECOND PAGE, ITEM NUMBER 8, IT

10:15AM 4    APPEARS THAT YOU WROTE, "IN TWO OCCASIONS, AT LEAST, WHERE I

10:15AM 5    HAVE BEEN INSPECTED BY CLIA AND VALIDATIONS WERE REVIEWED, THE

10:15AM 6    INSPECTORS ASKED US TO HAVE A CONCLUDING STATEMENT THAT

10:16AM 7    INDICATED THAT THE LABORATORY HAS DETERMINED THAT BASED UPON

10:16AM 8    THE DATA, THAT THE TEST IS SAFE AND EFFECTIVE FOR USE WITH

10:16AM 9    HUMAN BEINGS/PATIENTS."

10:16AM 10        DO YOU SEE THAT?

10:16AM 11   A.   I DO SEE IT.

10:16AM 12   Q.   AND THEN YOU CONTINUED, "THESE VALIDATIONS ARE EXCELLENT,

10:16AM 13   BUT THEY ARE MISSING THIS ELEMENT."

10:16AM 14        THOSE ARE YOUR WORDS; CORRECT?

10:16AM 15   A.   CORRECT.

10:16AM 16   Q.   AND YOU DESCRIBED THE REPORTS AS EXCELLENT BUT MISSING

10:16AM 17   THIS PIECE; CORRECT?

10:16AM 18   A.   CORRECT.

10:16AM 19   Q.   AND "THE INTRO SHOULD STATE THAT THE GOAL WAS TO DETERMINE

10:16AM 20   IF THE TEST WAS SAFE FOR USE ON PEOPLE, AND THE CONCLUSION

10:16AM 21   SHOULD STATE THAT THE TEST IS SAFE FOR PEOPLE."

10:16AM 22        THOSE ARE YOUR WORDS?

10:16AM 23   A.   YES, THOSE ARE MY WORDS.

10:16AM 24   Q.   AND THAT'S AFTER REVIEWING THERANOS'S DRAFT VALIDATION

10:16AM 25   REPORTS FOR SOME OF THESE TNAA ASSAYS; CORRECT?

10:16AM 1    A.   CORRECT.

10:16AM 2    Q.   YOU CAN SET THAT ASIDE.

10:17AM 3         AND IF YOU CAN TAKE A LOOK AT 20460.

10:17AM 4    A.   OKAY, I'M THERE.

10:17AM 5    Q.   20460 AT THE TOP OF THE PAGE, THE LATTER OF THE MESSAGES

10:17AM 6    IN THE CHAIN APPEARS TO BE DATED DECEMBER 14TH, 2013.

10:17AM 7         DO YOU SEE THAT?

10:17AM 8    A.   YES.

10:17AM 9    Q.   AND FROM DR. PATEL TO YOURSELF?

10:17AM 10   A.   YES.

10:17AM 11   Q.   WITH A COPY TO DANIEL YOUNG?

10:17AM 12   A.   I SEE IT.

10:17AM 13   Q.   AND THE SUBJECT LINE SAYS, RE B. PARAPERTUSSI VALID.SUGG?

10:17AM 14   A.   I SEE IT.

10:17AM 15   Q.   AND THEN THIS APPEARS TO BE AN EMAIL CHAIN BACK AND FORTH

10:17AM 16   RESPONSES BETWEEN YOURSELF AND DR. PATEL.

10:17AM 17        DO YOU SEE THAT?

10:17AM 18   A.   YES.

10:17AM 19   Q.   AND THIS RELATES AGAIN TO YOUR REVIEW OF THESE VALIDATION

10:17AM 20   REPORTS RELATING TO THERANOS'S NUCLEIC ACID AMPLIFICATION

10:18AM 21   TESTS; CORRECT?

10:18AM 22   A.   THEY'RE REFERRING TO ONE SPECIFIC ASSAY, NOT ALL TNAA.

10:18AM 23            MR. CAZARES:  MOVE TO ADMIT 20460, YOUR HONOR.

10:18AM 24            MR. BOSTIC:  NO OBJECTION.

10:18AM 25            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:18AM  1          (DEFENDANT'S EXHIBIT 20460 WAS RECEIVED IN EVIDENCE.)

10:18AM  2     BY MR. CAZARES:

10:18AM  3     Q.   AND FOCUSSING OUR ATTENTION TO BE PAGE 2 OF THE EXHIBIT.

10:18AM  4     ON PAGE 2 AT THE TOP, THERE APPEARS TO BE A MESSAGE FROM

10:18AM  5     YOURSELF TO DR. PATEL COPIED TO DR. YOUNG.

10:18AM  6          DO YOU SEE THAT?

10:18AM  7     A.   I DO.

10:18AM  8     Q.   DECEMBER 14TH, 2013.

10:18AM  9          DO YOU SEE THAT?

10:18AM 10     A.   OH, YEAH, IT WAS RIGHT AFTER I STARTED.

10:18AM 11     Q.   IN YOUR MESSAGE YOU WROTE, "PRANAV,

10:18AM 12          "I'VE GONE THROUGH WHAT YOU SENT ME BACK.  I WILL GO

10:18AM 13     THROUGH EVERY VALIDATION IN DETAIL, LIKE THIS, IF THE COMPANY

10:18AM 14     DEEMS THIS TO BE OF USE.  I REALLY THINK THESE ARE SOLID."

10:18AM 15          THOSE ARE YOUR WORDS; CORRECT?

10:18AM 16     A.   YES.

10:18AM 17     Q.   "BUT WITH SOME TWEAKING, THEY WOULD BECOME WELL REFERENCED

10:19AM 18     DOCUMENTS, AIR-TIGHT AGAINST INSPECTION."

10:19AM 19          THOSE ARE YOUR WORDS; CORRECT?

10:19AM 20     A.   CORRECT.

10:19AM 21     Q.   "ALSO, I'D LOVE TO LEARN THE TNAA, AND EVEN RUN IT AT SOME

10:19AM 22     POINT -- I WOULD LIKE TO HELP WITH THESE VALIDATIONS AT ALL

10:19AM 23     LEVELS."

10:19AM 24          THOSE ARE YOUR WORDS?

10:19AM 25     A.   YES.

| | | |
|---|---|---|
| 10:19AM | 1 | Q.   AND YOU HAD REVIEWED AT LEAST SOME OF THE VALIDATION |
| 10:19AM | 2 | REPORTS BY DECEMBER 2013; CORRECT? |
| 10:19AM | 3 | A.   I DON'T KNOW HOW MANY. |
| 10:19AM | 4 | Q.   BUT YOU DID REVIEW SOME? |
| 10:19AM | 5 | A.   I BELIEVE SO, YES. |
| 10:19AM | 6 | Q.   AND THAT'S WHAT IS REFLECTED IN THE MESSAGE; CORRECT? |
| 10:19AM | 7 | A.   CORRECT. |
| 10:19AM | 8 | Q.   IF YOU COULD TAKE A LOOK AT EXHIBIT 20456. |
| 10:19AM | 9 | A.   OKAY. |
| 10:19AM | 10 | Q.   20456 APPEARS TO BE A MESSAGE FROM -- OR DATED JANUARY 11, |
| 10:20AM | 11 | 2014. |
| 10:20AM | 12 | DO YOU SEE THAT? |
| 10:20AM | 13 | A.   YES. |
| 10:20AM | 14 | Q.   FROM YOURSELF TO MR. BALWANI? |
| 10:20AM | 15 | A.   YES. |
| 10:20AM | 16 | Q.   THE SUBJECT LINE EDISONS, ET AL. |
| 10:20AM | 17 | DO YOU SEE THAT? |
| 10:20AM | 18 | A.   YES. |
| 10:20AM | 19 | Q.   AND TAKE A LOOK AT THE MESSAGE AND SEE IF IT REFRESHES |
| 10:20AM | 20 | YOUR RECOLLECTION ABOUT THE DISCUSSION. |
| 10:20AM | 21 | A.   YES, IT APPEARS TO BE A REVIEW OF THINGS THAT I HAD BEEN |
| 10:20AM | 22 | DOING UP UNTIL JANUARY 11TH. |
| 10:20AM | 23 | Q.   AND IT WAS YOUR REGULAR PRACTICE TO COMMUNICATE WITH EMAIL |
| 10:20AM | 24 | BOTH WITH MR. BALWANI AS WELL AS OTHERS AT THERANOS? |
| 10:20AM | 25 | A.   CORRECT. |

```
10:20AM   1    Q.   AND YOU DID YOUR BEST TO COMMUNICATE ACCURATELY THE ISSUES

10:20AM   2    AND EVENTS THAT YOU WERE DEALING WITH IN THE LAB?

10:20AM   3    A.   YEAH, I WAS EAGER TO MAKE CLEAR THAT I WAS DOING MY JOB.

10:21AM   4              MR. CAZARES:  OKAY.  MOVE TO ADMIT 20456,

10:21AM   5    YOUR HONOR.

10:21AM   6              MR. BOSTIC:  IS THIS COMING IN AS A BUSINESS RECORD?

10:21AM   7              THE COURT:  I WOULD THINK THAT'S THE BASIS FOR THE

10:21AM   8    ADMISSION.

10:21AM   9              MR. CAZARES:  YES, YOUR HONOR.

10:21AM  10              MR. BOSTIC:  NO OBJECTION.

10:21AM  11              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:21AM  12         (DEFENDANT'S EXHIBIT 20456 WAS RECEIVED IN EVIDENCE.)

10:21AM  13    BY MR. CAZARES:

10:21AM  14    Q.   AND STARTING AT THE TOP OF THE MESSAGE, AGAIN, DATED

10:21AM  15    JANUARY 11TH, 2014, FROM YOURSELF TO MR. BALWANI.

10:21AM  16         DO YOU SEE THAT?

10:21AM  17    A.   YES.

10:21AM  18    Q.   AND THE SUBJECT LINE IS EDISONS ET AL.

10:21AM  19    A.   YES.

10:21AM  20    Q.   AND YOU WROTE, "SUNNY,

10:21AM  21         "I MET WITH SURAJ AND WE DISCUSSED THE 'GO LIVE' AND

10:21AM  22    VALIDATION ASSOCIATED TOPICS FOR THE EDISON IMMUNOASSAYS."

10:21AM  23         DO YOU SEE THAT?

10:21AM  24    A.   YES.

10:21AM  25    Q.   AND YOU WROTE, "I WILL WORK WITH HIM, IN MUCH THE SAME
```

10:21AM  1    CAPACITY AS I AM WORKING WITH PRANAV, TO GET THESE CLIA READY.

10:21AM  2    I HAVE TO SAY, THAT ONE OF THE THINGS I AM REALLY ENJOYING

10:21AM  3    ABOUT BEING HERE IS THE CALIBER OF INDIVIDUALS THAT ARE WORKING

10:21AM  4    HERE."

10:22AM  5         DO YOU SEE THAT?

10:22AM  6    A.   YES.

10:22AM  7    Q.   AND THOSE WERE YOUR THOUGHTS AT THE TIME; CORRECT?

10:22AM  8    A.   CORRECT.

10:22AM  9    Q.   "YOU TOLD ME A WHILE BACK, 'WE WILL NOT FAIL,' AND I HAVE

10:22AM 10    TO SAY, WITH PEOPLE LIKE THIS, I HAVE NO DOUBT."

10:22AM 11         THOSE WERE YOUR WORDS; CORRECT?

10:22AM 12    A.   CORRECT.

10:22AM 13    Q.   THE MESSAGE CONTINUES FURTHER DOWN NEAR THE BOTTOM.  YOU

10:22AM 14    WROTE, "SOUNDS CORNY, BUT I ALREADY THINK WE'RE MAKING IN-ROADS

10:22AM 15    TOWARDS STAFF MORALE AND CULTURE IN CLIA; DON'T WANT TO

10:22AM 16    OVERPROMISE ANYTHING; BUT.. THIS IS AN EXCELLENT GROUP POISED

10:22AM 17    TO DO GREAT WORK, AND I'M LETTING THEM KNOW THIS."

10:22AM 18         CORRECT?

10:22AM 19    A.   YES.

10:22AM 20    Q.   AND THOSE ARE YOUR WORDS TO MR. BALWANI; CORRECT?

10:22AM 21    A.   YES.

10:22AM 22    Q.   YOU CAN SET THAT ASIDE.

10:23AM 23             THE COURT:  FOLKS, WHY DON'T YOU TAKE A STANDING

10:23AM 24    BREAK HERE AND STRETCH FOR A MINUTE WHILE THE NEXT EXHIBIT IS

10:23AM 25    BEING SOUGHT.

10:23AM  1          (STRETCHING.)

10:23AM  2               THE COURT:  THANK YOU.

10:23AM  3          COUNSEL.

10:23AM  4               MR. CAZARES:  THANK YOU.

10:23AM  5     Q.   DR. PANDORI, IF YOU CAN TAKE A LOOK AT EXHIBIT 20265.

10:23AM  6     20265.

10:23AM  7     A.   I'M THERE.

10:23AM  8     Q.   AND 20265 APPEARS TO BE AN EMAIL BETWEEN YOURSELF AND

10:24AM  9     MR. BALWANI.

10:24AM  10          DO YOU SEE THAT?

10:24AM  11    A.   YES.

10:24AM  12    Q.   DATED MARCH 17TH, 2014?

10:24AM  13    A.   MARCH 18TH.

10:24AM  14    Q.   18TH.  I APOLOGIZE.  2014?  2014?

10:24AM  15    A.   OH, YES.

10:24AM  16               MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT PURSUANT TO

10:24AM  17    THE PARTIES' STIP REGARDING EMAILS.

10:24AM  18               MR. BOSTIC:  NO OBJECTION.

10:24AM  19               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:24AM  20          (DEFENDANT'S EXHIBIT 20265 WAS RECEIVED IN EVIDENCE.)

10:24AM  21    BY MR. CAZARES:

10:24AM  22    Q.   AND YOU CAN ALSO SEE THE MESSAGE UP ON TOP OF THE SCREEN,

10:24AM  23    DR. PANDORI, IF IT'S EASIER.

10:24AM  24    A.   EITHER WAY.

10:24AM  25    Q.   LOOKING AT THE TOP OF THE CHAIN, AGAIN, THE LATTER OF THE

10:24AM  1    MESSAGES APPEAR TO BE FROM MR. BALWANI TO YOURSELF COPYING

10:24AM  2    DANIEL YOUNG.

10:24AM  3        DO YOU SEE THAT?

10:24AM  4    A.   YES.

10:24AM  5    Q.   AND IT'S DATED MARCH 18TH, AS YOU SAID, 2014; CORRECT?

10:24AM  6    A.   CORRECT.

10:24AM  7    Q.   AND THE SUBJECT LINE SAYS RE: PA.

10:25AM  8        DO YOU SEE THAT?

10:25AM  9    A.   YES.

10:25AM  10   Q.   AND THEN IF WE SCROLL DOWN TO THE EARLIER OF THE MESSAGES

10:25AM  11   IN THE CHAIN --

10:25AM  12   A.   HOW FAR DOWN WOULD YOU LIKE ME TO GO?

10:25AM  13   Q.   START FROM THE BOTTOM.

10:25AM  14       THE FIRST MESSAGE IN THE CHAIN APPEARS TO BE FROM

10:25AM  15   MR. BALWANI TO YOURSELF MARCH 17TH, 2014; CORRECT?

10:25AM  16   A.   YES.

10:25AM  17   Q.   AND IN THE SUBJECT AGAIN IT'S PA.

10:25AM  18       AND MR. BALWANI ASKS YOU, "ARE YOU QUALIFIED TO BE LAB

10:25AM  19   DIRECTOR IN PENNSYLVANIA?"

10:25AM  20       DO YOU SEE THAT?

10:25AM  21   A.   YES.

10:25AM  22   Q.   AND THIS IS MARCH 17TH OF 2014.  YOU RECEIVED -- YOU

10:25AM  23   TESTIFIED ON FRIDAY THAT THE "WIRED" ARTICLE THAT REFLECTED AN

10:25AM  24   INTERVIEW BY MS. HOLMES WAS A CATALYST UPON YOUR LEAVING

10:25AM  25   THERANOS; CORRECT?

10:25AM  1      A.   CORRECT.

10:25AM  2      Q.   BECAUSE OF REPRESENTATIONS IN THE ARTICLE.

10:26AM  3           THAT'S WHAT YOU TESTIFIED TO; CORRECT?

10:26AM  4      A.   CORRECT.

10:26AM  5      Q.   AND YOU RECEIVED THAT ARTICLE IN FEBRUARY OF 2014;

10:26AM  6      CORRECT?

10:26AM  7      A.   YEAH.

10:26AM  8           I DON'T REMEMBER THE DATE EXACTLY.

10:26AM  9      Q.   YOU RECEIVED THE ARTICLE BEFORE MR. BALWANI WAS RAISING

10:26AM  10     THE ISSUE TO YOU ON MARCH 17TH, 2014, ABOUT BECOMING A LAB

10:26AM  11     DIRECTOR IN PENNSYLVANIA FOR THERANOS; CORRECT?

10:26AM  12     A.   WELL, I DON'T KNOW WHAT YOU MEAN BY "RECEIVED THE

10:26AM  13     ARTICLE."

10:26AM  14     Q.   YOU RECEIVED THE ARTICLE IN FEBRUARY OF 2014; CORRECT?

10:26AM  15              MR. BOSTIC:  ASKED AND ANSWERED.

10:26AM  16              THE COURT:  SUSTAINED.

10:26AM  17     BY MR. CAZARES:

10:26AM  18     Q.   LET'S CONTINUE WITH THE EXHIBIT.

10:26AM  19          YOU RESPONDED TO MR. BALWANI ON MARCH 17TH, 2014, "SUNNY,

10:26AM  20          "FROM WHAT I HAVE FOUND, YES, I AM QUALIFIED.  THEY MAY

10:26AM  21     ASK ME TO TAKE AN EXAM, BUT ACCORDING TO THIS, I QUALIFY."

10:26AM  22          AND THEN IT LOOKS LIKE YOU REFERENCED A WEBSITE OF SOME

10:26AM  23     SORT; CORRECT?

10:26AM  24     A.   CORRECT.

10:26AM  25     Q.   AND YOU DIDN'T SAY TO MR. BALWANI, NO, I HAVE NO INTEREST

10:27AM 1      IN BEING A LAB DIRECTOR FOR THERANOS; CORRECT?

10:27AM 2      A.   CORRECT.

10:27AM 3      Q.   AND IF WE CONTINUE WITH THE EXHIBIT, MR. BALWANI RESPONDED

10:27AM 4      TO YOU, AGAIN MARCH 17TH, 2014, "OK.  WE MAY NEED TO OPEN A LAB

10:27AM 5      THERE -- SIMILAR TO WHAT WE HAVE HERE AT 1601 (CLUNKERS AND

10:27AM 6      NORMANDY) OR INITIALLY ALL CLUNKERS AND THEN NORMANDY.  FYI."

10:27AM 7           DO YOU SEE THAT?

10:27AM 8      A.   YES.

10:27AM 9      Q.   AND IN THAT WHEN MR. BALWANI IS REFERENCING CLUNKERS, HE'S

10:27AM 10     TALKING ABOUT FDA APPROVED DEVICES; CORRECT?

10:27AM 11     A.   THAT'S MY MEMORY, YEAH.

10:27AM 12     Q.   AND NORMANDY RELATES TO THE LDT FOR FINGERSTICK TESTING;

10:27AM 13     CORRECT?

10:27AM 14     A.   CORRECT.

10:27AM 15     Q.   AND THEN MR. BALWANI CONTINUES, "CAN YOU INVENTORY WHAT WE

10:27AM 16     NEED TO BUILD A CLUNKERS LAB AND WHAT PERCENTAGE VOLUME WILL IT

10:27AM 17     COVER."

10:27AM 18          DO YOU SEE THAT?

10:27AM 19     A.   YES.

10:27AM 20     Q.   AND SO HE'S ASKING YOU TO ADVISE MR. BALWANI WHAT WILL BE

10:28AM 21     NEEDED FOR A NEW LAB; CORRECT?

10:28AM 22     A.   CORRECT.

10:28AM 23     Q.   AND THEN CONTINUING WITH THE EXHIBIT, MARCH 18TH OF 2014,

10:28AM 24     IT LOOKS LIKE YOU RESPONDED TO MR. BALWANI'S REQUEST; CORRECT?

10:28AM 25     A.   IT DOES, YES.

10:28AM   1    Q.   AND YOU WROTE, "SUNNY,

10:28AM   2        "LET ME KNOW IF YOU WOULD LIKE MORE INFORMATION OR DETAIL.

10:28AM   3    HERE IS A SUMMARY."

10:28AM   4        AND THEN YOU REFERENCED EQUIPMENT THAT WOULD BE NEEDED FOR

10:28AM   5    A NEW LABORATORY; CORRECT?

10:28AM   6    A.   CORRECT.

10:28AM   7    Q.   AND WHEN MR. BALWANI ASKED YOU ABOUT BECOMING A NEW LAB

10:28AM   8    DIRECTOR IN PENNSYLVANIA, YOU DID NOT ASK HIM -- WELL, SCRATCH

10:28AM   9    THAT.  SET THAT ASIDE.  YOU CAN PUT THAT ASIDE.

10:29AM  10        IF YOU CAN TAKE A LOOK AT EXHIBIT 20458.

10:29AM  11    A.   OKAY.

10:29AM  12    Q.   NOW, AS YOU SIT HERE TODAY, YOU DON'T RECALL WHAT DAY YOU

10:29AM  13    RECEIVED A COPY OF THE "WIRED" ARTICLE THAT YOU SAY LED TO YOUR

10:29AM  14    RESIGNATION?

10:29AM  15    A.   I DIDN'T REMEMBER THE EXACT DATE.

10:29AM  16    Q.   OKAY.  TAKE A LOOK AT EXHIBIT 20458.  20458.

10:29AM  17        ARE YOU LOOKING AT IT?

10:29AM  18    A.   YES.

10:29AM  19    Q.   AND IT APPEARS TO BE AN EMAIL?

10:29AM  20    A.   THERE IS A -- IT'S AN EMAIL, YES.

10:29AM  21    Q.   THE LATER OF WHICH APPEARS TO BE FROM A SWAPNA JOSHI.

10:30AM  22        DO YOU SEE THAT?

10:30AM  23    A.   YES.

10:30AM  24    Q.   TO YOURSELF?

10:30AM  25    A.   AND ADAM.

10:30AM   1    Q.   AND DR. ROSENDORFF.

10:30AM   2         DATED 2/27/2014.

10:30AM   3         DO YOU SEE THAT?

10:30AM   4    A.   YES.

10:30AM   5    Q.   AND THERE'S A REFERENCE TO "WIRED" ARTICLE.

10:30AM   6         DO YOU SEE THAT?

10:30AM   7    A.   I DO.

10:30AM   8    Q.   AND THEN BELOW THAT THERE'S A MESSAGE INVOLVING DR. YOUNG

10:30AM   9    AND OTHERS WITHIN THE COMP BIO LAB.

10:30AM  10         DO YOU SEE THAT?

10:30AM  11    A.   OH, THE TO IS COMP.BIO.

10:30AM  12    Q.   EXACTLY.

10:30AM  13         AND YOU KNOW WHO DR. YOUNG IS?

10:30AM  14    A.   YES.

10:30AM  15    Q.   AND SWAPNA JOSHI WORKED WITH DR. YOUNG; CORRECT?

10:30AM  16    A.   I DON'T REMEMBER JOSHI SWAPNA.

10:30AM  17    Q.   AND THE MESSAGE REFLECTS YOU RECEIVED THE "WIRED" ARTICLE

10:31AM  18    ON FEBRUARY 27, 2014; CORRECT?

10:31AM  19    A.   THIS LINK WAS SENT TO ME ON THAT DAY.

10:31AM  20    Q.   SO THAT WAS MORE THAN THREE MONTHS BEFORE YOU LEFT

10:31AM  21    THERANOS; CORRECT?

10:31AM  22    A.   YES.

10:31AM  23              MR. CAZARES:  MOVE TO ADMIT 20458, YOUR HONOR.

10:31AM  24              MR. BOSTIC:  NO OBJECTION.

10:31AM  25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:31AM   1            (DEFENDANT'S EXHIBIT 20458 WAS RECEIVED IN EVIDENCE.)

10:31AM   2       BY MR. CAZARES:

10:31AM   3       Q.   AGAIN, TO ORIENT THE JURY, THE EARLIER OF THE TWO MESSAGES

10:31AM   4       IN THE CHAIN APPEARS TO BE FROM DR. YOUNG TO COMP.BIO.

10:31AM   5            DO YOU SEE THAT?

10:31AM   6       A.   I DO.

10:31AM   7       Q.   IS THAT A LIST SERVICE OF SOME SORT?

10:31AM   8       A.   I DON'T KNOW WHAT THAT IS.

10:31AM   9       Q.   AND THE DATE IS FEBRUARY 20TH, 2014.

10:31AM  10            DO YOU SEE THAT?

10:31AM  11       A.   YES.

10:31AM  12       Q.   AND THE SUBJECT LINE IS "WIRED" ARTICLE.

10:31AM  13            DO YOU SEE THAT?

10:31AM  14       A.   YES.

10:31AM  15       Q.   AND THEN THERE'S A LINK TO A "WIRED" ARTICLE THAT

10:31AM  16       REFERENCES ELIZABETH HOLMES AND THERANOS.

10:32AM  17            DO YOU SEE THAT?

10:32AM  18       A.   YES.

10:32AM  19       Q.   AND AGAIN, THE "WIRED" ARTICLE RELATING TO MS. HOLMES IS

10:32AM  20       WHAT YOU SAID WAS A CATALYST TO YOUR RESIGNATION FROM THERANOS;

10:32AM  21       CORRECT?

10:32AM  22       A.   A BIG PART, YEP.

10:32AM  23       Q.   AND THEN CONTINUING ON THE CHAIN, IT APPEARS THAT YOU

10:32AM  24       RECEIVED IT FROM MR. JOSHI, THE LINK TO THE ARTICLE, ON

10:32AM  25       FEBRUARY 27, 2014; CORRECT?

10:32AM   1    A.   CORRECT.

10:32AM   2    Q.   AND THIS IS ALSO BEFORE MR. BALWANI ASKED YOU ABOUT

10:32AM   3    BECOMING A LAB DIRECTOR IN PENNSYLVANIA FOR THERANOS; CORRECT?

10:32AM   4    A.   CORRECT.

10:32AM   5    Q.   AND THIS IS ALSO BEFORE THE MAY 2014 TRANSITION REPORTS

10:32AM   6    THAT YOU SENT TO DR. ROSENDORFF AND MR. BALWANI WHERE YOU

10:32AM   7    ADVISED THAT THEY NEEDED TO DOUBLE THE NUMBER OF EDISONS IN THE

10:32AM   8    CLINICAL LAB; CORRECT?

10:32AM   9    A.   IT WAS BEFORE THAT EMAIL, YEAH.

10:32AM   10   Q.   YOU CAN SET THAT ASIDE.

10:33AM   11        YOU CAN TAKE A LOOK AT EXHIBIT 20253.  20253.

10:33AM   12   A.   OKAY, I'M THERE.

10:33AM   13   Q.   ARE YOU LOOKING AT 20253?

10:33AM   14   A.   I HAVE 20253.

10:33AM   15   Q.   OKAY.  AND 20253 APPEARS TO BE AN EMAIL CHAIN DATED

10:34AM   16   MAY 12TH OF 2014.

10:34AM   17        DO YOU SEE THAT?

10:34AM   18   A.   ARE YOU REFERRING TO 20253?

10:34AM   19   Q.   YES.

10:34AM   20   A.   NO, I DON'T MATCH THOSE DATES.

10:34AM   21   Q.   YOU KNOW WHAT?  SET THAT ONE ASIDE.

10:34AM   22        YOU WANT TO LOOK AT 20490.

10:34AM   23   A.   20490?

10:34AM   24   Q.   YES.

10:35AM   25   A.   DO YOU KNOW WHAT VOLUME THAT IS IN?

10:35AM 1    Q.   20490 WOULD BE IN THE SMALLER BINDER THAT SAYS YOUR NAME

10:35AM 2    ON THE FRONT.

10:35AM 3    A.   OKAY.  I'M THERE.

10:35AM 4    Q.   20490 APPEARS TO BE AN EMAIL CHAIN, THE LATTER OF WHICH AT

10:35AM 5    THE TOP OF THE FIRST PAGE LOOKS TO BE DATED 5/22/2014.

10:35AM 6         DO YOU SEE THAT?

10:35AM 7    A.   YES.

10:35AM 8    Q.   A MESSAGE FROM YOURSELF TO SANI HADZIAHETOVIC?

10:35AM 9         DO YOU SEE THAT?

10:35AM 10   A.   I SEE IT.

10:35AM 11   Q.   AND THE SUBJECT MATTER IS EDISONS.

10:35AM 12        DO YOU SEE THAT?

10:35AM 13   A.   YES.

10:35AM 14        MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT PER THE

10:35AM 15   PARTIES' STIPULATION REGARDING EMAILS.

10:35AM 16        MR. BOSTIC:  IF AS A BUSINESS RECORD, NO OBJECTION,

10:35AM 17   YOUR HONOR.

10:35AM 18        MR. CAZARES:  THIS ONE IS PRIOR INCONSISTENT

10:35AM 19   STATEMENTS, IMPEACHMENT RELATING TO EDISONS.

10:36AM 20        THE COURT:  WELL, I'LL ADMIT IT.  IT'S ADMITTED

10:36AM 21   PURSUANT TO THE STIPULATION.

10:36AM 22        (DEFENDANT'S EXHIBIT 20490 WAS RECEIVED IN EVIDENCE.)

10:36AM 23   BY MR. CAZARES:

10:36AM 24   Q.   AND WE CAN START AT THE TOP OF FIRST PAGE, DR. PANDORI,

10:36AM 25   AGAIN A MAY 22ND, 2014, MESSAGE FROM YOURSELF TO

PANDORI CROSS BY MR. CAZARES (RES.) 2258

10:36AM 1    SANI HADZIAHETOVIC.

10:36AM 2    A.   YES.

10:36AM 3    Q.   AND YOU WROTE, "OK SANI,

10:36AM 4         "THANK YOU FOR YOUR ATTENTION AND WORK TO GET THIS GOING.

10:36AM 5    LET ME KNOW HOW I CAN ASSIST."

10:36AM 6         DO YOU SEE THAT?

10:36AM 7    A.   YES.

10:36AM 8    Q.   AND THIS RELATES TO EDISONS IN SOME WAY?

10:36AM 9    A.   THAT'S THE SUBJECT LINE.

10:36AM 10   Q.   WHY DON'T WE GO BACK ON PAGE 4, MIDDLE OF THE PAGE, THERE

10:37AM 11   APPEARS TO BE A MESSAGE FROM YOURSELF, MAY 20, 2014.

10:37AM 12        DO YOU SEE THAT?

10:37AM 13   A.   YES.

10:37AM 14   Q.   AND THEN THE MESSAGE IS TO A CHINMAY PANGARKAR.

10:37AM 15        DO YOU SEE THAT?

10:37AM 16   A.   YES.

10:37AM 17   Q.   ADAM ROSENDORFF.

10:37AM 18        DO YOU SEE THAT?

10:37AM 19   A.   YES.

10:37AM 20   Q.   NISHIT DOSHI.

10:37AM 21        DO YOU SEE THAT?

10:37AM 22   A.   YES.

10:37AM 23   Q.   AURELIE SOUPPE?

10:37AM 24   A.   YES.

10:37AM 25   Q.   ROMINA RIENER?

10:37AM  1    A.   YES.

10:37AM  2    Q.   AS WELL AS HODA ALAMDAR; CORRECT?

10:37AM  3    A.   YES.

10:37AM  4    Q.   NOW, MS. SOUPPE, MS. RIENER, AND MS. ALAMDAR ALL WORKED

10:37AM  5    WITHIN THE CLINICAL LAB; CORRECT?

10:37AM  6    A.   YES.

10:37AM  7    Q.   BUT DR. PANGARKAR WAS NOT WITHIN THE CLINICAL LAB;

10:37AM  8    CORRECT?

10:37AM  9    A.   HE DIDN'T WORK AS A LAB TECH OR A CLS.  I BELIEVE HE

10:37AM  10   WORKED DEVELOPING CBC TESTS, BUT I'M NOT 100 PERCENT CLEAR ON

10:37AM  11   MY MEMORY ON THAT.

10:37AM  12   Q.   AND GETTING BACK TO THE MESSAGE FROM YOURSELF, YOU WROTE,

10:37AM  13   "HI, CHINMAY, NISHIT."

10:37AM  14        DO YOU SEE THAT?

10:37AM  15   A.   YES.

10:37AM  16   Q.   AND YOU WROTE, "THERE REMAINS AN ISSUE IN NORMANDY WITH

10:37AM  17   THE NUMBER OF EDISON READERS AVAILABLE FOR PATIENT TESTING.  WE

10:38AM  18   WILL SURELY NEED MORE READERS FOR THE FOLLOWING REASONS."

10:38AM  19        DO YOU SEE THAT?

10:38AM  20   A.   YES.

10:38AM  21   Q.   AND THOSE ARE YOUR WORDS; CORRECT?

10:38AM  22   A.   YES, THE FROM LINE IS ME.

10:38AM  23   Q.   AND THIS IS MAY 20, 2014.  THIS IS THE DAY AFTER YOUR

10:38AM  24   BIRTHDAY IN 2014; CORRECT?

10:38AM  25   A.   IT IS.

10:38AM 1    Q.   WHICH MEANS THIS IS A DAY WITHIN A DAY OF THE CONVERSATION

10:38AM 2    THAT YOU SAY YOU HAD WITH MS. HOLMES AND MR. BALWANI THAT LED

10:38AM 3    TO YOUR RESIGNATION AROUND THE TIME OF YOUR BIRTHDAY, MAY 19TH,

10:38AM 4    2014; CORRECT?

10:38AM 5    A.   WELL, AS I'VE SAID, I'M NOT -- I DON'T RECALL PRECISELY

10:38AM 6    THE DAY THAT I HAD THAT CONVERSATION.

10:38AM 7    Q.   WE CAN CONTINUE BACK TO THE MESSAGE.  UNDER ITEM 1 YOU

10:38AM 8    WROTE, "THE NUMBER OF EDISON TESTS IS ALREADY CHALLENGING THE

10:38AM 9    NUMBER WE HAVE."

10:38AM 10       DO YOU SEE THAT?

10:38AM 11   A.   YES.

10:38AM 12   Q.   AND THEN YOU FOLLOW, "A NEW WORKFLOW PROCESS WILL REQUIRE

10:38AM 13   ALL VACUTAINERS WITH EDISON-CAPABLE TESTS TO BE ALIQUOTED INTO

10:38AM 14   CTN AND TESTED ON EDISONS."

10:39AM 15       DO YOU SEE THAT?

10:39AM 16   A.   YES.

10:39AM 17   Q.   AND THE MESSAGE CONTINUES.  "MORE STORES ARE OPENING THIS

10:39AM 18   WEEK (WE CANNOT ESTIMATE HOW MANY MORE SPECIMENS WILL BE COMING

10:39AM 19   IN AS A RESULT)."

10:39AM 20       DO YOU SEE THAT?

10:39AM 21   A.   YES.

10:39AM 22   Q.   NOW, IN THE MESSAGE, YOU WERE NOT TELLING DR. PANGARKAR TO

10:39AM 23   STOP USING EDISONS FOR PATIENT TESTING; CORRECT?

10:39AM 24   A.   CORRECT.

10:39AM 25   Q.   AND IN THE MESSAGE, MAY 20, 2014, YOU ARE NOT TELLING

10:39AM   1    DR. ROSENDORFF TO STOP USING EDISONS FOR PATIENT TESTING;

10:39AM   2    CORRECT?

10:39AM   3    A.   CORRECT.

10:39AM   4    Q.   YOU'RE NOT TELLING ANY OF THE PERSONS IN EXHIBIT 20490 TO

10:39AM   5    STOP USING EDISONS; CORRECT?

10:39AM   6    A.   I DON'T HAVE THAT AUTHORITY, AND I DID NOT AT THAT TIME.

10:39AM   7    Q.   AND YOU'RE NOT MAKING THAT RECOMMENDATION IN EXHIBIT 20490

10:39AM   8    EITHER, ARE YOU?

10:39AM   9    A.   I'M NOT MAKING THAT RECOMMENDATION HERE.

10:39AM   10   Q.   IF WE CAN CONTINUE TO PAGE 5 OF THE MESSAGE.

10:40AM   11        YOU QUOTE, "THERE ARE APPARENTLY 2 ADDITIONAL READERS FOR

10:40AM   12   TSH, HOWEVER THEY ARE NOT BEEN CHARACTERIZED PROPERLY FOR USE."

10:40AM   13        DO YOU SEE THAT?

10:40AM   14   A.   YES.

10:40AM   15   Q.   AND THEN YOU FOLLOWED, "FOR TSH ALONE, WE HAVE ABOUT 10

10:40AM   16   TEST-HOURS OF DEMAND, NOT COUNTING BOTH QC RUNS AND ANY RERUNS

10:40AM   17   THAT ARE NECESSARY.

10:40AM   18        DO YOU SEE THAT?

10:40AM   19   A.   YES.

10:40AM   20   Q.   "OF COURSE OTHER TESTS ARE DEMANDING THE ATTENTION OF THE

10:40AM   21   TECHNICIAN, SO THINGS ARE NOT RUNNING PERFECTLY END-TO-END AND

10:40AM   22   SO THE AMOUNT OF WORK IS PRETTY HIGH."

10:40AM   23        DO YOU SEE THAT?

10:40AM   24   A.   CORRECT.

10:40AM   25   Q.   AND AT THAT TIME PATIENT VOLUME WAS INCREASING AT THE

10:40AM 1    CLINICAL LAB; CORRECT?

10:40AM 2    A.   YEAH.  I DON'T SPECIFICALLY RECALL WHAT THE NUMBERS WERE

10:40AM 3    AT THAT POINT IN TIME.

10:40AM 4    Q.   THE MESSAGE CONTINUES, "CLIA LAB AIMS TO BRING MORE PEOPLE

10:40AM 5    INTO THIS SECTION TO TRAIN."

10:40AM 6         DO YOU SEE THAT?

10:40AM 7    A.   YES.

10:40AM 8    Q.   "HOWEVER, IN ORDER TO BE EFFECTIVE, EXTRA PEOPLE WILL NEED

10:40AM 9    MORE READERS."

10:40AM 10        DO YOU SEE THAT?

10:40AM 11   A.   YES.

10:40AM 12   Q.   THOSE ARE YOUR WORDS; CORRECT?

10:41AM 13   A.   CORRECT.

10:41AM 14   Q.   FOR THE LAB TECHNICIANS TO BE MORE EFFECTIVE, THEY WILL

10:41AM 15   NEED MORE READERS?

10:41AM 16   A.   CORRECT.

10:41AM 17   Q.   AND BY READERS YOU MEAN MORE EDISONS; CORRECT?

10:41AM 18   A.   CORRECT.

10:41AM 19   Q.   AND THEN YOU WROTE, "I'D LIKE TO DISCUSS A PLAN TO DOUBLE

10:41AM 20   THE NUMBER OF READERS FOR THE THREE MAIN TESTS."

10:41AM 21        DO YOU SEE THAT?

10:41AM 22   A.   CORRECT.

10:41AM 23   Q.   THOSE ARE YOUR WORDS; CORRECT?

10:41AM 24   A.   CORRECT.

10:41AM 25   Q.   AND BY "THREE MAIN TESTS," THAT'S THREE MAIN TESTS RUN ON

10:41AM  1    EDISON FOR PATIENT TESTING; CORRECT?

10:41AM  2    A.   CORRECT.

10:41AM  3    Q.   AND "THIS WILL BE NECESSARY AS MORE STORES WILL BE OPENING

10:41AM  4    IN JUNE AND WE STILL DON'T KNOW THE IMPACT OF THE OPENINGS IN

10:41AM  5    MAY."

10:41AM  6         DO YOU SEE THAT?

10:41AM  7    A.   CORRECT.

10:41AM  8    Q.   SO YOU WERE EXPECTING PATIENT VOLUME TO GO UP AT THE TIME,

10:41AM  9    WHICH IS WHY YOU WERE ASKING FOR MORE EDISONS AT THE TIME;

10:41AM  10   CORRECT?

10:41AM  11   A.   YEAH.  THEY FAILED SO FREQUENTLY THAT WE NEEDED MORE OF

10:41AM  12   THEM.

10:41AM  13   Q.   BUT YOU'RE NOT SAYING STOP USING THEM, ARE YOU?

10:41AM  14   A.   NOT IN THIS EMAIL.

10:42AM  15   Q.   YOU CAN SET THAT ASIDE.

10:42AM  16        IF YOU CAN TAKE A LOOK AT EXHIBIT 20521.

10:42AM  17   A.   OKAY.  I'M THERE.

10:42AM  18   Q.   20521 APPEARS TO BE A MESSAGE, A CHAIN OF EMAILS, THE

10:42AM  19   LATTER OF WHICH IS DATED MAY 22ND, 2014.

10:42AM  20        DO YOU SEE THAT?

10:42AM  21   A.   I SEE THE EMAILS.

10:42AM  22   Q.   AND THE MESSAGE AT THE TOP APPEARS TO BE FROM YOURSELF.

10:42AM  23        DO YOU SEE THAT?

10:42AM  24   A.   YES.

10:42AM  25   Q.   TO MAX FOSQUE.

10:42AM   1          DO YOU SEE THAT?

10:42AM   2      A.   YES.

10:42AM   3      Q.   AND THE SUBJECT IS RE 35050 AND 23321.

10:43AM   4          DO YOU SEE THAT?

10:43AM   5      A.   YES.

10:43AM   6      Q.   AND MR. FOSQUE WAS ONE OF THOSE PROJECT MANAGERS AT

10:43AM   7      THERANOS; CORRECT?

10:43AM   8      A.   YES.

10:43AM   9      Q.   AND HE'S SOMEONE THAT YOU HAD OCCASION TO DEAL WITH IN

10:43AM   10     YOUR BUSINESS AT THERANOS; CORRECT?

10:43AM   11     A.   FREQUENT OCCASION.

10:43AM   12          MR. CAZARES:  MOVE TO ADMIT 20521, YOUR HONOR.

10:43AM   13          MR. BOSTIC:  NO OBJECTION.

10:43AM   14          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:43AM   15     (DEFENDANT'S EXHIBIT 20521 WAS RECEIVED IN EVIDENCE.)

10:43AM   16     BY MR. CAZARES:

10:43AM   17     Q.   NOW, STARTING AT THE TOP OF THE MESSAGE, THE LATTER OF THE

10:43AM   18     MESSAGES IN THE CHAIN, YOU WROTE TO MR. FOSQUE, "NO PROBLEM.

10:43AM   19          "I WHOLEHEARTEDLY EXPECTED IT TO PLAY OUT EXACTLY AS IT

10:43AM   20     PLAYED OUT.

10:43AM   21          "THANKS, MAX."

10:43AM   22          DO YOU SEE THAT?

10:43AM   23     A.   I SEE IT.

10:43AM   24     Q.   AND THEN IN RESPONSE -- THAT IS A RESPONSE TO A MESSAGE

10:44AM   25     FROM MR. FOSQUE WHERE HE WROTE, "THANKS... SHOULD I NOT HAVE

10:44AM 1      SENT THAT EMAIL, PERHAPS?

10:44AM 2           "WE WOULD HAVE LOOKED VERY FOOLISH IN FRONT OF A LARGE

10:44AM 3      DOCTOR'S GROUP IF WE HAD CALLED ONE OF THOSE PATIENTS FOR A

10:44AM 4      SECOND REDRAW..."

10:44AM 5           DO YOU SEE THAT?

10:44AM 6      A.   I SEE IT.

10:44AM 7      Q.   AND THE MESSAGE BELOW THAT APPEARS TO BE DATED MAY 21,

10:44AM 8      2014.

10:44AM 9           DO YOU SEE THAT?

10:44AM 10     A.   YES.

10:44AM 11     Q.   FROM YOURSELF; CORRECT?

10:44AM 12     A.   CORRECT.

10:44AM 13     Q.   TO MR. BALWANI?

10:44AM 14     A.   AMONG OTHERS.

10:44AM 15     Q.   MAX FOSQUE, DR. ROSENDORFF IS ALSO IN THE TO LINE.

10:44AM 16          DO YOU SEE THAT?

10:44AM 17     A.   I DO.

10:44AM 18     Q.   DANIEL YOUNG?

10:44AM 19     A.   YES.

10:44AM 20     Q.   NISHIT DOSHI.

10:44AM 21          DO YOU SEE THAT?

10:44AM 22     A.   YES.

10:44AM 23     Q.   AND TINA LIN?

10:44AM 24     A.   I SEE IT.

10:44AM 25     Q.   AND THEN THERE ARE OTHERS COPIED IN THE CC LINE?

10:44AM    1    A.    YES.

10:44AM    2    Q.    AND IN THE MESSAGE YOU WROTE, "I HAD BEEN NOTIFIED OF THIS

10:45AM    3    SITUATION VERY RECENTLY, TODAY, THROUGH MARIA WHO IS TRYING TO

10:45AM    4    REVIEW AND RELEASE THESE."

10:45AM    5          DO YOU SEE THAT?

10:45AM    6    A.    YES.

10:45AM    7    Q.    AND BY "THESE" THAT'S RELATING TO PATIENT RESULTS;

10:45AM    8    CORRECT?

10:45AM    9    A.    I GUESS SO.  I MEAN, THAT WOULD MAKE SENSE IN THE CONTEXT

10:45AM   10    OF THE EMAIL, BUT I DON'T KNOW FOR SURE.

10:45AM   11    Q.    AND THEN YOU CONTINUED IN THE MESSAGE, "THE SAMPLES ARE

10:45AM   12    BOTH LOCATED AND ARE SCHEDULED TO BE RUN ASAP."

10:45AM   13          DO YOU SEE THAT?

10:45AM   14    A.    YES.

10:45AM   15    Q.    AND THEN YOUR MESSAGE CONTINUES, "THE EDISON OPERATORS

10:45AM   16    FAILED TO ENTER THESE TWO SPECIMENS INTO THE WORKFLOW."

10:45AM   17          DO YOU SEE THAT?

10:45AM   18    A.    YES.

10:45AM   19    Q.    AND THEN YOU CONTINUED, "IN A PURSUIT OF WHY, IT SEEMS

10:45AM   20    THAT AT LEAST PART OF THE ISSUE WAS THAT THEY WERE NOT USING

10:45AM   21    THE PENDING LISTS NOW BEING GENERATED EACH DAY, AND INSTEAD

10:45AM   22    RELYING ON THE BINDER DOWNSTAIRS WITH THE SPECIMEN PRINTOUTS."

10:45AM   23          DO YOU SEE THAT?

10:45AM   24    A.    YEAH.

10:45AM   25    Q.    "TOMORROW THERE IS A CLIA WIDE MEETING TO DISCUSS THE

10:45AM   1    UTILIZATION OF THE NOVEL PENDING LISTS, AND TO REVIEW THIS

10:46AM   2    ISSUE."

10:46AM   3        DO YOU SEE THAT?

10:46AM   4    A.   YES.

10:46AM   5    Q.   SO YOU ARE REPORTING TO THE RECIPIENTS OF THE MESSAGE THAT

10:46AM   6    THE OPERATORS FAILED TO IDENTIFY TWO SPECIMENS AS NEEDING TO BE

10:46AM   7    RUN; CORRECT?

10:46AM   8    A.   YES.

10:46AM   9    Q.   AND THEN YOU WERE IDENTIFYING A WAY THAT YOU WERE GOING TO

10:46AM  10    SOLVE THAT PROBLEM IN THE FUTURE; CORRECT?

10:46AM  11    A.   YES.

10:46AM  12    Q.   AND THEN THE MESSAGE CONTINUES.  YOU WROTE, "RELATEDLY, I

10:46AM  13    HAVE ON TWO OCCASIONS IN THE LAST 2 WEEKS REQUESTED MORE EDISON

10:46AM  14    READERS TO BE MADE AVAILABLE IN NORMANDY."

10:46AM  15        DO YOU SEE THAT?

10:46AM  16    A.   YES.

10:46AM  17    Q.   THOSE ARE YOUR WORDS; CORRECT?

10:46AM  18    A.   CORRECT.

10:46AM  19    Q.   "TESTING VOLUMES ARE GOING UP AND HAVING ONLY 2 TO 3

10:46AM  20    READERS PER TEST CAUSES SPECIMENS TO BACK UP AND FOR THE

10:46AM  21    WORKFLOW TO GAIN COMPLEXITY."

10:46AM  22        DO YOU SEE THAT?

10:46AM  23    A.   OH, YEAH.

10:46AM  24    Q.   AND THIS BACKUP ISSUE OR TURN-AROUND TIME, THAT WAS A

10:46AM  25    CONCERN YOU HAD AT THE TIME; CORRECT?

10:46AM 1    A.   AMONG SEVERAL CONCERNS, YES.

10:47AM 2    Q.   AND THEN YOU CONTINUED, "I AM TOLD THAT MORE READERS ARE

10:47AM 3    ON THEIR WAY, AT LEAST FOR THE MOST COMMON TESTS."

10:47AM 4         CORRECT?

10:47AM 5    A.   CORRECT.

10:47AM 6    Q.   AND IN THE MESSAGE, YOU'RE NOT TELLING THE RECIPIENTS OF

10:47AM 7    THIS MESSAGE TO STOP USING EDISONS FOR PATIENT TESTING;

10:47AM 8    CORRECT?

10:47AM 9    A.   CORRECT.

10:47AM 10   Q.   AND AMONG THE RECIPIENTS OF THIS MESSAGE IS MR. BALWANI;

10:47AM 11   CORRECT?

10:47AM 12   A.   CORRECT.

10:47AM 13            MR. CAZARES:  YOUR HONOR, MAY I HAVE A MOMENT?

10:47AM 14            THE COURT:  YES.

10:48AM 15       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:48AM 16            MR. CAZARES:  YOUR HONOR, NO FURTHER QUESTIONS AT

10:48AM 17   THIS TIME.

10:48AM 18            THE COURT:  REDIRECT?

10:48AM 19            MR. BOSTIC:  YES, YOUR HONOR.

10:48AM 20       YOUR HONOR, MAY I ASK WHEN THE COURT IS CONSIDERING TAKING

10:48AM 21   A MORNING BREAK?

10:48AM 22            THE COURT:  WELL, MAYBE AT THE BOTTOM OF THE HOUR.

10:48AM 23   ANOTHER 40 MINUTES.

10:48AM 24       I DON'T SEE AN OBJECTION, SO LET'S DO THAT.

10:48AM 25            MR. BOSTIC:  THANK YOU, YOUR HONOR.  WE'LL PLAN

10:48AM  1    ACCORDINGLY.

10:48AM  2                      **REDIRECT EXAMINATION**

10:48AM  3    BY MR. BOSTIC:

10:48AM  4    Q.   GOOD MORNING, DR. PANDORI.

10:48AM  5    A.   GOOD MORNING.

10:48AM  6    Q.   I WOULD LIKE TO ASK YOU A FEW QUESTIONS FOLLOWING UP ON

10:48AM  7    YOUR CONVERSATION WITH MR. CAZARES OVER THE LAST COUPLE OF

10:48AM  8    DAYS.

10:49AM  9          FIRST I'D LIKE TO START ON THE TOPIC OF PROFICIENCY

10:49AM  10   TESTING AT THERANOS.  DO YOU RECALL TALKING ABOUT THAT ON YOUR

10:49AM  11   DIRECT EXAM AND THEN ON CROSS?

10:49AM  12   A.   YES, I DO.

10:49AM  13   Q.   AND IN PARTICULAR, DO YOU RECALL DISCUSSIONS ABOUT A TEST

10:49AM  14   THAT WAS RUN AT THERANOS ON PROFICIENCY TESTING SAMPLES IN

10:49AM  15   FEBRUARY OF 2014?

10:49AM  16   A.   YES.

10:49AM  17   Q.   ON CROSS, MR. CAZARES ASKED YOU WHETHER YOU HAD PERSONALLY

10:49AM  18   OBSERVED THAT TESTING BEING PERFORMED.

10:49AM  19          DO YOU RECALL THAT QUESTIONING?

10:49AM  20   A.   YES, I RECALL THAT.

10:49AM  21   Q.   AND YOUR TESTIMONY WAS THAT YOU HAD NOT SEEN THAT TESTING

10:49AM  22   ACTUALLY HAPPEN; CORRECT?

10:49AM  23   A.   CORRECT.

10:49AM  24   Q.   DO YOU HAVE ANY REASON, SITTING HERE TODAY, TO DOUBT THAT

10:49AM  25   THAT TEST WAS PERFORMED PROPERLY?

10:49AM 1          MR. CAZARES:  OBJECTION.  CALLS FOR SPECULATION.

10:49AM 2          THE COURT:  OVERRULED.

10:49AM 3          THE WITNESS:  NO, I HAVE NO REASON TO BELIEVE THAT

10:50AM 4     IT WAS TESTED INCORRECTLY.

10:50AM 5          LABORATORIES OPERATE BY STANDARD OPERATING PROCEDURES THAT

10:50AM 6     ARE WRITTEN AND TRAINED AND COMPETENCY IS ASSESSED, AND THAT'S

10:50AM 7     UNLIKE OTHER STYLES OF WORKPLACES.

10:50AM 8     BY MR. BOSTIC:

10:50AM 9     Q.   AND I'D LIKE TO ASK YOU, ON THAT SAME TOPIC, ABOUT

10:50AM 10    ERIKA CHEUNG SPECIFICALLY.  ARE YOU FAMILIAR WITH MS. CHEUNG

10:50AM 11    AND HER POSITION AT THE COMPANY?

10:50AM 12    A.   I AM.

10:50AM 13    Q.   ARE YOU FAMILIAR WITH MS. CHEUNG'S ROLE IN THE CLINICAL

10:50AM 14    LAB AT THERANOS DURING YOUR TIME THERE?

10:50AM 15    A.   I AM FAMILIAR.

10:50AM 16    Q.   AS PART OF MS. CHEUNG'S ROLE AT THERANOS, DID SHE HAVE

10:50AM 17    EXPERIENCE WITH THE PROCEDURES FOR RUNNING PATIENT SAMPLES ON

10:50AM 18    EDISON DEVICES?

10:50AM 19    A.   IT WAS MY UNDERSTANDING THAT SHE DID, YES.

10:50AM 20    Q.   AND WHERE DID THAT EXPERIENCE COME FROM BASED ON YOUR

10:50AM 21    UNDERSTANDING?

10:50AM 22    A.   THERANOS.

10:50AM 23    Q.   AND WHAT WAS IT ABOUT HER ROLE THAT GAVE HER THAT

10:50AM 24    EXPERIENCE?

10:51AM 25    A.   HER ROLE WAS AS A LABORATORY ASSOCIATE, AND THAT WAS THEIR

10:51AM  1    ROLE AND JOB DESCRIPTION.

10:51AM  2    Q.   THERE WAS ALSO SOME DISCUSSION WITH MR. CAZARES ABOUT

10:51AM  3    WHERE THE TEST MATERIAL FOR THAT FEBRUARY TEST CAME FROM.

10:51AM  4         DO YOU RECALL THAT?

10:51AM  5    A.   YES.

10:51AM  6    Q.   AND MR. CAZARES ASKED YOU ABOUT THE FACT THAT THOSE

10:51AM  7    SAMPLES HAD BEEN PREVIOUSLY RECEIVED AND USED FOR A ROUND OF

10:51AM  8    TESTING; IS THAT CORRECT?

10:51AM  9    A.   CORRECT.

10:51AM  10   Q.   DOES THAT FACT GIVE YOU ANY REASON TO DOUBT THE VALIDITY

10:51AM  11   OF THE FEBRUARY 2014 TESTS THAT WE'VE DISCUSSED?

10:51AM  12   A.   NOT AT THIS TIME.

10:51AM  13   Q.   THE FACT THAT THOSE SAMPLES HAD BEEN USED IN A PREVIOUS

10:51AM  14   ROUND, DOES THAT DEGRADE OR ERASE THE ABILITY OF THOSE SAMPLES

10:51AM  15   TO BE USED FOR THIS KIND OF TESTING?

10:52AM  16             MR. CAZARES:  OBJECTION.  702.

10:52AM  17             THE COURT:  OVERRULED.  OVERRULED.

10:52AM  18        YOU CAN ANSWER THE QUESTION.

10:52AM  19             THE WITNESS:  I'M NOT FAMILIAR WITH FOR THOSE

10:52AM  20   PARTICULAR TESTS EXACTLY, BUT IT WOULD BE COMMON, FROM A

10:52AM  21   STABILITY POINT OF VIEW OR --

10:52AM  22             MR. CAZARES:  OBJECTION.  FOUNDATION.

10:52AM  23             THE COURT:  SUSTAINED.

10:52AM  24        YOU CAN ASK ANOTHER QUESTION.

10:52AM  25             MR. BOSTIC:  MAY I LAY A FOUNDATION, YOUR HONOR?

10:52AM  1              THE COURT:  YES.

10:52AM  2      BY MR. BOSTIC:

10:52AM  3      Q.   DR. PANDORI, FROM YOUR WORK AT THERANOS, DO YOU HAVE AN

10:52AM  4      UNDERSTANDING AS TO THE GENERAL STABILITY OF SAMPLES LIKE WE'RE

10:52AM  5      TALKING ABOUT?

10:52AM  6      A.   FROM MY WORK AT THERANOS?

10:52AM  7      Q.   YES.

10:52AM  8      A.   I HAVE A GENERAL UNDERSTANDING OF THE STABILITY OF SUCH

10:52AM  9      SPECIMENS BASED ON THE ENTIRETY OF MY EXPERIENCE.

10:52AM  10     Q.   LET ME ASK YOU A MORE GENERAL QUESTION THEN.

10:52AM  11          YOU TESTIFIED EARLIER THAT IT WAS YOUR DECISION TO RUN

10:53AM  12     EDISON TESTING ON THESE SAMPLES IN FEBRUARY OF 2014; IS THAT

10:53AM  13     CORRECT?

10:53AM  14     A.   YES.

10:53AM  15     Q.   AND WHEN YOU DIRECTED THAT THAT TESTING HAPPEN, WHAT WAS

10:53AM  16     YOUR VIEW AS TO WHETHER THAT TESTING WAS GOING TO PROVIDE VALID

10:53AM  17     OR INVALID DATA?

10:53AM  18     A.   MY VIEW WAS THAT IT WOULD PROVIDE VALID DATA.

10:53AM  19     Q.   AND SITTING HERE TODAY, DO YOU HAVE ANY REASON TO DOUBT

10:53AM  20     THAT THAT DATA WAS VALID?

10:53AM  21     A.   I HAVE NONE.

10:53AM  22     Q.   MS. WACHS, CAN WE DISPLAY EXHIBIT 1548, AND SPECIFICALLY

10:53AM  23     THE ATTACHMENT.

10:53AM  24          DR. PANDORI, WHEN YOU WERE DISCUSSING THIS SPECIFIC TEST,

10:53AM  25     OR THIS TESTING WITH MR. CAZARES, THERE WAS ALSO SOME

10:53AM  1      DISCUSSION ABOUT AAP.

10:53AM  2           DO YOU RECALL THAT?

10:53AM  3      A.   YES.

10:53AM  4      Q.   AND THAT DISCUSSION CONCERNED, FOR EXAMPLE, WHETHER

10:54AM  5      THERANOS HAD A PEER GROUP SUCH THAT IT COULD DO PROFICIENCY

10:54AM  6      TESTING IN THE STANDARD, IN THE INDUSTRY STANDARD WAY; CORRECT?

10:54AM  7      A.   CORRECT.

10:54AM  8      Q.   AND YOU TESTIFIED THAT YOU RECOGNIZED THAT THERANOS DID

10:54AM  9      NOT HAVE A PEER GROUP SUCH THAT IT COULD DO STANDARD

10:54AM 10      PROFICIENCY TESTING; CORRECT?

10:54AM 11      A.   CORRECT.

10:54AM 12      Q.   AND WAS THAT YOUR UNDERSTANDING IN FEBRUARY OF 2014?

10:54AM 13      A.   NO.

10:54AM 14      Q.   WHEN YOU ORDERED THAT THIS TESTING TAKE PLACE IN FEBRUARY

10:54AM 15      OF 2014, HOW DID YOU ACCOUNT FOR THE FACT THAT THIS WAS NOT AAP

10:54AM 16      BUT WAS STANDARD PROFICIENCY TESTING?

10:54AM 17      A.   WELL, AT THIS MOMENT IN TIME I WASN'T AWARE OF AN AAP

10:54AM 18      PROTOCOL AT THERANOS.

10:54AM 19           MY PRIMARY DRIVE AND CONCERN IN THAT ACTIVITY WAS THAT WE

10:54AM 20      HAD NOT DONE PT PROPERLY, WHICH IS TO SAY THAT WE HAD NOT DONE

10:55AM 21      PROFICIENCY TESTING IN A MANNER CONSISTENT WITH HOW PATIENT

10:55AM 22      SPECIMENS ARE TREATED.

10:55AM 23           SO MY PRIMARY GOAL WAS TO -- THERE WERE TWO GOALS.  ONE

10:55AM 24      WAS TO GET THAT DONE; AND SECONDARILY, TO THEN SEE FOR MYSELF,

10:55AM 25      BECAUSE I WAS RELATIVELY NEW AT THAT COMPANY, HOW THE

10:55AM  1    PERFORMANCE WOULD GO.

10:55AM  2    Q.   IN RETROSPECT -- WELL, LET ME ASK A DIFFERENT QUESTION.

10:55AM  3         SUBSEQUENTLY DID YOU COME TO HAVE A BETTER UNDERSTANDING

10:55AM  4    OF AAP PROTOCOLS OR REQUIREMENTS AS IT RELATED TO THERANOS?

10:55AM  5    A.   I DID.

10:55AM  6    Q.   INCORPORATING THAT UNDERSTANDING IN RETROSPECT, DO YOU NOW

10:55AM  7    VIEW THE DATA THAT WE'RE LOOKING AT ON THE SCREEN AS INVALID OR

10:55AM  8    NOT USEFUL IN TERMS OF MEASURING THE PERFORMANCE OF THERANOS

10:55AM  9    TESTS?

10:55AM  10   A.   WELL, I WAS NOT ABLE TO ASCERTAIN THE ANSWER TO THAT

10:55AM  11   QUESTION.

10:55AM  12        YOU KNOW, I WASN'T THERE LONG ENOUGH FOR ANYBODY TO SHOW

10:56AM  13   ME ANY DATA THAT INDICATED THAT THERE WAS A MATRIX ISSUE.

10:56AM  14   ALTHOUGH THE CONSTRUCTION OF AAP'S PRIOR TO MY ARRIVAL AT

10:56AM  15   THERANOS WOULD IMPLY THAT SUCH STUDIES HAD BEEN DONE, I WAS

10:56AM  16   NEVER MADE AWARE OF THE RESULTS OF SUCH STUDIES.

10:56AM  17   Q.   LET ME ASK IT MAYBE A SIMPLER WAY.

10:56AM  18        WE REVIEWED THIS DATA DURING YOUR DIRECT EXAMINATION;

10:56AM  19   CORRECT?

10:56AM  20   A.   CORRECT.

10:56AM  21   Q.   AND THIS TEST IN FEBRUARY OF 2014, IN YOUR VIEW, DID IT

10:56AM  22   REVEAL ANY PROBLEMS OR RAISE ANY CONCERNS ABOUT THE ACCURACY OF

10:56AM  23   THERANOS'S TESTING?

10:56AM  24             MR. CAZARES:  OBJECTION.  702.

10:56AM  25             THE COURT:  OVERRULED.

10:56AM 1          THE WITNESS:  YES, IT DID.

10:56AM 2     BY MR. BOSTIC:

10:56AM 3     Q.   AND SUBSEQUENT TO THAT, DID YOUR ADDITIONAL DISCUSSIONS

10:56AM 4     ABOUT AAP, OR ANY OTHER TOPIC, REMOVE THOSE CONCERNS THAT THIS

10:56AM 5     DATA HAD RAISED ABOUT POSSIBLE INACCURACY WITH THERANOS TESTS?

10:56AM 6     A.   NO, THEY HAD NOT ALL BY THEMSELVES REMOVED THAT.

10:57AM 7     Q.   AND WHEN YOU LEFT THE COMPANY, DID YOU STILL HAVE CONCERNS

10:57AM 8     ABOUT THE ACCURACY OF THERANOS'S TESTING?

10:57AM 9     A.   YES.

10:57AM 10    Q.   LOOKING AT THIS DATA SPECIFICALLY, I'LL DRAW YOUR

10:57AM 11    ATTENTION TO THE PSA RESULTS IN COLUMNS D, E, F, AND G.

10:57AM 12         DO YOU SEE THAT DATA?

10:57AM 13    A.   I DO.

10:57AM 14    Q.   AND THERE WAS SOME DISCUSSION WITH MR. CAZARES ABOUT TWO

10:57AM 15    SAMPLES THAT WERE RERUN.

10:57AM 16         DO YOU RECALL THAT DISCUSSION?

10:57AM 17    A.   I DO.

10:57AM 18    Q.   AND MR. CAZARES SUGGESTED TO YOU THAT A RERUN MIGHT BE

10:57AM 19    NECESSARY IN CASES WHERE THERE WAS AN EQUIPMENT MALFUNCTION.

10:57AM 20         DO YOU RECALL THAT?

10:57AM 21    A.   YES.

10:57AM 22    Q.   DO YOU KNOW ONE WAY OR ANOTHER WHETHER THERE WAS AN

10:57AM 23    EQUIPMENT MALFUNCTION DURING THIS FEBRUARY 2014 TESTING?

10:57AM 24    A.   I DO NOT KNOW ONE WAY OR THE OTHER.

10:57AM 25    Q.   THE FACT THAT THOSE TWO SAMPLES WERE RERUN, DO THEY ALLOW

10:57AM  1    YOU TO DRAW ANY CONCLUSIONS OR REVEAL ANYTHING ABOUT THE

10:58AM  2    PRECISION OF THE TWO TESTING METHODS THAT ARE BEING USED?

10:58AM  3    A.    YEAH.   TAKEN AT FACE VALUE, THESE DATA DEMONSTRATED,

10:58AM  4    ALBEIT WITH TWO SAMPLES RUN, THAT THE PREDICATE METHOD HAD HIGH

10:58AM  5    PRECISION LIKELY, AND THAT THE THERANOS METHOD HAD LESS

10:58AM  6    PRECISION.

10:58AM  7    Q.    AND WOULD TESTING PRECISION BE ONE POSSIBLE REASON WHY YOU

10:58AM  8    MIGHT WANT TO RERUN SAMPLES IN A TEST LIKE THIS?

10:58AM  9    A.    WOULD PRECISION BE A REASON TO RERUN THEM?

10:58AM 10    Q.    WOULD A DESIRE TO TEST PRECISION BE A REASON WHY YOU MIGHT

10:58AM 11    WANT TO RERUN SAMPLES IN A TEST LIKE THIS?

10:58AM 12    A.    NOT IN A PROFICIENCY TEST.

10:58AM 13          BUT IN A VERIFICATION OR VALIDATION STUDY, YOU WOULD

10:58AM 14    REALLY WANT TO DEFINITELY RERUN SPECIMENS TO ASCERTAIN

10:58AM 15    PRECISION.

10:58AM 16              MR. CAZARES:   OBJECTION.   NONRESPONSIVE.

10:59AM 17              THE COURT:   OVERRULED.

10:59AM 18    BY MR. BOSTIC:

10:59AM 19    Q.    AND WAS THIS A FORMAL PROFICIENCY TEST?

10:59AM 20    A.    WAS WHAT A FORMAL PROFICIENCY TEST?

10:59AM 21    Q.    WHAT WE'RE LOOKING AT FROM FEBRUARY 2014.

10:59AM 22    A.    THEY WERE RUN ON FORMAL PROFICIENCY TESTING SPECIMENS.

10:59AM 23    Q.    BUT WHEN IT COMES TO -- AS FAR AS THE PROCEDURE AND THE

10:59AM 24    PROTOCOLS, WAS THIS A FORMAL PROFICIENCY TESTING PROCESS?

10:59AM 25    A.    UM, I'M SORRY THAT I'M STUCK ON THE WORD "FORMAL."   I

10:59AM  1      DON'T UNDERSTAND IT.

10:59AM  2          SOMEBODY NEEDED TO RUN PT REGULARLY AND ACCORDING TO

10:59AM  3      REGULATIONS, AND WE WERE TRYING TO ACHIEVE THAT.  SO IF THAT

10:59AM  4      MEETS THE DEFINITION OF "FORMAL," THEN, YES, IT WAS FORMAL.

10:59AM  5      Q.   UNDERSTOOD.

10:59AM  6          MS. WACHS, COULD WE CALL UP EXHIBIT 5545.  THIS WAS

10:59AM  7      PREVIOUSLY ADMITTED.  LET'S USE THE HARD COPY.

11:00AM  8          MS. ROBINSON, CAN WE USE THE ELMO FOR THAT?

11:00AM  9          EXHIBIT 5545 WAS PREVIOUSLY ADMITTED.  MAY I PUBLISH,

11:00AM 10      YOUR HONOR?

11:00AM 11              THE COURT:  YES.

11:00AM 12      BY MR. BOSTIC:

11:00AM 13      Q.   DR. PANDORI, DO YOU SEE ON THE SCREEN TRIAL EXHIBIT 5545?

11:00AM 14      A.   I SEE SOMETHING ON THE SCREEN, BUT I DON'T SEE THAT

11:00AM 15      NUMBER.  I'M SORRY.

11:00AM 16      Q.   THAT'S ALL RIGHT.

11:01AM 17          DO YOU SEE NOW AT THE BOTTOM THE EXHIBIT NUMBER?

11:01AM 18      A.   YES, I SEE THAT EXHIBIT NUMBER.

11:01AM 19      Q.   OKAY.  DO YOU RECALL DISCUSSING THIS DOCUMENT WITH

11:01AM 20      MR. CAZARES?

11:01AM 21      A.   WOULD YOU PLEASE MOVE THE DOCUMENT UPWARD?

11:01AM 22          YES.

11:01AM 23      Q.   YES.  AND THIS IS ALSO IN VOLUME 1 IN CASE YOU WOULD LIKE

11:01AM 24      TO FLIP THROUGH IT AT THE SAME TIME, BUT THAT'S UP TO YOU.

11:01AM 25      A.   IT'S CLEARLY VISIBLE ON THE SCREEN NOW.

PANDORI REDIRECT BY MR. BOSTIC

11:01AM  1    Q.   I'LL DRAW YOUR ATTENTION TO PAGE 3 OF THIS DOCUMENT.

11:01AM  2    A.   YES.

11:01AM  3    Q.   AND DO YOU SEE THERE AN EMAIL FROM LANGLY GEE TO YOU AND

11:01AM  4    OTHERS AT THERANOS WITH THE SUBJECT LINE UPDATED PT/AUDIT

11:01AM  5    RENEWALS SINCE 3/18?

11:01AM  6    A.   I SEE IT.

11:01AM  7    Q.   AND IT SAYS, "HERE ARE SURVEYS PERFORMED AND SCORES AND

11:01AM  8    UPDATE TO LICENSURES SINCE 3/18."

11:01AM  9         DO YOU SEE THAT?

11:01AM  10   A.   YES.

11:02AM  11   Q.   AND I'D LIKE TO ASK YOU ABOUT THE ACTUAL TESTING THAT IS

11:02AM  12   LISTED HERE.

11:02AM  13        DO YOU SEE A LIST BELOW OF DATES AND SURVEYS AND SCORES?

11:02AM  14   A.   I DO.

11:02AM  15   Q.   AND DO YOU UNDERSTAND THESE TO BE PROFICIENCY TESTING

11:02AM  16   RESULTS?

11:02AM  17   A.   I DO.

11:02AM  18   Q.   ARE THESE REFLECTING PROFICIENCY TESTING RESULTS FOR

11:02AM  19   TESTING PERFORMED ON THE THERANOS EDISON?

11:02AM  20   A.   FOR SOME OF THESE THERE'S NO WAY THAT COULD HAVE BEEN THE

11:02AM  21   CASE.

11:02AM  22   Q.   WHY DO YOU SAY THAT?

11:02AM  23   A.   BECAUSE FOR A LOT OF THESE THERE WERE NO, AT THAT TIME,

11:02AM  24   EDISON TESTS THAT RAN THOSE TESTS.

11:02AM  25   Q.   FOR EXAMPLE, WERE YOU -- WHERE IT SAYS API HEMATOLOGY, WAS

11:02AM   1    THE EDISON CAPABLE OF RUNNING ANY HEMATOLOGY TESTS DURING YOUR

11:02AM   2    TIME AT THE COMPANY?

11:02AM   3    A.   NO.

11:02AM   4         THAT WOULD ALSO HAVE BEEN TRUE FOR CAP INFECTIOUS DISEASE

11:02AM   5    SEROLOGY.  I ONLY REMEMBER ONE.  THOSE ARE GOING TO BE PANELS.

11:02AM   6    SO WHEN THEY COME, YOU DON'T NECESSARILY KNOW.

11:03AM   7         THERE MIGHT BE SEVERAL INFECTIOUS DISEASES IN A PANEL LIKE

11:03AM   8    THAT, AND I ONLY REMEMBER ONE EVER BEING CONSIDERED ON THE

11:03AM   9    EDISON.

11:03AM   10   Q.   HOW ABOUT SOMETHING LIKE CLINICAL MICROSCOPY?  COULD THAT

11:03AM   11   HAVE RELATED TO THE EDISON?

11:03AM   12   A.   NO.

11:03AM   13   Q.   SITTING HERE TODAY, ARE YOU ABLE TO SEE WHETHER ANY OF

11:03AM   14   THIS PROFICIENCY TESTING ACTUALLY RELATED TO THE THERANOS

11:03AM   15   ANALYZER.

11:03AM   16   A.   NO, I CAN'T.

11:03AM   17   Q.   I'D LIKE TO SHOW YOU ANOTHER EXHIBIT THAT YOU DISCUSSED

11:03AM   18   WITH MR. CAZARES, AND THAT'S NUMBER 20444.  I THINK THAT'S IN

11:04AM   19   VOLUME 2.

11:04AM   20        THIS WAS PREVIOUSLY ADMITTED.

11:04AM   21        MAY I PUBLISH, YOUR HONOR?

11:04AM   22             THE COURT:  YES.

11:04AM   23   BY MR. BOSTIC:

11:04AM   24   Q.   AND, DR. PANDORI, DO YOU SEE TRIAL EXHIBIT 20444 ON THE

11:04AM   25   SCREEN?

11:04AM  1    A.   YES.

11:04AM  2    Q.   THE SCREEN FROZE.

11:04AM  3              THE CLERK:  SHE HAS IT UP.

11:04AM  4              MR. BOSTIC:  OH.  EVEN BETTER.

11:04AM  5    Q.   LET'S GO TO THE SECOND PAGE OF THIS DOCUMENT, PLEASE.

11:05AM  6    A.   I'M THERE.

11:05AM  7    Q.   AND LET'S ZOOM IN ON ITEM NUMBER 8.

11:05AM  8         AND DO YOU REMEMBER DISCUSSING THIS LANGUAGE WITH

11:05AM  9    MR. CAZARES?

11:05AM  10   A.   YES.

11:05AM  11   Q.   IT STATES HERE THAT YOU HAD REVIEWED VALIDATIONS THAT WERE

11:05AM  12   EXCELLENT, BUT THEY WERE MISSING AN ELEMENT, STATING THAT THE

11:05AM  13   TEST WAS SAFE FOR USE ON PEOPLE.

11:05AM  14        DO YOU SEE THAT?

11:05AM  15   A.   YES.

11:05AM  16   Q.   THE SUBJECT LINE TO THIS EMAIL IS NAAT VALIDATIONS; IS

11:05AM  17   THAT CORRECT?

11:05AM  18   A.   YES.

11:05AM  19   Q.   DOES THAT RELATE TO A CERTAIN KIND OF ASSAY?

11:05AM  20   A.   YES, IT DOES.

11:05AM  21   Q.   AND WAS THAT KIND OF TEST RUN ON THE EDISON DEVICE?

11:05AM  22   A.   NO, IT WAS NOT.

11:05AM  23   Q.   SO THE TEST THAT YOU'RE TALKING ABOUT IN THIS EMAIL WHERE

11:05AM  24   YOU SAY THAT THE VALIDATIONS WERE EXCELLENT, OR WHERE YOU SAY

11:05AM  25   THAT THE TEST IS SAFE FOR PEOPLE, DOES THAT ACTUALLY RELATE TO

11:05AM  1     TESTING DONE ON THE THERANOS ANALYZER THAT YOU WORKED WITH IN

11:06AM  2     THE LAB?

11:06AM  3     A.   IT DOES NOT.

11:06AM  4     Q.   OKAY.  WE CAN SET THAT ASIDE.

11:06AM  5          I WON'T PUT IT UP RIGHT NOW, BUT DO YOU RECALL IN THE LAST

11:06AM  6     PORTION OF YOUR CONVERSATION WITH MR. CAZARES LOOKING AT AN

11:06AM  7     EMAIL FROM YOU TO MR. BALWANI WHERE YOU PRAISED THE CALIBER OF

11:06AM  8     THE PEOPLE AT THERANOS AND YOU EXPRESSED A POSITIVE ATTITUDE

11:06AM  9     ABOUT THE COMPANY?

11:06AM  10    A.   YEAH, I REMEMBER THAT.

11:06AM  11    Q.   AND DO YOU RECALL THAT THAT EMAIL WAS FROM RELATIVELY

11:06AM  12    EARLY ON IN YOUR TIME AT THE COMPANY?

11:06AM  13    A.   YES, I RECALL THAT.

11:06AM  14    Q.   AND DID THAT GENUINELY REFLECT YOUR ATTITUDE ABOUT

11:06AM  15    THERANOS AT THE TIME?

11:06AM  16    A.   IT DID AT THAT TIME.

11:06AM  17    Q.   DID THAT POSITIVE ATTITUDE ABOUT THE COMPANY CHANGE OVER

11:06AM  18    THE COURSE OF YOUR EMPLOYMENT AT THERANOS?

11:06AM  19    A.   CAN YOU RESTATE THE QUESTION, PLEASE?

11:06AM  20    Q.   SURE.  THE VIEWS THAT YOU EXPRESSED IN THAT EMAIL --

11:07AM  21    A.   YES.

11:07AM  22    Q.   -- WHERE YOU WERE POSITIVE AND HOPEFUL ABOUT THE COMPANY,

11:07AM  23    DID YOU KEEP FEELING THAT WAY THROUGHOUT YOUR TIME WORKING AT

11:07AM  24    THERANOS?

11:07AM  25    A.   WELL, THERE WERE TWO EXPRESSIONS THERE.  ONE WAS THE

11:07AM 1    CALIBER OF THE PEOPLE, BUT THE OVERALL FEELING OF THE COMPANY.

11:07AM 2        THERE WERE -- I LEFT THERE STILL FEELING THAT THERE WAS A

11:07AM 3    VERY HIGH CALIBER OF PERSONS THAT WERE WORKING THERE, BUT I

11:07AM 4    DIDN'T HAVE A HIGH OPINION OF THE COMPANY OVERALL.

11:07AM 5    Q.   IN THAT EMAIL YOU EXPRESSED OPTIMISM ABOUT THE COMPANY'S

11:07AM 6    CHANCE OF SUCCESS.

11:07AM 7        DO YOU RECALL THAT?

11:07AM 8    A.   EXCITEMENT.

11:07AM 9    Q.   AND DID THAT EXCITEMENT STAY WITH YOU THROUGHOUT YOUR TIME

11:07AM 10   AT THE COMPANY?

11:07AM 11   A.   IT DID NOT.

11:07AM 12   Q.   OKAY.  AND CAN YOU SUMMARIZE WHY NOT?

11:07AM 13   A.   WELL, FOR ONE, THE TESTS THAT WERE DEVELOPED AT THERANOS,

11:07AM 14   THE EDISONS DIDN'T WORK VERY WELL.

11:07AM 15       THEY -- IT REQUIRED THAT WE HAVE A LOT OF MACHINES, AND

11:07AM 16   MANY OF THE MACHINES WOULD FAIL REGULARLY, AND THAT'S WHY WE

11:07AM 17   NEEDED A LOT OF MACHINES.

11:08AM 18       THE CHEMISTRIES WERE RUN ON MODIFIED THIRD PARTY DEVICES,

11:08AM 19   THEY WEREN'T RUN ON THERANOS TECHNOLOGY, AND THEY FACED

11:08AM 20   CHALLENGES AS WELL.

11:08AM 21       THE -- WHEN WE, THAT WOULD BE LAB DIRECTORS OR CLIA

11:08AM 22   PERSONNEL, SOUGHT TO DO OUR JOBS AND TO TROUBLESHOOT OR TO

11:08AM 23   MAYBE PUT CERTAIN TESTING ASIDE WHILE WE WORKED ON THEM, WE MET

11:08AM 24   CHALLENGES WITH MANAGEMENT WHEN WE SOUGHT TO DO THAT.

11:08AM 25       AND SO IT DIDN'T FEEL LIKE A VERY GOOD PLACE TO ME.  I

11:08AM   1    WANTED THIS TO BE -- I THOUGHT THIS WAS SOMETHING MORE MATURE

11:08AM   2    IN ASSISTING THE PUBLIC'S HEALTH AND IT WAS FAR FROM THAT.

11:08AM   3    Q.   I WOULD LIKE TO TALK NOW ABOUT THE DAYS LEADING UP TO YOUR

11:08AM   4    DEPARTURE FROM THE COMPANY.

11:08AM   5         FIRST, JUST SO WE'RE CLEAR, DO YOU RECALL CONVERSATIONS

11:08AM   6    ABOUT A MEETING THAT YOU HAD WITH MR. BALWANI AND MS. HOLMES

11:08AM   7    WHERE YOU SUGGESTED MEETINGS SO THAT MS. HOLMES COULD MAKE

11:09AM   8    SURE, FOR EXAMPLE, THAT SHE WAS PROVIDING ACCURATE INFORMATION

11:09AM   9    ABOUT THE COMPANY?

11:09AM   10   A.   YES, I RECALL.

11:09AM   11   Q.   AND DO YOU KNOW EXACTLY WHEN THAT MEETING HAPPENED SITTING

11:09AM   12   HERE TODAY?

11:09AM   13   A.   NO.

11:09AM   14   Q.   YOU TESTIFIED EARLIER THAT IT WAS SOMETIME AROUND YOUR

11:09AM   15   BIRTHDAY.

11:09AM   16   A.   YES.

11:09AM   17   Q.   YOU TESTIFIED THAT YOU RESIGNED VERY SHORTLY AFTER THAT

11:09AM   18   MEETING.

11:09AM   19        IS THAT STILL YOUR TESTIMONY?

11:09AM   20   A.   YES.

11:09AM   21   Q.   AND WHEN YOU RESIGNED, DID YOU WALK OUT OF THE BUILDING

11:09AM   22   IMMEDIATELY THAT DAY, OR WAS THAT YOU GIVING YOUR TWO WEEK

11:09AM   23   NOTICE, OR SOMETHING ELSE?

11:09AM   24   A.   MY RECOLLECTION IS THAT I HAD A CONVERSATION WITH

11:09AM   25   MONA RAMAMURTHY WHEREUPON SHE -- WELL, I DON'T REMEMBER THE

11:09AM 1    EXACT NATURE OF THAT.

11:09AM 2         AND I REMEMBER GOING TO -- EXITING THROUGH THE SECURITY

11:09AM 3    OFFICE AND TALKING TO SOMEBODY NAMED EDGAR, AND THEN I REMEMBER

11:10AM 4    HE EITHER COMING OUTSIDE WITH ME OR WALKING ME ALL OF THE WAY,

11:10AM 5    I'M NOT SURE I REMEMBER, TO MY CAR.

11:10AM 6         AND HE SAID TO ME, SUNNY CALLED DOWN AND SAID I HAVE TO

11:10AM 7    SEARCH YOUR CAR.

11:10AM 8         AND I SAID, YOU DON'T HAVE TO SEARCH MY CAR, EDGAR.

11:10AM 9         AND HE SAID, YOU'RE RIGHT, I DON'T HAVE TO SEARCH YOUR

11:10AM 10   CARE.

11:10AM 11        AND I LEFT.

11:10AM 12   Q.   SO THAT MOMENT STANDS OUT IN YOUR MIND?

11:10AM 13   A.   YEAH.

11:10AM 14   Q.   AND DO YOU HAVE A MEMORY ONE WAY OR ANOTHER OF WHETHER

11:10AM 15   THAT HAPPENED ON THE SAME DAY AS YOUR MEETING WITH MR. BALWANI

11:10AM 16   AND MS. HOLMES, OR A WEEK LATER?  CAN YOU TELL US ONE WAY OR

11:10AM 17   ANOTHER?

11:10AM 18   A.   I RECALL IT HAPPENING THE SAME DAY.

11:10AM 19   Q.   THERE WAS DISCUSSION WITH MR. CAZARES ABOUT THE "WIRED"

11:10AM 20   ARTICLE AS WELL WHERE YOU SAW SOME INACCURATE OR MISLEADING

11:10AM 21   STATEMENTS.

11:10AM 22        DO YOU RECALL THAT?

11:10AM 23   A.   I RECALL.

11:10AM 24   Q.   AND MR. CAZARES ASKED YOU WHETHER YOU HAD IN FACT RECEIVED

11:10AM 25   THAT ARTICLE IN FEBRUARY OF 2014; IS THAT RIGHT?

11:10AM   1     A.   HE DID.

11:10AM   2     Q.   AND I'LL ASK YOU TO TURN TO -- OR ACTUALLY LET'S PROJECT

11:10AM   3     EXHIBIT 1599, WHICH IS THAT ARTICLE.  THIS WAS PREVIOUSLY

11:11AM   4     ADMITTED.

11:11AM   5          ACTUALLY, NO, LET'S TAKE THAT DOWN.  I'M SORRY?

11:11AM   6               MR. CAZARES:  THAT'S NOT IN EVIDENCE.

11:11AM   7               MR. BOSTIC:  IT'S NOT IN EVIDENCE.

11:11AM   8     Q.   DR. PANDORI, APOLOGIES.

11:11AM   9          IF I COULD ASK YOU TO TURN TO EXHIBIT 1599.  AND THAT'S

11:11AM  10     IN --

11:11AM  11     A.   DO YOU KNOW WHAT VOLUME THAT IS IN?

11:11AM  12     Q.   THAT'S IN THE WHITE BINDER, THE GOVERNMENT BINDER.

11:11AM  13     A.   OKAY.  I'M THERE.

11:11AM  14     Q.   AND WE WERE JUST TALKING ABOUT MR. CAZARES'S QUESTIONS TO

11:11AM  15     YOU ABOUT WHETHER YOU HAD RECEIVED THAT ARTICLE IN FEBRUARY OF

11:11AM  16     2014.

11:11AM  17          DO YOU REMEMBER THAT DISCUSSION?

11:11AM  18     A.   YES, I REMEMBER THAT DISCUSSION.

11:11AM  19     Q.   LOOKING AT EXHIBIT 1599, IS THERE A DATE INDICATED ON THAT

11:11AM  20     ARTICLE?

11:11AM  21     A.   YES.

11:11AM  22     Q.   AND WHAT IS THE DATE ON THE ARTICLE?

11:11AM  23     A.   MARCH 2014.

11:11AM  24     Q.   MR. CAZARES SHOWED YOU AN EMAIL WITH A LINK TO A "WIRED"

11:11AM  25     ARTICLE.

PANDORI REDIRECT BY MR. BOSTIC

11:11AM 1        DO YOU REMEMBER THAT?

11:11AM 2    A.   YES.

11:11AM 3    Q.   AND DO YOU KNOW WHETHER THAT LINK WAS TO THE ACTUAL

11:12AM 4    ARTICLE THAT WE HAVE BEEN TALKING ABOUT?

11:12AM 5    A.   NO, I DON'T KNOW THE ANSWER TO THAT QUESTION.

11:12AM 6    Q.   ASSUMING THAT IT WAS AND THE LINK WAS EMAILED TO YOU IN

11:12AM 7    FEBRUARY, DO YOU HAVE A MEMORY OF WHETHER YOU READ THE ARTICLE

11:12AM 8    ON THE DAY THAT YOU RECEIVED IT OR SOMETIME LATER?  DO YOU KNOW

11:12AM 9    THAT?

11:12AM 10   A.   NO, I DON'T KNOW THAT.

11:12AM 11   Q.   I'D LIKE TO TALK TO YOU ABOUT EXHIBIT 20277.

11:12AM 12        MS. WACHS, DO WE HAVE THAT ACCESSIBLE ELECTRONICALLY?

11:12AM 13        AND THIS WAS PREVIOUSLY ADMITTED.

11:12AM 14   A.   OKAY.

11:12AM 15   Q.   AND LET'S ZOOM IN ON THE TEXT OF YOUR EMAIL IN THE MIDDLE

11:12AM 16   OF THE PAGE, JUST THE FIRST FEW PARAGRAPHS.

11:12AM 17        DO YOU REMEMBER READING THIS WITH MR. CAZARES?

11:13AM 18   A.   YES.

11:13AM 19   Q.   AND YOU WRITE, "ADAM AND I WERE ABLE TO DISCUSS WITH ONE

11:13AM 20   ANOTHER THE RESULTS OF OUR ONE ON ONE CONVERSATIONS WITH EACH

11:13AM 21   OF YOU, AND ONE OF EVERYONE'S PRIMARY CONCERNS IS WORK HOURS."

11:13AM 22        DO YOU SEE THAT?

11:13AM 23   A.   YES.

11:13AM 24   Q.   MR. CAZARES POINTED OUT THAT THIS EMAIL DOES NOT MENTION

11:13AM 25   ANY CONCERNS ABOUT THE ACCURACY OR RELIABILITY OF THE DEVICES;

11:13AM  1      IS THAT RIGHT?

11:13AM  2      A.   CORRECT.

11:13AM  3      Q.   WHEN YOU WERE AT THERANOS, DID OTHER STAFF IN THE CLIA LAB

11:13AM  4      EXPRESS CONCERNS TO YOU ABOUT THE ACCURACY OR THE RELIABILITY

11:13AM  5      OF THE EDISON DEVICES?

11:13AM  6              MR. CAZARES:  OBJECTION.  HEARSAY.

11:13AM  7              MR. BOSTIC:  THE DEFENSE OPENED THE DOOR TO THIS,

11:13AM  8      YOUR HONOR.

11:13AM  9              MR. CAZARES:  IT'S STILL HEARSAY.

11:13AM  10             THE COURT:  IS THIS A YES OR NO ANSWER?

11:13AM  11             MR. BOSTIC:  YES, YOUR HONOR, FOR NOW.

11:13AM  12             THE COURT:  OVERRULED.

11:13AM  13         YOU CAN ANSWER YES OR NO.

11:13AM  14             THE WITNESS:  YES.

11:13AM  15     BY MR. BOSTIC:

11:13AM  16     Q.   AND WAS THAT SOMETHING THAT HAPPENED ON MULTIPLE

11:13AM  17     OCCASIONS?

11:13AM  18             MR. CAZARES:  SAME OBJECTION.

11:13AM  19             THE COURT:  OVERRULED.

11:14AM  20         YES OR NO?

11:14AM  21             THE WITNESS:  YES.

11:14AM  22     BY MR. BOSTIC:

11:14AM  23     Q.   IN THE EMAIL YOU WRITE, "ONE OF EVERYONE'S PRIMARY

11:14AM  24     CONCERNS IS WORK HOURS."

11:14AM  25             WHEN YOU WROTE THAT, DID YOU MEAN TO IMPLY THAT NO ONE HAD

11:14AM 1    ANY CONCERNS ABOUT ACCURACY OR RELIABILITY?

11:14AM 2    A.   NO, I DIDN'T MEAN TO IMPLY THAT.

11:14AM 3    Q.   OF THE INDIVIDUALS WHO EXPRESSED CONCERNS TO YOU ABOUT

11:14AM 4    ACCURACY AND RELIABILITY, WAS ERIKA CHEUNG ONE OF THEM?

11:14AM 5         MR. CAZARES:  OBJECTION.  IT CALLS FOR HEARSAY.

11:14AM 6         THE COURT:  SUSTAINED.

11:14AM 7    BY MR. BOSTIC:

11:14AM 8    Q.   LET'S TALK ABOUT THE TRANSITION MEMO THAT YOU REVIEWED

11:14AM 9    WITH MR. CAZARES.

11:14AM 10        WE CAN TAKE THIS EXHIBIT DOWN.

11:14AM 11        AND CAN WE PUT UP EXHIBIT 20279.

11:14AM 12        DR. PANDORI, DO YOU REMEMBER REVIEWING THIS EXHIBIT WITH

11:15AM 13   MR. CAZARES?

11:15AM 14   A.   I DO.

11:15AM 15   Q.   SITTING HERE TODAY, DO YOU HAVE A MEMORY OF WRITING THE

11:15AM 16   TRANSITION MEMO THAT WE'VE BEEN DISCUSSING?

11:15AM 17   A.   I DON'T HAVE A MEMORY OF IT.

11:15AM 18   Q.   YOU WERE ALSO SHOWN EXHIBIT 20498.

11:15AM 19        CAN WE PUT THAT ONE UP, MS. WACHS.

11:15AM 20        DR. PANDORI, YOU SEE THAT THIS IS AN EMAIL THAT ACTUALLY

11:15AM 21   HAS A FROM LINE THAT INDICATES THAT THE EMAIL IS FROM YOU.

11:15AM 22        DO YOU SEE THAT?

11:15AM 23   A.   YES.

11:15AM 24   Q.   THE PREVIOUS EXHIBIT THAT WE LOOKED AT, 20279, LACKED A

11:15AM 25   FROM LINE; IS THAT CORRECT?

PANDORI REDIRECT BY MR. BOSTIC

11:15AM  1     A.   CORRECT.

11:15AM  2     Q.   DID MR. CAZARES SHOW YOU THIS EXHIBIT BEFORE HE ASKED YOU

11:15AM  3     ABOUT WHETHER YOU HAD WRITTEN THE TRANSITION MEMO?

11:15AM  4     A.   NO, THAT'S NOT THE ORDER OF THINGS.

11:16AM  5     Q.   WOULD IT HAVE BEEN HELPFUL TO YOUR RECOLLECTION OF THINGS

11:16AM  6     TO HAVE SEEN THIS EMAIL BEFORE YOU WERE ASKED ABOUT THAT FIRST

11:16AM  7     EMAIL WITH NO FROM LINE?

11:16AM  8     A.   TO SEE THIS EMAIL WITHOUT HAVING SEEN THE TRANSITION

11:16AM  9     DOCUMENT?

11:16AM  10    Q.   DO YOU SEE THAT THIS EMAIL ATTACHES AN ATTACHMENT

11:16AM  11    INDICATING THAT IT IS THE TRANSITION MEMO?

11:16AM  12    A.   YES.

11:16AM  13    Q.   AND WOULD HAVING SEEN THIS EXHIBIT FIRST HAVE BEEN HELPFUL

11:16AM  14    TO YOU?

11:16AM  15    A.   IF IT INCLUDE -- NO -- PERHAPS.

11:16AM  16    Q.   DOES SEEING THIS EXHIBIT HELP YOUR UNDERSTANDING AS FAR AS

11:16AM  17    WHETHER OR NOT YOU SENT THIS EMAIL?

11:16AM  18    A.   DOES IT -- IT HAS A FROM LINE, WHICH MAKES ME FEEL MORE

11:16AM  19    INCLINED THAT I DID.

11:16AM  20    Q.   AND IN THIS EXHIBIT IN PARTICULAR, YOU SEND THE TRANSITION

11:17AM  21    REPORT TO MONA RAMAMURTHY AND SUNNY BALWANI; IS THAT CORRECT?

11:17AM  22    A.   YES.

11:17AM  23    Q.   LET'S LOOK AT THE TEXT OF THAT MEMO ITSELF.  IF WE CAN

11:17AM  24    FLIP FORWARD THROUGH THE DOCUMENT.

11:17AM  25         LET'S GO TO -- KEEP GOING.  WE'RE LOOKING FOR THE SECTION

11:17AM  1    ON EDISONS, WHICH I THINK IS ON PAGE 6.  THERE WE GO.

11:17AM  2         OKAY.  DO YOU SEE UNDER OTHER NOTES THERE'S A SECTION ON

11:17AM  3    EDISONS?

11:17AM  4    A.   YES.

11:17AM  5    Q.   AND IT SAYS HERE, "THE PRIMARY CONCERN IN THIS SECTION IS

11:17AM  6    THE AVAILABLE NUMBER OF DEVICES."

11:17AM  7         DO YOU SEE THAT?

11:17AM  8    A.   YES.

11:17AM  9    Q.   ARE YOU GENERALLY FAMILIAR WITH THE CONCEPT OF A

11:17AM  10   TRANSITION MEMO?

11:17AM  11   A.   YES.

11:17AM  12   Q.   IN THIS CASE, WHAT WOULD THE GOAL HAVE BEEN IN WRITING

11:18AM  13   THIS MEMO DURING THE TIME THAT YOU WERE LEAVING THE COMPANY?

11:18AM  14            MR. CAZARES:  OBJECTION.  FOUNDATION.  CALLS FOR

11:18AM  15   SPECULATION BASED ON THE WITNESS'S TESTIMONY ALREADY.

11:18AM  16            THE COURT:  REGARDING WHETHER HE WROTE IT OR NOT?  I

11:18AM  17   THINK THERE'S A FOUNDATION.

11:18AM  18        SUSTAINED.

11:18AM  19   BY MR. BOSTIC:

11:18AM  20   Q.   LET'S LOOK INSTEAD AT 20496.

11:18AM  21        DR. PANDORI, DO YOU REMEMBER DISCUSSING THIS EXHIBIT WITH

11:18AM  22   MR. CAZARES?

11:18AM  23   A.   YES.

11:18AM  24   Q.   AND IS THIS AN EMAIL FROM MS. RAMAMURTHY ASKING FOR A

11:18AM  25   TRANSITION MEMO?

11:18AM 1    A.   IT'S ASKING ME FOR SOME INFORMATION ABOUT THE LAB.

11:18AM 2    Q.   OKAY.  AND DID THE TRANSITION MEMO THAT WE LOOKED AT

11:18AM 3    SATISFY THIS REQUEST?

11:19AM 4    A.   YES.

11:19AM 5    Q.   AND MR. CAZARES POINTED OUT THAT THIS ASKS FOR ANYTHING

11:19AM 6    ELSE THAT YOU BELIEVE NEEDS TO BE DOCUMENTED FOR EFFECTIVE

11:19AM 7    TRANSITION PURPOSES.

11:19AM 8        DO YOU SEE THAT?

11:19AM 9    A.   I DO.

11:19AM 10   Q.   FOR EFFECTIVE TRANSITION PURPOSES IN THE SITUATION THAT

11:19AM 11   YOU WERE IN, WHY DID YOU DECIDE NOT TO DOCUMENT THE CONCERNS

11:19AM 12   THAT YOU HAD ABOUT THE ACCURACY AND RELIABILITY OF THERANOS

11:19AM 13   TESTING?

11:19AM 14          MR. CAZARES:  OBJECTION.  SPECULATION.  IT CALLS FOR

11:19AM 15   SPECULATION BASED ON THE WITNESS'S TESTIMONY ALREADY.

11:19AM 16          THE COURT:  OVERRULED.

11:19AM 17       YOU CAN ANSWER THE QUESTION.

11:19AM 18   BY MR. BOSTIC:

11:19AM 19   Q.   WOULD YOU LIKE THE QUESTION AGAIN, DOCTOR?

11:19AM 20   A.   NO.  I HAD ALREADY MADE MY CONCERNS KNOWN AT THAT TIME,

11:19AM 21   AND WHAT I WANTED TO HAVE DONE, NOBODY WAS GOING TO DO THAT, SO

11:19AM 22   WHAT POINT WAS THERE TO PUSH THIS FURTHER.

11:19AM 23       THERE WAS NO -- I DIDN'T HAVE THE AUTHORITY TO MAKE THAT

11:19AM 24   DECISION.  ASKING REPEATEDLY WOULD BE SOMEWHAT AKIN TO HITTING

11:19AM 25   YOUR HEAD AGAINST THE WALL.

PANDORI REDIRECT BY MR. BOSTIC

11:19AM 1   Q.   AND WE SAW A FEW MINUTES AGO THAT THIS TRANSITION MEMO WAS

11:20AM 2   SENT TO MR. BALWANI; IS THAT CORRECT?

11:20AM 3   A.   IN ADDITION TO MS. MONA RAMAMURTHY, I BELIEVE.

11:20AM 4   Q.   AND YOU SAID THAT YOU HAD PREVIOUSLY RAISED YOUR CONCERNS.

11:20AM 5        HAD YOU SPECIFICALLY RAISED THOSE CONCERNS TO MR. BALWANI

11:20AM 6   HIMSELF?

11:20AM 7   A.   YES.

11:20AM 8   Q.   AND WE ALSO SAW AN INSTANCE WHERE THE TRANSITION MEMO WAS

11:20AM 9   SENT TO DR. ROSENDORFF; IS THAT CORRECT?

11:20AM 10  A.   CORRECT.

11:20AM 11  Q.   AND AT THAT POINT HAD YOU ALREADY RAISED YOUR CONCERNS TO

11:20AM 12  DR. ROSENDORFF?

11:20AM 13  A.   ON MANY OCCASIONS.

11:20AM 14  Q.   DESCRIBE THAT.  HOW FREQUENTLY DID YOU HAVE THESE

11:20AM 15  CONVERSATIONS AND HOW DID THAT TOPIC COME UP?

11:20AM 16  A.   MORE THAN ONCE PER WEEK, AND IT CAME UP BECAUSE IT WAS A

11:20AM 17  NORMAL COURSE OF CONVERSATION BETWEEN DR. ROSENDORFF AND

11:20AM 18  MYSELF.

11:20AM 19  Q.   AND WHEN WE'RE TALKING ABOUT THIS SUBJECT, WHAT DO YOU

11:20AM 20  MEAN SPECIFICALLY?  WHAT ISSUES WERE BEING DISCUSSED ON A

11:20AM 21  REGULAR OCCASION WITH DR. ROSENDORFF?

11:20AM 22  A.   THE QUALITY OF THE MACHINERY AND THE QUALITY OF LAB

11:21AM 23  TESTING AT NORMANDY.

11:21AM 24  Q.   SO FOR THIS TRANSITION MEMO, IF IT WAS FOR

11:21AM 25  DR. ROSENDORFF'S BENEFIT, WOULD THERE HAVE BEEN ANY NEED TO

11:21AM   1    INCLUDE THOSE CONCERNS IN THE TRANSITION MEMO?

11:21AM   2              MR. CAZARES:  OBJECTION.  CALLS FOR SPECULATION AND

11:21AM   3    FOUNDATION.

11:21AM   4              THE COURT:  ARE YOU ASKING IF HE SENT THIS TO

11:21AM   5    DR. ROSENDORFF?

11:21AM   6              MR. BOSTIC:  NO.  I'M ASKING HIM ABOUT HIS PREVIOUS

11:21AM   7    CONVERSATIONS AND WHETHER ADDITIONAL DETAIL WOULD HAVE BEEN

11:21AM   8    NECESSARY.

11:21AM   9              MR. CAZARES:  AGAIN, IT CALLS FOR FOUNDATION AND

11:21AM  10    SPECULATION BASED ON HIS TESTIMONY ABOUT THE MEMO.

11:21AM  11              THE COURT:  I'LL SUSTAIN THE OBJECTION TO THAT

11:21AM  12    QUESTION.

11:21AM  13    BY MR. BOSTIC:

11:22AM  14    Q.   LET'S GO BACK TO THAT MEMO ITSELF.

11:22AM  15         SO IF WE CAN LOOK AT 20279 AND GO BACK TO THE SECTION ON

11:22AM  16    EDISONS, WHICH I THINK IS PAGE 6.

11:22AM  17         AND, DR. PANDORI, IN THIS SECTION YOU MENTION A NEED FOR

11:22AM  18    MORE UNITS; IS THAT CORRECT?

11:22AM  19    A.   CORRECT.

11:22AM  20    Q.   AND WE SAW OTHER INSTANCES WHERE YOU RECOMMENDED THAT THE

11:22AM  21    LAB OBTAIN AND USE MORE EDISON ANALYZERS; IS THAT RIGHT?

11:22AM  22    A.   THAT'S CORRECT.

11:22AM  23    Q.   AND WHY WAS THAT YOUR RECOMMENDATION IF YOU HAD CONCERNS

11:22AM  24    ABOUT THE ACCURACY AND RELIABILITY OF THE EDISONS?

11:22AM  25    A.   WELL, WE DIDN'T FULLY UNDERSTAND THE NATURE OF THE TROUBLE

11:22AM 1    WITH THE INSTRUMENT.  THAT WAS STILL BEING ASCERTAINED.

11:22AM 2        BUT SOME OF THEM WOULD PASS QUALITY CONTROL, AND SO IF YOU

11:22AM 3    WANTED TO GET PATIENT SPECIMENS DONE, YOU COULD TEST A WIDER

11:23AM 4    NUMBER OF INSTRUMENTS AND SEE WHICH ONCE WERE FUNCTIONING

11:23AM 5    CORRECTLY.

11:23AM 6    Q.   WE TALKED EARLIER ABOUT HOW MANY EDISONS WERE REQUIRED TO

11:23AM 7    RUN A PATIENT SAMPLE.

11:23AM 8        DO YOU RECALL THAT?

11:23AM 9    A.   YES.

11:23AM 10   Q.   HOW MANY EDISONS WERE NEEDED IN A GROUP TO RUN A SINGLE

11:23AM 11   PATIENT ASSAY?

11:23AM 12   A.   WELL, IT DEPENDS IF I ANSWER ON AVERAGE.  BUT ONE EDISON,

11:23AM 13   IF IT WAS WORKING CORRECTLY, COULD TEST ONE PATIENT SAMPLE.

11:23AM 14   Q.   ARE YOU AWARE OF A PRACTICE AT THERANOS WHERE DEVICES WERE

11:23AM 15   USED IN GROUPS OF THREE AND THEN SAMPLES, SAMPLE RESULTS WERE

11:23AM 16   AVERAGED OUT?

11:23AM 17   A.   YES.

11:23AM 18   Q.   DID THAT NEED, THE NEED TO RUN SAMPLES IN GROUPS OF THREE,

11:23AM 19   INCREASE THE NEED FOR ADDITIONAL EDISONS?

11:23AM 20   A.   YES.

11:24AM 21   Q.   DO YOU REMEMBER BEING SHOWN AN EMAIL BY MR. CAZARES WHERE

11:24AM 22   MR. BALWANI TOLD YOU THAT INVOLVEMENT OF THE PRODUCT MANAGEMENT

11:24AM 23   TEAM SHOULD BE ON YOUR TERMS?

11:24AM 24   A.   YES.

11:24AM 25   Q.   AND WAS THAT HOW IT ENDED UP WORKING DURING YOUR TIME AT

11:24AM 1    THERANOS?

11:24AM 2    A.   NO.

11:24AM 3    Q.   AND HOW DID IT ACTUALLY WORK AT THERANOS?

11:24AM 4    A.   FOR THE ENTIRETY OF MY TIME AT THERANOS, PRODUCT

11:24AM 5    MANAGEMENT TEAM MEMBERS HAD A SIGNIFICANT INFLUENCE IN ALL

11:24AM 6    MATTERS THAT I ENGAGED IN.

11:24AM 7    Q.   INCLUDING CLINICAL MATTERS?

11:24AM 8    A.   YES.

11:24AM 9    Q.   AND WHO DID THE PRODUCT MANAGEMENT TEAM REPORT TO?

11:24AM 10   A.   I DON'T REMEMBER THEIR STRUCTURE EXACTLY.  I BELIEVED IT

11:24AM 11   WAS SUNNY BALWANI.

11:24AM 12   Q.   DO YOU RECALL TESTIFYING ABOUT A TIME WHERE MR. BALWANI

11:24AM 13   CAME TO YOUR OFFICE TO CONFRONT YOU ABOUT YOUR VIEWS ON THE

11:24AM 14   EDISON?

11:24AM 15   A.   YES.

11:24AM 16   Q.   AND CAN YOU REMIND US WHO ACCOMPANIED HIM WHEN HE CAME TO

11:24AM 17   YOUR OFFICE TO DISCUSS THAT?

11:25AM 18   A.   TWO PRODUCT MANAGERS.

11:25AM 19   Q.   DO YOU RECALL, DURING CROSS-EXAMINATION, TALKING WITH

11:25AM 20   MR. CAZARES ABOUT CLIA REGULATIONS AND WHAT THEY SAY ABOUT THE

11:25AM 21   ROLE OF LAB DIRECTOR?

11:25AM 22   A.   YES.

11:25AM 23   Q.   AND WOULD YOU AGREE THAT CLIA REGULATIONS IN GENERAL SAY

11:25AM 24   THAT THE LAB DIRECTOR HAS A LOT OF AUTHORITY?

11:25AM 25   A.   YES.

11:25AM 1    Q.   AND THAT THE LAB DIRECTOR IS RESPONSIBLE FOR A NUMBER OF

11:25AM 2    THINGS WITHIN THE LAB, INCLUDING THE QUALITY OF THE RESULTS?

11:25AM 3    A.   YES.

11:25AM 4    Q.   TO DO THAT JOB, DOES A LAB DIRECTOR NEED TO HAVE AUTONOMY

11:25AM 5    AND AUTHORITY?

11:25AM 6             MR. CAZARES:  OBJECTION.  CALLS FOR SPECULATION.

11:25AM 7    FOUNDATION.

11:25AM 8             MR. BOSTIC:  I'M ASKING HIM ABOUT HIS JOB,

11:25AM 9    YOUR HONOR.

11:25AM 10            THE COURT:  OVERRULED.

11:25AM 11            THE WITNESS:  YOU KNOW, A LAB DIRECTOR NEEDS TO HAVE

11:25AM 12   THE AUTHORITY TO MAKE A LOT OF DIFFERENT DECISIONS IN ORDER TO

11:25AM 13   PERFORM THAT JOB CORRECTLY.

11:25AM 14   BY MR. BOSTIC:

11:25AM 15   Q.   AND AS LAB DIRECTOR AT THERANOS, DID MR. BALWANI AND

11:25AM 16   MS. HOLMES GIVE YOU THE LEVEL OF AUTHORITY THAT YOU NEEDED TO

11:26AM 17   ACT EFFECTIVELY AS A LAB DIRECTOR?

11:26AM 18            MR. CAZARES:  OBJECTION.  THE LAB DIRECTOR?

11:26AM 19   FOUNDATION, SPECULATION, AND ACTUALLY 403.

11:26AM 20            THE COURT:  THIS IS RELATED TO HIS JOB?

11:26AM 21            MR. BOSTIC:  YES, YOUR HONOR.

11:26AM 22            THE COURT:  HIS OPINION OF HIS JOB?

11:26AM 23            MR. BOSTIC:  YES, YOUR HONOR.

11:26AM 24            THE COURT:  OVERRULED.

11:26AM 25   BY MR. BOSTIC:

11:26AM  1    Q.   I'LL ASK YOU THE QUESTION AGAIN, DR. PANDORI, AND THAT

11:26AM  2    QUESTION IS -- FIRST OF ALL, CAN YOU REMIND US, WHAT WAS YOUR

11:26AM  3    JOB TITLE AND ROLE AT THERANOS?

11:26AM  4    A.   THE JOB TITLE WAS LABORATORY DIRECTOR.

11:26AM  5         THE ROLE WAS MORE OF A LOGISTICAL ASSISTANT DIRECTOR.

11:26AM  6    Q.   AND WE TALKED ABOUT WHAT THE REGULATIONS SAY ON PAPER

11:26AM  7    ABOUT THE LAB DIRECTOR ROLE; CORRECT?

11:26AM  8    A.   WE TALKED ABOUT THAT.

11:26AM  9    Q.   AND MY QUESTION NOW IS, DID MR. BALWANI AND MS. HOLMES

11:26AM  10   GIVE YOU AND DR. ROSENDORFF THE AUTHORITY AND POWER YOU NEEDED

11:26AM  11   IN THE COMPANY TO DO THAT JOB CORRECTLY?

11:26AM  12             MR. CAZARES:  OBJECTION.  403, FOUNDATION, CALLS FOR

11:26AM  13   SPECULATION.

11:26AM  14             THE COURT:  OVERRULED.

11:26AM  15             THE WITNESS:  NOT IN MY OPINION.

11:27AM  16   BY MR. BOSTIC:

11:27AM  17   Q.   AND WHY DO YOU SAY THAT?

11:27AM  18   A.   BECAUSE CERTAIN THINGS THAT I FELT THAT WE NEEDED TO DO IN

11:27AM  19   FURTHERANCE OF PATIENT SAFETY AND QUALITY, I DIDN'T HAVE THE

11:27AM  20   AUTHORITY TO MAKE THOSE DECISIONS.

11:27AM  21   Q.   AND ARE THOSE THE THINGS THAT WE HAVE BEEN DISCUSSING

11:27AM  22   THROUGHOUT YOUR TESTIMONY?

11:27AM  23   A.   YES.

11:27AM  24             MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

11:27AM  25             THE COURT:  YES.

PANDORI REDIRECT BY MR. BOSTIC

11:27AM   1          (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:27AM   2               MR. BOSTIC:  NO FURTHER QUESTIONS.

11:27AM   3          THANK YOU, DR. PANDORI.

11:27AM   4          YOU CAN TAKE THAT DOWN.

11:27AM   5               THE COURT:  DO YOU HAVE RECROSS?

11:27AM   6               MR. CAZARES:  I DO, YOUR HONOR.

11:27AM   7               THE COURT:  ALL RIGHT.  LET'S TAKE OUR BREAK, LADIES

11:27AM   8     AND GENTLEMEN, AND THEN WE'LL CONTINUE WITH DR. PANDORI.

11:27AM   9          THANK YOU.

11:27AM  10          (RECESS FROM 11:27 A.M. UNTIL 12:10 P.M.)

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

```
12:10PM   1              AFTERNOON SESSION

12:10PM   2         (JURY IN AT 12:10 P.M.)

12:10PM   3            THE COURT:  ALL COUNSEL ARE PRESENT.

12:10PM   4      THE JURY AND ALTERNATES ARE PRESENT.

12:11PM   5      DR. PANDORI IS BACK ON THE STAND.

12:11PM   6      YOU HAVE RECROSS?

12:11PM   7            MR. CAZARES:  A LITTLE BIT, YOUR HONOR.  THANK YOU.

12:11PM   8            THE COURT:  ALL RIGHT.

12:11PM   9              RECROSS-EXAMINATION

12:11PM  10  BY MR. CAZARES:

12:11PM  11  Q.   DR. PANDORI, YOU WERE ASKED ON REDIRECT ABOUT THE EMAIL

12:11PM  12  THAT IS REFLECTED IN EXHIBIT 20548, WHICH IS IN EVIDENCE.

12:11PM  13       CAN WE PUT THAT UP ON THE SCREEN.

12:11PM  14  A.   I SEE IT.

12:11PM  15  Q.   OKAY.  AND YOU RECALL THE MESSAGE AT THE LOWER PORTION OF

12:11PM  16  THE EXHIBIT FROM DANIEL YOUNG, THAT'S DR. YOUNG, WHO YOU'RE

12:11PM  17  FAMILIAR WITH; CORRECT?

12:11PM  18  A.   CORRECT.

12:11PM  19  Q.   AND THAT'S FEBRUARY 20, 2014.

12:11PM  20       DO YOU SEE THE DATE?

12:11PM  21  A.   I SEE IT.

12:11PM  22  Q.   AND THEN THERE'S A LINK TO AN INTERNET "WIRED" ARTICLE AND

12:11PM  23  THE DOCUMENT REFLECTS ELIZABETH HOLMES - THERANOS.

12:12PM  24       DO YOU SEE THAT?

12:12PM  25  A.   I DO.
```

12:12PM   1    Q.   AND IT APPEARS SOMEONE FORWARDED THAT MESSAGE, A

12:12PM   2    SWAPNA JOSHI.

12:12PM   3         YOU KNOW WHO DR. JOSHI IS; CORRECT?

12:12PM   4    A.   NO, I DON'T.

12:12PM   5    Q.   SOMEONE THAT WORKED AT THERANOS?

12:12PM   6    A.   IT APPEARS SO.

12:12PM   7    Q.   AND THE MESSAGE WAS SENT TO YOU ON FEBRUARY 27TH, 2014.

12:12PM   8         DO YOU SEE THAT?

12:12PM   9    A.   YES.

12:12PM  10    Q.   AND EMBEDDED IN THAT MESSAGE IS THE LINK TO THE "WIRED"

12:12PM  11    ARTICLE.

12:12PM  12         DO YOU SEE THAT?

12:12PM  13    A.   YES.

12:12PM  14    Q.   AND YOU'RE AWARE OF THE FACT THAT "WIRED" ISSUES ITS

12:12PM  15    ARTICLES ONLINE BEFORE IT ACTUALLY MAKES AVAILABLE THE HARD

12:12PM  16    COPY MAGAZINES ON NEWS STANDS; CORRECT?

12:12PM  17    A.   I'M NOT AWARE OF THAT FACT.

12:12PM  18    Q.   YOU CAN TAKE THAT DOWN, MR. ALLEN.

12:12PM  19         YOU WERE ASKED SOME QUESTIONS BY MR. BOSTIC ON REDIRECT

12:12PM  20    RELATING TO, AGAIN, THE NEW YORK PROFICIENCY SAMPLE EXPERIMENT

12:13PM  21    THAT WAS DONE IN FEBRUARY OF 2014.

12:13PM  22         DO YOU RECALL THAT?

12:13PM  23    A.   WAS IT A SPREADSHEET?

12:13PM  24    Q.   THE SPREADSHEET AND THE EXPERIMENT UNDERLYING THE

12:13PM  25    EXPERIMENT.

12:13PM  1         DO YOU RECALL THAT?

12:13PM  2    A.   OH, I RECALL THAT.

12:13PM  3    Q.   AND THAT WAS IN FEBRUARY OF 2014; CORRECT?

12:13PM  4    A.   I THINK SO.  YOU'D HAVE TO SHOW ME THE DATE AGAIN.

12:13PM  5    Q.   AND YOU TESTIFIED THAT YOU WERE THE PERSON WHO CAME UP

12:13PM  6    WITH THE IDEA TO DO THAT EXPERIMENT; CORRECT?

12:13PM  7    A.   THAT'S MY UNDERSTANDING.

12:13PM  8    Q.   AND AT THE TIME THAT YOU CAME UP WITH THAT IDEA, YOU WERE

12:13PM  9    UNAWARE OF THE FACT THAT DR. ROSENDORFF HAD ALREADY

12:13PM 10    IMPLEMENTED, VALIDATED, SIGNED OFF ON A STANDARD OPERATING

12:13PM 11    PROCEDURE TO PERFORM AAP ON THERANOS EDISON DEVICES; CORRECT?

12:13PM 12              MR. BOSTIC:  OBJECTION.  VAGUE.  COMPOUND.

12:13PM 13              THE COURT:  DID YOU UNDERSTAND THE QUESTION?

12:13PM 14              THE WITNESS:  THERE WERE SEVERAL VERBS.

12:13PM 15              THE COURT:  WHY DON'T YOU REPHRASE?

12:13PM 16    BY MR. CAZARES:

12:13PM 17    Q.   AT THE TIME, AT THE TIME THAT YOU SUGGESTED THE EXPERIMENT

12:13PM 18    IN FEBRUARY OF 2014 WITH THE NEW YORK PROFICIENCY TESTING

12:13PM 19    SAMPLES, YOU WERE UNAWARE THAT DR. ROSENDORFF HAD ALREADY

12:13PM 20    SIGNED OFF AND APPROVED A STANDARD OPERATING PROCEDURE FOR AAP

12:14PM 21    ON EDISON DEVICES; CORRECT?

12:14PM 22    A.   CORRECT.

12:14PM 23    Q.   AND THAT EXPERIMENT THAT YOU PERFORMED WASN'T PERFORMED

12:14PM 24    CONSISTENT WITH THAT STANDARD OPERATING PROCEDURE THAT HAD

12:14PM 25    ALREADY BEEN AUTHORIZED AND APPROVED BY DR. ROSENDORFF;

12:14PM  1    CORRECT?

12:14PM  2    A.   CORRECT.

12:14PM  3    Q.   AND YOU ALSO AGREED, I THINK WITH MR. BOSTIC, DID YOU NOT,

12:14PM  4    THAT THE CLINICAL LABORATORY SHOULD BE OPERATED AND CONDUCTED

12:14PM  5    CONSISTENT WITH THE STANDARD OPERATING PROCEDURES THAT WERE

12:14PM  6    ALREADY AUTHORIZED AND SIGNED OFF ON BY THE CLINICAL LABORATORY

12:14PM  7    DIRECTOR; CORRECT?

12:14PM  8    A.   DID YOU JUST SAY THAT JOHN BOSTIC ASKED ME THAT QUESTION?

12:14PM  9    Q.   WHAT I'M ASKING YOU IS THAT YOU AGREE THAT THE LABORATORY

12:14PM  10   SHOULD BE OPERATED AND ITS EMPLOYEES SHOULD PERFORM TESTING

12:14PM  11   CONSISTENT WITH THE STANDARD OPERATING PROCEDURES THAT WERE

12:14PM  12   APPROVED BY THE CLIA LAB DIRECTOR; CORRECT?

12:15PM  13   A.   IN A DIAGNOSTIC LABORATORY, THAT WOULD BE AN APPROPRIATE

12:15PM  14   COURSE OF ACTION AS LONG AS THOSE SOP'S HAVE BEEN APPROVED BY

12:15PM  15   THE LABORATORY DIRECTOR.

12:15PM  16   Q.   AND ADAM ROSENDORFF WAS THE LABORATORY DIRECTOR DURING THE

12:15PM  17   TIME THAT YOU WORKED AT THERANOS; CORRECT?

12:15PM  18   A.   CORRECT.

12:15PM  19   Q.   IF WE COULD PLEASE PUBLISH EXHIBIT 7440.  IT'S ALREADY IN

12:15PM  20   EVIDENCE.

12:15PM  21        AND, DR. PANDORI, LOOKING ON THE SCREEN, DO YOU SEE 7440

12:15PM  22   IS AN EMAIL THAT WE DISCUSSED EARLIER FROM YOURSELF TO

12:15PM  23   MR. BALWANI AND DR. ROSENDORFF?

12:15PM  24        DO YOU SEE THAT?

12:15PM  25   A.   YES, I DO.

12:15PM  1    Q.   AND THAT'S APRIL 17TH, 2014.

12:15PM  2         DO YOU SEE THAT?

12:15PM  3    A.   YES.

12:15PM  4    Q.   AND THIS IS SUBSEQUENT TO THAT EXPERIMENT USING THE

12:15PM  5    NEW YORK PROFICIENCY TESTING SAMPLES; CORRECT?

12:15PM  6    A.   YES.

12:15PM  7    Q.   AND IN THE MESSAGE YOU INDICATE, "ATTACHED, A SLIDE SHOW I

12:15PM  8    PUT TOGETHER GIVING AN OVERVIEW OF AAP AND HOW IT WORKS AND WHY

12:16PM  9    IT IS BETTER THAN PT."

12:16PM  10        DO YOU SEE THAT?

12:16PM  11   A.   YES.

12:16PM  12   Q.   AND THOSE ARE YOUR WORDS; CORRECT?

12:16PM  13   A.   CORRECT.

12:16PM  14   Q.   AND PT REFERS TO PROFICIENCY TESTING; CORRECT?

12:16PM  15   A.   YES, IT DOES.

12:16PM  16   Q.   AND IF WE CAN GO TO THE UNDERLYING POWERPOINT AT PAGE 6.

12:16PM  17        AND YOU PUT THE POWERPOINT TOGETHER; CORRECT?

12:16PM  18   A.   THAT'S MY -- YES.

12:16PM  19   Q.   AND INCLUDED IN THE POWERPOINT YOU PROVIDED TO MR. BALWANI

12:16PM  20   AND DR. ROSENDORFF, YOU WRITE, OR WROTE, IN THE PRESENTATION,

12:16PM  21   "THERANOS TESTS HAVE NO PEER GROUP."

12:16PM  22        CORRECT?

12:16PM  23   A.   YES.

12:16PM  24   Q.   AND YOU AGREED WITH THAT AT THE TIME; CORRECT?

12:16PM  25   A.   IN APRIL OF '17, IT WAS CLEAR -- ON APRIL 17TH I THINK IS

12:17PM  1    WHEN THAT WAS DATED, THERE WAS NO TECHNICAL PEER.

12:17PM  2    Q.   AND YOU ALSO WROTE IN THE PRESENTATION, "NORMAL PROCESS OF

12:17PM  3    PT IS THEREFORE NOT APPROPRIATE," EXCLAMATION POINT.

12:17PM  4         DO YOU SEE THAT?

12:17PM  5    A.   YES.

12:17PM  6    Q.   AND AGAIN, THIS IS YOUR PRESENTATION?

12:17PM  7    A.   CORRECT.

12:17PM  8    Q.   AND YOU AGREED WITH THAT AT THE TIME; CORRECT?

12:17PM  9    A.   CORRECT.

12:17PM  10            MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

12:17PM  11            THE COURT:  MR. BOSTIC?

12:17PM  12            MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

12:17PM  13            THE COURT:  MAY THIS WITNESS BE EXCUSED?

12:17PM  14            MR. CAZARES:  YES, YOUR HONOR.

12:17PM  15            MR. BOSTIC:  YES, YOUR HONOR.

12:17PM  16            THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU.

12:17PM  17        DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL?

12:17PM  18            MR. SCHENK:  YES, YOUR HONOR.

12:17PM  19        THE UNITED STATES CALLS CONSTANCE CULLEN.

12:18PM  20            THE COURT:  GOOD MORNING.  IF YOU WOULD JUST STAND

12:18PM  21    THERE AND RAISE YOUR RIGHT HAND WHILE YOU FACE OUR COURTROOM

12:18PM  22    DEPUTY, SHE HAS A QUESTION FOR YOU.

12:18PM  23        **(GOVERNMENT'S WITNESS, CONSTANCE CULLEN, WAS SWORN.)**

12:18PM  24            THE WITNESS:  YES.

12:18PM  25            THE COURT:  THANK YOU.

12:18PM 1        LET ME INVITE YOU TO HAVE A SEAT HERE IN THIS CHAIR.  FEEL

12:18PM 2   FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.  I THINK

12:18PM 3   THERE'S SOME REFRESHMENT THERE FOR YOU SHOULD YOU LIKE IT.

12:18PM 4        AND WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR

12:18PM 5   NAME AND THEN SPELL IT, PLEASE.

12:18PM 6            THE WITNESS:  YES.  MY NAME IS CONSTANCE CULLEN.

12:18PM 7   C-O-N-S-T-A-N-C-E, C-U-L-L-E-N.

12:19PM 8            THE COURT:  THANK YOU.  COUNSEL.

12:19PM 9            MR. SCHENK:  THANK YOU, YOUR HONOR.

12:19PM 10                   **DIRECT EXAMINATION**

12:19PM 11  BY MR. SCHENK:

12:19PM 12  Q.  DR. CULLEN, IF YOU ARE FULLY VACCINATED, AND WITH THE

12:19PM 13  COURT'S PERMISSION, I UNDERSTAND THAT YOU MAY TESTIFY WITHOUT A

12:19PM 14  MASK.

12:19PM 15  A.  YES.

12:19PM 16            THE COURT:  YES.  THANK YOU.

12:19PM 17            MR. SCHENK:  AND I'LL DO THE SAME.

12:19PM 18  Q.  DR. CULLEN, WAS THERE A TIME WHEN YOU WERE EMPLOYED BY A

12:19PM 19  COMPANY THAT WENT BY THE NAME OF SCHERING-PLOUGH?

12:19PM 20  A.  YES, I WAS.

12:19PM 21  Q.  AND HOW LONG DID YOU WORK AT SCHERING-PLOUGH?

12:19PM 22  A.  I WORKED THERE FROM 1996 UNTIL 2016.

12:19PM 23  Q.  AND WHILE YOU WERE WORKING AT SCHERING-PLOUGH, DID YOU

12:19PM 24  HAVE THE OPPORTUNITY TO BECOME FAMILIAR WITH ANOTHER COMPANY

12:19PM 25  CALLED THERANOS?

12:19PM  1    A.   YES.

12:19PM  2    Q.   DO YOU REMEMBER WHEN THAT WAS?

12:19PM  3    A.   YES.  IT WAS IN 2009.

12:19PM  4    Q.   AND WHAT WORK WERE YOU DOING AT SCHERING-PLOUGH IN 2009?

12:19PM  5    A.   I WAS LEADING A GROUP THAT WAS KNOWN AS THE BIOANALYTICAL

12:20PM  6    GROUP.  SO THE GROUP WAS RESPONSIBLE FOR DEVELOPING THE ASSAYS

12:20PM  7    THAT ARE NEEDED TO TEST DRUGS AND THE RESPONSES TO DRUGS IN

12:20PM  8    EITHER ANIMAL STUDIES OR HUMAN STUDIES.

12:20PM  9    Q.   OKAY.  WE'LL COME BACK TO THAT WORK IN A MOMENT.

12:20PM  10        I'D LIKE TO HAVE YOU SUMMARIZE YOUR EDUCATIONAL BACKGROUND

12:20PM  11   FOR THE JURY.

12:20PM  12   A.   YES.  I HAVE A PH.D. IN MOLECULAR IMMUNOLOGY AND A

12:20PM  13   BACHELOR'S DEGREE IN MICROBIOLOGY.

12:20PM  14   Q.   OKAY.  AND WHEN YOU STARTED AT SCHERING-PLOUGH IN 1996,

12:20PM  15   WHAT TYPE OF WORK WERE YOU DOING?

12:20PM  16   A.   IT WAS ESSENTIALLY THE SAME.  I HAD BEEN PROMOTED A NUMBER

12:20PM  17   OF TIMES THROUGHOUT THE YEARS UNTIL I WAS ACTUALLY LEADING THE

12:20PM  18   GROUP, SO --

12:20PM  19   Q.   AND WHEN YOU SAY "LEADING THE GROUP," WAS THAT IN 2009?

12:20PM  20   A.   YES, IT WAS.

12:20PM  21   Q.   OKAY.  DO YOU RECALL YOUR TITLE IN 2009?

12:20PM  22   A.   YES, DIRECTOR.

12:20PM  23   Q.   AND WHAT TYPE OF WORK WAS SCHERING-PLOUGH GOING TO DO AT

12:21PM  24   THERANOS THAT LED YOU TO BECOME FAMILIAR WITH THAT COMPANY?

12:21PM  25   A.   SO THERANOS WAS DEVELOPING ASSAYS TO MEASURE A VARIETY OF

1   DIFFERENT COMPONENTS IN HUMAN SERUM SAMPLES, OR BLOOD SAMPLES,

2   AND THAT MESHED VERY NICELY WITH THE WORK THAT WE WERE DOING IN

3   MY LAB.

4   Q.   AND WHAT TYPE OF WORK WERE YOU DOING IN YOUR LAB?

5   A.   WE WERE DESIGNING AND DEVELOPING THE ASSAYS TO MEASURE

6   DRUGS OR MARKERS OF EFFICACY OF THE DRUG IN PATIENT SAMPLES.

7   Q.   AND WHAT DOES THAT MEAN, MARKERS OF THE EFFICACY OF THE

8   DRUG?

9   A.   SO IF YOU'RE TESTING A DRUG, FOR EXAMPLE, THAT IS INTENDED

10   TO TREAT AN INFLAMMATORY AILMENT, THERE ARE WELL-KNOWN MARKERS

11   OF INFLAMMATION, AND YOU MEASURE THE CHANGE IN THOSE MARKERS AS

12   A RESULT OF A PATIENT BEING ADMINISTERED DRUG.

13   Q.   AND WHY WAS MEASURING THOSE MARKERS SOMETHING THAT WAS

14   INTERESTING OR VALUABLE TO YOUR WORK AT SCHERING-PLOUGH?

15   A.   BECAUSE IT PROVED THE EFFICACY OF THE DRUG, WHICH IS

16   REQUIRED AS PART OF OUR REGISTRATION OF THE DRUG WITH THE FOOD

17   AND DRUG ADMINISTRATION OR OTHER HEALTH AUTHORITIES.

18   Q.   DO YOU REMEMBER HOW YOU FIRST BECAME FAMILIAR WITH

19   THERANOS?

20   A.   MY BOSS HAD ASKED ME TO DO SOME WORK WITH THEM.  THAT

21   WAS -- HE ACTUALLY HAD RECEIVED THE REQUEST FROM THE HEAD OF

22   OUR EARLY CLINICAL RESEARCH GROUP.

23       THE EARLY CLINICAL RESEARCH GROUP IS RESPONSIBLE FOR THOSE

24   VERY FIRST HUMAN STUDIES, AND SO THAT GROUP IN PARTICULAR HAS

25   AN INTEREST IN MEASURING THESE MARKERS OF DRUG EFFICACY.

12:22PM  1    Q.   AM I FOLLOWING CORRECTLY, YOUR BOSS HEARD FROM SOMEBODY

12:22PM  2    ELSE THAT --

12:22PM  3    A.   HIS COLLEAGUE, YES.

12:22PM  4    Q.   AND WHAT IS YOUR BOSS'S NAME?

12:23PM  5    A.   STEVE FARRAND.

12:23PM  6    Q.   COULD YOU SPELL THE LAST NAME?

12:23PM  7    A.   F-A-R-R-A-N-D.

12:23PM  8    Q.   OKAY.  AND IS IT DR., DR. FARRAND?

12:23PM  9    A.   YES.

12:23PM  10   Q.   AND DR. FARRAND LEARNED ABOUT THERANOS FROM ANOTHER

12:23PM  11   EMPLOYEE AT SCHERING-PLOUGH?

12:23PM  12   A.   THAT'S RIGHT.  THAT PERSON'S NAME IS JIM MCLEOD,

12:23PM  13   M-C-L-E-O-D.

12:23PM  14   Q.   AND DR. MCLEOD MAKE THIS REFERRAL OR RECOMMENDATION TO

12:23PM  15   DR. FARRAND, WHO THEN BROUGHT YOU IN; IS THAT RIGHT?

12:23PM  16   A.   THAT'S RIGHT.

12:23PM  17   Q.   OKAY.  DO YOU REMEMBER WHAT YOUR FIRST INTRODUCTION OR

12:23PM  18   INTERACTION WITH SOMEBODY AT THERANOS WAS?

12:23PM  19   A.   I BELIEVE THAT I HAD EITHER A PHONE CALL OR AN EMAIL

12:23PM  20   CORRESPONDENCE, OR BOTH, WITH ELIZABETH HOLMES.

12:23PM  21   Q.   AND WAS MS. HOLMES THE INDIVIDUAL WHO YOU FIRST

12:23PM  22   COMMUNICATED WITH AT THERANOS?

12:23PM  23   A.   YES.

12:23PM  24   Q.   THANK YOU.

12:23PM  25        YOUR HONOR, MAY I APPROACH?

12:23PM   1                    THE COURT:  YES.

12:24PM   2                    MR. SCHENK:  (HANDING.)

12:24PM   3       Q.   DR. CULLEN, I'VE HANDED YOU A BINDER OF DOCUMENTS, AND I'M

12:24PM   4       GOING TO ASK YOU TO TURN TO WHAT IS THE FIRST TAB IN THAT

12:24PM   5       BINDER.  IT'S EXHIBIT 188.

12:24PM   6            DO YOU SEE THAT?

12:24PM   7       A.   YES, I DO.

12:24PM   8       Q.   AND I'LL ASK YOU TO LOOK AT IT, AND MY QUESTION IS, IS

12:24PM   9       THIS AN EMAIL EXCHANGE BETWEEN YOU AND MS. HOLMES AT THE

12:24PM  10       BEGINNING OF THIS RELATIONSHIP?

12:24PM  11       A.   YES.

12:24PM  12                    MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 188.

12:24PM  13                    MS. WALSH:  NO OBJECTION.

12:24PM  14                    THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:24PM  15            (GOVERNMENT'S EXHIBIT 188 WAS RECEIVED IN EVIDENCE.)

12:24PM  16       BY MR. SCHENK:

12:24PM  17       Q.   DR. CULLEN, IF WE LOOK AT THE VERY BOTTOM OF THE EMAIL IN

12:24PM  18       THE CHAIN, SO THE FIRST IN TIME, IT LOOKS LIKE MS. HOLMES WROTE

12:24PM  19       TO YOU AT THE END OF FEBRUARY 2009.

12:24PM  20            DO YOU SEE THAT?

12:24PM  21       A.   YES, I DO.

12:24PM  22       Q.   AND SHE REFERENCED A GOOD CALL WITH JIM MCLEOD -- IS THAT

12:25PM  23       THE INDIVIDUAL YOU MENTIONED A MOMENT AGO?

12:25PM  24       A.   THAT'S CORRECT.

12:25PM  25       Q.   -- AND IS LOOKING FOR A TIME TO FOLLOW UP WITH YOU,

12:25PM   1     DR. CULLEN; IS THAT RIGHT?

12:25PM   2     A.   THAT'S CORRECT.

12:25PM   3     Q.   AND THEN AT THE VERY TOP OF THIS DOCUMENT, THE FIRST

12:25PM   4     EMAIL, THE BEGINNING OF MARCH 2009, MS. HOLMES WRITES AGAIN,

12:25PM   5     "TAKE A LOOK AT THE ATTACHED PER OUR CONVERSATION -- IF WE GO

12:25PM   6     DOWN THIS PATH, THERE ARE TWO SETS OF DOCUMENTS THAT WILL

12:25PM   7     COMPLIMENT THIS SUMMARY -- ONE IS THE DETAILED PROTOCOL FOR

12:25PM   8     RUNNING THESE EXPERIMENTS, THE OTHER IS THE CARTRIDGE INSERTS

12:25PM   9     THAT DETAIL PERFORMANCE SPECIFICATIONS."

12:25PM   10         DO YOU SEE THAT?

12:25PM   11    A.   YES.

12:25PM   12    Q.   IT LOOKS LIKE AT THE BEGINNING OF THAT EMAIL MS. HOLMES

12:25PM   13    SAYS, "TAKE A LOOK AT THE ATTACHED, IF WE GO DOWN THIS PATH."

12:25PM   14    WHAT DID YOU UNDERSTAND THAT TO BE A REFERENCE TO?

12:25PM   15    A.   SO SCHERING-PLOUGH WAS CONSIDERING USING THERANOS TO

12:25PM   16    VALIDATE SOME ASSAYS FOR THEM WITH THEIR INSTRUMENTS.

12:25PM   17    Q.   WHAT DOES THAT MEAN, SCHERING-PLOUGH WAS CONSIDERING USING

12:26PM   18    THERANOS TO VALIDATE ASSAYS?

12:26PM   19    A.   SO THEY WOULD HAVE DONE THE WORK DEMONSTRATING THE UTILITY

12:26PM   20    OF THEIR INSTRUMENT FOR THE USE THAT SCHERING-PLOUGH HAD

12:26PM   21    INTENDED.

12:26PM   22    Q.   WHEN YOU SAY "THEY," IS THAT THERANOS?

12:26PM   23    A.   YES, THERANOS.

12:26PM   24    Q.   SO DESCRIBE TO ME MORE PRECISELY, WHAT IS THE WORK THAT

12:26PM   25    THERANOS WOULD HAVE DONE?

12:26PM  1    A.   SO IT'S REFERRED TO AS A VALIDATION.  IT'S REQUIRED IN

12:26PM  2    ACCORDANCE WITH THE FDA GUIDANCE IN ORDER TO DEMONSTRATE THE

12:26PM  3    REPRODUCIBILITY OF ANY GIVEN ASSAY THAT YOU'RE GOING TO USE TO

12:26PM  4    SUPPORT SUBMISSION FOR YOUR DRUG.

12:26PM  5    Q.   SO IF THIS WORK WAS DONE, YOU DESCRIBED SOME VALIDATION

12:26PM  6    WORK THAT THERANOS WOULD BE DOING.  WHAT WOULD SCHERING-PLOUGH,

12:26PM  7    WHAT WOULD YOU OR YOUR LAB BE DOING?

12:26PM  8    A.   IN THIS CASE WE WERE NOT DOING ANYTHING.

12:26PM  9    Q.   OKAY.  IF YOU'LL TURN NOW TO PAGE 2 OF THIS EXHIBIT, AND

12:27PM 10    THE REMAINING PAGE, I THINK IT GOES TO PAGE 3, COULD YOU LET

12:27PM 11    THE JURY KNOW WHAT THESE ARE, WHAT THE ATTACHMENTS ARE TO THIS

12:27PM 12    DOCUMENT?

12:27PM 13    A.   YES.  SO THIS IS A PROTOCOL FOR THE VALIDATION WORK THAT

12:27PM 14    I'VE JUST MENTIONED, AND A PROTOCOL IS A DOCUMENT THAT

12:27PM 15    DESCRIBES IN ADVANCE OF EXECUTING ANY LABORATORY WORK WHAT WORK

12:27PM 16    IS ACTUALLY TO BE DONE.

12:27PM 17    Q.   SO WOULD THIS DOCUMENT HAVE LAID OUT SCHERING-PLOUGH AND

12:27PM 18    THERANOS'S UNDERSTANDING OF WHAT THE PROTOCOL WOULD INVOLVE?

12:27PM 19    A.   THAT'S CORRECT.

12:27PM 20    Q.   AND UNDER THE FIRST LINE OF THE DOCUMENT, DO YOU SEE THE

12:27PM 21    LETTERS HS IN PARENTHESES, AND THEN CRP, IL-6, AND TNF-A

12:27PM 22    MULTIPLEX?

12:27PM 23    A.   YES.

12:27PM 24    Q.   AND COULD YOU TELL THE JURY WHAT THAT IS?

12:27PM 25    A.   YES.  THESE ARE THREE MARKERS OF INFLAMMATION.  SO CRP

12:28PM  1    STANDS FOR C REACTIVE PROTEIN; IL-6 STANDS FOR INTERLEUKIN 6;

12:28PM  2    AND TNF-A STANDS FOR TUMOR NECROSIS FACTOR ALPHA.

12:28PM  3    Q.   AND THEN THE WORD MULTIPLEX, WHAT DOES THAT MEAN IN THIS

12:28PM  4    CONTEXT?

12:28PM  5    A.   SO MULTIPLEX IS A WAY OF MEASURING ALL THREE OF THESE

12:28PM  6    ANALYTES SIMULTANEOUSLY AS OPPOSED TO MEASURING THEM

12:28PM  7    INDIVIDUALLY.

12:28PM  8    Q.   I SEE.  AND IS ANOTHER WORD FOR THESE THREE ANALYTES

12:28PM  9    ASSAYS?

12:28PM 10    A.   YES, ONE COULD USE THAT WORD TO DESCRIBE THEM.

12:28PM 11    Q.   AND THEN IF YOU'LL TURN TO THE FINAL PAGE IN THIS, WHICH

12:28PM 12    IS PAGE 3.  THERE'S A SECTION TITLED ESTIMATED SCHEDULE.

12:28PM 13         DO YOU SEE THAT?

12:29PM 14    A.   YES.

12:29PM 15    Q.   AND IT LOOKS LIKE THERE'S A LINE THAT BEGINS "TOTAL NUMBER

12:29PM 16    OF CARTRIDGES PROVIDED WILL BE 2,790 OF THE TNF-ALPHA, IL-6,

12:29PM 17    CRP MULTIPLEX.  UP TO 10 ADDITIONAL INSTRUMENTS WILL BE

12:29PM 18    SHIPPED.  THE TOTAL EXPECTED RUNTIME IS AROUND 1 MONTH.  THE

12:29PM 19    TOTAL HUMAN CAPITAL COMMITMENT WILL ONLY BE 5 DAYS OVER THE

12:29PM 20    ENTIRE PROGRAM DURATION AS IT ONLY TAKES UP TO 10 MINUTES TO

12:29PM 21    PREPARE AND LOAD A SAMPLE ON A SINGLE INSTRUMENT AFTER WHICH

12:29PM 22    THE INSTRUMENTS RUN ON THEIR OWN."

12:29PM 23         DO YOU SEE THAT?

12:29PM 24    A.   I DO SEE THAT.

12:29PM 25    Q.   SO WHAT IS -- CAN YOU DESCRIBE FOR THE JURY, WHAT DOES

12:29PM   1    THAT MEAN?  WHAT IS ACTUALLY OCCURRING DURING THE SCHEDULE?

12:29PM   2    A.   SO THE CARTRIDGES ARE THE INSERTS OR THE DISPOSABLE

12:30PM   3    PRODUCTS THAT ARE REQUIRED TO BE INSERTED INTO THE THERANOS

12:30PM   4    INSTRUMENT IN ORDER TO GENERATE A RESULT.

12:30PM   5        IN THIS CASE THOSE CARTRIDGES WERE DESIGNED TO BE ABLE TO

12:30PM   6    MEASURE ALL THREE, TNF-ALPHA, INTERLEUKIN-6, AND CRP

12:30PM   7    SIMULTANEOUSLY.

12:30PM   8        SORRY.  DO YOU HAVE OTHER QUESTIONS ABOUT THE SECTION THAT

12:30PM   9    YOU WANT ME TO DESCRIBE?

12:30PM  10    Q.   YES.  HOW ABOUT THE RUNTIME?

12:30PM  11    A.   OKAY.  SO THE RUNTIME PRESUMABLY IS THE AMOUNT OF TIME

12:30PM  12    THAT IT WOULD TAKE FROM THE INITIATION OF THE PROTOCOL TO THE

12:30PM  13    COMPLETION OF THE PROTOCOL, WHICH USUALLY REQUIRES A REPORT.

12:30PM  14    Q.   OKAY.  AND HOW LONG WOULD THE INITIATION OF THE PROTOCOL

12:30PM  15    TO THE END, INCLUDING THE REPORT, TAKE ON THIS SCHEDULE?

12:30PM  16    A.   IT LOOKS LIKE THEY'RE INDICATING IT WOULD TAKE ONE MONTH.

12:31PM  17    Q.   OKAY.  IF YOU'LL NOW TURN TO EXHIBIT 200.

12:31PM  18        DO YOU RECOGNIZE EXHIBIT 200?

12:31PM  19    A.   I HAVE SEEN IT PREVIOUSLY, YES.

12:31PM  20    Q.   OKAY.  IS THIS AN AGREEMENT, A SERVICES AGREEMENT BETWEEN

12:31PM  21    SCHERING-PLOUGH AND THERANOS INVOLVING THE PROTOCOL OR THE

12:31PM  22    PROJECT THAT WE HAVE BEEN DISCUSSING?

12:31PM  23    A.   YES.

12:31PM  24            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 200.

12:31PM  25            MS. WALSH:  NO OBJECTION.

12:31PM   1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:31PM   2          (GOVERNMENT'S EXHIBIT 200 WAS RECEIVED IN EVIDENCE.)

12:31PM   3     BY MR. SCHENK:

12:31PM   4     Q.   DR. CULLEN, IN THE FIRST PARAGRAPH, THE AGREEMENT

12:31PM   5     REFERENCES A SERVICES AGREEMENT BETWEEN SCHERING CORPORATION IN

12:31PM   6     NEW JERSEY AND THERANOS IN CALIFORNIA.

12:31PM   7          DO YOU SEE THAT?

12:31PM   8     A.   YES.

12:31PM   9     Q.   AND WHERE WERE YOU AND YOUR LAB WHILE THIS PROTOCOL WAS

12:32PM  10     BEING RUN?

12:32PM  11     A.   I WAS IN NEW JERSEY.

12:32PM  12     Q.   OKAY.  AND HOW ABOUT THERANOS?

12:32PM  13     A.   THERANOS WAS IN CALIFORNIA.

12:32PM  14     Q.   OKAY.  IF WE CAN NOW GO DOWN TO THE TERM THAT IS IN

12:32PM  15     PARAGRAPH NUMBERED 2.  IT LOOKS LIKE THE ANTICIPATED START DATE

12:32PM  16     WAS APRIL 15, 2009.

12:32PM  17          DO YOU SEE THAT?

12:32PM  18     A.   YES.

12:32PM  19     Q.   AND IT WOULD BE COMPLETED MAY 1ST, 2009?

12:32PM  20     A.   YES.

12:32PM  21     Q.   AND THEN LET'S LOOK AT THE PAYMENT TERMS.  THAT'S THE LAST

12:32PM  22     PARAGRAPH ON THIS PAGE, PARAGRAPH 4, SPRI.

12:32PM  23          WHAT IS SPRI?

12:32PM  24     A.   THAT STANDS FOR SCHERING-PLOUGH RESEARCH INSTITUTE, WHICH

12:32PM  25     IS A DIVISION THAT WAS WITHIN SCHERING CORPORATION.

12:32PM   1   Q.   "SPRI WILL PAY PROVIDER A ONE TIME PAYMENT OF $279,000 FOR

12:32PM   2   THE PROJECT."

12:32PM   3        WHO IS THE PROVIDER?

12:32PM   4   A.   THERANOS IS THE PROVIDER.

12:32PM   5   Q.   WAS THAT THE TOTAL DOLLAR AMOUNT FOR THIS CONTRACT, THE

12:33PM   6   TOTAL DOLLAR AMOUNT THAT SCHERING WAS GOING TO PAY THERANOS?

12:33PM   7   A.   AS FAR AS I KNOW.

12:33PM   8   Q.   COULD YOU NOW TURN TO TAB 201.

12:33PM   9        DO YOU RECOGNIZE THE EXHIBIT AT EXHIBIT NUMBER 201?

12:33PM  10   A.   NOT REALLY, NO.

12:33PM  11   Q.   IF YOU'LL TURN TO THE SECOND PAGE.

12:33PM  12        ON THE SECOND PAGE, DO YOU SEE AN EMAIL FROM MS. HOLMES TO

12:33PM  13   YOU?

12:33PM  14   A.   YES.

12:33PM  15   Q.   AND WAS THAT SENT IN ABOUT APRIL OF 2009?

12:33PM  16   A.   YES.

12:33PM  17   Q.   AND THEN IF WE GO AND LOOK AT THE FIRST PAGE, DOES IT

12:33PM  18   APPEAR THAT THAT COMMUNICATION WAS FORWARDED WITHIN THERANOS?

12:33PM  19   A.   YES, IT DOES.

12:33PM  20   Q.   AND IF YOU'LL LOOK AT PAGE 3 AND THE FOLLOWING PAGES WOULD

12:34PM  21   APPEAR TO BE ATTACHED.

12:34PM  22        DO YOU RECOGNIZE THOSE AS AN INVOICE AND ALSO ANOTHER COPY

12:34PM  23   OF THE PROTOCOL?

12:34PM  24   A.   YES TO BOTH, INVOICE AND PROTOCOL, I SEE THEM.

12:34PM  25             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 201.

12:34PM  1              MS. WALSH:  NO OBJECTION.

12:34PM  2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:34PM  3         (GOVERNMENT'S EXHIBIT 201 WAS RECEIVED IN EVIDENCE.)

12:34PM  4    BY MR. SCHENK:

12:34PM  5    Q.  IF WE CAN START WITH THE EMAIL ON PAGE 2 FROM MS. HOLMES

12:34PM  6    TO YOU.

12:34PM  7         DO YOU SEE WHERE MS. HOLMES WRITES, "IN FOLLOW UP TO OUR

12:34PM  8    DISCUSSIONS WITH CONNIE, WE HAVE CEMENTED A COMPREHENSIVE

12:34PM  9    VALIDATION PROGRAM ON ONE OF OUR MULTIPLEXED CYTOKINE PANELS.

12:34PM  10   I HAVE ATTACHED THE INVOICE AND PROGRAM OVERVIEW TO THIS EMAIL.

12:35PM  11   THIS INVOICE SHOULD WORK IN LIEU OF A CONTRACT AS THIS ANALYSIS

12:35PM  12   WILL BE DONE AT THERANOS AND THE SCOPE IS RESTRICTED TO

12:35PM  13   VALIDATION."

12:35PM  14        DO YOU SEE THAT?

12:35PM  15   A.  YES.

12:35PM  16   Q.  AND THEN IN THE NEXT PARAGRAPH, MS. HOLMES CONTINUES, "WE

12:35PM  17   DID OF COURSE WORK THROUGH THE VALIDATION PROGRAM WITH CONNIE

12:35PM  18   IN GREAT DETAIL.  WE WILL PRESENT THE RESULTS OF THE VALIDATION

12:35PM  19   BY YOUR VISIT IN MAY."

12:35PM  20        FIRST, DID YOU WORK THROUGH THIS VALIDATION WITH FOLKS AT

12:35PM  21   THERANOS OR MS. HOLMES?

12:35PM  22   A.  THAT WOULD HAVE BEEN THE PROTOCOL THAT YOU SHOWED EARLIER.

12:35PM  23   Q.  OKAY.  YOU HAD A ROLE IN --

12:35PM  24   A.  REVIEWING.

12:35PM  25   Q.  REVIEWING -- OKAY.

CULLEN DIRECT BY MR. SCHENK

12:35PM   1    A.   CORRECT.

12:35PM   2    Q.   AND THEN MS. HOLMES SAYS THERE'S A REFERENCE TO YOUR VISIT

12:35PM   3    IN MAY.

12:35PM   4         WHAT IS THAT A REFERENCE TO?

12:35PM   5    A.   SO SCHERING-PLOUGH SENT A DUE DILIGENCE TEAM TO THERANOS

12:35PM   6    IN MAY OF 2009.

12:35PM   7    Q.   OKAY.  AND WHAT IS A DUE DILIGENCE TEAM?

12:35PM   8    A.   SO IT'S A GROUP OF PEOPLE WITHIN THE COMPANY FROM

12:35PM   9    DIFFERENT DISCIPLINES THAT ARE SENT TO DO AN EVALUATION OF A

12:36PM   10   COMPANY IN ORDER TO VERIFY THAT THEY WOULD BE APPROPRIATE TO

12:36PM   11   WORK WITH AND COULD MEET THE, EXCUSE ME, THE NEEDS OF SCHERING

12:36PM   12   WITH RESPECT TO COMPLIANCE AND FINANCIALS, ET CETERA.

12:36PM   13   Q.   OKAY.  WE'LL COME BACK TO THAT MEETING IN JUST A MOMENT.

12:36PM   14        WOULD YOU TURN TO PAGE 3.

12:36PM   15        ON PAGE 3, I'M JUST WONDERING IF THE DOLLAR AMOUNT CHANGED

12:36PM   16   OR IF THERANOS IS INVOICING SCHERING-PLOUGH FOR THAT SAME

12:36PM   17   DOLLAR AMOUNT THAT WE DISCUSSED EARLIER.

12:36PM   18   A.   THAT'S THE SAME DOLLAR AMOUNT.

12:36PM   19   Q.   AND WHAT IS THE AMOUNT?

12:36PM   20   A.   $279,000.

12:36PM   21   Q.   AND IF YOU'LL TURN TO PAGE 6 OF THIS EXHIBIT.

12:36PM   22        PAGE 6 INCLUDES AN ESTIMATED SCHEDULE.

12:36PM   23        DID THE SCHEDULE CHANGE, OR ARE WE STILL LOOKING AT ABOUT

12:36PM   24   A ONE MONTH ESTIMATE?

12:37PM   25   A.   THE SCHEDULE IS THE SAME.

| | |
|---|---|
| 12:37PM | 1 |

Q.   ALL RIGHT.  IF YOU'LL NOW TURN TO TAB 192 IN YOUR BINDER.

        IS 192 A MEETING REMINDER FOR THE MEETING IN CALIFORNIA IN

PALO ALTO THAT YOU WERE JUST TALKING ABOUT, AND ALSO AN AGENDA?

A.   THAT'S RIGHT.

        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 192.

        MS. WALSH:  NO OBJECTION.

        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

     (GOVERNMENT'S EXHIBIT 192 WAS RECEIVED IN EVIDENCE.)

BY MR. SCHENK:

Q.   THE MEETING START DATE LOOKS LIKE IT'S MAY 5TH, 2009.

        DOES THAT SOUND ROUGHLY CORRECT TO YOU?

A.   YES.

Q.   AND UNDER PARTICIPANTS, THERE'S SOME INDIVIDUALS LISTED

FROM -- IT LOOKS LIKE FROM SCHERING-PLOUGH.

        DO YOU SEE YOUR NAME LISTED THERE?

A.   YES, I DO.

Q.   DID YOU, IN FACT, ATTEND THIS MEETING?

A.   YES, I DID.

Q.   WAS MS. HOLMES PRESENT?

A.   YES, SHE WAS.

Q.   WAS MR. BALWANI PRESENT?  DO YOU KNOW THAT NAME?

A.   I DID NOT KNOW THE NAME, AND I DO NOT RECALL IF THAT

PERSON WAS PRESENT.

Q.   OKAY.  IT'S POSSIBLE THAT YOU HAVE NEVER MET SOMEONE NAMED

MR. BALWANI?

12:38PM   1    A.   CORRECT.

12:38PM   2    Q.   OKAY.  IF YOU'LL NOW TURN TO THE SECOND PAGE, THE AGENDA,

12:38PM   3    DO YOU RECALL WHAT WAS DISCUSSED DURING THIS -- YOU CALLED IT A

12:38PM   4    DUE DILIGENCE MEETING?

12:38PM   5    A.   YES, I DO.

12:38PM   6    Q.   TELL THE JURY WHAT TOPICS WERE COVERED.

12:38PM   7    A.   SO WE WERE DISCUSSING THE TECHNOLOGY PREDOMINANTLY, WHAT

12:38PM   8    THE CAPABILITIES WERE, WHAT SORTS OF TESTS COULD BE DEVELOPED

12:38PM   9    ON THE PLATFORM.

12:38PM   10   Q.   AND DID YOU ASK QUESTIONS DURING THE MEETING?

12:38PM   11   A.   I DID.

12:38PM   12   Q.   AND WHO DID YOU DIRECT YOUR QUESTIONS TO?

12:38PM   13   A.   INITIALLY I DIRECTED MY QUESTIONS TO ELIZABETH HOLMES, AND

12:38PM   14   THEN SUBSEQUENTLY I DIRECTED THEM TO OTHER THERANOS EMPLOYEES

12:39PM   15   WHO WERE PARTICIPATING IN THE MEETING.

12:39PM   16   Q.   YOU SAID SUBSEQUENTLY YOU DIRECTED THEM TO OTHERS.  WHY

12:39PM   17   THE CHANGE?  WHY DID YOU START WITH MS. HOLMES AND THEN DIRECT

12:39PM   18   QUESTIONS TO OTHERS?

12:39PM   19   A.   I FELT AS THOUGH MS. HOLMES WAS NOT ANSWERING THE

12:39PM   20   QUESTIONS ADEQUATELY OR DIRECTLY, AND I WANTED TO SEE IF I

12:39PM   21   COULD GET MORE DIRECT ANSWERS FROM OTHER PARTICIPANTS FROM

12:39PM   22   THERANOS.

12:39PM   23   Q.   WHAT MAKES YOU SAY THAT?  WHY DO YOU SAY THAT YOU DIDN'T

12:39PM   24   THINK THAT MS. HOLMES WAS ANSWERING THEM ADEQUATELY?

12:39PM   25   A.   SO DURING THESE DUE DILIGENCE MEETINGS, THERE IS THE

12:39PM   1    EXPECTATION THAT A CERTAIN LEVEL OF TECHNICAL DETAIL WILL BE

12:39PM   2    DISCLOSED.  THAT'S IMPORTANT FOR SCHERING-PLOUGH IN THIS CASE

12:39PM   3    BECAUSE THAT'S THE WAY THAT WE EVALUATE WHETHER OR NOT THIS

12:39PM   4    INSTRUMENT COULD BE USED TO SUPPORT DRUG SUBMISSIONS TO THE FDA

12:40PM   5    OR OTHER HEALTH AUTHORITIES.

12:40PM   6        SO IT'S INCUMBENT UPON US TO HAVE A GOOD UNDERSTANDING OF

12:40PM   7    HOW THE INSTRUMENT WORKS.

12:40PM   8        AND WE WERE NOT ABLE TO GET THAT LEVEL OF DISCLOSURE OR

12:40PM   9    UNDERSTANDING THROUGH THE QUESTIONS WITH MS. HOLMES.

12:40PM  10    Q.   HOW ABOUT WHEN YOU PIVOTED AND STARTED ASKING QUESTIONS OF

12:40PM  11    OTHER PARTICIPANTS?

12:40PM  12    A.   NO.

12:40PM  13    Q.   DID YOU RECEIVE --

12:40PM  14    A.   NO.  AND THE REASON FOR THAT WAS AT EACH ATTEMPT TO ASK

12:40PM  15    OTHER INDIVIDUALS, MS. HOLMES INTERJECTED THE RESPONSE ON THEIR

12:40PM  16    BEHALF.

12:40PM  17    Q.   SO YOU DIDN'T GET RESPONSES FROM OTHER INDIVIDUALS EVEN

12:40PM  18    WHEN YOU DIRECTED A QUESTION AT THEM?

12:40PM  19    A.   THAT'S CORRECT.

12:40PM  20    Q.   DID YOU SAY TO MS. HOLMES DURING THIS MEETING THAT YOU

12:40PM  21    FELT THE ANSWERS WERE INSUFFICIENT OR INADEQUATE?

12:40PM  22    A.   NO.

12:40PM  23    Q.   WHY NOT?

12:40PM  24    A.   IT SEEMED APPARENT TO ME, I GUESS, AND IT'S AWKWARD.

12:41PM  25    Q.   OKAY.  WOULD YOU NOW TURN TO TAB 223.

12:41PM  1    A.   I THINK MY BINDER IS EMPTY AT 223.

12:41PM  2    Q.   YOUR BINDER IS EMPTY AT 223?

12:41PM  3    A.   YES.

12:41PM  4    Q.   LET ME GIVE YOU MY COPY.

12:41PM  5         MAY I APPROACH?

12:41PM  6             THE COURT:  YES.

12:41PM  7             MR. SCHENK:  (HANDING.)

12:41PM  8    Q.   DR. CULLEN, DO YOU RECOGNIZE THE DOCUMENT AT 223 AS AN

12:41PM  9    EMAIL FROM YOU TO SOMEONE AT THERANOS NAMED GARY FRENZEL?

12:41PM 10    A.   YES.

12:41PM 11             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 223.

12:41PM 12             MS. WALSH:  NO OBJECTION.

12:42PM 13             THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:42PM 14         (GOVERNMENT'S EXHIBIT 223 WAS RECEIVED IN EVIDENCE.)

12:42PM 15    BY MR. SCHENK:

12:42PM 16    Q.   AND IF WE CAN START AT THE BOTTOM OF THIS EMAIL.

12:42PM 17         THIS EMAIL WAS SENT IN JUNE OF 2009.

12:42PM 18         DO YOU SEE THAT?

12:42PM 19    A.   YES.

12:42PM 20    Q.   SO WOULD THAT HAVE BEEN ABOUT A MONTH OR A MONTH AND A

12:42PM 21    HALF AFTER YOUR MEETING IN PALO ALTO?

12:42PM 22    A.   THAT'S CORRECT.

12:42PM 23    Q.   AND IN THE EMAIL YOU ASK ABOUT AN UPDATE ON THE ASSAY

12:42PM 24    DEVELOPMENT.

12:42PM 25         DO YOU SEE THAT?

| | | |
|---|---|---|
| 12:42PM | 1 | A.   YES. |
| 12:42PM | 2 | Q.   AND WHAT WERE YOU LOOKING FOR? |
| 12:42PM | 3 | A.   SO I WAS LOOKING FOR DATA ASSOCIATED WITH THE PROTOCOL |
| 12:42PM | 4 | THAT WE DISCUSSED EARLIER. |
| 12:42PM | 5 | Q.   AND WHAT FORM WOULD THAT DATA HAVE TAKEN?  WHAT -- |
| 12:42PM | 6 | A.   IT WOULD HAVE BEEN PRESENTED IN A REPORT. |
| 12:42PM | 7 | Q.   OKAY.  SO YOU WANTED A REPORT, BUT HAD NOT RECEIVED IT |
| 12:42PM | 8 | YET? |
| 12:42PM | 9 | A.   THAT'S CORRECT. |
| 12:42PM | 10 | Q.   OKAY.  YOU TOLD US THAT YOU FOUND THE ANSWERS FROM |
| 12:42PM | 11 | MS. HOLMES INADEQUATE OR LESS THAN FORTHCOMING. |
| 12:42PM | 12 | WHY THEN WERE YOU STILL ASKING FOR A DATA REPORT? |
| 12:42PM | 13 | A.   I THINK BECAUSE WE CONSIDERED IT TO BE AN OUTSTANDING |
| 12:43PM | 14 | ITEM.  WE HAD PAID FOR THE WORK AND WANTED TO HAVE CLOSURE. |
| 12:43PM | 15 | Q.   OKAY.  SCHERING-PLOUGH HAD PAID ABOUT $280,000 FOR THIS |
| 12:43PM | 16 | WORK? |
| 12:43PM | 17 | A.   THAT'S CORRECT. |
| 12:43PM | 18 | Q.   AND PART OF WHAT THERANOS AGREED TO PROVIDE WAS A REPORT? |
| 12:43PM | 19 | A.   THAT'S RIGHT. |
| 12:43PM | 20 | Q.   IF YOU WILL NOW TURN TO PAGE 2 -- I'M SORRY, EXHIBIT 259. |
| 12:43PM | 21 | DOES EXHIBIT 259 INCLUDE AN EMAIL NOW FROM GARY FRENZEL TO |
| 12:43PM | 22 | YOU AND THEN A REPORT ATTACHED? |
| 12:43PM | 23 | A.   YES. |
| 12:43PM | 24 | MR. SCHENK:  YOUR HONOR, THE GOVERNMENT -- |
| 12:43PM | 25 | THE WITNESS:  SO DATED DECEMBER 3RD, 2009. |

12:43PM 1    BY MR. SCHENK:

12:43PM 2    Q.   YES, FROM MR. FRENZEL, DECEMBER OF 2009?

12:43PM 3    A.   YES, I HAVE THAT.

12:44PM 4         MR. SCHENK:   YOUR HONOR, THE GOVERNMENT OFFERS

12:44PM 5    EXHIBIT 259, INCLUDING THE ATTACHMENT.

12:44PM 6         MS. WALSH:   NO OBJECTION TO 259.

12:44PM 7         THE COURT:   IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:44PM 8    (GOVERNMENT'S EXHIBIT 259 WAS RECEIVED IN EVIDENCE.)

12:44PM 9    BY MR. SCHENK:

12:44PM 10   Q.   THANK YOU.

12:44PM 11        IF WE CAN LOOK AT THE EMAIL ON THE BOTTOM FROM

12:44PM 12   GARY FRENZEL, AND IT LOOKS LIKE FROM THE SIGNATURE HE'S THE VP

12:44PM 13   OF ASSAY SYSTEMS AT THERANOS.

12:44PM 14        DO YOU SEE THAT?

12:44PM 15   A.   YES, I DO.

12:44PM 16   Q.   AND HE WRITES, "HI CONNIE, I WAS ASKED TO SEND THIS REPORT

12:44PM 17   ON TO YOU, AND IF YOU CAN FORWARD TO THE PROPER PEOPLE.  AFTER

12:44PM 18   YOU AND YOUR GROUP HAVE AN OPPORTUNITY TO GO THROUGH IT, LET US

12:44PM 19   KNOW IF YOU WOULD LIKE TO ARRANGE A PHONE CONFERENCE TO DISCUSS

12:44PM 20   THE RESULTS."

12:44PM 21        DR. CULLEN, IS THIS THE REPORT THAT YOU WERE TALKING ABOUT

12:44PM 22   IN JUNE OF 2009?

12:44PM 23   A.   YES.

12:44PM 24   Q.   AND YOU RECEIVED IT AT THE END OF THAT YEAR, IN DECEMBER

12:44PM 25   OF 2009?

12:44PM  1      A.   YES.

12:44PM  2      Q.   AND IF YOU TURN TO THE NEXT PAGE, IT'S ACTUALLY PAGE 3 OF

12:44PM  3      THIS EXHIBIT, IS THIS WHERE THE REPORT BEGINS?

12:44PM  4      A.   YES.

12:44PM  5           MR. SCHENK:  YOUR HONOR, I HAVE SOME QUESTIONS ABOUT

12:44PM  6      THIS DOCUMENT, AND WITH A PENDING MOTION, I JUST WANT TO MAKE

12:45PM  7      SURE THAT THE COURT HAS AN OPPORTUNITY TO PROVIDE GUIDANCE IF

12:45PM  8      IT CHOOSES TO.

12:45PM  9           THE COURT:  WELL, I THINK WE'LL PROCEED BY QUESTION

12:45PM  10     AND OBJECTIONS IF THERE ARE ANY.

12:45PM  11          MR. SCHENK:  THANK YOU.

12:45PM  12     Q.   AT THE VERY TOP OF THIS DOCUMENT, DR. CULLEN, ABOVE WHERE

12:45PM  13     IT SAYS THERANOS MULTIPLEXED ASSAY PANEL VALIDATION REPORT, DO

12:45PM  14     YOU SEE A LOGO AT THE VERY TOP ON THE LEFT?

12:45PM  15     A.   YES.

12:45PM  16          MS. WALSH:  OBJECTION.

12:45PM  17          THE COURT:  OVERRULED.

12:45PM  18     BY MR. SCHENK:

12:45PM  19     Q.   YOU CAN ANSWER THE QUESTION.

12:45PM  20     A.   YES, I DO SEE THE LOGO.

12:45PM  21     Q.   OKAY.  AND WHOSE LOGO IS THAT?

12:45PM  22     A.   IT'S THERANOS'S LOGOS.

12:45PM  23     Q.   DR. CULLEN -- WELL, FIRST OF ALL, ON WHICH SIDE OF THE

12:45PM  24     DOCUMENT IS THE THERANOS LOGO?

12:45PM  25     A.   IT'S ON THE LEFT.

12:45PM  1    Q.   ON THE RIGHT SIDE OF THE DOCUMENT ACROSS FROM THE THERANOS

12:45PM  2    LOGO, DO YOU SEE ANY OTHER LOGOS?

12:45PM  3    A.   NO.

12:45PM  4    Q.   IF YOU COULD NOW TURN TO PAGE 5.

12:46PM  5         ON PAGE 5 OF THIS EXHIBIT, IT LOOKS LIKE THERE ARE THREE

12:46PM  6    GRAPHS.

12:46PM  7         DO YOU SEE THAT?

12:46PM  8    A.   YES.

12:46PM  9    Q.   AND WHOSE DATA IS THIS?

12:46PM  10   A.   THIS IS THERANOS'S.

12:46PM  11   Q.   AND DID SCHERING-PLOUGH GENERATE THIS DATA?

12:46PM  12   A.   NO.

12:46PM  13   Q.   WHO GENERATED THIS DATA?

12:46PM  14   A.   THERANOS.

12:46PM  15   Q.   IS THAT TRUE FOR THE ENTIRE CONTENT OF THIS DOCUMENT?

12:46PM  16   A.   THAT'S MY UNDERSTANDING, YES.

12:46PM  17   Q.   AND IF YOU'LL NOW TURN TO PAGE 19 OF THIS EXHIBIT, THERE'S

12:46PM  18   A SECTION CALLED CONCLUSIONS.

12:46PM  19        DO YOU SEE THAT?

12:46PM  20   A.   I DO.

12:46PM  21   Q.   AND WHOSE CONCLUSIONS WERE THESE?

12:46PM  22   A.   THESE WOULD HAVE BEEN THERANOS'S CONCLUSIONS SINCE IT WAS

12:46PM  23   THEIR REPORT.

12:46PM  24   Q.   WERE THESE YOUR CONCLUSIONS?

12:46PM  25   A.   NO.

12:46PM  1    Q.   WERE THESE THE CONCLUSIONS, TO YOUR KNOWLEDGE, OF ANYBODY

12:47PM  2    AT SCHERING-PLOUGH?

12:47PM  3    A.   NO.

12:47PM  4    Q.   THE FIRST SENTENCE IN THE CONCLUSIONS SECTION READS, "THE

12:47PM  5    THERANOS IL-6, TNF-A, CRP ASSAY MULTIPLEX HAS BEEN SHOWN TO

12:47PM  6    GIVE ACCURATE AND PRECISE RESULTS FOR THREE INDEPENDENTLY

12:47PM  7    CALIBRATED CARTRIDGE LOTS AND ALL THE MANY INSTRUMENTS USED."

12:47PM  8         DO YOU SEE THAT SENTENCE?

12:47PM  9    A.   YES.

12:47PM  10   Q.   WHEN THE CONCLUSION READS THAT THE ASSAY MULTIPLEX WAS

12:47PM  11   SHOWN TO GIVE ACCURATE AND PRECISE RESULTS, WAS THAT A

12:47PM  12   STATEMENT THAT SCHERING-PLOUGH WAS MAKING?

12:47PM  13   A.   NO.

12:47PM  14   Q.   DR. CULLEN, IF YOU WOULD NOW TURN TO TAB 262.

12:47PM  15        DO YOU SEE AN EMAIL EXCHANGE AGAIN IN DECEMBER OF 2009

12:48PM  16   BETWEEN GARY FRENZEL AND YOU?

12:48PM  17   A.   YES.

12:48PM  18        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS

12:48PM  19   EXHIBIT 262.

12:48PM  20        MS. WALSH:  NO OBJECTION.

12:48PM  21        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

12:48PM  22        (GOVERNMENT'S EXHIBIT 262 WAS RECEIVED IN EVIDENCE.)

12:48PM  23   BY MR. SCHENK:

12:48PM  24   Q.   AT THE BOTTOM OF THIS FIRST PAGE, IT LOOKS LIKE

12:48PM  25   MR. FRENZEL WRITES TO YOU THAT HE WANTS TO MAKE SURE THAT YOU

12:48PM  1    RECEIVED THE REPORT.

12:48PM  2         DO YOU SEE THAT?

12:48PM  3    A.   I DO.

12:48PM  4    Q.   AND THEN YOU FOLLOW UP THAT YOU'RE SORRY FOR THE SLOW

12:48PM  5    RESPONSE, YOU DID RECEIVE THE REPORT, BUT YOU WANT TO DEFER

12:48PM  6    DISCUSSIONS UNTIL JANUARY, YOU'RE SWAMPED WITH A MERGER WITH

12:48PM  7    MERCK.

12:48PM  8         WHAT IS THAT A REFERENCE TO?

12:48PM  9    A.   SO SCHERING-PLOUGH WAS ACQUIRED BY MERCK IN NOVEMBER OF

12:48PM  10   2009.

12:48PM  11   Q.   AND HOW DID THAT AFFECT YOUR JOB?

12:48PM  12   A.   MY JOB GOT MUCH BIGGER.

12:48PM  13   Q.   OKAY.  YOU RECEIVED THE VALIDATION REPORT, I THINK WE JUST

12:49PM  14   SAW, IN NOVEMBER; IS THAT RIGHT?

12:49PM  15   A.   THAT'S RIGHT.

12:49PM  16   Q.   AND DID YOU DO SOMETHING WITH THAT REPORT IN DECEMBER OF

12:49PM  17   2009?

12:49PM  18   A.   NO, OTHER THAN READ IT.

12:49PM  19   Q.   OKAY.  AND IT LOOKS LIKE GARY FRENZEL IS ASKING YOU ABOUT

12:49PM  20   FURTHER DISCUSSIONS, AND YOU SAID YOU WANTED TO DEFER THEM

12:49PM  21   UNTIL JANUARY; IS THAT RIGHT?

12:49PM  22   A.   THAT'S CORRECT.

12:49PM  23   Q.   DID YOU, IN FACT, HAVE FOLLOW-UP DISCUSSIONS WITH

12:49PM  24   GARY FRENZEL OR ANYBODY AT THERANOS --

12:49PM  25   A.   NO.

12:49PM   1      Q.   -- IN JANUARY OF 2010?

12:49PM   2      A.   NO.

12:49PM   3      Q.   HOW ABOUT AT ANY POINT AFTER DECEMBER 2009?

12:49PM   4      A.   NOT TO MY RECOLLECTION, NO.

12:49PM   5      Q.   WHY NOT?

12:49PM   6      A.   WE WEREN'T INTERESTED IN PURSUING THE TECHNOLOGY, AND

12:49PM   7      THERE WAS A LOT OF OTHER WORK THAT WAS HIGHER PRIORITY.

12:49PM   8      Q.   OKAY.  YOU SAID THAT YOU WERE NOT INTERESTED IN PURSUING

12:49PM   9      THE TECHNOLOGY.  DO YOU MEAN THE THERANOS TECHNOLOGY?

12:50PM  10      A.   I DO.

12:50PM  11      Q.   AND WHY DO YOU SAY THAT?  WHY WERE YOU, OR WHY WAS

12:50PM  12      SCHERING-PLOUGH NOT INTERESTED?

12:50PM  13      A.   I THINK IT WAS A COMBINATION OF THE DUE DILIGENCE VISIT,

12:50PM  14      AS WELL AS THE RESULTS IN THE VALIDATION REPORT.

12:50PM  15      Q.   OKAY.  THANK YOU.

12:50PM  16           WOULD YOU NOW TURN TO TAB 291.

12:50PM  17           NOW, THE FIRST PAGE IN 291 CONTAINS TWO EMAILS.  YOU'RE

12:50PM  18      NOT ON EITHER OF THE EMAILS; IS THAT RIGHT?

12:50PM  19      A.   THAT'S CORRECT.

12:50PM  20           MR. SCHENK:  YOUR HONOR, THE GOVERNMENT WILL OFFER

12:50PM  21      THE TOP EMAIL, THAT IS WEDNESDAY APRIL 14TH, 2010, AND THE

12:50PM  22      ATTACHMENTS, THE ATTACHMENTS ARE A TOTAL OF 55 PAGES, FOR A

12:51PM  23      NONHEARSAY PURPOSE.

12:51PM  24           THE COURT:  ARE THESE -- IS THIS SUBJECT TO THE

12:51PM  25      STIPULATION?

12:51PM   1          MR. SCHENK:  IT IS, BECAUSE THE BATES NUMBERS

12:51PM   2   DEMONSTRATE AUTHENTICITY.

12:51PM   3          MS. WALSH:  OBJECTION, YOUR HONOR.  THE BASIS FOR

12:51PM   4   THE OBJECTION IS OUR PENDING MOTION, 106, AND 403.

12:51PM   5          THE COURT:  ALL RIGHT.  THANK YOU.

12:51PM   6      AND, MR. SCHENK, YOU'RE ASKING THAT THE ATTACHMENTS BE

12:51PM   7   ADMITTED AS THEY APPEAR IN THIS EXHIBIT?

12:51PM   8          MR. SCHENK:  YES, YOUR HONOR.

12:51PM   9          THE COURT:  AND TELL ME AGAIN THE RELEVANCE AND THE

12:51PM  10   FOUNDATION FOR THESE COMING IN.

12:51PM  11          MR. SCHENK:  YES, YOUR HONOR.

12:51PM  12          THE COURT:  FOR WHAT PURPOSE?

12:51PM  13          MR. SCHENK:  YES, YOUR HONOR.

12:51PM  14      THE EMAIL INCLUDES MR. BALWANI, THE DEFENDANT, ON THE CC

12:52PM  15   LINE.  IT IS THEREFORE RELEVANT TO DEMONSTRATE THE DEFENDANT'S

12:52PM  16   STATE OF MIND AS TO TWO ISSUES, KNOWLEDGE AND INTENT; THAT IS,

12:52PM  17   WHAT IS DONE WITH THE ATTACHMENTS.

12:52PM  18      AND THE COURT SEES THREE UNDERLINED ATTACHMENTS IN THE

12:52PM  19   CAPTION OF THE EMAIL.

12:52PM  20      THE THIRD IS A VERSION OF THE DOCUMENT THAT WE HAVE JUST

12:52PM  21   DISCUSSED WITH DR. CULLEN, AND THE OTHERS MAY COME UP DURING

12:52PM  22   THE COURSE OF THE TRIAL.

12:52PM  23          THE COURT:  SO THESE ARE NOT COMING IN FOR THE TRUTH

12:52PM  24   OF ANYTHING ASSERTED, BUT RATHER THAT THEY WERE RECEIVED AT

12:52PM  25   LEAST BY MR. BALWANI PER THE EMAIL ADDRESS?

CULLEN DIRECT BY MR. SCHENK

12:52PM   1          MR. SCHENK:  PRECISELY.

12:52PM   2          THE COURT:  ALL RIGHT.  FOR THAT LIMITED PURPOSE --

12:52PM   3     I'LL OVERRULE THE OBJECTION.

12:52PM   4          AND FOR THAT LIMITED PURPOSE, LADIES AND GENTLEMEN, THESE

12:52PM   5     ARE BEING ADMITTED, THIS EMAIL IS BEING ADMITTED FOR THE

12:52PM   6     LIMITED PURPOSE OF KNOWLEDGE, THAT IS, KNOWLEDGE AS TO THE

12:52PM   7     RECIPIENT OF THE EMAIL, AND FOR THAT LIMITED PURPOSE ONLY.

12:53PM   8          MR. SCHENK:  THANK YOU.  PERMISSION TO PUBLISH JUST

12:53PM   9     THE TOP EMAIL?

12:53PM  10          THE COURT:  YES.

12:53PM  11          (GOVERNMENT'S EXHIBIT 291, TOP EMAIL AND ATTACHMENT, WAS

12:53PM  12     RECEIVED IN EVIDENCE.)

12:53PM  13     BY MR. SCHENK:

12:53PM  14     Q.   DR. CULLEN, I'M SHOWING YOU AN EMAIL THAT SAYS FROM

12:53PM  15     ELIZABETH HOLMES IN THE CAPTION.

12:53PM  16          DO YOU SEE THAT?

12:53PM  17     A.   I DO.

12:53PM  18     Q.   AND IT'S TO SOMEONE THAT APPEARS TO BE ALEX.JUNG --

12:53PM  19     J-U-N-G -- @WALGREENS.COM.

12:53PM  20          DO YOU SEE THAT?

12:53PM  21     A.   YES, I DO.

12:53PM  22     Q.   AND THEN ON THE CC LINE SOMEONE NAMED JAY.ROSAN@WALGREENS,

12:53PM  23     AND THEN SUNNY BALWANI.

12:53PM  24          DO YOU SEE THAT?

12:53PM  25     A.   I DO.

12:53PM 1    Q.   AND IN THE EMAIL IT APPEARS THAT THERE ARE THREE

12:53PM 2    ATTACHMENTS.  DO YOU SEE THE ATTACHMENTS LISTED UNDERLINED?

12:53PM 3    A.   I DO.

12:53PM 4    Q.   AND THEN IN THE BODY, THE FIRST PARAGRAPH READS, "DR. JAY,

12:53PM 5    ALEX,

12:53PM 6         "AS PER OUR DISCUSSION, PLEASE FIND THREE INDEPENDENT DUE

12:53PM 7    DILIGENCE REPORTS ON THERANOS SYSTEMS ATTACHED TO THIS EMAIL.

12:53PM 8    THESE REPORTS ARE FROM GLAXOSMITHKLINE, PFIZER, AND

12:54PM 9    SCHERING-PLOUGH AFTER THEIR OWN TECHNICAL VALIDATION AND

12:54PM 10   EXPERIENCE WITH THERANOS SYSTEMS IN THE FIELD.  PLEASE NOTE

12:54PM 11   THAT THESE DOCUMENTS ARE STRICTLY CONFIDENTIAL UNDER OUR CDA."

12:54PM 12        DID I READ THAT CORRECTLY?

12:54PM 13   A.   YES.

12:54PM 14   Q.   DR. CULLEN, WOULD YOU NOW TURN TO PAGE 34 OF THIS EXHIBIT?

12:54PM 15        EARLIER IN YOUR TESTIMONY WE TALKED ABOUT AN OCCASION WHEN

12:54PM 16   YOU REACHED OUT TO THERANOS TO OBTAIN A REPORT.

12:54PM 17        DO YOU REMEMBER THAT?

12:54PM 18   A.   YES.

12:54PM 19   Q.   WAS THAT AN ASSAY DEVELOPMENT REPORT?

12:54PM 20   A.   YES.

12:54PM 21   Q.   AND WAS THAT A REPORT INVOLVING THE IL-6, THE TNF-ALPHA,

12:54PM 22   AND CRP ASSAYS?

12:55PM 23   A.   THAT'S CORRECT.

12:55PM 24   Q.   AND ARE WE NOW LOOKING AT A VERSION OF AN ASSAY

12:55PM 25   DEVELOPMENT REPORT INVOLVING THOSE ASSAYS?

12:55PM  1    A.   YES.

12:55PM  2    Q.   ON THIS PORTION OF THE REPORT, I'M GOING TO ASK YOU WHAT

12:55PM  3    LOGO YOU SEE AT THE VERY TOP ON THE LEFT.

12:55PM  4              MS. WALSH:  OBJECTION.

12:55PM  5              THE COURT:  OVERRULED FOR THE REASONS PREVIOUSLY

12:55PM  6    STATED AS TO THE ADMISSIBILITY OF THIS.

12:55PM  7         AGAIN, IT'S ONLY AS TO KNOWLEDGE OF THE RECIPIENT AND NOT

12:55PM  8    FOR THE TRUTH OF ANY MATTERS ASSERTED IN THIS.

12:55PM  9              THE WITNESS:  THE LOGO IS SCHERING-PLOUGH.

12:55PM 10    BY MR. SCHENK:

12:55PM 11    Q.   AND AT THE VERY TOP ON THE RIGHT ACROSS FROM THAT LOGO, DO

12:55PM 12    YOU SEE ANOTHER LOGO?

12:55PM 13    A.   YES, THERANOS.

12:55PM 14    Q.   DR. CULLEN, IF YOU'LL NOW TURN TO PAGE 51.

12:55PM 15         DO YOU SEE A CONCLUSIONS SECTION?

12:55PM 16    A.   I DO.

12:55PM 17    Q.   IN THE FIRST SENTENCE DOES IT NOW READ, "THE THERANOS

12:56PM 18    IL-6, TNF-ALPHA, CRP ASSAY MULTIPLEX HAS BEEN SHOWN TO GIVE

12:56PM 19    MORE ACCURATE AND PRECISE RESULTS FOR THREE INDEPENDENTLY

12:56PM 20    CALIBRATED CARTRIDGE LOTS AND ALL THE MANY INSTRUMENTS USED

12:56PM 21    THAN CURRENT 'GOLD STANDARD' REFERENCE METHODS"?

12:56PM 22    A.   YES.

12:56PM 23    Q.   DR. CULLEN, DID ANYBODY FROM THERANOS EVER ASK YOU

12:56PM 24    PERMISSION TO AFFIX A SCHERING-PLOUGH LOGO TO THE THERANOS

12:56PM 25    ASSAY DEVELOPMENT REPORT?

12:56PM  1                    MS. WALSH:  OBJECTION.  106.

12:56PM  2                    THE COURT:  YOU'RE ASKING AGAIN THAT THIS COME IN

12:56PM  3     SOLELY FOR THE KNOWLEDGE OF -- EXCUSE ME, KNOWLEDGE AS TO THE

12:56PM  4     RECIPIENTS OF THE EMAIL?

12:57PM  5                    MR. SCHENK:  YES.

12:57PM  6                    THE COURT:  RIGHT.  OVERRULED.

12:57PM  7          YOU CAN ANSWER THE QUESTION.

12:57PM  8                    THE WITNESS:  OKAY.  THANK YOU.

12:57PM  9          THERANOS DID NOT ASK PERMISSION TO USE THE SCHERING-PLOUGH

12:57PM  10    LOGO ON ANY OF THE REPORTS.

12:57PM  11                   MR. SCHENK:  YOUR HONOR, I HAVE -- MAY I APPROACH?

12:57PM  12                   THE COURT:  YES.

12:57PM  13                   MR. SCHENK:  (HANDING.)

12:58PM  14    Q.   DR. CULLEN, I'VE HANDED YOU ANOTHER TAB.  THIS ONE IS

12:58PM  15    EXHIBIT 277.

12:58PM  16         DO YOU SEE THAT?

12:58PM  17    A.   YES.

12:58PM  18    Q.   AND AGAIN, IS THIS AN EMAIL THREAD -- YOU CAN TAKE A

12:58PM  19    MOMENT TO LOOK THROUGH IT -- BUT YOU ARE NOT ON THIS EMAIL

12:58PM  20    THREAD; IS THAT CORRECT?

12:58PM  21    A.   THAT'S CORRECT.

12:58PM  22                   MR. SCHENK:  YOUR HONOR, ONCE AGAIN, THE GOVERNMENT

12:58PM  23    INTENDS TO OFFER ONLY THE VERY TOP EMAIL AND THE ATTACHMENT IN

12:58PM  24    LIGHT OF OUR DISCUSSION.

12:58PM  25         THE PURPOSE IS THE SAME, FOR THE KNOWLEDGE OF THE

12:58PM  1    RECIPIENT ON THE CC LINE AS WE DISCUSSED ON THE MARCH 19TH

12:58PM  2    EMAIL EARLIER.

12:59PM  3                    THE COURT:  MS. WALSH.

12:59PM  4                    MS. WALSH:  OBJECTION.  106, 403, AND OUR PENDING

12:59PM  5    MOTION.

12:59PM  6                    THE COURT:  ALL RIGHT.  THANK YOU.

12:59PM  7         YOU'RE STRIKING THE BOTTOM EMAIL AND WANT JUST THE TOP?

12:59PM  8                    MR. SCHENK:  YES, YOUR HONOR.  SO ON PAGE 1, JUST

12:59PM  9    THAT VERY TOP EMAIL, AND THEN WE'LL PICK BACK UP ON PAGE 4,

12:59PM  10   WHICH IS WHERE THE ATTACHMENT BEGINS.

12:59PM  11                   THE COURT:  ALL RIGHT.  THANK YOU.

12:59PM  12        I'LL OVERRULE THE OBJECTION.

12:59PM  13        THIS IS BEING ADMITTED, AGAIN, LADIES AND GENTLEMEN, NOT

12:59PM  14   FOR THE TRUTH OF THE MATTER ASSERTED, BUT ONLY AS TO THE ISSUE

12:59PM  15   OF KNOWLEDGE, KNOWLEDGE OF THE RECIPIENT OF THIS EMAIL, FOR

12:59PM  16   THAT LIMITED PURPOSE ONLY.

12:59PM  17        AND YOU'LL STRIKE THE BOTTOM, AND IT'S OTHERWISE ADMITTED.

12:59PM  18        (GOVERNMENT'S EXHIBIT 277, TOP EMAIL AND ATTACHMENT, WAS

01:00PM  19   RECEIVED IN EVIDENCE.)

01:00PM  20                   MR. SCHENK:  THANK YOU.  AND OTHERWISE PERMISSION TO

01:00PM  21   PUBLISH?

01:00PM  22                   THE COURT:  YES.

01:00PM  23   BY MR. SCHENK:

01:00PM  24   Q.   DR. CULLEN, IF YOU'LL LOOK AT THE EMAIL EITHER IN FRONT OF

01:00PM  25   YOU OR ON THE SCREEN, DOES IT APPEAR TO BE AN EMAIL FROM

01:00PM  1    ELIZABETH HOLMES TO SOMEONE NAMED BRUCESHEPHERD@WAL-MART.COM.

01:00PM  2        DO YOU SEE THAT?

01:00PM  3    A.   YES.

01:00PM  4    Q.   AND THEN ON THE CC LINE, IS THERE SOMEONE NAMED

01:00PM  5    SUNNY BALWANI?

01:00PM  6    A.   YES.

01:00PM  7    Q.   AND THEN DO YOU SEE AN ATTACHMENT TO THIS EMAIL?

01:00PM  8    A.   YES.

01:00PM  9    Q.   AND IF YOU'LL NOW TURN TO PAGE 4 OF THE DOCUMENT, THE

01:00PM  10   FIRST PAGE OF THE ATTACHMENT.

01:00PM  11       DO YOU RECOGNIZE THIS DOCUMENT?

01:00PM  12   A.   YES.

01:00PM  13   Q.   AND WHAT IS THIS?

01:00PM  14   A.   IT'S THE SAME VALIDATION REPORT OR ASSAY DEVELOPMENT

01:00PM  15   REPORT THAT WAS PROVIDED TO US, SCHERING-PLOUGH.

01:00PM  16   Q.   OKAY.  AT THE VERY TOP OF THIS VERSION OF THE DOCUMENT, ON

01:00PM  17   THE LEFT-HAND SIDE IN THE HEADER, DO YOU SEE A LOGO?

01:00PM  18   A.   YES.

01:00PM  19   Q.   WHOSE LOGO?

01:00PM  20   A.   THERANOS.

01:00PM  21   Q.   I'M SORRY.  WHOSE LOGO?

01:01PM  22   A.   THERANOS.

01:01PM  23   Q.   ACROSS FROM THE THERANOS LOGO ON THIS VERSION, DO YOU SEE

01:01PM  24   ANY OTHER LOGOS?

01:01PM  25   A.   NO OTHER LOGO.

01:01PM  1      Q.   THANK YOU.

01:01PM  2           IN ADDITION TO TRAVELLING TO PALO ALTO AS PART OF YOUR DUE

01:01PM  3      DILIGENCE, WAS THERE AN OCCASION WHEN THERANOS PROVIDED ITS

01:01PM  4      TECHNOLOGY TO YOUR LAB IN NEW JERSEY?

01:01PM  5      A.   YES.  WE RECEIVED TWO INSTRUMENTS FROM THEM.

01:01PM  6      Q.   WAS THAT AT THE SAME TIME THAT THIS DUE DILIGENCE WORK WAS

01:01PM  7      GOING ON?

01:01PM  8      A.   I BELIEVE IT WAS PRIOR, BUT CLOSE TO THE SAME TIME.

01:01PM  9      Q.   OKAY.  AND FOR WHAT PURPOSE DID SCHERING-PLOUGH RECEIVE

01:01PM 10      THESE TWO DEVICES?

01:01PM 11      A.   JUST FOR BETA TESTING PURPOSES.

01:01PM 12      Q.   WHAT DOES THAT MEAN, BETA TESTING?

01:01PM 13      A.   JUST TO BE ABLE TO TEST THE TECHNOLOGY UNDER OUR

01:01PM 14      CONDITIONS IN OUR LAB.

01:01PM 15      Q.   AND DID YOU OR YOUR LAB DO THAT TESTING?

01:01PM 16      A.   YES, WE DID.

01:01PM 17      Q.   HOW DID YOU DO THAT?  WHAT, IN FACT, DID YOU DO?

01:02PM 18      A.   SO WE SPIKE ONE OF THE ANALYTES, EITHER TNF OR

01:02PM 19      INTERLEUKIN-6, OR C REACTIVE PROTEIN INTO HUMAN BLOOD

01:02PM 20      SPECIMENS, AND THEN WE MEASURE THEM.

01:02PM 21      Q.   DID YOU SAY SPIKED?

01:02PM 22      A.   YES.  SPIKED JUST MEANS THAT YOU CAN PURCHASE PURIFIED

01:02PM 23      REAGENTS AND PUT THEM INTO THE HUMAN SERUM SAMPLE SO THAT YOU

01:02PM 24      KNOW THE EXACT AMOUNT IN EACH SAMPLE THAT YOU'RE GOING TO TEST.

01:02PM 25      Q.   DO YOU KNOW HOW MANY SAMPLES SCHERING-PLOUGH RAN ON THESE

01:02PM   1    THERANOS DEVICES?

01:02PM   2    A.   I DON'T REMEMBER, NO.

01:02PM   3    Q.   WOULD YOU CALL THE WORK THAT SCHERING-PLOUGH DID ON THESE

01:02PM   4    THERANOS DEVICES VALIDATION?

01:02PM   5    A.   NO.

01:03PM   6    Q.   WHY NOT?

01:03PM   7    A.   THEY WERE INSUFFICIENT DETERMINATIONS.  WE DIDN'T DO

01:03PM   8    ENOUGH TESTS.  IT WAS SIMPLY A SUPERFICIAL LOOK AT THE

01:03PM   9    CAPABILITY OF THE INSTRUMENT.

01:03PM  10    Q.   AFTER RUNNING THESE TESTS ON THE THERANOS DEVICES, DID YOU

01:03PM  11    EVER TELL ANYBODY AT THERANOS THAT SCHERING-PLOUGH HAD NOW

01:03PM  12    VALIDATED THERANOS'S TECHNOLOGY OR THERANOS'S DEVICES?

01:03PM  13    A.   NO.

01:03PM  14    Q.   TO YOUR KNOWLEDGE, DID ANYBODY FROM SCHERING-PLOUGH, AFTER

01:03PM  15    TESTING THESE DEVICES AT SCHERING-PLOUGH, EVER TELL SOMEONE AT

01:03PM  16    THERANOS THAT SCHERING-PLOUGH HAD VALIDATE THERANOS'S

01:03PM  17    TECHNOLOGY?

01:03PM  18    A.   NO.

01:03PM  19              MR. SCHENK:  MAY I HAVE ONE MOMENT, YOUR HONOR?

01:03PM  20              THE COURT:  YES.

01:03PM  21         (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

01:04PM  22              MR. SCHENK:  THANK YOU, YOUR HONOR.

01:04PM  23         NO FURTHER QUESTIONS.

01:04PM  24              THE COURT:  CROSS-EXAMINATION?

01:04PM  25              MS. WALSH:  YES, YOUR HONOR.

01:04PM  1          MAY I APPROACH THE BENCH, YOUR HONOR?

01:04PM  2                  THE COURT:  YES, YES.  THANK YOU.

01:04PM  3                  MS. WALSH:  (HANDING.)

01:04PM  4          MAY I APPROACH THE WITNESS, YOUR HONOR?

01:05PM  5                  THE COURT:  YES, YES, OF COURSE.

01:05PM  6                  MS. WALSH:  THANK YOU.

01:05PM  7          (HANDING.)

01:05PM  8                      **CROSS-EXAMINATION**

01:05PM  9     BY MS. WALSH:

01:05PM  10    Q.   GOOD AFTERNOON, DR. CULLEN.

01:05PM  11         LET ME REMOVE MY MASK.  MY NAME IS AMY WALSH AND I

01:05PM  12    REPRESENT MR. BALWANI.

01:05PM  13         I'M GOING TO ASK YOU SOME QUESTIONS, AND I'M GOING TO ASK

01:05PM  14    YOU SOME QUESTIONS ABOUT YOUR DIRECT TESTIMONY.  OKAY?

01:05PM  15         SO YOU WERE ASKED WHETHER -- ABOUT THAT MAY 2009 MEETING,

01:05PM  16    WHETHER MR. BALWANI WAS PRESENT DURING THAT MEETING, AND YOU

01:05PM  17    SAID YOU DON'T REMEMBER; IS THAT RIGHT?

01:05PM  18    A.   YES.

01:05PM  19    Q.   AND YOU SAID THAT YOU DID NOT KNOW HIS NAME; IS THAT

01:05PM  20    CORRECT?

01:05PM  21    A.   THAT'S CORRECT.

01:05PM  22    Q.   AND MR. SCHENK ASKED YOU, IS IT POSSIBLE THAT YOU NEVER

01:05PM  23    MET MR. BALWANI; RIGHT?

01:05PM  24         AND YOU SAID YES, THAT'S POSSIBLE; RIGHT?

01:05PM  25    A.   CORRECT.

CULLEN CROSS BY MS. WALSH

01:06PM  1    Q.   AND, IN FACT, YOU'VE NEVER MET MR. BALWANI; CORRECT?

01:06PM  2    A.   NOT TO MY RECOLLECTION.

01:06PM  3    Q.   WELL, YOU DON'T RECOGNIZE HIM IN THE COURTROOM TODAY?

01:06PM  4    A.   NO.

01:06PM  5    Q.   AND IN ALL OF YOUR COMMUNICATIONS WITH THERANOS, YOU DID

01:06PM  6    NOT SPEAK WITH MR. BALWANI; IS THAT RIGHT?

01:06PM  7    A.   CORRECT.

01:06PM  8    Q.   YOU DIDN'T EMAIL WITH HIM; CORRECT?

01:06PM  9    A.   CORRECT.

01:06PM  10   Q.   AND IN ALL OF THE EMAILS THAT MR. SCHENK SHOWED YOU DURING

01:06PM  11   YOUR DIRECT TESTIMONY, MR. BALWANI WAS NOT ON ANY OF THOSE

01:06PM  12   EMAILS; RIGHT?

01:06PM  13   A.   CORRECT.

01:06PM  14   Q.   AND WERE YOU AWARE THAT DURING THE FIRST HALF OF 2009,

01:06PM  15   MR. BALWANI DIDN'T EVEN WORK FOR THERANOS?  WERE YOU AWARE OF

01:06PM  16   THAT?

01:06PM  17   A.   NO.

01:06PM  18   Q.   OKAY.  AND YOU JUST TESTIFIED ABOUT THE EARLY 2009 TIME

01:06PM  19   PERIOD WHEN THERANOS PROVIDED SCHERING-PLOUGH WITH THE TWO

01:06PM  20   DEVICES.

01:06PM  21       DO YOU REMEMBER THAT TESTIMONY?

01:07PM  22   A.   YES.

01:07PM  23   Q.   AND YOU SAID THAT YOU SPIKED THE SAMPLE.  I GUESS IT WAS

01:07PM  24   RUN IN THE MACHINE; IS THAT RIGHT?

01:07PM  25   A.   YES.

CULLEN CROSS BY MS. WALSH

01:07PM   1    Q.   OKAY.  AND SO THERANOS SENT SCHERING-PLOUGH TWO OF ITS

01:07PM   2    DEVICES; CORRECT?

01:07PM   3    A.   CORRECT.

01:07PM   4    Q.   AND SCHERING-PLOUGH HAD THOSE DEVICES INDEPENDENT OF

01:07PM   5    THERANOS; RIGHT?

01:07PM   6    A.   I DON'T KNOW WHAT YOU MEAN BY INDEPENDENT OF THERANOS.

01:07PM   7    Q.   YEAH.  I'LL ASK A DIFFERENT QUESTION.  THANKS.

01:07PM   8         THERANOS DID NOT SUPERVISE SCHERING-PLOUGH WHEN

01:07PM   9    SCHERING-PLOUGH SPIKED THE SAMPLES --

01:07PM  10    A.   CORRECT.

01:07PM  11    Q.   -- AND RAN THEM IN THE DEVICES?

01:07PM  12         THE COURT:  DR. CULLEN, I'M GOING TO ASK YOU TO WAIT

01:07PM  13    UNTIL THE QUESTION IS FINISHED.

01:07PM  14         THE WITNESS:  OKAY.

01:07PM  15         THE COURT:  AND THEN ANSWER.  THAT WAY IT WILL MAKE

01:07PM  16    OUR REPORTER MUCH HAPPIER AS WELL, SO THANK YOU.

01:07PM  17    BY MS. WALSH:

01:07PM  18    Q.   AND I'LL WAIT UNTIL YOUR ANSWER IS FINISHED, WHICH WILL

01:07PM  19    HELP.

01:07PM  20         SO SCHERING-PLOUGH HAD THE DEVICES; CORRECT?

01:07PM  21    A.   CORRECT.

01:07PM  22    Q.   AND INDEPENDENT OF THERANOS, SCHERING-PLOUGH COULD RUN THE

01:08PM  23    SAMPLES WHENEVER IT WANTED; RIGHT?

01:08PM  24    A.   CORRECT.

01:08PM  25    Q.   AND IT COULD EVALUATE THE RESULTS INDEPENDENT OF THERANOS;

01:08PM  1    CORRECT?

01:08PM  2    A.    THAT'S NOT CORRECT, BECAUSE THE INSTRUMENT ITSELF DID NOT

01:08PM  3    HAVE A READOUT FOR RESULTS.  THEY HAD TO BE SENT TO US.

01:08PM  4    Q.    THE RESULTS HAD TO BE SENT TO YOU?

01:08PM  5    A.    CORRECT.

01:08PM  6    Q.    FROM THERANOS?

01:08PM  7    A.    CORRECT.

01:08PM  8    Q.    OKAY.  BUT THE DEVICE ITSELF YOU HAD IN YOUR POSSESSION;

01:08PM  9    RIGHT?

01:08PM  10   A.    CORRECT.

01:08PM  11   Q.    AND YOU COULD RUN THE DEVICE; CORRECT?

01:08PM  12   A.    CORRECT.

01:08PM  13   Q.    AND YOU DIDN'T HAVE SOMEONE FROM THERANOS SUPERVISING THAT

01:08PM  14   PROCESS?

01:08PM  15   A.    ALL CORRECT.

01:08PM  16   Q.    OKAY.  AND YOU SAID THAT YOU TOOK A SUPERFICIAL LOOK AT

01:08PM  17   THE CAPABILITY OF THE MACHINE; IS THAT RIGHT?

01:08PM  18   A.    YES.

01:08PM  19   Q.    JUST NOW?

01:08PM  20        BUT, IN FACT, WHEN YOU DID TAKE WHATEVER LOOK YOU DID TAKE

01:08PM  21   AT THE MACHINE, YOU WERE -- YOUR TEAM WAS IMPRESSED WITH THE

01:08PM  22   MACHINE'S SENSITIVITY; ISN'T THAT RIGHT?

01:09PM  23   A.    THAT IS CORRECT.

01:09PM  24   Q.    OKAY.  AND AS FAR AS YOU COULD TELL, THE MACHINE PROVIDED

01:09PM  25   ACCURATE RESULTS; RIGHT?

01:09PM  1    A.   AS FAR AS WE COULD TELL, YES.

01:09PM  2    Q.   NOW, IN THE SPRING OF 2009, YOU SAID YOU WENT TO A MEETING

01:09PM  3    AT THERANOS IN CALIFORNIA; RIGHT?

01:09PM  4    A.   THAT'S CORRECT.

01:09PM  5    Q.   AND YOU FLEW HERE FROM NEW JERSEY?

01:09PM  6    A.   CORRECT.

01:09PM  7    Q.   AND THE PURPOSE OF THAT MEETING WAS TO HAVE A DISCUSSION

01:09PM  8    ABOUT THE THERANOS TECHNOLOGY; RIGHT?

01:09PM  9    A.   THAT'S CORRECT.

01:09PM 10    Q.   AND YOU WANTED TO TALK ABOUT THE CHEMISTRY IN THE ASSAYS;

01:09PM 11    RIGHT?

01:09PM 12    A.   CORRECT.

01:09PM 13    Q.   AND, IN FACT, IT WAS -- IT WASN'T JUST ONE ASSAY, IT WAS

01:09PM 14    THREE DIFFERENT ASSAYS; RIGHT?

01:09PM 15    A.   IT WAS THOSE THREE ASSAYS.  BUT IN ADDITION, WE WERE

01:09PM 16    INTERESTED IN PURSUING IT FOR POTENTIALLY OTHER ANALYTES,

01:09PM 17    INCLUDING PROPRIETARY.

01:09PM 18    Q.   OKAY.  BUT THE ASSAYS THAT YOU RAN, THERE WERE THREE

01:10PM 19    DIFFERENT ASSAYS; CORRECT?

01:10PM 20    A.   CORRECT.

01:10PM 21    Q.   AND THOSE THREE DIFFERENT ASSAYS RAN ON ONE CARTRIDGE; IS

01:10PM 22    THAT RIGHT?

01:10PM 23    A.   THAT IS CORRECT.

01:10PM 24    Q.   OKAY.  SO WHEN YOU CAME TO CALIFORNIA IN MAY OF 2009, THE

01:10PM 25    MEETING, THE PURPOSE OF THE MEETING WAS TO DISCUSS THE SCIENCE

CULLEN CROSS BY MS. WALSH

01:10PM 1    OF THE ASSAYS; CORRECT?

01:10PM 2    A.   CORRECT.

01:10PM 3    Q.   OKAY.  AND IF WE CAN PULL UP WHAT IS IN EVIDENCE AS

01:10PM 4    EXHIBIT 192.

01:10PM 5        AND THIS IS THE CALENDAR INVITE AND AGENDA FOR THAT

01:10PM 6    MEETING; CORRECT?

01:10PM 7    A.   YES.

01:10PM 8    Q.   AND IF WE CAN GO TO THE SECOND PAGE, THAT'S THE AGENDA,

01:10PM 9    AND I WANT TO FOCUS IN ON THE SCHERING-PLOUGH PARTICIPANTS IN

01:10PM 10   THAT MEETING.

01:10PM 11       SO ONE OF THE PARTICIPANTS WAS DR. ABUTARIF; IS THAT

01:11PM 12   RIGHT?

01:11PM 13   A.   YES.

01:11PM 14   Q.   AND HE WAS A PH.D. AND A SCIENTIST; CORRECT?

01:11PM 15   A.   CORRECT.

01:11PM 16   Q.   AND THERE WAS A DR. FICK, WHO WAS A MEDICAL DOCTOR; RIGHT?

01:11PM 17   A.   YES.

01:11PM 18   Q.   AND A DR. GHEYAS; CORRECT?

01:11PM 19   A.   CORRECT.

01:11PM 20   Q.   WITH A PH.D. IN STATISTICS?

01:11PM 21   A.   CORRECT.

01:11PM 22   Q.   AND A DR. VAN HOOGSTRATEN; CORRECT?

01:11PM 23   A.   CORRECT.

01:11PM 24   Q.   WHO IS BOTH A DOCTOR AND A PH.D.; RIGHT?

01:11PM 25   A.   THAT IS CORRECT.

01:11PM  1    Q.   AND LET'S LOOK AT THE PEOPLE WHO ATTENDED ON BEHALF OF

01:11PM  2    THERANOS.

01:11PM  3         THERE'S DR. IAN GIBBONS; CORRECT?

01:11PM  4    A.   YES.

01:11PM  5    Q.   AND HE'S A PH.D.?

01:11PM  6    A.   CORRECT.

01:11PM  7    Q.   AND DR. MICHELSON, ALSO A PH.D.; RIGHT?

01:11PM  8    A.   RIGHT.

01:11PM  9    Q.   AND DR. THIBONNIER; CORRECT?

01:11PM  10   A.   CORRECT.

01:11PM  11   Q.   AND ALSO HE WAS AN M.D.; RIGHT?

01:11PM  12   A.   CORRECT.

01:11PM  13   Q.   AND ACTUALLY THE CHIEF MEDICAL OFFICER OF THERANOS AT THE

01:12PM  14   TIME; RIGHT?

01:12PM  15   A.   CORRECT.

01:12PM  16   Q.   AND THEN DR. YOUNG, WHO WAS A PH.D.

01:12PM  17        DO YOU SEE HIM?

01:12PM  18   A.   CORRECT.

01:12PM  19   Q.   AND SO THIS WAS A MEETING REALLY AMONG THE SCIENTISTS

01:12PM  20   BETWEEN SCHERING-PLOUGH AND THERANOS; CORRECT?

01:12PM  21   A.   THAT IS CORRECT.

01:12PM  22   Q.   AND THIS IS A MEETING WHERE YOU FELT THAT, OR YOU

01:12PM  23   TESTIFIED THAT YOU HAD SOME ISSUES WITH MS. HOLMES'S CANDOR; IS

01:12PM  24   THAT RIGHT?

01:12PM  25   A.   THAT'S CORRECT.

CULLEN CROSS BY MS. WALSH

01:12PM 1    Q.   AND YOU SAID ON DIRECT THAT YOU DIDN'T FEEL THAT SHE WAS

01:12PM 2    ANSWERING THE QUESTIONS ADEQUATELY; IS THAT RIGHT?

01:12PM 3    A.   THAT'S CORRECT.

01:12PM 4    Q.   AND YOU FELT LIKE YOU COULDN'T GET A CERTAIN LEVEL OF

01:12PM 5    DISCLOSURE FROM THERANOS AT THE TIME; CORRECT?

01:12PM 6    A.   CORRECT.

01:12PM 7    Q.   BUT YOU DID NOT SAY ANYTHING DURING THAT MEETING ABOUT NOT

01:12PM 8    GETTING YOUR QUESTIONS ANSWERED; RIGHT?

01:12PM 9    A.   CORRECT.

01:12PM 10   Q.   YOU NEVER TOLD MS. HOLMES; CORRECT?

01:12PM 11   A.   CORRECT.

01:12PM 12   Q.   AND YOU NEVER TOLD ANY OF THE SCIENTISTS WHO PARTICIPATED

01:13PM 13   IN THAT MEETING; CORRECT?

01:13PM 14   A.   THAT'S CORRECT.

01:13PM 15   Q.   AND YOU SAID YOU DIDN'T DO THAT BECAUSE IT FELT AWKWARD AT

01:13PM 16   THE TIME; CORRECT?

01:13PM 17   A.   CORRECT.

01:13PM 18   Q.   BUT THE FACT IS THAT YOU NEVER EXPRESSED YOUR VIEWS?

01:13PM 19   A.   THAT IS CORRECT.

01:13PM 20   Q.   OKAY.  AND MR. BALWANI WAS NOT AT THIS MEETING; CORRECT?

01:13PM 21   A.   CORRECT.

01:13PM 22   Q.   OKAY.  AND MR. SCHENK SHOWED YOU EXHIBIT 223, WHICH WAS A

01:13PM 23   JUNE 2009 EMAIL.

01:13PM 24        YES, IF WE CAN PULL THAT UP.

01:13PM 25        AND ON THE BOTTOM EMAIL, DR. CULLEN, IN JUNE OF 2009, YOU

CULLEN CROSS BY MS. WALSH

01:13PM   1    ARE EMAILING GARY FRENZEL FROM THERANOS; RIGHT?

01:14PM   2    A.   CORRECT.

01:14PM   3    Q.   AND THE SUBJECT IS ASSAY DEVELOPMENT; RIGHT?

01:14PM   4    A.   YES.

01:14PM   5    Q.   AND YOU SAY, "HI GARY,

01:14PM   6         "WE HAD A TEAM MEETING TODAY AND JIM MCCLEOD ASKED ME TO

01:14PM   7    CHECK IN AND GET AN ASSAY DEVELOPMENT UPDATE FOR THE TEAM.

01:14PM   8    COULD YOU GIVE ME A SYNOPSIS OF WHERE THINGS ARE AT AND IF YOU

01:14PM   9    NEED ANYTHING FROM OUR END?"

01:14PM  10         THAT'S WHAT YOU SAID; RIGHT?

01:14PM  11    A.   CORRECT.

01:14PM  12    Q.   AND YOU DIDN'T EXPRESS ANY OF THE VIEWS THAT YOU SAY YOU

01:14PM  13    HAD IN THE MEETING IN THIS EMAIL EITHER; RIGHT?

01:14PM  14    A.   THAT IS CORRECT.

01:14PM  15    Q.   YOU DIDN'T RAISE ANY QUESTIONS ABOUT THE THERANOS

01:14PM  16    TECHNOLOGY; RIGHT?

01:14PM  17    A.   THAT IS CORRECT.

01:14PM  18    Q.   AND YOU DIDN'T COMMENT ON MS. HOLMES'S CANDOR IN THIS

01:14PM  19    EMAIL; CORRECT?

01:14PM  20    A.   CORRECT.

01:14PM  21    Q.   OKAY.  SO LET'S FAST FORWARD IN TIME TO DECEMBER 2009, AND

01:14PM  22    LET'S PULL UP WHAT IS IN EVIDENCE AS EXHIBIT 262.

01:15PM  23         AND IF WE GO FROM THE BOTTOM EMAIL FROM MR. FRENZEL TO YOU

01:15PM  24    AT 2:26 P.M., MR. FRENZEL EMAILS YOU SAYING, "HI CONNIE, I JUST

01:15PM  25    WANTED TO MAKE SURE THAT YOU RECEIVED THIS REPORT."

CULLEN CROSS BY MS. WALSH

01:15PM  1          AND HE'S REFERRING TO THE REPORT THAT WE JUST LOOKED AT;

01:15PM  2     CORRECT?

01:15PM  3     A.   THAT'S CORRECT.

01:15PM  4     Q.   AND "WE ARE LOOKING FORWARD TO DISCUSSING IT WITH YOU."

01:15PM  5          AND THEN IF WE CAN GO TO THE NEXT EMAIL UP.

01:15PM  6          AND WHAT YOU SAY TO HIM IS, "HI GARY,

01:15PM  7          "I'M SORRY FOR THE SLOW RESPONSE.  I DID RECEIVE THE

01:15PM  8     REPORT, I'D ACTUALLY LIKE TO DEFER OUR DISCUSSIONS UNTIL

01:15PM  9     JANUARY.  WE ARE TOTALLY SWAMPED WITH THE MERGER WITH MERCK."

01:15PM 10          IS THAT RIGHT?  IS THAT WHAT YOU WROTE?

01:15PM 11     A.   CORRECT.

01:15PM 12     Q.   OKAY.  AND YOU SAID ON DIRECT THAT YOU ACTUALLY READ THE

01:15PM 13     REPORT AT THE TIME YOU SENT THIS EMAIL; IS THAT CORRECT?

01:16PM 14     A.   THAT'S CORRECT.

01:16PM 15     Q.   AND YOU AGAIN IN THIS EMAIL DID NOT VOICE ANY CONCERNS

01:16PM 16     ABOUT THE THERANOS TECHNOLOGY; IS THAT CORRECT?

01:16PM 17     A.   THAT'S CORRECT.

01:16PM 18     Q.   AND YOU DID NOT VOICE THE CONCERNS THAT YOU SAID YOU HAD

01:16PM 19     IN THE MEETING ABOUT MS. HOLMES'S CANDOR; RIGHT?

01:16PM 20     A.   THAT IS CORRECT.

01:16PM 21     Q.   OKAY.  AND IT DOESN'T -- YOUR EMAIL DIDN'T SAY REALLY

01:16PM 22     ANYTHING ABOUT THE REPORT, WHETHER YOU THOUGHT IT WAS GOOD OR

01:16PM 23     BAD OR IF YOU HAD ISSUES WITH IT; CORRECT?

01:16PM 24     A.   CORRECT.

01:16PM 25     Q.   NOW, MR. SCHENK ASKED YOU --

01:16PM   1          WE CAN TAKE THAT DOWN, MR. ALLEN.  THANK YOU.

01:16PM   2          YOU DEFERRED THE DISCUSSIONS IN THE EMAIL THAT WE JUST SAW

01:16PM   3     WITH MR. FRENZEL BECAUSE OF THE MERGER; RIGHT?

01:16PM   4     A.   THAT'S CORRECT.

01:16PM   5     Q.   AND MR. FRENZEL ASKED YOU IF YOU HAD ANY OTHER DISCUSSIONS

01:16PM   6     WITH THERANOS -- I'M SORRY, WITHDRAWN ON THAT.

01:16PM   7          MY QUESTION IS MR. SCHENK, DURING YOUR DIRECT EXAMINATION,

01:17PM   8     ASKED YOU IF YOU HAD ANY FURTHER CONVERSATIONS WITH THERANOS

01:17PM   9     AFTER DECEMBER 2009; CORRECT?

01:17PM  10     A.   THAT IS CORRECT.

01:17PM  11     Q.   AND YOU SAID NOT THAT I RECALL; RIGHT?

01:17PM  12     A.   THAT IS CORRECT.

01:17PM  13     Q.   BUT ISN'T IT TRUE, DR. CULLEN, THAT YOU RECONNECTED WITH

01:17PM  14     THERANOS IN MARCH OF 2010?

01:17PM  15     A.   IF I DID, I DON'T REMEMBER IT.

01:17PM  16     Q.   OKAY.  AND I CAN SHOW YOU SOMETHING TO REFRESH YOUR

01:17PM  17     RECOLLECTION IF YOU NEED IT.

01:17PM  18     A.   SURE.

01:17PM  19     Q.   BUT DO YOU RECALL WRITING TO THERANOS THAT YOU ASKED A

01:17PM  20     SCIENTIST FROM YOUR GROUP TO REACH OUT TO GARY SO YOU COULD

01:17PM  21     DISCUSS THE REPORT?

01:17PM  22          DO YOU REMEMBER THAT?

01:17PM  23     A.   YES.

01:17PM  24     Q.   OKAY.  SO CAN WE -- ACTUALLY, CAN YOU TURN IN YOUR EXHIBIT

01:17PM  25     BINDER TO EXHIBIT 10574.  JUST LET ME KNOW WHEN YOU HAVE IT IN

01:18PM  1    FRONT OF YOU.

01:18PM  2    A.   I HAVE IT.

01:18PM  3    Q.   OKAY.  DO YOU SEE THE EMAIL FROM YOU TO MS. HOLMES?

01:18PM  4         DO YOU SEE THAT?

01:18PM  5    A.   YES.

01:18PM  6    Q.   AND THIS IS ON MARCH 6TH, 2010?

01:18PM  7    A.   YES.

01:18PM  8    Q.   IS THAT AN EMAIL THAT YOU SENT TO MS. HOLMES AT THE TIME

01:18PM  9    THAT THE EMAIL SAYS YOU SENT IT?

01:18PM  10   A.   YES.

01:18PM  11            MS. WALSH:  YOUR HONOR, WE OFFER 10574.

01:18PM  12            MR. SCHENK:  NO OBJECTION.

01:18PM  13            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:18PM  14        (DEFENDANT'S EXHIBIT 10574 WAS RECEIVED IN EVIDENCE.)

01:18PM  15   BY MS. WALSH:

01:18PM  16   Q.   OKAY.  DR. CULLEN, IN -- LET'S GO TO THE BOTTOM EMAIL FROM

01:18PM  17   MS. HOLMES.

01:18PM  18        WHAT SHE SAYS TO YOU IS -- AND AGAIN, THIS IS MARCH 5TH,

01:18PM  19   2010, A FEW MONTHS AFTER DECEMBER 2009.  AND SHE SAYS,

01:19PM  20   "CONNIE --

01:19PM  21        "CAROLYN LET ME KNOW THAT YOU TWO CONNECTED -- I AM REALLY

01:19PM  22   LOOKING FORWARD TO OUR NEXT CONVERSATION.  PLEASE LET ME KNOW

01:19PM  23   IF THERE IS ANYTHING WE CAN DO FROM OUR END TO HELP FACILITATE

01:19PM  24   THINGS MOVING FORWARD IN THE MEANTIME.

01:19PM  25        "CONGRATULATIONS ON YOUR NEW ROLE -- I WAS SO HAPPY TO

01:19PM  1    HEAR ABOUT IT."

01:19PM  2         DO YOU SEE THAT?

01:19PM  3    A.   YES, I DO.

01:19PM  4    Q.   AND SHE'S CONGRATULATING YOU ON YOUR NEW ROLE IN THE

01:19PM  5    MERGER; RIGHT?

01:19PM  6    A.   YES.

01:19PM  7    Q.   OKAY.  AND IF WE GO UP TO THE NEXT PART OF THE CHAIN, YOU

01:19PM  8    RESPOND TO MS. HOLMES AND YOU SAY, "HI ELIZABETH,

01:19PM  9         "THANKS FOR THE NOTE BELOW.  THINGS WILL SETTLE DOWN

01:19PM  10   EVENTUALLY.  IN THE MEANTIME, I'VE ASKED A SCIENTIST FROM MY

01:19PM  11   GROUP (DON LEE) TO REACH OUT TO GARY TO DISCUSS THE SPECIFICS

01:19PM  12   OF THE VALIDATION."

01:19PM  13        DO YOU SEE THAT?

01:19PM  14   A.   YES, I DO.

01:19PM  15   Q.   OKAY.  AND SO WHEN YOU TESTIFIED THAT YOU DIDN'T REMEMBER

01:20PM  16   ANY OTHER INTERACTION WITH THERANOS AFTER DECEMBER 2009, DOES

01:20PM  17   THIS REFRESH YOUR RECOLLECTION AS TO FURTHER COMMUNICATIONS

01:20PM  18   WITH THERANOS AFTER THAT POINT?

01:20PM  19   A.   IT DOES.

01:20PM  20   Q.   OKAY.  AND AGAIN, IN THIS EMAIL IN MARCH OF 2010, YOU

01:20PM  21   DON'T EXPRESS ANY MISGIVINGS ABOUT THE THERANOS TECHNOLOGY;

01:20PM  22   CORRECT?

01:20PM  23   A.   CORRECT.

01:20PM  24   Q.   NOR ANY MISGIVINGS ABOUT MS. HOLMES'S CANDOR OR ABILITY TO

01:20PM  25   ANSWER QUESTIONS ABOUT THE THERANOS TECHNOLOGY; RIGHT?

01:20PM    1    A.   CORRECT.

01:20PM    2              MS. WALSH:  YOUR HONOR, MAY I HAVE A MOMENT?

01:20PM    3              THE COURT:  YES.

01:20PM    4         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:21PM    5              MS. WALSH:  NOTHING FURTHER, YOUR HONOR.

01:21PM    6              THE COURT:  MR. SCHENK.

01:21PM    7              MR. SCHENK:  JUST BRIEFLY.

01:21PM    8                     **REDIRECT EXAMINATION**

01:21PM    9    BY MR. SCHENK:

01:21PM   10    Q.   DR. CULLEN, IN THIS FURTHER EMAIL THAT IS EXHIBIT 10574,

01:21PM   11    THE ONE YOU WERE DISCUSSING WITH MS. WALSH --

01:21PM   12    A.   YES.

01:21PM   13    Q.   -- WHERE MS. HOLMES WROTE TO YOU AND CONGRATULATED ON YOU

01:21PM   14    YOUR NEW ROLE AFTER THE MERGER, DID YOU RESPOND BY TELLING

01:21PM   15    MS. HOLMES THAT SCHERING-PLOUGH COMPREHENSIVELY VALIDATED

01:21PM   16    THERANOS'S TECHNOLOGY?

01:21PM   17    A.   NO.

01:21PM   18    Q.   DID YOU EVER SAY THAT TO MS. HOLMES?

01:21PM   19    A.   NO.

01:21PM   20    Q.   DID YOU EVER SAY THAT TO ANYBODY AT THERANOS?

01:21PM   21    A.   NO.

01:21PM   22    Q.   DID ANYBODY, TO YOUR KNOWLEDGE, FROM SCHERING-PLOUGH EVER

01:22PM   23    SAY THAT TO ANYBODY AT THERANOS?

01:22PM   24    A.   NO.

01:22PM   25    Q.   THANK YOU.

01:22PM   1          NO FURTHER QUESTIONS.

01:22PM   2                  THE COURT:  MS. WALSH?

01:22PM   3                  MS. WALSH:  NOTHING FURTHER.

01:22PM   4                  THE COURT:  MAY THIS WITNESS BE EXCUSED?

01:22PM   5                  MR. SCHENK:  YES.

01:22PM   6                  THE COURT:  MS. WALSH, MAY THIS WITNESS BE EXCUSED?

01:22PM   7                  MS. WALSH:  YES.

01:22PM   8                  THE COURT:  THANK YOU.  DOCTOR, YOU'RE EXCUSED.

01:22PM   9      THANK YOU.

01:22PM   10         DOES THE GOVERNMENT HAVE ADDITIONAL WITNESSES AVAILABLE

01:22PM   11     TODAY?

01:22PM   12                 MR. BOSTIC:  YES, YOUR HONOR, WE DO.

01:22PM   13         THE UNITED STATES CALLED DANIEL EDLIN.

01:23PM   14                 THE COURT:  FOLKS, IF YOU WANT TO STAND AND STRETCH

01:23PM   15     FOR A MOMENT WHILE THE WITNESS COMES IN.

01:23PM   16         SIR, IF YOU WOULD COME AND STAND AND RAISE YOUR RIGHT

01:23PM   17     HAND.

01:23PM   18         **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS SWORN.)**

01:23PM   19                 THE WITNESS:  YES.

01:23PM   20                 THE COURT:  PLEASE HAVE A SEAT HERE, SIR.

01:23PM   21         AND PLEASE BE SEATED EVERYONE.

01:23PM   22         THANK YOU.

01:23PM   23         MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST THAT

01:23PM   24     MICROPHONE AND THE CHAIR AS NEEDED FOR YOUR COMFORT.

01:23PM   25         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

01:23PM  1    AND THEN SPELL IT, PLEASE.

01:23PM  2              THE WITNESS:  DANIEL EDLIN, D-A-N-I-E-L, E-D-L-I-N.

01:23PM  3              THE COURT:  THANK YOU.

01:23PM  4         MR. BOSTIC.

01:23PM  5              MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:23PM  6                        **DIRECT EXAMINATION**

01:23PM  7    BY MR. BOSTIC:

01:23PM  8    Q.   GOOD AFTERNOON, MR. EDLIN.

01:23PM  9    A.   GOOD AFTERNOON.

01:23PM  10   Q.   I UNDERSTAND FROM THE COURT THAT YOU ARE PERMITTED TO

01:24PM  11   TESTIFY WITHOUT A MASK IF YOU ARE FULLY VACCINATED; IS THAT

01:24PM  12   CORRECT?

01:24PM  13   A.   YES.

01:24PM  14   Q.   MR. EDLIN, WAS THERE A TIME WHEN YOU WORKED FOR A COMPANY

01:24PM  15   CALLED THERANOS?

01:24PM  16   A.   YES.

01:24PM  17   Q.   DO YOU REMEMBER YOUR APPROXIMATE DATES OF EMPLOYMENT WITH

01:24PM  18   THE COMPANY?

01:24PM  19   A.   I JOINED SEPTEMBER OF 2011 AND LEFT IN DECEMBER OF 2016.

01:24PM  20   Q.   AND WHAT JOB TITLES DID YOU HAVE WHILE YOU WERE AT

01:24PM  21   THERANOS?

01:24PM  22   A.   I WAS HIRED AS A SENIOR PROJECT MANAGER, AND I RECEIVED A

01:24PM  23   PROMOTION THREE YEARS LATER TO LEAD STRATEGIC OPERATIONS,

01:24PM  24   OFFICE OF THE CEO.

01:24PM  25   Q.   AND I WANT TO TALK MORE ABOUT YOUR JOB RESPONSIBILITIES,

01:24PM   1    BUT FOR NOW, CAN YOU SUMMARIZE IN A FEW SENTENCES WHAT THOSE

01:24PM   2    ROLES INVOLVED?

01:24PM   3    A.   AS SENIOR PRODUCT MANAGER, I SUPPORTED KEY BUSINESS

01:24PM   4    PARTNERSHIPS, INCLUDING THE WALGREENS PARTNERSHIP.

01:25PM   5         I ALSO SUPPORTED RELATIONSHIPS WITH COMPONENTS OF THE

01:25PM   6    DEPARTMENT OF DEFENSE AND SOME PHARMACEUTICAL COMPANIES.

01:25PM   7         I WORKED WITH OTHER SENIOR PRODUCT MANAGERS TO SUPPORT

01:25PM   8    WORK WITH MARKETING AND COMMUNICATIONS COMPANIES.

01:25PM   9         AND I ALSO COORDINATED TECHNOLOGY DEMONSTRATIONS.

01:25PM   10   Q.   WHEN YOU LEFT THE COMPANY, DID YOU SAY THAT WAS END OF THE

01:25PM   11   YEAR 2016?

01:25PM   12   A.   CORRECT.

01:25PM   13   Q.   WHAT WAS THE NATURE OF YOUR DEPARTURE FROM THE COMPANY?

01:25PM   14   WERE YOU LAID OFF?  WERE YOU FIRED?  DID YOU QUIT?

01:25PM   15            MS. WALSH:  OBJECTION.  TIME PERIOD.

01:25PM   16            THE COURT:  THE TIMING OF HIS -- WHEN HE LEFT?

01:25PM   17            MS. WALSH:  YES.

01:25PM   18            THE COURT:  DID YOU WANT TO MAYBE JUST ASK A

01:25PM   19   QUESTION ABOUT THAT, WHEN HE LEFT JUST TO CLEAR THE RECORD.

01:25PM   20            MR. BOSTIC:  SURE.

01:25PM   21       IS THE CONFUSION AS TO WHEN HE LEFT?

01:25PM   22            THE COURT:  I THINK SO.

01:25PM   23   BY MR. BOSTIC:

01:25PM   24   Q.   MR. EDLIN, WHEN DID YOU LEAVE THE COMPANY?

01:25PM   25   A.   DECEMBER 2016.

01:26PM 1    Q.   AND WHY DID YOU LEAVE THE COMPANY IN DECEMBER OF 2016?

01:26PM 2              MS. WALSH:  OBJECTION.  RELEVANCE.

01:26PM 3              THE COURT:  OVERRULED.

01:26PM 4         YOU CAN ANSWER THE QUESTION.

01:26PM 5              THE WITNESS:  I LEFT THE COMPANY FOR TWO MAIN

01:26PM 6    REASONS:

01:26PM 7         ONE, I WANTED TO GO TO BUSINESS SCHOOL, WHICH I DID; AND

01:26PM 8    TWO, I NO LONGER BELIEVED, BASED ON WHAT I WAS SEEING, THAT THE

01:26PM 9    COMPANY WAS CAPABLE OF STANDING BEHIND THE CLAIMS IT HAD BEEN

01:26PM 10   MAKING ABOUT THE TECHNOLOGY.

01:26PM 11        THIS WAS ABOUT A YEAR AFTER THE FIRST

01:26PM 12   "WALL STREET JOURNAL" ARTICLE CAME OUT.  IN THAT PERIOD THE

01:26PM 13   COMPANY MADE SEVERAL ATTEMPTS TO PROVE ITS TECHNOLOGY, ALL OF

01:26PM 14   WHICH WERE UNSUCCESSFUL, AND I NO LONGER WANTED TO BE IN THAT

01:26PM 15   ENVIRONMENT.

01:26PM 16   BY MR. BOSTIC:

01:26PM 17   Q.   UNDERSTOOD.  I'LL WANT TO FOLLOW UP WITH YOU ON THAT

01:26PM 18   DECISION AND WHAT CAME BEHIND IT LATER.

01:26PM 19        BUT FOR NOW, CAN YOU GIVE US SOME INFORMATION ABOUT YOUR

01:26PM 20   BACKGROUND, STARTING WITH YOUR EDUCATION?

01:26PM 21   A.   FOR MY UNDERGRADUATE I ATTENDED DUKE UNIVERSITY AND

01:27PM 22   MAJORED IN PUBLIC POLICY AND RECEIVED A CERTIFICATE IN MARKETS

01:27PM 23   AND MANAGEMENT STUDIES.

01:27PM 24        I ALSO RECEIVED MY MASTER'S OF BUSINESS ADMINISTRATION

01:27PM 25   FROM THE UCLA ANDERSON SCHOOL OF MANAGEMENT.

EDLIN DIRECT BY MR. BOSTIC

01:27PM   1    Q.   AND IN BETWEEN OBTAINING THOSE DEGREES AND STARTING WORK

01:27PM   2    AT THERANOS, DID YOU HAVE ANY OTHER EMPLOYMENT?

01:27PM   3    A.   MY FIRST JOB OUT OF COLLEGE WAS AS AN EQUITY RESEARCH AND

01:27PM   4    SALES ASSISTANT AT TELSEY ADVISORY GROUP.

01:27PM   5    Q.   AND FOR HOW LONG WERE YOU THERE?

01:27PM   6    A.   ABOUT TWO YEARS.

01:27PM   7    Q.   SO LET'S TALK ABOUT HOW YOU CAME TO WORK AT THERANOS.

01:27PM   8         HOW DID YOU FIRST FIND OUT ABOUT THE COMPANY?

01:27PM   9    A.   I FIRST FOUND OUT ABOUT THE COMPANY THROUGH

01:27PM  10    ELIZABETH HOLMES'S BROTHER, CHRISTIAN.  HE AND I ATTENDED DUKE

01:27PM  11    TOGETHER, AND HE'S ONE OF MY CLOSEST FRIENDS, AND I KNEW THAT

01:27PM  12    HIS SISTER HAD DROPPED OUT OF STANFORD TO START HER OWN

01:27PM  13    COMPANY, WHICH IS THERANOS.

01:27PM  14    Q.   AND WHEN YOU FIRST HEARD ABOUT THERANOS, WAS IT IN

01:28PM  15    CONNECTION WITH THE JOB THAT YOU EVENTUALLY CAME TO HAVE, OR

01:28PM  16    DID YOU KNOW ABOUT IT BEFORE THEN?

01:28PM  17    A.   I KNEW ABOUT IT BEFORE THEN.

01:28PM  18    Q.   AND HOW DID YOU COME TO FIND OUT ABOUT THE POSSIBILITY

01:28PM  19    THAT YOU MIGHT WORK AT THERANOS?

01:28PM  20    A.   ABOUT TWO YEARS AFTER I GRADUATED FROM COLLEGE, CHRISTIAN

01:28PM  21    MOVED TO CALIFORNIA TO WORK AT THERANOS AND I KNEW THAT HE WAS

01:28PM  22    DOING THAT.

01:28PM  23         AND THEN A FEW MONTHS LATER, HE ACTUALLY GAVE ME A CALL TO

01:28PM  24    TELL ME THAT THERE MIGHT BE AN OPPORTUNITY FOR ME TO JOIN THE

01:28PM  25    COMPANY.

01:28PM   1      Q.   CAN YOU PLACE THAT IN TIME FOR US?  WHAT YEAR ARE WE

01:28PM   2      TALKING ABOUT NOW?

01:28PM   3      A.   THIS WAS AROUND JUNE OF 2011.

01:28PM   4      Q.   AND WERE YOU INTERESTED IN THAT OPPORTUNITY?

01:28PM   5      A.   I WAS.  IT SOUNDED LIKE A VERY EXCITING OPPORTUNITY WITH A

01:28PM   6      LOT OF POTENTIAL.  I DIDN'T RECEIVE A LOT OF INFORMATION ABOUT

01:28PM   7      IT AT THE TIME, BUT IT SOUNDED LIKE SOMETHING WORTH PURSUING.

01:29PM   8      Q.   AND DID YOU PURSUE THE JOB BASED ON THAT INTEREST?

01:29PM   9      A.   I DID.

01:29PM  10      Q.   CAN YOU SUMMARIZE THE APPLICATION INTERVIEW PROCESS?  WHAT

01:29PM  11      WERE THE STEPS INVOLVED?

01:29PM  12      A.   AFTER I HAD SOME INITIAL DISCUSSIONS WITH CHRISTIAN, I WAS

01:29PM  13      INVITED TO INTERVIEW AT THERANOS'S OFFICES.

01:29PM  14           CHRISTIAN ALSO EXTENDED THE SAME OFFER TO A FEW OF OUR

01:29PM  15      OTHER CLASSMATES FROM DUKE, AND A GROUP OF US WENT TO THE

01:29PM  16      THERANOS OFFICES IN PALO ALTO TO INTERVIEW WITH SUNNY AND

01:29PM  17      ELIZABETH, BOTH IN A GROUP SETTING AND ALSO ONE-ON-ONE.

01:29PM  18      Q.   AND APPROXIMATELY HOW MANY PEOPLE ARE WE TALKING ABOUT IN

01:29PM  19      THIS GROUP OF COLLEGE CLASSMATES WHO WERE INTERVIEWING FOR THIS

01:29PM  20      JOB AT THERANOS, OR THESE JOBS AT THERANOS?

01:29PM  21      A.   I THINK THERE WERE FOUR OTHER PEOPLE INITIALLY, AND THEN

01:29PM  22      ABOUT A YEAR LATER ANOTHER GENTLEMAN JOINED.

01:29PM  23      Q.   AS PART OF THAT INTERVIEW PROCESS, DID YOU HAVE

01:29PM  24      CONVERSATIONS WITH MR. BALWANI AND MS. HOLMES?

01:29PM  25      A.   YES.

EDLIN DIRECT BY MR. BOSTIC

01:29PM   1    Q.   AND DID YOU SPEAK TO THEM SEPARATELY OR TOGETHER, IF YOU

01:30PM   2    REMEMBER?

01:30PM   3    A.   I REMEMBER SPEAKING WITH THEM TOGETHER IN A GROUP SETTING

01:30PM   4    WITH THE OTHER PEOPLE WHO JOINED AS SENIOR PRODUCT MANAGERS,

01:30PM   5    AND THEN I HAD A TWO-ON-ONE DISCUSSION, SO I MET WITH ELIZABETH

01:30PM   6    AND SUNNY.

01:30PM   7    Q.   AND EVENTUALLY WERE YOU OFFERED A POSITION AT THERANOS?

01:30PM   8    A.   YES.

01:30PM   9    Q.   AND YOU ACCEPTED?

01:30PM   10   A.   CORRECT.

01:30PM   11   Q.   AT THE TIME THAT YOU FIRST STARTED AT THE COMPANY, WHAT

01:30PM   12   WAS YOUR UNDERSTANDING OF WHAT BUSINESS THE COMPANY WAS IN?

01:30PM   13   A.   I UNDERSTOOD THAT THE COMPANY WAS IN THE LABORATORY

01:30PM   14   TECHNOLOGY OR HEALTH CARE TECHNOLOGY BUSINESS, AND THAT THE

01:30PM   15   COMPANY'S MISSION WAS TO MAKE ACCESS TO LAB TESTING MORE

01:30PM   16   ACCESSIBLE TO PATIENTS, AND THAT THE PROPRIETARY UNDERLYING

01:30PM   17   TECHNOLOGY WAS CONNECTED TO BEING ABLE TO DO LABORATORY TESTING

01:30PM   18   ON A FINGERSTICK AND SMALL AMOUNT OF BLOOD.

01:30PM   19   Q.   WHEN YOU WERE FIRST HIRED AT THE COMPANY, YOUR JOB TITLE

01:31PM   20   WAS SENIOR PROJECT MANAGER YOU SAID?

01:31PM   21   A.   CORRECT.

01:31PM   22   Q.   CAN YOU DESCRIBE HOW THAT POSITION FITS INTO THE OVERALL

01:31PM   23   ORGANIZATION OF THE COMPANY?

01:31PM   24   A.   SO I JOINED A PRODUCT MANAGEMENT TEAM THAT ALREADY

01:31PM   25   EXISTED, AND WHEN I JOINED, I REPORTED DIRECTLY TO

01:31PM   1    CHRISTIAN HOLMES, WHO WAS THE TEAM LEAD, AND THEN CHRISTIAN

01:31PM   2    REPORTED UP TO SUNNY.

01:31PM   3    Q.   AND FROM YOUR TIME AT THE COMPANY, DID YOU COME TO

01:31PM   4    UNDERSTAND HOW MR. BALWANI AND MS. HOLMES FIT INTO THE OVERALL

01:31PM   5    ORGANIZATION OF THE COMPANY?

01:31PM   6    A.   YES.

01:31PM   7    Q.   HOW WOULD YOU DESCRIBE THEIR ROLES?

01:31PM   8    A.   SO ELIZABETH WAS THE CEO, AND SUNNY WAS THE PRESIDENT AND

01:31PM   9    COO.

01:31PM   10   Q.   OKAY.  YOU MENTIONED THAT AT THE BEGINNING YOU WERE

01:32PM   11   REPORTING TO CHRISTIAN HOLMES.  IS THAT MS. HOLMES'S YOUNGER OR

01:32PM   12   OLDER BROTHER, IF YOU KNOW?

01:32PM   13   A.   YOUNGER BROTHER.

01:32PM   14   Q.   DID THERE COME A TIME WHEN YOUR REPORTING OBLIGATIONS

01:32PM   15   CHANGED?

01:32PM   16   A.   YES.

01:32PM   17   Q.   AND WHEN DID THAT HAPPEN AND HOW DID IT CHANGE?

01:32PM   18   A.   THAT HAPPENED WHEN I RECEIVED MY PROMOTION AT THE END OF

01:32PM   19   2014.  SO THAT BEGAN IN JANUARY OF 2015.

01:32PM   20        AND AT THAT TIME I REPORTED DIRECTLY TO ELIZABETH HOLMES.

01:32PM   21   Q.   AND HOW DID YOUR JOB RESPONSIBILITIES CHANGE WITH THAT

01:32PM   22   PROMOTION?  AND IF YOU CAN START BY GIVING US YOUR NEW TITLE

01:32PM   23   FOLLOWING THE PROMOTION?

01:32PM   24   A.   MY NEW TITLE FOLLOWING THE PROMOTION WAS LEAD OF STRATEGIC

01:32PM   25   OPERATIONS, OFFICE OF THE CEO.

01:32PM   1        THE MAJORITY OF MY JOB RESPONSIBILITIES REMAINED, ALTHOUGH

01:32PM   2    AT THAT POINT IN TIME THE WALGREENS PARTNERSHIP AND OPERATION

01:32PM   3    HAD REALLY GOTTEN OFF THE GROUND, SO I SPENT LESS OF MY TIME

01:33PM   4    WORKING ON THAT.

01:33PM   5        AND THERE WAS ALSO AN OPERATIONAL COMPONENT TO THE NEW

01:33PM   6    ROLE WHERE I WORKED WITH OTHER MEMBERS OF THE OFFICE OF THE CEO

01:33PM   7    TO MAKE SURE THAT ANY PROJECTS OR REQUESTS REQUIRED ELIZABETH'S

01:33PM   8    FEEDBACK OR ATTENTION WERE RESPONDED TO IN A TIMELY FASHION.

01:33PM   9    Q.   I'D LIKE TO ASK YOU ABOUT THAT ROLE AND HOW FREQUENTLY IT

01:33PM  10    REQUIRED YOU TO INTERACT WITH MS. HOLMES AND MR. BALWANI, SO

01:33PM  11    LET'S BREAK THOSE UP.

01:33PM  12        FIRST OF ALL, HOW FREQUENTLY WERE YOU IN CONTACT WITH

01:33PM  13    MS. HOLMES IN THAT ROLE AT THE COMPANY?

01:33PM  14    A.   THE SECOND ROLE?

01:33PM  15    Q.   YES.

01:33PM  16    A.   GENERALLY ON A DAILY BASIS.

01:33PM  17    Q.   AND WERE YOU REPORTING DIRECTLY TO HER AT THAT TIME?

01:33PM  18    A.   YES.

01:33PM  19    Q.   AND HOW ABOUT MR. BALWANI?  HOW FREQUENTLY WERE YOU IN

01:33PM  20    CONTACT WITH HIM DURING THAT TIME PERIOD?

01:33PM  21        AND I GUESS WE'RE TALKING ABOUT FROM 2015 ON.

01:33PM  22    A.   IT WAS NOT NEARLY AS FREQUENT.

01:34PM  23    Q.   AND IF YOU COULD TRY TO QUANTIFY IT FOR US, WAS IT WEEKLY?

01:34PM  24    MONTHLY?  SOMETHING ELSE?

01:34PM  25    A.   I THINK WEEKLY OR BIWEEKLY.

EDLIN DIRECT BY MR. BOSTIC

01:34PM 1  Q.  HOW ABOUT FOR THE TIME PERIOD BEFORE YOUR PROMOTION?  SO

01:34PM 2  IF WE'RE TALKING ABOUT 2012 THROUGH 2014, HOW FREQUENTLY DID

01:34PM 3  YOU HAVE CONTACT WITH MR. BALWANI DURING THAT TIME PERIOD?

01:34PM 4  A.  I HAD CONTACT WITH MR. BALWANI MORE FREQUENTLY IN THAT

01:34PM 5  TIME PERIOD MAINLY AROUND THE WALGREENS PARTNERSHIP, WHEN THE

01:34PM 6  WALGREENS OPERATION BECAUSE SUNNY KIND OF OVERSAW THAT

01:34PM 7  RELATIONSHIP, AND AT THE TIME THAT'S WHERE I SPENT MOST OF MY

01:34PM 8  TIME.

01:34PM 9  Q.  CAN YOU TELL US MORE ABOUT THAT?  WHAT WAS YOUR ROLE IN

01:34PM 10 CONNECTION WITH THE WALGREENS PARTNERSHIP, AND WHY DID THAT

01:34PM 11 ENTAIL FREQUENT CONTACT WITH THE DEFENDANT, MR. BALWANI?

01:34PM 12 A.  IN MY ROLE I WORKED WITH THE OTHER SENIOR PRODUCT MANAGERS

01:35PM 13 TO OPERATIONALIZE AND PLAN WHAT THE WALGREENS OPERATION WOULD

01:35PM 14 LOOK LIKE, AND THAT INCLUDED MAINLY THE FRONT END CUSTOMER

01:35PM 15 EXPERIENCE PROCESS FOR PATIENTS AS THEY ENTERED A THERANOS

01:35PM 16 WELLNESS CENTER AND HAD THEIR SAMPLES COLLECTED IN THAT STORE.

01:35PM 17    THERE WERE ALSO A NUMBER OF OTHER ASPECTS, INCLUDING

01:35PM 18 SOFTWARE DEVELOPMENT AND APPLICATIONS THAT WERE USED BY

01:35PM 19 PHARMACISTS AND TECHNICIANS IN THE WALGREENS STORES IN THE

01:35PM 20 WELLNESS CENTERS TO CHECK PATIENTS IN, RUN THEIR INSURANCE,

01:35PM 21 EVALUATE THEIR LAB FORMS.

01:35PM 22    AND THEN THERE WAS ALSO ANOTHER SOFTWARE APPLICATION THAT

01:35PM 23 HELPED THE TECHNICIANS UNDERSTAND WHAT TUBES THEY NEEDED TO

01:35PM 24 COLLECT CERTAIN SAMPLES BASED ON THE PARTICULAR LAB ORDER.

01:35PM 25 Q.  DURING YOUR TIME AT THE COMPANY, DID YOU GET A SENSE FOR

01:36PM   1    HOW INFORMATION MOVED AROUND THE COMPANY?  AND IN PARTICULAR

01:36PM   2    I'M ASKING ABOUT WHETHER THE FLOW OF INFORMATION WAS RESTRICTED

01:36PM   3    WITHIN THERANOS?

01:36PM   4    A.   YES.

01:36PM   5    Q.   WHAT WAS YOUR SENSE THERE?

01:36PM   6    A.   THE FLOW OF INFORMATION WAS GENERALLY RESTRICTED, AND WHAT

01:36PM   7    I MEAN BY THAT IS CERTAIN INFORMATION WOULD NOT GET SHARED

01:36PM   8    OUTSIDE OF THE PARTICULAR TEAM TO WHICH THAT INFORMATION

01:36PM   9    APPLIED.

01:36PM  10    Q.   AND HOW DID YOU COME TO UNDERSTAND THAT THAT WAS THE WAY

01:36PM  11    OF THINGS AT THERANOS?

01:36PM  12    A.   THAT'S WHAT I WAS TOLD BY MY SUPERVISORS.

01:36PM  13    Q.   AND WHO ARE WE TALKING ABOUT, THE PEOPLE WHO TOLD YOU THAT

01:36PM  14    INFORMATION WAS TO BE RESTRICTED THAT WAY?

01:36PM  15    A.   THAT INCLUDED CHRISTIAN, ELIZABETH, AND SUNNY.

01:36PM  16    Q.   YOU HEARD DIRECTION LIKE THAT FROM ALL THREE OF THOSE

01:36PM  17    INDIVIDUALS?

01:36PM  18    A.   CORRECT.

01:36PM  19    Q.   SO FAR WE'VE BEEN TALKING ABOUT THE WAY THE INFORMATION

01:37PM  20    MOVED BETWEEN DIFFERENT EMPLOYEES WITHIN THE COMPANY; CORRECT?

01:37PM  21    A.   RIGHT.

01:37PM  22    Q.   AND HOW ABOUT THE FLOW OF INFORMATION FROM INSIDE OF THE

01:37PM  23    COMPANY TO OUTSIDE?  DID YOU GET DIRECTION ABOUT KEEPING

01:37PM  24    INFORMATION WITHIN THE COMPANY AND NOT PUBLICLY DISCLOSING IT?

01:37PM  25    A.   YES, THAT INFORMATION WAS ALSO RESTRICTED FROM BEING SENT

01:37PM   1    OUTSIDE OF THE COMPANY.

01:37PM   2         MY UNDERSTANDING WAS THAT NO INFORMATION SHOULD BE SHARED

01:37PM   3    OUTSIDE OF THE COMPANY UNLESS IT WAS APPROVED, AND IN MY CASE

01:37PM   4    THAT WOULD HAVE BEEN APPROVED BY CHRISTIAN, ELIZABETH, OR

01:37PM   5    SUNNY.

01:37PM   6    Q.   WHEN WE ARE TALKING ABOUT RESTRICTIONS ON FLOW OF

01:37PM   7    INFORMATION WITHIN THE COMPANY, WAS THERE ANYONE AT THE COMPANY

01:37PM   8    TO WHOM THOSE RESTRICTIONS DID NOT APPLY?

01:37PM   9         IN OTHER WORDS, WERE THERE PEOPLE AT THE COMPANY WHO WERE

01:37PM  10    ALLOWED TO KNOW ANYTHING, WHO DIDN'T HAVE RESTRICTIONS ON WHAT

01:37PM  11    THEY COULD KNOW?

01:37PM  12    A.   YES.

01:37PM  13    Q.   AND WHO FELL INTO THAT CATEGORY?

01:38PM  14    A.   ELIZABETH AND SUNNY.

01:38PM  15    Q.   SO BASED ON YOUR TIME AT THE COMPANY, WAS THERE ANY

01:38PM  16    INFORMATION THAT YOU UNDERSTOOD COULD NOT BE SHARED WITH EITHER

01:38PM  17    MS. HOLMES OR WITH MR. BALWANI?

01:38PM  18    A.   THAT WAS NOT MY EXPERIENCE.

01:38PM  19    Q.   AND BASED ON YOUR UNDERSTANDING, WAS THERE ANYONE ELSE

01:38PM  20    WITHIN THAT CATEGORY, THE CATEGORY OF PEOPLE WHO WERE ALLOWED

01:38PM  21    TO KNOW EVERYTHING THAT WAS HAPPENING AT THE COMPANY?

01:38PM  22    A.   NO.

01:38PM  23         MR. BOSTIC:  YOUR HONOR, I WASN'T SURE IF THE COURT

01:38PM  24    WANTED TO TAKE A BREAK AT 2:00 P.M. OR SOONER.

01:38PM  25         THE COURT:  I THOUGHT WE WOULD TAKE A BREAK AT 2:00

01:38PM   1    P.M., LADIES AND GENTLEMEN.

01:38PM   2             MR. BOSTIC:  UNDERSTOOD.

01:38PM   3    Q.  MR. EDLIN, WHILE WORKING AT THE COMPANY, DID YOU HAVE

01:38PM   4    OPPORTUNITIES TO OBSERVE MS. HOLMES AND MR. BALWANI'S WORKING

01:38PM   5    RELATIONSHIP?

01:38PM   6    A.  YES.

01:38PM   7    Q.  LET ME ASK A FEW QUESTIONS ABOUT THAT.

01:38PM   8         FIRST OF ALL, WHEN IT CAME TO THEIR POSITIONS AT THE

01:39PM   9    COMPANY, WERE THEY COEQUALS?  WAS ONE ABOVE THE OTHER IN THE

01:39PM  10    ORGANIZATIONAL CHART?

01:39PM  11         WHAT WAS YOUR UNDERSTANDING THERE?

01:39PM  12    A.  ASIDE FROM THE TITLES, I DID NOT REALLY SEE A DISTINCTION.

01:39PM  13    Q.  DO YOU MEAN TO SAY THAT THEY OPERATED AS EQUALS?

01:39PM  14    A.  YES, I THINK THAT'S A FAIR CHARACTERIZATION.

01:39PM  15    Q.  TELL ME ABOUT THAT.  WHAT MAKES YOU SAY THAT?

01:39PM  16    A.  IN MY EXPERIENCE, I SAW THE TWO OF THEM WORK VERY CLOSELY

01:39PM  17    TOGETHER ON A DAILY BASIS.

01:39PM  18         THEY WERE ALWAYS IN EACH OTHER'S OFFICES EITHER HAVING

01:39PM  19    LUNCH OR HAVING OTHER CONVERSATIONS.

01:39PM  20         FROM MY VANTAGE POINT, I RECEIVED DIRECTION AND UNDERSTOOD

01:39PM  21    THAT THEY BOTH HAD AN UNDERSTANDING OF THE OVERALL STRATEGY FOR

01:39PM  22    THE COMPANY.

01:39PM  23    Q.  AND TELL ME ABOUT -- YOU MENTIONED YOUR VANTAGE POINT.

01:40PM  24         HOW DID YOU HAVE A CHANCE TO SEE THESE TWO WORKING

01:40PM  25    TOGETHER?

EDLIN DIRECT BY MR. BOSTIC

01:40PM 1    A.   VISUALLY THEIR OFFICES HAD GLASS WINDOWS AND DOORS, SO I

01:40PM 2    WOULD ALWAYS BE ABLE TO SEE INSIDE OF THEIR OFFICES, AS ANYONE

01:40PM 3    ELSE WOULD.

01:40PM 4    Q.   AND DOES THAT HAVE SOMETHING TO DO WITH WHERE YOUR WORK

01:40PM 5    STATION WAS IN RELATION TO THEIR OFFICES?

01:40PM 6    A.   YES.

01:40PM 7    Q.   AND WHERE WAS YOUR WORK STATION?

01:40PM 8    A.   I SAT IN A POD OF DESKS OUTSIDE OF THEIR OFFICES, OR CLOSE

01:40PM 9    TO THEIR OFFICES.

01:40PM 10   Q.   AND BESIDES SITTING NEAR THEIR OFFICES AND BEING ABLE TO

01:40PM 11   SEE THEM WORKING, DID YOUR WORK ALSO INVOLVE CONTACT WITH THE

01:40PM 12   TWO OF THEM?

01:40PM 13   A.   YES.

01:40PM 14   Q.   WHEN IT CAME TO THE RESPONSIBILITIES OF MS. HOLMES AND

01:40PM 15   MR. BALWANI, DID YOU OBSERVE THEM COLLABORATING REGULARLY AT

01:41PM 16   THE COMPANY OR DID THEY TEND TO WORK SEPARATELY?  WHAT DID YOU

01:41PM 17   SEE IN THAT REGARD?

01:41PM 18   A.   I THINK THERE WAS A MIX.  THERE WERE CERTAIN AREAS THAT

01:41PM 19   EACH OF THEM FOCUSSED ON, AND THERE WERE OTHER AREAS WHERE IT

01:41PM 20   SEEMED MORE COLLABORATIVE.

01:41PM 21   Q.   DID YOU EVER HAVE A CHANCE TO SEE AN INSTANCE WHERE THE

01:41PM 22   TWO OF THEM DISAGREED ABOUT SOMETHING THAT HAPPENED AT

01:41PM 23   THERANOS?

01:41PM 24   A.   THERE WERE A NUMBER OF TIMES WHERE THERE WOULD BE A LIVELY

01:41PM 25   DISCUSSION ABOUT A CERTAIN STRATEGY OR A CERTAIN APPROACH, AND

01:41PM 1    I THINK AS PART OF A HEALTHY DISCUSSION THERE WAS SOME

01:41PM 2    DISAGREEMENT AT TIMES, YES.

01:41PM 3    Q.   AND DESPITE SEEING THAT AGREEMENT, IS IT STILL YOUR

01:41PM 4    TESTIMONY THAT THEY TENDED TO COLLABORATE AND AGREE ON THINGS?

01:41PM 5    A.   YES.

01:41PM 6    Q.   YOU TALKED ABOUT A ROLE THAT YOU HAD IN CONNECTION WITH

01:41PM 7    THE OPERATIONALIZATION OF THE TESTING AT WALGREENS; IS THAT

01:42PM 8    CORRECT?

01:42PM 9    A.   YES.

01:42PM 10   Q.   IN CONNECTION WITH THAT ROLE, DID YOU COME TO UNDERSTAND

01:42PM 11   GENERALLY WHAT KINDS OF DEVICES THE COMPANY WAS USING FOR BLOOD

01:42PM 12   TESTING?

01:42PM 13   A.   YES.

01:42PM 14   Q.   WHEN AND HOW DID YOU COME TO UNDERSTAND WHAT ANALYZERS THE

01:42PM 15   COMPANY WAS USING?

01:42PM 16   A.   I CAME TO UNDERSTAND THIS OVER A PERIOD OF TIME FROM WHEN

01:42PM 17   I JOINED THE COMPANY UP UNTIL THE LAST YEAR THAT I LEFT, AND

01:42PM 18   OVER THAT TIME I LEARNED MORE.

01:42PM 19       INITIALLY I WAS EXPOSED TO THE EDISON 3.0 VERSION OF THE

01:42PM 20   DEVICE MAINLY IN MY WORK SUPPORTING SOME OF THE PHARMACEUTICAL

01:42PM 21   AND MILITARY RELATIONSHIPS THAT THE COMPANY HAD.

01:42PM 22       AND THEN OVER TIME ADDITIONAL DEVICES WERE INCORPORATED

01:43PM 23   INTO THE TECHNOLOGY DEMONSTRATIONS, AND THAT'S HOW I LEARNED

01:43PM 24   ABOUT THOSE DEVICES.

01:43PM 25   Q.   OKAY.  I'D LIKE TO BREAK THAT OUT A LITTLE BIT.

01:43PM   1            YOU MENTIONED THE EDISON 3.0 DEVICE; IS THAT RIGHT?

01:43PM   2    A.   YES.

01:43PM   3    Q.   DID YOU HAVE AN UNDERSTANDING IN 2013 AND 2014 AS TO

01:43PM   4    GENERALLY WHAT THAT DEVICE COULD DO AND WHAT IT COULDN'T DO?

01:43PM   5    A.   I DON'T THINK SO.

01:43PM   6    Q.   SO, FOR EXAMPLE, DID YOU KNOW HOW MANY DIFFERENT KINDS OF

01:43PM   7    TESTS THE EDISON 3.0 COULD RUN?

01:43PM   8    A.   NO.

01:43PM   9    Q.   DID YOU KNOW WHETHER THERE WAS A SPECIFIC CATEGORY OF

01:43PM  10    TESTS THAT THE EDISON WAS LIMITED TO?

01:43PM  11    A.   I DON'T BELIEVE SO.

01:43PM  12    Q.   AND IS THAT BECAUSE YOUR JOB OR YOUR ROLE DIDN'T REQUIRE

01:43PM  13    YOU TO KNOW THAT INFORMATION?

01:43PM  14    A.   CORRECT.

01:43PM  15    Q.   AND YOU TESTIFIED THAT YOUR UNDERSTANDING OF WHAT DEVICES

01:43PM  16    THERANOS WAS USING CHANGED OVER TIME UP UNTIL THE END OF YOUR

01:44PM  17    TIME WITH THE COMPANY; IS THAT RIGHT?

01:44PM  18    A.   YES.

01:44PM  19    Q.   WHAT WERE SOME OF THE THINGS THAT YOU LEARNED ABOUT THE

01:44PM  20    COMPANY'S DEVICES TOWARDS THE END OF YOUR TIME WORKING AT

01:44PM  21    THERANOS?

01:44PM  22            MS. WALSH:  OBJECTION.  RELEVANCE.

01:44PM  23            THE COURT:  OVERRULED.

01:44PM  24    BY MR. BOSTIC:

01:44PM  25    Q.   WOULD YOU LIKE THE QUESTION AGAIN, MR. EDLIN?

01:44PM   1      A.   YES, PLEASE.

01:44PM   2      Q.   THE QUESTION WAS, WHAT WERE SOME OF THE THINGS THAT YOU

01:44PM   3      LEARNED ABOUT THE DEVICES THAT THE COMPANY WAS USING TOWARDS

01:44PM   4      THE END OF YOUR TIME THERE?

01:44PM   5      A.   WELL, IN 2016 I LEARNED THAT THE COMPANY HAD BEEN USING

01:44PM   6      THIRD PARTY DEVICES TO RUN FINGERSTICK SAMPLES, AND I ALSO

01:44PM   7      LEARNED IN THAT TIME THAT ONLY ONE VERSION OF THE THERANOS

01:44PM   8      DEVICE HAD BEEN USED FOR CLINICAL PATIENT SAMPLES.

01:44PM   9      Q.   AND YOU HAVE A MEMORY OF LEARNING THAT IN 2016?

01:44PM  10      A.   WELL, I FIRST HEARD ABOUT IT AT THE END OF 2015 IN "THE

01:44PM  11      WALL STREET JOURNAL" ARTICLE, AND I ATTENDED MEETINGS WHERE

01:45PM  12      THAT MATERIAL WAS DISCUSSED IN 2016, AND THAT'S WHEN I WOULD

01:45PM  13      SAY I LEARNED IT.

01:45PM  14      Q.   SO IN 2013, AROUND THE TIME OF THE WALGREENS ROLLOUT, EVEN

01:45PM  15      IN YOUR ROLE IN CONNECTION WITH THAT ROLLOUT AND IN YOUR ROLE

01:45PM  16      AS A PRODUCT MANAGER, YOU WEREN'T AWARE OF THE COMPANY'S USE OF

01:45PM  17      THIRD PARTY DEVICES FOR TESTING?

01:45PM  18               MS. WALSH:   OBJECTION.   ASKED AND ANSWERED.

01:45PM  19               THE COURT:   OVERRULED.

01:45PM  20           DO YOU UNDERSTAND THE QUESTION?

01:45PM  21               THE WITNESS:   CAN YOU REPEAT THE QUESTION, PLEASE?

01:45PM  22               MR. BOSTIC:   SURE.

01:45PM  23      Q.   THE QUESTION WAS, EVEN IN THE ROLE THAT YOU HAD IN

01:45PM  24      CONNECTION WITH THE WALGREENS ROLLOUT AND YOUR ROLE AS A

01:45PM  25      PRODUCT MANAGER, YOU DIDN'T KNOW IN 2013 AND 2014 THAT THERANOS

EDLIN DIRECT BY MR. BOSTIC

01:45PM 1    WAS RELYING ON THIRD PARTY DEVICES?

01:45PM 2    A.   CORRECT.

01:45PM 3    Q.   YOU MENTIONED THE EDISON 3 SERIES.

01:45PM 4        DID YOU LATER COME TO BE FAMILIAR WITH ANOTHER GENERATION

01:45PM 5    OF THERANOS ANALYZERS?

01:45PM 6    A.   YES.

01:45PM 7    Q.   AND CAN YOU TELL US ABOUT WHAT THOSE WERE AND HOW YOU

01:46PM 8    FOUND OUT ABOUT THEM?

01:46PM 9    A.   SO THE EDISON DEVICES WERE CONSIDERED THE 3 SERIES; THE

01:46PM 10   NEXT GENERATION DEVICES WERE CONSIDERED THE 4 SERIES; AND THERE

01:46PM 11   WERE THREE VARIATIONS OF THESE DEVICES, AND MY UNDERSTANDING

01:46PM 12   WAS THAT THESE DEVICES HAD THE CAPABILITY TO RUN ANY LAB TEST.

01:46PM 13   Q.   AND HOW DID YOU COME TO KNOW ABOUT THESE DEVICES?

01:46PM 14   A.   I FIRST LEARNED ABOUT THESE DEVICES AS PART OF THE

01:46PM 15   PLANNING WORK WITH THE DEPARTMENT OF DEFENSE.

01:46PM 16   Q.   AND THE DEVICES WE'RE TALKING ABOUT, I THINK YOU MENTIONED

01:46PM 17   THERE WERE THREE DIFFERENT VERSIONS OF THAT GENERATION.

01:46PM 18       CAN YOU WALK US THROUGH WHAT THOSE WERE?

01:46PM 19   A.   YES.  SO THE FIRST VERSION WAS INITIALLY CALLED THE

01:46PM 20   MINILAB, AND THAT DEVICE WAS ABOUT FOUR OR FIVE FEET TALL AND

01:47PM 21   IT CONSISTED OF THE COMPONENTS OF FOUR OR FIVE DIFFERENT

01:47PM 22   DEVICES STACKED ON TOP OF ONE ANOTHER.

01:47PM 23       AND THE OTHER VERSIONS WERE -- ONE WAS REFERRED TO AS A

01:47PM 24   4.0 MONOBAY, AND THAT WAS INTENDED FOR ONE SAMPLE AT A TIME.

01:47PM 25       AND THEN THE 4S WAS A SMALLER VERSION OF THE MONOBAY.

01:47PM 1    Q.   THE DEVICES THAT WE'RE TALKING ABOUT NOW, WERE THEY EVER

01:47PM 2    USED FOR CLINICAL PATIENT TESTING AT THERANOS TO YOUR

01:47PM 3    KNOWLEDGE?

01:47PM 4    A.   NO.

01:47PM 5    Q.   IN CONTRAST, THE EDISON THAT WE TALKED ABOUT BEFORE, THE

01:47PM 6    EDISON 3.0, WAS THAT USED FOR ACTUAL CLINICAL PATIENT TESTING?

01:47PM 7    A.   YES.

01:47PM 8    Q.   AND I WANT TO BE CLEAR, WHEN WE'RE TALKING ABOUT THE --

01:47PM 9    THESE NEXT GENERATION DEVICES, THE 4 SERIES THAT YOU MENTIONED,

01:47PM 10   WERE THEY USED FOR CLINICAL PATIENT TESTING AT ANY POINT IN

01:48PM 11   YOUR TIME AT THE COMPANY, INCLUDING AS LATE AS 2015 AND 2016?

01:48PM 12   A.   NO.

01:48PM 13   Q.   WE TALKED A MINUTE AGO ABOUT RESTRICTIONS ON FLOW OF

01:48PM 14   INFORMATION WITHIN THE COMPANY, WITHIN THERANOS.

01:48PM 15        LET ME ASK YOU ABOUT THAT SPECIFICALLY IN TERMS OF THE USE

01:48PM 16   OF THIRD PARTY DEVICES.

01:48PM 17        TO YOUR KNOWLEDGE, WAS THE COMPANY'S USE OF THIRD PARTY

01:48PM 18   DEVICES PUBLIC IN 2013 AND 2014?

01:48PM 19   A.   I DON'T BELIEVE SO.

01:48PM 20   Q.   AND WE TALKED ABOUT CATEGORIES OF INFORMATION THAT WERE

01:48PM 21   RESTRICTED AT THERANOS.  DID YOU UNDERSTAND THAT THE USE OF

01:48PM 22   THIRD PARTY DEVICES FELL INTO THAT CATEGORY, A CATEGORY OF

01:49PM 23   INFORMATION THAT SHOULD NOT BE SHARED WITHIN OR OUTSIDE OF THE

01:49PM 24   COMPANY?

01:49PM 25              MS. WALSH:  OBJECTION.  LEADING.

01:49PM  1          THE COURT:  SUSTAINED.

01:49PM  2          YOU CAN REPHRASE IT.

01:49PM  3     BY MR. BOSTIC:

01:49PM  4     Q.   LET ME ASK, DID YOU HAVE AN UNDERSTANDING AS TO WHETHER

01:49PM  5     THE USE OF THIRD PARTY DEVICES WAS A CONFIDENTIAL FACT AT

01:49PM  6     THERANOS OR WHETHER IT COULD BE SHARED FREELY OUTSIDE OF THE

01:49PM  7     COMPANY?

01:49PM  8     A.   I DON'T BELIEVE IT COULD HAVE BEEN SHARED FREELY.

01:49PM  9     Q.   WHEN YOU FOUND OUT ABOUT THE COMPANY'S USE OF THIRD PARTY

01:49PM 10     DEVICES, DID YOU BECOME AWARE OF THE COMPANY'S USE OF BOTH

01:49PM 11     MODIFIED THIRD PARTY DEVICES AND ALSO UNMODIFIED THIRD PARTY

01:49PM 12     DEVICES?

01:49PM 13     A.   I'M SORRY, CAN YOU REPEAT THE BEGINNING OF THAT QUESTION?

01:49PM 14     Q.   SURE.  WHEN YOU DID FIND OUT ABOUT THE COMPANY'S USE OF

01:49PM 15     THIRD PARTY DEVICES, DID YOU FIND OUT ABOUT THE USE OF MODIFIED

01:49PM 16     AND UNMODIFIED DEVICES?

01:49PM 17     A.   YES.

01:49PM 18     Q.   AND WHEN WE'RE TALKING ABOUT THE CONFIDENTIALITY REGARDING

01:50PM 19     THAT TOPIC AS YOU UNDERSTOOD IT, WAS THERE A DIFFERENCE THERE?

01:50PM 20     OR DID THOSE CONFIDENTIALITY OBLIGATIONS APPLY BOTH TO THE

01:50PM 21     MODIFIED DEVICES AND ALSO THE UNMODIFIED DEVICES?

01:50PM 22     A.   THERE WAS A POINT IN TIME AROUND JULY 2017 WHERE I BELIEVE

01:50PM 23     THAT ALL ASPECTS OF THE THERANOS TECHNOLOGY BECAME PUBLIC

01:50PM 24     INFORMATION, THIS WAS SHARED AT A CONFERENCE.

01:50PM 25          SO UP UNTIL THAT POINT, I DON'T BELIEVE THAT THAT WAS

01:50PM 1   PUBLIC INFORMATION, BUT I THINK AFTERWARD IT WAS.

01:50PM 2   Q.   AND CAN YOU HELP US NAIL THAT DOWN IN TIME?  DID YOU

01:50PM 3   MENTION A MONTH OR A YEAR?

01:50PM 4   A.   I BELIEVE IT WAS JULY OF 2016.

01:50PM 5   Q.   SO BEFORE THAT YOUR UNDERSTANDING WOULD HAVE BEEN THAT ALL

01:50PM 6   OF THESE FACTS WOULD HAVE BEEN RESTRICTED AND SHOULD HAVE BEEN

01:50PM 7   KEPT WITHIN THERANOS?

01:50PM 8   A.   RIGHT.

01:50PM 9   Q.   AS PART OF YOUR JOB AT THE COMPANY, DID YOU HANDLE TOURS

01:51PM 10  OF THE THERANOS FACILITIES?

01:51PM 11  A.   SOMETIMES.

01:51PM 12  Q.   WHO ELSE DID THAT WORK?  WHO ELSE WAS INVOLVED IN

01:51PM 13  PROVIDING TOURS OF THE FACILITIES FOR VIP VISITORS, FOR

01:51PM 14  EXAMPLE?

01:51PM 15  A.   IN MY EXPERIENCE IT WAS MAINLY ELIZABETH.

01:51PM 16  Q.   WAS MR. BALWANI ALSO INVOLVED IN SOME OF THOSE TOURS?

01:51PM 17  A.   SOME OF THEM, YES.

01:51PM 18  Q.   AND WHEN IT CAME TO TOURS, WHICH PORTIONS OF THE

01:51PM 19  FACILITIES DID YOU GIVE TOURS TO VIP'S TO?

01:51PM 20  A.   THE GENERAL WORKING SPACE FOR DIFFERENT EMPLOYEES AND THE

01:51PM 21  R&D LABS.

01:51PM 22  Q.   WAS THE R&D LAB WHERE, FOR EXAMPLE, THE NEXT GENERATION

01:51PM 23  DEVICES THAT WE TALKED ABOUT WERE BEING WORKED ON?

01:51PM 24       MS. WALSH:  OBJECTION.  LEADING.

01:51PM 25       THE COURT:  OVERRULED.

01:51PM  1            THE WITNESS:  I DO RECALL SEEING THOSE DEVICES IN

01:52PM  2       THE R&D LAB.

01:52PM  3       BY MR. BOSTIC:

01:52PM  4       Q.   HOW ABOUT THE CLINICAL LAB WHERE THE PREVIOUS GENERATION

01:52PM  5       DEVICES WERE BEING USED FOR PATIENT TESTING?  DID YOU EVER GIVE

01:52PM  6       A TOUR OF THE CLINICAL LAB DURING YOUR TIME AT THE COMPANY?

01:52PM  7       A.   NO.

01:52PM  8       Q.   AND WHOSE DECISION WAS IT WHO GOT TO SEE WHAT AT THE

01:52PM  9       COMPANY?  WHO CONTROLLED WHERE THOSE TOURS WENT AND WHAT WAS

01:52PM 10       COVERED?

01:52PM 11       A.   ELIZABETH AND SUNNY.

01:52PM 12       Q.   DO YOU REMEMBER AN OCCASION DURING YOUR TIME AT THE

01:52PM 13       COMPANY WHERE REPRESENTATIVES FROM WALGREENS CAME TO TOUR THE

01:52PM 14       THERANOS FACILITIES?

01:52PM 15       A.   YES.

01:52PM 16       Q.   AND IN ADVANCE OF THAT VISIT, WERE YOU ASKED TO PREPARE

01:52PM 17       ANY AREAS FOR THEM TO SEE?

01:52PM 18       A.   YES.

01:52PM 19       Q.   WHAT DO YOU REMEMBER ABOUT THAT?

01:52PM 20       A.   I REMEMBER THAT THERE WAS A ROOM ADJACENT TO THE CLINICAL

01:52PM 21       LAB AND ELIZABETH ASKED THAT I WORK WITH DANIEL YOUNG, WHO WAS

01:53PM 22       A HEAD SCIENTIST AT THERANOS, TO SET UP SEVERAL MINILAB DEVICES

01:53PM 23       IN THAT ROOM.

01:53PM 24       Q.   CAN YOU HELP US PLACE THIS IN TIME, FIRST OF ALL?

01:53PM 25            DO YOU REMEMBER WHAT YEAR APPROXIMATELY THIS WOULD HAVE

01:53PM    1    BEEN?

01:53PM    2    A.   2013.

01:53PM    3    Q.   AND DURING THIS TIME PERIOD, WERE THOSE DEVICES BEING USED

01:53PM    4    AT ALL FOR PATIENT TESTING?

01:53PM    5    A.   NO.

01:53PM    6    Q.   BECAUSE WE'RE TALKING ABOUT THE MINILAB, THE NEXT

01:53PM    7    GENERATION DEVICE; IS THAT RIGHT?

01:53PM    8    A.   CORRECT.

01:53PM    9    Q.   WERE THERE ANY OTHER INSTRUCTIONS THAT YOU RECEIVED IN

01:53PM   10    CONNECTION WITH THOSE DEVICES, FOR EXAMPLE, WHETHER THEY WERE

01:53PM   11    GOING TO BE FUNCTIONAL OR NOT?

01:53PM   12    A.   THE DIRECTION THAT I WAS GIVEN WAS TO MAKE SURE THAT THE

01:53PM   13    DEVICES WERE POWERED ON, THAT THEY HAD THE GRAPHIC USER

01:53PM   14    INTERFACE SHOWING ON THE SCREEN, AND THAT ONE OF THE DEVICES

01:54PM   15    SHOULD BE ABLE TO ACCEPT A CARTRIDGE.

01:54PM   16    Q.   AND I'M SORRY IF YOU SAID ALREADY, BUT APPROXIMATELY HOW

01:54PM   17    MANY OF THESE MINILAB DEVICES ARE WE TALKING ABOUT BEING PUT IN

01:54PM   18    THAT ROOM?

01:54PM   19    A.   I THINK IT WAS BETWEEN 10 TO 15.

01:54PM   20    Q.   AND DID YOU, IN FACT, FOLLOW THOSE INSTRUCTIONS AND SET UP

01:54PM   21    THOSE DEVICES IN THAT ROOM IN ADVANCE OF THE TOUR?

01:54PM   22    A.   I DON'T THINK I PERSONALLY SET THEM UP, BUT I WORKED WITH

01:54PM   23    ENGINEERS.  I ASKED ENGINEERS TO SET THEM UP.

01:54PM   24    Q.   YOUR JOB WAS TO MAKE SURE THAT IT WAS DONE?

01:54PM   25    A.   RIGHT.

01:54PM   1    Q.   AND WERE YOU A PART OF THAT TOUR WHEN THE WALGREENS VIP'S

01:54PM   2    CAME TO VISIT WHEN THAT ROOM WAS SET UP?

01:54PM   3    A.   NO.

01:54PM   4    Q.   SO DO YOU HAVE ANY KNOWLEDGE ABOUT WHAT MIGHT HAVE BEEN

01:54PM   5    SAID ABOUT THE DEVICES THAT WERE IN THAT ROOM?

01:55PM   6    A.   NO.

01:55PM   7    Q.   WAS MS. HOLMES INVOLVED IN THAT TOUR?

01:55PM   8    A.   YES.

01:55PM   9    Q.   WAS MR. BALWANI INVOLVED IN THAT TOUR?

01:55PM  10    A.   YES.

01:55PM  11    Q.   AFTER THE TOUR TOOK PLACE, DID THAT ROOM WITH ALL OF THOSE

01:55PM  12    DEVICES, THE NEXT GENERATION DEVICES, REMAIN SET UP THE WAY IT

01:55PM  13    WAS?

01:55PM  14    A.   NO.  THE DEVICES WERE REMOVED ABOUT A DAY OR TWO

01:55PM  15    AFTERWARD.

01:55PM  16    Q.   AND HOW DID THAT COME TO TAKE PLACE?

01:55PM  17    A.   ELIZABETH ASKED -- WELL, I ASKED ELIZABETH IF THOSE

01:55PM  18    DEVICES SHOULD REMAIN THERE, AND SHE SAID NO, PLEASE REMOVE

01:55PM  19    THEM.

01:55PM  20         AND SO I ASKED THE ENGINEERS TO DO THAT.

01:55PM  21    Q.   SEPARATE FROM YOUR WORK ON THE TOURS, DID YOU HAVE ANY

01:55PM  22    INVOLVEMENT IN TECHNOLOGY DEMONSTRATIONS FOR VIP VISITORS?

01:55PM  23    A.   YES, I HELPED TO COORDINATE THOSE TECHNOLOGY

01:55PM  24    DEMONSTRATIONS.

01:55PM  25    Q.   CAN YOU SUMMARIZE WHAT YOUR ROLE WAS IN CONNECTION WITH

EDLIN DIRECT BY MR. BOSTIC

THOSE DEMOS?

A.   MY ROLE WAS MAINLY TO COORDINATE WITH A NUMBER OF

DIFFERENT PERSONNEL WITHIN THE COMPANY FOR THE DEMOS.

     SO THERE WERE SOME HARDWARE ENGINEERS WHO WERE RESPONSIBLE

FOR ACTUALLY SETTING UP A DEVICE;

     THERE WERE SOFTWARE ENGINEERS WHO ARE RESPONSIBLE FOR

MAKING SURE THAT CERTAIN APPLICATIONS WERE ON THE DEVICE;

     AND THEN THERE WERE ALSO LAB PERSONNEL WHO WERE NOTIFIED

IN ORDER TO PROCESS AND VALIDATE THE SAMPLES AND TESTS.

Q.   CAN YOU WALK US THROUGH THE WORKFLOW FOR A TYPICAL

DEMONSTRATION STARTING WITH WHERE THE DEVICE WOULD BE FOR THE

DEMONSTRATION AND HOW IT WOULD GET THERE?

A.   SO FIRST I WOULD GET A NOTIFICATION FROM EITHER ELIZABETH

OR SUNNY THAT A CERTAIN GUEST, ALSO KNOWN AS VIP AT TIMES,

WOULD BE COMING TO THE OFFICES AND THAT A DEMO WAS NEEDED.

     SO THERE WERE INTERVIEW OR CONFERENCE ROOMS THAT WERE SET

UP FOR THIS PARTICULAR REASON, AND ONCE I RECEIVED THAT

INFORMATION, I WOULD THEN NOTIFY THE GROUP OF PEOPLE THAT I

JUST MENTIONED THAT A DEMO WAS HAPPENING AND THAT CERTAIN

DEVICES WOULD BE NEEDED TO BE SET UP.

     AND I WOULD ALSO LET THE LAB KNOW SO THAT THEY WOULD BE

READY TO EITHER VALIDATE OR PROCESS A SAMPLE AT A MOMENT'S

NOTICE SO THAT RESULTS COULD GET SENT BACK TO THAT GUEST AS

SOON AS POSSIBLE.

Q.   AND WHEN WE ARE TALKING ABOUT THE DEVICES THAT WERE IN THE

EDLIN DIRECT BY MR. BOSTIC

01:57PM 1    CONFERENCE ROOMS WHERE THE VIP'S WERE, WERE THEY ALWAYS THE

01:57PM 2    DEVICES THAT THE COMPANY WAS USING FOR CLINICAL PATIENT

01:58PM 3    TESTING, OR WERE THEY SOMETIMES THE NEXT GENERATION DEVICES

01:58PM 4    THAT WEREN'T BEING USED FOR PATIENT TESTING?

01:58PM 5    A.   IN MY EXPERIENCE THEY WERE ONLY THE THERANOS DEVICES, THE

01:58PM 6    THERANOS MANUFACTURED DEVICES.

01:58PM 7    Q.   AND BETWEEN THE DIFFERENT KINDS OF THERANOS MANUFACTURED

01:58PM 8    DEVICES, WERE THEY LIMITED TO, SAY, THE 3 SERIES THAT WAS

01:58PM 9    ACTUALLY BEING USED IN THE CLINICAL LAB, OR DID YOU SOMETIMES

01:58PM 10   PLACE IN THOSE CONFERENCE ROOMS THE NEXT GENERATION THERANOS

01:58PM 11   DEVICES THAT WEREN'T BEING USED FOR PATIENT TESTING?

01:58PM 12   A.   IN MY COORDINATION, OFTENTIMES OTHER PEOPLE WOULD OFTEN

01:58PM 13   PLACE THOSE DEVICES, BUT WHEN I FIRST JOINED THE COMPANY, ONLY

01:58PM 14   THE EDISON 3.0 VERSION WAS PLACED IN THOSE ROOMS; AND THEN OVER

01:58PM 15   TIME THE NEXT GENERATION OF DEVICES WERE ALSO PLACED IN THOSE

01:58PM 16   ROOMS.

01:58PM 17   Q.   WERE THERE INSTANCES WHERE A NEXT GENERATION DEVICE WAS

01:59PM 18   PLACED IN A ROOM, BUT OTHER DEVICES WERE NECESSARY TO RUN THE

01:59PM 19   SAMPLE, IF YOU RECALL?

01:59PM 20   A.   I DON'T RECALL KNOWING AT THAT TIME WHICH DEVICES WERE

01:59PM 21   USED TO TEST THE SAMPLES.

01:59PM 22   Q.   OKAY.  AND WE'LL LOOK AT SOME EMAILS IN A FEW MINUTES THAT

01:59PM 23   MIGHT REFRESH YOUR RECOLLECTION.

01:59PM 24       FOR NOW LET ME ASK, WERE YOU EVER ASKED TO PLACE A

01:59PM 25   NON-THERANOS ANALYZER IN ONE OF THESE CONFERENCE ROOMS FOR A

01:59PM  1    VIP VISIT?

01:59PM  2    A.   NO.

01:59PM  3    Q.   DID YOU EVER, FOR EXAMPLE, PUT ONE OF THE BIG

01:59PM  4    SIEMENS ADVIA'S IN A CONFERENCE ROOM FOR A DEMO?

01:59PM  5    A.   NO.

01:59PM  6    Q.   HOW ABOUT AN IMMULITE DEVICE?  DID YOU EVER PLACE AN

01:59PM  7    IMMULITE?

01:59PM  8    A.   NO.

01:59PM  9    Q.   HOW ABOUT A TECAN MACHINE?  WERE YOU EVER ASKED TO PLACE A

01:59PM  10   TECAN MACHINE IN A CONFERENCE ROOM FOR ONE OF THESE DEMOS?

01:59PM  11   A.   NO.

01:59PM  12          MR. BOSTIC:  YOUR HONOR, THIS MIGHT BE A GOOD TIME

01:59PM  13   FOR A BREAK.

01:59PM  14          THE COURT:  LET'S TAKE OUR BREAK, LADIES AND

01:59PM  15   GENTLEMEN.  WE'LL TAKE 30 MINUTES, LADIES AND GENTLEMEN,

02:00PM  16   30 MINUTES.

02:00PM  17       (RECESS FROM 2:00 P.M. UNTIL 2:34 P.M.)

02:34PM  18          THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

02:34PM  19       ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

02:34PM  20       THE JURY AND ALTERNATES ARE PRESENT.

02:34PM  21       MR. BOSTIC, WOULD YOU LIKE TO CONTINUE?

02:34PM  22          MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

02:34PM  23   Q.   WELCOME BACK, MR. EDLIN.

02:34PM  24   A.   THANK YOU.

02:34PM  25   Q.   WE WERE TALKING ABOUT HOW TECHNOLOGY DEMONSTRATIONS WORKED

02:34PM   1    AT THERANOS.

02:34PM   2         DO YOU HAVE THAT SUBJECT IN MIND?

02:34PM   3    A.   YES.

02:34PM   4              MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

02:34PM   5              THE COURT:  YES.

02:34PM   6              MR. BOSTIC:  (HANDING.)

02:34PM   7         I'VE JUST HANDED THE WITNESS A BINDER.  I BELIEVE THE

02:34PM   8    COURT ALREADY HAS A COPY AND SO DOES THE DEFENSE.

02:34PM   9              MS. WALSH:  YES, YOUR HONOR.

02:34PM  10    BY MR. BOSTIC:

02:34PM  11    Q.   MR. EDLIN, COULD I ASK YOU TO TURN TO TAB 959 IN THE

02:34PM  12    BINDER IN FRONT OF YOU.

02:35PM  13    A.   OKAY.

02:35PM  14    Q.   AND LET ME ASK, IN CONNECTION WITH THESE TECHNOLOGY

02:35PM  15    DEMONSTRATIONS AT THERANOS, YOU MENTIONED THAT YOU HAD A ROLE

02:35PM  16    IN COORDINATING THEM; IS THAT RIGHT?

02:35PM  17    A.   CORRECT.

02:35PM  18    Q.   DID YOU REGULARLY USE EMAIL IN ORDER TO COORDINATE WITH

02:35PM  19    THE VARIOUS PEOPLE WHO WERE INVOLVED IN THESE DEMONSTRATIONS?

02:35PM  20    A.   YES, AND SOMETIMES THERE WAS VERBAL COMMUNICATION AS WELL.

02:35PM  21    Q.   OKAY.  AND WHEN IT CAME TO THE EMAILS, WERE THOSE EMAILS

02:35PM  22    IN THOSE CASES THE MECHANISM BY WHICH THE DETAILS AND LOGISTICS

02:35PM  23    AND THE RESULTS OF THOSE DEMONSTRATIONS WERE COORDINATED AND

02:35PM  24    EXCHANGED WITHIN THERANOS?

02:35PM  25    A.   YES.

02:35PM  1    Q.   AND IN ORDER FOR THAT PART OF THE COMPANY'S BUSINESS TO

02:35PM  2    OPERATE, WAS IT IMPORTANT THAT THOSE EMAILS BE ACCURATE?

02:35PM  3    A.   YES.

02:35PM  4    Q.   AND AT THERANOS, WERE EMAILS LIKE THOSE PRESERVED SO THAT

02:36PM  5    THEY COULD BE REFERRED BACK TO LATER, IF NECESSARY?

02:36PM  6    A.   TO MY KNOWLEDGE, YES.

02:36PM  7    Q.   LOOKING AT TAB 959, DO YOU SEE AN EMAIL CHAIN INCLUDING

02:36PM  8    YOU AND OTHERS AT THERANOS RELATING TO COORDINATING ONE OF

02:36PM  9    THESE DEMOS?

02:36PM  10   A.   YES.

02:36PM  11          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 959.

02:36PM  12          MS. WALSH:  NO OBJECTION, YOUR HONOR.

02:36PM  13          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:36PM  14       (GOVERNMENT'S EXHIBIT 959 WAS RECEIVED IN EVIDENCE.)

02:36PM  15   BY MR. BOSTIC:

02:36PM  16   Q.   AND BEGINNING AT PAGE 2 OF THIS DOCUMENT, IF WE CAN ZOOM

02:36PM  17   IN ON THE TEXT OF YOUR EMAIL, MR. EDLIN, WE SEE AN EMAIL FROM

02:36PM  18   YOU DATED AUGUST 8TH, 2013; IS THAT CORRECT?

02:36PM  19   A.   CORRECT.

02:36PM  20   Q.   AND THE SUBJECT LINE IS DEMO ON AUGUST 13TH -- 4S AND

02:36PM  21   MINILAB.

02:36PM  22       DO YOU SEE THAT?

02:36PM  23   A.   YES.

02:36PM  24   Q.   TAKE A MOMENT TO REVIEW THIS IF YOU WOULD LIKE, BUT MY

02:36PM  25   QUESTION FOR YOU IS, WHAT WAS THE PURPOSE OF THIS EMAIL AND

EDLIN DIRECT BY MR. BOSTIC

```
02:36PM   1    WHAT WAS HAPPENING HERE?

02:37PM   2    A.   THE PURPOSE OF THIS EMAIL WAS TO NOTIFY DIFFERENT

02:37PM   3    PERSONNEL WHO EACH HAD DIFFERENT SPECIALTIES ABOUT A DEMO THAT

02:37PM   4    WAS GOING TO HAPPEN.

02:37PM   5         IT WAS TYPICAL TO SEND -- IT WAS TYPICAL THAT I WOULD SEND

02:37PM   6    THESE TYPES OF EMAILS IF A DEMO WERE TO HAPPEN.

02:37PM   7    Q.   AND ARE WE TALKING HERE ABOUT A DEMO THAT WAS GOING TO

02:37PM   8    TAKE PLACE AT THE THERANOS FACILITY?

02:37PM   9    A.   YES, AT THE THERANOS OFFICE.

02:37PM  10    Q.   IN THIS EMAIL YOU MENTION "WILL NEED TO HAVE A 4S AND

02:37PM  11    MINILAB SET UP IN INTERVIEW ROOM NUMBER 1."

02:37PM  12         DO YOU SEE THAT AT THE TOP OF THE MESSAGE?

02:37PM  13    A.   YES.

02:37PM  14    Q.   DOES THAT REFER TO THE ACTUAL DEVICES THAT WERE GOING TO

02:38PM  15    BE PRESENT DURING THE VIP MEETING?

02:38PM  16    A.   YES.

02:38PM  17    Q.   AND THE 4S AND MINILAB, CAN YOU REMIND US WHETHER THOSE

02:38PM  18    WERE CURRENT GEN THERANOS DEVICES USED FOR PATIENT TESTING, OR

02:38PM  19    WERE THEY NEXT GEN DEVICES THAT WERE NEVER USED FOR CLINICAL

02:38PM  20    TESTING?

02:38PM  21    A.   THEY WERE NEXT GENERATION DEVICES.

02:38PM  22    Q.   BELOW THAT IN THE EMAIL, THERE'S A PLAN A AND A PLAN B,

02:38PM  23    AND IT SAYS "PLAN A IS TO HAVE BOTH ABLE TO RUN NULL

02:38PM  24    PROTOCOLS."

02:38PM  25         DO YOU SEE THAT?
```

02:38PM  1     A.   YES.

02:38PM  2     Q.   AND THEN THERE'S A QUESTION.  YOU ASK, "MICHAEL -- CAN YOU

02:38PM  3     PLEASE REFRESH MY MEMORY IF THE NORMANDY OR THE DEMO APP IS

02:38PM  4     MORE APPROPRIATE FOR THIS?"

02:38PM  5          DO YOU SEE THAT?

02:38PM  6     A.   YES.

02:38PM  7     Q.   AND YOU SAYS "PLAN B IS TO HAVE THE 4S ABLE TO RUN A CBC,

02:38PM  8     IF POSSIBLE."

02:38PM  9          DO YOU SEE THAT?

02:38PM  10    A.   YES.

02:38PM  11    Q.   AND WHY WAS IT NECESSARY TO HAVE A PLAN A AND A PLAN B IN

02:38PM  12    THIS CASE?

02:38PM  13    A.   IT WAS NECESSARY BECAUSE AT THE TIME OF WRITING THIS

02:39PM  14    EMAIL, I WAS UNSURE OF WHAT WOULD BE AVAILABLE AND WHAT

02:39PM  15    WOULD -- WHAT THE DEVICES WOULD BE CAPABLE OF DOING FOR THIS

02:39PM  16    MEETING.

02:39PM  17    Q.   THIS EMAIL IS SENT ON AUGUST 8TH, 2013?

02:39PM  18    A.   RIGHT.

02:39PM  19    Q.   AND IT'S IN ADVANCE OF A DEMONSTRATION THAT WAS GOING TO

02:39PM  20    HAPPEN ABOUT FIVE DAYS LATER?

02:39PM  21    A.   CORRECT.

02:39PM  22    Q.   AND WAS THERE STILL SOME UNCERTAINTY ABOUT WHETHER THERE

02:39PM  23    WAS GOING TO BE A 4S ABLE TO RUN A BLOOD COUNT FIVE DAYS AFTER

02:39PM  24    THIS?

02:39PM  25    A.   AT THE TIME OF WRITING, YES, THERE WAS UNCERTAINTY.

EDLIN DIRECT BY MR. BOSTIC

02:39PM  1    Q.   WAS THAT A COMMON THING IN YOUR EXPERIENCE AT THERANOS FOR

02:39PM  2    THERE TO BE UNCERTAINTY ABOUT WHAT EQUIPMENT WOULD BE AVAILABLE

02:39PM  3    ON A CERTAIN DAY OR WHAT IT WOULD BE CAPABLE OF DOING?

02:39PM  4    A.   ONLY FOR A PERIOD OF TIME.

02:39PM  5         LATER ON THERE WAS MORE CERTAINTY AND A MORE RELIABLE

02:39PM  6    PROCESS FOR DEMOS.

02:40PM  7    Q.   THE PLAN A SECTION DISCUSSES THE POSSIBILITY OF HAVING

02:40PM  8    THESE TWO DEVICES, THE 4S AND THE MINILAB, BEING ABLE TO RUN

02:40PM  9    NULL PROTOCOLS.

02:40PM  10        DO YOU SEE THAT?

02:40PM  11   A.   YES.

02:40PM  12   Q.   AND CAN YOU EXPLAIN WHAT THE NULL PROTOCOL WAS IN THIS

02:40PM  13   CONTEXT?

02:40PM  14   A.   SO A PROTOCOL WAS ESSENTIALLY LOADED ONTO A DEVICE AND

02:40PM  15   ACCORDING TO A DIFFERENT PROTOCOL, IT PROGRAMMED WHAT THE

02:40PM  16   DEVICE WOULD ACTUALLY DO IF A CARTRIDGE WAS INSERTED INTO A

02:40PM  17   DEVICE OR IF OTHER FUNCTIONS WERE REQUESTED OR IF A USER

02:40PM  18   PRESSED A CERTAIN BUTTON ON THE DEVICE, FOR EXAMPLE.

02:40PM  19        A NULL PROTOCOL WAS ONE OF SEVERAL PROTOCOLS THAT WAS

02:40PM  20   AVAILABLE THROUGH THE DEMO APP, WHICH IS REFERRED TO HERE.

02:41PM  21        THE NULL PROTOCOL BASICALLY MEANS JUST AN EMPTY PROTOCOL.

02:41PM  22   SO THE NULL PROTOCOL WOULD NOT ATTEMPT TO RUN A BLOOD SAMPLE OR

02:41PM  23   RUN A SAMPLE.

02:41PM  24   Q.   SO LET'S IMAGINE THAT WE'RE IN THAT CONFERENCE ROOM, THE

02:41PM  25   DEVICE IS THERE, IT'S SET UP TO RUN THIS NULL PROTOCOL.

02:41PM 1       IF A SAMPLE IS PUT INTO THE MACHINE THEN, CAN YOU DESCRIBE

02:41PM 2   WHAT THE VISITOR WOULD SEE OR WHAT WOULD WE SEE IN THAT CASE?

02:41PM 3   A.   THE VISITOR WOULD SEE A GRAPHIC USER INTERFACE ON THE

02:41PM 4   DEVICE, AND THEN DEPENDING ON WHAT WAS DONE, THEY MIGHT SEE

02:41PM 5   DIFFERENT THINGS, BUT THERE COULD BE -- I THINK AT ONE POINT

02:41PM 6   THE DEVICE HAD LOADING OR INITIALIZING, SOMETHING LIKE THAT.

02:41PM 7   Q.   SO THE DEVICE RUNNING THE NULL PROTOCOL WOULD BE POWERED

02:41PM 8   ON AND THE SCREEN WOULD BE ON?

02:41PM 9   A.   CORRECT.

02:42PM 10  Q.   AND WHEN THE SAMPLE WAS LOADED, YOU SAID THE SCREEN MIGHT

02:42PM 11  SAY LOADING OR INITIALIZING?

02:42PM 12  A.   IF SOMETHING WAS LOADED.

02:42PM 13      BUT WHEN A USER FIRST SAW IT, THEY WOULD BASICALLY -- I

02:42PM 14  THINK THEY WOULD SEE A THERANOS LOGO, AND THEN A BUTTON THAT

02:42PM 15  WOULD INITIALIZE THE STEPS TO POTENTIALLY PROCESS A SAMPLE.

02:42PM 16  Q.   OKAY.  AND WHEN THE NULL PROTOCOL WAS RUNNING, WAS THE

02:42PM 17  DEVICE CAPABLE OF ACCEPTING A SAMPLE?  WOULD THE MACHINE OPEN

02:42PM 18  AND THEN TAKE IN THE SAMPLE?

02:42PM 19  A.   I THINK IT COULD BE CAPABLE.  BUT THE NULL PROTOCOL

02:42PM 20  ITSELF, YES, WOULD ACCEPT A CARTRIDGE AND THERE COULD BE A

02:42PM 21  NANOTAINER, OR NOT, ON THE CARTRIDGE, BUT THEN AFTERWARD

02:43PM 22  NOTHING WOULD HAPPEN.

02:43PM 23  Q.   SO THE SAMPLE WOULD GO INTO THE DEVICE, BUT THE DEVICE IS

02:43PM 24  NOT EVEN TRYING TO ACTUALLY RUN A TEST OR RETURN A RESULT; IS

02:43PM 25  THAT RIGHT?

02:43PM   1    A.   THAT IS MY UNDERSTANDING.

02:43PM   2    Q.   OKAY.  AND WAS THE NULL PROTOCOL AN ITEM OF SOFTWARE THAT

02:43PM   3    WAS SPECIFIC TO THE THERANOS EDISON?

02:43PM   4    A.   IN MY EXPERIENCE THE NULL PROTOCOL ONLY APPLIED TO THE

02:43PM   5    NEXT GENERATION VERSION OF THE DEVICES, SO THE 4S OR THE

02:43PM   6    MINILAB AS IS IN THIS EMAIL.

02:43PM   7    Q.   I SEE.

02:43PM   8         AND TO YOUR KNOWLEDGE, WAS THE NULL PROTOCOL SOMETHING

02:43PM   9    THAT WAS DEVELOPED IN HOUSE AT THERANOS?

02:43PM  10    A.   I BELIEVE SO.

02:43PM  11    Q.   WHO WOULD HAVE BEEN INVOLVED IN CREATING THE NULL

02:43PM  12    PROTOCOL?

02:43PM  13    A.   THE SOFTWARE DEVELOPERS.

02:43PM  14    Q.   AND THERE WAS A GROUP OF SOFTWARE DEVELOPERS AT THERANOS?

02:44PM  15    A.   YES.

02:44PM  16    Q.   AND TO WHOM DID THEY REPORT?

02:44PM  17    A.   TO SUNNY.

02:44PM  18    Q.   OKAY.  AND ARE YOU AWARE OF MR. BALWANI'S BACKGROUND?

02:44PM  19    A.   YES.

02:44PM  20    Q.   WHAT WAS HIS BACKGROUND OR SPECIALTY IN BEFORE HE CAME TO

02:44PM  21    THERANOS?

02:44PM  22    A.   I WOULD SAY BROADLY IN SOFTWARE.

02:44PM  23    Q.   YOU ASKED MICHAEL CRAIG WHETHER THE NORMANDY OR DEMO APP

02:44PM  24    IS MORE APPROPRIATE FOR THIS.

02:44PM  25         CAN YOU EXPLAIN FOR US WHAT THAT MEANS?  WHAT ARE THE APPS

02:44PM  1    AND WHAT IS THE DIFFERENCE BETWEEN THE NORMANDY AND THE DEMO

02:44PM  2    APP?

02:44PM  3    A.   A DEMO APP WAS USED FOR DEMOS.  THIS APP RESEMBLED WHAT I

02:44PM  4    THINK IS GENERALLY COMMON ON PHONE APPS IN TERMS OF A SIMPLE

02:44PM  5    DESIGN AND AN EASY USER EXPERIENCE.

02:44PM  6         I BELIEVE THAT THE NORMANDY APP WAS USED IN THE LAB AND

02:45PM  7    WAS NOT AS USER FRIENDLY TO, LET'S SAY, SOMEONE WHO WASN'T

02:45PM  8    FAMILIAR WITH THE DEVICE.

02:45PM  9    Q.   SO WHEN YOU'RE TALKING ABOUT USER FRIENDLINESS, ARE WE

02:45PM  10   TALKING ABOUT THINGS LIKE APPEARANCE AND HOW INTUITIVE IT IS?

02:45PM  11   A.   YES.

02:45PM  12   Q.   AND YOU'RE SAYING THAT THE VERSION OF THE INTERFACE THAT

02:45PM  13   WOULD SHOW UP DURING A DEMONSTRATION FOR A VIP WOULD BE

02:45PM  14   DIFFERENT FROM THE INTERFACE THAT WOULD ACTUALLY BE USED IN THE

02:45PM  15   LAB?

02:45PM  16             MS. WALSH:  OBJECTION.  LEADING.

02:45PM  17             THE COURT:  SUSTAINED.

02:45PM  18             MR. BOSTIC:  I CAN MOVE ON.

02:45PM  19   Q.   LET'S TURN TO THE FIRST PAGE OF THIS EXHIBIT AND LOOK AT

02:45PM  20   THE BOTTOM, AND I WANT TO ASK YOU ABOUT ANOTHER FEATURE OF THE

02:45PM  21   DEMO APP.

02:45PM  22        LET'S ZOOM IN ON THE BOTTOM COUPLE OF MESSAGES.  THERE.

02:45PM  23   THANKS.

02:45PM  24        DO YOU SEE ON THE BOTTOM THERE'S A RESPONSE TO YOUR

02:45PM  25   QUESTION TO MICHAEL CRAIG ON THE BOTTOM RELATING TO THE DEMO

02:46PM  1    APP?

02:46PM  2    A.   YES.

02:46PM  3    Q.   AND MR. CRAIG SAYS, "I WOULD RECOMMEND THE DEMO APP,

02:46PM  4    ALTHOUGH EITHER WOULD WORK.  THE DEMO APP MERELY SHIELDS

02:46PM  5    PROTOCOL FAILURES FROM THE CLIENT."

02:46PM  6        DO YOU SEE THAT?

02:46PM  7    A.   YES.

02:46PM  8    Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHAT THAT MEANS?

02:46PM  9    A.   YES.

02:46PM  10   Q.   AND WHAT DOES THAT MEAN?

02:46PM  11   A.   THIS MEANS THAT IF THE DEMO APP WAS ON THE DEVICE, AND IF

02:46PM  12   A TEST WAS BEING RUN AND THERE WAS AN ERROR, THAT ERROR WOULD

02:46PM  13   NOT APPEAR ON THE SCREEN.

02:46PM  14   Q.   AND ARE WE TALKING ABOUT THE KIND OF ERROR THAT MIGHT

02:46PM  15   PREVENT A RESULT FROM BEING RETURNED ON A SAMPLE?

02:46PM  16   A.   YES, ALONG WITH, I THINK THERE WERE A NUMBER OF DIFFERENT

02:46PM  17   KINDS OF ERRORS.

02:46PM  18   Q.   WHAT WOULD HAPPEN INSTEAD IF A DEVICE DURING DEMONSTRATION

02:46PM  19   WAS RUNNING THE DEMO APP AND IT ENCOUNTERED THAT KIND OF ERROR

02:46PM  20   THAT WOULD PREVENT IT FROM RETURNING A RESULT?  AGAIN, PUTTING

02:46PM  21   US BACK IN THE ROOM, WHAT WOULD WE SEE ON THE SCREEN, IF

02:46PM  22   ANYTHING?

02:46PM  23   A.   I THINK THAT THE SCREEN WOULD STILL SAY PROCESSING.

02:47PM  24   Q.   AND IT WOULD JUST SAY THAT INDEFINITELY?

02:47PM  25   A.   I'M NOT SURE WHEN IT STOPPED IF IT DID.

02:47PM  1    Q.   HOW WOULD THAT COMPARE TO THE VERSION OF THE SOFTWARE THAT

02:47PM  2    WOULD ACTUALLY RUN IN THE LAB, IF YOU KNOW?

02:47PM  3    A.   I'M NOT AN EXPERT ON THE NORMANDY APP OR WHAT WAS RUN IN

02:47PM  4    THE LAB, BUT IT'S MY UNDERSTANDING THAT AS SOON AS AN ERROR

02:47PM  5    OCCURRED, IT WOULD SHOW AND NOTIFY THE USER.

02:47PM  6    Q.   OKAY.  YOU RESPOND TO MR. CRAIG AND HIS DESCRIPTION ABOUT

02:47PM  7    THE DEMO APP SHIELDING PROTOCOL FAILURES, YOU WRITE "NEVER A

02:47PM  8    BAD THING."

02:47PM  9         DO YOU SEE THAT?

02:47PM  10   A.   YES.

02:47PM  11   Q.   AT THIS TIME DID YOU BELIEVE THAT IT WAS A GOOD IDEA TO

02:47PM  12   HAVE THIS DEMO APP IN PLACE DURING VIP DEMOS LIKE THIS?

02:47PM  13              MS. WALSH:  OBJECTION.

02:48PM  14              THE COURT:  OVERRULED.

02:48PM  15        YOU CAN ANSWER THE QUESTION.

02:48PM  16              THE WITNESS:  I BASED MY RECOMMENDATION ON THE

02:48PM  17   INFORMATION THAT I WAS GIVEN, AND THE RECOMMENDATION FROM

02:48PM  18   PEOPLE THAT I CONSIDERED EXPERTS AT THE COMPANY.

02:48PM  19   BY MR. BOSTIC:

02:48PM  20   Q.   AND WHEN WE'RE TALKING ABOUT THESE MEETINGS WITH VIP'S,

02:48PM  21   WHO WAS TYPICALLY RUNNING THESE MEETINGS?  WAS IT YOU ACTUALLY

02:48PM  22   RUNNING THE MEETINGS IN THE CONFERENCE ROOMS?

02:48PM  23   A.   NO.

02:48PM  24   Q.   WHO WAS -- WHO WOULD RUN THOSE MEETINGS?

02:48PM  25   A.   IN MY EXPERIENCE MOST OF THE MEETINGS WERE RUN BY

02:48PM   1    ELIZABETH, AND THERE WERE OTHER MEETINGS THAT WERE ALSO RUN

02:48PM   2    WITH SUNNY.

02:48PM   3    Q.   LOOKING AT THE TOP OF THE SELECTION THAT IS ON THE SCREEN

02:48PM   4    IN FRONT OF YOU, THERE'S A MESSAGE ON AUGUST 10TH, TWO DAYS

02:48PM   5    LATER, FROM DANIEL YOUNG.

02:48PM   6         DO YOU SEE THAT?

02:48PM   7    A.   YES.

02:48PM   8    Q.   HE SAYS, "WE HAVE RE-ALLOCATED THE 4S DEVICES, SO THEY ARE

02:49PM   9    NOT AVAILABLE FOR PREPARING TO RUN CBC FOR THIS DEMO,

02:49PM  10    UNFORTUNATELY."

02:49PM  11         DO YOU SEE THAT?

02:49PM  12    A.   YES.

02:49PM  13    Q.   DOES THIS MEAN THAT PLAN B IN YOUR EMAIL, BEING ABLE TO

02:49PM  14    HAVE THE 4S RUN A CBC, WAS NOT GOING TO BE POSSIBLE?

02:49PM  15    A.   THAT'S CORRECT.

02:49PM  16    Q.   LET'S LOOK AT THE TOP HALF OF PAGE 1, PLEASE.

02:49PM  17         IN YOUR EMAIL IN RESPONSE YOU SAY, "OK, THAT'S FINE."

02:49PM  18         DO YOU SEE THAT?

02:49PM  19    A.   YES.

02:49PM  20    Q.   AND YOU ASK, "WHEN ARE THE 4S AND THE MINILAB SCHEDULED TO

02:49PM  21    BE MOVED TO INTERVIEW ROOM NUMBER 1?"

02:49PM  22         DO YOU SEE THAT?

02:49PM  23    A.   YES.

02:49PM  24    Q.   AND THEN YOU ALSO ASK ABOUT PUTTING ONE OF THE 3.5'S IN

02:50PM  25    THE DEMO ROOM.

EDLIN DIRECT BY MR. BOSTIC

02:50PM 1          DO YOU SEE THAT?

02:50PM 2     A.   YES.

02:50PM 3     Q.   AND YOU ASK ABOUT THE COMFORT LEVEL WITH RUNNING A MALE

02:50PM 4     HEALTH/THYROID PANEL ON THE 3.5.

02:50PM 5          DO YOU SEE THAT?

02:50PM 6     A.   YES.

02:50PM 7     Q.   AND WHY WERE YOU ASKING ABOUT THE COMFORT LEVEL OF RUNNING

02:50PM 8     THAT ASSAY?

02:50PM 9     A.   I WAS INTERESTED IN UNDERSTANDING WHETHER THAT WOULD BE A

02:50PM 10    POTENTIAL OPTION FOR A DEMO MEETING, AND IF THAT TYPE OF TEST

02:50PM 11    COULD BE OFFERED TO THE GUESS.

02:50PM 12    Q.   IN OTHER WORDS, WHETHER THAT TEST WAS READY FOR USE IN

02:50PM 13    THIS KIND OF TEST?

02:50PM 14    A.   YES.

02:50PM 15    Q.   IN THE TOP EMAIL IN THIS CHAIN, SAMARTHA ANEKAL WRITES,

02:50PM 16    "DAN, THE ASSAY TEAMS ARE PLANNING ON USING THE 3.5 DEVICES

02:50PM 17    TOMORROW, BUT WE CAN MOVE ONE OF THE R&D UNITS IF IT'S JUST FOR

02:50PM 18    SHOW-AND-TELL?"

02:51PM 19         DO YOU SEE THAT?

02:51PM 20    A.   YES.

02:51PM 21    Q.   AND DO YOU RECALL WHEN THERANOS FIRST BEGAN OFFERING

02:51PM 22    CLINICAL BLOOD TESTS TO PATIENTS?

02:51PM 23    A.   YES.   IN SEPTEMBER OF 2013.

02:51PM 24    Q.   THE MONTH AFTER THIS TOOK PLACE?

02:51PM 25    A.   YES.

02:51PM   1    Q.   OKAY.  YOU CAN PUT THAT ASIDE.

02:51PM   2         I'LL ASK YOU TO TURN NEXT TO TAB 961 IN YOUR BINDER.

02:51PM   3    A.   OKAY.

02:51PM   4    Q.   AND AT 961, DO YOU SEE ANOTHER EMAIL CHAIN INCLUDING YOU,

02:51PM   5    MR. BALWANI, AND MS. HOLMES RELATING TO COORDINATION FOR A DEMO

02:51PM   6    THE FOLLOWING DAY?

02:51PM   7    A.   YES.

02:51PM   8         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 961.

02:51PM   9         MS. WALSH:  NO OBJECTION.

02:51PM   10         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:51PM   11    (GOVERNMENT'S EXHIBIT 961 WAS RECEIVED IN EVIDENCE.)

02:51PM   12   BY MR. BOSTIC:

02:51PM   13   Q.   SO, MR. EDLIN, STARTING WITH YOUR EMAIL, YOU WRITE TO

02:52PM   14   MS. HOLMES AND MR. BALWANI, "THE FOLLOWING DEVICES ARE PLANNED

02:52PM   15   TO BE IN THE DEMO/INTERVIEW ROOM."

02:52PM   16        DO YOU SEE THAT?

02:52PM   17   A.   YES.

02:52PM   18   Q.   AND WHY WERE YOU COORDINATING WITH MS. HOLMES AND

02:52PM   19   MR. BALWANI ON THE DETAILS FOR THIS DEMO FOR TOMORROW'S

02:52PM   20   MEETING?

02:52PM   21   A.   I WANTED TO MAKE SURE THAT THEY WERE AWARE OF WHICH

02:52PM   22   DEVICES WOULD BE IN THE ROOM AND WHAT THE CAPABILITIES WERE.

02:52PM   23        I BELIEVE IN THIS CASE THEY WERE BRINGING THE GUESTS TO

02:52PM   24   THE ROOM.

02:52PM   25   Q.   AND YOU MENTION AN ASSORTMENT OF DEVICES THAT WERE GOING

02:52PM 1   TO BE IN THE DEMO/INTERVIEW ROOM.  NUMBER ONE ON THAT LIST WAS

02:52PM 2   A 3.5 EDISON WITH A DEMO APP SET TO RUN THE NULL PROTOCOL.

02:52PM 3       DO YOU SEE THAT?

02:52PM 4   A.  YES.

02:52PM 5   Q.  AND THEN THERE'S A 4S WITH THE DEMO APP ALSO SET TO RUN

02:53PM 6   THE NULL PROTOCOL?

02:53PM 7   A.  YES.

02:53PM 8   Q.  AND THEN WE SEE TWO MINILABS, ONE THAT COULD RUN THE NULL

02:53PM 9   PROTOCOL AND ONE THAT COULD NOT; IS THAT RIGHT?

02:53PM 10  A.  YES.

02:53PM 11  Q.  AND THEN YOU ASK ABOUT WHETHER THEY WOULD ALSO LIKE TO

02:53PM 12  HAVE A 3.0 EDISON THAT COULD RUN THE H1N1 MILITARY DEMO; IS

02:53PM 13  THAT RIGHT?

02:53PM 14  A.  YES.

02:53PM 15  Q.  AND IF THAT 3.0 EDISON WAS NOT INCLUDED, WOULD ANY OF

02:53PM 16  THESE FOUR DEVICES THAT YOU LIST BE CAPABLE OF ACTUALLY RUNNING

02:53PM 17  A PATIENT SAMPLE IN THE ROOM?

02:53PM 18  A.  I'M NOT SURE.

02:53PM 19  Q.  THE FIRST THREE, IT MENTIONS THEY'RE SET TO RUN THE NULL

02:53PM 20  PROTOCOL; IS THAT CORRECT?

02:53PM 21  A.  YES.

02:53PM 22  Q.  DID THE NULL PROTOCOL INVOLVE ACTUALLY PROCESSING A

02:53PM 23  PATIENT SAMPLE AND RETURNING A RESULT?

02:54PM 24  A.  NO.

02:54PM 25  Q.  AND DEVICE NUMBER 4, YOU NOTE THAT IT WOULD NOT BE ABLE TO

02:54PM   1    RUN THE NULL PROTOCOL, DUE TO OLD PIPETTE NOZZLES THAT FAIL

02:54PM   2    ONCE THEY INITIALIZE IN THE PROTOCOL?

02:54PM   3    A.   RIGHT.

02:54PM   4    Q.   WOULD THAT DEVICE BE CAPABLE OF RUNNING A PATIENT SAMPLE

02:54PM   5    BASED ON THAT PROBLEM?

02:54PM   6    A.   I DON'T BELIEVE SO.

02:54PM   7    Q.   OKAY.  WE CAN PUT THAT ASIDE.  THANK YOU.

02:54PM   8         AND LET ME ASK YOU TO LOOK NEXT AT TAB 860, PLEASE.

02:55PM   9    A.   OKAY.

02:55PM  10    Q.   DO YOU SEE AT TAB 860 ANOTHER EMAIL CHAIN INCLUDING YOU

02:55PM  11    AND MS. HOLMES AND MR. BALWANI RELATING TO COORDINATION AND

02:55PM  12    RESULTS FROM ONE OF THESE DEMOS?

02:55PM  13    A.   YES.

02:55PM  14         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 860.

02:55PM  15         MS. WALSH:  NO OBJECTION.

02:55PM  16         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:55PM  17    (GOVERNMENT'S EXHIBIT 860 WAS RECEIVED IN EVIDENCE.)

02:55PM  18         MR. BOSTIC:  LET'S START ON PAGE 12.  THANK YOU,

02:55PM  19    MS. WACHS.  AND IF WE CAN ZOOM IN ON THE BOTTOM JUST TO HAVE

02:55PM  20    THAT HEADER INFORMATION FOR THAT EMAIL.

02:55PM  21    Q.   DO YOU SEE, MR. EDLIN, WE'RE ABOUT TO LOOK AT AN EMAIL

02:55PM  22    FROM YOU ON MAY 31ST, 2013?

02:55PM  23    A.   YES.

02:55PM  24    Q.   AND THE SUBJECT LINE IS SAMPLE RUNNING RIGHT NOW.

02:55PM  25         DO YOU SEE THAT?

02:55PM 1    A.   YES.

02:55PM 2    Q.   LET'S LOOK AT PAGE 13.

02:55PM 3         AT THE TOP OF PAGE 13 YOU ASK, "WHAT IS THE STATUS?  IT'S

02:56PM 4    ALREADY BEEN RUNNING FOR 1 HOUR 15 MINUTES AND HAS BEEN STUCK

02:56PM 5    ON 99 PERCENT FOR ABOUT 8 MINUTES."

02:56PM 6         DO YOU RECALL WHAT YOU WERE REFERRING TO IN THIS EMAIL?

02:56PM 7    A.   YES.

02:56PM 8    Q.   AND CAN YOU EXPLAIN IT FOR US?

02:56PM 9    A.   THIS REFERS TO A DEMO THAT WAS BEING RUN AT A HOSPITAL IN

02:56PM 10   NEW YORK, AND A SAMPLE WAS RUNNING ON ONE OF THE DEVICES IN THE

02:56PM 11   ROOM, AND I WAS KEEPING TABS ON THE DEVICE TO MAKE SURE THAT IT

02:56PM 12   WAS RUNNING AND THAT IT WOULD BE COMPLETED IN TIME FOR THE END

02:56PM 13   OF THE MEETING, AND I NOTICED THAT THE PROCESS, HAVING

02:56PM 14   COMPLETED IT, WAS STUCK ON 99 PERCENT.

02:56PM 15        SO I SENT AN EMAIL TO ONE OF THE -- TO SANDHYA, WHO WAS A

02:56PM 16   SOFTWARE ENGINEER OR A DEVELOPER, TO ASK ABOUT WHY THAT WAS.

02:56PM 17   Q.   AND WHEN THIS DEMO WAS HAPPENING, WERE YOU PRESENT IN

02:57PM 18   NEW YORK WITH THE DEVICE?

02:57PM 19   A.   YES.

02:57PM 20   Q.   AND YOU WERE COORDINATING WITH THERANOS PERSONNEL BACK IN

02:57PM 21   CALIFORNIA?

02:57PM 22   A.   CORRECT.

02:57PM 23   Q.   AND WHY WAS THE DEVICE IN THAT HOSPITAL IN NEW YORK?  WAS

02:57PM 24   IT THERE BECAUSE THAT HOSPITAL WAS USING THE DEVICE FOR PATIENT

02:57PM 25   TESTING?

02:57PM  1     A.   NO.   THAT MEETING WAS CENTERED ON SHARING WHAT THERANOS AS

02:57PM  2     A COMPANY WAS DOING AND EXPLORING POTENTIAL OPPORTUNITIES TO

02:57PM  3     PARTNER WITH THE HOSPITAL.

02:57PM  4     Q.   SO YOU WERE THERE WITH THE DEVICE FOR PURPOSES OF THAT

02:57PM  5     DEMONSTRATION?

02:57PM  6     A.   CORRECT.   I WAS WITH A GROUP OF THERANOS EMPLOYEES.

02:57PM  7     Q.   AND LET'S LOOK AT PAGE 11 OF THE EMAIL.

02:57PM  8          IF WE ZOOM IN ON THE MIDDLE OF THE PAGE, WE SEE THERE'S

02:57PM  9     SOME DISCUSSION ABOUT WHAT THE RUN TIME OF THAT SHOULD HAVE

02:57PM 10     BEEN; CORRECT?

02:57PM 11     A.   CORRECT.

02:58PM 12     Q.   AND THEN LET'S LOOK AT THE TOP OF THIS PAGE.

02:58PM 13          OKAY.   AND DO YOU SEE IN THE BOTTOM OF YOUR EMAIL HERE, IT

02:58PM 14     SAYS, "NOTE THAT THE SAME DONOR GAVE BLOOD FOR THE 3.0 RUN AS

02:58PM 15     WELL AS THE RUN SCHEDULED FOR TONIGHT, AND WE WILL BE COMPARING

02:58PM 16     RESULTS."

02:58PM 17          DO YOU SEE THAT?

02:58PM 18     A.   YES.

02:58PM 19     Q.   OKAY.   LET'S GO TO PAGE 10.   WE'RE MOVING FORWARD IN TIME

02:58PM 20     NOW.   LET'S ZOOM IN ON THE TEXT OF THIS MIDDLE EMAIL.

02:58PM 21          IS THIS AN EMAIL FROM YOU TO DANIEL YOUNG?

02:58PM 22     A.   YES.

02:58PM 23     Q.   IT SAYS AT THE TOP, "GIVEN THAT THE SAMPLES ARE BEING RUN

02:58PM 24     AT THIS LATE HOUR, I JUST WANT TO TOUCH BASE WITH YOU TO ENSURE

02:58PM 25     THAT WE'RE COORDINATED FOR THESE REPORTS."

02:58PM  1          DO YOU SEE THAT?

02:58PM  2     A.   YES.

02:58PM  3     Q.   WHAT ROLE DID DANIEL YOUNG HAVE IN CONNECTION WITH THE

02:58PM  4     RESULTS FROM THESE REPORTS, OR THESE DEMOS?

02:59PM  5     A.   DANIEL REVIEWED THE RESULTS AND THE TEST LOGS TO ENSURE

02:59PM  6     THAT THE TEST WAS VALID, AND HE INTERPRETED THE RESULTS, AND

02:59PM  7     THEN APPROVED THEM FOR DISTRIBUTION BACK TO THE GUEST.

02:59PM  8     Q.   AND WAS THAT HIS REGULAR ROLE IN CONNECTION WITH

02:59PM  9     DEMONSTRATIONS LIKE THIS?

02:59PM  10    A.   YES.

02:59PM  11    Q.   DID HE HAVE THAT SAME ROLE IN CONNECTION WITH CLINICAL

02:59PM  12    PATIENT TESTING AT THERANOS?

02:59PM  13    A.   I'M NOT EXACTLY SURE, BUT I KNOW THAT HE WAS A LAB

02:59PM  14    DIRECTOR.

02:59PM  15    Q.   YOU BELIEVE THAT DANIEL YOUNG WAS A LAB DIRECTOR OF THE

02:59PM  16    CLINICAL LAB AT THERANOS?

02:59PM  17    A.   I BELIEVE IT WAS IN THE ARIZONA LAB.

02:59PM  18    Q.   AT THE BOTTOM OF YOUR EMAIL, THE LAST SENTENCE SAYS, "I'LL

02:59PM  19    BASE MY SCHEDULE ON YOUR AVAILABILITY SO THAT WE CAN FINALIZE

03:00PM  20    THE REPORTS AND GET THEM TO EAH FOR APPROVAL AS SOON AS

03:00PM  21    POSSIBLE."

03:00PM  22         DO YOU SEE THAT?

03:00PM  23    A.   YES.

03:00PM  24    Q.   WAS EAH ELIZABETH HOLMES?

03:00PM  25    A.   YES.

03:00PM  1   Q.   AND WHAT WAS HER ROLE IN CONNECTION WITH THE RESULTS FROM

03:00PM  2   THESE DEMO TESTS?

03:00PM  3   A.   IN CONNECTION TO THIS PARTICULAR DEMO, I REMEMBER THAT

03:00PM  4   ELIZABETH WAS INTERESTED IN SEEING WHAT THE END RESULTS WOULD

03:00PM  5   BE.  BUT USUALLY SHE WAS NOT INVOLVED IN REVIEWING RESULTS FOR

03:00PM  6   DEMOS.

03:00PM  7   Q.   ALL RIGHT.  LET'S LOOK AT PAGE 8, AND THE BOTTOM OF THE

03:00PM  8   PAGE, AND JUST TO CAPTURE THAT HEADER INFORMATION FOR THAT

03:00PM  9   BOTTOM EMAIL.

03:00PM  10       WE'RE LOOKING AT AN EMAIL FROM YOU ON THAT SATURDAY,

03:00PM  11  JUNE 1ST, TO MS. HOLMES, MR. BALWANI, AND DANIEL YOUNG.

03:00PM  12       DO YOU SEE THAT?

03:00PM  13  A.   YES.

03:00PM  14  Q.   AND YOU'RE PROVIDING SOME INFORMATION ABOUT THE TEST.

03:01PM  15  LET'S LOOK, IN PARTICULAR, AT THE FOLLOWING PAGE, PAGE 9.

03:01PM  16       AND AT THE TOP OF THAT PAGE YOU SAY IN YOUR EMAIL, "IT

03:01PM  17  LOOKS LIKE THERE IS SOME DISCREPANCY BETWEEN THE TWO INFECTIOUS

03:01PM  18  PANEL RUNS -- ANY THOUGHTS ON WHY THIS IS THE CASE?"

03:01PM  19       DO YOU SEE THAT?

03:01PM  20  A.   YES.

03:01PM  21  Q.   AND DO YOU RECALL THAT EARLIER IN THE CHAIN WE SAW THAT

03:01PM  22  THIS SAME DONOR HAD DONATED FOR TWO DIFFERENT KINDS OF ANALYSIS

03:01PM  23  AND THE RESULTS WERE GOING TO BE COMPARED?

03:01PM  24  A.   YES.

03:01PM  25  Q.   AND YOU'RE HIGHLIGHTING A DISCREPANCY BETWEEN TWO RUNS OF

03:01PM   1      THE SAME PANEL; CORRECT?

03:01PM   2      A.   CORRECT.

03:01PM   3      Q.   BUT THESE SAMPLES WERE FROM THE SAME DONOR?

03:01PM   4      A.   CORRECT.

03:01PM   5      Q.   AND WHY DID YOU WANT TO ASK MS. HOLMES, MR. BALWANI, AND

03:02PM   6      DR. YOUNG ABOUT THIS?

03:02PM   7      A.   AS PART OF MY ROLE IN THIS DEMONSTRATION, MY ROLE WAS TO

03:02PM   8      SEND THE RESULTS BACK TO THE PATIENT, EMAIL THEM BACK AFTER

03:02PM   9      RECEIVING THEM FROM THE LAB, AND I NOTICED THAT THERE WAS A

03:02PM  10      DISCREPANCY, AND I WAS CURIOUS AS TO WHY THAT WAS, AND I WANTED

03:02PM  11      TO MAKE SURE THAT THE GROUP ON THIS EMAIL WAS AWARE OF IT.

03:02PM  12      Q.   LET'S LOOK AT PAGE 7 AND GET SOME MORE DETAILS ABOUT WHAT

03:02PM  13      WAS HAPPENING HERE.

03:02PM  14           I'M SORRY THAT THESE EMAILS ARE SO NARROW HERE.

03:02PM  15           LET'S LOOK AT YOUR MESSAGE, SO THE BOTTOM TWO-THIRDS.

03:02PM  16           DO YOU SEE YOU PROVIDE SOME ADDITIONAL CONTEXT ABOUT THIS

03:02PM  17      DISCREPANCY?  AND YOU SAY FOR TEST NUMBER 1 THE SAMPLE WAS

03:03PM  18      COLLECTED, DEPOSITED DIRECTLY INTO A CARTRIDGE, AND RUN ON

03:03PM  19      SITE.

03:03PM  20           THE CARTRIDGE HAD BEEN SHIPPED TO NYC IN STANDARD

03:03PM  21      PACKAGING.

03:03PM  22           DO YOU SEE THAT?

03:03PM  23      A.   YES.

03:03PM  24      Q.   AND LET'S TURN THE PAGE AND LOOK AT PAGE 8 WHERE AT THE

03:03PM  25      TOP YOU ADDRESS SAMPLE NUMBER 2, AND YOU SAY, "SAMPLE NUMBER 2

03:03PM  1    WAS ALIQUOTED FROM THE BCD 2.1 NANOTAINERS, PIPETTED DIRECTLY

03:03PM  2    INTO A CARTRIDGE, AND RUN AT THERANOS."

03:03PM  3         AND BELOW THAT YOU SAY, "BOTH CARTRIDGES WERE RUN ON THE

03:03PM  4    SAME READER."

03:03PM  5         DO YOU SEE THAT?

03:03PM  6    A.   YES.

03:03PM  7    Q.   AND SO IS THIS A SITUATION WHERE TWO SAMPLES FROM THE SAME

03:03PM  8    DONOR WERE RUN ON THE SAME THERANOS READER BUT PRODUCED TWO

03:03PM  9    DIFFERENT RESULTS?

03:03PM  10   A.   YES.

03:03PM  11   Q.   AND WHY IS THAT A PROBLEM?

03:03PM  12            MS. WALSH:  OBJECTION.

03:03PM  13            THE COURT:  IT MIGHT BE A FOUNDATIONAL ISSUE.  IF

03:04PM  14   YOU WANT TO LAY A FOUNDATION.

03:04PM  15   BY MR. BOSTIC:

03:04PM  16   Q.   LET ME ASK, WAS THAT VIEWED AS A PROBLEM AT THERANOS?

03:04PM  17   A.   YES.

03:04PM  18   Q.   LET'S LOOK AT THE TOP OF PAGE 7, AND ZOOM IN ON

03:04PM  19   MS. HOLMES'S EMAIL WHERE SHE WRITES TO YOU, DANIEL YOUNG, AND

03:04PM  20   SUNNY BALWANI, "THE DISCREPANCY WILL BE A PROBLEM."

03:04PM  21        DO YOU SEE THAT?

03:04PM  22   A.   YES.

03:04PM  23   Q.   AND WERE YOU A PART OF ANY DISCUSSIONS WITH MS. HOLMES OR

03:04PM  24   MR. BALWANI ABOUT THIS DISCREPANCY, THIS PROBLEM THAT YOU WERE

03:04PM  25   SEEING, BESIDES THIS EMAIL?

03:04PM   1     A.   NOT FOR THIS -- I DON'T BELIEVE, ASIDE FROM THIS EMAIL,

03:04PM   2     THERE WAS DISCUSSION ABOUT IT.

03:04PM   3     Q.   LET'S FAST FORWARD AND LOOK AT THE RESOLUTION HERE.  LET'S

03:04PM   4     GO TO PAGE 4 AND ZOOM IN ON THE TOP PART OF THE PAGE.

03:05PM   5          AND DO YOU SEE HERE AN EMAIL FROM MS. HOLMES ABOUT THIS

03:05PM   6     SAME TOPIC?

03:05PM   7     A.   YES.

03:05PM   8     Q.   AND AFTER GETTING SOME INFORMATION FROM DANIEL YOUNG, SHE

03:05PM   9     SAYS, "AGREE ON THE PA MEASLES RESULT."

03:05PM   10         DO YOU UNDERSTAND THAT TO REFER TO PALO ALTO?

03:05PM   11    A.   YES.

03:05PM   12    Q.   SHE SAYS, "AGREE ON THE PA MEASLES RESULT.  WE'LL ONLY

03:05PM   13    INCLUDE THAT ONE FROM PA.  I WOULD INTEGRATE THE PA ONLY

03:05PM   14    INFECTIOUS RESULTS WITH THE REST OF THE REPORT RESULTS AND THEN

03:05PM   15    ONLY CALL OUT AS INFECTIOUS THE ONES WE SHOW FOR BOTH PALO ALTO

03:05PM   16    AND NEW YORK."

03:05PM   17         DO YOU SEE THAT?

03:05PM   18    A.   YES.

03:05PM   19    Q.   LET'S GO TO PAGE 3 AND ZOOM IN ON THE TOP HALF OF THE

03:05PM   20    PAGE.

03:06PM   21         DO WE SEE HERE A MESSAGE FROM DANIEL YOUNG ON JUNE 1ST AT

03:06PM   22    5:11 P.M.?

03:06PM   23         DO YOU SEE THAT?

03:06PM   24    A.   YES.

03:06PM   25    Q.   AND BELOW THE BULLET POINTS IN HIS EMAIL, HE IS ADDRESSING

EDLIN DIRECT BY MR. BOSTIC

03:06PM 1    YOU, I BELIEVE, IS THAT RIGHT, WHERE HE SAYS DAN?

03:06PM 2    A.   YES.

03:06PM 3    Q.   HE SAYS, FOR BILIRUBIN, TOTAL, CAN YOU CHANGE THE

03:06PM 4    REFERENCE RANGE, AND HE PROVIDES A RANGE, AND REMOVE THE

03:06PM 5    L INDICATOR.

03:06PM 6         AND ON CALCIUM HE ALSO ASKS YOU TO CHANGE THE RANGE.  HE

03:06PM 7    SAYS IT DOESN'T CHANGE THE OUTCOME, BUT SHOWS THE RESULT TO BE

03:06PM 8    CLOSER TO THE REFERENCE RANGE.

03:06PM 9         DO YOU SEE THAT?

03:06PM 10   A.   YES.

03:06PM 11   Q.   AND CAN YOU EXPLAIN WHAT IS HAPPENING HERE?

03:06PM 12   A.   HERE THE REFERENCE RANGES FOR THE TESTS ARE BEING MODIFIED

03:06PM 13   AND THE RESULTING IMPACT IS THAT CERTAIN OF THE RESULTS COMPARE

03:07PM 14   DIFFERENTLY TO THAT RELATIVE RANGE.

03:07PM 15   Q.   FROM YOUR WORK AT THERANOS, DID YOU HAVE AN UNDERSTANDING

03:07PM 16   AS TO WHAT THE TERM "REFERENCE RANGE" MEANT?

03:07PM 17   A.   MY UNDERSTANDING IS THAT IF A RESULT FOR A CERTAIN TEST IS

03:07PM 18   WITHIN A REFERENCE RANGE, IT'S CONSIDERED A HEALTHY RESULT.

03:07PM 19   Q.   SO, FOR EXAMPLE, FOR THE BILIRUBIN TEST FOR THIS DEMO,

03:07PM 20   THIS EMAIL FROM DANIEL YOUNG SAYS THAT CHANGING THE REFERENCE

03:07PM 21   RANGE AS REQUESTED WOULD ALSO RESULT IN REMOVING THE

03:07PM 22   L INDICATOR.

03:07PM 23        DO YOU SEE THAT?

03:07PM 24   A.   YES.

03:07PM 25   Q.   AND DO YOU HAVE AN UNDERSTANDING AS TO WHAT THE

03:07PM   1    L INDICATOR WOULD MEAN?

03:07PM   2    A.   THAT WOULD REFER TO LOW.

03:07PM   3        SO IF A TEST RESULT WAS NOT WITHIN THE REFERENCE RANGE, IT

03:07PM   4    WOULD HAVE AN INDICATION, IN THIS CASE L, BUT IT COULD ALSO

03:07PM   5    HAVE AN INDICATION H FOR HIGH.

03:08PM   6    Q.   SO IN THIS CASE CHANGING THE REFERENCE RANGE WOULD RESULT

03:08PM   7    IN THE RESULT NO LONGER BEING LOW; IS THAT CORRECT?

03:08PM   8    A.   CORRECT.

03:08PM   9    Q.   AND FOR CALCIUM, IS DANIEL YOUNG SAYING THAT THE CHANGE IN

03:08PM  10    REFERENCE RANGE WOULD MAKE THE RESULT CLOSER TO THE REFERENCE

03:08PM  11    RANGE?

03:08PM  12        DO YOU SEE THAT?

03:08PM  13            MS. WALSH:  OBJECTION.

03:08PM  14            THE COURT:  OVERRULED.

03:08PM  15        YOU CAN ANSWER.

03:08PM  16            THE WITNESS:  CAN YOU REPEAT THE QUESTION?

03:08PM  17    BY MR. BOSTIC:

03:08PM  18    Q.   SURE.  DO YOU SEE IN THE EMAIL DANIEL YOUNG SAYING THAT

03:08PM  19    CHANGING THE REFERENCE RANGE FOR CALCIUM WOULD MAKE THE RESULTS

03:08PM  20    FOR THIS DONOR CLOSER TO THE REFERENCE RANGE?

03:08PM  21    A.   YES.

03:08PM  22    Q.   SO, IN OTHER WORDS, CLOSER TO THE NORMAL RANGE?

03:08PM  23    A.   CORRECT.

03:08PM  24    Q.   AND WAS THIS SOMETHING THAT YOU SAW ON MULTIPLE OCCASIONS,

03:08PM  25    DANIEL YOUNG ALTERING RESULTS OR REFERENCES FOR DEMOS THAT TOOK

03:08PM  1    PLACE AT THERANOS?

03:08PM  2            MS. WALSH:  OBJECTION.  LEADING.

03:08PM  3            THE COURT:  WOULD YOU REPHRASE?

03:09PM  4    BY MR. BOSTIC:

03:09PM  5    Q.   WAS THIS THE ONLY TIME THAT YOU SAW DANIEL YOUNG DO

03:09PM  6    SOMETHING LIKE THIS AFTER THE FACT WITH DEMO RESULTS, EITHER

03:09PM  7    ADJUSTING THE RESULTS THEMSELVES OR THE REFERENCE RANGES?

03:09PM  8    A.   NO.

03:09PM  9    Q.   YOU SAW THAT ON OTHER OCCASIONS?

03:09PM  10   A.   YES.

03:09PM  11   Q.   OKAY.  LET'S LOOK AT 871 NEXT, PLEASE, IN YOUR BINDER.

03:09PM  12        AND ONCE YOU HAVE IT, LET ME KNOW IF YOU SEE AT 871

03:09PM  13   ANOTHER EMAIL CHAIN INCLUDING YOU AND MR. BALWANI RELATING TO

03:09PM  14   DEMO COORDINATION.

03:09PM  15   A.   YES.

03:09PM  16            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 871.

03:09PM  17            MS. WALSH:  NO OBJECTION.

03:09PM  18            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:09PM  19        (GOVERNMENT'S EXHIBIT 871 WAS RECEIVED IN EVIDENCE.)

03:09PM  20            MR. BOSTIC:  LET'S START AT THE BOTTOM OF THIS PAGE,

03:09PM  21   PAGE 2.

03:09PM  22   Q.   DO YOU SEE THAT THIS STARTS WITH AN EMAIL FROM

03:09PM  23   CHRISTIAN HOLMES TO YOU AND OTHERS AT THERANOS; IS THAT RIGHT?

03:10PM  24   A.   YES.

03:10PM  25   Q.   AND IT SAYS, "SUNNY MENTIONED THAT HE'D LIKE TO RUN A DEMO

03:10PM  1    DURING AN EXEC MEETING NEXT TUESDAY."

03:10PM  2         DO YOU SEE THAT?

03:10PM  3    A.   YES.

03:10PM  4    Q.   LET'S GO UP ON THIS PAGE, AND ZOOM IN ON THE MIDDLE FEW

03:10PM  5    MESSAGES.

03:10PM  6         DANIEL YOUNG RESPONDS AND ASKS WHETHER THERE'S ANY

03:10PM  7    PREFERENCE FOR DEVICE TYPE, MONOBAY, MINILAB, OR 4S.

03:10PM  8         DO YOU SEE THAT?

03:10PM  9    A.   YES.

03:10PM 10    Q.   ARE THOSE ALL NEXT GENERATION DEVICES NEVER USED FOR

03:10PM 11    PATIENT TESTING AT THERANOS?

03:10PM 12              MS. WALSH:  OBJECTION.  LEADING.

03:10PM 13              THE COURT:  OVERRULED.

03:10PM 14              THE WITNESS:  YES.

03:10PM 15    BY MR. BOSTIC:

03:10PM 16    Q.   LET'S ZOOM OUT AND CAPTURE THE TOP OF THIS PAGE.

03:10PM 17         AND YOU WRITE BACK, "JUST CAUGHT UP WITH SUNNY.  HE

03:10PM 18    DEFINITELY WANTS TO HAVE A MINILAB AND THEN EITHER A 4S OR

03:10PM 19    MONOBAY (WHICHEVER IS WORKING BETTER)."

03:10PM 20         DO YOU SEE THAT?

03:11PM 21    A.   YES.

03:11PM 22    Q.   AND THAT PHRASE, "WHICHEVER IS WORKING BETTER," WHAT WAS

03:11PM 23    THE SIGNIFICANCE OF THAT?

03:11PM 24    A.   I THINK THAT REFERS TO THE DEVICE CAPABILITIES AND ABILITY

03:11PM 25    TO PROCESS A TEST OR RUN A TEST.

EDLIN DIRECT BY MR. BOSTIC

03:11PM  1    Q.   AND DURING YOUR TIME AT THERANOS, IS THAT SOMETHING THAT

03:11PM  2    KIND OF VARIED FROM DAY-TO-DAY WHETHER A CERTAIN DEVICE WAS

03:11PM  3    WORKING OR AVAILABLE FOR THIS KIND OF DEMO?

03:11PM  4    A.   I THINK I MENTIONED EARLIER THERE WAS A TIME PERIOD WHEN

03:11PM  5    THERE WAS A LITTLE UNCERTAINTY, AND THIS FALLS WITHIN THAT TIME

03:11PM  6    PERIOD.

03:11PM  7    Q.   LET'S GO TO PAGE 1, AND LET'S ZOOM IN ON THE BOTTOM HALF

03:11PM  8    OF THE PAGE.

03:11PM  9         THERE'S AN EMAIL FROM YOU AT THE BOTTOM WHERE YOU SAY,

03:11PM 10    FOR TOMORROW'S DEMO, WE'D LIKE TO HAVE A MINILAB AND EITHER A

03:11PM 11    4S OR MONOBAY, WITH THE NORMANDY SHELL UPLOADED.

03:11PM 12         DO YOU SEE THAT?

03:12PM 13    A.   YES.

03:12PM 14    Q.   AND THEN AT THE BOTTOM YOU SAY, "SAM INDICATED THAT THE

03:12PM 15    DEVICES ARE CAPABLE OF RUNNING A CBC."

03:12PM 16         DO YOU SEE THAT?

03:12PM 17    A.   YES.

03:12PM 18    Q.   AND YOU ASK THAT FIVE PRACTICE TESTS BE RUN ON EACH DEVICE

03:12PM 19    TO MAKE SURE THAT THEY'RE ABLE TO DO SO?

03:12PM 20    A.   YES.

03:12PM 21    Q.   AND WHY DID YOU THINK THAT THAT STEP WAS NECESSARY?

03:12PM 22    A.   I'M NOT SURE IF I THOUGHT THE STEP WAS NECESSARY, BUT I

03:12PM 23    BELIEVE THAT I WAS PASSING ALONG A REQUEST TO DO THOSE TESTS TO

03:12PM 24    ENSURE THAT THE DEVICES WERE FUNCTIONING IN AN ACCEPTABLE WAY.

03:12PM 25    Q.   LET'S ZOOM IN ON THE TOP HALF OF THIS PAGE.

EDLIN DIRECT BY MR. BOSTIC

03:12PM  1          DO YOU SEE AT THE BOTTOM OF THAT COLLECTION AN EMAIL FROM

03:12PM  2     MR. BALWANI TO YOU AND DANIEL YOUNG?

03:12PM  3     A.   YES.

03:12PM  4     Q.   HE SAYS, "GIVEN ML DOESN'T HAVE CYTO, WHAT ARE WE PLANNING

03:12PM  5     ON RUNNING ON ML?"

03:12PM  6          DO YOU SEE THAT?

03:12PM  7     A.   YES.

03:12PM  8     Q.   AND WHAT WAS ML REFERRING TO?

03:12PM  9     A.   THE MINILAB TOWER, I BELIEVE AT THIS TIME.

03:12PM  10    Q.   OKAY.  THANK YOU.

03:12PM  11         AND WHEN MR. BALWANI SAYS, "THE ML DOESN'T HAVE CYTO," DO

03:13PM  12    YOU HAVE A SENSE OR AN UNDERSTANDING OF WHAT "CYTO" MEANS

03:13PM  13    THERE?

03:13PM  14    A.   CYTOMETRY, WHICH WAS A CERTAIN TYPE OF TEST.

03:13PM  15    Q.   AND DOES THAT CATEGORY OF TESTS HAVE ANYTHING TO DO WITH

03:13PM  16    THE CBC, COMPLETE BLOOD COUNT, THAT WAS SUPPOSED TO BE RUN

03:13PM  17    HERE?

03:13PM  18              MS. WALSH:  OBJECTION.  LEADING.

03:13PM  19              THE COURT:  OVERRULED.

03:13PM  20              THE WITNESS:  YES.

03:13PM  21    BY MR. BOSTIC:

03:13PM  22    Q.   DANIEL YOUNG WRITES BACK TO MR. BALWANI.  HE SAYS, "RIGHT

03:13PM  23    NOW, WE ARE NOT PLANNING ON RUNNING ANYTHING ON THE ML,

03:13PM  24    UNFORTUNATELY.  THE GENERAL CHEMISTRY AND ELISA ASSAYS ARE NOT

03:13PM  25    PERFORMING ADEQUATELY FOR A DEMO AT THE MOMENT."

EDLIN DIRECT BY MR. BOSTIC

03:13PM 1      DO YOU SEE THAT?

03:13PM 2  A.   YES.

03:13PM 3  Q.   AND THEN ABOVE THAT, DO YOU SEE THAT MR. BALWANI FORWARDS

03:13PM 4  THIS TO MS. HOLMES WITH THE COMMENT, "VERY FRUSTRATING"?

03:13PM 5  A.   YES.

03:13PM 6  Q.   LET'S GO TO TAB 966 NEXT.

03:14PM 7      ONCE YOU'RE THERE, LET ME KNOW WHETHER YOU RECOGNIZE 966

03:14PM 8  AS ANOTHER EMAIL, INTERNAL AT THERANOS, INCLUDING YOU, RELATING

03:14PM 9  TO THE VIP DEMO.

03:14PM 10  A.   YES.

03:14PM 11      MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 966,

03:14PM 12  AND I'M OFFERING THE EMAIL ONLY, NOT THE ATTACHMENTS.

03:14PM 13      THE WITNESS:  I'M SURE, I'M -- I'M NOT SURE IF YOU

03:14PM 14  ASKED WHETHER THE EMAIL WAS FROM ME.  I THINK IT'S FROM

03:14PM 15  DANIEL YOUNG HERE.

03:14PM 16      MR. BOSTIC:  THANK YOU.  I DIDN'T MEAN TO SAY

03:14PM 17  THAT --

03:14PM 18      THE WITNESS:  OKAY.

03:14PM 19  BY MR. BOSTIC:

03:14PM 20  Q.   -- IF I DID.  BUT DOES THIS EMAIL INCLUDE YOU?

03:14PM 21  A.   YES.

03:14PM 22      MS. WALSH:  NO OBJECTION.

03:14PM 23      THE COURT:  JUST THE EMAIL WILL BE ADMITTED, AND IT

03:14PM 24  MAY BE PUBLISHED.

03:14PM 25      (GOVERNMENT'S EXHIBIT 966, EMAIL ONLY, WAS RECEIVED IN

03:14PM   1      EVIDENCE.)

03:14PM   2               MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:15PM   3          LET'S ZOOM IN ON THE CONTENT OF THIS EMAIL, SO THE TOP

03:15PM   4      HALF OF PAGE 1.

03:15PM   5      Q.   AND DO YOU SEE AN EMAIL FROM DANIEL YOUNG TO YOU,

03:15PM   6      CHRISTIAN HOLMES, ELIZABETH HOLMES, AND SUNNY BALWANI AT

03:15PM   7      THERANOS?

03:15PM   8      A.   YES.

03:15PM   9      Q.   AND IT ATTACHES WHAT DANIEL YOUNG REFERS TO AS DEMO

03:15PM  10      RESULTS FOR THE SIX SUBJECTS.

03:15PM  11          DO YOU SEE THAT?

03:15PM  12      A.   YES.

03:15PM  13      Q.   DO YOU RECALL A TIME IN AUGUST OF 2013 WHERE MULTIPLE

03:15PM  14      INDIVIDUALS FROM WALGREENS VISITED THERANOS?

03:15PM  15      A.   YES.

03:15PM  16      Q.   AND DO YOU KNOW WHETHER AS PART OF THAT VISIT THEY

03:15PM  17      RECEIVED DEMO TESTS OR NOT?

03:15PM  18      A.   THEY DID.

03:15PM  19      Q.   DANIEL YOUNG WRITES IN HIS EMAIL, LOOKING AT THE SECOND

03:16PM  20      TOPIC THERE -- ACTUALLY, FIRST, LET ME ASK YOU ABOUT ONE

03:16PM  21      QUESTION.

03:16PM  22          IN YOUR BINDER YOU HAVE HARD COPIES OF THE ATTACHMENTS TO

03:16PM  23      THIS EMAIL.

03:16PM  24          DO YOU SEE THAT IN FRONT OF YOU?

03:16PM  25      A.   YES.

EDLIN DIRECT BY MR. BOSTIC

03:16PM 1    Q.   I'LL ASK YOU TO FLIP THROUGH AND SEE IF YOU CAN FIND A

03:16PM 2    NAME.  ACTUALLY LOOK AT PAGE 7 OF THE EXHIBIT.

03:16PM 3         AND DO YOU SEE THE NAME NIMESH JHAVERI APPEARING ON

03:16PM 4    PAGE 7?

03:16PM 5    A.   YES.

03:16PM 6    Q.   AND DO YOU RECOGNIZE THAT NAME?

03:16PM 7    A.   YES.

03:16PM 8    Q.   AND WHO WAS NIMESH JHAVERI?

03:16PM 9    A.   HE WORKED AT WALGREENS.

03:16PM 10   Q.   AND GOING BACK TO PAGE 1, OR LOOKING AT THE SCREEN, DO YOU

03:16PM 11   SEE THAT ONE OF THE ATTACHMENTS SAYS LAB REPORT 8-13-2013 NJ?

03:16PM 12   A.   YES.

03:16PM 13   Q.   IN DANIEL YOUNG'S EMAIL, THE SECOND PARAGRAPH, HE SAYS, "I

03:17PM 14   'CORRECTED' ASSAY RESULTS THAT I ATTRIBUTED TO BCD COLLECTION

03:17PM 15   PROBLEMS."

03:17PM 16        HE SAYS, "THE GC RESULTS LOOK GOOD AFTER SUCH CLEANUP."

03:17PM 17        DO YOU SEE THAT?

03:17PM 18   A.   YES.

03:17PM 19   Q.   THE QUESTION IS, DO YOU HAVE AN UNDERSTANDING AS TO HOW

03:17PM 20   DANIEL YOUNG WENT ABOUT, QUOTE, "CORRECTING" THE RESULTS FOR

03:17PM 21   DEMOS LIKE THIS?

03:17PM 22   A.   I DO NOT.

03:17PM 23   Q.   WERE YOU PART OF THAT PROCESS AT ALL?

03:17PM 24   A.   NO.

03:17PM 25   Q.   LOOKING AT THE FOURTH PARAGRAPH OF HIS EMAIL, HE SAYS,

03:17PM 1    "EACH SUBJECT HAD THE THYROID PANEL PERFORMED.  I REMOVED THE

03:17PM 2    THYROID RESULTS THAT I FELT WERE QUESTIONABLE."

03:17PM 3         DO YOU SEE THAT?

03:17PM 4    A.   YES.

03:17PM 5    Q.   AND HE SAYS, "THERE ARE A FEW OUT OF RANGE RESULTS LEFT IN

03:17PM 6    THE REPORT, BUT THEY ARE VERY CLOSE TO THE REFERENCE RANGE."

03:17PM 7         AND HE SAYS IN PARENTHESES, "(NOTE THAT I THINK THERE IS

03:18PM 8    SOMETHING WRONG WITH THE TT3 ASSAY/REAGENTS, AND AM FOLLOWING

03:18PM 9    UP WITH SHARADA.  I REMOVED ALL TT3 RESULTS.)"

03:18PM 10        DO YOU SEE THAT?

03:18PM 11   A.   YES.

03:18PM 12   Q.   AND THIS WAS IN MID-AUGUST 2013; IS THAT RIGHT?

03:18PM 13   A.   YES.

03:18PM 14   Q.   AND THAT IS ROUGHLY A MONTH BEFORE THERANOS BEGAN PATIENT

03:18PM 15   TESTING?

03:18PM 16   A.   YES.

03:18PM 17   Q.   OKAY.  WE CAN PUT THAT ASIDE.

03:18PM 18        IF I COULD ASK YOU TO TURN TO TAB 957, PLEASE.

03:18PM 19        LET ME ASK, ON THE EMAIL THAT WE WERE JUST LOOKING AT WITH

03:18PM 20   THE RESULTS FROM WALGREENS, WHAT IS YOUR UNDERSTANDING OF WHY

03:18PM 21   MR. BALWANI WAS INCLUDED ON THAT EMAIL?

03:18PM 22        LET ME ASK IT A DIFFERENT WAY.  WHAT WAS MR. BALWANI'S

03:18PM 23   ROLE IN CONNECTION WITH THE WALGREENS PARTNERSHIP AT THIS TIME?

03:18PM 24   A.   AT THIS TIME SUNNY OVERSAW THAT RELATIONSHIP WITH

03:19PM 25   WALGREENS.

03:19PM  1    Q.   IN THAT ROLE, WAS HE INVOLVED AT ALL WITH THE MEETINGS AND

03:19PM  2    VISITS FROM WALGREENS PERSONNEL?

03:19PM  3    A.   YES.

03:19PM  4    Q.   I WOULD JUST ASK YOU TO TURN TO TAB 957.

03:19PM  5         DO YOU HAVE THAT IN FRONT OF YOU?

03:19PM  6    A.   YES.

03:19PM  7    Q.   AND DO YOU SEE AT 957 ANOTHER EMAIL CHAIN AT THERANOS

03:19PM  8    RELATING TO DEMO WORKFLOW?

03:19PM  9    A.   YES.

03:19PM  10             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 957.

03:19PM  11             MS. WALSH:  OBJECTION.  HEARSAY.

03:19PM  12             THE COURT:  IS THIS FIVE PAGES, MR. BOSTIC?

03:19PM  13             MR. BOSTIC:  YES, YOUR HONOR.

03:19PM  14             THE COURT:  IS THIS SUBJECT TO A STIPULATION OR IS

03:20PM  15   THIS 803(6)?

03:20PM  16             MR. BOSTIC:  SO, YOUR HONOR, AS TO AUTHENTICITY,

03:20PM  17   THIS DOES FALL WITHIN THE PARTIES' STIPULATION AND I'M OFFERING

03:20PM  18   IT UNDER 803(6).  I BELIEVE THAT THIS WITNESS HAS PREVIOUSLY

03:20PM  19   LAID THE FOUNDATION.

03:20PM  20             THE COURT:  WHY DON'T YOU JUST LAY THE FOUNDATION

03:20PM  21   BRIEFLY, AND THEN WE'LL GO ON.

03:20PM  22   BY MR. BOSTIC:

03:20PM  23   Q.   MR. EDLIN, WE TALKED BEFORE ABOUT THE WAY THAT THE EMAIL

03:20PM  24   WAS USED IN ORDER TO COORDINATE AND COMMUNICATE ABOUT DEMOS; IS

03:20PM  25   THAT RIGHT?

03:20PM   1    A.   YES.

03:20PM   2    Q.   AND WAS THE USE OF THE EMAIL IN THAT WAY AN IMPORTANT PART

03:20PM   3    OF HOW THESE DEMOS WERE MONITORED AND ARRANGED AND ORGANIZED AT

03:20PM   4    THERANOS?

03:20PM   5    A.   YES.

03:20PM   6    Q.   AND TO FULFILL THAT PURPOSE, DID THE EMAILS HAVE TO BE

03:20PM   7    ACCURATE?

03:20PM   8    A.   YES.

03:20PM   9    Q.   AND WERE THE EMAILS RETAINED SO THAT THEY COULD BE

03:20PM   10   REFERENCED BACK LATER, IF NECESSARY?

03:20PM   11   A.   I BELIEVE THEY WERE.

03:20PM   12        MR. BOSTIC:  YOUR HONOR, I OFFER THIS EXHIBIT 957

03:20PM   13   UNDER 803(6).

03:20PM   14        MS. WALSH:  NO OBJECTION.

03:20PM   15        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:20PM   16     (GOVERNMENT'S EXHIBIT 957 WAS RECEIVED IN EVIDENCE.)

03:21PM   17   BY MR. BOSTIC:

03:21PM   18   Q.   AND LET'S START WITH PAGE 2 OF THIS EXHIBIT AND ZOOM IN ON

03:21PM   19   THE MIDDLE OF THE PAGE.

03:21PM   20     MR. EDLIN, DO YOU RECALL THAT WE WERE JUST LOOKING AT AN

03:21PM   21   EMAIL ATTACHING SIX LAB REPORTS FROM A DEMO IN MID-AUGUST 2013?

03:21PM   22   A.   YES.

03:21PM   23   Q.   AND YOU SEE HERE AN EMAIL FROM YOU MENTIONING, "WE WILL BE

03:21PM   24   COLLECTING FINGERSTICK SAMPLES VERY SOON.  PLEASE BE ON

03:21PM   25   STANDBY."

03:21PM  1    A.   I DO.

03:21PM  2    Q.   AND THEN YOU SAY, "WE HAVE SIX SAMPLES; PLEASE MEET IN THE

03:21PM  3    LAB FOR THE HANDOFF."

03:21PM  4    A.   YES.

03:21PM  5    Q.   DOES THIS MEAN THAT THE SAMPLES WERE NOT BEING PROCESSED

03:21PM  6    IN A CONFERENCE ROOM?

03:21PM  7    A.   YES.

03:21PM  8    Q.   CAN YOU EXPLAIN WHAT THAT MEANS THEN?  WHERE WERE THEY

03:21PM  9    PROCESSED?  WHERE WERE THE TESTS RUN?

03:21PM  10   A.   I'M NOT EXACTLY SURE WHERE THEY WERE RUN, BUT IN THIS

03:22PM  11   INSTANCE I MET THE LABORATORY PERSONNEL IN THE R&D LAB, HANDED

03:22PM  12   OFF THE SAMPLES TO THEM, AND THEN THAT WAS THE EXTENT OF MY

03:22PM  13   INVOLVEMENT.

03:22PM  14   Q.   LET'S GO TO PAGE 1 OF THIS EXHIBIT AND ZOOM IN ON THE

03:22PM  15   BOTTOM.

03:22PM  16        AND DO YOU SEE AT THE BOTTOM THERE THAT'S AN EMAIL FROM

03:22PM  17   NICHOLAS HAASE?

03:22PM  18   A.   YES.

03:22PM  19   Q.   AND WHAT WAS HIS POSITION AT THE COMPANY?

03:22PM  20   A.   I BELIEVE HE WAS A SCIENTIST.

03:22PM  21   Q.   HE SAYS, "UPDATE:  WE JUST STARTED THE ADVIA RUN OF ALL

03:22PM  22   SAMPLES."

03:22PM  23        DO YOU SEE THAT?

03:22PM  24   A.   I DO.

03:22PM  25   Q.   AND WHAT DOES ADVIA REFER TO THERE?

03:22PM  1      A.   A THIRD PARTY DEVICE.

03:22PM  2      Q.   OKAY.  SO THAT'S A BLOOD ANALYZER THAT WASN'T BUILT BY

03:22PM  3      THERANOS?

03:22PM  4      A.   CORRECT.

03:22PM  5      Q.   DO YOU KNOW WHETHER YOU WERE IN THIS MEETING IN MID-2013

03:23PM  6      WITH THE WALGREENS PERSONNEL?

03:23PM  7      A.   I DON'T RECALL WHETHER I WAS IN A PART OF THE MEETING.

03:23PM  8           I KNOW THAT I WAS NOT IN THE ENTIRE MEETING.

03:23PM  9      Q.   DO YOU KNOW ONE WAY OR THE OTHER WHETHER THE WALGREENS

03:23PM 10      VIP'S WERE TOLD THAT THEIR SAMPLES WERE BEING RUN NOT ON

03:23PM 11      THERANOS DEVICES, BUT ON THIRD PARTY ANALYZERS?

03:23PM 12               MS. WALSH:  OBJECTION.  FOUNDATION.

03:23PM 13               THE COURT:  OVERRULED.

03:23PM 14           YOU CAN ANSWER THE QUESTION IF YOU KNOW.

03:23PM 15      BY MR. BOSTIC:

03:23PM 16      Q.   CAN I REPEAT THAT QUESTION FOR YOU, MR. EDLIN?

03:23PM 17      A.   SURE.

03:23PM 18      Q.   THE QUESTION WAS, DO YOU KNOW ONE WAY OR THE OTHER WHETHER

03:23PM 19      THE WALGREENS VIP'S WERE TOLD THAT THEIR SAMPLES WERE BEING RUN

03:23PM 20      NOT ON THERANOS DEVICES, BUT ON THIRD PARTY ANALYZERS?

03:23PM 21      A.   I DON'T KNOW.

03:23PM 22      Q.   LET'S GO TO TAB 1014, PLEASE.

03:24PM 23           AND LOOKING AT TAB 1014, DO YOU SEE ANOTHER INTERNAL EMAIL

03:24PM 24      AT THERANOS RELATING TO A DEMONSTRATION IN AUGUST?

03:24PM 25      A.   YES.

03:24PM  1        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1014.

03:24PM  2        MS. WALSH:  NO OBJECTION.

03:24PM  3        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:24PM  4    (GOVERNMENT'S EXHIBIT 1014 WAS RECEIVED IN EVIDENCE.)

03:24PM  5   BY MR. BOSTIC:

03:24PM  6   Q.   AND LET'S START ON PAGE 4.

03:24PM  7   A.   OKAY.

03:24PM  8   Q.   MR. EDLIN, DO YOU RECALL AROUND THIS TIME IN AUGUST 2013

03:24PM  9   WORKING ON A DEMONSTRATION FOR A WRITER WITH "THE

03:24PM  10  WALL STREET JOURNAL"?

03:24PM  11  A.   YES.

03:24PM  12  Q.   DO YOU RECALL THAT WRITER'S NAME?

03:24PM  13  A.   JOE RAGO.

03:24PM  14  Q.   IN AN EMAIL FROM YOU -- AND LET'S ZOOM IN ON YOUR EMAIL

03:24PM  15  FROM AUGUST 20TH AT 3:51.

03:25PM  16       YOU SAY, "THIS THURSDAY 8/22 WE WILL BE HOSTING A DEMO AT

03:25PM  17  OUR OFFICES.  THERE WILL BE ONE MALE PATIENT, ONE FINGERSTICK

03:25PM  18  DRAW, AND TIMING IS TBD."

03:25PM  19       DO YOU SEE THAT?

03:25PM  20  A.   YES.

03:25PM  21  Q.   YOU SAY, "PLANNED TESTS WILL CONSIST OF SOME COMBINATION

03:25PM  22  OF THE FOLLOWING:  CBC, CHEM 14, LIPIDS, THYROID PANEL OR MALE

03:25PM  23  HEALTH."

03:25PM  24       IS THAT RIGHT?

03:25PM  25  A.   YES.

03:25PM   1    Q.   AND THEN YOU SAY, "FOR THIS DEMO, WE WILL NEED TO TURN

03:25PM   2    AROUND RESULTS FASTER THAN EVER BEFORE -- IDEALLY IN 1 HOUR AND

03:25PM   3    NO LONGER THAN 2 HOURS.

03:25PM   4         DO YOU SEE THAT?

03:25PM   5    A.   YES.

03:25PM   6    Q.   AND DO YOU KNOW WHY THIS DEMO NEEDED TO BE COMPLETED,

03:25PM   7    QUOTE, "FASTER THAN EVER BEFORE"?

03:25PM   8    A.   WELL, TYPICALLY FOR DEMOS THE RESULT WOULD BE RETURNED BY

03:25PM   9    THE END OF THE BUSINESS DAY.

03:25PM  10         IN THIS SCENARIO, ELIZABETH WANTED THE RESULTS TO BE

03:26PM  11    RETURNED BEFORE THE END OF THE MEETING, AND FROM THE POINT OF

03:26PM  12    THIS DEMO, THE MEETING WOULD HAVE ENDED AFTER ONE OR TWO HOURS

03:26PM  13    AFTER THE SAMPLE IS TAKEN.

03:26PM  14    Q.   AND THIS KIND OF SPEED, THIS KIND OF TURN-AROUND TIME ON A

03:26PM  15    DEMO IS SOMETHING THAT THERANOS HADN'T DONE BEFORE; IS THAT

03:26PM  16    RIGHT?

03:26PM  17              MS. WALSH:   OBJECTION.   LEADING.

03:26PM  18              THE COURT:   SUSTAINED.

03:26PM  19    BY MR. BOSTIC:

03:26PM  20    Q.   LOOKING AT YOUR EMAIL WHERE YOU SAY, "WE WILL NEED TO TURN

03:26PM  21    AROUND RESULTS FASTER THAN EVER BEFORE," HAD THERANOS

03:26PM  22    PREVIOUSLY BEEN CAPABLE OF TURNING AROUND DEMO RESULTS IN THIS

03:26PM  23    KIND OF TIME PERIOD?

03:26PM  24    A.   I THINK THE COMPANY WAS CAPABLE OF IT, BUT IT HAD NOT DONE

03:26PM  25    THAT.

03:26PM  1    Q.   LOOKING AT YOUR EMAIL FURTHER DOWN, YOU SAY, "SAM AND

03:26PM  2    MICHAEL -- SIMILAR TO LAST WEEK, PLEASE SET UP TWO MINILABS,

03:27PM  3    ONE 4S, AND ONE 3.5 IN INTERVIEW ROOM NUMBER 1."

03:27PM  4         DO YOU SEE THAT?

03:27PM  5    A.   YES.

03:27PM  6    Q.   ARE ALL OF THOSE DEVICES THERANOS BUILT DEVICES?

03:27PM  7    A.   YES.

03:27PM  8    Q.   AND YOU SAY, "THE MINILABS, 4S, AND 3.5 SHOULD HAVE THE

03:27PM  9    DEMO APP THAT CAN RUN NULL PROTOCOLS."

03:27PM  10        DO YOU SEE THAT?

03:27PM  11   A.   YES.

03:27PM  12   Q.   LET'S GO TO PAGE 2.

03:27PM  13        DO YOU SEE AT THE BOTTOM OF PAGE 2 THAT YOU WERE HEADING

03:27PM  14   IN, ACCORDING TO YOUR EMAIL, TO COLLECT THE FINGERSTICK SAMPLE?

03:27PM  15   A.   YES.

03:27PM  16   Q.   LET'S LOOK AT THE TOP OF PAGE 2.

03:27PM  17        AND DO YOU SEE THERE AN EMAIL FROM YOU TO MR. BALWANI?

03:27PM  18   A.   YES.

03:27PM  19   Q.   AND YOU SAY, "UNFORTUNATELY BY THE LOOKS OF THE THYROID

03:28PM  20   PANEL RESULTS BELOW IT APPEARS TO HAVE HAD MAJOR ISSUES AGAIN."

03:28PM  21        DO YOU SEE THAT?

03:28PM  22   A.   YES.

03:28PM  23   Q.   A COUPLE OF QUESTIONS THERE.  FIRST OF ALL, YOU SAY "IT

03:28PM  24   APPEARS TO HAVE HAD MAJOR ISSUES AGAIN."

03:28PM  25        WAS THIS NOT THE FIRST TIME THAT YOU WERE AWARE OF THE

03:28PM  1    THYROID PANEL HAVING PROBLEMS?

03:28PM  2    A.   THAT'S RIGHT.

03:28PM  3    Q.   WHAT DO YOU REMEMBER ABOUT PROBLEMS WITH THAT PARTICULAR

03:28PM  4    ASSAY?

03:28PM  5    A.   I REMEMBER THAT THE RESULTS FROM TESTS ON THAT ASSAY WERE

03:28PM  6    NOT VIABLE.

03:28PM  7    Q.   AND WAS THIS IN THE CONTEXT OF DEMO TESTING OR OTHER R&D

03:28PM  8    WORK?  WHERE DID THAT UNDERSTANDING COME FROM?

03:28PM  9    A.   I DON'T REMEMBER SPECIFICALLY, BUT I THINK IT WAS IN

03:28PM  10   CONNECTION WITH A DEMO, OTHERWISE -- AND I SAY THAT BECAUSE

03:28PM  11   THAT WAS MY INVOLVEMENT.  SO IT'S POSSIBLE THAT THERE WERE

03:29PM  12   PRACTICE TESTS DONE AT SOME EARLIER POINT.

03:29PM  13   Q.   IF YOU LOOK AT THE BOTTOM OF PAGE 1, YOU SEE THE HEADER

03:29PM  14   INFORMATION FOR THE EMAIL THAT WE'RE LOOKING AT.

03:29PM  15        AND YOU SEND THIS EMAIL JUST TO SUNNY BALWANI; IS THAT

03:29PM  16   RIGHT?

03:29PM  17   A.   YES.

03:29PM  18   Q.   WHY DID YOU SEND THIS EMAIL DIRECTLY TO MR. BALWANI?  WHY

03:29PM  19   HIM?

03:29PM  20   A.   I DON'T REMEMBER EXACTLY.

03:29PM  21   Q.   WHAT ROLE DID MR. BALWANI HAVE GENERALLY WHEN IT CAME TO

03:29PM  22   DEMOS LIKE THIS ONE?

03:29PM  23   A.   OFTEN SUNNY WAS KEPT IN THE LOOP IF A DEMO WAS FOR A GUEST

03:29PM  24   OR A GROUP OF PEOPLE THAT WOULD HAVE BEEN, YOU KNOW, RELEVANT

03:29PM  25   TO HIM OR THAT HE WAS INTERESTED IN KNOWING ABOUT.

EDLIN DIRECT BY MR. BOSTIC

03:30PM  1    Q.   OKAY.  GOING BACK TO YOUR EMAIL AT THE TOP OF PAGE 2.

03:30PM  2    A.   YES.

03:30PM  3    Q.   YOU SAY, "THE THYROID PANEL APPEARS TO HAVE HAD MAJOR

03:30PM  4    ISSUES AGAIN."

03:30PM  5         YOU GO ON TO SAY, "THIS IS AFTER CALIBRATION WAS RE-DONE

03:30PM  6    YESTERDAY, AFTER A CLINICAL CORRECTION WAS PUT IN PLACE FOR

03:30PM  7    TT3, AND AFTER DANIEL REVIEWED RECENT DATA AND SAID HE WAS

03:30PM  8    CONFIDENT THAT AT LEAST 5 OF THESE RESULTS WOULD WORK."

03:30PM  9         DO YOU SEE THAT?

03:30PM  10   A.   YES.

03:30PM  11   Q.   LET'S GO TO PAGE 1 AND LOOK AT MR. BALWANI'S REACTION.

03:30PM  12   A.   OKAY.

03:30PM  13   Q.   AND DO YOU SEE THE EMAIL FROM HIM WHERE HE SAYS, "TO SAY

03:30PM  14   THIS IS DEEPLY DISAPPOINTING WILL BE A GROSS UNDERSTATEMENT"?

03:30PM  15   A.   I DO.

03:30PM  16   Q.   HE SAYS, "WE HAVE BEEN ASKING TO GET THIS CARTRIDGE BUILT

03:30PM  17   AND QAED AND TESTED FOR MONTHS NOW AND EVERY SINGLE RUN WE HAVE

03:31PM  18   HAD ON THYROID PANEL HAS BEEN A DISASTER."

03:31PM  19        DO YOU SEE THAT?

03:31PM  20   A.   YES.

03:31PM  21   Q.   AND THIS IS ABOUT ONE WEEK BEFORE THE END OF AUGUST; IS

03:31PM  22   THAT RIGHT?

03:31PM  23   A.   YES.

03:31PM  24   Q.   AND ONE MONTH BEFORE THERANOS BEGAN PATIENT TESTING?

03:31PM  25   A.   YES.

03:31PM  1     Q.   LET'S LOOK AT THE EMAIL ABOVE THAT FROM

03:31PM  2     SUREKHA GANGADKHEDKAR.

03:31PM  3          DO YOU SEE HERE ANOTHER REPORT SENT DIRECTLY TO

03:31PM  4     MR. BALWANI, INCLUDING YOU AND DANIEL YOUNG, REGARDING THESE

03:31PM  5     RESULTS?

03:31PM  6     A.   YES.

03:31PM  7     Q.   AND SUREKHA GANGADKHEDKAR SAYS, "WITH THE PRESENT RUN,

03:31PM  8     HERE IS THE BREAK-UP OF THE RESULTS," AND THEN SHE PROVIDES A

03:31PM  9     NUMBERED LIST.

03:31PM  10    A.   YES.

03:31PM  11    Q.   SHE NOTES NUMBER 2, THERE'S AN ASSAY THAT WAS OORL DUE TO

03:31PM  12    SUBSTRATE EVAPORATION.

03:31PM  13         DO YOU KNOW WHAT OORL STOOD FOR AT THERANOS?

03:31PM  14    A.   OUT OF RANGE LOW.

03:31PM  15    Q.   UNDER NUMBER 4 FOR THE TT3 ASSAY, SHE NOTES THAT THAT WAS

03:32PM  16    ALSO WAS OUT OF RANGE LOW; IS THAT CORRECT?

03:32PM  17    A.   YES.

03:32PM  18    Q.   AND SHE SAYS AT THE BOTTOM THAT "THIS POINTS TO

03:32PM  19    CARRY-OVER/CONTAMINATION DURING THE RUN AND NOT RELATED TO

03:32PM  20    ASSAY ISSUES."

03:32PM  21         DO YOU SEE THAT?

03:32PM  22    A.   YES.

03:32PM  23    Q.   AND THEN FOR NUMBER 6 SHE SAYS "FT-4 -- RESULT REPORTED,

03:32PM  24    HIGH."

03:32PM  25         DO YOU SEE THAT?

EDLIN DIRECT BY MR. BOSTIC

03:32PM  1    A.   YES.

03:32PM  2    Q.   AND SHE SAYS, "SINCE WE DO NOT HAVE SAMPLE TO TEST ON THE

03:32PM  3    REFERENCE METHOD, NOT POSSIBLE TO MAKE A CONCLUSION ON THE HIGH

03:32PM  4    RESULTS."

03:32PM  5         DID I READ THAT CORRECTLY?

03:32PM  6    A.   YES.

03:32PM  7    Q.   AND FINALLY AT THE TOP OF THIS PAGE, DO YOU SEE THAT

03:32PM  8    MR. BALWANI TOOK THE STEP TO FORWARD THAT INFORMATION TO

03:32PM  9    MS. HOLMES?

03:32PM  10   A.   I DO.

03:32PM  11   Q.   LET'S LOOK AT 1157 NEXT.

03:33PM  12        AND AT 1157, DO YOU SEE AN EMAIL FROM YOU TO OTHERS AT

03:33PM  13   THERANOS RELATING TO A DEMO THE FOLLOWING DAY?

03:33PM  14   A.   YES.

03:33PM  15             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1157.

03:33PM  16             MS. WALSH:  IF IT'S 803(6), I HAVE NO OBJECTION,

03:33PM  17   YOUR HONOR.

03:33PM  18             MR. BOSTIC:  IT IS.

03:33PM  19             THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:33PM  20        (GOVERNMENT'S EXHIBIT 1157 WAS RECEIVED IN EVIDENCE.)

03:33PM  21   BY MR. BOSTIC:

03:33PM  22   Q.   AND LET'S ZOOM IN ON THE TOP HALF OF PAGE 1.

03:33PM  23        MR. EDLIN, DO YOU SEE THAT THIS RELATES TO A DEMO THAT WAS

03:33PM  24   GOING TO HAPPEN APPARENTLY ON SEPTEMBER 24TH, 2013?

03:33PM  25   A.   YES.

EDLIN DIRECT BY MR. BOSTIC

03:33PM 1    Q.   AT THIS POINT HAD THERANOS BEGUN PATIENT TESTING YET?

03:33PM 2    A.   YES.

03:33PM 3    Q.   IN THIS EMAIL, PAUL PATEL WRITES, "DANIEL,

03:33PM 4         "ARE WE EXPECTING TO RUN THIS SAMPLE ON ADVIA?"

03:34PM 5         DO YOU SEE THAT QUESTION?

03:34PM 6    A.   YES.

03:34PM 7    Q.   AND ON THE TOP WE SEE YOUR EMAIL RESPONSE.

03:34PM 8         YOU SAY, "PLEASE PLAN ON RUNNING THIS SAMPLE USING THE

03:34PM 9    SAME PROCESSES AS LAST WEEK, IE, THE CURRENT WORKFLOW IN

03:34PM 10   NORMANDY."

03:34PM 11        WHAT DOES THAT MEAN, "THE CURRENT WORKFLOW IN NORMANDY"?

03:34PM 12   A.   I THINK THAT REFERS TO HOW THE NORMANDY LAB OPERATED.

03:34PM 13   Q.   OKAY.  WAS THAT THE LAB RUNNING PATIENT TESTS?

03:34PM 14   A.   I'M NOT SURE.

03:34PM 15   Q.   YOU GO ON TO SAY IN THAT EMAIL, "TO ANSWER PAUL'S

03:34PM 16   QUESTION, I BELIEVE THAT ADVIA IS USED FOR THIS FOR GC ASSAYS."

03:34PM 17        DO YOU SEE THAT?

03:34PM 18   A.   I DO.

03:34PM 19   Q.   AND DID YOU TESTIFY EARLIER THAT ADVIA WAS A NON-THERANOS

03:34PM 20   THIRD PARTY DEVICE?

03:34PM 21   A.   YES, AND AT THIS POINT I WAS LIKELY PASSING INFORMATION

03:34PM 22   FROM DANIEL YOUNG TO PAUL.

03:35PM 23   Q.   LET'S GO BACK, JUST BRIEFLY, TO PAGE 2 AND ZOOM IN ON THE

03:35PM 24   BOTTOM HALF.

03:35PM 25        AND WE SEE HERE AN EMAIL FROM YOU, AGAIN, RELATING TO

03:35PM   1    COORDINATION OF THIS DEMO?

03:35PM   2    A.   YES.

03:35PM   3    Q.   AND AT THE BOTTOM YOU SAY, "SAM AND MICHAEL -- WE WILL

03:35PM   4    ALSO NEED TO SET UP MINILABS AND A 4S IN INTERVIEW ROOM NUMBER

03:35PM   5    1."

03:35PM   6         DO YOU SEE THAT?

03:35PM   7    A.   YES.

03:35PM   8    Q.   AND WAS EITHER THE MINILAB OR THE 4S PART OF THE WORKFLOW

03:35PM   9    IN THE THERANOS CLINICAL LAB?

03:35PM  10    A.   NOT TO MY KNOWLEDGE.

03:35PM  11    Q.   ALL RIGHT.  SO, IN OTHER WORDS, IS THIS A SITUATION WHERE

03:35PM  12    THE NEXT GENERATION DEVICES WERE SET UP IN A CONFERENCE ROOM

03:35PM  13    WHERE THE MEETING WAS HELD, BUT THOSE DEVICES WERE NEVER USED

03:35PM  14    FOR CLINICAL PATIENT TESTING?

03:36PM  15         MS. WALSH:  OBJECTION.  LEADING.

03:36PM  16         THE COURT:  IT WAS LEADING.  I'LL ALLOW IT.

03:36PM  17    YOU CAN ANSWER THE QUESTION.

03:36PM  18         THE WITNESS:  CAN YOU REPEAT THE QUESTION, PLEASE?

03:36PM  19         MR. BOSTIC:  SURE.

03:36PM  20    Q.   ARE WE LOOKING AT A SITUATION WHERE NEXT GENERATION

03:36PM  21    DEVICES, NOT USED FOR CLINICAL PATIENT TESTING, WERE SET UP IN

03:36PM  22    THE ACTUAL CONFERENCE ROOM?

03:36PM  23    A.   YES.

03:36PM  24    Q.   OKAY.  FINALLY, LET'S LOOK AT TAB 3070, 3070.

03:36PM  25         AND DO YOU SEE HERE AN EMAIL CHAIN INCLUDING YOU,

03:36PM 1    MS. HOLMES, AND MR. BALWANI RELATING TO A TEST FOR A VIP GUEST?

03:36PM 2    A.   YES.

03:36PM 3         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 3070,

03:37PM 4    AND WE'RE GOING TO REDACT THE PATIENT NAME.

03:37PM 5         MS. WALSH:  NO OBJECTION.

03:37PM 6         THE COURT:  IT'S ADMITTED.  SUBJECT TO REDACTION, IT

03:37PM 7    MAY BE PUBLISHED.

03:37PM 8    (GOVERNMENT'S EXHIBIT 3070 WAS RECEIVED IN EVIDENCE.)

03:37PM 9    BY MR. BOSTIC:

03:37PM 10   Q.   AND LET'S GO FIRST TO THE BOTTOM OF PAGE 1, AND WE SEE

03:37PM 11   THAT WE'RE ABOUT TO LOOK AT AN EMAIL FROM YOU, MR. EDLIN, ON

03:37PM 12   DECEMBER 27TH, 2015; IS THAT CORRECT?

03:37PM 13   A.   YES.

03:37PM 14   Q.   SO YEARS AFTER THERANOS HAD BEGUN PATIENT TESTING?

03:37PM 15   A.   OVER TWO YEARS, YES.

03:37PM 16   Q.   AND LET'S TURN THE PAGE.  THE SUBJECT LINE SAYS MESSAGING

03:37PM 17   FOR VIP GUESTS.

03:37PM 18        AND LOOKING AT THE CONTENT OF THE EMAIL, LET'S ZOOM IN ON

03:37PM 19   THE TOP.  IT SAYS -- YOU WRITE, "YESTERDAY WE SENT DR.," AND

03:37PM 20   WE'VE REDACTED THE NAME, "HIS RESULTS FROM THE STUDY IN WHICH

03:37PM 21   WE COMPARE FINGERSTICK CTN RESULTS TO VENOUS RESULTS RUN AT

03:37PM 22   THERANOS, ARUP, AND UCSF."

03:38PM 23        DO YOU SEE THAT?

03:38PM 24   A.   YES.

03:38PM 25   Q.   YOU THEN SAY, "WE WERE UNABLE TO RETURN 5 TEST RESULTS FOR

03:38PM  1    THE CTN FOR THE FOLLOWING REASONS."

03:38PM  2        WHAT WAS THE CTN?

03:38PM  3    A.   IT STANDS FOR CAPILLARY TUBE AND NANOTAINER, AND IT WAS A

03:38PM  4    THERANOS MANUFACTURED DEVICE THAT COLLECTED A BLOOD SAMPLE FROM

03:38PM  5    A FINGERSTICK.

03:38PM  6    Q.   AND WAS THE CTN USED WITH THERANOS SPECIFIC TESTS OR WAS

03:38PM  7    IT ALSO USED WITH REGULAR COMMERCIALLY AVAILABLE TESTS, IF YOU

03:38PM  8    KNOW?

03:38PM  9    A.   I BELIEVE IT WAS RUN IN CONNECTION TO THERANOS SPECIFIC

03:38PM 10    TESTS.

03:38PM 11    Q.   OKAY.  SO YOU'RE WRITING THAT THE LAB WAS UNABLE TO RETURN

03:38PM 12    FIVE TEST RESULTS FOR THE THERANOS METHODS FOR THE FOLLOWING

03:38PM 13    REASONS.

03:38PM 14        UNDER NUMBER 1, POTASSIUM, CHLORIDE, AND SODIUM?

03:38PM 15    A.   YES.

03:38PM 16    Q.   YOU WRITE, "SAMPLE BECAME CONTAMINATED DURING

03:39PM 17    CENTRIFUGATION."

03:39PM 18        DO YOU SEE THAT?

03:39PM 19    A.   YES.

03:39PM 20    Q.   UNDER PART B THERE FOR THOSE SAME ASSAYS UNDER ROOT CAUSE,

03:39PM 21    YOU WRITE, "THE CONTAMINATION OF THE CTN IS NOT DUE TO ANY

03:39PM 22    HUMAN ERROR."

03:39PM 23        DO YOU SEE THAT?

03:39PM 24    A.   YES, AND IN THIS CASE I WAS RELAYING INFORMATION DIRECTLY

03:39PM 25    FROM TINA.

03:39PM  1    Q.   AND YOUR UNDERSTANDING AGAIN, APPARENTLY FROM TINA, WAS

03:39PM  2    THAT, QUOTE, "WE DON'T KNOW HOW OR WHY THIS HAPPENED"; IS THAT

03:39PM  3    RIGHT?

03:39PM  4    A.   YES.

03:39PM  5    Q.   AND THEN GOING DOWN TO ITEM 2 IN THE LIST FOR CALCIUM AND

03:39PM  6    TOTAL PROTEIN?

03:39PM  7    A.   YES.

03:39PM  8    Q.   YOU WRITE, "THESE TWO RESULTS WERE STATISTICALLY

03:39PM  9    SIGNIFICANTLY TOO HIGH RELATIVE TO THE VENOUS REPORT."

03:39PM 10        DO YOU SEE THAT?

03:39PM 11    A.   YES.

03:39PM 12    Q.   CAN YOU EXPLAIN WHAT THAT MEANS?  WHAT WAS BEING COMPARED

03:39PM 13    IN THIS CASE?

03:39PM 14    A.   IN THIS CASE RESULTS FROM A FINGERSTICK WERE BEING

03:39PM 15    COMPARED TO RESULTS FROM A VENIPUNCTURE.

03:40PM 16    Q.   OKAY.  AND UNDER B WHERE IT SAYS ROOT CAUSE, YOU WRITE,

03:40PM 17    "UNKNOWN."

03:40PM 18        DO YOU SEE THAT?

03:40PM 19    A.   YES.  AND, AGAIN, IN THIS CASE I WAS PASSING ALONG

03:40PM 20    INFORMATION FROM A SCIENTIST.

03:40PM 21    Q.   OKAY.  LET'S LOOK AT PAGE 1 TO GET SOME MORE DETAILS ABOUT

03:40PM 22    WHO THIS DONOR WAS, WHO THIS SUBJECT WAS.

03:40PM 23        ZOOM IN ON THE BOTTOM HALF OF THE PAGE.

03:40PM 24        AND DO YOU SEE AN EMAIL FROM CHRISTIAN HOLMES TO HIS

03:40PM 25    SISTER, ELIZABETH HOLMES, AND SUNNY BALWANI?

EDLIN DIRECT BY MR. BOSTIC

03:40PM 1    A.   YES.

03:40PM 2    Q.   AND HE SAYS, "FYI -- THIS IS THE DOC EAH MET AT FORBES

03:40PM 3    CONFERENCE AND INVITED TO DO COMPARISON."

03:40PM 4         DO YOU SEE THAT?

03:40PM 5    A.   YES.

03:40PM 6    Q.   AND CHRISTIAN HOLMES WRITES, "HE WAS VERY PLEASANT IN

03:40PM 7    PERSON BUT NOTED HE INTENDS TO WRITE ABOUT HIS EXPERIENCE AND

03:40PM 8    RESULTS."

03:40PM 9         DO YOU SEE THAT?

03:40PM 10   A.   YES.

03:40PM 11   Q.   LOOKING AT THAT EMAIL, YOU ARE NOT INCLUDED ON THAT

03:40PM 12   PARTICULAR EMAIL MESSAGE; IS THAT CORRECT?

03:40PM 13   A.   THAT'S CORRECT.

03:40PM 14   Q.   AND GOING UP TO THE MESSAGE ABOVE THAT, WE SEE A RESPONSE

03:41PM 15   FROM MS. HOLMES.

03:41PM 16   A.   YES.

03:41PM 17   Q.   AND THAT ONE DOES INCLUDE YOU; CORRECT?

03:41PM 18   A.   YES.

03:41PM 19   Q.   AND SHE WRITES, "YOU CAN SAY WE DO RUN THOSE ASSAYS, BUT

03:41PM 20   WERE NOT ABLE TO RUN THEM ON THIS SAMPLE, APPARENTLY DUE TO A

03:41PM 21   HUMAN ERROR IN SAMPLE HANDLING."

03:41PM 22        DO YOU SEE THAT?

03:41PM 23   A.   YES.

03:41PM 24   Q.   MS. HOLMES IS SAYING TO TELL THE DOCTOR THAT THE ASSAYS

03:41PM 25   COULD NOT BE RUN ON THE SAMPLE; IS THAT CORRECT?

03:41PM  1      A.   YES.

03:41PM  2      Q.   IN FACT, WEREN'T THE ASSAYS RUN ON THIS SAMPLE?

03:41PM  3      A.   YES.

03:41PM  4      Q.   SHE ALSO SAYS TO TELL THE DOCTOR THAT THE PROBLEM WAS,

03:41PM  5      QUOTE, "DUE TO A HUMAN ERROR IN SAMPLE HANDLING."

03:41PM  6           DO YOU SEE THAT?

03:41PM  7      A.   YES.

03:41PM  8      Q.   HADN'T YOU JUST REPORTED THAT YOUR UNDERSTANDING FROM TINA

03:41PM  9      WAS THAT THE CONTAMINATION WAS NOT DUE TO ANY HUMAN ERROR?

03:41PM  10     A.   THAT WAS HER UNDERSTANDING, YES.

03:42PM  11     Q.   AND WHEN YOU SAY "HER UNDERSTANDING," DO YOU MEAN TINA'S

03:42PM  12     UNDERSTANDING?

03:42PM  13     A.   I DO.

03:42PM  14     Q.   AT THE TIME, IN DECEMBER OF 2015, DID YOU NOTE THE

03:42PM  15     INCONSISTENCY BETWEEN WHAT MS. HOLMES WAS SAYING SHOULD BE

03:42PM  16     REPRESENTED AND WHAT WAS BEING DISCUSSED INTERNALLY?

03:42PM  17     A.   I'M NOT SURE WHAT YOU MEAN.

03:42PM  18     Q.   SITTING HERE TODAY, DO YOU SEE THE INCONSISTENCY BETWEEN

03:42PM  19     WHAT MS. HOLMES IS SAYING SHOULD BE SAID TO THE DOCTOR AND WHAT

03:42PM  20     ACTUALLY HAPPENED AT THERANOS?

03:42PM  21     A.   I DO.

03:42PM  22              MS. WALSH:  OBJECTION.  RELEVANCE.

03:42PM  23              THE COURT:  OVERRULED.

03:42PM  24              THE WITNESS:  I DO NOTE THE INCONSISTENCY, YES.

03:42PM  25     BY MR. BOSTIC:

EDLIN DIRECT BY MR. BOSTIC

03:42PM  1   Q.   SO MY QUESTION IS, AT THE TIME IN DECEMBER OF 2015, DID

03:42PM  2   YOU NOTICE THAT INCONSISTENCY?

03:42PM  3   A.   I'M NOT SURE WHETHER -- I DON'T REMEMBER.

03:43PM  4   Q.   OKAY.  WE CAN PUT THAT ASIDE.

03:43PM  5        I'D LIKE TO MOVE ON, IN OUR REMAINING TIME TODAY, TO A

03:43PM  6   DIFFERENT TOPIC AND TALK ABOUT YOUR INVOLVEMENT IN THE

03:43PM  7   MARKETING OF THERANOS AND SOME MEDIA RELATIONS INVOLVING THE

03:43PM  8   COMPANY.  OKAY?

03:43PM  9   A.   OKAY.

03:43PM  10  Q.   FIRST, LET'S START WITH THE THERANOS WEBSITE.

03:43PM  11       DO YOU RECALL A TIME WHEN THERANOS WAS PREPARING TO LAUNCH

03:43PM  12  A NEW VERSION OF ITS PUBLIC WEBSITE?

03:43PM  13  A.   YES.

03:43PM  14  Q.   AND WHEN DID THAT TAKE PLACE?

03:43PM  15  A.   IT TOOK PLACE IN 2013 LEADING UP TO THE LAUNCH WITH

03:43PM  16  WALGREENS.

03:43PM  17  Q.   DO YOU KNOW APPROXIMATELY WHAT MONTH THAT WOULD HAVE BEEN

03:43PM  18  THEN, OR MONTHS THAT WE WOULD BE TALKING ABOUT?

03:43PM  19  A.   IT WAS LIKELY IN THE SUMMER OF 2013.

03:43PM  20  Q.   AND AROUND THAT TIME, DID YOU HAVE A ROLE IN ASSISTING

03:43PM  21  WITH THE CONTENT OF THE THERANOS WEBSITE?

03:43PM  22  A.   YES.

03:43PM  23  Q.   AND WHAT WAS YOUR ROLE?

03:43PM  24  A.   MY ROLE WAS TO WORK DIRECTLY WITH THE ACCOUNT MANAGERS AND

03:44PM  25  ACCOUNT SUPERVISORS AT TBWACHIAT/DAY TO TRACK DELIVERABLES,

03:44PM   1    FACILITATE INFORMATION AND COMMUNICATION.

03:44PM   2    Q.   AND YOU MENTIONED TBWACHIAT/DAY?

03:44PM   3    A.   YES.

03:44PM   4    Q.   AND WHAT IS THAT?

03:44PM   5    A.   THAT'S A MARKETING AND ADVERTISING AGENCY.

03:44PM   6    Q.   AND WHAT WAS ITS RELATIONSHIP TO THERANOS BACK IN 2013?

03:44PM   7    A.   THEY WERE THE AGENCY OR VENDOR THAT THERANOS WAS

03:44PM   8    PARTNERING WITH TO DEVELOP A MARKETING COMMUNICATIONS -- A

03:44PM   9    MARKETING AND COMMUNICATIONS STRATEGY WHICH INCLUDED THE

03:44PM   10   WEBSITE REDESIGN.

03:44PM   11   Q.   AND WHEN IT CAME TO THE REDESIGN OF THE WEBSITE, WERE

03:44PM   12   MS. HOLMES AND MR. BALWANI INVOLVED AS CEO AND COO OF THE

03:44PM   13   COMPANY?

03:44PM   14   A.   YES.

03:44PM   15   Q.   AND IN WHAT WAY WERE THEY INVOLVED?

03:44PM   16   A.   THE COMPANY HAD SEVERAL MEETINGS WITH A NUMBER OF

03:45PM   17   DIFFERENT EMPLOYEES AT CHIAT/DAY, AND ELIZABETH AND SUNNY I

03:45PM   18   THINK SPOKE WITH THEM TO ESTABLISH THE TERMS OF THE

03:45PM   19   RELATIONSHIP AND THE SCOPE OF THAT RELATIONSHIP, AND ALSO TO

03:45PM   20   PROVIDE INFORMATION ABOUT THE DIRECTION OF THE COMPANY AND THE

03:45PM   21   STRATEGY AND WHAT THEY WERE HOPING TO ACHIEVE THROUGH A

03:45PM   22   MARKETING EFFORT.

03:45PM   23   Q.   I'LL ASK YOU TO LOOK IN YOUR BINDER AT TAB 3965, PLEASE.

03:45PM   24        AND DO YOU HAVE THAT IN FRONT OF YOU?

03:45PM   25   A.   I DO.

EDLIN DIRECT BY MR. BOSTIC

03:45PM 1    Q.   AT 3965, DO YOU SEE AN EMAIL INCLUDING YOU, MR. BALWANI,

03:45PM 2    AND MS. HOLMES RELATING TO WEBSITE CONTENT?

03:45PM 3    A.   YES.

03:45PM 4              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 3965.

03:45PM 5              MS. WALSH:  YOUR HONOR, WE OBJECT BASED ON HEARSAY.

03:46PM 6    THERE ARE MULTIPLE LAYERS OF HEARSAY IN THIS EMAIL.

03:46PM 7              THE COURT:  MR. BOSTIC, ARE YOU SEEKING TO INTRODUCE

03:46PM 8    THE ENTIRETY?  IT LOOKS LIKE THERE'S A BROCHURE OR SOMETHING.

03:46PM 9              MR. BOSTIC:  YES, YOUR HONOR, BUT NOT FOR ITS TRUTH.

03:46PM 10   THIS IS NOT FOR HEARSAY.  THIS IS TO SHOW WHAT WAS BEING

03:46PM 11   CONSIDERED AS CONTENT FOR THE WEBSITE AT THE TIME.

03:46PM 12   IT'S ALSO RELEVANT TO NOTICE TO MS. HOLMES AND MR. BALWANI

03:46PM 13   ABOUT THAT CONTENT AND ISSUES WITH THE CONTENT.

03:47PM 14        (PAUSE IN PROCEEDINGS.)

03:47PM 15             THE COURT:  ALL RIGHT.  THANK YOU.

03:47PM 16   I'LL ADMIT THIS ONLY FOR THE ISSUE OF NOTICE.

03:47PM 17   LADIES AND GENTLEMEN, THIS IS NOT OFFERED FOR THE TRUTH OF

03:47PM 18   THE MATTER ASSERTED.  IT'S NOT BEING ADMITTED FOR THE TRUTH OF

03:47PM 19   ANYTHING ASSERTED IN THESE DOCUMENTS AT ALL, BUT RATHER JUST

03:47PM 20   FOR THE NOTICE OF THE INFORMATION, BUT NOT FOR THE TRUTH.

03:47PM 21   AND IT CAN BE ADMITTED FOR THAT LIMITED PURPOSE AND

03:47PM 22   PUBLISHED.

03:47PM 23             MR. BOSTIC:  THANK YOU, YOUR HONOR.

03:47PM 24        (GOVERNMENT'S EXHIBIT 3965 WAS RECEIVED IN EVIDENCE.)

03:47PM 25             MR. BOSTIC:  MS. WACHS, IF WE CAN ZOOM IN ON THE

03:47PM   1    HEADER INFORMATION FIRST.

03:47PM   2    Q.   AND DO YOU SEE HERE AN EMAIL FROM SOMEONE NAMED

03:47PM   3    JEFFREY BLICKMAN TO MS. HOLMES, CC'ING MR. BALWANI,

03:47PM   4    CHRISTIAN HOLMES, AND YOU?

03:47PM   5    A.   YES.

03:47PM   6    Q.   WHO WAS JEFF BLICKMAN AT THERANOS?

03:47PM   7    A.   JEFF BLICKMAN WAS A SENIOR PRODUCT MANAGER THAT I WORKED

03:47PM   8    WITH.

03:47PM   9    Q.   THE SUBJECT LINE HERE IS .COM PDF AND JIM FOX'S COMMENTS.

03:47PM  10         DO YOU SEE THAT?

03:48PM  11    A.   YES.

03:48PM  12    Q.   AND LET'S LOOK AT THE CONTENT OF THE EMAIL.  JUST ZOOM IN

03:48PM  13    ON THE TOP HALF OF THAT FOR NOW.

03:48PM  14         AND MR. BLICKMAN WRITES, "ELIZABETH -- HERE'S THE PDF

03:48PM  15    SCREENSHOTS OF THE LATEST .COM TO SEND TO COUNSEL."

03:48PM  16         WAS THIS CONTENT FOR THE WEBSITE?

03:48PM  17    A.   YES.

03:48PM  18    Q.   HE SAYS, "ALONG WITH JIM'S (ABRIDGED) FEEDBACK FROM TODAY,

03:48PM  19    REMOVED ANYTHING BASED ON PERSONAL OPINION."

03:48PM  20         DO YOU SEE THAT?

03:48PM  21    A.   YES.

03:48PM  22    Q.   AND I'D LIKE TO DRAW YOUR ATTENTION TO THE FIRST TWO ITEMS

03:48PM  23    ON THIS LIST.  THE FIRST ONE SAYS, "WHAT IS THE SOURCE/BACKUP

03:48PM  24    DATA FOR 'AT THERANOS WE CAN PERFORM ALL LAB TESTS ON A SAMPLE

03:48PM  25    1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW'?"

EDLIN DIRECT BY MR. BOSTIC

03:48PM   1        DO YOU SEE THAT?

03:48PM   2    A.   YES.

03:48PM   3    Q.   AND THE ITEM 2 SAYS, "OUR REVOLUTION/OUR TECHNOLOGY -- 'A

03:49PM   4    TINY DROP IS ALL IT TAKES' -- WE OFTEN USE MORE THAN ONE DROP;

03:49PM   5    WE SHOULD SAY 'A FEW DROPS IS ALL IT TAKES,'" AND THEN OTHER

03:49PM   6    ALTERNATIVES ARE PROVIDED.

03:49PM   7        DO YOU SEE THAT?

03:49PM   8    A.   YES.

03:49PM   9    Q.   WHAT WAS YOUR UNDERSTANDING OF THE PURPOSE OF THESE

03:49PM  10    COMMENTS ON THE WEBSITE CONTENT?

03:49PM  11    A.   THE PURPOSE WAS TO CORRECT ANY -- WAS TO PROPOSE CHANGES

03:49PM  12    THAT WOULD CORRECT ANY INACCURACIES OR INCONSISTENCIES WITH THE

03:49PM  13    WEBSITE CONTENT.

03:49PM  14    Q.   OKAY.  IF I COULD ASK YOU TO LOOK AT PAGE 4 OF THIS

03:49PM  15    EXHIBIT.

03:49PM  16        MS. WACHS, ZOOM IN ON THE TOP PART OF THE PAGE.

03:49PM  17        AND IT'S A LITTLE FAINT, BUT DO YOU SEE THAT CONTENT THAT

03:49PM  18    IS BEING COMMENTED ON, THE LANGUAGE OF THE NANOTAINER AND THEN

03:49PM  19    THE TEXT "AT THERANOS WE CAN PERFORM ALL LAB TESTS ON A SAMPLE

03:50PM  20    1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW"?

03:50PM  21    A.   YES.

03:50PM  22    Q.   AT THIS TIME IN SEPTEMBER OF 2013, DID YOU KNOW WHETHER OR

03:50PM  23    NOT THAT STATEMENT WAS TRUE AS TO THE COMPANY'S TECHNOLOGY?

03:50PM  24    A.   I DON'T THINK I HAD A BASIS TO MAKE AN ASSESSMENT ONE WAY

03:50PM  25    OR THE OTHER.

03:50PM 1    Q.   OKAY.  BELOW THE TEXT THAT WE'RE LOOKING AT HERE, THERE'S

03:50PM 2    A LINE THAT SAYS, "A TINY DROP IS ALL IT TAKES."

03:50PM 3        IS THAT ADDITIONAL TEXT THAT WAS BEING COMMENTED ON IN THE

03:50PM 4    EMAIL THAT WE JUST LOOKED AT?

03:50PM 5    A.   YES.

03:50PM 6    Q.   LET'S GO DOWN A LITTLE BIT MORE ON THIS PAGE AND LOOK AT A

03:50PM 7    SECTION WHERE THERE'S A TITLE, "HIGHEST LEVELS OF ACCURACY."

03:50PM 8    A.   YES.

03:50PM 9    Q.   AND THAT'S VERY DIFFICULT TO READ.

03:50PM 10       BUT DO YOU SEE TEXT THERE THAT SAYS, "HIGHEST LEVELS OF

03:51PM 11   ACCURACY," AND REFERS TO SYSTEMATICALLY ELIMINATING -- WELL, I

03:51PM 12   WON'T TRY TO READ THAT.

03:51PM 13       (LAUGHTER.)

03:51PM 14           MR. BOSTIC:  I WON'T INTERPRET THAT.

03:51PM 15           THE COURT:  THANK YOU, MR. BOSTIC.

03:51PM 16   BY MR. BOSTIC:

03:51PM 17   Q.   LET'S KEEP IT TO THE TITLE.

03:51PM 18       DO YOU SEE THE QUOTE THERE, "HIGHEST LEVELS OF ACCURACY"?

03:51PM 19   A.   YES.

03:51PM 20   Q.   IN YOUR ROLE THERE WORKING AT THERANOS, DID YOU HAVE THE

03:51PM 21   OPPORTUNITY TO REVIEW THE ACTUAL PUBLIC WEBSITE OF THE COMPANY?

03:51PM 22   A.   YES.

03:51PM 23   Q.   AND SITTING HERE TODAY, DO YOU RECALL WHETHER THE WEBSITE

03:51PM 24   ENDED UP MAKING CLAIMS ABOUT THE HIGHEST LEVELS OF ACCURACY?

03:51PM 25   A.   I DON'T RECALL THE SPECIFIC WORDING.

03:51PM  1    Q.   OKAY.  I'LL ASK YOU TO TURN TO TAB 3981, PLEASE.

03:52PM  2         AND LOOKING AT 3981, DO YOU SEE ANOTHER EMAIL CHAIN

03:52PM  3    INCLUDING YOU AND MS. HOLMES AND RELATING TO WEBSITE CONTENT?

03:52PM  4    A.   YES.

03:52PM  5              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 3981.

03:52PM  6              MS. WALSH:  YOUR HONOR, THIS EXHIBIT HAS THE SAME

03:52PM  7    ISSUE AS THE LAST ONE.  THERE ARE MULTIPLE LAYERS OF HEARSAY.

03:52PM  8              MR. BOSTIC:  AND IT'S OFFERED FOR THE SAME PURPOSE,

03:52PM  9    YOUR HONOR.

03:52PM  10             THE COURT:  NOTICE.  NOTICE AS TO?

03:52PM  11             MR. BOSTIC:  NOTICE AS TO WEBSITE CONTENT AND

03:52PM  12   POTENTIAL ISSUES WITH THE WEBSITE CONTENT.

03:52PM  13             THE COURT:  ALL RIGHT.  THANK YOU.

03:52PM  14        LADIES AND GENTLEMEN, THIS WILL BE ADMITTED NOT FOR THE

03:52PM  15   TRUTH OF THE MATTER ASSERTED, BUT SOLELY FOR THE ISSUE OF

03:52PM  16   NOTICE AS TO WEBSITE CONTENT AND ANY ISSUES THERETO, SOLELY FOR

03:52PM  17   THAT PURPOSE.

03:52PM  18        AND IT MAY BE PUBLISHED.

03:52PM  19        (GOVERNMENT'S EXHIBIT 3981 WAS RECEIVED IN EVIDENCE.)

03:53PM  20             MR. BOSTIC:  AND LET'S START BY ZOOMING IN ON THE

03:53PM  21   BOTTOM HALF OF PAGE 1.

03:53PM  22   Q.   DO YOU SEE, MR. EDLIN, AN EMAIL FROM SOMEONE NAMED

03:53PM  23   JAIME WOLSZON?

03:53PM  24   A.   YES.

03:53PM  25   Q.   AND DO YOU REMEMBER WHO JAMIE WOLSZON WAS IN RELATION TO

EDLIN DIRECT BY MR. BOSTIC

03:53PM  1    THERANOS?

03:53PM  2    A.   I BELIEVE SHE'S AN OUTSIDE COUNSEL.

03:53PM  3    Q.   AND SHE'S SENDING AN EMAIL TO SOMEONE NAMED KATE BEARDSLEY

03:53PM  4    WHOSE EMAIL ADDRESS IS @BEARDSLEYLAWPLLC.

03:53PM  5         DO YOU SEE THAT?

03:53PM  6    A.   YES.

03:53PM  7    Q.   AND THE EMAIL SAYS, "PLEASE FIND BELOW MY COMMENTS TO THE

03:53PM  8    THERANOS WEBSITE."

03:53PM  9         DO YOU SEE THAT?

03:53PM  10   A.   YES.

03:53PM  11   Q.   AND SHE WRITES A COUPLE OF SENTENCES LATER, "AS DISCUSSED,

03:53PM  12   THEY FALL WITHIN THE CATEGORIES OF SUBSTANTIATION FOR

03:53PM  13   SUPERLATIVE OR COMPARATIVE PERFORMANCE CLAIMS."

03:53PM  14        DO YOU SEE THAT?

03:53PM  15   A.   YES.

03:53PM  16   Q.   AND BEFORE WE LEAVE THIS PAGE, IF WE CAN JUST ZOOM IN ON

03:54PM  17   THE TOP HALF, AND DO YOU SEE THAT THE COMMENTS THAT WE ARE

03:54PM  18   ABOUT TO REVIEW WERE FORWARDED ON SEPTEMBER 6TH FROM MS. HOLMES

03:54PM  19   TO HER BROTHER AND TO SUNNY BALWANI?

03:54PM  20   A.   YES.

03:54PM  21   Q.   OKAY.  LET'S LOOK AT WHAT THOSE COMMENTS ARE.

03:54PM  22        LET'S GO TO PAGE 2 OF THE EXHIBIT.  AND LET'S ZOOM IN ON

03:54PM  23   THE TOP FIRST.

03:54PM  24        WE SEE HERE A BULLET POINT LIST OF COMMENTS TO THE WEBSITE

03:54PM  25   CONTENT; CORRECT?

03:54PM   1    A.   YES.

03:54PM   2    Q.   AND THE FIRST BULLET POINT SAYS, "PLEASE REMOVE REFERENCES

03:54PM   3    TO 'ALL' TESTS AND REPLACE WITH STATEMENTS SUCH AS 'MULTIPLE'

03:54PM   4    OR 'SEVERAL.'  IT IS HIGHLY UNLIKELY THAT THE LABORATORY CAN

03:54PM   5    PERFORM EVERY CONCEIVABLE TEST, BOTH FROM A LOGISTICAL

03:54PM   6    STANDPOINT AND BECAUSE THE CLIA CERTIFICATION DESIGNATES

03:54PM   7    SPECIFIC SPECIALTIES OF TESTS THE LAB PERFORMS."

03:55PM   8         DO YOU SEE THAT?

03:55PM   9    A.   YES.

03:55PM  10    Q.   AND THE SECOND BULLET HAS A SIMILAR COMMENT.  IT SAYS,

03:55PM  11    "FOR A SIMILAR REASON, REPLACE 'FULL RANGE' WITH 'BROAD

03:55PM  12    RANGE.'"

03:55PM  13         DO YOU SEE THAT?

03:55PM  14    A.   YES.

03:55PM  15    Q.   AND SITTING HERE TODAY, DO YOU RECALL WHAT THE THERANOS

03:55PM  16    WEBSITE ENDED UP SAYING ABOUT THE RANGE OF TESTS THAT COULD BE

03:55PM  17    PERFORMED?

03:55PM  18    A.   I DON'T REMEMBER THE SPECIFIC WORDING.

03:55PM  19    Q.   OKAY.  WE CAN COME BACK TO THAT.

03:55PM  20         LET'S GO DOWN IN THE SAME BULLET POINT LIST.

03:55PM  21         AND THERE'S A LINE THAT SAYS "REPLACE 'FASTER AND

03:55PM  22    EASIER.'"

03:55PM  23    A.   RIGHT.

03:55PM  24    Q.   IT SAYS, "REPLACE 'FASTER AND EASIER' WITH 'FAST AND

03:55PM  25    EASY.'"

03:55PM  1      IS THIS A COMMENT SEEKING TO CHANGE ONE OF THOSE

03:55PM  2  SUPERLATIVE CLAIMS REFERENCED ON THE PREVIOUS PAGE?

03:55PM  3  A.   YES.

03:55PM  4  Q.   THERE'S ANOTHER COMMENT THAT SAYS, "REPLACE 'HIGHEST

03:55PM  5  QUALITY' WITH 'HIGH QUALITY.'"

03:55PM  6      DO YOU SEE THAT?

03:55PM  7  A.   YES.

03:55PM  8  Q.   AND THEN THERE'S ONE THAT SAYS, "ENSURE SUBSTANTIATION FOR

03:55PM  9  '4 HOURS OR LESS.'"

03:56PM  10     DO YOU SEE THAT?

03:56PM  11  A.   YES.

03:56PM  12  Q.   SITTING HERE TODAY, DO YOU KNOW WHETHER THESE CHANGES WERE

03:56PM  13  IN FACT MADE?

03:56PM  14  A.   I'M NOT SURE EXACTLY.

03:56PM  15  Q.   LET'S GO TO THE BOTTOM OF PAGE 2 AND ZOOM IN ON THE LAST

03:56PM  16  FEW BULLET POINTS -- ACTUALLY START A LITTLE HIGHER.  ACTUALLY

03:56PM  17  THE BOTTOM FIVE OR SO.

03:56PM  18     DO YOU SEE SOMETHING, MR. EDLIN, SOMETHING REFERENCING CV

03:56PM  19  AT THE SECOND BULLET POINT THERE?

03:56PM  20  A.   YES.

03:56PM  21  Q.   IT SAYS "A CV OF LESS THAN 10 PERCENT COULD STILL BE TOO

03:56PM  22  HIGH -- IT DEPENDS ON THE TEST."

03:56PM  23     DO YOU SEE THAT?

03:56PM  24  A.   YES.

03:56PM  25  Q.   AND IT SAYS, "REPLACE 'HIGHEST LEVELS OF ACCURACY' WITH

EDLIN DIRECT BY MR. BOSTIC

03:57PM 1    'HIGH LEVELS OF ACCURACY.'"

03:57PM 2        DO YOU SEE THAT?

03:57PM 3    A.   YES.

03:57PM 4    Q.   LET'S GO TO PAGE 3 AND SEE A COUPLE MORE OF THESE

03:57PM 5    COMMENTS, AND LET'S ZOOM IN ON THE TOP.  AND THE ADVICE TO

03:57PM 6    MS. HOLMES FORWARDED TO MR. BALWANI WAS TO, QUOTE, "CHANGE

03:57PM 7    'MORE PRECISE' TO 'PRECISE.'"

03:57PM 8        DO YOU SEE THAT IN THE THIRD BULLET POINT?

03:57PM 9    A.   YES.

03:57PM 10   Q.   AND LET'S GO TO PAGE 4 AND ZOOM IN ON THE TOP.

03:57PM 11       DO YOU SEE THE SECOND BULLET POINT READS, "ENSURE

03:57PM 12   SUBSTANTIATION FOR 'UNPRECEDENTED SPEED AND ACCURACY.'"

03:57PM 13       DO YOU SEE THAT ADVICE?

03:57PM 14   A.   YES.

03:57PM 15   Q.   AND LET'S LOOK AT THE BOTTOM OF THIS LIST.

03:57PM 16       AND DO YOU SEE THE SECOND TO THE BOTTOM CONTAINS THE

03:58PM 17   ADVICE TO MS. HOLMES AND MR. BALWANI TO REMOVE THE, QUOTE,

03:58PM 18   "UNRIVALLED ACCURACY"?

03:58PM 19       DO YOU SEE THAT?

03:58PM 20   A.   YES.

03:58PM 21   Q.   AND DO YOU KNOW WHETHER ANY OF THESE CHANGES WERE MADE TO

03:58PM 22   THE WEBSITE CONTENT?

03:58PM 23   A.   I DON'T RECALL SPECIFICALLY.

03:58PM 24   Q.   DO YOU KNOW WHETHER, SUBSEQUENT TO THIS TIME, MS. HOLMES

03:58PM 25   OR MR. BALWANI USED LANGUAGE SIMILAR TO THIS IN DESCRIBING THE

03:58PM  1    COMPANY'S TECHNOLOGY TO INVESTORS OF THE COMPANY?

03:58PM  2    A.   YES.

03:58PM  3    Q.   WHAT DO YOU KNOW ABOUT THAT?

03:58PM  4    A.   I RECALL THAT SOME OF THIS SAME TERMINOLOGY WAS USED IN

03:58PM  5    MATERIALS THAT WERE INCLUDED IN INVESTMENT BINDERS THAT WERE

03:58PM  6    SENT TO INVESTORS OR POTENTIAL INVESTORS.

03:58PM  7    Q.   THIS SAME LANGUAGE THAT THE DEFENDANT WAS ADVISED SHOULD

03:58PM  8    NOT BE ON THE WEBSITE?

03:58PM  9    A.   I'M NOT SURE IF IT REFERS TO ALL OF THE INFORMATION WE

03:58PM  10   JUST REVIEWED, BUT I DO RECALL THAT THERE IS AT LEAST SOME OF

03:59PM  11   THIS INFORMATION.

03:59PM  12   Q.   OKAY.  I'D LIKE TO TAKE A LOOK AT SOME OF THAT WITH YOU.

03:59PM  13        BUT THIS MIGHT BE A GOOD TIME TO BREAK FOR THE DAY,

03:59PM  14   YOUR HONOR.

03:59PM  15        THE COURT:  ALL RIGHT.  LET'S DO THAT.

03:59PM  16        LET'S BREAK -- WE'LL TAKE OUR LONG WEEKEND RECESS, LADIES

03:59PM  17   AND GENTLEMEN.

03:59PM  18        PLEASE RECALL THAT WE WILL NOT BE IN SESSION TOMORROW, NOR

03:59PM  19   FRIDAY.

03:59PM  20        WE WILL NEXT BE TOGETHER ON APRIL 12TH, APRIL 12TH AT

03:59PM  21   9:00 A.M.

03:59PM  22        I ONCE AGAIN REMIND YOU OF THE ADMONISHMENT.  PLEASE DO

03:59PM  23   NOT DISCUSS THIS CASE, LEARN ANYTHING ABOUT THIS, OR IN ANY WAY

03:59PM  24   COME ACROSS ANY INFORMATION ABOUT THIS CASE.

03:59PM  25        I'LL ASK YOU THAT QUESTION WHETHER ANY OF THOSE THINGS

03:59PM 1    OCCURRED WHEN WE NEXT GET TOGETHER ON THE 12TH.

03:59PM 2        LET ME ALSO TELL YOU THAT MY SENSE IS THAT ON THE 12TH WE

03:59PM 3    MIGHT HAVE A SEATING CHANGE.  AND, OF COURSE, I HAVE NOT TOLD

03:59PM 4    MS. ROBINSON THAT WE WILL DO THAT, BUT WHAT WE EXPECT TO DO IS

04:00PM 5    TO ALLOW OUR DEAR FRIENDS IN THE PEWS OUT THERE, IN THE

04:00PM 6    COMFORTABLE WOOD SEATS, TO MOVE INTO THE FIRST CLASS, BUSINESS

04:00PM 7    CLASS SECTION HERE, AND WE'LL ROTATE FOLKS DOWN ACCORDINGLY.

04:00PM 8        (LAUGHTER.)

04:00PM 9        THE COURT:  SO WE'LL COORDINATE ALL OF THAT NEXT

04:00PM 10   WEEK FOR YOU, BUT WE'LL START THAT NEXT WEEK.

04:00PM 11       SO HAVE A GREAT LONG WEEKEND.  ENJOY, AND WE'LL SEE YOU

04:00PM 12   SOON.  THANK YOU.  SEE YOU TUESDAY.

04:00PM 13       AND, MR. EDLIN, IF YOU COULD RETURN ON THE 12TH AT

04:00PM 14   9:00 A.M., THAT WOULD BE GREAT.

04:00PM 15       THE WITNESS:  YES, YOUR HONOR.

04:00PM 16       (JURY OUT AT 4:00 P.M.)

04:00PM 17       THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

04:00PM 18   YOU.

04:00PM 19       THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE

04:01PM 20   WEEKEND, AND MR. EDLIN HAS LEFT THE COURTROOM.

04:01PM 21       COUNSEL AND MR. BALWANI ARE PRESENT.

04:01PM 22       I JUST WANTED TO INDICATE ON THE RECORD, THE COURT DID

04:01PM 23   ALLOW 291 TO COME IN, 259 TO COME IN, OVER -- I DO WANT TO

04:01PM 24   MEMORIALIZE MS. WALSH'S OBJECTIONS, AS WELL AS MEMORIALIZING

04:01PM 25   THE CONVERSATIONS THAT WE HAD PREVIOUSLY WITH COUNSEL REGARDING

04:01PM   1     1237, WHICH WAS THE MOTION TO EXCLUDE THIS EVIDENCE.

04:01PM   2          THE COURT ALLOWED, AS THE RECORD REFLECTS, THIS TO COME IN

04:01PM   3     FOR A VERY LIMITED PURPOSE, A LIMITED PURPOSE OF KNOWLEDGE

04:01PM   4     ONLY, AS MR. BALWANI WAS A RECIPIENT, AMONGST OTHERS, OF AN

04:01PM   5     EMAIL THAT CONTAINED THAT.

04:01PM   6          IT WAS NOT ADMITTED FOR ANY OTHER PURPOSE, AND ANY OTHER

04:02PM   7     ADDITIONAL USE OF THAT INFORMATION HAS YET TO BE DETERMINED.

04:02PM   8          SO IT WAS ADMITTED SOLELY FOR THAT LIMITED PURPOSE OF

04:02PM   9     KNOWLEDGE.

04:02PM   10         IN DOING SO, THE COURT ALSO -- THERE WAS A 403 OBJECTION

04:02PM   11    BY MS. WALSH.

04:02PM   12         THE COURT FOUND, AND DOES FIND, THAT THE PROBATIVE VALUE

04:02PM   13    AS TO THE KNOWLEDGE ISSUE, AGAIN, THAT LIMITED KNOWLEDGE ISSUE,

04:02PM   14    OUTWEIGHS ANY PREJUDICIAL IMPACT, UNFAIR PREJUDICIAL IMPACT

04:02PM   15    THAT ADMISSION OF THAT EVIDENCE FOR THAT LIMITED PURPOSE

04:02PM   16    CARRIES.

04:02PM   17         SO I JUST WANTED TO SUBSTANTIATE THE COURT'S RULING ON

04:02PM   18    THAT NOW THAT WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

04:02PM   19         SO HAVE A GOOD WEEKEND EVERYONE.  WE'LL SEE YOU NEXT WEEK.

04:02PM   20    I THINK IT'S GOING TO BE WARM THIS WEEK, SO ENJOY, AND WE'LL

04:02PM   21    SEE YOU SOON.

04:02PM   22         THANK YOU.

04:02PM   23              MR. BOSTIC:  THANK YOU.

04:02PM   24              MR. SCHENK:  THANK YOU.

04:02PM   25              MR. CAZARES:  THANK YOU, YOUR HONOR.

2443

04:02PM    1              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

04:02PM    2          (COURT ADJOURNED AT 4:02 P.M.)

           3

           4

           5

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      IRENE RODRIGUEZ, CSR, CRR

17    CERTIFICATE NUMBER 8076

18

19    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR

20    CERTIFICATE NUMBER 9595

21         DATED:  APRIL 6, 2022

22

23

24

25