```
 1

 2                    UNITED STATES DISTRICT COURT

 3                  NORTHERN DISTRICT OF CALIFORNIA

 4                        SAN JOSE DIVISION

 5

      UNITED STATES OF AMERICA,      )  CR-18-00258-EJD
 6                                   )
                       PLAINTIFF,    )  SAN JOSE, CALIFORNIA
 7                                   )
               VS.                   )  APRIL 13, 2022
 8                                   )
      RAMESH "SUNNY" BALWANI,        )  VOLUME 17
 9                                   )
                       DEFENDANT.    )  PAGES 2465 - 2724
10      _____ )
                                        SEALED PAGES 2718 - 2724
11
                   TRANSCRIPT OF TRIAL PROCEEDINGS
12             BEFORE THE HONORABLE EDWARD J. DAVILA
                   UNITED STATES DISTRICT JUDGE
13
      A P P E A R A N C E S:
14
      FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
15                          BY:  JOHN C. BOSTIC
                                 JEFFREY B. SCHENK
16                          150 ALMADEN BOULEVARD, SUITE 900
                            SAN JOSE, CALIFORNIA 95113
17
                            BY:  ROBERT S. LEACH
18                               KELLY VOLKAR
                            1301 CLAY STREET, SUITE 340S
19                          OAKLAND, CALIFORNIA 94612

20          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21      OFFICIAL COURT REPORTER:
                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                          CERTIFICATE NUMBER 8074

23
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
24                TRANSCRIPT PRODUCED WITH COMPUTER

25
```

```
 1      A P P E A R A N C E S: (CONT'D)

 2      FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                BY:  MOLLY MCCAFFERTY
 3                                   SHAWN ESTRADA
                                THE ORRICK BUILDING
 4                              405 HOWARD STREET
                                SAN FRANCISCO, CALIFORNIA 94105
 5
                                BY:  JEFFREY COOPERSMITH
 6                                   AARON BRECHER
                                     AMANDA MCDOWELL
 7                              701 FIFTH AVENUE, SUITE 5600
                                SEATTLE, WASHINGTON 98104
 8
                                BY:  STEPHEN CAZARES
 9                              77 SOUTH FIGUEROA STREET, SUITE 3200
                                LOS ANGELES, CALIFORNIA 90017
10
                                BY:  AMY WALSH
11                              51 W 52ND STREET
                                NEW YORK, NEW YORK 10019
12

13      ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                                BY:  MADDI WACHS, PARALEGAL
14                                   SARA SLATTERY, PARALEGAL

15                              ORRICK, HERRINGTON & SUTCLIFFE
                                JENNIFER CYGNOR, PARALEGAL
16
                                PROLUMINA
17                              BY:  COREY ALLEN
                                2200 SIXTH AVENUE, SUITE 425
18                              SEATTLE, WASHINGTON 98121

19                              UNITED STATES POSTAL INSPECTION SERVICE
                                BY:  CHRISTOPHER MCCOLLOW
20
                                FEDERAL BUREAU OF INVESTIGATION
21                              BY:  MARIO C. SCUSSEL

22                              UNITED STATES FOOD & DRUG
                                ADMINISTRATION
23                              BY:  GEORGE SCAVDIS

24

25
```

2467

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**DANIEL EDLIN**
        DIRECT EXAM BY MR. BOSTIC (RES.)          P. 2505
        CROSS-EXAM BY MS. WALSH                   P. 2584

1

INDEX OF EXHIBITS

2

|  | IDENT. | EVIDENCE |
|---|---|---|

3

GOVERNMENT'S

4

| 5805 |  | 2508 |
|---|---|---|
| 5804 |  | 2518 |
| 1106 |  | 2522 |
| 5801 |  | 2526 |
| 1940 |  | 2529 |
| 4869 |  | 2531 |
| 1752 |  | 2537 |
| 504 |  | 2542 |
| 588 |  | 2550 |
| 1027 |  | 2552 |
| 5413 |  | 2562 |
| 5387I |  | 2570 |

<u>INDEX OF EXHIBITS</u>

                              IDENT.        EVIDENCE


<u>DEFENDANT'S</u>

| | IDENT. | EVIDENCE |
|---|---|---|
| 7239 | | 2598 |
| 7747 | | 2614 |
| 20186 | | 2616 |
| 7243 | | 2621 |
| 20538, PG.30 | | 2625 |
| 20537 | | 2628 |
| 20486 | | 2636 |
| 7244 | | 2640 |
| 20550 | | 2667 |
| 966A, REDACTED ATTACHMENT | | 2672 |
| 20536 | | 2675 |
| 20173 | | 2679 |
| 20175 | | 2680 |
| 20547 | | 2683 |
| 20548 | | 2685 |
| 10467 | | 2690 |
| 10469 | | 2693 |
| 10468 | | 2694 |
| 10558 | | 2708 |
| 20167 | | 2710 |
| 10554 | | 2713 |

|   |   |
|---|---|
| | 1 | SAN JOSE, CALIFORNIA                         APRIL 13, 2022 |
| | 2 |                    P R O C E E D I N G S |
| 08:36AM | 3 |      (COURT CONVENED AT 8:36 A.M.) |
| 08:36AM | 4 |      (JURY OUT AT 8:36 A.M.) |
| 08:36AM | 5 |           THE COURT:  LET'S GO ON THE RECORD IN THE BALWANI |
| 08:36AM | 6 | MATTER. |
| 08:36AM | 7 |      ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT. |
| 08:36AM | 8 |      WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 08:36AM | 9 |      I THINK WE WERE GOING TO TALK THIS MORNING REGARDING THE |
| 08:36AM | 10 | DEFENSE DOCKET 1396 FILED ON APRIL 8TH.  THE GOVERNMENT HAS |
| 08:36AM | 11 | THIS, I THINK. |
| 08:36AM | 12 |      MR. BOSTIC, DO YOU WANT TO SPEAK TO THIS? |
| 08:36AM | 13 |           MR. BOSTIC:  YES, YOUR HONOR. |
| 08:36AM | 14 |           THE COURT:  I'VE READ AND REVIEWED THIS PLEADING. |
| 08:37AM | 15 |           MR. BOSTIC:  YES.  GOOD MORNING, YOUR HONOR.  THANK |
| 08:37AM | 16 | YOU. |
| 08:37AM | 17 |      FIRST OF ALL, I THINK WE CAN NARROW THE ISSUES FOR THE |
| 08:37AM | 18 | COURT'S CONSIDERATION THIS MORNING A LITTLE BIT. |
| 08:37AM | 19 |      FIRST OF ALL, IN FINALIZING THE GOVERNMENT'S OUTLINE FOR |
| 08:37AM | 20 | TODAY, THERE'S SOME EXHIBITS THAT WE WILL NOT PLAN TO INTRODUCE |
| 08:37AM | 21 | THROUGH MR. EDLIN.  I THINK THE ONLY EXHIBITS RAISED BY THE |
| 08:37AM | 22 | DEFENSE THAT WE STILL NEED TO ADDRESS ARE EXHIBITS 504 AND |
| 08:37AM | 23 | 1776. |
| 08:37AM | 24 |      SO THE GOVERNMENT DOES NOT PLAN TO INTRODUCE 551, 983 OR |
| 08:37AM | 25 | 1496. |

08:37AM 1          THE COURT:  OKAY.  THANK YOU.

08:37AM 2       MS. WALSH, ARE YOU WITHDRAWING YOUR MOTION THEN?

08:37AM 3          MS. WALSH:  NO, YOUR HONOR.

08:37AM 4     (LAUGHTER.)

08:37AM 5          MR. BOSTIC:  YOUR HONOR, IF I COULD TAKE THOSE IN

08:37AM 6   REVERSE ORDER AND START WITH 1776?

08:38AM 7          THE COURT:  SURE.

08:38AM 8          MR. BOSTIC:  1776 IS THE "FORTUNE" ARTICLE WRITTEN

08:38AM 9   BY ROGER PARLOFF AND PUBLISHED IN JUNE OF 2013.  THAT ARTICLE

08:38AM 10  IS NOT COMING IN FOR ITS TRUTH.  IT'S NOT BEING OFFERED FOR

08:38AM 11  THAT PURPOSE.  IT CONTAINS FALSE AND MISLEADING STATEMENTS

08:38AM 12  ABOUT THERANOS.

08:38AM 13     THE COURT IS AWARE FROM THE PREVIOUS TRIAL AND FROM

08:38AM 14  EVIDENCE THAT HAS BEEN SUBMITTED IN VARIOUS PLEADINGS THAT

08:38AM 15  MS. HOLMES WAS INTERVIEWED IN CONNECTION WITH THAT PIECE.  SHE

08:38AM 16  MADE STATEMENTS TO THE WRITER, MR. PARLOFF, AND THEN THOSE

08:38AM 17  STATEMENTS FORMED THE BASIS OF SOME OF THE CLAIMS AND QUOTES IN

08:38AM 18  THAT ARTICLE.

08:38AM 19     WHAT IS EVEN MORE IMPORTANT IS THAT THERANOS SUBSEQUENTLY

08:38AM 20  SENT THAT ARTICLE TO INVESTORS IN THIS CASE, AND THAT IS IN

08:38AM 21  TRIAL EXHIBIT 1770.  I'M SORRY, I DON'T HAVE A COPY.

08:38AM 22     BUT THAT WAS INTRODUCED IN THE LAST TRIAL, AN EMAIL FROM

08:38AM 23  THERANOS TO ALL OF THE SHAREHOLDERS ATTACHING THAT VERY ARTICLE

08:39AM 24  ACTUALLY FOR THE PURPOSE OF SENDING AROUND THAT ARTICLE.

08:39AM 25     SO 1776 AND ITS CONTENT ARE IMPORTANT NOT TO PROVE THE

08:39AM 1    TRUTH OF WHAT IS IN THAT ARTICLE, BUT BECAUSE THE ARTICLE

08:39AM 2    ITSELF WAS A TOOL THAT THE DEFENDANTS USED TO SPREAD FALSE

08:39AM 3    INFORMATION ABOUT THE COMPANY.

08:39AM 4        AND EVEN THE FACT THAT THE DEFENDANT KNEW THAT THAT

08:39AM 5    CONTENT WAS OUT THERE IN THE PUBLIC IS RELEVANT HERE BECAUSE OF

08:39AM 6    THE WAY THAT THAT ARTICLE WAS USED TO PROPAGATE THOSE

08:39AM 7    MISUNDERSTANDINGS ABOUT THE COMPANY AND AID IN THE FRAUD.

08:39AM 8        SO FOR THAT REASON IT'S NOT COMING IN FOR HEARSAY

08:39AM 9    PURPOSES.

08:39AM 10            THE COURT:  SO DOES THERE HAVE TO BE A CONNECTION TO

08:39AM 11   MR. BALWANI?  THE OTHER TRIAL, THE PATH FOR THAT WAS A LITTLE

08:39AM 12   DIFFERENT.

08:39AM 13       BUT I WAS JUST CURIOUS ABOUT THIS, THINKING ABOUT THIS,

08:39AM 14   DOES THERE HAVE TO BE A DIFFERENT PATH AS TO MR. BALWANI, THAT

08:39AM 15   IS, AS YOU SAY THE PARLOFF ARTICLE WAS PART OF A PACKET SENT TO

08:40AM 16   INVESTORS TO SUPPORT, I SUPPOSE, ENTICE, WHATEVER, POSITIVE

08:40AM 17   INVESTMENT DECISIONS.

08:40AM 18       DOES THERE HAVE TO BE A NEXUS CONNECTION TO MR. BALWANI

08:40AM 19   REGARDING ADMISSIBILITY TODAY?  I SUPPOSE THE SUB QUESTION IS

08:40AM 20   IT PREMATURE?  IS IT APPROPRIATE TO GET THAT IN NOW THROUGH

08:40AM 21   THIS WITNESS WITHOUT A CONTEXT OF THAT?

08:40AM 22            MR. BOSTIC:  I THINK, YOUR HONOR, THAT THE NEXUS OR

08:40AM 23   THE CONNECTION TO MR. BALWANI IS BY VIRTUE OF HIS PARTICIPATION

08:40AM 24   IN THE CONSPIRACY, AND I THINK THE PARTIES HAVE HAD SUFFICIENT

08:40AM 25   TIME TO REVIEW THE RELEVANT LAW ON COCONSPIRATOR LIABILITY AND

08:40AM 1    VICARIOUS LIABILITY.  AND WE KNOW THAT IT'S NOT THE CASE THAT

08:40AM 2    JUST BECAUSE AN ACT IS COMMITTED BY A COCONSPIRATOR THAT IT'S

08:40AM 3    NOT ADMISSIBLE AGAINST THE OTHER COCONSPIRATOR.

08:41AM 4        SO HERE THE FACT THAT MS. HOLMES WAS THE ONE WHO SAT FOR

08:41AM 5    THAT INTERVIEW DOESN'T MEAN THAT THE CONTENT OF THAT ARTICLE

08:41AM 6    ISN'T ADMISSIBLE AS TO MR. BALWANI.

08:41AM 7        IT WAS A TOOL THAT WAS USED TO ACCOMPLISH THE AIMS OF

08:41AM 8    THEIR SHARE IN THE CONSPIRACY TO DEFRAUD INVESTORS, AND

08:41AM 9    ACTUALLY PATIENTS AS WELL, BECAUSE EVERYTHING THAT IS IN THE

08:41AM 10   PUBLIC VIEW, EVERY ARTICLE THAT GOES OUT WOULD HAVE BEEN

08:41AM 11   INTENDED BY THE DEFENDANTS TO INFLUENCE NOT JUST INVESTORS BUT

08:41AM 12   ALSO PATIENTS WHO ARE CONSIDERING WHERE TO HAVE THEIR BLOOD

08:41AM 13   TESTING DONE.

08:41AM 14       SO THE DEFENDANT'S KNOWLEDGE OF THAT CONTENT, HIS

08:41AM 15   AWARENESS OF IT, AND ANY USE BY MS. HOLMES OR INFLUENCE THAT

08:41AM 16   MS. HOLMES HAD OVER THE CONTENT IS RELEVANT IN THIS CASE

08:41AM 17   BECAUSE THOSE WERE FORESEEABLE STEPS TAKEN TO ACCOMPLISH THE

08:41AM 18   CONSPIRACY THAT THESE TWO DEFENDANTS JOINED IN TOGETHER.

08:41AM 19           THE COURT:  SO -- IN CONCEPT, I AGREE WITH

08:41AM 20   EVERYTHING YOU'VE SAID.  I SUPPOSE MY QUESTION IS HAS THERE

08:42AM 21   BEEN A PRIMA FACIE CONSPIRACY SHOWN YET?  AND I'D BE HAPPY TO

08:42AM 22   HEAR FROM YOU ABOUT THAT.

08:42AM 23       THAT I THINK WOULD BE THE CONDITION PRECEDENT AT LEAST FOR

08:42AM 24   SOME OTHER COCONSPIRATOR'S STATEMENTS, ET CETERA, AT LEAST A

08:42AM 25   BASIS FOR THAT ADMISSIBILITY.

08:42AM 1      AND BECAUSE I'M ASKING THE QUESTION, PERHAPS IT SUGGESTS

08:42AM 2   THAT I HAVE A QUESTION ABOUT THAT.

08:42AM 3           MR. BOSTIC:  SO, YOUR HONOR, I THINK THERE HAS BEEN

08:42AM 4   AND I THINK THAT WILL BE FURTHER DEVELOPED TODAY THROUGH

08:42AM 5   MR. EDLIN'S ADDITIONAL TESTIMONY.

08:42AM 6      WE HAVE HEARD ABOUT THE DEFENDANT'S INVOLVEMENT IN THE

08:42AM 7   CLIA LAB WHERE PATIENT TESTING WAS CONDUCTED, HIS AWARENESS IN

08:42AM 8   THAT REGARD AND HIS COMMUNICATIONS WITH MS. HOLMES AND

08:42AM 9   COMMUNICATIONS INCLUDING MS. HOLMES WHERE SHE ALSO KNEW ABOUT

08:42AM 10  THOSE ISSUES.

08:42AM 11     WE'VE ALSO HEARD ABOUT INTERACTIONS WHERE THEY WERE

08:43AM 12  ALIGNED IN, FOR EXAMPLE, SHUTTING DOWN A REQUEST FROM

08:43AM 13  DR. PANDORI TO HAVE REGULAR MEETINGS WHERE THE TECHNICAL PEOPLE

08:43AM 14  COULD MAKE SURE THAT MS. HOLMES HAD ACCURATE INFORMATION TO

08:43AM 15  CONVEY ABOUT THE TESTING AND WHAT WAS AVAILABLE.

08:43AM 16     MR. BALWANI WAS THE ONE WHO SAID, I THINK, QUOTE, "THAT'S

08:43AM 17  NOT GOING TO HAPPEN," AND MS. HOLMES DID NOT OBJECT.

08:43AM 18     SO WE HAVE SEEN SEVERAL DOCUMENTS, AND WE'VE HEARD

08:43AM 19  TESTIMONY ABOUT THESE TWO DEFENDANTS BEING ALIGNED IN BOTH

08:43AM 20  THEIR KNOWLEDGE OF THOSE ISSUES AND THEIR INTENTION TO CONTINUE

08:43AM 21  TO USE THE FLAWED DEVICES FOR PATIENT TESTING.  I THINK THAT

08:43AM 22  DOES SATISFY A PRIMA FACIE CONSPIRACY CASE AS TO THE PATIENT

08:43AM 23  COUNTS AND THAT SIDE OF THINGS.

08:43AM 24     ON THE INVESTOR SIDE, WE'RE STARTING TO GET INTO SOME OF

08:43AM 25  THE WEBSITE CONTENT, AND I THINK WE'LL SEE SOME MORE OF THAT

08:43AM  1      THIS MORNING WITH MR. EDLIN.

08:43AM  2           THERE WILL BE EXHIBITS SHOWING THAT SOME OF THE MISLEADING

08:43AM  3      INFORMATION THAT WAS HIGHLIGHTED BY COUNSEL IN ADVANCE OF THE

08:44AM  4      RELEASE OF THE WEBSITE AND THE LAUNCH STILL ENDED UP ON THE

08:44AM  5      WEBSITE, LANGUAGE CLAIMING THE HIGHEST LEVELS OF QUALITY,

08:44AM  6      HIGHEST LEVELS OF ACCURACY, THINGS LIKE THAT REMAINED ON THE

08:44AM  7      WEBSITE TO BE VIEWED BY BOTH POTENTIAL PATIENTS AND POTENTIAL

08:44AM  8      INVESTORS, AND WE'LL HEAR TESTIMONY ABOUT HOLMES AND BALWANI'S

08:44AM  9      INVOLVEMENT IN THAT WEBSITE FINALIZATION.  SO I THINK THAT WILL

08:44AM  10     MAKE SOME PROGRESS THERE ALSO.

08:44AM  11          FINALLY, WE'LL HEAR ABOUT SOME OF THE CONTENT OF THE

08:44AM  12     INVESTOR PRESENTATION THROUGH MR. EDLIN.  I PLAN TO INTRODUCE

08:44AM  13     AN EXAMPLE INVESTOR PRESENTATION THROUGH HIM.  AND AS THE COURT

08:44AM  14     KNOWS FROM THE LAST TRIAL, THOSE PRESENTATIONS CONTAIN SEVERAL

08:44AM  15     EXAMPLES OF THESE FALSE STATEMENTS OR MISLEADING STATEMENTS

08:44AM  16     ABOUT WHAT THE COMPANY COULD DO, WHAT IT HAD DONE, AND WE'LL

08:44AM  17     HEAR ABOUT, AGAIN, MS. HOLMES AND MR. BALWANI'S INVOLVEMENT ON

08:44AM  18     THAT SIDE OF THINGS.

08:44AM  19          THE COURT:  SO THAT'S THE -- AND, MS. WALSH, I KNOW

08:45AM  20     YOU'RE EAGER TO SPEAK.

08:45AM  21          BUT THAT'S THE PIECE, CANDIDLY, FULL TRANSPARENCY, THAT'S

08:45AM  22     THE PIECE THAT IS MISSING FOR ME NOW IS THAT I JUST DON'T SEE A

08:45AM  23     ROBUST PRIMA FACIE SHOWING AT THIS POINT.

08:45AM  24          MS. WALSH.

08:45AM  25          MS. WALSH:  YES, YOUR HONOR.

08:45AM   1          SO I AGREE, I DON'T THINK A PRIMA FACIE CONSPIRACY TO

08:45AM   2     DEFRAUD PATIENTS OR INVESTORS HAS BEEN SHOWN AT THIS POINT.

08:45AM   3          AND AS TO MR. EDLIN, REGARDING THE WEBSITE IN PARTICULAR,

08:45AM   4     SINCE MR. BOSTIC RAISED THAT, YOU KNOW, MR. BOSTIC ELICITED

08:45AM   5     THAT MR. EDLIN DIDN'T REMEMBER WHETHER THOSE CHANGES WERE MADE,

08:45AM   6     AND WE SENT THE GOVERNMENT THE ACTUAL WEB PAGES TO SHOW THAT

08:45AM   7     MANY OF THOSE CHANGES WERE IN FACT MADE.

08:45AM   8          SO, ACTUALLY, THE EVIDENCE IS GOING TO SHOW MANY OF THE

08:45AM   9     CHANGES RECOMMENDED BY LAWYERS WERE MADE ON THE WEBSITE.  MAYBE

08:45AM  10     NOT ALL OF THEM.  IT WASN'T PERFECT.  BUT MANY OF THEM WERE

08:45AM  11     MADE.

08:45AM  12          SO I DON'T THINK THE WEBSITE TESTIMONY IS GOING TO BRING

08:46AM  13     US ANY CLOSER TO A PRIMA FACIE CASE FOR CONSPIRACY.

08:46AM  14          SAME THING WITH WALGREENS MARKETING LITERATURE.  YOU KNOW,

08:46AM  15     I THINK THE EVIDENCE WILL SHOW THAT THE COMPANY WAS DOING ITS

08:46AM  16     BEST TO IMPLEMENT CHANGES RECOMMENDED BY THE LAWYERS IN THAT

08:46AM  17     MARKETING MATERIAL.

08:46AM  18          SO I AGREE, I DON'T THINK A PRIMA FACIE CONSPIRACY HAS

08:46AM  19     BEEN SHOWN, AND I'M NOT SURE IT WILL BE THROUGH MR. EDLIN.

08:46AM  20          ON THE PARLOFF ARTICLE IN PARTICULAR, THERE'S ANOTHER

08:46AM  21     HEARSAY HURDLE THAT THE GOVERNMENT NEEDS TO GET OVER, AND THAT

08:46AM  22     IS THAT THE STATEMENTS MS. HOLMES MADE TO MR. PARLOFF, THAT SHE

08:46AM  23     ACTUALLY MADE THOSE PARTICULAR STATEMENTS THAT ARE IN THE

08:46AM  24     ARTICLE.  SO THAT HE TOOK THEM DOWN ACCURATELY, AND THAT IS IN

08:46AM  25     FACT, WHAT SHE SAID.

2477

08:46AM 1      THE GOVERNMENT IN THE LAST TRIAL CALLED MR. PARLOFF TO

08:46AM 2  TESTIFY FOR THIS VERY REASON, TO ESTABLISH THAT THAT'S WHAT SHE

08:46AM 3  TOLD HIM, AND I DON'T SEE ANY REASON WHY HE SHOULDN'T HAVE TO

08:47AM 4  TESTIFY HERE LIKEWISE.

08:47AM 5      THE COURT:  OKAY.

08:47AM 6      MR. BOSTIC:  SO, YOUR HONOR, GOING IN REVERSE ORDER,

08:47AM 7  I DON'T BELIEVE THAT EXHIBIT 1776 WAS ADMITTED THROUGH

08:47AM 8  MR. PARLOFF IN THE LAST TRIAL.  IT WAS ALREADY IN EVIDENCE.

08:47AM 9      SO HIS TESTIMONY THAT MS. HOLMES SAID THOSE STATEMENTS WAS

08:47AM 10 NOT A PRECONDITION FOR ADMISSION, AND NOR SHOULD IT BE HERE.

08:47AM 11     THE COURT:  I THINK IT CAME IN WITHOUT OBJECTION IF

08:47AM 12 I RECALL.

08:47AM 13     MR. BOSTIC:  THAT MAY BE CORRECT, YOUR HONOR.

08:47AM 14     AND I THINK A SIMILAR SEQUENCE IS APPROPRIATE HERE.

08:47AM 15 AGAIN, THE FACT THAT THE CONTENT OF THE ARTICLE WAS SHARED WITH

08:47AM 16 INVESTORS IS RELEVANT IN AND OF ITSELF.

08:47AM 17     THE GOVERNMENT WOULDN'T OPPOSE AN INSTRUCTION FROM THE

08:47AM 18 COURT THAT THE ARTICLE IS NOT BEING OFFERED FOR THE TRUTH THAT

08:47AM 19 MS. HOLMES MADE THE STATEMENTS IN THE ARTICLE.  IT REALLY IS

08:47AM 20 THE SUBSEQUENT USE OF THE ARTICLE THAT FORMS THE BASIS FOR WHY

08:48AM 21 IT'S IMPORTANT HERE.

08:48AM 22     THE COURT:  WOULD THEN A COVER PAGE OF THE ARTICLE

08:48AM 23 SUFFICE, THE COVER PAGE WITHOUT THE MATERIAL IF IT'S NOT

08:48AM 24 RELEVANT OR IT'S NOT OFFERED FOR THE TRUTH, THEN -- AND THE

08:48AM 25 RELEVANCE IS THERE WAS A HOLMES INTERVIEW WITH PARLOFF, AN

08:48AM 1    ARTICLE THAT WAS FAVORABLE TO THE COMPANY, AND IT WAS PART OF

08:48AM 2    THE MATERIAL, SOLICITATION MATERIAL SENT OUT, ISN'T THAT

08:48AM 3    ENOUGH?

08:48AM 4            MR. BOSTIC:  NO, YOUR HONOR, FOR THE SAME REASON

08:48AM 5    THAT WE COULDN'T RELY SIMPLY ON THE COVER PAGES TO THE SLIDE

08:48AM 6    PRESENTATIONS THAT WENT TO THE INVESTORS.

08:48AM 7        THE CONTENT OF THE FALSE STATEMENTS IS CRITICAL.  THE JURY

08:48AM 8    NEEDS TO SEE WHAT FALSE AND MISLEADING INFORMATION POTENTIAL

08:48AM 9    INVESTORS WERE RECEIVING FROM THE COMPANY.  AND THAT'S ALL

08:48AM 10   WE'RE ASKING TO DO HERE, TO SHOW THAT THIS ARTICLE EXISTED,

08:48AM 11   THAT IT WAS SENT BY DEFENDANT'S COMPANY TO CURRENT INVESTORS,

08:49AM 12   AND THAT IT CONTAINED FALSE STATEMENTS, STATEMENTS THAT THIS

08:49AM 13   DEFENDANT WOULD HAVE KNOWN TO BE FALSE.

08:49AM 14       THE FACT THAT --

08:49AM 15           THE COURT:  HOW DO WE DO THAT WHILE WE TELL THE JURY

08:49AM 16   "BUT IT'S NOT OFFERED FOR THE TRUTH OF THE FALSE STATEMENTS OR

08:49AM 17   THE TRUTH OF THE POSITION THAT THE STATEMENTS ARE FALSE"?

08:49AM 18           MR. BOSTIC:  SO I THINK MS. WALSH'S OBJECTION IS TO

08:49AM 19   THE JURY VIEWING THE ARTICLE AND RELYING ON IT TO BELIEVE THAT

08:49AM 20   MS. HOLMES SAID THE THINGS IN THE ARTICLE.

08:49AM 21       IT'S NOT IMPORTANT THAT THE JURY MAKE ANY CONCLUSIONS

08:49AM 22   ABOUT THAT, THOUGH.  WE WON'T ASK THEM TO CONCLUDE FROM THE

08:49AM 23   ARTICLE THAT MR. PARLOFF CORRECTLY TOOK IT DOWN AND REPRESENTED

08:49AM 24   WHAT MS. HOLMES SAID.

08:49AM 25       SO THAT'S ABOUT WHY THE ARTICLE SAYS WHAT IT SAYS.  THAT'S

08:49AM 1   BESIDE THE POINT HERE.

08:49AM 2           THE COURT:  OKAY.

08:49AM 3           MR. BOSTIC:  THE MORE IMPORTANT POINT IS WHAT THE

08:49AM 4   ARTICLE SAYS AND THE FACT THAT THE COMPANY SENT THAT

08:49AM 5   INFORMATION TO INVESTORS ASKING INVESTORS AT THAT POINT TO RELY

08:49AM 6   ON THE CONTENT OF THE ARTICLE FOR THEIR UNDERSTANDING ABOUT

08:50AM 7   WHAT THE COMPANY COULD DO.

08:50AM 8       IT'S AT THAT STAGE THAT THE CONTENT BECOMES RELEVANT AND

08:50AM 9   ADMISSIBLE BECAUSE BY SENDING THE ARTICLE TO INVESTORS, THE

08:50AM 10  COMPANY, DEFENDANT'S COMPANY, WAS PERPETUATING THOSE FALSE

08:50AM 11  UNDERSTANDINGS, SPREADING THOSE FALSE UNDERSTANDINGS.  IT

08:50AM 12  DOESN'T MATTER HOW THAT CONTENT GOT INTO THE ARTICLE IN THE

08:50AM 13  FIRST PLACE.

08:50AM 14          MS. WALSH:  PART OF THE PROBLEM, YOUR HONOR, IS THAT

08:50AM 15  THE GOVERNMENT HAS NOT PROVEN THAT THOSE ASSERTIONS ARE FALSE.

08:50AM 16  SO WE'RE GOING TO HAVE AN ARTICLE COME INTO EVIDENCE WITH A

08:50AM 17  BUNCH OF ASSERTIONS.  THERE'S NO EVIDENCE THAT MS. HOLMES

08:50AM 18  ACTUALLY SAID THOSE THINGS TO MR. PARLOFF.

08:50AM 19      THE EVIDENCE HASN'T BEEN ESTABLISHED THAT THOSE ASSERTIONS

08:50AM 20  ARE FALSE, AND IT'S EXTREMELY PREJUDICIAL TO -- SO IT'S

08:50AM 21  HEARSAY, BUT IT'S ALSO EXTREMELY PREJUDICIAL TO MR. BALWANI.

08:50AM 22  HE HAD NOTHING TO DO WITH THIS INTERVIEW.  HE WASN'T THERE.  HE

08:50AM 23  DIDN'T ADVISE HER WHILE SHE WAS TALKING TO REPORTERS.

08:51AM 24      SO THERE IS -- YOUR FIRST QUESTION WAS IS THERE A

08:51AM 25  CONNECTION TO MR. BALWANI?  AND IT HAS NOT BEEN CONNECTED TO

08:51AM 1    HIM.

08:51AM 2                MR. BOSTIC:  SO, YOUR HONOR, JUST TO CORRECT A FEW

08:51AM 3    THINGS.

08:51AM 4        IT'S ABSOLUTELY NOT TRUE THAT THERE'S NO EVIDENCE IN THE

08:51AM 5    CASE TO SHOW THAT THE STATEMENTS IN THE ARTICLE ARE FALSE.

08:51AM 6        THE ARTICLE INCLUDES STATEMENTS LIKE, FOR EXAMPLE, QUOTE,

08:51AM 7    "IT'S NOT JUST THE BLOOD DRAWS THAT ARE TINY, IT'S ALSO THE

08:51AM 8    ANALYTICAL SYSTEMS THAT THERANOS USES TO PERFORM THE TESTS."

08:51AM 9        THIS JURY HAS ALREADY HEARD THAT THERANOS USED LARGE

08:51AM 10   DEVICES, THIRD PARTY DEVICES TO DO ITS TESTS.

08:51AM 11       THE ARTICLE SAYS, "THERANOS DOES NOT BUY ANY ANALYZERS

08:51AM 12   FROM THIRD PARTIES."

08:51AM 13       THE JURY HAS HEARD THAT THAT'S NOT TRUE, THAT THE COMPANY

08:51AM 14   DID BUY THIRD PARTY ANALYZERS.

08:51AM 15       THE ARTICLE ALSO SAYS THAT "THERANOS CURRENTLY OFFERS MORE

08:51AM 16   THAN 200 AND IS RAMPING UP TO OFFER MORE THAN 1,000 OF THE MOST

08:52AM 17   COMMONLY ORDERED BLOOD DIAGNOSTIC TESTS ALL WITHOUT THE NEED

08:52AM 18   FOR A SYRINGE."

08:52AM 19       WE KNOW FROM MULTIPLE WITNESSES THAT THERANOS RELIED ON

08:52AM 20   VEIN PUNCTURE FOR MANY OF THE TESTS THAT IT WAS OFFERING AND

08:52AM 21   THAT IT COULD NOT DO THIS MANY TESTS SIMPLY ON FINGERSTICK.

08:52AM 22       SO THE JURY KNOWS THAT THESE STATEMENTS ARE FALSE.  THE

08:52AM 23   FACT THAT DEFENDANT'S COMPANY SENT THESE FALSE STATEMENTS TO

08:52AM 24   INVESTORS IS THE POINT.

08:52AM 25       IT DOESN'T MATTER HOW THE FALSE STATEMENTS CAME TO BE IN

08:52AM 1    THIS DOCUMENT FOR PURPOSES OF ESTABLISHING THAT POINT.

08:52AM 2          THE COURT:  OKAY.  WELL, THANK YOU FOR THAT.

08:52AM 3    I STILL HAVE A QUESTION ABOUT THE CONNECTION BETWEEN

08:52AM 4    MR. BALWANI AND YOU SUGGESTING THAT THAT'S TO COME, JUDGE.

08:52AM 5    WE'RE GOING TO LAY THAT FOUNDATION.

08:52AM 6    SO I SUPPOSE THE WAY I LOOK AT THIS NOW IS THAT I SUSTAIN

08:52AM 7    THE OBJECTION SUBJECT TO A FOUNDATION BEING LAID.

08:52AM 8          MR. BOSTIC:  WHAT I'LL DO, YOUR HONOR, IS I'LL MOVE

08:52AM 9    1776 UNTIL LATER IN THE EXAMINATION.

08:53AM 10          THE COURT:  SURE.

08:53AM 11          MR. BOSTIC:  AND WE'LL SEE IF WE CAN OVERCOME THAT

08:53AM 12   OBJECTION.

08:53AM 13          THE COURT:  SURE.

08:53AM 14          MR. BOSTIC:  I JUST WANT TO MAKE SURE THAT WE'RE

08:53AM 15   CLEAR, WHILE WE HAVE A CHANCE TO ARGUE WITHOUT THE JURY

08:53AM 16   PRESENT, THAT THIS IS NOT TO COME IN FOR THE PURPOSE OF

08:53AM 17   ESTABLISHING THAT HOLMES SAID WHAT SHE SAID.

08:53AM 18   ALTHOUGH THE COURT KNOWS FROM EVIDENCE THAT THE COURT HAS

08:53AM 19   PREVIOUSLY SEEN THAT THAT EVIDENCE DOES EXIST, BUT WE ARE

08:53AM 20   NOT -- BUT WE HAVE NOT INTRODUCED IT YET IN THIS TRIAL.

08:53AM 21   SO I CAN MOVE 1776.

08:53AM 22   AND I THINK JUST TO ANSWER ONE POINT THAT THE DEFENSE

08:53AM 23   RAISED ON THE WEBSITE, THE GOVERNMENT DOES PLAN TO INTRODUCE A

08:53AM 24   COPY OF A FEBRUARY 2014 VERSION OF THE THERANOS PUBLIC WEBSITE.

08:53AM 25          THE WITNESS PREVIOUSLY DIDN'T REMEMBER EXACTLY WHAT WAS ON

08:53AM 1      THE WEBSITE.  I BELIEVE THAT THIS DOCUMENT CAN REFRESH HIS

08:53AM 2      RECOLLECTION.  I UNDERSTAND THAT HE WILL ALSO RECOGNIZE IT FOR

08:53AM 3      WHAT IT IS.

08:54AM 4          MS. WALSH SAID THAT SHE SENT THE GOVERNMENT COPIES OF THAT

08:54AM 5      WEBSITE.  ACTUALLY, I BELIEVE WHAT SHE SENT WAS A PARTIAL

08:54AM 6      PORTION OF THAT WEBSITE FROM THE INTERNET ARCHIVES.

08:54AM 7          I THEN ASKED THE DEFENSE IF THEY WOULD BE WILLING TO

08:54AM 8      INTRODUCE THE ENTIRE VERSION OF THE WEBSITE FROM THAT SAME

08:54AM 9      SOURCE.  I DON'T THINK I HEARD BACK, OR THE ANSWER WAS NO.

08:54AM 10         THE GOVERNMENT PLANS TO OFFER THE FULL VERSION OF THAT

08:54AM 11     FEBRUARY 2014 WEBSITE.  THAT MIGHT BE SOMETHING THAT WE NEED TO

08:54AM 12     TALK ABOUT IN ADVANCE ALSO DEPENDING ON THE DEFENSE'S POSITION

08:54AM 13     ON THAT.

08:54AM 14             THE COURT:  CAN YOU SPEAK TO THAT NOW, MS. WALSH?

08:54AM 15             MS. WALSH:  I CAN, YOUR HONOR, YES.

08:54AM 16         RIGHT.  SO WE SENT THE GOVERNMENT THE PAGES OF THE

08:54AM 17     WEBSITE, THE ACTUAL WEBSITE THAT RELATED TO THE TESTIMONY FROM

08:54AM 18     WEDNESDAY AND MR. EDLIN SAYING I DON'T REMEMBER WHETHER THIS

08:54AM 19     CORRECTION WAS MADE.  SO WE SENT THOSE OVER.

08:54AM 20         THERE'S NO QUESTION, WE WANT THE JURY TO HEAR THAT MANY OF

08:54AM 21     THE CORRECTIONS WERE MADE TO THE WEBSITE.  SO WE'RE ALL IN

08:54AM 22     FAVOR OF THAT.

08:55AM 23         IF MR. BOSTIC WANTS TO OFFER THE ACTUAL WEB PAGES THROUGH

08:55AM 24     THIS WITNESS ON DIRECT, THAT'S FINE.  WE DON'T OBJECT.

08:55AM 25             THE COURT:  OKAY.

08:55AM 1          MR. BOSTIC:  UNDERSTOOD, YOUR HONOR.

08:55AM 2          THE COURT:  OKAY.  THANK YOU.

08:55AM 3      504.

08:55AM 4          MR. BOSTIC:  AS TO 504, YOUR HONOR, THE GOVERNMENT

08:55AM 5   IS SEEKING TO ADMIT THIS TO -- FOR SIMILAR REASONS AS IT WAS

08:55AM 6   INTRODUCED AND ADMITTED IN THE HOLMES TRIAL.

08:55AM 7          FALSE STATEMENTS MADE TO THE MILITARY ARE NOT 404(B)

08:55AM 8   EVIDENCE.  THEY WEREN'T ADMITTED UNDER 404(B) IN THE PREVIOUS

08:55AM 9   TRIAL.  WE DON'T OFFER THEM AS THAT HERE.

08:55AM 10         INSTEAD, THEY'RE ADMISSIBLE BECAUSE IN THE DEFENDANT'S

08:55AM 11  SHARED SCHEME TO DEFRAUD INVESTORS, FALSE STATEMENTS WERE MADE

08:55AM 12  ABOUT THE NATURE AND EXTENT OF THERANOS'S CONTACTS WITH THE

08:55AM 13  MILITARY.

08:55AM 14         THE DEFENDANTS LED INVESTORS TO BELIEVE THAT THERANOS'S

08:55AM 15  HARDWARE WAS BEING USED BY THE MILITARY IN A MORE SUBSTANTIAL

08:55AM 16  WAY THAN IT ACTUALLY WAS.

08:55AM 17         MR. EDLIN IS GOING TO TESTIFY ABOUT THE LIMITED

08:56AM 18  ENGAGEMENTS WITH THE MILITARY AND THE FACT THAT THERANOS

08:56AM 19  DEVICES WERE, FOR EXAMPLE, NEVER USED FOR ACTUAL CLINICAL

08:56AM 20  TESTING OF SOLDIERS BY THE MILITARY.

08:56AM 21         MS. HOLMES'S FALSE STATEMENTS TO THE MILITARY ABOUT WHAT

08:56AM 22  THE DEVICES COULD DO ARE INEXTRICABLY INTERTWINED WITH THAT

08:56AM 23  EVIDENCE BECAUSE THEY SHOW THAT MS. HOLMES, AND BY EXTENSION

08:56AM 24  MR. BALWANI, WOULD HAVE BEEN AWARE THAT THE MILITARY WANTED A

08:56AM 25  DEVICE THAT COULD DO CERTAIN THINGS, AND THE FACT THAT

08:56AM  1    MS. HOLMES HAD TO DECEIVE THE MILITARY ABOUT THE ABILITY OF THE

08:56AM  2    THERANOS ANALYZER IN ORDER TO KEEP THEM INTERESTED, IN ORDER TO

08:56AM  3    HAVE ANY RELATIONSHIP WITH THE MILITARY AT ALL IS RELEVANT

08:56AM  4    BECAUSE THE AGREED-UPON FRAUD ON INVESTORS INCLUDED FALSE

08:56AM  5    STATEMENTS ABOUT THE EXTENT OF THAT RELATIONSHIP.

08:56AM  6         SO IT AIDED THE AGREED-UPON FRAUD TO HAVE THE MILITARY ON

08:57AM  7    THE HOOK, AS IT WERE, BECAUSE THEN THERE WAS SOME CONTACT, SOME

08:57AM  8    RELATIONSHIP THAT COULD LATER THEN BE EXAGGERATED BY THESE

08:57AM  9    DEFENDANTS IN THEIR CONVERSATIONS WITH INVESTORS WHO WERE

08:57AM  10   IMPRESSED BY THE MILITARY'S INTEREST AND THE MILITARY'S

08:57AM  11   REPORTED USE OF THE DEVICE.

08:57AM  12        SO THAT'S ONE REASON WHY THIS IS ADMISSIBLE EVEN AS TO

08:57AM  13   MR. BALWANI.

08:57AM  14        SEPARATELY, IT ALSO SHOWS THAT THIS RELATIONSHIP WITH THE

08:57AM  15   MILITARY WAS NEVER GOING TO GET OFF THE GROUND BECAUSE THE

08:57AM  16   MILITARY'S INTEREST WAS PREMISED ON ITS UNDERSTANDING OF WHAT

08:57AM  17   THE DEVICE COULD DO.  THAT UNDERSTANDING WAS FALSE.  IT WAS

08:57AM  18   BASED ON THESE FALSE REPRESENTATIONS.

08:57AM  19        SO IT'S FURTHER PROOF THAT THE MILITARY NEVER ACTUALLY

08:57AM  20   USED THE DEVICE AND WAS NEVER GOING TO BECAUSE THE DEVICE

08:57AM  21   PROMISE TO THE MILITARY NEVER ACTUALLY MATERIALIZED.

08:57AM  22             THE COURT:  OKAY.  MS. WALSH.

08:57AM  23             MS. WALSH:  YES, YOUR HONOR.

08:58AM  24        THIS IS 404(B).  IT'S ANOTHER ACT THAT WAS NOT NOTICED TO

08:58AM  25   THE DEFENSE AND THE OTHER ACT IS DECEIVING THE MILITARY ABOUT

08:58AM 1    THE CAPABILITIES OF THE THERANOS MACHINE.

08:58AM 2        WHAT IS CHARGED IN THE INDICTMENT IS DECEIVING PATIENTS

08:58AM 3    AND INVESTORS ABOUT THAT SAME SUBJECT.

08:58AM 4        THE TWO WAYS IN THE CIRCUIT THAT 404(B) CAN COME IN IS IF

08:58AM 5    THE ACTS ARE PART -- IF THEY CONSTITUTE A SINGLE CRIMINAL

08:58AM 6    TRANSACTION WITH THE CHARGED CONDUCT, WHICH CLEARLY IS NOT THE

08:58AM 7    CASE HERE.  IT'S NOT ONE TRANSACTION.

08:58AM 8        AND THE REASON THAT MR. BOSTIC INVOKED IS, IT IS

08:58AM 9    INEXTRICABLY INTERTWINED BECAUSE IT'S NECESSARY FOR THE

08:58AM 10   GOVERNMENT TO OFFER THAT EVIDENCE TO TELL A COHERENT STORY.  SO

08:58AM 11   THAT'S THE SECOND WAY THAT EVIDENCE CAN BE VIEWED AS

08:58AM 12   INEXTRICABLY INTERTWINED, AND, THEREFORE, NOT 404(B).

08:58AM 13       THE SECOND PRONG IS THE ONLY ONE THAT WOULD POSSIBLY

08:59AM 14   APPLY.  AND WHAT MR. BOSTIC IS SAYING IS THAT -- IT'S A

08:59AM 15   NARRATIVE THAT HE WANTS TO ARGUE TO THE JURY, WHICH HE'S

08:59AM 16   ENTITLED TO DO, OF COURSE, BUT SHOWING THAT THE MILITARY WAS

08:59AM 17   ALLEGEDLY DECEIVED IS NOT NECESSARY TO SHOWING THAT INVESTORS

08:59AM 18   WERE ALLEGEDLY DECEIVED.

08:59AM 19       AND THE REASON, IS THAT MR. BOSTIC CAN ELICIT FROM

08:59AM 20   MR. EDLIN, AND OTHERS, THAT THEY -- THAT THERANOS WORKED WITH

08:59AM 21   THE MILITARY, BUT IT TURNED OUT THAT THE RELATIONSHIP EITHER

08:59AM 22   ENDED OR GOT PUT ON PAUSE AT THE TIME THERANOS WAS TALKING TO

08:59AM 23   INVESTORS, AND, THEREFORE, WHEN THEY WERE TALKING TO INVESTORS

08:59AM 24   AND MAKING REPRESENTATIONS ABOUT THE RELATIONSHIP, THOSE

08:59AM 25   REPRESENTATIONS WERE FALSE.

08:59AM 1      IT IS NOT NECESSARY TO SHOW THAT THERANOS DECEIVED THE

08:59AM 2   MILITARY IN ORDER TO PROVE THAT.

09:00AM 3          THE COURT:  OKAY.  WHAT -- AND I THINK I UNDERSTAND

09:00AM 4   YOUR ARGUMENT FROM YOUR PLEADINGS, BUT MY QUESTION IS, IS IT

09:00AM 5   404(B) OR IS IT PART OF THE SCHEME?

09:00AM 6      FROM MR. BOSTIC'S POSITION, THE GOVERNMENT'S POSITION, IS

09:00AM 7   THAT PART OF THE SCHEME WAS TO ENTICE INVESTORS OR GET

09:00AM 8   INVESTORS TO BUY INTO THE COMPANY AND TO ENHANCE THAT

09:00AM 9   PRESENTATION, HAVING THE MILITARY ON BOARD OR HAVING THE

09:00AM 10   MILITARY AS A CLIENT, A SUBSCRIBER, WHATEVER, GIVES SOME TYPE

09:00AM 11   OF MILITARY GOVERNMENTAL RATIFICATION, WHICH WOULD ENHANCE THE

09:00AM 12   REPUTATION, WHICH WOULD THEN PERHAPS INCREASE INVESTOR

09:00AM 13   INTEREST, AND, THEREFORE, PART OF THIS SCHEME TO DEFRAUD.

09:01AM 14      THAT'S THE ARGUMENT I HEAR THEM SAYING.  IT IS NOT OTHER

09:01AM 15   EVIDENCE, IT IS ACTUALLY INTERNAL EVIDENCE OF THE SCHEME

09:01AM 16   ITSELF.  SO IT IS NOT A SEPARATE OFFENSE LIKE IN THE

09:01AM 17   VIZCARRA-MARTINEZ CASE, SIMPLE POSSESSION OF A CONTROLLED

09:01AM 18   SUBSTANCE WAS NOT PERMITTED TO BE INTRODUCED AGAINST THAT

09:01AM 19   GENTLEMAN FOR CHARGES OF A CONSPIRACY TO DISTRIBUTE, I THINK IT

09:01AM 20   WAS, BECAUSE IT HAD NOTHING TO DO.  IT WAS SEPARATE, IT WAS A

09:01AM 21   SEPARATE OFFENSE.

09:01AM 22      BUT HERE WHAT -- AND THE WAY I LOOK AT IT IS THAT IT JUST

09:01AM 23   SEEMS THAT THAT -- GETTING THE MILITARY INVOLVED ENHANCED THE

09:01AM 24   SALE, THE PITCH, AND THAT WAS PART OF THE SCHEME.

09:01AM 25      ISN'T THAT THE WAY THAT IT COULD BE LOOKED AT?

09:01AM 1          MS. WALSH:  IT COULD BE LOOKED AT THAT WAY,

09:01AM 2     YOUR HONOR, BUT I DON'T THINK THAT'S THE STANDARD.

09:01AM 3          THIS IS UNCHARGED CONDUCT.

09:01AM 4          DECEIVING THE MILITARY IS A CRIME, AND MR. BOSTIC IS GOING

09:02AM 5     TO ELICIT THAT.  AND IT'S NOT CHARGED IN THE INDICTMENT.

09:02AM 6          SO IT IS, IT IS UNCHARGED MISCONDUCT.

09:02AM 7          AND THE ONLY WAY UNCHARGED MISCONDUCT COMES IN IS IF IT IS

09:02AM 8     INEXTRICABLY INTERTWINED, AND THERE ARE TWO WAYS THAT THE

09:02AM 9     GOVERNMENT CAN MEET THAT TEST.  ONE IS IF IT'S A PART OF A

09:02AM 10    SINGLE CRIMINAL TRANSACTION, WHICH IT IS NOT; AND, TWO, IS IF

09:02AM 11    IT IS NECESSARY TO TELL A COHERENT STORY, WHICH IT IS NOT.  IT

09:02AM 12    IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE FRAUD ON THE

09:02AM 13    MILITARY TO PROVE FRAUD ON THE INVESTORS.

09:02AM 14          THE COURT:  MR. BOSTIC.

09:02AM 15          MR. BOSTIC:  NOT MUCH TO ADD, YOUR HONOR.

09:02AM 16     I THINK THAT THE KEY IS THE REASON FOR WHICH THIS EVIDENCE

09:02AM 17    IS BEING OFFERED, AND IT'S NOT BEING OFFERED FOR 404 PURPOSES,

09:02AM 18    EITHER 404(A) OR 404(B).

09:02AM 19          THESE WERE ACTIONS TAKEN IN FURTHERANCE OF THE SCHEME TO

09:03AM 20    DEFRAUD INVESTORS.

09:03AM 21          THE FACT THAT THEY MIGHT ALSO BE MORALLY WRONG OR LEGALLY

09:03AM 22    WRONG, I'M NOT SURE THAT'S ESTABLISHED, BUT THE FACT THAT THEY

09:03AM 23    MIGHT BE OTHER WRONGS, DOESN'T MEAN THAT THEY CAN'T BE

09:03AM 24    ADMISSIBLE TO SHOW HOW THEY WERE DONE IN FURTHERANCE OF THE

09:03AM 25    CHARGED OFFENSE, AND THAT IS WHAT IS HAPPENING HERE.  I THINK

```
09:03AM   1    THAT IS CONSISTENT WITH THE DEFINITION OF WHAT IT MEANS TO BE

09:03AM   2    INEXTRICABLY INTERTWINED, AND THAT IS THE BASIS ON WHICH THEY

09:03AM   3    WERE ADMITTED IN THE PREVIOUS TRIAL OVER A SIMILAR OBJECTION,

09:03AM   4    BY THE WAY.

09:03AM   5              THE COURT:  MS. WALSH.

09:03AM   6              MS. WALSH:  YEAH.  THE ONLY OTHER POINT THAT I

09:03AM   7    DIDN'T RAISE IS THAT OF COURSE THE DANGER IS THE JURY WILL

09:03AM   8    CONCLUDE, WELL, THEY'RE LYING TO THE MILITARY, THEY'RE LYING TO

09:03AM   9    INVESTORS AND LINKING THE TWO TOGETHER.

09:03AM  10         AND I THINK WE LAY OUT IN OUR BRIEF HOW SIMILAR THE

09:03AM  11    REPRESENTATIONS ARE THAT ARE MADE TO THE MILITARY VERSUS THE

09:04AM  12    INVESTORS, AND SO THE REAL DANGER IS THAT WHEN THE JURORS HEAR,

09:04AM  13    OH, THEY MADE ALL OF THESE MISREPRESENTATIONS TO THE MILITARY,

09:04AM  14    THEY WILL THEN LEAP TO THE CONCLUSION THAT THEY LIED TO THE

09:04AM  15    INVESTORS, TOO.  AND THAT'S NOT APPROPRIATE.

09:04AM  16              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.  AND THANK

09:04AM  17    YOU FOR THE PLEADINGS, INCLUDING THE CHART IN THE PLEADINGS

09:04AM  18    THAT DIRECTED US ALL TO THE DOCUMENT, OR THE TRANSCRIPT RATHER,

09:04AM  19    IN THE HOLMES TRIAL WHICH WAS HELPFUL TO REVIEW THAT AND LOOK

09:04AM  20    AT THAT.

09:04AM  21         I AM GOING TO OVERRULE THE OBJECTION AND DENY THE MOTION

09:04AM  22    AS TO THIS 504.

09:04AM  23         I DO THINK THAT THE EVIDENCE SHOWS THAT THAT COLLOQUY,

09:04AM  24    THAT CONVERSATION IS INEXTRICABLY INTERTWINED WITH THE OVERALL

09:04AM  25    SCHEME, AND FOR THE REASONS THAT I STATED EARLIER, IT DOES
```

09:04AM 1   APPEAR THAT THAT SCHEME WAS TO ESTABLISH A RELATIONSHIP WITH

09:04AM 2   THE MILITARY SUCH THAT THAT RELATIONSHIP COULD BE USED TO THEN

09:05AM 3   ENHANCE INVESTORS' INTERESTS.

09:05AM 4       IT WOULD SERVE THE PURPOSE OF CREATING GREATER INTEREST BY

09:05AM 5   THE INVESTORS BECAUSE OF THE IMPRIMATUR OF THE UNITED STATES

09:05AM 6   MILITARY BEING ALSO A CUSTOMER GIVING THE COMPANY THE

09:05AM 7   IMPRIMATUR OF THE MILITARY, AND THAT WOULD ENHANCE THE

09:05AM 8   INVESTMENTS.

09:05AM 9       SO I DO FIND IT IS NOT 404(B).  I DON'T SEE IT AS 404 AT

09:05AM 10  ALL, BUT RATHER I DO FIND IT IS INEXTRICABLY INTERTWINED WITH

09:05AM 11  THE OVERALL SCHEME AND NOT SEPARATE, NOT SEPARATE OFFENSES AT

09:05AM 12  ALL.  SO I AM GOING TO OVERRULE THE OBJECTION.  I DO FIND THAT

09:05AM 13  UNDER 403 ALSO THE PROBATIVE VALUE OF THIS OUTWEIGHS ANY UNFAIR

09:05AM 14  PREJUDICE AND CERTAINLY THE PARTIES CAN EXPLAIN THAT, AND

09:05AM 15  WHETHER THE GOVERNMENT ARGUES THAT THEY LIED TO THE MILITARY

09:06AM 16  AND THEY LIED, I'M NOT CERTAIN THAT'S THE GOVERNMENT'S

09:06AM 17  ARGUMENT, BUT WE'LL SEE, AND WE'LL SEE IF THAT WILL BE

09:06AM 18  PERMITTED OR NOT.  I JUST DON'T KNOW WHAT THAT IS GOING TO BE.

09:06AM 19      BUT I DO THINK THAT UNDER 403, THE PROBATIVE VALUE OF THIS

09:06AM 20  OUTWEIGHS, OUTWEIGHS ANY UNFAIR PREJUDICE.

09:06AM 21      SO I'M GOING TO RESPECTFULLY DECLINE YOUR INVITATION TO

09:06AM 22  STRIKE OR NOT ALLOW THE GOVERNMENT TO INTRODUCE 504.

09:06AM 23      AND YOU'RE NOT -- I THINK YOU'VE TOLD US ALREADY, THE

09:06AM 24  GOVERNMENT DOES NOT INTEND TO PROCEED ON ANY OF THE OTHER

09:06AM 25  EXHIBITS THAT WERE REFERENCED IN MS. WALSH'S MOTION.

2490

09:06AM 1          MR. BOSTIC:  CORRECT, YOUR HONOR.

09:06AM 2          THE COURT:  OKAY.  I THINK WE FINISHED THE

09:06AM 3    CONVERSATION THIS MORNING.

09:06AM 4          MS. WALSH:  I THINK THERE ARE A COUPLE OF OTHER

09:06AM 5    ITEMS, YOUR HONOR, THAT WE WANTED TO RAISE.

09:06AM 6          THE COURT:  SURE.

09:06AM 7          MS. WALSH:  MR. BOSTIC IS OFFERING ADDITIONAL TEXTS

09:06AM 8    FROM EXHIBIT 5387, AND HE PROVIDED US WITH THE EXCERPTS THAT

09:07AM 9    HE'S GOING TO OFFER, AND WE DO HAVE SOME HEARSAY OBJECTIONS.

09:07AM 10         I DON'T KNOW IF THE COURT WANTS TO HEAR THOSE NOW OR IN

09:07AM 11   THE MOMENT.

09:07AM 12         BUT THE ONE -- A COUPLE IN PARTICULAR THAT I THINK ARE

09:07AM 13   WORTH TALKING ABOUT ARE TEXTS BETWEEN MS. HOLMES AND

09:07AM 14   MR. BALWANI ABOUT SAFEWAY, ABOUT MS. HOLMES'S COMMUNICATIONS

09:07AM 15   WITH STEVE BURD, I ASSUME AT SAFEWAY, OR OTHERS AT SAFEWAY.

09:07AM 16         AND OUR OBJECTION ON THOSE IS THE HEARSAY, THAT THIS IS

09:07AM 17   HEARSAY.  THESE ARE STATEMENTS BY MS. HOLMES TO MR. BALWANI

09:07AM 18   ABOUT FACTUAL ASSERTIONS REGARDING SAFEWAY.

09:07AM 19         SO WE WOULD OBJECT ON HEARSAY GROUNDS ON THAT ONE.

09:07AM 20         THE COURT:  OKAY.

09:07AM 21         MR. BOSTIC:  YOUR HONOR, AS TO THAT ONE, I DON'T

09:07AM 22   MEAN TO INTERRUPT, BUT MAYBE WE SHOULD TAKE THEM ONE BY ONE.

09:07AM 23         MS. WALSH:  SURE.

09:07AM 24         MR. BOSTIC:  ON THAT ONE THE GOVERNMENT IS NOT

09:07AM 25   SEEKING TO ADMIT MS. HOLMES'S STATEMENTS FOR THEIR TRUTH RATHER

09:08AM  1    IT'S TO SHOW WHAT THE DEFENDANTS WERE TALKING ABOUT AT VARIOUS

09:08AM  2    TIMES, AND OBVIOUSLY MR. BALWANI'S STATEMENTS COME IN AS AN

09:08AM  3    EXCEPTION TO THE HEARSAY RULES.  MS. HOLMES'S STATEMENTS ARE

09:08AM  4    NECESSARY SIMPLY TO PROVIDE THE OTHER SIDE OF THAT

09:08AM  5    CONVERSATION.

09:08AM  6         SO WE WOULDN'T BE OPPOSED TO AN INSTRUCTION FROM THE COURT

09:08AM  7    THAT HER STATEMENTS ON THAT TOPIC ARE NOT COMING IN FOR THE

09:08AM  8    TRUTH.

09:08AM  9              THE COURT:  OKAY.

09:08AM 10              MS. WALSH:  YOUR HONOR, THERE ARE LOTS AND LOTS OF

09:08AM 11    TEXTS THAT THE GOVERNMENT CAN OFFER TO SHOW WHAT MR. BALWANI

09:08AM 12    AND MS. HOLMES WERE TALKING ABOUT AT VARIOUS TIMES.

09:08AM 13         I DON'T -- I THINK THERE'S A SERIOUS HEARSAY PROBLEM WITH

09:08AM 14    THE SAFEWAY ASSERTIONS THAT MS. HOLMES IS MAKING.

09:08AM 15         THAT'S OUR POSITION.

09:08AM 16              THE COURT:  OKAY.  WELL, I DON'T HAVE THAT IN FRONT

09:08AM 17    OF ME.  THANKS FOR THE HEADS UP, THOUGH.

09:08AM 18              MS. WALSH:  I HAVE A COPY FOR THE COURT IF THAT --

09:08AM 19              THE COURT:  OH, THANK YOU.

09:08AM 20              MS. WALSH:  (HANDING.)

09:08AM 21         AND THAT SET OF TEXTS IS ON PAGE 1.

09:09AM 22              THE COURT:  ON THE FIRST PAGE?

09:09AM 23              MS. WALSH:  YES, THE FIRST PAGE.

09:09AM 24         (PAUSE IN PROCEEDINGS.)

09:09AM 25              THE COURT:  IS THIS THE -- I'M JUST GOING TO POINT

| | | |
|---|---|---|
| 09:09AM | 1 | OUT, IT LOOKS LIKE IT'S EAH 6-22-2011 AT 12:51 P.M.  "STEVE |
| 09:09AM | 2 | WANTS WARRANTS FOR HITTING," THOSE TYPES OF COMMENTS? |
| 09:09AM | 3 | MS. WALSH:  EXACTLY, YOUR HONOR. |
| 09:09AM | 4 | MR. BOSTIC:  YES, YOUR HONOR. |
| 09:09AM | 5 | THE COURT:  OKAY.  SO IT LOOKS LIKE THEY, FROM |
| 09:09AM | 6 | MR. BOSTIC'S COMMENT, THEY ADD CONTEXT TO THE CONVERSATION |
| 09:09AM | 7 | PERHAPS, AND I WOULD INSTRUCT -- IF THESE WERE OFFERED, I WOULD |
| 09:09AM | 8 | INSTRUCT THE JURY THAT MS. HOLMES'S TEXTS ARE NOT OFFERED FOR |
| 09:10AM | 9 | THE TRUTH OF THE MATTER ASSERTED IN HER TEXTS BUT SOLELY TO |
| 09:10AM | 10 | PROVIDE CONTEXT FOR THE COMMUNICATION FROM MR. BALWANI, WHICH |
| 09:10AM | 11 | ARE ADMISSIBLE. |
| 09:10AM | 12 | YOU HAD SOME OTHERS? |
| 09:10AM | 13 | MS. WALSH:  I DID. |
| 09:10AM | 14 | THE NEXT ONE IS ON PAGE 10 OF THE EXHIBIT.  STARTING |
| 09:10AM | 15 | TOWARD THE BOTTOM ON 6-23-2011 AT 12:02 A.M., AND IT CONTINUES |
| 09:10AM | 16 | ON TO THE NEXT PAGE UNTIL 12:07 A.M. |
| 09:10AM | 17 | MR. BOSTIC:  THAT MIGHT BE PAGE 4 OF THE EXHIBIT, |
| 09:10AM | 18 | BUT PAGE 10 OF THE 449? |
| 09:10AM | 19 | MS. WALSH:  YEAH.  I GUESS THE PAGE NUMBERING IS |
| 09:10AM | 20 | CONFUSING.  YES, PAGE 10 OF 449, CORRECT. |
| 09:10AM | 21 | THE COURT:  AND IT LOOKS LIKE THERE'S SOME |
| 09:11AM | 22 | HIGHLIGHTED PORTIONS IN THE MARGINS. |
| 09:11AM | 23 | IS THAT -- DOES THAT IDENTIFY THE OBJECTED MATERIAL? |
| 09:11AM | 24 | MS. WALSH:  IT DOES.  I BELIEVE THAT'S MR. BOSTIC'S, |
| 09:11AM | 25 | OR THE GOVERNMENT, SHOWING WHICH PORTIONS HE WAS GOING TO |

```
09:11AM   1        OFFER.

09:11AM   2               THE COURT:  RIGHT.  AND YOU OBJECT TO ALL OF THAT?

09:11AM   3               MS. WALSH:  SO FROM 6-23-2011 AT 12:02 A.M. CARRYING

09:11AM   4        OVER ON TO PAGE 11, 6-23-2011 AT 12:07 A.M.

09:11AM   5           AND THE GIST OF THIS, YOUR HONOR, IS THAT THERE --

09:11AM   6        MR. BALWANI AND MS. HOLMES ARE TALKING ABOUT BEING ON A PLANE

09:11AM   7        AND ORDERING FOOD AND COMPLAINING ABOUT THE FLIGHT AND CHAIRS

09:11AM   8        AND TALKING ABOUT FIRST CLASS VERSUS NOT AND UPGRADES.

09:11AM   9           I JUST THINK THIS GOES BEYOND THE COURT'S RULING IN THE

09:12AM  10        MIL OPINION THAT SOME EVIDENCE CAN BE OFFERED TO SHOW TYPICAL

09:12AM  11        PERKS TO SILICON VALLEY CEO'S.  UNDERSTOOD -- WE UNDERSTAND THE

09:12AM  12        COURT'S RULING.  I THINK THIS GOES BEYOND IT.

09:12AM  13               THE COURT:  MR. BOSTIC, THE OBJECTION IS THAT THIS

09:12AM  14        IS A YELP REVIEW OF THE AIRLINE.

09:12AM  15               MR. BOSTIC:  SO, YOUR HONOR, THE PURPOSE OF THIS

09:12AM  16        EXHIBIT IN GENERAL IS TO PROVIDE A FEW SNAPSHOTS THROUGH TIME

09:12AM  17        OF THE KINDS OF CONVERSATIONS THAT THE DEFENDANTS HAVE IN

09:12AM  18        CONNECTION WITH THEIR BUSINESS AND PERSONAL RELATIONSHIP.

09:12AM  19           THIS WILL BE IN CONNECTION WITH TESTIMONY FROM MR. EDLIN

09:12AM  20        ABOUT WHAT HE OBSERVED OF THEIR PERSONAL AND WORKING

09:12AM  21        RELATIONSHIP.

09:12AM  22           SO THE POINT OF THIS IS NOT TO EMPHASIZE THAT MR. BALWANI

09:12AM  23        WAS FLYING FIRST CLASS.  THE POINT IS TO SHOW THAT MR. BALWANI

09:12AM  24        AND MS. HOLMES COMMUNICATED ABOUT BUSINESS MATTERS -- EXCUSE

09:12AM  25        ME, ABOUT BUSINESS MATTERS, ABOUT PERSONAL MATTERS, EVEN
```

09:13AM  1    MUNDANE THINGS, WHAT WAS HAPPENING TO THEM AT VARIOUS MOMENTS

09:13AM  2    IN TIME.

09:13AM  3        THE FACT THAT IT MENTIONS MR. BALWANI BEING IN FIRST CLASS

09:13AM  4    DOES NOT RENDER IT INADMISSIBLE UNDER THE COURT'S ORDER.

09:13AM  5        I BELIEVE THERE HAS ALREADY BEEN TESTIMONY IN THIS CASE

09:13AM  6    ABOUT THE COMPANY'S USE OF PRIVATE JETS.  IF THAT'S ADMISSIBLE,

09:13AM  7    I'M NOT SURE WHY FIRST CLASS TRAVEL SHOULD BE INADMISSIBLE.

09:13AM  8    FIRST CLASS TRAVEL IS MORE MODEST OR COST EFFECTIVE THAN

09:13AM  9    PRIVATE JET TRAVEL I UNDERSTAND.

09:13AM  10       MOREOVER, THERE'S NOTHING IN THIS EXCHANGE THAT GOES

09:13AM  11   BEYOND THE LEVEL OF -- THAT DESCRIBES PERKS BEYOND WHAT A

09:13AM  12   TYPICAL C SUITE EXECUTIVE AT A COMPANY LIKE THIS WOULD ENJOY.

09:13AM  13       SO THERE'S NOTHING LIKE, FOR EXAMPLE, DISCUSSIONS OF WHAT

09:13AM  14   MS. HOLMES SPENT HER MONEY ON, THE LUXURY GOODS, PERSONAL

09:14AM  15   PURCHASES.  THE THINGS THAT THE COURT HAS BEEN CONCERNED ABOUT

09:14AM  16   IN THE PAST WHEN IT CAME TO THIS KIND OF TESTIMONY JUST DON'T

09:14AM  17   SHOW UP HERE.

09:14AM  18            THE COURT:  OKAY.  MS. WALSH.

09:14AM  19            MS. WALSH:  SO, YOUR HONOR, YEAH, I DON'T SEE WHY

09:14AM  20   THIS PARTICULAR TEXT CHAIN IS NECESSARY TO PROVE THAT

09:14AM  21   MR. BALWANI AND MS. HOLMES MAY HAVE FLOWN FIRST CLASS

09:14AM  22   SOMETIMES.

09:14AM  23       BY THE WAY, MR. BALWANI PAID FOR HIS OWN TRAVEL MUCH OF

09:14AM  24   THE TIME, SO I'M NOT SURE THIS IS A PERK, A COMPANY PERK.  AND

09:14AM  25   IT'S JUST ON THE BOTTOM OF PAGE 10 MR. BALWANI SAYS, "I'M

09:14AM   1    HUNGRY.  THESE GUYS RAN OUT OF MEALS IN FIRST CLASS.  CLOWNS I

09:14AM   2    SWEAR."

09:14AM   3         I DON'T SEE HOW IT ADDS TO THE POINT THAT MR. BOSTIC SAYS

09:14AM   4    HE WANTS TO MAKE.

09:14AM   5         THE EFFECT IS THAT THEY'RE COMPLAINING ABOUT THE SERVICE

09:14AM   6    THAT THEY'RE GETTING ON THE AIRLINE, AND I THINK IT'S

09:15AM   7    PREJUDICIAL, IT'S NOT PARTICULARLY PROBATIVE OF THE FACT THAT

09:15AM   8    THEY'RE GETTING PERKS FROM THE COMPANY, AND I THINK IT SHOULD

09:15AM   9    BE EXCLUDED.

09:15AM  10         THE COURT:  OKAY.  MR. BOSTIC, WHAT ABOUT THE

09:15AM  11    "CLOWNS"?  ANY OBJECTION IF WE STRIKE THE "CLOWNS"?

09:15AM  12         MR. BOSTIC:  NO OBJECTION TO REDACTING THAT.

09:15AM  13         THE COURT:  I THINK WE CAN REDACT THAT.

09:15AM  14         I TAKE YOUR POINT, MS. WALSH, BUT I DO THINK THAT THIS IS

09:15AM  15    ADMISSIBLE TO SHOW A RELATIONSHIP, AT LEAST A BUSINESS

09:15AM  16    RELATIONSHIP BETWEEN MS. HOLMES AND MR. BALWANI, THEY'RE

09:15AM  17    CONFERRING ABOUT, IT APPEARS TO BE, PLANS REGARDING MEETINGS,

09:15AM  18    AND SO I'M GOING TO ALLOW IT OVER YOUR OBJECTION.

09:15AM  19         BUT I WILL REDACT THE "CLOWNS" PART OF THAT LAST LINE.

09:15AM  20         MS. WALSH:  THANK YOU, YOUR HONOR.

09:16AM  21         THE COURT:  YOU'RE WELCOME.

09:16AM  22    WAS THERE ANOTHER?

09:16AM  23         MS. WALSH:  I'M JUST TAKING A MOMENT TO CHECK.

09:16AM  24         THE COURT:  I'D ALSO LIKE TO REVIEW AGAIN JUST OUR

09:16AM  25    SCHEDULE QUICKLY BEFORE WE BREAK TODAY SO I CAN INFORM THE JURY

09:16AM  1    OF THAT, TOO.

09:16AM  2              MS. WALSH:  YEAH.  THAT'S ALL FOR THE TEXTS.

09:16AM  3              THE COURT:  OKAY.  THANK YOU.

09:16AM  4         SO WE'RE GOING UNTIL 4:00 TODAY.

09:16AM  5         FRIDAY WE'LL BREAK AT NOON, AND I'LL TELL THE JURY THAT.

09:16AM  6    WE'LL BREAK AT NOON.

09:16AM  7         WE'LL BE IN SESSION THE 19TH, THE 20TH, AND THE 22ND.

09:16AM  8         DO YOU HAVE THE -- I'M SORRY, MS. ROBINSON.  DO YOU HAVE

09:17AM  9    THE TIMES THAT WE END THEN?  I DIDN'T BRING THAT SHEET WITH ME

09:17AM  10   THAT WE'RE ENDING ON THOSE DAYS, THE 19TH, THE 20TH?

09:17AM  11        I KNOW WE HAD THOUGHT ABOUT HAVING A SESSION ON THE

09:17AM  12   MORNING OF THE 18TH.  THAT'S NOT GOING TO WORK APPARENTLY.

09:17AM  13             THE CLERK:  YOU'RE RIGHT, THAT'S NOT GOING TO WORK.

09:17AM  14        THE 19TH WE CAN END AT 4:00.

09:17AM  15        THE 20TH WE CAN END AT 4:00.

09:17AM  16        THE 22ND WE'LL END AT 4:00.  SO WE'LL HAVE FULL DAYS.

09:17AM  17             THE COURT:  AND THERE ARE SOME BREAKS IN THOSE DAYS,

09:17AM  18   I BELIEVE.

09:17AM  19             THE CLERK:  YOU'RE RIGHT.  ONE MOMENT.

09:17AM  20             THE COURT:  I'M SORRY, I DIDN'T BRING THE SHEET.

09:17AM  21             THE CLERK:  THAT'S OKAY.

09:17AM  22        (PAUSE IN PROCEEDINGS.)

09:18AM  23             THE COURT:  I CAN GET THE SHEET.  IT'S JUST ON MY

09:18AM  24   DESK, AND I DIDN'T BRING IT.

09:18AM  25        THE NEXT WEEK WE'RE IN TRIAL ON THE 26TH AND 27TH, I

09:18AM  1    BELIEVE.

09:18AM  2         MR. SCHENK?

09:18AM  3              MR. SCHENK:  YES, YOUR HONOR.

09:18AM  4         I WAS LOOKING YESTERDAY, AND WE DISCUSSED ENDING AT 2:45

09:18AM  5    ON BOTH THE 19TH AND THE 22ND.

09:18AM  6         WE EITHER HAD THAT DISCUSSION ON MONDAY OR TUESDAY OF THIS

09:18AM  7    WEEK.

09:18AM  8              THE COURT:  THAT WAS SUCH A LONG TIME AGO.

09:18AM  9              MR. SCHENK:  YES.

09:18AM 10              THE COURT:  I HAVE THAT SHEET IN MY OFFICE I THINK.

09:18AM 11              THE CLERK:  I HAVE IT HERE.

09:18AM 12              THE COURT:  OH, YOU DO.

09:18AM 13              THE CLERK:  SO ON THE 19TH WE END AT 3:00 O'CLOCK

09:18AM 14    AND ON THE 22ND WE END AT 3:00 O'CLOCK.

09:18AM 15         BUT ON THE 20TH, WE CAN END AT 4:00.  WE'LL HAVE A FULL

09:18AM 16    DAY.  OKAY.

09:18AM 17              THE COURT:  OKAY.  AND THEN THE 29TH WE ARE IN

09:18AM 18    SESSION ALL DAY, I BELIEVE.

09:19AM 19              THE CLERK:  THAT'S CORRECT.

09:19AM 20              THE COURT:  AND JUST TO CONFIRM, MAY 3RD, WE WILL BE

09:19AM 21    AVAILABLE ALL DAY AND AS WELL AS THE 4TH ALL DAY.

09:19AM 22         IS THAT RIGHT?

09:19AM 23              THE CLERK:  YES.  YES.

09:19AM 24              MR. SCHENK:  YES.

09:19AM 25              THE COURT:  OKAY.  AND WE ARE -- FOR MAY WE'RE

09:19AM 1    TRYING TO SEE IF WE CAN HAVE AN AFTERNOON SESSION ON THE 23RD

09:19AM 2    AND PERHAPS AN AFTERNOON SESSION ON THE 26TH.

09:19AM 3        THE 27TH THERE WILL BE A ONE HOUR BREAK, 12:45 TO 1:45 IT

09:19AM 4    LOOKS LIKE.  THAT'S NEW INFORMATION FOR YOU I THINK.  SO THAT'S

09:20AM 5    THE UPDATE.

09:20AM 6        AND TODAY I'LL ASK AND INQUIRE OF OUR JURORS WHETHER OR

09:20AM 7    NOT AN 8:30 START IS SOMETHING THAT THEY CAN ACCOMMODATE.

09:20AM 8        OKAY.

09:20AM 9            MS. WALSH:  YOUR HONOR, BEFORE WE BREAK, AND THERE

09:20AM 10   ARE TWO MORE ITEMS, AND I DON'T KNOW IF MR. BOSTIC WANTS TO

09:20AM 11   RETURN TO THE PODIUM.

09:20AM 12       THIS IS JUST IN WAY OF A HEADS UP TO PUT THE COURT ON

09:20AM 13   NOTICE.  ONE OF THE EXHIBITS THAT I THINK THE GOVERNMENT WILL

09:20AM 14   ELICIT THROUGH MR. EDLIN IS 4858, AND THAT IS AN INVESTOR

09:20AM 15   PACKET THAT WAS SENT TO RDV CORPORATION, THIS IS THE DEVOS

09:20AM 16   FAMILY COMPANY, AND IN THAT PACKET INCLUDES THE PFIZER REPORT.

09:20AM 17   AND WE'VE BRIEFED THIS ISSUE, YOUR HONOR, AND YOU RULED LAST

09:21AM 18   WEEK REGARDING SCHERING-PLOUGH.  THAT REPORT WAS ALLOWED TO

09:21AM 19   COME IN.

09:21AM 20       AND, OF COURSE, THE PFIZER REPORT IS VERY DIFFERENT FROM

09:21AM 21   SCHERING-PLOUGH BECAUSE THERE IS NO EVIDENCE THAT MR. BALWANI

09:21AM 22   EVER SAW THE REPORT WITH JUST THE THERANOS LOGO, HE ONLY SAW

09:21AM 23   THIS ONE WITH THE TWO LOGOS.

09:21AM 24       AND I UNDERSTAND THIS WENT TO INVESTORS.  SO WE DON'T

09:21AM 25   OBJECT TO THE DOCUMENT ITSELF COMING IN, BUT WHAT WE OBJECT TO

09:21AM 1    IS QUESTIONING THAT WILL IMPLY THAT THERE WAS ANYTHING IMPROPER

09:21AM 2    ABOUT -- CONNECTED TO THE LOGOS ON THIS REPORT OR ANY ARGUMENT

09:21AM 3    LATER TO THE JURY THAT THIS REPORT WAS SOMEHOW FRAUDULENT OR

09:21AM 4    IMPROPER BECAUSE OF THE TWO LOGOS.

09:21AM 5              MR. BOSTIC:  SO, YOUR HONOR, I MAY NOT ACTUALLY USE

09:21AM 6    THAT EXHIBIT AT ALL WITH THIS WITNESS, AND IF I DO, I DON'T

09:21AM 7    PLAN TO HIGHLIGHT THE LOGOS OR MAKE THE KIND OF ARGUMENT THAT

09:22AM 8    THE DEFENSE IS CONCERNED ABOUT WITH THIS WITNESS.

09:22AM 9              MS. WALSH:  OKAY.  ALL RIGHT.

09:22AM 10             THE COURT:  GREAT.

09:22AM 11             MS. WALSH:  AND ONE MORE HOUSEKEEPING ITEM, AND I

09:22AM 12   PROMISE I'M DONE.

09:22AM 13        WE HAVE A SHORT VIDEO, IT'S A 45-SECOND VIDEO.  WE WILL

09:22AM 14   NEED MR. EDLIN TO AUTHENTICATE IT TO GET IT INTO EVIDENCE, AND

09:22AM 15   WE CAN DO THAT.  I'M TOLD BY MS. ROBINSON, WE CAN SHOW HIS

09:22AM 16   SCREEN TO HIM ONLY FOR HIM TO SAY, "YES, I RECOGNIZE IT" OR

09:22AM 17   "NO, I DON'T."

09:22AM 18        BUT I JUST WANTED TO GIVE THE COURT A HEADS UP THAT WE

09:22AM 19   WILL BE DOING THAT.

09:22AM 20             THE COURT:  OKAY.

09:22AM 21             MR. BOSTIC:  NO OBJECTION TO THAT PROCEDURE,

09:22AM 22   YOUR HONOR.  WE'LL SEE WHETHER THIS WITNESS CAN PROPERLY LAY A

09:22AM 23   FOUNDATION FOR THE EXHIBIT.

09:22AM 24             THE COURT:  HAVE YOU SEEN THE EXHIBIT?

09:22AM 25             MR. BOSTIC:  I HAVE, YES, YOUR HONOR.

09:22AM  1          THE COURT:  OKAY.  GREAT.

09:22AM  2      SCHEDULING?  WILL WE FINISH MR. EDLIN TODAY?

09:22AM  3          MR. BOSTIC:  I THINK THE GOVERNMENT HAS TWO HOURS OR

09:22AM  4  LESS REMAINING WITH THIS WITNESS, SO I THINK WE'LL BE PASSING

09:22AM  5  THE WITNESS AROUND THE TIME OF THE FIRST BREAK.

09:23AM  6          THE COURT:  OKAY.

09:23AM  7          MS. WALSH:  I THINK WE HAVE SEVERAL HOURS OF

09:23AM  8  CROSS-EXAMINATION.  IT MAY BE THREE, IT MAY BE FOUR, BUT I HOPE

09:23AM  9  TO FINISH TODAY.

09:23AM 10          THE COURT:  OKAY.  AND THEN WE HAVE ONE OTHER

09:23AM 11  WITNESS.

09:23AM 12      WILL WE FINISH THAT WITNESS IN OUR HALF DAY IN OUR NEXT

09:23AM 13  SESSION?

09:23AM 14          MR. BOSTIC:  I'LL DEFER TO MR. SCHENK, YOUR HONOR.

09:23AM 15          MR. SCHENK:  YOUR HONOR, I THINK THAT'S UNLIKELY, I

09:23AM 16  THINK, THAT IF WE HAVE THREE HOURS, SAY, GIVE OR TAKE ON

09:23AM 17  FRIDAY.

09:23AM 18      WHEN THIS WITNESS TESTIFIED IN THE HOLMES TRIAL, HE BEGAN

09:23AM 19  THE DAY AT 9:30, AND HE LEFT THE STAND AT 2:00 P.M. WITH TWO,

09:23AM 20  25 MINUTE BREAKS THAT DAY.

09:23AM 21      SO I SUSPECT THAT HIS TESTIMONY WILL CARRY OVER UNTIL THE

09:23AM 22  FOLLOWING TUESDAY.  WE LAST MET AND I CONFERRED WITH HIM THAT

09:23AM 23  HE'S AVAILABLE TO STAY IN TOWN THROUGH NEXT TUESDAY AND FINISH

09:23AM 24  UP HIS TESTIMONY.

09:24AM 25      IF FOR SOME REASON WE COULD NOT MEET NEXT TUESDAY, A

09:24AM 1      STATEMENT THAT I HESITATE TO MAKE, HE WOULD HAVE TO LEAVE TOWN

09:24AM 2      AND WE WOULD HAVE TO CALL SOME OTHER WITNESS OUT OF ORDER AND

09:24AM 3      FINISH HIM LATER.  HE CANNOT STAY IN CALIFORNIA PAST TUESDAY.

09:24AM 4            THE COURT:  I SEE.  OKAY.

09:24AM 5         I'M PAUSING HERE.  WHEN I TELL OUR JURY THAT WE'RE GOING

09:24AM 6      TO BREAK AT NOON, IF THERE'S AN EXPRESSION THAT THEY WILL COME

09:24AM 7      BACK IN THE AFTERNOON -- I KNOW WE TALKED ABOUT THIS, AND I

09:24AM 8      THINK WE ALL AGREED THAT IT DOESN'T SOUND LIKE IT'S SOMETHING

09:24AM 9      THAT WE WANT TO DO -- I SUPPOSE THERE'S A POSSIBILITY THAT WE

09:24AM 10     COULD ASK THE JURY TO COME BACK AT 1:00 O'CLOCK, 2:00 O'CLOCK,

09:24AM 11     SOMETHING LIKE THAT.

09:24AM 12        I DON'T KNOW IF THERE'S ANY INTEREST IN THAT.  I WOULDN'T

09:24AM 13     WANT TO GO TOO LATE.  I THINK IT'S PASSOVER ALSO, AND I

09:24AM 14     WOULDN'T WANT TO GO TOO LATE INTO THE DAY.

09:24AM 15        WITHOUT MAKING ANY INQUIRY, I JUST WANT TO RESPECT THE

09:25AM 16     HOLIDAYS.  SO IT MAY BE THAT WE'LL JUST HAVE TO BREAK AT NOON

09:25AM 17     AND TAKE IT AS IT IS.  SO.  OKAY.

09:25AM 18            MR. SCHENK:  I THINK THAT'S PROBABLY RIGHT.  MAYBE

09:25AM 19     WE DISCUSS FRIDAY MORNING, BUT UNLESS WE WERE CERTAIN THAT WE

09:25AM 20     WERE GOING TO FINISH MR. JHAVERI BY RETURNING ON FRIDAY, IT

09:25AM 21     SEEMS THAT HE WOULD HAVE TO STAY THROUGH TUESDAY ANYWAY.

09:25AM 22            THE COURT:  YES, IT SOUNDS LIKE IT.

09:25AM 23        OKAY.  GREAT.  THANKS VERY MUCH.

09:25AM 24            MS. WALSH:  THANK YOU.

09:25AM 25        (RECESS FROM 9:25 A.M. UNTIL 9:32 A.M.)

09:32AM  1          (JURY IN AT 9:32 A.M.)

09:32AM  2              THE COURT:  PLEASE BE SEATED.  THANK YOU FOR YOUR

09:32AM  3    COURTESY.  GOOD MORNING EVERYONE.

09:32AM  4         WE ARE BACK ON THE RECORD IN THE BALWANI MATTER.

09:32AM  5         ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

09:32AM  6         OUR JURY AND ALTERNATES ARE PRESENT.

09:33AM  7         GOOD MORNING EVERYONE.  THANK YOU FOR YOUR PATIENCE THIS

09:33AM  8    MORNING.  I NEEDED SOME HELP FROM THESE LAWYERS ABOUT A

09:33AM  9    QUESTION, AND THAT'S WHY WE'RE STARTING A LITTLE BIT LATE.

09:33AM  10         BEFORE WE GO FURTHER, LET ME ASK THAT QUESTION.

09:33AM  11         DURING OUR BREAK, DID ANY OF YOU HAVE CAUSE TO VIEW, SEE,

09:33AM  12    READ OR DISCUSS ANYTHING TO DO WITH THIS CASE?

09:33AM  13         IF SO, PLEASE RAISE YOUR HAND.

09:33AM  14         THANK YOU.  I SEE NO HANDS.

09:33AM  15         I'D LIKE TO TAKE A MOMENT TO TALK TO YOU ABOUT OUR

09:33AM  16    SCHEDULE.

09:33AM  17         WE'LL GO TODAY UNTIL 4:00 O'CLOCK.

09:33AM  18         FRIDAY WE WILL BREAK AT NOON, AND WE WILL NOT BE IN

09:33AM  19    SESSION THEREAFTER.  WE WILL TAKE OUR WEEKEND RECESS AT NOON

09:33AM  20    THIS FRIDAY.

09:33AM  21         WE HAVE SOME OTHER SCHEDULE CHANGES THAT WE'LL PROVIDE FOR

09:33AM  22    YOU.

09:33AM  23         I JUST WANT TO BE TRANSPARENT WITH YOU.  I'M CONCERNED

09:33AM  24    ABOUT OUR SCHEDULE THAT WE GAVE YOU EARLIER.  AND ONE OF THE

09:33AM  25    THINGS THAT I WAS TALKING TO THE LAWYERS ABOUT IS TRYING TO

2503

09:34AM  1    CAPTURE SOME ADDITIONAL TIME FOR THE TRIAL.  THAT MAY MEAN

09:34AM  2    EXTENDING OUR DAYS AND ALSO FINDING ADDITIONAL DAYS ON A MONDAY

09:34AM  3    OR A THURSDAY WHERE WE CAN HAVE SOME SESSIONS.

09:34AM  4         WE'RE GOING TO WORK ON GIVING YOU A PROJECTED SCHEDULE

09:34AM  5    SUCH THAT YOU CAN CHECK YOUR SCHEDULES TO SEE IF THAT WOULD

09:34AM  6    ACCOMMODATE TO CAPTURE EVEN AN EXTRA COUPLE OF HOURS.

09:34AM  7         I THINK -- I DO WANT TO KEEP ON OUR SCHEDULE, THAT IS, THE

09:34AM  8    TIMELINE WHEN WE COMPLETE EVIDENCE.  TO DO THAT, I THINK WE'RE

09:34AM  9    GOING TO NEED TO MAKE SOME ADJUSTMENTS, SO I APPRECIATE YOUR

09:34AM  10   CONTINUED COOPERATION.  WE'LL GIVE YOU THAT, AND WE'LL WORK ON

09:34AM  11   THAT, AND GIVE YOU THOSE DATES THAT WE'RE GOING TO ASK YOU TO

09:34AM  12   LOOK AT FOR THAT PURPOSE.

09:34AM  13        ANOTHER THING THAT WAS BROUGHT TO MY ATTENTION WAS THE

09:34AM  14   FACT THAT I'M INFORMED THAT YOU HAVE COLLECTIVELY DISCUSSED THE

09:34AM  15   FACT THAT YOU WOULD ALL LIKE TO MOVE INTO THE FIRST CLASS

09:35AM  16   SEATING HERE IN THESE LOVELY SEATS, AND I'M INFORMED THROUGH

09:35AM  17   MS. ROBINSON THAT YOU'VE AGREED THAT THAT'S SOMETHING THAT YOU

09:35AM  18   WOULD LIKE TO DO.

09:35AM  19        IS THERE ANY OBJECTION TO THAT?  I DON'T SEE ANY HANDS TO

09:35AM  20   THAT.

09:35AM  21        OKAY.  WE WON'T DO THAT NOW, BUT AT OUR NEXT BREAK, WE'LL

09:35AM  22   TRY TO COORDINATE THAT AND SEE IF WE CAN MOVE EVERYBODY UP

09:35AM  23   ACCORDING TO THEIR NUMBERS.

09:35AM  24        WE MAY STILL HAVE -- I THINK THE MATH WILL WORK OUT WHERE

09:35AM  25   ONE INDIVIDUAL MIGHT BE SEATED OUTSIDE.  WE'LL PROBABLY HAVE

09:35AM 1    THAT OUTSIDE SEAT ON THIS SIDE CLOSER TO THE WITNESS STAND, BUT

09:35AM 2    THAT WOULD CERTAINLY RELIEVE THOSE IN THE BLEACHER SEATS IN THE

09:35AM 3    FRONT ROW THERE AND GET THEM BACK INTO THE MIX HERE.

09:35AM 4        I WAS JUST HANDED A NOTE AND THIS TELLS ME THAT ONE OR TWO

09:36AM 5    JURORS HAVE BEEN ADVISED TO WEAR SUNSHADES DUE TO LIGHTS AND

09:36AM 6    SCREENS EYE STRAINS AND HEADACHES.

09:36AM 7        IF THIS IS RELATED TO THE LIGHTING IN THE COURTROOM HERE,

09:36AM 8    WE HAVE LED LIGHTS IN THIS COURTROOM.  THESE ARE RELATIVELY NEW

09:36AM 9    LIGHTS THAT WERE PUT IN ABOUT THREE YEARS AGO, I THINK.  I JUST

09:36AM 10   WANT TO SAY IT IS A MUCH MORE ENHANCED LIGHTING, AND THE

09:36AM 11   LIGHTING THAT THESE REPLACED, THE COURTROOM, IT WAS VERY DIM,

09:36AM 12   AND IT LOOKED LIKE MAYBE THE BASEMENT OF A LIBRARY IN A

09:36AM 13   UNIVERSITY OR SOMETHING.  IT WAS QUITE DIM IN HERE.

09:36AM 14       SO IT IS A GREAT ENHANCEMENT.  I'M SORRY TO HEAR THAT IT

09:36AM 15   IS CAUSING SOME DIFFICULTIES, BUT IF YOU HAVE TO DO THAT TO

09:36AM 16   LOOK AT THE SCREENS, THAT'S -- I JUST WANT TO SAY THAT.

09:37AM 17       COUNSEL, ANY COMMENT ON THAT?

09:37AM 18           MR. SCHENK:  NO, YOUR HONOR.

09:37AM 19           MR. COOPERSMITH:  NOTHING, YOUR HONOR.

09:37AM 20           THE COURT:  OKAY.  THANK YOU.

09:37AM 21       ANY COMMENT ON THE JURY MOVING BACK INTO THE FULL

09:37AM 22   COMPLEMENT OF THE JURY BOX?

09:37AM 23           MR. SCHENK:  NO, YOUR HONOR.

09:37AM 24           MS. WALSH:  NO, YOUR HONOR.

09:37AM 25           THE COURT:  OKAY.  THANK YOU.

09:37AM  1          THANK YOU VERY MUCH, FOLKS.  THANK YOU FOR THAT.

09:37AM  2          DO WE HAVE THE WITNESS, MR. EDLIN HERE?

09:37AM  3              MR. BOSTIC:  YES, YOUR HONOR.

09:37AM  4              THE COURT:  GREAT.

09:37AM  5          GOOD MORNING, SIR.  IF YOU WOULD RESUME YOUR SEAT.  MAKE

09:37AM  6  YOURSELF COMFORTABLE AGAIN.

09:37AM  7          YOU CAN REMOVE YOUR MASK WHILE YOU TESTIFY.

09:37AM  8          WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:38AM  9  AGAIN, PLEASE.

09:38AM  10             THE WITNESS:  DANIEL EDLIN.

09:38AM  11             THE COURT:  THANK YOU, SIR.  I'LL REMIND YOU THAT

09:38AM  12  YOU'RE STILL UNDER OATH.

09:38AM  13             THE WITNESS:  THANK YOU, YOUR HONOR.

09:38AM  14      **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS PREVIOUSLY**

09:38AM  15  **SWORN.)**

09:38AM  16                  **DIRECT EXAMINATION (RESUMED)**

09:38AM  17  BY MR. BOSTIC:

09:38AM  18  Q.   GOOD MORNING, MR. EDLIN.

09:38AM  19  A.   GOOD MORNING.

09:38AM  20  Q.   DO YOU RECALL WHEN WE LEFT OFF LAST WEEK WE WERE LOOKING

09:38AM  21  AT SOME COMMUNICATIONS WHERE MS. HOLMES AND MR. BALWANI WERE

09:38AM  22  RECEIVING SOME ADVICE ABOUT CLAIMS ON THE THERANOS WEBSITE?

09:38AM  23  A.   I DO.

09:38AM  24  Q.   LET'S GO BACK TO THAT JUST BRIEFLY.  CAN WE LOOK AT

09:38AM  25  EXHIBIT 3981.

09:38AM  1       THIS IS ALREADY ADMITTED.  MAY I PUBLISH, YOUR HONOR?

09:38AM  2             THE COURT:  YES.

09:38AM  3             MR. BOSTIC:  MS. WACHS, LET'S ZOOM IN ON THE BOTTOM

09:39AM  4   HALF OF THIS PAGE.

09:39AM  5   Q.   MR. EDLIN, DO YOU REMEMBER THIS EMAIL FORWARDING TO

09:39AM  6   MS. HOLMES SOME COMMENTS FROM HYMAN PHELPS AND SOMEONE NAMED

09:39AM  7   JAIME WOLSZON?

09:39AM  8   A.   RIGHT.

09:39AM  9   Q.   AND IF WE CAN ZOOM OUT AND CAPTURE THE TOP HALF OF THE

09:39AM 10   PAGE.

09:39AM 11       DO YOU SEE THAT ON SEPTEMBER 6TH, 2013, MS. HOLMES

09:39AM 12   FORWARDED THIS TO CHRISTIAN HOLMES, HER BROTHER, AND TO

09:39AM 13   SUNNY BALWANI; CORRECT?

09:39AM 14   A.   CORRECT.

09:39AM 15   Q.   AND CAN YOU REMIND US APPROXIMATELY WHEN DID THERANOS HAVE

09:39AM 16   ITS PUBLIC LAUNCH WHEN IT STARTED OFFERING SERVICES TO THE

09:39AM 17   PUBLIC?

09:39AM 18   A.   ABOUT A WEEK AFTER THIS EMAIL.

09:39AM 19   Q.   LET'S GO TO PAGE 2 OF THIS EXHIBIT.  IF WE CAN ZOOM IN ON

09:39AM 20   THE TOP HALF.

09:39AM 21       MR. EDLIN, DO YOU RECALL SEEING ADVICE LIKE WHAT APPEARS

09:40AM 22   ABOUT TWO-THIRDS DOWN THIS SELECTION WHERE IT SAYS, "REPLACE

09:40AM 23   'HIGHEST QUALITY' WITH 'HIGH QUALITY'"?

09:40AM 24   A.   YES.

09:40AM 25   Q.   AND THE SECOND BULLET DOWN FROM THE TOP IT READS, "FOR A

09:40AM   1      SIMILAR REASON," AS MENTIONED ABOVE, "REPLACE 'FULL RANGE' WITH

09:40AM   2      'BROAD RANGE.'"

09:40AM   3           DO YOU SEE THAT?

09:40AM   4      A.   I DO.

09:40AM   5      Q.   AND LET'S LOOK AT THE BOTTOM HALF OF THIS PAGE.

09:40AM   6           AND DO YOU SEE THAT THE THIRD UP FROM THE BOTTOM INCLUDES

09:40AM   7      THE ADVICE, "REPLACE 'HIGHEST LEVELS OF ACCURACY' WITH 'HIGH

09:40AM   8      LEVELS OF ACCURACY'"?

09:40AM   9      A.   YES.

09:40AM   10     Q.   I'D LIKE YOU TO LOOK AT ANOTHER DOCUMENT.  AND I'LL BE

09:40AM   11     HANDING YOU SOME ADDITIONAL MATERIALS TODAY.

09:40AM   12          MAY I APPROACH, YOUR HONOR?

09:40AM   13               THE COURT:  YES.

09:40AM   14               MR. BOSTIC:  (HANDING.)

09:41AM   15     Q.   MR. EDLIN, I'VE HANDED YOU WHAT HAS BEEN MARKED AS 5805.

09:41AM   16          DO YOU HAVE THAT IN FRONT OF YOU?

09:41AM   17     A.   YES.

09:41AM   18     Q.   AND HAVE YOU REVIEWED THIS DOCUMENT BEFORE?

09:41AM   19     A.   YES.

09:41AM   20     Q.   AND DO YOU RECOGNIZE WHAT IT IS?

09:41AM   21     A.   I DO.

09:41AM   22     Q.   WHAT IS 5805?

09:41AM   23     A.   THIS IS CONSISTENT WITH MY RECOLLECTION OF THE THERANOS

09:41AM   24     WEBSITE.

09:41AM   25     Q.   OKAY.  AND CAN YOU TELL US APPROXIMATELY WHAT TIME

09:41AM  1    PERIOD -- WELL, LET ME ASK, IN YOUR ROLE AT THERANOS, DID YOU

09:41AM  2    HAVE OCCASION TO REVIEW THE THERANOS WEBSITE?

09:41AM  3    A.   YES.

09:41AM  4    Q.   AND FOR WHAT REASON DID YOU REVIEW THE THERANOS WEBSITE

09:42AM  5    WHEN YOU WERE WORKING AT THE COMPANY?

09:42AM  6    A.   WELL, IT WAS THE COMPANY'S WEBSITE, SO I OFTENTIMES

09:42AM  7    CHECKED IT.  SOMETIMES I WAS PART OF A TEAM THAT WAS INVOLVED

09:42AM  8    WITH MAKING UPDATES TO THE WEBSITE, AND IN THOSE INSTANCES I

09:42AM  9    CHECKED THE WEBSITE AS WELL.

09:42AM  10   Q.   AND IN THE COURSE OF THAT, DID YOU BECOME GENERALLY

09:42AM  11   FAMILIAR WITH THE CONTENT OF THE WEBSITE?

09:42AM  12   A.   YES.

09:42AM  13   Q.   AND DOES EXHIBIT 5805 REFLECT THAT CONTENT?  IS IT

09:42AM  14   CONSISTENT WITH YOUR RECOLLECTION?

09:42AM  15   A.   IT IS.

09:42AM  16        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5805.

09:42AM  17        MS. WALSH:  NO OBJECTION.

09:42AM  18        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:42AM  19   (GOVERNMENT'S EXHIBIT 5805 WAS RECEIVED IN EVIDENCE.)

09:42AM  20        MR. BOSTIC:  AND, YOUR HONOR, AS TO THIS DOCUMENT,

09:42AM  21   I'VE RUN THIS BY THE DEFENSE, WE WOULD LIKE TO PUBLISH A NATIVE

09:42AM  22   VERSION OF THIS PDF.  IT'S THE SAME CONTENT, BUT IT WILL BE

09:43AM  23   MORE LEGIBLE ON THE SCREEN.

09:43AM  24        THE COURT:  THAT'S FINE.

09:43AM  25   BY MR. BOSTIC:

09:43AM 1      Q.   MR. EDLIN, DO YOU SEE HERE THAT THIS IS A VERSION OF THE

09:43AM 2      THERANOS WEBSITE FROM THE WAYBACK MACHINE AS INDICATED AT THE

09:43AM 3      TOP OF THE PAGE?

09:43AM 4           DO YOU SEE THAT?

09:43AM 5      A.   YES.

09:43AM 6      Q.   AND AT THE UPPER RIGHT HAND OF THE PAGE THERE'S A DATE

09:43AM 7      INDICATED FEBRUARY 8TH, 2014.

09:43AM 8           DO YOU SEE THAT?

09:43AM 9      A.   I DO.

09:43AM 10     Q.   IS THERE ANYTHING ABOUT THE APPEARANCE OF THIS WEBSITE

09:43AM 11     THAT IS CONSISTENT WITH THAT DATE BASED ON YOUR RECOLLECTION?

09:43AM 12     A.   WELL, I CAN SEE THAT THE THERANOS LOGO IS A VERSION THAT I

09:43AM 13     BELIEVE WAS THE LOGO AT THE TIME.  I KNOW THAT IT WAS CHANGED

09:43AM 14     AT SOME POINT LATER ON.

09:43AM 15     Q.   AND THE VERSION OF THE LOGO THAT WE'RE LOOKING AT IS

09:43AM 16     CONSISTENT WITH THE EARLIER VERSION OF THE LOGO?

09:44AM 17     A.   THERE WAS A VERSION OF THE LOGO WHEN I FIRST JOINED THE

09:44AM 18     COMPANY IN 2011, AND THEN IT CHANGED TO THIS VERSION, AND THEN

09:44AM 19     THERE WAS A THIRD.

09:44AM 20     Q.   LET'S LOOK AT SOME OF THE CONTENT ON THE THERANOS WEBSITE

09:44AM 21     AT THIS TIME.

09:44AM 22          IF WE CAN ZOOM OUT TO CAPTURE MORE OF THIS PAGE, AND THEN

09:44AM 23     UNDER WHERE IT SAYS, "THE LAB TEST, REINVENTED," LET'S ZOOM IN

09:44AM 24     ON THAT LANGUAGE.

09:44AM 25          AND, MR. EDLIN, DO YOU SEE -- AND JUST BEAR WITH US.

09:44AM  1        DO YOU SEE AT THE LOWER LEFT-HAND CORNER OF THE PAGE IT

09:44AM  2   SAYS, "THE LAB TEST, REINVENTED"?

09:44AM  3        AND IT READS, "NO BIG NEEDLES.  NO ENDLESS WAITING.  WE'VE

09:44AM  4   BUILT A WHOLE NEW APPROACH TO GETTING YOU ANSWERS"?

09:44AM  5   A.   YES.

09:44AM  6   Q.   AND LET'S GO TO THE SECOND PAGE OF THIS WEBSITE.

09:45AM  7        LET'S SEE.  A LITTLE FURTHER DOWN.  THERE'S A SECTION WITH

09:45AM  8   A HEADING "ONE DROP.  A WORLD OF ANSWERS."

09:45AM  9        CAN WE MAKE THAT A LITTLE LARGER, MS. WACHS.

09:45AM 10        DO YOU SEE, MR. EDLIN, THERE'S TEXT THERE THAT SAYS, "OUR

09:45AM 11   LABORATORY CAN PRECISELY ANALYZE TINY SAMPLES.  A FEW DROPS ARE

09:45AM 12   ALL WE NEED TO PERFORM MOST TESTS.  SO NOW, YOU CAN HAVE YOUR

09:45AM 13   LABS -- FROM BLOOD, URINE, FLUIDS, AND MORE -- DONE QUICKLY,

09:45AM 14   EASILY, AND ACCURATELY."

09:45AM 15        DO YOU SEE THAT?

09:45AM 16   A.   YES.

09:45AM 17   Q.   LET'S GO A LITTLE FURTHER DOWN.  LET'S SEE.  UNDER A "A

09:45AM 18   FULL RANGE OF TESTS," DO YOU SEE THERE'S A SECTION THAT SAYS "A

09:45AM 19   FULL RANGE OF TESTS.  A FRACTION OF THE COST"?

09:45AM 20   A.   YES.

09:45AM 21   Q.   AND THEN THERE'S TEXT THAT SAYS, "WE OFFER A FULL RANGE OF

09:45AM 22   LABORATORY TESTS, FROM COMMON PANELS TO SPECIALIZED TESTS.  ALL

09:45AM 23   WITH SPEED AND THE HIGHEST LEVELS OF QUALITY."

09:46AM 24        DO YOU SEE THAT?

09:46AM 25   A.   YES.

09:46AM   1    Q.   AND I WANT TO ASK YOU ABOUT THAT PHRASE "HIGHEST LEVELS OF

09:46AM   2    QUALITY."

09:46AM   3         FIRST OF ALL, DO YOU RECALL SEEING THAT PHRASE IDENTIFIED

09:46AM   4    ON THE DOCUMENT WITH ADVICE THAT WE WERE JUST LOOKING AT

09:46AM   5    BEFORE?

09:46AM   6    A.   YES.

09:46AM   7    Q.   WE ALSO SAW ON THAT DOCUMENT MENTION OF THE PHRASE

09:46AM   8    "HIGHEST LEVELS OF ACCURACY."

09:46AM   9         DO YOU RECALL THAT?

09:46AM  10    A.   YES.

09:46AM  11    Q.   DO YOU RECALL ANY DISCUSSIONS WHEN YOU WERE AT THERANOS

09:46AM  12    ABOUT THE TERM "QUALITY" VERSUS THE TERM "ACCURACY"?

09:46AM  13    A.   VAGUELY.

09:46AM  14    Q.   WHAT DO YOU REMEMBER ABOUT THAT?

09:46AM  15    A.   I REMEMBER THERE WERE DISCUSSIONS ABOUT WHAT WORDING TO

09:46AM  16    USE TO DESCRIBE AFTER SEEING "QUALITY."

09:46AM  17    Q.   AND IN THOSE DISCUSSIONS WAS THERE A DIFFERENCE BETWEEN

09:46AM  18    HOW QUALITY WAS BEING USED AND HOW ACCURACY WAS BEING USED?

09:46AM  19    A.   I DON'T RECALL.

09:46AM  20    Q.   DURING YOUR TIME AT THERANOS AND IN THIS CONTEXT, WAS

09:46AM  21    THERE A MEANING FOR THE TERM "QUALITY" THAT MEANT SOMETHING

09:47AM  22    OTHER THAN ACCURACY AND RELIABILITY OF TESTS?

09:47AM  23              MS. WALSH:  OBJECTION.  LEADING.

09:47AM  24              THE COURT:  SUSTAINED.

09:47AM  25    BY MR. BOSTIC:

09:47AM   1    Q.   MR. EDLIN, DID THE TERM "QUALITY" AT THERANOS, IN YOUR

09:47AM   2    EXPERIENCE, HAVE A SPECIAL OR UNIQUE MEANING?

09:47AM   3    A.   NOT THAT I WAS AWARE OF.

09:47AM   4    Q.   AND AS IT WAS USED IN THIS CONTEXT, WAS IT EQUIVALENT TO

09:47AM   5    OR WAS IT DIFFERENT FROM ACCURACY AND RELIABILITY?

09:47AM   6    A.   I THINK IT WAS SIMILAR.

09:47AM   7    Q.   LET'S GO TO PAGE 3 OF THE EXHIBIT.  LET'S SEE.

09:47AM   8         THERE'S A HEADING THAT READS, "A FEW DROPS IS ALL IT

09:48AM   9    TAKES."

09:48AM   10        DO YOU SEE THAT?

09:48AM   11   A.   YES.

09:48AM   12   Q.   AND THERE THE WEBSITE READS, "THERANOS'S PATENTED

09:48AM   13   TECHNOLOGY CAN ANALYZE SAMPLES AS SMALL AS 1/1,000 THE SIZE OF

09:48AM   14   A TYPICAL BLOOD DRAW.  OUR TESTS ARE CERTIFIED IN OUR CLIA

09:48AM   15   LABORATORY AND COVER A FULL RANGE FROM BLOOD, URINE, AND OTHER

09:48AM   16   SAMPLES.  IT'S FAST, EASY, AND THE HIGHEST LEVEL OF QUALITY."

09:48AM   17        SO WE SEE AGAIN THAT "HIGHEST LEVEL OF QUALITY" LANGUAGE

09:48AM   18   APPEARING?

09:48AM   19   A.   RIGHT.

09:48AM   20   Q.   AND LET'S GO DOWN ON THE SAME PAGE.

09:48AM   21        I THINK THERE'S A SECTION THAT BEGINS "HIGH LEVELS OF

09:48AM   22   PRECISION."

09:48AM   23        DO YOU SEE THAT?

09:48AM   24   A.   YES.

09:48AM   25   Q.   AND THERE THE TEXT SAYS, "BY SYSTEMATICALLY CONTROLLING

09:48AM  1    AND STANDARDIZING OUR MICRO-PROCESSES, WE OFFER TESTS WITH HIGH

09:48AM  2    LEVELS OF PRECISION."

09:48AM  3         DO YOU SEE THAT?

09:48AM  4    A.   YES.

09:48AM  5    Q.   AND THEN IT SAYS, "WE'VE ALSO AUTOMATED OUR PRE- AND

09:49AM  6    POST-ANALYTIC PROCESSES, MINIMIZING HUMAN PROCESSING -- THE

09:49AM  7    CAUSE OF THE MAJORITY OF LAB-TEST ERRORS."

09:49AM  8         DID I READ THAT CORRECTLY?

09:49AM  9    A.   YES.

09:49AM 10    Q.   AND WHEN YOU WERE AT THE COMPANY, DID YOU HAVE A BASIS TO

09:49AM 11    KNOW WHETHER CLAIMS LIKE THIS WERE TRUE OR FALSE?

09:49AM 12    A.   I HAD NO BASIS TO KNOW, BUT I HAD NO REASON TO DOUBT THAT

09:49AM 13    THE CLAIMS WERE ACCURATE.

09:49AM 14    Q.   LET'S GO TO PAGE 6 NEXT.

09:49AM 15         AND ACTUALLY, GOING BACK UP TO THAT FIRST BLOCK OF TEXTS

09:49AM 16    UNDER "INNOVATION MEETS ACCESSIBILITY."

09:49AM 17         DO YOU SEE HERE THE WEBSITE CLAIMS THAT "BECAUSE WE

09:49AM 18    BELIEVE EVERYONE DESERVES ACCESS TO THE BEST TECHNOLOGY, THE

09:49AM 19    BEST SCIENCE, AND THE BEST TOOLS TO HELP THEM AND THEIR DOCTOR

09:49AM 20    KNOW MORE ABOUT THEIR HEALTH"?

09:49AM 21    A.   I SEE THAT, YES.

09:50AM 22    Q.   LET'S GO TO PAGE 21 NEXT.

09:50AM 23         AND UNDER THAT SECTION THAT SAYS, "WELCOME TO THERANOS,"

09:50AM 24    DO YOU SEE THERE'S LANGUAGE THAT SAYS, "THERANOS'S LABORATORY

09:50AM 25    CAN ANALYZE SMALLER SAMPLES THAN PREVIOUSLY POSSIBLE, WITH

09:50AM  1    SPEED AND THE HIGHEST LEVELS OF ACCURACY"?

09:50AM  2        DO YOU SEE THAT?

09:50AM  3    A.   YES.

09:50AM  4    Q.   THAT LANGUAGE, "THE HIGHEST LEVELS OF ACCURACY," IS THAT

09:50AM  5    THE SAME LANGUAGE THAT WE SAW MS. HOLMES AND MR. BALWANI BEING

09:50AM  6    ADVISED AGAINST USING EARLIER?

09:50AM  7    A.   I BELIEVE SO.

09:50AM  8    Q.   AND AGAIN, IN THE BOTTOM OF THAT SECTION, DO YOU SEE

09:50AM  9    THERE'S ANOTHER REFERENCE TO "THE HIGHEST-QUALITY LAB TESTING"?

09:50AM 10    A.   YES.

09:50AM 11    Q.   OKAY.  FINALLY, LET'S GO TO PAGE 22.  IF WE CAN MOVE OVER

09:51AM 12    A LITTLE BIT.

09:51AM 13        SO UNDER THIS BLOCK OF TEXT THERE'S A HEADING "ONE TINY

09:51AM 14    DROP.  THOUSANDS OF ANSWERS."

09:51AM 15        DO YOU SEE THAT?

09:51AM 16    A.   YES.

09:51AM 17    Q.   AND THE LANGUAGE HERE SAYS, "THERANOS CAN PERFORM A FULL

09:51AM 18    RANGE OF TESTS ON SAMPLES AS SMALL AS A FEW TINY DROPS."

09:51AM 19        DO YOU SEE THAT?

09:51AM 20    A.   YES.

09:51AM 21    Q.   AND THEN SKIPPING DOWN A LITTLE BIT.  DO YOU SEE THERE'S

09:51AM 22    LANGUAGE THAT SAYS, "AND WE PROVIDE THE HIGHEST LEVEL OF

09:51AM 23    OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN BOTH OUR PRE- AND

09:51AM 24    POST-ANALYTIC PROCESSES, TO REALIZE THE HIGHEST LEVEL OF

09:51AM 25    ACCURACY AND PRECISION"?

EDLIN DIRECT BY MR. BOSTIC (RES.)

09:51AM  1          DO YOU SEE THAT?

09:51AM  2     A.  YES.

09:51AM  3     Q.  OKAY.  YOU CAN PUT THAT EXHIBIT ASIDE.  THANK YOU.

09:51AM  4          BESIDES THE PUBLIC THERANOS WEBSITE, DID THE COMPANY ALSO

09:52AM  5     MARKET TO PATIENTS USING BROCHURES AND OTHER MARKETING

09:52AM  6     MATERIALS?

09:52AM  7     A.  YES.

09:52AM  8     Q.  AND DID YOU HAVE ANY ROLE IN CONNECTION WITH DEVELOPING

09:52AM  9     AND REVIEWING THE CONTENT FOR THOSE MATERIALS?

09:52AM 10     A.  I HAD A ROLE IN FACILITATING THE REVIEW AND APPROVAL AND

09:52AM 11     THE INVESTMENT OF THOSE MATERIALS.

09:52AM 12     Q.  DESCRIBE THAT.  WHAT DID YOUR ROLE ACTUALLY REQUIRE YOU TO

09:52AM 13     DO?

09:52AM 14     A.  IN MY ROLE I WORKED WITH TBWACHIAT/DAY.  IN PARTNERSHIP

09:52AM 15     WITH THEIR ACCOUNT MANAGERS CHIAT/DAY DEVELOPED CONTENT, AND I

09:52AM 16     MADE SURE THAT THAT CONTENT WAS REVIEWED AND APPROVED BY SUNNY

09:52AM 17     AND ELIZABETH IN A TIMELY FASHION, AND THEN SENT BACK TO

09:52AM 18     CHIAT/DAY.

09:52AM 19     Q.  DID YOU COME TO UNDERSTAND IN THAT ROLE WHAT KIND OF

09:52AM 20     APPROVAL WAS NECESSARY FOR THAT MARKETING CONTENT?

09:52AM 21     A.  ELIZABETH AND SUNNY'S APPROVAL.

09:53AM 22     Q.  DID YOU EVER OBSERVE SITUATIONS WHERE -- FIRST OF ALL, LET

09:53AM 23     ME ASK JUST SO IT'S CLEAR, WHAT WAS CHIAT/DAY?

09:53AM 24     A.  A MARKETING AND ADVERTISING AGENCY THAT THERANOS WORKED

09:53AM 25     WITH.

09:53AM  1     Q.   INDEPENDENT FROM THERANOS?

09:53AM  2     A.   YES.

09:53AM  3     Q.   DID YOU EVER OBSERVE AN INSTANCE WHERE CHIAT/DAY WAS ABLE

09:53AM  4     TO MAKE THE DECISION ON ITS OWN ABOUT WHO WOULD APPEAR IN ITS

09:53AM  5     MARKETING DOCUMENTATION?

09:53AM  6     A.   NO.  IT REQUIRES APPROVAL.

09:53AM  7     Q.   AND IN REQUIRING APPROVAL FROM THERANOS, WAS THERE ANYONE

09:53AM  8     AT THE COMPANY BESIDES MS. HOLMES AND MR. BALWANI WHO HAD THE

09:53AM  9     AUTHORITY TO PROVIDE THAT APPROVAL FOR THE MARKETING MATERIALS?

09:53AM 10     A.   NO.

09:53AM 11     Q.   HOW ABOUT YOU, WERE YOU EXERCISING YOUR JUDGMENT IN

09:53AM 12     DECIDING WHAT THESE DOCUMENTS WOULD SAY?

09:53AM 13     A.   NO.

09:53AM 14     Q.   IN DOING THAT WORK, DID YOU BECOME GENERALLY FAMILIAR WITH

09:54AM 15     THE CONTENT OF THE BROCHURES AND MARKETING MATERIALS?

09:54AM 16     A.   I DID.

09:54AM 17     Q.   OKAY.  I'D LIKE TO SHOW YOU ANOTHER DOCUMENT.

09:54AM 18          MAY I APPROACH, YOUR HONOR?

09:54AM 19               THE COURT:  YES.

09:54AM 20               MR. BOSTIC:  (HANDING.)

09:54AM 21     Q.   MR. EDLIN, DO YOU HAVE EXHIBIT 5804 IN FRONT OF YOU?

09:54AM 22     A.   YES.

09:54AM 23     Q.   AND IS 5804 A 2013 SEPTEMBER 9TH EMAIL FROM

09:54AM 24     CHRISTIAN HOLMES TO INDIVIDUALS AT WALGREENS?

09:55AM 25     A.   YES.

09:55AM  1    Q.   DO YOU RECOGNIZE THE NAMES OF THE INDIVIDUALS AT

09:55AM  2    WALGREENS?

09:55AM  3    A.   I RECOGNIZE ONE NAME.

09:55AM  4    Q.   AND IS THAT NAME A NAME OF SOMEONE THAT YOU HAD CONTACT

09:55AM  5    WITH IN THIS ROLE AT THERANOS WHEN YOU WORKED THERE?

09:55AM  6    A.   YES.

09:55AM  7    Q.   AND CAN YOU DESCRIBE, IN CONNECTION WITH THE BROCHURE AND

09:55AM  8    MARKETING MATERIALS THAT WE'RE TALKING ABOUT, WHAT WAS

09:55AM  9    CHRISTIAN HOLMES'S ROLE?

09:55AM 10    A.   CHRISTIAN WAS THE TEAM LEAD FOR THE PRODUCT MANAGEMENT

09:55AM 11    TEAM, AND HE WAS THE MAIN POINT OF CONTACT WHO INTERFACED WITH

09:55AM 12    WALGREENS.

09:55AM 13    Q.   AND I'LL ASK YOU TO LOOK AT PAGE 3 OF THE EXHIBIT, PLEASE.

09:56AM 14         TELL ME IF YOU RECOGNIZE THE DOCUMENT THAT STARTS AT

09:56AM 15    PAGE 3?

09:56AM 16    A.   I DO.

09:56AM 17    Q.   WHAT IS IT?

09:56AM 18    A.   IT IS A MECHANICAL FOR THE BROCHURE, PATIENT BROCHURE.

09:56AM 19    Q.   AND WHAT DOES THAT MEAN, "A MECHANICAL"?

09:56AM 20    A.   IT'S ESSENTIALLY A DRAFT OF THE BROCHURE BEFORE IT GETS

09:56AM 21    PRINTED.

09:56AM 22              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5804.

09:56AM 23              MS. WALSH:  OBJECTION, YOUR HONOR.  HEARSAY.

09:56AM 24         THIS WITNESS IS NOT ON THIS EMAIL, AND IT CONTAINS HEARSAY

09:56AM 25    WITHIN.

09:56AM 1          MR. BOSTIC:  SO, YOUR HONOR, THE PARTIES'

09:56AM 2    STIPULATION COVERS THIS DOCUMENT AS TO AUTHENTICATION, AND I

09:56AM 3    BELIEVE THIS WITNESS HAS LAID A FOUNDATION FOR ITS ADMISSION.

09:56AM 4          THE COURT:  ALL RIGHT.  THANK YOU.  I'LL OVERRULE

09:56AM 5    THE OBJECTION.  THIS IS ADMITTED.

09:56AM 6          (GOVERNMENT'S EXHIBIT 5804 WAS RECEIVED IN EVIDENCE.)

09:57AM 7          MR. BOSTIC:  MAY WE PUBLISH, YOUR HONOR?

09:57AM 8          THE COURT:  YES.

09:57AM 9          MR. BOSTIC:  IF WE CAN DISPLAY 5804.

09:57AM 10      I THINK WE NEED TO RESET THE SYSTEM PERHAPS.

09:57AM 11          THE CLERK:  SURE.

09:57AM 12      (PAUSE IN PROCEEDINGS.)

09:58AM 13          MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

09:58AM 14          THE COURT:  YES.

09:58AM 15      (PAUSE IN PROCEEDINGS.)

09:58AM 16          MR. BOSTIC:  SO I THINK WE'RE DISPLAYING IT, BUT

09:58AM 17    IT'S NOT COMING UP ON THE SCREEN FOR SOME REASON.

09:58AM 18          THE CLERK:  DO YOU WANT TO USE THE ELMO?

09:58AM 19          MR. BOSTIC:  WE CAN.

09:58AM 20      SO, YOUR HONOR, I'LL TRY DISPLAYING THIS ON THE ELMO, AND

09:58AM 21    WE'LL SEE IF THE RESOLUTION IS GOOD ENOUGH.

09:58AM 22          THE COURT:  SURE.

09:58AM 23    BY MR. BOSTIC:

09:58AM 24    Q.  FIRST OF ALL, MR. EDLIN, DO YOU SEE THAT WE'RE LOOKING AT

09:58AM 25    AN EMAIL FROM CHRISTIAN HOLMES TO INDIVIDUALS AT WALGREENS?

09:58AM  1      A.   YES.

09:58AM  2      Q.   AND DO YOU SEE THAT THE TEXT OF HIS EMAIL SAYS, "ATTACHED

09:58AM  3      IS THE UPDATED BROCHURE MECHANICAL."

09:59AM  4           AND THEN IT SAYS, "PLEASE USE THIS VERSION FOR ADDITIONAL

09:59AM  5      ROUNDS OF BROCHURES TO BE DELIVERED TO STORES, AND HOPEFULLY IN

09:59AM  6      THE NEAR TERM."

09:59AM  7           IT SAYS, "WE WENT AHEAD AND PRINTED A FEW HUNDRED OF THESE

09:59AM  8      TO PUT IN THE STORES UNTIL THE NEW BATCH ARRIVES FROM YOUR

09:59AM  9      END."

09:59AM  10          DO YOU SEE THAT LANGUAGE?

09:59AM  11     A.   YES.

09:59AM  12     Q.   OKAY.  LET'S SEE IF WE CAN CAPTURE THE CONTENT.

09:59AM  13          DO YOU SEE WHAT IS DISPLAYED ON THE SCREEN NOW?

09:59AM  14     A.   YES.

09:59AM  15     Q.   AND IS THIS WHAT YOU IDENTIFIED BEFORE AS THE ACTUAL

09:59AM  16     BROCHURE ITSELF?

09:59AM  17     A.   I THINK I IDENTIFIED IT AS THE MECHANICAL FOR THE

09:59AM  18     BROCHURE.

09:59AM  19     Q.   AND DOES THE MECHANICAL FOR THE BROCHURE HAVE THE SAME

10:00AM  20     CONTENT?

10:00AM  21     A.   YES.

10:00AM  22     Q.   LET'S SEE.  I'LL DRAW YOUR ATTENTION TO ONE SECTION THAT

10:00AM  23     READS, "ONE TINY DROP CHANGES EVERYTHING."

10:00AM  24          DO YOU SEE THAT?

10:00AM  25     A.   YES.

10:00AM   1    Q.   AND THEN UNDERNEATH THERE'S LANGUAGE THAT SAYS, "AT

10:00AM   2    THERANOS, WE'RE CHANGING LAB TESTING FOREVER.  AS THE WORLD'S

10:00AM   3    FIRST AND ONLY CLIA-CERTIFIED LABORATORY CAPABLE OF RUNNING ALL

10:00AM   4    OF ITS TESTS ON MICRO-SAMPLES, WE CAN PERFORM OUR TESTS ON TINY

10:00AM   5    SAMPLE AMOUNTS."

10:00AM   6         DO YOU SEE THAT?

10:00AM   7    A.   YES.

10:00AM   8    Q.   LET'S SEE.  I'LL SHOW YOU ANOTHER SECTION.

10:00AM   9         DO YOU SEE HERE IT SAYS, "ONE DROP.  A WORLD OF ANSWERS"?

10:00AM  10    A.   YES.

10:00AM  11    Q.   AND UNDER THAT SECTION DO YOU SEE IT READS, "WITH

10:01AM  12    THERANOS, ALL WE NEED IS A TINY SAMPLE"?

10:01AM  13    A.   YES.

10:01AM  14    Q.   AND IT THEN SAYS, "AND FROM THAT SAMPLE, WE CAN PERFORM

10:01AM  15    THE FULL RANGE OF TESTS."

10:01AM  16         DO YOU SEE THAT?

10:01AM  17    A.   YES.

10:01AM  18    Q.   I'LL SHOW YOU THE NEXT PAGE OF THIS BROCHURE.

10:01AM  19         ARE WE LOOKING AT NOW AN ADDITIONAL PAGE OF CONTENT FOR

10:01AM  20    THIS PATIENT BROCHURE?

10:01AM  21    A.   YES.

10:01AM  22    Q.   BY THE WAY, DO YOU KNOW FROM YOUR WORK ON THE WALGREENS

10:01AM  23    ROLLOUT HOW THIS WAS DISTRIBUTED OR WHERE IT WAS PLACED?

10:01AM  24    A.   IT WAS PLACED IN THERANOS WELLNESS CENTERS WITHIN

10:01AM  25    WALGREENS STORES.

10:01AM  1    Q.   AND WHO WAS THE INTENDED AUDIENCE FOR THIS BROCHURE?

10:01AM  2    A.   GUESTS OR PATIENTS WHO CAME IN TO GET LAB TESTING.

10:02AM  3    Q.   ON PAGE 4 OF THE EXHIBIT, SO THE SECOND PAGE OF THIS

10:02AM  4    BROCHURE, THERE'S A HEADING THAT SAYS, "BETTER ANSWERS,

10:02AM  5    FASTER."

10:02AM  6         DO YOU SEE THAT?

10:02AM  7    A.   YES.

10:02AM  8    Q.   AND THERE'S A CLAIM UNDERNEATH IT THAT SAYS, "BY

10:02AM  9    AUTOMATING OUR PRE- AND POST-ANALYTIC PROCESSES, WE DRASTICALLY

10:02AM  10   MINIMIZE HUMAN PROCESSING -- THE CAUSE OF THE MAJORITY OF LAB

10:02AM  11   TEST ERRORS.  BY STANDARDIZING OUR PROCESSES, WE OFFER TESTS

10:02AM  12   WITH THE HIGHEST LEVELS OF ACCURACY."

10:02AM  13        DO YOU SEE THAT?

10:02AM  14   A.   YES.

10:02AM  15   Q.   OKAY.  YOU CAN SET THAT ASIDE.  THANK YOU.

10:02AM  16        DO YOU RECALL DURING YOUR TIME AT THERANOS, AN ARTICLE

10:02AM  17   BEING WRITTEN BY SOMEONE NAMED JOSEPH RAGO AT "THE

10:03AM  18   WALL STREET JOURNAL"?

10:03AM  19   A.   YES.

10:03AM  20   Q.   AND CAN I ASK YOU TO LOOK AT THE BINDER IN FRONT OF YOU AT

10:03AM  21   TAB 1090.

10:03AM  22   A.   OKAY.

10:03AM  23   Q.   AND AT 1090, DO YOU SEE AN EMAIL FROM JEFFRY BLICKMAN TO

10:03AM  24   MR. BALWANI, MS. HOLMES, CHRISTIAN HOLMES, AND YOU AT THERANOS?

10:03AM  25   A.   YES.

10:03AM  1    Q.   AND IS THAT EMAIL DATED SEPTEMBER 2013 -- OR SORRY,

10:03AM  2    SEPTEMBER 6TH, 2013?

10:03AM  3    A.   YES.

10:03AM  4    Q.   AND DOES THIS RELATE TO THE CONTENT OF THAT ARTICLE?

10:03AM  5    A.   YES.

10:03AM  6              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1090.

10:04AM  7              MS. WALSH:  OBJECTION.  HEARSAY WITHIN HEARSAY.

10:04AM  8              MR. BOSTIC:  SO, YOUR HONOR, THIS ARTICLE ITSELF IS

10:04AM  9    ALREADY ADMITTED AS EXHIBIT 1106.

10:04AM 10         THE PURPOSE OF THIS EXHIBIT IS TO SHOW MR. BALWANI'S

10:04AM 11    REVIEW OF THE CONTENT BEFORE IT WAS PUBLISHED.

10:04AM 12              THE COURT:  ALL RIGHT.  THANK YOU.

10:04AM 13         THE OBJECTION IS OVERRULED.  THIS IS ADMITTED, AND IT MAY

10:04AM 14    BE PUBLISHED.

10:04AM 15         (GOVERNMENT'S EXHIBIT 1106 WAS RECEIVED IN EVIDENCE.)

10:04AM 16              MR. BOSTIC:  LET'S ZOOM IN ON THE BOTTOM HALF OF

10:04AM 17    THIS PAGE, PLEASE.

10:04AM 18    Q.   MR. EDLIN, DO YOU SEE THAT THIS EMAIL STARTS WITH AN EMAIL

10:04AM 19    FROM JOE RAGO?

10:04AM 20    A.   YES.

10:04AM 21    Q.   AND WHO WAS JOE RAGO?

10:05AM 22    A.   HE WAS A REPORTER OR A WRITER FOR "THE

10:05AM 23    WALL STREET JOURNAL."

10:05AM 24    Q.   AND IN THIS EMAIL ON SEPTEMBER 6TH HE WRITES TO MS. HOLMES

10:05AM 25    AND JEFFRY BLICKMAN AT THERANOS.

10:05AM   1          DO YOU SEE THAT?

10:05AM   2     A.   YES.

10:05AM   3     Q.   AND THE SUBJECT LINE IS READBACK.

10:05AM   4          HE SAYS, "DEEPLY SORRY FOR THE DELAY, COULDN'T BE HELPED

10:05AM   5     ON MY END, BUT PLEASE FIND BELOW ALL THE QUOTES WE PLAN TO USE

10:05AM   6     IN THE INTERVIEW, MY PARAPHRASES AND ALL FACTUAL STATEMENTS

10:05AM   7     ABOUT THERANOS."

10:05AM   8          DO YOU SEE THAT?

10:05AM   9     A.   YES.

10:05AM   10    Q.   LET'S GO UP TO -- SORRY.  LET ME JUST GO DOWN TO THE

10:05AM   11    SECOND PARAGRAPH IN THIS EMAIL.

10:05AM   12         IT SAYS, "IF ANY POINTS NEED TO BE CLARIFIED, IF I'VE

10:05AM   13    EXPLAINED SOMETHING INCOMPLETELY OR LEFT OUT SOMETHING

10:05AM   14    IMPORTANT, OR OF COURSE IF THERE'S AN OUT AND OUT ERROR PLEASE

10:05AM   15    LET ME KNOW AND WE'LL CORRECT."

10:05AM   16         DO YOU SEE THAT?

10:05AM   17    A.   YES.

10:05AM   18    Q.   AND LET'S ZOOM OUT AND ZOOM IN ON THE TOP HALF OF THIS

10:06AM   19    PAGE.

10:06AM   20         AND WE SEE HERE A MESSAGE FROM JEFF BLICKMAN TO MS. HOLMES

10:06AM   21    AND MR. BALWANI AND OTHERS AT THERANOS; CORRECT?

10:06AM   22    A.   JEFF SENDS IT TO ELIZABETH AND THEN COPIES THE OTHERS,

10:06AM   23    YES.

10:06AM   24    Q.   AND HE SAYS, "WENT THREW THIS AND HIGHLIGHTED A FEW THINGS

10:06AM   25    IN YELLOW DIRECTLY IN HIS EMAIL, AND SUMMARIZED BELOW."

10:06AM  1          DO YOU SEE THAT?

10:06AM  2     A.   YES.

10:06AM  3     Q.   AND AMONG THE ISSUES THAT HE NOTES, TOWARDS THE BOTTOM OF

10:06AM  4     THE SELECTION, THE THIRD HASHMARK FROM THE BOTTOM THERE'S A

10:06AM  5     LINE THAT SAYS, "HE CALLS OUT," QUOTE, "'IMPROVED ACCURACY'

10:06AM  6     WHEN TALKING ABOUT REDUCTION OF HUMAN ERROR THROUGH

10:06AM  7     AUTOMATION."

10:06AM  8          DO YOU SEE THAT?

10:06AM  9     A.   YES.

10:06AM  10    Q.   AND LET'S LOOK AT PAGE 2 OF THIS EXHIBIT.

10:07AM  11         AND ON PAGE 2, MR. EDLIN, DO YOU SEE THAT MR. RAGO

10:07AM  12    INCLUDES THE TEXT OF THE ARTICLE THAT WAS GOING TO BE PUBLISHED

10:07AM  13    ABOUT THERANOS?

10:07AM  14    A.   YES.

10:07AM  15    Q.   AND LET'S GO TO PAGE 3 AND ZOOM IN ON THE THIRD PARAGRAPH

10:07AM  16    FROM THE TOP OR THE SECOND FULL PARAGRAPH.

10:07AM  17         AND DO YOU SEE THERE HERE'S THE LANGUAGE ABOUT IMPROVED

10:07AM  18    ACCURACY THAT MR. BLICKMAN WAS REFERENCING IN HIS EMAIL?

10:07AM  19    A.   YES.

10:07AM  20    Q.   LET'S LOOK AT THE ACTUAL ARTICLE ITSELF.

10:07AM  21         YOUR HONOR, EXHIBIT 1106 IS ALREADY ADMITTED.  MAY WE

10:07AM  22    PUBLISH?

10:07AM  23              THE COURT:  YES.

10:07AM  24    BY MR. BOSTIC:

10:07AM  25    Q.   LET'S LOOK AT THE FIRST INDENTED PARAGRAPH ON PAGE 1.

10:08AM  1          MR. EDLIN, IN THE FINAL PUBLISHED VERSION OF THE ARTICLE,

10:08AM  2     DO YOU SEE THAT IT CLAIMS IN THE MIDDLE OF THIS PARAGRAPH THAT

10:08AM  3     "THERANOS'S PROCESSES ARE FASTER, CHEAPER AND MORE ACCURATE

10:08AM  4     THAN THE CONVENTIONAL METHODS"?

10:08AM  5     A.   I DO.

10:08AM  6     Q.   AND LET'S LOOK AT PAGE 2 OF THIS EXHIBIT.  ZOOM IN ON THE

10:08AM  7     THIRD PARAGRAPH FROM THE BOTTOM.

10:08AM  8          DO YOU SEE THERE THE ARTICLE READS, "ANOTHER THERANOS

10:08AM  9     ADVANCE IS ITS TESTING'S ACCURACY"?

10:08AM 10     A.   YES.

10:08AM 11     Q.   YOU CAN PUT THAT ASIDE.

10:08AM 12          I HAVE ANOTHER DOCUMENT FOR YOU TO REVIEW.

10:09AM 13          MAY I APPROACH, YOUR HONOR?

10:09AM 14              THE COURT:  YES.

10:09AM 15     BY MR. BOSTIC:

10:09AM 16     Q.   MR. EDLIN, DO YOU HAVE WHAT HAS BEEN MARKED AS

10:09AM 17     EXHIBIT 5801 IN FRONT OF YOU?

10:09AM 18     A.   YES.

10:09AM 19     Q.   AND IS 5801 AN EMAIL FROM MR. BLICKMAN TO THE SAME GROUP

10:09AM 20     OF PEOPLE THAT WE WERE JUST LOOKING AT, MS. HOLMES, CC'ING

10:09AM 21     MR. BALWANI, CHRISTIAN HOLMES, AND YOURSELF?

10:09AM 22     A.   YES.

10:09AM 23     Q.   AND DOES IT RELATE TO THE CONTENT OF ANOTHER NEWS ARTICLE

10:09AM 24     PUBLISHED ABOUT THERANOS?

10:09AM 25     A.   IT RELATES TO A MAGAZINE ARTICLE.

10:09AM   1        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5801.

10:10AM   2        MS. WALSH:  YOUR HONOR, NO OBJECTION.

10:10AM   3     THE PARTIES HAVE STIPULATED THAT THE "WIRED" MAGAZINE WAS

10:10AM   4  PUBLISHED ONLINE ON FEBRUARY 18TH, 2014.

10:10AM   5        THE COURT:  ALL RIGHT.  THANK YOU.

10:10AM   6     IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:10AM   7     (GOVERNMENT'S EXHIBIT 5801 WAS RECEIVED IN EVIDENCE.)

10:10AM   8  BY MR. BOSTIC:

10:10AM   9  Q.   OKAY.  SO LET'S ZOOM IN FIRST ON THE EMAIL ITSELF.

10:10AM  10     MR. EDLIN, ARE WE LOOKING AT, AGAIN, AN EMAIL FROM

10:10AM  11  FEBRUARY 18TH, 2014, WITH THE SUBJECT "WIRED" ARTICLE?

10:10AM  12  A.   YES.

10:10AM  13  Q.   AND WAS THAT EMAIL SENT TO MR. BALWANI, AMONG OTHERS?

10:10AM  14  A.   YES.

10:10AM  15  Q.   LET'S GO TO PAGE 2 OF THIS EXHIBIT.  LET'S SEE IF WE CAN

10:10AM  16  ZOOM IN ON THAT TEXT.  WE MAY NEED TO SWITCH VERSIONS OR FIGURE

10:10AM  17  OUT SOMETHING ELSE, BUT LET'S SEE HOW READABLE IT IS.

10:11AM  18     MR. EDLIN, CAN YOU MAKE OUT THIS TEXT ON THE SCREEN?

10:11AM  19  A.   I THINK I CAN.

10:11AM  20  Q.   DO YOU SEE TOWARDS THE BOTTOM OF THE SELECTION THERE

10:11AM  21  THERE'S A LINE THAT SAYS, "INSTEAD OF VIALS OF BLOOD, ONE FOR

10:11AM  22  EVERY TEST NEEDED, THERANOS REQUIRES ONLY A PINPRICK AND A DROP

10:11AM  23  OF BLOOD."

10:11AM  24     DO YOU SEE THAT?

10:11AM  25  A.   YES.

10:11AM   1    Q.   IT THEN SAYS, "WITH THAT, THEY CAN PERFORM HUNDREDS OF

10:11AM   2    TESTS, FROM STANDARD CHOLESTEROL CHECKS TO SOPHISTICATED," AND

10:11AM   3    THEN LET'S TURN THE PAGE, AND ZOOM IN ON THE TOP LEFT, "TO

10:11AM   4    SOPHISTICATED GENETIC ANALYSES."

10:11AM   5        DO YOU SEE THAT?

10:11AM   6    A.   YES.

10:11AM   7    Q.   AND IT THEN SAYS, "THE RESULTS ARE FASTER, MORE ACCURATE,

10:11AM   8    AND FAR CHEAPER THAN CONVENTIONAL METHODS."

10:12AM   9        DO YOU SEE THAT?

10:12AM   10   A.   YES.

10:12AM   11   Q.   OKAY.  WE CAN SET THAT ASIDE.  THANK YOU.

10:12AM   12        DID YOUR WORK AT THERANOS INVOLVE ANY INVOLVEMENT IN

10:12AM   13   PREPARING MATERIALS OR PRESENTATIONS THAT WOULD GO TO POTENTIAL

10:12AM   14   INVESTORS IN THE COMPANY?

10:12AM   15   A.   MY WORK WAS MOSTLY RELATED TO COMPILING THOSE MATERIALS,

10:12AM   16   YES.

10:12AM   17   Q.   AND DESCRIBE WHAT WAS INVOLVED IN THAT?  WHAT DID YOU

10:12AM   18   ACTUALLY DO?

10:12AM   19   A.   WITH REGARD TO THAT PROCESS, ELIZABETH WOULD NOTIFY

10:12AM   20   SOMETIMES A GROUP OF PEOPLE, INCLUDING ME, THAT BINDERS SHOULD

10:12AM   21   BE PREPARED FOR CERTAIN INVESTORS.

10:12AM   22        AND I WORKED WITH A GROUP OF PEOPLE TO PRINT OUT SOME OF

10:12AM   23   THOSE DOCUMENTS, IN SOME INSTANCES UPDATE CERTAIN SECTIONS WITH

10:13AM   24   NEW NEWS OR RECENT DEVELOPMENTS WITH BUSINESS PARTNERS, PRINT

10:13AM   25   OUT THE MATERIALS, PHYSICALLY PUT THEM INTO A BINDER, AND THEN

10:13AM  1    MAIL THEM OUT.

10:13AM  2    Q.   AND WHEN IT CAME TO THE CONTENT OF THOSE MATERIALS THAT

10:13AM  3    WERE GOING TO INVESTORS, SAME QUESTION AS BEFORE, WERE YOU KIND

10:13AM  4    OF EXERCISING YOUR OWN JUDGMENT IN DECIDING WHAT SHOULD BE IN

10:13AM  5    THERE, WHAT IT SHOULD SAY?

10:13AM  6    A.   NO.  ALL OF THE MATERIALS WERE INCLUDED BASED ON THE

10:13AM  7    PRE-APPROVED CHECKLIST THAT WAS REVIEWED AND APPROVED BY

10:13AM  8    ELIZABETH.

10:13AM  9    Q.   AND WAS MR. BALWANI INVOLVED AT ALL IN REVIEWING OR

10:13AM  10   APPROVING THE CONTENT FOR THESE BINDERS?

10:13AM  11   A.   HIS ONLY INVOLVEMENT, I RECALL IN SOME INSTANCES WHERE

10:13AM  12   THERE WAS A FINANCIAL SECTION, ELIZABETH TOLD ME TO GO TO SUNNY

10:13AM  13   TO GET CERTAIN MATERIALS AND THEN PUT THEM INTO THE BINDER.

10:14AM  14   Q.   AND WERE THESE MATERIALS EVER IN CONNECTION WITH MEETINGS

10:14AM  15   THAT WOULD TAKE PLACE WITH THESE POTENTIAL INVESTORS IN THE

10:14AM  16   COMPANY?

10:14AM  17   A.   I DO RECALL SOME MEETINGS.

10:14AM  18   Q.   AND DID THOSE MEETINGS INCLUDE MS. HOLMES, MR. BALWANI, OR

10:14AM  19   BOTH, AS YOU RECALL?

10:14AM  20   A.   SOME MEETINGS INCLUDED BOTH.  SOME MEETINGS INCLUDED ONE

10:14AM  21   OR THE OTHER.

10:14AM  22   Q.   LET ME ASK YOU TO LOOK AT TAB 1940 IN THE BINDER IN FRONT

10:14AM  23   OF YOU, PLEASE.

10:15AM  24        AND DO YOU HAVE 1940?

10:15AM  25   A.   YES.

10:15AM 1    Q.   THIS IS AN EMAIL FROM YOU ON SEPTEMBER 16TH, 2014; IS THAT

10:15AM 2    RIGHT?

10:15AM 3    A.   YES.

10:15AM 4    Q.   AND DOES IT RELATE TO YOUR WORK WITH MS. HOLMES INVOLVING

10:15AM 5    THE CONTENT OF INVESTMENT MATERIALS BINDERS?

10:15AM 6    A.   YES.

10:15AM 7             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1940.

10:15AM 8             MS. WALSH:  NO OBJECTION.

10:15AM 9             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:15AM 10       (GOVERNMENT'S EXHIBIT 1940 WAS RECEIVED IN EVIDENCE.)

10:15AM 11   BY MR. BOSTIC:

10:15AM 12   Q.   MR. EDLIN, DO YOU SEE THE EMAIL NOW ON THE SCREEN FROM

10:15AM 13   SEPTEMBER OF 2014?

10:15AM 14   A.   YES.

10:15AM 15   Q.   AND DO YOU RECALL THE APPROXIMATE TIMEFRAME DURING WHICH

10:15AM 16   YOU WERE WORKING ON BINDERS FOR THE COMPANY?  WAS IT THROUGHOUT

10:15AM 17   THE ENTIRE TIME OR A NARROWER TIME?

10:15AM 18   A.   IT WAS NOT THE ENTIRE TIME.  THERE WAS A NARROW TIME.

10:15AM 19   Q.   AND WAS 2014 PART OF THAT TIMEFRAME?

10:16AM 20   A.   YES.

10:16AM 21   Q.   CAN YOU DESCRIBE THE PURPOSE OF THE EMAIL THAT YOU SENT IN

10:16AM 22   SEPTEMBER OF 2014 THAT WE'RE LOOKING AT?

10:16AM 23   A.   THIS EMAIL IS IN RESPONSE TO AN EMAIL REQUEST FROM

10:16AM 24   ELIZABETH WHO ASKED TO SEE THE CONTENTS OF THE TWO BINDERS THAT

10:16AM 25   WERE BEING PREPARED COMPARED TO OTHER BINDERS THAT WERE SENT

10:16AM 1    PREVIOUSLY.

10:16AM 2    Q.   AND WHAT IS THE -- WHAT ARE YOU GENERALLY DESCRIBING IN

10:16AM 3    YOUR RESPONSE TO THAT EMAIL?

10:16AM 4    A.   IN THIS EMAIL I'M OUTLINING THE CONTENTS OF BOTH

10:17AM 5    INVESTMENT BINDERS.

10:17AM 6    Q.   AND DID THE BINDERS THAT YOU PREPARED FOR POTENTIAL

10:17AM 7    INVESTORS EVER INCLUDE SLIDE PRESENTATIONS ABOUT THERANOS?

10:17AM 8    A.   YES.

10:17AM 9    Q.   DID YOU PREPARE BINDERS WITH SLIDE PRESENTATIONS ON

10:17AM 10   MULTIPLE OCCASIONS?

10:17AM 11   A.   YES.

10:17AM 12   Q.   CAN I ASK YOU TO LOOK AT TAB 4869 IN YOUR BINDER.

10:17AM 13        LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU.

10:17AM 14   A.   I DO.

10:17AM 15   Q.   DO YOU RECALL A TIME WHEN SOMEONE NAMED RUPERT MURDOCH WAS

10:17AM 16   CONSIDERING AN INVESTMENT IN THERANOS?

10:17AM 17   A.   YES.

10:17AM 18   Q.   AND DO YOU REMEMBER APPROXIMATELY WHEN THAT WAS?

10:18AM 19   A.   I DON'T REMEMBER EXACTLY, BUT I BELIEVE IT WAS WITHIN THAT

10:18AM 20   NARROWER WINDOW THAT WE DISCUSSED.

10:18AM 21   Q.   DO YOU RECALL HAVING ANY ROLE IN CONNECTION WITH

10:18AM 22   MR. MURDOCH'S CONSIDERATION OF A POSSIBLE INVESTMENT?

10:18AM 23   A.   I RECALL -- CAN YOU REPEAT THE QUESTION?

10:18AM 24   Q.   SURE.

10:18AM 25        DID YOU HAVE ANY ROLE IN CONNECTION WITH HIS CONSIDERATION

10:18AM  1    OF AN INVESTMENT?  FOR EXAMPLE, WOULD YOU HAVE BEEN PREPARING

10:18AM  2    MATERIALS FOR HIS REVIEW AT THAT TIME?

10:18AM  3    A.   I BELIEVE I DID.

10:18AM  4    Q.   OKAY.  AT TAB 4869, DO YOU RECOGNIZE THE DOCUMENT THAT IS

10:18AM  5    INCLUDED THERE?

10:18AM  6    A.   YES.

10:18AM  7    Q.   AND WHAT IS THAT?

10:18AM  8    A.   THIS IS ONE OF THE SLIDE PRESENTATIONS THAT WAS INCLUDED

10:18AM  9    IN THE INVESTMENT BINDERS, AND THIS IS A GENERAL OVERVIEW OF

10:19AM 10    THE COMPANY.

10:19AM 11            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:19AM 12    5869 -- I'M SORRY, 4869.

10:19AM 13            MS. WALSH:  NO OBJECTION.

10:19AM 14            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:19AM 15        (GOVERNMENT'S EXHIBIT 4869 WAS RECEIVED IN EVIDENCE.)

10:19AM 16    BY MR. BOSTIC:

10:19AM 17    Q.   SO, MR. EDLIN, BEGINNING WITH PAGE 3 HERE -- ACTUALLY,

10:19AM 18    LET'S GO BACK TO -- LET'S GO TO PAGE 1 FOR A MOMENT TO THE

10:19AM 19    TITLE PAGE.

10:19AM 20        AND DO YOU SEE THAT THIS WAS PART OF A CONFIDENTIAL

10:19AM 21    INVESTMENT MATERIALS FOR RUPERT MURDOCH WITH THE THERANOS LOGO

10:19AM 22    AT THE TOP?

10:19AM 23    A.   YES.

10:19AM 24    Q.   AND LET'S GO TO THE NEXT PAGE, PLEASE.

10:19AM 25        AND DO YOU SEE THE TITLE HERE IS THERANOS CONFIDENTIAL

10:19AM  1     OVERVIEW?

10:19AM  2     A.   YES.

10:19AM  3     Q.   AND LOOKING AT THE SLIDES THAT COME AFTER THIS, WAS THIS

10:20AM  4     PRESENTATION SHARED JUST WITH MR. MURDOCH OR ARE YOU AWARE OF

10:20AM  5     IT BEING SENT TO OTHER INVESTORS?

10:20AM  6     A.   I'M NOT AWARE OF THIS PRESENTATION BEING SHARED WITH OTHER

10:20AM  7     INVESTORS.

10:20AM  8     Q.   HOW ABOUT SIMILAR SLIDE PRESENTATIONS WITH SOME OF THE

10:20AM  9     SAME CONTENT, ARE YOU AWARE OF THAT BEING SHARED WITH ANY OTHER

10:20AM  10    INVESTORS?

10:20AM  11    A.   YES.

10:20AM  12    Q.   LET'S GO TO PAGE 3, PLEASE.  LET'S ZOOM IN ON THAT TEXT.

10:20AM  13         AND DO YOU SEE HERE IN THIS PRESENTATION FOR AN INVESTOR

10:20AM  14    THERE'S LANGUAGE THAT SAYS, "THERANOS'S PROPRIETARY, PATENTED

10:20AM  15    TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK

10:20AM  16    AND TESTS FROM MICRO-SAMPLES OF OTHER MATRICES."

10:20AM  17         DO YOU SEE THAT?

10:20AM  18    A.   YES.

10:20AM  19    Q.   AND IT THEN SAYS, "AND GENERATES SIGNIFICANTLY HIGHER

10:20AM  20    INTEGRITY DATA THAN CURRENTLY POSSIBLE."

10:20AM  21         DO YOU SEE THAT?

10:20AM  22    A.   YES.

10:20AM  23    Q.   LET'S GO TO PAGE 15.  LET'S LOOK AT THE SECOND TO THE

10:21AM  24    BOTTOM BULLET POINT HERE.  THIS IS UNDER A TITLE THAT SAYS COST

10:21AM  25    SAVINGS.

10:21AM  1          DO YOU SEE THAT?

10:21AM  2     A.   YES.

10:21AM  3     Q.   AND AT THE SECOND TO THE BOTTOM BULLET POINT THE INVESTOR

10:21AM  4     PRESENTATION SAYS, "THE UNPRECEDENTED LACK OF VARIATION FROM

10:21AM  5     SYSTEM TO SYSTEM YIELDS HIGHER INTEGRITY DATA AND LONGITUDINAL

10:21AM  6     TRENDING."

10:21AM  7          DO YOU SEE THAT?

10:21AM  8     A.   YES.

10:21AM  9     Q.   WHEN YOU WERE WORKING AT THE COMPANY, DID YOU HAVE A BASIS

10:21AM  10    TO KNOW WHETHER THERANOS'S TESTS HAD AN ACTUALLY UNPRECEDENTED

10:21AM  11    LACK OF VARIATION?

10:21AM  12    A.   I DID NOT.

10:21AM  13    Q.   LET'S LOOK AT PAGE 28 NEXT.

10:22AM  14         DO YOU SEE HERE THERE'S A TITLE "SAME TESTS, A WHOLE NEW

10:22AM  15    APPROACH"?

10:22AM  16    A.   YES.

10:22AM  17    Q.   AND IT READS BELOW THAT, "THE ACTIONABLE INFORMATION YOU

10:22AM  18    NEED, 1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW."

10:22AM  19         DO YOU SEE THAT?

10:22AM  20    A.   YES.

10:22AM  21    Q.   AND THERE'S SOME IMAGES BENEATH THAT.

10:22AM  22         COULD YOU TELL US WHAT IS DEPICTED IN THOSE IMAGES?

10:22AM  23    A.   THOSE IMAGES ARE OF THE FINGERSTICK PROCESS, AND IT ALSO

10:22AM  24    SHOWS A NANOTAINER.

10:22AM  25    Q.   AND WHAT WAS THE NANOTAINER AT THERANOS?

10:22AM  1      A.   THE NANOTAINER WAS THE SMALL TUBE THAT THE COMPANY USED TO

10:22AM  2      COLLECT FINGERSTICK SAMPLES.

10:22AM  3      Q.   BELOW THOSE IMAGES IT SAYS, "THERANOS RUNS ANY TEST

10:22AM  4      AVAILABLE IN CENTRAL LABORATORIES, AND PROCESSES ALL SAMPLE

10:22AM  5      TYPES."

10:22AM  6           DO YOU SEE THAT?

10:22AM  7      A.   YES.

10:22AM  8      Q.   AND SKIPPING DOWN TO THE BOTTOM OF THAT SELECTION, DO YOU

10:23AM  9      SEE THERE'S LANGUAGE THAT SAYS, "THERANOS PROVIDES THE HIGHEST

10:23AM 10      LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR

10:23AM 11      PRE- AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS

10:23AM 12      OF ACCURACY AND PRECISION"?

10:23AM 13      A.   YES.

10:23AM 14      Q.   AND DO YOU RECALL BEFORE WHEN WE WERE LOOKING AT A

10:23AM 15      DISCUSSION ABOUT WHETHER THE WEBSITE SHOULD INCLUDE CLAIMS OF

10:23AM 16      HIGHEST LEVELS OF ACCURACY?

10:23AM 17      A.   YES.

10:23AM 18      Q.   IS THIS THE SAME LANGUAGE APPEARING IN AN INVESTOR

10:23AM 19      PRESENTATION?

10:23AM 20      A.   YES.

10:23AM 21      Q.   AND WE SEE ONE MORE EXAMPLE OF THAT IF WE GO TO PAGE 30.

10:23AM 22           AND HERE DO YOU SEE CONTENT WITH THE TITLE "A NEW STANDARD

10:23AM 23      IN QUALITY"?

10:23AM 24      A.   YES.

10:23AM 25      Q.   AND UNDERNEATH THAT THERE'S A SUBHEADING THAT READS, "THE

10:24AM 1   HIGHEST LEVELS OF ACCURACY."

10:24AM 2       DO YOU SEE THAT?

10:24AM 3   A.   YES.

10:24AM 4   Q.   AND AGAIN, THE INVESTOR PRESENTATION SAYS BELOW THE

10:24AM 5   GRAPHIC, "BY SYSTEMATICALLY CONTROLLING AND STANDARDIZING OUR

10:24AM 6   PROCESSES, THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF

10:24AM 7   ACCURACY."

10:24AM 8       DID I READ THAT CORRECTLY?

10:24AM 9   A.   YES.

10:24AM 10  Q.   OKAY.  WE CAN PUT THAT ASIDE.  THANK YOU.

10:24AM 11      MR. EDLIN, CAN YOU PLEASE LOOK AT -- ACTUALLY, LET ME HAND

10:24AM 12  YOU ANOTHER DOCUMENT.

10:24AM 13      MAY I APPROACH, YOUR HONOR?

10:24AM 14          THE COURT:  YES.

10:24AM 15      FOLKS, IF YOU WANT TO STAND UP AND STRETCH FOR A MOMENT,

10:24AM 16  PLEASE FEEL FREE.

10:25AM 17      (STRETCHING.)

10:25AM 18  BY MR. BOSTIC:

10:25AM 19  Q.   MR. EDLIN, DO YOU HAVE AN EXHIBIT IN FRONT OF YOU MARKED

10:25AM 20  1752?

10:25AM 21  A.   YES.

10:25AM 22  Q.   AND IS IT AN EMAIL FROM MS. HOLMES TO YOU ON JUNE 1ST,

10:25AM 23  2014?

10:25AM 24  A.   YES.

10:25AM 25  Q.   AND DO YOU SEE THAT THE SUBJECT LINE IS ROGER PARLOFF,

10:25AM 1      AGGREGATED ACTION ITEMS?

10:25AM 2      A.   YES.

10:25AM 3      Q.   AND DO YOU RECOGNIZE THAT NAME, ROGER PARLOFF?

10:25AM 4      A.   YES.

10:25AM 5      Q.   AND WHO WAS THAT IN CONNECTION WITH THERANOS?

10:26AM 6      A.   HE WAS A JOURNALIST FOR "FORTUNE" MAGAZINE, AND HE WROTE A

10:26AM 7      PIECE ON THERANOS.

10:26AM 8      Q.   AND IN THIS EMAIL FROM MS. HOLMES TO YOU, CAN YOU DESCRIBE

10:26AM 9      THE PURPOSE OF THIS EMAIL?

10:26AM 10     A.   THE TOP EMAIL OR JUST GENERALLY?

10:26AM 11     Q.   GENERALLY THE CHAIN?

10:26AM 12     A.   YEAH.   THIS REFERS TO AN AGGREGATED LIST OF ACTION ITEMS

10:26AM 13     INCLUDING FOLLOW-UP MATERIALS THAT WERE IN CONNECTION TO THE

10:26AM 14     ARTICLE THAT MR. PARLOFF WAS WRITING, AND MY ROLE WAS TO

10:26AM 15     AGGREGATE ALL OF THE ACTION ITEMS AND ENSURE THAT THE

10:26AM 16     APPROPRIATE PERSONNEL WITHIN THE COMPANY WERE PROVIDING

10:26AM 17     INFORMATION RESPECTIVE TO THEIR ACTION ITEMS.

10:27AM 18     Q.   DID YOUR INVOLVEMENT WITH THAT PROCESS GIVE YOU AN

10:27AM 19     UNDERSTANDING AS TO WHO MR. PARLOFF INTERVIEWED IN CONNECTION

10:27AM 20     WITH THE ARTICLE?

10:27AM 21     A.   I RECALL THAT HE ONLY INTERVIEWED ELIZABETH.

10:27AM 22     Q.   AND THAT'S YOUR RECOLLECTION?

10:27AM 23     A.   YES.

10:27AM 24          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1752.

10:27AM 25          MS. WALSH:  NO OBJECTION.

10:27AM   1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:27AM   2          (GOVERNMENT'S EXHIBIT 1752 WAS RECEIVED IN EVIDENCE.)

10:27AM   3     BY MR. BOSTIC:

10:27AM   4     Q.   LET'S LOOK AT THE BOTTOM OF PAGE 1, PLEASE.

10:27AM   5          HERE'S AN EMAIL FROM YOU TO MS. HOLMES CC'ING OTHERS WHERE

10:27AM   6     YOU SAY, "HI ELIZABETH,

10:27AM   7          "PLEASE SEE BELOW/ATTACHED FOR THE ROGER PARLOFF ACTION

10:27AM   8     ITEMS LIST."

10:27AM   9          DO YOU SEE THAT?

10:27AM  10     A.   YES.

10:27AM  11     Q.   AND CAN YOU DESCRIBE WHAT THIS LIST IS THAT WE'RE LOOKING

10:28AM  12     AT IN THE CHART AND WHAT ITS PURPOSE WAS?

10:28AM  13     A.   THIS IS THE LIST OF CATEGORIES OF INFORMATION THAT I

10:28AM  14     BELIEVE WERE REFERENCED IN ELIZABETH'S DISCUSSION WITH

10:28AM  15     MR. PARLOFF, AND THIS WAS INFORMATION THAT WAS REQUESTED.

10:28AM  16          SO THIS LIST INCLUDES THE TYPE OF INFORMATION AS WELL AS

10:28AM  17     THE RESOURCE WITHIN THE COMPANY WHO IS TASKED WITH PROVIDING

10:28AM  18     THAT INFORMATION.

10:28AM  19     Q.   LET'S ZOOM OUT AND LOOK AT THE TOP OF THIS PAGE.

10:28AM  20          AND THERE WE SEE A MESSAGE FROM MS. HOLMES JUST TO YOU ON

10:28AM  21     JUNE 1ST.

10:28AM  22          AND DO YOU SEE THAT THERE'S AN ATTACHMENT TITLED THERANOS

10:28AM  23     MULTIPLEXED PANEL VALIDATION REPORT SCHERING-PLOUGH?

10:28AM  24     A.   YES.

10:28AM  25     Q.   WHAT WAS YOUR UNDERSTANDING AT THE TIME AS TO WHY

10:29AM 1    MS. HOLMES WAS SENDING YOU THAT DOCUMENT?

10:29AM 2              MS. WALSH:  OBJECTION.

10:29AM 3              THE COURT:  SPECULATION.

10:29AM 4              THE WITNESS:  I --

10:29AM 5    BY MR. BOSTIC:

10:29AM 6    Q.   LET ME ASK YOU A FOUNDATIONAL QUESTION, MR. EDLIN.

10:29AM 7         DO YOU RECALL AROUND THIS TIME CONVERSATIONS WITH

10:29AM 8    MS. HOLMES ABOUT THIS TO DO LIST AND PROVIDING INFORMATION TO

10:29AM 9    MR. PARLOFF?

10:29AM 10   A.   YES.

10:29AM 11   Q.   DID THOSE DISCUSSIONS INCLUDE REPORTS RELATING TO

10:29AM 12   THERANOS'S WORK WITH PHARMACEUTICAL COMPANIES?

10:29AM 13   A.   YES.

10:29AM 14   Q.   DID MS. HOLMES GIVE YOU DIRECTION ABOUT WHAT YOU WERE

10:29AM 15   SUPPOSED TO DO WHEN YOU RECEIVED THE REPORT ATTACHED TO THIS

10:29AM 16   EMAIL?

10:29AM 17   A.   I DON'T RECALL WHAT THE DIRECTION WAS, BUT I DO RECALL

10:30AM 18   THAT THERE WAS A COLLECTION OF MATERIALS THAT WAS SENT TO

10:30AM 19   MR. PARLOFF AT ONE POINT.

10:30AM 20   Q.   LET'S LOOK AT PAGE 7 OF THIS EXHIBIT.

10:30AM 21        MR. EDLIN, ARE WE LOOKING NOW AT THE ATTACHMENT ITSELF,

10:30AM 22   THAT ATTACHMENT TITLED THERANOS MULTIPLEXED VALIDATION REPORT

10:30AM 23   SCHERING-PLOUGH?

10:30AM 24   A.   YES.

10:30AM 25   Q.   AND IF WE CAN ZOOM IN ON THE TOP OF THE PAGE.

10:30AM   1          DO YOU SEE THAT AT THE TOP OF THE PAGE THERE ARE TWO LOGOS

10:30AM   2   INCLUDED?

10:30AM   3   A.   YES.

10:30AM   4   Q.   AND ONE IS FOR SCHERING-PLOUGH; IS THAT CORRECT?

10:30AM   5   A.   YES.

10:30AM   6   Q.   AND THE OTHER IS FOR THERANOS; IS THAT RIGHT?

10:30AM   7   A.   YES.

10:30AM   8   Q.   DO YOU HAVE ANY KNOWLEDGE ABOUT HOW THE SCHERING-PLOUGH

10:30AM   9   LOGO CAME TO BE ON THIS PARTICULAR DOCUMENT?

10:30AM   10  A.   I DO NOT.

10:30AM   11  Q.   OKAY.  WE CAN SET THAT ASIDE.  THANK YOU.

10:31AM   12         MR. EDLIN, DO YOU HAVE A TAB IN YOUR BINDER MARKED 1776?

10:31AM   13  A.   I DO.

10:31AM   14  Q.   AND DO YOU RECOGNIZE WHAT IS AT 1776?

10:31AM   15  A.   YES.

10:31AM   16  Q.   AND WHAT IS IT?

10:31AM   17  A.   THIS LOOKS TO BE THE "FORTUNE" ARTICLE THAT MR. PARLOFF

10:31AM   18  WROTE.

10:31AM   19  Q.   AND IS THE DATE OF THAT ARTICLE JUNE 12TH, 2014?

10:31AM   20  A.   YES.

10:31AM   21          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1776.

10:31AM   22          MS. WALSH:  OBJECTION.

10:31AM   23          THE COURT:  I'LL SUSTAIN THE OBJECTION AT THIS POINT

10:31AM   24  WITHOUT FOUNDATION.

10:32AM   25  BY MR. BOSTIC:

10:32AM 1    Q.   LET ME JUST ASK YOU A COUPLE OF OTHER FOUNDATIONAL

10:32AM 2    QUESTIONS, MR. EDLIN.

10:32AM 3    A.   UH-HUH.

10:32AM 4    Q.   WHEN THIS ARTICLE WAS PUBLISHED, DO YOU REMEMBER WHETHER

10:32AM 5    YOU REVIEWED THE ARTICLE?

10:32AM 6    A.   I REMEMBER READING THE ARTICLE.

10:32AM 7    Q.   AND IS WHAT IS AT 1776 A TRUE AND CORRECT COPY OF THE

10:32AM 8    ARTICLE ITSELF?

10:32AM 9    A.   IT APPEARS TO BE.

10:32AM 10   Q.   OKAY.  WE CAN SET THAT ASIDE FOR NOW.

10:32AM 11        I'D LIKE TO SHIFT GEARS AND TALK ABOUT WORK THAT YOU DID

10:32AM 12   AT THERANOS RELATING TO COMMUNICATIONS WITH THE MILITARY.

10:32AM 13        DO YOU RECALL THAT WORK?

10:32AM 14   A.   YES.

10:32AM 15   Q.   TELL US ABOUT YOUR ROLE THERE?  WHAT WAS YOUR JOB IN

10:32AM 16   CONNECTION WITH DEALINGS THAT THERANOS HAD WITH THE MILITARY?

10:32AM 17   A.   I SUPPORTED RELATIONSHIPS WITH VARIOUS DIVISIONS OF THE

10:32AM 18   DEPARTMENT OF DEFENSE, AND IN THAT ROLE I HELPED TO FACILITATE

10:33AM 19   COORDINATION AND INFORMATION SHARING RELATED TO A NUMBER OF

10:33AM 20   DIFFERENT PROGRAMS THAT WERE INTENDED TO EVALUATE THE THERANOS

10:33AM 21   TECHNOLOGY COMPARED TO LAB TESTING THAT WAS AVAILABLE TO THE

10:33AM 22   MILITARY AT THE TIME.

10:33AM 23   Q.   AND WHAT WAS THE POINT OF THOSE COMPARISONS AS YOU

10:33AM 24   UNDERSTOOD THEM?

10:33AM 25   A.   THE COMPARISON WAS TO EVALUATE HOW THERANOS LAB TESTING

10:33AM  1    COMPARED TO TESTING THAT THE MILITARY HAD WITH THE EVENTUAL

10:33AM  2    GOAL OF THE PROGRAM TO USE THERANOS TESTING FOR THE MILITARY.

10:33AM  3    Q.   AND IN THAT ROLE WERE YOU IN TOUCH WITH ONE COMPONENT OF

10:33AM  4    THE MILITARY OR MULTIPLE COMPONENTS?

10:33AM  5    A.   MULTIPLE COMPONENTS.

10:34AM  6    Q.   DO YOU REMEMBER WHAT SOME OF THEM WERE?

10:34AM  7    A.   YES.   THERE WAS U.S. CENTCOM, SOCOM, AFRICOM, AND THE

10:34AM  8    INSTITUTION OF SURGICAL RESEARCH.

10:34AM  9    Q.   AND YOU MENTIONED I THINK SOME ABBREVIATIONS.   IT'S OKAY

10:34AM 10    IF YOU CAN'T, BUT ARE YOU ABLE TO EXPAND AND EXPLAIN THOSE FOR

10:34AM 11    US STARTING WITH CENTCOM?   WHAT DOES THAT STAND FOR?

10:34AM 12    A.   U.S. CENTRAL COMMAND, SPECIAL OPERATIONS COMMAND, AFRICA

10:34AM 13    COMMAND.

10:34AM 14    Q.   AND IN THAT ROLE WERE YOU SPEAKING ON BEHALF OF THERANOS

10:34AM 15    OR WERE YOU ACTING AS A GO-BETWEEN FOR SOMEONE ELSE WHO WAS

10:34AM 16    MAKING DECISIONS FOR THE COMPANY?

10:34AM 17    A.   I'D SAY THE LATER.   ANY SUBSTANTIVE COMMUNICATION THAT I

10:35AM 18    HAD WITH ANY MEMBER, ANY DIVISION WITHIN THE MILITARY WAS BASED

10:35AM 19    ON INFORMATION THAT I HAD DISCUSSED WITH ELIZABETH AND GOT FROM

10:35AM 20    ELIZABETH, AND SOMETIMES THOSE DISCUSSIONS INFORMED EMAIL

10:35AM 21    DRAFTS THAT ARE THEN SENT TO ELIZABETH TO REVIEW AND APPROVE,

10:35AM 22    AND SHE WOULD DO THAT BEFORE I SENT OUT ANY COMMUNICATION BACK

10:35AM 23    TO THE MILITARY.

10:35AM 24    Q.   I WANT TO ASK YOU ABOUT SOME OF THOSE CONTACTS, BUT LET ME

10:35AM 25    SKIP TO THE END AND ASK YOU, IN YOUR EXPERIENCE AT THERANOS,

10:35AM   1    DID THE MILITARY EVER ACTUALLY USE A THERANOS DEVICE FOR THE

10:35AM   2    DIAGNOSIS OR TREATMENT OF SOLDIERS?

10:35AM   3    A.   NOT TO MY KNOWLEDGE.

10:35AM   4    Q.   CAN YOU TURN TO TAB 504 IN YOUR BINDER, PLEASE.

10:36AM   5         AND DO YOU RECOGNIZE WHAT IS AT 504?

10:36AM   6    A.   YES.

10:36AM   7    Q.   AND IS IT AN EMAIL FROM JANUARY 2012 FROM YOU TO A

10:36AM   8    REPRESENTATIVE OF THE U.S. MILITARY?

10:36AM   9    A.   YES.

10:36AM  10    Q.   AND DOES IT INCLUDE AN ATTACHMENT PRESENTING INFORMATION

10:36AM  11    ABOUT THERANOS?

10:36AM  12    A.   YES.

10:36AM  13         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 504.

10:36AM  14         MS. WALSH:  OTHER THAN OUR DISCUSSION THIS MORNING,

10:36AM  15    NO OBJECTION.

10:36AM  16         THE COURT:  THANK YOU.  IT'S ADMITTED, 504 IS

10:36AM  17    ADMITTED, AND IT MAY BE PUBLISHED.

10:36AM  18         MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:36AM  19    (GOVERNMENT'S EXHIBIT 504 WAS RECEIVED IN EVIDENCE.)

10:36AM  20         MR. BOSTIC:  LET'S START WITH PAGE 1.

10:36AM  21         LET'S ZOOM IN ON THE MIDDLE OF THE PAGE, FIRST, TO SEE

10:37AM  22    MAJOR COOK'S EMAIL.  ACTUALLY STARTING A LITTLE LOWER DOWN.

10:37AM  23         PERFECT.  THANK YOU.

10:37AM  24    Q.   MR. EDLIN, WHO WAS MAJOR STEPHEN COOK, IF YOU REMEMBER?

10:37AM  25    A.   MAJOR STEPHEN COOK WAS A PART OF SPECIAL OPERATIONS

EDLIN DIRECT BY MR. BOSTIC (RES.)

10:37AM 1    COMMAND.

10:37AM 2    Q.   AND IN HIS EMAIL TO YOU, IN THAT SECOND SENTENCE HE SAYS,

10:37AM 3    "AS YOU KNOW, WE'RE LOOKING TO EVALUATE YOUR SYSTEM TO

10:37AM 4    DETERMINE ITS UTILITY ACROSS THE OPERATIONS AND ENVIRONMENTS IN

10:37AM 5    WHICH WE'D LIKE TO DEPLOY IT."

10:37AM 6        DO YOU SEE THAT?

10:37AM 7    A.   YES.

10:37AM 8    Q.   AND IT SAYS, "IN ORDER TO DO SO, WE'D LIKE TO CONDUCT AN

10:37AM 9    ASSESSMENT PERIOD AFTER WHICH WE'D LIKELY MOVE FORWARD WITH A

10:37AM 10   12-MONTH RENEWABLE SERVICE CONTRACT."

10:37AM 11       DO YOU SEE THAT?

10:37AM 12   A.   YES.

10:37AM 13   Q.   AND THEN SKIPPING TWO PARAGRAPHS DOWN HE PROPOSES THREE

10:38AM 14   DEVICES, GPS DISABLED.

10:38AM 15       DO YOU SEE THAT?

10:38AM 16   A.   YES.

10:38AM 17   Q.   AND ACTUALLY ONE ABOVE THAT.  IT SAYS, "RUNNING UP TO 400

10:38AM 18   ASSAYS EACH MONTH."

10:38AM 19       DO YOU SEE THAT?

10:38AM 20   A.   YES.

10:38AM 21   Q.   AND THOSE ASSAYS INCLUDE "COMPLETE BLOOD COUNT."

10:38AM 22       DO YOU SEE THAT?

10:38AM 23   A.   YES.

10:38AM 24   Q.   DO YOU KNOW WHETHER THE EDISON DEVICE USED IN THE CLINICAL

10:38AM 25   LAB WAS ABLE TO RUN A COMPLETE BLOOD COUNT OR NOT?

10:38AM   1      A.   I HAVE LEARNED THAT IT WAS NOT ABLE TO.

10:38AM   2           MS. WALSH:   OBJECTION.

10:38AM   3           THE COURT:   SUSTAINED.

10:38AM   4      THE LAST ANSWER IS STRICKEN, LADIES AND GENTLEMEN.

10:38AM   5      BY MR. BOSTIC:

10:38AM   6      Q.   MR. EDLIN, DID YOU KNOW DURING YOUR TIME AT THE COMPANY

10:38AM   7      WHETHER THE EDISON DEVICE WAS ABLE TO RUN A COMPLETE BLOOD

10:38AM   8      COUNT OR NOT?

10:38AM   9      A.   YES, THERE WAS A POINT IN TIME WHERE I LEARNED THAT.

10:39AM  10      Q.   AND HOW DID YOU COME TO LEARN THAT WHILE YOU WERE AT THE

10:39AM  11      COMPANY?

10:39AM  12      A.   I CAME TO LEARN THAT, I BELIEVE IN CONNECTION WITH ONE OF

10:39AM  13      THE PROGRAMS WITH THE MILITARY WHEN WE NEEDED TO -- WHEN A

10:39AM  14      DECISION WAS MADE ON WHICH DEVICES WERE GOING TO BE USED FOR

10:39AM  15      THE PROGRAM.

10:39AM  16      Q.   OKAY.  WE'LL CIRCLE BACK TO THAT IN A COUPLE MINUTES.

10:39AM  17      A.   OKAY.

10:39AM  18      Q.   FOR NOW LET ME ASK YOU, IN JANUARY OF 2012, DURING THE

10:39AM  19      TIME OF THIS EMAIL, DID YOU KNOW WHETHER THE THERANOS EDISON

10:39AM  20      COULD PERFORM A COMPLETE BLOOD COUNT?

10:39AM  21      A.   I DON'T BELIEVE SO.

10:39AM  22      Q.   OKAY.  LET'S LOOK AT THE ATTACHMENT TO THIS EMAIL, AND

10:39AM  23      THAT IS ON PAGE 5 OF THE EXHIBIT.

10:40AM  24           AND CAN YOU TELL US WHAT WE'RE LOOKING AT HERE BEGINNING

10:40AM  25      ON PAGE 5?

| | | |
|---|---|---|
| 10:40AM | 1 | A.   THIS LOOKS TO BE A BACKGROUND AND OVERVIEW DOCUMENT ABOUT |
| 10:40AM | 2 | THERANOS. |
| 10:40AM | 3 | Q.   AND WHERE DID THIS CONTENT COME FROM? |
| 10:40AM | 4 | A.   I DON'T RECALL WHERE ALL OF THE CONTENT CAME FROM. |
| 10:40AM | 5 | I RECALL THAT A DOCUMENT EXISTED, BUT I DON'T KNOW WHERE |
| 10:40AM | 6 | THE INFORMATION CAME FROM. |
| 10:40AM | 7 | Q.   DID THIS INFORMATION COME FROM WITHIN THERANOS, OR DID IT |
| 10:40AM | 8 | COME FROM THE MILITARY, OR A THIRD SOURCE, IF YOU KNOW? |
| 10:40AM | 9 | A.   THIS WAS A THERANOS-PRODUCED DOCUMENT. |
| 10:40AM | 10 | Q.   MS. HOLMES IS CC'D ON YOUR EMAIL TO MAJOR COOK ATTACHING |
| 10:40AM | 11 | THIS MEMO. |
| 10:41AM | 12 | DO YOU REMEMBER WHETHER MS. HOLMES WOULD HAVE REVIEWED AND |
| 10:41AM | 13 | APPROVED THIS MEMO BEFORE IT WAS SENT TO THE MILITARY? |
| 10:41AM | 14 | A.   I RECALL THAT SHE DID. |
| 10:41AM | 15 | Q.   LET'S LOOK AT SOME OF THE CONTENT HERE.  LET'S ZOOM IN ON |
| 10:41AM | 16 | THE TOP THIRD OF THE PAGE. |
| 10:41AM | 17 | DO YOU SEE UNDER BACKGROUND THERE'S A CLAIM THAT SAYS, |
| 10:41AM | 18 | "THERANOS HAS CREATED A POINT-OF-SERVICE LABORATORY |
| 10:41AM | 19 | INFRASTRUCTURE THAT GENERATES REAL-TIME DATA FROM A FINGERSTICK |
| 10:41AM | 20 | OF BLOOD OR OTHER MICRO-VOLUMES OF DIFFERENT SAMPLE TYPES |
| 10:41AM | 21 | DELIVERING HIGHER QUALITY DATA THAN PREVIOUSLY POSSIBLE." |
| 10:41AM | 22 | A.   YES. |
| 10:41AM | 23 | Q.   AND IT THEN SAYS, "THIS TECHNOLOGY IS AN INDUSTRY FIRST." |
| 10:41AM | 24 | DO YOU SEE THAT? |
| 10:41AM | 25 | A.   YES. |

10:41AM  1    Q.   AND THE FIRST BULLET POINT UNDERNEATH SAYS, "EACH THERANOS

10:41AM  2    DEVICE CAN RUN EVERY TEST CURRENTLY AVAILABLE THROUGH THE

10:41AM  3    TRADITIONAL CENTRALIZED OR HOSPITAL LABORATORY INFRASTRUCTURE."

10:41AM  4         DO YOU SEE THAT?

10:41AM  5    A.   YES.

10:41AM  6    Q.   AND DID YOU KNOW AT THE TIME WHETHER THAT STATEMENT WAS

10:42AM  7    TRUE OR FALSE?

10:42AM  8    A.   I DIDN'T KNOW, BUT I HAD NO REASON TO DOUBT ITS ACCURACY.

10:42AM  9    Q.   LOOKING AT THE SECOND TO THE BOTTOM BULLET POINT IN THIS

10:42AM 10    COLLECTION, THERE'S A CLAIM THAT READS, "THERANOS MANUFACTURES

10:42AM 11    ALL OF ITS TECHNOLOGIES AND SYSTEMS WITHIN THE UNITED STATES."

10:42AM 12         DO YOU SEE THAT?

10:42AM 13    A.   YES.

10:42AM 14    Q.   CAN YOU REMIND US WHEN YOU BECAME AWARE OF THE COMPANY'S

10:42AM 15    RELIANCE ON THIRD PARTY DEVICES?

10:42AM 16    A.   CAN YOU SPECIFY THE PREVIOUS QUESTION.

10:42AM 17    Q.   SURE.

10:42AM 18         DO YOU RECALL YOUR PREVIOUS TESTIMONY THAT WHEN YOU

10:42AM 19    LEARNED THAT THE COMPANY WAS USING NON-THERANOS DEVICES FOR

10:43AM 20    SOME OF ITS TESTS?

10:43AM 21    A.   I LEARNED THAT THE COMPANY WAS USING THIRD PARTY DEVICES

10:43AM 22    FOR FINGERSTICK TESTS IN 2016.  I DON'T RECALL EXACTLY WHEN --

10:43AM 23    I DON'T RECALL EXACTLY.

10:43AM 24    Q.   OKAY.  AND THIS DOCUMENT ONLY MENTIONS FINGERSTICK TESTING

10:43AM 25    OF BLOOD; IS THAT CORRECT?

10:43AM 1      A.   YES.

10:43AM 2      Q.   LET ME ASK IT A DIFFERENT WAY.

10:43AM 3           DO YOU SEE ANY MENTION OF VEIN SAMPLES, OR VENIPUNCTURE,

10:43AM 4      IN THIS DOCUMENT?

10:43AM 5      A.   WELL, AT THE TOP IT SAYS FINGERSTICK OR OTHER

10:43AM 6      MICRO-VOLUMES OF DIFFERENT SAMPLE TYPES.

10:43AM 7      Q.   OKAY.

10:43AM 8      A.   SO I DON'T SEE A MENTION OF VENOUS HERE.

10:43AM 9      Q.   LET'S TURN THE PAGE, AND LET'S ZOOM IN UNDER MILITARY

10:44AM 10     APPLICATIONS UNDER PROJECT SCOPE.

10:44AM 11          DO YOU SEE UNDER MEDEVAC AT THE TOP, "THE ABILITY TO TEST

10:44AM 12     AND TRIAGE WOUNDED SOLDIERS AT THE TIME OF IMPACT AND DURING

10:44AM 13     EVALUATION (E.G. IN A HELICOPTER)."

10:44AM 14          DO YOU SEE THAT?

10:44AM 15     A.   YES.

10:44AM 16     Q.   AND TO YOUR KNOWLEDGE WAS ANY THERANOS DEVICE EVER USED IN

10:44AM 17     THIS WAY, IN OTHER WORDS, TO TEST SOLDIERS ON A MEDICAL

10:44AM 18     HELICOPTER?

10:44AM 19     A.   NO.

10:44AM 20     Q.   UNDER TELECOMMUNICATIONS THAT LAST SENTENCE SAYS,

10:44AM 21     "THERANOS FIELD SYSTEMS' RUGGED, MODULAR DESIGN WITH INTEGRATED

10:44AM 22     COMMUNICATIONS CAPABILITY AND GPS ENABLE FULL OPERABILITY IN

10:45AM 23     THE FIELD."

10:45AM 24          DO YOU SEE THAT?

10:45AM 25     A.   YES.

EDLIN DIRECT BY MR. BOSTIC (RES.)

10:45AM  1    Q.   IN YOUR EXPERIENCE WITH THERANOS DEVICES, DID YOU FIND

10:45AM  2    THEM TO BE RUGGED?

10:45AM  3    A.   NO.

10:45AM  4    Q.   WHAT MAKES YOU SAY THAT?

10:45AM  5    A.   IN MY EXPERIENCE, THE DEVICES HAD TO BE PLUGGED INTO A

10:45AM  6    POWER SOURCE AND KEPT IN A STATIONARY POSITION, AND THEY

10:45AM  7    COULDN'T BE MOVED WHEN THE DEVICE WAS OPERATING.

10:45AM  8    Q.   IN CONNECTION WITH YOUR WORK WITH THE MILITARY, DID YOU

10:45AM  9    EVER SHIP THERANOS DEVICES TO THE MILITARY?

10:45AM 10    A.   YES.

10:45AM 11    Q.   WHEN DO YOU RECALL DOING THAT?

10:45AM 12    A.   I RECALL THAT DEVICES WERE SHIPPED TO SOCOM, I BELIEVE IT

10:45AM 13    WAS 2014, AND DEVICES WERE ALSO SENT TO AFRICOM.

10:45AM 14    Q.   OKAY.  LET ME ASK YOU ABOUT SOCOM FIRST.

10:45AM 15         WE CAN TAKE THIS EXHIBIT DOWN.  THANK YOU, MS. WACHS.

10:46AM 16         WHEN IT CAME TO SHIPPING THE DEVICES TO SOCOM, WAS THAT

10:46AM 17    SOMEWHERE WITHIN THE U.S. OR SOMEWHERE OVERSEAS?

10:46AM 18    A.   IT WAS IN KENTUCKY.

10:46AM 19    Q.   AND WHAT WAS THE PURPOSE OF SHIPPING DEVICES TO SPECIAL

10:46AM 20    OPERATIONS COMMAND IN KENTUCKY?

10:46AM 21    A.   THEY WERE SHIPPED IN CONNECTION TO THE EVALUATIVE PROGRAMS

10:46AM 22    THAT WE WERE PLANNING WITH THEM.

10:46AM 23    Q.   AND WHEN YOU SAY, "EVALUATIVE PROGRAMS," WHAT DOES THAT

10:46AM 24    MEAN?

10:46AM 25    A.   THAT REFERS TO THE EVALUATION OF THERANOS DEVICES COMPARED

EDLIN DIRECT BY MR. BOSTIC (RES.)                          2549

10:46AM  1    TO THE TESTING AVAILABLE TO THE MILITARY.

10:46AM  2    Q.   AND DO YOU REMEMBER HOW MANY DEVICES APPROXIMATELY WERE

10:46AM  3    SHIPPED TO KENTUCKY AT THAT TIME?

10:46AM  4    A.   I BELIEVE IT WAS THREE.

10:46AM  5    Q.   AND DO YOU KNOW WHETHER SOCOM EVER ACTUALLY USED THOSE

10:46AM  6    DEVICES TO RUN ASSAYS AND EVALUATE PERFORMANCE?

10:46AM  7    A.   I DON'T BELIEVE THEY DID.

10:46AM  8    Q.   YOU MENTIONED EARLIER THE ARMY INSTITUTE OF SURGICAL

10:47AM  9    RESEARCH; IS THAT RIGHT?

10:47AM 10    A.   YES.

10:47AM 11    Q.   AND CAN YOU DESCRIBE THERANOS'S CONTACTS WITH THAT

10:47AM 12    COMPONENT?

10:47AM 13    A.   I RECALL HAVING TWO MAIN CONTACTS AND THAT PROGRAM WAS FOR

10:47AM 14    A BURN STUDY IN CONNECTION TO EVALUATING SEPSIS WITH BURN

10:47AM 15    PATIENTS.

10:47AM 16    Q.   AND DID THAT STUDY ACTUALLY TAKE PLACE?

10:47AM 17    A.   YES.

10:47AM 18    Q.   AND WAS THIS THE MILITARY CONNECTION INVOLVING THERANOS

10:47AM 19    THAT GOT THE FURTHEST ALONG?

10:47AM 20    A.   I THINK IT'S FAIR TO SAY THAT.

10:48AM 21    Q.   NONETHELESS, DID THAT STUDY INVOLVE THE ACTUAL USE OF THE

10:48AM 22    THERANOS DEVICE TO DIAGNOSE AND TREAT SOLDIERS TO YOUR

10:48AM 23    KNOWLEDGE?

10:48AM 24            MS. WALSH:  OBJECTION.  LEADING.

10:48AM 25            THE COURT:  OVERRULED.

10:48AM  1          THE WITNESS:  TO MY KNOWLEDGE, NO.

10:48AM  2     BY MR. BOSTIC:

10:48AM  3     Q.   LET ME DIRECT YOUR ATTENTION TO TAB 588 IN THE BINDER IN

10:48AM  4     FRONT OF YOU.

10:48AM  5          AND DO YOU SEE AT 588 AN EMAIL CHAIN BETWEEN

10:48AM  6     COLONEL ERIN EDGAR AND ELIZABETH HOLMES?

10:48AM  7     A.   YES.

10:48AM  8             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:48AM  9     EXHIBIT 588.

10:48AM 10             MS. WALSH:  NO OBJECTION.

10:48AM 11             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:48AM 12        (GOVERNMENT'S EXHIBIT 588 WAS RECEIVED IN EVIDENCE.)

10:48AM 13             MR. BOSTIC:  AND LET'S ZOOM IN ON THE FIRST EMAIL,

10:49AM 14     THE BOTTOM EMAIL.

10:49AM 15     Q.   DURING YOUR TIME AT THERANOS, DID YOU HAVE CONTACT WITH

10:49AM 16     SOMEBODY NAMED COLONEL ERIN EDGAR?

10:49AM 17     A.   I DON'T BELIEVE I HAD MUCH CONTACT WITH HIM, BUT I BELIEVE

10:49AM 18     I'M AWARE THAT HE WAS INVOLVED IN OUR PROGRAM, IN THE THERANOS

10:49AM 19     PROGRAM WITH CENTCOM.

10:49AM 20     Q.   OKAY.  AND THAT WAS GOING TO BE MY NEXT QUESTION.

10:49AM 21          WHICH COMPONENT OF THE MILITARY WAS HE FAMILIAR WITH?  YOU

10:49AM 22     SAID CENTCOM?

10:49AM 23     A.   YES.

10:49AM 24     Q.   AROUND THIS TIME IN APRIL OF 2012, WHAT WAS CENTCOM TRYING

10:49AM 25     TO DO WITH RESPECT TO THE THERANOS DEVICE?

10:49AM  1    A.   CENTCOM WAS INTERESTED IN A SIMILAR TYPE OF EVALUATION OF

10:49AM  2    THE THERANOS TECHNOLOGY COMPARED TO THE TESTING THAT WAS

10:49AM  3    AVAILABLE.

10:49AM  4    Q.   AND THIS EMAIL HAS THE SUBJECT LINE THERANOS UPDATE TO

10:50AM  5    GENERAL MATTIS.

10:50AM  6         DO YOU SEE THAT?

10:50AM  7    A.   YES.

10:50AM  8    Q.   AND HOW WAS GENERAL MATTIS CONNECTED TO THESE

10:50AM  9    COMMUNICATIONS BETWEEN CENTCOM AND THERANOS?

10:50AM  10   A.   I'M NOT SURE BEYOND JUST WHAT IS WRITTEN IN THE EMAILS,

10:50AM  11   BUT YEAH.

10:50AM  12   Q.   OKAY.   THE MENTION IN THIS EMAIL TO THE EFFORT OF GETTING

10:50AM  13   THE ANALYZERS INTO THEATER.

10:50AM  14        DO YOU SEE THAT?

10:50AM  15   A.   YES.

10:50AM  16   Q.   AROUND THIS TIME, DID THAT RELATE TO USE ON THE

10:50AM  17   BATTLEFIELD TO TREAT SOLDIERS?

10:50AM  18   A.   AT THIS TIME, NO.   I THINK THAT WAS THE EVENTUAL GOAL IF

10:50AM  19   THE PROGRAM WAS SUCCESSFUL.

10:50AM  20   Q.   AND SO WHAT STAGES WERE THINGS AT WITH CENTCOM AT THIS

10:50AM  21   TIME IN APRIL OF 2012?

10:51AM  22   A.   AT THIS TIME I WOULD SAY THEY WERE IN THE PLANNING STAGE.

10:51AM  23   Q.   LET'S LOOK AT EXHIBIT 1027 TO GET SOME MORE DETAILS ON

10:51AM  24   THAT.

10:51AM  25        AND AT 1027, DO YOU SEE AN EMAIL FROM YOURSELF TO

10:51AM  1    MS. HOLMES WITH THE SUBJECT LINE THERANOS LIMITED OBJECTIVE

10:51AM  2    EXPERIMENT?

10:51AM  3    A.   YES.

10:51AM  4    Q.   AND DOES THIS RELATE TO CONTINUING EXPLORATION OF POSSIBLE

10:51AM  5    USE BY CENTCOM?

10:51AM  6    A.   YES.

10:51AM  7            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1027.

10:51AM  8            MS. WALSH:  NO OBJECTION.

10:51AM  9            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:51AM  10       (GOVERNMENT'S EXHIBIT 1027 WAS RECEIVED IN EVIDENCE.)

10:51AM  11           MR. BOSTIC:  LET'S START BY ZOOMING IN ON THE MIDDLE

10:52AM  12   OF THE PAGE TO CAPTURE THE EMAIL FROM MARTIN DRAKE.

10:52AM  13   Q.   SO, MR. EDLIN, THIS EMAIL IS FROM JULY 24TH, 2013; IS THAT

10:52AM  14   CORRECT?

10:52AM  15   A.   YES.

10:52AM  16   Q.   AND THE SUBJECT HEADING HERE IS THERANOS LIMITED OBJECTIVE

10:52AM  17   EXPERIMENT.

10:52AM  18       DO YOU RECALL WHAT THAT REFERRED TO?  WHAT WAS THE LIMITED

10:52AM  19   OBJECTIVE EXPERIMENT?

10:52AM  20   A.   THAT WAS THE NAME OF THE EVALUATION OF THAT PROGRAM.

10:52AM  21   Q.   IN THE -- LET'S SEE.

10:52AM  22       IN THIS EMAIL, MARTIN DRAKE SAYS, "I AM A SCIENCE ADVISOR

10:52AM  23   WITH U.S. CENTRAL COMMAND."

10:52AM  24       DO YOU SEE THAT?

10:52AM  25   A.   YES.

10:52AM 1    Q.   AND IT SAYS, "GENERAL MATTIS CHARGED OUR COMMAND SURGEON

10:52AM 2    AND ME TO CONDUCT AN INVESTIGATION INTO THE COMPARATIVE

10:52AM 3    BENEFITS OF YOUR TECHNOLOGY AND APPROACH OVER LEGACY METHODS

10:53AM 4    AND EQUIPMENT."

10:53AM 5         DO YOU SEE THAT?

10:53AM 6    A.   YES.

10:53AM 7    Q.   AND IT SAYS, "WE HAVE BEEN UNABLE TO PUSH YOUR EQUIPMENT

10:53AM 8    TO THEATER SO THAT WE COULD CONDUCT A PROPER EXPERIMENT."

10:53AM 9         DO YOU SEE THAT?

10:53AM 10   A.   YES.

10:53AM 11   Q.   SO THIS IS NOW SUMMER OF 2013.

10:53AM 12        AT THIS POINT HAD THE DEALINGS WITH CENTCOM GOTTEN TO THE

10:53AM 13   POINT WHERE THE MILITARY WAS READY TO USE THERANOS DEVICES TO

10:53AM 14   ACTUALLY TEST AND TREAT SOLDIERS?

10:53AM 15   A.   NO.

10:53AM 16   Q.   WHY NOT?  WHAT STILL NEEDED TO HAPPEN FIRST?

10:53AM 17   A.   AT THIS POINT, CENTCOM STILL HAD NOT HAD EXPERIENCE USING

10:53AM 18   THE THERANOS DEVICES AND RUNNING TESTS.

10:54AM 19   Q.   LET'S GO BACK TO PAGE 1 OF THIS EXHIBIT, AND LET'S ZOOM IN

10:54AM 20   ON MARTIN DRAKE'S EMAIL ON THIS PAGE.

10:54AM 21        HERE, DO YOU SEE AN EMAIL IN AUGUST OF 2013 THAT READS IN

10:54AM 22   THE SECOND PARAGRAPH, "IN ORDER FOR US TO REQUEST RESOURCES IN

10:54AM 23   FINANCIAL YEAR 2014 TO CONDUCT THIS LOE, WE WILL REQUIRE A FIRM

10:54AM 24   COMMITMENT FROM YOU WHEN THERANOS WILL BE AVAILABLE, IN

10:54AM 25   THEATER, AND READY FOR TEST.  PLEASE PICK A DATE IN CALENDAR

10:54AM 1     YEAR 2014 WHEN YOU KNOW BEYOND DOUBT YOU WILL BE READY TO

10:54AM 2     TEST."

10:54AM 3          DO YOU SEE THAT?

10:54AM 4     A.   YES.

10:54AM 5     Q.   AND AROUND THIS TIME WERE THERE ISSUES WITH THE COMPANY'S

10:54AM 6     READINESS FOR THE TESTS THAT THE MILITARY WANTED TO PERFORM?

10:54AM 7     A.   MY UNDERSTANDING AT THIS TIME WAS THAT THE COMPANY WAS

10:54AM 8     STILL IN THE PROCESS OF CUSTOMIZATION FOR THE PROGRAM.

10:54AM 9     Q.   AND WHERE DID THAT UNDERSTANDING COME FROM?

10:54AM 10    A.   THAT'S WHAT I WAS TOLD BY ELIZABETH AND OTHER SCIENTISTS.

10:55AM 11    Q.   LET'S LOOK AT THE TOP EMAIL ON THIS PAGE.

10:55AM 12         HERE'S YOUR RESPONSE TO MARTIN DRAKE'S REQUEST FOR A DATE

10:55AM 13    CERTAIN FOR WHEN THE COMPANY COULD DO THE TEST; CORRECT?

10:55AM 14    A.   YES.

10:55AM 15    Q.   AND YOU SAY IN THE THIRD PARAGRAPH DOWN, "LOOKING AHEAD TO

10:55AM 16    2014, WE WOULD BE ABLE TO DELIVER ALL OF OUR EQUIPMENT TO

10:55AM 17    THEATER AND BEGIN TESTING BY AUGUST 1ST."

10:55AM 18         DO YOU SEE THAT?

10:55AM 19    A.   YES.

10:55AM 20    Q.   AND SO IN OTHER WORDS, THE COMPANY NEEDED ANOTHER YEAR TO

10:55AM 21    COMPLETE ITS WORK AND BE READY FOR THAT TESTING?

10:55AM 22    A.   THAT'S WHAT I WAS TOLD.

10:55AM 23    Q.   WERE YOU STILL AT THE COMPANY IN AUGUST OF 2014?

10:55AM 24    A.   YES.

10:55AM 25    Q.   AND DID THIS LIMITED OBJECTIVE EXPERIMENT ACTUALLY BEGIN A

| | | |
|---|---|---|
| 10:55AM | 1 | YEAR LATER, IN AUGUST OF 2014? |
| 10:55AM | 2 | A.   NO. |
| 10:55AM | 3 | Q.   DID THIS LIMITED OBJECTIVE EXPERIMENT EVER TAKE PLACE |
| 10:55AM | 4 | DURING YOUR TIME AT THE COMPANY? |
| 10:55AM | 5 | A.   NO. |
| 10:55AM | 6 | Q.   OKAY.  WE CAN SET THAT EXHIBIT ASIDE. |
| 10:56AM | 7 | DID YOU EVER TRAVEL TO MILITARY BASES IN CONNECTION WITH |
| 10:56AM | 8 | YOUR WORK AT THERANOS? |
| 10:56AM | 9 | A.   YES. |
| 10:56AM | 10 | Q.   AND WHAT DO YOU RECALL ABOUT THAT? |
| 10:56AM | 11 | A.   I RECALL TRAVELLING TO THE MACDILL AIRFORCE BASE IN TAMPA |
| 10:56AM | 12 | FOR A SECURITY TEST ON THE THERANOS DEVICES. |
| 10:56AM | 13 | Q.   AND WHAT DOES "SECURITY TEST" MEAN IN THE CONTEXT OF WHAT |
| 10:56AM | 14 | THE MILITARY WAS TRYING TO DO WITH THE DEVICES? |
| 10:56AM | 15 | A.   CENTCOM WAS INTERESTED IN PLUGGING IN ONE OF THE THERANOS |
| 10:56AM | 16 | DEVICES TO ITS SERVER TO UNDERSTAND WHAT ITS VULNERABILITIES |
| 10:56AM | 17 | WERE FROM A SECURITY PERSPECTIVE. |
| 10:56AM | 18 | Q.   AND DID THAT TEST INVOLVE ANY EVALUATION OF THE ACTUAL |
| 10:56AM | 19 | PERFORMANCE OF THE MACHINE IN CLINICAL TESTING? |
| 10:56AM | 20 | A.   NO. |
| 10:56AM | 21 | Q.   WE HAVEN'T SPOKEN ABOUT AFRICOM YET. |
| 10:57AM | 22 | WHAT DO YOU RECALL ABOUT AFRICOM'S EXPLORATION OF POSSIBLE |
| 10:57AM | 23 | USE OF THE THERANOS DEVICE? |
| 10:57AM | 24 | A.   AFRICOM WAS INTERESTED IN THE VIABILITY OF THERANOS |
| 10:57AM | 25 | DEVICES IN CERTAIN TEST DEVICES. |

10:57AM 1          I RECALL THAT, I BELIEVE, THREE EDISON DEVICES WERE I

10:57AM 2     THINK FIRST SENT TO EUROPE AND THEN FLOWN TO AFRICA TO DO SOME

10:57AM 3     TESTING.

10:57AM 4     Q.   AND DO YOU RECALL WHETHER THAT TESTING INCLUDED ACTUAL

10:57AM 5     CLINICAL USE OF THE DEVICES?

10:57AM 6          IN OTHER WORDS, WERE THE DEVICES USED IN AFRICA TO RUN

10:57AM 7     REAL TESTS ON PATIENTS THAT MEDICAL DECISIONS WERE BASED ON?

10:57AM 8     A.   NO.  FOR THAT PROGRAM, THE POINT OF CONTACT THERE SENT

10:58AM 9     THERANOS PREDETERMINED RESULTS THAT THEY WERE INTERESTED IN

10:58AM 10    SEEING ON THE THERANOS SCREEN, BUT IT'S MY UNDERSTANDING THAT

10:58AM 11    NO CLINICAL TESTS WERE DONE.

10:58AM 12    Q.   SO IF THE POINT OF THE TEST WASN'T TO ACTUALLY EVALUATE

10:58AM 13    THE CLINICAL PERFORMANCE OF THE MACHINE, WHAT WAS THE POINT OF

10:58AM 14    THE TEST AS YOU UNDERSTOOD IT?

10:58AM 15    A.   I UNDERSTOOD THAT THE POINT OF THE PROGRAM WAS TO EVALUATE

10:58AM 16    HOW THE DEVICES PERFORMED, INCLUDING USABILITY, AND IF THE

10:58AM 17    DEVICES WOULD POWER ON IN CERTAIN TESTING ENVIRONMENTS.

10:58AM 18    Q.   SO THINKING ABOUT ALL OF THE CONTACT THAT YOU HAD WITH THE

10:59AM 19    MILITARY AND YOUR KNOWLEDGE OF THE COMPANY'S INVOLVEMENT THERE,

10:59AM 20    DURING YOUR TIME AT THE COMPANY, WERE THERANOS ANALYZERS EVER

10:59AM 21    USED BY THE MILITARY CLINICALLY IN THE TREATMENT OF DEPLOYED

10:59AM 22    SOLDIERS?

10:59AM 23    A.   NOT TO MY KNOWLEDGE.

10:59AM 24    Q.   DID THE MILITARY DEPLOY ANY THERANOS DEVICES TO A

10:59AM 25    BATTLEFIELD OR A WAR ZONE FOR CLINICAL USE?

10:59AM 1    A.   NO.

10:59AM 2    Q.   TO YOUR KNOWLEDGE, DID THE MILITARY EVER SEND A SINGLE

10:59AM 3    THERANOS ANALYZER TO THE MIDDLE EAST?

10:59AM 4    A.   NO.

10:59AM 5    Q.   AND TO YOUR KNOWLEDGE, WAS A THERANOS ANALYZER EVER

10:59AM 6    INSTALLED ON A MEDEVAC OR ANOTHER MILITARY HELICOPTER?

10:59AM 7    A.   NO.

10:59AM 8    Q.   DID YOU EVER DISCUSS WITH MS. HOLMES THE REASON WHY THE

10:59AM 9    MILITARY PROJECTS DIDN'T MOVE FURTHER ALONG?

10:59AM 10   A.   YES.

10:59AM 11   Q.   AND WHAT DO YOU REMEMBER HER SAYING ABOUT THAT?

11:00AM 12              MS. WALSH:  OBJECTION.  HEARSAY.

11:00AM 13              MR. BOSTIC:  IT'S NOT FOR THE TRUTH, YOUR HONOR.

11:00AM 14              THE COURT:  FOR WHAT PURPOSE?

11:00AM 15              MR. BOSTIC:  SO I THINK THIS IS TO -- I THINK THE

11:00AM 16   RELEVANT COMPARISON IS BETWEEN WHAT MS. HOLMES SAID AND THE

11:00AM 17   ACTUAL STATE OF THE TECHNOLOGY AT THE COMPANY.

11:00AM 18              THE COURT:  AND THAT'S NOT FOR THE TRUTH?

11:00AM 19              MR. BOSTIC:  NO, YOUR HONOR.  IN FACT, I BELIEVE THE

11:00AM 20   EVIDENCE WOULD SHOW THAT IT'S A FALSE STATEMENT.

11:00AM 21              THE COURT:  ALL RIGHT.  THANK YOU.

11:00AM 22       LADIES AND GENTLEMEN, THIS WILL BE ADMITTED NOT FOR THE

11:00AM 23   TRUTH OF THE MATTER ASSERTED IN THIS STATEMENT BY MS. HOLMES,

11:00AM 24   BUT ONLY AS TO ANY ISSUE OF FALSITY.  IT'S NOT FOR THE TRUTH OF

11:00AM 25   THE MATTER ASSERTED.

11:00AM  1    BY MR. BOSTIC:

11:00AM  2    Q.   SO, MR. EDLIN, THE QUESTION WAS, WHAT REASON, IF ANY, DID

11:01AM  3    MS. HOLMES GIVE YOU FOR WHY THE MILITARY PROJECTS WERE MOVING

11:01AM  4    FURTHER ALONG?

11:01AM  5    A.   SHE TOLD ME THAT IT WAS A RESOURCE ISSUE AND THAT THE

11:01AM  6    COMPANY'S LIMITED RESOURCES HAD TO BE DIRECTED TOWARDS

11:01AM  7    PREPARING FOR THE COMMERCIAL RETAIL LAUNCH.

11:01AM  8    Q.   IN THAT CONVERSATION, OR ANY OTHER CONVERSATION, DID

11:01AM  9    MS. HOLMES EVER TALK ABOUT LIMITATIONS IN CAPABILITIES OF THE

11:01AM  10   THERANOS DEVICES AS BEING THE REASON WHY THOSE CONTACTS WITH

11:01AM  11   THE MILITARY DIDN'T MOVE FORWARD?

11:01AM  12   A.   SHE DID NOT.

11:01AM  13   Q.   IN ANY COMMUNICATIONS THAT YOU WERE INVOLVED IN WITH THE

11:01AM  14   MILITARY, WAS THE MILITARY EVER TOLD THAT DEVICE READINESS, OR

11:01AM  15   THE CAPABILITIES OF THE DEVICE WERE THE REASON WHY THESE

11:01AM  16   PROJECTS WEREN'T MOVING FORWARD?

11:01AM  17   A.   I RECALL THAT THE FACT THAT THERANOS WAS CUSTOMIZING ITS

11:02AM  18   DEVICES FOR A PROGRAM AND NEEDED TIME TO DO THAT WAS BEING

11:02AM  19   DISCUSSED.

11:02AM  20   Q.   YOU REMEMBER IT BEING DISCUSSED IN TERMS OF CUSTOMIZATION?

11:02AM  21   A.   YES.

11:02AM  22   Q.   AND DO YOU RECALL THE MILITARY EVER BEING TOLD THAT

11:02AM  23   THERANOS DIDN'T HAVE A SINGLE DEVICE THAT COULD RUN ALL OF THE

11:02AM  24   TESTS THAT THE MILITARY NEEDED?

11:02AM  25   A.   NO.

```
11:02AM   1              MS. WALSH:  OBJECTION.  LEADING.

11:02AM   2              THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

11:02AM   3   BY MR. BOSTIC:

11:02AM   4   Q.   AND THE ANSWER WAS?

11:02AM   5   A.   NO.

11:02AM   6   Q.   I'D LIKE TO SHIFT GEARS AND TALK ABOUT THERANOS PATIENTS.

11:02AM   7        IN YOUR ROLE AT THERANOS, WERE YOU GENERALLY AWARE OF

11:02AM   8   CALLS THAT THE COMPANY WOULD GET FROM PATIENTS OR DOCTORS ABOUT

11:02AM   9   QUESTIONABLE OR INACCURATE TEST RESULTS?

11:02AM  10   A.   I WAS GENERALLY AWARE.

11:02AM  11   Q.   ALL RIGHT.  HOW DID YOU COME TO BE AWARE OF THAT

11:02AM  12   HAPPENING?

11:02AM  13   A.   ON A FEW INSTANCES I WAS COPIED ON EMAIL SERVICE.

11:03AM  14   Q.   FROM YOUR WORK AT THE COMPANY, DO YOU KNOW WHETHER THERE

11:03AM  15   WERE PEOPLE WHO WORKED THERE WHO WERE DESIGNATED TO RECEIVE

11:03AM  16   THOSE CALLS FROM CUSTOMERS OR PATIENTS?

11:03AM  17   A.   YES.

11:03AM  18   Q.   AND WHAT GROUP OF PEOPLE ARE WE TALKING ABOUT THERE?

11:03AM  19   A.   I BELIEVE THERE WAS A CUSTOMER SERVICES GROUP THAT

11:03AM  20   RECEIVED THOSE CALLS.

11:03AM  21   Q.   AND ARE YOU AWARE OF WHERE THAT CUSTOMER SERVICES GROUP

11:03AM  22   SAT, IN OTHER WORDS, AT WHAT FACILITY?

11:03AM  23   A.   SO WE WERE IN -- I WAS IN THREE DIFFERENT BUILDINGS WHEN I

11:03AM  24   WAS EMPLOYED BY THE COMPANY.  I DO RECALL THAT IN THE SECOND

11:03AM  25   BUILDING, THAT TEAM WAS AT THE THERANOS OFFICES IN PALO ALTO.
```

11:03AM  1         I DON'T RECALL WHERE THAT GROUP WAS LOCATED IN MY -- IN

11:03AM  2    THE THIRD BUILDING THAT I WAS APART OF IT.

11:03AM  3    Q.   OKAY.  AND THESE ARE BUILDINGS THAT YOU MOVED TO

11:03AM  4    SEQUENTIALLY?

11:04AM  5    A.   CORRECT.

11:04AM  6    Q.   LET ME ASK YOU TO TURN TO TAB 5413 IN THE BINDER IN FRONT

11:04AM  7    OF YOU.

11:04AM  8         OKAY.  DO YOU HAVE 5413?

11:04AM  9    A.   YES.

11:04AM 10    Q.   AND IS THIS AN EMAIL, INCLUDING YOU ON THE CHAIN, RELATING

11:04AM 11    TO A QUESTION FROM A PATIENT OR PHYSICIAN ABOUT A THERANOS LAB

11:04AM 12    TEST RESULT?

11:04AM 13    A.   YES.

11:04AM 14         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5413.

11:04AM 15         MS. WALSH:  OBJECTION, YOUR HONOR.  THERE ARE

11:04AM 16    MULTIPLE LEVELS OF HEARSAY IN THIS EMAIL.

11:04AM 17         THE COURT:  MR. BOSTIC.

11:05AM 18    BY MR. BOSTIC:

11:05AM 19    Q.   MR. EDLIN, DURING YOUR TIME AT THERANOS, WAS EMAIL USED AS

11:05AM 20    A PRIMARY MEANS OF COMMUNICATION BETWEEN EMPLOYEES?

11:05AM 21    A.   YES.

11:05AM 22    Q.   AND WHEN IT CAME TO THE WORK OF THE LAB AND THE RESULTS

11:05AM 23    THAT WENT OUT, WAS EMAIL USED TO DOCUMENT AND DISCUSS ISSUES

11:05AM 24    ABOUT SOME OF THOSE RESULTS?

11:05AM 25    A.   I DON'T KNOW SPECIFICALLY ABOUT THE LAB COMMUNICATIONS,

11:05AM 1    BUT I BELIEVE IT WAS A COMBINATION OF EMAILS AND CONVERSATIONS.

11:05AM 2    Q.   AND WERE YOU SOMETIMES INCLUDED IN INSTANCES OF EMAIL

11:05AM 3    CHAINS DISCUSSING ISSUES AROUND PATIENT COMPLAINTS LIKE THE ONE

11:06AM 4    IN FRONT OF YOU?

11:06AM 5    A.   IT WAS INFREQUENT, BUT SOMETIMES, YES.

11:06AM 6    Q.   AND IN THOSE EMAILS, WAS IT IMPORTANT FOR THE PEOPLE

11:06AM 7    CONVEYING THE INFORMATION TO BE ACCURATE SO THAT THE ISSUES

11:06AM 8    COULD BE ADDRESSED?

11:06AM 9    A.   YES.

11:06AM 10   Q.   AND WERE EMAILS LIKE THIS PRESERVED AT THERANOS SO THAT

11:06AM 11   THEY COULD BE REFERRED BACK TO LATER IF NEEDED?

11:06AM 12   A.   I BELIEVE SO.

11:06AM 13        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5413

11:06AM 14   UNDER 803(6).

11:06AM 15        MS. WALSH:  YOUR HONOR, ON PAGES 2 THROUGH 3, I

11:06AM 16   BELIEVE THAT FOUNDATION TAKES CARE OF THE EMAIL TO MR. EDLIN.

11:06AM 17        BUT ON PAGES 2 THROUGH 3, THERE ARE FURTHER ASSERTIONS

11:06AM 18   THAT ARE HEARSAY WITHIN HEARSAY, AND I BELIEVE MR. BOSTIC IS

11:06AM 19   OFFERING THOSE FOR THE TRUTH.

11:06AM 20        MR. BOSTIC:  AT A MINIMUM, I BELIEVE THIS SHOULD

11:07AM 21   COME IN FOR NOTICE TO MR. BALWANI WHO IS ON THE SECOND TOP

11:07AM 22   EMAIL OF PAGE 1.

11:07AM 23        THE COURT:  ALL RIGHT.  THANK YOU.

11:07AM 24   ANYTHING FURTHER, MS. WALSH?

11:07AM 25        MS. WALSH:  NO, YOUR HONOR.

11:07AM  1            THE COURT:  ALL RIGHT.  THANK YOU.

11:07AM  2            I'LL ADMIT THIS.

11:07AM  3            LADIES AND GENTLEMEN, THIS IS OFFERED NOT FOR THE EMAILS

11:07AM  4   AND THE CONTENT, THAT IS, THE CONTENT FROM THE SENDER OF THE

11:07AM  5   EMAIL REGARDING SERVICES, IT'S NOT OFFERED FOR THE TRUTH OF THE

11:07AM  6   MATTER ASSERTED, BUT ONLY AS TO THE ISSUE OF NOTICE TO THE

11:07AM  7   RECIPIENTS OF THE EMAIL OF WHICH MR. BALWANI WAS ONE.

11:07AM  8            SO IT'S FOR THAT LIMITED PURPOSE.

11:07AM  9            MR. BOSTIC.

11:07AM 10            AND IT MAY BE PUBLISHED.

11:07AM 11            (GOVERNMENT'S EXHIBIT 5413 WAS RECEIVED IN EVIDENCE.)

11:07AM 12            MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:07AM 13   Q.   SO LOOKING AT EXHIBIT 5413, LET'S START WITH PAGE 2 AND

11:08AM 14   THE BOTTOM OF THE PAGE.

11:08AM 15            MR. EDLIN, THIS IS AN EMAIL FROM JULY 29TH, 2014, FROM

11:08AM 16   SOMEONE NAMED AMELIA AGUIRRE TO CHRISTIAN HOLMES AND TO YOU.

11:08AM 17            DO YOU SEE THAT?

11:08AM 18   A.   YES.

11:08AM 19   Q.   AND THE SUBJECT IS PATIENT REQUESTING PHYSICIAN CALL

11:08AM 20   REGARDING LAB RESULTS.

11:08AM 21            AND THE TEXT SAYS, "I RECEIVED A CALL FROM PATIENT," AND

11:08AM 22   WE REDACTED THE NAME.  IT SAYS, "HE EXPRESSED THAT HE DOES NOT

11:08AM 23   BELIEVE OUR RESULTS WERE NOT ACCURATE," ALTHOUGH THAT MAY BE A

11:08AM 24   TYPO, "FROM HIS LAST VISIT AND HIS PHYSICIAN AGREES (NOT

11:08AM 25   CONSISTENT WITH HISTORY)."

11:08AM  1        DO YOU SEE THAT?

11:08AM  2    A.   YES.

11:08AM  3    Q.   AND LET'S GO TO PAGE 3.  AND ZOOM IN THE TOP TWO

11:08AM  4    PARAGRAPHS THERE.

11:08AM  5        THE REPORT SAYS, "HE CAME TO THERANOS MOST RECENTLY ON

11:08AM  6    JULY 22ND, AND THE RESULTS FOR INR WERE .9.  HIS PHYSICIAN SENT

11:09AM  7    HIM TO LABCORP 2 DAYS LATER BECAUSE HE BELIEVED THE LAB RESULTS

11:09AM  8    WERE LOW AND HIS RESULT AT LABCORP FOR INR WAS 3.1 (WHICH

11:09AM  9    PATIENT SAYS IS MORE CONSISTENT WITH HIS HISTORY WHICH IS

11:09AM  10   USUALLY BETWEEN 2.0 AND 3.0)."

11:09AM  11       DO YOU SEE THAT?

11:09AM  12   A.   YES.

11:09AM  13   Q.   AND IT SAYS, "HE CURRENTLY HAS A STANDING ORDER FOR PT/INR

11:09AM  14   FROM HIS DOCTOR, HOWEVER, HE DOES NOT WANT TO CONTINUE TO COME

11:09AM  15   TO THERANOS EVEN THOUGH HE HAS A STANDING ORDER UNTIL WE VERIFY

11:09AM  16   THAT OUR RESULTS ARE ACCURATE."

11:09AM  17       DO YOU SEE THAT?

11:09AM  18   A.   YES.

11:09AM  19   Q.   AND LET'S GO BACK TO PAGE 2, AND LET'S ZOOM IN ON THE

11:09AM  20   EMAIL FROM CHRISTIAN HOLMES TO YOU AND TO MAX FOSQUE.

11:09AM  21   A.   YES.

11:09AM  22   Q.   AND CHRISTIAN HOLMES SAYS TO MAX, "CAN YOU PULL THE

11:09AM  23   RESULTS HISTORY FOR THIS PATIENT ON THE INR HE'S ASKING ABOUT?

11:09AM  24   ELIZABETH WANTS TO REVIEW THEN HAVE SOMEONE CALL THE

11:09AM  25   PATIENT/DOC BACK."

11:10AM   1        DO YOU SEE THAT?

11:10AM   2   A.   YES.

11:10AM   3   Q.   DURING YOUR TIME AT THE COMPANY, DID YOU HAVE AN

11:10AM   4   UNDERSTANDING OF WHAT ROLE ELIZABETH HOLMES HAD IN REVIEWING

11:10AM   5   PATIENT RESULTS IN SITUATIONS SUCH AS THIS?

11:10AM   6   A.   I BELIEVE ON SOME OCCASIONS SHE WORKED WITH WHOEVER WOULD

11:10AM   7   BE RESPONDING TO WORKING WITH THE PHYSICIAN ON CERTAIN

11:10AM   8   MESSAGING AND SCRIPTING.

11:10AM   9   Q.   IN FACT, LET'S GO TO PAGE 1 OF THIS EXHIBIT.  AND LOOK AT

11:10AM   10  THE TOP TWO MESSAGES OR THE TOP THREE MESSAGES.

11:10AM   11       WE SEE A MESSAGE AT THE BOTTOM FROM MS. HOLMES TO THIS

11:10AM   12  GROUP, INCLUDING MR. BALWANI.

11:10AM   13       DO YOU SEE THAT?

11:10AM   14  A.   YES.

11:10AM   15  Q.   SHE SAYS, "MAX -- NEED YOU TO TRIAGE THIS, THEN COME BRIEF

11:10AM   16  ME ON WHAT HAPPENED.  FROM THERE WE'LL DECIDE WHO WILL CALL."

11:10AM   17       DO YOU SEE THAT?

11:10AM   18  A.   YES.

11:10AM   19  Q.   MAX FOSQUE THEN ASKS, "WHAT DOES THIS MEAN?"

11:11AM   20       IS THAT EMAIL JUST TO YOU?

11:11AM   21  A.   I BELIEVE IT'S TO CHRISTIAN.

11:11AM   22  Q.   I SEE.

11:11AM   23       AND THEN CHRISTIAN HOLMES WRITES BACK, "WHAT SUNNY JUST

11:11AM   24  SAID -- HOPE THAT MAKES SENSE.  BASICALLY HAVE NISHIT LOOK AT

11:11AM   25  THE DATA AND SEE IF ANYTHING WENT WRONG (IDENTIFY THE ISSUE)

11:11AM   1    THEN WORK WITH ELIZABETH ON SCRIPTING WHILE SUNNY ADDRESSES

11:11AM   2    ROOT CAUSE OF ANY ISSUE INTERNALLY."

11:11AM   3         DO YOU SEE THAT?

11:11AM   4    A.   YES.

11:11AM   5    Q.   AND THAT REFERENCE TO ELIZABETH HOLMES WORKING ON

11:11AM   6    SCRIPTING, WHAT IS YOUR UNDERSTANDING OF WHAT SCRIPTING WOULD

11:11AM   7    HAVE MEANT IN THAT CONTEXT?

11:11AM   8    A.   I THINK IT REFERS TO MESSAGING THAT WOULD RELATE TO THE

11:11AM   9    SPECIFIC ISSUE.

11:11AM  10    Q.   MESSAGING TO WHOM?

11:11AM  11    A.   PHYSICIANS.

11:11AM  12    Q.   AND THEN IT SAYS, "WHILE SUNNY ADDRESSES ROOT CAUSE OF ANY

11:12AM  13    ISSUE INTERNALLY."

11:12AM  14         WHAT IS YOUR UNDERSTANDING OF WHAT WOULD BE INVOLVED IN

11:12AM  15    THAT?

11:12AM  16    A.   MY UNDERSTANDING IS THAT SUNNY WOULD WORK WITH THE

11:12AM  17    LABORATORY PERSONNEL TO UNDERSTAND WHAT CAUSED THE ISSUE.

11:12AM  18         SO INTERNALLY I BELIEVE IT WOULD REFER TO WITHIN THE

11:12AM  19    CLINICAL LAB OR WITH THERANOS SCIENTISTS.

11:12AM  20    Q.   OKAY.  WE CAN SET THAT ASIDE.

11:12AM  21         I'D LIKE TO ASK YOU A FEW QUESTIONS ABOUT THE RELATIONSHIP

11:12AM  22    BETWEEN MS. HOLMES AND MR. BALWANI.

11:12AM  23         WE TALKED EARLIER ABOUT THEIR WORKING RELATIONSHIP AND

11:12AM  24    WHAT YOU OBSERVED THERE.  I'D LIKE TO ASK YOU NOW ABOUT THEIR

11:12AM  25    PERSONAL RELATIONSHIP.

11:12AM  1        WHEN YOU WERE WORKING AT THE COMPANY, WERE YOU AWARE THAT

11:12AM  2    MS. HOLMES AND MR. BALWANI HAD A PERSONAL RELATIONSHIP?

11:12AM  3    A.   YES.

11:12AM  4    Q.   HOW DID YOU KNOW ABOUT THAT?

11:12AM  5    A.   WHEN I WAS FIRST INTRODUCED TO SUNNY IN -- WHEN I WAS

11:13AM  6    STILL IN COLLEGE, HE WAS INTRODUCED TO ME AS ELIZABETH'S

11:13AM  7    BOYFRIEND.

11:13AM  8    Q.   EVEN BEFORE YOU STARTED WORK AT THE COMPANY?

11:13AM  9    A.   YES.

11:13AM 10    Q.   AND WHEN YOU STARTED WORK AT THE COMPANY, WERE MS. HOLMES

11:13AM 11    AND MR. BALWANI STILL ROMANTICALLY INVOLVED?

11:13AM 12    A.   I BELIEVE SO -- I'M NOT SURE OF THE EXACT NATURE OF THEIR

11:13AM 13    RELATIONSHIP, BUT I BELIEVE THERE WAS STILL A RELATIONSHIP

11:13AM 14    OUTSIDE OF THE OFFICE.

11:13AM 15    Q.   DURING THE TIME THAT YOU WORKED AT THE COMPANY, WAS THAT

11:13AM 16    RELATIONSHIP PUBLIC KNOWLEDGE?

11:13AM 17        IN OTHER WORDS, WAS IT SOMETHING THAT WAS FREELY SHARED

11:13AM 18    WITH EMPLOYEES OF THE COMPANY?

11:13AM 19    A.   NO.

11:13AM 20    Q.   DURING THE TIME THAT YOU WERE AN EMPLOYEE AT THE COMPANY,

11:13AM 21    DID YOU HAVE ANY OPPORTUNITIES TO OBSERVE MS. HOLMES AND

11:13AM 22    MR. BALWANI OUTSIDE OF THE WORK CONTEXT IN THE PERSONAL

11:14AM 23    CONTEXT?

11:14AM 24    A.   YES.

11:14AM 25    Q.   AND HOW DID THOSE OPPORTUNITIES COME UP?

11:14AM  1    A.   THEY CAME UP WHEN CHRISTIAN WOULD USUALLY TELL MYSELF OR

11:14AM  2    OTHER MEMBERS OF THE PRODUCT MANAGEMENT TEAM, WE WOULD, YOU

11:14AM  3    KNOW, BE INVITED TO DINNER, EITHER TO GO OUT TO DINNER OR THERE

11:14AM  4    WERE OTHER TIMES THAT WE WENT TO SUNNY'S HOUSE FOR DINNER.

11:14AM  5    Q.   AND DURING THAT TIME, DID YOU OBSERVE MR. BALWANI AND

11:14AM  6    MS. HOLMES ACTING AS A COUPLE?

11:14AM  7    A.   YES.

11:14AM  8    Q.   AND DURING PART OF THAT TIME PERIOD, WERE MS. HOLMES AND

11:14AM  9    MR. BALWANI LIVING TOGETHER AT THE SAME ADDRESS?

11:14AM 10    A.   YES.

11:14AM 11    Q.   AND DO YOU REMEMBER WHAT DATE RANGE WE WOULD BE TALKING

11:14AM 12    ABOUT THERE APPROXIMATELY?

11:14AM 13    A.   I'M NOT SURE OF THE EXACT DATES, BUT I THINK IN THE 2013

11:15AM 14    TO '14 TO PART OF '15 RANGE.

11:15AM 15    Q.   DURING YOUR TIME AT THE COMPANY, WAS IT YOUR UNDERSTANDING

11:15AM 16    THAT MS. HOLMES AND MR. BALWANI WERE IN A ROMANTIC RELATIONSHIP

11:15AM 17    THE ENTIRE TIME, OR DID YOU COME TO UNDERSTAND AT SOME POINT

11:15AM 18    THAT THAT RELATIONSHIP ENDED?

11:15AM 19         WHAT DID YOU KNOW ABOUT THAT?

11:15AM 20    A.   I DIDN'T HAVE AN UNDERSTANDING OF THAT.

11:15AM 21    Q.   LET ME SHOW YOU ONE MORE DOCUMENT.

11:15AM 22         MAY I APPROACH, YOUR HONOR?

11:15AM 23            THE COURT:  YES.

11:16AM 24         MR. BOSTIC, BEFORE WE MOVE INTO THIS, I'M BEING REQUESTED

11:16AM 25    FOR A BREAK BY ONE OF THE JURORS.

```
11:16AM   1              MR. BOSTIC:  NOW IS A GOOD TIME, YOUR HONOR.

11:16AM   2              THE COURT:  LET'S TAKE OUR MORNING BREAK, LADIES AND

11:16AM   3      GENTLEMEN.  THANK YOU.

11:50AM   4          (RECESS FROM 11:17 A.M. UNTIL 11:50 A.M.)

11:50AM   5          (JURY OUT AT 11:50 A.M.)

11:50AM   6              THE COURT:  LET'S GO BACK ON THE RECORD.

11:50AM   7          I JUST WANTED TO SAY, COUNSEL, AFTER WE BREAK TODAY, I'D

11:50AM   8      LIKE TO KEEP ONE JUROR WHO HAS EXPRESSED SOME ISSUES REGARDING

11:50AM   9      MEDICAL APPOINTMENTS THAT WE SHOULD DISCUSS.  I'M GOING TO KEEP

11:51AM  10      THE JUROR, AND WE'LL TALK WITH HIM PRIVATELY OUTSIDE OF THE

11:51AM  11      PRESENCE OF THE OTHER JURORS.

11:51AM  12          I JUST WANTED TO LET YOU KNOW THAT.

11:51AM  13          WE'LL BRING OUR JURY IN.  I THINK THEY'RE GOING TO

11:51AM  14      RECONSTITUTE THEMSELVES IN THE BOX.  SO THIS WILL TAKE A

11:51AM  15      MOMENT.

11:51AM  16          (PAUSE IN PROCEEDINGS.)

11:55AM  17          (JURY IN AT 11:55 A.M.)

11:55AM  18              THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

11:55AM  19      ARE PRESENT.

11:55AM  20          MR. EDLIN IS ON THE STAND.

11:55AM  21          OUR JURY IS PRESENT RECONSTITUTED IN THE BOX.

11:55AM  22          JUST ON OBSERVATION, FOLKS, IT LOOKS LIKE THIS WILL BE A

11:55AM  23      FULL FLIGHT.

11:55AM  24          (LAUGHTER.)

11:55AM  25              THE COURT:  SO I'M GLAD.  YOU LOOK GOOD THERE.
```

11:55AM   1    THANK YOU.  I APPRECIATE THAT.

11:55AM   2         IF ANY -- DURING THE PROCEEDINGS, IF ANYONE HAS ANY ISSUE

11:55AM   3    ABOUT ANYTHING, YOU SHOULD PLEASE LET ME KNOW, LET MS. ROBINSON

11:55AM   4    KNOW, RAISE YOUR HAND IF YOU NEED TO ADJUST ANY OF THESE

11:55AM   5    SCREENS.

11:55AM   6         YOU MIGHT WANT TO ADJUST THESE SCREENS NOW IN

11:55AM   7    ANTICIPATION, BUT IF ANY OTHER ISSUE COMES UP REGARDING YOUR

11:55AM   8    COMFORT IN THE SEATING, PLEASE LET ME KNOW AND WE'LL DO --

11:55AM   9    WE'LL MAKE EFFORTS TO ACCOMMODATE THINGS.

11:56AM  10         OTHERWISE, ENJOY THE FLIGHT.  YOU'RE VERY COMPACT.

11:56AM  11         I HAVE TO SAY WE HAVEN'T SEEN -- IT'S BEEN ABOUT TWO YEARS

11:56AM  12    SINCE WE ACTUALLY HAD A JURY FULLY CONSTITUTED IN THE BOX HERE.

11:56AM  13    SO IT'S REFRESHING FOR ME TO SEE A FULL BOX AS WE GET BACK TO

11:56AM  14    NORMALCY IN OUR COURTS.

11:56AM  15         SO THANK YOU VERY MUCH.

11:56AM  16              JURORS:  YAY.

11:56AM  17              THE COURT:  MR. BOSTIC.

11:56AM  18              MR. BOSTIC:  THANK YOU, YOUR HONOR.

11:56AM  19    Q.   MR. EDLIN, BEFORE THE BREAK, I THINK I HANDED YOU A COPY

11:56AM  20    OF WHAT HAS BEEN MARKED AS EXHIBIT 5387I.

11:56AM  21         DO YOU HAVE THAT IN FRONT OF YOU?

11:56AM  22    A.   YES.

11:56AM  23    Q.   WHEN YOU WERE AN EMPLOYEE AT THERANOS, DID YOU EVER

11:56AM  24    COMMUNICATE WITH MS. HOLMES AND MR. BALWANI BY TEXT MESSAGE?

11:56AM  25    A.   SOMETIMES, YES.

11:56AM  1    Q.   DID YOU EVER HAVE OCCASION, THOUGH, TO SEE THEIR TEXT

11:56AM  2    CORRESPONDENCE BETWEEN EACH OTHER, JUST THE TWO OF THEM?

11:56AM  3    A.   NO.

11:56AM  4    Q.   I'D LIKE TO REVIEW SOME OF THOSE TEXT MESSAGES WITH YOU.

11:57AM  5         YOUR HONOR, THE GOVERNMENT OFFERS 5387I.

11:57AM  6              MS. WALSH:  NO OBJECTION, YOUR HONOR.

11:57AM  7              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:57AM  8         (GOVERNMENT'S EXHIBIT 5387I WAS RECEIVED IN EVIDENCE.)

11:57AM  9    BY MR. BOSTIC:

11:57AM  10   Q.   FIRST, BEFORE WE ZOOM IN AND LOOK AT ANY OF THESE

11:57AM  11   MESSAGES, I ASKED YOU BEFORE WHETHER MS. HOLMES AND

11:57AM  12   MR. BALWANI'S RELATIONSHIP WAS SOMETHING THAT COULD BE FREELY

11:57AM  13   SHARED AND DISCUSSED AT THERANOS.

11:57AM  14        DO YOU REMEMBER THAT?

11:57AM  15   A.   YES.

11:57AM  16   Q.   AND DO YOU REMEMBER WHAT YOUR ANSWER WAS ON THAT?

11:57AM  17   A.   NO.

11:57AM  18   Q.   AND HOW DID YOU COME TO UNDERSTAND THAT THEIR RELATIONSHIP

11:57AM  19   WAS NOT SOMETHING THAT COULD BE OPENLY DISCUSSED AT THE

11:57AM  20   COMPANY?

11:57AM  21   A.   I DON'T REMEMBER A SPECIFIC CONVERSATION.  I DON'T

11:58AM  22   REMEMBER A SPECIFIC CONVERSATION.

11:58AM  23   Q.   YOU MENTIONED THAT THERE WAS A GROUP OF PRODUCT MANAGERS

11:58AM  24   WHO WOULD SOMETIMES BE INVITED TO THE HOUSE WHERE MS. HOLMES

11:58AM  25   AND MR. BALWANI LIVED; IS THAT RIGHT?

11:58AM   1    A.   YES.

11:58AM   2    Q.   WHAT WAS IT ABOUT THAT GROUP THAT, IN YOUR UNDERSTANDING,

11:58AM   3    MADE IT OKAY FOR THEM TO KNOW ABOUT THE EXISTENCE OF THE

11:58AM   4    RELATIONSHIP?

11:58AM   5    A.   WE HAD MET BEFORE I HAD STARTED WORKING THERE, AND

11:58AM   6    SIMILARLY OTHER -- WE MET BEFORE WE STARTED WORKING AT

11:58AM   7    THERANOS, AND WE WERE AWARE OF THAT RELATIONSHIP EXISTING.

11:58AM   8    Q.   AND ARE WE TALKING THEN ABOUT THE GROUP OF

11:58AM   9    CHRISTIAN HOLMES'S COLLEGE CLASSMATES?

11:58AM  10    A.   YES.

11:58AM  11    Q.   STARTING AT PAGE 1 OF THIS EXHIBIT, I'LL ASK YOU TO LOOK

11:59AM  12    AT THE TOP PORTION OF THESE TEXT MESSAGES.

11:59AM  13         DO YOU SEE THAT WE'RE LOOKING AT TEXTS FROM JUNE OF 2011?

11:59AM  14    A.   YES.

11:59AM  15    Q.   AND THIS BEGINS WITH A MESSAGE FROM MS. HOLMES TO

11:59AM  16    MR. BALWANI SAYING, "STEVE WANTS WARRANTS FOR HITTING 50 PER

11:59AM  17    DAY PER STORE."

11:59AM  18         DO YOU SEE THAT?

11:59AM  19    A.   YES.

11:59AM  20    Q.   ARE YOU AWARE -- WELL, LET ME ASK YOU, WERE YOU WORKING AT

11:59AM  21    THE COMPANY IN JUNE OF 2011?

11:59AM  22    A.   NO.

11:59AM  23    Q.   WHEN YOU STARTED AT THE COMPANY, WERE YOU AWARE OF

11:59AM  24    DEALINGS THAT THE COMPANY HAD HAD WITH SAFEWAY?

11:59AM  25    A.   YES.

11:59AM   1    Q.   AND WHAT WERE YOU AWARE OF IN THAT REGARD?

11:59AM   2    A.   I WAS AWARE THAT THE COMPANY WAS WORKING WITH SAFEWAY TO

11:59AM   3    PLAN A ROLLOUT SIMILAR TO THE WALGREENS ROLLOUT WHERE

11:59AM   4    THERANOS -- LAB TESTING WOULD BE AVAILABLE THROUGH SAFEWAY.

11:59AM   5    Q.   AND DO YOU RECOGNIZE THE NAME STEVE BURD FROM YOUR TIME AT

12:00PM   6    THERANOS?

12:00PM   7    A.   YES.  HE WAS THE CEO OF SAFEWAY AT THAT TIME.

12:00PM   8    Q.   MS. HOLMES TEXTS THAT "STEVE WANTS WARRANTS FOR HITTING 50

12:00PM   9    PER DAY PER STORE."

12:00PM  10         SHE THEN ASKED, "YOU THERE?"

12:00PM  11         THEN MR. BALWANI SAYS, "WE CANT DO THAT."

12:00PM  12         DO YOU SEE THAT?

12:00PM  13    A.   YES.

12:00PM  14    Q.   AND MR. BALWANI ASKS, "IN WHAT TIMEFRAME?"

12:00PM  15         AND MS. HOLMES SAYS, "DIDN'T SAY."

12:00PM  16         AND MR. BALWANI SAYS, "BESIDES.  WE DON'T KNOW IF DOCS

12:00PM  17    WILL LIKE SAFEWAY OVER OTHERS."

12:00PM  18         DO YOU SEE THAT?

12:00PM  19    A.   YES.

12:00PM  20    Q.   AND HE SAYS, "WHAT IF SAFEWAY BUNGLES UP."

12:00PM  21         DID I READ THAT CORRECTLY?

12:00PM  22    A.   YES.

12:00PM  23    Q.   AND LET'S ZOOM OUT AND ZOOM IN ON THE NEXT PORTION.

12:00PM  24         MR. BALWANI ASKS A CLARIFYING QUESTION "YOU MEAN 50

12:00PM  25    PATIENTS PER DAY PER STORE RIGHT?"

12:00PM  1              AND MS. HOLMES SAYS, "YES"; RIGHT?

12:01PM  2      A.   YES.

12:01PM  3      Q.   AND MR. BALWANI GOES ON TO EXPLAIN WHY HE'S OPPOSED TO THE

12:01PM  4      IDEA.

12:01PM  5              DO YOU SEE THAT?

12:01PM  6      A.   YES.

12:01PM  7      Q.   AND MR. BALWANI THEN ASKS, "STILL ON PHONE WITH HIM?"

12:01PM  8              AND MS. HOLMES SAYS, "YES."

12:01PM  9              DO YOU SEE THAT?

12:01PM  10     A.   YES.

12:01PM  11     Q.   LET'S NOW GO TO THE NEXT PAGE OF THE EXHIBIT AND LET'S

12:01PM  12     ZOOM IN ON THE TOP HALF.

12:01PM  13             AGAIN, MORE COMMUNICATIONS ON JUNE 22ND, 2011.

12:01PM  14             MS. HOLMES SAYS, A THIRD FROM THE TOP, "MEETING WAS

12:01PM  15     PERFECT."

12:01PM  16             DO YOU SEE THAT?

12:01PM  17     A.   YES.

12:01PM  18     Q.   MR. BALWANI SAYS, "AWESOME.  U R ALWAYS PERFECT."

12:01PM  19             DO YOU SEE THAT?

12:01PM  20     A.   YES.

12:01PM  21     Q.   AND MS. HOLMES REPORTS ABOUT HALF WAY DOWN THAT SELECTION,

12:01PM  22     "THEY WANT IN, WANT TO INVEST, WANT TO BE MOST PREFERRED

12:01PM  23     PARTNER."

12:01PM  24             DO YOU SEE THAT?

12:01PM  25     A.   YES.

12:02PM   1    Q.   AND MR. BALWANI RESPONDS, "AGTG.  HMFR."

12:02PM   2         DO YOU SEE THAT?

12:02PM   3    A.   YES.

12:02PM   4    Q.   AND MS. HOLMES ASKS, "WHAT DOES AGTG MEAN?"

12:02PM   5         AND MR. BALWANI RESPONDS, "ALL GLORY TO GOD."

12:02PM   6         DO YOU SEE THAT?

12:02PM   7    A.   YES.

12:02PM   8    Q.   AND LET'S ZOOM IN ON THE BOTTOM OF THIS PAGE, THE BOTTOM

12:02PM   9    HALF.

12:02PM  10         AND DO YOU SEE SOME COMMUNICATIONS HERE RELATING TO

12:02PM  11    MR. BALWANI'S FLIGHT STATUS AND HIS FLIGHT BEING DELAYED?

12:02PM  12    A.   YES.

12:02PM  13    Q.   AND HE TALKS ABOUT WHETHER HE'S GOING TO WORK ON THE

12:02PM  14    PLANE.

12:02PM  15         DO YOU SEE THAT TOWARDS THE BOTTOM OF THE PAGE?

12:02PM  16    A.   YES.

12:02PM  17    Q.   LET'S GO TO PAGE 3 AND ZOOM IN ON THIS PORTION.

12:03PM  18         DO YOU SEE HERE MORE DISCUSSION ABOUT IMMEDIATE PLANS, AND

12:03PM  19    THEN ALSO A THIRD FROM THE BOTTOM A DISCUSSION ABOUT AN EMAIL

12:03PM  20    THAT MR. BALWANI SENT ABOUT LARRY SUMMER AND SQUARE.

12:03PM  21         HE SAYS, "GOOD TIME FOR US TO TALK WITH HANK NEXT MONTH

12:03PM  22    AFTER GLORY 2 (C2)."

12:03PM  23         DO YOU SEE THAT?

12:03PM  24    A.   YES.

12:03PM  25    Q.   AND THEN SOME ADDITIONAL INFORMATION ABOUT MS. HOLMES'S

12:03PM  1    LANDING TIME; CORRECT?

12:03PM  2    A.   YES.

12:03PM  3    Q.   AND THEN MR. BALWANI SAYS, "BE SAFE.  TEXT ME WHEN U LAND

12:03PM  4    AND ARRIVE."

12:03PM  5         DO YOU SEE THAT?

12:03PM  6    A.   YES.

12:03PM  7    Q.   LET'S GO TO THE FOLLOWING PAGE.  LET'S ZOOM IN ON THAT TOP

12:03PM  8    PORTION.

12:03PM  9         DO YOU SEE SOME MESSAGES FROM MR. BALWANI AND MS. HOLMES

12:03PM  10   EXPRESSING AFFECTION FOR EACH OTHER?

12:03PM  11   A.   YES.

12:03PM  12   Q.   LET'S GO DOWN TO THE BOTTOM SECTION.

12:04PM  13        WE SEE SOME MORE DISCUSSION BETWEEN MR. BALWANI AND

12:04PM  14   MS. HOLMES ABOUT DINNER PLANS; CORRECT?

12:04PM  15   A.   YES.

12:04PM  16   Q.   LET'S GO TO THE FOLLOWING PAGE.  LET'S ZOOM IN ON THE

12:04PM  17   BOTTOM PORTION HERE, THE BOTTOM THIRD OR SO.

12:04PM  18        AND DO YOU SEE HERE THERE'S A MESSAGE FROM MR. BALWANI ON

12:04PM  19   JUNE 23RD, 2011, "THRU SKYPE WE R TOGETHER.  CAN'T BE APART

12:04PM  20   FROM U FOR EVEN FEW HOURS."

12:04PM  21        DO YOU SEE THAT?

12:04PM  22   A.   YES.

12:04PM  23   Q.   LET'S GO TO THE NEXT PAGE.  ZOOM IN ON THAT PORTION.

12:04PM  24        DO YOU SEE HERE SOME ADDITIONAL MESSAGES BETWEEN

12:05PM  25   MS. HOLMES AND MR. BALWANI EXPRESSING AFFECTION AND

12:05PM   1      APPRECIATION FOR THEIR RELATIONSHIP?

12:05PM   2      A.   YES.

12:05PM   3      Q.   LET'S GO TO THE FOLLOWING PAGE.  THAT'S PAGE 7 OF THE

12:05PM   4      EXHIBIT.  ZOOM IN ON THAT PORTION.

12:05PM   5           AND DO YOU SEE HERE A DISCUSSION ABOUT TOUCH SCREENS

12:05PM   6      STARTING WITH A TEXT MESSAGE FROM MR. BALWANI TO MS. HOLMES NOW

12:05PM   7      IN MAY OF 2012?

12:05PM   8      A.   YES.

12:05PM   9      Q.   AND DO YOU SEE THAT MR. BALWANI TALKS ABOUT A PREVIOUS

12:05PM  10      PURCHASE OR A PAYMENT FOR 200 12-INCH TOUCH SCREENS?

12:05PM  11      A.   YES.

12:05PM  12      Q.   AND MR. BALWANI THEN TELLS MS. HOLMES, "I DON'T THINK WE

12:05PM  13      WILL USE MORE THAN 20 OR 30 OF THESE THIS YEAR SO I AM TRYING

12:06PM  14      TO RETURN 170-180 OF THESE IF WE CAN."

12:06PM  15           DO YOU SEE THAT?

12:06PM  16      A.   YES.

12:06PM  17      Q.   AND MR. BALWANI THEN EXPLAINS THAT THE 20 TO 30 CAN BE

12:06PM  18      USED IN MONOS OR MINILABS THAT WE WILL SEND OUT FOR COOL DEMOS.

12:06PM  19           AND HE SAYS FOR ALL NORMANDY MACHINES, WE WILL USE THE

12:06PM  20      EXISTING 8.4 INCH SCREENS.

12:06PM  21           DO YOU SEE THAT?

12:06PM  22      A.   YES.

12:06PM  23      Q.   DURING YOUR TIME AT THE COMPANY, DO YOU RECALL DIFFERENT

12:06PM  24      VERSIONS OF DEVICES THAT WERE SENT OUT FOR DEMOS VERSUS

12:06PM  25      VERSIONS THAT WERE USED INTERNALLY FOR PATIENT TESTING?

EDLIN DIRECT BY MR. BOSTIC (RES.)

12:06PM 1    A.   CAN YOU REPEAT THE QUESTION.

12:06PM 2    Q.   SURE.

12:06PM 3         DURING YOUR TIME AT THE COMPANY, DID YOU EVER WITNESS

12:06PM 4    DIFFERENT VERSIONS OF DEVICES BEING SENT OUT FOR DEMOS THAT

12:06PM 5    WERE DIFFERENT FROM THE VERSIONS THAT WERE USED IN HOUSE FOR

12:06PM 6    PATIENT TESTING?

12:06PM 7    A.   AND WHEN YOU SAY, "SENT OUT FOR DEMOS"?

12:06PM 8    Q.   WELL, I GUESS I'M REFERRING TO THE LANGUAGE OF

12:07PM 9    MR. BALWANI'S TEXT WHERE HE SAYS, "MONOS AND MINILABS THAT WE

12:07PM 10   SENT OUT FOR COOL DEMOS."

12:07PM 11        LET ME JUST ASK, DO YOU HAVE A MEMORY OF A PRACTICE THAT

12:07PM 12   IS CONSISTENT WITH THIS TEXT?

12:07PM 13   A.   NO.

12:07PM 14   Q.   YOU TESTIFIED EARLIER ABOUT MONOS AND MINILABS AND OTHER

12:07PM 15   NEXT GENERATION DEVICES.

12:07PM 16        DO YOU REMEMBER THAT TESTIMONY?

12:07PM 17   A.   YES.

12:07PM 18   Q.   WERE THOSE DEVICES USED FOR PATIENT TESTING AT THERANOS?

12:07PM 19   A.   NO.

12:07PM 20   Q.   DO YOU SEE FURTHER DOWN THE PAGE THERE'S SOME ADDITIONAL

12:07PM 21   DISCUSSION AND PLANNING BETWEEN MS. HOLMES AND MR. BALWANI

12:07PM 22   ABOUT DEVICE SPECIFICATIONS AND ALLOCATION?

12:08PM 23   A.   YES.

12:08PM 24   Q.   LET'S GO TO PAGE 10 OF THE EXHIBIT, AND LET'S ZOOM IN ON

12:08PM 25   THE TOP HALF OF THE PAGE.

12:08PM   1           AND DO YOU SEE HERE THAT NOW WE'RE IN NOVEMBER 2013, SO

12:08PM   2    WE'VE MOVED FORWARD IN TIME?

12:08PM   3    A.   YES.

12:08PM   4    Q.   AND NOVEMBER 18TH, 2013, WE SEE MR. BALWANI TEXTS "HOME"

12:08PM   5    TO MS. HOLMES.

12:08PM   6           DO YOU SEE THAT?

12:08PM   7    A.   YES.

12:08PM   8    Q.   MS. HOLMES RESPONDS WITH A SMILEY FACE AND SAYS, "I AM

12:08PM   9    THERE IN SPIRIT."

12:08PM   10          SHE SAYS, "MAKE FIRE SO WE WILL BE CLOSE."

12:08PM   11          DO YOU SEE THAT?

12:08PM   12   A.   YES.

12:08PM   13   Q.   AND THEN THERE'S SOME MORE DISCUSSION EXPRESSING AFFECTION

12:08PM   14   AND THEN DISCUSSING SOME PLANS TO WORK.

12:08PM   15          DO YOU SEE THAT?

12:08PM   16   A.   YES.

12:08PM   17   Q.   LET'S GO TO PAGE 12.  LET'S ZOOM IN ON THE TOP TWO-THIRDS

12:09PM   18   OF THIS PORTION.

12:09PM   19          AND NOW WE'RE IN OCTOBER 2014.

12:09PM   20          DO YOU SEE THAT?

12:09PM   21   A.   YES.

12:09PM   22   Q.   AROUND THIS TIME, WAS IT YOUR UNDERSTANDING THAT

12:09PM   23   MS. HOLMES AND MR. BALWANI WERE STILL TOGETHER?

12:09PM   24   A.   YES.

12:09PM   25   Q.   MR. BALWANI TEXTS THAT HE MISSES MS. HOLMES WHEN THEY ARE

12:09PM   1    NOT TOGETHER.

12:09PM   2         DO YOU SEE THAT?

12:09PM   3    A.   YES.

12:09PM   4    Q.   AND THEN THERE'S SOME MORE DISCUSSION EXPRESSING AFFECTION

12:09PM   5    FOR EACH OTHER.

12:09PM   6         DO YOU SEE THAT?

12:09PM   7    A.   YES.

12:09PM   8    Q.   AND THEN THERE IS SOME PLANS -- I'M SORRY, SOME DISCUSSION

12:09PM   9    ABOUT PLANS FOR THE DAY.

12:09PM  10         AND AT THE BOTTOM THERE'S A REQUEST FROM MR. BALWANI TO

12:09PM  11    "PLEASE GET CVS DONE THIS A.M. HAVE SCOTT AND CHRISTIAN IN

12:09PM  12    TRICORDER ALL MORNING AND TELL THEM WHAT CHANGES U WANT."

12:10PM  13         DO YOU SEE THAT?

12:10PM  14    A.   YES.

12:10PM  15    Q.   AND WHAT WAS TRICORDER IF YOU REMEMBER?

12:10PM  16    A.   IT WAS THE NAME OF A CONFERENCE ROOM.

12:10PM  17    Q.   LET'S LOOK AT PAGE 13.

12:10PM  18         HERE WE'RE IN NOVEMBER 2014.  DO YOU SEE A TEXT FROM

12:10PM  19    MR. BALWANI TO MS. HOLMES MENTIONING A FULL MOON?

12:10PM  20    A.   YES.

12:10PM  21    Q.   AND MS. HOLMES WRITES WITH A SET OF GOALS OR A LIST OF

12:10PM  22    BULLET POINTS.

12:10PM  23         DO YOU SEE THAT?

12:10PM  24    A.   YES.

12:10PM  25    Q.   SHE SAYS, "TOTAL CONFIDENCE IN MYSELF BEST BUSINESS PERSON

12:10PM  1      OF THE YEAR.

12:10PM  2           "FOCUS.

12:10PM  3           "DETAILS EXCELLENT.

12:10PM  4           "DON'T GIVE WHAT ANYONE THINKS.

12:10PM  5           "ENGAGE EMPLOYEES IN MEETINGS BY STORIES AND MAKING IT

12:10PM  6      ABOUT THEM."

12:10PM  7           DO YOU SEE THAT?

12:10PM  8      A.   YES.

12:10PM  9      Q.   AND THEN AFTER SHE ASKS FOR A RESPONSE, MR. BALWANI

12:11PM  10     WRITES, "AWESOME.  U R LISTENING AND PAYING ATTENTION."

12:11PM  11          DO YOU SEE THAT?

12:11PM  12     A.   YES.

12:11PM  13     Q.   AND IN 2014, APPROXIMATELY HOW OLD WAS MS. HOLMES?

12:11PM  14              MS. WALSH:  OBJECTION.

12:11PM  15              THE COURT:  THIS IS AS TO PERSONAL KNOWLEDGE, IF HE

12:11PM  16     HAS PERSONAL KNOWLEDGE?

12:11PM  17              MR. BOSTIC:  YES.

12:11PM  18              THE COURT:  YOU CAN ANSWER THE QUESTION.

12:11PM  19              THE WITNESS:  APPROXIMATELY 30.

12:11PM  20     BY MR. BOSTIC:

12:11PM  21     Q.   AND APPROXIMATELY HOW OLD WAS MR. BALWANI AT THAT TIME?

12:11PM  22              MS. WALSH:  OBJECTION.  RELEVANCE.

12:11PM  23              THE COURT:  OVERRULED.

12:11PM  24              THE WITNESS:  I DON'T KNOW SPECIFICALLY.

12:11PM  25     BY MR. BOSTIC:

12:11PM 1    Q.   WHAT IS YOUR BEST ESTIMATE?

12:11PM 2            MS. WALSH:  OBJECTION.  FOUNDATION.

12:11PM 3            THE COURT:  SUSTAINED AS TO THE FORM OF THE

12:11PM 4    QUESTION.

12:11PM 5    BY MR. BOSTIC:

12:11PM 6    Q.   HOW ABOUT WHEN IT CAME TO BUSINESS EXPERIENCE, WHAT WAS

12:11PM 7    YOUR UNDERSTANDING AS TO HOW MUCH BUSINESS EXPERIENCE

12:11PM 8    MS. HOLMES HAD WHEN SHE FOUNDED THERANOS?

12:12PM 9    A.   MY UNDERSTANDING WAS THAT THERANOS WAS THE EXTENT OF HER

12:12PM 10   BUSINESS EXPERIENCE.

12:12PM 11   Q.   AND FROM WORKING WITH MR. BALWANI, DO YOU HAVE AN

12:12PM 12   UNDERSTANDING OF THE EXTENT OF HIS BUSINESS EXPERIENCE BEFORE

12:12PM 13   HE CAME TO THERANOS?

12:12PM 14   A.   SUNNY HAD A VERY SUCCESSFUL CAREER.

12:12PM 15   Q.   FINALLY, LET'S LOOK AT PAGE 14 OF THE EXHIBIT.

12:12PM 16       SO NOW WE'RE MOVING FORWARD IN TIME.  YOU SEE NOW WE'RE IN

12:12PM 17   MAY OF 2015.

12:12PM 18       DO YOU SEE THAT?

12:12PM 19   A.   YES.

12:12PM 20   Q.   AND THERE ARE MORE TEXTS BETWEEN MS. HOLMES AND

12:12PM 21   MR. BALWANI DURING THIS TIME PERIOD EXPRESSING AFFECTION FOR

12:12PM 22   EACH OTHER.

12:12PM 23       DO YOU SEE THAT?

12:12PM 24   A.   YES.

12:12PM 25   Q.   AND THERE'S ALSO DISCUSSION OF THEIR WHEREABOUTS AND PLANS

12:13PM   1      FOR THE IMMEDIATE FUTURE.

12:13PM   2           DO YOU SEE THAT?

12:13PM   3      A.   YES.

12:13PM   4      Q.   OKAY.  WE CAN PUT THAT ASIDE.  I'D LIKE TO TALK ABOUT THE

12:13PM   5      CIRCUMSTANCES OF YOUR DEPARTURE FROM THE COMPANY AND THE

12:13PM   6      REASONS FOR IT.

12:13PM   7           DID YOU BECOME AWARE IN 2015 THAT THERE WAS GOING TO BE A

12:13PM   8      NEGATIVE ARTICLE PUBLISHED ABOUT THERANOS?

12:13PM   9      A.   I BECAME AWARE THAT "THE WALL STREET JOURNAL" WAS GOING TO

12:13PM  10      WRITE A PIECE THAT WOULD NOT BE FAVORABLE.

12:13PM  11      Q.   AND DID YOU FIND OUT ABOUT THAT BEFORE THE PIECE WAS

12:13PM  12      ACTUALLY PUBLISHED?

12:13PM  13      A.   I BELIEVE IT WAS CLOSE TO THE TIME IT WAS.

12:13PM  14      Q.   AND HOW DID YOU LEARN ABOUT THAT INCOMING ARTICLE, IF YOU

12:13PM  15      REMEMBER?

12:13PM  16      A.   I -- AS PART OF MY ROLES AND RESPONSIBILITIES, I WORKED

12:14PM  17      WITH MARKETING AND COMMUNICATIONS, AND I BASICALLY HEARD RUMORS

12:14PM  18      THAT THIS WAS HAPPENING.

12:14PM  19      Q.   SO OTHERS AT THE COMPANY KNEW AS WELL; IS THAT CORRECT?

12:14PM  20      A.   I BELIEVE SO, YES.

12:14PM  21      Q.   AT SOME POINT IN 2015, DID THE ARTICLE ACTUALLY COME OUT?

12:14PM  22      A.   YES.

12:14PM  23      Q.   DO YOU REMEMBER THE APPROXIMATE TIMING OF THE ARTICLE?

12:14PM  24      A.   OCTOBER 2015.

12:14PM  25      Q.   WHAT DO YOU REMEMBER, AND JUST AT A HIGH LEVEL, ABOUT THE

12:14PM  1    COMPANY'S RESPONSE TO THAT ARTICLE IN THE WEEKS AND MONTHS

12:14PM  2    AFTER IT WAS PUBLISHED?

12:14PM  3    A.   I REMEMBER THAT THE COMPANY VEHEMENTLY DENIED THE CLAIMS

12:14PM  4    THAT WERE MADE IN "THE WALL STREET JOURNAL" ARTICLE ABOUT

12:14PM  5    THERANOS.

12:14PM  6    Q.   AND OTHER THAN DENYING THE CLAIMS, DID THE COMPANY DO ANY

12:15PM  7    WORK TO TRY TO DISPROVE THOSE CLAIMS?

12:15PM  8    A.   I RECALL THAT THE COMPANY CLAIMED THAT IT WOULD BE ABLE TO

12:15PM  9    PUT OUT DATA AND INFORMATION THAT WOULD PROVE ITS SCIENCE AND

12:15PM  10   TECHNOLOGY AND REFUTE THE CLAIMS FROM "THE WALL STREET JOURNAL"

12:15PM  11   ARTICLE.

12:15PM  12   Q.   DID THERE COME A POINT IN TIME WHERE YOU DECIDED TO END

12:15PM  13   YOUR TIME AT THERANOS?

12:15PM  14   A.   YES.

12:15PM  15   Q.   AND WHY DID YOU MAKE THAT DECISION AND WHEN?

12:15PM  16   A.   IN THE YEAR AFTER "THE WALL STREET JOURNAL" ARTICLES CAME

12:15PM  17   OUT AND THERANOS MADE THOSE CLAIMS THAT IT WOULD BE ABLE TO

12:15PM  18   REFUTE WHAT WAS SAID IN "THE WALL STREET JOURNAL" ARTICLES,

12:15PM  19   THERE WERE SEVERAL OPPORTUNITIES THAT THE COMPANY HAD TO DO

12:15PM  20   THAT, AND THEY WERE ALL UNSUCCESSFUL.

12:15PM  21        AND I ULTIMATELY REACHED THE CONCLUSION THAT THE REASON

12:15PM  22   THAT THOSE OPPORTUNITIES WERE UNSUCCESSFUL WAS BECAUSE THE

12:16PM  23   COMPANY COULD NOT PROVE ITS TECHNOLOGY AND WAS NOT CAPABLE OF

12:16PM  24   DOING IT AND WAS NEVER GOING TO BE ABLE TO DO THAT.

12:16PM  25        SO I LEFT THE COMPANY IN DECEMBER OF 2016.

12:16PM  1      Q.   THANK YOU, MR. EDLIN.

12:16PM  2           NO FURTHER QUESTIONS AT THIS TIME.

12:16PM  3                THE COURT:  MS. WALSH, DO YOU HAVE

12:16PM  4      CROSS-EXAMINATION?

12:16PM  5                MS. WALSH:  I DO, YOUR HONOR.

12:17PM  6           (PAUSE IN PROCEEDINGS.)

12:17PM  7                MS. WALSH:  MAY I APPROACH THE BENCH, YOUR HONOR?

12:17PM  8                THE COURT:  YES.

12:17PM  9                MS. WALSH:  (HANDING.)

12:17PM 10           MAY I APPROACH MR. EDLIN?

12:17PM 11                THE COURT:  YES, PLEASE.

12:18PM 12                MS. WALSH:  (HANDING.)

12:18PM 13                          **CROSS-EXAMINATION**

12:18PM 14      BY MS. WALSH:

12:18PM 15      Q.   GOOD AFTERNOON, MR. EDLIN.

12:18PM 16      A.   GOOD AFTERNOON.

12:18PM 17      Q.   MY NAME IS AMY WALSH, AND I REPRESENT MR. BALWANI.

12:18PM 18           I'M GOING TO ASK YOU A FEW QUESTIONS ABOUT YOUR TESTIMONY

12:18PM 19      LAST WEEK AND THIS MORNING.  OKAY?

12:18PM 20      A.   OKAY.

12:18PM 21      Q.   OKAY.  SO I FIRST WANT TO START WITH YOUR BACKGROUND.

12:18PM 22           YOU WERE EMPLOYED BY THERANOS FROM SEPTEMBER 2011 TO

12:18PM 23      DECEMBER 2016; IS THAT RIGHT?

12:18PM 24      A.   CORRECT.

12:18PM 25      Q.   OKAY.  AND BEFORE YOU WORKED AT THERANOS, YOU WORKED AT A

EDLIN CROSS BY MS. WALSH

12:18PM  1    FIRM CALLED TELSEY ADVISORY GROUP; IS THAT RIGHT?

12:18PM  2    A.   YES.

12:18PM  3    Q.   AND THAT WAS EQUITY ANALYST SHOP OR A FIRM; IS THAT

12:18PM  4    CORRECT?

12:18PM  5    A.   RIGHT, EQUITY RESEARCH.  I THINK I SAID EQUITY RESEARCH

12:18PM  6    FIRM.

12:18PM  7    Q.   THANK YOU.  I APOLOGIZE.

12:19PM  8         WHAT DID YOU DO FOR THAT FIRM?

12:19PM  9    A.   I SUPPORTED THEIR INSTITUTIONAL SALES DESK AND SOME OF THE

12:19PM  10   RESEARCH ANALYSTS.

12:19PM  11   Q.   OKAY.  AND YOU WORKED THERE FOR ABOUT A YEAR; IS THAT

12:19PM  12   RIGHT?

12:19PM  13   A.   IT WAS ABOUT TWO YEARS.

12:19PM  14   Q.   OKAY.  AND I TAKE IT THAT YOUR WORK AT THAT FIRM DIDN'T

12:19PM  15   HAVE ANYTHING TO DO WITH BLOOD TESTING; CORRECT?

12:19PM  16   A.   CORRECT.

12:19PM  17   Q.   AND IT WASN'T SCIENCE BASED; IS THAT RIGHT?

12:19PM  18   A.   THAT'S RIGHT.

12:19PM  19   Q.   OKAY.  AND BEFORE YOU WORKED AT THAT FIRM, YOU GRADUATED

12:19PM  20   FROM DUKE UNIVERSITY; RIGHT?

12:19PM  21   A.   CORRECT.

12:19PM  22   Q.   AND YOU WERE A PUBLIC POLICY MAJOR; RIGHT?

12:19PM  23   A.   YES.

12:19PM  24   Q.   AND I THINK YOU ALSO SAID THAT YOU GOT A CERTIFICATE IN

12:19PM  25   MARKETS AND MANAGEMENT; CORRECT?

12:19PM  1    A.   CORRECT.

12:19PM  2    Q.   AND YOU DID NOT GET ANY DEGREES IN SCIENCE OR MATH FROM

12:19PM  3    DUKE; RIGHT?

12:19PM  4    A.   CORRECT.

12:19PM  5    Q.   AND YOU HAVE NO TRAINING IN HEMATOLOGY OR MICROBIOLOGY;

12:20PM  6    CORRECT?

12:20PM  7    A.   CORRECT.

12:20PM  8    Q.   OKAY.  SO IS IT FAIR TO SAY THAT YOU WOULD NOT CONSIDER

12:20PM  9    YOURSELF A SCIENTIST?

12:20PM 10    A.   THAT'S FAIR TO SAY.

12:20PM 11    Q.   AND THAT WAS TRUE WHILE YOU WORKED AT THERANOS; RIGHT?

12:20PM 12    A.   YES.

12:20PM 13    Q.   OKAY.  SO WHEN YOU WORKED AT THERANOS, YOU TOLD US THAT

12:20PM 14    YOU MANAGED DIFFERENT RELATIONSHIPS AT THERANOS; CORRECT?

12:20PM 15    A.   CORRECT.

12:20PM 16    Q.   OKAY.  AND THOSE WERE WITH THE MILITARY; RIGHT?

12:20PM 17    A.   RIGHT.

12:20PM 18    Q.   PHARMACEUTICAL COMPANIES; CORRECT?

12:20PM 19    A.   CORRECT.

12:20PM 20    Q.   YOU SENT INFORMATION TO INVESTORS; RIGHT?

12:20PM 21    A.   CORRECT.

12:20PM 22    Q.   AND YOU TOLD US ABOUT FACILITATING THESE TECHNOLOGY

12:20PM 23    DEMONSTRATIONS; RIGHT?

12:20PM 24    A.   CORRECT.

12:20PM 25    Q.   AND YOU ALSO -- YOU JUST TESTIFIED THIS MORNING ABOUT

12:20PM    1        COORDINATING THERANOS'S WEBSITE AND MARKETING MATERIALS; IS

12:20PM    2        THAT RIGHT?

12:20PM    3        A.   I WAS LESS INVOLVED IN THE WEBSITE.

12:21PM    4             BUT, YES, AS PART OF THE WORK THAT WE DID WITH CHIAT/DAY,

12:21PM    5        THERE WERE -- I WORKED ON THAT RELATIONSHIP ALONG WITH TWO

12:21PM    6        OTHER PRODUCT MANAGERS.

12:21PM    7        Q.   OKAY.  AND CHIAT/DAY WAS THE MARKETING FIRM THAT THERANOS

12:21PM    8        WAS WORKING WITH AT THE TIME?

12:21PM    9        A.   CORRECT.

12:21PM   10        Q.   AND WE'RE GOING TO COME BACK TO CHIAT/DAY LATER.

12:21PM   11             BUT THAT'S WHO THEY WERE; RIGHT?

12:21PM   12        A.   RIGHT.

12:21PM   13        Q.   OKAY.  AND AS A PRODUCT MANAGER AT THERANOS, YOU WERE NOT,

12:21PM   14        OR YOU DIDN'T CONSIDER YOURSELF, AN EXPERT IN THERANOS'S

12:21PM   15        TECHNOLOGY AT THE TIME; RIGHT?

12:21PM   16        A.   RIGHT.

12:21PM   17        Q.   OKAY.  YOU WEREN'T AN EXPERT IN THE CHEMISTRY OF HOW THE

12:21PM   18        ASSAYS WORKED; RIGHT?

12:21PM   19        A.   RIGHT.

12:21PM   20        Q.   AND YOU WERE NOT AN EXPERT IN THE SOFTWARE THAT RAN THE

12:21PM   21        MACHINES; RIGHT?

12:21PM   22        A.   RIGHT.

12:21PM   23        Q.   OR THE SOFTWARE THAT SHOWED ON THE USER INTERFACE OF THE

12:21PM   24        MACHINES; CORRECT?

12:21PM   25        A.   CORRECT.

12:21PM  1    Q.   AND YOU ALSO WERE NOT AN EXPERT IN THE HARDWARE, THE

12:22PM  2    ROBOTICS INSIDE THE MACHINE THAT OPERATED THE TESTS; CORRECT?

12:22PM  3    A.   CORRECT.

12:22PM  4    Q.   OKAY.  OTHER TEAMS OF PEOPLE AT THERANOS WERE IN CHARGE OF

12:22PM  5    THOSE AREAS; RIGHT?

12:22PM  6    A.   RIGHT.

12:22PM  7    Q.   AND YOU -- AND WE'RE GOING TO TALK MORE ABOUT THIS, BUT

12:22PM  8    GENERALLY, YOU WENT TO THOSE TEAMS PERIODICALLY WHEN YOU NEEDED

12:22PM  9    INFORMATION RELATED TO THOSE SUBJECT AREAS; IS THAT FAIR?

12:22PM 10    A.   YES.

12:22PM 11    Q.   OKAY.  YOU'VE ALSO TALKED ABOUT YOUR WORK WITH MS. HOLMES

12:22PM 12    VERSUS MR. BALWANI.

12:22PM 13         DO YOU REMEMBER THAT?

12:22PM 14    A.   YES.

12:22PM 15    Q.   AND YOU WORKED WITH BOTH OF THEM; CORRECT?

12:22PM 16    A.   CORRECT.

12:22PM 17    Q.   BUT I THINK YOU TESTIFIED THAT YOU WORKED MORE -- MUCH

12:22PM 18    MORE CLOSELY WITH MS. HOLMES; RIGHT?

12:22PM 19    A.   RIGHT.

12:22PM 20    Q.   THAN YOU DID WITH MR. BALWANI; CORRECT?

12:22PM 21    A.   CORRECT.

12:22PM 22    Q.   AND I THINK YOU SAID THAT THEY THEMSELVES WORKED CLOSELY

12:22PM 23    TOGETHER; RIGHT?

12:22PM 24    A.   RIGHT.

12:22PM 25    Q.   AT LEAST AS FAR AS YOU OBSERVED; RIGHT?

12:23PM  1    A.   RIGHT.

12:23PM  2    Q.   BUT THEY ALSO HAD DIFFERENT ROLES AT THE COMPANY; IS THAT

12:23PM  3    RIGHT?

12:23PM  4    A.   THAT WAS MY UNDERSTANDING, YES.

12:23PM  5    Q.   OKAY.  AND MS. HOLMES'S ROLE RELATED TO THE SCIENCE OF THE

12:23PM  6    ASSAYS; IS THAT FAIR?

12:23PM  7    A.   YES.

12:23PM  8    Q.   AND SHE WAS MUCH MORE INVOLVED IN THE R&D LAB; CORRECT?

12:23PM  9    A.   CORRECT.

12:23PM 10    Q.   AND SHE'S THE ONE WHO HAD THE RELATIONSHIPS WITH THE

12:23PM 11    PHARMACEUTICAL COMPANIES; RIGHT?

12:23PM 12    A.   RIGHT.

12:23PM 13    Q.   AND SHE IS THE PERSON WHO HAD THE RELATIONSHIPS WITH THE

12:23PM 14    VARIOUS DIFFERENT MILITARY COMPONENTS; IS THAT RIGHT?

12:23PM 15    A.   THAT'S RIGHT.

12:23PM 16    Q.   AND, IN FACT, THE EMAILS, WE'LL LOOK AT THESE AGAIN, BUT

12:23PM 17    THE EMAILS THAT YOU HAD REGARDING THOSE MILITARY COMPONENTS

12:23PM 18    WERE PRIMARILY WITH HER; RIGHT?

12:23PM 19    A.   CORRECT.

12:23PM 20    Q.   OKAY.  SHE WAS ALSO THE ONE WHO WAS MORE ENGAGED IN THE

12:24PM 21    PUBLIC RELATIONS CAMPAIGN FOR THERANOS; IS THAT RIGHT?

12:24PM 22    A.   YES.

12:24PM 23    Q.   AND SHE IS THE ONE WHO WORKED ON THE BRANDING OF THERANOS

12:24PM 24    WITH CHIAT/DAY; RIGHT?

12:24PM 25    A.   YES.

12:24PM   1    Q.   AND SHE DID WORK ON DESIGNING THE LOGO OF THERANOS;

12:24PM   2    CORRECT?

12:24PM   3    A.   CORRECT.

12:24PM   4    Q.   AND YOU TALKED ABOUT THE LOGO CHANGING FROM PERIOD TO

12:24PM   5    PERIOD.

12:24PM   6         SHE WAS THE ONE WHO WORKED MOST CLOSELY ON THAT; RIGHT?

12:24PM   7    A.   RIGHT.

12:24PM   8    Q.   OKAY.  AND SHE WAS THE FACE OF THERANOS TO THE OUTSIDE

12:24PM   9    WORLD; IS THAT FAIR?

12:24PM   10   A.   YES.

12:24PM   11   Q.   SHE DID PRESS INTERVIEWS; CORRECT?

12:24PM   12   A.   CORRECT.

12:24PM   13   Q.   AND SHE APPEARED ON THE COVER OF MAGAZINES AND NEWSPAPERS;

12:24PM   14   RIGHT?

12:24PM   15   A.   CORRECT.

12:24PM   16   Q.   AND SHE DID A TED TALK; CORRECT?

12:24PM   17   A.   IT WAS TED MED, BUT YES.

12:24PM   18   Q.   TED MED.  OKAY.

12:24PM   19        AND I THINK YOU ALSO SAID LAST WEEK THAT SHE WAS THE

12:24PM   20   PRIMARY PERSON MEETING WITH THE SO-CALLED "VIP'S" THAT CAME

12:24PM   21   INTO THE COMPANY; RIGHT?

12:24PM   22   A.   RIGHT.

12:24PM   23   Q.   AND I THINK YOU ALSO SAID THAT SHE WAS THE ONE WHO RAN

12:25PM   24   MOST OF THE DEMO MEETINGS; RIGHT?

12:25PM   25   A.   RIGHT.

EDLIN CROSS BY MS. WALSH

12:25PM 1    Q.   AND SHE WAS THE ONE WHO GAVE MOST OF THE TOURS OF THE

12:25PM 2    FACILITIES; CORRECT?

12:25PM 3    A.   RIGHT, RIGHT.

12:25PM 4    Q.   OKAY.  AND SO LET'S TURN TO MR. BALWANI'S AREA OF

12:25PM 5    CONCENTRATION.

12:25PM 6         HE WAS IN CHARGE OF OPERATIONS OF THE COMPANY; RIGHT?

12:25PM 7    A.   RIGHT.

12:25PM 8    Q.   AND HIS SPECIALTY WAS SOFTWARE, WASN'T IT?

12:25PM 9    A.   THAT WAS MY UNDERSTANDING.

12:25PM 10   Q.   HE WAS IN CHARGE OF SOFTWARE INVESTMENT; RIGHT?

12:25PM 11   A.   YES.

12:25PM 12   Q.   SOFTWARE DESIGN; CORRECT?

12:25PM 13   A.   YES.

12:25PM 14   Q.   THE LAB INFORMATION SYSTEM; RIGHT?

12:25PM 15   A.   RIGHT.

12:25PM 16   Q.   AND THAT'S WHERE ALL OF THE PATIENT DATA WAS KEPT;

12:25PM 17   CORRECT?

12:25PM 18   A.   I BELIEVE SO.

12:25PM 19   Q.   AND HE WAS INVOLVED IN DESIGNING, ALONG WITH A TEAM OF

12:25PM 20   OTHER PEOPLE, BUT DESIGNING THAT SYSTEM; RIGHT?

12:25PM 21   A.   RIGHT.

12:25PM 22   Q.   IN FACT, HE HAD A BACKGROUND IN SOFTWARE; RIGHT?

12:26PM 23   A.   RIGHT.

12:26PM 24   Q.   AND HE WORKED FOR MICROSOFT?

12:26PM 25   A.   YES.

12:26PM   1    Q.   AND THEN HE HAD HIS OWN STARTUP COMPANY WHICH HE SOLD

12:26PM   2    BEFORE HE CAME TO THERANOS; RIGHT?

12:26PM   3    A.   RIGHT.

12:26PM   4    Q.   AND HE WAS ALSO IN CHARGE AT THERANOS OF THE MANUFACTURING

12:26PM   5    OF THE DEVICES; RIGHT?

12:26PM   6    A.   I DON'T KNOW EXACTLY.

12:26PM   7    Q.   OKAY.  BUT MR. BALWANI DID NOT HAVE A MEDICAL DEGREE;

12:26PM   8    RIGHT?

12:26PM   9    A.   AS FAR AS I'M CONCERNED.

12:26PM  10    Q.   AS FAR AS YOU KNOW; RIGHT?

12:26PM  11    A.   YES.

12:26PM  12    Q.   AND HE DIDN'T HAVE ANY TRAINING, AS FAR AS YOU'RE AWARE,

12:26PM  13    IN BIOSCIENCE; CORRECT?

12:26PM  14    A.   AS FAR AS I UNDERSTAND, YES.

12:26PM  15    Q.   AND AS FAR AS YOU'RE AWARE, HE DIDN'T PLAY A ROLE IN

12:26PM  16    DEVELOPING THOSE CHEMISTRIES THAT WENT INTO THE ACTUAL BLOOD

12:26PM  17    TESTS TO MAKE THEM WORK; RIGHT?

12:26PM  18    A.   RIGHT.

12:26PM  19    Q.   AND THAT WAS MS. HOLMES'S EXPERTISE, ALONG WITH OTHERS;

12:26PM  20    CORRECT?

12:26PM  21    A.   CORRECT.

12:27PM  22    Q.   SO YOU MENTIONED IN YOUR WORK AT THERANOS YOU RELIED ON

12:27PM  23    VARIOUS DIFFERENT SCIENTISTS IN THESE DIFFERENT GROUPS WITHIN

12:27PM  24    THE COMPANY; RIGHT?

12:27PM  25    A.   RIGHT.

12:27PM 1    Q.   AND SO WHEN YOU NEEDED INFORMATION, YOU CONSULTED WITH

12:27PM 2    THOSE PEOPLE FROM TIME TO TIME; IS THAT RIGHT?

12:27PM 3    A.   RIGHT.

12:27PM 4    Q.   AND WHEN THOSE SCIENTISTS GAVE YOU INFORMATION, YOU RELIED

12:27PM 5    ON IT; CORRECT?

12:27PM 6    A.   YES.

12:27PM 7    Q.   AND OFTEN YOU WOULD PASS THE INFORMATION FROM THEM TO

12:27PM 8    WHOEVER WAS ASKING FOR IT; CORRECT?

12:27PM 9    A.   YES.

12:27PM 10   Q.   OKAY.  AND ONE OF THOSE SCIENTISTS WAS DR. DANIEL YOUNG.

12:27PM 11        DO YOU REMEMBER HIM?

12:27PM 12   A.   YES.

12:27PM 13   Q.   AND HE WAS IN CHARGE OF THE THERANOS SYSTEMS AND

12:27PM 14   COMPUTATIONAL BIOSCIENCES.

12:27PM 15        DO YOU REMEMBER THAT?

12:27PM 16   A.   YES.

12:27PM 17   Q.   ALL RIGHT.  HE PLAYED A PROMINENT ROLE IN THE R&D LAB;

12:27PM 18   RIGHT?

12:27PM 19   A.   I BELIEVE SO.

12:27PM 20   Q.   AND HE WAS AN EXTREMELY KNOWLEDGEABLE PERSON, WAS HE NOT?

12:28PM 21   A.   HE WAS.

12:28PM 22   Q.   HE GRADUATED FROM M.I.T.; CORRECT?

12:28PM 23   A.   YES.

12:28PM 24   Q.   AND HE HAD VARIOUS DEGREES IN MECHANICAL ENGINEERING;

12:28PM 25   RIGHT?

12:28PM  1    A.   YES.

12:28PM  2    Q.   HE ALSO HAD WORKED IN THE BIOSCIENCES FIELD BEFORE HE CAME

12:28PM  3    TO THERANOS; RIGHT?

12:28PM  4    A.   I DON'T KNOW THE SPECIFICS, BUT THAT WAS MY UNDERSTANDING.

12:28PM  5    Q.   OKAY.  AND YOU GENERALLY FOUND HIM, IN YOUR EXPERIENCE, TO

12:28PM  6    BE GENUINELY KNOWLEDGEABLE ABOUT THE THERANOS ASSAYS; CORRECT?

12:28PM  7    A.   CORRECT.

12:28PM  8    Q.   AND YOU HAD CONFIDENCE IN WHAT HE WAS TELLING YOU AT THE

12:28PM  9    TIME; RIGHT?

12:28PM  10   A.   YES.

12:28PM  11   Q.   OKAY.  SO WHEN A QUESTION WOULD COME UP ABOUT THE SCIENCE

12:28PM  12   OR THE RESULTS OF A PARTICULAR ASSAY, YOU DEFERRED GENERALLY TO

12:28PM  13   DR. YOUNG, DIDN'T YOU?

12:28PM  14   A.   I DID.

12:28PM  15   Q.   AND WE'RE GOING TO LOOK AT SOME EMAILS REGARDING THE

12:29PM  16   DEMOS.

12:29PM  17        IT WAS DR. YOUNG'S JOB TO ANALYZE THOSE TEST RESULTS;

12:29PM  18   RIGHT?

12:29PM  19   A.   YES.

12:29PM  20   Q.   AND HE WOULD LOOK AT THE DATA; RIGHT?

12:29PM  21   A.   RIGHT.

12:29PM  22   Q.   AND HE WOULD MAKE CERTAIN JUDGMENTS BASED ON THE SCIENCE;

12:29PM  23   CORRECT?

12:29PM  24   A.   CORRECT.

12:29PM  25   Q.   AND HE WOULD MAKE DECISIONS ABOUT WHAT SHOULD BE REPORTED

12:29PM   1   OUT TO THE VISITOR WHO GOT THE DEMONSTRATION; IS THAT RIGHT?

12:29PM   2   A.   THAT'S RIGHT.

12:29PM   3   Q.   AND YOU REFERRED TO HIM ENTIRELY IN THAT DECISION MAKING

12:29PM   4   PROCESS; CORRECT?

12:29PM   5   A.   YES.

12:29PM   6   Q.   OKAY.  NOW, YOU MENTIONED YOU INTERACTED WITH DIFFERENT

12:29PM   7   TEAMS AT THERANOS.  ONE OF THOSE TEAMS WAS THE ASSAY

12:29PM   8   DEVELOPMENT TEAM.

12:29PM   9        DO YOU REMEMBER THAT?

12:29PM  10   A.   YES.

12:29PM  11   Q.   AND THEN THERE WAS AN ASSAY --

12:29PM  12   A.   THERE WERE A COUPLE -- THERE WERE SEVERAL OF THEM, YES.

12:29PM  13   Q.   RIGHT.  THERE WERE SEVERAL OF THEM; CORRECT?

12:29PM  14   A.   YES.

12:29PM  15   Q.   AND THEY CORRESPONDED GENERALLY TO THE TYPE OF ASSAYS THAT

12:29PM  16   THEY WORKED ON; IS THAT FAIR?

12:30PM  17   A.   YES.

12:30PM  18   Q.   AND SO THERE WAS A SEPARATE ASSAY DEVELOPMENT TEAM FOR

12:30PM  19   IMMUNOASSAYS, FOR EXAMPLE?

12:30PM  20   A.   RIGHT.

12:30PM  21   Q.   FOR CYTOMETRY; RIGHT?

12:30PM  22   A.   RIGHT.

12:30PM  23   Q.   FOR GENERAL CHEMISTRY; CORRECT?

12:30PM  24   A.   CORRECT.

12:30PM  25   Q.   AND FOR THIS TEST CALLED NUCLEIC ACID AMPLIFICATION;

12:30PM  1     RIGHT?

12:30PM  2     A.   RIGHT.

12:30PM  3     Q.   AND YOU WERE AWARE AT THE TIME THAT MANY DIFFERENT ASSAYS

12:30PM  4     WERE BEING DEVELOPED WITHIN THERANOS; RIGHT?

12:30PM  5     A.   RIGHT.

12:30PM  6     Q.   AND, IN FACT, YOU SAW MANY OF THOSE ASSAY INVESTMENT

12:30PM  7     REPORTS DESCRIBING HOW THE ASSAYS WERE DEVELOPED; RIGHT?

12:30PM  8     A.   CORRECT.

12:30PM  9     Q.   AND THOSE REPORTS CONTAINED A LOT OF SCIENTIFIC AND

12:30PM  10    TECHNICAL DATA; RIGHT?

12:30PM  11    A.   RIGHT.

12:30PM  12    Q.   AND THEY WERE FAIRLY LONG?

12:30PM  13    A.   YES.

12:30PM  14    Q.   AND THERE WAS ONE FOR EACH INDIVIDUAL ASSAY THAT THERANOS

12:30PM  15    DEVELOPED; CORRECT?

12:30PM  16          MR. BOSTIC:  OBJECTION.  FOUNDATION.

12:30PM  17          THE COURT:  CAN YOU LAY A FOUNDATION FOR HIS

12:30PM  18    KNOWLEDGE OF THAT.

12:30PM  19          MS. WALSH:  SURE.

12:30PM  20    Q.   MR. EDLIN, YOU SAW MANY OF THOSE ASSAY DEVELOPMENT

12:31PM  21    REPORTS; RIGHT?

12:31PM  22    A.   YES.

12:31PM  23    Q.   AND GENERALLY, DID A REPORT RELATE TO ONE ASSAY OR MORE

12:31PM  24    THAN ONE ASSAY?

12:31PM  25    A.   I RECALL THAT EACH REPORT RELATED TO ONE ASSAY.

12:31PM 1    Q.   SO LET ME HAVE YOU TURN IN YOUR BINDER TO EXHIBIT 7239.

12:31PM 2    A.   YES.

12:31PM 3    Q.   DO YOU HAVE THAT IN FRONT OF YOU?

12:31PM 4    A.   YES.

12:31PM 5    Q.   OKAY.  IS THAT AN EMAIL BETWEEN -- TO ELIZABETH HOLMES?

12:32PM 6         DO YOU SEE THAT?

12:32PM 7    A.   YES.

12:32PM 8    Q.   AND IT'S FROM A FELLOW NAMED CHINMAY PANGARKAR?

12:32PM 9    A.   YES.

12:32PM 10   Q.   AND WHO WAS CHINMAY PANGARKAR?

12:32PM 11   A.   HE WAS THE LEAD OF THE CYTOMETRY ASSAY DEVELOPMENT TEAM.

12:32PM 12   Q.   OKAY.  AND YOU'RE ON COPY; RIGHT?

12:32PM 13   A.   YES.

12:32PM 14   Q.   AND DR. YOUNG IS ON COPY; CORRECT?

12:32PM 15   A.   YES.

12:32PM 16   Q.   AND THE DATE OF THE EMAIL IS JUNE 21ST, 2012.

12:32PM 17        DO YOU SEE THAT?

12:32PM 18   A.   YES.

12:32PM 19        MS. WALSH:  YOUR HONOR, THE GOVERNMENT -- I'M SORRY,

12:32PM 20   THE DEFENSE OFFERS EXHIBIT 7329.

12:32PM 21        MR. BOSTIC:  HEARSAY.

12:32PM 22      (PAUSE IN PROCEEDINGS.)

12:32PM 23        MS. WALSH:  I CAN LAY A FOUNDATION, YOUR HONOR.

12:32PM 24        THE COURT:  SURE.

12:32PM 25   BY MS. WALSH:

12:32PM   1    Q.   SO, MR. EDLIN, JUST LIKE MR. BOSTIC ASKED YOU ON DIRECT

12:32PM   2    EXAMINATION, DID YOU USE EMAIL IN THE REGULAR COURSE OF

12:32PM   3    THERANOS BUSINESS THAT YOU DID FOR THE COMPANY?

12:32PM   4    A.   YES.

12:32PM   5    Q.   AND WAS IT YOUR REGULAR PRACTICE TO USE EMAIL?

12:33PM   6    A.   YES.

12:33PM   7    Q.   AND DID IT HELP YOU CONDUCT OR DO YOUR JOB AT THERANOS TO

12:33PM   8    BE ABLE TO COMMUNICATE THROUGH EMAIL?

12:33PM   9    A.   YES.

12:33PM   10   Q.   AND DID OTHER EMPLOYEES THAT YOU INTERACTED WITH IN YOUR

12:33PM   11   JOB COMMUNICATE WITH YOU THROUGH EMAIL?

12:33PM   12   A.   YES.

12:33PM   13   Q.   AND TO DO YOUR JOB, WAS IT IMPORTANT FOR EVERYONE ON THE

12:33PM   14   EMAIL TO BE AS ACCURATE AS POSSIBLE IN COMMUNICATING THE

12:33PM   15   INFORMATION?

12:33PM   16   A.   YES.

12:33PM   17   Q.   AND WERE THERANOS EMAILS PRESERVED SO THAT LATER ON THEY

12:33PM   18   COULD BE USED AND CHECKED AND READ BY OTHERS?

12:33PM   19   A.   YES.

12:33PM   20        MS. WALSH:  YOUR HONOR, WE OFFER 7239.

12:33PM   21        MR. BOSTIC:  SAME OBJECTION AS TO THIS PARTICULAR

12:33PM   22   EMAIL.

12:33PM   23        THE COURT:  I'LL OVERRULE THE OBJECTION.  IT'S

12:33PM   24   ADMITTED.

12:33PM   25        (DEFENDANT'S EXHIBIT 7239 WAS RECEIVED IN EVIDENCE.)

12:33PM  1          THE COURT:  AND IT MAY BE PUBLISHED.

12:34PM  2     BY MS. WALSH:

12:34PM  3     Q.   OKAY.  SO LET'S TAKE A LOOK AT 7239.

12:34PM  4          YOU MENTIONED THAT CHINMAY PANGARKAR WAS A SENIOR

12:34PM  5     SCIENTIST IN THE COMPUTATIONAL BIOSCIENCES IN CHARGE OF THE

12:34PM  6     CYTOMETRY ASSAYS; RIGHT?

12:34PM  7     A.   RIGHT.

12:34PM  8     Q.   AND HE WAS A PH.D.; CORRECT?

12:34PM  9     A.   CORRECT.

12:34PM  10    Q.   AND HE'S IN THIS EMAIL SAYING "HI ELIZABETH:

12:34PM  11         "ASSAYS DEVELOPMENT AND CLINICAL STUDY SUMMARY REPORTS FOR

12:34PM  12    ALL CYTOMETRY ASSAYS ARE LOCATED AT THE FOLLOWING LOCATION."

12:34PM  13         AND THEN THERE'S A LINK TO THE REPORTS.

12:34PM  14         DO YOU SEE THAT?

12:34PM  15    A.   YES.

12:34PM  16    Q.   AND THEN DR. PANGARKAR SAYS TO YOU AND MS. HOLMES AND

12:34PM  17    DR. YOUNG, "SOME COMMENTS TO GO WITH THESE REPORTS:

12:34PM  18         "REPORTS HAVE BEEN WRITTEN TO DEMONSTRATE.

12:34PM  19         "THAT THERE IS SOUND SCIENCE AND METHOD DEVELOPMENT BEHIND

12:34PM  20    OUR ASSAYS.

12:34PM  21         "THAT OUR ASSAYS GIVE RESULTS THAT AGREE WITH PREDICATE

12:34PM  22    METHODS WITHIN CLIA PRESCRIBED LIMITS."

12:35PM  23         DO YOU SEE THAT?

12:35PM  24    A.   YES.

12:35PM  25    Q.   AND PREDICATE METHODS IS A TEST RUNNING ON COMMERCIAL

12:35PM  1    MACHINES.

12:35PM  2         IS THAT ANOTHER WAY OF SAYING THAT?

12:35PM  3    A.   I BELIEVE SO.

12:35PM  4    Q.   AND CLIA IS -- CORRESPONDS TO CLINICAL LAB REQUIREMENTS;

12:35PM  5    IS THAT RIGHT?

12:35PM  6    A.   I BELIEVE SO.

12:35PM  7    Q.   OKAY.  WE CAN TAKE THAT DOWN.

12:35PM  8         OKAY.  SO YOU INTERACTED WITH THE ASSAY DEVELOPMENT TEAMS

12:35PM  9    AND THE SOFTWARE TEAMS; IS THAT RIGHT?

12:35PM  10   A.   ON OCCASIONS.

12:35PM  11   Q.   AND ALSO THE HARDWARE TEAMS; CORRECT?

12:35PM  12   A.   YES.

12:35PM  13   Q.   OKAY.  AND YOU TESTIFIED LAST WEEK THAT THERE WERE --

12:35PM  14   THERE WAS A GENERAL PRACTICE OF RESTRICTING INFORMATION WITHIN

12:36PM  15   THERANOS.

12:36PM  16        DO YOU REMEMBER THAT?

12:36PM  17   A.   YES.

12:36PM  18   Q.   OKAY.  BUT YOU WERE ABLE TO DO YOUR JOB AND COMMUNICATE

12:36PM  19   WITH PEOPLE ACROSS DIFFERENT AREAS OF THE COMPANY, WEREN'T YOU?

12:36PM  20   A.   YES.

12:36PM  21   Q.   WHEN YOU NEEDED INFORMATION, YOU COULD GO TO THEM AND ASK

12:36PM  22   THEM A QUESTION; RIGHT?

12:36PM  23   A.   YES.

12:36PM  24   Q.   AND THEY WOULD GIVE YOU AN ANSWER; RIGHT?

12:36PM  25   A.   YES.

12:36PM    1    Q.   AND YOU FELT LIKE YOU COULD RELY ON THEIR ANSWERS;

12:36PM    2    CORRECT?

12:36PM    3    A.   CORRECT.

12:36PM    4    Q.   AND YOU UNDERSTOOD AT THE TIME THAT THERANOS WAS

12:36PM    5    DEVELOPING VALUABLE TECHNOLOGY; RIGHT?

12:36PM    6    A.   YES.

12:36PM    7    Q.   IT WAS A RELATIVELY NEW COMPANY AT THE TIME; RIGHT?

12:36PM    8    A.   RIGHT.

12:36PM    9    Q.   AND NEW IN THE BLOOD TESTING SPACE; CORRECT?

12:36PM   10    A.   CORRECT.

12:36PM   11    Q.   AND IT WAS DEVELOPING ITS OWN CHEMISTRIES TO TEST BLOOD;

12:36PM   12    RIGHT?

12:36PM   13    A.   I'M NOT SURE IF I HAD THAT UNDERSTANDING AT THE TIME, BUT

12:36PM   14    I DID KNOW THAT IT WAS DEVELOPING ITS OWN TECHNOLOGY.

12:37PM   15    Q.   OKAY.  AND IT WAS DEVELOPING ITS OWN SOFTWARE; RIGHT?

12:37PM   16    A.   RIGHT.

12:37PM   17    Q.   AND WRITING SOFTWARE FROM SCRATCH; CORRECT?

12:37PM   18    A.   RIGHT.

12:37PM   19    Q.   AND IT WAS ALSO BUILDING ITS OWN HARDWARE; RIGHT?

12:37PM   20    A.   RIGHT.

12:37PM   21    Q.   AND ALSO DEVELOPING PROCESSES TO RUN THE BLOOD TESTING

12:37PM   22    MACHINES.

12:37PM   23         IS THAT FAIR?

12:37PM   24    A.   YES.

12:37PM   25    Q.   AND WHEN I SAY "PROCESSES," I'M REFERRING TO PROTOCOLS.

12:37PM  1    THERE WERE CERTAIN PROTOCOLS FOR RUNNING DIFFERENT MACHINES; IS

12:37PM  2    THAT RIGHT?

12:37PM  3    A.   CAN YOU SPECIFY KIND OF WHICH MACHINES AND IN WHICH

12:37PM  4    CONTEXT THAT'S FOR?

12:37PM  5    Q.   SURE.

12:37PM  6         FOR THERANOS'S TECHNOLOGY THAT IT WAS DEVELOPING, IT WAS

12:37PM  7    DEVELOPING HARDWARE; RIGHT?

12:37PM  8    A.   RIGHT.

12:37PM  9    Q.   SOFTWARE; CORRECT?

12:37PM 10    A.   RIGHT.

12:37PM 11    Q.   THE ASSAY ITSELF; RIGHT?

12:37PM 12    A.   RIGHT.

12:37PM 13    Q.   AND THAT'S WHAT THE ASSAY DEVELOPMENT TEAMS WERE

12:38PM 14    DEVELOPING?

12:38PM 15    A.   RIGHT.

12:38PM 16    Q.   BUT ALSO THE PROCESSES TO PUT ALL OF THOSE THINGS

12:38PM 17    TOGETHER; RIGHT?

12:38PM 18    A.   RIGHT.

12:38PM 19    Q.   IN ORDER TO MAKE THE MACHINE WORK IN A UNIFIED WAY;

12:38PM 20    CORRECT?

12:38PM 21    A.   CORRECT.

12:38PM 22    Q.   OKAY.  AND THERANOS OBTAINED PATENTS ON MUCH OF ITS WORK;

12:38PM 23    RIGHT?

12:38PM 24    A.   THAT WAS MY UNDERSTANDING.

12:38PM 25    Q.   AND THE PATENTS PROTECTED THE INTELLECTUAL PROPERTY OF

12:38PM   1    THERANOS; RIGHT?

12:38PM   2    A.   I DON'T KNOW THE SPECIFICS, BUT THAT'S, OF COURSE, WHAT

12:38PM   3    PATENTS DO.

12:38PM   4    Q.   GENERALLY?

12:38PM   5    A.   RIGHT.

12:38PM   6    Q.   AND YOU'RE AWARE THAT THERANOS HELD MANY PATENTS; IS THAT

12:38PM   7    RIGHT?

12:38PM   8    A.   YES.

12:38PM   9    Q.   AND FOR IDEAS THAT IT WAS DEVELOPING THAT IT DIDN'T HAVE

12:38PM  10    PATENTS FOR, THERE WAS CONCERN WITHIN THE COMPANY THAT HAD TO

12:38PM  11    PROTECT THOSE IDEAS; RIGHT?

12:38PM  12         MR. BOSTIC:  OBJECTION.  CALLS FOR SPECULATION.

12:38PM  13    LACKS FOUNDATION.

12:38PM  14         THE COURT:  COULD YOU ASK THAT IN A DIFFERENT WAY?

12:38PM  15         MS. WALSH:  SURE.

12:39PM  16    Q.   WELL, MR. EDLIN, YOU TESTIFIED THAT THERE WAS SOME

12:39PM  17    RESTRICTION ON THE FLOW OF INFORMATION WITHIN THERANOS;

12:39PM  18    CORRECT?

12:39PM  19    A.   CORRECT.

12:39PM  20    Q.   AND ISN'T IT YOUR UNDERSTANDING THAT ONE OF THE REASONS

12:39PM  21    THERE WAS RESTRICTION ON THE FLOW OF INFORMATION IS BECAUSE THE

12:39PM  22    COMPANY WANTED TO PROTECT ITS IDEAS AND INTELLECTUAL PROPERTY?

12:39PM  23         MR. BOSTIC:  SAME OBJECTION.

12:39PM  24         THE COURT:  YOU'RE ASKING IF HE HAS PERSONAL

12:39PM  25    KNOWLEDGE OF THIS?

12:39PM   1              MS. WALSH:  JUST HIS UNDERSTANDING.

12:39PM   2              THE COURT:  YOU CAN ANSWER THE QUESTION, SIR, BASED

12:39PM   3      ON YOUR PERSONAL KNOWLEDGE.

12:39PM   4              THE WITNESS:  THAT WAS MY UNDERSTANDING.

12:39PM   5      BY MS. WALSH:

12:39PM   6      Q.   IT WAS?

12:39PM   7      A.   YES.

12:39PM   8      Q.   AND ONE OF THE REASONS THAT WAS THE CASE, WAS BECAUSE

12:39PM   9      THERANOS HAD COMPETITORS IN THE BLOOD TESTING MARKET; RIGHT?

12:39PM  10      A.   THAT WAS ONE OF THE REASONS.

12:39PM  11      Q.   RIGHT.  THERE WERE TWO VERY LARGE COMPANIES THAT WERE

12:39PM  12      THERANOS'S COMPETITORS; RIGHT?

12:39PM  13      A.   I'M NOT SURE AT THE TIME TO WHEN I LEARNED THAT, BUT, YES,

12:40PM  14      TWO INCUMBENTS IN THE -- I'M NOT SURE WHEN I -- I DON'T

12:40PM  15      REMEMBER.

12:40PM  16              THE COURT:  DID YOU SAY TWO INCUMBENTS IN THE LAB

12:40PM  17      INDUSTRY?

12:40PM  18              THE WITNESS:  YES.

12:40PM  19              MS. WALSH:  THANK YOU.

12:40PM  20      Q.   AND THE TWO INCUMBENTS WERE LABCORP AND QUEST; RIGHT?

12:40PM  21      A.   RIGHT.

12:40PM  22      Q.   AND THEY WERE TWO LARGE BLOOD TESTING COMPANIES; CORRECT?

12:40PM  23      A.   YES.

12:40PM  24      Q.   AND THEY OCCUPIED MOST OF THE MARKET IN BLOOD TESTING AT

12:40PM  25      THE TIME; IS THAT RIGHT?

EDLIN CROSS BY MS. WALSH

12:40PM 1   A.   I DON'T KNOW THE SPECIFICS.

12:40PM 2   Q.   OKAY.  DID YOU HAVE AN UNDERSTANDING AT THE TIME WHEN YOU

12:40PM 3   WERE WORKING AT THERANOS, THAT THAT WAS THE CASE?

12:40PM 4   A.   I DON'T RECALL THE EXACT PERCENTAGE OF THE MARKET.

12:40PM 5   Q.   OKAY.  HOW ABOUT JUST GENERALLY, THEY OCCUPIED MOST OF THE

12:40PM 6   MARKET?

12:40PM 7   A.   I THINK MOST WOULD REQUIRE A MAJORITY, I JUST DON'T

12:41PM 8   REMEMBER THE EXACT PERCENTAGE.

12:41PM 9   Q.   OKAY.  ALL RIGHT.  SO I WANT TO SHIFT GEARS NOW TO

12:41PM 10  WALGREENS.

12:41PM 11       YOU HAD A ROLE IN INTERACTING WITH WALGREENS, DID YOU NOT,

12:41PM 12  WHILE YOU WERE AT THERANOS?

12:41PM 13  A.   I DID.

12:41PM 14  Q.   AND YOUR ROLE, I THINK YOU TESTIFIED THAT IT INVOLVED

12:41PM 15  OPERATIONALIZING THE ROLLOUT; RIGHT?

12:41PM 16  A.   RIGHT.

12:41PM 17  Q.   AND YOUR ROLE IN CONNECTION WITH WALGREENS RELATED TO THE

12:41PM 18  PATIENT EXPERIENCE AT WALGREENS; IS THAT FAIR?

12:41PM 19  A.   YES.

12:41PM 20  Q.   AND PART OF WHAT YOU DID, WAS YOU PROVIDED THE TRAINING

12:41PM 21  FOR PHLEBOTOMISTS IN WALGREENS; CORRECT?

12:42PM 22  A.   NOT ALL OF THE TRAINING, BUT I WAS INVOLVED WITH THE

12:42PM 23  TRAINING, YES.

12:42PM 24  Q.   WHAT WERE YOU INVOLVED WITH?

12:42PM 25  A.   I WORKED WITH THE REST OF MY TEAM AND ALSO WITH OTHER

12:42PM    1    PERSONNEL WITHIN THERANOS TO DEVELOP A TRAINING PROGRAM THAT I,

12:42PM    2    ALONG WITH OTHER MEMBERS OF THE PRODUCT MANAGEMENT TEAM,

12:42PM    3    PRESENTED TO, IT WAS AT FIRST A GROUP OF WALGREENS TECHNICIANS,

12:42PM    4    AND WE DEVELOPED THE TRAINING MODEL WHERE WE WOULD TRAIN A

12:42PM    5    GROUP OF TECHNICIANS, AND THEN THEY THEMSELVES WOULD BE ABLE TO

12:42PM    6    TRAIN A GROUP OF TECHNICIANS.

12:42PM    7    Q.   OKAY.  AND SO YOU AND OTHERS DEVELOPED THAT TRAINING OF

12:42PM    8    TRAIN THE TRAINER; IS THAT RIGHT?

12:42PM    9    A.   RIGHT, IN CONSULTATION WITH OTHER EXPERTS WITHIN THE

12:42PM   10    COMPANY.

12:42PM   11    Q.   AND YOU ALSO TRAINED THE TECHNICIANS, OR THE PERSON WHO

12:43PM   12    TRAINED THE TECHNICIANS, ON THE SOFTWARE APPS THAT WERE

12:43PM   13    ASSOCIATED WITH THERANOS; IS THAT RIGHT?

12:43PM   14    A.   I PERSONALLY DON'T RECALL DELIVERING THAT TRAINING, BUT I

12:43PM   15    DO RECALL THAT THAT WAS PART OF THE TRAINING.

12:43PM   16    Q.   OKAY.  AND THAT SOFTWARE RELATED TO CHECKING THE PATIENT

12:43PM   17    IN AT WALGREENS; RIGHT?

12:43PM   18    A.   RIGHT.

12:43PM   19    Q.   CHECKING THEIR INSURANCE; CORRECT?

12:43PM   20    A.   CORRECT.

12:43PM   21    Q.   EVALUATING THEIR LAB FORMS AT THE TIME; RIGHT?

12:43PM   22    A.   RIGHT.

12:43PM   23    Q.   AND ALSO, I THINK YOU MENTIONED TRAINING THE TECHNICIANS

12:43PM   24    ON THE APPS TO HELP THEM UNDERSTAND WHICH TUBES THEY NEEDED TO

12:43PM   25    HELP COLLECT THE BLOOD; IS THAT RIGHT?

EDLIN CROSS BY MS. WALSH

12:43PM  1    A.   RIGHT.

12:43PM  2    Q.   AND THERE WERE VARIOUS DIFFERENT TUBES THAT THEY COULD

12:43PM  3    USE; RIGHT?

12:43PM  4    A.   RIGHT.

12:43PM  5    Q.   SO THEY HAD TO KNOW WHICH ONES TO USE?

12:43PM  6    A.   CORRECT.

12:43PM  7    Q.   SO LET'S JUST TALK MORE BROADLY ABOUT THE

12:44PM  8    THERANOS-WALGREENS RELATIONSHIP.  ALL RIGHT?

12:44PM  9    A.   UH-HUH.

12:44PM  10   Q.   THERANOS PARTNERED WITH WALGREENS TO BRING ITS BLOOD

12:44PM  11   TESTING SERVICES INTO WALGREENS; CORRECT?

12:44PM  12   A.   YES.

12:44PM  13   Q.   AND THE GOVERNMENT ASKED YOU QUESTIONS ABOUT THE

12:44PM  14   WALGREENS-THERANOS RELATIONSHIP IN 2013.

12:44PM  15        DO YOU REMEMBER THAT?

12:44PM  16   A.   YES.

12:44PM  17   Q.   RIGHT BEFORE THE ROLLOUT; RIGHT?

12:44PM  18   A.   YES.

12:44PM  19   Q.   BUT, IN FACT, WALGREENS AND THERANOS HAD A RELATIONSHIP, A

12:44PM  20   PARTNERSHIP YEARS BEFORE THE ROLLOUT; RIGHT?

12:44PM  21   A.   YES.

12:44PM  22   Q.   AND DO YOU REMEMBER THAT THE LAUNCH, THE WALGREENS LAUNCH

12:44PM  23   WAS SCHEDULED FOR 2012 AND IT GOT POSTPONED?

12:44PM  24        DO YOU RECALL THAT?

12:44PM  25   A.   I RECALL THAT IT WAS POSTPONED.

12:44PM  1    Q.   OKAY.  AND THE ORIGINAL IDEA IN THE PARTNERSHIP BETWEEN

12:45PM  2    THERANOS AND WALGREENS WAS TO PUT THERANOS'S DEVICES IN

12:45PM  3    WALGREENS.

12:45PM  4         DO YOU REMEMBER THAT?

12:45PM  5    A.   YES.

12:45PM  6    Q.   AND THAT WAS GOING TO BE CALLED A POINT OF SERVICE MODEL;

12:45PM  7    RIGHT?

12:45PM  8    A.   I'M FAMILIAR WITH THE TERM, I'M JUST NOT FAMILIAR WITH HOW

12:45PM  9    IT WAS DESCRIBED AT THAT TIME.

12:45PM  10   Q.   OKAY.  BUT THE ORIGINAL IDEA WAS TO PUT THE DEVICES IN

12:45PM  11   WALGREENS; RIGHT?

12:45PM  12   A.   RIGHT.

12:45PM  13   Q.   OKAY.  AND AT A CERTAIN POINT IN TIME THAT CHANGED; RIGHT?

12:45PM  14   A.   RIGHT.

12:45PM  15   Q.   AND IT CHANGED FOR VARIOUS DIFFERENT REASONS, SOME RELATED

12:45PM  16   TO FDA APPROVAL THAT MIGHT BE REQUIRED ON THE DEVICE TO MOVE IT

12:45PM  17   FROM THERANOS INTO THE WALGREENS STORES; RIGHT?

12:45PM  18         MR. BOSTIC:  LACKS FOUNDATION.  CALLS FOR

12:45PM  19   SPECULATION.

12:45PM  20         THE COURT:  CAN YOU LAY A FOUNDATION FOR THAT

12:45PM  21   QUESTION?

12:45PM  22         MS. WALSH:  SURE.

12:46PM  23   Q.   SO THE MODEL CHANGED FROM PUTTING DEVICES IN THE STORES;

12:46PM  24   RIGHT?

12:46PM  25   A.   RIGHT.

12:46PM  1    Q.   AND IT CHANGED FOR A NUMBER OF DIFFERENT REASONS.

12:46PM  2         DO YOU REMEMBER ANY OF THE REASONS?

12:46PM  3              MR. BOSTIC:  CALLS FOR HEARSAY.

12:46PM  4              THE COURT:  CAN YOU ASK IF HE WAS INVOLVED WITH ANY

12:46PM  5    OF THOSE?

12:46PM  6              MS. WALSH:  SURE.

12:46PM  7    Q.   MR. EDLIN, WERE YOU INVOLVED IN THE EARLIER RELATIONSHIP

12:46PM  8    BETWEEN THERANOS AND WALGREENS?

12:46PM  9    A.   WHEN I JOINED THE COMPANY, THERE WAS AN EXISTING

12:46PM 10    RELATIONSHIP WITH WALGREENS AND THAT WAS -- THAT RELATIONSHIP

12:46PM 11    WAS MY PRIMARY, YOU KNOW, ROLES AND RESPONSIBILITIES AT THE

12:46PM 12    COMPANY.

12:47PM 13         SO I WAS INVOLVED WITH THAT RELATIONSHIP AS EARLY AS 2011

12:47PM 14    WHEN I JOINED THE COMPANY.

12:47PM 15    Q.   OKAY.  AND YOU'RE AWARE -- NOT TO BE REPETITIVE -- BUT THE

12:47PM 16    ORIGINAL IDEA WAS TO PUT THE DEVICES IN THE WALGREENS; RIGHT?

12:47PM 17    A.   RIGHT.

12:47PM 18    Q.   AND AT A CERTAIN POINT IN TIME THAT CHANGED; RIGHT?

12:47PM 19    A.   RIGHT.

12:47PM 20    Q.   AND THE PARTIES, WALGREENS AND THERANOS, AGREED THAT THEY

12:47PM 21    WERE GOING TO CHANGE HOW THIS ROLLOUT WAS GOING TO OCCUR;

12:47PM 22    RIGHT?

12:47PM 23    A.   THERE WAS A MUTUAL AGREEMENT GIVEN THAT THAT IS WHAT

12:47PM 24    HAPPENED, BUT I WAS NOT APART OF THOSE CONVERSATIONS.

12:47PM 25    Q.   UNDERSTOOD.

12:47PM  1         AND THE CHANGE THAT OCCURRED WAS THAT THERANOS WAS NOW,

12:47PM  2     INSTEAD OF PUTTING DEVICES IN WALGREENS, THERANOS WAS GOING TO

12:47PM  3     COLLECT BLOOD SAMPLES IN WALGREENS, SHIP THEM BACK TO THERANOS,

12:47PM  4     AND PROCESS THE TESTS IN THERANOS.

12:47PM  5         DO YOU REMEMBER THAT?

12:47PM  6     A.   YES.

12:47PM  7     Q.   AND THAT CHANGE AND THAT PHASE OF SHIPPING SAMPLES BACK TO

12:48PM  8     THERANOS, THAT WAS REFERRED TO AS PHASE I.

12:48PM  9         DO YOU REMEMBER THAT?

12:48PM 10     A.   YES.

12:48PM 11     Q.   OKAY.  AND PUTTING THE MACHINES IN THE STORES, THAT WAS

12:48PM 12     GOING TO BE PHASE II; RIGHT?

12:48PM 13     A.   I DON'T, I DON'T RECALL.

12:48PM 14     Q.   OKAY.  BUT THAT WAS THE NEXT PHASE; IS THAT FAIR?  WHETHER

12:48PM 15     IT'S CALLED PHASE II OR SOMETHING ELSE, THAT WAS THE NEXT

12:48PM 16     PHASE, PUTTING THE DEVICES IN THE STORES?

12:48PM 17     A.   I'M NOT SURE WHETHER THAT IDEA ENDURED OR IF THAT WAS --

12:48PM 18     CONTINUED TO ALWAYS BE THE PLAN.  I'M NOT SURE.

12:48PM 19     Q.   OKAY.  WELL, IT WAS THE GOAL, THOUGH, OF THERANOS TO

12:49PM 20     ULTIMATELY PUT DEVICES IN WALGREENS STORES; RIGHT?

12:49PM 21     A.   I THINK THAT WAS THE INITIAL GOAL.

12:49PM 22         I'M NOT SURE WHETHER, AFTER THERE WAS THE CHANGE, IF THAT

12:49PM 23     WAS STILL THE GOAL OR IF THAT CHANGED OR IF IT CHANGED

12:49PM 24     PERMANENTLY.

12:49PM 25     Q.   OKAY.  AND PART OF THE GOAL ALSO, PUTTING ASIDE WALGREENS,

12:49PM   1    WAS TO PUT DEVICES IN OTHER LOCATIONS OUTSIDE OF THERANOS.

12:49PM   2         DO YOU REMEMBER THAT?

12:49PM   3    A.   YES.

12:49PM   4    Q.   PLACES LIKE HOSPITALS; RIGHT?

12:49PM   5    A.   RIGHT.

12:49PM   6    Q.   DOCTOR OFFICES; CORRECT?

12:49PM   7    A.   RIGHT.

12:49PM   8    Q.   ULTIMATELY PUTTING DEVICES IN MILITARY HOSPITALS; RIGHT?

12:49PM   9    A.   RIGHT.

12:49PM  10    Q.   OKAY.  BUT THIS WALGREENS ROLLOUT THAT OCCURRED IN 2013,

12:49PM  11    THAT WAS LIMITED TO THIS PHASE I MODEL; CORRECT?

12:49PM  12    A.   THAT BECAME THE WHOLE MODEL.

12:49PM  13    Q.   SO IN YOUR EXPERIENCE, WHAT HAPPENED WAS THE WALGREENS --

12:50PM  14    THE TESTING THAT OCCURRED IN 2013 WITH THE SHIPMENTS COMING

12:50PM  15    INTO THERANOS --

12:50PM  16    A.   RIGHT.

12:50PM  17    Q.   -- THAT WAS THE MODEL; RIGHT?

12:50PM  18    A.   THAT BECAME THE MODEL.  AND, YOU KNOW, I DON'T RECALL

12:50PM  19    WORKING ON A DIFFERENT MODEL.

12:50PM  20         SO THAT BECAME THE MODEL, AND THAT ESSENTIALLY WAS HOW THE

12:50PM  21    WALGREENS OPERATION CONTINUED TO PROCEED.

12:50PM  22    Q.   AND SO YOU PERSONALLY DIDN'T WORK ON ANY PHASE II MODEL;

12:50PM  23    RIGHT?

12:50PM  24    A.   RIGHT.

12:50PM  25    Q.   OR PUTTING DEVICES IN STORES; RIGHT?

12:50PM   1      A.   RIGHT.

12:50PM   2           THE WALGREENS OPERATION, YOU KNOW, STOPPED AFTER I THINK

12:50PM   3      55 STORES WERE SET UP, WHICH WAS WITH RESPECT TO THE OVERALL,

12:51PM   4      THE OVERALL NUMBER OF WALGREENS STORES THAT TESTING WOULD

12:51PM   5      POTENTIALLY BE AVAILABLE AT, WHICH I THINK WAS OVER 8,000.

12:51PM   6      FIFTY-FIVE WAS EARLY ON IN THAT PROCESS.

12:51PM   7      Q.   UNDERSTOOD.

12:51PM   8           BUT THE GOAL WAS TO PUT -- TO OPEN THERANOS SERVICE

12:51PM   9      CENTERS IN WALGREENS ACROSS THE COUNTRY; RIGHT?

12:51PM  10      A.   RIGHT.

12:51PM  11      Q.   OKAY.  AND ARE YOU AWARE THAT FOR TESTING PATIENT SAMPLES,

12:51PM  12      WHEN WALGREENS OPENED IN SEPTEMBER OF 2013, THE SERIES 3

12:51PM  13      DEVICES WERE THE DEVICES THAT WERE USED FOR TESTING PATIENT

12:51PM  14      SAMPLES?

12:51PM  15      A.   I'M NOT SURE IF I KNEW IF THE DEVICES WERE USED TO TEST

12:51PM  16      PATIENT SAMPLES, BUT AT THAT TIME I RECALL THAT THOSE WERE THE

12:52PM  17      DEVICES THAT WERE PLANNED TO INITIALLY BE IN THE WALGREENS

12:52PM  18      STORES.

12:52PM  19      Q.   OKAY.  AND YOU TESTIFIED ABOUT NEXT GENERATION DEVICES AS

12:52PM  20      WELL; RIGHT?

12:52PM  21      A.   RIGHT.

12:52PM  22      Q.   AND THAT WAS THE 4 SERIES DEVICE; CORRECT?

12:52PM  23      A.   CORRECT.

12:52PM  24      Q.   AND YOU SAID THAT THERE WERE THREE VARIATIONS OF THE

12:52PM  25      4 SERIES; RIGHT?

12:52PM   1    A.   RIGHT.

12:52PM   2    Q.   THERE WAS THE 4.0 MONOBAY; CORRECT?

12:52PM   3    A.   CORRECT.

12:52PM   4    Q.   AND THE 4S; CORRECT?

12:52PM   5    A.   CORRECT.

12:52PM   6    Q.   AND THAT WAS A SMALLER VERSION OF THE MONOBAY; CORRECT?

12:52PM   7    A.   CORRECT.

12:52PM   8    Q.   AND THE MINILAB; RIGHT?

12:52PM   9    A.   RIGHT.

12:52PM  10    Q.   AND THE MINILAB WAS KIND OF NEXT GENERATION, WASN'T IT?

12:52PM  11    A.   I DON'T THINK I HAD THAT UNDERSTANDING AT THE TIME.

12:53PM  12         I THOUGHT MY UNDERSTANDING WAS THAT BOTH OF THE DEVICES

12:53PM  13    WERE THE NEXT GENERATION.

12:53PM  14         SO I DON'T THINK I WAS TOLD THAT -- WHAT THE SEQUENCE

12:53PM  15    WOULD BE IN TERMS OF WHEN THEY'RE AVAILABLE.

12:53PM  16    Q.   OKAY.  BUT THE MINILAB WAS SEVERAL DIFFERENT MONOBAYS ON

12:53PM  17    TOP OF EACH OTHER; RIGHT?

12:53PM  18    A.   THE MONOBAY BLADE, WHICH IS KIND OF THE SHELF OF

12:53PM  19    COMPONENTS, YES, ON TOP OF EACH OTHER.

12:53PM  20    Q.   RIGHT.  AND THE MINILAB WOULD BE ABLE TO RUN MANY

12:53PM  21    DIFFERENT TESTS ALL AT ONCE; RIGHT?

12:53PM  22    A.   THAT'S WHAT IT WAS DESIGNED TO DO.

12:53PM  23    Q.   RIGHT.

12:53PM  24    A.   RIGHT.

12:53PM  25    Q.   AND THE MONOBAY COULD NOT RUN AS MANY TESTS AT THE SAME

12:53PM   1      TIME; RIGHT?

12:53PM   2      A.   CORRECT.

12:53PM   3      Q.   OKAY.

12:53PM   4           SO LET'S PULL UP, IF WE COULD, YOUR HONOR, EXHIBIT 5388,

12:54PM   5      WHICH IS ALREADY IN EVIDENCE?

12:54PM   6                THE COURT:   YES.

12:54PM   7      BY MS. WALSH:

12:54PM   8      Q.   DO YOU SEE THAT, MR. EDLIN?

12:54PM   9      A.   YES.

12:54PM  10      Q.   AND THAT'S A PHOTO OF THE 3 SERIES EDISON; RIGHT?

12:54PM  11      A.   YES.

12:54PM  12      Q.   OKAY.  AND IF YOU CAN TURN IN YOUR BINDER TO 7747.

12:54PM  13           DO YOU SEE THAT?

12:54PM  14      A.   I DO.

12:54PM  15      Q.   AND WHAT DO YOU RECOGNIZE THAT TO BE?

12:54PM  16      A.   A 4S.

12:54PM  17      Q.   A 4S DEVICE, THERANOS'S 4S DEVICE?

12:54PM  18      A.   YES, I BELIEVE SO.

12:54PM  19                MS. WALSH:   OKAY.  YOUR HONOR, WE OFFER 7747.

12:55PM  20                MR. BOSTIC:   NO OBJECTION.

12:55PM  21                THE COURT:   IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:55PM  22           (DEFENDANT'S EXHIBIT 7747 WAS RECEIVED IN EVIDENCE.)

12:55PM  23      BY MS. WALSH:

12:55PM  24      Q.   OKAY.  SO THAT'S THE 7747 DEVICE.

12:55PM  25           AND THAT WAS THE DEVICE THAT YOU USED IN YOUR WORK WITH

12:55PM   1    THE MILITARY; RIGHT?

12:55PM   2    A.   THERE WAS A SHIFT TO THAT DEVICE, AND THAT WAS THE

12:55PM   3    INTENDED DEVICE THAT WAS -- THAT WOULD BE INTENDED TO BE USED

12:55PM   4    WITH THE MILITARY.

12:55PM   5    Q.   RIGHT.

12:55PM   6         BUT IN YOUR INTERACTIONS WITH THE MILITARY, YOU SAID YOU

12:55PM   7    SHIPPED SOME DEVICES TO MACDILL AIRFORCE BASE; RIGHT?

12:55PM   8    A.   YES.

12:55PM   9    Q.   AND THEN THERE WAS SOME FEEDBACK FROM THE MILITARY THAT

12:55PM  10    THE DEVICE NEEDED TO BE SMALLER; RIGHT?

12:55PM  11         DO YOU REMEMBER THAT?

12:55PM  12    A.   YES, BUT THAT'S NOT EXACTLY THE SEQUENCE OF EVENTS.

12:55PM  13    Q.   OKAY.  SO IS THIS 4S DEVICE, THOUGH, THE SMALLER VERSION

12:56PM  14    OF THE 4 SERIES DEVICE?

12:56PM  15    A.   YES.

12:56PM  16    Q.   OKAY.  AND THAT WAS A PRODUCT OF YOUR INTERACTION AND WORK

12:56PM  17    WITH THE MILITARY; RIGHT?

12:56PM  18    A.   WHEN -- I DON'T KNOW.

12:56PM  19         WHEN I WORKED WITH THE MILITARY, THERE WAS A REQUEST FOR A

12:56PM  20    SMALLER, LIGHTER DEVICE, AND WHEN I CONVEYED THAT INFORMATION

12:56PM  21    TO ELIZABETH, IT SEEMED THAT SHE HAD -- WAS ALREADY AWARE OF A

12:56PM  22    VERSION OF -- AWARE OF A MODEL THAT WAS SIMILAR TO THE 4S.

12:56PM  23         SO I DON'T KNOW IF THAT SPECIFICALLY WAS THE CAUSE AND

12:56PM  24    EFFECT.  LIKE, IT SEEMED TO ME THAT THERE WAS ALREADY A

12:57PM  25    PROTOTYPE OR AN IDEA OF THIS BEFORE MY WORK WITH THE MILITARY.

12:57PM   1    Q.   OKAY.  BUT REGARDLESS OF WHEN THE IDEA CAME INTO BEING,

12:57PM   2    THIS WAS THE DEVICE THAT YOU USED IN CONNECTION WITH THE

12:57PM   3    MILITARY?  THIS IS WHAT YOU WERE WORKING ON; RIGHT?

12:57PM   4    A.   THIS IS WHAT THE SCIENTISTS AND THE ENGINEERING TEAMS WERE

12:57PM   5    WORKING ON, YES.

12:57PM   6    Q.   SURE.  AND YOU WORKED ON IT, TOO, JUST IN A DIFFERENT

12:57PM   7    ROLE; RIGHT?

12:57PM   8    A.   I DON'T KNOW IF I WOULD SAY I WORKED ON IT.

12:57PM   9    Q.   OKAY.  YOU HAD SOME INVOLVEMENT WITH THIS DEVICE, DID YOU

12:57PM  10    NOT?

12:57PM  11    A.   YES.

12:57PM  12    Q.   OKAY.  AND THAT INVOLVEMENT RELATED TO THERANOS'S

12:57PM  13    RELATIONSHIPS WITH THE MILITARY; IS THAT FAIR?

12:57PM  14    A.   YES.

12:57PM  15    Q.   OKAY.  CAN YOU TURN IN YOUR BINDER TO 20186.

12:58PM  16         DO YOU SEE THAT?

12:58PM  17    A.   YES.

12:58PM  18    Q.   AND DO YOU RECOGNIZE WHAT THAT IS?

12:58PM  19    A.   YES.

12:58PM  20    Q.   AND WHAT IS IT?

12:58PM  21    A.   4S AND ITS COMPONENTS.

12:58PM  22         MS. WALSH:  OKAY.  YOUR HONOR, WE OFFER 20186.

12:58PM  23         MR. BOSTIC:  NO OBJECTION.

12:59PM  24         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:59PM  25         (DEFENDANT'S EXHIBIT 20186 WAS RECEIVED IN EVIDENCE.)

12:59PM  1    BY MS. WALSH:

12:59PM  2    Q.   OKAY.  SO, MR. EDLIN, THIS IS A DIAGRAM; RIGHT?

12:59PM  3    A.   YES.

12:59PM  4    Q.   AND YOU SAID IT WAS OF THE 4S?

12:59PM  5    A.   YES.

12:59PM  6    Q.   OKAY.  ON THE TOP IT SAYS MINILAB.

12:59PM  7         IS THE MINILAB JUST A GROUPING OF THIS DEVICE STACKED UP

12:59PM  8    ONE ON TOP OF THE OTHER?

12:59PM  9    A.   NO, I DON'T BELIEVE SO.

12:59PM  10   Q.   OKAY.  AND HOW IS THIS DEVICE DIFFERENT FROM THE MINILAB?

12:59PM  11   A.   SO THIS IS -- THIS IS AN IMAGE OF A 4S.  IT WAS RENAMED

12:59PM  12   MINILAB FOR THE PURPOSE OF A PARTICULAR PRESENTATION IN 2015.

01:00PM  13        MY UNDERSTANDING AT THAT TIME WAS THAT THE DEVICE THAT WAS

01:00PM  14   PREVIOUSLY NAMED THE MINILAB WAS NO LONGER IN PRODUCTION.

01:00PM  15   Q.   OKAY.  BUT THIS WAS A NEXT GENERATION DEVICE; RIGHT?

01:00PM  16   A.   CORRECT.

01:00PM  17   Q.   OKAY.  AND YOU SEE ALL OF THE COMPONENTS ON THIS EXHIBIT?

01:00PM  18   A.   CORRECT.

01:00PM  19   Q.   AND IT HAD A MATERIAL HANDLING ROBOT.

01:00PM  20        DO YOU SEE THAT?

01:00PM  21   A.   YES.

01:00PM  22   Q.   A CENTRIFUGE ON THE RIGHT SIDE; RIGHT?

01:00PM  23   A.   RIGHT.

01:00PM  24   Q.   A CYTOMETER; RIGHT?

01:00PM  25   A.   RIGHT.

01:00PM 1   Q.   THE CARTRIDGE IS ON THE BOTTOM WHERE THE BLOOD SAMPLE

01:00PM 2   WOULD GO; CORRECT?

01:00PM 3   A.   RIGHT.

01:00PM 4   Q.   AND SO ALL OF THESE COMPONENTS WERE BUILT AND PUT INTO

01:00PM 5   THIS MACHINE; CORRECT?

01:00PM 6   A.   I'M NOT SURE.  I DON'T KNOW IF EVERY SINGLE COMPONENT

01:01PM 7   COULD EXIST IN THE MACHINE AT THE SAME TIME.

01:01PM 8   Q.   OKAY.  BUT YOUR UNDERSTANDING WAS THIS MACHINE HAD

01:01PM 9   DIFFERENT COMPONENTS TO BE ABLE TO TEST DIFFERENT FAMILIES OF

01:01PM 10  ASSAYS, RIGHT, NOT JUST ONE FAMILY?

01:01PM 11  A.   RIGHT.

01:01PM 12  Q.   OKAY.  WE CAN TAKE THIS DOWN.

01:01PM 13       ALL RIGHT.  I WANT TO SHIFT GEARS NOW TO DEMOS.  YOU

01:01PM 14  TESTIFIED LAST WEEK QUITE A BIT ABOUT TECH DEMOS; RIGHT?

01:01PM 15  A.   RIGHT.

01:01PM 16  Q.   AND YOU SAID ESSENTIALLY THAT YOU WERE THE COORDINATOR FOR

01:01PM 17  THE LOGISTICS OF THE DEMOS; CORRECT?

01:01PM 18  A.   CORRECT.

01:01PM 19  Q.   YOU MADE SURE THE ROOM WAS SET UP WITH THE MACHINES THAT

01:01PM 20  WERE REQUESTED; RIGHT?

01:01PM 21  A.   RIGHT.

01:01PM 22  Q.   YOU MADE SURE THE ENGINEERS HAD BROUGHT THOSE MACHINES

01:01PM 23  INTO THE ROOM AT THE RIGHT TIME; RIGHT?

01:01PM 24  A.   RIGHT.

01:02PM 25  Q.   AND YOU WORKED WITH OTHER PEOPLE TO PREPARE FOR THE DEMO;

EDLIN CROSS BY MS. WALSH

01:02PM  1    CORRECT?

01:02PM  2    A.   CORRECT.

01:02PM  3    Q.   YOU WORKED WITH THE ASSAY TEAM ON THE DEMOS; RIGHT?

01:02PM  4    A.   TO COORDINATE, YES.

01:02PM  5    Q.   TO COORDINATE, SURE.

01:02PM  6    A.   RIGHT.

01:02PM  7    Q.   THE ASSAY TEAMS HELPED YOU WHEN YOU NEEDED HELP FROM THEM;

01:02PM  8    RIGHT?

01:02PM  9    A.   YES.

01:02PM  10   Q.   OKAY.  AND SAME WITH THE HARDWARE TEAM; RIGHT?

01:02PM  11   A.   RIGHT.

01:02PM  12   Q.   AND ALSO THE SAME WITH THE SOFTWARE TEAM; RIGHT?

01:02PM  13   A.   CORRECT.

01:02PM  14   Q.   AND THERE WERE OTHER SCIENTISTS WHO, IF YOU NEEDED THEIR

01:02PM  15   HELP, THEY WOULD HELP PARTICIPATE AND SET UP THIS DEMO; RIGHT?

01:02PM  16   A.   RIGHT.

01:02PM  17   Q.   AND SOMETIMES THERE WERE, YOU KNOW, 10 TO 15 DIFFERENT

01:02PM  18   SCIENTISTS WORKING AND SETTING UP THE DEMOS; IS THAT FAIR?

01:02PM  19   A.   THAT'S FAIR.

01:02PM  20   Q.   AND COMING BACK TO DR. DANIEL YOUNG, HE ALSO WAS SOMEONE

01:02PM  21   WHO PARTICIPATED AND HELPED IN THE DEMO PROCESS; RIGHT?

01:02PM  22   A.   YES.

01:02PM  23   Q.   AND AS YOU TESTIFIED, HE ULTIMATELY REVIEWED AND APPROVED

01:03PM  24   ANY TEST RESULTS; RIGHT?

01:03PM  25   A.   RIGHT.

01:03PM  1    Q.   AND NOT ALL DEMONSTRATIONS WERE THE SAME; RIGHT?

01:03PM  2    A.   RIGHT.

01:03PM  3    Q.   AND SOME YOU UNDERSTOOD OCCURRED IN THERANOS WHICH YOU

01:03PM  4    TESTIFIED ABOUT; RIGHT?

01:03PM  5    A.   RIGHT.

01:03PM  6    Q.   AND SOME OCCURRED OUTSIDE OF THERANOS; RIGHT?

01:03PM  7    A.   RIGHT.

01:03PM  8    Q.   AND I THINK WE SAW ONE OF THOSE?

01:03PM  9    A.   RIGHT.

01:03PM 10    Q.   WE'LL SEE MORE.

01:03PM 11         AND IN THE ONES OUTSIDE OF THERANOS, MS. HOLMES MIGHT

01:03PM 12    TRAVEL TO THOSE DEMOS; RIGHT?

01:03PM 13    A.   RIGHT.

01:03PM 14    Q.   AND YOU SOMETIMES TRAVELLED TO THOSE; CORRECT?

01:03PM 15    A.   SOMETIMES, YES.

01:03PM 16    Q.   AND THE DEMOS ALSO COULD BE DIFFERENTIATED BECAUSE --

01:03PM 17    WITHDRAWN.

01:03PM 18         THE DEMOS ALSO HAD DIFFERENT PURPOSES; CORRECT?

01:03PM 19    A.   THAN?  OH, DIFFERENT DEMOS RESPECTIVE TO ONE ANOTHER?

01:03PM 20    Q.   LET ME MAKE IT MORE CLEAR.

01:04PM 21         SOMETIMES DEMOS WERE JUST SO PEOPLE COULD SEE THE SOFTWARE

01:04PM 22    AND THE TECHNOLOGY; RIGHT?

01:04PM 23    A.   CORRECT.

01:04PM 24    Q.   THEY DIDN'T WANT TO GET THEIR BLOOD DRAWN; RIGHT?

01:04PM 25    A.   RIGHT.

01:04PM   1    Q.   THEY DIDN'T WANT TO GET A FINGER PRICK; RIGHT?

01:04PM   2    A.   RIGHT, RIGHT.

01:04PM   3    Q.   AND OTHER DEMOS MIGHT BE TO SOMEONE WHO DID WANT TO

01:04PM   4    EXPERIENCE FINGERSTICK, THEY WONDERED WHAT IT FELT LIKE; RIGHT?

01:04PM   5    A.   RIGHT.

01:04PM   6    Q.   AND THEY WANTED TO SEE HOW THE PROCESS WORKED; RIGHT?

01:04PM   7    A.   RIGHT.

01:04PM   8    Q.   AND OTHER DEMOS WERE BOTH; CORRECT?

01:04PM   9    A.   CORRECT.

01:04PM   10   Q.   SO LET'S TURN -- ACTUALLY, IF YOU COULD TURN IN YOUR

01:04PM   11   BINDER TO 7243.

01:05PM   12   A.   OKAY.

01:05PM   13   Q.   SO IS THAT AN EMAIL FROM MS. HOLMES TO DR. YOUNG COPYING

01:05PM   14   YOU?

01:05PM   15   A.   YES.

01:05PM   16   Q.   AND THE DATE IS AUGUST 1ST, 2012; RIGHT?

01:05PM   17   A.   YES.

01:05PM   18   Q.   AND IT RELATES TO A DEMO; CORRECT?

01:05PM   19   A.   YES.

01:05PM   20          MS. WALSH:  YOUR HONOR, WE OFFER 7243.

01:05PM   21          MR. BOSTIC:  NO OBJECTION.

01:05PM   22          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:05PM   23      (DEFENDANT'S EXHIBIT 7243 WAS RECEIVED IN EVIDENCE.)

01:05PM   24   BY MS. WALSH:

01:05PM   25   Q.   OKAY.  SO LET'S GO TO THE BOTTOM EMAIL FIRST IN TIME.

01:05PM  1          MS. HOLMES IS EMAILING DR. YOUNG, AND YOU'RE NOT COPIED ON

01:05PM  2     THIS, JULY 31ST, 2012.

01:05PM  3          AND SHE SAYS, "DO WE HAVE A COUPLE MINILABS THAT ARE FULLY

01:05PM  4     ASSEMBLED WITH FUNCTIONAL SCREENS/ELECTRONICS THAT ARE EASY TO

01:05PM  5     SHOW A CLIENT TOMORROW MID-DAY?"

01:05PM  6          DO YOU SEE THAT?

01:05PM  7     A.   YES.

01:05PM  8     Q.   AND SHE'S REFERRING TO NEXT GENERATION TECHNOLOGY; RIGHT?

01:06PM  9     A.   YES.

01:06PM 10     Q.   AND THIS IS 2012, SO IT'S REALLY NEXT GENERATION; RIGHT?

01:06PM 11     A.   RIGHT.

01:06PM 12     Q.   OKAY.  DR. YOUNG RESPONDS, "YES, WE HAVE FULLY FUNCTIONAL

01:06PM 13     MINILABS.  I WILL MAKE SURE THE DISPLAY IS READY AS WELL.  DO

01:06PM 14     YOU WANT THIS IN THE CONFERENCE ROOM?

01:06PM 15          "ALSO, DO YOU WANT ANY TESTS RUN IN THE MACHINE, OR JUST

01:06PM 16     TO HAVE IT POWERED UP WITH THE DISPLAY SHOWING SOMETHING

01:06PM 17     INTERESTING?"

01:06PM 18          AND SHE SAYS, "WE CAN PUT THEM IN AN INTERVIEW ROOM.

01:06PM 19     YES -- IF WE CAN EASILY HAVE THEM READY TO ACCEPT CARTRIDGES WE

01:06PM 20     SHOULD.  ALSO YES ON THE SCREEN... WE SHOULD NOT DO A LOT OF

01:06PM 21     EXTRA WORK FOR THIS THOUGH."

01:06PM 22          AND THEN DR. YOUNG RESPONDS, "OK, I'LL GET THIS PREPARED.

01:06PM 23          "RIGHT NOW, WE ARE NOT READY TO RUN WHOLE BLOOD SAMPLES IN

01:06PM 24     THIS DEVICE."

01:06PM 25          DO YOU SEE THAT?

01:06PM   1      A.   YES.

01:06PM   2      Q.   AND THEN MS. HOLMES'S RESPONSE IS "WE'RE NOT RUNNING

01:06PM   3      SAMPLES -- JUST DEMONSTRATING THE HARDWARE."

01:07PM   4           DO YOU SEE THAT?

01:07PM   5      A.   YES.

01:07PM   6      Q.   AND THIS IS AN EXAMPLE WHERE YOU'RE REALLY SHOWING THE

01:07PM   7      MACHINE, THE HARDWARE, AND HOW IT WORKS WITHOUT RUNNING A

01:07PM   8      SAMPLE; CORRECT?

01:07PM   9      A.   CORRECT.

01:07PM   10     Q.   OKAY.  OKAY.  LET'S TALK ABOUT THESE IN CONNECTION WITH

01:07PM   11     THE DEMO APP AND YOU TALKED ABOUT THIS LAST WEEK; CORRECT?

01:07PM   12     A.   RIGHT.

01:07PM   13     Q.   SO THERANOS HAD DEVELOPED A LOT OF SOFTWARE FOR THESE

01:07PM   14     MACHINES; CORRECT?

01:07PM   15     A.   CORRECT.

01:07PM   16     Q.   ESPECIALLY FOR THE NEXT GENERATION MACHINES; RIGHT?

01:07PM   17     A.   CORRECT.

01:07PM   18     Q.   AND THERANOS HAD DEVELOPED A LOT OF DIFFERENT APPS FOR

01:07PM   19     DIFFERENT SCENARIOS AND USES FOR THE MACHINE.

01:07PM   20           IS THAT FAIR?

01:07PM   21     A.   I WAS AWARE OF A FEW.  I'M NOT SURE HOW MANY ADDITIONAL

01:08PM   22     APPS WERE DEVELOPED.

01:08PM   23     Q.   OKAY.  BUT THERE WERE SOME; RIGHT?

01:08PM   24     A.   YES.

01:08PM   25     Q.   OKAY.  AND I THINK YOU TESTIFIED LAST WEEK THAT IT WAS

EDLIN CROSS BY MS. WALSH

01:08PM 1    KIND OF LIKE AN IPHONE OR A SMART PHONE WHERE YOU COULD SEE

01:08PM 2    DIFFERENT APPS ON THE SCREEN; RIGHT?

01:08PM 3    A.   I THINK I REFERRED TO THE INTUITIVENESS AND SIMPLE SCREEN

01:08PM 4    OF AN IPHONE APP, BUT I DON'T RECALL BEING ABLE TO SEE MULTIPLE

01:08PM 5    APPS AS YOU CAN ON A PHONE SELECTING A DIFFERENT APP TO USE.

01:08PM 6    Q.   OKAY.  SO LET'S TURN THEN TO IN YOUR BINDER TO 20538.

01:09PM 7    A.   OKAY.

01:09PM 8    Q.   AND TAKE A LOOK AT THE EMAIL AND THE ATTACHED EXHIBIT.

01:09PM 9    A.   OKAY.

01:09PM 10   Q.   AND PARTICULARLY LOOK AT PAGE 30 ON THE EXHIBIT.

01:10PM 11   A.   OKAY.

01:10PM 12   Q.   IS THAT THE -- ONE OF THE SCREENS THAT WOULD APPEAR ON THE

01:10PM 13   DEVICE THAT SHOWED THE USER INTERFACE WITH THE DIFFERENT APPS?

01:10PM 14   A.   I DON'T HAVE A RECOLLECTION OF SEEING THIS ON A NEXT

01:10PM 15   GENERATION DEVICE.

01:10PM 16       I DO RECALL SEEING SOMETHING SIMILAR ON A 3.0 SERIES

01:10PM 17   EARLIER IN MY TIME AT THERANOS.

01:10PM 18   Q.   OKAY.  AND TAKE A LOOK AT THE PAGES 7 THROUGH 13.

01:11PM 19   A.   OKAY.

01:11PM 20   Q.   DO YOU RECOGNIZE THOSE AS THE SCREENS A USER MIGHT SEE IF

01:11PM 21   THEY PRESS THE USER DIARY ON THE SCREEN?

01:11PM 22   A.   I DON'T RECOGNIZE THIS.

01:11PM 23   Q.   OKAY.  SO IT WAS JUST PAGE 30, AND YOU RECOGNIZE PAGE 30

01:11PM 24   AS ON THE 3.0 SERIES; IS THAT RIGHT?

01:11PM 25   A.   RIGHT.

01:11PM  1      Q.   OKAY.

01:11PM  2           YOUR HONOR, WE OFFER PAGE 30 OF 20538?

01:11PM  3               MR. BOSTIC:  NO OBJECTION TO THAT PAGE, YOUR HONOR.

01:11PM  4               THE COURT:  PAGE 30 OF 20538 IS ADMITTED, AND IT MAY

01:11PM  5      BE PUBLISHED.

01:11PM  6           (DEFENDANT'S EXHIBIT 20538, PAGE 30 WAS RECEIVED IN

01:12PM  7      EVIDENCE.)

01:12PM  8      BY MS. WALSH:

01:12PM  9      Q.   OKAY.  MR. EDLIN, YOU SAID YOU RECOGNIZE THIS ON THE 3.0

01:12PM  10     SERIES; RIGHT?

01:12PM  11     A.   RIGHT.

01:12PM  12     Q.   AND THIS WAS THE HOME SCREEN OF THAT DEVICE; RIGHT?

01:12PM  13     A.   UM, THIS WAS NOT THE MOST COMMON HOME SCREEN THAT I SAW,

01:12PM  14     BUT I DO REMEMBER SEEING A HOME SCREEN THAT RESEMBLED THIS.

01:12PM  15     Q.   OKAY.  AND WHAT WAS THE MOST COMMON HOME SCREEN THAT YOU

01:12PM  16     SAW?

01:12PM  17     A.   I RECALL IT JUST SAID THERANOS ON IT.

01:12PM  18     Q.   OKAY.  ALL RIGHT.

01:12PM  19          BUT YOU DO RECALL SEEING THIS SCREEN AT SOME POINT; RIGHT?

01:12PM  20     A.   I DON'T KNOW ABOUT THIS SPECIFIC SCREEN, BUT IT DOES

01:12PM  21     RESEMBLE -- IT DOES RESEMBLE A SCREEN THAT I DO REMEMBER

01:12PM  22     SEEING.

01:12PM  23     Q.   OKAY.  AND THERE ARE VARIOUS DIFFERENT BUTTONS OR SQUARES

01:12PM  24     THAT YOU CAN PUSH ON THE SCREEN; RIGHT?

01:12PM  25     A.   RIGHT.

01:12PM  1    Q.   AND THE SCREEN WAS SUCH THAT YOU COULD TOUCH IT, IT WAS A

01:13PM  2    TOUCHSCREEN --

01:13PM  3    A.   YES.

01:13PM  4    Q.   -- AND IT WOULD BRING YOU TO A NEXT OR A NEW MENU; RIGHT?

01:13PM  5    A.   IT WOULD ADVANCE THE APP BASED ON WHAT YOU SELECTED.

01:13PM  6    Q.   OKAY.  AND SO IF YOU PRESSED FOOD DIARY, FOR EXAMPLE, IT

01:13PM  7    MIGHT BRING YOU TO ANOTHER SET OF -- ANOTHER SCREEN RELATED TO

01:13PM  8    THE FOOD DIARY; IS THAT RIGHT?

01:13PM  9    A.   I DON'T HAVE FAMILIARITY WITH ANYTHING BEYOND JUST THE

01:13PM 10    SCREEN.

01:13PM 11    Q.   OKAY.  AND I REALIZE, MR. EDLIN, IT'S BEEN ALMOST A DECADE

01:13PM 12    SINCE YOU'VE LOOKED AT THESE THINGS OR SINCE YOU WORKED AT

01:13PM 13    THERANOS?

01:13PM 14    A.   UH-HUH.

01:13PM 15    Q.   SO I UNDERSTAND THAT.  AND MEMORIES FADE; RIGHT?

01:13PM 16    A.   RIGHT.

01:13PM 17    Q.   SO LET'S TAKE THAT DOWN.

01:13PM 18         YOUR HONOR, WHAT I'D LIKE TO DO IS TO SHOW MR. EDLIN ONLY

01:13PM 19    A SHORT VIDEO, WITH NO AUDIO, ON HIS SCREEN, AND ASK HIM IF HE

01:14PM 20    RECOGNIZES THAT VIDEO.

01:14PM 21              THE COURT:  IS THAT POSSIBLE -- DO WE HAVE IT CUED

01:14PM 22    UP?

01:14PM 23              MS. WALSH:  WE DO HAVE IT CUED UP, AND IT'S

01:14PM 24    EXHIBIT 20537 FOR THE RECORD.

01:14PM 25    Q.   SO, MR. EDLIN, YOU'RE GOING TO SEE SOMETHING ON YOUR

01:14PM 1     SCREEN, AND I'LL ASK YOU IF YOU RECOGNIZE IT.

01:14PM 2     A.   OKAY.

01:14PM 3          (VIDEO PLAYING OFF THE RECORD.)

01:14PM 4               THE WITNESS:  I DO RECOGNIZE THIS.

01:14PM 5     BY MS. WALSH:

01:14PM 6     Q.   OKAY.  WHAT IS IT?

01:14PM 7     A.   THIS IS AN APP WITH INSTRUCTIONS ON HOW TO COLLECT AND

01:15PM 8     PROCESS A SAMPLE ON A THERANOS DEVICE.

01:15PM 9     Q.   AND DO YOU --

01:15PM 10         WELL, BEFORE I ASK YOU THAT, YOUR HONOR, WE OFFER 20537.

01:15PM 11              MR. BOSTIC:  NO OBJECTION.

01:15PM 12    BY MS. WALSH:

01:15PM 13    Q.   AND BEFORE WE PLAY IT, I JUST WANT TO ASK, THIS IS ON A

01:15PM 14    4 SERIES DEVICE, ISN'T IT?

01:15PM 15    A.   YES.

01:15PM 16    Q.   AND THAT'S NEXT GENERATION; RIGHT?

01:15PM 17    A.   RIGHT.

01:15PM 18    Q.   AND WHAT YOU SEE ON THE SCREEN IS INSTRUCTIONS ON HOW TO

01:15PM 19    COLLECT A BLOOD SAMPLE WITH THE MACHINE THERE; RIGHT?

01:15PM 20    A.   RIGHT.

01:15PM 21    Q.   OKAY.  AND SO WE'RE GOING TO PLAY IT.  AND IF YOU COULD,

01:15PM 22    MR. EDLIN, TELL US WHAT IS HAPPENING AS IT'S PLAYING?

01:15PM 23              THE COURT:  LET ME ADMIT THIS NOW, AND IF YOU'D LIKE

01:15PM 24    TO PLAY IT NOW, IF NOW IS A GOOD TIME TO PLAY IT, WE CAN PLAY

01:15PM 25    IT.

01:15PM   1              MS. WALSH:  OKAY.  THANK YOU.

01:16PM   2              (DEFENDANT'S EXHIBIT 20537 WAS RECEIVED IN EVIDENCE.)

01:16PM   3              (VIDEO PLAYING OFF THE RECORD.)

01:16PM   4       BY MS. WALSH:

01:16PM   5       Q.   SO PLEASE NARRATE FOR US WHAT IS HAPPENING.

01:16PM   6       A.   OKAY.  USER TAPS THE SCREEN TO BEGIN.

01:16PM   7              THIS IS GIVING INSTRUCTIONS ON HOW TO COLLECT A

01:16PM   8       FINGERSTICK SAMPLE.

01:16PM   9              THE FINGER IS WARM, AND THE FINGER GETS WIPED WITH THE

01:16PM  10       ALCOHOL SWIPE.

01:16PM  11              IT IS PAUSED TO SHOW THE FUNCTIONALITY.

01:16PM  12              THIS IS THE FINGERSTICK GRIP.

01:16PM  13              AND THEN A LANCET USING A CTN TO COLLECT THE BLOOD SAMPLE.

01:16PM  14              REMOVING THE NANOTAINER FROM THE CTN.

01:16PM  15              OPENING THE THERANOS DEVICE.

01:16PM  16              AND PUTTING A CARTRIDGE WITH THE NANOTAINER INTO THE

01:16PM  17       DEVICE.

01:16PM  18       Q.   OKAY.  AND AGAIN, THIS IS ON A 4 SERIES DEVICE; RIGHT?

01:16PM  19       A.   YES.

01:16PM  20       Q.   OKAY.  AND LET ME ASK YOU ABOUT A FEW TERMS THAT YOU

01:17PM  21       MENTIONED WHEN YOU WERE NARRATING THIS.

01:17PM  22              YOU MENTIONED A CTN?

01:17PM  23       A.   RIGHT.

01:17PM  24       Q.   AND WHAT IS A CTN?

01:17PM  25       A.   A CAPILLARY TUBE NANOTAINER.  IT WAS A THERANOS

EDLIN CROSS BY MS. WALSH

01:17PM   1    MANUFACTURED DEVICE THAT COLLECTED THE BLOOD FROM A FINGERSTICK

01:17PM   2    AND THEN TRANSFERRED THAT BLOOD INTO A LITTLE NANOTAINER TUBE.

01:17PM   3    Q.   OKAY.  AND YOU SAID THE NANOTAINER, HOW DOES THE

01:17PM   4    NANOTAINER DIFFER FROM THE CTN?

01:17PM   5    A.   THE CTN HAS TWO PARTS, IT'S THE CAPILLARY TUBE, THE CT,

01:17PM   6    AND THEN THE NANOTAINER, WHICH IS THE N.  SO THE NANOTAINER

01:17PM   7    DETACHES FROM THE CTN.

01:17PM   8    Q.   OKAY.  AND WHAT HAPPENS TO THE NANOTAINER AFTER IT

01:17PM   9    DETACHES?

01:17PM  10    A.   THE NANOTAINER GETS ENTERED INTO A CARTRIDGE, AND THEN

01:17PM  11    THAT CARTRIDGE IS INSERTED INTO A DEVICE, AND THEN THAT BLOOD

01:18PM  12    SAMPLE IS PROCESSED IN THE DEVICE.

01:18PM  13    Q.   AND THEN THE CARTRIDGE WE SAW IN THE VIDEO KIND OF GOING

01:18PM  14    INTO A LITTLE HOLE IN THE DEVICE, IS THAT WHERE THE CARTRIDGE

01:18PM  15    WOULD BE PLACED?

01:18PM  16    A.   RIGHT.  THERE IS KIND OF A DOOR THAT OPENS UP AND THEN YOU

01:18PM  17    PUT THE CARTRIDGE IN, AND THEN IT -- THE DEVICE ACCEPTS AND

01:18PM  18    PULLS IN THE CARTRIDGE, AND THAT CARTRIDGE HAS ALL OF THE

01:18PM  19    DIFFERENT CHEMISTRIES THAT WOULD BE NEEDED FOR A TEST.

01:18PM  20    Q.   OKAY.  SO LET'S NOW TURN TO THE SUBJECT OF THE NULL

01:18PM  21    PROTOCOL.  OKAY?

01:18PM  22    A.   UH-HUH.

01:18PM  23    Q.   SO IN THE EARLY DAYS OF THE COMPANY, THE THERANOS MACHINES

01:18PM  24    WERE BUILT TO ANALYZE A BLOOD SAMPLE; RIGHT?

01:18PM  25    A.   HOW EARLY?

01:19PM  1    Q.   BEFORE THE DEMO APP AND THE NULL PROTOCOL WERE WRITTEN,

01:19PM  2    THE MACHINE NEEDED A BLOOD SAMPLE IN ORDER TO OPERATE PROPERLY;

01:19PM  3    IS THAT RIGHT?

01:19PM  4    A.   I DON'T KNOW THE VARIOUS USE CASES OF THE MACHINE.  THAT,

01:19PM  5    I WAS NOT DIRECTLY INVOLVED WITH.

01:19PM  6    Q.   OKAY.  BUT BEFORE THE NULL PROTOCOL WAS WRITTEN, IF YOU

01:19PM  7    PUT A CARTRIDGE IN THE MACHINE WITHOUT A BLOOD SAMPLE, IT WOULD

01:19PM  8    CAUSE THE MACHINE TO BE CONFUSED, WOULDN'T IT?

01:19PM  9    A.   THAT WAS MY EXPERIENCE.

01:19PM 10    Q.   RIGHT.  BECAUSE THE MACHINE WAS EXPECTING TO GET A BLOOD

01:19PM 11    SAMPLE; RIGHT?

01:19PM 12    A.   RIGHT.

01:19PM 13    Q.   AND IT DIDN'T HAVE A BLOOD SAMPLE; RIGHT?

01:19PM 14    A.   RIGHT.

01:19PM 15    Q.   AND SO IT EITHER WOULD SHUT DOWN OR KICK UP ERRORS, BUT IT

01:20PM 16    WOULD NOT OPERATE PROPERLY; RIGHT?

01:20PM 17    A.   RIGHT.

01:20PM 18    Q.   AND SO FOR DEMONSTRATIONS WHERE PEOPLE DID NOT WANT TO

01:20PM 19    GIVE BLOOD IN ORDER TO RUN THAT DEMONSTRATION BEFORE THE NULL

01:20PM 20    PROTOCOL, PEOPLE WOULD HAVE TO DONATE THEIR BLOOD; RIGHT?

01:20PM 21        THEY WOULD HAVE TO GET A FINGERSTICK TO GO INTO THAT

01:20PM 22    CARTRIDGE?

01:20PM 23    A.   DO YOU MEAN -- IN WHAT SETTING?

01:20PM 24    Q.   FOR A DEMO?

01:20PM 25    A.   I DID SEE THAT HAPPEN ON OCCASION.

01:20PM  1    Q.   OKAY.  SO IN ORDER TO PREVENT THAT FROM HAPPENING, WHEN

01:20PM  2    THERE WAS A DEMO WITH NO BLOOD SAMPLE, THE SOFTWARE TEAM WROTE

01:20PM  3    A PROTOCOL; RIGHT?

01:20PM  4    A.   RIGHT.

01:20PM  5    Q.   AND THAT PROTOCOL WAS THE NULL PROTOCOL; RIGHT?

01:20PM  6    A.   I BELIEVE SO.

01:21PM  7    Q.   AND IT TOLD THE MACHINE THAT THERE WAS NO BLOOD IN THE

01:21PM  8    CARTRIDGE; RIGHT?

01:21PM  9    A.   I DON'T KNOW THOSE DETAILS IN TERMS OF WHAT IT TOLD THE

01:21PM  10   MACHINE.

01:21PM  11        I JUST KNOW THAT A NULL PROTOCOL DID NOT ATTEMPT TO RUN A

01:21PM  12   BLOOD SAMPLE.

01:21PM  13   Q.   OKAY.  AND YOU SAID LAST WEEK THAT THE NULL PROTOCOL

01:21PM  14   BASICALLY MEANS AN EMPTY PROTOCOL; RIGHT?

01:21PM  15   A.   RIGHT.

01:21PM  16   Q.   IT MEANS NOTHING, THERE'S NOTHING THERE; RIGHT?

01:21PM  17   A.   RIGHT.

01:21PM  18   Q.   OKAY.  AND THE MACHINE WOULD NOT ATTEMPT TO RUN A BLOOD

01:21PM  19   TEST IF IT WAS PROGRAMMED IN, THAT THERE WAS NOTHING, THAT

01:21PM  20   THERE WAS NO BLOOD IN THAT CARTRIDGE; RIGHT?

01:21PM  21   A.   RIGHT.

01:21PM  22   Q.   AND THERE WERE NEVER ANY BLOOD SAMPLES PUT INTO THE

01:22PM  23   MACHINE WHEN YOU WERE RUNNING THE NULL PROTOCOL; RIGHT?

01:22PM  24   A.   RIGHT.

01:22PM  25            MR. BOSTIC:  OBJECTION.  CALLS FOR SPECULATION.

01:22PM  1              THE COURT:  I'LL ALLOW THE ANSWER TO REMAIN.  YOU

01:22PM  2   CAN ASK ANOTHER QUESTION.

01:22PM  3              MS. WALSH:  OKAY.

01:22PM  4   Q.  SO I JUST WANT TO BE REALLY CLEAR ABOUT THIS, WHEN A

01:22PM  5   MACHINE WAS PROGRAMMED -- AND LET ME ASK YOU SOME FOUNDATION.

01:22PM  6       YOU WERE FAMILIAR WITH RUNNING THESE DEMOS; RIGHT?

01:22PM  7   A.  YES.

01:22PM  8   Q.  WE SAW EMAILS LAST WEEK, WE'RE GOING TO LOOK AT SOME MORE,

01:22PM  9   BUT WE SAW EMAILS LAST WEEK RELATING TO THE NULL PROTOCOL;

01:22PM 10   RIGHT?

01:22PM 11   A.  RIGHT.

01:22PM 12   Q.  AND IN YOUR EXPERIENCE AT THE COMPANY, WAS THERE EVER A

01:22PM 13   TIME THAT YOU REMEMBERED THAT THE MACHINE WAS RUNNING A NULL

01:22PM 14   PROTOCOL AND A BLOOD SAMPLE WAS PUT INTO THE MACHINE?

01:22PM 15   A.  I DON'T HAVE A RECOLLECTION OF THAT HAPPENING.

01:22PM 16   Q.  OKAY.  AND THE GOVERNMENT ASKED YOU A HYPOTHETICAL LAST

01:22PM 17   WEEK, AND I JUST WANT TO MAKE SURE THAT IT'S REALLY, REALLY

01:23PM 18   CLEAR.

01:23PM 19       SO TURN IN YOUR VOLUME 2, YOUR VOLUME 2.

01:23PM 20   A.  OKAY.

01:23PM 21   Q.  AND IF YOU TURN TO EXHIBIT 28460.

01:23PM 22   A.  OKAY.

01:23PM 23   Q.  AND I'M LOOKING AT LINES -- SORRY.

01:23PM 24       28460, PAGE 2383?

01:24PM 25   A.  I'M SORRY, WHAT WAS THE PAGE?

01:24PM  1    Q.   2383.  AND IT CARRIES OVER TO 2384 WHEN YOU GET THERE.

01:24PM  2    A.   YOU SAID 28460 AND THEN THERE ARE ONLY THREE DIGITS FOR

01:24PM  3    THE PAGES.

01:24PM  4    Q.   OKAY.  HOLD ON.

01:24PM  5    A.   OH, I'M SORRY.  AT THE TOP.

01:24PM  6    Q.   YEAH.  OKAY.

01:24PM  7    A.   OKAY.

01:24PM  8    Q.   SO THE BOTTOM OF 2383 CARRYING OVER TO 2384, THE QUESTION,

01:24PM  9    "SO LET'S IMAGINE."

01:24PM  10        DO YOU SEE THAT?

01:24PM  11   A.   YES.

01:24PM  12   Q.   AND SO YOU WERE ASKED A HYPOTHETICAL LAST WEEK?

01:24PM  13   A.   YES.

01:24PM  14   Q.   AND THE HYPOTHETICAL PREMISED -- WAS PREMISED ON THE

01:24PM  15   DEVICE BEING IN THE ROOM; RIGHT?

01:24PM  16   A.   RIGHT.

01:24PM  17   Q.   DO YOU SEE THAT?

01:24PM  18   A.   YES.

01:24PM  19   Q.   AND IT WAS THAT THE DEVICE WAS SET UP TO RUN THE NULL

01:25PM  20   PROTOCOL.

01:25PM  21        DO YOU SEE THAT?

01:25PM  22   A.   YES.

01:25PM  23   Q.   AND ALSO THAT A SAMPLE WAS PUT INTO THE MACHINE.

01:25PM  24        DO YOU SEE THAT?

01:25PM  25   A.   YES, IF A SAMPLE WAS PUT INTO THE MACHINE.  YES.

01:25PM  1    Q.   RIGHT.  BUT IT'S NOT THE CASE THAT A SAMPLE WAS PUT INTO A

01:25PM  2    MACHINE RUNNING THE NULL PROTOCOL, IS IT?

01:25PM  3              MR. BOSTIC:  FOUNDATION.  CALLS FOR SPECULATION.  I

01:25PM  4    THINK THE QUESTION WAS AS TO HIS PERSONAL EXPERIENCE.

01:25PM  5              THE COURT:  THAT'S WHAT YOU WERE ASKING WHAT HIS

01:25PM  6    PERSONAL EXPERIENCE.

01:25PM  7              MS. WALSH:  THAT'S RIGHT.

01:25PM  8              THE COURT:  RIGHT.  DO YOU UNDERSTAND THE QUESTION?

01:25PM  9              THE WITNESS:  WOULD YOU MIND REPEATING IT?

01:25PM 10    BY MS. WALSH:

01:25PM 11    Q.   SURE.

01:25PM 12         IT WAS YOUR EXPERIENCE AT THERANOS, WASN'T IT, THAT IF THE

01:25PM 13    NULL PROTOCOL WAS RUNNING ON A MACHINE, A BLOOD SAMPLE WAS NOT

01:25PM 14    PUT IN THAT MACHINE; IS THAT CORRECT?

01:25PM 15    A.   THAT'S CORRECT.

01:25PM 16    Q.   LET'S TURN TO AN EXHIBIT THAT THE GOVERNMENT SHOWED YOU

01:25PM 17    LAST WEEK ABOUT THE NULL PROTOCOL, 959.

01:26PM 18         YOUR HONOR, THIS ONE IS IN EVIDENCE SO PERMISSION TO

01:26PM 19    PUBLISH?

01:26PM 20              THE COURT:  YES.

01:26PM 21    BY MS. WALSH:

01:26PM 22    Q.   OKAY.  IF YOU LOOK AT THE BOTTOM OF PAGE 1, MR. EDLIN, IT

01:26PM 23    TALKS ABOUT THE DEMO APP SHIELDING PROTOCOL FAILURES.

01:26PM 24         DO YOU SEE THAT?

01:26PM 25    A.   YES.

01:26PM  1     Q.   AND THE GOVERNMENT ASKED YOU ABOUT THE DEMO APP IN

01:26PM  2     CONNECTION WITH THE NULL PROTOCOL.

01:26PM  3          WE WERE TALKING ABOUT THAT LAST WEEK; RIGHT?

01:26PM  4     A.   YES.

01:26PM  5     Q.   AND THERE WAS NOTHING OR YOU DIDN'T BELIEVE YOU WERE DOING

01:26PM  6     ANYTHING NEFARIOUS IN RUNNING THESE DEMOS USING THE DEMO APP OR

01:26PM  7     THE NULL PROTOCOL, DID YOU?

01:26PM  8     A.   NO.

01:26PM  9     Q.   YOU WEREN'T TRYING TO TRICK ANYONE; RIGHT?

01:26PM  10    A.   RIGHT.

01:26PM  11    Q.   YOU WEREN'T TRYING TO PULL THE WOOL OVER ANYONE'S EYES;

01:26PM  12    CORRECT?

01:26PM  13    A.   CORRECT.

01:26PM  14    Q.   AND YOU HAD NO REASON TO BELIEVE AT THE TIME THAT ANYONE

01:27PM  15    ELSE AT THERANOS WAS DOING THAT; RIGHT?

01:27PM  16    A.   RIGHT.

01:27PM  17    Q.   YOU WERE SIMPLY RUNNING THE DEMOS TO TRY TO SHOW A VISITOR

01:27PM  18    HOW THE TECHNOLOGY WORKED; RIGHT?

01:27PM  19    A.   CORRECT.

01:27PM  20    Q.   AND MANY OF THE MACHINES THAT YOU WERE DOING THAT ON WERE

01:27PM  21    NEXT GENERATION MACHINES; RIGHT?

01:27PM  22    A.   AT A CERTAIN POINT, YES.

01:27PM  23    Q.   OKAY.  IF YOU COULD, MR. EDLIN, TURN IN YOUR BINDER TO

01:27PM  24    20486.

01:28PM  25    A.   OKAY.

01:28PM   1    Q.   OKAY.  JUST TAKE A LOOK AT THAT EMAIL AND TELL US WHETHER

01:28PM   2    THAT WAS EMAIL CORRESPONDENCE BETWEEN YOU, AND MR. BALWANI, AND

01:28PM   3    DR. YOUNG REGARDING THE DEPARTMENT OF DEFENSE APP?

01:28PM   4    A.   YES.

01:28PM   5    Q.   AND THAT EMAIL IS IN APRIL OF 2013.

01:28PM   6         DO YOU SEE THAT?

01:28PM   7    A.   YES.

01:28PM   8    Q.   OKAY.

01:28PM   9         YOUR HONOR, WE OFFER 20486.

01:28PM  10              MR. BOSTIC:  NO OBJECTION.

01:28PM  11              THE COURT:  IT'S ADMITTED.

01:28PM  12         (DEFENDANT'S EXHIBIT 20486 WAS RECEIVED IN EVIDENCE.)

01:28PM  13    BY MS. WALSH:

01:28PM  14    Q.   SO LET'S TURN TO PAGE 2 OF THAT EMAIL.  AND THIS PART OF

01:28PM  15    THE EMAIL IS FROM MR. BALWANI TO YOU ON APRIL 13TH?

01:28PM  16    A.   RIGHT.

01:28PM  17    Q.   AND WHAT THE EMAIL SAYS, "DAN,

01:28PM  18         "WE ARE GETTING COUPLE OF 4S DEVICES THIS WEEK AND NEXT.

01:28PM  19    AS PART OF STRESS TESTING THEM, I WANT YOU TO SPEND COUPLE OF

01:28PM  20    HOURS OR DESIGNATE SOMEONE FROM QA TO SPEND A DAY STRESS

01:29PM  21    TESTING THE DOD APP."

01:29PM  22         DO YOU SEE THAT?

01:29PM  23    A.   YES.

01:29PM  24    Q.   AND DO YOU REMEMBER WHAT THE DOD APP WAS?

01:29PM  25    A.   YES.  IT WAS AN APP THAT WAS INTENDED FOR THE PROGRAMS

01:29PM  1    WITH THE MILITARY THAT I DISCUSSED EARLIER TODAY.

01:29PM  2    Q.   OKAY.  AND HE CONTINUES.

01:29PM  3         "AND RUNNING A DUMMY CARTRIDGE AND VIEWING RESULTS FROM

01:29PM  4    THE CLOUD.  THE ENTIRE PROCESS IS NOW CODE COMPLETE AND

01:29PM  5    INTEGRATED SO EVEN IF YOU RUN A CONTROL CARTRIDGE THAT RUNS FOR

01:29PM  6    5 MINUTES, IT WILL GIVE YOU SOME RESULT.  SHEKAR IS CODE

01:29PM  7    COMPLETE WITH SERVER SIDE CODE."

01:29PM  8         DO YOU SEE THAT?

01:29PM  9    A.   YES.

01:29PM  10   Q.   AND WHO WAS SHEKAR?

01:29PM  11   A.   SHEKAR WAS A SOFTWARE DEVELOPER.  I'M SURE HE HAD A HIGHER

01:29PM  12   TITLE THAN THAT AT THERANOS.

01:29PM  13   Q.   OKAY.  AND THEN IF WE CONTINUE UP THE EMAIL, YOU RESPOND,

01:30PM  14   OR I GUESS YOU FORWARD THIS TO DR. YOUNG, AND YOU SAY, "HI

01:30PM  15   DANIEL."

01:30PM  16        AND THAT'S DANIEL YOUNG; RIGHT?

01:30PM  17   A.   RIGHT.

01:30PM  18   Q.   "SUNNY WOULD LIKE TO START STRESS TESTING THE DOD APP ON

01:30PM  19   THE 4S NEXT MONDAY -- WILL YOU BE ABLE TO PROVIDE A DUMMY

01:30PM  20   CARTRIDGE?"

01:30PM  21        DO YOU SEE THAT?

01:30PM  22   A.   YES.

01:30PM  23   Q.   AND THE 4S IS THE NEXT GENERATION DEVICE; RIGHT?

01:30PM  24   A.   RIGHT.

01:30PM  25   Q.   AND DR. YOUNG RESPONDS TO YOU, "WHAT DO YOU WANT TO RUN ON

01:30PM  1     THIS CARTRIDGE?"

01:30PM  2         RIGHT?

01:30PM  3     A.   RIGHT.

01:30PM  4     Q.   AND AGAIN, THE CARTRIDGE IS THE THING THAT YOU PUT IN THE

01:30PM  5     MACHINE THAT MAY OR MAY NOT HAVE BLOOD IN IT; RIGHT?

01:30PM  6     A.   RIGHT.

01:30PM  7     Q.   AND THEN YOU RESPOND TO DR. YOUNG AND SAY, "INITIALLY WE

01:30PM  8     ONLY HAVE TO RUN A NULL PROTOCOL, BUT LATER IN THE WEEK IF WE

01:30PM  9     COULD RUN CARTRIDGES SIMILAR TO THE ONES WE WILL BE DEPLOYING

01:30PM 10     THAT WOULD BE IDEAL -- WHATEVER WE CAN GET THAT WILL BE AS

01:30PM 11     CLOSE TO A REAL-LIFE SIMULATION AS POSSIBLE SO WE CAN TEST ALL

01:31PM 12     OF THE FACETS OF THE APP."

01:31PM 13         DO YOU SEE THAT?

01:31PM 14     A.   YES.

01:31PM 15     Q.   SO THIS IS NOT EVEN -- THIS IS AN INTERNAL THERANOS EMAIL;

01:31PM 16     RIGHT?

01:31PM 17     A.   YES.

01:31PM 18     Q.   AND THIS IS NOT AN INVESTOR DEMO; RIGHT?

01:31PM 19     A.   CORRECT.

01:31PM 20     Q.   YOU'RE JUST STRESS TESTING A DEVICE; CORRECT?

01:31PM 21     A.   CORRECT.

01:31PM 22     Q.   AND YOU ARE SAYING YOU MIGHT RUN THE NULL PROTOCOL IN THAT

01:31PM 23     STRESS TESTING; RIGHT?

01:31PM 24     A.   RIGHT.

01:31PM 25     Q.   SO AGAIN, THERE WAS NOTHING NEFARIOUS ABOUT RUNNING THE

01:31PM  1     NULL PROTOCOL ON THESE MACHINES; CORRECT?

01:31PM  2     A.   CORRECT.

01:31PM  3     Q.   THIS IS NOT EVEN AN OUTWARD FACING EMAIL; RIGHT?

01:31PM  4     A.   RIGHT.

01:31PM  5     Q.   AND IT'S NOT ABOUT PRESENTING THERANOS TECHNOLOGY TO AN

01:31PM  6     OUTSIDE PARTY FOR THE STRESS TESTING; RIGHT?

01:31PM  7     A.   CORRECT.

01:31PM  8     Q.   OKAY.  WE CAN TAKE THAT DOWN.

01:32PM  9          LET'S TURN TO THE TECH DEMOS THAT DID INVOLVE TESTING.

01:32PM  10         YOU TESTIFIED ABOUT SOME OF THOSE LAST WEEK; RIGHT?

01:32PM  11    A.   RIGHT.

01:32PM  12    Q.   AND YOU ALSO MENTIONED LAST WEEK AND TODAY THAT SOME OF

01:32PM  13    THOSE DEMONSTRATIONS WERE RUN OUTSIDE OF THERANOS; RIGHT?

01:32PM  14    A.   YES.

01:32PM  15    Q.   OKAY.  SO LET'S TAKE A LOOK AT ONE OF THOSE.

01:32PM  16         THIS IS ONE THAT THE GOVERNMENT DIDN'T SHOW YOU.

01:32PM  17         TURN IN YOUR BINDER TO 7244.

01:32PM  18    A.   OKAY.

01:32PM  19    Q.   SO JUST READ THROUGH THAT EMAIL OR TAKE A LOOK AT IT.

01:33PM  20         AND IF YOU LOOK AT THE BOTTOM EMAIL, THIS IS AN EMAIL FROM

01:33PM  21    MR. BALWANI TO YOU AND OTHERS; RIGHT?

01:33PM  22    A.   RIGHT.

01:33PM  23    Q.   AND THE OTHERS ARE MOSTLY SCIENTISTS AT THERANOS; RIGHT?

01:33PM  24    A.   YES.

01:33PM  25    Q.   AND ON AUGUST 1ST, 2012; RIGHT?

01:33PM   1    A.   RIGHT.

01:33PM   2    Q.   AND IT RELATES TO A DEMO THAT TOOK PLACE IN CHICAGO.

01:33PM   3         DO YOU SEE THAT?

01:33PM   4    A.   YES.

01:33PM   5    Q.   OKAY.

01:33PM   6         YOUR HONOR, WE OFFER 7244.

01:33PM   7              MR. BOSTIC:   TWO LAYERS OF HEARSAY HERE, YOUR HONOR.

01:33PM   8         (PAUSE IN PROCEEDINGS.)

01:33PM   9              THE COURT:   MS. WALSH.

01:33PM   10             MS. WALSH:   YES, YOUR HONOR.   THIS IS A BUSINESS

01:33PM   11   RECORD.   I'M HAPPY TO LAY A FOUNDATION WITH THE WAY WE DID WITH

01:33PM   12   THE OTHER DEMO EMAILS.

01:33PM   13             THE COURT:   MR. BOSTIC, ARE YOU -- YOU HAVE CONCERN

01:34PM   14   WITH THE FIRST PARAGRAPH?

01:34PM   15             MR. BOSTIC:   YES, YOUR HONOR, THE FIRST PARAGRAPH

01:34PM   16   TOWARDS THE BOTTOM OF THE PAGE.   ALSO, I'M NOT SURE THAT THIS

01:34PM   17   QUALIFIES AS A BUSINESS RECORD, THIS KIND OF ONE-OFF

01:34PM   18   COMMUNICATION.

01:34PM   19        (PAUSE IN PROCEEDINGS.)

01:34PM   20             MS. WALSH:   IT ALSO GOES TO MR. BALWANI'S STATE OF

01:34PM   21   MIND, YOUR HONOR.   HE'S ON THE EMAIL.

01:34PM   22             THE COURT:   ALL RIGHT.   THANK YOU.

01:34PM   23        I'LL ADMIT THIS, AND IT MAY BE PUBLISHED.

01:34PM   24        (DEFENDANT'S EXHIBIT 7244 WAS RECEIVED IN EVIDENCE.)

01:34PM   25   BY MS. WALSH:

01:34PM  1    Q.   OKAY.  LET'S TAKE A LOOK AT THIS BOTTOM EMAIL.

01:35PM  2         AS I SAID, THIS IS FROM MR. BALWANI TO YOU AND A NUMBER OF

01:35PM  3    DIFFERENT PEOPLE.  AND I JUST WANT TO TAKE YOU THROUGH SOME OF

01:35PM  4    THEM TO SEE IF YOU KNOW WHO THEY ARE.

01:35PM  5    A.   YES.

01:35PM  6    Q.   SO DANIEL YOUNG WE'VE TALKED ABOUT?

01:35PM  7    A.   RIGHT.

01:35PM  8    Q.   SUREKHA GANGADKHEDKAR.

01:35PM  9         DO YOU SEE THAT NAME?

01:35PM  10   A.   YES.

01:35PM  11   Q.   AND SHE WAS THE LEADER OF THE IMMUNOASSAYS IN THE R&D

01:35PM  12   SECTION; RIGHT?

01:35PM  13   A.   YES.

01:35PM  14   Q.   AND DR. PAUL PATEL.

01:35PM  15        DO YOU SEE THAT NAME?

01:35PM  16   A.   YES.

01:35PM  17   Q.   HE WAS THE LEADER OF THE GENERAL CHEMISTRY ASSAYS IN R&D;

01:35PM  18   RIGHT?

01:35PM  19   A.   RIGHT.

01:35PM  20   Q.   AND CHINMAY PANGARKAR.

01:35PM  21        DO YOU SEE THAT?

01:35PM  22   A.   YES.

01:35PM  23   Q.   HE WAS IN CHARGE OF ASSAY DEVELOPMENT FOR CYTOMETRY AND

01:35PM  24   IMMUNOASSAYS; RIGHT?

01:35PM  25   A.   RIGHT.

EDLIN CROSS BY MS. WALSH

```
01:35PM   1    Q.   OKAY.  AND THERE ARE ALSO SOME PEOPLE ON HERE WHO WORKED

01:35PM   2    ON HARDWARE.

01:36PM   3         DO YOU SEE THE NAME SURAJ SAKSENA?

01:36PM   4    A.   YES.

01:36PM   5    Q.   HE WAS IN CHARGE OF CARTRIDGE MANUFACTURING, WAS HE NOT?

01:36PM   6    A.   I DON'T RECALL SPECIFICALLY.

01:36PM   7    Q.   OKAY.  AND HOW ABOUT IAN GIBBONS?

01:36PM   8         DO YOU RECOGNIZE THAT NAME?

01:36PM   9    A.   YES.

01:36PM  10    Q.   HE WAS ONE OF THE CHIEF SCIENTISTS AT THERANOS?

01:36PM  11    A.   YES.

01:36PM  12    Q.   AND ALL OF THOSE PEOPLE ARE PH.D.'S; RIGHT?

01:36PM  13    A.   I BELIEVE IAN WAS -- OH, ALL OF THESE PEOPLE.

01:36PM  14         I DON'T KNOW.  I REMEMBER CHINMAY AND IAN AS I RECALL, BUT

01:36PM  15    I WOULDN'T BE SURPRISED, IN FACT, IF THEY HAD PH.D.'S.

01:36PM  16    Q.   OKAY.  SO LET'S TAKE A LOOK AT WHAT MR. BALWANI SAYS TO

01:36PM  17    THIS GROUP.

01:36PM  18         HE SAYS, "I HEARD BACK FROM THE EXECUTIVE ON WHOM WE HAD

01:36PM  19    PERFORMED THE DEMO ON 7/16 IN CHICAGO."

01:36PM  20         DO YOU SEE THAT?

01:36PM  21    A.   YES.

01:36PM  22    Q.   AND DO YOU KNOW WHO OR -- YEAH, WHAT EXECUTIVE THAT WAS?

01:36PM  23    A.   I DON'T REMEMBER WHICH SPECIFIC EXECUTIVE.

01:37PM  24    Q.   AND HOW ABOUT, WHAT ABOUT THE COMPANY THAT THE EXECUTIVE

01:37PM  25    WAS EMPLOYED BY?
```

01:37PM  1    A.   I BELIEVE IT WAS WITH WALGREENS.

01:37PM  2    Q.   OKAY.  CONTINUING ON WITH WHAT MR. BALWANI SAYS.

01:37PM  3         "HE SAID HIS RESULTS FROM THE CENTRAL LAB THAT HE DID ON

01:37PM  4    HIS DOCTOR'S ORDER, WERE IDENTICAL TO THE RESULTS FROM OUR

01:37PM  5    SYSTEM DURING THE DEMO.  HE HAD GONE TO SEE HIS DOCTOR AFTER HE

01:37PM  6    GOT OUR RESULTS DURING THE DEMO."

01:37PM  7         AND THEN MR. BALWANI CONTINUES.  "I HOPE THIS GIVES AN

01:37PM  8    ADDITIONAL DOSE OF CONFIDENCE (NOT THAT YOU NEEDED MORE OF IT)

01:37PM  9    TO EVERYONE AS THESE WERE DIFFICULT ASSAYS -- INCLUDED

01:37PM 10    VITAMIN DIFFICULT.  WE ARE DOING GOOD WORK HERE AND WILL SAVE

01:37PM 11    MILLIONS OF LIVES AND WILL IMPROVE THE QUALITY OF CARE

01:37PM 12    DELIVERED TO HUNDREDS OF MILLIONS MORE BECAUSE OF OUR WORK.

01:37PM 13    THIS KNOWLEDGE AND CONVICTION SHOULD BE THE GREATEST SOURCE OF

01:38PM 14    OUR CONFIDENCE.  I THINK IT IS A UNIQUE OPPORTUNITY WHEN YOUR

01:38PM 15    CAREER AND WORK IS NOT JUST WORK THAT PAYS YOUR BILLS, BUT IS

01:38PM 16    ALSO IN SERVICE OF HUMANITY AND GOOD FOR THE GREATER GOOD.  I

01:38PM 17    HOPE YOU ALL SHARE THIS SENTIMENT."

01:38PM 18         DO YOU SEE THAT?

01:38PM 19    A.   YES.

01:38PM 20    Q.   AND ONE OF THERANOS'S GOALS WAS TO MAKE BLOOD TESTING MORE

01:38PM 21    ACCESSIBLE TO EVERYONE; RIGHT?

01:38PM 22    A.   RIGHT.

01:38PM 23    Q.   TO MAKE IT CHEAPER; RIGHT?

01:38PM 24    A.   RIGHT.

01:38PM 25    Q.   AND MORE CONVENIENT; RIGHT?

01:38PM  1     A.   CORRECT.

01:38PM  2     Q.   WE CAN TAKE THAT DOWN.

01:38PM  3          NOW, YOU TESTIFIED LAST WEEK ABOUT A DEMONSTRATION THAT

01:38PM  4     TOOK PLACE AT A NEW YORK CITY HOSPITAL.

01:38PM  5          DO YOU REMEMBER THAT?

01:38PM  6     A.   YES.

01:38PM  7     Q.   AND YOU SAID THAT THE PURPOSE OF THE MEETING WAS TO SHARE

01:38PM  8     WHAT THERANOS WAS WORKING ON; RIGHT?

01:38PM  9     A.   RIGHT.

01:38PM  10    Q.   AND TO EXPLORE POTENTIAL OPPORTUNITIES TO PARTNER WITH

01:38PM  11    THAT HOSPITAL; CORRECT?

01:38PM  12    A.   CORRECT.

01:38PM  13    Q.   AND PART OF THE MEETING, IN ADDITION TO THE DISCUSSION,

01:39PM  14    WAS TO RUN A DEMONSTRATION; RIGHT?

01:39PM  15    A.   RIGHT.

01:39PM  16    Q.   AND YOU HAD YOUR ROLE IN COORDINATING THAT DEMONSTRATION;

01:39PM  17    RIGHT?

01:39PM  18    A.   CORRECT.

01:39PM  19    Q.   AND THE DEVICE HAD TO BE SENT TO NEW YORK; RIGHT?

01:39PM  20    A.   RIGHT.

01:39PM  21    Q.   AND DANIEL YOUNG HAD HIS ROLE IN THE DEMONSTRATION; RIGHT?

01:39PM  22    A.   RIGHT.

01:39PM  23    Q.   AND HIS ROLE WAS TO REVIEW THE TEST RESULTS; RIGHT?

01:39PM  24    A.   RIGHT.

01:39PM  25    Q.   AND THE TEST LOGS; RIGHT?

01:39PM  1    A.   RIGHT.

01:39PM  2    Q.   AND TO ENSURE THE TEST WAS VALID.  I THINK YOU TESTIFIED

01:39PM  3    TO THAT LAST WEEK; RIGHT?

01:39PM  4    A.   RIGHT.

01:39PM  5    Q.   AND HE INTERPRETED THE RESULTS AND APPROVED THEM FOR

01:39PM  6    DISTRIBUTION BACK TO THE CLIENT; RIGHT?

01:39PM  7    A.   RIGHT.

01:39PM  8    Q.   OKAY.  SO LET'S TAKE A LOOK AT 860.

01:40PM  9         DO YOU HAVE THAT IN FRONT OF YOU?

01:40PM  10             THE COURT:  860?

01:40PM  11             MS. WALSH:  860.

01:40PM  12        YOUR HONOR, THIS IS IN EVIDENCE, SO I REQUEST THAT IT BE

01:40PM  13    PUBLISHED.

01:40PM  14             THE COURT:  YES.

01:40PM  15             MS. WALSH:  THANK YOU.

01:40PM  16   Q.   DO YOU HAVE IT, MR. EDLIN?  IT'S ON YOUR SCREEN.

01:40PM  17   A.   YEAH, SORRY.

01:40PM  18   Q.   OKAY.  SO LET'S GO TO PAGE 11 OF 860.

01:40PM  19        AND ON THE TOP OF PAGE 11 YOU ARE ASKING SUREKHA, CAN YOU

01:40PM  20   PLEASE SEND THE RESULTS TO DR. YOUNG; RIGHT?

01:40PM  21   A.   RIGHT.

01:40PM  22   Q.   AND YOU SAID THAT IS DANIEL, THAT'S DANIEL YOUNG; RIGHT?

01:40PM  23   A.   YES.

01:40PM  24   Q.   AND YOU SAY, "CAN YOU PLEASE REVIEW AND PROVIDE REFERENCE

01:40PM  25   RANGES AS WELL FOR THE LAB REPORT."

EDLIN CROSS BY MS. WALSH

01:40PM 1          DO YOU SEE THAT?

01:40PM 2     A.   YES.

01:40PM 3     Q.   AND NOW LET'S FLIP TO PAGE 10 AND YOU SEE THERE'S A BOX,

01:40PM 4     KIND OF A CHART OF ASSAYS THERE FROM SUREKHA.

01:40PM 5          DO YOU SEE THAT?

01:40PM 6     A.   YES.

01:40PM 7     Q.   AND THERE ARE SIX DIFFERENT ASSAYS LISTED; RIGHT?

01:41PM 8     A.   RIGHT.

01:41PM 9     Q.   AND THAT'S FOR ONE CARTRIDGE; RIGHT?

01:41PM 10    A.   RIGHT.

01:41PM 11    Q.   AND SO THAT'S A NEXT GENERATION DEVICE, ISN'T IT, SIX

01:41PM 12    ASSAYS ON ONE CARTRIDGE?

01:41PM 13    A.   I DON'T KNOW.

01:41PM 14    Q.   OKAY.  YOU SEE ONE OF THE ASSAYS IS HSV 1.

01:41PM 15         DO YOU SEE THAT?

01:41PM 16    A.   YES.

01:41PM 17    Q.   AND YOU REMEMBER THAT THERANOS GOT FDA APPROVAL ON THE

01:41PM 18    HSV 1 ASSAY.

01:41PM 19         DO YOU REMEMBER THAT?

01:41PM 20    A.   YES.

01:41PM 21    Q.   THAT'S LATER IN TIME, BUT IT WAS ULTIMATELY APPROVED BY

01:41PM 22    THE FDA; CORRECT?

01:41PM 23    A.   CORRECT.

01:42PM 24    Q.   AND WITH REGARD TO THAT ASSAY, THAT MEANT THAT THERANOS

01:42PM 25    COULD PUT ITS MACHINE IN A PLACE EXTERNAL TO THERANOS AND RUN

01:42PM   1    THAT ASSAY; RIGHT?

01:42PM   2              MR. BOSTIC:  FOUNDATION.  CALLS FOR A LEGAL

01:42PM   3    CONCLUSION.

01:42PM   4              MS. WALSH:  I'LL WITHDRAW IT.

01:42PM   5              THE COURT:  THE QUESTION IS WITHDRAWN.

01:42PM   6    BY MS. WALSH:

01:42PM   7    Q.   OKAY.  LET'S LOOK UP AT THE EMAIL.

01:42PM   8         AND YOU ASK DANIEL IN THE THIRD PARAGRAPH THERE, "CAN YOU

01:42PM   9    PLEASE CONFIRM THE UNITS BELOW AND THE REFERENCE RANGES FOR

01:42PM   10   THESE ASSAYS?

01:42PM   11        "WILL ANY OF THE REFERENCE RANGES CHANGE FOR THE OTHER

01:42PM   12   ASSAYS GIVEN THAT THE SUBJECT TODAY WAS FEMALE?  FOR REFERENCE,

01:42PM   13   I HAVE ATTACHED A SPREADSHEET COMPARING THE REFERENCE RANGES

01:42PM   14   FOR LAST TWO DEMOS WE DID -- THE ONE FROM EARLIER THIS WEEK

01:42PM   15   (MALE SUBJECT), AND THE LAST TIME WE TOOK THE SAMPLE AND SENT

01:42PM   16   IT BACK FROM PHOENIX (FEMALE SUBJECT).  I HAVE HIGHLIGHTED THE

01:42PM   17   DIFFERENCES IN YELLOW."

01:42PM   18        DO YOU SEE THAT?

01:42PM   19   A.   YES.

01:42PM   20   Q.   OKAY.  AND THERE YOU'RE TALKING ABOUT DETERMINING A

01:43PM   21   REFERENCE RANGE FOR THE TEST; RIGHT?

01:43PM   22   A.   RIGHT.

01:43PM   23   Q.   AND REFERENCE RANGES CHANGED FROM TIME TO TIME, DIDN'T

01:43PM   24   THEY?

01:43PM   25   A.   CAN YOU BE MORE SPECIFIC?

01:43PM  1    Q.   SURE.

01:43PM  2         WELL, YOU'RE ATTACHING A SPREADSHEET SHOWING TWO DIFFERENT

01:43PM  3    REFERENCE RANGES; RIGHT?  THAT'S WHAT YOU SAY IN YOUR EMAIL?

01:43PM  4    A.   THIS INDICATES TO ME THAT THERE CAN BE DIFFERENT REFERENCE

01:43PM  5    RANGES FOR A MALE AND FOR A FEMALE.

01:43PM  6    Q.   RIGHT.  AND THAT WASN'T UNUSUAL, WAS IT?

01:43PM  7    A.   NO.

01:43PM  8    Q.   AND YOU WEREN'T IN CHARGE OF SETTING THE REFERENCE RANGES;

01:43PM  9    RIGHT?

01:43PM 10    A.   CORRECT.

01:43PM 11    Q.   DR. YOUNG, THAT WAS HIS JOB; RIGHT?

01:44PM 12    A.   CORRECT.

01:44PM 13    Q.   AND IN YOUR EXPERIENCE WITH DR. YOUNG, HE SET THE

01:44PM 14    REFERENCE RANGES BASED ON THE SCIENCE THAT HE WAS AWARE OF;

01:44PM 15    RIGHT?

01:44PM 16         MR. BOSTIC:  FOUNDATION.  CALLS FOR SPECULATION.

01:44PM 17         THE COURT:  SUSTAINED.

01:44PM 18         MS. WALSH:  OKAY.  WELL, LET'S LOOK FURTHER IN THE

01:44PM 19    EMAIL.

01:44PM 20    Q.   SO ON PAGE 9 YOU POINT OUT AT THE TOP THAT THERE'S A

01:44PM 21    DISCREPANCY BETWEEN THE TWO INFECTIOUS PANEL RUNS; RIGHT?

01:44PM 22    A.   RIGHT.

01:44PM 23    Q.   AND THEN IF YOU GO TO PAGE 7, THAT'S WHEN MS. HOLMES SAYS,

01:44PM 24    "THE DISCREPANCY WILL BE A PROBLEM."

01:44PM 25         DO YOU REMEMBER THAT?

01:44PM  1      A.   YES.

01:44PM  2      Q.   THE GOVERNMENT HIGHLIGHTED THAT FOR YOU?

01:44PM  3      A.   YES.

01:44PM  4      Q.   AND SO I'M GOING TO GO FURTHER UP THE EMAIL TO LOOK AT

01:44PM  5      PARTS OF THE EMAIL THAT WE DIDN'T SEE LAST WEEK DURING YOUR

01:44PM  6      TESTIMONY.

01:44PM  7           ON PAGE 5, THE TOP OF PAGE 5 MS. HOLMES ASKS, "DANIEL --

01:45PM  8      IS OUR READ THAT THE SECOND RUN IN PA," THAT'S PALO ALTO;

01:45PM  9      RIGHT?

01:45PM  10     A.   RIGHT.

01:45PM  11     Q.   "SECOND RUN IN PALO ALTO IS THE MOST ACCURATE FOR ALL

01:45PM  12     THREE DISCREPANCIES?"

01:45PM  13          DO YOU SEE THAT?

01:45PM  14     A.   YES, AND SHE'S ASKING DR. YOUNG.

01:45PM  15     Q.   I WAS JUST GOING TO ASK YOU THAT, RIGHT.

01:45PM  16          SO GENERALLY AT THERANOS, DANIEL YOUNG IS DANIEL; RIGHT?

01:45PM  17     A.   YES.

01:45PM  18     Q.   AND YOU WERE REFERRED TO AS DAN; IS THAT FAIR?

01:45PM  19     A.   YES.

01:45PM  20     Q.   AND SO SHE'S ASKING DR. YOUNG, "IS OUR READ THAT THE

01:45PM  21     SECOND RUN IN PALO ALTO IS THE MOST ACCURATE."

01:45PM  22          CORRECT?

01:45PM  23     A.   YES.

01:45PM  24     Q.   OKAY.

01:45PM  25     A.   YES.

01:45PM 1    Q.   AND IF WE FLIP TO PAGE 4, DR. YOUNG RESPONDS TO HER, AND

01:45PM 2    HE SAYS, "YES, I TRUST THE SECOND RUN IN PALO ALTO.  OVER

01:45PM 3    90 PERCENT OF PEOPLE APPROXIMATELY 50 YEARS OF AGE SHOULD TEST

01:45PM 4    POSITIVE FOR MUMPS IGG BASED ON PUBLISHED SEROPREVALENCE

01:46PM 5    STUDIES."

01:46PM 6        DO YOU SEE THAT?

01:46PM 7    A.   UH-HUH, YES.

01:46PM 8    Q.   AND SO HERE IS AN EXAMPLE OF DR. YOUNG CONSULTING

01:46PM 9    SCIENTIFIC PUBLICATIONS AND USING HIS SCIENTIFIC BACKGROUND TO

01:46PM 10   EXPRESS HIS OPINION AS TO WHICH TEST IS MORE ACCURATE; RIGHT?

01:46PM 11   A.   RIGHT.

01:46PM 12   Q.   LET'S NOW GO -- IF YOU COULD, ACTUALLY, MR. EDLIN, LOOK AT

01:46PM 13   PAGES 3 AND 2.

01:46PM 14       AND THERE'S KIND OF A DEBATE BETWEEN MS. HOLMES AND

01:46PM 15   DR. YOUNG ABOUT THE SCIENCE OF WHAT HE'S SAYING.

01:46PM 16       DO YOU SEE THAT?

01:46PM 17   A.   YES.

01:46PM 18   Q.   OKAY.  AND THEN ON PAGE 2 WE CAN HIGHLIGHT FROM

01:46PM 19   MS. HOLMES, AFTER THAT DEBATE SHE SAYS, "GO AHEAD AND PREPARE

01:46PM 20   FINAL REPORT AND I'LL REVIEW IN PARALLEL."

01:46PM 21       DO YOU SEE THAT?

01:46PM 22   A.   YES.

01:46PM 23   Q.   AND BY THE WAY, IN THE EMAIL PARTS OF THE CHAIN WHERE

01:47PM 24   MS. HOLMES AND DR. YOUNG ARE DEBATING THE SCIENCE RELATED TO

01:47PM 25   THIS TEST, MR. BALWANI IS NOT SAYING ANYTHING, IS HE?

01:47PM   1     A.    NO.

01:47PM   2     Q.    HE'S NOT COMMENTING ON IT; RIGHT?

01:47PM   3     A.    RIGHT.

01:47PM   4     Q.    OKAY.  SO NOW LET'S FLIP TO PAGE 1.  LET'S LOOK AT

01:47PM   5     DANIEL YOUNG'S EMAIL ON JUNE 1ST, 2013, 7:44 P.M.

01:47PM   6          HE'S COMMENTING ON THE FINAL VERSION OF THE REPORT; RIGHT?

01:47PM   7     A.    RIGHT.

01:47PM   8     Q.    AND HE'S SAYING, "TOTAL HB SHOULD HAVE AN 'L' NEXT TO IT";

01:47PM   9     CORRECT?

01:47PM   10    A.    RIGHT.

01:47PM   11    Q.    INDICATING TO THE CUSTOMER THAT IT'S LOW; RIGHT?

01:47PM   12    A.    YES.

01:47PM   13    Q.    OKAY.  AND MS. HOLMES RESPONDS, "OK LET'S SEND IT OUT

01:47PM   14    AFTER THESE CHANGES.  I ASSUME IT IS BEST PRACTICE TO LEAVE THE

01:47PM   15    H AND L RESPECTIVELY FOR THE ONES THAT ARE JUST ONE POINT OUT

01:47PM   16    OF RANGE -- I HAVE SEEN SOME REPORTS THAT DON'T FLAG IT."

01:47PM   17          DO YOU SEE THAT?

01:47PM   18    A.    YES.

01:47PM   19    Q.    SO SHE'S SAYING IT'S THE BEST PRACTICE TO LEAVE THOSE

01:48PM   20    INDICATIONS HIGH AND LOW, SO LET'S DO THAT; RIGHT?

01:48PM   21    A.    IT SOUNDS LIKE SHE'S CONFIRMING WHETHER THEY SHOULD BE

01:48PM   22    MARKED AS HIGH OR LOW IF THEY'RE JUST ONE POINT OUT OF RANGE.

01:48PM   23    Q.    RIGHT.  OKAY.

01:48PM   24          AND THEN THE NEXT EMAIL UP IS FROM MR. BALWANI.

01:48PM   25          DO YOU SEE THAT?

01:48PM 1    A.   YES.

01:48PM 2    Q.   AND HE SAYS, "WE SHOULD DO THAT BECAUSE THAT'S WHAT ALL

01:48PM 3    COMPUTERIZED LIS SYSTEMS WILL DO.  NO FUZZY LOGIC..."

01:48PM 4         DO YOU SEE THAT?

01:48PM 5    A.   YES.

01:48PM 6    Q.   AND THIS IS THE FIRST TIME THAT HE'S COMMENTING IN THIS 11

01:48PM 7    OR SO PAGE EMAIL CHAIN; RIGHT?

01:48PM 8    A.   YES.

01:48PM 9    Q.   AND WHAT HE'S SAYING IS EVEN IF IT'S ONE POINT OUT OF

01:48PM 10   RANGE, IF IT'S OUT OF RANGE, IT'S OUT OF RANGE, AND WE SHOULD

01:48PM 11   INDICATE THAT ON THE REPORT; RIGHT?

01:48PM 12   A.   RIGHT.

01:48PM 13   Q.   OKAY.  WE CAN TAKE THAT DOWN.

01:49PM 14        THE COURT:  FOLKS, WHY DON'T YOU TAKE A STANDING

01:49PM 15   BREAK, AND LET'S SEE HOW THAT WORKS IN YOUR SEATING ARRANGEMENT

01:49PM 16   NOW BEFORE WE MOVE TO THE NEXT DOCUMENT.

01:49PM 17        I THOUGHT WE WOULD BREAK, MS. WALSH, ABOUT A QUARTER PAST

01:49PM 18   THE HOUR AT 2:15.

01:49PM 19        MS. WALSH:  SURE.  THAT'S FINE.

01:49PM 20        (STRETCHING.)

01:50PM 21   BY MS. WALSH:

01:50PM 22   Q.   CAN YOU TURN TO PAGE 957 IN YOUR BINDER?

01:50PM 23   A.   VOLUME 1?

01:50PM 24   Q.   VOLUME 1, YEAH.

01:50PM 25        THE COURT:  IT MAY NOT BE.

01:50PM  1          MS. WALSH:  I'M SORRY.  THIS IS IN EVIDENCE.  I

01:50PM  2   APOLOGIZE.  SO WE'LL JUST PUBLISH IT ON YOUR SCREEN.  YEAH.

01:50PM  3   Q.   OKAY.  SO EXHIBIT 957.

01:50PM  4        SO BEFORE WE GET INTO THE EMAIL, MR. EDLIN, YOU TESTIFIED

01:50PM  5   ON DIRECT THAT THE FIRST TIME YOU LEARNED THAT THERANOS WAS

01:50PM  6   USING THIRD PARTY DEVICES TO RUN FINGERSTICK SAMPLES WAS IN

01:50PM  7   2005, AROUND THE TIME OF "THE WALL STREET JOURNAL"; IS THAT

01:50PM  8   RIGHT?

01:50PM  9   A.   THAT IS WHEN I HEARD THE CLAIM FOR THE FIRST TIME, 2015,

01:51PM  10  WITH THE ARTICLE, BUT I REMEMBER LEARNING IT IN MEETINGS IN

01:51PM  11  2016.

01:51PM  12  Q.   OKAY.  SO AGAIN, IT'S BEEN A LONG TIME SINCE YOU WORKED AT

01:51PM  13  THERANOS, SO LET'S TAKE A LOOK AT THIS EMAIL.  THIS IS ONE THAT

01:51PM  14  THE GOVERNMENT SHOWED YOU.

01:51PM  15       AND WHAT THE GOVERNMENT SHOWED YOU IS ON PAGE 1 OF THIS

01:51PM  16  EMAIL.  IT RELATES TO DEMO WORKFLOW.  THIS IS AUGUST 2013.  AND

01:51PM  17  THE EMAIL IS FROM NICHOLAS HAASE.

01:51PM  18       WHO WAS HE, AGAIN?

01:51PM  19  A.   A SCIENTIST.

01:51PM  20  Q.   OKAY.  AND IT'S TO YOU, DR. YOUNG, AND ALL OF THESE

01:51PM  21  SCIENTISTS THAT WE HAVE ALREADY GONE THROUGH, ALSO COPYING

01:51PM  22  JEFF BLICKMAN.

01:51PM  23       HE WAS ON THE PRODUCT MANAGEMENT TEAM AS WELL; RIGHT?

01:51PM  24  A.   YES.

01:51PM  25  Q.   OKAY.  AND MR. HAASE SAYS, "UPDATE:  WE JUST STARTED THE

01:51PM   1    ADVIA RUN OF ALL SAMPLES."

01:51PM   2         DO YOU SEE THAT?

01:51PM   3    A.   YES.

01:51PM   4    Q.   OKAY.  AND IF WE TURN NOW TO PAGE 2 OF THE EXHIBIT IN THE

01:51PM   5    MIDDLE AT 10:53 A.M. THERE'S AN EMAIL FROM YOU TO ALL OF THESE

01:52PM   6    PEOPLE AND IT SAYS, "HI ALL -- WE WILL BE COLLECTING

01:52PM   7    FINGERSTICK SAMPLES VERY SOON.  PLEASE BE ON STANDBY."

01:52PM   8         DO YOU SEE THAT?

01:52PM   9    A.   YES.

01:52PM   10   Q.   AND SO THIS IS AN INSTANCE WHEN FINGERSTICK SAMPLES ARE

01:52PM   11   BEING RUN ON THE ADVIA; RIGHT?

01:52PM   12   A.   ARE YOU ASKING ME IF THAT IS WHAT HAPPENED KNOWING WHAT I

01:52PM   13   KNOW NOW OR JUST BASED ON WHAT I KNEW AT THE TIME?

01:52PM   14   Q.   JUST BASED ON THIS EMAIL.

01:52PM   15   A.   RIGHT.

01:52PM   16   Q.   THIS IS AN EMAIL SHOWING -- AND YOU'RE ON THE EMAIL;

01:52PM   17   RIGHT?

01:52PM   18   A.   RIGHT.

01:52PM   19   Q.   AND AN EMAIL SHOWING THAT THE COMMERCIAL MACHINE WAS USED,

01:52PM   20   THE ADVIA; RIGHT?

01:52PM   21   A.   RIGHT.

01:52PM   22   Q.   AND -- BUT IT WAS USED TO RUN FINGERSTICK SAMPLES; RIGHT?

01:52PM   23   A.   RIGHT.

01:52PM   24   Q.   AND SO YOU'RE ON THIS EMAIL AT THE TIME.  THE EMAIL

01:52PM   25   INDICATES THAT YOU WERE AWARE OF THAT; RIGHT?

EDLIN CROSS BY MS. WALSH

01:52PM  1    A.   I AM COPIED ON THE EMAIL.  I DON'T KNOW IF I WAS -- I

01:53PM  2    DON'T THINK I WAS AWARE OF THAT, THOUGH.

01:53PM  3    Q.   MEANING YOU WEREN'T KIND OF PUTTING THE TWO TOGETHER AND

01:53PM  4    DRAWING A CONCLUSION?

01:53PM  5    A.   CORRECT.

01:53PM  6    Q.   BUT -- SO IT'S CLEAR, BACK IN 2013 YOU WERE CLEARLY ON

01:53PM  7    THIS EMAIL WHERE THE ADVIA WAS BEING USED TO RUN FINGERSTICK

01:53PM  8    SAMPLES; RIGHT?

01:53PM  9    A.   YES.

01:53PM  10   Q.   AND MS. -- THE GOVERNMENT ASKED YOU ABOUT COMMERCIAL

01:53PM  11   MACHINES, ONE OF THEM BEING THE ADVIA; RIGHT?

01:53PM  12   A.   CORRECT.

01:53PM  13   Q.   BUT THERANOS MODIFIED THOSE MACHINES TO RUN FINGERSTICK

01:53PM  14   SAMPLES; CORRECT?

01:53PM  15   A.   YES.

01:53PM  16   Q.   AND WHAT THEY DID -- WHAT THERANOS DID, WAS IT CHANGED

01:53PM  17   SOME OF THE SOFTWARE IN CONNECTION WITH THE MACHINE; RIGHT?

01:53PM  18   A.   I DON'T KNOW THE SPECIFICS, BUT, YES.

01:54PM  19   Q.   OKAY.  AND IT MADE -- WHATEVER CHANGES IT MADE, THERANOS

01:54PM  20   CAME UP WITH THOSE CHANGES AND CHANGED THOSE COMMERCIAL

01:54PM  21   MACHINES; RIGHT?

01:54PM  22   A.   I DON'T KNOW HOW THE DECISIONS CAME ABOUT.

01:54PM  23   Q.   RIGHT.  BUT PUT ASIDE THE HOW.  THEY MODIFIED THE

01:54PM  24   MACHINES; CORRECT?

01:54PM  25   A.   CORRECT.

01:54PM  1    Q.   AND THE REASON FOR MODIFYING THOSE MACHINES, WAS SO THOSE

01:54PM  2    COMMERCIAL MACHINES COULD RUN FINGERSTICK SAMPLES; RIGHT?

01:54PM  3    A.   RIGHT.

01:54PM  4    Q.   THE MACHINES, IF YOU DON'T MODIFY THEM, WOULD HAVE RUN

01:54PM  5    VENOUS SAMPLES; CORRECT?

01:54PM  6    A.   I BELIEVE SO.

01:54PM  7    Q.   AND VENOUS SAMPLES ARE TAKEN FROM THE ARM; RIGHT?

01:54PM  8    A.   RIGHT.

01:54PM  9    Q.   AND THAT'S DIFFERENT FROM FINGERSTICK, TAKING FROM THE

01:54PM  10   FINGER; RIGHT?

01:54PM  11   A.   RIGHT.

01:54PM  12   Q.   OKAY.  OKAY.  WE CAN TAKE THAT DOWN.

01:55PM  13        LET'S LOOK AT ANOTHER EXAMPLE, 1157, WHICH IS IN EVIDENCE,

01:55PM  14   SO WE CAN PUBLISH THAT.

01:55PM  15        SO HERE'S ANOTHER EXAMPLE IN 2013.  IF WE LOOK AT PAGE 1,

01:55PM  16   MR. EDLIN, THIS IS GOING TO BE ON THE SCREEN.

01:55PM  17        PAUL PATEL IN THE MIDDLE EMAILS YOU, AND DR. YOUNG, AND

01:55PM  18   DR. PANGARKAR, AND DR. SIVARAMAN.

01:55PM  19        "DANIEL,

01:55PM  20        "ARE WE EXPECTING TO RUN THIS SAMPLE ON THE ADVIA?"

01:55PM  21        DO YOU SEE THAT?

01:55PM  22   A.   YES.

01:55PM  23   Q.   AND THE ADVIA IS THE COMMERCIAL MACHINE.  YOU TESTIFIED TO

01:55PM  24   THAT; RIGHT?

01:55PM  25   A.   YES.  AND PAUL IS ASKING DANIEL YOUNG HERE.  AS WE

01:55PM  1    ESTABLISHED, I WENT BY DAN AND HE WENT BY DANIEL.

01:56PM  2    Q.   CORRECT.  SO DANIEL IS DANIEL YOUNG, AND YOU'RE DAN.

01:56PM  3         SO HE'S ASKING DR. YOUNG; RIGHT?

01:56PM  4    A.   RIGHT.

01:56PM  5    Q.   AND THIS IS THE PART OF THE EMAIL THAT THE GOVERNMENT

01:56PM  6    SHOWED YOU; RIGHT?

01:56PM  7    A.   RIGHT.

01:56PM  8    Q.   AND THEN IF WE TURN TO PAGE 2, WHICH THE GOVERNMENT DIDN'T

01:56PM  9    SHOW YOU, THE EMAIL FROM YOU TO ALL OF THESE PEOPLE REGARDING

01:56PM  10   THE DEMO TOMORROW MORNING YOU SAY, "PLEASE NOTE THAT WE HAVE A

01:56PM  11   PATIENT COMING IN TOMORROW MORNING FOR A DEMO FROM 9:00 TO

01:56PM  12   10:00, AND THE FINGERSTICK COLLECTION WILL LIKELY BE AT 10:00

01:56PM  13   A.M."

01:56PM  14        DO YOU SEE THAT?

01:56PM  15   A.   YES.

01:56PM  16   Q.   AND SO THIS IS ANOTHER EXAMPLE OF FINGERSTICK BEING RUN ON

01:56PM  17   ADVIA MACHINES; RIGHT?

01:56PM  18   A.   UM, I THINK I'M WRITING IN REFERENCE TO -- CAN YOU REPEAT

01:57PM  19   THE QUESTION?

01:57PM  20   Q.   SURE.

01:57PM  21        THE EMAIL REFERS TO, ON THE FIRST PAGE, TO AN ADVIA;

01:57PM  22   RIGHT?  AN ADVIA MACHINE?

01:57PM  23   A.   RIGHT.

01:57PM  24   Q.   AND FOR THE SAME DEMO ON PAGE 2, YOU'RE SAYING THAT THE

01:57PM  25   SAMPLES ARE GOING TO BE FINGERSTICK COLLECTION.

01:57PM 1           DO YOU SEE THAT?

01:57PM 2      A.   YES.

01:57PM 3      Q.   AND SO THIS IS ANOTHER EMAIL SHOWING FINGERSTICK SAMPLES

01:57PM 4      BEING RUN ON THE ADVIA; RIGHT?

01:57PM 5      A.   WELL, THE ADVIA WAS REFERENCING THE FIRST SET OF SAMPLES

01:57PM 6      THAT WERE RUN, AND THEN THIS IS DESCRIBING A DIFFERENT DEMO

01:57PM 7      THAT IS BEING RUN IN THE FUTURE.

01:57PM 8           SO I DON'T THINK THERE'S ANY DISCUSSION ABOUT HOW THESE

01:57PM 9      SAMPLES ARE RUN.

01:57PM 10     Q.   OKAY.  SO AT 2:11 P.M. YOU SAY TO THIS GROUP OF PEOPLE,

01:58PM 11     "HELLO ALL,

01:58PM 12          "PLEASE NOTE THAT WE HAVE A PATIENT COMING IN."

01:58PM 13          AND IT'S GOING TO BE A FINGERSTICK COLLECTION; RIGHT?

01:58PM 14     A.   RIGHT.

01:58PM 15     Q.   AND THEN THERE'S A QUESTION FROM MATTHEW BLACK, "IF YOU

01:58PM 16     FIND OUT, PLEASE LET US KNOW WHAT FORMAT THIS WILL COME IN";

01:58PM 17     RIGHT?

01:58PM 18          DO YOU SEE THAT?

01:58PM 19     A.   YES.

01:58PM 20     Q.   OKAY.  AND THEN AN EMAIL FROM DR. PANGARKAR, "PLEASE

01:58PM 21     ADVISE"; RIGHT?

01:58PM 22          AT THE BOTTOM OF PAGE 1.

01:58PM 23     A.   YES.

01:58PM 24     Q.   AND THEN THE NEXT EMAIL UP YOU SAY, "DANIEL -- CAN YOU

01:58PM 25     PLEASE ADVISE IF WE NEED TO USE RAM SCIENTIFIC TUBES."

EDLIN CROSS BY MS. WALSH

01:58PM 1      DO YOU SEE THAT?

01:58PM 2   A.   YES.

01:58PM 3   Q.   AND THEN DR. PATEL SAYS, "DANIEL,

01:59PM 4      "ARE WE EXPECTING TO RUN THIS SAMPLE ON THE ADVIA?"

01:59PM 5      DO YOU SEE THAT?

01:59PM 6   A.   YES.

01:59PM 7   Q.   AND MY ONLY QUESTION IS, THIS IS AN EMAIL CONTAINING A

01:59PM 8   DISCUSSION ABOUT RUNNING FINGERSTICK SAMPLES ON THE ADVIA;

01:59PM 9   RIGHT?

01:59PM 10  A.   RIGHT.

01:59PM 11  Q.   OKAY.  AND THIS IS ANOTHER EXAMPLE OF THE DISCUSSION AT

01:59PM 12  LEAST OF FINGERSTICK SAMPLES ON ADVIA'S; RIGHT?

01:59PM 13  A.   YES.

01:59PM 14  Q.   AND WHEN FINGERSTICK SAMPLES ARE BEING RUN ON ADVIA'S,

01:59PM 15  THEY'RE MODIFIED MACHINES; CORRECT?

01:59PM 16  A.   THAT'S MY UNDERSTANDING.

01:59PM 17  Q.   RIGHT.  AND YOUR UNDERSTANDING IS THAT THOSE MODIFICATIONS

01:59PM 18  WERE MADE BY THERANOS; RIGHT?

01:59PM 19  A.   RIGHT.

01:59PM 20  Q.   OKAY.  LET'S TAKE A LOOK AT 871 THAT IS ON THE SCREEN.

02:00PM 21      IT IS IN EVIDENCE, YOUR HONOR.

02:00PM 22          THE COURT:  ALL RIGHT.

02:00PM 23  BY MS. WALSH:

02:00PM 24  Q.   DO YOU SEE 871, MR. EDLIN?

02:00PM 25  A.   YES.

02:00PM   1    Q.   OKAY.  AND THIS IS AN EMAIL THAT THE GOVERNMENT SHOWED YOU

02:00PM   2    LAST WEEK.  THIS RELATES TO A DEMO.

02:00PM   3         DO YOU SEE THAT?

02:00PM   4    A.   YES.

02:00PM   5    Q.   AND WE CAN START -- LET'S START WITH THE EMAIL ON PAGE 2

02:00PM   6    FROM DANIEL YOUNG, SECOND FROM THE TOP.

02:00PM   7         DANIEL YOUNG IS ASKING, "ANY PREFERENCE FOR DEVICE TYPE

02:01PM   8    (MONOBAY, MINILAB, 4S)?"

02:01PM   9         DO YOU SEE THAT?

02:01PM  10    A.   YES.

02:01PM  11    Q.   AND THOSE ARE ALL NEXT GENERATION DEVICES; RIGHT?

02:01PM  12    A.   CORRECT.

02:01PM  13    Q.   AND CHRISTIAN HOLMES SAYS, "NO PREFERENCE -- WHATEVER YOU

02:01PM  14    THINK IS BEST FOR THE PANEL/TESTS THAT ARE CHOSEN."

02:01PM  15         DO YOU SEE THAT?

02:01PM  16    A.   YES.

02:01PM  17    Q.   AND THEN YOU SAY, "JUST CAUGHT UP WITH SUNNY.  HE

02:01PM  18    DEFINITELY WANTS TO HAVE A MINILAB, AND THEN EITHER A 4S OR

02:01PM  19    MONOBAY (WHICHEVER IS WORKING BETTER)"; RIGHT?

02:01PM  20    A.   YES.

02:01PM  21    Q.   AND AGAIN, THESE ARE NEXT GENERATION DEVICES; CORRECT?

02:01PM  22    A.   CORRECT.

02:01PM  23    Q.   AND THE ASSAYS PUT ON THEM, SOME OF THEM ARE STILL IN

02:01PM  24    DEVELOPMENT; RIGHT?

02:01PM  25    A.   RIGHT.

02:01PM 1    Q.   AND IT'S R&D; RIGHT?

02:01PM 2    A.   RIGHT.

02:01PM 3    Q.   OKAY.  LET'S GO TO PAGE 1, THE EMAIL FROM DANIEL YOUNG,

02:02PM 4    THE SECOND FROM THE TOP.

02:02PM 5         DANIEL YOUNG SAYS, "RIGHT NOW, WE ARE NOT PLANNING ON

02:02PM 6    RUNNING ANYTHING ON THE MINILAB, UNFORTUNATELY."

02:02PM 7         THIS IS ON THE MINILAB; RIGHT?

02:02PM 8    A.   YES.

02:02PM 9    Q.   "THE GENERAL CHEMISTRY AND ELISA ASSAYS ARE NOT PERFORMING

02:02PM 10   ADEQUATELY FOR A DEMO AT THE MOMENT"; RIGHT?

02:02PM 11   A.   RIGHT.

02:02PM 12   Q.   AND THEN MR. BALWANI SAYS, "THAT'S VERY FRUSTRATING";

02:02PM 13   RIGHT?

02:02PM 14   A.   RIGHT.

02:02PM 15   Q.   AND MR. BALWANI SPECIFICALLY ASKED FOR A MINILAB TO BE

02:02PM 16   SHOWN; RIGHT?

02:02PM 17        CORRECT?

02:02PM 18   A.   CAN YOU JUST -- LET ME SEE IT ONE MORE TIME.

02:02PM 19   Q.   I'M SORRY.  IT'S ON PAGE 2.

02:02PM 20   A.   YEAH.

02:02PM 21   Q.   YOU SAY JUST CAUGHT UP WITH SUNNY.  HE DEFINITELY WANTS A

02:02PM 22   MINILAB.

02:02PM 23        DO YOU SEE THAT?

02:02PM 24   A.   YES.

02:02PM 25   Q.   AND DANIEL YOUNG IS SAYING SORRY, BUT THE GENERAL

02:02PM   1      CHEMISTRY AND THE ELISA ASSAYS ARE NOT RUNNING ON THE MINILAB;

02:02PM   2      IS THAT RIGHT?

02:02PM   3      A.   RIGHT.

02:02PM   4      Q.   AND SO HE'S FRUSTRATED THAT THEY CAN'T RUN THOSE

02:02PM   5      PARTICULAR ASSAYS ON THE MINILAB AT THAT POINT IN TIME;

02:03PM   6      CORRECT?

02:03PM   7      A.   YES.

02:03PM   8      Q.   OKAY.  WE CAN TAKE THAT DOWN.

02:03PM   9           THERE'S ONE MORE, AND THEN WE CAN TAKE THE BREAK.

02:03PM  10           YOUR HONOR, IF WE CAN LOOK AT WHAT IS ON THE SCREEN 1014

02:03PM  11      WHICH IS IN EVIDENCE?

02:03PM  12                THE COURT:  1014?

02:03PM  13                MS. WALSH:  YES.

02:03PM  14                THE COURT:  ALL RIGHT.

02:04PM  15      BY MS. WALSH:

02:04PM  16      Q.   OKAY.  MR. EDLIN, IF YOU WOULD LOOK AT PAGE 2, THE TOP OF

02:04PM  17      PAGE 2, YOU'RE SAYING TO MR. BALWANI, "SUNNY,

02:04PM  18           "UNFORTUNATELY BY THE LOOKS OF THE THYROID PANEL RESULTS

02:04PM  19      BELOW IT APPEARS TO HAVE HAD MAJOR ISSUES AGAIN."

02:04PM  20           DO YOU SEE THAT?

02:04PM  21      A.   YES.

02:04PM  22      Q.   AND THEN MR. BALWANI SAYS THIS IS DEEPLY DISAPPOINTING.

02:04PM  23           DO YOU SEE THAT?

02:04PM  24      A.   YES.

02:04PM  25      Q.   AND THEN DR. GANGADKHEDKAR SAYS, "HI SUNNY,

02:04PM   1          "THIS CARTRIDGE WAS A RECENT BUILD."

02:04PM   2          DO YOU SEE THAT?

02:04PM   3          SHE'S TALKING ABOUT EVAPORATION OF REAGENTS.

02:04PM   4          DO YOU SEE THAT?

02:04PM   5     A.   YES.

02:04PM   6     Q.   AND SHE SAYS, "THE LAST TIME THIS LOT WAS USED WAS FOR THE

02:04PM   7     DEMO ON 8/13 WHERE ALL THE RUNS WENT WELL WITH NO FAILURES."

02:05PM   8          DO YOU SEE THAT?

02:05PM   9     A.   YES.

02:05PM   10    Q.   OKAY.  BUT THIS DEMONSTRATION, AGAIN, WAS A NEXT

02:05PM   11    GENERATION DEMONSTRATION, WASN'T IT?

02:05PM   12          AND IF YOU COULD, JUST TO ORIENT YOU, MR. EDLIN, LOOK AT

02:05PM   13    THE DEVICES THAT ARE PUT IN THE DEMO ARE TWO MINILABS, ONE 4S.

02:05PM   14          DO YOU SEE THAT?

02:05PM   15    A.   AND 1.35?

02:05PM   16    Q.   RIGHT.

02:05PM   17          SO NEXT GENERATION PLUS?

02:05PM   18    A.   OR CURRENT GENERATION AND NEXT GENERATION, RIGHT.

02:05PM   19    Q.   RIGHT.

02:05PM   20          BUT THERE ARE 4S'S AND WHAT YOU DESCRIBED AS THE NEXT

02:05PM   21    GENERATION DEVICES IN THE ROOM; RIGHT?

02:06PM   22    A.   YES.

02:06PM   23    Q.   OKAY.  OKAY.  WE CAN TAKE THAT DOWN.

02:06PM   24          YOUR HONOR, WOULD THIS BE A GOOD TIME TO BREAK?

02:06PM   25          THE COURT:  SURE.  LET'S DO THAT.

02:06PM  1      LET'S TAKE A BREAK, LADIES AND GENTLEMEN, NOW.

02:06PM  2      WE'LL BE BACK IN ABOUT 25 TO 30 MINUTES.

02:06PM  3      (RECESS FROM 2:06 P.M. UNTIL 2:40 P.M.)

02:40PM  4          THE COURT:  WE'RE BACK ON THE RECORD.

02:40PM  5      THE JURY IS PRESENT.

02:40PM  6      ALL COUNSEL ARE PRESENT.

02:40PM  7      MS. WALSH.

02:40PM  8          MS. WALSH:  YES.  THANK YOU.

02:40PM  9  Q.  OKAY.  WELCOME BACK, MR. EDLIN.

02:40PM 10  A.  THANK YOU.

02:40PM 11  Q.  ALL RIGHT.  SO I WANT TO TURN NOW TO SOME DEMOS THAT YOU

02:40PM 12  COORDINATED IN CONNECTION WITH WALGREENS EXECUTIVES COMING IN

02:41PM 13  TO THERANOS IN THE SUMMER OF 2013.  OKAY?

02:41PM 14  A.  OKAY.

02:41PM 15  Q.  BEFORE THOSE EXECUTIVES CAME IN -- I THINK IT WAS

02:41PM 16  AUGUST 2013; RIGHT?

02:41PM 17  A.  YES.

02:41PM 18  Q.  OKAY.  AND THAT WAS A MONTH BEFORE THE WALGREENS ROLLOUT;

02:41PM 19  RIGHT?

02:41PM 20  A.  YES.

02:41PM 21  Q.  APPROXIMATELY?

02:41PM 22  A.  YES.

02:41PM 23  Q.  OKAY.  BEFORE WALGREENS EXECUTIVES CAME IN FOR THOSE DEMOS

02:41PM 24  IN AUGUST 2013, WALGREENS WAS ALREADY IN POSSESSION OF A

02:41PM 25  THERANOS DEVICE, WASN'T IT?

EDLIN CROSS BY MS. WALSH

02:41PM 1    A.   I RECALL THAT THEY DID HAVE A DEVICE AT ONE TIME, BUT I'M

02:41PM 2    NOT SURE ABOUT THE TIMING.

02:41PM 3    Q.   OKAY.  SO IF YOU COULD TURN IN YOUR BINDER TO 20550.

02:42PM 4    A.   OKAY.

02:42PM 5    Q.   OKAY.  AND THIS IS AN EMAIL CHAIN BETWEEN YOU AND

02:42PM 6    MR. BALWANI AND TIM KEMP.

02:42PM 7        DO YOU SEE THAT?

02:42PM 8    A.   YES.

02:42PM 9    Q.   AND WHO IS TIM KEMP?

02:42PM 10   A.   TIM KEMP, I BELIEVE HE WAS A FELLOW AT THERANOS.

02:43PM 11   Q.   OKAY.  AND TONY NUGENT WAS ON THIS CHAIN.

02:43PM 12       DO YOU SEE THAT?

02:43PM 13   A.   YES.

02:43PM 14   Q.   AND WHO WAS TONY NUGENT?

02:43PM 15   A.   HE WORKED ON THE DEVICE HARDWARE.

02:43PM 16   Q.   OKAY.  AND THERE'S A PERSON NAMED SUKHDEV BAINIWAL.

02:43PM 17       DO YOU SEE THAT?

02:43PM 18   A.   YES.

02:43PM 19   Q.   WHO WAS THAT PERSON?

02:43PM 20   A.   HE WORKED ON THE SOFTWARE TEAM.

02:43PM 21   Q.   OKAY.  AND WAS IT PART OF YOUR JOB TO ANSWER QUESTIONS

02:43PM 22   FROM DIFFERENT TEAMS REGARDING THERANOS DEVICES AND LOGISTICS

02:43PM 23   OF DEVICES, WAS THAT PART OF YOUR JOB TO ANSWER THOSE

02:43PM 24   QUESTIONS?

02:43PM 25   A.   TO ANSWER QUESTIONS FROM WHICH TEAMS?

02:43PM  1    Q.   THE HARDWARE TEAMS?

02:43PM  2    A.   I'M NOT SURE IF I WOULD CHARACTERIZE IT AS ANSWERING

02:43PM  3    QUESTIONS FROM THEM.

02:43PM  4    Q.   OKAY.  THIS EMAIL, THOUGH, IS ABOUT HARDWARE DEVICES;

02:44PM  5    RIGHT?

02:44PM  6    A.   I'M JUST TAKING A LOOK.

02:44PM  7    Q.   SURE.

02:44PM  8         (PAUSE IN PROCEEDINGS.)

02:44PM  9              THE WITNESS:  I THINK THIS REFERS TO THE LOCATIONS

02:44PM 10    OF DEVICES THAT WERE EITHER IN USE OR SENT OUTSIDE OF THE

02:44PM 11    COMPANY --

02:44PM 12    BY MS. WALSH:

02:44PM 13    Q.   OKAY.

02:44PM 14    A.   -- TO VARIOUS LOCATIONS.

02:44PM 15    Q.   AND CORRESPONDING IN THIS EMAIL CHAIN, WERE YOU TRYING TO

02:44PM 16    BE AS ACCURATE AS YOU COULD BE?

02:44PM 17    A.   YES.

02:44PM 18    Q.   AND, AGAIN, EMAILS LIKE THIS WERE USED DURING THE COURSE

02:44PM 19    OF THERANOS'S BUSINESS; CORRECT?

02:44PM 20    A.   YES.

02:44PM 21    Q.   AND THOSE EMAILS WERE PRESERVED; RIGHT?

02:44PM 22    A.   YES.

02:44PM 23              MS. WALSH:  YOUR HONOR, WE OFFER 20550.

02:45PM 24              MR. BOSTIC:  NO OBJECTION.

02:45PM 25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:45PM  1          (DEFENDANT'S EXHIBIT 20550 WAS RECEIVED IN EVIDENCE.)

02:45PM  2     BY MS. WALSH:

02:45PM  3     Q.   OKAY.  LET'S TURN TO PAGE 4 ON THAT EXHIBIT AND THE BOTTOM

02:45PM  4     EMAIL FROM MR. NUGENT.

02:45PM  5          DO YOU SEE THAT?

02:45PM  6     A.   YES.

02:45PM  7     Q.   AND THAT'S TO MR. BALWANI; RIGHT?

02:45PM  8     A.   YES.

02:45PM  9     Q.   AND THE DATE IS JULY 10TH, 2013; RIGHT?

02:45PM  10    A.   YES.

02:45PM  11    Q.   AND THE SUBJECT IS SUMMARY OF HISTORICAL EDISON NUMBERS SO

02:45PM  12    WE HAVE A FIXED POINT OF REFERENCE ON NUMBERS GOING FORWARD.

02:45PM  13         DO YOU SEE THAT?

02:45PM  14    A.   YES.

02:45PM  15    Q.   AND THEN MR. NUGENT LISTS "NUMBERS OF 3.0/3.05 EDISONS."

02:45PM  16         DO YOU SEE THAT?

02:45PM  17    A.   YES.

02:45PM  18    Q.   AND THOSE VERSIONS OF THE DEVICE WERE OLDER VERSIONS, WERE

02:46PM  19    THEY NOT?

02:46PM  20    A.   THEY WERE.

02:46PM  21    Q.   AND THEN THE THIRD HEADING DOWN SAYS, "FROM PHYSICAL COUNT

02:46PM  22    NEWARK AND 1601, 9-JULY-2013 AND ESTIMATE OF UNITS OUTSIDE";

02:46PM  23    RIGHT?

02:46PM  24    A.   YES.

02:46PM  25    Q.   AND THEN THE BOTTOM SAYS, "ESTIMATED NUMBER OF 3.0/3.05

02:46PM 1    DEPLOYED EXTERNALLY."

02:46PM 2         DO YOU SEE THAT?

02:46PM 3    A.   YES.

02:46PM 4    Q.   AND THEN IN THE BOTTOM EMAIL MR. BALWANI ASKS TIM KEMP,

02:46PM 5    "TIM,

02:46PM 6         "CAN YOU LOOK AT THE LOG FILES AND ACCOUNT FOR THE

02:46PM 7    25 UNITS HIGHLIGHTED THAT WE THINK ARE EXTERNAL.  1 OF THESE IS

02:46PM 8    AT WALGREENS AND AM CC'ING CHRISTIAN HERE SO WE CAN BRING THAT

02:46PM 9    IN.  DAN MAY KNOW MORE IN FIELD AT ABA ET CETERA."

02:47PM 10        DO YOU SEE THAT?

02:47PM 11   A.   YES.

02:47PM 12   Q.   AND YOU WERE THE DAN IN THAT EMAIL; RIGHT?

02:47PM 13   A.   YES.

02:47PM 14   Q.   AND WHAT IS FOR THE ABA?

02:47PM 15   A.   IT'S FOR THE AMERICAN BURN ASSOCIATION, AND THERANOS HAD

02:47PM 16   PARTNERED WITH THEM ON THE BURN STUDY THAT I HAD REFERENCED

02:47PM 17   EARLIER IN MY TESTIMONY.

02:47PM 18   Q.   RIGHT.  AND WE'LL LOOK AT SOME EMAILS REGARDING THAT.

02:47PM 19        BUT THAT WAS A STUDY WHERE THERANOS DEVICES WERE SENT TO A

02:47PM 20   NUMBER OF DIFFERENT HOSPITALS AROUND THE COUNTRY; RIGHT?

02:47PM 21   A.   RIGHT.

02:47PM 22   Q.   AND THOSE DEVICES WERE USED IN THOSE HOSPITALS; CORRECT?

02:47PM 23   A.   YES.

02:47PM 24   Q.   FOR THE PURPOSES OF THE STUDY; RIGHT?

02:47PM 25   A.   YES.

02:47PM  1    Q.  MOVING UP THE PAGE FROM PAGE 2 FROM TIM KEMP TO

02:47PM  2    MR. BALWANI COPYING YOU.

02:47PM  3        MR. KEMP SAYS ON THE FIRST LINE, "READER E000347 IS STILL

02:47PM  4    REGISTERED AS BEING AT WALGREENS."

02:48PM  5        DO YOU SEE THAT?

02:48PM  6    A.  YES.

02:48PM  7    Q.  OKAY.  AND THE READER IS ANOTHER WORD FOR THE DEVICE

02:48PM  8    ITSELF; RIGHT?

02:48PM  9    A.  YES.

02:48PM  10   Q.  SO THAT'S REFERRING TO THE EDISON; RIGHT?

02:48PM  11   A.  YES.

02:48PM  12   Q.  AND AS YOU JUST TESTIFIED TO, IT'S AN OLDER VERSION OF THE

02:48PM  13   EDISON; CORRECT?

02:48PM  14   A.  YES.

02:48PM  15   Q.  OKAY.  AND MR. KEMP IS SAYING IT'S STILL REGISTERED AS

02:48PM  16   BEING IN WALGREENS.

02:48PM  17       DO YOU SEE THAT?

02:48PM  18   A.  YES.

02:48PM  19   Q.  OKAY.  WE CAN TAKE THAT DOWN.

02:48PM  20       AND SO WALGREENS HAD A THERANOS DEVICE ALREADY IN ITS

02:48PM  21   POSSESSION BY AUGUST 2013; CORRECT?

02:48PM  22   A.  ACCORDING TO THAT LAST EMAIL THAT WE REVIEWED, YES.

02:48PM  23   Q.  RIGHT.

02:48PM  24   A.  YES.

02:48PM  25   Q.  RIGHT.  AND IT HAD AN OLDER VERSION OF THE DEVICE; RIGHT?

02:48PM  1    A.   YES.

02:48PM  2    Q.   OKAY.  AND THEN IT COMES TIME THAT WALGREENS EXECUTIVES

02:49PM  3    COME INTO THERANOS IN 2013; RIGHT?

02:49PM  4    A.   YES.

02:49PM  5    Q.   AND THEY COME THERE FOR A DEMO; RIGHT?

02:49PM  6    A.   YES.

02:49PM  7    Q.   OKAY.  SO LET'S LOOK AT EXHIBIT 959, WHICH IS IN EVIDENCE.

02:49PM  8         THAT IS GOING TO COME UP ON YOUR SCREEN WHEN WE PUBLISH

02:49PM  9    IT, MR. EDLIN.

02:49PM  10   A.   OKAY.  I SEE IT.

02:49PM  11   Q.   OKAY.  AND IF WE TURN TO PAGE 2 AND LOOK AT THE SUBJECT

02:50PM  12   LINE, DEMO ON 8/13.

02:50PM  13        DO YOU SEE THAT?

02:50PM  14   A.   YES.

02:50PM  15   Q.   AND THAT'S THE WALGREENS DEMO; RIGHT?

02:50PM  16   A.   YES.

02:50PM  17   Q.   AND THE SUBJECT LINE SAYS 4S AND MINILAB.

02:50PM  18        DO YOU SEE THAT?

02:50PM  19   A.   YES.

02:50PM  20   Q.   AND SO THE WALGREENS DEMO INVOLVED NEXT GENERATION DEVICES

02:50PM  21   IN AUGUST OF 2013; RIGHT?

02:50PM  22   A.   YES.

02:50PM  23   Q.   THE 4S AND THE MINILAB WERE NEXT GENERATION; CORRECT?

02:50PM  24   A.   CORRECT.

02:50PM  25   Q.   OKAY.  AND AS FAR AS YOU'RE AWARE -- WE TALKED ABOUT THIS

EDLIN CROSS BY MS. WALSH

02:50PM 1    CENTRAL LAB MODEL -- AS FAR AS YOU'RE AWARE, THE 4S AND THE

02:50PM 2    MINILAB, AT THIS POINT IN TIME IN AUGUST OF 2013, WERE NOT

02:50PM 3    GOING TO BE PLACED IN WALGREENS; RIGHT?

02:50PM 4    A.   CAN YOU JUST REPEAT THE FIRST PART OF THAT QUESTION?

02:50PM 5    Q.   SURE.

02:50PM 6         IN AUGUST OF 2013 WHEN WALGREENS IS COMING IN FOR THAT

02:50PM 7    DEMO --

02:50PM 8    A.   RIGHT.

02:50PM 9    Q.   -- AS FAR AS YOU'RE AWARE, THE NEXT GENERATION DEVICES,

02:51PM 10   THE 4S AND THE MINILAB, ARE NOT GOING TO BE PLACED INSIDE

02:51PM 11   WALGREENS; IS THAT CORRECT?

02:51PM 12   A.   ARE YOU ASKING ME IF THEY WERE GOING TO BE PLACED THERE AT

02:51PM 13   SOME POINT IN THE FUTURE, OR AT THAT PERIOD OF TIME?

02:51PM 14   Q.   AT THAT PERIOD OF TIME?

02:51PM 15   A.   NO.  THE COMPANY WAS PREPARING FOR THE CENTRALIZED LAB

02:51PM 16   MODEL.

02:51PM 17   Q.   OKAY.  IF YOU COULD TURN TO 966A IN YOUR BINDER.

02:52PM 18        DO YOU SEE THAT?

02:52PM 19   A.   YES.

02:52PM 20   Q.   966A IS AN EMAIL THAT WE HAVE ALREADY SEEN THAT IS IN

02:52PM 21   EVIDENCE AS 966, AND 966A HAS ONE OF THE LAB REPORTS ATTACHED,

02:52PM 22   WHICH HAS BEEN REDACTED FOR ALL OF THE PERSONAL INFORMATION.

02:52PM 23        DO YOU SEE THAT?

02:52PM 24   A.   YES.

02:52PM 25   Q.   OKAY.

02:52PM 1          YOUR HONOR, WE OFFER 966A?

02:52PM 2                  MR. BOSTIC:  APOLOGIES.  I DON'T THINK I HAVE A COPY

02:52PM 3      OF THIS IN MY BINDER.

02:53PM 4          (DISCUSSION OFF THE RECORD.)

02:53PM 5                  MR. BOSTIC:  NO OBJECTION, YOUR HONOR.

02:53PM 6                  THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:53PM 7          (GOVERNMENT'S EXHIBIT 966A, AND REDACTED ATTACHMENT, WAS

02:53PM 8      RECEIVED IN EVIDENCE.)

02:53PM 9      BY MS. WALSH:

02:53PM 10     Q.   OKAY.  AND LET'S JUST GO TO THE SECOND PAGE OF THAT

02:53PM 11     EXHIBIT.  IT'S PAGE 3 OF THE EXHIBIT.

02:53PM 12         AND THIS WAS THE LAB REPORT THAT WAS ATTACHED AS A RESULT

02:53PM 13     OF THE DEMO; CORRECT?

02:53PM 14     A.   CORRECT.

02:53PM 15     Q.   AND IF YOU LOOK AT THE TOP OF THAT REPORT, IT SAYS,

02:53PM 16     THERANOS TEST REPORT TECHNOLOGY DEMONSTRATION; RIGHT?

02:53PM 17     A.   YES.

02:53PM 18     Q.   AND THEN FURTHER DOWN IN THE FIRST BOX IT SAYS IN QUOTES

02:53PM 19     "TECHNOLOGY DEMONSTRATION"; RIGHT?

02:53PM 20     A.   YES.

02:53PM 21     Q.   AND IT SAYS THAT AGAIN IN THE SECOND BOX; RIGHT?

02:53PM 22     A.   YES.

02:53PM 23     Q.   AND THEN A THIRD TIME ALSO IN THE SECOND BOX?

02:53PM 24         DO YOU SEE THAT?

02:53PM 25     A.   YES.

02:53PM  1      Q.   OKAY.  WE CAN TAKE THAT DOWN.

02:54PM  2           AND SO THE GOVERNMENT SHOWED YOU 966, EXHIBIT 966 LAST

02:54PM  3      WEEK, AND THAT'S WHERE DR. YOUNG WAS MAKING DECISIONS ABOUT

02:54PM  4      WHAT TESTS TO INCLUDE, WHAT RESULTS TO INCLUDE, AND WHAT NOT TO

02:54PM  5      INCLUDE; IS THAT RIGHT?

02:54PM  6      A.   RIGHT.

02:54PM  7      Q.   OKAY.  AND AGAIN, YOU RELIED COMPLETELY ON HIM TO MAKE

02:54PM  8      THOSE DECISIONS; RIGHT?

02:54PM  9      A.   YES.

02:54PM 10      Q.   AND THAT WAS BASED ON HIS SCIENTIFIC EXPERTISE; RIGHT?

02:54PM 11      A.   YES.

02:54PM 12      Q.   AND ANY LITERATURE THAT HE MAY HAVE CONSULTED; RIGHT?

02:54PM 13      A.   YES.

02:54PM 14      Q.   AND WE SAW IN THE EXAMPLE OF THE NEW YORK HOSPITAL, HE DID

02:54PM 15      CONSULT WITH THE LITERATURE; RIGHT?

02:54PM 16      A.   YES.

02:54PM 17      Q.   OKAY.  OKAY.  MR. EDLIN, IF YOU CAN TURN IN YOUR BINDER TO

02:55PM 18      EXHIBIT 20536.

02:55PM 19      A.   OKAY.

02:55PM 20      Q.   DO YOU SEE THAT EMAIL?

02:55PM 21      A.   YES.

02:55PM 22      Q.   AND THAT'S AN EMAIL FROM YOU TO A GROUP OF PEOPLE WITHIN

02:55PM 23      THERANOS; RIGHT?

02:55PM 24      A.   YES.

02:55PM 25      Q.   MR. BALWANI IS ON THE EMAIL; CORRECT?

02:55PM   1    A.   YES.

02:55PM   2    Q.   AND THE DAY OF THE EMAIL IS NOVEMBER 14TH, 2013; RIGHT?

02:55PM   3    A.   YES.

02:55PM   4    Q.   AND THE SUBJECT LINE IS WAG SPECIMENS TONIGHT.

02:56PM   5         DO YOU SEE THAT?

02:56PM   6    A.   YES.

02:56PM   7    Q.   AND WAG REFERS TO WALGREENS; IS THAT CORRECT?

02:56PM   8    A.   CORRECT.

02:56PM   9    Q.   OKAY.  AND SO THIS IS AFTER THE RETAIL LAUNCH; RIGHT?

02:56PM  10    A.   RIGHT.

02:56PM  11    Q.   AND I THINK YOU TESTIFIED LAST WEEK THAT THE FIRST TIME

02:56PM  12    THAT YOU LEARNED THAT BLOOD SAMPLES WERE BEING RUN ON

02:56PM  13    COMMERCIAL DEVICES WAS MUCH LATER THAN 2013.

02:56PM  14         DO YOU REMEMBER THAT?

02:56PM  15    A.   THAT FINGERSTICK SAMPLES WERE, RIGHT.

02:56PM  16    Q.   OKAY.  AND YOU LEARNED THAT MUCH LATER?

02:56PM  17         THAT'S WHAT YOU TESTIFIED TO?

02:56PM  18    A.   RIGHT.

02:56PM  19    Q.   OKAY.  TAKE A LOOK AT THIS EMAIL.

02:56PM  20         AND AGAIN, MR. EDLIN, I REALIZE THAT IT'S BEEN ALMOST TEN

02:56PM  21    YEARS SINCE YOU WORKED AT THERANOS, BUT TAKE A LOOK AT THIS

02:56PM  22    EMAIL.

02:56PM  23         IS THIS EMAIL CORRESPONDENCE IN CONNECTION WITH SOME

02:56PM  24    WALGREENS SPECIMENS THAT WERE COMING INTO THERANOS?

02:56PM  25    A.   RIGHT.

02:56PM  1    Q.   OKAY.  AND IN THE MIDDLE PART OF THE EMAIL IT REFERS TO A

02:57PM  2    DEMO PATIENT.

02:57PM  3         DO YOU SEE THAT?

02:57PM  4         IT'S THE BOTTOM EMAIL, ONE, TWO -- THREE PARAGRAPHS DOWN.

02:57PM  5         DO YOU SEE THAT?

02:57PM  6    A.   YES.

02:57PM  7    Q.   OKAY.

02:57PM  8         YOUR HONOR, WE OFFER 20536.

02:57PM  9              MR. BOSTIC:  NO OBJECTION.

02:57PM 10              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:57PM 11         (DEFENDANT'S EXHIBIT 20536 WAS RECEIVED IN EVIDENCE.)

02:57PM 12    BY MS. WALSH:

02:57PM 13    Q.   SO IF WE TAKE A LOOK AT THE BOTTOM EMAIL, MR. EDLIN, THIS

02:57PM 14    IS FROM MAX FOSQUE.

02:57PM 15         DO YOU SEE THAT?

02:57PM 16    A.   YES.

02:57PM 17    Q.   AND WHO WAS MAX FOSQUE?

02:57PM 18    A.   HE WAS A PRODUCT MANAGER.

02:57PM 19    Q.   OKAY.  AND AS YOU SAID, THE DATE IS NOVEMBER 13TH, 2013;

02:57PM 20    RIGHT?

02:57PM 21    A.   YES.

02:57PM 22    Q.   AND IT'S ABOUT WALGREENS SPECIMENS COMING IN; RIGHT?

02:57PM 23    A.   YES.

02:57PM 24    Q.   AND THE OTHER PEOPLE ON THE EMAIL ARE DR. YOUNG; RIGHT?

02:57PM 25    A.   YES.

02:57PM 1    Q.   THE PRODUCT MANAGEMENT TEAM; CORRECT?

02:57PM 2    A.   YES.

02:57PM 3    Q.   MR. BALWANI; RIGHT?

02:58PM 4    A.   YES.

02:58PM 5    Q.   AND NORMANDY.

02:58PM 6         DO YOU SEE THAT?

02:58PM 7    A.   YES.

02:58PM 8    Q.   WHAT WAS THE NORMANDY EMAIL GROUP?

02:58PM 9    A.   NORMANDY REFERRED TO A LAB, BUT I'M NOT EXACTLY SURE WHO

02:58PM 10   WAS WITHIN THAT DISTRIBUTION LIST.

02:58PM 11   Q.   OKAY.  AND WHAT THE EMAIL SAYS IS, "THE FIRST SET OF LIVE

02:58PM 12   SPECIMENS FROM PHOENIX HAVE BEEN DROPPED AT THE AIRPORT AND

02:58PM 13   WILL BE ARRIVING AT 1601 AROUND 8:30 P.M.  THESE INCLUDE CTN'S

02:58PM 14   AND VACUTAINERS."

02:58PM 15        DO YOU SEE THAT?

02:58PM 16   A.   YES.

02:58PM 17   Q.   OKAY.  AND WERE YOU AWARE THAT WALGREENS DEMOS -- THERE

02:58PM 18   WAS A SET OF WALGREENS DEMOS THAT OCCURRED IN NOVEMBER OF 2013

02:58PM 19   IN PHOENIX.

02:58PM 20        DO YOU RECALL THAT?

02:58PM 21   A.   NO.

02:58PM 22   Q.   OKAY.  AND DIRECTING YOUR ATTENTION TO CTN'S AND

02:58PM 23   VACUTAINERS.

02:59PM 24        THE CTN'S WERE THE THINGS USED FOR FINGERSTICK TESTING;

02:59PM 25   RIGHT?

02:59PM   1      A.   RIGHT.

02:59PM   2      Q.   YOU EXPLAINED TO US HOW THAT WORKED; RIGHT?

02:59PM   3      A.   RIGHT.

02:59PM   4      Q.   AND VACUTAINER IS REFERRED TO VENOUS DRAWS; CORRECT?

02:59PM   5      A.   RIGHT.

02:59PM   6      Q.   OKAY.  THE EMAIL CONTINUES.  "ALL PATIENT AND PHYSICIAN

02:59PM   7      INFORMATION EXISTS IN LIS.  FOR PATIENTS THAT HAD CTN'S

02:59PM   8      COLLECTED, PLEASE ENTER ALL RESULTS IN LIS."

02:59PM   9           THAT'S THE LABORATORY INFORMATION SYSTEM; RIGHT?

02:59PM  10      A.   RIGHT.

02:59PM  11      Q.   "AND GENERATE THE REPORT FROM LIS.  FOR PATIENTS THAT HAD

02:59PM  12      VACUTAINERS COLLECTED, PLEASE PROCESS THESE ON CLUNKERS."

02:59PM  13           DO YOU SEE THAT?

02:59PM  14      A.   YES.

02:59PM  15      Q.   AND CLUNKERS REFERRED TO COMMERCIAL MACHINES; RIGHT?

02:59PM  16      A.   I DON'T KNOW SPECIFICALLY.

02:59PM  17      Q.   OKAY.  YOU KNOW, THOUGH, THAT VENOUS DRAWS WERE PROCESSED

02:59PM  18      ON COMMERCIAL MACHINES; CORRECT?

02:59PM  19      A.   CORRECT.

02:59PM  20      Q.   OKAY.  SO THIS EMAIL IS -- THIS EMAIL LAYS OUT SAMPLES

03:00PM  21      COMING IN FROM WALGREENS; RIGHT?

03:00PM  22      A.   RIGHT.

03:00PM  23      Q.   THEY'RE BOTH ON FINGERSTICK AND VENOUS DRAWS; RIGHT?

03:00PM  24      A.   RIGHT.

03:00PM  25      Q.   AND THEY'RE GOING TO BE PROCESSED ON WHAT ARE CALLED

03:00PM   1    CLUNKERS; RIGHT?

03:00PM   2    A.   THIS IS WHAT MAX IS ASKING ABOUT.  INDEPENDENT OF THIS

03:00PM   3    INSTRUCTION, I DIDN'T HAVE THE KNOWLEDGE OF HOW THE TESTS WERE

03:00PM   4    RUN.

03:00PM   5    Q.   SURE.  UNDERSTOOD.

03:00PM   6         BUT YOU ARE ON THIS EMAIL ABOUT VENOUS DRAWS BEING

03:00PM   7    PROCESSED IN THE LAB; CORRECT?

03:00PM   8    A.   YES.

03:00PM   9    Q.   AND IT WAS YOUR UNDERSTANDING THAT VENOUS DRAWS WERE

03:00PM   10   PROCESSED IN COMMERCIAL MACHINES; CORRECT?

03:00PM   11   A.   RIGHT.

03:00PM   12   Q.   OKAY.  WE CAN TAKE THAT DOWN.

03:00PM   13        OKAY.  MR. EDLIN, IF YOU COULD GO TO 20173 IN YOUR BINDER.

03:01PM   14        DO YOU SEE THAT?

03:01PM   15   A.   YES.

03:01PM   16   Q.   AND IS THAT AN EMAIL FROM MR. BALWANI TO YOU AND OTHERS

03:01PM   17   WHO WORKED ON DEMOS?

03:01PM   18   A.   YES.

03:01PM   19   Q.   AND THE DATE OF THIS EMAIL IS JANUARY 7TH, 2014?

03:01PM   20   A.   YES.

03:01PM   21   Q.   AND IT'S ABOUT A DEMO ON FRIDAY; IS THAT RIGHT?

03:01PM   22   A.   YES.

03:01PM   23        MS. WALSH:  YOUR HONOR, WE OFFER 20173.

03:01PM   24        MR. BOSTIC:  NO OBJECTION.

03:01PM   25        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

EDLIN CROSS BY MS. WALSH

03:02PM   1          (DEFENDANT'S EXHIBIT 20173 WAS RECEIVED IN EVIDENCE.)

03:02PM   2     BY MS. WALSH:

03:02PM   3     Q.   OKAY.  MR. EDLIN, WERE YOU AWARE OF -- READING THIS EMAIL,

03:02PM   4     WERE YOU AWARE OF AN INVESTOR COMING IN IN JANUARY 2014 FOR A

03:02PM   5     DEMO?

03:02PM   6     A.   I DON'T REMEMBER WHO THIS WAS ASSOCIATED WITH.

03:02PM   7     Q.   OKAY.  AND LET'S JUST HIGHLIGHT THE TEXT, THE FIRST

03:02PM   8     PARAGRAPH OF THIS EXHIBIT.

03:02PM   9          MR. BALWANI SAYS, "WE HAVE A VERY IMPORTANT DEMO THIS

03:02PM   10    FRIDAY BETWEEN 9:00 TO 1:00.  I WOULD LIKE TO DEMO ENTIRE END

03:02PM   11    TO END PROCESS FROM COLLECTING SAMPLE TO RUNNING IT ON DEVICES

03:02PM   12    AND SHOWING RESULTS ON .ME IPHONE AND ANDROID."

03:02PM   13         DO YOU SEE THAT?

03:02PM   14    A.   YES.

03:03PM   15    Q.   AND HE WANTS TO HAVE TWO PHONES READY FOR THE DEMO AS

03:03PM   16    WELL; RIGHT?

03:03PM   17    A.   YES.

03:03PM   18    Q.   AND WHAT IS THE .ME THAT IS BEING REFERRED TO THERE?

03:03PM   19    A.   I BELIEVE THAT REFERRED TO THE THERANOS APP FOR AN IPHONE

03:03PM   20    WHERE A PATIENT COULD SEE THE RESULTS.

03:03PM   21    Q.   OKAY.  AND ANY OTHER INFORMATION THAT COULD BE ACCESSED

03:03PM   22    THROUGH THAT APP?

03:03PM   23    A.   I RECALL THERE WAS CERTAIN BACKGROUND INFORMATION FOR EACH

03:03PM   24    TEST AND WHAT THE RESULT MEANT AND THE RESULT ALONG WITH THE

03:03PM   25    REFERENCE RANGE.  I BELIEVE YOU COULD FIND A WALGREENS

03:03PM  1    LOCATION, A WELLNESS CENTER LOCATION, AND THAT IS WHAT IS

03:03PM  2    COMING TO MIND RIGHT NOW.

03:03PM  3    Q.   OKAY.  AND IT WAS MR. BALWANI'S SOFTWARE TEAM WHO

03:03PM  4    DEVELOPED THAT SOFTWARE FOR THOSE APPS; CORRECT?

03:03PM  5    A.   CORRECT.

03:03PM  6    Q.   OKAY.  IF YOU COULD TURN TO 20175 IN YOUR BINDER,

03:04PM  7    MR. EDLIN.

03:04PM  8    A.   OKAY.

03:04PM  9    Q.   TAKE A LOOK AT THAT EMAIL, AND IT HAS AN ATTACHMENT.

03:04PM 10         DO YOU SEE THAT?

03:04PM 11    A.   YES.

03:04PM 12    Q.   OKAY.  AND IS THIS AN EMAIL CHAIN ABOUT A DEMO REPORT?

03:04PM 13    A.   YES.

03:04PM 14    Q.   OKAY.

03:04PM 15         WE OFFER 20175, INCLUDING THE ATTACHMENT WHICH SHOULD BE

03:04PM 16    REDACTED FOR THE PERSONAL INFORMATION.

03:04PM 17              MR. BOSTIC:  NO OBJECTION.

03:04PM 18    BY MS. WALSH:

03:04PM 19    Q.   OKAY.  SO LET'S PUBLISH --

03:04PM 20              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:05PM 21         (DEFENDANT'S EXHIBIT 20175 WAS RECEIVED IN EVIDENCE.)

03:05PM 22    BY MS. WALSH:

03:05PM 23    Q.   LET'S LOOK AT THE EMAIL.

03:05PM 24         OKAY.  LET'S LOOK AT THE BOTTOM EMAIL, AND MAX FOSQUE IS

03:05PM 25    SAYING TO YOU AND DR. YOUNG, "DANIEL Y," MEANING DR. YOUNG, "IF

EDLIN CROSS BY MS. WALSH

03:05PM  1    YOU WOULDN'T MIND QUICKLY REVIEWING THIS REPORT BEFORE ITS SENT

03:05PM  2    THAT WOULD BE GREAT."

03:05PM  3         DO YOU SEE THAT?

03:05PM  4    A.   YES.

03:05PM  5    Q.   AND THEN DR. YOUNG EMAILS BACK SAYING, "THE RESULTS LOOK

03:05PM  6    FINE."

03:05PM  7         DO YOU SEE THAT?

03:05PM  8    A.   YES.

03:05PM  9    Q.   AND THEN YOU ATTACH THE FINAL REPORT; RIGHT?

03:05PM 10    A.   YES.

03:05PM 11    Q.   OKAY.  AND THESE ARE THE RESULTS FROM THE DEMONSTRATION

03:05PM 12    THAT WE JUST SAW THAT YOU WERE SETTING UP FOR ON JANUARY 7TH;

03:05PM 13    RIGHT?

03:05PM 14    A.   CORRECT.

03:05PM 15    Q.   AND THAT IS EXHIBIT 20173; RIGHT?

03:06PM 16    A.   CORRECT.

03:06PM 17    Q.   AND THE NAME ON THE ATTACHMENT, THE NAME ON THE REPORT?

03:06PM 18         DO YOU SEE THAT NAME?

03:06PM 19    A.   YES.

03:06PM 20    Q.   DO YOU RECOGNIZE THAT NAME?

03:06PM 21    A.   I DON'T.

03:06PM 22    Q.   OKAY.  YOU DON'T ASSOCIATE VIVEK KHANNA WITH ANY

03:06PM 23    PARTICULAR GUEST THAT CAME IN?

03:06PM 24    A.   NOT AS I SIT HERE TODAY.

03:06PM 25    Q.   OKAY.  NOW WE'RE GOING TO SWITCH GEARS AND TALK ABOUT

03:06PM  1    THERANOS'S RELATIONSHIP WITH CHIAT/DAY.

03:06PM  2         DO YOU REMEMBER THAT?

03:06PM  3    A.   YES.

03:06PM  4    Q.   AND YOU TESTIFIED ABOUT THE RELATIONSHIP MOSTLY IN THE

03:06PM  5    PERIOD 2013.

03:06PM  6         DO YOU REMEMBER THAT?

03:06PM  7    A.   YOU'RE ASKING IF THE TESTIMONY REFERRED TO INFORMATION IN

03:07PM  8    2013.

03:07PM  9    Q.   THAT'S RIGHT.

03:07PM  10   A.   YES.

03:07PM  11   Q.   AND SO THE GOVERNMENT ASKED YOU QUESTIONS ABOUT THE

03:07PM  12   RELATIONSHIP IN 2013; IS THAT RIGHT?

03:07PM  13   A.   YES.

03:07PM  14   Q.   OKAY.  BUT THE RELATIONSHIP WITH CHIAT/DAY ACTUALLY BEGAN

03:07PM  15   IN 2012.

03:07PM  16        IS THAT YOUR RECOLLECTION?

03:07PM  17   A.   I DON'T REMEMBER THE SPECIFIC DATE, BUT THAT SOUNDS

03:07PM  18   REASONABLE.  THERE WAS A RELATIONSHIP, YOU KNOW, BEFORE THE

03:07PM  19   WALGREENS LAUNCH.

03:07PM  20   Q.   OKAY.  SO IF YOU COULD TURN TO 20547.

03:07PM  21        DO YOU SEE THAT?

03:07PM  22   A.   YES.

03:07PM  23   Q.   AND IS THAT AN EMAIL FROM SOMEONE FROM CHIAT/DAY TO YOU

03:07PM  24   AND MR. BALWANI AND OTHERS AT THERANOS AND CHIAT/DAY?

03:08PM  25   A.   YES.

03:08PM   1    Q.   OKAY.  AND THE DATE OF THAT EMAIL IS NOVEMBER 9TH, 2012.

03:08PM   2         DO YOU SEE THAT?

03:08PM   3    A.   YES.

03:08PM   4    Q.   OKAY.  AND IS THIS RELATED TO THE THERANOS CHIAT/DAY

03:08PM   5    RELATIONSHIP?

03:08PM   6    A.   I BELIEVE SO.

03:08PM   7              MS. WALSH:  YOUR HONOR, WE OFFER 20547.

03:08PM   8              MR. BOSTIC:  NO OBJECTION.

03:08PM   9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:08PM   10        (DEFENDANT'S EXHIBIT 20547 WAS RECEIVED IN EVIDENCE.)

03:08PM   11   BY MS. WALSH:

03:08PM   12   Q.   SO LET'S TAKE A LOOK AT THIS EMAIL.  THIS IS AN EMAIL FROM

03:08PM   13   SOMEONE NAMED KRISTEN LATTO WHO IS AN ACCOUNT DIRECTOR AT

03:08PM   14   CHIAT/DAY; RIGHT?

03:08PM   15   A.   YES.

03:08PM   16   Q.   AND THE ATTACHMENTS AND THE EMAIL INDICATES WHAT IS

03:08PM   17   ATTACHED ARE WHITE BOARD NOTES; RIGHT?

03:08PM   18   A.   YES.  RIGHT.

03:08PM   19   Q.   BRAND ARCHETYPES; CORRECT?

03:08PM   20   A.   YES.

03:08PM   21   Q.   AUDIENCE INSIGHT; RIGHT?

03:09PM   22   A.   RIGHT.

03:09PM   23   Q.   AND CONSUMER WORLD; RIGHT?

03:09PM   24   A.   RIGHT.

03:09PM   25   Q.   AND SO THIS IS IN NOVEMBER OF 2012; RIGHT?

03:09PM   1      A.   RIGHT.

03:09PM   2      Q.   AND WHAT THERANOS WAS DOING BACK IN 2012 WAS STARTING TO

03:09PM   3      DEVELOP ITS MARKETING MATERIALS; RIGHT?

03:09PM   4      A.   I BELIEVE SO.

03:09PM   5      Q.   AND THIS WAS ALMOST A YEAR BEFORE THE WALGREENS LAUNCH;

03:09PM   6      RIGHT?

03:09PM   7      A.   YES.

03:09PM   8      Q.   AND IN YOUR INTERACTION WITH CHIAT/DAY, CHIAT/DAY THE

03:09PM   9      MARKETING FIRM, DEVELOPED DIFFERENT SLIDE DECKS FOR DIFFERENT

03:09PM  10      AUDIENCES; IS THAT RIGHT?

03:10PM  11      A.   I DON'T RECALL THE SPECIFICS, BUT THAT SOUNDS FAMILIAR.

03:10PM  12      Q.   OKAY.  LET'S LOOK AT AN EMAIL, AND IT MAY REFRESH YOUR

03:10PM  13      RECOLLECTION.

03:10PM  14           WHY DON'T YOU TURN TO 20548.

03:10PM  15      A.   OKAY.

03:10PM  16      Q.   IS THIS ANOTHER EMAIL THAT YOU ARE ON WITH MR. BALWANI AND

03:10PM  17      OTHERS AT THERANOS AND CHIAT/DAY?

03:10PM  18      A.   YES.

03:10PM  19      Q.   AND WHAT IS ATTACHED IS JUST A SCHEDULE OF DELIVERABLES

03:10PM  20      AND DATES OF COMPLETION.

03:10PM  21           DO YOU SEE THAT?

03:10PM  22      A.   YES.

03:10PM  23              MS. WALSH:  YOUR HONOR, WE OFFER 20548.

03:10PM  24              MR. BOSTIC:  NO OBJECTION IF OFFERED AS A BUSINESS

03:10PM  25      RECORD.

03:10PM  1             MS. WALSH:  IT IS, YOUR HONOR.

03:10PM  2             THE COURT:  IT IS ADMITTED.  IT MAY BE PUBLISHED.

03:10PM  3          (DEFENDANT'S EXHIBIT 20548 WAS RECEIVED IN EVIDENCE.)

03:10PM  4   BY MS. WALSH:

03:10PM  5   Q.   OKAY.  SO LET'S LOOK AT THE BOTTOM EMAIL FROM

03:10PM  6   CHRISTIAN HOLMES.

03:10PM  7        HE SAYS, "STAN,

03:11PM  8        "HOPE YOU'RE DOING WELL.  ATTACHED IS A DASHBOARD OF OUR

03:11PM  9   KEY DELIVERABLES AND ASSOCIATED DATES OF COMPLETION."

03:11PM  10        DO YOU SEE THAT?

03:11PM  11   A.   YES.

03:11PM  12   Q.   AND THEN IF YOU FLIP THE ATTACHMENT, IT GOES THROUGH THE

03:11PM  13   ITEMS AND THE ITEMS CONSIST OF A SERIES OF DIFFERENT SLIDE

03:11PM  14   DECKS; RIGHT?

03:11PM  15   A.   YES.

03:11PM  16   Q.   AND THERE ARE SLIDE DECKS FOR HOSPITAL EXECUTIVES;

03:11PM  17   CORRECT?

03:11PM  18   A.   YES.

03:11PM  19   Q.   AND LARGE PROVIDERS; RIGHT?

03:11PM  20   A.   YES.

03:11PM  21   Q.   PHYSICIANS; RIGHT?

03:11PM  22   A.   YES.

03:11PM  23   Q.   AND THERE'S ONE RELATED TO THE THERANOS LAUNCH; RIGHT?

03:11PM  24   A.   YES.

03:11PM  25   Q.   AND LEAVE BEHIND FOR PATIENTS IN THE DOCTOR'S OFFICE;

EDLIN CROSS BY MS. WALSH

03:11PM 1    RIGHT?

03:11PM 2    A.   YES.

03:11PM 3    Q.   BUT AT THE TIME THAT THESE DECKS WERE BEING DEVELOPED,

03:11PM 4    MR. EDLIN, THERANOS DID NOT HAVE RELATIONSHIPS WITH HOSPITAL

03:11PM 5    EXECUTIVES; RIGHT?

03:11PM 6    A.   I'M NOT SURE I AGREE WITH THAT.

03:12PM 7    Q.   OKAY.   THERANOS HAD NOT ENTERED INTO ANY PARTNERSHIP WITH

03:12PM 8    A HOSPITAL TO PUT THE THERANOS DEVICE IN A HOSPITAL TO RUN

03:12PM 9    BLOOD TESTS?

03:12PM 10   A.   I'M NOT SURE.

03:12PM 11   Q.   OKAY.   HOW ABOUT DOCTOR'S OFFICES?   THERANOS HAD NOT

03:12PM 12   ENTERED INTO PARTNERSHIPS WITH DOCTORS TO PUT THE THERANOS

03:12PM 13   DEVICE IN DOCTOR'S OFFICES YET, HAD IT?

03:12PM 14   A.   I DON'T RECALL THE EXACT DATES.   I HAD -- I RECALL THAT

03:13PM 15   THERE WERE RELATIONSHIPS WITH HOSPITAL SYSTEMS AT ONE POINT.   I

03:13PM 16   THINK THOSE RELATIONSHIPS TOOK A SIMILAR PHASED APPROACH AS I

03:13PM 17   REFERENCED WITH SOME OF THE MILITARY RELATIONSHIPS WHERE

03:13PM 18   THERE'S AN EVALUATION INITIALLY.

03:13PM 19        BUT I DON'T REMEMBER WHEN THOSE WERE SIGNED AND THE EXTENT

03:13PM 20   OF WHERE AT THIS POINT IN TIME THERANOS WAS IN THOSE

03:13PM 21   RELATIONSHIPS.

03:13PM 22   Q.   OKAY.   BUT IN MEETING WITH CHIAT/DAY IN 2012, IS IT FAIR

03:13PM 23   TO SAY THAT THE PURPOSE OF THOSE MEETINGS WAS TO DEVELOP

03:13PM 24   MATERIALS ABOUT WHAT THERANOS -- THE GOALS THAT THERANOS WAS

03:13PM 25   TRYING TO ACHIEVE?

03:13PM   1            IS THAT FAIR?

03:13PM   2    A.   YES.

03:13PM   3    Q.   AND CERTAIN PROGRAMS THAT IT MIGHT ENTER INTO IN THE

03:13PM   4    FUTURE BUT HAD NOT YET NECESSARILY SECURED YET; IS THAT RIGHT?

03:14PM   5    A.   YES.

03:14PM   6    Q.   IT WAS KIND OF WORKSHOPPING ALL OF THE POSSIBLE IDEAS

03:14PM   7    RELATED TO THERANOS'S MISSION; RIGHT?

03:14PM   8    A.   YES.

03:14PM   9    Q.   OKAY.  AND YOU ALSO TESTIFIED ABOUT SENDING SLIDE DECKS TO

03:14PM  10    INVESTORS AND OTHER OUTSIDE PARTIES; RIGHT?

03:14PM  11    A.   RIGHT.

03:14PM  12    Q.   AND SOME OF THE SLIDE DECKS WERE TAILORED TO ONE AUDIENCE,

03:14PM  13    ONE KIND OF AUDIENCE; RIGHT?

03:14PM  14    A.   RIGHT.

03:14PM  15    Q.   OTHERS WERE TAILORED TO OTHERS; RIGHT?

03:14PM  16    A.   RIGHT.

03:15PM  17    Q.   SOME WERE FOR BUSINESS PARTNERS; CORRECT?

03:15PM  18    A.   CORRECT.

03:15PM  19    Q.   OTHERS WERE FOR INVESTORS; RIGHT?

03:15PM  20    A.   CORRECT.

03:15PM  21    Q.   AND MANY, MANY OF THE SLIDES WERE ABOUT THE COMPANY'S

03:15PM  22    INVESTIGATION; IS THAT TRUE?

03:15PM  23            MR. BOSTIC:  OBJECTION.  VAGUE.

03:15PM  24            THE COURT:  DO YOU UNDERSTAND THE QUESTION?

03:15PM  25            THE WITNESS:  CAN YOU DEFINE "MANY"?

03:15PM  1    BY MS. WALSH:

03:15PM  2    Q.   WELL, LET ME PUT IT THIS WAY, THERE WERE SLIDES IN THOSE

03:15PM  3    SLIDE DECKS --

03:15PM  4    A.   RIGHT.

03:15PM  5    Q.   -- THAT RELATED TO THE COMPANY'S MISSION; RIGHT?

03:15PM  6    A.   YES.

03:15PM  7    Q.   AND THE COMPANY'S GOALS TO MAKE HEALTH -- BLOOD TESTING

03:15PM  8    ACCESSIBLE TO EVERYONE; RIGHT?

03:15PM  9    A.   RIGHT.

03:15PM 10    Q.   GOALS ABOUT PRICING; RIGHT?

03:15PM 11    A.   RIGHT.

03:15PM 12    Q.   GOALS ABOUT DIFFERENT USE CASES FOR THERANOS TECHNOLOGY;

03:15PM 13    RIGHT?

03:15PM 14    A.   YES.

03:15PM 15    Q.   OKAY.  AND WHEN IT CAME TO -- WE'RE GOING TO GO FORWARD IN

03:16PM 16    TIME TO AUGUST, SEPTEMBER 2013.  OKAY?

03:16PM 17         WHEN IT CAME TO DEVELOPING THE CONTENT FOR THE WEBSITE,

03:16PM 18    THESE CHIAT/DAY SLIDES SERVED AS THE BASIS FOR SOME OF THAT

03:16PM 19    CONTENT, DIDN'T IT?

03:16PM 20    A.   FOR THE WEBSITE CONTENT?

03:16PM 21    Q.   YEAH.

03:16PM 22    A.   I DON'T SPECIFICALLY RECALL THAT SEQUENCE, BUT I DO RECALL

03:16PM 23    THERE WAS SIMILAR CONTENT ON THE WEBSITE AND IN THESE OTHER

03:16PM 24    PRESENTATIONS.

03:16PM 25    Q.   OKAY.  BUT IT'S FAIR TO SAY THAT REVISING THERANOS'S

03:16PM  1    WEBSITE IN THE SUMMER OF 2013 WAS A HUGE PROJECT FOR THE

03:17PM  2    COMPANY?

03:17PM  3    A.   YES.

03:17PM  4    Q.   IT TOOK A LOT OF WORK; RIGHT?

03:17PM  5    A.   YES.

03:17PM  6    Q.   AND THERANOS HAD A PRETTY PRIMITIVE WEBSITE BEFORE THAT

03:17PM  7    TIME; RIGHT?

03:17PM  8    A.   CORRECT.

03:17PM  9    Q.   AND THERE WE ARE SEVERAL PRODUCT MANAGERS LIKE YOU WHO

03:17PM  10   WERE INVOLVED IN THE CREATION AND REVISION OF THAT WEBSITE

03:17PM  11   CONTENT; RIGHT?

03:17PM  12   A.   I WOULD SAY THAT THERE WERE PRODUCT MANAGERS WHO WERE --

03:17PM  13   WHO WORKED CLOSELY WITH CHIAT/DAY ON THE REVISION OF THE

03:17PM  14   WEBSITE, BUT IT WAS MOSTLY CHIAT THAT CREATED THE CONTENT AND

03:17PM  15   MATERIALS.

03:17PM  16   Q.   OKAY.  AND THEN THE PRODUCT MANAGERS WORKED ON REVISING

03:17PM  17   THOSE MATERIALS FOR THE WEBSITE; IS THAT FAIR?

03:17PM  18   A.   THE PRODUCT MANAGERS, I MEAN MY ROLE WAS NOT INVOLVED WITH

03:18PM  19   REVISING.

03:18PM  20       THE REVISING WAS DONE MORE BETWEEN CHIAT/DAY AND ELIZABETH

03:18PM  21   OR SUNNY WITH REGARD TO THE WORDING.

03:18PM  22       AND MY ROLE WAS TO FACILITATE THOSE COMMUNICATIONS, MAKE

03:18PM  23   SURE THAT THE PROJECT STAYED ON TASK AND ON TARGET.

03:18PM  24       WHEN IT CAME TO CONTENT GENERATION, I WOULDN'T SAY THAT I

03:18PM  25   WAS INVOLVED WITH THAT.

03:18PM   1    Q.   OKAY.  LET'S TAKE A LOOK IN YOUR BINDER, IF YOU CAN, AT

03:18PM   2    EXHIBIT 10467.

03:19PM   3        DO YOU SEE THAT?

03:19PM   4    A.   YES.

03:19PM   5    Q.   OKAY.  AND IS THIS AN EMAIL CHAIN BETWEEN YOU, AND

03:19PM   6    JEFF BLICKMAN, AND DANIEL YOUNG ABOUT QUESTIONS REGARDING THE

03:19PM   7    THERANOS WEBSITE?

03:19PM   8    A.   YES.

03:19PM   9    Q.   AND THE DATE OF THE EMAIL IS SEPTEMBER 22ND, 2013;

03:19PM   10   CORRECT?

03:19PM   11   A.   YES.

03:19PM   12        MS. WALSH:  YOUR HONOR, WE OFFER EXHIBIT 10467 AS A

03:19PM   13   BUSINESS RECORD.

03:19PM   14        MR. BOSTIC:  NO OBJECTION.

03:19PM   15        THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:19PM   16      (DEFENDANT'S EXHIBIT 10467 WAS RECEIVED IN EVIDENCE.)

03:19PM   17   BY MS. WALSH:

03:19PM   18   Q.   OKAY.  LET'S TURN TO PAGE 5 OF 6 OF THE EMAIL.  AND THAT'S

03:20PM   19   AN EMAIL FROM YOU TO DANIEL YOUNG ON AUGUST 9TH, 2013.

03:20PM   20        DO YOU SEE THAT?

03:20PM   21   A.   YES.

03:20PM   22   Q.   AND YOU SAY, "HI DANIEL,

03:20PM   23        "WE HAVE A FEW QUESTIONS RELATED TO INFO-GRAPHICS THAT

03:20PM   24   WE'RE PLANNING TO INCLUDE ON THE WEBSITE, AND WE WERE HOPING

03:20PM   25   THAT YOU COULD LEND YOUR EXPERTISE."

03:20PM  1            DO YOU SEE THAT?

03:20PM  2       A.   YES.

03:20PM  3       Q.   AND GOING DOWN ON THAT SAME EMAIL, YOU'RE POINTING OUT

03:20PM  4       "FAST AND MEANINGFUL TURN-AROUND TIMES"; RIGHT?

03:20PM  5            DO YOU SEE THAT?   ITEM 1?

03:20PM  6       A.   YES.

03:20PM  7       Q.   OKAY.  AND WHAT YOU SAY IS, "FOR THIS GRAPHIC," AND THE

03:20PM  8       GRAPHIC IS BELOW THE TEXT, "WE WANT TO INCLUDE AN ASSAY THAT

03:20PM  9       TYPICALLY TAKES A LONG TIME TO TEST BUT THAT WE HAVE THE

03:20PM  10      ABILITY TO PROCESS QUICKLY, AND BY PROVIDING ANSWERS FASTER IT

03:20PM  11      WOULD MAKE A MEANINGFUL IMPACT ON THE DIAGNOSIS.  CAN YOU THINK

03:20PM  12      OF A SPECIFIC ASSAY THAT MEETS THIS CRITERIA?  VITAMIN D

03:21PM  13      DOESN'T QUITE WORK BECAUSE IT'S NOT CRITICAL TO HAVE THESE

03:21PM  14      RESULTS FAST.  ELIZABETH SUGGESTED USING A BACTERIA ASSAY."

03:21PM  15           DO YOU SEE THAT?

03:21PM  16      A.   YES.

03:21PM  17      Q.   AND THEN DR. YOUNG RESPONDS TO YOUR QUESTION AND HE SAYS,

03:21PM  18      "FAST TURN-AROUND TIME," AND HE GIVES SOME EXAMPLES,

03:21PM  19      "STREPTOCOCCUS PNEUMONIAE IS ONE OF THE MOST COMMON CAUSES OF

03:21PM  20      COMMUNITY-ACQUIRED PNEUMONIA.  CURRENT CRITERIA OF DIAGNOSIS

03:21PM  21      ARE BASED ON SPUTUM CULTURES.  MANY PATIENTS OFTEN RECEIVE,"

03:21PM  22      AND HE GOES ON ABOUT THE TECHNICAL ASPECTS OF WHAT YOU ASKED

03:21PM  23      HIM.

03:21PM  24           DO YOU SEE THAT?

03:21PM  25      A.   YES.

03:21PM  1    Q.   AND SO IN WORKING ON THE WEBSITE, YOU CONSULTED WITH THE

03:21PM  2    SCIENTIST, TOO, RIGHT?

03:21PM  3    A.   YES.

03:21PM  4    Q.   AND YOU WERE ASKING QUESTIONS ABOUT CONTENT; RIGHT?

03:21PM  5    A.   YES.

03:21PM  6    Q.   AND YOU WERE DOING THAT TO TRY TO MAKE THE WEBSITE

03:21PM  7    ACCURATE; RIGHT?

03:21PM  8    A.   YES.

03:21PM  9    Q.   YOU WANTED IT TO BE -- NOT HAVE ANY ERRORS; RIGHT?

03:22PM  10   A.   RIGHT.

03:22PM  11   Q.   AND TO BE PRECISE AND ACCURATE; RIGHT?

03:22PM  12   A.   CORRECT.

03:22PM  13   Q.   OKAY.  LET'S TURN NOW TO 10469 IN YOUR BINDER.

03:22PM  14   A.   OKAY.

03:22PM  15   Q.   OKAY.  IS THIS AN EMAIL FROM YOU TO MS. HOLMES COPYING

03:22PM  16   CHRISTIAN HOLMES AND JEFF BLICKMAN ABOUT THE DOT COM.

03:22PM  17        DO YOU SEE THAT?

03:22PM  18   A.   YES.

03:22PM  19   Q.   AND THE DATE IS AUGUST 30TH, 2013; RIGHT?

03:22PM  20   A.   YES.

03:22PM  21   Q.   AND THE DOT COM, I TAKE IT, WAS THE THERANOS WEBSITE?

03:23PM  22   A.   AUGUST 30TH, 2013.

03:23PM  23            THE COURT:  WE DIDN'T GET AN ANSWER.

03:23PM  24            MS. WALSH:  SORRY.

03:23PM  25   Q.   WAS THE DOT COM REFERRING TO THE THERANOS WEBSITE?

03:23PM  1    A.   YES.

03:23PM  2    Q.   AND IS THE DATE OF THE EMAIL AUGUST 30TH, 2013?

03:23PM  3    A.   YES.

03:23PM  4    Q.   OKAY.

03:23PM  5         YOUR HONOR, WE OFFER 10467 -- 10469.

03:23PM  6              MR. BOSTIC:  NO OBJECTION.

03:23PM  7              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:23PM  8         (DEFENDANT'S EXHIBIT 10469 WAS RECEIVED IN EVIDENCE.)

03:23PM  9    BY MS. WALSH:

03:23PM  10   Q.   OKAY.  SO IN THIS EMAIL YOU'RE REACHING OUT TO MS. HOLMES

03:23PM  11   ABOUT THE WEBSITE AND YOU SAY, "I'VE ATTACHED SOME OPTIONS FOR

03:23PM  12   A GRAPH TO ILLUSTRATE THE BETTER DATA FROM FRESHER SAMPLES

03:23PM  13   PIECE OF .COM."

03:23PM  14        DO YOU SEE THAT?

03:23PM  15   A.   YES.

03:23PM  16   Q.   AND THEN THE SECOND PARAGRAPH SAYS, "PLEASE LET US KNOW IF

03:23PM  17   YOU HAVE ANY COMMENTS ON THIS.  WE'LL NEED TO SEND FEEDBACK ON

03:23PM  18   THIS TO CHIAT TONIGHT."

03:24PM  19        DO YOU SEE THAT?

03:24PM  20   A.   YES.

03:24PM  21   Q.   AND IF WE COULD JUST TURN TO THE FIRST GRAPHIC.

03:24PM  22        AND THIS -- WHAT YOU'RE ASKING ABOUT IS THE DECAY OF

03:24PM  23   ANALYTES IN BLOOD AND SERUM.

03:24PM  24        DO YOU SEE THAT?

03:24PM  25   A.   YES.

03:24PM   1    Q.   AND THAT WAS A FAIRLY TECHNICAL TOPIC; CORRECT?

03:24PM   2    A.   CORRECT.

03:24PM   3    Q.   AND SO YOU'RE REACHING OUT TO ELIZABETH TO GET SOME

03:24PM   4    FEEDBACK FROM HER; RIGHT?

03:24PM   5    A.   CORRECT.

03:24PM   6    Q.   OKAY.  SO LET'S, IF YOU CAN, MR. EDLIN, TURN TO 10468.

03:24PM   7    A.   OKAY.

03:24PM   8    Q.   AND IF YOU LOOK AT THE BOTTOM EMAIL THAT IS DATED

03:24PM   9    AUGUST 29TH, 2013; RIGHT?

03:24PM  10    A.   RIGHT.

03:24PM  11    Q.   AND THAT'S THE SAME EMAIL THAT YOU SENT TO MS. HOLMES IN

03:24PM  12    THE LAST EXHIBIT THAT WE LOOKED AT; IS THAT RIGHT?

03:24PM  13    A.   YES.

03:25PM  14    Q.   OKAY.  AND SO IT'S PICKING UP ON THE CHAIN; RIGHT?

03:25PM  15    A.   RIGHT.

03:25PM  16    Q.   AND THEN IT CONTINUES ON IN THE CHAIN BETWEEN MS. HOLMES

03:25PM  17    AND DR. YOUNG AND OTHERS AT THERANOS.

03:25PM  18         DO YOU SEE THAT?

03:25PM  19    A.   YES.

03:25PM  20         MS. WALSH:  YOUR HONOR, WE OFFER 10468.

03:25PM  21         MR. BOSTIC:  NO OBJECTION.

03:25PM  22         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:25PM  23         (DEFENDANT'S EXHIBIT 10468 WAS RECEIVED IN EVIDENCE.)

03:25PM  24    BY MS. WALSH:

03:25PM  25    Q.   OKAY.  SO GOING TO WHERE WE PICK UP ON THE CHAIN IS WHERE

03:25PM  1    MS. HOLMES GETS YOUR EMAIL AND THEN SHE FORWARDS IT OR SHE

03:25PM  2    LOOPS IN DANIEL YOUNG.

03:25PM  3        DO YOU SEE THAT?

03:25PM  4    A.   YES.

03:25PM  5    Q.   AND SHE SAYS, "DANIEL:  ARE YOU SAYING 2 HOURS FROM THE

03:25PM  6    TIME IT BECOMES SERUM IN THE BELOW GRAPH"; RIGHT?

03:25PM  7    A.   RIGHT.

03:25PM  8    Q.   AND SHE'S ASKING ABOUT THE RATE OF DECAY; RIGHT?

03:25PM  9    A.   RIGHT.

03:25PM 10    Q.   AND SO THE FIRST THING MS. HOLMES DOES IS TO LOOP IN

03:25PM 11    DANIEL YOUNG TO ANSWER THAT QUESTION; CORRECT?

03:25PM 12    A.   CORRECT.

03:25PM 13    Q.   AND THEN THERE IS SOME BACK AND FORTH BETWEEN MS. HOLMES

03:25PM 14    AND DR. YOUNG THAT IS A LITTLE BIT TECHNICAL.

03:26PM 15        BUT LET'S GO TO THE TOP EMAIL.  AND THIS IS FROM

03:26PM 16    MS. HOLMES, AND SHE SAYS, "IF THEY CURRENTLY DO REFRIGERATE

03:26PM 17    THEN WE SHOULD REFLECT THAT SO WE ARE MAKING AN ACCURATE

03:26PM 18    CLAIM."

03:26PM 19        DO YOU SEE THAT?

03:26PM 20    A.   YES.

03:26PM 21    Q.   AND SO THERE'S AN EXAMPLE OF MS. HOLMES TRYING TO MAKE THE

03:26PM 22    WEBSITE AS ACCURATE AS POSSIBLE; CORRECT?

03:26PM 23    A.   CORRECT.

03:26PM 24    Q.   OKAY.  OKAY.  SO YOU ALSO TESTIFIED IN CONNECTION WITH THE

03:26PM 25    WEBSITE THAT THERANOS GOT SOME FEEDBACK FROM ITS ATTORNEYS ON

03:26PM  1    THE CONTENT OF THE WEBSITE.

03:27PM  2         DO YOU REMEMBER THAT?

03:27PM  3    A.   YES.

03:27PM  4    Q.   AND ONE OF THEM WAS AN IN-HOUSE ATTORNEY, THAT WAS

03:27PM  5    JIM FOX, REMEMBER?

03:27PM  6    A.   YES.

03:27PM  7    Q.   AND THE OTHER ONE WAS AN OUTSIDE ATTORNEY, THAT WAS

03:27PM  8    KATE BEARDSLEY; CORRECT?

03:27PM  9    A.   CORRECT.

03:27PM  10   Q.   AND THEY PROPOSED CERTAIN CHANGES TO THE WEBSITE; RIGHT?

03:27PM  11   A.   YES.

03:27PM  12   Q.   AND TO TRY TO CORRECT ANY INCONSISTENCIES?

03:27PM  13        DO YOU REMEMBER?

03:27PM  14   A.   YES.

03:27PM  15   Q.   SO TURN TO 20166.

03:27PM  16   A.   OKAY.

03:27PM  17   Q.   AND JUST LOOK THROUGH THAT CHAIN.

03:28PM  18        IS THAT AN EMAIL CHAIN ON SEPTEMBER 6TH THROUGH

03:28PM  19   SEPTEMBER 11TH, 2013?

03:28PM  20   A.   YES.

03:28PM  21   Q.   AND THIS IS AN EMAIL CHAIN REGARDING UPDATES OR WORKING ON

03:28PM  22   THE WEBSITE; IS THAT RIGHT?

03:28PM  23   A.   JUST ONE MOMENT, PLEASE.

03:28PM  24        (PAUSE IN PROCEEDINGS.)

03:28PM  25             THE WITNESS:  YES.

EDLIN CROSS BY MS. WALSH

03:29PM 1          MS. WALSH:  OKAY.  WE OFFER 20166.

03:29PM 2          MR. BOSTIC:  FOUNDATION AND AUTHENTICATION.  I DON'T

03:29PM 3  SEE THE WITNESS ON THIS EMAIL, AND IT LACKS A BATES NUMBER.

03:29PM 4          MS. WALSH:  OKAY, YOUR HONOR.  WE CAN PUT THIS

03:29PM 5  ASIDE, AND I CAN COME BACK TO IT, IF NECESSARY.

03:29PM 6  Q.   OKAY.  SO YOU TESTIFIED THIS MORNING ABOUT THE FEEDBACK

03:29PM 7  THERANOS GOT FROM ITS ATTORNEYS AND THE WHY WEBSITE PAGES IN

03:29PM 8  FEBRUARY OF 2014.

03:29PM 9       DO YOU REMEMBER THAT?

03:29PM 10 A.   YES.

03:29PM 11 Q.   AND THAT EXHIBIT WITH THE WEBSITE PAGES WAS 5805, AND WE

03:29PM 12 CAN SHOW IT TO YOU AGAIN.

03:29PM 13 A.   IF YOU DON'T MIND.

03:30PM 14 Q.   LET'S PULL UP 5805.

03:30PM 15      ARE THESE THE WEBSITE PAGES THAT WERE LIVE IN FEBRUARY OF

03:30PM 16 2014?

03:30PM 17 A.   YES, TO THE BEST OF MY RECOLLECTION.

03:30PM 18 Q.   OKAY.

03:30PM 19      YOUR HONOR, I HAVE A DEMONSTRATIVE THAT I WOULD LIKE TO

03:30PM 20 USE, AND I CAN HAND IT UP TO THE COURT, AND THE WITNESS, AND

03:30PM 21 COUNSEL.

03:30PM 22          THE COURT:  OKAY.  SURE.

03:30PM 23          MS. WALSH:  (HANDING.)

03:31PM 24 Q.   OKAY.  MR. EDLIN, YOU WERE SHOWN EXHIBIT 3965, WHICH IS IN

03:31PM 25 EVIDENCE.

03:31PM   1              AND WHAT I'D LIKE TO REQUEST, IS THAT WE PUBLISH PAGE 4 OF

03:31PM   2       THAT EXHIBIT.

03:31PM   3                    THE COURT:  YES.

03:31PM   4       BY MS. WALSH:

03:31PM   5       Q.   AND THE GOVERNMENT SHOWED YOU ONE OF THESE PAGES.  THIS IS

03:31PM   6       ONE OF THE DRAFT PAGES OF THE WEBSITE; RIGHT?

03:31PM   7       A.   YES.

03:31PM   8       Q.   OKAY.  AND IF YOU WANT TO GET EXHIBIT 3965 IN FRONT OF

03:31PM   9       YOU, THAT MIGHT HELP.

03:31PM  10       A.   OKAY.  JUST ONE SECOND.

03:32PM  11              OKAY.

03:32PM  12       Q.   AND YOU SEE THE FIRST -- THESE ARE THE DRAFT PAGES; RIGHT?

03:32PM  13       A.   YES.

03:32PM  14       Q.   OKAY.  AND YOU SEE THE FIRST ENTRY, "A TINY DROP IS ALL IT

03:32PM  15       TAKES."

03:32PM  16              DO YOU SEE THAT?

03:32PM  17              YOU CAN LOOK ON THE SCREEN FOR THAT.

03:32PM  18       A.   YES.

03:32PM  19       Q.   OKAY.  AND IF YOU COULD JUST TURN IN YOUR EXHIBIT TO 3965

03:32PM  20       JUST ON YOUR OWN.

03:32PM  21       A.   UH-HUH.

03:32PM  22       Q.   TO THE FIRST PAGE, WHICH IS THE EMAIL FROM THE ATTORNEY,

03:32PM  23       JIM FOX.

03:32PM  24              DO YOU HAVE THAT IN FRONT OF YOU?

03:32PM  25       A.   YES.

EDLIN CROSS BY MS. WALSH

03:32PM 1    Q.   AND YOU SEE HOW HE SAYS IN HIS ADVICE --

03:32PM 2    A.   RIGHT.

03:32PM 3    Q.   -- "A TINY DROP IS ALL IT TAKES.  WE OFTEN USE MORE THAN

03:33PM 4    ONE DROP.  WE SHOULD SAY A FEW DROPS IS ALL IT TAKES"?

03:33PM 5         DO YOU SEE THAT?

03:33PM 6    A.   YES.

03:33PM 7    Q.   OKAY.  NOW, LET'S TURN TO 5805 TO THAT SAME PAGE, WHICH IS

03:33PM 8    PAGE 3.

03:33PM 9         DO YOU SEE THAT ON THE SCREEN?

03:33PM 10   A.   I DO.

03:33PM 11   Q.   AND DO YOU SEE THAT "A TINY DROP" HAS BEEN CHANGED TO "A

03:33PM 12   FEW DROPS IS ALL IT TAKES."

03:33PM 13        DO YOU SEE THAT?

03:33PM 14   A.   YES.

03:33PM 15   Q.   OKAY.  SO LET'S TAKE THOSE DOWN AND PUT UP OUR

03:33PM 16   DEMONSTRATIVE.

03:33PM 17            MR. BOSTIC:  YOUR HONOR, APOLOGIES.  I DO HAVE

03:33PM 18   OBJECTIONS TO AT LEAST PORTIONS OF THE DEMONSTRATIVE.  IF IT'S

03:33PM 19   POSSIBLE TO DISPLAY ONLY THE FIRST ROW FOR NOW, I WOULDN'T HAVE

03:33PM 20   AN OBJECTION TO THAT.

03:33PM 21            MS. WALSH:  SURE, YOUR HONOR.

03:33PM 22            THE COURT:  ALL RIGHT.

03:33PM 23            MS. WALSH:  WE'LL DO THE FIRST ROW.

03:33PM 24            THE COURT:  AND, LADIES AND GENTLEMEN, EXCUSE ME.

03:34PM 25   THIS IS A, THIS IS A DEMONSTRATIVE.  IT IS NOT BEING INTRODUCED

03:34PM  1    INTO EVIDENCE AT THIS POINT, SO YOU WILL NOT HAVE THIS AS PART

03:34PM  2    OF YOUR EVIDENCE.

03:34PM  3         IT'S MERELY A TOOL USED TO DESCRIBE OTHER EVIDENCE THAT

03:34PM  4    MAY HAVE ALREADY BEEN ADMITTED.

03:34PM  5         SO IT'S BEING SHOWN TO YOU SOLELY FOR THAT PURPOSE.

03:34PM  6         COUNSEL.

03:34PM  7              MS. WALSH:  THANK YOU.

03:34PM  8    Q.   OKAY.  SO WE SEE ON THE LEFT COLUMN THE DRAFT WEBSITE

03:34PM  9    LANGUAGE THAT WAS IN 3965, "A TINY DROP IS ALL IT TAKES";

03:34PM  10   RIGHT?

03:34PM  11   A.   YES.

03:34PM  12   Q.   AND THEN THE DRAFT FROM THE ATTORNEYS IS "A FEW DROPS IS

03:34PM  13   ALL IT TAKES OR AS LITTLE AS ONE DROP IS ALL IT TAKES, OR SOME

03:34PM  14   PHRASE"; RIGHT?

03:34PM  15   A.   YES.

03:34PM  16   Q.   AND THEN SOME FINAL LANGUAGE THAT WENT LIVE IS CHANGED TO

03:34PM  17   "A FEW DROPS IS ALL IT TAKES"; RIGHT?

03:35PM  18   A.   CORRECT.

03:35PM  19   Q.   OKAY.  SO WE CAN TAKE THAT DOWN.

03:35PM  20        NOW LET'S GO BACK TO 3965, WHICH ARE THE DRAFT WEBSITE

03:35PM  21   PAGES.  ON PAGE 4 THE SECOND ENTRY IS, "FASTER RESULTS.  FASTER

03:35PM  22   ANSWERS."

03:35PM  23        DO YOU SEE THAT?

03:35PM  24   A.   YES.

03:35PM  25   Q.   AND THEN IF YOU TURN TO EXHIBIT 3981 IN YOUR BINDER.

EDLIN CROSS BY MS. WALSH

| | | |
|---|---|---|
| 03:35PM | 1 | A.   OKAY. |
| 03:35PM | 2 | Q.   AND YOU SEE THIS IS THE ADVICE FROM THE OTHER LAWYER, |
| 03:36PM | 3 | KATE BEARDSLEY? |
| 03:36PM | 4 | A.   YES. |
| 03:36PM | 5 | Q.   DO YOU REMEMBER THAT? |
| 03:36PM | 6 | A.   YES. |
| 03:36PM | 7 | Q.   AND ON PAGE 2 OF THE EXHIBIT SHE SAYS IN ONE OF THE MIDDLE |
| 03:36PM | 8 | BULLETS, "REPLACE 'FASTER AND EASIER' WITH 'FAST AND EASY.'" |
| 03:36PM | 9 | DO YOU SEE THAT? |
| 03:36PM | 10 | A.   YES. |
| 03:36PM | 11 | Q.   AND THEN IF WE CAN PUT UP THE FINAL WEB PAGES, WHICH IS |
| 03:36PM | 12 | 5805 ON PAGE 3, YOU SEE THAT THE CHANGE WAS MADE, "FAST |
| 03:36PM | 13 | RESULTS.   FAST ANSWERS." |
| 03:36PM | 14 | DO YOU SEE THAT? |
| 03:36PM | 15 | A.   YES. |
| 03:36PM | 16 | Q.   OKAY.  LET'S NEXT GO TO -- |
| 03:36PM | 17 | A.   ACTUALLY, I SEE ON THE BEARDSLEY GUIDANCE IT SAYS, |
| 03:36PM | 18 | "REPLACE 'FASTER AND EASIER' WITH 'FAST AND EASY.'" |
| 03:36PM | 19 | Q.   RIGHT? |
| 03:36PM | 20 | A.   AND THIS HAS -- THIS IS WORDED JUST SLIGHTLY DIFFERENTLY, |
| 03:36PM | 21 | BUT, YES, "FASTER" WAS CHANGED TO "FAST." |
| 03:37PM | 22 | Q.   EXACTLY. |
| 03:37PM | 23 | SO IT'S SLIGHTLY DIFFERENT BUT "FASTER" WAS CHANGED TO |
| 03:37PM | 24 | "FAST"; CORRECT? |
| 03:37PM | 25 | A.   CORRECT. |

EDLIN CROSS BY MS. WALSH

03:37PM 1    Q.   OKAY.  SO LET'S GO TO THE THIRD ONE ON THAT PAGE -- I'M

03:37PM 2    SORRY, THIRD ONE ON THE DRAFT PAGES IN 3965, "HIGHEST LEVELS OF

03:37PM 3    ACCURACY."

03:37PM 4        DO YOU SEE THAT?

03:37PM 5    A.   YES.

03:37PM 6    Q.   OKAY.  AND THEN IF YOU TURN TO MS. BEARDSLEY'S ADVICE ON

03:37PM 7    3981 IN YOUR BINDER --

03:37PM 8    A.   UH-HUH.

03:37PM 9    Q.   -- THIRD BULLET FROM THE BOTTOM --

03:37PM 10   A.   RIGHT.

03:37PM 11   Q.   -- "REPLACE 'HIGHEST LEVELS OF ACCURACY' WITH 'HIGHEST

03:37PM 12   LEVELS OF ACCURACY.'"

03:37PM 13       DO YOU SEE THAT?

03:37PM 14   A.   YES.

03:37PM 15   Q.   AND WHAT ENDS UP ON THE LIVE WEBSITE ON EXHIBIT 5805 IS

03:37PM 16   "HIGH LEVELS OF PRECISION."

03:37PM 17       DO YOU SEE THAT?

03:37PM 18   A.   I DO.

03:37PM 19   Q.   AND AGAIN, THIS IS AN EXAMPLE OF THE EXACT CHANGE WASN'T

03:38PM 20   MADE, BUT A CHANGE WAS MADE FROM "HIGHEST LEVELS OF ACCURACY,"

03:38PM 21   TO "HIGH LEVELS OF PRECISION"; CORRECT?

03:38PM 22   A.   CORRECT.

03:38PM 23   Q.   AND LET'S GO TO THE NEXT ONE ON 3965.  THE FOURTH ONE DOWN

03:38PM 24   IS "MORE PRECISE TRENDING."

03:38PM 25       THIS IS ON THE DRAFT WEB PAGES; RIGHT?

03:38PM  1    A.   YES.

03:38PM  2    Q.   AND THEN IF YOU GO TO MS. BEARDSLEY, HER ADVICE IN 3981 ON

03:38PM  3    PAGE 3 --

03:38PM  4    A.   YES.

03:38PM  5    Q.   -- THE THIRD BULLET DOWN.

03:38PM  6    A.   I SEE.

03:38PM  7    Q.   SHE SAYS, "CHANGE 'MORE PRECISE' TO 'PRECISE'"; RIGHT?

03:38PM  8    A.   YES.

03:38PM  9    Q.   AND WHAT ENDS UP BEING THE LIVE PAGES ON EXHIBIT 5805, THE

03:39PM  10   WORD IS CHANGED TO "PRECISE"; RIGHT?

03:39PM  11   A.   RIGHT.

03:39PM  12   Q.   "PRECISE TRENDING"; CORRECT?

03:39PM  13   A.   CORRECT.

03:39PM  14   Q.   AND THEN LET'S LOOK ON THE SAME PAGES OF THE DRAFT ON PAGE

03:39PM  15   3965 ABOVE, "A TINY DROP IS ALL IT TAKES."

03:39PM  16        IT'S A LITTLE HARD TO SEE?

03:39PM  17   A.   UH-HUH.

03:39PM  18   Q.   BUT THE TEXT, IT SAYS, "AT THERANOS, WE CAN PERFORM ALL

03:39PM  19   LAB TESTS ON A SAMPLE 1/1,000 THE SIZE OF A TYPICAL BLOOD

03:39PM  20   DRAW."

03:39PM  21        DO YOU SEE THAT?

03:39PM  22   A.   I DO.

03:39PM  23   Q.   OKAY.  AND THEN IF YOU GO TO MS. BEARDSLEY'S ADVICE,

03:39PM  24   EXHIBIT 3981 AT PAGE 2, SHE SAYS, "ENSURE SUBSTANTIATION FOR A

03:40PM  25   CLAIM 1/1,000 THE SIZE OF TYPICAL BLOOD DRAW."

03:40PM   1           DO YOU SEE THAT?

03:40PM   2    A.   YES.

03:40PM   3    Q.   AND THEN IF WE GO TO THE LIVE PAGES, A CHANGE IS MADE AND

03:40PM   4    WHAT THE CHANGE IS, "AT THERANOS, WE CAN PERFORM OUR LAB TESTS

03:40PM   5    ON SAMPLES AS SMALL AS 1/1,000 THE SIZE OF A TYPICAL BLOOD

03:40PM   6    DRAW."

03:40PM   7           DO YOU SEE THAT?

03:40PM   8    A.   YES.

03:40PM   9    Q.   SO "ALL" WAS CHANGED TO "OUR" AND TEXT WAS ADDED "AS SMALL

03:40PM  10    AS."

03:40PM  11           DO YOU SEE THAT?

03:40PM  12    A.   I DO.

03:41PM  13    Q.   OKAY.  LET'S GO TO PAGE 7 OF EXHIBIT 3965.

03:41PM  14           IN THE MIDDLE OF THE PAGE, THE DRAFT WEB PAGE IS "A

03:41PM  15    COMPLETE TEST MENU."

03:41PM  16           DO YOU SEE THAT?

03:41PM  17    A.   "A COMPLETE TEST MENU," YES.

03:41PM  18    Q.   "A COMPLETE TEST MENU," YES.

03:41PM  19           AND IF YOU GO TO MS. BEARDSLEY'S ADVICE ON PAGE 3, ONE,

03:41PM  20    TWO, THREE, FOUR, FIVE -- SIX BULLETS UP FROM THE TOP SHE SAYS,

03:41PM  21    "CHANGE 'COMPLETE' TO 'COMPREHENSIVE.'"

03:41PM  22           DO YOU SEE THAT?

03:41PM  23    A.   YES.

03:41PM  24    Q.   AND IF WE GO TO THE ACTUAL WEBSITE CAPTURES, ON PAGE 6, IT

03:42PM  25    SAYS, "A COMPREHENSIVE TEST MENU."

EDLIN CROSS BY MS. WALSH

03:42PM 1         DO YOU SEE THAT?

03:42PM 2    A.   I DO.

03:42PM 3    Q.   SO "COMPLETE" WAS CHANGED TO "COMPREHENSIVE"; RIGHT?

03:42PM 4    A.   YES.

03:42PM 5    Q.   OKAY.  LET'S SET ALL OF THOSE ASIDE.

03:42PM 6         AND SO JUST TO ASK ONE MORE QUESTION ABOUT THE WEBSITE,

03:42PM 7    BASED ON WHAT YOU'VE SEEN AND THE EMAILS THAT YOU'VE SEEN

03:42PM 8    RELATED TO THIS, IN YOUR OWN EXPERIENCE, YOU AND YOUR

03:43PM 9    COLLEAGUES WERE DOING THE BEST YOU COULD TO TRY TO MAKE THAT

03:43PM 10   WEBSITE ACCURATE, WEREN'T YOU?

03:43PM 11        MR. BOSTIC:  OBJECTION.  FOUNDATION.  CALLS FOR

03:43PM 12   SPECULATION.

03:43PM 13        THE COURT:  COULD YOU LAY A FOUNDATION.

03:43PM 14        MS. WALSH:  SURE.

03:43PM 15   Q.   SO YOU WORKED ON PARTS OF THE WEBSITE; CORRECT?  WE SAW

03:43PM 16   THAT IN THE EMAILS; RIGHT?

03:43PM 17   A.   CORRECT.

03:43PM 18   Q.   AND CHRISTIAN HOLMES WORKED ON THE WEBSITE; CORRECT?

03:43PM 19   A.   YES.

03:43PM 20   Q.   AND YOU POSED QUESTIONS TO MS. HOLMES; RIGHT?

03:43PM 21   A.   YES.

03:43PM 22   Q.   AND LAWYERS WERE GIVING YOU FEEDBACK; CORRECT?

03:43PM 23   A.   CORRECT.

03:43PM 24   Q.   AND WE SAW SOME OF THAT FEEDBACK WAS IMPLEMENTED; RIGHT?

03:43PM 25   A.   RIGHT.

EDLIN CROSS BY MS. WALSH

03:43PM  1    Q.   SO IS IT FAIR TO SAY THAT YOU WERE MAKING GREAT EFFORT TO

03:43PM  2    TRY TO MAKE THE WEBSITE ACCURATE?

03:43PM  3              MR. BOSTIC:  ARE WE ASKING ABOUT THIS WITNESS

03:43PM  4    INDIVIDUALLY?

03:43PM  5              MS. WALSH:  YES, YOUR HONOR, YES.

03:43PM  6              THE COURT:  IT'S ABOUT HIS EFFORTS.

03:43PM  7              MS. WALSH:  YES.

03:43PM  8              THE COURT:  DO YOU UNDERSTAND THAT, SIR?

03:43PM  9              THE WITNESS:  I DO.

03:43PM  10             THE COURT:  OKAY.  YOU CAN ANSWER THE QUESTION.

03:43PM  11             THE WITNESS:  THE ANSWER IS YES.

03:43PM  12             THE COURT:  OKAY.

03:43PM  13             MS. WALSH:  THANK YOU.

03:43PM  14    Q.   AND YOU DIDN'T HAVE REASON TO BELIEVE THAT ANYONE ELSE WHO

03:44PM  15    WAS WORKING ON THE WEBSITE WITH YOU WAS NOT TRYING TO MAKE IT

03:44PM  16    ACCURATE?

03:44PM  17             MR. BOSTIC:  SAME OBJECTIONS.  CALLS FOR

03:44PM  18    SPECULATION.

03:44PM  19             MS. WALSH:  JUST WHAT HE OBSERVED.

03:44PM  20             THE COURT:  I THINK YOU'LL NEED TO LAY A BETTER

03:44PM  21    FOUNDATION FOR THAT.

03:44PM  22             MS. WALSH:  OKAY.

03:44PM  23    Q.   SO WHAT WE'VE SEEN IN THE EMAILS IS LAWYERS GIVING

03:44PM  24    FEEDBACK; RIGHT?

03:44PM  25    A.   RIGHT.

03:44PM 1    Q.   AND THERANOS PERSONNEL IMPLEMENTING THE FEEDBACK; RIGHT?

03:44PM 2    A.   RIGHT.

03:44PM 3    Q.   AND PEOPLE CONSULTING WITH EACH OTHER ABOUT MAKING THE

03:44PM 4    WEBSITE ACCURATE; RIGHT?

03:44PM 5    A.   RIGHT.

03:44PM 6    Q.   AND I TAKE IT YOU DID NOT OBSERVE ANYTHING IN YOUR WORK AT

03:44PM 7    THERANOS, WORKING ON THIS WEBSITE, THAT MADE YOU CONCLUDE THAT

03:44PM 8    THE PEOPLE YOU WERE WORKING WITH WERE TRYING TO NOT MAKE THE

03:45PM 9    WEBSITE ACCURATE?

03:45PM 10            MR. BOSTIC:  SAME OBJECTIONS.  SAME QUESTION.

03:45PM 11            THE COURT:  SUSTAINED.

03:45PM 12   BY MS. WALSH:

03:45PM 13   Q.   ALL RIGHT.  LET'S MOVE ON TO THE WALGREENS BROCHURE.

03:45PM 14       MAY I JUST CHECK SOMETHING, YOUR HONOR?

03:45PM 15            THE COURT:  YES, OF COURSE.

03:45PM 16       (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

03:46PM 17   BY MS. WALSH:

03:46PM 18   Q.   ALL RIGHT.  MR. EDLIN, PLEASE TURN IN YOUR BINDER TO

03:46PM 19   EXHIBIT 10558.

03:46PM 20   A.   OKAY.

03:46PM 21   Q.   SO THIS IS AN EMAIL THAT YOU'RE ON; RIGHT?

03:46PM 22   A.   YES.

03:46PM 23   Q.   AND MR. CHRISTIAN HOLMES IS ON THIS EMAIL; CORRECT?

03:46PM 24   A.   YES.

03:46PM 25   Q.   AND THE EMAIL IS WITH A PERSON NAMED MIKE YAGI; CORRECT?

03:46PM  1    A.   YES.

03:46PM  2    Q.   AND MR. YAGI IS WITH CHIAT/DAY; RIGHT?

03:46PM  3    A.   YES.

03:46PM  4    Q.   AND THE DATE OF THE EMAIL IS SEPTEMBER 5TH, 2013; RIGHT?

03:46PM  5    A.   RIGHT.

03:46PM  6    Q.   AND THE SUBJECT IS BROCHURE FEEDBACK; RIGHT?

03:46PM  7    A.   RIGHT.

03:46PM  8            MS. WALSH:  YOUR HONOR, WE OFFER 10558.

03:46PM  9            MR. BOSTIC:  NO OBJECTION.

03:46PM  10           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:46PM  11       (DEFENDANT'S EXHIBIT 10558 WAS RECEIVED IN EVIDENCE.)

03:47PM  12   BY MS. WALSH:

03:47PM  13   Q.   SO LET'S LOOK AT WHAT MR. HOLMES SAYS TO MIKE.

03:47PM  14       "MIKE,

03:47PM  15       "I HOPE YOU'RE DOING WELL.  I JUST CAUGHT UP WITH

03:47PM  16   ELIZABETH -- SHE HAD A CONVERSATION WITH OUR REGULATORY FOLKS

03:47PM  17   AND THEY WANT TO MAKE A FEW CHANGES ON THE BROCHURE FOR

03:47PM  18   WALGREENS.  THESE ARE RELATIVELY MINOR BUT WILL NEED TO

03:47PM  19   IMPLEMENT THEM AS SOON AS WE CAN FOR ADDITIONAL PRINTING OF THE

03:47PM  20   BROCHURE.  HERE IS THE FEEDBACK AND WE CAN DISCUSS -- I BELIEVE

03:47PM  21   ELIZABETH IS GOING TO JOIN ALL OF THE MEETINGS ON

03:47PM  22   FEEDBACK/CHANGES PER THIS NOTE."

03:47PM  23       AND THEN MR. HOLMES LISTS THE FEEDBACK; RIGHT?

03:47PM  24   A.   RIGHT.

03:47PM  25   Q.   AND ONE OF THEM "ON THE ONE 'TINY DROP CHANGES EVERYTHING'

EDLIN CROSS BY MS. WALSH

03:47PM  1    PANEL I WOULD SAY 'TINY' RATHER THAN THE 'TINIEST'"; RIGHT?

03:47PM  2    A.   RIGHT.

03:47PM  3    Q.   AND "ON THE 'ONE DROP A WORLD OF ANSWERS PANEL, I WOULD

03:47PM  4    ASSUME THAT WE ARE NOT PROVIDING EVERY TEST THAT ANYONE WOULD

03:47PM  5    EVER WANT.  YOU MIGHT WANT TO STAY A FULL RANGE OF

03:47PM  6    STANDARD/COMMON/MOST FREQUENT TESTS"; RIGHT?

03:47PM  7    A.   RIGHT.

03:48PM  8    Q.   AND SO THIS IS AN EXAMPLE OF MR. HOLMES GETTING FEEDBACK

03:48PM  9    THROUGH MS. HOLMES ABOUT FEEDBACK FROM THE REGULATORY FOLKS AT

03:48PM  10   THERANOS; RIGHT?

03:48PM  11   A.   RIGHT.

03:48PM  12   Q.   AND THOSE REGULATORY FOLKS, THOSE ARE THE REGULATORY

03:48PM  13   LAWYERS WITHIN THERANOS; IS THAT CORRECT?

03:48PM  14   A.   YES.

03:48PM  15   Q.   AND HE'S COMMUNICATING -- MR. HOLMES IS COMMUNICATING THAT

03:48PM  16   FEEDBACK TO CHIAT/DAY; RIGHT?

03:48PM  17   A.   RIGHT.

03:48PM  18   Q.   SO THAT CHIAT/DAY CAN IMPLEMENT CHANGES TO THE MARKETING

03:48PM  19   MATERIALS; CORRECT?

03:48PM  20   A.   CORRECT.

03:48PM  21   Q.   OKAY.  LET'S TURN TO 20167.

03:49PM  22   A.   OKAY.

03:49PM  23   Q.   AND TAKE A LOOK AT THAT EMAIL.

03:50PM  24   A.   OKAY.  IT'S A LONG EMAIL.

03:50PM  25   Q.   I'M NOT GOING TO ASK YOU ABOUT EVERYTHING.

03:50PM   1    A.   OKAY.

03:50PM   2    Q.   GENERALLY SPEAKING, HAVING REVIEWED THE EMAIL, IS THIS AN

03:51PM   3    EMAIL THAT YOU'RE ON, MR. BALWANI IS ON, MS. HOLMES IS ON, AND

03:51PM   4    OTHERS ARE ON REGARDING A MEDIA INQUIRY FROM G2 INTELLIGENCE?

03:51PM   5    A.   YES.

03:51PM   6    Q.   AND IS THE DATE OF THE EMAIL SEPTEMBER 13TH, 2013?

03:51PM   7    A.   YES.  YES.

03:51PM   8         MS. WALSH:  YOUR HONOR, WE OFFER 20167.

03:51PM   9         MR. BOSTIC:  NO OBJECTION.

03:51PM  10         THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:51PM  11    (DEFENDANT'S EXHIBIT 20167 WAS RECEIVED IN EVIDENCE.)

03:51PM  12    BY MS. WALSH:

03:51PM  13    Q.   LET'S TURN TO PAGE 7 OF THE EMAIL JUST TO ORIENT US.

03:51PM  14         DO YOU SEE THAT?

03:51PM  15    A.   I DO.

03:51PM  16    Q.   AND THIS IS AN EMAIL FROM LAURA FOGELMAN FROM GROW

03:51PM  17    MARKETING.

03:51PM  18         DO YOU SEE THAT?

03:51PM  19    A.   YES.

03:51PM  20    Q.   AND THIS IS TO MS. HOLMES, MR. BALWANI, YOU AND OTHERS;

03:51PM  21    RIGHT?

03:51PM  22    A.   YES.

03:51PM  23    Q.   AND BY THE WAY, WHAT WAS GROW MARKETING?

03:51PM  24    A.   IT WAS A MARKETING AND COMMUNICATIONS COMPANY THAT

03:52PM  25    THERANOS CONSULTED WITH IN PREPARATION FOR THE WALGREENS

EDLIN CROSS BY MS. WALSH

03:52PM   1     LAUNCH.

03:52PM   2     Q.   OKAY.  AND WHAT MS. FOGELMAN IS SAYING IS, "WE RECEIVED A

03:52PM   3     MEDIA INQUIRY TODAY FROM RON SHINKMAN OF G2 INTELLIGENCE, A

03:52PM   4     CREDIBLE LAB INDUSTRY PUBLICATION."

03:52PM   5          DO YOU SEE THAT?

03:52PM   6     A.   YES.

03:52PM   7     Q.   AND THEN IF YOU GO FORWARD TO PAGE 4, THIS IS AN EMAIL

03:52PM   8     FROM JEFF BLICKMAN TO YOU, AND MR. BALWANI, AND MS. HOLMES, AND

03:52PM   9     OTHERS; RIGHT?

03:52PM  10     A.   YES.

03:52PM  11     Q.   AND IT SETS FORTH A LIST OF QUESTIONS FROM

03:53PM  12     G2 INTELLIGENCE?

03:53PM  13     A.   RIGHT.

03:53PM  14     Q.   THAT G2 INTELLIGENCE WANTED ANSWERED FOR THE PUBLICATION;

03:53PM  15     RIGHT?

03:53PM  16     A.   CORRECT.

03:53PM  17     Q.   AND I WANT TO DIRECT YOUR ATTENTION TO QUESTION NUMBER 7.

03:53PM  18          DO YOU SEE THAT?

03:53PM  19     A.   YES.

03:53PM  20     Q.   AND QUESTION NUMBER 7 FROM THE PUBLICATION ASKS, "HOW MUCH

03:53PM  21     BLOOD IS REQUIRED (IN NANOLITERS OR MICROGRAMS)?  ALTHOUGH IT

03:53PM  22     IS MENTIONED IN THE RELEASE, HOW SPECIFICALLY WILL IT BE DRAWN?

03:53PM  23     THE BLOOD WILL BE DRAWN --" OH, I'M SORRY.

03:53PM  24          SO THAT'S THE QUESTION; RIGHT?

03:53PM  25     A.   YES.

03:53PM 1    Q.   AND THEN THE TEXT AFTER THAT IS MR. BLICKMAN ANSWERING THE

03:53PM 2    QUESTION; RIGHT?

03:53PM 3    A.   THAT'S RIGHT.

03:53PM 4    Q.   AND THEN MR. BLICKMAN SAYS THE BLOOD WILL BE DRAWN IN A

03:53PM 5    THREE STEP PROCESS -- PLACE FINGER WARMER ON PATIENT'S

03:53PM 6    FINGERTIP; CLEAN THE FINGER TIP; AND DEPRESS TINY LANCET ON

03:53PM 7    FINGER; TECHNICIAN COLLECTS BLOOD IN SMALL DISPOSABLE DEVICES

03:54PM 8    TO FILL OR NANOTAINER TUBES WITH A FEW DROPS OF SAMPLE.

03:54PM 9         DO YOU SEE THAT?

03:54PM 10   A.   YES.

03:54PM 11   Q.   AND SO THAT'S MR. BLICKMAN'S ANSWER TO QUESTION 7; RIGHT?

03:54PM 12   A.   YES.

03:54PM 13   Q.   AND THEN IF WE GO TO PAGE 2, MR. BALWANI RESPONDS.

03:54PM 14        DO YOU SEE THAT?

03:54PM 15   A.   YES.

03:54PM 16   Q.   AND HIS RESPONSE SPILLS OVER ON TO PAGE 3.

03:54PM 17        AND WHAT I WANT TO FOCUS ON IS WHAT HE ADDS TO QUESTION 7.

03:54PM 18        DO YOU SEE THAT?

03:54PM 19   A.   YES.

03:54PM 20   Q.   OKAY.  AND WHAT HE ADDS IN ALL CAPS IS, "FIX THIS TO ALSO

03:54PM 21   INCLUDE VENIPUNCTURE.  WE DON'T WANT TO BE CONFUSED WITH POINT

03:54PM 22   OF SERVICE FINGERSTICK TECHNOLOGY.  YOU CAN FOCUS ON SMALL

03:54PM 23   VOLUME.  BLOOD VOLUME REQUIREMENTS VARY BY TEST."

03:54PM 24        DO YOU SEE THAT?

03:54PM 25   A.   I DO.

03:54PM  1    Q.   AND SO MR. BALWANI IS COMMUNICATING THIS NEEDS TO BE

03:55PM  2    FIXED, WE NEED TO SAY VENIPUNCTURE; RIGHT?

03:55PM  3    A.   RIGHT.

03:55PM  4    Q.   AND THIS IS TO A JOURNALIST WHO IS GOING TO PUBLISH

03:55PM  5    SOMETHING FOR THE PUBLIC TO READ ABOUT THERANOS; CORRECT?

03:55PM  6    A.   CORRECT.

03:55PM  7    Q.   OKAY.  WE CAN TAKE THAT DOWN.

03:55PM  8         LET'S GO TO 10554 IN YOUR BINDER, MR. EDLIN.

03:55PM  9    A.   OKAY.

03:55PM  10   Q.   IS THIS AN EMAIL WITH YOU, MR. BALWANI, AND MS. HOLMES,

03:55PM  11   AND GROW MARKETING RELATING TO THE JOE RAGO INTERVIEW?

03:55PM  12   A.   YES.

03:55PM  13   Q.   AND IS THE DATE OF THE EMAIL AUGUST 20TH, 2013?

03:56PM  14   A.   YES.

03:56PM  15            MS. WALSH:  YOUR HONOR, WE OFFER 10554.

03:56PM  16            MR. BOSTIC:  NO OBJECTION.

03:56PM  17            THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:56PM  18        (DEFENDANT'S EXHIBIT 10554 WAS RECEIVED IN EVIDENCE.)

03:56PM  19   BY MS. WALSH:

03:56PM  20   Q.   AND THIS IS JOE RAGO FROM "THE WALL STREET JOURNAL";

03:56PM  21   CORRECT?

03:56PM  22   A.   CORRECT.

03:56PM  23   Q.   AND SO MS. FOGELMAN ON -- JUST TO SHOW THE HEADER ON

03:56PM  24   PAGE 1, SHE'S EMAILING YOU, AND MR. BLICKMAN, AND MR. BALWANI,

03:56PM  25   AND OTHERS FOR THERANOS STATS/SOURCES FOR JOE RAGO INTERVIEW.

03:56PM   1          DO YOU SEE THAT?

03:56PM   2     A.   YES.

03:56PM   3     Q.   AND IF WE GO TO PAGE 2, ONE ITEM THAT SHE'S LOOKING FOR IS

03:56PM   4     THE FIFTH BULLET DOWN FROM THE TOP WHERE IT SAYS, "THE PRE- AND

03:57PM   5     POST-ANALYTICAL PHASES OF THE LAB TESTING PROCESS AMOUNT FOR

03:57PM   6     93 PERCENT OF ERRORS."

03:57PM   7          AND SHE ASKS, "IS THERE A MORE RECENT STATISTIC THAN THIS

03:57PM   8     1993 AACC ARTICLE?"

03:57PM   9          DO YOU SEE THAT?

03:57PM   10    A.   I DO.

03:57PM   11    Q.   AND THEN LET'S GO TO THE TOP EMAIL.  AND THIS IS

03:57PM   12    MR. HOLMES RESPONDING TO MS. FOGELMAN'S INQUIRY; RIGHT?

03:57PM   13    A.   RIGHT.

03:57PM   14    Q.   AND HE GOES THROUGH A NUMBER OF DIFFERENT ITEMS BUT WITH

03:57PM   15    REGARD TO WHAT HE JUST ASKED AND I JUST READ, MR. HOLMES SAYS,

03:57PM   16    "THE SOURCE OF THIS STAT CAME FROM A CLINICAL CHEMISTRY ARTICLE

03:57PM   17    IN 1993, AS WE SENT EARLIER, BUT THIS STATISTIC IS STILL OFTEN

03:57PM   18    MENTIONED IN MORE CONTEMPORARY ARTICLES.  FOR EXAMPLE, THE

03:57PM   19    IDENTIFICATION OF THE TYPES OF PREANALYTICAL ERRORS IN THE

03:57PM   20    CLINICAL CHEMISTRY LABORATORY PUBLISHED BY LABMEDICINE IN 2009

03:57PM   21    CITES THE ARTICLE/STAT IN 1993 IN ITS FIRST FOOTNOTE."

03:58PM   22         DO YOU SEE THAT?

03:58PM   23    A.   YES.

03:58PM   24    Q.   OKAY.  AND SO THIS IS CHRISTIAN HOLMES TRYING TO

03:58PM   25    SUBSTANTIATE THE DIFFERENT BULLETS THAT MS. FOGELMAN IS ASKING

03:58PM  1    ABOUT; RIGHT?

03:58PM  2    A.   RIGHT.

03:58PM  3    Q.   ALL IN PREPARATION FOR THE RAGO INTERVIEW OF MS. HOLMES;

03:58PM  4    CORRECT?

03:58PM  5    A.   YES.

03:58PM  6         MS. WALSH:  YOUR HONOR, I AM AT A BREAKING POINT, IF

03:58PM  7    THE COURT IS AT A CONVENIENT POINT TO BREAK FOR THE DAY.

03:58PM  8         THE COURT:  YOU'RE NOT GOING TO FINISH IN TWO

03:58PM  9    MINUTES?

03:58PM  10        MS. WALSH:  NO, I AM NOT.

03:58PM  11        THE COURT:  ALL RIGHT.  LET'S TAKE OUR BREAK, LADIES

03:58PM  12   AND GENTLEMEN.  WE'RE GOING TO RECESS NOW.  REMEMBER, WE'LL

03:58PM  13   RESUME ON FRIDAY, AND WE WILL RESUME ON FRIDAY, AND WE WILL END

03:58PM  14   OUR FRIDAY AT NOON.

03:58PM  15        SO LET ME REMIND YOU OF THE ADMONISHMENT.

03:59PM  16        PLEASE DO NOT DO ANY INVESTIGATION OR IN ANY WAY ATTEMPT

03:59PM  17   TO LEARN ANYTHING ABOUT THIS CASE, DO NOT DISCUSS THE CASE,

03:59PM  18   SEE, WATCH, READ OR VIEW ANYTHING TO DO WITH IT.

03:59PM  19        WITH THAT ADMONISHMENT, HAVE A GOOD EVENING.  WE'LL SEE

03:59PM  20   YOU ON FRIDAY.

03:59PM  21        I'M GOING TO ASK JUROR NUMBER 8, IF YOU COULD STAY JUST

03:59PM  22   FOR A MOMENT, PLEASE.  JUROR NUMBER 8, IF YOU COULD REMAIN.

03:59PM  23        BUT EVERYONE ELSE, HAVE A GOOD EVENING.  WE'LL SEE YOU

03:59PM  24   FRIDAY.

03:59PM  25        LIKEWISE, MR. EDLIN, WE'LL SEE YOU FRIDAY MORNING AT

03:59PM  1    9:00 O'CLOCK.

03:59PM  2                THE WITNESS:  YES, YOUR HONOR.

03:59PM  3                THE COURT:  THANK YOU.

03:59PM  4          (JURY OUT AT 3:59 P.M.)

04:00PM  5          (JUROR NUMBER 8 PRESENT.)

04:00PM  6                THE COURT:  ALL RIGHT.  THANK YOU.  PLEASE BE

04:00PM  7    SEATED.  THANK YOU.

04:00PM  8          ALL RIGHT.  THE RECORD SHOULD REFLECT THAT OUR JURY HAS

04:00PM  9    LEFT FOR THE DAY.

04:00PM  10         ALL COUNSEL ARE PRESENT.

04:00PM  11         JUROR NUMBER 8 IS PRESENT.

04:00PM  12         SIR, I WANTED TO TALK TO YOU ABOUT SOME INFORMATION THAT

04:00PM  13    WAS DELIVERED TO ME THROUGH OUR COURTROOM DEPUTY.

04:00PM  14         THIS DOES INVOLVE -- AND MY SENSE IS THAT IT IS GOING TO

04:00PM  15    INVOLVE SOME PERSONAL INFORMATION ABOUT YOU IN REGARDS TO YOUR

04:00PM  16    SERVICE HERE.  YOU'RE NOT IN TROUBLE, LET ME JUST SAY THAT.  IT

04:00PM  17    HAS NOTHING TO DO WITH THAT.  IT'S JUST REALLY ABOUT YOUR

04:00PM  18    SCHEDULING AND SCHEDULING FOR YOU, AND I THINK IT MAY TOUCH ON

04:01PM  19    SOME PERSONAL MATTERS.

04:01PM  20         SO TO THAT EXTENT, AND TO RESPECT YOUR PRIVACY, I AM GOING

04:01PM  21    TO INDICATE THAT THESE PROCEEDINGS SHOULD BE SEALED NOW AS WELL

04:01PM  22    AS THIS PORTION OF THE TRANSCRIPT.  SO ANYONE WHO IS NOT

04:01PM  23    ATTACHED TO THIS CASE, THAT IS, A MEMBER OF THE DEFENSE TEAM OR

04:01PM  24    PROSECUTION TEAM, I'M GOING TO ASK YOUR CONSIDERATION AND IF

04:01PM  25    YOU COULD LEAVE THE COURTROOM, PLEASE.

EDLIN CROSS BY MS. WALSH

04:01PM   1          THANK YOU.

         2          **(SEALED PROCEEDINGS PAGES 2718 - 2724.)**

         3

         4

         5

         6

         7

         8

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                      CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16         IRENE RODRIGUEZ, CSR, RMR, CRR
           CERTIFICATE NUMBER 8074

17

18         DATED:  APRIL 13, 2022

19

20

21

22

23

24

25