1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4

   UNITED STATES OF AMERICA,        )
5                                    )  CR-18-00258-EJD
                   PLAINTIFF,        )
6                                    )  SAN JOSE, CALIFORNIA
             VS.                     )
7                                    )  APRIL 15, 2022
   RAMESH "SUNNY" BALWANI,          )
8                                    )  VOLUME 18
                   DEFENDANT.        )
9   _____ )  PAGES 2725 - 2841

10

11           TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE EDWARD J. DAVILA
12              UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
15                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
16                         SAN JOSE, CALIFORNIA 95113

17                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
18                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
19
              (APPEARANCES CONTINUED ON THE NEXT PAGE.)
20
     OFFICIAL COURT REPORTER:
21                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
22

23       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
            TRANSCRIPT PRODUCED WITH COMPUTER
24

25

```
 1     A P P E A R A N C E S: (CONT'D)

 2     FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                               BY:  MOLLY MCCAFFERTY
 3                                  SHAWN ESTRADA
                               THE ORRICK BUILDING
 4                             405 HOWARD STREET
                               SAN FRANCISCO, CALIFORNIA 94105
 5
                               BY:  JEFFREY COOPERSMITH
 6                                  AARON BRECHER
                                    AMANDA MCDOWELL
 7                             701 FIFTH AVENUE, SUITE 5600
                               SEATTLE, WASHINGTON 98104
 8
                               BY:  STEPHEN CAZARES
 9                             77 SOUTH FIGUEROA STREET, SUITE 3200
                               LOS ANGELES, CALIFORNIA 90017
10
                               BY:  AMY WALSH
11                             51 W 52ND STREET
                               NEW YORK, NEW YORK 10019
12

13     ALSO PRESENT:          OFFICE OF THE U.S. ATTORNEY
                               BY:  MADDI WACHS, PARALEGAL
14                                  SARA SLATTERY, PARALEGAL

15                             ORRICK, HERRINGTON & SUTCLIFFE
                               JENNIFER CYGNOR, PARALEGAL
16
                               PROLUMINA
17                             BY:  COREY ALLEN
                               2200 SIXTH AVENUE, SUITE 425
18                             SEATTLE, WASHINGTON 98121

19                             UNITED STATES POSTAL INSPECTION SERVICE
                               BY:  CHRISTOPHER MCCOLLOW
20
                               FEDERAL BUREAU OF INVESTIGATION
21                             BY:  MARIO C. SCUSSEL

22                             UNITED STATES FOOD & DRUG
                               ADMINISTRATION
23                             BY:  GEORGE SCAVDIS

24

25
```

1

INDEX OF PROCEEDINGS

2

GOVERNMENT'S:

3

4  **DANIEL EDLIN**
   CROSS-EXAM BY MS. WALSH (RES.)            P. 2731
5  REDIRECT EXAM BY MR. BOSTIC               P. 2804
   RECROSS-EXAM BY MS. WALSH                 P. 2833

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>INDEX OF EXHIBITS</u>

|  | IDENT. | EVIDENCE |
|---|---|---|

<u>GOVERNMENT'S</u>

| 4018 |  | 2782 |
|---|---|---|

<u>DEFENDANT'S</u>

| 10462 |  | 2742 |
|---|---|---|
| 7694 |  | 2747 |
| 13993 & 13993A |  | 2753 |
| 13986 |  | 2758 |
| 10446 |  | 2759 |
| 10457 |  | 2765 |
| 20160 |  | 2768 |
| 20472 |  | 2770 |
| 20161 & 20162 |  | 2772 |
| 10472 |  | 2773 |
| 20546 |  | 2784 |
| 20544 |  | 2789 |
| 20545 |  | 2790 |
| 13988 |  | 2794 |
| 20183 |  | 2798 |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | SAN JOSE, CALIFORNIA                          APRIL 15, 2022          |
|       | 2  | P R O C E E D I N G S                                                |
| 09:08AM | 3  | (COURT CONVENED AT 9:08 A.M.)                                       |
| 09:08AM | 4  | (JURY OUT AT 9:08 A.M.)                                             |
| 09:23AM | 5  | THE COURT:  WE'RE BACK ON THE RECORD IN THE BALWANI                 |
| 09:23AM | 6  | MATTER.  ALL COUNSEL ARE PRESENT.                                   |
| 09:23AM | 7  | MR. BALWANI IS PRESENT.                                             |
| 09:23AM | 8  | OUR JURY AND ALTERNATES ARE PRESENT.                                |
| 09:23AM | 9  | I LOOKED OUT AT THE AUDIENCE BECAUSE I'M NOT USED TO THIS.          |
| 09:23AM | 10 | I HAVE TO GET USED TO US BEING BACK IN THE JURY BOX HERE.  IT'S     |
| 09:23AM | 11 | NICE TO SEE YOU ALL, LADIES AND GENTLEMEN.                          |
| 09:23AM | 12 | LET ME ASK YOU THAT QUESTION THAT YOU ARE ALL FAMILIAR             |
| 09:23AM | 13 | WITH.                                                               |
| 09:23AM | 14 | DURING OUR BREAK, DID YOU OR ANYONE ON OUR JURY HAVE CAUSE          |
| 09:23AM | 15 | TO READ, VIEW, DISCUSS, OR IN ANY WAY LEARN ANYTHING ABOUT THIS     |
| 09:23AM | 16 | CASE OUTSIDE OF WHAT YOU'VE LEARNED IN THIS COURTROOM?              |
| 09:23AM | 17 | ANYONE HAVE ANY EXPOSURE TO ANY MATERIAL?                           |
| 09:23AM | 18 | I SEE NO HANDS.  THANK YOU VERY MUCH.                               |
| 09:23AM | 19 | AND IS OUR WITNESS HERE?  WE'LL HAVE MR. EDLIN COME IN.             |
| 09:23AM | 20 | LADIES AND GENTLEMEN, WHILE MR. EDLIN IS COMING TO THE              |
| 09:24AM | 21 | STAND, WE'LL HAVE ONE BREAK TODAY, MAYBE 20, 20, 25 MINUTE          |
| 09:24AM | 22 | BREAK MIDWAY THROUGH TODAY.                                         |
| 09:24AM | 23 | WE'RE GOING TO END A LITTLE BEFORE NOON, ABOUT FIVE OR             |
| 09:24AM | 24 | TEN MINUTES BEFORE NOON TODAY.                                      |
| 09:24AM | 25 | I DO WANT TO TELL YOU OUR WONDERFUL STAFF HAVE LOOKED AT            |

09:24AM 1      OUR CALENDARS, AND WE HAVE IDENTIFIED SOME DATES THAT WE MAY BE

09:24AM 2      ABLE TO CAPTURE ADDITIONAL TIME.  AND WE'RE GOING TO GIVE YOU

09:24AM 3      THOSE CALENDARS FOR YOU TO LOOK AT AND STUDY, AND NEXT WEEK

09:24AM 4      WE'LL TALK.  I'LL ASK YOU SOME QUESTIONS ABOUT WHETHER OR NOT

09:24AM 5      YOU CAN MAKE YOURSELVES AVAILABLE AT SOME TIME.

09:24AM 6          ONE OF THE OTHER QUESTIONS, AND YOU'LL SEE ON THE SCHEDULE

09:24AM 7      WE GIVE YOU, IS WHETHER WE CAN START OUR PROCEEDINGS AT 8:30.

09:24AM 8      I KNOW THAT PRESENTS SOME ISSUES FOR SOME OF YOU, BUT I'D LIKE

09:24AM 9      TO DISCUSS THAT IF WE CAN.

09:24AM 10         SO WE'LL GIVE YOU THAT AT THE END OF THE DAY AND SOMETHING

09:24AM 11     THAT YOU CAN TAKE HOME WITH YOU.

09:24AM 12         ALL RIGHT.  THANK YOU VERY MUCH.

09:24AM 13         MR. EDLIN IS ON THE STAND.

09:24AM 14         SIR, IF YOU COULD JUST REPEAT YOUR NAME, PLEASE, STATE

09:25AM 15     YOUR NAME.

09:25AM 16             THE WITNESS:  DANIEL EDLIN.

09:25AM 17             THE COURT:  THANK YOU.

09:25AM 18         **(GOVERNMENT'S WITNESS, DANIEL EDLIN, WAS PREVIOUSLY**

09:25AM 19     **SWORN.)**

09:25AM 20             THE COURT:  MS. WALSH.

09:25AM 21             MS. WALSH:  THANK YOU, YOUR HONOR.

09:25AM 22         MAY I REMOVE MY MASK, YOUR HONOR?

09:25AM 23             THE COURT:  YES, YES.  THANK YOU.

09:25AM 24     ///

09:25AM 25     ///

09:25AM  1          **CROSS-EXAMINATION (RESUMED)**

09:25AM  2     BY MS. WALSH:

09:25AM  3     Q.   GOOD MORNING, MR. EDLIN.   WELCOME BACK.

09:25AM  4     A.   GOOD MORNING.   THANK YOU.

09:25AM  5     Q.   SO I WANT TO PICK UP THE TESTIMONY THIS MORNING WITH THE

09:25AM  6     INTERVIEW OF MS. HOLMES BY ROGER PARLOFF.

09:25AM  7          AND JUST TO ORIENT OURSELVES, MR. PARLOFF WAS A WRITER;

09:25AM  8     CORRECT?

09:25AM  9     A.   CORRECT.

09:25AM 10     Q.   AND HE WAS WRITING A PIECE FOR "FORTUNE" MAGAZINE; IS THAT

09:25AM 11     RIGHT.

09:25AM 12     A.   THAT'S RIGHT.

09:25AM 13     Q.   AND THAT WAS AN ARTICLE ON THERANOS; RIGHT?

09:25AM 14     A.   CORRECT.

09:25AM 15     Q.   AND YOU AND OTHERS AT THERANOS DID SOME WORK TO PREPARE

09:25AM 16     FOR THAT INTERVIEW; CORRECT?

09:25AM 17     A.   YES.

09:26AM 18     Q.   SO LET'S TAKE A LOOK AT EXHIBIT 1752, WHICH IS IN

09:26AM 19     EVIDENCE.

09:26AM 20          YOUR HONOR, MAY WE PUBLISH THAT?

09:26AM 21               THE COURT:  YES.

09:26AM 22     BY MS. WALSH:

09:26AM 23     Q.   AND, MR. EDLIN, THIS IS AN EMAIL CHAIN AMONG YOU, AND

09:26AM 24     MS. HOLMES, AND MR. BLICKMAN, AND CHRISTIAN HOLMES REGARDING

09:26AM 25     SOME ITEMS TO BE PREPARED FOR THE PARLOFF INTERVIEW; IS THAT

09:26AM 1    RIGHT?

09:26AM 2    A.   YES.

09:26AM 3    Q.   AND THE DATE OF THAT EMAIL IS JUNE 1ST, 2014; CORRECT?

09:26AM 4         WELL, THE TOP EMAIL IS JUNE 1ST, 2014; RIGHT?

09:26AM 5    A.   YES.

09:26AM 6    Q.   OKAY.  AND THE SUBJECT IS ROGER PARLOFF - AGGREGATED

09:26AM 7    ACTION ITEMS.

09:26AM 8         DO YOU SEE THAT?

09:26AM 9    A.   YES.

09:26AM 10   Q.   OKAY.  AND JUST TAKE A LOOK AT THE EMAIL CHAIN THROUGHOUT.

09:26AM 11   IT'S A FAIRLY LONG CHAIN.

09:26AM 12   A.   IS THIS IN ONE OF THE BINDERS?

09:27AM 13   Q.   NO.  IT'S ON THE SCREEN.

09:27AM 14   A.   OKAY.

09:27AM 15   Q.   YEAH.  IF WE COULD JUST SCROLL THROUGH THE CHAIN.

09:27AM 16        AND MY QUESTION IS, MR. BALWANI IS NOT ON THIS EMAIL

09:27AM 17   CHAIN; IS THAT RIGHT?

09:27AM 18   A.   RIGHT.

09:27AM 19   Q.   AND ATTACHED TO THE CHAIN -- WITHDRAWN.

09:27AM 20        AS PART OF THE CHAIN WITHIN THE EMAIL, THERE IS A

09:27AM 21   CHECKLIST.

09:27AM 22        DO YOU SEE THAT?

09:27AM 23   A.   YES.

09:27AM 24   Q.   AND IF WE GO TO PAGE 1, THE CHECKLIST HAS ACTION ITEMS;

09:27AM 25   RIGHT?

09:27AM  1    A.   YES.

09:27AM  2    Q.   AND THEN THERE'S A COLUMN TO THE RIGHT CALLED RESOURCE.

09:27AM  3         DO YOU SEE THAT?

09:27AM  4    A.   YES.

09:27AM  5    Q.   AND THERE ARE DIFFERENT PEOPLE ASSIGNED TO COLLECT

09:27AM  6    DIFFERENT PIECES OF INFORMATION; IS THAT FAIR?

09:27AM  7    A.   YES.

09:27AM  8    Q.   AND LET'S JUST GO THROUGH SOME OF THOSE.

09:27AM  9         SO ON PAGE 1 REGARDING THE LAB FORM REFLEX TESTING

09:28AM  10   CONFIGURATION, THAT WAS ASSIGNED TO DANIEL YOUNG; RIGHT?

09:28AM  11   A.   RIGHT.

09:28AM  12   Q.   THE SEPSIS PAPER THAT WILL BE PUBLISHED.

09:28AM  13        ALSO DR. YOUNG; RIGHT?

09:28AM  14   A.   RIGHT.

09:28AM  15   Q.   AND THAT SEPSIS PAPER RELATED TO YOUR WORK WITH THE BURN

09:28AM  16   STUDY IN CONNECTION WITH THE MILITARY; IS THAT CORRECT?

09:28AM  17   A.   I BELIEVE THERE WAS ANOTHER SEPSIS STUDY.

09:28AM  18   Q.   OKAY.  SO THE NEXT ITEM IS BACKGROUND ON THE FACT THAT WE

09:28AM  19   FIGURED OUT HOW TO FREEZE CAPILLARY BLOOD.

09:28AM  20        DO YOU SEE THAT?

09:28AM  21   A.   YES.

09:28AM  22   Q.   AND DR. YOUNG WAS IN CHARGE OF THAT; CORRECT?

09:28AM  23   A.   YES.

09:28AM  24   Q.   AND THEN DATA ON THE AMOUNT OF BLOOD REQUIRED TO DO

09:28AM  25   ADDITIONAL TESTS USING A TRADITIONAL SAMPLE THAT COULD DO ANY

09:28AM 1     POSSIBLE REFLEX TESTS VERSUS THERANOS.

09:28AM 2          ALSO DR. YOUNG; RIGHT?

09:28AM 3     A.   RIGHT.

09:28AM 4     Q.   AND THEN DATA ON PERFORMANCE OF POC INSTRUMENTS NOT BEING

09:28AM 5     ACCURATE, AS ACCURATE/GOOD.

09:28AM 6          ALSO DR. YOUNG; RIGHT?

09:29AM 7     A.   YES.

09:29AM 8     Q.   DATA ON ANY COMBINATION OF TESTS BEING ABLE TO BE DONE ON

09:29AM 9     OUR FRAMEWORK.

09:29AM 10         ALSO DR. YOUNG; CORRECT?

09:29AM 11    A.   CORRECT.

09:29AM 12    Q.   AND THEN IF WE FLIP OVER TO PAGE 2 -- AND I'M NOT GOING TO

09:29AM 13    GO THROUGH EVERY SINGLE ONE OF THESE BUT JUST A COUPLE.

09:29AM 14         LANGUAGE ON WHAT HE CAN SAY ABOUT OUR HAVING DEVICES, HOW

09:29AM 15    MANY DEVICES WE ARE USING IN EACH FACILITY.

09:29AM 16         THAT WAS ASSIGNED TO MS. HOLMES; RIGHT?

09:29AM 17    A.   RIGHT.

09:29AM 18    Q.   AND THEN NUMBER 17, LANGUAGE ON THE DEVICE COMPARISON AND

09:29AM 19    LAB COMPARISON BETWEEN THERANOS AND QUEST.

09:29AM 20         ALSO MS. HOLMES?

09:29AM 21    A.   YES.

09:29AM 22    Q.   AND IF WE GO DOWN TO NUMBER 40, POSSIBLE PT DATA.

09:29AM 23         PT IS PROFICIENCY TESTING; RIGHT?

09:29AM 24    A.   RIGHT.

09:29AM 25    Q.   AND VALIDATION REPORTS, PHARMA REPORTS, AND VALUATION.

EDLIN CROSS BY MS. WALSH (RES.)

09:29AM   1           THAT WAS ALSO ASSIGNED TO MS. HOLMES; RIGHT?

09:29AM   2   A.   RIGHT.

09:29AM   3   Q.   AND THEN IF WE GO TO PAGE 3, THERE'S SOMETHING THAT SAYS

09:29AM   4   DONE - PER EAH.

09:30AM   5           DO YOU SEE THAT?

09:30AM   6   A.   YES.

09:30AM   7   Q.   AND THAT'S A REFERENCE TO MS. HOLMES; RIGHT?

09:30AM   8   A.   RIGHT.

09:30AM   9   Q.   AND NUMBER 2 IS DATA - SHOWING OUR PERFORMANCE VERSUS

09:30AM  10   HOSPITAL LABS OR OTHER LABS.

09:30AM  11           THAT WAS ASSIGNED TO DR. YOUNG; RIGHT?

09:30AM  12   A.   RIGHT.

09:30AM  13   Q.   AND THEN FOLLOW UP ON VITAMIN D CV AND NIST/CDC STANDARDS

09:30AM  14   BEING LESS THAN 5 PERCENT.

09:30AM  15           THAT WAS DR. YOUNG; CORRECT?

09:30AM  16   A.   CORRECT.

09:30AM  17   Q.   AND WHAT DOES CV STAND FOR?

09:30AM  18   A.   COEFFICIENT OF VARIATION.

09:30AM  19   Q.   OKAY.  AND ON THIS LIST OF TASKS, THERE WERE ABOUT 30 OR

09:30AM  20   MORE TASKS, MR. BALWANI DOES NOT APPEAR ANYWHERE ON THIS LIST,

09:30AM  21   DOES HE?

09:30AM  22   A.   IF YOU COULD JUST ZOOM BACK TO THE FULL LIST.

09:30AM  23           NO.

09:30AM  24   Q.   OKAY.  WE CAN TAKE THAT DOWN.

09:30AM  25           SO, MR. EDLIN, THE PARLOFF INTERVIEW, THAT WAS MS. HOLMES

09:30AM   1    SITTING FOR THE INTERVIEW; CORRECT?

09:30AM   2    A.   YES.

09:31AM   3    Q.   WERE YOU PRESENT FOR THAT INTERVIEW?

09:31AM   4    A.   NO.

09:31AM   5    Q.   DO YOU KNOW IF MR. BALWANI WAS PRESENT?

09:31AM   6    A.   I DON'T.  I DON'T BELIEVE HE WAS.

09:31AM   7    Q.   ALL RIGHT.  NOW, I WANT TO TURN TO YOUR TESTIMONY ABOUT

09:31AM   8    YOUR RELATIONSHIPS WITH THE MILITARY.  OKAY?

09:31AM   9         GENERALLY SPEAKING, IS IT FAIR TO SAY THAT IT WAS

09:31AM   10   MS. HOLMES WHO HAD THE RELATIONSHIPS WITH THE DIFFERENT

09:31AM   11   COMPONENTS OF THE MILITARY?

09:31AM   12   A.   YES.

09:31AM   13   Q.   AND SHE WAS THE ONE LEADING THERANOS'S EFFORTS IN THOSE

09:31AM   14   RELATIONSHIPS; IS THAT CORRECT?

09:31AM   15   A.   CORRECT.

09:31AM   16   Q.   AND SO YOU WORKED CLOSELY WITH HER IN YOUR COMMUNICATIONS

09:31AM   17   WITH THE MILITARY; CORRECT?

09:31AM   18   A.   CORRECT.

09:31AM   19   Q.   SO THE FIRST COMPONENT I WANT TO ASK YOU ABOUT IS SOCOM.

09:31AM   20        DO YOU REMEMBER TESTIFYING ABOUT THAT?

09:31AM   21   A.   YES.

09:31AM   22   Q.   AND WHAT DOES SOCOM STAND FOR?

09:31AM   23   A.   SPECIAL OPERATIONS COMMAND.

09:32AM   24   Q.   OKAY.  THE GOVERNMENT SHOWED YOU EXHIBIT 504, WHICH IS IN

09:32AM   25   EVIDENCE.

09:32AM 1        AND, YOUR HONOR, CAN WE PUBLISH THAT?

09:32AM 2              THE COURT:  YES.

09:32AM 3              MS. WALSH:  IF WE CAN PULL THAT UP.

09:32AM 4    Q.   AND THIS WAS THE EMAIL TO MAJOR COOK; CORRECT?

09:32AM 5    A.   CORRECT.

09:32AM 6    Q.   AND THAT WAS WITH THE ATTACHMENT THAT DESCRIBED THERANOS.

09:32AM 7        DO YOU REMEMBER THAT?

09:32AM 8    A.   YES.

09:32AM 9    Q.   AND MR. BALWANI IS NOT ON EITHER ONE OF THESE EMAILS IN

09:32AM 10   THE CHAIN; IS THAT RIGHT?

09:32AM 11   A.   RIGHT.

09:32AM 12   Q.   IF WE CAN TURN TO THE ATTACHMENT ON PAGE 6, THE PROJECT

09:33AM 13   SCOPE.

09:33AM 14       YOU WERE ASKED ABOUT THAT; RIGHT?

09:33AM 15   A.   YES.

09:33AM 16   Q.   AND THE SCOPE OF THE PROJECT CONTEMPLATED MILITARY

09:33AM 17   INTERACTIONS; CORRECT?

09:33AM 18   A.   YES.

09:33AM 19   Q.   AND IT CONTEMPLATED THE ABILITY TO TEST AND TRIAGE WOUNDED

09:33AM 20   SOLDIERS AT THE TIME OF IMPACT AND DURING EVACUATION ON THE

09:33AM 21   MEDEVAC; RIGHT?

09:33AM 22   A.   RIGHT.

09:33AM 23   Q.   AND THAT WAS ONE OF THE GOALS OF THE RELATIONSHIP; RIGHT?

09:33AM 24   A.   CORRECT.

09:33AM 25   Q.   AND YOU ENDED UP SHIPPING THREE DEVICES TO SOCOM; RIGHT?

09:33AM  1      A.   RIGHT.

09:33AM  2      Q.   AND SO SOCOM HAD THE DEVICES IN THEIR POSSESSION; CORRECT?

09:33AM  3      A.   CORRECT.

09:33AM  4      Q.   THEY COULD HAVE DONE TESTING WHILE THE DEVICE WAS IN THEIR

09:33AM  5      POSSESSION; RIGHT?

09:33AM  6      A.   I BELIEVE THEY JUST HAD DEVICES AND NOT CARTRIDGES.

09:33AM  7      Q.   OKAY.  BUT THEY HAD THE DEVICES APART FROM THERANOS,

09:33AM  8      SEPARATE AND APART FROM THERANOS; RIGHT?

09:33AM  9      A.   RIGHT.

09:33AM 10      Q.   ALL RIGHT.  SO YOU ALSO TESTIFIED ABOUT THE U.S. ARMY BURN

09:34AM 11      STUDY.

09:34AM 12           DO YOU REMEMBER THAT?

09:34AM 13      A.   YES.

09:34AM 14      Q.   AND THAT WAS A STUDY THAT WAS CONDUCTED AS A PART OF

09:34AM 15      THERANOS PARTNERING WITH THE U.S. ARMY; RIGHT?

09:34AM 16      A.   I'M NOT SURE WHETHER THE OFFICIAL PARTNERSHIP WAS WITH THE

09:34AM 17      ARMY OR THE AMERICAN BURN ASSOCIATION, BUT IT WAS IN

09:34AM 18      CONSULTATION WITH THE ARMY.

09:34AM 19      Q.   OKAY.  IN CONSULTATION WITH.

09:34AM 20           AND THERE WERE MEMBERS OF THE MILITARY THAT YOU WORKED

09:34AM 21      WITH IN CONNECTION WITH THAT STUDY; IS THAT FAIR?

09:34AM 22      A.   YES.

09:34AM 23      Q.   AND THE STUDY HAD ALREADY BEGUN WHEN YOU HAD ARRIVED AT

09:34AM 24      THERANOS; RIGHT?

09:34AM 25      A.   CORRECT.

EDLIN CROSS BY MS. WALSH (RES.)

09:34AM 1      Q.   AND THE DOCTOR WHO WAS LEADING THE STUDY WAS

09:34AM 2      DR. KEVIN CHUNG; RIGHT?

09:34AM 3      A.   RIGHT.

09:34AM 4      Q.   AND HE WAS A MEMBER OF THE MILITARY; CORRECT?

09:34AM 5      A.   CORRECT.

09:34AM 6      Q.   AND THE STUDY WAS FUNDED, WAS IT NOT, BY THE U.S. ARMY

09:34AM 7      INSTITUTE OF SURGICAL RESEARCH?

09:34AM 8      A.   RIGHT.

09:34AM 9      Q.   AND THE STUDY WAS A CLINICAL TRIAL, WASN'T IT?

09:34AM 10     A.   I AM NOT SURE.

09:34AM 11     Q.   OKAY.  WELL, WE'LL LOOK AT A DOCUMENT AND THAT MAY HELP

09:35AM 12     YOU ANSWER THAT.

09:35AM 13     A.   OKAY.

09:35AM 14     Q.   BUT DURING THE COURSE OF THIS STUDY YOU SENT THERANOS

09:35AM 15     DEVICES TO VARIOUS DIFFERENT HOSPITALS AROUND THE COUNTRY;

09:35AM 16     RIGHT?

09:35AM 17     A.   RIGHT.

09:35AM 18     Q.   AND WE SAW THAT YESTERDAY IN THAT LIST OF DEVICES THAT

09:35AM 19     WERE SENT OUT TO DIFFERENT STATES AND DIFFERENT CITIES.

09:35AM 20          DO YOU REMEMBER THAT?

09:35AM 21     A.   YES.

09:35AM 22     Q.   OKAY.  AND THERE WERE ABOUT 40 EDISONS THAT WERE SENT TO

09:35AM 23     DIFFERENT HOSPITALS, GIVE OR TAKE?

09:35AM 24     A.   I THINK THAT'S ABOUT RIGHT.

09:35AM 25     Q.   AND THE HOSPITAL RECEIVED THE DEVICES AND WERE ABLE TO USE

EDLIN CROSS BY MS. WALSH (RES.)

09:35AM  1    THOSE DEVICES ON THEIR OWN; RIGHT?

09:35AM  2    A.   RIGHT.

09:35AM  3    Q.   AND THAT WAS FOR THE PURPOSES OF THE STUDY; CORRECT?

09:35AM  4    A.   CORRECT.

09:35AM  5    Q.   AND THE DEVICES THAT WERE SENT WERE 3 SERIES DEVICES;

09:35AM  6    RIGHT?

09:35AM  7    A.   CORRECT.

09:35AM  8    Q.   OKAY.  AND SO THE POINT OF THE STUDY WAS TO DO AN

09:35AM  9    EVALUATION OF SEPSIS IN CONNECTION WITH BURN VICTIMS.

09:35AM  10       DO YOU REMEMBER THAT?

09:35AM  11   A.   YES.

09:35AM  12   Q.   AND THE ARMY OR THE PEOPLE WHO WERE DOING THIS STUDY CAME

09:36AM  13   TO LEARN THAT BURN VICTIMS HAVE A PARTICULAR SUSCEPTIBILITY TO

09:36AM  14   SEPSIS; IS THAT RIGHT?

09:36AM  15   A.   YES.

09:36AM  16   Q.   OKAY.  AND SEPSIS IS AN EXTREMELY SERIOUS CONDITION;

09:36AM  17   CORRECT?

09:36AM  18   A.   CORRECT.

09:36AM  19   Q.   IT CAN BE LIFE THREATENING; RIGHT?

09:36AM  20   A.   RIGHT.

09:36AM  21   Q.   AND SO THE POINT OF THE STUDY WAS TO TRY TO IMPROVE

09:36AM  22   TREATMENT FOR THOSE BURN VICTIMS TO PREVENT SEPSIS; CORRECT?

09:36AM  23   PREVENT OR TREAT SEPSIS?

09:36AM  24   A.   I THINK THAT'S FAIR.

09:36AM  25   Q.   OKAY.  AND YOUR ROLE IN THE STUDY WAS ESSENTIALLY AS A

09:36AM   1    COORDINATOR; RIGHT?

09:36AM   2    A.   RIGHT.

09:36AM   3    Q.   SIMILAR TO YOUR ROLE IN OTHER ASPECTS OF THE COMPANY -- OF

09:36AM   4    THERANOS; RIGHT?

09:36AM   5    A.   RIGHT.

09:36AM   6    Q.   AND IN THAT ROLE, YOU COMMUNICATED WITH RESEARCH

09:36AM   7    COORDINATORS AT THE DIFFERENT HOSPITALS; RIGHT?

09:36AM   8    A.   RIGHT.

09:36AM   9    Q.   IF THEY HAD QUESTIONS, THEY WOULD CONTACT YOU?

09:36AM   10   A.   RIGHT.

09:36AM   11   Q.   AND YOU DID TRAINING AT THE HOSPITALS; CORRECT?

09:37AM   12   A.   CORRECT.

