UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


UNITED STATES OF AMERICA,          )
                                   )   CR-18-00258-EJD
                 PLAINTIFF,        )
                                   )   SAN JOSE, CALIFORNIA
          VS.                      )
                                   )   APRIL 22, 2022
RAMESH "SUNNY" BALWANI,            )
                                   )   VOLUME 21
                 DEFENDANT.        )
_____    )   PAGES 3451 - 3696



TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                       BY:  JOHN C. BOSTIC
                            JEFFREY B. SCHENK
                       150 ALMADEN BOULEVARD, SUITE 900
                       SAN JOSE, CALIFORNIA 95113

                       BY:  ROBERT S. LEACH
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612

          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                       IRENE L. RODRIGUEZ, CSR, RMR, CRR
                       CERTIFICATE NUMBER 8074
                       LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595

          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER

1        A P P E A R A N C E S: (CONT'D)

2        FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                 BY:  MOLLY MCCAFFERTY
3                                     SHAWN ESTRADA
                                 THE ORRICK BUILDING
4                                405 HOWARD STREET
                                 SAN FRANCISCO, CALIFORNIA 94105

5
                                 BY:  JEFFREY COOPERSMITH
6                                     AARON BRECHER
                                      AMANDA MCDOWELL
7                                701 FIFTH AVENUE, SUITE 5600
                                 SEATTLE, WASHINGTON 98104

8
                                 BY:  STEPHEN CAZARES
9                                77 SOUTH FIGUEROA STREET, SUITE 3200
                                 LOS ANGELES, CALIFORNIA 90017

10
                                 BY:  AMY WALSH
11                               51 W 52ND STREET
                                 NEW YORK, NEW YORK 10019

12

13       ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                                 BY:  MADDI WACHS, PARALEGAL
14                                    SARA SLATTERY, PARALEGAL

15                               ORRICK, HERRINGTON & SUTCLIFFE
                                 JENNIFER CYGNOR, PARALEGAL
16                               REESE ORNATE

17                               PROLUMINA
                                 BY:  COREY ALLEN
18                               2200 SIXTH AVENUE, SUITE 425
                                 SEATTLE, WASHINGTON 98121

19
                                 UNITED STATES POSTAL INSPECTION SERVICE
20                               BY:  CHRISTOPHER MCCOLLOW

21                               FEDERAL BUREAU OF INVESTIGATION
                                 BY:  MARIO C. SCUSSEL

22
                                 UNITED STATES FOOD & DRUG
23                               ADMINISTRATION
                                 BY:  GEORGE SCAVDIS

24

25

1

INDEX OF PROCEEDINGS

2

3

GOVERNMENT'S:

4

5 **ADAM ROSENDORFF**

CROSS-EXAM BY MR. COOPERSMITH (RES.)       P. 3493

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

|  | IDENT. | EVIDENCE |
|---|---|---|
| **GOVERNMENT'S** | | |
| 1031 | | 3515 |
| 1305 | | 3524 |
| 4037 | | 3661 |
| **DEFENDANT'S** | | |
| 9921 | | 3507 |
| 9379 | | 3521 |
| 9004, 9007, 9013, 9016, 9020, 9026, | | 3532 |
| 9031, 9042, 9046, 9048, 9052, 9057, | | |
| 9082, 9086, 9098, 9099, 9102, 9105, | | |
| 9111, 9113, 9123, 9126, 9129, 9137, | | |
| 9158, 9162, 9166, 9167, 9196, 9201, | | |
| 9204, 9243, 9245, 9252, 9260, 9264, | | |
| 9268, 9276, 9279, 9284, 9315, 9319, | | |
| 9323, 9326, 9341, 9352, 9368, 9372, | | |
| 9375, 9378, 9381, 9382, 9384, 9387, | | |
| 9393, 9409, AND 9412 | | |
| 7462 | | 3547 |
| 7314 | | 3559 |
| 7324 | | 3575 |
| 13880 | | 3579 |
| 20351 | | 3582 |
| 12464 | | 3583 |
| 20424 | | 3588 |
| 20423 | | 3590 |
| 20303 | | 3593 |
| 20570 | | 3622 |
| 13809 | | 3623 |
| 13905 | | 3635 |
| 9940 | | 3648 |
| 12846 | | 3653 |
| 20302 | | 3658 |
| 20317 | | 3665 |
| 20316 | | 3668 |
| 13893 | | 3617 |
| 20342 | | 3675 |
| 20431 | | 3678 |
| 20335 | | 3681 |
| 20336 | | 3684 |
| 7490 | | 3686 |
| 20371 | | 3689 |
| 20564 | | 3692 |

Line timestamps:
10:28AM (line 9), 10:28AM, 10:28AM, 10:29AM (line 10), 10:29AM, 10:29AM (line 11), 10:29AM, 10:29AM (line 12), 10:30AM, 10:30AM (line 13)

3455

```
         1     SAN JOSE, CALIFORNIA                        APRIL 22, 2022
08:35AM  2                        P R O C E E D I N G S
08:35AM  3          (COURT CONVENED AT 8:35 A.M.)
08:35AM  4          (JURY OUT AT 8:35 A.M.)
08:35AM  5              THE COURT:  WE'RE ON THE RECORD IN THE BALWANI
08:35AM  6     MATTER.  ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.
08:36AM  7          WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.
08:36AM  8          WE WERE GOING TO DISCUSS A COUPLE OF MATTERS THIS MORNING.
08:36AM  9          FIRST OF ALL, COUNSEL, I THINK MS. ROBINSON PROVIDED YOU
08:36AM 10     WITH A GRAPH, A GRAPHIC OF -- DO YOU HAVE THIS? -- OF THE
08:36AM 11     JURY'S AVAILABILITY?  DID THEY GET THAT?
08:36AM 12              THE CLERK:  NO, I HAVEN'T GOT THAT.  I APOLOGIZE.
08:36AM 13              THE COURT:  OH, THIS ONE (INDICATING)?
08:36AM 14          I THOUGHT IT WAS GOING TO BE PRINTED.
08:36AM 15              THE CLERK:  I'LL ASK MICHELLE.
08:36AM 16              THE COURT:  THANKS.
08:36AM 17          WE'LL GET YOU THIS IN JUST A MOMENT.  IT'S A COMPILATION
08:36AM 18     OF THE JURY'S AVAILABILITY FOR EXTENDED TIME, AND WE'LL GET YOU
08:36AM 19     COPIES OF THAT IN JUST A MOMENT.
08:36AM 20          ALSO, IN REGARDS TO THE JURY, WE'VE HAD REQUESTS THAT THE
08:36AM 21     JURORS BE ABLE TO MOVE THEIR SEATS INDEPENDENTLY, AND I'M GOING
08:37AM 22     TO -- SOME OF THEM WANT TO MOVE ABOUT THE JURY BOX.
08:37AM 23          I DON'T THINK THAT'S APPROPRIATE TO -- I'VE TALKED ABOUT
08:37AM 24     AN AIRLINE FLIGHT AND THIS IS NOT SELF-SELECT YOUR SEAT.
08:37AM 25          BUT WHAT I WILL DO IS HAVE THEM MOVE FRONT AND BACK AND
```

08:37AM 1    KIND OF LIKE A LINE CHANGE, AND MR. BOSTIC IS NOW FAMILIAR WITH

08:37AM 2    THAT CONCEPT.  SO WE'LL ALLOW THEM TO MOVE FRONT AND BACK TO

08:37AM 3    ALLOW THEM TO CHANGE THEIR SEATING.

08:37AM 4         I THINK THERE'S BEEN A REQUEST FOR JUROR NUMBER 2,

08:37AM 5    PERHAPS, TO MOVE TO A DIFFERENT SEAT.  HE IS A TALLER

08:37AM 6    INDIVIDUAL, AND JUST FOR TRIAL MANAGEMENT, I DON'T WANT HIM TO

08:37AM 7    SIT IN FRONT OF SOMEONE AND BLOCK THEM.

08:37AM 8         SO WE'LL PROBABLY ASK HIM TO SIT IN MAYBE ONE OF THE

08:37AM 9    CORNER SEATS.  SO THAT'S THE ONLY CHANGE IN THE JURY

08:37AM 10   COMPOSITION NOW.

08:37AM 11        ANY COMMENT ON THAT?

08:37AM 12             MR. SCHENK:  NO, YOUR HONOR.

08:38AM 13             MR. COOPERSMITH:  NO, YOUR HONOR.

08:38AM 14             THE COURT:  OKAY.  THANK YOU.

08:38AM 15        I ALSO ASKED MS. ROBINSON TO PROVIDE YOU WITH COPIES OF A

08:38AM 16   MOTION THAT WILL BE CALENDARED THAT WILL BE HEARD ON MONDAY, I

08:38AM 17   THINK, ON OUR REGULAR CRIMINAL CALENDAR.

08:38AM 18        I DON'T KNOW IF YOU WERE SERVED OR IF YOU RECEIVED A COPY

08:38AM 19   OF THESE PLEADINGS, THAT IS, IF YOU WERE SERVED BY THE MOVING

08:38AM 20   PARTY OR NOT.

08:38AM 21        BUT IT'S SCHEDULED FOR MONDAY AT 1:30.  I JUST WANTED YOU

08:38AM 22   TO HAVE COPIES OF THE PUBLIC FILINGS FOR WHATEVER REASON AND

08:38AM 23   INTEREST YOU MIGHT HAVE.

08:38AM 24             MR. COOPERSMITH:  IS THIS THE MOTION BY MR. RAFAT?

08:38AM 25             THE COURT:  YES.  YES.

08:38AM 1          MR. COOPERSMITH:  THANK YOU.  YES, WE'VE RECEIVED

08:38AM 2     THAT.

08:38AM 3          MR. SCHENK:  YOUR HONOR, JUST ONE QUESTION ON

08:38AM 4     THAT --

08:38AM 5          THE COURT:  OH, THAT'S BETTER.

08:38AM 6          THE CLERK:  SORRY.

08:38AM 7          MR. SCHENK:  WOULD THE COURT BENEFIT FROM THE

08:39AM 8     GOVERNMENT'S PRESENCE AT THE HEARING ON MONDAY?

08:39AM 9          THE COURT:  IT'S A MOTION INTERVENE IN THE CASE, AND

08:39AM 10    YOU'RE PARTIES IN THE CASE.

08:39AM 11         I READ THE DECLARATION.  THE DECLARATION SUGGESTS THAT

08:39AM 12    YOU'VE BEEN SERVED.  I DON'T KNOW IF YOU HAD OR NOT.  THE COURT

08:39AM 13    IS NOT ACTING AS AN AGENT OF THE MOVING PARTY IN PROVIDING YOU

08:39AM 14    COPIES.  THESE ARE ON THE PUBLIC DOCKET, OF COURSE.

08:39AM 15         BUT I GIVE IT TO YOU FOR YOUR INFORMATION AS TO WHETHER OR

08:39AM 16    NOT YOU FEEL YOU NEED TO BE PRESENT AT THE HEARING TO SPEAK AS

08:39AM 17    TO WHETHER OR NOT AND WHAT ACTION THE COURT SHOULD TAKE ON THE

08:39AM 18    PLEADINGS.

08:39AM 19         I DON'T KNOW IF YOU'VE SEEN THEM OR NOT.  YOU DON'T HAVE

08:39AM 20    TO ANSWER THAT, BUT I'VE JUST PROVIDED THEM TO YOU TODAY FOR

08:39AM 21    YOUR BENEFIT AND YOUR CONSIDERATION.

08:39AM 22         MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

08:39AM 23         MR. SCHENK:  THANK YOU.

08:39AM 24         THE COURT:  ALL RIGHT.  NEXT, LET'S TALK ABOUT --

08:39AM 25    LET'S SEE.  I AM GOING TO READ THE STIPULATION IN DOCUMENT 1402

3458

08:40AM 1    THIS MORNING TO THE JURY.  THAT'S THE "WIRED" MAGAZINE ARTICLE,

08:40AM 2    AS WE'VE DISCUSSED.

08:40AM 3        I HAVE READ AND REVIEWED -- AND MOVING ON TO ANOTHER

08:40AM 4    TOPIC, I'VE READ AND REVIEWED THE REVISED PROPOSED ORDER

08:40AM 5    SUBMITTED BY THE DEFENSE IN REGARDS TO A CURATIVE INSTRUCTION,

08:40AM 6    AND THE COURT HAS CONSIDERED THIS, CONSIDERED THE COMMENTS OF

08:40AM 7    COUNSEL AND THEIR ASSISTANCE IN THIS ISSUE, AND THE COURT,

08:40AM 8    RESPECTFULLY, IS NOT GOING TO GIVE THIS.  THE COURT DOES NOT

08:40AM 9    FEEL THAT THE CONDUCT THAT OCCURRED IN THE EXAMINATION OF THE

08:40AM 10   WITNESS CAUSES -- MR. EDLIN, CAUSES AND RISES TO THE LEVEL THAT

08:40AM 11   A CURATIVE INSTRUCTION IS APPROPRIATE.

08:40AM 12       I DON'T BELIEVE IT IS IN THIS MATTER.  SO I'M GOING TO

08:40AM 13   RESPECTFULLY DECLINE THE INVITATION TO GIVE THIS INSTRUCTION.

08:40AM 14       SO THANK YOU FOR THAT.

08:40AM 15           MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

08:40AM 16       I DO UNDERSTAND THE COURT'S RULING, BUT WILL THE COURT

08:41AM 17   CONSIDER AS AN ALTERNATIVE INSTRUCTING THE JURY TO DISREGARD

08:41AM 18   THE QUESTIONS AND ANSWERS?

08:41AM 19           THE COURT:  NO.  THANK YOU.

08:41AM 20           MR. COOPERSMITH:  OKAY.  THANK YOU, YOUR HONOR.

08:41AM 21           THE COURT:  YOU'RE WELCOME.

08:41AM 22       AND FOR THE SAME REASONS.

08:41AM 23       NEXT, LET'S TALK ABOUT DOCUMENT 1381.  THAT IS THE BENCH

08:41AM 24   MEMORANDUM REGARDING EVIDENCE OF PRIOR INCONSISTENT STATEMENTS.

08:41AM 25   THIS WAS FILED BY THE DEFENSE.

08:41AM 1          MR. COOPERSMITH, ANYTHING ELSE ON THIS?

08:41AM 2               MR. COOPERSMITH:  MY COLLEAGUE, MS. SCHURICHT, HAS

08:41AM 3     HOPEFULLY A BRIEF PRESENTATION OF THAT ISSUE.

08:41AM 4               THE COURT:  SURE.

08:41AM 5               MR. COOPERSMITH:  AND I THINK MR. BOSTIC IS PREPARED

08:41AM 6     TO SPEAK TO THAT ISSUE AS WELL.

08:41AM 7               THE COURT:  OKAY.

08:41AM 8          GOOD MORNING.

08:41AM 9               MS. SCHURICHT:  GOOD MORNING.

08:41AM 10         MAY I REMOVE MY MASK?

08:41AM 11              THE COURT:  PLEASE.

08:41AM 12              MS. SCHURICHT:  GOOD MORNING, YOUR HONOR.

08:41AM 13    SACHI SCHURICHT ON BEHALF OF MR. BALWANI.

08:42AM 14         I APPRECIATE HAVING TIME THIS MORNING TO DISCUSS ONE

08:42AM 15    METHOD OF CROSS-EXAMINATION THAT THE DEFENSE MAY PURSUE WITH

08:42AM 16    DR. ROSENDORFF, AND POTENTIALLY WITH OTHER GOVERNMENT WITNESSES

08:42AM 17    AS WELL.

08:42AM 18         AS YOU LIKELY GATHERED FROM OUR BENCH MEMORANDUM, AND WE

08:42AM 19    ALSO SENT A FEW VIDEO CLIPS TO THE COURT LAST NIGHT --

08:42AM 20              THE COURT:  THREE.

08:42AM 21              MS. SCHURICHT:  YES, THREE.  AND APOLOGIES, WE HAD

08:42AM 22    TO SEND THREE REPLACEMENT VIDEOS LATER IN THE EVENING.

08:42AM 23              THE COURT:  I MAY NOT HAVE SEEN THOSE.  I SAW ABOUT

08:42AM 24    THREE LAST NIGHT OR SOMETHING LIKE THAT.

08:42AM 25              MS. SCHURICHT:  I'M SORRY.  WE CAN MAKE SURE YOU

08:42AM   1   HAVE THE PROPER ONES AVAILABLE IF YOU WOULD LIKE TO REVIEW

08:42AM   2   THEM.

08:42AM   3           THE COURT:  AND YOU'VE PROVIDED THE GOVERNMENT WITH

08:42AM   4   THOSE AS WELL?

08:42AM   5           MS. SCHURICHT:  YES, AND ADDITIONAL ONES AS WELL.

08:42AM   6       AS YOU GATHERED, WE THINK DR. ROSENDORFF HAS TESTIFIED

08:42AM   7   WITH STATEMENTS THAT ARE INCONSISTENT WITH PRIOR STATEMENTS HE

08:42AM   8   MADE UNDER OATH IN DEPOSITIONS IN RELATED CIVIL LITIGATION.

08:42AM   9           THE COURT:  AND WHAT HAPPENS IN TRIAL WHEN THAT

08:42AM  10   OCCURS?

08:42AM  11           MS. SCHURICHT:  WELL, THERE ARE DIFFERENT APPROACHES

08:43AM  12   THE DEFENSE CAN TAKE, YOUR HONOR.  I THINK THERE'S KIND OF A

08:43AM  13   CLASSIC FORM OF IMPEACHMENT WHERE THE DEFENSE MAY READ THE

08:43AM  14   PRIOR INCONSISTENT STATEMENT AND CONFRONT THE WITNESS WITH IT

08:43AM  15   ON THE STAND.

08:43AM  16       AS OUR MEMO EXPLAINED, WE THINK THE RULES ALSO PERMIT THE

08:43AM  17   ADMISSION INTO EVIDENCE OF THE PRIOR INCONSISTENT STATEMENTS

08:43AM  18   THEMSELVES IN THE MOST PROBATIVE FORM THAT IS AVAILABLE TO THE

08:43AM  19   DEFENSE.

08:43AM  20           THE COURT:  SO IS THERE A DISTINCTION BETWEEN 613

08:43AM  21   AND 801?

08:43AM  22           MS. SCHURICHT:  I THINK SO.  I THINK THEY BOTH APPLY

08:43AM  23   HERE.

08:43AM  24       RULE 801 MAKES CLEAR THAT A PRIOR INCONSISTENT MADE UNDER

08:43AM  25   PENALTY OF PERJURY IN A LEGAL PROCEEDING IS NOT HEARSAY.

3461

08:43AM  1          THE COURT:  IT'S NOT HEARSAY.

08:43AM  2          MS. SCHURICHT:  IT'S ADMISSIBLE FOR ITS TRUTH.

08:43AM  3          THE COURT:  IT'S SUBSTANTIVE EVIDENCE THEN.

08:43AM  4          MS. SCHURICHT:  EXACTLY.

08:43AM  5       AND HERE DR. ROSENDORFF HAS TESTIFIED ABOUT ISSUES THAT

08:43AM  6   ARE HIGHLY MATERIAL TO THE CASE, AND WHEN THERE'S NO OTHER BAR

08:43AM  7   TO THE ADMISSION OF THAT EVIDENCE, WE THINK A VIDEO RECORDING

08:43AM  8   THAT SHOWS HIS DEMEANOR, HIS BODY LANGUAGE, OTHER VERBAL AND

08:44AM  9   NONVERBAL INDICIA OF CREDIBILITY, WE THINK THAT'S THE MOST

08:44AM 10   PROBATIVE SUBSTANTIVE EVIDENCE, AS YOU SAY, FOR THE JURY TO

08:44AM 11   REVIEW.

08:44AM 12          THE COURT:  HAVE YOU PREPARED A TRANSCRIPT OF THOSE

08:44AM 13   DEPOSITIONS?  I DIDN'T SEE THOSE.

08:44AM 14       DO YOU HAVE TRANSCRIPTS?

08:44AM 15          MS. SCHURICHT:  WE DO.  WE HAVE CREATED STAND ALONE

08:44AM 16   EXCERPTS OF THE PRECISE STATEMENTS.

08:44AM 17          THE COURT:  I SEE.

08:44AM 18          MS. SCHURICHT:  AND I SHOULD SAY WE HAVE CREATED

08:44AM 19   SHORT VIDEO CLIPS WHEN THAT IS AVAILABLE, FOR INSTANCE, FOR

08:44AM 20   DEPOSITIONS THAT WERE VIDEO RECORDED.

08:44AM 21       IT'S POSSIBLE THAT DR. ROSENDORFF MAY TESTIFY IN A WAY

08:44AM 22   THAT IS INCONSISTENT WITH, FOR INSTANCE, SOMETHING SAID AT THE

08:44AM 23   HOLMES TRIAL.

08:44AM 24       WE, OF COURSE, DON'T HAVE A VIDEO RECORDING OF THAT, BUT

08:44AM 25   WE'VE CREATED EXCERPTS OF THE TRANSCRIPT.

08:44AM  1              THE COURT:  OKAY.

08:44AM  2              MS. SCHURICHT:  AND JUST TO FINISH ANSWERING YOUR

08:44AM  3     PRIOR QUESTION, RULE 613(B) I THINK ALSO APPLIES HERE, BUT

08:44AM  4     ALLOWS THE ADMISSION OF EXTRINSIC EVIDENCE OF A PRIOR

08:44AM  5     INCONSISTENT STATEMENT REGARDLESS OF WHETHER IT WAS MADE UNDER

08:44AM  6     OATH OR NOT.

08:44AM  7         BUT THAT ALLOWS THE ADMISSION OF THIS EVIDENCE FOR

08:45AM  8     IMPEACHMENT PURPOSES.

08:45AM  9              THE COURT:  NOT AS SUBSTANTIVE EVIDENCE.

08:45AM  10              MS. SCHURICHT:  RIGHT, RIGHT.

08:45AM  11         TO BE CLEAR, WE THINK THEY BOTH APPLY HERE.  WE THINK IT'S

08:45AM  12     ADMISSIBLE FOR ITS TRUTH AS WELL.

08:45AM  13              THE COURT:  LET ME -- THE OBSERVATION THAT I WOULD

08:45AM  14     MAKE ON THE VIDEOS THAT I'VE LOOKED AT, AND IT SOUNDS LIKE

08:45AM  15     THEY'RE NOT THE ONES THAT YOU SEEK TO INTRODUCE, THEY'RE NOT

08:45AM  16     THE UPDATED ONES, BUT I LOOKED AT A COUPLE OF THEM.

08:45AM  17         I DON'T KNOW THE CONTEXT -- EXCUSE ME.  I DON'T KNOW

08:45AM  18     THE -- WELL, THE CONTEXT OF WHEN THOSE WERE TAKEN, IF THEY WERE

08:45AM  19     PART OF AN S.E.C. -- THEY CERTAINLY WEREN'T PART OF THE HOLMES

08:45AM  20     TRIAL OR SOME OTHER CIVIL MATTER.

08:45AM  21         BUT WHAT I DID NOTE WAS THAT THERE WAS A ROLLING

08:45AM  22     TRANSCRIPT, AS WE OFTEN SEE, AND WHICH CAPTURED OBJECTIONS FROM

08:45AM  23     COUNSEL.

08:45AM  24         WHICH IS A PROBLEM, I THINK.  I'M JUST GIVING YOU A HEADS

08:45AM  25     UP ON THAT FOR THE VIDEO PURPOSE.

3463

08:46AM  1          SO THAT'S A CONSIDERATION I WANT TO LEAVE YOU WITH FOR

08:46AM  2     SHOWING THE VIDEOS.  I'M NOT QUITE CONVINCED THAT THAT PORTION,

08:46AM  3     SHOULD THE JURY RECEIVE THAT, THAT IT CONTAINS OBJECTIONS AND

08:46AM  4     ALSO CONTAINED THE ROLLING SCRIPT, AND I DON'T KNOW IF YOU CAN

08:51AM  5     MODIFY THAT OR NOT.

08:51AM  6          MS. SCHURICHT:  I BELIEVE THAT MR. ALLEN CAN REMOVE

08:51AM  7     THE ROLLING SCRIPT AT THE BOTTOM IF THAT'S THE COURT'S

08:51AM  8     PREFERENCE.

08:51AM  9          AND THEN I THINK OF COURSE THE AUDIO STILL CAPTURES SOME

08:51AM  10    OF THE ATTORNEY'S COMMENTS.  I THINK FOR SOME OF THEM IT'S

08:51AM  11    ALMOST INAUDIBLE BECAUSE THE WITNESS OR THE DEPONENT HIMSELF IS

08:51AM  12    THE ONLY ONE MIKED UP.

08:51AM  13         I'M NOT SURE IF IT'S ANY COMFORT FOR THE COURT, BUT I WILL

08:51AM  14    NOTE THAT THE JURY ALSO HEARS OUR OBJECTIONS HERE IN COURT AND

08:51AM  15    IS INSTRUCTED THAT SHOULD NOT AFFECT THEIR INTERPRETATION OF

08:51AM  16    THE ULTIMATE EVIDENCE.

08:51AM  17         THE COURT:  AND IN COURT THEY GET THE BENEFIT OF THE

08:51AM  18    COURT'S RULING.

08:51AM  19         MS. SCHURICHT:  TRUE.  THOUGH, FOR INSTANCE, IF AN

08:51AM  20    OBJECTION IS OVERRULED, IT STILL APPEARS ON THE RECORD, THE

08:51AM  21    JURY STILL HEARD IT.

08:51AM  22         SO I'M NOT SURE IT WOULD BE THAT CONFUSING TO THEM, BUT WE

08:51AM  23    CAN CERTAINLY REMOVE THAT ROLLING SCRIPT.

08:51AM  24         THE COURT:  OKAY.  THAT WAS AN OBSERVATION I MADE.

08:51AM  25         MR. BOSTIC.

08:51AM 1          MR. BOSTIC:  THANK YOU, YOUR HONOR.

08:51AM 2      I DON'T THINK THE GOVERNMENT DISAGREES -- WELL, LET ME SAY

08:51AM 3  THE GOVERNMENT DOESN'T DISAGREE WITH THE DEFENSE ABOUT THE

08:51AM 4  PROTOCOL FOR INTRODUCING ANY INCONSISTENT STATEMENTS INTO

08:51AM 5  EVIDENCE.

08:51AM 6      I AGREE THAT THAT IS PERMISSIBLE AND WE DON'T OBJECT TO

08:51AM 7  THE VIDEO BEING USED.

08:51AM 8      I THINK IT'S IMPORTANT TO STRESS THE PROCESS BY WHICH THAT

08:51AM 9  HAPPENS, AND HERE'S WHERE I'M SOMEWHAT CONCERNED THE PARTIES

08:51AM 10  MIGHT END UP PARTING WAYS.

08:51AM 11      OBVIOUSLY FOR A PRIOR INCONSISTENT STATEMENT TO BE

08:51AM 12  ADMISSIBLE UNDER THE RELEVANT RULE, IT MUST ACTUALLY BE

08:51AM 13  INCONSISTENT WITH SOMETHING THAT THE WITNESS HAS SAID ON THE

08:51AM 14  STAND.

08:51AM 15      I DID RECEIVE THE -- OR A BATCH OF PRIOR TESTIMONY

08:51AM 16  EXCERPTS FROM THE DEFENSE LAST NIGHT.

08:51AM 17      THIS MORNING I RESPONDED TO THEM WITH SOME RULE 106

08:51AM 18  ADDITIONS THAT THE GOVERNMENT FEELS ARE NECESSARY FOR SEVERAL

08:51AM 19  OF THOSE.

08:51AM 20      I'M NOT SURE WHETHER THE DEFENSE OPPOSED ANY OR ALL OF

08:51AM 21  THEM.

08:51AM 22      ACTUALLY, I'M INFORMED THAT THEY MAY AGREE WITH ONE, OR

08:51AM 23  ONE MIGHT BE INCLUDED IN THEIR SELECTED EXCERPT.

08:51AM 24      BUT I THINK AS OF NOW, LOOKING AT THE SECTIONS THAT THE

08:51AM 25  DEFENSE HAS PROPOSED, I'M HAVING TROUBLE SEEING THE LINE UP

08:51AM 1    BETWEEN THE PREVIOUS STATEMENTS THAT THEY WANT TO INTRODUCE AND

08:51AM 2    ANY CONFLICTING TESTIMONY THAT DR. ROSENDORFF HAS GIVEN SO FAR.

08:51AM 3        SO I DON'T WANT TO GET AHEAD OF OURSELVES IF SOME OF THESE

08:51AM 4    ARE OFFERED IN ANTICIPATION THAT HE MAY SAY SOMETHING

08:51AM 5    INCONSISTENT DURING THE REST OF THE CROSS-EXAMINATION.

08:51AM 6        BUT TO THE EXTENT THAT THE DEFENSE THINKS THEY ARE RIPE

08:51AM 7    NOW, AS TO ANY THAT THE DEFENSE THINKS THAT DR. ROSENDORFF HAS

08:51AM 8    ALREADY TESTIFIED INCONSISTENTLY TO, IT MIGHT BENEFIT FROM SOME

08:51AM 9    DISCUSSION NOW, BECAUSE I THINK EVEN BEFORE THE DEFENSE CAN

08:51AM 10   REFER TO PRIOR TESTIMONY, EVEN ASKING THE WITNESS, DID YOU

08:51AM 11   PREVIOUSLY TESTIFY, I THINK THAT NEEDS TO COME AFTER A PRIMA

08:51AM 12   FACIE SHOWING HAS BEEN MADE OF AN INCONSISTENT STATEMENT.

08:51AM 13       I DON'T THINK THAT SHOWING HAS BEEN MADE YET.

08:51AM 14           MS. SCHURICHT:  SO, FIRST OF ALL, I WILL CLARIFY,

08:51AM 15   YES, SOME OF THE CLIPS THAT WE -- AND EXCERPTS THAT WE SHARED

08:51AM 16   WITH THE GOVERNMENT LAST NIGHT WERE ANTICIPATORY AND WHETHER OR

08:51AM 17   NOT WE SEEK TO ADMIT THEM WILL DEPEND ON HOW THE WITNESS

08:51AM 18   TESTIFIES IN COURT TODAY.  IF HE ANSWERS QUESTIONS CONSISTENTLY

08:51AM 19   WITH HOW HE'S ANSWERED THEM IN THE PAST, WE'RE PERFECTLY HAPPY

08:51AM 20   WITH THAT AND WILL NOT NEED TO INTRODUCE ADDITIONAL CLIPS.

08:51AM 21       THE THREE VIDEOS THAT WE SENT TO THE COURT -- AND AGAIN, I

08:51AM 22   APOLOGIZE THAT THE REVISED ONES WERE SENT SO LATE.

08:51AM 23           THE COURT:  10:30, I THINK IT WAS 10:30 P.M.

08:51AM 24       AND I HAVE TO APOLOGIZE TO YOU, I DID NOT -- I WAS ON THE

08:51AM 25   COMPUTER AT 10:30 LAST NIGHT, BUT I DIDN'T CHECK ECF FOR ANY

08:51AM   1      FILINGS, SO I DIDN'T NOTICE THEM.

08:51AM   2           MS. SCHURICHT:  THAT'S QUITE UNDERSTANDABLE,

08:51AM   3      YOUR HONOR.

08:51AM   4      I DO THINK FOR THOSE THREE EXCERPTS THERE HAS BEEN AN

08:51AM   5      INCONSISTENCY ESTABLISHED BASED ON WHAT DR. ROSENDORFF HAS

08:51AM   6      TESTIFIED TO ON WEDNESDAY.

08:51AM   7      I DID RECEIVE FOUR, I THINK, 106 ADDITIONS FROM THE

08:51AM   8      GOVERNMENT THIS MORNING.  I'D BE HAPPY TO TALK THROUGH THEM.  I

08:51AM   9      THINK WE MAY TAKE ISSUE WITH ONE OF THEM.

08:51AM  10      THE REMAINDER I THINK WE'RE ALREADY IN SUBSTANTIVE

08:51AM  11      AGREEMENT, OR WE DON'T SEE A PROBLEM WITH THE ADDITIONAL

08:51AM  12      PROPOSED CONTEXT.

08:51AM  13      SO PERHAPS I SHOULD RAISE THE ONE THAT THERE MAY BE

08:51AM  14      DISAGREEMENT ABOUT.

08:51AM  15           THE COURT:  RIGHT.  AND FIRST OF ALL, LET ME -- I

08:51AM  16      APPRECIATE THE OPPORTUNITY TO DISCUSS THIS BEFORE WE BEGIN.

08:51AM  17      WE'RE ENDING TODAY AT ABOUT 2:45, SO I APPRECIATE OUR TIME

08:51AM  18      BEFORE WE START EVIDENCE TO DISCUSS THESE ISSUES.

08:51AM  19      LOOKING FORWARD, I'M JUST CURIOUS IF THERE'S GOING TO BE

08:51AM  20      ISSUES REGARDING THIS, ARE WE -- BUT WE SHOULD THINK ABOUT A

08:51AM  21      PROTOCOL.  ARE WE GOING TO STOP THE PROCEEDING AND REVIEW THE

08:51AM  22      TRANSCRIPTS OR WHATEVER THEY ARE TO HAVE THE COURT MAKE A

08:51AM  23      DECISION?  IT SOUNDS LIKE THAT'S WHERE WE'RE HEADED.

08:51AM  24           MS. SCHURICHT:  I'M HOPING WE CAN AVOID THAT

08:51AM  25      SITUATION, YOUR HONOR.

3467

08:51AM  1          THE COURT:  YES, I AGREE.  I SHARE THAT.

08:51AM  2          MS. SCHURICHT:  SO WE SHARED A FULLER BATCH OF

08:51AM  3   EXCERPTS WITH THE GOVERNMENT LAST NIGHT IN AN EFFORT TO GIVE

08:51AM  4   THEM AN OPPORTUNITY TO PREVIEW -- AGAIN, THIS IS ALL A BIT

08:51AM  5   ANTICIPATORY -- BUT TO PREVIEW WHAT WE MIGHT SEEK TO USE IN

08:52AM  6   THIS MANNER.

08:52AM  7          SO I'M HOPING IF THERE ARE CONCERNS ABOUT THE DEGREE OF

08:52AM  8   THE INCONSISTENCY OR POTENTIAL 106 ADDITIONS, THAT COULD BE

08:52AM  9   RAISED QUITE EFFICIENTLY.  THE 106 ADDITIONS HAVE ALREADY BEEN

08:52AM 10   PROVIDED TO US, AND I THINK WE CAN WORK THAT OUT BEFORE WE MOVE

08:52AM 11   TO INTRODUCE ANYTHING.

08:52AM 12          AS TO WHETHER OR NOT AN INCONSISTENCY HAS BEEN

08:52AM 13   ESTABLISHED, I DO THINK THAT REQUIRES A STATEMENT BY STATEMENT

08:52AM 14   ASSESSMENT.

08:52AM 15          I WOULD POINT YOUR HONOR TO SOME CASE LAW CITED ON PAGE 2

08:52AM 16   OF OUR MEMORANDUM.  I BELIEVE IT'S THE MORGAN CASE, THE TRAN

08:52AM 17   CASE, WHICH SAY THAT THE NINTH CIRCUIT HAS ADOPTED, IN LINE

08:52AM 18   WITH MOST OTHER CIRCUITS, A NON-TECHNICAL UNDERSTANDING OF

08:52AM 19   INCONSISTENCY.  THE STATEMENTS DO NOT NEED TO BE DIAMETRICALLY

08:52AM 20   OPPOSED.

08:52AM 21          YOU UNDERSTAND.

08:52AM 22          SO I WOULD JUST SAY IF THERE'S A CLOSE CALL OR ANY

08:52AM 23   AMBIGUITY AROUND WHETHER THE STATEMENTS ARE INCONSISTENT, I

08:53AM 24   THINK IN THAT INSTANCE IT'S APPROPRIATE FOR THE JURY TO VIEW

08:53AM 25   THE TWO STATEMENTS AND TO ASSESS FOR THEMSELVES HOW

08:53AM  1    INCONSISTENT THEY THINK THEY ARE.

08:53AM  2            THE COURT:  SHOULD THE COURT REVIEW THAT BEFORE THAT

08:53AM  3    PROCESS OCCURS?

08:53AM  4            MS. SCHURICHT:  I THINK IF THE GOVERNMENT LODGES AN

08:53AM  5    OBJECTION ON THIS QUESTION OF INCONSISTENCY, IT'S PERFECTLY

08:53AM  6    PROPER FOR THE COURT TO DO THAT.

08:53AM  7            MR. BOSTIC:  YOUR HONOR, I THINK, TO ANSWER THE

08:53AM  8    COURT'S QUESTION ABOUT PROCESS AND PROTOCOL GOING FORWARD

08:53AM  9    TODAY, THE GOVERNMENT HAS NO INTEREST IN NECESSARILY DELAYING

08:53AM  10   PROCEEDINGS.

08:53AM  11       BUT AS LEAST AS TO THE THREE STATEMENTS THAT THE DEFENSE

08:53AM  12   BELIEVES ARE RIPE FOR INTRODUCTION NOW, WE MIGHT BENEFIT FROM

08:53AM  13   DISCUSSING THOSE AT THIS TIME TO SEE IF THE COURT AGREES THAT

08:53AM  14   THOSE STATEMENTS WERE INCONSISTENT WITH A PRIOR TESTIMONY.

08:53AM  15           THE COURT:  SURE.  IS IT YOUR DESIRE TO INTRODUCE

08:53AM  16   THOSE THIS MORNING, TO TOUCH ON THOSE?

08:53AM  17           MS. SCHURICHT:  I THINK AT LEAST ONE OF THEM,

08:54AM  18   YOUR HONOR.  I'M NOT SURE ABOUT THE OTHER TWO.

08:54AM  19           THE COURT:  WELL, LET'S TALK ABOUT THE ONE AT LEAST

08:54AM  20   THAT IS BEFORE US.

08:54AM  21           MS. SCHURICHT:  SO THIS ONE I THINK IS MARKED AS

08:54AM  22   EXHIBIT 28052F.

08:54AM  23       UNFORTUNATELY, I ONLY HAVE ONE PRINTOUT WITH MY OWN NOTES

08:54AM  24   OF THE PROPOSED ADDITION.

08:54AM  25           MR. BOSTIC:  THAT'S OKAY.  I HAVE ACCESS TO THEM.

3469

08:54AM  1          THE COURT:  I BEG YOUR PARDON.  THIS IS EXHIBIT?

08:54AM  2          MS. SCHURICHT:  IT'S 28052F.

08:54AM  3          THE COURT:  AM I GOING TO FIND THIS IN ONE OF THESE

08:54AM  4    BINDERS?

08:54AM  5          MS. SCHURICHT:  YOU ARE, BUT I HAVE A PRINTOUT

08:54AM  6    (HANDING.)

08:54AM  7          THE COURT:  OH, LOVELY.

08:54AM  8       THANK YOU.

08:55AM  9       (PAUSE IN PROCEEDINGS.)

08:55AM 10          THE COURT:  OKAY.  THANK YOU.

08:55AM 11          MS. SCHURICHT:  YEAH.  SO I'VE HANDED UP THE EXCERPT

08:55AM 12    THAT I'VE JUST REFERENCED, AND THEN I BELIEVE HIGHLIGHTED IN

08:55AM 13    YELLOW IS THE PORTION OF THE TESTIMONY FROM WEDNESDAY.

08:55AM 14       SO THE COURT MAY RECALL ON WEDNESDAY, I THINK ONE OF THE

08:55AM 15    GOVERNMENT'S FIRST QUESTIONS OF DR. ROSENDORFF WAS WHY HE

08:56AM 16    RESIGNED FROM THERANOS, AND I'VE HIGHLIGHTED HIS ANSWER HERE.

08:56AM 17       HE EXPLAINED THAT HE WAS INITIALLY EXCITED TO WORK AT THE

08:56AM 18    COMPANY, BUT AS TIME WENT BY -- AND I'M SKIPPING AHEAD TO

08:56AM 19    LINE 14 -- THE FREQUENCY AND SEVERITY OF COMPLAINTS THAT HE WAS

08:56AM 20    RECEIVING FROM CLINICIANS REALLY REACHED A CRESCENDO, "AND IT

08:56AM 21    GOT TO A POINT WHERE I FELT LIKE MY INTEGRITY AS A PHYSICIAN

08:56AM 22    WAS AT RISK."

08:56AM 23       AND THEN HE MENTIONS A CONCERN AS WELL ABOUT PROFICIENCY

08:56AM 24    TESTING.

08:56AM 25          THE EXCERPT THAT WE'VE ISOLATED HERE IN EXHIBIT 8 --

3470

08:56AM 1    EXCUSE ME, 28052F IS FROM A DEPOSITION, I BELIEVE IN 2018 OR

08:56AM 2    2019, WHERE DR. ROSENDORFF IS ALSO ASKED WHY HE STOPPED WORKING

08:56AM 3    AT THERANOS, AND HIS ANSWER IS SIMPLY THAT HE WAS UNSATISFIED

08:56AM 4    WITH MANAGEMENT'S RESPONSE ABOUT HIS PROFICIENCY TESTING

08:57AM 5    CONCERNS.

08:57AM 6         AND THEN NOTABLY, THE QUESTIONER THERE FOLLOWS UP TWICE

08:57AM 7    AND ASKS HIM IF THERE WERE ANY OTHER CONCERNS THAT LED TO HIS

08:57AM 8    RESIGNATION, AND HE SAID THAT WAS THE MAIN ONE.

08:57AM 9         HE'S ASKED AGAIN, WERE THERE SMALLER CONCERNS THAT YOU HAD

08:57AM 10   IN ADDITION TO THE PROFICIENCY TESTING ONE?

08:57AM 11        AND HIS ANSWER IS NO.

08:57AM 12        WE THINK ON THIS DISCRETE QUESTION OF WHY HE DECIDED TO

08:57AM 13   ULTIMATELY RESIGN FROM THE COMPANY, THERE IS -- EVEN THOUGH A

08:57AM 14   DIAMETRICALLY OPPOSITE ANSWER IS NOT REQUIRED, WE THINK THOSE

08:57AM 15   ARE PRETTY CONSISTENT.

08:57AM 16        THE GOVERNMENT HAS PROPOSED ADDING, I BELIEVE, OH, JUST

08:57AM 17   ONE PAGE OF TESTIMONY FROM THE DEPOSITION -- WHICH, AGAIN,

08:57AM 18   APOLOGIES, I DON'T HAVE A PRINTOUT.

08:57AM 19            MR. BOSTIC:  YOUR HONOR, WITH PERMISSION, I HAVE A

08:57AM 20   BINDER FOR THE COURT WITH TWO TRANSCRIPTS, THE ARIZONA

08:57AM 21   DEPOSITION TRANSCRIPT AND THE COLMAN DEPOSITION TRANSCRIPT.

08:57AM 22   THESE ARE TWO FROM WHICH THE DEFENSE HAS EXCERPTED.

08:58AM 23        IF I COULD PASS THAT UP TO THE COURT?

08:58AM 24            THE COURT:  SURE.  THANK YOU.

08:58AM 25            MR. BOSTIC:  (HANDING.)

08:58AM 1                THE COURT:  OKAY.  AND YOU HAVE SOME 106 THAT YOU

08:58AM 2      WOULD LIKE ME TO LOOK AT HERE?

08:58AM 3                MR. BOSTIC:  YES, YOUR HONOR.

08:58AM 4          IN THE ARIZONA TRANSCRIPT, WHICH I BELIEVE IS THE FIRST

08:58AM 5      TAB, THE DEFENSE'S EXCERPT, I BELIEVE, COMES FROM PAGE 167.

08:58AM 6          JUST A FEW PAGES LATER ON 177, DR. ROSENDORFF IS ASKED

08:58AM 7      ABOUT THE CORRESPONDENCE THAT HE HAD WITH MS. HOLMES WHEN HE

08:58AM 8      ASKED TO BE TAKEN OFF OF THE CLIA LAB LICENSE, THAT WAS

08:58AM 9      EFFECTIVELY HIS RESIGNATION FROM THE COMPANY.

08:59AM 10         AND HE WAS ASKED ABOUT WHAT MADE HIM FEEL REAL

08:59AM 11     UNCOMFORTABLE ABOUT WHAT WAS HAPPENING IN THE COMPANY, AND HE

08:59AM 12     ANSWERED ABOUT LOSING CONFIDENCE IN THE ACCURACY OF THE LAB

08:59AM 13     TESTING, BEING ASKED TO VOUCH FOR RESULTS THAT HE WAS NOT

08:59AM 14     CONFIDENT IN, NOT KNOWING WHAT METHODS WERE BEING USED.

08:59AM 15         SO JUST A FEW MINUTES AFTER THE EXCERPT THAT THE DEFENSE

08:59AM 16     IS OFFERING, HE PROVIDES A MORE FULL ANSWER TO THAT SAME

08:59AM 17     QUESTION.

08:59AM 18         SO THE GOVERNMENT'S CONCERN IS THAT WITHOUT THIS

08:59AM 19     ADDITIONAL TESTIMONY, THE JURY MIGHT BE LEFT WITH THE

08:59AM 20     IMPRESSION THAT HE CAME UP WITH ADDITIONAL JUSTIFICATIONS FOR

08:59AM 21     LEAVING IN BETWEEN THAT DEPOSITION AND TODAY.

08:59AM 22         THIS TESTIMONY A FEW PAGES LATER SHOWS THAT'S NOT THE

08:59AM 23     CASE.

08:59AM 24         SO THE GOVERNMENT THINKS IT SHOULD COME IN WITH THAT

08:59AM 25     DEFENSE EXCERPT UNDER RULE 106.  IF NOT, IT SHOULD CERTAINLY BE

08:59AM   1    ADMISSIBLE AS A PRIOR INCONSISTENT STATEMENT.

08:59AM   2         THE COURT:  COUNSEL.

08:59AM   3         MS. SCHURICHT:  SO I WILL JUST MAKE CLEAR THAT WE

08:59AM   4    DON'T, WE DON'T DISAGREE THAT THE GOVERNMENT HAS AN OPPORTUNITY

09:00AM   5    TO ELICIT ADDITIONAL TESTIMONY FROM DR. ROSENDORFF.

09:00AM   6         IF HE HAS -- I BELIEVE HE ALREADY TESTIFIED ON WEDNESDAY

09:00AM   7    THAT HE WAS ASKED TO BE REMOVED FROM THE CLIA LICENSE AND FELT

09:00AM   8    A CERTAIN LEVEL OF DISCOMFORT WITH THAT, AND HE CAN CERTAINLY

09:00AM   9    BE ASKED ABOUT THAT AGAIN ON REDIRECT AND THE GOVERNMENT CAN

09:00AM   10   ASK HIM TO EXPLAIN ANY INCONSISTENCY IN HIS PRIOR TESTIMONY

09:00AM   11   THAT COMES OUT ON CROSS.

09:00AM   12        SO I'M NOT SURE THIS NEEDS TO BE ADDED TO THE EXCERPT

09:00AM   13   ITSELF WHEN DR. ROSENDORFF WAS ASKED POINT-BLANK, WHY DID YOU

09:00AM   14   RESIGN FROM THERANOS?

09:00AM   15        HE THEN WAS ASKED TWO FOLLOW-UP QUESTIONS, GIVING HIM

09:00AM   16   FURTHER OPPORTUNITY TO EXPRESS ANY EVEN SMALLER CONCERNS.

09:00AM   17        WE DON'T, WE DON'T TAKE ISSUE WITH HIS, HIS -- YOU KNOW,

09:00AM   18   WE CAN'T DENY IN HIS TESTIMONY THAT HE ASKED TO BE REMOVED FROM

09:00AM   19   THE CLIA LICENSE BECAUSE OF DISCOMFORT WITH THAT, AND I'M NOT

09:01AM   20   SUGGESTING HE CAN'T BE ASKED ABOUT THAT.

09:01AM   21        I JUST DON'T THINK THAT IT'S THE SAME ISSUE AS HIS ANSWER

09:01AM   22   WHEN HE'S ASKED, WHY DID YOU RESIGN FROM THE COMPANY?

09:01AM   23        AND I CERTAINLY DON'T THINK HIS ADDITIONAL TESTIMONY TEN

09:01AM   24   PAGES LATER IN THIS DEPOSITION IS NECESSARY UNDER RULE 106 TO

09:01AM   25   AVOID LEAVING THE JURY WITH A MISUNDERSTANDING OF HIS ANSWER

3473

09:01AM    1    TO, WHY DID YOU RESIGN?

09:01AM    2            THE COURT:  I SEE.  IT'S MORE A QUESTION OF TIMING

09:01AM    3    IS WHAT I HEAR YOU SAYING.

09:01AM    4        YOUR PREFERENCE IS NOT TO HAVE THIS COME IN WITH THE

09:01AM    5    INTIMACY OF YOUR PRIOR INCONSISTENT STATEMENT, BUT I HEAR YOU

09:01AM    6    SAYING YOU RECOGNIZE THAT MR. BOSTIC, SHOULD HE DECIDE ON

09:01AM    7    REDIRECT, TO INTRODUCE THIS, YOU WOULD HAVE NO OBJECTION.

09:01AM    8            MS. SCHURICHT:  I THINK IF IT'S -- UNDER THE RULES,

09:01AM    9    IF WE INTRODUCE PRIOR INCONSISTENT STATEMENTS, IF THERE IS A

09:02AM   10    PRIOR CONSISTENT STATEMENT, THE RULE AUTHORIZES ITS ADMISSION.

09:02AM   11            THE COURT:  AND THEN THE NINTH CIRCUIT, AS YOU TOLD

09:02AM   12    ME, THE NINTH CIRCUIT TAKES A LIBERAL VIEW.  THOSE DON'T HAVE

09:02AM   13    TO BE PER SE AND BLACK AND WHITE INCONSISTENT, BUT THERE'S SOME

09:02AM   14    LATITUDE IN THAT.

09:02AM   15            MS. SCHURICHT:  YES, THERE'S A HIGH DEGREE OF

09:02AM   16    FLEXIBILITY.

09:02AM   17            THE COURT:  RIGHT.  AND DO YOU THINK -- I'M SORRY TO

09:02AM   18    INTERRUPT YOU.

09:02AM   19        BUT DO YOU THINK THAT THIS -- MR. BOSTIC'S EXCERPT WOULD

09:02AM   20    FALL IN THAT CATEGORY?

09:02AM   21            MS. SCHURICHT:  SO --

09:02AM   22            THE COURT:  I'M ASKING YOU TO CONCEDE SOMETHING.

09:02AM   23            MS. SCHURICHT:  I KNOW.  I UNDERSTAND THAT.

09:02AM   24        I GUESS MY -- IF THERE'S A LINE OF QUESTIONING THAT WAS

09:02AM   25    ASKED ON DIRECT EXAMINATION, IF WE THEN FOLLOW UP ON IT IN

3474

09:02AM 1    CROSS-EXAMINATION, IT'S WITHIN THE SCOPE, I THINK HE HAS AN

09:02AM 2    OPPORTUNITY TO PROBE THAT ISSUE FURTHER.

09:03AM 3         I'M NOT -- I DON'T THINK THAT THIS IS NECESSARILY

09:03AM 4    INCONSISTENT WITH THE PRECISE ANSWER THAT HE GAVE SUCH THAT WE

09:03AM 5    NEED TO, AGAIN, EXPAND OUR CLIP.

09:03AM 6         THE COURT:  SURE.  AND I APOLOGIZE.  I DIDN'T MEAN

09:03AM 7    TO PUT YOU ON THE SPOT WHERE YOU WERE GOING TO MAKE A

09:03AM 8    CONCESSION ON THE RECORD HERE ABOUT A PIECE OF EVIDENCE AND

09:03AM 9    OTHERWISE NOT PRESERVE ANY OBJECTION YOU MIGHT HAVE.

09:03AM 10        BUT I RAISE THE POINT, AS I SAID, TIMING IS WHAT IT IS.

09:03AM 11   MY SENSE IS THE DEFENSE OBJECTS TO THE 106 COMING IN AT THE

09:03AM 12   SAME TIME AS THE INCONSISTENT STATEMENT.

09:03AM 13        YOU RECOGNIZE THAT THE GOVERNMENT HAS, OR AN OPPOSING

09:03AM 14   PARTY HAS THE OPPORTUNITY TO REHABILITATE, AS IT USED TO BE

09:03AM 15   CALLED, AND YOU RECOGNIZE THE RULES PERMIT THAT?

09:03AM 16        SOMETHING ELSE?

09:03AM 17        MS. SCHURICHT:  I'LL JUST SAY I THINK THE QUESTION

09:03AM 18   ON WHETHER AN ADDITIONAL PIECE OF THE TRANSCRIPT CAN COME IN IN

09:03AM 19   RESPONSE TO THE PRIOR INCONSISTENT STATEMENT, THE QUESTION

09:04AM 20   REALLY IS WHAT THE ISSUE IS, WHAT THE TOPIC IS THAT IS BEING

09:04AM 21   DISCUSSED IN THAT STATEMENT.

09:04AM 22        SO IN THIS INSTANCE IT'S THE REASONS FOR DR. ROSENDORFF'S

09:04AM 23   RESIGNATION.  IT'S NOT HIS, HIS DESIRE TO BE REMOVED FROM THE

09:04AM 24   CLIA LICENSE.

09:04AM 25        HE COULD HAVE SAID, IN RESPONSE TO THAT DEPOSITION

09:04AM 1    QUESTION, I RESIGNED BECAUSE I WAS UNCOMFORTABLE BEING ON THE

09:04AM 2    CLIA LICENSE, AND HERE ARE THE REASONS THAT I WAS UNCOMFORTABLE

09:04AM 3    BEING ON THE CLIA LICENSE.

09:04AM 4        INSTEAD, HE REFERRED SOLELY TO PROFICIENCY TESTING.

09:04AM 5        AND SO I THINK IF WE THINK ABOUT THE TOPICS AS HIS REASONS

09:04AM 6    FOR RESIGNING, IT IS A SEPARATE, DISCRETE TOPIC FROM THESE

09:04AM 7    OTHER CONCERNS ABOUT THE LICENSE OF THE LAB.

09:04AM 8        THE COURT:  OKAY.

09:04AM 9        MR. BOSTIC:  ON THAT, YOUR HONOR, IF THE LAW TELLS

09:04AM 10   US NOT TO TAKE AN OVERLY TECHNICAL READ OF WHAT IS CONSISTENT

09:04AM 11   AND WHAT IS INCONSISTENT, THEN THAT'S A DISTINCTION WITHOUT A

09:04AM 12   DIFFERENCE.

09:04AM 13       DR. ROSENDORFF TESTIFIED WHEN HE WAS ON THE STAND IN THIS

09:04AM 14   TRIAL THE DAY BEFORE YESTERDAY THAT WHEN HE ASKED TO BE TAKEN

09:05AM 15   OFF OF THE CLIA LICENSE, I'M PARAPHRASING, BUT THAT WAS

09:05AM 16   ESSENTIALLY THE SAME THING AS HIM RESIGNING FROM HIS POSITION

09:05AM 17   AS LAB DIRECTOR WHICH REQUIRED HIM TO BE ON THAT CLIA LICENSE.

09:05AM 18       SO WE ARE TALKING ABOUT THE SAME TOPIC HERE.

09:05AM 19       I DON'T KNOW WHY WHEN HE WAS FIRST ASKED THAT QUESTION HE

09:05AM 20   DIDN'T INCLUDE THESE TOPICS IN HIS INITIAL ANSWER.

09:05AM 21       BUT WHEN, SO SOON AFTER THAT FIRST ANSWER, HE THEN IS

09:05AM 22   GIVEN AN OPPORTUNITY AND TAKES IT TO PROVIDE A MORE FULSOME

09:05AM 23   EXPLANATION, THE QUESTION BECOMES, IS THAT FIRST STATEMENT

09:05AM 24   ACTUALLY INCONSISTENT?  HOW BROADLY SHOULD WE LOOK AT HIS PRIOR

09:05AM 25   TESTIMONY?

09:05AM  1        AND HERE I THINK WHERE IT FOLLOWS IN SUCH CLOSE PROXIMITY,

09:05AM  2   NOT ONLY IS IT ADMISSIBLE UNDER THE RULE 104 PRIOR INCONSISTENT

09:05AM  3   STATEMENT BUT IT ACTUALLY SHOULD COME IN UNDER RULE 106 BECAUSE

09:05AM  4   THIS WAS ALL ADDRESSING THE SAME TOPIC DURING THAT DEPOSITION.

09:05AM  5        AND WHILE THE GOVERNMENT IS HAPPY TO FIX ANY

09:06AM  6   MISUNDERSTANDING ON THE PART OF THE JURY DURING REDIRECT,

09:06AM  7   THERE'S NO WAY THAT THEY SHOULD HAVE TO WAIT SEVERAL DAYS TO

09:06AM  8   HAVE THAT MISIMPRESSION CLEARED UP.

09:06AM  9             THE COURT:  OKAY.  THANK YOU.

09:06AM 10        ANYTHING FURTHER?

09:06AM 11             MS. SCHURICHT:  NOTHING ON THE SUBSTANCE OF THE

09:06AM 12   RULES, YOUR HONOR.

09:06AM 13        I WOULD JUST SAY AT A MINIMUM, I THINK IT WOULD BE

09:06AM 14   APPROPRIATE FOR US TO INTRODUCE THE EXCERPTS THAT WE'VE

09:06AM 15   IDENTIFIED, ASSUMING THERE'S A SUFFICIENT INCONSISTENCY, AND IF

09:06AM 16   THE GOVERNMENT FEELS THE NEED TO SUPPLEMENT THAT ON REDIRECT, I

09:06AM 17   THINK THAT'S AN APPROPRIATE PROCEDURE.

09:06AM 18             THE COURT:  OKAY.

09:06AM 19             MR. BOSTIC:  I THINK THERE WERE TWO MORE EXCERPTS

09:06AM 20   THAT THE DEFENSE THOUGHT THERE WAS ALREADY A SUFFICIENT

09:06AM 21   INCONSISTENCY THAT THEY'RE READY TO INTRODUCE.

09:06AM 22        I'M NOT SURE IF NOW WOULD BE A GOOD TIME TO DISCUSS THOSE

09:06AM 23   OR IF THERE WILL BE ANOTHER OPPORTUNITY, BUT THE GOVERNMENT

09:06AM 24   WOULD LIKE TO ADDRESS THOSE WITH THE COURT IF THAT'S THE

09:06AM 25   DEFENSE'S POSITION.

09:06AM   1          THE COURT:  SHOULD WE DO THAT NOW OR DO YOU WANT

09:06AM   2   SOME TIME TO MEET AND CONFER?  IT'S ABOUT TEN AFTER 9:00 NOW.

09:06AM   3          MS. SCHURICHT:  DO YOU MIND JUST TELLING ME THE

09:07AM   4   NUMBERS FOR THEM --

09:07AM   5          THE COURT:  LET'S -- LET ME DO THIS.  LET ME HAVE

09:07AM   6   YOUR CONVERSATION, I'LL ASK YOU TO MEET AND CONFER ON THAT IN A

09:07AM   7   MOMENT.

09:07AM   8       AS TO THIS ISSUE WITH THE CURRENT, I'LL PERMIT THE -- OF

09:07AM   9   COURSE, FOLLOWING THE RULES, IF THE DEFENSE WISHES TO INTRODUCE

09:07AM   10  28052F AS AN INCONSISTENT STATEMENT, I'LL PERMIT THAT.

09:07AM   11      IS IT YOUR DESIRE TO PROVIDE A VIDEO OF THIS?

09:07AM   12         MS. SCHURICHT:  YES.  WE HAVE THEM ALL CUED UP.

09:07AM   13         THE COURT:  OKAY.

09:07AM   14         MS. SCHURICHT:  AND THEY'RE CURRENTLY PREPARED WITH

09:07AM   15  THE ROLLING SCRIPT, BUT THAT'S EASILY REMOVABLE.

09:07AM   16         THE COURT:  GREAT.  AND LET ME SAY THAT MY

09:07AM   17  PREFERENCE IS TO REMOVE THE ROLLING SCRIPT SUCH THAT I DON'T

09:07AM   18  HAVE TO ADVISE THE JURY THAT -- WHAT WE ALL KNOW IS THAT THE

09:08AM   19  STATEMENTS, THE SPOKEN WORDS ARE WHAT IS EVIDENCE, NOT THE

09:08AM   20  TRANSCRIPT.  I WOULD JUST AS SOON AVOID THAT WHOLE ISSUE IF WE

09:08AM   21  CAN.

09:08AM   22         MS. SCHURICHT:  SURE.  I SHOULD MAKE ONE THING

09:08AM   23  CLEAR, WHICH IS THAT WE HAVE CORRESPONDING TRANSCRIPT EXCERPTS

09:08AM   24  THAT WE'VE CREATED ALONG WITH THE VIDEO CLIPS, SO WE WOULD SEEK

09:08AM   25  TO ADMIT AND THEN PLAY FOR THE JURY THE VIDEO, AND THEN WE

| | | |
|---|---|---|
| 09:08AM | 1 | DON'T NEED TO PUBLISH THE TRANSCRIPT EXCERPTS AT THE SAME TIME, |
| 09:08AM | 2 | BUT WE WOULD LIKE TO ADMIT THAT INTO EVIDENCE SIMPLY SO THE |
| 09:08AM | 3 | JURY HAS IT WITH THEM WHILE DELIBERATING, GIVEN THE KIND OF |
| 09:08AM | 4 | LOGISTICAL CHALLENGE OF COMING BACK IN TO RE-WATCH A VERY SHORT |
| 09:08AM | 5 | VIDEO CLIP. |
| 09:08AM | 6 | THE COURT:  ARE YOU SEEKING TO INTRODUCE THE VIDEO |
| 09:08AM | 7 | AS WELL? |
| 09:08AM | 8 | MS. SCHURICHT:  YES. |
| 09:08AM | 9 | THE COURT:  SO IF THE COURT ALLOWED THE VIDEO TO |
| 09:08AM | 10 | COME IN WITH THE TRANSCRIPT ON IT, WOULD THAT SOLVE THE PROBLEM |
| 09:08AM | 11 | OF YOUR TRANSCRIPT? |
| 09:08AM | 12 | MS. SCHURICHT:  OH, WITH THE ROLLING SCRIPT? |
| 09:09AM | 13 | THE COURT:  RIGHT. |
| 09:09AM | 14 | MS. SCHURICHT:  I THINK IT WOULD STILL BE USEFUL FOR |
| 09:09AM | 15 | THE JURY TO HAVE THE TRANSCRIPT EXCERPTS IN EVIDENCE SO THAT |
| 09:09AM | 16 | THEY COULD REVIEW THEM DURING DELIBERATIONS. |
| 09:09AM | 17 | THE ROLLING SCRIPT I THINK IS HELPFUL IF THERE'S ANY |
| 09:09AM | 18 | DIFFICULT UNDERSTANDING THE VIDEO -- |
| 09:09AM | 19 | THE COURT:  OKAY. |
| 09:09AM | 20 | MS. SCHURICHT:  BUT I DO THINK WE WOULD ADMIT BOTH. |
| 09:09AM | 21 | THE COURT:  OKAY. |
| 09:09AM | 22 | MR. BOSTIC:  I'LL DEFER TO THE COURT ON THAT ISSUE. |
| 09:09AM | 23 | AND I'M HAPPY TO MEET WITH THE DEFENSE ON THE REMAINING |
| 09:09AM | 24 | CLIPS. |
| 09:09AM | 25 | THE COURT:  GREAT.  LET ME ASK YOU TO DO THAT, |

3479

09:09AM 1    PLEASE, TO MEET ON THE REMAINING CLIPS.

09:09AM 2        DO YOU ANTICIPATE THAT THOSE WILL BE AN ISSUE TODAY?  I'M

09:09AM 3    SURE YOU'RE GOING TO FINISH YOUR CROSS-EXAMINATION OF THIS

09:09AM 4    WITNESS TODAY, LIKELY BEFORE NOON?

09:09AM 5        (LAUGHTER.)

09:09AM 6        MS. SCHURICHT:  YEAH, GIVEN THE PACING THIS MORNING,

09:09AM 7    PROBABLY IN AN HOUR.

09:09AM 8        THE COURT:  I'M ASKING YOU TO CONCEDE THINGS AGAIN,

09:09AM 9    AREN'T I?  I'M SORRY.  I'M NOT GOING TO DO THAT AGAIN.

09:09AM 10       SO WHY DON'T YOU MEET AND CONFER ON THESE OTHERS IF YOU

09:09AM 11   CAN.

09:09AM 12       AS FOR THE ISSUES TODAY ON THIS ONE, AND I'LL --

09:10AM 13   MR. BOSTIC, I'M NOT GOING TO HAVE THAT PLAYED NOW, BUT IF YOU

09:10AM 14   WISH TO INTRODUCE THAT IN REDIRECT, YOU'LL BE PERMITTED TO DO

09:10AM 15   SO.

09:10AM 16       MR. BOSTIC:  UNDERSTOOD.  THANK YOU, YOUR HONOR.

09:10AM 17       THE COURT:  OKAY.

09:10AM 18       MS. SCHURICHT:  THANK YOU.

09:10AM 19       THE COURT:  OKAY.  WE'RE GOING TO PASS OUT OUR COLOR

09:10AM 20   SHEETS NOW, AND YOU CAN LOOK AT THEM.

09:10AM 21       MR. COOPERSMITH.

09:10AM 22       MR. COOPERSMITH:  YEAH, ONE OTHER MATTER LEFT OVER

09:10AM 23   FROM WEDNESDAY IF I COULD JUST BRIEFLY HAVE YOUR ATTENTION?

09:10AM 24       THE COURT:  SURE.

09:10AM 25       MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

3480

09:10AM 1              THIS HAS TO DO WITH THE CLIA REGULATIONS.

09:10AM 2              THE EXHIBIT NUMBER WAS 7603DD, AND IT WAS A SET OF CLIA

09:10AM 3      REGULATIONS THAT DEALT WITH THE DUTIES OF A LAB DIRECTOR AT A

09:10AM 4      CLIA LABORATORY.

09:10AM 5              AND YOU MIGHT REMEMBER WE DISCUSSED WITH YOUR HONOR ON

09:10AM 6      WEDNESDAY THE COURT'S CONCERNS ABOUT ADMITTING REGULATIONS, AND

09:10AM 7      THE COURT SUGGESTED THAT MAYBE IT WOULD BE A DEMONSTRATIVE.

09:11AM 8              YOU HAVEN'T RULED ON WHETHER THAT'S PROPER, EITHER.

09:11AM 9              BUT IN THE MEANTIME, WE HAVE PREPARED A DEMONSTRATIVE.  I

09:11AM 10     HAVE GIVEN A COPY TO MR. BOSTIC, AND IF I COULD HAND THAT UP TO

09:11AM 11     YOUR HONOR.

09:11AM 12                  THE COURT:  SURE.

09:11AM 13                  MR. COOPERSMITH:  WHAT WE DID WAS TRY TO PARE IT

09:11AM 14     DOWN TO THE BARE MINIMUM OF WHAT WE THINK IS NECESSARY IN THE

09:11AM 15     REGULATIONS.

09:11AM 16                  THE COURT:  ABSOLUTELY.  OKAY.  LET ME SEE YOUR

09:11AM 17     WORK.

09:11AM 18                  MR. COOPERSMITH:  OKAY (HANDING).

09:11AM 19          (PAUSE IN PROCEEDINGS.)

09:11AM 20                  THE COURT:  MR. BOSTIC.

09:11AM 21                  MR. BOSTIC:  SO, YOUR HONOR, I SHARE THE COURT'S

09:11AM 22     CONCERNS ABOUT THE REGULATIONS COMING INTO EVIDENCE, BUT I HAVE

09:11AM 23     THE SAME CONCERNS ABOUT THEM BEING USED AS A DEMONSTRATIVE.

09:12AM 24              I THINK THE DISTINCTION BETWEEN WHAT IS IN EVIDENCE AND

09:12AM 25     WHAT IS A DEMONSTRATIVE MATTERS A GREAT DEAL TO JURISTS, BUT TO

3481

09:12AM  1      JURORS I THINK THAT HAVING THE LAW DISPLAYED ON A SCREEN IN

09:12AM  2      FRONT OF THEM CARRIES SERIOUS RISK OF CONFUSING THE JURY AS TO

09:12AM  3      WHAT THEY'RE SUPPOSED TO APPLY IN THIS CASE AND WHY THEY'RE

09:12AM  4      BEING SHOWN THIS.

09:12AM  5          AND IT'S STILL NOT CLEAR TO ME WHY THEY WOULD BE SHOWN

09:12AM  6      REGULATIONS THAT IMPOSE OBLIGATIONS ON THE LABORATORY DIRECTOR.

09:12AM  7          THE DANGER IS, OF COURSE, THAT MR. BALWANI IS ON TRIAL FOR

09:12AM  8      WIRE FRAUD AND CONSPIRACY HERE, AND THOSE CHARGES RELATE TO

09:12AM  9      ALLEGATIONS THAT HE KNOWINGLY DEFRAUDED PATIENTS BY CAUSING

09:12AM  10     THEM TO RECEIVE TEST RESULTS THAT WERE NOT SUFFICIENTLY

09:12AM  11     ACCURATE OR RELIABLE.

09:12AM  12         WHEN THE JURY SEES REGULATIONS THAT SAY THE LAB DIRECTOR

09:12AM  13     IS RESPONSIBLE FOR THE ACCURACY OF THE TESTS, THE RUNNING OF

09:13AM  14     THE TESTS, THEY MIGHT MISTAKENLY BELIEVE THAT THAT MEANS THAT

09:13AM  15     MR. BALWANI CANNOT BE FOUND GUILTY OF THE CHARGES.

09:13AM  16         IF THAT'S NOT THE CASE LEGALLY, THEN WHY DO THEY NEED TO

09:13AM  17     KNOW THAT THIS IS WHAT THE LAW PROVIDES?  WHAT ARE THEY

09:13AM  18     SUPPOSED TO DO WITH THIS?

09:13AM  19         ARE THEY SUPPOSED TO DECIDE WHETHER THIS IS IN CONFLICT

09:13AM  20     WITH THE CHARGES AGAINST THE DEFENDANT?  THAT'S A LEGAL

09:13AM  21     QUESTION.

09:13AM  22         ARE THEY SUPPOSED TO WEIGH DR. ROSENDORFF'S CONDUCT

09:13AM  23     AGAINST THE STANDARDS HERE?

09:13AM  24         MR. COOPERSMITH SAID THE OTHER DAY THAT THE PURPOSE OF

09:13AM  25     THIS IS TO ESTABLISH THAT DR. ROSENDORFF UNDERSTOOD HIS JOB

09:13AM 1   RESPONSIBILITIES.

09:13AM 2        BUT THERE'S NO SIGN THAT HE DIDN'T, AND HE IS OBVIOUSLY IN

09:13AM 3   THE BEST POSITION TO TESTIFY ABOUT WHAT THE POSITION OF LAB

09:13AM 4   DIRECTOR MEANT AT THERANOS, WHAT WAS WITHIN HIS PURVIEW, WHAT

09:13AM 5   WAS NOT, AND WHAT HE IT ON A DAILY BASIS.  HE CAN TESTIFY ABOUT

09:13AM 6   THAT WITHOUT REFERENCE TO THE REGULATIONS, AND CERTAINLY

09:14AM 7   WITHOUT THE JURY SEEING AND SCRUTINIZING THE TEXT OF THE

09:14AM 8   REGULATIONS.

09:14AM 9        MR. COOPERSMITH:  YOUR HONOR, A FEW THINGS.

09:14AM 10       FIRST OF ALL, IT IS IMPORTANT TO ESTABLISH WHAT EXACTLY

09:14AM 11  ARE DR. ROSENDORFF'S RESPONSIBILITIES AS THE LAB DIRECTOR.

09:14AM 12       AND AS I SAID THE OTHER DAY, AND I STICK TO THIS, WE'RE

09:14AM 13  NOT SEEKING TO PICK OR CHERRY PICK EXACTLY WHAT DR. ROSENDORFF

09:14AM 14  DID THAT IS IN VIOLATION OF THE REGULATIONS.  IT'S JUST

09:14AM 15  ESTABLISHING A BASELINE THAT THIS IS WHAT THE REGULATIONS

09:14AM 16  PROVIDE, THIS IS WHAT A LAB DIRECTOR DOES.

09:14AM 17       BUT I WANT TO MENTION A COUPLE OF OTHER THINGS.

09:14AM 18       TO BRIEFLY REITERATE A POINT I MADE ON WEDNESDAY, THE

09:14AM 19  GOVERNMENT HAS ALREADY GOTTEN BOTH DR. ROSENDORFF, AND

09:14AM 20  DR. PANDORI BEFORE THAT, TO TESTIFY ABOUT WHAT THE DUTIES ARE

09:14AM 21  UNDER THE LAW FOR PROFICIENCY TESTING.

09:14AM 22       YOU KNOW, THERE DIDN'T SEEM TO BE A CONCERN ON THE

09:14AM 23  GOVERNMENT'S PART THAT THAT WAS GOING TO CONFUSE THE JURY ABOUT

09:14AM 24  THAT.

09:14AM 25       THE COURT:  I'M SORRY TO INTERRUPT YOU.  CAN YOU

09:15AM   1    HELP ME WITH THAT?

09:15AM   2         THEY INTRODUCED EVIDENCE OF THE DUTIES UNDER THE LAW?

09:15AM   3         DID THEY INTRODUCE THE LAW IN THEIR CASE?

09:15AM   4              MR. COOPERSMITH:  THEY INTRODUCED TESTIMONY THAT IN

09:15AM   5    THE VIEW OF DR. PANDORI AND DR. ROSENDORFF, THE LAW REQUIRED

09:15AM   6    CERTAIN THINGS FOR PROFICIENCY TESTING, NAMELY, IT REQUIRED

09:15AM   7    THEM TO REPORT ON THE PRIMARY METHODS.

09:15AM   8              THE COURT:  SURE.

09:15AM   9              MR. COOPERSMITH:  THEY TESTIFIED THAT THE COMPANY

09:15AM  10    WAS NOT DOING PT ON THE PRIMARY METHODS, WHICH THEY AT SOME

09:15AM  11    POINT DEEMED TO BE THE EDISON METHOD, AND THEREFORE, THIS WAS A

09:15AM  12    PROBLEM AND A VIOLATION THAT THE COMPANY WAS COMMITTING.

09:15AM  13         AND I DID NOT HEAR ANY COMMENT FROM THE GOVERNMENT THAT

09:15AM  14    THAT WAS A DANGER OF CONFUSING THE JURY ABOUT WHETHER THE JURY

09:15AM  15    WOULD THINK THAT MR. BALWANI IS GUILTY OF SOMETHING BECAUSE THE

09:15AM  16    COMPANY DIDN'T FOLLOW THE LAW ON PT TESTING.

09:15AM  17              THE COURT:  DID THE GOVERNMENT INTRODUCE EVIDENCE OF

09:15AM  18    THE REGULATIONS EITHER AS A DEMONSTRATIVE OR SEEK TO INTRODUCE

09:15AM  19    THE REGULATIONS IN THAT EXAMINATION?

09:15AM  20              MR. COOPERSMITH:  THEY DID NOT, YOUR HONOR.

09:16AM  21         HOWEVER, I THINK AUTHORITATIVE TESTIMONY FROM TWO

09:16AM  22    LABORATORY DIRECTORS WHO ARE QUALIFIED AS SUCH IS TANTAMOUNT TO

09:16AM  23    THE SAME THING.

09:16AM  24         BUT I WANT TO --

09:16AM  25              THE COURT:  SO WOULDN'T THAT APPLY TO YOUR

09:16AM 1   EXAMINATION, THAT YOU ASKED THEM THE SAME QUESTIONS AND THEY

09:16AM 2   RESPOND WITH THEIR SAME OPINIONS, OR IN THIS CASE

09:16AM 3   DR. ROSENDORFF'S SAME OPINIONS CONCURRENT WITH HOW HE RESPONDED

09:16AM 4   TO THE GOVERNMENT'S?  ISN'T THAT THE SAME THING?

09:16AM 5          MR. COOPERSMITH:  I THINK THE FACT THAT THE

09:16AM 6   GOVERNMENT CHOSE NOT TO INTRODUCE THE REGULATIONS, THEY DIDN'T

09:16AM 7   OFFER ANYTHING, SHOULDN'T GOVERN HOW WE PROCEED.

09:16AM 8       AND THEY JUST NEVER OFFERED THE EVIDENCE.  AND THERE WAS

09:16AM 9   NOTHING STOPPING THEM FROM DOING THAT.

09:16AM 10      BUT I WANT TO GO TO A LARGER POINT, YOUR HONOR, WHICH IS A

09:16AM 11  REAL CONCERN TO THE DEFENSE, AND THAT IS, THE GOVERNMENT HAS

09:16AM 12  ACTUALLY FILED AN AFFIRMATIVE MOTION IN LIMINE ON THIS POINT.

09:16AM 13  THEY WANT TO INTRODUCE A CMS INSPECTION REPORT FROM THE

09:16AM 14  INSPECTION.  YOUR HONOR MIGHT RECALL THAT WAS DONE AT THERANOS

09:16AM 15  IN SEPTEMBER, STARTING IN SEPTEMBER OF 2015.

09:17AM 16      THEY WANT TO INTRODUCE AN INSPECTION REPORT THAT IS

09:17AM 17  CHOCK-FULL OF ONE ALLEGED REGULATORY VIOLATION AFTER ANOTHER

09:17AM 18  AND IT QUOTES THE REGULATIONS AND IT CITES THE REGULATIONS.

09:17AM 19      AND THE CMS REPORT ITSELF ACTUALLY QUOTES SOME OF THE SAME

09:17AM 20  LABORATORY DIRECTOR REGULATIONS I THINK WE'RE TRYING TO ADMIT,

09:17AM 21  BUT IT QUOTES A LOT OF OTHER REGULATIONS WHICH CMS IN THEIR

09:17AM 22  VIEW BELIEVED THERANOS WAS VIOLATING.

09:17AM 23      AND I KNOW THAT IN THE HOLMES TRIAL YOUR HONOR, IN CLOSING

09:17AM 24  INSTRUCTIONS, PROVIDED INSTRUCTIONS TO THE JURY THAT THE JURY

09:17AM 25  SHOULD NOT CONSIDER VIOLATIONS OF THE CIVIL REGULATIONS AS

09:17AM  1    EVIDENCE OF ELEMENTS OF THE CRIME.  I DO THINK THAT IS AN

09:17AM  2    APPROPRIATE INSTRUCTION.

09:17AM  3         BUT WHEN THE GOVERNMENT IS SEEKING TO INTRODUCE A SET OF

09:17AM  4    REGULATIONS THAT ARE QUOTED VERBATIM WITH CITATIONS IN THE CMS

09:17AM  5    REPORT, IT DOESN'T, IT DOESN'T MAKE SENSE TO ME THAT THEY'RE

09:17AM  6    TRYING TO THEN EXCLUDE OUR MUCH MORE MODEST EFFORT TO SHOW WHAT

09:18AM  7    THE BASIC DUTIES OF A LAB DIRECTOR ARE BY REFERENCE TO THE

09:18AM  8    REGULATIONS.

09:18AM  9         AND IF THE GOVERNMENT IS REALLY TAKING THIS POSITION THAT

09:18AM  10   THESE REGULATIONS ARE GOING TO CONFUSE THE JURY, I DON'T THINK

09:18AM  11   THE CMS REPORT SHOULD COME IN AT ALL BECAUSE IT'S JUST

09:18AM  12   CHOCK-FULL OF THESE REGULATIONS WITH CITATIONS.

09:18AM  13        MR. BOSTIC:  SO, YOUR HONOR, THE POINT OF THE CMS

09:18AM  14   REPORT AS A PIECE OF EVIDENCE IN THIS CASE IS NOT FOR THE TEXT

09:18AM  15   OF WHAT THE REGULATIONS REQUIRE, WHAT OBLIGATIONS THE LAW

09:18AM  16   IMPOSES.

09:18AM  17        THE POINT OF THAT IS THAT THAT DOCUMENT PROVIDED NOTICE TO

09:18AM  18   THE DEFENDANT ABOUT SERIOUS PROBLEMS AT THE LAB, AND IT ALSO

09:18AM  19   SERVES AS DOCUMENTATION THAT THOSE PROBLEMATIC CONDITIONS WERE

09:18AM  20   PRESENT AT THERANOS.

09:18AM  21        THIS ISSUE HAS BEEN LITIGATED BEFORE, IT SOUNDS LIKE IT

09:18AM  22   MIGHT BE LITIGATED AGAIN IN THIS CASE, AND I DON'T WANT US TO

09:18AM  23   GET SIDE-TRACKED INTO TALKING ABOUT THAT, ALTHOUGH I'M HAPPY TO

09:18AM  24   ANSWER ANY QUESTIONS THAT THE COURT MIGHT HAVE.

09:18AM  25        WHEN IT COMES TO INTRODUCING THE TEXT OF THE REGULATIONS

09:18AM 1      ALONE AS A DEMONSTRATIVE OR AS A PIECE OF EVIDENCE, THE

09:18AM 2      GOVERNMENT HAS NOT TRIED TO DO THAT, AND THAT WAS A DELIBERATE

09:19AM 3      DECISION.

09:19AM 4          THE GOVERNMENT ALSO HAS NOT ASKED, I DON'T BELIEVE, ANY

09:19AM 5      QUESTIONS DIRECTLY ELICITING TESTIMONY ABOUT WHAT THE LAW

09:19AM 6      REQUIRED.

09:19AM 7          WE DID ASK QUESTIONS ABOUT WHY LABORATORY DIRECTORS TOOK

09:19AM 8      CERTAIN ACTIONS, WHY THEY PERCEIVED CERTAIN PROBLEMS AS

09:19AM 9      PROBLEMS, AND IN ANSWERING, THEY REFERRED TO THEIR LEGAL

09:19AM 10     OBLIGATIONS.

09:19AM 11         BUT THAT'S NOT THE SAME THING AS PUTTING THE LAW IN FRONT

09:19AM 12     OF THE JURY.

09:19AM 13         IF WHAT THE DEFENSE IS SEEKING TO DO IS A RESPONSE TO

09:19AM 14     THAT, THEN THEY SHOULD PROCEED IN A SIMILAR MANNER.  ASKING

09:19AM 15     QUESTIONS TO DR. ROSENDORFF ABOUT HIS JOB RESPONSIBILITIES AND

09:19AM 16     THE SCOPE OF HIS JOB AT THERANOS, THAT IS A MATCH FOR WHAT THE

09:19AM 17     GOVERNMENT HAS DONE.

09:19AM 18         PUTTING THE LAW IN FRONT OF THE JURY CARRIES A 403 RISK.

09:19AM 19             MR. COOPERSMITH:  YOUR HONOR, AS I SAID ON

09:19AM 20     WEDNESDAY, OUR PREFERENCE WOULD BE TO INTRODUCE THE FULL

09:19AM 21     EXHIBIT, 7603DD.

09:19AM 22         AS YOU'VE SEEN, WE'VE PREPARED A DEMONSTRATIVE.  I THINK

09:20AM 23     IT'S A RELATIVELY BRIEFER EXCERPT OF WHAT WE THINK ESTABLISHES

09:20AM 24     THE BASE LINE OF THE LAB DIRECTOR'S RESPONSIBILITIES.

09:20AM 25         THIS IS VERY MUCH AT ISSUE IN DR. ROSENDORFF'S TESTIMONY.

09:20AM 1    I THINK IT'S IMPORTANT THAT THE JURY UNDERSTANDS WHAT IS A LAB

09:20AM 2    DIRECTOR SUPPOSED TO DO AND --

09:20AM 3         THE COURT:  SO YOU WANT THE JURY THEN TO TAKE THE

09:20AM 4    DEMONSTRATIVE THEN AS THE LAW, AND TO MEASURE DR. ROSENDORFF'S

09:20AM 5    TESTIMONY AS TO THE DEMONSTRATIVE?  IT SOUNDS LIKE THAT'S WHAT

09:20AM 6    YOU'RE ASKING THEM TO DO.

09:20AM 7         MR. COOPERSMITH:  YOUR HONOR, I JUST THINK THAT I'M

09:20AM 8    TRYING TO ESTABLISH, WHAT IS THE JOB OF A LAB DIRECTOR?  WHAT

09:20AM 9    ARE HIS DUTIES?  RIGHT?

09:20AM 10   AND IF DR. ROSENDORFF WANTS TO SAY, YES, I UNDERSTAND THIS

09:20AM 11   IS WHAT THE LAW REQUIRES MY DUTIES TO BE, BUT I DIDN'T FOLLOW

09:20AM 12   MY DUTIES, I SUPPOSE HE'S FREE TO DO THAT.

09:20AM 13   BUT THAT'S IMPORTANT TO ESTABLISH, WHAT IS THE JOB OF THE

09:20AM 14   LAB DIRECTOR?  AND I THINK WE'RE ENTITLED TO SHOW THAT WITH

09:20AM 15   EVIDENCE AND NOT JUST RELY ON THE WORDS OF DR. ROSENDORFF'S --

09:20AM 16   WORDS FROM HIS OWN MOUTH, WHICH, YOU KNOW, FRANKLY WE DON'T

09:20AM 17   TRUST AS MUCH AS WHAT IS IN THE WRITTEN REGULATION.

09:21AM 18   SO I THINK IT'S APPROPRIATE, ESPECIALLY GIVEN, AS I SAID,

09:21AM 19   THE GOVERNMENT'S TESTIMONY THAT THEY ELICITED ON PT AND THEIR

09:21AM 20   EFFORT, WHICH THEY ACTUALLY WON THAT RULING BEFORE YOUR HONOR,

09:21AM 21   ON THE CMS REPORT, WHICH IS PUTTING THE LAW IN FRONT OF THE

09:21AM 22   JURY.

09:21AM 23   I MEAN, ONCE THE JURY HAS THE CMS REPORT, THEY HAVE ALL OF

09:21AM 24   THE LAW, ALL OF THE REGULATIONS, JUST THE SAME AS PUTTING THE

09:21AM 25   REGULATION IN FRONT OF THE JURY IS THE SAME THING, EXACTLY THE

3488

09:21AM   1    SAME TEST, EXACTLY THE SAME CITATIONS.

09:21AM   2         THE COURT:  WHAT TYPE OF -- IF I ALLOW THIS, WHAT

09:21AM   3    SHOULD I TELL THE JURY TO DO WITH THESE REGULATIONS?

09:21AM   4         MR. COOPERSMITH:  I THINK IT'S APPROPRIATE TO TELL

09:21AM   5    THE JURY THE SAME THING WE'RE HOPING THE COURT WILL TELL THE

09:21AM   6    JURY ABOUT THE GOVERNMENT'S REGULATORY VIOLATION EVIDENCE, AND

09:21AM   7    THAT IS THAT THESE REGULATORY VIOLATIONS ARE NOT TO BE

09:21AM   8    CONSIDERED TO -- FOR THE ELEMENTS OF THE OFFENSE, AND THEY'RE

09:21AM   9    ALSO NOT TO BE CONSIDERED FOR WHETHER DR. ROSENDORFF VIOLATED

09:21AM   10   THE CLIA REGULATION.  THAT'S NOT A PART OF THE CASE.

09:21AM   11        BUT IT'S JUST SIMPLY TO ESTABLISH WHAT ARE THE DUTIES OF A

09:22AM   12   LAB DIRECTOR.

09:22AM   13        MR. BOSTIC:  BUT WHY DOES THE JURY NEED TO KNOW WHAT

09:22AM   14   THE LEGAL DUTIES OF A LAB DIRECTOR ARE IF THEY'RE NOT MEANT TO

09:22AM   15   JUDGE DR. ROSENDORFF'S COMPLIANCE OR MISTAKENLY BELIEVE THAT

09:22AM   16   THESE REGULATIONS HAD THE EFFECT OF REMOVING ANY CULPABILITY

09:22AM   17   FROM THE DEFENDANT FOR THE CHARGES IN THIS CASE?

09:22AM   18        THE COURT:  I THINK THAT'S THE PROBLEM THAT ARISES

09:22AM   19   WITH THIS.

09:22AM   20        I ASKED YOU TO PREPARE DEMONSTRATIVES, AND THANK YOU FOR

09:22AM   21   DOING THAT, IN RESPONSE TO THE COURT'S DECISION THAT I WASN'T

09:22AM   22   GOING TO ADMIT THE REGULATIONS THEMSELVES.  I JUST THOUGHT THAT

09:22AM   23   WAS INAPPROPRIATE.

09:22AM   24        AND IN LOOKING AT THE DEMONSTRATIVES HERE, I'M NOT GOING

09:22AM   25   TO PRECLUDE YOU FROM ASKING THE DOCTOR HIS UNDERSTANDING OF HIS

OBLIGATIONS.  IF HE DOESN'T REMEMBER THEM, YOU CAN REFRESH HIS
RECOLLECTION WITH THESE.

IF HE TESTIFIES TO SOMETHING, TO A CONDUCT THAT HE DID,
YOU CAN ASK HIM IF HE FEELS THAT'S PART OF HIS DUTIES, AND THEN
YOU COULD PERHAPS SHOW THIS TO HIM, WITHOUT SHOWING IT TO THE
JURY, TO HAVE HIS RECOLLECTION REFRESHED OR SOMETHING.

I DO THINK THAT THERE IS GREAT RISK IN CONFUSION IF THE
JURY IS SHOWN REGULATIONS AND THEN ASKED TO NOT MAKE A DECISION
ABOUT REGULATIONS AND HIS CONDUCT, THEN A JURY -- IT SEEMS LIKE
WHAT YOU'RE DOING IS THAT YOU'RE PUTTING THE DOCTOR'S LEGAL
PERFORMANCE AND POTENTIAL LIABILITIES IN FRONT OF THE JURY, AND
THERE'S A DANGER IN THAT THAT CAUSES ME SOME CONCERN.

I RESPECT AND APPRECIATE ON CROSS-EXAMINATION YOU WANT TO
TEST HIS MEMORY OF HIS DUTIES AND THE THINGS THAT HE WAS
SUPPOSED TO DO AND DIDN'T DO ACCORDINGLY.

BUT TO HAVE A SEPARATE ISSUE ABOUT, WELL, YOU DID VIOLATE
THIS REGULATION THEN, DIDN'T YOU?  I JUST DON'T SEE THE
RELEVANCE IN THAT.

I DO THINK THAT YOU HAVE -- IF YOU DISAGREE WITH HIS
CONDUCT AND HOW HE HANDLED THINGS, YOU CERTAINLY CAN PROBE THAT
AND CROSS-EXAMINE THAT AND ASK HIM IF HE REALLY DOES FEEL THAT
THAT WAS WITHIN HIS PURVIEW OR HE FELL SHORT OF HIS
RESPONSIBILITIES.

I'M NOT GOING TO PRECLUDE YOU AT ALL FROM CROSS-EXAMINING
AND PROBING HIM ON THAT.

09:24AM 1    BUT I DO THINK THAT THERE IS SOME GREAT RISK IN PUTTING

09:24AM 2    THE LAW ON HIS DUTIES IN FRONT OF THE JURY AND THEN THE

09:24AM 3    TEMPTATION IS FOR THE JURY TO THEN MAKE SOME LEGAL CONCLUSIONS

09:24AM 4    THAT THEY SHOULDN'T BE TASKED WITH.

09:24AM 5    SO I'M NOT GOING TO ALLOW YOU TO USE THESE, AS YOU'VE

09:24AM 6    PRESENTED THEM, TO THE JURY AS DEMONSTRATIVES.

09:24AM 7    YOU MAY BE ABLE TO USE THEM FOR SOME OTHER PURPOSE IN YOUR

09:24AM 8    EXAMINATION, AND WE'LL SEE WHERE THAT GOES.

09:24AM 9    LET ME -- I THINK WE'VE PROVIDED YOU WITH THE SCHEDULES,

09:25AM 10   AND WE'RE NOT GOING TO TALK ABOUT THAT NOW.  YOU'LL NEED TO

09:25AM 11   LOOK AT THOSE, I THINK, AND ABSORB THEM.

09:25AM 12   I THINK ONE OF THE JURORS INDICATED SHE HAS AN APPOINTMENT

09:25AM 13   SET FOR NEXT -- IS THE 28TH, I THINK?  IS THAT RIGHT?

09:25AM 14   I DON'T HAVE IT IN FRONT IT OF ME.

09:25AM 15   OH, HERE IT IS.  YES.

09:25AM 16   (DISCUSSION OFF THE RECORD.)

09:25AM 17        THE COURT:  WE HAVE ONE JUROR WHO HAS PATIENTS

09:25AM 18   SCHEDULED AND INFORMS THAT SHE'S BOOKED UNTIL THE END OF MAY.

09:25AM 19   BUT LET'S LET YOU ABSORB THIS AND THEN AT THE BREAK MAYBE

09:25AM 20   WE CAN HAVE SOME MORE CONVERSATION ON THAT.

09:25AM 21        MR. COOPERSMITH:  YES, YOUR HONOR.

09:25AM 22        THE COURT:  RIGHT.

09:26AM 23   ARE WE READY TO GO?  IS EVERYTHING CLEAR WITH THE WITNESS?

09:26AM 24        MR. SCHENK:  DR. ROSENDORFF TOOK A TEST THIS

09:26AM 25   MORNING, AND THE TEST RESULT WAS NEGATIVE.

09:26AM   1                    THE COURT:  OKAY.  THANK YOU.  OKAY.

09:26AM   2          SHOULD WE BRING THE JURY IN THEN?

09:26AM   3                    MR. COOPERSMITH:  YES, YOUR HONOR.

09:26AM   4          IF I COULD TAKE A TWO MINUTE COMFORT BREAK, I WOULD

09:26AM   5    APPRECIATE THAT.

09:26AM   6                    THE COURT:  YES.  EXACTLY.

09:26AM   7          (LAUGHTER.)

09:26AM   8                    THE COURT:  IT'S GOING TO TAKE US SOME TIME TO GET

09:26AM   9    THINGS ORGANIZED HERE, SO WE'LL BRING THEM IN THEN IN ABOUT

09:26AM  10    FIVE MINUTES.

09:26AM  11                    MR. COOPERSMITH:  THANK YOU.

09:26AM  12                    MR. SCHENK:  THANK YOU.

09:26AM  13          (RECESS FROM 9:26 A.M. UNTIL 9:36 A.M.)

09:36AM  14          (JURY IN AT 9:36 A.M.)

09:36AM  15                    THE COURT:  THANK YOU.  GOOD MORNING.  THANK YOU

09:36AM  16    AGAIN FOR YOUR COURTESY.

09:36AM  17          PLEASE BE SEATED.

09:36AM  18          WE'RE BACK ON THE RECORD IN THE BALWANI MATTER.

09:37AM  19          ALL COUNSEL ARE PRESENT.  MR. -- THERE YOU ARE.  ALL

09:37AM  20    COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

09:37AM  21          OUR JURY AND ALTERNATES ARE PRESENT.

09:37AM  22          DR. ROSENDORFF HAS RETURNED TO THE STAND.

09:37AM  23          GOOD MORNING, LADIES AND GENTLEMEN.  I'M SORRY FOR THE

09:37AM  24    DELAY.  I HAD TO SPEAK WITH THE LAWYERS ABOUT SOME THINGS THIS

09:37AM  25    MORNING.

09:37AM 1      LET ME ASK YOU THAT QUESTION AGAIN.  DURING OUR BREAK, HAS

09:37AM 2  ANYONE HERE HAD OCCASION TO LEARN, DISCUSS, READ, OR SEE

09:37AM 3  ANYTHING TO DO WITH THIS CASE?  IF SO, PLEASE RAISE YOUR HAND.

09:37AM 4      I SEE NO HANDS.  THANK YOU FOR THAT.

09:37AM 5      WE DID RECEIVE YOUR INFORMATION REGARDING AVAILABILITY FOR

09:37AM 6  ADDITIONAL TIME, AND WE'VE COMPILED THAT IN SOME KIND OF A

09:37AM 7  SPREADSHEET, AND WE'RE GOING TO DISCUSS THAT WITH COUNSEL TO

09:37AM 8  SEE WHAT WE CAN DO.

09:37AM 9      THANKS FOR THAT.

09:37AM 10      WE'LL LET YOU KNOW WHEN AND IF WE CAN FILL SOME OF THOSE

09:38AM 11  SPOTS.

09:38AM 12      BEFORE -- MR. COOPERSMITH, BEFORE YOU BEGIN YOUR, OR

09:38AM 13  CONTINUE WITH YOUR EXAMINATION, LADIES AND GENTLEMEN, I DID

09:38AM 14  WANT TO -- I NEGLECTED TO ADVISE YOU OF A STIPULATION THAT THE

09:38AM 15  PARTIES HAVE REACHED, AND I APOLOGIZE, I SHOULD HAVE DONE THIS

09:38AM 16  LAST WEEK.

09:38AM 17      BUT THE PARTIES DID REACH A STIPULATION AS TO SOME

09:38AM 18  EVIDENCE IN THIS CASE.

09:38AM 19      COUNSEL, MAY I READ THIS STIPULATION NOW?  THIS IS

09:38AM 20  DOCUMENT 1402.

09:38AM 21          MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

09:38AM 22          MR. BOSTIC:  YES, YOUR HONOR.

09:38AM 23          THE COURT:  THANK YOU.

09:38AM 24      THE STIPULATION, LADIES AND GENTLEMEN, IS AS FOLLOWS:  THE

09:38AM 25  "WIRED" MAGAZINE ARTICLE INCLUDED AS A LINK IN TRIAL

09:38AM   1      EXHIBIT 20458 AND DISCUSSED DURING DR. PANDORI'S TESTIMONY WAS

09:39AM   2      PUBLISHED BY "WIRED" MAGAZINE ONLINE ON FEBRUARY 18TH, 2014.

09:39AM   3           DID I READ THAT STIPULATION ACCURATELY, MR. COOPERSMITH?

09:39AM   4                MR. COOPERSMITH:  YES, YOUR HONOR.

09:39AM   5                MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

09:39AM   6                THE COURT:  ALL RIGHT.  THANK YOU.

09:39AM   7           LADIES AND GENTLEMEN, THE PARTIES HAVE AGREED TO THESE

09:39AM   8      FACTS AS I'VE JUST READ THEM TO YOU.  THOSE FACTS ARE NOW

09:39AM   9      CONCLUSIVELY ESTABLISHED AND THEY'RE PART OF THE RECORD IN THIS

09:39AM  10      MATTER.

09:39AM  11           THANK YOU.

09:39AM  12           MR. COOPERSMITH, ANYTHING FURTHER ON THIS?

09:39AM  13                MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

09:39AM  14                THE COURT:  MR. BOSTIC?

09:39AM  15                MR. BOSTIC:  NO, YOUR HONOR.  THANK YOU.

09:39AM  16                THE COURT:  DO YOU HAVE QUESTIONS?

09:39AM  17                MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

09:39AM  18           **(GOVERNMENT'S WITNESS, ADAM ROSENDORFF, PREVIOUSLY WAS**

09:39AM  19      **SWORN.)**

09:39AM  20                     **CROSS-EXAMINATION (RESUMED)**

09:39AM  21      BY MR. COOPERSMITH:

09:39AM  22      Q.   GOOD MORNING, AND WELCOME BACK, DR. ROSENDORFF.

09:39AM  23      A.   GOOD MORNING.

09:39AM  24      Q.   I JUST WANT TO BEGIN WHERE WE LEFT OFF ON WEDNESDAY, AND

09:39AM  25      THAT'S WITH THE RESPONSIBILITIES OF THE LAB DIRECTOR.

09:39AM   1         SO JUST TO REFRESH, YOU WERE THE LAB DIRECTOR AT THERANOS

09:39AM   2    DURING THE TIME THAT YOU WORKED THERE ONCE YOU BECAME THE LAB

09:40AM   3    DIRECTOR ON THE CLIA LICENSE; IS THAT CORRECT?

09:40AM   4    A.   CORRECT.

09:40AM   5    Q.   OKAY.  AND YOU UNDERSTAND THAT AS LAB DIRECTOR, YOU HAD

09:40AM   6    CERTAIN DUTIES THAT WERE REQUIRED OF YOU AS LAB DIRECTOR; IS

09:40AM   7    THAT RIGHT?

09:40AM   8    A.   UNDER THE CLIA REGULATIONS, YES.

09:40AM   9    Q.   RIGHT.  AND I JUST WANT TO GO THROUGH A FEW OF THOSE.

09:40AM  10         SO YOU UNDERSTAND THAT A LABORATORY THAT IS -- WELL, LET

09:40AM  11    ME STEP BACK FOR A MINUTE.

09:40AM  12         THE LABORATORY THAT YOU WERE RUNNING FROM THE FALL OF 2013

09:40AM  13    AND UNTIL YOU LEFT THERANOS, THAT WAS WHAT IS KNOWN AS A HIGH

09:40AM  14    COMPLEXITY LAB; IS THAT RIGHT?

09:40AM  15    A.   CORRECT, CORRECT.

09:40AM  16    Q.   AND A HIGH COMPLEXITY LAB IS WHERE THE LABORATORY CAN, IN

09:40AM  17    ADDITION TO RUNNING FDA APPROVED EQUIPMENT TO TEST BLOOD, ALSO

09:40AM  18    COULD RUN LABORATORY DEVELOPED TESTS?

09:40AM  19    A.   CORRECT.

09:40AM  20    Q.   AND THOSE ARE OFTEN CALLED LDT'S?

09:40AM  21    A.   YES.

09:40AM  22    Q.   AND LABORATORIES THAT YOU WERE FAMILIAR WITH, EVEN APART

09:40AM  23    FROM THERANOS, RUN LDT'S IN THEIR LAB; IS THAT RIGHT?

09:41AM  24    A.   MANY DO, YES.

09:41AM  25    Q.   AND THERE ARE CERTAIN PROCEDURES IF A LAB IS GOING TO RUN

09:41AM  1    LDT'S?

09:41AM  2    A.   CORRECT.

09:41AM  3    Q.   AND ONE SUCH PROCEDURE IS THAT THE LAB HAS TO BE LICENSED

09:41AM  4    AS A HIGH COMPLEXITY LAB?

09:41AM  5    A.   CORRECT.

09:41AM  6    Q.   SO IF A LAB IS A MODERATE COMPLEXITY LAB, IT COULDN'T RUN

09:41AM  7    LDT'S; IS THAT RIGHT?

09:41AM  8    A.   I'M NOT SURE ON THAT POINT.

09:41AM  9    Q.   OKAY.  BUT AT LEAST YOU KNOW THAT IF A LAB WANTS -- GO

09:41AM 10    AHEAD, I'M SORRY.

09:41AM 11    A.   IF YOU RUN EVEN ONE LDT, I THINK YOU IMMEDIATELY BECOME A

09:41AM 12    HIGH COMPLEXITY LABORATORY.

09:41AM 13    Q.   RIGHT.  AND THEN THE REGULATIONS ALSO REQUIRE THAT THE

09:41AM 14    LABORATORY DIRECTOR OF A HIGH COMPLEX LAB HAVE CERTAIN

09:41AM 15    QUALIFICATIONS; IS THAT RIGHT?

09:41AM 16    A.   YES, YES.

09:41AM 17    Q.   AND YOU MET THOSE QUALIFICATIONS?

09:41AM 18    A.   YES.

09:41AM 19    Q.   AND WHEN YOU STARTED WORKING AT THERANOS, YOU WERE

09:41AM 20    ACTUALLY MOVING FROM PENNSYLVANIA TO CALIFORNIA; RIGHT?

09:41AM 21    A.   CORRECT.

09:41AM 22    Q.   AND SO YOU HAD TO OBTAIN LICENSURE IN CALIFORNIA AS WELL?

09:41AM 23    A.   MEDICAL LICENSURE, CORRECT.

09:41AM 24    Q.   BECAUSE YOU WERE NEW TO THE STATE OF CALIFORNIA?

09:41AM 25    A.   CORRECT.

09:41AM 1    Q.   OKAY.  SO IN ADDITION TO THE NEED TO HAVE A LABORATORY

09:42AM 2    DIRECTOR QUALIFIED TO RUN A HIGH COMPLEXITY LAB, IS IT THE CASE

09:42AM 3    THAT THE LABORATORY DIRECTOR HAS TO BE QUALIFIED TO MANAGE AND

09:42AM 4    DIRECT LABORATORY PERSONNEL WHO ARE ACTUALLY RUNNING THE HIGH

09:42AM 5    COMPLEXITY TESTS?

09:42AM 6    A.   THE LABORATORY DIRECTOR IS RESPONSIBLE FOR ENSURING THAT

09:42AM 7    SUFFICIENTLY TRAINED PERSONNEL ARE WORKING IN THE LAB AND THAT

09:42AM 8    THEIR TRAINING AND COMPETENCY IS DOCUMENTED.

09:42AM 9    Q.   OKAY.  AND THAT'S THE LABORATORY DIRECTOR'S JOB?

09:42AM 10   A.   IT FALLS UNDER THE LABORATORY DIRECTOR, BUT THEY WILL

09:42AM 11   DELEGATE THIS, PARTICULARLY IN A LARGE LAB, THEY WILL DELEGATE

09:42AM 12   THIS TO SUPERVISORS.

09:42AM 13   Q.   AND YOU CAN RELY ON GENERAL SUPERVISORS AND TECHNICAL

09:43AM 14   SUPERVISORS TO PERFORM SOME OF THOSE TASKS?

09:43AM 15   A.   IDEALLY, YES.

09:43AM 16   Q.   RIGHT.  SUCH AS TRAINING TASKS?

09:43AM 17   A.   CORRECT.

09:43AM 18   Q.   BUT ULTIMATELY THE LAB DIRECTOR HAS TO OVERSEE THAT

09:43AM 19   PROCESS; IS THAT RIGHT?

09:43AM 20   A.   WELL, UNDER THE LAW, A LABORATORY DIRECTOR IS RESPONSIBLE

09:43AM 21   FOR ABSOLUTELY EVERYTHING.

09:43AM 22   Q.   RIGHT.

09:43AM 23   A.   BUT IN ANY EVENT.

09:43AM 24   Q.   DR. ROSENDORFF, THE LABORATORY DIRECTOR IS ALSO

09:43AM 25   RESPONSIBLE FOR MAKING SURE THAT THE TESTS PERFORMED BY THE

09:43AM  1    LABORATORY, ARE PERFORMED ACCURATELY AND CORRECTLY; IS THAT

09:43AM  2    RIGHT?

09:43AM  3    A.   I DON'T KNOW EXACTLY WHAT STATUTE YOU'RE REFERRING TO.  IF

09:43AM  4    YOU COULD POINT ME TO THE STATUTE.

09:43AM  5    Q.   CERTAINLY.  AND IF IT WOULD HELP TO REFRESH, I CAN HAND UP

09:43AM  6    SOMETHING TO YOU.

09:43AM  7         MAY I APPROACH, YOUR HONOR?

09:43AM  8              THE COURT:  YES.

09:43AM  9              MR. COOPERSMITH:  (HANDING.)

09:44AM  10   Q.   DR. ROSENDORFF, I'VE HANDED YOU SOME EXCERPTS AND JUST TO

09:44AM  11   GO THROUGH THOSE.  THEY'RE NUMBERED AT THE TOP.  AND THE ONE

09:44AM  12   THAT I WAS REFERRING TO IN THE LAST QUESTION WAS ON PAGE 3 OF

09:44AM  13   THE DOCUMENT THAT I'VE HANDED YOU.

09:44AM  14   A.   YES, YES.

09:44AM  15   Q.   AND COULD YOU SEE THAT IS NUMBERED 493.1145?

09:44AM  16   A.   YES.

09:44AM  17   Q.   AND LOOKING AT THAT, DOES THAT REFRESH YOUR MEMORY THAT

09:44AM  18   ONE OF THE LAB DIRECTOR'S RESPONSIBILITIES IS TO RECORD AND

09:44AM  19   REPORT TEST RESULTS PROMPTLY, ACCURATELY, AND PROFICIENTLY, AND

09:44AM  20   FOR ENSURING COMPLIANCE WITH APPLICABLE REGULATIONS?

09:44AM  21   A.   THIS MEANS THAT THE REPORTING TESTS IS CONCORDANT WITH

09:44AM  22   WHAT THE LABORATORY IS PUTTING OUT AS THE RESULT.  THAT'S ALL

09:44AM  23   THAT MEANS.

09:44AM  24   Q.   OKAY.  BUT IT ALSO -- AM I RIGHT, THAT ONE OF THE LAB

09:45AM  25   DIRECTOR'S RESPONSIBILITIES IS TO, IN THE COURSE OF OVERSEEING

09:45AM   1    THE LAB, TO MAKE SURE THE TESTS THAT ARE BEING CONDUCTED ARE

09:45AM   2    PERFORMED ACCURATELY?

09:45AM   3    A.   SO, AS I SAID YESTERDAY, IF THE LABORATORY IS IN VIOLATION

09:45AM   4    OF ANY CMS REG SUCH THAT IT RESULTS IN JEOPARDY AND CLOSURE OF

09:45AM   5    THE LAB, THE LABORATORY DIRECTOR AND OWNER ARE HELD JOINTLY

09:45AM   6    LIABLE.

09:45AM   7    Q.   YES.  BUT IN TERMS OF THE RESPONSIBILITY BEFORE A

09:45AM   8    VIOLATION OCCURS, IF ONE DOES, THE LABORATORY DIRECTOR HAS

09:45AM   9    TO -- AS ONE OF THE DUTIES, HAS TO ENSURE THAT THE LABORATORY

09:45AM   10   IS TESTING IN AN ACCURATE MANNER?

09:45AM   11   A.   DOESN'T THE INDICATED SANCTIONS APPROVE WHO IS ULTIMATELY

09:45AM   12   RESPONSIBLE IN THAT REGARD?

09:45AM   13   Q.   FROM -- YOU GET TO A LABORATORY'S LAB DIRECTOR,

09:45AM   14   DR. ROSENDORFF, AND FROM DAY ONE THAT YOU ARE LAB DIRECTOR,

09:46AM   15   BEFORE ANYTHING HAPPENS, YOU KNOW THAT GOING IN THAT ONE OF

09:46AM   16   YOUR JOBS IS TO DO EVERYTHING THAT YOU CAN TO MAKE SURE THE

09:46AM   17   TESTS ARE ACCURATE; IS THAT CORRECT?

09:46AM   18   A.   AND I DID.

09:46AM   19   Q.   OKAY.  YOU CAN PUT THAT ASIDE, DR. ROSENDORFF.

09:46AM   20        I'D LIKE TO SWITCH TOPICS AND TALK ABOUT THE ASSAY

09:46AM   21   DEVELOPMENT PROCESS AT THERANOS.  OKAY?

09:46AM   22   A.   SURE.

09:46AM   23   Q.   SO YOU UNDERSTAND THAT PRIOR TO THE TIME THAT THERANOS

09:46AM   24   STARTED TESTING PATIENT BLOOD BY COLLECTING SAMPLES AT

09:46AM   25   WALGREENS, THERE HAD BEEN RESEARCH AND DEVELOPMENT WORK ON

09:46AM   1      THESE SMALL BLOOD SAMPLE ASSAYS?

09:46AM   2      A.   I BELIEVE SO, YES.

09:46AM   3      Q.   AND THERE WAS AN R&D DEPARTMENT AT THERANOS WHO WAS

09:46AM   4      RESPONSIBLE FOR CONDUCTING THAT RESEARCH; IS THAT RIGHT?

09:46AM   5      A.   YES.

09:46AM   6      Q.   AND THE -- THAT HAD GONE ON FOR SOME TIME PRIOR TO EVEN

09:47AM   7      YOUR ARRIVAL AT THERANOS AS I UNDERSTAND IT; RIGHT?

09:47AM   8      A.   YES.

09:47AM   9      Q.   AND THE RESEARCH AND DEVELOPMENT PROCESS WAS TO ACTUALLY

09:47AM  10      DEVELOP THE NOVEL TECHNOLOGY THAT THERANOS WAS TRYING TO OFFER;

09:47AM  11      IS THAT RIGHT?

09:47AM  12      A.   YES, THERANOS CONSIDERED THE TECHNOLOGY NOVEL, YES.

09:47AM  13      Q.   RIGHT.  AND THE NOVELTY, AT LEAST ACCORDING TO THE

09:47AM  14      COMPANY, WAS TO DEVELOP A LOT OF ASSAYS THAT COULD USE VERY

09:47AM  15      SMALL BLOOD SAMPLES SUCH AS A CAPILLARY TUBE SAMPLE FROM A

09:47AM  16      FINGER?

09:47AM  17      A.   YES.

09:47AM  18      Q.   OKAY.  AND THAT AT THE TIME THAT THE -- YOU WORKED ON A

09:47AM  19      VALIDATION OF ASSAYS FOR THE CLINICAL LAB, A LOT OF THAT WORK

09:47AM  20      ON DEVELOPING ASSAYS HAD ALREADY OCCURRED IN THE RESEARCH AND

09:47AM  21      DEVELOPMENT SECTION; RIGHT?

09:47AM  22      A.   MY UNDERSTANDING WAS THAT IT WAS MORE IN LINE WITH

09:48AM  23      PRE-VALIDATION.

09:48AM  24           I WAS INVOLVED IN THE -- THE PRE-VALIDATION IS R&D

09:48AM  25      EXPERIMENTS AND WORK THAT OCCUR TO PROOF OF PRINCIPLE AND MAKE

09:48AM  1      SURE -- IT'S NOT VALIDATION WORK PER SE.

09:48AM  2          VALIDATION INVOLVES A PLAN THAT IS APPROVED BY A LAB

09:48AM  3      DIRECTOR, AND THEN YOU EXECUTE THE VALIDATION, ET CETERA.

09:48AM  4      Q.  RIGHT.

09:48AM  5          SO THE RESEARCH AND DEVELOPMENT WORK THAT IS DONE IS NOT

09:48AM  6      THE SAME AS THE CLIA VALIDATION WORK THAT HAS TO BE DONE BEFORE

09:48AM  7      A LAB HAS TO TEST PATIENTS; CORRECT?

09:48AM  8      A.  THE VALIDATION HAS TO FOLLOW THE PLAN, AND IT'S USUALLY

09:48AM  9      CONDUCTED BY R&D.

09:48AM  10     Q.  RIGHT.

09:48AM  11         AND JUST SO MY QUESTION IS CLEAR, I'LL TRY TO ASK IT IN A

09:48AM  12     BETTER WAY.  THERE'S -- ONE THING IS ASSAY DEVELOPMENT WORK

09:48AM  13     THAT THE R&D DEPARTMENT DOES BEFORE ANYONE TRIES TO VALIDATE IT

09:49AM  14     FOR THE CLIA LAB?

09:49AM  15     A.  CORRECT, CORRECT.

09:49AM  16     Q.  OKAY.  BUT AT SOME POINT A LABORATORY COULD TAKE THAT WORK

09:49AM  17     AND THEN GO THROUGH THE STEPS NECESSARY TO VALIDATE IT FOR THE

09:49AM  18     CLIA LAB; CORRECT?

09:49AM  19     A.  CORRECT.

09:49AM  20     Q.  OKAY.  AND BEFORE THAT HAPPENS, THE ASSAY CAN'T BE USED TO

09:49AM  21     TEST PATIENTS; CORRECT?

09:49AM  22     A.  CORRECT.

09:49AM  23     Q.  OKAY.  BUT WHEN YOU STARTED WORKING ON THESE ASSAY

09:49AM  24     VALIDATIONS, OBVIOUSLY WITH THE RESEARCH AND DEVELOPMENT PEOPLE

09:49AM  25     AS WELL, THE COMPANY WASN'T STARTING FROM SCRATCH IN TERMS OF

09:49AM  1    DEVELOPING SMALL BLOOD SAMPLE ASSAYS?

09:49AM  2    A.   I'M NOT VERY FAMILIAR WITH THE WORK THAT OCCURRED IN R&D

09:49AM  3    PRIOR TO STARTING IN THE LABORATORY.

09:49AM  4    Q.   OKAY.  I MIGHT HAVE SOME THINGS THAT MIGHT HELP REFRESH

09:49AM  5    YOUR RECOLLECTION.

09:49AM  6         BUT FOR NOW CAN WE LOOK AT EXHIBIT 9921, AND THAT IS IN, I

09:49AM  7    BELIEVE, THE SECOND VOLUME OF YOUR BINDERS.

09:50AM  8              THE WITNESS:  YOUR HONOR, MAY I ASK A PROCEDURAL

09:50AM  9    QUESTION?

09:50AM 10              THE COURT:  YES.

09:50AM 11              THE WITNESS:  I'M WONDERING IN THE INTEREST OF TIME,

09:50AM 12    WHETHER THE EXHIBIT CAN JUST BE SHOWN ON THE SCREEN RATHER THAN

09:50AM 13    HUNTING FOR IT IN THE BINDERS, BUT I DON'T KNOW WHAT THE

09:50AM 14    COURT'S PROCEDURE IS.

09:50AM 15              MR. COOPERSMITH:  I THINK DR. ROSENDORFF MAKES AN

09:50AM 16    EXCELLENT SUGGESTION, IT MIGHT SAVE US SOME TIME.

09:50AM 17              THE COURT:  WELL, IF YOU HAVE THE ABILITY -- THANK

09:50AM 18    YOU, DR. ROSENDORFF.

09:50AM 19         IF YOU HAVE THE ABILITY AND THE DESIRE TO SHOW THE EXHIBIT

09:50AM 20    ONLY TO THE WITNESS AND THE LAWYERS PRIOR TO ITS ADMISSION, AND

09:50AM 21    THEN MAKE WHATEVER MOTIONS YOU WOULD LIKE AS TO ITS

09:50AM 22    ADMISSIBILITY, THAT WOULD BE FINE AND WE CAN SEE HOW IT GOES.

09:50AM 23         ANY OBJECTION TO THAT, MR. BOSTIC?

09:50AM 24              MR. BOSTIC:  NO, YOUR HONOR.

09:51AM 25              MR. COOPERSMITH:  I UNDERSTAND THAT MS. ROBINSON HAS

09:51AM  1    THE ABILITY TO DISPLAY IT TO JUST THE COURT AND COUNSEL AND THE

09:51AM  2    WITNESS AND NOT TO THE JURY UNTIL IT HAS BEEN --

09:51AM  3         THE COURT:  THAT'S MY UNDERSTANDING.  AND I HAVE

09:51AM  4    CONTINUED HIGH CONFIDENCE IN OUR ELECTRICAL AV SYSTEM AS WE GO

09:51AM  5    FORWARD.

09:51AM  6         (LAUGHTER.)

09:51AM  7         THE CLERK:  WE MIGHT WANT TO TURN OFF THAT MONITOR

09:51AM  8    AT THAT DESK WHERE NO ONE IS SITTING IN FRONT OF YOU HAVE AT

09:51AM  9    DEFENSE TABLE.

09:52AM  10        (DISCUSSION OFF THE RECORD.)

09:52AM  11        THE COURT:  AS LONG AS THE PRECAUTIONS HAVE BEEN

09:52AM  12   TAKEN THAT ALL OF THE MONITORS THAT ARE FACING THE PUBLIC ARE

09:52AM  13   NOT ADMISSIBLE PRIOR TO THE INTRODUCTION OF EVIDENCE.  AND

09:52AM  14   WE'VE HAD THOSE COME UP DURING TRIAL.  AND IF THOSE PRECAUTIONS

09:52AM  15   ARE TAKEN, THEN WE CAN FOLLOW THIS PROTOCOL.

09:52AM  16        MR. COOPERSMITH:  I THINK IT WOULD BE POSSIBLE TO

09:52AM  17   TURN OFF THE MONITORS.

09:52AM  18        THE COURT:  I THINK THAT'S BEEN DONE.  I THINK

09:52AM  19   THAT'S BEEN ACCOMPLISHED.

09:52AM  20        MR. COOPERSMITHD:  GREAT.

09:52AM  21        THE COURT:  SO 9921?

09:52AM  22        MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

09:52AM  23   Q.   AND, DR. ROSENDORFF, IF FOR ANY REASON YOU NEED TO SEE THE

09:52AM  24   PAPER COPY, THEN OBVIOUSLY JUST LET ME KNOW AND WE CAN DO THAT.

09:52AM  25        OKAY?

09:52AM   1    A.   THANK YOU.

09:52AM   2    Q.   OKAY.  SO LOOKING AT EXHIBIT 9921, WHICH YOU SEE ON YOUR

09:52AM   3    SCREEN, YOU SEE THAT THIS IS A THERANOS DOCUMENT, AND IT'S A

09:52AM   4    MASTER VALIDATION PLAN FOR ELISA ASSAYS ON THERANOS DEVICES.

09:52AM   5         DO YOU SEE THAT?

09:52AM   6    A.   YES.

09:52AM   7    Q.   AND DO YOU SEE THAT THIS WAS SIGNED BY SEVERAL

09:52AM   8    INDIVIDUALS?

09:52AM   9    A.   YES.

09:52AM   10   Q.   AND ONE OF THEM IS SUREKHA GANGAKHEDKAR.

09:53AM   11        DO YOU SEE THAT?

09:53AM   12   A.   I THINK YOU MANGLED HER LAST NAME.

09:53AM   13   Q.   I'M SURE I DID.  DO YOU HAVE A BETTER PRONUNCIATION?

09:53AM   14   A.   I DO NOT, NO.

09:53AM   15   Q.   OKAY.  WELL, WE'LL CALL HER SUREKHA FOR THE MOMENT.

09:53AM   16   A.   OKAY.  OKAY.

09:53AM   17   Q.   AND YOU'RE FAMILIAR WITH THAT PERSON; RIGHT?

09:53AM   18   A.   YES, I AM.

09:53AM   19   Q.   AND SHE WAS SOMEONE WHO WORKED IN THE RESEARCH AND

09:53AM   20   DEVELOPMENT LAB AT THERANOS?

09:53AM   21   A.   YES.

09:53AM   22   Q.   AND SHE WORKED ON ELISA ASSAYS IN PARTICULAR?

09:53AM   23   A.   YES.

09:53AM   24   Q.   AND IS ANOTHER WORD FOR ELISA ASSAYS, IMMUNOASSAYS?

09:53AM   25   A.   YES.

09:53AM   1    Q.   AND THAT'S THE TYPE ASSAY THAT THE EDISON 3 SERIES COULD

09:53AM   2    RUN?

09:53AM   3    A.   YES.

09:53AM   4    Q.   AND YOU RECOGNIZE HER ON THE DOCUMENT?

09:53AM   5    A.   YES, I SEE HER NAME.

09:53AM   6    Q.   AND THIS IS A PROCEDURE THAT WAS ACTUALLY PRE-DATING YOUR

09:53AM   7    TIME AT THERANOS ON A MASTER VALIDATION PLAN; IS THAT CORRECT?

09:53AM   8    A.   IT APPEARS TO BE.

09:53AM   9         MR. COOPERSMITH:  YES.  YOUR HONOR, WE OFFER

09:54AM  10    EXHIBIT 9921.

09:54AM  11         MR. BOSTIC:  YOUR HONOR, AUTHENTICATION.

09:54AM  12         MR. COOPERSMITH:  YOUR HONOR, I THINK AUTHENTICATION

09:54AM  13    WOULD BE ACCOMPLISHED BY ATTRIBUTES OF THE DOCUMENT.  HE

09:54AM  14    RECOGNIZED SUREKHA'S NAME, AND SHE SIGNED THE DOCUMENT.

09:54AM  15         IT ACTUALLY HAS A CMS BATES NUMBER INDICATING IT CAME FROM

09:54AM  16    CMS.

09:54AM  17         I DON'T THINK THERE'S AN AUTHENTICATION DOCUMENT -- AN

09:54AM  18    AUTHENTICATION ISSUE BASED ON THE FEATURES OF THE DOCUMENT,

09:54AM  19    WHICH IS ONE OF THE WAYS THAT THE DOCUMENT CAN BE

09:54AM  20    AUTHENTICATED.

09:54AM  21         THE COURT:  CAN YOU JUST ASK A COUPLE OF MORE

09:54AM  22    FOUNDATIONAL QUESTIONS, PLEASE.

09:54AM  23         MR. COOPERSMITH:  YES, YOUR HONOR.

09:54AM  24    Q.   DR. ROSENDORFF, YOU ALSO SEE ARNOLD GELB, M.D., ON THE

09:54AM  25    DOCUMENT?

09:54AM  1    A.   YES, I DO.

09:54AM  2    Q.   AND THAT WAS THE PERSON WHO WAS THE LAB DIRECTOR PRIOR TO

09:54AM  3    YOUR ARRIVAL?

09:54AM  4    A.   NO.  THE LABORATORY DIRECTOR OF RECORD WAS SPENCER HIRAKI.

09:55AM  5    Q.   RIGHT.  BUT YOU KNOW WHO DR. GELB WAS; RIGHT?

09:55AM  6    A.   I BELIEVE HE WAS THE CLIA LABORATORY DIRECTOR BEFORE

09:55AM  7    DR. HIRAKI WENT ON TO THE LICENSE.

09:55AM  8    Q.   OKAY.  BUT YOU RECOGNIZE HIS NAME ON THE DOCUMENT?

09:55AM  9    A.   YES, I RECOGNIZE HIS NAME.

09:55AM  10   Q.   AND DR. GELB, AT THE TIME HE WAS LABORATORY DIRECTOR

09:55AM  11   BEFORE DR. HIRAKI, WOULD HAVE BEEN IN A POSITION TO SIGN AND

09:55AM  12   APPROVE SOP'S JUST LIKE ANY OTHER LAB DIRECTOR, AS FAR AS YOU

09:55AM  13   KNOW; RIGHT?

09:55AM  14   A.   I'M NOT SURE WHAT YOU'RE ASKING, I'M SORRY.

09:55AM  15   Q.   OKAY.  I'LL ASK A DIFFERENT QUESTION.

09:55AM  16        SO YOU SEE THE DOCUMENT IS A STANDARD OPERATING PROCEDURE

09:55AM  17   THAT IT SAYS AT THE TOP?

09:55AM  18   A.   YES.

09:55AM  19   Q.   AND IT HAS A THERANOS LOGO AS IT EXISTED AT THE TIME ON

09:55AM  20   IT.

09:55AM  21        DO YOU SEE THAT?

09:55AM  22   A.   YES.  I WASN'T THERE SO I DON'T KNOW WHAT THE LOGO WAS.

09:55AM  23   Q.   OKAY.  BUT DO YOU SEE THE NAME THERANOS AND IT'S A LOGO;

09:55AM  24   RIGHT?

09:55AM  25   A.   YES.

09:55AM   1    Q.   OKAY.  AND THIS FORM, WHERE YOU HAVE A BOX AT THE TOP THAT

09:55AM   2    INDICATES WHAT THE DOCUMENT IS, AND THEN IT HAS SPACES FOR THE

09:56AM   3    AUTHOR, AND THE REVIEWER, AND THE APPROVER, THAT'S A FORM THAT

09:56AM   4    YOU HAVE SEEN BEFORE ON LOTS OF OTHER STANDARD OPERATING

09:56AM   5    PROCEDURES AT THERANOS; CORRECT?

09:56AM   6    A.   I'M A LITTLE CONFUSED WITH THIS DOCUMENT BECAUSE AT THE

09:56AM   7    TOP IT SAYS STANDARD OPERATING PROCEDURE AND THEN TWO LINES

09:56AM   8    DOWN IT SAYS MASTER VALIDATION PLAN.

09:56AM   9         SO A VALIDATION PLAN IS NOT AN OPERATING PROCEDURE.

09:56AM  10         AN OPERATING PROCEDURE IS SOMETHING THAT THE LAB DOES ONCE

09:56AM  11    YOU GO INTO PRODUCTION.

09:56AM  12    Q.   YES, DR. ROSENDORFF.

09:56AM  13         BUT MY QUESTION IS DIFFERENT.  I'M SIMPLY ASKING WHETHER

09:56AM  14    THE FORM OF THE DOCUMENT, WHERE IT SAYS STANDARD OPERATING

09:56AM  15    PROCEDURE AT THE TOP, AND IT HAS A SPACE FOR AUTHORS, AND

09:56AM  16    REVIEWERS, AND APPROVERS JUST LIKE THIS DOCUMENT DOES, THAT'S A

09:56AM  17    FORM THAT YOU'VE SEEN AT THERANOS MANY TIMES IN ALL SORTS OF

09:56AM  18    DIFFERENT SOP'S AND VALIDATION REPORTS; CORRECT?

09:56AM  19    A.   YES.

09:56AM  20    Q.   AND THIS DOCUMENT LOOKS JUST LIKE THAT DOCUMENT IN TERMS

09:57AM  21    OF THE FORM OF THE DOCUMENT; CORRECT?

09:57AM  22    A.   YES, I BELIEVE SO.

09:57AM  23    Q.   OKAY.  AND IF YOU JUST, WITHOUT READING IT OUT LOUD TO THE

09:57AM  24    JURY, YOU SEE THAT IN THE BODY OF THE DOCUMENT, EVEN IF YOU

09:57AM  25    TURN TO THE SECOND PAGE IN THE TABLE OF CONTENTS, IT HAS, LIKE,

09:57AM   1    VARIOUS SECTIONS REGARDING DIFFERENT ASPECTS OF VALIDATION THAT

09:57AM   2    HAVE TO OCCUR.

09:57AM   3        DO YOU SEE THAT?

09:57AM   4    A.   YES.

09:57AM   5    Q.   AND, FOR EXAMPLE, ACCURACY AND PRECISION AND SENSITIVITY

09:57AM   6    AND SO FORTH.

09:57AM   7        DO YOU SEE THAT?

09:57AM   8    A.   YES.

09:57AM   9            MR. COOPERSMITH:  YOUR HONOR, WE OFFER EXHIBIT 9921.

09:57AM  10            THE COURT:  I'LL ADMIT IT, AND IT MAY BE PUBLISHED.

09:57AM  11        (DEFENDANT'S EXHIBIT 9921 WAS RECEIVED IN EVIDENCE.)

09:57AM  12    BY MR. COOPERSMITH:

09:57AM  13    Q.   DR. ROSENDORFF, DO YOU SEE THE FIRST PAGE?  AND THIS IS,

09:57AM  14    AGAIN, SOMETHING THAT EXISTED BEFORE YOUR TIME AT THERANOS;

09:57AM  15    CORRECT?

09:57AM  16    A.   YES.

09:57AM  17    Q.   AND IT'S AS YOU SAID, THE MASTER VALIDATION PLAN FOR ELISA

09:58AM  18    ASSAYS ON THERANOS DEVICES?

09:58AM  19    A.   YES.

09:58AM  20    Q.   AND IF YOU TURN TO THE SECOND PAGE THAT HAS THE TABLE OF

09:58AM  21    CONTENT, YOU SEE THERE'S A LIST OF DIFFERENT SECTIONS?

09:58AM  22    A.   YES.

09:58AM  23    Q.   AND, FOR EXAMPLE, JUST TO DISCUSS A FEW, SECTION 12 IS

09:58AM  24    QUALITY CONTROL?

09:58AM  25    A.   YES.

09:58AM 1   Q.   AND SECTION 13 IS PRECISION?

09:58AM 2   A.   YES.

09:58AM 3   Q.   AND SECTION 14 IS ANALYTICAL SENSITIVITY?

09:58AM 4   A.   YES.

09:58AM 5   Q.   OKAY.  AND 16 IS ACCURACY/TRUENESS/AND COMPARABILITY?

09:58AM 6   A.   YES.

09:58AM 7   Q.   AND TO PICK OUT ONE MORE.  SECTION 20 IS STABILITY?

09:58AM 8   A.   YES.

09:58AM 9   Q.   SO THESE THINGS ARE, AS YOU UNDERSTAND IT AS LAB DIRECTOR,

09:58AM 10   ARE THINGS THAT ARE REQUIRED TO DO WHEN YOU VALIDATE AN ASSAY

09:58AM 11   IN A CLIA LAB; CORRECT?

09:58AM 12   A.   THIS IS A LARGER SET OF ITEMS THAN WOULD BE REQUIRED UNDER

09:59AM 13   CLIA.

09:59AM 14   Q.   OKAY.  SO THERE'S MORE SECTIONS HERE THAN WHAT IS ACTUALLY

09:59AM 15   REQUIRED UNDER CLIA; IS THAT RIGHT?

09:59AM 16   A.   YES.

09:59AM 17   Q.   OKAY.  AND THAT'S WHAT'S THE TABLE OF CONTENTS.

09:59AM 18        IF YOU GO TO THE PAGE 5 OF THE DOCUMENT.  AND I'M

09:59AM 19   REFERRING TO THE PAGE NUMBERS IN THE LITTLE BOX AT THE BOTTOM.

09:59AM 20   YOU CAN SEE THEM ON YOUR SCREEN.  THIS IS PAGE 5 OF 17.

09:59AM 21        DO YOU SEE THAT?

09:59AM 22   A.   YES, SIR.

09:59AM 23   Q.   AND IF YOU GO TO SECTION 4, "RESPONSIBILITIES."

09:59AM 24        DO YOU SEE SECTION 4.1, "IT IS THE RESPONSIBILITY OF THE

09:59AM 25   LABORATORY DIRECTOR TO ENSURE THAT THE ELISA ASSAYS INDICATED

09:59AM  1    IN ATTACHMENT," AND THERE'S A NUMBER, "ARE QUALIFIED AND

09:59AM  2    VALIDATED ON THE THERANOS SYSTEMS IN ACCORDANCE WITH THE

09:59AM  3    QUALIFICATION PLAN SPECIFIED IN THIS DOCUMENT."

09:59AM  4        DO YOU SEE THAT?

09:59AM  5    A.   YES, I DO.

09:59AM  6    Q.   AND THAT IS, IN FACT, THE DUTY OF THE LAB DIRECTOR TO SO

09:59AM  7    ENSURE; IS THAT CORRECT?

09:59AM  8    A.   YES.

09:59AM  9    Q.   IF YOU GO TO PAGE 7 OF 17 OF THE DOCUMENT.

10:00AM  10       DO YOU SEE THERE'S A SECTION 12 ON QUALITY CONTROL?

10:00AM  11   A.   YES.

10:00AM  12   Q.   AND IT SAYS, SECTION 12.1, "TWO TO FOUR LEVEL QUALITY

10:00AM  13   CONTROL SAMPLES (E.G. LLOQ, QC LOW, QC MEDIAN AND QC HIGH) AS

10:00AM  14   APPROPRIATE TO THE ASSAY WILL BE ANALYZED AND EACH RUN ON EACH

10:00AM  15   INSTRUMENT FOR EACH EXPERIMENT."

10:00AM  16       DO YOU SEE THAT?

10:00AM  17   A.   YES.

10:00AM  18   Q.   AND IF YOU GO TO SECTION -- I'M SORRY, PAGE 14 OF 17.

10:00AM  19       DO YOU SEE THERE'S SECTION 22 THERE?

10:00AM  20   A.   YES.

10:00AM  21   Q.   AND THAT'S TITLED ALTERNATIVE ASSESSMENT PROCEDURE?

10:00AM  22   A.   YES.

10:00AM  23   Q.   AND THEN 22.1 SAYS, "BECAUSE OF THE UNIQUE FEATURES OF THE

10:00AM  24   THERANOS SYSTEMS, TRADITIONAL PROFICIENCY TESTING PROGRAMS ARE

10:00AM  25   NOT EXPECTED TO BE APPLICABLE."

10:00AM 1          DO YOU SEE THAT?

10:00AM 2     A.   YES.

10:00AM 3     Q.   AND THEN SECTION 22.2 READS, "INSTEAD, AN ALTERNATIVE

10:01AM 4     ASSESSMENT PROGRAM (AAP) WILL BE DEVELOPED AS DESCRIBED IN CLSI

10:01AM 5     GUIDELINES GP 29-A 2."

10:01AM 6          DO YOU SEE THAT?

10:01AM 7     A.   YES.

10:01AM 8     Q.   AND CLSI, CAN YOU TELL US WHAT THAT IS?

10:01AM 9     A.   CLINICAL LABORATORY STANDARDS INSTITUTE.

10:01AM 10    Q.   AND THAT'S A GROUP, I THINK THEY'RE BASED IN PENNSYLVANIA?

10:01AM 11    A.   CORRECT.

10:01AM 12    Q.   WHO ISSUE GUIDELINES FOR CLINICAL LABS?

10:01AM 13    A.   CORRECT.

10:01AM 14    Q.   AND THEIR VIEWS ARE OFTEN CONSIDERED BY LABORATORIES?

10:01AM 15    A.   YES.

10:01AM 16    Q.   AND USED TO IMPLEMENT PROCEDURES BECAUSE THEY'RE

10:01AM 17    CONSIDERED TO BE AUTHORITATIVE?

10:01AM 18    A.   YES.

10:01AM 19    Q.   OKAY.  AND AT TIMES YOU WOULD REFER TO CLSI MATERIALS TO

10:01AM 20    DO YOUR JOB AS LAB DIRECTOR?

10:01AM 21    A.   YES.

10:01AM 22    Q.   OKAY.  AND, IN FACT, THERE ARE CLSI MATERIALS THAT

10:01AM 23    SPECIFICALLY RELATE TO ALTERNATIVE ASSESSMENT PROCEDURES; IS

10:01AM 24    THAT RIGHT?

10:01AM 25    A.   I -- THAT'S MY UNDERSTANDING FROM READING THIS GP 29, I

10:02AM   1    GUESS, THAT'S THE ONE THAT HANDLES IT.

10:02AM   2    Q.   OKAY.  WE'LL LOOK AT A THING OR TWO IN A FEW MINUTES THAT

10:02AM   3    DEAL WITH THAT.

10:02AM   4    A.   OKAY.

10:02AM   5    Q.   AND THEN LET'S JUST GO -- I THINK THAT'S ALL ON THAT

10:02AM   6    DOCUMENT.  YOU CAN PUT THAT ASIDE.

10:02AM   7         OKAY.  WE WERE TALKING A FEW MINUTES AGO ABOUT THE WORK

10:02AM   8    THAT GOES INTO DEVELOPING AN ASSAY ON THE RESEARCH SIDE BEFORE

10:02AM   9    IT GETS TO THE POINT OF TRYING TO BE -- TRYING TO VALIDATE IT

10:02AM  10    FOR THE CLIA LAB.

10:02AM  11         DO YOU REMEMBER THAT?

10:02AM  12    A.   YES.

10:02AM  13    Q.   OKAY.  AND I'D LIKE TO SHOW YOU AN EXHIBIT, WHICH IS 1031,

10:02AM  14    AND WE CAN JUST SHOW IT ON THE SCREENS.

10:03AM  15         OKAY.  DO YOU SEE EXHIBIT 1031, DR. ROSENDORFF?

10:03AM  16    A.   YES.

10:03AM  17    Q.   AND THIS IS AN EMAIL FROM THE SAME PERSON WHOSE NAME I

10:03AM  18    WON'T EVEN ATTEMPT THIS TIME, SUREKHA?

10:03AM  19    A.   GANGAKHEDKAR.  I THINK THAT'S HOW YOU PRONOUNCE IT.

10:03AM  20    Q.   OKAY.  THANK YOU, DR. ROSENDORFF.  I APPRECIATE IT.

10:03AM  21    A.   UH-HUH.

10:03AM  22    Q.   IT'S AN EMAIL FROM HER TO A GROUP OF PEOPLE, INCLUDING

10:03AM  23    DR. DANIEL YOUNG, YOURSELF, ELIZABETH HOLMES, AND IT HAS A COPY

10:03AM  24    TO SHARADA SIVARAMAN.

10:03AM  25         DO YOU SEE THAT?

10:03AM  1    A.   YES.

10:03AM  2    Q.   AND DR. SIVARAMAN WAS ALSO A SCIENTIST WHO WORKED IN THE

10:03AM  3    RESEARCH AND DEVELOPMENT SECTION AT THERANOS?

10:03AM  4    A.   YES.

10:03AM  5    Q.   OKAY.  AND SAME WITH DR. YOUNG; RIGHT?

10:03AM  6    A.   HE WAS THE VP OF THERANOS SYSTEMS AND THAT WAS HIS TITLE,

10:03AM  7    AND HE HAD A HAND IN EVERYTHING REALLY.

10:03AM  8    Q.   I'M SORRY, I DIDN'T HEAR YOU.

10:03AM  9    A.   HE HAD A HAND IN EVERYTHING.

10:03AM  10   Q.   RIGHT.  DR. YOUNG HAD A HAND IN EVERYTHING?

10:03AM  11   A.   YEAH.

10:03AM  12   Q.   AND TO FIX PROBLEMS IF THEY AROSE AND DEAL WITH ASSAYS IN

10:04AM  13   GENERAL?

10:04AM  14   A.   YES.

10:04AM  15   Q.   AND MR. BALWANI RELIED ON DR. YOUNG FOR THOSE PURPOSES; IS

10:04AM  16   THAT RIGHT?

10:04AM  17           MR. BOSTIC:  OBJECTION.  IT CALLS FOR SPECULATION

10:04AM  18   AND LACKS FOUNDATION.

10:04AM  19           THE COURT:  DO YOU WANT TO LAY A FOUNDATION?

10:04AM  20           MR. COOPERSMITH:  SURE, YOUR HONOR.

10:04AM  21   Q.   YOU HAD AN OPPORTUNITY WHILE YOU WERE AT THERANOS TO

10:04AM  22   OBSERVE DR. YOUNG PERFORMING HIS JOB; IS THAT RIGHT?

10:04AM  23   A.   YES.

10:04AM  24   Q.   AND YOU HAD AN OPPORTUNITY TO OBSERVE MR. BALWANI

10:04AM  25   INTERACTING WITH DR. YOUNG?

10:04AM   1   A.   YES.

10:04AM   2   Q.   AND YOU UNDERSTOOD FROM THAT OBSERVATION THAT MR. BALWANI

10:04AM   3   WAS RELYING ON DR. YOUNG FOR A LOT OF ISSUES THAT CAME UP WITH

10:04AM   4   ASSAYS AT THERANOS?

10:04AM   5           MR. BOSTIC:  SPECULATION.  ALSO VAGUE.

10:04AM   6           THE COURT:  MAYBE YOU SHOULD DEVELOP THAT A LITTLE

10:04AM   7   MORE.

10:04AM   8   BY MR. COOPERSMITH:

10:04AM   9   Q.   WELL, DO YOU HAVE AN UNDERSTANDING OF THAT,

10:04AM  10   DR. ROSENDORFF?

10:04AM  11   A.   THAT MR. BALWANI RELIED ON DR. YOUNG?

10:04AM  12   Q.   YES.

10:04AM  13   A.   TO --

10:04AM  14           MR. BOSTIC:  SAME OBJECTION, YOUR HONOR.  CALLS FOR

10:05AM  15   SPECULATION.

10:05AM  16           THE COURT:  CAN YOU ASK FOUNDATIONAL QUESTIONS FOR

10:05AM  17   THAT.

10:05AM  18           MR. COOPERSMITH:  YES, YOUR HONOR, I'LL CERTAINLY

10:05AM  19   TRY.

10:05AM  20   Q.   DR. ROSENDORFF, WERE YOU PRIVY TO CONVERSATIONS BETWEEN

10:05AM  21   MR. BALWANI AND DR. YOUNG ABOUT ASSAYS AND ISSUES THAT AROSE

10:05AM  22   OVER TIME?

10:05AM  23   A.   NO, I WAS NOT PRIVY TO IN-PERSON CONVERSATIONS BETWEEN THE

10:05AM  24   TWO OF THEM.

10:05AM  25   Q.   WERE YOU PRIVY TO EMAILS THAT WERE CIRCULATED BETWEEN THE

10:05AM   1     TWO OF THEM?

10:05AM   2     A.   YES, I WAS.

10:05AM   3     Q.   AND FROM THE EMAILS, DO YOU HAVE AN UNDERSTANDING OF THE

10:05AM   4     RELIANCE -- WHETHER MR. BALWANI RELIED ON DR. YOUNG FOR ISSUES

10:05AM   5     THAT AROSE IN CONNECTION WITH ASSAYS?

10:05AM   6     A.   I GUESS SO.  I MEAN, I'M NOT SURE WHO DANIEL REPORTED TO.

10:05AM   7          I MEAN, MY SENSE WAS THAT SUNNY WAS HOLDING HIM

10:05AM   8     ACCOUNTABLE FOR THE TECHNICAL PERFORMANCE OF THE ASSAYS, YEAH.

10:06AM   9     Q.   OKAY.

10:06AM   10    A.   YEAH.  I DON'T KNOW, I'M JUST TRYING TO ANSWER YOUR

10:06AM   11    QUESTION AS BEST AS I CAN.

10:06AM   12    Q.   AND THAT'S ALL I CAN ASK, DR. ROSENDORFF.  SO THANK YOU.

10:06AM   13    A.   YEAH.

10:06AM   14    Q.   ACTUALLY, LOOKING AT EXHIBIT 1031 YOU SEE, AGAIN, THIS IS

10:06AM   15    AN EMAIL AS I DESCRIBED, AND IT'S DATED AUGUST 24TH, 2013.

10:06AM   16         DO YOU SEE THAT?

10:06AM   17    A.   YES, YES.

10:06AM   18    Q.   AND THIS WAS PRIOR TO THE LAUNCH OF THERANOS BLOOD TESTING

10:06AM   19    SERVICES AT WALGREENS; IS THAT CORRECT?

10:06AM   20    A.   YES.

10:06AM   21    Q.   AND DO YOU SEE THAT THE DOCUMENT REFERS TO CERTAIN

10:06AM   22    DEVELOPMENT REPORTS?

10:06AM   23    A.   YES.

10:06AM   24         MR. COOPERSMITH:  YOUR HONOR, WE OFFER EXHIBIT 1031.

10:06AM   25         MR. BOSTIC:  NO OBJECTION.

10:06AM   1            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:06AM   2            (GOVERNMENT'S EXHIBIT 1031 WAS RECEIVED IN EVIDENCE.)

10:06AM   3       BY MR. COOPERSMITH:

10:06AM   4       Q.   OKAY.  SO LOOKING AT --

10:07AM   5            THE COURT:  WE NEED TO TURN THE JUROR'S MONITORS ON.

10:07AM   6            THE CLERK:  I TURNED THEM ON.

10:07AM   7            THE COURT:  OH.  THERE WE GO.  THANK YOU.

10:07AM   8            MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

10:07AM   9       Q.   SO YOU SEE THAT THIS IS AN EMAIL AND THERE'S ACTUALLY SOME

10:07AM  10       ATTACHMENTS LISTED AT THE TOP?

10:07AM  11       A.   YES.

10:07AM  12       Q.   AND ONE OF THEM IS TSH MASTER VALIDATION PLAN FOR ELISA

10:07AM  13       ASSAYS.

10:07AM  14            DO YOU SEE THAT?

10:07AM  15       A.   YES.

10:07AM  16       Q.   AND THEN THERE ARE TWO OTHER ATTACHMENTS.

10:07AM  17            DO YOU SEE THAT?

10:07AM  18       A.   YES.

10:07AM  19       Q.   AND ONE OF THEM IS THERANOS TSH ASSAY DEVELOPMENT REPORT?

10:07AM  20       A.   YES.

10:07AM  21       Q.   AND SO AN ASSAY DEVELOPMENT REPORT IS SOMETHING DIFFERENT

10:07AM  22       FROM A CLIA ASSAY REPORT?

10:07AM  23       A.   YES.

10:07AM  24       Q.   AN ASSAY DEVELOPMENT REPORT IS SOMETHING THAT THE RESEARCH

10:07AM  25       AND DEVELOPMENT SECTION AT THERANOS PUT OUT ON THEIR OWN; IS

10:07AM   1   THAT RIGHT?

10:07AM   2   A.   CORRECT.

10:07AM   3   Q.   OKAY.  AND IT WOULD NOT BE SUFFICIENT TO ACTUALLY RUN THE

10:07AM   4   ASSAY IN THE CLIA LAB; RIGHT?

10:07AM   5   A.   IT WOULD BE NECESSARY, BUT NOT SUFFICIENT.

10:07AM   6   Q.   OKAY.  AND SO IT JUST WORKED THAT THE CLIA LAB COULD LATER

10:07AM   7   BUILD ON TO TRY TO APPROVE AN ASSAY OR VALIDATE AN ASSAY IN THE

10:07AM   8   CLIA LAB?

10:07AM   9   A.   YES.

10:07AM  10   Q.   OKAY.  AND THEN THE EMAIL SAYS, "HI DANIEL & ADAM,

10:08AM  11        "ATTACHED ARE THE DEVELOPMENT REPORTS FOR TSH AND TPSA AND

10:08AM  12   THE VALIDATION PLAN FOR TSH."

10:08AM  13        DO YOU SEE THAT?

10:08AM  14   A.   I CAN EXPLAIN A LITTLE BIT WHAT THE DIFFERENCE IS BETWEEN

10:08AM  15   THE DEVELOPMENT REPORTS AND A PLAN IF THAT'S HELPFUL.

10:08AM  16   Q.   PLEASE DO.

10:08AM  17   A.   WELL, SO BY THE TIME YOU GET TO DOING THE ACTUAL

10:08AM  18   VALIDATION, THE METHOD HAS TO BE LOCKED DOWN AND RECEIVED IN

10:08AM  19   GRANULAR DETAIL EXACTLY WHAT INSTRUMENT YOU'RE USING, WHAT

10:08AM  20   REAGENTS, SOFTWARE, WHO IS PERFORMING IT, ET CETERA.

10:08AM  21        SO YOU CAN'T CHANGE THE ASSAY AFTER THE VALIDATION IS

10:08AM  22   SIGNED WITHOUT A NEW VALIDATION.

10:08AM  23   Q.   RIGHT.

10:08AM  24   A.   THAT JUST HAPPENED CONSTANTLY AT THERANOS THAT THE ASSAY

10:08AM  25   WAS CHANGING ALL OF THE TIME AND THE QA DEPARTMENT HAD TO TRY

10:08AM  1    TO KEEP AN EYE ON IT TO FIND OUT IF THINGS WERE BEING

10:08AM  2    REVALIDATED OR NOT.  IT WAS IMPOSSIBLE FOR ME TO JUST KEEP

10:09AM  3    TRACK OF WHAT THE ACTUAL ASSAY WAS.

10:09AM  4            MR. COOPERSMITH:  OKAY.  YOUR HONOR, I'M GOING TO

10:09AM  5    MOVE TO STRIKE THAT ANSWER AS NONRESPONSIVE TO THE QUESTION.

10:09AM  6            THE COURT:  WELL, YOU ASKED HIM TO EXPLAIN.

10:09AM  7            MR. COOPERSMITH:  WELL, I THINK HE EXPLAINED

10:09AM  8    SOMETHING DIFFERENT.

10:09AM  9            MR. BOSTIC:  YOUR HONOR, THAT WAS RESPONSIVE TO A

10:09AM 10    QUITE OPEN ENDED QUESTION FROM THE DEFENSE COUNSEL.

10:09AM 11        (PAUSE IN PROCEEDINGS.)

10:09AM 12            THE COURT:  I WILL STRIKE THE LAST SENTENCE ABOUT

10:09AM 13    "IMPOSSIBLE FOR ME TO JUST KEEP TRACK OF WHAT THE ASSAY WAS,"

10:09AM 14    THAT'S STRICKEN.

10:09AM 15            MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

10:09AM 16    Q.   DR. ROSENDORFF, GOING BACK TO THE EMAIL THAT WE HAVE ON

10:09AM 17    THE SCREEN, THESE WERE ASSAY DEVELOPMENT REPORTS THAT WERE

10:09AM 18    BEING SENT TO YOU AND DR. YOUNG IN PREPARATION FOR DOING THE

10:10AM 19    CLIA VALIDATION WORK; CORRECT?

10:10AM 20    A.   I DON'T KNOW EXACTLY WHAT THE INTENT IS OF THIS EMAIL.

10:10AM 21    Q.   OKAY.  GOING BACK TO SOMETHING YOU SAID BEFORE.  YOU SAID

10:10AM 22    THAT BY THE TIME YOU DO THE CLIA VALIDATION, THE ASSAY AND WHAT

10:10AM 23    IS GOING TO GO INTO RUNNING THAT SIEMENS ADVIA HAVE TO BE

10:10AM 24    LOCKED DOWN.

10:10AM 25            I THINK THOSE WERE YOUR WORDS?

ROSENDORFF CROSS BY MR. COOPERSMITH (RES.)                    3518

10:10AM   1    A.   YES.

10:10AM   2    Q.   ALL RIGHT.  BUT ALL OF THAT HAS TO BE DONE IN THE RESEARCH

10:10AM   3    AND DEVELOPMENT SECTION BEFORE THE ASSAY GETS TO THE POINT OF

10:10AM   4    CLIA VALIDATION?

10:10AM   5    A.   CORRECT.

10:10AM   6    Q.   OKAY.  AND THAT WORK, YOU UNDERSTAND, WAS BEING DONE BY

10:10AM   7    SCIENTISTS SUCH AS SUREKHA GANGAKHEDKAR?

10:10AM   8         I'M TAKING A RISK WITH HER NAME AGAIN.

10:10AM   9         BUT THAT'S THE WORK THAT HAS TO BE DONE WITH SCIENTISTS

10:10AM  10    LIKE THAT; RIGHT?

10:10AM  11    A.   YES.

10:10AM  12    Q.   IF YOU TURN TO THE -- WELL, BEFORE WE GET TO THAT, LET'S

10:11AM  13    JUST GO TO THE SECOND PARAGRAPH BECAUSE I THINK IT MAY ANSWER

10:11AM  14    SOMETHING THAT YOU JUST DISCUSSED.

10:11AM  15         "AS DISCUSSED IN A MEETING WITH ELIZABETH, PLEASE REVIEW

10:11AM  16    THE DATA IN THE DEVELOPMENT REPORTS FOR USABILITY TOWARDS

10:11AM  17    VALIDATION AND PROPOSE WHAT WILL BE NEEDED FOR VERIFICATION FOR

10:11AM  18    THE 3.5 SYSTEM WITH THE PRE-DILUTIONS."

10:11AM  19         DO YOU SEE THAT?

10:11AM  20    A.   YES.

10:11AM  21    Q.   SO THAT HELPS YOU UNDERSTAND THE PURPOSE OF THE EMAIL;

10:11AM  22    RIGHT?  IT'S TO REVIEW THE DATA IN THE DEVELOPMENT REPORTS FOR

10:11AM  23    USABILITY TOWARDS THE CLIA VALIDATION.

10:11AM  24         DO YOU SEE THAT?

10:11AM  25    A.   RIGHT.  SO WHAT THIS IS SAYING IS, HEY, CAN WE USE THE

10:11AM   1    DATA IN THE PRE-VALIDATION FOR THE VALIDATION.

10:11AM   2         I THINK THAT'S WHAT THIS IS ASKING.

10:11AM   3    Q.   OKAY.  IF YOU GO TO THE SECOND PAGE OF THE DOCUMENT, YOU

10:11AM   4    SEE THAT THAT IS AN UNSIGNED VERSION OF SOMETHING CALLED A

10:11AM   5    MASTER VALIDATION PLAN FOR ELISA ASSAYS ON THERANOS DEVICES?

10:12AM   6    A.   YES.

10:12AM   7    Q.   AND THE EFFECTIVE DATE OF THE DOCUMENT IS 8/23/13?

10:12AM   8    A.   YES.

10:12AM   9    Q.   AND ABOVE THAT YOU SEE IT HAS DOCUMENT NUMBER

10:12AM   10   REVISION:  A?

10:12AM   11   A.   YES.

10:12AM   12   Q.   OKAY.  AND THEN THIS IS ACTUALLY THE SAME TITLE OF THE

10:12AM   13   DOCUMENT THAT WE SAW BEFORE IN A SIGNED VERSION BY DR. GELB AND

10:12AM   14   OTHERS; RIGHT?

10:12AM   15   A.   YES.  SO MY CONFUSION HERE IS WHY THERE'S AN EFFECTIVE

10:12AM   16   DATE WITH NO SIGNATURES.

10:12AM   17   Q.   OKAY.  BUT YOU RECEIVED THIS ON AUGUST 24TH, 2013; RIGHT?

10:12AM   18   A.   OH, THIS IS THE ATTACHMENT?  THIS IS THE CONTENTS?

10:12AM   19   Q.   YES.

10:12AM   20   A.   OKAY.

10:12AM   21   Q.   AND YOU CAN SEE IF YOU TURN TO THE -- IT HAS PAGE NUMBERS

10:12AM   22   AT THE VERY BOTTOM IN THE MIDDLE, AND IF YOU TURN TO PAGE 15 OF

10:13AM   23   THE DOCUMENT, OR I GUESS IT WILL BE TURNED FOR YOU.

10:13AM   24        YOU SEE THAT THERE'S -- THAT THAT SECTION ON ALTERNATIVE

10:13AM   25   ASSESSMENT PROCEDURE?

10:13AM  1    A.   YES.

10:13AM  2    Q.   AND THAT HAS THAT LANGUAGE 22.1, "BECAUSE OF UNIQUE

10:13AM  3    FEATURES OF THE THERANOS SYSTEMS, TRADITIONAL PROFICIENCY

10:13AM  4    TESTING PROGRAMS ARE NOT EXPECTED TO BE APPLICABLE."

10:13AM  5         DO YOU SEE THAT?

10:13AM  6    A.   YES, YES.

10:13AM  7    Q.   OKAY.  YOU CAN PUT THAT ASIDE, DR. ROSENDORFF.

10:13AM  8         I GUESS IT WILL BE PUT ASIDE FOR YOU IF YOU'RE LOOKING AT

10:13AM  9    THE SCREEN.

10:13AM 10    A.   GOOD POINT.  GOOD POINT.

10:13AM 11    Q.   OKAY.  IN THE EMAIL THAT WE JUST LOOKED AT, AND IF WE NEED

10:14AM 12    TO LOOK AT IT AGAIN I SUPPOSE WE CAN, THERE'S A TRANSMISSION ON

10:14AM 13    THE EMAIL.  IT STATED THERE'S A TRANSMISSION OF AN ASSAY

10:14AM 14    DEVELOPMENT REPORT FOR PSA AND TSH.

10:14AM 15         DO YOU RECALL THAT?

10:14AM 16    A.   YES.

10:14AM 17    Q.   OKAY.  IF YOU COULD TAKE A LOOK AT EXHIBIT 9379.

10:14AM 18         AND YOU SEE THAT'S THE TOTAL PROSTATE SPECIFIC ANTIGEN,

10:14AM 19    TPSA, ASSAY DEVELOPMENT REPORT?

10:14AM 20    A.   YES.

10:14AM 21    Q.   AND IT'S A DOCUMENT THAT GOES THROUGH FROM PAGE 1 TO

10:15AM 22    PAGE 14?

10:15AM 23    A.   OH, YES, THE LAST PAGE IS 14, UH-HUH.

10:15AM 24    Q.   AND THIS IS AN ASSAY DEVELOPMENT REPORT THAT WAS

10:15AM 25    TRANSMITTED TO YOU ALONG WITH THE EMAIL THAT WE LOOKED AT IN

10:15AM  1    EXHIBIT 1031?

10:15AM  2    A.   YES.

10:15AM  3              MR. COOPERSMITH:  YOUR HONOR, WE OFFER EXHIBIT 9379.

10:15AM  4              MR. BOSTIC:  NO OBJECTION.

10:15AM  5              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:15AM  6         (DEFENDANT'S EXHIBIT 9379 WAS RECEIVED IN EVIDENCE.)

10:15AM  7    BY MR. COOPERSMITH:

10:15AM  8    Q.   AND YOU SEE THE TITLE AS I JUST READ IT, DR. ROSENDORFF?

10:15AM  9    A.   YES.

10:15AM  10   Q.   AND THEN IF YOU GO TO THE LAST PAGE, THERE'S A CONCLUSION.

10:15AM  11        DO YOU SEE THAT?

10:15AM  12   A.   YES.

10:15AM  13   Q.   AND IT READS, "WE HAVE SUCCESSFULLY DEVELOPED AN

10:15AM  14   IMMUNOASSAY TO DETECT TOTAL PROSTATE-SPECIFIC ANTIGEN (PSA) IN

10:15AM  15   HUMAN SERUM AND PLASMA."

10:16AM  16        DO YOU SEE THAT?

10:16AM  17   A.   YES, I SEE THAT.

10:16AM  18   Q.   AND THE "WE" THERE YOU UNDERSTAND REFERS TO THE RESEARCH

10:16AM  19   AND DEVELOPMENT PART OF THERANOS?

10:16AM  20   A.   YES.

10:16AM  21   Q.   AND NOT THE CLIA VALIDATION GROUP?

10:16AM  22   A.   CORRECT.

10:16AM  23   Q.   AND SO TO DO THE CLIA VALIDATION OF THAT SAME ASSAY, THERE

10:16AM  24   WOULD HAVE TO BE THIS ADDITIONAL WORK THAT IS REQUIRED TO PUT

10:16AM  25   THIS ASSAY ONLINE IN THE CLINICAL LAB; IS THAT RIGHT?

10:16AM  1    A.   CORRECT.

10:16AM  2    Q.   AND THAT WOULD BE TRUE OF ANY OTHER ASSAY DEVELOPMENT

10:16AM  3    REPORT THAT EXISTED; RIGHT?

10:16AM  4    A.   YES.

10:16AM  5    Q.   AND THERE WERE A LOT OF ASSAY DEVELOPMENT REPORTS AT

10:16AM  6    THERANOS; RIGHT?

10:16AM  7    A.   YES.

10:16AM  8    Q.   THERE WERE -- WOULD IT SURPRISE YOU TO LEARN, MAYBE I

10:16AM  9    COULD SAVE MYSELF FROM LIFTING DOCUMENTS, BUT WOULD IT SURPRISE

10:16AM  10   YOU TO LEARN THAT IF WE PUT THEM IN BINDERS, THERE WOULD BE SIX

10:16AM  11   BINDERS OF ASSAY DEVELOPMENT REPORTS THAT THERANOS DEVELOPED?

10:16AM  12   A.   NO, IT WOULDN'T SURPRISE ME, NO.

10:16AM  13   Q.   OKAY.  THAT'S CONSISTENT WITH YOUR MEMORY OF BEING AT

10:17AM  14   THERANOS THAT THERE WAS A LOT OF THAT WORK DONE?

10:17AM  15   A.   YES.

10:17AM  16   Q.   OKAY.  THERE'S ANOTHER EXHIBIT, BUT I THINK YOU CAN SEE IT

10:17AM  17   ON YOUR SCREEN.  IT'S EXHIBIT 1305.

10:17AM  18   A.   OH, NOTHING IS SHOWING UP ON MY SCREEN.

10:17AM  19   Q.   OKAY.  LET'S SEE IF WE CAN GET THAT UP THERE.

10:17AM  20   A.   OH, THERE IT IS.

10:17AM  21   Q.   OKAY.  AND DO YOU SEE EXHIBIT 1305 IS AN EMAIL STRING WITH

10:17AM  22   A NUMBER OF PEOPLE ON IT?

10:17AM  23        AND THEN IF YOU LOOK AT THE SECOND EMAIL ON THE FIRST

10:17AM  24   PAGE, YOU SEE THAT THERE'S AN EMAIL FROM A PRANAV PATEL.

10:18AM  25        DO YOU SEE THAT?

10:18AM 1    A.   YES.

10:18AM 2    Q.   AND IT'S TO A GROUP OF PEOPLE INCLUDING MR. BALWANI,

10:18AM 3    DR. YOUNG, DR. ANEKAL, AND YOURSELF.

10:18AM 4         DO YOU SEE THAT?

10:18AM 5    A.   YES.

10:18AM 6    Q.   AND IT RELATES TO, IN TERMS OF THE SUBJECT, TNAA UPDATE

10:18AM 7    AND VALIDATION PLANS?

10:18AM 8    A.   YES.

10:18AM 9    Q.   AND TNAA, DOES THAT REFER TO THERANOS NUCLEIC ACID

10:18AM 10   AMPLIFICATION?

10:18AM 11   A.   YES.

10:18AM 12   Q.   AND THAT'S A MOLECULAR TEST THAT THERANOS, YOU UNDERSTAND,

10:18AM 13   WAS DEVELOPING AT ONE POINT?

10:18AM 14   A.   YES, YOU'VE DONE YOUR HOMEWORK.

10:18AM 15   Q.   OKAY.  THANK YOU, DR. ROSENDORFF.

10:18AM 16   A.   SURE.

10:18AM 17   Q.   AND THEN IF YOU GO TO THE EMAIL, IT ACTUALLY TALKS ABOUT

10:18AM 18   SOME ASSAY DEVELOPMENT ISSUES; IS THAT RIGHT?

10:18AM 19   A.   YES.

10:18AM 20   Q.   AND YOU RECEIVED THIS EMAIL AT THE TIME THAT YOU WORKED AT

10:18AM 21   THERANOS?

10:18AM 22   A.   YES.

10:18AM 23        MR. COOPERSMITH:  YOUR HONOR, WE OFFER 1305.

10:18AM 24        MR. BOSTIC:  NO OBJECTION.

10:18AM 25        THE COURT:  IS THIS IN THE BINDERS?

| | | |
|---|---|---|
| 10:18AM | 1 | MR. COOPERSMITH:  YOU KNOW, I THINK WE MIGHT HAVE A |
| 10:18AM | 2 | HANDOUT, YOUR HONOR, NOW THAT I THINK OF IT. |
| 10:19AM | 3 | MAY I APPROACH? |
| 10:19AM | 4 | THE COURT:  YES.  THANK YOU. |
| 10:19AM | 5 | MR. COOPERSMITH:  (HANDING.) |
| 10:19AM | 6 | THE COURT:  OKAY. |
| 10:19AM | 7 | MR. COOPERSMITH: |
| 10:19AM | 8 | Q.  OKAY.  LOOKING AT -- |
| 10:19AM | 9 | THE COURT:  I HAVEN'T ADMITTED IT.  PARDON ME. |
| 10:19AM | 10 | YOU'RE AHEAD OF ME. |
| 10:19AM | 11 | IT'S ADMITTED, AND IT MAY BE PUBLISHED. |
| 10:19AM | 12 | MR. COOPERSMITH:  THANK YOU. |
| 10:19AM | 13 | (GOVERNMENT'S EXHIBIT 1305 WAS RECEIVED IN EVIDENCE.) |
| 10:19AM | 14 | BY MR. COOPERSMITH: |
| 10:19AM | 15 | Q.  SO WE'RE LOOKING AT THE SECOND EMAIL ON THE FIRST PAGE. |
| 10:19AM | 16 | IF WE CAN ZOOM IN ON THAT EMAIL. |
| 10:19AM | 17 | A.  YES. |
| 10:19AM | 18 | Q.  AND DO YOU REMEMBER PRANAV PATEL? |
| 10:19AM | 19 | A.  I DO REMEMBER HIM. |
| 10:19AM | 20 | Q.  ANOTHER RESEARCH AND DEVELOPMENT SCIENTIST WHO WORKED AT |
| 10:19AM | 21 | THERANOS? |
| 10:19AM | 22 | A.  YES. |
| 10:19AM | 23 | Q.  AND WE TALKED ABOUT THESE OTHER PEOPLE, BUT |
| 10:20AM | 24 | SAMARTHA ANEKAL, DO YOU RECALL HIM? |
| 10:20AM | 25 | A.  YES. |

10:20AM   1    Q.   AND HE'S ANOTHER SCIENTIST WHO WORKED AT THERANOS?

10:20AM   2    A.   I HONESTLY DON'T KNOW WHAT HIS PORTFOLIO OR ROLE WAS TO BE

10:20AM   3    HONEST.

10:20AM   4    Q.   WAS HE INVOLVED IN MANUFACTURING?

10:20AM   5    A.   I JUST DON'T KNOW.

10:20AM   6    Q.   OKAY.  BUT YOU DO REMEMBER THE NAME?

10:20AM   7    A.   YEAH, I REMEMBER IT.

10:20AM   8    Q.   OKAY.  AND IN THE SECOND EMAIL DR. PATEL WRITES, "HI,

10:20AM   9         "BRIEF UPDATE TOWARDS JANUARY 31ST GOAL (DETAILED IN

10:20AM  10    ATTACHED SPREADSHEET)."

10:20AM  11         AND THEN, "ASSAYS DEVELOPMENT 76 ASSAYS ARE COMPLETE AND

10:20AM  12    16 IN PROGRESS.  5 OF THE (60 IN PROGRESS ARE 90 PERCENT

10:20AM  13    COMPLETE."

10:20AM  14         DO YOU SEE THAT?

10:20AM  15    A.   YES.

10:20AM  16    Q.   AND THEN IT SAYS, "ASSAY VALIDATION" -- AND JUST TO PAUSE

10:20AM  17    THERE FOR A MINUTE.  YOU UNDERSTAND THAT'S RESEARCH AND

10:20AM  18    DEVELOPMENT?

10:20AM  19    A.   ASSAYS DEV, YES.

10:20AM  20    Q.   YES.  THE SECOND BULLET DR. ROSENDORFF SAYS, "ASSAY

10:20AM  21    VALIDATION (WITHOUT CLINICAL SAMPLES:  20 ASSAYS VALIDATED WITH

10:21AM  22    FURTHER 33 IN PROGRESS."

10:21AM  23    A.   YES.

10:21AM  24    Q.   AND THEN, "LDT VALIDATION" IT SAYS, "13 ASSAYS LDT

10:21AM  25    VALIDATED WITH FURTHER 4 -- 90 PERCENT DONE."

10:21AM 1          DO YOU SEE THAT?

10:21AM 2     A.   YES.

10:21AM 3     Q.   AND THEN, "WE EXPECT THEM TO BE FINISHED BY END OF NEXT

10:21AM 4     WEEK WITH FINAL REPORTS."

10:21AM 5          DO YOU SEE THAT?

10:21AM 6     A.   YES.

10:21AM 7     Q.   AND THEN IT SAYS, "FOLLOWING ASSAYS ARE LDT VALIDATED AS

10:21AM 8     OF TODAY."

10:21AM 9          AND THEN IT HAS A LIST OF ASSAYS GOING ON TO THE NEXT

10:21AM 10    PAGE.

10:21AM 11         DO YOU SEE THAT?

10:21AM 12    A.   YES.

10:21AM 13    Q.   AND THIS WAS ALL WORK THAT WAS BEING DONE AT THERANOS TO

10:21AM 14    TRY TO MOVE TOWARDS VALIDATION OF THESE LABS THAT COULD

10:21AM 15    EVENTUALLY BE USED; RIGHT?

10:21AM 16    A.   I'M SORRY, COULD YOU --

10:21AM 17    Q.   OF COURSE.  YOU UNDERSTAND THIS WAS ALL WORK AT THERANOS

10:21AM 18    TO VALIDATE THESE -- YOU KNOW WHAT, I'M GOING TO WITHDRAW THE

10:21AM 19    QUESTION.  I'M NOT EVEN GOING TO ATTEMPT IT.

10:21AM 20         THE COURT:  MR. COOPERSMITH, MAYBE THE DECAF.

10:22AM 21         MR. COOPERSMITH:  YOU KNOW, THAT'S A GREAT

10:22AM 22    SUGGESTION, YOUR HONOR.  I WILL WORK ON THAT.

10:22AM 23         THE WITNESS:  THAT'S REALLY FUNNY.

10:22AM 24    (LAUGHTER.)

10:22AM 25         THE COURT:  WELL, IT'S ABOUT TIME, RIGHT?

10:22AM  1         GO AHEAD, MR. COOPERSMITH.

10:22AM  2             MR. COOPERSMITH:  RIGHT.  I HAD ONE MORE CUP OF

10:22AM  3   COFFEE THAN I PROBABLY SHOULD HAVE THIS MORNING.

10:22AM  4         OKAY.

10:22AM  5   Q.   SO, DR. ROSENDORFF, LET'S JUST MOVE TO THE ISSUE OF

10:22AM  6   VALIDATION IN THE CLINICAL LAB AS OPPOSED TO THE RESEARCH AND

10:22AM  7   DEVELOPMENT WORK.  OKAY?

10:22AM  8   A.   SURE.  YEAH.

10:22AM  9   Q.   AND THAT YOU UNDERSTAND THAT THERE HAD TO BE A DECISION

10:22AM 10   MADE BY SOMEONE AT THERANOS AS TO WHICH ASSAYS WOULD BE

10:22AM 11   VALIDATED FROM ALL OF THE RESEARCH AND DEVELOPMENT WORK THAT

10:22AM 12   WAS DONE, SOMEONE HAD TO JUST MAKE A DECISION WHICH ONES ARE WE

10:22AM 13   GOING TO ACTUALLY MOVE TO VALIDATE IN THE CLIA LAB; RIGHT?

10:22AM 14   A.   YEAH, FOR SURE.

10:22AM 15   Q.   AND THERE WAS -- THE DECISION WAS AT LEAST IN PART A

10:23AM 16   BUSINESS DECISION?

10:23AM 17   A.   CORRECT.

10:23AM 18   Q.   AND IN PART IT WAS ALSO A DECISION ABOUT WHICH ASSAYS WERE

10:23AM 19   READY FOR THAT PROCESS; RIGHT?

10:23AM 20   A.   CORRECT, CORRECT.

10:23AM 21   Q.   AND IN THAT REGARD, YOU UNDERSTAND THAT THE GOAL THAT

10:23AM 22   THERANOS HAD AT THE TIME OF THE WALGREENS LAUNCH FOR BLOOD

10:23AM 23   TESTING WAS TO TRY TO VALIDATE ASSAYS THAT WOULD BE AMONG THE

10:23AM 24   MOST COMMONLY ORDERED TESTS?

10:23AM 25             MR. BOSTIC:  FOUNDATION.  SPECULATION.

10:23AM   1           THE COURT:  YOU'RE ASKING IF THAT'S HIS PERSONAL

10:23AM   2    KNOWLEDGE?

10:23AM   3           MR. COOPERSMITH:  YES, YOUR HONOR.  YES.

10:23AM   4           THE COURT:  YES.  YOU CAN ANSWER THE QUESTION,

10:23AM   5    WITHIN YOUR PERSONAL KNOWLEDGE.

10:23AM   6           THE WITNESS:  I DO RECALL AN EFFORT EARLY IN 2013

10:23AM   7    TO -- THAT BASICALLY SAID THAT ELIZABETH AND SUNNY'S GOAL WAS

10:23AM   8    THAT THERANOS WOULD BE ABLE TO RUN 99 PERCENT OF LABORATORY

10:23AM   9    TESTS OFFERED.  SO THAT'S MY RECOLLECTION.

10:24AM  10        I'LL JUST STOP THERE.

10:24AM  11    BY MR. COOPERSMITH:

10:24AM  12    Q.   OKAY.  AND, DR. ROSENDORFF, YOU UNDERSTAND THAT OF ALL OF

10:24AM  13    THE ASSAYS THAT A LAB COULD POTENTIALLY RUN, THAT THERE ARE

10:24AM  14    SOME THAT ARE VERY COMMON?

10:24AM  15    A.   YES.

10:24AM  16    Q.   THAT DOCTORS ORDER ALL OF THE TIME?

10:24AM  17    A.   YES.

10:24AM  18    Q.   AND THEN THERE ARE OTHER ASSAYS THAT ARE, YOU KNOW, MORE

10:24AM  19    OBSCURE; RIGHT?

10:24AM  20    A.   YES.

10:24AM  21    Q.   AND IT'S MORE RARE THAT A DOCTOR WOULD ORDER THAT

10:24AM  22    PARTICULAR TEST; RIGHT?

10:24AM  23    A.   YES.

10:24AM  24    Q.   SO IF A LABORATORY WERE TO DEVELOP AN ASSAY THAT WAS ONE

10:24AM  25    OF THOSE MORE RARE ONES, IT MIGHT DO A LOT OF WORK IN

10:24AM 1    DEVELOPING AN ASSAY, BUT AS IT TURNS OUT THEY WOULDN'T GET MANY

10:24AM 2    ORDERS FOR IT; RIGHT?

10:24AM 3    A.   YES.

10:24AM 4    Q.   BUT THERE ARE OTHERS WHERE IT'S -- I THINK YOU SAID THE

10:24AM 5    OTHER DAY IN YOUR TESTIMONY LIKE BREAD AND BUTTER TYPE ASSAYS;

10:24AM 6    RIGHT?

10:24AM 7    A.   YES.

10:24AM 8    Q.   OKAY.  AND YOU UNDERSTAND OR DO YOU UNDERSTAND THAT AT

10:24AM 9    THERANOS THERE WAS AT LEAST A GOAL TO TRY TO PUT ONLINE IN THE

10:24AM 10   CLIA LAB THE FINGERSTICK ASSAYS THAT WERE MOST COMMONLY

10:24AM 11   ORDERED?

10:24AM 12   A.   YES, THAT WAS THE INITIAL PLAN, YES.

10:24AM 13   Q.   OKAY.  AND YOU UNDERSTAND THAT ONE OF THE FACTORS THAT

10:25AM 14   ACTUALLY WENT INTO WHICH ASSAYS TO ACTUALLY BRING ONLINE;

10:25AM 15   RIGHT?

10:25AM 16   A.   YES.

10:25AM 17   Q.   OKAY.  NOW, ONCE YOU GET TO THE CLIA VALIDATION PROCESS,

10:25AM 18   NOW THE LAB DIRECTOR HAS TO BE SATISFIED THAT THE CRITERIA ARE

10:25AM 19   MET TO ACTUALLY USE THE ASSAY FOR PATIENT TESTING; RIGHT?

10:25AM 20   A.   YES.

10:25AM 21   Q.   AND IN ORDER TO MAKE SURE THAT IS PERFORMED AND

10:25AM 22   DOCUMENTED, THERE'S A VALIDATION REPORT THAT IS PREPARED FOR

10:25AM 23   THAT PURPOSE?

10:25AM 24   A.   YES.

10:25AM 25   Q.   AND THE VALIDATION REPORTS ARE SOMETHING THAT THE

10:25AM   1    LABORATORY DIRECTOR HAS TO SIGN OFF ON?

10:25AM   2    A.   CORRECT.

10:25AM   3    Q.   AND YOU, AS LABORATORY DIRECTOR, WOULD HAVE TO SIGN OFF ON

10:25AM   4    THOSE VALIDATION REPORTS; CORRECT?

10:25AM   5    A.   YES.

10:25AM   6    Q.   AND ULTIMATELY YOU SIGNED QUITE A FEW OF THOSE VALIDATION

10:25AM   7    REPORTS?

10:25AM   8    A.   YES.

10:25AM   9    Q.   AND I'D LIKE TO SHOW YOU A BINDER -- I THINK I MAY HAVE TO

10:26AM  10    HAND IT UP.

10:26AM  11             MR. COOPERSMITH:  YOUR HONOR, MAY I APPROACH?

10:26AM  12             THE COURT:  YES.

10:26AM  13             MR. COOPERSMITH:  THANK YOU.  (HANDING.)

10:27AM  14    Q.   OKAY.  DR. ROSENDORFF, I'VE HANDED YOU A BINDER, AND THE

10:27AM  15    BINDER HAS SIGNED VALIDATION REPORTS.

10:27AM  16         YOUR HONOR, WE MOVE TO ADMIT ALL OF THESE ASSAY

10:27AM  17    DEVELOPMENT -- I'M SORRY, CLIA VALIDATION REPORTS SIGNED BY

10:27AM  18    DR. ROSENDORFF PURSUANT TO THE STIPULATION OF THE PARTIES.

10:27AM  19             MR. BOSTIC:  YOUR HONOR, WE HAVE STIPULATED.  I

10:27AM  20    WONDER IF THE EXHIBIT NUMBERS SHOULD BE READ OUT FOR THE

10:27AM  21    RECORD?

10:27AM  22             MR. COOPERSMITH:  AND I BELIEVE WE HAVE A WRITTEN

10:27AM  23    STIPULATION THAT WE CAN USE FOR THAT.

10:27AM  24         WITH YOUR PERMISSION, YOUR HONOR, I'LL READ THE NUMBERS,

10:27AM  25    AND THEN I CAN HAND UP THE STIPULATION AS WELL.

10:27AM  1               THE COURT:  SURE.  THAT'S FINE.

10:27AM  2               MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

10:27AM  3               THE COURT:  SO, LADIES AND GENTLEMEN, AS I TOLD YOU

10:27AM  4      EARLIER THIS MORNING, THE PARTIES HAVE MET AND CONFERRED AND

10:27AM  5      AGREED, AGREED UPON -- IT SOUNDS LIKE THEY HAVE AGREED UPON

10:27AM  6      CERTAIN DOCUMENTS, AND THEY HAVE STIPULATED TO THE ADMISSION OF

10:27AM  7      THESE DOCUMENTS.

10:28AM  8           MR. COOPERSMITH IS GOING TO READ THE STIPULATION THAT

10:28AM  9      IDENTIFIED EACH OF THE DOCUMENTS FOR US NOW, MR. COOPERSMITH?

10:28AM 10               MR. COOPERSMITH:  YES, YOUR HONOR.

10:28AM 11               THE COURT:  ALL RIGHT.  THANK YOU.  SO PLEASE DO PAY

10:28AM 12      ATTENTION AS THIS STIPULATION IS READ.

10:28AM 13           MR. COOPERSMITH.

10:28AM 14               MR. COOPERSMITH:  YES, YOUR HONOR.

10:28AM 15           THE PARTIES STIPULATE AND AGREE TO THE ADMISSION OF THE

10:28AM 16      FOLLOWING EXHIBITS INTO EVIDENCE:  9004, 9007, 9013, 9016,

10:28AM 17      9020, 9026, 9031, 9042, 9046, 9048, 9052, 9057, 9082, 9086,

10:28AM 18      9098, 9099, 9102, 9105, 9111, 9113, 9123, 9126, 9129, 9137,

10:29AM 19      9158, 9162, 9166, 9167, 9196, 9201, 9204, 9243, 9245, 9252,

10:29AM 20      9260, 9264, 9268, 9276, 9279, 9284, 9315, 9319, 9323, 9326,

10:29AM 21      9341, 9352, 9368, 9372, 9375, 9378, 9381, 9382, 9384, 9387,

10:30AM 22      9393, 9409, AND 9412.

10:30AM 23               THE COURT:  DO YOU AGREE WITH THAT, MR. BOSTIC?

10:30AM 24               MR. BOSTIC:  YES, YOUR HONOR, THE GOVERNMENT

10:30AM 25      STIPULATES TO THE ADMISSION OF THOSE DOCUMENTS.

10:30AM 1          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, AS I

10:30AM 2    MENTIONED EARLIER THIS MORNING AS TO ANOTHER DOCUMENT, THE

10:30AM 3    PARTIES HAVE AGREED TO THESE FACTS THAT HAVE BEEN READ TO YOU

10:30AM 4    BY MR. COOPERSMITH.

10:30AM 5        THE COURT WILL ADMIT THOSE EXHIBITS, AND THOSE FACTS ARE

10:30AM 6    NOW CONCLUSIVELY ESTABLISHED FOR YOU.  THANK YOU.

10:30AM 7        (DEFENDANT'S EXHIBITS 9004, 9007, 9013, 9016, 9020, 9026,

10:28AM 8    9031, 9042, 9046, 9048, 9052, 9057, 9082, 9086, 9098, 9099,

10:28AM 9    9102, 9105, 9111, 9113, 9123, 9126, 9129, 9137, 9158, 9162,

10:29AM 10   9166, 9167, 9196, 9201, 9204, 9243, 9245, 9252, 9260, 9264,

10:29AM 11   9268, 9276, 9279, 9284, 9315, 9319, 9323, 9326, 9341, 9352,

10:29AM 12   9368, 9372, 9375, 9378, 9381, 9382, 9384, 9387, 9393, 9409, AND

10:30AM 13   9412 WERE RECEIVED IN EVIDENCE.)

10:31AM 14          MR. COOPERSMITH:  YES, YOUR HONOR.  WE HAVE A SIGNED

10:31AM 15   VERSION OF IT, AND WE WILL FILE IT IN THE RECORD ONCE WE HAVE A

10:31AM 16   CHANCE TO DO SO.

10:31AM 17          THE COURT:  THAT'S FINE.  THANK YOU.

10:31AM 18          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

10:31AM 19   Q.   OKAY.  DR. ROSENDORFF, I'VE HANDED YOU A BINDER, AND I'M

10:31AM 20   NOT GOING TO GO THROUGH EVERY ONE OF THESE, BUT IF YOU WANT TO

10:31AM 21   JUST FAMILIARIZE YOURSELF WITH IT.

10:31AM 22       THESE ARE THE ASSAY DEVELOPMENT -- I'M SORRY, ASSAY CLIA

10:31AM 23   VALIDATION REPORTS THAT YOU SIGNED WHILE YOU WERE THE LAB

10:31AM 24   DIRECTOR AT THERANOS?

10:31AM 25   A.   YES.

10:31AM  1    Q.   OKAY.  AND THESE ARE VALIDATION REPORTS FOR BOTH THE

10:31AM  2    EDISON DEVICES AND THE MODIFIED PREDICATE DEVICES; CORRECT?

10:31AM  3    A.   YES.

10:31AM  4    Q.   AND JUST TO STEP BACK FOR A MINUTE, WHEN A LABORATORY

10:31AM  5    PURCHASES AND RUNS FDA PREDICATE APPROVED EQUIPMENT UNMODIFIED,

10:31AM  6    YOU DON'T HAVE TO DO THE VALIDATION REPORTS; RIGHT?

10:32AM  7    A.   YOU DO WHAT IS CALLED A VERIFICATION.  IT'S AN ABRIDGED --

10:32AM  8    YOU RUN SAMPLES TO MAKE SURE THAT THE METHOD IS PERFORMING

10:32AM  9    CORRECTLY, BUT IT'S NOT AS INVOLVED AS A VALIDATION.

10:32AM  10   Q.   RIGHT.

10:32AM  11   A.   YEAH.

10:32AM  12   Q.   BUT FOR THOSE UNMODIFIED PREDICATE MACHINES, THERE'S STILL

10:32AM  13   SOME REQUIREMENT THAT YOU RUN TESTS TO MAKE SURE THAT THE

10:32AM  14   MACHINE IS OPERATING AS DESIGNED IN THE LABORATORY; RIGHT?

10:32AM  15   A.   YES.

10:32AM  16   Q.   BUT FOR THE LABORATORY DEVELOPED TESTS, THE LDT'S, THERE

10:32AM  17   HAS TO BE A MORE EXTENSIVE VALIDATION PROCESS?

10:32AM  18   A.   YES, YES.

10:32AM  19   Q.   AND THAT VALIDATION PROCESS IS ACTUALLY REQUIRED BY

10:32AM  20   REGULATION?

10:32AM  21   A.   YES, IT IS.

10:32AM  22   Q.   AND THAT'S THE WORK THAT IS REPRESENTED BY THE REPORTS

10:32AM  23   THAT I'VE JUST HANDED YOU IN THAT BINDER?

10:32AM  24   A.   YES, THAT'S CORRECT.

10:32AM  25   Q.   OKAY.  LET'S JUST LOOK AT A FEW OF THEM JUST TO ORIENT

10:33AM  1      OURSELVES.

10:33AM  2          SO, FOR EXAMPLE, IF YOU LOOK AT EXHIBIT 9412.  AND THEY

10:33AM  3      SHOULD BE IN ORDER.

10:33AM  4          AND YOU CAN SEE IT ON THE SCREEN AS WELL?

10:33AM  5      A.   YES.

10:33AM  6      Q.   9412 IS THE ASSAY VALIDATION REPORT ON EDISON 3.X THERANOS

10:33AM  7      SYSTEMS SPECIFICALLY FOR VITAMIN D.

10:33AM  8          DO YOU SEE THAT?

10:33AM  9      A.   YES.

10:33AM  10     Q.   AND THAT WAS SIGNED BY YOU ON SEPTEMBER 30TH OF 2013; IS

10:33AM  11     THAT CORRECT?

10:33AM  12     A.   YES.

10:33AM  13     Q.   AND THEN IF YOU GO TO ANOTHER ONE, EXHIBIT 9196, THIS IS

10:34AM  14     THE VALIDATION REPORT YOU SIGNED FOR THE ASSAY HCG?

10:34AM  15     A.   YES.

10:34AM  16     Q.   AND I THINK YOU DESCRIBED IT ON DIRECT WITH MR. BOSTIC,

10:34AM  17     BUT THAT IS AN ASSAY THAT IS USED TO TEST TO SEE IF A WOMAN IS

10:34AM  18     PREGNANT?

10:34AM  19     A.   YES.

10:34AM  20     Q.   AND YOU SIGNED THAT ON MARCH 9TH, 2014; IS THAT CORRECT?

10:34AM  21     A.   YES.

10:34AM  22     Q.   AND THEN IF YOU GO TO EXHIBIT 9409.  THAT'S THE

10:34AM  23     VITAMIN B12 ASSAY VALIDATION REPORT; RIGHT?

10:35AM  24     A.   YES.

10:35AM  25     Q.   AND THEN YOU SIGNED THAT DOCUMENT ON AUGUST 5TH, 2014?

10:35AM  1     A.   YES.

10:35AM  2     Q.   OKAY.  AND THEN LET'S GO TO ONE MORE.  9155.

10:35AM  3          THIS IS THE ASSAY VALIDATION REPORT -- I'M SORRY?

10:35AM  4          MR. BOSTIC:  APOLOGIES.  THAT ONE IS NOT IN

10:35AM  5     EVIDENCE.

10:35AM  6          MR. COOPERSMITH:  OKAY.  LET'S NOT GO TO 9155 IN

10:35AM  7     THAT CASE.

10:35AM  8          LET'S GO TO 9158.

10:35AM  9     Q.   9158 IS THE ELISA ASSAY VALIDATION REPORT FOR ESTRADIOL ON

10:35AM 10     THE EDISON 3.5.

10:35AM 11          DO YOU SEE THAT?

10:35AM 12     A.   YES.

10:35AM 13     Q.   AND YOU SIGNED THAT ON SEPTEMBER 18TH, 2014?

10:35AM 14     A.   YES.

10:35AM 15     Q.   AND IN ORDER FOR AN ASSAY TO BE RUN IN THE LAB, I THINK WE

10:35AM 16     DISCUSSED THIS, YOUR SIGNATURE IS NECESSARY ON THE DOCUMENT; IS

10:35AM 17     THAT RIGHT?

10:35AM 18     A.   YES.

10:35AM 19     Q.   NOW, WHEN YOU SIGNED THESE VALIDATION REPORTS, IT WAS ALSO

10:36AM 20     NECESSARY FOR YOU TO REVIEW THE DATA THAT WAS PREPARED FOR THE

10:36AM 21     PURPOSE OF VALIDATION?

10:36AM 22     A.   YES.

10:36AM 23     Q.   AND THAT DATA WOULD INCLUDE TESTS TO DETERMINE WHETHER THE

10:36AM 24     DEVICE WAS ACCURATE, THE ASSAY WAS ACCURATE?

10:36AM 25     A.   YES.

10:36AM  1    Q.   AND WHETHER IT WAS PRECISE?

10:36AM  2    A.   YES.

10:36AM  3    Q.   AND WHETHER THERE WAS APPROPRIATE SENSITIVITY?

10:36AM  4    A.   YES.

10:36AM  5    Q.   AND IS SENSITIVITY WHERE YOU'RE TRYING TO MAKE SURE THAT

10:36AM  6    THE ASSAY DETECTING THE PARTICULAR ANALYTE THAT YOU'RE

10:36AM  7    INTERESTED IS NOT SOME OTHER ANALYTE?

10:36AM  8    A.   YEAH.  I MEAN, I DON'T WANT TO GET TOO TECHNICAL, BUT

10:36AM  9    SENSITIVITY IS UNDERSTOOD IN TWO DIFFERENT WAYS.

10:36AM  10       FOR A QUANTITATIVE ASSAY, SENSITIVITY CAN ALSO REFER TO

10:36AM  11   HOW LOW YOU CAN GO.

10:36AM  12       AND THEN THERE'S A LABORATORY CONCEPT OF SENSITIVITY,

10:36AM  13   WHICH IS IF YOU TAKE 100 PEOPLE WITH DISEASE, AND YOU DO THE

10:37AM  14   TEST, HOW MANY OF THOSE TESTS WILL COME UP POSITIVE.

10:37AM  15   Q.   OKAY.  AND THERE'S ANOTHER ASPECT THAT HAS TO BE TESTED

10:37AM  16   CALLED SPECIFICITY; IS THAT RIGHT?

10:37AM  17   A.   CORRECT, CORRECT.

10:37AM  18   Q.   AND SPECIFICITY MAY BE THE ONE I WAS THINKING OF.  THAT'S

10:37AM  19   WHERE YOU'RE TRYING TO MAKE SURE THAT THE TESTS DETECT THE

10:37AM  20   ANALYTE YOU'RE INTERESTED IN AND NOT SOMETHING ELSE; RIGHT?

10:37AM  21   A.   YEAH.  AGAIN, SPECIFICITY IS UNDERSTOOD IN SOME CONTEXTS

10:37AM  22   TO MEAN INTERFERING SUBSTANCES, WHICH MEANS YOU'RE PICKING UP

10:37AM  23   WHAT YOU THINK YOU ARE, BUT IT'S FORMALLY DEFINED AS IF YOU

10:37AM  24   HAVE 100 PEOPLE WHO DON'T HAVE A DISEASE, HOW MANY OF THOSE ARE

10:37AM  25   NEGATIVE.

10:37AM  1    Q.   OKAY.  BUT IN ANY EVENT, THESE DIFFERENT ATTRIBUTES HAVE

10:37AM  2    TO BE PART OF THE WORK GOING INTO CLIA VALIDATION; RIGHT?

10:37AM  3    A.   YES.

10:37AM  4    Q.   AND YOU HAVE TO BE SATISFIED THAT ALL OF THOSE ARE MET TO

10:37AM  5    PUT YOUR SIGNATURE ON THE DOCUMENT?

10:37AM  6    A.   YES.

10:37AM  7    Q.   AND THAT IN THE CASE OF THERANOS, YOU SIGNED THE

10:38AM  8    VALIDATION REPORTS BECAUSE YOU THOUGHT THEY WERE VALID; RIGHT?

10:38AM  9    A.   I SIGNED THEM TRUSTING THAT THE DATA THAT WAS BEING SHOWN

10:38AM  10   TO ME WAS TRUTHFUL.

10:38AM  11   Q.   AND THE DATA WAS BEING PREPARED BY RESEARCH AND

10:38AM  12   DEVELOPMENT SCIENTISTS AT THERANOS?

10:38AM  13   A.   CORRECT.

10:38AM  14   Q.   AND YOU HAVE NO EVIDENCE OR REASON TO THINK THAT THE DATA

10:38AM  15   THAT THEY WERE PRESENTING TO YOU WAS NOT TRUTHFUL?

10:38AM  16   A.   I DIDN'T AT THE TIME.  I DO NOW.

10:38AM  17   Q.   OKAY.  BUT AT THE TIME --

10:38AM  18   A.   I TRUSTED IT AT THE TIME, YEAH.

10:38AM  19   Q.   OKAY.  AND YOU TRUSTED IT AT THE TIME.  BUT YOU DIDN'T

10:38AM  20   BELIEVE THAT THE PEOPLE WHO WERE PROVIDING THE DATA WERE

10:38AM  21   SOMEHOW DISHONEST OR GIVING YOU DATA THAT WAS FALSE, DID YOU?

10:38AM  22   A.   NO.  I OPERATED ON THE BASIS OF TRUST.

10:38AM  23   Q.   BECAUSE THEY WERE LIKE FELLOW SCIENTISTS WHO WORKED IN THE

10:38AM  24   RESEARCH AND DEVELOPMENT LAB; RIGHT?

10:38AM  25   A.   EXACTLY.

10:38AM  1    Q.   SUNNY BALWANI DIDN'T GIVE YOU THE DATA FOR THE ASSAY

10:38AM  2    DEVELOPMENT REPORTS?

10:39AM  3    A.   OF COURSE NOT.

10:39AM  4    Q.   AND YOU SIGNED THEM BECAUSE, AGAIN, YOU THOUGHT THEY WERE

10:39AM  5    VALID?

10:39AM  6    A.   YES.

10:39AM  7    Q.   AND YOU SIGNED THEM -- YOU DIDN'T SIGN THEM BECAUSE OF

10:39AM  8    SOME PRESSURE THAT WAS PUT ON YOU, DID YOU?

10:39AM  9    A.   THERE WAS AN IMMENSE AMOUNT OF PRESSURE TO GET VALIDATIONS

10:39AM  10   DONE, AND I DIDN'T HAVE AS MUCH TIME AS I WOULD HAVE LIKED TO

10:39AM  11   READ THEM OVER AND APPROVE THEM AND REVIEW THE DATA.

10:39AM  12   Q.   SO THE PRESSURE CAME FROM THE FACT THAT THE COMPANY WAS

10:39AM  13   PLANNING TO LAUNCH WITH THE WALGREENS STORES; CORRECT?

10:39AM  14   A.   YES.

10:39AM  15   Q.   AND THAT YOU UNDERSTOOD MANAGEMENT WAS VERY EAGER TO GET

10:39AM  16   THAT PROGRAM GOING; RIGHT?

10:39AM  17   A.   YES.

10:39AM  18   Q.   AND ONE OF THE THINGS THAT WERE NECESSARY TO DO THAT WOULD

10:39AM  19   BE ASSAY VALIDATION; RIGHT?

10:39AM  20   A.   YES.

10:39AM  21   Q.   BUT IN ANY EVENT, YOU SIGNED THEM BECAUSE THEY WERE VALID,

10:39AM  22   NOT BECAUSE OF ANY PRESSURE THAT WAS PUT ON YOU; CORRECT?

10:39AM  23   A.   CORRECT.

10:39AM  24   Q.   OKAY.  LET'S JUST TALK ABOUT THE MODIFIED PREDICATE

10:40AM  25   DEVICES FOR A MINUTE.

10:40AM 1           THOSE WERE ALSO PART OF THE WORK THAT WAS DONE IN THE

10:40AM 2    RUN-UP TO THE WALGREENS LAUNCH; RIGHT?

10:40AM 3    A.   YES.

10:40AM 4    Q.   AND A MODIFIED PREDICATE DEVICE, AND I THINK YOU DESCRIBED

10:40AM 5    THIS EARLIER, IS AN FDA APPROVED DEVICE THAT THERANOS

10:40AM 6    PURCHASED; RIGHT?

10:40AM 7    A.   YES.

10:40AM 8    Q.   AND THEN HAD TO MAKE CERTAIN MODIFICATIONS TO ENABLE IT TO

10:40AM 9    RUN SMALL BLOOD SAMPLES; RIGHT?

10:40AM 10   A.   YES.

10:40AM 11   Q.   AND THAT WOULD INCLUDE SOME CHANGES TO THE SOFTWARE?

10:40AM 12   A.   YES.

10:40AM 13   Q.   AND THE HARDWARE?

10:40AM 14   A.   YES.

10:40AM 15   Q.   AND THERE WERE ALSO -- THERE WAS A NEED TO WORK OUT THE

10:40AM 16   DILUTION STEPS; RIGHT?

10:40AM 17   A.   YES.

10:40AM 18   Q.   AND DILUTION IS SIMPLY TAKING THE BLOOD SAMPLES AND ADDING

10:41AM 19   SOME OTHER LIQUID TO IT TO MAKE THE VOLUME LARGER; RIGHT?

10:41AM 20   A.   YOU TAKE THE BLOOD, YOU SPIN IT DOWN, YOU TAKE OUT THE

10:41AM 21   CLEAR PORTION, AND THEN YOU ADD EITHER SALINE OR WATER TO IT,

10:41AM 22   YEAH.

10:41AM 23   Q.   OKAY.  AND DILUTION IN THE LAB INDUSTRY IS NOT SOMETHING

10:41AM 24   THAT IS UNCOMMON; RIGHT?

10:41AM 25   A.   I COULD DESCRIBE THE CONTEXT WHERE IT'S CUSTOMARILY

10:41AM   1       PERFORMED.

10:41AM   2       Q.   I THINK I WILL ASK THE QUESTIONS OF YOU, DR. ROSENDORFF.

10:41AM   3       AND THE QUESTION I HAVE, IN FDA APPROVED DEVICES, THERE ARE

10:41AM   4       DILUTION STEPS THAT TAKE PLACE INSIDE OF THE EQUIPMENT?

10:41AM   5       A.   I, I -- I'M NOT ON THE EQUIPMENT DEVELOPMENT SIDE, SO I'M

10:41AM   6       NOT SURE I CAN COMMENT ON THAT.

10:41AM   7       Q.   LET ME SEE IF I CAN HELP YOU.  IF WE CAN TAKE A LOOK AT AN

10:41AM   8       EXHIBIT.

10:42AM   9            AND I THINK YOU CAN SEE IT ON THE SCREEN.

10:42AM   10           BUT LET'S NOT PUBLISH IT YET, MR. ALLEN.

10:42AM   11           AND DO YOU SEE THAT EXHIBIT 204 IS THE OPERATOR GUIDE FOR

10:42AM   12      THE ADVIA 1800 CHEMISTRY SYSTEM?

10:42AM   13      A.   YES.

10:42AM   14      Q.   AND THAT'S THE MANUFACTURER'S OPERATOR'S GUIDE DOCUMENT;

10:42AM   15      RIGHT?

10:42AM   16      A.   YES.

10:42AM   17      Q.   AND THERANOS HAD ADVIA 1800 MACHINES THAT IT USED; RIGHT?

10:42AM   18      A.   YES.

10:42AM   19      Q.   AND SO THIS WOULD BE NECESSARY TO HAVE IN POSSESSION AT

10:42AM   20      THERANOS TO RUN THAT EQUIPMENT; RIGHT?

10:42AM   21      A.   YES.

10:42AM   22      Q.   AND YOU'RE FAMILIAR WITH THE ADVIA 1800 OPERATOR'S GUIDE;

10:42AM   23      RIGHT?

10:42AM   24      A.   NO, NOT REALLY.

10:42AM   25      Q.   BUT YOU'VE SEEN IT BEFORE?

10:42AM  1     A.   I THINK SO.

10:42AM  2     Q.   OKAY.  BUT JUST ON THE SUBJECT OF DILUTION, IF YOU COULD

10:42AM  3     TURN TO PAGE 25.

10:43AM  4          AND YOU SEE IT HAS SOME DISCUSSION OF DILUTION THERE?

10:43AM  5     A.   OH, IT SAYS -- I'M JUST READING THE SECOND TO THE LAST

10:43AM  6     PARAGRAPH.

10:43AM  7     Q.   DR. ROSENDORFF, DON'T READ FROM THE DOCUMENT BECAUSE IT'S

10:43AM  8     NOT IN EVIDENCE YET.

10:43AM  9     A.   OH, I'M SORRY.  I APOLOGIZE.

10:43AM 10     Q.   THANK YOU.  AND WHAT I'M JUST POINTING YOU TO IS THAT

10:43AM 11     THERE ARE SECTIONS IN THE DOCUMENT ABOUT SAMPLE DILUTION.

10:43AM 12          DO YOU SEE THAT?

10:43AM 13     A.   YES.

10:43AM 14     Q.   OKAY.  AND THIS WAS A DOCUMENT THAT WAS PUT OUT BY THE

10:43AM 15     SIEMENS COMPANY; RIGHT?

10:43AM 16     A.   YES.

10:43AM 17     Q.   NOT THERANOS?

10:43AM 18     A.   CORRECT.

10:43AM 19     Q.   OKAY.  YOU CAN PUT THAT ASIDE.

10:43AM 20          AND JUST TO TALK A LITTLE BIT MORE ABOUT MODIFIED

10:43AM 21     PREDICATES, IF YOU COULD TURN TO 9098, AND THAT'S ONE OF THE

10:43AM 22     EXHIBITS IN EVIDENCE FROM THE CLIA ASSAY BINDER THAT WE GAVE

10:44AM 23     YOU A FEW MINUTES AGO.

10:44AM 24     A.   UH-HUH.

10:44AM 25     Q.   AND THIS DOCUMENT HAS TO DO WITH THE ASSAY CALLED

10:44AM   1    CHLORIDE.

10:44AM   2         DO YOU SEE THAT?

10:44AM   3    A.   YES.

10:44AM   4    Q.   AND THAT'S ONE OF THE ISE ASSAYS; RIGHT?

10:44AM   5    A.   YES.

10:44AM   6    Q.   ALONG WITH SODIUM AND POTASSIUM?

10:44AM   7    A.   CORRECT.

10:44AM   8    Q.   AND THE DOCUMENT READS VALIDATION OF MODIFIED SIEMENS

10:44AM   9    CHLORIDE ASSAY.

10:44AM   10        DO YOU SEE THAT?

10:44AM   11   A.   YES.

10:44AM   12   Q.   AND SO FOR ONE OF THOSE ASSAYS TO BE PRODUCED AT THERANOS,

10:44AM   13   THAT SAME PROCESS OF ASSAY VALIDATION HAD TO BE USED; RIGHT?

10:44AM   14   A.   YES.

10:44AM   15   Q.   OKAY.  AND THAT'S YOUR SIGNATURE ON THE DOCUMENT IN THIS

10:44AM   16   CASE?

10:44AM   17   A.   YES.

10:44AM   18   Q.   OKAY.  AND I THINK ON YOUR DIRECT EXAMINATION YOU TALKED

10:44AM   19   ABOUT SOME ISSUES WITH THE PARTICULAR ASSAY CALLED POTASSIUM.

10:44AM   20        DO YOU REMEMBER THAT?

10:44AM   21   A.   YES.

10:44AM   22   Q.   OKAY.  AND WE'LL GET TO THAT LATER ON.

10:45AM   23        BUT FOR THE MOMENT, YOU BELIEVED, WHILE YOU WERE WORKING

10:45AM   24   AT THERANOS, THAT THE THERANOS PROTOCOLS RUNNING ON ADVIAS, THE

10:45AM   25   MODIFIED PREDICATES, WORKED REMARKABLY WELL, EXCEPT FOR

10:45AM  1    POTASSIUM; RIGHT?

10:45AM  2    A.   AT THE TIME OF VALIDATION I THOUGHT THEY WERE WORKING

10:45AM  3    WELL.

10:45AM  4         AS WE WENT INTO PRODUCTION, AND AS TIME WENT ON I KNEW

10:45AM  5    THEY WEREN'T.

10:45AM  6    Q.   BUT YOU BELIEVED, EVEN WHEN YOU LEFT THERANOS, THAT THE

10:45AM  7    MODIFIED PREDICATES WORKED REMARKABLY WELL, WITH THE EXCEPTION

10:45AM  8    OF THE POTASSIUM THAT WE'LL DISCUSS LATER?

10:45AM  9    A.   THAT'S NOT MY BELIEF, SIR, NO.

10:45AM  10   Q.   OKAY.  I'D LIKE YOU TO TURN TO EXHIBIT 28403.  I'M SORRY.

10:46AM  11   28324.

10:46AM  12        MR. BOSTIC:  COUNSEL, WHAT BINDER IS THAT IN?

10:46AM  13        MR. COOPERSMITH:  I'M TRYING TO DETERMINE THAT

10:46AM  14   MYSELF.

10:46AM  15        COULD WE SHOW 28324 ON THE SCREEN, WITHOUT PUBLISHING IT

10:46AM  16   OBVIOUSLY.

10:46AM  17        THE COURT:  VOLUME 3, I BELIEVE.

10:46AM  18        MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

10:47AM  19        (PAUSE IN PROCEEDINGS.)

10:47AM  20   BY MR. COOPERSMITH:

10:47AM  21   Q.   OKAY.  WELL, LOOKING AT IT ON THE SCREEN, IF YOU COULD

10:47AM  22   TURN TO PAGE 5, OR IT WILL BE TURNED FOR YOU ON THE SCREEN.

10:47AM  23        AND PRIOR TO YOUR TESTIMONY IN COURT, DR. ROSENDORFF, YOU

10:47AM  24   MET WITH THE GOVERNMENT ON MANY OCCASIONS?

10:47AM  25   A.   CORRECT.

10:47AM  1    Q.   AND YOU PROVIDED THEM INFORMATION ABOUT WHAT YOU RECALLED

10:47AM  2    ABOUT YOUR TIME AT THERANOS?

10:47AM  3    A.   CORRECT.

10:47AM  4    Q.   AND THOSE INTERVIEWS WERE ATTENDED BY FEDERAL AGENTS; IS

10:47AM  5    THAT RIGHT?

10:47AM  6    A.   CORRECT.

10:47AM  7    Q.   AND THEY WERE ATTENDED BY PROSECUTORS?

10:47AM  8    A.   CORRECT.

10:47AM  9    Q.   AND INCLUDING SOME OF THE PROSECUTORS WHO ARE SITTING AT

10:48AM  10   THE TABLE TODAY?

10:48AM  11   A.   SO I RECALL MR. LEACH WAS PRESENT DURING THE S.E.C.

10:48AM  12   INTERVIEW.

10:48AM  13   Q.   OKAY.  AND IF WE CAN TURN TO THE FIRST PAGE OF THE

10:48AM  14   DOCUMENT.

10:48AM  15        SOMETIMES THERE WERE OTHER AGENCIES INVOLVED WITH THE

10:48AM  16   INTERVIEWS, TOO?

10:48AM  17   A.   CORRECT.

10:48AM  18   Q.   AND THERE WAS A PARTICULAR INTERVIEW ON JUNE 7TH OF 2017?

10:48AM  19   A.   I DON'T INDEPENDENTLY RECALL THAT.  I'M JUST READING THE

10:48AM  20   DATE.

10:48AM  21   Q.   OKAY.  DO YOU HAVE ANY DOUBT THAT YOU HAD AN INTERVIEW ON

10:48AM  22   JUNE 7TH, 2017?

10:48AM  23   A.   NO, I HAVE NO REASON TO DOUBT IT.

10:48AM  24   Q.   OKAY.  AND THAT WAS AFTER YOU LEFT THERANOS?

10:48AM  25   A.   CORRECT.

10:48AM  1    Q.   AND IT WAS ABOUT FIVE YEARS AGO; RIGHT?

10:48AM  2    A.   YES.

10:48AM  3    Q.   AND AT THE TIME, YOU WERE PROVIDING INFORMATION ABOUT

10:48AM  4    THERANOS AND WHAT YOU RECALLED; IS THAT RIGHT?

10:48AM  5    A.   YES.

10:48AM  6    Q.   AND YOU KNEW THAT IT WAS IMPORTANT THAT YOU TOLD THE

10:48AM  7    TRUTH?

10:49AM  8    A.   YES.

10:49AM  9    Q.   AND YOU DID YOUR BEST TO TELL THE TRUTH?

10:49AM  10   A.   YES.

10:49AM  11   Q.   AND YOU KNEW THAT IF YOU DIDN'T TELL THE TRUTH, THERE

10:49AM  12   COULD BE CONSEQUENCES; RIGHT?

10:49AM  13   A.   YES.

10:49AM  14   Q.   BECAUSE YOU WERE TALKING TO FEDERAL AGENTS AND

10:49AM  15   PROSECUTORS?

10:49AM  16   A.   YES.

10:49AM  17   Q.   OKAY.  AND DURING THE INTERVIEW -- IF YOU FLIP TO PAGE 5,

10:49AM  18   MR. ALLEN -- YOU TOLD THE GOVERNMENT THAT YOU BELIEVED THE T

10:49AM  19   PROTOCOL AND FINGERSTICK DRAW WORKED REMARKABLY WELL FOR MOST

10:49AM  20   ANALYTES OTHER THAN POTASSIUM, YOU HAD NO OTHER CONCERNS ABOUT

10:49AM  21   THERANOS ASSAYS.

10:49AM  22        THAT'S WHAT YOU TOLD THE GOVERNMENT?

10:49AM  23   A.   I BELIEVE SO, YES.

10:49AM  24   Q.   OKAY.  DR. ROSENDORFF, LET'S JUST TALK ABOUT THERANOS

10:50AM  25   TECHNOLOGY IN GENERAL FOR A MINUTE?

ROSENDORFF CROSS BY MR. COOPERSMITH (RES.)

10:50AM  1      A.   SURE.

10:50AM  2      Q.   IF YOU COULD TURN TO -- OR IT WILL BE ON THE SCREEN, I

10:50AM  3      KEEP FORGETTING -- EXHIBIT 7462.

10:50AM  4           EXHIBIT 7462 DO YOU SEE IS AN EMAIL STRING BETWEEN YOU AND

10:50AM  5      MR. BALWANI BASED ON THE FEW TOP EMAILS?

10:50AM  6      A.   YES.

10:50AM  7      Q.   AND THEN THERE WERE OTHER PEOPLE WHO WORKED AT THERANOS

10:50AM  8      WHO WERE COPIED OR SENDERS ON THE OTHER EMAILS; RIGHT?

10:50AM  9      A.   YES.

10:50AM 10      Q.   AND IT'S DATED IN JULY, JULY 18TH AND 19TH, 2014?

10:50AM 11      A.   YES.

10:50AM 12      Q.   IS THAT RIGHT?

10:51AM 13           AND THIS IS A DOCUMENT THAT YOU SENT OR RECEIVED AS THE

10:51AM 14      EMAIL -- AS THE CASE MIGHT BE FOR PURPOSES OF CONDUCTING THE

10:51AM 15      BUSINESS AT THERANOS AT THE TIME?

10:51AM 16      A.   YES.

10:51AM 17      Q.   AND YOU USED EMAILS AT THERANOS FREQUENTLY TO COMMUNICATE

10:51AM 18      ISSUES AND THINGS THAT WERE GOING ON?

10:51AM 19      A.   YES.

10:51AM 20      Q.   AND YOU WERE REPORTING ON EVENTS THAT OCCURRED THAT YOU

10:51AM 21      LEARNED WHILE YOU WERE ON THE JOB; IS THAT RIGHT?

10:51AM 22      A.   YES.

10:51AM 23      Q.   AND YOU KNEW THAT IT WAS IMPORTANT TO BE ACCURATE WHEN YOU

10:51AM 24      COMMUNICATED THOSE THINGS SO THAT THE COMPANY WOULD BE ABLE TO

10:51AM 25      TAKE ACTION ACCORDINGLY?

10:51AM  1    A.   YES.

10:51AM  2    Q.   AND YOU KNEW THAT THERANOS HAD A SYSTEM TO STORE THESE

10:51AM  3    EMAILS SO THAT IF THERE WAS ANY NEED TO REFER BACK TO THEM,

10:51AM  4    THEY COULD DO THAT?

10:51AM  5    A.   YES.

10:51AM  6              MR. COOPERSMITH:  YOUR HONOR, WE OFFER 7462.

10:51AM  7              MR. BOSTIC:  NO OBJECTION.

10:51AM  8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:51AM  9         (DEFENDANT'S EXHIBIT 7462 WAS RECEIVED IN EVIDENCE.)

10:51AM  10   BY MR. COOPERSMITH:

10:51AM  11   Q.   OKAY.  LET'S GO TO THE EARLIEST EMAIL IN TIME, WHICH IS ON

10:51AM  12   PAGE -- THE SECOND TO THE LAST PAGE.

10:52AM  13        AND DO YOU SEE THERE'S AN EMAIL FROM AMELIA AGUIRRE?

10:52AM  14   A.   YES.

10:52AM  15   Q.   AND SHE WAS SOMEONE WHO WORKED AT THERANOS?

10:52AM  16   A.   YES.

10:52AM  17   Q.   WAS SHE A CUSTOMER SERVICE REPRESENTATIVE?

10:52AM  18   A.   I THINK SO, YEAH, YEAH.

10:52AM  19   Q.   OKAY.  AND SHE SENDS IT TO YOU, THIS PARTICULAR EMAIL, AND

10:52AM  20   NICHOLAS MENCHEL.

10:52AM  21        DO YOU SEE THAT?

10:52AM  22   A.   YES.

10:52AM  23   Q.   AND MR. MENCHEL WAS A PROJECT MANAGER?

10:52AM  24   A.   YES.

10:52AM  25   Q.   AND IT SAYS "HI ADAM,

10:52AM   1        "DR. PHILIP CHEN WOULD LIKE TO BE CALLED ABOUT LIPID PANEL

10:52AM   2    RESULTS."

10:52AM   3        AND IT HAS A CERTAIN PATIENT, BUT THE NAME IS REDACTED.

10:52AM   4        DO YOU SEE THAT?

10:52AM   5    A.   YES.

10:52AM   6    Q.   AND IT SAYS, "DR. CHEN INDICATED THE RESULTS ARE NOT

10:52AM   7    CONSISTENT WITH PATIENT'S HISTORY.  THIS IS THE ONLY PATIENT

10:52AM   8    THAT DR. CHEN HAS SENT TO THERANOS AND THE PATIENT HAS ONLY

10:52AM   9    COME IN ONCE."

10:52AM  10        DO YOU SEE THAT?

10:52AM  11    A.   YES.

10:52AM  12    Q.   AND THIS WAS AN INQUIRY THAT YOU LEARNED ABOUT FROM A

10:52AM  13    PHYSICIAN NAME DR. CHEN.

10:53AM  14        DO YOU SEE THAT?

10:53AM  15    A.   YES.

10:53AM  16    Q.   OKAY.  AND THEN THE ISSUE HAS TO DO WITH A LIPID PANEL;

10:53AM  17    RIGHT?

10:53AM  18    A.   YES.

10:53AM  19    Q.   AND THAT'S LIKE HDL AND LDL?

10:53AM  20    A.   CORRECT.

10:53AM  21    Q.   IF YOU GO TO THE PAGE, AND WE'LL JUST USE THE BATES NUMBER

10:53AM  22    BECAUSE THERE'S NO PAGE NUMBERS, IT'S ENDING IN 586.

10:53AM  23        YOU SEE THERE'S AN EMAIL FROM YOU AT THE VERY BOTTOM,

10:53AM  24    "SPOKE TO PHYSICIAN, DR. PHILIP CHEN -- HE WOULD LIKE A RERUN.

10:53AM  25    IF THIS IS NOT POSSIBLE, WE WILL DO A REDRAW."

10:53AM  1              DO YOU SEE THAT?

10:53AM  2      A.   YES.

10:53AM  3      Q.   AND THEN YOUR EMAIL GOES ON TO THE NEXT PAGE, AND THEN YOU

10:53AM  4      WROTE DOWN SOME DETAILS IN FOUR BULLET POINTS.

10:53AM  5              DO YOU SEE THAT?

10:53AM  6      A.   YES.

10:53AM  7      Q.   AND THE FIRST BULLET POINT IS ABOUT CHOLESTEROL AND LDL

10:53AM  8      AND THEY'RE RUNNING 30 PERCENT HIGHER THAN THE PATIENT'S

10:53AM  9      BASELINE.

10:53AM  10             DO YOU SEE THAT?

10:53AM  11     A.   YES.

10:53AM  12     Q.   AND THEN THE SECOND BULLET SAYS THE PHYSICIAN EXPRESSED

10:53AM  13     DOUBTS REGARDING THE TECHNOLOGY?

10:53AM  14     A.   YES.

10:53AM  15     Q.   AND REPEATEDLY ASKED YOU ABOUT WHAT OUR METHOD IS AND HOW

10:54AM  16     WE ENSURE ACCURACY.

10:54AM  17             DO YOU SEE THAT?

10:54AM  18     A.   YES.

10:54AM  19     Q.   AND THEN YOU REPORT THERE, "I REPLIED THAT THERANOS

10:54AM  20     METHODS HAVE BEEN EXTENSIVELY VALIDATED AGAINST FDA APPROVED

10:54AM  21     PREDICATE METHODS -- I DIDN'T DESCRIBE THE THERANOS METHOD PER

10:54AM  22     COMPANY'S NONDISCLOSURE AND CONFIDENTIALITY RULES."

10:54AM  23             DO YOU SEE THAT?

10:54AM  24     A.   YES.

10:54AM  25     Q.   AND THOSE ARE YOUR WORDS, SIR?

10:54AM   1    A.   I BELIEVE SO.  I MEAN, THEY'RE APPENDED TO AN EMAIL THAT

10:54AM   2    CAME FROM ME, SO, YEAH.

10:54AM   3    Q.   OKAY.  AND THEN THE NEXT BULLET POINT YOU WROTE,

10:54AM   4    "PHYSICIAN ASKED IF HE IS THE ONLY M.D. QUERYING LIPID

10:54AM   5    RESULTS."

10:54AM   6         DO YOU SEE THAT?

10:54AM   7    A.   YES.

10:54AM   8    Q.   AND YOU SAID, AS YOU REPORTED IN THIS EMAIL, "I ANSWERED

10:54AM   9    THAT THE RATE OF PHYSICIAN QUERIES IS NOT HIGHER THAN MIGHT BE

10:54AM   10   EXPECTED, AND IS NOT HIGHER THAN IN MY PREVIOUS JOB AT

10:54AM   11   UNIVERSITY OF PITTSBURGH."

10:54AM   12        DO YOU SEE THAT?

10:54AM   13   A.   YES.

10:54AM   14   Q.   AND THAT'S WHAT YOU REPORTED TO THE PHYSICIAN WHEN HE

10:54AM   15   ASKED YOU THAT QUESTION; RIGHT?

10:54AM   16   A.   YES.

10:54AM   17   Q.   AND THEN YOU REPORTED THAT IN TURN TO OTHER PEOPLE AT

10:54AM   18   THERANOS?

10:54AM   19   A.   YES.

10:54AM   20   Q.   OKAY.  LET'S GO TO THE EMAIL ABOVE THAT ONE.

10:55AM   21        AND THEN YOU SENT AN EMAIL TO AGAIN MR. MENCHEL AND

10:55AM   22   MS. AGUIRRE, AND THEN YOU COPIED TINA LIN AND NISHIT DOSHI AND

10:55AM   23   DR. YOUNG; RIGHT?

10:55AM   24   A.   YES.

10:55AM   25   Q.   AND BECAUSE, UNLIKE MR. MENCHEL AND AGUIRRE, THE OTHER

10:55AM   1      PEOPLE WERE PEOPLE WHO WORKED IN THE RESEARCH AND DEVELOPMENT

10:55AM   2      OR THE CLIA LAB; RIGHT?

10:55AM   3      A.   YES.

10:55AM   4      Q.   OKAY.  AND THERE YOU WROTE, "TINA/NISHIT/DANIEL,

10:55AM   5           "CAN WE PLEASE REVIEW THE CTN IMAGE FOR THE FOLLOWING

10:55AM   6      PATIENT, BASED ON THE QUERY BELOW?"

10:55AM   7           DO YOU SEE THAT?

10:55AM   8      A.   YES.

10:55AM   9      Q.   AND SO THE CTN IMAGE IS BASICALLY LIKE A PHOTO OF THE CTN;

10:55AM  10      RIGHT?

10:55AM  11      A.   YES.

10:55AM  12      Q.   AND THE CTN IS THE CAPILLARY TUBE AND NANOTAINER?

10:55AM  13      A.   YES.

10:55AM  14      Q.   AND THAT'S THE DEVICE THAT ACTUALLY COLLECT THE BLOOD FROM

10:56AM  15      THE FINGER; RIGHT?

10:56AM  16      A.   CORRECT.

10:56AM  17      Q.   AND LOOKING AT THE IMAGE MIGHT HELP YOU UNDERSTAND IF

10:56AM  18      THERE WAS SOME PROBLEM WITH THE WAY THE SAMPLE WAS COLLECTED;

10:56AM  19      RIGHT?

10:56AM  20      A.   WELL, THAT WAS THE THEORY, YEAH.

10:56AM  21      Q.   OKAY.  WELL, THAT'S WHAT YOU ASKED FOR?

10:56AM  22      A.   YES.

10:56AM  23      Q.   OKAY.  AND THEN IF YOU GO UP THE CHAIN HERE, THERE'S AN

10:56AM  24      EMAIL AT THE BOTTOM OF THE PAGE ENDING WITH 584, AND WE'LL JUST

10:56AM  25      LOOK AT THE VERY TOP PART OF THAT FROM NISHIT DOSHI.

10:56AM  1         DO YOU SEE THAT?

10:56AM  2    A.   YES.

10:56AM  3    Q.   AND DR. DOSHI WAS SOMEONE WHO WORKED IN THE NORMANDY LAB;

10:56AM  4    CORRECT?

10:56AM  5    A.   YES.

10:56AM  6    Q.   AND IT SAYS, IF YOU GO TO THE NEXT PAGE AND LOOK AT THE

10:56AM  7    EMAIL, IT SAYS, "HI SUNNY,

10:56AM  8         "I AM NOT SURE IF YOU READ THIS ALREADY.

10:56AM  9         "WE ARE CONFIDENT ABOUT OUR LIPID PANEL RESULTS BASED ON

10:57AM  10   THE DAILY RUNS WHERE WE COMPARE FINGERSTICK SAMPLES TO NEAT

10:57AM  11   VENOUS (PREDICATE)."

10:57AM  12        RIGHT?

10:57AM  13   A.   YES.

10:57AM  14   Q.   AND ABOVE THAT SUNNY BALWANI WRITES TO YOU, AND HE SAYS,

10:57AM  15   "ADAM,

10:57AM  16        "WE NEED TO CALL THIS DOCTOR AND BE A BIT MORE FIRM ABOUT

10:57AM  17   OUR PERFORMANCE.  WE CAN DO A REDRAW BUT HIS IGNORANT COMMENTS

10:57AM  18   ARE NOT OK.  YOU CAN EXPLAIN TO HIM WE RUN THOUSANDS OF SAMPLES

10:57AM  19   AND OUR SAMPLE TRACKING IS VERY TIGHT."

10:57AM  20        DO YOU SEE THAT?

10:57AM  21   A.   YES.

10:57AM  22   Q.   AND THEN HE SAYS, "WE CAN DO REDRAW FOR NO CHARGE TO THE

10:57AM  23   PATIENT, NO PROBLEMS."

10:57AM  24        DO YOU SEE THAT?

10:57AM  25   A.   YES.

10:57AM  1    Q.   AND DOCTOR -- MR. BALWANI WROTE THAT JUST TEN MINUTES

10:57AM  2    AFTER HE GOT THE EMAIL FROM MR. DOSHI.

10:57AM  3         DO YOU SEE THAT?

10:57AM  4    A.   YES.

10:57AM  5    Q.   AND THEN YOU WROTE IN RESPONSE, A LITTLE BIT LATER IN THE

10:57AM  6    AFTERNOON, "SUNNY,

10:57AM  7         "I WAS EMPHATIC WITH DR. CHEN REGARDING OUR RIGOROUS

10:57AM  8    VALIDATION AND QUALITY PROCESS.  I DO NOT AGREE WITH ANY OF

10:58AM  9    DR. CHEN'S INSINUATIONS.  IN MY EXPERIENCE, THERE ARE ALWAYS A

10:58AM  10   HANDFUL OF M.D.'S WHO REFUSE TO ACKNOWLEDGE SCIENTIFIC DATA

10:58AM  11   ABOUT THEIR PATIENTS.  WE HAVE NOW REVIEWED THE CTN IMAGINE AND

10:58AM  12   ALL QC IS IN ORDER."

10:58AM  13        DO YOU SEE THAT?

10:58AM  14   A.   YES.

10:58AM  15   Q.   AND THEN YOU WROTE, "IF THERE IS FURTHER MESSAGING I

10:58AM  16   SHOULD BE RELAYING, PLEASE LET ME KNOW."

10:58AM  17        RIGHT?

10:58AM  18   A.   YES.

10:58AM  19   Q.   AND THEN MR. BALWANI RESPONDED, "THAT'S AWESOME, ADAM.  I

10:58AM  20   APPRECIATE IT.  I THINK YOU ARE RIGHT, SOME WILL ALWAYS BE

10:58AM  21   DOUBTERS -- HAPPENS WITH EVERY NEW TECHNOLOGY.  THANKS."

10:58AM  22        DO YOU SEE THAT?

10:58AM  23   A.   YES.

10:58AM  24   Q.   AND THAT'S WHAT YOUR EXCHANGE WITH MR. BALWANI WAS AT THAT

10:58AM  25   TIME; RIGHT?

10:58AM  1    A.   YES.

10:58AM  2    Q.   OKAY.  YOU CAN PUT THAT ASIDE, OR WE WILL PUT THAT ASIDE.

10:58AM  3         AND, DR. ROSENDORFF, WHEN YOU WERE AT THERANOS, YOU NEVER

10:59AM  4    OFFERED TESTS THAT YOU THOUGHT WERE INACCURATE AND UNRELIABLE

10:59AM  5    WHILE YOU WERE SERVING AS LAB DIRECTOR?

10:59AM  6    A.   SO THAT'S A BIT OF A LEADING QUESTION, I THINK.

10:59AM  7    Q.   I'M ALLOWED TO ASK THOSE.

10:59AM  8         (LAUGHTER.)

10:59AM  9         THE WITNESS:  ONE DOESN'T KNOW AT THE TIME THAT A

10:59AM  10   RESULT IS INACCURATE.  IT OFTEN COMES TO LIGHT AFTER THE FACT

10:59AM  11   WHERE A PHYSICIAN QUERIES RESULTS OR QC STARTS TO FAIL OR YOU

10:59AM  12   SEE A RASH OF ABNORMAL VALUES THAT ARE NOT EXPECTED TO OCCUR

10:59AM  13   STATISTICALLY.  SO --

10:59AM  14   BY MR. COOPERSMITH:

10:59AM  15   Q.   THANK YOU, DR. ROSENDORFF.  BUT LET ME ASK THE QUESTION AS

10:59AM  16   PRECISELY AS I CAN,

10:59AM  17   A.   UH-HUH.

10:59AM  18   Q.   WHILE YOU WERE THE LAB DIRECTOR AT THERANOS, YOU NEVER

10:59AM  19   THOUGHT THAT TESTS THAT YOU WERE OFFERING AND RELEASING WERE

10:59AM  20   INACCURATE OR UNRELIABLE; CORRECT?

11:00AM  21   A.   I CAME TO DOUBT THE ACCURACY OF THE TESTING, AND WHEN

11:00AM  22   THOSE DOUBTS REACHED A CERTAIN THRESHOLD, I LEFT THE COMPANY.

11:00AM  23   Q.   OKAY.  BUT WHILE YOU WERE AT THERANOS, YOU DID NOT RELEASE

11:00AM  24   OR AUTHORIZE THE RELEASE OF ANY RESULT THAT YOU THOUGHT WAS

11:00AM  25   INACCURATE OR UNRELIABLE?  YOU WOULDN'T DO THAT; RIGHT?

11:00AM  1    A.   WELL, HOW AM I SUPPOSED TO KNOW AT THE TIME WHETHER

11:00AM  2    RESULTS ARE INACCURATE?

11:00AM  3    Q.   WELL, WHEN YOU WERE AT THERANOS, RESULTS WERE OBTAINED

11:00AM  4    FROM THE BLOOD TESTS THAT WERE CONDUCTED ON PATIENTS; RIGHT?

11:00AM  5    A.   YES.

11:00AM  6    Q.   AND IF THE LAB BELIEVED THOSE WERE APPROPRIATE, THOSE WERE

11:00AM  7    RELEASED TO PATIENTS; RIGHT?

11:00AM  8    A.   YES.

11:00AM  9    Q.   AND YOU NEVER RELEASED RESULTS, OR ALLOWED THAT TO HAPPEN,

11:00AM  10   IF YOU HAD A DOUBT AS TO WHETHER THE RESULT WAS ACCURATE;

11:00AM  11   RIGHT?

11:00AM  12   A.   IF QC PASSES AND IF PROCEDURES ARE FOLLOWED AND THERE'S NO

11:00AM  13   DEVIATION FROM SOP, THE PROCEDURE IS TO RELEASE THE RESULTS.

11:00AM  14   Q.   AND THAT'S WHAT YOU WOULD DO?

11:01AM  15   A.   YES.

11:01AM  16   Q.   AND WHEN YOU DID THAT, YOU WERE NOT ALLOWING RESULTS TO BE

11:01AM  17   RELEASED WITH THE BELIEF THAT THEY WERE INACCURATE OR

11:01AM  18   UNRELIABLE; RIGHT?

11:01AM  19   A.   IT'S NOT REALLY A QUESTION OF BELIEF.

11:01AM  20        IT'S A QUESTION OF FOLLOWING ESTABLISHED QUALITY

11:01AM  21   PROTOCOLS.

11:01AM  22   Q.   OKAY.  AND YOU NEVER PROVIDED PATIENT RESULTS THAT YOU

11:01AM  23   KNEW WERE INACCURATE OR UNRELIABLE AT THE TIME YOU PROVIDED

11:01AM  24   THEM; CORRECT?

11:01AM  25   A.   CORRECT.

11:01AM  1    Q.   AND YOU WERE NEVER TOLD BY MR. BALWANI TO REPORT AN

11:01AM  2    INACCURATE REPORT?

11:01AM  3    A.   NO.

11:01AM  4    Q.   AND YOU WERE NEVER TOLD BY MS. HOLMES TO REPORT AN

11:01AM  5    INACCURATE REPORT?

11:01AM  6    A.   NO.

11:01AM  7    Q.   OKAY.  DR. ROSENDORFF, LET'S SWITCH TO ANOTHER TOPIC,

11:01AM  8    WHICH IS THE LAUNCH OF THE TESTING SERVICES AT WALGREENS.

11:02AM  9         OKAY?

11:02AM  10   A.   UH-HUH.

11:02AM  11        THE COURT:  LET'S HAVE -- FOLKS, STAND AND STRETCH

11:02AM  12   IF YOU WOULD LIKE FOR JUST A MOMENT WHILE WE LOOK AT THAT.

11:02AM  13        WE'LL BREAK IN ABOUT AN HOUR.

11:02AM  14        MR. COOPERSMITH:  I'M SORRY?

11:02AM  15        THE COURT:  WE'LL BREAK AT NOON.

11:02AM  16        MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:02AM  17        (STRETCHING.)

11:02AM  18        THE COURT:  MR. COOPERSMITH.

11:02AM  19        MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:02AM  20   Q.   TO START OFF ON THIS TOP, DR. ROSENDORFF, CAN YOU TAKE A

11:02AM  21   LOOK AT EXHIBIT 7314.

11:03AM  22        AND DO YOU SEE THIS IS AN EMAIL AMONG MR. BALWANI,

11:03AM  23   MS. HOLMES, AND DR. YOUNG?

11:03AM  24   A.   YES.

11:03AM  25   Q.   AND YOU'RE NOT ON THIS PARTICULAR EMAIL; RIGHT?

11:03AM   1      A.   NO.

11:03AM   2      Q.   BUT WHILE YOU WERE AT THERANOS, YOU KNEW THERE WERE A LOT

11:03AM   3      OF EMAILS GOING BACK AND FORTH AMONG VARIOUS PEOPLE THAT YOU

11:03AM   4      WERE NOT NECESSARILY ON THE EMAIL; RIGHT?

11:03AM   5      A.   YEAH.  THERE WERE A LOT OF EMAILS THAT I SHOULD HAVE BEEN

11:03AM   6      ON THAT I WASN'T.

11:03AM   7      Q.   OKAY.  BUT THERE WERE SOME, EVEN IF YOU SHOULD OR

11:03AM   8      SHOULDN'T HAVE BEEN ON THEM, YOU KNEW THAT THERE WERE OTHER

11:03AM   9      EMAILS BEING SENT WHERE YOU WERE NOT ON THE EMAILS; RIGHT?

11:03AM  10      A.   ARE YOU ASKING ME IF I WAS CC'D ON EVERY EMAIL

11:03AM  11      COMMUNICATION IN THE COMPANY?

11:03AM  12      Q.   RIGHT.  AND OF COURSE YOU WEREN'T; RIGHT?

11:03AM  13      A.   NO.

11:03AM  14      Q.   AND SOMETIMES YOU SENT EMAILS AND YOU DIDN'T COPY

11:03AM  15      EVERYONE?

11:03AM  16      A.   NO, NO.

11:03AM  17      Q.   OKAY.  AND -- BUT YOU UNDERSTOOD THAT IN THERANOS, AS WE

11:04AM  18      DISCUSSED BEFORE, EMAILS WERE THE SYSTEM USED TO TRANSMIT

11:04AM  19      INFORMATION; RIGHT?

11:04AM  20      A.   YES.

11:04AM  21      Q.   AND PEOPLE LIKE DR. YOUNG WERE TRANSMITTING INFORMATION

11:04AM  22      FOR THE PURPOSE OF TRYING TO GET THERANOS'S WORK DONE?

11:04AM  23               MR. BOSTIC:  FOUNDATION.

11:04AM  24               THE COURT:  YOU'RE DOING THAT NOW?

11:04AM  25               MR. COOPERSMITH:  I AM TRYING, YOUR HONOR.

11:04AM  1    Q.   SO, DR. ROSENDORFF, YOU RECEIVED A LOT OF EMAILS FROM

11:04AM  2    DR. YOUNG; RIGHT?

11:04AM  3    A.   YES.

11:04AM  4    Q.   AND YOU SENT A LOT OF EMAILS TO DR. YOUNG?

11:04AM  5    A.   YES.

11:04AM  6    Q.   AND WHEN DR. YOUNG COMMUNICATED WITH YOU BY EMAIL, HE WAS

11:04AM  7    TRYING TO PROVIDE INFORMATION TO YOU THAT WOULD BE USED IN THE

11:04AM  8    COURSE OF THE WORK AT THERANOS; RIGHT?

11:04AM  9    A.   YES.

11:04AM 10    Q.   AND THAT SOMETIMES IT WOULD HAVE INFORMATION ABOUT THE

11:04AM 11    STATUS OF ASSAYS AND THINGS LIKE THAT?

11:04AM 12    A.   YES.

11:04AM 13    Q.   AND THAT YOU UNDERSTOOD THAT WAS NECESSARY TO TAKE FURTHER

11:04AM 14    ACTION IF APPROPRIATE; RIGHT?

11:04AM 15    A.   YES.

11:04AM 16    Q.   AND THAT WHEN THAT HAPPENED, THERE WOULD BE A NEED TO HAVE

11:04AM 17    THE INFORMATION BE ACCURATE SO THE ACTION COULD BE BASED ON

11:05AM 18    ACCURATE INFORMATION; CORRECT?

11:05AM 19    A.   YES.

11:05AM 20    Q.   AND THERANOS HAD A SYSTEM OF STORING EMAILS SO IF SOMEONE

11:05AM 21    NEEDED TO REFER TO THEM LATER, THAT COULD HAPPEN; RIGHT?

11:05AM 22    A.   YES, I BELIEVE SO.

11:05AM 23    Q.   AND IF YOU LOOK AT 7314, EVEN THOUGH YOU'RE NOT ON IT,

11:05AM 24    THIS IS ONE OF THOSE EMAILS WHERE DR. YOUNG IS TRANSMITTING

11:05AM 25    INFORMATION ABOUT THE STATUS OF CERTAIN ASSAYS PRIOR TO THE

11:05AM  1    LAUNCH OF WALGREENS; RIGHT?

11:05AM  2    A.   YES, IT APPEARS SO.

11:05AM  3              MR. COOPERSMITH:  YOUR HONOR, WE OFFER 7314

11:05AM  4    AUTHENTIC PURSUANT TO THE PARTIES' STIPULATION, ON BATES

11:05AM  5    NUMBERS, AND IT'S A BUSINESS RECORD.

11:05AM  6              MR. BOSTIC:  HEARSAY, YOUR HONOR.

11:05AM  7              THE COURT:  ARE YOU INTENDING TO INCLUDE THE

11:05AM  8    ATTACHMENT?

11:05AM  9              MR. COOPERSMITH:  I DON'T NEED THE ATTACHMENT,

11:05AM 10    YOUR HONOR.  IT'S REALLY JUST THE TWO PAGE EMAIL.

11:05AM 11              THE COURT:  ALL RIGHT.

11:05AM 12              MR. BOSTIC:  SAME OBJECTION, YOUR HONOR.  HEARSAY

11:05AM 13    GIVEN THAT THIS WITNESS IS NOT ON THE --

11:05AM 14              THE COURT:  IS THIS BEING OFFERED AS A BUSINESS

11:06AM 15    RECORD?

11:06AM 16              MR. COOPERSMITH:  YES, YOUR HONOR.

11:06AM 17              THE COURT:  I'LL ADMIT IT AS A BUSINESS RECORD UNDER

11:06AM 18    803(6).  THE FOUNDATION HAS BEEN LAID, AND IT MAY BE PUBLISHED.

11:06AM 19    NOT THE ATTACHMENT.

11:06AM 20         (DEFENDANT'S EXHIBIT 7314 WAS RECEIVED IN EVIDENCE.)

11:06AM 21              MR. COOPERSMITH:  YES, YOUR HONOR.

11:06AM 22         MR. ALLEN, JUST THE EMAIL ITSELF AND NOT THE ATTACHMENT.

11:06AM 23    Q.   OKAY.  LOOKING AT THE EMAIL, IS EXHIBIT 7314, YOU SEE THIS

11:06AM 24    IS AN EMAIL FROM DR. YOUNG AND TO MS. HOLMES AND MR. BALWANI?

11:06AM 25    A.   YES.

11:06AM  1      Q.    AND IT'S DATED AUGUST 19TH, 2013?

11:06AM  2      A.    YES.

11:06AM  3      Q.    AND THE SUBJECT IS TEST LAUNCH LIST.

11:06AM  4            DO YOU SEE THAT?

11:06AM  5      A.    YES.

11:06AM  6      Q.    OKAY.  AND IT SAYS, "THE CURRENT LAUNCH LIST COVERS 200

11:06AM  7      TESTS, IN BOTH BLOOD AND URINE SAMPLES."

11:06AM  8      A.    YES.

11:06AM  9      Q.    "THE COLLECTION OF THESE REPORTABLES COVERS MORE THAN

11:06AM  10     97 PERCENT OF TEST FREQUENCY FOR THESE TWO MATRICES."

11:06AM  11           DO YOU SEE THAT?

11:06AM  12     A.    YES.

11:06AM  13     Q.    AND THEN IT SAYS, "BLOOD TESTS FOR LAUNCH INCLUDE GENERAL

11:06AM  14     CHEMISTRY, ELISA, AND CYTOMETRY."

11:07AM  15     A.    YES.

11:07AM  16     Q.    AND THEN IT DESCRIBES A TOTAL OF 158 TESTS/REPORTABLES"?

11:07AM  17     A.    YES.

11:07AM  18     Q.    AND THEN ON -- GOING DOWN A FEW MORE BULLETS DOWN, IT

11:07AM  19     SAYS, "92 ARE ELISA."

11:07AM  20     A.    YES.

11:07AM  21     Q.    AND THOSE ARE THE IMMUNOASSAYS?

11:07AM  22     A.    YES.

11:07AM  23     Q.    AND THEN IT SAYS 62 ON EDISON?

11:07AM  24     A.    YES.

11:07AM  25     Q.    AND THEN 30 ON ADVIA WITH SIEMENS CHEMISTRY; RIGHT?

11:07AM  1     A.   YES.

11:07AM  2     Q.   AND STICKING TO THE 62 ON EDISON NUMBER, WHEN THERANOS

11:07AM  3     LAUNCHED WITH WALGREENS, THERE WERE NOT 62 ASSAYS ON EDISON

11:07AM  4     ACTUALLY PUT IN OPERATION; RIGHT?

11:07AM  5     A.   CAN YOU JUST REMIND ME OF THE DATE OF THIS EMAIL?

11:07AM  6     Q.   SURE.   IT'S AUGUST 19TH, 2013.

11:07AM  7     A.   OH, UM -- YEAH, NO.   MY RECOLLECTION IS IT WAS JUST ONE OR

11:07AM  8     TWO THAT WERE VALIDATED ON THE EDISON AT THAT TIME.

11:07AM  9     Q.   AT THAT TIME?

11:07AM  10    A.   CORRECT.

11:07AM  11    Q.   AND THEN EVEN GOING FORWARD DURING THE REST OF YOUR TIME

11:08AM  12    AT THERANOS, ULTIMATELY THERANOS I THINK PUT A TOTAL OF ABOUT

11:08AM  13    12 ON EDISONS; IS THAT RIGHT?

11:08AM  14    A.   IT SOUNDS ABOUT RIGHT.

11:08AM  15    Q.   OKAY.   AND NOT 62; RIGHT?

11:08AM  16    A.   NO.

11:08AM  17    Q.   BUT DR. YOUNG SAYS HERE THAT 62 ON EDISON IS AT LEAST PART

11:08AM  18    OF THE LAUNCH LIST AT THIS TIME AS FAR AS THIS EMAIL IS

11:08AM  19    CONCERNED?

11:08AM  20    A.   YES, THAT'S WHAT HE'S REPRESENTING TO MR. BALWANI AND

11:08AM  21    MS. HOLMES.

11:08AM  22    Q.   YES.   THANK YOU.

11:08AM  23    A.   YES.

11:08AM  24    Q.   AND, AND I THINK YOU TALKED ABOUT THIS IN YOUR DIRECT

11:08AM  25    EXAMINATION WHEN MR. BOSTIC WAS QUESTIONING YOU, BUT AN EDISON

11:08AM   1    DEVICE, IT CAN RUN A SAMPLE, BUT IT CAN'T RUN, YOU KNOW,

11:08AM   2    MULTIPLE PATIENT SAMPLES AT ONCE; RIGHT?

11:08AM   3    A.   NO, IT CANNOT.

11:08AM   4    Q.   RIGHT.  BUT A SIEMENS ADVIA CAN RUN MULTIPLE PATIENT

11:08AM   5    SAMPLES AT ONCE; RIGHT?

11:08AM   6    A.   NO, IT CANNOT.

11:08AM   7    Q.   OKAY.  IT CAN'T DO THAT EITHER?

11:08AM   8    A.   NO.

11:08AM   9    Q.   BUT IN TERMS OF, LIKE, TAKING AN HOUR OF TIME, A

11:08AM  10    SIEMENS ADVIA CAN RUN MANY MORE SAMPLES IN AN HOUR THAN A

11:09AM  11    THERANOS MACHINE COULD?

11:09AM  12    A.   CORRECT.

11:09AM  13    Q.   AND THAT'S WHAT A SIEMENS ADVIA OR OTHER COMMERCIAL

11:09AM  14    EQUIPMENT LIKE THAT IS DESIGNED TO DO; RIGHT?

11:09AM  15    A.   YES.

11:09AM  16    Q.   AND IT'S FOR HIGH VOLUME OPERATION; RIGHT?

11:09AM  17    A.   CORRECT.

11:09AM  18    Q.   AND YOU UNDERSTAND THAT THE EDISON, AS DESIGNED, WAS NOT

11:09AM  19    REALLY DESIGNED TO RUN IN A CENTRAL LAB THAT WAS GETTING

11:09AM  20    HUNDREDS OF THOUSANDS OF SAMPLES A DAY; RIGHT?

11:09AM  21    A.   I WOULD BE SPECULATING ON THE INTENT OF THAT INSTRUMENT.

11:09AM  22    Q.   OKAY.  BUT YOU, IN ANY EVENT, UNDERSTOOD THAT THE SIEMENS

11:09AM  23    DEVICE OR OTHER COMMERCIAL DEVICES THAT WERE MEANT FOR HIGH

11:09AM  24    VOLUME COULD RUN MANY MORE SAMPLES PER HOUR; RIGHT?

11:09AM  25    A.   THAT WAS THE REALITY, YEAH.

11:09AM  1    Q.   AND SOMETIMES THAT TOPIC IS REFERRED TO AS HIGH

11:09AM  2    THROUGHPUT; RIGHT?

11:09AM  3    A.   YES, YES.

11:09AM  4    Q.   AND IF YOU'RE COLLECTING A LOT OF SAMPLES IN VARIOUS

11:09AM  5    LOCATIONS SUCH AS WALGREENS STORES, IT MIGHT BE ADVANTAGEOUS TO

11:09AM  6    HAVE A HIGH THROUGHPUT WAY OF RUNNING THE SAMPLES; RIGHT?

11:09AM  7    A.   THERE'S DIFFERENT MODELS DEPENDING ON SAMPLE VOLUME,

11:10AM  8    CLINICAL SETTING.

11:10AM  9    Q.   OKAY.  BUT IN ANY EVENT, IF THERANOS WAS COLLECTING

11:10AM  10   SAMPLES AT WALGREENS STORES AND SHIPPING THOSE ALL TO A CENTRAL

11:10AM  11   LABORATORY IT WAS RUNNING, IT COULD RUN THOSE FASTER ON SIEMENS

11:10AM  12   MACHINES COMPARED TO AN EDISON DEVICE; RIGHT?

11:10AM  13   A.   I'M NOT SURE WHY YOU'RE COMPARING THE SIEMENS DEVICE TO

11:10AM  14   THE EDISON, BECAUSE THE EDISON IS IMMUNOASSAY AND THE IMMULITE

11:10AM  15   WAS THE IMMUNOASSAY, AND SO THAT'S MORE OF AN APPLES TO APPLES

11:10AM  16   COMPARISON.

11:10AM  17   Q.   OKAY.  FAIR ENOUGH.

11:10AM  18        SO LET'S TALK ABOUT THE IMMULITE IN THIS CASE; RIGHT?

11:10AM  19   A.   YEAH.

11:10AM  20   Q.   THE IMMULITE COULD ALSO RUN MORE SAMPLES PER HOUR THAN THE

11:10AM  21   EDISON DEVICE?

11:10AM  22   A.   YES.

11:10AM  23   Q.   OKAY.  AND THAT IF THERANOS WAS COLLECTING SAMPLES FROM

11:10AM  24   WALGREENS STORES AND SHIPPING THEM TO A CENTRAL LABORATORY, IT

11:10AM  25   COULD RUN MANY MORE OF THOSE SAMPLES PER HOUR ON AN IMMULITE

11:11AM   1    COMPARED TO AN EDISON?

11:11AM   2    A.   CORRECT.

11:11AM   3    Q.   OKAY.  AND THAT'S TRUE IF YOU WERE RUNNING A MODIFIED

11:11AM   4    IMMULITE; RIGHT?

11:11AM   5    A.   CORRECT.

11:11AM   6    Q.   SO THE SAME THROUGHPUT ISSUE, JUST DIFFERENT SAMPLE SIZE;

11:11AM   7    RIGHT?

11:11AM   8    A.   SO YOU'RE ASKING IF THE MODIFIED IMMULITE HAS THE SAME

11:11AM   9    THROUGHPUT CAPABILITY AS AN UNMODIFIED IMMULITE ASSAY?

11:11AM  10    Q.   RIGHT.  AND IT DOES; RIGHT?

11:11AM  11    A.   I DON'T KNOW.

11:11AM  12    Q.   BUT IN ANY EVENT, THE IMMULITE --

11:11AM  13    A.   I MEAN, I WOULD SAY NO BECAUSE YOU'VE GOT TO DILUTE THE

11:11AM  14    SAMPLE FIRST TO RUN IT --

11:11AM  15    Q.   OKAY.

11:11AM  16    A.   -- MODIFIED ON THE IMMULITE.  SO I WOULD SAY NO.  YEAH, IT

11:11AM  17    TAKES LONGER.

11:11AM  18    Q.   BECAUSE YOU HAVE THAT STEP OF PREDILUTION?

11:11AM  19    A.   YEAH, YEAH.

11:11AM  20    Q.   AS OPPOSED TO WHEN YOU'RE RUNNING IT MODIFIED, WHATEVER

11:11AM  21    DILUTION IT WAS DOING IT WOULD BE INTERNAL TO THE MACHINE?

11:11AM  22    A.   I DON'T KNOW ABOUT INTERNAL DILUTIONS IN THE IMMULITES.

11:11AM  23    Q.   OKAY.  WE MAY LOOK AT THAT AT SOME POINT.

11:11AM  24    A.   OKAY.

11:11AM  25    Q.   BUT IN ANY EVENT, THE MODIFIED IMMULITE COULD RUN MORE

ROSENDORFF CROSS BY MR. COOPERSMITH (RES.)

11:12AM 1    SAMPLES PER HOUR COMPARED TO AN EDISON; RIGHT?

11:12AM 2    A.   YES.

11:12AM 3    Q.   OKAY.  AND YOU WERE, I TAKE IT, NOT INVOLVED IN THE

11:12AM 4    BUSINESS OPERATIONS OF THERANOS?

11:12AM 5    A.   NOT AT ALL, NO.

11:12AM 6    Q.   OR IN THE DISCUSSIONS THAT THERANOS HAD WITH WALGREENS?

11:12AM 7    A.   NO, NOT AT ALL.

11:12AM 8    Q.   OR ABOUT WHAT MADE SENSE FOR, YOU KNOW, DOING BUSINESS

11:12AM 9    WITH WALGREENS AND COLLECTING SAMPLES?

11:12AM 10   A.   NO.  THAT WASN'T MY JOB.

11:12AM 11   Q.   AND YOU DON'T KNOW ANYTHING ABOUT THE CONTRACTS BETWEEN

11:12AM 12   THERANOS AND WALGREENS?

11:12AM 13   A.   NO, DEFINITELY NOT, NO.

11:12AM 14   Q.   AND WHAT THOSE SAMPLES WOULD SAY ABOUT HOW SAMPLES ARE

11:12AM 15   COLLECTED?

11:12AM 16   A.   NO.

11:12AM 17   Q.   OKAY.  LEADING UP TO THE LAUNCH, THERE WERE QUITE A FEW

11:12AM 18   TESTS THAT HAD TO BE ACCOMPLISHED IN ORDER TO ACTUALLY GO LIVE

11:12AM 19   WITH WALGREENS, SO TO SPEAK; RIGHT?

11:13AM 20   A.   YES.

11:13AM 21   Q.   AND WE TALKED ABOUT ASSAY VALIDATION; RIGHT?

11:13AM 22   A.   YES.

11:13AM 23   Q.   AND THERE WERE ALSO A LOT OF LOGISTICAL TASKS THAT HAD TO

11:13AM 24   BE COMPLETED; CORRECT?

11:13AM 25   A.   YES.

11:13AM  1    Q.   AND THERE HAD TO BE A FUNCTIONING LABORATORY INFORMATION

11:13AM  2    SYSTEM?

11:13AM  3    A.   CORRECT.

11:13AM  4    Q.   IN ORDER TO START THE PROGRAM WITH WALGREENS?

11:13AM  5    A.   CORRECT.

11:13AM  6    Q.   OKAY.  LET'S TAKE A LOOK AT EXHIBIT 1049, WHICH I BELIEVE

11:13AM  7    IS ALREADY IN EVIDENCE FROM YOUR DIRECT EXAMINATION.

11:13AM  8        EXHIBIT 1049 IS AN EMAIL FROM AUGUST 29TH, 2013.

11:14AM  9        DO YOU SEE THAT?

11:14AM  10   A.   YES.

11:14AM  11   Q.   AND THEN IN THE BOTTOM YOU ARE INFORMING MS. HOLMES AND

11:14AM  12   DR. YOUNG THAT YOU HAVE SOME MEDICAL AND OPERATIONAL CONCERNS

11:14AM  13   ABOUT OUR READINESS FOR SEPTEMBER 9TH.

11:14AM  14       DO YOU SEE THAT?

11:14AM  15   A.   YES.

11:14AM  16   Q.   AND YOU HAVE TWO CATEGORIES OF CONCERN.  THE FIRST IS

11:14AM  17   MEDICAL.

11:14AM  18       DO YOU SEE THAT?

11:14AM  19   A.   YES.

11:14AM  20   Q.   AND THE FIRST HEADING UNDER MEDICAL IS GLUCOSE?

11:14AM  21   A.   YES.

11:14AM  22   Q.   AND YOU DISCUSS SIGNIFICANT NEGATIVE BIAS; RIGHT?

11:14AM  23   A.   YES.

11:14AM  24   Q.   OKAY.  IF YOU WOULD GO TO THE NEXT PAGE AND GO DOWN THE

11:14AM  25   EMAIL.

ROSENDORFF CROSS BY MR. COOPERSMITH (RES.)

11:14AM 1      THEN YOUR SECOND HEADING FOR MEDICAL CONCERNS IS SODIUM?

11:14AM 2   A.   YES.

11:14AM 3   Q.   AND THEN THE OTHER SET OF CONCERNS YOU HAD TO DO WITH WERE

11:14AM 4   OPERATIONAL CONCERNS; RIGHT?

11:14AM 5   A.   YES.

11:14AM 6   Q.   AND THEN IT HAD TO DO WITH TRAINING ON THE NEW PROTOCOLS

11:14AM 7   AND ISSUES WITH OTHER THINGS; RIGHT?

11:14AM 8   A.   YES.

11:14AM 9   Q.   AND THEN IF YOU GO TO THE TOP OF THE FIRST PAGE OR THE TOP

11:15AM 10  EMAIL, AND THEN YOU SEE MS. HOLMES FORWARDS THAT TO

11:15AM 11  MR. BALWANI?

11:15AM 12  A.   YES.

11:15AM 13  Q.   AND THAT MR. BALWANI WRITES AT THE TOP, "I ASSUME WE CAN

11:15AM 14  USE SIEMENS CHEMISTRY FOR GLUCOSE AND SODIUM?  IF YES THEN WE

11:15AM 15  SHOULD."

11:15AM 16      RIGHT?

11:15AM 17  A.   IS THAT WHAT YOU'RE ASKING ME IF THAT'S WHAT THE TEXT ON

11:15AM 18  THE SCREEN SAYS?

11:15AM 19  Q.   THAT'S ALL I'M ASKING YOU FOR THE MOMENT.

11:15AM 20  A.   YES.

11:15AM 21  Q.   OKAY.

11:15AM 22  A.   YES.

11:15AM 23  Q.   AND IT HAS ANOTHER DISCUSSION ABOUT OPERATIONAL, "WE

11:15AM 24  SHOULD TELL HIM WE WILL LIMIT NUMBER OF SAMPLES."

11:15AM 25      AND IF THERE WERE FEWER SAMPLES COMING IN, IT WOULD BE

11:15AM  1    EASIER TO DEAL WITH LOGISTICS AND OPERATIONS IF YOU HAD

11:15AM  2    RELATIVELY FEW SAMPLES COMING IN AS OPPOSED TO MANY SAMPLES?

11:15AM  3    A.   TRUE.

11:15AM  4    Q.   OKAY.  BUT ON THE CHEMISTRY ISSUE, MR. BALWANI SAYS, "I

11:15AM  5    ASSUME WE CAN USE SIEMENS CHEMISTRY FOR GLUCOSE AND SODIUM?"

11:15AM  6         RIGHT?

11:15AM  7    A.   YES.

11:15AM  8    Q.   AND THAT WOULD BE LIKE USING THE FDA APPROVED SIEMENS

11:16AM  9    MACHINE AS OPPOSED TO ANYTHING THAT THERANOS DEVELOPED; RIGHT?

11:16AM  10   A.   WELL, THE SIEMENS MACHINE WAS USED IN BOTH CASES, SO I'M

11:16AM  11   NOT SURE WHAT MR. BALWANI MEANS BY THIS.

11:16AM  12   Q.   RIGHT.

11:16AM  13        BUT YOU UNDERSTAND SIEMENS CHEMISTRY REFERS TO THE SIEMENS

11:16AM  14   CHEMISTRY AS OPPOSED TO THE THERANOS ASSAY; RIGHT?

11:16AM  15   A.   SO SOME OF THE THERANOS TESTS USED SIEMENS CHEMISTRY AND

11:16AM  16   SOME OF THEM USED THERANOS DEVELOPED CHEMISTRIES.

11:16AM  17   Q.   OKAY.  BUT MR. BALWANI WAS -- WELL, YOU UNDERSTAND THAT IF

11:16AM  18   MR. BALWANI WAS COMMUNICATING THAT UNMODIFIED PREDICATE SHOULD

11:16AM  19   BE USED, HE WAS ACTUALLY AGREEING THAT IF YOU HAD CONCERNS

11:16AM  20   ABOUT GLUCOSE AND SODIUM ON THERANOS DEVICES, THAT SHOULDN'T BE

11:16AM  21   IMPLEMENTED UNTIL THOSE CONCERNS WERE RESOLVED; RIGHT?

11:16AM  22   A.   I CAN'T SPECULATE ON MR. BALWANI'S INTENT OR MEANING HERE.

11:17AM  23   IT'S JUST VERY UNCLEAR TO ME WHAT HE MEANS BY THIS, I'M SORRY.

11:17AM  24   Q.   OKAY.  DR. ROSENDORFF, IN FACT, YOU EXPRESSED THESE

11:17AM  25   CONCERNS ABOUT THESE TWO ASSAYS, SODIUM AND GLUCOSE, ON

11:17AM  1    AUGUST 29TH, PRIOR TO THE WALGREENS LAUNCH; RIGHT?

11:17AM  2    A.   IN THIS EMAIL YOU MEAN?

11:17AM  3    Q.   YES.

11:17AM  4    A.   YES, YES.

11:17AM  5    Q.   OKAY.  AND YOU WOULD NOT HAVE WANTED THOSE ASSAYS TO GO

11:17AM  6    ONLINE ON THERANOS ASSAYS IF YOU WERE NOT SATISFIED THAT THEY

11:17AM  7    WERE APPROPRIATE; RIGHT?

11:17AM  8    A.   CORRECT.

11:17AM  9    Q.   AND IF YOU COULD TAKE A LOOK AT EXHIBIT 9352.

11:17AM  10        9352 IS IN EVIDENCE AND IT'S A VALIDATION REPORT FOR

11:18AM  11   MODIFIED SIEMENS ASSAY OF SODIUM.

11:18AM  12        DO YOU SEE THAT?

11:18AM  13   A.   YES.

11:18AM  14   Q.   AND THAT'S SIGNED BY YOU ON MARCH 24TH, 2014; RIGHT?

11:18AM  15   A.   SOMETHING DOESN'T MAKE SENSE HERE BECAUSE AT THE DATE AT

11:18AM  16   THE TOP IS SEPTEMBER 26TH, 2013, AND MY SIGNATURE SAYS

11:18AM  17   MARCH 24, 2014.

11:18AM  18   Q.   WELL, YOU WROTE THAT DATE RIGHT NEXT TO YOUR SIGNATURE

11:18AM  19   BLOCK; RIGHT?

11:18AM  20   A.   YES.

11:18AM  21   Q.   AND SO YOU DATED THE DOCUMENT MARCH 24TH, 2014; RIGHT?

11:18AM  22   A.   IT APPEARS THAT'S WHEN IT WAS PRESENTED TO ME BUT --

11:18AM  23   Q.   SO EVEN IF THE DOCUMENT WAS PREPARED BY SOMEONE ON

11:18AM  24   SEPTEMBER 26TH, 2014, YOU DIDN'T SIGN IT UNTIL MARCH 24TH,

11:18AM  25   2014; RIGHT?

11:18AM   1          DR. ROSENDORFF, EVEN IF THE DOCUMENT WAS PREPARED AT THE

11:18AM   2     END OF SEPTEMBER 2013, YOU DIDN'T SIGN IT UNTIL MARCH 24TH,

11:19AM   3     2014; RIGHT?

11:19AM   4     A.   WELL, THAT'S WHAT IT LOOKS LIKE.

11:19AM   5          BUT AS I SAID BEFORE, THERE WAS NO DOCUMENT CONTROL AT

11:19AM   6     THERANOS.  SO THAT DATE OF SEPTEMBER 26TH, 2013 IS -- REALLY,

11:19AM   7     REALLY CAN'T BE TRUSTED.  WE KNOW THESE DOCUMENTS OR REVISIONS

11:19AM   8     WERE PROTECTED OR WERE NOT RECORDED IN A CONTROLLED WAY IN A

11:19AM   9     SOFTWARE SYSTEM.

11:19AM  10          GO AHEAD, SORRY.

11:19AM  11     Q.   THAT'S OKAY.

11:19AM  12          I HEAR YOU SAYING THAT.  BUT THE DOCUMENT CONTROL ISSUES

11:19AM  13     YOU'RE NOW REFERRING TO, THAT DIDN'T AFFECT THE DATE THAT YOU

11:19AM  14     PUT NEXT TO YOUR SIGNATURE, DOES IT?

11:19AM  15     A.   IT AFFECTS THE RELEVANCE OF THAT DATE VERSUS WHAT IS AT

11:19AM  16     THE TOP OF THE DOCUMENT.

11:19AM  17     Q.   OKAY.

11:19AM  18     A.   OR EVEN THE TITLE OF THE DOCUMENT.  I MEAN, YES, THAT'S MY

11:19AM  19     HANDWRITING, AND THAT'S THE DATE I PUT DOWN.

11:19AM  20          BUT WHAT AM I CERTIFYING TO THERE?

11:19AM  21     Q.   IT SAYS APPROVER.

11:20AM  22          DO YOU SEE THAT?

11:20AM  23     A.   YES.

11:20AM  24     Q.   AND THEN YOU SIGNED YOUR SIGNATURE OVER THE

11:20AM  25     ADAM ROSENDORFF, M.D.

11:20AM  1          DO YOU SEE THAT?

11:20AM  2     A.   YES.

11:20AM  3     Q.   AND THEN IT HAS DATE, AND IT HAS THE TITLE LABORATORY

11:20AM  4     DIRECTOR; RIGHT?

11:20AM  5     A.   YES.

11:20AM  6     Q.   AND THEN YOU DATED IT MARCH 24TH, '14; RIGHT?

11:20AM  7     A.   BUT HOW DOES THAT RELATE TO THE REST OF THIS EXHIBIT, SIR?

11:20AM  8     Q.   OKAY.  I DON'T INTEND TO ANSWER YOUR QUESTION, BUT I'M

11:20AM  9     ASKING ANOTHER QUESTION TO SEE IF WE CAN CLARIFY THIS.

11:20AM 10          SO, DR. ROSENDORFF, MARCH 24TH, 2014, IS MANY MONTHS AFTER

11:20AM 11     THE PREVIOUS EXHIBIT WE SAW AND WE EXPRESSED CONCERNS ABOUT

11:20AM 12     SODIUM; RIGHT?

11:20AM 13     A.   CORRECT.

11:20AM 14     Q.   AND, IN FACT, IT'S GOING FROM AUGUST ALL OF THE WAY UNTIL

11:20AM 15     MARCH.  SO IT'S ABOUT SEVEN MONTHS; RIGHT?

11:20AM 16     A.   YES.

11:20AM 17     Q.   TURNING TO THE OTHER CONCERN YOU HAD --

11:20AM 18     A.   ARE YOU ASSERTING THAT MY SIGNATURE APPLIES TO THIS

11:21AM 19     DOCUMENT?

11:21AM 20     Q.   SIR, YOU PUT YOUR SIGNATURE ON VALIDATION REPORTS?

11:21AM 21     A.   CORRECT.

11:21AM 22     Q.   THIS IS ONE OF THEM?

11:21AM 23     A.   WELL, AS I'VE SAID, THERE'S NO, THERE WAS NO DOCUMENT

11:21AM 24     CONTROL AT THERANOS, SO I CAN'T VOUCH FOR THE FACT THAT THE

11:21AM 25     SIGNATURE RELATES TO THIS DOCUMENT.

11:21AM  1    Q.  OKAY.  SO -- WELL, LET'S EXPLORE THAT SINCE YOU SAY THAT.

11:21AM  2        IF YOU LOOK AT THE BODY OF THE DOCUMENT, YOU SEE -- AND

11:21AM  3    WE'RE TALKING ABOUT EXHIBIT 9352, AND IF YOU GO TO PAGE 2 OF

11:21AM  4    THE DOCUMENT --

11:21AM  5    A.  YES.

11:21AM  6    Q.  -- YOU SEE THERE'S THE SODIUM PLASMA ASSAY?

11:21AM  7    A.  YES.

11:21AM  8    Q.  AND THEN THERE IS DIFFERENT SECTIONS OF THE DOCUMENT THAT

11:21AM  9    ARE LISTED THERE?

11:21AM  10   A.  YES.

11:21AM  11   Q.  AND THOSE ARE THE VALIDATION REQUIREMENTS THAT HAVE TO BE

11:21AM  12   DONE FOR AN ASSAY; RIGHT?

11:21AM  13   A.  YES.

11:21AM  14   Q.  AND THEN THE REST OF THE DOCUMENT ACTUALLY GOES THROUGH

11:21AM  15   THE PAGES OF THE DOCUMENT TO GO THROUGH THE DATA AND WHAT

11:22AM  16   HAPPENED WITH THE VALIDATION; RIGHT?

11:22AM  17   A.  YES.

11:22AM  18   Q.  AND YOU PUT YOUR SIGNATURE ON THE COVER PAGE ON

11:22AM  19   MARCH 24TH, 2014; RIGHT?

11:22AM  20   A.  IT APPEARS SO.

11:22AM  21   Q.  OKAY.  AND YOU DON'T HAVE ANY EVIDENCE AS YOU SIT HERE

11:22AM  22   TODAY THAT THIS DOCUMENTS IS NOT WHAT YOU SIGNED; CORRECT?

11:22AM  23   A.  I WOULD NOT HAVE SIGNED A DOCUMENT IN MARCH OF 2014 IF THE

11:22AM  24   ASSAY HAD GONE LIVE IN EARLY 2013.  I WOULD NOT HAVE DONE THAT.

11:22AM  25   Q.  THANK YOU, DR. ROSENDORFF.

11:22AM   1          BUT YOU WOULD HAVE SIGNED IT IF IT DIDN'T GO LIVE; RIGHT?

11:22AM   2     A.   CORRECT.

11:22AM   3     Q.   RIGHT.  SO IF THE ASSAY DIDN'T GO LIVE IN 2013, YOU COULD

11:22AM   4     HAVE SIGNED IT IN MARCH OF 2014 WHEN YOU DEEMED IT APPROPRIATE

11:22AM   5     TO DO SO; RIGHT?

11:22AM   6     A.   CORRECT.

11:22AM   7     Q.   OKAY.  LET'S GO TO EXHIBIT 9184.

11:23AM   8          AND CAN YOU SEE IT ON YOUR SCREEN, DR. ROSENDORFF?

11:23AM   9     A.   YES.

11:23AM   10    Q.   AND THIS IS NOT IN EVIDENCE.  IT'S TITLED VALIDATION OF

11:23AM   11    MODIFIED THERANOS GLUCOSE ASSAY.

11:23AM   12         DO YOU SEE THAT?

11:23AM   13    A.   YES.

11:23AM   14    Q.   AND, IN FACT, YOUR SIGNATURE DOESN'T APPEAR ON THIS

11:23AM   15    DOCUMENT AT ALL; RIGHT?

11:23AM   16    A.   IT DOES NOT.

11:23AM   17    Q.   AND YOU HAVE NO RECOLLECTION OF EVER SIGNING A GLUCOSE

11:23AM   18    VALIDATION REPORT AT THERANOS; RIGHT?

11:23AM   19    A.   I BELIEVE I DID ACTUALLY.

11:23AM   20    Q.   OKAY.  WELL, IF THAT EXISTS, I'M SURE WE'LL SEE THAT AT

11:23AM   21    SOME POINT.

11:23AM   22    A.   OKAY.

11:23AM   23    Q.   OKAY.  LET'S GO TO EXHIBIT 7324.  IT'S ALWAYS THE LAST

11:24AM   24    PLACE YOU LOOK.

11:24AM   25         OKAY.  TURNING TO EXHIBIT 7324.  DO YOU SEE THIS IS AN

11:24AM  1    EMAIL STRING AMONG YOU, DR. YOUNG, AND DR. GANGAKHEDKAR?

11:24AM  2        DO YOU SEE THAT?

11:24AM  3    A.   I'M SORRY.  THERE'S NOTHING THAT IS APPEARING ON MY SCREEN

11:24AM  4    RIGHT NOW.

11:24AM  5        OH THERE IT IS.  THERE IT IS.  UH-HUH.

11:24AM  6    Q.   GREAT.  DO YOU SEE THE EMAIL HEADER THERE?

11:25AM  7    A.   YES.

11:25AM  8    Q.   AND THEN THIS IS AROUND SEPTEMBER 7TH, 2013?

11:25AM  9    A.   YES.

11:25AM 10    Q.   AND IT RELATES TO CERTAIN ASSAYS THAT WERE -- THE COMPANY

11:25AM 11    WAS WORKING ON IN CONNECTION WITH THE WALGREENS LAUNCH?

11:25AM 12    A.   YES.

11:25AM 13    Q.   AND THIS IS ANOTHER ONE OF THOSE EMAILS THAT WAS

11:25AM 14    TRANSMITTED AMONG THERANOS PERSONNEL TO DO THE WORK THAT WAS

11:25AM 15    GOING ON AT THE TIME?

11:25AM 16    A.   YES.

11:25AM 17    Q.   AND THE PURPOSE OF THIS WAS TO TRANSMIT INFORMATION

11:25AM 18    ACCURATELY SO THAT PEOPLE COULD TAKE APPROPRIATE ACTION?

11:25AM 19    A.   I'M SORRY TO BE A PAIN, BUT IT JUST SEEMS LIKE EVERY

11:25AM 20    EXHIBIT THAT GETS SHOWN, YOU ASK THE SAME LIST OF QUESTIONS.

11:25AM 21        I DON'T KNOW IF THAT'S STANDARD PROCEDURE IN THESE KINDS

11:25AM 22    OF CASES, BUT IT JUST SEEMS REALLY REPETITIVE.

11:25AM 23            THE COURT:  SIR, THERE ARE RULES OF EVIDENCE THAT

11:25AM 24    HAVE TO BE FOLLOWED.

11:25AM 25            THE WITNESS:  OKAY.

11:25AM  1                    THE COURT:  SO WE APPRECIATE YOUR PATIENCE.

11:26AM  2                    THE WITNESS:  OKAY.  THANK YOU, YOUR HONOR.

11:26AM  3        BY MR. COOPERSMITH:

11:26AM  4        Q.   YEAH.  I'M SORRY, I'M NOT TRYING TO WASTE YOUR TIME,

11:26AM  5        DR. ROSENDORFF.  BUT AS JUDGE DAVILA SAID, SOMETIMES THIS IS

11:26AM  6        REQUIRED.

11:26AM  7             BUT YOU KNOW WHAT, I'M GOING TO OFFER 7324.

11:26AM  8                    MR. BOSTIC:  NO OBJECTION.

11:26AM  9                    THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:26AM 10             (DEFENDANT'S EXHIBIT 7324 WAS RECEIVED IN EVIDENCE.)

11:26AM 11        BY MR. COOPERSMITH:

11:26AM 12        Q.   OKAY.  SO LET'S GO TO PAGE 3 OF THE DOCUMENT, AND THAT'S

11:26AM 13        AN EMAIL FROM DR. SIVARAMAN.

11:26AM 14             DO YOU SEE THAT AT THE BOTTOM?

11:26AM 15        A.   YES.

11:26AM 16        Q.   AND IT'S AN EMAIL DATED SEPTEMBER 7TH, 2013, TO YOU,

11:26AM 17        DR. YOUNG, COPIED TO ELIZABETH HOLMES AND SUREKHA.

11:26AM 18             DO YOU SEE THAT?

11:26AM 19        A.   YES.

11:26AM 20        Q.   AND IT SAYS, "PLEASE FIND ATTACHED VALIDATION DATA SUMMARY

11:26AM 21        FILES FOR TPSA, VITAMIN D, AND TSH."

11:26AM 22             DO YOU SEE THAT?

11:26AM 23        A.   YES.

11:26AM 24        Q.   AND THOSE WERE THREE OF THE ASSAYS THAT THERANOS WAS

11:27AM 25        WORKING ON IN PREPARATION FOR THE WALGREENS LAUNCH?

11:27AM  1    A.   YES.

11:27AM  2    Q.   IF YOU GO UP THE CHAIN TO THE NEXT EMAIL, THIS IS AN EMAIL

11:27AM  3    FROM DANIEL YOUNG TO YOU AND OTHERS.

11:27AM  4         AND HE WRITES, "THANKS... REVIEWING THE DATA.  MAYBE WE

11:27AM  5    CAN MEET AT 3:00 P.M. TOGETHER TO DISCUSS?"

11:27AM  6         RIGHT?

11:27AM  7    A.   YES.

11:27AM  8    Q.   AND IT HAS A TIMELINE OF WHAT DANIEL YOUNG THINKS SHOULD

11:27AM  9    HAPPEN TO CONTINUE WORKING ON THESE ASSAYS.

11:27AM  10        DO YOU SEE THAT?

11:27AM  11   A.   YES.

11:27AM  12   Q.   AND THEN ABOVE THAT THERE'S AN EMAIL FROM YOU, AND IT'S

11:27AM  13   FROM YOU TO DANIEL YOUNG, SHARADA SIVARAMAN, AGAIN COPIED TO

11:27AM  14   ELIZABETH HOLMES AND SUREKHA.

11:27AM  15        DO YOU SEE THAT?

11:27AM  16   A.   YES.

11:27AM  17   Q.   AND MR. BALWANI IS NOT ON THIS EMAIL; RIGHT?

11:27AM  18   A.   NO.

11:27AM  19   Q.   AND THEN IT SAYS, "SHARADA,

11:27AM  20        "THANKS -- THE DATA LOOKS GREAT."

11:27AM  21        DO YOU SEE THAT?

11:27AM  22   A.   YES.

11:27AM  23   Q.   AND THAT'S WHAT YOU TOLD DR. SIVARAMAN; RIGHT?

11:28AM  24   A.   YES.

11:28AM  25   Q.   AND IT SAYS, "THE ACCURACY/BIAS PLOTS COMPARING THE EDISON

11:28AM  1    3.5 WITH PREDICATE (VITAMIN D, TSH) ARE EXCELLENT LIKE THE

11:28AM  2    CURRENT REFERENCE RANGES COULD EASILY BE ADJUSTED BASED ON THE

11:28AM  3    REGRESSION FORMULA."

11:28AM  4         DO YOU SEE THAT?

11:28AM  5    A.   YES.

11:28AM  6    Q.   AND THEN IT GOES ON.

11:28AM  7         DO YOU SEE THAT?

11:28AM  8    A.   YES.

11:28AM  9    Q.   LET'S PUT THAT ASIDE.

11:28AM  10        NOW, LET'S TALK ABOUT THE LAUNCH ITSELF.  IF YOU COULD

11:28AM  11   REFER -- AND I GUESS WE COULD DO IT ON THE SCREEN -- TO

11:28AM  12   EXHIBIT 28466.

11:28AM  13        MR. ALLEN, IF WE COULD SHOW DR. ROSENDORFF PAGE 3250 AT

11:28AM  14   LINE 17.

11:29AM  15        DO YOU HAVE THAT IN FRONT OF YOU?

11:29AM  16   A.   YES.

11:29AM  17   Q.   OKAY.  I JUST WANT TO MAKE SURE THAT WE'RE ALL CLEAR ON

11:29AM  18   THE TESTIMONY HERE.

11:29AM  19        DO YOU REMEMBER ON WEDNESDAY MR. BOSTIC ASKED YOU A

11:29AM  20   QUESTION ABOUT WHETHER THERE CAME A TIME IN 2013 WHEN THERANOS

11:29AM  21   LAUNCHED ITS TESTING SERVICES TO THE GENERAL PUBLIC?

11:29AM  22        DO YOU SEE THAT?

11:29AM  23   A.   YES.

11:29AM  24   Q.   AND YOU RESPONDED YES, AND THAT IT WAS THE LAUNCH TO THE

11:29AM  25   GENERAL PUBLIC IN EARLY SEPTEMBER, AROUND SEPTEMBER 9TH?

11:29AM   1    A.   YES.

11:29AM   2    Q.   OKAY.  AND YOUR TESTIMONY ON WEDNESDAY THEN WAS THAT

11:29AM   3    SEPTEMBER 9TH WAS A LAUNCH TO THE, QUOTE, GENERAL PUBLIC?

11:29AM   4    A.   YES.

11:29AM   5    Q.   OKAY.  LET'S TAKE A LOOK AT EXHIBIT 13880.

11:30AM   6         OKAY.  DO YOU SEE THAT EXHIBIT 13880 IS AN EMAIL FROM

11:30AM   7    THERANOS HUMAN RESOURCES TO ALL THERANOS EMPLOYEES?

11:30AM   8         DO YOU SEE THAT?

11:30AM   9    A.   YES.

11:30AM   10   Q.   AND THAT WAS -- YOU WERE AN EMPLOYEE OF THERANOS AT THE

11:30AM   11   TIME; RIGHT?

11:30AM   12   A.   CORRECT.

11:30AM   13   Q.   AND SO YOU WERE INCLUDED ON EMAIL LISTS OF ALL THERANOS

11:30AM   14   EMPLOYEE AT THE TIME?

11:30AM   15   A.   CORRECT.

11:30AM   16   Q.   AND THIS EMAIL RELATES TO THE -- IT'S DATED

11:30AM   17   SEPTEMBER 11TH; CORRECT?

11:30AM   18   A.   YES.

11:30AM   19   Q.   OF 2013?

11:30AM   20   A.   YES.

11:30AM   21   Q.   AND IT RELATES TO THE INITIAL BLOOD TESTING THAT WAS GOING

11:31AM   22   ON AT THE PALO ALTO WALGREENS; RIGHT?

11:31AM   23   A.   YES.

11:31AM   24   Q.   OKAY.

11:31AM   25        YOUR HONOR, WE OFFER EXHIBIT 13880.

11:31AM   1          MR. BOSTIC:  NO OBJECTION.

11:31AM   2          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:31AM   3          (DEFENDANT'S EXHIBIT 13880 WAS RECEIVED IN EVIDENCE.)

11:31AM   4     BY MR. COOPERSMITH:

11:31AM   5     Q.   OKAY.  LET'S TAKE A LOOK AT IT.

11:31AM   6          IT SAYS, "ALL,

11:31AM   7          "AS MENTIONED IN OUR ALL EMPLOYEE MEETING, WE ARE NOW

11:31AM   8     OFFERING FREE SCREENINGS TO ALL THERANOS EMPLOYEES, FRIENDS AND

11:31AM   9     FAMILY."

11:31AM  10          DO YOU SEE THAT?

11:31AM  11     A.   YES.

11:31AM  12     Q.   AND IT SAYS, "WE HAVE AN INDEPENDENT PHYSICIAN,

11:31AM  13     DR. ARJALI JAIN" --

11:31AM  14     A.   YES.

11:31AM  15     Q.   -- "WHO WE ARE COLLABORATING WITH TO MAKE THESE SERVICES

11:31AM  16     AVAILABLE TO YOU.  DR. JAIN RECEIVED HER M.D. FROM

11:31AM  17     JOHNS HOPKINS," AND IT GOES ON.

11:31AM  18          DO YOU SEE THAT?

11:31AM  19     A.   YES.

11:31AM  20     Q.   AND THEN IT GOES ON, "STARTING TODAY, ALL EMPLOYEES,

11:31AM  21     FRIENDS, AND FAMILY WILL BE ABLE TO GO TO OUR WELLNESS CENTER

11:32AM  22     AT DOWNTOWN PALO ALTO WALGREENS LOCATION AND RECEIVE A VARIETY

11:32AM  23     OF TESTS SO EVERYONE GETS TO SEE OUR FIRST STORE."

11:32AM  24          DO YOU SEE THAT?

11:32AM  25     A.   YES.

11:32AM   1    Q.   AND SO THIS BLOOD TESTING AS INITIALLY CONCEIVED WAS FOR

11:32AM   2    EMPLOYEES, FRIENDS, AND FAMILY?

11:32AM   3    A.   CORRECT.

11:32AM   4    Q.   AND THEN IT GOES ON TO SAY, "THE FIRST PANEL WE ARE

11:32AM   5    OFFERING IS A COMPLETE BLOOD COUNT WITH HBA1C TEST."

11:32AM   6         DO YOU SEE THAT?

11:32AM   7    A.   YES.

11:32AM   8    Q.   AND HBA1C IS A TEST THAT IS DONE TO MONITOR DIABETES?

11:32AM   9    A.   CORRECT.

11:32AM   10   Q.   AND COMPLETE BLOOD COUNT IS A CYTOMETRY TEST?

11:32AM   11   A.   YES.

11:32AM   12   Q.   AND THOSE WERE THE INITIAL TESTS THAT WERE BEING OFFERED

11:32AM   13   DURING THIS FRIENDS AND FAMILY OPENING.

11:32AM   14        DO YOU SEE THAT?

11:32AM   15   A.   I DON'T RECALL THAT OTHER THAN READING IT HERE TODAY.

11:32AM   16   Q.   OKAY.  AND THEN IT GOES ON, IF YOU GO DOWN THE PAGE A

11:32AM   17   LITTLE BIT, THERE'S A HEADING, TO GET STARTED, PLEASE FOLLOW

11:32AM   18   THESE SIMPLE STEPS.

11:32AM   19        DO YOU SEE THAT?

11:32AM   20   A.   YES.

11:32AM   21   Q.   AND IT SAYS "EMPLOYEES:  ALL EMPLOYEES WILL BE

11:33AM   22   PRE-AUTHORIZED BY DR. JAIN FOR THESE TESTS.  PLEASE CLICK ON

11:33AM   23   THIS LINK TO SCHEDULE A TIME SLOT THAT IS CONVENIENT FOR YOU."

11:33AM   24        DO YOU SEE THAT?

11:33AM   25   A.   YES.

11:33AM   1    Q.   AND THAT'S BECAUSE IN CALIFORNIA, TO GO GET A LAB TEST,

11:33AM   2    YOU HAVE TO HAVE A DOCTOR PRESCRIBING THAT; RIGHT?

11:33AM   3    A.   CORRECT.

11:33AM   4    Q.   AND DR. JAIN WAS ON THE SCENE IN ORDER TO PRESCRIBE THOSE

11:33AM   5    TESTS; RIGHT?

11:33AM   6    A.   CORRECT.

11:33AM   7    Q.   RIGHT.  SHE WAS MADE AVAILABLE FOR THAT PURPOSE?

11:33AM   8    A.   CORRECT.

11:33AM   9    Q.   AND IF YOU GO TO THE NEXT SECTION THERE, IT SAYS YOUR

11:33AM  10    FRIENDS AND FAMILY.  SO THE FRIENDS AND FAMILY OF THE

11:33AM  11    EMPLOYEES, THEY'RE INSTRUCTED TO USE THE SAME LINK ABOVE TO

11:33AM  12    SCHEDULE THEIR TIME SLOT.

11:33AM  13        DO YOU SEE THAT?

11:33AM  14    A.   YES.

11:33AM  15    Q.   LET'S LOOK AT 20351.

11:34AM  16        DO YOU HAVE 20351, SIR?

11:34AM  17    A.   NOT YET, SIR.

11:34AM  18    Q.   OKAY.  NOW YOU SEE IT?

11:34AM  19    A.   YES.

11:34AM  20    Q.   AND YOU RECOGNIZE THIS AS A FLYER THAT WAS AVAILABLE FOR

11:34AM  21    THOSE INITIAL TESTS THAT WERE BEING DONE AT THE PALO ALTO

11:34AM  22    WALGREENS?

11:34AM  23    A.   YES.

11:34AM  24    Q.   AND IT RELATES TO THAT SAME BLOOD TESTING THAT WE WERE

11:34AM  25    JUST TALKING ABOUT IN THE PREVIOUS EXHIBIT?

11:34AM 1        A.   YES.

11:34AM 2                  MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20351.

11:35AM 3                  MR. BOSTIC:  NO OBJECTION.

11:35AM 4                  THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

11:35AM 5             (DEFENDANT'S EXHIBIT 20351 WAS RECEIVED IN EVIDENCE.)

11:35AM 6        BY MR. COOPERSMITH:

11:35AM 7        Q.   OKAY.  SO LOOKING AT THE FLYER, IT SAYS FREE HEALTH

11:35AM 8        SCREENING OFFERED FROM A TINY FINGERSTICK; RIGHT?

11:35AM 9        A.   YES.

11:35AM 10       Q.   AND THIS SAYS, "COMPLETE BLOOD COUNT AND DIABETES

11:35AM 11       SCREENING TESTS FOR ALL THERANOS EMPLOYEES, FAMILY AND

11:35AM 12       FRIENDS."

11:35AM 13            DO YOU SEE THAT?

11:35AM 14       A.   YES.

11:35AM 15       Q.   AND SO THAT WAS WHAT WAS GOING ON ON SEPTEMBER 9TH; RIGHT?

11:35AM 16       A.   YES.

11:35AM 17       Q.   OKAY.  LET'S JUMP AHEAD.

11:35AM 18            DO YOU REMEMBER THAT YOU WERE TALKING ABOUT, DURING YOUR

11:35AM 19       DIRECT EXAMINATION, THAT RIGHT BEFORE THAT SEPTEMBER 9TH

11:35AM 20       INITIAL BLOOD TEST OFFERING AT WALGREENS IN PALO ALTO, THAT YOU

11:35AM 21       NEEDED MORE TIME TO WORK ON THE ASSAYS; RIGHT?

11:35AM 22       A.   YES.

11:35AM 23       Q.   AND YOU WERE ASKED QUESTIONS ON DIRECT ABOUT THAT SUBJECT

11:36AM 24       AND HOW THERE WASN'T ENOUGH TIME BEFORE THE LAUNCH WAS COMING

11:36AM 25       ON SEPTEMBER 9TH?

11:36AM   1     A.   YES.

11:36AM   2     Q.   OKAY.  WE'VE JUST SEEN WHAT ACTUALLY HAPPENED ON

11:36AM   3     SEPTEMBER 9TH; RIGHT?

11:36AM   4     A.   YES.

11:36AM   5     Q.   NOW, LET'S GO A FEW MONTHS, OR A COUPLE OF MONTHS AHEAD,

11:36AM   6     OR ONE MONTH AHEAD AND LOOK AT EXHIBIT 12464.

11:36AM   7          OKAY.  DO YOU SEE THIS IS AN EMAIL STRING AMONG YOU AND

11:36AM   8     MR. BALWANI?

11:36AM   9     A.   YES.

11:36AM  10     Q.   AND IT'S DATED NOVEMBER 7TH AND NOVEMBER 8TH, 2013?

11:37AM  11     A.   YES.

11:37AM  12     Q.   AND IT RELATES TO, AGAIN, THE LAUNCH OF WALGREENS?

11:37AM  13     A.   IT LOOKS LIKE THIS WAS AFTER THE LAUNCH.

11:37AM  14     Q.   WELL, IT WAS NOVEMBER 8TH?

11:37AM  15     A.   YES.

11:37AM  16     Q.   AND SO IT RELATES TO THE WALGREENS BLOOD TESTING?

11:37AM  17     A.   YES.

11:37AM  18          MR. COOPERSMITH:  OKAY, YOUR HONOR, WE OFFER

11:37AM  19     EXHIBIT 12464.

11:37AM  20          MR. BOSTIC:  NO OBJECTION.

11:37AM  21          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

11:37AM  22       (DEFENDANT'S EXHIBIT 12464 WAS RECEIVED IN EVIDENCE.)

11:37AM  23     BY MR. COOPERSMITH:

11:37AM  24     Q.   OKAY.  LET'S LOOK AT THE BOTTOM EMAIL, FIRST IN TIME.

11:37AM  25          AND MR. BALWANI WRITES ON NOVEMBER 7TH, 2013, "ADAM,

11:37AM  1    "WE WOULD LIKE TO OPEN OUR 300 UNIVERSITY AVENUE STORE TO

11:37AM  2    PUBLIC THIS COMING MONDAY."

11:37AM  3        DO YOU SEE THAT?

11:37AM  4    A.   YES.

11:37AM  5    Q.   "WE FEEL CONFIDENT THAT WE CAN HANDLE 30 SAMPLES PER DAY

11:37AM  6    FROM THIS LOCATION AT THIS POINT.  AND IT HAS BEEN 2 MONTHS

11:37AM  7    SINCE WE HAVE BEEN OUT IN WAG.  IT'S TIME TO GO LIVE."

11:38AM  8        DO YOU SEE THAT?

11:38AM  9    A.   YES.

11:38AM  10   Q.   AND IT SAYS, WE WILL BE ALSO OPENING OUR FIRST PHOENIX

11:38AM  11   LOCATION NEXT WEEK.

11:38AM  12       DO YOU SEE THAT?

11:38AM  13   A.   YES.

11:38AM  14   Q.   AND THEN IF YOU GO TO THE NEXT PAGE, MR. BALWANI WRITES,

11:38AM  15   "THE KEY IS TO HAVE PERFECT DISCIPLINE AND SOP'S," STANDARD

11:38AM  16   OPERATING PROCEDURES, "IN PLACE TO MAKE SURE WE HAVE A PLAN FOR

11:38AM  17   EVERYTHING AND EVERYONE IN THE CHAIN KNOWS WHAT NEEDS TO BE

11:38AM  18   DONE.  WE WILL WORK ON THIS FROM NOW THRU NEXT 5 DAYS AND I

11:38AM  19   KNOW WE WILL GET THIS DONE."

11:38AM  20       DO YOU SEE THAT?

11:38AM  21   A.   YES.

11:38AM  22   Q.   AND THEN HE WRITES, "I WOULD LIKE TO ASK AT THIS TIME IF

11:38AM  23   YOU HAVE A REASON TO THINK WE NEED MORE TIME OR TEST OUT

11:38AM  24   SOMETHING THAT WE HAVEN'T THOUGHT ABOUT.  WE WILL BE PICKING UP

11:38AM  25   SAMPLES EVERY HOUR OR SO DURING NOVEMBER FROM THE

11:38AM  1    300 UNIVERSITY AVENUE LOCATION SO I THINK AT A POINT WE WILL

11:38AM  2    NEVER HAVE TOO MANY SAMPLES TO DEAL WITH AT ONE POINT."

11:38AM  3        DO YOU SEE THAT?

11:38AM  4    A.   YES.

11:38AM  5    Q.   SO MR. BALWANI IS ASKING YOU TO PROVIDE ANY REASON IF YOU

11:38AM  6    NEED MORE TIME OR ANYTHING ELSE THAT YOU THINK NEEDS TO BE

11:38AM  7    DONE; RIGHT?

11:38AM  8    A.   YES.

11:38AM  9    Q.   AND THEN YOU RESPONDED IN THE EMAIL ON THE FIRST PAGE;

11:39AM  10   CORRECT?

11:39AM  11   A.   YES.

11:39AM  12   Q.   AND YOU WROTE, "SUNNY,

11:39AM  13       "THIS IS VERY EXCITING THAT WE ARE BROADENING OUR TESTING

11:39AM  14   TO A WIDER BASE."

11:39AM  15       DO YOU SEE THAT?

11:39AM  16   A.   YES.

11:39AM  17   Q.   AND THEN YOU SAY, "THERE ARE A FEW ISSUES THAT NEED TO BE

11:39AM  18   ADDRESSED."

11:39AM  19       RIGHT?

11:39AM  20   A.   YES.

11:39AM  21   Q.   AND THEN YOU HAVE OPERATIONAL ISSUES; RIGHT?

11:39AM  22   A.   YES.

11:39AM  23   Q.   AND THEN YOU HAVE MEDICAL/SCIENTIFIC ISSUES; RIGHT?

11:39AM  24   A.   YES.

11:39AM  25   Q.   AND THE MEDICAL/SCIENTIFIC ISSUES ARE WHAT YOU ARE

11:39AM  1    POINTING OUT THAT YOU THINK WOULD GO TO THE ABILITY OF THE

11:39AM  2    ASSAYS TO FUNCTION PROPERLY; RIGHT?

11:39AM  3    A.   YES.

11:39AM  4    Q.   AND IN THIS CASE YOU'RE IDENTIFYING AS AN ISSUE

11:39AM  5    SENSITIVITY OF VITAMIN D, TSH, AND POSSIBLY CTNI.

11:39AM  6         DO YOU SEE THAT?

11:39AM  7    A.   SO IT'S NOT JUST THE MEDICAL/SCIENTIFIC ISSUES THAT ARE

11:39AM  8    IMPORTANT FOR GOOD LABORATORY PRACTICE AND ACCURATE RESULTS.

11:39AM  9    IT'S ALSO THE CHAIN OF COMMAND.

11:39AM  10   Q.   I'M GOING TO INTERRUPT YOU BECAUSE I JUST WANT MY QUESTION

11:39AM  11   ANSWERED, OKAY?

11:39AM  12   A.   YEAH.

11:39AM  13   Q.   SO IN THIS EMAIL YOU WERE JUST POINTING OUT THE

11:39AM  14   MEDICAL/SCIENTIFIC ISSUES THAT I JUST READ, CORRECT, IN THIS

11:40AM  15   EMAIL?

11:40AM  16   A.   NO.

11:40AM  17   Q.   WELL, THAT'S WHAT YOU'RE SAYING IN THIS EMAIL; RIGHT?

11:40AM  18   A.   OPERATIONAL -- THERE'S OPERATIONAL AT THE TOP.

11:40AM  19   Q.   CORRECT.  YOU'RE POINTING OUT SOME OPERATIONAL ISSUES;

11:40AM  20   CORRECT?

11:40AM  21   A.   UH-HUH, UH-HUH.

11:40AM  22   Q.   AND THEN YOU'RE ALSO POINTING OUT SOME MEDICAL AND

11:40AM  23   SCIENTIFIC ISSUES?

11:40AM  24   A.   CORRECT.

11:40AM  25   Q.   AND THEN YOU SPECIFICALLY WRITE WHAT YOUR MEDICAL AND

11:40AM 1   SCIENTIFIC ISSUES WERE AT THE TIME; RIGHT?

11:40AM 2   A.   YES.

11:40AM 3   Q.   AND THAT WAS IN RESPONSE TO MR. BALWANI'S EMAIL WHERE HE

11:40AM 4   ASKED YOU FOR ANYTHING THAT YOU HAD TO SAY AT THAT POINT;

11:40AM 5   RIGHT?

11:40AM 6   A.   YES.

11:40AM 7   Q.   OKAY.  AND THEN YOU POINTED OUT SPECIFICALLY SENSITIVITY

11:40AM 8   ISSUES SURROUNDING VITAMIN D, TSH, AND POSSIBLY CTNI; RIGHT?

11:40AM 9   A.   YES.

11:40AM 10  Q.   AND THEN YOU GO ON TO EXPLAIN WHAT YOUR CONCERN WAS;

11:40AM 11  RIGHT?

11:40AM 12  A.   YES.

11:40AM 13  Q.   OKAY.  SO LET'S TALK ABOUT THAT.

11:40AM 14       FIRST OF ALL, ON THE ISSUE OF VITAMIN D, YOU HAD ACTUALLY

11:41AM 15  SIGNED THAT VALIDATION REPORT ON SEPTEMBER 30TH, 2013; CORRECT?

11:41AM 16  A.   I DO NOT RECALL.

11:41AM 17  Q.   OKAY.  LET'S JUST TAKE A QUICK LOOK AT EXHIBIT 9412 THAT

11:41AM 18  IS IN THAT VALIDATION REPORT BINDER THAT I HANDED YOU, OR MAYBE

11:41AM 19  YOU CAN SEE IT ON THE SCREEN AND YOU CAN SEE THE DATE

11:41AM 20  SEPTEMBER 30TH, 2013?

11:41AM 21  A.   YES.

11:41AM 22  Q.   AND THAT'S THE VITAMIN D VALIDATION REPORT; CORRECT?

11:41AM 23  A.   YES.

11:41AM 24  Q.   AND THEN IF YOU GO TO EXHIBIT 20424, WHICH IS NOT YET IN

11:41AM 25  EVIDENCE.

| | | |
|---|---|---|
| 11:41AM | 1 | DO YOU SEE 20424? |
| 11:41AM | 2 | A.   YES. |
| 11:41AM | 3 | Q.   AND THIS IS DR. SIVARAMAN SENDING YOU AN EMAIL ON |
| 11:41AM | 4 | NOVEMBER 20TH, 2013? |
| 11:41AM | 5 | A.   YES. |
| 11:41AM | 6 | Q.   TO YOU AND TO DR. YOUNG? |
| 11:41AM | 7 | A.   YES. |
| 11:41AM | 8 | Q.   AND ALSO A COPY TO RAN HU, H-U? |
| 11:41AM | 9 | A.   YES. |
| 11:41AM | 10 | Q.   OKAY.  AND THEN THERE'S CERTAIN ATTACHMENTS. |
| 11:42AM | 11 | DO YOU SEE THAT? |
| 11:42AM | 12 | A.   YES. |
| 11:42AM | 13 | Q.   AND THIS RELATES TO VITAMIN D AND TSH; RIGHT? |
| 11:42AM | 14 | A.   YES. |
| 11:42AM | 15 | Q.   OKAY. |
| 11:42AM | 16 | YOUR HONOR, WE OFFER EXHIBIT -- |
| 11:42AM | 17 | THE COURT:  20424. |
| 11:42AM | 18 | MR. COOPERSMITH:  -- 20424, YES, THANK YOU. |
| 11:42AM | 19 | MR. BOSTIC:  NO OBJECTION. |
| 11:42AM | 20 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 11:42AM | 21 | (DEFENDANT'S EXHIBIT 20424 WAS RECEIVED IN EVIDENCE.) |
| 11:42AM | 22 | BY MR. COOPERSMITH: |
| 11:42AM | 23 | Q.   OKAY, LOOKING AT THE EMAIL, IT SAYS DR. SIVARAMAN IS |
| 11:42AM | 24 | SENDING YOU THE UPDATED REVISED VITAMIN D AND TSH REPORTS WITH |
| 11:42AM | 25 | THE REPEAT OF THE ANALYTICAL SENSITIVITY EXPERIMENTS, THE DATA |

11:42AM  1    OF WHICH WAS SHARED WITH YOU IN THE LAST MEETING.

11:42AM  2         DO YOU SEE THAT?

11:42AM  3    A.   YES.

11:42AM  4    Q.   BECAUSE SHE WAS RESPONDING TO THE ISSUES THAT YOU WERE

11:42AM  5    RAISING ABOUT SENSITIVITY ON THESE TWO ASSAYS; CORRECT?

11:42AM  6    A.   YES.

11:42AM  7    Q.   AND THEN IT GOES ON TO SAY, "PLEASE LET ME KNOW HOW YOU

11:42AM  8    WOULD LIKE THE REVISIONS TO BE INCORPORATED.  DO WE KEEP OR

11:42AM  9    REMOVE THE ORIGINAL SECTION AND ALSO IF YOU NEED TO SIGN THESE

11:42AM  10   TWO REPORTS AGAIN."

11:42AM  11        DO YOU SEE THAT?

11:43AM  12   A.   YES.

11:43AM  13   Q.   AND SO AFTER YOU RAISED THESE CONCERNS ABOUT THESE

11:43AM  14   PARTICULAR ASSAYS, ADDITIONAL WORK WAS DONE IN THE RESEARCH AND

11:43AM  15   DEVELOPMENT LAB TO SOLVE FOR THE SENSITIVITY ISSUES; RIGHT?

11:43AM  16   A.   THAT'S WHAT IT LOOKS LIKE, YEAH, YEAH.

11:43AM  17   Q.   OKAY.  AND MR. BALWANI WAS NOT ON THESE EMAILS; RIGHT?

11:43AM  18   A.   NO, HE'S NOT.

11:43AM  19   Q.   AND IF YOU GO TO THE NEXT EXHIBIT, 20423.

11:43AM  20        DO YOU SEE THAT YET?

11:43AM  21        OKAY.  DO YOU SEE IT ON YOUR SCREEN?

11:43AM  22   A.   YES.

11:43AM  23   Q.   AND DO YOU SEE AT THE BOTTOM THERE'S THE SAME EMAIL THAT

11:43AM  24   WE JUST LOOKED AT FROM DR. SIVARAMAN?

11:43AM  25   A.   YES.

11:43AM 1    Q.   AND THEN THIS IS A DIFFERENT EMAIL CHAIN, SO IT HAS A

11:43AM 2    RESPONSE FROM YOU; CORRECT?

11:43AM 3    A.   YES.

11:43AM 4    Q.   AND THEN YOU WERE JUST RESPONDING TO DR. SIVARAMAN AFTER

11:43AM 5    SHE SENT YOU THOSE REVISED REPORTS THAT DEALT WITH SENSITIVITY?

11:44AM 6    A.   YES.

11:44AM 7    Q.   OKAY.

11:44AM 8         YOUR HONOR, WE OFFER 20423.

11:44AM 9              MR. BOSTIC:  NO OBJECTION.

11:44AM 10             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:44AM 11        (DEFENDANT'S EXHIBIT 20423 WAS RECEIVED IN EVIDENCE.)

11:44AM 12   BY MR. COOPERSMITH:

11:44AM 13   Q.   OKAY.  NOW THAT WE'RE ALL SEEING IT, YOU SEE IT'S FROM YOU

11:44AM 14   TO DR. SIVARAMAN AND THE SUBJECT IS REVISED TSH AND VITAMIN D

11:44AM 15   REPORTS?

11:44AM 16   A.   YES.

11:44AM 17   Q.   AND AGAIN, MR. BALWANI IS NOT ON THIS EMAIL; RIGHT?

11:44AM 18   A.   YES.

11:44AM 19   Q.   IT SAYS, "HI, SHARADA,

11:44AM 20        "THE NEW VITAMIN D REPORT LOOKS GOOD -- 2 MINOR POINTS."

11:44AM 21        DO YOU SEE THAT?

11:44AM 22   A.   YES.

11:44AM 23   Q.   AND THEN YOU GO ON AND EXPLAIN SOMETHING THAT YOU WOULD

11:44AM 24   LIKE DELETED IN CONNECTION WITH THE REFERENCE RANGE; RIGHT?

11:44AM 25   A.   YES.

11:44AM  1    Q.   YOU CAN TAKE THAT DOWN, MR. ALLEN.

11:44AM  2         NOW, VITAMIN D IN PARTICULAR, AT TIME IT'S A DIFFICULT

11:44AM  3    ASSAY; RIGHT?

11:45AM  4    A.   I'M NOT SURE.

11:45AM  5    Q.   OKAY.  LET'S TAKE A LOOK AT AN EXHIBIT ALREADY IN

11:45AM  6    EVIDENCE, 20046.

11:45AM  7         AND DO YOU SEE THIS IS AN EMAIL STRING WITH A NUMBER OF

11:45AM  8    PEOPLE, INCLUDING YOURSELF?

11:45AM  9         BUT THE ONE I WANT TO FOCUS ON WAS THE EMAIL FROM

11:45AM  10   DR. PANDORI TO MR. BALWANI, MR. GEE, YOURSELF, AND

11:45AM  11   DANIEL YOUNG, WITH COPIES TO OTHERS.

11:45AM  12        DO YOU SEE THAT?

11:45AM  13   A.   YES.

11:45AM  14   Q.   AND THEN DR. PANDORI WRITES, "OK.

11:45AM  15        LANGLY, NOTE.

11:45AM  16        "ALSO, ALL,

11:45AM  17        "ATTACHED IS AN INTERESTING PAPER I'VE FOUND ON THE TOPIC

11:45AM  18   OF VARIABILITY OF VITAMIN D ASSAYS ON VARIOUS

11:45AM  19   METHODS/EQUIPMENT.  IT MAY BE USEFUL IN REGARDS TO OUR EFFORT

11:46AM  20   TO ESTABLISH FAIR RANGES OF ACCEPTABILITY FOR AAP THIS ANALYTE,

11:46AM  21   WHICH SEEMS NOTORIOUS FOR VARIABILITY ON EVEN FDA APPROVED

11:46AM  22   TESTS."

11:46AM  23        RIGHT?

11:46AM  24   A.   YES.

11:46AM  25   Q.   AND YOU AGREE WITH DR. PANDORI THAT VITAMIN D IS NOTORIOUS

11:46AM   1    FOR VARIABILITY?

11:46AM   2    A.   WELL, I DON'T WANT TO GET TOO TECHNICAL, BUT THERE'S 25

11:46AM   3    OH, OR 25 HYDROXY VITAMIN D, THERE'S 1,25 HYDROXY VITAMIN D.

11:46AM   4        THE ASSAYS TO DETECT TOTAL VITAMIN D, MY SENSE IS THAT

11:46AM   5    THEY'RE BETTER THAN THE ONES THAT CLAIM TO DETECT THE 25

11:46AM   6    HYDROXY VITAMIN D.

11:46AM   7        I MEAN, I'M JUST SAYING THERE'S MORE NUANCE TO THIS THAN

11:46AM   8    WHAT YOU'RE SAYING.

11:46AM   9    Q.   I'M SURE THAT'S THE CASE, BUT I'M SIMPLY ASKING HERE

11:46AM  10    WHETHER YOU AGREE WITH DR. PANDORI IN TERMS OF WHAT HE'S SAYING

11:47AM  11    IN THIS EMAIL?

11:47AM  12    A.   I'M NOT SURE WHAT HE'S SAYING, BECAUSE HE'S JUST SAYING

11:47AM  13    VITAMIN D, YOU KNOW, PERIOD.

11:47AM  14    Q.   OKAY.  DID YOU READ THE PAPER THAT HE ATTACHED?

11:47AM  15    A.   I DON'T RECALL.

11:47AM  16    Q.   OKAY.  AND WAS THAT YOUR USUAL PRACTICE?  IF DR. PANDORI

11:47AM  17    OR SOMEONE ELSE IN THE SCIENTIFIC TEAM SENT THE PAPER, WOULD

11:47AM  18    YOU TRY TO READ IT?

11:47AM  19    A.   I WOULD TRY TO, YES.

11:47AM  20    Q.   OKAY.  LET'S TAKE A LOOK AT EXHIBIT 20303.

11:47AM  21        OKAY.  DO YOU HAVE THAT ON YOUR SCREEN?

11:47AM  22    A.   YES.

11:47AM  23    Q.   AND IS THIS AN EMAIL STRING BETWEEN YOU AND MR. BALWANI

11:47AM  24    DATED NOVEMBER 11TH, 2013?

11:47AM  25    A.   YES.

11:47AM   1    Q.   AND IT RELATES TO PHOENIX?

11:47AM   2    A.   YES.

11:47AM   3    Q.   AND YOU UNDERSTOOD THAT THERANOS WAS PLANNING TO OPEN

11:48AM   4    STORES IN PHOENIX?

11:48AM   5    A.   YES.

11:48AM   6              MR. COOPERSMITH:  AND I OFFER 20303.

11:48AM   7              MR. BOSTIC:  NO OBJECTION.

11:48AM   8              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

11:48AM   9         (DEFENDANT'S EXHIBIT 20303 WAS RECEIVED IN EVIDENCE.)

11:48AM  10    BY MR. COOPERSMITH:

11:48AM  11    Q.   DR. ROSENDORFF, DO YOU SEE IN THE BOTTOM EMAIL MR. BALWANI

11:48AM  12    IS WRITING TO YOU WITH A SUBJECT PHX, WHICH IS PHOENIX?

11:48AM  13    A.   YES.

11:48AM  14    Q.   AND THEN HE SAYS "ADAM,

11:48AM  15         "PLEASE NOTE THAT SINCE THE LOCAL MARKET NOW ALREADY KNOWS

11:48AM  16    THAT WE ARE IN ARIZONA, WE ARE ANNOUNCING PRESENCE IN 2 STORES

11:48AM  17    IN PHOENIX TOMORROW."

11:48AM  18         DO YOU SEE THAT?

11:48AM  19    A.   YES.

11:48AM  20    Q.   "WE WILL STILL CONTINUE TO MODULATE THE NUMBER OF SAMPLES

11:48AM  21    FROM THERE SO THAT THE TOTAL NUMBER OF SAMPLES THIS MONTH STILL

11:48AM  22    STAYS BELOW 100 PER DAY."

11:48AM  23         DO YOU SEE THAT?

11:48AM  24    A.   YES.

11:48AM  25    Q.   AND THAT WAS THAT OPERATIONAL ISSUE THAT WE DISCUSSED

11:48AM   1    EARLIER WHERE IT WOULD BE EASIER TO DEAL WITH A LOWER NUMBER OF

11:48AM   2    SAMPLES?

11:48AM   3    A.   YOU STILL HAVE TO -- WELL, I CAN'T ANSWER THAT YES OR NO.

11:49AM   4    Q.   OKAY.  AND THEN YOUR RESPONSE TO MR. BALWANI'S MESSAGE IS

11:49AM   5    "EXCELLENT"?

11:49AM   6    A.   YES.

11:49AM   7    Q.   "THANK YOU."

11:49AM   8    A.   YES.

11:49AM   9    Q.   NOTHING ELSE?

11:49AM  10    A.   YES.

11:49AM  11    Q.   DR. ROSENDORFF, DO YOU REMEMBER ON DIRECT WHEN YOU WERE

11:49AM  12    TALKING TO MR. BOSTIC YOU DISCUSSED AN INSPECTION THAT HAD

11:49AM  13    OCCURRED IN SEPTEMBER OF 2013?

11:49AM  14    A.   YES.

11:49AM  15    Q.   AND I THINK ON TUESDAY WHEN I STARTED ASKING YOU

11:49AM  16    QUESTIONS, WE SAW THAT THE INSPECTOR WAS AN EILEEN NORKIN.

11:49AM  17         DO YOU REMEMBER THAT?

11:49AM  18    A.   FROM YESTERDAY, YES.

11:49AM  19    Q.   OR I THINK IT MIGHT HAVE BEEN WEDNESDAY.

11:49AM  20    A.   OH, I'M SORRY.  CORRECT.  I'M SORRY, YEAH.

11:49AM  21    Q.   OKAY.  AND, IN FACT, THIS WAS A ROUTINE INSPECTION THAT

11:50AM  22    WAS PLANNED; IS THAT RIGHT?

11:50AM  23    A.   CORRECT.

11:50AM  24    Q.   AND THIS INSPECTOR CAME AND LOOKED AT THE THERANOS LAB;

11:50AM  25    RIGHT?

11:50AM   1      A.   CORRECT.

11:50AM   2      Q.   AND I THINK THAT, JUST TO MAKE SURE WE'RE CLEAR, HER JOB

11:50AM   3      AS YOU UNDERSTOOD IT WAS TO INSPECT THE THERANOS CLINICAL LAB;

11:50AM   4      RIGHT?

11:50AM   5      A.   CORRECT.

11:50AM   6      Q.   IT WAS NOT TO INSPECT THE RESEARCH AND DEVELOPMENT LAB?

11:50AM   7      A.   CORRECT.

11:50AM   8      Q.   AND YOU SAID ON WEDNESDAY THAT MR. BALWANI HAD -- HE

11:50AM   9      DIDN'T WANT PEOPLE TO LOOK AT THE RESEARCH AND DEVELOPMENT LAB;

11:50AM  10      RIGHT?

11:50AM  11      A.   CORRECT.

11:50AM  12      Q.   AND THERE WAS NO REASON THAT MS. NORKIN NEEDED TO INSPECT

11:50AM  13      THAT LAB; RIGHT?

11:50AM  14      A.   NO.

11:50AM  15      Q.   BECAUSE HER ONLY JOB WAS TO MAKE SURE THAT THAT LAB WAS

11:50AM  16      OPERATING PROPERLY ON THE CLINICAL LAB SIDE; RIGHT?

11:50AM  17      A.   CORRECT.

11:50AM  18      Q.   AND THE RESEARCH AND DEVELOPMENT LAB IS WHERE THERANOS IS

11:50AM  19      WORKING ON NEW ASSAYS AND NEW THINGS; RIGHT?

11:50AM  20      A.   CORRECT.

11:50AM  21      Q.   AND THERE WAS NO -- MS. NORKIN NEVER REQUESTED TO INSPECT

11:51AM  22      THE RESEARCH AND DEVELOPMENT LAB; RIGHT?

11:51AM  23      A.   I WAS NEVER WITH HER -- I WASN'T WITH HER THE WHOLE TIME

11:51AM  24      SHE WAS THERE THAT DAY, SO I COULDN'T REALLY SAY.

11:51AM  25      Q.   AND AS FAR AS THE TIME THAT YOU SPENT WITH HER, SHE DIDN'T

11:51AM 1    ASK YOU ABOUT THAT?

11:51AM 2    A.   NO.

11:51AM 3    Q.   AND THEN YOU ALSO SAID IN YOUR DIRECT EXAMINATION THAT YOU

11:51AM 4    SHOWED HER VALIDATION REPORTS.

11:51AM 5    A.   YES.

11:51AM 6    Q.   AND THE VALIDATION REPORTS WERE FOR THE EDISON DEVICE?

11:51AM 7    A.   I BELIEVE SO, YES.

11:51AM 8    Q.   AND ALSO FOR THE MODIFIED PREDICATE DEVICE?

11:51AM 9    A.   YES.

11:51AM 10   Q.   AND SO BECAUSE YOU SHOWED THOSE TO HER, YOU WERE INFORMING

11:51AM 11   HER THAT THERANOS WAS RUNNING THOSE PIECES OF EQUIPMENT IN THE

11:51AM 12   LAB; RIGHT?

11:51AM 13   A.   I WAS INFORMING HER OF THE LDT'S THAT WE WERE RUNNING.

11:51AM 14   Q.   RIGHT.  AND THE LDT'S WERE THE EDISON AND THE MODIFIED

11:51AM 15   PREDICATE; RIGHT?

11:51AM 16   A.   CORRECT.

11:51AM 17   Q.   AND SO AFTER THAT, IF SHE HAD REQUESTED TO SEE THE ACTUAL

11:51AM 18   DEVICES IN THE NORMANDY LAB, YOU WOULD HAVE ALLOWED HER TO DO

11:51AM 19   THAT; RIGHT?

11:51AM 20   A.   YES.

11:51AM 21   Q.   YOU WOULDN'T HAVE REFUSED?

11:52AM 22   A.   NO, I WOULD NOT.

11:52AM 23   Q.   YOU WEREN'T TRYING TO HIDE ANYTHING FROM MS. NORKIN, WERE

11:52AM 24   YOU?

11:52AM 25   A.   I WAS NOT.

11:52AM  1    Q.   AND, IN FACT, PART OF NOT HIDING ANYTHING FROM HER WAS

11:52AM  2    SHOWING HER THESE VALIDATION REPORTS?

11:52AM  3    A.   CORRECT.

11:52AM  4    Q.   AND SO IF SHE HAD ANY OTHER QUESTIONS ABOUT THE OPERATION

11:52AM  5    OF ANY DEVICE THAT WAS RUNNING BLOOD TESTS IN THE CLINICAL LAB,

11:52AM  6    YOU WOULD HAVE HAD TO PROVIDE THAT INFORMATION?

11:52AM  7    A.   YES.

11:52AM  8    Q.   AND YOU WOULD HAVE DONE THAT?

11:52AM  9    A.   YES.

11:52AM  10   Q.   OKAY.

11:52AM  11        YOUR HONOR, I'M GOING TO GO TO ANOTHER TOPIC.  I KNOW IT'S

11:52AM  12   A LITTLE BEFORE 12:00.  WOULD THIS BE A GOOD TIME FOR A BREAK?

11:52AM  13            THE COURT:  YOU'RE NOT GOING TO FINISH IT IN SEVEN

11:52AM  14   MINUTES?

11:52AM  15            MR. COOPERSMITH:  NO, YOUR HONOR.

11:52AM  16            THE COURT:  ALL RIGHT.

11:52AM  17        LET'S TAKE OUR LUNCH BREAK NOW, LADIES AND GENTLEMEN.

11:52AM  18   LET'S TAKE 30 MINUTES, AND THEN WE'LL COME BACK.

11:52AM  19            MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:52AM  20            THE COURT:  YOU'RE WELCOME.

11:52AM  21        (LUNCH RECESS TAKEN AT 11:52 A.M.)

         22

         23

         24

         25

|          |    |                                                           |
|----------|----|-----------------------------------------------------------|
| 11:53AM  | 1  | **AFTERNOON SESSION**                                     |
| 12:35PM  | 2  | (JURY IN AT 12:35 P.M.)                                   |
| 12:35PM  | 3  | THE COURT:  THANK YOU.  WE ARE BACK ON THE RECORD.        |
| 12:35PM  | 4  | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.         |
| 12:35PM  | 5  | DR. ROSENDORFF IS STILL ON THE STAND.                    |
| 12:35PM  | 6  | I'LL REMIND YOU, DR. ROSENDORFF, YOU'RE STILL UNDER OATH. |
| 12:35PM  | 7  | I JUST WANTED TO REMIND YOU, FOLKS, WE ARE GOING TO BREAK |
| 12:35PM  | 8  | TODAY AT 2:45, 2:45 TODAY.                                |
| 12:35PM  | 9  | THANK YOU.                                                |
| 12:35PM  | 10 | MR. COOPERSMITH.                                          |
| 12:35PM  | 11 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR.                  |
| 12:35PM  | 12 | Q.  GOOD AFTERNOON, DR. ROSENDORFF.                       |
| 12:35PM  | 13 | A.  GOOD AFTERNOON.                                       |
| 12:36PM  | 14 | Q.  SO LET'S SWITCH TO A DIFFERENT SUBJECT, AND I WANT TO TALK |
| 12:36PM  | 15 | TO YOU ABOUT THE LABORATORY INFORMATION SYSTEM AT THERANOS. |
| 12:36PM  | 16 | OKAY?                                                     |
| 12:36PM  | 17 | A.  UH-HUH.                                               |
| 12:36PM  | 18 | Q.  AND YOU REMEMBER THERE WAS -- I THINK WE MENTIONED IT |
| 12:36PM  | 19 | EARLIER, THERE WAS A LABORATORY INFORMATION SYSTEM?       |
| 12:36PM  | 20 | A.  YES.                                                  |
| 12:36PM  | 21 | Q.  AND IT NEEDED TO BE UP AND RUNNING BEFORE THE WALGREENS |
| 12:36PM  | 22 | TESTING BEGAN?                                            |
| 12:36PM  | 23 | A.  YES.                                                  |
| 12:36PM  | 24 | Q.  AND THE LABORATORY INFORMATION SYSTEM WAS A DATABASE  |
| 12:36PM  | 25 | ESSENTIALLY; CORRECT?                                     |

12:36PM    1    A.   YES.

12:36PM    2    Q.   AND IN THE LABORATORY INFORMATION SYSTEM, LIKE, ALL OF THE

12:36PM    3    PATIENT RESULTS WERE HOUSED; RIGHT?

12:36PM    4    A.   CORRECT.

12:36PM    5    Q.   SO IF YOU WANTED TO LOOK UP ANY PATIENT RESULT, YOU COULD

12:36PM    6    DO THAT FROM LIS?

12:36PM    7    A.   CORRECT, CORRECT.

12:36PM    8    Q.   AND IF YOU WANTED TO KNOW ALL OF THE, FOR EXAMPLE, HCG

12:36PM    9    TESTS DONE IN A CERTAIN MONTH, YOU COULD DO THAT WITH LIS;

12:36PM   10    RIGHT?

12:36PM   11    A.   CORRECT.

12:36PM   12    Q.   AND I THINK YOU MENTIONED IN THE DIRECT EXAMINATION ON

12:36PM   13    WEDNESDAY THAT YOU WOULD, IN CONNECTION WITH INQUIRIES FROM

12:37PM   14    PHYSICIANS, YOU WOULD DO A TECHNICAL REVIEW TO SEE IF THINGS

12:37PM   15    HAD GONE WRONG AND TRY TO UNDERSTAND WHAT HAPPENED; RIGHT?

12:37PM   16    A.   YES.

12:37PM   17    Q.   NOW, WHEN AN ISSUE AROSE, YOU YOURSELF OR SOMEBODY ELSE

12:37PM   18    WOULD PULL INFORMATION FROM LIS TO PROVIDE DATA TO ADDRESS THE

12:37PM   19    SITUATION; CORRECT?

12:37PM   20    A.   YES.

12:37PM   21    Q.   AND THAT THE TYPE OF DATA COULD INCLUDE THE SPECIFIC ASSAY

12:37PM   22    THAT WAS USED?

12:37PM   23    A.   YES.

12:37PM   24    Q.   AND THE MACHINE THAT IT WAS RUN ON?

12:37PM   25    A.   YES.

12:37PM   1    Q.   AND THE REFERENCE RANGE?

12:37PM   2    A.   CAN WE REWIND A LITTLE BIT?

12:37PM   3         SO I DON'T THINK THAT THE SPECIFIC MACHINES WERE RECORDED

12:37PM   4    IN THE LIS AT THERANOS.  THEY'RE SUPPOSED TO BE.  I MEAN,

12:37PM   5    THAT'S GOOD LIS THAT YOU KNOW EXACTLY WHAT INSTRUMENT SOMETHING

12:37PM   6    WAS RUN ON, YEAH.

12:37PM   7    Q.   OKAY.  IF I COULD REFER YOU -- AND I'VE HANDED YOU SOME

12:37PM   8    BINDERS, PROBABLY ON WEDNESDAY, THAT HAVE SOME PRIOR TESTIMONY

12:37PM   9    IN THEM.

12:38PM  10    A.   UH-HUH.

12:38PM  11    Q.   AND YOU SHOULD HAVE THEM.  I'M SORRY TO REFER YOU BACK TO

12:38PM  12    BINDERS, BUT IT'S -- IF YOU COULD FIND EXHIBIT 28400.

12:38PM  13    A.   OKAY.  DO YOU KNOW WHICH BINDER IT IS IN?

12:38PM  14    Q.   YES.  IT WOULD BE IN VOLUME 4.  IT SHOULD BE LABELLED.

12:38PM  15    A.   OKAY.  GOT IT.

12:38PM  16    Q.   OKAY.  AND IF YOU COULD TURN TO PAGE 2090?

12:38PM  17    A.   I'M SORRY, PAGE 20 -- OH, YOU'RE REFERENCING THE TOP RIGHT

12:38PM  18    HAND?

12:38PM  19    Q.   YES, PLEASE.  THANK YOU.  THANK YOU.

12:38PM  20    A.   OKAY.  GOT IT.

12:39PM  21    Q.   OKAY.  AND IF YOU TAKE A LOOK AT LINE 9?

12:39PM  22    A.   YES.

12:39PM  23    Q.   AND LINE 10?

12:39PM  24    A.   YES, I'M SEEING IT.

12:39PM  25    Q.   OKAY.  DOES THAT REFRESH YOUR MEMORY THAT THE --

12:39PM   1    A.   WELL, I MEAN, TO CLARIFY --

12:39PM   2    Q.   WELL, CAN I JUST FINISH MY QUESTION?

12:39PM   3    A.   I'M SORRY.  I INTERRUPTED YOU.

12:39PM   4    Q.   THAT'S OKAY.  THANK YOU.

12:39PM   5         DOES THAT REFRESH YOUR MEMORY THAT THE LIS COULD HAVE

12:39PM   6    INCLUDED THE MACHINE THAT IT WAS RUN ON?

12:39PM   7    A.   THE LIS WOULD TELL YOU IF IT WAS RUN ON AN EDISON VERSUS

12:39PM   8    AN IMMULITE VERSUS AN -- IT WOULDN'T TELL YOU THE ACTUAL

12:39PM   9    MACHINE.  SO THE SERIAL NUMBER OF -- FOR INSTANCE, YOU KNOW,

12:39PM   10   THERE ARE MULTIPLE EDISONS, SO IT COULDN'T TELL YOU WHICH

12:39PM   11   PARTICULAR EDISON WAS BEING USED.

12:39PM   12   Q.   OKAY.  YOU DON'T REMEMBER THAT THAT WAS THE CASE, THAT IT

12:39PM   13   COULD TELL YOU A SPECIFIC EDISON BY SERIAL NUMBER?

12:40PM   14   A.   I DON'T BELIEVE IT COULD.

12:40PM   15   Q.   OKAY.  BUT IT WOULD TELL YOU WHETHER IT WAS AN EDISON OR

12:40PM   16   IMMULITE OR SOME OTHER --

12:40PM   17   A.   YES, YES.  I BELIEVE SO, YES.

12:40PM   18   Q.   AND YOU UNDERSTAND THAT IT WOULD ALSO TELL YOU THE

12:40PM   19   REFERENCE RANGE FOR THAT PARTICULAR TEST?

12:40PM   20   A.   YES.

12:40PM   21   Q.   THE TIME OF ARRIVAL IN THE LAB OF THE SAMPLE; CORRECT?

12:40PM   22   A.   YES.

12:40PM   23   Q.   AND THE TIME THAT THE REPORT WAS RELEASED?

12:40PM   24   A.   YES.

12:40PM   25   Q.   AND, OF COURSE, THE ACTUAL RESULTS; RIGHT?

12:40PM   1      A.   YES.

12:40PM   2      Q.   AND ALSO QUALITY CONTROL INFORMATION?

12:40PM   3      A.   YES.

12:40PM   4      Q.   AND YOU YOURSELF, YOU WERE ABLE TO LOG IN, AND YOU DID LOG

12:40PM   5      INTO THE LIS SYSTEM TO REVIEW DATA ON YOUR OWN; CORRECT?

12:40PM   6      A.   YES, I DID.

12:40PM   7      Q.   OKAY.  AND WHEN INQUIRIES CAME IN FROM PHYSICIANS, YOU

12:40PM   8      WOULD GO TO LIS TO SEE HOW THERANOS RESULTS WERE TRENDING;

12:41PM   9      CORRECT?

12:41PM  10      A.   I DON'T RECALL.

12:41PM  11      Q.   OKAY.  TAKE A LOOK AT, IT SHOULD BE IN THE SAME BINDER,

12:41PM  12      EXHIBIT 28404.

12:41PM  13      A.   OKAY.

12:41PM  14      Q.   AND I'M GOING TO REFER YOU SPECIFICALLY TO PAGE 2908.

12:41PM  15      A.   OH, GOT IT.

12:41PM  16      Q.   THANK YOU.

12:41PM  17           AND I'M GOING TO REFER YOU IN PARTICULAR TO LINES 24 AND

12:42PM  18      25?

12:42PM  19      A.   OKAY.

12:42PM  20      Q.   AND DOES THAT REFRESH YOUR MEMORY THAT WHEN INQUIRIES CAME

12:42PM  21      IN, YOU COULD GO TO LIS AND SEE HOW THE THERANOS RESULTS HAD

12:42PM  22      BEEN TRENDING?

12:42PM  23      A.   YES, IT DOES.

12:42PM  24      Q.   OKAY.  AND THAT IS, IN FACT, WHAT HAPPENED; RIGHT?

12:42PM  25      A.   YES.

12:42PM  1    Q.   AND THEN YOU COULD ALSO SEE HOW MANY RESULTS ARE OUT OF

12:42PM  2    REFERENCE RANGE WHEN YOU WERE DOING THIS WORK; RIGHT?

12:42PM  3    A.   YES.

12:42PM  4    Q.   AND ESSENTIALLY, WHEN AN INQUIRY CAME IN, YOU WOULD USE

12:42PM  5    LIS TO DO AN INVESTIGATION; RIGHT?

12:42PM  6    A.   YES.

12:42PM  7    Q.   AND THAT'S THE WAY YOU RESOLVED, AT LEAST ONE OF THE TOOLS

12:42PM  8    YOU USED TO RESOLVE, WHEN A PHYSICIAN INQUIRY CAME IN, WHAT WAS

12:42PM  9    GOING ON AND HOW YOU MIGHT RESPOND TO THE PHYSICIAN?

12:42PM  10   A.   CORRECT.

12:42PM  11   Q.   AND ULTIMATELY DETERMINE WHETHER YOU COULD TELL THE

12:42PM  12   PHYSICIAN THE TEST IS VALID OR, YOU KNOW, SOMETHING ELSE SHOULD

12:42PM  13   BE DONE OR THAT SORT OF THING?

12:42PM  14   A.   CORRECT.

12:43PM  15   Q.   ALL RIGHT.  NOW, WITH RESPECT TO LIS, YOU TOLD THE

12:43PM  16   GOVERNMENT ABOUT LIS AS EARLY AS JUNE 2017; CORRECT?

12:43PM  17   A.   I DON'T RECALL.

12:43PM  18   Q.   OKAY.  TAKE A LOOK AT EXHIBIT 28324.

12:43PM  19          MR. BOSTIC:  I HAVE A RELEVANCE OBJECTION TO THIS

12:43PM  20   LINE.

12:43PM  21          THE COURT:  THERE WAS A RELEVANCE OBJECTION.

12:43PM  22          MR. COOPERSMITH:  YOUR HONOR, I THINK WE'VE

12:43PM  23   DISCUSSED THIS PRETTY EXTENSIVELY.  THIS IS PART OF THE

12:43PM  24   DEFENSE.

12:43PM  25          THE COURT HAS ALREADY RULED THAT THE QUALITY AND NATURE OF

12:43PM   1      THE GOVERNMENT'S INVESTIGATION IS AT ISSUE AND IT'S FAIR GAME,

12:43PM   2      AND THAT'S WHAT THE RELEVANCE IS.

12:43PM   3                THE COURT:  WELL, THANK YOU.

12:43PM   4           LET'S HEAR WHAT YOUR QUESTION IS IN REGARDS TO 28324, IS

12:44PM   5      IT?

12:44PM   6                MR. COOPERSMITH:  YES.

12:44PM   7      Q.   SO, DR. ROSENDORFF, I'M JUST HAVING YOU LOOK AT

12:44PM   8      EXHIBIT 28324.

12:44PM   9           DO YOU SEE THAT?

12:44PM   10     A.   YES.

12:44PM   11     Q.   AND THAT'S REFLECTING THE INTERVIEW OF YOU ON JUNE 7TH,

12:44PM   12     2017?

12:44PM   13     A.   YES.

12:44PM   14     Q.   AND I THINK I REFERRED TO THIS EARLIER, BUT THIS IS ONE OF

12:44PM   15     THOSE INTERVIEWS WHERE YOU'RE TALKING TO A GROUP OF AGENTS AND

12:44PM   16     OTHERS, AND PROSECUTORS?

12:44PM   17     A.   YES.

12:44PM   18     Q.   AND ONE OF THOSE TIMES WHEN YOU KNEW YOU HAD TO BE

12:44PM   19     TRUTHFUL?

12:44PM   20     A.   YES.

12:44PM   21     Q.   AND YOU WERE TRYING TO DO THAT; RIGHT?

12:44PM   22     A.   YES.

12:44PM   23     Q.   AND IN THAT SESSION, IF I CAN REFER YOU TO PAGE 5, PLEASE,

12:44PM   24     SIR.

12:44PM   25     A.   I HAVE IT.

12:44PM   1    Q.   IF YOU LOOK AT THE MIDDLE OF THE PAGE, THERE'S A PARAGRAPH

12:44PM   2    THAT STARTS WITH "INFORMATION."

12:44PM   3    A.   OKAY.  I HAVE IT NOW.

12:44PM   4    Q.   IN THAT PARAGRAPH, YOU IN THIS INTERVIEW, IN FACT,

12:44PM   5    INFORMED THE GOVERNMENT THAT THERE WAS A SYSTEM CALLED LIS;

12:45PM   6    CORRECT?

12:45PM   7    A.   YES.

12:45PM   8    Q.   AND THAT THE SYSTEM WAS PUT INTO USE RIGHT AROUND THE TIME

12:45PM   9    OF THE WALGREENS LAUNCH?

12:45PM  10    A.   YES.

12:45PM  11    Q.   AND THAT IT COULD SEARCH TEST RESULTS BY ANALYTE, ANALYTE

12:45PM  12    VALUES IN PATIENTS?

12:45PM  13    A.   YES.

12:45PM  14    Q.   AND THAT DOCUMENTS WERE AUTO SIGNED THROUGH THE LIS

12:45PM  15    SYSTEM; RIGHT?

12:45PM  16         THE COURT:  IS THIS IN REGARDS TO A 613 ISSUE OR --

12:45PM  17         MR. COOPERSMITH:  NO, YOUR HONOR.  I'M SIMPLY

12:45PM  18    POINTING OUT THAT HE INFORMED THE GOVERNMENT ABOUT THE LIS

12:45PM  19    SYSTEM IN JUNE OF 2017, AND I THINK I'M DONE WITH THAT TOPIC.

12:45PM  20         THE COURT:  OKAY.  AS OPPOSED TO -- YOU WERE READING

12:45PM  21    A DOCUMENT.

12:45PM  22      ANYHOW, WHY DON'T YOU FINISH YOUR QUESTION?  GO AHEAD AND

12:45PM  23    FINISH YOUR QUESTION.

12:45PM  24         MR. COOPERSMITH:  I DON'T HAVE ANY FURTHER QUESTIONS

12:45PM  25    ABOUT THIS DOCUMENT.

12:45PM   1              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

12:46PM   2      BY MR. COOPERSMITH:

12:46PM   3      Q.   I'D LIKE TO MOVE TO A DIFFERENT TOPIC, DR. ROSENDORFF.

12:46PM   4           AND DURING THE DIRECT EXAMINATION FROM WEDNESDAY, YOU

12:46PM   5      TALKED ABOUT QUALITY CONTROL PROCEDURES AT THERANOS; RIGHT?

12:46PM   6      A.   YES, I DID.

12:46PM   7      Q.   OKAY.  AND THAT WAS SOMETHING THAT WAS DONE IN THE CLIA

12:46PM   8      LAB; CORRECT?

12:46PM   9      A.   CORRECT.

12:46PM  10      Q.   AND IT WAS DONE FOR EDISON DEVICES THAT WERE RUNNING BLOOD

12:46PM  11      TESTS?

12:46PM  12      A.   CORRECT.

12:46PM  13      Q.   AND ALSO MODIFIED PREDICATES?

12:46PM  14      A.   CORRECT.

12:46PM  15      Q.   AND ALSO UNMODIFIED PREDICATES?

12:46PM  16      A.   CORRECT.

12:46PM  17      Q.   AND ANY LAB HAS TO DO QUALITY CONTROL IN ORDER TO MAKE

12:46PM  18      SURE THAT THE TESTING INSTRUMENTS ARE PERFORMING IN A WAY THAT

12:46PM  19      IS APPROPRIATE FOR TESTING HUMAN BLOOD SAMPLES; RIGHT?

12:46PM  20      A.   CORRECT.

12:46PM  21      Q.   AND AT THERANOS, IN FACT, THE QUALITY CONTROL ON ALL THOSE

12:46PM  22      DEVICES WAS DONE ON A DAILY BASIS?

12:46PM  23      A.   WELL, SOMETIMES MORE.  I MEAN, SOMETIMES MORE FREQUENTLY

12:47PM  24      THAN THAT.

12:47PM  25      Q.   OKAY.  SO AT LEAST DAILY, BUT SOMETIMES MORE FREQUENTLY?

12:47PM  1    A.   YEAH, YEAH.

12:47PM  2    Q.   AND THE PROTOCOL WAS THAT IF A DEVICE DIDN'T PASS QUALITY

12:47PM  3    CONTROL, THEN IT WOULDN'T BE USED FOR PATIENT TESTING?

12:47PM  4    A.   CORRECT.

12:47PM  5    Q.   UNTIL FURTHER STEPS WERE TAKEN?

12:47PM  6    A.   CORRECT.

12:47PM  7    Q.   AND THAT COULD INVOLVE RECALIBRATION; RIGHT?

12:47PM  8    A.   CORRECT.

12:47PM  9    Q.   AND THAT WAS TRUE FOR ANY DEVICE, INCLUDING PREDICATES?

12:47PM  10   A.   CORRECT.

12:47PM  11   Q.   OR MODIFIED PREDICATES?

12:47PM  12   A.   CORRECT.

12:47PM  13   Q.   OR EDISON DEVICES?

12:47PM  14   A.   CORRECT.

12:47PM  15   Q.   AND YOU YOURSELF DIDN'T RUN THE SAMPLES IN THAT MACHINE;

12:47PM  16   RIGHT?

12:47PM  17   A.   UM, I THINK I RAN A FEW AFTER I JOINED THE COMPANY.

12:47PM  18   Q.   OKAY.

12:47PM  19   A.   I WANTED TO LEARN HOW IT WAS DONE, SO I HAD SOME OF THE

12:47PM  20   CLS'S TRAIN ME.

12:47PM  21   Q.   OKAY.  THAT MAKES SENSE.

12:47PM  22        BUT GOING -- YOU KNOW, ON A ROUTINE BASIS, IT WAS LAB

12:47PM  23   ASSOCIATES AND OTHER PEOPLE LIKE THAT; RIGHT?

12:47PM  24   A.   CORRECT.

12:47PM  25   Q.   OKAY.  BUT YOU WERE OVERSEEING THAT PROCESS AS LAB

12:47PM  1    DIRECTOR?

12:47PM  2    A.   CORRECT.

12:47PM  3    Q.   OKAY.  I'D LIKE TO TAKE A LOOK AT AN EXHIBIT WITH YOU, AND

12:48PM  4    I BELIEVE IT'S 1430.

12:48PM  5         I BELIEVE IT IS ALREADY IN EVIDENCE, YOUR HONOR.

12:48PM  6         OKAY.  DO YOU SEE THAT EXHIBIT 1430 IS AN EMAIL FROM YOU

12:48PM  7    TO THE ENTIRE CLIA LAB --

12:48PM  8    A.   YES.

12:48PM  9    Q.   -- EMAIL ADDRESS?

12:48PM  10        AND THAT WOULD HAVE INCLUDED ALL OF THE PEOPLE WHO WORKED

12:48PM  11   IN THE CLIA LAB; RIGHT?

12:48PM  12   A.   CORRECT.

12:48PM  13   Q.   AND MAYBE OTHERS?

12:48PM  14   A.   CORRECT.

12:48PM  15   Q.   AND IN THAT EMAIL YOU'RE SAYING, "DEAR CLIA,

12:48PM  16        "PLEASE REFER TO THE FOLLOWING QC POLICIES."

12:48PM  17        RIGHT?

12:48PM  18   A.   YES.

12:48PM  19   Q.   AND THIS IS ON JANUARY 16TH, 2014?

12:48PM  20   A.   CORRECT.

12:48PM  21   Q.   AND YOU'RE COMMUNICATING TO THE CLIA LAB EMPLOYEES THAT

12:48PM  22   THESE ARE QC POLICIES THAT YOU WANT THEM TO FOLLOW; RIGHT?

12:48PM  23   A.   YES.

12:49PM  24   Q.   OKAY.  AND THEN IF YOU GO TO THE NEXT PAGE, EVEN THOUGH

12:49PM  25   THERE'S AN EMAIL WITH YOUR -- FROM YOU, THERE'S NOT A

12:49PM  1    SIGNATURE, OR THERE WAS NO SIGNATURES ON THIS PAGE.

12:49PM  2        DO YOU SEE THAT?

12:49PM  3    A.   YES.

12:49PM  4    Q.   AND YOU PROBABLY CAN'T REMEMBER WHY THAT IS; RIGHT?

12:49PM  5    A.   I DON'T RECALL.

12:49PM  6    Q.   OKAY.  BUT THEN LET'S GO TO THE NEXT PAGE.

12:49PM  7        AND THEN THERE'S A DAILY QC SECTION.

12:49PM  8        DO YOU SEE THAT?

12:49PM  9    A.   YES.

12:49PM  10   Q.   AND THAT SAYS, "RUN AT LEAST 2 AND PREFERABLY 3 CONTROLS"?

12:49PM  11   A.   YES.

12:49PM  12   Q.   AND THEN IF YOU GO ON, THERE'S A CONTINUOUS QC SECTION?

12:49PM  13   A.   YES.

12:49PM  14   Q.   AND THAT CONTINUOUS QC IS SOMETHING DIFFERENT THAN DAILY

12:49PM  15   QC; RIGHT?

12:49PM  16   A.   CORRECT.

12:49PM  17   Q.   AND IT'S A PROCESS WHERE OVER TIME YOU LOOK AT THE TRENDS

12:49PM  18   OF THE QC; RIGHT?

12:49PM  19   A.   CORRECT.  A QC -- A QC RESULT CAN BE ASSESSED RELATIVE TO

12:49PM  20   OTHER HISTORICAL QC RESULTS AND RESULT IN A FAILURE, IF THAT

12:50PM  21   MAKES SENSE.

12:50PM  22        FOR INSTANCE, 2.7, "TEN CONSECUTIVE OBSERVATIONS ON THE

12:50PM  23   SAME SIDE OF THE MEAN LINE," YOU KNOW, NONE OF THOSE QC RESULTS

12:50PM  24   IN AND OF THEMSELVES WOULD BE A FAILURE.

12:50PM  25        BUT WHEN YOU GET TEN ON THE SAME SIDE OF THE LINE, YOU

12:50PM  1    KNOW, ONE DAY YOU GET THE TENTH AND THEN YOU FAIL ACCORDING TO

12:50PM  2    THE WESTGARD RULES.

12:50PM  3    Q.   RIGHT.  AND UNDER THE CONTINUOUS QC RULES, LABS LOOK AT

12:50PM  4    THAT WITH REFERENCE TO SOMETHING CALLED THE WESTGARD RULES?

12:50PM  5    A.   YES.

12:50PM  6    Q.   AND IS THERE SOMETHING CALLED LEVEY-JENNINGS CHARTS THAT

12:50PM  7    GO INTO THAT?

12:50PM  8    A.   CORRECT.

12:50PM  9    Q.   OKAY.  AND THIS IS REALLY JUST LOOKING AT QC OVER TIME AS

12:50PM  10   OPPOSED TO LIKE ON A DAILY BASIS; RIGHT?

12:50PM  11   A.   CORRECT.

12:50PM  12   Q.   AND THE POLICY IS THAT EVEN IF QC WERE TO PASS ON A GIVEN

12:50PM  13   INSTRUMENT EVERY DAY, YOU WOULD STILL PULL THE INSTRUMENT IF IT

12:50PM  14   WAS -- IF THE TRENDING OVER TIME WAS NOT UP TO SNUFF; RIGHT?

12:51PM  15   A.   CORRECT.

12:51PM  16   Q.   OKAY.  AND THAT WAS THE POLICY?

12:51PM  17   A.   CORRECT.

12:51PM  18   Q.   OKAY.  IF YOU GO TO PAGE 4 OF THE DOCUMENT.

12:51PM  19        AND THIS PAGE REFERENCES EDISON QC IN PARTICULAR; RIGHT?

12:51PM  20   A.   YES.

12:51PM  21   Q.   AND I THINK YOU TESTIFIED ON DIRECT ABOUT THE NEED TO

12:51PM  22   ESTABLISH QC RANGES?

12:51PM  23   A.   YES.

12:51PM  24   Q.   AND THAT'S REFLECTED IN SECTION 3.1?

12:51PM  25   A.   YES.

12:51PM  1    Q.   AND THEN IT TALKS ABOUT THE ACCEPTABLE LOW AND HIGH QC

12:51PM  2    RANGES WITH REFERENCE TO TWO STANDARD DEVIATIONS.

12:51PM  3         DO YOU SEE THAT?

12:51PM  4    A.   YES.

12:51PM  5    Q.   AND STANDARD DEVIATIONS, THESE ARE JUST A REFERENCE TO HOW

12:51PM  6    FAR AWAY FROM A GIVEN VALUE IT CAN BE AND STILL BE ABLE TO

12:51PM  7    PASS; RIGHT?

12:51PM  8    A.   WELL, YEAH, STANDARD DEVIATION IS STATISTICAL.  SO WHEN

12:51PM  9    YOU MINUS 2 SD'S -- I DON'T WANT TO GET TOO TECHNICAL.  IT'S

12:52PM  10   PROBABLY NOT NECESSARY.

12:52PM  11   Q.   IT'S PROBABLY NOT.

12:52PM  12   A.   YEAH.

12:52PM  13   Q.   BUT I WILL JUST ASK YOU THIS, THIS -- FROM YOUR EXPERIENCE

12:52PM  14   AS A LAB DIRECTOR, YOU KNOW, USING THESE STANDARD DEVIATION

12:52PM  15   MEASURES WITH QUALITY CONTROL, THAT'S A TYPICAL LAB PRACTICE;

12:52PM  16   RIGHT?

12:52PM  17   A.   YES, IT IS.

12:52PM  18   Q.   YOU WEREN'T DOING ANYTHING UNUSUAL OR DIFFERENT?

12:52PM  19   A.   NO, I WAS NOT.

12:52PM  20   Q.   OKAY.  AND THE REASON WHY YOU LOOK AT STANDARD DEVIATIONS

12:52PM  21   IS BECAUSE YOU'RE REALLY NOT EXPECTING, IF YOU RUN A PARTICULAR

12:52PM  22   SAMPLE, OR EVEN A BIORAD SAMPLE FOR QC, YOU'RE NOT EXPECTING TO

12:52PM  23   GET EXACTLY THE SAME VALUE EVERY TIME YOU RUN THAT; RIGHT?

12:52PM  24   A.   THE CLOSER THOSE VALUES ARE, THE BETTER THE TEST.

12:52PM  25   Q.   OF COURSE.  BUT YOU'RE NOT EXPECTING AN IDENTICAL TEST;

12:52PM  1    RIGHT?

12:52PM  2    A.   IF YOU STEP ON A SCALE TWICE YOU'RE GOING TO GET A

12:53PM  3    DIFFERENT READING.

12:53PM  4    Q.   AND IF, FOR EXAMPLE, SOMEONE WERE TO TAKE A BLOOD SAMPLE

12:53PM  5    FROM ME AND RUN IT ON ANY BLOOD TESTING INSTRUMENT TWO TIMES,

12:53PM  6    FIVE TIMES, TEN TIMES, YOU WOULD NOT EXPECT THE IDENTICAL

12:53PM  7    NUMBER?

12:53PM  8    A.   NO.

12:53PM  9    Q.   AND THAT WOULD BE REALLY RARE?

12:53PM  10   A.   YES, IT WOULD BE RARE.

12:53PM  11   Q.   OKAY.  BUT YOU'RE HOPING, IF THE INSTRUMENT IS FUNCTIONING

12:53PM  12   PROPERLY, THAT IF IT'S CLOSE ENOUGH, THAT YOU COULD

12:53PM  13   STATISTICALLY DECIDE THAT IT'S APPROPRIATE, IT'S GOING TO PASS;

12:53PM  14   RIGHT?

12:53PM  15   A.   YES.

12:53PM  16   Q.   OKAY.  AND THAT'S WHAT THIS REALLY IS DOING, THE STANDARD

12:53PM  17   DEVIATION METHODOLOGY; RIGHT?

12:53PM  18   A.   YES.

12:53PM  19   Q.   AND IF YOU GO TO THE EDISON DAILY QC SECTION OF THIS.

12:53PM  20        THIS IS THE SECTION THAT DEALS WITH THE DAILY QUALITY ON

12:53PM  21   THE EDISON MACHINE; RIGHT?

12:53PM  22   A.   YES.

12:53PM  23   Q.   SO LET'S JUST GO THROUGH THAT.  IT SAYS 3.2.1, "RUN AT

12:53PM  24   LEAST 2 AND PREFERABLY LEVELS.  ENSURE QC MATERIAL IS NOT

12:53PM  25   OUTDATED/EXPIRED."

12:54PM   1          DO YOU SEE THAT?

12:54PM   2     A.   YES.

12:54PM   3     Q.   AND SO AS A STARTING POINT, THE PERSON WHO IS DOING THIS

12:54PM   4     TEST HAS TO MAKE SURE THE REAGENT IS NOT EXPIRED; RIGHT?

12:54PM   5     A.   CORRECT.

12:54PM   6     Q.   BECAUSE THAT COULD AFFECT THE RESULTS?

12:54PM   7     A.   CORRECT.

12:54PM   8     Q.   BUT THEN IN ADDITION, THE QC RUN HAS TO BE AT LEAST TWO,

12:54PM   9     AND IT DOESN'T -- THERE'S, LIKE, A WORD MISSING?

12:54PM  10     A.   YEAH, I THINK, I THINK IT -- I THINK I MEANT THREE JUST

12:54PM  11     BASED ON LOOKING AT A PREVIOUS DOCUMENT.  TWO AND PREFERABLY

12:54PM  12     THREE IS WHAT I MEANT TO SAY.

12:54PM  13     Q.   OKAY.  TWO, AND PREFERABLY THREE?

12:54PM  14     A.   YEAH.

12:54PM  15     Q.   AND SO THAT MEANS THAT IN ORDER FOR A MACHINE, AN EDISON

12:54PM  16     DEVICE IN THIS INSTANCE, TO PASS QC, IT HAS TO PASS AT LEAST

12:54PM  17     TWO AND MAYBE THREE LEVELS; RIGHT?

12:54PM  18     A.   CORRECT.

12:54PM  19     Q.   AND SO IT'S NOT LIKE A ONE AND DONE, SO TO SPEAK?

12:54PM  20     A.   NO.

12:54PM  21     Q.   AND SO IF EVERYTHING PASSES REFERRING TO 3.2.2, REFERRING

12:54PM  22     TO THE DOCUMENT, THEN THE MACHINE IS PASSING QC AND IT CAN RUN

12:54PM  23     PATIENT TESTS; RIGHT?

12:54PM  24     A.   RIGHT.

12:54PM  25     Q.   BUT IF IT FAILS, THEN YOU HAVE TO REDO THE QC?

12:55PM   1    A.   YES.

12:55PM   2    Q.   AND FAILURE IS DEFINED AS A FAILURE OF ONE OR MORE LEVELS;

12:55PM   3    RIGHT?

12:55PM   4    A.   CORRECT.

12:55PM   5    Q.   AND SO IF IT PASSES ONE LEVEL AND NOT BOTH, THEN THE

12:55PM   6    MACHINE FAILS QC?

12:55PM   7    A.   CORRECT.

12:55PM   8    Q.   AND IT WOULD NOT BE USED FOR PATIENT TESTING AT THAT

12:55PM   9    POINT?

12:55PM  10    A.   CORRECT.

12:55PM  11    Q.   OKAY.  AND THEN IF YOU REPEAT QC ON 3.2.4, IF THE QUALITY

12:55PM  12    CONTROL STILL FAILS, THEN YOU HAVE TO RECALIBRATE THE

12:55PM  13    INSTRUMENT?

12:55PM  14    A.   RIGHT.

12:55PM  15    Q.   AND THAT'S A MORE LENGTHY PROCESS?

12:55PM  16    A.   CORRECT.

12:55PM  17    Q.   AND THEN ON 3.2.5, THE POLICY IS IF THE QC PASSES AFTER

12:55PM  18    RECALIBRATION, THEN YOU RUN PATIENT SPECIMENS; RIGHT?

12:55PM  19    A.   YES.

12:55PM  20    Q.   BUT IF IT STILL FAILS, THEN THERE'S, IN CAPITAL LETTERS,

12:55PM  21    STOP; RIGHT?

12:55PM  22    A.   YES.

12:55PM  23    Q.   AND THAT'S WHEN THE POLICY SAYS YOU HAVE TO CONSULT WITH

12:56PM  24    THE THERANOS TECHNICAL SUPPORT; RIGHT?

12:56PM  25    A.   YES.

12:56PM 1    Q.   BECAUSE NOW YOU HAVE TO LOOK MORE DEEPLY INTO THE PROBLEM

12:56PM 2    AND TRY TO FIGURE OUT WHAT IS GOING ON?

12:56PM 3    A.   YES.

12:56PM 4    Q.   OKAY.  AND THIS WAS YOUR POLICY?

12:56PM 5    A.   YES, IT WAS.

12:56PM 6    Q.   OKAY.  NOW, THIS MAY SOUND LIKE A BASIC QUESTION, BUT

12:56PM 7    THESE QC TESTS, I THINK WE ESTABLISHED THE OTHER DAY THAT THIS

12:56PM 8    IS USING, IN THE CASE OF EDISON, SOMETHING -- A PRODUCT FROM A

12:56PM 9    COMPANY CALLED BIORAD?

12:56PM 10   A.   CORRECT.

12:56PM 11   Q.   AND IT'S NOT ACTUALLY HUMAN BLOOD; RIGHT?

12:56PM 12   A.   THIS IS, UM -- IT'S CONSTITUTED TO RESEMBLE SERUM AND

12:56PM 13   PLASMA.  IT'S GOT -- YOU KNOW, I DON'T WANT TO GO INTO IT TOO

12:56PM 14   CLOSELY, BUT IT'S THE CLOSEST YOU CAN GET TO HUMAN BLOOD.

12:56PM 15       IT ALSO NEEDS TO BE PRETTY STABLE TO BE ABLE TO RUN IT FOR

12:56PM 16   A PERIOD OF TIME.  IT NEEDS TO WITHSTAND TRANSPORTATION.  IT

12:56PM 17   HAS DETERGENTS, BUFFERS IN IT AND WHATNOT, PROTEINS.

12:57PM 18   Q.   RIGHT.  THAT'S WHAT IS NEEDED TO LIKE MANUFACTURE AND

12:57PM 19   TRANSPORT THESE TYPE OF QC MATERIALS?

12:57PM 20   A.   YEAH, AND THEY'RE COMMONLY USED FOR QC BLOOD TESTS.

12:57PM 21   Q.   RIGHT.  BUT EVEN THOUGH THEY'RE MADE TO MIMIC HUMAN BLOOD,

12:57PM 22   THEY'RE NOT ACTUALLY HUMAN BLOOD?

12:57PM 23   A.   CORRECT, CORRECT.

12:57PM 24   Q.   AGAIN, IT SOUNDS LIKE A BASIC QUESTION, BUT WHEN ONE OF

12:57PM 25   THE LABORATORY RUNS PERSONNEL RUN ONE OF THESE QC TESTS AND

12:57PM  1     THEY GET A RESULT, NOTHING IS BEING REPORTED TO A PATIENT AT

12:57PM  2     THAT POINT; RIGHT?

12:57PM  3     A.   CORRECT.  CORRECT, YES.

12:57PM  4     Q.   OKAY.  SO LET'S TALK ABOUT AN ISSUE THAT CAME UP ON

12:57PM  5     DIRECT.

12:57PM  6          AND AT THERANOS, DO YOU RECALL THERE WAS A PROCEDURE WHERE

12:57PM  7     THERE WERE ACTUALLY SIX DATA POINTS THAT WERE YIELDED FROM THE

12:57PM  8     EDISON?

12:57PM  9     A.   YES.

12:57PM  10    Q.   RIGHT?

12:57PM  11         AND THAT WAS BECAUSE TO RUN A BLOOD TEST, THERE WOULD

12:57PM  12    ACTUALLY BE THREE EDISON MACHINES USED?

12:58PM  13    A.   THREE AT ONE POINT, AND THEN WHEN THE SIXTH TIP CAME

12:58PM  14    ABOUT, IT WAS JUST THE ONE INSTRUMENT.

12:58PM  15    Q.   SO ORIGINALLY THERE WERE THREE EDISONS RUNNING A TEST, AND

12:58PM  16    EACH EDISON HAD TWO TIPS; RIGHT?

12:58PM  17    A.   CORRECT, CORRECT.

12:58PM  18    Q.   BUT THEN YOU REMEMBER ANOTHER POINT IN TIME WHERE THAT WAS

12:58PM  19    MODIFIED SO THAT THE EDISON WOULD HAVE THREE TIPS?

12:58PM  20    A.   SIX.

12:58PM  21    Q.   OR ALL SIX; RIGHT?

12:58PM  22    A.   CORRECT.

12:58PM  23    Q.   AND SO THAT MEANT THAT YOU ONLY NEEDED ONE EDISON?

12:58PM  24    A.   CORRECT.

12:58PM  25    Q.   AND SO THERE WAS, LIKE, I GUESS A MANUFACTURING CHANGE IN

12:58PM   1    HOW THE EDISONS WERE MANUFACTURED?

12:58PM   2    A.   CORRECT.

12:58PM   3    Q.   AND SO AT SOME POINT IN TIME YOU NODE LONGER NEEDED THE

12:58PM   4    THREE EDISONS, AND YOU COULD DO THE TESTS WITH ONE EDISON?

12:58PM   5    A.   CORRECT.

12:58PM   6    Q.   AND BECAUSE YOUR SIX DATA POINTS CAME RIGHT FROM THE ONE

12:58PM   7    MACHINE?

12:58PM   8    A.   CORRECT.

12:58PM   9    Q.   AND YOU DIDN'T NEED THREE ANYMORE?

12:58PM  10    A.   CORRECT.

12:58PM  11    Q.   BUT EITHER WAY, IN THE PREVIOUS INCARNATION OR THE LATER

12:58PM  12    INCARNATION, YOU'RE STILL GETTING SIX DATA POINTS; RIGHT?

12:58PM  13    A.   YES.

12:58PM  14    Q.   THEY'RE CALLED TIPS, BUT THEY'RE ESSENTIALLY SIX DATA

12:59PM  15    POINTS?

12:59PM  16    A.   CORRECT.

12:59PM  17    Q.   AND THE TIPS JUST REFERS TO, LIKE, AN ACTUAL PHYSICAL

12:59PM  18    MECHANISM WITHIN THE DEVICE; RIGHT?

12:59PM  19    A.   THE TIP IS -- BASICALLY IT'S A PIECE OF PLASTIC THAT FITS

12:59PM  20    OVER A PROBE, TO MY KNOWLEDGE, AND IT'S COATED WITH ANTIBODIES.

12:59PM  21    I MEAN, EACH OF THOSE TIPS IS INVOLVED IN PRODUCING A SINGLE

12:59PM  22    OBSERVATION, YEAH.

12:59PM  23    Q.   OKAY.  AND YOU REMEMBER YOU TALKED TO US ON DIRECT THERE

12:59PM  24    WAS A PROCEDURE AT THERANOS WHERE EVEN THOUGH THERE WERE SIX

12:59PM  25    DATA POINTS, THE FINAL ANSWER OR RESULT COULD BE BASED ON FOUR

12:59PM  1    OF THE SIX?

12:59PM  2    A.   CORRECT.

12:59PM  3    Q.   AND THAT'S SOMETIMES KNOWN AS THE PROCESS OF OUTLIER

12:59PM  4    REMOVAL?

12:59PM  5    A.   CORRECT.

12:59PM  6    Q.   AND LET'S LOOK AT EXHIBIT 1525, WHICH YOU CAN SEE ON YOUR

12:59PM  7    SCREEN, I THINK.

01:00PM  8         AND EXHIBIT 1525 HAS BEEN PREVIOUSLY ADMITTED, SO WITH

01:00PM  9    YOUR PERMISSION, WE WOULD LIKE TO PUBLISH IT, YOUR HONOR.

01:00PM 10              THE COURT:  YES.

01:00PM 11              MR. COOPERSMITH:  THANK YOU.

01:00PM 12    Q.   LET'S GO TO THE EARLIEST EMAIL IN TIME.

01:00PM 13         AND THIS IS FROM ERIKA CHEUNG.

01:00PM 14         DO YOU SEE THAT?

01:00PM 15    A.   YES.

01:00PM 16    Q.   AND SHE WAS ONE OF THE LAB ASSOCIATES?

01:00PM 17    A.   YES.

01:00PM 18    Q.   AND ON FEBRUARY 10TH, 2014, SHE WROTE TO YOU AND JAMIE LIU

01:00PM 19    AND DR. PANDORI?

01:00PM 20    A.   YES.

01:00PM 21    Q.   AND SHE SAID "I RERAN THE LEVEL 1 QC FOR TSH, IT FAILED

01:00PM 22    AGAIN."

01:00PM 23    A.   YES.

01:00PM 24    Q.   AND THE DATA IS IN THE -- THERE'S A NUMBER AND IT GOES ON?

01:00PM 25    A.   YES.

01:00PM  1    Q.   AND SHE GOES ON TO TALK ABOUT RECALIBRATING AND SO FORTH.

01:00PM  2         DO YOU SEE THAT?

01:00PM  3    A.   YES.

01:00PM  4    Q.   AND THEN LET'S GO TO THE EMAIL AT THE TOP OF PAGE 3.

01:01PM  5         IT SAYS, "HI ADAM,

01:01PM  6         "USED A NEW BSA BUFFER... STILL FAILED.  IF I DELETE TO

01:01PM  7    POINT THAT COULD PROBABLY CONSIDERED OUTLIERS ON MY RERUN, THE

01:01PM  8    QC WOULD PASS.  I ATTACHED THE DATA SHOWING WHAT I'M TALKING

01:01PM  9    ABOUT.  OTHERWISE, I'M NOT SURE WHAT TO DO NOW EXCEPT WAIT

01:01PM 10    UNTIL THE CAPSYS QC'S ARE COMPLETED."

01:01PM 11         RIGHT?

01:01PM 12    A.   YES.

01:01PM 13    Q.   AND THE CAPSYS, CAPSYS REFERS TO A TYPE OF CARTRIDGE THAT

01:01PM 14    THERANOS WAS MANUFACTURING?

01:01PM 15    A.   YES.

01:01PM 16    Q.   OKAY.  AND THEN IF YOU GO TO THE NEXT PAGE, THEN YOU

01:01PM 17    RESPONDED TO MS. CHEUNG.

01:01PM 18         DO YOU SEE THAT?

01:01PM 19    A.   YES.

01:01PM 20    Q.   AND YOU WROTE, "HI ERIKA,

01:01PM 21         "YES WE CAN DELETE AS MANY AS 2 OF THE 6 DATA POINTS."

01:01PM 22         RIGHT?

01:01PM 23    A.   CORRECT.

01:01PM 24    Q.   AND MR. BALWANI IS NOT ON THE EMAIL; RIGHT?

01:01PM 25    A.   CORRECT.

01:01PM  1    Q.   AND THEN ABOVE THAT, DR. PANDORI SAYS, "IS THIS SOMETHING

01:01PM  2    THAT CLIA CAN STAND ON AS A POLICY, OR DO YOU WANT THEM TO

01:02PM  3    CHECK WITH US FIRST BEFORE DOING THIS?"

01:02PM  4         RIGHT?

01:02PM  5    A.   YES.

01:02PM  6    Q.   AND SO DR. PANDORI IS ASKING YOU A QUESTION; CORRECT?

01:02PM  7    A.   YES.

01:02PM  8    Q.   AND NOBODY ELSE?

01:02PM  9    A.   CORRECT.

01:02PM  10   Q.   AND THEN YOU RESPOND, "THIS RULE WILL BE PART OF THE

01:02PM  11   ALGORITHM WHEN THE EDISON 3.5 CALCULATIONS ARE AUTOMATED."

01:02PM  12        RIGHT?

01:02PM  13   A.   YES.

01:02PM  14   Q.   AND THAT ALGORITHM WAS SOMETHING THAT DR. YOUNG WAS

01:02PM  15   WORKING ON?

01:02PM  16   A.   UM, I DON'T KNOW -- WELL, THAT'S SOMETHING THAT DR. YOUNG

01:02PM  17   TOLD ME, YES, YES.

01:02PM  18   Q.   OKAY.  THAT HE WAS WORKING ON THIS ALGORITHM; RIGHT?

01:02PM  19   A.   YES.

01:02PM  20   Q.   OKAY.  BECAUSE HE'S AN EXPERT IN BIOSTATISTICS; RIGHT?

01:02PM  21   A.   I THINK SO, YES, YEAH.

01:02PM  22   Q.   AND THEN DR. PANDORI WROTE ON THE BOTTOM, "SO IT IS OK FOR

01:02PM  23   THE CLA TO DO THIS AUTOMATICALLY UNTIL THEN I ASSUME."

01:02PM  24   A.   YES.

01:02PM  25   Q.   AND THE CLA IS THE CLINICAL LAB ASSOCIATE?

01:02PM   1    A.   YES.

01:02PM   2    Q.   AND THAT IS SOMEONE LIKE ERIKA CHEUNG?

01:02PM   3    A.   YES.

01:02PM   4    Q.   AND THEN ABOVE THAT YOU WROTE, "YES -- IT'S OK IF THEY DO

01:03PM   5    IT -- THAT IS WHY WE ARE RUNNING 3 EDISONS -- TO GET ENOUGH

01:03PM   6    DATA POINTS AND AVERAGE OUT VARIABILITY."

01:03PM   7         RIGHT?

01:03PM   8    A.   YES.

01:03PM   9    Q.   AND SO YOU'RE APPROVING OF THE PROCESS?

01:03PM   10   A.   YES.

01:03PM   11   Q.   AND MR. BALWANI IS NOT ON THAT EMAIL EITHER?

01:03PM   12   A.   NO.

01:03PM   13   Q.   OKAY.  LET'S TAKE A LOOK AT EXHIBIT 13809.

01:04PM   14        ACTUALLY, EVEN BEFORE THAT, LET'S JUST SET THAT UP BY

01:04PM   15   LOOKING AT EXHIBIT 20570, MR. ALLEN.

01:04PM   16        DO YOU SEE 20570 IN FRONT OF YOU?

01:04PM   17   A.   YES.

01:04PM   18   Q.   AND THIS IS AN EMAIL OR INVITATION MEETING FROM MR. GEE.

01:04PM   19        DO YOU SEE THAT?

01:04PM   20   A.   YES.

01:04PM   21   Q.   AND IT'S FROM JULY 10TH, 2014?

01:04PM   22   A.   YES.

01:04PM   23   Q.   AND REQUIRED ATTENDEES INCLUDE ADAM ROSENDORFF; RIGHT?

01:04PM   24   A.   CORRECT.

01:04PM   25   Q.   AND IS IT ABOUT REVIEWING AND DISCUSSING QUARTER 1 AND

01:04PM  1    QUARTER 2 QUALITY?

01:04PM  2    A.   YES.

01:04PM  3    Q.   AND THAT WAS -- I THINK WE TALKED ABOUT THIS ON WEDNESDAY,

01:04PM  4    BUT MR. GEE IS THE QUALITY CONTROL MANAGER AND FROM TIME TO

01:04PM  5    TIME PRESENTED DATA ON QUALITY CONTROL PERFORMANCE AT THERANOS;

01:04PM  6    RIGHT?

01:04PM  7    A.   YES.

01:04PM  8    Q.   AND THIS WAS ONE OF THOSE MEETINGS TO TRY TO DO THAT KIND

01:04PM  9    OF PRESENTATION?

01:04PM  10   A.   YES.

01:04PM  11   Q.   OKAY.  AND IF YOU GO TO 20571, THE NEXT EXHIBIT.

01:05PM  12        OH, I'M SORRY, YOUR HONOR.  I OFFER 20570.

01:05PM  13             MR. BOSTIC:  NO OBJECTION.

01:05PM  14             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:05PM  15        (DEFENDANT'S EXHIBIT 20570 WAS RECEIVED IN EVIDENCE.)

01:05PM  16             MR. COOPERSMITH:  THANK YOU.

01:05PM  17   Q.   AND THEN LET'S GO TO 20571.

01:05PM  18        AND DO YOU SEE THAT ON YOUR SCREEN?

01:05PM  19   A.   YES.

01:05PM  20   Q.   AND THIS IS WHERE YOU ACCEPTED THE MEETING INVITATION?

01:05PM  21   A.   YES.

01:05PM  22   Q.   BECAUSE YOU WANTED TO GO TO THE MEETING TO LEARN ABOUT

01:05PM  23   QUALITY CONTROL PERFORMANCE?

01:05PM  24   A.   YES.

01:05PM  25   Q.   OKAY.  NOW LET'S LOOK AT 13809.

01:05PM  1          OKAY.  LOOKING AT 13809, THIS IS ACTUALLY THE PRESENTATION

01:05PM  2     THAT MR. GEE MADE AT THAT MEETING; CORRECT?

01:05PM  3     A.   I BELIEVE SO.

01:05PM  4     Q.   OKAY.  AND IT'S THE SAME DATE, RIGHT, JULY 10TH, 2014?

01:06PM  5     A.   YES.

01:06PM  6     Q.   AND IT'S TITLED QUALITY SYSTEMS PRESENTATION Q1/Q2, 2014

01:06PM  7     REVIEW.

01:06PM  8          DO YOU SEE THAT?

01:06PM  9     A.   YES.

01:06PM  10    Q.   AND YOU RECALL AT THESE MEETINGS, MR. GEE WOULD MAKE A

01:06PM  11    PRESENTATION ABOUT WHAT HE SAW IN THE QUALITY CONTROL

01:06PM  12    PERFORMANCE?

01:06PM  13    A.   YES.

01:06PM  14    Q.   AND THAT WAS SO YOU COULD GET THAT INFORMATION?

01:06PM  15    A.   USUALLY HE WOULD PRINT THINGS OUT ON A PIECE OF PAPER AND

01:06PM  16    WE WOULD LOOK AT THE PIECE OF PAPER TOGETHER.

01:06PM  17    Q.   BUT THEN SOMETIMES HE WOULD SHOW SLIDES?

01:06PM  18    A.   I THINK SO.

01:06PM  19    Q.   AND THIS IS ONE OF THE OCCASIONS WHERE HE SHOWED SLIDES?

01:06PM  20    A.   I THINK SO.

01:06PM  21             MR. COOPERSMITH:  OKAY.  YOUR HONOR, WE OFFER

01:06PM  22    EXHIBIT 13809.

01:06PM  23             MR. BOSTIC:  NO OBJECTION.

01:06PM  24             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:06PM  25         (DEFENDANT'S EXHIBIT 13809 WAS RECEIVED IN EVIDENCE.)

01:06PM   1    BY MR. COOPERSMITH:

01:06PM   2    Q.   LET'S GO TO THE FIRST PAGE.  THAT'S WHAT I READ TO YOU,

01:06PM   3    DR. ROSENDORFF?

01:06PM   4    A.   YES.

01:06PM   5    Q.   AND IT HAS AN AGENDA ON THE SECOND PAGE?

01:06PM   6    A.   YES.

01:06PM   7    Q.   AND THAT'S GOING THROUGH THE DIFFERENT THINGS THAT MR. GEE

01:06PM   8    WANTED TO PRESENT; RIGHT?

01:06PM   9    A.   YES.

01:07PM  10    Q.   OKAY.  AND THEN THE NEXT PAGE HAS A MISSION AND CORE

01:07PM  11    STATEMENT.

01:07PM  12         DO YOU SEE THAT?

01:07PM  13    A.   YES.

01:07PM  14    Q.   IF YOU GO TO PAGE -- I GUESS IT'S THE NEXT PAGE AFTER

01:07PM  15    THAT.

01:07PM  16         DO YOU SEE IT HAS THERANOS LABORATORY LICENSURES?

01:07PM  17    A.   YES.

01:07PM  18    Q.   AND HERE MR. GEE IS JUST REVIEWING WHICH STATES LICENSED

01:07PM  19    THERANOS FOR OPERATING VARIOUS FACILITIES; IS THAT RIGHT?

01:07PM  20    A.   YES.

01:07PM  21    Q.   AND THEN THERE'S A REFERENCE, LABORATORY LICENSURES.

01:07PM  22         DO YOU SEE THAT?

01:07PM  23    A.   YES.

01:07PM  24    Q.   AND THOSE WERE OUTSIDE LABORATORIES THAT THERANOS COULD

01:07PM  25    SEND SAMPLES TO IF THEY WANTED TO; RIGHT?

01:07PM  1    A.   YES.

01:07PM  2    Q.   AND ONE OF THEM WAS ARUP?

01:07PM  3    A.   CORRECT.

01:07PM  4    Q.   AND ONE OF THEM WAS UCSF?

01:07PM  5    A.   YES.

01:07PM  6    Q.   AND THAT WAS -- OKAY.  SORRY.  LET ME START AGAIN.

01:08PM  7         THE OUTSIDE LABORATORIES, THOSE WERE THERE SO THAT IF

01:08PM  8    THERANOS DIDN'T HAVE A TEST, IT COULD SEND THOSE TO ANOTHER LAB

01:08PM  9    TO DO?

01:08PM 10    A.   CORRECT.

01:08PM 11    Q.   AND WHEN A PATIENT GOT A RESULT FROM ONE OF THOSE OUTSIDE

01:08PM 12    LABORATORIES, IT SAID RIGHT ON THE REPORT THAT IT WAS FROM ARUP

01:08PM 13    OR SAN FRANCISCO; RIGHT?

01:08PM 14    A.   I BELIEVE SO.  I MEAN, THAT'S REQUIRED UNDER CLIA, YEAH.

01:08PM 15    YEAH.

01:08PM 16    Q.   OKAY.  SO THEN MOVING FORWARD THROUGH THE EXHIBIT.

01:08PM 17         IF YOU GO TO NOT THE NEXT PAGE, BUT THE PAGE AFTER THAT,

01:08PM 18    THIS IS CALLED WALGREENS/THERANOS SAMPLES BY STORE; RIGHT?

01:08PM 19    A.   YES.

01:08PM 20    Q.   AND THIS GOES THROUGH, IN A BAR GRAPH FORM, EACH MONTH AND

01:08PM 21    HOW MANY SAMPLES ARE COMING FROM WALGREENS; IS THAT RIGHT?

01:08PM 22    A.   YEAH.  I MEAN, IT LOOKS LIKE THERE'S FOUR DIFFERENT

01:09PM 23    LOCATIONS, FOUR DIFFERENT STORES, TESTING --

01:09PM 24    Q.   RIGHT.

01:09PM 25    A.   -- JOINING OR WHATEVER YOU WANT TO -- TESTING LOCATIONS,

01:09PM  1    YEAH.

01:09PM  2    Q.   RIGHT.  SO BY STORE, AND AT THE BOTTOM YOU UNDERSTAND THAT

01:09PM  3    THOSE NUMBERS -- IF YOU CAN HIGHLIGHT THE VERY BOTTOM -- THOSE

01:09PM  4    ARE JUST, YOU KNOW, PARTICULAR WALGREENS STORES; RIGHT?

01:09PM  5    A.   YES.

01:09PM  6    Q.   AND THEN IT'S -- EACH OF THE BARS RELATE TO A PARTICULAR

01:09PM  7    STORE?

01:09PM  8    A.   YES.

01:09PM  9    Q.   AND THEN IT JUST SHOWS OVER THIS TIME THAT THE SAMPLE

01:09PM 10    VOLUME BY STORE IS GOING UP?

01:09PM 11    A.   YES.

01:09PM 12    Q.   AND THEN THE NEXT PAGE HAS AN AVERAGE WAIT TIME AT

01:09PM 13    WALGREENS STORES FOR THERANOS TESTING.

01:09PM 14        DO YOU SEE THAT?

01:09PM 15    A.   YES.

01:09PM 16    Q.   OKAY.  THEN IF YOU GO TO THE NEXT PAGE, IT HAS A SECTION

01:09PM 17    ABOUT REDRAWS BY STORE LOCATION.

01:10PM 18        DO YOU SEE THAT?

01:10PM 19    A.   YES.

01:10PM 20    Q.   AND SO MR. GEE IS TRACKING THIS INFORMATION?

01:10PM 21    A.   YES.

01:10PM 22    Q.   AND THEN IT HAS, IF YOU GO TO TWO MORE PAGES AFTER THAT,

01:10PM 23    CLIA TRAINING.

01:10PM 24        DO YOU SEE THAT?

01:10PM 25    A.   YES.

01:10PM  1    Q.   AND THESE ARE JUST VARIOUS TRAINING EXERCISES THAT HAD

01:10PM  2    GONE ON AT THERANOS?

01:10PM  3    A.   YES.

01:10PM  4    Q.   OKAY.  AND THEN IF YOU GO TO PAGE -- THE NEXT PAGE, YOU

01:10PM  5    SEE THERE'S A PROCESS IMPROVEMENT SECTION?

01:10PM  6    A.   YES.

01:10PM  7    Q.   AND THAT WAS SOMETHING THAT MR. GEE AND EVERYONE WAS

01:10PM  8    INTERESTED IN, TO CONTINUE TO IMPROVE THE PROCESS; RIGHT?

01:10PM  9    A.   YES.

01:10PM  10   Q.   AND THAT WAS TRUE OF ALL ORGANIZATIONS THAT YOU'VE BEEN A

01:10PM  11   PART OF; RIGHT?

01:10PM  12   A.   CONTINUOUS QUALITY IMPROVEMENT, YES.

01:10PM  13   Q.   AND THAT'S ACTUALLY A CONCEPT THAT YOU EMBRACE AS A LAB

01:10PM  14   DIRECTOR?

01:10PM  15   A.   YES, I DO.

01:10PM  16   Q.   OKAY.  AND THEN IF YOU SEE THE FIRST BULLET THERE, THAT'S

01:10PM  17   "IMPROVEMENTS TO LIS."

01:11PM  18        THAT WAS ONE OF THE BULLETS THAT MR. GEE DISCUSSED?

01:11PM  19   A.   YES.

01:11PM  20   Q.   "PENDING LAB REVIEW, FAX CAPABILITY FROM LIS, AND CRITICAL

01:11PM  21   REVIEW SCREEN."

01:11PM  22        DO YOU SEE THAT?

01:11PM  23   A.   YES.

01:11PM  24   Q.   AND SO THESE WERE SOME OF THE THINGS BEING WORKED ON;

01:11PM  25   RIGHT?

01:11PM  1      A.   YES.

01:11PM  2      Q.   AND THEN IF YOU GO TO THE NEXT PAGE, YOU SEE THAT THERE'S

01:11PM  3      A QUALITY CONTROL SECTION?

01:11PM  4      A.   YES.

01:11PM  5      Q.   AND THAT THIS HAS, IN THE LEFT-HAND COLUMN, QUARTER 4.

01:11PM  6           DO YOU SEE THAT?

01:11PM  7      A.   YES.

01:11PM  8      Q.   AND THAT WOULD BE QUARTER 4 OF 2013; RIGHT?

01:11PM  9      A.   YES.

01:11PM 10      Q.   SO ROUGHLY THE -- WELL, NOT EVEN ROUGHLY, PRECISELY THE

01:11PM 11      LAST THREE MONTHS OF 2013; RIGHT?

01:11PM 12      A.   CORRECT.

01:11PM 13      Q.   AND IT SAYS HERE THERE'S 172 ASSAYS PERFORMED.

01:11PM 14           DO YOU SEE THAT?

01:11PM 15      A.   YES.

01:11PM 16      Q.   AND 10,192 CONTROLS WERE ANALYZED; RIGHT?

01:11PM 17      A.   YES.

01:11PM 18      Q.   AND .14 PERCENT CONTROLS FAILED.

01:11PM 19           DO YOU SEE THAT?

01:11PM 20      A.   YES.

01:11PM 21      Q.   AND THEN IF YOU GO TO Q1, PREDICATE, THE NEXT SECTION,

01:12PM 22      THEN IT SAYS -- THIS IS PREDICATE MACHINES; RIGHT?

01:12PM 23      A.   YES.

01:12PM 24      Q.   SO UNMODIFIED PREDICATE MACHINES?

01:12PM 25      A.   CORRECT.

01:12PM  1    Q.   AND THERE WERE 132 ASSAYS PERFORMED; CORRECT?

01:12PM  2    A.   YES.

01:12PM  3    Q.   AND 8,458 CONTROLS WERE ANALYZED; RIGHT?

01:12PM  4    A.   CORRECT.

01:12PM  5    Q.   AND .75 PERCENT CONTROLS FAILED; RIGHT?

01:12PM  6    A.   YES.

01:12PM  7    Q.   AND YOU SAID IN YOUR DIRECT TESTIMONY ON WEDNESDAY THAT ON

01:12PM  8    A BAD DAY, I THINK YOU SAID, A PREDICATE MACHINE, UNMODIFIED

01:12PM  9    PREDICATE MACHINE WOULD FAIL 2 TO 3 PERCENT OF THE TIME?

01:12PM 10    A.   YES.

01:12PM 11    Q.   AND SO APPARENTLY THEY'RE DOING A LITTLE BIT BETTER THAN

01:12PM 12    THAT; RIGHT?

01:12PM 13    A.   YES.

01:12PM 14    Q.   AND THEN FOR Q1 THERANOS, DO YOU SEE THAT?

01:12PM 15    A.   YES.

01:12PM 16    Q.   IT SAYS THERE ARE 52 ASSAYS PERFORMED?

01:12PM 17    A.   YES.

01:12PM 18    Q.   AND 3,879 CONTROLS ARE ANALYZED?

01:12PM 19    A.   YES.

01:12PM 20    Q.   AND 2.9 PERCENT CONTROLS FAILED?

01:12PM 21    A.   I'M JUST READING ALONG WITH YOU, YEAH.

01:12PM 22    Q.   RIGHT.  WELL, THAT'S WHAT MR. GEE REPORTED?

01:13PM 23    A.   I'M SORRY?

01:13PM 24    Q.   WELL, YOU DIDN'T WRITE THIS PRESENTATION?

01:13PM 25    A.   NO, NO.

01:13PM   1    Q.   MR. GEE PRESENTED THE MATERIAL; RIGHT?

01:13PM   2    A.   YES, YES.

01:13PM   3    Q.   NOT MR. BALWANI?

01:13PM   4    A.   NO.

01:13PM   5    Q.   AND MR. GEE PRESENTED THIS INFORMATION; RIGHT?

01:13PM   6    A.   YES.

01:13PM   7    Q.   OKAY.  LET'S MOVE TO A DIFFERENT TOPIC, AND THAT'S

01:13PM   8    PROFICIENCY TESTING.  ALL RIGHT?

01:13PM   9    A.   UH-HUH.

01:13PM  10    Q.   AND YOU DISCUSSED THAT AT LENGTH IN YOUR TESTIMONY.

01:13PM  11    A.   YES.

01:13PM  12    Q.   OKAY.  SO YOU DIDN'T -- YOU WEREN'T, I DON'T THINK, SHOWN

01:13PM  13    A DOCUMENT ON DIRECT, BUT YOU REFERRED TO A TIME WHEN SOME

01:14PM  14    PROFICIENCY TESTING MATERIAL WAS RUN ON EDISON DEVICES?

01:14PM  15    A.   YES.

01:14PM  16    Q.   AND I THINK YOU DESCRIBED IT AS LEFTOVER PROFICIENCY

01:14PM  17    TESTING MATERIAL?

01:14PM  18    A.   YES.

01:14PM  19    Q.   OKAY.  AND YOU RECALL THAT WAS AN INSTANCE WHERE SOME

01:14PM  20    LEFTOVER PROFICIENCY TESTING MATERIAL THAT CAME FROM NEW YORK

01:14PM  21    STATE WAS RUN ON EDISONS; RIGHT?

01:14PM  22    A.   AND API AS WELL, YES.

01:14PM  23    Q.   OKAY.  API AND NEW YORK STATE?

01:14PM  24    A.   YES.

01:14PM  25    Q.   AND THOSE WERE THE TWO OUTSIDE ORGANIZATIONS THAT SUPPLY

ROSENDORFF CROSS BY MR. COOPERSMITH (RES.)                    3631

01:14PM   1      PROFICIENCY TESTING MATERIAL?

01:14PM   2      A.   YES.

01:14PM   3      Q.   RIGHT.  AND I THINK YOU ALSO SAID ON DIRECT THAT FOR

01:14PM   4      TRADITIONAL PROFICIENCY TESTING, A LAB RUNS THE PROFICIENCY

01:14PM   5      TESTING SAMPLES; RIGHT?

01:14PM   6      A.   YES.

01:14PM   7      Q.   AND THEN GETS THE RESULTS, AND THEN THEY SEND THE RESULTS

01:14PM   8      OFF TO THE TESTING AGENCY; RIGHT?

01:14PM   9      A.   CORRECT.

01:14PM  10      Q.   SO IT COULD HAVE BEEN NEW YORK STATE OR API?

01:14PM  11      A.   CORRECT.

01:14PM  12      Q.   OR OTHERS; RIGHT?

01:14PM  13      A.   CORRECT.

01:14PM  14      Q.   OKAY.  AND THERE'S -- THE JOB IN TRADITIONAL PROFICIENCY

01:15PM  15      TESTING OF THE TESTING AGENCY IS TO BASICALLY COMPARE THE

01:15PM  16      PROFICIENCY TEST RESULTS TO OTHER RESULTS THAT THEY GET FROM

01:15PM  17      OTHER LABORATORIES AROUND THE COUNTRY THAT ARE RUNNING THE SAME

01:15PM  18      INSTRUMENT; RIGHT?

01:15PM  19      A.   CORRECT.

01:15PM  20      Q.   SO IT HAS TO BE LIKE AN APPLE-TO-APPLE TYPE OF COMPARISON;

01:15PM  21      RIGHT?

01:15PM  22      A.   CORRECT.

01:15PM  23      Q.   AND SO IF YOU'RE RUNNING A SIEMENS IMMULITE AND YOU DO

01:15PM  24      PROFICIENCY TESTING ON THAT INSTRUMENT, THEN THE TESTING AGENCY

01:15PM  25      WOULD COMPARE THE RESULTS THAT YOU PROVIDE WITH OTHER LABS THAT

01:15PM  1    RUN THE SAME TYPE OF MATERIAL ON IMMULITES; RIGHT?

01:15PM  2    A.   CORRECT.

01:15PM  3    Q.   AND THAT'S SOMETIMES CALLED THE PEER GROUP; RIGHT?

01:15PM  4    A.   CORRECT.

01:15PM  5    Q.   BUT IN OTHER SITUATIONS THERE IS NOT A PEER GROUP; RIGHT?

01:15PM  6    A.   CORRECT.

01:15PM  7    Q.   BECAUSE THERE'S SOME TYPE OF NOVEL TECHNOLOGY AT WORK;

01:15PM  8    RIGHT?

01:15PM  9    A.   SO I THINK FOR CAP, IF THERE ARE TEN OR FEWER USERS, THEY

01:16PM  10   WON'T COMPARE YOU AGAINST THOSE PEERS BECAUSE THERE'S JUST NOT

01:16PM  11   ENOUGH PEOPLE.

01:16PM  12   Q.   RIGHT.  AND IN THE CASE OF EDISON DEVICES, THERE WERE NO

01:16PM  13   OTHER LABS AS YOU UNDERSTOOD; RIGHT?

01:16PM  14   A.   CORRECT.

01:16PM  15   Q.   AND IN THE CASE OF MODIFIED PREDICATES, THERE WERE NO

01:16PM  16   OTHER LABS; RIGHT?

01:16PM  17   A.   CORRECT.

01:16PM  18   Q.   AND THE -- I THINK YOU SAID THIS ON DIRECT, BUT THE

01:16PM  19   SOLUTION TO THAT LACK OF PEER GROUP ISSUE IS TO DO A DIFFERENT

01:16PM  20   FORM OF PROFICIENCY TESTING CALLED AAP; RIGHT?

01:16PM  21   A.   CORRECT.

01:16PM  22   Q.   AND THAT STANDS FOR ALTERNATIVE ASSESSMENT PROCEDURE;

01:16PM  23   RIGHT?

01:16PM  24   A.   CORRECT.

01:16PM  25   Q.   OKAY.  AND YOU RECOGNIZED THAT THAT WAS THE CORRECT WAY TO

01:16PM  1    DO THINGS FOR SOMETHING LIKE AN EDISON THAT DIDN'T HAVE A PEER

01:16PM  2    GROUP; RIGHT?

01:16PM  3    A.   YES.

01:16PM  4    Q.   AND IT DOESN'T MEAN THAT YOU CAN'T RUN THE INSTRUMENT, IT

01:16PM  5    JUST MEANS YOU HAVE TO DO A DIFFERENT TYPE OF PROFICIENCY

01:16PM  6    TESTING?

01:16PM  7    A.   CORRECT.

01:16PM  8    Q.   OKAY.  AND THIS WAS SOMETHING THAT WAS RECOGNIZED PRETTY

01:16PM  9    EARLY ON AT THERANOS?

01:16PM  10   A.   YES.

01:16PM  11   Q.   IN FACT, I THINK WE SAW IN AN EXHIBIT THAT WAS DATED

01:16PM  12   BEFORE YOUR TIME, IN 2011, WHERE THERE WAS A SECTION ON THE

01:17PM  13   NEED TO DO AAP; RIGHT?

01:17PM  14   A.   YES.

01:17PM  15   Q.   OKAY.  AND THE AAP THAT WAS AT LEAST IN THE STANDARD

01:17PM  16   OPERATING PROCEDURE AT THERANOS, AND WE'LL GET TO THAT, BUT

01:17PM  17   IT'S NOT COMPARING THERANOS RESULTS TO A PEER GROUP OF OTHER

01:17PM  18   LABORATORIES; RIGHT?

01:17PM  19   A.   NO, IT IS NOT.

01:17PM  20   Q.   IT IS ACTUALLY TAKING HUMAN BLOOD SAMPLES THAT ARE

01:17PM  21   OBTAINED FROM EMPLOYEES AT THERANOS AND COMPARING THE RESULTS

01:17PM  22   OF THE ACTUAL HUMAN BLOOD SAMPLES ON EDISON RUNS VERSUS

01:17PM  23   PREDICATE UNMODIFIED RUNS; RIGHT?

01:17PM  24   A.   YES, THAT WOULD HAVE BEEN ONE WAY TO DO THE AAP.  I'D HAVE

01:17PM  25   TO REFRESH MY MEMORY AS TO EXACTLY WHAT THE DOCUMENT SAID, BUT

01:17PM   1    I THINK THAT'S CORRECT.

01:17PM   2    Q.   OKAY.  AND I'LL SHOW IT TO YOU IN A FEW MINUTES,

01:17PM   3    DR. ROSENDORFF.  THANK YOU.

01:17PM   4    A.   YEAH.

01:17PM   5    Q.   BUT LET'S JUST GO BACK TO THE SUMMER OF 2013 AND SHOW YOU

01:17PM   6    EXHIBIT 13905.

01:18PM   7         AND DO YOU HAVE THAT IN FRONT OF YOU?

01:18PM   8    A.   YES.

01:18PM   9    Q.   AND THIS IS AN EMAIL FROM SYLVIA CHANG.

01:18PM  10         DO YOU SEE THAT?

01:18PM  11    A.   MAY I BE EXCUSED FOR A FEW MINUTES TO GO TO THE RESTROOM?

01:18PM  12              THE COURT:  YES.  OF COURSE.  LET'S TAKE A BRIEF

01:18PM  13    BREAK, LADIES AND GENTLEMEN, ABOUT SEVEN MINUTES, PLEASE.

01:18PM  14         (RECESS FROM 1:18 P.M. UNTIL 1:29 P.M.)

01:29PM  15              THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

01:29PM  16         ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

01:29PM  17         MR. COOPERSMITH.

01:29PM  18              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

01:29PM  19    Q.   OKAY.  SO BEFORE THE BREAK, DR. ROSENDORFF, WE WERE

01:29PM  20    TALKING ABOUT PROFICIENCY TESTING.

01:29PM  21    A.   YES.

01:29PM  22    Q.   AND A FORM OF PROFICIENCY TESTING CALLED AAP; RIGHT?

01:29PM  23    A.   YES.

01:29PM  24    Q.   OKAY.  SO WE WERE ABOUT TO GO OVER EXHIBIT 13905.

01:29PM  25         DO YOU STILL SEE THAT?

01:29PM   1    A.   YES.

01:30PM   2    Q.   AND THAT IS AN EMAIL FROM A SYLVIA CHANG TO MR. BALWANI

01:30PM   3    WITH A COPY TO YOURSELF AND KERRY ELENITOBA-JOHNSON.

01:30PM   4         DO YOU SEE THAT?

01:30PM   5    A.   YES.

01:30PM   6    Q.   AND ALSO HODA ALAMDAR; RIGHT?

01:30PM   7    A.   YES.

01:30PM   8    Q.   AND SYLVIA CHANG WAS A LAB SCIENTIST AT THERANOS?

01:30PM   9    A.   YES.

01:30PM  10    Q.   AND IN THIS CASE SHE WAS SENDING AN EMAIL ABOUT THE

01:30PM  11    HANDLING AND SCHEDULING AND SUBMITTING OF THE PROFICIENCY

01:30PM  12    SAMPLES?

01:30PM  13    A.   YES.

01:30PM  14    Q.   AND THIS WAS ON JULY 27TH, 2013?

01:30PM  15    A.   YES.

01:30PM  16    Q.   AND THIS WAS PRIOR TO THE WALGREENS LAUNCH; CORRECT?

01:30PM  17    A.   CORRECT.

01:30PM  18         MR. COOPERSMITH:  YOUR HONOR, WE OFFER 13905.

01:30PM  19         MR. BOSTIC:  NO OBJECTION.

01:30PM  20         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:30PM  21    (DEFENDANT'S EXHIBIT 13905 WAS RECEIVED IN EVIDENCE.)

01:30PM  22    BY MR. COOPERSMITH:

01:30PM  23    Q.   SO LOOKING AT THE DOCUMENT, DR. ROSENDORFF, AND IT HAS THE

01:30PM  24    DATE THAT I'VE DESCRIBED, BUT YOU SEE IT SAYS, "SUNNY," THIS IS

01:30PM  25    MS. CHANG WRITING, "PER YOUR REQUEST, HERE ARE THE DETAIL FOR

01:30PM  1    HANDLING, SCHEDULING AND SUBMITTING PROFICIENCY SAMPLES."

01:30PM  2         DO YOU SEE THAT?

01:31PM  3    A.   YES.

01:31PM  4    Q.   SO SHE SEEMS TO BE RESPONDING TO MR. BALWANI; CORRECT?

01:31PM  5    A.   YES.

01:31PM  6    Q.   AND THEN SHE SAYS SHE'S ATTACHING A STANDARD OPERATING

01:31PM  7    PROCEDURE FOR REFERENCE.

01:31PM  8         DO YOU SEE THAT?

01:31PM  9    A.   YES.

01:31PM 10    Q.   AND THEN ATTACHED TO THE EXHIBIT, TO THE EMAIL, THERE'S

01:31PM 11    SEVERAL PAGES OF THE DRAFT STANDARD OPERATING PROCEDURE?

01:31PM 12    A.   YES.

01:31PM 13    Q.   AND THIS WAS FOR YOUR REVIEW; CORRECT?

01:31PM 14    A.   YES.

01:31PM 15    Q.   AND IT LOOKS LIKE THE DOCUMENT THAT WAS SENT HAS A

01:31PM 16    DOCUMENT NUMBER AT THE TOP.

01:31PM 17         DO YOU SEE THAT?

01:31PM 18    A.   YES.

01:31PM 19    Q.   AND IT HAS A REVISION:  C?

01:31PM 20    A.   YES.

01:31PM 21    Q.   AND THEN BELOW THAT THERE'S AN EFFECTIVE DATE; RIGHT?

01:31PM 22    A.   YES.

01:31PM 23    Q.   AND THE EFFECTIVE DATE PRINTED ON THIS DRAFT DOCUMENT IS

01:31PM 24    ACTUALLY BEFORE YOUR TIME AT THERANOS; RIGHT?

01:31PM 25    A.   CORRECT.

01:31PM   1    Q.   OKAY.  AND IT DOESN'T EVEN HAVE A SPACE FOR A SIGNATURE

01:31PM   2    BECAUSE YOU WEREN'T THERE AT THE TIME; RIGHT?

01:31PM   3    A.   CORRECT.

01:31PM   4    Q.   BUT THEN IF YOU GO TO THE NEXT -- I'M SORRY.  IT'S PAGE 3

01:31PM   5    OF 6, AND IT HAS A SECTION ON RESPONSIBILITIES.

01:32PM   6         DO YOU SEE THAT?

01:32PM   7    A.   YES.

01:32PM   8    Q.   AND IT SAYS, "LABORATORY TESTING PERSONNEL ARE RESPONSIBLE

01:32PM   9    FOR THE FOLLOWING," AND THEN THERE'S THREE SUBSECTIONS.

01:32PM  10         "RECEIVING AND PROCESSING THE PROFICIENCY TESTING

01:32PM  11    SAMPLES."

01:32PM  12    A.   YES.

01:32PM  13    Q.   "REPORTING THE RESULTS TO THE TS OR DESIGNEE FOR

01:32PM  14    EVALUATION."

01:32PM  15         RIGHT?

01:32PM  16    A.   YES.

01:32PM  17    Q.   AND THEN, "COMPLETING APPLICABLE FIELDS ON A PARTICULAR

01:32PM  18    FORM."

01:32PM  19         RIGHT?

01:32PM  20    A.   YES.

01:32PM  21    Q.   AND THEN IF YOU GO TO PAGE 4 OF 6.

01:32PM  22         THEN THERE'S A SECTION ON PROFICIENCY TESTING FOR

01:32PM  23    COMMERCIAL PT; RIGHT?

01:32PM  24    A.   YES.

01:32PM  25    Q.   AND SO THIS WOULD BE FOR THE UNMODIFIED PREDICATES; RIGHT?

01:32PM   1    A.   CORRECT.

01:32PM   2    Q.   AND THEN IF YOU GO TO THE NEXT PAGE, 5.3 -- SECTION 5.3.

01:32PM   3         THERE'S A SECTION ABOUT ALTERNATIVE ASSESSMENT PROCEDURE?

01:32PM   4    A.   YES.

01:32PM   5    Q.   AND THAT WOULD APPLY "FOR NON-CMS REGULATED TESTS OR THOSE

01:33PM   6    WHICH LACK FDA CLEARANCE, COMMERCIAL OR EXTERNAL PT PROGRAMS

01:33PM   7    MAY NOT BE AVAILABLE."

01:33PM   8         DO YOU SEE THAT?

01:33PM   9    A.   YES.

01:33PM  10    Q.   AND THAT'S THE SAME THING THAT WE WERE JUST TALKING ABOUT

01:33PM  11    WITH AAP; RIGHT?

01:33PM  12    A.   YES.

01:33PM  13    Q.   OKAY.  LET'S PUT THAT ASIDE AND GO TO EXHIBIT 9939.

01:33PM  14         AND THIS HAS BEEN PREVIOUSLY ADMITTED, YOUR HONOR.

01:33PM  15              THE COURT:  THANK YOU.

01:33PM  16    BY MR. COOPERSMITH:

01:33PM  17    Q.   YOU SEE THIS IS A STANDARD OPERATING PROCEDURE, AND THIS

01:33PM  18    ONE ACTUALLY HAS YOUR NAME ON IT?

01:33PM  19    A.   YES.

01:33PM  20    Q.   AND THE DATE IS DECEMBER 2ND, 2013?

01:33PM  21    A.   YES.

01:33PM  22    Q.   AND ACCORDING TO THE TOP, IT'S PROFICIENCY TESTING FOR

01:33PM  23    THERANOS LAB-DEVELOPED TESTS FOR EDISON 3.5?

01:33PM  24    A.   YES.

01:33PM  25    Q.   OKAY.  SO THIS IS THE PROCEDURE THAT YOU ACTUALLY PUT IN

01:33PM  1      PLACE IN EARLY DECEMBER OF 2013 FOR PROFICIENCY TESTING ON THE

01:33PM  2      ACTUAL THERANOS EDISON DEVICE; RIGHT?

01:34PM  3      A.   YES.

01:34PM  4      Q.   OKAY.  IF WE GO TO --

01:34PM  5           SORRY ABOUT THAT.  GO TO PAGE 3 OF 8.  YOU SEE IT HAS THE

01:34PM  6      PURPOSE AT THE TOP?

01:34PM  7      A.   YES.

01:34PM  8      Q.   AND THE PURPOSE OF THIS PROPOSAL IS "TO DEVISE AN

01:34PM  9      ALTERNATIVE ASSESSMENT PROPOSED (AAP) FOR LABORATORY DEVELOPED

01:34PM 10      TESTS ON THE EDISON 3.5 IMMUNOASSAY INSTRUMENT."

01:35PM 11      A.   YES.

01:35PM 12      Q.   AND THEN IF YOU GO DOWN UNDER RESPONSIBILITIES, YOU SEE IT

01:35PM 13      SAYS, "IT IS THE RESPONSIBILITY OF THE TECHNICAL SUPERVISOR TO

01:35PM 14      ENSURE THAT THE ALTERNATIVE ASSESSMENT PROCEDURE IS CONDUCTED

01:35PM 15      AT LEAST" TWICE A -- "TWICE TIMES A YEAR FOR ALL 4 ANALYTES."

01:35PM 16           DO YOU SEE THAT?

01:35PM 17      A.   YES.

01:35PM 18      Q.   AND THEN AT 3.3, THE FIRST SUBSECTION THERE, 3.3.1, IT

01:35PM 19      SAYS, "THE TECHNICAL SUPERVISOR IS RESPONSIBLE FOR MAKING SURE

01:35PM 20      THAT PROFICIENCY TESTING SAMPLES ARE IDENTIFIED AND PREPARED

01:35PM 21      FOR THE LABORATORY."

01:35PM 22           AND THEN IT GOES ON, IF YOU GO TO THE NEXT PAGE, TO DEFINE

01:35PM 23      WHAT THE RESPONSIBILITIES OF THE TECHNICAL SUPERVISOR ARE;

01:35PM 24      RIGHT?

01:35PM 25      A.   YES.

01:35PM  1    Q.   AND THEN ON 3.4 IT SAYS, "THE LABORATORY DIRECTOR IS

01:35PM  2    RESPONSIBLE FOR THE FOLLOWING:

01:35PM  3        "REVIEWING AND APPROVING EACH PT TESTING EVENT

01:35PM  4    DOCUMENTATION."

01:35PM  5        DO YOU SEE THAT?

01:35PM  6    A.   YES.

01:35PM  7    Q.   AND THIS IS THE PROCEDURE THAT YOU PUT IN PLACE?

01:35PM  8    A.   YES.

01:35PM  9    Q.   AND YOU ACTUALLY DEFINED YOUR OWN RESPONSIBILITIES THERE

01:35PM  10   IN 3.4?

01:35PM  11   A.   YES.

01:35PM  12   Q.   OKAY.  NOBODY ELSE WAS RESPONSIBLE FOR THAT 3.4.1 ITEM?

01:36PM  13   A.   NO.

01:36PM  14   Q.   OKAY.  AND THEN IF YOU GO TO PAGE 5, I THINK I MAY HAVE

01:36PM  15   REFERENCED THIS BEFORE, BUT DO YOU SEE THAT THERE'S A

01:36PM  16   PROCEDURE?

01:36PM  17   A.   YES.

01:36PM  18   Q.   AND THIS DEFINES ACTUALLY HOW THE AAP PROCEDURE WOULD

01:36PM  19   WORK; RIGHT?

01:36PM  20   A.   YES.

01:36PM  21   Q.   AND IT'S "OBTAINED 5 VENOUS CLINICAL SAMPLES FROM AN

01:36PM  22   IN-HOUSE COLLECTION."

01:36PM  23   A.   RIGHT.

01:36PM  24   Q.   THAT MEANS FROM EMPLOYEE?

01:36PM  25   A.   YES.

01:36PM  1    Q.   AND THAT MEANS YOU'RE COLLECTING REALLY HUMAN BLOOD;

01:36PM  2    RIGHT?

01:36PM  3    A.   YES.

01:36PM  4    Q.   AND NOT USING PROFICIENCY TESTING MATERIAL THAT IS

01:36PM  5    SUPPLIED BY AN OUTSIDE TESTING LAB; RIGHT?

01:36PM  6    A.   CORRECT.

01:36PM  7    Q.   AND THAT'S BECAUSE THERE WAS AT LEAST A CONCERN THAT USING

01:36PM  8    THE PT MATERIAL FROM OUTSIDE TESTING SERVICES WOULD CREATE

01:36PM  9    SOMETHING CALLED A MATRIX EFFECT.

01:36PM 10        DO YOU REMEMBER THAT?

01:36PM 11    A.   I THINK DANIEL YOUNG MENTIONED THAT IN ONE OF HIS EMAILS.

01:36PM 12    Q.   OKAY.  DANIEL YOUNG BELIEVED -- WELL, DO YOU RECALL

01:36PM 13    DANIEL YOUNG INFORMED YOU THAT HE THOUGHT THERE WAS SOMETHING

01:37PM 14    CALLED THE MATRIX EFFECT; RIGHT?

01:37PM 15    A.   I THINK SO, YES.

01:37PM 16    Q.   AND THAT WOULD PRECLUDE THE USE OF OUTSIDE TESTING

01:37PM 17    MATERIAL ON THERANOS INSTRUMENTS; RIGHT?

01:37PM 18    A.   THAT WAS HIS POSITION, YES.

01:37PM 19    Q.   RIGHT.  BUT YOU INSTITUTED A PROCEDURE, WHICH WE'RE NOW

01:37PM 20    LOOKING AT, THAT ACTUALLY PUT IN PLACE A PROCEDURE THAT ADOPTED

01:37PM 21    DANIEL YOUNG'S VIEW OF THAT SITUATION; RIGHT?

01:37PM 22    A.   I'M JUST NOT SURE WHEN DANIEL'S EMAIL CAME THROUGH VERSUS

01:37PM 23    THE DATE OF THIS SOP, BUT I RECALL DANIEL SENDING AN EMAIL

01:37PM 24    TALKING ABOUT THE MATRIX EFFECT.

01:37PM 25    Q.   OKAY.

01:37PM   1    A.   AND THEN I DON'T KNOW WHERE THAT STANDS IN RELATION TO

01:37PM   2    THIS SOP.

01:37PM   3    Q.   BUT DANIEL YOUNG'S RECOMMENDATION ABOUT THE MATRIX EFFECT

01:37PM   4    WAS, BECAUSE OF THAT, THAT THIS COMPANY SHOULD DO THIS AAP

01:37PM   5    PROCEDURE; RIGHT?

01:37PM   6    A.   THAT WAS HIS POSITION, YES.

01:38PM   7    Q.   AND THEN YOU SIGNED THE PROCEDURE WE'RE NOW LOOKING AT

01:38PM   8    THAT IMPLEMENTED THAT EXACT RECOMMENDATION; RIGHT?

01:38PM   9    A.   YES.

01:38PM   10   Q.   OKAY.  NOW, IF YOU GO TO THE BOTTOM -- WELL, STICK WITH

01:38PM   11   THAT SAME SECTION.

01:38PM   12       DO YOU SEE 4.6?

01:38PM   13   A.   YES.

01:38PM   14   Q.   IT SAYS, "CALCULATE THE AVERAGE BIAS OF THE THERANOS LDT

01:38PM   15   TEST AS FOLLOWS," AND THEN IT HAS AN EQUATION AFTER THAT?

01:38PM   16   A.   YES.

01:38PM   17   Q.   AND AVERAGE BIAS MEANS THAT THERE MIGHT BE A DIFFERENCE

01:38PM   18   BETWEEN THE VALUE THAT THE PREDICATE MACHINE OBTAINS VERSUS THE

01:38PM   19   THERANOS DEVICE; RIGHT?

01:38PM   20   A.   SORRY, SAY AGAIN.

01:38PM   21   Q.   AVERAGE BIAS, THAT REFERS TO HOW THERE MIGHT BE A

01:38PM   22   DIFFERENCE IN THE VALUE ACHIEVED OR THE RESULT IN THE

01:38PM   23   PROFICIENCY TESTING EXPERIMENT FROM THE PREDICATE DEVICE VERSUS

01:38PM   24   THE THERANOS DEVICE; RIGHT?

01:38PM   25   A.   YES.

01:38PM   1    Q.   AND THAT IF THAT BIAS IS A CONSISTENT BIAS, IT MIGHT BE

01:38PM   2    POSSIBLE TO APPLY SOMETHING CALLED A BIAS CORRECTION; RIGHT?

01:39PM   3    A.   YES.

01:39PM   4    Q.   AND THAT WOULD ADJUST FOR THAT ISSUE; RIGHT?

01:39PM   5    A.   YES.

01:39PM   6    Q.   OKAY.  AND THAT WAS SOMETHING THAT DANIEL YOUNG WORKED A

01:39PM   7    LOT AND SPENT A LOT OF TIME ON?

01:39PM   8    A.   THE BIAS CORRECTION WAS DONE ON THE IMMULITE WITH DILUTED

01:39PM   9    BLOOD SAMPLES TO TRY TO REDUCE THE, YOU KNOW, THE BIAS BETWEEN

01:39PM  10    THE TWO METHODS, YEAH.

01:39PM  11    Q.   OKAY.

01:39PM  12    A.   BUT IT DOESN'T REALLY PERTAIN TO PROFICIENCY TESTING.

01:39PM  13    Q.   WELL, IN THE SECTION THAT WE'RE LOOKING AT, ONE OF THE

01:39PM  14    THINGS THAT HAS TO BE DONE AS A STEP IN THE AAP PROCEDURE IS TO

01:39PM  15    CALCULATE THE AVERAGE BIAS OF THE THERANOS --

01:39PM  16    A.   CORRECT.  CORRECT.

01:39PM  17    Q.   AND JUST TO STEP BACK TO MAYBE A MORE BASIC POINT, DO YOU

01:39PM  18    SEE 4.3 AND 4.4?

01:39PM  19    A.   YES.

01:39PM  20    Q.   AND THIS IS ACTUALLY WHAT IS DEFINING THE AAP TEST; RIGHT?

01:39PM  21    YOU'RE SPLITTING THE SAMPLES INTO TWO DIFFERENT CONTAINERS;

01:39PM  22    RIGHT?

01:39PM  23    A.   YES.

01:39PM  24    Q.   AND THOSE ARE CALLED ALIQUOTS; RIGHT?

01:39PM  25    A.   CORRECT.

01:39PM   1    Q.   AND THOSE TWO DIFFERENT ALIQUOTS OR CONTAINERS, ONE IS RUN

01:40PM   2    ON A PREDICATE AND ONE IS RUN ON A THERANOS DEVICE; RIGHT?

01:40PM   3    A.   CORRECT.

01:40PM   4    Q.   AND THE IDEA IS TO COMPARE THE RESULTS?

01:40PM   5    A.   CORRECT.

01:40PM   6    Q.   AND YOU SEE BELOW THAT, THERE'S ACCEPTANCE CRITERIA IN THE

01:40PM   7    NEXT SECTION?

01:40PM   8    A.   YES.

01:40PM   9    Q.   AND THIS DEFINES WHAT IS REQUIRED FOR THE EXPERIMENT TO BE

01:40PM   10   DEEMED -- TO PASS; RIGHT?

01:40PM   11   A.   YES.

01:40PM   12   Q.   OKAY.  AND THEN ON 5.3, "IF AN ANALYTE FAILS A PROFICIENCY

01:40PM   13   EVENT, CORRECTIVE ACTIONS WILL BE IMPLEMENTED, ACCORDING TO

01:40PM   14   ANOTHER PROCEDURE."

01:40PM   15        DO YOU SEE THAT?

01:40PM   16   A.   YES.

01:40PM   17   Q.   AND NOW, IF YOU GO TO THE NEXT PAGE, PAGE 6, YOU SEE THAT

01:40PM   18   THERE'S A SECTION CALLED REFERENCES?

01:40PM   19   A.   YES.

01:40PM   20   Q.   AND ONE OF THE REFERENCES -- WELL, THE FIRST REFERENCE ON

01:40PM   21   7.1 IS TO A PARTICULAR CMS REGULATION; RIGHT?

01:40PM   22   A.   YES.

01:40PM   23   Q.   AND THEN THERE ARE OTHER REFERENCES TO CMS REGULATIONS;

01:41PM   24   RIGHT?

01:41PM   25   A.   YES.

01:41PM  1    Q.   AND THOSE ARE THE ONES THAT ARE CALLED CFR'S; RIGHT?

01:41PM  2    A.   CORRECT.

01:41PM  3    Q.   AND CODE OF FEDERAL REGULATION?

01:41PM  4    A.   CORRECT.

01:41PM  5    Q.   AND THEN THERE'S TWO OTHER REFERENCES TO CLSI; RIGHT?

01:41PM  6    A.   YES.

01:41PM  7    Q.   AND WE TALKED ABOUT THAT EARLIER?

01:41PM  8    A.   YES.

01:41PM  9    Q.   AND IS THAT THAT AUTHORITATIVE GROUP IN PENNSYLVANIA THAT

01:41PM  10   ISSUES GUIDANCE FOR LABORATORIES; RIGHT?

01:41PM  11   A.   YES.

01:41PM  12   Q.   IN THIS CASE WHEN YOU WERE MAKING THIS PROCEDURE, YOU

01:41PM  13   ACTUALLY REFERENCED THE CLSI, OR TWO OF THE CLSI GUIDELINES;

01:41PM  14   RIGHT?

01:41PM  15   A.   YES.

01:41PM  16   Q.   AND LET'S LOOK AT ONE OF THEM, AND THAT'S GP 29.  AND IF

01:41PM  17   WE CAN TURN -- OR JUST LOOK AT THE SCREEN, EXHIBIT 20418.

01:41PM  18        OKAY.  DO YOU SEE THAT 20418 IS THE PARTICULAR CLSI

01:42PM  19   GUIDELINE THAT WAS REFERENCED IN YOUR PROTOCOL?

01:42PM  20   A.   YES.

01:42PM  21   Q.   AND YOU REVIEW THIS IN ORDER TO DEVISE THE POLICY; RIGHT?

01:42PM  22   A.   YES.

01:42PM  23   Q.   AND SO THIS WAS ONE OF THE CASES WHERE YOU WERE RELYING ON

01:42PM  24   THE CLSI MATERIAL TO INFORM WHAT THE PROCEDURE SHOULD BE AT

01:42PM  25   THERANOS?

01:42PM  1    A.   YES.

01:42PM  2              MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20418.

01:42PM  3              MR. BOSTIC:  YOUR HONOR, 401, 403.

01:42PM  4              THE COURT:  I'LL SUSTAIN THE OBJECTION WITHOUT

01:42PM  5    ANYTHING FURTHER.

01:42PM  6         I DO THINK THE PROBATIVE VALUE IS OUTWEIGHED BY

01:42PM  7    SUBSTANTIAL PREJUDICE, SO I'LL SUSTAIN THE OBJECTION.

01:42PM  8    BY MR. COOPERSMITH:

01:42PM  9    Q.   OKAY.  WITHOUT SHOWING IT TO THE JURY, DR. ROSENDORFF,

01:42PM 10    I'LL ASK YOU SOME QUESTIONS ABOUT THIS, AND WE'LL SEE WHAT YOU

01:42PM 11    REMEMBER.

01:42PM 12         SO AS I WAS ASKING YOU, CLSI WAS THIS GROUP THAT PROVIDED

01:42PM 13    GUIDANCE; RIGHT?

01:42PM 14    A.   YES.

01:43PM 15    Q.   AND IN THIS CASE THEY PROVIDED GUIDANCE ON THE ALTERNATIVE

01:43PM 16    ASSESSMENT PROCEDURE; RIGHT?

01:43PM 17    A.   YES.

01:43PM 18    Q.   AND THAT YOU REVIEWED THIS TO HELP YOU DEVISE YOUR

01:43PM 19    PROTOCOL; RIGHT?

01:43PM 20    A.   YES.

01:43PM 21    Q.   AND DO YOU REMEMBER GENERALLY THAT THE CLSI GUIDANCE THAT

01:43PM 22    YOU REFERENCED ACTUALLY DID HAVE INFORMATION ABOUT HOW AAP

01:43PM 23    COULD BE IMPLEMENTED AND SO FORTH?

01:43PM 24    A.   I, I REALLY DON'T REMEMBER MUCH ABOUT THIS PARTICULAR

01:43PM 25    DOCUMENT, SIR.

01:43PM 1    Q.   OKAY.  BUT AT THE TIME -- IT'S NOW SEVERAL YEARS AGO?

01:43PM 2    A.   YEAH.

01:43PM 3    Q.   AT THE TIME, THAT'S SOMETHING THAT YOU REFERRED TO AS A

01:43PM 4    DOCUMENT TO HELP INFORM WHAT YOU DID; RIGHT?

01:43PM 5    A.   YES, IT APPEARS.

01:43PM 6    Q.   OKAY.  IF YOU COULD TAKE A LOOK AT EXHIBIT 9940.

01:44PM 7         THIS ONE IS NOT ADMITTED YET, BUT YOU CAN TAKE A LOOK AT

01:44PM 8    IT.

01:44PM 9         THIS IS A STANDARD OPERATING PROCEDURE AT THERANOS FOR

01:44PM 10   PROFICIENCY TESTING FOR THERANOS LAB DEVELOPED TESTS.

01:44PM 11        DO YOU SEE THAT?

01:44PM 12   A.   YES.

01:44PM 13   Q.   AND AGAIN, IT HAS YOUR SIGNATURE ON IT?

01:44PM 14   A.   YES.

01:44PM 15   Q.   AND THAT'S DECEMBER 2ND, 2013?

01:44PM 16   A.   YES.

01:44PM 17   Q.   THAT'S THE SAME DATE AS THE OTHER PROCEDURE THAT WE JUST

01:44PM 18   LOOKED AT?

01:44PM 19   A.   YES.

01:44PM 20   Q.   AND THIS PROCEDURE DEALS WITH DOING PROFICIENCY TESTING ON

01:44PM 21   MODIFIED PREDICATES; RIGHT?

01:44PM 22   A.   YES, IT APPEARS.

01:44PM 23        JUST TO BE -- JUST TO CLARIFY, YOU KNOW, NOT ALL OF THE

01:44PM 24   THERANOS LDT'S WERE ON MODIFIED FDA APPROVED DEVICES.

01:44PM 25   Q.   WELL, SOME OF THEM ARE ON EDISON; RIGHT?

01:44PM    1    A.   WELL, YEAH, SOME OF THE EDISON.  THE CBC'S WERE DONE ON

01:45PM    2    BECTON DICKINSON FLOW CYTOMETRY.

01:45PM    3    Q.   FOR SOME TIME THAT YOU WERE THERE?

01:45PM    4    A.   YES.

01:45PM    5    Q.   AND IF YOU GO TO PAGE 3 OF THE DOCUMENT.  YOU SEE THERE'S

01:45PM    6    A PURPOSE.

01:45PM    7         AND WITHOUT READING IT TO THE JURY, DO YOU SEE WHAT

01:45PM    8    SECTION 1.1 SAYS?

01:45PM    9    A.   YES.

01:45PM   10    Q.   AND THAT CLARIFIES WHAT THIS PROTOCOL WAS?

01:45PM   11    A.   YES.

01:45PM   12         MR. COOPERSMITH:  OKAY.  YOUR HONOR, WE OFFER

01:45PM   13    EXHIBIT 9940.

01:45PM   14         MR. BOSTIC:  NO OBJECTION.

01:45PM   15         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:45PM   16    (DEFENDANT'S EXHIBIT 9940 WAS RECEIVED IN EVIDENCE.)

01:45PM   17    BY MR. COOPERSMITH:

01:45PM   18    Q.   AND LET'S JUST GO LOOK AT THAT SAME THING THAT I

01:45PM   19    MENTIONED, SECTION 1.1.

01:45PM   20         SO THE PURPOSE HERE IS TO DEVISE AN ALTERNATIVE ASSESSMENT

01:45PM   21    PROTOCOL FOR LABORATORY DEVELOPED TESTS ON THE ADVIA-1800

01:45PM   22    CHEMISTRY ANALYZER; RIGHT?

01:45PM   23    A.   YES.

01:45PM   24    Q.   AND SO SPECIFIC TO THAT PARTICULAR DEVICE; RIGHT?

01:45PM   25    A.   YES.

01:45PM  1    Q.   THAT THERANOS MODIFIED?

01:45PM  2    A.   YES.

01:45PM  3    Q.   AND THIS WAS NECESSARY BECAUSE THERANOS HAD MODIFIED IT;

01:46PM  4    RIGHT?

01:46PM  5    A.   CORRECT.

01:46PM  6    Q.   AND SO WITHOUT GOING THROUGH THE REST OF THE DOCUMENT,

01:46PM  7    THIS IS BASICALLY THE COUNTERPART OF THE PROCEDURE THAT WE SAW

01:46PM  8    ON THE EDISON; RIGHT?

01:46PM  9    A.   YES.

01:46PM  10   Q.   AND IT DOCUMENTS THE SAME PROCEDURE THAT IS NECESSARY FOR

01:46PM  11   A MODIFIED PREDICATE AS OPPOSED TO AN EDISON; RIGHT?

01:46PM  12   A.   I DON'T REMEMBER IF THE PROCEDURE IS THE SAME OR NOT.

01:46PM  13   Q.   OKAY.  WELL, LET'S JUST LOOK AT ONE THING --

01:46PM  14   A.   OKAY.

01:46PM  15   Q.   AND IT'S PAGE 5, SECTION 4, PROCEDURE.

01:46PM  16   A.   I SEE.

01:46PM  17   Q.   DO YOU SEE THERE'S THE SAME PROCEDURE THERE?

01:46PM  18   A.   YES.

01:46PM  19   Q.   OKAY.  OKAY.  DR. ROSENDORFF, LET'S GO BACK TO THAT

01:47PM  20   PROFICIENCY TESTING EXPERIMENT THAT WE DISCUSSED, AND I KNOW

01:47PM  21   YOU DISCUSSED IT WITH MR. BOSTIC AS WELL.

01:47PM  22        AND THAT'S THE EXPERIMENT WITH THE NEW YORK STATE AND API

01:47PM  23   SAMPLES THAT WERE DONE ON EDISON; RIGHT?

01:47PM  24   A.   YES.

01:47PM  25   Q.   AND THOSE WERE THE OUTSIDE PROFICIENCY TESTING MATERIALS?

01:47PM 1      A.   YES.

01:47PM 2      Q.   AND SO THOSE WERE NOT -- RUNNING THOSE ON EDISON WAS NOT

01:47PM 3      ACCORDING TO THE PROTOCOLS AND PROCEDURE THAT YOU PUT IN PLACE

01:47PM 4      THAT WE JUST LOOKED AT?

01:47PM 5      A.   NO.

01:47PM 6      Q.   AND IT WAS SOMETHING OUTSIDE OF ANY SOP THAT THE COMPANY

01:47PM 7      HAD?

01:47PM 8      A.   CORRECT.

01:47PM 9      Q.   AND IT WAS SOMETHING THAT THE COMPANY HAD DECIDED NOT TO

01:47PM 10     DO; RIGHT?

01:47PM 11     A.   CORRECT.

01:47PM 12     Q.   AND THE EXPERIMENT THAT WAS RUN WITH THOSE SAMPLES,

01:47PM 13     BECAUSE IT WASN'T IN THE PROTOCOL, WOULD YOU AGREE WITH ME THAT

01:47PM 14     THAT EXPERIMENT RUNNING EDISON -- RUNNING PROFICIENCY TESTING

01:47PM 15     SAMPLES FROM NEW YORK STATE AND API ON EDISON, THE RESULTS

01:47PM 16     CANNOT BE DEEMED A FAILURE OF PROFICIENCY TESTING ON EDISON;

01:48PM 17     CORRECT?

01:48PM 18     A.   NOT ACCORDING TO THE SOP, NO.

01:48PM 19     Q.   OKAY.  AND, IN FACT, BECAUSE IT WASN'T THE ACCEPTED

01:48PM 20     PROTOCOL FOR RUNNING PROFICIENCY ON EDISON, IT IS NOT THE CASE

01:48PM 21     THAT IT FAILED PT; CORRECT?

01:48PM 22     A.   FORMALLY, NO.  CORRECT.

01:48PM 23     Q.   OKAY.  AND THAT'S SOMETHING THAT -- WELL, I'LL WITHDRAW

01:48PM 24     THAT.

01:48PM 25          LET'S MOVE TO A DIFFERENT EXHIBIT.

01:48PM  1          AT ONE POINT DR. PANDORI DEVELOPED A POWERPOINT, RIGHT,

01:48PM  2     THAT EXPLAINED WHAT AAP WAS ABOUT AND WHAT SHOULD HAPPEN;

01:48PM  3     RIGHT?

01:48PM  4     A.   I REMEMBER IT FROM THE HOLMES TRIAL, YEAH.

01:48PM  5     Q.   OKAY.  BUT YOU REMEMBER IT FROM THE TIME THAT IT HAPPENED

01:48PM  6     AS WELL; RIGHT?

01:48PM  7     A.   I THINK SO, YES, YEAH.

01:49PM  8     Q.   OKAY.  LET ME SEE IF I CAN FIND THAT.

01:49PM  9          LET'S LOOK AT EXHIBIT 7440.

01:49PM  10         THIS IS ALREADY IN EVIDENCE, YOUR HONOR.  I THINK IT MAY

01:49PM  11    BE UP ALREADY, BUT IF NOT, CAN WE PUBLISH IT?

01:49PM  12              THE COURT:  YES, IT MAY BE PUBLISHED.

01:50PM  13              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

01:50PM  14    Q.   SO, DR. ROSENDORFF, WE'RE LOOKING AT EXHIBIT 7440, AND YOU

01:50PM  15    SEE THERE'S AN EMAIL FROM DR. PANDORI TO MR. BALWANI AND TO

01:50PM  16    YOURSELF.

01:50PM  17         DO YOU SEE THAT?

01:50PM  18    A.   YES.

01:50PM  19    Q.   AND HE'S ATTACHING A SLIDE SHOW HE PUT TOGETHER ABOUT AAP?

01:50PM  20    A.   YES.

01:50PM  21    Q.   AND YOU -- NOW THAT YOU'RE LOOKING AT -- IF YOU WANT TO

01:50PM  22    FLIP THROUGH THE DOCUMENT, OR MAYBE WE CAN SCROLL THROUGH IT AT

01:50PM  23    LEAST STARTING WITH THE THIRD PAGE.

01:50PM  24         YOU RECOGNIZE THIS AS THE POWERPOINT THAT DR. PANDORI PUT

01:50PM  25    TOGETHER?

01:50PM  1      A.   I DON'T -- I DON'T KNOW WHAT YOU'RE ASKING.  I DON'T KNOW

01:50PM  2      WHAT THE QUESTION IS.

01:50PM  3      Q.   YOU KNOW WHAT?  LET'S ASK A BETTER QUESTION.

01:50PM  4      A.   OKAY.

01:50PM  5      Q.   THERE'S A PAGE, AND I'M NOT SURE OF THE PAGE NUMBERS, BUT

01:50PM  6      THE HEADING AT THE TOP SAYS THERANOS TESTS HAVE NO PEER GROUPS?

01:50PM  7      A.   YES.

01:50PM  8      Q.   THAT'S THE PAGE.

01:50PM  9      A.   YES.

01:50PM  10     Q.   AND YOU SEE IT SAYS, "NORMAL OF PT IS THEREFORE NOT

01:51PM  11     APPROPRIATE."

01:51PM  12          DO YOU SEE THAT?

01:51PM  13     A.   YES.

01:51PM  14     Q.   AND THAT'S WHAT DR. PANDORI SAID IN HIS POWERPOINT?

01:51PM  15     A.   YES.

01:51PM  16     Q.   AND IT SAYS, "ADDITIONALLY, SYNTHETIC MATRIX OF MANY

01:51PM  17     COMMERCIALLY AVAILABLE PT SAMPLES IS NOT AN APPROPRIATE ONE FOR

01:51PM  18     MANY THERANOS TESTS."

01:51PM  19          RIGHT?

01:51PM  20     A.   YES.

01:51PM  21     Q.   AND THAT'S WHAT YOU WERE SAYING BEFORE THAT DR. YOUNG

01:51PM  22     THOUGHT; RIGHT?

01:51PM  23     A.   THAT WAS HIS POSITION, YES.

01:51PM  24     Q.   AND DR. PANDORI PUT THAT IN HIS POWERPOINT?

01:51PM  25     A.   YES, HE DID.

01:51PM   1    Q.   OKAY.  WE CAN PUT THAT ASIDE.

01:51PM   2         WELL, LET'S TAKE A LOOK AT EXHIBIT 12846, WHICH IS NOT IN

01:51PM   3    EVIDENCE.

01:52PM   4         LOOKING AT EXHIBIT 12846, DO YOU SEE THAT THIS IS AN EMAIL

01:52PM   5    STRING AMONG YOU AND CHRISTIAN HOLMES AND ALSO ANAM KHAN?

01:52PM   6         DO YOU SEE THAT?

01:52PM   7    A.   YES.

01:52PM   8    Q.   AND THIS IS FROM BASICALLY MID-OCTOBER OF 2014?

01:52PM   9    A.   YES.

01:52PM  10    Q.   OKAY.  AND IT RELATES TO A PARTICULAR INQUIRY FROM A

01:52PM  11    PHYSICIAN; IS THAT RIGHT?

01:52PM  12    A.   YES.

01:52PM  13    Q.   AND THAT WAS A DR. KRAL?

01:52PM  14    A.   YES.

01:52PM  15    Q.   AND YOU WERE CORRESPONDING WITH ANAM KHAN AND

01:52PM  16    CHRISTIAN HOLMES TO MAKE SURE THAT YOU GET THE INFORMATION TO

01:52PM  17    RESPOND TO THE INFORMATION?

01:52PM  18    A.   YES.

01:52PM  19    Q.   OKAY.

01:52PM  20         YOUR HONOR, WE OFFER 12846.

01:53PM  21              MR. BOSTIC:  NO OBJECTION.

01:53PM  22              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:53PM  23         (DEFENDANT'S EXHIBIT 12846 WAS RECEIVED IN EVIDENCE.)

01:53PM  24    BY MR. COOPERSMITH:

01:53PM  25    Q.   AND IF YOU GO TO THE EARLIEST EMAIL IN TIME, THAT'S AN

01:53PM  1    EMAIL FROM ANAM, ANAM KHAN.

01:53PM  2         DO YOU SEE THAT?  AND THAT'S THE INQUIRY THAT I MENTIONED

01:53PM  3    FROM DR. KRAL?

01:53PM  4              MR. BOSTIC:  YOUR HONOR, I BELIEVE THERE'S SOME

01:53PM  5    PATIENT INFORMATION ON THE SCREEN.

01:53PM  6              MR. COOPERSMITH:  OH, YES.  LET'S TAKE THAT DOWN.

01:53PM  7              THE COURT:  LET'S TAKE THAT DOWN.

01:53PM  8              MR. COOPERSMITH:  AND ARE YOU ABLE TO REDACT THAT,

01:53PM  9    MR. ALLEN?

01:53PM  10   BY MR. COOPERSMITH:

01:53PM  11   Q.   THANK YOU.

01:53PM  12        DR. ROSENDORFF, WE HAVE THE EMAIL UP, BUT WITHOUT THE

01:53PM  13   PATIENT INFORMATION.

01:53PM  14        THAT'S THE EMAIL THAT I WAS REFERRING TO ABOUT DR. KRAL;

01:54PM  15   RIGHT?

01:54PM  16   A.   YES.

01:54PM  17   Q.   AND YOU -- IF YOU GO TO THE SECOND PAGE OF THE EXHIBIT.

01:54PM  18   YOU'RE EVENTUALLY GOING TO CALL THE PHYSICIAN; RIGHT?

01:54PM  19   A.   YES.

01:54PM  20   Q.   AND SO YOU ASKED FOR THE PHONE NUMBER?

01:54PM  21   A.   YES.

01:54PM  22   Q.   AND THEN ON THE EMAIL ON THE FIRST PAGE, THE SECOND EMAIL,

01:54PM  23   THEN YOU WROTE BACK TO ANAM KHAN, "REPORTING ON YOUR CALL WITH

01:54PM  24   DR. KRAL."

01:54PM  25        RIGHT?

01:54PM   1    A.   YES.

01:54PM   2    Q.   AND IT SAYS, "ANAM,

01:54PM   3         "THANKS -- I JUST GOT OFF THE PHONE WITH DR. KRAL.  SHE IS

01:54PM   4    PUZZLED WITH LOW FT4 RESULTS," AND SHE HAS MORE INFORMATION.

01:54PM   5         AND THEN SHE SAYS, "AT STANFORD, ON BOTH RESULTS CAME BACK

01:54PM   6    AS NORMAL."

01:54PM   7         DO YOU SEE THAT?

01:54PM   8    A.   YES.

01:54PM   9    Q.   AND THEN IT'S REPORTING ON YOUR CALL WITH DR. KRAL; RIGHT?

01:55PM  10    A.   YES.

01:55PM  11    Q.   AND THEN IT SAYS, "THE M.D. IS EXTREMELY POSITIVE AND

01:55PM  12    EXCITED BY THERANOS AND WANTS US TO CRUSH QUEST DIAGNOSTICS."

01:55PM  13         RIGHT?

01:55PM  14    A.   YES.

01:55PM  15    Q.   AND WHAT IS QUEST DIAGNOSTICS?

01:55PM  16    A.   IT'S AN INTERNATIONAL DIAGNOSTICS COMPANY.

01:55PM  17    Q.   ANOTHER TESTING LAB?

01:55PM  18    A.   YES.

01:55PM  19    Q.   MUCH LARGER THAN THERANOS?

01:55PM  20    A.   YES.

01:55PM  21    Q.   OKAY.  AND THEN AFTER THAT THERE'S A NOTE IN YOUR EMAIL.

01:55PM  22         DO YOU SEE THAT?

01:55PM  23    A.   YES.

01:55PM  24    Q.   AND YOU WROTE, "AAP PERFORMED ON 4/18/2014 INDICATES THAT

01:55PM  25    THE THERANOS METHOD IS, ON AVERAGE, 10 PERCENT LOWER THAN THE

01:55PM 1    PREDICATE (IMMULITE) METHOD," AND THEN YOU HAVE SOME DATA, AND

01:55PM 2    THEN YOU SAY, "WHICH IS ACCEPTABLE."

01:55PM 3         DO YOU SEE THAT?

01:55PM 4    A.   YES.

01:55PM 5    Q.   AND THAT'S WHAT YOU REFERRING TO, TO ANSWER THE DOCTOR'S

01:55PM 6    INQUIRY?

01:55PM 7    A.   YES.

01:55PM 8    Q.   OKAY.  OKAY.  LET'S GO TO A DIFFERENT TOPIC.

01:56PM 9         AND I THINK WE MENTIONED THIS BEFORE, BUT ONE OF THE

01:56PM 10   ASSAYS THAT WE'VE DISCUSSED DURING THE COURSE OF YOUR

01:56PM 11   TESTIMONY, AND ALSO WAS AN ISSUE AT THE TIME, IS THE ASSAY

01:56PM 12   POTASSIUM; RIGHT?

01:56PM 13   A.   YES.

01:56PM 14   Q.   OKAY.  SO LET'S LOOK AT THE POTASSIUM ISSUE.

01:56PM 15        SO STARTING WITH EXHIBIT 9313.  LOOKING AT THAT DOCUMENT,

01:56PM 16   AND WE CAN MAYBE GO TO OTHER PAGES IF NECESSARY, BUT THIS IS

01:57PM 17   THE POTASSIUM ASSAY DEVELOPMENT REPORT FOR POTASSIUM; IS THAT

01:57PM 18   RIGHT?

01:57PM 19   A.   YES.

01:57PM 20   Q.   AND THAT'S, AS WE DISCUSSED BEFORE, SOMETHING THAT IS IN

01:57PM 21   THE RESEARCH AND DEVELOPMENT LAB?

01:57PM 22   A.   YES.

01:57PM 23   Q.   AND THAT'S ALL THE PRELUDE TO EVENTUALLY PUTTING AN ASSAY

01:57PM 24   INTO THE CLIA LAB; RIGHT?

01:57PM 25   A.   YES.

01:57PM  1    Q.   AND YOU RECOGNIZE THIS AS THE POTASSIUM DEVELOPMENT REPORT

01:57PM  2    FROM RESEARCH AND DEVELOPMENT AT THERANOS?

01:57PM  3    A.   I'M JUST READING THE TITLE OF IT.

01:57PM  4    Q.   OKAY.  YOU DON'T HAVE ANY SEPARATE RECOLLECTION OF THE

01:57PM  5    DOCUMENT?

01:57PM  6    A.   NO.

01:57PM  7    Q.   BUT YOU KNOW THAT THERE WERE A LOT OF ASSAY DEVELOPMENT

01:57PM  8    REPORTS DONE FOR VARIOUS ASSAYS; RIGHT?

01:57PM  9    A.   YES.

01:57PM  10   Q.   AND IT DOESN'T SURPRISE YOU THAT THIS ONE IS FOR

01:57PM  11   POTASSIUM?

01:57PM  12   A.   NO.

01:57PM  13   Q.   OKAY.  LET'S LOOK AT EXHIBIT 20302.

01:58PM  14        AND EXHIBIT 20302 IS THE STANDARD OPERATING PROCEDURE FOR

01:58PM  15   PROVIDING POTASSIUM ON A MODIFIED SIEMENS ASSAY?

01:58PM  16   A.   YES.

01:58PM  17   Q.   OKAY.  AND THIS WAS A DOCUMENT THAT YOU SIGNED ON

01:58PM  18   NOVEMBER 19TH, 2013?

01:58PM  19   A.   20TH, YEAH.

01:58PM  20   Q.   OKAY.  ON NOVEMBER 20TH?

01:58PM  21   A.   YES, SIR.

01:58PM  22   Q.   OF 2013?

01:58PM  23   A.   YES.

01:58PM  24        MR. COOPERSMITH:  OKAY.  YOUR HONOR, WE OFFER 20302.

01:58PM  25        MR. BOSTIC:  NO OBJECTION.

ROSENDORFF CROSS BY MR. COOPERSMITH (RES.)                    3658

01:58PM   1              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:58PM   2              (DEFENDANT'S EXHIBIT 20302 WAS RECEIVED IN EVIDENCE.)

01:58PM   3       BY MR. COOPERSMITH:

01:58PM   4       Q.   SO THIS IS NOT A VALIDATION REPORT, THIS IS ACTUALLY THE

01:58PM   5       ACTUAL PROCEDURE FOR RUNNING POTASSIUM; RIGHT?

01:58PM   6       A.   YES.

01:58PM   7       Q.   AND SO IN ADDITION TO THE VALIDATION REPORTS, THERE ALSO

01:58PM   8       HAS TO BE A PROCEDURE FOR HOW THE LAB PERSONNEL HAVE TO

01:58PM   9       ACTUALLY GO ABOUT RUNNING THE TESTS; RIGHT?

01:59PM  10       A.   CORRECT.

01:59PM  11       Q.   AND THEY'RE SUPPOSED TO FOLLOW THAT OPERATING PROCEDURE;

01:59PM  12       RIGHT?

01:59PM  13       A.   CORRECT.

01:59PM  14       Q.   AND THAT'S SO THEY DON'T MAKE MISTAKES; RIGHT?

01:59PM  15       A.   CORRECT.

01:59PM  16       Q.   BUT SOMETIMES THEY DO?

01:59PM  17       A.   YES.

01:59PM  18       Q.   AND THERE ARE A VARIETY OF MISTAKES THAT COULD BE MADE;

01:59PM  19       RIGHT?

01:59PM  20       A.   SURE.

01:59PM  21       Q.   AND SO WITH REGARD TO POTASSIUM, THERE IS WHAT IS CALLED

01:59PM  22       PREANALYTIC MISTAKES, OR ERRORS; RIGHT?

01:59PM  23       A.   YES.

01:59PM  24       Q.   AND THE PREANALYTIC ERRORS ARE BEFORE THE SAMPLE EVEN GETS

01:59PM  25       TO THE LAB TO TEST; RIGHT?

01:59PM  1   A.   SO THIS SOP WOULD NOT COVER THE PREANALYTIC PROCEDURES

01:59PM  2   SUCH AS THE BLOOD COLLECTION ITSELF.

01:59PM  3   Q.   RIGHT.  BUT -- THANK YOU.

01:59PM  4        BUT APART FROM THE PROCEDURE THEN, THERE IS SOMETHING

01:59PM  5   KNOWN AS PREANALYTIC ERROR?

01:59PM  6   A.   YES.

01:59PM  7   Q.   AND THAT COULD INVOLVE SOMETHING LIKE THE METHOD OF BLOOD

01:59PM  8   COLLECTION; RIGHT?

01:59PM  9   A.   CORRECT.

01:59PM  10  Q.   SO WHEN BLOOD IS COLLECTED, THERE COULD BE A PROBLEM WITH

01:59PM  11  THE WAY THAT THE SAMPLE IS COLLECTED; RIGHT?

01:59PM  12  A.   CORRECT.

01:59PM  13  Q.   AND THAT WOULDN'T NECESSARILY BE A PROBLEM WITH THE

02:00PM  14  TECHNOLOGY, IT MIGHT BE A PROBLEM WITH THE WAY THAT THE PERSON

02:00PM  15  WHO COLLECTED THE SAMPLE WENT ABOUT DOING THAT; RIGHT?

02:00PM  16  A.   YES.  IT COULD ALSO BE THE FUNCTIONING OF THE CTN.

02:00PM  17  Q.   A VARIETY OF THINGS?

02:00PM  18  A.   A VARIETY OF THINGS, YEAH.

02:00PM  19  Q.   AND ONE THING THAT COULD HAPPEN WITH REGARD TO POTASSIUM

02:00PM  20  IN PARTICULAR IS SOMETHING CALLED HEMOLYSIS?

02:00PM  21  A.   CORRECT.

02:00PM  22  Q.   AND THAT WOULD BE WHERE THE ACTUAL PROCESS OF COLLECTING

02:00PM  23  THE SAMPLE RESULTS IN RED BLOOD CELLS BASICALLY BURSTING?

02:00PM  24  A.   CORRECT.

02:00PM  25  Q.   AND THAT CREATES KIND OF ARTIFACTS THAT DON'T MAKE THE

02:00PM   1    TEST WORK AS DESIGNED; CORRECT?

02:00PM   2    A.   CORRECT.

02:00PM   3    Q.   AND THAT'S SOMETHING THAT HAPPENED AT THERANOS FROM TIME

02:00PM   4    TO TIME; RIGHT?

02:00PM   5    A.   FREQUENTLY.

02:00PM   6    Q.   AND THAT HAPPENS IN OTHER LABS, TOO?

02:00PM   7    A.   YES.

02:00PM   8    Q.   AND, IN FACT, ALL LABS MAKE ERRORS; RIGHT?

02:00PM   9    A.   YES.

02:00PM   10   Q.   AND IN YOUR EXPERIENCE WORKING AS OTHER LABS, INCLUDING

02:00PM   11   THE UNIVERSITY OF PITTSBURGH, WHICH I KNOW YOU DISCUSSED ON

02:00PM   12   DIRECT, THERE WERE ERRORS THAT WERE OCCASIONALLY MADE; RIGHT?

02:01PM   13   A.   YES.

02:01PM   14   Q.   AND YOU DID YOUR BEST TO CORRECT THEM?

02:01PM   15   A.   YES.

02:01PM   16   Q.   OKAY.  LET'S GO TO THE NEXT EXHIBIT, WHICH IS 9315.

02:01PM   17        AND 9315 I THINK SHOULD ALREADY BE IN EVIDENCE UNDER THE

02:01PM   18   STIPULATION.

02:01PM   19        DO YOU SEE THAT IN FRONT OF YOU, DR. ROSENDORFF?

02:01PM   20   A.   YES.

02:01PM   21   Q.   AND THIS IS THE VALIDATION OF MODIFIED SIEMENS POTASSIUM

02:01PM   22   ASSAY; RIGHT?

02:01PM   23   A.   YES.

02:01PM   24   Q.   AND SO THIS WAS POTASSIUM RUNNING ON ONE OF THOSE MODIFIED

02:01PM   25   PREDICATE DEVICES; RIGHT?

02:01PM  1      A.    YES.

02:01PM  2      Q.    AND YOU SIGNED THE DOCUMENT ON MARCH 24TH OF 2014?

02:01PM  3      A.    YES.

02:01PM  4      Q.    AND THIS IS ACTUALLY THE VALIDATION REPORT; RIGHT?

02:02PM  5      A.    YES.

02:02PM  6      Q.    OKAY.  AND YOU SIGNED THAT BECAUSE AT THE TIME YOU WERE

02:02PM  7      SATISFIED THAT THE ASSAY WAS APPROPRIATE FOR CLINICAL USE?

02:02PM  8      A.    YES.

02:02PM  9      Q.    LET'S GO TO EXHIBIT 4037.

02:02PM  10          EXHIBIT 4037, DO YOU SEE IT'S AN EMAIL STRING INCLUDING

02:02PM  11     YOURSELF AND A VARIETY OF OTHER PEOPLE AT THERANOS; IS THAT

02:03PM  12     RIGHT?

02:03PM  13     A.    YES.

02:03PM  14     Q.    AND IT'S FROM MID-NOVEMBER, '13?

02:03PM  15     A.    YES.

02:03PM  16     Q.    AND IT'S ABOUT, IT'S ABOUT SOME DEMOS; IS THAT RIGHT?

02:03PM  17     A.    IT'S FROM DAN EDLIN, YES, IT'S ABOUT DEMOS.

02:03PM  18     Q.    OKAY.  AND THIS IS.

02:03PM  19          YOUR HONOR, WE MOVE 4037 INTO EVIDENCE.

02:03PM  20              THE COURT:  4037.

02:03PM  21              MR. COOPERSMITH:  4037.

02:03PM  22              MR. BOSTIC:  NO OBJECTION.

02:03PM  23              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:03PM  24          (GOVERNMENT'S EXHIBIT 4037 WAS RECEIVED IN EVIDENCE.)

02:03PM  25     BY MR. COOPERSMITH:

02:03PM  1    Q.   IF YOU GO TO THE EMAIL THAT IS EARLIEST IN TIME, THAT'S

02:03PM  2    NOVEMBER 15TH, FROM MR. EDLIN?

02:03PM  3    A.   YES.

02:03PM  4    Q.   AND HE SAYS, "HI ALL,

02:03PM  5         "THIS AFTERNOON AT 3:30 P.M. WE WILL HAVE TWO PATIENTS AT

02:03PM  6    WAG FOR A FINGERSTICK.  THESE ARE DEMO PATIENTS, BUT THE

02:04PM  7    COLLECTION WILL TAKE PLACE AT WAG."

02:04PM  8         RIGHT?

02:04PM  9    A.   YES.

02:04PM  10   Q.   AND SO EVEN THOUGH THIS WAS A DEMONSTRATION, THE

02:04PM  11   COLLECTION IN THIS CASE WOULD TAKE PLACE AT A WALGREENS STORE?

02:04PM  12   A.   YES.

02:04PM  13   Q.   THAT'S WHAT WAG IS?

02:04PM  14   A.   YES.

02:04PM  15   Q.   WHEN YOU TALK ABOUT ISE ASSAYS, WHAT ARE THE ISE ASSAYS?

02:04PM  16   A.   SODIUM, POTASSIUM, AND CHLORIDE.

02:04PM  17   Q.   SO POTASSIUM IS ONE OF THE ISE ASSAYS?

02:04PM  18   A.   YES.

02:04PM  19   Q.   OKAY.  AND IF YOU GO TO SORT OF THE MIDDLE EMAIL ON PAGE 2

02:04PM  20   OF THE EXHIBIT, THAT SAYS, "DANIEL, THE RESULTS FOR THE WAG

02:04PM  21   DEMO ARE ATTACHED.  THE ISE ASSAYS WERE RUN WITH A 1:1

02:04PM  22   DILUTION, AND THE DILUTION FACTOR WAS ENTERED IN THE ADVIA, SO

02:04PM  23   IT CORRECTED FOR THE DILUTION."

02:04PM  24        DO YOU SEE THAT?

02:04PM  25   A.   YES.

02:04PM   1    Q.   AND SO WE'RE TALKING ABOUT, IN THIS EMAIL, ISE ASSAYS THAT

02:05PM   2    WERE RUN AS A DEMO; RIGHT?

02:05PM   3    A.   YES.

02:05PM   4    Q.   AND THEN IF YOU GO TO THE NEXT PAGE, THERE'S AN EMAIL ON

02:05PM   5    THE FIRST PAGE ON THE VERY BOTTOM FROM SOMEONE NAMED LINDA LY.

02:05PM   6         DO YOU SEE THAT?

02:05PM   7    A.   YES.

02:05PM   8    Q.   AND MS. LY WRITES TO A GROUP OF PEOPLE "UNLESS EREZ NEEDS

02:05PM   9    TO CORRECT USING THE MQ'S WHICH WERE RUN WITH THE SAMPLE AND

02:05PM   10   ALSO DILUTED 1:1 (SHOULD BE INCLUDED IN THE ASSAY RESULT DATA

02:05PM   11   FILE FOR THE ISE'S).  IS THERE NO CORRECTION FOR THAT?

02:05PM   12        DO YOU SEE THAT?

02:05PM   13   A.   YES.

02:05PM   14   Q.   AND THEN ANOTHER THERANOS PERSON NAMED SARAH CABAYAN.

02:05PM   15        DO YOU SEE THAT?

02:05PM   16   A.   YES.

02:05PM   17   Q.   SHE SAYS, "I DON'T KNOW IF ANYBODY HAS EXPLAINED WHERE

02:05PM   18   THIS CORRECTION COMES FROM, I DON'T THINK THE RESULTS SHOULD BE

02:05PM   19   ADJUSTED."

02:05PM   20        RIGHT?

02:05PM   21   A.   YES, I SEE THAT.

02:05PM   22   Q.   AND THAT WAS MS. CABAYAN'S OPINION; RIGHT?

02:06PM   23   A.   YES.

02:06PM   24   Q.   AND SHE WAS A LAB ASSOCIATE?

02:06PM   25   A.   SHE WAS A CLS.

02:06PM  1     Q.   ONE OF THE CLS'S?

02:06PM  2     A.   YEAH.

02:06PM  3     Q.   AND THAT WAS THE VIEW THAT SHE EXPRESSED; RIGHT?

02:06PM  4     A.   YES.

02:06PM  5     Q.   AND IN THE NEXT EMAIL, JUST ABOUT FOUR MINUTES LATER, FROM

02:06PM  6     DANIEL YOUNG SAYS, "OK TO RELEASE FROM MY POINT OF VIEW."

02:06PM  7     A.   YES.

02:06PM  8     Q.   AND THEN A MINUTE LATER YOU WROTE, "APPROVED"; RIGHT?

02:06PM  9     A.   YES.

02:06PM  10    Q.   SO YOU DISAGREED WITH MS. CABAYAN?

02:06PM  11    A.   I THINK WHAT I WAS APPROVING WERE THE RESULTS.  I DON'T

02:06PM  12    KNOW IF I WAS EXPRESSLY TALKING ABOUT BIAS -- WHAT WAS IT

02:06PM  13    CALLED?  THE CORRECTION?

02:06PM  14    Q.   IT DOESN'T EXPLAIN IT.  IT JUST SAYS CORRECTION,

02:06PM  15    DR. ROSENDORFF.

02:06PM  16         SO APPARENTLY MS. CABAYAN HAD A VIEW THAT SHE DIDN'T THINK

02:06PM  17    THE RESULTS SHOULD BE ADJUSTED.

02:06PM  18         DO YOU SEE THAT?

02:06PM  19    A.   YES.

02:06PM  20    Q.   AND DANIEL YOUNG, NOTWITHSTANDING THAT, HE SAYS FOUR

02:07PM  21    MINUTES LATER, "OK TO RELEASE FROM MY POINT OF VIEW."

02:07PM  22         RIGHT?

02:07PM  23    A.   I DON'T KNOW IF THE RESULTS WERE CORRECTED OR NOT --

02:07PM  24    Q.   DR. ROSENDORFF, IN ANY EVENT, WITHIN A SPAN OF ABOUT FIVE

02:07PM  25    MINUTES, MS. CABAYAN EXPRESSED HER VIEW?

02:07PM   1    A.   YES.

02:07PM   2    Q.   AND DANIEL YOUNG SAID, "OK TO RELEASE"; RIGHT?

02:07PM   3    A.   YES.

02:07PM   4    Q.   AND THEN YOU SAID "APPROVED"?

02:07PM   5    A.   YES.

02:07PM   6    Q.   OKAY.  AND MR. EDLIN AT THE VERY TOP, JUST TO CLOSE THE

02:07PM   7    LOOP, SAYS, "GREAT, THANKS"; RIGHT?

02:07PM   8    A.   YES.

02:07PM   9    Q.   ALL RIGHT.

02:08PM  10         LET'S TAKE A LOOK AT 20317.

02:08PM  11         OKAY.  THIS IS AN EMAIL STRING FROM APRIL OF 2014?

02:08PM  12    A.   YES.

02:08PM  13    Q.   DO YOU SEE THAT?

02:08PM  14         AND IT'S RELATING TO A CERTAIN CTN THAT WAS COLLECTED?

02:08PM  15    A.   YES.

02:08PM  16    Q.   AND AT THE TOP OF THE EMAIL IT'S FROM HODA ALAMDAR TO

02:08PM  17    YOURSELF AND OTHERS?

02:08PM  18    A.   YES.

02:08PM  19    Q.   OKAY.

02:08PM  20         YOUR HONOR, WE OFFER 20317.

02:08PM  21             MR. BOSTIC:  NO OBJECTION.

02:08PM  22             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:08PM  23         (DEFENDANT'S EXHIBIT 20317 WAS RECEIVED IN EVIDENCE.)

02:08PM  24    BY MR. COOPERSMITH:

02:08PM  25    Q.   OKAY.  JUST TO ORIENT OURSELVES, GOING TO THE EARLIEST

02:08PM  1    EMAIL IN TIME, THERE'S AN EMAIL FROM TINA LIN ON PAGE 5 AND SHE

02:09PM  2    WRITES TO MS. ALAMDAR AND OTHERS, "NO, LET ME GO ADD A NOTE ON

02:09PM  3    ALL OF THE ISE'S TONIGHT.  THEY ARE NOT YET READY FOR CLIA

02:09PM  4    REVIEW."

02:09PM  5         DO YOU SEE THAT?

02:09PM  6    A.   YES.

02:09PM  7    Q.   OKAY.  AND THEN IF YOU GO TO PAGE 2 OF THE DOCUMENT,

02:09PM  8    THERE'S AN EMAIL FROM TINA LIN TO A GROUP OF PEOPLE, INCLUDING

02:09PM  9    YOURSELF.

02:09PM  10        DO YOU SEE THAT?

02:09PM  11   A.   YES.

02:09PM  12   Q.   AND IT SAYS "HI HODA,

02:09PM  13        "THE RERUN RESULTS WERE NOT GOOD.  WE WILL HAVE TO GO WITH

02:09PM  14   THE RESULTS FROM LAST NIGHT.  NOTE THAT THERE WAS NOT ENOUGH

02:09PM  15   SAMPLE TO RERUN 19016."

02:09PM  16        DO YOU SEE THAT?

02:09PM  17   A.   YES.

02:09PM  18   Q.   AND THE NEXT EMAIL WAS FROM MS. ALAMDAR AGAIN.

02:09PM  19        SHE WRITES, "HI ADAM,

02:09PM  20        "JUST TO CONFIRM, WE CAN RELEASE ALL ISE'S INCLUDING THE

02:09PM  21   CRITICAL RESULTS FOR 52136, FOR K," THAT'S POTASSIUM?

02:09PM  22   A.   YES.

02:09PM  23   Q.   "SEE BELOW EMAIL FROM TINA"; RIGHT?

02:10PM  24   A.   YES.

02:10PM  25   Q.   SO THAT WAS AN EMAIL DIRECTLY TO YOU; RIGHT?

02:10PM 1   A.   YES.

02:10PM 2   Q.   AND THEN YOU RESPONDED ON APRIL 23RD AT 4:57 P.M.?

02:10PM 3   A.   YES.

02:10PM 4   Q.   "HODA, PLEASE MEASURE THE LDH ON CTN WITH THE K OF 7.4"?

02:10PM 5   A.   YES.

02:10PM 6   Q.   AND YOU'RE GIVING HER SPECIFIC INSTRUCTIONS?

02:10PM 7   A.   YES.

02:10PM 8   Q.   AND BY THE WAY, MR. BALWANI IS NOT ON THE EMAIL; RIGHT?

02:10PM 9   A.   YES.

02:10PM 10  Q.   AND THEN YOU RESPOND AGAIN AT 5:21 P.M., "HODA, I'M

02:10PM 11  ASSUMING YOU HAVE CONFIRMED WITH TINA LIN AND DANIEL YOUNG THAT

02:10PM 12  THE CTN WAS NOT COMPROMISED IN ANY WAY.  IF THIS IS THE CASE,

02:10PM 13  THEN PLEASE CALL IT CRITICAL FOR THIS PATIENT."

02:10PM 14       RIGHT?

02:10PM 15  A.   YES.

02:10PM 16  Q.   AND COMPROMISED MEANS IT COULD BE THAT HEMOLYSIS ISSUE

02:10PM 17  THAT WE TALKED ABOUT BEFORE; RIGHT?

02:10PM 18  A.   YEAH, AND IF THE HDL IS VERY HIGH, IT WOULD INDICATE

02:10PM 19  HEMOLYSIS AS WELL.

02:10PM 20  Q.   RIGHT.  SO YOU WERE ASKING HER TO CHECK FOR THAT?

02:10PM 21  A.   YES.

02:10PM 22  Q.   AND SHE REPORTED, "HI ADAM,

02:10PM 23       "I LOOKED AT THE CTN IMAGE FOR 19016.  THE CTN IS NOT

02:11PM 24  HEMOLYZED.  WE ARE GOING TO RELEASE ALL OF THE ISE'S INCLUDING

02:11PM 25  THE CRITICAL K"; RIGHT?

02:11PM 1    A.   YES.

02:11PM 2    Q.   AND THIS WAS AN INSTANCE WHERE YOU AGREED TO RELEASE A

02:11PM 3    CRITICAL POTASSIUM AFTER YOU WERE SATISFIED THAT IT WASN'T

02:11PM 4    HEMOLYZED AND EVERYTHING ELSE CHECKED OUT?

02:11PM 5    A.   HEMOLYZED, YES.

02:11PM 6    Q.   HEMOLYZED.   THANK YOU.

02:12PM 7         LET'S GO TO 20316.

02:12PM 8         20316, DR. ROSENDORFF, IS AN EMAIL STRING AMONG YOURSELF

02:12PM 9    AND OTHER LAB PERSONNEL AT THERANOS?

02:12PM 10   A.   YES.

02:12PM 11   Q.   AND IT RELATES TO GENERAL CHEMISTRY RESULTS?

02:12PM 12   A.   YES.

02:12PM 13   Q.   AND IT'S APRIL 2014; IS THAT RIGHT?

02:12PM 14   A.   YES.

02:12PM 15   Q.   AND, YOUR HONOR, WE OFFER 20316.

02:12PM 16        MR. BOSTIC:  NO OBJECTION.

02:12PM 17        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:12PM 18        (DEFENDANT'S EXHIBIT 20316 WAS RECEIVED IN EVIDENCE.)

02:12PM 19   BY MR. COOPERSMITH:

02:12PM 20   Q.   LET'S GO TO THE EARLIEST EMAIL IN TIME, AND THIS IS FROM

02:12PM 21   ELLEN SANG.

02:12PM 22        DO YOU SEE THAT?

02:12PM 23   A.   YES.

02:12PM 24   Q.   AND IT SAYS "HI GUYS,

02:12PM 25        "MORE GC RESULTS HAS BEEN UPLOADED TO LIS."

02:12PM   1          DO YOU SEE THAT?

02:12PM   2     A.   YES.

02:12PM   3     Q.   AND IT SAYS, "PLEASE NOTE THAT CTN 7720 IS SHORT VOLUME

02:12PM   4     AND WE HAD TO HAND DILUTE ISE AND RAN MULTIQUALS ON EVOWARE."

02:12PM   5          DO YOU SEE THAT?

02:12PM   6     A.   YES.

02:12PM   7     Q.   AND SO THAT'S AN INITIAL TOPIC.

02:13PM   8          BUT THEN IF YOU GO TO THE EMAIL ON PAGE 1 FROM

02:13PM   9     STELLA HOWARD, THAT'S TO YOU WITH A COPY TO MS. ALAMDAR.

02:13PM  10          DO YOU SEE THAT?

02:13PM  11     A.   YES.

02:13PM  12     Q.   SHE SAYS, "ADAM,

02:13PM  13          "SHOULD I RELEASE THE 5.8 POTASSIUM RESULT WITH A NOTE

02:13PM  14     SAYING STATING THAT IT'S HEMOLYZED THEN...?  I'M SORRY, I GUESS

02:13PM  15     I AM NOT UNDERSTANDING THE ACCEPTABLE WORKFLOW FROM ISE'S THAT

02:13PM  16     ARE COMING OUT LOW/HIGH."

02:13PM  17     A.   YES.

02:13PM  18     Q.   AND THEN SHE GOES ON, "SO IN THE FUTURE WE WILL RELEASE

02:13PM  19     RESULTS IF THEY ARE READY FOR CLIA REVIEW, WITHOUT CHECKING

02:13PM  20     WITH YOU ADAM, REGARDLESS IF THEY ARE LOW/HIGH.  WE SHOULD ONLY

02:13PM  21     CHECK WITH YOU IF THEY ARE CRITICAL."

02:13PM  22          THAT'S WHAT SHE IS STATING AND ASKING YOU TO GIVE HER SOME

02:13PM  23     GUIDANCE; RIGHT?

02:13PM  24     A.   YES.

02:13PM  25     Q.   AND THEN YOU DID ON THE EMAIL AT THE TOP.  YOU RESPONDED

ROSENDORFF CROSS BY MR. COOPERSMITH (RES.)

02:13PM   1    AND YOU WROTE, "HI STELLA,

02:13PM   2        "IF THE SAMPLE APPEARS HEMOLYZED TO THE CLS, THEN IT IS

02:14PM   3    THE CLS DISCRETION TO ACCEPT THE RESULTS, USING THE HEMOLYSIS

02:14PM   4    VISUAL CHART IN NORMANDY, SINCE WE DON'T HAVE AN AUTOMATED

02:14PM   5    HEMOLYSIS METHOD YET."

02:14PM   6        DO YOU SEE THAT?

02:14PM   7    A.   YES.

02:14PM   8    Q.   AND THEN YOU SAY, "IN SUMMARY, THE RESULTS CAN BE RELEASED

02:14PM   9    WHEN R&D SIGNS OFF ON THE CTN."

02:14PM  10        THAT'S ONE WAY RESULTS CAN BE RELEASED; RIGHT?

02:14PM  11    A.   YES.

02:14PM  12    Q.   OR TWO, "CLS SIGNS OFF THAT THE CTN WAS NOT HEMOLYZED."

02:14PM  13    A.   YES.

02:14PM  14    Q.   OR THREE, "ISE'S ARE NOT CRITICAL."

02:14PM  15        RIGHT?

02:14PM  16    A.   YES.

02:14PM  17    Q.   SO THIS IS A POLICY YOU'RE PUTTING IN PLACE?

02:14PM  18    A.   YES.

02:14PM  19    Q.   AND YOU SAY, "RESULTS SHOULD COME TO ME," AS LAB DIRECTOR

02:14PM  20    I GUESS, "AND WHEN CRITICAL, OR SOME OTHER QUESTION THAT IS NOT

02:14PM  21    COVERED IN THESE POINTS."

02:14PM  22        SO YOU WANTED TO REVIEW THE CRITICAL RESULTS; RIGHT?

02:14PM  23    A.   YES.

02:14PM  24    Q.   BECAUSE THAT'S IMPORTANT; RIGHT?  IF YOU'RE GOING TO REACH

02:14PM  25    A CRITICAL RESULT, BEFORE YOU TELL A PATIENT YOU HAVE CRITICAL

02:14PM  1    POTASSIUM OR ANYTHING, YOU WOULD WANT TO MAKE SURE AS BEST YOU

02:15PM  2    COULD THAT THAT WAS CORRECT; RIGHT?

02:15PM  3    A.   YES.

02:15PM  4    Q.   NOW, YOU UNDERSTAND, AND I THINK YOU TESTIFIED, THAT THERE

02:15PM  5    WERE ISSUES THAT WERE OF SOME CONCERN TO YOU ABOUT POTASSIUM;

02:15PM  6    RIGHT?

02:15PM  7    A.   YES.

02:15PM  8    Q.   AND THAT -- BUT THE COMPANY DIDN'T JUST THROW UP ITS HANDS

02:15PM  9    AND RELEASE THE RESULTS ANYWAY, THEY ACTUALLY TRIED TO WORK ON

02:15PM  10   THE PROBLEM; RIGHT?

02:15PM  11   A.   THEY DID.

02:15PM  12   Q.   AND LET'S TAKE A LOOK AT 13893.

02:15PM  13       13893 YOU SEE IS AN EMAIL STRING AMONG YOU, MR. BALWANI,

02:16PM  14   AND OTHERS FROM MAY OF 2014?

02:16PM  15   A.   YES.

02:16PM  16           MR. COOPERSMITH:  YOUR HONOR, WE OFFER 13893.

02:16PM  17           MR. BOSTIC:  NO OBJECTION.

02:16PM  18           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:16PM  19       (DEFENDANT'S EXHIBIT 13893 WAS RECEIVED IN EVIDENCE.)

02:16PM  20   BY MR. COOPERSMITH:

02:16PM  21   Q.   OKAY.  LET'S LOOK AT THE EARLIEST EMAIL IN TIME, AND

02:16PM  22   THAT'S AN EMAIL FROM DANIEL YOUNG; RIGHT?

02:16PM  23   A.   YES.

02:16PM  24   Q.   AND IT'S RELATING TO ISE STUDIES?

02:16PM  25   A.   YES.

02:16PM  1    Q.   WHICH, AS WE DISCUSSED, INCLUDES POTASSIUM?

02:16PM  2    A.   YES.

02:16PM  3    Q.   AND IT SAYS, "I WANTED TO UPDATE YOU ON THE ISE STUDIES IN

02:16PM  4    PREPARATION FOR SWITCHING BACK TO THE DILUTED ISE PROTOCOLS ON

02:16PM  5    TUESDAY."

02:16PM  6         DO YOU SEE THAT?

02:16PM  7    A.   YES.

02:16PM  8    Q.   AND DR. YOUNG WRITES, "WITH OUR NEW APPROACH, WE HAVE NOW

02:16PM  9    SHOWN THAT WE CAN PROCESS AND RUN ISE'S WITH DILUTED VENOUS

02:16PM  10   SAMPLES WITH GREAT ACCURACY AND PRECISION (SHOWN NOW OVER

02:16PM  11   10 DAYS AND 48 SUBJECTS)."

02:17PM  12        DO YOU SEE THAT?

02:17PM  13   A.   YES.

02:17PM  14   Q.   AND THAT WAS WHAT DR. YOUNG WAS WRITING?

02:17PM  15   A.   YES.

02:17PM  16   Q.   AND MR. BALWANI WROTE BACK ON MAY 24TH, 12:03 P.M. HE

02:17PM  17   WRITES, "DANIEL,

02:17PM  18        "THIS IS TRULY GREAT PROGRESS AND A BIG COMPETITIVE

02:17PM  19   ADVANTAGE FOR US.

02:17PM  20        "WE NEED TO KEEP THIS PROJECT, THE CODE, CALIBRATION, AND

02:17PM  21   EVERYTHING WE LEARNED HERE AS THERANOS TRADE SECRET.  EVERYONE

02:17PM  22   WHO WAS WORKING ON THIS NEEDS TO UNDERSTAND THIS.  THIS ALSO

02:17PM  23   SHOULD NOT BE COMMUNICATED TO ANYONE IN CLIA WHO DOESN'T NEED

02:17PM  24   TO KNOW HOW WE DO THIS CALIBRATION AND HOW WE GOT WHERE WE ARE

02:17PM  25   ON THIS PROJECT.  BESIDES ADAM, NO ONE IN CLIA NEEDS TO KNOW

02:17PM   1    ABOUT OUR SECRET SAUCE AND IF ADAM THINKS ANYONE ELSE NEEDS TO

02:17PM   2    KNOW THIS THEN WE NEED TO GET THEM UNDER SAME AGREEMENT AROUND

02:17PM   3    OUR TRADE SECRET.  THERE IS NO ONE ON THE INDUSTRY CAPABLE OF

02:17PM   4    DOING WHAT WE HAVE ACCOMPLISHED HERE BECAUSE OF THE MASSIVE

02:17PM   5    LEARNINGS AND TRIAL AND ERRORS.  WE NEED TO PROTECT THIS."

02:17PM   6         DO YOU SEE THAT?

02:17PM   7    A.   YES.

02:17PM   8    Q.   OKAY.  AND IN RESPONSE TO MR. BALWANI, DANIEL YOUNG WROTE,

02:17PM   9    "SOUNDS GOOD.  I WILL GET TOGETHER WITH MONA AND DRAFT THE

02:18PM  10    STRATEGY."

02:18PM  11         RIGHT?

02:18PM  12    A.   YES.

02:18PM  13    Q.   AND MONA WAS A HUMAN RESOURCES PERSON?

02:18PM  14    A.   YEAH, SHE WAS A LAWYER, HR, HEAD OF HR THERE.

02:18PM  15    Q.   AND SHE WAS A LAWYER AND ALSO THE HEAD OF HR?

02:18PM  16    A.   CORRECT.

02:18PM  17    Q.   AND THEN ABOVE THAT IS AN EMAIL FROM YOU TO DR. YOUNG

02:18PM  18    COPYING MR. BALWANI, MS. HOLMES, AND MONA RAMAMURTHY.

02:18PM  19         AND YOU SAY "DANIEL,

02:18PM  20         "CONGRATULATIONS ON CRACKING THIS.

02:18PM  21         "REGARDS,

02:18PM  22         "ADAM."

02:18PM  23         RIGHT?

02:18PM  24    A.   YES.

02:18PM  25    Q.   AND THAT'S WITH RESPECT TO THE ISE'S?

02:18PM  1      A.   YES.

02:18PM  2      Q.   NOW, AFTER THAT, THOUGH, THERE WERE STILL SOME ISSUES THAT

02:18PM  3      SURFACED EVEN THOUGH AT THE TIME DR. YOUNG AND OTHERS HAD

02:18PM  4      THOUGHT THEY HAD SOLVED ALL OF THE PROBLEMS; RIGHT?

02:18PM  5      A.   CORRECT.

02:18PM  6      Q.   AND LET'S GO TO EXHIBIT 20342.

02:19PM  7           THIS IS AN EMAIL STRING FROM OCTOBER -- I'M SORRY.

02:19PM  8           PUTTING ASIDE THE TOP EMAIL, THERE'S AN EMAIL FROM JUNE OF

02:19PM  9      '14, AN EMAIL STRING; RIGHT?

02:19PM  10     A.   YES.

02:19PM  11     Q.   AND THIS RELATES TO PATIENT RESULTS SINCE MAY 24TH FOR

02:19PM  12     POTASSIUM?

02:19PM  13     A.   YES.

02:19PM  14     Q.   AND WHAT YOU AND OTHERS WERE SEEING WAS THAT SOME OF THE

02:19PM  15     POTASSIUMS WERE FLAGGING HIGH OR LOW; RIGHT?

02:20PM  16          LET ME WITHDRAW THAT AND ASK A BETTER QUESTION.

02:20PM  17          YOU WERE SEEING SOME RESULTS THAT YOU THOUGHT IT WAS

02:20PM  18     IMPORTANT TO RAISE BECAUSE YOU WERE STILL SEEING SOME ISSUES

02:20PM  19     EVEN AFTER THE EMAIL THAT WE PREVIOUSLY SAW; RIGHT?

02:20PM  20     A.   YES.

02:20PM  21     Q.   OKAY.  AND ON -- IF YOU LOOK AT -- WELL, LET ME JUST SEE

02:20PM  22     IF I CAN DO THIS FIRST.

02:20PM  23          CAN WE, YOUR HONOR -- YOUR HONOR, WE OFFER 20342.

02:20PM  24               MR. BOSTIC:  NO OBJECTION.

02:20PM  25               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

ROSENDORFF CROSS BY MR. COOPERSMITH (RES.)

02:20PM  1          (DEFENDANT'S EXHIBIT 20342 WAS RECEIVED IN EVIDENCE.)

02:20PM  2     BY MR. COOPERSMITH:

02:20PM  3     Q.   OKAY.  AND I WANTED TO SHOW YOU THE EMAIL THAT STARTS ON

02:20PM  4     THE BOTTOM OF PAGE 1.  THIS IS ON JUNE 28TH, 2014.

02:20PM  5          DO YOU SEE THAT?

02:20PM  6     A.   YES.

02:20PM  7     Q.   DR. YOUNG WRITES, "I WANTED TO PROVIDE A BRIEF UPDATE ON

02:20PM  8     OUR REVIEW OF POTASSIUM DATA AND OUR REFINED FOCUS TO ADDRESS

02:21PM  9     THAT."

02:21PM 10          DO YOU SEE THAT?

02:21PM 11     A.   YES.

02:21PM 12     Q.   AND HE SAYS, "FIRST, I WAS NOTICING THAT OUR POTASSIUM

02:21PM 13     DATA FROM OUR IN-HOUSE SAMPLES HAS LESS ISSUES THAN OUR WAG

02:21PM 14     POTASSIUM SAMPLES."

02:21PM 15          SO HE DID SOME ANALYSIS, AND HERE'S A SUMMARY; RIGHT?

02:21PM 16     A.   YES.

02:21PM 17     Q.   AND THEN THERE'S A SUMMARY CHART THAT INDICATES WHAT HE'S

02:21PM 18     TALKING ABOUT; RIGHT?

02:21PM 19     A.   YES.

02:21PM 20     Q.   AND THEN HE SAYS, "AS THIS SHOWS, SAMPLES FROM PHOENIX ARE

02:21PM 21     SHOWING HIGHER POTASSIUM RESULTS THAN WAG SAMPLES FROM

02:21PM 22     PALO ALTO AND SAMPLES COLLECTED IN-HOUSE."

02:21PM 23          DO YOU SEE THAT?

02:21PM 24     A.   YES.

02:21PM 25     Q.   AND HE SAYS, "I BELIEVE THIS IS LIKELY DUE TO THREE

02:21PM  1    COMBINED EFFECTS."

02:21PM  2         AND THE FIRST IS "SAMPLE STORAGE TIME."

02:21PM  3         DO YOU SEE THAT?

02:21PM  4    A.   YES.

02:21PM  5    Q.   AND THE SECOND IS "IN FIELD AND NORMANDY SAMPLE PROCESSING

02:21PM  6    PROCEDURES (NAMELY, CENTRIFUGE PROCEDURES)."

02:21PM  7         DO YOU SEE THAT?

02:21PM  8    A.   YES.

02:21PM  9    Q.   AND THEN THREE, "POSSIBLE SAMPLE COLLECTION TECHNIQUE

02:21PM  10   DIFFERENCES."

02:21PM  11        DO YOU SEE THAT?

02:21PM  12   A.   YES.

02:21PM  13   Q.   AND THEN HE SAYS, "WE HAVE PLANNED A STUDY TO UNDERSTAND

02:22PM  14   THESE FACTORS."

02:22PM  15   A.   YES.

02:22PM  16   Q.   AND THEN MR. BALWANI RESPONDS ON JUNE 28TH AND SAYS, "I

02:22PM  17   AGREE WITH THIS BUT WOULD LIKE TO MOVE RAPIDLY SO WE CAN HAVE

02:22PM  18   THE RIGHT PERFECT SOLUTION IN PLACE ASAP."

02:22PM  19        RIGHT?

02:22PM  20   A.   YES.

02:22PM  21   Q.   AND THEN DR. YOUNG REPORTS ON JUNE 28TH AT 3:46 P.M.

02:22PM  22        "INITIAL STUDY WAS RUN AND ANALYZED TODAY -- SHOWING

02:22PM  23   IMPROVEMENTS AND SUPPORTS HYPOTHESIS."

02:22PM  24        RIGHT?

02:22PM  25   A.   YES.

02:22PM    1    Q.   AND THEN HE SAYS, "WE ARE INITIATING MORE EXTENSIVE STUDY

02:22PM    2    ACROSS TWO DAYS."

02:22PM    3         DO YOU SEE THAT?

02:22PM    4    A.   YES.

02:22PM    5    Q.   AND HE SAYS, "THE GOAL OF THE STUDY IS TO ESTABLISH AND

02:22PM    6    DEMONSTRATE OPTIMAL PROCEDURES FOR SAMPLE PROCESSING TO ENSURE

02:22PM    7    RELIABLE TEST RESULTS."

02:22PM    8    A.   MY SCREEN JUST WENT BLANK.  I THINK IT'S REBOOTING.

02:22PM    9    Q.   OKAY.  DO YOU HAVE IT ON THE SCREEN?

02:22PM   10    A.   NO.

02:22PM   11    Q.   OKAY.

02:22PM   12         THE COURT:  IS IT ON THE JUROR'S SCREEN?

02:22PM   13         YES.

02:22PM   14         MR. COOPERSMITH:  I THINK WE CAN HAVE YOU PULL THE

02:22PM   15    HARD COPY DOCUMENT.

02:23PM   16         THE WITNESS:  IT SHOULD BE COMING UP.

02:23PM   17         OH, THERE IT IS.

02:23PM   18    BY MR. COOPERSMITH:

02:23PM   19    Q.   I'M JUST POINTING YOU TO THE EMAIL.  I DON'T NEED TO READ

02:23PM   20    IT AGAIN.

02:23PM   21         BUT DO YOU SEE DANIEL RESPONDED?

02:23PM   22    A.   YES.

02:23PM   23    Q.   OKAY.  LET'S TAKE A LOOK, DR. ROSENDORFF, AT

02:24PM   24    EXHIBIT 20431.

02:24PM   25         THIS IS ANOTHER EMAIL STRING AMONG YOU AND MR. BALWANI AND

02:24PM 1      DANIEL YOUNG.

02:24PM 2           DO YOU SEE THAT?

02:24PM 3      A.   YES.

02:24PM 4      Q.   AND MS. HOLMES?

02:24PM 5      A.   YES.

02:24PM 6      Q.   OKAY.  AND THIS ALSO RELATES TO POTASSIUM?

02:24PM 7      A.   YES.

02:24PM 8      Q.   AND IT'S FROM JULY OF 2014?

02:24PM 9      A.   YES.

02:24PM 10              MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20431.

02:25PM 11              MR. BOSTIC:  NO OBJECTION.

02:25PM 12              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:25PM 13          (DEFENDANT'S EXHIBIT 20431 WAS RECEIVED IN EVIDENCE.)

02:25PM 14     BY MR. COOPERSMITH:

02:25PM 15     Q.   AND IN THIS EXHIBIT, IF YOU LOOK AT THE FIRST PAGE,

02:25PM 16     DR. YOUNG WRITES TO YOU, AND MR. BALWANI, AND MS. HOLMES,

02:25PM 17     POTASSIUM STATUS.

02:25PM 18          DO YOU SEE THAT?

02:25PM 19     A.   YES.

02:25PM 20     Q.   "IN PREPARATION FOR OUR DISCUSSION, I WANTED TO SEND OUT A

02:25PM 21     FEW UPDATES THAT WE CAN DISCUSS IN MORE DETAIL TOGETHER."

02:25PM 22          THERE'S A HEADING POTASSIUM ASSAY (P-PROTOCOL ON ADVIA)

02:25PM 23     RIGHT?

02:25PM 24     A.   YES.

02:25PM 25     Q.   HE WRITES, "DILUTED PROTOCOL VERSUS NEAT/PREDICATE

02:25PM   1    PROTOCOL CONTINUES TO PERFORM WELL."

02:25PM   2        DO YOU SEE THAT?

02:25PM   3    A.   YES.

02:25PM   4    Q.   "RUNNING FINGERSTICK SAMPLES NEAT COMPARE WELL TO RUNNING

02:25PM   5    FINGERSTICK SAMPLES DILUTED."

02:25PM   6        DO YOU SEE THAT?

02:25PM   7    A.   YES.

02:25PM   8    Q.   "RUNNING VENOUS SAMPLES DILUTED COMPARE WELL TO RUNNING

02:26PM   9    VENOUS SAMPLES NEAT."

02:26PM  10        RIGHT?

02:26PM  11    A.   YES.

02:26PM  12    Q.   THAT'S WHAT DR. YOUNG IS SAYING?

02:26PM  13    A.   THAT'S WHAT HE'S SAYING.

02:26PM  14    Q.   SO HE'S TRYING TO WORK ON THE ISSUES THAT WERE OF CONCERN;

02:26PM  15    IS THAT RIGHT?

02:26PM  16    A.   YES.

02:26PM  17    Q.   NOW, IF YOU GO BELOW THAT, DO YOU SEE AFTER THE CHART HE

02:26PM  18    WRITES, "BASED ON THIS, I DO NOT RECOMMEND ESTABLISHING A NEW

02:26PM  19    POTASSIUM REFERENCE RANGE AT THIS TIME FOR FINGERSTICK

02:26PM  20    SAMPLES."

02:26PM  21        DO YOU SEE THAT?

02:26PM  22    A.   YES.

02:26PM  23    Q.   AND THAT WAS A SUBJECT THAT YOU DISAGREED WITH DR. YOUNG

02:26PM  24    ABOUT; RIGHT?

02:26PM  25    A.   YES.

02:26PM  1    Q.   HE BELIEVED THAT THE REFERENCE RANGE SHOULD BE THE SAME

02:26PM  2    FOR FINGERSTICK SAMPLES AND VENOUS SAMPLES; RIGHT?

02:26PM  3    A.   CORRECT.

02:26PM  4    Q.   AND YOU THOUGHT THAT THERE SHOULD BE A DIFFERENT REFERENCE

02:26PM  5    RANGE?

02:26PM  6    A.   CORRECT.

02:26PM  7    Q.   AND SO IT WAS A SUBJECT THAT YOU AND DR. YOUNG DISAGREED

02:26PM  8    WITH?

02:26PM  9    A.   CORRECT.

02:26PM  10   Q.   AND -- WELL, LET'S GO TO ANOTHER EXHIBIT, 20335.

02:27PM  11        AND DO YOU SEE 20335 IS AN EMAIL WITH THE SUBJECT OF

02:27PM  12   MEETING MINUTES?

02:27PM  13   A.   YES.

02:27PM  14   Q.   ABOUT CRITICAL REPORTING AND CTN RELEASING?

02:27PM  15   A.   YES.

02:27PM  16   Q.   AND THIS WAS FROM MONETTE ROCKEYMORE?

02:27PM  17   A.   YES.

02:27PM  18   Q.   AND SHE WAS ANOTHER EMPLOYEE WHO WORKED IN THE LAB?

02:27PM  19   A.   YES.

02:27PM  20   Q.   AND IT WAS TO YOU AND OTHERS ABOUT THIS SUBJECT OF

02:28PM  21   CRITICAL REPORTING?

02:28PM  22   A.   YES.

02:28PM  23           MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20335.

02:28PM  24           MR. BOSTIC:  NO OBJECTION.

02:28PM  25           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:28PM  1            (DEFENDANT'S EXHIBIT 20335 WAS RECEIVED IN EVIDENCE.)

02:28PM  2       BY MR. COOPERSMITH:

02:28PM  3       Q.   IT SAYS, "HI ADAM,

02:28PM  4            "PLEASE SEE ATTACHED FOR THE MINUTES OF THE MEETING.  TO

02:28PM  5       MAKE IT MORE CONVENIENT FOR EVERYONE, I HAVE ALSO INCLUDED

02:28PM  6       SCREENSHOT OF THE DISCUSSION WE HAD TODAY."

02:28PM  7            DO YOU SEE THAT?

02:28PM  8       A.   YES.

02:28PM  9       Q.   AND THIS IS A SCREENSHOT CAPTURING A DISCUSSION THAT WAS

02:28PM  10      HAD AT THIS PARTICULAR MEETING?

02:28PM  11      A.   YES.

02:28PM  12      Q.   AND THIS WAS AMONG LAB STAFF; RIGHT?

02:28PM  13      A.   I'M SORRY.

02:28PM  14      Q.   THIS WAS AMONG THE LAB STAFF, THIS MEETING?

02:28PM  15      A.   I DON'T RECALL.

02:28PM  16      Q.   OKAY.  BUT AT LEAST THAT'S WHO IS ON THE EMAIL; RIGHT?

02:28PM  17      A.   YES.

02:28PM  18      Q.   AND IF YOU GO TO THE CHART --

02:28PM  19      A.   OH, JUST THE EMAIL IS FROM HER TO ME.

02:28PM  20      Q.   YES.

02:28PM  21      A.   YES, THAT'S IT.

02:28PM  22      Q.   SHE'S GIVING YOU THE MINUTES OF THE MEETING; RIGHT?

02:28PM  23      A.   YES.

02:29PM  24      Q.   FOR YOUR REVIEW.

02:29PM  25           AND ON THE CHART, IF YOU FOLLOW THE FLOW CHART, ON THE

02:29PM 1    UPPER LEFT OF THE FIRST BOX IT SAYS LIHEP CTN?

02:29PM 2    A.   YES.

02:29PM 3    Q.   AND THAT'S A TYPE OF CTN; RIGHT?

02:29PM 4    A.   YES.

02:29PM 5    Q.   AND SO IT'S A BLOOD COLLECTION DEVICE?

02:29PM 6    A.   YES.

02:29PM 7    Q.   AND LIHEP IS LITHIUM HEPARIN?

02:29PM 8    A.   YES.

02:29PM 9    Q.   AND THERE'S DIFFERENT TYPES OF CTN'S, BUT THAT'S ONE OF

02:29PM 10   THEM?

02:29PM 11   A.   CORRECT.

02:29PM 12   Q.   AND THEN THE LIHEP CTN, IF THERE ARE NORMAL RESULTS FOR

02:29PM 13   NAK OR CI, THAT'S SODIUM CHLORIDE OR POTASSIUM?

02:29PM 14   A.   YES.

02:29PM 15   Q.   AND THEN CHECK THE CTN IMAGE; RIGHT?

02:29PM 16   A.   YES.

02:29PM 17   Q.   BRIDGE OR INTERFACE -- IF IT'S BRIDGE OR INTERFACE OR

02:29PM 18   COMPROMISED, THEN YOU GO YES VOID ABNORMAL AND CRITICAL

02:29PM 19   RESULTS; RIGHT?

02:29PM 20   A.   YES.

02:29PM 21   Q.   BUT IF IT'S NOT BRIDGE OR INTERFERENCE OR COMPROMISED,

02:29PM 22   THEN RELEASE RESULTS.

02:29PM 23        THAT'S THE FLOW CHART; RIGHT?

02:29PM 24   A.   YES.

02:29PM 25   Q.   AND THEN ON THE BOX BELOW THE PROCEDURE IS LIHEP CTN, IF

02:30PM   1   IT'S NORMAL, GOOD TO RELEASE; RIGHT?

02:30PM   2   A.   YES.

02:30PM   3   Q.   AND THEN THERE'S A FURTHER PROCEDURE OF WHAT TO DO IF IT'S

02:30PM   4   ABNORMAL; RIGHT?

02:30PM   5   A.   YES.

02:30PM   6   Q.   AND THEN, YOU KNOW, I WON'T READ IT ALL, BUT THAT'S WHAT

02:30PM   7   THE FLOW CHART IS; RIGHT?

02:30PM   8   A.   YES.

02:30PM   9   Q.   OKAY.  NOW, YOU, AS A BASIS, AS WELL FROM THE MEETING, YOU

02:30PM   10   IMPLEMENTED THAT PROCEDURE; RIGHT?

02:30PM   11   A.   I DON'T RECALL.

02:30PM   12   Q.   LET'S TAKE A LOOK AT 20336.

02:30PM   13        AND THIS IS ANOTHER EMAIL FROM YOU TO THE ENTIRE CLIA LAB

02:30PM   14   EMAIL GROUP?

02:30PM   15   A.   YES.

02:30PM   16   Q.   AND IT RELATES TO THE SAME TOPIC, CTN INTEGRITY AND

02:30PM   17   CRITICAL VALUES?

02:30PM   18   A.   YES.

02:30PM   19   Q.   AND IT SAYS -- WELL, I WON'T READ IT YET.

02:30PM   20        BUT IT'S AN EMAIL THAT YOU WROTE IN THE NORMAL COURSE OF

02:31PM   21   BUSINESS AT THERANOS; RIGHT?

02:31PM   22   A.   YES.

02:31PM   23           MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20336.

02:31PM   24           MR. BOSTIC:  NO OBJECTION.

02:31PM   25           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:31PM  1          (DEFENDANT'S EXHIBIT 20336 WAS RECEIVED IN EVIDENCE.)

02:31PM  2     BY MR. COOPERSMITH:

02:31PM  3     Q.   AND THEN IT SAYS, "CLIA,

02:31PM  4          "PLEASE REVIEW THE FOLLOWING SOP REGARDING CTN INTEGRITY

02:31PM  5     AND CRITICAL VALUES."

02:31PM  6          RIGHT?

02:31PM  7     A.   YES.

02:31PM  8     Q.   AND THIS IS A PROCEDURE THAT YOU'RE IMPLEMENTING?

02:31PM  9     A.   YES.

02:31PM 10     Q.   AND IF YOU GO TO PAGE 3 OF THE DOCUMENT, YOU SEE IT'S THE

02:31PM 11     SAME FLOW CHART THAT WE JUST REVIEWED?

02:31PM 12     A.   YES.

02:31PM 13     Q.   AND SO BASICALLY WHAT CAME OUT OF THE MEETING WAS A COUPLE

02:31PM 14     OF FLOW CHARTS AND THEN YOU IMPLEMENT THAT AS A PROCEDURE;

02:31PM 15     RIGHT?

02:31PM 16     A.   YES.

02:31PM 17     Q.   OKAY.  AND IT HAD TO DO WITH REPORTING CRITICAL VALUES FOR

02:31PM 18     ASSAYS, INCLUDING POTASSIUM?

02:31PM 19     A.   YES.

02:31PM 20     Q.   OKAY.  LET'S GO TO 7490.

02:32PM 21          EXHIBIT 7490 IS AN EMAIL STRING -- THE TOP ONE IS BETWEEN

02:32PM 22     YOU AND MR. BALWANI AND OTHERS, AND THEN THERE ARE OTHER EMAILS

02:32PM 23     GOING ON THE PAGE WITH OTHERS.

02:32PM 24          DO YOU SEE THAT?

02:32PM 25     A.   YES.

02:32PM  1    Q.   AND IT'S AN EMAIL THAT WAS SENT REGARDING CRITICAL ISE'S?

02:32PM  2    A.   YES.

02:32PM  3    Q.   AND THIS WAS ON OCTOBER 27TH, 2014?

02:32PM  4    A.   YES.

02:32PM  5    Q.   AND IT RELATED TO THE SAME TOPIC WE HAVE BEEN DISCUSSING,

02:32PM  6    THE USE OF CRITICAL ISE'S, WHICH INCLUDED POTASSIUM?

02:32PM  7    A.   YES.

02:32PM  8             MR. COOPERSMITH:  YOUR HONOR, WE OFFER EXHIBIT 7490.

02:32PM  9             MR. BOSTIC:  YOUR HONOR, HEARSAY OBJECTION AS TO THE

02:32PM 10    EMAIL FROM THE DEFENDANT.

02:33PM 11         (PAUSE IN PROCEEDINGS.)

02:33PM 12             THE COURT:  MR. COOPERSMITH, IT LOOKS LIKE IT'S THE

02:33PM 13    TOP TWO EMAILS ON THAT FIRST PAGE.

02:33PM 14             MR. COOPERSMITH:  I ASSUME MR. BOSTIC WAS OBJECTING

02:33PM 15    TO THE TOP EMAIL FROM MR. BALWANI TO DR. ROSENDORFF AND OTHERS.

02:33PM 16             MR. BOSTIC:  CORRECT, YOUR HONOR.

02:33PM 17             THE COURT:  THERE'S TWO, I THINK, TWO EMAILS.

02:33PM 18    THAT'S RIGHT.

02:33PM 19             MR. COOPERSMITH:  WELL, MR. BOSTIC CAN CLARIFY.  I

02:33PM 20    ASSUMED HIS OBJECTION WAS ONLY TO THE TOP EMAIL.

02:33PM 21             MR. BOSTIC:  SO, YOUR HONOR, I THINK THE SAME ISSUE

02:33PM 22    DOES APPLY NOT TO THE TOP TWO ON THAT PAGE, BUT THE TWO

02:33PM 23    MESSAGES FROM THE DEFENDANT ON THAT PAGE.

02:33PM 24             THE COURT:  ALL RIGHT.  I'LL SUSTAIN IT UNLESS YOU

02:33PM 25    HAVE ANOTHER EXPLANATION OR USE.

02:33PM   1              MR. COOPERSMITH:  SURE.  WHY DON'T WE REDACT THOSE

02:33PM   2    TWO EMAILS, AND IF THERE'S NO FURTHER OBJECTION, I WOULD OFFER

02:33PM   3    IT THAT WAY.

02:33PM   4              THE COURT:  OKAY.  THAT'S FINE.

02:34PM   5         WITH THOSE REDACTIONS THEN, IT WOULD BE ADMITTED, AND IT

02:34PM   6    MAY BE PUBLISHED.

02:34PM   7         (DEFENDANT'S EXHIBIT 7490 WAS RECEIVED IN EVIDENCE.)

02:34PM   8    BY MR. COOPERSMITH:

02:34PM   9    Q.   AND I'M JUST REALLY GOING TO REFER YOU TO A PARTICULAR

02:34PM  10    EMAIL YOU SENT ON OCTOBER 27TH, 2014, AT 3:28 P.M.

02:34PM  11         DO YOU SEE THAT IN THE MIDDLE OF THE PAGE?

02:34PM  12    A.   YES.

02:34PM  13    Q.   AND IT SAYS, REGARDING CRITICAL ISE'S, "WE HAD A MEETING

02:34PM  14    WITH TINA, NISHIT, AND THE CLIA LEADERSHIP ABOUT 6 WEEKS AGO TO

02:34PM  15    COME UP WITH A CONSISTENT PRACTICE."

02:34PM  16         RIGHT?

02:34PM  17    A.   YES.

02:34PM  18    Q.   AND THAT WAS REGARDING HOW TO HANDLE CRITICAL ISE'S;

02:34PM  19    RIGHT?

02:34PM  20    A.   YES.

02:34PM  21    Q.   AND THAT WAS A MEETING THAT YOU CONDUCTED WITHOUT

02:34PM  22    MR. BALWANI; RIGHT?

02:34PM  23    A.   I DON'T REMEMBER IF MR. BALWANI WAS AT THE MEETING OR NOT.

02:35PM  24    SORRY.

02:35PM  25    Q.   OKAY.  BUT IN ANY EVENT, YOU'RE REPORTING IN THIS EMAIL

02:35PM 1   THAT YOU'RE REPORTING TO MR. BALWANI THAT YOU HAD HAD AN

02:35PM 2   EARLIER MEETING?

02:35PM 3   A.   YES.

02:35PM 4   Q.   RIGHT?

02:35PM 5        OKAY.  LET'S TAKE A LOOK AT EXHIBIT 7503.

02:35PM 6        DO YOU SEE THIS IS ANOTHER EMAIL STRING AMONG YOU,

02:35PM 7   MR. BALWANI, AND DR. DOSHI, AND ELIZABETH HOLMES AND OTHERS.

02:36PM 8        DO YOU SEE THAT?

02:36PM 9   A.   YES.

02:36PM 10        I DON'T SEE MY NAME ANYWHERE HERE.  I'M SORRY.

02:36PM 11   Q.   OKAY.

02:36PM 12   A.   I'M JUST LOOKING IT OVER, AND YOU SAID AMONG YOU, AND I

02:36PM 13   DON'T MEAN MY NAME.

02:36PM 14   Q.   OKAY.  LET'S PUT THAT ONE ASIDE AND RESERVE THAT.

02:36PM 15        OKAY.  LET'S GO TO A DIFFERENT SUBJECT IN THE TIME WE HAVE

02:36PM 16   REMAINING TODAY, AND THAT'S THE SUBJECT OF HCG.

02:36PM 17        DO YOU REMEMBER TALKING ABOUT THAT ON DIRECT EXAM?

02:36PM 18   A.   YES.

02:37PM 19   Q.   SO IF YOU PUT UP EXHIBIT 9196, MR. ALLEN, WHICH IS ALREADY

02:37PM 20   IN EVIDENCE, THAT'S THE VALIDATION REPORT FOR HCG ON EDISON?

02:37PM 21   A.   YES.

02:37PM 22   Q.   AND THAT'S FROM MARCH 2014.

02:37PM 23        DO YOU SEE THAT?

02:37PM 24   A.   YES.

02:37PM 25   Q.   SO TO THE EXTENT THAT THERE ARE -- WELL, I WITHDRAW THAT.

02:37PM   1           BUT AS WE DISCUSSED BEFORE, THE PREREQUISITE FOR RUNNING

02:37PM   2      AN ASSAY IN THE CLIA LAB WOULD BE FOR ONE OF THESE VALIDATION

02:37PM   3      REPORTS TO BE SIGNED; RIGHT?

02:37PM   4      A.   CORRECT.

02:37PM   5      Q.   LET'S GO TO EXHIBIT 20371.

02:38PM   6           DO YOU SEE THIS IS AN EMAIL STRING ABOUT HAVING A MEETING

02:38PM   7      ON MAY 30TH, 2014?

02:38PM   8      A.   YES.

02:38PM   9      Q.   AND IT'S WITH SEASON FLORES, WHO IS THE EXECUTIVE

02:38PM  10      ASSISTANT TO ELIZABETH HOLMES?

02:38PM  11      A.   YES.

02:38PM  12      Q.   AND IT'S REGARDING -- WELL, IT'S ABOUT A SUBJECT PERTINENT

02:38PM  13      TO THE CLIA LAB; RIGHT?

02:38PM  14      A.   YEAH.  I DON'T KNOW WHAT THE EXACT TOPIC IS, BUT IT SAYS

02:38PM  15      CLIA MEETING, IMPORTANCE HIGH, YEAH.

02:38PM  16      Q.   OKAY.  AND THE MEETING INVITE IS IT 3:34 P.M. ON MAY 30TH?

02:38PM  17      A.   YES.

02:38PM  18      Q.   AND THE REQUEST IS FOR THE MEETING AT 4:00 P.M.; RIGHT?

02:39PM  19      A.   YES.

02:39PM  20      Q.   SO PRETTY QUICKLY AFTER THE EMAIL?

02:39PM  21      A.   YEP.

02:39PM  22           MR. COOPERSMITH:  YOUR HONOR, WE OFFER

02:39PM  23      EXHIBIT 20371.

02:39PM  24           MR. BOSTIC:  NO OBJECTION.

02:39PM  25           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:39PM   1            (DEFENDANT'S EXHIBIT 20371 WAS RECEIVED IN EVIDENCE.)

02:39PM   2                 THE COURT:  MR. COOPERSMITH.

02:39PM   3                 MR. COOPERSMITH:  YES, OF COURSE, YOUR HONOR.

02:39PM   4       Q.  DO YOU SEE, DR. ROSENDORFF, THERE'S AN EMAIL REFERRED TO

02:39PM   5       FROM MS. FLORES, "ELIZABETH HAS ASKED ME TO COORDINATE A CLIA

02:39PM   6       MEETING THIS AFTERNOON FOR 4:00 P.M."

02:39PM   7            DO YOU SEE THAT?

02:39PM   8       A.  YES.

02:39PM   9       Q.  AND AGAIN, THAT'S AT 3:34 P.M.; RIGHT?

02:39PM   10      A.  YES.

02:39PM   11      Q.  AND SHE ASKS YOU FOR A LIST OF ATTENDEE; RIGHT?

02:39PM   12      A.  YES.

02:39PM   13      Q.  AND YOU RESPOND, "SEASON,

02:39PM   14           IF IT'S THE WHOLE CLIA, THEN CLIA SHOULD BE INVITED (THERE

02:39PM   15      IS A DIRECTORY).  IF IT IS JUST CURRENT CLIA LEADERSHIP, THEN

02:39PM   16      THE FOLLOWING PEOPLE SHOULD BE INVITED."

02:39PM   17           AND THEN YOU ARE IDENTIFYING THE PEOPLE WHO YOU THOUGHT

02:40PM   18      SHOULD ATTEND; RIGHT?

02:40PM   19      A.  YES.

02:40PM   20      Q.  AND THAT INCLUDES MS. ALAMDAR; RIGHT?

02:40PM   21      A.  YES.

02:40PM   22      Q.  AND MR. GEE?

02:40PM   23      A.  YES.

02:40PM   24      Q.  AND OTHERS; RIGHT?

02:40PM   25      A.  YES.

02:40PM   1      Q.   OKAY.  LET'S GO TO EXHIBIT 4145.

02:41PM   2           OKAY.  I THINK THIS IS ALREADY IN EVIDENCE, SO IF WE CAN

02:41PM   3      PUBLISH IT, YOUR HONOR.

02:41PM   4                THE COURT:  YES.

02:41PM   5      BY MR. COOPERSMITH:

02:41PM   6      Q.   AND THIS IS ON THE SAME DAY AS THE LAST EXHIBIT THAT WE

02:41PM   7      LOOKED AT; RIGHT?

02:41PM   8      A.   YES.

02:41PM   9      Q.   AND ELIZABETH HOLMES SAYS, "I'VE DONE MANY MEETINGS ON

02:41PM   10     THIS TODAY"; RIGHT?

02:41PM   11     A.   YES.

02:41PM   12     Q.   REGARDING HCG?

02:41PM   13     A.   YES.

02:41PM   14     Q.   NOW, YOU ON DIRECT WERE ASKED -- LET'S JUST GO TO 28466.

02:41PM   15          IF WE CAN SHOW THAT ON DR. ROSENDORFF'S SCREEN, PLEASE.

02:41PM   16     EXHIBIT 28466, AND PARTICULARLY PAGE 7.  IF YOU COULD REFER TO

02:42PM   17     THAT PAGE?

02:42PM   18                MR. BOSTIC:  YOUR HONOR, RELEVANCE TO DISPLAYING

02:42PM   19     THIS TO THE WITNESS AT THIS POINT.

02:42PM   20                THE COURT:  DO YOU WANT TO -- WHY DON'T YOU ASK A

02:42PM   21     QUESTION.

02:42PM   22                MR. COOPERSMITH:  SURE.

02:42PM   23     Q.   DR. ROSENDORFF, DO YOU REMEMBER TESTIFYING ON WEDNESDAY

02:42PM   24     ABOUT HCG?

02:42PM   25     A.   YES.

02:42PM   1    Q.   AND DO YOU REMEMBER TESTIFYING THAT YOU MADE A DECISION IN

02:42PM   2    AN EMAIL THAT USE OF EDISON FOR HCG TESTING NEEDED TO STOP?

02:42PM   3    A.   YES.

02:42PM   4    Q.   AND THAT WAS ON MAY 30TH?

02:42PM   5    A.   I DON'T RECALL THE DATE, SIR.

02:42PM   6    Q.   OKAY.  WE CAN LOOK AT THAT.

02:42PM   7         BUT IN ANY EVENT, YOU RECALL THAT EMAIL; RIGHT?

02:42PM   8    A.   YES.

02:42PM   9    Q.   AND THAT YOU WERE ASKED A QUESTION, YOU REMEMBER, ABOUT

02:42PM   10   DID YOU EVER GO BACK ON THE DECISION AND AUTHORIZE THERANOS TO

02:42PM   11   USE THE EDISON?

02:42PM   12        AND YOU SAID YOU DID NOT; RIGHT?

02:42PM   13   A.   YES.

02:42PM   14   Q.   THAT'S YOUR TESTIMONY, SIR?

02:42PM   15   A.   YES.

02:42PM   16   Q.   OKAY.  LET'S TAKE A LOOK AT 20564.

02:43PM   17        YOUR HONOR, THESE NEXT TWO EMAILS WILL BE THE LAST EMAILS

02:43PM   18   I THINK BEFORE WE HAVE TO BREAK AT 2:45, IF THAT'S OKAY.

02:43PM   19             THE COURT:  OF COURSE.

02:43PM   20   BY MR. COOPERSMITH:

02:43PM   21   Q.   206 -- I'M SORRY, 20564.

02:43PM   22        DO YOU HAVE THAT IN FRONT OF YOU?

02:43PM   23   A.   YES.

02:43PM   24   Q.   AND THIS IS AN EMAIL STRING AMONG YOURSELF AND MS. ALAMDAR

02:43PM   25   AND CHINMAY PANGARKAR.

02:43PM  1          DO YOU SEE THAT?

02:43PM  2     A.   YES.

02:43PM  3     Q.   AND THERE ARE OTHERS ON THE EMAIL STRING AS WELL; RIGHT?

02:43PM  4     A.   YES.

02:43PM  5     Q.   AND THIS RELATES TO HCG?

02:43PM  6     A.   YES.

02:43PM  7     Q.   AND THIS WAS FROM JUNE 5TH AND 6TH OF 2014?

02:43PM  8     A.   YES.

02:43PM  9     Q.   SO IF THE EMAIL THAT YOU SENT TO STOP TESTING ON EDISON

02:44PM 10     WAS ON MAY 30TH, THIS WOULD JUST BE A FEW DAYS AFTER THAT;

02:44PM 11     RIGHT?

02:44PM 12     A.   YES.

02:44PM 13     Q.   OKAY.  AND THEN IF YOU GO TO THE EMAIL ON THE BOTTOM OF

02:44PM 14     PAGE 1, AND IT CONTINUES TO PAGE 2, IT'S FROM HODA ALAMDAR AT

02:44PM 15     1:20 P.M. TO YOU, DR. ROSENDORFF.

02:44PM 16     A.   YES.

02:44PM 17     Q.   IT SAYS, WITH REGARD TO A PARTICULAR SAMPLE, "TO CONFIRM,

02:44PM 18     I CAN RELEASE" --

02:44PM 19          MR. BOSTIC:  YOUR HONOR, THIS IS NOT IN EVIDENCE.

02:44PM 20          MR. COOPERSMITH:  OH, IT ISN'T.

02:44PM 21     I OFFER THESE IN THAT CASE.

02:44PM 22          MR. BOSTIC:  901.

02:44PM 23          MR. COOPERSMITH:  YOUR HONOR, HE'S IDENTIFIED IT AS

02:44PM 24     AN EMAIL THAT HE'S FAMILIAR WITH AND SENT AND RECEIVED.

02:44PM 25          THE COURT:  WHAT IS IT THAT -- ARE YOU SEEKING TO

02:44PM   1    INTRODUCE THE ENTIRETY OF THIS DOCUMENT, ALL OF THE PAGES HERE,

02:44PM   2    OR WHAT?

02:45PM   3            MR. COOPERSMITH:  YOUR HONOR, I'M INTENDING TO

02:45PM   4    INTRODUCE THIS AS AN EMAIL STRING.

02:45PM   5            THE COURT:  ALL OF THIS?

02:45PM   6            MR. COOPERSMITH:  YES, YOUR HONOR.

02:45PM   7            THE COURT:  I'LL ALLOW IT.  IT CAN BE ADMITTED AND

02:45PM   8    PUBLISHED.

02:45PM   9        (DEFENDANT'S EXHIBIT 20564 WAS RECEIVED IN EVIDENCE.)

02:45PM  10            MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

02:45PM  11    Q.  IF YOU GO TO THE BOTTOM EMAIL, YOU SEE IT SAYS FROM

02:45PM  12    HODA ALAMDAR TO DR. ROSENDORFF, AND HER QUESTION, "TO CONFIRM,

02:45PM  13    I CAN RELEASE THE HCG RESULT?"

02:45PM  14        DO YOU SEE THAT?

02:45PM  15    A.  YES.

02:45PM  16    Q.  AND THEN YOU WRITE BACK RIGHT AFTER THAT, "PLEASE HOLD THE

02:45PM  17    RESULT UNTIL CHINMAY IS DONE WITH HIS RLU STUDY TODAY -- WE CAN

02:45PM  18    RUN CTN HCG BUT NEED TO HOLD RESULTS UNTIL WE KNOW WHAT THE

02:45PM  19    INVALID CUTOFF IS."

02:45PM  20        DO YOU SEE THAT?

02:45PM  21    A.  YES.

02:45PM  22    Q.  AND SO YOU WANTED TO HOLD EVERYTHING UNTIL CHINMAY WAS

02:45PM  23    DONE WITH HIS STUDY?

02:45PM  24    A.  YES.

02:45PM  25    Q.  AND THEN MS. ALAMDAR WRITES, "ADAM/CHINMAY,

ROSENDORFF CROSS BY MR. COOPERSMITH (RES.)                3694

02:45PM  1        "ANY UPDATES ON THE HCG?  WE HAVE MULTIPLE PATIENTS

02:45PM  2   PENDING TO BE RELEASED."

02:46PM  3        RIGHT?

02:46PM  4   A.   YES.

02:46PM  5   Q.   AND THEN YOU WRITE, "HODA,

02:46PM  6        "CHINMAY WILL BE IMPLEMENTING A SCRIPT SHORTLY TO

02:46PM  7   REQUALIFY VALID VERSUS INVALID HCG VALUES.  STAY TUNED."

02:46PM  8        RIGHT?

02:46PM  9   A.   YES.

02:46PM  10  Q.   YOU'RE STILL WAITING FOR DR. PANGARKAR'S STUDY; RIGHT?

02:46PM  11  A.   YES.

02:46PM  12  Q.   AND THEN HE SAYS, "WE ARE WORKING ON AND WILL LET YOU KNOW

02:46PM  13  WHEN IT IS READY."

02:46PM  14       DO YOU SEE THAT?

02:46PM  15  A.   YES.

02:46PM  16  Q.   AND THEN ABOVE THAT DR. PANGARKAR SENDS AN EMAIL TO YOU

02:46PM  17  AND HE WRITES, "HI HODA," WITH REGARDS TO THE SAMPLES, "ARE

02:46PM  18  READY TO BE RELEASED.  THE LATEST RESULTS THAT YOU CAN RELEASE

02:46PM  19  ARE IN."

02:46PM  20       AND HE GIVES AN S DRIVE LOCATION; RIGHT?

02:46PM  21  A.   YES.

02:46PM  22  Q.   AND SO HE INFORMS YOU THAT HE IS RELEASING THE RESULTS?

02:46PM  23  A.   YES.

02:46PM  24  Q.   AND YOU HAD TOLD HIM THAT WHEN THE STUDY WAS COMPLETED,

02:46PM  25  THAT'S WHAT COULD HAPPEN; RIGHT?

02:46PM  1      A.   YES.

02:46PM  2              MR. COOPERSMITH:  OKAY.  NO FURTHER QUESTIONS FOR

02:46PM  3      TODAY, YOUR HONOR.

02:46PM  4              THE COURT:  ALL RIGHT.  THANK YOU.  LADIES AND

02:46PM  5      GENTLEMEN, WE'LL TAKE OUR WEEKEND BREAK NOW.

02:46PM  6          AND, YES, YOU CAN --

02:46PM  7              THE WITNESS:  I'M SORRY.

02:46PM  8              THE COURT:  RESTRAIN YOUR ENTHUSIASM, DOCTOR.

02:46PM  9          (LAUGHTER.)

02:47PM  10             THE COURT:  WE'LL BE BACK TUESDAY, TUESDAY NEXT AT

02:47PM  11     9:00 A.M.

02:47PM  12         WHEN WE COME BACK, I THINK WHAT WE'RE GOING TO DO, MUCH

02:47PM  13     LIKE IN HOCKEY, WE'LL DO A LINE CHANGE AND THE FRONT SEATS WILL

02:47PM  14     MOVE TO THE BACK AND THE BACK TO THE FRONT, AND WE MAY HAVE

02:47PM  15     SOME OTHER ADJUSTMENTS TO MAKE, BUT WE'LL DO THAT.

02:47PM  16         LET ME REMIND YOU OF THE ADMONITION.  DURING YOUR WEEKEND

02:47PM  17     AND MONDAY OFF, PLEASE DO NOT DO ANY INVESTIGATION, DO NOT

02:47PM  18     DISCUSS, READ, LISTEN TO OR IN ANY WAY TRY TO LEARN ANYTHING

02:47PM  19     ABOUT THIS CASE.

02:47PM  20         HAVE A LOVELY WEEKEND.  I HOPE THE RAIN CONTINUES.  WE

02:47PM  21     NEED IT.

02:47PM  22         ENJOY.  AND WE'LL SEE YOU NEXT TUESDAY.

02:47PM  23         THANK YOU.

02:47PM  24         AND, DR. ROSENDORFF, WE'LL SEE YOU TUESDAY AS WELL.  THANK

02:47PM  25     YOU.

02:47PM  1              THE WITNESS:  THANK YOU, YOUR HONOR.

02:48PM  2          (JURY OUT AT 2:48 P.M.)

02:48PM  3              THE COURT:  PLEASE BE SEATED.  THANK YOU.

02:48PM  4       THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THEIR

02:48PM  5    WEEKEND, AND DR. ROSENDORFF HAS LEFT THE COURTROOM.

02:48PM  6          ANYTHING BEFORE WE BREAK, COUNSEL?

02:48PM  7              MR. COOPERSMITH:  NO, YOUR HONOR.

02:48PM  8              MR. BOSTIC:  NO, YOUR HONOR.

02:48PM  9              THE COURT:  ALL RIGHT.  GREAT.  HAVE A GREAT

02:48PM 10    WEEKEND.  WE'LL SEE YOU NEXT WEEK.  THANK YOU.

02:48PM 11          (COURT ADJOURNED AT 2:48 P.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        _____
          IRENE RODRIGUEZ, CSR, CRR
17        CERTIFICATE NUMBER 8076

18        _____

19        LEE-ANNE SHORTRIDGE, CSR, CRR
          CERTIFICATE NUMBER 9595
20

21        DATED:  APRIL 22, 2022

22

23

24

25