1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,          )
6                                        )  CR-18-00258-EJD
                     PLAINTIFF,          )
7                                        )  SAN JOSE, CALIFORNIA
               VS.                       )
8                                        )  APRIL 26, 2022
      RAMESH "SUNNY" BALWANI,            )
9                                        )  VOLUME 22
                     DEFENDANT.          )
10    _____    )  PAGES 3697 - 3959

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                             BY:  JOHN C. BOSTIC
16                                JEFFREY B. SCHENK
                             150 ALMADEN BOULEVARD, SUITE 900
17                           SAN JOSE, CALIFORNIA 95113

18                           BY:  ROBERT S. LEACH
                                  KELLY VOLKAR
19                           1301 CLAY STREET, SUITE 340S
                             OAKLAND, CALIFORNIA 94612
20
            (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
      OFFICIAL COURT REPORTERS:
22                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
                               CERTIFICATE NUMBER 8074
23                             LEE-ANNE SHORTRIDGE, CSR, CRR
                               CERTIFICATE NUMBER 9595
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

```
1        A P P E A R A N C E S: (CONT'D)

2        FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                 BY:  MOLLY MCCAFFERTY
3                                     SHAWN ESTRADA
                                 THE ORRICK BUILDING
4                                405 HOWARD STREET
                                 SAN FRANCISCO, CALIFORNIA 94105
5
                                 BY:  JEFFREY COOPERSMITH
6                                     AARON BRECHER
                                      AMANDA MCDOWELL
7                                701 FIFTH AVENUE, SUITE 5600
                                 SEATTLE, WASHINGTON 98104
8
                                 BY:  STEPHEN CAZARES
9                                77 SOUTH FIGUEROA STREET, SUITE 3200
                                 LOS ANGELES, CALIFORNIA 90017
10
                                 BY:  AMY WALSH
11                               51 W 52ND STREET
                                 NEW YORK, NEW YORK 10019
12

13       ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                                 BY:  MADDI WACHS, PARALEGAL
14                                    SARA SLATTERY, PARALEGAL

15                               ORRICK, HERRINGTON & SUTCLIFFE
                                 JENNIFER CYGNOR, PARALEGAL
16
                                 PROLUMINA
17                               BY:  COREY ALLEN
                                 2200 SIXTH AVENUE, SUITE 425
18                               SEATTLE, WASHINGTON 98121

19                               UNITED STATES POSTAL INSPECTION SERVICE
                                 BY:  CHRISTOPHER MCCOLLOW
20
                                 FEDERAL BUREAU OF INVESTIGATION
21                               BY:  MARIO C. SCUSSEL

22                               UNITED STATES FOOD & DRUG
                                 ADMINISTRATION
23                               BY:  GEORGE SCAVDIS

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**ADAM ROSENDORFF**
CROSS-EXAM BY MR. COOPERSMITH (RES.)    P. 3717
REDIRECT EXAM BY MR. BOSTIC             P. 3726
RECROSS-EXAM BY MR. COOPERSMITH         P. 3766
FURTHER REDIRECT EXAM BY MR. BOSTIC     P. 3784
FURTHER RECROSS-EXAM BY MR. COOPERSMITH P. 3786


**LISA PETERSON**
DIRECT EXAM BY MR. LEACH                P. 3827
CROSS-EXAM BY MR. COOPERSMITH           P. 3818

1

2                          INDEX OF EXHIBITS

3                          IDENT.        EVIDENCE

4        GOVERNMENT'S

5        5418                             3736
         5421                             3742
6        5422                             3743
         4316                             3748
7        1295                             3750
         1944, PAGE 2                     3834
8        5809                             3837
         5432                             3840
9        2015                             3844
         2073                             3851
10       4858                             3868
         1853                             3887
11       2107                             3895
         2139                             3900
12       2146                             3904
         2166                             3909
13       5808                             3913
         1944                             3917

14

15

16

17

18       DEFENDANT'S

19       9939                             3717
         13888                            3723
20       13875                            3737
         13876                            3739
21       20565                            3771
         20306                            3781

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                      APRIL 26, 2022

 2                     P R O C E E D I N G S

 3         (COURT CONVENED AT 9:16 A.M.)

 4         (JURY OUT AT 9:16 A.M.)

 5              THE COURT:  THANK YOU.  PLEASE BE SEATED.

 6         ALL RIGHT.  THANK YOU.

 7         WE'RE ON THE RECORD IN THE BALWANI MATTER.  ALL COUNSEL

 8    ARE PRESENT.  MR. BALWANI IS PRESENT.

 9         THANK YOU FOR YOUR PATIENCE THIS MORNING, LADIES AND

10    GENTLEMEN.

11         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  WE RECEIVED --

12    MS. ROBINSON RECEIVED A NOTE YESTERDAY AFTERNOON ABOUT THREE

13    MATTERS THAT MR. COOPERSMITH WANTED TO -- IS THIS RIGHT, SIR?

14              MR. COOPERSMITH:  YES, YOUR HONOR.

15              THE COURT:  RIGHT.  WHAT WOULD YOU LIKE TO TALK

16    ABOUT?

17              MR. COOPERSMITH:  THANK YOU.

18         THERE ARE A FEW MATTERS, YOUR HONOR.  THANK YOU.

19         FIRST, THERE'S AN EXHIBIT THAT -- IT'S EXHIBIT 9939 THAT

20    WAS ADMITTED CONDITIONALLY WHEN ERIKA CHEUNG WAS ON THE STAND.

21    AND WE BELIEVE WE'VE LAID THE FOUNDATION THROUGH DR. ROSENDORFF

22    TO REMOVE THE CONDITION.

23         I DON'T KNOW IF THERE'S ANY DISPUTE ABOUT THAT.  I COULD

24    CITE THE COURT TO THE TRANSCRIPT, BUT IF THE COURT WOULD LIKE

25    ME TO DO IT IN FRONT OF THE JURY, I JUST WANT TO MAKE SURE THAT
```

09:18AM  1     WE'RE ON THE SAME WAVELENGTH WITH THE GOVERNMENT ON THAT

09:18AM  2     PARTICULAR POINT.

09:18AM  3              MR. BOSTIC:  NO OBJECTION.  APOLOGIES, YOUR HONOR.

09:18AM  4              THE COURT:  THE EXHIBIT WAS ADMITTED CONDITIONALLY.

09:18AM  5     I THINK THE CONDITION THE COURT STATED WAS THAT IF THE

09:18AM  6     FOUNDATION WAS NOT LAID, THAT THE COURT WOULD STRIKE IT OR GIVE

09:18AM  7     SOME OTHER INFORMATION.

09:18AM  8              MR. COOPERSMITH:  OKAY.

09:18AM  9              THE COURT:  SO IF YOU WANT TO REFERENCE IT AND

09:18AM 10     INDICATE THAT YOU WANT THE COURT TO INDICATE THAT THAT IS

09:18AM 11     ADMITTED, THAT'S FINE.  I THINK IT WAS ADMITTED UNTIL THE

09:18AM 12     CONTRARY.

09:18AM 13              MR. COOPERSMITH:  IF THAT'S THE CASE THEN,

09:18AM 14     YOUR HONOR, I DON'T THINK I NEED TO DO ANYTHING ELSE.  I JUST

09:18AM 15     WANTED TO MAKE SURE --

09:18AM 16              THE COURT:  RIGHT.

09:18AM 17          BUT IF YOU WOULD LIKE ME TO INDICATE THAT IT'S ADMITTED

09:19AM 18     AND THE CONDITIONS ARE LIFTED?

09:19AM 19              MR. COOPERSMITH:  OKAY.  THAT WOULD BE HELPFUL,

09:19AM 20     YOUR HONOR.  THANK YOU.  I APPRECIATE THAT.

09:19AM 21              THE COURT:  SURE.

09:19AM 22              MR. COOPERSMITH:  THE SECOND MATTER, THERE'S A --

09:19AM 23     YOU MIGHT RECALL LAST WEEK ON APRIL 20TH, THERE WAS AN ARGUMENT

09:19AM 24     IN THE MORNING ABOUT DR. ROSENDORFF'S POST-THERANOS CAREER AND

09:19AM 25     THERE WERE THREE DIFFERENT LABS THAT HE WAS ASSOCIATED WITH.

09:19AM  1          ONE OF THEM WAS A LAB CALLED PERKIN ELMER, AND I JUST

09:19AM  2     WANTED TO MAKE SURE IT WAS CLEAR FOR THE RECORD THAT ON

09:19AM  3     APRIL 21ST, I RECEIVED INFORMATION FROM THE GOVERNMENT THAT THE

09:19AM  4     LAB WHERE DR. ROSENDORFF IS THE LAB DIRECTOR, WHICH IS THE

09:19AM  5     VALENCIA BRANCH OF THIS PERKIN ELMER LAB, IS ACTUALLY CLOSING

09:19AM  6     BECAUSE APPARENTLY THE STATE OF CALIFORNIA CANCELLED THE

09:19AM  7     CONTRACT WITH THE LAB.

09:19AM  8          AND THEN ON APRIL 22ND, WHICH WAS FRIDAY, I RECEIVED AN

09:19AM  9     EMAIL WHERE DR. ROSENDORFF HAD SENT AN EMAIL TO GARY YAMAMOTO,

09:19AM  10    WHO IS AN EMPLOYEE OF CMS, AND DR. ROSENDORFF WAS ASKING THAT

09:20AM  11    HE BE REMOVED FROM THE LICENSE, YOU KNOW, IMMEDIATELY UPON THE

09:20AM  12    LAB CLOSING, WHICH IS GOING TO BE ON MAY 18TH, APPARENTLY.

09:20AM  13         AND THEN DR. ROSENDORFF SENT ANOTHER EMAIL SAYING, CAN WE

09:20AM  14    DO THIS BASICALLY AS SOON AS POSSIBLE ON MAY 19TH, AND THEN

09:20AM  15    MR. YAMAMOTO SAID, YOU KNOW, WE'LL DO OUR BEST.

09:20AM  16         BUT I THINK THIS IS JUST ADDITIONAL INFORMATION THAT

09:20AM  17    DR. ROSENDORFF SEEMS TO BE VERY CONCERNED ABOUT HIS REPUTATION.

09:20AM  18    HE -- YOU KNOW, HE'S GOING SO FAR AS TO IMMEDIATELY WANT TO

09:20AM  19    REMOVE HIMSELF FROM THE LICENSE.

09:20AM  20         IT IS ADDITIONAL INFORMATION THAT APPARENTLY NOT

09:20AM  21    EVERYTHING IS RIGHT WITH THIS PARTICULAR LAB, BECAUSE EVEN

09:20AM  22    THOUGH, AS THE COURT KNOWS, THE IMMEDIATE JEOPARDY WAS

09:20AM  23    APPARENTLY RESOLVED, SEVERAL IMMEDIATE JEOPARDIES, IN FACT, THE

09:20AM  24    STATE OF CALIFORNIA IS CANCELLING THE CONTRACT AND THE LAB IS

09:20AM  25    CLOSING.

09:20AM 1      SO WE RENEW OUR REQUEST TO GO INTO IT WITH DR. ROSENDORFF,

09:20AM 2  BUT AT THE VERY LEAST, WE WANT TO MAKE SURE IT IS VERY CLEAR ON

09:21AM 3  THE RECORD.

09:21AM 4           MR. BOSTIC:  SO, YOUR HONOR, THE GOVERNMENT'S

09:21AM 5  POSITION IS THE SAME.  NOTHING HAS CHANGED THAT SHOULD CHANGE

09:21AM 6  THE COURT'S ANALYSIS HERE.

09:21AM 7      FIRST OF ALL, WHEN WE'RE TALKING ABOUT WHETHER THERE IS

09:21AM 8  SOMETHING HANGING OVER DR. ROSENDORFF THAT MIGHT GIVE HIM

09:21AM 9  HYPOTHETICAL MOTIVE TO SHAVE HIS TESTIMONY IN FAVOR OF THE

09:21AM 10  GOVERNMENT, THAT STILL HAS NOT BEEN SHOWN.

09:21AM 11      THE PREVIOUS IMMEDIATE JEOPARDY FINDINGS WERE RESOLVED, AS

09:21AM 12  COUNSEL ADMITTED.

09:21AM 13      AND TO THE EXTENT THAT THIS LAB CLOSURE HAS ANYTHING TO DO

09:21AM 14  WITH THAT, IT APPEARS THAT THAT ISSUE IS NOW RESOLVED ALSO.

09:21AM 15      THE LAB IS GOING TO BE CLOSED, SO THERE'S NO SHOWING THAT

09:21AM 16  THERE IS ANY PENDING DECISION THAT DR. ROSENDORFF MIGHT AGAIN

09:21AM 17  HYPOTHETICALLY TRY TO INFLUENCE THROUGH HIS TESTIMONY.

09:21AM 18      WHEN IT COMES TO THE REPUTATIONAL ARGUMENT, MY MAIN

09:21AM 19  CONCERN IS THAT THAT ARGUMENT IS TOO BROAD AND CAPTURES TOO

09:21AM 20  MUCH.  THE FACT THAT A WITNESS MIGHT HAVE ANOTHER MATTER IN THE

09:22AM 21  PUBLIC VIEW THAT MAKES HIM LOOK BAD CANNOT BE ENOUGH TO WARRANT

09:22AM 22  DELVING INTO THAT ON CROSS-EXAMINATION.  OTHERWISE IT WOULD

09:22AM 23  OPEN THE DOOR TO ALL KINDS OF THINGS.

09:22AM 24      I THINK THE FACT THAT THE LAB IS CLOSING AS A RESULT OF

09:22AM 25  THE PROBLEMS IS AN ASSUMPTION ON MR. COOPERSMITH'S PART.  I'M

09:22AM  1    NOT AWARE OF ANY OFFICIAL LANGUAGE FROM THE STATE THAT EXPLAINS

09:22AM  2    THAT THAT'S WHY THAT DECISION WAS MADE.

09:22AM  3        SOMETHING I SAW INDICATED THAT IT WAS RELATING TO THE

09:22AM  4    AVAILABILITY OF OTHER ALTERNATIVES.  I BELIEVE THAT LAB, AT

09:22AM  5    LEAST MY UNDERSTANDING WAS THAT IT WAS BROUGHT INTO OPERATION

09:22AM  6    FOR PURPOSES OF DOING THIS TESTING, AND SO THE CANCELLATION OF

09:22AM  7    THAT CONTRACT IS -- REMOVES THAT LAB'S REASON FOR BEING.

09:22AM  8        THAT'S NOT THE SAME THING AS THE LAB BEING SHUT DOWN AS AN

09:22AM  9    ENFORCEMENT ACTION.  I THINK THAT'S AN IMPORTANT DISTINCTION.

09:22AM 10        BUT I THINK THE OVERARCHING POINT IS THAT THIS IS

09:22AM 11    COMPLETELY UNRELATED TO DR. ROSENDORFF'S WORK AT THERANOS, AND

09:23AM 12    FOR THAT REASON SHOULDN'T BE ADMISSIBLE UNDER 403.

09:23AM 13            THE COURT:  ANYTHING FURTHER?

09:23AM 14            MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

09:23AM 15            THE COURT:  OKAY.  THANK YOU.

09:23AM 16        WELL, IT -- THANK YOU FOR UPDATING ME ON THE STATUS WITH

09:23AM 17    THIS LABORATORY.

09:23AM 18        AND I HAVEN'T HEARD ANYTHING THAT SUGGESTS IT WAS ANYTHING

09:23AM 19    OTHER THAN A BUSINESS DECISION.  I DON'T KNOW IF THE CONTRACT

09:23AM 20    WAS CANCELLED.  IS THAT A BUSINESS DECISION OF THE STATE, OR

09:23AM 21    WAS IT BECAUSE OF SOME INVESTIGATION?

09:23AM 22        IT SOUNDS LIKE IT MIGHT BE ALL RELATED, BUT I JUST DON'T

09:23AM 23    THINK THAT THERE'S ENOUGH, MR. COOPERSMITH, BASED ON WHAT

09:23AM 24    YOU'VE TOLD ME.

09:23AM 25            MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

3706

09:23AM 1      MY FOCUS WAS REALLY ON, FROM DR. ROSENDORFF'S PERSPECTIVE,

09:23AM 2  WANTING TO BE, ACCORDING TO THE EMAIL THAT WE RECEIVED FROM THE

09:23AM 3  GOVERNMENT ON FRIDAY, WANTING TO BE REMOVED FROM THE

09:23AM 4  LABORATORY, YOU KNOW, IMMEDIATELY, LIKE THIS IS HIS FIRST

09:23AM 5  THOUGHT, I DON'T WANT TO BE ASSOCIATED WITH THIS ANYMORE.

09:23AM 6      THAT WAS REALLY THE FOCUS MORE THAN WHAT THE REASONS WERE

09:24AM 7  FOR THE STATE -- ALTHOUGH MY SENSE IS THE LAB -- THE STATE

09:24AM 8  CANCELLED THE CONTRACT BECAUSE THE LAB HAD A CHECKERED PAST,

09:24AM 9  BUT IT'S REALLY THE FOCUS ON WHAT DR. ROSENDORFF IS MOTIVATED

09:24AM 10  BY AND HIS BIAS.

09:24AM 11      THE COURT:  AND THE PROBLEM IS, THOSE ARE NOT

09:24AM 12  ATTENUATED.  ALL OF THOSE SEEM TO BE CONNECTED IN SOME WAY THAT

09:24AM 13  WOULD, FROM A 403 ANALYSIS, WOULD REQUIRE US TO LOOK INTO

09:24AM 14  REASON, REASON, REASON, AND THEN ULTIMATELY YOUR REASON,

09:24AM 15  DR. ROSENDORFF.

09:24AM 16      AND THAT SEEMS TO ME TO BE A MINI TRIAL.  WE'VE USED THAT

09:24AM 17  PHRASE.  AND THE -- WHATEVER PROBATIVE VALUE THAT THAT RAISES

09:24AM 18  FROM YOUR PERSPECTIVE THAT HE WANTS TO DISTANCE HIMSELF FROM A

09:24AM 19  FORMER EMPLOYER IS OUTWEIGHED BY THE TIME THAT WE WOULD HAVE TO

09:24AM 20  INVEST IN THAT, AND ALSO ANY POTENTIAL UNFAIR PREJUDICE WITHOUT

09:25AM 21  HAVING TO GO THROUGH A COMPLETE, A COMPLETE REVIEW OF ALL OF

09:25AM 22  THAT PROCESS.

09:25AM 23      I JUST CAN -- AT LEAST BASED ON WHAT YOU'VE TOLD ME TODAY,

09:25AM 24  I'M NOT GOING TO PERMIT IT.

09:25AM 25      MR. COOPERSMITH:  OKAY.  THANK YOU, YOUR HONOR.  I

09:25AM   1    UNDERSTAND.

09:25AM   2        THE NEXT MATTER IS THE COURT MAY RECALL THAT ON DIRECT

09:25AM   3    EXAMINATION -- AND THE TRANSCRIPT PAGE FROM THIS TRIAL IS 3243

09:25AM   4    TO 3244 -- DR. ROSENDORFF TESTIFIED THAT VALIDATIONS ARE RUN BY

09:25AM   5    R&D SCIENTISTS FOR THE MOST PART, WHO DO NOT HAVE ANY

09:25AM   6    PROFESSIONAL RESPONSIBILITY TO REPRESENT DATA ACCURATELY IN THE

09:25AM   7    VALIDATION.

09:25AM   8        AND THEN AGAIN ON DIRECT AT PAGE 3262, DR. ROSENDORFF SAYS

09:25AM   9    THAT HE FELT LIKE R&D WAS BEING PRESSURED TO PRODUCE DATA THAT

09:25AM  10    INDICATED A CERTAIN RESULT, AND HE WASN'T SURE -- ENTIRELY SURE

09:25AM  11    HE COULD TRUST WHAT HE WAS LOOKING AT, BUT HE DECIDED TO TRUST.

09:25AM  12        AND THEN ON CROSS I ASKED HIM A QUESTION, AFTER HE RAISED

09:26AM  13    THIS ISSUE AGAIN ABOUT TRUSTING DATA, I ASKED HIM IF IT WAS

09:26AM  14    PREPARED BY RESEARCH AND DEVELOPMENT SCIENTISTS, AND HE SAID

09:26AM  15    CORRECT.

09:26AM  16        AND THEN I SAID, YOU DIDN'T HAVE ANY REASON TO THINK WHAT

09:26AM  17    THEY WERE PRESENTING WAS NOT TRUTHFUL?

09:26AM  18        AND HE SAID, I DIDN'T AT THE TIME.  I DO NOW.

09:26AM  19        THAT WAS HIS TESTIMONY.

09:26AM  20        AND THE REASON I'M RAISING THIS WITH THE COURT IS THAT I

09:26AM  21    DON'T BELIEVE THAT DR. ROSENDORFF HAS ANY PERCIPIENT KNOWLEDGE

09:26AM  22    OF SOME FALSE DATA THAT HE RECEIVED FROM RESEARCH AND

09:26AM  23    DEVELOPMENT TO PREPARE VALIDATION REPORTS OR APPROVE THEM.

09:26AM  24        AND, YOU KNOW, IF HE HAD THAT PERCIPIENT KNOWLEDGE, I

09:26AM  25    THINK WE WOULD HAVE SEEN IT IN VOLUMINOUS DISCOVERY WE HAVE

09:26AM 1    RECEIVED ABOUT DR. ROSENDORFF.

09:26AM 2         SO MY POINT IN RAISING THIS, YOUR HONOR, IS THAT I DON'T

09:26AM 3    THINK THE PROSECUTION SHOULD BE PERMITTED TO ASK QUESTIONS

09:26AM 4    ABOUT WHY HE NOW BELIEVES, YEARS AFTER THE FACT, THAT HE MIGHT

09:26AM 5    HAVE RECEIVED DATA THAT HE DOESN'T BELIEVE IS TRUTHFUL OR

09:27AM 6    ANYTHING LIKE THAT, UNLESS THE GOVERNMENT CAN MAKE A PROFFER

09:27AM 7    THAT HE ACTUALLY HAD PERCIPIENT KNOWLEDGE WHILE HE WAS AT

09:27AM 8    THERANOS IF THAT'S THE CASE.

09:27AM 9         BECAUSE OBVIOUSLY THERE'S BEEN ALL SORTS OF NEWS REPORTS

09:27AM 10   AND TESTIMONY HE HAS GIVEN, AND HE MAY HAVE -- HE MAY BELIEVE

09:27AM 11   HE HAS OTHER SOURCES OF INFORMATION.

09:27AM 12        AND I JUST WANT TO -- AND MAYBE THE GOVERNMENT DOESN'T

09:27AM 13   PLAN TO ELICIT THAT ON REDIRECT, BUT I THOUGHT I WOULD RAISE

09:27AM 14   THAT.

09:27AM 15             THE COURT:  MR. BOSTIC.

09:27AM 16             MR. BOSTIC:  SO, YOUR HONOR, THE REDIRECT IS

09:27AM 17   STILL -- IT'S NOT FINALIZED BECAUSE THE CROSS IS NOT FINISHED,

09:27AM 18   BUT IF THE GOVERNMENT DOES GO INTO THAT TOPIC, IT WON'T BE TO

09:27AM 19   ELICIT FURTHER TESTIMONY ABOUT REASONS WHY DR. ROSENDORFF MIGHT

09:27AM 20   THINK THAT SOMEONE IN R&D WAS DISHONEST WITH HIM.

09:27AM 21        I HAVE NO INTENTION OF PURSUING THAT.

09:27AM 22        I THINK TO THE EXTENT DR. ROSENDORFF HAS DIFFERENT VIEWS

09:27AM 23   OF THE VALIDATION REPORTS NOW THAN HE DID WHEN HE SIGNED THEM

09:27AM 24   OR HAD DIFFERENT VIEWS WHEN HE LEFT THE COMPANY OF THOSE

09:27AM 25   VALIDATION REPORTS VERSUS WHEN HE SIGNED THEM, I THINK WE ARE

09:27AM 1    ENTITLED TO EXPLORE THAT, AND I THINK ONE RELEVANT FACT, ONE

09:28AM 2    THING THAT HE DID OBSERVE IS THE PRESSURE THAT HE REFERENCED

09:28AM 3    FROM MR. BALWANI AND OTHERS ON R&D TO ACHIEVE CERTAIN RESULTS.

09:28AM 4        SO I THINK IT IS APPROPRIATE TO ASK HIM FOLLOW-UP

09:28AM 5    QUESTIONS, IF THERE ARE ANY, ABOUT WHAT HE OBSERVED WITH

09:28AM 6    RESPECT TO THAT PRESSURE, AND HOW THAT MAY HAVE OR MAY NOT HAVE

09:28AM 7    AFFECTED HIS VIEW OF THE VALIDATION REPORTS THEMSELVES.

09:28AM 8            THE COURT:  IN HINDSIGHT YOU MEAN?

09:28AM 9            MR. BOSTIC:  YES, YOUR HONOR, IN LIGHT OF WHAT HE

09:28AM 10   SUBSEQUENTLY OBSERVED WITH THE PERFORMANCE OF THE ASSAYS AT THE

09:28AM 11   COMPANY.

09:28AM 12           MR. COOPERSMITH:  AND, YOUR HONOR, MY QUARREL IS NOT

09:28AM 13   WITH DRAWING OUT FROM DR. ROSENDORFF, WHICH, YOU KNOW, THE

09:28AM 14   GOVERNMENT HAS ALREADY DONE ON DIRECT, THAT AS HE CONTINUED TO

09:28AM 15   WORK AT THERANOS, HE RECEIVED INFORMATION ABOUT THE PERFORMANCE

09:28AM 16   OF TESTS THAT, YOU KNOW, HE THOUGHT WAS IMPORTANT TO NOTE IN

09:28AM 17   ADDITION TO THE VALIDATION, PROVING ASSAYS AT THE TIME OF

09:28AM 18   VALIDATION.

09:28AM 19       MY ONLY ISSUE IS THAT, AND IT SOUNDS LIKE WE'RE IN

09:29AM 20   AGREEMENT ON THIS POINT, THAT THE GOVERNMENT CAN'T DRAW OUT,

09:29AM 21   DR. ROSENDORFF, WHY DID YOU -- WHAT INFORMATION DO YOU HAVE NOW

09:29AM 22   THAT YOU THINK THE DATA THAT YOU GOT FROM RESEARCH AND

09:29AM 23   DEVELOPMENT WAS SOMEHOW FALSE OR INACCURATE DATA?

09:29AM 24       YOU KNOW, THAT'S -- AND IT SOUNDS LIKE MR. BOSTIC DOESN'T

09:29AM 25   INTEND TO DO THAT.

3710

09:29AM 1       BUT WHAT MR. BOSTIC HAS NOW STATED HE DOES INTEND TO

09:29AM 2  INQUIRE INTO, THAT'S NOT MY POINT.  AND IF DR. ROSENDORFF HAD

09:29AM 3  PERCIPIENT KNOWLEDGE AT THERANOS THAT HE WANTED TO EXPLAIN OR

09:29AM 4  WHETHER IT'S ABOUT PRESSURE, HE CAN DO THAT.

09:29AM 5       THE COURT:  ARE YOU SAYING IF THE QUESTION POSED TO

09:29AM 6  HIM ON REDIRECT IS, WHAT FORMS THE BASIS OF THAT OPINION?

09:29AM 7       MR. COOPERSMITH:  RIGHT.  OR EVEN QUESTIONS DESIGNED

09:29AM 8  TO SUGGEST THAT THE DATA THAT UNDERLIES THE VALIDATIONS WAS

09:29AM 9  INACCURATE OR UNTRUTHFUL OR, YOU KNOW, SOME KIND OF FRAUD

09:29AM 10  PERPETRATED ON HIM WHEN HE SIGNED THE VALIDATION REPORTS, THOSE

09:29AM 11  QUESTIONS DESIGNED TO ASK THAT OR EVEN GETTING HIM TO EXPLAIN,

09:29AM 12  OKAY, WHAT DOES DR. ROSENDORFF BELIEVE NOW ABOUT THE QUALITY OR

09:30AM 13  THE INTEGRITY OF THE DATA I SHOULD SAY.  THAT'S THE ONLY THING

09:30AM 14  THAT I THINK IS OFF LIMITS.

09:30AM 15      EVERYTHING ELSE ABOUT WHAT HE OBSERVED AND WHETHER HE

09:30AM 16  THOUGHT THE ASSAYS WERE PERFORMING WELL AND WHETHER THE

09:30AM 17  VALIDATION REPORTS TELL THE WHOLE STORY AND WHETHER YOU ALSO

09:30AM 18  HAVE TO LOOK AT PERFORMANCE AFTER VALIDATION, THE GOVERNMENT

09:30AM 19  HAS ALREADY DONE THAT, AND IF THEY WANT TO DO IT AGAIN, THAT'S

09:30AM 20  NOT THE ISSUE, RIGHT?

09:30AM 21       THE COURT:  AND SO IF THE QUESTION IS, YOU'VE TOLD

09:30AM 22  US NOW, LOOKING BACK NOW, AND IF THE QUESTION IS, WHAT FORMS

09:30AM 23  THAT OPINION, THAT'S OKAY?

09:30AM 24       MR. COOPERSMITH:  IF, IF, IF HE'S ASKED, LOOKING

09:30AM 25  BACK NOW, WHAT FORMS YOUR OPINION THAT THE DATA THAT YOU

3711

```
09:30AM   1    RECEIVED FROM RESEARCH AND DEVELOPMENT WAS INACCURATE OR LACKED
09:30AM   2    INTEGRITY OR WAS FALSE OR SOMETHING LIKE THAT, THAT'S NOT OKAY
09:30AM   3    FROM MY PERSPECTIVE BECAUSE I DON'T THINK HE HAS PERCIPIENT
09:30AM   4    KNOWLEDGE OF THAT ISSUE.
09:30AM   5         HE MAY WELL HAVE PERCIPIENT KNOWLEDGE ABOUT HOW THE
09:30AM   6    ASSAYS -- IN FACT, I THINK HE DOES -- HOW THE ASSAYS PERFORMED
09:30AM   7    WHILE HE WAS AT THERANOS.
09:31AM   8         BUT I DON'T BELIEVE, FROM ALL OF THE DISCOVERY THAT I HAVE
09:31AM   9    RECEIVED, HE HAS PERCIPIENT KNOWLEDGE ABOUT DATA BEING
09:31AM  10    FALSIFIED OR LACKING INTEGRITY AND THAT HE GOT FROM OTHER
09:31AM  11    RESEARCH AND DEVELOPMENT SCIENTISTS.
09:31AM  12         HE TESTIFIED HE DIDN'T GET THE DATA FROM MR. BALWANI, HE
09:31AM  13    GOT IT FROM THE R&D DEPARTMENT.
09:31AM  14         SO THAT'S THE ONLY THING THAT I THINK CAN'T BE ASKED IN
09:31AM  15    HINDSIGHT OR NOT.  IT'S NOT SOMETHING THAT REALLY WAS BASED ON
09:31AM  16    HIS EXPERIENCE AT THERANOS.
09:31AM  17              THE COURT:  OKAY.
09:31AM  18         MR. BOSTIC.
09:31AM  19              MR. BOSTIC:  SO I WON'T ASK HIM TO SPECULATE AS TO
09:31AM  20    WHETHER ANYONE IN R&D MIGHT HAVE HAD, YOU KNOW, NEFARIOUS
09:31AM  21    MOTIVES IN FALSIFYING INFORMATION.
09:31AM  22         I WILL TRY TO CRAFT MY QUESTIONS TO AVOID ELICITING THAT.
09:31AM  23         DR. ROSENDORFF WILL ANSWER THE QUESTIONS AS BEST HE CAN.
09:31AM  24         I THINK THAT WHAT HAPPENED HERE IS THERE'S A DISCONNECT
09:31AM  25    OBVIOUSLY BETWEEN THE VALIDATION REPORTS, WHICH WERE SUFFICIENT
```

3712

09:31AM  1    FOR DR. ROSENDORFF TO SIGN AND APPROVE THE TESTS, AND THEN THE

09:32AM  2    SUBSEQUENT PERFORMANCE, AND IN EXPLAINING THAT DISCONNECT, THE

09:32AM  3    FACT THAT THE VALIDATION DATA LOOKED OKAY, WHEREAS THE ASSAYS

09:32AM  4    PERFORMED BADLY IN THE CLINICAL SETTING, I THINK THERE ARE

09:32AM  5    SEVERAL RELEVANT FACTS, INCLUDING THE FACT THAT THE VALIDATION

09:32AM  6    WAS RUSHED, THE FACT THAT MANAGEMENT APPLIED PRESSURE ON R&D TO

09:32AM  7    GET THAT VALIDATION DONE.

09:32AM  8        I THINK IN DR. ROSENDORFF'S MIND THAT COULD PROPERLY FORM

09:32AM  9    THE BASIS OF WHY HE VIEWS THOSE VALIDATION REPORTS DIFFERENTLY

09:32AM  10   NOW FROM BACK THEN.

09:32AM  11             THE COURT:  AND YOU DON'T PART COMPANY WITH HIM

09:32AM  12   EXPRESSING --

09:32AM  13             MR. COOPERSMITH:  THAT'S NOT MY QUARREL, YOUR HONOR.

09:32AM  14       THE ISSUE WAS SOLELY ON WHETHER THE DATA WAS FALSE.

09:32AM  15       AND HE MIGHT HAVE SOME SPECULATIVE, YOU KNOW, VIEWS, THAT,

09:32AM  16   WELL, IF IN HIS VIEW THE ASSAYS DIDN'T PERFORM AS HE THOUGHT

09:32AM  17   THEY SHOULD HAVE AFTER VALIDATION, THEN THAT MUST MEAN THAT THE

09:32AM  18   DATA IS FALSE, THAT'S NOT -- I DON'T THINK THAT SHOULD BE

09:32AM  19   PERMISSIBLE BECAUSE THAT'S SPECULATION.

09:32AM  20       OR BY THE SAME TOKEN, IF HE THINKS HE'S ACQUIRED OTHER

09:32AM  21   KNOWLEDGE, YOU KNOW, AFTER HE LEFT THERANOS THAT MAKES HIM

09:33AM  22   BELIEVE DATA WAS FALSIFIED.  IT'S JUST ABOUT THE FALSIFIED

09:33AM  23   ISSUE.

09:33AM  24       IF MR. BOSTIC WANTS TO GO INTO AGAIN HIS VIEWS ABOUT

09:33AM  25   WHETHER THE ASSAYS PERFORMED AS HE WOULD HAVE EXPECTED AFTER

```
09:33AM   1    VALIDATION, THAT'S NOT MY QUARREL.

09:33AM   2              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU FOR THAT.

09:33AM   3         YOU ALSO FILED LAST NIGHT, AT 10:25, DOCUMENT 1413.  AND

09:33AM   4    YOU ASKED FOR A HEARING AT 2:00 P.M. TODAY ON THIS.

09:33AM   5              MR. COOPERSMITH:  WELL, YES, OBVIOUSLY SUBJECT TO

09:33AM   6    THE COURT'S SCHEDULING CONCERNS AND WHENEVER THE COURT CAN HEAR

09:33AM   7    IT.

09:33AM   8         THAT IS A MOTION THAT WE FILED.  IT RELATES TO A WITNESS

09:33AM   9    THAT WE EXPECT WILL BE CALLED BY THE GOVERNMENT NAMED

09:33AM  10    SUNIL DHAWAN WHO THE COURT MIGHT BE FAMILIAR WITH.

09:33AM  11         SO, MS. WALSH WILL ARGUE THAT PARTICULAR MOTION.

09:33AM  12              THE COURT:  OKAY.

09:33AM  13              MR. COOPERSMITH:  BUT THERE ARE A COUPLE OF OTHER

09:33AM  14    THINGS, YOUR HONOR, THREE OTHER THINGS ACTUALLY, WITH RESPECT

09:33AM  15    TO A WITNESS WHO WILL TESTIFY EVEN BEFORE DR. DHAWAN.  I'VE

09:34AM  16    RAISED THESE ISSUES WITH MR. LEACH.  AND THE WITNESS IS

09:34AM  17    LISA PETERSON, WHO I THINK IS THE NEXT WITNESS AFTER

09:34AM  18    DR. ROSENDORFF.

09:34AM  19         AND THERE ARE THREE ISSUES THAT I THINK WE NEED TO GO INTO

09:34AM  20    BEFORE THAT WITNESS TAKES THE STAND, WHICH MIGHT WELL BE

09:34AM  21    SOMETIME IN THE LATE MORNING, DEPENDING ON HOW LONG

09:34AM  22    MR. BOSTIC'S REDIRECT IS.

09:34AM  23              THE COURT:  OKAY.  WELL, LET ME ASK A QUESTION ABOUT

09:34AM  24    TIMING AND WHERE WE ARE.

09:34AM  25         DR. ROSENDORFF IS STILL ON CROSS?
```

09:34AM 1              MR. COOPERSMITH:  YES, YOUR HONOR.

09:34AM 2              THE COURT:  AND WHAT IS YOUR TIME ESTIMATE?

09:34AM 3              MR. COOPERSMITH:  VERY SHORT, YOUR HONOR.

09:34AM 4              THE COURT:  OKAY.  AND THEN WE'LL BE DONE WITH HIM

09:34AM 5  BY OUR FIRST BREAK DO YOU THINK, OR --

09:34AM 6              MR. BOSTIC:  I WOULD THINK SO, YOUR HONOR.  I WOULD

09:34AM 7  THINK THE REDIRECT WOULD BE LESS THAN AN HOUR.

09:34AM 8              THE COURT:  OKAY.  AND THEN MS. PETERSON WOULD BE

09:34AM 9  YOUR NEXT WITNESS?

09:34AM 10             MR. BOSTIC:  YES, YOUR HONOR.

09:34AM 11             THE COURT:  RIGHT.  SO WHEN SHOULD WE DISCUSS

09:34AM 12  MS. PETERSON?  SHOULD WE DO THAT AT OUR BREAK?

09:34AM 13             MR. COOPERSMITH:  THAT WOULD BE FINE, YOUR HONOR.

09:34AM 14             THE COURT:  RIGHT.

09:34AM 15             MR. COOPERSMITH:  I DON'T KNOW IF THE BREAK IS AT

09:34AM 16  11:30.

09:34AM 17             THE COURT:  PROBABLY.  WE'RE GETTING A VERY LATE

09:35AM 18  START, LATER THAN I WOULD HAVE LIKED, AND I HAD SOME OTHER

09:35AM 19  MATTERS I HAD TO DEAL WITH.

09:35AM 20    SO PROBABLY 11:30, NOON, SOMETHING LIKE THAT.

09:35AM 21             MR. COOPERSMITH:  RIGHT.  I'M JUST NOT SURE WE'LL

09:35AM 22  MAKE IT THAT FAR, BECAUSE LITERALLY MY ADDITIONAL CROSS OF

09:35AM 23  DR. ROSENDORFF MIGHT BE, YOU KNOW, 15 OR 20 MINUTES.

09:35AM 24    MR. BOSTIC HAS UNDER AN HOUR APPARENTLY, SO WE MAY NOT

09:35AM 25  EVEN HAVE TO MAKE IT TO THE BREAK BEFORE WE HAVE TO CALL

09:35AM 1    ANOTHER WITNESS.

09:35AM 2         THE COURT:  OKAY.  WELL, WE CAN -- YOU KNOW, WHY

09:35AM 3    DON'T WE BRING THE JURY OUT, LET'S JUST START WITH

09:35AM 4    DR. ROSENDORFF AND SEE WHERE WE GO WHERE WITH HIM, AND IF WE

09:35AM 5    NEED TO TAKE ANOTHER BREAK, I THINK THE JURY IS KIND OF USED TO

09:35AM 6    THAT.

09:35AM 7         MR. COOPERSMITH:  YES, YOUR HONOR.  OKAY.  THANK

09:35AM 8    YOU.

09:35AM 9         THE COURT:  GREAT.

09:35AM 10        AND THEN WE'LL -- THE ISSUE REGARDING DOCUMENT 1413, IT

09:35AM 11   SOUNDS LIKE WE CAN DEFER THAT.

09:35AM 12        MS. PETERSON'S TESTIMONY WILL BE HALF A DAY, A DAY?  DO WE

09:35AM 13   KNOW ABOUT THAT?  ANY ESTIMATE ABOUT --

09:35AM 14        MR. BOSTIC:  I THINK THE GOVERNMENT ANTICIPATES THAT

09:36AM 15   THAT WITNESS WILL OCCUPY THE BALANCE OF THE DAY.

09:36AM 16        THE COURT:  I SEE.  OKAY.  OKAY.  FAIR ENOUGH.

09:36AM 17        AND THEN WE CAN HEAR FROM MS. WALSH AND HER MOTION MAYBE

09:36AM 18   TOMORROW SOMETIME IF THAT WORKS OKAY WITH YOU.

09:36AM 19        MR. COOPERSMITH:  THAT SOUNDS GREAT.

09:36AM 20        THE COURT:  OKAY.  GREAT.  THANK YOU.

09:36AM 21        MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:36AM 22        (RECESS FROM 9:36 A.M. UNTIL 9:40 A.M.)

09:40AM 23        (JURY IN AT 9:40 A.M.)

09:41AM 24        THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK YOU

09:41AM 25   AGAIN FOR YOUR COURTESY.

| | | |
|---|---|---|
| 09:41AM | 1 | WE ARE BACK ON THE RECORD.  OUR JURY IS PRESENT. |
| 09:41AM | 2 | DR. ROSENDORFF IS PRESENT. |
| 09:41AM | 3 | SIR, I'LL REMIND YOU THAT YOU ARE STILL UNDER OATH. |
| 09:41AM | 4 | ALL COUNSEL ARE PRESENT. |
| 09:41AM | 5 | MR. BALWANI IS PRESENT. |
| 09:41AM | 6 | **(GOVERNMENT'S WITNESS, ADAM ROSENDORFF, PREVIOUSLY WAS** |
| 09:41AM | 7 | **SWORN.)** |
| 09:41AM | 8 | THE COURT:  LADIES AND GENTLEMEN, GOOD MORNING. |
| 09:41AM | 9 | I'M SEEING A DIFFERENT PERSPECTIVE OF OUR JURY.  WE'VE |
| 09:41AM | 10 | DONE THE LINE CHANGE.  SO WE'VE ADJUSTED SEATING.  I HOPE THAT |
| 09:42AM | 11 | WORKS FOR YOU. |
| 09:42AM | 12 | LET ME ASK THE JURY, MR. COOPERSMITH, BEFORE YOU BEGIN |
| 09:42AM | 13 | YOUR EXAMINATION, DURING THE BREAK, DID ANYONE HAVE CAUSE TO |
| 09:42AM | 14 | READ, LEARN, LISTEN, DISCUSS, OR SEE ANYTHING ABOUT THIS CASE? |
| 09:42AM | 15 | IF SO, PLEASE RAISE YOUR HAND. |
| 09:42AM | 16 | I SEE NO HANDS.  THANK YOU VERY MUCH. |
| 09:42AM | 17 | I APPRECIATE THAT. |
| 09:42AM | 18 | MR. COOPERSMITH, YOU'D LIKE TO CONTINUE WITH YOUR |
| 09:42AM | 19 | EXAMINATION? |
| 09:42AM | 20 | MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU. |
| 09:42AM | 21 | ONE MATTER, YOUR HONOR.  WE HAD DISCUSSED LAST FRIDAY |
| 09:42AM | 22 | EXHIBIT 9939, AND THAT WAS AN EXHIBIT CONDITIONALLY ADMITTED |
| 09:42AM | 23 | EARLIER IN THE TRIAL, AND WE WOULD MOVE FOR THE FULL ADMISSION |
| 09:42AM | 24 | OF THAT EXHIBIT. |
| 09:42AM | 25 | THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, YOU |

09:42AM  1    MAY RECALL THERE WAS AN EXHIBIT 9939 THAT THE COURT ADMITTED

09:42AM  2    CONDITIONALLY, AND THAT EXHIBIT I TOLD YOU WAS ADMITTED SUBJECT

09:42AM  3    TO A FOUNDATION BEING LAID.

09:43AM  4        I TOLD YOU THAT IF THE FOUNDATION WAS NOT LAID, THE COURT

09:43AM  5    WOULD STRIKE THE EXHIBIT AND ANY TESTIMONY ABOUT IT.

09:43AM  6        THERE HAS BEEN SUFFICIENT EVIDENCE RAISED, AND SO THAT

09:43AM  7    EXHIBIT IS ADMITTED WITHOUT ANY CONDITIONS.

09:43AM  8            MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:43AM  9        (DEFENDANT'S EXHIBIT 9939 WAS RECEIVED IN EVIDENCE.)

09:43AM  10           THE COURT:  YOU'RE WELCOME.

09:43AM  11             **CROSS-EXAMINATION (RESUMED)**

09:43AM  12   BY MR. COOPERSMITH:

09:43AM  13   Q.   AND GOOD MORNING, DR. ROSENDORFF.

09:43AM  14   A.   GOOD MORNING.

09:43AM  15   Q.   SO AS OF TODAY, YOU STILL WORK IN THE LAB INDUSTRY; IS

09:43AM  16   THAT CORRECT?

09:43AM  17   A.   CORRECT.

09:43AM  18   Q.   AND YOU'RE A LAB DIRECTOR?

09:43AM  19   A.   CORRECT.

09:43AM  20   Q.   OKAY.  DR. ROSENDORFF, DO YOU REMEMBER ON FRIDAY I ASKED

09:43AM  21   YOU SOME QUESTIONS ABOUT THE INITIAL LAUNCH OF THERANOS BLOOD

09:43AM  22   TESTING SERVICES AT WALGREENS?

09:43AM  23   A.   YES.

09:43AM  24   Q.   AND I ASKED YOU IN PARTICULAR ABOUT SOME QUESTIONS THAT

09:43AM  25   YOU HAD BEEN ASKED ON DIRECT EXAMINATION BY MR. BOSTIC ABOUT

09:43AM  1     THAT LAUNCH.

09:43AM  2          DO YOU REMEMBER THAT?

09:43AM  3     A.   YES.  I BELIEVE THERE WAS A DISTINCTION BEING MADE BETWEEN

09:44AM  4     A PUBLIC LAUNCH AND A FRIENDS AND FAMILY LAUNCH.

09:44AM  5     Q.   YES, YES.

09:44AM  6     A.   OKAY.

09:44AM  7     Q.   AND, IN FACT, YOU RECALL THAT ON WEDNESDAY LAST WEEK

09:44AM  8     DURING YOUR DIRECT EXAMINATION, MR. BOSTIC ASKED YOU ABOUT

09:44AM  9     WHETHER THERE WAS A LAUNCH TO THE GENERAL PUBLIC ON

09:44AM  10    SEPTEMBER 9TH OF 2013.

09:44AM  11         DO YOU RECALL THAT?

09:44AM  12    A.   YES.

09:44AM  13    Q.   AND THEN ON CROSS, WE TALKED ABOUT THE FRIENDS AND FAMILY

09:44AM  14    LAUNCH THAT OCCURRED ON SEPTEMBER 9TH.

09:44AM  15         DO YOU REMEMBER THAT?

09:44AM  16    A.   YES.

09:44AM  17    Q.   OKAY.  AND YOU TOLD THE GOVERNMENT ABOUT THE LAUNCH BEING

09:44AM  18    ONLY OPEN TO FRIENDS AND FAMILY AND NOT TO THE GENERAL PUBLIC

09:44AM  19    BACK IN 2018; CORRECT?

09:44AM  20    A.   I DON'T RECALL, SIR.

09:44AM  21    Q.   OKAY.  SO LET ME SEE IF I CAN REFRESH YOUR MEMORY.

09:44AM  22         COULD YOU TAKE A LOOK AT EXHIBIT 28408, WHICH IS IN ONE OF

09:44AM  23    THE TESTIMONY BINDERS THAT YOU SHOULD HAVE.  28408.

09:45AM  24    A.   SO I ONLY HAVE ONE TESTIMONY BINDER.  IT SAYS WITNESS

09:45AM  25    BINDER, I BELIEVE.

ROSENDORFF CROSS BY MR. COOPERSMITH (RES.)

09:45AM  1      YOU'RE REFERRING TO THE U.S.A. VERSUS BALWANI BINDER.  I'M

09:45AM  2   SORRY.

09:45AM  3      28 --

09:45AM  4   Q.  YES.

09:45AM  5   A.  AND ANY IDEA WHICH ONE THAT SHOULD BE IN?

09:45AM  6   Q.  I THINK THERE SHOULD BE ONE LABELLED PRIOR TESTIMONY THAT

09:45AM  7   I'VE HANDED YOU.  I KNOW IT'S BEEN A FEW DAYS.

09:46AM  8   A.  NO.

09:46AM  9   Q.  OKAY.  YOU DON'T SEE IT?

09:46AM  10   A.  NO.

09:46AM  11   Q.  OKAY.

09:46AM  12      YOUR HONOR, MAY I SHOW THIS TO THE GOVERNMENT AND THEN

09:46AM  13   APPROACH THE WITNESS?

09:46AM  14          THE COURT:  YES, YES.

09:46AM  15          MR. COOPERSMITH:  (HANDING.)

09:46AM  16   Q.  OKAY.  DR. ROSENDORFF, I'VE HANDED YOU PAGES 82 AND 83 OF

09:46AM  17   SOME PRIOR TESTIMONY.

09:46AM  18      DO YOU SEE THAT?

09:46AM  19   A.  YES, YES.

09:46AM  20   Q.  AND YOU GAVE THAT TESTIMONY IN 2018?

09:46AM  21   A.  YES.

09:46AM  22   Q.  OKAY.  AND DOES THAT REFRESH YOUR MEMORY THAT YOU TOLD THE

09:46AM  23   GOVERNMENT IN 2018 THAT THERE WAS A SOFT LAUNCH NOT OPEN TO THE

09:47AM  24   GENERAL PUBLIC?

09:47AM  25   A.  YES.

09:47AM  1    Q.   OKAY.  THANK YOU.  I CAN TAKE THAT BACK.

09:47AM  2         MAY I APPROACH, YOUR HONOR?

09:47AM  3              THE COURT:  YES.

09:47AM  4              THE WITNESS:  (HANDING.)

09:47AM  5    BY MR. COOPERSMITH:

09:47AM  6    Q.   OKAY.  DR. ROSENDORFF, DO YOU RECALL, AND YOU MIGHT NOT

09:47AM  7    REMEMBER THE NUMBER, BUT DURING YOUR DIRECT EXAMINATION YOU

09:47AM  8    WERE SHOWN EXHIBIT 1772, WHICH IS ALREADY IN EVIDENCE.

09:47AM  9         SO I THINK WE CAN JUST PUT THAT ON THE SCREEN WITH YOUR

09:47AM  10   PERMISSION, YOUR HONOR?

09:47AM  11              THE COURT:  YES.

09:48AM  12   BY MR. COOPERSMITH:

09:48AM  13   Q.   AND DO YOU SEE EXHIBIT 1772, DR. ROSENDORFF, ON THE SCREEN

09:48AM  14   IN FRONT OF YOU?

09:48AM  15   A.   YES, I DO.

09:48AM  16   Q.   AND THIS WAS A DISCUSSION THAT YOU WERE HAVING WITH

09:48AM  17   MR. BALWANI ABOUT THE SUBJECT OF ALIQUOTING BLOOD FROM

09:48AM  18   VACUTAINERS TO SMALLER DEVICES FOR TESTING ON EDISON?

09:48AM  19   A.   YES.

09:48AM  20   Q.   AND LOOKING AT THE EMAIL THAT YOU SENT ON JUNE 11TH, 2014,

09:48AM  21   AT 5:25 P.M., I'D JUST LIKE TO LOOK AT THE LAST -- THE SECOND

09:48AM  22   TO THE LAST SENTENCE OF YOUR EMAIL.

09:48AM  23        DO YOU SEE YOU SAY, "I'D LIKE TO PERHAPS SUSPEND

09:48AM  24   VACUTAINER ALIQUOTING UNTIL WE CAN GO TO 2 SHIFTS."

09:48AM  25        RIGHT?

09:48AM  1    A.   YES.  PERHAPS.  I SAID PERHAPS, YES.

09:48AM  2    Q.   RIGHT.  AND WHAT YOU'RE COMMUNICATING THERE IS NOT TO STOP

09:48AM  3    ALIQUOTING ALTOGETHER, BUT TO SUSPEND IT UNTIL YOU CAN GET MORE

09:49AM  4    PERSONNEL TO WORK ON ADDITIONAL SHIFTS.

09:49AM  5         THAT'S WHAT YOU'RE SAYING IN THIS EMAIL; RIGHT?

09:49AM  6    A.   NOT IN OTHER EMAILS.

09:49AM  7    Q.   OKAY.  I'M JUST LOOKING AT THIS EMAIL, SIR.

09:49AM  8    A.   YES, THAT'S THE LITERAL MEANING OF THIS EMAIL.

09:49AM  9    Q.   RIGHT.  THAT WHEN OTHER PERSONNEL CAME TO MANAGE

09:49AM  10   ADDITIONAL SHIFTS, THEN IT COULD RESUME; RIGHT?

09:49AM  11   A.   YES.  IT WAS A SUGGESTION.

09:49AM  12   Q.   OKAY.  OKAY.  AND DO YOU SEE MR. BALWANI WROTE ABOVE, "WE

09:49AM  13   NEED THIS MESS RESOLVED ASAP.  I AM ASKING FOR MORE READERS FOR

09:49AM  14   OVER 2 WEEKS NOW AND WE HAVE A TOTAL OF 27

09:49AM  15   WORKING/READY/CALIBRATED EDISONS IN CLIA."

09:49AM  16        DO YOU SEE THAT?

09:49AM  17   A.   YES.

09:49AM  18   Q.   OKAY.  SO NOW I'D LIKE TO SHOW YOU ANOTHER EXHIBIT THAT IS

09:49AM  19   PART OF THE SAME EMAIL STRING, AND THAT'S EXHIBIT 13888, AND

09:49AM  20   YOU SHOULD BE ABLE TO SEE THAT ON YOUR SCREEN IN A MINUTE.

09:50AM  21        (PAUSE IN PROCEEDINGS.)

09:50AM  22             THE WITNESS:  DO YOU HAVE A QUESTION PENDING, SIR?

09:50AM  23             MR. COOPERSMITH:  I'M ABOUT TO.  SORRY FOR THE

09:50AM  24   DELAY.

09:50AM  25             THE WITNESS:  NO PROBLEM.

09:50AM   1      BY MR. COOPERSMITH:

09:50AM   2      Q.   DO YOU SEE ON EXHIBIT 13888 THERE'S THE SAME EMAIL THAT WE

09:50AM   3      JUST DISCUSSED ON THE BOTTOM EMAIL ON THE FIRST PAGE?

09:50AM   4      A.   YES.

09:50AM   5      Q.   AND THEN THERE'S A RESPONSE FROM MR. BALWANI TO THAT

09:50AM   6      EMAIL, WHICH IS DIFFERENT FROM THE RESPONSE THAT WE JUST SAW;

09:50AM   7      RIGHT?

09:50AM   8      A.   IT'S A CLARIFICATION OF A STRATEGY WHERE IF WE DID GO BACK

09:50AM   9      TO ALIQUOTING, HOW WE WOULD GO ABOUT DOING THAT.

09:51AM  10      Q.   RIGHT.  SO ACTUALLY THE SAME EMAIL THAT YOU WROTE THAT WE

09:51AM  11      JUST DISCUSSED, MR. BALWANI RESPONDED TWICE, AND THEN ONE OF

09:51AM  12      THEM, AS YOU JUST SAID, WAS A CLARIFICATION.

09:51AM  13           IS THAT FAIR?

09:51AM  14      A.   YEAH.  I BELIEVE IN OTHER EMAILS I MORE STRONGLY SUGGESTED

09:51AM  15      THAT WE SHOULD DISCONTINUE THIS PRACTICE.

09:51AM  16      Q.   OKAY.  BUT I'M ASKING ABOUT THESE EMAILS, SIR.

09:51AM  17      A.   YES.

09:51AM  18      Q.   AND YOU SEE THERE'S TWO DIFFERENT RESPONSES MR. BALWANI

09:51AM  19      MADE TO THE SAME EMAIL; RIGHT?

09:51AM  20      A.   I'M SORRY.  I MISUNDERSTOOD.

09:51AM  21           THIS -- AT THE TOP IS MR. BALWANI'S INSTRUCTIONS ABOUT HOW

09:51AM  22      THIS WOULD HAPPEN.

09:51AM  23      Q.   OKAY.

09:51AM  24      A.   NOT A SUGGESTION FROM ME.

09:51AM  25      Q.   OKAY.  WHY DON'T WE JUST LOOK AT IT.

09:51AM  1          YOUR HONOR, WE OFFER EXHIBIT 13888.

09:51AM  2              MR. BOSTIC:  NO OBJECTION.

09:51AM  3              THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

09:51AM  4          (DEFENDANT'S EXHIBIT 13888 WAS RECEIVED IN EVIDENCE.)

09:51AM  5      BY MR. COOPERSMITH:

09:51AM  6      Q.   OKAY.  DR. ROSENDORFF, DO YOU SEE ON THE BOTTOM OF THE

09:51AM  7      FIRST PAGE THERE'S THE SAME EMAIL THAT WE WERE LOOKING AT WHEN

09:52AM  8      WE WERE DISCUSSING 1772?

09:52AM  9      A.   YES.

09:52AM  10     Q.   AND THAT'S YOUR EMAIL, AND IT TALKS ABOUT THE "SUSPEND

09:52AM  11     VACUTAINER ALIQUOTING UNTIL WE CAN GO TO 2 SHIFTS."

09:52AM  12          DO YOU SEE THAT?

09:52AM  13     A.   YES.

09:52AM  14     Q.   AND THEN LET'S GO TO MR. BALWANI'S ADDITIONAL RESPONSE.

09:52AM  15          SO HE SAYS, "ADAM.  WE WON'T ALIQUOT THE HIGH VOLUME TESTS

09:52AM  16     LIKE TSH FOR NOW AS YOU SUGGESTED AND RUN THEM UPSTAIRS.  WE

09:52AM  17     WILL TWEAK THE SOFTWARE TO ALLOW US TO DO THAT.  IN THE

09:52AM  18     MEANTIME WE WILL PUSH MORE DEVICES TO DONE.  THE DRIVING FACTOR

09:52AM  19     WILL BE NO BACKLOG OR DELAY IN PATIENT SAMPLES TAT."

09:52AM  20          DO YOU SEE THAT?

09:52AM  21     A.   YES.

09:52AM  22     Q.   AND SO THAT'S MR. BALWANI'S CLARIFICATION AS YOU PUT IT?

09:52AM  23     A.   YES.

09:52AM  24     Q.   ALL RIGHT.  SO WHEN YOU WERE ON DIRECT EXAMINATION, YOU

09:52AM  25     REMEMBER MR. BOSTIC ASKED YOU IF MR. BALWANI'S SOLUTION TO WHAT

09:53AM  1    YOU EXPRESSED IN THIS EMAIL WAS TO MANUFACTURE OR PUT MORE

09:53AM  2    EDISONS ONLINE.

09:53AM  3         DO YOU REMEMBER THAT?

09:53AM  4    A.   ARE YOU ASKING ME ABOUT WHAT ACTUALLY HAPPENED VERSUS HIS

09:53AM  5    STATED SOLUTION?

09:53AM  6    Q.   I'M ASKING A DIFFERENT QUESTION.  LET ME START AGAIN.

09:53AM  7    A.   OKAY.

09:53AM  8    Q.   SO ON DIRECT EXAMINATION, DO YOU RECALL THAT MR. BOSTIC

09:53AM  9    ASKED YOU ABOUT THIS PARTICULAR EMAIL, WHETHER MR. BALWANI'S

09:53AM  10   SOLUTION TO THE ISSUE THAT YOU RAISED WAS TO PUT MORE EDISONS

09:53AM  11   ONLINE.

09:53AM  12        DO YOU RECALL THAT?

09:53AM  13   A.   YES.

09:53AM  14   Q.   AND YOU SAID YES?

09:53AM  15   A.   YES.

09:53AM  16   Q.   OKAY.  I'D LIKE TO SHOW YOU EXHIBIT 20279, WHICH IS

09:53AM  17   ALREADY IN EVIDENCE.

09:53AM  18        OKAY.  DO YOU SEE ON THE FIRST PAGE THERE'S AN EMAIL

09:54AM  19   FROM -- WELL, IT'S AN EMAIL TO YOU.

09:54AM  20        DO YOU SEE THAT?

09:54AM  21   A.   YES.

09:54AM  22   Q.   AND IT'S ON MAY 30TH, 2014?

09:54AM  23   A.   YES.

09:54AM  24   Q.   AND IT'S A TRANSITION REPORT FROM DR. PANDORI?

09:54AM  25   A.   YES.

09:54AM  1    Q.   OKAY.

09:54AM  2    A.   DO YOU KNOW IF THE TIMES MENTIONED ARE PACIFIC STANDARD

09:54AM  3    TIME OR GENERAL MEANTIME -- OR DO YOU KNOW WHAT THE TIME IS

09:54AM  4    REFERRED TO BY ANY CHANCE?

09:54AM  5    Q.   I KNOW THAT -- WELL, YOU KNOW THAT SOMETIMES EMAILS ARE IN

09:54AM  6    THE -- IN PACIFIC TIME; RIGHT?

09:54AM  7    A.   SURE.

09:54AM  8    Q.   AND SOMETIMES THEY'RE IN WHAT IS CALLED UTC TIME; RIGHT?

09:54AM  9    A.   THE -- IN MY EXPERIENCE, INTERNAL EMAILS IN COMPANIES I'VE

09:54AM  10   WORKED FOR IN CALIFORNIA ARE ALL ANNOTATED WITH PST.

09:54AM  11   Q.   RIGHT.  BUT YOU'VE CERTAINLY SEEN OCCASIONS IN YOUR

09:54AM  12   CAREER, AND INCLUDING AT THERANOS, WHERE EMAILS COME OUT IN UTC

09:54AM  13   TIME FOR VARIOUS REASONS; RIGHT?

09:55AM  14   A.   I, I -- THAT'S NOT MY RECOLLECTION, THOUGH.

09:55AM  15   Q.   OKAY.  BUT IN ANY EVENT, THIS IS AN EMAIL THAT YOU

09:55AM  16   RECEIVED FROM DR. PANDORI; CORRECT?

09:55AM  17   A.   IT APPEARS TO BE.

09:55AM  18   Q.   OKAY.  AND LET'S GO TO PAGE 6.

09:55AM  19        DO YOU SEE THERE'S A SECTION CALLED OTHER NOTES?

09:55AM  20   A.   YES.

09:55AM  21   Q.   AND DR. PANDORI WROTE THERE, "EDISONS:  THE PRIMARY

09:55AM  22   CONCERN IN THIS SECTION IS THE AVAILABLE NUMBER OF DEVICES."

09:55AM  23        DO YOU SEE THAT?

09:55AM  24   A.   YES.

09:55AM  25   Q.   AND THEN HE WROTE, "FOR FT4, VITAMIN D, AND TSH, AT LEAST

09:55AM  1    A DOUBLING OF THE NUMBER OF UNITS IS NECESSARY, IN MY OPINION."

09:55AM  2        DO YOU SEE THAT?

09:55AM  3    A.   YES, I DO.

09:55AM  4            MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

09:55AM  5            THE COURT:  NO FURTHER QUESTIONS?

09:55AM  6            MR. COOPERSMITH:  ON CROSS, NO, YOUR HONOR.

09:56AM  7            THE COURT:  THERE'S REDIRECT.

09:56AM  8            THE WITNESS:  OKAY, EXCELLENT.  THANK YOU.

09:56AM  9        THANK YOU, MR. COOPERSMITH.

09:56AM 10            MR. COOPERSMITH:  YOU'RE WELCOME.

09:56AM 11            MR. BOSTIC:  IF I COULD JUST HAVE A MOMENT TO GET

09:56AM 12    SET UP, YOUR HONOR?

09:56AM 13            THE COURT:  YES.

09:56AM 14        (PAUSE IN PROCEEDINGS.)

09:56AM 15                        **REDIRECT EXAMINATION**

09:56AM 16    BY MR. BOSTIC:

09:56AM 17    Q.   GOOD MORNING, DR. ROSENDORFF.

09:56AM 18    A.   GOOD MORNING, MR. BOSTIC.

09:56AM 19    Q.   I'D LIKE TO ASK YOU JUST A FEW QUESTIONS ABOUT SOME TOPICS

09:56AM 20    THAT YOU DISCUSSED WITH MR. COOPERSMITH, AND IF WE COULD START

09:57AM 21    WITH THE LAUNCH IN SEPTEMBER 2013.

09:57AM 22        DO YOU HAVE THAT TIME PERIOD IN MIND?

09:57AM 23    A.   YES.

09:57AM 24    Q.   THERE'S BEEN SOME DISCUSSION ABOUT WHETHER THAT WAS A

09:57AM 25    LAUNCH TO THE PUBLIC AT LARGE OR TO THERANOS FRIENDS AND

09:57AM   1    FAMILY.

09:57AM   2         DO YOU REMEMBER THAT DISCUSSION?

09:57AM   3    A.   YES, I DO.

09:57AM   4    Q.   MY QUESTION IS, FROM THE PERSPECTIVE OF A LABORATORY

09:57AM   5    DIRECTOR, IS THERE A SIGNIFICANT DIFFERENCE BETWEEN THOSE TWO?

09:57AM   6    A.   NO DIFFERENCE WHATSOEVER.

09:57AM   7    Q.   CAN YOU EXPLAIN WHY A LAB DIRECTOR VIEWS THOSE TWO

09:57AM   8    SCENARIOS THE SAME?

09:57AM   9    A.   IN BOTH THE SOFT AND A PUBLIC LAUNCH, THOSE TESTS ARE

09:57AM   10   PRESCRIBED AT THE DIRECTION OF A PHYSICIAN.

09:57AM   11        IN ADDITION, THOSE TESTS ARE -- THE RESULTS OF THOSE TESTS

09:57AM   12   ARE BEING USED TO MAKE HEALTH CARE DECISIONS, SOMETIMES VERY

09:57AM   13   IMPORTANT, CRITICAL HEALTH CONDITIONS.

09:57AM   14        AND THIRDLY, THOSE PEOPLE ARE STILL HUMAN BEINGS THAT

09:58AM   15   REQUIRE THE SAME DEGREE OF CARE AS WOULD THE PUBLIC.

09:58AM   16   Q.   SO IN TERMS OF THE ACCURACY AND RELIABILITY OF CLINICAL

09:58AM   17   TESTING, ARE YOUR STANDARDS FOR ACCURACY AND RELIABILITY

09:58AM   18   RELAXED AT ALL IN A FRIENDS AND FAMILY LAUNCH SCENARIO?

09:58AM   19   A.   NOT AT ALL.  BUT THERE'S NO BETA TESTING IN HEALTH CARE.

09:58AM   20   Q.   YOU ALSO DISCUSSED WITH DOCTOR -- OR MR. COOPERSMITH --

09:58AM   21   SORRY -- CONTINUOUS QUALITY CONTROL.

09:58AM   22        DO YOU REMEMBER THAT?

09:58AM   23   A.   YES, I DID.

09:58AM   24   Q.   CAN YOU EXPLAIN JUST BRIEFLY WHAT THE DIFFERENCE IS

09:58AM   25   BETWEEN DAILY QUALITY CONTROL AND CONTINUOUS QUALITY CONTROL?

09:58AM   1    A.   SO NOT TO BE NITPICKY, BUT I THINK THE PHRASE IS

09:58AM   2    CONTINUOUS QUALITY IMPROVEMENT.   IT'S A PRINCIPLE THAT ALMOST

09:58AM   3    ALL GOOD LABORATORIES FOLLOW WHERE YOU'RE JUST NOT LOOKING TO

09:58AM   4    FOLLOW THE LAW, YOU'RE LOOKING TO IMPROVE QUALITY AND PROCESSES

09:58AM   5    THROUGHOUT THE LIFE OF THE LAB.

09:59AM   6    Q.   AND DO YOU RECALL A DISCUSSION WITH MR. COOPERSMITH ABOUT

09:59AM   7    SOMETHING CALLED LEVEY-JENNINGS AND THE WESTGARD RULES?

09:59AM   8    A.   YES, I DO.

09:59AM   9    Q.   AND IS THAT SOMETHING THAT TAKES PLACE OVER A PERIOD OF

09:59AM   10   TIME AS OPPOSED TO DAILY QUALITY CONTROL TESTING?

09:59AM   11   A.   YES, IT DOES.

09:59AM   12   Q.   ON DIRECT WE TALKED ABOUT SOME PROBLEMS THAT YOU OBSERVED

09:59AM   13   WITH THERANOS'S PERFORMANCE IN DAILY QUALITY CONTROL.

09:59AM   14       DO YOU RECALL THAT?

09:59AM   15   A.   YES.

09:59AM   16   Q.   WHEN IT COMES TO THIS KIND OF OVER TIME TRACKING OF

09:59AM   17   QUALITY CONTROL PERFORMANCE, I'M WONDERING WHETHER PERFORMANCE

09:59AM   18   OVER TIME CAN MAKE UP FOR BAD PERFORMANCE ON DAILY QUALITY

09:59AM   19   CONTROL.

09:59AM   20       DO YOU UNDERSTAND THAT QUESTION?

09:59AM   21   A.   CAN I ASK YOU TO DIG INTO THAT A LITTLE BIT MORE?

09:59AM   22   Q.   YES.

09:59AM   23       SO WE TALKED ABOUT PROBLEMS WITH DAILY QUALITY CONTROL

09:59AM   24   PROBLEMS AT THERANOS; RIGHT?

09:59AM   25   A.   YES.

| | | |
|---|---|---|
| 09:59AM | 1 | Q.   IS THERE ANY WAY THAT LOOKING AT THE DATA OVER TIME COULD |
| 10:00AM | 2 | REDEEM THAT PERFORMANCE? |
| 10:00AM | 3 |     IN OTHER WORDS -- |
| 10:00AM | 4 |         MR. COOPERSMITH:  OBJECTION.  LEADING. |
| 10:00AM | 5 |         THE COURT:  WHY DON'T YOU REASK THE QUESTION? |
| 10:00AM | 6 | BY MR. BOSTIC: |
| 10:00AM | 7 | Q.   IN OTHER WORDS, DR. ROSENDORFF, IS THERE ANY SCENARIO |
| 10:00AM | 8 | WHERE THE PROBLEMS IDENTIFIED WITH DAILY QUALITY CONTROL GO |
| 10:00AM | 9 | AWAY WHEN YOU LOOK AT THINGS LIKE WESTGARD RULES AND |
| 10:00AM | 10 | LEVEY-JENNINGS? |
| 10:00AM | 11 |         MR. COOPERSMITH:  OBJECTION.  LEADING. |
| 10:00AM | 12 |         THE COURT:  OVERRULED. |
| 10:00AM | 13 |         THE WITNESS:  NO.  IN MY OPINION -- IT'S JUST AN |
| 10:00AM | 14 | OPINION, IT'S NOT EXPERT TESTIMONY -- DAILY QC IS THE MOST |
| 10:00AM | 15 | IMPORTANT QC.  IN FACT, IT'S ALSO PART OF WESTGARD RULES.  SO |
| 10:00AM | 16 | IT'S WRAPPED UP INTO WESTGARD RULES, DAILY QC. |
| 10:00AM | 17 | BY MR. BOSTIC: |
| 10:00AM | 18 | Q.   THERE'S ALSO BEEN SOME DISCUSSION DURING DIRECT AND CROSS |
| 10:00AM | 19 | ABOUT THERANOS'S METHOD OF DILUTING BLOOD SAMPLES BEFORE |
| 10:00AM | 20 | TESTING. |
| 10:00AM | 21 |     DO YOU RECALL THAT? |
| 10:00AM | 22 | A.   YES. |
| 10:00AM | 23 | Q.   DURING YOUR TIME AT THERANOS, DID YOU OBSERVE ANY PROBLEMS |
| 10:01AM | 24 | CREATED IN TERMS OF ACCURACY OR SENSITIVITY AS A RESULT OF |
| 10:01AM | 25 | THERANOS'S PRACTICE OF DILUTING SAMPLES? |

10:01AM   1          MR. COOPERSMITH:  OBJECTION.  702.

10:01AM   2          THE COURT:  OVERRULED.

10:01AM   3          THE WITNESS:  DURING VALIDATION, THERE WERE ATTEMPTS

10:01AM   4   TO MATCH THE MANUFACTURER SENSITIVITY FOR THE TEST.

10:01AM   5       THOSE, THOSE -- THAT SENSITIVITY IS SPELLED OUT IN THE

10:01AM   6   PACKAGE INSERT OF THE TEST.

10:01AM   7       BECAUSE OF THE DILUTION, IN MULTIPLE INSTANCES WE WERE NOT

10:01AM   8   ABLE TO MATCH THE SENSITIVITY OF THE PREDICATE TESTS.

10:01AM   9   BY MR. BOSTIC:

10:01AM  10   Q.   AND WHAT DOES THAT MEAN IN PLAIN ENGLISH IF THE THERANOS

10:01AM  11   TESTS COULD NOT MATCH THE SENSITIVITY OF THE CONVENTIONAL

10:01AM  12   TESTS?

10:01AM  13   A.   IT MEANS THAT THE LABORATORY WOULD NOT BE ABLE TO REPORT

10:01AM  14   BELOW A CERTAIN NUMBER.

10:01AM  15       THAT NUMBER WOULD BE HIGHER FOR THE THERANOS TESTS.

10:01AM  16       SO, FOR INSTANCE, IF -- TO DETECT MILD LIVER DAMAGE, YOU

10:02AM  17   NEED TO GO DOWN TO 20 UNITS OF AST.  THERANOS WOULD ONLY BE

10:02AM  18   ABLE TO GO UP TO MAYBE 50 OR 60 -- GO DOWN TO 50 OR 60, I'M

10:02AM  19   SORRY.

10:02AM  20       SO IN MANY CLINICAL SCENARIOS, THE THERANOS TESTS JUST

10:02AM  21   DIDN'T HAVE THE SENSITIVITY.

10:02AM  22   Q.   THERE WAS ALSO SOME DISCUSSION ABOUT YOUR OBSERVATIONS

10:02AM  23   WHEN IT CAME TO SOMETHING CALLED HEMOLYSIS.

10:02AM  24       DO YOU REMEMBER THAT?

10:02AM  25   A.   YES.

10:02AM  1    Q.   AND CAN YOU REMIND US WHAT HEMOLYSIS MEANS?

10:02AM  2    A.   YEAH, SURE.  HEMOLYSIS IS WHEN YOU COLLECT THE BLOOD,

10:02AM  3    PARTICULARLY WHEN YOU DO A FINGER PRICK AND YOU SQUEEZE THE

10:02AM  4    FINGER, WHAT HAPPENS IS THAT YOU DAMAGE THE RED BLOOD CELLS AND

10:02AM  5    THEY POP.

10:02AM  6         AND SO WHATEVER IS INSIDE OF THE RED BLOOD CELLS GETS INTO

10:02AM  7    THE SAMPLE, AND IT CAN REALLY INTERFERE WITH THE DETECTION OF A

10:02AM  8    LOT OF DIFFERENT THINGS.

10:02AM  9    Q.   IN YOUR EXPERIENCE AT THERANOS, DID HEMOLYSIS HAVE ANY

10:03AM 10    EFFECT ON THE ACCURACY AND RELIABILITY OF CERTAIN TESTS?

10:03AM 11              MR. COOPERSMITH:  OBJECTION.  702.

10:03AM 12              MR. BOSTIC:  I'M JUST ASKING ABOUT HIS OBSERVATIONS,

10:03AM 13    YOUR HONOR.

10:03AM 14              THE COURT:  OVERRULED.

10:03AM 15         YOU CAN ANSWER THE QUESTION.

10:03AM 16              THE WITNESS:  YES.  THERE'S A LARGE AMOUNT OF

10:03AM 17    HEMOGLOBIN IN RED BLOOD CELLS, AND WHEN THAT SPILLS OUT INTO

10:03AM 18    THE SAMPLE IT TURNS IT PINK AND THAT INTERFERES WITH THE

10:03AM 19    ABILITY OF THE READERS TO READ WHAT IS IN THE SAMPLE.

10:03AM 20    BY MR. BOSTIC:

10:03AM 21    Q.   AND IS THAT SOMETHING THAT YOU SAW HAPPEN AT THERANOS?

10:03AM 22    A.   YES.

10:03AM 23    Q.   AND WAS IT A FREQUENT OR INFREQUENT THING THAT YOU

10:03AM 24    OBSERVED?

10:03AM 25    A.   FREQUENT.

10:03AM  1    Q.   AND WHEN IT CAME TO HEMOLYSIS, THINKING OF THE THERANOS

10:03AM  2    FINGERSTICK METHOD VERSUS THE CONVENTIONAL VEIN DRAW, DID YOU

10:03AM  3    OBSERVE HEMOLYSIS HAPPEN MORE IN ONE THAN THE OTHER?

10:03AM  4    A.   WAY, WAY MORE FREQUENTLY WITH FINGERSTICK.  I CAN'T -- I

10:03AM  5    COULD VENTURE THE PERCENTAGE, BUT I'LL JUST LEAVE IT AT THAT,

10:04AM  6    THAT IT WAS WAY MORE FREQUENT WITH FINGERSTICK.

10:04AM  7    Q.   OKAY.  YOU WERE ALSO ASKED SOME QUESTIONS DURING

10:04AM  8    CROSS-EXAMINATION ABOUT THERANOS'S LABORATORY INFORMATION

10:04AM  9    SYSTEM.

10:04AM  10        DO YOU REMEMBER THAT?

10:04AM  11   A.   YES.

10:04AM  12   Q.   CAN YOU -- LET'S SEE.

10:04AM  13        LET ME ASK, IF YOU WERE LOOKING AT THE LAB RESULT AND

10:04AM  14   TRYING TO DETERMINE WHETHER IT WAS ACCURATE OR INACCURATE AFTER

10:04AM  15   THE FACT --

10:04AM  16   A.   YES.

10:04AM  17   Q.   -- WHAT KINDS OF DATA WOULD YOU BE LOOKING AT?

10:04AM  18   A.   I WOULD GO BACK AND REVIEW THE QUALITY CONTROL RECORDS FOR

10:04AM  19   THAT DAY.

10:04AM  20   Q.   WHEN IT CAME TO IDENTIFYING A PARTICULAR LAB RESULT AS

10:04AM  21   INACCURATE, WOULD YOU EVER CONSIDER PATIENT FACTORS, LIKE HOW A

10:04AM  22   PATIENT WAS PRESENTING?

10:04AM  23   A.   YES.  CLINICALLY IF A PATIENT'S HYPERTHYROID, FOR

10:04AM  24   INSTANCE, HAS AN OVERACTIVE THYROID GLAND, I WOULD FULLY EXPECT

10:05AM  25   THE TSH TO BE VERY, VERY LOW.

10:05AM  1        IF WE -- IN TALKING TO THE DOCTORS WHO ARE ORDERING THE

10:05AM  2   TESTS, IF THE THERANOS TEST WASN'T SHOWING THAT, THAT WOULD

10:05AM  3   RAISE ALARM BELLS FOR ME.

10:05AM  4   Q.   SO LET'S TAKE AN EXAMPLE LIKE THAT.

10:05AM  5        INFORMATION FROM A PATIENT'S DOCTOR ABOUT CONDITIONS THAT

10:05AM  6   THE PATIENT MIGHT HAVE OR HOW THEY WERE PRESENTING, WOULD THAT

10:05AM  7   INFORMATION BE STORED IN THERANOS'S LABORATORY INFORMATION

10:05AM  8   SYSTEM?

10:05AM  9   A.   NO, IT WOULD NOT.

10:05AM 10   Q.   WHEN IDENTIFYING SPECIFIC LAB RESULTS AS INACCURATE, WOULD

10:05AM 11   YOU EVER CONSIDER CONTEMPORANEOUS RESULTS FROM OTHER LABS

10:05AM 12   BESIDES THERANOS?

10:05AM 13   A.   YES, OF COURSE.  ON FREQUENT OCCASIONS I WOULD GET EMAILS

10:05AM 14   FROM DOCTORS SAYING THAT THE PATIENT HAD BEEN TESTED AT THE

10:05AM 15   SAME TIME AT QUEST OR A DAY LATER AT QUEST, FOR INSTANCE, AND

10:05AM 16   HAD VERY DIFFERENT RESULTS.

10:05AM 17   Q.   AND SAME QUESTION FOR THAT.

10:05AM 18        WAS -- WERE RESULTS FROM CONVENTIONAL LABS, NON-THERANOS

10:06AM 19   LABS, STORED IN THE THERANOS LABORATORY INFORMATION SYSTEM?

10:06AM 20   A.   NO.

10:06AM 21   Q.   LOOKING AT THE LABORATORY INFORMATION SYSTEM -- FIRST OF

10:06AM 22   ALL, LET ME ASK, DID YOU EVER ACTUALLY ACCESS THE LIS?  DID YOU

10:06AM 23   LOG IN AND VIEW THE DATA?

10:06AM 24   A.   I DID.

10:06AM 25   Q.   LOOKING AT THAT DATA, WAS IT POSSIBLE TO LOOK AT THE

10:06AM 1       INDIVIDUAL RESULTS AND IDENTIFY THEM INDIVIDUALLY AS ACCURATE

10:06AM 2       OR INACCURATE?

10:06AM 3       A.   NO.

10:06AM 4       Q.   I'D LIKE TO ASK YOU SOME QUESTIONS ABOUT THE HCG TEST.

10:06AM 5            CAN YOU REMIND US WHAT THAT TEST WAS USED FOR?

10:06AM 6       A.   THE COURT REPORTER IS PROBABLY USED TO THIS LONG WORD BY

10:06AM 7       NOW, BUT IT'S HUMAN CHORIONIC GONADOTROPIN, AND THAT'S A

10:06AM 8       PREGNANCY HORMONE.

10:06AM 9              MR. BOSTIC:  THANK YOU.

10:06AM 10           YOUR HONOR, 4147 IS ALREADY ADMITTED.

10:06AM 11           MAY WE PUBLISH?

10:07AM 12             THE COURT:  YES.

10:07AM 13      BY MR. BOSTIC:

10:07AM 14      Q.   DR. ROSENDORFF, WE SEE HERE AN EMAIL THAT WE REVIEWED

10:07AM 15      BEFORE FROM MAY 30TH, 2014, --

10:07AM 16             MR. COOPERSMITH:  I'M SORRY TO INTERRUPT,

10:07AM 17      YOUR HONOR.  BUT MY SCREEN IS SOMEHOW NOT -- YOU HAVE TO TURN

10:07AM 18      IT ON APPARENTLY.

10:07AM 19           (LAUGHTER.)

10:07AM 20      BY MR. BOSTIC:

10:07AM 21      Q.   DR. ROSENDORFF, YOUR SCREEN IS ON; CORRECT?

10:07AM 22      A.   YES, SIR.

10:07AM 23      Q.   DO YOU SEE YOUR EMAIL FROM MAY 30TH, 2014, WHERE YOU RELAY

10:07AM 24      YOUR DECISION TO STOP HCG TESTING ON THE EDISON?

10:07AM 25             DO YOU SEE THAT?

```
10:07AM   1     A.   YES.

10:07AM   2     Q.   IF I COULD ASK YOU TO LOOK NEXT, AND MAYBE WE CAN JUST --

10:07AM   3                THE COURT:  OH, THEIR MONITORS ARE OFF.  LET'S SEE

10:07AM   4     IF WE CAN FIX THE JURY'S MONITORS.

10:07AM   5          THEY'RE ON NOW?

10:07AM   6                JUROR:  YES.

10:07AM   7                THE COURT:  OKAY.

10:07AM   8     BY MR. BOSTIC:

10:07AM   9     Q.   I'M JUST ABOUT TO ASK IF THEY CAN BE TURNED OFF AGAIN.  IF

10:07AM  10     WE CAN JUST SHOW TO DR. ROSENDORFF --

10:07AM  11                THE COURT:  ARE YOU SURE WE WANT TO GO THERE,

10:07AM  12     MR. BOSTIC?

10:08AM  13                MR. BOSTIC:  LET'S TRY IT ONCE.

10:08AM  14          IF WE CAN JUST SHOW TO DR. ROSENDORFF EXHIBIT 5418.

10:08AM  15                THE COURT:  ALL RIGHT.  LET'S TRY THAT 5418 JUST TO

10:08AM  16     DR. ROSENDORFF.

10:08AM  17     BY MR. BOSTIC:

10:08AM  18     Q.   DO YOU HAVE THAT ON YOUR SCREEN, DR. ROSENDORFF?

10:08AM  19     A.   YES, I DO.

10:08AM  20     Q.   AND IS THIS A CONTINUATION OF THAT SAME EMAIL CHAIN

10:08AM  21     RELATING TO YOUR DECISION TO STOP HCG EDISON TESTING?

10:08AM  22     A.   YES, IT IS.

10:08AM  23                MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5418.

10:08AM  24                MR. COOPERSMITH:  NO OBJECTION.

10:08AM  25                THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.
```

10:08AM 1    LET'S SEE IF IT IS.

10:08AM 2         GREAT.

10:08AM 3         (GOVERNMENT'S EXHIBIT 5418 WAS RECEIVED IN EVIDENCE.)

10:08AM 4    BY MR. BOSTIC:

10:08AM 5    Q.   SO, DR. ROSENDORFF, NOW LOOKING AT 5418, DO YOU SEE THAT

10:08AM 6    THIS IS -- WE SEE A COUPLE OF MESSAGES FROM JUNE 2014 FOLLOWING

10:08AM 7    YOUR DECISION.

10:08AM 8         DO YOU SEE THAT?

10:08AM 9    A.   YES, I DO.

10:08AM 10   Q.   AND DO YOU SEE THAT THERE'S A MESSAGE FROM DANIEL YOUNG TO

10:09AM 11   SUNNY BALWANI AND CHINMAY PANGARKAR SECOND TO THE TOP OF THE

10:09AM 12   PAGE?

10:09AM 13   A.   YES, I DO SEE THAT.

10:09AM 14   Q.   SO A FEW DAYS AFTER YOU SUSPENDED HCG EDISON TESTING,

10:09AM 15   DANIEL YOUNG WRITES TO THE DEFENDANT, "BY THE WAY, WE NEVER

10:09AM 16   SWITCHED TO IMMULITE IN LIS -- IT WAS NOT CLEAR TO ME THAT THIS

10:09AM 17   DECISION WAS MADE."

10:09AM 18        DO YOU SEE THAT?

10:09AM 19   A.   YES, I DO.

10:09AM 20   Q.   AROUND THIS TIME, LATE MAY, EARLY JUNE 2014, WAS THERE ANY

10:09AM 21   QUESTION IN YOUR MIND AS TO WHETHER THAT DECISION TO SUSPEND

10:09AM 22   EDISON HCG TESTING HAD BEEN MADE?

10:09AM 23   A.   NO, THERE WAS NO QUESTION.

10:09AM 24   Q.   NEXT, IF I COULD JUST SHOW YOU EXHIBIT 13875.

10:09AM 25        JUST ON DR. ROSENDORFF'S SCREEN.

10:09AM 1      AND DO YOU HAVE 13875 NOW?

10:09AM 2      A.   YES, I DO.

10:09AM 3      Q.   AND DO YOU SEE HERE SOME ADDITIONAL EMAIL CORRESPONDENCE,

10:10AM 4      INCLUDING YOU AND MR. BALWANI, ABOUT HCG STATUS?

10:10AM 5      A.   YES, I DO.

10:10AM 6           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:10AM 7      13875.

10:10AM 8           MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

10:10AM 9           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:10AM 10          (DEFENDANT'S EXHIBIT 13875 WAS RECEIVED IN EVIDENCE.)

10:10AM 11     BY MR. BOSTIC:

10:10AM 12     Q.   AND NOW THAT WE CAN ALL SEE THAT, LET'S LOOK AT THE BOTTOM

10:10AM 13     MESSAGE ON PAGE 1.

10:10AM 14          AND DO YOU SEE HERE, DR. ROSENDORFF, THERE'S AN EMAIL FROM

10:10AM 15     YOU TO MR. BALWANI AND DANIEL YOUNG ON JUNE 4TH?

10:10AM 16     A.   YES, I SEE THAT.

10:10AM 17     Q.   AND DO YOU SEE THAT THERE IS A DISCUSSION ABOUT THE PLAN

10:10AM 18     GOING FORWARD FOR HCG?

10:10AM 19     A.   YES.

10:10AM 20     Q.   AND UNDER GOING FORWARD, DO YOU SEE NUMBER 1, IT SAYS,

10:10AM 21     "CHANGE HCG TO VACUTAINER (SST OR GOLD-TOP), AND RUN ON

10:10AM 22     IMMULITE."

10:10AM 23          DO YOU SEE THAT?

10:10AM 24     A.   YES, I DO.

10:10AM 25     Q.   AND CAN YOU EXPLAIN WHAT THAT MEANS?

10:10AM 1    A.   THAT WOULD MEAN PERMANENTLY CHANGING THE WAY THERANOS

10:11AM 2    TESTED HCG TO DISCONTINUE TESTING ON VENOUS BLOOD USING THE

10:11AM 3    VACUTAINER -- I'M SORRY, TO DISCONTINUE TESTING USING THE

10:11AM 4    FINGER PRICK AND TO ONLY TEST USING VENOUS BLOOD OR VACUTAINER,

10:11AM 5    AND TO ONLY RUN ON THE IMMULITE.

10:11AM 6    Q.   WAS THE IMMULITE A NON-THERANOS ANALYZER?

10:11AM 7    A.   YES, IT WAS.

10:11AM 8    Q.   LET'S LOOK AT PAGE 2 AND CONTINUE IN YOUR EMAIL.

10:11AM 9         DO YOU SEE THAT NUMBER 3 IN THE PLAN THERE IS TO "RESUME

10:11AM 10   CTN HCG WHEN WE HAVE RESOLVED THESE ISSUES."

10:11AM 11        DO YOU SEE THAT?

10:11AM 12   A.   YES, I DO.

10:11AM 13   Q.   LET'S GO BACK TO PAGE 1 AND LOOK AT DR. YOUNG'S MESSAGE IN

10:11AM 14   THE MIDDLE.

10:11AM 15        AND DO YOU SEE IN DR. YOUNG'S MESSAGE HE SAYS AT THE

10:11AM 16   BOTTOM, "IF WE NEED TO COLLECT VACUTAINERS TOMORROW, WE WOULD

10:11AM 17   NEED TO SEND SPECIAL INSTRUCTIONS TO THE PSC'S.  RIGHT NOW WE

10:12AM 18   ARE NOT PLANNING ON DOING THIS."

10:12AM 19        DO YOU SEE THAT?

10:12AM 20   A.   YES, I DO.

10:12AM 21   Q.   IN OTHER WORDS, DOES THAT MEAN THAT IT WAS NOT PLANNED AT

10:12AM 22   THIS TIME TO ACTUALLY COLLECT VACUTAINERS FOR HCG THE FOLLOWING

10:12AM 23   DAY?

10:12AM 24            MR. COOPERSMITH:  OBJECTION.  CALLS FOR SPECULATION.

10:12AM 25            THE COURT:  CAN YOU REPHRASE THAT, PLEASE.

10:12AM  1    BY MR. BOSTIC:

10:12AM  2    Q.   DR. ROSENDORFF, IN ORDER TO ACTUALLY IMPLEMENT THIS CHANGE

10:12AM  3    AND RUN HCG ON VACUTAINERS AND NON-THERANOS DEVICES, WOULD IT

10:12AM  4    HAVE BEEN NECESSARY TO COMMUNICATE WITH THE THERANOS PATIENT

10:12AM  5    SERVICE CENTERS?

10:12AM  6    A.   YES.

10:12AM  7    Q.   AND WOULD THAT HAVE TO BE DONE IN ORDER FOR THEM TO KNOW

10:12AM  8    ABOUT THAT CHANGE?

10:12AM  9    A.   YES.

10:12AM  10   Q.   OKAY.  WE CAN SET THAT ASIDE.

10:12AM  11        AND NEXT, IF I COULD SHOW JUST ON YOUR SCREEN,

10:12AM  12   DR. ROSENDORFF, EXHIBIT 5420?

10:13AM  13   A.   I HAVE IT.

10:13AM  14   Q.   ACTUALLY, LET'S SKIP TO, INSTEAD, 13876.  AGAIN, JUST ON

10:13AM  15   YOUR SCREEN.

10:13AM  16        AND DO YOU SEE HERE AN EMAIL CHAIN INCLUDING YOU AND

10:13AM  17   MR. BALWANI ABOUT THE STATUS OF HCG TESTING?

10:13AM  18   A.   YES.

10:13AM  19        MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS

10:13AM  20   13876.

10:13AM  21        MR. COOPERSMITH:  NO OBJECTION.

10:13AM  22        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:13AM  23        (DEFENDANT'S EXHIBIT 13876 WAS RECEIVED IN EVIDENCE.)

10:13AM  24   BY MR. BOSTIC:

10:13AM  25   Q.   AND LET'S START ON PAGE 2 AT THE TOP OF THAT PAGE.

ROSENDORFF REDIRECT BY MR. BOSTIC                                    3740

10:13AM   1         AND, DR. ROSENDORFF, DO YOU SEE AN EMAIL FROM YOU TO

10:13AM   2    CHINMAY PANGARKAR, SURAJ SAKSENA AND SUNNY BALWANI ASKING FOR A

10:13AM   3    STATUS UPDATE ON THE HCG EDISON?

10:13AM   4    A.   YES, I DO.

10:13AM   5    Q.   AND LET'S GO TO PAGE 1, AND DO WE SEE AT THE BOTTOM OF

10:14AM   6    PAGE 1 THERE'S AN EMAIL FROM CHINMAY PANGARKAR AND HE SAYS,

10:14AM   7    "BASED ON REPORTS SINCE FRIDAY, WE HAVE BEEN CONSISTENTLY

10:14AM   8    PASSING QC -- SO WE DON'T HAVE A PROBLEM WITH THE CURRENT

10:14AM   9    BUILD."

10:14AM   10        DO YOU SEE THAT?

10:14AM   11   A.   YES, I DO.

10:14AM   12   Q.   AND LET'S GO FORWARD IN TIME AND MOVE UP THE PAGE, AND

10:14AM   13   LOOK AT THE TOP OF THE PAGE, THE TOP TWO MESSAGES.

10:14AM   14        AND DO YOU SEE YOU ASK THAT GROUP, "SO HCG IS BACK ON

10:14AM   15   VACUTAINERS?"

10:14AM   16   A.   YES.

10:14AM   17   Q.   AND MR. BALWANI RESPONDS, "NO.  IT IS ON NANOTAINERS PER

10:14AM   18   CHINMAY'S EMAIL BELOW."

10:14AM   19        DO YOU SEE THAT?

10:14AM   20   A.   YES, I DO.

10:14AM   21   Q.   SO AS OF JUNE 16TH, WHAT METHOD WAS BEING USED AT THERANOS

10:14AM   22   TO RUN HCG TESTING, ACCORDING TO THIS?

10:14AM   23   A.   NANOTAINERS.

10:14AM   24   Q.   AND DOES THAT MEAN A THERANOS ANALYZER?

10:14AM   25   A.   YES.

| | | |
|---|---|---|
| 10:14AM | 1 | Q.   IN THAT EMAIL YOU'RE ASKING THIS GROUP, INCLUDING |
| 10:14AM | 2 | MR. BALWANI, WHAT METHOD IS BEING USED. |
| 10:14AM | 3 | DO YOU SEE THAT? |
| 10:15AM | 4 | A.   YES. |
| 10:15AM | 5 | Q.   IF THIS HAD BEEN YOUR DECISION ABOUT WHICH METHOD WAS USED |
| 10:15AM | 6 | TO RUN HCG TESTING, WOULD THERE HAVE BEEN ANY NEED FOR YOU TO |
| 10:15AM | 7 | ASK ON THIS DATE? |
| 10:15AM | 8 | A.   NO.  I WAS CONSTANTLY CLARIFYING -- I'M SORRY. |
| 10:15AM | 9 | I WAS CONSTANTLY TRYING TO GET TO THE TRUTH OF HOW THINGS |
| 10:15AM | 10 | ACTUALLY WERE BEING DONE, REGARDLESS OF MY INSTRUCTIONS. |
| 10:15AM | 11 | Q.   FOLLOWING THIS TIME PERIOD IN MID-JUNE, DO YOU RECALL |
| 10:15AM | 12 | WHETHER THE ISSUES WITH HCG, ACCURACY AND RELIABILITY, WERE |
| 10:15AM | 13 | RESOLVED OR NOT? |
| 10:15AM | 14 | A.   I DON'T BELIEVE THEY WERE, NO. |
| 10:15AM | 15 | Q.   LET'S LOOK AT SOME EXAMPLES OF THAT. |
| 10:15AM | 16 | FIRST OF ALL, IF I COULD JUST SHOW ON YOUR SCREEN 5421? |
| 10:15AM | 17 | A.   I HAVE IT. |
| 10:15AM | 18 | Q.   DO YOU SEE -- |
| 10:15AM | 19 | A.   I HAVE IT. |
| 10:15AM | 20 | Q.   AND DO YOU SEE THAT 5421 IS AN EMAIL INCLUDING YOU AND |
| 10:16AM | 21 | MR. BALWANI RELATING TO QUALITY CONTROL PERFORMANCE? |
| 10:16AM | 22 | A.   YES. |
| 10:16AM | 23 | MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5421. |
| 10:16AM | 24 | MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR. |
| 10:16AM | 25 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |

10:16AM   1          (GOVERNMENT'S EXHIBIT 5421 WAS RECEIVED IN EVIDENCE.)

10:16AM   2    BY MR. BOSTIC:

10:16AM   3    Q.   AND LOOKING AT 5421, DO YOU SEE THAT IN THIS EMAIL, THIS

10:16AM   4    MESSAGE FROM LANGLY GEE, THERE'S A REFERENCE TO 33 EDISONS

10:16AM   5    UNDERGOING QUALITY CONTROL ON THIS DATE IN LATE JUNE?

10:16AM   6    A.   YES.

10:16AM   7    Q.   AND DO YOU SEE OUT OF THOSE 33, IT'S REPORTED THAT ONLY 20

10:16AM   8    EDISONS PASSED.

10:16AM   9          DO YOU SEE THAT?

10:16AM   10   A.   YES.

10:16AM   11   Q.   AND DO YOU SEE THAT IT'S REPORTED THAT "9 EDISONS FOR TES,

10:16AM   12   TSH, HCG, FT4 AND VITAMIN D FAILED LEVEL 1 AND/OR LEVEL 2 QC"?

10:17AM   13   A.   YES.

10:17AM   14   Q.   SO, IN OTHER WORDS, ARE WE STILL SEEING EDISONS FAIL HCG

10:17AM   15   QUALITY CONTROL IN LATE JUNE 2014?

10:17AM   16   A.   YES, WE ARE.

10:17AM   17   Q.   AND IF I CAN SHOW YOU NEXT JUST ON YOUR SCREEN

10:17AM   18   EXHIBIT 5422?

10:17AM   19   A.   I HAVE IT.

10:17AM   20   Q.   OKAY.  AND DO YOU SEE THERE A SIMILAR UPDATE FROM

10:17AM   21   LANGLY GEE ABOUT QUALITY CONTROL PERFORMANCE FOR EDISONS?

10:17AM   22   A.   YES.

10:17AM   23            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5422.

10:17AM   24            MR. COOPERSMITH:  NO OBJECTION.

10:17AM   25            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:17AM 1          (GOVERNMENT'S EXHIBIT 5422 WAS RECEIVED IN EVIDENCE.)

10:17AM 2     BY MR. BOSTIC:

10:17AM 3     Q.   DR. ROSENDORFF, HERE'S AN EMAIL FROM LANGLY GEE ON

10:17AM 4     JUNE 28TH, 2014.

10:17AM 5          IS THAT CORRECT?

10:17AM 6     A.   YES.

10:17AM 7     Q.   AND HERE UNDER THE SUBJECT LINE, INSTRUMENT BRING UP, HE

10:17AM 8     REPORTS THAT ONLY 17 OF 35 EDISONS PASSED QUALITY CONTROL FROM

10:18AM 9     THE PREVIOUS NIGHT.

10:18AM 10         DO YOU SEE THAT REPORT?

10:18AM 11    A.   YES.

10:18AM 12    Q.   AND THE NEXT SENTENCE REPORTS THAT HCG IS NOT AVAILABLE

10:18AM 13    YET FOR TESTING.

10:18AM 14         DO YOU SEE THAT?

10:18AM 15    A.   YES, I DO.

10:18AM 16    Q.   17 OUT OF 35 EDISONS PASSING, IS THAT LESS THAN HALF OF

10:18AM 17    THE NUMBER OF EDISONS THAT PASSED QUALITY CONTROL?

10:18AM 18    A.   YES, IT IS.

10:18AM 19    Q.   OKAY.  WE CAN SET THAT ASIDE.

10:18AM 20         WHEN IT CAME TO QUALITY CONTROL PERFORMANCE AT THERANOS,

10:18AM 21    WERE PROBLEMS RELATED ONLY TO THE HCG ASSAY?

10:18AM 22    A.   NO.

10:18AM 23    Q.   EXHIBIT 13809 WAS PREVIOUSLY ADMITTED.

10:18AM 24         MAY WE DISPLAY, YOUR HONOR?

10:18AM 25              THE COURT:  YES.

10:18AM 1    BY MR. BOSTIC:

10:18AM 2    Q.   AND LOOKING AT THIS FIRST PAGE, DO YOU REMEMBER DISCUSSING

10:18AM 3    THIS PRESENTATION WITH MR. COOPERSMITH DURING

10:18AM 4    CROSS-EXAMINATION?

10:18AM 5    A.   YES, I DID.

10:18AM 6    Q.   AND I'D LIKE TO DRAW YOUR ATTENTION TO PAGE 12 OF THIS

10:18AM 7    PRESENTATION.

10:18AM 8        AND DO YOU REMEMBER LOOKING AT THIS SLIDE WITH

10:19AM 9    MR. COOPERSMITH?

10:19AM 10   A.   YES, I DID.

10:19AM 11   Q.   DO YOU RECALL THAT ON DIRECT WE LOOKED AT A REPORT

10:19AM 12   INDICATING A 26 PERCENT QUALITY CONTROL FAILURE RATE FOR

10:19AM 13   MARCH 2014?

10:19AM 14   A.   YES.   THAT WAS THE AVERAGE QC FAILURE RATE FOR THAT MONTH

10:19AM 15   ACROSS THE EDISONS.

10:19AM 16   Q.   DO YOU SEE THAT THIS CHART LISTS OTHER PERCENTAGES FOR

10:19AM 17   CONTROLS FAILED?

10:19AM 18   A.   YES, I DO.

10:19AM 19   Q.   FIRST OF ALL, LET ME ASK, ARE YOU ABLE TO VOUCH FOR THESE

10:19AM 20   NUMBERS AND WHETHER THEY REPRESENT THE TYPICAL PERFORMANCE OF

10:19AM 21   QUALITY CONTROL AT THERANOS?

10:19AM 22   A.   NO, I'M NOT.

10:19AM 23   Q.   LET ME ASK YOU ABOUT THE TWO SECTIONS AT THE BOTTOM, ONE

10:19AM 24   RELATES TO Q1 PREDICATE AND THE OTHER ONE SAYS Q1 THERANOS.

10:19AM 25        DO YOU SEE THAT?

10:19AM  1    A.   YES, I DO.

10:19AM  2    Q.   CAN YOU EXPLAIN WHAT THE DIFFERENCE IS BETWEEN THOSE TWO

10:19AM  3    SECTIONS?

10:19AM  4    A.   SO Q1 THERANOS WOULD BE ALL OF THE CONTROLS THAT WERE RUN

10:20AM  5    ON THE THERANOS INSTRUMENTS AND WHAT THAT FAILURE RATE WAS.

10:20AM  6         SO THOSE THERANOS INSTRUMENTS WOULD BE THE EDISON AND THE

10:20AM  7    MODIFIED SIEMENS TEST.

10:20AM  8    Q.   OKAY.  AND THE THIRD BULLET POINT DOWN UNDER EACH OF THESE

10:20AM  9    SHOWS THE PERCENTAGE OF CONTROLLED FAILS -- EXCUSE ME, OF

10:20AM 10    CONTROLS FAILED, AT LEAST ACCORDING TO THIS PRESENTATION.

10:20AM 11         DO YOU SEE THAT?

10:20AM 12    A.   YES.

10:20AM 13    Q.   AND DO YOU SEE THAT THE THERANOS DEVICES SHOW A

10:20AM 14    2.9 PERCENT CONTROL FAILURE RATE?

10:20AM 15    A.   YES, I DO.

10:20AM 16    Q.   AND THE PREDICATE DEVICES SHOW A .75 PERCENT CONTROL

10:20AM 17    FAILURE RATE?

10:20AM 18    A.   YES, I DO.

10:20AM 19    Q.   SO I ASKED YOU ABOUT THESE SPECIFIC NUMBERS ALREADY, BUT

10:20AM 20    LET ME ASK GENERALLY WHETHER IT SQUARES WITH YOUR RECOLLECTION

10:20AM 21    THAT THE THERANOS ASSAYS FAILED CONTROL ABOUT THREE OR FOUR

10:20AM 22    TIMES MORE OFTEN THAN THE PREDICATE DEVICES?

10:20AM 23    A.   AT LEAST.  AT LEAST.

10:20AM 24    Q.   OKAY.  WE CAN SET THAT ASIDE.

10:21AM 25         I'D LIKE TO ASK YOU SOME FOLLOW-UP QUESTIONS ABOUT AN

10:21AM 1      INSPECTION THAT OCCURRED AT THERANOS IN 2013.

10:21AM 2          DO YOU REMEMBER THAT?

10:21AM 3      A.   YES, I DO.

10:21AM 4              MR. BOSTIC:  YOUR HONOR, I'D LIKE TO DISPLAY

10:21AM 5      EXHIBIT 4047 THAT HAS BEEN PREVIOUSLY ADMITTED.

10:21AM 6              THE COURT:  YES.

10:21AM 7      BY MR. BOSTIC:

10:21AM 8      Q.   AND, DR. ROSENDORFF, DO YOU REMEMBER LOOKING AT THIS EMAIL

10:21AM 9      FROM MS. HOLMES ABOUT A PATH FOR THE AUDITORS TO AVOID AREAS

10:21AM 10     THAT CANNOT BE ACCESSED?

10:21AM 11     A.   YES.

10:21AM 12     Q.   YOU TESTIFIED ON CROSS-EXAMINATION THAT AT NO TIME WERE

10:21AM 13     YOU TRYING TO DECEIVE THE INSPECTORS OR CONCEAL ANYTHING FROM

10:21AM 14     THEM; CORRECT?

10:21AM 15     A.   I WAS NOT.

10:21AM 16     Q.   IF I COULD SHOW YOU JUST ON YOUR SCREEN EXHIBIT 4316.

10:22AM 17     A.   I SEE IT.

10:22AM 18     Q.   AND LET'S -- WELL, LET ME ASK, IS THIS AN EMAIL FROM

10:22AM 19     DANIEL YOUNG TO YOU RELATING TO THIS TOPIC AND WHAT WAS TO BE

10:22AM 20     COVERED ON THAT INSPECTION?

10:22AM 21     A.   YES, IT DOES.

10:22AM 22             MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 4316.

10:22AM 23             MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  HEARSAY.

10:22AM 24             THE COURT:  IS THIS A BUSINESS RECORD?

10:22AM 25             MR. BOSTIC:  I BELIEVE IT IS, YOUR HONOR.  I THINK

10:22AM  1    THE FOUNDATION HAS BEEN LAID, BUT I'M HAPPY TO DO MORE.

10:22AM  2        THIS ALSO IS NOT OFFERED FOR THE TRUTH.  THIS IS A

10:22AM  3    DIRECTION BEING GIVEN.

10:22AM  4            THE COURT:  MR. COOPERSMITH.

10:22AM  5            MR. COOPERSMITH:  YOUR HONOR, IT'S HEARSAY.

10:22AM  6    MR. BALWANI IS NOT ON THIS EMAIL.

10:22AM  7            THE COURT:  ALL RIGHT.  THANK YOU.

10:22AM  8        WHY DON'T YOU LAY A FOUNDATION FOR A BUSINESS RECORD.

10:22AM  9    BY MR. BOSTIC:

10:22AM 10    Q.  DR. ROSENDORFF, AROUND THIS TIME PERIOD, WERE YOU AND

10:22AM 11    OTHERS AT THERANOS EXCHANGING EMAILS IN ORDER TO COORDINATE FOR

10:22AM 12    THIS UPCOMING INSPECTION?

10:22AM 13    A.  THIS EMAIL AT 11:58 WAS AN EMAIL THAT DANIEL SENT TO ME IN

10:23AM 14    RESPONSE TO AN EMAIL THAT I SENT TO HIM.

10:23AM 15    Q.  AND BEFORE WE GET INTO THE SPECIFIC EMAIL, BECAUSE IT'S

10:23AM 16    NOT ADMITTED YET --

10:23AM 17    A.  OH, I'M SORRY.

10:23AM 18    Q.  -- LET ME JUST ASK YOU GENERALLY, WAS THE EMAIL USED

10:23AM 19    INTERNALLY AT THERANOS FOR THE PURPOSES OF COORDINATING THIS

10:23AM 20    INSPECTION?

10:23AM 21    A.  YES, ABSOLUTELY.

10:23AM 22    Q.  AND IN THOSE EMAILS, WAS IT IMPORTANT FOR THE INDIVIDUALS

10:23AM 23    WRITING TO RELAY INSPECTION ACCURATELY?

10:23AM 24    A.  YES.

10:23AM 25    Q.  AND WERE THESE EMAILS PRESERVED SO THAT THEY COULD BE

10:23AM   1    REFERENCED LATER IF NEEDED?

10:23AM   2    A.   YES.

10:23AM   3              MR. BOSTIC:  YOUR HONOR, WE OFFER 4316 AS A BUSINESS

10:23AM   4    RECORD.

10:23AM   5              THE COURT:  IT'S ADMITTED.

10:23AM   6              MR. COOPERSMITH:  SAME OBJECTION, YOUR HONOR.

10:23AM   7              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:23AM   8         (GOVERNMENT'S EXHIBIT 4316 WAS RECEIVED IN EVIDENCE.)

10:23AM   9              MR. BOSTIC:  AND MAY WE PUBLISH, YOUR HONOR?

10:23AM  10              THE COURT:  YES.

10:23AM  11    BY MR. BOSTIC:

10:23AM  12    Q.   LOOKING AT 4316, DO YOU SEE AN EMAIL FROM DANIEL YOUNG TO

10:23AM  13    YOU WITH THE SUBJECT LINE NORMANDY LAB?

10:23AM  14    A.   YES, I DO SEE THAT.

10:23AM  15    Q.   AND THE TEXT SAYS, "LET'S NOT REMIND HER ABOUT THE

10:24AM  16    DOWNSTAIRS LAB UNLESS SHE ASKS AGAIN.  JUST SIMPLER IF WE CAN

10:24AM  17    JUST SHOW HER THE LAB UPSTAIRS."

10:24AM  18         DO YOU SEE THAT?

10:24AM  19    A.   YES, I DO.

10:24AM  20    Q.   AND WHAT IS THIS REFERRING TO?

10:24AM  21    A.   I'LL TRY TO EXPLAIN IT WITHOUT REFERENCING MY PREVIOUS

10:24AM  22    EMAIL I THINK IF THAT'S THE INSTRUCTIONS OF THE COURT.

10:24AM  23    Q.   NO, THAT'S FINE.  YOU CAN REFERENCE YOUR PREVIOUS EMAIL.

10:24AM  24    A.   OH.

10:24AM  25              MY PREVIOUS EMAIL ESSENTIALLY SAID -- I DON'T REMEMBER THE

10:24AM  1    EXACT TEXT, BUT IT WAS BASICALLY A QUESTION FROM ME TO DANIEL

10:24AM  2    SAYING, ARE WE GOING TO BE SHOWING HER THE DOWNSTAIRS

10:24AM  3    LABORATORY?

10:24AM  4    Q.   AND WHAT IS YOUR UNDERSTANDING OF THE DIRECTION THAT YOU

10:24AM  5    RECEIVED BACK FROM DANIEL YOUNG?

10:24AM  6    A.   HE SAID, NO, WE WILL NOT BE SHOWING HER THE DOWNSTAIRS

10:24AM  7    LABORATORY UNTIL SHE ASKS AGAIN.

10:24AM  8    Q.   AND WHO IS THE "HER" IN THIS EMAIL?

10:24AM  9    A.   THE INSPECTOR FROM LABORATORY FIELD SERVICES.

10:24AM 10    Q.   AND FINALLY, CAN YOU REMIND US OF THE DIFFERENCE BETWEEN

10:24AM 11    THE DOWNSTAIRS LAB AND THE UPSTAIRS LAB AT THERANOS?

10:24AM 12    A.   THE DOWNSTAIRS LAB CONTAINED ALL OF THE EDISONS, AND IT

10:25AM 13    WAS WHERE THE DILUTION METHODS WERE BEING RUN ON THE MODIFIED

10:25AM 14    SIEMENS INSTRUMENTS.

10:25AM 15        THE UPSTAIRS LAB CONTAINED EXCLUSIVELY PREDICATE DEVICES.

10:25AM 16    Q.   AT THE TOP PART OF THIS PAGE THAT YOU CAN SEE ON YOUR

10:25AM 17    SCREEN, YOU FORWARD THIS EMAIL TO AN EMAIL ADDRESS THAT WE HAVE

10:25AM 18    REDACTED.

10:25AM 19        BUT DO YOU RECALL FORWARDING THIS TO YOUR PERSONAL EMAIL

10:25AM 20    ADDRESS?

10:25AM 21    A.   YES, I DID.

10:25AM 22    Q.   AND WHY DID YOU DECIDE TO DO THAT IN NOVEMBER OF 2014, THE

10:25AM 23    FOLLOWING YEAR?

10:25AM 24    A.   I WAS, I WAS UNEASY.  I WAS UNCOMFORTABLE WITH THE

10:25AM 25    DIRECTION THAT I HAD BEEN GIVEN BY MR. YOUNG, AND I WANTED TO,

10:25AM  1    TO LEAVE A PAPER TRAIL FOR THE FUTURE.

10:25AM  2    Q.   AROUND THE TIME OF THIS INSPECTION, DO YOU RECALL

10:25AM  3    RECEIVING ADDITIONAL INSTRUCTION FROM MR. BALWANI ABOUT WHAT

10:25AM  4    AREAS OF THE LAB WOULD BE ACCESSIBLE TO THE INSPECTOR?

10:26AM  5    A.   WHAT I RECALL MR. BALWANI EXPLICITLY SAID IS I DON'T WANT

10:26AM  6    ANYBODY GOING IN AND OUT OF NORMANDY DURING THE PERIOD OF THE

10:26AM  7    INSPECTION.

10:26AM  8    Q.   OKAY.  LET'S LOOK AT ANOTHER EXAMPLE OF DIRECTION AT

10:26AM  9    EXHIBIT 1295.  AND IF WE CAN PUT THAT JUST ON DR. ROSENDORFF'S

10:26AM 10    SCREEN.

10:26AM 11        DR. ROSENDORFF, DO YOU SEE AN EXHIBIT MARKED 1295 IN FRONT

10:26AM 12    OF YOU?

10:26AM 13    A.   YES, I SEE IT.

10:26AM 14    Q.   AND DO YOU SEE THAT THIS IS AN EMAIL FROM MR. BALWANI TO

10:26AM 15    YOU AND OTHERS AT THERANOS PROVIDING SOME DIRECTION IN

10:26AM 16    CONNECTION WITH THAT INSPECTION?

10:26AM 17    A.   YES, SIR.

10:26AM 18            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1295.

10:26AM 19            MR. COOPERSMITH:  NO OBJECTION.

10:26AM 20            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:27AM 21        (GOVERNMENT'S EXHIBIT 1295 WAS RECEIVED IN EVIDENCE.)

10:27AM 22    BY MR. BOSTIC:

10:27AM 23    Q.   SO, DR. ROSENDORFF, LOOKING AT THIS EMAIL, IS THIS FROM

10:27AM 24    THAT SAME INSPECTION THAT WE'VE BEEN TALKING ABOUT?

10:27AM 25    A.   YES, IT IS.

10:27AM   1    Q.   AND DO YOU SEE THAT MR. BALWANI DIRECTS YOU AND OTHERS AT

10:27AM   2    THERANOS, "FOR THE AREA INSIDE OF THE NORMANDY LAB THAT IS

10:27AM   3    CORDONED OFF BY THE DIVIDERS -- IF THE INSPECTOR ASKS, WE

10:27AM   4    SHOULD SAY THAT THIS AREA IS FOR FUTURE GROWTH AND IS BEING

10:27AM   5    ORGANIZED (AS IS THE CASE) BUT IS STILL RESTRICTED ONLY TO THE

10:27AM   6    CLIA LAB AND AUTHORIZED TEAM (AS IS THE CASE)."

10:27AM   7         DO YOU SEE THAT?

10:27AM   8    A.   YES, I DO.

10:27AM   9    Q.   AND DURING THAT TIME PERIOD, DO YOU RECALL A PORTION OF

10:27AM   10   THE NORMANDY LAB BEING CORDONED OFF BY DIVIDERS FOR THIS

10:27AM   11   INSPECTION?

10:27AM   12   A.   I RECALL THAT THE BANKS OF EDISONS WERE BEHIND THE

10:27AM   13   DIVIDERS OR PARTITIONS, SIMILAR TO THE KIND YOU SEE IN OPEN

10:27AM   14   OFFICE SPACE WHERE YOU HAVE WALLS ON STANDS THAT WOULD SEPARATE

10:28AM   15   ONE OFFICE FROM ANOTHER.

10:28AM   16        I DON'T REMEMBER AT THIS SPECIFIC TIME WHAT NORMANDY

10:28AM   17   LOOKED LIKE.

10:28AM   18   Q.   LET ME ASK THEN, BASED ON YOUR PREVIOUS EXPERIENCE AS A

10:28AM   19   LAB DIRECTOR, WAS IT NORMAL OR UNUSUAL TO RECEIVE THIS KIND OF

10:28AM   20   DIRECTION FROM MANAGEMENT ABOUT HOW TO RESPOND TO INSPECTOR

10:28AM   21   QUESTIONS?

10:28AM   22   A.   SITTING HERE TODAY, I FEEL THAT IT IS INAPPROPRIATE.

10:28AM   23   Q.   DID YOU HAVE THAT REACTION AT THE TIME?

10:28AM   24   A.   I WAS UNCOMFORTABLE WITH THE DIRECTION THAT MR. BALWANI

10:28AM   25   WAS GIVING.

10:28AM   1       Q.   OKAY.  WE CAN SET THAT ASIDE.

10:28AM   2            I'D LIKE TO TALK TO YOU NEXT ABOUT THE VALIDATION WORK

10:28AM   3       THAT YOU WITNESSED AND WERE INVOLVED WITH AT THERANOS.

10:28AM   4       A.   YES.

10:28AM   5       Q.   I WANT TO MAKE SURE THAT WE'RE CLEAR ON THE RELATIONSHIP

10:28AM   6       BETWEEN VALIDATION AND ONGOING QUALITY EVALUATION STEPS.

10:29AM   7       A.   YES.

10:29AM   8       Q.   FIRST OF ALL, CAN YOU EXPLAIN THE DIFFERENCE BETWEEN THOSE

10:29AM   9       TWO?

10:29AM  10       A.   VALIDATION IS A SERIES OF DATA GATHERING EXERCISES --

10:29AM  11       THAT'S A LITTLE VERBOSE.  I APOLOGIZE.  IT'S A SERIES OF

10:29AM  12       EXPERIMENTS BASICALLY THAT THE R&D FOLKS DO FOLLOWING A STRICT

10:29AM  13       PLAN.

10:29AM  14            WHEN THEY DRAW UP THE PLAN, THEY REFERENCE CLIA LAW IN

10:29AM  15       TERMS OF WHAT NEEDS TO BE PROVEN, AND THEY ALSO -- WE ALSO

10:29AM  16       REFERENCED GUIDANCE DOCUMENTS.

10:29AM  17            THAT VALIDATION IS PERFORMED IN R&D AND THE DATA IS

10:29AM  18       RECORDED.  THE PERFORMANCE CHARACTERISTICS OF THE TEST ARE

10:29AM  19       PROVEN, AND THEN THE LABORATORY DIRECTOR MAKES A DECISION ABOUT

10:29AM  20       WHETHER THAT TEST IS APPROPRIATE FOR PATIENT CARE.

10:29AM  21       Q.   SO YOU JUST DESCRIBED THE VALIDATION PROCESS THAT OCCURS

10:29AM  22       BEFORE AN ASSAY IS USED FOR PATIENT TESTING; IS THAT RIGHT?

10:29AM  23       A.   YES.

10:29AM  24       Q.   AND HOW IS THAT DIFFERENT FROM WHAT HAPPENS AFTER A TEST

10:30AM  25       STARTS BEING USED ON PATIENTS?

10:30AM  1    A.   THE QUALITY CONTROL DOESN'T STOP AFTER THE VALIDATION IS

10:30AM  2    COMPLETE.

10:30AM  3         AS MENTIONED, THERE'S DAILY OR PER SHIFT QC THAT NEEDS TO

10:30AM  4    BE RUN BEFORE YOU COULD RUN PATIENT SAMPLES.

10:30AM  5         THERE IS LONGITUDINAL QC, LEVEY-JENNINGS.  THERE IS

10:30AM  6    INSTRUMENT MAINTENANCE.  THERE ARE A NUMBER OF THINGS THAT HAVE

10:30AM  7    TO BE DONE TO ENSURE QUALITY AFTER VALIDATION IS COMPLETE.

10:30AM  8    Q.   AND YOU TESTIFIED DURING CROSS-EXAMINATION ABOUT CHANGES

10:30AM  9    THAT YOU WOULD SOMETIMES SEE MADE TO THERANOS ASSAYS AFTER

10:30AM  10   VALIDATION.

10:30AM  11        DO YOU RECALL THAT?

10:30AM  12   A.   YES.

10:30AM  13   Q.   AND CAN YOU EXPLAIN WHAT YOU WERE REFERRING TO THERE?

10:30AM  14   A.   BECAUSE OF THE PROBLEMS WITH THE THERANOS TESTS, R&D WAS

10:30AM  15   CONSTANTLY MAKING CHANGES TO THE INSTRUMENTATION, THE

10:31AM  16   CHEMISTRY, THE SOFTWARE OF THE INSTRUMENTS.

10:31AM  17        WHENEVER YOU HAVE ANY ONE OF THOSE CHANGES, YOU HAVE TO

10:31AM  18   REVALIDATE THE TESTS BECAUSE IT'S A BRAND NEW TEST.

10:31AM  19   Q.   AND IS THAT SOMETHING THAT YOU SAW HAPPEN FREQUENTLY AT

10:31AM  20   THERANOS?

10:31AM  21   A.   YES.

10:31AM  22   Q.   THAT REVALIDATION WORK AND THOSE CHANGES TO THE ASSAYS,

10:31AM  23   DID THAT CREATE ANY CHALLENGES FOR YOU IN YOUR ROLE TRYING TO

10:31AM  24   ENSURE ACCURACY?

10:31AM  25   A.   THERE WAS NO TRANSPARENCY REGARDING WHAT VERSION OF THE

10:31AM 1    TEST WAS BEING RUN, WHAT CHANGES HAD BEEN MADE, AND IT WAS

10:31AM 2    ESSENTIALLY IMPOSSIBLE FOR ME TO KEEP UP AND TO REVALIDATE

10:31AM 3    EVERY NEW TWEAK ON THE TEST.

10:31AM 4    Q.   ON THAT SAME TOPIC OF ASSAY VALIDATION, YOU'VE ALSO SEEN

10:31AM 5    SOME EXAMPLES OF ASSAY DEVELOPMENT REPORTS.

10:31AM 6         DO YOU RECALL THAT?

10:31AM 7    A.   YES.

10:31AM 8    Q.   IS AN ASSAY DEVELOPMENT REPORT SUFFICIENT FOR AN ASSAY TO

10:32AM 9    BE APPROVED AND USED ON PATIENTS?

10:32AM 10   A.   NO.  I'M NOT EVEN SURE WHAT COMPONENTS WENT INTO THE ASSAY

10:32AM 11   DEVELOPMENT REPORT.

10:32AM 12        I MEAN, THE ANTIBODIES, THE CHEMISTRIES, THE METHODS MAY

10:32AM 13   HAVE BEEN COMPLETELY DIFFERENT, SO I'M JUST NOT SURE WHAT THE

10:32AM 14   RELEVANCE OF THE REPORT IS TO THE ACTUAL VALIDATION.

10:32AM 15   Q.   SO AS A LAB DIRECTOR, IF YOU'RE TRYING TO ENSURE THAT THE

10:32AM 16   TEST THAT YOU'RE OFFERING IS ACCURATE, DO YOU LOOK BACK AT THE

10:32AM 17   ASSAY DEVELOPMENT REPORT FOR THAT SPECIFICALLY?

10:32AM 18   A.   NO, SIR.

10:32AM 19   Q.   WHAT DOCUMENT DO YOU RELY UPON FOR THAT?

10:32AM 20   A.   THE VALIDATION REPORT.

10:32AM 21   Q.   WHEN IT CAME TO THE THERANOS ASSAYS AND THEIR VALIDATION,

10:32AM 22   YOU TESTIFIED THAT YOU SIGNED MANY VALIDATION REPORTS FOR THOSE

10:32AM 23   ASSAYS; CORRECT?

10:32AM 24   A.   YES, I DID.

10:33AM 25   Q.   AND WHEN YOU SIGNED THEM, YOU WERE SATISFIED THAT THOSE

10:33AM  1    WERE SUFFICIENT FOR PATIENT USE?

10:33AM  2    A.   THOSE REPORTS ARE RAN UNDER IDEAL CONDITIONS BY R&D, AND I

10:33AM  3    RELIED ON THOSE FOLKS TO PRESENT ACCURATE DATA, IN OTHER WORDS,

10:33AM  4    DATA THAT REFLECTED WHAT -- THE DATA THAT THEY'RE ACTUALLY

10:33AM  5    GETTING WHEN THEY'RE RUNNING THE VALIDATION.

10:33AM  6         SO BASED ON ALL OF THAT, YES, I DIDN'T HAVE ANY GROUNDS TO

10:33AM  7    REJECT THE VALIDATION, YES.

10:33AM  8    Q.   AND BASED ON THE DATA IN THE VALIDATION REPORTS, DID THE

10:33AM  9    ASSAYS MEET THE STANDARDS IN YOUR VIEW?

10:33AM 10    A.   YES, THEY DID.

10:33AM 11    Q.   AND ONCE THE ASSAYS STARTED BEING USED ON PATIENTS, DID

10:33AM 12    THEY CONTINUE TO MEET THE APPLICABLE STANDARDS IN YOUR VIEW AS

10:33AM 13    LAB DIRECTOR?

10:33AM 14    A.   NO, THEY DID NOT.

10:33AM 15    Q.   YOU TESTIFIED PREVIOUSLY THAT -- SO I WANT TO TALK MORE

10:33AM 16    ABOUT THE DISCONNECT BETWEEN WHAT YOU SAW IN THE VALIDATION

10:33AM 17    REPORTS VERSUS WHAT YOU SAW IN THE PERFORMANCE OF THE TESTS.

10:34AM 18         YOU TESTIFIED EARLIER THAT IN YOUR VIEW THE VALIDATION

10:34AM 19    PHASE OF THINGS AT THERANOS WAS RUSHED; IS THAT CORRECT?

10:34AM 20    A.   YES.

10:34AM 21    Q.   AND WHAT MAKES YOU SAY THAT, OR WHAT MADE YOU FEEL THAT

10:34AM 22    WAY?

10:34AM 23    A.   THE APPROACH OF DILUTING BLOOD AND RUNNING THEM ON SIEMENS

10:34AM 24    WAS DECIDED ON I BELIEVE ONLY A MONTH OR TWO BEFORE THE GO LIVE

10:34AM 25    DATE, AND THERE WERE JUST DOZENS AND DOZENS OF TESTS THAT WE

10:34AM  1    WERE REQUIRED TO VALIDATE, AND WE WERE WORKING 24/7 RUNNING

10:34AM  2    THESE SIEMENS INSTRUMENTS DAY AND NIGHT, BLURRY EYED TECHS, AND

10:34AM  3    I WAS GETTING A CONSTANT STREAM OF DATA AND REPORTS TO REVIEW.

10:34AM  4         AND THERE WAS A CLEAR EXPECTATION THAT THIS WAS GOING TO

10:34AM  5    GET DONE.

10:34AM  6    Q.   AND WHERE WAS THAT EXPECTATION COMING FROM?

10:35AM  7    A.   FROM MR. BALWANI AND MS. HOLMES.

10:35AM  8    Q.   I'D LIKE TO SHOW YOU EXHIBIT 7314.

10:35AM  9         THAT'S PREVIOUSLY ADMITTED, YOUR HONOR.  MAY WE DISPLAY?

10:35AM 10              THE COURT:  YES.

10:35AM 11    BY MR. BOSTIC:

10:35AM 12    Q.   DR. ROSENDORFF, DO YOU REMEMBER REVIEWING THIS DOCUMENT

10:35AM 13    DURING CROSS-EXAMINATION?

10:35AM 14    A.   YES.  THIS IS THE ONE FROM MR. LUCAS.

10:35AM 15    Q.   ALL RIGHT.

10:35AM 16    A.   DR. YOUNG.  I'M SORRY.  I APOLOGIZE.

10:35AM 17    Q.   AND DO YOU SEE THAT THIS IS FROM MID TO LATE AUGUST 2013,

10:35AM 18    A FEW WEEKS BEFORE THE LAUNCH DATE?

10:35AM 19    A.   YES.

10:35AM 20    Q.   IF I COULD DRAW YOUR ATTENTION TO THE MIDDLE OF THE PAGE

10:35AM 21    WHERE IT TALKS ABOUT ELISA ASSAYS.

10:35AM 22         DO YOU SEE THAT IN DISCUSSING THE TEST MENU FOR LAUNCH,

10:35AM 23    DR. YOUNG REFERENCES 92 ELISA OR IMMUNOASSAYS?

10:35AM 24    A.   YES.

10:35AM 25    Q.   AND DO YOU SEE THAT HE SAYS 62 ASSAYS ON EDISON AND 30 ON

10:36AM 1    ADVIA WITH SIEMENS CHEMISTRY?

10:36AM 2    A.   YES.

10:36AM 3    Q.   DID THERANOS EVER VALIDATE 62 ASSAYS FOR USE ON THE

10:36AM 4    EDISON?

10:36AM 5    A.   NO.

10:36AM 6    Q.   DO YOU REMEMBER WHAT THE ACTUAL NUMBER WAS IN YOUR

10:36AM 7    RECOLLECTION?

10:36AM 8    A.   WHEN I LEFT, I THINK THERE WERE ABOUT 11 OR 12, BUT --

10:36AM 9    Q.   AND THAT'S EVEN AT THE TIME THAT YOU LEFT IN NOVEMBER OF

10:36AM 10   THE FOLLOWING YEAR?

10:36AM 11   A.   YES.

10:36AM 12   Q.   LET'S GO DOWN TO THE BOTTOM OF THIS PAGE, AND THERE'S A

10:36AM 13   PARAGRAPH BEGINNING "ONE MAJOR EFFORT INCLUDES."

10:36AM 14       DO YOU SEE HERE DR. YOUNG WRITES TO MR. BALWANI AND

10:36AM 15   MS. HOLMES, "ONE MAJOR EFFORT INCLUDES VALIDATING ALL 64

10:36AM 16   ELISA'S ON EDISON DEVICES."

10:36AM 17       DO YOU SEE THAT?

10:36AM 18   A.   OH, ARE WE STILL ON -- I'M SORRY, MY VOICE IS LOUD ALL OF

10:36AM 19   A SUDDEN.

10:36AM 20       ARE WE STILL ON MR. YOUNG'S EMAIL?

10:37AM 21   Q.   YES.  DO YOU SEE THIS IS THE SAME EXHIBIT AND EMAIL?

10:37AM 22   A.   YES.

10:37AM 23   Q.   AND HE WRITES, "ONE MAJOR EFFORT INCLUDES VALIDATING ALL

10:37AM 24   64 ELISA'S ON EDISON DEVICES."

10:37AM 25   A.   YES.

10:37AM    1    Q.   AND SO AT THIS TIME, A COUPLE WEEKS BEFORE THE LAUNCH, IS

10:37AM    2    IT YOUR RECOLLECTION THAT NO ASSAYS WERE VALIDATED ON THE

10:37AM    3    EDISON ITSELF?

10:37AM    4    A.   I DON'T RECALL SPECIFICALLY.  IF ANY WERE, IT WOULD HAVE

10:37AM    5    BEEN ONE OR TWO.

10:37AM    6    Q.   OKAY.  WE CAN SET THAT ASIDE.

10:37AM    7         DO YOU REMEMBER DISCUSSING -- SO BY THE WAY, THE EMAIL

10:37AM    8    THAT WE JUST LOOKED AT ALSO REFERENCES THIRD PARTY DEVICES.

10:37AM    9         DO YOU REMEMBER THAT?

10:37AM   10    A.   YES.

10:37AM   11    Q.   AND ON CROSS-EXAMINATION, MR. COOPERSMITH ASKED YOU ABOUT

10:37AM   12    THE THROUGHPUT OF THOSE THIRD PARTY DEVICES.

10:37AM   13         DO YOU REMEMBER THAT?

10:37AM   14    A.   YES, YES.

10:37AM   15    Q.   AND FROM YOUR TIME AT THERANOS OR WORKING AT PREVIOUS

10:38AM   16    LABS, CAN YOU TELL US, FOR EXAMPLE, ABOUT HOW MANY ASSAYS THE

10:38AM   17    SIEMENS ADVIA WAS ABLE TO RUN IN AN HOUR OR IN A DAY, OR CAN

10:38AM   18    YOU TELL US HOW MUCH HIGHER ITS THROUGHPUT WAS COMPARED TO THE

10:38AM   19    EDISON?

10:38AM   20    A.   SO IT'S THE ADVIA 1800, AND THE 1800 REFERS TO HOW MANY

10:38AM   21    SAMPLES CAN BE RUN.

10:38AM   22         I DON'T REMEMBER WHAT THE TIME PERIOD IS FOR THOSE 1800,

10:38AM   23    BUT THE SIEMENS -- SO YOU'RE ASKING ABOUT SIEMENS VERSUS

10:38AM   24    MODIFIED SIEMENS?

10:38AM   25    Q.   I'M ACTUALLY -- WELL, YOU CAN GIVE ME A DIFFERENT ANSWER

10:38AM  1        IF IT'S DIFFERENT FOR BOTH.

10:38AM  2             BUT I'M ASKING ABOUT THE DEVICE IN GENERAL.

10:38AM  3        A.   THE SIEMENS INSTRUMENTS HAD MUCH HIGHER THROUGHPUT AND

10:38AM  4        MUCH HIGHER RELIABILITY.

10:38AM  5        Q.   DO YOU HAVE EXHIBIT 204 IN ONE OF THE DEFENSE BINDERS?  IT

10:39AM  6        MIGHT BE IN VOLUME 1.

10:39AM  7        A.   YES.

10:39AM  8        Q.   AND DO YOU RECALL THAT THIS WAS THE OPERATOR'S MANUAL FOR

10:39AM  9        THE SIEMENS ADVIA 1800?

10:39AM 10        A.   YES.

10:39AM 11        Q.   CAN I ASK YOU TO LOOK AT PAGE 13 OF THAT DOCUMENT?

10:39AM 12        A.   YES.

10:39AM 13        Q.   AND AT THE TOP THERE'S A SECTION, SYSTEM OVERVIEW.

10:39AM 14             DO YOU SEE THAT?

10:39AM 15        A.   YES, I DO.

10:39AM 16        Q.   AND DOES THAT REFRESH YOUR RECOLLECTION AS TO THE

10:39AM 17        THROUGHPUT LEVEL OF THE SIEMENS ADVIA 1800?

10:39AM 18        A.   YES.  IT'S 1800 TESTS PER HOUR.

10:39AM 19        Q.   AND HOW MANY TESTS, APPROXIMATELY, WAS THE EDISON ABLE TO

10:39AM 20        RUN IN ONE HOUR?

10:39AM 21        A.   ONE IF YOU WERE LUCKY.

10:39AM 22        Q.   I'D LIKE TO SHOW YOU EXHIBIT 9921, WHICH I BELIEVE WAS

10:40AM 23        ALREADY ADMITTED.

10:40AM 24             MAY WE DISPLAY, YOUR HONOR?

10:40AM 25                  THE COURT:  YES.

10:40AM  1    BY MR. BOSTIC:

10:40AM  2    Q.   DR. ROSENDORFF, DO YOU REMEMBER REVIEWING THIS DOCUMENT

10:40AM  3    WITH MR. COOPERSMITH?

10:40AM  4    A.   YES, I DO.

10:40AM  5    Q.   OKAY.  AND THIS DOCUMENT HAS AN EFFECTIVE DATE IN NOVEMBER

10:40AM  6    OF 2011.

10:40AM  7         DO YOU SEE THAT?

10:40AM  8    A.   YES, I DO.

10:40AM  9    Q.   IS THAT ALMOST TWO YEARS BEFORE THERANOS LAUNCHED ITS

10:40AM  10   TESTING SERVICES?

10:40AM  11   A.   YES.

10:40AM  12   Q.   AND IF WE COULD LOOK AT THE TOP OF THIS PAGE UNDER TESTING

10:40AM  13   SYSTEMS AND ZOOM IN ON WHAT IT SAYS THERE.

10:40AM  14        DO YOU SEE ABOUT HALFWAY OR TWO-THIRDS OF THE WAY DOWN

10:40AM  15   THAT PARAGRAPH IT SAYS, "THE SYSTEM ENABLES RESULTS IN UNDER AN

10:41AM  16   HOUR WITH PRECISION AND ACCURACY EQUIVALENT TO TRADITIONAL

10:41AM  17   CLINICAL LABORATORY ANALYZERS"?

10:41AM  18   A.   YES.

10:41AM  19   Q.   DR. ROSENDORFF, AFTER WORKING WITH THOSE DEVICES AND THOSE

10:41AM  20   SYSTEMS FOR MORE THAN A YEAR, WAS THAT YOUR EXPERIENCE WITH

10:41AM  21   THEM?

10:41AM  22   A.   THIS IS A LIE.

10:41AM  23   Q.   OKAY.  WE CAN PUT THAT ASIDE.

10:41AM  24        SO LOOKING BACK AT THE VALIDATION WORK, LET ME ASK WHETHER

10:41AM  25   THOSE VALIDATION REPORTS AND THE VALIDATION DATA WAS ON YOUR

10:41AM   1    MIND THROUGHOUT YOUR TIME AT THERANOS WHEN YOU WERE SEEING

10:41AM   2    ISSUES COME UP WITH THE TESTING ACCURACY?

10:41AM   3    A.   YES.

10:41AM   4    Q.   AND HOW DID YOU RECONCILE WHAT YOU HAD SEEN IN VALIDATION

10:41AM   5    WITH WHAT YOU WERE SEEING WITH THE ASSAY'S OVERALL PERFORMANCE?

10:41AM   6    A.   I COULDN'T.  I COULDN'T AT ALL.  IT BOTHERED ME.  IT

10:42AM   7    PUZZLED ME.  I CAME UP WITH THEORIES AS TO WHY THAT WAS

10:42AM   8    HAPPENING.  WAS THE VALIDATION DATA REALLY CORRECT?  HAD THE

10:42AM   9    TEST CHANGED RADICALLY?

10:42AM  10         I SPOKE TO DR. YOUNG ABOUT IT.  HE ALSO WAS BOTHERED BY

10:42AM  11    THE FACT THAT THE TEST RESULTS WERE -- THE RELIABILITY OF THE

10:42AM  12    TESTING WAS NOT MATCHING WHAT WAS IN THE VALIDATION REPORTS.

10:42AM  13    Q.   SEEING THE PROBLEMS THAT YOU SAW WITH TESTING ACCURACY AND

10:42AM  14    RELIABILITY, DID THE VALIDATION REPORTS AND THE VALIDATION DATA

10:42AM  15    PROVIDE YOU ANY COMFORT ON THOSE TOPICS?

10:42AM  16    A.   NO, THEY DIDN'T.

10:42AM  17         AS I MENTIONED, IT WAS QUESTIONABLE WHETHER THOSE RESULTS

10:42AM  18    WERE EVEN RELEVANT TO THE TESTS THAT WERE RUNNING AT THE TIME.

10:42AM  19    Q.   DO YOU RECALL DURING CROSS-EXAMINATION SEEING A COUPLE

10:42AM  20    EXAMPLES OF EMAILS THAT YOU SENT TO MR. BALWANI OR OTHERS WHERE

10:42AM  21    YOU WERE POSITIVE OR EXCITED ABOUT DEVELOPMENTS AT THERANOS?

10:42AM  22    A.   YES.  THERE WERE TIMES WHERE I WANTED TO CONVEY ENTHUSIASM

10:43AM  23    AND TO BE ENCOURAGING TO MY COWORKERS.

10:43AM  24    Q.   WERE THOSE POSITIVE FEELINGS GENUINE THAT YOU CONVEYED IN

10:43AM  25    THE EMAILS?

10:43AM   1    A.   YES.

10:43AM   2    Q.   DID THAT POSITIVE FEELING LAST THROUGHOUT YOUR TIME AT THE

10:43AM   3    COMPANY?

10:43AM   4    A.   NO, IT DID NOT.

10:43AM   5    Q.   IN SPEAKING TO MR. BALWANI, DID YOU LIMIT YOURSELF TO

10:43AM   6    EXPRESSING POSITIVE VIEWS ONLY, OR DID YOU ALSO MAKE HIM AWARE

10:43AM   7    OF YOUR CONCERNS ABOUT THE PROBLEMS THAT YOU WERE SEEING?

10:43AM   8    A.   MOST OF MY COMMUNICATION WITH MR. BALWANI WAS ABOUT

10:43AM   9    PROBLEMS AND CONCERNS.

10:43AM  10    Q.   DO YOU RECALL THAT ON CROSS-EXAMINATION YOU WERE SHOWN A

10:43AM  11    LAB DIRECTOR ATTESTATION THAT YOU SIGNED ACKNOWLEDGING YOUR

10:43AM  12    RESPONSIBILITY FOR THE ACCURACY AND RELIABILITY OF THERANOS

10:43AM  13    TESTS?

10:43AM  14    A.   YES, I RECALL.

10:43AM  15    Q.   AT THERANOS, WERE YOU EMPOWERED TO DO WHAT NEEDED TO BE

10:43AM  16    DONE TO ENSURE TESTING ACCURACY AND RELIABILITY?

10:44AM  17    A.   NO, I WAS NOT.

10:44AM  18    Q.   WHAT MAKES YOU SAY THAT?

10:44AM  19    A.   I WAS LEFT OUT OF EMAILS.  I ESSENTIALLY WAS LIED TO.  I

10:44AM  20    KNOW THAT'S A STRONG WORD.

10:44AM  21         I WAS COUNTERMANDED.  CHAIN OF COMMAND WAS NOT OBEYED,

10:44AM  22    ET CETERA.

10:44AM  23    Q.   AND AS LAB DIRECTOR AT THERANOS, WHO WAS IT AT THE COMPANY

10:44AM  24    WHO DECIDED HOW MUCH POWER AND AUTHORITY YOU HAD?

10:44AM  25    A.   MR. BALWANI AND MS. HOLMES.

10:44AM  1    Q.   DURING CROSS-EXAMINATION YOU WERE ASKED ABOUT WHETHER

10:44AM  2    THOSE TWO INDIVIDUALS, MR. BALWANI OR MS. HOLMES, HAD EVER

10:44AM  3    ORDERED YOU TO SEND OUT A RESULT THAT YOU KNEW TO BE

10:44AM  4    INACCURATE.

10:44AM  5         DO YOU REMEMBER THAT QUESTION?

10:44AM  6    A.   YES, I DO.

10:44AM  7    Q.   FIRST OF ALL, WHEN A RESULT IS ABOUT TO BE SENT OUT, IS IT

10:44AM  8    ALWAYS POSSIBLE TO KNOW WHETHER THAT RESULT IS ACCURATE OR

10:45AM  9    INACCURATE?

10:45AM  10   A.   MOST OF THE TIME IT'S NOT POSSIBLE TO KNOW.  IN FACT,

10:45AM  11   ASSUMING QC PASSES, IT'S IMPOSSIBLE TO KNOW.

10:45AM  12   Q.   SO LET ME ASK YOU A DIFFERENT VERSION OF THAT QUESTION,

10:45AM  13   WHICH IS, AT THERANOS, WERE YOU REQUIRED TO RELY ON A TESTING

10:45AM  14   SYSTEM THAT YOU BELIEVED WAS NOT SUFFICIENTLY ACCURATE OR

10:45AM  15   RELIABLE?

10:45AM  16            MR. COOPERSMITH:  OBJECTION.  LEADING.

10:45AM  17            THE COURT:  SUSTAINED.

10:45AM  18   BY MR. BOSTIC:

10:45AM  19   Q.   LET ME ASK IT A DIFFERENT WAY.

10:45AM  20        DR. ROSENDORFF, BY THE TIME YOU LEFT THE COMPANY, DID YOU

10:45AM  21   HAVE FAITH IN THE ACCURACY AND RELIABILITY OF THE THERANOS

10:45AM  22   TESTING SYSTEMS?

10:45AM  23   A.   I DID NOT.

10:45AM  24   Q.   WAS THAT PART OF THE REASON WHY YOU LEFT THE COMPANY?

10:45AM  25   A.   THAT WAS THE MAIN REASON.

10:45AM   1    Q.   AND WHO WAS IT AT THE COMPANY WHO MADE THE DECISIONS ABOUT

10:45AM   2    WHAT SYSTEMS WOULD BE USED FOR PATIENT TESTING?

10:45AM   3    A.   MR. BALWANI.

10:45AM   4    Q.   BEFORE -- OR BESIDES LEAVING THE COMPANY, AND BESIDES YOUR

10:46AM   5    TESTIMONY IN THIS CASE, HAVE YOU TAKEN ANY OTHER STEPS IN

10:46AM   6    RESPONSE TO THE PROBLEMS THAT YOU SAW AT THERANOS?

10:46AM   7    A.   SORRY.  SO AFTER I LEFT THE COMPANY?

10:46AM   8         MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  RELEVANCE.

10:46AM   9         THE COURT:  WAS THAT THE QUESTION, AFTER HE LEFT THE

10:46AM  10    COMPANY?

10:46AM  11         MR. BOSTIC:  YES, YOUR HONOR.

10:46AM  12         THE WITNESS:  YEAH --

10:46AM  13         THE COURT:  EXCUSE ME.

10:46AM  14         THE WITNESS:  I'M SORRY.

10:46AM  15         THE COURT:  I'M NOT CERTAIN OF THE RELEVANCE OF

10:46AM  16    THAT.  I'LL SUSTAIN IT WITHOUT A FOUNDATION.

10:46AM  17         MR. BOSTIC:  SO, YOUR HONOR, I THINK THIS IS

10:46AM  18    RELEVANT TO THE IMPORTANCE THAT THIS WITNESS ASCRIBES TO THE

10:46AM  19    ISSUES THAT HE SAW.

10:46AM  20         I CAN ASK IT A DIFFERENT WAY TO TRY TO GET IT BACK.

10:46AM  21         THE COURT:  WHY DON'T YOU TRY TO DO THAT.  THANK

10:46AM  22    YOU.

10:46AM  23    BY MR. BOSTIC:

10:46AM  24    Q.   DR. ROSENDORFF, BASED ON THE PROBLEMS THAT YOU SAW AT

10:46AM  25    THERANOS, WERE YOU SATISFIED SIMPLY WITH SEPARATING YOURSELF

10:46AM  1    FROM THE COMPANY?

10:47AM  2    A.   NO.  MY CONSCIENCE WAS -- I WAS REALLY BOTHERED BY WHAT I

10:47AM  3    HAD EXPERIENCED AT THE COMPANY.

10:47AM  4    Q.   AND DID THAT FEELING AND WHAT YOU HAD SEEN AT THE COMPANY

10:47AM  5    CAUSE YOU TO TAKE ANY ADDITIONAL STEPS?

10:47AM  6            MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  SAME

10:47AM  7    QUESTION.  RELEVANCE.

10:47AM  8            THE COURT:  SUSTAINED.

10:47AM  9    BY MR. BOSTIC:

10:47AM 10    Q.   DR. ROSENDORFF, IN LEAVING THE COMPANY, OR WHEN YOU LEFT

10:47AM 11    THE COMPANY, DID MR. BALWANI ASK YOU ANY QUESTIONS ABOUT THE

10:47AM 12    VALIDATION WORK THAT HAD PREVIOUSLY BEEN PERFORMED?

10:47AM 13    A.   DURING MY TENURE OR AFTER I LEFT?  I'M SORRY.

10:47AM 14    Q.   AS YOU WERE DECIDING TO LEAVE THE COMPANY.

10:47AM 15    A.   AH.

10:47AM 16       NO.  I SAID TO MR. BALWANI IN THE LAST DAY THAT IT WASN'T

10:47AM 17    WORTH MY REPUTATION TO STAY AT THE COMPANY.

10:47AM 18            MR. BOSTIC:  ONE MOMENT, YOUR HONOR.

10:47AM 19       (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

10:48AM 20            MR. BOSTIC:  NO FURTHER QUESTIONS AT THIS TIME.

10:48AM 21    THANK YOU.

10:48AM 22            THE COURT:  RECROSS.

10:48AM 23       FOLKS, WHY DON'T YOU STAND UP FOR A MOMENT WHILE

10:48AM 24    MR. COOPERSMITH COMES TO THE LECTERN.

10:49AM 25       (STRETCHING.)

10:49AM  1          **RECROSS-EXAMINATION**

10:49AM  2     BY MR. COOPERSMITH:

10:49AM  3     Q.   DR. ROSENDORFF, WE MIGHT BE ON THE HOME STRETCH HERE.

10:49AM  4          SO DURING REDIRECT, DO YOU REMEMBER MR. BOSTIC ASKED YOU

10:49AM  5     SOME ADDITIONAL QUESTIONS ABOUT HCG?

10:49AM  6     A.   YES.

10:49AM  7     Q.   AND HE SHOWED YOU SOME EMAILS.  IN FACT, HE SHOWED YOU

10:49AM  8     EXHIBIT 4147, WHICH IS THE MAY 30TH, 2014, EMAIL WHERE YOU

10:49AM  9     DIRECTED THAT HCG TESTING BE STOPPED?

10:49AM  10    A.   YES.

10:49AM  11    Q.   AND YOU DID THAT BECAUSE YOU HAD QUESTIONS ABOUT THAT

10:49AM  12    ASSAY AT THAT TIME; CORRECT?

10:49AM  13    A.   YES.

10:49AM  14    Q.   AND YOU DECIDED TO SEND AN EMAIL ORDERING THAT THE EDISON

10:49AM  15    TESTING BE STOPPED; RIGHT?

10:49AM  16    A.   YES, YES.

10:49AM  17    Q.   OKAY.  AND THEN YOU -- MR. BOSTIC SHOWED YOU AN EXHIBIT, I

10:50AM  18    BELIEVE IT WAS EXHIBIT 5418, WHERE THERE WAS AN ISSUE ABOUT

10:50AM  19    WHAT NOTATION WE'VE MADE IN LIS.

10:50AM  20    A.   I'M DRAWING A BLANK ON THAT ONE.  SORRY.

10:50AM  21    Q.   LET'S TAKE A LOOK AT IT SO IT'S EASIER.

10:50AM  22    A.   OKAY.

10:50AM  23    Q.   SO THIS IS 5418.

10:50AM  24         DO YOU SEE THAT IN FRONT OF YOU?

10:50AM  25    A.   YES.

10:50AM  1    Q.   AND I MIGHT HAVE BEEN THINKING ABOUT A DIFFERENT EXHIBIT.

10:50AM  2         NO, THIS IS THE ONE?

10:50AM  3         SO DO YOU SEE THAT MS. ALAMDAR SAYS, THIS IS ON JUNE 4TH,

10:50AM  4    2014, AND SHE SAYS, "HI ADAM,

10:50AM  5         "I SEE SOME RESULTS IN LIS FOR HCG (FROM EDISON)" AND THEN

10:50AM  6    THERE'S A PATIENT NAME THAT IS REDACTED.  AND IT SAYS, "THE

10:50AM  7    RESULT IS OORL; CAN WE RELEASE THIS PATIENT OR WE ONLY RELEASE

10:51AM  8    HCG FROM IMMULITE?"

10:51AM  9         DO YOU SEE THAT?

10:51AM  10   A.   YES.

10:51AM  11   Q.   AND THEN THE IMMULITE IS THE PREDICATE MACHINE?

10:51AM  12   A.   YES.

10:51AM  13   Q.   AND THEN WE ZOOM OUT AGAIN.

10:51AM  14        AND THEN AFTER MR. BALWANI FORWARDED THAT TO DANIEL YOUNG

10:51AM  15   AND DR. PANGARKAR, DO YOU SEE THERE'S AN EMAIL FROM

10:51AM  16   DANIEL YOUNG?

10:51AM  17   A.   YES.

10:51AM  18   Q.   AND HE SAYS, "BY THE WAY, WE NEVER SWITCHED TO IMMULITE IN

10:51AM  19   LIS -- IT WAS NOT CLEAR TO ME THAT THIS DECISION WAS MADE."

10:51AM  20        RIGHT?  AND THEN HE GOES ON.

10:51AM  21        DO YOU SEE THAT?

10:51AM  22   A.   YES.

10:51AM  23   Q.   AND WHETHER OR NOT THEY SWITCHED TO IMMULITE IN LIS, THIS

10:51AM  24   EMAIL BY ITSELF DOESN'T TELL US WHETHER RESULTS WERE BEING

10:51AM  25   RELEASED TO PATIENTS ON JUNE 4TH; CORRECT?

10:51AM  1      A.   SO HODA'S EMAIL SAYING, HEY, YOU KNOW, I SEE SOME RESULTS

10:51AM  2      FOR THE EDISON FOR HCG, I HAVE NO IDEA WHAT TIME PERIOD THOSE

10:51AM  3      RESULTS REFER TO.

10:51AM  4      Q.   RIGHT.

10:51AM  5      A.   YEAH.

10:51AM  6      Q.   THANK YOU.

10:51AM  7      A.   YES.

10:51AM  8      Q.   AND MY QUESTION IS, JUST TO MAKE SURE IT GETS ANSWERED --

10:52AM  9      A.   YES.

10:52AM  10     Q.   -- IN THIS EMAIL THAT WE'RE LOOKING AT NOW, AND IF WE JUST

10:52AM  11     ZOOM IN ON IT, IT'S THIS JUNE 4TH EMAIL AT 5:12 P.M., THIS

10:52AM  12     ISSUE ABOUT SWITCHING TO THE IMMULITE IN THE LABORATORY

10:52AM  13     INFORMATION SYSTEM, THE LIS --

10:52AM  14     A.   YES.

10:52AM  15     Q.   -- WE CAN'T TELL FROM THIS ONE EMAIL WHETHER THE RESULTS

10:52AM  16     WERE BEING RELEASED TO PATIENTS ON JUNE 4TH; CORRECT?

10:52AM  17     A.   CORRECT.

10:52AM  18     Q.   OKAY.  AND IF WE WANTED TO KNOW MORE ABOUT THAT, WE WOULD

10:52AM  19     HAVE TO LOOK AT LIS; RIGHT?

10:52AM  20     A.   YES, ABSOLUTELY.

10:52AM  21     Q.   OKAY.  DR. ROSENDORFF, YOU WERE THEN SHOWN ANOTHER EMAIL,

10:52AM  22     WHICH IS EXHIBIT 13875.

10:52AM  23          CAN WE SEE THAT?

10:52AM  24          AND THIS EMAIL, IF YOU LOOK AT THE VERY BOTTOM ONE, YOU'RE

10:52AM  25     GIVING SOME ADDITIONAL INSTRUCTIONS ON JUNE 4TH, 2014?

10:52AM   1    A.   YES.

10:52AM   2    Q.   AND THIS WAS JUST A FEW DAYS AFTER YOUR MAY 30TH DIRECTION

10:53AM   3    TO STOP EDISON TESTING?

10:53AM   4    A.   YES.

10:53AM   5    Q.   AND THEN YOU SAY THAT YOU, CHINMAY -- WHICH IS

10:53AM   6    DR. PANGARKAR; CORRECT?

10:53AM   7    A.   YES.

10:53AM   8    Q.   -- AND DR. YOUNG, WHO IS DANIEL, DISCUSSED THE PLAN FOR

10:53AM   9    HCG.

10:53AM   10        DO YOU SEE THAT?

10:53AM   11   A.   YES.

10:53AM   12   Q.   AND THEN YOU SAY, "GOING FORWARD."

10:53AM   13        DO YOU SEE THAT SECTION?

10:53AM   14   A.   YES.

10:53AM   15   Q.   AND THEN YOU SAY, "CHANGE HCG TO VACUTAINER."

10:53AM   16        RIGHT?

10:53AM   17   A.   YES.

10:53AM   18   Q.   "RUN ON IMMULITE."

10:53AM   19   A.   I MEAN, I HAD ALREADY SAID CHANGE BACK ON MAY 30TH.

10:53AM   20   Q.   RIGHT.  BUT YOU'RE SAYING IT AGAIN?

10:53AM   21   A.   I'M SAYING IT AGAIN, YES.

10:53AM   22   Q.   AND THEN NUMBER 2 SAYS, "HOLD RECURRENT CTN ORDERS FOR HCG

10:53AM   23   AND CALL FOR REDRAW ON VACUTAINER AS NEEDED."

10:53AM   24        RIGHT?

10:53AM   25   A.   YES.

10:53AM 1    Q.   AND SO ANY SAMPLE THAT WAS ALREADY COLLECTED UP TO THAT

10:53AM 2    POINT ON A CTN WOULD BE HELD ACCORDING TO YOUR INSTRUCTIONS;

10:53AM 3    RIGHT?

10:53AM 4    A.   YES.

10:53AM 5    Q.   OKAY.  NOW, LET'S LOOK AT THAT EXHIBIT WE SAW THE OTHER

10:54AM 6    DAY, WHICH IS 20564.

10:54AM 7         AND YOU SEE THIS IS JUST TWO DAYS LATER ON JUNE 6TH?

10:54AM 8    A.   YES.

10:54AM 9    Q.   AND THEN YOU WROTE IN THE MIDDLE EMAIL THERE AT

10:54AM 10   12:37 P.M., "HODA,

10:54AM 11        "CHINMAY WILL BE IMPLEMENTING A SCRIPT SHORTLY TO

10:54AM 12   REQUALIFY VALID VERSUS INVALID HCG VALUES.  STAY TUNED."

10:54AM 13        DO YOU SEE THAT?

10:54AM 14   A.   YES.

10:54AM 15   Q.   AND THEN IF YOU GO UP TO THE TOP THERE'S AN EMAIL THAT

10:54AM 16   SAYS, "WE ARE WORKING ON," AND THEN THERE'S A NUMBER, "AND WILL

10:54AM 17   LET YOU KNOW WHEN IT IS READY."

10:54AM 18        DO YOU SEE THAT?

10:54AM 19   A.   YES.

10:54AM 20   Q.   AND THEN DR. PANGARKAR SENDS YOU AN EMAIL AT THE TOP THERE

10:54AM 21   AT 9:06 P.M., UTC.

10:54AM 22        DO YOU SEE THAT?

10:54AM 23   A.   YES.

10:54AM 24   Q.   AND SO THIS LOOKS LIKE THIS IS AN EMAIL WHERE UTC TIME

10:54AM 25   SHOWS UP IN A THERANOS EMAIL?

| | | |
|---|---|---|
| 10:55AM | 1 | A.   YES. |
| 10:55AM | 2 | Q.   SO THAT CAN HAPPEN APPARENTLY? |
| 10:55AM | 3 | A.   APPARENTLY. |
| 10:55AM | 4 | Q.   AND THEN DR. PANGARKAR WRITES, "THESE PARTICULAR SAMPLES |
| 10:55AM | 5 | ARE READY TO BE RELEASED.  THE LATEST RESULTS THAT YOU CAN |
| 10:55AM | 6 | RELEASE ARE IN." |
| 10:55AM | 7 | AND IT GIVES AN S DRIVE LOCATION; RIGHT? |
| 10:55AM | 8 | A.   YES. |
| 10:55AM | 9 | Q.   AND THAT'S A SHARED DRIVE WHERE PEOPLE CAN ACCESS THAT; |
| 10:55AM | 10 | RIGHT? |
| 10:55AM | 11 | A.   YES. |
| 10:55AM | 12 | Q.   AND LET'S LOOK AT ANOTHER EXHIBIT, WHICH IS 20565, AND |
| 10:55AM | 13 | THIS IS NOT IN EVIDENCE YET SO JUST LOOK AT IT ON YOUR SCREEN. |
| 10:55AM | 14 | AND THIS IS AN EMAIL CHAIN BETWEEN YOU AND OTHERS IN THE |
| 10:55AM | 15 | THERANOS LAB; IS THAT RIGHT? |
| 10:55AM | 16 | A.   YES. |
| 10:55AM | 17 | Q.   AND IT'S ON JUNE 10TH, 2014? |
| 10:55AM | 18 | A.   YES. |
| 10:56AM | 19 | MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20565. |
| 10:56AM | 20 | MR. BOSTIC:  NO OBJECTION. |
| 10:56AM | 21 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:56AM | 22 | (DEFENDANT'S EXHIBIT 20565 WAS RECEIVED IN EVIDENCE.) |
| 10:56AM | 23 | BY MR. COOPERSMITH: |
| 10:56AM | 24 | Q.   OKAY.  LET'S START FROM THE EARLIEST EMAIL IN TIME SO WE |
| 10:56AM | 25 | CAN GET ORIENTED. |

10:56AM  1          DO YOU SEE THERE'S AN EMAIL FROM TINA LIN?

10:56AM  2          DO YOU SEE THAT?

10:56AM  3     A.   YES.

10:56AM  4     Q.   AND SHE WAS ONE OF THE CLS'S IN THE LAB?

10:56AM  5     A.   YES.  -- UH, NO.  TINA WAS A MATH MAJOR AT BERKELEY, I

10:56AM  6     THINK.

10:56AM  7     Q.   OKAY.

10:56AM  8     A.   SHE --

10:56AM  9     Q.   OKAY.  BUT SHE WORKED IN THE CLIA LAB?

10:56AM  10    A.   SHE WORKED IN NORMANDY.

10:56AM  11    Q.   OKAY.  AND WHICH IS PART OF THE CLIA LAB?

10:56AM  12    A.   YES.

10:56AM  13    Q.   OKAY.  AND MS. LYNN WRITES, "HI CLA'S,

10:56AM  14         "CTN FOR NUMBER 89751 WAS CALCULATED TO NOT HAVE ENOUGH

10:56AM  15    PLASMA."

10:56AM  16         DO YOU SEE THAT EMAIL?

10:56AM  17    A.   YES.

10:56AM  18    Q.   AND THEN THE CTN REFERS TO THE CAPILLARY TUBE AND

10:56AM  19    NANOTAINER; RIGHT?

10:56AM  20    A.   YES.

10:56AM  21    Q.   AND SO SHE'S REFERRING TO A FINGERSTICK SAMPLE?

10:57AM  22    A.   YES.

10:57AM  23    Q.   AND THEN IF YOU GO ABOVE THAT --

10:57AM  24    A.   SO THAT SAMPLE WOULD HAVE BEEN RUN OUTSIDE OF SOP.

10:57AM  25    Q.   OKAY.  SHE'S JUST TELLING YOU ABOUT A SAMPLE THAT IS ON

10:57AM 1    FINGERSTICK; RIGHT?

10:57AM 2    A.   YES.

10:57AM 3    Q.   OKAY.  AND THEN ABOVE THAT HODA ALAMDAR WROTE:

10:57AM 4         "HI ADAM,

10:57AM 5         "I BELIEVE I CAN REPORT THIS PATIENT AS GREATER THAN

10:57AM 6    4941."

10:57AM 7         DO YOU SEE THAT?

10:57AM 8    A.   YES.

10:57AM 9    Q.   AND THEN IT GOES ON TO SAY, "LOOKS LIKE THIS PATIENT CAME

10:57AM 10   BACK AGAIN TODAY AND MOST LIKELY HER RESULTS WILL STILL BE

10:57AM 11   GREATER THAN 4941 SINCE SHE MIGHT BE PREGNANT.  SHOULD WE HAVE

10:57AM 12   THE HCG QUANT SAMPLES TO BE COLLECTED VENOUS SO THAT IT THEY

10:57AM 13   CAN BE RUN ON IMMULITE FOR DILUTION."

10:57AM 14        DO YOU SEE THAT?

10:57AM 15   A.   YES.

10:57AM 16   Q.   AND THEN YOU WROTE BACK TO MS. ALAMDAR, RIGHT ABOVE THAT,

10:57AM 17   YOU WROTE, "YES, PLEASE REPORT AS GREATER THAN 4941, IF THAT IS

10:57AM 18   THE LATEST OORH VALUE."

10:57AM 19        DO YOU SEE THAT?

10:57AM 20   A.   YES.

10:57AM 21   Q.   AND SO YOU WERE DIRECTING MS. ALAMDAR TO RELEASE THE

10:58AM 22   RESULTS FOR THAT CTN SAMPLE; CORRECT?

10:58AM 23   A.   YES.

10:58AM 24   Q.   AND THIS IS FOR HCG?

10:58AM 25   A.   YES.

10:58AM   1    Q.   OKAY.  AND NOW IF YOU GO TO THE FIRST PAGE OF THE EXHIBIT,

10:58AM   2    GO TO THE VERY TOP.

10:58AM   3         DO YOU SEE MS. ALAMDAR IS TELLING YOU, "HI ADAM,

10:58AM   4         "THIS PATIENT IS BACK AND HER NEW HCG RESULT IS 3121.1."

10:58AM   5         DO YOU SEE THAT?

10:58AM   6    A.   YES.

10:58AM   7    Q.   AND SHE SAYS, "I WILL RELEASE THIS PATIENT."

10:58AM   8         RIGHT?

10:58AM   9    A.   YES.

10:58AM  10    Q.   AND SHE'S TELLING YOU THIS ON JUNE 10TH?

10:58AM  11    A.   YES.

10:58AM  12         YOU DON'T REALLY KNOW FROM THE EMAIL HOW THIS WAS RUN,

10:58AM  13    JUST AS AN ASIDE.

10:59AM  14    Q.   IT WAS FROM A CTN FINGERSTICK SAMPLE; RIGHT?

10:59AM  15    A.   FROM THE LAST EMAIL --

10:59AM  16    Q.   LET'S GO TO THE SECOND PAGE OF THE SAME EXHIBIT.

10:59AM  17         SO IN YOUR EMAIL ON JUNE 9TH, 2014, YOU SAY, "YES PLEASE

10:59AM  18    REPORT AS GREATER THAN 4941?"

10:59AM  19         DO YOU SEE THAT?

10:59AM  20    A.   YES.

10:59AM  21    Q.   AND SO THAT'S WITH REGARDS TO A FINGERSTICK SAMPLE;

10:59AM  22    CORRECT?

10:59AM  23    A.   YES.

10:59AM  24    Q.   AND THAT'S ON JUNE 9TH?

10:59AM  25    A.   YES.

10:59AM   1    Q.   AND SO THAT'S ACTUALLY A DAY BEFORE?

10:59AM   2    A.   YES.

10:59AM   3    Q.   SO, DR. ROSENDORFF, YOU WERE ASKED SOME QUESTIONS ABOUT

11:00AM   4    THE SIEMENS ADVIA.

11:00AM   5         DO YOU RECALL THAT?

11:00AM   6    A.   I WAS ASKING?

11:00AM   7    Q.   YES -- NO, I'M SORRY.  MR. BOSTIC ASKED YOU SOME QUESTIONS

11:00AM   8    ABOUT THE SIEMENS ADVIA ON REDIRECT?

11:00AM   9    A.   OH, YES.

11:00AM   10   Q.   OKAY.  AND IT'S CORRECT THAT THERE IS ALSO DILUTION, OR

11:00AM   11   THERE IS DILUTION INTERNAL TO THAT ADVIA DEVICE; CORRECT?

11:00AM   12   A.   I JUST DON'T RECALL HONESTLY.  I MEAN, I CAN'T STATE AS A

11:00AM   13   MATTER OF FACT TODAY, YEAH.

11:00AM   14   Q.   OKAY.  LET'S LOOK AT ONE OF THE PRIOR TESTIMONIES FROM

11:00AM   15   YOU, DR. ROSENDORFF.

11:00AM   16        SO IF YOU COULD LOOK AT EXHIBIT 28053.  AND IT SHOULD BE

11:01AM   17   IN THAT PRIOR TESTIMONY BINDER.

11:01AM   18   A.   I HAVE IT.

11:01AM   19   Q.   IF YOU COULD TURN IN YOUR PRIOR -- IN THAT EXHIBIT 28053

11:01AM   20   TO PAGE 240.

11:02AM   21   A.   YES, YES.

11:02AM   22   Q.   AND IN PARTICULAR, AT LINE 12.

11:02AM   23        DO YOU SEE IT THERE?  LINE 12 THROUGH 14?

11:02AM   24   A.   YES.

11:02AM   25   Q.   AND DOES THAT REFRESH YOUR MEMORY THAT YOU'VE PREVIOUSLY

11:02AM   1    TESTIFIED THAT THERE IS DILUTION INTERNAL TO THE ADVIA DEVICE?

11:02AM   2    A.   YES, THAT DOES REFRESH MY MEMORY.

11:02AM   3    Q.   OKAY.  AND THAT'S WHAT YOU SAID; RIGHT?

11:02AM   4    A.   YES.

11:02AM   5    Q.   OKAY.  AND IN ADDITION -- WELL, I THINK THAT'S SUFFICIENT.

11:02AM   6    A.   SO THIS MEANS DILUTION WOULD HAVE HAPPENED TWICE WITH THE

11:02AM   7    MODIFIED METHODS, ONCE OUTSIDE OF THE INSTRUMENT AND ONCE

11:02AM   8    INSIDE OF THE INSTRUMENT.

11:02AM   9    Q.   OKAY.  YOU WEREN'T HEAVILY INVOLVED IN THE MODIFICATION OF

11:02AM   10   THE ADVIA MACHINES TO RUN SMALL SAMPLES, WERE YOU?

11:02AM   11   A.   NO, I WAS NOT.

11:02AM   12   Q.   SO YOU DON'T REALLY KNOW WHAT DILUTION PROTOCOLS WERE

11:02AM   13   CHANGED INTERNALLY TO COMPENSATE FOR THE OUTSIDE DILUTION, DO

11:02AM   14   YOU?

11:02AM   15   A.   ARE YOU SAYING THAT I WASN'T FAMILIAR WITH HOW THE ASSAY

11:02AM   16   WAS RUN?

11:02AM   17   Q.   WELL, I'M HOPING YOU WERE, DR. ROSENDORFF.

11:03AM   18        BUT MY QUESTION TO YOU IS, ARE YOU -- YOU'RE AWARE, AREN'T

11:03AM   19   YOU, THAT WHEN THE MACHINES WERE MODIFIED, THERE WAS A

11:03AM   20   MODIFICATION OF THE DILUTION PROTOCOL INTERNAL TO THE ADVIA'S?

11:03AM   21   A.   NO, I DON'T BELIEVE SO, NO, NOT AT ALL.

11:03AM   22   Q.   YOU DON'T THINK THAT'S TRUE?

11:03AM   23   A.   NO.  THAT'S WRONG.

11:03AM   24   Q.   ALL RIGHT.

11:03AM   25   A.   THE DILUTIONS HAPPENED BEFORE THE SAMPLES GOT LOADED ON TO

11:03AM  1    THE INSTRUMENT, THE TECANS WOULD BE USED TO -- WOULD USE SALINE

11:03AM  2    OR WATER TO DO THE DILUTIONS.

11:03AM  3         I WAS NOT AWARE OF ANY MODIFICATION TO THE INTERNAL

11:03AM  4    DILUTION PROCEDURE.

11:03AM  5    Q.   YOU'RE NOT AWARE?

11:03AM  6    A.   NO.

11:03AM  7    Q.   OKAY.  DR. ROSENDORFF, DO YOU REMEMBER MR. BOSTIC ASKED

11:03AM  8    YOU SOME QUESTIONS DURING REDIRECT ABOUT THE LABORATORY

11:03AM  9    INFORMATION SYSTEM?

11:03AM  10   A.   YES.

11:03AM  11   Q.   AND HE ASKED YOU ABOUT WHETHER THE LIS AT THERANOS WOULD

11:04AM  12   HAVE PATIENT RESULTS THAT THERANOS DIDN'T CONDUCT AT ALL?

11:04AM  13   A.   YES.

11:04AM  14   Q.   AND, OF COURSE, IT WOULDN'T; RIGHT?

11:04AM  15   A.   IT WOULD NOT.

11:04AM  16   Q.   OKAY.  BUT WHEN YOU WERE LOOKING INTO A QUESTION, YOU

11:04AM  17   WOULD USE THE LIS AS ONE OF THE TOOLS TO DO YOUR INVESTIGATION;

11:04AM  18   RIGHT?

11:04AM  19   A.   YES.

11:04AM  20   Q.   AND YOU COULD ACCESS THAT?

11:04AM  21   A.   RIGHT.

11:04AM  22   Q.   AND THAT YOU WOULD ALSO LOOK AT TIMES AT PATIENT TRENDS;

11:04AM  23   RIGHT?

11:04AM  24   A.   YES.

11:04AM  25   Q.   AND SO, FOR EXAMPLE, IF THERE WAS A PATIENT ON A

ROSENDORFF RECROSS BY MR. COOPERSMITH                      3778

11:04AM   1        PARTICULAR DAY WHERE THERE WAS AN INQUIRY AND YOU WANTED TO

11:04AM   2        KNOW ALL OF THE OTHER PATIENTS WHO HAD THAT SAME ASSAY RUN,

11:04AM   3        COULD YOU LOOK AT LIS AND LEARN THAT INFORMATION; RIGHT?

11:04AM   4        A.   YES, I COULD.

11:04AM   5        Q.   OKAY.  AND SO YOU COULD COMBINE THE INFORMATION FROM LIS

11:04AM   6        WITH OTHER INFORMATION ABOUT HOW THE PATIENT PRESENTED AND SO

11:04AM   7        FORTH TO COME UP WITH SOME CONCLUSIONS ABOUT WHAT HAD OCCURRED;

11:04AM   8        RIGHT?

11:04AM   9        A.   YES.

11:04AM  10        Q.   AND WITH REGARD TO QUALITY CONTROL, DO YOU REMEMBER THAT

11:05AM  11        MR. BOSTIC ASKED YOU SOME QUESTIONS ABOUT A PRESENTATION THAT

11:05AM  12        MR. GEE PRESENTED ON QUALITY CONTROL?

11:05AM  13        A.   ON REDIRECT, YES, YES.

11:05AM  14        Q.   RIGHT.  AND ALSO WHEN I --

11:05AM  15        A.   THAT WAS THE SECOND TIME I HAD SEEN IT TODAY.

11:05AM  16        Q.   RIGHT.

11:05AM  17        A.   I MEAN IN THIS TRIAL, YEAH.

11:05AM  18        Q.   OKAY.  AND THERE WAS A NUMBER THAT MR. BOSTIC FOCUSSED YOU

11:05AM  19        ON, AS I DID, WHICH WAS THE 2.9 PERCENT CONTROL FAILURE RATE.

11:05AM  20             DO YOU REMEMBER THAT?

11:05AM  21        A.   YES.

11:05AM  22        Q.   OKAY.  AND THEN MR. BOSTIC ASKED YOU SOME QUESTIONS ABOUT

11:05AM  23        HOW THAT SEEMED DIFFERENT THAN ANOTHER EXHIBIT WHICH SHOWED

11:05AM  24        SOME QC FAILURE RESULTS FROM MARCH OF 2014?

11:05AM  25        A.   I CAN FULLY EXPLAIN THAT.

11:05AM  1    Q.   WELL, LET'S -- LET ME JUST ASK THE QUESTIONS.  OKAY?

11:05AM  2    A.   UH-HUH.

11:05AM  3    Q.   AND THE SAME PERSON COMPILED THOSE TWO DIFFERENT

11:05AM  4    DOCUMENTS; RIGHT?

11:05AM  5    A.   YES.

11:05AM  6    Q.   AND THAT'S MR. GEE?

11:05AM  7    A.   YES.

11:05AM  8    Q.   AND, IN FACT, AS YOU SAID THE OTHER DAY WHEN I WAS

11:06AM  9    QUESTIONING YOU, THE QC DATA WAS ONE OF THE THINGS IN LIS;

11:06AM  10   CORRECT?

11:06AM  11   A.   YES.

11:06AM  12   Q.   OKAY.  SO IF WE WANTED TO KNOW EVERYTHING ABOUT QC DURING

11:06AM  13   ANY TIME PERIOD, WE COULD GO TO LIS AND LOOK AT THAT; RIGHT?

11:06AM  14   A.   YES.

11:06AM  15   Q.   IF WE HAD THE ABILITY TO DO THAT?

11:06AM  16   A.   YES.

11:06AM  17   Q.   OKAY.  AND, DR. ROSENDORFF, SWITCHING TO ANOTHER

11:06AM  18   SUBJECT --

11:06AM  19   A.   DO YOU WANT ME TO EXPLAIN OR NOT?

11:06AM  20   Q.   WELL, I'M GOING TO ASK YOU THE QUESTIONS, AND THAT'S ALL

11:06AM  21   I'VE GOT ON THAT.  OKAY?

11:06AM  22        SO I'M GOING TO GO TO THE NEXT TOPIC.

11:06AM  23        LET'S LOOK AT -- LET'S TALK ABOUT THE INSPECTION BY THE

11:06AM  24   CDPH INSPECTOR.

11:06AM  25   A.   OKAY.

11:06AM  1    Q.   AND THAT WAS IN DECEMBER OF 2013?

11:06AM  2    A.   YES.

11:06AM  3    Q.   AND THE -- ON REDIRECT MR. BOSTIC ASKED YOU SOME QUESTIONS

11:06AM  4    ABOUT THAT INSPECTION.

11:06AM  5         DO YOU REMEMBER THAT?

11:06AM  6    A.   YES.

11:06AM  7    Q.   OKAY.  AND YOU TALKED ABOUT SOME PARTITIONS OR DIVIDERS IN

11:07AM  8    THE NORMANDY LAB?

11:07AM  9    A.   YES.

11:07AM  10   Q.   BUT YOU ACTUALLY, AS WE DISCUSSED THE OTHER DAY, YOU

11:07AM  11   ACTUALLY SHOWED THE INSPECTOR VALIDATION REPORTS FOR THE EDISON

11:07AM  12   DEVICE?

11:07AM  13   A.   YES, WE DID.

11:07AM  14   Q.   AND FOR THE MODIFIED PREDICATES?

11:07AM  15   A.   YES.

11:07AM  16   Q.   AND IF THE INSPECTOR HAD ASKED YOU TO SEE ANY PART OF THE

11:07AM  17   CLINICAL LAB, YOU WOULD HAVE SHOWED IT TO HER; RIGHT?

11:07AM  18   A.   YES.

11:07AM  19   Q.   YOU WOULDN'T HAVE REFUSED TO DO THAT; RIGHT?

11:07AM  20   A.   NO.

11:07AM  21   Q.   AND IT TURNS OUT SHE DIDN'T ASK THAT?

11:07AM  22   A.   SHE DID NOT.

11:07AM  23   Q.   SO SHE SAW VALIDATION REPORTS?

11:07AM  24   A.   YES.

11:07AM  25   Q.   AND SHE KNEW THERE WERE EDISONS -- BASED ON THAT

ROSENDORFF RECROSS BY MR. COOPERSMITH                              3781

11:07AM   1    INFORMATION, YOU UNDERSTOOD THAT SHE KNEW THAT THERE WERE THOSE

11:07AM   2    DEVICES BEING RUN IN THE LAB; RIGHT?

11:07AM   3    A.   YES.

11:07AM   4    Q.   AND SHE DIDN'T ACTUALLY ASK TO SEE THE PHYSICAL DEVICE;

11:07AM   5    RIGHT?

11:07AM   6    A.   NO, SHE DID NOT.

11:07AM   7    Q.   OKAY.  I WANT TO SHOW YOU ANOTHER EXHIBIT, WHICH IS 20306,

11:07AM   8    AND YOU CAN LOOK AT THAT ON YOUR SCREEN.

11:08AM   9         OKAY.  DO YOU SEE AT THE BOTTOM THIS IS AN EMAIL STRING

11:08AM  10    FROM THERANOS AROUND OR ON DECEMBER 1ST, 2013?

11:08AM  11    A.   YES.

11:08AM  12    Q.   OKAY.  AND THIS IS RIGHT BEFORE THAT INSPECTION THAT WE

11:08AM  13    JUST DISCUSSED?

11:08AM  14    A.   YES.

11:08AM  15    Q.   AND THEN DO YOU SEE THERE'S AN EMAIL FROM SCOTT MARMER TO

11:08AM  16    YOU AND OTHERS?

11:08AM  17    A.   YES.

11:08AM  18    Q.   INCLUDING EDGAR PAZ?

11:08AM  19    A.   YES.

11:08AM  20    Q.   AND THEN ALSO THE ENTIRE CLIA LAB?

11:08AM  21    A.   YES.

11:08AM  22         MR. COOPERSMITH:  OKAY.  YOUR HONOR, WE OFFER 20306.

11:08AM  23         MR. BOSTIC:  NO OBJECTION.

11:08AM  24         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:08AM  25         (DEFENDANT'S EXHIBIT 20306 WAS RECEIVED IN EVIDENCE.)

| | | |
|---|---|---|
| 11:08AM | 1 | BY MR. COOPERSMITH: |
| 11:08AM | 2 | Q.   OKAY.  SO LET'S GO TO THE EARLIEST EMAIL IN TIME. |
| 11:08AM | 3 | AND YOU WROTE ON DECEMBER 1ST, 2013, "PLEASE GRANT |
| 11:09AM | 4 | PERMISSION FOR CLIA INSPECTORS TO VISIT US ON DECEMBER 3RD AT |
| 11:09AM | 5 | 10:30 A.M.  THEY WILL BE DOING DOCUMENT REVIEW IN CONFERENCE |
| 11:09AM | 6 | ROOM 1776, AND WALK THROUGH THE UPSTAIRS CLIA LAB AS WELL AS |
| 11:09AM | 7 | NORMANDY CLIA LAB." |
| 11:09AM | 8 | DO YOU SEE THAT? |
| 11:09AM | 9 | A.   YES. |
| 11:09AM | 10 | Q.   AND "THE VISIT SHOULD LAST ABOUT 4 HOURS." |
| 11:09AM | 11 | A.   YES. |
| 11:09AM | 12 | Q.   AND YOU'RE GIVING INSTRUCTIONS TO VARIOUS THERANOS STAFF |
| 11:09AM | 13 | PEOPLE THAT THAT IS GOING TO OCCUR; RIGHT? |
| 11:09AM | 14 | A.   YES. |
| 11:09AM | 15 | Q.   AND ABOVE THAT DO YOU SEE THERE'S AN EMAIL FROM EDGAR PAZ, |
| 11:09AM | 16 | AND HE SAYS, "HELLO SUNNY, |
| 11:09AM | 17 | "PLEASE READ EMAIL BELOW AND LET ME KNOW HOW YOU WOULD |
| 11:09AM | 18 | LIKE US TO PROCEED WITH THE CLIA INSPECTOR VISIT." |
| 11:09AM | 19 | DO YOU SEE THAT? |
| 11:09AM | 20 | A.   YES. |
| 11:09AM | 21 | Q.   AND THEN ABOVE THAT MR. BALWANI WRITES, "APPROVED." |
| 11:09AM | 22 | "SCOTT CAN APPROVE SUCH VISITS." |
| 11:09AM | 23 | DO YOU SEE THAT? |
| 11:09AM | 24 | A.   YES. |
| 11:09AM | 25 | Q.   AND THEN GOING ABOVE THAT, DO YOU SEE THERE'S A |

| | | |
|---|---|---|
| 11:09AM | 1 | DECEMBER 1ST, 2013, EMAIL FROM MR. PAZ? |
| 11:10AM | 2 | A.   YES. |
| 11:10AM | 3 | Q.   AND HE WRITES, "CORRECT, WOULD YOU LIKE FOR US TO PROVIDE |
| 11:10AM | 4 | SECURITY ESCORT DURING THE VISIT INTO BOTH CLIA AREAS?" |
| 11:10AM | 5 | RIGHT? |
| 11:10AM | 6 | A.   YES, I SEE THAT. |
| 11:10AM | 7 | Q.   THAT'S NORMANDY AND THEN THE UPSTAIRS LAB AS WELL? |
| 11:10AM | 8 | A.   YES. |
| 11:10AM | 9 | Q.   AND THEN YOU SEE ABOVE THAT MR. BALWANI WROTE BACK TO |
| 11:10AM | 10 | MR. PAZ AND SAID "NO"? |
| 11:10AM | 11 | DO YOU SEE THAT? |
| 11:10AM | 12 | A.   I DON'T REALLY KNOW WHAT HE MEANS. |
| 11:10AM | 13 | Q.   YOU JUST SEE THAT MR. BALWANI RESPONDED "NO" TO MR. PAZ'S |
| 11:10AM | 14 | QUESTION; RIGHT? |
| 11:10AM | 15 | A.   YES. |
| 11:10AM | 16 | Q.   AND THE QUESTION WAS, "WOULD YOU LIKE FOR US TO PROVIDE |
| 11:10AM | 17 | SECURITY ESCORT DURING THE VISIT INTO BOTH CLIA AREAS?" |
| 11:10AM | 18 | DO YOU SEE THAT? |
| 11:10AM | 19 | A.   YES, I SEE THE WORD AND -- I SEE THE WORD "NO," YES. |
| 11:10AM | 20 | Q.   OKAY.  DR. ROSENDORFF, ARE YOU SAYING IN YOUR TESTIMONY |
| 11:11AM | 21 | TODAY THAT YOU RELEASED RESULTS TO PATIENTS WHILE YOU WERE A |
| 11:11AM | 22 | LAB DIRECTOR AT THERANOS THAT YOU DID NOT THINK WERE ACCURATE? |
| 11:11AM | 23 | A.   I'M A LITTLE CONFUSED BY THE DOUBLE NEGATIVE THERE. |
| 11:11AM | 24 | Q.   OKAY.  LET ME SEE IF I CAN HELP YOU. |
| 11:11AM | 25 | A.   YEAH. |

11:11AM 1     Q.   OKAY.  IS IT YOUR TESTIMONY UNDER OATH, DR. ROSENDORFF,

11:11AM 2     THAT WHILE YOU WERE AT THERANOS, THAT YOU RELEASED OR ALLOWED

11:11AM 3     THE RELEASE OF RESULTS TO PATIENTS THAT YOU DID NOT THINK WERE

11:11AM 4     ACCURATE?

11:11AM 5     A.   I NEVER RELEASED RESULTS THAT I THOUGHT WERE INACCURATE,

11:11AM 6     NO.

11:11AM 7     Q.   YOU NEVER DID THAT?

11:11AM 8     A.   NO.

11:12AM 9     Q.   BECAUSE YOU WOULDN'T DO THAT?

11:12AM 10    A.   NO, I WOULD NOT.

11:12AM 11         MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

11:12AM 12         THE COURT:  MR. BOSTIC?

11:12AM 13         MR. BOSTIC:  VERY BRIEFLY, YOUR HONOR.

11:12AM 14                **FURTHER REDIRECT EXAMINATION**

11:12AM 15    BY MR. BOSTIC:

11:12AM 16    Q.   DR. ROSENDORFF, DURING YOUR CONVERSATION WITH

11:12AM 17    MR. COOPERSMITH JUST NOW, YOU OFFERED TO PROVIDE AN EXPLANATION

11:12AM 18    AS TO THE DIFFERENCES BETWEEN THE QC FAILURE NUMBERS WE SAW IN

11:12AM 19    THE SLIDE PRESENTATION VERSUS THAT EMAIL IN MARCH 2014.

11:12AM 20         DO YOU RECALL THAT?

11:12AM 21    A.   YES, I DO.

11:12AM 22    Q.   I WOULD LIKE TO HEAR THAT EXPLANATION.  CAN YOU EXPLAIN?

11:12AM 23    A.   OH, SURE.

11:12AM 24         SO MR. GEE'S QC FAILURE RATE FOR Q1 ON THE THERANOS

11:13AM 25    METHODS INCLUDES BOTH EDISON AND MODIFIED SIEMENS.

11:13AM  1        THE EMAIL WE WERE REVIEWING PREVIOUSLY WITH THE 26 OR

11:13AM  2   20 PERCENT FAILURE RATE, THAT'S EDISONS ONLY.

11:13AM  3        HOWEVER, THERANOS WAS RUNNING NEAT QC, BIORAD QC ON THE

11:13AM  4   SIEMENS INSTRUMENT AND USING THAT QC FOR THE MODIFIED SIEMENS

11:13AM  5   TEST.

11:13AM  6        SO BECAUSE THERE WERE SO MANY MORE OF THOSE QC SAMPLES RUN

11:13AM  7   THAN THE EDISON QC SAMPLES, THAT THAT WOULD ARTIFICIALLY PAINT

11:13AM  8   A ROSY PICTURE OF HOW THE QC WAS ACTUALLY -- DOES THAT MAKE

11:13AM  9   SENSE TO YOU?

11:13AM 10   Q.   I THINK SO.

11:13AM 11        LET ME ASK, IN YOUR EXPERIENCE WITH THE EDISONS AND THE

11:13AM 12   MODIFIED THIRD PARTY DEVICES, WHICH PERFORMED BETTER ON QC?

11:13AM 13             MR. COOPERSMITH:  OBJECTION.  BEST EVIDENCE.

11:13AM 14             THE COURT:  THIS CALLS FOR HIS OBSERVATIONS, HIS

11:14AM 15   PERSONAL OBSERVATIONS?

11:14AM 16             MR. BOSTIC:  EXACTLY, YOUR HONOR.

11:14AM 17             THE COURT:  YOU CAN ANSWER THE QUESTION.

11:14AM 18             THE WITNESS:  AS I SAID, THE QC FOR THE MODIFIED

11:14AM 19   SIEMENS WAS NO DIFFERENT FROM THE QC FOR THE UNMODIFIED

11:14AM 20   SIEMENS.

11:14AM 21        THERE WAS NO DILUTION OF THOSE SAMPLES.  THERE SHOULD HAVE

11:14AM 22   BEEN BECAUSE PATIENT SAMPLES WERE BEING DILUTED, TOO.

11:14AM 23   BY MR. BOSTIC:

11:14AM 24   Q.   I SEE.  ARE YOU SAYING THERE WAS A DIFFERENCE BETWEEN HOW

11:14AM 25   QC WAS RUN ON THE MODIFIED INSTRUMENTS VERSUS HOW PATIENT

11:14AM  1    SAMPLES WERE RUN ON THE MODIFIED INSTRUMENTS?

11:14AM  2    A.   YES, YES, YES.

11:14AM  3              MR. COOPERSMITH:  OBJECTION.  MOVE TO STRIKE.

11:14AM  4              THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

11:14AM  5    BY MR. BOSTIC:

11:14AM  6    Q.   AND FINALLY, DR. ROSENDORFF, WE'VE DISCUSSED A COUPLE OF

11:14AM  7    TIMES YOUR DECISION IN LATE MAY TO DISCONTINUE HCG TESTING ON

11:14AM  8    THE EDISON.

11:14AM  9         DO YOU REMEMBER THAT?

11:14AM  10   A.   YES.

11:14AM  11   Q.   MR. COOPERSMITH JUST SHOWED YOU SOME EMAILS INDICATING

11:14AM  12   THAT HCG TESTING WAS STILL CONTINUING ON THE EDISON EVEN IN

11:15AM  13   JUNE OF 2014.

11:15AM  14        DID YOU SEE THAT?

11:15AM  15   A.   YES.

11:15AM  16   Q.   MY QUESTION FOR YOU IS, DID YOU DECIDE TO RESUME OR

11:15AM  17   CONTINUE HCG TESTING ON THE EDISON AS LAB DIRECTOR AT THERANOS?

11:15AM  18   A.   NO, I DID NOT.

11:15AM  19   Q.   NO FURTHER QUESTIONS.  THANK YOU.

11:15AM  20              MR. COOPERSMITH:  JUST BRIEFLY, YOUR HONOR.  THANK

11:15AM  21   YOU.

11:15AM  22                  **FURTHER RECROSS-EXAMINATION**

11:15AM  23   BY MR. COOPERSMITH:

11:15AM  24   Q.   SO JUST NOW MR. BOSTIC ASKED YOU SOME QUESTIONS ABOUT THE

11:15AM  25   QC DATA THAT MR. GEE PRESENTED.

11:15AM 1      A.   YES.

11:15AM 2      Q.   AND YOU OFFERED AN EXPLANATION; RIGHT?

11:15AM 3      A.   YES.

11:15AM 4      Q.   OKAY.  ARE YOU SAYING THAT YOU KNEW ABOUT THIS ISSUE AT

11:15AM 5      THE TIME IN THE MIDDLE OF 2014?

11:15AM 6      A.   WHICH ISSUE ARE YOU REFERRING TO?

11:15AM 7      Q.   WELL, YOU JUST DESCRIBED AN ISSUE ABOUT NEAT SAMPLES BEING

11:15AM 8      RUN ON THE QC FOR THE MODIFIED PREDICATES; RIGHT?

11:15AM 9      A.   YES.

11:15AM 10     Q.   AND YOU'RE NOW SAYING TODAY THAT YOU THINK THAT THAT WAS

11:16AM 11     NOT APPROPRIATE?

11:16AM 12     A.   YES.

11:16AM 13     Q.   AND ARE YOU SAYING THAT YOU KNEW THAT AT THE TIME,

11:16AM 14     DR. ROSENDORFF?

11:16AM 15     A.   I DON'T RECALL.

11:16AM 16     Q.   BUT YOU COULD HAVE TOLD MR. GEE, IF YOU WANTED TO, DO SOME

11:16AM 17     DIFFERENT METHOD OF QC IF YOU WANTED TO; RIGHT?

11:16AM 18     A.   HE WASN'T THE ONE RUNNING THE QC, SIR.  HE WAS JUST

11:16AM 19     REPORTING IT.

11:16AM 20     Q.   WELL, I THINK WE SAW LAST WEEK THAT YOU WERE THE ONE WHO

11:16AM 21     CIRCULATED THE QC PROTOCOL; RIGHT?

11:16AM 22     A.   THERE WERE A NUMBER OF QC PROTOCOLS SHOWN.

11:16AM 23     Q.   AND WE LOOKED AT ONE THAT YOU CIRCULATED?

11:16AM 24     A.   I THINK SO.

11:16AM 25     Q.   SETTING THE QC POLICY FOR THERANOS?

11:16AM  1    A.   I BELIEVE SO.

11:16AM  2    Q.   AND IF YOU WANTED TO CHANGE THAT PROTOCOL, YOU COULD HAVE

11:16AM  3    SENT ANOTHER QC POLICY THAT CHANGED WHATEVER YOU WANTED TO

11:16AM  4    CHANGE; CORRECT?

11:16AM  5    A.   WELL, THE QC POLICY NEVER SPELLED OUT, HEY, DILUTE THE QC

11:16AM  6    SAMPLES THE SAME WAY YOU'RE DILUTING THE PATIENT SAMPLES.

11:16AM  7    Q.   IF YOU WANTED TO INSTRUCT THE LAB TO DO A DIFFERENT

11:16AM  8    DILUTION PROTOCOL, YOU COULD HAVE DONE THAT; RIGHT?

11:17AM  9    A.   YES.

11:17AM 10         MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

11:17AM 11         MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

11:17AM 12         THE COURT:  MAY THIS WITNESS BE EXCUSED?

11:17AM 13         MR. COOPERSMITH:  YES, YOUR HONOR.

11:17AM 14         MR. BOSTIC:  NO, YOUR HONOR.

11:17AM 15         THE COURT:  YOU'RE EXCUSED, SIR.  YOU MAY LEAVE

11:17AM 16    THOSE BINDERS THERE.

11:17AM 17         THE WITNESS:  OKAY.

11:17AM 18         THE COURT:  WHY DON'T WE TAKE OUR MORNING BREAK NOW,

11:17AM 19    LADIES AND GENTLEMEN.  LET'S TAKE OUR MORNING BREAK.  LET'S

11:17AM 20    TAKE 30 MINUTES, PLEASE.

11:17AM 21         AND LET ME TELL YOU, IT MAY BE -- I HAVE SOME QUESTIONS

11:17AM 22    FOR THE LAWYERS ABOUT SOME ADDITIONAL EVIDENCE, SO IT MIGHT BE

11:17AM 23    A LITTLE LONGER.  I'M JUST TELLING YOU THAT.

11:17AM 24         ALSO, MY SENSE IS THAT WE'RE GOING TO BREAK TODAY NO LATER

11:17AM 25    THAN 2:45, COUNSEL, 2:45 THIS AFTERNOON.

| | | |
|---|---|---|
| 11:17AM | 1 | SO ENJOY YOUR BREAK. |
| 11:17AM | 2 | (JURY OUT AT 11:17 A.M.) |
| 11:18AM | 3 | THE COURT:  ALL RIGHT.  PLEASE BE SEATED.  THANK |
| 11:18AM | 4 | YOU. |
| 11:18AM | 5 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR A |
| 11:18AM | 6 | MORNING BREAK.  ALL COUNSEL ARE PRESENT. |
| 11:18AM | 7 | THE GOVERNMENT HAS ANOTHER WITNESS TO CALL THEN? |
| 11:18AM | 8 | MR. LEACH:  YES, YOUR HONOR. |
| 11:18AM | 9 | THE COURT:  AND IT'S MS. PETERSON? |
| 11:18AM | 10 | MR. LEACH:  IT IS, YOUR HONOR. |
| 11:18AM | 11 | THE COURT:  THANK YOU.  SHOULD WE DISCUSS ISSUES |
| 11:18AM | 12 | REGARDING HER TESTIMONY NOW? |
| 11:18AM | 13 | MR. LEACH:  SURE. |
| 11:18AM | 14 | MR. COOPERSMITH:  THAT WOULD BE HELPFUL, YOUR HONOR. |
| 11:18AM | 15 | THE COURT:  SURE.  OKAY.  SO THE GOVERNMENT WILL |
| 11:19AM | 16 | CALL MS. PETERSON NEXT. |
| 11:19AM | 17 | MR. LEACH:  YES, YOUR HONOR. |
| 11:19AM | 18 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:19AM | 19 | AND DO YOU HAVE SOME DISCUSSION POINTS? |
| 11:19AM | 20 | MR. COOPERSMITH:  YES, YOUR HONOR, THANK YOU. |
| 11:19AM | 21 | JUST THREE THINGS. |
| 11:19AM | 22 | THE FIRST ISSUE IS THAT WE RECEIVED AN FBI 302 LAST NIGHT |
| 11:19AM | 23 | FROM MR. LEACH OF A VERY RECENT INTERVIEW WITH MS. PETERSON, |
| 11:19AM | 24 | AND THERE'S INFORMATION IN THERE ABOUT HOW MS. PETERSON SAID |
| 11:19AM | 25 | SHE WAS UNAWARE OF THE ROMANTIC RELATIONSHIP BETWEEN |

11:19AM 1    MR. BALWANI AND MS. HOLMES.

11:19AM 2         AND I CONFERRED WITH MR. LEACH EARLIER THIS MORNING AND I

11:19AM 3    HAVE BEEN INFORMED THAT THE GOVERNMENT DOES, IF ALLOWED, INTEND

11:19AM 4    TO INQUIRE INTO THAT ISSUE, WHETHER MS. PETERSON WAS AWARE OF

11:19AM 5    THE RELATIONSHIP, AND PRESUMABLY SHE WOULD SAY NO.

11:19AM 6         AND THEN PERHAPS MR. LEACH WOULD INQUIRE INTO THE REASONS

11:20AM 7    WHY SHE MIGHT OR MIGHT NOT CONSIDER THAT IMPORTANT.

11:20AM 8         WE DON'T THINK THAT'S A PROPER SUBJECT.

11:20AM 9         I BELIEVE THAT THIS WAS A SUBJECT THAT WAS DESCRIBED, YOU

11:20AM 10   KNOW, IT SEEMS LIKE YEARS AGO NOW, BUT IT'S MAYBE ABOUT TWO

11:20AM 11   YEARS AGO IN THE GOVERNMENT'S 404(B) NOTICES IN 2020, THAT THIS

11:20AM 12   MIGHT BE AN AREA.  OBVIOUSLY THIS IS NOT SOMETHING CHARGED IN

11:20AM 13   THE INDICTMENT, YOU KNOW, HIDING A RELATIONSHIP.

11:20AM 14        WE JUST DON'T THINK THIS IS A PROPER SUBJECT.  WE THINK

11:20AM 15   IT'S NOT RELEVANT UNDER 401.

11:20AM 16        AND WE ALSO THINK IT'S MORE PREJUDICIAL THAN PROBATIVE

11:20AM 17   UNDER 403 BECAUSE MS. PETERSON IS REALLY HERE TO TALK ABOUT

11:20AM 18   WHAT SHE LEARNED ABOUT THE COMPANY AND, IN HER VIEW, WHY RDV,

11:20AM 19   THE DEVOS FAMILY COMPANY, INVESTED IN THERANOS.

11:20AM 20        AND AS TO WHETHER SHE WAS AWARE OF A RELATIONSHIP OR NOT

11:20AM 21   SHOULDN'T REALLY HAVE ANY BEARING ON THIS.

11:20AM 22        AND, FRANKLY, YOUR HONOR, THE FACT THAT MR. BALWANI AND

11:20AM 23   MS. HOLMES TRIED TO KEEP THINGS PROFESSIONAL, YOU KNOW, AT THE

11:21AM 24   OFFICE AND WEREN'T ENGAGING IN PUBLIC DISPLAYS OF AFFECTION IN

11:21AM 25   FRONT OF MS. PETERSON OR TELLING HER VERBALLY THAT, I DON'T

11:21AM 1    THINK THAT REALLY BEARS ON THE CHARGES IN THIS CASE.

11:21AM 2         IN A NUTSHELL, WE DON'T THINK THAT SHOULD BE ALLOWED.

11:21AM 3              THE COURT:  THANK YOU.

11:21AM 4         SO IT'S THE QUESTIONS REGARDING WHETHER OR NOT

11:21AM 5    MS. PETERSON HAD KNOWLEDGE OF A RELATIONSHIP BETWEEN

11:21AM 6    MR. BALWANI AND MS. HOLMES?

11:21AM 7              MR. COOPERSMITH:  BASED ON DISCOVERY, I BELIEVE HER

11:21AM 8    ANSWER TO THAT WOULD BE NO, SHE DID NOT.  RIGHT?

11:21AM 9         AND THEN PRESUMABLY, I DON'T WANT TO PUT QUESTIONS IN

11:21AM 10   MR. LEACH'S MOUTH, BUT MY UNDERSTANDING FROM THE 302 AND A

11:21AM 11   LITTLE BIT FROM CONFERING WITH HIM IS THAT THERE WOULD BE

11:21AM 12   QUESTIONS ABOUT, YOU KNOW, WHETHER THAT MATTERED TO HER AND WHY

11:21AM 13   IT WAS IMPORTANT AND WOULD SHE HAVE WANTED TO KNOW THAT?

11:21AM 14             THE COURT:  FOR INVESTMENT PURPOSES?

11:21AM 15             MR. COOPERSMITH:  RIGHT.

11:21AM 16             THE COURT:  WOULD IT HAVE MADE A DIFFERENCE IF SHE

11:21AM 17   HAD KNOWN THAT FOR INVESTMENT PURPOSES?

11:21AM 18             MR. COOPERSMITH:  RIGHT, TO HER VIEW OF THE

11:21AM 19   INVESTMENT OR SOMETHING LIKE THAT.

11:21AM 20             THE COURT:  I SEE.

11:21AM 21             MR. COOPERSMITH:  MR. LEACH CAN OBVIOUSLY ARTICULATE

11:21AM 22   BETTER WHAT HE'S GOING AFTER BETTER THAN ME, BUT I THINK FROM

11:22AM 23   OUR STANDPOINT THIS SHOULD NOT BE A SUBJECT OF QUESTIONING.

11:22AM 24             THE COURT:  ALL RIGHT.

11:22AM 25        MR. LEACH.

3792

11:22AM  1          MR. LEACH:  YOUR HONOR, THIS IS RELEVANT AND IT'S

11:22AM  2     INEXTRICABLY INTERTWINED WITH THE ALLEGATIONS OF THE

11:22AM  3     INDICTMENT.

11:22AM  4          THE FACT IS THAT MS. HOLMES AND MR. BALWANI CONCEALED

11:22AM  5     THEIR ROMANTIC RELATIONSHIP FROM INVENTORS.  MS. PETERSON IS

11:22AM  6     NOT THE ONLY ONE WHO WILL SAY THIS.  I ANTICIPATE VIRTUALLY ALL

11:22AM  7     OF THE OTHER INVESTORS WILL SAY THEY WERE UNAWARE OF A ROMANTIC

11:22AM  8     RELATIONSHIP BETWEEN THE CHIEF EXECUTIVE OFFICER AND THE CHIEF

11:22AM  9     OPERATING OFFICER OF THIS SMALL COMPANY WHO EXERCISED VIRTUALLY

11:22AM 10     TOTAL CONTROL OVER THE COMPANY.

11:22AM 11          MS. PETERSON WAS UNAWARE OF THAT.

11:22AM 12          WE'VE ASKED HER, WOULD THAT HAVE BEEN RELEVANT TO YOUR

11:22AM 13     INVESTMENT DECISION, TO THE DECISION TO PART WITH MONEY OR

11:22AM 14     PROPERTY?

11:22AM 15          I ANTICIPATE HER ANSWER WILL BE YES, AND THAT ANSWER MAKES

11:22AM 16     SENSE BECAUSE WHEN YOU'RE INVESTING IN A SMALL COMPANY, YOU

11:23AM 17     WOULD THINK THAT THE CEO WOULD HIRE NOT SIMPLY SOMEBODY WHO SHE

11:23AM 18     WAS ROMANTICALLY INVOLVED WITH, BUT SOMEBODY WHO WAS THE BEST

11:23AM 19     PERSON FOR THE JOB.

11:23AM 20          I ANTICIPATE THAT MS. PETERSON WILL SAY THE FACT THAT

11:23AM 21     THERE'S A ROMANTIC RELATIONSHIP BETWEEN THE CEO AND THE COO,

11:23AM 22     NOT JUST OF THIS COMPANY BUT OF ANY COMPANY, RAISES A NUMBER OF

11:23AM 23     QUESTIONS ABOUT CONFLICT OF INTEREST, WHETHER OR NOT THAT

11:23AM 24     PERSON IS THE APPROPRIATE PERSON FOR THE JOB.

11:23AM 25          AND I DON'T KNOW WHETHER THAT'S RIGHT OR THAT'S WRONG, BUT

11:23AM   1    I ANTICIPATE THAT'S HER TESTIMONY, AS WELL AS THE TESTIMONY OF

11:23AM   2    MANY OTHER INVESTORS.

11:23AM   3        AND I DON'T UNDERSTAND THE BASIS FOR -- YOU KNOW,

11:23AM   4    MR. COOPERSMITH MIGHT DISAGREE WITH THAT.  MR. COOPERSMITH

11:23AM   5    MIGHT THINK THAT THIS IS PERSONAL.

11:23AM   6        BUT THEY HELD THEMSELVES OUT AS THE TWO MOST IMPORTANT

11:23AM   7    PEOPLE WITHIN THIS COMPANY, AND THEY HELD OUT THE FACT THAT

11:23AM   8    MR. BALWANI HAD A PARTICULAR EXPERTISE IN SOFTWARE THAT MADE

11:23AM   9    HIM THE BEST CANDIDATE TO RUN THIS NOVEL LAB TESTING COMPANY,

11:23AM  10    AND I THINK THE FACT THAT THEY HAD A RELATIONSHIP AND WERE

11:24AM  11    ROMANTICALLY INVOLVED WAS AN EQUAL, IF NOT GREATER, REASON FOR

11:24AM  12    WHY MR. BALWANI WAS THERE, AND IT'S CERTAINLY SOMETHING THAT

11:24AM  13    INVESTORS, IN HINDSIGHT, WANTED TO KNOW ABOUT AND THINK IS

11:24AM  14    RELEVANT TO THE INVESTMENT DECISION.

11:24AM  15        SO I DON'T SEE A BASIS UNDER 401 OR 403 FOR THIS TO BE

11:24AM  16    EXCLUDED.

11:24AM  17        I DON'T THINK IT'S 404(B), IT'S INEXTRICABLY INTERTWINED

11:24AM  18    WITH THE DEFENSE.

11:24AM  19        AT A MINIMUM, WE PROVIDED NOTICE, SO I DON'T THINK THERE'S

11:24AM  20    ANY ISSUE WITH THAT THERE.

11:24AM  21        AND YOU -- SHE'S NOT THE ONLY ONE WHO WILL SAY THIS.

11:24AM  22    INVESTORS WILL SAY, OF COURSE, IN A SMALL COMPANY WHERE WE'RE

11:24AM  23    INVESTING TENS, HUNDREDS OF MILLIONS OF DOLLARS, IF THERE IS A

11:24AM  24    RELATIONSHIP BETWEEN THE TWO MOST IMPORTANT PRINCIPALS OF THE

11:24AM  25    COMPANY THAT MIGHT AFFECT HOW THEY INTERACT, WHAT DECISIONS

11:24AM  1    THEY MAKE, HOW THEY'RE COMPENSATED, A WHOLE HOST OF POSSIBLE

11:24AM  2    CONFLICTS THAT ARISE, INVESTORS ARE GOING TO SAY THAT THEY

11:24AM  3    WANTED TO KNOW ABOUT THAT AND THEY THINK IT'S MATERIAL TO THE

11:24AM  4    INVESTMENT DECISION.

11:25AM  5         THOSE ARE THE FACTS, YOUR HONOR, AND THE JURY SHOULD HEAR

11:25AM  6    THAT.

11:25AM  7         THE OTHER ISSUE IS THAT THERE'S A GREAT DEAL OF --

11:25AM  8    CERTAINLY IN THE LAST TRIAL, AND TO SOME EXTENT IN THIS TRIAL,

11:25AM  9    THERE'S BEEN THEMES FROM THE DEFENSE OF MR. BALWANI RELIED ON

11:25AM  10   MS. HOLMES BECAUSE OF HER EXPERIENCE WITH THE TECHNOLOGY, OR,

11:25AM  11   YOU KNOW, I WAS JUST THE FINANCE GUY OR I WAS JUST RESPONSIBLE

11:25AM  12   FOR WALGREENS.

11:25AM  13        THERE'S A RELIANCE DEFENSE HERE, AND THE RELATIONSHIP IS

11:25AM  14   RELEVANT TO THAT RELIANCE DEFENSE AND THE INVESTORS'

11:25AM  15   UNDERSTANDING OF THAT IS RELEVANT TO AN ASSESSMENT OF WHY THEY

11:25AM  16   INVESTED.

11:25AM  17        SO WE THINK THIS IS COMPLETELY FAIR GAME.  IT'S NOT

11:25AM  18   EXCLUDABLE.  IT'S CERTAINLY RELEVANT AND IT'S NOT EXCLUDABLE

11:25AM  19   UNDER 403 OR 404.

11:25AM  20        I ADMIT, IT'S UNCOMFORTABLE ASKING QUESTIONS, DID YOU KNOW

11:25AM  21   ABOUT THE RELATIONSHIP?

11:25AM  22        AND PEOPLE ARE ENTITLED TO HAVE THEIR PRIVATE LIVES, BUT

11:25AM  23   WHEN IT'S THE TWO MOST IMPORTANT PEOPLE WITHIN THIS COMPANY,

11:26AM  24   THEY'RE HOLDING OUT SOME PARTICULAR EXPERTISE, IF THERE'S ANY

11:26AM  25   REASON, ROMANTIC OR OTHERWISE, WHY A PERSON MIGHT BE IN THAT

11:26AM  1    POSITION, EXERCISING CERTAIN RESPONSIBILITY, THAT'S SOMETHING

11:26AM  2    THAT INVESTORS WANT TO KNOW ABOUT.

11:26AM  3              THE COURT:  THANK YOU.

11:26AM  4         SO IS THE QUESTION, WERE YOU AWARE, AND WOULD THAT HAVE

11:26AM  5    MATTERED?

11:26AM  6              MR. LEACH:  YES.

11:26AM  7              THE COURT:  ARE THOSE THE TWO QUESTIONS?

11:26AM  8              MR. LEACH:  YES.

11:26AM  9              THE COURT:  IN GENERAL?

11:26AM  10             MR. LEACH:  YES, NO GREATER THAN THAT.

11:26AM  11             MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:26AM  12        I THINK I'M, INDEED, VERY FAR APART FROM MR. LEACH ON THIS

11:26AM  13   POINT.

11:26AM  14        I WILL NOTE, FIRST OF ALL, IN RESPONDING TO MR. LEACH,

11:26AM  15   THAT THE GOVERNMENT I BELIEVE HAS SAID THIS IS NOT AN OMISSIONS

11:26AM  16   CASE.

11:26AM  17        IN FACT, THE COURT MAY REMEMBER IN THE PREVIOUS TRIAL THAT

11:26AM  18   THE GOVERNMENT HAD DROPPED ITS REQUEST FOR AN INSTRUCTION THAT

11:26AM  19   TOLD THE JURY THAT IN FINAL INSTRUCTIONS ABOUT OMISSIONS.

11:26AM  20        AND THAT'S EVEN JUST TALKING ABOUT OMISSIONS THAT RELATE

11:26AM  21   TO, YOU KNOW, WHAT THE COMPANY WAS DOING WITH THEIR TECHNOLOGY

11:26AM  22   OR THEIR WALGREENS PROGRAM AND SO FORTH.

11:26AM  23        THIS IS VERY FAR AFIELD FROM THAT.  THIS IS OMISSIONS TO

11:27AM  24   TELL AN INVESTOR THAT MR. BALWANI AND MS. HOLMES ARE IN A

11:27AM  25   RELATIONSHIP, AND THEN IT SOUNDS LIKE SOME SPECULATIVE

11:27AM  1    TESTIMONY THAT THEY'RE TRYING TO ELICIT ABOUT, WELL, HOW COULD

11:27AM  2    THAT HAVE POSSIBLY, IF YOU LOOKED AT THIS IN THE RIGHT LIGHT,

11:27AM  3    HAVE MADE A DIFFERENCE?  COULD THERE SOMEHOW HAVE BEEN SOME

11:27AM  4    CONFLICT OR SOME OTHER ISSUE, NONE OF WHICH -- IT SOUNDS

11:27AM  5    SPECULATIVE, YOUR HONOR.

11:27AM  6        AND THEN FINALLY, I THINK THE WHOLE FACTUAL PREMISE FOR

11:27AM  7    THIS, WHAT MR. LEACH JUST SAID, IS WRONG.

11:27AM  8        WE ALREADY HEARD TESTIMONY IN THIS CASE FROM THE

11:27AM  9    GOVERNMENT'S WITNESS, MS. YAM, THAT BASED ON THE BOARD MINUTES,

11:27AM  10   THE BOARD INTERVIEWED CANDIDATES, THEY CONSIDERED OTHER

11:27AM  11   CANDIDATES, AND THEY SELECTED MR. BALWANI FOR THE ROLE THAT HE

11:27AM  12   HAD AT THERANOS.

11:27AM  13       SO I DON'T EVEN THINK THE FACTUAL PREMISES IS RIGHT.

11:27AM  14       BUT IN ANY EVENT, YOUR HONOR, THE IMPORTANT POINT IS THAT

11:27AM  15   THIS IS A ROMANTIC RELATIONSHIP, THIS IS NOTHING ABOUT THE

11:27AM  16   COMPANY.

11:27AM  17       THE FACT THAT TWO EXECUTIVES HAVE AN AFFAIR, IT HAPPENS

11:28AM  18   EVERY DAY ALL THROUGH CORPORATE AMERICA, AND IF THE PEOPLE

11:28AM  19   DECIDE TO KEEP IT PROFESSIONAL AT THE OFFICE OR NOT WEAR THEIR

11:28AM  20   HEARTS ON THEIR SLEEVES WHEN THEY'RE TALKING TO INVESTORS, THAT

11:28AM  21   SHOULD HAVE NO RELEVANCE OR BEARING ON THE ISSUES THAT ARE

11:28AM  22   ACTUALLY CHARGED IN THIS CASE.

11:28AM  23           THE COURT:  THANK YOU.

11:28AM  24       IS THERE GOING TO BE SOME FOUNDATIONAL TESTIMONY FROM THIS

11:28AM  25   WITNESS ABOUT -- AND PARDON ME, I'LL JUST PUT IT IN THE

3797

11:28AM  1    COLLOQUIAL -- THE PITCH AND WHO MADE THE PITCH AND HOW THE

11:28AM  2    PITCH WAS MADE TO INVESTORS?

11:28AM  3         MR. LEACH:  YES, YOUR HONOR.

11:28AM  4         THE COURT:  AND DID THAT INCLUDE MS. HOLMES AND

11:28AM  5    MR. BALWANI, EACH OF THEM MAKING THE PITCH OR PART OF THE

11:28AM  6    PITCH?

11:28AM  7         MR. LEACH:  IT WILL, YOUR HONOR.  I ANTICIPATE THERE

11:28AM  8    WILL BE TESTIMONY ABOUT A MEETING IN PALO ALTO IN OCTOBER OF

11:28AM  9    2014, A ROUGHLY FOUR OR FIVE HOUR MEETING WHERE BOTH MS. HOLMES

11:28AM  10   AND MR. BALWANI PARTICIPATED IN AN INVESTMENT PITCH WITH

11:28AM  11   MS. PETERSON.

11:28AM  12        THERE ALSO WILL BE EVIDENCE THAT MR. BALWANI FOLLOWED UP

11:28AM  13   AFTER THAT MEETING TO, YOU KNOW, ACTUALLY SECURE THE INVESTMENT

11:29AM  14   AND THE WIRE.

11:29AM  15        SO THERE WILL BE EVIDENCE OF A PITCH IN THE MIDDLE OF

11:29AM  16   OCTOBER WHERE BOTH MS. HOLMES AND MR. BALWANI WERE PRESENT.

11:29AM  17        THE COURT:  OKAY.  THANK YOU.

11:29AM  18        YOU HAD ANOTHER POINT?  NOT ON THIS, BUT ON ANOTHER ONE

11:29AM  19   YOU WANTED TO RAISE?

11:29AM  20        MR. COOPERSMITH:  THERE WERE OTHERS, BUT DOES THE

11:29AM  21   COURT HAVE ENOUGH INFORMATION ABOUT --

11:29AM  22        THE COURT:  YES, I THINK SO.

11:29AM  23        MR. COOPERSMITH:  OKAY.  THANK YOU, YOUR HONOR.

11:29AM  24        THE NEXT ISSUE HAS TO DO WITH AN EXHIBIT THAT THE

11:29AM  25   GOVERNMENT I UNDERSTAND PLANS TO OFFER, WHICH IS 1944,

3798

11:29AM   1    EXHIBIT 1944.

11:29AM   2        EXHIBIT 1944 IS AN EMAIL FROM A PERSON NAMED

11:29AM   3    JERRY TUBERGEN, WHO I BELIEVE IS SOMEONE THAT MS. PETERSON

11:29AM   4    WORKED WITH, AND HE WAS AT A HIGHER LEVEL THAN MS. PETERSON,

11:29AM   5    BUT SOMEONE SHE WORKED WITH.

11:29AM   6        AND THEN THE EMAIL IS NOT TO MS. PETERSON, BUT IT'S TO ONE

11:29AM   7    OF THE DEVOS FAMILY MEMBERS, A DICK DEVOS AND SOME OTHER FAMILY

11:30AM   8    MEMBERS AS WELL, AND IT ATTACHES AN ARTICLE THAT JERRY TUBERGEN

11:30AM   9    WAS POINTING OUT.

11:30AM   10       AND THE ARTICLE IS THE ROGER PARLOFF ARTICLE THAT THE

11:30AM   11   COURT IS FAMILIAR WITH.  IT HAS MS. HOLMES PICTURED ON IT, AND

11:30AM   12   THEN IT HAS VARIOUS QUOTATIONS FROM MS. HOLMES AND OTHERS ALL

11:30AM   13   THROUGHOUT THE ARTICLE ABOUT THERANOS AND ITS HISTORY AND WHAT

11:30AM   14   SUPPOSEDLY IT COULD DO.

11:30AM   15       SO THAT'S THE PARLOFF ARTICLE.

11:30AM   16       WE KNOW FROM OTHER EXHIBITS, YOUR HONOR, THAT THIS IS

11:30AM   17   SOMETHING THAT MR. TUBERGEN, ONE OF THE RDV PEOPLE, RECEIVED

11:30AM   18   FROM A DIFFERENT INVESTOR WITNESS, WHO WE WILL EVENTUALLY SEE

11:30AM   19   AT TRIAL, NAMED DAN MOSLEY, WHO'S A LAWYER AT

11:30AM   20   CRAVATH, SWAINE & MOORE.

11:30AM   21       MR. MOSLEY FORWARDS MR. TUBERGEN THE ARTICLE, MR. TUBERGEN

11:30AM   22   THEN FORWARDS IT TO SOME DEVOS FAMILY MEMBERS, AND THAT

11:30AM   23   FORWARDING IS EXHIBIT 1944.

11:30AM   24       SO IT DIDN'T COME FROM MR. BALWANI.  IT CAME FROM THIS

11:31AM   25   OTHER SOURCE.

3799

11:31AM 1    THE COURT, DURING MR. EDLIN'S TESTIMONY, SUSTAINED AN

11:31AM 2    OBJECTION TO THE GOVERNMENT'S ATTEMPT TO INTRODUCE THE PARLOFF

11:31AM 3    ARTICLE AT THAT TIME.

11:31AM 4    THE GOVERNMENT NOW WANTS TO INTRODUCE IT THROUGH

11:31AM 5    MS. PETERSON.

11:31AM 6    I BELIEVE MS. PETERSON WOULD SAY, IF THE GOVERNMENT WAS

11:31AM 7    ALLOWED TO ASK HER, THAT SHE READ THE ARTICLE AND THAT SHE TOOK

11:31AM 8    SOME INFORMATION FROM IT.

11:31AM 9    BUT THE ARTICLE CONTAINS NOT ONLY DOUBLE, BUT I THINK

11:31AM 10   TRIPLE HEARSAY.  IT'S NOT FROM MR. BALWANI.

11:31AM 11   MR. PARLOFF HAS NOT TESTIFIED, AND MAY OR MAY NOT, WE

11:31AM 12   DON'T KNOW THAT YET.

11:31AM 13   AND IT'S A DOCUMENT THAT SHOULD BE EXCLUDED BECAUSE OF THE

11:31AM 14   HEARSAY PROBLEM AND THE SAME OBJECTION THAT THE COURT ALREADY

11:31AM 15   SUSTAINED IN THE CASE OF MR. EDLIN.

11:31AM 16   THE COURT:  OKAY.

11:31AM 17   MR. LEACH:  YOUR HONOR, MS. PETERSON WAS PROVIDED

11:31AM 18   WITH A BINDER OF DUE DILIGENCE MATERIALS UNDER A

11:31AM 19   CONFIDENTIALITY AGREEMENT SIGNED BY MR. BALWANI.

11:31AM 20   THE DUE DILIGENCE PACKAGE INCLUDES A REFERENCE TO A NUMBER

11:32AM 21   OF NEWS ARTICLES, INCLUDING THE PARLOFF ARTICLE.

11:32AM 22   AND I ANTICIPATE MS. PETERSON WILL SAY SHE UNDERSTOOD

11:32AM 23   THERANOS TO BE SAYING, GO TO THESE ARTICLES, READ THEM, THIS IS

11:32AM 24   WHAT YOU SHOULD RELY ON IN MAKING AN INVESTMENT DECISION.

11:32AM 25   WE ARE NOT OFFERING -- SO IT WAS ABSOLUTELY HELD OUT BY

3800

11:32AM 1   THERANOS ESSENTIALLY AS A PROSPECTUS, SOMETHING THAT THE

11:32AM 2   INVESTORS SHOULD READ AND DIGEST AND RELY ON AND COUNT ON.

11:32AM 3       AND IT'S BEING PROVIDED UNDER A CONFIDENTIALITY AGREEMENT

11:32AM 4   EXECUTED BY THE DEFENDANT.

11:32AM 5       WE ARE NOT OFFERING THE PARLOFF ARTICLE FOR THE TRUTH OF

11:32AM 6   THE STATEMENTS IN THERE.  THESE ARE, ON A VERY REAL LEVEL, THE

11:32AM 7   REPRESENTATIONS THAT WERE MADE TO RDV AS PART OF ITS INVESTMENT

11:32AM 8   PROCESS.

11:32AM 9       AND MS. PETERSON IS GOING TO SAY, I'VE READ THIS, I'VE

11:32AM 10  RELIED ON THIS, THIS IS PART OF THE BASIS FOR MY INVESTMENT

11:32AM 11  DECISION.

11:32AM 12      THE TRUTH OR FALSITY OF THE STATEMENTS IN THE PARLOFF

11:33AM 13  ARTICLE ARE IRRELEVANT.  THEY ARE OFFERED SIMPLY BECAUSE THESE

11:33AM 14  ARE THE STATEMENTS THAT WERE MADE TO THE WORLD AND QUITE

11:33AM 15  FOCUSSED TO RDV THROUGH THE INVESTMENT MATERIALS TO

11:33AM 16  MS. PETERSON.

11:33AM 17      WE ARE OFFERING THIS BECAUSE WE THINK MANY OF THE

11:33AM 18  STATEMENTS IN THE PARLOFF ARTICLE ARE FALSE, AND I THINK WE

11:33AM 19  HAVE PROVEN THE FALSITY OF MANY OF THE REPRESENTATIONS IN THIS

11:33AM 20  ARTICLE.

11:33AM 21      SO I THINK THE WHOLE THING SHOULD COME IN, BUT AT A

11:33AM 22  MINIMUM, YOU KNOW, I'M PREPARED TO GO THROUGH MODEST PORTIONS

11:33AM 23  OF THE ARTICLE TO HIGHLIGHT PARTICULAR PHRASES THAT WE THINK

11:33AM 24  ARE FALSE THAT MS. PETERSON FOUND MATERIAL THAT WERE HELD OUT

11:33AM 25  TO HER BY THERANOS AND THESE DEFENDANTS AS INFORMATION THAT

11:33AM 1    THEY SHOULD RELY ON.

11:33AM 2        SO THERE IS NO HEARSAY PROBLEM HERE.  THAT'S THE ONLY

11:33AM 3    OBJECTION THAT I'M HEARING FROM THEM.

11:33AM 4        FRANKLY, WE'RE OFFERING IT FOR THE FALSITY, NOT FOR THE

11:34AM 5    TRUTH.  SO I DON'T THINK THE HEARSAY OBJECTION IS WELL TAKEN.

11:34AM 6        IF IT'S THE ENTIRETY, AND I'M ACTUALLY NOT QUITE SURE WHAT

11:34AM 7    PROVISION OF THIS IS CAUSING MR. COOPERSMITH ANGST, BUT IF

11:34AM 8    THERE IS SOMETHING IN THERE, YOU KNOW, THERE'S A SMALL

11:34AM 9    PERCENTAGE OF STATEMENTS I WANTED TO HIGHLIGHT WITH HER, AND WE

11:34AM 10   WOULD BE PREPARED TO DO THAT, TOO, IF NECESSARY.

11:34AM 11          MR. COOPERSMITH:  ALL OF IT, YOUR HONOR.

11:34AM 12       BUT HERE'S THE PROBLEM WITH WHAT MR. LEACH JUST SAID.

11:34AM 13       SO, FIRST OF ALL, WE DON'T EVEN KNOW AT THIS POINT IN THIS

11:34AM 14   TRIAL WHETHER MR. PARLOFF EVEN GOT IT RIGHT.  I DON'T KNOW

11:34AM 15   WHETHER THE STATEMENTS HE'S QUOTING FROM MS. HOLMES AND OTHERS

11:34AM 16   IN THE ARTICLE ARE CORRECT, AND WE DON'T KNOW THAT.

11:34AM 17       SO THERE'S THAT LAYER OF HEARSAY REGARDLESS OF WHAT THE

11:34AM 18   GOVERNMENT IS OFFERING THE OTHER STATEMENTS IN THERE.  SO

11:34AM 19   MR. LEACH HAS NOT SOLVED FOR THAT LAYER OF HEARSAY IN ANY WAY.

11:34AM 20       AND I WILL ALSO JUST SAY, YOUR HONOR, THAT IN THIS TRIAL,

11:34AM 21   THEY HAVE NOT EVEN LINKED THIS TO MR. BALWANI.

11:34AM 22       AS I SAID IN THE FIRST PLACE, THIS ARTICLE GETS TO RDV, TO

11:35AM 23   MR. TUBERGEN, WHO IS ULTIMATELY MS. PETERSON'S BOSS, IT GETS TO

11:35AM 24   RDV BECAUSE OF SOMEONE ELSE WHO SENDS IT AND NOT MR. BALWANI,

11:35AM 25   RIGHT?

11:35AM 1          THE COURT:  OKAY.  BUT IS IT AN ISSUE -- PARDON ME

11:35AM 2    FOR INTERRUPTING YOU.

11:35AM 3        WHAT I HEARD MR. LEACH SAY IS THAT WHATEVER THE SOURCE OF

11:35AM 4    THE ARTICLE, IT WAS FORWARDED TO MS. PETERSON AS PART OF THE

11:35AM 5    INVESTMENT PITCH BY YOUR CLIENT.

11:35AM 6        DOES THAT CHANGE THINGS?

11:35AM 7          MR. COOPERSMITH:  WELL, FIRST OF ALL, THAT'S NOT

11:35AM 8    ACCURATE.

11:35AM 9          THE COURT:  OH.

11:35AM 10          MR. COOPERSMITH:  AND WE HEARD TESTIMONY FROM

11:35AM 11   MR. EDLIN ABOUT INVESTOR PITCHES, AND WHAT MR. EDLIN TESTIFIED

11:35AM 12   IS THAT THE ONLY THING THAT HE EVER GOT FROM MR. BALWANI WAS

11:35AM 13   THE FINANCIAL PIECE OF THIS PITCH, IF YOU WILL.

11:35AM 14        I'M SURE THAT MR. LEACH IS GOING TO GO INTO THAT FINANCIAL

11:35AM 15   PIECE AT LENGTH, AND WE'RE NOT OBJECTING TO THAT.

11:35AM 16        BUT THIS BINDER DOES NOT CONTAIN THE ARTICLE.  IT'S NOT IN

11:35AM 17   THE BINDER.

11:35AM 18        AND THIS IS -- I THINK WHAT MR. LEACH IS REFERRING TO IS

11:36AM 19   EXHIBIT 4858, WHICH IS A VERY LENGTHY DOCUMENT WITH A LOT OF

11:36AM 20   SLIDES AND OTHER MATERIALS.

11:36AM 21        AND ONE OF THE PAGES OF THAT DOCUMENT, I BELIEVE IT'S

11:36AM 22   PAGE 104 OF EXHIBIT 4858, HAS A LIST OF ARTICLES, AND I THINK

11:36AM 23   THE TITLE OF IT IS PRESS ABOUT THERANOS.

11:36AM 24          THE COURT:  OKAY.

11:36AM 25          MR. COOPERSMITH:  AND ONE OF THEM IS THE ARTICLE,

3803

11:36AM 1   BUT THE ARTICLE ITSELF IS NOT THERE.

11:36AM 2       THERE'S NO EVIDENCE IN THIS TRIAL THAT MR. BALWANI

11:36AM 3   ASSEMBLED THAT PITCH OR SENT IT TO RDV.  IT'S JUST NOT LINKED

11:36AM 4   TO MR. BALWANI.

11:36AM 5       IN ADDITION TO THE FACT THAT THE ARTICLE, EVEN BEFORE THIS

11:36AM 6   SLIDE DECK WAS SENT AT RDV, THEY ALREADY HAD IT FROM A TOTALLY

11:36AM 7   DIFFERENT SOURCE.

11:36AM 8       SO IT'S JUST A NEWS MEDIA ARTICLE.  IT CONTAINS MULTIPLE

11:36AM 9   LAYERS OF HEARSAY THAT MR. LEACH HAS NOT SOLVED FOR AND IT

11:36AM 10  SHOULD NOT BE ADMITTED.

11:36AM 11          THE COURT:  WELL, LET ME EXPLORE THE ISSUE ABOUT THE

11:36AM 12  SOURCE OF IT.

11:36AM 13      MR. BALWANI DID NOT SEND THIS AS PART OF A PITCH?

11:36AM 14          MR. LEACH:  MR. BALWANI SIGNS A CONFIDENTIALITY

11:36AM 15  AGREEMENT FOR DUE DILIGENCE MATERIALS THAT GO TO RDV.

11:37AM 16      THOSE DUE DILIGENCE MATERIALS INCLUDE A POWERPOINT THAT,

11:37AM 17  AS MR. COOPERSMITH DESCRIBED, SAY RECENT PRESS, AND ONE OF THE

11:37AM 18  RECENT PRESS IS THE ARTICLE.

11:37AM 19      AND MS. PETERSON IS GOING TO SAY, WHEN I READ THESE DUE

11:37AM 20  DILIGENCE MATERIALS THAT WERE PROVIDED TO HER AS PART OF A

11:37AM 21  PROCESS THAT MR. BALWANI IS INVOLVED IN, I READ THAT AS

11:37AM 22  THERANOS SAYING GO TO THESE ARTICLES, READ THEM, RELY ON THEM.

11:37AM 23          THE COURT:  RIGHT.  AND SO -- I'M SORRY TO INTERRUPT

11:37AM 24  YOU, BUT IT'S IMPORTANT FOR ME TO KNOW MR. BALWANI'S ROLE IN

11:37AM 25  THE -- IN HER RECEIPT OF THOSE MATERIALS IN SUPPORT OF THE

3804

11:37AM 1    INVESTMENT AND WHAT WAS HIS ROLE.

11:37AM 2              MR. LEACH:  HE SIGNS THE CONFIDENTIALITY AGREEMENT

11:37AM 3    UNDER WHICH THE MATERIALS ARE PROVIDED.

11:37AM 4         MS. HOLMES FOLLOWS UP WITH AN EMAIL THAT IS -- SO HE

11:37AM 5    CERTAINLY KNOWS THAT SOME MATERIALS ARE GOING OUT TO HER.

11:37AM 6         MS. HOLMES WRITES IN AN EMAIL, "OUR TEAM WILL GET YOU THE

11:38AM 7    MATERIALS."

11:38AM 8         HE'S THEN PART OF A MEETING IN OCTOBER OF 2014 WHERE, YOU

11:38AM 9    KNOW, I DON'T THINK THE ARTICLE WAS PASSED AROUND, BUT THEY

11:38AM 10   TALKED ABOUT INFORMATION THAT IS IN THE DUE DILIGENCE

11:38AM 11   MATERIALS.

11:38AM 12        MS. PETERSON WILL SAY, I BROUGHT THE DUE DILIGENCE

11:38AM 13   MATERIALS WITH ME AND WE WENT THROUGH THEM, INCLUDING A

11:38AM 14   FINANCIAL STATEMENT THAT MR. BALWANI TALKED TO SPECIFICALLY.

11:38AM 15        SO THESE WERE SENT IN ADVANCE OF A MEETING THAT

11:38AM 16   MR. BALWANI PARTICIPATED IN.

11:38AM 17        I DO WANT TO GO TO THIS CONCEPT THAT THE GOVERNMENT --

11:38AM 18   BEFORE INTRODUCING ANY EVIDENCE, THE GOVERNMENT IS REQUIRED TO

11:38AM 19   PROVE THAT MR. BALWANI REVIEWED AND APPROVED EVERY SINGLE PAGE

11:38AM 20   OF THE POWERPOINT.

11:38AM 21        I THINK THAT'S AN ISSUE THAT GOES TO WEIGHT, YOUR HONOR,

11:38AM 22   AND NOT THE ADMISSIBILITY OF THE DOCUMENT.

11:38AM 23        MS. HOLMES IS SENDING A NUMBER OF THESE POWERPOINTS IN

11:38AM 24   CERTAIN INSTANCES.

11:38AM 25        THE COURT WILL HEAR FROM AN INVESTOR LATER,

BRIAN GROSSMAN, WHO WILL SAY, I RECEIVED A DUE DILIGENCE

POWERPOINT DIRECTLY FROM MR. BALWANI.

THE TEXT MESSAGES THAT ARE IN EVIDENCE AT 5387H INCLUDE A

TEXT AT PAGE 17 WHERE MS. HOLMES AND MR. BALWANI ARE TALKING

ABOUT WHAT DOCUMENTS SHOULD BE INCLUDED AND NOT INCLUDED IN

INVESTOR MATERIALS.

MS. HOLMES WRITES, "AM PLANNING ON INCLUDING ALL WE SENT

DST," WHICH I THINK IS ANOTHER PROSPECTIVE INVESTOR, "INCLUDING

THE PFIZER REPORTS, LET ME KNOW IF YOU DISAGREE, ALSO THE

HOSPITAL LIST."

SO THERE IS EVIDENCE, OUTSIDE OF MR. EDLIN, THAT

MS. HOLMES AND MR. BALWANI WERE COLLABORATING ON WHAT SHOULD OR

SHOULDN'T GO TO INVESTORS.

MR. COOPERSMITH HAS POINTS ON CROSS-EXAMINATION THAT HE'S

NOT THE ONE WHO PHYSICALLY SENT THE PARLOFF ARTICLE TO HER.  I

DON'T THINK WE HAVE EVIDENCE OF WHO STAMPED THE MAILING FOR THE

DUE DILIGENCE PACKAGES TO MS. PETERSON.

BUT HE'S ABSOLUTELY INVOLVED IN THIS PROCESS.  HE'S

COLLABORATING WITH MS. HOLMES IN OTHER INSTANCES ABOUT WHAT

SHOULD OR SHOULDN'T BE IN THERE.  THEY'RE WORKING TOGETHER IN

INVESTOR MEETINGS.

I THINK THESE SUPPORT AN INFERENCE THAT MR. BALWANI HAS

FAMILIARITY WITH WHAT IS IN THERE.

AND AGAIN, THEY'RE HOLDING -- MS. HOLMES, THERE'S ACTUALLY

NO QUESTION ABOUT THAT, IS HOLDING OUT THE PARLOFF ARTICLE AS

11:40AM 1    SOMETHING THAT COULD BE RELIED ON.

11:40AM 2        MR. BALWANI IS SITTING THERE IN THE MEETING PARTICIPATING

11:40AM 3    WHERE TOPICS WITHIN THAT ARTICLE, MAYBE NOT THE ARTICLE ITSELF,

11:40AM 4    COME UP.

11:40AM 5        ALL OF THESE ARE WEIGHT ARGUMENTS.  THEY'RE NOT EVEN

11:40AM 6    HEARSAY ARGUMENTS.

11:40AM 7        AND THIS IS A FRAUD CASE, YOUR HONOR.  WHAT THE

11:40AM 8    DEFENDANT -- OR WHAT THE VICTIMS RELIED ON OR REVIEWED IS

11:40AM 9    RELEVANT TO MATERIALITY.  SHE'S GOING TO SAY SHE READ IT AND

11:40AM 10   PLACED WEIGHT ON IT.

11:40AM 11       IT'S A -- YOU KNOW, IT'S NOT JUST -- IT'S NOT JUST

11:40AM 12   IMPORTANT FOR WHO MADE THE STATEMENT, BUT FOR WHAT INFORMATION

11:41AM 13   WAS RELEVANT TO HER OR NOT RELEVANT TO HER IN MAKING HER

11:41AM 14   INVESTMENT DECISION.

11:41AM 15           THE COURT:  OKAY.

11:41AM 16           MR. COOPERSMITH:  YOUR HONOR, THE COURT ASKED A

11:41AM 17   DIRECT QUESTION OF MR. LEACH, WHICH WAS, WHAT EXACTLY WAS

11:41AM 18   MR. BALWANI'S ROLE IN SENDING THE POWERPOINT?

11:41AM 19       AND WHAT I HEARD FROM MR. LEACH WAS A LOT OF KIND OF

11:41AM 20   SKATING AROUND THE MARGINS OF THAT, BUT NOT AN ANSWER THAT

11:41AM 21   MR. BALWANI WAS INVOLVED IN SENDING THIS POWERPOINT.

11:41AM 22       THE TESTIMONY FROM MR. EDLIN WAS THAT HE WAS INVOLVED.

11:41AM 23   MR. EDLIN HAD ASKED FOR FINANCIAL INFORMATION FROM MR. BALWANI,

11:41AM 24   AND THAT WAS IT.

11:41AM 25       AND THE FACT THAT TOPICS THAT ALSO WERE ADDRESSED IN THE

11:41AM  1    PARLOFF ARTICLE WERE ALSO DISCUSSED AT THE MEETING THAT THE

11:41AM  2    DEVOS FAMILY AND MS. PETERSON ATTENDED IN MID-OCTOBER OF '14,

11:41AM  3    IF THE GOVERNMENT WANTS TO ASK MS. PETERSON WHAT SHE REMEMBERS

11:41AM  4    ABOUT THAT MEETING WHILE MR. BALWANI WAS PRESENT, I'M THINK

11:41AM  5    THAT'S FAIR GAME AND I'M SURE THEY WILL DO THAT.

11:41AM  6         BUT THE FACT THAT THERE WERE ALSO TOPICS THAT ALSO APPEAR

11:41AM  7    IN THE PARLOFF ARTICLE, WELL, BOTH WERE ABOUT THERANOS, SO IT'S

11:42AM  8    NOT SURPRISING THAT THERE WAS OVERLAP THERE.  BUT THAT DOES NOT

11:42AM  9    IN ANY WAY MAKE THE PARLOFF ARTICLE ADMISSIBLE.

11:42AM  10        SO THEY HAVE NOT -- IT IS REALLY IMPORTANT, AS THE COURT

11:42AM  11   ASKED, WHAT MR. BALWANI'S ROLE IS.  I HAVE NOT HEARD FROM

11:42AM  12   MR. LEACH AN EXPLANATION THAT WOULD MAKE THIS TRIPLE HEARSAY

11:42AM  13   DOCUMENT ADMISSIBLE.

11:42AM  14            THE COURT:  WELL, WHAT ABOUT MR. LEACH'S POINT THAT

11:42AM  15   THIS IS NOT, IT'S NOT HEARSAY, IT'S NOT OFFERED FOR THE TRUTH

11:42AM  16   OF THE MATTER ASSERTED?

11:42AM  17            MR. COOPERSMITH:  RIGHT.

11:42AM  18        SO, YOUR HONOR, WHERE THAT FAILS IS THERE'S A JOURNALIST

11:42AM  19   NAMED ROGER PARLOFF, RIGHT, WHO HAS NOT TESTIFIED IN THIS

11:42AM  20   TRIAL -- AND MAYBE HE WILL, MAYBE HE WON'T -- AND MR. PARLOFF

11:42AM  21   IS PUTTING DOWN IN AN ARTICLE WHAT HE CLAIMS PEOPLE SAID.

11:42AM  22        AS TO WHETHER HE'S CORRECT OR NOT CORRECT OR MAKING IT UP,

11:42AM  23   WE JUST DON'T KNOW BECAUSE WE HAVE NOT HEARD FROM HIM IN THIS

11:42AM  24   TRIAL.

11:42AM  25        SO THAT'S THE HEARSAY LAYER THAT MR. LEACH'S ARGUMENT

3808

11:42AM 1    CANNOT SURMOUNT, AND IT'S HEARSAY BASED ON THAT.

11:42AM 2         AS TO WHAT IS THE CONTENT OF IT AS TO MS. HOLMES IS QUOTED

11:43AM 3    AS SAYING SOMETHING, IT MAY WELL BE TRUE THAT THEY'RE TRYING TO

11:43AM 4    OFFER THAT FOR THE FALSITY AS OPPOSED TO THE TRUTH.

11:43AM 5         BUT THEY CAN'T GET BY THAT LAYER OF HEARSAY WHERE IT'S

11:43AM 6    MR. PARLOFF WHO IS REPORTING ON WHAT, IN THIS CASE, MS. HOLMES

11:43AM 7    SAID AND OTHER PEOPLE SAID.

11:43AM 8         SO THAT'S THE LAYER OF HEARSAY THAT IS THE PROBLEM.

11:43AM 9              THE COURT:  OKAY.

11:43AM 10        MR. LEACH.

11:43AM 11             MR. LEACH:  YOUR HONOR, IF I TAKE THIS PIECE OF

11:43AM 12   PAPER RIGHT HERE, SOMETHING -- I HAPPENED TO WRITE ON THIS

11:43AM 13   ONE -- BUT THAT I DIDN'T WRITE AND THAT INCLUDES LOTS OF QUOTES

11:43AM 14   FROM SOMEONE ELSE AND I HAND THIS TO YOU AND I SAY, YOU SHOULD

11:43AM 15   RELY ON THIS FOR YOUR INVESTMENT DECISION, THERE'S NO HEARSAY

11:43AM 16   PROBLEM.  IT'S, IT'S -- THERE'S NO HEARSAY PROBLEM.  IT'S WHAT

11:43AM 17   SHE IS RELYING ON.

11:43AM 18        IT DOESN'T MATTER IF IT SAYS, PARLOFF SAYS HOLMES SAID X.

11:43AM 19        IT'S THE DEFENDANTS HOLDING THIS OUT IS THE THING THAT

11:43AM 20   SHOULD BE RELIED ON IT, WHOEVER SAID WHAT IN IT.

11:43AM 21        WE'RE NOT OFFERING IT FOR ITS TRUTH.  WE'RE NOT OFFERING

11:43AM 22   IT FOR HOLMES SAID THESE THINGS TO PARLOFF.

11:43AM 23        WE'RE OFFERING IT BECAUSE THERANOS, THROUGH MS. HOLMES AND

11:44AM 24   MR. BALWANI, HELD IT OUT THERE.

11:44AM 25        WHAT I HEAR OF THE CORE OF THE DEFENSE ARGUMENT IS THAT

3809

11:44AM  1    BALWANI DIDN'T WRITE THIS, BALWANI MAY NOT HAVE EVEN KNOWN

11:44AM  2    ABOUT IT.

11:44AM  3         ALL OF THOSE ARE WEIGHT ARGUMENTS.  HE WANTS TO

11:44AM  4    DISASSOCIATE HIMSELF FROM THE FALSE STATEMENTS IN THE ARTICLE.

11:44AM  5    HE CAN DO THAT THROUGH CROSS-EXAMINATION.

11:44AM  6         I DIDN'T SIT FOR IT.

11:44AM  7         WE THINK HE DID.

11:44AM  8         I DIDN'T KNOW THE ARTICLE -- DID MR. BALWANI HAND YOU THE

11:44AM  9    ARTICLE?

11:44AM  10        NO.

11:44AM  11        HE CAN DISASSOCIATE HIMSELF FROM THE STATEMENTS IN THERE

11:44AM  12   ALL HE WANTS THROUGH CROSS-EXAMINATION, AND THAT MAY OR MAY NOT

11:44AM  13   BE EFFECTIVE, BUT IT'S NOT HEARSAY.

11:44AM  14        AND HE'S LINKED TO THESE INVESTMENT PITCHES, NOT JUST IN

11:44AM  15   THIS PARTICULAR ONE, BUT VIRTUALLY EVERYONE THAT THE COURT IS

11:44AM  16   GOING TO HEAR FROM.

11:44AM  17        HE PERSONALLY SENDS OUT A DUE DILIGENCE PACKAGE TO

11:44AM  18   BRIAN GROSSMAN.

11:44AM  19        THE TEXT MESSAGES ARE CLEAR AS DAY THAT THEY'RE

11:44AM  20   COLLABORATING ABOUT WHAT SHOULD GO IN THERE.

11:44AM  21        EVERYTHING THAT MR. COOPERSMITH IS RAISING IS A WEIGHT

11:44AM  22   ARGUMENT, NOT A VALID HEARSAY ARGUMENT.

11:45AM  23             THE COURT:  OKAY.  THANK YOU.

11:45AM  24             MR. COOPERSMITH:  YOUR HONOR, JUST TO BRIEFLY

11:45AM  25   RESPOND TO THAT.

11:45AM 1      WHAT I HEARD MR. LEACH SAYING AS THE ANSWER TO THE HEARSAY

11:45AM 2   PROBLEM OF MR. PARLOFF REPORTING ON THINGS IS THAT MR. BALWANI,

11:45AM 3   ACCORDING TO MR. LEACH, IS THE ONE WHO REPRESENTS, HEY, READ

11:45AM 4   THIS ARTICLE, THIS IS ABOUT THERANOS, THIS IS GREAT.

11:45AM 5      THE PROBLEM IS THAT THERE IS NO EVIDENCE THAT THAT'S WHAT

11:45AM 6   HAPPENED.  THAT'S NOT CORRECT.

11:45AM 7      MR. EDLIN SAID THE ONLY THING HE GOT FROM MR. BALWANI WAS

11:45AM 8   FINANCIAL INFORMATION.

11:45AM 9      AS I'VE SAID, THE RDV PEOPLE GET THIS ARTICLE FROM A

11:45AM 10  DIFFERENT SOURCE, NOT FROM MR. BALWANI.

11:45AM 11     THERE'S NO EVIDENCE THAT MR. BALWANI REPRESENTED THAT THIS

11:45AM 12  IS SOMETHING THAT THEY SHOULD READ.

11:45AM 13     MR. LEACH DOES NOT, APPARENTLY, HAVE EVIDENCE THAT THIS

11:45AM 14  ARTICLE WAS DISCUSSED AT THE MEETING HE'S REFERRING TO IN

11:45AM 15  OCTOBER.  IN FACT, HE ADMITTED THAT.

11:45AM 16     SO THESE ARE JUST NOT THE FACTS.

11:45AM 17     AS FOR MR. GROSSMAN, I THINK WHEN MR. GROSSMAN COMES ON

11:45AM 18  THE STAND, WE'LL DEAL WITH WHATEVER ISSUES WE HAVE WITH HIM,

11:45AM 19  BUT THAT'S NOT RELEVANT TO THIS MATTER.

11:45AM 20          THE COURT:  WHAT ABOUT THE FACT THAT MR. LEACH IS

11:46AM 21  TALKING ABOUT NDA'S THAT YOUR CLIENT SIGNED IN RELATION TO

11:46AM 22  THESE DOCUMENTS?

11:46AM 23          MR. COOPERSMITH:  RIGHT.  THAT WAS ONE OF WHAT I

11:46AM 24  DESCRIBED AS SKATING AROUND THE MARGINS OF THINGS.

11:46AM 25     SURE, MR. BALWANI'S ADMINISTRATIVE TASK OF MAKING SURE A

```
11:46AM   1      NONDISCLOSURE AGREEMENT WAS SIGNED BEFORE CONFIDENTIAL
11:46AM   2      MATERIALS WERE SENT TO THIS PROSPECTIVE INVESTOR, BUT THAT IN
11:46AM   3      NO WAY INFORMS AS TO WHAT WAS SENT, AND IT CERTAINLY IN NO WAY
11:46AM   4      INFORMS THAT MR. BALWANI SAID, WELL, SEND THE PARLOFF ARTICLE
11:46AM   5      TO HIM.
11:46AM   6          THIS WAS A JUST GENERAL NDA THAT WOULD COVER ANYTHING.  IN
11:46AM   7      FACT, IT'S THE KIND OF THING THAT WOULD COVER EVERYTHING BUT
11:46AM   8      SOMETHING LIKE THE PARLOFF ARTICLE.
11:46AM   9          NDA'S ARE FOR CONFIDENTIAL, YOU KNOW, TRADE SECRET,
11:46AM  10      PROPRIETARY TYPE OF INFORMATION DISCLOSURE ISSUES, NOT A PUBLIC
11:46AM  11      ARTICLE THAT IS IN "FORTUNE" ARTICLE.
11:46AM  12              THE COURT:  WELL, IS THAT A PITCH, THOUGH?  IS THAT
11:46AM  13      THE COMPANY'S PITCH?  IS THAT WHAT THE NDA WAS INVOLVING?
11:46AM  14              MR. COOPERSMITH:  THE NDA IS JUST FACILITATING THE
11:46AM  15      ABILITY TO SEND PROPRIETARY INFORMATION TO A POTENTIAL
11:46AM  16      INVESTOR.  THAT'S IT.
11:47AM  17              THE COURT:  IS THAT THE PITCH, WHAT WAS BEING SENT,
11:47AM  18      MR. LEACH?
11:47AM  19              MR. COOPERSMITH:  YES, YOUR HONOR.  IT WAS, IT WAS
11:47AM  20      FACILITATING THE SENDING OF PROPRIETARY INFORMATION, WHICH YOU
11:47AM  21      COULD DESCRIBE AS THE PITCH MATERIALS OR THE --
11:47AM  22              THE COURT:  RIGHT.
11:47AM  23              MR. COOPERSMITH:  -- BUT THAT'S NOT --
11:47AM  24              THE COURT:  DOES THAT MAKE A DIFFERENCE?
11:47AM  25              MR. LEACH:  IT ABSOLUTELY DOES NOT, YOUR HONOR.
```

11:47AM  1      THE DEFENSE WANT TO SAY THAT THE DEFENDANT SIGNED THE

11:47AM  2  CONFIDENTIALITY AGREEMENT UNDER WHICH THE DUE DILIGENCE

11:47AM  3  MATERIALS WERE SENT, BUT HE HAS NO IDEA WHAT IS IN THE DUE

11:47AM  4  DILIGENCE MATERIALS.

11:47AM  5      THAT'S AN ARGUMENT THAT CAN BE MADE.

11:47AM  6      BUT I THINK A FAIR INFERENCE FROM THE FACT THAT HE'S

11:47AM  7  SIGNING THE DOCUMENT UNDER WHICH THE DUE DILIGENCE MATERIALS

11:47AM  8  ARE PROVIDED SUPPORT AN INFERENCE THAT HE HAS SOME

11:47AM  9  UNDERSTANDING OF WHAT IS IN THE DUE DILIGENCE MATERIALS.

11:47AM 10          THE COURT:  I'M SORRY TO INTERRUPT YOU.

11:47AM 11      BUT, MR. COOPERSMITH, THAT'S WHAT SWAYS ME TO THINK THAT

11:47AM 12  THAT THEN -- IF THAT'S THE TRAIL -- I DON'T KNOW HOW THIS IS

11:47AM 13  GOING TO COME OUT, BUT LET ME TELL YOU, IF THAT IS THE

11:47AM 14  FOUNDATION FOR THIS, THEN IT SEEMS TO BE A WEIGHT ISSUE AS

11:48AM 15  OPPOSED TO AN ADMISSIBILITY ISSUE.

11:48AM 16      IF, IN FACT, THERE IS -- THIS NDA WAS SIGNED AND THE

11:48AM 17  REASON FOR THAT WAS TO ALLOW THE MATERIALS FOR A PITCH,

11:48AM 18  INVESTMENT PITCH TO BE SENT, AND IT HAS PARTIES' SIGNATURES ON

11:48AM 19  IT, THEN ALBEIT AS SMALL AS THAT MIGHT BE, MINUTE AS THAT MIGHT

11:48AM 20  BE, IF IT INFORMS, IF IT'S PART OF THE PITCH, THEN THAT -- IT

11:48AM 21  SEEMS TO ME THAT THAT MIGHT BE ADMISSIBLE, AND THEN IT BECOMES

11:48AM 22  AN ISSUE OF WEIGHT, AS YOU SAID, THE DILUTION OF IT.

11:48AM 23      SO LET ME JUST SAY, I'M GOING TO WAIT TO SEE HOW THAT

11:48AM 24  FOUNDATION DEVELOPS AND SEE IF IT'S SUFFICIENT OR NOT.

11:48AM 25          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

3813

11:48AM 1      WELL, I THINK THIS ISSUE OF SIGNING AN NDA IS A SLENDER

11:48AM 2  READ INDEED, AND ONE OF THE REASONS IS THAT THE NDA WOULD IN NO

11:48AM 3  WAY BE NECESSARY TO SEND MS. PETERSON OR RDV THE PARLOFF

11:48AM 4  ARTICLE OR A CITATION TO IT.  THAT HAS NOTHING TO DO WITH IT.

11:49AM 5      THAT'S EXACTLY WHAT AN NDA DOES NOT COVER, RIGHT?  THIS IS

11:49AM 6  A "FORTUNE" ARTICLE --

11:49AM 7          THE COURT:  SURE, RIGHT.  WELL, LET'S JUST SEE WHAT

11:49AM 8  DEVELOPS.  WE'LL SEE HOW WIDE THAT NET DEVELOPS WITH THE

11:49AM 9  EVIDENCE.

11:49AM 10     WHAT WAS YOUR THIRD ISSUE?

11:49AM 11         MR. COOPERSMITH:  OH.  THANK YOU, YOUR HONOR.

11:49AM 12     IN THE SAME INVESTOR MATERIALS DOCUMENT THAT WE WERE JUST

11:49AM 13 TALKING ABOUT, WHICH IS EXHIBIT 4858, AND IT'S AT PAGE 104.

11:49AM 14 THIS IS ACTUALLY WHERE I THINK I MISCITED PAGE 104.

11:49AM 15     PAGE 104 IS WHERE THE PFIZER REPORT EXISTS.  I THINK THE

11:49AM 16 PRESS PART WAS ANOTHER PAGE.

11:49AM 17     BUT THE PFIZER REPORT APPEARS ON PAGE 104 OF EXHIBIT 4858,

11:49AM 18 AND THE COURT IS FAMILIAR WITH THAT DOCUMENT.  THIS IS THE

11:49AM 19 DOCUMENT THAT, AS IT EXISTS IN THIS EXHIBIT, HAS THE PFIZER

11:49AM 20 LOGO AND THE THERANOS LOGO, AND THEN IT HAS MANY PAGES OF

11:50AM 21 DESCRIPTION OF THE PROJECT THAT THEY WERE EXPECTING TO HAVE.

11:50AM 22     WE'RE NOT OBJECTING TO THE ADMISSIBILITY OF THAT REPORT.

11:50AM 23 I THINK MS. PETERSON WILL SAY THAT SHE RECEIVED THAT BINDER AND

11:50AM 24 THIS WAS AMONG THE THINGS THAT SHE REVIEWED IN HELPING RDV TO

11:50AM 25 MAKE AN INVESTMENT DECISION.

11:50AM 1        SO WE'RE NOT ASKING FOR THE REPORT TO BE EXCLUDED.

11:50AM 2        WHAT WE ARE ASKING FOR, YOUR HONOR, IS FOR THE GOVERNMENT

11:50AM 3   NOT TO BE ABLE TO HIGHLIGHT THE LOGOS ISSUE BECAUSE, AS THE

11:50AM 4   COURT MAY REMEMBER FROM ANOTHER ARGUMENT INVOLVING

11:50AM 5   SCHERING-PLOUGH, AT THAT TIME THE COURT ALLOWED THE

11:50AM 6   SCHERING-PLOUGH LOGOS ISSUE INTO EVIDENCE BECAUSE THERE WAS

11:50AM 7   EVIDENCE THAT MR. BALWANI AT LEAST HAD POSSESSION IN HIS EMAIL

11:50AM 8   ACCOUNT OF A SCHERING-PLOUGH REPORT WITHOUT THE LOGOS.

11:50AM 9        AND THERE WAS EVIDENCE THAT HE HAD POSSESSION OF THE

11:50AM 10  DOCUMENT WITH THE SCHERING-PLOUGH LOGO.

11:50AM 11       THAT DOES NOT EXIST FOR PFIZER, SO THERE'S NO EVIDENCE

11:50AM 12  THAT MR. BALWANI HAS EVER SEEN THE PFIZER REPORT WITHOUT THE

11:50AM 13  PFIZER LOGO.

11:50AM 14       SO AGAIN, THE REPORT IS PART OF EXHIBIT 4858, AND IT WILL

11:51AM 15  COME IN WITH THAT EXHIBIT, BUT WE DON'T THINK THE GOVERNMENT

11:51AM 16  SHOULD BE ALLOWED TO HIGHLIGHT, WELL, DO YOU SEE THIS LOGO?

11:51AM 17  AND DID THAT MAKE YOU THINK THAT --

11:51AM 18            THE COURT:  SO ARE YOU SAYING THAT THE LOGO SHOULD

11:51AM 19  BE REDACTED FROM THE EXHIBIT?

11:51AM 20            MR. COOPERSMITH:  NO.  I THINK THE LOGO CAN REMAIN.

11:51AM 21            THE COURT:  OH.

11:51AM 22            MR. COOPERSMITH:  IT'S A MATTER OF NOT ASKING

11:51AM 23  QUESTIONS DESIGNED TO ELICIT TESTIMONY THAT, YEAH, THE FACT

11:51AM 24  THAT PFIZER'S LOGO WAS ON THERE REALLY MATTERED TO ME AND THAT

11:51AM 25  MADE ME THINK IT WAS A PFIZER REPORT, RIGHT.

| | |
|---|---|
| 11:51AM | 1 |
| 11:51AM | 2 |
| 11:51AM | 3 |
| 11:51AM | 4 |
| 11:51AM | 5 |
| 11:51AM | 6 |
| 11:51AM | 7 |
| 11:51AM | 8 |
| 11:51AM | 9 |
| 11:51AM | 10 |

11:51AM  1      THE COURT:  HOW DO WE DO THAT?  IF IT COMES IN WITH

11:51AM  2  THE LOGO ON IT, THE DOCUMENT SAYS WHAT IT SAYS, BUT YOU WOULD

11:51AM  3  ASK MR. LEACH NOT TO DRAW ATTENTION TO IT?

11:51AM  4      MR. COOPERSMITH:  YEAH, NOT TO HIGHLIGHT AND NOT ASK

11:51AM  5  QUESTIONS THAT ARE DESIGNED TO SHOW THAT THERE IS SOMETHING

11:51AM  6  WRONG WITH THE FACT THAT PFIZER'S LOGO WAS THERE AND THAT SORT

11:51AM  7  OF THING.

11:51AM  8      THE COURT:  SO HE COULD ASK, OR YOU COULD ASK, DO

11:51AM  9  YOU SEE TWO LOGOS ON THERE?

11:51AM  10      MR. COOPERSMITH:  I DON'T THINK, HAVING MADE THIS

11:51AM  11  ARGUMENT, YOUR HONOR, I'M GOING TO HIGHLIGHT ON CROSS.

11:51AM  12      THE COURT:  THAT'S WHAT I'M TRYING TO DEFINE IS WHEN

11:51AM  13  YOU SAY HIGHLIGHT, IF MR. LEACH SAYS, OKAY, WHAT IS THIS?

11:52AM  14    WELL, THIS IS A DOCUMENT AND IT HAS PFIZER AND IT HAS

11:52AM  15  THERANOS ON IT.

11:52AM  16      MR. COOPERSMITH:  THAT'S OKAY.

11:52AM  17    IT'S JUST WHEN YOU START SAYING, WELL, DID THE PFIZER

11:52AM  18  LOGO, DID THAT MATTER TO YOU?  DID THAT SEND YOU SOME MESSAGE

11:52AM  19  ABOUT WHO ACTUALLY WROTE THIS REPORT?  AND WOULD IT BE

11:52AM  20  INTERESTING FOR YOU TO KNOW, LIKE, ACTUALLY THERE'S ANOTHER

11:52AM  21  VERSION?  OR WOULD IT BE INTERESTING FOR YOU TO KNOW THAT

11:52AM  22  PFIZER DIDN'T APPROVE THIS?

11:52AM  23    OR THINGS LIKE THAT, RIGHT?

11:52AM  24      THE COURT:  SO I THINK FIRST QUESTION IS ONE IS

11:52AM  25  LIKELY TO BE ASKED, I DON'T KNOW.  WE WILL HAVE MR. LEACH --

11:52AM 1   YOU AND I KEEP GETTING INTO MR. LEACH'S CASE ABOUT WHAT HE'S

11:52AM 2   GOING TO ASK -- BUT IT SEEMS THAT, BASED ON OUR CONVERSATION,

11:52AM 3   IF THAT DOCUMENT COMES IN, THE QUESTION WOULD BE, DID YOU RELY

11:52AM 4   ON THIS FOR YOUR INVESTMENT DECISION?  YES, NO?  IF SO, WHY?

11:52AM 5       WITHOUT ASKING THE QUESTION, IS THE FACT THAT THERE'S A

11:52AM 6   BRAND ON THERE, DID THAT INFORM YOU?

11:52AM 7           MR. COOPERSMITH:  EXACTLY, YOUR HONOR.

11:52AM 8       IF THE GOVERNMENT WANTS TO ASK MS. PETERSON QUESTIONS

11:52AM 9   ABOUT WHETHER SHE RELIED ON THE REPORT, THAT'S FAIR GAME.

11:53AM 10      IT'S JUST ABOUT WHETHER SHE RELIED ON THE FACT THAT THERE

11:53AM 11  WAS A PFIZER LOGO OR WHETHER THAT WAS MEANINGFUL TO HER IN SOME

11:53AM 12  WAY.  THAT'S WHERE THE LINE IS I THINK.

11:53AM 13          THE COURT:  WELL, WE'VE MESSED AROUND WITH YOUR

11:53AM 14  DIRECT, MR. LEACH.

11:53AM 15      HOW WOULD YOU LIKE TO EXAMINE?

11:53AM 16          MR. LEACH:  I APPRECIATE MR. COOPERSMITH'S

11:53AM 17  CONSTRUCTIVE SUGGESTIONS.

11:53AM 18      THIS IS A WEIGHT ISSUE, YOUR HONOR.

11:53AM 19      HE -- THE DEFENSE IS NOT OBJECTING TO THE ADMISSION OF THE

11:53AM 20  DOCUMENT.  THEY'RE OBJECTING TO HIGHLIGHTS IN THE DOCUMENT AND

11:53AM 21  QUESTIONS IN THE DOCUMENT.

11:53AM 22      THAT, TO ME, SCREAMS OUT THAT THIS IS A WEIGHT ISSUE.

11:53AM 23      MS. PETERSON RECEIVES, IN THE DUE DILIGENCE MATERIALS THAT

11:53AM 24  MR. BALWANI AUTHORIZED, A REPORT WITH PFIZER'S LOGO AND

11:53AM 25  THERANOS'S LOGO WHICH SHE BELIEVED, NOT BECAUSE OF THE LOGOS,

11:53AM 1    BUT BECAUSE OF THE CONTENT OF THE ARTICLE, WERE THE CONCLUSIONS

11:53AM 2    OF PFIZER.

11:53AM 3        WE KNOW THAT THEY AREN'T.

11:53AM 4        I INTEND TO ASK HER, DID SHE THINK THAT THESE WERE

11:54AM 5    PFIZER'S CONCLUSIONS, AND DID THAT MATTER TO HER?

11:54AM 6        I DON'T NECESSARILY NEED TO DWELL ON THE LOGO.

11:54AM 7        BUT THIS ISSUE IS EMERGING BECAUSE WE'RE GOING TO HAVE, I

11:54AM 8    ANTICIPATE THERE MAY BE OTHER PHARMACEUTICAL WITNESSES WHO

11:54AM 9    TESTIFY TO THE VERSIONS THAT DON'T HAVE THE LOGOS.

11:54AM 10       SO THIS IS A WEIGHT QUESTION.  WHAT DID MR. BALWANI KNOW

11:54AM 11   ABOUT THIS AND WHEN DID HE KNOW ABOUT IT?

11:54AM 12       WE KNOW FROM THE TEXT MESSAGES THAT HE WAS DIRECTING, OR

11:54AM 13   MS. HOLMES WAS ASKING HIM, OR TELLING HIM, I'M GOING TO INCLUDE

11:54AM 14   THE PFIZER REPORT IN THE INVESTMENT MATERIALS.

11:54AM 15       SO THERE'S EVIDENCE FROM THE TEXT MESSAGES ON PAGE 17 OF

11:54AM 16   5387 THAT THEY'RE DISCUSSING, DO WE INCLUDE THIS?  DO WE NOT

11:54AM 17   INCLUDE THIS?

11:54AM 18       DURING THE CROSS-EXAMINATION OF MR. EDLIN, THE DEFENSE PUT

11:54AM 19   IN EMAILS BETWEEN PFIZER AND MR. BALWANI IN THE 2013 TO 2015

11:54AM 20   TIME PERIOD, WHICH ARE SUGGESTIVE THAT MR. BALWANI KNOWS

11:55AM 21   SOMETHING ABOUT THE PFIZER RELATIONSHIP.

11:55AM 22       IN ADDITION, IN THEIR OPENING STATEMENT THEY SAID THAT

11:55AM 23   MR. BALWANI DID HIS DUE DILIGENCE BEFORE COMING TO THE COMPANY,

11:55AM 24   AND WE THINK THAT DUE DILIGENCE WOULD INVOLVE UNDERSTANDING IN

11:55AM 25   AS MUCH DETAIL AS POSSIBLE WHAT THE COMPANY WAS OR WASN'T DOING

11:55AM  1     WITH PFIZER.

11:55AM  2         THEY THINK THAT THERE'S INSUFFICIENT -- AND WE ALSO HAVE

11:55AM  3     EVIDENCE THAT WITH RESPECT TO ANOTHER PHARMACEUTICAL COMPANY,

11:55AM  4     HE RECEIVED THE VERSION THAT HAD ONLY THE THERANOS LOGO AND A

11:55AM  5     VERSION THAT HAD BOTH THE THERANOS AND THE PHARMACEUTICAL

11:55AM  6     COMPANY.

11:55AM  7         AND I THINK IT'S A FAIR WEIGHT ARGUMENT.  YOU KNOW, IF HE

11:55AM  8     HAD THAT INFORMATION FOR ONE PHARMACEUTICAL COMPANY, I THINK

11:55AM  9     THAT SUPPORTS THE EVIDENCE THAT HE HAD INFORMATION ABOUT OTHER

11:55AM 10     PHARMACEUTICAL COMPANIES.

11:55AM 11         IF THEY THINK THAT WE HAVEN'T TIED MR. BALWANI TO THIS

11:55AM 12     ISSUE OF THE DOCTRINE OF THE LOGOS, I'M SURE WE'LL HEAR ABOUT

11:55AM 13     THAT IN CLOSING ARGUMENT.

11:56AM 14         BUT THERE'S AMPLE EVIDENCE SHOWING THAT MR. BALWANI IS

11:56AM 15     INVOLVED IN THE PFIZER RELATIONSHIP, THAT HE KNOWS THE REVENUE

11:56AM 16     THAT IS NOT BEING GENERATED FROM IT, AND HE'S CONSULTING WITH

11:56AM 17     MS. HOLMES ABOUT JUDGMENTS ABOUT WHETHER TO INCLUDE IT OR NOT

11:56AM 18     INCLUDE IT IN INVESTOR MATERIALS.

11:56AM 19         DID HE KNOW ABOUT EVERY SINGLE ASPECT OF THE REPORT,

11:56AM 20     INCLUDING THE LOGO?  THAT'S A WEIGHT ARGUMENT.

11:56AM 21             THE COURT:  SO ARE YOU GOING TO -- THANK YOU.

11:56AM 22         ARE YOU GOING TO ASK, YOU RECEIVED THIS, YOU SAW THE

11:56AM 23     LOGOS, WAS THIS MATERIAL TO YOUR DECISION AND WHY?  AND THAT'S

11:56AM 24     IT?

11:56AM 25             MR. LEACH:  YES.

11:56AM  1          THE COURT:  OKAY.  OKAY.  THAT SEEMS FAIR GAME TO

11:56AM  2     ME.

11:56AM  3          MR. COOPERSMITH:  WELL, I MEAN, THE FACT THAT

11:56AM  4     THERE'S A DOCUMENT AND IT HAS LOGOS ON IT, SURE.

11:56AM  5          BUT WHAT WOULD BE A PROBLEM -- AND AGAIN, I'M NOT TRYING

11:56AM  6     TO PUT WORDS OR SUGGEST QUESTIONS TO MR. LEACH, BUT I'M JUST

11:56AM  7     TRYING TO EXPLORE THE LENGTH OF THIS, RIGHT?

11:56AM  8          THE COURT:  YES, SURE.

11:57AM  9          MR. COOPERSMITH:  SO THERE WOULD HAVE TO BE A GOOD

11:57AM  10    FAITH BASIS TO ASK QUESTIONS THAT ARE DESIGNED TO CAST DOUBT ON

11:57AM  11    WHETHER THE PFIZER LOGO WAS REALLY AUTHENTICALLY ON THE

11:57AM  12    DOCUMENT.

11:57AM  13         THE COURT:  I DIDN'T HEAR MR. LEACH SAY THAT, AT

11:57AM  14    LEAST AS TO THIS WITNESS.  MAYBE I MISHEARD HIM.  BUT HE WAS

11:57AM  15    TALKING ABOUT OTHER WITNESSES THAT MAY COME UP.

11:57AM  16         I DON'T KNOW IF THIS WITNESS CAN TESTIFY ABOUT THIS.  MY

11:57AM  17    SENSE IS THAT SHE HAY NOT BE ABLE TO TESTIFY ABOUT THE

11:57AM  18    LEGITIMACY OF ONE DOCUMENT OR ANOTHER.

11:57AM  19         THE GRAVAMEN OF HER TESTIMONY, I THINK, IS THAT SHE WAS

11:57AM  20    EMPOWERED BY THE DEVOS FAMILY TO INVESTIGATE INVESTMENTS, TO

11:57AM  21    MAKE RECOMMENDATIONS TO THEM AS TO INVESTMENTS, AND THE

11:57AM  22    EXAMINATION WILL BE IF SHE MADE A RECOMMENDATION, AND IF SO,

11:57AM  23    WHY, AND WHAT DID SHE RELY ON IN THAT DECISION.  THAT'S IT.

11:57AM  24         MR. COOPERSMITH:  SURE, YOUR HONOR.

11:57AM  25         THE TYPE OF QUESTION -- AND THAT'S ALL FINE.

11:58AM 1       THE TYPE OF QUESTION THAT WOULD BE IMPROPER IS, YOU KNOW,

11:58AM 2   MS. PETERSON, DOES THE PRESENCE OF THE PFIZER LOGO ON IT, DID

11:58AM 3   THAT MAKE YOU THINK THAT PFIZER ACTUALLY AUTHORED THIS REPORT?

11:58AM 4   RIGHT?

11:58AM 5       AND THAT TYPE OF QUESTION, OR EVEN GOING BEYOND THAT,

11:58AM 6   WOULD BE IMPROPER BECAUSE THERE'S NO GOOD FAITH BASIS TO

11:58AM 7   BELIEVE THAT MR. BALWANI -- THERE'S NO EVIDENCE THAT

11:58AM 8   MR. BALWANI KNOWS ANYTHING ABOUT THIS DOCUMENT EVER BEING

11:58AM 9   ANYTHING OTHER THAN A DOCUMENT WITH A PFIZER LOGO BECAUSE

11:58AM 10   THERE'S NO EVIDENCE THAT HE EVER RECEIVED IT IN ANY OTHER FORM.

11:58AM 11       I ALSO BELIEVE THAT THE REPORT WAS BEFORE HIS TIME AT

11:58AM 12   THERANOS.

11:58AM 13       SO THERE'S A REPORT.  IF SOMEONE PUT A PFIZER LOGO ON IT,

11:58AM 14   THEN THAT'S, ACCORDING TO THE EVIDENCE IN THIS CASE, NOT

11:58AM 15   SOMETHING THAT IS KNOWN TO MR. BALWANI.

11:58AM 16       THE COURT:  SO SHE'S NOT -- YOU WOULD OBJECT TO HER

11:58AM 17   TESTIFYING AS TO WHY THIS WAS MATERIAL TO HER BECAUSE IT HAD A

11:58AM 18   PFIZER LOGO ON IT?

11:58AM 19       MR. COOPERSMITH:  WELL, QUESTIONS DESIGNED TO

11:58AM 20   ELICIT, WHAT WAS REALLY IMPORTANT TO ME, FROM MS. PETERSON'S

11:59AM 21   PERSPECTIVE, IS THAT IT HAD THE PFIZER LOGO.

11:59AM 22       IF SHE WANTS TO TESTIFY THAT SHE LOOKED AT THE REPORT AND

11:59AM 23   THE REPORT HAD MEANING TO HER AND INFLUENCED HER DECISIONS AND

11:59AM 24   RECOMMENDATIONS, THAT'S FINE.

11:59AM 25       IT'S REALLY JUST THIS NARROW QUESTION ABOUT TRYING TO

11:59AM 1    ELICIT TESTIMONY THAT IS DESIGNED TO SHOW THAT THERE IS

11:59AM 2    SOMETHING WRONG WITH THE FACT THAT THERE'S A LOGO OF PFIZER ON

11:59AM 3    THE DOCUMENT.  THAT'S WHERE IT'S IMPROPER.

11:59AM 4           THE COURT:  DOES THAT, DOES THAT BLEED OVER TO A

11:59AM 5    QUESTION ABOUT, WHAT DO YOU SEE ON THE DOCUMENT?

11:59AM 6       I SEE A BRAND.  I SEE A BRAND NAME HERE.

11:59AM 7       OKAY.  DID THAT INFLUENCE YOUR DECISION?

11:59AM 8       YES, IT DID.

11:59AM 9       WHY?

11:59AM 10      BECAUSE THERE'S A BRAND NAME ON IT AND I FEEL STRONGLY

11:59AM 11   ABOUT PFIZER.  THEY'RE WORLD HEROS NOW.  THEY'VE CREATED A

11:59AM 12   VACCINE THAT SAVED LIVES.

11:59AM 13      NOT AT THE TIME OF THE DOCUMENT OF COURSE.

11:59AM 14      BUT JUST THE BRANDING ALONE, IS THAT WRONG FOR HER TO BE

11:59AM 15   ABLE TO SAY THAT?

11:59AM 16          MR. COOPERSMITH:  YOUR HONOR, THOSE KINDS OF

11:59AM 17   QUESTIONS ARE IMPROPER BECAUSE THEY ARE DRAWING ATTENTION TO

12:00PM 18   THIS LOGO ISSUE.

12:00PM 19          AND IF THE COURT REMEMBERS THE SCHERING-PLOUGH ISSUE,

12:00PM 20   WHICH DID COME INTO EVIDENCE AND THERE WAS EVEN A WITNESS FROM

12:00PM 21   SCHERING-PLOUGH, THE ONLY REASON WHY THAT CAME INTO EVIDENCE,

12:00PM 22   BASED ON THE COURT'S RULING, WAS BECAUSE THERE WAS EVIDENCE

12:00PM 23   THAT OF COURSE THE GOVERNMENT SAID WENT TO WEIGHT, THAT

12:00PM 24   MR. BALWANI AT LEAST HAD POSSESSION OF A VERSION OF THE

12:00PM 25   SCHERING-PLOUGH REPORT -- I'M GOING TO SAY POSSESSION, MEANING

3822

```
12:00PM   1    IT WAS ON HIS COMPUTER SYSTEM, WHETHER HE LOOKED AT IT OR NOT

12:00PM   2    IS NOT IN EVIDENCE -- BUT HE AT LEAST HAD POSSESSION OF A

12:00PM   3    SCHERING-PLOUGH REPORT WITHOUT THE SCHERING-PLOUGH LOGO.

12:00PM   4         THERE'S NOTHING LIKE THAT FOR PFIZER.  THERE'S NO EVIDENCE

12:00PM   5    THAT MR. BALWANI EVER SAW THE SCHERING-PLOUGH REPORT WITHOUT

12:00PM   6    THE PFIZER.  SO --

12:00PM   7              THE COURT:  NO.  I JUST DON'T UNDERSTAND -- AND I'M

12:00PM   8    SORRY I'M BEING A LITTLE THICK ON THIS I GUESS -- I JUST DON'T

12:00PM   9    UNDERSTAND WHY SHE CAN'T SAY, I RECEIVED THIS IN THE PACKET;

12:00PM  10    YEAH, IT HAS -- YOU KNOW, IT IS WHAT IT IS.  THE DOCUMENT

12:00PM  11    SPEAKS FOR ITSELF.

12:00PM  12         AND IT WAS OR WASN'T MATERIAL TO MY DECISION FOR WHATEVER

12:00PM  13    REASON.

12:00PM  14              MR. COOPERSMITH:  SO, YOUR HONOR, WE CAN'T -- I

12:00PM  15    CERTAINLY CAN'T THINK OF ALL OF THE QUESTIONS THAT MR. LEACH IS

12:01PM  16    CAPABLE OF ASKING, BUT I THINK THE POINT TO ME OUGHT TO BE

12:01PM  17    CLEAR, THAT WHAT MR. LEACH CAN SAY, YOU SEE THIS DOCUMENT?  YOU

12:01PM  18    SEE IT'S GOT PFIZER AT THE TOP?  OKAY.

12:01PM  19         BUT ONCE HE STARTS GETTING INTO, DID YOU REALLY THINK THAT

12:01PM  20    THIS WAS A PFIZER REPORT, YOU KNOW?  DID THE FACT THAT THIS HAD

12:01PM  21    THE IMPRIMATUR WITH A LOGO OF PFIZER, DID THAT MAKE A

12:01PM  22    DIFFERENCE?  IF THIS JUST A THERANOS REPORT, WOULD THAT -- WHEN

12:01PM  23    YOU START GETTING INTO THAT KIND OF THING, THAT'S WHERE THE

12:01PM  24    PROBLEM IS.

12:01PM  25         BUT, YEAH, THE DOCUMENT IS WHAT IT IS, AND IT'S COMING
```

3823

12:01PM  1    INTO EVIDENCE I BELIEVE.

12:01PM  2            THE COURT:  BUT IF SHE SAYS, YEAH, I LOOKED AT IT

12:01PM  3    AND IT HAS THESE TWO BRAND NAMES ON IT.  I LOOKED AT IT, IT

12:01PM  4    INFLUENCED ME --

12:01PM  5            MR. COOPERSMITH:  RIGHT.

12:01PM  6            THE COURT:  -- BECAUSE OF THE BRAND NAMES.  BUT THAT

12:01PM  7    WAS ONE THING, BUT THE INFORMATION ON IT ALSO.

12:01PM  8            MR. COOPERSMITH:  SHE MAY SAY THAT, YOUR HONOR.  WE

12:01PM  9    DON'T KNOW THAT.

12:01PM  10       BUT THE ISSUE IS THAT WE CAN'T CONTROL EVERYTHING THAT

12:01PM  11   COMES OUT OF THE WITNESS'S MOUTH.

12:01PM  12       WHAT WE CAN CONTROL IS MR. LEACH DRAWING SOME ATTENTION TO

12:01PM  13   SOME KIND OF IMPROPRIETY.

12:01PM  14           THE COURT:  OKAY.  I THINK I UNDERSTAND.

12:01PM  15      DO YOU UNDERSTAND, MR. LEACH?

12:01PM  16           MR. LEACH:  I DO, YOUR HONOR.

12:02PM  17           THE COURT:  ALL RIGHT.  WELL, AS TO THIS, I WILL

12:02PM  18   PERMIT QUESTIONS ABOUT WHAT THE DOCUMENT IS AND WHAT IT SAYS,

12:02PM  19   AND ALSO QUESTIONS AS TO WHETHER IT INFORMED HER DECISION, HER

12:02PM  20   INVESTMENT DECISION, AND SHE CAN SAY WHY.

12:02PM  21       ANYTHING FURTHER WILL HAVE TO -- AND I TEND TO AGREE WITH

12:02PM  22   MR. COOPERSMITH, THIS ISN'T A SEARCH FOR WHETHER A DOCUMENT WAS

12:02PM  23   ALTERED OR NOT FROM THIS WITNESS.

12:02PM  24       THIS IS A SEARCH FOR WHAT INFORMED HER DECISION AND WHY.

12:02PM  25           MR. LEACH:  UNDERSTOOD, YOUR HONOR.

12:02PM 1          THE COURT:  THAT MAKES SENSE TO ME.

12:02PM 2      AS TO YOUR FIRST QUESTION REGARDING THE INQUIRY ABOUT HER

12:02PM 3  AWARENESS OF A RELATIONSHIP, I DO THINK -- I AM GOING TO PERMIT

12:02PM 4  THAT QUESTION IF SHE, IF SHE KNEW ABOUT THAT.

12:02PM 5      I DO THINK THAT THAT IS RELEVANT TO AN INVESTMENT

12:02PM 6  DECISION.

12:02PM 7      WE'VE HEARD OTHER WITNESSES, NOT IN THIS CASE, BUT I

12:03PM 8  REFERENCED THE SAFEWAY GENTLEMAN WHO WAS THE CEO OF SAFEWAY, I

12:03PM 9  THINK HE WAS ASKED, WOULD THAT HAVE MADE A DIFFERENCE IF YOU

12:03PM 10  KNEW?  AND HE TALKED ABOUT -- HE'S A CORPORATE PERSON, AND HE

12:03PM 11  TALKED ABOUT SIMILAR THINGS THAT MR. LEACH TALKED ABOUT

12:03PM 12  INFORMING A DECISION.  WELL, IF THERE WAS A RELATIONSHIP, THAT

12:03PM 13  WOULD PRESENT CONFLICT.  I THINK HE EVEN TALKED ABOUT CONFLICTS

12:03PM 14  OF INTEREST.  IT WOULD TALK ABOUT THE WISDOM OF OPERATIONAL

12:03PM 15  FUNCTIONS.

12:03PM 16      OF COURSE, THIS WAS JUST HIS OPINION AS A CEO HIMSELF, BUT

12:03PM 17  HE RAISED THOSE ISSUES.

12:03PM 18      I THINK THERE'S SOME CURRENCY IN THOSE OBSERVATIONS AS TO

12:03PM 19  AN INVESTMENT AND A BUSINESS RELATIONSHIP FOR AN INVESTOR TO

12:03PM 20  MAKE A FULLY INFORMED DECISION ABOUT THAT, SO I WOULD ALLOW

12:03PM 21  THAT QUESTION.

12:03PM 22      IT IS MORE INEXTRICABLY INTERTWINED, IF YOU WILL, TO THE

12:03PM 23  SCHEME THAN NOT, AND I DON'T THINK 403 ISSUES PRECLUDE ITS

12:03PM 24  ADMISSION.

12:03PM 25      AS TO NUMBER 2, THE EXHIBIT 1944, THAT IS A LET'S HURRY UP

3825

12:04PM  1    AND WAIT AND SEE WHAT HAPPENS WITH THAT FOUNDATIONALLY OR NOT.

12:04PM  2        I THINK I'VE TOLD YOU WHAT -- THE OBSERVATIONS THAT I

12:04PM  3    HAVE, AND WE'LL SEE IF THAT FOUNDATION CAN BE LAID.

12:04PM  4        SO LET'S TAKE OUR BREAK.  WE'LL TAKE ABOUT 15 MINUTES, I

12:04PM  5    GUESS, SOMETHING LIKE THAT FOR US, AND THEN WE'LL COME BACK.

12:04PM  6        AND THEN THIS WITNESS IS HERE?

12:04PM  7            MR. LEACH:  YES, YOUR HONOR.

12:04PM  8            THE COURT:  AND WE'LL GO FOR A COUPLE OF HOURS.  I

12:04PM  9    APOLOGIZE, BUT WE'LL DO THE BEST THAT WE CAN TODAY.

12:04PM  10           MR. LEACH:  THANK YOU, YOUR HONOR.

12:04PM  11           MR. COOPERSMITH:  OKAY.  THANK YOU.

12:04PM  12       (RECESS FROM 12:04 P.M. UNTIL 12:24 P.M.)

12:26PM  13       (JURY IN AT 12:26 P.M.)

12:26PM  14           THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

12:26PM  15   THE JURY IS PRESENT.  ALL COUNSEL ARE PRESENT.

12:26PM  16       THANK YOU FOR YOUR PATIENCE, LADIES AND GENTLEMEN.  I DID

12:26PM  17   NEED TO KEEP COUNSEL A LITTLE LONGER TO HELP ME WITH SOME

12:26PM  18   THINGS.

12:26PM  19       DOES THE GOVERNMENT HAVE ANOTHER WITNESS?

12:26PM  20           MR. LEACH:  WE DO, YOUR HONOR.

12:26PM  21       THE UNITED STATES CALLS LISA PETERSON.

12:26PM  22           THE COURT:  THANK YOU.

12:26PM  23       GOOD AFTERNOON.

12:26PM  24       IF YOU COULD COME HERE AND STAND HERE FOR A MOMENT WHILE

12:26PM  25   YOU FACE OUR COURTROOM DEPUTY AND RAISE YOUR RIGHT HAND, SHE

```
12:26PM   1    HAS A QUESTION FOR YOU.

12:26PM   2              (GOVERNMENT'S WITNESS, LISA PETERSON, WAS SWORN.)

12:27PM   3              THE WITNESS:  I DO.

12:27PM   4              THE COURT:  PLEASE HAVE A SEAT UP HERE.  I'LL INVITE

12:27PM   5    YOU TO MAKE YOURSELF COMFORTABLE.

12:27PM   6         FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

12:27PM   7    NEED.

12:27PM   8         THAT MICROPHONE WILL HAVE TO COME DOWN, WON'T IT.  IT WILL

12:27PM   9    BEND DOWN A LITTLE MORE IF YOU WOULD LIKE.

12:27PM  10         IF YOU'RE VACCINATED AND FULLY BOOSTED, YOU CAN TAKE YOUR

12:27PM  11    MASK OFF.  THANK YOU.

12:27PM  12              THE WITNESS:  YES, UH-HUH.

12:27PM  13              THE COURT:  WHEN YOU ARE COMFORTABLE, WOULD YOU

12:27PM  14    PLEASE STATE YOUR NAME AND THEN SPELL IT, PLEASE.

12:27PM  15              THE WITNESS:  LISA PETERSON.  L-I-S-A,

12:27PM  16    P-E-T-E-R-S-O-N.

12:27PM  17              THE COURT:  THANK YOU.

12:27PM  18         AND, MS. PETERSON, IF YOU COULD JUST MAYBE BEND THAT MIKE

12:27PM  19    UP.  THERE WE GO.  I THINK THAT MIGHT WORK BETTER.

12:27PM  20              THE WITNESS:  IS THAT BETTER?

12:27PM  21              THE COURT:  YES, I THINK SO.  LET'S SEE.

12:27PM  22              THE WITNESS:  THAT'S BETTER.

12:27PM  23              MR. LEACH:  I THINK THAT WORKS, MS. PETERSON.

12:27PM  24         DOES THAT WORK FOR THE COURT?

12:27PM  25              THE COURT:  YES.  THANK YOU.
```

12:27PM  1              MR. LEACH:  MAY I INQUIRE?

12:27PM  2              THE COURT:  YES.

12:27PM  3                    **DIRECT EXAMINATION**

12:28PM  4    BY MR. LEACH:

12:28PM  5    Q.   GOOD AFTERNOON, MS. PETERSON.

12:28PM  6    A.   HI.

12:28PM  7    Q.   I NOTE YOU'VE TAKEN YOUR MASK OFF.  IF YOU'RE FULLY

12:28PM  8    VACCINATED AND BOOSTED, AND IF YOU'RE COMFORTABLE, YOU CAN

12:28PM  9    TESTIFY WITHOUT A MASK.

12:28PM  10   A.   RIGHT.

12:28PM  11   Q.   AND WHERE DO YOU WORK?

12:28PM  12   A.   I WORK FOR RDV CORPORATION.

12:28PM  13   Q.   WHAT IS RDV CORPORATION?

12:28PM  14   A.   RDV CORPORATION IS THE FAMILY OFFICE FOR THE DEVOS FAMILY

12:28PM  15   IN GRAND RAPIDS, MICHIGAN.  I WORK IN THEIR INVESTMENT GROUP.

12:28PM  16   Q.   WHEN YOU SAY YOU WORK IN THEIR INVESTMENT GROUP, WHAT DO

12:28PM  17   YOU DO?

12:28PM  18   A.   WE INVEST IN PRIVATE EQUITY FIRMS ON BEHALF OF THE FAMILY.

12:28PM  19   Q.   HOW LONG HAVE YOU WORKED FOR RDV CORPORATION?

12:28PM  20   A.   I'VE BEEN THERE 17 YEARS.

12:28PM  21   Q.   OKAY.  IN APPROXIMATELY OCTOBER 2014, DID RDV CORPORATION

12:28PM  22   MAKE AN INVESTMENT IN THERANOS?

12:28PM  23   A.   YES, WE DID.

12:28PM  24   Q.   WE'RE GOING TO GET TO THAT IN A LITTLE DETAIL, BUT BEFORE

12:28PM  25   WE DO, COULD YOU BRIEFLY DESCRIBE FOR US YOUR EDUCATIONAL AND

12:28PM   1   PROFESSIONAL BACKGROUND?

12:28PM   2   A.   I GRADUATED FROM MICHIGAN STATE UNIVERSITY IN 1992, AND I

12:29PM   3   WORKED AT A COMMERCIAL BANK FOR A WHILE, AND THEN AN INVESTMENT

12:29PM   4   BANK FOR ABOUT SIX YEARS, AND THEN I'VE BEEN AT RDV EVER SINCE.

12:29PM   5   Q.   WHEN YOU WORKED AT THE INVESTMENT BANK, WHAT WERE YOUR JOB

12:29PM   6   RESPONSIBILITIES?

12:29PM   7   A.   WE DID A LOT OF PRIVATE PLACEMENTS, SO IN FINDING

12:29PM   8   INVESTORS TO INVEST IN CERTAIN COMPANIES AND DO THINGS, AS WELL

12:29PM   9   AS BUYING AND SELLING BUSINESSES.

12:29PM  10   Q.   OKAY.  AND WHEN DID YOU START WORKING FOR RDV?

12:29PM  11   A.   2000 -- JANUARY OF 2005.

12:29PM  12   Q.   AND DO YOU STILL WORK THERE TODAY?

12:29PM  13   A.   YES.

12:29PM  14   Q.   SO APPROXIMATELY 17 YEARS?

12:29PM  15   A.   YES.

12:29PM  16   Q.   AND WHAT POSITION -- MY QUESTIONS WILL RELATE PRIMARILY TO

12:29PM  17   THE TIME PERIOD 2014 AND 2015.

12:29PM  18        WHAT WAS YOUR POSITION IN THOSE YEARS?

12:29PM  19   A.   I WAS A MANAGING DIRECTOR IN THE INVESTMENT GROUP.

12:29PM  20   Q.   OKAY.  AND AS A MANAGING DIRECTOR IN THE INVESTMENT GROUP,

12:29PM  21   COULD YOU DESCRIBE FOR US YOUR JOB RESPONSIBILITIES?  WHAT DID

12:29PM  22   YOU DO?

12:29PM  23   A.   I MANAGED THE U.S. PORTFOLIO OF INVESTMENTS IN THE PRIVATE

12:30PM  24   EQUITY FIRMS THAT WE INVESTED IN.

12:30PM  25   Q.   WHAT DO YOU MEAN BY "PRIVATE EQUITY FIRMS"?

12:30PM  1    A.   WE DON'T INVEST IN COMPANIES DIRECTLY NORMALLY, AND WE

12:30PM  2    DON'T DO ANY VENTURE OR ANY PUBLIC INVESTING.

12:30PM  3         ALL WE DO IS INVEST IN PRIVATE EQUITY FIRMS, AND THEN

12:30PM  4    THOSE FIRMS USE OUR MONEY AND INVEST IN OTHER COMPANIES.

12:30PM  5    Q.   CAN YOU GIVE ME AN EXAMPLE OF SOME OF THE INVESTMENTS OF

12:30PM  6    PRIVATE EQUITY FIRMS THAT RDV INVESTS IN, MIGHT INVEST IN?

12:30PM  7    A.   THE NAMES PROBABLY NOBODY WOULD KNOW, LIKE VISTA EQUITY,

12:30PM  8    WE WOULD INVEST IN THAT, AND THEN THEY WOULD TAKE MULTIPLE

12:30PM  9    INVESTORS' MONEY AND INVEST IN COMPANIES, AND I MANAGE THOSE

12:30PM  10   TYPES OF RELATIONSHIPS.

12:30PM  11   Q.   OKAY.  SO YOU MANAGE RELATIONSHIPS WITH OTHER -- WITH

12:30PM  12   PRIVATE EQUITY FIRMS?

12:30PM  13   A.   CORRECT.

12:30PM  14   Q.   AND MAKE SURE THEY'RE DOING A GOOD JOB IN INVESTING YOUR

12:30PM  15   MONEY?

12:31PM  16   A.   CORRECT.

12:31PM  17   Q.   AND IN OR AROUND 2014, DID YOU BECOME FAMILIAR WITH A

12:31PM  18   COMPANY CALLED THERANOS?

12:31PM  19   A.   YES.

12:31PM  20   Q.   AND HOW DID YOU FIRST BECOME AWARE OF THERANOS?

12:31PM  21   A.   OUR CEO AND CIO, THAT'S ONE PERSON, IS JERRY TUBERGEN, HE

12:31PM  22   HAD BOTH TITLES, HE WAS MADE AWARE OF THERANOS AT A BDT

12:31PM  23   CONFERENCE.  HE MET ELIZABETH HOLMES.  AND I HAPPENED TO BE ON

12:31PM  24   THE PLANE ON THE WAY BACK RIDING WITH HIM, AND HE TOLD ME ALL

12:31PM  25   ABOUT IT.

12:31PM   1    Q.   OKAY.  WHEN YOU SAY MR. TUBERGEN TOLD YOU ALL ABOUT IT,

12:31PM   2    DID HE EXPRESS SOME ENTHUSIASM ABOUT A POTENTIAL INVESTMENT?

12:31PM   3    A.   YES.

12:31PM   4    Q.   AND WERE YOU GIVEN ANY RESPONSIBILITIES IN CONNECTION WITH

12:31PM   5    A POSSIBLE INVESTMENT IN THERANOS?

12:31PM   6    A.   YES.  I ACTUALLY ASKED ON THAT PLANE RIDE IF I COULD WORK

12:31PM   7    ON THE TRANSACTION IF THEY DECIDED TO MOVE FORWARD WITH IT, AND

12:31PM   8    HE SAID YES.

12:31PM   9    Q.   WHEN YOU SAY YOU ASKED, DID YOU IN SOME SENSE VOLUNTEER

12:31PM   10   FOR THIS?

12:31PM   11   A.   YES.

12:31PM   12   Q.   WHY DID YOU VOLUNTEER FOR THIS?

12:31PM   13   A.   I FOUND IT VERY INTERESTING.  MY HUSBAND IS DIABETIC AND

12:32PM   14   HAS A LOT OF BLOOD TESTS, AND I MANAGE THE HEALTH CARE PRIVATE

12:32PM   15   EQUITY FIRMS THAT WE WORKED WITH, SO IT SORT OF WENT HAND IN

12:32PM   16   HAND WITH THAT.

12:32PM   17   Q.   SO YOU HAD AN INTEREST IN THE SUBJECT MATTER?  AM I

12:32PM   18   HEARING THAT CORRECT?

12:32PM   19   A.   YES.

12:32PM   20   Q.   AND WERE YOU ALSO IMPRESSED BY ELIZABETH HOLMES?

12:32PM   21   A.   YES.

12:32PM   22   Q.   OKAY.  HOW SO?

12:32PM   23   A.   JUST YOUNG, FEMALE, TOOK AN INTEREST IN WHAT SHE WAS

12:32PM   24   TRYING TO DO.

12:32PM   25   Q.   OKAY.  DID THIS POTENTIAL TRANSACTION WITH THERANOS DIFFER

12:32PM  1   FROM OTHER INVESTMENTS THAT YOU TYPICALLY WORKED ON FOR RDV?

12:32PM  2   A.   YES.   TYPICALLY, AGAIN, THERE'S A PRIVATE EQUITY FIRM IN

12:32PM  3   BETWEEN US.   OFTENTIMES THE PRIVATE EQUITY FIRM WILL INVEST IN

12:32PM  4   SOMETHING THAT NEEDS MORE MONEY THAN THE FUND CAN DO AND THEY

12:32PM  5   WILL CALL US SO WE COINVEST ALONGSIDE OF THEM, SO I DO A LOT OF

12:32PM  6   THAT.

12:32PM  7        AND THAT'S SORT OF DIRECT.   IT'S KIND OF INDIRECT, BUT

12:33PM  8   IT'S ALONGSIDE THE PRIVATE EQUITY FIRM.

12:33PM  9        THIS WAS SOMETHING THAT WAS SHOWN TO US INDIRECTLY THROUGH

12:33PM 10   BDT, BUT THEY DIDN'T HAVE ANY ROLE IN IT.

12:33PM 11        SO IT WAS VERY DIFFERENT THAN WHAT WE NORMALLY DO, YES.

12:33PM 12   Q.   OKAY.   DIFFERENT BECAUSE YOU WERE CONTEMPLATING INVESTING

12:33PM 13   DIRECTLY AS OPPOSED TO THROUGH --

12:33PM 14        THE COURT:   MS. PETERSON, LET ME -- LET HIM FINISH

12:33PM 15   HIS QUESTION AND THEN YOU CAN ANSWER IT, AND HE'LL WAIT UNTIL

12:33PM 16   YOU'RE FINISHED.

12:33PM 17        THE WITNESS:   GREAT.   SORRY.

12:33PM 18   BY MR. LEACH:

12:33PM 19   Q.   SO IN THIS CIRCUMSTANCE, YOU WERE CONTEMPLATING INVESTING

12:33PM 20   DIRECTLY INTO A COMPANY AS OPPOSED TO A PRIVATE EQUITY FIRM

12:33PM 21   THAT WOULD PICK THE INVESTMENTS?

12:33PM 22   A.   YES.

12:33PM 23   Q.   LET ME DRAW YOUR --

12:33PM 24        MAY I APPROACH, YOUR HONOR?

12:33PM 25        THE COURT:   YES.

| | | |
|---|---|---|
| 12:33PM | 1 | MR. LEACH:  (HANDING.) |
| 12:34PM | 2 | Q.   MS. PETERSON, I'VE PLACED BEFORE YOU A BINDER OF |
| 12:34PM | 3 | DOCUMENTS, AND IF I COULD ASK YOU TO TURN TO TAB 1944 IN YOUR |
| 12:34PM | 4 | BINDER. |
| 12:34PM | 5 | DO YOU HAVE THAT IN FRONT OF YOU? |
| 12:34PM | 6 | A.   YES. |
| 12:34PM | 7 | Q.   OKAY.  IS THIS AN EMAIL DATED SEPTEMBER 18TH, 2014, FROM |
| 12:34PM | 8 | JERRY TUBERGEN? |
| 12:34PM | 9 | A.   YES. |
| 12:34PM | 10 | Q.   AND HE WAS YOUR BOSS AT RDV AT THE TIME? |
| 12:34PM | 11 | A.   CORRECT. |
| 12:34PM | 12 | Q.   AND THIS TIME PERIOD, SEPTEMBER OF 2014, IS THIS |
| 12:34PM | 13 | CONSISTENT WITH THE TIME PERIOD WHEN YOU WERE FIRST APPROACHED |
| 12:34PM | 14 | ABOUT WORKING ON A POTENTIAL INVESTMENT IN THERANOS? |
| 12:34PM | 15 | A.   YES. |
| 12:34PM | 16 | Q.   AND IS THIS -- WAS THIS EMAIL EXCHANGED IN THE ORDINARY |
| 12:34PM | 17 | COURSE OF RDV'S BUSINESS? |
| 12:34PM | 18 | A.   IT WAS VERY COMMON TO -- FOR JERRY TO SEND SOMETHING TO |
| 12:35PM | 19 | THE INVESTMENT COMMITTEE IF HE SAW SOMETHING THAT WAS |
| 12:35PM | 20 | INTERESTING, BUT IT -- JERRY IS NOT NORMALLY THE ONE ROUTING |
| 12:35PM | 21 | SOMETHING THAT HE JUST SAW.  HE WAS JUST VERY -- HE, HE WAS |
| 12:35PM | 22 | VERY INTERESTED AND ENTHUSED ABOUT WHAT HE HAD HEARD AT THE |
| 12:35PM | 23 | MEETING THAT DAY. |
| 12:35PM | 24 | Q.   OKAY.  AND WAS THIS PREPARED AT OR AROUND THE TIME OF THE |
| 12:35PM | 25 | EMAIL BEING SENT? |

12:35PM  1    A.   YES.

12:35PM  2    Q.   AND WAS IT MAINTAINED DURING THE ORDINARY COURSE OF RDV'S

12:35PM  3    BUSINESS?

12:35PM  4    A.   YES.

12:35PM  5              MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS --

12:35PM  6    THERE'S AN ATTACHMENT TO -- LET ME JUST ASK A FEW MORE

12:35PM  7    FOUNDATIONAL QUESTIONS, MS. PETERSON.

12:35PM  8    Q.   THERE'S AN ATTACHMENT TO THE EMAIL THAT STARTS ON PAGE 2.

12:35PM  9         DO YOU SEE THAT?

12:35PM  10   A.   YES.

12:35PM  11   Q.   ARE YOU FAMILIAR WITH THE ATTACHMENT?

12:35PM  12   A.   YES.

12:35PM  13   Q.   AND WHAT IS THE ATTACHMENT?

12:35PM  14   A.   IT'S AN ARTICLE THAT HE OBTAINED WHILE AT THAT MEETING,

12:35PM  15   AND WE WERE LOOKING AT IT ON THE PLANE RIDE ON THE WAY HOME.

12:36PM  16   Q.   OKAY.  AND DID YOU RELY ON THE ARTICLE IN THE COURSE OF

12:36PM  17   MAKING RECOMMENDATIONS ABOUT THERANOS?

12:36PM  18   A.   YES.

12:36PM  19   Q.   OKAY.

12:36PM  20        YOUR HONOR, AT THIS TIME THE GOVERNMENT OFFERS PAGE 2.

12:36PM  21   IT'S NUMBERED PAGE 2 OF EXHIBIT 1944.

12:36PM  22        IT'S THE FIRST PAGE OF THE DOCUMENT, BUT IT SAYS PAGE 2

12:36PM  23   DOWN AT THE BOTTOM?

12:36PM  24              THE COURT:  MR. COOPERSMITH, DO YOU HAVE THAT?

12:36PM  25              MR. COOPERSMITH:  YOUR HONOR, WE DON'T OBJECT TO THE

12:36PM  1   ADMISSION OF PAGE 2 OF EXHIBIT 1944 AS A BUSINESS RECORD OF

12:36PM  2   RDV.

12:36PM  3              THE COURT:  OKAY.

12:36PM  4              MR. COOPERSMITH:  IF THAT IS THE ONLY THING BEING

12:36PM  5   OFFERED, THEN NO OBJECTION TO THAT PAGE.

12:36PM  6              MR. LEACH:  THAT'S ALL I'M OFFERING AT THIS TIME,

12:36PM  7   YOUR HONOR.

12:36PM  8              THE COURT:  OKAY.  THAT PAGE IS ADMITTED UNDER

12:36PM  9   803(6), AND IT MAY BE PUBLISHED.

12:37PM 10        (GOVERNMENT'S EXHIBIT 1944, PAGE 2, WAS RECEIVED IN

12:37PM 11   EVIDENCE.)

12:37PM 12   BY MR. LEACH:

12:37PM 13   Q.   AND IF WE CAN PLEASE ZOOM IN ON THE TOP PORTION,

12:37PM 14   MS. WACHS.

12:37PM 15        MS. PETERSON, DO YOU SEE JERRY TUBERGEN'S NAME IN THE FROM

12:37PM 16   LINE AT THE VERY TOP?

12:37PM 17   A.   YES.

12:37PM 18   Q.   AND DO YOU SEE THE DATE, SEPTEMBER 18TH, 2014?

12:37PM 19   A.   YES.

12:37PM 20   Q.   OKAY.  AND IS THIS EMAIL TO MEMBERS OF THE DEVOS FAMILY

12:37PM 21   WITH RESPONSIBILITY FOR INVESTMENTS IN THERANOS?

12:37PM 22   A.   YES.

12:37PM 23   Q.   MR. TUBERGEN WRITES HERE, "THIS MORNING I HAD ONE OF THE

12:37PM 24   MOST INTERESTING MEETINGS I CAN RECALL WITH THE WOMAN PROFILED

12:37PM 25   IN THE ATTACHED 'FORTUNE' MAGAZINE ARTICLE."

12:37PM  1          DO YOU SEE THAT LANGUAGE?

12:37PM  2     A.   YES.

12:37PM  3     Q.   AND DO YOU BELIEVE THAT TO BE A REFERENCE TO

12:37PM  4     ELIZABETH HOLMES?

12:37PM  5     A.   YES.

12:37PM  6     Q.   "IF YOU GET A CHANCE TO TAKE A LOOK AT THIS ARTICLE PRIOR

12:37PM  7     TO TOMORROW'S FC MEETING I WOULD ENCOURAGE YOU TO DO SO."

12:37PM  8          WHAT IS THE FC MEETING?

12:37PM  9     A.   FAMILY COUNSEL.

12:37PM  10    Q.   "I WOULD LIKE TO SEE IF WE CAN FIND 15 MINUTES TOMORROW TO

12:37PM  11    SHARE WITH YOU AND DISCUSS A VERY UNIQUE INVESTMENT

12:38PM  12    OPPORTUNITY."

12:38PM  13         DO YOU SEE THAT?

12:38PM  14    A.   YES.

12:38PM  15    Q.   AND "THE VERY UNIQUE INVESTMENT OPPORTUNITY" WAS THERANOS?

12:38PM  16    A.   YES.

12:38PM  17    Q.   OKAY.  AND THIS IS ROUGHLY CONSISTENT WITH THE TIME PERIOD

12:38PM  18    WHEN YOU GOT INVOLVED IN THE THERANOS ASSIGNMENT?

12:38PM  19    A.   YES.

12:38PM  20    Q.   OKAY.  AFTER -- AND DID YOU RECEIVE A COPY OF THE ARTICLE

12:38PM  21    THAT IS ATTACHED TO THIS EMAIL?

12:38PM  22    A.   YES.

12:38PM  23    Q.   OKAY.  AFTER RECEIVING THE ARTICLE, AFTER BEING ASKED TO

12:38PM  24    LOOK AT THERANOS, WHAT DID YOU DO?

12:38PM  25    A.   I READ THE ARTICLE FULLY AND THEN STARTED LOOKING AROUND

12:38PM   1    ON THE INTERNET.

12:38PM   2    Q.   OKAY.  WHEN YOU SAY YOU LOOKED AROUND ON THE INTERNET,

12:38PM   3    WHAT WERE YOU LOOKING FOR?

12:38PM   4    A.   JUST GOOGLING AND TRYING TO GET TO BETTER KNOW THE COMPANY

12:38PM   5    AND WHAT I COULD FIND OF HER, WATCHING VIDEOS ON YOUTUBE.

12:38PM   6    Q.   OKAY.  AND AT SOME POINT DID YOU HAVE MORE SUBSTANTIVE

12:38PM   7    CONVERSATIONS WITH MS. HOLMES ABOUT A POTENTIAL INVESTMENT IN

12:38PM   8    THERANOS?

12:38PM   9    A.   YES.

12:38PM   10   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO EXHIBIT 5809.

12:39PM   11        DO YOU HAVE THAT?

12:39PM   12   A.   YES.

12:39PM   13   Q.   OKAY.  IS THIS A TRUE AND CORRECT COPY OF AN EMAIL FROM

12:39PM   14   YOUR BOSS, MR. TUBERGEN, TO ELIZABETH HOLMES ON OR ABOUT

12:39PM   15   SEPTEMBER 19TH, 2014?

12:39PM   16   A.   YES.

12:39PM   17   Q.   AND DOES IT ATTACH A CONFIDENTIAL DISCLOSURE AGREEMENT

12:39PM   18   BETWEEN THERANOS AND RDV CORPORATION?

12:39PM   19   A.   YES.

12:39PM   20   Q.   OKAY.  I DRAW YOUR ATTENTION TO THE BOTTOM OF PAGE 2.

12:39PM   21        DO YOU SEE A SIGNATURE UNDER THE LINE THERANOS?

12:39PM   22   A.   YES.

12:39PM   23   Q.   AND DO YOU SEE A NAME ASSOCIATED WITH THAT SIGNATURE?

12:39PM   24   A.   YES.

12:39PM   25             MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

12:39PM  1    EXHIBIT 5809.

12:39PM  2              MR. COOPERSMITH:  WE OBJECT TO THE FIRST PAGE OF

12:39PM  3    EXHIBIT 5809 AS HEARSAY.

12:40PM  4              MR. LEACH:  I CAN ASK MORE FOUNDATIONAL QUESTIONS,

12:40PM  5    YOUR HONOR.

12:40PM  6              THE COURT:  SURE.

12:40PM  7    BY MR. LEACH:

12:40PM  8    Q.   MS. PETERSON, WITH RESPECT TO PAGE 1, WAS THIS EMAIL

12:40PM  9    MAINTAINED IN THE ORDINARY COURSE OF RDV'S BUSINESS?

12:40PM  10   A.   YES.

12:40PM  11   Q.   AND WAS IT PRESERVED IN THE ORDINARY COURSE OF RDV'S

12:40PM  12   BUSINESS?

12:40PM  13   A.   YES, IN OUR DOCUMENT MANAGEMENT SYSTEM.

12:40PM  14   Q.   OKAY.  AND WAS IT YOUR PRACTICE TO MAINTAIN AND RETAIN

12:40PM  15   AGREEMENTS BETWEEN RDV AND POTENTIAL INVESTMENTS --

12:40PM  16   A.   YES.

12:40PM  17   Q.   -- AS WELL AS THE COMMUNICATIONS BACK AND FORTH SO YOU

12:40PM  18   COULD HAVE A RECORD OF THAT?

12:40PM  19   A.   YES.

12:40PM  20             MR. LEACH:  YOUR HONOR, I OFFER PAGE 1 OF

12:40PM  21   EXHIBIT 5809.

12:40PM  22             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:40PM  23        (GOVERNMENT'S EXHIBIT 5809 WAS RECEIVED IN EVIDENCE.)

12:40PM  24             MR. LEACH:  AND, MS. WACHS, IF WE CAN ZOOM IN TO THE

12:40PM  25   TOP.

12:41PM  1    Q.   DO YOU SEE THE FROM LINE WITH MR. TUBERGEN'S NAME IN IT,

12:41PM  2    MS. PETERSON?

12:41PM  3    A.   YES.

12:41PM  4    Q.   AND ABOVE THAT THERE'S A CC LINE WITH DMOSLEY@CRAVATH.COM.

12:41PM  5         DO YOU SEE THAT?

12:41PM  6    A.   YES.

12:41PM  7    Q.   AND WHO IS DMOSLEY@CRAVATH.COM?

12:41PM  8    A.   DAN MOSLEY IS AN ESTATE ATTORNEY THAT THE FAMILY HAS USED

12:41PM  9    IN THE PAST, AND HE IS -- HOW HE LEARNED ABOUT THERANOS, HE IS

12:41PM  10   THE ONE WHO SET UP THE MEETING WITH ELIZABETH IN CHICAGO AT THE

12:41PM  11   BDT CONFERENCE.

12:41PM  12   Q.   AND CRAVATH, IS THAT A LAW FIRM?

12:41PM  13   A.   YES.

12:41PM  14   Q.   IS THAT A LAW FIRM IN NEW YORK?

12:41PM  15   A.   I BELIEVE SO.

12:41PM  16   Q.   OKAY.

12:41PM  17   A.   HE WAS IN NEW YORK, YES.

12:41PM  18   Q.   OKAY.  AND MR. TUBERGEN WRITES, "HI ELIZABETH,

12:41PM  19        "I'VE ATTACHED AN EXECUTED COPY OF THE CONFIDENTIALITY

12:41PM  20   AGREEMENT.  PLEASE LET ME KNOW IF YOU NEED ANYTHING ELSE.

12:41PM  21        "THANKS SO MUCH AND HAVE A GREAT WEEKEND."

12:41PM  22        DO YOU SEE THAT LANGUAGE?

12:41PM  23   A.   YES.

12:41PM  24   Q.   AND IF WE CAN GO TO PAGE 2.

12:42PM  25        WHAT WAS THE PURPOSE OF THIS CONFIDENTIAL DISCLOSURE

12:42PM 1    AGREEMENT?

12:42PM 2    A.   THAT WE WOULD, AS AN INVESTOR AND AS WE CONTEMPLATE THE

12:42PM 3    INVESTMENT, THAT WE WOULD KEEP THINGS CONFIDENTIAL.

12:42PM 4    Q.   OKAY.  DID THIS IN ANY WAY FACILITATE THE PROVISION OF

12:42PM 5    DOCUMENTS TO RDV?

12:42PM 6    A.   YES, WE WERE TO KEEP THOSE CONFIDENTIAL AS WELL.

12:42PM 7    Q.   OKAY.  AND BEFORE YOU RECEIVED ANY CONFIDENTIAL -- I

12:42PM 8    GUESS, WHY DID YOU ENTER INTO THIS AGREEMENT?

12:42PM 9    A.   SO THAT WE COULD RECEIVE INFORMATION FROM THEM TO REVIEW

12:42PM 10   AS PART OF THE INVESTMENT DECISION.

12:42PM 11   Q.   OKAY.  UP IN THE TOP LEFT CORNER THERE'S A DATE,

12:42PM 12   AUGUST 19TH, 2014.

12:42PM 13        DO YOU SEE THAT?

12:42PM 14   A.   YES.

12:42PM 15   Q.   AND THEN DOWN AT THE BOTTOM THERE ARE TWO SIGNATURES.

12:42PM 16   A.   YES.

12:42PM 17   Q.   AND DO YOU SEE THE SIGNATURE OF SUNNY BALWANI?

12:43PM 18   A.   YES.

12:43PM 19   Q.   AND DO YOU RECOGNIZE MR. TUBERGEN'S SIGNATURE TO THE RIGHT

12:43PM 20   OF RDV?

12:43PM 21   A.   YES.

12:43PM 22   Q.   AND LET ME ASK YOU TO NEXT LOOK AT DOCUMENT 5432.

12:43PM 23        IS THIS ANOTHER EMAIL IN THE CHAIN THAT WE JUST SAW

12:43PM 24   RELATING TO THE CONFIDENTIAL DISCLOSURE AGREEMENT BETWEEN RDV

12:43PM 25   AND THERANOS?

12:43PM 1      A.   YES.

12:43PM 2      Q.   AND LIKE THE EMAIL THAT WE JUST LOOKED AT, WAS THIS

12:43PM 3      PREPARED IN THE ORDINARY COURSE OF RDV'S BUSINESS?

12:43PM 4      A.   YES.

12:43PM 5      Q.   AND DID YOU PRESERVE THIS IN THE ORDINARY COURSE OF RDV'S

12:43PM 6      BUSINESS?

12:43PM 7      A.   YES.

12:43PM 8      Q.   AND WAS IT IMPORTANT TO BE ACCURATE GOING BACK AND FORTH

12:43PM 9      WITH THE POTENTIAL COMPANY THAT RDV WAS GOING TO INVEST IN SO

12:43PM 10     YOU HAD A RECORD OF THE INVESTMENT AND THE DECISIONS?

12:44PM 11     A.   YES.

12:44PM 12            MR. LEACH:  YOUR HONOR, I OFFER EXHIBIT 5432.

12:44PM 13            MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

12:44PM 14            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:44PM 15        (GOVERNMENT'S EXHIBIT 5432 WAS RECEIVED IN EVIDENCE.)

12:44PM 16     BY MR. LEACH:

12:44PM 17     Q.   LET'S START AT THE BOTTOM, MS. PETERSON.

12:44PM 18        DO YOU SEE THE FIRST EMAIL IN THIS CHAIN IS THE ONE THAT

12:44PM 19     WE SAW IN THE PRIOR EXHIBIT, 5809?

12:44PM 20     A.   YES.

12:44PM 21     Q.   AND THEN AS WE GO UP, IT APPEARS THAT MS. HOLMES WROTE,

12:44PM 22     "GOT IT.  WE'RE VERY MUCH LOOKING FORWARD TO OUR MEETING.

12:44PM 23        "I'VE HAD OUR TEAM PREPARE MATERIALS FOR YOU -- LET US

12:44PM 24     KNOW THE BEST ADDRESS TO WHICH TO SEND THEM AND WE'LL GET THEM

12:44PM 25     OUT TO YOU."

PETERSON DIRECT BY MR. LEACH

12:44PM  1          DO YOU SEE THAT LANGUAGE?

12:44PM  2     A.   YES.

12:44PM  3     Q.   DO YOU KNOW WHAT SHE'S REFERRING TO BY MATERIALS THAT THE

12:44PM  4     TEAM PREPARED?

12:44PM  5     A.   WE WERE SENT TWO LARGE BINDERS, DILIGENCE BINDERS FULL OF

12:44PM  6     INFORMATION.

12:44PM  7     Q.   AND AT A HIGH LEVEL, WHAT WAS IN THOSE TWO BINDERS OF

12:44PM  8     DILIGENCE INFORMATION?

12:44PM  9     A.   INFORMATION ABOUT THERANOS, ITS MISSION, A BIT OF ITS

12:45PM 10     HISTORY, AND PHARMACEUTICAL VERIFICATIONS OF THE -- THAT THE

12:45PM 11     EQUIPMENT WORKED, AND THEN A WHOLE LOT OF TESTING INFORMATION

12:45PM 12     THAT -- I'M NOT A SCIENTIST, SO THE SECOND BINDER WAS DIFFICULT

12:45PM 13     TO FOLLOW.

12:45PM 14     Q.   OKAY.  WE'LL GET BACK TO SOME OF THE DETAILS OF THAT.

12:45PM 15          BUT YOU BELIEVED THAT THE MATERIALS REFERRED TO IN THIS

12:45PM 16     EMAIL ARE THE DILIGENCE BINDERS THAT WERE PROVIDED TO YOU?

12:45PM 17     A.   YES.

12:45PM 18     Q.   OKAY.  MS. HOLMES ALSO WROTE, "WE CAN ALSO BE AVAILABLE TO

12:45PM 19     SET UP A CALL TO CONNECT ON BACKGROUND AND ANY ASSOCIATED

12:45PM 20     FOLLOW UP BY PHONE IN ADVANCE OF OUR MEETING IF WE DON'T HAVE

12:45PM 21     THE CHANCE TO SEE YOU UNTIL YOU'RE OTHERWISE OUT HERE IN

12:45PM 22     OCTOBER."

12:45PM 23          DO YOU SEE THAT?

12:45PM 24     A.   YES.

12:45PM 25     Q.   AND DID YOU, IN FACT, PARTICIPATE IN A CALL WITH

12:45PM   1    MS. HOLMES AFTER THIS EMAIL EXCHANGE?

12:45PM   2    A.   YES.

12:45PM   3    Q.   UP AT THE TOP THERE'S A RESPONSE BY MR. TUBERGEN WHERE HE

12:46PM   4    SAYS, "IS THERE SOMEONE I MAY HAVE MY EA" -- IS THAT EXECUTIVE

12:46PM   5    ASSISTANT?

12:46PM   6    A.   YES.

12:46PM   7    Q.   -- "CONNECT WITH TO ARRANGE THE DETAILS OF OUR VISIT ON

12:46PM   8    THE 14TH?"

12:46PM   9         DO YOU SEE THAT?

12:46PM  10    A.   YES.

12:46PM  11    Q.   AND THE VISIT ON THE 14TH, WHAT DOES THAT REFER TO?

12:46PM  12    A.   THAT WAS GOING TO BE OUR DILIGENCE MEETING, WHICH WAS

12:46PM  13    GOING TO BE US AND SUNNY AND ELIZABETH.

12:46PM  14    Q.   OKAY.  AND DID THAT MEETING END UP TAKING PLACE?

12:46PM  15    A.   YES.

12:46PM  16    Q.   WAS THAT OUT HERE IN CALIFORNIA?

12:46PM  17    A.   YES.

12:46PM  18    Q.   DID YOU PARTICIPATE IN THAT MEETING?

12:46PM  19    A.   YES.

12:46PM  20    Q.   DID MR. BALWANI PARTICIPATE IN THAT MEETING?

12:46PM  21    A.   YES.

12:46PM  22    Q.   DID MS. HOLMES PARTICIPATE?

12:46PM  23    A.   YES.

12:46PM  24    Q.   OKAY.  AND IN ADDITION TO THAT MEETING IN OCTOBER, YOU HAD

12:46PM  25    A PHONE CALL WITH MS. HOLMES IN ADVANCE; IS THAT FAIR?

12:46PM  1    A.   CORRECT.

12:46PM  2    Q.   OKAY.  LET'S LOOK AT EXHIBIT 2015.

12:47PM  3         DO YOU RECOGNIZE THIS?

12:47PM  4    A.   YES.

12:47PM  5    Q.   AND WHAT IS THIS?

12:47PM  6    A.   THESE ARE THE NOTES THAT I TOOK DURING THE CALL THAT WE

12:47PM  7    HAD WITH ELIZABETH ON OCTOBER 3RD.

12:47PM  8    Q.   OKAY.  WHO PARTICIPATED IN THIS CALL?

12:47PM  9    A.   JERRY TUBERGEN AND MYSELF AND ELIZABETH.

12:47PM 10    Q.   MR. BALWANI WAS NOT PRESENT FOR THIS?

12:47PM 11    A.   NOT THAT I KNOW OF.

12:47PM 12    Q.   OKAY.  AND WAS THIS PHONE CALL WITH MS. HOLMES PART OF

12:47PM 13    YOUR PROCESS IN TRYING TO OBTAIN INFORMATION ABOUT WHAT THE

12:47PM 14    COMPANY WAS ABOUT?

12:47PM 15    A.   YES.  TO OBTAIN SOME GENERAL INFORMATION, MORE MISSION

12:47PM 16    TYPE STUFF, AND ALSO TO SET UP THE DUE DILIGENCE MEETING THAT

12:47PM 17    WE WERE GOING TO HAVE LATER THAT MONTH.

12:47PM 18    Q.   AND --

12:47PM 19    A.   ALL OF THAT.

12:47PM 20    Q.   AND -- DID YOU RELY ON THE STATEMENTS OF MS. HOLMES IN THE

12:47PM 21    COURSE OF MAKING A RECOMMENDATION TO INVEST IN THERANOS?

12:48PM 22    A.   YES.

12:48PM 23    Q.   OKAY.  THESE ARE YOUR NOTES OF THE MEETING?

12:48PM 24    A.   YES.

12:48PM 25    Q.   DID YOU PREPARE THESE IN THE ORDINARY COURSE OF BUSINESS?

12:48PM   1    A.   YES.

12:48PM   2    Q.   DID YOU PREPARE THEM AT OR AROUND THE TIME OF THE PHONE

12:48PM   3    CALL?

12:48PM   4    A.   YES.

12:48PM   5    Q.   AND DID YOU PRESERVE THEM IN ORDER TO MAINTAIN A RECORD OF

12:48PM   6    WHAT RDV WAS INVESTING IN AND WHY?

12:48PM   7    A.   YES.

12:48PM   8        THIS WAS PRESERVED, AS WELL AS A MUCH LONGER MEMO WAS MADE

12:48PM   9    AS WELL BECAUSE WE NEEDED TO COMMUNICATE THIS NOT JUST TO

12:48PM  10    MEMORIALIZE IT, BUT ALSO TO SEND IT TO THE FAMILY MEMBERS AS

12:48PM  11    WELL.

12:48PM  12            MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

12:48PM  13    EXHIBIT 2015.

12:48PM  14            MR. COOPERSMITH:  802 OBJECTION, YOUR HONOR.

12:48PM  15            THE COURT:  IS THIS COMING IN AS A BUSINESS RECORD?

12:48PM  16            MR. LEACH:  YES, YOUR HONOR.

12:48PM  17            THE COURT:  YES.  IT WILL BE ADMITTED PURSUANT TO

12:48PM  18    803(6) AS A BUSINESS RECORD, AND IT MAY BE PUBLISHED.

12:48PM  19        (GOVERNMENT'S EXHIBIT 2015 WAS RECEIVED IN EVIDENCE.)

12:48PM  20            MR. LEACH:  THANK YOU, YOUR HONOR.

12:48PM  21        MS. WACHS, IF WE CAN ZOOM IN ON THE TOP HALF OF THIS.

12:49PM  22    Q.   DO YOU SEE AT THE TOP, MS. PETERSON, WHERE IT SAYS

12:49PM  23    "THERANOS CONF CALL NOTES"?

12:49PM  24    A.   YES.

12:49PM  25    Q.   AND THEN THERE'S A DATE AND THE NAME ELIZABETH HOLMES AND

PETERSON DIRECT BY MR. LEACH

12:49PM 1    TWO ACRONYMS.  WHAT ARE THOSE ACRONYMS?

12:49PM 2    A.   THAT'S JERRY'S INITIALS AND MY INITIALS.

12:49PM 3    Q.   AND IS THEN SAYS, "WHAT IS THE LONG-TERM VISION OF

12:49PM 4    THERANOS?"

12:49PM 5         WAS THAT ONE OF THE TOPICS ON THE PHONE CALL ON THE 3RD?

12:49PM 6    A.   YES, THOSE WERE OUR -- THE DARKENED STUFF WAS OUR

12:49PM 7    QUESTIONS THAT WE ASKED OF HER.

12:49PM 8    Q.   YOU WROTE, "BUILD A PLATFORM FOR DECENTRALIZED HEALTH CARE

12:49PM 9    USING THERANOS'S INFRASTRUCTURE."

12:49PM 10        DO YOU SEE THAT?

12:49PM 11   A.   YES.

12:49PM 12   Q.   IS THAT SOMETHING THAT MS. HOLMES TOLD YOU?

12:49PM 13   A.   YES.

12:49PM 14   Q.   "START WITH LASER-FOCUS ON COMMERCIAL LAB MARKET, THEN

12:49PM 15   DIRECT TO CONSUMER MARKETS."

12:49PM 16        DO YOU SEE THAT LANGUAGE?

12:49PM 17   A.   YES.

12:49PM 18   Q.   AND THEN THERE'S A LINE FOR WALGREENS.  DID THE TOPIC OF

12:49PM 19   WALGREENS COME UP IN THIS CONVERSATION WITH MS. HOLMES?

12:50PM 20   A.   YES.

12:50PM 21   Q.   WHAT DID SHE TELL YOU ABOUT WALGREENS?

12:50PM 22   A.   SHE TOLD US THAT THEY HAD STARTED -- THEY HAD A CONTRACT

12:50PM 23   WITH THEM, THAT THEY WERE IN 40 STORES, AND THEY WERE GOING TO

12:50PM 24   BEGIN THEIR ROLLOUT AND IT WAS -- THEY HAD CONTRACTS WITH THEM

12:50PM 25   AND THAT THEY HAD JUST BOUGHT BOOTS IN EUROPE AT THE TIME,

12:50PM  1    WALGREENS HAD BOUGHT BOOTS, AND THAT THAT WAS GOING TO BE A

12:50PM  2    NICE SEGUE INTO GETTING INTO THE MORE GLOBAL MARKET.

12:50PM  3    Q.   THERE'S A LINE FOR INSURANCE.

12:50PM  4         DO YOU SEE THAT?

12:50PM  5    A.   YES.

12:50PM  6    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT INSURANCE?

12:50PM  7    A.   THAT THIS WAS ANOTHER MARKET THAT DOES, THAT DOES BLOOD

12:50PM  8    TESTS, AND THAT WAS A MARKET THAT THEY WANTED TO TAP INTO.

12:50PM  9    Q.   SAME QUESTIONS FOR HOSPITAL/DOC GROUPS.

12:50PM  10        WHAT DOES THAT REFER TO?

12:50PM  11   A.   THAT THE HOSPITALS AND DOCTOR GROUPS PRESCRIBE TESTS TO

12:50PM  12   THEIR PATIENTS, AND THEY ALSO DO TESTS THAT SHE WANTED THAT

12:51PM  13   GROUP AS WELL.

12:51PM  14   Q.   AND THERE'S A REFERENCE TO PHARMA.

12:51PM  15        DO YOU SEE THAT?

12:51PM  16   A.   YES.

12:51PM  17   Q.   DID MS. HOLMES TELL YOU THERANOS WAS DOING WORK WITH

12:51PM  18   PHARMACEUTICAL COMPANIES?

12:51PM  19   A.   YES.

12:51PM  20   Q.   OKAY.  WHAT DID SHE SAY?

12:51PM  21   A.   SHE SAID THAT THEY HAD BEEN DOING WORK FOR PHARMACEUTICAL

12:51PM  22   COMPANIES, TEN OF THE TOP PHARMACEUTICAL COMPANIES FOR THE LAST

12:51PM  23   NINE TO TEN YEARS.

12:51PM  24   Q.   FURTHER BELOW -- IF WE CAN ZOOM OUT, MS. WACHS -- THERE'S

12:51PM  25   A LINE "WALGREENS.

12:51PM 1          "NATIONAL ROLLOUT.

12:51PM 2          "PROJECTIONS BASED ON 900 STORES."

12:51PM 3          DO YOU SEE THAT?

12:51PM 4     A.   YES.

12:51PM 5     Q.   AND WHAT DID THAT REFER TO?

12:51PM 6     A.   WITHIN THE BINDER THERE WERE TWO PAGES OF FINANCIAL

12:51PM 7     INFORMATION, AND WE WANTED TO KNOW WHAT THE WALGREENS ROLLOUT

12:51PM 8     WAS GOING TO BE AND WHAT WAS THE BASIS FOR THOSE PROJECTIONS OR

12:52PM 9     THOSE FINANCIAL STATEMENTS FOR 2015.

12:52PM 10         AND SHE SAID THAT WAS BASED ON 900 STORES, A ROLLOUT GOING

12:52PM 11    FROM 40 TO 900.

12:52PM 12    Q.   AND DURING THIS OCTOBER CALL, DID MS. HOLMES DESCRIBE FOR

12:52PM 13    YOU ANY ISSUES WITH THE WALGREENS ROLLOUT?

12:52PM 14    A.   NO.

12:52PM 15    Q.   DID SHE SAY ANYTHING TO THE EFFECT THAT WALGREENS WAS NOT

12:52PM 16    GOING TO EXPAND IN ADDITIONAL STORES UNTIL THERANOS COULD GET

12:52PM 17    ITS FINGERSTICK TESTING TO A LOWER PERCENTAGE?

12:52PM 18    A.   NO.

12:52PM 19              MR. COOPERSMITH:  OBJECTION.  LACKS FOUNDATION.

12:52PM 20    MOVE TO STRIKE.

12:52PM 21              THE COURT:  YOU'RE ASKING WHETHER SHE RECEIVED THIS

12:52PM 22    INFORMATION?

12:52PM 23              MR. LEACH:  YES.

12:52PM 24              THE COURT:  OVERRULED.  THAT ANSWER CAN REMAIN.

12:52PM 25    BY MR. LEACH:

12:52PM 1    Q.   FURTHER BELOW IT SAYS "RISKS."

12:52PM 2         DO YOU SEE THAT?

12:52PM 3    A.   YES.

12:52PM 4    Q.   AND THERE'S A LINE, "NOW HAVE LONG-TERM CONTRACTS, SO RISK

12:52PM 5    IS EXECUTION."

12:52PM 6         DO YOU SEE THAT?

12:52PM 7    A.   YES.

12:52PM 8    Q.   AND WHAT DID -- IS THAT SOMETHING THAT MS. HOLMES TOLD

12:52PM 9    YOU?

12:52PM 10   A.   YES.

12:52PM 11   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN, "RISK IS

12:53PM 12   EXECUTION"?

12:53PM 13   A.   THAT THEY HAD CONTRACTS WITH -- THE TWO THAT WE TALKED

12:53PM 14   ABOUT THE MOST WAS SAFEWAY AND WALGREENS, AND THAT THE RISK TO

12:53PM 15   IT WAS THE ROLLOUT AND MAKING SURE THAT THEY HAD THE PEOPLE IN

12:53PM 16   PLACE AND THE RESOURCES TO ACTUALLY EXECUTE ON THE ROLLOUT

12:53PM 17   PLAN.

12:53PM 18   Q.   IN THIS PHONE CALL, DID MS. HOLMES MENTION ANYTHING

12:53PM 19   RELATING TO TECHNOLOGY RISK?

12:53PM 20   A.   NO.

12:53PM 21   Q.   OKAY.  YOU MENTIONED A MEMO THAT YOU PREPARED AFTER THIS

12:53PM 22   PHONE CALL.

12:53PM 23        DO YOU RECALL THAT TESTIMONY, MS. PETERSON?

12:53PM 24   A.   YES.

12:53PM 25   Q.   OKAY.  LET ME ASK YOU TO PLEASE LOOK AT EXHIBIT 2073.

12:54PM    1          DO YOU RECOGNIZE THIS EMAIL?

12:54PM    2     A.   YES.

12:54PM    3     Q.   AND I'M ON -- IT SAYS PAGE 3 DOWN AT THE BOTTOM, BUT IT'S

12:54PM    4     ACTUALLY THE FIRST PAGE OF THE EXHIBIT.

12:54PM    5          DO YOU SEE THAT?

12:54PM    6     A.   YES.

12:54PM    7     Q.   AND WHAT IS THIS DOCUMENT?

12:54PM    8     A.   THIS WAS AN EMAIL THAT I HAD SENT TO JERRY AND COPIED

12:54PM    9     MIKE LUNT, WHO WAS OUR IN-HOUSE COUNSEL AT THE TIME, JUST A

12:54PM   10     SUMMARY MEMO.

12:54PM   11          JERRY HAD ASKED FOR A SUMMARY NOT ONLY OF THE PHONE CALL,

12:54PM   12     BUT ALSO A SUMMARY OF THINGS THAT WERE IN THE BINDER, TO BEGIN

12:54PM   13     TO PREPARE FOR THE DILIGENCE MEETING THAT WE WERE GOING TO HAVE

12:54PM   14     IN CALIFORNIA.

12:54PM   15     Q.   OKAY.  IN ADVANCE OF THE PHONE CALL THAT YOU HAD WITH

12:54PM   16     MS. HOLMES, DID YOU RECEIVE THE TWO BINDERS OF DILIGENCE

12:54PM   17     DOCUMENTS?

12:54PM   18     A.   YES.

12:54PM   19     Q.   AND DID YOU REVIEW THOSE CAREFULLY?

12:54PM   20     A.   YES.

12:54PM   21     Q.   AND WHY DID YOU REVIEW THOSE CAREFULLY?

12:54PM   22     A.   THAT'S MY JOB.  YOU KNOW, TO BETTER UNDERSTAND EVERYTHING

12:55PM   23     THAT WE GOT, AND ALSO TO BEGIN TO FORM QUESTIONS TO ASK WHILE

12:55PM   24     WE WERE ON THE DILIGENCE RUN.

12:55PM   25     Q.   AND THE MEMO THAT IS ATTACHED TO THE EMAIL IN

12:55PM 1    EXHIBIT 27-- 2073 BEGINNING ON PAGE 4, IS THIS SOMETHING THAT

12:55PM 2    YOU PREPARED?

12:55PM 3    A.   YES.

12:55PM 4    Q.   AND DID YOU PREPARE THIS IN THE ORDINARY COURSE OF

12:55PM 5    BUSINESS?

12:55PM 6    A.   YES.

12:55PM 7    Q.   AND DID YOU PREPARE THIS BASED ON THE DILIGENCE MATERIALS

12:55PM 8    THAT YOU HAD RECEIVED, THE PUBLIC INFORMATION THAT YOU HAD

12:55PM 9    REVIEWED, AND YOUR PHONE CONVERSATION WITH MS. HOLMES?

12:55PM 10   A.   YES.

12:55PM 11   Q.   AND WERE YOU TRYING TO BE AS ACCURATE AS POSSIBLE IN

12:55PM 12   SUMMARIZING THE INVESTMENT OPPORTUNITY?

12:55PM 13   A.   YES.

12:55PM 14   Q.   OKAY.  AND WAS THIS PRESERVED IN THE ORDINARY COURSE OF

12:55PM 15   RDV'S BUSINESS?

12:55PM 16   A.   YES.

12:55PM 17           MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

12:55PM 18   EXHIBIT 2073.

12:55PM 19           MR. COOPERSMITH:  YOUR HONOR, OBJECTION UNDER 802.

12:55PM 20      AND I'LL ALSO NOTE THAT THE DOCUMENT HAS MULTIPLE LAYERS

12:55PM 21   OF HEARSAY IN IT.

12:56PM 22           THE COURT:  YOU'RE SPEAKING ABOUT THE MEMO ITSELF?

12:56PM 23   IS THAT WHAT YOU'RE TALKING ABOUT?

12:56PM 24           MR. COOPERSMITH:  I'M TALKING ABOUT THE ATTACHMENT,

12:56PM 25   YOUR HONOR, YES.

PETERSON DIRECT BY MR. LEACH

12:56PM  1                   THE COURT:  RIGHT, RIGHT.

12:56PM  2              MR. LEACH.

12:56PM  3                   MR. LEACH:  YOUR HONOR, THIS IS A BUSINESS RECORD OF

12:56PM  4    RDV UNDER 803(6).

12:56PM  5         I'M ALSO OFFERING IT NOT FOR THE TRUTH, BUT ALSO AS THE

12:56PM  6    MEMORIALIZATION AS FOR THE REASONS OF WHY THEY INVESTED.

12:56PM  7                   THE COURT:  AND THIS IS THE MEMO DATED OCTOBER 3RD,

12:56PM  8    2014?

12:56PM  9                   MR. LEACH:  YES, YOUR HONOR.

12:56PM 10                   THE COURT:  ALL RIGHT.  IT'S ADMITTED.  THE

12:56PM 11    OBJECTION IS OVERRULED, AND IT'S ADMITTED UNDER 803(6).

12:56PM 12         (GOVERNMENT'S EXHIBIT 2073 WAS RECEIVED IN EVIDENCE.)

12:56PM 13                   MR. LEACH:  MAY I DISPLAY, YOUR HONOR?

12:56PM 14                   THE COURT:  YES.

12:56PM 15                   MR. LEACH:  THANK YOU.

12:56PM 16         IF WE CAN GO TO THE FIRST PAGE OF THE DOCUMENT, MS. WACHS.

12:56PM 17              EXCELLENT.  AND IF WE CAN ZOOM IN AT THE TOP, PLEASE.

12:56PM 18    Q.   MS. PETERSON, DO YOU SEE YOUR NAME IN THE FROM LINE?

12:57PM 19    A.   YES.

12:57PM 20    Q.   AND THE DATE OF THIS IS OCTOBER 12TH, 2014?

12:57PM 21    A.   CORRECT.

12:57PM 22    Q.   SO THAT'S AFTER YOUR PHONE CALL WITH MS. HOLMES?

12:57PM 23    A.   YES.

12:57PM 24    Q.   BUT BEFORE YOUR TRIP OUT TO CALIFORNIA?

12:57PM 25    A.   YES.

12:57PM    1    Q.   OKAY.  YOU WROTE, "HEY, JERRY, HERE'S THE MEMO YOU WERE

12:57PM    2    LOOKING FOR THAT GOES A LITTLE FURTHER BEYOND JUST SUMMARIZING

12:57PM    3    THE CALL LAST WEEK WITH ELIZABETH.  I ALSO TRIED TO INCORPORATE

12:57PM    4    A HIGH-LEVEL OVERVIEW OF THE KEY PARTS OF EVERYTHING I'VE READ

12:57PM    5    IN THE MATERIALS SHE SENT."

12:57PM    6         DO YOU SEE THAT LANGUAGE?

12:57PM    7    A.   YES.

12:57PM    8    Q.   THE MATERIALS SHE SENT, WAS THAT A REFERENCE TO THE DUE

12:57PM    9    DILIGENCE BINDERS?

12:57PM   10    A.   YES.

12:57PM   11    Q.   AND THOSE WERE PROVIDED UNDER THE CONFIDENTIALITY

12:57PM   12    AGREEMENT THAT MR. BALWANI EXECUTED?

12:57PM   13    A.   CORRECT.

12:57PM   14    Q.   AND YOU THEN WROTE, "I THINK IT GIVES YOU AND THE FAMILY

12:57PM   15    MEMBERS GOING ON THIS TRIP A SHORT BUT SOLID BASIS OF THE

12:57PM   16    COMPANY, ITS OBJECTIVES, ITS HISTORY, ITS ADVANTAGES, ITS

12:57PM   17    SKEPTIC'S VIEWS, ET CETERA, AND ENOUGH OF A VIEW TO HAVE AN

12:58PM   18    ENGAGED AND PRODUCTIVE MEETING ON TUESDAY WITHOUT HAVING TO

12:58PM   19    READ THROUGH THE FOOT OF MATERIALS SHE SENT."

12:58PM   20         DO YOU SEE THAT?

12:58PM   21    A.   YES.

12:58PM   22    Q.   AND IS THAT A FAIR SUMMARY OF YOUR MEMO?

12:58PM   23    A.   YES.

12:58PM   24    Q.   AND LET'S GO TO THE PAGE -- THE NEXT PAGE.

12:58PM   25         LET'S ZOOM IN ON THE FIRST HALF IF WE COULD, MS. WACHS.

PETERSON DIRECT BY MR. LEACH

12:58PM  1         DO YOU SEE IN THE TO LINE IT'S FROM YOU AND AN INDIVIDUAL

12:58PM  2    NAMED MICHAEL LUNT?

12:58PM  3    A.   YES.

12:58PM  4    Q.   AND THERE'S A TO LINE FROM JERRY TUBERGEN AND A FROM LINE

12:58PM  5    FROM YOU AND MICHAEL LUNT.

12:58PM  6         WHO WAS MICHAEL LUNT?

12:58PM  7    A.   HE WAS OUR IN-HOUSE COUNSEL AT THE TIME.

12:58PM  8    Q.   YOU THEN WRITE, "RECAP OF CONVERSATIONS WITH

12:58PM  9    ELIZABETH HOLMES AND EXCERPTS FROM WRITTEN MATERIALS PROVIDED

12:58PM 10    TO RDV ON THE COMPANY."

12:58PM 11         DO YOU SEE THAT LANGUAGE?

12:58PM 12    A.   YES.

12:58PM 13    Q.   AND YOU THEN WROTE, "WHAT IS THERANOS TODAY?

12:58PM 14         "INSTEAD OF VIALS OF BLOOD (ONE FOR EVERY TEST NEEDED)

12:59PM 15    THERANOS REQUIRES ONLY A PINPRICK AND A DROP OF BLOOD TO

12:59PM 16    PERFORM HUNDREDS OF TESTS, FROM STANDARD CHOLESTEROL CHECKS TO

12:59PM 17    SOPHISTICATED GENETIC ANALYSES."

12:59PM 18         DO YOU SEE THAT LANGUAGE?

12:59PM 19    A.   YES.

12:59PM 20    Q.   WHERE DID YOU GET THAT INFORMATION?

12:59PM 21    A.   SHE HAD SAID THAT MANY TIMES IN DESCRIBING WHAT THERANOS

12:59PM 22    IS.

12:59PM 23         IT'S ALSO SUMMARIZED IN SOME OF THE OTHER MATERIALS THAT

12:59PM 24    WE READ, BUT WE HEARD THIS FROM HER MANY TIMES.

12:59PM 25    Q.   AND WAS THAT RELEVANT TO RDV'S INVESTMENT DECISION?

12:59PM   1     A.   YES.

12:59PM   2     Q.   AND HOW SO?

12:59PM   3     A.   THAT YOU COULD DO THAT WITH A -- THAT THE MACHINE COULD DO

12:59PM   4     THAT WITH A PINPRICK AND IT COULD PERFORM HUNDREDS OF TESTS.

12:59PM   5     Q.   IT THEN GOES ON TO SAY, "THE RESULTS ARE FASTER (COUPLE

12:59PM   6     HOURS), MORE ACCURATE (100 PERCENT AUTOMATED, NO MANUAL

12:59PM   7     HANDLING THE SAMPLE), AND FAR CHEAPER THAN CONVENTIONAL

12:59PM   8     METHODS."

12:59PM   9          DO YOU SEE THAT LANGUAGE?

12:59PM  10     A.   YES.

12:59PM  11     Q.   AND WHERE DID YOU GET THAT INFORMATION?

01:00PM  12     A.   THAT CAME FROM HER AS WELL, AND I'M SURE IT'S PROBABLY IN

01:00PM  13     THE MATERIALS AS WELL.

01:00PM  14     Q.   WAS THAT INFORMATION RELEVANT TO RDV'S INVESTMENT

01:00PM  15     DECISION?

01:00PM  16     A.   YES.

01:00PM  17     Q.   WHY?

01:00PM  18     A.   WE REALLY THOUGHT, IF IT DID ALL OF THIS, IT WAS GOING TO

01:00PM  19     CHANGE HEALTH CARE.  IT WAS VERY TRANSFORMATIVE AND IT WAS

01:00PM  20     CHEAPER.

01:00PM  21     Q.   LET'S LOOK AT PAGE 2, PLEASE, OR 2 OF THE MEMO, PAGE 5 OF

01:00PM  22     THE EXHIBIT.

01:00PM  23          THERE'S A PARAGRAPH TITLED "DESCRIBE THE WALGREENS

01:00PM  24     OPPORTUNITY."

01:00PM  25          DO YOU SEE THAT?

01:00PM  1    A.   YES.

01:00PM  2    Q.   AND WAS THAT A QUESTION THAT YOU POSED TO MS. HOLMES AT

01:00PM  3    SOME POINT?

01:00PM  4    A.   YES.  THIS WAS FROM THE PHONE CALL.

01:00PM  5    Q.   OKAY.  AND I WANT TO DRAW YOUR ATTENTION TO THE MIDDLE OF

01:00PM  6    THE PARAGRAPH.  THERE'S A LINE THAT SAYS, "THERANOS'S REVENUE

01:00PM  7    FOR 2015 IS PROJECTED TO BE $990 MILLIN AND ASSUMES THEY OPEN

01:01PM  8    900 WALGREENS-THERANOS CENTERS NEXT YEAR."

01:01PM  9         DO YOU SEE THAT LANGUAGE?

01:01PM 10    A.   YES.

01:01PM 11    Q.   WAS THAT INFORMATION IMPORTANT TO RDV'S INVESTMENT

01:01PM 12    DECISION?

01:01PM 13    A.   EXTREMELY IMPORTANT, YES.

01:01PM 14    Q.   WHY IS THAT?

01:01PM 15    A.   BECAUSE IT SHOWED THAT THE REVENUE BEING PRESENTED IN 2015

01:01PM 16    WAS FULLY SUPPORTED BY CONTRACTS WITH WALGREENS THAT INCLUDED

01:01PM 17    THIS ROLLOUT, WHICH WE DID READ WITHIN THE WALGREENS 10-K THAT

01:01PM 18    THEY WERE MOVING FORWARD WITH THAT A YEAR -- I THINK IT WAS THE

01:01PM 19    2013 10-K.

01:01PM 20         SO WE DIDN'T HEAR ANYTHING CONTRARY TO THAT FROM

01:01PM 21    ELIZABETH HOLMES OR SUNNY.

01:01PM 22    Q.   AND THERE WAS A REFERENCE TO -- AND WHERE DID THIS

01:01PM 23    INFORMATION COME FROM, THE $990 MILLION AND THE 900 --

01:02PM 24    A.   THAT CAME FROM ELIZABETH WHEN WE WERE SPEAKING TO HER, AS

01:02PM 25    WELL AS THE FINANCIALS WERE IN THE BINDER.

01:02PM  1    Q.   THE DUE DILIGENCE MATERIALS THAT WERE PROVIDED TO YOU?

01:02PM  2    A.   YES.

01:02PM  3    Q.   OKAY.  IF WE COULD GO FURTHER DOWN, MS. WACHS.

01:02PM  4         DO YOU SEE THE BOLD HEADLINE, "WHAT ARE THE MAIN RISKS

01:02PM  5    THAT THERANOS FACES?"

01:02PM  6    A.   YES.

01:02PM  7    Q.   AND YOU WROTE, "HOLMES BELIEVES THE COMPANY'S PRIMARY RISK

01:02PM  8    IS THE EXECUTION OF ITS BUSINESS PLAN, RATHER THAN TECHNOLOGY,

01:02PM  9    VALIDATION, AND CUSTOMER ACCEPTANCE."

01:02PM 10         DO YOU SEE THAT LANGUAGE?

01:02PM 11    A.   YES.

01:02PM 12    Q.   AND WAS THAT IMPORTANT TO RDV'S INVESTMENT DECISION?

01:02PM 13    A.   VERY.

01:02PM 14    Q.   OKAY.  AND WHERE DID YOU GET THIS INFORMATION?

01:02PM 15    A.   THIS CAME DIRECTLY FROM HER IN OUR PHONE CONVERSATION.

01:02PM 16    Q.   OKAY.  AND WHY WAS THIS RELEVANT TO YOU?

01:02PM 17    A.   BECAUSE IT SHOWED THAT IT HAS BEEN DOING TESTS FOR YEARS

01:02PM 18    AND WAS VALIDATED BY PHARMACEUTICAL COMPANIES.

01:02PM 19    Q.   IT GOES ON TO SAY, "SINCE 2005 THERANOS'S CLIENTS INCLUDED

01:03PM 20    10 OF THE TOP 15 PHARMACEUTICAL COMPANIES AS THEY CONDUCTED

01:03PM 21    CLINICAL TRIALS."

01:03PM 22         DO YOU SEE THAT LANGUAGE?

01:03PM 23    A.   YES.

01:03PM 24    Q.   AND WHERE DID YOU GET THAT INFORMATION?

01:03PM 25    A.   FROM ELIZABETH.

01:03PM  1    Q.   AND WAS THAT RELEVANT TO YOU?

01:03PM  2    A.   VERY, YES.

01:03PM  3    Q.   WHY?

01:03PM  4    A.   BECAUSE IT SHOWED THAT -- AGAIN, IT VALIDATED THE SCIENCE

01:03PM  5    AND THAT IT WORKED AND IT HAD BEEN WORKING FOR MANY YEARS WITH

01:03PM  6    PHARMACEUTICAL COMPANIES.

01:03PM  7    Q.   FURTHER ON IT SAYS, "THROUGH THIS WORK, THERANOS HAS BEEN

01:03PM  8    COMPREHENSIVELY VALIDATED OVER THE LAST 9 YEARS BY THE 10

01:03PM  9    LARGEST PHARMACEUTICAL COMPANIES."

01:03PM 10        IS THAT CONSISTENT WITH STATEMENTS THAT MS. HOLMES MADE TO

01:03PM 11    YOU?

01:03PM 12    A.   YES.

01:03PM 13    Q.   OKAY.  IF WE COULD ZOOM FURTHER DOWN, THERE'S A HEADING

01:03PM 14    "WHAT ARE THERANOS'S KEY OBJECTIVES FOR THE MEETING ON

01:03PM 15    OCTOBER 14TH?"

01:03PM 16        DO YOU SEE THAT PARAGRAPH?

01:04PM 17    A.   YES.

01:04PM 18    Q.   OKAY.  AND THE MEETING ON OCTOBER 14TH, IS THAT A

01:04PM 19    REFERENCE TO A MEETING BETWEEN RDV AND THERANOS?

01:04PM 20    A.   YES.

01:04PM 21    Q.   AND DID YOU ATTEND THAT MEETING?

01:04PM 22    A.   YES.

01:04PM 23    Q.   AND THAT'S THE MEETING OUT HERE IN PALO ALTO?

01:04PM 24    A.   YES.

01:04PM 25    Q.   YOU WROTE, "HOLMES IS SEEKING INVESTORS WHO WANT TO BUILD

01:04PM  1      A GREAT COMPANY THAT WILL BOTH 'DO WELL AND DO GOOD' OVER THE

01:04PM  2      COURSE OF MULTIPLE GENERATIONS.

01:04PM  3           "THUS, HOLMES AND THE THERANOS TEAM WANT TO GET TO KNOW

01:04PM  4      THE PEOPLE MAKING THE INVESTMENT, UNDERSTANDING THEIR

01:04PM  5      INVESTMENT PHILOSOPHY AND TARGET INVESTMENT PROFILE AS WELL AS

01:04PM  6      MEET IN PERSON THOSE WHO WILL BE INTERACTING WITH THE COMPANY

01:04PM  7      ON A GO-FORWARD BASIS."

01:04PM  8           DO YOU SEE THAT LANGUAGE?

01:04PM  9      A.   YES.

01:04PM  10     Q.   AND WHAT WERE YOU GETTING AT THERE?

01:04PM  11     A.   I WAS TRYING TO CONVEY TO THE FAMILY MEMBERS THAT WERE

01:04PM  12     GOING TO GO ON THIS TRIP WHAT THE -- PART OF THE AGENDA FOR THE

01:04PM  13     MEETING WAS TO GET TO KNOW EACH OTHER.

01:04PM  14          SHE MADE IT CLEAR THAT THEY WANTED TO HAND PICK FIVE TO

01:04PM  15     EIGHT FAMILY INVESTORS BECAUSE THE TRADITIONAL INVESTORS OF,

01:05PM  16     I'LL CALL IT VENTURE FIRMS OR OTHER INSTITUTIONAL MONEY, KIND

01:05PM  17     OF HAD A TIMEFRAME ON THEY WANTED THEIR MONEY BACK.

01:05PM  18          SO SHE WAS LOOKING FOR FAMILY INVESTORS THAT COULD -- THAT

01:05PM  19     WERE SEEKING THIS MORE LONG-TERM, DO GOOD TRANSFORM HEALTH CARE

01:05PM  20     TYPE OF INVESTORS.

01:05PM  21          SO WE WANTED -- I WANTED TO MAKE SURE THAT THE FAMILY

01:05PM  22     UNDERSTOOD WHAT SHE WAS LOOKING FOR, YOU KNOW, AS WE WENT OUT

01:05PM  23     THERE.

01:05PM  24     Q.   WHEN YOU SAY "HAND PICKED," WAS THERE -- DID YOU FEEL AT

01:05PM  25     THE TIME THAT YOU WERE BEING PICKED AS MUCH AS YOU WERE PICKING

01:05PM   1    THERANOS?

01:05PM   2    A.   YES.

01:05PM   3              MR. COOPERSMITH:  OBJECTION.  LEADING.

01:05PM   4              THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

01:05PM   5    BY MR. LEACH:

01:05PM   6    Q.   CAN YOU EXPLAIN THAT?

01:05PM   7    A.   YES.  IT WAS PRETTY CLEAR TO US -- I THINK IT'S EVEN IN

01:05PM   8    THE LETTER THAT SHE HAD WRITTEN TO US IN THE FRONT OF THE

01:06PM   9    BINDERS -- THAT SHE WAS -- SHE DESIRED TO HAVE FIVE TO EIGHT

01:06PM  10    INVESTORS, FAMILY TYPE INVESTORS.

01:06PM  11         SO, YES, WE DID FEEL AS THOUGH -- THAT'S A SMALL NUMBER OF

01:06PM  12    PEOPLE, SO WE FELT, WHEN WE WENT OUT THERE, THAT WE WANTED TO

01:06PM  13    MAKE SURE THAT SHE UNDERSTOOD OUR BELIEFS AND INVESTMENT

01:06PM  14    PHILOSOPHIES AS MUCH AS WE UNDERSTOOD THEIRS.

01:06PM  15    Q.   DID THAT INFLUENCE IN ANY WAY HOW YOU WENT ABOUT YOUR

01:06PM  16    WORK?

01:06PM  17    A.   NOT ME PARTICULARLY.

01:06PM  18         BUT I THINK IT'S IMPORTANT FOR THE FAMILY, AND FOR JERRY,

01:06PM  19    THAT WE INVEST IN THINGS THAT SHARE THE SAME COMMON BELIEFS AND

01:06PM  20    VISION FOR THINGS SUCH AS HEALTH CARE AND EDUCATION.

01:06PM  21    Q.   LET'S LOOK AT THE NEXT PAGE OF THIS DOCUMENT.

01:06PM  22         DO YOU SEE UP AT THE TOP THE HEADING "APPENDIX --

01:07PM  23    STATISTICS AND NOTEWORTHY ITEMS"?

01:07PM  24    A.   YES.

01:07PM  25    Q.   AND THEN THERE'S A NUMBER OF BULLETS.

01:07PM   1        WHY WERE YOU INCLUDING THIS INFORMATION IN YOUR MEMO?

01:07PM   2   A.   THIS WAS JUST A NUMBER OF THINGS THAT I HAD TAKEN FROM THE

01:07PM   3   BINDERS AND THINGS THAT I HAD READ, A NUMBER -- THEY HAD

01:07PM   4   REFERENCED A NUMBER OF ARTICLES TO READ IN THE BINDER, AND A

01:07PM   5   LOT OF THIS STUFF WAS PULLED FROM THERE.

01:07PM   6        I JUST WANTED THE FAMILY TO HAVE A FULL -- THE DEVOSES

01:07PM   7   THAT WENT ON THE TRIP TO HAVE A FULL UNDERSTANDING OF

01:07PM   8   EVERYTHING THAT I HAD READ.

01:07PM   9   Q.   DID YOU BELIEVE THAT THIS INFORMATION WAS RELEVANT TO AN

01:07PM  10   INVESTMENT DECISION?

01:07PM  11   A.   VERY, YES.

01:07PM  12   Q.   OKAY.  IN THE THIRD BULLET IT SAYS, "THE PRE- AND

01:07PM  13   POST-ANALYTICAL PHASES OF THE LAB TESTING PROCESS (HUMAN

01:07PM  14   INTERACTION PARTS) ACCOUNT FOR 93 PERCENT OF ERRORS.  THERANOS

01:07PM  15   AUTOMATES THE PRE- AND POST-ANALYTIC PROCESSES (NO MANUAL

01:08PM  16   HANDLING OF THE SAMPLE), DRASTICALLY MINIMIZING THE HUMAN

01:08PM  17   ELEMENTS OF PROCESSING WHICH IS PROVEN TO CAUSE OF THE MAJORITY

01:08PM  18   OF LAB TEST ERRORS."

01:08PM  19        DO YOU SEE THAT LANGUAGE?

01:08PM  20   A.   YES.

01:08PM  21   Q.   AND WHERE DID YOU GET THAT INFORMATION?

01:08PM  22   A.   THAT COULD HAVE BEEN WRITTEN SOMEWHERE, TOO, BUT I DO

01:08PM  23   RECALL HER TALKING ABOUT THAT AT LENGTH.

01:08PM  24   Q.   AND WAS THIS IMPORTANT TO YOU?

01:08PM  25   A.   YES.

01:08PM   1   Q.   DOWN TOWARDS THE BOTTOM THERE'S A BULLET, "THERANOS USES

01:08PM   2   THEIR OWN ANALYZER EQUIPMENT."

01:08PM   3        DO YOU SEE THAT LANGUAGE?

01:08PM   4   A.   YES.

01:08PM   5   Q.   AND WAS THAT YOUR UNDERSTANDING?

01:08PM   6   A.   YES.

01:08PM   7   Q.   WAS THAT IMPORTANT TO YOU?

01:08PM   8   A.   YES.

01:08PM   9   Q.   WHY?

01:08PM  10   A.   WE DID HAVE A DISCUSSION AROUND THE -- WHY IT DIDN'T HAVE

01:08PM  11   TO BE FDA APPROVED, AND THIS WAS KIND OF THE ANSWER THAT THEY

01:08PM  12   HAD GIVEN, THAT THEY USED THEIR OWN ANALYZER EQUIPMENT, THEY

01:08PM  13   DON'T SELL THEM.

01:08PM  14        SO, YEAH, IT WAS IMPORTANT FOR US TO UNDERSTAND AS MUCH AS

01:09PM  15   WE COULD HOW THEY DO WHAT THEY DO.

01:09PM  16   Q.   OKAY.  WAS IT IMPRESSIVE TO YOU THAT THERANOS USES ITS OWN

01:09PM  17   ANALYZER EQUIPMENT?

01:09PM  18   A.   YES, IT WAS IMPRESSIVE THAT IT WORKED.

01:09PM  19   Q.   OKAY.  AND WHERE DID YOU GET THIS INFORMATION, "THERANOS

01:09PM  20   USES THEIR OWN ANALYZER EQUIPMENT"?

01:09PM  21   A.   THAT WAS MENTIONED MANY TIMES THROUGH THE COURSE OF OUR

01:09PM  22   DILIGENCE, AND I'M SURE IT'S IN THE MATERIALS AS WELL.

01:09PM  23   Q.   OKAY.  WHEN YOU SAY IT WAS MENTIONED MANY TIMES, DO YOU

01:09PM  24   MEAN THE PHONE CALL WITH MS. HOLMES?

01:09PM  25   A.   YES, YES.  AND IT WAS SAID AGAIN AT THE MEETING.

01:09PM   1    Q.   THE MEETING OUT IN CALIFORNIA?

01:09PM   2    A.   YES.

01:09PM   3    Q.   OKAY.   IN THE NEXT -- AT ANY POINT IN TIME DID MS. HOLMES

01:09PM   4    OR MR. BALWANI TELL YOU THAT THERANOS USED EQUIPMENT

01:09PM   5    MANUFACTURED BY OTHERS?

01:09PM   6    A.   NO.

01:09PM   7    Q.   OKAY.   AT ANY POINT IN TIME DID THEY TELL YOU THAT THEY

01:09PM   8    WERE MODIFYING DEVICES MADE BY SIEMENS TO DO BLOOD TESTING?

01:10PM   9    A.   NO.

01:10PM  10    Q.   WOULD THAT HAVE BEEN RELEVANT TO YOU?

01:10PM  11    A.   YES.

01:10PM  12    Q.   WHY?

01:10PM  13    A.   BECAUSE, AGAIN, WE NEEDED TO KNOW HOW THEY WERE DOING

01:10PM  14    THINGS, AND THEY TOLD US THAT EVERYTHING WAS BEING DONE ON

01:10PM  15    THEIR OWN ANALYZER EQUIPMENT AND THAT IT WORKED AND IT WAS

01:10PM  16    VALIDATED BY PHARMACEUTICAL COMPANIES.   THAT WAS VERY

01:10PM  17    IMPORTANT.

01:10PM  18    Q.   IN THE NEXT BULLET IT READS, "A THERANOS ANALYZER STATION

01:10PM  19    IS A SMALL FRACTION OF THE SIZE OF A CURRENT LAB MAKING IT

01:10PM  20    POSSIBLE TO PLACE A THERANOS LAB IN THE OPERATING ROOM OR IN A

01:10PM  21    MILITARY EVACUATION HELICOPTER," AND THEN IT CONTINUES.

01:10PM  22         DO YOU SEE THAT?

01:10PM  23    A.   YES.

01:10PM  24    Q.   WHERE DID YOU GET THIS INFORMATION?

01:10PM  25    A.   THAT MAY BE FROM ONE OF THE ARTICLES THAT I HAD READ, BUT

01:10PM  1    WE ALSO TALKED ABOUT THAT AGAIN, HER WORK WITH THE -- THEIR

01:10PM  2    WORK WITH THE DOD, THE DEPARTMENT OF DEFENSE, WHEN WE WERE AT

01:11PM  3    THE MEETING.

01:11PM  4    Q.   THE MEETING IN CALIFORNIA?

01:11PM  5    A.   YES.

01:11PM  6    Q.   AND WHAT WAS SAID THERE?

01:11PM  7    A.   THAT -- PRETTY MUCH THAT, THAT THEY WERE DOING A LOT OF

01:11PM  8    WORK FOR THE DEPARTMENT OF DEFENSE, AND THAT IT WAS ON MILITARY

01:11PM  9    HELICOPTERS.

01:11PM  10        THEY WERE ALSO WORKING ON EBOLA.  AT THE TIME I RECALL

01:11PM  11   TALKING A LOT ABOUT THAT THEY WERE TRYING TO WORK WITH THE DOD

01:11PM  12   ON HOW THEY COULD APPROACH THE EBOLA SCARE AT THE TIME.

01:11PM  13   Q.   THIS SAYS, "A THERANOS ANALYZER STATION IS A SMALL

01:11PM  14   FRACTION OF THE SIZE OF A CURRENT LAB."

01:11PM  15        WAS THAT IMPRESSIVE TO YOU?

01:11PM  16   A.   YES.

01:11PM  17   Q.   AND WAS IT RELEVANT TO THE INVESTMENT DECISION?

01:11PM  18   A.   YES.  BECAUSE OF THE SIZE, IT WAS POSSIBLE TO PUT THESE

01:11PM  19   THINGS -- SHE KEPT SAYING THAT SHE WANTED TO PUT AN ANALYZER

01:11PM  20   WITHIN, YOU KNOW, FIVE MILES OF EVERY HUMAN OR CONSUMER.

01:11PM  21        AND GIVEN THE SIZE OF IT, YOU COULD THEORETICALLY PUT IT

01:11PM  22   IN PEOPLE'S HOMES EVENTUALLY.

01:11PM  23   Q.   LET ME DRAW YOUR ATTENTION TO THE NEXT BULLET.

01:12PM  24        ROUGHLY HALFWAY THROUGH IT READS, "UNLIKE MOST LABS,

01:12PM  25   THERANOS DOES NOT BUY ANALYZER EQUIPMENT FROM A 3RD PARTY, AND

01:12PM   1    THEY DO NOT SELL THEIR ANALYZERS TO OTHER LABS."

01:12PM   2         DO YOU SEE THAT?

01:12PM   3    A.   YES.

01:12PM   4    Q.   WAS THAT A TOPIC THAT WAS DISCUSSED IN THE OCTOBER -- IN

01:12PM   5    THE MEETING IN PALO ALTO?

01:12PM   6    A.   YES.

01:12PM   7    Q.   AND WAS THIS RELEVANT TO YOU?

01:12PM   8    A.   YES.

01:12PM   9    Q.   THANK YOU, MS. WACHS.  WE CAN TAKE THAT DOWN.

01:12PM   10        I'D LIKE TO FOCUS ON THE MEETING YOU'VE BEEN MENTIONING

01:12PM   11   OUT IN PALO ALTO.

01:12PM   12        WHO WENT TO -- YOU DON'T WORK IN PALO ALTO, DO YOU?

01:12PM   13   A.   NO.

01:12PM   14   Q.   WHERE DO YOU WORK?

01:12PM   15   A.   IN GRAND RAPIDS, MICHIGAN.

01:13PM   16   Q.   OKAY.  SO YOU FLEW OUT TO CALIFORNIA IN OCTOBER OF 2014?

01:13PM   17   A.   CORRECT.

01:13PM   18   Q.   AND WHO WAS WITH YOU?

01:13PM   19   A.   DOUG DEVOS, WHICH WAS THE CHAIRMAN OF OUR INVESTMENT

01:13PM   20   COMMITTEE AT THE TIME; JERRY TUBERGEN; MYSELF; RICK DEVOS, WHO

01:13PM   21   REPRESENTED DICK AND BETSY'S FAMILY; AND CHERI DEVOS, WHO IS

01:13PM   22   ONE OF THE OTHER CHILDREN, SECOND GENERATION CHILDREN.

01:13PM   23   Q.   AND WHO FROM THERANOS DID YOU MEET WITH?

01:13PM   24   A.   SUNNY BALWANI AND ELIZABETH HOLMES.

01:13PM   25   Q.   HOW LONG DID THE MEETING LAST?

01:13PM 1    A.   IT WAS A GOOD FOUR TO FOUR AND A HALF HOURS, WHICH

01:13PM 2    INCLUDED A TOUR, WHICH WAS ABOUT, I DON'T KNOW, 45 MINUTES TO

01:13PM 3    AN HOUR.

01:13PM 4    Q.   AND WHEN YOU SAY "A TOUR," WHAT DID YOU TOUR?

01:13PM 5    A.   WE TOURED THE LOCATION, THIS WAS DONE LAST, AND SAW THE

01:13PM 6    ANALYZER EQUIPMENT, AND THEN CHERI -- WE SAW THE WELLNESS ROOM

01:13PM 7    THAT THEY HAD IN THE BUILDING, WHICH WAS EXPLAINED TO US THAT

01:14PM 8    THIS WAS PRETTY MUCH THE SETUP THAT THEY HAD AT WALGREENS, AND

01:14PM 9    CHERI HAD HER BLOOD TESTED.

01:14PM 10        SO IT WAS KIND OF AN EXPERIENCE OF WHAT YOU WOULD HAVE

01:14PM 11   GOTTEN IF YOU HAD GONE TO WALGREENS.

01:14PM 12   Q.   AND WHEN YOU SAY "CHERI HAD HER BLOOD TESTED," WHAT DID

01:14PM 13   YOU OBSERVE?

01:14PM 14   A.   THAT SHE WENT IN AND HAD HER FINGERSTICK BLOOD TESTED.

01:14PM 15        AND THEN THEY DIDN'T SHOW US, YOU KNOW, RUNNING IT THROUGH

01:14PM 16   THE ANALYZER.  THEY JUST SAID THEY WOULD GET HER BACK HER TEST

01:14PM 17   RESULTS.

01:14PM 18   Q.   DID THEY SHOW YOU ANY DEVICES MANUFACTURED BY THIRD

01:14PM 19   PARTIES?

01:14PM 20   A.   NONE, NO.

01:14PM 21   Q.   AND DID THEY SHOW YOU ANY SIEMENS ANALYZERS?

01:14PM 22   A.   NO.

01:14PM 23   Q.   AND THE DEVICE THAT YOU WERE SHOWN, DESCRIBE IT FOR US.

01:14PM 24   WHAT DID YOU SEE?

01:14PM 25   A.   IT WAS ABOUT, I DON'T KNOW, A FOOT AND A HALF TALL, LIKE A

01:14PM  1     COMPUTER CPU UNIT, IT LOOKED LIKE THAT.

01:14PM  2     Q.   AND DID YOU BELIEVE THAT WAS THE DEVICE THAT THERANOS WAS

01:15PM  3     USING FOR ITS TESTING?

01:15PM  4     A.   YES.  IT WAS VERY CLEAR THAT THAT'S WHAT THEY WERE USING.

01:15PM  5     Q.   WHY DO YOU SAY THAT?

01:15PM  6     A.   IT WAS REPEATEDLY SAID THAT THIS IS HOW THEY DID THINGS.

01:15PM  7     Q.   OKAY.  I WANT TO -- SO THE MEETING AS A WHOLE WAS ABOUT

01:15PM  8     FOUR AND A HALF HOURS?

01:15PM  9     A.   ROUGHLY, YEAH.

01:15PM  10    Q.   AND WAS MR. BALWANI PRESENT FOR ALL OF THE MEETING?

01:15PM  11    A.   HE WAS PRESENT FOR EVERYTHING IN THE ROOM WHERE WE WERE

01:15PM  12    DISCUSSING EVERYTHING.

01:15PM  13         HE DID NOT GO ON THE TOUR.

01:15PM  14    Q.   OKAY.  AND DESCRIBE THE SUBSTANCE OF THE MEETING.  WHAT

01:15PM  15    WAS SAID?

01:15PM  16    A.   WE SPENT A LOT OF TIME REALLY GOING OVER, FOR THE THREE

01:15PM  17    FAMILY MEMBERS THAT WERE PRESENT, A LOT OF THE MISSION AND HOW

01:15PM  18    IT DOES WHAT IT DOES, THE CONTRACTS.

01:15PM  19         WE SPENT A FAIR AMOUNT OF TIME ON THE FINANCIALS AND WHAT

01:15PM  20    MADE UP THOSE FINANCIALS, WHICH LED TO CONVERSATIONS AROUND THE

01:15PM  21    PHARMACEUTICAL COMPANIES THAT THEY HAD WORKED WITH AND JUST THE

01:16PM  22    MISSION OF WHERE SHE WANTED TO GO.

01:16PM  23         OUR SIDE OF THE TABLE TALKED A LOT ABOUT HEALTH CARE AND

01:16PM  24    THAT THEY HAVE A PASSION, THIS DEVOS FAMILY HAS A PASSION FOR

01:16PM  25    HEALTH CARE.

01:16PM  1          DOUG WAS THE CEO OF AMWAY AT THE TIME, AND THEY TALKED A

01:16PM  2     LOT ABOUT POTENTIAL WAYS THAT AMWAY COULD HELP THERANOS GO

01:16PM  3     GLOBAL.

01:16PM  4          SO THERE WAS A LOT OF BACK AND FORTH AROUND, YOU KNOW, THE

01:16PM  5     BASIS OF THE COMPANY, WHAT SHE WANTED TO DO WITH IT, THE

01:16PM  6     FINANCIALS, AND THEN POTENTIALLY HOW WE COULD HELP.

01:16PM  7     Q.   YOU TALKED EARLIER ABOUT THE TWO BINDERS OF DUE DILIGENCE

01:16PM  8     MATERIALS THAT YOU RECEIVED.

01:16PM  9          DID YOU BRING THOSE WITH YOU?

01:16PM 10     A.   I DID, YEAH.

01:16PM 11     Q.   AND DID YOU ASK QUESTIONS OF MS. HOLMES AND MR. BALWANI

01:16PM 12     BASED ON THOSE DUE DILIGENCE MATERIALS?

01:16PM 13     A.   THERE WERE QUESTIONS ASKED, YES, BY OUR SIDE OF THE TABLE.

01:16PM 14     Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO WHAT WE'VE MARKED AS

01:17PM 15     EXHIBIT 4858.

01:17PM 16          4858 IS ABOUT 187 PAGES.

01:17PM 17          DO YOU SEE THAT?

01:17PM 18     A.   YES.

01:17PM 19     Q.   OKAY.  ARE YOU FAMILIAR WITH THIS DOCUMENT?

01:17PM 20     A.   YES.

01:17PM 21     Q.   AND WHAT IS IT?

01:17PM 22     A.   THIS WAS THE FIRST BINDER THAT WAS SENT TO US AS PART OF

01:17PM 23     THE DUE DILIGENCE MATERIALS.

01:17PM 24     Q.   OKAY.  AND DID YOU RELY ON THE STATEMENTS IN EXHIBIT 4858

01:17PM 25     IN THE COURSE OF MAKING AN INVESTMENT DECISION?

01:17PM  1    A.   YES.

01:17PM  2    Q.   OKAY.  AND ARE THESE THE DUE DILIGENCE MATERIALS THAT WERE

01:17PM  3    PROVIDED PURSUANT TO THE CONFIDENTIAL DISCLOSURE AGREEMENT THAT

01:17PM  4    WE LOOKED AT PREVIOUSLY?

01:17PM  5    A.   YES.

01:17PM  6    Q.   OKAY.

01:17PM  7         YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 4858.

01:17PM  8         MR. COOPERSMITH:  802, YOUR HONOR.

01:18PM  9         THE COURT:  AND YOU'RE OFFERING THE ENTIRETY OF THE

01:18PM 10    DOCUMENT?

01:18PM 11         MR. LEACH:  YES, YOUR HONOR.

01:18PM 12         THE COURT:  OKAY.  THE OBJECTION IS OVERRULED.  IT'S

01:18PM 13    ADMITTED, AND IT MAY BE PUBLISHED.

01:18PM 14         (GOVERNMENT'S EXHIBIT 4858 WAS RECEIVED IN EVIDENCE.)

01:18PM 15         MR. LEACH:  AND WE MAY DISPLAY, YOUR HONOR?

01:18PM 16         THE COURT:  YES.

01:18PM 17         MR. LEACH:  OKAY.

01:18PM 18    Q.   MS. PETERSON, I DRAW YOUR ATTENTION TO PAGE 1.

01:18PM 19         DO YOU SEE THE TITLE THERANOS CONFIDENTIAL OVERVIEW?

01:18PM 20    A.   YES.

01:18PM 21    Q.   AND THIS IS ESSENTIALLY A POWERPOINT OF INFORMATION ABOUT

01:18PM 22    THERANOS THAT YOU RELIED ON IN THE COURSE OF MAKING THE

01:19PM 23    INVESTMENT DECISION?

01:19PM 24    A.   YES.

01:19PM 25    Q.   AND WERE THE REPRESENTATIONS IN HERE IMPORTANT TO YOU?

01:19PM  1    A.   YES.

01:19PM  2    Q.   OKAY.  WHY?

01:19PM  3    A.   WELL, IT'S IMPORTANT TO KNOW EXACTLY WHAT WE'RE INVESTING

01:19PM  4    IN, AND THERE'S A LOT OF INFORMATION IN HERE.

01:19PM  5    Q.   INFORMATION THAT YOU COULDN'T GET FROM OTHER SOURCES?

01:19PM  6    A.   CORRECT.

01:19PM  7    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 3.

01:19PM  8         DO YOU SEE THE HEADING THERANOS INC.?

01:19PM  9    A.   YES.

01:19PM  10   Q.   AND THERE'S SOME HIGHLIGHTING -- WELL, WE'VE HIGHLIGHTED

01:19PM  11   THERANOS INC.

01:19PM  12        THERE'S SOME ADDITIONAL HIGHLIGHTING BELOW THAT IN THE

01:19PM  13   PARAGRAPH BEGINNING "THERANOS'S PROPRIETARY, PATENTED

01:19PM  14   TECHNOLOGY."

01:19PM  15        DO YOU SEE THE HIGHLIGHTING?

01:19PM  16   A.   YES.

01:19PM  17   Q.   IS THAT YOUR HIGHLIGHTING?

01:19PM  18   A.   YES.

01:19PM  19   Q.   AND THEN THERE IS SOME HANDWRITING.  IT SAYS, "CLINICAL

01:19PM  20   LAB IMPROVEMENT AMENDMENTS."

01:19PM  21        IS THAT YOUR HANDWRITING?

01:19PM  22   A.   YES.

01:19PM  23   Q.   THIS READS, "THERANOS'S PROPRIETARY, PATENTED TECHNOLOGY

01:20PM  24   RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK AND TESTS FOR

01:20PM  25   MICRO-SAMPLES OF OTHER MATRIXES AND GENERATES SIGNIFICANTLY

01:20PM  1    HIGHER INTEGRITY DATA THAN CURRENTLY POSSIBLE."

01:20PM  2         DO YOU SEE THAT LANGUAGE?

01:20PM  3    A.   YES.

01:20PM  4    Q.   AND WAS THIS INFORMATION IMPORTANT TO YOU?

01:20PM  5    A.   YES.

01:20PM  6    Q.   OKAY.  WHY DID YOU HIGHLIGHT "GENERATES SIGNIFICANTLY

01:20PM  7    HIGHER INTEGRITY DATA THAN CURRENTLY POSSIBLE"?

01:20PM  8    A.   BECAUSE IT'S IMPORTANT.

01:20PM  9    Q.   OKAY.  IN THE, IN THE THIRD PARAGRAPH IT SAYS, "CURRENT

01:20PM  10   AND PAST CLIENTS INCLUDE 10 OF THE TOP 15 MAJOR PHARMACEUTICAL

01:20PM  11   COMPANIES, MID SIZED BIO-PHARMAS, PROMINENT RESEARCH

01:20PM  12   INSTITUTIONS, HEALTH CARE PAYORS, AND U.S. AND FOREIGN

01:20PM  13   GOVERNMENT HEALTH AND MILITARY ORGANIZATIONS."

01:20PM  14        DO YOU SEE THAT LANGUAGE?

01:20PM  15   A.   YES.

01:20PM  16   Q.   WAS THAT IMPRESSIVE TO YOU?

01:20PM  17   A.   VERY.

01:20PM  18   Q.   DID THIS TOPIC COME UP IN YOUR MEETING OUT IN CALIFORNIA?

01:21PM  19   A.   YES.

01:21PM  20   Q.   AND WHAT DID MS. HOLMES AND MR. BALWANI TELL YOU ABOUT

01:21PM  21   THERANOS'S WORK WITH THE MILITARY?

01:21PM  22   A.   THAT THEY WERE DOING WORK FOR THE DEPARTMENT OF DEFENSE.

01:21PM  23   AND, AGAIN, I DON'T REMEMBER ALL OF THE SPECIFICS, BUT I RECALL

01:21PM  24   THEM TALKING ABOUT IT BEING IN HELICOPTERS, EVACUATION

01:21PM  25   HELICOPTERS, AS WELL AS I DO RECALL CONVERSATIONS AROUND EBOLA

01:21PM  1    AND THEM TRYING TO FIGURE OUT HOW TO TACKLE THAT ISSUE.

01:21PM  2    Q.   LET'S LOOK AT PAGE 4, PLEASE.

01:21PM  3         IS THIS A LISTING OF MEMBERS OF THERANOS'S BOARD OF

01:21PM  4    DIRECTORS?

01:21PM  5    A.   YES.

01:21PM  6    Q.   AND THIS WAS AN IMPRESSIVE LIST TO YOU?

01:21PM  7    A.   YES.

01:21PM  8    Q.   DOWN AT THE BOTTOM IT SAYS SUNNY BALWANI, THERANOS

01:21PM  9    PRESIDENT AND COO.

01:21PM  10        DO YOU SEE THAT LANGUAGE?

01:21PM  11   A.   YES.

01:21PM  12   Q.   AND YOU UNDERSTOOD MR. BALWANI WAS THE PRESIDENT AND CHIEF

01:21PM  13   EXECUTIVE OFFICER OF THE COMPANY?

01:21PM  14            MR. COOPERSMITH:  OBJECTION.  MISSTATES THE TITLE.

01:22PM  15            MR. LEACH:  I THINK I SAID EXECUTIVE.

01:22PM  16        CHIEF OPERATING OFFICER.

01:22PM  17        THANK YOU, MR. COOPERSMITH.

01:22PM  18            THE WITNESS:  CORRECT.

01:22PM  19   BY MR. LEACH:

01:22PM  20   Q.   AND WAS THERE ANYBODY ELSE BESIDES MS. HOLMES AND

01:22PM  21   MR. BALWANI IN YOUR MEETING OUT IN CALIFORNIA?

01:22PM  22   A.   NO.

01:22PM  23   Q.   IF WE LOOK AT THE NEXT SLIDE, PAGE 5, DO YOU SEE WHERE IT

01:22PM  24   SAYS "THERANOS IS CERTIFIED AS A HIGH COMPLEXITY CLIA

01:22PM  25   LABORATORY"?

01:22PM  1          DO YOU SEE THAT?

01:22PM  2     A.   YES.

01:22PM  3     Q.   AND AT THE TIME, HAD YOU HAD ANY EXPERIENCE WITH SOMETHING

01:22PM  4     CALLED CLIA?

01:22PM  5     A.   NO.

01:22PM  6     Q.   I THINK YOU WROTE IN HANDWRITING "CLINICAL LAB IMPROVEMENT

01:22PM  7     AMENDMENTS"?

01:22PM  8     A.   CORRECT.

01:22PM  9     Q.   IS THAT -- WE NEED TO SPEAK ONE AT A TIME, MS. PETERSON.

01:22PM  10    A.   YEP.

01:22PM  11    Q.   IS THAT BECAUSE YOU WERE LEARNING ABOUT IT FOR THE FIRST

01:22PM  12    TIME?

01:22PM  13    A.   YES.

01:22PM  14    Q.   OKAY.  AND IN THE HIGHLIGHTED ROW IT SAYS, "HIGH

01:22PM  15    COMPLEXITY REQUIRES THE HIGHEST LEVEL OF TRAINING, TECHNIQUE,

01:23PM  16    AND RESULT INTERPRETATION MOST STRINGENT STANDARDS.  LABS ARE

01:23PM  17    SURVEYED ROUTINELY AND RANDOMLY."

01:23PM  18          IS THAT INFORMATION THAT YOU LEARNED FROM THERANOS THROUGH

01:23PM  19    THE DUE DILIGENCE MATERIALS?

01:23PM  20    A.   YES.

01:23PM  21    Q.   OKAY.  LET'S LOOK AT THE NEXT PAGE.

01:23PM  22          DO YOU SEE A CERTIFICATE OF COMPLIANCE?

01:23PM  23    A.   YES.

01:23PM  24    Q.   AND DO YOU SEE THE NAME ADAM ROSENDORFF, M.D., DIRECT?

01:23PM  25    A.   YES.

01:23PM  1    Q.   DID THE NAME ADAM ROSENDORFF COME UP IN YOUR MEETING IN

01:23PM  2    CALIFORNIA IN OCTOBER OF 2014?

01:23PM  3    A.   NOT THAT I RECALL.

01:23PM  4    Q.   OKAY.  DID MS. HOLMES OR MR. BALWANI BRING TO YOUR

01:23PM  5    ATTENTION ANY ISSUES THAT DR. ROSENDORFF WAS RAISING?

01:23PM  6    A.   NO.

01:23PM  7    Q.   LET'S LOOK AT THE NEXT TAB, TAB 7, OR PAGE 7.

01:23PM  8         DO YOU SEE WHERE IT SAYS, "THERANOS PROFICIENCY TESTING

01:23PM  9    AND AUDITS"?

01:24PM  10   A.   YES.

01:24PM  11   Q.   IT THEN READS, "SINCE 2011 THERANOS'S CLIA LAB HAS BEEN

01:24PM  12   SUBJECTED TO REGULAR PROFICIENCY TESTING (TESTING OF BLINDED

01:24PM  13   SAMPLES) BY MULTIPLE NATIONALLY RECOGNIZED AGENCIES."

01:24PM  14        DO YOU SEE THAT LANGUAGE?

01:24PM  15   A.   YES.

01:24PM  16   Q.   AND WAS THAT IMPRESSIVE TO YOU?

01:24PM  17   A.   YES.

01:24PM  18   Q.   AND DID YOU UNDERSTAND THAT THE PROFICIENCY TESTING

01:24PM  19   DESCRIBED IN THIS SLIDE RELATED TO THE DEVICE THAT THERANOS WAS

01:24PM  20   SHOWING YOU?

01:24PM  21   A.   THAT WAS MY UNDERSTANDING, YES.

01:24PM  22   Q.   WHY WAS THAT YOUR UNDERSTANDING?

01:24PM  23   A.   BECAUSE THAT WAS THE ONLY DEVICE THAT WE KNEW THAT THEY

01:24PM  24   USED.

01:24PM  25   Q.   OKAY.  THERE'S SOME LINES AND NUMBERS IN HERE UNDER THE

01:24PM  1    COLUMNS AGENCY SURVEY, DATE, SCORE.

01:24PM  2         DO YOU SEE THAT?

01:24PM  3    A.   YES.

01:24PM  4    Q.   AND THE FIRST ONE IS API HEMATOLOGY, NOVEMBER 23RD, 2011.

01:24PM  5         DO YOU SEE THAT?

01:24PM  6    A.   YES.

01:24PM  7    Q.   AND DID YOU BELIEVE THAT PROFICIENCY TESTING TO RELATE TO

01:24PM  8    THE DEVICE THAT YOU OBSERVED?

01:24PM  9    A.   YES.

01:24PM  10   Q.   BASED ON THIS, DID YOU UNDERSTAND THERANOS WAS USING ITS

01:25PM  11   DEVICE IN ITS CLIA LAB AT THE TIME OF THE PROFICIENCY TESTING?

01:25PM  12   A.   YES.

01:25PM  13   Q.   THE NEXT LINE SAYS, "API

01:25PM  14   CHEMISTRY/IMMUNOLOGY/IMMUNOCHEMISTRY."  AND THERE'S A DATE OF

01:25PM  15   JUNE 1, 2012.

01:25PM  16        DO YOU SEE THAT?

01:25PM  17   A.   YES.

01:25PM  18   Q.   BASED ON THIS STATEMENT, DID YOU BELIEVE THAT THERANOS WAS

01:25PM  19   USING ITS ANALYZER IN THE CLIA LAB IN 2012?

01:25PM  20   A.   YES.

01:25PM  21   Q.   WAS THAT IMPRESSIVE TO YOU?

01:25PM  22   A.   YES.

01:25PM  23   Q.   WHY?

01:25PM  24   A.   AGAIN, IT WAS THE ONLY ANALYZER MACHINE THAT WE THOUGHT

01:25PM  25   THEY EVER USED, SO -- AND IT WAS, TO US, THIRD PARTY VALIDATED

01:25PM  1    BY THIS PROFICIENCY TESTING AND AUDIT.

01:25PM  2    Q.   IF THIS PROFICIENCY TESTING RELATED TO FDA APPROVED

01:25PM  3    DEVICES MADE BY OTHERS, WOULD THAT HAVE BEEN EQUALLY RELEVANT

01:26PM  4    TO YOU?

01:26PM  5    A.   RELEVANT, BUT THAT -- BAD.

01:26PM  6    Q.   BAD WHY?

01:26PM  7    A.   THAT'S NOT AT ALL WHAT WE UNDERSTOOD AT THE TIME THAT THEY

01:26PM  8    WERE USING.

01:26PM  9    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 8.

01:26PM  10       DO YOU SEE WHERE IT SAYS VALIDATION OF THERANOS TESTS IN

01:26PM  11   BOLD?

01:26PM  12   A.   YES.

01:26PM  13   Q.   AND BENEATH THAT -- AND THERE'S -- I'VE HIGHLIGHTED THAT,

01:26PM  14   OR MS. WACHS HAS HIGHLIGHTED THAT HEADING AGAIN, BUT THERE'S

01:26PM  15   ALSO SOME HIGHLIGHTING BELOW THAT.

01:26PM  16       IS THAT YOUR HIGHLIGHTING AGAIN?

01:26PM  17   A.   YES.

01:26PM  18   Q.   THIS READS, "THERANOS HAS BEEN COMPREHENSIVELY VALIDATED

01:26PM  19   OVER THE COURSE OF THE LAST SEVEN YEARS BY TEN OF THE FIFTEEN

01:26PM  20   LARGEST PHARMACEUTICAL COMPANIES, WITH HUNDREDS OF THOUSANDS OF

01:26PM  21   ASSAYS PROCESSED."

01:26PM  22       IS THAT CONSISTENT WITH STATEMENTS MADE TO YOU BY

01:26PM  23   MS. HOLMES IN THE PHONE CALL THAT YOU HAD WITH HER?

01:27PM  24   A.   YES.

01:27PM  25   Q.   AND DID THIS TOPIC COME UP IN YOUR MEETING IN CALIFORNIA

01:27PM 1    IN OCTOBER?

01:27PM 2    A.   YES.

01:27PM 3    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 10.

01:27PM 4         MS. PETERSON, THERE'S SOME IMAGES ON THE SCREEN.

01:27PM 5         TO THE LEFT THERE ARE FOUR VIALS OF BLOOD, AND TO THE

01:27PM 6    RIGHT THERE IS A SMALLER VIAL WITH A SMALLER AMOUNT OF BLOOD.

01:27PM 7         DO YOU SEE THAT?

01:27PM 8    A.   YES.

01:27PM 9    Q.   AND WHAT DID YOU UNDERSTAND THIS TO REPRESENT?

01:27PM 10   A.   THAT THE LEFT, LARGER VIALS WERE THE TRADITIONAL VEIN DRAW

01:27PM 11   THAT OTHER LABS USE; AND THAT THE FINGERSTICK, SMALLER VIAL, IS

01:27PM 12   WHAT WAS USED BY THERANOS.

01:27PM 13   Q.   OKAY.  IF I COULD MOVE TO PAGE 14, PLEASE.

01:28PM 14        I'M SORRY.  PAGE 12, MS. WACHS.

01:28PM 15        DO YOU SEE THE HEADING OVERVIEW OF CURRENT LABORATORY

01:28PM 16   MARKET?

01:28PM 17   A.   YES.

01:28PM 18   Q.   OKAY.  AND IN THE FIRST BULLET IT READS, "DECADES OLD

01:28PM 19   BUSINESS PROCESSES -- AND TECHNOLOGY INVESTMENTS AROUND THOSE

01:28PM 20   BUSINESS PROCESSES -- WITH VERY LITTLE MOTIVATION TO INNOVATE,

01:28PM 21   HAS CREATED A DUOPOLY OF BUSINESSES BURDENED WITH

01:28PM 22   INFRASTRUCTURE COSTS AND LITTLE/NO R&D."

01:28PM 23        DO YOU SEE THAT?

01:28PM 24   A.   YES.

01:28PM 25   Q.   AND DID YOU UNDERSTAND R&D TO BE RESEARCH AND DEVELOPMENT?

PETERSON DIRECT BY MR. LEACH

01:28PM   1    A.   CORRECT.

01:28PM   2    Q.   AND TO THE RIGHT THERE'S SOME HANDWRITING, QUEST LAB CORP.

01:28PM   3         WAS THAT YOUR HANDWRITING?

01:28PM   4    A.   YES.

01:28PM   5    Q.   WHAT WERE YOU CONVEYING THERE?

01:28PM   6    A.   I WAS JUST NOTING WHO THE DUOPOLY WAS, WAS THOSE TWO.

01:28PM   7    Q.   OKAY.  IS THAT INFORMATION THAT YOU GOT FROM MS. HOLMES

01:28PM   8    AND MR. BALWANI?

01:28PM   9    A.   YES.

01:28PM   10   Q.   IT THEN SAYS, "SELECT CONTRACTS BETWEEN LABS AND INSURANCE

01:28PM   11   COMPANIES HAVE SET PRECEDENT FOR HIGHER COSTS FOR 'PULL

01:29PM   12   THROUGH' PATIENTS."

01:29PM   13        IN THE COURSE OF YOUR DIALOGUE WITH MS. HOLMES AND

01:29PM   14   MR. BALWANI, DID THEY MAKE STATEMENTS ABOUT THE COSTS OF THE

01:29PM   15   TESTS THAT THEY OFFERED?

01:29PM   16   A.   YES.

01:29PM   17   Q.   AND WAS THAT IMPRESSIVE TO YOU?

01:29PM   18   A.   YES.

01:29PM   19   Q.   AND DID YOU BELIEVE THAT THOSE TESTS COULD BE OFFERED AT A

01:29PM   20   LOW COST BECAUSE THERANOS WAS PROFITABLE?

01:29PM   21   A.   YES.

01:29PM   22   Q.   OKAY.  NOW, MS. WACHS, IF WE CAN GO TO PAGE 14.

01:29PM   23        DO YOU SEE THE HEADING COST SAVINGS, THE FULL RANGE OF

01:29PM   24   TESTS.  A FRACTION OF THE COSTS?

01:29PM   25   A.   YES.  I'M SORRY.

01:29PM  1    Q.   NO PROBLEM.

01:29PM  2         WAS THIS INFORMATION IMPORTANT TO YOU?

01:29PM  3    A.   YES.

01:29PM  4    Q.   WHY?

01:29PM  5    A.   BECAUSE, IF IT DID THAT, IT WAS DEFINITELY GOING TO

01:29PM  6    TRANSFORM HEALTH CARE.  IF YOU CAN OFFER THESE TYPES OF BLOOD

01:29PM  7    TESTS THAT WERE LESS INVASIVE TO PEOPLE VIA FINGERSTICK AND DO

01:30PM  8    IT AT MUCH LESS COST, MORE PEOPLE WOULD PROBABLY GET TESTED,

01:30PM  9    WHICH, AGAIN, IT GOES BACK TO TRYING TO IMPROVE PREVENTATIVE

01:30PM 10    HEALTH CARE.

01:30PM 11    Q.   CAN WE GO TO THE NEXT SLIDE, PLEASE, SLIDE 15.

01:30PM 12         DO YOU SEE THE FOURTH -- OR THE SECOND BULLET FROM THE

01:30PM 13    BOTTOM, "THE UNPRECEDENTED LACK OF VARIATION FROM SYSTEM TO

01:30PM 14    SYSTEM YIELDS HIGHER INTEGRITY DATA."

01:30PM 15         DO YOU SEE THAT LANGUAGE?

01:30PM 16    A.   YES.

01:30PM 17    Q.   WAS THIS INFORMATION IMPORTANT TO YOU?

01:30PM 18    A.   YES.

01:30PM 19    Q.   AND THEN IT LOOKS TO THE RIGHT LIKE YOU WROTE, "THERANOS

01:30PM 20    IS STANDARDIZED."

01:30PM 21         WHAT DID YOU MEAN BY THAT?

01:30PM 22    A.   I'M NOT EXACTLY SURE.

01:30PM 23    Q.   DID MS. HOLMES OR MR. BALWANI MAKE STATEMENTS TO YOU TO

01:30PM 24    THE EFFECT OF WE ARE AUTOMATED BY VIRTUE OF HAVING ONE MACHINE?

01:31PM 25    A.   THEY MADE A LOT OF STATEMENTS AROUND THE AUTOMATION, AS

01:31PM   1    WELL AS THE LESS FREQUENT HANDLING BY AN INDIVIDUAL.

01:31PM   2         I THINK THERE WERE STATS AROUND MANY OF THE ERRORS CAME

01:31PM   3    FROM THE HUMAN TOUCH OF THE SAMPLES, AND THEY DIDN'T HAVE THAT.

01:31PM   4    Q.   OKAY.

01:31PM   5    A.   SO IT WAS LESS ERRORS.

01:31PM   6    Q.   IF WE CAN NOW FLIP TO PAGE 28.

01:31PM   7         DO YOU SEE THE HEADING SAME TESTS, A WHOLE NEW APPROACH?

01:31PM   8    A.   YES.

01:31PM   9    Q.   AND BENEATH THAT DO YOU SEE WHERE IT SAYS, "THE ACTIONABLE

01:31PM  10    INFORMATION YOU NEED 1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW."

01:31PM  11         AND THEN THERE ARE SOME IMAGES.

01:31PM  12         DO YOU SEE THAT?

01:31PM  13    A.   YES.

01:31PM  14    Q.   "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL LABORATORIES,

01:31PM  15    AND PROCESSES ALL SAMPLE TYPES."

01:31PM  16         WAS THIS INFORMATION IMPORTANT TO YOU?

01:31PM  17    A.   VERY.

01:31PM  18    Q.   HOW SO?

01:32PM  19    A.   BECAUSE THAT WAS REVOLUTIONARY THAT THIS MACHINE COULD DO

01:32PM  20    THAT.  IT COULD PROCESS, WE WERE TOLD, HUNDREDS OF TESTS, AND

01:32PM  21    MULTIPLE TESTS WITH THE SAME FINGERSTICK DRAW.

01:32PM  22    Q.   OKAY.  DID MS. HOLMES OR MR. BALWANI EVER TELL YOU THAT

01:32PM  23    THERANOS WAS DOING THE MAJORITY OF ITS TESTS FROM VEIN DRAWS?

01:32PM  24    A.   NO.

01:32PM  25    Q.   FURTHER BELOW IT SAYS, "THERANOS PROVIDES THE HIGHEST

01:32PM   1    LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE-

01:32PM   2    AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST LEVELS OF

01:32PM   3    ACCURACY AND PRECISION."

01:32PM   4        WERE THOSE STATEMENTS IMPORTANT TO YOU?

01:32PM   5    A.   YES.

01:32PM   6    Q.   OKAY.  IF WE CAN GO TO PAGE 31, PLEASE.

01:32PM   7        DO YOU SEE THE HEADING A NEW STANDARD IN QUALITY?

01:33PM   8    A.   YES.

01:33PM   9    Q.   AND BENEATH THAT IT SAYS, "THE HIGHEST LEVELS OF

01:33PM  10    ACCURACY."

01:33PM  11        WHAT DID YOU UNDERSTAND THAT TO MEAN?

01:33PM  12    A.   THAT THE MACHINE WAS VERY ACCURATE.

01:33PM  13    Q.   WAS THAT IMPORTANT TO YOU?

01:33PM  14    A.   YES.

01:33PM  15    Q.   WHY?

01:33PM  16    A.   BECAUSE IT, IT WORKED.  IT DID WHAT THEY SAID IT WOULD

01:33PM  17    DO --

01:33PM  18    Q.   OKAY.  AND DID THIS --

01:33PM  19    A.   -- ACCURATELY.

01:33PM  20    Q.   AND DID THIS TOPIC COME UP IN YOUR MEETING IN CALIFORNIA

01:33PM  21    WITH MR. BALWANI?

01:33PM  22    A.   YES.

01:33PM  23    Q.   OKAY.  AND WHAT WAS SAID?

01:33PM  24    A.   REPEATEDLY SAID THAT THE MACHINE WORKED, THAT -- IT WASN'T

01:33PM  25    EVER A QUESTION IN OUR MIND THAT IT DIDN'T WORK GIVEN ALL OF

01:33PM  1     THE INFORMATION THAT THEY HAD SAID AND GIVEN US.

01:33PM  2     Q.   OKAY.  LET'S LOOK AT PAGE 32.

01:33PM  3          DO YOU SEE THE HEADING NEW POSSIBILITIES IN THE LAB?

01:33PM  4     A.   YES.

01:33PM  5     Q.   AND THEN IN THE LEFT COLUMN, UNDER ROUTINE, SPECIALTY AND

01:34PM  6     ESOTERIC TESTING, THERE ARE SOME BULLETS, "THERANOS RUNS ANY

01:34PM  7     TEST AVAILABLE IN CENTRAL LABORATORIES.

01:34PM  8          "THERANOS CAN PROCESS ANY SAMPLE TYPE."

01:34PM  9          AND THEN TO THE RIGHT, "THE UNPRECEDENTED LACK OF

01:34PM 10     VARIATION WITH THERANOS YIELDS:

01:34PM 11          "HIGHER INTEGRITY DATA AND LONGITUDINAL TRENDING?"

01:34PM 12          IS THIS ADDITIONAL INFORMATION YOU RELIED ON IN THE

01:34PM 13     INVESTMENT DECISION?

01:34PM 14     A.   YES.

01:34PM 15     Q.   AND IF WE CAN GO TO PAGE 33.

01:34PM 16          DO YOU SEE THE HEADING FASTER RESULTS.  FASTER ANSWERS?

01:34PM 17     A.   YES.

01:34PM 18     Q.   WAS THAT RELEVANT TO YOU?

01:34PM 19     A.   YES.  THAT THEY COULD DO A BLOOD TEST AND PROVIDE RESULTS

01:34PM 20     IN HOURS WAS VERY IMPORTANT; THAT IS, AGAIN, JUST

01:34PM 21     TRANSFORMING -- IT'S TRANSFORMATIVE IN HEALTH CARE TO BE ABLE

01:34PM 22     TO DO THAT.

01:34PM 23     Q.   OKAY.  HOW IS THAT TRANSFORMATIVE, IF IT CAN HAPPEN?

01:34PM 24     A.   MOST -- AGAIN, MY HUSBAND GETS A LOT OF BLOOD TESTS AND IT

01:35PM 25     TAKES A LOT LONGER THAN A COUPLE HOURS.

01:35PM   1          SO TO GET RESULTS QUICKER, AND TO ALSO DO MULTIPLE TESTS

01:35PM   2     WITH THE ONE VIAL WAS IMPORTANT TO US.

01:35PM   3     Q.   LET'S GO TO SLIDE 40.

01:35PM   4          DO YOU SEE THE HEADING THERANOS'S FOOTPRINT UPON NATIONAL

01:35PM   5     DEPLOYMENT:  THERANOS WELLNESS CENTERS IN WALGREENS?

01:35PM   6     A.   YES.

01:35PM   7     Q.   OKAY.  AND DO YOU SEE THE IMAGE OF THE MAP WITH LOTS OF

01:35PM   8     GREEN SCATTERED THROUGHOUT?

01:35PM   9     A.   YES.

01:35PM   10    Q.   OKAY.  IN YOUR -- DID THE NOTION OF THERANOS BEING IN 900

01:35PM   11    WALGREENS STORES BY THE END OF 2015 COME UP IN YOUR

01:35PM   12    CONVERSATION IN CALIFORNIA?

01:35PM   13    A.   YES.

01:35PM   14    Q.   OKAY.  AND AT ANY POINT IN TIME DID MS. HOLMES OR

01:35PM   15    MR. BALWANI TELL YOU OF ANY ISSUES OR PROBLEMS WITH THE

01:35PM   16    WALGREENS RELATIONSHIP?

01:35PM   17    A.   NO.

01:35PM   18    Q.   OKAY.  DID THEY TELL YOU THAT WALGREENS WAS FRUSTRATED BY

01:36PM   19    THE HIGH PERCENTAGE OF VENOUS DRAWS?

01:36PM   20    A.   NO.

01:36PM   21    Q.   LET'S GO TO PAGE 49.

01:36PM   22         DO YOU SEE THE HEADING RECENT PRESS?

01:36PM   23    A.   YES.

01:36PM   24    Q.   AND THERE'S A NUMBER OF ARTICLES LISTED, "BBC WORLD NEWS,"

01:36PM   25    "FORTUNE," "FORBES."

01:36PM  1        DO YOU SEE THOSE?

01:36PM  2   A.   YES.

01:36PM  3   Q.   AND TO THE RIGHT THERE'S AN IMAGE OF A "FORTUNE" ARTICLE

01:36PM  4   THAT SAYS, "THIS CEO IS OUT FOR BLOOD."

01:36PM  5        DO YOU SEE THAT?

01:36PM  6   A.   YES.

01:36PM  7   Q.   AND WHAT DID YOU UNDERSTAND THIS SLIDE TO MEAN?

01:36PM  8   A.   THAT THIS WAS RECENT MEDIA AND PRESS AND INTERVIEWS THAT

01:36PM  9   SHE HAD GIVEN AND SUGGESTED TO ME TO GO OUT AND REVIEW ALL OF

01:36PM 10   THESE, WHICH I DID.

01:37PM 11   Q.   OKAY.  WE LOOKED EARLIER AT AN EMAIL FROM MR. TUBERGEN

01:37PM 12   WITH AN ARTICLE ATTACHED TO IT.

01:37PM 13        IS THAT PART OF WHAT YOU DID IN TERMS OF GOING OUT AND

01:37PM 14   READING EVERYTHING THAT YOU COULD?

01:37PM 15   A.   YES.

01:37PM 16   Q.   OKAY.  AND THE ARTICLE TO THE RIGHT, "THIS CEO IS OUT FOR

01:37PM 17   BLOOD," DO YOU UNDERSTAND THAT TO BE THE ARTICLE FROM

01:37PM 18   MR. PARLOFF?

01:37PM 19   A.   YES.

01:37PM 20   Q.   AND THAT'S SOMETHING THAT YOU READ AND RELIED ON?

01:37PM 21   A.   YES.

01:37PM 22   Q.   LET'S LOOK AT PAGE 103.

01:37PM 23        DO YOU SEE THE TITLE EXEMPLARY REPORTS FROM PHARMACEUTICAL

01:37PM 24   PARTNERS?

01:37PM 25   A.   YES.

01:37PM   1    Q.   OKAY.  AND WHAT DID YOU UNDERSTAND THIS TO BE?

01:37PM   2    A.   I UNDERSTOOD THESE TO BE KIND OF THIRD PARTY REPORTS AND

01:38PM   3    VALIDATION OF USING THE ANALYZERS.

01:38PM   4    Q.   AND WHAT DO YOU MEAN BY "THIRD PARTY"?

01:38PM   5    A.   NOT PART OF THERANOS.

01:38PM   6    Q.   AND THIS WAS PART OF THE DUE DILIGENCE MATERIALS THAT WERE

01:38PM   7    PROVIDED TO YOU?

01:38PM   8    A.   YES.

01:38PM   9    Q.   OKAY.  LET'S LOOK AT THE NEXT PAGE.  IF WE CAN ZOOM IN UP

01:38PM  10    A LITTLE BIT MORE ON PAGE 4, AND IF WE CAN ZOOM IN ON THE TOP

01:38PM  11    HALF ALL OF THE WAY DOWN TO THE BULLET FOR CONCLUSIONS.

01:38PM  12         WAS THIS PART OF WHAT YOU REVIEWED, MS. PETERSON?

01:38PM  13    A.   YES.

01:38PM  14    Q.   AND WHAT DID YOU UNDERSTAND THIS TO BE?

01:38PM  15    A.   A REPORT BY PFIZER THAT VALIDATED THE WORK THAT THEY HAD

01:38PM  16    DONE USING THEIR ANALYZER, USING THERANOS'S ANALYZERS.

01:38PM  17    Q.   DID YOU RELY ON THIS REPORT IN THE COURSE OF MAKING YOUR

01:38PM  18    INVESTMENT DECISION?

01:38PM  19    A.   YES.

01:38PM  20    Q.   OKAY.  WHY DID YOU RELY ON THIS?

01:38PM  21    A.   ANY OUTSIDE EXTERNAL VALIDATION OF THE ANALYZERS WAS

01:39PM  22    HELPFUL TO US, THAT IT WORKED.

01:39PM  23    Q.   AND DID THIS TOPIC OF EXTERNAL THIRD PARTY VALIDATIONS

01:39PM  24    COME UP IN YOUR MEETING IN CALIFORNIA WITH MR. BALWANI?

01:39PM  25    A.   YES.

01:39PM  1    Q.   HOW SO?

01:39PM  2    A.   THEY TALKED A LOT ABOUT THE TEN YEARS OF WORK THAT THEY

01:39PM  3    HAD DONE WITH THE TOP PHARMACEUTICAL COMPANIES, WE TALKED ABOUT

01:39PM  4    THAT QUITE A BIT, AND HOW THEY COULD DO THEIR STUDIES AND DO

01:39PM  5    FINGERSTICK DRAWS SOONER.

01:39PM  6         YOU COULD ONLY DO VEIN DRAWS, LIKE, ONCE EVERY THREE DAYS,

01:39PM  7    AND THESE YOU COULD DO A COUPLE TIMES A DAY, AND IT WAS HELPFUL

01:39PM  8    TO THESE PHARMACEUTICAL STUDIES.

01:39PM  9         WE TALKED A LOT ABOUT HOW THE ANALYZERS WERE BEING USED

01:39PM  10   WITHIN THOSE COMPANIES.

01:39PM  11   Q.   BY THE WAY, DID MS. HOLMES DO ALL OF THE TALKING IN THIS

01:39PM  12   OCTOBER MEETING?

01:39PM  13   A.   NOT ALL OF THE TALKING, NO.

01:40PM  14   Q.   DID MR. BALWANI SPEAK TO PARTICULAR ISSUES IN THE MEETING?

01:40PM  15   A.   MY RECOLLECTION IS THAT THE MOST OF HIS PARTICIPATION WAS

01:40PM  16   AROUND THE FINANCIALS.

01:40PM  17   Q.   OKAY.  WERE THERE PARTS OF THE MEETING WHERE MS. HOLMES OR

01:40PM  18   MR. BALWANI DISAGREED WITH EACH OTHER?

01:40PM  19   A.   NO.

01:40PM  20   Q.   OKAY.  DID YOU VIEW THEM AS SPEAKING WITH ONE VOICE?

01:40PM  21   A.   YES.

01:40PM  22   Q.   ON THIS PAGE THERE'S A BULLET, CONCLUSIONS, GENERAL,

01:40PM  23   TECHNICAL, ECONOMIC.

01:40PM  24        DO YOU SEE THAT?

01:40PM  25   A.   YES.

PETERSON DIRECT BY MR. LEACH

01:40PM  1    Q.   IF YOU COULD NOW TURN TO PAGE 129, THERE ARE A NUMBER OF

01:40PM  2    CONCLUSIONS LISTED HERE, GENERAL, TECHNICAL, AND ECONOMIC.

01:40PM  3         DO YOU SEE THAT?

01:40PM  4    A.   YES.

01:40PM  5    Q.   AND THIS IS SOMETHING THAT YOU REVIEWED AND RELIED ON?

01:40PM  6    A.   YES.

01:40PM  7    Q.   OKAY.  DID YOU BELIEVE THESE TO BE CONCLUSIONS OF PFIZER?

01:41PM  8    A.   YES.

01:41PM  9    Q.   FOR EXAMPLE, IN GENERAL -- IN THE FIRST GENERAL CONCLUSION

01:41PM 10    IT SAYS, "THE THERANOS SYSTEM PERFORMED WITH SUPERIOR

01:41PM 11    PERFORMANCE TO REFERENCE ASSAYS WHILE RUNNING IN A COMPLEX

01:41PM 12    AMBULATORY ENVIRONMENT."

01:41PM 13         DID YOU BELIEVE THAT TO BE A CONCLUSION OF PFIZER?

01:41PM 14    A.   YES.

01:41PM 15    Q.   AND WAS THAT IMPORTANT TO YOU?

01:41PM 16    A.   YES.

01:41PM 17    Q.   OKAY.  WE CAN TAKE THAT DOWN.

01:41PM 18         IF I COULD PLEASE DRAW YOUR ATTENTION, MS. PETERSON, TO

01:41PM 19    EXHIBIT 1853.

01:41PM 20         DO YOU RECOGNIZE THIS?

01:41PM 21    A.   YES.

01:41PM 22    Q.   AND WHAT IS THIS?

01:41PM 23    A.   THESE ARE THE TWO FINANCIAL PAGES THAT CAME IN THE

01:42PM 24    DILIGENCE BINDER.

01:42PM 25    Q.   AND THERE'S SOME HANDWRITING ON THIS DOCUMENT.

01:42PM  1          IS THAT YOUR HANDWRITING?

01:42PM  2      A.  YES.

01:42PM  3      Q.  AND WAS ALL OF THE HANDWRITING DONE AT THE SAME TIME?

01:42PM  4      A.  NO.  THE QUESTIONS THAT ARE LIGHTER PRINT I KNOW WERE DONE

01:42PM  5      BEFORE THE MEETING IN PALO ALTO, AND THE DARKER PRINT WAS WHAT

01:42PM  6      WE TALKED ABOUT AT THE MEETING.

01:42PM  7      Q.  OKAY.  AND IS THIS -- DID YOU DISCUSS THIS DOCUMENT WITH

01:42PM  8      MR. BALWANI IN YOUR MEETING IN CALIFORNIA?

01:42PM  9      A.  YES.

01:42PM  10          MR. LEACH:  YOUR HONOR, I BELIEVE 1853 IS IN

01:42PM  11     EVIDENCE.  IT MIGHT BE WITH SOME CONDITIONS.

01:42PM  12          I'D LIKE TO OFFER IT UNCONDITIONALLY.

01:42PM  13          MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

01:42PM  14          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:42PM  15          (GOVERNMENT'S EXHIBIT 1853 WAS RECEIVED IN EVIDENCE.)

01:43PM  16     BY MR. LEACH:

01:43PM  17     Q.  SO THIS IS A DOCUMENT THAT YOU RECEIVED FROM THERANOS,

01:43PM  18     MS. PETERSON?

01:43PM  19     A.  YES.

01:43PM  20     Q.  AND YOU DISCUSSED IT WITH MS. HOLMES AND MR. BALWANI IN

01:43PM  21     YOUR MEETING IN CALIFORNIA?

01:43PM  22     A.  YES.

01:43PM  23     Q.  OKAY.  TO THE LEFT UP AT THE TOP IT SAYS, THERANOS

01:43PM  24     CONFIDENTIAL, PROJECTED STATEMENT OF INCOME.

01:43PM  25          DO YOU SEE THAT?

PETERSON DIRECT BY MR. LEACH                                    3888

01:43PM 1    A.   YES.

01:43PM 2    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN PROJECTED

01:43PM 3    STATEMENT OF INCOME?

01:43PM 4    A.   YES.  2015 WOULD HAVE BEEN A PROJECTION BASED ON THE

01:43PM 5    CONTRACTS THAT THEY HAD, AND WE TALKED THROUGH WHERE THAT

01:43PM 6    REVENUE WAS GOING TO COME FROM.

01:43PM 7        THE 2014, IT WAS ALREADY MID-OCTOBER, SO WE ASSUMED THAT

01:43PM 8    THEY WERE VERY CLOSE TO THOSE NUMBERS FOR 2014.

01:43PM 9    Q.   YOU'RE REFERRING TO THE COLUMNS TO THE RIGHT WHERE IT SAYS

01:43PM 10   PERIOD ENDING DECEMBER 31ST, 2014?

01:44PM 11   A.   YES.

01:44PM 12   Q.   DECEMBER 31ST, 2015?

01:44PM 13   A.   YES.

01:44PM 14   Q.   OKAY.  AND YOU MADE REFERENCE TO THE TIME PERIOD WHEN YOU

01:44PM 15   RECEIVED THESE, OCTOBER OF 2014?

01:44PM 16   A.   YES.

01:44PM 17   Q.   AND HOW DID THAT RELATE TO THE FACT THAT THE COLUMN TO THE

01:44PM 18   LEFT RELATES TO NUMBERS FOR THE PERIOD ENDING DECEMBER 2014?

01:44PM 19   A.   THEY -- IT WAS OUR UNDERSTANDING THAT THEY WERE ON TRACK

01:44PM 20   TO PRODUCE THIS TYPE OF INCOME STATEMENT FOR THE YEAR ENDING

01:44PM 21   12/31/2014 GIVEN IT WAS ALREADY ALMOST THE END OF OCTOBER.

01:44PM 22   Q.   WHEN YOU SAY IT WAS ALREADY ALMOST THE END OF OCTOBER, CAN

01:44PM 23   YOU EXPLAIN WHY THAT FACT WAS RELEVANT TO YOU?

01:44PM 24   A.   THEY MADE NO MENTION THAT THEY WEREN'T ANYWHERE NEAR BEING

01:44PM 25   ON TRACK TO HIT THAT NUMBER FOR THAT YEAR.

01:44PM  1    Q.   IN THE LEFT THERE'S A ROW, REVENUE U.S. COMMERCIAL ONLY.

01:44PM  2         DO YOU SEE THAT?

01:44PM  3    A.   YES.

01:44PM  4    Q.   AND THEN BENEATH THAT THERE ARE A NUMBER OF ADDITIONAL

01:45PM  5    ROWS:  LAB SERVICES FROM REVENUE U.S. RETAIL PHARMACIES.

01:45PM  6         DO YOU SEE THAT?

01:45PM  7    A.   YES.

01:45PM  8    Q.   AND TO THE RIGHT THERE'S A NUMBER, 42 MILLION, IN THE

01:45PM  9    COLUMN 12/31/2014.

01:45PM  10        DO YOU SEE THAT?

01:45PM  11   A.   YES.

01:45PM  12   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

01:45PM  13   A.   THAT THAT WAS THE REVENUE THAT THEY EXPECTED TO GET FROM

01:45PM  14   RETAIL PHARMACIES, INCLUDING WALGREENS, FOR THAT YEAR.

01:45PM  15   Q.   AND BENEATH THAT THERE'S LAB SERVICES REVENUE FROM

01:45PM  16   PHYSICIANS' OFFICES, AND TO THE RIGHT $11 MILLION.

01:45PM  17        DO YOU SEE THAT?

01:45PM  18   A.   YES.

01:45PM  19   Q.   AND WHAT DID YOU UNDERSTAND THAT TO REPRESENT?

01:45PM  20   A.   THE REVENUE THAT THEY EXPECTED TO GET FROM THE PHYSICIAN

01:45PM  21   OFFICE WORK THAT THEY WERE DOING FOR 12/31/2014.

01:45PM  22   Q.   AND BENEATH THAT IT SAYS LAB SERVICES REVENUE FROM

01:45PM  23   HOSPITAL, AND TO THE RIGHT $47 MILLION.

01:45PM  24        WHAT DID YOU UNDERSTAND THAT TO BE?

01:45PM  25   A.   THEY HAD MENTIONED A NUMBER OF HOSPITAL SYSTEMS, LIKE

PETERSON DIRECT BY MR. LEACH

01:46PM   1    DIGNITY HEALTH AND OTHERS, THAT WERE USING THE ANALYZER, SO WE

01:46PM   2    ASSUMED THAT THAT WAS COMING FROM THOSE CLIENTS.

01:46PM   3    Q.   AND THEN BENEATH THAT THERE'S A $40 MILLION ENTRY FOR

01:46PM   4    PHARMACEUTICAL SERVICES.

01:46PM   5         DO YOU SEE THAT?

01:46PM   6    A.   YES.

01:46PM   7    Q.   AND WHAT DID YOU UNDERSTAND THAT TO BE?

01:46PM   8    A.   I'M NOT SURE SPECIFICALLY THE SERVICES PIECE OF IT.  I

01:46PM   9    DON'T RECALL THE ANSWER TO THAT.

01:46PM  10         BUT THAT THEY HAD REVENUE COMING FROM SOME FORM OF

01:46PM  11    PHARMACEUTICAL SERVICES TO THE TUNE OF $40 MILLION FOR THAT

01:46PM  12    YEAR.

01:46PM  13    Q.   TO THE RIGHT IN THE COLUMN FOR 2015, IT LOOKS LIKE THE --

01:46PM  14    THERE WAS A NUMBER 161 MILLION -- WELL, BEFORE I GET TO THAT,

01:46PM  15    THERE'S A NUMBER 470 MILLION FOR LAB SERVICES FROM U.S. RETAIL

01:46PM  16    PHARMACIES.

01:46PM  17         DO YOU SEE THAT?

01:46PM  18         470 MILLION?

01:47PM  19    A.   OH, YES.

01:47PM  20    Q.   OKAY.  AND YOU THOUGHT THAT WAS FROM WALGREENS AND OTHER

01:47PM  21    RETAIL PHARMACIES?

01:47PM  22    A.   CORRECT, AND SAFEWAY.

01:47PM  23    Q.   OKAY.  AND ABOVE THAT THERE'S THE LINE -- THERE'S SOME

01:47PM  24    HANDWRITING, 900 LOCATIONS.

01:47PM  25         DO YOU SEE THAT?

01:47PM 1    A.   YES.

01:47PM 2    Q.   AND DOES THAT SOMEHOW RELATE TO THE 470 MILLION IN

01:47PM 3    PROJECTED REVENUE?

01:47PM 4    A.   YES, THAT WAS THE ROLLOUT FOR WALGREENS.

01:47PM 5    Q.   BENEATH THAT IT LOOKS LIKE THERE WAS 161 MILLION

01:47PM 6    ASSOCIATED WITH LAB SERVICES REVENUE FROM PHYSICIAN OFFICES,

01:47PM 7    BUT THAT'S CROSSED OUT.

01:47PM 8        DID YOU CROSS THAT OUT?

01:47PM 9    A.   YES.   DURING THE MEETING THEY MADE SOME MINOR CHANGES THAT

01:47PM 10   THEY WANTED US TO NOTE, SO I NOTED THOSE ON THE PAGE.

01:47PM 11   Q.   WHEN YOU SAY "THEY," THAT'S MS. HOLMES AND MR. BALWANI?

01:47PM 12   A.   YES.

01:47PM 13   Q.   AND SO WERE MS. HOLMES AND MR. BALWANI TELLING RDV IN THE

01:47PM 14   MEETING, PHYSICIAN OFFICES REVENUE IS NOT GOING TO BE 161

01:47PM 15   MILLION, IT'S GOING TO BE 160 MILLION?

01:47PM 16   A.   YES.

01:48PM 17   Q.   IS THAT REPRESENTATIVE OF THE LEVEL OF CHANGES THAT THEY

01:48PM 18   WERE DESCRIBING IN THAT OCTOBER 2014 MEETING?

01:48PM 19   A.   YES.

01:48PM 20   Q.   SAME QUESTIONS WITH RESPECT TO WHAT YOU CROSSED OUT FOR

01:48PM 21   ONSITE SERVICES REVENUE FROM HOSPITALS AND PHARMACEUTICAL

01:48PM 22   SERVICES.

01:48PM 23       CAN YOU TELL US WHAT THOSE CHANGES REPRESENT?

01:48PM 24   A.   THIS SAME CONVERSATION, THEY JUST MADE SOME MINOR CHANGES

01:48PM 25   AS TO WHERE THE REVENUE SOURCES WERE COMING FROM, AND I JUST

PETERSON DIRECT BY MR. LEACH

01:48PM  1    NOTED THEM.

01:48PM  2    Q.   THE GRAND TOTAL OF REVENUE PROJECTED FOR 2015 IS

01:48PM  3    $990 MILLION.

01:48PM  4         DO YOU SEE THAT?

01:48PM  5    A.   YES.

01:48PM  6    Q.   AND WAS THAT RELEVANT TO YOU?

01:48PM  7    A.   YES.

01:48PM  8    Q.   HOW SO?

01:48PM  9    A.   WELL, IT SHOWED TREMENDOUS GROWTH, THE FACT THAT THEY

01:48PM  10   WERE, THEY WERE -- THAT REVENUE THAT WE WERE TOLD WAS ALL UNDER

01:48PM  11   CONTRACT, THAT WOULD MEAN SIGNIFICANT GROWTH FOR THE BUSINESS.

01:48PM  12        EVEN IF THEY HAD HIT HALF OF THAT NUMBER IN 2015, WE WOULD

01:49PM  13   HAVE CONSIDERED THIS A BIG SUCCESS.  THEY WERE ON THEIR WAY TO,

01:49PM  14   YOU KNOW, MOVING THE BALL FORWARD.

01:49PM  15        IN OUR WORLD, YOU DON'T HAVE TO EXACTLY HIT THAT NUMBER,

01:49PM  16   BUT YOU HAVE TO GET CLOSE, IN THE BALLPARK SO TO SPEAK.

01:49PM  17   Q.   IS $150,000 IN THE BALLPARK?

01:49PM  18   A.   NO.

01:49PM  19   Q.   OKAY.  AT ANY POINT IN TIME DID MS. HOLMES OR MR. BALWANI

01:49PM  20   TELL, PRIOR TO 2016, TELL YOU THAT 2014 REVENUE WAS LESS THAN A

01:49PM  21   MILLION DOLLARS?

01:49PM  22   A.   NO.

01:49PM  23   Q.   OKAY.  AT ANY POINT IN TIME DID THEY TELL YOU THAT

01:49PM  24   PHARMACEUTICAL REVENUE FOR 2014 WAS ZERO?

01:49PM  25   A.   NO.

01:49PM   1    Q.   AT ANY POINT IN TIME DID THEY TELL YOU THAT LAB SERVICES

01:49PM   2    REVENUE FROM HOSPITALS IN 2014 WAS ZERO?

01:49PM   3    A.   WELL, FROM HOSPITAL -- YEAH.  NO, THEY NEVER DID.

01:49PM   4    Q.   OKAY.  DID THEY EVER TELL YOU THAT REVENUE FROM 2014 FOR

01:50PM   5    PHYSICIAN OFFICES WAS ZERO?

01:50PM   6    A.   NO.

01:50PM   7    Q.   FURTHER BELOW IN THE EBITDA -- THERE'S A ROW FOR EBITDA,

01:50PM   8    E-B-I-T-D-A.

01:50PM   9         DO YOU SEE THAT?

01:50PM   10   A.   YES.

01:50PM   11   Q.   AND WHAT IS EBITDA?

01:50PM   12   A.   EARNINGS BEFORE INTEREST, TAXES, DEPRECIATION, AND

01:50PM   13   AMORTIZATION.

01:50PM   14        IT'S A MEASURE OF CASH FLOW.

01:50PM   15   Q.   AND TO THE FAR RIGHT THERE'S THE NUMBER 23.9 PERCENT AND

01:50PM   16   IT'S CIRCLED.

01:50PM   17   A.   YES.

01:50PM   18   Q.   AND WHAT WERE YOU GETTING AT THERE?

01:50PM   19   A.   I HAD CALC'D IT PRIOR TO THE MEETING, AND THAT'S WHY IT'S

01:50PM   20   LIGHTER, AND I CIRCLED IT, AND WE TALKED ABOUT THAT MARGIN

01:50PM   21   BEING THAT MARGIN AT THE TIME.

01:50PM   22   Q.   AND DID MR. BALWANI MAKE ANY STATEMENTS ABOUT WHERE THAT

01:50PM   23   MARGIN WAS HEADED?

01:50PM   24   A.   THEY EXPECTED IT TO GROW OVER TIME, THAT IT WOULD INCREASE

01:51PM   25   FROM THE 24 PERCENT.

01:51PM  1    Q.   BUT IT WAS ALREADY A PROFITABLE MARGIN?

01:51PM  2    A.   YES.

01:51PM  3    Q.   OKAY.  IF WE COULD GO BACK UP TO THE TOP AND LOOK AT 2015,

01:51PM  4    BACK TO THE NUMBER 470 MILLION FOR U.S. RETAIL PHARMACIES FOR

01:51PM  5    2015.

01:51PM  6    A.   YES.

01:51PM  7    Q.   DID MS. HOLMES OR MR. BALWANI EVER TELL YOU THAT THAT

01:51PM  8    NUMBER FOR 2015 WAS LESS THAN A MILLION DOLLARS?

01:51PM  9    A.   NO.

01:51PM  10   Q.   DID THEY EVER TELL YOU THAT THE 160 MILLION FOR PHYSICIAN

01:51PM  11   OFFICES WAS ZERO?

01:51PM  12   A.   NO.

01:51PM  13   Q.   DID THEY EVER TELL YOU THAT THE PHARMA REVENUE FOR 2015

01:51PM  14   WAS ZERO?

01:51PM  15   A.   NO.

01:51PM  16   Q.   I'D LIKE YOU TO NOW PLEASE LOOK, MS. PETERSON, AT WHAT WE

01:51PM  17   HAVE MARKED AS EXHIBIT 2107.

01:52PM  18          THE COURT:  WHILE THAT'S COMING UP, FOLKS, WHY DON'T

01:52PM  19   YOU STAND UP AND STRETCH IF YOU WOULD LIKE FOR A MOMENT.

01:52PM  20       YOU CAN, TOO, MS. PETERSON.

01:52PM  21          THE WITNESS:  THANK YOU.

01:52PM  22       (STRETCHING.)

01:52PM  23          THE COURT:  YOU MAY PROCEED.

01:52PM  24          MR. LEACH:  THANK YOU, YOUR HONOR.

01:52PM  25   Q.   MS. PETERSON, IS EXHIBIT 2107 AN EMAIL FROM MR. BALWANI TO

01:52PM 1    JERRY TUBERGEN WITH A CC TO ELIZABETH HOLMES AND DOUG DEVOS

01:52PM 2    FROM AMWAY?

01:52PM 3    A.   YES.

01:52PM 4            MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

01:52PM 5    EXHIBIT 2107.

01:53PM 6            MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

01:53PM 7            THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:53PM 8        (GOVERNMENT'S EXHIBIT 2107 WAS RECEIVED IN EVIDENCE.)

01:53PM 9            MR. LEACH:  I'D LIKE TO START, IF WE COULD,

01:53PM 10   MS. WACHS, ON PAGE 2.

01:53PM 11   Q.   DOWN TOWARDS THE BOTTOM THERE'S AN EMAIL FROM MR. TUBERGEN

01:53PM 12   TO ELIZABETH HOLMES AND SUNNY BALWANI DATED OCTOBER 19TH, 2014.

01:53PM 13       DO YOU SEE THAT?

01:53PM 14   A.   YES.

01:53PM 15   Q.   OKAY.  AND THIS STARTS OUT, "ELIZABETH AND SUNNY,

01:53PM 16       "THANK YOU SO VERY MUCH FOR OUR MEETING TUESDAY."

01:53PM 17       DO YOU SEE THAT?

01:53PM 18   A.   YES.

01:53PM 19   Q.   AND DO YOU BELIEVE THAT TO BE A REFERENCE TO YOUR MEETING

01:53PM 20   WITH MS. HOLMES AND MR. BALWANI IN CALIFORNIA?

01:53PM 21   A.   YES.

01:53PM 22   Q.   IN THE SECOND PARAGRAPH IT SAYS, "WE WOULD LOVE TO MOVE

01:53PM 23   FORWARD AND BE A PART OF THE NEW SHAREHOLDER BASE YOU ARE

01:53PM 24   ASSEMBLING.  AS WE DISCUSSED, AN INVESTMENT OF 100 MILLION," OR

01:53PM 25   100M, "SEEMS TO FIT, IF THAT WORKS FOR YOU AND THE COMPANY."

PETERSON DIRECT BY MR. LEACH

01:54PM   1          DO YOU SEE THAT?

01:54PM   2     A.   YES.

01:54PM   3     Q.   AND IS THAT APPROXIMATELY THE INVESTMENT THAT RDV

01:54PM   4     ULTIMATELY MAKES IN THE COMPANY?

01:54PM   5     A.   YES.

01:54PM   6     Q.   IT THEN SAYS, "WE ARE TRULY HONORED TO HAVE THIS

01:54PM   7     OPPORTUNITY."

01:54PM   8          AND THEN IN THE NEXT PARAGRAPH, "PLEASE HAVE WHOMEVER IS

01:54PM   9     APPROPRIATE FOLLOW UP WITH ME REGARDING NEXT STEPS AT THEIR

01:54PM  10     EARLIEST CONVENIENCE."

01:54PM  11          DO YOU SEE THAT LANGUAGE?

01:54PM  12     A.   YES.

01:54PM  13     Q.   AND THEN IF WE CAN GO TO THE TOP, DO YOU SEE MS. HOLMES

01:54PM  14     REPLIES, "SUNNY WILL FOLLOW WITH A NOTE TOMORROW WITH THE

01:54PM  15     DETAILS FROM HERE."

01:54PM  16          DO YOU SEE THAT?

01:54PM  17     A.   YES.

01:54PM  18     Q.   AND IS THAT CONSISTENT WITH YOUR MEMORY OF THE OCTOBER

01:54PM  19     MEETING IN PALO ALTO, THAT MR. BALWANI TOOK OVER TO EXECUTE THE

01:54PM  20     INVESTMENT?

01:54PM  21     A.   YES.

01:54PM  22     Q.   LET'S GO TO THE FIRST PAGE.

01:55PM  23          DO YOU SEE WHERE MR. BALWANI WROTE, "PER ELIZABETH'S

01:55PM  24     EMAIL, ATTACHED PLEASE FIND ALL OF THE RELEVANT DOCUMENTS FOR

01:55PM  25     THE INVESTMENT."

PETERSON DIRECT BY MR. LEACH

01:55PM 1          FIRST BULLET, "THE FILE NAMED NEWINVESTOR.ZIP IS A FOLDER

01:55PM 2     THAT CONTAINS THE SOFT COPY OF ALL OF THE INVESTMENT DOCUMENTS

01:55PM 3     YOU ALREADY HAVE IN THE INVESTMENT BINDER."

01:55PM 4          DO YOU SEE THAT?

01:55PM 5     A.   YES.

01:55PM 6     Q.   AND THE INVESTMENT BINDER, IS THAT A REFERENCE TO THE TWO

01:55PM 7     BINDERS OF DUE DILIGENCE MATERIALS THAT YOU RECEIVED?

01:55PM 8     A.   YES, THOSE WERE IN THERE.

01:55PM 9     Q.   IT THEN SAYS, "THE 2 ADDITIONAL DOCUMENTS ATTACHED TO THIS

01:55PM 10    EMAIL ARE THE SIGNATURE PAGE AND WIRING INSTRUCTIONS."

01:55PM 11         DO YOU SEE THAT?

01:55PM 12    A.   YES.

01:55PM 13    Q.   AND THEN IN THE NEXT PARAGRAPH IT ENDS, "ONCE EXECUTED,

01:55PM 14    YOU CAN SEND THE ORIGINAL OF THE EXECUTED DOCUMENT TO MY

01:55PM 15    ATTENTION AT THE ADDRESS BELOW."

01:55PM 16         DO YOU SEE THAT?

01:55PM 17    A.   YES.

01:55PM 18    Q.   AND THEN DO YOU SEE WHERE MR. BALWANI WROTE, "PLEASE LET

01:55PM 19    ME KNOW IF I CAN PROVIDE ANY ASSISTANCE WITH ANY OF THESE

01:55PM 20    DOCUMENTS"?

01:55PM 21    A.   YES.

01:55PM 22    Q.   OKAY.  I'D LIKE TO LOOK AT THE DOCUMENTS THAT ARE

01:56PM 23    ATTACHED, AND IF WE CAN START ON PAGE 56.

01:56PM 24         DO YOU SEE THE TITLE SERIES C-2 PREFERRED STOCK PURCHASE

01:56PM 25    AGREEMENT?

PETERSON DIRECT BY MR. LEACH

01:56PM   1    A.   YES.

01:56PM   2    Q.   AND WHAT IS THE PURPOSE OF THIS DOCUMENT?

01:56PM   3    A.   THIS WAS THE SECURITY IN WHICH WE WERE INVESTING IN.

01:56PM   4    Q.   OKAY.   AND IF WE CAN LOOK AT PAGE 61.

01:56PM   5         DO YOU SEE THERE'S A SECTION FOR REPRESENTATIONS AND

01:56PM   6    WARRANTIES OF THE INVESTORS?

01:56PM   7    A.   YES.

01:56PM   8    Q.   AND THE INVESTOR HERE WAS RDV OR ONE OF ITS SUBSIDIARIES?

01:56PM   9    A.   CORRECT.

01:56PM   10   Q.   AND SO THESE ARE REPRESENTATIONS THAT THERANOS REQUIRES OF

01:56PM   11   RDV --

01:56PM   12   A.   YES.

01:56PM   13   Q.   -- FOR THE INVESTMENT TO TAKE PLACE?

01:56PM   14   A.   YES.

01:56PM   15   Q.   OKAY.   IF WE CAN GO TO THE NEXT PAGE, PAGE 62.

01:57PM   16        IN 4.3, DO YOU SEE THE HEADING INVESTMENT EXPERIENCE?

01:57PM   17   A.   YES.

01:57PM   18   Q.   AND IT READS, "SUCH INVESTOR" -- THAT'S RDV?

01:57PM   19   A.   YES.

01:57PM   20   Q.   -- "OR ITS PURCHASER REPRESENTATIVE, WITHIN THE MEANING OF

01:57PM   21   REGULATION D, RULE 501(H)," AND THEN IT CONTINUES, "HAS

01:57PM   22   SUBSTANTIAL EXPERIENCE IN EVALUATING AND INVESTING IN PRIVATE

01:57PM   23   PLACEMENT TRANSACTIONS OF SECURITIES IN COMPANIES SIMILAR TO

01:57PM   24   THE COMPANY."

01:57PM   25        DO YOU SEE THAT LANGUAGE?

PETERSON DIRECT BY MR. LEACH

01:57PM   1    A.   YES.

01:57PM   2    Q.   AND THAT LANGUAGE WAS TRUE; CORRECT?

01:57PM   3    A.   YES.

01:57PM   4    Q.   RDV HAD SUBSTANTIAL INVESTMENT EXPERIENCE?

01:57PM   5    A.   YES.

01:57PM   6    Q.   IN 4.4 THERE'S A PARAGRAPH, SPECULATIVE NATURE OF

01:57PM   7    INVESTMENT.

01:57PM   8         DO YOU SEE THAT?

01:57PM   9    A.   YES.

01:57PM  10    Q.   AND IF WE CAN ZOOM IN, MS. HOLLIMAN (SIC), JUST SO WE CAN

01:57PM  11    SEE IT A LITTLE BETTER.

01:57PM  12         THIS SAYS, "SUCH INVESTOR UNDERSTANDS AND ACKNOWLEDGES

01:57PM  13    THAT THE COMPANY HAS A LIMITED FINANCIAL AND OPERATING HISTORY

01:58PM  14    AND THAT AN INVESTMENT IN THE COMPANY IS HIGHLY SPECULATIVE AND

01:58PM  15    INVOLVES SUBSTANTIAL RISKS."

01:58PM  16         DO YOU SEE THAT LANGUAGE?

01:58PM  17    A.   YES.

01:58PM  18    Q.   AND WERE THE REPRESENTATIONS IN PARAGRAPH 4.4 TRUE TO THE

01:58PM  19    BEST OF YOUR KNOWLEDGE?

01:58PM  20    A.   YES.

01:58PM  21    Q.   OKAY.  IF WE CAN LOOK AT 4.5, ACCESS TO DATA.

01:58PM  22         DOES THIS RELATE TO ACCESS THAT RDV WAS PROVIDED IN

01:58PM  23    ADVANCE OF THE INVESTMENT DECISION?

01:58PM  24    A.   IT DOES ACKNOWLEDGE THAT WE DID HAVE ACCESS TO THEM AND TO

01:58PM  25    ASK QUESTIONS AND GOT THE MATERIALS.

01:58PM 1    Q.   OKAY.  AND ARE THE REPRESENTATIONS IN PARAGRAPH 4.5 TRUE?

01:58PM 2    A.   YES.

01:58PM 3    Q.   OKAY.  DID YOU RELY ON THE DUE DILIGENCE MATERIALS THAT

01:58PM 4    WERE PROVIDED TO RDV?

01:58PM 5    A.   YES.

01:58PM 6    Q.   AND DID YOU RELY ON THE STATEMENTS THAT MS. HOLMES MADE IN

01:58PM 7    THE PHONE CALL YOU HAD WITH HER AND IN THE MEETING THAT YOU HAD

01:58PM 8    WITH MS. HOLMES AND MR. BALWANI?

01:58PM 9    A.   YES.

01:58PM 10   Q.   OKAY.  WE CAN TAKE THAT DOWN, MS. WACHS.

01:59PM 11        IF I CAN DRAW YOUR ATTENTION TO 2139.

01:59PM 12        IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI IN

01:59PM 13   OR AROUND OCTOBER 8TH, 2014?

01:59PM 14   A.   YES.

01:59PM 15        MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

01:59PM 16   EXHIBIT 2139.

01:59PM 17        MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

01:59PM 18        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:59PM 19        (GOVERNMENT'S EXHIBIT 2139 WAS RECEIVED IN EVIDENCE.)

01:59PM 20   BY MR. LEACH:

01:59PM 21   Q.   IF WE CAN PLEASE START ON PAGE 2.

01:59PM 22        MS. PETERSON, THERE'S AN EMAIL HERE THAT READS -- FROM YOU

01:59PM 23   TO MR. BALWANI WITH THE SUBJECT RDV INVESTMENTS.

01:59PM 24        DO YOU SEE THAT?

01:59PM 25   A.   YES.

01:59PM 1    Q.   AND THIS SAYS, "HI SUNNY, DO YOU HAVE JUST A FEW MINUTES

02:00PM 2    YET TODAY TO TALK?  JUST TRYING TO MANAGE LOGISTICS OF CLOSING.

02:00PM 3    LET ME KNOW A GOOD TIME."

02:00PM 4         WHAT DID YOU MEAN BY "LOGISTICS OF CLOSING"?

02:00PM 5    A.   WHAT THE PLAN WAS AND HOW THEY WANTED TO RECEIVE THE

02:00PM 6    MONEY, AND I DID NOT HAVE THE WIRE INSTRUCTIONS FROM JERRY, SO

02:00PM 7    I NEEDED THOSE.

02:00PM 8    Q.   JERRY IS MR. TUBERGEN?

02:00PM 9    A.   CORRECT.

02:00PM 10   Q.   YOUR BOSS?

02:00PM 11   A.   YES.

02:00PM 12   Q.   OKAY.  AND IF WE CAN GO TO PAGE 1, PLEASE.

02:00PM 13        DO YOU SEE ROUGHLY HALFWAY THROUGH THE PAGE, MR. BALWANI

02:00PM 14   WRITES "HI LISA,

02:00PM 15        "GREAT TO TALK TO YOU.  ATTACHED ARE THE WIRING

02:00PM 16   INSTRUCTIONS"?

02:00PM 17   A.   YES.

02:00PM 18   Q.   SO MR. BALWANI GOT YOU THE WIRING INSTRUCTIONS?

02:00PM 19   A.   YES.

02:00PM 20   Q.   AND THEN UP AT THE TOP YOU REPLY, "WONDERFUL SUNNY, THANK

02:00PM 21   YOU."

02:00PM 22        IT THEN CONTINUES.

02:00PM 23        "I APPRECIATE THE COLOR ON REPORTING, HELPS ME IN MANAGING

02:00PM 24   THOSE EXPECTATIONS ON THIS END.  A CAP CHART ISN'T NECESSARY,

02:01PM 25   BUT CERTAINLY WOULD HELP ME MANAGE MY INTERNAL REPORTING, BUT

02:01PM  1    ONLY IF YOU ARE COMFORTABLE SHARING THAT AT SOME POINT POST

02:01PM  2    CLOSE -- AND IF YOU PREFER A REDACTED VERSION TO KEEP OTHER

02:01PM  3    INVESTOR NAMES CONFIDENTIAL, THAT WORKS TOO."

02:01PM  4        DO YOU SEE THAT?

02:01PM  5    A.   YES.

02:01PM  6    Q.   AND WHAT WERE YOU GETTING AT HERE?

02:01PM  7    A.   OTHER PARTS OF LOGISTICS OF CLOSING IS TO MAKE SURE THAT I

02:01PM  8    HAVE EVERYTHING THAT I NEED TO KIND OF MANAGE THE INVESTMENT

02:01PM  9    GOING FORWARD, AND TWO OF THOSE THINGS IS A CAP CHART SO THAT I

02:01PM  10   CAN -- I KNEW EXACTLY WHAT WE OWNED IN TERMS OF A PERCENTAGE SO

02:01PM  11   THAT I COULD EVENTUALLY DO VALUATIONS OF THE BUSINESS IN THE

02:01PM  12   FUTURE.  SO THAT WAS IMPORTANT TO ME.

02:01PM  13       AS WELL AS WE TYPICALLY GET MONTHLY FINANCIAL STATEMENTS

02:01PM  14   FROM ANY COINVESTMENT THAT WE MAKE WITH A PRIVATE EQUITY FUND.

02:01PM  15       I NEEDED TO FULLY UNDERSTAND AND MANAGE EXPECTATIONS OF

02:02PM  16   HOW WE WERE GOING TO RECEIVE FINANCIAL INFORMATION IN THE

02:02PM  17   FUTURE FROM THE COMPANY.

02:02PM  18       SO WE HAD A DISCUSSION AROUND THAT AS WELL.

02:02PM  19   Q.   WHAT DID MR. BALWANI SAY?

02:02PM  20   A.   HE TOLD ME THAT THEY WEREN'T GOING TO SEND ANYTHING OUT IN

02:02PM  21   WRITING IN TERMS OF FINANCIAL INFORMATION, THAT IT WAS FOR

02:02PM  22   CONFIDENTIALITY REASONS, AND THAT THEY EXPECTED TO MEET WITH

02:02PM  23   INVESTORS REGULARLY MORE OFTEN, EVEN MORE OFTEN THAN ANNUALLY

02:02PM  24   BECAUSE THEY WANTED TO AGAIN GET OUR INSIGHT.  ALL OF THE

02:02PM  25   INVESTORS HAD MANAGED BUSINESSES, LARGE BUSINESSES BEFORE, AND

02:02PM   1    THEY WANTED TO GET OUR INPUT.

02:02PM   2         SO WE WERE LEFT WITH THE UNDERSTANDING THAT WE WERE GOING

02:02PM   3    TO HAVE REGULAR CONVERSATIONS AROUND THE FINANCIAL PERFORMANCE

02:02PM   4    OF THE COMPANY AND HOW IT WAS MOVING FORWARD, BUT IT WAS GOING

02:02PM   5    TO COME IN THE FORM OF VERBAL MEETINGS VERSUS IN TANGIBLE

02:03PM   6    WRITING OR EMAIL.

02:03PM   7    Q.   DID EVEN THOSE VERBAL MEETINGS END UP HAPPENING?

02:03PM   8    A.   NO.

02:03PM   9    Q.   THERE'S ALSO REFERENCE TO A CAP TABLE.

02:03PM  10         WHAT DID MR. BALWANI TELL YOU ABOUT THE CAP TABLE?

02:03PM  11    A.   I UNDERSTAND THE CONFIDENTIALITY AROUND WANTING -- NOT

02:03PM  12    WANTING NAMES PRESENTED IN A CAP CHART, SO I WAS OFFERING TO

02:03PM  13    REDACT THE NAMES.

02:03PM  14         I REALLY JUST WANTED TO UNDERSTAND THE OWNERSHIP

02:03PM  15    CAPITALIZATION OF THE BUSINESS, AND I WAS TRYING TO GET THAT

02:03PM  16    INFORMATION REDACTED OR NOT REDACTED.

02:03PM  17         HE -- I COULDN'T GET IT BEFORE CLOSE, BUT HE DID PROMISE

02:03PM  18    ME ON THIS PHONE CALL THAT I WOULD GET IT -- HAVE SOMETHING

02:03PM  19    AFTER CLOSE, AND I NEVER DID.

02:03PM  20    Q.   YOU NEVER GOT SOMETHING EVEN AFTER THE CLOSE?

02:03PM  21    A.   NO.

02:03PM  22    Q.   OKAY.  LET'S LOOK AT EXHIBIT 2146.

02:04PM  23         DO YOU HAVE THAT IN FRONT OF YOU?

02:04PM  24    A.   YES.

02:04PM  25    Q.   IS THIS AN EMAIL EXCHANGE BETWEEN YOU AND MR. TUBERGEN

02:04PM    1    AROUND THE TIME OF YOUR PHONE CALL WITH MR. BALWANI?

02:04PM    2    A.   YES.

02:04PM    3    Q.   AND DID YOU SEND THIS EMAIL IN THE ORDINARY COURSE OF

02:04PM    4    RDV'S BUSINESS?

02:04PM    5    A.   YES.

02:04PM    6    Q.   AND WAS IT IMPORTANT FOR YOU TO BE TRUTHFUL WITH

02:04PM    7    MR. TUBERGEN REGARDING THE STATUS OF THE CLOSE?

02:04PM    8    A.   YES.

02:04PM    9    Q.   AND WAS THIS MAINTAINED IN THE ORDINARY COURSE OF RDV'S

02:04PM   10    BUSINESS?

02:04PM   11    A.   YES.

02:04PM   12         MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

02:04PM   13    EXHIBIT 2146.

02:04PM   14         MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

02:04PM   15         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:04PM   16    (GOVERNMENT'S EXHIBIT 2146 WAS RECEIVED IN EVIDENCE.)

02:04PM   17         MR. LEACH:  IF WE CAN ZOOM IN, PLEASE, MS. WACHS, ON

02:04PM   18    THE BOTTOM PORTION.

02:04PM   19    Q.   THERE'S AN EMAIL FROM YOU, MS. PETERSON, WHERE YOU WROTE,

02:04PM   20    "SPOKE TO SUNNY."

02:05PM   21         DO YOU SEE THAT?

02:05PM   22    A.   YES.

02:05PM   23    Q.   IS THAT A REFERENCE TO THE PHONE CALL THAT YOU JUST

02:05PM   24    TESTIFIED TO WITH MR. BALWANI?

02:05PM   25    A.   YES.

02:05PM 1    Q.   OKAY.  YOU WROTE, "THEIR GOAL IS TO HAVE ALL DOCS IN AS

02:05PM 2    SOON AS POSSIBLE THIS WEEK AND $$$ FROM ALL INVESTORS NO LATER

02:05PM 3    THAN FRIDAY.  THEY ARE CAPPING THE FUND RAISE AT 500M AND

02:05PM 4    EXPECT IT TO COME FROM 5-8 ENTITIES.  THEY HAVE MUCH MORE

02:05PM 5    DEMAND THAN 500M BUT WANT TO CAP IT AT 500M.  ONLY WAY THEY

02:05PM 6    TAKE MORE THAN 500M IS 'IF SOMEONE IS EXTREMELY DISGRUNTLED AND

02:05PM 7    COMPLAINED TO A BOARD MEMBER OR SOMETHING.'"

02:05PM 8         DO YOU SEE THAT?

02:05PM 9    A.   YES.

02:05PM 10   Q.   AND WHAT WERE YOU GETTING AT THERE?

02:05PM 11   A.   I WANTED TO GET A GOOD UNDERSTANDING OF WHAT THEY WERE

02:05PM 12   GOING TO DO WITH THE CASH AND HOW MUCH CASH THEY WERE GOING TO

02:05PM 13   GET IN, BECAUSE HOW MUCH CASH THEY BRING IN TELLS ME HOW MUCH

02:05PM 14   MY 100 MILLION IS OF THE TOTAL.  SO THAT WAS IMPORTANT TO ME.

02:06PM 15        AND THE FACT THAT THEY WERE CAPPING IT AT 500, I WAS GLAD

02:06PM 16   ABOUT THAT BECAUSE I DID NOT WANT THEM RAISING A BILLION

02:06PM 17   DOLLARS OR WHATEVER BECAUSE THAT JUST MEANS WE OWN LESS.

02:06PM 18        SO IT WAS GOOD TO HAVE AN UNDERSTANDING OF THAT.

02:06PM 19   Q.   IN THE NEXT PARAGRAPH IT SAYS, "THEY ARE PLANNING ON OUR

02:06PM 20   100M.  I TOLD HIM OUR DOCS WOULD BE IN BY TOMORROW."

02:06PM 21        YOU THEN CONTINUE.

02:06PM 22        "I ASKED IF THEY WERE PLANNING TO CASH SOME EXISTING

02:06PM 23   INVESTORS OUT RIGHT AWAY AND HE INDICATED THAT THEY HAVE NO

02:06PM 24   IMMEDIATE NEED FOR THE MONEY, THAT IT INITIALLY WILL JUST SIT

02:06PM 25   ON THE B/S."

PETERSON DIRECT BY MR. LEACH

02:06PM 1          DO YOU SEE THAT?

02:06PM 2     A.   YES.

02:06PM 3     Q.   AND IS B/S BALANCE SHEET?

02:06PM 4     A.   YES.

02:06PM 5     Q.   AND IS THIS ACCURATELY SUMMARIZING WHAT MR. BALWANI TOLD

02:06PM 6     YOU?

02:06PM 7     A.   YES.

02:06PM 8     Q.   AND WAS THIS RELEVANT TO YOU?

02:06PM 9     A.   YES, IT WAS VERY RELEVANT.

02:06PM 10    Q.   WHY?

02:06PM 11    A.   BECAUSE WE HAD ORIGINALLY BEEN TOLD IN THE MEETING IN

02:07PM 12    PALO ALTO A COUPLE WEEKS EARLIER THAT THEY WERE GOING TO USE

02:07PM 13    SOME OF THE MONEY, NOT ALL OF IT, BUT SOME OF THE MONEY TO CASH

02:07PM 14    OUT SOME EXISTING INVESTORS, SO I WAS SURPRISED THAT THERE WAS

02:07PM 15    NO IMMEDIATE NEED FOR THE CASH.

02:07PM 16    Q.   IN THE LAST PARAGRAPH YOU WROTE, "I ASKED WHEN WE SHOULD

02:07PM 17    CHECK BACK WITH THEM AGAIN ON ANY UPDATES AND HE SAID THEY

02:07PM 18    WOULD REACH OUT AT A MINIMUM ANNUALLY, BUT THEIR GOAL IS TO

02:07PM 19    MEET MUCH MORE OFTEN THAN THAT.  THIS GROUP OF INVESTORS IS

02:07PM 20    MUCH MORE STRATEGIC AND THEY WANT TO TAP INTO THAT MORE OFTEN

02:07PM 21    THAN ANNUALLY."

02:07PM 22         DO YOU SEE THAT LANGUAGE?

02:07PM 23    A.   YES.

02:07PM 24    Q.   AND IS THAT A FAIR SUMMARY OF WHAT MR. BALWANI SAID?

02:07PM 25    A.   YES.

02:07PM  1    Q.   AND DID THOSE LESS THAN ANNUAL MEETINGS EVEN HAPPEN?

02:07PM  2    A.   NO.

02:07PM  3    Q.   "HE WAS TALKING ABOUT THEM COMING TO G.R." -- WHAT DOES

02:07PM  4    G.R. REFER TO?

02:07PM  5    A.   TO GRAND RAPIDS.

02:07PM  6    Q.   -- "TO HOPEFULLY TAP INTO DOUG/AMWAY MANAGEMENT TO LEARN

02:08PM  7    MORE ABOUT GOING GLOBAL.  NOT SURE HOW MUCH INTERACTION THERE

02:08PM  8    WILL BE WITH OTHER INVESTORS, WE'LL HAVE TO WAIT AND SEE."

02:08PM  9         AND THEN IT SAYS, "AT LEAST INITIALLY, HE WAS CLEAR THAT

02:08PM  10   THEY AREN'T PLANNING TO PUT ANY UPDATES OR FINANCIAL

02:08PM  11   INFORMATION IN WRITING FOR CONFIDENTIALITY PURPOSES."

02:08PM  12        DO YOU SEE THAT?

02:08PM  13   A.   YES.

02:08PM  14   Q.   IS THAT WHAT MR. BALWANI TOLD YOU?

02:08PM  15   A.   YES.

02:08PM  16   Q.   WAS THAT USUAL, UNUSUAL?

02:08PM  17   A.   UNUSUAL.

02:08PM  18   Q.   HOW SO?

02:08PM  19   A.   NORMALLY THERE'S NO -- I MEAN, WE'VE ALREADY SIGNED A

02:08PM  20   CONFIDENTIALITY AGREEMENT.  WE'RE AN INVESTOR.  NORMALLY

02:08PM  21   COMPANIES DON'T HAVE AN ISSUE SHARING FINANCIAL INFORMATION.

02:08PM  22   Q.   JUST TWO MORE DOCUMENTS, MS. PETERSON.

02:08PM  23        I'D LIKE TO DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

02:08PM  24   2166.

02:09PM  25        DO YOU RECOGNIZE THIS?

02:09PM  1    A.   YES.

02:09PM  2    Q.   AND WHAT IS THIS?

02:09PM  3    A.   THIS IS A FORMAL INVESTMENT MEMO THAT I DO TO THE

02:09PM  4    INVESTMENT COMMITTEE THAT GETS SIGNED TO APPROVE THE

02:09PM  5    INVESTMENT.

02:09PM  6    Q.   DO YOU RECOGNIZE THE SIGNATURES ON PAGE 7?

02:09PM  7    A.   YES.

02:09PM  8    Q.   DID YOU PREPARE THIS IN THE ORDINARY COURSE OF RDV'S

02:09PM  9    BUSINESS?

02:09PM  10   A.   YES.

02:09PM  11   Q.   DID YOU PREPARE THIS AT -- OR FROM INFORMATION AT THE TIME

02:09PM  12   YOU PREPARED THIS?

02:09PM  13   A.   YES.

02:09PM  14   Q.   AND DID YOU MAINTAIN THIS IN THE ORDINARY COURSE OF RDV'S

02:09PM  15   BUSINESS?

02:09PM  16   A.   YES.

02:09PM  17   Q.   DOES THIS ESSENTIALLY MEMORIALIZE THE REASONS FOR THE

02:09PM  18   INVESTMENT?

02:09PM  19   A.   YES, AND THE STRENGTHS AND WEAKNESSES, YES.

02:09PM  20           MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

02:09PM  21   EXHIBIT 2166.

02:09PM  22           MR. COOPERSMITH:  802, YOUR HONOR.

02:09PM  23           THE COURT:  THIS IS A BUSINESS RECORD?

02:09PM  24           MR. LEACH:  YES, YOUR HONOR.

02:09PM  25           THE COURT:  IT'S ADMITTED UNDER 803(6).

02:10PM   1          IT MAY BE PUBLISHED.

02:10PM   2          (GOVERNMENT'S EXHIBIT 2166 WAS RECEIVED IN EVIDENCE.)

02:10PM   3     BY MR. LEACH:

02:10PM   4     Q.   MS. PETERSON, I DRAW YOUR ATTENTION TO THE TOP PORTION OF

02:10PM   5     THE DOCUMENT.

02:10PM   6          DO YOU SEE WHERE IT SAYS, "RDV APPROVAL DOCUMENT -- NEW

02:10PM   7     EQUITY INVESTMENT.

02:10PM   8          "DIRECT INVESTMENT:  THERANOS INC."

02:10PM   9          DO YOU SEE THAT?

02:10PM  10     A.   YES.

02:10PM  11     Q.   AND IS THIS A FORM THAT YOU USE ORDINARILY IN YOUR

02:10PM  12     BUSINESS?

02:10PM  13     A.   YES.

02:10PM  14     Q.   OKAY.  TO THE RIGHT IT SAYS, "CLOSED:  OCTOBER 31ST,

02:10PM  15     2014."

02:10PM  16          IS THAT CONSISTENT WITH WHEN THE TRANSACTION CLOSED?

02:10PM  17     A.   YES.

02:10PM  18     Q.   THERE'S A SECTION RDV OPPORTUNITY, AND THEN ANOTHER

02:10PM  19     SECTION COMPANY OVERVIEW.

02:10PM  20          DO YOU SEE THAT?

02:10PM  21     A.   YES.

02:10PM  22     Q.   AND IS SOME OF THE INFORMATION IN HERE DRAWN FROM THE MEMO

02:10PM  23     THAT YOU PREPARED EARLIER?

02:10PM  24     A.   YES.

02:10PM  25     Q.   OKAY.  FOR EXAMPLE, YOU WROTE, "THERANOS MANUFACTURES ITS

02:10PM   1    ANALYZER EQUIPMENT."

02:10PM   2         DO YOU SEE THAT IN THE SECOND PARAGRAPH?

02:10PM   3    A.   YES.

02:10PM   4    Q.   AND IS THAT CONSISTENT WITH WHAT MS. HOLMES AND

02:11PM   5    MR. BALWANI TOLD YOU?

02:11PM   6    A.   YES.

02:11PM   7    Q.   IF WE GO TO THE NEXT PAGE, PLEASE.

02:11PM   8         DO YOU SEE THERE'S A FINANCIAL SUMMARY?

02:11PM   9    A.   YES.

02:11PM  10    Q.   AND IS THE DATA IN HERE DRAWN FROM THE SPREADSHEET THAT WE

02:11PM  11    SAW IN 1853 AS INFORMED BY YOUR CONVERSATION WITH MR. BALWANI

02:11PM  12    AND MS. HOLMES?

02:11PM  13    A.   YES.

02:11PM  14    Q.   TO THE FAR RIGHT THERE ARE SOME FINANCIAL NOTES?

02:11PM  15    A.   YES.

02:11PM  16    Q.   WHERE DOES THIS INFORMATION COME FROM?

02:11PM  17    A.   THAT ALL CAME FROM THE CONVERSATION IN PALO ALTO.

02:11PM  18    Q.   OKAY.  AND SO I SEE IN THE SECOND BULLET, "2015 ASSUMES

02:11PM  19    THEY OPEN APPROXIMATELY 1,200 LOCATIONS ACROSS WALGREENS AND

02:11PM  20    SAFEWAY."

02:11PM  21         DO YOU SEE THAT?

02:11PM  22    A.   YES.

02:11PM  23    Q.   AND THAT'S INFORMATION THAT MR. BALWANI PROVIDED YOU?

02:11PM  24    A.   YES.

02:11PM  25    Q.   IF WE CAN GO TO PAGE 5.

02:12PM  1              DO YOU SEE THAT THERE'S A DESCRIPTION OF THE CURRENT BOARD

02:12PM  2      OF DIRECTORS?

02:12PM  3      A.   YES.

02:12PM  4      Q.   AND THERE'S AN ENTRY FOR MR. BALWANI WHERE IT SAYS,

02:12PM  5      "PRESIDENT AND COO OF THERANOS:  ENTREPRENEUR AND COMPUTER

02:12PM  6      SCIENTIST; JOINED THERANOS AFTER DROPPING OUT OF THE COMPUTER

02:12PM  7      SCIENCE PROGRAM AT STANFORD UNIVERSITY."

02:12PM  8              AND THEN IT CONTINUES.

02:12PM  9              DO YOU SEE THAT?

02:12PM  10     A.   YES.

02:12PM  11     Q.   PRIOR TO THE END OF 2015, DID YOU HAVE ANY UNDERSTANDING

02:12PM  12     THAT MS. HOLMES AND MR. BALWANI WAS IN A ROMANTIC RELATIONSHIP?

02:12PM  13     A.   NO.

02:12PM  14              MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  THE SAME

02:12PM  15     REASONS THAT WE DISCUSSED EARLIER.

02:12PM  16              THE COURT:  OVERRULED.

02:12PM  17          YOUR ANSWER?

02:12PM  18              THE WITNESS:  NO.

02:12PM  19     BY MR. LEACH:

02:12PM  20     Q.   THEY NEVER TOLD YOU THAT?

02:12PM  21     A.   NO.

02:12PM  22     Q.   WOULD THAT HAVE BEEN RELEVANT TO THE INVESTMENT DECISION?

02:12PM  23     A.   I THINK IT WOULD HAVE SPURRED A LOT OF DISCUSSION NOT ONLY

02:13PM  24     AMONGST OURSELVES, BUT ALSO WITH THEM AT THE -- IN PALO ALTO.

02:13PM  25              IT'S FRAUGHT WITH CONFLICT, SO I THINK WE WOULD HAVE

02:13PM   1   WANTED TO DISCUSS THAT AT LENGTH.

02:13PM   2   Q.   WHEN YOU SAY "IT'S FRAUGHT WITH CONFLICT," WHAT DO YOU

02:13PM   3   MEAN?

02:13PM   4   A.   ANY TIME YOU HAVE A FAMILY MEMBER OR A SPOUSE OR SIBLING,

02:13PM   5   OR WHOMEVER, IN A BUSINESS AND WE'RE MAKING AN INVESTMENT, YOU

02:13PM   6   WANT TO MAKE SURE THAT THE PEOPLE YOU'RE INVESTING WITH ARE

02:13PM   7   MAKING SOUND BUSINESS DECISIONS, NOT EMOTIONAL DECISIONS.

02:13PM   8        SO I'M NOT SAYING THAT THAT'S WHAT WOULD HAVE HAPPENED,

02:13PM   9   BUT I THINK WE WOULD HAVE HAD A LOT OF DISCUSSION AROUND THAT

02:13PM  10   AS A GROUP AMONGST OURSELVES, AS WELL AS WITH THEM, WHETHER --

02:13PM  11   COULD WE IDENTIFY -- WERE THERE CONFLICTS, AND DID WE HAVE THE

02:14PM  12   RIGHT PEOPLE IN THE RIGHT SEATS AT THIS COMPANY TO MAKE THIS

02:14PM  13   LARGE OF AN INVESTMENT.

02:14PM  14   Q.   LET ME DRAW YOUR ATTENTION, PLEASE, TO PAGE 6.

02:14PM  15        DO YOU SEE WHERE IT SAYS, "A THERANOS ANALYZER STATION IS

02:14PM  16   A SMALL FRACTION OF THE SIZE OF A CURRENT LAB"?

02:14PM  17   A.   YES.

02:14PM  18   Q.   OKAY.  PRIOR TO THE INVESTMENT, WERE YOU EVER TOLD THAT

02:14PM  19   THERANOS WAS USING THIRD PARTY MACHINES TO DO SOME OF ITS

02:14PM  20   TESTING?

02:14PM  21   A.   NO, NEVER.

02:14PM  22   Q.   WERE YOU EVER TELL TOLD THAT THEY WERE USING THIRD PARTY

02:14PM  23   MACHINES TO DO THE MAJORITY OF ITS TESTING?

02:14PM  24   A.   NO.

02:14PM  25   Q.   PRIOR TO THE INVESTMENT, WERE YOU EVER TOLD THAT THERANOS

02:14PM   1    WAS USING ITS ANALYZER FOR NO MORE THAN 12 ASSAYS?

02:14PM   2    A.   NO.

02:14PM   3    Q.   WOULD THAT HAVE BEEN IMPORTANT TO YOU?

02:14PM   4    A.   VERY, YES.

02:14PM   5    Q.   LET'S LOOK AT EXHIBIT 5808.

02:15PM   6         IS THIS A COPY OF THE WIRE TRANSFER FOR RDV'S INVESTMENT?

02:15PM   7    A.   YES.

02:15PM   8    Q.   AND DOES THIS ACCURATELY REFLECT THE DATES AND DETAILS OF

02:15PM   9    RDV'S INVESTMENT?

02:15PM  10    A.   YES.

02:15PM  11              MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

02:15PM  12    EXHIBIT 5808.

02:15PM  13              MR. COOPERSMITH:  ONE MOMENT, YOUR HONOR.

02:15PM  14         (PAUSE IN PROCEEDINGS.)

02:15PM  15              MR. COOPERSMITH:  NO OBJECTION.

02:15PM  16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:15PM  17         (GOVERNMENT'S EXHIBIT 5808 WAS RECEIVED IN EVIDENCE.)

02:15PM  18    BY MR. LEACH:

02:15PM  19    Q.   MS. PETERSON, UP IN THE LEFT CORNER THERE'S A DATE,

02:15PM  20    OCTOBER 31ST, 2014.

02:15PM  21         DO YOU SEE THAT?

02:15PM  22    A.   YES.

02:15PM  23    Q.   AND DOWN IN ROUGHLY THE MIDDLE, THERE'S AN AMOUNT RECEIVED

02:16PM  24    OF $99,999,984.

02:16PM  25         DO YOU SEE THAT?

```
02:16PM   1    A.   YES.

02:16PM   2    Q.   IS THAT THE AMOUNT OF RDV'S INVESTMENT?

02:16PM   3    A.   YES.

02:16PM   4    Q.   OKAY.  THERE'S AN ORIGINATOR FOR THIS WIRE LISTED AS

02:16PM   5    LAKESHORE CAPITAL.

02:16PM   6         WHAT IS THAT?

02:16PM   7    A.   A CASH ACCOUNT OF THE DEVOS FAMILY.

02:16PM   8    Q.   OKAY.  AND THEN THERE'S AN ORIGINATOR'S BANK,

02:16PM   9    GRAND RAPIDS, MICHIGAN.

02:16PM  10         DO YOU SEE THAT?

02:16PM  11    A.   YES.

02:16PM  12    Q.   AND IS THAT WHERE RDV MAINTAINED BANK ACCOUNTS?

02:16PM  13    A.   THROUGH NORTHERN TRUST, WHICH WAS HEADQUARTERED IN

02:16PM  14    CHICAGO.

02:16PM  15    Q.   OKAY.  AND THERE'S AN ENTITY FOR THE BENEFICIARY -- OR FOR

02:16PM  16    THE REFERENCE TO THE BENEFICIARY LISTED AS DYNASTY FINANCIAL II

02:16PM  17    LLC.

02:16PM  18         DO YOU SEE THAT?

02:16PM  19    A.   YES.

02:16PM  20    Q.   AND WHAT IS THAT?

02:16PM  21    A.   THAT'S THE INVESTMENT ENTITY THAT WE USED.

02:17PM  22    Q.   AT ANY POINT IN TIME, DID RDV RECOVER ITS $99 MILLION?

02:17PM  23    A.   NO.

02:17PM  24         MR. LEACH:  YOUR HONOR, MAY I HAVE A MOMENT?

02:17PM  25         THE COURT:  YES.
```

02:17PM  1           (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:17PM  2      BY MR. LEACH:

02:17PM  3      Q.   JUST A FEW MORE QUESTIONS, MS. PETERSON.

02:17PM  4           IF WE CAN GO BACK TO EXHIBIT 5809.

02:17PM  5           YOUR HONOR, I'D LIKE TO MAKE SURE -- I'M OFFERING THE

02:17PM  6      ENTIRE EMAIL, BOTH THE EXHIBIT AND THE ATTACHMENT.

02:17PM  7                THE COURT:   YES, THERE WAS -- THANK YOU FOR THIS.  I

02:17PM  8      HAD A NOTE TO THIS.

02:18PM  9           I NOTICE THERE WAS SOME CONVERSATION ABOUT PAGE 1 AND THE

02:18PM 10      COURT ADMITTED PAGE 1 AND SAID IT MAY BE PUBLISHED, AND THEN

02:18PM 11      PAGE 2 WAS ACTUALLY PUBLISHED.

02:18PM 12           THE ENTIRETY OF THE DOCUMENT WAS ADMITTED.

02:18PM 13                MR. LEACH:   I APOLOGIZE, YOUR HONOR.  I INTENDED TO

02:18PM 14      MOVE THE ENTIRETY OF THE DOCUMENT.

02:18PM 15                THE COURT:   AND THAT WAS THE COURT'S UNDERSTANDING,

02:18PM 16      THAT THE ENTIRETY OF THE DOCUMENT WAS ADMITTED.  IT WAS

02:18PM 17      PUBLISHED.

02:18PM 18                MR. COOPERSMITH:   YES, YOUR HONOR, I UNDERSTAND.

02:18PM 19                THE COURT:   OKAY.  THANK YOU.  SO THE RECORD IS

02:18PM 20      CLEAR, IT WAS ADMITTED, BOTH PAGES.

02:18PM 21      BY MR. LEACH:

02:18PM 22      Q.   OKAY.  AND IF WE CAN GO BACK, PLEASE TO EXHIBIT 1944.

02:18PM 23           MS. PETERSON, DO YOU RECALL PAGE 1 OF THIS DOCUMENT, THE

02:18PM 24      EMAIL FROM MR. TUBERGEN ATTACHING THE ROGER PARLOFF ARTICLE?

02:18PM 25      A.   HANG ON.

02:18PM   1             19?  OR THERE IT IS, SORRY.

02:18PM   2             YES.

02:18PM   3   Q.   AND THE ARTICLE IS SOMETHING THAT YOU REVIEWED IN

02:19PM   4   CONNECTION WITH THE INVESTMENT DECISION?

02:19PM   5   A.   YES.

02:19PM   6   Q.   AND BASED ON THE DUE DILIGENCE MATERIALS THAT WE LOOKED

02:19PM   7   THROUGH, DID YOU UNDERSTAND THERANOS WAS REFERRING YOU TO THAT

02:19PM   8   ARTICLE?

02:19PM   9   A.   YES.

02:19PM  10   Q.   AND WAS THAT PART OF THE REASON WHY YOU PLACED WEIGHT ON

02:19PM  11   IT?

02:19PM  12   A.   YES.

02:19PM  13             MR. LEACH:  YOUR HONOR, AT THIS TIME I OFFER THE

02:19PM  14   ENTIRETY OF EXHIBIT 1944.

02:19PM  15             THE COURT:  ARE YOU OFFERING THE ARTICLE THAT IS

02:19PM  16   ATTACHED FOR THE TRUTH OF THE MATTER ASSERTED IN THAT ARTICLE?

02:19PM  17             MR. LEACH:  NO, YOUR HONOR.

02:19PM  18             THE COURT:  WHAT IS THE PURPOSE OF IT, OR WHAT DO

02:19PM  19   YOU SEEK TO ADMIT THEN?

02:20PM  20             MR. LEACH:  I SEEK TO ADMIT IT FOR THE FALSITY OF

02:20PM  21   CERTAIN OF THE STATEMENTS.

02:20PM  22        IN ADDITION, THIS IS PART OF THE BASIS OF RDV'S

02:20PM  23   INVESTMENT, BUT I'M NOT OFFERING IT FOR THE TRUTH OF THE

02:20PM  24   STATEMENTS IN THE ARTICLE.

02:20PM  25             THE COURT:  ALL RIGHT.

PETERSON DIRECT BY MR. LEACH

02:20PM 1                AND YOU WISH TO LODGE AN OBJECTION?

02:20PM 2                      MR. COOPERSMITH:  FOR THE REASONS WE DISCUSSED

02:20PM 3       EARLIER, YOUR HONOR, YES.

02:20PM 4                      THE COURT:  ALL RIGHT.  THANK YOU.  THANK YOU.

02:20PM 5                LADIES AND GENTLEMEN, THIS WILL BE ADMITTED OVER COUNSEL'S

02:20PM 6       OBJECTION.

02:20PM 7                HOWEVER, THIS -- THAT IS, THE ARTICLE THAT IS ATTACHED TO

02:20PM 8       1944 -- IS NOT OFFERED FOR THE TRUTH OF THE MATTER ASSERTED IN

02:20PM 9       THE ARTICLE, WHICH IS TO SAY IT'S NOT OFFERED FOR THE TRUTH OF

02:20PM 10      THE AUTHOR'S STATEMENT, NOR ANYONE THAT THE AUTHOR QUOTES IN

02:20PM 11      THE ARTICLE.

02:20PM 12               IT'S OFFERED, IS OFFERED RATHER, NOT FOR THE TRUTH BUT, AS

02:20PM 13      MR. LEACH HAS INDICATED, FOR ANY FALSE ISSUES REGARDING

02:20PM 14      FALSITY, NOT THE TRUTH.

02:20PM 15               DOES THAT CAPTURE THE REASON THAT YOU'RE INTRODUCING THIS,

02:20PM 16      MR. LEACH?

02:20PM 17                     MR. LEACH:  IT DOES, YOUR HONOR.  THANK YOU.

02:20PM 18                     THE COURT:  ALL RIGHT.  FOR THAT LIMITED PURPOSE

02:20PM 19      ONLY, LADIES AND GENTLEMEN.

02:20PM 20          (GOVERNMENT'S EXHIBIT 1944 WAS RECEIVED IN EVIDENCE.)

02:20PM 21                     MR. LEACH:  AND IF I MAY DISPLAY, YOUR HONOR?

02:20PM 22                     THE COURT:  YES.

02:20PM 23      BY MR. LEACH:

02:20PM 24      Q.  MS. PETERSON, DO YOU SEE THE CAPTION OF THIS ARTICLE IS

02:20PM 25      "NEW BLOOD."

02:20PM  1      A.   YES.

02:20PM  2      Q.   AND DO YOU SEE THE AUTHOR OF THIS IS ROGER PARLOFF?

02:21PM  3      A.   YES.

02:21PM  4      Q.   AND IF WE LOOK AT PAGE 4, DO YOU SEE AN IMAGE OF

02:21PM  5      MS. HOLMES?

02:21PM  6      A.   YES.

02:21PM  7      Q.   LET'S LOOK BRIEFLY, PLEASE, AT PAGE 8 OF THE EXHIBIT.  IF

02:21PM  8      WE CAN ZOOM IN ON THE SECOND OR THE THIRD FULL PARAGRAPH ON THE

02:21PM  9      LEFT HAND COLUMN.

02:21PM  10          DO YOU SEE WHERE IT SAYS, "THERANOS, WHICH DOES NOT BUY

02:21PM  11     ANY ANALYZERS FROM THIRD PARTIES, IS THEREFORE IN A UNIQUE

02:21PM  12     POSITION.  WHILE IT WOULD NEED FDA APPROVAL TO SELL ITS OWN

02:21PM  13     ANALYZERS TO OTHER LABS, IT DOESN'T DO THAT.  IT USES ITS

02:21PM  14     ANALYZERS ONLY IN ITS OWN CMS CERTIFIED LAB."

02:21PM  15          DO YOU SEE THAT LANGUAGE?

02:21PM  16     A.   YES.

02:21PM  17     Q.   AND WAS THIS INFORMATION RELEVANT TO YOU?

02:21PM  18     A.   YES.

02:21PM  19     Q.   AND WAS THIS INFORMATION CONSISTENT WITH WHAT MS. HOLMES

02:21PM  20     AND MR. BALWANI TOLD YOU IN THE MEETING IN PALO ALTO?

02:21PM  21     A.   YES.

02:22PM  22          MR. LEACH:  THANK YOU, YOUR HONOR.

02:22PM  23          I HAVE NOTHING FURTHER.

02:22PM  24          THE COURT:  CROSS-EXAMINATION?

02:22PM  25          FOLKS, AGAIN, IF YOU WANT TO STRETCH, FEEL FREE TO DO

02:22PM 1    THAT.

02:22PM 2         AS I SAID, WE'LL END AT 2:45.

02:22PM 3         MR. COOPERSMITH, WE CAN GO UNTIL 3:00 O'CLOCK AND BE FINE,

02:22PM 4    JUST TO GET YOU STARTED.

02:22PM 5         MR. COOPERSMITH:  OKAY, YOUR HONOR.  THANK YOU.

02:22PM 6                        **CROSS-EXAMINATION**

02:22PM 7    BY MR. COOPERSMITH:

02:22PM 8    Q.   GOOD AFTERNOON, MS. PETERSON.

02:22PM 9    A.   HI.

02:22PM 10   Q.   MY NAME IS JEFF COOPERSMITH, AND I REPRESENT MR. BALWANI.

02:22PM 11   OKAY?

02:22PM 12        AND FOR THE REMAINDER OF THE AFTERNOON, I'LL ASK YOU SOME

02:23PM 13   QUESTIONS TO FOLLOW UP ON SOME THINGS THAT MR. LEACH ASKED YOU.

02:23PM 14        OKAY?

02:23PM 15   A.   OKAY.

02:23PM 16   Q.   AND UNFORTUNATELY IT'S PROBABLY GOING TO BE THE CASE THAT

02:23PM 17   YOU'LL BE BACK TOMORROW.

02:23PM 18   A.   OKAY.

02:23PM 19   Q.   SO SORRY ABOUT THAT, BUT THAT'S HOW IT GOES.  OKAY?

02:23PM 20        MS. PETERSON, I UNDERSTAND THAT YOU WORKED FOR, OR YOU

02:23PM 21   STILL WORK FOR RDV ACTUALLY; RIGHT?

02:23PM 22   A.   CORRECT.

02:23PM 23   Q.   AND YOU'VE WORKED THERE FOR 17 YEARS I THINK YOU SAID?

02:23PM 24   A.   YES.

02:23PM 25   Q.   AND SO YOU HAD CONSIDERABLE FAMILIARITY WITH RDV AND ITS

02:23PM   1    OPERATIONS?

02:23PM   2    A.   YES.

02:23PM   3    Q.   AND I JUST WANT TO MAKE SURE THAT WE UNDERSTAND WHAT RDV

02:23PM   4    IS.

02:23PM   5         I THINK RDV -- ARE THOSE THE INITIALS OF RICHARD DEVOS?

02:23PM   6    A.   YES.

02:23PM   7    Q.   AND IS HE THE FOUNDER OF AMWAY?

02:23PM   8    A.   YES, COFOUNDER.

02:23PM   9    Q.   THE COFOUNDER OF AMWAY?

02:23PM  10    A.   YES.

02:23PM  11    Q.   AND THAT'S A COMPANY THAT IS BASED IN GRAND RAPIDS,

02:23PM  12    MICHIGAN?

02:23PM  13    A.   YES.

02:23PM  14    Q.   AND THE AMWAY BUSINESS, DOES IT STILL EXIST?

02:24PM  15    A.   YES.

02:24PM  16    Q.   AND THAT BUSINESS GENERATED BASICALLY A FORTUNE FOR THE

02:24PM  17    DEVOS FAMILY; IS THAT RIGHT?

02:24PM  18    A.   YES.

02:24PM  19    Q.   OKAY.  AND WHEN YOU JOINED RDV, WAS AMWAY AN ALREADY GOING

02:24PM  20    BUSINESS?

02:24PM  21    A.   A GROWING OR?

02:24PM  22    Q.   WAS IT ALREADY GOING ON?

02:24PM  23    A.   YES.

02:24PM  24    Q.   IT HAD ALREADY BEEN FOUNDED BEFORE YOU GOT THERE?

02:24PM  25    A.   YES.  IT'S BEEN FOUNDED FOR 50 YEARS, 60 YEARS.

02:24PM  1      Q.   OKAY.  AND IT STILL OPERATES TODAY; RIGHT?

02:24PM  2      A.   YES.

02:24PM  3      Q.   IS RICHARD DEVOS STILL WITH US?

02:24PM  4      A.   NO.

02:24PM  5      Q.   SORRY ABOUT THAT.

02:24PM  6           DID YOU KNOW HIM PERSONALLY?

02:24PM  7      A.   YES.

02:24PM  8      Q.   OKAY.  AND WITHIN THE FAMILY, THERE ARE GENERATIONS OF

02:24PM  9      FAMILY MEMBERS; IS THAT RIGHT?

02:24PM  10     A.   YES.

02:24PM  11     Q.   AND SOME OF THEM ARE INVOLVED WITH THE BUSINESS?

02:24PM  12     A.   NOT ANYMORE.

02:24PM  13     Q.   OKAY.  BUT THERE ARE SOME FAMILY MEMBERS WHO ARE INVOLVED

02:24PM  14     WITH THE RDV INVESTMENT BUSINESS?

02:24PM  15     A.   THEY'RE ONLY ON OUR INVESTMENT COMMITTEE.

02:24PM  16          THEY'RE NOT -- THERE'S NO EMPLOYEES AT RDV THAT ARE

02:24PM  17     DEVOS FAMILY MEMBERS.

02:25PM  18     Q.   OKAY.  BUT THE INVESTMENT COMMITTEE IS A GROUP OF FAMILY

02:25PM  19     MEMBERS?

02:25PM  20     A.   YES.

02:25PM  21     Q.   AND AT THE TIME OF THE INVESTMENT THAT YOU DISCUSSED WITH

02:25PM  22     MR. LEACH IN OCTOBER OF 2014, WAS DICK DEVOS ON THE INVESTMENT

02:25PM  23     COMMITTEE?

02:25PM  24     A.   YES.

02:25PM  25     Q.   AND RICK DEVOS?

02:25PM  1     A.   YES.

02:25PM  2     Q.   AND DAN DEVOS?

02:25PM  3     A.   YES.

02:25PM  4     Q.   AND DOUG DEVOS?

02:25PM  5     A.   YES.  DOUG WAS THE CHAIRMAN.

02:25PM  6     Q.   OKAY.

02:25PM  7     A.   I'M NOT SURE IF DICK WAS ON THE INVESTMENT COMMITTEE AT

02:25PM  8     THAT TIME OR RICK WAS HIS REPRESENTATIVE.  IT CHANGES A LOT.

02:25PM  9     THEY PUT DIFFERENT FAMILY MEMBERS ON IT ON OCCASION.

02:25PM 10     Q.   IT'S SORT OF A ROTATING GROUP OF FAMILY MEMBERS?

02:25PM 11     A.   YES, SOMEWHAT.

02:25PM 12     Q.   BUT THOSE WERE THE MEMBERS OF THE INVESTMENT COMMITTEE,

02:25PM 13     WHOEVER HAPPENS TO BE ON IT AT ANY GIVEN TIME, THOSE ARE

02:25PM 14     ACTUALLY THE PEOPLE WHO MAKE THE INVESTMENT DECISIONS FOR RDV;

02:25PM 15     IS THAT RIGHT?

02:25PM 16     A.   YES.  NOT ALL OF THEM.

02:25PM 17     Q.   I'M SORRY?

02:25PM 18     A.   NOT ALL OF THEM.

02:25PM 19     Q.   NOT ALL OF THEM?

02:25PM 20     A.   NO.  THEY APPROVE THE PRIVATE EQUITY GROUPS THAT WE INVEST

02:26PM 21     WITH, AND JERRY TUBERGEN AND NOW RANDY DAMSTRA HAVE AUTHORITY

02:26PM 22     TO APPROVE CERTAIN OF THESE COINVESTMENTS UNDERNEATH THERE

02:26PM 23     WITHOUT HAVING TO GO TO AN INVESTMENT COMMITTEE.

02:26PM 24     Q.   OKAY.

02:26PM 25     A.   BUT THIS PARTICULAR ONE HAD TO BE APPROVED BY THE

02:26PM  1    INVESTMENT COMMITTEE, YES.

02:26PM  2    Q.  WHEN YOU SAY "THIS PARTICULAR ONE," YOU MEAN THERANOS?

02:26PM  3    A.  YES.

02:26PM  4    Q.  OKAY.  THAT WAS GOING TO BE MY QUESTION, SO THANK YOU.

02:26PM  5        ALL RIGHT.  LET ME MAKE SURE I UNDERSTAND WHO THESE PEOPLE

02:26PM  6    ARE.

02:26PM  7        SO RICK DEVOS, IS HE WHAT YOU CALL A GENERATION 3 FAMILY

02:26PM  8    MEMBER?

02:26PM  9    A.  YES, THE OLDEST GRANDSON.

02:26PM 10    Q.  SO HE'S A GRANDSON OF RDV, OR RICHARD DEVOS; RIGHT?

02:26PM 11    A.  YES.

02:26PM 12    Q.  AND THEN DAN DEVOS, IS HE WHAT YOU CALL A GENERATION 2

02:26PM 13    FAMILY MEMBER?

02:26PM 14    A.  YES.

02:26PM 15    Q.  SO HE WOULD BE A SON OF RICHARD DEVOS?

02:26PM 16    A.  YES.

02:26PM 17    Q.  AND DOUG DEVOS?

02:26PM 18    A.  IS A G2, SON OF RICHARD DEVOS.

02:26PM 19    Q.  OKAY.  I THINK THE ONE WE DIDN'T MENTION WAS DICK DEVOS;

02:27PM 20    RIGHT?

02:27PM 21    A.  CORRECT.

02:27PM 22    Q.  AND WHAT WAS HIS RELATIONSHIP TO RICK DEVOS?

02:27PM 23    A.  HE'S A G2, A SON OF RICHARD DEVOS.

02:27PM 24    Q.  OKAY.  YOU ALSO MENTIONED SOMEONE EARLIER IN YOUR

02:27PM 25    TESTIMONY TODAY NAMED CHERI DEVOS; IS THAT RIGHT?

02:27PM  1      A.   YES.

02:27PM  2      Q.   AND IS SHE RELATED TO RICHARD DEVOS AS WELL?

02:27PM  3      A.   YES, SHE'S A DAUGHTER.

02:27PM  4      Q.   SO SHE'S A GENERATION 2 FAMILY MEMBER?

02:27PM  5      A.   CORRECT.

02:27PM  6      Q.   AND I THINK YOU SAID SOME OF THESE PEOPLE FROM THE DEVOS

02:27PM  7      FAMILY WERE ACTUALLY WITH YOU IN PALO ALTO WHEN YOU MET IN

02:27PM  8      OCTOBER 14TH, 2014?

02:27PM  9      A.   YES.   FOUR FAMILY MEMBERS OF THE G2 FAMILIES WERE

02:27PM 10      REPRESENTED AT THAT MEETING.   RICK REPRESENTING DICK -- AND I

02:27PM 11      GUESS DAN WAS NOT THERE, SO CHERI, RICK, AND DOUG WERE THERE.

02:27PM 12           AND DOUG WAS THE CHAIRMAN OF THE INVESTMENT COMMITTEE AT

02:27PM 13      THE TIME.

02:27PM 14      Q.   OKAY.   AND THESE INVESTMENT COMMITTEE MEMBERS HAD TO BE

02:27PM 15      THERE BECAUSE ULTIMATELY IT WAS THEIR DECISION WHETHER TO

02:27PM 16      INVEST?

02:28PM 17      A.   THEY DON'T NORMALLY GO ON A DILIGENCE CALL LIKE THIS ONE,

02:28PM 18      NOT ALWAYS.   OFTEN IT'S THE -- THE WORK IS DONE WITHIN THE

02:28PM 19      TEAMS, WITHIN THE INVESTMENT GROUP, AND JERRY PRESENTS IT TO

02:28PM 20      THE INVESTMENT COMMITTEE.

02:28PM 21      Q.   OKAY.   BUT IN THIS CASE THE MEMBERS OF THE INVESTMENT

02:28PM 22      COMMITTEE WHO WENT TO THE MEETING IN PALO ALTO, THEY WERE ABLE

02:28PM 23      TO TALK TO SUNNY BALWANI AND ELIZABETH HOLMES FIRSTHAND; RIGHT?

02:28PM 24      A.   YES.

02:28PM 25      Q.   AND THAT WAS ONE THING THAT THEY COULD USE TO HELP GUIDE

02:28PM  1    THEIR DECISION; RIGHT?

02:28PM  2    A.   YES.

02:28PM  3    Q.   AND YOUR ROLE WAS NOT TO MAKE AN INVESTMENT DECISION;

02:28PM  4    CORRECT?

02:28PM  5    A.   CORRECT.

02:28PM  6    Q.   AND YOUR ROLE WAS TO REVIEW MATERIALS AND WRITE MEMOS THAT

02:28PM  7    YOU WERE HOPING WOULD BE USED TO ASSESS THE INVESTMENT; RIGHT?

02:28PM  8    A.   I WAS THERE TO HELP FACILITATE A TRANSACTION SHOULD THEY

02:28PM  9    CHOOSE TO INVEST.  I CERTAINLY -- THEY LISTEN -- JERRY IS NOT

02:29PM 10    ON THE INVESTMENT COMMITTEE EITHER, BUT OUR OPINIONS MATTER TO

02:29PM 11    THEM.

02:29PM 12        BUT, NO, THEY WERE THE ONES WHO VOTE.

02:29PM 13    Q.   I MEAN, YOU AT LEAST HOPE YOUR OPINIONS MATTER; RIGHT?

02:29PM 14    A.   UH-HUH.

02:29PM 15    Q.   BECAUSE YOU WORK THERE?

02:29PM 16    A.   I HAVE WORKED THERE AND I'VE BEEN THERE FOR 17 YEARS, YES.

02:29PM 17    Q.   RIGHT.  SO LET'S TALK ABOUT JERRY TUBERGEN.

02:29PM 18        I THINK YOU SAID HE WAS, AT THE TIME AT LEAST, BOTH THE

02:29PM 19    CHIEF INVESTMENT OFFICER AND THE CHIEF EXECUTIVE OFFICER?

02:29PM 20    A.   YES, AND THE PRESIDENT.

02:29PM 21    Q.   OF RDV?

02:29PM 22    A.   CORRECT.

02:29PM 23    Q.   AND HE'S NOT A FAMILY MEMBER?

02:29PM 24    A.   CORRECT.

02:29PM 25    Q.   AND WOULD YOU DESCRIBE MR. TUBERGEN, JERRY TUBERGEN, AS AN

02:29PM  1     EXPERT IN INVESTMENTS?

02:29PM  2     A.   HE'S A VERY GOOD INVESTOR.  AN EXPERT, THAT'S SUBJECTIVE,

02:29PM  3     I GUESS.

02:29PM  4     Q.   YOU WOULD SAY HE'S A VERY GOOD --

02:29PM  5     A.   HE'S A VERY SUCCESSFUL INVESTOR, YES.

02:29PM  6     Q.   AND SO YOU WOULD DESCRIBE HIM AS A SAVVY PERSON?

02:29PM  7     A.   A SUCCESSFUL INVESTOR, YES.

02:29PM  8     Q.   AND SAVVY?

02:29PM  9     A.   I THINK HE MAKES VERY GOOD INVESTMENT DECISIONS, YES.

02:29PM 10     Q.   OKAY.  AND HOW MANY PEOPLE WORK IN YOUR OFFICE AT RDV?

02:30PM 11     A.   TODAY ABOUT -- AT RDV CORP., THERE'S ABOUT 140 PEOPLE.

02:30PM 12          IN THE INVESTMENT GROUP, IT'S ABOUT 35.

02:30PM 13     Q.   OKAY.  HOW ABOUT AT THE TIME OF THE THERANOS INVESTMENT,

02:30PM 14     HOW MANY PEOPLE WORKED THERE, AS BEST YOU CAN TELL US?

02:30PM 15     A.   PROBABLY 110 WITHIN RDV CORP., AND IN THE INVESTMENT GROUP

02:30PM 16     PROBABLY 20 TO 25.

02:30PM 17     Q.   OKAY.  AND ALL OF THOSE PEOPLE WHO WORK FOR RDV, THEIR JOB

02:30PM 18     IS IN SOME WAY TO HELP MANAGE THE INVESTMENTS OF THE RDV?

02:30PM 19     A.   THE 20 TO 25 PEOPLE IN THE INVESTMENT GROUP IS THE

02:30PM 20     INVESTMENT PIECE, AND WE UTILIZE BOTH THE TAX DEPARTMENT AND

02:30PM 21     THE ACCOUNTING DEPARTMENT, WHICH ALSO HAVE OTHER ROLES, TOO, IN

02:30PM 22     FAMILY SERVICES.

02:30PM 23          THERE'S A VERY LARGE ACCOUNTING GROUP AND A VERY LARGE TAX

02:30PM 24     GROUP THAT MANAGES THE FAMILY'S WEALTH OUT OF THAT GROUP, AS

02:30PM 25     WELL AS A FOUNDATION AND I.T. SUPPORT AND OTHER THINGS WITHIN

02:31PM  1    RDV CORPORATION.

02:31PM  2    Q.   THANK YOU, MS. PETERSON.

02:31PM  3         AND THERANOS WAS JUST ONE OF MANY INVESTMENTS, I'M

02:31PM  4    ASSUMING.

02:31PM  5    A.   YES.

02:31PM  6    Q.   OKAY.  NOW, IN TERMS OF WHO YOU REPORTED TO, YOU REPORTED

02:31PM  7    TO SOMEONE NAMED RANDY DAMSTRA; RIGHT?

02:31PM  8    A.   YES.

02:31PM  9    Q.   AT THE TIME?

02:31PM  10   A.   YES.

02:31PM  11   Q.   AND STILL?

02:31PM  12   A.   YES.

02:31PM  13   Q.   AND WHO IS RANDY DAMSTRA?

02:31PM  14   A.   HE AT THE TIME WAS BASICALLY HEAD OF THE INVESTMENT GROUP

02:31PM  15   WHO REPORTED UP TO JERRY TUBERGEN, AND THERE WAS A

02:31PM  16   ROBERT SCHIERBEEK, S-C-H-I-E-R-B-E-E-K, AND HE RAN THE FAMILY

02:31PM  17   SERVICES SIDE OF THE BUSINESS, AND THEY BOTH REPORTED UP AND TO

02:31PM  18   JERRY.

02:31PM  19   Q.   OKAY.  AND THEN IN TURN, JERRY REPORTED DIRECTLY TO THE

02:31PM  20   FAMILY; IS THAT RIGHT?

02:31PM  21   A.   YES, AND TO THE INVESTMENT COMMITTEE, AND THE BOARD.

02:32PM  22   Q.   AND WAS THE BOARD MADE UP OF FAMILY MEMBERS AS WELL?

02:32PM  23   A.   YES.

02:32PM  24   Q.   OKAY.  I HAVE A COUPLE OF BINDERS THAT I'M GOING TO PASS

02:32PM  25   UP TO YOU IF THAT'S OKAY.

02:32PM   1          LET ME GET THEM.

02:33PM   2          MAY I APPROACH THE WITNESS, YOUR HONOR?

02:33PM   3              THE COURT:  YES.

02:33PM   4              MR. COOPERSMITH:  (HANDING.)

02:33PM   5          THANK YOU.

02:33PM   6     Q.   OKAY.  DO YOU REMEMBER A MINUTE AGO I ASKED YOU WHETHER

02:33PM   7     JERRY TUBERGEN WAS AN EXPERT ON INVESTMENTS IN YOUR VIEW?

02:33PM   8     A.   YES.

02:33PM   9     Q.   AND YOU SAID THAT YOU THOUGHT HE WAS A VERY GOOD INVESTOR,

02:33PM  10     BUT YOU DIDN'T QUITE SAY HE WAS AN EXPERT IN INVESTMENTS; IS

02:33PM  11     THAT RIGHT?

02:33PM  12     A.   I DON'T -- DEFINE "EXPERT" I GUESS.

02:33PM  13     Q.   OKAY.

02:33PM  14     A.   NEVER LOSES MONEY?  I MEAN, IS THAT AN EXPERT?

02:34PM  15     Q.   SO I'D LIKE YOU TO JUST TAKE A LOOK AT, I THINK IT'S IN

02:34PM  16     THE SECOND OF YOUR BINDERS, AND IT'S VOLUME 2, AND THERE'S AN

02:34PM  17     EXHIBIT THAT IS LABELLED 28412.

02:34PM  18     A.   YES.

02:34PM  19     Q.   AND IF YOU COULD TURN TO PAGE 4724 OF THAT EXHIBIT?

02:34PM  20     A.   WHAT PAGE?  I'M SORRY.

02:34PM  21     Q.   PAGE 4724.

02:34PM  22     A.   28412?

02:34PM  23     Q.   YES.  THANK YOU?

02:34PM  24     A.   PAGE 4 -- I'M SORRY, I'M NOT -- I'M SEEING PAGES 100.

02:34PM  25     Q.   IN THE EXHIBIT 4 -- I'M SORRY.  IN EXHIBIT 28412, THERE

02:34PM 1    SHOULD BE A PAGE 4724.

02:35PM 2            THE COURT:  IN THE UPPER RIGHT-HAND CORNER.

02:35PM 3            MR. COOPERSMITH:  YES.  SORRY ABOUT THAT.

02:35PM 4        YES, IN THE UPPER RIGHT-HAND CORNER.

02:35PM 5        THANK YOU, YOUR HONOR.

02:35PM 6        OH, 4724.  OKAY.

02:35PM 7    BY MR. COOPERSMITH:

02:35PM 8    Q.   AND DO YOU SEE ON THAT PAGE THERE ARE LINE NUMBERS?

02:35PM 9    A.   YES.

02:35PM 10   Q.   AND THEN IF YOU COULD LOOK AT LINES 20 THROUGH 22.

02:35PM 11       DO YOU SEE THAT?

02:35PM 12   A.   YES.

02:35PM 13   Q.   OKAY.  AND THIS IS PRIOR TESTIMONY THAT YOU GAVE?

02:35PM 14   A.   OKAY.  YES.

02:35PM 15   Q.   ALL RIGHT.  AND IN THAT PRIOR TESTIMONY YOU WERE ASKED A

02:35PM 16   QUESTION, DID YOU CONSIDER HIM TO BE AN EXPERT ON

02:35PM 17   INVESTMENTS --

02:35PM 18           MR. LEACH:  YOUR HONOR, OBJECTION.  HEARSAY.

02:35PM 19           THE COURT:  WHY DON'T YOU LAY A FOUNDATION AND ASK

02:35PM 20   THAT QUESTION AGAIN IN ANOTHER WAY.

02:35PM 21       THIS IS 613?

02:35PM 22           MR. LEACH:  YES, YOUR HONOR.

02:35PM 23           THE COURT:  ALL RIGHT.  SO WHY DON'T YOU LET HER

02:35PM 24   READ IT AND THEN ASK A QUESTION ABOUT HER TESTIMONY.

02:35PM 25           MR. COOPERSMITH:  OKAY.

02:35PM  1    Q.   MS. PETERSON, LET ME JUST ASK YOU A FEW OTHER THINGS.

02:36PM  2         SO YOU'VE TESTIFIED BEFORE IN CONNECTION WITH THERANOS;

02:36PM  3    RIGHT.

02:36PM  4    A.   YES.

02:36PM  5    Q.   AND ON MORE THAN ONE OCCASION?

02:36PM  6    A.   AT TRIAL OR DEPOSITION?  I'M --

02:36PM  7    Q.   WHATEVER THE PROCEEDING, YOU'VE TESTIFIED UNDER OATH ON

02:36PM  8    MORE THAN ONE OCCASION?

02:36PM  9    A.   YES.

02:36PM  10   Q.   OKAY.  AND WHEN YOU TESTIFIED BEFORE, EACH TIME YOU DID

02:36PM  11   THAT, YOU RAISED YOUR RIGHT HAND, YOU TOOK AN OATH TO TELL THE

02:36PM  12   TRUTH?

02:36PM  13   A.   YES.

02:36PM  14   Q.   AND YOU UNDERSTOOD THAT THAT'S WHAT YOU HAD TO DO; RIGHT?

02:36PM  15   A.   YES.

02:36PM  16   Q.   AND IN CONNECTION WITH THAT, YOU WERE ASKED QUESTIONS AND

02:36PM  17   YOU GAVE ANSWERS; RIGHT?

02:36PM  18   A.   YES.

02:36PM  19   Q.   AND YOU UNDERSTAND TRANSCRIPTS WERE CREATED?

02:36PM  20   A.   YES.

02:36PM  21   Q.   AND GOING BACK TO THE QUESTION OF THIS PARTICULAR POINT,

02:36PM  22   WHETHER MR. TUBERGEN WAS AN EXPERT, YOU SEE IN YOUR TESTIMONY

02:36PM  23   EARLIER YOU HAD AGREED THAT MR. TUBERGEN WAS AN EXPERT IN

02:36PM  24   INVESTMENTS; CORRECT?

02:36PM  25   A.   YES, EXPERT, EXCELLENT INVESTOR.

02:37PM   1          IT'S HARD TO DEFINE "EXPERT."

02:37PM   2     Q.   OKAY.  I'M JUST --

02:37PM   3     A.   I UNDERSTAND, YES.

02:37PM   4     Q.   IN YOUR PREVIOUS TESTIMONY, YOU AGREED THAT HE WAS AN

02:37PM   5     EXPERT ON INVESTMENTS; RIGHT?

02:37PM   6     A.   YES.

02:37PM   7     Q.   AND YOU AREN'T QUITE GETTING THERE WITH ME TODAY; RIGHT?

02:37PM   8     A.   YES.

02:37PM   9     Q.   OKAY.  LET'S GO TO AN EXHIBIT THAT THE GOVERNMENT SHOWED

02:37PM   10    YOU ON DIRECT, MS. PETERSON, AND THAT'S EXHIBIT 1944.

02:37PM   11         AND, YOU KNOW, YOU CAN FIND IT IN THE BINDER, OR I THINK

02:37PM   12    WE CAN SHOW IT ON THE SCREEN, TOO, WHATEVER YOUR PREFERENCE IS.

02:37PM   13    SOME PEOPLE LIKE PAPER AND SOME PEOPLE LIKE SCREENS.

02:37PM   14    A.   OKAY.

02:37PM   15    Q.   DO YOU SEE THIS IS AN EMAIL ON THE FIRST PAGE FROM

02:37PM   16    MR. TUBERGEN?

02:37PM   17    A.   YES.

02:37PM   18    Q.   AND HE IS ATTACHING THE ARTICLE FROM "FORTUNE" MAGAZINE?

02:38PM   19    A.   YES.

02:38PM   20    Q.   AND HE SAYS, "THIS MORNING I HAD ONE OF THE MOST

02:38PM   21    INTERESTING MEETINGS I CAN RECALL WITH THE WOMAN PROFILED IN

02:38PM   22    THE ATTACHED "FORTUNE" MAGAZINE ARTICLE.

02:38PM   23         DO YOU SEE THAT?

02:38PM   24    A.   YES.

02:38PM   25    Q.   AND I THINK YOU SAID HE WAS REFERRING TO MS. HOLMES?

PETERSON CROSS BY MR. COOPERSMITH

02:38PM  1    A.   YES.

02:38PM  2    Q.   AND YOU UNDERSTAND THAT MR. TUBERGEN MET MS. HOLMES AT A

02:38PM  3    CONFERENCE?

02:38PM  4    A.   YES.

02:38PM  5    Q.   AND THAT WAS A CONFERENCE SPONSORED BY A GROUP CALLED BDT?

02:38PM  6    A.   YES.

02:38PM  7    Q.   AND BDT STANDS FOR BYRON D. TROTT?

02:38PM  8    A.   YES.

02:38PM  9    Q.   AND MR. TROTT IS AN INVESTMENT BANKER?

02:38PM  10   A.   HE'S AN INVESTOR BANKER AND PRIVATE EQUITY FIRM NOW.  HE'S

02:38PM  11   RAISED MONEY THAT HE INVESTS.

02:38PM  12   Q.   AND RDV HAS WORKED WITH MR. TROTT IN THE PAST?

02:38PM  13   A.   YES.

02:38PM  14   Q.   AND MR. TROTT IS SOMEONE THAT YOU WOULD DESCRIBE AS A WISE

02:38PM  15   INVESTOR?

02:38PM  16   A.   YES.

02:38PM  17   Q.   AND MR. TROTT HAS A SPECIALTY OF HELPING WEALTHY FAMILIES

02:38PM  18   INVEST FUNDS; IS THAT RIGHT?

02:38PM  19   A.   YES.

02:38PM  20   Q.   AND HE SPONSORS A CONFERENCE IN CHICAGO EVERY YEAR?

02:39PM  21   A.   AS PART OF HIS -- THE FUND THAT HE INVESTS MONEY FOR, YES,

02:39PM  22   THEY HOLD AN ANNUAL MEETING OF THEIR INVESTORS.

02:39PM  23   Q.   I'M SORRY TO INTERRUPT YOU.

02:39PM  24        HAVE YOU EVER BEEN TO THAT CONFERENCE?

02:39PM  25   A.   ONLY -- YES, I WAS THERE AFTER THIS INVESTMENT IN 2016,

02:39PM  1    2017.

02:39PM  2    Q.   OKAY.  BUT AT THE 2014 TIME PERIOD, YOU DIDN'T ATTEND

02:39PM  3    MR. TROTT'S CONFERENCE THAT YEAR?

02:39PM  4    A.   NO.  I WASN'T THE LEAD PERSON ON THIS INVESTMENT IN THIS

02:39PM  5    GROUP AT THE TIME.

02:39PM  6    Q.   BUT JERRY TUBERGEN DID ATTEND THE CONFERENCE?

02:39PM  7    A.   YES.

02:39PM  8    Q.   AND HE -- YOU UNDERSTAND HE CAME BACK FROM THAT CONFERENCE

02:39PM  9    WITH SOME INFORMATION ABOUT MS. HOLMES?

02:39PM  10   A.   YES.

02:39PM  11   Q.   BECAUSE HE ACTUALLY MET HER AT THE CONFERENCE; RIGHT?

02:39PM  12   A.   YES.

02:39PM  13   Q.   AND ONE OF THE THINGS THAT HE DID WAS PULL UP AN ARTICLE

02:39PM  14   FROM "FORTUNE"?

02:39PM  15   A.   YES.  I ACTUALLY RODE HOME ON A PRIVATE AIRPLANE WITH HIM

02:40PM  16   AFTER HE HAD HIS MEETING, AND HE GAVE ME THAT ARTICLE.

02:40PM  17   Q.   YOU WEREN'T AT THE BDT CONFERENCE, BUT YOU WERE ON THE

02:40PM  18   PRIVATE JET WITH MR. TUBERGEN?

02:40PM  19   A.   YES, ON THE WAY HOME.  I HAD OTHER MEETINGS IN CHICAGO.

02:40PM  20   Q.   I SEE.  SO YOU WERE FLYING BACK TO GRAND RAPIDS WITH

02:40PM  21   MR. TUBERGEN?

02:40PM  22   A.   CORRECT.

02:40PM  23   Q.   AND HE PULLED UP AN ARTICLE AND SHOWED IT TO YOU?

02:40PM  24   A.   YES.  HE SAID BASICALLY EXACTLY WHAT HE SAID HERE, IT WAS

02:40PM  25   ONE OF THE MOST INTERESTING MEETINGS THAT HE HAD EVER HAD.  AND

02:40PM  1    RANDY WAS WITH ME, MY BOSS, SO IT WAS THE TWO OF US, AND HIM,

02:40PM  2    TELLING US ABOUT THE MEETING HE HAD HAD AND HE HANDED ME THAT

02:40PM  3    ARTICLE.

02:40PM  4    Q.   NOW, MR. TUBERGEN AT THE CONFERENCE, HE DIDN'T MEET WITH

02:40PM  5    MR. BALWANI; CORRECT?

02:40PM  6    A.   I DON'T KNOW.

02:40PM  7    Q.   YOU DON'T KNOW ONE WAY OR THE OTHER?

02:40PM  8    A.   I DON'T KNOW.

02:40PM  9    Q.   OKAY.  BUT ON THE PLANE RIDE BACK, HE TOLD YOU ABOUT

02:40PM  10   MS. HOLMES?

02:40PM  11   A.   YES.

02:40PM  12   Q.   AND HE SHOWED YOU AN ARTICLE?

02:40PM  13   A.   YES, AND THAT HER BROTHER, CHRISTIAN, WAS THERE.  I DO

02:41PM  14   RECALL THAT.

02:41PM  15   Q.   CHRISTIAN HOLMES WAS AT THE CONFERENCE AS WELL?

02:41PM  16   A.   WAS AT THIS MEETING.

02:41PM  17   Q.   OKAY.  AND THEN WHEN MR. TUBERGEN SHOWED YOU THE

02:41PM  18   "FORTUNE" ARTICLE ON THE AIRPLANE, DID YOU READ IT RIGHT THEN?

02:41PM  19   A.   NO.

02:41PM  20   Q.   YOU READ IT LATER?

02:41PM  21   A.   YES.

02:41PM  22   Q.   OKAY.  BUT YOU UNDERSTAND THAT MR. TUBERGEN HAD PULLED

02:41PM  23   THAT ARTICLE UP OR IT HAD BEEN HANDED TO HIM OR SOMETHING OF

02:41PM  24   THAT NATURE?

02:41PM  25   A.   HE HAD BEEN GIVEN THAT TO HIM AT THE MEETING.

02:41PM  1    Q.   OKAY.  SOMEONE GAVE IT TO HIM AT THE MEETING?

02:41PM  2    A.   YES.

02:41PM  3    Q.   OKAY.  BUT YOU DON'T KNOW EXACTLY WHO?

02:41PM  4    A.   NO.

02:41PM  5    Q.   OKAY.  NOW, AT SOME POINT, THOUGH, YOU DID READ THE

02:41PM  6    ARTICLE; CORRECT?

02:41PM  7    A.   YES.

02:41PM  8    Q.   AND THAT WAS ONE OF THE THINGS THAT YOU USED TO INFORM THE

02:41PM  9    MEMOS THAT YOU WROTE?

02:41PM  10   A.   ONE OF THE THINGS, YES.

02:41PM  11   Q.   OKAY.  AND LET'S LOOK AT THE ARTICLE A LITTLE BIT MORE

02:41PM  12   THAT YOU SAW ON DIRECT.

02:41PM  13        SO IF YOU GO TO THE FIRST PAGE, THAT'S THE EMAIL, BUT IF

02:41PM  14   YOU GO TO PAGE 3 OF THE EXHIBIT, I THINK IT'S LABELLED

02:42PM  15   PAGE 3 -- NOW I'M REFERRING TO THE BOTTOM MIDDLE NUMBERS,

02:42PM  16   MS. PETERSON.

02:42PM  17        YOU CAN SEE IT ON THE SCREEN IF THAT'S OKAY WITH YOU.

02:42PM  18   A.   CORRECT.

02:42PM  19   Q.   OKAY.  SO YOU SEE THE BOTTOM MIDDLE, THERE'S A PAGE 3?

02:42PM  20   A.   YES.

02:42PM  21   Q.   RIGHT.  AND THEN IT'S "NEW BLOOD" IT SAYS WITH KIND OF A

02:42PM  22   BLOOD DROP ON THE PAGE?

02:42PM  23   A.   YES.

02:42PM  24   Q.   OKAY.  AND THEN THE NEXT PAGE IS A PICTURE OF MS. HOLMES;

02:42PM  25   RIGHT?

02:42PM   1     A.   YES.

02:42PM   2     Q.   NOW, IF WE GO TO PAGE 5 OF THE ARTICLE, DO YOU SEE IN THE

02:42PM   3     VERY FIRST PARAGRAPH IN THE UPPER LEFT IT TALKS ABOUT

02:42PM   4     MS. HOLMES SPENDING A SUMMER WORKING IN A LAB.

02:42PM   5          DO YOU SEE THAT?

02:42PM   6     A.   YES.

02:42PM   7     Q.   AND THEN IT REFERS TO A PERSON NAMED ROBERTSON.

02:42PM   8          DO YOU SEE THAT?

02:42PM   9     A.   YES.

02:42PM   10    Q.   AND DO YOU UNDERSTAND THAT'S CHANNING ROBERTSON?

02:43PM   11    A.   YES, SOMEONE THAT SHE -- SOME PROFESSOR THAT SHE HAD AT

02:43PM   12    STANFORD, IF I RECALL CORRECTLY.

02:43PM   13    Q.   RIGHT.  AND MR. -- THE PARAGRAPH TALKS ABOUT

02:43PM   14    PROFESSOR ROBERTSON; CORRECT?

02:43PM   15    A.   YES.

02:43PM   16    Q.   AND IT SAYS IN THE SECOND PARAGRAPH, "I REMEMBER HER

02:43PM   17    SAYING, AND WE COULD PUT A CELL PHONE CHIP ON IT, AND IT COULD

02:43PM   18    TELEMETER OUT TO THE DOCTOR OR THE PATIENT WHAT WAS GOING ON,

02:43PM   19    ROBERTSON RECOUNTS.  AND I KIND OF KICKED MYSELF.  I'D

02:43PM   20    CONSULTED IN THIS AREA FOR 30 YEARS BUT I'D NEVER SAID HERE WE

02:43PM   21    MAKE ALL OF THESE GIZMOS THAT MEASURE, AND ALL OF THESE SYSTEMS

02:43PM   22    THAT DELIVER, BUT I NEVER BROUGHT THE TWO TOGETHER."

02:43PM   23          DO YOU SEE THAT?

02:43PM   24    A.   YES.

02:43PM   25    Q.   YOU UNDERSTAND THAT HE'S TALKING ABOUT SOMETHING THAT

02:43PM   1        MS. HOLMES CAME TO HIM WITH, SOME INVENTION?

02:43PM   2                MR. LEACH:  YOUR HONOR --

02:43PM   3                THE COURT:  EXCUSE ME, MR. COOPERSMITH.

02:43PM   4                MR. LEACH:  OBJECTION.  I THINK THIS GOES BEYOND THE

02:43PM   5    PURPOSE OF WHICH THIS EXHIBIT WAS ADMITTED.

02:43PM   6                THE COURT:  YOU'RE CALLING HER ATTENTION TO THIS AND

02:43PM   7    WHETHER SHE RED IT AND WHETHER THIS INFORMED HER DECISION?

02:44PM   8                MR. COOPERSMITH:  YES, YOUR HONOR.

02:44PM   9                THE COURT:  OKAY.  WELL, YOU CAN ASK ABOUT THOSE

02:44PM  10    THINGS.

02:44PM  11        BUT ANYTHING ABOUT THE INVENTION BEHIND THE SCENES MIGHT

02:44PM  12    NOT BE RELEVANT TO THAT IF IT'S OUTSIDE OF HER PERSONAL

02:44PM  13    KNOWLEDGE.

02:44PM  14                MR. COOPERSMITH:  OKAY.  I'LL TRY TO STAY WITHIN --

02:44PM  15    OR COLOR WITHIN THE LINES, AS THEY SAY.

02:44PM  16                THE COURT:  SURE.

02:44PM  17    BY MR. COOPERSMITH:

02:44PM  18    Q.   OKAY.  IF YOU GO ON TO THE PARAGRAPH THAT STARTS, "THAT

02:44PM  19    CLINCHED IT FOR HIM."

02:44PM  20        DO YOU SEE THAT?

02:44PM  21    A.   UH-HUH.

02:44PM  22    Q.   AND IT SAYS, "THAT CLINCHED IT FOR HIM, WHEN I FINALLY

02:44PM  23    CONNECTED WITH WHAT ELIZABETH FUNDAMENTALLY IS, HE SAYS, I

02:44PM  24    REALIZED THAT I COULD HAVE JUST AS WELL BEEN LOOKING INTO THE

02:44PM  25    EYES OF A STEVE JOBS OR A BILL GATES."

02:44PM   1           DO YOU SEE THAT?

02:44PM   2      A.   YES.

02:44PM   3      Q.   AND THAT'S A QUOTE WHAT PROFESSOR CHANNING ROBERTSON, THIS

02:44PM   4      PROFESSOR, IS SAYING ABOUT MS. HOLMES?

02:44PM   5      A.   YES.

02:44PM   6      Q.   AND YOU YOURSELF, EVEN BEFORE YOU WERE INVOLVED WITH THIS

02:44PM   7      INVESTMENT, THOUGHT MS. HOLMES WAS VERY IMPRESSIVE; RIGHT?

02:44PM   8      A.   YES.

02:44PM   9      Q.   AND THAT'S ONE OF THE REASONS YOU WANTED TO BE INVOLVED

02:45PM  10      WITH THE INVESTMENT; RIGHT?

02:45PM  11      A.   YES, THAT I WANTED TO WORK ON IT, YES.

02:45PM  12      Q.   IN FACT, YOU VOLUNTEERED TO DO THAT BECAUSE YOU THOUGHT IT

02:45PM  13      WAS INTERESTING?

02:45PM  14      A.   YES.

02:45PM  15      Q.   AND THEN IT GOES ON IN THE VERY NEXT LINE TO SAY, "WITH

02:45PM  16      ROBERTSON'S BLESSING, HOLMES STARTED HER COMPANY."

02:45PM  17           DO YOU SEE THAT?

02:45PM  18      A.   YES.

02:45PM  19      Q.   OKAY.  IF YOU GO TO PAGE 6 OF THE ARTICLE.

02:45PM  20           AND IF YOU GO TO THE PARAGRAPH THAT STARTS "PRECISELY HOW

02:45PM  21      THERANOS."

02:45PM  22           DO YOU SEE THAT?

02:45PM  23      A.   YES.

02:45PM  24      Q.   AND I WANT TO GO TO THE NEXT PARAGRAPH, AND IT READS, "THE

02:45PM  25      SCALE OF THERANOS'S OPERATIONS AT THE MOMENT IS MODEST."

02:45PM  1          DO YOU SEE THAT?

02:45PM  2     A.   YES.

02:45PM  3     Q.   AND YOU UNDERSTOOD THAT WAS THE CASE AT THE TIME IN

02:45PM  4     OCTOBER OF 2014; RIGHT?

02:45PM  5     A.   NO.

02:45PM  6     Q.   WELL, SO YOU DIDN'T BELIEVE THIS PART OF THE ARTICLE?

02:45PM  7     A.   THE PARTS OF THE ARTICLE THAT WERE RELEVANT TO US AND THE

02:45PM  8     PARTS THAT I RECALL AND REMEMBER ARE THE PARTS THAT ARE IN MY

02:46PM  9     MEMOS.

02:46PM  10    Q.   OKAY.  BUT NONETHELESS, THIS INFORMATION IS IN THE

02:46PM  11    ARTICLE; RIGHT?

02:46PM  12    A.   CORRECT.

02:46PM  13    Q.   AND THAT WAS AVAILABLE FOR YOU TO CONSIDER; CORRECT?

02:46PM  14    A.   CORRECT.

02:46PM  15    Q.   THEN IT GOES ON, "ITS PHLEBOTOMISTS CURRENTLY TAKE

02:46PM  16    PHYSICIAN-ORDERED BLOOD DRAWS (AND SALIVA, URINE, FECES, AND

02:46PM  17    OTHER SAMPLES) AT COLLECTION CENTERS THE COMPANY OPERATES AT

02:46PM  18    ITS HEADQUARTERS IN PALO ALTO AND AT 21 WALGREENS -- ONE IN

02:46PM  19    PALO ALTO AND THE REST IN PHOENIX."

02:46PM  20         DO YOU SEE THAT?

02:46PM  21    A.   YES.

02:46PM  22    Q.   AND SO THIS ARTICLE IS TELLING ANYONE WHO READ IT THAT

02:46PM  23    THERE ARE COLLECTION CENTERS WHERE THE BLOOD IS COLLECTED AT

02:46PM  24    WALGREENS?

02:46PM  25    A.   THAT WAS NEVER, EVER MENTIONED IN OUR CONVERSATIONS WITH

02:46PM  1    ELIZABETH OR SUNNY BALWANI AT THE PALO ALTO MEETING.

02:46PM  2         WE WERE UNDER THE COMPLETE UNDERSTANDING THAT THEIR

02:46PM  3    ANALYZER MACHINE IS THE ONLY THING THAT THEY USED, AND

02:46PM  4    FINGERSTICK WAS THE ONLY WAY THAT THEY WERE DOING BLOOD TESTS.

02:46PM  5    Q.   OKAY.  BUT MR. PARLOFF, IN HIS ARTICLE, WRITES THESE WORDS

02:47PM  6    THAT I JUST READ; CORRECT?

02:47PM  7    A.   YES, AND THEY WERE ALSO IN 40 WALGREENS STORES AND THIS

02:47PM  8    SAYS 21, SO --

02:47PM  9    Q.   OKAY.  WE'LL TALK ABOUT THAT IN A FEW MINUTES, OR PERHAPS

02:47PM  10   TOMORROW.

02:47PM  11        BUT RIGHT NOW MY ONLY QUESTION IS, THIS WAS AN ARTICLE

02:47PM  12   THAT YOU TESTIFIED THAT YOU CONSIDERED IN CONNECTION WITH

02:47PM  13   HELPING RDV DECIDE ON THIS INVESTMENT; CORRECT?

02:47PM  14   A.   YES, PARTS OF IT.

02:47PM  15   Q.   AND THESE WORDS OF MR. PARLOFF WERE RIGHT THERE IN THE

02:47PM  16   ARTICLE FOR YOU TO CONSIDER IF YOU HAD WANTED TO; CORRECT?

02:47PM  17   A.   YES.

02:47PM  18   Q.   ABOUT THE COLLECTION CENTERS?

02:47PM  19   A.   YES.

02:47PM  20   Q.   NOW, LET'S GO ON TO THE NEXT COLUMN.

02:47PM  21        DO YOU SEE IN THE SECOND PARAGRAPH UP FROM THE BOTTOM THAT

02:47PM  22   IS UP ON THE SCREEN RIGHT NOW, IT SAYS, "I JUST THINK THIS IS

02:48PM  23   SO EXCITING, SAYS MARK LARET, THE CEO OF UCSF MEDICAL CENTER,

02:48PM  24   ABOUT WHAT HE'S SEEN SO FAR."

02:48PM  25        DO YOU SEE THAT?

02:48PM  1    A.   YES.

02:48PM  2    Q.   "I MEAN, HERE IT IS.  THIS IS THE TRUE TRANSFORMATION OF

02:48PM  3    HEALTH CARE, RIGHT HERE IN FRONT OF US."

02:48PM  4         DO YOU SEE THAT?

02:48PM  5    A.   YES.

02:48PM  6    Q.   AND DO YOU UNDERSTAND THAT UCSF IS THE UNIVERSITY OF

02:48PM  7    CALIFORNIA SAN FRANCISCO MEDICAL CENTER?

02:48PM  8    A.   YES.

02:48PM  9    Q.   AND THEN IT GOES ON, "THE FIRST TIME I HEARD ABOUT THIS I

02:48PM  10   THOUGHT IT WAS SNAKE OIL AND MIRRORS, SAYS DAVID HELFET, THE

02:48PM  11   CHIEF OF ORTHOPEDIC TRAUMA AT THE HOSPITAL FOR SPECIAL SURGERY

02:48PM  12   IN MANHATTAN."

02:48PM  13        DO YOU SEE THAT?

02:48PM  14   A.   YES.

02:48PM  15   Q.   AND DID YOU EVER TALK TO DR. HELFET?

02:48PM  16   A.   NO.

02:48PM  17   Q.   AND THEN IT SAYS, "BUT AFTER REVIEWING VOLUMINOUS

02:48PM  18   VALIDATION STUDIES SUPPLIED TO HIM BY THE COMPANY, HE HAS

02:48PM  19   BECOME A BELIEVER AND IS URGING HIS HOSPITAL TO CONSIDER

02:48PM  20   ADOPTION."

02:48PM  21        DO YOU SEE THAT?

02:48PM  22   A.   YES.

02:48PM  23   Q.   AND THEN IT GOES ON TO SAY, "IT'S REAL DATA, HE SAYS.

02:49PM  24   IT'S NOT THEIR INTERPRETATION.  (THERANOS HAS INVITED HELFET TO

02:49PM  25   JOIN ITS MEDICAL ADVISORY BOARD, HE SAYS, BUT HE HAS NOT

02:49PM  1    DECIDED WHETHER TO DO SO.)"

02:49PM  2        DO YOU SEE THAT?

02:49PM  3    A.   YES.

02:49PM  4    Q.   AND THEN IT GOES ON TO SAY, "HELFET SEES AN OPPORTUNITY TO

02:49PM  5    ENLIST THERANOS LAB SERVICES IN THE IDENTIFICATION OF SO-CALLED

02:49PM  6    HOSPITAL-ACQUIRED INFECTIONS -- A MAJOR SCOURGE IN HEALTH CARE

02:49PM  7    TODAY."

02:49PM  8        DO YOU SEE THAT?

02:49PM  9    A.   YES.

02:49PM  10   Q.   OKAY.  AND DID YOU DO ANY FOLLOW-UP WITH THE HOSPITAL FOR

02:49PM  11   SPECIAL SURGERY IN MANHATTAN OR DR. HELFET?

02:49PM  12   A.   NO.

02:49PM  13   Q.   OKAY.  IF WE CAN GO TO PAGE 8 OF THE ARTICLE, AND GO TO

02:50PM  14   THE SECOND COLUMN -- ACTUALLY LET'S GO TO THE FIRST COLUMN,

02:50PM  15   FIRST.

02:50PM  16       IF YOU GO TWO PARAGRAPHS FROM THE BOTTOM OF THE FIRST

02:50PM  17   COLUMN THERE, DO YOU SEE WHERE IT SAYS, "MOREOVER, HOLMES

02:50PM  18   STRESSES, THERANOS IS CURRENTLY SEEKING FDA CLEARANCE FOR EVERY

02:50PM  19   ONE OF ITS TESTS, EVEN THOUGH IT'S UNDER NO LEGAL OBLIGATION TO

02:50PM  20   DO SO."

02:50PM  21       DO YOU SEE THAT?

02:50PM  22   A.   YES.

02:50PM  23   Q.   AND THEN IT SAYS, "(SHE HAS SUBMITTED MANY HUNDREDS OF

02:50PM  24   PAGES OF VALIDATION DATA IN THIS EFFORT, AND HAS SHOWN MUCH OF

02:50PM  25   THAT DATA TO 'FORTUNE.')"

02:50PM   1          DO YOU SEE THAT?

02:50PM   2   A.   YES.

02:50PM   3   Q.   AND THEN IT SAYS -- I'LL READ IT AGAIN.

02:50PM   4          DO YOU SEE WHERE IT SAYS, "THERANOS MAY, IN FACT, BE THE

02:50PM   5   ONLY LAB TO HAVE EVER SOUGHT FDA CLEARANCE FOR LDT'S"?

02:50PM   6          DO YOU SEE THAT?

02:50PM   7   A.   YES.

02:50PM   8   Q.   AND DO YOU UNDERSTAND THAT LDT'S ARE LAB DEVELOPED TESTS?

02:50PM   9   A.   YES.

02:50PM  10   Q.   AND YOU ARE AWARE THAT THERANOS DID SUBMIT AN APPLICATION

02:51PM  11   FOR FDA APPROVAL FOR ONE OF ITS ASSAYS RUNNING ON THE THERANOS

02:51PM  12   SYSTEM?

02:51PM  13   A.   YES.

02:51PM  14   Q.   AND YOU UNDERSTAND THE FDA APPROVED THAT PARTICULAR ASSAY?

02:51PM  15   A.   THE ONE, YES.

02:51PM  16   Q.   RIGHT, RUNNING ON THE THERANOS SYSTEM?

02:51PM  17   A.   YES.

02:51PM  18   Q.   AND THEN --

02:51PM  19   A.   THAT WAS AFTER OUR INVESTMENT, THOUGH.

02:51PM  20   Q.   RIGHT.  THE APPROVAL WAS AFTER THE INVESTMENT?

02:51PM  21   A.   YES.

02:51PM  22   Q.   AND THEN IF YOU GO TO THE PARAGRAPH RIGHT BELOW THAT, IT

02:51PM  23   SAYS, "BEYOND THE VALIDATION DISPUTES, SKEPTICS ALSO QUESTION

02:51PM  24   THERANOS'S BUSINESS MODEL."

02:51PM  25          DO YOU SEE THAT?

02:51PM  1    A.   YES.

02:51PM  2    Q.   AND THEN IT SAYS, "THEY DOUBT ITS ABILITY TO SCALE UP ANY

02:51PM  3    TIME SOON TO THE LEVELS NECESSARY TO BECOME A SERIOUS

02:51PM  4    COMPETITOR, ESPECIALLY SINCE THE BUSINESS HAS SO MANY

02:51PM  5    UNGLAMOROUS ASPECTS UNRELATED TO TESTING -- BILLING, CUSTOMER

02:51PM  6    SERVICE, SORTING, REGULATORY COMPLIANCE, AND THE LOGISTICS OF

02:51PM  7    TRANSPORTING SAMPLES FROM PHYSICIANS TO LABS."

02:52PM  8         DO YOU SEE THAT?

02:52PM  9    A.   YES.

02:52PM  10   Q.   AND THEN IT GOES ON IN THE NEXT PARAGRAPH, "QUEST" -- AND

02:52PM  11   YOU UNDERSTAND QUEST IS ONE OF THE COMPETITORS?

02:52PM  12            MR. LEACH:  YOUR HONOR --

02:52PM  13            THE COURT:  EXCUSE ME.

02:52PM  14            MR. LEACH:  YOUR HONOR, I OBJECT AND MOVE TO STRIKE

02:52PM  15   THIS.  HE'S READING FROM AN ARTICLE THAT IS NOT IN FOR ITS

02:52PM  16   TRUTH.

02:52PM  17            MR. COOPERSMITH:  YOUR HONOR, THEY PUT THIS ARTICLE

02:52PM  18   INTO EVIDENCE.

02:52PM  19            THE COURT:  OH, I REMEMBER WHO PUT IT IN, OF COURSE.

02:52PM  20        ARE WE GOING TO GO THROUGH THE WHOLE ARTICLE?

02:52PM  21            MR. COOPERSMITH:  NO, NO, YOUR HONOR.  I DON'T THINK

02:52PM  22   WE HAVE TIME FOR THAT.

02:52PM  23            THE COURT:  OKAY.  I AGREE.

02:52PM  24        WELL, LET'S CONTINUE.

02:52PM  25        YOU HAVE A QUESTION ABOUT QUEST?

02:52PM   1        MR. COOPERSMITH:  YES, YOUR HONOR.

02:52PM   2        THE COURT:  ALL RIGHT.  I'LL ALLOW YOU TO ASK THAT

02:52PM   3   QUESTION.

02:52PM   4        MR. COOPERSMITH:  THANK YOU.

02:52PM   5   Q.  MS. PETERSON, I THINK YOU SAID BEFORE THAT QUEST WAS ONE

02:52PM   6   OF THE MAJOR LABORATORY COMPANIES IN THE UNITED STATES THAT WAS

02:52PM   7   IDENTIFIED AS A MAJOR COMPETITOR TO THERANOS?

02:52PM   8   A.  YES.

02:52PM   9   Q.  A MUCH LARGER COMPANY AT THE TIME; CORRECT?

02:52PM  10   A.  YES.

02:52PM  11   Q.  AND ACCORDING TO THE ARTICLE, THEY EMPLOYED 45,000 PEOPLE,

02:52PM  12   AND OWNED A FLEET OF 3,000 VEHICLES AND 20 AIRPLANES AND SO ON

02:52PM  13   AND SO ON?

02:52PM  14        DO YOU SEE THAT?

02:52PM  15   A.  YES.

02:52PM  16   Q.  AND THERANOS DIDN'T HAVE THAT AT THE TIME.

02:53PM  17        YOU UNDERSTOOD THAT?

02:53PM  18   A.  CORRECT.

02:53PM  19   Q.  RIGHT.  AND THEN IT TALKED ABOUT HOW SKEPTICS WERE

02:53PM  20   DOUBTING THERANOS'S ABILITY TO SCALE; RIGHT?

02:53PM  21   A.  YES.

02:53PM  22   Q.  IS THAT RIGHT, MS. PETERSON?

02:53PM  23   A.  YES.

02:53PM  24   Q.  AND, IN FACT, YOU INCORPORATED THAT INFORMATION INTO YOUR

02:53PM  25   MEMOS THAT YOU LOOKED AT BEFORE WITH MR. LEACH?

02:53PM 1    A.   YES.  THIS IS ONE THING THAT I DID POINT OUT.

02:53PM 2    Q.   RIGHT.  ONE OF THE RISKS THAT YOU SAW IN THE INVESTMENT;

02:53PM 3    RIGHT?

02:53PM 4    A.   YES.

02:53PM 5    Q.   THAT THERANOS WOULD NOT --

02:53PM 6    A.   AGAIN, IT GOES BACK TO EXECUTION, THE EXECUTION RISK AND

02:53PM 7    RESOURCES AND THE ABILITY TO SCALE THE BUSINESS, NOT THAT IT

02:53PM 8    DIDN'T WORK.

02:53PM 9    Q.   RIGHT.  THANK YOU.

02:53PM 10        SO THE RISK THAT IS BEING DISCUSSED IN THE ARTICLE ABOUT

02:53PM 11   WHAT THE SKEPTICS THINK, THAT'S THE SAME POINT THAT YOU WERE

02:53PM 12   MAKING WHEN YOU WERE TALKING ABOUT EXECUTION RISK?

02:53PM 13   A.   SHE ALSO SAID THAT IN BOTH MEETINGS, SPECIFICALLY IN THE

02:53PM 14   PHONE CALL THAT WE HAD, THAT NOW THAT THEY HAD THE CONTRACTS,

02:54PM 15   THE RISK TO THEM WAS EXECUTION, THAT IT WAS ALL ABOUT THE

02:54PM 16   PEOPLE.

02:54PM 17   Q.   RIGHT.  AND THE EXECUTION RISK WOULD BE THAT THEY WOULDN'T

02:54PM 18   BE ABLE TO SCALE UP THEIR BUSINESS; RIGHT?

02:54PM 19   A.   NOT THAT THEY WOULDN'T BE ABLE TO, BUT THAT THAT IS THE

02:54PM 20   RISK, THAT THE EXECUTION PART OF THE BUSINESS IS WHERE THEY

02:54PM 21   NEEDED TO SPEND THE MOST TIME AND FOCUS.

02:54PM 22   Q.   RIGHT.

02:54PM 23        BUT THE EXECUTION RISK, AS YOU PUT IT, WOULD BE THAT THE

02:54PM 24   COMPANY WOULDN'T BE ABLE TO ACTUALLY OPEN ALL OF THE WALGREENS

02:54PM 25   STORES WITH WALGREENS THAT THEY WERE HOPING TO OPEN; RIGHT?

02:54PM   1    A.    THEY -- THAT WAS THE GOAL.  THAT WAS THE WHOLE BUSINESS

02:54PM   2    PLAN WAS TO ROLL OUT TO WALGREENS, AND SO, YES, WE THOUGHT THAT

02:54PM   3    THEY COULD ROLL OUT.

02:54PM   4         WOULD THEY ROLL OUT TO 900 STORES IN THE FOLLOWING YEAR?

02:54PM   5         AGAIN, EVEN IF THEY HAD HIT HALF OF THOSE ROLLOUTS, WE

02:54PM   6    THOUGHT THEY WOULD GO BEYOND THE 42 OR 40 THAT THEY HAD AT THE

02:54PM   7    TIME.

02:54PM   8    Q.    OKAY.  THANK YOU, MS. PETERSON.

02:55PM   9         BUT I WANT TO HAVE A DIFFERENT QUESTION ANSWERED, RIGHT?

02:55PM  10         MY QUESTION IS VERY SIMPLE.  THE EXECUTION RISK THAT YOU

02:55PM  11    REFERRED TO IN THE MEMOS THAT YOU WROTE, OKAY --

02:55PM  12    A.    YES.

02:55PM  13    Q.    -- YOU'RE TALKING ABOUT THE RISK THAT THE COMPANY, DESPITE

02:55PM  14    THEIR GOALS, WOULD NOT ACTUALLY BE ABLE TO OPEN ALL OF THE

02:55PM  15    WALGREENS STORES THAT THEY WANTED TO; RIGHT?

02:55PM  16    A.    THAT WAS A RISK, YES.

02:55PM  17    Q.    RIGHT.

02:55PM  18    A.    BUT THAT'S NOT -- THAT WASN'T THEIR VISION.  THAT

02:55PM  19    WASN'T -- WE DIDN'T INTEND -- INVEST THINKING THAT THEY

02:55PM  20    WOULDN'T HIT THOSE NUMBERS.

02:55PM  21    Q.    YOU INVESTED HOPING THAT THEY WOULD HIT THOSE NUMBERS;

02:55PM  22    RIGHT?

02:55PM  23    A.    YES.

02:55PM  24    Q.    RIGHT?

02:55PM  25    A.    GIVEN EVERYTHING THAT THEY HAD SAID, WE HAD -- WE DIDN'T

02:55PM  1      HAVE ANY REASON TO BELIEVE THAT THEY WOULDN'T ROLL OUT AS

02:55PM  2      PLANNED.

02:55PM  3      Q.   BUT YOU UNDERSTOOD THAT THERE WAS A RISK?

02:55PM  4      A.   YES.   THERE'S A RISK IN EVERY INVESTMENT.

02:55PM  5      Q.   RIGHT.   AND THERE'S NOTHING -- WHEN SOMEONE IS PROJECTING

02:55PM  6      A FUTURE OF A BUSINESS, FOR EXAMPLE, OPENING UP HUNDREDS OF

02:56PM  7      STORES AT WALGREENS, THERE'S NO GUARANTEES THAT THAT WILL

02:56PM  8      ACTUALLY HAPPEN; RIGHT?

02:56PM  9      A.   CORRECT.   BUT THERE WERE FUNDAMENTAL THINGS THAT WE WERE

02:56PM  10     RELYING ON THAT WEREN'T TRUE THAT WERE -- THAT THE ANALYZER

02:56PM  11     ACTUALLY WORKED, AND IT DIDN'T.

02:56PM  12          AND AS WELL AS THAT THEY WERE DOING WORK FOR

02:56PM  13     PHARMACEUTICAL COMPANIES, WHICH THEY WEREN'T.

02:56PM  14          SO THERE WERE A LOT OF THINGS THAT WE RELIED ON.

02:56PM  15     Q.   MS. PETERSON, YOU'VE NEVER TESTED THE THERANOS ANALYZER?

02:56PM  16     A.   NO.

02:56PM  17     Q.   OKAY.   SO YOU DON'T HAVE ANY FIRST-HAND KNOWLEDGE AS TO

02:56PM  18     WHETHER IT WORKS OR NOT; CORRECT?

02:56PM  19     A.   CORRECT.

02:56PM  20     Q.   OKAY.   SO, MS. PETERSON, I JUST WANT TO GO BACK TO

02:56PM  21     EXECUTION RISK.

02:56PM  22          YOU UNDERSTOOD THAT THERE'S NO GUARANTEES THAT THE COMPANY

02:56PM  23     WOULD ACTUALLY BE ABLE TO EXECUTE THEIR BUSINESS PLAN TO OPEN

02:56PM  24     HUNDREDS OF WALGREENS STORES?

02:56PM  25     A.   CORRECT.

02:56PM  1    Q.   AND THERE'S NO GUARANTEES, JUST LIKE THERE'S NO GUARANTEES

02:56PM  2    FOR ANY BUSINESS; RIGHT?

02:56PM  3    A.   CORRECT.

02:56PM  4    Q.   AND FOR ALL OF THE OTHER INVESTMENTS THAT RDV, YOUR

02:56PM  5    EMPLOYER, MAKES, SOMETIMES SOME ARE SUCCESSFUL AND SOMETIMES

02:56PM  6    SOME ARE LESS THAN SUCCESSFUL; RIGHT?

02:56PM  7    A.   CORRECT.

02:56PM  8    Q.   RIGHT.  AND SOMETIMES, YOU KNOW, DESPITE EVERYONE'S BEST

02:57PM  9    EFFORTS, THOSE COMPANIES DON'T ACTUALLY SUCCEED; CORRECT?

02:57PM  10   A.   CORRECT.

02:57PM  11   Q.   AND RDV TRIES TO DO THE BEST IT CAN TO PUT ITS MONEY WHERE

02:57PM  12   IT THINKS IT WILL HAVE WINNERS; RIGHT?

02:57PM  13   A.   YES.

02:57PM  14   Q.   BUT IT DOESN'T ALWAYS PICK WINNERS?

02:57PM  15   A.   NO.

02:57PM  16   Q.   OKAY.  LET'S JUST RETURN TO THE EXHIBIT, WHICH IS 1944,

02:57PM  17   EXHIBIT 1944.

02:57PM  18        IF YOU GO TO PAGE 8, I THINK WE WERE ON THAT, ON THE

02:57PM  19   RIGHT-HAND SIDE.

02:57PM  20        DO YOU SEE IT REFERS TO BOARD MEETINGS IN THE SECOND TO

02:57PM  21   THE LAST PARAGRAPH?

02:57PM  22   A.   YES.

02:57PM  23   Q.   AND DO YOU SEE IT MENTIONS A PARTICULAR LAWYER WHO ATTENDS

02:57PM  24   BOARD MEETINGS, DAVID BOIES?

02:58PM  25        DO YOU SEE THAT?

PETERSON CROSS BY MR. COOPERSMITH

02:58PM   1    A.   YES.

02:58PM   2    Q.   DO YOU KNOW MR. BOISE PERSONALLY?

02:58PM   3    A.   NO.

02:58PM   4    Q.   BUT DO YOU KNOW WHO HE IS?

02:58PM   5    A.   AS PART OF THIS, YES.

02:58PM   6    Q.   AND SOMEONE WHO HAD BEEN FAMOUS FOR CERTAIN CASES HE HAD

02:58PM   7    WORKED ON; RIGHT?

02:58PM   8    A.   WHAT I COULD GATHER FROM THE ARTICLE.

02:58PM   9         I DIDN'T KNOW HIM BEFORE THIS, NO.

02:58PM   10   Q.   OKAY.  LET'S GO TO PAGE 9 OF THE EXHIBIT.

02:58PM   11        AND THEN IF YOU GO TO THE SECOND, OR THE RIGHT-HAND COLUMN

02:58PM   12   ON PAGE 9 AND YOU SEE THERE'S A LINE, OR THERE'S A PARAGRAPH

02:58PM   13   REFERRING TO DR. HENRY KISSINGER?

02:58PM   14   A.   YES.

02:58PM   15   Q.   AND IT SAYS, "SHE LOOKS LIKE 19, SAYS BOARD MEMBER

02:58PM   16   HENRY KISSINGER, AGE 91," I GUESS; RIGHT?

02:58PM   17   A.   YES.

02:58PM   18   Q.   AND YOU KNOW WHO DR. KISSINGER IS?

02:59PM   19   A.   YES.

02:59PM   20   Q.   AND HE WAS THE SECRETARY OF STATE DURING THE NIXON

02:59PM   21   ADMINISTRATION; RIGHT?

02:59PM   22   A.   THAT PERSON I KNEW, YES.

02:59PM   23   Q.   YES.

02:59PM   24        AND THEN IT GOES ON TO SAY, "ASKED TO ASSESS HER AS A

02:59PM   25   LEADER -- BECAUSE HE'S SEEN A FEW" -- "HE," MEANING

02:59PM  1    DR. KISSINGER, "RESPONDS, 'I CAN'T COMPARE HER TO ANYONE ELSE

02:59PM  2    BECAUSE I HAVEN'T SEEN ANYONE WITH HER SPECIAL ATTRIBUTES.  SHE

02:59PM  3    HAS IRON WILL, STRONG DETERMINATION.  BUT NOTHING DRAMATIC.

02:59PM  4    THERE IS NO PERFORMANCE ASSOCIATED WITH HER.  I HAVE SEEN NO

02:59PM  5    SIGN THAT FINANCIAL GAIN IS OF ANY INTEREST TO HER.  SHE'S LIKE

02:59PM  6    A MONK.  SHE ISN'T FLASHY.  SHE WOULDN'T WALK INTO A ROOM AND

02:59PM  7    TAKE IT OVER.  BUT SHE WOULD ONCE THE SUBJECT GETS TO HER

02:59PM  8    FIELD.'"

02:59PM  9        DO YOU SEE THAT?

02:59PM  10   A.   I DO.  BUT NONE OF THE OPINIONS OF THESE OTHER PEOPLE

02:59PM  11   REALLY MATTERED TO US.

02:59PM  12   Q.   BUT IT WAS RIGHT THERE FOR THE TAKING IN THE ARTICLE THAT

02:59PM  13   YOU REVIEWED; RIGHT?

02:59PM  14   A.   BUT IT DOESN'T REALLY MATTER WHAT A PERSON SAID ABOUT HER

02:59PM  15   LEADERSHIP CAPABILITIES.

03:00PM  16       WE WERE LISTENING TO WHAT THEY WERE SAYING -- WE WERE

03:00PM  17   INFORMED BY SOME OF THE THINGS THAT WERE IN THIS ARTICLE, BUT

03:00PM  18   WE DIDN'T BASE OUR ENTIRE INVESTMENT DECISION ON THIS ARTICLE.

03:00PM  19   Q.   OKAY.  BUT YOU RELIED ON THIS IN WRITING YOUR MEMO?

03:00PM  20   A.   PARTS OF IT, YES.

03:00PM  21   Q.   RIGHT.  OKAY.

03:00PM  22   A.   THE PARTS WHERE SHE'S TALKING.

03:00PM  23   Q.   RIGHT.  YOU CHOSE TO EMPHASIZE SOME PARTS OR PAY ATTENTION

03:00PM  24   TO SOME PARTS AND CHOSE NOT TO PAY ATTENTION TO OTHER PARTS;

03:00PM  25   RIGHT?

03:00PM  1    A.   WE CHOSE TO PAY ATTENTION TO THE PARTS WHERE SHE'S

03:00PM  2    ACTUALLY TALKING ABOUT RELEVANT THINGS, NOT WHAT OTHER PEOPLE

03:00PM  3    WERE SAYING ABOUT HER.

03:00PM  4    Q.   OKAY.  YOU DIDN'T CARE ABOUT THAT?

03:00PM  5    A.   I DIDN'T SAY I DIDN'T CARE ABOUT IT.

03:00PM  6         IT'S JUST NOT -- IT WASN'T RELEVANT TO OUR INVESTMENT

03:00PM  7    DECISION WHAT HENRY KISSINGER THOUGHT OF HER.

03:00PM  8    Q.   OKAY.  LET'S GO TO PAGE 11.

03:00PM  9              THE COURT:  DO YOU -- MR. COOPERSMITH, DO YOU INTEND

03:00PM  10   TO GO TO SEVERAL OTHER PAGES?

03:00PM  11        SHOULD WE BREAK NOW?

03:00PM  12             MR. COOPERSMITH:  WELL, OBVIOUSLY, AS THE COURT

03:00PM  13   PREFERS.  THIS IS THE LAST PAGE, SO MAYBE A COUPLE OF POINTS.

03:01PM  14             THE COURT:  OKAY.  LET'S FINISH THAT THEN.

03:01PM  15             MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

03:01PM  16   Q.   IF YOU GO TO THE BOTTOM OF PAGE 11, DO YOU SEE AT THE VERY

03:01PM  17   BOTTOM THERE'S A QUOTE FROM MR. BALWANI?

03:01PM  18        DO YOU SEE THAT?

03:01PM  19   A.   WHERE IT STARTS "ELIZABETH"?

03:01PM  20   Q.   YES.

03:01PM  21   A.   YES.

03:01PM  22   Q.   IT SAYS, "ELIZABETH HAS HAD A VERY CLEAR VISION OF WHERE

03:01PM  23   SHE WANTED TO TAKE THIS SINCE THE TIME I MET HER, SAYS

03:01PM  24   SUNNY BALWANI."

03:01PM  25        DO YOU SEE THAT?

03:01PM   1       A.   YES.

03:01PM   2       Q.   AND IT GOES ON IN THE QUOTED PART, "THE BUSINESS STRATEGY,

03:01PM   3       THE TACTICS OF WHAT TO DO FIRST, WHAT TO OFFER WHEN -- THAT HAS

03:01PM   4       CHANGED, BUT THE OVERALL GOAL AND DIRECTION HAS BEEN LINEAR."

03:01PM   5            DO YOU SEE THAT?

03:01PM   6       A.   YES.

03:01PM   7       Q.   AND THEN IF YOU GO TO JUST THE LAST THING ON THE SAME

03:01PM   8       PAGE, GO OVER TO THE RIGHT-HAND COLUMN, AND THE LAST PARAGRAPH

03:01PM   9       BEFORE THE SECTION WITH THE BIG A, IT SAYS "TODAY HOLMES IS A

03:01PM   10      CO-INVESTOR ON 82 U.S. AND 189 FOREIGN PATENT APPLICATIONS, OF

03:02PM   11      WHICH 18 IN THE UNITED STATES AND 66 ABROAD HAVE BEEN GRANTED.

03:02PM   12      THOSE ARE IN ADDITION TO ANOTHER 186 APPLICATIONS THERANOS HAS

03:02PM   13      FILED WORLDWIDE THAT DON'T LIST HOLMES AS AN INVESTOR, OF WHICH

03:02PM   14      18 HAVE ALREADY BEEN GRANTED."

03:02PM   15           DO YOU SEE THAT?

03:02PM   16      A.   YES.

03:02PM   17      Q.   AND THE INTELLECTUAL PROPERTY ASPECT OF THERANOS, THAT WAS

03:02PM   18      INTERESTING TO YOU; RIGHT?

03:02PM   19      A.   YES.

03:02PM   20      Q.   AND, IN FACT, I THINK WE'LL HAVE TO TALK ABOUT THIS

03:02PM   21      TOMORROW, BUT THERE WAS SOME MORE INFORMATION ABOUT THAT IN THE

03:02PM   22      INVESTMENT MATERIALS THAT YOU RECEIVED; RIGHT?

03:02PM   23      A.   YES.

03:02PM   24           MR. COOPERSMITH:   OKAY.

03:02PM   25           YOUR HONOR, THAT'S GOOD FOR TODAY.

03:02PM  1          THE COURT:  OKAY.  LET'S TAKE OUR EVENING RECESS,

03:02PM  2     LADIES AND GENTLEMEN.

03:02PM  3          PLEASE, AS ALWAYS, I REMIND YOU OF THE ADMONITION.  DO NOT

03:02PM  4     READ, DISCUSS, OR IN ANY WAY ATTEMPT TO LEARN ANYTHING ABOUT

03:02PM  5     THIS CASE DURING THE BREAK.

03:02PM  6          WE'LL SEE YOU BACK TOMORROW MORNING AT 9:00 A.M.,

03:02PM  7     9:00 A.M., PLEASE.

03:02PM  8          AND, MS. PETERSON, IF YOU COULD RETURN TOMORROW MORNING, I

03:02PM  9     WOULD BE GRATEFUL.

03:02PM 10          AND HAVE A WONDERFUL EVENING.  THANK YOU.

03:03PM 11          (JURY OUT AT 3:03 P.M.)

03:03PM 12          THE COURT:  YOU CAN STAND DOWN.

03:03PM 13          ALL RIGHT.  THANK YOU.  PLEASE BE SEATED.

03:03PM 14          THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT.

03:03PM 15          MS. PETERSON HAS LEFT THE COURTROOM.

03:03PM 16          ALL COUNSEL AND MR. BALWANI REMAIN.

03:03PM 17          ANYTHING FURTHER BEFORE WE BREAK FOR THE DAY?

03:03PM 18          MR. LEACH?

03:03PM 19          MR. LEACH:  BRIEFLY, YOUR HONOR.

03:03PM 20          THE COURT:  SURE.

03:03PM 21          MR. LEACH:  I JUST WANTED TO EXPLAIN FURTHER THE

03:04PM 22     BASIS FOR THE OBJECTION.

03:04PM 23          THE ARTICLE IS IN EVIDENCE.  IT'S IN EVIDENCE FOR A

03:04PM 24     PARTICULAR PURPOSE.

03:04PM 25          MR. COOPERSMITH --

3955

03:04PM 1           MR. COOPERSMITH:  IF I COULD JUST DIRECT, I THINK

03:04PM 2    MS. PETERSON'S COUNSEL IS STILL IN THE ROOM, AND I'M NOT SURE

03:04PM 3    THAT'S APPROPRIATE WHILE SHE'S STILL UNDER CROSS.

03:04PM 4           THE COURT:  WELL, OKAY.  IT LOOKS LIKE HE MIGHT BE

03:04PM 5    LEAVING.

03:04PM 6       (PROCEEDINGS HELD OUT OF THE PRESENCE OF MS. PETERSON'S

03:04PM 7    COUNSEL.)

03:04PM 8           THE COURT:  MR. LEACH.

03:04PM 9           MR. LEACH:  SO THE BASIS OF THE OBJECTION,

03:04PM 10   YOUR HONOR, WAS SIMPLY THE READING OF QUOTES FROM PARTICULAR

03:04PM 11   PEOPLE WITH NO QUESTION.

03:04PM 12      I THINK IT WAS ARGUMENT.  THE ARTICLE IS IN FOR THE

03:04PM 13   PURPOSE OF DID YOU READ THIS AND DID YOU RELY ON IT, AND I

03:04PM 14   THINK THE POINT OF THE EXAMINATION WAS TO SIMPLY READ IT.

03:04PM 15      SO I WANTED TO ARTICULATE THAT.  I THINK WE'RE AT THE END,

03:04PM 16   BUT THAT WAS THE BASIS OF THE OBJECTION.

03:04PM 17          THE COURT:  OKAY.  THANK YOU.

03:04PM 18          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

03:04PM 19      WE ARE DONE WITH THAT EXHIBIT.

03:04PM 20          THE COURT:  OKAY.

03:04PM 21          MR. COOPERSMITH:  BUT IN ANY EVENT, I THINK IT'S

03:05PM 22   PROPER CROSS TO HIGHLIGHT THINGS THAT THE GOVERNMENT ITSELF PUT

03:05PM 23   INTO EVIDENCE, SO THAT'S WHAT I WAS DOING.

03:05PM 24          THE COURT:  OKAY.  ALL RIGHT.  WELL, IT'S DONE.  AND

03:05PM 25   THE JURY HAS IT, SO GREAT.

03:05PM 1          MR. COOPERSMITH:  THANK YOU.

03:05PM 2          THE COURT:  SO TIMING, JUST TIMING, WHAT DO YOU

03:05PM 3  THINK ABOUT TOMORROW?

03:05PM 4          MR. COOPERSMITH:  YOU KNOW, I -- MY ESTIMATE FOR HER

03:05PM 5  WAS ABOUT TWO TO TWO AND A HALF HOURS, WHICH ABOUT HALF AN HOUR

03:05PM 6  IS DONE.

03:05PM 7      SO I'M HOPEFUL THAT I CAN GET THIS DONE, YOU KNOW,

03:05PM 8  TOMORROW MORNING.

03:05PM 9          THE COURT:  OH, OKAY.

03:05PM 10         MR. COOPERSMITH:  OBVIOUSLY THINGS HAPPEN, BUT

03:05PM 11 THAT'S MY GOAL.

03:05PM 12         THE COURT:  SURE.

03:05PM 13     MR. LEACH.

03:05PM 14         MR. LEACH:  REDIRECT WILL BE LIMITED.

03:05PM 15     WE HAVE ANOTHER WITNESS AVAILABLE TOMORROW AFTERNOON.

03:05PM 16     I THINK, GIVEN THE PACE, WE WON'T GET PAST THAT WITNESS.

03:05PM 17 BUT I'LL TALK WITH MR. SCHENK AND MR. BOSTIC ABOUT IF WE NEED

03:05PM 18 ANOTHER WITNESS EVEN AFTER THE WITNESS AFTER MS. PETERSON.

03:05PM 19     AND THEN ON FRIDAY, I THINK GIVEN THE PACE, WE MAY NEED TO

03:06PM 20 SUPPLEMENT OUR DISCLOSURES TO THE DEFENSE IN TERMS OF WHO WE

03:06PM 21 ARE CALLING.

03:06PM 22         THE COURT:  OKAY.  THE QUESTION ON MS. WALSH'S

03:06PM 23 MOTION, IS THAT SOMETHING THAT WE NEED TO TALK ABOUT TOMORROW

03:06PM 24 MORNING, OR IS THAT LIKELY WE'LL GET TO THAT WITNESS?

03:06PM 25         MR. SCHENK:  YES, YOUR HONOR.

03:06PM   1                THE WITNESS AFTER MS. PETERSON IS DR. DHAWAN.

03:06PM   2                     THE COURT:  OKAY.

03:06PM   3                     MR. SCHENK:  DR. DHAWAN I THINK IS TRAVELLING TO A

03:06PM   4     MEDICAL CONFERENCE.

03:06PM   5           SO IF WE DON'T FINISH HIM ON WEDNESDAY, HE'S GOING TO BE

03:06PM   6     OUT OF TOWN FOR A FEW DAYS, SO WE'LL HAVE TO AGAIN TAKE A

03:06PM   7     WITNESS OUT OF ORDER.

03:06PM   8           MY HOPE IS THAT HIS DIRECT AND CROSS ARE RELATIVELY BRIEF

03:06PM   9     AND THAT WE COULD FINISH HIM.

03:06PM   10          I'M NOT EXACTLY SURE HOW LATE WE'RE GOING TOMORROW, BUT I

03:06PM   11    JUST WANTED TO INFORM THE COURT THAT IF WE DON'T FINISH HIM ON

03:06PM   12    WEDNESDAY, MY UNDERSTANDING IS THAT HE'S UNAVAILABLE TO PICK UP

03:06PM   13    HIS TESTIMONY FRIDAY MORNING AND WE'LL HAVE TO START WITH A

03:06PM   14    DIFFERENT WITNESS.

03:06PM   15                     THE COURT:  OKAY.

03:06PM   16                     MR. SCHENK:  BUT, YES, TO ANSWER THE COURT'S

03:06PM   17    QUESTION, IT SOUNDS LIKE TOMORROW MORNING -- OR IT SOUNDS LIKE

03:06PM   18    THE FIRST BREAK WOULD BE THE APPROPRIATE TIME TO HANDLE THE

03:07PM   19    DEFENSE MOTION REGARDING A DR. DHAWAN EXHIBIT.

03:07PM   20                     THE COURT:  OKAY.  THANK YOU.

03:07PM   21          MS. WALSH.

03:07PM   22                     MS. WALSH:  YES, YOUR HONOR.

03:07PM   23          HOW LATE ARE WE GOING TOMORROW?

03:07PM   24                     THE COURT:  WELL, I WAS GOING TO ASK WHICH ONE OF

03:07PM   25    YOU WAS GOING TO ASK THE JURY IF THEY CAN STAY UNTIL 10:00 P.M.

03:07PM   1              (LAUGHTER.)

03:07PM   2                   MS. WALSH:  MR. COOPERSMITH.

03:07PM   3                   THE COURT:  I HAD PLANNED TO GO UNTIL 4:00 TOMORROW,

03:07PM   4       THAT WAS MY THOUGHT, TO HAVE ONE OF OUR LONGER DAYS, MAYBE

03:07PM   5       5:00.  BUT CERTAINLY AT LEAST UNTIL 4:00.  THAT WAS MY HOPE.

03:07PM   6                   MS. WALSH:  OKAY.  IF IT'S A LONGER DAY, I

03:07PM   7       ANTICIPATE BEING FINISHED WITH CROSS OF DR. DHAWAN, BUT IT

03:07PM   8       DEPENDS ON THE DIRECT.

03:07PM   9              BUT THE LATER WE GO, THE GREATER CHANCE IT WILL BE --

03:07PM  10                   THE COURT:  SURE.  AND IT MAY BE THAT I THINK THE

03:07PM  11       JURORS ARE EAGER TO HAVE THINGS MOVE ALONG AS WELL, AND YOU

03:07PM  12       KNOW, WHAT IS THE DIFFERENCE BETWEEN 4:00 AND 5:00 P.M.  IT'S

03:07PM  13       JUST ANOTHER HOUR ON THE FREEWAY, I SUPPOSE.  BUT WE'LL SEE HOW

03:07PM  14       THAT WORKS.  THANK YOU FOR THAT THEN.

03:08PM  15              OKAY.  MAYBE WE'LL HAVE DISCUSSION REGARDING YOUR MOTION

03:08PM  16       AT A BREAK TOMORROW.

03:08PM  17              AND I APOLOGIZE FOR THE LATE START THIS MORNING.

03:08PM  18              WE ALSO HAVE THE JUROR'S LISTS, AND WE'LL NEED TO TALK, WE

03:08PM  19       SHOULD TALK ABOUT THIS SOMETIME TO SEE WHERE WE CAN CAPTURE

03:08PM  20       SOME MORE TIME, BUT WE HAVE TO FIND TIME TO DO THAT.

03:08PM  21              OKAY.

03:08PM  22                   MR. SCHENK:  THANK YOU.

03:08PM  23                   MR. COOPERSMITH:  THANK YOU.

03:08PM  24                   MR. LEACH:  THANK YOU.

03:08PM  25                   THE COURT:  GREAT.  WE'LL SEE YOU TOMORROW.

3959

03:08PM   1           OH, YOU CAN SIT DOWN.  PLEASE.  GO AHEAD.

03:08PM   2           (COURT ADJOURNED AT 3:08 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 5:18-cr-00258-EJD   Document 1535   Filed 07/19/22   Page 264 of 264

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076
17

18         _____
19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595
20

21         DATED:  APRIL 26, 2022

22

23

24

25