UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) CR-18-00258-EJD |
| PLAINTIFF, | ) |
| | ) SAN JOSE, CALIFORNIA |
| VS. | ) |
| | ) APRIL 27, 2022 |
| RAMESH "SUNNY" BALWANI, | ) |
| | ) VOLUME 23 |
| DEFENDANT. | ) |
| _____ | ) PAGES 3960 - 4226 |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                        BY:  JOHN C. BOSTIC
                             JEFFREY B. SCHENK
                        150 ALMADEN BOULEVARD, SUITE 900
                        SAN JOSE, CALIFORNIA 95113

                        BY:  ROBERT S. LEACH
                        1301 CLAY STREET, SUITE 340S
                        OAKLAND, CALIFORNIA 94612

        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTERS:
                        IRENE L. RODRIGUEZ, CSR, RMR, CRR
                        CERTIFICATE NUMBER 8074
                        LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595

        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S: (CONT'D)

FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                        BY:  MOLLY MCCAFFERTY
                             SHAWN ESTRADA
                        THE ORRICK BUILDING
                        405 HOWARD STREET
                        SAN FRANCISCO, CALIFORNIA 94105

                        BY:  JEFFREY COOPERSMITH
                             AARON BRECHER
                             AMANDA MCDOWELL
                        701 FIFTH AVENUE, SUITE 5600
                        SEATTLE, WASHINGTON 98104

                        BY:  STEPHEN CAZARES
                        77 SOUTH FIGUEROA STREET, SUITE 3200
                        LOS ANGELES, CALIFORNIA 90017

                        BY:  AMY WALSH
                        51 W 52ND STREET
                        NEW YORK, NEW YORK 10019


ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                        BY:  MADDI WACHS, PARALEGAL
                             SARA SLATTERY, PARALEGAL

                        ORRICK, HERRINGTON & SUTCLIFFE
                        JENNIFER CYGNOR, PARALEGAL

                        PROLUMINA
                        BY:  COREY ALLEN
                        2200 SIXTH AVENUE, SUITE 425
                        SEATTLE, WASHINGTON 98121

                        UNITED STATES POSTAL INSPECTION SERVICE
                        BY:  CHRISTOPHER MCCOLLOW

                        FEDERAL BUREAU OF INVESTIGATION
                        BY:  MARIO C. SCUSSEL

                        UNITED STATES FOOD & DRUG
                        ADMINISTRATION
                        BY:  GEORGE SCAVDIS

1

<u>INDEX OF PROCEEDINGS</u>

2

GOVERNMENT'S:

3

4

**LISA PETERSON**
CROSS-EXAM BY MR. COOPERSMITH (RES.)     P. 3965
5     REDIRECT EXAM BY MR. LEACH               P. 4051
RECROSS-EXAM BY MR. COOPERSMITH          P. 4062

6

7

**SUNIL DHAWAN**
DIRECT EXAM BY MR. SCHENK                P. 4080
8     CROSS-EXAM BY MS. WALSH                  P. 4135
REDIRECT EXAM BY MR. SCHENK              P. 4202
9     RECROSS-EXAM BY MS. WALSH.               P. 4212
FURTHER REDIRECT EXAM BY MR. SCHENK      P. 4216

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

                              IDENT.          EVIDENCE

GOVERNMENT'S

2033                                          3995
2192                                          4004
2120                                          4029
2170                                          4040
2098                                          4042
2537                                          4084
2248                                          4086
2760                                          4103
2772                                          4106
2791                                          4112
4528                                          4114
2548                                          4129
2972                                          4131
2219                                          4216




DEFENDANT'S

20433                                         3981
10588                                         4033
13987                                         4047
10527                                         4101
20064                                         4148
20067                                         4151
10525                                         4159
20575                                         4162
10526                                         4164
10577                                         4177
9941                                          4186
20467                                         4190
9369                                          4192
9962                                          4194

```
 1      SAN JOSE, CALIFORNIA                    APRIL 27, 2022

 2                    P R O C E E D I N G S

 3           (COURT CONVENED AT 9:05 A.M.)

 4           (JURY IN AT 9:05 A.M.)

 5               THE COURT:  THANK YOU.  GOOD MORNING.

 6      PLEASE BE SEATED.  THANK YOU AGAIN FOR YOUR COURTESY.

 7      WE'RE BACK ON THE RECORD.  OUR JURY IS PRESENT.

 8      GOOD MORNING, LADIES AND GENTLEMEN.

 9      ALL COUNSEL AND MR. BALWANI IS PRESENT.

10      AND MS. PETERSON IS BACK ON THE STAND.  GOOD MORNING.

11               THE WITNESS:  GOOD MORNING.

12               THE COURT:  I'LL REMIND YOU THAT YOU ARE STILL UNDER

13      OATH.

14           **(GOVERNMENT'S WITNESS, LISA PETERSON, PREVIOUSLY WAS**

15      **SWORN.)**

16               THE COURT:  BEFORE MR. COOPERSMITH CONTINUES, LADIES

17      AND GENTLEMEN OF THE JURY, I HAVE TO ASK YOU THAT QUESTION

18      AGAIN.

19           DURING THE BREAK, HAVE ANY OF YOU HAD CAUSE TO SEE, HEAR,

20      READ, DISCUSS, OR LEARN ANYTHING ABOUT THIS CASE?

21           IF SO, PLEASE RAISE YOUR HAND FOR ME.

22           I SEE NO HANDS.

23           THANK YOU VERY MUCH FOR THAT.

24           MR. COOPERSMITH, YOU HAVE ADDITIONAL QUESTIONS?

25               MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.
```

09:05AM 1              THE COURT:  PLEASE PROCEED.  THANK YOU.

09:05AM 2                  **CROSS-EXAMINATION (RESUMED)**

09:05AM 3    BY MR. COOPERSMITH:

09:05AM 4    Q.   GOOD MORNING.  MS. PETERSON.

09:06AM 5    A.   GOOD MORNING.

09:06AM 6    Q.   SO JUST TO START OFF HERE THIS MORNING, I THINK ON DIRECT

09:06AM 7    WHEN YOU WERE TALKING TO MR. LEACH YOU WERE ASKED SOME

09:06AM 8    QUESTIONS ABOUT THE RELATIONSHIP BETWEEN MR. BALWANI AND

09:06AM 9    MS. HOLMES.

09:06AM 10        DO YOU RECALL THAT?

09:06AM 11   A.   YES.

09:06AM 12   Q.   AND YOU SAID THAT YOU DIDN'T KNOW THAT THEY WERE IN A

09:06AM 13   RELATIONSHIP; IS THAT RIGHT?

09:06AM 14   A.   CORRECT.

09:06AM 15   Q.   AND YOU ALSO SAID THAT IF YOU HAD KNOWN THAT, YOU MIGHT

09:06AM 16   HAVE HAD SOME ADDITIONAL QUESTIONS.

09:06AM 17        DO YOU REMEMBER THAT?

09:06AM 18   A.   YEAH.  I BELIEVE IT WOULD HAVE SPURRED DISCUSSION, OF

09:06AM 19   COURSE.

09:06AM 20   Q.   RIGHT.  THAT'S WHAT YOU SAID ON DIRECT; RIGHT?

09:06AM 21   A.   UH-HUH.

09:06AM 22   Q.   AND I JUST WANT TO SHOW YOU A COUPLE OF EXHIBITS THAT ARE

09:06AM 23   ALREADY IN EVIDENCE.

09:06AM 24        OH, I'M SORRY.

09:06AM 25        ONE OF THE QUESTIONS THAT I THINK YOU HAD WAS YOU WOULD

09:06AM  1    WANT TO MAKE SURE THAT THE RIGHT PEOPLE WERE IN THE RIGHT

09:06AM  2    SEATS.  I THINK THOSE WERE THE WORDS YOU USED; RIGHT?

09:06AM  3    A.   YES.

09:06AM  4    Q.   MEANING THAT MR. BALWANI WAS IN HIS POSITION BECAUSE OF

09:06AM  5    MERIT AS OPPOSED TO HE WAS DATING MS. HOLMES; RIGHT?

09:07AM  6    A.   CORRECT.

09:07AM  7    Q.   OKAY.  I'D LIKE TO SHOW YOU THE FIRST EXHIBIT -- IT IS

09:07AM  8    ALREADY IN EVIDENCE, YOUR HONOR -- EXHIBIT 20510.

09:07AM  9         AND IF YOU'LL GO TO PAGE 4, MR. ALLEN.

09:07AM  10        THESE ARE BOARD MINUTES FROM AROUND THE TIME THAT

09:07AM  11   MR. BALWANI JOINED THE COMPANY.

09:07AM  12        DO YOU SEE WHERE IT SAYS, "THE BOARD DISCUSSED ADDING A

09:07AM  13   NEW DIRECTOR TO THE BOARD AND REVIEWED SEVERAL CANDIDATES FOR

09:07AM  14   CONSIDERATION"?

09:07AM  15        DO YOU SEE THAT?

09:07AM  16   A.   YES.

09:07AM  17   Q.   AND THEN IT SAYS, "AFTER DISCUSSION, THE BOARD UNANIMOUSLY

09:07AM  18   AGREED TO ELECT RAMESH 'SUNNY' BALWANI AS VICE CHAIRMAN."

09:07AM  19        DO YOU SEE THAT?

09:07AM  20   A.   YES.

09:07AM  21   Q.   GOING TO THE NEXT EXHIBIT, WHICH IS 20512.

09:08AM  22        AND THESE ARE BOARD MINUTES FROM AUGUST 10TH, 2010.

09:08AM  23        AND IF YOU GO TO PAGE 7, MR. ALLEN.

09:08AM  24        DO YOU SEE THERE'S A SECTION THERE CALLED "ADDITIONAL

09:08AM  25   COMPENSATION MATTERS; AMENDMENT OF BYLAWS," MS. PETERSON?

PETERSON CROSS BY MR. COOPERSMITH (RES.)

09:08AM   1    A.   YES.

09:08AM   2    Q.   AND THEN IT SAYS, "THE BOARD THEN APPROVED THE ADDITION OF

09:08AM   3    AN OPERATIONAL TITLE OF PRESIDENT AND COO FOR SUNNY BALWANI

09:08AM   4    AFTER DISCUSSING HIS PERFORMANCE AND CONTRIBUTIONS AND

09:08AM   5    OPERATIONAL ROLE."

09:08AM   6        DO YOU SEE THAT?

09:08AM   7    A.   YES.

09:08AM   8    Q.   OKAY.  AND YOU UNDERSTAND THAT THE BOARD WAS COMPOSED OF

09:08AM   9    PEOPLE OTHER THAN MS. HOLMES; RIGHT?

09:08AM  10    A.   YES.

09:08AM  11    Q.   OKAY.  OKAY.  WHEN YOU FIRST STARTED WORKING ON THE RDV

09:08AM  12    INVESTMENT IN THERANOS, ONE OF THE FIRST THINGS YOU DID IS YOU

09:08AM  13    PERFORMED SOME GOOGLE SEARCHES; IS THAT RIGHT?

09:09AM  14    A.   YES.

09:09AM  15    Q.   AND YOU WERE TRYING TO FIND ANYTHING YOU COULD ABOUT

09:09AM  16    THERANOS THAT WAS IN PUBLIC; RIGHT?

09:09AM  17    A.   YEAH.  I WAS JUST TRYING TO GOOGLE AND FIND THINGS THAT

09:09AM  18    TALKED ABOUT THERANOS AND SPEECHES OF HERS.

09:09AM  19    Q.   SO THINGS THAT YOU COULD FIND ON GOOGLE; RIGHT?

09:09AM  20    A.   UH-HUH.

09:09AM  21    Q.   SO THERE WERE SOME SPEECHES THAT SHE HAD ON YOUTUBE AND

09:09AM  22    THINGS LIKE THAT?

09:09AM  23    A.   YES.

09:09AM  24    Q.   OKAY.  AND THEN YOU ALSO UNDERSTAND THAT THE THERANOS

09:09AM  25    WEBSITE WAS PUBLICLY AVAILABLE; RIGHT?

09:09AM  1     A.   YES.

09:09AM  2     Q.   AND ALSO THE WALGREENS WEBSITE; RIGHT?

09:09AM  3     A.   YES.

09:09AM  4     Q.   AND YOU LOOKED AT THE WALGREENS WEBSITE?

09:09AM  5     A.   I DON'T RECALL.

09:09AM  6     Q.   YOU DON'T RECALL ONE WAY OR THE OTHER?

09:09AM  7     A.   I DON'T RECALL.

09:09AM  8     Q.   OKAY.  YOU MIGHT HAVE, OR YOU'RE SURE YOU DIDN'T?

09:09AM  9     A.   I DON'T RECALL IF I DID OR NOT.

09:09AM 10     Q.   OKAY.  CLEAR ENOUGH.

09:09AM 11          AND THEN THE THERANOS WEBSITE, YOU LOOKED AT THAT; RIGHT?

09:09AM 12     A.   I DID LOOK AT THAT.  I DO REMEMBER LOOKING AT THE PRICE

09:09AM 13     LIST.

09:09AM 14     Q.   AND SINCE YOU MENTIONED THAT, LET'S TAKE A LOOK AT

09:10AM 15     EXHIBIT 3741A WHICH IS ALREADY IN EVIDENCE.

09:10AM 16          AND WHEN YOU SAY -- I'M SORRY.  I'LL WAIT FOR YOUR --

09:10AM 17          (PAUSE IN PROCEEDINGS.)

09:10AM 18            THE WITNESS:  I DON'T SEE ANYTHING THAT IS 3.  37?

09:10AM 19     BY MR. COOPERSMITH:

09:10AM 20     Q.   YES.  CAN YOU SEE IT ON YOUR SCREEN, MS. PETERSON?

09:10AM 21     A.   YES.

09:10AM 22     Q.   OKAY.  AND YOU SEE THE THERANOS, AND THERE'S A LIST OF

09:10AM 23     ASSAYS, AND THERE ARE PRICES NEXT TO EACH ONE?

09:10AM 24     A.   YES.

09:10AM 25     Q.   AND WHEN YOU SAY YOU LOOKED AT THE THERANOS PRICE LIST,

09:10AM 1    THAT'S WHAT YOU'RE TALKING ABOUT; RIGHT?

09:10AM 2    A.   YES.

09:10AM 3    Q.   AND THEN YOU SEE THAT NEXT TO EACH OF THE BLOOD TESTS THAT

09:10AM 4    ARE LISTED THERE OF THE DIFFERENT ASSAYS, THESE ACTUALLY ARE

09:10AM 5    PRICE LISTED; RIGHT?

09:10AM 6    A.   YES.

09:10AM 7    Q.   AND THAT WAS ONE OF THE THINGS THAT THERANOS WAS TRYING TO

09:11AM 8    DO, TO CREATE SOME PRICE TRANSPARENCY AROUND TESTING; RIGHT?

09:11AM 9    A.   CORRECT.

09:11AM 10   Q.   WE'LL GO BACK TO THAT IN A MINUTE.

09:11AM 11        BUT LET'S LOOK AT EXHIBIT 5805, WHICH IS ALREADY IN

09:11AM 12   EVIDENCE.

09:11AM 13        AND THIS IS FROM THE THERANOS WEBSITE, MS. PETERSON.

09:11AM 14        IF WE CAN GO TO PAGE 4, MR. ALLEN.  AND IF WE BLOW UP "THE

09:11AM 15   ONLY THING WE WANT YOU TO FEEL IS BETTER."

09:11AM 16        DO YOU SEE THAT?

09:11AM 17   A.   YES.

09:11AM 18   Q.   AND THIS SAYS, "INSTEAD OF A BIG, INTIMIDATING NEEDLE, OUR

09:11AM 19   CERTIFIED PHLEBOTOMISTS CAN USE A TINY FINGERSTICK OR A

09:11AM 20   MICRO-SAMPLE FROM A VENOUS DRAW.  OCCASIONALLY A VENIPUNCTURE

09:11AM 21   MAY BE REQUIRED BASED ON THE LAB ORDER, BUT THIS IS UNCOMMON,

09:11AM 22   AND OUR AIM IS TO ELIMINATE THAT SCENARIO ENTIRELY."

09:12AM 23        DO YOU SEE THAT?

09:12AM 24   A.   YES.

09:12AM 25   Q.   OKAY.  SO THE WEBSITE TALKS ABOUT VENOUS DRAWS; RIGHT?

09:12AM  1    A.   YES, BUT THEY NEVER DID.

09:12AM  2    Q.   OKAY.  OKAY.  I'M JUST ASKING WHAT THE WEBSITE SAID.

09:12AM  3    A.   YEAH.

09:12AM  4    Q.   OKAY.  AND THEN IF WE GO TO EXHIBIT 14207, I DON'T THINK

09:12AM  5    THAT'S IN EVIDENCE, SO LET'S JUST SHOW THAT ON MS. PETERSON'S

09:12AM  6    SCREEN.

09:12AM  7         AND I KNOW, MS. PETERSON, YOU SAID YOU COULDN'T QUITE

09:12AM  8    REMEMBER THE WALGREENS WEBSITE, BUT I WANT TO SHOW IT TO YOU TO

09:12AM  9    SEE IF IT JOGS YOUR MEMORY.

09:12AM  10        DO YOU RECOGNIZE THIS AS THE WALGREENS WEBSITE THAT

09:12AM  11   EXISTED WITH REGARD TO THERANOS?

09:12AM  12   A.   NO.

09:12AM  13   Q.   OKAY.  SO LOOKING AT THIS WEB PAGE DOESN'T JOG YOUR

09:12AM  14   MEMORY?

09:12AM  15   A.   NO.

09:12AM  16   Q.   SO IT'S POSSIBLE THAT YOU NEVER GOOGLED THIS AT ALL OR

09:13AM  17   FOUND THIS ON GOOGLE?

09:13AM  18   A.   IT'S POSSIBLE.

09:13AM  19   Q.   OKAY.  LET'S GO TO EXHIBIT 1113, WHICH IS ALREADY IN

09:13AM  20   EVIDENCE.

09:13AM  21        AND DO YOU RECOGNIZE THIS AS A PRESS RELEASE THAT WAS PUT

09:13AM  22   OUT BY WALGREENS AND THERANOS?

09:13AM  23   A.   YES.

09:13AM  24   Q.   OKAY.  AND I NOTE THE DATE OF IT, SEPTEMBER 9TH, 2013, IS

09:13AM  25   PRIOR TO YOUR GETTING INVOLVED WITH WORKING ON THE THERANOS

09:13AM   1    INVESTMENT; CORRECT?

09:13AM   2    A.   YES.

09:13AM   3    Q.   AND DID YOU -- WHEN YOU WERE DOING YOUR GOOGLING, DID YOU

09:13AM   4    COME ACROSS THIS?

09:14AM   5    A.   I DON'T RECALL SPECIFICALLY.

09:14AM   6         BUT I DO RECALL KNOWING THAT THE WALGREENS CONTRACT AND

09:14AM   7    STUFF WAS SIGNED AND LAUNCHING A YEAR BEFORE OUR INVESTMENT.

09:14AM   8    Q.   OKAY.  AND IF YOU LOOK AT THE FIRST PARAGRAPH THERE IN

09:14AM   9    THE -- I THINK IT'S THE LAST SENTENCE OF THE FIRST PARAGRAPH,

09:14AM  10    IT SAYS, "THE SAMPLES ARE EITHER TAKEN FROM A TINY FINGERSTICK

09:14AM  11    OR A MICRO-SAMPLE TAKEN FROM TRADITIONAL METHODS, ELIMINATING

09:14AM  12    THE NEED FOR LARGER NEEDLES AND NUMEROUS VIALS OF BLOOD

09:14AM  13    REQUIRED FOR MOST DIAGNOSTIC LAB TESTING."

09:14AM  14         DO YOU SEE THAT?

09:14AM  15    A.   YES.

09:14AM  16    Q.   AND YOU UNDERSTOOD THAT TRADITIONAL METHODS MEANS

09:14AM  17    VENOUS DRAWS?

09:14AM  18    A.   AGAIN, THAT WAS NEVER DISCUSSED, SO IF I READ THIS OR -- I

09:14AM  19    DON'T RECALL.

09:14AM  20    Q.   OKAY.  AND I'M ASKING A DIFFERENT QUESTION.

09:14AM  21         DO YOU UNDERSTAND THAT TRADITIONAL METHODS MEANS

09:14AM  22    VENOUS DRAWS?

09:14AM  23    A.   YEAH, I DO NOW.  YES.

09:14AM  24    Q.   OKAY.  THAT'S WHAT YOU UNDERSTAND?

09:14AM  25    A.   YES.  BUT EVERY CONVERSATION WAS AROUND FINGERSTICK, SO --

09:15AM 1      Q.   OKAY.

09:15AM 2           YOUR HONOR, I MOVE TO STRIKE HER ANSWER AS NONRESPONSIVE.

09:15AM 3                THE COURT:  THE LAST ABOUT --

09:15AM 4                MR. COOPERSMITH:  YES.

09:15AM 5                THE COURT:  -- ABOUT EVERY CONVERSATION WAS ABOUT --

09:15AM 6                MR. COOPERSMITH:  RIGHT.  THAT WAS NOT MY QUESTION.

09:15AM 7                THE COURT:  THE LAST ABOUT EVERY PART WAS -- EVERY

09:15AM 8      PART OF THE CONVERSATION WAS ABOUT FINGERSTICKS, THAT'S WHAT

09:15AM 9      YOU'RE ASKING TO BE STRICKEN?

09:15AM 10               MR. COOPERSMITH:  RIGHT.

09:15AM 11               THE COURT:  ALL RIGHT.

09:15AM 12          THAT PORTION, LADIES AND GENTLEMEN, IS STRICKEN AS

09:15AM 13     NONRESPONSIVE.

09:15AM 14          YOU CAN ASK ANOTHER QUESTION.

09:15AM 15               MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:15AM 16     Q.   OKAY.  LET'S GO BACK TO THAT EXHIBIT THAT WE WERE JUST

09:15AM 17     LOOKING AT, WHICH IS EXHIBIT 3741A, MR. ALLEN.

09:15AM 18          OKAY.  THIS WAS THE BLOOD TESTING MENU.

09:15AM 19          NOW, MS. PETERSON, YOU DESCRIBED IN YOUR TESTIMONY

09:15AM 20     YESTERDAY THAT YOU ATTENDED A MEETING AT THERANOS ON

09:15AM 21     OCTOBER 14TH, 2014; RIGHT?

09:15AM 22     A.   CORRECT.

09:15AM 23     Q.   AND AT THAT MEETING, NO ONE EVER TOLD YOU THAT MR. BALWANI

09:16AM 24     OR MS. HOLMES -- NO ONE EVER TOLD YOU SPECIFICALLY THAT ALL OF

09:16AM 25     THESE TESTS ON THIS MENU WERE BEING RUN ON THERANOS TECHNOLOGY;

PETERSON CROSS BY MR. COOPERSMITH (RES.)

09:16AM 1    CORRECT?

09:16AM 2    A.   THEY CERTAINLY LED US TO BELIEVE THAT THERE WERE HUNDREDS

09:16AM 3    OF TESTS THAT THEY WERE DOING, WHICH IS WHY I LOOKED AT THIS,

09:16AM 4    BECAUSE I WAS TRYING TO GET A SENSE OF NOT ONLY THE PRICE, BUT

09:16AM 5    HOW MANY TESTS THEY WERE PERFORMING.

09:16AM 6    Q.   OKAY.  YOU SAID THAT THEY LED YOU TO BELIEVE.

09:16AM 7         BUT MY QUESTION IS, NO ONE SPECIFICALLY TOLD YOU THAT ALL

09:16AM 8    OF THESE TESTS WERE RUNNING ON THERANOS TECHNOLOGY; CORRECT?

09:16AM 9    A.   NO.  I WOULD SAY -- I WOULD DISAGREE WITH THAT.  THEY TOLD

09:16AM 10   US ALL OF THEIR TESTS WERE BEING RUN ON THEIR ANALYZER.

09:16AM 11   Q.   OKAY.  I'D LIKE TO REFER YOU TO AN EXHIBIT YOU SHOULD HAVE

09:16AM 12   IN YOUR BINDER.  IT'S EXHIBIT 28448.

09:17AM 13        OKAY.  DO YOU HAVE THAT, MS. PETERSON?

09:17AM 14   A.   YES.

09:17AM 15   Q.   AND IF YOU COULD TURN TO PAGE 68, PLEASE.

09:17AM 16        DO YOU HAVE THAT, MS. PETERSON?

09:17AM 17   A.   YES.

09:17AM 18   Q.   OKAY.  AND THIS IS TESTIMONY THAT YOU GAVE IN A GRAND JURY

09:17AM 19   PROCEEDING; CORRECT?

09:18AM 20   A.   YES.

09:18AM 21   Q.   AND YOU SWORE UNDER OATH TO TELL THE TRUTH?

09:18AM 22   A.   YES.

09:18AM 23   Q.   AND YOU KNEW THAT YOU WERE SUPPOSED TO TELL THE TRUTH;

09:18AM 24   RIGHT?

09:18AM 25   A.   YES.

09:18AM   1    Q.   AND YOU WERE ASKED QUESTIONS AT THAT GRAND JURY SESSION;

09:18AM   2    RIGHT?

09:18AM   3    A.   YES.

09:18AM   4    Q.   IT WAS A VERY FORMAL SORT OF SESSION; RIGHT?

09:18AM   5    A.   YES.

09:18AM   6    Q.   SOLEMN EVEN; RIGHT?

09:18AM   7    A.   IT WAS A LONG TIME AGO, YEAH.

09:18AM   8    Q.   OKAY.  IT WAS IN 2018?

09:18AM   9    A.   YES.

09:18AM   10   Q.   AND YOU WERE ASKED A QUESTION BY ONE OF THE JURORS, RIGHT,

09:18AM   11   ON LINE 23 ON PAGE 68?

09:18AM   12   A.   THAT'S A STATEMENT BY SOMEONE ELSE.

09:18AM   13        I GUESS I'M MISUNDERSTANDING THE QUESTION.

09:18AM   14   Q.   OKAY.  I'M JUST GOING TO DIRECT YOU TO LINE 23 ON PAGE 68,

09:19AM   15   AND THE JUROR ASKED THE QUESTION:  WELL, I DON'T HEAR --

09:19AM   16        MR. LEACH:  YOUR HONOR, OBJECTION.  HEARSAY.  THIS

09:19AM   17   IS NOT PROPER.

09:19AM   18        THE COURT:  SUSTAINED.

09:19AM   19   YOU CAN DO THIS A DIFFERENT WAY.

09:19AM   20        MR. COOPERSMITH:  OKAY, YOUR HONOR.

09:19AM   21   Q.   OKAY.  MS. PETERSON, YOU WERE ASKED A QUESTION BY ONE OF

09:19AM   22   THE GRAND JURORS; CORRECT?

09:19AM   23        PAGE 68, LINE 23.

09:20AM   24   A.   WHAT I'M READING, IT'S JUST ONE LINE.

09:20AM   25   Q.   OKAY.

PETERSON CROSS BY MR. COOPERSMITH (RES.)

09:20AM  1    A.   IT'S NOT WHAT I -- IT'S NOT ME TALKING.

09:20AM  2    Q.   OKAY, MS. PETERSON.  I'LL GET THERE.

09:20AM  3         YOUR HONOR, I THINK WHAT WOULD BE EASIER IS, PURSUANT TO

09:20AM  4    RULE 801 AND RULE 613, I WOULD LIKE TO JUST PUT UP THE

09:20AM  5    TRANSCRIPT FOR MS. PETERSON SO WE CAN ALL SEE IT.

09:20AM  6         AND I THINK THE --

09:20AM  7              THE COURT:  CAN YOU ASK THE QUESTION ABOUT DID SHE

09:20AM  8    MAKE A STATEMENT AND CLASSIC 613?  IS THERE ANOTHER WAY THAT

09:20AM  9    YOU CAN DO THAT?

09:20AM  10              MR. COOPERSMITH:  I WILL TRY, YOUR HONOR, SURE.

09:20AM  11              THE COURT:  OKAY.

09:20AM  12   BY MR. COOPERSMITH:

09:20AM  13   Q.   MS. PETERSON, WE WERE TALKING ABOUT -- JUST A FEW MINUTES

09:20AM  14   AGO BEFORE I GOT INTO THIS TRANSCRIPT, YOU SAID THAT YOU WERE

09:20AM  15   TOLD THAT, SPECIFICALLY THAT THERANOS WAS RUNNING ALL OF THESE

09:20AM  16   BLOOD TESTS ON ITS THERANOS DEVICES; CORRECT?

09:20AM  17   A.   I SAID THAT IN THIS TRANSCRIPT, OR I SAID THAT I --

09:20AM  18   Q.   NO.  JUST A FEW MINUTES AGO WHEN I ASKED YOU THE QUESTION.

09:21AM  19   A.   IT WAS OUR UNDERSTANDING THAT THEY WERE DOING HUNDREDS OF

09:21AM  20   TESTS ON THEIR ANALYZER, YES.

09:21AM  21   Q.   AND I'M TRYING TO SEPARATE WHAT YOUR UNDERSTANDING WAS

09:21AM  22   VERSUS WHAT YOU WERE TOLD.

09:21AM  23        DO YOU UNDERSTAND?

09:21AM  24   A.   THEY NEVER, EVER MENTIONED TO US THAT THEY WERE DOING

09:21AM  25   VENOUS DRAWS.

| 09:21AM | 1 | Q.   OKAY. |

09:21AM   1   Q.   OKAY.

09:21AM   2   A.   VERBALLY, EVER.

09:21AM   3   Q.   MY QUESTION ISN'T THAT.

09:21AM   4   A.   OKAY.

09:21AM   5   Q.   SO LET ME START AGAIN.

09:21AM   6   A.   OKAY.

09:21AM   7   Q.   AGAIN, I'M TRYING TO SEPARATE WHAT YOU UNDERSTOOD AND WHAT

09:21AM   8   YOU WERE TOLD.

09:21AM   9   A.   OKAY.

09:21AM   10   Q.   AND I UNDERSTAND YOUR TESTIMONY AS YOU UNDERSTOOD THAT

09:21AM   11   THEY WERE DOING ALL OF THEIR TESTS ON THERANOS TECHNOLOGY;

09:21AM   12   RIGHT?

09:21AM   13   A.   YES.

09:21AM   14   Q.   THAT'S WHAT YOU'RE SAYING THAT YOU UNDERSTOOD?

09:21AM   15   A.   YES.

09:21AM   16   Q.   BUT YOU WERE NEVER SPECIFICALLY TOLD THAT BY ANYONE FROM

09:21AM   17   THERANOS?

09:21AM   18   A.   WHEN THEY SAID THEY WERE DOING HUNDREDS OF TESTS ON THEIR

09:21AM   19   ANALYZER, I THINK THAT'S TELLING ME THAT THEY DO ALL OF THEIR

09:21AM   20   TESTS ON THEIR ANALYZER.

09:21AM   21   Q.   SO IS IT YOUR TESTIMONY TODAY UNDER OATH THAT YOU RECEIVED

09:21AM   22   A SPECIFIC STATEMENT FROM MR. BALWANI THAT EVERY SINGLE TEST

09:22AM   23   THAT THEY WERE DOING WAS RUN ON A THERANOS ANALYZER?

09:22AM   24   A.   I DON'T RECALL SPECIFICALLY WHO SAID IT, BUT THAT'S --

09:22AM   25   THAT IS WHAT WE WERE TOLD.

09:22AM  1    Q.   OKAY.  YOU DON'T RECALL SPECIFICALLY WHO SAID IT?

09:22AM  2    A.   NO.

09:22AM  3    Q.   OKAY.  AND SPECIFICALLY, WHAT IS IT THAT YOU'RE SAYING

09:22AM  4    THAT YOU WERE TOLD BY SOMEONE WHO YOU CAN'T IDENTIFY?

09:22AM  5    A.   I -- DEFINITELY ELIZABETH SAID THOSE THINGS.

09:22AM  6         I DON'T KNOW IF MR. BALWANI DID OR NOT, BUT HE WAS IN THE

09:22AM  7    ROOM THE ENTIRE MEETING THAT WE HAD AND DIDN'T CORRECT HER.

09:22AM  8         SO I DON'T RECALL SPECIFICALLY WHO SAID WHAT.

09:22AM  9    Q.   AND WHEN YOU SAY "THOSE THINGS," SPECIFICALLY WHAT IS THE

09:22AM 10    STATEMENT THAT YOU'RE REFERRING TO?

09:22AM 11    A.   THE COMMENT THAT YOU'RE TRYING TO GET ME TO SAY THAT NO

09:22AM 12    ONE EXACTLY SAID IT.

09:22AM 13    Q.   I'M JUST ASKING FOR YOUR WORDS, BEST AS YOU CAN RECALL,

09:22AM 14    WHAT IS THE STATEMENT THAT YOU ARE SAYING?

09:22AM 15    A.   THAT WE PERFORM HUNDREDS OF TESTS ON OUR THERANOS

09:22AM 16    EQUIPMENT.

09:22AM 17    Q.   OKAY.  AND THAT -- DOES IT ALSO INCLUDE THAT ALL OF THE

09:22AM 18    TESTS THAT THERANOS WAS RUNNING WERE ALL CONDUCTED ON THERANOS

09:23AM 19    EQUIPMENT?

09:23AM 20    A.   YES.

09:23AM 21    Q.   OKAY.

09:23AM 22         YOUR HONOR, I THINK WE HAVE AN INCONSISTENCY FROM THE

09:23AM 23    TRANSCRIPT, AND I'D LIKE TO PUBLISH IT.

09:23AM 24              THE COURT:  YOU WOULD LIKE TO PUBLISH PAGE 68,

09:23AM 25    LINE 23, THROUGH PAGE 69, LINE 11?

09:23AM  1          MR. COOPERSMITH:  YES, YOUR HONOR.

09:23AM  2          THE COURT:  ALL RIGHT.  WE CAN PUBLISH THAT.

09:23AM  3          (PUBLISHED. )

09:23AM  4     BY MR. COOPERSMITH:

09:23AM  5     Q.   OKAY.  SO THIS IS THE STATEMENT I WAS REFERRING TO --

09:23AM  6          THE COURT:  YES.

09:23AM  7          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:23AM  8     Q.   PAGE 68, LINE 23, DO YOU SEE THERE'S A GRAND JUROR WHO

09:23AM  9     ASKS, "WELL, I DON'T HEAR THAT THERE WAS A STATEMENT THAT THE

09:23AM  10    ACTUAL 150 OR 200 TESTS WERE ALL CONDUCTED," AND WE GO TO THE

09:23AM  11    NEXT PAGE, AND THEN YOU STARTED TALKING, "I CAN'T RECALL IS

09:23AM  12    HER --"

09:23AM  13         BUT THE GRAND JUROR FINISHES THE QUESTION "-- USING THAT

09:23AM  14    EQUIPMENT.  I DON'T HEAR THAT STATEMENT."

09:24AM  15         MR. ALLEN, IF WE CAN PUT THE FIRST PAGE UP AT THE SAME

09:24AM  16    TIME.  THANK YOU.  JUST SO WE CAN SEE THE WHOLE QUESTION.

09:24AM  17         SO THE QUESTION IS "WELL, I DON'T HEAR THAT THERE WAS EVER

09:24AM  18    A STATEMENT THAT THE ACTUAL 150 OR 200 TESTS WERE ALL CONDUCTED

09:24AM  19    USING THAT EQUIPMENT.  I DON'T HEAR THAT STATEMENT."

09:24AM  20         AND YOUR ANSWER WAS:  "I DON'T RECALL A SPECIFIC, YOU

09:24AM  21    KNOW, SHE SAID THIS ON THIS DATE.  BUT WE ABSOLUTELY, IT WAS

09:24AM  22    OUR UNDERSTANDING FOR SURE AFTER EVERYTHING WE READ AND WHAT WE

09:24AM  23    HEARD IS THAT THEIR COMPANY WAS -- WAS A COMPANY THAT WAS DOING

09:24AM  24    150 TO 200 PLUS TESTS ON THEIR EQUIPMENT THAT THEY MANUFACTURED

09:24AM  25    USING MICRO-SAMPLES OF BLOOD IN THESE 'NANOTAINERS' IN THEIR

09:24AM   1      BOX.  THERE WAS NEVER -- IT WAS NEVER A FOCAL POINT THAT THEY

09:24AM   2      WERE DOING IT ANY OTHER WAY."

09:24AM   3           DO YOU SEE THAT?

09:24AM   4      A.   YES.

09:24AM   5      Q.   AND SO IT WAS YOUR UNDERSTANDING THAT THEY WERE DOING IT

09:24AM   6      THAT WAY?

09:24AM   7      A.   YES.

09:24AM   8      Q.   BUT YOU DON'T RECALL A STATEMENT THAT WAS MADE TO YOU

09:25AM   9      ABOUT THAT POINT; RIGHT?

09:25AM  10           MR. LEACH:  OBJECTION, YOUR HONOR.  ASKED AND

09:25AM  11      ANSWERED.

09:25AM  12           THE COURT:  I THINK SHE ANSWERED THE QUESTION.

09:25AM  13      BY MR. COOPERSMITH:

09:25AM  14      Q.   OKAY.  AND YOUR TESTIMONY THAT WE'RE REFERRING TO IN THE

09:25AM  15      EXHIBIT ON THE SCREEN, THAT WAS TRUTHFUL TESTIMONY?

09:25AM  16      A.   YES.

09:25AM  17      Q.   OKAY.  OKAY.  YOU MENTIONED ON DIRECT, MS. PETERSON, THAT

09:25AM  18      YOU HAD REVIEWED AN S.E.C. FILING FROM WALGREENS; IS THAT

09:25AM  19      CORRECT?

09:25AM  20      A.   YES.

09:25AM  21      Q.   AND I THINK YOU MIGHT HAVE SAID IT WAS A 10-K?

09:25AM  22      A.   YES, FROM 2013, I THINK, THE YEAR BEFORE OUR INVESTMENT.

09:25AM  23      Q.   RIGHT.  THANK YOU.

09:25AM  24           IF YOU CAN TAKE A LOOK AT EXHIBIT 20433.  IT WILL JUST

09:25AM  25      COME UP ON YOUR SCREEN, OR IF YOU CAN FIND IT IN THE BINDERS,

PETERSON CROSS BY MR. COOPERSMITH (RES.)

09:25AM  1    IT'S NOT IN EVIDENCE YET.

09:26AM  2    A.   OKAY.

09:26AM  3    Q.   AND YOU SEE THAT THIS IS A FORM 8-K FILED BY WALGREENS?

09:26AM  4    A.   YES.

09:26AM  5    Q.   AND WHAT YOU LOOKED AT COULD HAVE BEEN AN 8-K?

09:26AM  6    A.   MY IN-HOUSE COUNSEL PULLED THIS AND I KNOW THERE WAS AN

09:26AM  7    EMAIL.  I DIDN'T LOOK AT THE FORM -- I DIDN'T LOOK THROUGH

09:26AM  8    THIS, HE DID.  AND HE SENT AN EMAIL TO JERRY AND I WITH A

09:26AM  9    HIGHLIGHT OF THE -- ONE LINE IN THE WHATEVER IT WAS.  IT WAS

09:26AM  10   THE YEAR-END REPORT FOR WALGREENS THAT SAID THAT THEY WERE

09:26AM  11   GOING TO -- THEY WERE WORKING ON THERANOS AND WORKING ON THE

09:26AM  12   ROLLOUT OF THAT.

09:26AM  13   Q.   OKAY.  YOU JUST GOT KIND OF A SNIPPET FROM YOUR IN-HOUSE

09:26AM  14   COUNSEL?

09:26AM  15   A.   CORRECT.

09:26AM  16   Q.   OKAY.  IF YOU COULD TURN IN THE EXHIBIT, OR MAYBE IT WILL

09:26AM  17   JUST COME UP ON YOUR SCREEN, TO PAGE 9 OF THE EXHIBIT.

09:27AM  18        AND DO YOU SEE THERE ARE BULLET POINTS THERE,

09:27AM  19   MS. PETERSON?

09:27AM  20   A.   YES.

09:27AM  21   Q.   AND IF YOU GO TO THE THIRD BULLET POINT ON THE PAGE, AND

09:27AM  22   JUST READ IT TO YOURSELF.

09:27AM  23   A.   YES.

09:27AM  24   Q.   OKAY.  AND THAT'S THE SNIPPET THAT YOU SAW?

09:27AM  25   A.   IT'S SOMETHING ALONG THOSE LINES, YES.

09:27AM   1    Q.   OKAY.

09:27AM   2         YOUR HONOR, WE OFFER THE FIRST PAGE OF EXHIBIT 20433 AND

09:27AM   3    PAGE 9.

09:27AM   4              MR. LEACH:  YOUR HONOR, I THINK THE WHOLE EXHIBIT

09:27AM   5    SHOULD COME IN.  NO OBJECTION TO THOSE PAGES, BUT I THINK THE

09:27AM   6    WHOLE EXHIBIT SHOULD COME IN.

09:27AM   7              MR. COOPERSMITH:  I DON'T HAVE ANY OBJECTION TO

09:27AM   8    THAT, YOUR HONOR.

09:27AM   9              THE COURT:  ALL RIGHT.  THE ENTIRETY OF THE EXHIBIT

09:27AM  10    WILL BE ADMITTED, AND IT MAY BE PUBLISHED.

09:27AM  11         (DEFENDANT'S EXHIBIT 20433 WAS RECEIVED IN EVIDENCE.)

09:27AM  12    BY MR. COOPERSMITH:

09:27AM  13    Q.   JUST TO ORIENT OURSELVES, MS. PETERSON, WE'LL GO TO THE

09:28AM  14    FIRST PAGE, AND DO YOU SEE THAT'S THE 8-K, FIRST PAGE OF THE

09:28AM  15    DOCUMENT?

09:28AM  16    A.   YES.  IS THERE A DATE?

09:28AM  17    Q.   THERE SHOULD BE.

09:28AM  18    A.   IT'S DECEMBER OF '13.

09:28AM  19    Q.   DO YOU SEE THAT NOW?

09:28AM  20    A.   YES.

09:28AM  21    Q.   OKAY.  AND IF YOU GO TO PAGE 9, AND IF WE CAN JUST

09:28AM  22    HIGHLIGHT THAT THIRD BULLET.

09:28AM  23         AND THEN YOU SEE IT SAYS, "TAKING THE NEXT STEP IN

09:28AM  24    THERANOS AND WALGREENS PLANNED NATIONAL ROLLOUT OF THERANOS

09:28AM  25    WELLNESS CENTERS BY OPENING TWO NEW CENTERS AT WALGREENS STORES

09:28AM 1    IN THE PHOENIX AREA.  A THERANOS WELLNESS CENTER IS ALSO

09:28AM 2    LOCATED AT A WALGREENS STORE IN PALO ALTO, CALIFORNIA."

09:28AM 3        DO YOU SEE THAT?

09:28AM 4    A.   YES.

09:28AM 5    Q.   AND SO THAT STATEMENT SAYS THAT THERE IS ONE WALGREENS

09:28AM 6    STORE IN PALO ALTO, AND THERE'S SOME MORE IN THE PHOENIX,

09:28AM 7    ARIZONA AREA; RIGHT?

09:28AM 8    A.   YES.

09:28AM 9    Q.   AND THIS IS WALGREENS SAYING THAT?  YOU UNDERSTAND THAT?

09:28AM 10   A.   YES.

09:29AM 11   Q.   OKAY.  YOU CAN PUT THAT ASIDE.

09:29AM 12            JUROR:  JUDGE, ARE WE SUPPOSED TO SEE THIS?

09:29AM 13            THE COURT:  IT SHOULD BE ADMITTED.

09:29AM 14            THE CLERK:  APOLOGIES.

09:29AM 15            THE COURT:  IS IT ON THE SCREEN NOW?

09:29AM 16            JUROR:  NO.

09:29AM 17            THE COURT:  OH, SORRY.

09:29AM 18        THANK YOU, MADAM JUROR.  GIVE US A SECOND.

09:29AM 19        IS IT UP NOW?

09:29AM 20            JUROR:  YES.

09:29AM 21            MR. COOPERSMITH:  AND I'M SORRY, I'LL HAVE TO GO

09:29AM 22   BACK OVER THIS, YOUR HONOR.

09:29AM 23            THE COURT:  OF COURSE.  OF COURSE.

09:29AM 24   BY MR. COOPERSMITH:

09:29AM 25   Q.   SORRY ABOUT THAT, MS. PETERSON, BUT WE NEED THE JURORS TO

09:29AM 1    SEE IT.

09:29AM 2    A.   OF COURSE.

09:29AM 3    Q.   AND NOW THAT EVERYONE HAS IT ON THE SCREEN AND I'M LOOKING

09:29AM 4    AT THE THIRD BULLET -- ACTUALLY LET'S GO TO THE FIRST PAGE SO

09:29AM 5    EVERYONE CAN SEE THE DOCUMENTS.

09:29AM 6        THIS IS A WALGREENS REPORT TO THE S.E.C.; CORRECT?

09:29AM 7    A.   CORRECT.

09:29AM 8    Q.   AND YOU SEE THERE'S A DATE ON IT, WHICH IS HIGHLIGHTED?

09:29AM 9    A.   YES.

09:29AM 10   Q.   OKAY.  AND NOW IF YOU GO TO THAT PAGE 9, AND YOU SEE

09:30AM 11   WALGREENS DISCLOSING THIS PARTICULAR INFORMATION; RIGHT?

09:30AM 12   A.   YES.

09:30AM 13   Q.   AND THIS IS WALGREENS MAKING THAT DISCLOSURE; CORRECT?

09:30AM 14   A.   CORRECT.

09:30AM 15   Q.   OKAY.  ALL RIGHT.  WE CAN PUT THAT ASIDE.

09:30AM 16       OKAY.  DURING YOUR TESTIMONY YESTERDAY, MS. PETERSON, YOU

09:30AM 17   REFERRED TO SOME BINDERS THAT YOU LOOKED AT IN EARLY OCTOBER OF

09:30AM 18   2014?

09:30AM 19   A.   YES.

09:30AM 20   Q.   AND THE BINDERS WERE SENT TO MR. TUBERGEN?

09:30AM 21   A.   CORRECT.

09:30AM 22   Q.   AND THEN YOU WENT TO HIS OFFICE AND RETRIEVED THE BINDERS

09:30AM 23   FROM HIM?

09:30AM 24   A.   YES.  I MADE A COPY.

09:30AM 25   Q.   RIGHT.  SO YOU WENT TO THE COPY MACHINE AND MADE COPIES?

09:31AM  1    A.   YES.

09:31AM  2    Q.   YOU PERSONALLY MADE THE COPIES?

09:31AM  3    A.   YES.

09:31AM  4    Q.   AND MR. TUBERGEN HAD NOT LOOKED AT THE BINDERS?

09:31AM  5    A.   NO.  HE -- I --

09:31AM  6            MR. LEACH:  OBJECTION, YOUR HONOR.  CALLS FOR

09:31AM  7    SPECULATION.

09:31AM  8            THE WITNESS:  I CAN'T SAY WHETHER HE LOOKED AT THEM.

09:31AM  9            THE COURT:  EXCUSE ME.  THERE'S AN OBJECTION.

09:31AM 10            THE WITNESS:  SORRY.

09:31AM 11            THE COURT:  SO DO YOU WANT TO --

09:31AM 12            MR. COOPERSMITH:  I'LL ASK A DIFFERENT QUESTION.

09:31AM 13            THE COURT:  WHY DON'T YOU ASK IT IN A DIFFERENT WAY?

09:31AM 14        THE RESPONSE IS STRICKEN.

09:31AM 15    BY MR. COOPERSMITH:

09:31AM 16    Q.   SO FROM WHAT YOU KNOW, YOU DON'T KNOW WHETHER MR. TUBERGEN

09:31AM 17    LOOKED AT THE BINDERS OR NOT; RIGHT?

09:31AM 18    A.   I DON'T KNOW.

09:31AM 19    Q.   BUT YOU MADE A COPY?

09:31AM 20    A.   YES.

09:31AM 21    Q.   AND SO YOU COULD LOOK AT THEM?

09:31AM 22    A.   YES, AND I LEFT HIM THE ORIGINALS.

09:31AM 23    Q.   AND YOU DID LOOK AT THE COPY YOU MADE; RIGHT?

09:31AM 24    A.   YES.

09:31AM 25    Q.   AND THEN THERE WERE TWO BINDERS?

09:31AM   1      A.   YES.

09:31AM   2      Q.   AND ONE OF THEM WAS THE MATERIAL THAT YOU REVIEWED WITH

09:31AM   3      MR. LEACH YESTERDAY?

09:31AM   4      A.   YES.

09:31AM   5      Q.   AND WE'LL LOOK AT THAT SOME MORE IN A BIT.

09:31AM   6           BUT THERE WAS A SECOND BINDER; RIGHT?

09:31AM   7      A.   YES.

09:31AM   8      Q.   AND THE SECOND BINDER HAD DATA IN IT; RIGHT?

09:31AM   9      A.   YES, IT WAS VERY SCIENTIFIC.

09:31AM  10      Q.   SCIENTIFIC, TECHNICAL DATA; RIGHT?

09:31AM  11      A.   YES.

09:31AM  12      Q.   BUT -- AND THERANOS SENT THAT TO YOU?

09:31AM  13      A.   YES.

09:32AM  14      Q.   OR SENT IT TO RDV; RIGHT?

09:32AM  15      A.   CORRECT.

09:32AM  16      Q.   AND YOU COULD HAVE DONE ANYTHING THAT YOU WANTED WITH THAT

09:32AM  17      DATA IF YOU HAD SO CHOSEN; RIGHT?

09:32AM  18      A.   CORRECT.

09:32AM  19      Q.   AND YOU NEVER, LIKE, HIRED ANY CONSULTANTS OR OTHERWISE

09:32AM  20      TRIED TO DIG INTO THE SCIENTIFIC DATA; RIGHT?

09:32AM  21                MR. LEACH:  OBJECTION.  RELEVANCE.  403.

09:32AM  22                THE COURT:  ARE YOU -- IS THIS THE LAST QUESTION IN

09:32AM  23      THIS AREA?

09:32AM  24                MR. COOPERSMITH:  ON THIS PARTICULAR TECHNICAL

09:32AM  25      BINDER ISSUE, YEAH.

PETERSON CROSS BY MR. COOPERSMITH (RES.)

09:32AM 1    THE COURT:  ALL RIGHT.  YOU CAN ASK ANOTHER

09:32AM 2    QUESTION.

09:32AM 3    MR. COOPERSMITH:  OKAY.

09:32AM 4    THE COURT:  SO I'LL ALLOW THAT LAST QUESTION.

09:32AM 5    MR. COOPERSMITH:  WAS THERE AN ANSWER?  I'M NOT SURE

09:32AM 6    I HEARD IT.

09:32AM 7    THE COURT:  NO.  SHE CAN ANSWER.

09:32AM 8    THE WITNESS:  NO.

09:32AM 9    MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:32AM 10   Q.   BUT GOING TO THE FIRST BINDER, THAT'S WHAT YOU LOOKED

09:32AM 11   THROUGH TO TRY TO UNDERSTAND WHAT THERANOS WAS SENDING; RIGHT?

09:32AM 12   A.   YES.

09:32AM 13   Q.   OKAY.  NOW, THE SAME DAY THAT YOU TOOK THE BINDERS AND

09:33AM 14   MADE A COPY, THAT WAS THE SAME DAY THAT YOU HAD A CALL WITH

09:33AM 15   MS. HOLMES?

09:33AM 16   A.   I BELIEVE SO.

09:33AM 17   Q.   AND MR. TUBERGEN WAS ON THE LINE?

09:33AM 18   A.   YES.

09:33AM 19   Q.   AND AT THE TIME THAT YOU HAD THE CALL, YOU HAD NOT ALREADY

09:33AM 20   LOOKED AT THE BINDERS?

09:33AM 21   A.   I BELIEVE I FLIPPED THROUGH THEM TO TRY TO GET A SENSE OF

09:33AM 22   SOME HIGH-LEVEL QUESTIONS THAT WE WANTED TO ASK FIRST.

09:33AM 23   Q.   OKAY.  AND FLIPPING THROUGH IT MEANS LOOKING AT IT BRIEFLY

09:33AM 24   WITHOUT GETTING INTO DETAIL ABOUT IT?  IS THAT WHAT YOU'RE

09:33AM 25   SAYING?

09:33AM 1    A.  ENOUGH TO BE PREPARED TO HAVE A PHONE CALL, YES.

09:33AM 2    Q.  OKAY.  AND IS THAT HOW YOU WERE ABLE TO FORMULATE THE

09:33AM 3    QUESTIONS THAT YOU WANTED TO ASK MS. HOLMES IN THAT CALL?

09:33AM 4    A.  YES.

09:33AM 5    Q.  OKAY.  IF WE COULD TAKE A LOOK AT EXHIBIT 2015, WHICH IS

09:33AM 6    ALREADY IN EVIDENCE.

09:34AM 7       THESE ARE THE NOTES THAT YOU TOOK OF THAT CALL WITH

09:34AM 8    MS. HOLMES?

09:34AM 9    A.  YES.

09:34AM 10   Q.  AND MR. TUBERGEN WAS ALSO ON THE CALL; CORRECT?

09:34AM 11   A.  YES.

09:34AM 12   Q.  AND MR. BALWANI WAS NOT ON THE CALL?

09:34AM 13   A.  NOT THAT I KNOW OF.

09:34AM 14   Q.  OKAY.  WELL, NO ONE EVER ANNOUNCED HIM OR --

09:34AM 15   A.  CORRECT.

09:34AM 16   Q.  RIGHT.  OKAY.

09:34AM 17      AND THEN IF YOU GO THROUGH IT, YOU SEE THERE'S A BOLD AT

09:34AM 18   THE TOP, "WHAT IS THE LONG-TERM VISION OF THERANOS?"

09:34AM 19      DO YOU SEE THAT?

09:34AM 20   A.  YES.

09:34AM 21   Q.  AND THAT WAS A QUESTION THAT YOU HAD; RIGHT?

09:34AM 22   A.  YES.

09:34AM 23   Q.  AND YOU AND MR. TUBERGEN WERE INTERESTED IN WHAT THE

09:34AM 24   LONG-TERM VISION OF THERANOS WAS?

09:34AM 25   A.  YES, WE WANTED TO HEAR HER TELL US AGAIN -- HE ALREADY

09:34AM  1     HEARD IT, I HAD NOT -- WHAT THEIR VISION OF THE COMPANY WAS.

09:34AM  2     Q.   AND LONG-TERM VISION MEANS YEARS OUT INTO THE FUTURE?

09:34AM  3     A.   WHERE THEY ARE NOW AND WHERE THEY ARE GOING, YES.

09:34AM  4     Q.   INCLUDING YEARS OUT INTO THE FUTURE?

09:35AM  5     A.   SURE.

09:35AM  6     Q.   AND THEN IT SAYS BELOW THAT, THERE'S A LINE THAT READS,

09:35AM  7     "START WITH A LASER-FOCUS ON COMMERCIAL LAB MARKET

09:35AM  8     ($180 BILLION), AND THEN DIRECT TO CONSUMER MARKETS."

09:35AM  9          DO YOU SEE THAT?

09:35AM  10    A.   YES.

09:35AM  11    Q.   AND YOU UNDERSTOOD FROM WHAT MS. HOLMES HAD TOLD YOU THAT

09:35AM  12    THE START THAT THERANOS WAS TRYING TO ENGAGE IN WAS TO HAVE A

09:35AM  13    LASER-FOCUS ON THE COMMERCIAL LAB MARKET; RIGHT?

09:35AM  14    A.   THAT WAS WHERE THEY WERE GOING TO BEGIN, YES.

09:35AM  15    Q.   FOR EXAMPLE, THE WALGREENS PROGRAM?

09:35AM  16    A.   YES.

09:35AM  17    Q.   OKAY.  AND THEN BELOW THAT IT HAS WALGREENS.

09:35AM  18         DO YOU SEE THAT?

09:35AM  19    A.   YES.

09:35AM  20    Q.   AND THEN IT HAS INSURANCE AND HOSPITAL.

09:35AM  21         DO YOU SEE THAT?

09:35AM  22    A.   YES.

09:35AM  23    Q.   AND THEN IT HAS PHARMA.

09:35AM  24         DO YOU SEE THAT?

09:35AM  25    A.   YES.

09:35AM   1      Q.   AND IT SAYS, "MARKET:  TBD."

09:35AM   2           DO YOU SEE THAT?

09:35AM   3      A.   YES.

09:35AM   4      Q.   AND THAT MEANS TO BE DETERMINED?

09:35AM   5      A.   YES.

09:35AM   6      Q.   AND THEN IF YOU GO DOWN THE PAGE, IT SAYS WALGREENS.

09:35AM   7           SO YOU HAD -- AND IT'S IN BOLD.  SO THAT'S YOUR QUESTION

09:36AM   8      OR SERIES OF QUESTIONS; RIGHT?

09:36AM   9      A.   YES.  YES.

09:36AM  10      Q.   SO YOU HAD A PARTICULAR INTEREST IN WHAT WAS GOING ON WITH

09:36AM  11      WALGREENS; RIGHT?

09:36AM  12      A.   YES, THE CONTRACTS WERE PARAMOUNT TO OUR INVESTMENT

09:36AM  13      DECISION.

09:36AM  14      Q.   RIGHT.  THE WALGREENS PROGRAM WAS, LIKE, REALLY IMPORTANT

09:36AM  15      TO MAKING THE DECISION; RIGHT?

09:36AM  16      A.   YES.

09:36AM  17      Q.   OKAY.  AND THEN BELOW THAT IT SAYS "PROJECTIONS BASED ON

09:36AM  18      900 STORES."

09:36AM  19           DO YOU SEE THAT?

09:36AM  20      A.   YES.

09:36AM  21      Q.   AND YOU UNDERSTOOD THAT FINANCIAL INFORMATION, AND WE'LL

09:36AM  22      TALK ABOUT THIS A LITTLE MORE, TOO, THE FINANCIAL INFORMATION

09:36AM  23      FOR 2015 WAS BASED ON AN ASSUMPTION OF 200 STORES BEING IN

09:36AM  24      OPERATION BETWEEN WALGREENS AND THERANOS; RIGHT?

09:36AM  25      A.   200 --

09:36AM  1    Q.   I'M SORRY, I SAID 900.  I MEANT TO SAY 900.

09:36AM  2    A.   YES, THAT'S WHAT THEY TOLD US.

09:36AM  3    Q.   RIGHT.  THAT THAT WAS AN ASSUMPTION, IF THEY ACTUALLY

09:36AM  4    BUILT THOSE STORES, THEN THAT'S WHAT THEIR REVENUE PROJECTION

09:36AM  5    FOR 2015 WOULD BE BASED ON; RIGHT?

09:36AM  6    A.   CORRECT.

09:36AM  7    Q.   OKAY.  NOW, YOU WOULD HAVE BEEN HAPPY -- I DON'T WANT TO

09:37AM  8    SAY YOU PERSONALLY -- IF THE 900 STORES WAS EVEN 200 STORES;

09:37AM  9    RIGHT?

09:37AM  10   A.   I WOULD LIKE TO HAVE SEEN MORE THAN -- TO GET MORE TO

09:37AM  11   HALF.  BUT ANYTHING ABOVE THE 40 THAT THEY WERE AT SHOWED THAT

09:37AM  12   THEY WERE MOVING IN THE RIGHT DIRECTION.

09:37AM  13        WE KNEW THAT THESE WERE PROJECTIONS, BUT THERE WAS NEVER

09:37AM  14   ANY INDICATION THAT WALGREENS WAS NOT GOING TO ROLL OUT PAST

09:37AM  15   THE 40 THAT THEY WERE ALREADY IN.

09:37AM  16   Q.   OKAY.  YOU WEREN'T PRIVY TO THE DISCUSSIONS BETWEEN

09:37AM  17   THERANOS AND WALGREENS?

09:37AM  18   A.   NO.

09:37AM  19   Q.   OKAY.  AND SO -- BUT YOU WOULD HAVE BEEN HAPPY WITH

09:37AM  20   ANYTHING OVER THE 40, RIGHT, IS WHAT YOU JUST SAID?

09:37AM  21   A.   WE WOULD HAVE -- I THINK I SAID YESTERDAY, IF THEY HAD HIT

09:37AM  22   HALF OF THESE STORES, WE WOULD HAVE CONSIDERED THAT A SUCCESS.

09:37AM  23   Q.   AND YOU WOULD HAVE BEEN HAPPY WITH EVEN 200 STORES IN

09:37AM  24   2015; RIGHT?

09:37AM  25   A.   WE PLANNED ON 900, AND WE ALSO PLANNED ON 300 FROM

09:38AM   1   SAFEWAY, AMONG MANY OTHERS.  SO, I MEAN, WE WOULD HAVE HOPED

09:38AM   2   THAT THEY WERE MOVING FORWARD ON THE PLAN OF WHAT THEY LAID OUT

09:38AM   3   FOR US.

09:38AM   4   Q.   OKAY.  AND MY QUESTION IS SIMPLY VERY NARROW.  IT'S YOU

09:38AM   5   WOULD HAVE BEEN HAPPY IF THERANOS EVEN HAD 200 STORES IN 2015?

09:38AM   6           MR. LEACH:  OBJECTION, YOUR HONOR.  ASKED AND

09:38AM   7   ANSWERED.

09:38AM   8           THE COURT:  I'LL ALLOW YOU TO ANSWER.

09:38AM   9      DO YOU UNDERSTAND THE QUESTION?

09:38AM  10           THE WITNESS:  I WOULD HAVE LIKED TO HAVE SEEN THEM

09:38AM  11   COME CLOSE TO THEIR PLAN.

09:38AM  12   BY MR. COOPERSMITH:

09:38AM  13   Q.   OKAY.  OKAY.  LET'S HAVE YOU TAKE A LOOK AT EXHIBIT 28311

09:38AM  14   IN YOUR BINDERS.

09:39AM  15           OKAY.  DO YOU HAVE THAT?

09:39AM  16   A.   YES.

09:39AM  17   Q.   OKAY.  AND DO YOU SEE THAT'S A MEMORANDUM?

09:39AM  18   A.   YES.

09:39AM  19   Q.   OKAY.  NOW, IN APRIL OF 2017, YOU GAVE AN INTERVIEW TO

09:39AM  20   SOME PEOPLE WHO WORKED FOR THE GOVERNMENT; RIGHT?

09:39AM  21   A.   YES.

09:39AM  22   Q.   AND ONE OF THE PEOPLE WHO WAS THERE WAS POSTAL INSPECTOR

09:39AM  23   CHRISTOPHER MCCOLLOW?

09:39AM  24   A.   OKAY.

09:39AM  25   Q.   AND HE'S SITTING RIGHT THERE (INDICATING)?

PETERSON CROSS BY MR. COOPERSMITH (RES.)

09:39AM   1    A.   OKAY.

09:39AM   2    Q.   DO YOU RECOGNIZE HIM?

09:39AM   3    A.   I DON'T.

09:39AM   4    Q.   AND THERE WERE OTHER PEOPLE THERE FROM OTHER GOVERNMENTAL

09:39AM   5    AGENCIES?

09:39AM   6    A.   YES.

09:39AM   7    Q.   AND DID YOU UNDERSTAND THAT YOU WERE GIVING AN INTERVIEW

09:39AM   8    IN CONNECTION WITH AN INVESTIGATION THAT THE GOVERNMENT WAS

09:39AM   9    DOING?

09:39AM  10    A.   YES.

09:39AM  11    Q.   AND YOU UNDERSTAND THAT YOU WERE REQUIRED TO TELL THE

09:39AM  12    TRUTH?

09:39AM  13    A.   YES.

09:39AM  14    Q.   AND THAT THERE WERE CONSEQUENCES IF YOU DIDN'T; RIGHT?

09:40AM  15    A.   YES.

09:40AM  16    Q.   AND YOU DID TRY TO TELL THE TRUTH; RIGHT?

09:40AM  17    A.   YES.

09:40AM  18    Q.   OKAY.  AND IF YOU COULD TAKE A LOOK AT PAGE 4 OF THE

09:40AM  19    DOCUMENT IN FRONT OF YOU, AND IF YOU WOULD LOOK AT THE THIRD

09:40AM  20    PARAGRAPH UP FROM IT THE BOTTOM.

09:40AM  21         YOU TOLD THE GOVERNMENT DURING THAT INTERVIEW THAT YOU

09:40AM  22    THOUGHT 900 STORES MAY HAVE BEEN AMBITIOUS, BUT YOU WERE STILL

09:40AM  23    COMFORTABLE WITH THE INVESTMENT EVEN IF THERANOS WAS ONLY

09:40AM  24    LOCATED IN 200 STORES?

09:40AM  25    A.   OKAY.

09:40AM  1    Q.   THAT'S WHAT YOU TOLD THE GOVERNMENT?

09:40AM  2    A.   YES, THEY WERE MOVING FORWARD.  THAT WOULD HAVE BEEN -- I

09:40AM  3    WOULDN'T HAVE BEEN -- I DON'T THINK WE WOULD HAVE BEEN SUPER

09:40AM  4    HAPPY THAT THEY DIDN'T HIT THEIR PLAN, BUT THEY WERE DEFINITELY

09:41AM  5    MOVING TOWARDS A ROLLOUT AT 200 STORES.

09:41AM  6    Q.   OKAY.  AND YOU UNDERSTOOD THAT 900 STORES MAY HAVE BEEN

09:41AM  7    AMBITIOUS?

09:41AM  8    A.   YES.

09:41AM  9    Q.   AND YOU WOULD HAVE BEEN STILL COMFORTABLE IF THEY HAD ONLY

09:41AM  10   HAD 200 STORES IN 2015?

09:41AM  11   A.   YES.

09:41AM  12   Q.   OKAY.  LET'S GO BACK TO EXHIBIT 2015 THAT WE WERE JUST

09:41AM  13   LOOKING AT A MINUTE AGO AND JUST FINISH THE DOCUMENT.

09:41AM  14        DO YOU SEE THERE'S A SECTION CALLED RISKS?

09:41AM  15   A.   YES.

09:41AM  16   Q.   AND UNDER THAT YOU WRITE, "NOW HAVE LONG-TERM CONTRACTS,

09:41AM  17   SO RISK IS EXECUTION"; RIGHT?

09:41AM  18   A.   YES.  ELIZABETH SAID THAT.

09:41AM  19   Q.   RIGHT.  AND WE TALKED ABOUT THAT YESTERDAY?

09:41AM  20   A.   YES.

09:41AM  21   Q.   OKAY.  IF YOU WOULD GO TO THE NEXT PAGE.

09:42AM  22        OH, I'M SORRY, JUST DO ONE OTHER THING ON THE FIRST PAGE.

09:42AM  23        UNDER THAT SAME SECTION, RISKS, DO YOU SEE THAT THERE'S A

09:42AM  24   SECTION THAT SAYS, "USED ARIZONA MARKET AS TEST"?

09:42AM  25   A.   YES.

09:42AM  1     Q.   AND THEN IF YOU GO TO THE NEXT PAGE, THERE'S A SECTION OR

09:42AM  2     A NOTE ABOUT "TALK ABOUT RDV INVESTMENT PHILOSOPHY"?

09:42AM  3     A.   YES.

09:42AM  4     Q.   AND ONE OF THEM IS TO "BUILD GREAT LONG-TERM COMPANIES"?

09:42AM  5     A.   YES.

09:42AM  6     Q.   AND BELOW THAT THERE'S A SECTION CALLED "THIS ROUND"?

09:42AM  7     A.   YES.

09:42AM  8     Q.   AND THAT'S REFERRING TO THE INVESTMENT ROUND; RIGHT?

09:42AM  9     A.   YES.  WE ASKED HER THE PLANS FOR THE CAPITAL RAISE.

09:42AM 10     Q.   OKAY.  AND THEN THERE'S A "USE OF PROCEEDS."

09:42AM 11          AND THEN YOU WROTE "DID NOT DISCUSS"; RIGHT?

09:42AM 12     A.   CORRECT.

09:42AM 13     Q.   AND SO ON THAT CALL, THAT WAS SOMETHING THAT WAS NOT

09:42AM 14     DISCUSSED; RIGHT?

09:42AM 15     A.   CORRECT.

09:42AM 16     Q.   OKAY.  OKAY.  LET'S PUT THAT ASIDE.

09:43AM 17          IF WE CAN GO TO EXHIBIT 2033.  THIS IS NOT IN EVIDENCE.

09:43AM 18          BUT IF YOU TAKE A LOOK AT IT ON YOUR SCREEN, MS. PETERSON,

09:43AM 19     DO YOU SEE THAT IT'S AN EMAIL -- IT'S AN EMAIL STRING BETWEEN

09:43AM 20     YOU AND OTHER PEOPLE AT RDV?

09:43AM 21     A.   YES.

09:43AM 22     Q.   AND IT RELATES TO THE THERANOS INVESTMENT?

09:43AM 23     A.   YES.

09:43AM 24          MR. COOPERSMITH:  YOUR HONOR, WE OFFER 2033.

09:43AM 25          MR. LEACH:  NO OBJECTION, YOUR HONOR.

09:43AM    1              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:43AM    2         (GOVERNMENT'S EXHIBIT 2033 WAS RECEIVED IN EVIDENCE.)

09:43AM    3    BY MR. COOPERSMITH:

09:43AM    4    Q.   OKAY.  AND AT THE BOTTOM THERE'S AN EMAIL FROM

09:43AM    5    KARIUKI KUNGU?

09:43AM    6    A.   YES, KARIUKI KUNGU.

09:43AM    7    Q.   KARIUKI KUNGU, THANK YOU.

09:44AM    8         AND HE SAYS, "HEY LISA,

09:44AM    9         "WE WERE WONDERING IF BDT IS THE GP WE SHOULD LIST FOR

09:44AM   10    THERANOS?"

09:44AM   11         DO YOU SEE THAT?

09:44AM   12    A.   YES.

09:44AM   13    Q.   AND BDT IS THE BYRON TROTT ORGANIZATION?

09:44AM   14    A.   YES, THEY'RE A PRIVATE EQUITY FIRM.

09:44AM   15    Q.   THANK YOU, MS. PETERSON.

09:44AM   16         AND GP, THAT REFERS TO GENERAL PARTNER; IS THAT RIGHT?

09:44AM   17    A.   CORRECT.

09:44AM   18    Q.   AND THEN YOU ANSWERED, "NO, THEY ARE NOT PART OF THIS

09:44AM   19    TRANSACTION.  IT'S A DIRECT."

09:44AM   20         IS THAT RIGHT?

09:44AM   21    A.   YES.

09:44AM   22    Q.   AND YOU TALKED ABOUT THIS YESTERDAY.  THIS WAS A DIRECT

09:44AM   23    INVESTMENT IN THERANOS; RIGHT?

09:44AM   24    A.   YES.

09:44AM   25    Q.   AND THEN ABOVE THAT MR. -- I'M SORRY, IS IT MISTER OR

09:44AM  1    MISS?

09:44AM  2    A.   MISTER.

09:44AM  3    Q.   MR. KUNGU SAYS, "OK COOL.  ARE THERE ANY OF THE GP'S THAT

09:45AM  4    ARE INVESTING, KIND OF LIKE PARTNERS GROUP WITH MULTI PLAN."

09:45AM  5         DO YOU SEE THAT?

09:45AM  6    A.   YES.

09:45AM  7    Q.   AND THEN YOU RESPOND, "NO, SHE" -- ARE YOU REFERRING TO

09:45AM  8    MS. HOLMES THERE?

09:45AM  9    A.   YES.

09:45AM  10   Q.   "SHE DOESN'T WANT ANYONE WITH A FORCED TIME HORIZON

09:45AM  11   INVESTING."

09:45AM  12        DO YOU SEE THAT?

09:45AM  13   A.   YES.

09:45AM  14   Q.   "AND THE FAMILIES SHE IS BRINGING IN NOW ARE TAKING OUT

09:45AM  15   THE CURRENT VC."

09:45AM  16        DO YOU SEE THAT?

09:45AM  17   A.   YES.

09:45AM  18   Q.   AND THAT'S VENTURE CAPITAL?

09:45AM  19   A.   YES.

09:45AM  20   Q.   AND SO YOU UNDERSTOOD AT THIS TIME THAT YOU WERE HAVING

09:45AM  21   THIS EMAIL EXCHANGE THAT MS. HOLMES DID NOT WANT INVESTORS WHO

09:45AM  22   HAD A FORCED TIME HORIZON; RIGHT?

09:45AM  23   A.   THAT WAS MY UNDERSTANDING, YES.

09:45AM  24   Q.   MEANING PEOPLE THAT WANTED TO CASH OUT OF THE INVESTMENT

09:45AM  25   MORE QUICKLY?

PETERSON CROSS BY MR. COOPERSMITH (RES.)

09:45AM 1    A.   SHE WANTED LONGER TERM CAPITAL.

09:45AM 2    Q.   RIGHT.  LONGER TERM INVESTORS?

09:45AM 3    A.   YES.

09:45AM 4    Q.   OKAY.  LET'S GO TO EXHIBIT 2073, AND THIS IS ALREADY IN

09:46AM 5    EVIDENCE.

09:46AM 6         THIS IS AN EMAIL AND AN ATTACHED MEMO THAT YOU PREPARED

09:46AM 7    RELATING TO THERANOS; CORRECT?

09:46AM 8    A.   YES.

09:46AM 9    Q.   AND IF YOU GO TO THE EMAIL JUST TO START WITH, THERE'S A

09:46AM 10   LINE THERE WHERE YOU SAY THAT YOU'RE PREPARING THE MEMO, AND

09:46AM 11   THE WORDS YOU USED ARE WITHOUT -- SO THAT OTHERS WOULDN'T HAVE

09:46AM 12   TO READ THROUGH THE WHOLE FOOT OF MATERIALS.

09:46AM 13        IS THAT WHAT YOU'RE SAYING?

09:46AM 14   A.   YES.

09:46AM 15   Q.   AND THAT'S WHY YOU TOOK ON THE TASK OF LOOKING THROUGH THE

09:46AM 16   BINDERS AND TRYING TO SYNTHESIZE MATERIALS; RIGHT?

09:46AM 17   A.   YES.

09:46AM 18   Q.   SO OTHERS WOULDN'T HAVE TO LOOK THROUGH THE BINDERS?

09:46AM 19   A.   CORRECT.

09:46AM 20        AND THEY WEREN'T ON THE PHONE CALL, SO CAPTURING WHAT WAS

09:46AM 21   SAID WAS IMPORTANT.

09:46AM 22   Q.   OKAY.  AND THIS IS A MEMO THAT YOU WROTE ON OCTOBER 3RD?

09:47AM 23   A.   CORRECT.

09:47AM 24   Q.   OKAY.

09:47AM 25   A.   WELL, BETWEEN THE 3RD AND THE 12TH.

PETERSON CROSS BY MR. COOPERSMITH (RES.)

09:47AM 1    Q.    OKAY.  IF WE GO TO THE NEXT PAGE, THIS IS THE FIRST PAGE

09:47AM 2    OF THE MEMO, AND THEN AT THIS TIME BETWEEN THE 3RD AND THE

09:47AM 3    12TH, I THINK YOU JUST SAID, OF OCTOBER OF 2014, AT THAT POINT

09:47AM 4    YOU HAD NEVER MET OR SPOKEN TO SUNNY BALWANI; RIGHT?

09:47AM 5    A.    CORRECT.

09:47AM 6    Q.    AND THE ONLY CONTACT THAT YOU HAD WITH MR. BALWANI WAS AT

09:47AM 7    THAT MEETING ON OCTOBER 14TH AND IN SOME EMAILS AFTER THAT;

09:47AM 8    RIGHT?

09:47AM 9    A.    CORRECT.

09:47AM 10    Q.    OKAY.  AND I THINK YOU SAID THE MEETING ON OCTOBER 14TH,

09:47AM 11    WHICH WE'LL GET TO, WAS ABOUT FOUR TO FOUR AND A HALF HOURS?

09:47AM 12    A.    YES.

09:47AM 13    Q.    OKAY.  AND PART OF THAT, THE LAST PART OF IT WAS A TOUR;

09:47AM 14    RIGHT?

09:47AM 15    A.    CORRECT.

09:47AM 16    Q.    AND MR. BALWANI DIDN'T GO ON THE TOUR?

09:47AM 17    A.    CORRECT.

09:47AM 18    Q.    BUT HE WAS AT THE MEETING?

09:47AM 19    A.    YES.

09:47AM 20    Q.    OKAY.  LET'S JUST GO TO THE SECOND PAGE OF THE MEMO,

09:48AM 21    EXHIBIT 2073.

09:48AM 22    AND AT THIS TIME YOUR UNDERSTANDING WAS, IF YOU LOOK AT

09:48AM 23    THE FIRST LINE AFTER "DESCRIBE THE WALGREENS OPPORTUNITY," AT

09:48AM 24    THIS TIME YOU UNDERSTOOD THAT -- YOUR UNDERSTANDING WAS THAT

09:48AM 25    THERANOS OPERATES JUST 22 LAB LOCATIONS.

PETERSON CROSS BY MR. COOPERSMITH (RES.)

09:48AM 1          DO YOU SEE THAT?

09:48AM 2     A.   YES.

09:48AM 3     Q.   OKAY.  AND THEN IF YOU GO DOWN FURTHER, THERE'S A LINE IN

09:48AM 4     THAT SAME PARAGRAPH THAT SAYS, "THERANOS'S REVENUE FOR 2015 IS

09:48AM 5     PROJECTED TO BE $990 MILLION AND ASSUMES THEY OPEN 900

09:48AM 6     WALGREENS-THERANOS CENTERS NEXT YEAR."

09:48AM 7          DO YOU SEE THAT?

09:48AM 8     A.   YES.

09:48AM 9     Q.   OKAY.  NOW, THEN YOU HAVE A SECTION BELOW THAT CALLED

09:48AM 10    "WHAT ARE THE MAIN RISKS?"

09:48AM 11         DO YOU SEE THAT?

09:48AM 12    A.   YES.

09:48AM 13    Q.   AND AGAIN, YOU'RE IDENTIFYING THE SAME RISKS; RIGHT?

09:48AM 14    A.   I'M IDENTIFYING THE SAME RISKS, THE EXECUTION, YES.

09:48AM 15    Q.   RIGHT.  THAT'S WHAT I WAS REFERRING TO.

09:48AM 16    A.   YES.

09:48AM 17    Q.   AND SO THAT FIRST SENTENCE, IT SAYS, "HOLMES BELIEVES THE

09:49AM 18    COMPANY'S PRIMARY RISK IS THE EXECUTION OF ITS BUSINESS PLAN,

09:49AM 19    RATHER THAN TECHNOLOGY, VALIDATION, AND CUSTOMER ACCEPTANCE.

09:49AM 20         DO YOU SEE THAT?

09:49AM 21    A.   YES.

09:49AM 22    Q.   AND SO THAT'S WHAT YOU UNDERSTOOD THERANOS WAS TELLING YOU

09:49AM 23    THEIR MAIN RISK WAS; RIGHT?

09:49AM 24    A.   YES.

09:49AM 25    Q.   AND AGAIN, EXECUTION RISK, OR EXECUTION OF THE BUSINESS

09:49AM   1    PLAN, THAT'S THE RISK THAT DESPITE THEIR GOALS, THEY WOULDN'T

09:49AM   2    ACTUALLY ROLL OUT ALL OF THE STORES THAT THEY WANTED TO ROLL

09:49AM   3    OUT?

09:49AM   4    A.   THAT'S CORRECT.

09:49AM   5    Q.   OKAY.  IF WE GO TO THE LAST SECTION ON THAT SAME PAGE,

09:49AM   6    THAT'S PAGE 5 OF THE EXHIBIT, THERE'S A SECTION ABOUT "WHAT ARE

09:49AM   7    THERANOS'S KEY OBJECTIVES FOR THE MEETING ON OCTOBER 14TH?"

09:49AM   8         RIGHT?

09:49AM   9    A.   YES.

09:49AM   10   Q.   AND SO THIS WAS TRYING TO INFORM YOUR GROUP THAT -- JUST

09:49AM   11   PREPARING FOR THE OCTOBER 14TH MEETING; RIGHT?

09:49AM   12   A.   YES.

09:49AM   13   Q.   AND YOU WROTE, "THERANOS DESIRES A LONG-TERM PARTNERSHIP

09:49AM   14   WITH INVESTORS IN THE CURRENT FUNDRAISING ROUND.  IN

09:49AM   15   PARTICULAR, HOLMES IS SEEKING INVESTORS WHO WANT TO BUILD A

09:50AM   16   GREAT COMPANY THAT WILL BOTH 'DO WELL AND DO GOOD' OVER THE

09:50AM   17   COURSE OF MULTIPLE GENERATIONS."

09:50AM   18        DO YOU SEE THAT?

09:50AM   19   A.   YES.

09:50AM   20   Q.   "WITH LESS EMPHASIS ON LIQUIDITY AND MORE EMPHASIS ON

09:50AM   21   LONG-TERM CAPITAL APPRECIATION."

09:50AM   22        DO YOU SEE THAT?

09:50AM   23   A.   YES.

09:50AM   24   Q.   AND THAT'S WHAT YOU UNDERSTOOD FROM YOUR CONVERSATION WITH

09:50AM   25   MS. HOLMES?

09:50AM   1    A.   YES.

09:50AM   2    Q.   AND RDV WAS PREPARED TO MAKE A MULTI-GENERATIONAL

09:50AM   3    COMMITMENT?

09:50AM   4    A.   YES.

09:50AM   5    Q.   LET'S GO TO THE NEXT PAGE, PAGE 6.

09:50AM   6         AND IN PARTICULAR, LET'S JUST START WITH THE BULLET POINT

09:50AM   7    THAT BEGINS WITH PATENTS, "HOLMES'S NAME IS ON 18 U.S. AND 66

09:50AM   8    FOREIGN."

09:50AM   9         DO YOU SEE THAT?

09:50AM  10    A.   YES.

09:50AM  11    Q.   AND WE TALKED ABOUT THIS YESTERDAY.  THIS WAS SOMETHING OF

09:50AM  12    INTEREST TO YOU, THAT THERANOS HAD ENGAGED IN THIS PROCESS OF

09:50AM  13    OBTAINING PATENTS ON THEIR TECHNOLOGY?

09:51AM  14    A.   YES.

09:51AM  15    Q.   AND THEN IF YOU GO TO, THERE'S A BULLET BELOW THAT AND IT

09:51AM  16    SAYS, "A THERANOS ANALYZER STATION IS A SMALL FRACTION OF THE

09:51AM  17    SIZE OF A CURRENT LAB."

09:51AM  18         DO YOU SEE THAT?

09:51AM  19    A.   YES.

09:51AM  20    Q.   AND IT SAYS, "MAKING IT POSSIBLE TO PLACE A THERANOS LAB

09:51AM  21    IN THE OPERATING ROOM OR IN A MILITARY EVACUATION HELICOPTER,

09:51AM  22    ON SHIPS, IN REFUGEE CAMPS, VIRTUALLY ANYWHERE."

09:51AM  23         AND THEN IT GOES ON.

09:51AM  24         DO YOU SEE THAT?

09:51AM  25    A.   YES.

09:51AM  1    Q.   AND YOU UNDERSTAND THAT IF THE DEVICE WAS SMALL, THAT

09:51AM  2    WOULD MAKE THINGS POSSIBLE; RIGHT?

09:51AM  3    A.   YES.

09:51AM  4    Q.   AND YOU DON'T REMEMBER THE SPECIFICS OF WHAT MS. HOLMES OR

09:51AM  5    MR. BALWANI TOLD YOU ABOUT THE MILITARY APPLICATION; CORRECT?

09:51AM  6    A.   AT THIS POINT IN TIME WHEN THIS MEMO WAS DONE, NO.

09:51AM  7         BUT WHEN WE WERE THERE ON THE 14TH THAT WAS DISCUSSED.

09:51AM  8    Q.   OKAY.  AND WHEN YOU WERE THERE ON THE 14TH, YOU REMEMBER

09:52AM  9    THAT THEY DISCUSSED SOMETHING ABOUT THE DEPARTMENT OF DEFENSE;

09:52AM 10    RIGHT?

09:52AM 11    A.   YES.

09:52AM 12    Q.   AND SOMETHING ABOUT HELICOPTERS?

09:52AM 13    A.   YES.

09:52AM 14    Q.   BUT YOU DON'T REMEMBER SPECIFICALLY WHAT THEY SAID?

09:52AM 15    A.   JUST THAT THE ANALYZERS WERE ON MILITARY HELICOPTERS AND

09:52AM 16    BEING USED BY THE DEPARTMENT OF DEFENSE.

09:52AM 17    Q.   BUT DO YOU REMEMBER THEIR EXACT WORDS?

09:52AM 18    A.   NOT THE EXACT WORDS, NO.

09:52AM 19    Q.   BUT YOU NEVER -- HELICOPTERS CAME UP IN THE CONVERSATION?

09:52AM 20    A.   YES.

09:52AM 21    Q.   AND THE DEPARTMENT OF DEFENSE?

09:52AM 22    A.   AND THAT THEY WERE BEING USED IN MILITARY USES ON

09:52AM 23    HELICOPTERS, YES.

09:52AM 24    Q.   THAT THEY HAD SOME RELATIONSHIP WITH THE MILITARY?

09:52AM 25    A.   YES.

09:52AM  1    Q.   AND THERE WAS SOME EFFORT TO PUT THESE DEVICES ON

09:52AM  2    HELICOPTERS?

09:52AM  3    A.   YES.

09:52AM  4    Q.   OKAY.  OKAY.  LET'S LOOK AT EXHIBIT 2192.

09:53AM  5         AND THIS IS NOT IN EVIDENCE, SO LET'S JUST LOOK AT IT

09:53AM  6    TOGETHER FOR A MINUTE, MS. PETERSON.

09:53AM  7         THIS IS AN EMAIL FROM A PERSON NAMED CAMDEN BRIEDEN?

09:53AM  8    A.   UH-HUH.

09:53AM  9    Q.   TO YOU AND OTHERS WITHIN RDV.

09:53AM  10        DO YOU SEE THAT?

09:53AM  11   A.   YES.

09:53AM  12   Q.   AND THIS IS NOVEMBER 6TH, 2014?

09:53AM  13   A.   YES.

09:53AM  14   Q.   AND SO THIS IS JUST ACTUALLY A FEW DAYS AFTER THE

09:53AM  15   INVESTMENT WAS MADE; RIGHT?

09:53AM  16   A.   YES.

09:53AM  17   Q.   AND WAS THAT ON OCTOBER 31ST?

09:53AM  18   A.   YES.

09:53AM  19   Q.   AND THIS IS A FORM THAT RDV ROUTINELY FILLS OUT IN THE

09:53AM  20   COURSE OF ITS INVESTMENT WORK?

09:53AM  21   A.   YES.

09:53AM  22   Q.   AND IT WAS FILLED OUT IN THE CASE OF THERANOS, TOO?

09:53AM  23   A.   YES.

09:53AM  24   Q.   OKAY.

09:53AM  25        YOUR HONOR, WE OFFER 2192.

PETERSON CROSS BY MR. COOPERSMITH (RES.)                        4004

09:53AM   1              MR. LEACH:  I'M SORRY, COUNSEL.  I DON'T HAVE A COPY

09:53AM   2    OF 2192 IN MY BINDER.

09:54AM   3              THE COURT:  I DON'T THINK I DO, EITHER.

09:54AM   4              MR. COOPERSMITH:  OKAY.  LET'S SEE.  DO YOU NEED

09:54AM   5    ANOTHER COPY?

09:54AM   6              MR. LEACH:  I CAN LOOK AT IT FIRST.

09:54AM   7              MR. COOPERSMITH:  OF COURSE.

09:54AM   8         (HANDING.)

09:54AM   9              MR. COOPERSMITH:  AND DOES YOUR HONOR HAVE A COPY?

09:54AM  10              THE COURT:  NO.

09:54AM  11              MR. COOPERSMITH:  YOUR HONOR, I GUESS I COULD HAND

09:54AM  12    UP MY COPY OR JUST TO NOT WASTE TIME.

09:54AM  13              THE COURT:  WELL, IT IS ON THE SCREEN, ISN'T IT?

09:54AM  14              MR. COOPERSMITH:  YES.

09:54AM  15              THE COURT:  THAT'S FINE.

09:54AM  16              MR. LEACH:  I HAVE NO OBJECTION.

09:54AM  17              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:54AM  18         (GOVERNMENT'S EXHIBIT 2192 WAS RECEIVED IN EVIDENCE.)

09:54AM  19              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:54AM  20    Q.   OKAY.  SO NOW WE'RE ALL LOOKING AT EXHIBIT 2192, AND THIS

09:54AM  21    IS THE FORM.  AND YOU SEE IT'S FROM THIS PERSON CAMDEN BRIEDEN?

09:54AM  22    A.   YES.

09:54AM  23    Q.   AND WHO IS THAT?

09:54AM  24    A.   HE'S AN ANALYST.

09:54AM  25    Q.   SOMEONE YOU WORK WITH AT RDV?

09:55AM  1    A.   YES.

09:55AM  2    Q.   AND HE WROTE, "LISA -- CAN YOU PLEASE HELP FILL IN THE

09:55AM  3    BLANKS FOR THERANOS EFRONT TEMPLATE AS BEST AS POSSIBLE.  WE

09:55AM  4    UNDERSTAND THIS IS A UNIQUE INVESTMENT AND MAY NOT HAVE

09:55AM  5    PROJECTED EXIT OR RETURN NUMBERS.  IF YOU CAN PROVIDE A BEST

09:55AM  6    GUESS, THAT'S GREAT.  THIS WILL BE USED IN FORECASTING CASH

09:55AM  7    FLOWS.  ANY QUESTIONS, JUST ASK MYSELF OR ANDREW.  THANKS FOR

09:55AM  8    YOUR HELP WITH THIS -- CAM."

09:55AM  9         RIGHT?

09:55AM  10   A.   YES.

09:55AM  11   Q.   AND SO MR. BRIEDEN NEEDED THIS PIECE TO KEEP IN THE FILE

09:55AM  12   ABOUT THIS PARTICULAR INVESTMENT; RIGHT?

09:55AM  13   A.   IT'S VERY COMMON FOR US WHEN WE INVEST IN PRIVATE EQUITY

09:55AM  14   FUNDS AND DO THOSE COINVESTMENTS, THOSE HAVE MORE OF A FINITE

09:55AM  15   LIFE TO THEM BECAUSE THESE PRIVATE EQUITY FUNDS HAVE TO GET OUT

09:55AM  16   OF THE INVESTMENT.

09:55AM  17        THIS ONE WASN'T ATTACHED TO A PRIVATE EQUITY FUND, SO IT

09:55AM  18   WAS A LITTLE BIT DIFFICULT TO FILL OUT THIS FORM.

09:55AM  19   Q.   RIGHT.

09:55AM  20   A.   SO HE ASKED FOR MY HELP.

09:56AM  21        BUT THE -- YES, WE FILL THIS OUT FOR EVERYTHING.

09:56AM  22   Q.   OKAY.  AND SO EVEN THOUGH THERANOS WAS A LITTLE BIT OF A

09:56AM  23   DIFFERENT THING COMPARED TO THE PRIVATE EQUITY INVESTMENTS --

09:56AM  24   A.   YES.

09:56AM  25   Q.   -- MR. BRIEDEN AND YOURSELF STILL WANTED THE FORM TO BE

09:56AM  1    FILLED OUT; RIGHT?

09:56AM  2    A.   WE ATTEMPTED TO.  AND THIS IS REALLY USED FOR THE FAMILY'S

09:56AM  3    CASH FLOW PLANNING PURPOSES.  IF IT DOESN'T COME OUT THE WAY

09:56AM  4    THAT WE FORECASTED IT IN THE SYSTEM, THEY JUST PUSH IT OUT.

09:56AM  5         IT'S REALLY USED AS A TOOL TO PLAN FOR THE FAMILY FOR CASH

09:56AM  6    FLOW INVESTING.

09:56AM  7    Q.   THANK YOU.  THE WRITING ON IT, IS THAT YOUR HANDWRITING?

09:56AM  8    A.   YES.  YES.

09:56AM  9    Q.   OKAY.  SO LET'S GO THROUGH IT A LITTLE BIT.

09:56AM  10        SO THE FIRST BOX I WANTED TO SHOW YOU IS THAT THERE'S A

09:56AM  11   SECTION FOR "PLANNED END FUND DATE/COINVESTMENT EXIT."

09:56AM  12        DO YOU SEE THAT?

09:56AM  13   A.   YES.

09:57AM  14   Q.   AND THAT WOULD BE FOR ANY INVESTMENT WHEN RDV WOULD BE

09:57AM  15   LIKE OUT OF THE INVESTMENT ALL TOGETHER; RIGHT?

09:57AM  16   A.   AGAIN, IT'S A PLANNING TOOL, SO WE USUALLY PUT FIVE YEARS

09:57AM  17   IN THERE, LIKE FOR EVERYTHING.

09:57AM  18   Q.   OKAY.  RIGHT.  BUT JUST SO WE UNDERSTAND WHAT THAT IS

09:57AM  19   REFERRING TO, THIS PARTICULAR ITEM, IT'S LIKE WHEN RDV WOULD BE

09:57AM  20   COMPLETELY OUT OF THE INVESTMENT; RIGHT?

09:57AM  21   A.   AGAIN, IT'S JUST A CASH FLOW PLANNING TOOL.

09:57AM  22        BUT, YES, IT'S A DATE WE PUT ON THERE SO WHEN WE DO OUR

09:57AM  23   CASH FLOW FORECASTING, THIS INVESTMENT SHOWS UP SOMEWHERE.

09:57AM  24        WE DON'T -- WE CAN'T PUT IT IN THERE AS INFINITE IF WE'RE

09:57AM  25   GOING TO HOLD IT LONG-TERM.  SO WE JUST DECIDED TO PUT IT OUT

09:57AM   1    THERE A LITTLE LONGER THAN WE PUT OTHER INVESTMENTS.

09:57AM   2    Q.   OKAY.  THANK YOU.  I JUST WANT TO MAKE SURE IN MY QUESTION

09:57AM   3    AND ANSWER.

09:57AM   4        MY QUESTION IS REALLY SIMPLE:  IT'S THIS PARTICULAR ITEM,

09:57AM   5    PUTTING ASIDE WHAT YOU WROTE, THE ITEM IS JUST CALLING FOR LIKE

09:57AM   6    AN EXIT DATE FOR THE INVESTMENT; RIGHT?

09:57AM   7    A.   YES.

09:58AM   8    Q.   OKAY.  SO AN EXIT DATE WOULD MEAN THE TIME THAT RDV SELLS

09:58AM   9    THE INVESTMENT OR IT'S OTHERWISE OVER; RIGHT?

09:58AM  10    A.   YES.

09:58AM  11    Q.   AND IN THE CASE OF THERANOS YOU WROTE ON THAT ITEM,

09:58AM  12    "GUESS."

09:58AM  13        RIGHT?

09:58AM  14    A.   YES.

09:58AM  15    Q.   AND NEXT TO THAT, SEVEN YEARS?

09:58AM  16    A.   YES.

09:58AM  17    Q.   AND SO THAT WAS A GUESS?

09:58AM  18    A.   YES.

09:58AM  19    Q.   AND THEN IF YOU GO BELOW THAT, YOU SEE THERE'S THIS

09:58AM  20    THING CALLED -- FURTHER DOWN THE PAGE, "TARGET IRR.

09:58AM  21        DO YOU SEE THAT?

09:58AM  22    A.   YES.

09:58AM  23    Q.   AND WHAT IS IRR?

09:58AM  24    A.   INTERNAL RATE OF RETURN.

09:58AM  25    Q.   SO THAT'S THE RATE OF RETURN ON THE INVESTMENT RDV MIGHT

09:58AM  1    REASONABLY EXPECT; RIGHT?

09:58AM  2    A.   YES.

09:58AM  3    Q.   SO IN OTHER WORDS, IF IT WAS A LOAN, HYPOTHETICALLY, AND

09:58AM  4    IN A DIFFERENT SITUATION IT WAS A LOAN AND THE INTEREST RATE

09:58AM  5    WAS 10 PERCENT, THE RATE OF RETURN IN THAT SITUATION WOULD BE

09:58AM  6    10 PERCENT; RIGHT?

09:58AM  7    A.   YES.

09:58AM  8    Q.   OKAY.  SO THIS IS ASKING WHAT RATE OF RETURN COULD RDV

09:59AM  9    REASONABLY EXPECT; RIGHT?

09:59AM  10   A.   YES.

09:59AM  11   Q.   OKAY.  AND THEN YOU WROTE THERE "GUESS."

09:59AM  12        CORRECT?

09:59AM  13   A.   YES.

09:59AM  14   Q.   AND THEN IT SAYS, "SEVEN YEARS; FIVE TIMES AT 30 PERCENT

09:59AM  15   IRR."

09:59AM  16        DO YOU SEE THAT?

09:59AM  17   A.   YES.

09:59AM  18   Q.   AND THEN BELOW THAT YOU WROTE, "NO RETURN ESTIMATES WERE

09:59AM  19   PROVIDED; THIS IS RDV TARGETS."

09:59AM  20   A.   YES.

09:59AM  21   Q.   SO THERANOS DID NOT PROVIDE ANY RETURN ESTIMATES TO YOU;

09:59AM  22   RIGHT?

09:59AM  23   A.   NO.

09:59AM  24   Q.   AND SO YOU WERE JUST DOING THIS INTERNALLY?

09:59AM  25   A.   THIS WAS KIND OF STANDARD.  AGAIN, IT WAS FOR CASH FLOW

09:59AM  1    PLANNING PURPOSES.

09:59AM  2    Q.   OKAY.  BECAUSE IT IS -- IN OTHER SITUATIONS, THE OTHER

09:59AM  3    PARTY THAT YOU INVESTED WITH COULD TELL YOU THAT WE EXPECT A

09:59AM  4    CERTAIN RATE OF RETURN; RIGHT?

09:59AM  5    A.   THEY ALWAYS DO, YES.

09:59AM  6    Q.   BUT IN THE CASE OF THERANOS, THEY DID NOT DO THAT?

09:59AM  7    A.   NO.

09:59AM  8    Q.   OKAY.  AND THEN YOU SEE ABOVE THAT IT SAYS, "THE HOLD

09:59AM  9    PERIOD IS INDEFINITE"?

09:59AM  10   A.   YES.

10:00AM  11   Q.   THAT MEANS THAT RDV DIDN'T HAVE A PARTICULAR END DATE

10:00AM  12   WHERE THEY WOULD BE OUT OF THE INVESTMENT; RIGHT?

10:00AM  13   A.   CORRECT.

10:00AM  14   Q.   THAT'S BECAUSE THIS WAS A MULTI-GENERATIONAL COMMITMENT

10:00AM  15   LIKE WE JUST DISCUSSED; RIGHT?

10:00AM  16   A.   YES, THEY VIEWED THIS AS A LONG-TERM HOLD.

10:00AM  17   Q.   OKAY.  LET'S GO TO ANOTHER EXHIBIT THAT YOU REVIEWED

10:00AM  18   ALREADY ON DOCUMENT 4858.

10:00AM  19        AND THIS IS ALREADY IN EVIDENCE, YOUR HONOR.

10:00AM  20           THE COURT:  ALL RIGHT.

10:00AM  21   BY MR. COOPERSMITH:

10:00AM  22   Q.   DO YOU HAVE 4858 IN FRONT OF YOU?

10:00AM  23   A.   YES.

10:00AM  24   Q.   AND THIS IS THE FIRST OF THE TWO BINDERS; RIGHT?

10:00AM  25   A.   YES.

10:00AM   1              (LAUGHTER.)

10:00AM   2                   THE WITNESS:  I THINK THEY BOTH HAVE THE SAME COVER

10:00AM   3     ON THEM, SO IF YOU SHOW ME MORE OF THE DOCUMENT I CAN TELL YOU.

10:00AM   4     BY MR. COOPERSMITH:

10:00AM   5     Q.   WELL, SURE.  AND WHEN WE FLIP THROUGH IT, YOU WILL SEE

10:00AM   6     THAT THIS IS NOT THE ONE WITH THE CLINICAL DATA.

10:01AM   7     A.   OKAY.

10:01AM   8     Q.   AND SO THAT MEANS IT'S THE FIRST OF THE BINDERS?

10:01AM   9     A.   CORRECT.

10:01AM  10     Q.   AND THE COVER PAGE WE'RE LOOKING AT IT JUST SAYS THERANOS,

10:01AM  11     AND THIS IS THERANOS PROPRIETARY AND CONFIDENTIAL.

10:01AM  12          DO YOU SEE THAT?

10:01AM  13     A.   YES.

10:01AM  14     Q.   LET'S GO TO -- I KNOW YOU LOOKED AT SOME OTHER PAGES WITH

10:01AM  15     MR. LEACH, BUT I WANT TO SHOW YOU SOME DIFFERENT PAGES IN SOME

10:01AM  16     CASES.

10:01AM  17          SO THE FIRST PAGE, IF YOU LOOK AT PAGE 8 OF THE DOCUMENT.

10:01AM  18     A.   YES.

10:01AM  19     Q.   AND YOU SEE IT'S HEADED VALIDATION OF THERANOS TESTS?

10:01AM  20     A.   YES.

10:01AM  21     Q.   AND THEN IT HAS A REFERENCE TO GLAXOSMITHKLINE.

10:01AM  22          DO YOU SEE THAT?

10:01AM  23     A.   YES.

10:01AM  24     Q.   AND THEN BELOW THAT IT SAYS, "EXCERPTS FROM JOHNS HOPKINS

10:01AM  25     DUE DILIGENCE AND TECHNOLOGY VALIDATION."

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4011

10:01AM   1            DO YOU SEE THAT?

10:01AM   2    A.   YES.

10:01AM   3    Q.   AND IT SAYS, "THE TECHNOLOGY IS NOVEL AND SOUND.  IT CAN

10:01AM   4    ACCURATELY RUN A WIDE RANGE OF ROUTINE AND SPECIAL ASSAYS"?

10:01AM   5    A.   YES.

10:01AM   6    Q.   "NO MAJOR WEAKNESSES WERE IDENTIFIED"?

10:02AM   7    A.   YES.

10:02AM   8    Q.   AND YOU UNDERSTAND WHAT JOHNS HOPKINS WAS; RIGHT?

10:02AM   9    A.   YES.

10:02AM  10    Q.   THIS IS A WORLD LEADING MEDICAL CENTER BASED IN BALTIMORE?

10:02AM  11    A.   YES.

10:02AM  12    Q.   AND THIS WAS SOMETHING THAT WOULD BE COMFORTING AND

10:02AM  13    ASSURING, REASSURING TO RDV; RIGHT?

10:02AM  14    A.   YES.

10:02AM  15    Q.   AND THIS WAS IMPRESSIVE TO YOU?

10:02AM  16    A.   YES.

10:02AM  17    Q.   LET'S LOOK AT EXHIBIT 20532, MR. ALLEN.

10:02AM  18            THIS IS ALSO IN EVIDENCE.

10:02AM  19    A.   2?

10:02AM  20    Q.   20532.  I THINK IT WILL JUST COME UP ON YOUR SCREEN.  I'M

10:02AM  21    NOT SURE YOU HAVE THAT IN YOUR BINDER.

10:02AM  22            DO YOU SEE THIS WAS A SUMMARY OF

10:02AM  23    HOPKINS/WALGREENS/THERANOS MEETING?

10:02AM  24    A.   YES.

10:02AM  25    Q.   FROM APRIL 27TH, 2010?

10:03AM  1    A.   YES.

10:03AM  2    Q.   AND, MR. ALLEN, IF WE CAN GO TO THE SECOND PAGE.

10:03AM  3         DO YOU SEE THAT LINE WHERE IT SAYS, "NO MAJOR WEAKNESSES

10:03AM  4    WERE IDENTIFIED"?

10:03AM  5    A.   YES.

10:03AM  6    Q.   DID THE GOVERNMENT EVER SHOW YOU THAT?

10:03AM  7    A.   I DON'T RECALL.

10:03AM  8    Q.   OKAY.  LET'S GO BACK TO EXHIBIT 4858.  LET'S GO TO

10:03AM  9    PAGE 14.

10:03AM  10        THIS SLIDE IS COST SAVINGS?

10:03AM  11   A.   YES.

10:03AM  12   Q.   AND DO YOU UNDERSTAND THAT THAT WAS ONE OF THE THINGS THAT

10:03AM  13   THERANOS WAS TRYING TO DO; RIGHT?

10:03AM  14   A.   YES.

10:03AM  15   Q.   AND THAT'S PART OF THE REASON WHY THEY HAD THESE PRICES

10:03AM  16   PUBLISHED ON THEIR WEBSITE?

10:03AM  17   A.   CORRECT.

10:03AM  18   Q.   AND THAT WAS INTERESTING TO RDV AS WELL?

10:03AM  19   A.   YES.

10:03AM  20   Q.   AND YOU UNDERSTAND THE BLOOD TESTS THAT WERE BEING OFFERED

10:03AM  21   IN WALGREENS STORES WERE ACTUALLY CHEAPER THAN OTHER BLOOD

10:03AM  22   TESTS THAT YOU MIGHT GET FROM OTHER COMPANIES?

10:04AM  23   A.   THAT WAS OUR UNDERSTANDING, YES.

10:04AM  24   Q.   OKAY.  IF YOU GO TO PAGE 19, YOU SEE THAT SLIDE IS COST

10:04AM  25   SAVINGS FOR NATIONAL MEDICAID?

PETERSON CROSS BY MR. COOPERSMITH (RES.)

10:04AM 1    A.   YES.

10:04AM 2    Q.   AND THEN IF YOU GO TO THE NEXT PAGE, IT'S COST SAVINGS FOR

10:04AM 3    NATIONAL MEDICARE; RIGHT?

10:04AM 4    A.   YES.

10:04AM 5    Q.   AND THESE ARE GOVERNMENT PROGRAMS THAT PAY HEALTH CARE

10:04AM 6    EXPENSES FOR SOME PEOPLE; RIGHT?

10:04AM 7    A.   YES.

10:04AM 8    Q.   OKAY.  AND FOR THE NATIONAL MEDICARE ONE, DO YOU SEE THAT

10:04AM 9    THERE'S A BAR GRAPH WHERE IT HAS THE SAVINGS ON THE VERTICAL

10:04AM 10   COLUMN, AND ON THE HORIZONTAL COLUMN THERE ARE YEARS?

10:04AM 11   A.   YES.

10:04AM 12   Q.   AND THAT FOR 2014, IT'S 2014E.

10:04AM 13        DO YOU SEE THAT?

10:04AM 14   A.   YES.

10:04AM 15   Q.   LIKE AN ESTIMATE; RIGHT?

10:04AM 16   A.   YES.

10:04AM 17   Q.   OKAY.  AND THE SAME FOR MEDICAID ON PAGE 19?

10:04AM 18   A.   YES.

10:04AM 19   Q.   OKAY.  LET'S GO TO PAGE 39.

10:05AM 20        DO YOU SEE THERE THIS SLIDE IS THERANOS INFRASTRUCTURE?

10:05AM 21   A.   YES.

10:05AM 22   Q.   AND IT SAYS IN THE FIRST PART THERE, "NATIONAL RETAIL

10:05AM 23   FOOTPRINT, HOSPITAL, AND HEALTH PLAN PARTNERSHIPS THROUGHOUT

10:05AM 24   THE UNITED STATES FOR AN UNPRECEDENTED INFRASTRUCTURE WHICH

10:05AM 25   EXCEEDS THAT ANY OF ANY RETAIL LABORATORY IN TODAY'S MARKET."

10:05AM   1          DO YOU SEE THAT?

10:05AM   2     A.   YES.

10:05AM   3     Q.   AND "EXCEEDS" YOU UNDERSTAND IS A PRESENT TENSE VERB;

10:05AM   4     RIGHT?

10:05AM   5     A.   YES.

10:05AM   6     Q.   SO WITHOUT KNOWING ANYTHING ELSE, IF YOU READ THAT, IT

10:05AM   7     WOULD SUGGEST THAT RIGHT AT THAT POINT, THERANOS HAS

10:05AM   8     "UNPRECEDENTED INFRASTRUCTURE WHICH EXCEEDS THAT OF ANY RETAIL

10:05AM   9     LABORATORY IN TODAY'S MARKET."

10:05AM   10          RIGHT?

10:05AM   11    A.   I'M NOT SURE I UNDERSTAND THE QUESTION.

10:05AM   12    Q.   OKAY.  WELL, I'LL ASK A DIFFERENT ONE.

10:05AM   13          SO, MS. PETERSON, YOU KNEW WHEN YOU WERE LOOKING AT THESE

10:06AM   14    BINDERS IN OCTOBER OF 2014 THAT THERANOS DID NOT HAVE AN

10:06AM   15    "UNPRECEDENTED INFRASTRUCTURE WHICH EXCEEDS THAT OF ANY RETAIL

10:06AM   16    LABORATORY IN TODAY'S MARKET"; RIGHT?

10:06AM   17    A.   YES, WE KNEW THAT THEY DID NOT HAVE THAT.

10:06AM   18    Q.   RIGHT.  AND, IN FACT, YOU KNEW THAT THERE WERE OTHER

10:06AM   19    COMPANIES, INCLUDING QUEST, THAT HAD MUCH LARGER FOOTPRINTS IN

10:06AM   20    THE UNITED STATES; RIGHT?

10:06AM   21    A.   YES.

10:06AM   22    Q.   OKAY.  SO THIS WAS ASPIRATIONAL FOR THERANOS?

10:06AM   23    A.   THIS WAS THEIR PROJECTIONS.

10:06AM   24          THEIR PROJECTIONS WERE THEIR PROJECTIONS.

10:06AM   25          BUT, YES, THEY WEREN'T WHERE THEY WANTED TO BE YET.

10:06AM   1    Q.   RIGHT.  THIS WAS A GOAL THAT THEY HAD?

10:06AM   2    A.   YES.

10:06AM   3    Q.   OKAY.  IF YOU GO TO THE NEXT PAGE, PAGE 40, YOU SEE

10:06AM   4    THERE'S A MAP WITH A LOT OF DOTS?

10:06AM   5    A.   YES.

10:06AM   6    Q.   AND UNFORTUNATELY THEY SEEM TO BE MOSTLY ON THE EAST

10:06AM   7    COAST.

10:06AM   8         DO YOU SEE THAT?

10:06AM   9    A.   YES.

10:07AM  10    Q.   BUT YOU SEE THIS IS A WALGREENS WELLNESS CENTER MAP OF

10:07AM  11    WHAT THE TOTAL WALGREENS FOOTPRINT COULD BE?

10:07AM  12    A.   YES.

10:07AM  13    Q.   AND YOU KNEW THAT WASN'T IN EXISTENCE AT THAT PARTICULAR

10:07AM  14    TIME THAT YOU WERE LOOKING AT THESE BINDERS; RIGHT?

10:07AM  15    A.   CORRECT.

10:07AM  16    Q.   OKAY.  AND IF YOU GO TO THE NEXT PAGE, PAGE 41.

10:07AM  17         YOU SEE THERANOS WELLNESS CENTERS; RIGHT?

10:07AM  18    A.   YES.

10:07AM  19    Q.   AND IT SAYS WALGREENS AND OTHER RETAIL PHARMACIES.

10:07AM  20         DO YOU SEE THAT?

10:07AM  21    A.   YES.

10:07AM  22    Q.   AND THEN BELOW THERANOS'S FOOTPRINT AT RETAIL IT SAYS,

10:07AM  23    "THERANOS WELLNESS CENTERS ARE LOCATED WITHIN A SMALLER RADIUS

10:07AM  24    FROM THE PATIENT, AND OPEN LONGER HOURS THAN CURRENTLY

10:07AM  25    AVAILABLE."

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4016

10:07AM   1            DO YOU SEE THAT?

10:07AM   2       A.   YES.

10:07AM   3       Q.   AND IT GOES ON AND SAYS, "THERANOS HAS MORE WELLNESS

10:07AM   4   CENTERS THAN ANY OTHER LAB PROVIDER IN CALIFORNIA."

10:07AM   5            DO YOU SEE THAT?

10:07AM   6       A.   YES.

10:07AM   7       Q.   AND YOU KNEW AT THE TIME THAT YOU WERE LOOKING AT THESE

10:07AM   8   BINDERS IN OCTOBER OF 2014 THAT THERANOS DID NOT HAVE MORE

10:08AM   9   WELLNESS CENTERS THAN ANY LAB PROVIDER IN CALIFORNIA?

10:08AM  10       A.   YES.

10:08AM  11       Q.   AND, IN FACT, IF YOU QUICKLY TURN TO PAGE 74, YOU SEE

10:08AM  12   UNDER CONVENIENT LOCATIONS --

10:08AM  13       A.   YES.

10:08AM  14       Q.   -- AND IT HAS A GREEN SYMBOL FOR THEIR HEADQUARTERS?

10:08AM  15       A.   YES.

10:08AM  16       Q.   AND THEN ANOTHER FLAG FOR THE WALGREENS STORE IN

10:08AM  17   PALO ALTO; RIGHT?

10:08AM  18       A.   YES.

10:08AM  19       Q.   AND THEN IF YOU GO TO THE PAGES BEFORE THAT, PAGES --

10:08AM  20   LET'S START WITH PAGE 72.  DO YOU SEE THAT IT HAS LOCATIONS

10:08AM  21   NOTED IN THE PHOENIX AREA?

10:08AM  22       A.   YES.

10:08AM  23       Q.   AND THEN IF YOU GO TO PAGE 73, IT ACTUALLY LISTS THOSE

10:08AM  24   LOCATIONS; RIGHT?

10:08AM  25       A.   YES.

| | | |
|---|---|---|
| 10:08AM | 1 | Q.   OKAY.  SO GOING BACK TO PAGE 41 WITH THE STATEMENT THAT |
| 10:08AM | 2 | "THERANOS HAS MORE WELLNESS CENTERS THAN ANY LAB PROVIDER IN |
| 10:09AM | 3 | CALIFORNIA," YOU UNDERSTOOD THAT THIS WAS A GOAL THAT THEY HAD; |
| 10:09AM | 4 | RIGHT? |
| 10:09AM | 5 | A.   YES. |
| 10:09AM | 6 | Q.   IF YOU WOULD GO TO PAGE 83. |
| 10:09AM | 7 | YOU SEE THIS SLIDE JUST HAS AN EXAMPLE OF PRICING FOR |
| 10:09AM | 8 | ASSAYS? |
| 10:09AM | 9 | A.   YES. |
| 10:09AM | 10 | Q.   AND IN THIS EXAMPLE IT WOULD BE CBC, CMP, LIPID, TSH, AND |
| 10:09AM | 11 | VITAMIN D? |
| 10:09AM | 12 | A.   YES. |
| 10:09AM | 13 | Q.   AND THE PRICE IN THIS EXAMPLE WOULD BE $54 FOR ALL OF |
| 10:09AM | 14 | THOSE TESTS? |
| 10:09AM | 15 | A.   YES. |
| 10:09AM | 16 | Q.   OKAY.  AND THEN IF YOU GO TO PAGE 90. |
| 10:10AM | 17 | DO YOU SEE THAT THERE'S A SLIDE THAT "EVERY THERANOS TEST |
| 10:10AM | 18 | BEGINS WITH YOU, THE PHYSICIAN"? |
| 10:10AM | 19 | A.   YES. |
| 10:10AM | 20 | Q.   AND SO THIS SLIDE, THE WAY THAT IT'S WRITTEN, IT SEEMS TO |
| 10:10AM | 21 | BE DIRECTED TO AN AUDIENCE OF PHYSICIANS; RIGHT? |
| 10:10AM | 22 | A.   YES. |
| 10:10AM | 23 | Q.   BECAUSE YOU, THE PHYSICIAN, DOESN'T REFER TO YOU OR YOUR |
| 10:10AM | 24 | COLLEAGUES AT RDV; RIGHT? |
| 10:10AM | 25 | A.   CORRECT. |

10:10AM 1    Q.    OKAY.  AND THEN HERE IT SAYS, "FAX ANY LAB ORDER FORM TO

10:10AM 2    THERANOS."

10:10AM 3          RIGHT?

10:10AM 4    A.    YES.

10:10AM 5    Q.    "DIRECT YOUR PATIENTS TO THE NEAREST THERANOS WELLNESS

10:10AM 6    CENTER."

10:10AM 7          RIGHT?

10:10AM 8    A.    YES.

10:10AM 9    Q.    AND THEN IT SAYS, "RECEIVE YOUR PATIENT'S RESULTS IN LESS

10:10AM 10   THAN 48 HOURS ON AVERAGE."

10:10AM 11         RIGHT?

10:10AM 12   A.    YES.

10:10AM 13   Q.    AND THAT WAS IN THE BINDER THAT YOU WERE LOOKING AT;

10:10AM 14   RIGHT?

10:10AM 15   A.    YES, AMONG OTHER THINGS.

10:11AM 16   Q.    LET'S GO TO PAGE 133, AND I WON'T GO THROUGH ALL OF THESE,

10:11AM 17   MS. PETERSON.

10:11AM 18         BUT IF YOU LOOK AT PAGE 133 ALL OF THE WAY THROUGH 187.

10:11AM 19   IF WE CAN JUST FLIP THROUGH THOSE.

10:11AM 20         YOU SEE THAT THESE ARE ALL JUST LISTS OF THERANOS PATENTS

10:11AM 21   AND OTHER INTELLECTUAL PROPERTY; CORRECT?

10:11AM 22   A.    CORRECT.

10:11AM 23   Q.    AND THAT'S -- WE TALKED ABOUT THIS BEFORE, BUT THIS WAS

10:11AM 24   SOMETHING THAT YOU WERE INTERESTED IN?

10:11AM 25   A.    YES.  ALL OF THIS SPEAKS TO US TRYING TO GET AT WHETHER

10:11AM 1    THE ANALYZER WORKED COMMERCIALLY.

10:11AM 2    Q.   RIGHT.  AND DID YOU, DID YOU GO TO THE U.S. PATENT AND

10:11AM 3    TRADEMARK OFFICE AND DO ANY RESEARCH ABOUT THAT?

10:11AM 4    A.   NO.

10:11AM 5            MR. LEACH:  OBJECTION.  RELEVANCE.

10:11AM 6            THE COURT:  I'LL LET THE ANSWER REMAIN.

10:11AM 7        YOU CAN CONTINUE.

10:11AM 8    BY MR. COOPERSMITH:

10:11AM 9    Q.   OKAY.  LET'S GO TO EXHIBIT 1853.  THAT'S ALREADY IN

10:12AM 10   EVIDENCE.

10:12AM 11       DO YOU SEE IT ON YOUR SCREEN?

10:12AM 12   A.   YES.

10:12AM 13   Q.   OKAY.  AND YOU DISCUSSED THIS WITH MR. LEACH YESTERDAY?

10:12AM 14   A.   YES.

10:12AM 15   Q.   AND THIS WAS A DOCUMENT THAT YOU LOOKED AT IN CONNECTION

10:12AM 16   WITH YOUR WORK WITH THE THERANOS INVESTMENT?

10:12AM 17   A.   YES.

10:12AM 18   Q.   OKAY.  LET'S JUST GO THROUGH A FEW POINTS ON IT.

10:12AM 19       SO DO YOU SEE THAT IT SAYS PROJECTED STATEMENT OF INCOME?

10:12AM 20       DO YOU SEE THAT?

10:12AM 21   A.   YES.

10:12AM 22   Q.   AND THAT THERE'S COLUMNS FOR A PERIOD ENDING JANUARY --

10:12AM 23   I'M SORRY, A PERIOD ENDING DECEMBER 31ST, 2014, AND A PERIOD

10:12AM 24   ENDING DECEMBER 31ST, 2015.

10:12AM 25       DO YOU SEE THAT?

10:12AM  1    A.   YES.

10:12AM  2    Q.   AND YOU ASSUMED THAT THE PROJECTIONS WERE REALLY APPLYING

10:12AM  3    TO 2015; RIGHT?

10:12AM  4    A.   I ASSUMED THAT THE PROJECTIONS -- YES.

10:13AM  5    Q.   OKAY.  THE -- IF YOU GO THROUGH IT, THOUGH, YOU SEE

10:13AM  6    THERE'S A SECTION RIGHT THERE ON "LAB SERVICES FROM U.S. RETAIL

10:13AM  7    PHARMACIES"?

10:13AM  8    A.   YES.

10:13AM  9    Q.   AND I THINK YOUR TESTIMONY WAS THAT IT WOULD BE EITHER

10:13AM  10   WALGREENS OR SAFEWAY; RIGHT?

10:13AM  11   A.   YES.

10:13AM  12   Q.   AND IT DIDN'T MATTER TO RDV IF IT WAS SAFEWAY IN

10:13AM  13   PARTICULAR; RIGHT?

10:13AM  14   A.   NO.

10:13AM  15   Q.   IT COULD BE ANOTHER RETAIL PHARMACY?

10:13AM  16   A.   NO.  BUT IT WAS IMPORTANT TO US THAT THEY HAD CONTRACTS

10:13AM  17   WITH SAFEWAY AND WALGREENS THAT SUPPORT THE 2015 PROJECTION.

10:13AM  18   Q.   RIGHT.  BUT IF IT ENDED UP THAT THE -- ANOTHER PHARMACY

10:13AM  19   BESIDES WALGREENS WAS ANOTHER ONE, LIKE, FOR EXAMPLE, CVS, THAT

10:13AM  20   WOULDN'T HAVE MATTERED; RIGHT?

10:13AM  21   A.   THAT WOULD HAVE BEEN FINE.

10:13AM  22        BUT WHAT WE WERE RELYING ON WAS THE FACT THAT THEY HAD

10:13AM  23   THESE CONTRACTS WITH THESE TWO INDIVIDUALS.

10:13AM  24   Q.   RIGHT, THE OPPORTUNITY --

10:13AM  25   A.   THESE TWO COMPANIES.

10:13AM   1    Q.   THE OPPORTUNITY TO ROLL OUT WITH THESE TWO COMPANIES?

10:14AM   2    A.   RIGHT.

10:14AM   3    Q.   BUT IF THEY ENDED UP SUBSTITUTING CVS FOR SAFEWAY, THAT

10:14AM   4    WOULDN'T HAVE BEEN A BIG DEAL?

10:14AM   5    A.   NO.

10:14AM   6    Q.   IF YOU GO TO THE NEXT LINE, "LAB SERVICES REVENUE FROM

10:14AM   7    PHYSICIANS OFFICES."

10:14AM   8    A.   YES.

10:14AM   9    Q.   YOU UNDERSTOOD THAT WOULD BE HAVING PHYSICIANS' OFFICES

10:14AM  10    USE THERANOS FOR THEIR BLOOD TESTING SERVICES?

10:14AM  11    A.   YES.

10:14AM  12    Q.   AND THEN SAME WITH "LAB SERVICES REVENUE FROM HOSPITALS"?

10:14AM  13    A.   YES.

10:14AM  14    Q.   AND THERE'S ANOTHER ONE BELOW THAT, "ON SITE SERVICES

10:14AM  15    REVENUE FROM HOSPITALS"; RIGHT?

10:14AM  16    A.   YES.

10:14AM  17    Q.   AND THAT'S A DIFFERENT ITEM, IT APPEARS FROM THE DOCUMENT,

10:14AM  18    COMPARED TO THE LAB SERVICES REVENUE FROM HOSPITAL?

10:14AM  19    A.   YES.

10:14AM  20    Q.   AND THEN FOR THE ON SITE SERVICES REVENUE FROM HOSPITALS,

10:14AM  21    DO YOU SEE THAT THERE'S NO, NO REVENUE PROJECTION FOR THAT

10:14AM  22    ITEM; RIGHT?

10:14AM  23    A.   FOR 2014.

10:15AM  24    Q.   RIGHT.  THERE IS ONE FOR 2015?

10:15AM  25    A.   YES.

10:15AM  1      Q.   BUT NOT FOR 2014?

10:15AM  2      A.   CORRECT.

10:15AM  3      Q.   AND THEN "PHARMACEUTICAL SERVICES."

10:15AM  4           DO YOU SEE THAT?

10:15AM  5      A.   YES.

10:15AM  6      Q.   AND THERE ARE NUMBERS IN THE PROJECTIONS FOR THOSE; RIGHT?

10:15AM  7      A.   YES.

10:15AM  8      Q.   AND DO YOU UNDERSTAND THAT IF A PHARMACEUTICAL COMPANY WAS

10:15AM  9      RUNNING A CLINICAL TRIAL AND THEY NEEDED THEIR CLINICAL TRIAL

10:15AM 10      SUBJECTS TO GET BLOOD TESTS, THOSE PEOPLE COULD GO TO WALGREENS

10:15AM 11      OR SOME OTHER LOCATION TO GET THOSE BLOOD TESTS; RIGHT?

10:15AM 12      A.   IT WAS OUR UNDERSTANDING THAT THE CLINICAL TRIALS THAT

10:15AM 13      THEY WERE DOING WITH THEIR ANALYZER WAS WITH -- WE WERE

10:15AM 14      ASSUMING THAT WHEN THEY SAID THAT THEY WERE WORKING WITH 10 OF

10:15AM 15      THE TOP 15 PHARMACEUTICAL COMPANIES, THAT THEY HAD THE

10:15AM 16      ANALYZERS AT THEIR CLINICAL TRIALS.

10:15AM 17      Q.   RIGHT.  BUT THE IDEA WAS TO IN SOME WAY USE THE ANALYZERS

10:15AM 18      IN CONNECTION WITH CLINICAL TRIALS; RIGHT?

10:15AM 19      A.   YES.

10:15AM 20      Q.   THERANOS'S BLOOD TESTING SERVICES?

10:15AM 21      A.   YES.

10:15AM 22      Q.   OKAY.  NOW, IF YOU HAD GO DOWN THE DOCUMENT -- WELL, LET'S

10:16AM 23      JUST STICK WITH THE SECOND COLUMN.  THIS IS THE PERIOD ENDING

10:16AM 24      DECEMBER 31ST, 2015.

10:16AM 25           DO YOU SEE THAT?

10:16AM  1    A.   YES.

10:16AM  2    Q.   AND YOU UNDERSTOOD THAT TO GET TO THE REVENUE NUMBER FOR

10:16AM  3    THE RETAIL PHARMACIES ITEM, THERE WOULD NEED TO BE 900

10:16AM  4    LOCATIONS; RIGHT?

10:16AM  5    A.   YES.

10:16AM  6    Q.   AND FEWER LOCATIONS WOULD MEAN FEWER REVENUE, LESS

10:16AM  7    REVENUE?

10:16AM  8    A.   YES.

10:16AM  9    Q.   OKAY.  AND THEN IF YOU GO DOWN, YOU SEE THERE'S AN

10:16AM  10   OPERATING EXPENSES SECTION?

10:16AM  11   A.   YES.

10:16AM  12   Q.   AND THEN THERE'S A PROJECTION FOR THE RESEARCH AND

10:16AM  13   DEVELOPMENT EXPENSE FOR BOTH YEARS.

10:16AM  14       DO YOU SEE THAT?

10:16AM  15   A.   YES.

10:16AM  16   Q.   AND THE PROJECTION FOR 2014, YEAR ENDING 2014 IS

10:16AM  17   $57 MILLION.

10:16AM  18       DO YOU SEE THAT?

10:16AM  19   A.   YES.

10:16AM  20   Q.   AND THAT'S THE R&D EXPENSE THERANOS WAS PROJECTING; RIGHT?

10:16AM  21   A.   YES.

10:17AM  22   Q.   AND THEN FOR THE YEAR ENDING 2015, THEY WERE PROJECTING

10:17AM  23   127 MILLION IN R&D EXPENSE?

10:17AM  24   A.   YES.

10:17AM  25   Q.   OKAY.  JUST TO FINISH THIS PAGE, IF YOU GO TO THE

10:17AM   1    DIFFERENT SECTORS THERE, YOU SEE THERE'S ANOTHER ITEM FOR DOD,

10:17AM   2    DEPARTMENT OF DEFENSE?

10:17AM   3    A.   YES.

10:17AM   4    Q.   AND YOU UNDERSTOOD THAT THAT MEANT DEPARTMENT OF DEFENSE?

10:17AM   5    A.   OH, SURE, YEAH.

10:17AM   6    Q.   AND THEN IT HAS, FOR THE YEAR ENDING 2014, TO BE

10:17AM   7    DETERMINED, TBD?

10:17AM   8    A.   YES.

10:17AM   9    Q.   AND THEN FOR THE NEXT YEAR, ALSO TO BE DETERMINED?

10:17AM  10    A.   YES.

10:17AM  11    Q.   OKAY.  LET'S GO TO THE NEXT PAGE OF THE DOCUMENT, PAGE 2.

10:17AM  12         THIS IS THE -- IT'S LIKE A BALANCE SHEET BASICALLY; RIGHT?

10:17AM  13    A.   YES.

10:17AM  14    Q.   AND IT'S FOR THE PERIOD ENDING JULY 14TH, 2014?

10:17AM  15    A.   YES.

10:17AM  16    Q.   AND YOU DIDN'T SEE ANY LATER BALANCE SHEET FOR SOME LATER

10:17AM  17    PERIOD IN 2014?

10:17AM  18    A.   NO.

10:17AM  19    Q.   FOR EXAMPLE, WHEN YOU WERE THERE AT THERANOS IN OCTOBER,

10:18AM  20    YOU DIDN'T GET AN UPDATED ONE FOR OCTOBER OF 2014?

10:18AM  21    A.   NO.

10:18AM  22    Q.   AND YOU DIDN'T ASK FOR ONE?

10:18AM  23    A.   NO.

10:18AM  24    Q.   IF YOU SEE THAT -- I'M SORRY.  ON THIS PAGE, THERE'S AN

10:18AM  25    ITEM THERE FOR DEFERRED REVENUE AND CUSTOMER DEPOSITS?

10:18AM 1    A.   YES.

10:18AM 2    Q.   AND THAT'S 168 MILLION AND A LITTLE MORE.

10:18AM 3         DO YOU SEE THAT?

10:18AM 4    A.   YES.

10:18AM 5    Q.   OKAY.  AND YOU HAVE SOME HANDWRITING THERE.

10:18AM 6         IS THAT YOUR HANDWRITING?

10:18AM 7    A.   YES.

10:18AM 8    Q.   AND A QUESTION MARK?

10:18AM 9    A.   YES.

10:18AM 10   Q.   AND DID YOU EVER FIND OUT WHAT THAT WAS?

10:18AM 11   A.   NOT UNTIL LATER.

10:18AM 12   Q.   OKAY.  AND LATER YOU FOUND OUT THAT IT WAS MONEY, AT LEAST

10:18AM 13   SOME OF THAT 168 MILLION WAS MONEY FROM WALGREENS THAT THEY

10:18AM 14   PROVIDED TO THERANOS TO HELP FUND A NATIONAL ROLLOUT?

10:18AM 15   A.   YES, I FOUND THAT OUT WHEN THERE WAS THE LAWSUIT GOING ON

10:18AM 16   BETWEEN THEM THAT THAT'S WHAT THAT WAS.

10:18AM 17   Q.   OKAY.  BUT YOU DIDN'T KNOW AT THE TIME?

10:18AM 18   A.   NO.

10:18AM 19   Q.   OKAY.  LET'S TALK ABOUT THE MEETING ON OCTOBER 14TH; OKAY?

10:19AM 20        AND YOU WENT THERE AND YOU HAD SOME DEVOS FAMILY MEMBERS

10:20AM 21   WITH YOU?

10:20AM 22   A.   YES, THREE OF THEM.

10:20AM 23   Q.   AND THAT WAS DOUG DEVOS?

10:20AM 24   A.   DOUG DEVOS, RICK DEVOS, AND CHERI VANDERWEIDE,

10:20AM 25   V-A-N-D-E-R-W-E-I-D-E, DEVOS.

10:20AM  1    Q.   AND DOUG AND RICK DEVOS, AT THE TIME IN OCTOBER OF 2014,

10:20AM  2    THEY WERE ON THE RDV INVESTMENT COMMITTEE?

10:20AM  3    A.   YES.  DOUG WAS THE CHAIRMAN.

10:20AM  4    Q.   AT THAT POINT CHERI DEVOS WAS NOT ON THE INVESTMENT

10:20AM  5    COMMITTEE?

10:20AM  6    A.   THERE WERE TWO OTHER FAMILY MEMBERS ON THE INVESTMENT

10:20AM  7    COMMITTEE.  I'M NOT SURE IF ONE WAS RELATED TO CHERI OR NOT.

10:20AM  8    Q.   OKAY.  AND YOU ALREADY SAID THE MEETING WAS FOUR, FOUR AND

10:20AM  9    A HALF HOURS OR SOMETHING LIKE THAT; RIGHT?

10:20AM  10   A.   YES.

10:20AM  11   Q.   AND YOU REMEMBER MR. BALWANI WAS THERE?

10:20AM  12   A.   YES.

10:20AM  13   Q.   AND MS. HOLMES?

10:20AM  14   A.   YES.

10:20AM  15   Q.   AND IF I HEARD YOU CORRECTLY YESTERDAY, YOUR TESTIMONY IS

10:20AM  16   THAT MR. BALWANI, HIS PARTICULAR FOCUS AT THE MEETING WAS ON

10:20AM  17   THE FINANCIAL INFORMATION?

10:20AM  18   A.   YES.

10:20AM  19   Q.   AND MR. BALWANI -- I THINK YOU SAID YESTERDAY THAT THERE

10:21AM  20   WAS A DISCUSSION ABOUT FINANCIAL INFORMATION AT THAT MEETING;

10:21AM  21   RIGHT?

10:21AM  22   A.   YES.

10:21AM  23   Q.   AND MR. BALWANI LED THAT DISCUSSION?

10:21AM  24   A.   YES.

10:21AM  25   Q.   AND MR. BALWANI PUT UP SOME ITEMS ON THE SCREEN RELATING

10:21AM   1    TO FINANCIALS; CORRECT?

10:21AM   2    A.   IT -- ELIZABETH DID A LOT OF THE TALKING.  WE DID SOME

10:21AM   3    TALKING AS WELL.

10:21AM   4         BUT I DO RECALL THE SECTION OF THE DISCUSSION THAT

10:21AM   5    INVOLVED THE FINANCIALS WAS MORE WHEN SUNNY TOOK THE LEAD.

10:21AM   6    Q.   OKAY.  AND IN THAT DISCUSSION THAT MR. BALWANI LED, HE PUT

10:21AM   7    UP SOME FINANCIAL INFORMATION ON THE SCREEN; RIGHT?

10:21AM   8    A.   THOSE TWO PAGES THAT WE JUST LOOKED AT.

10:21AM   9    Q.   WELL, OTHER FINANCIAL INFORMATION AS WELL; RIGHT?

10:21AM  10    A.   I DON'T BELIEVE SO.

10:21AM  11    Q.   OKAY.

10:21AM  12    A.   I DON'T RECALL IF THAT WAS THE CASE.

10:21AM  13    Q.   IS IT YOUR TESTIMONY TODAY, MS. PETERSON, THAT THE ONLY

10:21AM  14    THING PUT UP ON THE SCREEN WAS THE TWO PAGES OF FINANCIAL

10:21AM  15    INFORMATION THAT WE JUST LOOKED AT?

10:22AM  16    A.   THE ONLY TWO THINGS THAT I REMEMBER DISCUSSING WERE

10:22AM  17    THOSE -- ARE THOSE TWO PAGES.

10:22AM  18    Q.   OKAY.  BUT IS IT YOUR TESTIMONY THAT THERE WAS NOTHING

10:22AM  19    ELSE ON THE SCREEN?

10:22AM  20    A.   I DON'T REMEMBER.

10:22AM  21    Q.   YOU DON'T REMEMBER ONE WAY OR THE OTHER?

10:22AM  22    A.   NO.

10:22AM  23    Q.   OKAY.  SO IF THERE WAS MORE INFORMATION PRESENTED ON THE

10:22AM  24    SCREEN, YOU JUST CAN'T TELL US ABOUT THAT BECAUSE YOU DON'T

10:22AM  25    REMEMBER IT TODAY; RIGHT?

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4028

10:22AM   1    A.   CORRECT.

10:22AM   2    Q.   OKAY.  BUT YOU DO REMEMBER THERE WAS SOME FINANCIAL

10:22AM   3    INFORMATION PUT UP ON THE SCREEN; RIGHT?

10:22AM   4    A.   I DO REMEMBER THOSE TWO PAGES, AND THOSE TWO PAGES WERE

10:22AM   5    DISCUSSED BECAUSE THEY MADE CHANGES TO A FEW OF THE NUMBERS,

10:22AM   6    YES.

10:22AM   7    Q.   OKAY.  BUT YOU CAN'T REMEMBER WHAT ELSE MAY HAVE BEEN ON

10:22AM   8    THE SCREEN?

10:22AM   9    A.   NO.

10:22AM   10             MR. LEACH:  YOUR HONOR --

10:22AM   11             THE COURT:  I THINK WE'VE DEVELOPED THAT.

10:22AM   12             MR. COOPERSMITH:  WE ARE, YOUR HONOR.  WE ARE DONE

10:22AM   13    WITH THAT.

10:22AM   14    Q.   OKAY.  LET'S TAKE A LOOK AT EXHIBIT 2120.

10:23AM   15         DO YOU SEE THAT 2120 IS AN EMAIL STRING AMONG YOU AND

10:23AM   16    MR. TUBERGEN?

10:23AM   17    A.   YES.

10:23AM   18    Q.   AND THIS WAS IN CONNECTION WITH THE THERANOS INVESTMENT?

10:23AM   19    A.   YES.

10:23AM   20    Q.   AND IT'S AROUND OCTOBER -- WELL, IT'S IN OCTOBER OF 2014?

10:23AM   21    A.   OCTOBER 23RD, YES.

10:23AM   22    Q.   OKAY.  AND OTHER EMAILS EARLIER THAN THAT; RIGHT?  WE'LL

10:23AM   23    JUST LOOK AT IT.

10:23AM   24         YOUR HONOR, WE'LL OFFER 2120.

10:23AM   25             MR. LEACH:  I DON'T HAVE A COPY OF THIS.

10:23AM  1            THE COURT:  I DON'T EITHER.  IT'S NOT IN MY BINDER.

10:23AM  2            MR. COOPERSMITH:  MAY I SHOW COUNSEL?

10:23AM  3            THE COURT:  YES, PLEASE.

10:23AM  4            MR. COOPERSMITH:  (HANDING.)

10:24AM  5        YOUR HONOR, IS IT ACCEPTABLE FOR YOU TO LOOK AT IT ON THE

10:24AM  6    SCREEN?

10:24AM  7            THE COURT:  YOU'RE SEEKING TO ADMIT IT?

10:24AM  8            MR. COOPERSMITH:  YES, YOUR HONOR.

10:24AM  9            THE COURT:  ANY OBJECTION?

10:24AM  10           MR. LEACH:  I HAVE NO OBJECTION.

10:24AM  11           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:24AM  12       (GOVERNMENT'S EXHIBIT 2120 WAS RECEIVED IN EVIDENCE.)

10:24AM  13           MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

10:24AM  14    Q.  LET'S GO TO THE EARLIEST EMAIL IN TIME, MS. PETERSON, AND

10:24AM  15    YOU SEE RICK DEVOS WRITES TO YOU ON OCTOBER 15TH AND HE SAYS,

10:24AM  16    "ARE YOU GOING TO FOLLOW UP WITH YOUR WALGREENS CONTACT ON

10:24AM  17    THERANOS?  CURIOUS FOR THEIR ASSESSMENT."

10:24AM  18        DO YOU SEE THAT?

10:24AM  19    A.  YES.

10:24AM  20    Q.  AND THEN YOU WROTE BACK AND SAY, "HEY RICK, SORRY FOR THE

10:24AM  21    DELAY.  I WAS IN-FLIGHT."

10:24AM  22        AND THAT'S BECAUSE YOU WERE ON YOUR WAY BACK FROM

10:24AM  23    CALIFORNIA.  RIGHT?

10:24AM  24    A.  I DON'T REMEMBER.

10:24AM  25    Q.  OKAY.  "I PLAN TO REGROUP WITH JERRY TO DISCUSS NEXT STEPS

10:25AM   1    (WE DIDN'T HAVE TIME TODAY TO TOUCH BASE ON THAT ONE GIVEN MY

10:25AM   2    FLIGHT SCHEDULE).  I'LL KEEP YOU POSTED."

10:25AM   3         DO YOU SEE THAT?

10:25AM   4    A.   YES.

10:25AM   5    Q.   AND THEN YOU RESPOND FURTHER A FEW DAYS LATER ON

10:25AM   6    OCTOBER 23RD AND YOU SAY, "JERRY ASKED ME TO HOLD OFF ON THAT

10:25AM   7    INQUIRY.  HE SAID HE'D CONNECT WITH YOU ON THOUGHT PROCESS."

10:25AM   8         DO YOU SEE THAT?

10:25AM   9    A.   YES.

10:25AM  10    Q.   AND THE INQUIRY BEING REFERRED TO THERE IS THE INQUIRY TO

10:25AM  11    A CONTACT AT WALGREENS; RIGHT?

10:25AM  12    A.   YES.

10:25AM  13    Q.   AND THEN IF YOU GO TO THE FIRST PAGE, YOU SEE AT THE

10:25AM  14    BOTTOM THAT'S OCTOBER 23RD, AND YOU SAY, "SLIGHT TEE-UP JUST SO

10:25AM  15    I DIDN'T LEAVE HIM HANGING... BY THE WAY, I'LL GET YOU WRITE-UP

10:26AM  16    TONIGHT OFF BPOC DINNER.

10:26AM  17         DO YOU SEE THAT?

10:26AM  18    A.   YES.

10:26AM  19    Q.   AND WHAT WAS THE WRITE-UP YOU WERE REFERRING TO?

10:26AM  20    A.   THAT WAS THE APPROVAL DOCUMENT.

10:26AM  21    Q.   OKAY.  AND THAT'S ONE OF THE EXHIBITS YOU SAW YESTERDAY?

10:26AM  22    A.   YES.

10:26AM  23    Q.   OKAY.  WE'LL GET TO THAT.

10:26AM  24         AND IF WE GO BELOW THAT, ABOVE THAT RATHER, THERE'S

10:26AM  25    ANOTHER EMAIL ON OCTOBER 23RD WHERE YOU WROTE, "THERE'S A BIG

| | |
|---|---|
| 10:26AM | 1 | HOLE IN THE WRITE-UP THAT I LEFT OPEN FOR A VERY BASIC CAP |
| 10:26AM | 2 | TABLE." |
| 10:26AM | 3 | DO YOU SEE THAT? |
| 10:26AM | 4 | A.   YES. |
| 10:26AM | 5 | Q.   "THERE ARE SOME REALLY BASIC PRE- AND POST-DEAL FIGURES |
| 10:26AM | 6 | THAT I SHOULD GET FROM SUNNY BEFORE I FINALIZE THIS"; RIGHT? |
| 10:26AM | 7 | A.   YES. |
| 10:26AM | 8 | Q.   NOTHING CONTROVERSIAL? |
| 10:26AM | 9 | A.   CORRECT. |
| 10:26AM | 10 | Q.   SO YOU'RE TALKING ABOUT THIS ISSUE OF WANTING THE CAP |
| 10:26AM | 11 | TABLE THAT YOU DISCUSSED YESTERDAY? |
| 10:26AM | 12 | A.   YES. |
| 10:26AM | 13 | Q.   AND THEN MR. TUBERGEN RESPONDED; RIGHT? |
| 10:26AM | 14 | A.   YES. |
| 10:26AM | 15 | Q.   AND HE WROTE, "I WOULDN'T WORRY ABOUT THAT DETAIL RIGHT |
| 10:26AM | 16 | NOW.  I DO KNOW THEY WILL HAVE SOMEWHERE BETWEEN 500 AND |
| 10:26AM | 17 | POTENTIALLY 600 MILLION OF NEW CAPITAL COMING IN AT $17 PER |
| 10:26AM | 18 | SHARE." |
| 10:26AM | 19 | AND THEN IF YOU GO DOWN TO THE LAST PART, HE SAYS, "WE |
| 10:26AM | 20 | DON'T NECESSARILY HAVE TO FOLLOW THE SAME TEMPLATE AS OUR OTHER |
| 10:27AM | 21 | EQUITY INVESTMENTS." |
| 10:27AM | 22 | DO YOU SEE THAT? |
| 10:27AM | 23 | A.   YES. |
| 10:27AM | 24 | Q.   AND THEN ABOVE THAT YOU SAY, "I CAN MAKE IT WORK." |
| 10:27AM | 25 | RIGHT? |

10:27AM   1   A.   YES.

10:27AM   2   Q.   SO THAT'S YOU AND MR. TUBERGEN TALKING ABOUT THE NEED FOR

10:27AM   3   A CAP TABLE?

10:27AM   4   A.   YES.

10:27AM   5        THE ONLY REASON WE NEED A CAP TABLE IS TO ESTABLISH OUR

10:27AM   6   OWNERSHIP, WHICH YOU CAN DO WITH THE SIMPLE MATH THAT HE LAID

10:27AM   7   OUT.

10:27AM   8        WHAT I NEEDED IT FOR WAS IN THE FUTURE WHEN WE DID

10:27AM   9   VALUATIONS.

10:27AM  10   Q.   OKAY.  THANK YOU.

10:27AM  11        ALL RIGHT.  LET ME HAVE YOU TAKE A LOOK AT EXHIBIT 10588,

10:27AM  12   WHICH IS NOT IN EVIDENCE YET.

10:28AM  13        OKAY.  AND, MS. PETERSON, I THINK YOU REVIEWED SOME OF

10:28AM  14   THIS WITH MR. LEACH YESTERDAY.

10:28AM  15        BUT DO YOU SEE THAT THIS IS A THERANOS INC. SERIES C-2

10:28AM  16   PREFERRED STOCK AGREEMENT?

10:28AM  17   A.   YES.

10:28AM  18   Q.   STOCK PURCHASE AGREEMENT?

10:28AM  19   A.   YES.

10:28AM  20   Q.   AND DO YOU UNDERSTAND THAT THIS WAS A FORMAL DOCUMENT THAT

10:28AM  21   WAS SIGNED TO FACILITATE RDV'S INVESTMENT IN THERANOS?

10:28AM  22   A.   YES.

10:28AM  23   Q.   AND YOU'RE NOT THE SIGNATORY FOR THIS?

10:28AM  24   A.   NO.

10:28AM  25   Q.   AND THIS WOULD BE SOMEONE AT -- WHO WORKS FOR THE FAMILY?

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4033

10:28AM 1    A.   IT'S AN EXECUTIVE WITHIN RDV CORP. WHO SIGNS DOCUMENTS.

10:28AM 2    Q.   OKAY.  AND IN THE CASE OF RDV, WAS THAT ROBERT SCHIERBEEK?

10:28AM 3    A.   YES.

10:28AM 4    Q.   AND HE'S THE CHIEF OPERATING OFFICER?

10:28AM 5    A.   AT THE TIME, YES.

10:28AM 6    Q.   OKAY.  SO LOOKING AT EXHIBIT 10588, YOU WILL RECOGNIZE

10:29AM 7    THIS AS THE STOCK PURCHASE AGREEMENT IN CONNECTION WITH THE

10:29AM 8    THERANOS INVESTMENT?

10:29AM 9    A.   YES.

10:29AM 10           MR. COOPERSMITH:  YOUR HONOR, WE OFFER

10:29AM 11   EXHIBIT 10588.

10:29AM 12           MR. LEACH:  NO OBJECTION.

10:29AM 13           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:29AM 14      (DEFENDANT'S EXHIBIT 10588 WAS RECEIVED IN EVIDENCE.)

10:29AM 15   BY MR. COOPERSMITH:

10:29AM 16   Q.   IF YOU LOOK AT THE FIRST PAGE AND THE TITLE, IT HAS SOME

10:29AM 17   LANGUAGE HERE, BUT YOU UNDERSTAND THAT THIS IS THE AGREEMENT TO

10:29AM 18   PURCHASE THERANOS STOCK; RIGHT?

10:29AM 19   A.   CORRECT.

10:29AM 20   Q.   OKAY.  AND IF YOU LOOK AT PAGE 7, OR RATHER PAGE 6.

10:29AM 21      I THINK MR. LEACH REVIEWED SOME OF THIS INFORMATION WITH

10:29AM 22   YOU, BUT THERE'S A SECTION CALLED "REPRESENTATIONS AND

10:29AM 23   WARRANTIES OF THE INVESTORS"; RIGHT?

10:29AM 24   A.   YES.

10:29AM 25   Q.   AND RDV IS ONE OF THE INVESTORS?

10:29AM 1      A.    YES.

10:29AM 2      Q.    SO THESE ARE THINGS THAT RDV IS PROMISING THERANOS?

10:29AM 3      A.    YES.

10:29AM 4      Q.    OKAY.  LET'S LOOK AT SECTION 4.2, "INVESTMENT INTENT.

10:30AM 5      SUCH INVESTOR IS ACQUIRING THE SHARES AND THE CONVERSION SHARES

10:30AM 6      FOR INVESTMENT FOR ITS OWN ACCOUNT, NOT AS A NOMINEE OR AGENT,

10:30AM 7      AND NOT WITH THE VIEW TO, OR FOR RESALE IN CONNECTION WITH, ANY

10:30AM 8      DISTRIBUTION THEREOF, AND SUCH INVESTOR HAS NO PRESENT

10:30AM 9      INTENTION OF SELLING, GRANTING ANY PARTICIPATION IN OR

10:30AM 10     OTHERWISE DISTRIBUTING THE SAME."

10:30AM 11          DO YOU SEE THAT?

10:30AM 12     A.    YES.

10:30AM 13     Q.    AND SO THAT MEANS THAT RDV AS AN INVESTOR DOESN'T HAVE ANY

10:30AM 14     PRESENT INTENTION AT THAT TIME OF SELLING ITS SHARES; RIGHT?

10:30AM 15     A.    THEY DON'T WANT US TO TRANSFER OUR SHARES TO SOMEONE ELSE.

10:30AM 16     THEY WANTED TO KNOW WHO THEIR PARTNERS WERE.  AND I'M TELLING

10:30AM 17     THEM THAT WE WON'T TRANSFER THEM.

10:30AM 18     Q.    THAT IS WHAT RDV IS PROMISING?

10:30AM 19     A.    YES.

10:30AM 20     Q.    AND THE NEXT SECTION 4.3, "INVESTMENT EXPERIENCE."  IT

10:30AM 21     SAYS, "SUCH INVESTOR, OR ITS PURCHASER REPRESENTATIVE, WITHIN

10:30AM 22     THE MEANING OF REGULATION D, PROMULGATED BY THE SECURITIES AND

10:30AM 23     EXCHANGE COMMISSION," -- INVESTMENT EXPERIENCE, IT JUST SAYS

10:31AM 24     THAT -- I'LL MAKE IT SIMPLER.

10:31AM 25          THIS IS JUST SAYING THAT THE -- RDV, AS SIGNING THIS, IS

10:31AM   1    SAYING THAT RDV HAS SUBSTANTIAL EXPERIENCE IN EVALUATING AND IN

10:31AM   2    INVESTING IN TRANSACTIONS LIKE THIS; RIGHT?

10:31AM   3    A.   YES.

10:31AM   4    Q.   OKAY.  IT ALSO SAYS THAT RDV CAN PROTECT ITS OWN

10:31AM   5    INTERESTS; RIGHT?

10:31AM   6    A.   YES.

10:31AM   7    Q.   AND THAT RDV HAS THE KNOWLEDGE AND EXPERIENCE IN FINANCIAL

10:31AM   8    AND BUSINESS MATTERS, SO IT'S CAPABLE OF EVALUATING THE MERITS;

10:31AM   9    RIGHT?

10:31AM  10    A.   YES.

10:31AM  11    Q.   AND THAT WAS TRUE OF RDV; RIGHT?

10:31AM  12    A.   YES.

10:31AM  13    Q.   AND IT'S A FAIRLY LARGE STAFF OF PEOPLE DEDICATED TO THIS

10:31AM  14    PURPOSE; RIGHT?

10:31AM  15    A.   YES.

10:31AM  16    Q.   OF WHICH YOU WERE ONE?

10:31AM  17    A.   YES.

10:31AM  18    Q.   AND YOU SEE 4.4, SPECULATIVE NATURE OF INVESTMENT?

10:32AM  19    A.   YES.

10:32AM  20    Q.   AND HERE YOU UNDERSTAND THAT RDV IS PROMISING THAT IT

10:32AM  21    UNDERSTANDS AND ACKNOWLEDGES THAT THE COMPANY, MEANING

10:32AM  22    THERANOS, HAS A LIMITED FINANCIAL AND OPERATING HISTORY.

10:32AM  23        DO YOU SEE THAT?

10:32AM  24    A.   YES.

10:32AM  25    Q.   AND THAT AN INVESTMENT IN THE COMPANY IS HIGHLY

10:32AM  1    SPECULATIVE.

10:32AM  2         DO YOU SEE THAT?

10:32AM  3    A.   YES.

10:32AM  4    Q.   AND IT INVOLVES SUBSTANTIAL RISKS?

10:32AM  5    A.   YES.

10:32AM  6    Q.   AND THAT THE INVESTOR, IN THIS CASE RDV, CAN BEAR THE

10:32AM  7    ECONOMIC RISK OF THAT; RIGHT?

10:32AM  8    A.   YES.

10:32AM  9    Q.   AND THAT EVEN CAN BEAR THE ECONOMIC RISK OF SUFFERING THE

10:32AM 10    COMPLETE LOSS OF THE INVESTMENT; RIGHT?

10:32AM 11    A.   YES.

10:32AM 12    Q.   OKAY.  AND THEN THE NEXT SECTION, 4.5, IS CALLED ACCESS TO

10:32AM 13    DATA.

10:32AM 14         DO YOU SEE THAT?

10:32AM 15    A.   YES.

10:32AM 16    Q.   AND THE FIRST PART JUST SAYS THAT RDV HAD AN OPPORTUNITY

10:32AM 17    TO ASK QUESTIONS; RIGHT?

10:32AM 18    A.   YES.

10:32AM 19    Q.   AND RECEIVE OTHER INFORMATION?

10:32AM 20    A.   YES.

10:32AM 21    Q.   AND THEN IF YOU GO TO THE MIDDLE OF THAT, IT SAYS, "SUCH

10:32AM 22    INVESTOR UNDERSTANDS THAT SUCH DISCUSSIONS, AS WELL AS ANY

10:33AM 23    INFORMATION ISSUED BY THE COMPANY, WERE INTENDED TO DESCRIBE

10:33AM 24    CERTAIN ASPECTS OF THE COMPANY'S BUSINESS AND PROSPECTS, BUT

10:33AM 25    WERE NOT NECESSARILY A THOROUGH OR EXHAUSTIVE DESCRIPTION."

PETERSON CROSS BY MR. COOPERSMITH (RES.)

10:33AM   1           DO YOU SEE THAT?

10:33AM   2     A.   YES.

10:33AM   3     Q.   AND THAT'S SAYING THAT THERE ARE OTHER THINGS THAT

10:33AM   4     THERANOS MIGHT BE DOING THAT WEREN'T IN THE DESCRIPTION THAT

10:33AM   5     THEY GAVE TO RDV; RIGHT?

10:33AM   6     A.   YES.

10:33AM   7     Q.   IT GOES ON AND SAYS, "SUCH INVESTOR ACKNOWLEDGES THAT ANY

10:33AM   8     BUSINESS PLANS PREPARED BY THE COMPANY HAVE BEEN, AND CONTINUE

10:33AM   9     TO BE, SUBJECT TO CHANGE."

10:33AM  10           DO YOU SEE THAT?

10:33AM  11     A.   YES.

10:33AM  12     Q.   "AND THAT ANY PROJECTIONS INCLUDED IN SUCH BUSINESS PLANS

10:33AM  13     OR OTHERWISE ARE NECESSARILY SPECULATIVE IN NATURE, AND IT CAN

10:33AM  14     BE EXPECTED THAT SOME OR ALL OF THE ASSUMPTIONS UNDERLYING THE

10:33AM  15     PROJECTIONS WILL NOT MATERIALIZE OR WILL VARY SIGNIFICANTLY

10:33AM  16     FROM ACTUAL RESULTS."

10:33AM  17           DO YOU SEE THAT?

10:33AM  18     A.   YES.

10:33AM  19     Q.   AND RDV IS PROMISING THERANOS THAT THEY UNDERSTAND THIS;

10:33AM  20     RIGHT?

10:33AM  21     A.   YES.

10:33AM  22     Q.   OKAY.  AND THEN 4.6, GOING TO THAT, THAT'S THE SECTION

10:33AM  23     ABOUT ACCREDITED INVESTOR.

10:34AM  24           DO YOU SEE THAT?

10:34AM  25     A.   YES.

10:34AM 1    Q.   AND DO YOU UNDERSTAND THAT THAT JUST MEANS AN INVESTOR FOR

10:34AM 2    CERTAIN FINANCIAL WORTH THAT COULD MAKE AN INVESTMENT LIKE

10:34AM 3    THIS; RIGHT?

10:34AM 4    A.   YES.

10:34AM 5    Q.   SO JUST NOT ANYONE OFF THE STREET COULD MAKE AN INVESTMENT

10:34AM 6    LIKE THIS; RIGHT?

10:34AM 7    A.   CORRECT.

10:34AM 8    Q.   OKAY.  AND THEN IF YOU GO TO THE NEXT PAGE, SECTION 4.9,

10:34AM 9    DO YOU SEE IT SAYS, "NO PUBLIC MARKET"?

10:34AM 10   A.   YES.

10:34AM 11   Q.   AND SO DO YOU UNDERSTAND THAT THAT MEANS THAT THERE'S NO

10:34AM 12   PUBLIC TRADING OF THERANOS STOCK?

10:34AM 13   A.   CORRECT.

10:34AM 14   Q.   SO FINDING A BUYER FOR STOCK, IF ANYONE EVER WANTED TO

10:34AM 15   SELL IT, MIGHT BE DIFFICULT; RIGHT?

10:34AM 16   A.   CORRECT.

10:34AM 17   Q.   YOU COULDN'T JUST GO TO THE NEW YORK STOCK EXCHANGE AND

10:34AM 18   PLACE AN ORDER, LIKE A SALE ORDER OR SOMETHING; RIGHT?

10:34AM 19   A.   CORRECT.

10:34AM 20   Q.   AND IF YOU GO TO ONE OTHER THING PAGE 17, SECTION 7.8.

10:35AM 21       DO YOU SEE THERE'S A SECTION CALLED "ENTIRE AGREEMENT"?

10:35AM 22   A.   YES.

10:35AM 23   Q.   AND IT SAYS, "THIS AGREEMENT, INCLUDING THE EXHIBITS

10:35AM 24   ATTACHED HERETO, CONSTITUTE THE FULL AND ENTIRE UNDERSTANDING

10:35AM 25   AND AGREEMENT AMONG THE PARTIES WITH REGARD TO THE SUBJECTS

10:35AM 1   HEREOF AND SUPERSEDE ANY PRIOR AGREEMENTS OR UNDERSTANDING WITH

10:35AM 2   RESPECT TO THE SUBJECT MATTER HEREOF."

10:35AM 3       DO YOU SEE THAT?

10:35AM 4   A.   YES, I SEE THAT.

10:35AM 5   Q.   AND "THE SUBJECT MATTER HEREOF" WAS RDV'S INVESTMENT IN

10:35AM 6   THERANOS?

10:35AM 7   A.   CORRECT.

10:35AM 8   Q.   OKAY.  IF YOU GO TO PAGE -- WELL, IT MAY NOT HAVE A PAGE

10:35AM 9   NUMBER, BUT THERE'S A SECTION ABOUT MASTER SIGNATURE PAGES.

10:35AM 10      MR. ALLEN, IF YOU GO TO PAGE 18, AND THEN IT'S THREE MORE

10:35AM 11  PAGES AFTER THAT.

10:35AM 12      THERE YOU GO.

10:35AM 13      DO YOU SEE THAT IT SAYS, "MASTER SIGNATURE PAGES OF THE

10:35AM 14  INVESTORS LISTED ON THE SCHEDULE OF INVESTORS HAVE BEEN

10:35AM 15  INTENTIONALLY WITHHELD PER CONFIDENTIALITY AGREEMENTS WITH THE

10:35AM 16  COMPANY."

10:36AM 17      RIGHT?

10:36AM 18  A.   YES.

10:36AM 19  Q.   AND SO IF YOU COULD TAKE A LOOK AT EXHIBIT 2170.

10:36AM 20      DO YOU SEE THAT EXHIBIT 2170 IS AN EMAIL FROM MR. TUBERGEN

10:36AM 21  TO MR. BALWANI WITH A COPY TO MS. HOLMES AND MS. PETERSON?

10:36AM 22  A.   YES.

10:36AM 23  Q.   AND THAT'S DATED OCTOBER 31ST?

10:36AM 24  A.   YES.

10:36AM 25  Q.   AND THAT'S THE SIGNATURE PAGE BASICALLY; RIGHT?

10:36AM 1      A.   YES.

10:36AM 2      Q.   OKAY.

10:36AM 3           YOUR HONOR, WE OFFER 2170.

10:36AM 4                MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:36AM 5                THE COURT:  2170 IS ADMITTED.  IT MAY BE PUBLISHED.

10:36AM 6           (GOVERNMENT'S EXHIBIT 2170 WAS RECEIVED IN EVIDENCE.)

10:36AM 7      BY MR. COOPERSMITH:

10:36AM 8      Q.   AND IF YOU GO TO THE FIRST PAGE, THAT'S THE EMAIL THAT I

10:36AM 9      WAS JUST TALKING ABOUT; RIGHT?

10:36AM 10     A.   YES.

10:36AM 11     Q.   AND THEN THE SECOND PAGE IS ACTUALLY THE SIGNATURE PAGE

10:36AM 12     AND THAT'S WHERE MR. SCHIERBEEK'S SIGNATURE APPEARS; RIGHT?

10:36AM 13     A.   CORRECT.

10:36AM 14     Q.   AND YOU RECOGNIZE THAT?

10:36AM 15     A.   YES.

10:36AM 16     Q.   AND IT IS DATED OCTOBER 2014?

10:37AM 17     A.   YES.

10:37AM 18     Q.   AND SO THERE'S A DATE MISSING, BUT IT'S ACTUALLY

10:37AM 19     OCTOBER 31ST; RIGHT?

10:37AM 20     A.   YES.

10:37AM 21     Q.   OKAY.  YOU MENTIONED, BEFORE WE GOT INTO THAT DOCUMENT, AN

10:37AM 22     APPROVAL MEMORANDUM THAT YOU PREPARED.

10:37AM 23     A.   YES.

10:37AM 24     Q.   AND IF YOU COULD LOOK AT EXHIBIT 2166, WHICH IS ALREADY IN

10:37AM 25     EVIDENCE, THAT'S THE DOCUMENT THAT YOU'RE REFERRING TO?

10:37AM   1      A.   YES.

10:37AM   2      Q.   AND THIS IS A DOCUMENT THAT YOU PREPARED SO THAT

10:37AM   3      MR. TUBERGEN COULD SIGN IT SIGNIFYING APPROVAL FROM HIS

10:37AM   4      STANDPOINT?

10:37AM   5      A.   JERRY SIGNS ON BEHALF OF THE INVESTMENT COMMITTEE.

10:37AM   6      Q.   OKAY.  BUT THE ACTUAL DECISION IS MADE BY THE INVESTMENT

10:37AM   7      COMMITTEE?

10:37AM   8      A.   CORRECT.

10:37AM   9      Q.   NOT MR. TUBERGEN?

10:37AM  10      A.   CORRECT.

10:37AM  11      Q.   OKAY.

10:38AM  12               THE COURT:  FOLKS, WHY DON'T YOU STAND UP AND TAKE A

10:38AM  13      STANDING BREAK WHILE WE MOVE TO THE NEXT TOPIC.

10:38AM  14          YOU CAN, TOO, MS. PETERSON, IF YOU WOULD LIKE.

10:38AM  15               THE WITNESS:  THANK YOU.

10:38AM  16          (STRETCHING.)

10:39AM  17      BY MR. COOPERSMITH:

10:39AM  18      Q.   OKAY.  IF YOU COULD TAKE A LOOK, MS. PETERSON, AT

10:39AM  19      EXHIBIT 2098, WHICH IS NOT IN EVIDENCE YET.

10:39AM  20          DO YOU SEE THIS IS AN EMAIL STRING AMONG MR. TUBERGEN,

10:39AM  21      MS. HOLMES, MR. BALWANI, AND OTHERS, INCLUDING YOURSELF ON SOME

10:39AM  22      OF THE EMAILS.

10:39AM  23          DO YOU SEE THAT?

10:39AM  24      A.   YES.

10:39AM  25      Q.   AN INTERNAL EMAIL STRING WITHIN RDV?

10:39AM   1   A.   YES.

10:39AM   2   Q.   AND THIS IS RELATING TO THE THERANOS INVESTMENT?

10:39AM   3   A.   YES.

10:39AM   4            MR. COOPERSMITH:  YOUR HONOR, WE OFFER 2098.

10:39AM   5            MR. LEACH:  NO OBJECTION.

10:39AM   6            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:39AM   7        (GOVERNMENT'S EXHIBIT 2098 WAS RECEIVED IN EVIDENCE.)

10:39AM   8   BY MR. COOPERSMITH:

10:39AM   9   Q.   OKAY.  IF YOU GO TO THE EARLIEST EMAIL IN TIME FROM

10:39AM  10   MR. TUBERGEN ON SEPTEMBER 18TH, HE WRITES, "DEAR ELIZABETH,

10:39AM  11        "WHAT A GREAT PLEASURE IT WAS TO MEET YOU."

10:39AM  12        RIGHT?

10:39AM  13   A.   YES.

10:39AM  14   Q.   THAT WAS LONG BEFORE -- WELL, NOT LONG BEFORE.  IT WAS A

10:40AM  15   MONTH BEFORE THE MEETING AT THERANOS; RIGHT?

10:40AM  16   A.   YES.

10:40AM  17   Q.   AND THEN THE EMAIL CONTINUES WITH SOME ITEMS AFTER THE

10:40AM  18   MEETING.

10:40AM  19        SO IF YOU GO TO THE EMAIL FROM MR. TUBERGEN ON

10:40AM  20   OCTOBER 19TH AT 7:47 A.M., DO YOU SEE THAT IT SAYS, "THANK YOU

10:40AM  21   SO VERY MUCH FOR OUR MEETING TUESDAY"?

10:40AM  22        DO YOU SEE THAT?

10:40AM  23   A.   YES.

10:40AM  24   Q.   AND IN THE SECOND PARAGRAPH OF THAT, IT SAYS, "WE WOULD

10:40AM  25   LOVE TO MOVE FORWARD AND BE A PART OF THE NEW SHAREHOLDER BASE

10:40AM   1     YOU ARE ASSEMBLING.  AS WE DISCUSSED, AN INVESTMENT OF

10:40AM   2     $100 MILLION SEEMS TO FIT, IF THAT WORKS FOR YOU AND THE

10:40AM   3     COMPANY."

10:40AM   4          DO YOU SEE THAT?

10:40AM   5     A.   YES.

10:40AM   6     Q.   AND ACTUALLY VERBALLY THE MEMBERS OF THE DEVOS FAMILY AT

10:40AM   7     THE MEETING ON OCTOBER 14TH AT THERANOS COMMITTED TO A

10:40AM   8     $100 MILLION INVESTMENT?

10:40AM   9     A.   THEY DIDN'T COMMIT TO 100 MILLION, BUT THEY DEFINITELY

10:40AM   10    TALKED ABOUT THE 100 MILLION.

10:40AM   11         THEY ASKED ELIZABETH IF THAT WAS APPROPRIATE SIZING GIVEN

10:41AM   12    SOME OF THE OTHER INVESTORS.

10:41AM   13         THEY MAY HAVE SAID WE WOULD LIKE TO DO 100 MILLION, BUT WE

10:41AM   14    STILL HAVE TO GO THROUGH OUR PROCESS OF APPROVING IT BEFORE

10:41AM   15    IT'S ACTUALLY FORMALLY COMMITTED.

10:41AM   16    Q.   OKAY.

10:41AM   17    A.   BUT, YES, AT THE MEETING -- WE WENT INTO THE MEETING

10:41AM   18    THINKING WE WOULD DO 50, AND AFTER THE MEETING -- OR DURING THE

10:41AM   19    MEETING IT WAS DISCUSSED SIZING OF THE INVESTMENT.

10:41AM   20         AND THEN I DO RECALL US DISCUSSING IT OUTSIDE OF THE

10:41AM   21    MEETING IN THE PARKING GARAGE, OR PARKING LOT, BECAUSE I WAS

10:41AM   22    GOING A DIFFERENT DIRECTION, AND THEY WANTED ME TO WORK UP THE

10:41AM   23    APPROVAL DOCUMENT FOR THE 100 MILLION.

10:41AM   24    Q.   OKAY.  BUT IF YOU COULD GO TO THAT BINDER OF YOUR PRIOR

10:41AM   25    TESTIMONY, MS. PETERSON.

PETERSON CROSS BY MR. COOPERSMITH (RES.)                4044

10:42AM   1        AND THE QUESTION I WANT TO ASK YOU IS, ISN'T IT THE CASE

10:42AM   2   THAT BEFORE THE INVESTMENT MEMO, THAT APPROVAL MEMO THAT YOU

10:42AM   3   WROTE, THE COMMITMENT HAD ALREADY BEEN MADE VERBALLY?

10:42AM   4   A.   UM, IT WAS DEFINITELY SAID.  I MEAN "COMMITMENT" TO ME

10:42AM   5   MEANS IT'S APPROVED AND DONE, AND THERE'S STILL MORE STEPS TO

10:42AM   6   GO.

10:42AM   7        BUT, YES, THEY DID COMMIT, THEY DID COMMIT VERBALLY THAT

10:42AM   8   THEY WANTED TO DO 100 MILLION.  IT WAS UNDERSTOOD.

10:42AM   9        BUT WE STILL HAD TO TALK ABOUT IT INTERNALLY, AND ALSO

10:42AM  10   STILL GO THROUGH OUR PROCESS.

10:42AM  11   Q.   OKAY.  THANK YOU.

10:42AM  12        LET'S GO BACK TO THE EXHIBIT THAT WE WERE LOOKING AT,

10:42AM  13   WHICH IS 2098.  OKAY?

10:42AM  14   A.   YES.

10:42AM  15   Q.   AND IF YOU GO TO PAGE 3 -- I GUESS IT STARTS ON PAGE 2

10:42AM  16   FROM MR. TUBERGEN TO YOU ON OCTOBER 20TH.

10:43AM  17        DO YOU SEE THAT?

10:43AM  18   A.   YES.

10:43AM  19   Q.   AND HE WRITES, "DETAIL -- I JUST REREAD THE ATTACHED EMAIL

10:43AM  20   CHAIN AND NOTICED I OMITTED YOU IN REFERENCING OUR MEETING.  MY

10:43AM  21   APOLOGIES, AN OVERSIGHT ON MY PART THAT WAS CERTAINLY NOT

10:43AM  22   INTENTIONAL.  GOOD NEWS IS WE ARE IN AND I'M VERY ENCOURAGED BY

10:43AM  23   THIS DEAL.

10:43AM  24        "THANKS FOR YOUR HELP ON THIS, LISA."

10:43AM  25        DO YOU SEE THAT?

10:43AM  1     A.   YES.

10:43AM  2     Q.   AND YOU WROTE BACK, "NO WORRIES.  I'LL DOCUMENT SOMETHING

10:43AM  3     FOR THE FILE THAT YOU CAN SIGN AS 'APPROVED.'"

10:43AM  4          DO YOU SEE THAT?

10:43AM  5     A.   YES.

10:43AM  6     Q.   "LET ME KNOW HOW I CAN BE HELPFUL GOING FORWARD.  WOULD

10:43AM  7     LOVE TO STAY REMOTELY CONNECTED ON THIS AS IT REALLY FASCINATES

10:43AM  8     ME."

10:43AM  9          DO YOU SEE THAT?

10:43AM 10     A.   YES.

10:43AM 11     Q.   SO A PROFESSIONAL RESPONSE TO MR. TUBERGEN?

10:43AM 12     A.   YES.

10:43AM 13     Q.   AND THEN YOU SENT ANOTHER EMAIL TO SOMEONE NAMED

10:43AM 14     PAT LACROMBE?

10:43AM 15     A.   YES.

10:43AM 16     Q.   SOMEONE YOU THOUGHT YOU COULD CONFIDE IN?

10:43AM 17     A.   YES.

10:43AM 18     Q.   AND YOU WROTE "DIDN'T EVEN MENTION MY NAME"; RIGHT?

10:43AM 19     A.   YES.

10:43AM 20     Q.   AND THAT'S REFERRING TO MR. TUBERGEN?

10:44AM 21     A.   YES.

10:44AM 22     Q.   "WHAT A JOKE"; RIGHT?

10:44AM 23     A.   YES.

10:44AM 24     Q.   AND YOU SAID, "THAT STINGS BIG TIME AFTER PULLING AN

10:44AM 25     ALL-NIGHTER GETTING PREPARED.  WHY DON'T I EVER LEARN?"

PETERSON CROSS BY MR. COOPERSMITH (RES.)                4046

10:44AM   1          RIGHT?

10:44AM   2     A.   YES.

10:44AM   3     Q.   AND THAT'S HOW YOU FELT AT THE TIME?

10:44AM   4     A.   YES.  NO ONE LIKES TO BE SLIGHTED BY THEIR BOSS.

10:44AM   5     Q.   RIGHT.

10:44AM   6     A.   BUT HE DID EMAIL ME BACK AND HE SAID, I'M SORRY I OMITTED

10:44AM   7     YOU, AND I FELT A LOT BETTER ABOUT THAT.

10:44AM   8     Q.   AND THAT WAS NICE OF HIM?

10:44AM   9     A.   YEAH.

10:44AM   10    Q.   ALL RIGHT.  LET'S TAKE A LOOK AT EXHIBIT 13987.

10:44AM   11         13987 IS AN EMAIL THAT YOU SENT TO COLLEAGUES WITHIN RDV?

10:45AM   12    A.   YES.

10:45AM   13    Q.   AND A RESPONSE FROM ANDREW MASON?

10:45AM   14    A.   YES.

10:45AM   15    Q.   AND WHO IS ANDREW MASON?

10:45AM   16    A.   HE JUST WORKS IN THE INVESTMENT GROUP.

10:45AM   17    Q.   OKAY.  AND THIS IS ON NOVEMBER 5TH, 2014?

10:45AM   18    A.   YES.

10:45AM   19    Q.   AND SO THIS IS FIVE DAYS AFTER THE INVESTMENT WAS ACTUALLY

10:45AM   20    MADE; RIGHT?

10:45AM   21    A.   YES.

10:45AM   22              MR. COOPERSMITH:  YOUR HONOR, WE OFFER

10:45AM   23    EXHIBIT 13987.

10:45AM   24              MR. LEACH:  NO OBJECTION, YOUR HONOR.

10:45AM   25              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:45AM  1          (DEFENDANT'S EXHIBIT 13987 WAS RECEIVED IN EVIDENCE.)

10:45AM  2     BY MR. COOPERSMITH:

10:45AM  3     Q.    OKAY.  LOOKING AT THE BOTTOM EMAIL FROM NOVEMBER 5TH, YOU

10:45AM  4     WROTE TO MR. MASON AND OTHERS, "JERRY WANTS TO BRING THERANOS

10:45AM  5     TO IC."

10:45AM  6          DO YOU SEE THAT?

10:45AM  7     A.    YES.

10:45AM  8     Q.    AND THAT'S INVESTMENT COMMITTEE?

10:45AM  9     A.    YES.

10:45AM  10    Q.    "NOT SURE WHEN THAT WILL BE, NOR IS IT RELEVANT GIVEN

10:45AM  11    WE'VE FUNDED, BUT FYI, I WON'T HAVE SIGNATURE ON APPROVAL DOC

10:45AM  12    FOR A BIT."

10:45AM  13         DO YOU SEE THAT?

10:45AM  14    A.    YES.

10:45AM  15    Q.    AND SO AT THIS POINT THE APPROVAL MEMO THAT YOU WROTE HAD

10:45AM  16    NOT BEEN SIGNED; RIGHT?

10:46AM  17    A.    NO.

10:46AM  18    Q.    AND THAT WAS AFTER THE INVESTMENT WAS ALREADY MADE?

10:46AM  19    A.    IT WAS.  BUT THEY FLEW HOME TOGETHER AND I KNOW THEY

10:46AM  20    DISCUSSED THE INVESTMENT, AND GIVEN THAT THERE ARE THREE

10:46AM  21    MEMBERS OF THE INVESTMENT COMMITTEE ON THE PLANE ON THE WAY

10:46AM  22    HOME, JERRY HAD TOLD ME THAT IT WAS APPROVED VERBALLY BY THE

10:46AM  23    INVESTMENT COMMITTEE.

10:46AM  24    Q.    RIGHT.

10:46AM  25    A.    BUT HE WANTED TO TAKE THE MEMO THROUGH BECAUSE THERE WERE

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4048

10:46AM  1    SOME MEMBERS THAT WEREN'T ON THIS TRIP.

10:46AM  2    Q.   OKAY.  SO ON THE WAY BACK FROM CALIFORNIA ON THE RDV JET,

10:46AM  3    THEN THE INVESTMENT COMMITTEE PEOPLE WERE ON THAT PLANE; RIGHT?

10:46AM  4    A.   YES, AND THEY WERE AT THE MEETING IN PALO ALTO.

10:46AM  5    Q.   RIGHT.

10:46AM  6    A.   YES.

10:46AM  7    Q.   SO THERE WAS NO NEED TO HAVE AN INVESTMENT COMMITTEE

10:46AM  8    MEETING PRIOR TO INVESTMENT?

10:46AM  9    A.   THEY DID THAT EITHER ON THE PHONE -- THAT'S JERRY'S DOMAIN

10:46AM  10   OF GETTING THE OKAY FROM THE INVESTMENT COMMITTEE FOR ME TO

10:46AM  11   FUND.

10:46AM  12   Q.   OKAY.  AND YOU DIDN'T ATTEND ANY INVESTMENT COMMITTEE

10:47AM  13   MEETING; CORRECT?

10:47AM  14   A.   NO.

10:47AM  15   Q.   AND, IN FACT, YOU DON'T KNOW WHETHER ANY OF YOUR MEMOS

10:47AM  16   WERE EVER READ BY THE INVESTMENT COMMITTEE?

10:47AM  17   A.   THE, THE EARLY MEMO, THE FIRST MEMO WAS DEFINITELY READ

10:47AM  18   BECAUSE WE WENT THROUGH IT IN DETAIL ON THE PLANE ON THE WAY

10:47AM  19   OUT TO THE MEETING TOGETHER.

10:47AM  20   Q.   OKAY.  YOU DON'T KNOW WHETHER -- LET'S START WITH THE

10:47AM  21   SECOND ONE.

10:47AM  22       YOU DON'T KNOW WHETHER THE SECOND MEMO WAS EVER READ?

10:47AM  23   A.   I DON'T, NO.

10:47AM  24   Q.   AND THE FIRST ONE -- WELL, YOU WROTE TWO MEMOS; RIGHT?

10:47AM  25   A.   YES.

```
10:47AM   1    Q.   AND ONE WAS THE ONE ON OCTOBER 3RD THAT WE LOOKED AT;
10:47AM   2    RIGHT?
10:47AM   3    A.   YES, THAT WAS SENT ON THE 12TH, CORRECT.
10:47AM   4    Q.   OKAY.  AND THE OTHER ONE WAS THE APPROVAL MEMO THAT WE
10:47AM   5    TALKED ABOUT; RIGHT?
10:47AM   6    A.   YES.
10:47AM   7    Q.   AND YOU DON'T KNOW WHETHER EITHER OF THOSE WERE ACTUALLY
10:47AM   8    READ BY THE INVESTMENT COMMITTEE; CORRECT?
10:47AM   9    A.   LIKE I SAID, THERE ARE THREE PEOPLE THAT WERE ON THE
10:47AM  10    INVESTMENT COMMITTEE, INCLUDING THE CHAIRMAN THAT WAS AT THE
10:47AM  11    MEETING, AND WE TALKED ABOUT THE FIRST MEMO AT LENGTH ON THE
10:48AM  12    WAY OUT.  THERE WAS FOUR HOURS ON THE PLANE ON THE WAY OUT
10:48AM  13    THERE.
10:48AM  14         SO, YES, THAT WAS THOROUGHLY REVIEWED AND DISCUSSED.
10:48AM  15    THAT'S WHEN WE DISCUSSED WHETHER WE SHOULD TALK TO WALGREENS OR
10:48AM  16    NOT.
10:48AM  17         AND THEN ON THE WAY HOME, I WAS NOT ON THE PLANE, BUT IT
10:48AM  18    WAS -- THERE WAS APPROVAL RECEIVED BY JERRY.  OTHERWISE I
10:48AM  19    COULDN'T HAVE WIRED THE MONEY.
10:48AM  20    Q.   OKAY.  LET'S LOOK AT SOME PRIOR TESTIMONY AT 28412 IS THE
10:48AM  21    EXHIBIT NUMBER.  IT SHOULD BE IN YOUR TESTIMONY BINDER,
10:48AM  22    MS. PETERSON.
10:48AM  23    A.   YES.
10:48AM  24    Q.   AND IF YOU COULD TAKE A LOOK AT PAGE 4742.
10:49AM  25         DO YOU HAVE THAT?
```

PETERSON CROSS BY MR. COOPERSMITH (RES.)                    4050

10:49AM   1    A.   YES.

10:49AM   2    Q.   AND THIS WAS PRIOR TESTIMONY THAT YOU GAVE IN CONNECTION

10:49AM   3    WITH THE THERANOS MATTER?

10:49AM   4    A.   YES.

10:49AM   5    Q.   AND YOU WERE UNDER OATH WHEN YOU WERE TESTIFYING?

10:49AM   6    A.   YES, YES.

10:49AM   7    Q.   AND YOU KNEW YOU HAD TO TELL THE TRUTH; RIGHT?

10:49AM   8    A.   YES.

10:49AM   9    Q.   AND YOU WERE ASKED THE QUESTION ABOUT THE MEMOS, PLURAL;

10:49AM  10    RIGHT?

10:49AM  11    A.   YES.

10:49AM  12    Q.   AND YOU WERE ASKED A QUESTION ABOUT WHETHER YOU KNOW

10:49AM  13    WHETHER ANY OF THE MEMOS WERE EVER READ BY THE INVESTMENT

10:49AM  14    COMMITTEE; RIGHT?

10:49AM  15    A.   YES.

10:49AM  16    Q.   AND YOU SAID CORRECT, MEANING YOU DIDN'T KNOW IF THEY READ

10:49AM  17    THE MEMOS OR NOT; RIGHT?

10:49AM  18    A.   I CAN'T SAY THAT THEY READ THEM, BUT WE DEFINITELY

10:49AM  19    DISCUSSED THEM AT LENGTH ON THE PLANE TO CLARIFY THAT.

10:49AM  20    Q.   THAT WAS MY QUESTION.

10:49AM  21    A.   SORRY.

10:49AM  22    Q.   YOU DON'T KNOW WHETHER THE MEMOS WERE EVER READ BY THE

10:49AM  23    INVESTMENT COMMITTEE; CORRECT?

10:49AM  24    A.   I CAN'T SAY THAT SOMEONE PHYSICALLY READ THEM, NO.

10:50AM  25         BUT WE DEFINITELY WENT THROUGH THEM AND DISCUSSED THEM ON

10:50AM  1        THE PLANE.

10:50AM  2        Q.   AND DO YOU HAVE ANY NOTES OF THOSE CONVERSATIONS?

10:50AM  3        A.   NO.

10:50AM  4             (PAUSE IN PROCEEDINGS.)

10:50AM  5             MR. COOPERSMITH:  CAN I HAVE A MOMENT TO CONFER WITH

10:50AM  6   MY COLLEAGUES, YOUR HONOR?

10:50AM  7             THE COURT:  YES.

10:50AM  8        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:51AM  9             MR. COOPERSMITH:  NO FURTHER QUESTIONS, YOUR HONOR.

10:51AM  10            THE COURT:  REDIRECT?

10:51AM  11            MR. LEACH:  YES, YOUR HONOR, BRIEFLY.

10:51AM  12                     **REDIRECT EXAMINATION**

10:51AM  13   BY MR. LEACH:

10:52AM  14       Q.   DO YOU NEED A GLASS OF WATER, MS. PETERSON?

10:52AM  15       A.   NO, I'M GOOD.

10:52AM  16       Q.   GOOD MORNING.

10:52AM  17       A.   GOOD MORNING.

10:52AM  18       Q.   I JUST HAVE A FEW FOLLOW-UP QUESTIONS FOR YOU FOLLOWING

10:52AM  19   MR. COOPERSMITH'S EXAMINATION.

10:52AM  20            MS. WACHS, IF WE COULD PLEASE DISPLAY EXHIBIT 4858.

10:52AM  21            DO YOU RECALL QUESTIONS ABOUT THIS POWERPOINT THAT WAS

10:52AM  22   AMONG THE DUE DILIGENCE MATERIALS RDV RECEIVED FROM THERANOS?

10:52AM  23       A.   YES.

10:52AM  24       Q.   AND YOU WERE ASKED SOME QUESTIONS ABOUT WHETHER THE

10:52AM  25   COMMENTS MS. HOLMES AND MR. BALWANI MADE WERE ASPIRATIONAL OR

10:52AM  1    PRESENT TENSE.

10:52AM  2         DO YOU RECALL SOME OF THOSE QUESTIONS?

10:52AM  3    A.   YES.

10:52AM  4    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 3.

10:53AM  5         DO YOU SEE THE LINE, "THERANOS'S PROPRIETARY, PATENTED

10:53AM  6    TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS FROM A FINGERSTICK"?

10:53AM  7         DO YOU SEE THAT LANGUAGE?

10:53AM  8    A.   YES.

10:53AM  9    Q.   AND DID YOU UNDERSTAND "RUNS" TO BE PRESENT TENSE?

10:53AM  10   A.   YES.

10:53AM  11   Q.   DID YOU THINK THIS STATEMENT WAS ASPIRATIONAL?

10:53AM  12   A.   NO.

10:53AM  13   Q.   THIS SAYS, "GENERATES SIGNIFICANTLY HIGHER INTEGRITY DATA

10:53AM  14   THAN CURRENTLY POSSIBLE."

10:53AM  15        DO YOU SEE THAT?

10:53AM  16   A.   YES.

10:53AM  17   Q.   AND DID YOU THINK THAT WAS PRESENT TENSE?

10:53AM  18   A.   YES.

10:53AM  19   Q.   AND DID YOU THINK THAT WAS ASPIRATIONAL?

10:53AM  20   A.   NO.

10:53AM  21   Q.   IN THE THIRD PARAGRAPH, IT SAYS, "CURRENT AND PAST CLIENTS

10:53AM  22   INCLUDE 10 OF THE TOP 15 MAJOR PHARMACEUTICAL COMPANIES."

10:53AM  23        DO YOU SEE THAT?

10:53AM  24   A.   YES.

10:53AM  25   Q.   AND IT GOES ON TO TALK ABOUT MILITARY ORGANIZATIONS.

10:53AM  1          DO YOU SEE THAT?

10:53AM  2     A.   YES.

10:53AM  3     Q.   AND IN YOUR MEETING WITH MS. HOLMES AND MR. BALWANI IN

10:53AM  4     OCTOBER, DID THEY SAY THE DEVICE WAS BEING USED ON MILITARY

10:53AM  5     HELICOPTERS?

10:53AM  6     A.   THAT IT HAD BEEN.

10:53AM  7     Q.   OKAY.  WAS THERE ANYTHING ASPIRATIONAL ABOUT THAT?

10:54AM  8     A.   NO.

10:54AM  9     Q.   LET'S LOOK AT PAGE 7.

10:54AM 10          DO YOU SEE THIS LISTING OF PROFICIENCY TESTING RESULTS?

10:54AM 11     A.   YES.

10:54AM 12     Q.   FROM NATIONALLY RECOGNIZED AGENCIES?

10:54AM 13     A.   YES.

10:54AM 14     Q.   AND I THINK YOU SAID ON DIRECT THAT YOU BELIEVED THESE TO

10:54AM 15     RELATE TO THE THERANOS ANALYZER, NOT SOME THIRD PARTY DEVICE?

10:54AM 16     A.   YES.

10:54AM 17     Q.   AND DID YOU UNDERSTAND THIS TO BE ASPIRATIONAL?

10:54AM 18     A.   NO.

10:54AM 19     Q.   WAS THIS SOMETHING THAT HAD HAPPENED IN THE PAST?

10:54AM 20     A.   YES, SINCE 2011.

10:54AM 21     Q.   LET ME DRAW YOUR ATTENTION TO PAGE 8, AND I DRAW YOUR

10:54AM 22     ATTENTION TO THE FIRST PARAGRAPH UNDER "VALIDATION OF THERANOS

10:54AM 23     TESTS."

10:54AM 24          DO YOU SEE WHERE IT SAYS, "THERANOS HAS BEEN

10:54AM 25     COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

10:54AM  1    YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES."

10:55AM  2         DID YOU CONSIDER THAT TO BE ASPIRATIONAL?

10:55AM  3    A.   NO.

10:55AM  4    Q.   AND LET'S LOOK AT PAGE 28, PLEASE.

10:55AM  5         DO YOU SEE THE LINE, "THERANOS RUNS ANY TEST AVAILABLE IN

10:55AM  6    CENTRAL LABORATORIES, AND PROCESSES ALL SAMPLE TYPES"?

10:55AM  7    A.   YES.

10:55AM  8    Q.   AND THAT'S -- DID YOU CONSIDER THAT TO BE ASPIRATIONAL?

10:55AM  9    A.   NO.

10:55AM 10    Q.   DID YOU THINK THAT WAS SOMETHING THAT THERANOS WAS

10:55AM 11    CURRENTLY DOING?

10:55AM 12    A.   YES.

10:55AM 13    Q.   WITH ITS ANALYZER?

10:55AM 14    A.   YES.

10:55AM 15    Q.   AND ALL OF THAT IS BASED ON YOUR CONVERSATIONS WITH

10:55AM 16    MS. HOLMES AND MR. BALWANI IN PALO ALTO?

10:55AM 17    A.   YES.

10:55AM 18    Q.   THANK YOU, MS. WACHS.  WE CAN TAKE THAT DOWN.

10:55AM 19         AND I THINK YOU WERE ASKED SOME QUESTIONS ABOUT THE

10:55AM 20    THERANOS WEBSITE.

10:55AM 21    A.   YES.

10:55AM 22    Q.   AND DO YOU RECALL SOME QUESTIONS FROM MR. COOPERSMITH

10:55AM 23    ABOUT THAT?

10:55AM 24    A.   YES.

10:55AM 25    Q.   AND IF WE COULD PLEASE DISPLAY EXHIBIT 5805.

10:56AM   1          MAY I HAVE ONE MOMENT, YOUR HONOR?

10:56AM   2               THE COURT:  YES.

10:56AM   3          (PAUSE IN PROCEEDINGS.)

10:56AM   4     BY MR. LEACH:

10:56AM   5     Q.   DO YOU RECALL BEING ASKED QUESTIONS ABOUT EXHIBIT 5805?

10:56AM   6     A.   YES.

10:56AM   7     Q.   OKAY.  IF WE COULD GO TO PAGE 2, PLEASE, MS. WACHS, AND IF

10:56AM   8     WE COULD PLEASE ZOOM IN ON THE PART THAT SAYS, "ONE DROP.  A

10:56AM   9     WORLD OF ANSWERS."

10:56AM  10          AND IF THERE'S A WAY WE CAN -- CAN WE TRY ZOOMING IN ON

10:56AM  11     THAT AGAIN, MS. WACHS.

10:56AM  12          DO YOU SEE WHERE IT SAYS, "OUR LABORATORY CAN PRECISELY

10:56AM  13     ANALYZE TINY SAMPLES.  A FEW DROPS ARE ALL WE NEED TO PERFORM

10:57AM  14     MOST TESTS."

10:57AM  15          DO YOU SEE THAT LANGUAGE?

10:57AM  16     A.   YES.

10:57AM  17     Q.   IS THAT CONSISTENT WITH WHAT MS. HOLMES AND MR. BALWANI

10:57AM  18     TOLD YOU IN YOUR MEETING IN PALO ALTO?

10:57AM  19     A.   YES.

10:57AM  20     Q.   IF WE CAN GO DOWN A LITTLE BIT FURTHER TO THE LINE THAT

10:57AM  21     SAYS, "A FULL RANGE OF TESTS.  A FRACTION OF THE COST."

10:57AM  22          DO YOU SEE WHERE IT SAYS, "WE OFFER A FULL RANGE OF

10:57AM  23     LABORATORY TESTS, FROM COMMON PANELS TO SPECIALIZED TESTS.  ALL

10:57AM  24     WITH SPEED AND THE HIGHEST LEVELS OF QUALITY."

10:57AM  25          DO YOU SEE THAT LANGUAGE?

10:57AM   1      A.   YES.

10:57AM   2      Q.   AND IS THAT CONSISTENT WITH WHAT MS. HOLMES AND

10:57AM   3      MR. BALWANI TOLD YOU IN THE MEETING IN PALO ALTO?

10:57AM   4      A.   YES.

10:57AM   5      Q.   IF WE CAN GO TO THE NEXT PAGE, MS. WACHS.

10:57AM   6           THERE'S A LINE THAT SAYS, "A FEW DROPS IS ALL IT TAKES."

10:57AM   7           DO YOU SEE ANOTHER REFERENCE TO THE HIGHEST LEVEL OF

10:57AM   8      QUALITY IN THIS PARAGRAPH?

10:57AM   9      A.   YES.

10:57AM   10     Q.   AND IS THAT CONSISTENT WITH WHAT MS. HOLMES AND

10:58AM   11     MR. BALWANI TOLD YOU AT THE MEETING IN PALO ALTO?

10:58AM   12     A.   YES.

10:58AM   13     Q.   OKAY.  THANK YOU, MS. WACHS.  WE CAN TAKE THAT DOWN.

10:58AM   14          YESTERDAY YOU WERE ASKED SOME QUESTIONS ABOUT THE PARLOFF

10:58AM   15     ARTICLE THAT YOU READ.

10:58AM   16     A.   YES.

10:58AM   17     Q.   DO YOU RECALL QUESTIONS ABOUT THAT?

10:58AM   18     A.   YES.

10:58AM   19     Q.   AND IF WE COULD DISPLAY EXHIBIT 1944.

10:58AM   20          IF WE CAN GO TO PAGE 5 OF THE EXHIBIT, MS. WACHS.

10:58AM   21          DO YOU RECALL QUESTIONS FROM MR. COOPERSMITH ABOUT ASPECTS

10:58AM   22     OF THIS ARTICLE?

10:58AM   23     A.   YES.

10:58AM   24     Q.   OKAY.  IF WE COULD PLEASE ENLARGE THE PARAGRAPH ON THE --

10:58AM   25     TOWARDS THE BOTTOM RIGHT IN THE COLUMN TO THE RIGHT WHERE IT

10:58AM  1    SAYS, "THE RESULTS OF THERANOS'S TESTS."

10:59AM  2         DO YOU SEE WHERE IT SAYS, "THE RESULTS OF THERANOS'S TESTS

10:59AM  3    ARE AVAILABLE WITHIN HOURS -- OFTEN MATCHING THE SPEED OF

10:59AM  4    EMERGENCY STAT LABS TODAY, THOUGH STAT LABS, WHICH ARE HIGHLY

10:59AM  5    INEFFICIENT, CAN USUALLY PERFORM ONLY IN A LIMITED MENU OF

10:59AM  6    MAYBE 40 TESTS."

10:59AM  7         DO YOU SEE THAT LANGUAGE?

10:59AM  8    A.   YES.

10:59AM  9    Q.   WAS THAT RELEVANT TO YOU?

10:59AM  10   A.   YES.

10:59AM  11   Q.   AND WAS THAT SOMETHING THAT YOU RELIED ON?

10:59AM  12   A.   YES, AND THAT WAS CONSISTENT WITH WHAT WE WERE TOLD.

10:59AM  13   Q.   OKAY.  IF WE CAN PLEASE GO TO PAGE 7.  AND IN THE COLUMN

10:59AM  14   TO THE RIGHT THERE'S A PARAGRAPH BEGINNING "IMPORTANTLY."

10:59AM  15        RIGHT IN THE MIDDLE.

10:59AM  16        DO YOU SEE WHERE IT SAYS, "IMPORTANTLY, IT'S NOT JUST THE

10:59AM  17   BLOOD DRAWS THAT ARE TINY.  IT'S ALSO THE ANALYTICAL SYSTEMS

10:59AM  18   THERANOS USES TO PERFORM THE TESTS.  THEY TAKE UP A SMALL

11:00AM  19   FRACTION OF THE FOOTPRINT REQUIRED BY A CONVENTIONAL LAB

11:00AM  20   TODAY."

11:00AM  21        DO YOU SEE THAT?

11:00AM  22   A.   YES.

11:00AM  23   Q.   AND WAS THAT RELEVANT TO YOU?

11:00AM  24   A.   YES.

11:00AM  25   Q.   WAS THAT CONSISTENT WITH WHAT MS. HOLMES AND MR. BALWANI

11:00AM 1    TOLD YOU?

11:00AM 2    A.   YES.

11:00AM 3    Q.   THANK YOU, MS. WACHS.  YOU CAN TAKE THAT DOWN, PLEASE.

11:00AM 4         AND IF WE COULD PLEASE DISPLAY EXHIBIT 1853.

11:00AM 5         DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT THIS

11:00AM 6    PROJECTED STATEMENT OF INCOME?

11:00AM 7    A.   YES.

11:00AM 8    Q.   AND TO THE RIGHT YOU HAD WRITTEN "900 LOCATIONS."

11:00AM 9         DO YOU SEE THAT?

11:00AM 10   A.   YES.

11:00AM 11   Q.   AND I THINK YOU TESTIFIED THAT YOU UNDERSTOOD THAT IN

11:00AM 12   2015, THERANOS MIGHT NOT BE ABLE TO ACHIEVE EXACTLY 900

11:00AM 13   LOCATIONS?

11:00AM 14   A.   CORRECT.

11:00AM 15   Q.   OKAY.  BUT YOU THOUGHT THAT THEY WOULD BE WITHIN THAT

11:00AM 16   BALLPARK?

11:00AM 17   A.   YES, THAT'S WHAT THEY WERE INDICATING, YES.

11:00AM 18   Q.   OKAY.  AND I THINK ON DIRECT YOU TESTIFIED THAT YOU

11:01AM 19   BELIEVED, YOU KNOW, THERE WAS SOME DEVIATION FROM A PROJECTION

11:01AM 20   THAT YOU WERE PREPARED FOR; IS THAT CORRECT?

11:01AM 21   A.   YES.

11:01AM 22   Q.   EXPLAIN WHAT YOU MEAN BY THAT.

11:01AM 23   A.   A PROJECTION IS A PROJECTION.  WE UNDERSTAND THAT.

11:01AM 24        BUT I NEVER RECEIVED PROJECTIONS THAT THEY DON'T COME

11:01AM 25   CLOSE TO, AT LEAST MOVING IN THE RIGHT DIRECTION.

11:01AM   1          THE 12 -- THE THING THAT REALLY GETS US ON THIS ONE IS

11:01AM   2     THAT THE 12/31/14 REVENUE SAID 140 MILLION AND WE WERE A MONTH

11:01AM   3     AND A HALF FROM YEAR END --

11:01AM   4     Q.   OKAY.

11:01AM   5     A.   -- AND THEY WERE NOT EVEN CLOSE TO THAT.

11:01AM   6          SO, YES, WE UNDERSTAND 2015 WAS A PROJECTION, BUT THEY

11:01AM   7     KNEW THEY WEREN'T GOING TO GET NEAR THESE NUMBERS.

11:01AM   8     Q.   DO YOU CONSIDER SOMETHING LESS THAN $1 MILLION TO BE CLOSE

11:01AM   9     TO $140 MILLION?

11:01AM  10     A.   NO.

11:01AM  11     Q.   DO YOU CONSIDER SOMETHING LESS THAN $200 MILLION TO BE

11:02AM  12     CLOSE TO $990 MILLION?

11:02AM  13     A.   WITHIN ABOUT 10 PERCENT WOULD HAVE BEEN OKAY.

11:02AM  14     Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THIS BEING A

11:02AM  15     LONG-TERM INVESTMENT FOR RDV.

11:02AM  16     A.   YES.

11:02AM  17     Q.   DOES THAT MEAN REVENUE PROJECTIONS ARE IRRELEVANT TO YOU?

11:02AM  18     A.   NOT THAT THEY'RE IRRELEVANT, NO.

11:02AM  19          BUT IT'S DIFFICULT TO PROJECT OUT THREE, FOUR, FIVE, TEN

11:02AM  20     YEARS FROM NOW.

11:02AM  21          BUT GIVEN EVERYTHING -- GIVEN THE VISION OF ELIZABETH AND

11:02AM  22     SUNNY, WE KNEW THAT THIS HAD THE POTENTIAL TO TRANSFORM HEALTH

11:02AM  23     CARE, WHICH IS -- WE RELIED, WE RELIED ON THE FACT THAT THEY

11:02AM  24     HAD DONE A LOT OF WORK IN THE PAST WITH PHARMACEUTICAL

11:02AM  25     COMPANIES TO GET THEM TO THIS POINT, AND THAT THEY HAD A LOT OF

11:02AM 1    GROWTH POTENTIAL FROM WHERE THEY WERE TODAY.

11:02AM 2    Q.   OKAY.

11:02AM 3    A.   AT THE TIME.  SORRY.

11:03AM 4    Q.   AND DID YOU RELY ON THE STATEMENTS THAT MS. HOLMES AND

11:03AM 5    MR. BALWANI MADE AT THE MEETING IN PALO ALTO IN OCTOBER?

11:03AM 6    A.   YES.

11:03AM 7    Q.   WERE THOSE RELEVANT TO THE INVESTMENT DECISIONS?

11:03AM 8    A.   ABSOLUTELY.

11:03AM 9    Q.   YOU WERE ALSO -- MR. COOPERSMITH WENT OVER WITH YOU, AS I

11:03AM 10   DID, SOME OF THE REPRESENTATIONS IN THE STOCK PURCHASE

11:03AM 11   AGREEMENT.

11:03AM 12       DO YOU RECALL THAT TESTIMONY?

11:03AM 13   A.   YES.

11:03AM 14   Q.   WHATEVER IS IN THE LEGAL DOCUMENT FORMALIZING THE

11:03AM 15   INVESTMENT, DID YOU NONETHELESS ACCEPT THE TRUTH OF WHAT

11:03AM 16   MS. HOLMES AND MR. BALWANI WERE SAYING TO YOU?

11:03AM 17   A.   YES.

11:03AM 18   Q.   AND DID YOU RELY ON THAT?

11:03AM 19   A.   YES.

11:03AM 20   Q.   MS. WACHS, IF WE COULD PLEASE DISPLAY EXHIBIT 2166.

11:03AM 21       DO YOU RECALL BEING ASKED QUESTIONS ABOUT THE APPROVAL

11:03AM 22   DOCUMENT THAT YOU PREPARED?

11:03AM 23   A.   YES.

11:03AM 24   Q.   OKAY.  AND YOU WERE ASKED SOME QUESTIONS ABOUT YOU DON'T

11:03AM 25   KNOW WHO READ THIS?

11:03AM 1    A.   CORRECT.

11:03AM 2    Q.   OKAY.  AND IF WE COULD PLEASE LOOK AT PAGE 7.

11:04AM 3         YOU RECOGNIZE THE SIGNATURES ON THIS DOCUMENT?

11:04AM 4    A.   YES.

11:04AM 5    Q.   THOSE ARE NOT YOUR SIGNATURES; RIGHT?

11:04AM 6    A.   NO.

11:04AM 7    Q.   THAT'S MR. TUBERGEN?

11:04AM 8    A.   YES.

11:04AM 9    Q.   AND MR. DAMSTRA?

11:04AM 10   A.   YES.

11:04AM 11   Q.   OKAY.  AND IN THE INVESTMENT RISK, THERE'S A PORTION THAT

11:04AM 12   SAYS, "FURTHERMORE, UNLIKE MOST LABS, THERANOS DOES NOT BUY

11:04AM 13   ANALYZER EQUIPMENT FROM A THIRD PARTY AND THEY DO NOT SELL

11:04AM 14   THEIR ANALYZERS TO OTHER LABS."

11:04AM 15        DO YOU SEE THAT?

11:04AM 16   A.   YES.

11:04AM 17   Q.   IS THAT SOMETHING THAT MS. HOLMES AND MR. BALWANI TALKED

11:04AM 18   ABOUT IN YOUR MEETING IN CALIFORNIA?

11:04AM 19   A.   YES.

11:04AM 20   Q.   AND IS THAT SOMETHING THAT YOU RELIED ON?

11:04AM 21   A.   YES.

11:04AM 22        MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

11:04AM 23        THE COURT:  YES.

11:04AM 24   (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:04AM 25        MR. LEACH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

11:04AM  1              THANK YOU.

11:04AM  2              THANK YOU, MS. PETERSON.

11:04AM  3                   THE COURT:  MR. COOPERSMITH.

11:04AM  4                   THE WITNESS:  THANK YOU.

11:05AM  5                   MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:05AM  6                        **RECROSS-EXAMINATION**

11:05AM  7     BY MR. COOPERSMITH

11:05AM  8     Q.   MS. PETERSON, I THINK WE REALLY ARE IN THE HOME STRETCH

11:05AM  9     NOW.

11:05AM  10         SO WHAT I WANTED TO START WITH IS JUST MR. LEACH ASKED YOU

11:05AM  11    SOME QUESTIONS JUST NOW ABOUT WHAT YOU RELIED ON.

11:05AM  12         DO YOU RECALL THAT?

11:05AM  13    A.   YES.

11:05AM  14    Q.   AND, IN FACT, THE PEOPLE WHO ACTUALLY MAKE THE DECISION AT

11:05AM  15    RDV TO INVEST OR NOT ARE THE PEOPLE FROM THE DEVOS FAMILY ON

11:05AM  16    THE INVESTMENT COMMITTEE; RIGHT?

11:05AM  17    A.   THAT'S CORRECT.

11:05AM  18    Q.   OKAY.  AND THEN MR. LEACH ASKED YOU SOME QUESTIONS ABOUT

11:05AM  19    THE OCTOBER 14TH, 2014, MEETING YOU ATTENDED WITH OTHERS AT

11:05AM  20    THERANOS?

11:05AM  21    A.   YES.

11:05AM  22    Q.   RIGHT?

11:05AM  23         AND DID MR. BALWANI OR MS. HOLMES TELL YOU THAT IN AUGUST

11:05AM  24    OF 2014 AN EXECUTIVE AT WALGREENS SENT THEM AN EMAIL SAYING

11:06AM  25    THAT WALGREENS WOULD TOUCH 2,000 STORES IN 2015?

11:06AM  1    A.   NO, I DON'T RECALL THEM SAYING THERE WAS A MEMO.

11:06AM  2    Q.   OKAY.  YOU DON'T RECALL EITHER OF THEM SAYING THAT THERE

11:06AM  3    WAS AN EMAIL FROM A WALGREENS EXECUTIVE ABOUT TOUCHING 2,000

11:06AM  4    STORES IN 2015?

11:06AM  5    A.   I DON'T RECALL THAT.

11:06AM  6    Q.   OKAY.  AND DID MR. BALWANI OR MS. HOLMES TELL YOU IN THE

11:06AM  7    OCTOBER 14TH MEETING THAT THERANOS, IN SEPTEMBER, HAD GIVEN

11:06AM  8    DIRECTION TO RAMP UP THEIR EMPLOYEE HIRING TO BE READY FOR A

11:06AM  9    LARGER ROLLOUT?

11:06AM  10   A.   WHAT IS THE QUESTION?  DID THEY TELL US THAT?

11:06AM  11   Q.   DID THEY TELL YOU AT THE MEETING THAT THERANOS WAS

11:06AM  12   DIRECTING THEIR HR PERSONNEL TO ENGAGE IN HIRING RAMP UP IN

11:06AM  13   ORDER TO ACCOMPLISH THE ROLLOUT?

11:06AM  14   A.   THEY DEFINITELY TOLD US THAT THEY WERE GETTING READY TO,

11:06AM  15   YES, ROLL IT OUT.

11:07AM  16   Q.   AND DID THEY TELL YOU THAT THEY WERE HIRING A LOT MORE

11:07AM  17   PEOPLE TO DO THAT?

11:07AM  18   A.   WELL, THAT ALL GOES BACK TO THE EXECUTION RISK AND MAKING

11:07AM  19   SURE THAT THEY HAD ENOUGH PEOPLE TO EXECUTE THE PLAN.  SO, YES.

11:07AM  20   Q.   SO YOU UNDERSTOOD THAT THEY WERE ENGAGING IN THAT HIRING

11:07AM  21   PRACTICE?

11:07AM  22   A.   YES.

11:07AM  23   Q.   RIGHT?

11:07AM  24   A.   YES.

11:07AM  25   Q.   IN ORDER TO DO THE ROLLOUT; RIGHT?

11:07AM  1    A.    YES.

11:07AM  2                MR. COOPERSMITH:  OKAY.

11:07AM  3          NOTHING FURTHER, YOUR HONOR.

11:07AM  4                MR. LEACH:  NOTHING FURTHER, YOUR HONOR.

11:07AM  5                THE COURT:  MAY THIS WITNESS BE EXCUSED?

11:07AM  6                MR. LEACH:  NO, YOUR HONOR.

11:07AM  7                MR. COOPERSMITH:  YES, YOUR HONOR.

11:07AM  8                THE COURT:  MS. PETERSON, YOU'RE EXCUSED.

11:07AM  9                THE WITNESS:  THANK YOU.

11:07AM 10                THE COURT:  LADIES AND GENTLEMEN, WE'LL TAKE OUR

11:07AM 11    MORNING BREAK NOW, OUR MORNING BREAK OF 30 MINUTES, AND THEN

11:07AM 12    WE'LL COME BACK.

11:07AM 13          THE GOVERNMENT HAS ANOTHER WITNESS, I TAKE IT?

11:07AM 14                MR. SCHENK:  YES.

11:07AM 15                THE COURT:  ALL RIGHT.  THANK YOU.

11:07AM 16          (RECESS FROM 11:07 A.M. UNTIL 11:37 A.M.)

        17

        18

        19

        20

        21

        22

        23

        24

        25

|          |     |                                                                                 |
|----------|-----|---------------------------------------------------------------------------------|
| 11:37AM  | 1   | **AFTERNOON SESSION**                                                           |
| 11:37AM  | 2   | (JURY OUT AT 11:37 A.M.)                                                        |
| 11:39AM  | 3   | THE COURT:  WELL, LET'S GO ON THE RECORD.                                       |
| 11:40AM  | 4   | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  ALL COUNSEL                         |
| 11:40AM  | 5   | ARE PRESENT.  MR. BALWANI IS PRESENT.                                           |
| 11:40AM  | 6   | WE'RE GOING TO DISCUSS 1413, WHICH IS MR. BALWANI'S MOTION                      |
| 11:40AM  | 7   | TO EXCLUDE 3217.                                                                |
| 11:40AM  | 8   | AND MS. WALSH.                                                                  |
| 11:40AM  | 9   | MS. WALSH:  SURE.  THANK YOU, YOUR HONOR.                                       |
| 11:40AM  | 10  | SO THIS MOTION RELATES TO GOVERNMENT'S EXHIBIT 3217, WHICH                      |
| 11:40AM  | 11  | IS A ONE-PAGE EMAIL FROM HEATHER KING, WHO WAS IN-HOUSE COUNSEL                 |
| 11:40AM  | 12  | AT THERANOS, TO DR. DHAWAN, WHO IS ABOUT TO BE A WITNESS IN                     |
| 11:40AM  | 13  | THIS TRIAL.  THE DATE IS JULY 9TH, 2016.                                        |
| 11:40AM  | 14  | AND THE TEXT OF THE EMAIL IS "DR. DHAWAN, PLEASE SEE                            |
| 11:40AM  | 15  | ATTACHED AND LET ME KNOW IF YOU WANT TO DISCUSS."                               |
| 11:40AM  | 16  | THE ISSUE THAT WE HAVE WITH THIS EMAIL IS THE SUBJECT                           |
| 11:40AM  | 17  | LINE, BECAUSE THE SUBJECT LINE SAYS CMS NOTICE ON IMPOSITION OF                 |
| 11:41AM  | 18  | SANCTIONS.                                                                      |
| 11:41AM  | 19  | AND OUR POSITION IS THAT THAT SUBJECT LINE IS DOUBLE                            |
| 11:41AM  | 20  | HEARSAY.  WELL, THE EMAIL ITSELF IS DOUBLE HEARSAY BECAUSE OF                   |
| 11:41AM  | 21  | THE SUBJECT LINE.                                                               |
| 11:41AM  | 22  | THE FIRST LEVEL OF HEARSAY IS THAT IT'S AN EMAIL FROM                           |
| 11:41AM  | 23  | HEATHER KING WHO IS NOT A WITNESS AND AN OUT OF COURT WITNESS.                  |
| 11:41AM  | 24  | BUT BEYOND THAT, THE OTHER LAYER OF HEARSAY IS THAT IT'S A                      |
| 11:41AM  | 25  | FACTUAL ASSERTION THAT CMS HAS IMPOSED SANCTIONS ON THERANOS.                   |

11:41AM  1       IT'S BEING OFFERED FOR THE TRUTH.  IT DOES NOT FALL WITHIN

11:41AM  2   THE PUBLIC RECORDS EXCEPTION TO THE HEARSAY RULE.

11:41AM  3       YOUR HONOR TALKED ABOUT THIS A LITTLE IN THE HOLMES TRIAL,

11:41AM  4   AND I THINK THE DISTINCTION WAS MADE BETWEEN THE SANCTIONS

11:41AM  5   LETTER, WHICH HAS ALL KINDS OF CREDIBILITY DETERMINATIONS,

11:41AM  6   VERSUS THE CMS REPORT, WHICH THE COURT HELD CONTAINED

11:41AM  7   OBSERVATIONS OF A PUBLIC OFFICIAL UNDER A DUTY TO REPORT.

11:42AM  8       SO THE SANCTIONS LETTER AND ANY REFERENCE TO IT DO NOT

11:42AM  9   FALL INTO THE PUBLIC RECORD EXCEPTION TO THE HEARSAY RULE.  WE

11:42AM 10   DON'T THINK IT FALLS INTO ANY EXCEPTION.

11:42AM 11       AND IN ADDITION TO THE DOUBLE HEARSAY PROBLEM, WE DON'T

11:42AM 12   THINK THAT IT'S PARTICULARLY RELEVANT, AND IT -- IN ANY EVENT,

11:42AM 13   THE PROBATIVE VALUE OF THE JURY KNOWING THAT CMS IMPOSED

11:42AM 14   SANCTIONS IS FAR OUTWEIGHED BY THE UNDUE PREJUDICIAL EFFECT OF

11:42AM 15   THAT.

11:42AM 16       THIS IS NOT A CASE ABOUT CMS SANCTIONS.  IT'S ABOUT FRAUD.

11:42AM 17       AND TO THE EXTENT THAT CMS FINDINGS -- THE COURT HAS FOUND

11:42AM 18   CMS FINDINGS MIGHT COME INTO THE TRIAL, CERTAINLY THE SANCTIONS

11:42AM 19   THAT WERE ISSUED SHOULD NOT AND ARE NOT RELEVANT TO THE

11:42AM 20   CHARGES.

11:42AM 21       WHAT I HAVE PROPOSED TO THE GOVERNMENT THAT I THINK WOULD

11:42AM 22   SOLVE THE PROBLEM IS TO JUST REDACT THE SUBJECT LINE.

11:42AM 23       AND IF THE GOVERNMENT WANTS TO ASK DR. DHAWAN ABOUT THE

11:43AM 24   TIMING OF HIM GETTING ANY NOTIFICATION ABOUT THE CMS -- ANY

11:43AM 25   RESULTS FROM THE AUDIT, WE DON'T HAVE A PROBLEM WITH THAT.

11:43AM  1          IT'S JUST ELICITING THROUGH THIS WITNESS WHAT THOSE

11:43AM  2     RESULTS WERE.

11:43AM  3          THE COURT:  OKAY.  THANK YOU.

11:43AM  4          YOU KNOW, MR. SCHENK, I READ THIS AND THE FIRST THING I

11:43AM  5     THOUGHT WAS -- WELL, FIRST THING -- I THOUGHT, WELL, MAYBE JUST

11:43AM  6     REDACTING THE SUBJECT LINE AS MS. WALSH SAID.

11:43AM  7          BUT I'M HAPPY TO HEAR FROM YOU.

11:43AM  8          MR. SCHENK:  YES.  THANK YOU VERY MUCH, YOUR HONOR.

11:43AM  9     A FEW POINTS.

11:43AM 10          FIRST, I COULD LAY A BUSINESS RECORD FOUNDATION FOR THE

11:43AM 11     EMAIL.  I'M SURE DR. DHAWAN WOULD SAY THAT HE RECEIVED EMAILS

11:43AM 12     LIKE THIS FROM FOLKS AT THERANOS THAT GAVE HIM INFORMATION THAT

11:43AM 13     HE NEEDED TO DO HIS JOB.

11:43AM 14          SO I THINK THAT CURES THE HEARSAY CONCERNS.  IT IS A

11:43AM 15     BUSINESS RECORD.

11:43AM 16          SO NOW LET'S GET TO THE 403 ANALYSIS WHETHER THE WORD

11:43AM 17     "SANCTIONS" IS SO PREJUDICIAL THAT IT IS -- IT OUTWEIGHS ANY

11:44AM 18     PROBATIVE VALUE.

11:44AM 19          AND HERE'S WHY IT DOESN'T.

11:44AM 20          DR. DHAWAN STARTED WORK IN THERANOS IN NOVEMBER OF 2014.

11:44AM 21     DR. DHAWAN WAS PRESENT DURING THIS CMS INSPECTION ABOUT A YEAR

11:44AM 22     LATER IN SEPTEMBER OF '15, AND THIS DOCUMENT, WHICH IS NOW

11:44AM 23     AGAIN NOT QUITE A YEAR LATER, BUT JULY OF '16 IS THE FIRST TIME

11:44AM 24     THAT DHAWAN LEARNS THAT THINGS MIGHT NOT BE AS THEY SEEM IN THE

11:44AM 25     LAB.

4068

11:44AM  1    EVERYTHING ELSE THAT HE'S HEARING IS GIVING HIM A ROSY

11:44AM  2    PICTURE.  EVEN HIS PRESENCE DURING THE CMS INSPECTION, HOW IT

11:44AM  3    WAS JUST AN HOUR OR SO, BUT HE WAS PRESENT AND HE WAS UNAWARE

11:44AM  4    OF ANY CONCERNS THAT BALWANI OR HOLMES HAD ABOUT HOW THE

11:44AM  5    INSPECTION WAS GOING.

11:44AM  6    AFTER THE INSPECTION, THERE'S A TON OF DIALOGUE BETWEEN

11:45AM  7    THERANOS AND CMS ABOUT PROBLEMS, TRYING TO FIX THEM.

11:45AM  8    DHAWAN IS CUT OUT OF THE LOOP ON ALL OF THAT.

11:45AM  9    IT IS NECESSARY IN ORDER FOR THE JURY TO APPRECIATE THE

11:45AM 10    STORY THAT DHAWAN HAS VERSUS REALITY.

11:45AM 11    THE STORY THAT DHAWAN HAS IS EVERYTHING AFTER THE CMS

11:45AM 12    INSPECTION WAS FINE.  HE DIDN'T KNOW THAT CMS HAD ANY CONCERNS.

11:45AM 13    HE CERTAINLY DIDN'T KNOW THAT IN JANUARY A DOCUMENT THAT THE

11:45AM 14    COURT RULED AT THE MOTIONS IN LIMINE STAGE CALLED THE 2567

11:45AM 15    COMES IN, HE HAD NO IDEA ABOUT THAT, AND THAT WAS SIX MONTHS

11:45AM 16    BEFORE THIS EMAIL.

11:45AM 17    AND IT IS, I THINK, PROBATIVE TO SHOW THAT THINGS WERE NOT

11:45AM 18    GOING WELL WITH CMS.

11:45AM 19    I DON'T -- I DON'T PLAN AND I'M NOT SEEKING TO OFFER THE

11:45AM 20    ACTUAL SANCTIONS, THE ATTACHMENT.

11:45AM 21    THE COURT:  OKAY.  THAT WAS MY NEXT QUESTION,

11:45AM 22    WHETHER THAT WAS GOING TO COME IN.

11:45AM 23    MR. SCHENK:  NO.  I'M NOT OFFERING PAGE 2 OR LATER

11:46AM 24    IN 3217.  I JUST SEEK TO ADMIT THE EMAIL.

11:46AM 25    AND THE COURT CAN SEE THAT THE SUBJECT LINE OF THE EMAIL

4069

11:46AM 1    IS TAKEN FROM THE REGARDING LINE OF THE LETTER.  IT ISN'T AS

11:46AM 2    THOUGH HEATHER KING IS USING SOME OPINION OR ANALYSIS IN ORDER

11:46AM 3    TO CRAFT THAT SUBJECT LINE.  SHE USES THE PHRASE "IMPOSITION OF

11:46AM 4    SANCTIONS," WHICH COMES FROM THE TITLE OF THE DOCUMENT.

11:46AM 5        DR. DHAWAN, AND FRANKLY, MR. BALWANI, ARE ON THE LETTER

11:46AM 6    THAT THEY RECEIVED, THE IMPOSITION OF SANCTIONS.  IT IS

11:46AM 7    COMPLETELY APPROPRIATE TO ASK DR. DHAWAN IF THIS NOTICE, IF

11:46AM 8    THIS LETTER THAT HE WAS SENT FROM THERANOS IN JULY WAS THE

11:46AM 9    FIRST TIME HE EVER LEARNED THAT CMS HAD SOME CONCERNS, THAT THE

11:46AM 10   INSPECTION DID NOT GO WELL.

11:46AM 11       THE COURT:  SO THANK YOU.  THANK YOU.

11:46AM 12       DOES IT HAVE TO MENTION -- I THINK MS. WALSH'S CONCERN IS

11:46AM 13   THE PEJORATIVE TERM "SANCTIONS," AND DOES THE NOTICE HAVE TO

11:47AM 14   INCLUDE THAT?

11:47AM 15       WILL THERE BE EVIDENCE THROUGH DR. DHAWAN OR OTHERS THAT

11:47AM 16   THERE WERE SANCTIONS IMPOSED?

11:47AM 17       MR. SCHENK:  SO I DID NOT INTEND TO EXPLORE THE

11:47AM 18   QUESTION OF SANCTIONS WITH DR. DHAWAN.

11:47AM 19       I DON'T INTEND TO ASK HIM WHETHER HE OR THERANOS WAS

11:47AM 20   PUNISHED OR ANY OF THOSE QUESTIONS.

11:47AM 21       BUT I DON'T THINK THAT THAT REQUIRES REDACTION OF THE

11:47AM 22   PHRASE BECAUSE THE EXTENT -- THE JURY IS ENTITLED TO UNDERSTAND

11:47AM 23   THAT THE EXTENT OF THE INFORMATION THAT WAS HIDDEN FROM HIM WAS

11:47AM 24   SIGNIFICANT, THAT IT WASN'T JUST CMS COMING IN AND HAVING A

11:47AM 25   CONCERN THAT SOME I'S WEREN'T DOTTED, SO TO SPEAK.

11:47AM 1        BUT THERE'S SIGNIFICANT DIALOGUE BETWEEN THERANOS AND CMS

11:47AM 2    THAT DR. DHAWAN AS LAB DIRECTOR IS ENTIRELY CUT OUT OF.

11:47AM 3        AND I THINK IT'S UNFAIR TO REDACT THE EMAIL IN A WAY THAT

11:47AM 4    DOESN'T GIVE THE JURY -- I APPRECIATE AND AGREE THAT THE WORD

11:48AM 5    "SANCTIONS" DOES HAVE SOME PUNCH.  CMS CARED, AND THIS WAS

11:48AM 6    REALLY IMPORTANT, AND CMS HAD THIS ENTIRE DIALOGUE WITH

11:48AM 7    THERANOS AND THE LAB DIRECTOR DIDN'T KNOW ABOUT IT, AND I THINK

11:48AM 8    THAT IS WHAT MAKES IT PROBATIVE.

11:48AM 9        AND I DON'T INTEND TO ARGUE, AS MS. WALSH HAS EXPRESSED,

11:48AM 10   WHAT SHE WOULD CALL THE INAPPROPRIATE ASPECT OF IT, THAT THE

11:48AM 11   JURY SHOULD ALLOW CMS'S OPINION TO REPLACE THE JURY'S OPINION,

11:48AM 12   BECAUSE CMS FOUND SOME VIOLATIONS, THAT THE JURY SHOULD

11:48AM 13   CONVICT.

11:48AM 14       I DON'T INTEND TO ARGUE IT THAT WAY, BUT I DON'T THINK

11:48AM 15   THAT MEANS THAT THE PHRASE "SANCTIONS" MUST THEREFORE BE

11:48AM 16   REDACTED JUST BECAUSE THERE'S SOME ARGUMENT THAT COULD BE MADE

11:48AM 17   BASED UPON THAT PHRASE.

11:48AM 18            THE COURT:  THANK YOU.

11:48AM 19       SO YOU'RE NOT GOING TO GET IN THE LETTER THAT FOLLOWS THIS

11:48AM 20   FROM THE INSPECTOR THAT OUTLINES ALL OF THE ISSUES, IT'S

11:48AM 21   MULTIPLE PAGES, BUT YOU WOULD LIKE TO ASK THE DOCTOR IF HE

11:49AM 22   RECEIVED THIS, AND THEN ASK HIM QUESTIONS ABOUT HIS KNOWLEDGE

11:49AM 23   OF THE OPERATIONS OF THE LAB BOTH AT A TIME PRECEDING HIM AND

11:49AM 24   DURING THE TIME THAT HE WAS LAB DIRECTOR?

11:49AM 25            MR. SCHENK:  I INTEND TO ASK HIM WHETHER HIS VIEW OF

11:49AM 1    HOW THE CMS INSPECTION WENT CHANGED WHEN HE RECEIVED THIS.  DID

11:49AM 2    HE HAVE ONE VIEW LEADING UP TO THE SEPTEMBER 2015 INSPECTION

11:49AM 3    AND FOLLOWING THE 2015 INSPECTION THROUGH JULY?  AND THEN IN

11:49AM 4    JULY, DID HE THEN HAVE A DIFFERENT OPINION ABOUT HOW THE

11:49AM 5    INSPECTION WENT?

11:49AM 6            THE COURT:  AND THAT'S RELEVANT BECAUSE?

11:49AM 7            MR. SCHENK:  BECAUSE THE DEFENDANT HIRED DHAWAN AND

11:49AM 8    THEN KEPT HIM IN THE DARK, AND THAT'S RELEVANT INTENT.

11:49AM 9            THE COURT:  AND THAT'S GOING -- YOU HAVE EVIDENCE OF

11:49AM 10   THAT.  THIS IS PART OF IT, I PRESUME?

11:49AM 11           MR. SCHENK:  CORRECT.  YES, YOUR HONOR.  IF DHAWAN

11:49AM 12   SAYS, YES, I LEARNED SOMETHING NEW FROM THIS, I THINK THAT'S ON

11:49AM 13   ALL FOUR'S WITH THE CONCEPT THAT HE WAS KEPT IN THE DARK.

11:50AM 14           THE COURT:  MS. WALSH.

11:50AM 15           MS. WALSH:  YES, YOUR HONOR.

11:50AM 16           THE COURT:  PARDON ME FOR INTERRUPTING YOU.  SO THE

11:50AM 17   LETTER IS NOT COMING IN, THAT GIVES YOU SOME RELIEF.

11:50AM 18           MS. WALSH:  SOME.  YES, SOME.  I WOULD RATHER THAT

11:50AM 19   IT NOT COME IN.

11:50AM 20           THE COURT:  RIGHT.

11:50AM 21           MS. WALSH:  BUT I DO WANT TO ADDRESS THE EMAIL --

11:50AM 22           THE COURT:  OF COURSE.

11:50AM 23           MS. WALSH:  -- THAT IS BEING OFFERED.

11:50AM 24       THE GOVERNMENT SKIPPED OVER THE SECOND LEVEL OF HEARSAY,

11:50AM 25   WHICH IS CMS'S FACTUAL ASSERTION THAT WE ARE IMPOSING SANCTIONS

11:50AM 1     ON THERANOS.  THAT'S A FACTUAL ASSERTION THAT IS IN THE LETTER,

11:50AM 2     AND THEN IS REPEATED BY ANOTHER PERSON, AN OUT-OF-COURT

11:50AM 3     DECLARANT, IN THE EMAIL.  THERE ARE TWO LEVELS OF HEARSAY.

11:50AM 4          SO EVEN IF THE EMAIL COULD BE A BUSINESS RECORD, THE

11:50AM 5     CONTENT OF THAT SUBJECT LINE IS YET ANOTHER ASSERTION THAT'S

11:50AM 6     BEING REPEATED BY AN OUT-OF-COURT DECLARANT.

11:50AM 7          SO I THINK -- I DON'T THINK THE HEARSAY PROBLEM IS CURED

11:50AM 8     AT ALL.  I THINK MAKING AN ASSERTION BY AN OUT-OF-COURT

11:51AM 9     DECLARANT THAT SOME OTHER DECLARANT HAS SAID WE'RE IMPOSING

11:51AM 10    SANCTIONS IS DOUBLE HEARSAY.

11:51AM 11         WE DON'T HAVE A WITNESS TO CROSS-EXAMINE TO ASK AND TEST

11:51AM 12    WHAT THE SANCTIONS WERE, WHY WERE THEY ISSUED?

11:51AM 13         IT'S JUST A BALD ASSERTION OFFERED FOR THE TRUTH WITH NO

11:51AM 14    CONTEXT AT ALL.

11:51AM 15         AND NOT THAT I WANT TO HAVE THE CONTEXT, BUT I DON'T THINK

11:51AM 16    IT IS APPROPRIATE THAT THIS SUBJECT LINE SHOULD KIND OF SNEAK

11:51AM 17    IN THE FACT THAT CMS ISSUED SANCTIONS AT THIS POINT IN TIME.

11:51AM 18              THE COURT:  WILL THERE BE EVIDENCE OF SANCTIONS

11:51AM 19    AGAIN?  I THINK I ASKED THAT.

11:51AM 20              MR. SCHENK:  YOUR HONOR, THAT ARGUMENT IS A RED

11:51AM 21    HERRING.

11:51AM 22         DR. DHAWAN COULD SAY, I WAS SANCTIONED AND I'M HAPPY TO

11:51AM 23    EXPLAIN THAT TO YOU.

11:51AM 24         SO IF MS. WALSH HAS HER WISH, THERE'S A WITNESS ON THE

11:51AM 25    STAND SHE COULD CROSS WHETHER THIS IS AN UNSUPPORTED

11:51AM 1      OUT-OF-COURT STATEMENT.  I'M OFFERING NOT TO GO THERE.

11:52AM 2          SO TO NOW SUGGEST THE GOVERNMENT'S CONCESSION THAT IT WILL

11:52AM 3      NOT EXPLORE THE SANCTIONS THAT DR. DHAWAN HIMSELF SUFFERED

11:52AM 4      SHOULDN'T BE USED AGAINST US TO NOW PROHIBIT THE ADMISSION OF

11:52AM 5      THAT PHRASE.

11:52AM 6              THE COURT:  WELL, THAT WAS MY QUESTION.

11:52AM 7          YOU'RE NOT GOING TO INTRODUCE EVIDENCE OF THE SANCTIONS OR

11:52AM 8      ANYTHING LIKE THAT?

11:52AM 9              MR. SCHENK:  I DO NOT INTEND, CORRECT, TO ASK

11:52AM 10     DR. DHAWAN ABOUT THE SUBSTANCE OF THE SANCTIONS.

11:52AM 11             THE COURT:  THEN IS IT -- WHAT IS THE FAIRNESS OF

11:52AM 12     JUST HAVING THE WORD "SANCTIONS" OUT THERE WITH NO REFERENCE TO

11:52AM 13     IT?  THEN IT'S JUST FLOATING OUT THERE, AND I COULD SEE HOW THE

11:52AM 14     JURY COULD NEGATIVELY SPECULATE ABOUT SANCTIONS.

11:52AM 15         AND IS THAT, IS THAT UNFAIR PREJUDICE?

11:52AM 16             MR. SCHENK:  NO, YOUR HONOR.

11:52AM 17         I THINK THAT IS THE DICHOTOMY BETWEEN WHAT DR. DHAWAN

11:52AM 18     BELIEVED CMS'S VIEW OF THE INSPECTION WAS VERSUS REALITY.

11:52AM 19         AND TO SUGGEST OTHERWISE IS TO DENY THE JURY RELEVANT

11:53AM 20     INFORMATION.

11:53AM 21         WHAT THE COURT IS CONCERNED ABOUT IS ARGUMENTS MADE BASED

11:53AM 22     UPON THAT IMPLICATION, SUGGESTING THAT IF THERANOS GOT

11:53AM 23     SANCTIONED CIVILLY OR MR. BALWANI GOT SANCTIONED CIVILLY, THAT

11:53AM 24     THAT SHOULD REPLACE THE JUDGMENT OF THIS JURY.

11:53AM 25         AND THE GOVERNMENT'S ARGUMENTS IN CLOSING AND THE COURT'S

4074

11:53AM 1    JURY INSTRUCTIONS PREVENT THAT UNFAIR PREJUDICE FROM OCCURRING.

11:53AM 2       BUT YOU DON'T ALSO THEN NEED TO REDACT BUSINESS RECORD

11:53AM 3    DOCUMENTS TO PREVENT THE JURY FROM KNOWING THAT WHAT MR. --

11:53AM 4    WHAT DR. DHAWAN BELIEVED TO BE THE CASE WAS VERY DIFFERENT FROM

11:53AM 5    WHAT WAS ACTUALLY THE CASE.

11:53AM 6          THE COURT:  AND IS THE EMAIL NECESSARY?  CAN YOU

11:53AM 7    JUST ASK HIM, DID YOU RECEIVE AN EMAIL FROM -- REGARDING CMS

11:53AM 8    AND NOTICE OF ACTION TAKEN, AND DID THINGS CHANGE AFTER THAT?

11:53AM 9          MR. SCHENK:  I THINK THAT WOULD DEPEND ON

11:53AM 10   DR. DHAWAN'S MEMORY AND WHETHER THE EMAIL WOULD THEN NEED TO BE

11:54AM 11   REFRESHED, USED TO REFRESH HIS MEMORY.

11:54AM 12         THE COURT:  RIGHT.

11:54AM 13         MR. SCHENK:  I DON'T KNOW IF DR. DHAWAN WILL SAY "I

11:54AM 14   REMEMBER ON THIS DATE," OR EVEN ROUGHLY THIS DATE BEING

11:54AM 15   INFORMED OF IT.

11:54AM 16         THE COURT:  SURE.

11:54AM 17         MR. SCHENK:  BUT I HAVE A CONCERN THAT IF I DON'T

11:54AM 18   GROUND IT IN A DOCUMENT, WHAT HIS ANSWERS TO MY QUESTIONS WILL

11:54AM 19   BE IF I JUST ASK MORE GENERALLY.

11:54AM 20      IF I GROUND IT IN THE DOCUMENT AND I DON'T OFFER THE

11:54AM 21   ATTACHMENT, I THINK WE HAVE MORE OF A LEASH ON THE WAY THAT

11:54AM 22   CONVERSATION WILL GO THAN IF I JUST ASKED HIM, DID THERE COME A

11:54AM 23   POINT IN TIME WHEN YOU REALIZED THE INSPECTION DIDN'T GO AS YOU

11:54AM 24   THOUGHT?

11:54AM 25         THE COURT:  RIGHT.

11:54AM   1          MR. SCHENK:  IT'S MORE OPEN ENDED.  I'M HAPPY TO DO

11:54AM   2   IT THAT WAY, BUT --

11:54AM   3          THE COURT:  NO, I UNDERSTAND.  AND THE POTENTIAL FOR

11:54AM   4   THAT IS WE DON'T KNOW.

11:54AM   5          MS. WALSH:  WELL, YOUR HONOR, THE GOVERNMENT COULD

11:54AM   6   INSTRUCT ITS WITNESS TO NOT BLURT OUT ANYTHING ABOUT SANCTIONS

11:54AM   7   AND TO KEEP TO TIGHT QUESTIONING.  I THINK THAT HAPPENS ALL THE

11:54AM   8   TIME.

11:54AM   9       SO I THINK IT'S POSSIBLE TO CIRCUMSCRIBE DR. DHAWAN'S

11:55AM  10   TESTIMONY JUST TO THE FACT THAT HE GOT NOTIFICATION FROM

11:55AM  11   MS. KING IN JULY AS TO SOME RESULTS FROM THE CMS AUDIT.

11:55AM  12       AND I DID WANT TO ADDRESS ANOTHER POINT THAT MR. SCHENK

11:55AM  13   RAISED, WHICH WAS THE RELEVANCE OF THIS BEING THAT MR. -- THAT

11:55AM  14   DR. DHAWAN WAS KEPT IN THE DARK ABOUT HOW THE CMS AUDIT WAS

11:55AM  15   GOING.

11:55AM  16       SO MR. DHAWAN WAS PRESENT ONLY FOR THE INTRODUCTION

11:55AM  17   PORTION OF THE CMS AUDIT AND THEN HE LEFT.  HE WAS NOT THERE --

11:55AM  18   IT'S NOT LIKE HE WAS THERE LISTENING TO WHAT WAS GOING ON AND

11:55AM  19   THEN HE WAS KEPT IN THE DARK ABOUT THE RESULTS OF THE BACK AND

11:55AM  20   FORTH THAT HAD OCCURRED WITHOUT IN FRONT OF HIM.  HE WAS THERE

11:55AM  21   FOR THE INTRODUCTION AND THEN HE LEFT.

11:55AM  22       TO THE EXTENT THE GOVERNMENT WANTS TO PROVE GENERALLY THAT

11:55AM  23   DR. DHAWAN WAS KEPT IN THE DARK ABOUT THE LAB, WHICH IS I THINK

11:56AM  24   THE GREATER POINT THAT THEY WOULD WANT TO PROVE, THAT'S WHAT

11:56AM  25   THIS -- I MEAN, TO SOME EXTENT, THE WHOLE TRIAL IS ABOUT THAT.

11:56AM  1    I DON'T SEE WHY WE HAVE TO GO TO CMS SANCTIONS TO PROVE

11:56AM  2    THAT DR. DHAWAN WAS KEPT IN THE DARK ABOUT WHAT WAS GOING ON IN

11:56AM  3    THE LAB.

11:56AM  4        IT'S GOING TO BE VERY CLEAR FROM THE TESTIMONY THAT HE WAS

11:56AM  5    A PART-TIME LAB DIRECTOR, THAT HE DIDN'T VISIT THE LAB VERY

11:56AM  6    OFTEN, THAT HE HAD VERY FEW EMAILS ABOUT THE LAB.

11:56AM  7        ALL OF THAT PAINTS THE PICTURE THAT I THINK THE GOVERNMENT

11:56AM  8    WANTS TO, WHICH IS HE WAS NOT IN CLOSE CONTACT WITH THE LAB.

11:56AM  9        THERE'S NO, THERE'S NO ADDED RELEVANCE OR PROBATIVE VALUE

11:56AM  10    TO GETTING IN THIS EMAIL ABOUT SANCTIONS, AND IT ADDS ENORMOUS

11:56AM  11    PREJUDICE BECAUSE THE JURY IS GOING TO SAY, OH, WELL, IF THE

11:56AM  12    LAB WAS SANCTIONED, THEN MR. BALWANI IS GUILTY.

11:56AM  13            THE COURT:  MR. SCHENK.

11:56AM  14            MR. SCHENK:  YOUR HONOR, I APPRECIATE MS. WALSH

11:56AM  15    THINKS WE HAVE SUFFICIENT EVIDENCE IN ONE BUCKET, WHICH IS

11:57AM  16    DHAWAN IN THE DARK ABOUT THE DAY-TO-DAY RUNNING OF THE LAB.

11:57AM  17        BUT I DON'T THINK THAT THAT MEANS THAT THE GOVERNMENT

11:57AM  18    SHOULD BE PROHIBITED FROM EXPLORING ANOTHER AREA IN WHICH HE

11:57AM  19    WAS KEPT IN THE DARK, ESPECIALLY WHEN IT GOES RIGHT TO

11:57AM  20    MR. BALWANI'S FEET, AND THAT IS THE INTERACTIONS WITH THE

11:57AM  21    REGULATOR.

11:57AM  22        MR. BALWANI ASKS DR. DHAWAN TO COME TO THE CMS INSPECTION.

11:57AM  23        AFTER THE CMS INSPECTION DOESN'T GO WELL, MR. BALWANI

11:57AM  24    DOESN'T SHARE ANY OF THAT INFORMATION WITH DR. DHAWAN.

11:57AM  25        SO IT IS RELEVANT EVIDENCE THAT THIS JURY SHOULD HEAR WHEN

4077

11:57AM 1    THE JURY INSTRUCTIONS ASK THEM TO REACH CONCLUSIONS ABOUT

11:57AM 2    MR. BALWANI'S INTENT, AND TO SORT OF FALSELY LIMIT THE

11:57AM 3    GOVERNMENT TO EXPLORING JUST DR. DHAWAN'S UNDERSTANDING OR

11:57AM 4    INVOLVEMENT IN THE DAY-TO-DAY OPERATION OF THE LAB IS UNFAIR.

11:57AM 5        WE SHOULD ALSO GET TO PROVE TO THE JURY THAT HE WAS KEPT

11:57AM 6    IN THE DARK ABOUT THE REGULATOR'S INTERACTIONS WITH THE LAB.

11:57AM 7            THE COURT:  WELL, I THINK YOU PROBABLY PART COMPANY

11:58AM 8    WITH THAT EVIDENCE COMING IN, OR THE TYPE OF IT, MS. WALSH, BUT

11:58AM 9    THE GOVERNMENT CAN PUT THEIR CASE ON TO ALLEGE WHAT THEY

11:58AM 10   BELIEVE HAS HAPPENED, AND THE JURY WILL DECIDE WHETHER OR NOT

11:58AM 11   MR. BALWANI HAS ACTED TO KEEP DR. DHAWAN IN THE DARK OR NOT,

11:58AM 12   WHATEVER THE EVIDENCE SHOWS.

11:58AM 13       BUT, YOU KNOW, FROM THAT ASPECT, THEY'RE PERMITTED TO PUT

11:58AM 14   SOMETHING ON IN THAT REGARD.

11:58AM 15           MS. WALSH:  SURE, YOUR HONOR.  I DON'T DISPUTE THAT

11:58AM 16   AT ALL.

11:58AM 17       BUT THEY HAVE TO DO THAT WITHIN THE RULES OF EVIDENCE, AND

11:58AM 18   SO IF THE ISSUE IS MR. BALWANI KEPT DR. DHAWAN IN THE DARK

11:58AM 19   ABOUT THE FACT THAT THE CMS AUDIT WAS GOING BADLY, THEY CAN ASK

11:58AM 20   DR. DHAWAN, DID MR. BALWANI EVER TELL YOU HOW THE CMS AUDIT

11:58AM 21   WENT?

11:58AM 22       AND HE'LL SAY, NO, HE NEVER TOLD ME.

11:58AM 23           THE COURT:  WELL, I THINK THE POINT WE HEARD IS THAT

11:58AM 24   THE GOVERNMENT WOULD THEN SEEK TO SAY, YOU RECEIVED SOMETHING,

11:58AM 25   EITHER THIS DOCUMENT, IF IT COMES IN, OR YOU RECEIVED NOTICE

11:58AM  1      THAT CMS HAD TAKEN SOME ACTION OR HAD SOME OPINION THAT WAS

11:59AM  2      NEGATIVE TOWARDS THE LABORATORY?

11:59AM  3          THAT'S SOMETHING THAT -- AND THEN FROM THAT THE QUESTION

11:59AM  4      WOULD BE, AS MR. SCHENK SAID, IS THAT THE FIRST TIME THAT YOU

11:59AM  5      HEARD THERE WERE PROBLEMS IN THE LAB?  WHICH SUGGESTS THERE WAS

11:59AM  6      A VACUUM THAT HE WAS KEPT FROM.

11:59AM  7          MS. WALSH:  RIGHT.  I JUST -- I GUESS THE REALLY

11:59AM  8      PREJUDICIAL PORTION IS THE SANCTIONS PORTION.

11:59AM  9          THE COURT:  RIGHT.

11:59AM  10         MS. WALSH:  AND THE SANCTIONS -- AS THE COURT

11:59AM  11     COMMENTED IN THE PRIOR TRIAL, THE SANCTIONS ARE SEPARATE AND

11:59AM  12     APART FROM THE CMS FINDINGS, AND REALLY THE SANCTIONS SHOULD

11:59AM  13     NOT COME INTO THIS TRIAL AT ALL.

11:59AM  14         AND IT CERTAINLY SHOULDN'T COME IN THROUGH A ONE-LINE

11:59AM  15     SUBJECT LINE ON AN EMAIL FROM AN OUT-OF-COURT DECLARANT.

11:59AM  16         THE COURT:  WHAT I'D LIKE -- THANK YOU.

11:59AM  17     ANYTHING FURTHER, MR. SCHENK?

11:59AM  18         MR. SCHENK:  NO, YOUR HONOR.

11:59AM  19         THE COURT:  WHAT I'D LIKE TO DO, MR. SCHENK, IS HAVE

11:59AM  20     YOU EXAMINE THE WITNESS AS WE DISCUSSED, I DISCUSSED, ASK HIM,

12:00PM  21     WITHOUT INTRODUCING THE DOCUMENT, BUT ASK HIM THAT QUESTION

12:00PM  22     ABOUT KNOWLEDGE OF WAS THE LAB DIFFERENT, HOWEVER YOU SAID YOU

12:00PM  23     WERE GOING TO PHRASE IT, AND WE'LL SEE WHAT HAPPENS.  IF YOU

12:00PM  24     NEED TO REFRESH HIS RECOLLECTION, WE'LL SEE.

12:00PM  25         IF HE SAYS SOMETHING ELSE, WE'LL BE ON PINS AND NEEDLES

| | | |
|---|---|---|
| 12:00PM | 1 | AND SEE, AND SEE HOW THAT IS. |
| 12:00PM | 2 | OKAY.  THANKS VERY MUCH.  LET'S BRING OUR JURY OUT. |
| 12:00PM | 3 | I'M THINKING WE'RE GOING TO GO UNTIL 4:00 TODAY.  I'M |
| 12:00PM | 4 | HOPING WE'LL GO UNTIL 4:00 TODAY. |
| 12:00PM | 5 | ARE WE ANTICIPATING THIS WITNESS WILL OCCUPY JUST THE REST |
| 12:00PM | 6 | OF TODAY? |
| 12:00PM | 7 | MR. SCHENK:  YES, YOUR HONOR. |
| 12:00PM | 8 | THE COURT:  IS THAT JUST THE GOVERNMENT'S |
| 12:00PM | 9 | EXAMINATION? |
| 12:00PM | 10 | MR. SCHENK:  I HOPE THAT, ALTHOUGH MS. WALSH WILL |
| 12:00PM | 11 | HAVE BETTER INFORMATION THAN ME, I HOPE WE CAN FINISH WITH |
| 12:00PM | 12 | DR. DHAWAN IF WE HAVE THAT MUCH TIME LEFT IN THE DAY. |
| 12:00PM | 13 | THE COURT:  OKAY.  TERRIFIC.  THANK YOU. |
| 12:00PM | 14 | MS. WALSH:  THANK YOU. |
| 12:01PM | 15 | (RECESS FROM 12:01 P.M. UNTIL 12:04 P.M.) |
| 12:04PM | 16 | (JURY IN AT 12:04 P.M.) |
| 12:04PM | 17 | THE COURT:  WE ARE BACK ON THE RECORD.  THE JURY IS |
| 12:08PM | 18 | PRESENT.  MR. BALWANI IS PRESENT. |
| 12:08PM | 19 | DOES THE GOVERNMENT HAVE A WITNESS TO CALL? |
| 12:08PM | 20 | MR. SCHENK:  YES, WE DO, YOUR HONOR. |
| 12:08PM | 21 | THE GOVERNMENT CALLS SUNIL DHAWAN. |
| 12:08PM | 22 | THE COURT:  THANK YOU. |
| 12:08PM | 23 | SIR, IF YOU WOULD JUST STEP OVER HERE AND FACE OUR |
| 12:08PM | 24 | COURTROOM DEPUTY WHILE YOU RAISE YOUR RIGHT HAND, SHE HAS A |
| 12:08PM | 25 | QUESTION FOR YOU. |

12:08PM   1                    THE CLERK:  SIR.

12:08PM   2                    THE WITNESS:  SORRY.

12:08PM   3           **(GOVERNMENT'S WITNESS, SUNIL DHAWAN, WAS SWORN.)**

12:08PM   4                    THE WITNESS:  YES.

12:09PM   5                    THE CLERK:  ALL RIGHT.  THANK YOU.

12:09PM   6                    THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  MAKE

12:09PM   7      YOURSELF COMFORTABLE.

12:09PM   8           FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

12:09PM   9           WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

12:09PM   10     AND THEN SPELL IT, PLEASE.

12:09PM   11                   THE WITNESS:  MAY I REMOVE MY MASK, JUDGE?

12:09PM   12                   THE COURT:  YOU'RE FULLY VACCINATED?

12:09PM   13                   THE WITNESS:  YES.

12:09PM   14                   THE COURT:  YES.

12:09PM   15                   THE WITNESS:  SUNIL S. DHAWAN.

12:09PM   16                   THE COURT:  AND SPELL IT, PLEASE.

12:09PM   17                   THE WITNESS:  S-U-N-I-L, S, D-H-A-W-A-N.

12:09PM   18                   THE COURT:  THANK YOU.

12:09PM   19          COUNSEL.

12:09PM   20                   MR. SCHENK:  THANK YOU, YOUR HONOR.

12:09PM   21                        **DIRECT EXAMINATION**

12:09PM   22     BY MR. SCHENK:

12:09PM   23     Q.   GOOD AFTERNOON, DR. DHAWAN.  HOW ARE YOU?

12:09PM   24     A.   GOOD, THANK YOU.

12:09PM   25     Q.   DR. DHAWAN, DO YOU KNOW SOMEONE NAMED SUNNY BALWANI?

12:09PM 1    A.    YES.

12:09PM 2    Q.    HOW DID YOU MEET HIM?

12:09PM 3    A.    MANY YEARS AGO AS A PATIENT.

12:09PM 4    Q.    AS A PATIENT OF YOURS?

12:09PM 5    A.    YES.

12:09PM 6    Q.    ARE YOU A MEDICAL DOCTOR?

12:09PM 7    A.    YES, SIR.

12:09PM 8    Q.    AND DESCRIBE FOR THE JURY, PLEASE, YOUR MEDICAL TRAINING.

12:09PM 9    A.    I DID MY MEDICAL SCHOOL AND THEN INTERNAL MEDICINE

12:10PM 10   RESIDENCY, AND THEN I DID A DERMATOLOGY RESIDENCY AFTERWARDS.

12:10PM 11   Q.    AND DO YOU PRACTICE MEDICINE NOW?

12:10PM 12   A.    YES, I DO.

12:10PM 13   Q.    WHERE?

12:10PM 14   A.    IN FREMONT AND MILPITAS.

12:10PM 15   Q.    AND WHAT IS THE NAME OF YOUR PRACTICE?

12:10PM 16   A.    CENTER FOR DERMATOLOGY.

12:10PM 17   Q.    AND WHEN DID YOU MEET MR. BALWANI?  DO YOU KNOW THE YEAR?

12:10PM 18   A.    IT WOULD HAVE BEEN AT LEAST 15 -- PROBABLY EARLY 2000'S.

12:10PM 19   Q.    WERE YOU AT THAT TIME WORKING AT THE SAME DERMATOLOGY

12:10PM 20   CENTER?

12:10PM 21   A.    YES.

12:10PM 22   Q.    AND WHAT DO YOU DO THERE?

12:10PM 23   A.    I AM ONE OF THE PARTNERS THERE.  I MANAGE PATIENTS, AND

12:10PM 24   HAVE A CLINICAL RESEARCH OFFICE AS WELL THAT WE RUN.

12:10PM 25   Q.    ARE THOSE TWO SEPARATE THINGS, YOUR PATIENTS AND YOUR

12:10PM 1    CLINICAL RESEARCH?

12:10PM 2    A.    THEY ARE SEPARATE, BUT THEY'RE INTERMINGLED.  THEY WORK

12:10PM 3    TOGETHER.

12:10PM 4    Q.    WOULD YOU JUST SPEND A MOMENT DESCRIBING FOR THE JURY THE

12:10PM 5    CLINICAL RESEARCH WORK THAT YOU DO?

12:10PM 6    A.    SO I WORK FOR BIOTECH PHARMACEUTICAL DEVICE MANUFACTURERS

12:10PM 7    IN PART OF THE APPROVAL PROCESS IN FRONT OF THE FOOD AND DRUG

12:11PM 8    ADMINISTRATION TO GET THEIR PRODUCT APPROVED, AND WE DO TRIALS

12:11PM 9    ON PATIENTS ON A ROUTINE BASIS.

12:11PM 10   Q.    AND IF WE CAN THINK OF THEM AS TWO SIDES OF YOUR WORK,

12:11PM 11   WHICH ONE WAS THE ONE WHERE YOU HAD THE OPPORTUNITY TO MEET

12:11PM 12   MR. BALWANI?

12:11PM 13   A.    IN THE REGULAR PRACTICE.

12:11PM 14   Q.    AS A PATIENT IN YOUR REGULAR PRACTICE?

12:11PM 15   A.    YES.

12:11PM 16   Q.    THROUGH YOUR DISCUSSIONS WITH MR. BALWANI, DID HE EVER

12:11PM 17   TELL YOU WHERE HE WORKED?

12:11PM 18   A.    INITIALLY MANY YEARS AGO, YES.  I DON'T RECALL WHERE THOSE

12:11PM 19   PLACES WERE.

12:11PM 20   Q.    OKAY.  WAS THERE A POINT IN TIME WHEN HE DESCRIBED TO YOU

12:11PM 21   A COMPANY CALLED THERANOS?

12:11PM 22   A.    HE DID.

12:11PM 23   Q.    AND DO YOU REMEMBER WHEN THAT WAS?

12:11PM 24   A.    I BELIEVE IT WAS 2014, PERHAPS 2013.

12:11PM 25   Q.    OKAY.  DID HE ASK YOU TO WORK AT THERANOS?

12:11PM 1      A.   INITIALLY, NO.

12:11PM 2           BUT I BELIEVE AT THE END OF 2014 HE ASKED ME TO DO SOME

12:12PM 3      WORK FOR THEM.

12:12PM 4      Q.   WHAT TYPE OF WORK WAS HE INTERESTED IN HAVING YOU DO FOR

12:12PM 5      THERANOS?

12:12PM 6      A.   MEDICAL DIRECTOR FOR A SHORT PERIOD OF TIME.

12:12PM 7      Q.   MEDICAL DIRECTOR?

12:12PM 8      A.   OR DIRECTOR OF THE LAB ACTUALLY.

12:12PM 9      Q.   LAB DIRECTOR?

12:12PM 10     A.   YES, SIR.

12:12PM 11     Q.   OKAY.  DID YOU EVENTUALLY SAY YES?  DID YOU ACCEPT THAT

12:12PM 12     JOB?

12:12PM 13     A.   YES.

12:12PM 14     Q.   WE'LL LOOK AT SOME DOCUMENTS IN A MOMENT, BUT FOR HOW LONG

12:12PM 15     WERE YOU LAB DIRECTOR?  DO YOU RECALL?

12:12PM 16     A.   IT VARIED.

12:12PM 17          MY INITIAL IMPRESSION WAS THAT IT WAS ONLY GOING TO BE FOR

12:12PM 18     A FEW MONTHS, LIKE TWO OR THREE MONTHS, AND THEN IT ENDED UP

12:12PM 19     STRETCHING OUT TO I BELIEVE CLOSE TO EIGHT, NINE MONTHS.

12:12PM 20     Q.   OKAY.  WE'LL LOOK AT THAT ALSO.

12:12PM 21          LET'S START WHEN YOU BEGAN YOUR TIME AS LAB DIRECTOR.

12:12PM 22     A.   UH-HUH.

12:12PM 23     Q.   DO YOU KNOW THAT DATE, OR WOULD IT HELP IF I SHOWED YOU

12:12PM 24     SOME DOCUMENTS?

12:12PM 25     A.   IT WOULD BE IN THE DOCUMENTS, CORRECT.

12:12PM   1            MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

12:12PM   2            THE COURT:  PLEASE.

12:13PM   3            MR. SCHENK:  THANK YOU.  (HANDING.)

12:13PM   4    Q.  DR. DHAWAN, I'VE HANDED YOU A BINDER OF DOCUMENTS, AND I'M

12:13PM   5    GOING TO ASK YOU TO START BY TURNING TO THE TAB MARKED 2537.

12:13PM   6        YOUR HONOR, I BELIEVE I CAN OFFER THIS BY STIPULATION OF

12:13PM   7    THE PARTIES.

12:13PM   8            THE COURT:  MS. WALSH?

12:13PM   9            MS. WALSH:  YES, YOUR HONOR.

12:13PM  10        THERE IS ONE SMALL REDACTION THAT I REQUESTED.  MR. SCHENK

12:13PM  11    MAY KNOW WHAT I'M TALKING ABOUT.

12:13PM  12            MR. SCHENK:  YES.  I DO NOT INTEND TO --

12:13PM  13            MS. WALSH:  ALL RIGHT.  THANK YOU.

12:13PM  14        NO OBJECTION, YOUR HONOR.

12:13PM  15            THE COURT:  THIS IS ADMITTED.  IT MAY BE PUBLISHED.

12:13PM  16        (GOVERNMENT'S EXHIBIT 2537 WAS RECEIVED IN EVIDENCE.)

12:13PM  17    BY MR. SCHENK:

12:13PM  18    Q.  DR. DHAWAN, IT WILL APPEAR ON THE SCREEN, AND IT WILL BE

12:13PM  19    IN THE BINDER, SO TAKE YOUR PICK.

12:13PM  20        IF WE CAN START ON PAGE 6 OF THIS DOCUMENT.

12:14PM  21        SORT OF IN THE MIDDLE OF THE PAGE, DO YOU SEE AN EMAIL --

12:14PM  22    ACTUALLY MORE TOWARDS THE BOTTOM, THERE IS SOMETHING THAT SAYS,

12:14PM  23    ON FRIDAY, NOVEMBER 14, 2014.

12:14PM  24        DO YOU SEE THAT?

12:14PM  25    A.  YES.

12:14PM  1    Q.   AND IS THAT AN EMAIL FROM MR. BALWANI TO YOU?

12:14PM  2    A.   YES.

12:14PM  3    Q.   IN THAT FIRST PARAGRAPH, MR. BALWANI THANKS YOU FOR TAKING

12:14PM  4    HIS CALL.

12:14PM  5         AND HE THEN GOES ON TO SAY, "THE TIME COMMITMENT IS VERY

12:14PM  6    MINIMAL.  THIS WILL BE MOSTLY AN ON CALL CONSULTING ROLE AND I

12:14PM  7    AM EXTREMELY CONFIDENT THAT IT WON'T INTERFERE WITH YOUR WORK

12:14PM  8    OR WITH YOUR FAMILY LIFE."

12:14PM  9         AND THEN TOWARDS THE BOTTOM OF THE SCREEN WE SEE, "THIS

12:14PM  10   WILL BE 1-3 MONTHS," AND THEN IT CONTINUES ON THE NEXT PAGE,

12:14PM  11   "ROLE."

12:14PM  12        DO YOU SEE THAT?

12:14PM  13   A.   YES.

12:14PM  14   Q.   AND WAS THIS THE BEGINNING OF A CONVERSATION BETWEEN YOU

12:14PM  15   AND MR. BALWANI ABOUT YOU BECOMING A LAB DIRECTOR AT THERANOS?

12:14PM  16   A.   YES.

12:14PM  17   Q.   AND IS THAT CONSISTENT WITH YOUR MEMORY THAT IT WAS AROUND

12:15PM  18   NOVEMBER OF 2014?

12:15PM  19   A.   YES.

12:15PM  20   Q.   DO YOU KNOW WHETHER THERANOS HAD A LAB DIRECTOR BEFORE YOU

12:15PM  21   OR WHETHER YOU WERE GOING TO BE THE FIRST LAB DIRECTOR IN

12:15PM  22   NOVEMBER OF 2014?

12:15PM  23   A.   MY RECOLLECTION IS THAT THERE WAS SOMEBODY BEFORE ME.

12:15PM  24   Q.   DID MR. BALWANI DESCRIBE TO YOU THE CIRCUMSTANCES OF THAT

12:15PM  25   INDIVIDUAL'S DEPARTURE?

DHAWAN DIRECT BY MR. SCHENK                                          4086

12:15PM  1    A.   NO.

12:15PM  2    Q.   YOU HAD NO KNOWLEDGE OF WHY THAT PERSON LEFT; IS THAT

12:15PM  3    RIGHT?

12:15PM  4    A.   NO.

12:15PM  5    Q.   IF YOU'LL NOW GO UP ONE EMAIL ON PAGE 6, YOU RESPOND, IT

12:15PM  6    LOOKS LIKE, "SUNNY,

12:15PM  7         "I CAN DO THIS -- WHAT IS NEXT STEP?"

12:15PM  8         DO YOU SEE THAT?

12:15PM  9    A.   YES.

12:15PM  10   Q.   AND SO IS THIS THE BEGINNING OF YOU ACCEPTING THE JOB AS

12:15PM  11   LAB DIRECTOR?

12:15PM  12   A.   YES.

12:15PM  13   Q.   I'M GOING TO NOW ASK YOU TO TURN TO TAB 2248.

12:15PM  14        AND I BELIEVE THIS IS ALSO OFFERED BY STIPULATION,

12:15PM  15   YOUR HONOR.

12:15PM  16            MS. WALSH:  YES.  NO OBJECTION.

12:16PM  17            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:16PM  18        2248?

12:16PM  19            MR. SCHENK:  YES, YOUR HONOR, 2248.

12:16PM  20        (GOVERNMENT'S EXHIBIT 2248 WAS RECEIVED IN EVIDENCE.)

12:16PM  21   BY MR. SCHENK:

12:16PM  22   Q.   DR. DHAWAN, IS THIS AN EMAIL FROM AN INDIVIDUAL AT

12:16PM  23   THERANOS TO YOU, NOW ATTACHING AN EMPLOYMENT AGREEMENT, OR WHAT

12:16PM  24   IS CALLED A CONSULTING AGREEMENT?

12:16PM  25   A.   YES.

12:16PM  1     Q.   AND IS THIS A FEW WEEKS LATER NOW TOWARDS THE END OF

12:16PM  2     NOVEMBER 2014?

12:16PM  3     A.   YES.

12:16PM  4     Q.   WOULD YOU TURN TO PAGE 2 OF THIS EXHIBIT?

12:16PM  5          ACTUALLY, THAT'S FINE.  PAGE 2 AT THE VERY TOP, DO YOU SEE

12:16PM  6     IT'S ENTERED INTO AND THERE'S A DATE.

12:16PM  7          THE DATE IS NOVEMBER 19TH, 2014?

12:16PM  8     A.   YES.

12:16PM  9     Q.   SO IS THAT THE DATE THAT YOU BEGAN AS THERANOS LAB

12:16PM  10    DIRECTOR?

12:16PM  11    A.   YES.

12:16PM  12    Q.   WOULD YOU NOW TURN TO PAGE 7 OF THIS EXHIBIT.

12:16PM  13         DOES THIS EXHIBIT A LAY OUT YOUR COMPENSATION AND THE

12:17PM  14    SERVICES THAT YOU WOULD PERFORM?

12:17PM  15    A.   YES.

12:17PM  16    Q.   FIRST, WHO WAS YOUR CONTACT AT THERANOS?

12:17PM  17    A.   IT WOULD HAVE BEEN SUNNY, MR. BALWANI.

12:17PM  18    Q.   OKAY.  AND HERE IT SAYS, "SUNNY BALWANI, PRESIDENT AND

12:17PM  19    COO."

12:17PM  20         TELL ME NOW IF IN REALITY THAT WAS TRUE.  I SEE THE

12:17PM  21    DOCUMENT SAYS THAT YOUR PRINCIPAL CONTACT WAS MR. BALWANI, BUT

12:17PM  22    HOW ABOUT IN PRACTICE?  ONCE YOU STARTED THERE, WAS MR. BALWANI

12:17PM  23    YOUR PRIMARY CONTACT IN FACT?

12:17PM  24    A.   IN FACT, YES.

12:17PM  25    Q.   THE NEXT -- NUMBER 2 TALKS ABOUT SERVICES.

DHAWAN DIRECT BY MR. SCHENK

12:17PM   1            DOES IT SAY YOU WILL BE SERVING AS A LAB DIRECTOR AND

12:17PM   2    CLINICAL CONSULTANT OF THERANOS'S CLIA LAB?

12:17PM   3    A.   YES.

12:17PM   4    Q.   IN YOUR PRACTICE THAT YOU DESCRIBED TO US A MOMENT AGO,

12:17PM   5    YOUR DERMATOLOGY PRACTICE, DID YOU HAVE PRIOR EXPERIENCE BEING

12:17PM   6    A LAB DIRECTOR?

12:17PM   7    A.   YES, IN MY OWN PRACTICE.

12:18PM   8    Q.   WERE THERE DIFFERENCES BETWEEN THE THERANOS LAB AND YOUR

12:18PM   9    LAB?

12:18PM  10    A.   YES.  WE DID MORE HISTOPATHOLOGIC EXAMINATIONS,

12:18PM  11    H-I-S-T-O-P-A-T-H-O-L-O-G-I-C, EXAMINATIONS OF SLIDES.

12:18PM  12    Q.   I'M SORRY.  IN WHICH ONE?

12:18PM  13    A.   IN MY OWN -- IN OUR PRACTICE.

12:18PM  14    Q.   OKAY.  SO IN YOUR PRACTICE, THE LAB WORK INVOLVED PUTTING

12:18PM  15    A SUBSTANCE ON A SLIDE AND LOOKING AT IT?

12:18PM  16    A.   PROCESS SLIDES ACTUALLY.

12:18PM  17    Q.   AND HOW IS THAT DIFFERENT FROM WHAT YOU UNDERSTOOD THE

12:18PM  18    WORK AT THERANOS TO BE?

12:18PM  19    A.   IT WOULD BE MORE LABORATORY VALUES, LABORATORY

12:18PM  20    EXAMINATIONS OF BLOOD SAMPLES, ET CETERA.

12:18PM  21    Q.   IN NOVEMBER OF 2014 WHEN YOU AGREED TO TAKE ON THIS ROLE

12:18PM  22    AT THERANOS, WHAT DID YOU UNDERSTAND THERANOS TO DO?

12:18PM  23    A.   USING A DEVICE TO ANALYZE BLOOD SPECIMENS.

12:19PM  24    Q.   AND WHERE DID YOU GET THAT UNDERSTANDING?

12:19PM  25    A.   MOSTLY FROM MY RESEARCH ON -- ON THE INTERNET AND ON

DHAWAN DIRECT BY MR. SCHENK                                      4089

12:19PM   1      GOOGLE.

12:19PM   2      Q.   MR. BALWANI ASKED YOU TO BE LAB DIRECTOR AT THERANOS, AND

12:19PM   3      THEN YOU LEARNED ABOUT THERANOS THROUGH GOOGLE?

12:19PM   4      A.   I PREVIOUSLY HAD BEEN RESEARCHING THE COMPANY THROUGH

12:19PM   5      GOOGLE AND MY INTERNET --

12:19PM   6      Q.   WHAT DO YOU MEAN --

12:19PM   7      A.   -- SEARCHES.

12:19PM   8      Q.   I'M SORRY.

12:19PM   9      A.   I HEARD ABOUT THE COMPANY, AND THEN ONCE HE CONTACTED ME,

12:19PM  10      I STARTED LOOKING IT UP.

12:19PM  11      Q.   SO WAS THIS GOOGLE RESEARCH, WAS THAT AT THE SAME TIME OR

12:19PM  12      AROUND THE SAME TIME THAT MR. BALWANI OFFERED YOU THE JOB?

12:19PM  13      A.   I LOOKED AT IT PREVIOUSLY AND AT THE SAME TIME, YES.

12:19PM  14      Q.   AND YOU SAID IT WAS BLOOD TESTING USING A DEVICE; IS THAT

12:19PM  15      RIGHT?

12:19PM  16      A.   YES.

12:19PM  17      Q.   AND DID YOU KNOW WHO MADE THE DEVICE?  WAS IT A DEVICE

12:19PM  18      THAT THERANOS BOUGHT OR WHETHER IT A DEVICE THAT THERANOS MADE?

12:19PM  19      A.   I WAS NEVER TOLD OF ANY OF THAT, NO.

12:19PM  20      Q.   HOW ABOUT ONCE YOU STARTED WORKING THERE?  I WAS

12:19PM  21      ORIGINALLY ASKING BEFORE YOU STARTED.

12:19PM  22         NOW YOU'VE BEEN LAB DIRECTOR.  DID YOU GAIN KNOWLEDGE ON

12:20PM  23      THAT SPECIFIC QUESTION, HOW THERANOS WAS TESTING THE BLOOD?

12:20PM  24      A.   NO.

12:20PM  25      Q.   I'M SORRY.  THE ANSWER?

12:20PM  1    A.   NO.

12:20PM  2    Q.   IF WE CAN NOW LOOK ON NUMBER 3, COMPENSATION.

12:20PM  3         IT SAYS THE COMPENSATION WAS $5,000 A MONTH.

12:20PM  4         DID THERE COME A POINT IN TIME WHEN YOU ASKED TO BE PAID A

12:20PM  5    DIFFERENT WAY?

12:20PM  6    A.   YES.

12:20PM  7    Q.   AND DESCRIBE THAT TO THE JURY.

12:20PM  8    A.   I ELECTED TO GET PAID USING STOCK OPTIONS, OR RESTRICTED

12:20PM  9    STOCK UNITS, WHATEVER THE COMPANY WAS ABLE TO DO.

12:20PM  10   Q.   WHY?

12:20PM  11   A.   I THOUGHT THAT THAT WOULD BE A BETTER WAY OF COMPENSATING

12:20PM  12   ME FOR MY TIME.

12:20PM  13   Q.   I'D LIKE TO NOW TALK TO YOU ABOUT A PERIOD OF TIME OF

12:20PM  14   ABOUT EIGHT MONTHS, SO NOVEMBER OF 2014 THROUGH JULY OF 2015.

12:20PM  15        I'M WONDERING WHAT KIND OF WORK YOU DID FOR THERANOS

12:20PM  16   DURING THIS PERIOD OF TIME.

12:20PM  17        FIRST, CAN YOU ESTIMATE FOR THE JURY THE TOTAL NUMBER OF

12:21PM  18   HOURS THAT YOU SPENT WORKING ON THERANOS RELATED PROJECTS

12:21PM  19   DURING THIS EIGHT MONTH PERIOD OF TIME?

12:21PM  20   A.   IT WAS MINIMAL.  THERE WAS NO -- I WAS WAITING FOR THEM TO

12:21PM  21   ASK ME TO DO THINGS AND WOULD NOT -- WAS NOT ASKED TO DO ANY

12:21PM  22   FUNCTIONS.

12:21PM  23        SO INDEPENDENTLY, I WAS NOT ABLE TO DO ANYTHING.

12:21PM  24   Q.   AND WHEN YOU SAY "IT WAS MINIMAL," DO YOU HAVE AN ABILITY

12:21PM  25   TO PUT A NUMBER?

12:21PM  1    A.   A FEW HOURS, PERHAPS.

12:21PM  2    Q.   SO A TOTAL OF A FEW HOURS?

12:21PM  3    A.   YES.

12:21PM  4    Q.   DURING THIS EIGHT MONTH PERIOD OF TIME?

12:21PM  5    A.   YES.

12:21PM  6    Q.   HOW ABOUT PHYSICALLY GOING TO THERANOS.

12:21PM  7         YOU DESCRIBED TO US WHERE YOUR PRACTICE IS.

12:21PM  8    A.   YES.

12:21PM  9    Q.   DID -- DID YOU HAVE TO GO TO THERANOS DURING THIS EIGHT

12:21PM  10   MONTHS?

12:21PM  11   A.   ONCE OR TWICE IS MY RECOLLECTION.

12:21PM  12   Q.   AND FOR WHAT PURPOSE?

12:21PM  13   A.   FOR A TOUR.

12:21PM  14   Q.   DESCRIBE THAT.  WHAT DID YOU SEE ON THE TOUR?

12:21PM  15   A.   THE LAB, THE LAB FACILITIES.

12:21PM  16   Q.   WHO WAS PRESENT FROM THERANOS?

12:21PM  17   A.   SUNNY, MR. BALWANI, AND OTHER MEMBERS OF THE STAFF.

12:22PM  18   Q.   DO YOU REMEMBER THE BLOOD TESTING TECHNOLOGY BEING

12:22PM  19   DESCRIBED TO YOU?

12:22PM  20   A.   IT WAS DESCRIBED, AND I WAS SHOWN -- THIS IS GOING BACK

12:22PM  21   SEVEN YEARS NOW, SO MY RECOLLECTION IS NOT AS GOOD AS IT WOULD

12:22PM  22   HAVE BEEN -- BUT I WAS SHOWN MACHINES, YES.

12:22PM  23   Q.   CAN YOU DESCRIBE FOR THE JURY WHAT THE MACHINES LOOKED

12:22PM  24   LIKE?

12:22PM  25   A.   LARGE BLOOD ANALYZING MACHINES.  THEY'RE FAIRLY DECENT

12:22PM 1    SIZE, NOT VERY LARGE, BUT MACHINES BASICALLY.

12:22PM 2    Q.   AND WHEN YOU SAY "LARGE," DO YOU MEAN -- WHAT DO YOU MEAN

12:22PM 3    BY THAT?

12:22PM 4    A.   I MEAN, SITTING ON A DESKTOP.   THERE WERE OTHER MACHINES

12:22PM 5    THAT WERE THERE THAT WERE PROBABLY NOT FROM THERANOS.

12:22PM 6         BUT THAT WAS MY RECOLLECTION.

12:22PM 7    Q.   I WAS JUST GOING TO ASK THAT.

12:22PM 8         DO YOU HAVE A RECOLLECTION OF WHETHER THE MACHINES THAT

12:22PM 9    YOU SAW WERE MADE BY THERANOS OR WERE OFF-THE-SHELF BLOOD

12:22PM 10   ANALYZERS?

12:22PM 11   A.   MY RECOLLECTION IS NOT CLEAR AT THIS POINT, BUT I RECALL

12:22PM 12   SEEING WHAT LOOKED LIKE MACHINES THAT WERE NOT THERANOS

12:22PM 13   MACHINES THAT WERE IN THE LAB, YES.

12:22PM 14   Q.   HOW ABOUT DURING THIS TOUR, DID YOU LEARN WHAT -- WHICH

12:23PM 15   MACHINES THERANOS WAS ACTUALLY USING TO TEST BLOOD?

12:23PM 16   A.   NO, I DID NOT.

12:23PM 17   Q.   DURING THE -- THIS EIGHT MONTH PERIOD OF TIME, DID ANYBODY

12:23PM 18   FROM THE LAB EVER CALL YOU TO TALK ABOUT A PARTICULAR RESULT,

12:23PM 19   THEY WERE RUNNING BLOOD TESTS, THEY GOT A PARTICULAR RESULT,

12:23PM 20   AND THEY WANTED TO SPEAK TO YOU AS LAB DIRECTOR ABOUT THE

12:23PM 21   RESULT?   DID THAT EVER OCCUR?

12:23PM 22   A.   NO.

12:23PM 23   Q.   WAS THERE EVER AN OCCASION -- SO THAT QUESTION WAS WITH

12:23PM 24   REGARD TO A THERANOS EMPLOYEE.

12:23PM 25   A.   RIGHT.

12:23PM  1    Q.   WAS THERE EVER A TIME WHEN A DOCTOR WHO HAD ORDERED LABS

12:23PM  2    SPOKE TO YOU ABOUT A THERANOS TEST RESULT?

12:23PM  3    A.   NO.

12:23PM  4    Q.   WAS THERE EVER A TIME THAT A PATIENT, SOMEONE WHO RECEIVED

12:23PM  5    THE RESULTS, WANTED TO SPEAK TO THE LAB DIRECTOR?  DID YOU EVER

12:23PM  6    HAVE THAT EXPERIENCE?

12:23PM  7    A.   NO.

12:23PM  8    Q.   WAS THERE EVER A TIME WHEN SOMEONE AT THERANOS ASKED YOU

12:24PM  9    WHETHER THEY SHOULD STOP RUNNING CERTAIN BLOOD TESTS ON CERTAIN

12:24PM  10   MACHINES?

12:24PM  11       SO, FOR INSTANCE, WERE RUNNING AN HCG TEST USING THIS

12:24PM  12   MACHINE, DR. DHAWAN, SHOULD WE KEEP DOING IT OR SHOULD WE STOP?

12:24PM  13       DID YOU EVER HAVE THAT EXPERIENCE?

12:24PM  14   A.   NO.

12:24PM  15   Q.   I'D LIKE TO BRING YOU UP UNTIL AUGUST OF 2015.

12:24PM  16       IN AUGUST OF 2015, DID YOU -- DID YOU KNOW ABOUT AN FDA

12:24PM  17   INSPECTION AT THERANOS?

12:24PM  18   A.   I WAS TOLD IT WAS COMING IN SEPTEMBER, I BELIEVE.

12:24PM  19   Q.   SO YOU KNEW ABOUT AN INSPECTION IN SEPTEMBER?

12:24PM  20   A.   YES.

12:24PM  21   Q.   AND WAS THAT INSPECTION BY CMS, THE CENTER FOR MEDICARE

12:24PM  22   AND MEDICAID SERVICES?

12:24PM  23   A.   YES.

12:24PM  24   Q.   SO WHAT I'M WONDERING ABOUT IS A YEAR EARLIER, IN AUGUST,

12:25PM  25   DID YOU HAVE ANY INVOLVEMENT IN THE FDA, A DIFFERENT GOVERNMENT

12:25PM   1    AGENCY?

12:25PM   2         DO YOU REMEMBER THAT?

12:25PM   3    A.   I DON'T RECALL.

12:25PM   4    Q.   DURING YOUR TIME AS LAB DIRECTOR, DID YOU EVER HIRE AN

12:25PM   5    EMPLOYEE IN THE LAB, MAKE A DECISION ABOUT WHO SHOULD BE HIRED

12:25PM   6    INTO THE LAB?

12:25PM   7    A.   NO.

12:25PM   8    Q.   I'M SORRY?

12:25PM   9    A.   NO.

12:25PM  10    Q.   DID YOU EVER MAKE A DECISION ABOUT WHO SHOULD BE FIRED, AN

12:25PM  11    EMPLOYEE WAS NOT WORKING OUT IN THE LAB, DID YOU EVER TERMINATE

12:25PM  12    ANYBODY?

12:25PM  13    A.   NO.

12:25PM  14    Q.   HOW ABOUT REVIEWING PATIENT TEST RESULTS?  WAS THERE EVER

12:25PM  15    AN OCCASION WHEN YOU WERE SENT A RESULT BECAUSE SOMEONE IN THE

12:25PM  16    LAB WANTED TO KNOW WHETHER THIS SHOULD BE RELEASED TO A

12:25PM  17    PATIENT?

12:25PM  18         DID THAT EVER HAPPEN?

12:25PM  19    A.   NO.

12:25PM  20    Q.   SO YOU DIDN'T REVIEW ONE PATIENT RESULT THE ENTIRE TIME?

12:25PM  21    A.   NO.

12:25PM  22    Q.   IF YOU NOW WOULD TURN IN YOUR BINDER TO 4520, 4520.

12:25PM  23         YOUR HONOR, 4520 HAS BEEN PREVIOUSLY ADMITTED.  PERMISSION

12:26PM  24    TO PUBLISH?

12:26PM  25              THE COURT:  YES.

12:26PM   1    BY MR. SCHENK:

12:26PM   2    Q.   IF IT'S EASIER, DR. DHAWAN, I'M SHOWING YOU ON THE SCREEN

12:26PM   3    EXHIBIT 4520.

12:26PM   4        NOW, THIS IS AN EMAIL THAT YOU ARE NOT ON; IS THAT

12:26PM   5    CORRECT?

12:26PM   6    A.   YES.

12:26PM   7    Q.   AND DOES IT APPEAR, THOUGH, THAT IT WAS SENT TO

12:26PM   8    SUNNY BALWANI?

12:26PM   9        DO YOU SEE THAT?

12:26PM  10    A.   YES.

12:26PM  11    Q.   ON SEPTEMBER 14TH, 2015.

12:26PM  12        DO YOU SEE THAT?

12:26PM  13    A.   YES.

12:26PM  14    Q.   AND THERE'S TWO ATTACHMENTS.  I'M GOING TO DIRECT YOUR

12:26PM  15    ATTENTION TO THE SECOND ATTACHMENT, THE ONE THAT IS AN EXCEL

12:26PM  16    FILE.

12:26PM  17        AND IF YOU WOULD NOW TURN TO PAGE 37 OF EXHIBIT 4520, AND

12:26PM  18    I'M GOING TO SHOW YOU -- FIRST THE COLUMN HEADINGS ARE

12:26PM  19    APPEARING ON THE SCREEN.

12:26PM  20        DO YOU SEE THAT?

12:26PM  21    A.   YES.  YES.

12:27PM  22    Q.   AND WE HAVE NOW MATCHED UP THE COLUMN HEADINGS WITH THE

12:27PM  23    CONTENT OF THE COLUMNS.

12:27PM  24        DO YOU SEE THAT?

12:27PM  25    A.   YES.

12:27PM  1    Q.   AND IS IT EASIER FOR YOU LOOKING IN THE BINDER?

12:27PM  2    A.   YEAH, I THINK I'M GOING TO LOOK ON THE SCREEN HERE, YES.

12:27PM  3    Q.   OKAY.  I CAN GIVE YOU A MINUTE IF YOU WANT TO --

12:27PM  4    A.   NO, I'M GOOD.  THANK YOU.

12:27PM  5    Q.   SO I WANT TO DIRECT YOUR ATTENTION TO ONE THAT LOOKS LIKE

12:27PM  6    THE DATE IS JANUARY 28, 2015.

12:27PM  7         DO YOU SEE THAT?

12:27PM  8    A.   I'M SORRY.  I SEE A JANUARY 26TH -- OH, I'M SORRY.

12:27PM  9         I SEE IT RIGHT NOW, YES, ON THE LEFT SIDE.

12:27PM 10    Q.   AND JUST TO CONFIRM, YOU WERE LAB DIRECTOR ON

12:27PM 11    JANUARY 28TH, 2015; IS THAT CORRECT?

12:27PM 12    A.   YES.

12:27PM 13    Q.   AND THE NEXT COLUMN THAT HAS CONTENT LOOKS LIKE COLLECTION

12:27PM 14    METHOD.

12:27PM 15         DO YOU SEE THAT?

12:27PM 16    A.   YES.

12:27PM 17    Q.   AND IT SAYS CTN.

12:28PM 18         DO YOU KNOW WHAT A CTN IS?

12:28PM 19    A.   THAT'S INITIALS, BUT I DON'T KNOW WHAT THAT STANDS FOR.

12:28PM 20    Q.   CTN DOESN'T HAVE MEANING TO YOU, WHAT THAT MEANS?

12:28PM 21    A.   COLLECTION METHOD?

12:28PM 22         NO, IT DOES NOT.

12:28PM 23    Q.   OKAY.  IF WE CAN NOW GO OVER TO THE SQUARE WITH THE MOST

12:28PM 24    CONTENT, DO YOU SEE THAT SORT OF IN THE MIDDLE IT SAYS PATIENT,

12:28PM 25    AND THEN A NAME IS REDACTED.

12:28PM  1          DO YOU SEE THAT?

12:28PM  2     A.   YES.

12:28PM  3     Q.   AND IT TALKS ABOUT ON JANUARY 21ST, 2015, CERTAIN ASSAYS,

12:28PM  4     "SODIUM, CHLORIDE, CALCIUM, WERE ALL ABNORMAL.  NO REASON FOR

12:28PM  5     THIS AS THEY HAVE NEVER BEEN ABNORMAL BEFORE, SO SHE SENT HER

12:28PM  6     BACK ON 1/27 TO HAVE THEM REPEATED, AND THEY WERE ALL NORMAL."

12:28PM  7          DO YOU SEE THAT?

12:28PM  8     A.   YES.

12:28PM  9     Q.   SO I THINK I NEGLECTED TO TELL YOU, BUT THE TITLE OF THE

12:28PM  10    FILE FOR THIS DOCUMENT INCLUDES THE WORD "COMPLAINTS."

12:29PM  11         DO YOU WANT TO FLIP BACK?  MAYBE I SHOULD SHOW THAT TO

12:29PM  12    YOU.

12:29PM  13         PAGE 1 OF THIS EXHIBIT, THE FILE IS ENTITLED FINAL LOG OF

12:29PM  14    COMPLAINTS AND IRQ'S.

12:29PM  15         DO YOU SEE THAT?

12:29PM  16    A.   WHAT IS THE PAGE NUMBER?  I APOLOGIZE.

12:29PM  17    Q.   PAGE 1.

12:29PM  18    A.   OH, PAGE 1.  I JUST SEE APPENDIX ON PAGE 1.

12:29PM  19         BUT PAGE 2 --

12:29PM  20    Q.   PAGE 1 IS THE EMAIL.  THE SECOND ATTACHMENT UNDER THE WORD

12:29PM  21    "RECEIVED."

12:29PM  22         IT'S ALSO ON THE SCREEN NOW IN FRONT OF YOU.

12:29PM  23    A.   OKAY.  GOT IT.  FINAL LOG.  I SEE IT.

12:30PM  24    Q.   SO IN JANUARY OF 2015, WERE YOU INFORMED OF THIS

12:30PM  25    PARTICULAR PATIENT GETTING ABNORMAL SODIUM, CHLORIDE, AND

12:30PM 1       CALCIUM RESULTS?

12:30PM 2       A.   NO.

12:30PM 3       Q.   WERE YOU INFORMED OF A DESIRE TO HAVE THE PATIENT

12:30PM 4       RETESTED?

12:30PM 5       A.   NO.

12:30PM 6       Q.   DID YOU MAKE ANY DECISIONS ABOUT WHETHER THERANOS SHOULD

12:30PM 7       STILL USE WHAT IS CALLED A COLLECTION METHOD OF CTN FOR THESE

12:30PM 8       ASSAYS?

12:30PM 9       A.   NO.

12:30PM 10      Q.   WOULD YOU NOW TURN TO PAGE 38.  IT'S THE NEXT PAGE IN THIS

12:30PM 11      CHART.

12:30PM 12           AND I'D LIKE TO NOW SHOW YOU THE ONE THAT IS NOT COLORED

12:30PM 13      PINK.  IT IS THE ONE ZOOMED IN.

12:30PM 14           DO YOU SEE THAT?

12:30PM 15      A.   YES.

12:30PM 16      Q.   AND NOW THE DATE IS FEBRUARY 3RD, 2015.

12:30PM 17           DO YOU SEE THAT?

12:30PM 18      A.   YES.

12:30PM 19      Q.   AND WERE YOU LAB DIRECTOR ALSO AT THIS TIME?

12:30PM 20      A.   YES.

12:30PM 21      Q.   AND IS THE COLLECTION METHOD STILL CTN?

12:30PM 22      A.   YES.

12:30PM 23      Q.   AND THEN DO YOU SEE IN THE CONTENT, "DOCTOR," AND THEN THE

12:31PM 24      NAME IS REDACTED, "IS CONCERNED WITH THE DIFFERENCE IN OUR

12:31PM 25      RESULTS.  HE SAID THAT EACH HCG RESULTS SHOULD NOT VARY THAT

12:31PM  1    MUCH FROM LAB TO LAB OR DAY-TO-DAY."

12:31PM  2         DR. DHAWAN, ARE YOU FAMILIAR WITH THE HCG TEST?

12:31PM  3    A.   YES.

12:31PM  4    Q.   AND WHAT IS THAT IN YOUR EXPERIENCE?

12:31PM  5    A.   IT'S A PREGNANCY TEST.

12:31PM  6    Q.   DID SOMEONE IN THE THERANOS LAB INFORM YOU ABOUT THIS

12:31PM  7    DOCTOR'S CONCERNS REGARDING THE HCG TESTING?

12:31PM  8    A.   NO.

12:31PM  9    Q.   DID YOU MAKE ANY DECISIONS ABOUT WHICH DEVICE THERANOS

12:31PM  10   SHOULD BE TESTING HCG ON?

12:31PM  11   A.   NO.

12:31PM  12   Q.   DID ANYBODY ASK YOU WHETHER THEY SHOULD STILL USE THIS

12:31PM  13   COLLECTION METHOD OF CTN?

12:31PM  14   A.   NO.

12:31PM  15   Q.   WOULD YOU NOW TURN TO PAGE 44 OF THIS COMPLAINT DOCUMENT.

12:32PM  16        I WOULD LIKE TO GO TO THE THIRD ONE DOWN, AND THIS ONE

12:32PM  17   LOOKS LIKE IT'S DATED MAY 19TH.

12:32PM  18        DO YOU SEE THAT?

12:32PM  19   A.   YES.

12:32PM  20   Q.   WERE YOU LAB DIRECTOR AT THE TIME?

12:32PM  21   A.   YES.

12:32PM  22   Q.   AND DO YOU SEE CTN AND VENOUS NOW LISTED?

12:32PM  23   A.   YES.

12:32PM  24   Q.   AND IF WE GO TO THE CONTENT HERE, "PSA VERY HIGH ON MAY 14

12:32PM  25   THEN NORMAL ON MAY 18 -- HE IS NOT CONVINCED THAT THE RESULTS

12:32PM   1    FROM MAY 14 ARE FOR HIS PATIENT -- POSSIBLY BELONG TO ANOTHER

12:32PM   2    PATIENT -- HE WANTS TO BE ASSURED THAT THE RESULTS FROM

12:32PM   3    MAY 18TH ARE CORRECT FOR HIS PATIENT AND POSSIBLE RERUN PSA

12:32PM   4    TOTAL."

12:32PM   5         ARE YOU FAMILIAR WITH THE ASSAY PSA?

12:32PM   6    A.   YES.

12:32PM   7    Q.   AND WHAT IS THAT?

12:32PM   8    A.   PROSTATE SPECIFIC ANTIGEN, AND IT'S USED IN ADULT MEN OVER

12:33PM   9    50.

12:33PM  10    Q.   AND WHEN THIS COMPLAINT CAME IN AROUND MAY OF 2015, DID

12:33PM  11    ANYBODY REACH OUT TO YOU ABOUT WHETHER THERANOS SHOULD CONTINUE

12:33PM  12    TESTING PSA ON CTN?

12:33PM  13    A.   NO.

12:33PM  14    Q.   HOW ABOUT THIS DOCTOR WHO HAS SOME CONCERNS THAT THE

12:33PM  15    RESULT DIDN'T EVEN BELONG TO HIS PATIENT?  DO YOU HAVE A

12:33PM  16    RECOLLECTION OF SPEAKING TO THIS DOCTOR?

12:33PM  17    A.   NO.

12:33PM  18    Q.   DID ANYBODY FROM THERANOS INFORM YOU THAT THIS DOCTOR HAD

12:33PM  19    CALLED WITH THAT CONCERN?

12:33PM  20    A.   NO.

12:33PM  21    Q.   WOULD YOU NOW PLEASE TURN TO EXHIBIT 10527.  I BELIEVE

12:33PM  22    IT'S THE LAST EXHIBIT IN YOUR BINDER.

12:33PM  23         YOUR HONOR, THE GOVERNMENT OFFERS 10527 BY STIPULATION.

12:33PM  24              MS. WALSH:  ONE MOMENT, YOUR HONOR.

12:34PM  25              NO OBJECTION.

12:34PM  1              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:34PM  2         (GOVERNMENT'S EXHIBIT 10527 WAS RECEIVED IN EVIDENCE.)

12:34PM  3              MR. SCHENK:  THANK YOU.

12:34PM  4    Q.   DR. DHAWAN, DO YOU SEE EXHIBIT 10527 ON THE SCREEN IN

12:34PM  5    FRONT IT OF YOU?

12:34PM  6    A.   YES.

12:34PM  7    Q.   OR IN THE BINDER?

12:34PM  8    A.   YES.

12:34PM  9    Q.   AND SO I WANT TO START WITH THE EMAIL THAT BEGINS ON

12:34PM 10    TUESDAY, AUGUST 4TH, 2015.

12:34PM 11         DO YOU SEE THAT?

12:34PM 12    A.   YES.

12:34PM 13    Q.   AN INDIVIDUAL NAMED LANGLY GEE WRITES YOU AN EMAIL; IS

12:34PM 14    THAT CORRECT?

12:34PM 15    A.   YES.

12:34PM 16    Q.   AND IN IT HE WRITES, "HI DR. DHAWAN:

12:34PM 17         "MY NAME IS LANGLY GEE AND I AM THE QA/QC MANAGER FOR

12:34PM 18    THERANOS INC."

12:34PM 19         WAS MR. GEE INTRODUCING HIMSELF TO YOU OR HAD YOU MET HIM

12:34PM 20    BEFORE?

12:34PM 21    A.   I BELIEVE HE WAS INTRODUCING HIMSELF TO ME.

12:34PM 22    Q.   AND THEN TWO PARAGRAPHS DOWN HE WRITES, "MY FIRST SET OF

12:34PM 23    SEVEN DOCUMENTS (VALIDATION, SOP'S AND EMPLOYEE TRAINING) HAS

12:35PM 24    TO DO WITH THERANOS'S NEW LAUNCH OF," AND THEN IT LISTS ASSAYS.

12:35PM 25         DO YOU SEE THAT?

12:35PM 1    A.   YES.

12:35PM 2    Q.   AND THEN IN THAT SENTENCE JUST BEFORE WHAT WE HIGHLIGHTED,

12:35PM 3    DR. GEE SAYS HE'S GOING TO BEGIN SENDING DOCUMENTS TO YOU FOR

12:35PM 4    YOUR SIGNATURE.

12:35PM 5    A.   YES.

12:35PM 6    Q.   DO YOU RECALL THIS OCCURRING, INDIVIDUALS FROM THERANOS

12:35PM 7    SENDING DOCUMENTS TO YOU FOR YOU TO SIGN?

12:35PM 8    A.   YES.

12:35PM 9    Q.   IN THE PARAGRAPH THAT BEGINS, "ONCE," IT LOOKS LIKE HE

12:35PM 10   WRITES, "GOING FORWARD THERE WILL BE AT LEAST ANOTHER 300-400

12:35PM 11   MORE DOCUMENTS FOR YOUR REVIEW."

12:35PM 12       DR. DHAWAN, DO YOU HAVE A RECOLLECTION OF THAT, RECEIVING

12:35PM 13   A NUMBER OF DOCUMENTS AT THAT VOLUME?

12:35PM 14   A.   I CAN'T RECALL THE EXACT VOLUME, BUT I DID RECEIVE

12:35PM 15   DOCUMENTS.

12:35PM 16   Q.   OKAY.  MANY DOCUMENTS; IS THAT FAIR?

12:35PM 17   A.   YES.

12:35PM 18   Q.   AND THEN IF WE GO TO THE VERY TOP OF THIS EMAIL, IT LOOKS

12:35PM 19   LIKE YOU RESPOND TO A QUESTION DR. GEE ASKS WITH "SEND 50 PER

12:36PM 20   WEEK."

12:36PM 21       IS THAT RIGHT?

12:36PM 22   A.   YES.

12:36PM 23   Q.   AND SO EXPLAIN TO THE JURY WHAT WAS HAPPENING THERE.

12:36PM 24   WHAT, IN FACT, WERE YOU REQUESTING?

12:36PM 25   A.   I WAS REQUESTING THAT A LIMITED NUMBER OF THE DOCUMENTS BE

12:36PM   1    SENT TO ME SO THAT I WOULDN'T GET OVERWHELMED WITH TOO MANY

12:36PM   2    DOCUMENTS TO READ AND SIGN.

12:36PM   3    Q.   OKAY.  AND DO YOU HAVE A RECOLLECTION, WERE SOME DOCUMENTS

12:36PM   4    IN FACT SENT TO YOU ELECTRONICALLY?

12:36PM   5    A.   YES, I HAVE A RECOLLECTION THAT, YES, SOME DOCUMENTS WERE

12:36PM   6    SENT.

12:36PM   7    Q.   AND THEN HOW ABOUT WAS THERE AN INSTANCE WHEN YOU WENT TO

12:36PM   8    THERANOS AND PHYSICALLY SIGNED DOCUMENTS, NOT THAT YOU RECEIVED

12:36PM   9    ELECTRONICALLY, BUT ALSO?

12:36PM  10    A.   YES, ONCE.

12:36PM  11    Q.   OKAY.  LET'S TALK ABOUT THAT.

12:36PM  12         WOULD YOU NOW TURN TO 2760 IN YOUR BINDER?

12:36PM  13         YOUR HONOR, THE GOVERNMENT OFFERS 2760 BY STIPULATION.

12:36PM  14              MS. WALSH:  NO OBJECTION, YOUR HONOR.

12:36PM  15              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:36PM  16         (GOVERNMENT'S EXHIBIT 2760 WAS RECEIVED IN EVIDENCE.)

12:37PM  17    BY MR. SCHENK:

12:37PM  18    Q.   IF WE CAN START WITH PAGE 2 OF THIS EXHIBIT.

12:37PM  19         DR. DHAWAN, ON PAGE 2, DO YOU SEE AN EMAIL FROM

12:37PM  20    MR. BALWANI TO YOU ON SEPTEMBER 9TH, 2015?

12:37PM  21    A.   YES.

12:37PM  22    Q.   A LITTLE EARLIER YOU DESCRIBED FOR THE JURY A RECOLLECTION

12:37PM  23    OF A CMS INSPECTION.  IS THAT RIGHT?

12:37PM  24    A.   YES.

12:37PM  25    Q.   WAS THAT INSPECTION IN SEPTEMBER OF 2015?

12:37PM  1     A.   YES.

12:37PM  2     Q.   WAS THIS EMAIL DESCRIBING TO YOU SOME WORK IN ADVANCE OF

12:37PM  3     THAT INSPECTION?

12:37PM  4     A.   YES.

12:37PM  5     Q.   SO THE FIRST -- ACTUALLY, THE PARAGRAPH THAT BEGINS "THE

12:37PM  6     ISSUANCE OF," DO YOU SEE THAT?

12:37PM  7     A.   YES.

12:37PM  8     Q.   DOES THAT PARAGRAPH TALK ABOUT WHAT YOU DESCRIBED TO THE

12:37PM  9     JURY EARLIER, SEEKING OPTIONS IN LIEU OF A SALARY?

12:37PM  10    A.   YES.

12:37PM  11    Q.   AND THEN THE NEXT PARAGRAPH THAT BEGINS, "I ALSO NEED," DO

12:37PM  12    YOU SEE THAT?

12:37PM  13    A.   YES.

12:37PM  14    Q.   AND SO MR. BALWANI NEEDS YOUR HELP WITH AN ADDITIONAL

12:37PM  15    MATTER.  "WE HAVE A LAB AUDIT COMING UP ON 9/22 AT 9:00 A.M."

12:38PM  16         WAS THAT THE CMS INSPECTION?

12:38PM  17    A.   YES.

12:38PM  18    Q.   "(THESE HAPPEN ONCE EVERY TWO YEARS), AND WANTED TO SEE IF

12:38PM  19    YOU CAN BE PRESENT FOR AT LEAST THE FIRST PART OF IT."

12:38PM  20         WERE YOU, IN FACT, PRESENT FOR THE FIRST PART OF IT?

12:38PM  21    A.   YES.

12:38PM  22    Q.   "I HAVE A VERY CAPABLE TEAM THAT HAS TAKEN CARE OF ALL OF

12:38PM  23    THE DETAILS AS ALWAYS, BUT WOULD LIKE TO HAVE YOU HERE FOR THE

12:38PM  24    FIRST PART OR SO AND THE INTRODUCTION OF OUR TEAM.  IN

12:38PM  25    PREPARATION FOR THE LAB AUDIT, I WILL PERSONALLY WALK YOU

12:38PM   1    THROUGH ALL OF THE LATEST UPDATES WITH OUR TEAM -- WE HAVE

12:38PM   2    HIRED MANY EXPERTS FROM THE INDUSTRY TO MAKE SURE LAB IS

12:38PM   3    FLAWLESS AND AUDIT READY, SO I DON'T ANTICIPATE ANY HICCUPS,

12:38PM   4    BUT AS ALWAYS, WANT YOU TO BE FAMILIAR WITH IT."

12:38PM   5         GOING INTO THE AUDIT, SO THIS MONTH OF SEPTEMBER,

12:38PM   6    DR. DHAWAN, DID YOU RELY ON STATEMENTS LIKE THIS FROM

12:39PM   7    MR. BALWANI TO HELP IN THE PREPARATION?

12:39PM   8    A.   YES.

12:39PM   9    Q.   DID YOU BELIEVE THAT MR. BALWANI HAD THIS TEAM THAT HE

12:39PM   10   DESCRIBED AND THAT THERE WOULDN'T BE HICCUPS?

12:39PM   11   A.   YES.

12:39PM   12   Q.   IF WE NOW COULD TURN TO THE FIRST PAGE.

12:39PM   13        THE FIRST PAGE OF 2760, ARE YOU JUST GENERALLY TALKING

12:39PM   14   ABOUT WHEN YOU WOULD GO INTO THERANOS TO SIGN DOCUMENTS?

12:39PM   15   A.   YES.

12:39PM   16   Q.   DO YOU SEE WHERE HE SAYS "CAN WE DO TOMORROW AT 6:00 P.M.

12:39PM   17   FOR SIGNING AND WALK THROUGH?"

12:39PM   18        IT'S TOWARDS THE BOTTOM.

12:39PM   19   A.   YES.

12:39PM   20   Q.   AND DID THAT, IN FACT, HAPPEN?  WAS THERE AN OCCASION WHEN

12:39PM   21   YOU WENT TO THERANOS TO SIGN DOCUMENTS?

12:39PM   22   A.   YES.

12:39PM   23   Q.   WOULD YOU TURN TO 2772?

12:39PM   24        YOUR HONOR, THE GOVERNMENT OFFERS 2772 BY STIPULATION.

12:40PM   25             MS. WALSH:  NO OBJECTION.

DHAWAN DIRECT BY MR. SCHENK

12:40PM 1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:40PM 2          (GOVERNMENT'S EXHIBIT 2772 WAS RECEIVED IN EVIDENCE.)

12:40PM 3    BY MR. SCHENK:

12:40PM 4    Q.   IF WE COULD START WITH THE EMAIL ON THE BOTTOM.

12:40PM 5          ON MONDAY, SEPTEMBER 14TH, 2015, MR. BALWANI WRITES TO

12:40PM 6    YOU, "THANKS FOR DROPPING BY.

12:40PM 7          "I NEED COUPLE OF HOURS FROM YOU THIS COMING WEEKEND.

12:40PM 8    UNFORTUNATELY I HAVE CLOSE TO 300 SOP'S THAT NEED SIGNING.  I

12:40PM 9    CAN HAVE TEAM SEND THIS OUT 50 AT A TIME EACH DAY THIS WEEK

12:40PM 10   ELECTRONICALLY AS THAT MIGHT BE EASIER.  SORRY FOR THE LAST

12:40PM 11   MINUTE ON THIS.  I WAS TRYING TO FIND A WAY TO AVOID DOING THIS

12:40PM 12   MANUALLY... THANKS IN ADVANCE."

12:40PM 13         AND THEN DO YOU SEE YOUR RESPONSE TO MR. BALWANI ON THE

12:40PM 14   TOP OF THIS PAGE?

12:40PM 15   A.   YES.

12:40PM 16   Q.   AND DO YOU, IN FACT, DECLINE HIS INVITATION TO SIGN

12:40PM 17   ELECTRONICALLY, BUT INSTEAD SAY YOU'LL COME IN ON SATURDAY?

12:41PM 18   A.   YES.

12:41PM 19   Q.   AND JUST BY DOING THE MATH, WAS SATURDAY SEPTEMBER 19TH

12:41PM 20   THEN, IF THIS WAS TUESDAY, THE 15TH?

12:41PM 21   A.   I WOULD THINK SO.  I DON'T RECALL.

12:41PM 22   Q.   DID YOU GO INTO THERANOS THAT SATURDAY TO SIGN SOME

12:41PM 23   DOCUMENTS?

12:41PM 24   A.   I WENT IN ON A SATURDAY, YES.

12:41PM 25         MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

12:41PM  1              THE COURT:  YES.

12:41PM  2              MR. SCHENK:  (HANDING.)

12:41PM  3    Q.   DR. DHAWAN, I'VE HANDED YOU A BINDER OF DOCUMENTS THAT

12:41PM  4    HAVE BEEN PREVIOUSLY ADMITTED IN THIS TRIAL AND THEY CONTAIN

12:41PM  5    VALIDATION REPORTS.

12:41PM  6         WHAT I WOULD ASK YOU TO DO, FIRST, IS LOOK AT A TAB IN

12:41PM  7    THERE, 9086.

12:42PM  8         DO YOU SEE THAT DOCUMENT?

12:42PM  9    A.   YES.

12:42PM  10   Q.   AND DO YOU SEE YOUR SIGNATURE ON THAT DOCUMENT?

12:42PM  11   A.   I DO NOT.

12:42PM  12   Q.   OKAY.  OTHER THAN THAT DOCUMENT, I'M GOING TO ASK YOU TO

12:42PM  13   LOOK AT THE REST OF THE DOCUMENTS IN THIS BINDER AND TELL ME IF

12:42PM  14   THERE ARE ANY THAT YOU DID NOT SIGN ON 9-19-2015, ON

12:42PM  15   SEPTEMBER 19TH, 2015?

12:42PM  16   A.   ARE YOU ASKING ME TO LOOK AT SECTION 9086, OR ALL OF THE

12:42PM  17   WHOLE THING?

12:42PM  18   Q.   YEAH, EVERY OTHER DOCUMENT IN THE BINDER, OTHER THAN THAT

12:42PM  19   ONE.

12:42PM  20   A.   YES, I'M NOTICING MY SIGNATURE ON ALL OF THE OTHER

12:42PM  21   DOCUMENTS, YES.

12:43PM  22         (PAUSE IN PROCEEDINGS.)

12:43PM  23              THE WITNESS:  YES, IT APPEARS THAT MY SIGNATURE IS

12:43PM  24   ON ALL OF THESE DOCUMENTS, YES.

12:43PM  25   BY MR. SCHENK:

12:43PM   1    Q.   SO IS IT TRUE THAT OTHER THAN EXHIBIT 9086, YOU SIGNED

12:43PM   2    EVERY ONE OF THOSE ON SEPTEMBER 19TH?

12:43PM   3    A.   YES.

12:43PM   4    Q.   AND FOR THE RECORD, YOUR HONOR, I BELIEVE THIS WAS A

12:43PM   5    DEFENSE EXHIBIT ADMITTED THROUGH DR. ROSENDORFF.

12:43PM   6         WHEN YOU WERE SIGNING THESE DOCUMENTS -- I HAVE A FEW

12:43PM   7    QUESTIONS ABOUT YOUR PROCESS.

12:43PM   8    A.   YES.

12:43PM   9    Q.   DID MR. BALWANI OR SOMEONE ELSE HAND THEM TO YOU, OR DO

12:43PM   10   YOU HAVE A RECOLLECTION OF THAT?

12:43PM   11   A.   THEY WERE PLACED IN FRONT OF ME, YES.

12:43PM   12   Q.   DO YOU REMEMBER WHO PLACED THEM, OR YOU DON'T REMEMBER?

12:43PM   13   A.   I BELIEVE IT WAS MR. BALWANI, BUT IT MAY HAVE BEEN ONE OF

12:43PM   14   HIS STAFF.  I JUST DON'T RECALL.

12:43PM   15   Q.   UM, WHEN YOU -- DID YOU READ THE DOCUMENTS WHEN YOU SIGNED

12:43PM   16   THEM?

12:43PM   17   A.   I LOOKED THROUGH THEM, YES.

12:44PM   18   Q.   OKAY.  WHAT DO YOU MEAN, "LOOKED THROUGH THEM"?

12:44PM   19   A.   I LOOKED AND SAW THAT THEY HAD BEEN SIGNED BY

12:44PM   20   ADAM ROSENDORFF APPROXIMATELY A YEAR EARLIER.

12:44PM   21   Q.   AND HELP ME UNDERSTAND THAT.

12:44PM   22        DID THAT MATTER TO YOU THAT ADAM ROSENDORFF SIGNED IT A

12:44PM   23   YEAR EARLIER?

12:44PM   24   A.   THAT WAS IMPORTANT BECAUSE HE WAS THE PREVIOUS DIRECTOR

12:44PM   25   THAT HAD BEEN THERE, YES.

12:44PM   1    Q.   AND WHY IS THAT IMPORTANT?  WHY DID THAT MATTER?

12:44PM   2    A.   THAT MEANS THAT SOMEBODY ELSE LOOKED AT IT BEFORE ME.

12:44PM   3    Q.   OKAY.  WHEN YOU WERE LOOKING THROUGH THE DOCUMENTS, WAS

12:44PM   4    THERE ANY OCCASION WHEN YOU MADE A COMMENT?  AND BY THAT I MEAN

12:44PM   5    DID YOU LOOK THROUGH THE DOCUMENTS AND SAY, YOU KNOW WHAT, I

12:44PM   6    DON'T THINK THIS SHOULD BE HERE, I WANT THIS CHANGE MADE?

12:44PM   7         DID YOU MAKE ANY EDITS OR HAVE ANY COMMENTS ON ANY

12:44PM   8    DOCUMENT THAT YOU SIGNED THAT DAY?

12:44PM   9    A.   NO.

12:44PM   10   Q.   IN THE DOCUMENTS, DO YOU SEE REFERENCES TO SOMETHING

12:44PM   11   CALLED AN EDISON?

12:44PM   12   A.   I'M LOOKING AT THE DOCUMENTS THEMSELVES.

12:45PM   13        I DON'T SEE IT IN THE DOCUMENTS THAT I'M LOOKING AT RIGHT

12:45PM   14   AT THIS POINT.

12:45PM   15   Q.   DO YOU KNOW WHAT AN EDISON IS?

12:45PM   16   A.   THAT IS THE DEVICE THAT THERANOS HAD.

12:45PM   17   Q.   AND HOW DID YOU KNOW THAT?

12:45PM   18   A.   I KNEW THAT BECAUSE I LOOKED ALL OF THIS STUFF UP.

12:45PM   19   Q.   AND WHEN YOU SAY YOU LOOKED IT UP, WHAT DO YOU MEAN?

12:45PM   20   A.   I RESEARCHED IT PREVIOUSLY.

12:45PM   21   Q.   AND IS THIS THE REFERENCE TO WHAT YOU WERE TELLING US

12:45PM   22   EARLIER --

12:45PM   23   A.   YES.

12:45PM   24   Q.   -- ABOUT GOOGLE?

12:45PM   25   A.   YES.

12:45PM   1    Q.   WHEN YOU WERE SIGNING THESE DOCUMENTS, DID YOU SEE ANY

12:45PM   2    ACTUAL BLOOD TESTS RUN THAT DAY?

12:45PM   3    A.   NO.

12:45PM   4    Q.   WHEN YOU WERE SIGNING THE DOCUMENTS, DID YOU SPEAK TO

12:45PM   5    ANYBODY ELSE WHOSE SIGNATURE APPEARED ON THE DOCUMENTS?

12:45PM   6         YOU TOLD US ABOUT ADAM ROSENDORFF.  DID YOU TALK TO HIM

12:45PM   7    WHEN YOU WERE SIGNING THE DOCUMENTS?

12:45PM   8    A.   HE WAS NOT THERE, SO I DIDN'T GET A CHANCE TO TALK TO HIM.

12:45PM   9    Q.   YOU UNDERSTOOD HE WAS NOT AT THERANOS?

12:45PM  10    A.   YES.

12:45PM  11    Q.   HOW ABOUT OTHER INDIVIDUALS THAT SIGNED THE DOCUMENTS?

12:45PM  12    DID YOU HAVE AN OPPORTUNITY TO CONSULT WITH ANYBODY ELSE?

12:45PM  13    A.   NO.

12:45PM  14    Q.   WHEN YOU WERE SIGNING THE DOCUMENTS, DID YOU KNOW WHETHER

12:46PM  15    THEY REFLECTED TESTS THAT WERE BEING RUN IN THE CLINICAL LAB?

12:46PM  16    A.   THAT WAS WHAT WAS SHOWN TO ME, YES.

12:46PM  17    Q.   AND DID YOU KNOW HOW THE TESTS WERE PERFORMING WHEN YOU

12:46PM  18    SIGNED THE DOCUMENTS?

12:46PM  19    A.   IN GENERAL.  BUT SPECIFICALLY WITH EACH TEST, WHAT WAS

12:46PM  20    SHOWN TO ME IS WHAT WAS SHOWN TO ME.  BUT --

12:46PM  21    Q.   SO WHEN YOU WERE SHOWN A DOCUMENT ABOUT AN ASSAY OR A TEST

12:46PM  22    THAT WAS RUNNING IN THE CLINICAL LAB --

12:46PM  23    A.   YES.

12:46PM  24    Q.   -- I GUESS I'M WONDERING, DID YOU HAVE THE OPPORTUNITY TO

12:46PM  25    SEE OR ASK ANYBODY QUESTIONS ABOUT WHETHER IN THE CLINICAL LAB

12:46PM 1    THE ASSAY WAS ACTUALLY WORKING, TESTING ACCURATELY?

12:46PM 2    A.   I DIDN'T GET A CHANCE TO ASK HIM THAT QUESTION.

12:46PM 3    Q.   OKAY.  AND -- BUT YOU SIGNED IT.  IS THAT FAIR?

12:46PM 4    A.   YES.

12:46PM 5    Q.   IF WE CAN NOW TALK ABOUT THE CMS AUDIT.

12:47PM 6         YOU SAID TO US A MOMENT AGO THAT YOU WENT TO THE AUDIT; IS

12:47PM 7    THAT RIGHT?

12:47PM 8    A.   YES.

12:47PM 9    Q.   AND WHAT DO YOU REMEMBER ABOUT YOUR ATTENDANCE THERE?  HOW

12:47PM 10   LONG WERE YOU THERE?

12:47PM 11   A.   I WAS THERE FROM APPROXIMATELY 8:00 OR 8:30 TO ABOUT 10:00

12:47PM 12   IN THE MORNING.

12:47PM 13   Q.   AND WHAT DID YOU DO DURING THE AUDIT?

12:47PM 14   A.   I WAS THERE -- I WAS INTRODUCED, AND THEN THE CMS AUDITOR,

12:47PM 15   ALONG WITH A REPRESENTATIVE FROM THE STATE OF CALIFORNIA -- MY

12:47PM 16   RECOLLECTION IS NOT 100 PERCENT CLEAR, BUT THERE WERE SEVERAL

12:47PM 17   INDIVIDUALS FROM CMS AND I BELIEVE FROM THE STATE.

12:47PM 18        AND THEY WERE INQUIRING -- YOU KNOW, DOING A CONVERSATION

12:47PM 19   WITH THE THERANOS STAFF, INCLUDING MR. BALWANI AND OTHERS, AND

12:47PM 20   I WAS SITTING IN THE BACK OF THE ROOM OR THE SIDE OF THE ROOM.

12:47PM 21   Q.   DID YOU MAKE ANY PRESENTATIONS?

12:48PM 22   A.   NO.

12:48PM 23   Q.   DO YOU REMEMBER IF ANYBODY FROM CMS OR THE STATE ASKED YOU

12:48PM 24   QUESTIONS?

12:48PM 25   A.   THEY DIDN'T ASK ME ANYTHING, NO.

12:48PM  1     Q.   THEY DID NOT ASK YOU?

12:48PM  2     A.   NO.

12:48PM  3     Q.   IF YOU'LL NOW TURN TO 2791.

12:48PM  4          DO YOU HAVE THAT IN FRONT OF YOU?

12:48PM  5     A.   YES.

12:48PM  6     Q.   IS THIS AN EMAIL FROM SOMEONE NAMED MONA RAMAMURTHY TO

12:48PM  7     YOU?

12:48PM  8     A.   YES.

12:48PM  9     Q.   AND DOES IT INCLUDE AN EMPLOYMENT AGREEMENT FROM THERANOS?

12:48PM  10    A.   YES.

12:48PM  11              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2791.

12:48PM  12              MS. WALSH:  IS THIS BEING OFFERED PURSUANT TO

12:48PM  13    803(6)?

12:48PM  14              MR. SCHENK:  YES.

12:49PM  15              MS. WALSH:  THEN NO OBJECTION.

12:49PM  16              THE COURT:  IT'S ADMITTED PURSUANT TO 803(6) AS A

12:49PM  17    BUSINESS RECORD, AND IT CAN BE PUBLISHED.

12:49PM  18              MR. SCHENK:  THANK YOU, YOUR HONOR.

12:49PM  19         (GOVERNMENT'S EXHIBIT 2791 WAS RECEIVED IN EVIDENCE.)

12:49PM  20    BY MR. SCHENK:

12:49PM  21    Q.   DR. DHAWAN, IN THIS EMAIL, WHICH IS DATED SEPTEMBER 21ST,

12:49PM  22    2015, DO YOU SEE MS. RAMAMURTHY CONGRATULATING YOU ON YOUR

12:49PM  23    TERMS OF EMPLOYMENT JOINING THERANOS?

12:49PM  24    A.   YES.

12:49PM  25    Q.   AND WAS SEPTEMBER 21ST THE DAY BEFORE THE CMS INSPECTION?

12:49PM   1    A.   I BELIEVE SO, YES.

12:49PM   2         THE CMS INSPECTION WAS THAT WEDNESDAY, I BELIEVE.  I

12:49PM   3    BELIEVE IT WAS WEDNESDAY MORNING.  IT MAY HAVE BEEN EITHER THE

12:49PM   4    22ND OR THE -- IT WAS THE 22ND.  IT WAS THE DAY BEFORE, YES.

12:49PM   5    Q.   IT WAS EITHER ONE OR TWO DAYS BEFORE?

12:49PM   6    A.   YES, YES.

12:49PM   7    Q.   AND IN THE -- LET'S TURN TO PAGE 2 OF THE EXHIBIT.

12:49PM   8         DO YOU SEE AN AT WILL EMPLOYMENT AGREEMENT?

12:49PM   9    A.   YES.

12:49PM  10    Q.   HAD YOU BEEN THE THERANOS LAB DIRECTOR SINCE THE PRIOR

12:49PM  11    NOVEMBER BY THIS TIME?

12:50PM  12    A.   YES.

12:50PM  13    Q.   WHY THEN DID YOU RECEIVE AN EMPLOYMENT AGREEMENT A DAY OR

12:50PM  14    TWO DAYS BEFORE THE CMS INSPECTION IF YOU HAD BEEN WORKING AS

12:50PM  15    LAB DIRECTOR SINCE THE PRIOR NOVEMBER?

12:50PM  16    A.   I'M NOT SURE WHY THEY SENT IT TO ME THAT LATE.

12:50PM  17    Q.   YOU DON'T KNOW WHY THEY DID?

12:50PM  18    A.   NO.

12:50PM  19    Q.   IF YOU'LL NOW TURN TO PAGE 12.

12:50PM  20         DO YOU SEE HERE A LETTER TO YOU THAT ANNOUNCES

12:50PM  21    CONFIRMATION OF THE TERMS OF YOUR EMPLOYMENT AS LAB DIRECTOR

12:50PM  22    REPORTING TO SUNNY BALWANI?

12:50PM  23         DO YOU SEE THAT IN THE VERY FIRST SENTENCE?

12:50PM  24    A.   YES.

12:50PM  25    Q.   AND AGAIN, IS THAT TRUE, DID YOU REPORT TO MR. BALWANI AS

12:50PM   1        THE LAB DIRECTOR?

12:50PM   2   A.   HE WAS MY ONLY CONTACT AT THE COMPANY, YES.

12:50PM   3   Q.   AND DO YOU SEE, ABOUT HALFWAY DOWN THE PAGE, IT SAYS,

12:50PM   4   "YOUR START DATE WITH THE COMPANY IS JUNE 1ST, 2015"?

12:51PM   5   A.   YES.

12:51PM   6   Q.   HAD YOU BEEN, IN FACT, WORKING AS LAB DIRECTOR MUCH BEFORE

12:51PM   7   JUNE 1ST, 2015?

12:51PM   8   A.   YES.

12:51PM   9   Q.   SINCE THE PRIOR NOVEMBER?

12:51PM  10   A.   YES.

12:51PM  11   Q.   WOULD YOU NOW TURN TO TAB 4528.

12:51PM  12        YOUR HONOR, THE GOVERNMENT OFFERS 4528 PURSUANT TO

12:51PM  13   STIPULATION.

12:51PM  14           MS. WALSH:  NO OBJECTION.

12:51PM  15           THE COURT:  IT'S ADMITTED AND MAY BE PUBLISHED.

12:51PM  16        (GOVERNMENT'S EXHIBIT 4528 WAS RECEIVED IN EVIDENCE.)

12:51PM  17   BY MR. SCHENK:

12:51PM  18   Q.   DR. DHAWAN, THIS IS CALLED A CLIA LABORATORY OVERVIEW AND

12:51PM  19   IT'S DATED SEPTEMBER 22ND, 2015.

12:51PM  20        DO YOU SEE THAT?

12:51PM  21   A.   YES.

12:51PM  22   Q.   AND TAKE A MOMENT TO FLIP THROUGH IT.  I'M WONDERING IF

12:51PM  23   YOU RECALL THIS BEING A SLIDE DECK THAT WAS SHOWN DURING THE

12:51PM  24   CMS INSPECTION.

12:51PM  25   A.   I DON'T RECALL THIS, THIS SLIDE OR SLIDE DECK.

12:52PM   1    Q.   OKAY.  DO YOU REMEMBER WHETHER CMS WAS SHOWN ANY SLIDES?

12:52PM   2    A.   I DON'T RECALL THEM BEING SHOWN THE SLIDES WHEN I WAS

12:52PM   3    THERE IN THE MEETING.

12:52PM   4    Q.   OKAY.  I'D LIKE TO SHOW YOU A FEW PAGES IN IT.  IF YOU

12:52PM   5    COULD TURN TO PAGE 3.

12:52PM   6         WE SEE ON PAGE 3 COLLECTION SITES ON THIS MAP.

12:52PM   7         DO YOU SEE THAT IT LOOKS LIKE THERE'S ONE IN CALIFORNIA

12:52PM   8    AND 42 IN ARIZONA.

12:52PM   9         DO YOU SEE THAT?

12:52PM  10    A.   YES.

12:52PM  11    Q.   AND THEN ONE IN PENNSYLVANIA.  DID YOU KNOW THAT THERANOS

12:52PM  12    HAD A COLLECTION SITE IN PENNSYLVANIA?

12:52PM  13    A.   I DON'T RECALL THE PENNSYLVANIA SITE.  I KNEW ABOUT THE

12:52PM  14    ONES IN ARIZONA AND CALIFORNIA.

12:52PM  15    Q.   YOU WERE FAMILIAR WITH --

12:52PM  16    A.   THAT THEY HAD COLLECTION SITES IN THESE TWO STATES.

12:52PM  17    Q.   IN ARIZONA AND CALIFORNIA?

12:52PM  18    A.   YES.

12:52PM  19    Q.   BUT NOT PENNSYLVANIA?

12:52PM  20    A.   I DON'T RECALL.

12:52PM  21    Q.   WOULD YOU NOW TURN TO THE SLIDE ON PAGE 5.

12:53PM  22         ON PAGE 5, IT'S TITLED NEWARK, CALIFORNIA CLIA LABORATORY.

12:53PM  23         IS THAT CONSISTENT WITH YOUR UNDERSTANDING?  WAS

12:53PM  24    THERANOS'S CLIA LAB IN NEWARK, CALIFORNIA?

12:53PM  25    A.   YES.

12:53PM  1    Q.   AND THEN IF YOU'LL LOOK AT THE LICENSE ON THE RIGHT, THE

12:53PM  2    IMAGE, THERE ARE TWO NAMES ON THAT.

12:53PM  3         IS YOUR NAME ONE OF THE NAMES LISTED AS LAB DIRECTOR?

12:53PM  4    A.   YES.

12:53PM  5    Q.   AND THEN UNDER YOUR NAME THERE IS SOMEONE NAMED

12:53PM  6    LYNETTE SAWYER.

12:53PM  7         DO YOU SEE THAT?

12:53PM  8    A.   YES.

12:53PM  9    Q.   AND DO YOU KNOW WHO THAT IS?

12:53PM  10   A.   SHE WAS ANOTHER LAB DIRECTOR.

12:53PM  11   Q.   AT THERANOS?

12:53PM  12   A.   YES.

12:53PM  13   Q.   DID YOU -- HAVE YOU EVER MET HER?

12:53PM  14   A.   NO.

12:53PM  15   Q.   DID YOU EVER CONSULT WITH HER AND TALK ABOUT LAB TESTING

12:53PM  16   OR ANYTHING?

12:53PM  17   A.   NO.

12:53PM  18   Q.   HOW DO YOU KNOW SHE WAS A LAB DIRECTOR AT THERANOS?

12:53PM  19   A.   I FOUND OUT LATER.

12:53PM  20   Q.   AND WHEN YOU SAY "LATER," DO YOU MEAN AFTER YOU WERE NO

12:53PM  21   LONGER LAB DIRECTOR AT THERANOS?

12:53PM  22   A.   YES.

12:53PM  23   Q.   AND SO WHILE YOU WERE LAB DIRECTOR, WE SAW THAT BEGINNING

12:53PM  24   IN NOVEMBER OF 2014, YOU DIDN'T KNOW ABOUT LYNETTE SAWYER AT

12:54PM  25   THAT POINT; IS THAT RIGHT?

DHAWAN DIRECT BY MR. SCHENK

12:54PM 1    A.   YEAH, I DID NOT KNOW.

12:54PM 2    Q.   WOULD YOU TURN NOW TO PAGE 6.

12:54PM 3         PAGE 6 SAYS THAT, "ALL HIGH-COMPLEXITY SAMPLES ARE SHIPPED

12:54PM 4    TO THE NEWARK LAB."

12:54PM 5         AND THEN IT LOOKS LIKE THE ARROWS ARE COMING FROM

12:54PM 6    PENNSYLVANIA AND ARIZONA.

12:54PM 7         I'M WONDERING IF YOU KNEW ABOUT THIS.  DID YOU KNOW THAT

12:54PM 8    THERANOS WAS COLLECTING SAMPLES IN ARIZONA AND SENDING THEM TO

12:54PM 9    THE CALIFORNIA LAB IN NEWARK?

12:54PM 10   A.   I KNEW THAT THE CALIFORNIA LAB IN NEWARK WAS DOING THE

12:54PM 11   WORK, YES.

12:54PM 12   Q.   HOW ABOUT ANY LABS IN ARIZONA?  DID YOU KNOW WHETHER SOME

12:54PM 13   TESTS THAT WERE DONE IN ARIZONA WERE BEING TESTED IN ARIZONA,

12:54PM 14   OR DID YOU THINK THAT THEY WERE ALL BEING SHIPPED?

12:54PM 15   A.   I DID NOT KNOW WHAT PERCENTAGE WAS BEING DONE AT WHICH

12:54PM 16   FACILITY.

12:54PM 17   Q.   AND WHEN YOU SAY YOU DIDN'T KNOW WHAT PERCENT, DOES THAT

12:55PM 18   MEAN THAT YOU KNEW OF AT LEAST SOME?

12:55PM 19   A.   MY RECOLLECTION WAS THAT THERE WAS SOME BEING DONE IN

12:55PM 20   ARIZONA, BUT I DON'T REMEMBER CLEARLY HOW MANY OR WHAT

12:55PM 21   PERCENTAGE.

12:55PM 22   Q.   HOW ABOUT WHAT DISTINGUISHED BETWEEN THE TWO?  DID YOU

12:55PM 23   KNOW WHAT CAUSED A SAMPLE THAT WAS COLLECTED IN ARIZONA TO BE

12:55PM 24   TESTED IN ARIZONA VERSUS TESTED IN CALIFORNIA?

12:55PM 25   A.   I DID NOT.

12:55PM 1    Q.   DID, DID MR. BALWANI OR ANYBODY AT THERANOS EVER TALK TO

12:55PM 2    YOU ABOUT THAT DECISION, ABOUT SOME SAMPLES GOING TO ARIZONA

12:55PM 3    VERSUS CALIFORNIA?

12:55PM 4    A.   THEY DID NOT.

12:55PM 5    Q.   WOULD YOU NOW TURN TO PAGE 9.

12:55PM 6         PAGE 9 IS A CLIA LAB ORG CHART.

12:55PM 7         DO YOU SEE THAT?

12:55PM 8    A.   YES.

12:55PM 9    Q.   SO IF WE COULD FIRST FOCUS ON THOSE -- THE THREE BOXES

12:55PM 10   THAT INCLUDE MS. HOLMES, MR. BALWANI, AND YOU.

12:55PM 11   A.   YES.

12:55PM 12   Q.   DO YOU SEE THOSE?

12:55PM 13   A.   YES.

12:55PM 14   Q.   IS THAT ACCURATE IN YOUR EXPERIENCE?  DID -- WAS YOUR

12:55PM 15   UNDERSTANDING THAT MS. HOLMES WAS CEO, MR. BALWANI WAS

12:55PM 16   PRESIDENT AND COO, AND YOU WERE THE LABORATORY DIRECTOR?

12:56PM 17   A.   I'M SEEING IT IN THIS ORGANIZATIONAL CHART.  I DID NOT SEE

12:56PM 18   THIS CHART PREVIOUSLY.

12:56PM 19   Q.   HOW ABOUT JUST YOUR EXPERIENCE AT THERANOS?  IS THIS

12:56PM 20   CONSISTENT WITH WHAT YOU EXPERIENCED AT THERANOS?

12:56PM 21   A.   MY EXPERIENCE WAS THAT I WAS GOING TO BE A CONSULTANT FOR

12:56PM 22   A LIMITED AMOUNT OF TIME.

12:56PM 23   Q.   OKAY.  WAS THAT DIFFERENT THAN WHAT -- THAN REALITY?

12:56PM 24   A.   I WAS SUPPOSED TO BE A CONSULTANT.  THIS IS A MUCH MORE

12:56PM 25   EXTENSIVE ORGANIZATIONAL CHART THAN I WOULD HAVE PRESUMED.

12:56PM  1     Q.   OKAY.  IF WE CAN NOW LOOK AT THE BOX TO THE RIGHT THAT'S

12:56PM  2     CALLED CLINICAL LABORATORY ASSISTANT.

12:56PM  3          DO YOU SEE THAT?

12:56PM  4     A.   YES.

12:56PM  5     Q.   AND DO YOU KNOW WHAT CLINICAL LABORATORY ASSISTANTS, OR

12:56PM  6     CLA'S, ARE?

12:56PM  7     A.   THEY'RE PEOPLE THAT WORK IN THE LABORATORY, YES, AND WE'VE

12:56PM  8     SEEN THEM IN OTHER LABORATORIES THAT WE'VE INTERACTED WITH.

12:56PM  9     Q.   HOW ABOUT IN YOUR PRACTICE?  DO YOU HAVE CLA'S?

12:56PM  10    A.   NO.

12:57PM  11    Q.   IN THIS BOX, DO YOU SEE, ABOUT SIX OR SEVEN NAMES DOWN, DO

12:57PM  12    YOU SEE MR. BALWANI'S NAME?

12:57PM  13    A.   SIX OR SEVEN?  YES.

12:57PM  14    Q.   DID YOU KNOW THAT MR. BALWANI WAS BOTH A CLA AND ALSO THE

12:57PM  15    CHIEF OPERATING OFFICER AND PRESIDENT?

12:57PM  16    A.   I DID NOT.

12:57PM  17    Q.   DID MR. BALWANI -- DID YOU APPROVE ANY OF THE INDIVIDUALS

12:57PM  18    WHO BECAME CLA'S AT THE THERANOS CLIA LAB?

12:57PM  19    A.   NO.

12:57PM  20    Q.   DID MR. BALWANI ASK YOU IF HE COULD BE A CLA IN THE LAB?

12:57PM  21    A.   NO, I NEVER WAS ASKED.

12:57PM  22    Q.   HOW ABOUT THE HIRING OF ANY INDIVIDUALS?  WE SEE A LIST OF

12:57PM  23    NAMES HERE.  DID YOU MAKE ANY HIRING DECISIONS?

12:57PM  24    A.   NO.

12:57PM  25    Q.   HOW ABOUT SPEAKING WITH?  DID YOU SPEAK WITH -- OTHER THAN

12:57PM   1    MR. BALWANI, WERE THERE INDIVIDUALS HERE THAT YOU HAD

12:57PM   2    CONVERSATIONS WITH ABOUT PARTICULAR LAB TESTS, WHETHER A RESULT

12:57PM   3    SHOULD BE REPORTED TO A PATIENT?

12:57PM   4    A.   NO.

12:57PM   5    Q.   JUST ONE FINAL QUESTION ON THIS.  WOULD YOU TURN TO

12:58PM   6    PAGE 12.

12:58PM   7         ON PAGE 12 THERE'S A DESCRIPTION OF YOU AND THE TITLE LAB

12:58PM   8    DIRECTOR.

12:58PM   9         DO YOU SEE THAT?

12:58PM   10   A.   YES.

12:58PM   11   Q.   AND I'M JUST WONDERING IF THIS IS ACCURATE.

12:58PM   12   A.   YES.

12:58PM   13        MR. SCHENK:  YOUR HONOR, NOW I'D LIKE PERMISSION TO

12:58PM   14   PUBLISH 5 -- ONE LAST QUESTION.

12:58PM   15   Q.   SO DURING THE INSPECTION, YOU SAID THAT YOU WERE PRESENT

12:58PM   16   FOR HOW LONG?

12:58PM   17   A.   APPROXIMATELY TWO HOURS.

12:58PM   18   Q.   AND DID YOU GET A SENSE IN THOSE TWO HOURS HOW THE

12:58PM   19   INSPECTION WAS GOING?

12:58PM   20        BY THAT I MEAN, DID YOU FEEL A MEASURE OF CONCERN, OR DID

12:58PM   21   YOU THINK THAT THE INSPECTION WAS GOING OKAY?  DID YOU HAVE AN

12:58PM   22   OPINION.

12:58PM   23   A.   I DID NOT HAVE AN OPINION.

12:58PM   24   Q.   AT THE END OF TWO HOURS, DID YOU LEAVE THE BUILDING, OR

12:59PM   25   LEAVE THERANOS?

12:59PM  1    A.   I ASKED IF I WAS NEEDED FOR ANY FURTHER DUTIES, AND I WAS

12:59PM  2    TOLD THAT THERE WAS NOTHING ELSE THAT I NEEDED TO BE THERE FOR.

12:59PM  3    Q.   WHO DID YOU ASK?

12:59PM  4    A.   I BELIEVE I ASKED MR. BALWANI.

12:59PM  5    Q.   HAVE YOU MET ELIZABETH HOLMES BEFORE?

12:59PM  6    A.   ONCE.

12:59PM  7    Q.   AND WHEN WAS THAT?

12:59PM  8    A.   THE DAY OF THE INSPECTION MY RECOLLECTION IS.

12:59PM  9    Q.   AND DESCRIBE THAT CIRCUMSTANCE TO THE JURY.  WHERE DID YOU

12:59PM  10   MEET HER?

12:59PM  11   A.   I WAS SITTING OUTSIDE OF THE ROOM WHERE THE INSPECTION WAS

12:59PM  12   BEING DONE, AND SHE WALKED BY AND SAID HELLO AND SAID THANK YOU

12:59PM  13   FOR BEING HERE.

12:59PM  14   Q.   AND DID YOU HAVE FURTHER CONVERSATIONS WITH MS. HOLMES ON

12:59PM  15   THAT DAY?

12:59PM  16   A.   NO.

12:59PM  17   Q.   AND HOW ABOUT BEFORE THAT DAY OR SINCE?

12:59PM  18   A.   NO.

12:59PM  19   Q.   THAT WAS THE ONE AND ONLY INTERACTION?

12:59PM  20   A.   YES.

12:59PM  21        MR. SCHENK:  YOUR HONOR, PERMISSION TO PUBLISH

12:59PM  22   5387H.  IT HAS BEEN PREVIOUSLY ADMITTED.

12:59PM  23        THE COURT:  YES.

01:00PM  24   BY MR. SCHENK:

01:00PM  25   Q.   DR. DHAWAN, I'M GOING TO ASK YOU SOME QUESTIONS ABOUT SOME

01:00PM   1    TEXT MESSAGES.

01:00PM   2        YOU'RE NOT ON THESE TEXT MESSAGES, BUT THE FIRST ONE I

01:00PM   3    WOULD LIKE TO FOCUS YOUR ATTENTION ON IS ON PAGE 61.

01:00PM   4        DO YOU SEE THAT?

01:00PM   5    A.   YES.

01:00PM   6    Q.   THIS EXCHANGE IS DATED APRIL 28TH, 2015.

01:00PM   7        DO YOU SEE THAT?

01:00PM   8    A.   YES.

01:00PM   9    Q.   WERE YOU THERANOS'S LAB DIRECTOR AT THE TIME?

01:00PM  10    A.   YES.

01:00PM  11    Q.   DO YOU SEE MR. BALWANI WRITING, "IT IS MOST MADDENING

01:00PM  12    THERE IS NO FOCUS IN ANY CHEMICAL TEAMS AND NO PRODUCT COMING

01:00PM  13    OUT."

01:00PM  14        AND THEN AT THE BOTTOM OF THIS SCREEN, "MOST DISAPPOINTING

01:00PM  15    HOW BAD THESE PEOPLE ARE."

01:00PM  16        DO YOU SEE THAT?

01:00PM  17    A.   YES.

01:00PM  18    Q.   AND WOULD YOU NOW TURN TO PAGE 82.

01:00PM  19        WE'RE NOW LOOKING AT SOME MESSAGES FROM MAY 13TH, 2015.

01:01PM  20        DO YOU SEE THAT?

01:01PM  21    A.   YES.

01:01PM  22    Q.   DR. DHAWAN, WERE YOU LAB DIRECTOR OF THERANOS AROUND

01:01PM  23    MAY 13TH OF 2015?

01:01PM  24    A.   YES.

01:01PM  25    Q.   DO YOU SEE AT THE VERY TOP WHERE MR. BALWANI WRITES,

01:01PM  1    "SECONDLY.  WE NEED A BETTER STRATEGY FOR NORMANDY.  FOR A LONG

01:01PM  2    TIME" -- I'M SORRY.  "FOR A LONG TIME TO COME WE WILL HAVE

01:01PM  3    HYBRID SOLUTIONS."

01:01PM  4        DO YOU SEE THAT?

01:01PM  5    A.   YES.

01:01PM  6    Q.   AND ARE YOU FAMILIAR WITH THE TERM "NORMANDY"?

01:01PM  7    A.   I AM NOT.

01:01PM  8    Q.   YOU DON'T KNOW WHAT "NORMANDY" MEANS?

01:01PM  9    A.   NOT IN THIS CONTEXT.

01:01PM  10   Q.   IF YOU'LL NOW TURN TO PAGE 84.

01:01PM  11       AT THE VERY TOP OF PAGE 84, DO YOU SEE A MESSAGE FROM

01:01PM  12   MR. BALWANI ON MAY 14TH, 2015?

01:01PM  13   A.   YES.

01:01PM  14   Q.   AND WERE YOU LAB DIRECTOR ON THAT DATE?

01:01PM  15   A.   YES.

01:01PM  16   Q.   AND DID YOU SEE MR. BALWANI WRITING, "AT NEWARK DOING

01:02PM  17   REVIEWS AND TERMINATIONS"?

01:02PM  18   A.   YES.

01:02PM  19   Q.   AND DID WE LOOK AT A SLIDE A MOMENT AGO THAT SAID NEWARK

01:02PM  20   WAS THE LOCATION OF THERANOS'S CLIA LAB?

01:02PM  21   A.   YES.

01:02PM  22   Q.   DID YOU KNOW WHO WAS -- WHEN YOU WERE LAB DIRECTOR, DID

01:02PM  23   YOU KNOW WHO WAS MAKING THE HIRING AND FIRING DECISIONS IN THE

01:02PM  24   LAB?

01:02PM  25   A.   NOT DIRECTLY.

01:02PM   1     Q.   YOU DID NOT KNOW?

01:02PM   2     A.   NO.

01:02PM   3     Q.   WOULD YOU NOW TURN TO PAGE 85.

01:02PM   4     A.   YES.

01:02PM   5     Q.   ANOTHER MESSAGE FROM MAY 14TH, 2015.  DO YOU SEE WHERE

01:02PM   6     MR. BALWANI WRITES, "OUR PROBLEM HERE IS LACK OF MANAGEMENT NOT

01:02PM   7     PEOPLE."

01:02PM   8          DO YOU SEE THAT?

01:02PM   9     A.   YES.

01:02PM   10    Q.   AND DID YOU SHARE THAT OPINION WHEN YOU WERE LAB DIRECTOR?

01:02PM   11    DID YOU THINK THAT THERE WAS A PROBLEM IN NEWARK THAT INVOLVED

01:02PM   12    MANAGEMENT OF THE LAB?

01:02PM   13    A.   I WAS NEVER GIVEN THE INFORMATION TO MAKE THAT OPINION.

01:02PM   14    Q.   WOULD YOU NOW TURN TO PAGE 87.

01:03PM   15         DO YOU SEE MESSAGES ON PAGE 87 FROM JUNE 3RD, 2015?

01:03PM   16    A.   UH-HUH.

01:03PM   17    Q.   I'M SORRY.  WAS THAT A YES?

01:03PM   18    A.   YES.  I'M SORRY, YES.

01:03PM   19    Q.   AND WERE YOU LAB DIRECTOR AT THAT TIME, JUNE 2015?

01:03PM   20    A.   YES.

01:03PM   21    Q.   AND DO YOU SEE THE THIRD MESSAGE DOWN FROM MR. BALWANI

01:03PM   22    READS, "I DEAL WITH CLIA EVERY DAY AND I HATE THE LOW QUALITY

01:03PM   23    OF PEOPLE IN LAB INCLUDING WHAT YOU SAW YESTERDAY IN MAYO CEO."

01:03PM   24         DO YOU SEE THAT?

01:03PM   25    A.   YES.

01:03PM   1    Q.   AND IN JUNE, DID YOU DEAL WITH THE FOLKS THAT WORKED IN

01:03PM   2    CLIA AND AT THE THERANOS LAB IN NEWARK?

01:03PM   3    A.   NO.

01:03PM   4    Q.   WOULD YOU NOW TURN TO PAGE 103.

01:03PM   5         AT THE BOTTOM OF PAGE 103, DO YOU SEE SOME MESSAGES

01:03PM   6    EXCHANGED ON SEPTEMBER 1ST, 2015?

01:04PM   7    A.   YES.

01:04PM   8    Q.   WERE YOU LAB DIRECTOR ON SEPTEMBER 1ST, 2015?

01:04PM   9    A.   YES.

01:04PM  10    Q.   DO YOU SEE WHERE MR. BALWANI WRITES, "WE NEED TO CHANGE

01:04PM  11    DOT COM PROVIDER SECTION.  IT TALKS ABOUT MICRO SAMPLES AND

01:04PM  12    REFLECT TESTING ON MICRO SAMPLES."

01:04PM  13         AND THEN ABOUT THREE LINES DOWN, "JUST SAYING IT IS A

01:04PM  14    DISASTER."

01:04PM  15         DO YOU SEE THAT?

01:04PM  16    A.   YES.

01:04PM  17    Q.   AND, DR. DHAWAN, DO YOU KNOW WHAT THE THERANOS WEBSITE

01:04PM  18    SAID REGARDING THE WAY BLOOD WAS DRAWN, WHETHER IT WAS

01:04PM  19    FINGERSTICK OR VENOUS?  DID YOU LOOK INTO THAT?

01:04PM  20    A.   I DID NOT.

01:04PM  21    Q.   WOULD YOU TURN NOW TO PAGE 111.

01:04PM  22         DO YOU SEE SOME MESSAGES ON THIS PAGE ON SEPTEMBER 22ND,

01:05PM  23    2015?

01:05PM  24    A.   YES.

01:05PM  25    Q.   AND I THINK WE TALKED ABOUT THIS, BUT FIRST, WERE YOU LAB

01:05PM  1    DIRECTOR ON SEPTEMBER 22ND?

01:05PM  2    A.   YES.

01:05PM  3    Q.   AND WAS THIS ALSO DURING THE CMS INSPECTION?

01:05PM  4    A.   YES.

01:05PM  5    Q.   MR. BALWANI WRITES, "VERY HOSTILE SO FAR.  THEY HAVE

01:05PM  6    COMPLAINTS."

01:05PM  7         AND THEN A FEW MESSAGES DOWN DO YOU SEE WHERE MS. HOLMES

01:05PM  8    WRITES, "PRAYING LITERALLY NONSTOP"?

01:05PM  9    A.   YES.

01:05PM  10   Q.   DR. DHAWAN, DID YOU KNOW THAT CMS -- OR DID YOU SHARE THIS

01:05PM  11   OPINION THAT THEY WERE VERY HOSTILE AND THEY HAVE COMPLAINTS?

01:05PM  12   A.   I DIDN'T HEAR ANYTHING TO THAT EFFECT WHEN I WAS THERE.

01:05PM  13   Q.   AND HOW ABOUT THIS COMMENT ABOUT PRAYING?  WAS THAT YOUR

01:05PM  14   EXPERIENCE DURING THE CMS INSPECTION, THAT YOU FELT A NEED TO

01:05PM  15   PRAY IT WAS GOING SO POORLY?

01:05PM  16   A.   I DIDN'T FEEL THAT NEED.

01:05PM  17   Q.   WOULD YOU NOW TURN TO THE NEXT PAGE, PAGE 112.

01:06PM  18        DO YOU SEE AT THE TOP ALSO ON SEPTEMBER 22ND WHERE

01:06PM  19   MR. BALWANI WRITES, "OUR VALIDATION REPORTS ARE TERRIBLE.

01:06PM  20   REALLY PAINFUL GOING THRU THIS PROCESS.  SAME ISSUES FDA

01:06PM  21   POINTED OUT."

01:06PM  22        WE TALKED ABOUT A TIME WHEN YOU WENT TO VISIT THERANOS, DO

01:06PM  23   YOU RECALL, ON SEPTEMBER 19TH?

01:06PM  24   A.   YES.

01:06PM  25   Q.   SO A FEW DAYS BEFORE THIS, WERE YOU BEING ASKED TO SIGN

01:06PM  1    VALIDATION REPORTS THAT DAY?

01:06PM  2    A.   COSIGN THEM, YES.

01:06PM  3    Q.   AND WHEN MR. BALWANI -- I THINK YOU SAID HE PUT THEM IN

01:06PM  4    FRONT OF YOU AND ASKED YOU TO SIGN THEM.  DID HE TELL YOU THEY

01:06PM  5    WERE TERRIBLE?

01:06PM  6    A.   NO.

01:06PM  7    Q.   IF YOU WOULD NOW LOOK A LITTLE BIT FURTHER DOWN, WE'VE

01:06PM  8    MOVED INTO SEPTEMBER 23RD.  WE'RE STILL ON THE SAME PAGE,

01:06PM  9    PAGE 112.

01:06PM  10        DO YOU SEE MS. HOLMES WRITING, "WILL MAKE SURE ALL TEAMS

01:06PM  11   ARE REVIEWING REPORTS.  LET ME KNOW ANYTHING ELSE CAN DO TO

01:06PM  12   SUPPORT."

01:06PM  13        AND THEN MR. BALWANI RESPONDS, "GOING BAD SO FAR.  PRAY.

01:07PM  14        "DANIEL HAS NOTHING READY.

01:07PM  15        "TOLD ME EVERYTHING IS IN THE BINDERS.

01:07PM  16        "NOT THERE.

01:07PM  17        "PRAYING."

01:07PM  18        DO YOU SEE THAT?

01:07PM  19   A.   YES.

01:07PM  20   Q.   AND THEN I'M JUST GOING TO ASK YOU ABOUT ONE FINAL

01:07PM  21   MESSAGE, PAGE 113.

01:07PM  22        DO YOU SEE MS. HOLMES WRITES, "PRAYING CONTINUALLY"?

01:07PM  23   A.   YES.

01:07PM  24   Q.   AFTER THE INSPECTION COMPLETED, SO A DAY OR TWO AFTER YOU

01:07PM  25   WERE THERE THAT MORNING --

DHAWAN DIRECT BY MR. SCHENK

01:07PM 1   A.   YES.

01:07PM 2   Q.   -- SEPTEMBER 22ND, WHAT WAS YOUR IMPRESSION OF HOW THE

01:07PM 3   INSPECTION WENT?  DID YOU HAVE AN IMPRESSION?  AND IF SO, WHAT

01:07PM 4   WAS IT?

01:07PM 5   A.   I COULDN'T HAVE GENERATED AN IMPRESSION.  I WAS NOT THERE

01:07PM 6   LONG ENOUGH, AND I WAS NOT AS DIRECTLY INVOLVED.

01:07PM 7   Q.   DID MR. BALWANI CALL YOU, OR ANYONE FROM THERANOS CALL

01:07PM 8   YOU, AFTER THE INSPECTION TO LET YOU KNOW HOW IT WENT?

01:07PM 9   A.   I DON'T RECALL ANY CALLS TO ME.

01:07PM 10  Q.   I'D LIKE TO NOW ASK YOU TO LOOK AT 2548.

01:08PM 11       DO YOU SEE THIS TWO-PAGE EXHIBIT AT 2548?

01:08PM 12  A.   YES.

01:08PM 13  Q.   IS THIS AN EMAIL EXCHANGE THAT INCLUDES AN EMAIL FROM

01:08PM 14  SOMEONE OUTSIDE OF THERANOS, AND THEN YOU FORWARD THAT TO

01:08PM 15  MR. BALWANI AND HAVE A DIALOGUE WITH HIM?

01:08PM 16  A.   YES.

01:08PM 17  Q.   AND, DR. DHAWAN, WHEN YOU WERE WORKING AT THERANOS, WAS

01:08PM 18  EMAIL THE WAY YOU COMMUNICATED WITH MR. BALWANI ABOUT WORK

01:08PM 19  MATTERS?

01:08PM 20  A.   YES, AND I WOULD OCCASIONALLY CALL ON THE CELL.

01:08PM 21  Q.   IF YOU HAD A QUESTION ABOUT HOW TO HANDLE SOMETHING, WOULD

01:08PM 22  YOU USE EMAIL FROM TIME TO TIME TO COMMUNICATE WITH

01:08PM 23  MR. BALWANI?

01:08PM 24  A.   YES.

01:08PM 25           MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2548.

01:08PM  1                 MS. WALSH:  NO OBJECTION.

01:09PM  2                 THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:09PM  3            (GOVERNMENT'S EXHIBIT 2548 WAS RECEIVED IN EVIDENCE.)

01:09PM  4                 MR. SCHENK:  THANK YOU.

01:09PM  5       Q.   IF WE COULD START AT THE VERY BOTTOM OF THAT FIRST PAGE.

01:09PM  6            DO YOU SEE AN EMAIL FROM SOMEONE NAMED DAVID CROWE?

01:09PM  7       A.   YES.

01:09PM  8       Q.   AND HIS EMAIL ADDRESS ENDS AT FT.COM.

01:09PM  9            DO YOU KNOW WHAT THAT IS?

01:09PM  10      A.   I LEARNED LATER IT WAS "THE FINANCIAL TIMES."

01:09PM  11      Q.   SO WAS A REPORTER REACHING OUT TO YOU?

01:09PM  12      A.   YES.

01:09PM  13      Q.   AND THE REPORTER REACHES OUT TO YOU IN OCTOBER OF 2015; IS

01:09PM  14      THAT RIGHT?

01:09PM  15      A.   YES.

01:09PM  16      Q.   AND IN OCTOBER -- SO THIS IS THE NEXT MONTH, A MONTH AFTER

01:09PM  17      THE INSPECTION?

01:09PM  18      A.   YES.

01:09PM  19      Q.   HE SAYS, "AS A MATTER OF URGENCY, OUR CONVERSATION WILL BE

01:09PM  20      ON A BACKGROUND BASIS."

01:09PM  21            DO YOU SEE THAT?

01:09PM  22      A.   YES.

01:09PM  23      Q.   AND THEN YOU FORWARD THIS TO MR. BALWANI, AND YOU LET HIM

01:09PM  24      KNOW THAT YOU TALKED TO THE REPORTER SUPERFICIALLY; IS THAT

01:09PM  25      RIGHT?

01:09PM 1    A.   YES, UH-HUH.

01:09PM 2    Q.   AND YOU TOLD THE REPORTER TO CONTACT MR. BALWANI?

01:09PM 3    A.   YES.

01:09PM 4    Q.   AND THEN DO YOU SEE THE RESPONSE FROM MR. BALWANI AT THE

01:09PM 5    VERY TOP?

01:09PM 6    A.   YES.

01:09PM 7    Q.   DOES MR. BALWANI SAY, "THANKS.  WILL SPEAK IN THE A.M.

01:10PM 8    THANKS FOR THE HELP AND STICKING BY.  APPRECIATE IT."

01:10PM 9         DO YOU SEE WHERE HE WROTE "STICKING BY"?

01:10PM 10   A.   YES.

01:10PM 11   Q.   DO YOU KNOW WHAT HE MEANT BY THAT, OR WHAT DID THAT MEAN

01:10PM 12   TO YOU?

01:10PM 13   A.   I'M NOT SURE WHAT THAT MEANT.

01:10PM 14   Q.   THE NEXT PARAGRAPH, "IN FUTURE, JUST DON'T ANSWER ANY

01:10PM 15   QUESTIONS AS THEY WILL TRAP YOU OR MISQUOTE YOU.  WE ARE TRYING

01:10PM 16   TO GET ON TOP OF THE SITUATION AND RELEASE OUR STATEMENTS TO

01:10PM 17   REFUTE THE FALSEHOODS, BUT THIS STUFF TAKES TIME."

01:10PM 18        DO YOU SEE THAT?

01:10PM 19   A.   YES.

01:10PM 20   Q.   WHAT ABOUT THE REFERENCE TO "ON TOP OF THE SITUATION"?

01:10PM 21   DID THAT MEAN ANYTHING TO YOU?

01:10PM 22   A.   AT THAT TIME, NO.

01:10PM 23   Q.   WOULD YOU NOW TURN TO EXHIBIT 2972.

01:10PM 24        DR. DHAWAN, IS 2972 AN EMAIL FROM DANIEL YOUNG TO YOU IN

01:11PM 25   NOVEMBER OF 2015?

01:11PM  1    A.   YES.

01:11PM  2              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2972.

01:11PM  3              MS. WALSH:  OBJECTION.  407.

01:11PM  4              THE COURT:  MR. SCHENK.

01:11PM  5              MR. SCHENK:  YOUR HONOR, REVIEWING QC DATA IS NOT A

01:11PM  6    REMEDIAL MEASURE.  THAT'S SOMETHING THAT WE HAVE HEARD

01:11PM  7    TESTIMONY ABOUT THAT LAB DIRECTORS DO.

01:11PM  8              THE COURT:  THE OBJECTION IS OVERRULED.  THIS WILL

01:11PM  9    BE ADMITTED AND IT MAY BE PUBLISHED.

01:11PM  10             MR. SCHENK:  THANK YOU.

01:11PM  11        (GOVERNMENT'S EXHIBIT 2972 WAS RECEIVED IN EVIDENCE.)

01:11PM  12   BY MR. SCHENK:

01:11PM  13   Q.   DR. DHAWAN, DO YOU SEE THIS EMAIL FROM SOMEONE NAMED

01:11PM  14   DANIEL YOUNG AT THE BEGINNING OF NOVEMBER 2015?

01:11PM  15   A.   YES.

01:11PM  16   Q.   AND DID YOU KNOW DANIEL YOUNG?  DID THAT NAME SOUND

01:11PM  17   FAMILIAR BEFORE NOVEMBER?

01:11PM  18   A.   I HAD MET HIM ONCE.

01:11PM  19   Q.   AND DO YOU REMEMBER WHEN THAT WAS?  WAS IT CMS INSPECTION

01:12PM  20   OR A TOUR?

01:12PM  21   A.   I BELIEVE IT WAS AT THE CMS INSPECTION.

01:12PM  22   Q.   IN THIS EMAIL HE SAYS THAT HE'S GOING TO SCHEDULE A

01:12PM  23   MEETING TO REVIEW MONTHLY QC DATA FOR THESE TWO MONTHS,

01:12PM  24   SEPTEMBER AND OCTOBER.

01:12PM  25   A.   YES, YES.

01:12PM   1     Q.   AND WHAT I'M WONDERING, IS THAT SOMETHING THAT YOU HAD

01:12PM   2     DONE BEFORE?  YOU WERE THERANOS LAB DIRECTOR FOR ABOUT A YEAR

01:12PM   3     NOW.  THIS IS NOVEMBER 2015, AND I THINK WE SAW YOU STARTED IN

01:12PM   4     NOVEMBER OF 2014.

01:12PM   5     A.   YES.

01:12PM   6     Q.   HAD YOU REVIEWED QC DATA AT ALL IN THAT YEAR?

01:12PM   7     A.   I WAS NEVER SENT ANY QC DATA TO REVIEW.

01:12PM   8     Q.   I'M SORRY?

01:12PM   9     A.   I WAS NEVER SENT ANY QC DATA TO REVIEW.

01:12PM   10    Q.   SO WHEN DANIEL YOUNG REACHES OUT TO YOU, THIS IS THE FIRST

01:12PM   11    TIME THAT SOMEONE SEEMED TO BE PRESENTING YOU WITH QC DATA?

01:12PM   12    A.   YES.

01:12PM   13    Q.   AND THERE'S REFERENCE TO SCHEDULING A MEETING.  I'M

01:12PM   14    WONDERING IF EVEN THIS MEETING EVER HAPPENED?  DO YOU HAVE A

01:12PM   15    RECOLLECTION OF THAT?

01:12PM   16    A.   I DON'T RECALL THIS MEETING EVER HAPPENING.

01:12PM   17    Q.   AFTER THIS TIME, NOVEMBER OF 2015, DID THERE COME A POINT

01:13PM   18    IN TIME WHEN YOU STOPPED BEING THE THERANOS LAB DIRECTOR?

01:13PM   19    A.   THERE WAS NO DEFINITE DATE GIVEN TO ME.  I JUST --

01:13PM   20    PEOPLE -- I DID NOT HEAR BACK FROM THEM.

01:13PM   21    Q.   SO JUST AT SOME POINT YOU NO LONGER HEARD?

01:13PM   22    A.   YES.

01:13PM   23    Q.   BUT YOU DON'T HAVE AN END DATE IN YOUR MIND WHEN YOU WERE

01:13PM   24    NO LONGER THE LAB DIRECTOR?

01:13PM   25    A.   MY RECOLLECTION IS THAT THEY HIRED SOMEONE ELSE ON A

01:13PM 1    FULL-TIME BASIS, BECAUSE I WAS VERY PART-TIME WORK.  I WAS

01:13PM 2    SUPPOSED TO BE A CONSULTANT.

01:13PM 3        AND I BELIEVE THAT THAT WAS AROUND THIS TIME, BUT I DON'T

01:13PM 4    HAVE AN EXACT DATE.

01:13PM 5    Q.   OKAY.  DO YOU REMEMBER HOW YOU FOUND OUT THAT A NEW LAB

01:13PM 6    DIRECTOR WAS HIRED?

01:13PM 7    A.   I DON'T RECALL HOW I FOUND OUT, BUT IT WASN'T DIRECTLY

01:13PM 8    FROM THEM.

01:13PM 9    Q.   DID THERE COME A POINT IN TIME WHEN YOU -- WHEN YOUR

01:13PM 10   OPINION OF HOW THE CMS INSPECTION WENT, WHEN THAT CHANGED?  WAS

01:13PM 11   THERE A POINT IN TIME WHEN YOU THOUGHT YOUR IMPRESSION ON

01:14PM 12   SEPTEMBER 22ND MIGHT NOT BE ACCURATE, MAYBE IT WAS DIFFERENT?

01:14PM 13   A.   WHEN THE NOTIFICATION FROM CMS CAME.

01:14PM 14   Q.   OKAY.  AND WAS THAT IN JULY OF 2016?

01:14PM 15   A.   IT WAS SEVERAL -- SIX TO EIGHT MONTHS LATER, YES.

01:14PM 16   Q.   WOULD IT HELP YOU IF I SHOWED YOU A DOCUMENT TO REFRESH

01:14PM 17   YOUR RECOLLECTION?

01:14PM 18   A.   YES, YES.

01:14PM 19   Q.   AND WOULD YOU TURN TO 3217?

01:14PM 20   A.   YES.

01:14PM 21   Q.   SO A MOMENT AGO YOU SAID YOU RECEIVED SOME NOTIFICATION.

01:14PM 22   A.   YES.

01:14PM 23   Q.   IS THIS -- DOES THIS REFRESH YOUR RECOLLECTION --

01:14PM 24   A.   YES.

01:14PM 25   Q.   -- I'M SORRY, THAT IN JULY OF 2015 YOU LEARNED ADDITIONAL

01:14PM   1      INFORMATION ABOUT HOW THE CMS INSPECTION WENT?

01:14PM   2      A.   YES.

01:14PM   3      Q.   HOW ABOUT IN CONVERSATIONS WITH MR. BALWANI?  WAS THERE

01:14PM   4      EVER A TIME WHEN MR. BALWANI TOLD YOU ABOUT THE RESULTS OF THE

01:14PM   5      CMS INSPECTION?

01:14PM   6      A.   NO.

01:14PM   7      Q.   NOT IN THE IMMEDIATE DAYS AFTERWARDS, AND NOT EVEN YEARS

01:15PM   8      AFTERWARDS; IS THAT RIGHT?

01:15PM   9      A.   I DON'T RECALL ANY CONVERSATIONS LIKE THAT.

01:15PM   10     Q.   YOU TOLD THE JURY EARLIER THAT DURING THAT EIGHT MONTH

01:15PM   11     PERIOD OF TIME THAT I ASKED YOU TO FOCUS ON, NOVEMBER OF '14

01:15PM   12     WHEN YOU STARTED THROUGH ABOUT JULY OF '15, YOU WORKED A FEW

01:15PM   13     HOURS, I THINK.

01:15PM   14     A.   YES.

01:15PM   15     Q.   A SMALL AMOUNT OF TIME?

01:15PM   16     A.   YES.

01:15PM   17     Q.   DOES THAT ESTIMATE CHANGE IF NOW WE ADD IN THE ADDITIONAL

01:15PM   18     TIME THAT YOU SERVED AS LAB DIRECTOR?  SO NOW FROM JULY OF '15

01:15PM   19     ON UNTIL THIS DATE THAT YOU'RE UNCERTAIN OF WHEN A NEW LAB

01:15PM   20     DIRECTOR WAS HIRED.  DID THE NUMBER OF HOURS THAT YOU EVER

01:15PM   21     WORKED CHANGE SIGNIFICANTLY?

01:15PM   22     A.   IT WAS VERY LIMITED.

01:15PM   23     Q.   AND THAT WAS TRUE EVEN AFTER JULY OF '15; IS THAT RIGHT?

01:15PM   24     A.   YES.

01:15PM   25              MR. SCHENK:  YOUR HONOR, MAY I HAVE A MOMENT?

01:15PM  1                    THE COURT:  YES.

01:15PM  2              (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

01:16PM  3                    MR. SCHENK:  THANK YOU, YOUR HONOR.

01:16PM  4         NO FURTHER QUESTIONS.

01:16PM  5                    THE COURT:  CROSS-EXAMINATION?

01:16PM  6                    MS. WALSH:  YES, YOUR HONOR.

01:16PM  7         MAY I HAVE A MOMENT, YOUR HONOR?

01:16PM  8                    THE COURT:  YES.

01:16PM  9                    MS. WALSH:  JUST GETTING SOME BINDERS.  AH.

01:17PM  10        MAY I APPROACH THE WITNESS, YOUR HONOR?

01:17PM  11                    THE COURT:  PLEASE.

01:17PM  12                    MS. WALSH:  (HANDING.)

01:17PM  13        MAY I REMOVE MY MASK?

01:17PM  14                    THE COURT:  YES.

01:17PM  15                    MS. WALSH:  THANK YOU.

01:17PM  16                    **CROSS-EXAMINATION**

01:17PM  17        BY MS. WALSH:

01:17PM  18        Q.   ALL RIGHT.  GOOD AFTERNOON, DR. DHAWAN.  MY NAME IS

01:17PM  19        AMY WALSH AND I REPRESENT MR. BALWANI.

01:17PM  20        A.   HELLO.

01:17PM  21        Q.   I'M GOING TO ASK YOU SOME QUESTIONS ABOUT YOUR TESTIMONY

01:17PM  22        ON DIRECT TODAY.

01:17PM  23        A.   YES.

01:17PM  24        Q.   OKAY.  SO LET'S START WITH YOUR BACKGROUND.  YOU ARE A

01:17PM  25        MEDICAL DOCTOR; CORRECT?

DHAWAN CROSS BY MS. WALSH

01:17PM 1     A.   YES.

01:17PM 2     Q.   AND YOU WENT UNDERGRADUATE AT SAN FRANCISCO STATE

01:17PM 3     UNIVERSITY; RIGHT?

01:17PM 4     A.   YES.

01:17PM 5     Q.   YOU GOT A BACHELOR'S IN CHEMISTRY?

01:17PM 6     A.   YES.

01:17PM 7     Q.   AND YOU GRADUATED SUMMA CUM LAUDE; CORRECT?

01:17PM 8     A.   YES.

01:17PM 9     Q.   AND YOU WERE ON THE DEAN'S LIST FOR ALL FOUR YEARS THERE?

01:18PM 10    A.   YES.

01:18PM 11    Q.   AND THEN YOU WENT TO THE MEDICAL SCHOOL AT THE UNIVERSITY

01:18PM 12    OF SOUTHERN CALIFORNIA; IS THAT RIGHT?

01:18PM 13    A.   YES.

01:18PM 14    Q.   AND THEN FOLLOWING MEDICAL SCHOOL, YOU DID TWO DIFFERENT

01:18PM 15    RESIDENCIES; IS THAT RIGHT?

01:18PM 16    A.   YES.

01:18PM 17    Q.   ONE WAS INTERNAL MEDICINE; CORRECT?

01:18PM 18    A.   YES.

01:18PM 19    Q.   AND THEN A RESIDENCY IN DERMATOLOGY; RIGHT?

01:18PM 20    A.   YES.

01:18PM 21    Q.   OKAY.  AND YOU ULTIMATELY BECAME THE CHIEF RESIDENT IN

01:18PM 22    DERMATOLOGY; RIGHT?

01:18PM 23    A.   YES.

01:18PM 24    Q.   FOLLOWING THAT, YOU WERE AN ATTENDING PHYSICIAN AT

01:18PM 25    MOUNT SINAI MEDICAL CENTER; IS THAT RIGHT?

DHAWAN CROSS BY MS. WALSH

01:18PM 1    A.   NOT MOUNT SINAI.  IT WAS MOUNT ZION.

01:18PM 2    Q.   MOUNT ZION, OKAY.

01:18PM 3    A.   YES.

01:18PM 4    Q.   AND THAT WAS IN THE DEPARTMENT OF INTERNAL MEDICINE AND

01:18PM 5    EMERGENCY MEDICINE; IS THAT RIGHT?

01:18PM 6    A.   YES, YES.

01:18PM 7    Q.   AND YOU'RE ALSO, AND YOU WERE AT THE TIME, A PROFESSOR AT

01:18PM 8    STANFORD UNIVERSITY MEDICAL SCHOOL; IS THAT RIGHT?

01:18PM 9    A.   I'M AN ADJUNCT CLINICAL ASSISTANT PROFESSOR, YES.

01:18PM 10   Q.   OKAY.  AND OF COURSE YOU'RE LICENSED TO PRACTICE MEDICINE

01:19PM 11   IN THE STATE OF CALIFORNIA; RIGHT?

01:19PM 12   A.   YES.

01:19PM 13   Q.   AND YOU'RE CERTIFIED BY THE MEDICAL BOARD OF DERMATOLOGY;

01:19PM 14   RIGHT?

01:19PM 15   A.   YES.

01:19PM 16   Q.   AND THE MEDICAL BOARD OF CALIFORNIA?

01:19PM 17   A.   YES.

01:19PM 18   Q.   OKAY.  AND YOU -- I THINK YOU SAID THIS ON DIRECT, YOU'VE

01:19PM 19   PRACTICED MEDICINE FOR 32 YEARS; IS THAT RIGHT?

01:19PM 20   A.   YES.

01:19PM 21   Q.   AND YOU HAVE 18 YEARS OF CLINICAL RESEARCH EXPERIENCE;

01:19PM 22   CORRECT?

01:19PM 23   A.   YES.  NINETEEN NOW.

01:19PM 24   Q.   NINETEEN NOW.

01:19PM 25        OKAY.  AND YOU HAVE YOUR OWN MEDICAL PRACTICE; RIGHT?

01:19PM  1    A.   I'M PART OF A GROUP.

01:19PM  2    Q.   OKAY.  SO YOU'RE PART OF A GROUP?

01:19PM  3    A.   YES.

01:19PM  4    Q.   AND THAT GROUP IS THE CALIFORNIA CENTER FOR DERMATOLOGY?

01:19PM  5    A.   IT'S THE CENTER FOR DERMATOLOGY, YES.

01:19PM  6    Q.   CENTER FOR DERMATOLOGY?

01:19PM  7    A.   YES.

01:19PM  8    Q.   AND IN ADDITION, YOU WERE A LAB DIRECTOR FOR YOUR OWN LAB;

01:19PM  9    RIGHT?

01:19PM  10   A.   YES.

01:19PM  11   Q.   AND THAT LAB WAS EAST BAY DERMATOLOGY MEDICAL GROUP;

01:20PM  12   CORRECT?

01:20PM  13   A.   YES, YES.

01:20PM  14   Q.   AND, OF COURSE, YOU WERE LISTED AS THE LAB DIRECTOR ON THE

01:20PM  15   CLIA LICENSE FOR THAT LAB?

01:20PM  16   A.   YES.

01:20PM  17   Q.   AND EAST BAY, THAT LAB, EAST BAY --

01:20PM  18   A.   YES.

01:20PM  19   Q.   -- THAT WAS A HIGH COMPLEXITY LAB; IS THAT RIGHT?

01:20PM  20   A.   YES.

01:20PM  21   Q.   OKAY.  AND I THINK YOU SAID THIS ON DIRECT, IT SPECIALIZED

01:20PM  22   IN HISTOPATHOLOGY; CORRECT?

01:20PM  23   A.   YES, AMONG OTHER THINGS, YES.

01:20PM  24   Q.   AND HISTOPATHOLOGY INVOLVES EXAMINING CELLS UNDER A

01:20PM  25   MICROSCOPE; RIGHT?

01:20PM   1    A.   YES.

01:20PM   2    Q.   AND THE PURPOSE IS TO DIAGNOSE DISEASES; RIGHT?

01:20PM   3    A.   YES.

01:20PM   4    Q.   AND INCLUDING CANCER AND SKIN DISEASES; CORRECT?

01:20PM   5    A.   YES.

01:20PM   6    Q.   OKAY.  SO LET'S TAKE A LOOK AT 2219, WHICH I THINK IS IN

01:20PM   7    EVIDENCE.

01:21PM   8         ACTUALLY -- NO.  OKAY.  2219 IN YOUR BINDER, DR. DHAWAN.

01:21PM   9    A.   YES.

01:21PM   10         THE CLERK:  MS. WALSH, IT IS.

01:21PM   11         MS. WALSH:  OKAY.  YOUR HONOR, THIS EXHIBIT IS IN

01:21PM   12    EVIDENCE.  MAY IT BE PUBLISHED?

01:21PM   13         THE COURT:  YES.

01:21PM   14    BY MS. WALSH:

01:21PM   15    Q.   AND TURNING TO PAGE 2 TO 3 OF THAT EXHIBIT --

01:21PM   16    A.   YES.

01:21PM   17    Q.   -- THIS IS WHERE MR. BALWANI REACHES OUT TO YOU IN

01:21PM   18    NOVEMBER OF 2014; RIGHT?

01:21PM   19    A.   YES.

01:21PM   20    Q.   OKAY.  AND HE SAYS, "SUNIL.

01:21PM   21         "THANKS FOR TAKING MY CALL.

01:21PM   22         "THE TIME COMMITMENT IS VERY MINIMAL.  THIS WILL BE MOSTLY

01:21PM   23    AN ON CALL CONSULTING ROLE."

01:21PM   24         AND YOU TESTIFIED TO THAT; RIGHT?

01:21PM   25    A.   YES.

01:21PM  1    Q.   OKAY.  "AND I AM EXTREMELY CONFIDENT THAT IT WON'T

01:21PM  2    INTERFERE WITH YOUR WORK OR WITH YOUR FAMILY LIFE.  I AM

01:21PM  3    ATTACHING THE REQUIREMENTS HERE."

01:22PM  4         AND MR. BALWANI ATTACHES THE CLIA REQUIREMENTS?

01:22PM  5    A.   YES.

01:22PM  6    Q.   AND DO YOU SEE THOSE ON PAGE 3?

01:22PM  7    A.   YES.

01:22PM  8    Q.   AND THE CLIA REQUIREMENTS, IT SAYS FOR M.D.'S THERE ARE

01:22PM  9    THE FOLLOWING ALTERNATIVES.

01:22PM 10         NUMBER 2 SAYS, "LICENSED TO PRACTICE MEDICINE IN THE STATE

01:22PM 11    IN WHICH THE LABORATORY IS LOCATED AND EITHER HAVE AT LEAST ONE

01:22PM 12    YEAR OF LABORATORY TRAINING DURING MEDICAL RESIDENCY OR"

01:22PM 13    SKIPPING DOWN TO TWO, "HAVE AT LEAST 2 YEARS OF EXPERIENCE

01:22PM 14    DIRECTING OR SUPERVISING HIGH COMPLEXITY TESTING."

01:22PM 15         DO YOU SEE THAT?

01:22PM 16    A.   YES.

01:22PM 17    Q.   AND THAT IS SOMETHING THAT YOU HAD DONE WHEN MR. BALWANI

01:22PM 18    REACHED OUT TO YOU; RIGHT?

01:22PM 19    A.   YES.

01:22PM 20    Q.   AND SO YOU WERE FULLY QUALIFIED TO BE A LAB DIRECTOR FOR A

01:22PM 21    HIGH COMPLEXITY LAB; CORRECT?

01:22PM 22    A.   YES.

01:22PM 23    Q.   OKAY.  AND YOU'RE AWARE THAT MR. BALWANI REACHED OUT TO

01:22PM 24    YOU BECAUSE HE WAS LOOKING FOR A LAB DIRECTOR TO REPLACE THE

01:23PM 25    PRIOR LAB DIRECTOR; RIGHT?

DHAWAN CROSS BY MS. WALSH

01:23PM  1    A.   YES.

01:23PM  2    Q.   AND THAT WAS DR. ADAM ROSENDORFF; RIGHT?

01:23PM  3    A.   YES.

01:23PM  4    Q.   AND DR. ROSENDORFF CAME OFF THE CLIA LICENSE IN AROUND

01:23PM  5    DECEMBER OF 2014.

01:23PM  6         DO YOU RECALL THAT?

01:23PM  7    A.   I DON'T HAVE THE EXACT DATE, BUT --

01:23PM  8    Q.   BUT WAS IT AROUND THAT TIME?

01:23PM  9    A.   I WOULD HAVE TO LOOK AT THE PAPERWORK, BUT YEAH, I WOULD

01:23PM  10   ASSUME.

01:23PM  11   Q.   SURE, SURE.  SO LET'S -- IF YOU CAN IN YOUR BINDER,

01:23PM  12   DR. DHAWAN, TURN TO 10567.  IT'S THE SECOND PAGE OF THAT

01:23PM  13   EXHIBIT.

01:23PM  14   A.   YES.

01:23PM  15   Q.   DOES THAT REFRESH YOUR RECOLLECTION AS TO WHEN

01:23PM  16   DR. ROSENDORFF CAME OFF THE THERANOS CLIA LICENSE?

01:23PM  17   A.   YES.

01:23PM  18   Q.   OKAY.  AND THAT WAS DECEMBER 17TH, 2014?

01:23PM  19   A.   YES.

01:23PM  20   Q.   OKAY.  AND IF WE CAN JUST PUT UP 2219 AGAIN ON PAGE 2.

01:24PM  21        MR. BALWANI DIDN'T JUST -- DR. DHAWAN, IF YOU COULD JUST

01:24PM  22   LOOK AT THE SCREEN AT 2219.

01:24PM  23   A.   SURE.  YES.

01:24PM  24   Q.   WHEN MR. BALWANI CONTACTED YOU, HE WASN'T -- HE WAS

01:24PM  25   REACHING OUT TO YOU; RIGHT?

DHAWAN CROSS BY MS. WALSH

01:24PM  1    A.   YES.

01:24PM  2    Q.   BUT HE ALSO SAYS IN HIS EMAIL, "PLEASE LET ME KNOW IF YOU

01:24PM  3    WILL BE ABLE TO DO THIS OR PERHAPS SOMEONE ELSE YOU KNOW";

01:24PM  4    CORRECT?

01:24PM  5    A.   YES.

01:24PM  6    Q.   SO HE WAS LOOKING FOR A LAB DIRECTOR?

01:24PM  7    A.   YES.

01:24PM  8    Q.   OKAY.  AND BEFORE MR. BALWANI EMAILED YOU, YOU WERE AWARE,

01:24PM  9    WEREN'T YOU, THAT HE WAS CONDUCTING A BROADER SEARCH FOR A NEW

01:24PM  10   LAB DIRECTOR?

01:24PM  11            MR. SCHENK:  OBJECTION.  SPECULATION.

01:24PM  12            THE WITNESS:  I DID NOT KNOW THAT.

01:24PM  13            THE COURT:  EXCUSE ME, SIR.

01:24PM  14       WHY DON'T YOU LAY A FOUNDATION A LITTLE BIT MORE.

01:25PM  15            MS. WALSH:  SURE.

01:25PM  16   Q.   SO, DR. DHAWAN, MR. BALWANI REACHED OUT TO YOU TO SEE IF

01:25PM  17   YOU KNEW OF ANYONE ELSE WHO COULD BE A LAB DIRECTOR BESIDES

01:25PM  18   YOU; RIGHT?

01:25PM  19   A.   YES.

01:25PM  20   Q.   THAT'S IN THE EMAIL; RIGHT?

01:25PM  21   A.   YES.

01:25PM  22   Q.   AND WERE YOU AWARE THAT HE WAS LOOKING FOR OTHER PEOPLE TO

01:25PM  23   BECOME A LAB DIRECTOR?  JUST WERE YOU AWARE?

01:25PM  24            MR. SCHENK:  OBJECTION.  LEADING.

01:25PM  25            THE COURT:  SUSTAINED.

BY MS. WALSH:

Q.   OKAY.  DID YOU HAVE ANY MORE CONVERSATIONS WITH

MR. BALWANI ABOUT SEARCHES FOR A LAB DIRECTOR?

A.   I DON'T RECALL ANY CONVERSATIONS WHERE I WAS TOLD THAT

THERE WAS A SEARCH GOING ON SUCH AS, YOU KNOW, WHEN PEOPLE

SEARCH FOR A POSITION, NO.

Q.   OKAY.  AND DID YOU HAVE ANY CONVERSATIONS WITH OTHER

EMPLOYEES OF THERANOS ABOUT THE FACT THAT THEY WERE LOOKING FOR

A LAB DIRECTOR?

A.   I DID NOT.

Q.   OKAY.  NOW, YOU TESTIFIED ON DIRECT THAT YOU TOOK A COUPLE

OF TOURS OF THERANOS DURING THAT TIME PERIOD NOVEMBER 2014

THROUGH JUNE 2015?

     DO YOU REMEMBER THAT TESTIMONY?

A.   YES.

Q.   OKAY.  AND MR. BALWANI WAS ONE OF THE PEOPLE WHO TOOK YOU

ON THAT TOUR; RIGHT?

A.   YES.

Q.   OKAY.  AND I THINK YOU SAID THAT THERE WERE OTHER THERANOS

LAB PEOPLE WHO WERE ON THAT TOUR; RIGHT?

A.   YES.

Q.   AND THAT WAS AT THE NEWARK LAB; CORRECT?

A.   YES.

Q.   AND YOU GOT SHOWN AROUND DURING THE COURSE OF THE TOUR;

RIGHT?

DHAWAN CROSS BY MS. WALSH

01:26PM  1     A.   YES.

01:26PM  2     Q.   AND AS YOU SAID, YOU MET OTHER THERANOS PERSONNEL; RIGHT?

01:26PM  3     A.   YES.

01:26PM  4     Q.   AND DO YOU REMEMBER MEETING A FELLOW NAMED MAX FOSQUE?

01:26PM  5     A.   I DON'T RECALL THAT NAME.

01:26PM  6     Q.   OKAY.  HOW ABOUT GURBIR SIDHU?

01:27PM  7     A.   I DON'T RECALL THAT NAME SPECIFICALLY, NO.

01:27PM  8     Q.   OKAY.  AND I'M GOING TO JUST GO THROUGH A COUPLE MORE

01:27PM  9     NAMES TO SEE IF IT JOGS YOUR RECOLLECTION, OKAY?

01:27PM 10          MEREYDA BUENROSTRA, DO YOU REMEMBER MEETING HER?

01:27PM 11     A.   I DO NOT.

01:27PM 12     Q.   AND HOW ABOUT MELISSA MCCORMICK?  DO YOU REMEMBER MEETING

01:27PM 13     HER?

01:27PM 14     A.   I DO NOT.

01:27PM 15     Q.   OKAY.  DURING THE COURSE OF THE TOUR, THOUGH, YOU WERE

01:27PM 16     SHOWN THERANOS BLOOD TESTING DEVICES; RIGHT?

01:27PM 17     A.   I WAS SHOWN MULTIPLE BLOOD TESTING DEVICES, YES.

01:27PM 18     Q.   RIGHT.  AND YOU SAID YOU SAW ONE OF THEM WAS A LARGER

01:27PM 19     MACHINE?

01:27PM 20     A.   RIGHT.

01:27PM 21     Q.   CORRECT?

01:27PM 22     A.   YES.

01:27PM 23     Q.   IT LOOKED LIKE A COMMERCIALLY BOUGHT MACHINE PERHAPS;

01:27PM 24     RIGHT?

01:27PM 25     A.   YES.

01:27PM 1    Q.  BUT YOU WERE ALSO SHOWN THE EDISON, WEREN'T YOU?

01:27PM 2    A.  YES.

01:27PM 3    Q.  AND WHEN MR. BALWANI REACHED OUT TO YOU, HE TALKED TO YOU

01:28PM 4    ABOUT THE WORKLOAD THAT WOULD BE INVOLVED IN YOUR BEING LAB

01:28PM 5    DIRECTOR AT THERANOS; RIGHT?

01:28PM 6    A.  YES.

01:28PM 7    Q.  AND HE DIDN'T WANT IT TO IMPINGE TOO MUCH ON YOUR TIME;

01:28PM 8    CORRECT?

01:28PM 9    A.  YES.

01:28PM 10   Q.  AND HE THOUGHT -- HE SAID IT WOULD BE TEMPORARY; RIGHT?

01:28PM 11   A.  YES.

01:28PM 12   Q.  AND LIMITED IN HOURS; CORRECT?

01:28PM 13   A.  YES.

01:28PM 14   Q.  AND YOU ALSO SAID THAT YOU WERE AWARE THAT THERANOS HAD

01:28PM 15   OPENED UP THIS LABORATORY IN ARIZONA; RIGHT?

01:28PM 16   A.  YES.

01:28PM 17   Q.  AND WE SAW ON THE MAP THAT WAS SHOWN TO YOU ON YOUR DIRECT

01:28PM 18   EXAMINATION THAT THERE WERE MANY PATIENT SERVICE CENTERS IN

01:28PM 19   ARIZONA; CORRECT?

01:28PM 20   A.  YES.

01:28PM 21   Q.  AND MR. BALWANI TOLD YOU, DIDN'T HE, THAT ARIZONA WAS

01:28PM 22   GOING TO PROCESS MANY OF THE SAMPLES THAT WERE COMING IN FROM

01:28PM 23   THOSE PATIENT SERVICE CENTERS?

01:28PM 24   A.  I WAS TOLD THAT.  I'M TRYING TO REMEMBER WHEN AND WHO TOLD

01:28PM 25   ME.

01:28PM  1          I BELIEVE IT WAS MR. BALWANI, BUT I DON'T RECALL NOW.

01:28PM  2     Q.   OKAY.  SO YOU DON'T REMEMBER WHEN, BUT YOU DO REMEMBER

01:29PM  3     THAT HE TOLD YOU THAT?

01:29PM  4     A.   YES.

01:29PM  5     Q.   OKAY.  AND YOU WERE AWARE, WEREN'T YOU, THAT WHEN THE

01:29PM  6     ARIZONA LAB OPENED, DR. DANIEL YOUNG WAS THE LAB DIRECTOR FOR

01:29PM  7     THAT LAB; RIGHT?

01:29PM  8     A.   THAT I WAS AWARE OF, YES.

01:29PM  9     Q.   OKAY.  AND YOU, IN FACT, MET DR. YOUNG AT SOME POINT?

01:29PM 10     A.   YES.

01:29PM 11     Q.   AND YOU THINK IT MAY HAVE BEEN DURING THE CLIA INSPECTION;

01:29PM 12     IS THAT RIGHT?

01:29PM 13     A.   YES.

01:29PM 14     Q.   AND DID YOU MEET HIM ON THE EARLIER TOURS THAT YOU WENT ON

01:29PM 15     AT NEWARK?

01:29PM 16     A.   I DON'T RECALL MEETING HIM PRIOR TO THAT SEPTEMBER DATE,

01:29PM 17     THE CLIA INSPECTION.

01:29PM 18     Q.   OKAY.  AND MR. BALWANI ALSO MENTIONED TO YOU, DIDN'T HE,

01:29PM 19     THAT THERE WAS SOMEONE IN THE THERANOS LAB WHO WAS TRYING TO

01:29PM 20     BECOME QUALIFIED TO BECOME A LAB DIRECTOR.

01:29PM 21          DO YOU REMEMBER THAT?

01:29PM 22     A.   I DO NOT.

01:29PM 23     Q.   DO YOU REMEMBER HEARING ABOUT A FELLOW NAMED

01:29PM 24     SURAJ SAKSENA?

01:30PM 25     A.   I'M FAMILIAR WITH THE NAME --

DHAWAN CROSS BY MS. WALSH

01:30PM  1     Q.   UH-HUH.

01:30PM  2     A.   -- ONLY.

01:30PM  3     Q.   OKAY.  MAYBE I CAN SHOW YOU SOME DOCUMENTS.

01:30PM  4     A.   SURE.

01:30PM  5     Q.   TURN TO 20064 IN YOUR BINDER.

01:30PM  6          DO YOU SEE THAT EMAIL CHAIN?

01:30PM  7     A.   YES.

01:30PM  8     Q.   AND THAT'S AN EMAIL CHAIN BETWEEN YOU AND MR. -- I SHOULD

01:30PM  9     SAY DR. SAKSENA; CORRECT?

01:30PM  10    A.   YES.

01:30PM  11    Q.   AND MR. BALWANI IS ON THAT EMAIL CHAIN?

01:30PM  12    A.   YES.

01:30PM  13    Q.   OKAY.  AND THIS RELATES TO A LETTER THAT DR. SAKSENA IS

01:31PM  14    REQUESTING FROM YOU; IS THAT RIGHT?

01:31PM  15    A.   YES.

01:31PM  16    Q.   AND THIS IS IN CONNECTION WITH THERANOS'S BUSINESS, IS

01:31PM  17    THAT RIGHT, OF RUNNING THE LAB?

01:31PM  18    A.   YES.

01:31PM  19    Q.   AND AS YOU SAID ON DIRECT, PEOPLE FROM -- EMPLOYEES OF

01:31PM  20    THERANOS WOULD EMAIL YOU FROM TIME TO TIME ABOUT THERANOS

01:31PM  21    BUSINESS; RIGHT?

01:31PM  22    A.   YES.

01:31PM  23    Q.   AND THAT WAS WITHIN THE REGULAR COURSE OF THERANOS'S

01:31PM  24    BUSINESS; CORRECT?

01:31PM  25    A.   YES.

01:31PM   1      Q.   AND IN THOSE EMAILS, IT WAS IMPORTANT FOR YOU TO BE

01:31PM   2      ACCURATE WHEN YOU RESPONDED TO THERANOS EMPLOYEES, WASN'T IT?

01:31PM   3      A.   YES.

01:31PM   4      Q.   OKAY.  AND VICE VERSA?  IT WAS IMPORTANT FOR THEM TO BE

01:31PM   5      ACCURATE WITH YOU; CORRECT?

01:31PM   6      A.   YES.

01:31PM   7      Q.   OKAY.  AND AS FAR AS YOU KNOW, THE THERANOS EMAILS WERE

01:31PM   8      PRESERVED SO THAT IF ANYONE WANTED TO COME BACK LATER AND LOOK

01:31PM   9      AT THEM, THEY WOULD BE AVAILABLE, AS FAR AS YOU KNEW?

01:31PM  10      A.   YES.

01:31PM  11               MS. WALSH:  YOUR HONOR, WE OFFER 20064.

01:31PM  12               MR. SCHENK:  YOUR HONOR, WE HAVE AN AUTHENTICATION

01:31PM  13      OBJECTION THAT MIGHT REQUIRE A MORE LENGTHY DISCUSSION.  I

01:32PM  14      DON'T KNOW IF THERE IS A TIME THAT WOULD BE APPROPRIATE FOR

01:32PM  15      THAT.

01:32PM  16               MS. WALSH:  WELL, YOUR HONOR, DR. DHAWAN RECOGNIZES

01:32PM  17      IT.  THAT'S HIS EMAIL, SO I DON'T THINK THERE'S AN

01:32PM  18      AUTHENTICATION ISSUE.

01:32PM  19               THE COURT:  IS IT THE CONTENTS OF THE EMAIL THAT

01:32PM  20      YOU'RE CONCERNED ABOUT?

01:32PM  21               MR. SCHENK:  NO.  NO.  THERE'S A 901 ISSUE.

01:32PM  22               THE COURT:  I'LL OVERRULE THE OBJECTION.  IT CAN BE

01:32PM  23      ADMITTED.

01:32PM  24          (DEFENDANT'S EXHIBIT 20064 WAS RECEIVED IN EVIDENCE.)

01:32PM  25      BY MS. WALSH:

01:32PM   1    Q.   OKAY.  SO LET'S PULL THAT UP.

01:32PM   2        SO AT THE BOTTOM PORTION OF THE EMAIL, SURAJ SAKSENA IS

01:33PM   3    WRITING TO YOU, DR. DHAWAN, AND HE SAYS THAT -- AND THE DATE IS

01:33PM   4    OCTOBER 6TH; 2015; RIGHT?

01:33PM   5    A.   YES.

01:33PM   6    Q.   AND HE SAYS, "IT WAS A PLEASURE MEETING YOU A COUPLE WEEKS

01:33PM   7    BACK DURING THE LAB INSPECTION.

01:33PM   8        "AS SUNNY MENTIONED TO YOU DURING OUR MEETING, I HAVE

01:33PM   9    APPLIED WITH THE CALIFORNIA LABORATORY FIELD SERVICES FOR A

01:33PM  10    CLINICAL CHEMIST LICENSE.  AS PART OF MY APPLICATION REVIEW, I

01:33PM  11    HAVE BEEN ASKED BY THE EXAMINER TO PROVIDE A LETTER FROM THE

01:33PM  12    LAB DIRECTOR CONFIRMING MY TRAINING AND WORK EXPERIENCE IN THE

01:33PM  13    CLIA LABORATORY."

01:33PM  14        DO YOU SEE THAT?

01:33PM  15    A.   YES.

01:33PM  16    Q.   OKAY.  SO DR. SAKSENA WAS REACHING OUT TO YOU TELLING YOU

01:33PM  17    THAT HE WAS APPLYING FOR THIS LICENSE; RIGHT?

01:33PM  18    A.   YES.

01:33PM  19    Q.   BUT HE HAS TO PROVIDE A LETTER FROM THE LAB DIRECTOR;

01:33PM  20    CORRECT?

01:33PM  21    A.   YES.

01:33PM  22    Q.   OKAY.  AND THEN YOU AGREE TO PROVIDE THAT LETTER FOR HIM;

01:33PM  23    RIGHT?

01:33PM  24    A.   YES.

01:33PM  25    Q.   AND YOU ASK HIM, SHOULD I SIGN IT VIA DOCUSIGN OR SOME

01:33PM   1    OTHER WAY?

01:33PM   2    A.   UH-HUH.

01:33PM   3    Q.   AND DR. SAKSENA SAYS, "THANK YOU SO MUCH FOR YOUR PROMPT

01:34PM   4    ATTENTION TO THIS.  THE DOCUSIGN VERSION WILL BE ENOUGH."

01:34PM   5         DO YOU SEE THAT?

01:34PM   6    A.   YES.

01:34PM   7    Q.   AND THEN YOU WENT ON TO WRITE THAT LETTER; CORRECT?

01:34PM   8    A.   YES.

01:34PM   9    Q.   OKAY.  IF YOU --

01:34PM  10    A.   I DON'T SEE A COPY OF IT.

01:34PM  11    Q.   RIGHT.  I'M GOING TO SHOW IT TO YOU NOW.

01:34PM  12         IF YOU COULD TURN IN YOUR BINDER TO 20067.

01:34PM  13         DO YOU WANT TO TAKE A MINUTE TO READ IT?

01:34PM  14    A.   I PERUSED IT, YES.

01:34PM  15    Q.   OKAY.  THIS IS THE LETTER THAT YOU SIGNED FOR DR. SAKSENA,

01:34PM  16    ISN'T IT?

01:34PM  17    A.   YES.

01:34PM  18    Q.   OKAY.  AND YOU SENT THIS -- YOU WERE SIGNING AS THERANOS'S

01:34PM  19    LAB DIRECTOR; RIGHT?

01:34PM  20    A.   YES.

01:34PM  21    Q.   OKAY.  AND THE THERANOS LOGO IS ON THE LETTERHEAD OF

01:35PM  22    THERANOS; RIGHT?

01:35PM  23    A.   YES.

01:35PM  24    Q.   AND YOU SENT IT TO LABORATORY FIELD SERVICES FOR

01:35PM  25    CALIFORNIA DEPARTMENT OF PUBLIC HEALTH; CORRECT?

DHAWAN CROSS BY MS. WALSH

01:35PM   1    A.   YES.

01:35PM   2    Q.   AND, OF COURSE, IT'S IMPORTANT TO BE ACCURATE IN A LETTER

01:35PM   3    TO THE HEALTH AUTHORITIES; RIGHT?

01:35PM   4    A.   YES.

01:35PM   5    Q.   OKAY.  AND AS FAR AS YOU WERE AWARE, THE LETTER WAS

01:35PM   6    PRESERVED SO WE CAN COME BACK AND LOOK AT IT LATER; RIGHT?

01:35PM   7    A.   YES.

01:35PM   8         MS. WALSH:  YOUR HONOR, I OFFER 20067.

01:35PM   9         MR. SCHENK:  NO OBJECTION.

01:35PM   10        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:35PM   11        MS. WALSH:  THANK YOU.

01:35PM   12   (DEFENDANT'S EXHIBIT 20067 WAS RECEIVED IN EVIDENCE.)

01:35PM   13   BY MS. WALSH:

01:35PM   14   Q.   SO, DR. DHAWAN, TURNING TO PAGE 2 OF THE LETTER.

01:35PM   15   A.   UH-HUH, YES.

01:35PM   16   Q.   AND THAT'S YOUR SIGNATURE AT THE BOTTOM?

01:35PM   17   A.   YES.

01:35PM   18   Q.   AND LOOKING AT THE PARAGRAPH STARTING WITH "FURTHER."

01:35PM   19        IT'S THE SECOND PARAGRAPH.

01:35PM   20   A.   YES.

01:35PM   21   Q.   AND THE SECOND SENTENCE SAYS, "DR. SAKSENA HAS HELPED

01:36PM   22   PERFORM HIGH-COMPLEXITY LABORATORY DEVELOPED TESTS" -- THOSE

01:36PM   23   ARE LDT'S; RIGHT?

01:36PM   24   A.   YES.

01:36PM   25   Q.   AND THOSE ARE TESTS THAT THERANOS DEVELOPED IN ITS LAB;

01:36PM  1    CORRECT?

01:36PM  2    A.   YES.

01:36PM  3    Q.   AS OPPOSED TO COMMERCIAL ONES; RIGHT?

01:36PM  4    A.   YES.

01:36PM  5    Q.   YES.  -- "DEVELOPED BY THERANOS IN THE SPECIALTIES OF

01:36PM  6    CHEMISTRY, HEMATOLOGY, IMMUNOASSAYS (ENDOCRINOLOGY) FOR A

01:36PM  7    PERIOD OF THREE YEARS (I HAVE ATTACHED A LIST OF THE HIGH

01:36PM  8    COMPLEXITY LDT'S THAT ARE PERFORMED IN THE THERANOS

01:36PM  9    CLIA-CERTIFIED LABORATORY TO THIS LETTER)."

01:36PM  10        AND THEN IF YOU TURN TO THE FIRST PAGE OF THIS LETTER, YOU

01:36PM  11   INTRODUCE YOURSELF AS THE CLIA LAB DIRECTOR FOR THE CLIA

01:36PM  12   CERTIFIED HIGH COMPLEXITY LAB; CORRECT?

01:36PM  13   A.   YES.

01:36PM  14   Q.   AND YOU'RE WRITING IN SUPPORT OF DR. SURAJ SAKSENA'S

01:36PM  15   APPLICATION FOR A CLINICAL CHEMIST LICENSE; RIGHT?

01:37PM  16   A.   YES.

01:37PM  17   Q.   I'LL GO SLOWER.

01:37PM  18        AND YOU SAY, "I HAVE SERVED AS LABORATORY DIRECTOR SINCE

01:37PM  19   DECEMBER 2014"; RIGHT?

01:37PM  20   A.   YES.

01:37PM  21   Q.   "PRIOR TO MY TENURE, ADAM ROSENDORFF, M.D., SERVED AS

01:37PM  22   LABORATORY DIRECTOR OF THIS FACILITY."

01:37PM  23        RIGHT?

01:37PM  24   A.   YES.

01:37PM  25   Q.   "UNDER OUR SUPERVISION, DR. SAKSENA HAS SATISFIED BOTH THE

DHAWAN CROSS BY MS. WALSH

01:37PM  1    TRAINING AND THE WORK EXPERIENCE REQUIREMENTS FOR THIS

01:37PM  2    LICENSE."

01:37PM  3         RIGHT?

01:37PM  4    A.   YES.

01:37PM  5    Q.   AND A COUPLE MORE SENTENCES.

01:37PM  6         "AS REQUIRED BY THIS CITATION, HE HAS COMPLETED THE

01:37PM  7    EQUIVALENT OF ONE YEAR OF TRAINING AS A LICENSED TRAINEE IN THE

01:37PM  8    FIELD OF CLINICAL CHEMISTRY."

01:37PM  9         RIGHT?

01:37PM  10   A.   YES.

01:37PM  11   Q.   "IN ADDITION, AS FURTHER REQUIRED BY THIS, DR. SAKSENA HAS

01:37PM  12   MORE THAN THREE YEARS EXPERIENCE IN CLINICAL CHEMISTRY IN A

01:37PM  13   HIGH COMPLEXITY CLINICAL LABORATORY."

01:37PM  14        RIGHT?

01:37PM  15   A.   YES.

01:37PM  16   Q.   AND SO DOES THIS HELP YOU REMEMBER THAT DR. SAKSENA WAS

01:38PM  17   TRYING TO GET CERTIFIED TO BECOME A LAB DIRECTOR IN A HIGH

01:38PM  18   COMPLEXITY LAB; RIGHT?

01:38PM  19   A.   YES.

01:38PM  20   Q.   IN THE STATE OF CALIFORNIA?

01:38PM  21   A.   YES.

01:38PM  22   Q.   AND THE INTENTION WAS THAT HE WAS GOING TO BE THE

01:38PM  23   FULL-TIME LAB DIRECTOR AT THERANOS'S CLIA LAB?

01:38PM  24             MR. SCHENK:  OBJECTION.  SPECULATION.

01:38PM  25             THE WITNESS:  I DIDN'T KNOW.

01:38PM   1                THE COURT:  SUSTAINED AS TO THE LAST PART AS

01:38PM   2    SPECULATION.

01:38PM   3          IF YOU WANT TO BREAK THAT UP.

01:38PM   4                MS. WALSH:  SURE.

01:38PM   5    Q.   SO DR. SAKSENA WAS APPLYING FOR THIS LICENSE; RIGHT?

01:38PM   6    A.   YES.

01:38PM   7    Q.   AND HIS GOAL IN APPLYING FOR THIS, IF YOU KNOW, WAS TO BE

01:38PM   8    CERTIFIED TO BE LAB DIRECTOR IN A HIGH COMPLEXITY LAB IN

01:38PM   9    CALIFORNIA; RIGHT?

01:38PM  10    A.   IF THAT'S WHAT HE WAS TRYING TO DO, YES.

01:38PM  11    Q.   YEAH.  AND THERANOS'S LAB IN NEWARK, CALIFORNIA WAS A HIGH

01:38PM  12    COMPLEXITY LAB; CORRECT?

01:38PM  13    A.   YES.

01:38PM  14    Q.   AND AS FAR AS YOU'RE AWARE, THERANOS DIDN'T HAVE ANOTHER

01:38PM  15    CALIFORNIA LAB THAT WAS HIGH COMPLEXITY; RIGHT?

01:39PM  16    A.   AS FAR AS I'M AWARE, YES.

01:39PM  17    Q.   OKAY.  OKAY.

01:39PM  18          WE CAN TAKE THAT DOWN.

01:39PM  19          DID YOU EVER LEARN, DR. DHAWAN, HOW DR. SAKSENA DID ON HIS

01:39PM  20    EXAM TO GET THAT LICENSE?

01:39PM  21    A.   I DON'T HAVE ACCESS TO THAT INFORMATION, NO.

01:39PM  22    Q.   WERE YOU EVER TOLD IT?

01:39PM  23    A.   I DON'T RECALL.

01:39PM  24    Q.   OKAY.  AND ARE YOU AWARE, DR. DHAWAN, THAT AT A CERTAIN

01:39PM  25    POINT LATER IN TIME, CALIFORNIA LAW REGARDING THE

01:39PM  1    QUALIFICATIONS FOR LAB DIRECTORS CHANGED?  ARE YOU AWARE OF

01:40PM  2    THAT?

01:40PM  3                MR. SCHENK:  OBJECTION.  RELEVANCE.

01:40PM  4                THE COURT:  ARE YOU TIME STAMPING THIS TO HIS TIME

01:40PM  5    WITH THIS COMPANY OR -- I DON'T SEE THE RELEVANCE OTHERWISE, SO

01:40PM  6    YOU'LL HAVE TO LAY A BETTER FOUNDATION.

01:40PM  7                MS. WALSH:  SURE.  SURE.

01:40PM  8    Q.   SO YOU'RE AWARE THAT DR. SAKSENA WAS APPLYING TO BE A LAB

01:40PM  9    DIRECTOR AT A HIGH COMPLEXITY LAB; RIGHT?

01:40PM  10   A.   YES.

01:40PM  11   Q.   AND THERE WERE CERTAIN REQUIREMENTS UNDER CALIFORNIA LAW

01:40PM  12   FOR SOMEONE WHO WASN'T A MEDICAL DOCTOR; IS THAT RIGHT?

01:40PM  13   A.   YES.

01:40PM  14   Q.   AND THE REQUIREMENTS FOR A PH.D. WERE DIFFERENT FROM A

01:40PM  15   MEDICAL DOCTOR?  WERE YOU AWARE OF THAT?

01:40PM  16   A.   YES, I WAS.

01:40PM  17   Q.   OKAY.  AND A PH.D. COULD BECOME A LAB DIRECTOR FOR A HIGH

01:40PM  18   COMPLEXITY LAB IF HE HAD A CERTAIN AMOUNT OF TRAINING; RIGHT?

01:40PM  19   A.   YES.

01:40PM  20   Q.   IN A LAB; RIGHT?

01:40PM  21   A.   YES.

01:40PM  22   Q.   AND PASSED AN EXAM; CORRECT?

01:40PM  23   A.   I WOULD HAVE TO LOOK AT THE STATUTE.  I DON'T HAVE THAT

01:41PM  24   STATUTE IN FRONT OF ME.

01:41PM  25   Q.   OKAY.  ARE YOU AWARE THAT THAT WAS GENERALLY THE

01:41PM   1    REQUIREMENT, THAT IT WAS TRAINING PLUS THE EXAM?

01:41PM   2    A.   THERE ARE SPECIFIC REQUIREMENTS FOR THAT AND I'D HAVE TO

01:41PM   3    LOOK THEM UP.  I'M SORRY, I DON'T HAVE THEM IN FRONT OF ME.

01:41PM   4    Q.   AND I GUESS I COULD MOVE ON FROM THEM, BUT ARE YOU AWARE

01:41PM   5    THAT THOSE REQUIREMENTS CHANGED AT A CERTAIN POINT IN TIME?

01:41PM   6            MR. SCHENK:  RELEVANCE.

01:41PM   7            THE COURT:  SUSTAINED.

01:41PM   8            MS. WALSH:  OKAY.  WELL, MAYBE WE'LL COME BACK TO

01:41PM   9    THAT.

01:42PM  10        (PAUSE IN PROCEEDINGS.)

01:42PM  11    BY MS. WALSH:

01:42PM  12    Q.   OKAY.  SO, MR. SCHENK ASKED YOU ABOUT DR. LYNETTE SAWYER

01:42PM  13    ON DIRECT.

01:42PM  14        DO YOU REMEMBER THAT?

01:42PM  15    A.   YES.

01:42PM  16    Q.   AND WHEN -- SO SHE WAS THE CO-LAB DIRECTOR WHILE YOU WERE

01:42PM  17    THE LAB DIRECTOR OF THERANOS; IS THAT RIGHT?

01:42PM  18    A.   YES.

01:42PM  19    Q.   AND SHE WAS ALSO HIRED IN NOVEMBER 2014 TO BE A

01:42PM  20    CO-LAB DIRECTOR; CORRECT?

01:42PM  21    A.   ACCORDING TO WHAT I'VE SEEN, YES.

01:42PM  22    Q.   OKAY.  AND SHE -- BEING A CO-LAB DIRECTOR, SHE WAS,

01:42PM  23    SIMILAR TO YOU, NOT A FULL-TIME LAB DIRECTOR; IS THAT RIGHT?

01:42PM  24    A.   I DON'T KNOW HOW MUCH TIME SHE SPENT.  I'M SORRY.

01:42PM  25    Q.   OKAY.  WERE YOU AWARE THAT SHE WAS A LAB DIRECTOR PURSUANT

01:43PM  1    TO A CONSULTING AGREEMENT LIKE YOU?

01:43PM  2    A.   I WAS NOT AWARE OF AN AGREEMENT.

01:43PM  3    Q.   OKAY.  BUT YOU ARE AWARE THAT YOU WERE BOTH LISTED ON THE

01:43PM  4    CLIA LICENSE AGREEMENT AS LAB DIRECTORS; RIGHT?

01:43PM  5    A.   YES.

01:43PM  6    Q.   OKAY.  OKAY.  AND SO DURING THIS PERIOD, NOVEMBER 2014 TO

01:43PM  7    JUNE -- THROUGH JUNE 2015, YOU TESTIFIED THAT YOU WERE ONLY

01:43PM  8    WORKING A FEW HOURS AT THERANOS; CORRECT?

01:43PM  9    A.   YES.

01:43PM  10   Q.   OKAY.  AND WHILE YOU WERE ONLY WORKING A FEW HOURS, YOU

01:43PM  11   WERE AWARE, WEREN'T YOU, THAT DR. SAWYER WAS SIGNING DOCUMENTS

01:44PM  12   RELATED TO THE LAB?

01:44PM  13   A.   I WAS NEVER TOLD THAT, AND NOT -- NO INFORMATION LIKE THAT

01:44PM  14   WAS GIVEN TO ME, SO I WAS NOT AWARE OF WHAT SHE WAS SIGNING.

01:44PM  15   Q.   OKAY.  SO YOU WEREN'T AWARE AT THE TIME THAT SHE WAS

01:44PM  16   SIGNING A LOT OF DOCUMENTS?

01:44PM  17   A.   NO.  I WAS NEVER SHOWN THOSE DOCUMENTS, NO.

01:44PM  18   Q.   OKAY.  SO LET'S -- WHY DON'T YOU TURN IN YOUR BINDER TO

01:44PM  19   10525.

01:44PM  20        DO YOU SEE THAT DOCUMENT?

01:44PM  21   A.   YES, I DO.

01:44PM  22   Q.   AND DO YOU SEE THAT THAT WAS SIGNED BY LYNETTE SAWYER?

01:45PM  23   A.   YES.

01:45PM  24   Q.   AND IT'S DATED JANUARY 11TH, 2015; IS THAT RIGHT?

01:45PM  25   A.   YES.

01:45PM   1    Q.   AND IT REFERS TO A VERIFICATION OF AN ADVIA 2400.

01:45PM   2         DO YOU SEE THAT?

01:45PM   3    A.   YES.

01:45PM   4    Q.   AND THAT'S A TESTING DEVICE; RIGHT?

01:45PM   5    A.   YES.

01:45PM   6    Q.   OKAY.

01:45PM   7         YOUR HONOR, WE OFFER 10525.

01:45PM   8              MR. SCHENK:  FOUNDATION.

01:45PM   9              THE COURT:  CAN YOU LAY A FOUNDATION THROUGH THIS

01:45PM  10    WITNESS?

01:45PM  11              MS. WALSH:  YES, I CAN TRY.

01:45PM  12    Q.   DR. DHAWAN, DO YOU UNDERSTAND WHEN TESTS ARE BROUGHT

01:45PM  13    ONLINE IN A LAB, THERE ARE REGULATIONS THAT ALLOW A LAB

01:45PM  14    DIRECTOR TO VERIFY THAT IT'S APPROPRIATE TO BRING THAT TEST

01:45PM  15    ONLINE; RIGHT?

01:45PM  16    A.   YES.

01:45PM  17    Q.   OKAY.  AND EITHER LAB -- IF THERE ARE TWO LAB DIRECTORS,

01:45PM  18    EITHER LAB DIRECTOR CAN ATTEST TO THAT VERIFICATION AND CERTIFY

01:45PM  19    THAT IT'S APPROPRIATE FOR THAT TEST TO BE OFFERED IN THE LAB;

01:46PM  20    IS THAT RIGHT?

01:46PM  21    A.   YES.

01:46PM  22    Q.   AND SO YOUR CO-LAB DIRECTOR, DR. SAWYER, WOULD HAVE HAD

01:46PM  23    THE ABILITY UNDER THE LAW TO SERVE THAT FUNCTION, TO VERIFY LAB

01:46PM  24    TESTS; RIGHT?

01:46PM  25    A.   THAT'S PART OF THE STATUTE, YES.

DHAWAN CROSS BY MS. WALSH

01:46PM  1    Q.   AND WHEN THAT IS DONE, THOSE RECORDS ARE MAINTAINED BY THE

01:46PM  2    LAB; RIGHT?

01:46PM  3    A.   YES.

01:46PM  4    Q.   AND SO IF THERE'S EVER A QUESTION ABOUT WHEN THE TEST WAS

01:46PM  5    VERIFIED, PEOPLE COULD GO BACK AND LOOK AT THAT DOCUMENTATION;

01:46PM  6    RIGHT?

01:46PM  7    A.   YES.

01:46PM  8    Q.   AND DO YOU RECOGNIZE THIS DOCUMENT AS ONE OF THOSE

01:46PM  9    DOCUMENTS VERIFYING THE TESTS WITHIN THE THERANOS LAB?

01:46PM  10   A.   YES.

01:46PM  11          MS. WALSH:   YOUR HONOR, WE OFFER 10525.

01:46PM  12          THE COURT:   IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:46PM  13       (DEFENDANT'S EXHIBIT 10525 WAS RECEIVED IN EVIDENCE.)

01:46PM  14   BY MS. WALSH:

01:46PM  15   Q.   OKAY.  SO LOOKING AT THE TOP LEFT, THIS WAS PREPARED FOR

01:46PM  16   THERANOS; RIGHT?

01:47PM  17   A.   YES.

01:47PM  18   Q.   AND IT RELATES TO THE ADVIA 2400?

01:47PM  19   A.   YES.

01:47PM  20   Q.   FOR A SPECIFIC BLOOD TEST; CORRECT?

01:47PM  21   A.   YES.

01:47PM  22   Q.   AND THE VERIFICATION DATE WAS NOVEMBER 21ST, 2014; RIGHT?

01:47PM  23   A.   YES.

01:47PM  24   Q.   AND THEN AT THE BOTTOM DR. SAWYER'S SIGNATURE APPEARS;

01:47PM  25   RIGHT?

01:47PM   1      A.   YES.

01:47PM   2      Q.   AND THE DATE IS JANUARY 11TH, 2015; RIGHT?

01:47PM   3      A.   YES.

01:47PM   4      Q.   AND THAT'S IN THAT PERIOD THAT YOU WEREN'T DOING THAT MUCH

01:47PM   5      WORK AT THERANOS; CORRECT?

01:47PM   6      A.   YES.

01:47PM   7      Q.   OKAY.  AND WHAT SHE SAYS IN SIGNING THIS DOCUMENT IS, "I

01:47PM   8      HAVE REVIEWED THE MVP DATA" --

01:47PM   9           DO YOU KNOW WHAT THAT IS?

01:47PM  10      A.   I'M NOT FAMILIAR WITH THAT SPECIFIC TERM.  I'D HAVE TO

01:47PM  11      LOOK IT UP.

01:47PM  12      Q.   OKAY.  -- "FOR SERUM BARBITURATE ON THE ADVIA 2400 AND

01:47PM  13      APPROVE THE USE OF THIS TEST IN OUR FACILITY."

01:47PM  14           DO YOU SEE THAT?

01:47PM  15      A.   YES.

01:47PM  16      Q.   AND SO DR. SAWYER IS APPROVING THAT TEST; CORRECT?

01:48PM  17      A.   YES.

01:48PM  18      Q.   ALL RIGHT.  YOU CAN TAKE THAT DOWN.

01:48PM  19           DR. DHAWAN, IF YOU CAN TURN IN YOUR BINDER TO 20575.

01:48PM  20           AND DO YOU RECOGNIZE THIS AS A STANDARD OPERATING

01:48PM  21      PROCEDURE AT THERANOS?

01:48PM  22      A.   IT SAYS SOP, YES.

01:48PM  23      Q.   SOP, OKAY.

01:48PM  24           AND THIS WAS SIGNED BY DR. SAWYER ALSO; RIGHT?

01:48PM  25      A.   YES.

01:48PM  1    Q.   ON MAY 5TH, 2015?

01:48PM  2    A.   YES.

01:48PM  3    Q.   CORRECT?

01:48PM  4         YOUR HONOR, WE OFFER 20575.

01:48PM  5              MR. SCHENK:  FOUNDATION.

01:48PM  6              THE COURT:  DO YOU WANT TO JUST LAY A FOUNDATION?

01:48PM  7              MS. WALSH:  SURE.

01:49PM  8    Q.   DR. DHAWAN, YOU'RE AWARE THAT IN ORDER TO -- ONCE A TEST

01:49PM  9    IS VERIFIED OR VALIDATED IN A LAB, THE LAB HAS TO ESTABLISH

01:49PM 10    CERTAIN STANDARD OPERATING PROCEDURES THAT GOVERN THE STEPS FOR

01:49PM 11    OPERATING THAT TEST; IS THAT RIGHT?

01:49PM 12    A.   YES.

01:49PM 13    Q.   OKAY.  AND A LAB DIRECTOR UNDER THE LAW IS AUTHORIZED TO

01:49PM 14    APPROVE STANDARD OPERATING PROCEDURES FOR A LAB; CORRECT?

01:49PM 15    A.   YES.

01:49PM 16    Q.   AND DR. SAWYER DURING THIS TIME PERIOD WAS ONE OF THE LAB

01:49PM 17    DIRECTORS AT THERANOS; RIGHT?

01:49PM 18    A.   YES.

01:49PM 19    Q.   AND SHE APPROVED THE STANDARD OPERATING PROCEDURE; RIGHT?

01:49PM 20    A.   YES.

01:49PM 21              MS. WALSH:  YOUR HONOR, WE OFFER 20575.

01:49PM 22              THE COURT:  AND HAS HE TESTIFIED IF HE'S SEEN THESE

01:49PM 23    SOP'S BEFORE?

01:49PM 24         MAYBE YOU CAN JUST ASK HIM IF HE'S FAMILIAR WITH THIS.  IF

01:49PM 25    YOU DID, I MISSED IT.  I APOLOGIZE.

01:50PM   1        MS. WALSH:  SURE.

01:50PM   2   Q.   SO, DR. DHAWAN, HAVE YOU SEEN THE STANDARD OPERATING

01:50PM   3   PROCEDURE BEFORE?

01:50PM   4   A.   THIS ONE I DON'T RECALL.

01:50PM   5   Q.   OKAY.  IS THIS -- IS THERE ANYTHING UNUSUAL ABOUT THIS --

01:50PM   6   ABOUT WHAT APPEARS HERE THAT IS DIFFERENT FROM STANDARD

01:50PM   7   OPERATING PROCEDURES YOU'VE SEEN IN YOUR WORK AT YOUR LAB AS A

01:50PM   8   LAB DIRECTOR?

01:50PM   9   A.   IT'S -- THIS IS A STANDARD, STANDARD OPERATING PROCEDURE,

01:50PM  10   SO --

01:50PM  11        MS. WALSH:  YOUR HONOR, WE OFFER THE EXHIBIT.

01:50PM  12        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:50PM  13      (DEFENDANT'S EXHIBIT 20575 WAS RECEIVED IN EVIDENCE.)

01:50PM  14   BY MS. WALSH:

01:50PM  15   Q.   OKAY.  LET'S LOOK AT THE TOP.  AGAIN, IT SAYS STANDARD

01:50PM  16   OPERATING PROCEDURE.

01:50PM  17      DR. SAWYER SIGNED IT; CORRECT?

01:50PM  18   A.   YES.

01:50PM  19   Q.   AND THAT'S ON MAY 5TH, 2015; RIGHT?

01:50PM  20   A.   YES.

01:50PM  21   Q.   AND AGAIN, THIS IS DURING THAT PERIOD WHERE YOU WERE NOT

01:50PM  22   DOING THAT MUCH WORK FOR THERANOS; RIGHT?

01:50PM  23   A.   YES.

01:50PM  24   Q.   OKAY.  AND THERE ARE OTHER PEOPLE WHO SIGNED THIS BEFORE

01:51PM  25   DR. SAWYER SIGNED IT; RIGHT?

DHAWAN CROSS BY MS. WALSH

01:51PM   1    A.   YES.

01:51PM   2    Q.   FOR EXAMPLE, LINDSAY MARSH IS THE FIRST PERSON, AND IT

01:51PM   3    LOOKS LIKE SHE'S THE AUTHOR OF THE DOCUMENT; RIGHT?

01:51PM   4    A.   YES.

01:51PM   5    Q.   AND HER TITLE IS CLINICAL LABORATORY ASSOCIATE; RIGHT?

01:51PM   6    A.   YES.

01:51PM   7    Q.   AND THEN LINA CASTRO REVIEWED THE DOCUMENT; RIGHT?

01:51PM   8    A.   YES.

01:51PM   9    Q.   AND HER TITLE IS CLINICAL LABORATORY SCIENTIST; CORRECT?

01:51PM  10    A.   YES.

01:51PM  11    Q.   AND THEN THERE'S ANOTHER REVIEWER WHO IS GODFRED MASINDE.

01:51PM  12         DO YOU SEE THAT?

01:51PM  13    A.   YES.

01:51PM  14    Q.   HE'S A PH.D.; RIGHT?

01:51PM  15    A.   YES.

01:51PM  16    Q.   AND HE'S A TECHNICAL SUPERVISOR; RIGHT?

01:51PM  17    A.   YES.

01:51PM  18    Q.   AND TECHNICAL SUPERVISORS ARE PRETTY HIGH RANKED WITHIN

01:51PM  19    THE LAB; CORRECT?

01:51PM  20    A.   YES.

01:51PM  21    Q.   AND DID YOU MEET DR. MASINDE?

01:51PM  22    A.   ONCE.

01:51PM  23    Q.   OKAY.  AND THEN FINALLY, AFTER ALL OF THOSE PEOPLE HAVE

01:51PM  24    REVIEWED THIS DOCUMENT, DR. SAWYER, YOUR CO-LAB DIRECTOR, SIGNS

01:51PM  25    THE DOCUMENT; CORRECT?

01:51PM   1    A.   YES.

01:52PM   2    Q.   OKAY.  WE CAN TAKE THAT DOWN.

01:52PM   3         I JUST HAVE ONE MORE.  IT'S 10526.

01:52PM   4         DO YOU SEE THAT?

01:52PM   5    A.   YES.

01:52PM   6    Q.   OKAY.  AND IS THAT ANOTHER STANDARD OPERATING PROCEDURE AT

01:52PM   7    THERANOS?

01:52PM   8    A.   YES.

01:52PM   9    Q.   AND THIS WAS FOR THE CLIA LAB; RIGHT?

01:52PM  10    A.   YES.

01:52PM  11    Q.   AND THIS SOP WAS SIGNED BY A NUMBER OF DIFFERENT PEOPLE,

01:52PM  12    INCLUDING DR. SAWYER AS THE LAB DIRECTOR; RIGHT?

01:52PM  13    A.   YES.

01:52PM  14    Q.   AND IT WAS SIGNED ON MARCH 30TH, 2015; CORRECT?

01:52PM  15    A.   YES.

01:52PM  16              MS. WALSH:  YOUR HONOR, WE OFFER 10526.

01:52PM  17              MR. SCHENK:  SAME OBJECTIONS, YOUR HONOR.

01:52PM  18              THE COURT:  AS TO FOUNDATION, IS THAT THE OBJECTION?

01:53PM  19    I'M SORRY.

01:53PM  20              MR. SCHENK:  YES.

01:53PM  21              THE COURT:  OVERRULED.  THIS IS ADMITTED AND IT MAY

01:53PM  22    BE PUBLISHED.

01:53PM  23         (DEFENDANT'S EXHIBIT 10526 WAS RECEIVED IN EVIDENCE.)

01:53PM  24    BY MS. WALSH:

01:53PM  25    Q.   AND WE'LL JUST TAKE A QUICK LOOK AT THIS, DR. DHAWAN.

DHAWAN CROSS BY MS. WALSH

01:53PM   1            THE FIRST SIGNATORY IS BROOKE BIVENS.

01:53PM   2            DO YOU SEE THAT?

01:53PM   3       A.   YES.

01:53PM   4       Q.   AND TITLED CLA; RIGHT?

01:53PM   5       A.   YES.

01:53PM   6       Q.   AND WHAT DOES THAT STAND FOR?

01:53PM   7       A.   CLINICAL LABORATORY ASSOCIATE.

01:53PM   8       Q.   YES.  AND THAT'S IN MARCH OF 2015; RIGHT?

01:53PM   9       A.   YES.

01:53PM  10       Q.   AND THE NEXT ONE IS LINA CASTRO.  WE SAW HER FROM BEFORE;

01:53PM  11  RIGHT?

01:53PM  12       A.   YES.

01:53PM  13       Q.   AND SHE'S A CLS; CORRECT?

01:53PM  14       A.   YES.

01:53PM  15       Q.   AND THEN AGAIN DR. MASINDE READS IT AND APPROVES IT AFTER

01:53PM  16  THEM; RIGHT?

01:53PM  17       A.   YES, YES.

01:53PM  18       Q.   AND HE WAS THE TECHNICAL SUPERVISOR?

01:53PM  19       A.   YES.

01:53PM  20       Q.   AND THEN FINALLY, DR. SAWYER GIVES HER FINAL APPROVAL;

01:53PM  21  CORRECT?

01:53PM  22       A.   YES.

01:53PM  23       Q.   AND SHE DOES THAT ON MARCH 30TH, 2015; RIGHT?

01:53PM  24       A.   YES.

01:53PM  25       Q.   AND AGAIN, THIS IS DURING THAT PERIOD WHERE YOU WERE NOT

01:53PM  1    REALLY WORKING TOO MUCH AT THERANOS?

01:53PM  2    A.   YES.

01:53PM  3    Q.   OKAY.  AND JUST ONE MORE THING I WANTED TO POINT OUT ON

01:54PM  4    PAGE 4 OF THE EXHIBIT UNDER RESPONSIBILITIES, JUST 4.1.

01:54PM  5         "IT IS THE RESPONSIBILITY OF THE LABORATORY DIRECTOR OR

01:54PM  6    DESIGNEE THEREOF (I.E. TECHNICAL OR GENERAL SUPERVISOR) TO

01:54PM  7    ENSURE TESTING PERSONNEL ARE ADEQUATELY TRAINED IN THESE

01:54PM  8    METHODS."

01:54PM  9         DO YOU SEE THAT?

01:54PM  10   A.   YES.

01:54PM  11   Q.   ON PAGE 4?

01:54PM  12   A.   YES.

01:54PM  13   Q.   AND IT IS YOUR UNDERSTANDING, ISN'T IT, THAT IT IS A LAB

01:54PM  14   DIRECTOR'S RESPONSIBILITY TO MAKE SURE EVERYONE IN THE LAB IS

01:54PM  15   TRAINED; RIGHT?

01:54PM  16   A.   YES.

01:54PM  17   Q.   EVEN IF THE LAB DIRECTOR DOESN'T DO IT HIM OR HERSELF AND

01:54PM  18   DELEGATES THAT TO OTHERS, ULTIMATELY IT IS THE LAB DIRECTOR'S

01:54PM  19   RESPONSIBILITY; CORRECT?

01:54PM  20   A.   AS IT SAYS HERE IN THE SOP, YES.

01:54PM  21   Q.   OKAY.  SO I WANT TO SWITCH GEARS AND TALK ABOUT YOUR

01:55PM  22   COMPENSATION ARRANGEMENTS WITH THERANOS.  YOU SPOKE A LITTLE

01:55PM  23   BIT ABOUT THAT ON DIRECT.

01:55PM  24        YOU STARTED OUT WITH A CONSULTING AGREEMENT; RIGHT?

01:55PM  25   A.   YES.

DHAWAN CROSS BY MS. WALSH

01:55PM 1    Q.   AND THE CONSULTING AGREEMENT CALLED FOR YOU BEING PAID IN

01:55PM 2    CASH; RIGHT?

01:55PM 3    A.   YES.

01:55PM 4    Q.   BUT YOU EXPRESSED A DESIRE TO MR. BALWANI TO BE PAID BY

01:55PM 5    STOCK OPTIONS; CORRECT?

01:55PM 6    A.   YES.

01:55PM 7    Q.   AND IT WAS EITHER STOCK OPTIONS OR RESTRICTED STOCK UNITS,

01:55PM 8    WHICHEVER THERANOS WAS ISSUING AT THE TIME; RIGHT?

01:55PM 9    A.   YES.

01:55PM 10   Q.   OKAY.  AND THAT SWITCH FROM BEING A PAID CONSULTANT TO

01:56PM 11   BEING PAID IN STOCK, THAT TOOK A WHILE TO WORK OUT, DIDN'T IT?

01:56PM 12   A.   I BELIEVE SO, YES.

01:56PM 13   Q.   OKAY.  THERE WAS A LOT OF BACK AND FORTH, NEGOTIATING WHAT

01:56PM 14   IT WOULD BE; RIGHT?

01:56PM 15   A.   I THINK IT WAS JUST TIME.  THERE WAS NOT -- I DON'T RECALL

01:56PM 16   NEGOTIATION.

01:56PM 17   Q.   OKAY.  BUT IT TOOK SOME TIME TO WORK THAT OUT?

01:56PM 18   A.   YES.

01:56PM 19   Q.   OKAY.  AND YOU KNOW, OR I GUESS DID YOU LEARN THAT

01:56PM 20   THERANOS AT THE TIME WASN'T ISSUING STOCK OPTIONS TO ITS

01:56PM 21   EMPLOYEES?

01:56PM 22   A.   I DID NOT KNOW THAT.

01:56PM 23   Q.   OKAY.  AND WHAT MR. BALWANI ENDED UP OFFERING YOU WERE

01:56PM 24   RESTRICTED STOCK UNITS; RIGHT?

01:56PM 25   A.   YES.

01:56PM  1     Q.   OKAY.  AND YOU WERE AWARE, WEREN'T YOU, THAT THE BOARD IS

01:56PM  2     THE ONE WHO HAS TO APPROVE EITHER STOCK OPTIONS OR RESTRICTED

01:56PM  3     STOCK UNITS; RIGHT?

01:56PM  4     A.   I'M AWARE NOW, YES.

01:56PM  5     Q.   OKAY.  AND ALL OF THAT TOOK TIME; CORRECT?

01:56PM  6     A.   IT TOOK TIME, YES.

01:57PM  7     Q.   OKAY.  AND YOU TESTIFIED ON DIRECT THAT YOU RECEIVED THIS

01:57PM  8     EMPLOYMENT AGREEMENT FOR YOU TO BE AN AT WILL EMPLOYEE.

01:57PM  9          DO YOU REMEMBER THAT?

01:57PM  10    A.   YES, IT WAS SHOWN TO ME, YES.

01:57PM  11    Q.   OKAY.  AND THAT WAS FROM MONA RAMAMURTHY.

01:57PM  12         DO YOU REMEMBER THAT?

01:57PM  13    A.   YES, YES.

01:57PM  14    Q.   AND SHE SENT YOU THE EMPLOYMENT AGREEMENT; RIGHT?

01:57PM  15    A.   YES.

01:57PM  16    Q.   AND IN THE EMPLOYMENT AGREEMENT, IT ARTICULATES THE

01:57PM  17    RESTRICTED STOCK UNIT THAT YOU'RE BEING ISSUED; RIGHT?

01:57PM  18    A.   YES.

01:57PM  19    Q.   OKAY.  AND YOU SAID YOU WEREN'T SURE WHY SHE SENT YOU

01:57PM  20    THAT; RIGHT?

01:57PM  21    A.   I WASN'T SURE WHY IT WAS SENT ON THAT DATE.

01:57PM  22    Q.   YEAH.  OKAY.

01:57PM  23         DID YOU THINK THE FACT THAT YOU WERE GETTING RESTRICTED

01:57PM  24    STOCK UNITS MAY HAVE HAD SOMETHING TO DO WITH GETTING AN

01:57PM  25    EMPLOYMENT AGREEMENT FROM THE COMPANY WITH THESE RESTRICTED

01:57PM   1   STOCK UNIT IN IT?

01:57PM   2   A.   YEAH, THAT MADE LOGICAL SENSE THAT THAT WAS MY

01:58PM   3   COMPENSATION, YEAH.

01:58PM   4   Q.   RIGHT.  AND IT TOOK THAT LONG TO GET THE STOCK UNITS

01:58PM   5   ISSUED TO YOU TO SEND YOU THE EMPLOYMENT AGREEMENT; RIGHT?

01:58PM   6   A.   I DON'T KNOW WHAT THE INNER WORKINGS IN THE COMPANY WERE

01:58PM   7   TO GET ME THOSE.  I JUST KNEW IT TOOK TIME, SO IT TOOK TIME.

01:58PM   8   Q.   RIGHT.  AND EVEN THOUGH YOU DIDN'T KNOW THE INNER

01:58PM   9   WORKINGS, YOU KNEW THAT IT TOOK THAT AMOUNT OF TIME TO FINALLY

01:58PM  10   NAIL DOWN HOW MANY RESTRICTED STOCK UNITS YOU WERE GOING TO

01:58PM  11   GET?

01:58PM  12   A.   AGAIN, I DON'T KNOW THE INNER WORKINGS OF THE COMPANY AND

01:58PM  13   I CAN'T SAY WHY IT TOOK THAT LONG, BUT IT TOOK THAT LONG.

01:58PM  14   Q.   IT TOOK THAT LONG?

01:58PM  15   A.   I JUST DON'T KNOW WHY.

01:58PM  16   Q.   UNDERSTOOD.  OKAY.

01:58PM  17        SO YOU'VE ALSO TESTIFIED, AND WE'VE BEEN THROUGH THIS SO I

01:59PM  18   DON'T WANT TO DWELL ON IT TOO MUCH, BUT YOU WERE PART-TIME?

01:59PM  19   A.   UH-HUH.

01:59PM  20   Q.   AND YOU DIDN'T SPEND TOO MUCH TIME AT THERANOS; RIGHT?

01:59PM  21   A.   YES.

01:59PM  22   Q.   YOU DIDN'T SPEND MUCH TIME?

01:59PM  23   A.   YES.

01:59PM  24   Q.   AND AT THE TIME, THE CLIA REGULATIONS ALLOWED FOR YOU TO

01:59PM  25   BE A PART-TIME LAB DIRECTOR, DIDN'T IT?

01:59PM   1      A.   I WOULD HAVE TO REVIEW THE CLIA REGULATIONS COMPLETELY,

01:59PM   2      BUT I WOULD ASSUME YES.

01:59PM   3      Q.   OKAY.  WELL, LET'S TAKE A LOOK AT 7603DD, WHICH IS IN YOUR

01:59PM   4      BINDER.

02:00PM   5           DO YOU HAVE THAT IN FRONT OF YOU?

02:00PM   6      A.   YES, I DO.

02:00PM   7      Q.   OKAY.  AND IF YOU WOULD TURN TO PAGE 2 ON THE BOTTOM OF

02:00PM   8      THE EXHIBIT, YOU SEE THERE'S A SECTION IN THE RIGHT-HAND

02:00PM   9      COLUMN, STANDARD LABORATORY DIRECTOR RESPONSIBILITIES?

02:00PM  10      A.   RIGHT.

02:00PM  11      Q.   AND IF YOU LOOK DOWN AT C AND D, TAKE A MINUTE AND JUST

02:00PM  12      READ THOSE TWO PROVISIONS.

02:00PM  13               THE COURT:  TO HIMSELF?

02:00PM  14               MS. WALSH:  TO HIMSELF, YEAH.

02:00PM  15           (PAUSE IN PROCEEDINGS.)

02:00PM  16               THE WITNESS:  YES.

02:00PM  17      BY MS. WALSH:

02:00PM  18      Q.   OKAY.  DOES THAT HELP YOU REMEMBER WHETHER THE CLIA

02:00PM  19      REGULATIONS ALLOWED YOU TO BE A PART-TIME LAB DIRECTOR?

02:00PM  20      A.   YES.

02:00PM  21      Q.   THEY DID; RIGHT?

02:00PM  22      A.   YES.

02:00PM  23      Q.   OKAY.  AND THEY ALLOWED TO BE, OR ANYONE WHO WAS

02:00PM  24      QUALIFIED, TO BE A LAB DIRECTOR AT UP TO FIVE LABS; CORRECT?

02:00PM  25      A.   YES.

DHAWAN CROSS BY MS. WALSH

02:00PM  1    Q.   OKAY.  AND YOU WERE A LAB DIRECTOR JUST FOR TWO; RIGHT?

02:00PM  2    A.   YES.

02:00PM  3    Q.   AT THE TIME?

02:00PM  4    A.   YES.

02:00PM  5    Q.   OKAY.  AND WHAT THE CLIA REGS ALSO REQUIRED WAS THAT YOU

02:01PM  6    BE AVAILABLE BY TELEPHONE OR EMAIL; RIGHT?

02:01PM  7    A.   YES.

02:01PM  8    Q.   SO IF ANYONE HAD QUESTIONS, THEY COULD CALL YOU; RIGHT?

02:01PM  9    A.   YES.

02:01PM  10   Q.   AND YOU WERE AVAILABLE; RIGHT?

02:01PM  11   A.   YES.

02:01PM  12   Q.   YOU SAID THAT ON DIRECT, THAT YOU MADE SURE THAT THERANOS

02:01PM  13   KNEW THAT YOU WERE AVAILABLE?

02:01PM  14   A.   YES.

02:01PM  15   Q.   SO THERE WAS NO -- YOU WERE ALLOWED TO BE THERE PART-TIME;

02:01PM  16   RIGHT?

02:01PM  17   A.   YES.

02:01PM  18   Q.   AND YOU WERE ALLOWED TO WORK FOR UP TO FIVE DIFFERENT LABS

02:01PM  19   AS A LAB DIRECTOR; RIGHT?

02:01PM  20   A.   YES.

02:01PM  21   Q.   AND SO NO ONE WAS PRETENDING THAT YOU WERE THERE EVERY

02:01PM  22   SINGLE DAY AT THERANOS; RIGHT?

02:01PM  23          MR. SCHENK:  OBJECTION.  SPECULATION, FOUNDATION,

02:01PM  24   AND RELEVANCE.

02:01PM  25          THE COURT:  SUSTAINED AS TO SPECULATION.

02:01PM   1    BY MS. WALSH:

02:01PM   2    Q.   SO, DR. DHAWAN, YOU DIDN'T COME INTO THERANOS EVERY SINGLE

02:01PM   3    DAY; RIGHT?

02:01PM   4    A.   YES.

02:01PM   5    Q.   BUT YOU -- THAT WAS ALLOWED UNDER THE REGS; CORRECT?

02:02PM   6         MR. SCHENK:   OBJECTION.   LACKS RELEVANCE.

02:02PM   7         THE COURT:   SUSTAINED.

02:02PM   8    BY MS. WALSH:

02:02PM   9    Q.   OKAY.   DR. DHAWAN, YOU'VE TESTIFIED THAT THE REGULATIONS

02:02PM  10    ALLOW YOU TO BE A PART-TIME LAB DIRECTOR; CORRECT?

02:02PM  11    A.   YES.

02:02PM  12    Q.   AND BEING A PART-TIME LAB DIRECTOR MEANS THAT YOU DON'T

02:02PM  13    HAVE TO COME INTO THE LAB EVERY DAY; CORRECT?

02:02PM  14    A.   BASED ON WHAT IT SAYS HERE.

02:02PM  15    Q.   OKAY.

02:02PM  16    A.   IT SAYS YOU HAVE TO BE IN CONTACT.

02:02PM  17    Q.   OKAY.   NOW, WHILE YOU WERE NOT AT THE LAB, THERE WERE MANY

02:02PM  18    SCIENTISTS WORKING AT THERANOS AT THE TIME; RIGHT?

02:02PM  19    A.   YES.

02:02PM  20    Q.   YOU MET SOME OF THEM; CORRECT?

02:02PM  21    A.   YES.

02:02PM  22    Q.   AND YOU INTERACTED WITH SOME OF THEM; RIGHT?

02:02PM  23    A.   YES.

02:02PM  24    Q.   YOU SAID YOU -- I THINK YOU JUST SAID THAT YOU MET

02:02PM  25    DR. MASINDE?

02:02PM 1    A.    YES.

02:02PM 2    Q.    AND YOU HAD CONTACT WITH DR. SAKSENA REGARDING HIS

02:02PM 3    APPLICATION TO BE A LAB DIRECTOR; RIGHT?

02:02PM 4    A.    YES.

02:02PM 5    Q.    AND YOU SAID YOU ALSO MET DANIEL YOUNG; RIGHT?

02:02PM 6    A.    YES.

02:02PM 7    Q.    DR. YOUNG.

02:03PM 8    A.    YES.

02:03PM 9    Q.    OKAY.  AND THESE WERE ALL PROFESSIONAL SCIENTISTS, WEREN'T

02:03PM 10   THEY?

02:03PM 11   A.    YES, THEY ARE ALL PH.D.'S, YES.

02:03PM 12   Q.    OKAY.  AND IT WAS APPROPRIATE, WASN'T IT, FOR YOU TO RELY

02:03PM 13   ON THE WORK THAT THEY WERE DOING?

02:03PM 14   A.    YES.

02:03PM 15   Q.    OKAY.  LET'S TAKE A LOOK AT EXHIBIT 4528, WHICH IS IN

02:03PM 16   EVIDENCE.

02:03PM 17       LET'S GO TO PAGE 7.

02:03PM 18       DO YOU HAVE THAT IN FRONT OF YOU DR. DHAWAN?

02:03PM 19   A.    YES, YES.

02:03PM 20   Q.    OKAY.  AND THAT'S AN ORG CHART OF THE TOP LEVEL SCIENTISTS

02:04PM 21   WITHIN THE LAB; RIGHT?

02:04PM 22   A.    YES.

02:04PM 23   Q.    AND IT SHOWS DR. MASINDE, THE TOP TECHNICAL SUPERVISOR;

02:04PM 24   RIGHT?

02:04PM 25   A.    YES.

02:04PM  1    Q.   AND IT ALSO SHOWS LANGLY GEE.

02:04PM  2         DO YOU REMEMBER HIM?

02:04PM  3    A.   YES.

02:04PM  4    Q.   OKAY.  HE WAS THE QA/QC MANAGER; RIGHT?

02:04PM  5    A.   YES.

02:04PM  6    Q.   AND HE WORKED FULL TIME IN THE LAB; RIGHT?

02:04PM  7    A.   YES.

02:04PM  8    Q.   AND HODA ALAMDAR, DO YOU REMEMBER HER?

02:04PM  9    A.   YES.

02:04PM  10   Q.   AND SHE WAS THE TECHNICAL SUPERVISOR, OR A TECHNICAL

02:04PM  11   SUPERVISOR; RIGHT?

02:04PM  12   A.   YES.

02:04PM  13   Q.   AND GURBIR SIDHU, DO YOU REMEMBER HIM?

02:04PM  14   A.   I RECALL MEETING HIM ONCE, YES.

02:04PM  15   Q.   AND HE WAS THE GENERAL SUPERVISOR; RIGHT?

02:04PM  16   A.   YES.

02:04PM  17   Q.   AND SO IN DOING YOUR WORK -- AND WE'RE GOING TO LOOK AT

02:04PM  18   WHAT YOU DID IN A MINUTE -- BUT YOU RELIED ON THESE SCIENTISTS

02:04PM  19   WHO WERE WORKING FULL TIME IN THE LAB; CORRECT?

02:04PM  20   A.   YES.

02:05PM  21   Q.   AND THEN LET'S TAKE A LOOK AT THIS EXHIBIT AT SLIDE 12.

02:05PM  22        THESE ARE THE CREDENTIALS OF DR. DANIEL YOUNG.

02:05PM  23        DO YOU SEE THAT?

02:05PM  24   A.   YES.

02:05PM  25   Q.   AND HE WAS CURRENTLY AT THE TIME A LAB DIRECTOR; RIGHT?

DHAWAN CROSS BY MS. WALSH

02:05PM  1     A.   YES.

02:05PM  2     Q.   AND HE WAS THE LAB DIRECTOR OF ARIZONA?

02:05PM  3     A.   YES.

02:05PM  4     Q.   AND IT SAYS HE WAS INVOLVED AS AN EXECUTIVE AND SUPERVISOR

02:05PM  5     IN THE RESEARCH AND DEVELOPMENT OF A WIDE VARIETY OF CLINICAL

02:05PM  6     ASSAYS SPANNING MULTIPLE CATEGORIES OF TESTING.

02:05PM  7          DO YOU SEE THAT?

02:05PM  8     A.   YES.

02:05PM  9     Q.   AND THEN IT SAYS HE HAS AN ENGINEERING DOCTORATE FROM

02:05PM  10    M.I.T.

02:05PM  11         DO YOU SEE THAT?

02:05PM  12    A.   YES.

02:05PM  13    Q.   OKAY.  AND THEN FURTHER DOWN IT DESCRIBES HIS DUTIES, AND

02:05PM  14    IT COVERED OVERSIGHT OF CLINICAL LABORATORY TESTING, QUALITY

02:06PM  15    AND PROFICIENCY TESTING.

02:06PM  16         DO YOU SEE THAT?

02:06PM  17    A.   YES.

02:06PM  18    Q.   IS IT SAYS, "HE HAS ALSO SUPERVISED VALIDATION OF TESTING

02:06PM  19    FOR ASSAY METHODS IN THE CATEGORIES OF CLINICAL CHEMISTRY,

02:06PM  20    HEMATOLOGY, IMMUNOASSAYS, AND MOLECULAR BIOLOGY INCLUDING

02:06PM  21    VERIFICATION AND VALIDATION," AND IT GOES ON.

02:06PM  22         DO YOU SEE THAT?

02:06PM  23    A.   YES.

02:06PM  24    Q.   AND SO YOU RELIED ON DR. YOUNG AS WELL, WHO WAS A

02:06PM  25    PROFESSIONAL SCIENTIST, IN YOUR WORK FOR THERANOS; RIGHT?

02:06PM    1    A.    YES.

02:06PM    2    Q.    OKAY.  OKAY.  LET'S TAKE A LOOK AT 10577.

02:07PM    3          DO YOU SEE THAT?

02:07PM    4    A.    YES.

02:07PM    5    Q.    OKAY.  AND THIS DOCUMENT IS -- THIS WAS SIGNED BY YOU;

02:07PM    6    RIGHT?

02:07PM    7    A.    YES.

02:07PM    8    Q.    AND THIS IS A DELEGATION OF RESPONSIBILITIES BY YOU TO

02:07PM    9    OTHERS IN THE LAB; IS THAT RIGHT?

02:07PM   10    A.    YES.

02:07PM   11    Q.    OKAY.  AND THIS IS ALLOWED UNDER THE CLIA REGULATIONS;

02:07PM   12    RIGHT?

02:07PM   13    A.    YES.

02:07PM   14    Q.    BECAUSE, AGAIN, YOU CAN'T BE THERE EVERY DAY; CORRECT?

02:07PM   15    A.    YES.

02:07PM   16    Q.    AND SO YOU WERE ALLOWED TO DELEGATE TO OTHER SCIENTISTS

02:07PM   17    SOME OF THE DUTIES THAT YOU HAVE AS THE LAB DIRECTOR; CORRECT?

02:07PM   18    A.    YES.

02:07PM   19    Q.    AND THIS IS ONE OF THOSE DOCUMENTS; RIGHT?

02:07PM   20    A.    YES.

02:07PM   21    Q.    OKAY.  AND IT IS DATED SEPTEMBER 5TH, 2015; RIGHT?

02:07PM   22    A.    YES.

02:07PM   23          MS. WALSH:  YOUR HONOR, WE OFFER 10577.

02:07PM   24          MR. SCHENK:  NO OBJECTION.

02:07PM   25          THE COURT:  THIS IS THREE PAGES?

DHAWAN CROSS BY MS. WALSH

02:08PM 1          MS. WALSH:  YES.

02:08PM 2          THE COURT:  AND THEY'RE -- ARE THEY -- YOU'LL

02:08PM 3   DEVELOP THIS, BUT ARE THESE THREE SEPARATE DELEGATIONS?

02:08PM 4   THERE'S THREE DIFFERENT DATES ON THERE.  I'LL ALLOW IT AND YOU

02:08PM 5   CAN PUBLISH, BUT MAYBE YOU CAN FLESH THAT OUT.

02:08PM 6          (DEFENDANT'S EXHIBIT 10577 WAS RECEIVED IN EVIDENCE.)

02:08PM 7          MS. WALSH:  SURE.

02:08PM 8          THE COURT:  AND I THOUGHT WE WOULD TAKE OUR

02:08PM 9   AFTERNOON BREAK IN ABOUT FIVE OR TEN MINUTES IF YOU WANT TO GO

02:08PM 10  AHEAD WITH THIS DOCUMENT.

02:08PM 11         MS. WALSH:  OKAY.

02:08PM 12  Q.  SO, DR. DHAWAN, LET'S LOOK AT THE FIRST PAGE.

02:08PM 13     AND THIS PAGE DESCRIBES THE QUALIFICATIONS AND DUTIES AND

02:08PM 14  RESPONSIBILITIES OF A LABORATORY SUPERVISOR/TECHNICAL

02:09PM 15  SUPERVISOR.

02:09PM 16     DO YOU SEE THAT?

02:09PM 17  A.  YES.

02:09PM 18  Q.  AND IT ESTABLISHES THAT THAT PERSON REPORTS TO THE LAB

02:09PM 19  DIRECTOR; RIGHT?

02:09PM 20  A.  YES.

02:09PM 21  Q.  OKAY.  AND IT DESCRIBES IN DETAIL THE DUTIES AND

02:09PM 22  RESPONSIBILITIES OF THAT TECHNICAL SUPERVISOR.

02:09PM 23     DO YOU SEE THAT IN THE MIDDLE?

02:09PM 24  A.  YES, YES.

02:09PM 25  Q.  OKAY.  AND WHAT IT SAYS IS THAT THE TECHNICAL SUPERVISOR

DHAWAN CROSS BY MS. WALSH

02:09PM 1    SHALL BE AVAILABLE TO LABORATORY TESTING PERSONNEL AT ALL TIMES

02:09PM 2    TO PROVIDE EITHER ON-SITE, TELEPHONE, OR ELECTRONIC

02:09PM 3    CONSULTATION.

02:09PM 4        DO YOU SEE THAT?

02:09PM 5    A.   YES.

02:09PM 6    Q.   "THE TECHNICAL SUPERVISOR IS RESPONSIBLE FOR THE

02:09PM 7    FOLLOWING."

02:09PM 8        AND I'M NOT GOING TO READ WORD FOR WORD EVERY ONE, BUT TO

02:09PM 9    SUMMARIZE, ONE IS THE DAY-TO-DAY SUPERVISION OF HIGH COMPLEXITY

02:09PM 10   TEST PERFORMANCE.

02:09PM 11       DO YOU SEE THAT?

02:09PM 12   A.   YES.

02:09PM 13   Q.   AND TWO IS REVIEW OF ALL RELEVANT DOCUMENTS AND

02:09PM 14   PROCEDURES; RIGHT?

02:09PM 15   A.   YES.

02:09PM 16   Q.   AND THREE IS PROVIDE REGULATORY ADVICE FOR COMPLIANCE;

02:09PM 17   RIGHT?

02:09PM 18   A.   YES.

02:09PM 19   Q.   AND FOUR IS ACT AS A LIAISON WITH REGULATORS; CORRECT?

02:10PM 20   A.   YES.

02:10PM 21   Q.   OKAY.  SIX IS ATTEND ALL SCHEDULED QA MEETINGS TO PROVIDE

02:10PM 22   ADVICE ON COMPLIANCE AND QUALITY IMPROVEMENTS; RIGHT?

02:10PM 23   A.   YES.

02:10PM 24   Q.   SEVEN IS TRAIN, OBSERVE, AND DOCUMENT EMPLOYEES PERFORMING

02:10PM 25   WHAT GOES ON IN THE LAB; RIGHT?

DHAWAN CROSS BY MS. WALSH

02:10PM 1    A.    YES.

02:10PM 2    Q.    OKAY.  AND THEN LET'S TURN TO THE NEXT PAGE.

02:10PM 3          IT SAYS, "THE LABORATORY DIRECTOR DELEGATES THE FOLLOWING

02:10PM 4    RESPONSIBILITIES TO THE TECHNICAL SUPERVISOR WHO HAS

02:10PM 5    SPECIALTIES IN HEMATOLOGY."

02:10PM 6          AND THE DELEGATION IS TO HODA ALAMDAR; RIGHT?

02:10PM 7    A.    YES.

02:10PM 8    Q.    AND THE FIRST PAGE THAT DESCRIBED THE DUTIES AND

02:10PM 9    RESPONSIBILITIES AND THE QUALIFICATIONS, THAT PAGE ALSO RELATED

02:10PM 10   TO HODA ALAMDAR; CORRECT?

02:11PM 11   A.    YES.

02:11PM 12   Q.    OKAY.  AND WHAT IS BEING DELEGATED IS APPROPRIATE -- I'M

02:11PM 13   ON PAGE 2 -- APPROPRIATE TEST METHOD SELECTION; RIGHT?

02:11PM 14   A.    YES.

02:11PM 15   Q.    AND VERIFICATION; CORRECT?

02:11PM 16   A.    YES.

02:11PM 17   Q.    TO DETERMINE THE ACCURACY AND PRECISION OF THE TEST;

02:11PM 18   RIGHT?

02:11PM 19   A.    YES.

02:11PM 20   Q.    ENSURING THE DEVELOPMENT OF QUALITY ASSESSMENT AND QUALITY

02:11PM 21   CONTROL PROGRAMS; RIGHT?

02:11PM 22   A.    YES.

02:11PM 23   Q.    DEVELOPING REMEDIAL ACTIONS; CORRECT?

02:11PM 24   A.    YES.

02:11PM 25   Q.    AND IT GOES ON?

02:11PM   1      A.   YES, YES.

02:11PM   2      Q.   OKAY.  AND PAGE 3 IS THE SAME THING, EXCEPT RELATED TO

02:11PM   3      IMMUNOLOGY AND CHEMISTRY.

02:11PM   4           ON PAGE 2 IT WAS IMMUNOLOGY.

02:11PM   5           DO YOU SEE THAT?

02:11PM   6      A.   YES.

02:11PM   7      Q.   AND FOR EACH ONE, HODA ALAMDAR SIGNS; RIGHT?

02:11PM   8      A.   YES.

02:11PM   9      Q.   AND YOU SIGNED AS THE LAB DIRECTOR; RIGHT?

02:11PM   10     A.   YES.

02:11PM   11     Q.   AND SO THOSE PROVISIONS ABOUT DOING QUALITY ASSURANCE AND

02:11PM   12     QUALITY CONTROL AND MAKING SURE THAT THAT IS GOING ON AND

02:12PM   13     REVIEWING IT, THAT WAS ALL DELEGATED TO HODA ALAMDAR, WASN'T

02:12PM   14     IT?

02:12PM   15     A.   YES.

02:12PM   16     Q.   OKAY.  SO TO THE EXTENT THAT YOU DIDN'T REVIEW QC AND QA,

02:12PM   17     YOU HAD DELEGATED THOSE RESPONSIBILITIES TO A HIGHLY QUALIFIED

02:12PM   18     PERSON IN THE LAB; CORRECT?

02:12PM   19     A.   YES.

02:12PM   20     Q.   OKAY.

02:12PM   21          YOUR HONOR, THIS MIGHT BE A GOOD TIME TO BREAK.

02:12PM   22               THE COURT:   OKAY.  LET'S DO THAT, LADIES AND

02:12PM   23     GENTLEMEN.  LET'S TAKE ABOUT 25, 30 MINUTES, LADIES AND

02:12PM   24     GENTLEMEN, FOR OUR AFTERNOON BREAK.

02:12PM   25          WE'RE GOING TO END AT 4:00 TODAY, PLEASE, 4:00.  I'M

02:12PM  1    HOPING WE CAN END AT 4:00.

02:12PM  2         I JUST WANT TO GIVE YOU ADVANCED NOTICE, IF THE LAWYERS

02:12PM  3    ARE VERY CLOSE TO FINISHING AND IT GOES A LITTLE PAST 4:00, I'D

02:12PM  4    LIKE TO ACCOMPLISH THAT FOR ALL OF OUR CONVENIENCE, BUT I'M

02:12PM  5    QUITE CONFIDENT THAT WON'T BE THE CASE.

02:12PM  6         SO WE'LL SEE.  HAVE A GOOD BREAK.  THANK YOU.

02:12PM  7         (RECESS FROM 2:12 P.M. UNTIL 2:39 P.M.)

02:39PM  8              THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES

02:39PM  9    PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

02:39PM  10        MS. WALSH.

02:39PM  11             MS. WALSH:  YES.  THANK YOU, YOUR HONOR.

02:40PM  12        ALL RIGHT.  MAY I INQUIRE, YOUR HONOR?

02:40PM  13             THE COURT:  YES.

02:40PM  14             MS. WALSH:  ALL RIGHT.  THANK YOU.

02:40PM  15    Q.   DR. DHAWAN, WELCOME BACK.

02:40PM  16        WE WERE JUST REVIEWING AN EXHIBIT 10577, AND THAT WAS THE

02:40PM  17    DELEGATION DOCUMENT, DELEGATION OF AUTHORITY DOCUMENT THAT YOU

02:40PM  18    AND I WERE JUST GOING OVER.

02:40PM  19        DO YOU REMEMBER THAT?

02:40PM  20    A.   YES.

02:40PM  21    Q.   OKAY.  AND THAT DOCUMENT SETS OUT THE DELEGATIONS THAT WE

02:40PM  22    JUST WENT THROUGH IN DETAIL.

02:40PM  23        BUT YOU HAD BEEN DELEGATING YOUR AUTHORITY AS LAB DIRECTOR

02:40PM  24    SINCE YOU STARTED AT THERANOS AND YOU WERE ON THE CLIA

02:40PM  25    CERTIFICATE; IS THAT RIGHT?

02:40PM 1    A.   YES.

02:40PM 2    Q.   OKAY.  AND YOU WERE DELEGATING TO THE INDIVIDUALS THAT

02:40PM 3    WERE LISTED IN THAT DOCUMENT 10577 THAT WE JUST LOOKED AT?

02:40PM 4    A.   YES.

02:40PM 5    Q.   OKAY.  NOW WE'RE GOING TO GO FORWARD TO THE SUMMER OF

02:41PM 6    2015.

02:41PM 7         AND THIS IS WHEN LANGLY GEE, WHO WAS HEAD OF QUALITY

02:41PM 8    CONTROL -- DO YOU REMEMBER THAT?

02:41PM 9    A.   YES.

02:41PM 10   Q.   AND HE REACHED OUT TO YOU AND SAID, DHAWAN, WE NEED YOU TO

02:41PM 11   SIGN A FAIR NUMBER OF DOCUMENTS, AND YOU SUGGESTED, SEND THEM

02:41PM 12   TO ME 50 AT A TIME.

02:41PM 13        DO YOU REMEMBER THAT?

02:41PM 14   A.   YES.

02:41PM 15   Q.   OKAY.  AND THERE WAS NO LEGAL REQUIREMENT THAT YOU WERE

02:41PM 16   AWARE THAT HE SEND YOU ALL OF THESE DOCUMENTS TO SIGN IN

02:41PM 17   ADVANCE OF THE CMS AUDIT; CORRECT?

02:41PM 18            MR. SCHENK:  OBJECTION.  RELEVANCE, AND CALLS FOR A

02:41PM 19   LEGAL CONCLUSION.

02:41PM 20            THE COURT:  SUSTAINED AS TO A CONCLUSION.

02:41PM 21   BY MS. WALSH:

02:42PM 22   Q.   OKAY.  DR. DHAWAN, ARE YOU AWARE OF ANY REGULATION

02:42PM 23   REQUIRING YOU TO SIGN ALL OF THE DOCUMENTS THAT YOU DID?

02:42PM 24            MR. SCHENK:  YOUR HONOR, SAME OBJECTION.

02:42PM 25            THE COURT:  AS TO THE FORM OF THE QUESTION.

02:42PM   1          DO YOU WANT TO ASK HIM AS TO HIS JOB DESCRIPTION OR SOME

02:42PM   2     OTHER WAY?

02:42PM   3              MS. WALSH:  OKAY.

02:42PM   4     Q.   SO WE'LL LOOK AT SOME OF THESE DOCUMENTS IN A MINUTE, BUT

02:42PM   5     YOU RECEIVED A FAIRLY LARGE NUMBER OF DOCUMENTS; RIGHT?

02:42PM   6     A.   YES.

02:42PM   7     Q.   AND THIS WAS IN ADVANCE OF THE CMS AUDIT; CORRECT?

02:42PM   8     A.   YES.

02:42PM   9     Q.   AND YOU WERE ASKED TO REVIEW THOSE DOCUMENTS; RIGHT?

02:42PM  10     A.   YES.

02:42PM  11     Q.   OTHERS HAD SIGNED THE DOCUMENTS BEFORE YOU DID; CORRECT?

02:42PM  12     A.   YES.

02:42PM  13     Q.   AND AT THE TIME THAT THE DOCUMENTS WERE WRITTEN, YOU WERE

02:42PM  14     NOT THE LAB DIRECTOR AT THERANOS; RIGHT?

02:42PM  15     A.   YES.

02:42PM  16     Q.   AND MANY OF THEM WERE SIGNED BY THE LAB DIRECTOR WHO WAS

02:42PM  17     THERE AT THE TIME; RIGHT?

02:42PM  18     A.   YES.

02:42PM  19     Q.   AND THAT WAS ADAM ROSENDORFF; RIGHT?

02:42PM  20     A.   YES.

02:42PM  21     Q.   AND YOUR SIGNING THESE DOCUMENTS WAS NOT REQUIRED UNDER

02:43PM  22     YOUR DUTIES AS A LAB DIRECTOR; IS THAT RIGHT?

02:43PM  23              MR. SCHENK:  SAME OBJECTION.

02:43PM  24              THE COURT:  SUSTAINED.

02:43PM  25     BY MS. WALSH:

02:43PM  1    Q.   OKAY.  IN ANY EVENT, DR. DHAWAN, DR. ROSENDORFF HAD

02:43PM  2    ALREADY APPROVED MANY OF THE DOCUMENTATION THAT YOU HAD

02:43PM  3    REVIEWED; IS THAT RIGHT?

02:43PM  4    A.   YES.

02:43PM  5    Q.   AND HE WAS A LAB DIRECTOR THAT WORKED FULL TIME AT

02:43PM  6    THERANOS; RIGHT?

02:43PM  7    A.   YES.

02:43PM  8    Q.   AND WHEN YOU REVIEWED AND SIGNED OFF ON THOSE DOCUMENTS

02:43PM  9    BASED ON THE WORK THAT HE HAD DONE, THAT GAVE YOU SOME COMFORT

02:43PM  10   IN PLACING YOUR SIGNATURE ON THOSE DOCUMENTS; CORRECT?

02:43PM  11   A.   IF THEY WERE SIGNED PREVIOUSLY BY MULTIPLE PEOPLE, YES,

02:44PM  12   YOU'RE MORE CONFIDENT.  YES.

02:44PM  13   Q.   BECAUSE YOU'RE RELYING ON THE WORK THAT THEY HAD DONE;

02:44PM  14   RIGHT?

02:44PM  15   A.   YES.

02:44PM  16   Q.   AND THOSE PEOPLE -- AND WE CAN LOOK AT THE DOCUMENTS, BUT

02:44PM  17   YOUR RECOLLECTION IS THAT THOSE PEOPLE WERE SCIENTISTS; RIGHT?

02:44PM  18   A.   YES.

02:44PM  19   Q.   AND ONE OF THEM WAS DR. ADAM ROSENDORFF; CORRECT?

02:44PM  20   A.   YES.

02:44PM  21   Q.   WHO WAS A MEDICAL DOCTOR; RIGHT?

02:44PM  22   A.   YES.

02:44PM  23   Q.   AND HE WAS THE FULL-TIME LAB DIRECTOR AT THERANOS;

02:44PM  24   CORRECT?

02:44PM  25   A.   YES.

02:44PM  1    Q.   OKAY.  SO LET'S LOOK AT A COUPLE OF THE ONES THAT YOU DID

02:44PM  2    SIGN DURING THAT SUMMER OF 2015.

02:44PM  3         TAKE A LOOK IN YOUR BINDER AT 9387.

02:44PM  4         AND 9387 IS IN EVIDENCE, YOUR HONOR.  IF WE COULD PUBLISH

02:45PM  5    IT?

02:45PM  6              THE COURT:  YES.

02:45PM  7              MS. WALSH:  THANK YOU.

02:45PM  8    Q.   DO YOU SEE THAT, DR. DHAWAN?

02:45PM  9    A.   YES.

02:45PM  10   Q.   AND THIS IS A VALIDATION REPORT FOR THE TPSA ELISA ASSAY

02:45PM  11   ON THE EDISON 3.X THERANOS SYSTEM; RIGHT?

02:45PM  12   A.   YES.

02:45PM  13   Q.   AND THAT REFERRED TO THERANOS TECHNOLOGY; RIGHT?

02:45PM  14   A.   YES.

02:45PM  15   Q.   AND THE VALIDATION REPORT WAS SIGNED BY MICHELLE JOHNSON;

02:45PM  16   RIGHT?

02:45PM  17   A.   YES.

02:45PM  18   Q.   SHE WAS AN IMMUNOASSAY RESEARCH ASSOCIATE ACCORDING TO THE

02:45PM  19   DOCUMENT?

02:45PM  20   A.   YES.

02:45PM  21   Q.   AND SHARADA SIVARAMAN, PH.D.

02:45PM  22        DO YOU SEE THAT?

02:45PM  23   A.   YES.

02:45PM  24   Q.   IMMUNOASSAY TEAM LEADER; RIGHT?

02:45PM  25   A.   YES.

02:45PM   1    Q.   AND DR. DANIEL YOUNG, WE'VE TALKED ABOUT HIM; RIGHT?

02:45PM   2    A.   YES.

02:45PM   3    Q.   AND DR. ADAM ROSENDORFF, WHO APPROVED -- WHO APPROVED THE

02:45PM   4    VALIDATION REPORT ON SEPTEMBER 30TH, 2013; CORRECT?

02:45PM   5    A.   YES.

02:45PM   6    Q.   AND THEN YOU PLACED YOUR SIGNATURE AFTER DR. ROSENDORFF'S

02:45PM   7    ON SEPTEMBER 19TH, 2015; CORRECT?

02:45PM   8    A.   YES.

02:46PM   9    Q.   OKAY.  LET'S TURN TO 9941, DR. DHAWAN, IN YOUR BINDER.

02:46PM   10   A.   YES.

02:46PM   11   Q.   DO YOU SEE THAT YOU SIGNED THIS REPORT AS WELL?

02:46PM   12   A.   YES.

02:46PM   13   Q.   AND YOU SIGNED IT ON SEPTEMBER 19TH, 2015?

02:46PM   14   A.   YES.

02:46PM   15   Q.   AND THIS WAS AN SOP; CORRECT?

02:46PM   16   A.   YES.

02:46PM   17   Q.   AND WE'VE TALKED ABOUT SOP'S BEFORE IN THE LAB; RIGHT?

02:46PM   18   A.   YES.

02:46PM   19   Q.   AND THIS DIDN'T DIFFER FROM THE OTHERS THAT YOU SIGNED IN

02:46PM   20   FORM; RIGHT?

02:46PM   21   A.   NO.

02:46PM   22          MS. WALSH:  YOUR HONOR, WE OFFER 9941.

02:46PM   23          MR. SCHENK:  NO OBJECTION.

02:46PM   24          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:46PM   25          (DEFENDANT'S EXHIBIT 9941 WAS RECEIVED IN EVIDENCE.)

02:46PM 1    BY MS. WALSH:

02:46PM 2    Q.   OKAY.  SO LOOKING AT THE FIRST PAGE, THIS SOP WAS FOR

02:46PM 3    PROFICIENCY TESTING FOR THERANOS LAB-DEVELOPED TESTS

02:47PM 4    (IMMUNOASSAYS).

02:47PM 5         DO YOU SEE THAT?

02:47PM 6    A.   YES.

02:47PM 7    Q.   AND AGAIN, LAB-DEVELOPED TESTS WERE TESTS THAT THERANOS

02:47PM 8    DEVELOPED IN HOUSE; RIGHT?

02:47PM 9    A.   YES.

02:47PM 10   Q.   AND SO THIS WAS THE PROFICIENCY TESTING FOR THOSE ASSAYS;

02:47PM 11   RIGHT?

02:47PM 12   A.   YES.

02:47PM 13   Q.   AND THE AUTHOR WAS DR. SAKSENA, WHO WE HAVE TALKED ABOUT;

02:47PM 14   CORRECT?

02:47PM 15   A.   YES.

02:47PM 16   Q.   AND HE WAS THE DIRECTOR OF ASSAY SYSTEMS.

02:47PM 17        THIS WAS THEN REVIEWED BY DANIEL YOUNG.

02:47PM 18        DO YOU SEE THAT?

02:47PM 19   A.   YES.

02:47PM 20   Q.   AND THEN IT WAS FINALLY SIGNED BY YOU IN SEPTEMBER OF

02:47PM 21   2015.

02:47PM 22        DO YOU SEE THAT?

02:47PM 23   A.   YES.

02:47PM 24   Q.   OKAY.  AND LET'S GO TO PAGE 3 OF THE EXHIBIT.

02:48PM 25        AND THIS STATES THE PURPOSE OF THE SOP, AND IT SAYS, "THE

02:48PM  1        PURPOSE OF THIS PROPOSAL IS TO DEVISE AN ALTERNATIVE ASSESSMENT

02:48PM  2        PROTOCOL (AAP) FOR LABORATORY-DEVELOPED TESTS ON THE EDISON 3.5

02:48PM  3        IMMUNOASSAY INSTRUMENT."

02:48PM  4            DO YOU SEE THAT?

02:48PM  5        A.   YES.

02:48PM  6        Q.   AND THEN IT GIVES A GUIDELINE, "FOR NON-CMS REGULATED

02:48PM  7        TESTS OR THOSE WHICH LACK FDA CLEARANCE, COMMERCIAL OR EXTERNAL

02:48PM  8        PT PROGRAMS MAY NOT BE AVAILABLE FOR CERTAIN ANALYTES."

02:48PM  9            DO YOU SEE THAT?

02:48PM 10        A.   YES.

02:48PM 11        Q.   "IN SUCH INSTANCES, AN AAP WILL BE USED TO ENSURE ACCURACY

02:48PM 12        OF THE ONGOING TEST SYSTEM PERFORMANCE."

02:48PM 13            DO YOU SEE THAT?

02:48PM 14        A.   YES.

02:48PM 15        Q.   AND THEN THE SCOPE SAYS UNDER 2.1, "THE ALTERNATIVE

02:48PM 16        ASSESSMENT PROTOCOL (AAP) APPLIES TO ALL LABORATORY DEVELOPED

02:48PM 17        TESTS ON THE EDISON 3.5 INSTRUMENT AND WILL BE CONDUCTED EVERY

02:49PM 18        SIX MONTHS."

02:49PM 19            RIGHT?

02:49PM 20        A.   YES.

02:49PM 21        Q.   AND THIS WAS -- LET ME ASK IT AGAIN BECAUSE THAT WAS

02:49PM 22        CONFUSING.

02:49PM 23            THIS IS THE ALTERNATIVE ASSESSMENT PROTOCOL THAT YOU

02:49PM 24        SIGNED -- IN THE SOP THAT YOU SIGNED?

02:49PM 25        A.   YES.

02:49PM 1    Q.    OKAY.  LET'S TURN NOW TO PAGE 6 OF THE EXHIBIT, AND THIS

02:49PM 2    IS THE REVISION HISTORY.

02:49PM 3         DO YOU SEE THAT?

02:49PM 4         SECTION 8 IS THE REVISION HISTORY?

02:49PM 5    A.    YES.

02:49PM 6    Q.    OKAY.  AND YOU SEE HOW THERE'S AN EFFECTIVE DATE OF

02:49PM 7    NOVEMBER 26TH, 2013; RIGHT?

02:49PM 8    A.    YES.

02:49PM 9    Q.    AND THE INITIATOR OF THE DOCUMENT WAS ADAM ROSENDORFF.

02:49PM 10        DO YOU SEE THAT?

02:49PM 11   A.    YES.

02:49PM 12   Q.    OKAY.  WE CAN TAKE THAT DOWN.

02:50PM 13        OKAY.  IF YOU COULD, DR. DHAWAN, TURN TO 20467.

02:50PM 14        DO YOU SEE THAT?

02:50PM 15   A.    YES.

02:50PM 16   Q.    AND THIS IS A TEST PLAN FOR A VERIFICATION PLAN FOR THE

02:50PM 17   DREW3.

02:50PM 18        DO YOU SEE THAT?

02:50PM 19   A.    YES.

02:50PM 20   Q.    AND YOU SIGNED THIS DOCUMENT; RIGHT?

02:50PM 21   A.    YES.

02:50PM 22   Q.    AND YOU SIGNED IT ON NOVEMBER 15TH, 2015; RIGHT?

02:50PM 23   A.    YES.

02:50PM 24   Q.    AND THIS IS SIMILAR TO THE OTHER DOCUMENTS THAT YOU SIGNED

02:51PM 25   THAT WERE SENT TO YOU FROM THERANOS; IS THAT CORRECT?

02:51PM  1      A.   YES.

02:51PM  2      Q.   AND THERE ARE OTHER SIGNATURES ABOVE YOURS REVIEWING AND

02:51PM  3      AUTHORING THE DOCUMENT; IS THAT RIGHT?

02:51PM  4      A.   YES.

02:51PM  5              MS. WALSH:  OKAY.  YOUR HONOR, WE OFFER 20467.

02:51PM  6              MR. SCHENK:  NO OBJECTION.

02:51PM  7              THE COURT:  IT IS ADMITTED AND IT MAY BE PUBLISHED.

02:51PM  8      (DEFENDANT'S EXHIBIT 20467 WAS RECEIVED IN EVIDENCE.)

02:51PM  9      BY MS. WALSH:

02:51PM  10     Q.   SO ON THE FIRST PAGE YOU SEE IT'S A TEST PLAN.

02:51PM  11          DO YOU SEE THAT?

02:51PM  12     A.   YES.

02:51PM  13     Q.   AND UNDER THAT, IT SAYS VERIFICATION PLAN FOR DREW3, AN

02:51PM  14     AUTOMATED HEMATOLOGY ANALYZER?

02:51PM  15     A.   YES.

02:51PM  16     Q.   OKAY.  SO LET'S TURN TO PAGE 3 OF THE EXHIBIT.

02:51PM  17     A.   YES.

02:51PM  18     Q.   AND PAGE 3.1.1 SAYS, "THE PURPOSE OF THIS TEST PLAN IS TO

02:51PM  19     DEFINE THE EXPERIMENTS AND SELECTION CRITERIA FOR VERIFICATION

02:51PM  20     OF THE COMPLETE BLOOD COUNT," THAT'S CBC, "WITHIN THE CLIA

02:52PM  21     INFRASTRUCTURE, USING DREW3" -- THAT'S A DEVICE; RIGHT?

02:52PM  22     A.   YEAH.

02:52PM  23     Q.   -- "AN AUTOMATED HEMATOLOGY ANALYZER."

02:52PM  24          DO YOU SEE THAT?

02:52PM  25     A.   YES.

02:52PM  1     Q.   OKAY.  AND THEN IF WE LOOK AT THE SCOPE, 2.1.

02:52PM  2          "THIS PLAN APPLIES TO RUNNING DREW3, AN AUTOMATED

02:52PM  3     HEMATOLOGY ANALYZER FDA 510 CLEARED METHODOLOGY PER CLSI

02:52PM  4     RECOMMENDATION IN THERANOS CLINICAL LABORATORY."

02:52PM  5          DO YOU SEE THAT?

02:52PM  6     A.   YES.

02:52PM  7     Q.   OKAY.  AND THERE'S A LOT OF TECHNICAL INFORMATION IN HERE

02:52PM  8     THAT WE WON'T GO THROUGH, BUT I DO WANT YOU TO TURN TO PAGE 10.

02:52PM  9          ARE YOU ON PAGE 10?

02:52PM  10    A.   YES.

02:52PM  11    Q.   AND AT THE TOP IT SAYS, "VERIFICATION REPORT, VERIFICATION

02:52PM  12    OF DREW3 FOR COMPLETE BLOOD COUNT."

02:52PM  13         DO YOU SEE THAT?

02:52PM  14    A.   YES.

02:52PM  15    Q.   AND THE ORIGINATOR IS A PERSON NAMED POORNIMA KOLHAR.

02:53PM  16         DO YOU SEE THAT?

02:53PM  17    A.   YES.

02:53PM  18    Q.   AND THE DATE THAT THIS ORIGINATED WAS AUGUST 30TH, 2014;

02:53PM  19    CORRECT?

02:53PM  20    A.   YES.

02:53PM  21    Q.   OKAY.  JUST A COUPLE MORE ON THESE.  IF YOU COULD TURN TO

02:53PM  22    9369.

02:53PM  23         DO YOU SEE THAT?

02:53PM  24    A.   YES.

02:53PM  25    Q.   AND THIS IS ANOTHER VALIDATION DOCUMENT; RIGHT?

02:53PM  1    A.   YES.

02:53PM  2    Q.   AND IT'S FOR TSH; RIGHT?

02:53PM  3    A.   YES.

02:53PM  4    Q.   YOU SIGNED THE DOCUMENT?

02:53PM  5    A.   YES.

02:53PM  6    Q.   AND THE DATE IS NOVEMBER 15TH, 2015; IS THAT CORRECT,

02:54PM  7    DR. DHAWAN?

02:54PM  8    A.   YES.

02:54PM  9    Q.   AND YOUR SIGNATURE FOLLOWS A SERIES OF OTHER SIGNATURES BY

02:54PM  10   THERANOS EMPLOYEES; CORRECT?

02:54PM  11   A.   YES.

02:54PM  12            MS. WALSH:  YOUR HONOR, WE OFFER 9369.

02:54PM  13            MR. SCHENK:  NO OBJECTION.

02:54PM  14            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:54PM  15       (DEFENDANT'S EXHIBIT 9369 WAS RECEIVED IN EVIDENCE.)

02:54PM  16   BY MS. WALSH:

02:54PM  17   Q.   OKAY.  AND JUST QUICKLY ON THIS ONE.

02:54PM  18       DR. DHAWAN, ON THE TOP IT INDICATES IT'S A TSH ELISA ASSAY

02:54PM  19   REPORT.

02:54PM  20       DO YOU SEE THAT?

02:54PM  21   A.   YES.

02:54PM  22   Q.   AND IT'S A VALIDATION REPORT ON THE EDISON 3.5 THERANOS

02:54PM  23   SYSTEM; RIGHT?

02:54PM  24   A.   YES.

02:54PM  25   Q.   AND THAT'S ONE OF THE THERANOS DEVICES; CORRECT?

02:54PM  1    A.    YES.

02:54PM  2    Q.    AND THEN IT'S AUTHORED BY MICHELLE JOHNSON; RIGHT?

02:54PM  3    A.    YES.

02:54PM  4    Q.    APPROVED BY DR. SIVARAMAN; CORRECT?

02:54PM  5    A.    YES.

02:54PM  6    Q.    DR. YOUNG; RIGHT?

02:54PM  7    A.    YES.

02:54PM  8    Q.    AND GURBIR SIDHU; CORRECT?

02:54PM  9    A.    YES.

02:54PM  10   Q.    AND, OF COURSE, YOU APPROVED IT AS WELL AS THE LAB

02:55PM  11   DIRECTOR; CORRECT?

02:55PM  12   A.    YES.

02:55PM  13   Q.    OKAY.  AND JUST A COUPLE MORE THINGS I WANT TO POINT OUT.

02:55PM  14         ON PAGE 2 UNDER SUMMARY, IT SAYS -- THE VALIDATION REPORT

02:55PM  15   SAYS, "THERANOS HAS EVALUATED THE USE OF THERANOS SYSTEM 3.5

02:55PM  16   PLATFORM FOR THYROID STIMULATING HORMONE, (TSH).  THE

02:55PM  17   VALIDATION REPORT WAS PREPARED BY MICHELLE JOHNSON ON

02:55PM  18   SEPTEMBER 23RD, 2013."

02:55PM  19         DO YOU SEE THAT?

02:55PM  20   A.    YES.

02:55PM  21   Q.    AND IN THE CHART ON PAGE 2 IT SAYS, "THE ACCURACY WAS

02:55PM  22   DETERMINED BY TESTING 92 UNIQUE PATIENT SAMPLES USING THE

02:55PM  23   EDISON 3.5 METHOD AND THE PREDICATE METHOD," AND THEN IT GOES

02:55PM  24   THROUGH A COMPARISON.

02:55PM  25         DO YOU SEE THAT?

02:55PM  1    A.   YES.

02:55PM  2    Q.   OKAY.  IF YOU COULD TURN TO 9962.

02:56PM  3         DO YOU SEE THAT?

02:56PM  4    A.   YES.

02:56PM  5    Q.   OKAY.  AND IS YOUR SIGNATURE ON 9962?

02:56PM  6    A.   IT'S AT THE BOTTOM, YES.

02:56PM  7    Q.   IT'S AT THE VERY BOTTOM?

02:56PM  8    A.   YES.

02:56PM  9    Q.   OKAY.  NEXT TO SEPTEMBER 19TH, 2015?

02:56PM  10   A.   UH-HUH.

02:56PM  11   Q.   OKAY.  AND YOU'RE SIGNING QUALITY SYSTEMS MANUAL.

02:56PM  12        DO YOU SEE THAT?

02:56PM  13   A.   YES.

02:56PM  14   Q.   AND THAT'S IN CONNECTION WITH THE OPERATION OF A LAB;

02:56PM  15   CORRECT?

02:56PM  16   A.   YES.

02:56PM  17   Q.   AND IT'S AFTER ALL OF THESE OTHER THERANOS EMPLOYEES HAVE

02:56PM  18   SIGNED; RIGHT?

02:56PM  19   A.   YES.

02:56PM  20        MS. WALSH:  OKAY.  YOUR HONOR, WE OFFER 9962.

02:56PM  21        MR. SCHENK:  NO OBJECTION.

02:56PM  22        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:56PM  23        (DEFENDANT'S EXHIBIT 9962 WAS RECEIVED IN EVIDENCE.)

02:56PM  24   BY MS. WALSH:

02:56PM  25   Q.   OKAY.  AND AGAIN, WE'RE SEEING MORE OF THE SAME THING, BUT

02:57PM   1    A SERIES OF SCIENTISTS SIGNED THIS REPORT; CORRECT?

02:57PM   2    A.   YES.

02:57PM   3    Q.   AND THEN YOU SIGNED YOUR NAME AT THE END; RIGHT?

02:57PM   4    A.   YES.

02:57PM   5    Q.   AND YOU WERE RELYING ON THE WORK THAT THEY HAD PREVIOUSLY

02:57PM   6    DONE?

02:57PM   7    A.   YES.

02:57PM   8    Q.   OKAY.  AND IF WE LOOK AT PAGE 35 OF THIS REPORT, YOU SEE

02:57PM   9    ALL OF THAT REVISION HISTORY?

02:57PM   10   A.   YES.

02:57PM   11   Q.   OKAY.  IS IT FAIR TO SAY THAT, BASED ON YOUR EXPERIENCE IN

02:57PM   12   SIGNING THESE REPORTS, THERE WERE MANY REVISIONS OF THE REPORTS

02:57PM   13   BY VARIOUS DIFFERENT PEOPLE; CORRECT?

02:57PM   14   A.   WHATEVER IS LISTED, YES.

02:57PM   15   Q.   YEAH.  AND THESE WERE FULL-TIME THERANOS EMPLOYEES; RIGHT?

02:57PM   16   A.   YES.

02:57PM   17   Q.   AND THE REVISIONS JUST REPRESENT ITERATIONS OF THE REPORT

02:57PM   18   OVER TIME; IS THAT FAIR?

02:57PM   19   A.   YES.

02:57PM   20   Q.   OKAY.  OKAY.  SO, DR. DHAWAN, YOU ALSO TESTIFIED ABOUT

02:58PM   21   YOUR INVOLVEMENT IN THE CMS INSPECTION IN THE FALL OF 2015.

02:58PM   22        DO YOU REMEMBER THAT?

02:58PM   23   A.   YES.

02:58PM   24   Q.   AND THAT TOOK PLACE AT THERANOS; RIGHT?

02:58PM   25   A.   YES.

02:58PM 1   Q.   AND YOU WERE INVOLVED FOR A COUPLE OF HOURS AT THE

02:58PM 2   BEGINNING OF THE INSPECTION; CORRECT?

02:58PM 3   A.   YES.

02:58PM 4   Q.   BUT OTHER SCIENTISTS FROM THERANOS WERE THERE; RIGHT?

02:58PM 5   A.   YES.

02:58PM 6   Q.   MR. BALWANI WAS THERE; CORRECT?

02:58PM 7   A.   YES.

02:58PM 8   Q.   AND THERE WAS DISCUSSION BETWEEN CMS AND THE OTHER

02:58PM 9   SCIENTISTS IN THE ROOM; RIGHT?

02:58PM 10  A.   YES.

02:58PM 11  Q.   OKAY.  AND LET'S TAKE A LOOK AT AN EXHIBIT THAT YOU LOOKED

02:58PM 12  AT ON DIRECT.  IT'S 2760.  AND IF WE CAN TURN TO PAGE 2 OF THE

02:59PM 13  EXHIBIT.

02:59PM 14       THIS IS WHERE MR. BALWANI WAS TELLING YOU, WE HAVE A LAB

02:59PM 15  AUDIT COMING UP ON 9/22?

02:59PM 16  A.   YES.

02:59PM 17  Q.   AND HE SAID HE HAD A VERY CAPABLE TEAM THAT IS TAKING CARE

02:59PM 18  OF ALL OF THE DETAILS; RIGHT?

02:59PM 19  A.   YES.

02:59PM 20  Q.   AND TOWARDS THE BOTTOM OF THAT PARAGRAPH HE SAYS, "WE HAVE

02:59PM 21  HIRED MANY EXPERTS FROM THE INDUSTRY TO MAKE SURE LAB IS

02:59PM 22  FLAWLESS AND AUDIT READY, SO I DON'T ANTICIPATE ANY HICCUPS."

02:59PM 23       DO YOU SEE THAT?

02:59PM 24  A.   YES.

02:59PM 25  Q.   OKAY.  AND DO YOU RECALL THAT IN ADVANCE OF THE CMS AUDIT,

DHAWAN CROSS BY MS. WALSH

02:59PM  1    THERANOS HAD BEEN WORKING WITH A CONSULTING FIRM TO PREPARE FOR

02:59PM  2    IT?

02:59PM  3    A.   I DON'T SPECIFICALLY RECALL THAT.  I'D HAVE TO LOOK BACK

03:00PM  4    AT THE RECORDS, BUT I DON'T RECALL THAT.

03:00PM  5    Q.   SURE.  SO WHY DON'T YOU TAKE A LOOK AT THE SMALLER BINDER

03:00PM  6    THAT YOU HAVE.

03:00PM  7         AND IF YOU WOULD LOOK AT 28408 AND TURN TO PAGE 3819, AND

03:00PM  8    IF YOU COULD READ LINES 5 THROUGH 10 ON PAGE 3819 TO YOURSELF.

03:01PM  9    A.   YES.

03:01PM  10   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT THERANOS WAS

03:01PM  11   WORKING WITH A CONSULTING COMPANY?

03:01PM  12   A.   YES.

03:01PM  13   Q.   OKAY.  AND THAT WAS TO PREPARE FOR THE AUDIT; RIGHT?

03:01PM  14   A.   YES.

03:01PM  15   Q.   AND TO MAKE SURE EVERYTHING WAS IN PLACE FOR THE AUDITORS;

03:01PM  16   CORRECT?

03:01PM  17   A.   YES.

03:01PM  18   Q.   OKAY.

03:01PM  19        THE COURT:  DID YOU ANSWER THAT QUESTION?

03:01PM  20        THE WITNESS:  YES.

03:01PM  21   BY MS. WALSH:

03:01PM  22   Q.   AND YOU YOURSELF HAD BEEN THROUGH THESE AUDITS BEFORE;

03:01PM  23   RIGHT?

03:01PM  24   A.   YES.

03:01PM  25   Q.   AT YOUR OWN LAB?

03:01PM   1    A.   YES.

03:01PM   2    Q.   AND SO IN THE MONTHS LEADING UP TO THIS AUDIT, YOU MADE

03:01PM   3    SOME TRIPS TO THERANOS; RIGHT?

03:01PM   4    A.   YES.

03:01PM   5    Q.   AND THE -- WHEN YOU ARRIVED AT THERANOS, THE SCIENTISTS

03:01PM   6    SHOWED YOU -- DID A WALKTHROUGH WITH YOU OF THE LAB; CORRECT?

03:01PM   7    A.   YES.

03:01PM   8    Q.   AND MR. BALWANI WAS THERE; RIGHT?

03:01PM   9    A.   YES.

03:01PM  10    Q.   BUT OTHER SCIENTISTS WERE THERE?

03:01PM  11    A.   YES.

03:01PM  12    Q.   AND YOU FOUND THE WALKTHROUGH HELPFUL; RIGHT?

03:01PM  13    A.   INFORMATIVE, YES.

03:02PM  14    Q.   AND YOU ALSO TESTIFIED ABOUT A PRESENTATION THAT WAS SHOWN

03:02PM  15    DURING THE CMS AUDIT.

03:02PM  16         DO YOU REMEMBER THAT?

03:02PM  17    A.   I DON'T RECALL THE EXACT PRESENTATION.  I WAS THERE, BUT

03:02PM  18    I'M NOT SURE WHETHER THERE WAS A SLIDE SHOW ON NOT, BUT THERE

03:02PM  19    WAS SOME PRESENTATION MADE, YES.

03:02PM  20    Q.   OKAY.  SO LET'S TAKE A LOOK AT THE PRESENTATION, WHICH IS

03:02PM  21    IN EVIDENCE, 4528.

03:02PM  22         WE LOOKED AT THIS BEFORE.

03:02PM  23         BUT I WANT TO DRAW YOUR ATTENTION TO PAGE 2.

03:03PM  24         AND DO YOU SEE THAT MAP THERE?

03:03PM  25    A.   YES.

DHAWAN CROSS BY MS. WALSH

03:03PM  1    Q.   OKAY.  AND THAT MAP -- WELL, WHAT IT SAYS, THE SLIDE

03:03PM  2    SAYS -- AND THIS WAS PRESENTED TO CMS; RIGHT?

03:03PM  3    A.   YES.

03:03PM  4    Q.   OKAY.  WHAT THE SLIDE SAYS IS, "COLLECTION SITES.

03:03PM  5         "THERANOS'S PATIENT SERVICE CENTERS ARE CURRENTLY LOCATED

03:03PM  6    IN CALIFORNIA, ARIZONA, AND PENNSYLVANIA."

03:03PM  7         RIGHT?

03:03PM  8    A.   YES.

03:03PM  9    Q.   AND THE MAP INDICATES THAT THERE'S ONE PATIENT SERVICE

03:03PM  10   CENTER IN CALIFORNIA; RIGHT?

03:03PM  11   A.   YES.

03:03PM  12   Q.   AND 42 PATIENT SERVICE CENTERS IN ARIZONA; RIGHT?

03:03PM  13   A.   YES.

03:03PM  14   Q.   AND YOU KNEW THAT THERANOS OPENED A LAB IN ARIZONA TO

03:03PM  15   SERVICE THOSE PATIENT SERVICE CENTERS; CORRECT?

03:03PM  16   A.   YES.

03:03PM  17   Q.   AND DR. YOUNG WAS THE LAB DIRECTOR OF THAT LAB; RIGHT?

03:03PM  18   A.   YES.

03:03PM  19   Q.   OKAY.  AND DURING THE COURSE OF THE CMS AUDIT, THE PART

03:04PM  20   THAT YOU WERE THERE FOR --

03:04PM  21   A.   YES.

03:04PM  22   Q.   -- ONE OF THE REGULATORS MADE COMMENTS ABOUT HOW CMS WAS

03:04PM  23   UNDER PRESSURE TO INSPECT THERANOS BECAUSE REPORTERS WERE

03:04PM  24   MAKING INQUIRIES.

03:04PM  25        DO YOU REMEMBER THAT?

DHAWAN CROSS BY MS. WALSH

03:04PM   1           MR. SCHENK:  OBJECTION.  HEARSAY.

03:04PM   2           THE COURT:  SUSTAINED.

03:04PM   3    BY MS. WALSH:

03:04PM   4    Q.   OKAY.  LET ME TURN TO ANOTHER TOPIC THEN.

03:04PM   5         OKAY.  SO YOU TESTIFIED ON DIRECT, DR. DHAWAN, TO -- ABOUT

03:05PM   6    AN EXHIBIT THAT THE GOVERNMENT SHOWED YOU THAT HAD SOME

03:05PM   7    COMPLAINTS, SOME PATIENT COMPLAINTS, AND A BIG SPREADSHEET.

03:05PM   8         DO YOU REMEMBER SEEING THAT?

03:05PM   9    A.   YES.

03:05PM   10   Q.   AND THE GOVERNMENT POINTED OUT THREE DIFFERENT COMPLAINTS

03:05PM   11   IN THAT SPREADSHEET.

03:05PM   12        DO YOU REMEMBER THAT?

03:05PM   13   A.   YES.

03:05PM   14   Q.   OKAY.  AND YOU DIDN'T SEE IN THAT SPREADSHEET WHETHER

03:05PM   15   THERE WAS ANY INVESTIGATION OF THOSE COMPLAINTS, DID YOU?

03:05PM   16   A.   I DON'T RECALL SEEING THAT IN THERE, NO, I DON'T.

03:05PM   17   Q.   OKAY.  THERE WASN'T A SUMMARY OF THE QC DATA THAT WAS

03:05PM   18   REFERRED TO IN THAT SPREADSHEET; RIGHT?

03:05PM   19   A.   I DON'T RECALL -- I DIDN'T SEE THAT, NO.

03:05PM   20   Q.   OKAY.  AND THERE WASN'T INVESTIGATIVE STEPS THAT WERE LAID

03:05PM   21   OUT IN THAT SPREADSHEET; RIGHT?

03:05PM   22   A.   YEAH, NO, I DIDN'T SEE THAT.

03:05PM   23   Q.   IT WAS JUST THE COMPLAINTS THEMSELVES; CORRECT?

03:05PM   24   A.   YES.

03:05PM   25   Q.   AND THERE WAS ALSO NO INDICATION ONE WAY OR ANOTHER

03:06PM  1    WHETHER THE COMPLAINTS HAD BEEN RESOLVED; RIGHT?

03:06PM  2    A.   I DIDN'T SEE ANY RESOLUTION IN THAT DOCUMENT, NO.

03:06PM  3    Q.   OKAY.  AND THE DOCUMENT DIDN'T CONTAIN ANY DATA FROM THE

03:06PM  4    SYSTEMS WITHIN THERANOS; RIGHT?

03:06PM  5    A.   I DON'T RECALL.  NO, IT DIDN'T SEEM TO SHOW ANYTHING OTHER

03:06PM  6    THAN THE COMPLAINT.

03:06PM  7    Q.   OKAY.

03:06PM  8         MS. WALSH:  MAY I HAVE A MOMENT, YOUR HONOR?

03:06PM  9         THE COURT:  YES.

03:06PM  10   (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

03:07PM  11   BY MS. WALSH:

03:07PM  12   Q.   OKAY.  DR. DHAWAN, JUST ONE MORE QUESTION ABOUT THAT CMS

03:07PM  13   AUDIT WHERE YOU WERE PRESENT.

03:07PM  14        WAS THERE DISCUSSION ABOUT CMS BEING UNDER PRESSURE IN THE

03:07PM  15   ROOM?

03:07PM  16        MR. SCHENK:  YOUR HONOR, SAME OBJECTION.

03:07PM  17        THE COURT:  SUSTAINED.

03:07PM  18        MS. WALSH:  YOUR HONOR, THESE ARE STATEMENTS BY A

03:07PM  19   PARTY OPPONENT.  THIS IS THE GOVERNMENT MAKING THOSE

03:07PM  20   STATEMENTS, SO --

03:07PM  21        THE COURT:  SUSTAINED.

03:07PM  22        MS. WALSH:  OKAY.  I HAVE NOTHING FURTHER,

03:07PM  23   YOUR HONOR.

03:08PM  24        THE COURT:  REDIRECT?

03:08PM  25   ///

03:08PM    1                    **REDIRECT EXAMINATION**

03:08PM    2    BY MR. SCHENK:

03:08PM    3    Q.   GOOD AFTERNOON, DR. DHAWAN.

03:08PM    4    A.   GOOD AFTERNOON.

03:08PM    5    Q.   I'D LIKE TO FOLLOW UP ON A FEW TOPICS THAT YOU DISCUSSED

03:08PM    6    WITH MS. WALSH, AND THE FIRST IS TO GET SOME GENERAL

03:08PM    7    CLARIFICATION REGARDING INSTANCES WHEN YOU WERE ANSWERING HER

03:08PM    8    QUESTIONS, BUT MAKING ASSUMPTIONS.

03:08PM    9         AND BY THAT I MEAN, FOR INSTANCE, MS. WALSH ASKED YOU IF

03:08PM   10    CERTAIN EMPLOYEES WERE FULL TIME, LIKE I THINK ONE OF THE

03:08PM   11    EXAMPLES WAS ADAM ROSENDORFF, AND I THINK YOU TESTIFIED THAT HE

03:08PM   12    WAS.

03:08PM   13         HOW DO YOU KNOW THAT?

03:08PM   14    A.   I ASSUME, WHEN I WAS TOLD THAT HE WAS A FULL-TIME

03:08PM   15    EMPLOYEE, THAT MEANT HE WAS A FULL-TIME EMPLOYEE.  BUT I

03:08PM   16    WASN'T -- I DIDN'T SEE HIS EMPLOYMENT RECORDS, SO --

03:08PM   17    Q.   AND HAVE YOU MEANT DR. ROSENDORFF?

03:08PM   18    A.   NO, I HAVE NOT.

03:08PM   19    Q.   THERE WERE INSTANCES WHEN MS. WALSH SAID YOU SIGNED

03:08PM   20    VALIDATION REPORTS AND YOUR SIGNATURE WAS THE LAST SIGNATURE,

03:09PM   21    SO YOU WERE RELYING ON THE WORK OF THE INDIVIDUALS WHO HAD

03:09PM   22    SIGNED IT BEFORE YOU.

03:09PM   23         DO YOU RECALL THOSE QUESTIONS?

03:09PM   24    A.   YES.

03:09PM   25    Q.   OKAY.  AND I THINK SHE TALKED TO YOU ABOUT SOME OF THEIR

DHAWAN REDIRECT BY MR. SCHENK

03:09PM  1    EDUCATIONAL BACKGROUND, SOME WERE PH.D.'S.

03:09PM  2        DO YOU RECALL THAT?

03:09PM  3    A.   YES.

03:09PM  4    Q.   AND WHEN YOU SAY YOU WERE RELYING ON THEIR WORK, WERE YOU

03:09PM  5    MAKING AN ASSUMPTION THAT THEY HAD DONE GOOD QUALITY WORK?

03:09PM  6    A.   YES, BECAUSE THEY HAD SIGNED THE DOCUMENTS.

03:09PM  7    Q.   BUT HAD YOU EVER SPOKEN TO THEM ABOUT THE UNDERLYING

03:09PM  8    SUBSTANCE OF THE WORK THAT THEY DID OR THE DOCUMENT THAT YOU

03:09PM  9    WERE SIGNING?

03:09PM 10    A.   I HAD NO WAY TO ANSWER THAT QUESTION.

03:09PM 11            THE COURT:  DOCTOR, COULD YOU BRING THAT MICROPHONE

03:09PM 12    DOWN?

03:09PM 13            THE WITNESS:  SORRY.

03:09PM 14            THE COURT:  MAYBE BEND IT DOWN.  I WISH THEY WERE

03:09PM 15    PARABOLIC.

03:09PM 16            THE WITNESS:  NO, THAT'S OKAY.

03:09PM 17        I DIDN'T HAVE AN OPPORTUNITY TO ASK THEM THOSE QUESTIONS.

03:09PM 18    BY MR. SCHENK:

03:09PM 19    Q.   YOU SAID THAT YOU HAD DELEGATED SOME RESPONSIBILITIES TO

03:10PM 20    THE TECHNICAL SUPERVISOR AND OTHER INDIVIDUALS.

03:10PM 21        DO YOU RECALL THAT LINE OF QUESTIONING?

03:10PM 22    A.   YES.

03:10PM 23    Q.   AND I'M WONDERING IF YOU MADE AN ASSUMPTION THAT SOMEONE

03:10PM 24    WOULD LET YOU KNOW IF THERE WERE PROBLEMS, IF THERE WERE

03:10PM 25    QUALITY PROBLEMS, OR ACCURACY PROBLEMS.

03:10PM 1          WHEN YOU WERE LAB DIRECTOR AT THERANOS, DID YOU ASSUME

03:10PM 2     THAT SOMEONE WOULD LET YOU KNOW IF THERE WERE SUCH PROBLEMS?

03:10PM 3     A.   YES, THAT'S GENERALLY THEIR JOB.

03:10PM 4     Q.   AND WHO WAS YOUR POINT OF CONTACT AT THERANOS?

03:10PM 5     A.   SUNNY.  MR. BALWANI, I'M SORRY.

03:10PM 6     Q.   AND NOW I'D LIKE TO GO THROUGH A FEW OF THE DOCUMENTS THAT

03:10PM 7     YOU TALKED TO MS. WALSH ABOUT.

03:10PM 8          CAN WE START WITH 20064.  THAT WAS ADMITTED.

03:10PM 9               THE COURT:  OH, WE NEED TO TURN THE MONITORS BACK ON

03:10PM 10    I THINK.

03:10PM 11              THE WITNESS:  YES.

03:10PM 12              THE COURT:  THERE WE GO.

03:10PM 13    BY MR. SCHENK:

03:10PM 14    Q.   DOCTOR, DO YOU RECALL DISCUSSING THIS EMAIL WITH

03:11PM 15    MS. WALSH?

03:11PM 16    A.   YES.

03:11PM 17    Q.   AND THERE'S AN EMAIL AT THE BOTTOM FROM DR. SAKSENA TO YOU

03:11PM 18    ASKING IF YOU'LL WRITE A LETTER, OR SIGN A LETTER.

03:11PM 19         DO YOU RECALL THAT?

03:11PM 20    A.   YES.

03:11PM 21    Q.   AND WHAT'S THE DATE OF THIS REQUEST FROM DR. SAKSENA?

03:11PM 22    A.   10-7-2015.

03:11PM 23    Q.   I'M SORRY, THE --

03:11PM 24    A.   10-7-2015 -- OH, AT THE BOTTOM IT IS 10-6.  10-6.

03:11PM 25    Q.   SO THE EMAIL WAS WRITTEN TO YOU ON OCTOBER 6, 2015?

03:11PM 1     A.   YES.

03:11PM 2     Q.   WOULD YOU NOW TURN TO 20067?

03:11PM 3     A.   YES.

03:11PM 4     Q.   IS THIS THE LETTER THAT YOU WROTE?

03:11PM 5     A.   YES.

03:11PM 6     Q.   WHAT IS THE DATE?

03:11PM 7     A.   OCTOBER 6TH, 2015.

03:11PM 8     Q.   IS THAT THE SAME DATE THAT DR. SAKSENA MADE THE REQUEST?

03:11PM 9     A.   YES.

03:11PM 10    Q.   DID, IN FACT, SOMEONE GIVE YOU THIS LETTER AND ASK YOU TO

03:11PM 11    SIGN IT?

03:11PM 12    A.   YES, THAT'S USUALLY THE WAY THIS IS DONE.

03:11PM 13    Q.   SO THIS WAS LIKE THE BIG STACK OF VALIDATION REPORTS, YOU

03:11PM 14    WERE GIVEN THEM AND ASKED TO SIGN?

03:12PM 15    A.   YES, SOMEBODY CREATES THEM AND YOU REVIEW THEM AND SIGN

03:12PM 16    THEM.

03:12PM 17    Q.   OKAY.  THERE ARE STATEMENTS IN THE CONTENT, IN THE BODY OF

03:12PM 18    THIS LETTER.

03:12PM 19    A.   YES.

03:12PM 20    Q.   WERE YOU ASSUMING THAT THESE WERE ALL TRUE?

03:12PM 21    A.   YES.

03:12PM 22    Q.   THERE IS A -- I THINK THE QUESTIONS THAT MS. WALSH WAS

03:12PM 23    ASKING YOU DURING THIS TIME WERE DID YOU UNDERSTAND THAT THERE

03:12PM 24    WAS SOME HOPE THAT DR. SAKSENA MIGHT BECOME A LAB DIRECTOR.

03:12PM 25         IS THAT RIGHT?  DO YOU REMEMBER THAT LINE OF QUESTIONING?

DHAWAN REDIRECT BY MR. SCHENK

```
03:12PM   1      A.   YES.

03:12PM   2      Q.   AND IT TALKS ABOUT IN HERE AN APPLICATION TO BECOME A

03:12PM   3      CLINICAL CHEMIST?

03:12PM   4      A.   YES.

03:12PM   5      Q.   IS THAT RIGHT?

03:12PM   6      A.   YES.

03:12PM   7      Q.   IN FACT, HAD YOU BEEN LAB DIRECTOR AT THERANOS SINCE

03:12PM   8      NOVEMBER OR DECEMBER, DEPENDING ON WHICH DOCUMENT WE LOOK AT --

03:12PM   9      A.   YES.

03:12PM  10      Q.   -- FROM 2014?  IS THAT RIGHT?

03:12PM  11      A.   YES.

03:12PM  12      Q.   SO THIS WORK WITH SIGNING A LETTER ON DR. SAKSENA'S BEHALF

03:12PM  13      WAS, IN FACT, TEN MONTHS AFTER YOU WERE THERE; IS THAT RIGHT?

03:12PM  14      A.   I WAS STILL -- THIS WAS RIGHT AFTER THE CMS AUDIT, SO IT'S

03:13PM  15      AROUND THE SAME TIME.  THE CMS AUDIT WAS ABOUT THAT TIME.

03:13PM  16      Q.   AND YOU WERE EMAILING WITH MR. BALWANI TO BECOME LAB

03:13PM  17      DIRECTOR IN NOVEMBER OF 2014; IS THAT RIGHT?

03:13PM  18      A.   '14, YES.

03:13PM  19      Q.   OKAY.  MS. WALSH SHOWED YOU SOME DOCUMENTS THAT HAD

03:13PM  20      SOMEONE NAMED LYNETTE SAWYER'S SIGNATURE ON THEM?

03:13PM  21      A.   YES.

03:13PM  22      Q.   AND SHE SAID THAT THIS DOCUMENT, AND SHE SAID THAT FOR

03:13PM  23      SEVERAL OF THEM, WAS AT A PERIOD OF TIME WHEN YOU WEREN'T DOING

03:13PM  24      THAT MUCH WORK FOR THERANOS.

03:13PM  25           DO YOU RECALL THAT?
```

03:13PM   1    A.   YES.

03:13PM   2    Q.   AND I THINK ONE WAS IN JANUARY OF 2015, ONE WAS IN MARCH

03:13PM   3    OF 2015.

03:13PM   4         AND MY QUESTION IS, WAS THERE ANY PERIOD WHEN YOU WERE

03:13PM   5    ACTUALLY DOING A LOT OF WORK FOR THERANOS?

03:13PM   6    A.   THERE WAS NEVER A PERIOD WHERE I WAS DOING A SIGNIFICANT

03:13PM   7    AMOUNT OF WORK FOR THE COMPANY.

03:13PM   8    Q.   WHEN YOU SAW ON THESE DOCUMENTS LYNETTE SAWYER'S

03:13PM   9    SIGNATURE --

03:13PM  10    A.   YES.

03:13PM  11    Q.   -- DO YOU KNOW WHAT INFORMATION SHE WAS PROVIDED BEFORE

03:14PM  12    SHE SIGNED THE DOCUMENTS?

03:14PM  13    A.   NO.

03:14PM  14    Q.   DO YOU KNOW IF YOU RECEIVED A CERTAIN KIND OF DOCUMENTS,

03:14PM  15    LIKE LET'S SAY INVOLVING THERANOS LAB DEVELOPED TESTS --

03:14PM  16    A.   RIGHT.

03:14PM  17    Q.   -- BUT SHE RECEIVED A DIFFERENT KIND OF DOCUMENT, LIKE THE

03:14PM  18    CMS DOCUMENT THAT YOU SAW?

03:14PM  19    A.   I WAS NOT MADE AWARE OF ANY OF THAT.

03:14PM  20    Q.   SO YOU DON'T KNOW WHETHER THERANOS GAVE HER ONE TYPE OF

03:14PM  21    DOCUMENT AND YOU A DIFFERENT TYPE?

03:14PM  22    A.   I DON'T KNOW.

03:14PM  23    Q.   OKAY.  AND YOU DON'T KNOW WHETHER SHE WAS GIVEN

03:14PM  24    INFORMATION AT THE TIME THAT SHE WAS ASKED TO SIGN THE

03:14PM  25    DOCUMENTS OR WHAT THAT INFORMATION WAS?

03:14PM  1    A.   I DON'T KNOW.

03:14PM  2    Q.   THERE WAS A DOCUMENT, AND IT WAS 10577 IF YOU WANT TO LOOK

03:14PM  3    IN THE BINDER.  IT WAS THE DELEGATION OF RESPONSIBILITIES

03:14PM  4    DOCUMENT.

03:14PM  5         AND I THINK -- DO YOU RECALL THAT?

03:14PM  6    A.   I'M LOOKING FOR IT.  ONE SECOND, SIR.

03:15PM  7         YES.

03:15PM  8    Q.   AND AM I RIGHT THAT YOU SIGNED THAT ONE IN SEPTEMBER OF

03:15PM  9    2015?

03:15PM  10   A.   YES.

03:15PM  11   Q.   SO YOU HAD BEEN LAB DIRECTOR FOR QUITE SOME TIME BY THEN;

03:15PM  12   IS THAT RIGHT?

03:15PM  13   A.   YES.

03:15PM  14   Q.   AND I THINK MS. WALSH GOT UP AFTER THE BREAK AND ASKED

03:15PM  15   YOU, HAD YOU BEEN DELEGATING SINCE YOU STARTED AT THERANOS.

03:15PM  16        DO YOU REMEMBER THAT QUESTION?

03:15PM  17   A.   YES.

03:15PM  18   Q.   AND HOW DID YOU ANSWER?

03:15PM  19   A.   THE ASSUMPTION IS THAT YOU DELEGATE BECAUSE ALL OF THESE

03:15PM  20   JOBS HAVE TO BE DONE BY THESE VARIOUS PEOPLE, SO IT'S AN

03:15PM  21   ASSUMPTION THAT -- IT'S A NATURAL ASSUMPTION THAT YOU'RE GOING

03:15PM  22   TO DELEGATE.

03:15PM  23   Q.   DR. DHAWAN, YOU READ MY MIND.  I WAS GOING TO ASK YOU IF

03:15PM  24   YOU MADE AN ASSUMPTION.  I WAS GOING TO ASK YOU IF YOU WERE

03:15PM  25   MAKING AN ASSUMPTION THAT YOU HAD, IN FACT, BEEN DELEGATING ALL

03:15PM  1    THAT TIME THAT YOU HAD WORKED THERE?

03:15PM  2    A.   BECAUSE THAT'S USUALLY WHAT YOU DO WHEN YOU'RE A LAB

03:15PM  3    DIRECTOR.

03:15PM  4    Q.   AND THEN JUST A FEW MORE QUESTIONS.

03:16PM  5         MS. WALSH SHOWED YOU SOME VERIFICATION DOCUMENTS, ONE

03:16PM  6    INVOLVING SOMETHING CALLED A DREW3?

03:16PM  7    A.   YES.

03:16PM  8    Q.   DO YOU REMEMBER THAT?

03:16PM  9         DO YOU KNOW WHAT DEVICE THERANOS WAS USING TO RUN OR TO

03:16PM  10   TEST CBC, COMPLETE BLOOD COUNTS?

03:16PM  11   A.   TO VERIFY THE RESULTS?  I'M SORRY, I DIDN'T GET THE LINE

03:16PM  12   OF QUESTIONING.

03:16PM  13   Q.   DO YOU KNOW IF THERANOS WAS DOING CBC TESTS FOR PATIENTS

03:16PM  14   WHILE YOU WORKED THERE?

03:16PM  15   A.   I DON'T RECALL.

03:16PM  16   Q.   DO YOU KNOW WHAT DEVICE THEY WERE USING TO RUN CBC, IF

03:16PM  17   THEY WERE?

03:16PM  18   A.   I DON'T RECALL AT THIS POINT.

03:16PM  19   Q.   HOW ABOUT FOR TSH?

03:16PM  20   A.   I DON'T RECALL.

03:16PM  21   Q.   DO YOU KNOW IF THERANOS WAS RUNNING TSH BLOOD TESTS FOR

03:16PM  22   PATIENTS?

03:16PM  23   A.   I'D HAVE TO LOOK BACK AT THE RECORDS.  I DON'T RECALL.

03:16PM  24   Q.   YOU DON'T HAVE A RECOLLECTION OF IT?

03:16PM  25   A.   NO, I DO NOT.

03:16PM  1    Q.  SO IS THE SAME TRUE THAT YOU DON'T KNOW WHICH DEVICE THEY

03:16PM  2    WERE USING?

03:16PM  3    A.  I DO NOT KNOW.

03:16PM  4    Q.  AND HOW ABOUT WOULD -- WOULD THE SAME ANSWER BE FOR ANY

03:16PM  5    ASSAY?  IF I ASKED YOU ABOUT ANY ASSAY, WOULD YOU SAY YOU DON'T

03:17PM  6    RECALL?

03:17PM  7    A.  I DON'T RECALL BECAUSE I WAS NEVER TOLD THIS INFORMATION.

03:17PM  8    Q.  OKAY.  YOU -- MS. WALSH ASKED YOU ABOUT THE TOUR THAT YOU

03:17PM  9    TOOK, AND I THINK YOU SAID THAT YOU FOUND IT INFORMATIVE.

03:17PM  10   A.  YES.

03:17PM  11   Q.  AND WHAT DID YOU FIND INFORMATIVE ABOUT IT?

03:17PM  12   A.  JUST THE VAST ARRAY OF MACHINES THAT THEY WERE USING.

03:17PM  13   Q.  AND TELL ME MORE ABOUT THAT.  DID THEY TELL YOU, THIS IS

03:17PM  14   THE PARTICULAR MACHINE TO USE FOR THESE TESTS, OR WHAT WERE --

03:17PM  15   A.  THEY WEREN'T SPECIFIC.

03:17PM  16   Q.  SO --

03:17PM  17   A.  THEY JUST HAD A LARGE NUMBER OF MACHINES IN THE NEWARK

03:17PM  18   FACILITY.

03:17PM  19   Q.  HELP ME UNDERSTAND THEN THE USE OF THE WORD "INFORMATIVE."

03:17PM  20       WHAT DID YOU LEARN?

03:17PM  21   A.  I JUST LEARNED THAT THERE WERE A LARGE NUMBER OF MACHINES

03:17PM  22   IN THE FACILITY AND THAT THEY WERE USING SOME SIEMENS MACHINES

03:17PM  23   AND SOME OTHER DEVICES.

03:17PM  24   Q.  I SEE.  SO YOU WERE NOT CONNECTING THEM WITH ANY

03:17PM  25   PARTICULAR BLOOD TEST, YOU JUST SAW THERANOS'S INVENTORY?

03:17PM 1    A.   EXACTLY.

03:17PM 2    Q.   GOT IT.

03:17PM 3         IF WE COULD BRING UP EXHIBIT 4528, AND THEN PAGE 6.

03:18PM 4         YOUR HONOR, THIS HAS BEEN PREVIOUSLY ADMITTED.

03:18PM 5              THE COURT:   YES.

03:18PM 6    BY MR. SCHENK:

03:18PM 7    Q.   I THINK MS. WALSH WAS ASKING YOU IF YOU RECALL THAT

03:18PM 8    THERANOS HAD A LAB IN ARIZONA AND THAT DR. YOUNG WAS THE LAB

03:18PM 9    DIRECTOR IN ARIZONA.

03:18PM 10        DO YOU RECALL THAT LINE OF QUESTIONING?

03:18PM 11   A.   YES.

03:18PM 12   Q.   AND I THINK SHE EVEN SAID THAT THEY OPENED A LAB IN

03:18PM 13   ARIZONA TO SERVICE THE ARIZONA PATIENT SERVICE CENTERS.

03:18PM 14        DO YOU RECALL THAT?

03:18PM 15   A.   YES.

03:18PM 16   Q.   IN FACT, THOUGH, DOES THIS DOCUMENT SHOW YOU THAT SAMPLES

03:18PM 17   THAT WERE TAKEN IN ARIZONA WERE SOMETIMES SHIPPED TO YOUR LAB

03:18PM 18   IN CALIFORNIA?

03:18PM 19   A.   THAT'S WHAT THIS DOCUMENT SAYS, THAT ALL THE HIGH

03:18PM 20   COMPLEXITY SAMPLES WERE SHIPPED OUT.

03:18PM 21   Q.   SO THE LAB THAT DR. YOUNG SUPERVISED IN ARIZONA --

03:18PM 22   A.   YES.

03:18PM 23   Q.   -- DID NOT TEST ALL OF THE SAMPLES THAT WERE TAKEN FROM

03:18PM 24   PATIENTS IN ARIZONA; IS THAT RIGHT?

03:18PM 25   A.   THAT'S WHAT THIS DOCUMENT WOULD SAY, YES.

03:18PM  1    Q.   ALL RIGHT.  THANK YOU.

03:18PM  2         NO FURTHER QUESTIONS, YOUR HONOR.

03:19PM  3              THE COURT:  MS. WALSH?

03:19PM  4              MS. WALSH:  YES.

03:19PM  5                      **RECROSS-EXAMINATION**

03:19PM  6    BY MS. WALSH:

03:19PM  7    Q.   DR. DHAWAN, ON THE SUBJECT OF SURAJ SAKSENA --

03:19PM  8    A.   YES.

03:19PM  9    Q.   -- MR. SCHENK POINTED OUT THAT THE DATE OF THAT

03:19PM  10   RECOMMENDATION LETTER THAT YOU SIGNED -- YOU SIGNED THAT

03:19PM  11   LETTER; RIGHT?

03:19PM  12   A.   YES.  I HAVE TO LOOK AT IT AGAIN, BUT YES.

03:19PM  13   Q.   OKAY.  THAT WAS IN 2015; RIGHT?

03:19PM  14   A.   YES.

03:19PM  15   Q.   OKAY.  AND I'M GOING TO ASK YOU TO TURN IN YOUR BINDER TO

03:19PM  16   20466.

03:19PM  17   A.   YES.

03:19PM  18   Q.   TAKE A LOOK AT THAT EMAIL, WILL YOU?

03:20PM  19   A.   YES.

03:20PM  20   Q.   DOES THAT REFRESH YOUR RECOLLECTION AS TO WHEN DR. SAKSENA

03:20PM  21   WAS SEEKING TO BECOME QUALIFIED TO BECOME A LAB DIRECTOR?

03:20PM  22              MR. SCHENK:  OBJECTION.  IMPROPER REFRESH.  THERE

03:20PM  23   WAS NO STATEMENT ABOUT A LACK OF KNOWLEDGE.

03:20PM  24              THE COURT:  YOU NEED TO LAY A FOUNDATION.

03:20PM  25              MS. WALSH:  OH.  SURE.  SURE.  OKAY.

03:20PM 1    Q.   DR. DHAWAN --

03:20PM 2    A.   YES.

03:20PM 3    Q.   -- DO YOU RECALL WHEN DR. SAKSENA BEGAN HIS PROCESS FOR

03:20PM 4    BECOMING QUALIFIED TO BECOME A LAB DIRECTOR AT A HIGH

03:20PM 5    COMPLEXITY LAB?

03:20PM 6    A.   I WOULD HAVE TO REVIEW THE LETTER TO GET THE DATES AND ALL

03:20PM 7    OF THE INFORMATION THAT WAS ON THE LETTER, BUT, YES.  I'D HAVE

03:20PM 8    TO LOOK AT THE LETTER AGAIN, YOU KNOW, THE LETTER THAT WAS

03:20PM 9    CREATED AND I HAD TO SIGN FOR HIM.

03:20PM 10   Q.   OKAY.  WE CAN DO THAT.

03:20PM 11   A.   I MEAN, IT SAYS HERE 2014 IS WHEN HE STARTED SOME OF THE

03:21PM 12   PROCESS.

03:21PM 13   Q.   OKAY.  IF YOU WANT TO LOOK AT THE LETTER, WE CAN TURN BACK

03:21PM 14   TO THAT.

03:21PM 15   A.   SURE.  WHICH, WHICH ONE WAS THAT?

03:21PM 16   Q.   20064.

03:21PM 17   A.   20064.

03:21PM 18   Q.   AND 20067 IS THE LETTER ITSELF.

03:21PM 19   A.   SO IT'S APPARENTLY SINCE 2014 THAT HE WAS SEEKING TO DO

03:21PM 20   THIS, AND HE HAS THE JOB DESCRIPTION SINCE 2013.

03:21PM 21        SO HE'S HAD EXPERIENCE FOR THREE YEARS FROM 2013.  SO

03:21PM 22   THOSE ARE THE DATES, 2013, 2014, 2015.

03:21PM 23   Q.   OKAY.  DOES THAT REFRESH YOUR RECOLLECTION AS TO WHEN HE

03:21PM 24   BEGAN?

03:21PM 25   A.   YES, SO IT WAS THREE YEARS PRIOR.

DHAWAN RECROSS BY MS. WALSH

03:21PM  1    Q.   AND HE BEGAN IN 2014?

03:22PM  2    A.   UM, LET ME LOOK AT THE LETTER AGAIN.  I APOLOGIZE.

03:22PM  3         (PAUSE IN PROCEEDINGS.)

03:22PM  4              THE WITNESS:  HE BEGAN IN 2014, YES.

03:22PM  5    BY MS. WALSH:

03:22PM  6    Q.   OKAY.  AND THAT WAS TO START THE PROCESS --

03:22PM  7    A.   YES.

03:22PM  8    Q.   -- OF BECOMING QUALIFIED; CORRECT?

03:22PM  9    A.   YES, YES.

03:22PM  10   Q.   OKAY.  AND THEN MR. SCHENK ASKED YOU ABOUT THE STATEMENTS

03:22PM  11   IN THE LETTER THAT YOU WROTE -- THAT YOU SIGNED; RIGHT?

03:22PM  12   A.   YES.

03:22PM  13   Q.   AND YOU SAID YOU ASSUMED ALL OF THE STATEMENTS WERE TRUE;

03:22PM  14   CORRECT?

03:22PM  15   A.   YES.

03:22PM  16   Q.   AND THAT WAS -- YOU THOUGHT THAT WAS A REASONABLE

03:22PM  17   ASSUMPTION; RIGHT?

03:22PM  18   A.   YES.

03:22PM  19   Q.   YOU DIDN'T THINK DR. SAKSENA WAS LYING TO YOU ABOUT HIS

03:22PM  20   QUALIFICATIONS, DID YOU?

03:22PM  21   A.   NO.

03:22PM  22   Q.   OKAY.  AND MR. SCHENK ASKED YOU MORE ABOUT YOUR

03:22PM  23   ASSUMPTIONS, YOUR ASSUMPTION ABOUT DR. ROSENDORFF BEING A

03:22PM  24   FULL-TIME EMPLOYEE.

03:22PM  25         DO YOU REMEMBER THAT?

03:22PM   1       A.   YES.

03:22PM   2       Q.   AND YOU SAID YOU HADN'T LOOKED AT HIS EMPLOYMENT RECORDS;

03:23PM   3   RIGHT?

03:23PM   4       A.   YES.

03:23PM   5       Q.   BUT IT WAS A REASONABLE ASSUMPTION FOR YOU TO BELIEVE HE

03:23PM   6   WAS A FULL-TIME EMPLOYEE, WAS IT NOT?

03:23PM   7       A.   IT'S REASONABLE, YES.

03:23PM   8       Q.   OKAY.  AND THE ASSUMPTION THAT YOU WERE MAKING ABOUT

03:23PM   9   DELEGATING TO EMPLOYEES THAT THEY WOULD BE DOING THEIR JOBS, DO

03:23PM  10   YOU REMEMBER THAT?

03:23PM  11       A.   YES.

03:23PM  12       Q.   AND THAT WAS A REASONABLE ASSUMPTION; RIGHT?

03:23PM  13       A.   YES.

03:23PM  14       Q.   OKAY.  AND MR. SCHENK ALSO ASKED YOU ABOUT THE PEOPLE TO

03:23PM  15   WHOM YOU DELEGATED.  IT WAS THEIR JOB TO RAISE ISSUES TO YOU IF

03:23PM  16   THERE WERE ISSUES?  HE ASKED YOU THAT QUESTION; RIGHT?

03:23PM  17       A.   YES.

03:23PM  18       Q.   DO YOU HAVE ANY REASON TO BELIEVE THAT THEY WEREN'T DOING

03:23PM  19   THEIR JOB IN THAT REGARD?

03:23PM  20       A.   THERE WAS -- I HAD NO EVIDENCE THAT THAT WAS HAPPENING,

03:23PM  21   NO.

03:23PM  22       Q.   OKAY.

03:23PM  23            YOUR HONOR, I HAVE ONE ITEM THAT I WANT TO CONSULT WITH

03:24PM  24   THE GOVERNMENT ON BEFORE I STEP DOWN.

03:24PM  25                 THE COURT:   OF COURSE.

03:24PM 1          (DISCUSSION OFF THE RECORD.)

03:24PM 2              MS. WALSH:  YOUR HONOR, THERE WAS ONE EXHIBIT, 2219,

03:24PM 3      THAT I NOW OFFER INTO EVIDENCE, AND I UNDERSTAND THE GOVERNMENT

03:24PM 4      DOES NOT HAVE ANY OBJECTION.

03:24PM 5              MR. SCHENK:  NO OBJECTION.

03:24PM 6              THE COURT:  ALL RIGHT.  THAT WILL BE ADMITTED AND IT

03:24PM 7      MAY BE PUBLISHED.

03:24PM 8          (GOVERNMENT'S EXHIBIT 2219 WAS RECEIVED IN EVIDENCE.)

03:24PM 9              MS. WALSH:  AND MAY I HAVE ONE MOMENT, YOUR HONOR?

03:24PM 10             THE COURT:  YES.

03:24PM 11         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

03:25PM 12             MS. WALSH:  THANK YOU, YOUR HONOR.  NO FURTHER

03:25PM 13     QUESTIONS.

03:25PM 14             THE COURT:  OH, I'M LOOKING BEHIND YOU.  SORRY.

03:25PM 15         MR. SCHENK.

03:25PM 16             MR. SCHENK:  THANK YOU, YOUR HONOR.

03:25PM 17                     **FURTHER REDIRECT EXAMINATION**

03:25PM 18     BY MR. SCHENK:

03:25PM 19     Q.   DR. DHAWAN, MS. WALSH JUST ASKED YOU IF YOU HAD ANY REASON

03:25PM 20     TO DOUBT THAT INDIVIDUALS IN THE LAB WOULD RAISE ISSUES WITH

03:25PM 21     YOU, WERE WORKING HARD AND DOING THEIR JOB; IS THAT RIGHT?

03:25PM 22         AND I THINK YOU ANSWERED THAT, NO, YOU DIDN'T HAVE ANY

03:25PM 23     REASON TO DOUBT THAT; IS THAT CORRECT?

03:25PM 24     A.   YES.

03:25PM 25     Q.   WERE YOU SAYING THAT BASED ON JUST THE TIME THAT YOU WERE

03:25PM  1     WORKING AT THERANOS AS LAB DIRECTOR?

03:26PM  2     A.   YES.

03:26PM  3     Q.   I JUST WANT A YES OR NO TO THIS QUESTION.

03:26PM  4          AFTER YOU LEFT THERANOS, DOES THAT -- DID THAT CHANGE?  DO

03:26PM  5     YOU NOW HAVE REASONS TO DOUBT?

03:26PM  6               MS. WALSH:  OBJECTION.

03:26PM  7               MR. SCHENK:  YOUR HONOR, THEY --

03:26PM  8               THE COURT:  I THINK IT'S -- I THINK IT'S FAIR GAME

03:26PM  9     NOW.  I DO.

03:26PM  10         SO YOU CAN ANSWER THE QUESTION.

03:26PM  11              THE WITNESS:  CAN YOU REPHRASE?  I'M SORRY, I WANT

03:26PM  12    TO MAKE SURE I GET THE PRECISE QUESTION.

03:26PM  13    BY MR. SCHENK:

03:26PM  14    Q.   YES.  YOU TOLD ME THAT YOU DIDN'T HAVE -- I THINK YOU TOLD

03:26PM  15    MS. WALSH THAT YOU DIDN'T HAVE ANY REASON TO DOUBT THE WORK OF

03:26PM  16    INDIVIDUALS WHO YOU DELEGATED TO, AND I JUST WANTED TO NAIL

03:26PM  17    DOWN THE TIME OF WHEN YOU HELD THAT BELIEF.

03:26PM  18    A.   YES.

03:26PM  19    Q.   IT SOUNDED TO ME LIKE YOU WERE SAYING, WHEN I WORKED AT

03:26PM  20    THERANOS, I DIDN'T HAVE ANY REASON TO DOUBT THAT.

03:26PM  21         AND I'M JUST WONDERING, YES OR NO, DID THAT OPINION CHANGE

03:26PM  22    AFTER YOU LEFT?  SINCE YOU STOPPED BEING LAB DIRECTOR, DO YOU

03:26PM  23    NOW ACTUALLY HAVE REASON TO DOUBT THAT?

03:26PM  24    A.   THE WORK OF THE INDIVIDUALS THAT WERE REPORTING UP, YOU

03:27PM  25    MEAN THE INDIVIDUALS THAT WERE, LIKE, LANGLY GEE AND ALL OF

03:27PM   1    THOSE INDIVIDUALS?

03:27PM   2    Q.   YEAH.   I JUST WANT THE SAME QUESTION THAT MS. WALSH ASKED

03:27PM   3    YOU.   SHE DIDN'T SPECIFY NAMES.

03:27PM   4    A.   THERE'S DOUBT NOW, YEAH.

03:27PM   5    Q.   THANK YOU.

03:27PM   6         NO FURTHER QUESTIONS.

03:27PM   7              MS. WALSH:   NOTHING FURTHER.

03:27PM   8              THE COURT:   ALL RIGHT.   MAY THIS WITNESS BE EXCUSED?

03:27PM   9              MR. SCHENK:   YES, YOUR HONOR.

03:27PM   10             MS. WALSH:   YES, YOUR HONOR.

03:27PM   11             THE COURT:   YOU'RE EXCUSED.   THANK YOU, SIR.

03:27PM   12        DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL TODAY?

03:27PM   13             MR. SCHENK:   NO, YOUR HONOR.

03:27PM   14             THE COURT:   ALL RIGHT.   SHOULD WE THEN TAKE OUR

03:27PM   15   BREAK NOW AND THEN WE'LL RESUME AGAIN FRIDAY MORNING?

03:27PM   16             MR. SCHENK:   YES, YOUR HONOR.

03:27PM   17             THE COURT:   AND THE GOVERNMENT WILL HAVE A WITNESS.

03:27PM   18        ALL RIGHT.   WELL, I PROMISED YOU 4:00 O'CLOCK, AND I'M

03:27PM   19   GOING TO DISAPPOINT YOU ONCE AGAIN.

03:27PM   20        WE'LL TAKE OUR EVENING BREAK NOW, LADIES AND GENTLEMEN.

03:28PM   21   ENJOY YOUR EVENING.

03:28PM   22        WE'LL SEE YOU AGAIN FRIDAY, THIS FRIDAY, PLEASE.

03:28PM   23        AND AGAIN, I REMIND YOU OF THE ADMONISHMENT, PLEASE DON'T

03:28PM   24   DO ANYTHING TO LEARN ANYTHING, DISCUSS, OR READ OR SEE ANYTHING

03:28PM   25   ABOUT THIS CASE DURING THE BREAK.

03:28PM   1          HAVE A GOOD BREAK, AND WE'LL SEE YOU FRIDAY MORNING.

03:28PM   2          THANK YOU.

03:28PM   3          (JURY OUT AT 3:28 P.M.)

03:28PM   4              THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:28PM   5          THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE

03:28PM   6   DAY.  ALL COUNSEL AND MR. BALWANI REMAIN.

03:28PM   7          JUST SCHEDULING FOR FRIDAY, IF I COULD JUST ASK THAT.

03:29PM   8              MR. SCHENK:  YOUR HONOR, I THINK THE GOVERNMENT

03:29PM   9   HOPES TO CALL TWO INVESTORS ON FRIDAY.  WE'LL HAVE THE FIRST

03:29PM  10   AVAILABLE AT 9:00 A.M.

03:29PM  11              THE COURT:  OKAY.

03:29PM  12              MR. SCHENK:  I'M NOT SURE WE'LL GET THROUGH BOTH

03:29PM  13   INVESTORS, BUT I'M NOT SURE THAT ONE WOULD FILL THE DAY, SO

03:29PM  14   WE'LL HAVE A SECOND TO AT LEAST START.

03:29PM  15              THE COURT:  RIGHT.  OKAY.  THAT SOUNDS GOOD.  OKAY.

03:29PM  16          ANYTHING FURTHER BEFORE WE BREAK FOR THE EVENING?

03:29PM  17              MR. SCHENK:  YOUR HONOR, I OBJECTED ON AUTHENTICITY

03:29PM  18   GROUNDS, AND I DON'T WANT TO REVISIT THAT RULING, BUT I HAVE A

03:29PM  19   CONCERN THAT THIS IS GOING TO COME UP AGAIN.

03:29PM  20          AND WE COULD EITHER ADDRESS IT NOW OR WE CAN ADDRESS IT

03:29PM  21   LATER.

03:29PM  22          MY CONCERN IS THAT IT'S A LITTLE BIT TIME CONSUMING TO DO

03:29PM  23   IT WHILE WE HAVE THE JURY HERE, IT MIGHT NOT BE THE BEST USE OF

03:29PM  24   THEIR TIME.  I'M NOT GOING TO PROVIDE MORE DETAIL, BUT MAYBE

03:30PM  25   SOME MORE DIRECTION FROM THE COURT IF THE COURT WOULD

4220

| | |
|---|---|
| 03:30PM | 1 |

APPRECIATE DISCUSSION ON IT OR NOT.

THE COURT:  ARE YOU ASKING THAT WE REVISIT AN

OBJECTION HERE?  OR LOOKING FORWARD IF THERE'S GOING TO BE SOME

AUTHENTICATION ISSUES REGARDING FUTURE EXHIBITS?

MR. SCHENK:  YES, YOUR HONOR.

I'M NOT ASKING THE COURT TO REVISIT A PRIOR RULING.  I

JUST THINK THAT THE SAME CIRCUMSTANCES MAY ARISE IN THE FUTURE,

AND I WONDER IF ADDITIONAL INFORMATION WOULD BE USEFUL FOR THE

COURT IN THE FUTURE.

THE COURT:  SURE.

MR. SCHENK:  BUT NO, NOTHING IN THE PAST.

THE COURT:  OKAY.  THANK YOU FOR THE HEADS UP.

ANYTHING?

MR. COOPERSMITH:  I'M NOT REALLY SURE WHAT THE

OBJECTION IS.  SO IF I HEAR WHAT IT IS, I CAN CERTAINLY ADDRESS

IT WHENEVER THE COURT PREFERS TO DO THAT.

THE COURT:  I THINK IT WAS AUTHENTICITY IS WHAT WE

HEARD.

MR. COOPERSMITH:  THE OBJECTION THAT I HEARD DURING

THIS LAST WITNESS, DR. DHAWAN, WAS --

THE COURT:  I TURNED TO YOU TO SAY, IS THERE

ANYTHING ELSE YOU WANT TO RAISE BEFORE WE BREAK?

MR. COOPERSMITH:  NO, NOTHING ELSE I WANT TO RAISE,

OTHER THAN I'M MYSTIFIED BY THE AUTHENTICATION OBJECTION WHEN

THE WITNESS AUTHENTICATED THE EMAIL ON THE WITNESS STAND.

03:31PM   1          THE COURT:  MR. SCHENK SAID WE'RE NOT GOING BACK TO

03:31PM   2   THAT.

03:31PM   3          MR. COOPERSMITH:  OKAY.

03:31PM   4          THE COURT:  HE'S LIVING WITH MY RULING.

03:31PM   5          MR. COOPERSMITH:  GOOD.

03:31PM   6          THE COURT:  RIGHT.  BUT GOING FORWARD, THERE MIGHT

03:31PM   7   BE SOME OTHER ISSUES REGARDING FUTURE EXHIBITS.

03:31PM   8       RIGHT?

03:31PM   9          MR. SCHENK:  CORRECT.

03:31PM  10          THE COURT:  RIGHT.  SO IF YOU WANT TO TALK ABOUT

03:31PM  11   THOSE NOW, YOU ANTICIPATE THEM, I'M HAPPY TO DO THAT NOW IF YOU

03:31PM  12   WISH, IF YOU THINK THERE ARE GOING TO BE SOME ISSUES ABOUT

03:31PM  13   THEM.

03:31PM  14          MR. SCHENK:  SURE.  AND I'LL BE BRIEF, YOUR HONOR.

03:31PM  15       THE PARTIES REACHED A STIPULATION THAT COVERS EMAILS THAT

03:31PM  16   HAVE CERTAIN BATES NUMBERS.

03:31PM  17       THE DEFENSE HAS INTRODUCED EMAILS THAT HAVE NO BATES

03:31PM  18   NUMBERS, SO THEY'RE NOT COVERED BY THE STIPULATION.

03:31PM  19       IN FACT, BEFORE THIS WITNESS, THE DEFENSE SHARED A COUPLE

03:31PM  20   OF EXHIBITS WITHOUT BATES NUMBERS WITH THE GOVERNMENT, AND I

03:31PM  21   RAISED THIS EXACT OBJECTION AND SAID I HAVE CONCERNS ABOUT

03:31PM  22   THESE THREE EXHIBITS.

03:31PM  23       I WAS THEN TOLD, WE WILL NOT OFFER THOSE THREE.

03:31PM  24       I RESPONDED AND SAID, OKAY, BUT IF THERE ARE ANY OTHERS

03:32PM  25   WITHOUT BATES NUMBERS, I'D LIKE TO KNOW BECAUSE I WANT TO RAISE

4222

03:32PM  1    THAT, AND I DIDN'T RECEIVE A RESPONSE, SO I ASSUMED THAT WAS

03:32PM  2    NOT GOING TO BE AN ISSUE, WHICH IS WHY I NOW BELIEVE THAT WE

03:32PM  3    SHOULD DISCUSS THIS BECAUSE I DON'T KNOW THAT I'M GOING TO GET

03:32PM  4    NOTICE THE NEXT TIME.

03:32PM  5         THE COURT:  SURE.  OKAY.

03:32PM  6         MR. SCHENK:  AND HERE IS REALLY THE ISSUE:

03:32PM  7    AUTHENTICITY OF AN EMAIL I DON'T THINK IS SUFFICIENT IF THE

03:32PM  8    WITNESS JUST SAYS, I RECOGNIZE MY EMAIL ADDRESS ON IT.

03:32PM  9         I THINK THAT IS SUFFICIENT IF AUTHENTICITY IS ESTABLISHED.

03:32PM 10    THEN WE GET TO BUSINESS RECORDS OR OTHER EXCEPTIONS THAT WE

03:32PM 11    HAVE BEEN DOING IN THIS TRIAL.

03:32PM 12         BUT A WITNESS WHO, LIKE DR. DHAWAN, MAY HAVE ABSOLUTELY NO

03:32PM 13    RECOLLECTION OF SENDING OR RECEIVING THAT PARTICULAR EMAIL, I

03:32PM 14    THINK IT IS FAIR TO EXPECT MORE AUTHENTICATION PROVIDED THAN

03:32PM 15    JUST, THAT'S MY EMAIL ADDRESS AND I HAVE NO RECOLLECTION OF

03:32PM 16    SENDING OR RECEIVING THIS EMAIL.

03:32PM 17         I DO THINK THAT THE BAR FOR AUTHENTICITY IS HIGHER THAN

03:33PM 18    THAT, AND WE HAVE A STIPULATION FOR CERTAIN BATES NUMBERS, AND

03:33PM 19    WHEN THERE'S NO BATES NUMBER, WE JUST -- THERE'S NO STIPULATION

03:33PM 20    ON THAT ISSUE.

03:33PM 21         THE COURT:  SURE.  OKAY.

03:33PM 22         MR. COOPERSMITH:  YOUR HONOR, I THINK THAT

03:33PM 23    AUTHENTICATION UNDER THE 900 SERIES OF THE FEDERAL RULES, AS

03:33PM 24    THE COURT KNOWS, CAN BE DONE IN A VARIETY OF WAYS.

03:33PM 25         SOMETIMES THERE'S A STIPULATION.  THERE IS THAT FOR

4223

03:33PM   1       CERTAIN DOCUMENTS.

03:33PM   2            IT ALSO CAN BE DONE BY ATTRIBUTES OF THE DOCUMENT, WHETHER

03:33PM   3       THE WITNESS RECOGNIZES HIS EMAIL SIGNATURE, WHETHER HE

03:33PM   4       RECOGNIZES THE PEOPLE ON THE EMAIL, THE CHARACTER AND NATURE

03:33PM   5       AND THE FORMAT OF THE DOCUMENT.

03:33PM   6            IT GOES ON AND ON.  THERE ARE ALL SORTS OF WAYS THAT

03:33PM   7       AUTHENTICATION CAN BE ACCOMPLISHED.

03:33PM   8            ALL OF THESE WITNESSES, AS THE COURT RULED IN THE MOMENT,

03:33PM   9       WERE ABLE TO ACKNOWLEDGE THAT THIS WAS THEIR EMAIL, AND I THINK

03:33PM  10       THAT IN THAT SITUATION THEY'RE AUTHENTIC.

03:33PM  11            NOW, WHAT I THINK THE GOVERNMENT IS REALLY OBJECTING TO

03:33PM  12       HERE IS NOT THAT.  I THINK THAT THEY SEE THAT THERE ARE SOME

03:34PM  13       DOCUMENTS THAT THE DEFENSE, THROUGH OUR DEFENSE INVESTIGATION,

03:34PM  14       WERE ABLE TO OBTAIN, THAT THEY DON'T HAVE.

03:34PM  15            AND THIS IS, THIS IS CROSS-EXAMINATION.  WE DON'T HAVE AN

03:34PM  16       OBLIGATION TO PROVIDE IT TO THE GOVERNMENT UNDER RULE 16 WHEN

03:34PM  17       THEY'RE USED ON CROSS.

03:34PM  18            AND AS I SAID TO THE COURT BEFORE, IF WE DO HAVE DOCUMENTS

03:34PM  19       WE INTEND TO USE IN OUR CASE, WE WILL PROVIDE THEM TO THE

03:34PM  20       GOVERNMENT WHEN WE KNOW WE INTEND TO DO THAT UNDER THE RULES.

03:34PM  21            BUT THIS IS CROSS-EXAMINATION.

03:34PM  22            AND THE GOVERNMENT HAD YEARS OF OPPORTUNITY TO ISSUE GRAND

03:34PM  23       JURY SUBPOENAS AND WHATEVER THEY WANTED TO DO TO OBTAIN ANY

03:34PM  24       DOCUMENT THAT THEY WANTED, AND IF WE WERE ABLE TO OBTAIN SOME

03:34PM  25       THAT THEY DIDN'T, AND THEY DIDN'T HAVE THEM, YOU KNOW, THAT'S

4224

03:34PM 1      JUST THE WAY THAT TRIAL GOES.

03:34PM 2          I DON'T THINK THIS AUTHENTICATION ARGUMENT IS ANYTHING

03:34PM 3      MORE THAN A FIG LEAF FOR SOME IRRITATION THAT THEY DIDN'T

03:34PM 4      COMPLETE THEIR INVESTIGATION OR GET EVERYTHING THEY THINK THEY

03:34PM 5      SHOULD HAVE GOTTEN.

03:34PM 6          BUT THIS IS NOT AN AUTHENTICATION ISSUE.  THE RULED IN THE

03:35PM 7      MOMENT ON THE AUTHENTICATION, THE WITNESS WAS ABLE TO RECOGNIZE

03:35PM 8      THE EMAIL.  THAT HAS HAPPENED EACH AND EVERY TIME THAT WE HAVE

03:35PM 9      INTRODUCED ONE OF THESE DOCUMENTS THAT MR. SCHENK IS

03:35PM 10     COMPLAINING ABOUT.

03:35PM 11         SO I DON'T KNOW IF THERE WILL BE MORE OF THIS.  I GUESS IT

03:35PM 12     DEPENDS ON WHAT THE GOVERNMENT DOES ON DIRECT WITH ITS

03:35PM 13     WITNESSES AND WHAT CROSS WE MAY HAVE AND WHAT DOCUMENTS ARE

03:35PM 14     CALLED FORTH FOR IMPEACHMENT OR OTHER CROSS-EXAMINATION

03:35PM 15     PURPOSES.

03:35PM 16         AND I THINK THAT'S WHERE WE ARE.

03:35PM 17             THE COURT:  ANYTHING FURTHER?

03:35PM 18             MR. SCHENK:  MR. COOPERSMITH AVOIDED THE ISSUE BY

03:35PM 19     ALLEGING THAT THE GOVERNMENT IS ATTEMPTING TO USE 901 AS A

03:35PM 20     DISCOVERY TOOL.  THAT ISN'T OCCURRING.

03:35PM 21         WHAT WE'RE TRYING TO DO IS HAVE SUFFICIENT INFORMATION SO

03:35PM 22     WE CAN SPEAK INTELLIGENTLY TO THE AUTHENTICITY OF AN EMAIL.

03:35PM 23         THAT'S WHY THE PARTIES ENTER INTO STIPULATIONS, BECAUSE

03:35PM 24     THEY BOTH FEEL THAT THEY UNDERSTAND A CERTAIN SET OF DOCUMENTS

03:35PM 25     IS AUTHENTIC AND IT ISN'T WORTH CHAIN OF CUSTODY OR SOME OTHER

4225

03:35PM  1    ISSUE THAT COMES UP WITH AUTHENTICITY.

03:35PM  2         WE ENTERED INTO STIPULATIONS WITH REGARD TO THE EMAILS OR

03:35PM  3    DOCUMENTS THAT WE WERE FAMILIAR WITH.

03:36PM  4         AND THE FACT THAT THE DEFENSE HAS ADDITIONAL DOCUMENTS IS

03:36PM  5    NOT WHAT IS OF CONCERN TO THE GOVERNMENT.  THE GOVERNMENT'S

03:36PM  6    CONCERN IS AUTHENTICITY.

03:36PM  7         AND IF THEY MEET THAT HURDLE, WE'RE NOT GOING TO OBJECT ON

03:36PM  8    AUTHENTICITY GROUNDS, BUT WE DO HAVE A CONCERN IF THE DOCUMENTS

03:36PM  9    DON'T HAVE THE RELIABILITY THAT THE BATES NUMBER PROVIDES THAT

03:36PM  10   LED TO THE STIPULATION, AND THAT'S WHY I RAISE IT NOW.

03:36PM  11             THE COURT:  OKAY.

03:36PM  12             MR. COOPERSMITH:  YOUR HONOR, TWO QUICK THINGS.

03:36PM  13        IN THE PAST WHEN THE GOVERNMENT HAS COMPLAINED ABOUT THIS

03:36PM  14   VERY ISSUE, AND I THINK IT'S AT LEAST TWO OTHER TIMES AT TRIAL

03:36PM  15   AND BEFORE TRIAL, IT'S ALWAYS BEEN FRAMED AS, YOU KNOW, SOMEHOW

03:36PM  16   WE HAVE AN OBLIGATION TO GIVE IT TO THEM.

03:36PM  17        NOW APPARENTLY THE GOVERNMENT HAS REALIZED THAT'S WRONG,

03:36PM  18   AND NOW THEY'RE MAKING A DIFFERENT OBJECTION.

03:36PM  19        BUT WHAT IT SOUNDS LIKE, EVEN THOUGH MR. SCHENK SAYS HE

03:36PM  20   WASN'T TRYING TO REVISIT THINGS THAT HAVE ALREADY OCCURRED, IT

03:36PM  21   SEEMS TO ME WHAT HE'S ARGUING IS THAT THE AUTHENTICATION THAT

03:36PM  22   WAS ESTABLISHED AND THE COURT RULED ON FOR THIS WITNESS AND

03:36PM  23   OTHERS BEFORE THAT IS SOMEHOW NOT SUFFICIENT.

03:36PM  24        AND I JUST DON'T THINK THAT'S TRUE.  I THINK I AGREE WITH

03:37PM  25   THE COURT IN TERMS OF THE COURT'S RULING ON THESE MATTERS ON

03:37PM 1     AUTHENTICATION AS THESE DOCUMENTS HAVE ARISEN.

03:37PM 2         I'M CONFIDENT THAT THE COURT WILL MAKE SOUND RULINGS GOING

03:37PM 3     FORWARD ON THE SAME ISSUE, AND THAT IF THEY COME FORWARD, WE

03:37PM 4     WILL AUTHENTICATE THEM AS REQUIRED BY THE RULES, AND I'M

03:37PM 5     CERTAIN THEY'RE ENTITLED TO OBJECT IF THEY THINK THERE'S AN

03:37PM 6     OBJECTION.

03:37PM 7             THE COURT:  ANYTHING FURTHER?

03:37PM 8             MR. SCHENK:  NO.

03:37PM 9             THE COURT:  THIS HAS BEEN HELPFUL.  THANK YOU.

03:37PM 10            MR. COOPERSMITH:  YOU'RE WELCOME.

03:37PM 11            THE CLERK:  COURT IS ADJOURNED.

03:37PM 12        (COURT ADJOURNED AT 3:37 P.M.)

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1
2
3                      CERTIFICATE OF REPORTERS
4
5
6
7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE
8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10    HEREBY CERTIFY:
11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13    ABOVE-ENTITLED MATTER.
14
15
16                      _____
                        IRENE RODRIGUEZ, CSR, CRR
17                      CERTIFICATE NUMBER 8076
18
                        _____
19                      LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595
20
21                      DATED:  APRIL 27, 2022
22
23
24
25