09:37AM   13   Q.   SOME OF THE HOSPITALS ALREADY HAD THE 3.0 DEVICES; RIGHT?

09:37AM   14   A.   CORRECT.

09:37AM   15   Q.   AND SOME DIDN'T; RIGHT?

09:37AM   16   A.   RIGHT.

09:37AM   17   Q.   AND FOR ONES WHO DIDN'T, YOU SENT THOSE DEVICES TO THE

09:37AM   18   HOSPITALS; CORRECT?

09:37AM   19   A.   YES.

09:37AM   20   Q.   OKAY.  AND WHEN YOU SENT THOSE DEVICES TO THOSE HOSPITALS,

09:37AM   21   YOU WORKED WITH THE SOFTWARE ENGINEERS AT THERANOS TO PREPARE

09:37AM   22   THE DEVICES; RIGHT?

09:37AM   23   A.   RIGHT.

09:37AM   24   Q.   BECAUSE THE DEVICES HAD TO BE PREPARED AND PACKAGED AND

09:37AM   25   SHIPPED OUT TO THE HOSPITALS.

EDLIN CROSS BY MS. WALSH (RES.)

| | | |
|---|---|---|
| 09:37AM | 1 | IS THAT FAIR? |
| 09:37AM | 2 | A.   YES. |
| 09:37AM | 3 | Q.   OKAY.  SO TURN IN YOUR BINDER TO 10462. |
| 09:37AM | 4 | A.   OKAY.  LET ME JUST GET THERE. |
| 09:38AM | 5 | Q.   OKAY.  IS THIS AN EMAIL BETWEEN YOU AND A PERSON NAMED |
| 09:38AM | 6 | ELSA COATES AND OTHERS? |
| 09:38AM | 7 | A.   YES. |
| 09:38AM | 8 | Q.   IT'S FROM ELSA COATES; CORRECT? |
| 09:38AM | 9 | A.   CORRECT. |
| 09:38AM | 10 | Q.   AND WHO WAS ELSA COATES? |
| 09:38AM | 11 | A.   SHE WAS A CLINICAL RESEARCH COORDINATOR WITH THE ARMY. |
| 09:38AM | 12 | Q.   OKAY.  AND THE DATE OF THE EMAIL IS NOVEMBER 9TH, 2012; IS |
| 09:38AM | 13 | THAT RIGHT? |
| 09:38AM | 14 | A.   YES. |
| 09:38AM | 15 | Q.   AND WAS THIS EMAIL IN CONNECTION WITH YOUR WORK FOR THE |
| 09:38AM | 16 | BURN STUDY? |
| 09:38AM | 17 | A.   YES. |
| 09:38AM | 18 | MS. WALSH:  YOUR HONOR, WE OFFER 10462. |
| 09:38AM | 19 | MR. BOSTIC:  NO OBJECTION. |
| 09:38AM | 20 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:38AM | 21 | (DEFENDANT'S EXHIBIT 10462 WAS RECEIVED IN EVIDENCE.) |
| 09:38AM | 22 | BY MS. WALSH: |
| 09:38AM | 23 | Q.   OKAY.  LET'S TAKE A LOOK AT PAGE 1, THIS FIRST PAGE THAT |
| 09:38AM | 24 | WE ARE ON. |
| 09:38AM | 25 | THIS EMAIL WAS SENT FROM ELSA COATES TO YOU AND A WHOLE |

09:38AM  1    GROUP OF OTHER PEOPLE.

09:38AM  2         DO YOU SEE THAT?

09:38AM  3    A.   YES.

09:38AM  4    Q.   AND GOING DOWN TO THE FOURTH PARAGRAPH, THE EMAIL GIVES

09:39AM  5    SOME DIRECTIONS ON WHERE YOU SHOULD BE DROPPED OFF.

09:39AM  6         DO YOU SEE THAT?

09:39AM  7    A.   YES.

09:39AM  8    Q.   AND IT'S THE SAN ANTONIO MILITARY MEDICAL CENTER; RIGHT?

09:39AM  9    A.   YES.

09:39AM 10    Q.   AND IT SAYS IT'S "FORMALLY KNOWN AS THE BROOKE ARMY

09:39AM 11    MEDICAL CENTER"; RIGHT?

09:39AM 12    A.   RIGHT.

09:39AM 13    Q.   IF WE CAN TURN TO PAGE 2, THERE WAS A LONG LIST OF PEOPLE

09:39AM 14    AT THE TOP OF PAGE 2 WHO WERE GOING TO THIS MEETING?

09:39AM 15    A.   RIGHT.

09:39AM 16    Q.   AND JUST SO IT'S CLEAR, THIS WAS ABOUT A MEETING THAT YOU

09:39AM 17    WERE GOING TO ATTEND WITH A BUNCH OF OTHER PEOPLE; RIGHT?

09:39AM 18    A.   CORRECT.

09:39AM 19    Q.   AND THESE PEOPLE ARE ON THE EMAIL?

09:39AM 20    A.   YES.

09:39AM 21    Q.   AND THIS LIST ARE SOME OF THE ATTENDEES AT THAT MEETING;

09:39AM 22    RIGHT?

09:39AM 23    A.   YES.

09:39AM 24    Q.   AND SOME OF THEM YOU CAN SEE ARE MEDICAL DOCTORS; RIGHT?

09:39AM 25    A.   CORRECT.

```
09:39AM   1    Q.   AND THERE'S YOU AT THE BOTTOM; RIGHT?

09:40AM   2    A.   YES.

09:40AM   3    Q.   AND YOU'RE REPRESENTING THERANOS?

09:40AM   4    A.   RIGHT.

09:40AM   5    Q.   AND IF WE GO DOWN TO THE LAST EMAIL OR THE LAST ONE ON

09:40AM   6    PAGE 2, THIS IS FROM ELSA COATES?

09:40AM   7    A.   CORRECT.

09:40AM   8    Q.   AND SHE SAYS, "OUR OBJECTIVE IS TO PROVIDE EXTENSIVE

09:40AM   9    TRAINING ON THE PROTOCOL AND INTERVENTIONAL PROCEDURES,

09:40AM  10    THERANOS READERS, VELOS/PAPER, CRFS, REGULATORY DOCUMENTS, AND

09:40AM  11    THE DCC WEBSITE."

09:40AM  12         DO YOU SEE THAT?

09:40AM  13    A.   YES.

09:40AM  14    Q.   AND SO THIS WAS AN EMAIL IN FURTHERANCE OF YOUR PROVIDING

09:40AM  15    TRAINING ON THE THERANOS READERS; IS THAT RIGHT?

09:40AM  16    A.   THAT'S RIGHT.

09:40AM  17    Q.   AND THEN YOU WENT TO THE DIFFERENT HOSPITAL TO GIVE THAT

09:40AM  18    TRAINING; CORRECT?

09:40AM  19    A.   TO -- YES.  I WENT TO SOME OF THE HOSPITAL.  NOT ALL.

09:40AM  20    Q.   SOME?

09:40AM  21    A.   RIGHT.

09:40AM  22    Q.   AND HOW MANY DID YOU GO TO?  DO YOU REMEMBER?

09:40AM  23    A.   I DON'T REMEMBER EXACTLY.  IT COULD BE FIVE OR SIX.

09:41AM  24    Q.   OKAY.  AND THOSE WERE IN VARIOUS DIFFERENT PARTS OF THE

09:41AM  25    COUNTRY?
```

EDLIN CROSS BY MS. WALSH (RES.)

| | | |
|---|---|---|
| 09:41AM | 1 | A.   CORRECT. |
| 09:41AM | 2 | Q.   OKAY.  AND SO WHEN YOU WENT TO THE HOSPITAL, AND EVEN WHEN |
| 09:41AM | 3 | YOU WERE BACK AT THERANOS, YOU WOULD KEEP IN CONTACT WITH THE |
| 09:41AM | 4 | PEOPLE AT THE HOSPITAL RUNNING THOSE MACHINES; IS THAT FAIR? |
| 09:41AM | 5 | A.   YES. |
| 09:41AM | 6 | Q.   AND IF THEY HAD QUESTIONS ABOUT THE MACHINE, THEY WOULD |
| 09:41AM | 7 | CALL YOU; RIGHT? |
| 09:41AM | 8 | A.   YES. |
| 09:41AM | 9 | Q.   AND IF THEY HAD ANY ISSUES, LIKE CONNECTIVITY REGARDING |
| 09:41AM | 10 | THE MACHINES, THEY WOULD CONTACT YOU; CORRECT? |
| 09:41AM | 11 | A.   CORRECT. |
| 09:41AM | 12 | Q.   OR SOMETIMES CARTRIDGES NEEDED TO BE REPLACED.  THAT WOULD |
| 09:41AM | 13 | BE SOMETHING THAT YOU WOULD TALK TO THEM ABOUT; RIGHT? |
| 09:41AM | 14 | A.   RIGHT. |
| 09:41AM | 15 | Q.   OKAY.  AND YOU WERE THE ONE RESPONSIBLE FOR GETTING THEM |
| 09:41AM | 16 | WHATEVER THEY NEEDED SO THAT THEY COULD RUN THE MACHINE IN THE |
| 09:41AM | 17 | HOSPITAL; RIGHT? |
| 09:41AM | 18 | A.   RIGHT. |
| 09:41AM | 19 | Q.   AND SO ONCE THE STUDY BEGAN, DATA STARTED TO BE GENERATED; |
| 09:42AM | 20 | RIGHT? |
| 09:42AM | 21 | A.   RIGHT. |
| 09:42AM | 22 | Q.   BLOOD SAMPLES WERE TAKEN FROM THE PATIENTS; RIGHT? |
| 09:42AM | 23 | A.   RIGHT. |
| 09:42AM | 24 | Q.   AND THE SAMPLES WERE ANALYZED ON THE THERANOS READERS; |
| 09:42AM | 25 | RIGHT? |

09:42AM 1    A.   RIGHT.

09:42AM 2    Q.   THEY WERE SENT BACK DIGITALLY TO THERANOS; CORRECT?

09:42AM 3    A.   THE DATA, YES.

09:42AM 4    Q.   THE DATA, YES.

09:42AM 5         AND THAT DATA WAS PROVIDED TO DR. CHUNG; RIGHT?

09:42AM 6    A.   YES.

09:42AM 7    Q.   HE WAS THE ONE WHO WAS IN CHARGE OF THE ENTIRE STUDY;

09:42AM 8    CORRECT?

09:42AM 9    A.   CORRECT.

09:42AM 10   Q.   AND THAT STUDY WENT ON FOR THREE OR FOUR YEARS, DIDN'T IT?

09:42AM 11   A.   IT DID.

09:42AM 12   Q.   AT THE END OF THE STUDY, A REPORT WAS PUBLISHED ON THE

09:42AM 13   FINDINGS.

09:42AM 14        DO YOU REMEMBER THAT?

09:42AM 15   A.   YES.

09:42AM 16   Q.   AND THAT WAS A CULMINATION OF ALL OF THE WORK THAT HAD

09:42AM 17   BEEN DONE OVER THE THREE OR FOUR YEARS FOR THAT STUDY; RIGHT?

09:42AM 18   A.   RIGHT.

09:42AM 19   Q.   AND IT INVOLVED A LOT OF WORK; RIGHT?

09:42AM 20   A.   YES.

09:42AM 21   Q.   IT INVOLVED OTHER SCIENTISTS AT THERANOS; CORRECT?

09:42AM 22   A.   CORRECT.

09:42AM 23   Q.   SOFTWARE ENGINEERS; RIGHT?

09:42AM 24   A.   RIGHT.

09:42AM 25   Q.   AND YOU PLAYED A COORDINATING ROLE IN THOSE EFFORTS;

09:42AM  1    CORRECT?

09:42AM  2    A.   YES.

09:42AM  3    Q.   OKAY.  IF YOU CAN TURN TO 7694.

09:43AM  4         DO YOU SEE THAT?

09:43AM  5    A.   YES.

09:43AM  6    Q.   AND IS THAT THE RESULT OF THE STUDY THAT WAS PUBLISHED ON

09:43AM  7    THE BURN STUDY?

09:43AM  8    A.   YES.

09:43AM  9              MS. WALSH:  YOUR HONOR WE OFFER 7694?

09:43AM  10             MR. BOSTIC:  NO OBJECTION.

09:43AM  11             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:43AM  12        (DEFENDANT'S EXHIBIT 7694 WAS RECEIVED IN EVIDENCE.)

09:43AM  13   BY MS. WALSH:

09:43AM  14   Q.   OKAY.  SO LET'S JUST TAKE A LOOK FIRST AT THE TITLE OF

09:43AM  15   THIS EXHIBIT.

09:43AM  16        THE TITLE IS HIGH-VOLUME HEMOFILTRATION IN ADULT BURN

09:43AM  17   PATIENTS WITH SEPTIC SHOCK AND ACUTE KIDNEY INJURY; A MULTI

09:43AM  18   CENTER RANDOMIZED CONTROLLED TRIAL."

09:43AM  19        DO YOU SEE THAT?

09:43AM  20   A.   YES.

09:43AM  21   Q.   AND BELOW THE TITLE IS KEVIN K. CHUNG.

09:43AM  22        THAT'S DR. CHUNG; RIGHT?

09:43AM  23   A.   YES.

09:43AM  24   Q.   AND THEN THERE'S ELSA COATES, WHO YOU WERE ALSO IN CONTACT

09:44AM  25   WITH; RIGHT?

09:44AM   1    A.   RIGHT.

09:44AM   2    Q.   AND THEN AT THE BOTTOM OF THIS PAGE, THIS REPORT WAS

09:44AM   3    PRESENTED ON MARCH 24TH, 2017.

09:44AM   4         IS THAT CORRECT?

09:44AM   5    A.   YES.

09:44AM   6    Q.   AND THAT WAS AFTER YOU LEFT THERANOS; RIGHT?

09:44AM   7    A.   YES.

09:44AM   8    Q.   OKAY.  AND IF WE GO TO PAGE 3 OF THE REPORT, THE TOP LEFT

09:44AM   9    PARAGRAPH, DO YOU SEE ALL SIX CYTOKINES, AND THEN THERE'S A

09:44AM   10   LIST OF THESE DIFFERENT ABBREVIATIONS?

09:44AM   11   A.   YES.

09:44AM   12   Q.   OKAY.  AND IT SAYS THEY WERE MEASURED BY A SANDWICH ELISA

09:44AM   13   METHOD ON THE THERANOS 3.0 DEVICE?

09:44AM   14   A.   YES.

09:44AM   15   Q.   AND THOSE ABBREVIATIONS, EACH ONE OF THOSE IS A DIFFERENT

09:44AM   16   ASSAY, IS IT NOT?

09:44AM   17   A.   THAT'S MY UNDERSTANDING.

09:44AM   18   Q.   SO THERE WERE SIX DIFFERENT ASSAYS THAT WERE USED IN

09:45AM   19   CONNECTION WITH THE STUDY; RIGHT?

09:45AM   20   A.   RIGHT.

09:45AM   21   Q.   ALL ON THE 3.0 DEVICE?

09:45AM   22   A.   RIGHT.

09:45AM   23   Q.   OKAY.  IF YOU CAN TURN TO PAGE 7 OF THE REPORT.

09:45AM   24        PAGE 7 HAS THE ACKNOWLEDGEMENTS FOR THE STUDY; RIGHT?

09:45AM   25   A.   RIGHT.

09:45AM   1   Q.   AND IN THE SECOND COLUMN, IT'S A LITTLE HARD TO FIND, BUT

09:45AM   2   IN THE TOP PARAGRAPH ABOVE THE WORD "FUNDING," ABOUT FIVE LINES

09:45AM   3   UP.

09:45AM   4        DO YOU SEE THAT?

09:45AM   5   A.   YES.

09:45AM   6   Q.   THERE'S AN ACKNOWLEDGEMENT FOR THERANOS; RIGHT?

09:45AM   7   A.   RIGHT.

09:45AM   8   Q.   AND ELIZABETH HOLMES; CORRECT?

09:45AM   9   A.   CORRECT.

09:45AM  10   Q.   AND DANIEL YOUNG; RIGHT?

09:45AM  11   A.   RIGHT.

09:45AM  12   Q.   AND YOU; RIGHT?

09:45AM  13   A.   RIGHT.

09:45AM  14   Q.   AND THEN BELOW THAT IT SAYS, "THE FUNDING - THIS WORK WAS

09:45AM  15   FUNDED BY THE UNITED STATES ARMY MEDICAL RESEARCH AND MATERIAL

09:45AM  16   COMMAND."

09:45AM  17        DO YOU SEE THAT?

09:45AM  18   A.   I DO.

09:46AM  19   Q.   OKAY.  YOU CAN TAKE THAT DOWN.

09:46AM  20        SO THIS STUDY WAS A SUCCESS.  IT RESULTED IN DATA BEING

09:46AM  21   GENERATED; RIGHT?

09:46AM  22             MR. BOSTIC:  OBJECTION COMPOUND.

09:46AM  23             THE COURT:  DO YOU WANT TO ASK BOTH THOSE

09:46AM  24   SEPARATELY.

09:46AM  25             MS. WALSH:  SURE.

09:46AM   1    Q.   MR. EDLIN, THIS STUDY RESULTED IN DATA BEING GENERATED;

09:46AM   2    RIGHT?

09:46AM   3    A.   RIGHT.

09:46AM   4    Q.   FROM THE THERANOS MACHINES; CORRECT?

09:46AM   5    A.   RIGHT.

09:46AM   6    Q.   AND THAT DATA WAS ANALYZED BY DR. CHUNG; RIGHT?

09:46AM   7    A.   RIGHT.

09:46AM   8    Q.   IT ENDED UP IN A REPORT; CORRECT?

09:46AM   9    A.   CORRECT.

09:46AM   10   Q.   AND THAT REPORT WAS PRESENTED TO A MEDICAL ASSOCIATION;

09:46AM   11   RIGHT?

09:46AM   12   A.   RIGHT.

09:46AM   13   Q.   AND IT WAS PUBLISHED; RIGHT?

09:46AM   14   A.   RIGHT.

09:46AM   15   Q.   AND SO THE STUDY WAS A SUCCESS; IS THAT FAIR?

09:46AM   16   A.   I BELIEVE I WOULD SAY THAT THE STUDY WAS COMPLETED.  I

09:46AM   17   THINK THE INVESTIGATORS WERE HOPING TO GET MORE PATIENTS

09:46AM   18   ENROLLED, BUT IT WAS COMPLETED.

09:47AM   19   Q.   OKAY.  BUT FOR THE PATIENTS WHO WERE, THESE WERE BURN

09:47AM   20   VICTIMS; RIGHT?

09:47AM   21   A.   RIGHT.

09:47AM   22   Q.   SO FOR THE PATIENTS WHO WERE ENROLLED --

09:47AM   23            MADAM COURT REPORTER:  EXCUSE ME.  ONE MOMENT,

09:47AM   24   COUNSEL.

09:47AM   25            THE COURT:  EXCUSE ME.  I HEAR SOME DEVICE GOING

09:47AM  1      OFF.  CAN EVERYONE PLEASE CHECK YOUR DEVICES.

09:47AM  2          IS IT YOUR MACHINE?

09:48AM  3              MADAM COURT REPORTER:  I DON'T KNOW.

09:48AM  4              THE COURT:  MS. WALSH.

09:48AM  5              MS. WALSH:  SHOULD WE PAUSE AGAIN?

09:48AM  6          (PAUSE IN PROCEEDINGS.)

09:49AM  7      BY MS. WALSH:

09:49AM  8      Q.  SO, MR. EDLIN, UNDERSTANDING THAT THERE WERE PERHAPS NOT

09:49AM  9      AS MANY PATIENTS AS EVERYONE WANTED IN THE STUDY, THE PATIENTS

09:49AM  10     WHO DID PARTICIPATE IN THE STUDY, DATA WAS GENERATED FROM THOSE

09:49AM  11     PATIENTS; RIGHT?

09:49AM  12     A.  CORRECT.

09:49AM  13     Q.  AND THE STUDY WAS COMPLETED; RIGHT?

09:49AM  14     A.  YES.

09:49AM  15     Q.  AND A REPORT WAS PUBLISHED AND DELIVERED AT A CONFERENCE;

09:49AM  16     CORRECT?

09:49AM  17     A.  YES.

09:49AM  18     Q.  OKAY.  LET'S NOW MOVE ON TO YOUR WORK IN CONNECTION WITH

09:50AM  19     THE AFRICAN COMMAND.  OKAY?

09:50AM  20     A.  YES.

09:50AM  21     Q.  AND THAT'S ABBREVIATED AS AFRICOM; RIGHT?

09:50AM  22     A.  YES.

09:50AM  23     Q.  AND WHAT AFRICOM IS, IS IT'S THE MILITARY COMMAND FOR ALL

09:50AM  24     OF -- ALL OF THE MILITARY WHO IS DOING WORK ON THE AFRICAN

09:50AM  25     CONTINENT; IS THAT RIGHT?

09:50AM   1       A.   RIGHT.

09:50AM   2       Q.   OKAY.  AND THE GOVERNMENT ASKED YOU YESTERDAY WHETHER ANY

09:50AM   3   CLINICAL TESTING WAS PERFORMED ON THE MACHINE, ON THE THERANOS

09:50AM   4   MACHINE THAT WAS GIVEN TO AFRICOM.

09:50AM   5       DO YOU REMEMBER THAT?

09:50AM   6       A.   YES.

09:50AM   7       Q.   AND THE ANSWER WAS NO, THERE WAS NO CLINICAL TESTING

09:50AM   8   PERFORMED; RIGHT?

09:50AM   9       A.   RIGHT.

09:50AM  10       Q.   BUT THE FIRST STEP OF THAT RELATIONSHIP, WAS JUST TO SEE

09:50AM  11   HOW THE DEVICE PERFORMED IN CONDITIONS IN AFRICA; IS THAT

09:50AM  12   RIGHT?

09:50AM  13       A.   RIGHT.

09:50AM  14       Q.   BECAUSE THERE WERE EXTREME TEMPERATURES IN AFRICA; RIGHT?

09:50AM  15       A.   RIGHT.

09:50AM  16       Q.   AND AFRICOM HAD TO MAKE SURE THAT THE DEVICE COULD

09:50AM  17   WITHSTAND THOSE CONDITIONS; RIGHT?

09:50AM  18       A.   CORRECT.

09:51AM  19       Q.   AND SO YOU WERE, AGAIN, A COORDINATOR FOR THE DISCUSSIONS

09:51AM  20   WITH AFRICOM; RIGHT?

09:51AM  21       A.   RIGHT.

09:51AM  22       Q.   LET'S TAKE A LOOK THEN, IN CONNECTION WITH YOUR WORK,

09:51AM  23   LET'S TAKE A LOOK AT 13993 IN YOUR BINDER.

09:51AM  24       DO YOU SEE THAT?

09:51AM  25       A.   I DO.

09:51AM 1    Q.   AND JUST TAKE A LOOK THROUGH THE CHAIN.  IT'S A LONG

09:51AM 2    EMAIL.

09:51AM 3    A.   I'M FAMILIAR WITH IT, YES.

09:51AM 4    Q.   OKAY.  IS THAT AN EMAIL CHAIN WITH LIEUTENANT COLONEL

09:52AM 5    GIVENS, MS. HOLMES, CHRISTIAN HOLMES, AND YOU ABOUT YOUR WORK

09:52AM 6    IN CONNECTION WITH AFRICOM?

09:52AM 7    A.   YES.

09:52AM 8         MS. WALSH:  YOUR HONOR, THE GOVERNMENT -- WE OFFER

09:52AM 9    13993.

09:52AM 10        MR. BOSTIC:  YOUR HONOR, I WOULD OBJECT TO THIS

09:52AM 11   COMING IN WITHOUT THE ATTACHMENT.

09:52AM 12        THE COURT:  IS THAT A?

09:52AM 13        MS. WALSH:  IT IS A.  THAT'S FINE.

09:52AM 14        THE COURT:  DO YOU SEEK TO ADMIT 993 AND 993A?

09:52AM 15        MS. WALSH:  I'M HAPPY TO DO THAT, YES.

09:52AM 16        MR. BOSTIC:  NO OBJECTION.

09:52AM 17        THE COURT:  BOTH OF THOSE ARE ADMITTED 13993 AND

09:52AM 18   13993A ARE ADMITTED.  THEY MAY BE PUBLISHED.

09:52AM 19        (DEFENDANT'S EXHIBITS 13993 AND 13993A WERE RECEIVED IN

09:52AM 20   EVIDENCE.)

09:52AM 21   BY MS. WALSH:

09:52AM 22   Q.   OKAY.  SO LET'S TURN TO PAGE 11 OF THE EMAIL CHAIN.

09:52AM 23        ARE YOU THERE?

09:52AM 24   A.   YES.

09:52AM 25   Q.   OKAY.  THIS IS AN EMAIL FROM MELISSA GIVENS TO YOU,

09:53AM   1    MS. HOLMES, AND MR. HOLMES.

09:53AM   2         DO YOU SEE THAT?

09:53AM   3    A.   YES.

09:53AM   4    Q.   AND BY THE WAY, MR. BALWANI IS NOT ON THIS EMAIL CHAIN;

09:53AM   5    RIGHT?

09:53AM   6    A.   RIGHT.

09:53AM   7    Q.   OKAY.  AND WHAT -- MELISSA GIVENS WAS A

09:53AM   8    LIEUTENANT COLONEL; CORRECT?

09:53AM   9    A.   CORRECT.

09:53AM   10   Q.   AND WHAT SHE SAYS IS THAT "IT HAS BEEN AN EXTREMELY BUSY

09:53AM   11   WEEK FOR ME, SO I HAVE NOT HAD MUCH TIME TO DEVOTE TO PROTOCOL

09:53AM   12   WRITING.

09:53AM   13        "I FIGURED I CAN SEND YOU A SHELL OF THE PROTOCOL AND LET

09:53AM   14   YOU WORK ON FILLING IN PERTINENT DETAILS WHILE I FLESH OUT THE

09:53AM   15   REMAINDER OF THE PROTOCOL."

09:53AM   16        DO YOU SEE THAT?

09:53AM   17   A.   YES.

09:53AM   18   Q.   AND SO LET'S GO FORWARD THEN IN TIME TO PAGE 9.

09:53AM   19        AT THE BOTTOM YOU EMAIL LIEUTENANT COLONEL GIVENS.  WE'RE

09:53AM   20   IN MAY 2012?

09:53AM   21   A.   YES.

09:53AM   22   Q.   AND YOU SAY, "LIEUTENANT COLONEL GIVENS,

09:53AM   23        "THANK YOU.  CAN YOU ALSO PLEASE CLARIFY HOW YOU ENVISION

09:53AM   24   THE SHIPPING PROCESS FOR THE DEVICE AND THE CARTRIDGES.  WILL

09:54AM   25   WE BE SENDING THEM SEPARATELY TO DIFFERENT LOCATIONS?  IF SO,

09:54AM 1    CAN YOU PLEASE LET US KNOW WHERE THEY WILL BE SHIPPED?  I

09:54AM 2    RECALL YOUR SAYING DURING OUR MEETING THAT YOU WOULD CARRY THE

09:54AM 3    DEVICE WITH YOU; DOES THIS MEAN THAT WE WOULD FIRST SHIP THE

09:54AM 4    READER TO YOU IN GERMANY, AND THEN SHIP THE CARTRIDGES

09:54AM 5    SEPARATELY TO THE LOCATION IN THEATER?  THIS INFORMATION WILL

09:54AM 6    HELP ENSURE THAT WE HAVE ALL OF THE CUSTOMS PERMITS FOR

09:54AM 7    SHIPPING."

09:54AM 8         DO YOU SEE THAT?

09:54AM 9    A.   YES.

09:54AM 10   Q.   AND THEN SHE RESPONDS TO YOU IN THE NEXT EMAIL UP AND SHE

09:54AM 11   SAYS, "DAN,

09:54AM 12        "PLEASE PLAN ON SHIPPING THE DEVICE AND CARTRIDGES TO ME

09:54AM 13   IN GERMANY."

09:54AM 14        AND THEN IF WE GO DOWN TO THE NEXT PARAGRAPH.

09:54AM 15        "I WILL HAND CARRYING EVERYTHING WITH ME TO CAMEROON FOR

09:54AM 16   THE FIRST TEST."

09:54AM 17        DO YOU SEE THAT?

09:54AM 18   A.   YES.

09:54AM 19   Q.   AND LET'S MOVE FORWARD IN TIME TO PAGE 2.

09:54AM 20        AND YOU HAVE MORE QUESTIONS FOR LIEUTENANT COLONEL; RIGHT?

09:54AM 21   A.   RIGHT.

09:54AM 22   Q.   AND YOUR EMAIL AT 8:42 A.M. TO HER ASKS IN THE LAST

09:55AM 23   PARAGRAPH, "CAN YOU ALSO PLEASE ADDRESS THE FOLLOWING QUESTIONS

09:55AM 24   AS WE WORK ON PREPARING THE MATERIALS:

09:55AM 25        "HOW WILL THE CARTRIDGES BE STORED IN THE FIELD?  WE WILL

09:55AM 1    NEED TO PREPARE THE APPROPRIATE PACKAGING.

09:55AM 2        "HOW LONG WILL THE CARTRIDGES BE STORED IN THE FIELD?  YOU

09:55AM 3    MENTIONED THAT IT WOULD BE A LITTLE OVER A WEEK IN CAMEROON --

09:55AM 4    DO YOU HAVE ANY ADDITIONAL DETAILS?  HOW LONG WILL YOU BE IN

09:55AM 5    UGANDA?

09:55AM 6        "HOW WILL THE DEVICE BE TRANSPORTED IN THE FIELD?  I.E.,

09:55AM 7    DO YOU PLAN ON KEEPING THE DEVICE IN ITS PACKAGING IN BETWEEN

09:55AM 8    USE?  WHAT KIND OF CONDITIONS MIGHT BE ON THE MEDEVAC FROM

09:55AM 9    GERMANY TO UGANDA?"

09:55AM 10       AND THEN YOU ASK ABOUT THE POWER OUTLETS WHEN THE DEVICE

09:55AM 11   IS BEING USED.

09:55AM 12       DO YOU SEE THAT?

09:55AM 13   A.   YES.

09:55AM 14   Q.   OKAY.  AND THEN SHE RESPONDS ON PAGES 1 THROUGH 2 OF THIS

09:55AM 15   EMAIL, AND WHAT SHE SAYS IN HER SECOND PARAGRAPH IS, "THE

09:55AM 16   TRAINING SITE HAS OPEN AIR BUILDING WITH NO AC AND THE

09:56AM 17   TEMPERATURE WILL BE BETWEEN 100-110 DEGREES FAHRENHEIT"; RIGHT?

09:56AM 18   A.   RIGHT.

09:56AM 19   Q.   AND THOSE ARE HIGH TEMPERATURES CONSIDERING THAT THE

09:56AM 20   THERANOS DEVICES WERE NOT NECESSARILY BUILT FOR THOSE

09:56AM 21   TEMPERATURES; IS THAT RIGHT?

09:56AM 22   A.   THAT'S MY UNDERSTANDING.

09:56AM 23   Q.   AND THEN ON THE NEXT PAGE SHE SAYS, "WHEN WE FLY THE

09:56AM 24   EQUIPMENT FROM UGANDA, IT WILL BE ON A NON-PRESSURIZED AIRCRAFT

09:56AM 25   AT ALTITUDES LESS THAN 10,000 FEET.  TEMPERATURES WILL RANGE

EDLIN CROSS BY MS. WALSH (RES.)

```
09:56AM   1    FROM 100 DEGREES FAHRENHEIT WITH HIGH HUMIDITY WITH TO

09:56AM   2    60 DEGREES IN FLIGHT."

09:56AM   3        DO YOU SEE THAT?

09:56AM   4    A.   YES.

09:56AM   5    Q.   AND YOU'RE TALKING TO HER ABOUT THE TRANSPORT AND THE

09:56AM   6    VARIOUS DIFFERENT CONDITIONS ON THE FLIGHT; CORRECT?

09:56AM   7    A.   CORRECT.

09:56AM   8    Q.   AND THE TEMPERATURES ARE GOING TO BE PRETTY HIGH IN

09:56AM   9    AFRICA; IS THAT RIGHT?

09:56AM   10   A.   YES.

09:56AM   11   Q.   OKAY.  AND SO THERANOS THEN WORKED TO MAKE SURE THE DEVICE

09:57AM   12   THAT YOU WERE GOING TO SEND HER COULD WITHSTAND THOSE

09:57AM   13   TEMPERATURES; RIGHT?

09:57AM   14   A.   RIGHT.

09:57AM   15   Q.   DO YOU REMEMBER THAT?

09:57AM   16   A.   YES.

09:57AM   17   Q.   OKAY.  LET'S LOOK AT 13986.

09:57AM   18        DO YOU SEE THAT?

09:57AM   19   A.   YES.

09:57AM   20   Q.   AND IS THAT AN EMAIL FROM DANIEL YOUNG TO YOU, MS. HOLMES,

09:57AM   21   AND CHRISTIAN HOLMES?

09:57AM   22   A.   YES.

09:57AM   23   Q.   AND THAT'S IN CONNECTION WITH THE AFRICOM TRAINING AND

09:57AM   24   PROJECT; RIGHT?

09:57AM   25   A.   YES.
```

09:57AM  1          MS. WALSH:  YOUR HONOR, WE OFFER 13986.

09:57AM  2          MR. BOSTIC:  NO OBJECTION.

09:57AM  3          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:57AM  4       (DEFENDANT'S EXHIBIT 13986 WAS RECEIVED IN EVIDENCE.)

09:57AM  5    BY MS. WALSH:

09:57AM  6    Q.   SO THIS IS ON JUNE 1ST, 2012?

09:57AM  7    A.   RIGHT.

09:57AM  8    Q.   AND DANIEL YOUNG IS WRITING TO YOU AND CHRISTIAN HOLMES,

09:57AM  9    COPYING MS. HOLMES.

09:57AM  10          AND WHAT HE SAYS -- AND THE SUBJECT IS AFRICOM TRAINING.

09:57AM  11          AND WHAT HE SAYS IS, "48 HOURS OF CONTINUAL TESTING OF THE

09:58AM  12   READER AT 110 DEGREES FAHRENHEIT COMPLETED SUCCESSFULLY

09:58AM  13   TONIGHT.  WE RAN 100 PROTOCOLS SEQUENTIALLY -- SO I FEEL VERY

09:58AM  14   GOOD ABOUT RELIABILITY FOR THIS EMPLOYMENT.

09:58AM  15          "AFTER REMOVING THE DEVICE FROM THE THERMAL TESTING

09:58AM  16   CHAMBER, THE AFRICOM PROTOCOL WAS TESTED SUCCESSFULLY -- SO IT

09:58AM  17   IS GOOD TO GO FOR YOUR DEMO TOMORROW.

09:58AM  18          "READER IS #106 AND IS SITTING IN THE QA TEST AREA."

09:58AM  19          DO YOU SEE THAT?

09:58AM  20   A.   YES.

09:58AM  21   Q.   AND READER REFERS TO THE DEVICE ITSELF; RIGHT?

09:58AM  22   A.   CORRECT.

09:58AM  23   Q.   OKAY.  AND THE AFRICOM PROTOCOL, THAT WAS THE PROTOCOL

09:58AM  24   THAT LIEUTENANT COLONEL GIVENS GAVE TO THERANOS; RIGHT?

09:58AM  25   A.   RIGHT.

EDLIN CROSS BY MS. WALSH (RES.)

| | | |
|---|---|---|
| 09:58AM | 1 | Q.   SHE DECIDED WHAT TESTS TO RUN; CORRECT? |
| 09:58AM | 2 | A.   SHE DECIDED WHAT TEST RESULTS WOULD APPEAR ON THE SCREEN. |
| 09:58AM | 3 | Q.   RIGHT. |
| 09:58AM | 4 | A.   ON THE READER. |
| 09:58AM | 5 | Q.   RIGHT.  AND SO IT WASN'T CLINICAL TESTING FOR PATIENTS; |
| 09:58AM | 6 | RIGHT? |
| 09:58AM | 7 | A.   RIGHT. |
| 09:58AM | 8 | Q.   IT WAS JUST TO SEE IF THE DEVICE COULD WITHSTAND THESE |
| 09:59AM | 9 | EXTREME CONDITIONS; CORRECT? |
| 09:59AM | 10 | A.   CORRECT. |
| 09:59AM | 11 | Q.   LET'S TURN TO 10446 IN YOUR BINDER. |
| 09:59AM | 12 | DO YOU HAVE THAT? |
| 09:59AM | 13 | A.   I DO. |
| 09:59AM | 14 | Q.   OKAY.  IS THAT ANOTHER EMAIL BETWEEN YOU, |
| 09:59AM | 15 | LIEUTENANT COLONEL GIVENS, MS. HOLMES, AND CHRISTIAN HOLMES? |
| 09:59AM | 16 | A.   YES. |
| 09:59AM | 17 | Q.   AND DID THAT RELATE AGAIN TO THE AFRICOM PROJECT? |
| 09:59AM | 18 | A.   YES. |
| 09:59AM | 19 | MS. WALSH:  YOUR HONOR, WE OFFER 10446. |
| 09:59AM | 20 | MR. BOSTIC:  NO OBJECTION. |
| 09:59AM | 21 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:59AM | 22 | (DEFENDANT'S EXHIBIT 10446 WAS RECEIVED IN EVIDENCE.) |
| 09:59AM | 23 | BY MS. WALSH: |
| 09:59AM | 24 | Q.   OKAY.  SO IF WE GO TO THE BOTTOM EMAIL FROM |
| 10:00AM | 25 | LIEUTENANT COLONEL GIVENS. |

EDLIN CROSS BY MS. WALSH (RES.)

10:00AM 1        SHE WRITES, "THERANOS TEAM.

10:00AM 2        "I MADE IT BACK FROM 2 TRIPS TO AFRICA AND MANAGED TO WORK

10:00AM 3  THROUGH ALL OF THE CASES IN THE PROTOCOL.

10:00AM 4        "THE MACHINE TRAVELED WELL AND FUNCTIONED WELL.  MY ONLY

10:00AM 5  COMPLAINT IS THE TOUCHSCREEN -- VERY FRUSTRATING.

10:00AM 6        "I WILL BE PREPARING A FULL REPORT."

10:00AM 7        AND THEN SHE GOES ON.

10:00AM 8        A COUPLE OF PARAGRAPHS DOWN SHE SAYS, "BECAUSE THE MACHINE

10:00AM 9  SEEMED TO FUNCTION WELL IN THE ENVIRONMENT, I AM GOING TO WRITE

10:00AM 10  A PREPROPOSAL TO SUBMIT TO THE USSOCOM BISC IN HOPES OF GAINING

10:00AM 11  FUNDING FOR A FULL PROPOSAL THROUGH THE USSOCOM BAA FOR

10:00AM 12  EXTRAMURAL BIOMEDICAL RESEARCH AND DEVELOPMENT."

10:00AM 13        DO YOU SEE THAT?

10:00AM 14  A.   YES.

10:00AM 15  Q.   AND SHE GOES ON.

10:00AM 16        "MY GOAL WILL BE TO DEPLOY 3-5 MACHINES TO AFRICA TO USE

10:00AM 17  REALTIME AT LOCATIONS WHERE WE HAVE PERSISTENT PRESENCE AND

10:00AM 18  COLLECT REAL LABORATORY DATA AND COMPARE IT TO THE CURRENT

10:01AM 19  STANDARD OF CARE."

10:01AM 20        DO YOU SEE THAT?

10:01AM 21  A.   I DO.

10:01AM 22  Q.   SO SHE'S SAYING THAT THE DEVICE TRAVELLED WELL, IT

10:01AM 23  FUNCTIONED WELL; RIGHT?

10:01AM 24  A.   RIGHT.

10:01AM 25  Q.   AND SHE DIDN'T LIKE THE TOUCHSCREEN; RIGHT?

10:01AM 1     A.   RIGHT.

10:01AM 2     Q.   BUT THE NEXT STEP WAS TO WRITE UP A REPORT AND A

10:01AM 3     PREPROPOSAL FOR IT TO BE USED FOR TESTING; RIGHT?

10:01AM 4     A.   RIGHT.

10:01AM 5     Q.   OKAY.  AND THEN LET'S LOOK AT THE TOP EMAIL.

10:01AM 6          YOU REPLIED TO HER, "LIEUTENANT COLONEL GIVENS,

10:01AM 7          "WE ARE VERY HAPPY TO HEAR THAT THE TRIP WENT WELL AND

10:01AM 8     THAT THERE WERE NO ISSUES WITH TRAVEL AND FUNCTION OF THE

10:01AM 9     DEVICE.  AS SOON AS WE RECEIVE THE DEVICE WE WILL WORK ON

10:01AM 10    COMPILING THE PERFORMANCE DATA FOR YOU.

10:01AM 11         "PLEASE NOTE THAT WE HAVE DEVELOPED A FAMILY OF NEXT

10:01AM 12    GENERATION SYSTEMS WHICH INCLUDE A MUCH MORE DYNAMIC AND

10:01AM 13    SENSITIVE TOUCHSCREEN."

10:01AM 14         DO YOU SEE THAT?

10:01AM 15    A.   YES.

10:01AM 16    Q.   AND SO LIEUTENANT COLONEL GIVENS GOT THE 3.0 DEVICE;

10:01AM 17    RIGHT?

10:01AM 18    A.   RIGHT.

10:01AM 19    Q.   AND THE NEXT GENERATION MACHINES WERE THE 4 SERIES; RIGHT?

10:02AM 20    A.   RIGHT.

10:02AM 21    Q.   AND WE SPOKE ABOUT THOSE YESTERDAY; CORRECT?

10:02AM 22    A.   RIGHT.

10:02AM 23    Q.   AND THOSE 4 SERIES MACHINES HAD BETTER USER INTERFACES;

10:02AM 24    RIGHT?

10:02AM 25    A.   RIGHT.

EDLIN CROSS BY MS. WALSH (RES.)

10:02AM 1    Q.   MORE SENSITIVE SCREENS; RIGHT?

10:02AM 2    A.   RIGHT.

10:02AM 3    Q.   BETTER GRAPHICS; CORRECT?

10:02AM 4    A.   RIGHT.

10:02AM 5    Q.   AND SO THAT'S WHAT YOU'RE TELLING HER IS THAT WE HAVE NEXT

10:02AM 6    GENERATION GRAPHICS THAT ARE GOING TO BE BETTER; CORRECT?

10:02AM 7    A.   THIS IS WHAT ELIZABETH TOLD ME TO SAY TO HER, BUT THAT'S

10:02AM 8    WHAT IS BEING SAID HERE.

10:02AM 9    Q.   OKAY.  SO MS. HOLMES REVIEWED THIS EMAIL BEFORE YOU SENT

10:02AM 10   IT?

10:02AM 11   A.   YES.

10:02AM 12   Q.   OKAY.  BUT THIS IS WHAT WAS SENT TO LIEUTENANT COLONEL

10:02AM 13   GIVENS; RIGHT?

10:02AM 14   A.   RIGHT.

10:02AM 15   Q.   AND IT'S TRUE, WASN'T IT, THAT THE SCREENS ON THE 4 SERIES

10:02AM 16   DEVICES WERE BETTER; RIGHT?

10:02AM 17   A.   YES.

10:02AM 18   Q.   OKAY.  ALL RIGHT.  LET'S TALK NOW ABOUT YOUR WORK WITH

10:03AM 19   U.S. CENTRAL COMMAND.

10:03AM 20       DO YOU REMEMBER THAT?

10:03AM 21   A.   YES.

10:03AM 22   Q.   AND SO U.S. CENTRAL COMMAND WAS ABBREVIATED CENTCOM;

10:03AM 23   RIGHT?

10:03AM 24   A.   RIGHT.

10:03AM 25   Q.   AND IT WAS ANOTHER DIVISION OF THE DEPARTMENT OF DEFENSE;

10:03AM 1    CORRECT?

10:03AM 2    A.   CORRECT.

10:03AM 3    Q.   AND CENTCOM OVERSAW ALL OF THE MILITARY THAT WAS LOCATED

10:03AM 4    IN THE MIDDLE EAST; RIGHT?

10:03AM 5    A.   RIGHT.

10:03AM 6    Q.   AND YOU TESTIFIED THAT THAT RELATIONSHIP WITH CENTCOM

10:03AM 7    BEGAN IN ABOUT APRIL 2012.

10:03AM 8        DO YOU REMEMBER THAT?

10:03AM 9    A.   YES.

10:03AM 10   Q.   AND THE GOAL OF THE RELATIONSHIP WAS TO DEPLOY THERANOS

10:03AM 11   DEVICES TO AFGHANISTAN; RIGHT?

10:03AM 12   A.   YES.

10:03AM 13   Q.   WHERE THERE WAS A WAR GOING ON; CORRECT?

10:03AM 14   A.   RIGHT.

10:03AM 15   Q.   OKAY.  AND YOU ALSO TESTIFIED YESTERDAY THAT IN

10:04AM 16   APRIL 2012, THINGS WERE STILL IN THE PLANNING STAGES WITH

10:04AM 17   CENTCOM; RIGHT?

10:04AM 18   A.   RIGHT.

10:04AM 19   Q.   OKAY.  THEN IN SEPTEMBER 2012, YOU AND MR. HOLMES

10:04AM 20   TRAVELLED TO THE MACDILL AIR FORCE BASE IN TAMPA; RIGHT?

10:04AM 21   A.   I WOULD HAVE TO SEE THE EXACT DATE.

10:04AM 22   Q.   OKAY.  IF YOU LOOK IN YOUR BINDER AT 20205.

10:04AM 23   A.   OKAY.

10:04AM 24   Q.   JUST GLANCE THROUGH THAT.

10:05AM 25   A.   YES, I DO SEE THAT.

10:05AM  1    Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WENT TO THE

10:05AM  2    MACDILL AIRFORCE BASE IN SEPTEMBER OF 2012?

10:05AM  3    A.   IT DOES.

10:05AM  4    Q.   OKAY.  AND YOU WENT WITH MR. HOLMES; RIGHT?

10:05AM  5    A.   RIGHT.

10:05AM  6    Q.   THAT'S CHRISTIAN HOLMES; RIGHT?

10:05AM  7    A.   RIGHT.

10:05AM  8    Q.   AND YOU SENT THE DEVICE SEPARATELY; IS THAT RIGHT?

10:05AM  9    A.   RIGHT.

10:05AM  10   Q.   OKAY.  AND YOU SAID YESTERDAY THAT THE MILITARY DID A

10:05AM  11   SECURITY TEST ON THE DEVICE; RIGHT?

10:05AM  12   A.   RIGHT.

10:05AM  13   Q.   AND THAT WAS -- THAT INVOLVED PLUGGING THE DEVICE INTO A

10:05AM  14   SERVER; RIGHT?

10:05AM  15   A.   RIGHT.

10:05AM  16   Q.   AND SEEING WHERE THE VULNERABILITIES WERE IN THE DEVICE

10:05AM  17   WHEN IT WAS CONNECTED TO THE SERVER; RIGHT?

10:05AM  18   A.   RIGHT.

10:05AM  19   Q.   AND THOSE WERE I.T. VULNERABILITIES; RIGHT?

10:05AM  20   A.   YES.

10:05AM  21   Q.   OKAY.  AND THE MILITARY ALSO HAD A REACTION TO THE SIZE OF

10:05AM  22   THE DEVICE WHEN YOU WERE THERE; RIGHT?

10:05AM  23   A.   RIGHT.

10:06AM  24   Q.   MEMBERS OF THE MILITARY THOUGHT IT WAS TOO HEAVY; RIGHT?

10:06AM  25   A.   RIGHT.

EDLIN CROSS BY MS. WALSH (RES.)

10:06AM 1    Q.   AND TOO BIG?

10:06AM 2    A.   RIGHT.

10:06AM 3    Q.   SO YOU TOOK THAT INFORMATION BACK TO THERANOS; CORRECT?

10:06AM 4    A.   CORRECT.

10:06AM 5    Q.   AND IN RESPONSE TO THAT INFORMATION, THERANOS STARTED

10:06AM 6    MODIFYING THAT DEVICE; RIGHT?

10:06AM 7    A.   CORRECT.

10:06AM 8    Q.   THERANOS ENGINEERS WORKED TO MAKE THAT DEVICE SMALLER;

10:06AM 9    CORRECT?

10:06AM 10   A.   CORRECT.

10:06AM 11   Q.   AND LIGHTER; RIGHT?

10:06AM 12   A.   RIGHT.

10:06AM 13   Q.   AND ENGINEERS ALSO WORKED ON ADDRESSING ANY I.T.

10:06AM 14   VULNERABILITIES IN THE DEVICE; RIGHT?

10:06AM 15   A.   AS FAR AS I WAS CONCERNED.

10:06AM 16   Q.   OKAY.  SO TURN IN YOUR BINDER TO 10457.

10:07AM 17   A.   OKAY.

10:07AM 18   Q.   IS THAT AN EMAIL BETWEEN YOU, AND MAJOR CHRISTINE MURPHY,

10:07AM 19   AND ELIZABETH HOLMES ABOUT THE PROTOCOL FOR CENTCOM?

10:07AM 20   A.   YES.

10:07AM 21           MS. WALSH:  WE OFFER 10457.

10:07AM 22           MR. BOSTIC:  NO OBJECTION.

10:07AM 23           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:07AM 24       (DEFENDANT'S EXHIBIT 10457 WAS RECEIVED IN EVIDENCE.)

10:07AM 25   BY MS. WALSH:

10:07AM   1    Q.   OKAY.  SO THE BOTTOM EMAIL IS FROM MAJOR MURPHY TO YOU.

10:07AM   2         AND IT SAYS, "SIR,

10:07AM   3         "FOR YOUR REFERENCE, PLEASE FIND ATTACHED THE APPROVED

10:07AM   4    VERSION OF THE PROTOCOL"; RIGHT?

10:07AM   5    A.   RIGHT.

10:07AM   6    Q.   AND YOU FORWARDED THAT TO MS. HOLMES?

10:07AM   7    A.   CORRECT.

10:07AM   8    Q.   AND YOU SAY, "ATTACHED IS THE CENTCOM LOE PROTOCOL FOR

10:08AM   9    YOUR RECORDS"; RIGHT?

10:08AM  10    A.   RIGHT.

10:08AM  11    Q.   AND YOU SAY NOTE THAT THIS IS BEING ADJUSTED TO INCLUDE

10:08AM  12    THESE DIFFERENT ASSAYS; RIGHT?

10:08AM  13    A.   RIGHT.

10:08AM  14    Q.   OKAY.  LET'S TAKE A LOOK AT THE PROTOCOL ITSELF.  IF WE GO

10:08AM  15    TO PAGE 1.

10:08AM  16         THE STUDY TITLE IS LIMIT THE OBJECTIVE EQUIPMENT ON THE

10:08AM  17    THERANOS POINT OF SERVICE LAB DEVICE.

10:08AM  18         DO YOU SEE THAT?

10:08AM  19    A.   YES.

10:08AM  20    Q.   AND THEN IF WE GO TO PAGE 2, ITEM 3 IS STUDY FACILITIES.

10:08AM  21         AND WHAT IT LISTS IS COMBINED JOINT THEATER HOSPITAL,

10:08AM  22    BAGRAM AIRFORCE BASE, AFGHANISTAN; CORRECT?

10:08AM  23    A.   CORRECT.

10:08AM  24    Q.   THAT'S WHERE THE DEVICES WERE GOING TO BE SENT; RIGHT?

10:08AM  25    A.   RIGHT.

10:08AM   1    Q.   AND THEN IF YOU TURN TO PAGE 6, LOOKING AT THE ABSTRACT,

10:09AM   2    THE ABSTRACT SAYS, "THIS LOE WILL DOCUMENT THE FUNCTIONALITY OF

10:09AM   3    THE THERANOS DEVICE IN A FIELD ENVIRONMENT AFTER DEPLOYMENT AND

10:09AM   4    TRANSPORT FROM THE UNITED STATES.  THE LOE WILL ALSO DETERMINE

10:09AM   5    THE INFORMATION TECHNOLOGY COMPATIBILITY OF THE THERANOS DEVICE

10:09AM   6    WITH PRE-EXISTING DOD NETWORK COMMUNICATIONS HARDWARE AND

10:09AM   7    NETWORK SECURITY CONFIGURATIONS."

10:09AM   8         RIGHT?

10:09AM   9    A.   RIGHT.

10:09AM  10    Q.   THE DEVICE HAD TO BE, HAD TO BE WORKED SO THAT IT WAS

10:09AM  11    COMPATIBLE WITH THE DOD SYSTEMS, THE I.T.; CORRECT?

10:09AM  12    A.   RIGHT.

10:09AM  13    Q.   CERTAIN THINGS HAD TO BE DONE TO MAKE SURE THAT THOSE TWO

10:09AM  14    SYSTEMS COMMUNICATED; RIGHT?

10:09AM  15    A.   RIGHT.

10:09AM  16    Q.   AND THAT THEY COMMUNICATED IN A SAFE AND SECURE WAY;

10:09AM  17    CORRECT?

10:09AM  18    A.   CORRECT.

10:09AM  19    Q.   AND LET'S LOOK AT NUMBER 3, THE RESEARCH HYPOTHESES AND

10:09AM  20    OBJECTIVES.

10:09AM  21         IT SAYS, "THE OBJECTIVE OF THE LOE IS TO DOCUMENT THE

10:10AM  22    FUNCTIONALITY OF THE THERANOS IN A DEPLOYED SETTING UNDER FIELD

10:10AM  23    CONDITIONS AND ITS OPERATIONS ON THE DOD NETWORK."

10:10AM  24         DO YOU SEE THAT?

10:10AM  25    A.   YES.

10:10AM  1    Q.   OKAY.  AND SO YOU RECEIVED THIS PROTOCOL, THE APPROVED

10:10AM  2    VERSION OF THE PROTOCOL, IN NOVEMBER OF 2012; RIGHT?

10:10AM  3    A.   RIGHT.

10:10AM  4    Q.   AND YOU FORWARDED IT TO MS. HOLMES A SHORT TIME LATER IN

10:10AM  5    EARLY DECEMBER 2012; CORRECT?

10:10AM  6    A.   YES.

10:10AM  7    Q.   OKAY.  SO TURN NOW IN YOUR BINDER TO 20160.

10:10AM  8    A.   OKAY.

10:10AM  9    Q.   OKAY.  TAKE A LOOK AT THAT.

10:10AM  10        AND IS THAT AN EMAIL BETWEEN YOU AND MEMBERS OF THE

10:11AM  11   MILITARY AND MR. BALWANI ABOUT THE NETWORK CONNECTION RELATED

10:11AM  12   TO THE CENTCOM PROJECT?

10:11AM  13   A.   YES.

10:11AM  14            MS. WALSH:  YOUR HONOR, WE OFFER 20160.

10:11AM  15            MR. BOSTIC:  NO OBJECTION.

10:11AM  16            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:11AM  17        (DEFENDANT'S EXHIBIT 20160 WAS RECEIVED IN EVIDENCE.)

10:11AM  18   BY MS. WALSH:

10:11AM  19   Q.   OKAY.  TURNING TO PAGE 2 OF THAT EXHIBIT.

10:11AM  20        YOU EMAIL LIEUTENANT COMMANDER ROMERO.

10:11AM  21        DO YOU SEE THAT?

10:11AM  22   A.   YES.

10:11AM  23   Q.   AND WHAT YOU SAY IS, "WE ARE WORKING ON THE FINAL

10:11AM  24   CONFIGURATION STEPS FOR OUR SYSTEMS, AND WE WANT TO ENSURE THAT

10:11AM  25   WE CAN SUCCESSFULLY ESTABLISH CONNECTION ON THE NETWORK AT

10:11AM 1    CJTH."

10:11AM 2         DO YOU SEE THAT?

10:11AM 3    A.   YES.

10:11AM 4    Q.   AND CJTH WAS THE HOSPITAL IN BAGRAM; RIGHT?

10:11AM 5    A.   I BELIEVE SO.

10:11AM 6    Q.   AND THAT'S IN AFGHANISTAN?

10:11AM 7    A.   RIGHT.

10:11AM 8    Q.   AND THEN THE LAST SENTENCE SAYS, "WE HOPE TO BE ABLE TO

10:12AM 9    ADDRESS AS MANY I.T.-RELATED CONTINGENCIES AS POSSIBLE BEFORE

10:12AM 10   SHIPPING THE DEVICES TO THEATER"; RIGHT?

10:12AM 11   A.   RIGHT.

10:12AM 12   Q.   AND THEN HE WRITES BACK TO YOU, "MR. EDLIN, THERE IS NO

10:12AM 13   CELL PHONE CARRIER HERE THAT PROVIDES DATA CONNECTIVITY.  THE

10:12AM 14   LOCAL CELLPHONE PROVIDER IS ROSHAN."

10:12AM 15        AND THAT WAS A CARRIER IN AFGHANISTAN; RIGHT?

10:12AM 16   A.   I'M NOT SURE.

10:12AM 17   Q.   OKAY.  AND THEN LET'S GO UP THE CHAIN.

10:12AM 18        NEXT, YOU EMAIL MR. BALWANI; RIGHT?

10:12AM 19   A.   YES.

10:12AM 20   Q.   AND DO YOU SEE THAT?

10:12AM 21   A.   YES.

10:12AM 22   Q.   AND YOU SAY, "SUNNY,

10:12AM 23        "WOULD YOU MIND TAKING A QUICK LOOK AT THIS RESPONSE TO

10:12AM 24   THE LIEUTENANT COLONEL?  JUST WANT TO MAKE SURE THERE IS NO

10:12AM 25   CONFUSION ON THEIR END?"

EDLIN CROSS BY MS. WALSH (RES.)

| | | |
|---|---|---|
| 10:12AM | 1 | AND YOU SEND HIM A DRAFT OF THE EMAIL; RIGHT? |
| 10:12AM | 2 | A.   YES. |
| 10:12AM | 3 | Q.   AND THIS IS THE FIRST TIME THAT WE HAVE SEEN MR. BALWANI'S |
| 10:12AM | 4 | INVOLVEMENT IN ANY OF THESE MILITARY RELATIONSHIPS; RIGHT? |
| 10:12AM | 5 | A.   RIGHT. |
| 10:12AM | 6 | Q.   AND IT'S IN CONNECTION WITH WHATEVER I.T. REQUIREMENTS |
| 10:13AM | 7 | WERE NEEDED FOR THE MILITARY; IS THAT RIGHT? |
| 10:13AM | 8 | A.   YES. |
| 10:13AM | 9 | Q.   AND HE WAS IN CHARGE OF A TEAM THAT DID THAT; CORRECT? |
| 10:13AM | 10 | A.   CORRECT. |
| 10:13AM | 11 | Q.   OKAY.  LET'S GO TO 20472. |
| 10:13AM | 12 | DO YOU SEE THAT? |
| 10:13AM | 13 | A.   YES. |
| 10:13AM | 14 | Q.   AND IS THAT ANOTHER EMAIL WITH MR. BALWANI ABOUT THESE |
| 10:13AM | 15 | NETWORK REQUIREMENTS FOR AFGHANISTAN? |
| 10:13AM | 16 | A.   YES. |
| 10:14AM | 17 | MS. WALSH:  YOUR HONOR, WE OFFER 20472. |
| 10:14AM | 18 | MR. BOSTIC:  NO OBJECTION. |
| 10:14AM | 19 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:14AM | 20 | (DEFENDANT'S EXHIBIT 20472 WAS RECEIVED IN EVIDENCE.) |
| 10:14AM | 21 | BY MS. WALSH: |
| 10:14AM | 22 | Q.   OKAY.  LET'S GO TO PAGE 3 OF THE EMAIL. |
| 10:14AM | 23 | AND THIS IS FROM MR. BALWANI TO MICHAEL CRAIG AND OTHERS, |
| 10:14AM | 24 | COPYING YOU; RIGHT? |
| 10:14AM | 25 | A.   RIGHT. |

10:14AM 1    Q.   AND IT'S ON FEBRUARY 8TH, 2013; RIGHT?

10:14AM 2    A.   RIGHT.

10:14AM 3    Q.   AND IT RELATES TO NETWORKING UTILITY AND CONNECTIVITY IN

10:14AM 4    AFGHANISTAN.

10:14AM 5         DO YOU SEE THAT?

10:14AM 6    A.   YES.

10:14AM 7    Q.   AND MR. BALWANI SAYS, "WE WILL NEED TO DEPLOY 4S --"

10:14AM 8         THAT'S THE DEVICE; RIGHT?

10:14AM 9    A.   RIGHT.

10:14AM 10   Q.   "-- IN AFGHANISTAN AT THE END OF THE MONTH AND NEED TO

10:14AM 11   ABSOLUTE MAKE SURE THAT THE NETWORKING UTILITY IN THE DEVICE

10:14AM 12   WORKS FLAWLESSLY"; RIGHT?

10:14AM 13   A.   RIGHT.

10:14AM 14   Q.   AND THEN THE NEXT EMAIL, MR. BALWANI EMAILS AGAIN, YOU'RE

10:14AM 15   ON COPY, AND HE SAYS -- HE'S EMAILING MICHAEL CRAIG AND OTHERS?

10:15AM 16   A.   UH-HUH.

10:15AM 17   Q.   AND HE SAYS, "ANTTI,

10:15AM 18        "CAN YOU CREATE A SMALL NETWORK IN A SMALL ROOM DOWNSTAIRS

10:15AM 19   (LIKE AN I.T. LAB) WHERE WE HAVE A ROUTER THAT CREATES AN

10:15AM 20   ETHERNET WORK BUT BLOCKS ANY DEVICE FROM CONNECTING TO THE

10:15AM 21   INTERNET USING DIFFERENT NETWORKING POLICIES AND ONLY

10:15AM 22   LEGITIMATE DEVICE THAT CONNECT TO THE ETHERNET ARE ABLE TO

10:15AM 23   CONNECT TO THE INTERNET.  WE SHOULD KEEP THIS ROOM TO SIMULATE

10:15AM 24   ALL DIFFERENT CONNECTIVITY SCENARIOS WE WILL SEE IN

10:15AM 25   AFGHANISTAN."

EDLIN CROSS BY MS. WALSH (RES.)

10:15AM 1          DO YOU SEE THAT?

10:15AM 2     A.   YES.

10:15AM 3     Q.   AND SO HE'S WORKING WITH HIS TEAM TO TRY TO MAKE THIS

10:15AM 4     DEVICE SECURE TO SEND TO AFGHANISTAN; CORRECT?

10:15AM 5     A.   CORRECT.

10:15AM 6     Q.   OKAY.  IF YOU CAN TURN TO 20161 AND 20162.  AND THESE TWO

10:16AM 7     ARE VERY SHORT.  IF YOU COULD TAKE A LOOK AT EACH ONE.

10:16AM 8          SO TAKING A LOOK AT 20161, IS THAT ANOTHER EMAIL CHAIN

10:16AM 9     WITH MR. BALWANI ABOUT THE 4S DEPLOYMENT TO AFGHANISTAN AND THE

10:16AM 10    I.T. REQUIREMENTS?

10:16AM 11    A.   IT IS.

10:16AM 12    Q.   AND 20162 ALSO WITH MR. BALWANI REGARDING THE SAME?

10:16AM 13    A.   YES.

10:16AM 14    Q.   OKAY.

10:16AM 15         YOUR HONOR, WE OFFER 20161 AND 20162.

10:16AM 16              MR. BOSTIC:  NO OBJECTION.

10:16AM 17              THE COURT:  THEY'RE ADMITTED.  THEY MAY BE

10:16AM 18    PUBLISHED.

10:16AM 19         (DEFENDANT'S EXHIBITS 20161 AND 20162 WERE RECEIVED IN

10:16AM 20    EVIDENCE.)

10:16AM 21              MS. WALSH:  OKAY.  WE ACTUALLY DON'T NEED TO PUBLISH

10:16AM 22    THESE.  IT'S MORE OF THE SAME THAT WE JUST SAW.

10:16AM 23    Q.   BUT THOSE ARE ADDITIONAL EMAILS, ARE THEY NOT, WITH

10:17AM 24    MR. BALWANI ABOUT THIS I.T. ISSUE, IS IT NOT?

10:17AM 25    A.   YES.

10:17AM  1    Q.   OKAY.  SO THOSE TWO EMAILS WERE IN FEBRUARY 2013.

10:17AM  2         LET'S TURN NOW TO 10472.

10:17AM  3    A.   OKAY.

10:17AM  4    Q.   SO IS THIS AN EMAIL CHAIN WITH JIM -- JAMES SOMMER OF THE

10:17AM  5    ARMY, U.S. CENTCOM?

10:17AM  6    A.   YES.

10:17AM  7    Q.   AND MR. -- I GUESS DR. SOMMER WAS THE ARMY SCIENCE

10:17AM  8    ADVISOR; CORRECT?

10:17AM  9    A.   RIGHT.

10:17AM  10   Q.   AND WAS THIS ALSO IN CONNECTION WITH SHIPPING THERANOS'S

10:18AM  11   DEVICES TO CENTCOM?

10:18AM  12   A.   YES.

10:18AM  13   Q.   OKAY.

10:18AM  14        YOUR HONOR, WE OFFER EXHIBIT 10472.

10:18AM  15             MR. BOSTIC:  NO OBJECTION.

10:18AM  16             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:18AM  17        (DEFENDANT'S EXHIBIT 10472 WAS RECEIVED IN EVIDENCE.)

10:18AM  18   BY MS. WALSH:

10:18AM  19   Q.   IF WE GO TO THE BOTTOM EMAIL, THIS IS FROM DR. SOMMER TO

10:18AM  20   YOU, AND HE SAYS, "DAN,

10:18AM  21        "YOU HAD MENTIONED THAT THE DEVICE MIGHT BE SHIPPED AT THE

10:18AM  22   END OF THE MONTH.  HAVE YOU A FIRM DATE YET?"

10:18AM  23        AND YOU REPLY, "AT THIS POINT I WOULD ESTIMATE THAT AN

10:18AM  24   EARLY-MARCH TIMEFRAME IS MORE LIKELY THAN AN END-OF-FEBRUARY

10:18AM  25   SCENARIO"; RIGHT?

10:18AM 1    A.   YES.

10:18AM 2    Q.   AND YOU'RE STILL WORKING ON THE I.T. ISSUES ON THE DEVICE

10:18AM 3    AT THIS POINT IN TIME; RIGHT?

10:18AM 4    A.   OTHERS AT THERANOS WERE WORKING ON IT, BUT YES.

10:18AM 5    Q.   FAIR ENOUGH.

10:18AM 6         OTHERS AT THERANOS; RIGHT?

10:18AM 7    A.   YES.

10:18AM 8    Q.   AND SO YOU, DAN EDLIN, COULD NOT SHIP THAT DEVICE UNTIL IT

10:19AM 9    WAS FULLY FINALIZED FROM AN I.T. PERSPECTIVE; RIGHT?

10:19AM 10   A.   RIGHT.

10:19AM 11   Q.   AMONG OTHER THINGS, IF ANYTHING ELSE NEEDED TO BE DONE;

10:19AM 12   CORRECT?

10:19AM 13   A.   CORRECT.

10:19AM 14   Q.   SO LET'S GO TO PAGE 1.  THIS IS FROM DR. SOMMER TO YOU,

10:19AM 15   FEBRUARY 27TH, 2013.

10:19AM 16        AND DR. SOMMER SAYS, "DANIEL:

10:19AM 17        "THINGS AT DOD ARE REALLY GETTING MESSED UP WITH THE

10:19AM 18   UPCOMING SEQUESTRATION."

10:19AM 19        AND WHAT WAS YOUR UNDERSTANDING OF WHAT THE SEQUESTRATION

10:19AM 20   WAS?

10:19AM 21   A.   I DON'T RECALL.

10:19AM 22   Q.   SEQUESTRATION, IT WAS THE GOVERNMENT NOT HAVING MONEY AT

10:19AM 23   THE TIME TO DEVOTE TO PROJECTS.

10:19AM 24        IS THAT FAIR?

10:19AM 25   A.   YES.

10:19AM  1    Q.   AND DO YOU RECALL THAT HAPPENING IN CONNECTION WITH THE

10:19AM  2    CENTCOM PROJECT?

10:19AM  3    A.   YES.

10:19AM  4    Q.   AND HE SAYS, "THIS WILL AFFECT HOW WE DO THE UPCOMING LOE.

10:20AM  5    IF THE DEVICE IS NOT SHIPPED SOON, THE GOVERNMENT FOLKS LIKE

10:20AM  6    MYSELF WILL NOT BE ABLE TO TRAVEL TO THEATER."

10:20AM  7         DO YOU SEE THAT?

10:20AM  8    A.   YES.

10:20AM  9    Q.   OKAY.  AND THEN YOU WRITE BACK TO HIM SAYING, "MR. SOMMER,

10:20AM 10         "ANY ADDITIONAL INFORMATION YOU MAY HAVE ON HOW THE

10:20AM 11    SEQUESTRATION WILL AFFECT THE LOE WILL BE VERY USEFUL,

10:20AM 12    PARTICULARLY IF THERE ARE ANY FIRM DATES BY WHICH YOU WOULD

10:20AM 13    NEED THE DEVICES SHIPPED IN ORDER FOR YOU AND OTHER GOVERNMENT

10:20AM 14    FOLKS TO BE ABLE TO TRAVEL TO THEATER.

10:20AM 15         "REGARDING THE STATUS OF OUR SHIPMENT, PLEASE SEE BELOW

10:20AM 16    FOR AN UPDATE.  THIS SHOULD PROVIDE SOME INSIGHT INTO WHAT IS

10:20AM 17    DRIVING OUR SHIPMENT TIMELINES AS WE WORK TOWARD FINALIZING AN

10:20AM 18    EXACT DATE."

10:20AM 19         AND THEN YOU SAY, "AS PER OUR PREVIOUS DISCUSSIONS, THE 4S

10:20AM 20    DEVICES THAT WE ARE SHIPPING HAVE BEEN SPECIALLY BUILT FOR THE

10:20AM 21    PURPOSES OF OUR LOE.  IN SO DOING, WE HAVE HAD TO REVALIDATE

10:21AM 22    AND RETEST EVERY ASPECT OF THE DEVICE CONFIGURATION TO ENSURE

10:21AM 23    THAT THESE SYSTEMS MEET OUR STANDARDS AND EXPECTATIONS."

10:21AM 24         DO YOU SEE THAT?

10:21AM 25    A.   YES.

EDLIN CROSS BY MS. WALSH (RES.)

10:21AM  1    Q.   AND THE DEVICE WAS REBUILT; RIGHT?  IT WAS MADE SMALLER;

10:21AM  2    CORRECT?

10:21AM  3    A.   CORRECT.

10:21AM  4    Q.   AND LIGHTER; RIGHT?

10:21AM  5    A.   RIGHT.

10:21AM  6    Q.   AND THE I.T. CONFIGURATIONS INSIDE OF THE DEVICE WERE

10:21AM  7    CHANGED; RIGHT?

10:21AM  8    A.   RIGHT.

10:21AM  9    Q.   AND OTHER ASPECTS OF THE DEVICE CHANGED; CORRECT?

10:21AM  10   A.   CORRECT.

10:21AM  11   Q.   NOW, IF YOU GO DOWN ALMOST TO THE BOTTOM OF THAT PARAGRAPH

10:21AM  12   YOU SAY, "THESE PROCESSES HAVE GUIDED OUR DELIVERY TIMELINES;

10:21AM  13   WE HAVE BEEN ALLOCATING ALL OF THE RESOURCES WE CAN TO THIS

10:21AM  14   PROJECT IN PARALLEL WITH OUR COMPANY'S COMMERCIAL LAUNCH."

10:21AM  15        THAT WAS THE WALGREENS LAUNCH; RIGHT?

10:21AM  16   A.   YES.

10:21AM  17   Q.   AND THAT WAS HAPPENING AT THE SAME TIME OR ABOUT TO

10:21AM  18   HAPPEN; RIGHT?

10:21AM  19   A.   LATER THAT YEAR.

10:21AM  20   Q.   RIGHT.  BUT YOU WERE PREPARING FOR IT AT THE TIME; RIGHT?

10:21AM  21   A.   YES.

10:21AM  22   Q.   AND IT WAS A LOT OF WORK; RIGHT?

10:21AM  23   A.   YES.

10:21AM  24   Q.   AND CONTINUING ON.

10:21AM  25        "AS A RAPIDLY GROWING COMPANY, WE ARE MANAGING THESE

10:21AM  1   TIMELINES AS BEST AS POSSIBLE WHILE MAKING SURE THAT THE

10:21AM  2   INTEGRITY OF OUR PRODUCTS AND PROGRAM GOALS ARE NOT

10:22AM  3   COMPROMISED."

10:22AM  4       OKAY.  WE CAN TAKE THAT DOWN.

10:22AM  5       IF WE CAN LOOK AT 1027 WHICH IS IN EVIDENCE AND THE

10:22AM  6   GOVERNMENT PUBLISHED.

10:22AM  7       AND IF WE CAN LOOK AT THAT, YOUR HONOR?

10:22AM  8           THE COURT:  YES.

10:22AM  9   BY MS. WALSH:

10:22AM  10  Q.   AND YOU CAN LOOK AT THAT ON YOUR SCREEN, MR. EDLIN.

10:22AM  11      OKAY.  IF WE GO TO THE EMAIL ON PAGE 5.  THIS WAS AN EMAIL

10:22AM  12  THAT THE GOVERNMENT SHOWED YOU.  IT WAS FROM MARTIN DRAKE, THE

10:22AM  13  CHIEF SCIENCE AND TECHNOLOGY COMMAND SCIENCE ADVISOR.

10:23AM  14      DO YOU SEE THAT?

10:23AM  15  A.   YES.

10:23AM  16  Q.   AND MR. DRAKE WAS SENDING AN EMAIL TO MS. HOLMES SAYING --

10:23AM  17  INTRODUCING HIMSELF.  AND THE LAST SENTENCE OF THAT FIRST

10:23AM  18  PARAGRAPH HE IS SAYING, "FUNDING IS EXPIRING AND PERSONNEL ARE

10:23AM  19  BEING RE-DIRECTED TO OTHER ONGOING PROJECTS."

10:23AM  20      DO YOU SEE THAT?

10:23AM  21  A.   YES.

10:23AM  22  Q.   AND THEN YOU WROTE BACK TO MR. DRAKE AND SAID, "THANK YOU

10:23AM  23  VERY MUCH FOR YOUR NOTE, AND WE APPRECIATE ALL OF THE WORK THAT

10:23AM  24  YOU AND YOUR TEAM HAVE BEEN DOING TO SUPPORT OUR TEST EFFORTS

10:23AM  25  WITH U.S. CENTCOM.  WE HAVE PUT A SIGNIFICANT AMOUNT OF

10:23AM  1    RESOURCES AND INVESTED HEAVILY IN PREPARING FOR THIS

10:23AM  2    DEPLOYMENT, AND HAVE BEEN CUSTOMIZING BOTH OUR EQUIPMENT AND

10:23AM  3    TECHNOLOGY TO MEET THE SPECIFIC REQUIREMENTS OF OUR LOE AND THE

10:23AM  4    IRB WE HAVE IN PLACE FOR THIS.  WE REMAIN FOCUSSED ON BEING

10:23AM  5    ABLE TO PROVIDE YOU WITH AN INFRASTRUCTURE THAT CAN ADDRESS

10:23AM  6    MANY OF THE UNMET MEDICAL NEEDS FACED IN THEATER."

10:23AM  7        DO YOU SEE THAT?

10:23AM  8    A.   YES.

10:23AM  9    Q.   OKAY.  AND THEN IF WE CAN GO UP TO ANOTHER EMAIL THAT YOU

10:24AM 10    SEND ON PAGE 3 TO MR. DRAKE.  YOU SAY, "MR. DRAKE,

10:24AM 11        "THANK YOU FOR YOUR NOTE.  WE HAVE BEEN WORKING TO

10:24AM 12    DETERMINE A DATE IN LINE WITH YOUR QUESTION BELOW."

10:24AM 13        AND HIS QUESTION WAS PLEASE TELL ME WHEN YOU CAN SEND THE

10:24AM 14    DEVICE; RIGHT?

10:24AM 15    A.   RIGHT.

10:24AM 16    Q.   YEAH.  AND YOU SAY, "AS WE WANT TO MAKE SURE WE PROVIDE

10:24AM 17    YOU WITH TIMELINES THAT WE CAN DEFINITIVELY PLAN TOWARD IN THE

10:24AM 18    CONTEXT OF OBLIGATIONS WE HAVE PREVIOUSLY COMMITTED OURSELVES

10:24AM 19    TO AS A COMPANY."

10:24AM 20        DO YOU SEE THAT?

10:24AM 21    A.   YES.

10:24AM 22    Q.   AND THOSE OBLIGATIONS WERE THE CONTRACTS WITH WALGREENS;

10:24AM 23    RIGHT?

10:24AM 24    A.   RIGHT.

10:24AM 25    Q.   TO DO A RETAIL ROLLOUT; CORRECT?

10:24AM 1     A.   CORRECT.

10:24AM 2     Q.   FOR CONSUMER PATIENT BLOOD TESTING IN WALGREENS; RIGHT?

10:24AM 3     A.   RIGHT.

10:24AM 4     Q.   OKAY.  WE CAN TAKE THAT DOWN IS.

10:25AM 5          OKAY.  SO JUST GENERALLY REGARDING THESE MILITARY

10:25AM 6     PROJECTS, YOU WORKED HARD ON THESE PROJECTS; RIGHT?

10:25AM 7     A.   RIGHT.

10:25AM 8     Q.   YOU WANTED TO SEE THEM GET ACCOMPLISHED; RIGHT?

10:25AM 9     A.   RIGHT.

10:25AM 10    Q.   YOU SENT DEVICES TO SOCOM; RIGHT?

10:25AM 11    A.   RIGHT.

10:25AM 12    Q.   YOU SENT A DEVICE TO AFRICOM; CORRECT?

10:25AM 13    A.   CORRECT.

10:25AM 14    Q.   YOU SENT DEVICES TO HOSPITALS IN CONNECTION WITH THE BURN

10:25AM 15    STUDY; RIGHT?

10:25AM 16    A.   RIGHT.

10:25AM 17    Q.   YOU WERE DOING EVERYTHING YOU COULD TO MAKE THESE PROJECTS

10:25AM 18    SUCCEED; CORRECT?

10:25AM 19    A.   YES.

10:25AM 20    Q.   BUT THERE WERE CERTAIN THINGS OUT OF YOUR CONTROL THAT

10:25AM 21    GOT -- THAT INTERRUPTED THAT PROGRESS; CORRECT?

10:25AM 22    A.   CORRECT.

10:25AM 23    Q.   THERE WAS THE SEQUESTRATION ON THE MILITARY END; RIGHT?

10:25AM 24    A.   RIGHT.

10:25AM 25    Q.   AND THERE WAS THE WALGREENS LAUNCH ON THERANOS'S END;

10:25AM  1    RIGHT?

10:25AM  2    A.   RIGHT.

10:25AM  3    Q.   AND RESOURCES DID NEED TO BE ALLOCATED TO -- THERANOS

10:26AM  4    COULDN'T DO EVERYTHING ALL AT ONCE; IS THAT FAIR?

10:26AM  5    A.   YES.

10:26AM  6    Q.   AND IT HAD A CONTRACT WITH WALGREENS; RIGHT?

10:26AM  7    A.   RIGHT.

10:26AM  8    Q.   AND IT HAD TO LIVE UP TO THAT CONTRACT; RIGHT?

10:26AM  9    A.   RIGHT.

10:26AM  10   Q.   AND THAT CONTRACT INVOLVED AN EXTENSIVE AND LABOR

10:26AM  11   INTENSIVE RETAIL ROLLOUT; IS THAT FAIR?

10:26AM  12   A.   YES.

10:26AM  13   Q.   OKAY.

10:26AM  14        SO I WANT TO NEXT TALK TO YOU ABOUT YOUR WORK IN

10:26AM  15   CONNECTION WITH PHARMACEUTICAL COMPANIES.   OKAY?

10:26AM  16   A.   OKAY.

10:26AM  17   Q.   AND YOU TESTIFIED ON DIRECT THAT PART OF YOUR JOB WAS TO

10:26AM  18   SUPPORT THERANOS'S RELATIONSHIP WITH PHARMA COMPANIES; RIGHT?

10:26AM  19   A.   RIGHT.

10:26AM  20   Q.   AND THERANOS HAD SOME OF THOSE RELATIONSHIPS BEFORE YOU

10:26AM  21   BEGAN AT THERANOS; CORRECT?

10:26AM  22   A.   I BELIEVE IT WAS ALL OF THEM.

10:26AM  23   Q.   ALL OF THEM.

10:26AM  24   A.   YES.

10:26AM  25   Q.   OKAY.   SOME OF THEM CONTINUED AFTER THE WALGREENS LAUNCH;

10:26AM  1    RIGHT?

10:26AM  2    A.   I'M NOT SURE.

10:27AM  3    Q.   OKAY.  WELL, WE'RE GOING TO LOOK AT SOME DOCUMENTS AND YOU

10:27AM  4    CAN LET US KNOW.

10:27AM  5    A.   OKAY.

10:27AM  6    Q.   BUT BEFORE WE DO THAT, THOSE RELATIONSHIPS BETWEEN THE

10:27AM  7    PHARMACEUTICAL COMPANIES AND THERANOS WERE LED BY

10:27AM  8    ELIZABETH HOLMES; CORRECT?

10:27AM  9    A.   CORRECT.

10:27AM  10   Q.   MR. BALWANI WAS NOT INVOLVED IN THOSE RELATIONSHIPS AS FAR

10:27AM  11   AS YOU KNOW; RIGHT?

10:27AM  12   A.   RIGHT.

10:27AM  13   Q.   AND SHE WAS THE POINT PERSON FOR THE PEOPLE WITHIN THOSE

10:27AM  14   PHARMA COMPANIES; RIGHT?

10:27AM  15   A.   RIGHT.

10:27AM  16   Q.   AND WHATEVER YOU DID IN CONNECTION WITH THAT, YOU WERE

10:27AM  17   SUPERVISED BY HER; CORRECT?

10:27AM  18   A.   CORRECT.

10:27AM  19   Q.   AND SHE REVIEWED WHAT YOU DID; RIGHT?

10:27AM  20   A.   RIGHT.

10:27AM  21   Q.   SHE APPROVED WHAT YOU DID; CORRECT?

10:27AM  22   A.   YES.

10:27AM  23   Q.   OKAY.  SO LET'S TAKE A LOOK AT 4018.

10:28AM  24        DO YOU SEE THAT DOCUMENT?

10:28AM  25   A.   YES.

10:28AM  1      Q.   THAT'S A MEETING INVITE; RIGHT?

10:28AM  2      A.   YES.

10:28AM  3      Q.   AND IT'S IN OCTOBER OF 2013?

10:28AM  4      A.   YES.

10:28AM  5      Q.   DID -- AND DO YOU SEE YOUR NAME DOWN IN THE MIDDLE THERE?

10:28AM  6      A.   YES.

10:28AM  7      Q.   OKAY.  DOES THAT REFRESH YOUR RECOLLECTION AS TO THE

10:28AM  8      PHARMA RELATIONSHIPS CONTINUING PAST THE WALGREENS LAUNCH?

10:28AM  9      A.   I DON'T REMEMBER THIS PARTICULAR MEETING, BUT I DO SEE

10:28AM 10      THAT IT'S IN THE EMAIL.

10:28AM 11      Q.   OKAY.

10:28AM 12           YOUR HONOR, WE OFFER 4018.

10:28AM 13                MR. BOSTIC:  NO OBJECTION, YOUR HONOR.  BUT I THINK

10:28AM 14      THIS MAY BE BEYOND THE SCOPE OF DIRECT AND THE EVIDENCE IN THE

10:28AM 15      CASE-IN-CHIEF.

10:28AM 16                MS. WALSH:  YOUR HONOR, MR. EDLIN TESTIFIED THAT HE

10:29AM 17      COORDINATED WITH PHARMA COMPANIES, AND THIS IS JUST A MEETING

10:29AM 18      SHOWING THAT.

10:29AM 19                THE COURT:  I'LL OVERRULE THE OBJECTION.  THIS CAN

10:29AM 20      BE ADMITTED AND PUBLISHED.

10:29AM 21           (GOVERNMENT'S EXHIBIT 4018 WAS RECEIVED IN EVIDENCE.)

10:29AM 22      BY MS. WALSH:

10:29AM 23      Q.   AND SO THIS IS FROM SOMEONE FROM PFIZER, IS IT NOT,

10:29AM 24      MR. EDLIN?

10:29AM 25      A.   YES.

EDLIN CROSS BY MS. WALSH (RES.)

10:29AM  1   Q.   AND A PERSON NAMED SALLY SKERRITT; RIGHT?

10:29AM  2   A.   YES.

10:29AM  3   Q.   AND THE SUBJECT IS THERANOS SITE VISIT?

10:29AM  4   A.   YES.

10:29AM  5   Q.   AND DO YOU SEE THE NAME CRAIGLIPSET@PFIZER.COM?

10:29AM  6   A.   YES.

10:29AM  7   Q.   AND DO YOU REMEMBER WHO THAT WAS?

10:29AM  8   A.   I DO NOT.

10:29AM  9   Q.   AND THE PEOPLE WHO WERE IN ATTENDANCE AT THIS MEETING FROM

10:29AM  10   THERANOS WERE MS. HOLMES; RIGHT?

10:29AM  11   A.   I SEE THE NAMES ON THE MEETING INVITE, BUT I JUST DON'T

10:29AM  12   REMEMBER THE MEETING ITSELF.

10:29AM  13   Q.   OKAY.  FAIR ENOUGH.

10:30AM  14        YOU DON'T REMEMBER THE MEETING, BUT YOU SEE THREE NAMES

10:30AM  15   HERE, RIGHT, ON THIS DOCUMENT?

10:30AM  16   A.   YES.

10:30AM  17   Q.   AND THOSE THREE NAMES ARE MS. HOLMES; RIGHT?

10:30AM  18   A.   RIGHT.

10:30AM  19   Q.   CHRISTIAN HOLMES; CORRECT?

10:30AM  20   A.   CORRECT.

10:30AM  21   Q.   AND YOU; RIGHT?

10:30AM  22   A.   RIGHT.

10:30AM  23   Q.   AND FROM PFIZER YOU SEE AT THE BOTTOM THE NAME

10:30AM  24   CRAIG LIPSET; RIGHT?

10:30AM  25   A.   YES.

EDLIN CROSS BY MS. WALSH (RES.)

10:30AM  1    Q.   AND IT SAYS SENIOR DIRECTOR OF CLINICAL INNOVATION.

10:30AM  2         DO YOU SEE THAT?

10:30AM  3    A.   YES.

10:30AM  4    Q.   AND THERE ARE SOME OTHER PEOPLE FROM PFIZER ON THIS

10:30AM  5    DOCUMENT; RIGHT?

10:30AM  6    A.   CORRECT.

10:30AM  7    Q.   WE CAN TAKE THAT DOWN.

10:30AM  8         OKAY.  TAKE A LOOK AT 20546.

10:31AM  9    A.   OKAY.

10:31AM  10   Q.   OKAY.  DO YOU SEE THAT THIS IS AN EMAIL BETWEEN

10:31AM  11   MS. HOLMES, MR. BALWANI, MR. HOLMES, AND SOMEONE FROM PFIZER

10:31AM  12   ABOUT MEETING IN NOVEMBER OF 2013?

10:31AM  13   A.   YES.

10:31AM  14   Q.   OKAY.

10:31AM  15        YOUR HONOR, WE WOULD OFFER 20546?

10:31AM  16             MR. BOSTIC:  NO OBJECTION.

10:31AM  17             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:31AM  18        (DEFENDANT'S EXHIBIT 20546 WAS RECEIVED IN EVIDENCE.)

10:31AM  19   BY MS. WALSH:

10:31AM  20   Q.   IF WE TAKE A LOOK AT THE MIDDLE EMAIL, THERE'S A PERSON

10:32AM  21   NAMED MORTEN SOGAARD.

10:32AM  22        DO YOU SEE THAT?

10:32AM  23   A.   YES.

10:32AM  24   Q.   AND HE HAS A PFIZER EMAIL ADDRESS?

10:32AM  25   A.   YES.

10:32AM 1   Q.   AND DID YOU EVER DEAL WITH HIM?

10:32AM 2   A.   I DON'T BELIEVE SO.

10:32AM 3   Q.   OKAY.  AND MR. SOGAARD IS EMAILING CHRISTIAN HOLMES AND HE

10:32AM 4   SAYS, "MY SINCERE APOLOGIES, I SHOULD HAVE CHECKED ON OUR SIDE

10:32AM 5   FIRST.  I WILL FOLLOW UP TO MOVE THINGS ALONG ON OUR SIDE.

10:32AM 6   PLEASE TAKE MY MAIL AS AN EXPRESSION OF INTEREST AND EXCITEMENT

10:32AM 7   WITH YOUR TECHNOLOGY AND ASPIRATIONS THAT WE CAN MOVE FORWARD

10:32AM 8   WITH DISCUSSIONS AND HOPEFULLY A PARTNERSHIP.

10:32AM 9       "THANK YOU ALSO FOR CHECKING REGARDING THE PROPOSED

10:32AM 10  MEETING.  THAT COULD BE AN EXCELLENT OPPORTUNITY TO FURTHER

10:32AM 11  ENGAGE PFIZER SENIOR MANAGEMENT."

10:32AM 12      DO YOU SEE THAT?

10:32AM 13  A.   YES.

10:32AM 14  Q.   AND THEN MS. HOLMES WRITES BACK SAYING, "MORTEN:

10:32AM 15      "THANKS FOR THIS.  WE WOULD LOOK FORWARD TO MEETING WITH

10:32AM 16  YOUR PRESIDENT OF R&D AT JP MORGAN."

10:32AM 17      DO YOU SEE THAT?

10:33AM 18  A.   YES.

10:33AM 19  Q.   OKAY.  WERE YOU AWARE THAT PFIZER AND THERANOS SIGNED A

10:33AM 20  CONFIDENTIAL DISCLOSURE AGREEMENT IN DECEMBER OF 2013?

10:33AM 21  A.   I DON'T RECALL THAT.

10:33AM 22  Q.   OKAY.  TURN TO 20453.

10:33AM 23  A.   OKAY.

10:33AM 24  Q.   DO YOU SEE THAT DOCUMENT?

10:33AM 25  A.   YES.

EDLIN CROSS BY MS. WALSH (RES.)

10:33AM  1    Q.   DOES THAT REFRESH YOUR RECOLLECTION AS TO WHETHER A

10:33AM  2    CONFIDENTIAL DISCLOSURE AGREEMENT WAS SIGNED BY PFIZER AND

10:33AM  3    THERANOS IN DECEMBER OF 2013?

10:34AM  4    A.   I SEE THAT THIS WAS SIGNED AT THAT TIME, BUT I DON'T HAVE

10:34AM  5    A RECOLLECTION OF IT.

10:34AM  6    Q.   OKAY.

10:34AM  7    A.   I PERSONALLY DON'T HAVE A RECOLLECTION OF IT.

10:34AM  8    Q.   OKAY.   OKAY.   YOU CAN PUT THAT ASIDE.

10:34AM  9         OKAY.   JUST ONE MORE PFIZER DOCUMENT I WANT TO SHOW YOU,

10:34AM  10   AND THAT IS 20542.   TAKE A LOOK AT THAT.

10:35AM  11        DO YOU SEE THAT?

10:35AM  12   A.   YES.

10:35AM  13   Q.   AND THAT'S AN EMAIL CHAIN OF FEBRUARY 2015.

10:35AM  14        DO YOU SEE THAT?

10:35AM  15   A.   YES.

10:35AM  16   Q.   AND MR. BLICKMAN IS ON THAT EMAIL, IS THAT RIGHT, IN THE

10:35AM  17   MIDDLE EMAIL?

10:35AM  18   A.   YES.

10:35AM  19   Q.   OKAY.   AND WAS MR. BLICKMAN INVOLVED IN ALSO DOING SOME

10:35AM  20   COORDINATING WORK IN CONNECTION WITH THE PHARMA COMPANIES?

10:35AM  21   A.   I DON'T BELIEVE SO.

10:35AM  22   Q.   OKAY.   SO DOES THAT REFRESH YOUR RECOLLECTION AS TO

10:35AM  23   MEETINGS THAT THERANOS WAS HAVING WITH PFIZER IN CONNECTION

10:35AM  24   WITH WALGREENS?

10:35AM  25   A.   IT DOES NOT REFRESH MY PERSONAL RECOLLECTION.

EDLIN CROSS BY MS. WALSH (RES.)

10:36AM 1    Q.   OKAY.  DO YOU REMEMBER THAT THERE WAS A MOVE TO HAVE

10:36AM 2    PHARMACEUTICAL BLOOD TESTING FOR PEOPLE WHO WERE PARTICIPANTS

10:36AM 3    IN STUDIES IN WALGREENS?

10:36AM 4        DO YOU REMEMBER THAT?

10:36AM 5    A.   CAN YOU BE MORE SPECIFIC?

10:36AM 6    Q.   SURE.

10:36AM 7        SO THERANOS HAD PREVIOUSLY PARTNERED WITH PHARMA

10:36AM 8    COMPANIES; RIGHT?

10:36AM 9    A.   RIGHT.

10:36AM 10   Q.   AND IN THOSE PARTNERSHIPS, THERANOS PROVIDED BLOOD TESTING

10:36AM 11   FOR PATIENTS WHO PARTICIPATED IN PHARMA STUDIES; RIGHT?

10:36AM 12   A.   RIGHT.

10:36AM 13   Q.   AND THOSE PATIENTS MIGHT GET THEIR BLOOD TESTED AT THE

10:36AM 14   PHARMA COMPANY; RIGHT?

10:36AM 15   A.   RIGHT.

10:36AM 16   Q.   OR SOMETIMES IN THEIR HOMES; CORRECT?

10:36AM 17   A.   RIGHT.

10:36AM 18   Q.   AND THERE WAS AN IDEA THAT THERANOS WAS SPEAKING WITH

10:37AM 19   PHARMA COMPANIES ABOUT MOVING THAT BLOOD TESTING, THE LOCATION

10:37AM 20   OF THAT BLOOD TESTING TO WALGREENS; RIGHT?

10:37AM 21   A.   RIGHT.

10:37AM 22   Q.   AND PHARMA PATIENTS WHO WERE IN STUDIES COULD GO INTO THE

10:37AM 23   WALGREENS TO GET THEIR BLOOD TESTED THAT WOULD BE USED FOR THE

10:37AM 24   STUDY.

10:37AM 25       DO YOU REMEMBER THAT?

EDLIN CROSS BY MS. WALSH (RES.)

10:37AM   1    A.   YES.

10:37AM   2    Q.   OKAY.  AND NOW, WHEN YOU LOOK AT THIS EMAIL IN 2015, DOES

10:37AM   3    THAT REFRESH YOUR RECOLLECTION AS TO THAT BEING DISCUSSED

10:37AM   4    DURING THAT TIME PERIOD?

10:37AM   5    A.   YES.

10:37AM   6         MS. WALSH:  YOUR HONOR, WE OFFER 20542.

10:37AM   7         MR. BOSTIC:  HEARSAY AND FOUNDATION, YOUR HONOR.

10:37AM   8         THE COURT:  SUSTAINED.

10:38AM   9    BY MS. WALSH:

10:38AM  10    Q.   LET'S TAKE A LOOK AT 20544.

10:38AM  11         DO YOU SEE THAT DOCUMENT?

10:38AM  12    A.   YES.

10:38AM  13    Q.   AND THIS IS A DOCUMENT THAT YOU'RE ON; RIGHT?

10:38AM  14    A.   YES.

10:38AM  15    Q.   OKAY.  AND MR. BALWANI IS ON THIS ONE; RIGHT?

10:38AM  16    A.   YES.

10:38AM  17    Q.   AND MS. HOLMES; CORRECT?

10:38AM  18    A.   YES.

10:38AM  19    Q.   AND DR. YOUNG; RIGHT?

10:38AM  20    A.   YES.

10:38AM  21    Q.   AND THE BOTTOM EMAIL IS WITH SOMEONE FROM GSK.

10:38AM  22         DO YOU SEE THAT?

10:38AM  23    A.   YES.

10:38AM  24    Q.   AND THIS IS IN MARCH OF 2012.

10:38AM  25         DO YOU SEE THAT?

10:38AM 1    A.   YES.

10:38AM 2              MS. WALSH:  YOUR HONOR, WE OFFER 20544.

10:38AM 3              MR. BOSTIC:  NO OBJECTION.

10:38AM 4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:38AM 5         (DEFENDANT'S EXHIBIT 20544 WAS RECEIVED IN EVIDENCE.)

10:38AM 6    BY MS. WALSH:

10:38AM 7    Q.   OKAY.  IF WE LOOK AT THE BOTTOM EMAIL, THIS PERSON FROM

10:38AM 8    GSK YANNICK VERNAEVES-SCHOEN IS EMAILING YOU, AND HE SAID, "LET

10:38AM 9    ME INTRODUCE MYSELF AS THE CONTRACT MANAGER, IN CHARGE OF

10:39AM 10   SETTING UP ALL CONTRACT AGREEMENT FOR GSK -- GVCL PARTNERSHIP

10:39AM 11   ACTIVITIES.

10:39AM 12        "I HAVE BEEN REQUESTED TO ISSUE A MASTER LABORATORY

10:39AM 13   SERVICE AGREEMENT (MLSA) COVERING FUTURE ACTIVITIES BETWEEN GSK

10:39AM 14   AND YOUR LAB.

10:39AM 15        "CAN I PLEASE ASK YOU TO REVIEW ATTACHED DOCUMENTS AND

10:39AM 16   REVERT TO ME WITH ANY COMMENTS YOU MAY HAVE SO THAT WE CAN MOVE

10:39AM 17   FURTHER INTO CONTRACT DISCUSSION?"

10:39AM 18        DO YOU SEE THAT?

10:39AM 19   A.   YES.

10:39AM 20   Q.   AND THEN YOU EMAIL BACK AND YOU SAY, "HI ALL,

10:39AM 21        "I HAVE ATTACHED THE PROPOSED AGREEMENT FOR OUR UPCOMING

10:39AM 22   CLINICAL TRIAL WITH GSK STARTING JULY 1ST."

10:39AM 23        DO YOU SEE THAT?

10:39AM 24   A.   YES.

10:39AM 25   Q.   OKAY.  AND THIS IS MARCH 12TH, 2012; RIGHT?

10:39AM  1    A.   YES.

10:39AM  2    Q.   SO LET'S NOW TURN TO 20545.

10:40AM  3    A.   OKAY.

10:40AM  4    Q.   OKAY.  AND IS THIS A MEETING INVITE FOR DISCUSSION BETWEEN

10:40AM  5    GSK AND THERANOS, INCLUDING YOU, REGARDING A CONFIDENTIALITY

10:40AM  6    AGREEMENT?

10:40AM  7    A.   YES.

10:40AM  8    Q.   AND THAT'S IN CONNECTION WITH THE GSK-THERANOS

10:40AM  9    RELATIONSHIP; IS THAT RIGHT?

10:40AM  10   A.   YES.

10:40AM  11           MS. WALSH:  YOUR HONOR, WE OFFER 20545.

10:40AM  12           MR. BOSTIC:  NO OBJECTION.

10:40AM  13           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:40AM  14       (DEFENDANT'S EXHIBIT 20545 WAS RECEIVED IN EVIDENCE.)

10:40AM  15   BY MS. WALSH:

10:40AM  16   Q.   OKAY.  LET'S TAKE A LOOK AT THE TEXT AT THE BOTTOM UNDER

10:40AM  17   ATTENDEES IT SAYS, "DEARS" -- AND THIS IS A TEXT FROM GSK;

10:40AM  18   CORRECT?

10:41AM  19   A.   YES.

10:41AM  20   Q.   "DEARS, WE HAVE BEEN ENGAGED LATELY IN EMAIL CHANGES TO

10:41AM  21   SET-UP A CDA BETWEEN OUR COMPANIES.  DUE TO TIGHT TIME

10:41AM  22   CONSTRAINTS, AND BECAUSE THE CDA IS THE LIMITING FACTOR FOR

10:41AM  23   FURTHER IMPORTANT DISCUSSIONS, WE WOULD LIKE TO HAVE THIS CDA

10:41AM  24   FINAL BY WEEK 14."

10:41AM  25           DO YOU SEE THAT?

EDLIN CROSS BY MS. WALSH (RES.)

10:41AM  1    A.   YES.

10:41AM  2    Q.   AND THE CDA IS THE CONFIDENTIALITY AGREEMENT; RIGHT?

10:41AM  3    A.   RIGHT.

10:41AM  4    Q.   AND SO THE TWO COMPANIES COULD TALK FREELY WITH ONE

10:41AM  5    ANOTHER?

10:41AM  6    A.   CORRECT.

10:41AM  7    Q.   AND THEN IT SAYS, "TO ACHIEVE THIS, A TC --" TELEPHONE

10:41AM  8    CALL; RIGHT?

10:41AM  9    A.   RIGHT.

10:41AM  10   Q.   "-- IS PRESUMABLY THE MOST EFFICIENT WAY FROM NOW TO

10:41AM  11   DISCUSS TOWARD A FINAL AGREEMENT."

10:41AM  12        DO YOU SEE THAT?

10:41AM  13   A.   YES.

10:41AM  14   Q.   OKAY.  AND THIS IS IN APRIL 2012; RIGHT?

10:41AM  15   A.   RIGHT.

10:41AM  16   Q.   OKAY.  YOU CAN TAKE THAT DOWN.

10:42AM  17        ALL RIGHT.  NEXT I WANT TO SHIFT GEARS TO THE FDA APPROVAL

10:42AM  18   THAT THERANOS GOT ON ITS HSV I ASSAY.

10:42AM  19        DO YOU REMEMBER THAT?

10:42AM  20   A.   YES.

10:42AM  21   Q.   AND THE FDA, JUST FOR SOME CONTEXT, THE FDA IS THE FEDERAL

10:42AM  22   REGULATOR FOR ALL MEDICAL DEVICES; RIGHT?

10:42AM  23   A.   I BELIEVE SO.

10:42AM  24   Q.   AND FDA CLEARANCE IS A BIG DEAL TO GET ON A MEDICAL

10:42AM  25   DEVICE; RIGHT?

10:42AM   1    A.   YES.

10:42AM   2    Q.   AND IT TAKES A LOT OF WORK TO GET IT; CORRECT?

10:42AM   3          MR. BOSTIC:  OBJECTION.  FOUNDATION.

10:42AM   4          THE COURT:  WOULD YOU LAY A FOUNDATION FOR HIS

10:42AM   5    KNOWLEDGE.

10:42AM   6          MS. WALSH:  SURE.

10:42AM   7    Q.   SO YOU WERE AT THE COMPANY IN 2013 THROUGH '15; RIGHT?

10:42AM   8    A.   YES.

10:42AM   9    Q.   AND YOU WERE AWARE THAT THE SCIENTISTS IN THE R&D LAB WERE

10:42AM  10    WORKING ON GETTING FDA APPROVAL FOR ASSAYS THEY WERE

10:43AM  11    DEVELOPING; RIGHT?

10:43AM  12    A.   IN WHAT TIME PERIOD?

10:43AM  13    Q.   2015.

10:43AM  14    A.   YES.

10:43AM  15    Q.   OKAY.  AND YOU OBSERVED -- YOU DIDN'T WORK SIDE BY SIDE

10:43AM  16    WITH THEM; RIGHT?

10:43AM  17    A.   CORRECT.

10:43AM  18    Q.   BUT DID YOU HAVE SOME AWARENESS OF HOW MUCH WORK THEY WERE

10:43AM  19    PUTTING IN TO APPLY FOR FDA APPROVAL?

10:43AM  20    A.   YES.

10:43AM  21    Q.   AND HOW MUCH WORK WAS THAT?

10:43AM  22    A.   A LOT OF WORK.

10:43AM  23    Q.   OKAY.

10:43AM  24    A.   THEY WERE WORKING VERY HARD.

10:43AM  25    Q.   AND THERANOS FINALLY GOT FDA APPROVAL FOR ONE OF ITS

10:43AM   1      ASSAYS; RIGHT?

10:43AM   2      A.   YES.

10:43AM   3      Q.   AND THAT WAS THE HSV I ASSAY; CORRECT?

10:43AM   4      A.   CORRECT.

10:43AM   5      Q.   AND THE APPROVAL WAS NOT JUST FOR THE ASSAY ITSELF, BUT IT

10:43AM   6      WAS ALSO ON THE DEVICE IT RAN ON; RIGHT?

10:43AM   7      A.   YES.

10:43AM   8      Q.   AND FOR THE NANOTAINER THAT COLLECTED THE BLOOD; RIGHT?

10:44AM   9      A.   YES.

10:44AM  10      Q.   AND SO TURN IN YOUR BINDER TO 13988.

10:44AM  11           DO YOU SEE THAT?

10:44AM  12      A.   YES.

10:44AM  13      Q.   OKAY.  IS THAT AN EMAIL FROM MS. HOLMES TO ALL THERANOS

10:44AM  14      EMPLOYEES?

10:44AM  15      A.   YES.

10:44AM  16      Q.   AND IT'S ON JULY 2ND, 2015; RIGHT?

10:44AM  17      A.   YES.

10:44AM  18      Q.   AND YOU WERE EMPLOYED AT THERANOS AT THE TIME; RIGHT?

10:44AM  19      A.   YES.

10:44AM  20      Q.   AS WAS MR. BALWANI; CORRECT?

10:44AM  21      A.   YES.

10:44AM  22              MS. WALSH:  WE OFFER 13988.

10:44AM  23              MR. BOSTIC:  NO OBJECTION.

10:44AM  24              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:44AM  25           (DEFENDANT'S EXHIBIT 13988 WAS RECEIVED IN EVIDENCE.)

10:44AM  1    BY MS. WALSH:

10:44AM  2    Q.   SO IT'S TO ALL THERANOS EMPLOYEES.

10:45AM  3         AND MS. HOLMES SAYS, "IT IS WITH INCREDIBLE PRIDE THAT I

10:45AM  4    OFFICIALLY LET YOU KNOW THAT WE HAVE RECEIVED OUR FIRST FDA

10:45AM  5    CLEARANCE ON OUR SYSTEM, AND THE FIRST LABORATORY DEVELOPED

10:45AM  6    TEST WE HAVE FILED:  HSV 1.

10:45AM  7         "JOIN ME IN OUR MEETING THIS AFTERNOON TO DISCUSS AND

10:45AM  8    CELEBRATE TOGETHER.  WE WILL BE LIVE STREAMING WITH ARIZONA,

10:45AM  9    NEWARK, AND L.A."

10:45AM  10        DO YOU SEE THAT?

10:45AM  11   A.   YES.

10:45AM  12   Q.   OKAY.  AND YOU REMEMBER, RIGHT, THAT THIS WAS AN

10:45AM  13   INCREDIBLY HAPPY OCCASION AT THE COMPANY; RIGHT?

10:45AM  14   A.   YES.

10:45AM  15   Q.   THERE WAS A BIG PARTY; RIGHT?

10:45AM  16   A.   RIGHT.

10:45AM  17   Q.   WITH BALLOONS; CORRECT?

10:45AM  18   A.   RIGHT.

10:45AM  19   Q.   AND DANCING AND MUSIC; RIGHT?

10:45AM  20   A.   RIGHT.

10:45AM  21   Q.   AND THE ENTIRE -- ALL OF THE EMPLOYEES WERE IN ONE ROOM

10:45AM  22   BEING ADDRESSED BY MS. HOLMES; RIGHT?

10:46AM  23   A.   RIGHT.

10:46AM  24   Q.   AND THAT ADDRESS WAS BEING LIVE STREAMED TO THE ARIZONA

10:46AM  25   HEADQUARTERS OF THERANOS; RIGHT?

10:46AM 1    A.   RIGHT.

10:46AM 2    Q.   AND DURING THAT MEETING, MS. HOLMES MADE A PRESENTATION

10:46AM 3    ABOUT THE FDA CLEARANCE; CORRECT?

10:46AM 4    A.   YES.

10:46AM 5    Q.   AND SHE KIND OF EXPLAINED HOW IT CAME ABOUT; RIGHT?

10:46AM 6    A.   YES.

10:46AM 7    Q.   AND WHAT IT MEANT FOR THE COMPANY; CORRECT?

10:46AM 8    A.   YES.

10:46AM 9    Q.   SO TAKE A LOOK AT 20183.

10:46AM 10   A.   OKAY.

10:46AM 11   Q.   OKAY.  AND YOU SEE THAT'S AN EMAIL FROM DANIEL YOUNG TO

10:46AM 12   YOU; RIGHT?

10:46AM 13   A.   YES.

10:47AM 14   Q.   AND IT ATTACHES A POWERPOINT PRESENTATION; RIGHT?

10:47AM 15   A.   YES.

10:47AM 16   Q.   AND THEN IF YOU LOOK AT THE PRESENTATION -- DO YOU SEE

10:47AM 17   THAT?  YOU CAN JUST FLIP THROUGH IT.

10:47AM 18   A.   YES.

10:47AM 19   Q.   WAS DR. YOUNG EMAILING YOU A PRESENTATION FOR A POWERPOINT

10:47AM 20   FOR THAT MEETING?

10:47AM 21   A.   YES.

10:47AM 22   Q.   THAT IS WHERE MS. HOLMES SPOKE; RIGHT?

10:47AM 23   A.   YES.

10:47AM 24        MS. WALSH:  OKAY.  WE OFFER 20183.

10:47AM 25        MR. BOSTIC:  HEARSAY, YOUR HONOR, ALSO BEYOND THE

10:47AM   1    SCOPE.

10:47AM   2                THE COURT:  THIS IS A LITTLE BEYOND THE SCOPE OF

10:47AM   3    DIRECT.

10:47AM   4                MS. WALSH:  RIGHT.  IF I COULD ADDRESS THAT?

10:47AM   5        THE SCOPE OF THE DIRECT INVOLVED TESTIMONY ABOUT

10:47AM   6    THERANOS'S TECHNOLOGY ALLEGEDLY NOT WORKING, ISSUES WITH

10:48AM   7    DEVICES, THINGS BREAKING, AND PEOPLE BEING DISSATISFIED,

10:48AM   8    INCLUDING CUSTOMERS THAT WE SAW IN VARIOUS EXHIBITS.

10:48AM   9        THIS IS FDA APPROVAL FOR THE THERANOS DEVICE ON AT LEAST

10:48AM  10    ONE TEST, SO I THINK IT IS WITHIN THE SCOPE OF THE DIRECT.

10:48AM  11                THE COURT:  WHAT DOES THE FDA APPROVAL HAVE TO DO

10:48AM  12    WITH THE DEVICES BEING BROKEN OR HAVING PROBLEMS WITH THEM?

10:48AM  13                MS. WALSH:  BECAUSE THE FDA REVIEWED THE DEVICE AND

10:48AM  14    THE DATA AND THE OPERATION OF THE DEVICE, AND IT APPROVED IT AS

10:48AM  15    RELIABLE AND PRODUCING ACCURATE TESTING INFORMATION.

10:48AM  16                THE COURT:  IS THAT WHAT AN FDA APPROVAL IS?

10:48AM  17                MR. BOSTIC:  I DON'T THINK THAT'S BEEN ESTABLISHED,

10:48AM  18    YOUR HONOR.  I THINK THAT'S ATTORNEY ARGUMENT.

10:48AM  19                THE COURT:  I THINK THAT'S CORRECT.  I DON'T THINK

10:48AM  20    THAT'S IN EVIDENCE YET.

10:48AM  21                MS. WALSH:  RIGHT.

10:48AM  22        SO AS FAR AS THE HEARSAY ISSUE, YOUR HONOR, MR. BALWANI

10:48AM  23    WAS AT THIS PRESENTATION.  SO IT GOES TO HIS STATE OF MIND AS

10:49AM  24    TO THE VIABILITY OF THE THERANOS TECHNOLOGY.

10:49AM  25                THE COURT:  WHY DON'T YOU LAY A FOUNDATION FOR THAT.

10:49AM  1          MS. WALSH:  SURE.

10:49AM  2     Q.   MR. EDLIN, I ASKED YOU ABOUT THIS CELEBRATION AND THE

10:49AM  3     MEETING WHERE MS. HOLMES SPOKE; RIGHT?

10:49AM  4     A.   RIGHT.

10:49AM  5     Q.   YOU WERE THERE; RIGHT?

10:49AM  6     A.   YES.

10:49AM  7     Q.   MANY OTHER EMPLOYEES; CORRECT?

10:49AM  8     A.   CORRECT.

10:49AM  9     Q.   AND MR. BALWANI WAS THERE DURING IT; RIGHT?

10:49AM 10     A.   I BELIEVE HE WAS, YES.

10:49AM 11     Q.   AND YOU WERE SITTING CLOSE BY TO HIM, WERE YOU NOT?

10:49AM 12     A.   YES.

10:49AM 13          THE COURT:  WAS THIS DISPLAYED --

10:49AM 14          MS. WALSH:  FAIR ENOUGH, YOUR HONOR.

10:49AM 15     Q.   AND A SLIDE DECK WAS DISPLAYED; RIGHT?

10:49AM 16     A.   RIGHT.

10:49AM 17     Q.   AND DID IT CONTAIN THE INFORMATION THAT IS IN THIS SLIDE

10:49AM 18     DECK?  IF YOU COULD TAKE A LOOK AT IT, YEAH.

10:49AM 19     A.   I BELIEVE IT DID.

10:49AM 20     Q.   OKAY.

10:49AM 21          THE COURT:  AND YOU'RE ASKING THAT THIS BE ADMITTED

10:49AM 22     ONLY FOR THE STATE OF MIND OF YOUR CLIENT THEN?

10:50AM 23          MS. WALSH:  THAT'S RIGHT, YOUR HONOR.

10:50AM 24          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, THIS

10:50AM 25     WILL BE ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED IN

10:50AM  1    THE DOCUMENTS OR THE EMAILS, BUT SOLELY AS TO THE ISSUE OF THE

10:50AM  2    STATE OF MIND OF MR. BALWANI AS TO NOTICE OF THE INFORMATION

10:50AM  3    BUT NOT FOR ITS TRUTH.  AND IT CAN BE ADMITTED WITH THAT

10:50AM  4    LIMITATION AND PUBLISHED.

10:50AM  5         (DEFENDANT'S EXHIBIT 20183 WAS RECEIVED IN EVIDENCE.)

10:50AM  6    BY MS. WALSH:

10:50AM  7    Q.   OKAY.  IF WE CAN TURN IN THE SLIDE DECK TO PAGE 2.

10:50AM  8    A.   OKAY.

10:50AM  9    Q.   AND THIS SAYS, "THIS WAS A MAJOR MILESTONE FOR THERANOS

10:50AM  10   AND NATIONAL PREVENTATIVE HEALTH CARE LANDSCAPE."

10:50AM  11        DO YOU SEE THAT?

10:50AM  12   A.   YES.

10:50AM  13   Q.   AND IT HAS PART OF THE ANNOUNCEMENT, "THERANOS TODAY

10:51AM  14   ANNOUNCED THAT IT HAS RECEIVED THE U.S. FOOD AND DRUG

10:51AM  15   ADMINISTRATION CLEARANCE OF ITS TEST SYSTEM AND TEST FOR HERPES

10:51AM  16   SIMPLEX 1 VIRUS IGG."

10:51AM  17        DO YOU SEE THAT?

10:51AM  18   A.   YES.

10:51AM  19   Q.   AND THEN THE NEXT SLIDE SAYS, "THERANOS RECEIVES FDA

10:51AM  20   CLEARANCE AND REVIEW AND VALIDATION OF REVOLUTIONARY

10:51AM  21   FINGERSTICK TECHNOLOGY, TEST, AND ASSOCIATED TEST SYSTEM."

10:51AM  22        DO YOU SEE THAT?

10:51AM  23   A.   YES.

10:51AM  24   Q.   AND ON SLIDE 4, IT LISTS THE NUMBER OF CARTRIDGES RUN, THE

10:51AM  25   MINUTES OF PROTOCOL TIME, THE DEVICES USED; RIGHT?

10:51AM  1    A.   RIGHT.

10:51AM  2    Q.   AND YOU SEE THIS APPROVAL WAS ON THE 4S DEVICE; RIGHT?

10:51AM  3    A.   YES.

10:51AM  4    Q.   AND THE 4S DEVICE IS THE DEVICE THAT WE TALKED ABOUT IN

10:51AM  5    CONNECTION WITH THE LATER MILITARY RELATIONSHIPS; RIGHT?

10:51AM  6    A.   RIGHT.

10:51AM  7    Q.   OKAY.  AND THEN WE CAN GO FORWARD TO PAGE 15.

10:52AM  8         AND THIS JUST SHOWS ALL OF THE DIFFERENT PARTS OF THE

10:52AM  9    COMPANY THAT WORKED ON THIS FDA CLEARANCE.

10:52AM 10         DO YOU SEE THAT?

10:52AM 11    A.   YES.

10:52AM 12    Q.   AND SO -- YOU CAN PUT THAT ASIDE AND YOU CAN TAKE THAT

10:52AM 13    DOWN.

10:52AM 14         AND SO THIS WAS ANOTHER MAJOR PROJECT THAT WAS GOING ON IN

10:52AM 15    THE -- AT LEAST IN 2015, IF NOT 2014, TIMEFRAME AT THERANOS;

10:52AM 16    RIGHT?

10:52AM 17    A.   RIGHT.

10:52AM 18    Q.   AND IN ADDITION TO THE MILITARY RELATIONSHIPS; RIGHT?

10:52AM 19    A.   IN AROUND -- I BELIEVE THEY -- IN 2015 THOSE HAD CEASED.

10:52AM 20    Q.   OKAY.  IT WAS IN ADDITION TO THE RETAIL LAUNCH; RIGHT?

10:52AM 21    A.   RIGHT.

10:52AM 22    Q.   WHICH WAS ONGOING; CORRECT?

10:52AM 23    A.   CORRECT.

10:52AM 24    Q.   AND IT WAS A LOT OF WORK THAT HAD TO BE DONE; CORRECT?

10:52AM 25    A.   YES.

10:52AM   1      Q.   OKAY.  IF YOU CAN LOOK AT 2604?

10:53AM   2               THE COURT:  IS THAT IN VOLUME 2?

10:53AM   3               MS. WALSH:  YES.

10:53AM   4               THE WITNESS:  2604?

10:54AM   5      BY MS. WALSH:

10:54AM   6      Q.   2604.  IT'S TUCKED IN THERE.

10:54AM   7      A.   YEP.  I HAVE THAT IN VOLUME 1.

10:54AM   8      Q.   YOU HAVE IT?

10:54AM   9      A.   I HAVE IT IN VOLUME 1, YES.

10:54AM   10              MS. WALSH:  THANK YOU, YOUR HONOR.

10:54AM   11     Q.   DO YOU SEE THAT?

10:54AM   12     A.   YES.

10:54AM   13     Q.   AND IS THAT THE FDA APPROVAL OF THE HSV 1 ASSAY?

10:54AM   14     A.   I'M NOT SURE.

10:54AM   15     Q.   OKAY.  AND YOU WERE AWARE, MR. EDLIN, THAT -- I'LL WAIT

10:54AM   16     FOR YOU.

10:54AM   17     A.   OKAY.

10:54AM   18     Q.   YOU WERE AWARE THAT IN ADDITION TO THE FDA APPROVAL FOR

10:55AM   19     THE DEVICE, THERANOS ALSO GOT WHAT IS CALLED A CLIA WAIVER.

10:55AM   20          WERE YOU AWARE OF THAT?

10:55AM   21     A.   IT SOUNDS FAMILIAR.

10:55AM   22     Q.   OKAY.  AND THE CLIA WAIVER ALLOWED THERANOS TO PUT THE

10:55AM   23     DEVICE INTO A STORE; RIGHT?

10:55AM   24     A.   RIGHT.

10:55AM   25     Q.   OR INTO AN AIRPORT; RIGHT?

10:55AM  1     A.   RIGHT.

10:55AM  2     Q.   DIFFERENT LOCATIONS OUTSIDE OF THERANOS; RIGHT?

10:55AM  3     A.   RIGHT.

10:55AM  4     Q.   AND CONDUCT BLOOD TESTING OUTSIDE OF THERANOS; CORRECT?

10:55AM  5          MR. BOSTIC:  OBJECTION.  FOUNDATION.  CALLS FOR A

10:55AM  6     LEGAL CONCLUSION.

10:55AM  7          THE COURT:  CAN YOU LAY A FOUNDATION.

10:55AM  8          MS. WALSH:  I CAN MOVE ON FROM THIS, YOUR HONOR.

10:55AM  9          THE COURT:  ALL RIGHT.

10:55AM 10          MS. WALSH:  YEAH.  OKAY.

10:55AM 11          THE COURT:  SHOULD WE TAKE OUR BREAK NOW?  DO YOU

10:55AM 12     HAVE MORE MATERIAL TO COVER?

10:55AM 13          MS. WALSH:  I DON'T.  I HAVE FIVE MINUTES.

10:55AM 14          THE COURT:  OKAY.  LET'S LET YOU FINISH THAT AND

10:55AM 15     THEN WE'LL TAKE OUR BREAK, LADIES AND GENTLEMEN.

10:55AM 16     BY MS. WALSH:

10:55AM 17     Q.   OKAY.  MR. EDLIN, SO WE WERE TALKING ABOUT

10:55AM 18     ELIZABETH HOLMES SPEAKING TO THE WHOLE COMPANY.

10:55AM 19          AND YOU TESTIFIED YESTERDAY ABOUT HER AGE; RIGHT?

10:56AM 20          THE GOVERNMENT ASKED YOU ABOUT HER AGE.  DO YOU REMEMBER

10:56AM 21     THAT?

10:56AM 22     A.   YES.  YES.

10:56AM 23     Q.   AND SHE WAS AN EXTREMELY -- IN YOUR OBSERVATIONS AND IN

10:56AM 24     YOUR INTERACTIONS WITH HER, SHE WAS AN EXTREMELY ENGAGING

10:56AM 25     SPEAKER, WAS SHE NOT?

10:56AM 1     A.   YES.

10:56AM 2     Q.   SHE COULD REALLY HOLD THE ROOM WHEN SHE WAS SPEAKING TO A

10:56AM 3     CROWD; CORRECT?

10:56AM 4     A.   CORRECT.

10:56AM 5     Q.   EVERYONE WAS LISTENING TO ELIZABETH HOLMES; RIGHT?

10:56AM 6     A.   CORRECT.

10:56AM 7     Q.   AND SHE HAD A COMMANDING VOICE; RIGHT?

10:56AM 8     A.   YES.

10:56AM 9     Q.   AND SHE ALSO HAD A COMMAND OF THE DETAILS OF WHAT WENT ON

10:56AM 10    INSIDE OF THE COMPANY; RIGHT?

10:56AM 11    A.   YES.

10:56AM 12    Q.   SHE UNDERSTOOD THE CHEMISTRIES INVOLVED IN THE ASSAYS;

10:56AM 13    RIGHT?

10:56AM 14    A.   RIGHT.

10:56AM 15    Q.   SHE UNDERSTOOD HOW THE DEVICES WORKED; CORRECT?

10:56AM 16    A.   RIGHT.

10:56AM 17    Q.   SHE WAS LISTED AS AN INVENTOR ON MANY OF THOSE PATENTS;

10:56AM 18    CORRECT?

10:56AM 19    A.   CORRECT.

10:56AM 20    Q.   AND EVEN ONE ON ONE, NOT IN FRONT OF A BIG CROWD, BUT EVEN

10:56AM 21    ONE ON ONE, YOU INTERACTED WITH HER A LOT; RIGHT?

10:56AM 22    A.   RIGHT.

10:57AM 23    Q.   AND SHE WAS EXTREMELY ENGAGING; IS THAT FAIR?

10:57AM 24    A.   YES.

10:57AM 25    Q.   AND IN YOUR ENTIRE TIME AT THERANOS, IN CONNECTION WITH

10:57AM  1    YOUR WORK WITH THE MILITARY, IN CONNECTION WITH YOUR WORK

10:57AM  2    REGARDING THE DEMOS, PUTTING TOGETHER INVESTOR PACKETS, TALKING

10:57AM  3    TO PEOPLE WHO WANTED TO KNOW ABOUT THERANOS, YOU NEVER THOUGHT

10:57AM  4    THAT YOU WERE DECEIVING OR PLAYING A TRICK ON ANYONE, DID YOU?

10:57AM  5    A.   I DID NOT.

10:57AM  6              MS. WALSH:  MAY I HAVE A MOMENT, YOUR HONOR?

10:57AM  7              THE COURT:  YES.

10:57AM  8         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:58AM  9              MS. WALSH:  I HAVE NOTHING FURTHER, YOUR HONOR.

10:58AM 10              THE COURT:  ALL RIGHT.  THANK YOU.

10:58AM 11         MR. BOSTIC, WILL YOU HAVE REDIRECT?

10:58AM 12              MR. BOSTIC:  I WILL, YOUR HONOR.

10:58AM 13              THE COURT:  ALL RIGHT.  LET'S TAKE OUR BREAK, LADIES

10:58AM 14    AND GENTLEMEN.  WE'LL TAKE ABOUT A 20, 20 MINUTE BREAK, AND

10:58AM 15    THEN WE'LL CONTINUE WITH THE TESTIMONY.

10:55AM 16         (RECESS FROM 10:48 A.M. UNTIL 11:10 A.M.)

11:10AM 17              THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK

11:10AM 18    YOU.

11:10AM 19         WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT

11:10AM 20    ARE PRESENT AGAIN.

11:10AM 21         MR. BOSTIC.

11:10AM 22              MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

11:10AM 23    ///

11:10AM 24    ///

11:10AM 25    ///

**REDIRECT EXAMINATION**

BY MR. BOSTIC:

Q.   GOOD MORNING, MR. EDLIN.

A.   GOOD MORNING.

Q.   I'D LIKE TO FOLLOW UP ON SOME OF THE TOPICS THAT YOU

DISCUSSED WITH MR. BALWANI'S LAWYERS.

LET ME ASK YOU FIRST ABOUT THE TOPIC OF THE FDA'S DECISION

REGARDING THE HSV TEST IN 2015.

DO YOU HAVE THAT TOPIC IN MIND?

A.   YES.

Q.   FIRST OF ALL, THAT HSV TEST, WHAT WAS THE HSV TEST?

A.   HERPES SIMPLEX.

Q.   DURING YOUR DISCUSSION WITH MS. WALSH, SHE USED THE TERM

"APPROVAL" TO DESCRIBE WHAT THE FDA DID IN THAT CASE.

DO YOU RECALL THAT THE EXHIBIT THAT YOU REVIEWED WITH HER

REFERRED INSTEAD TO A CLEARANCE?

A.   I'D HAVE TO SEE IT AGAIN.

Q.   LET ME JUST ASK YOU THIS, ARE YOU AWARE OF SIGNIFICANT

DIFFERENCES BETWEEN AN FDA APPROVAL VERSUS AN FDA CLEARANCE?

A.   I'M NOT SURE.

Q.   OKAY.  DID YOUR JOB AT THERANOS REQUIRE YOU TO UNDERSTAND

THE DIFFERENCES BETWEEN AN FDA APPROVAL AND AN FDA CLEARANCE?

A.   NO.

Q.   THE FDA CLEARANCE FOR THE HERPES ASSAY IN 2015, FIRST OF

ALL, WHAT MONTH IN 2015 DID THAT TAKE PLACE IF YOU RECALL?

11:11AM  1    A.   I BELIEVE JULY.

11:11AM  2    Q.   AND CAN YOU REMIND US WHEN THERANOS BEGAN OFFERING PATIENT

11:11AM  3    TESTING TO THE PUBLIC?

11:11AM  4    A.   SEPTEMBER OF 2013.

11:12AM  5    Q.   AND THE FDA CLEARANCE IN JULY 2015, ALMOST TWO YEARS AFTER

11:12AM  6    THERANOS BEGAN OFFERING PATIENT TESTING, WHAT DEVICE, WHAT

11:12AM  7    ANALYZER DID THAT RELATE TO?

11:12AM  8    A.   THE 4S.

11:12AM  9    Q.   AND WAS THE 4S ANALYZER EVER USED BY THERANOS FOR ACTUAL

11:12AM  10   PATIENT TESTING?

11:12AM  11   A.   NO.

11:12AM  12   Q.   THAT HERPES TEST, WAS THAT A TEST THAT THERANOS EVER RAN

11:12AM  13   ON THE EDISON THAT IT USED FOR PATIENT TESTING, IF YOU KNOW?

11:12AM  14   A.   I DON'T KNOW.

11:12AM  15   Q.   YOU MENTIONED DURING CROSS-EXAMINATION THAT THE MINILAB

11:12AM  16   DEVICE WAS NO LONGER IN PRODUCTION IN 2015; IS THAT CORRECT?

11:12AM  17   A.   I DON'T RECALL SEEING THAT DEVICE IN 2015.  I REMEMBER

11:13AM  18   JUST SEEING THE 4S.

11:13AM  19   Q.   WAS IT YOUR UNDERSTANDING THAT AT SOME POINT IN THAT YEAR,

11:13AM  20   THE MINILAB WAS NO LONGER BEING PURSUED BY THERANOS?

11:13AM  21   A.   YES.

11:13AM  22   Q.   DURING YOUR TIME AT THE COMPANY, DID THE MINILAB EVER

11:13AM  23   REACH THE POINT WHERE IT WAS A FINISHED PRODUCT USED FOR

11:13AM  24   PATIENT TESTING?

11:13AM  25   A.   NO.

11:13AM 1    Q.   AND THERE WAS A POINT IN 2015 WHEN THE MINILAB WAS, BASED

11:13AM 2    ON YOUR UNDERSTANDING, NO LONGER EVEN IN DEVELOPMENT TOWARDS

11:13AM 3    THAT GOAL?

11:13AM 4    A.   I DIDN'T HAVE THAT UNDERSTANDING OF WHAT WAS GOING ON, ON

11:13AM 5    THE DEVELOPMENT SIDE.

11:13AM 6    Q.   I'D LIKE TO TALK TO YOU A LITTLE BIT ABOUT THE

11:13AM 7    DEMONSTRATIONS THAT YOU'VE TESTIFIED ABOUT.

11:13AM 8        WE'VE BEEN TALKING ABOUT THE EDISON VERSIONS USED FOR

11:14AM 9    PATIENT TESTING VERSUS THE NEXT GENERATION DEVICES.

11:14AM 10       DO YOU RECALL THAT DISCUSSION?

11:14AM 11   A.   YES.

11:14AM 12   Q.   AND THE NEXT GENERATION DEVICES, THE MINILAB, THE

11:14AM 13   4 SERIES, THE 4S, WERE ANY OF THOSE EVER USED FOR ACTUAL

11:14AM 14   CLINICAL PATIENT TESTING AT THERANOS?

11:14AM 15   A.   NO.

11:14AM 16   Q.   WERE THERE OCCASIONS WHERE YOU WERE ASKED TO PUT THOSE

11:14AM 17   NEXT GENERATION DEVICES IN CONFERENCE ROOMS FOR VIP MEETINGS

11:14AM 18   AND DEMONSTRATIONS?

11:14AM 19   A.   YES.

11:14AM 20   Q.   YOU WERE ASKED ON CROSS-EXAMINATION WHETHER IN CONNECTION

11:14AM 21   WITH THOSE DEMONSTRATIONS YOU PERSONALLY INTENDED TO DECEIVE

11:14AM 22   ANYONE.

11:14AM 23       CAN YOU REMIND US WHAT YOUR ANSWER WAS?

11:14AM 24   A.   I DID NOT.

11:14AM 25   Q.   FOR THOSE MEETINGS WHERE THE VIP'S WOULD MEET IN

11:14AM  1    CONFERENCE ROOMS AT THERANOS, WHO WOULD BE PRESENT ON THE

11:14AM  2    THERANOS SIDE?

11:14AM  3    A.   USUALLY ELIZABETH AND SOMETIMES SUNNY.

11:14AM  4    Q.   AND WERE YOU PRESENT FOR THE ENTIRETY OF ANY OR MANY OF

11:15AM  5    THOSE MEETINGS?

11:15AM  6    A.   SOME OF THEM.

11:15AM  7    Q.   OKAY.  WERE THERE MULTIPLE MEETINGS WITH VIP'S IN THESE

11:15AM  8    THERANOS CONFERENCE ROOMS WHERE YOU WEREN'T PRESENT FOR

11:15AM  9    PORTIONS OR ALL OF THEM?

11:15AM  10   A.   YES.

11:15AM  11   Q.   SO IF WE WANTED TO KNOW WHAT WAS SAID TO A VIP DURING ONE

11:15AM  12   OF THOSE MEETINGS WHEN YOU WEREN'T PRESENT, WOULD YOU BE ABLE

11:15AM  13   TO PROVIDE THAT INFORMATION FOR US?

11:15AM  14   A.   NO.

11:15AM  15   Q.   WE WOULD NEED TO ASK SOMEONE ELSE?

11:15AM  16   A.   CORRECT.

11:15AM  17   Q.   WE DISCUSSED THE NULL PROTOCOL AND THE DEMO APP DURING

11:15AM  18   YOUR DIRECT EXAMINATION.

11:15AM  19        DO YOU RECALL THAT?

11:15AM  20   A.   YES.

11:15AM  21   Q.   AND YOU GOT SOME ADDITIONAL QUESTIONS ABOUT THAT ON CROSS;

11:15AM  22   CORRECT?

11:15AM  23   A.   CORRECT.

11:15AM  24   Q.   AND DID YOU PERSONALLY COME UP WITH THE IDEA FOR THE NULL

11:15AM  25   PROTOCOL AT THERANOS?

EDLIN REDIRECT BY MR. BOSTIC

11:15AM 1    A.   NO.

11:15AM 2    Q.   AND HOW ABOUT THE DEMO APP, WAS THAT YOUR IDEA?

11:15AM 3    A.   NO.

11:15AM 4    Q.   WERE YOU INVOLVED IN ACTUALLY DEVELOPING EITHER OF THOSE

11:15AM 5    SOFTWARE ITEMS?

11:15AM 6    A.   NO.

11:15AM 7    Q.   AND WERE THOSE ITEMS DEVELOPED IN HOUSE AT THERANOS?

11:16AM 8    A.   YES.

11:16AM 9    Q.   AND WHO OR WHAT GROUP OF PEOPLE WOULD HAVE DEVELOPED THOSE

11:16AM 10   PIECES OF SOFTWARE?

11:16AM 11   A.   THE SOFTWARE DEVELOPMENT GROUP.

11:16AM 12   Q.   AND WHO DID THAT GROUP REPORT TO?

11:16AM 13   A.   SUNNY.

11:16AM 14   Q.   AND CAN YOU REMIND US WHAT WAS THE KEY FEATURE OF THE DEMO

11:16AM 15   APP AS IT RELATES TO VIP DEMONSTRATIONS THAT WE'VE BEEN TALKING

11:16AM 16   ABOUT, OR KEY FEATURES?

11:16AM 17   A.   ONE OF THE FEATURES WAS THAT IT SHIELDED ERRORS.  THE

11:16AM 18   OTHER FEATURE WAS THAT IT HAD A USER FRIENDLY TOUCHSCREEN.

11:16AM 19   Q.   AND WHEN YOU SAY, "IT SHIELDED ERRORS," WHAT DOES THAT

11:16AM 20   MEAN?  CAN YOU EXPLAIN?

11:16AM 21   A.   IF AN ERROR OCCURRED IN THE DEVICE, IT DID NOT APPEAR ON

11:16AM 22   THE SCREEN.

11:16AM 23   Q.   YOU WERE INVOLVED IN COORDINATING MANY ASPECTS OF THESE

11:16AM 24   DEMONSTRATIONS AT THERANOS; CORRECT?

11:17AM 25   A.   YES.

11:17AM 1   Q.   WERE YOU ALWAYS PRESENT FOR CONVERSATIONS THAT MS. HOLMES

11:17AM 2   OR MR. BALWANI HAD WITH THE VIP'S ABOUT THE DEMONSTRATIONS AND

11:17AM 3   WHAT THEY WERE GOING TO SEE, WHAT MIGHT BE HAPPENING BEHIND THE

11:17AM 4   SCENES?

11:17AM 5   A.   NO.

11:17AM 6   Q.   SO IF WE WANTED TO KNOW WHAT MR. BALWANI OR MS. HOLMES

11:17AM 7   SAID TO THE VIP'S ABOUT THAT, WE WOULD NEED TO ASK SOMEONE

11:17AM 8   ELSE?

11:17AM 9   A.   CORRECT.

11:17AM 10  Q.   AS THE PERSON COORDINATING THESE DEMONSTRATIONS, DID YOU

11:17AM 11  HAVE AN UNDERSTANDING ABOUT WHY THE DEMONSTRATIONS WERE TAKING

11:17AM 12  PLACE?

11:17AM 13  A.   IN SOME INSTANCES.

11:17AM 14  Q.   AS YOU UNDERSTOOD IT, WHAT WAS THE OVERALL POINT OF THESE

11:17AM 15  DEMONSTRATIONS?

11:17AM 16          MS. WALSH:  OBJECTION.  HEARSAY.

11:17AM 17          THE COURT:  OVERRULED.

11:17AM 18          THE WITNESS:  THE POINT WAS TO SHOW HOW THE THERANOS

11:17AM 19  TECHNOLOGY FUNCTIONED AND WHAT THE THERANOS TECHNOLOGY WAS.

11:17AM 20  BY MR. BOSTIC:

11:18AM 21  Q.   AND WAS IT TO SHOW HOW WELL THE THERANOS TECHNOLOGY

11:18AM 22  FUNCTIONED?

11:18AM 23  A.   I THINK IT WAS TO SHOW HOW WELL AND HOW THE TECHNOLOGY

11:18AM 24  FUNCTIONED.

11:18AM 25  Q.   AND THAT GOAL OF SHOWING WHAT THE TECHNOLOGY IS AND HOW

11:18AM   1   WELL IT FUNCTIONS, SITTING HERE TODAY, CAN YOU EXPLAIN HOW THAT

11:18AM   2   GOAL IS SERVED BY A PIECE OF SOFTWARE THAT HIDES ERRORS FROM A

11:18AM   3   VIP WHO IS WATCHING?

11:18AM   4           MS. WALSH:  OBJECTION.  ARGUMENT.

11:18AM   5           THE COURT:  COULD YOU REPHRASE THAT QUESTION.

11:18AM   6   BY MR. BOSTIC:

11:18AM   7   Q.   SITTING HERE TODAY, MR. EDLIN, DO YOU BELIEVE THAT THE

11:18AM   8   GOAL OF SHOWING HOW WELL THE THERANOS TECHNOLOGY WORKED WAS

11:18AM   9   SERVED BY A PIECE OF SOFTWARE THAT HID ERRORS FROM THE VIP

11:19AM  10   WATCHING?

11:19AM  11           MS. WALSH:  OBJECTION.  ARGUMENT.

11:19AM  12           THE COURT:  OVERRULED.

11:19AM  13   BY MR. BOSTIC:

11:19AM  14   Q.   IF YOU KNOW?

11:19AM  15   A.   CAN YOU REPEAT THE QUESTION?

11:19AM  16   Q.   SURE.

11:19AM  17        DO YOU BELIEVE THAT THE GOAL, THE GOAL THAT WE TALKED

11:19AM  18   ABOUT OF SHOWING HOW WELL THE THERANOS TECHNOLOGY WORKED WAS

11:19AM  19   SERVED BY USING SOFTWARE THAT HID ERRORS FROM THE VIP?

11:19AM  20   A.   I DON'T KNOW.

11:19AM  21   Q.   DO YOU RECALL DISCUSSION DURING YOUR DIRECT EXAMINATION OF

11:19AM  22   INSTANCES WHERE DANIEL YOUNG REMOVED OR CHANGED LABORATORY

11:19AM  23   RESULTS FOR THESE DEMOS?

11:19AM  24   A.   YES.

11:19AM  25   Q.   I'LL ASK YOU THE SAME QUESTION ABOUT THAT, WHICH IS, IF

EDLIN REDIRECT BY MR. BOSTIC

11:19AM  1    THE GOAL WAS TO DEMONSTRATE TO VIP'S HOW WELL THE THERANOS

11:19AM  2    TECHNOLOGY WORKED, DO YOU BELIEVE THAT THAT GOAL WAS SERVED BY

11:20AM  3    REMOVING OR CHANGING PROBLEMATIC RESULTS?

11:20AM  4            MS. WALSH:  OBJECTION.  ARGUMENT.

11:20AM  5            THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

11:20AM  6            THE WITNESS:  CAN YOU REPEAT THE QUESTION?

11:20AM  7    BY MR. BOSTIC:

11:20AM  8    Q.  SURE.

11:20AM  9        THE GOAL OF SHOWING HOW WELL THE THERANOS TECHNOLOGY

11:20AM  10   WORKED -- AND LET ME ASK, WAS THE POINT OF THESE

11:20AM  11   DEMONSTRATIONS, TO PRESENT AN HONEST PICTURE OF HOW WELL THE

11:20AM  12   THERANOS TECHNOLOGY WORKED IN YOUR MIND?

11:20AM  13   A.  YES.

11:20AM  14   Q.  SO THAT GOAL THEN, THE GOAL OF SHOWING HOW WELL THE

11:20AM  15   THERANOS TECHNOLOGY WORKED, DO YOU BELIEVE THAT GOAL WAS SERVED

11:20AM  16   BY THE PRACTICE OF REMOVING OR CHANGING PROBLEMATIC RESULTS

11:20AM  17   AFTER THE FACT, IF YOU KNOW?

11:20AM  18   A.  I DON'T KNOW.

11:20AM  19   Q.  MS. WALSH ASKED YOU ABOUT CONTACT THAT YOU HAD HAD WITH

11:20AM  20   SCIENTISTS WHO WORKED AT THERANOS.

11:20AM  21       DO YOU RECALL THOSE DISCUSSIONS?

11:20AM  22   A.  YES.

11:20AM  23   Q.  AND SHE ASKED YOU WHETHER YOU CONSULTED WITH THOSE

11:21AM  24   SCIENTISTS, AND I BELIEVE YOU SAID YOU DID?

11:21AM  25   A.  YES.

11:21AM 1    Q.   AND SHE ASKED YOU WHETHER YOU RELIED ON THOSE SCIENTISTS,

11:21AM 2    AND I BELIEVE YOU SAID YES; IS THAT RIGHT?

11:21AM 3    A.   RIGHT.

11:21AM 4    Q.   AND I THINK SHE MAY HAVE ASKED YOU WHETHER YOU DEFERRED TO

11:21AM 5    THOSE SCIENTISTS.

11:21AM 6         DID YOU?

11:21AM 7    A.   I DID.

11:21AM 8    Q.   AND WHY DID YOU CONSULT WITH, RELY ON, AND DEFER TO THE

11:21AM 9    SCIENTISTS AT THERANOS?

11:21AM 10   A.   BECAUSE THEY WERE THE EXPERTS WITHIN THE COMPANY WHO HAD

11:21AM 11   THE INFORMATION THAT I WAS ASKED TO GET AT THE TIME.

11:21AM 12   Q.   IN YOUR ROLE AT THERANOS, WHEN YOU WERE INTERACTING WITH

11:21AM 13   THESE SCIENTISTS WHO WERE THE EXPERTS, DID YOU EVER ARGUE WITH

11:21AM 14   THEM ABOUT THE SCIENCE?

11:21AM 15   A.   NO.

11:21AM 16   Q.   DID YOU EVER DISAGREE WITH THEM ON SCIENTIFIC POINTS?

11:21AM 17   A.   NO.

11:21AM 18   Q.   DID YOU EVER IGNORE THE ADVICE THAT THEY GAVE YOU ON

11:21AM 19   SCIENTIFIC POINTS?

11:21AM 20   A.   NO.

11:21AM 21   Q.   DID YOU EVER OVERRULE DECISIONS THAT THEY MADE ON POINTS

11:21AM 22   RELATING TO SCIENCE?

11:22AM 23   A.   NO.

11:22AM 24   Q.   MS. WALSH ALSO ASKED YOU ABOUT MR. BALWANI'S ROLE IN THE

11:22AM 25   COMPANY AS IT RELATED TO MS. HOLMES'S ROLE.

11:22AM  1          DO YOU RECALL THAT DISCUSSION?

11:22AM  2     A.   YES.

11:22AM  3     Q.   AND SHE LISTED A NUMBER OF THINGS THAT MS. HOLMES WAS

11:22AM  4     RESPONSIBLE FOR IN THE COMPANY AND SOME THINGS THAT MR. BALWANI

11:22AM  5     WAS RESPONSIBLE FOR AS WELL.

11:22AM  6          DO YOU RECALL THAT?

11:22AM  7     A.   YES.

11:22AM  8     Q.   AND DID SHE ASK YOU -- LET ME ASK IT A DIFFERENT WAY.

11:22AM  9          DID YOUR DISCUSSION WITH HER INCLUDE ALL OF THE AREAS FOR

11:22AM 10     WHICH MR. BALWANI WAS PRIMARILY RESPONSIBLE IN THE COMPANY?

11:22AM 11     A.   I DON'T BELIEVE SO.

11:22AM 12     Q.   OKAY.  WHAT AREAS WERE LEFT OUT OF THAT CONVERSATION, IF

11:22AM 13     YOU RECALL?

11:22AM 14     A.   I DON'T RECALL.

11:22AM 15     Q.   LET ME ASK YOU SOME SPECIFIC QUESTIONS THEN.

11:22AM 16          DO YOU RECALL MS. WALSH ASKING YOU ABOUT WHETHER

11:22AM 17     MR. BALWANI WAS PRIMARILY RESPONSIBLE FOR SOFTWARE AT THE

11:23AM 18     COMPANY?

11:23AM 19     A.   YES.

11:23AM 20     Q.   AND WHAT WAS THE ANSWER TO THAT?

11:23AM 21     A.   YES.

11:23AM 22     Q.   WAS MR. BALWANI ALSO RESPONSIBLE FOR FINANCIAL MATTERS AT

11:23AM 23     THE COMPANY, IF YOU KNOW?

11:23AM 24     A.   I BELIEVE SO.

11:23AM 25     Q.   OKAY.  AND WHAT MAKES YOU SAY THAT?

11:23AM 1      A.   WHEN I WAS ASKED TO HELP COMPILE SOME INVESTMENT BINDERS,

11:23AM 2      I RECALL THAT ELIZABETH TOLD ME TO GET THE FINANCIAL SECTION OF

11:23AM 3      THE BINDER FROM SUNNY.

11:23AM 4      Q.   AND SPEAKING OF CONTACT WITH INVESTORS, ARE YOU AWARE OF

11:23AM 5      ANY MEETINGS WITH THERANOS INVESTORS WHERE MR. BALWANI WAS

11:23AM 6      PRESENT FOR THOSE MEETINGS?

11:23AM 7      A.   I'M AWARE THAT THOSE MEETINGS HAPPENED.  I'M NOT SURE OF

11:23AM 8      THE SPECIFICS, THOUGH.

11:23AM 9      Q.   I'M SORRY FOR TALKING OVER YOU.

11:23AM 10         HOW ABOUT WHEN IT CAME TO THERANOS'S RELATIONSHIP WITH

11:23AM 11     WALGREENS, DID MR. BALWANI HAVE A PRIMARY ROLE THERE?

11:24AM 12     A.   YES.

11:24AM 13     Q.   WHAT MAKES YOU SAY THAT?

11:24AM 14     A.   IN MY ROLE AS A SENIOR PRODUCT MANAGER WORKING ON THE

11:24AM 15     WALGREENS PARTNERSHIP, MY TEAM REPORTED UP TO SUNNY.  HE

11:24AM 16     OVERSAW THAT PARTNERSHIP.

11:24AM 17     Q.   WHEN MS. WALSH WAS LISTING AREAS OF RESPONSIBILITY AT THE

11:24AM 18     COMPANY, I DON'T THINK SHE ASKED YOU ABOUT RESPONSIBILITY FOR

11:24AM 19     THE CLINICAL LAB.

11:24AM 20         SO WE'RE TALKING ABOUT THE PORTION OF THE BUSINESS THAT

11:24AM 21     ACTUALLY RAN PATIENT TESTING FOR THE PUBLIC; CORRECT?

11:24AM 22     A.   CORRECT.

11:24AM 23     Q.   BETWEEN MS. HOLMES AND MR. BALWANI, WHICH OF THEM, IN YOUR

11:24AM 24     EXPERIENCE, WAS MORE INVOLVED WITH THE OPERATIONS OF THE

11:24AM 25     CLINICAL LAB WHERE PATIENT TESTING WAS DONE?

11:24AM 1   A.   SUNNY.

11:24AM 2   Q.   AND WHAT MAKES YOU SAY THAT?

11:24AM 3   A.   NUMBER ONE, HE WAS THE COO AND IN CHARGE OF OPERATIONS

11:24AM 4   WITHIN THE COMPANY, AND MY UNDERSTANDING WAS THAT THE CLINICAL

11:24AM 5   LAB FELL WITHIN OPERATIONS.

11:25AM 6        I'M ALSO AWARE THAT AT ONE POINT A LAB DIRECTOR LEFT THE

11:25AM 7   COMPANY AND HE ASSUMED CONTROL, OR HE OVERSAW THE CLINICAL LAB

11:25AM 8   OPERATIONS.

11:25AM 9   Q.   AND AT THAT POINT WHERE MR. BALWANI TOOK MORE CONTROL OVER

11:25AM 10  THE LAB AFTER A LAB DIRECTOR LEFT, CAN YOU PLACE THAT IN TIME

11:25AM 11  FOR US?

11:25AM 12       DO YOU HAVE A RECOLLECTION AS TO APPROXIMATELY WHEN THAT

11:25AM 13  WAS?

11:25AM 14  A.   I BELIEVE IN 2014.

11:25AM 15  Q.   DO YOU STILL HAVE THE WHITE BINDER IN FRONT OF YOU?

11:25AM 16  A.   YES.

11:25AM 17  Q.   THE GOVERNMENT BINDER.

11:25AM 18       CAN I ASK YOU TO TURN TO TAB 1776, PLEASE.

11:26AM 19  A.   OKAY.

11:26AM 20  Q.   OKAY.  YOU HAVE EXHIBIT 1776 IN FRONT OF YOU?

11:26AM 21  A.   YES.

11:26AM 22  Q.   CAN YOU IDENTIFY EXHIBIT 1776 FOR US?

11:26AM 23  A.   THIS WAS AN ARTICLE IN "FORTUNE" MAGAZINE WRITTEN ABOUT

11:26AM 24  THERANOS.

11:26AM 25  Q.   AND DO YOU RECALL DISCUSSING THIS ARTICLE AND MS. HOLMES'S

11:26AM  1    INTERVIEW WITH MS. WALSH A FEW MINUTES AGO?

11:26AM  2    A.   YES.

11:26AM  3    Q.   YOU TESTIFIED ON CROSS-EXAMINATION THAT, GENERALLY

11:26AM  4    SPEAKING, MS. HOLMES WAS THE FACE OF THE COMPANY; IS THAT

11:26AM  5    CORRECT?

11:26AM  6    A.   YES.

11:26AM  7    Q.   AND YOU WERE ALSO ASKED ABOUT WHETHER MR. BALWANI WAS

11:26AM  8    PRESENT FOR MS. HOLMES'S INTERVIEW FOR THIS ARTICLE.

11:27AM  9         DO YOU RECALL THAT?

11:27AM  10   A.   YES.

11:27AM  11   Q.   COULD I DIRECT YOUR ATTENTION TO PAGE 21 OF THAT ARTICLE,

11:27AM  12   THE TOP PARAGRAPH.  I'LL JUST ASK YOU TO LOOK IT OVER.  THE

11:27AM  13   PAGE NUMBERS ARE AT THE VERY BOTTOM.

11:27AM  14   A.   OKAY.  I SEE THAT.

11:27AM  15   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. BALWANI WAS

11:27AM  16   ALSO INTERVIEWED FOR THIS "FORTUNE" ARTICLE?

11:27AM  17   A.   YES.

11:27AM  18   Q.   OKAY.  YOU CAN PUT THAT ASIDE.  THANK YOU.

11:27AM  19        DO YOU RECALL DISCUSSING WITH MR. BALWANI'S COUNSEL THE

11:27AM  20   WALGREENS RELATIONSHIP AND THE FACT THAT WALGREENS APPARENTLY

11:27AM  21   HAD A THERANOS DEVICE IN ITS POSSESSION?

11:27AM  22   A.   YES.

11:27AM  23   Q.   DO YOU RECALL ANY OF THE DETAILS ABOUT WHEN THAT DEVICE

11:27AM  24   WAS PROVIDED TO WALGREENS OR FOR WHAT PURPOSE?

11:28AM  25   A.   I DON'T.

11:28AM   1    Q.   DO YOU KNOW, FOR EXAMPLE, WHETHER THAT DEVICE WAS CAPABLE

11:28AM   2    OF RUNNING ANY ASSAYS?

11:28AM   3    A.   NO.

11:28AM   4    Q.   DO YOU KNOW WHETHER THERANOS PROVIDED THE CARTRIDGES AND

11:28AM   5    REAGENTS THAT WOULD BE NECESSARY TO ACTUALLY USE THAT DEVICE AS

11:28AM   6    AN ANALYZER?

11:28AM   7    A.   I DON'T.

11:28AM   8    Q.   DO YOU KNOW WHETHER WALGREENS WAS PERMITTED TO EXAMINE THE

11:28AM   9    DEVICE, FOR EXAMPLE, TO OPEN IT UP AND LOOK AT THE COMPONENTS?

11:28AM  10    A.   I'M NOT AWARE OF THOSE SPECIFIC CONVERSATIONS, BUT I

11:28AM  11    ASSUME THAT THEY WOULD NOT BE ALLOWED TO DO THAT.

11:28AM  12    Q.   WHAT MAKES YOU ASSUME THAT THAT WOULDN'T BE PERMITTED?

11:28AM  13    A.   IN MY EXPERIENCE, NO ONE OUTSIDE OF THE COMPANY WAS

11:28AM  14    PERMITTED TO DO THAT.

11:28AM  15    Q.   SPEAKING OF THE COMPANY'S RELATIONSHIPS WITH OUTSIDE

11:29AM  16    PARTNERS, DO YOU RECALL DISCUSSING WITH MS. WALSH SOME OF THE

11:29AM  17    CONTACTS THAT THE COMPANY HAD WITH PHARMACEUTICAL COMPANIES?

11:29AM  18    A.   YES.

11:29AM  19    Q.   OKAY.   AND YOU WERE SHOWN SOME INSTANCES IN 2013 WHERE

11:29AM  20    THERE WERE EMAILS AND DISCUSSIONS ABOUT SOME POSSIBLE FUTURE

11:29AM  21    DEALINGS.

11:29AM  22        DO YOU RECALL THAT GENERALLY?

11:29AM  23    A.   YES.

11:29AM  24    Q.   SITTING HERE TODAY, DO YOU HAVE A RECOLLECTION OF ANY OF

11:29AM  25    THOSE CONTACTS ACTUALLY TURNING INTO REAL REVENUE GENERATING

11:29AM  1    WORK FOR THERANOS?

11:29AM  2    A.   NO.

11:29AM  3    Q.   MS. WACHS, CAN WE PUBLISH --

11:29AM  4         YOUR HONOR, ACTUALLY, WE WOULD LIKE TO PUBLISH

11:29AM  5    EXHIBIT 7753, AND ONE OF THE ATTACHMENTS.  I BELIEVE THIS IS

11:30AM  6    PRE-ADMITTED.

11:30AM  7              THE COURT:  IT MAY BE PUBLISHED, YES.

11:30AM  8    BY MR. BOSTIC:

11:30AM  9    Q.   LET'S GO TO TAB 2.

11:30AM  10        MR. EDLIN, WHAT I'M SHOWING YOU IS A PRE-ADMITTED EXHIBIT.

11:30AM  11        HAVE YOU SEEN THESE FINANCIAL RECORDS BEFORE?

11:30AM  12   A.   NO.

11:30AM  13   Q.   I'LL DIRECT YOUR ATTENTION TO THE LEFT MOST COLUMN, A,

11:30AM  14   WHERE SOME ENTITIES ARE LISTED.

11:30AM  15        DO YOU SEE THOSE ENTITIES?

11:30AM  16   A.   YES.

11:30AM  17   Q.   AND DO YOU SEE THAT THEY INCLUDE COMPANIES LIKE PFIZER,

11:30AM  18   MERCK, AND OTHER PHARMACEUTICAL COMPANIES?

11:30AM  19   A.   YES.

11:30AM  20   Q.   AND DO YOU SEE AT THE TOP THERE'S A LINE FOR AMERICAN BURN

11:30AM  21   ASSOCIATION?

11:30AM  22   A.   YES.

11:30AM  23   Q.   AND CAN YOU REMIND US WHAT WAS THE COMPANY' WORK WITH THE

11:30AM  24   AMERICAN BURN ASSOCIATION?

11:30AM  25   A.   THE WORK WAS ON A STUDY LOOKING AT SEPSIS IN CONNECTION

11:30AM 1    WITH BURN PATIENTS.

11:30AM 2    Q.   LET'S SCROLL TO THE RIGHT IN THIS CHART, SO MOVING FORWARD

11:31AM 3    IN TIME, AND LET'S LOOK AT THE TIME PERIOD 2012, 2013, AND ON.

11:31AM 4         SO, MR. EDLIN, LOOKING AT THIS CHART, FIRST OF ALL, FOR

11:31AM 5    THE PHARMACEUTICAL COMPANIES, DO YOU SEE ON THIS CHART ANY

11:31AM 6    REVENUE, LET'S SEE, OTHER THAN -- ACTUALLY, LET ME JUST ASK, DO

11:31AM 7    YOU SEE ANY REVENUE ON THIS CHART FROM PHARMACEUTICAL COMPANIES

11:31AM 8    IN 2012 OR ON?

11:31AM 9    A.   IF I'M LOOKING AT THIS CORRECTLY, IT'S -- THERE'S A GAP

11:31AM 10   BETWEEN 2011 AND 2014.

11:31AM 11   Q.   OKAY.  SO I GUESS MY QUESTION IS, DO YOU SEE ANY INDICATED

11:31AM 12   REVENUE FROM PHARMACEUTICAL COMPANIES ON THIS CHART FOR THOSE

11:31AM 13   YEARS, 2012, 2013, OR ON?

11:31AM 14   A.   JUST 2014.

11:31AM 15   Q.   OKAY.  AND FOR 2014, YOU SEE THERE IS INCOME UNDER THE ROW

11:32AM 16   FOR AMERICAN BURN ASSOCIATION; IS THAT CORRECT?

11:32AM 17   A.   YES.

11:32AM 18   Q.   AND THE GRAND TOTAL FOR THE AMERICAN BURN ASSOCIATION

11:32AM 19   ENTITY IS ON THE RIGHT COLUMN THERE, AND IT SAYS 288,000.

11:32AM 20        DO YOU SEE THAT?

11:32AM 21   A.   YES.

11:32AM 22   Q.   IS THAT CONSISTENT WITH YOUR RECOLLECTION ABOUT THE TOTAL

11:32AM 23   AMOUNT OF MONEY THAT THERANOS ACTUALLY MADE FROM THAT MULTI

11:32AM 24   YEAR STUDY WITH THE AMERICAN BURN ASSOCIATION?

11:32AM 25   A.   I DON'T RECALL.

```
11:32AM   1    Q.   DO YOU HAVE ANY RECOLLECTION OF THE AMOUNT BEING, EXCUSE

11:32AM   2    ME, DIFFERENT FROM THIS AMOUNT OF 288,000?

11:32AM   3    A.   I DON'T RECALL --

11:32AM   4    Q.   OKAY.

11:32AM   5    A.   -- WHAT THE NUMBER WAS.

11:32AM   6    Q.   OKAY.  WE CAN PUT THAT ASIDE.  THANK YOU.

11:32AM   7         SPEAKING OF THAT BURN STUDY AND CONTACTS WITH THE

11:32AM   8    MILITARY, I'D LIKE TO DISCUSS THAT WITH YOU BRIEFLY.

11:32AM   9    A.   OKAY.

11:32AM  10    Q.   AND LET'S START WITH THE BURN STUDY.

11:32AM  11         MS. WACHS, DO WE HAVE THE ABILITY TO PROJECT 7694?

11:33AM  12         YOUR HONOR, THIS WAS PRE-ADMITTED?

11:33AM  13              THE COURT:  IT WAS, YES.

11:33AM  14              MR. BOSTIC:  IF WE CAN ZOOM IN ON THE ABSTRACT

11:33AM  15    SECTION, JUST THAT WHOLE BOX.

11:33AM  16    Q.   SO, MR. EDLIN, UNDER RESULTS, I THINK YOU TESTIFIED ABOUT

11:33AM  17    THE REASON WHY THE STUDY WAS TERMINATED.

11:33AM  18         DO YOU RECALL THAT?

11:33AM  19    A.   I'M NOT SURE IF IT WAS IN THAT CONTEXT.

11:33AM  20    Q.   OKAY.  LET ME ASK IT A BETTER WAY.

11:33AM  21    A.   OKAY.

11:33AM  22    Q.   DO YOU SEE UNDER RESULTS THE SECOND SENTENCE BEGINS, "THE

11:33AM  23    STUDY WAS TERMINATED DUE TO"?

11:33AM  24    A.   YES.

11:33AM  25    Q.   IT SAYS, "THE STUDY WAS TERMINATED DUE TO SLOW
```

11:33AM  1    ENROLLMENT."

11:33AM  2         DO YOU RECALL THAT?  CAN YOU EXPLAIN WHAT THAT MEANS?

11:33AM  3    A.   THAT MEANS THAT THE STUDY DID NOT ENROLL OR MAKE A PART OF

11:34AM  4    THAT STUDY.  THAT GENERAL PROCESS WAS SLOW.

11:34AM  5         I THINK THE STUDY WAS THE INVESTIGATOR'S HOPE THAT MORE

11:34AM  6    PATIENTS WOULD BE APART OF THAT STUDY.

11:34AM  7    Q.   ABOVE THAT IT INDICATES THAT A FEW DOZEN PATIENTS WERE

11:34AM  8    INVOLVED.

11:34AM  9         IS THAT CONSISTENT WITH YOUR RECOLLECTION?

11:34AM  10   A.   YES.

11:34AM  11   Q.   UNDER BACKGROUND, IT TALKS ABOUT THE OBJECTIVE OF THE

11:34AM  12   STUDY.

11:34AM  13        DO YOU SEE THAT?

11:34AM  14   A.   YES.

11:34AM  15   Q.   AND IT TALKS ABOUT A TREATMENT ABBREVIATED HBHF, WHICH

11:34AM  16   STANDS FOR HIGH-VOLUME HEMOFILTRATION.

11:34AM  17        DO YOU SEE THAT?

11:34AM  18   A.   YES.

11:34AM  19   Q.   AND DID THIS STUDY RELATE TO EXPLORING WHETHER THAT

11:34AM  20   TREATMENT WOULD BE AN EFFECTIVE TREATMENT FOR BURN PATIENTS?

11:35AM  21   A.   YES.

11:35AM  22   Q.   AND DID THERANOS HAVE ANYTHING TO DO WITH THE DEVELOPMENT

11:35AM  23   OF THAT TREATMENT, THAT HIGH-VOLUME HEMOFILTRATION?

11:35AM  24   A.   I DON'T BELIEVE SO.

11:35AM  25   Q.   OKAY.  LET'S MOVE FORWARD IN THIS EXHIBIT.

EDLIN REDIRECT BY MR. BOSTIC

11:35AM 1        LET'S GO TO THE SECOND TO THE LAST PAGE, PLEASE.  SO WE

11:35AM 2    CAN JUST KEEP SCROLLING FORWARD UNTIL WE GET THERE.  THERE IT

11:35AM 3    WAS.  JUST THE PREVIOUS PAGE.

11:35AM 4        LET'S ZOOM IN ON ACKNOWLEDGEMENTS SECTION IN THE LOWER

11:36AM 5    RIGHT CORNER.

11:36AM 6        MR. EDLIN, DO YOU SEE THAT THE ACKNOWLEDGEMENTS SECTION

11:36AM 7    LISTS A VARIETY OF PROFESSIONALS AND FACILITIES INVOLVED IN THE

11:36AM 8    STUDY?

11:36AM 9    A.   YES.

11:36AM 10   Q.   AND DO YOU SEE THAT THE FACILITIES INCLUDE MANY FACILITIES

11:36AM 11   THAT ARE NOT AFFILIATED WITH THE MILITARY?

11:36AM 12   A.   YES.

11:36AM 13   Q.   SO MY QUESTION IS, WAS THIS STUDY FOCUSSED ON THE

11:36AM 14   TREATMENT OF SOLDIERS AS SUBJECTS OR WAS IT BROADER THAN THAT?

11:36AM 15   A.   BROADER.

11:36AM 16   Q.   AND, AGAIN, JUST TO CLARIFY, BASED ON YOUR UNDERSTANDING

11:36AM 17   OF THE STUDY AND WORKING WITH IT, DID THIS STUDY INVOLVE THE

11:36AM 18   ACTUAL CLINICAL USE OF THE THERANOS ANALYZER?

11:36AM 19       IN OTHER WORDS, DID DOCTORS RELY ON THE RESULTS FROM THE

11:36AM 20   THERANOS TESTS TO MAKE ANY TREATMENT DECISIONS ABOUT PATIENTS?

11:37AM 21   A.   NO.

11:37AM 22   Q.   OKAY.  WE CAN PUT THAT ASIDE.  THANK YOU.

11:37AM 23       YOU WERE ALSO ASKED ABOUT THERANOS'S CONTACT WITH SPECIAL

11:37AM 24   OPERATIONS COMMAND.

11:37AM 25       DO YOU REMEMBER THAT?

11:37AM  1    A.   YES.

11:37AM  2    Q.   AND MS. WALSH ASKED YOU ABOUT AN INSTANCE WHERE DEVICES

11:37AM  3    WERE SENT TO SOCOM; IS THAT RIGHT?

11:37AM  4    A.   YES.

11:37AM  5    Q.   AND SHE ASKED YOU WHETHER SOCOM COULD RUN TESTS ON THOSE

11:37AM  6    DEVICES -- WELL, ACTUALLY, LET ME JUST ASK YOU THAT QUESTION.

11:37AM  7         TO YOUR RECOLLECTION, COULD SOCOM HAVE USED THOSE DEVICES

11:37AM  8    TO ACTUALLY RUN TESTS?

11:37AM  9    A.   I THINK I -- THEY WOULD HAVE NEEDED MORE MATERIAL, MORE

11:37AM  10   EQUIPMENT TO DO THAT.

11:37AM  11   Q.   YOU TESTIFIED ON CROSS THAT YOU DON'T BELIEVE THE

11:37AM  12   CARTRIDGES WERE INCLUDED WITH THOSE DEVICES?

11:37AM  13   A.   CORRECT.

11:37AM  14   Q.   EXPLAIN WHAT THAT MEANS.  WHAT WERE THE CARTRIDGES AND WHY

11:38AM  15   WERE THEY NECESSARY FOR USE WITH THE DEVICES?

11:38AM  16   A.   THE CARTRIDGES WERE A PIECE OF EQUIPMENT THAT SOMEONE

11:38AM  17   WOULD PUT A NANOTAINER OF BLOOD INTO.

11:38AM  18        CARTRIDGES ALSO HAD DIFFERENT CHEMISTRIES THAT WERE

11:38AM  19   REQUIRED TO DO TESTING.

11:38AM  20        SO A DEVICE ITSELF COULD NOT DO THE TESTING.  IT NEEDED

11:38AM  21   CARTRIDGES AND NANOTAINERS IN ORDER TO DO THE TESTING.

11:38AM  22   Q.   AND WOULD A LACK OF CARTRIDGES PREVENT SOCOM FROM USING

11:38AM  23   THE ANALYZER IN THE CLINICAL TREATMENT OF SOLDIERS?

11:38AM  24   A.   YES.

11:38AM  25   Q.   HOW ABOUT JUST TESTING THE DEVICE TO SEE IF IT PROVIDED

EDLIN REDIRECT BY MR. BOSTIC

11:38AM 1    ACCURATE RESULTS, WOULD THE LACK OF CARTRIDGES PREVENT THEM

11:38AM 2    FROM EVEN TAKING THAT STEP?

11:38AM 3    A.   YES.

11:38AM 4    Q.   I'D LIKE TO ASK YOU ABOUT THERANOS'S DEALINGS WITH

11:39AM 5    CENTCOM.  THAT'S CENTRAL COMMAND; RIGHT?

11:39AM 6    A.   RIGHT.

11:39AM 7    Q.   YOU WERE ASKED ABOUT A TRIP TO MACDILL BASE IN 2012 FOR A

11:39AM 8    SECURITY TEST.

11:39AM 9         DO YOU REMEMBER THAT TRIP?

11:39AM 10   A.   YES.

11:39AM 11   Q.   AND CAN YOU EXPLAIN TO US WHAT THE DEVICE HAD TO DO ON

11:39AM 12   THAT TRIP?  FOR EXAMPLE, WAS IT RUNNING ANY ACTUAL PATIENT

11:39AM 13   SAMPLES AT THAT TIME?

11:39AM 14   A.   IT DID NOT HAVE TO RUN ANY TESTS AT THAT TIME.

11:39AM 15   Q.   WHAT WAS IT DOING INSTEAD?

11:39AM 16   A.   IT ESSENTIALLY HAD TO TURN ON AND CONNECT TO THE NETWORK

11:39AM 17   AND SERVER, AND THAT WAS IT.

11:39AM 18   Q.   YOU WERE ALSO SHOWN A PROTOCOL FOR A LIMITED OBJECTIVE

11:39AM 19   EXPERIMENT WITH CENTCOM.

11:39AM 20        DO YOU REMEMBER SEEING THAT?

11:39AM 21   A.   YES.

11:39AM 22   Q.   MS. WACHS, DO WE HAVE THAT EXHIBIT TO DISPLAY?  IT'S

11:39AM 23   10472.

11:39AM 24        ACTUALLY, SORRY.  IT'S 10457.

11:40AM 25        MR. -- SORRY.  YOUR HONOR, MAY WE PUBLISH?

11:40AM  1          THE COURT:  YES.

11:40AM  2     BY MR. BOSTIC:

11:40AM  3     Q.   MR. EDLIN, DO YOU RECALL REVIEWING THIS EXHIBIT AND THE

11:40AM  4     ATTACHED PROTOCOL WITH MS. WALSH?

11:40AM  5     A.   YES.

11:40AM  6     Q.   AND LET'S LOOK AT THE ATTACHMENT, THE PROTOCOL ITSELF.

11:40AM  7          SO, FIRST OF ALL, CAN YOU EXPLAIN FOR US WHAT THE FUNCTION

11:40AM  8     OF THIS DOCUMENT WAS?  WHAT ARE WE ACTUALLY LOOKING AT?

11:40AM  9     A.   THIS DOCUMENT OUTLINES THE WORK THAT THERANOS WOULD DO

11:40AM 10     WITH CENTCOM TO EVALUATE THE TECHNOLOGY.

11:40AM 11     Q.   OKAY.  AND THIS WORK THAT WAS GOING TO TAKE PLACE, DID IT

11:40AM 12     ACTUALLY EVER HAPPEN?

11:40AM 13     A.   NO.

11:40AM 14     Q.   THE LIMITED OBJECTIVE EXPERIMENT WHERE A DEVICE WAS GOING

11:40AM 15     TO BE SHIPPED TO THE MIDDLE EAST AND EVALUATED BY THE MILITARY,

11:41AM 16     DID THAT ACTUALLY EVER TAKE PLACE?

11:41AM 17     A.   NO.

11:41AM 18     Q.   LET'S LOOK AT PAGE 12 OF THIS EXHIBIT.

11:41AM 19          LET'S KEEP GOING TO THE NEXT PAGE.

11:41AM 20          AND ONE MORE.  RIGHT THERE.

11:41AM 21          LET'S ZOOM IN ON THE TOP PORTION OF THIS PAGE.

11:41AM 22          MR. EDLIN, DO YOU SEE THAT NOW WE'RE LOOKING AT A PART OF

11:41AM 23     THAT DOCUMENT THAT HAS A LIST OF ASSAYS?

11:41AM 24     A.   YES.

11:41AM 25     Q.   AND I'LL DRAW YOUR ATTENTION TO JUST THE FIRST ONE ON THAT

11:41AM  1    LIST, WHICH IS CBC.

11:41AM  2         DO YOU HAVE AN UNDERSTANDING AS TO WHAT CBC IS OR WHAT IT

11:41AM  3    STANDS FOR?

11:42AM  4    A.   COMPLETE BLOOD COUNT.

11:42AM  5    Q.   AT THIS TIME, DO YOU KNOW WHETHER THERANOS HAD A HOME

11:42AM  6    BUILT ANALYZER THAT IT WAS USING FOR THE CBC ASSAY FOR PATIENT

11:42AM  7    TESTING?

11:42AM  8              MS. WALSH:  OBJECTION.  FOUNDATION.

11:42AM  9              THE COURT:  YOU'RE ASKING IF HE HAS PERSONAL

11:42AM 10    KNOWLEDGE OF THAT.  OVERRULED.

11:42AM 11         YOU CAN ANSWER THE QUESTION WHETHER YOU HAD PERSONAL

11:42AM 12    KNOWLEDGE.

11:42AM 13    BY MR. BOSTIC:

11:42AM 14    Q.   LET ME ASK IT AGAIN, MR. EDLIN.

11:42AM 15         THE QUESTION IS, AROUND THE TIME THAT THESE CONVERSATIONS

11:42AM 16    WERE HAPPENING WITH THE MILITARY, DO YOU KNOW WHETHER THERANOS

11:42AM 17    HAD A HOME BUILT ANALYZER THAT IT WAS ACTUALLY USING FOR CBC

11:42AM 18    ASSAYS FOR PATIENT TESTING?

11:42AM 19    A.   I DON'T BELIEVE IT DID.

11:42AM 20    Q.   LET'S LOOK AT EXHIBIT 10472, WHICH IS ANOTHER ONE THAT YOU

11:43AM 21    REVIEWED WITH MS. WALSH.

11:43AM 22         YOUR HONOR, MAY WE DISPLAY THIS?

11:43AM 23              THE COURT:  YES.

11:43AM 24    BY MR. BOSTIC:

11:43AM 25    Q.   MR. EDLIN, DO YOU RECALL REVIEWING THIS CORRESPONDENCE

EDLIN REDIRECT BY MR. BOSTIC

11:43AM   1    WHERE THERANOS WAS PREPARING TO SEND AN ANALYZER TO THE

11:43AM   2    MILITARY IN FEBRUARY OF 2013?

11:43AM   3    A.   YES.

11:43AM   4    Q.   YOU TESTIFIED THAT THERANOS LAUNCHED ITS TESTING SERVICES

11:43AM   5    TO THE PUBLIC IN SEPTEMBER 2013; IS THAT RIGHT?

11:43AM   6    A.   YES.

11:43AM   7    Q.   AND SO ABOUT SEVEN MONTHS AFTER THIS; IS THAT CORRECT?

11:43AM   8    A.   YES.

11:43AM   9    Q.   IN SEPTEMBER 2013, DID THERANOS HAVE A 4 SERIES DEVICE

11:43AM   10   THAT WAS AT THE POINT WHERE IT COULD BE USED FOR PATIENT

11:43AM   11   TESTING?

11:43AM   12   A.   I DON'T BELIEVE SO.

11:43AM   13   Q.   HOW ABOUT IN 2014, BASED ON YOUR UNDERSTANDING, WERE ANY

11:44AM   14   4 SERIES DEVICES READY TO BE USED FOR PATIENT TESTING AT

11:44AM   15   THERANOS IN 2014?

11:44AM   16   A.   I BELIEVE THEY WERE STILL UNDER DEVELOPMENT.

11:44AM   17   Q.   AND HOW ABOUT IN 2015, YEARS AFTER THIS EMAIL, DID

11:44AM   18   THERANOS HAVE A 4 SERIES DEVICE THAT IT COULD USE FOR PATIENT

11:44AM   19   TESTING?

11:44AM   20   A.   I KNOW THAT THE TESTS WERE NOT USED FOR PATIENT TESTING.

11:44AM   21   Q.   AND IS THAT TRUE FOR YOUR ENTIRE TIME AT THE COMPANY?

11:44AM   22   A.   YES.

11:44AM   23   Q.   LOOKING AT THIS EMAIL, I'LL DRAW YOUR ATTENTION TO THE

11:44AM   24   HIGHER -- I'M SORRY, THE ITALICIZED PARAGRAPH, WHICH IS THE

11:44AM   25   THIRD ONE DOWN.  LET'S DRAW YOUR ATTENTION TO THAT ONE.

EDLIN REDIRECT BY MR. BOSTIC

11:45AM 1      DO YOU SEE THERE'S -- ON THE THIRD LINE THERE'S A SENTENCE

11:45AM 2  THAT BEGINS, "WE HAVE SIGNIFICANTLY ACCELERATED THERANOS'S

11:45AM 3  PREVIOUSLY PLANNED RELEASE OF 4S IN ORDER TO MEET OUR

11:45AM 4  OBJECTIVES FOR THIS PROGRAM."

11:45AM 5      DO YOU SEE THAT?

11:45AM 6  A.   YES.

11:45AM 7  Q.   AND THIS CLAIM OF SIGNIFICANTLY ACCELERATING THE RELEASE

11:45AM 8  OF 4S, LET ME JUST ASK, WAS THE 4S DEVICE EVER ACTUALLY

11:45AM 9  RELEASED DURING YOUR TIME AT THE COMPANY?

11:45AM 10  A.   COULD YOU DEFINE "RELEASED"?

11:45AM 11  Q.   SURE.

11:45AM 12      WAS IT EVER SOLD TO ANY THIRD PARTIES, TO YOUR KNOWLEDGE?

11:45AM 13  A.   NO.

11:45AM 14  Q.   WAS IT EVER USED FOR CLINICAL PATIENT TESTING, TO YOUR

11:45AM 15  KNOWLEDGE?

11:45AM 16  A.   NO.

11:45AM 17  Q.   DID IT EVER COMPLETE THE RESEARCH AND DEVELOPMENT PROCESS,

11:45AM 18  TO YOUR KNOWLEDGE?

11:45AM 19  A.   I UNDERSTAND THAT IT RECEIVED THAT FDA CLEARANCE OR

11:46AM 20  APPROVAL FOR THE ONE TEST.

11:46AM 21  Q.   AND DID YOU UNDERSTAND THAT TO BE THE END OF ALL RESEARCH

11:46AM 22  AND DEVELOPMENT SUCH THAT THE 4S WAS COMPLETE AND A RELEASED

11:46AM 23  PRODUCT?

11:46AM 24  A.   NO.

11:46AM 25  Q.   FINALLY -- OKAY.  WE CAN SET THAT ASIDE.

11:46AM  1          FINALLY, LET ME ASK YOU, ON THE MILITARY TOPIC, ABOUT

11:46AM  2    THERANOS'S DEALINGS WITH AFRICOM.  IF WE CAN BRIEFLY DISPLAY

11:46AM  3    13993.

11:46AM  4          YOUR HONOR, THIS IS PRE-ADMITTED.

11:46AM  5              THE COURT:  YES.

11:46AM  6    BY MR. BOSTIC:

11:46AM  7    Q.  AND LET'S LOOK AT PAGE 5, PLEASE.  LET'S LOOK AT THE

11:46AM  8    BOTTOM OF THIS PAGE.

11:46AM  9          MR. EDLIN, DO YOU SEE HERE THAT MELISSA GIVENS FROM THE

11:47AM 10    MILITARY IS SPECIFYING VALUES FOR THE PATIENTS THAT WOULD BE

11:47AM 11    TESTED?

11:47AM 12    A.  YES.

11:47AM 13    Q.  CAN YOU EXPLAIN WHAT THAT MEANS IN TERMS OF WHETHER THE

11:47AM 14    DEVICE WAS ACTUALLY BEING USED TO PROVIDE RESULTS FOR PATIENTS?

11:47AM 15    A.  LIEUTENANT COLONEL GIVENS SENT A LIST OF RESULTS FOR

11:47AM 16    DIFFERENT PATIENT NUMBERS THAT WOULD BE DISPLAYED ON THE DEVICE

11:47AM 17    SCREEN.  SO THESE WERE ESSENTIALLY ARTIFICIAL RESULTS THAT WERE

11:47AM 18    PRELOADED INTO THE THERANOS SOFTWARE AND THEN DISPLAYED ON THE

11:47AM 19    SCREEN WHEN A CERTAIN PATIENT WAS -- A CERTAIN PATIENT NUMBER

11:47AM 20    WAS INPUT INTO THE APPLICATION.

11:47AM 21    Q.  SO, IN OTHER WORDS, THE DEVICE WAS NOT ACTUALLY RUNNING

11:47AM 22    TESTS ON SAMPLES AND RECORDING THE RESULTS?

11:47AM 23    A.  CORRECT.

11:48AM 24    Q.  AND DO YOU RECALL REVIEWING WITH MS. WALSH EMAILS ABOUT

11:48AM 25    FUTURE TESTING THAT AFRICOM WAS PLANNING?

EDLIN REDIRECT BY MR. BOSTIC

11:48AM  1    A.   YES.

11:48AM  2    Q.   AND DID THAT TESTING EVER ACTUALLY TAKE PLACE?

11:48AM  3    A.   NO.

11:48AM  4    Q.   OKAY.  WE CAN SET THAT ASIDE.

11:48AM  5         THE LAST TOPIC I WANT TO DISCUSS WITH YOU, MR. EDLIN, IS

11:48AM  6    THE ADVICE THAT THERANOS GOT AND THAT MR. BALWANI AND

11:48AM  7    MS. HOLMES RECEIVED ABOUT THE WEBSITE CONTENT.

11:48AM  8         DO YOU RECALL THAT?

11:48AM  9    A.   YES.

11:48AM  10        MR. BOSTIC:  YOUR HONOR, MAY WE PUBLISH 3981.  IT'S

11:48AM  11   BEEN PRE-ADMITTED.

11:48AM  12             THE COURT:  YES.

11:48AM  13   BY MR. BOSTIC:

11:48AM  14   Q.   MR. EDLIN, DO YOU RECALL DISCUSSING WITH MS. WALSH ABOUT

11:48AM  15   DIRECTION THAT THERANOS GOT ABOUT THE WEBSITE AND SHE HAD

11:48AM  16   SHOWED YOU SOME CHANGES THAT HAD BEEN MADE ON THE WEBSITE?

11:48AM  17   A.   YES.

11:48AM  18   Q.   AND LET'S LOOK AT THE BOTTOM OF THIS PAGE.

11:49AM  19        AND DO YOU SEE HERE THAT ABOUT HALF WAY DOWN THAT

11:49AM  20   PARAGRAPH IT MENTIONS THAT WHAT IS BEING CALLED OUT ARE

11:49AM  21   SITUATIONS WHERE THERE'S DISCUSSION ABOUT SUPERLATIVE OR

11:49AM  22   COMPARATIVE PERFORMANCE CLAIMS.

11:49AM  23        DO YOU SEE THAT?

11:49AM  24   A.   YES.

11:49AM  25   Q.   LET'S LOOK AT THE NEXT PAGE OF THIS EXHIBIT.

EDLIN REDIRECT BY MR. BOSTIC

11:49AM   1        AND DO YOU SEE OR DO YOU RECALL IN THIS EXHIBIT THAT

11:49AM   2    MR. BALWANI AND MS. HOLMES WERE ADVISED NOT TO USE LANGUAGE

11:49AM   3    LIKE "HIGHEST QUALITY, HIGHEST LEVELS OF ACCURACY"?

11:49AM   4    A.   YES.

11:49AM   5    Q.   AND LET'S GO TO THE NEXT PAGE HERE.

11:49AM   6        AND DO YOU SEE THAT THEY WERE ADVISED NOT TO USE THE

11:49AM   7    PHRASE "MORE PRECISE" AND TO SAY "PRECISE" INSTEAD?

11:49AM   8    A.   YES.

11:49AM   9    Q.   AND LET'S LOOK NOW AT THE FINAL VERSION OF THE WEBSITE,

11:50AM  10    WHICH IS 5805.

11:50AM  11        AND LET'S LOOK AT PAGE 2.

11:50AM  12        AND UNDER A FULL RANGE OF TESTS, IF WE CAN ZOOM IN ON

11:50AM  13    THAT.

11:50AM  14        DO YOU SEE THAT THE FINAL VERSION OF THE WEBSITE STILL HAD

11:50AM  15    THE LANGUAGE CLAIMING "THE HIGHEST LEVELS OF QUALITY"?

11:50AM  16    A.   I DO.

11:50AM  17    Q.   LET'S GO TO PAGE 3 AND UNDER WHERE IT SAYS, "A FEW DROPS."

11:50AM  18        DO YOU RECALL THAT THE WEBSITE AGAIN REPEATED THE CLAIM

11:50AM  19    ABOUT HAVING "THE HIGHEST LEVEL OF QUALITY"?

11:50AM  20    A.   I DO.

11:50AM  21    Q.   AND LET'S GO TO PAGE 21.  LET'S ZOOM IN UNDER ONE TINY

11:51AM  22    DROP ON THIS PAGE.

11:51AM  23        LET'S ZOOM OUT.

11:51AM  24        LET'S LOOK UNDER WELCOME AT THE TOP OF THE PAGE.

11:51AM  25        DO YOU RECALL THAT AGAIN THE FINAL VERSION OF THE WEBSITE

11:51AM  1    STILL HAS THE CLAIM ABOUT SPEED AND QUOTE, "THE HIGHEST LEVELS

11:51AM  2    OF ACCURACY"?

11:51AM  3    A.   I DO.

11:51AM  4    Q.   AND FINALLY, LET'S LOOK AT PAGE 22 AND THERE UNDER "ONE

11:51AM  5    TINY DROP."

11:51AM  6         DO YOU SEE HERE AGAIN THAT LANGUAGE THAT MR. BALWANI AND

11:51AM  7    MS. HOLMES WERE ADVISED NOT TO USE ABOUT "THE HIGHEST LEVEL OF

11:51AM  8    ACCURACY AND PRECISION"?

11:51AM  9    A.   I DO.

11:51AM  10   Q.   AND DO YOU RECALL THAT ON DIRECT, YOU SAW THE BROCHURE

11:52AM  11   THAT THERANOS USED TO MARKET TO PATIENTS?

11:52AM  12   A.   YES.

11:52AM  13   Q.   AND DO YOU RECALL SIMILAR LANGUAGE BEING USED IN THAT

11:52AM  14   BROCHURE?

11:52AM  15   A.   YES.

11:52AM  16   Q.   AND DO YOU RECALL THAT WE ALSO LOOKED AT AN EXAMPLE OF AN

11:52AM  17   INVESTOR PRESENTATION SENT BY THERANOS TO AN INVESTOR?

11:52AM  18   A.   YES.

11:52AM  19   Q.   AND DO YOU RECALL THAT THAT ALSO HAD SIMILAR CLAIMS ABOUT

11:52AM  20   "THE HIGHEST LEVELS OF ACCURACY"?

11:52AM  21   A.   YES.

11:52AM  22            MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

11:52AM  23            THE COURT:  YES.

11:52AM  24       (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:52AM  25            MR. BOSTIC:  NO FURTHER QUESTIONS.

11:52AM  1          MS. WALSH:  THANK YOU, YOUR HONOR.

11:52AM  2          CAN WE LEAVE THAT EXHIBIT UP IF THAT'S POSSIBLE.

11:53AM  3                    **RECROSS-EXAMINATION**

11:53AM  4     BY MS. WALSH:

11:53AM  5     Q.   THANK YOU.  I JUST WANT TO TAKE A LOOK AT THAT SENTENCE,

11:53AM  6     MR. EDLIN, THAT CONTAINED THE PHRASE "HIGHEST LEVEL OF ACCURACY

11:53AM  7     AND PRECISION," THAT FULL SENTENCE.  IF WE CAN HIGHLIGHT FROM

11:53AM  8     "AND," THE SENTENCE, "AND WE PROVIDE THE HIGHEST LEVEL OF

11:53AM  9     OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN BOTH OUR PRE- AND

11:53AM 10     POST-ANALYTIC PROCESSES, TO REALIZE THE HIGHEST LEVEL OF

11:53AM 11     ACCURACY AND PRECISION."

11:53AM 12          DO YOU SEE THAT?

11:53AM 13     A.   YES.

11:53AM 14     Q.   AND SO IT'S TO REALIZE THOSE HIGHEST LEVELS THAT THE

11:53AM 15     COMPANY WAS TRYING TO ACHIEVE; CORRECT?

11:53AM 16     A.   CORRECT.

11:53AM 17     Q.   OKAY.  AND APART FROM THE EMAILS THAT WE SAW FROM THE

11:53AM 18     LAWYERS, DO YOU REMEMBER THOSE LAWYERS, MR. EDLIN, WITH THE

11:53AM 19     LAWYER'S ADVICE?

11:53AM 20     A.   YES.

11:54AM 21     Q.   AND THERE WERE OTHER COMMUNICATIONS WITH THE LAWYERS AT

11:54AM 22     THERANOS ABOUT THE WEBSITE; CORRECT?

11:54AM 23     A.   I DON'T RECALL SPECIFIC INSTANCES, BUT I WOULD NOT BE

11:54AM 24     SURPRISED IF THAT HAPPENED.

11:54AM 25     Q.   OKAY.  THERE WERE PHONE CALLS WITH LAWYERS; RIGHT?

EDLIN RECROSS BY MS. WALSH

11:54AM 1      A.   I DON'T KNOW SPECIFICALLY.

11:54AM 2      Q.   ALL RIGHT.  ARE YOU AWARE THAT THERE WERE MEETINGS WITH

11:54AM 3      THE LAWYERS ABOUT THE MARKETING MATERIALS AND THE WEBSITE?

11:54AM 4      A.   I BELIEVE SO.

11:54AM 5      Q.   SO IS IT FAIR TO SAY THAT THOSE TWO EMAILS THAT WE SAW ARE

11:54AM 6      NOT THE ONLY COMMUNICATIONS WITH THE LAWYERS ABOUT THE WEBSITE?

11:54AM 7      A.   I DON'T KNOW SPECIFICALLY.

11:54AM 8      Q.   OKAY.  AND THE GOVERNMENT JUST ASKED YOU ABOUT THE FDA --

11:54AM 9      LET'S CALL IT FDA CLEARANCE TO BE PRECISE, THE FDA CLEARANCE

11:54AM 10     FOR THE HSV 1 ASSAY.

11:54AM 11          DO YOU REMEMBER THAT?

11:54AM 12     A.   YES.

11:54AM 13     Q.   AND THAT WAS IN 2015; RIGHT?

11:55AM 14     A.   RIGHT.

11:55AM 15     Q.   AND THE GOVERNMENT JUST POINTED OUT THAT PATIENT TESTING

11:55AM 16     WAS GOING ON SINCE 2013; RIGHT?

11:55AM 17     A.   RIGHT.

11:55AM 18     Q.   BUT THAT PATIENT TESTING WAS BASED ON THE CENTRAL LAB

11:55AM 19     MODEL; CORRECT?

11:55AM 20     A.   CORRECT.

11:55AM 21     Q.   WHERE THE SAMPLES WERE TAKEN AT WALGREENS; RIGHT?

11:55AM 22     A.   RIGHT.

11:55AM 23     Q.   AND THEY WERE SHIPPED TO THERANOS; CORRECT?

11:55AM 24     A.   CORRECT.

11:55AM 25     Q.   AND THEY WERE PROCESSED AT THERANOS; RIGHT?

```
11:55AM   1      A.   RIGHT.

11:55AM   2      Q.   AND THEN RESULTS WERE ISSUED; CORRECT?

11:55AM   3      A.   RIGHT.

11:55AM   4      Q.   AND THERE WAS NOTHING THAT VIOLATED FDA RULES AS FAR AS

11:55AM   5      YOU KNEW WITH THAT MODEL; IS THAT RIGHT?

11:55AM   6               MR. BOSTIC:  OBJECTION.  702, FOUNDATION, CALLS FOR

11:55AM   7      A LEGAL CONCLUSION.

11:55AM   8               THE COURT:  YOU CAN LAY A FOUNDATION OF HIS

11:55AM   9      KNOWLEDGE.

11:55AM  10               MS. WALSH:  SURE.

11:55AM  11      Q.   MR. EDLIN, YOU -- WERE YOU AWARE THAT THE POINT OF THE FDA

11:55AM  12      CLEARANCE IS THAT -- IS SO THAT THERANOS COULD PUT ITS DEVICES

11:55AM  13      OUTSIDE OF THERANOS?

11:55AM  14      A.   YES.

11:55AM  15      Q.   AND BEFORE, AND BEFORE IT DID THAT, IT WOULD HAVE TO RUN

11:56AM  16      THE TEST IN HOUSE; IS THAT RIGHT?

11:56AM  17      A.   BEFORE THE CLEARANCE?

11:56AM  18      Q.   YES.

11:56AM  19      A.   YES.

11:56AM  20      Q.   OKAY.  THE GOVERNMENT ALSO ASKED YOU ABOUT THE TEST

11:56AM  21      RESULTS COMING OUT OF THE DEMONSTRATIONS.

11:56AM  22           DO YOU REMEMBER THAT?

11:56AM  23      A.   YES.

11:56AM  24      Q.   AND ONE OF THE QUESTIONS TO YOU WAS WHETHER THE GOAL OF

11:56AM  25      THOSE DEMONSTRATIONS WAS TO PRESENT AN HONEST PICTURE OF WHAT
```

11:56AM  1   WAS GOING ON; RIGHT?

11:56AM  2   A.   YES.

11:56AM  3   Q.   AND THAT WAS THE GOAL; RIGHT?

11:56AM  4   A.   YES.

11:56AM  5   Q.   AND DID YOU BELIEVE THAT DANIEL YOUNG, IN DOING WHAT HE

11:56AM  6   WAS DOING, WAS BEING DISHONEST IN ANALYZING AND MAKING

11:56AM  7   DECISIONS ABOUT THOSE TEST RESULTS?

11:56AM  8   A.   NO.

11:56AM  9   Q.   YOU ALSO TESTIFIED THAT AT A CERTAIN POINT WHEN THE LAB

11:57AM 10   DIRECTORS AT THERANOS LEFT IN 2014 --

11:57AM 11        DO YOU REMEMBER THAT?

11:57AM 12   A.   YES.

11:57AM 13   Q.   -- AND AFTER THAT, MR. BALWANI OVERSAW THE LAB.

11:57AM 14        DO YOU REMEMBER THAT TESTIMONY?

11:57AM 15   A.   YES.

11:57AM 16   Q.   BUT MR. BALWANI WAS OVERSEEING THE LAB OPERATIONS;

11:57AM 17   CORRECT?

11:57AM 18   A.   I'M NOT SURE I UNDERSTAND THE DISTINCTION.

11:57AM 19   Q.   WELL, HE WASN'T QUALIFIED TO BE A LAB DIRECTOR, WAS HE?

11:57AM 20   A.   I DON'T BELIEVE SO.

11:57AM 21   Q.   AND HE WASN'T MAKING MEDICAL DECISIONS AS FAR AS YOU KNOW;

11:57AM 22   RIGHT?

11:57AM 23   A.   RIGHT.

11:57AM 24   Q.   HE DIDN'T HAVE A BIOSCIENCE BACKGROUND; RIGHT?

11:57AM 25   A.   RIGHT.

11:57AM 1    Q.   AND SO TO THE EXTENT THAT HE WAS IN CHARGE OF THAT

11:57AM 2    CLINICAL LAB, IT WAS RELATED TO THE OPERATIONS; RIGHT?

11:57AM 3    A.   RIGHT.

11:57AM 4    Q.   THE GOVERNMENT ALSO ASKED YOU ABOUT THE DEVICE THAT WAS

11:57AM 5    SENT TO WALGREENS.

11:57AM 6         DO YOU REMEMBER THAT?

11:57AM 7    A.   YES.

11:57AM 8    Q.   AND WHETHER THE -- THAT DEVICE COULD RUN ASSAYS; RIGHT?

11:57AM 9    A.   RIGHT.

11:57AM 10   Q.   AND WHETHER WALGREENS HAD CARTRIDGES TO RUN THOSE ASSAYS;

11:57AM 11   RIGHT?

11:57AM 12   A.   RIGHT.

11:57AM 13   Q.   COULD WE PULL UP EXHIBIT 20550, WHICH IS IN EVIDENCE.

11:58AM 14        AND THIS IS AN EMAIL FROM YOU TO MR. BALWANI?

11:58AM 15   A.   RIGHT.

11:58AM 16   Q.   AND IN THE SECOND PARAGRAPH YOU SAY, "THERE ARE CURRENTLY

11:58AM 17   40 READERS IN THE FIELD FOR THE ABA TRIAL"; RIGHT?

11:58AM 18   A.   YES.

11:58AM 19   Q.   AND THIS IS THE EMAIL THAT CONTAINS THE STATEMENT ABOUT

11:58AM 20   WALGREENS HAVING ONE OF THOSE READERS; CORRECT?

11:58AM 21   A.   CORRECT.

11:58AM 22   Q.   AND A READER IS A DEVICE; RIGHT?

11:58AM 23   A.   RIGHT.

11:58AM 24   Q.   AND WITH REGARD TO THE 40 READERS IN THE FIELD FOR THE ABA

11:58AM 25   TRIAL, THEY ALL HAD CARTRIDGES; RIGHT?

```
11:58AM   1        A.   RIGHT.

11:58AM   2        Q.   AND THEY WERE ALL RUNNING TESTS; RIGHT?

11:58AM   3        A.   RIGHT.

11:58AM   4        Q.   AND SO DO YOU HAVE ANY REASON TO BELIEVE THAT THE DEVICE

11:58AM   5    THAT WALGREENS HAD, DID NOT HAVE CARTRIDGES?

11:58AM   6        A.   I DON'T KNOW.

11:58AM   7        Q.   AND DO YOU HAVE ANY REASON TO BELIEVE THAT IT COULD NOT

11:58AM   8    RUN TESTS?

11:58AM   9        A.   NO.

11:58AM   10       Q.   OKAY.

11:59AM   11            MS. WALSH:  MAY I HAVE ONE MOMENT, YOUR HONOR?

11:59AM   12            THE COURT:  YES.

11:59AM   13        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

11:59AM   14            MS. WALSH:  NO FURTHER QUESTIONS.

11:59AM   15            THE COURT:  MR. BOSTIC?

11:59AM   16            MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

11:59AM   17            THE COURT:  MAY THIS WITNESS BE EXCUSED?

11:59AM   18            MR. BOSTIC:  YES, YOUR HONOR.

11:59AM   19            MS. WALSH:  YES, YOUR HONOR.

11:59AM   20            THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU VERY

11:59AM   21    MUCH.

11:59AM   22            THE WITNESS:  THANK YOU.

11:59AM   23            THE COURT:  YOU CAN JUST LEAVE THE BINDERS THERE.

11:59AM   24    THEY'LL BE COLLECTED.

11:59AM   25            LADIES AND GENTLEMEN, WE'LL TAKE OUR WEEKEND BREAK NOW.  I
```

| | | |
|---|---|---|
| 11:59AM | 1 | WANT TO DO TWO THINGS.  I WANT TO REMIND YOU OF THE |
| 12:00PM | 2 | ADMONISHMENT. |
| 12:00PM | 3 | PLEASE, DURING THE WEEKEND, DO NOT READ, DISCUSS, OR IN |
| 12:00PM | 4 | ANY WAY LEARN ANYTHING ABOUT THIS CASE. |
| 12:00PM | 5 | ALSO, I WANT TO TELL YOU, WE WILL -- MS. ROBINSON WILL BE |
| 12:00PM | 6 | GIVING YOU A CALENDAR.  I THINK IT'S COLOR CODED.  AND SHE'LL |
| 12:00PM | 7 | GIVE YOU THOSE BEFORE YOU LEAVE. |
| 12:00PM | 8 | PLEASE LOOK AT THESE OVER THE WEEKEND. |
| 12:00PM | 9 | THE GREEN -- I THINK THE GREEN LEGEND DISPLAYS DAYS THAT |
| 12:00PM | 10 | WE WOULD LIKE TO CAPTURE SOME EXTRA TIME THAT I MENTIONED |
| 12:00PM | 11 | EARLIER THIS MORNING.  SO IF YOU COULD PLEASE STUDY THAT AND |
| 12:00PM | 12 | THEN COMPARE IT TO YOUR SCHEDULES, AND I'D LIKE TO TALK WITH |
| 12:00PM | 13 | YOU ABOUT IT NEXT WEEK WHEN WE MEET AGAIN AS TO WHETHER OR NOT |
| 12:00PM | 14 | WE CAN CAPTURE SOME ADDITIONAL TIME SUCH THAT WE CAN KEEP OUR |
| 12:00PM | 15 | TRIAL ON SCHEDULE. |
| 12:00PM | 16 | I APPRECIATE YOUR ACCOMMODATION IN THIS, AND WE'LL TALK |
| 12:00PM | 17 | ABOUT IT NEXT WEEK. |
| 12:00PM | 18 | YOU HAVE A GOOD WEEKEND AND ENJOY YOUR WEEKENDS, AND WE'LL |
| 12:00PM | 19 | SEE YOU, I THINK IT'S TUESDAY, TUESDAY AT 9:00 A.M. |
| 12:01PM | 20 | ALL RIGHT.  THANK YOU. |
| 12:01PM | 21 | (JURY OUT AT 12:01 P.M.) |
| 12:01PM | 22 | THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK |
| 12:01PM | 23 | YOU, COUNSEL. |
| 12:01PM | 24 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE |
| 12:01PM | 25 | WEEKEND. |

12:01PM   1          COUNSEL, ANYTHING BEFORE WE ADJOURN FOR THE WEEKEND.

12:01PM   2               MR. BOSTIC:  NOTHING, YOUR HONOR.

12:01PM   3               THE COURT:  MS. WALSH?  MR. COOPERSMITH?

12:01PM   4               MR. COOPERSMITH:  NO, YOUR HONOR.

12:01PM   5               THE COURT:  ALL RIGHT.  THANK YOU.  HAVE A GOOD

12:01PM   6      WEEKEND.  ARE WE GETTING TOGETHER AT 8:30 ON TUESDAY -- NO,

12:01PM   7      THAT'S WEDNESDAY, ISN'T IT?

12:02PM   8               MR. BOSTIC:  I THINK IT'S CURRENTLY SET FOR TUESDAY,

12:02PM   9      YOUR HONOR.

12:02PM  10               THE COURT:  THAT'S RIGHT.

12:02PM  11          LET ME JUST ASK, SCHEDULING WISE, THE WITNESS THAT THAT

12:02PM  12      MOTION PERTAINS TO, IS THAT OUR NEXT WITNESS?

12:02PM  13               MR. BOSTIC:  AS OF NOW, YOUR HONOR, I BELIEVE HE'S

12:02PM  14      NOT NEXT, HE'S THE ONE AFTER THAT.

12:02PM  15               THE COURT:  AND THE NEXT WITNESS IS -- WILL WE

12:02PM  16      JUST -- SCHEDULING, WILL WE COMPLETE THAT WITNESS, DO YOU

12:02PM  17      THINK, ON TUESDAY?

12:02PM  18               MR. SCHENK:  YOUR HONOR, I THINK THE GOVERNMENT WILL

12:02PM  19      FINISH THE DIRECT IN THE MORNING ON TUESDAY.

12:02PM  20               THE COURT:  I SEE.  OKAY.  ALL RIGHT.

12:02PM  21          ANY IDEA YOU WANT TO OFFER, MR. COOPERSMITH?

12:02PM  22               MR. COOPERSMITH:  I THINK HE'S A FAIRLY IMPORTANT

12:02PM  23      WITNESS, BUT THERE MIGHT BE, YOU KNOW, A FAIR AMOUNT OF CROSS.

12:02PM  24          I HAVEN'T SEEN THE DIRECT YET, SO IT'S HARD TO SAY

12:02PM  25      EXACTLY.

12:02PM   1              THE COURT:  OKAY.

12:02PM   2              MR. COOPERSMITH:  BUT I'M NOT SURE THAT HE WILL BE

12:02PM   3    FINISHED ON TUESDAY, ALTHOUGH IT'S POSSIBLE.

12:02PM   4              THE COURT:  ALL RIGHT.  FAIR ENOUGH.  THANK YOU.

12:02PM   5    THANKS VERY MUCH.  ALL RIGHT.

12:02PM   6          (COURT ADJOURNED AT 12:02 P.M.)

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1

2

3                        <u>CERTIFICATE OF REPORTER</u>

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16                        _____
                          IRENE RODRIGUEZ, CSR, RMR, CRR
17                        CERTIFICATE NUMBER 8074

18

19                        DATED:  MARCH 15, 2022

20

21

22

23

24

25