1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,        )
6                                    )  CR-18-00258-EJD
                  PLAINTIFF,         )
7                                    )  SAN JOSE, CALIFORNIA
             VS.                     )
8                                    )  APRIL 29, 2022
    RAMESH "SUNNY" BALWANI,          )
9                                    )  VOLUME 24
                  DEFENDANT.         )
10   _____ )  PAGES 4227 - 4480

11

12               TRANSCRIPT OF TRIAL PROCEEDINGS
               BEFORE THE HONORABLE EDWARD J. DAVILA
13                 UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                               KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
           (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTERS:
22                              IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                CERTIFICATE NUMBER 8074
23                              LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1      A P P E A R A N C E S:  (CONT'D)

 2      FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                BY:  MOLLY MCCAFFERTY
 3                                   SHAWN ESTRADA
                                THE ORRICK BUILDING
 4                              405 HOWARD STREET
                                SAN FRANCISCO, CALIFORNIA 94105
 5
                                BY:  JEFFREY COOPERSMITH
 6                                   AARON BRECHER
                                     AMANDA MCDOWELL
 7                              701 FIFTH AVENUE, SUITE 5600
                                SEATTLE, WASHINGTON 98104
 8
                                BY:  STEPHEN CAZARES
 9                              77 SOUTH FIGUEROA STREET, SUITE 3200
                                LOS ANGELES, CALIFORNIA 90017
10
                                BY:  AMY WALSH
11                              51 W 52ND STREET
                                NEW YORK, NEW YORK 10019
12
13      ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                                BY:  MADDI WACHS, PARALEGAL
14                                   SARA SLATTERY, PARALEGAL

15                              ORRICK, HERRINGTON & SUTCLIFFE
                                JENNIFER CYGNOR, PARALEGAL
16
                                PROLUMINA
17                              BY:  COREY ALLEN
                                2200 SIXTH AVENUE, SUITE 425
18                              SEATTLE, WASHINGTON 98121

19                              UNITED STATES POSTAL INSPECTION SERVICE
                                BY:  CHRISTOPHER MCCOLLOW
20
                                FEDERAL BUREAU OF INVESTIGATION
21                              BY:  MARIO C. SCUSSEL

22                              UNITED STATES FOOD & DRUG
                                ADMINISTRATION
23                              BY:  GEORGE SCAVDIS

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**PATRICK MENDENHALL**
DIRECT EXAM BY MR. BOSTIC                P. 4265
CROSS-EXAM BY MR. CAZARES               P. 4320
REDIRECT EXAM BY MR. BOSTIC             P. 4366
RECROSS-EXAM BY MR. CAZARES             P. 4378
FURTHER REDIRECT EXAM BY MR. BOSTIC     P. 4386
FURTHER RECROSS-EXAM BY MR. CAZARES     P. 4387


**JOHN BRYAN TOLBERT**
DIRECT EXAM BY MR. SCHENK               P. 4401
CROSS-EXAM BY MR. CAZARES               P. 4454
REDIRECT EXAM BY MR. SCHENK             P. 4472
RECROSS-EXAM BY MR. CAZARES             P. 4474

INDEX OF EXHIBITS

                         IDENT.        EVIDENCE

GOVERNMENT'S

1102                                    4272
5814                                    4281
5825                                    4283
4059                                    4288
4060                                    4302
5824                                    4304
5823                                    4305
5822                                    4306
5821                                    4309
5820                                    4310
5819                                    4315
3940                                    4413
949                                     4416
4030                                    4420
1346                                    4429
5811, TOP THREE EMAILS, FIRST PAGE      4442
3530, PAGES 1-24 AND 32                 4444
3086                                    4450




DEFENDANT'S

20593                                   4352

1     SAN JOSE, CALIFORNIA                    APRIL 29, 2022

08:33AM   2                     P R O C E E D I N G S

08:33AM   3          (COURT CONVENED AT 8:33 A.M.)

08:33AM   4          (JURY OUT AT 8:33 A.M.)

08:33AM   5               THE COURT:  LET'S GO ON THE RECORD IN THE BALWANI

08:33AM   6     MATTER.

08:33AM   7          ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

08:33AM   8          WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

08:33AM   9          WE WERE GOING TO DISCUSS THIS MORNING, LET'S SEE, IT'S

08:34AM  10     DEFENSE 1416, MOTION TO EXCLUDE TRIAL EXHIBITS, AND 1417, THE

08:34AM  11     GOVERNMENT'S OPPOSITION.

08:34AM  12          SHOULD WE DISCUSS THOSE NOW?

08:34AM  13               MR. CAZARES:  YES, YOUR HONOR.

08:34AM  14          MS. MCDOWELL WILL HANDLE ARGUMENT FOR THE DEFENSE.

08:34AM  15               THE COURT:  GOOD MORNING.

08:34AM  16               MR. SCHENK:  GOOD MORNING, YOUR HONOR.

08:34AM  17               THE COURT:  SO LET ME START --

08:34AM  18               MS. MCDOWELL:  GOOD MORNING, YOUR HONOR.

08:34AM  19          I'M VACCINATED.

08:34AM  20               THE COURT:  YES, PLEASE.

08:34AM  21               MS. MCDOWELL:  THANK YOU.

08:34AM  22               THE COURT:  LET ME START WITH THE OPPOSITION.

08:34AM  23          AND MR. SCHENK'S TEAM TELLS US THAT THEY'RE NOT SEEKING TO

08:34AM  24     INTRODUCE THEIR 790 AND 4871.

08:34AM  25          DOES THAT END THE DISCUSSION?

4232

08:34AM   1          MS. MCDOWELL:  NO.

08:34AM   2          THE COURT:  REGRETTABLY, NO.

08:34AM   3          MS. MCDOWELL:  IT DOES NOT.

08:34AM   4       SO WE APPRECIATE THAT THEY'RE NOT GOING TO OFFER THOSE

08:35AM   5    EXHIBITS, BUT THEY DID INDICATE THAT THEY WERE GOING TO STILL

08:35AM   6    SEEK TESTIMONY ABOUT THOSE SAME TOPICS.

08:35AM   7          THE COURT:  OKAY.

08:35AM   8          MS. MCDOWELL:  SO I THINK THE ISSUES IN OUR MOTION

08:35AM   9    ARE STILL UP FOR DISCUSSION.

08:35AM  10       AND SO, YOUR HONOR, THE GOVERNMENT -- OUR POSITION IS THAT

08:35AM  11    THE GOVERNMENT SHOULD NOT BE PERMITTED TO ELICIT TESTIMONY

08:35AM  12    ABOUT PURPORTED MISREPRESENTATIONS MS. HOLMES MADE IN 2006 IN

08:35AM  13    THIS CASE BECAUSE MR. BALWANI HAS ABSOLUTELY NO ROLE OR NO

08:35AM  14    CONNECTION TO THOSE STATEMENTS, AND IT'S OUTSIDE OF ANY ALLEGED

08:35AM  15    CONSPIRACY IN THIS CASE.

08:35AM  16       SO AS A THRESHOLD MATTER, IF THE GOVERNMENT WERE TO ELICIT

08:35AM  17    THAT TESTIMONY, IT'S NOT ADMISSIBLE UNDER 401 AND THEN WE DON'T

08:35AM  18    SEE ANY PROBATIVE VALUE.

08:35AM  19       BUT IF THERE WERE SOME MINIMAL PROBATIVE VALUE, THE RISK

08:35AM  20    OF UNFAIR PREJUDICE IS SUBSTANTIAL HERE GIVEN THE JURY MAY

08:35AM  21    CONFLATE PURPORTED MISREPRESENTATIONS MS. HOLMES MADE IN 2006

08:36AM  22    WITH MR. BALWANI'S CRIMINAL INTENT, AND THAT'S JUST NOT

08:36AM  23    APPROPRIATE HERE.

08:36AM  24       AND I THINK IT'S IMPORTANT TO FRAME THE ISSUE WITH THE

08:36AM  25    FACTS THAT MR. TOLBERT NEVER MET MR. BALWANI.  HE'S NEVER BEEN

08:36AM  1    ON A CALL WITH HIM.

08:36AM  2          MR. BALWANI DID NOT JOIN THE COMPANY UNTIL THREE YEARS

08:36AM  3    AFTER ANY EVENTS IN 2006 OCCURRED.

08:36AM  4          MR. BALWANI HAD NO AFFILIATION WITH THERANOS IN 2006, AND

08:36AM  5    THERE'S ABSOLUTELY NO EVIDENCE CONNECTING HIM TO THOSE

08:36AM  6    STATEMENTS.

08:36AM  7          SO IF THE GOVERNMENT WERE TO ELICIT TESTIMONY THAT -- AND

08:36AM  8    WE HAVE A PREVIEW OF THAT TESTIMONY IN THE HOLMES TRIAL -- AND

08:36AM  9    IT WAS ALONG THE LINES OF ELICITING TESTIMONY FROM MR. TOLBERT

08:36AM  10   ABOUT DETAILED STATEMENTS MS. HOLMES MADE ABOUT THE FINANCIAL

08:37AM  11   PROJECTIONS THAT WERE GIVEN TO MR. TOLBERT IN 2006, INCLUDING

08:37AM  12   THAT MR. TOLBERT BELIEVED THAT THERANOS WOULD BE CASH FLOW

08:37AM  13   POSITIVE BY 2007 AND THAT THEY WOULD SEE A SIGNIFICANT REVENUE

08:37AM  14   INCREASE BY 2008, AS WELL AS ELICITING TESTIMONY FROM

08:37AM  15   MR. TOLBERT ABOUT HIS UNDERSTANDING OF THERANOS'S WORK WITH

08:37AM  16   PHARMACEUTICAL COMPANIES AND THE SUBSTANTIAL REVENUE THEY WOULD

08:37AM  17   BE GETTING FROM THAT.

08:37AM  18          SO THE RISK HERE IS THAT THE JURY WILL BE LEFT WITH THE

08:37AM  19   IMPRESSION THAT MS. HOLMES MADE PURPORTED MISREPRESENTATIONS IN

08:37AM  20   2006 AND THAT THAT WILL BE CONFLATED WITH MR. BALWANI OUTSIDE

08:37AM  21   OF ANY ALLEGED CONSPIRACY.

08:37AM  22          THE COURT:  OKAY.  SO IS THERE ANY ARGUMENT OR

08:37AM  23   DISPUTE THAT MR. BALWANI, IN 2013, ANY CONDUCT THAT HE ENGAGED

08:37AM  24   IN AT THAT TIME, DOES THAT FALL WITHIN THE CHARGED TIME PERIOD?

08:38AM  25          MS. MCDOWELL:  YOUR HONOR, I THINK THE GOVERNMENT

08:38AM 1    DID ADDRESS THAT IN THEIR MOTION, AND I THINK THERE IS AN ISSUE

08:38AM 2    AS TO WHETHER THE GOVERNMENT HAS SHOWN A CONSPIRACY AT THIS

08:38AM 3    POINT, BUT THAT IS AN ISSUE OF OUR MOTION THIS MORNING.

08:38AM 4        WE'RE FOCUSSING ON THE 2006 EVENTS, AND SO WE WOULD NEED

08:38AM 5    TO SEE WHAT SORT OF QUESTIONING THE GOVERNMENT SOUGHT ON THE

08:38AM 6    2013 TIME PERIOD AND WOULD PLAN TO OBJECT IF APPROPRIATE.

08:38AM 7        THE COURT:  SURE.  I'M SORRY, I DIDN'T ARTFULLY PUT

08:38AM 8    THAT QUESTION TO YOU.  I APOLOGIZE.

08:38AM 9        MY QUESTION IS NOT WHETHER IT'S BEEN PROVED YET, BUT

08:38AM 10   WHETHER THERE IS EVIDENCE OF MR. BALWANI'S CONDUCT IN 2013.

08:38AM 11   THAT WOULD BE WITHIN THE CHARGED PERIOD.

08:38AM 12       MS. MCDOWELL:  IF THERE IS EVIDENCE OF MR. BALWANI'S

08:38AM 13   STATEMENT IN 2013, YES, WE AGREE THAT IT'S WITHIN THE ALLEGED

08:38AM 14   CONSPIRACY IN THE INDICTMENT.

08:38AM 15       THE COURT:  AND IS THERE ANY WAY TO RELATE THE 2006

08:39AM 16   REPRESENTATIONS MADE BY MS. HOLMES TO THE SAME INVESTORS WHO

08:39AM 17   INVESTED IN 2013 THAT'S RELEVANT TO THIS CASE?

08:39AM 18       MS. MCDOWELL:  YOUR HONOR, I THINK IF YOU'RE ASKING

08:39AM 19   ABOUT KIND OF WHERE TO DRAW THE LINE, I DO THINK THAT SOME HIGH

08:39AM 20   LEVEL TESTIMONY ABOUT THE FACT THAT THE HALL GROUP INVESTED IN

08:39AM 21   2016, THE FACT THAT THAT INVESTMENT WAS $2 MILLION OR WAS DONE

08:39AM 22   INDIRECTLY THROUGH CHRIS LUCAS'S GROUP, HIGH LEVEL TESTIMONY

08:39AM 23   ABOUT THE TYPES OF DILIGENCE THAT MR. TOLBERT DID IN 2006 I

08:39AM 24   THINK WOULD BE APPROPRIATE.

08:39AM 25       I THINK WHAT WE'RE CONCERNED WITH HERE IS ELICITING

4235

08:39AM   1    TESTIMONY FROM MR. TOLBERT ABOUT SPECIFIC REPRESENTATIONS

08:39AM   2    MS. HOLMES MADE ABOUT FINANCIAL PROJECTIONS OR PHARMACEUTICAL

08:40AM   3    WORK THAT WOULD INTRODUCE PURPORTED MISREPRESENTATIONS THAT

08:40AM   4    COULD BE CONFLATED WITH MR. BALWANI.

08:40AM   5        AND THAT JUST EVISCERATES THE LIMITATIONS OF VICARIOUS

08:40AM   6    LIABILITY AND CONSPIRACY LAW.

08:40AM   7            THE COURT:  THANK YOU.  SO THEY'RE TWO DIFFERENT,

08:40AM   8    I'LL CALL THEM PITCHES, AND AGAIN, I DON'T MEAN ANYTHING

08:40AM   9    PEJORATIVE BY THAT, SO IT'S THE 2006 AND THEN THE 2013.

08:40AM   10       AND IN THE 2013, I THINK THE TRANSCRIPTS TELL US, 4489 TO

08:40AM   11   4493, I THINK, IT STARTS AT LINE 21 ON 4489, AND IT SEEMS THAT

08:40AM   12   WHAT MS. HOLMES IS SAYING IS SHE'S TALKING TO THE NEW INVESTORS

08:40AM   13   AND SAYING, REMEMBER, YOU CAME IN AT 70 -- PARDON ME, YOU CAME

08:41AM   14   IN EARLY, AND YOUR PRICE EARLY WAS $0.82 A SHARE, BUT NOW WE'RE

08:41AM   15   OFFERING YOU THIS AT $75 PER SHARE, AND THAT SHOULD SHOW YOU

08:41AM   16   HOW WELL WE'VE DONE.

08:41AM   17       THAT'S THE INFERENCE, ISN'T IT?  HOW WELL WE'VE DONE,

08:41AM   18   WE'VE MANAGED ALL OF THIS.  THE PRICE HAS INCREASED NOW TO 75,

08:41AM   19   WHICH SUGGESTS A TRAJECTORY, AN UPWARD TRAJECTORY, AND THAT'S

08:41AM   20   PART OF THE PITCH, YOU BETTER GET IN NOW, BECAUSE IF YOU DON'T

08:41AM   21   GET IN NOW, YOU WON'T -- YOU'LL GET IN LATER AND IT WILL COST

08:41AM   22   MORE, THAT TYPE OF THING.

08:41AM   23       AND THAT'S IN 2013.  SO THAT REFERENCES BACK THE INITIAL

08:41AM   24   $0.82 INVESTMENT, AND HOW DO YOU -- ISN'T THAT RELEVANT TO THE

08:41AM   25   2013 PITCH?

4236

```
08:41AM   1          MS. MCDOWELL:  I THINK THAT WOULD BE THE TYPE OF

08:41AM   2   TESTIMONY THAT WE WOULD SAY COULD BE ELICITED TO OFFER

08:41AM   3   BACKGROUND.  SO THE FACT THAT THEY INVESTED IN 2006 AND WHAT

08:41AM   4   THAT SHARE PRICE WAS, I THINK THAT COULD BE APPROPRIATE.

08:42AM   5          WHAT WE'RE FOCUSSED ON IS JUST PURPORTED

08:42AM   6   MISREPRESENTATIONS THAT WERE MADE IN 2006.

08:42AM   7          AND I THINK THE GOVERNMENT'S RESPONSE BRIEF AT PAGE 6, I

08:42AM   8   THINK, IS REALLY TELLING AND IS TROUBLING, FRANKLY.

08:42AM   9          THEY SAY AT DOCKET 417 AT PAGE 6, "WHILE DEFENDANT WAS NOT

08:42AM  10   AN EXECUTIVE OF THERANOS AND DID NOT MAKE STATEMENTS TO THESE

08:42AM  11   INVESTORS PRIOR TO 2009, HE ADOPTED AND EMBELLISHED ANY PRIOR

08:42AM  12   STATEMENTS ABOUT THE COMPANY MADE BY HIS CODEFENDANT WHEN IN

08:42AM  13   2013 HE SPOKE WITH SEVERAL INVESTORS."

08:42AM  14          AND, YOUR HONOR, THAT IS -- THAT STATEMENT IS NOT ROOTED

08:42AM  15   IN ANY FACT OR EVIDENCE, AND LIKE I'VE SAID BEFORE, IT WOULD

08:42AM  16   COMPLETELY EVISCERATE THE LIMITS OF VICARIOUS CONSPIRACY LAW

08:43AM  17   GIVEN THAT THIS IS THREE YEARS BEFORE MR. BALWANI HAD ANYTHING

08:43AM  18   TO DO WITH THE COMPANY, AND IT'S SEVEN YEARS BEFORE THE CHARGED

08:43AM  19   CONDUCT AT ISSUE.

08:43AM  20          SO WE'RE FOCUSSED ON THE SPECIFIC STATEMENTS MS. HOLMES

08:43AM  21   MADE ABOUT THE FINANCIAL PROJECTIONS, WORK WITH PHARMACEUTICAL

08:43AM  22   COMPANIES, WHAT SORT OF REVENUE THAT WOULD BRING IN, AND WE SAW

08:43AM  23   THAT IN THE PREVIOUS TRIAL, AND THAT'S KIND OF WHAT WE'RE

08:43AM  24   FOCUSSED ON TODAY.

08:43AM  25          THE COURT:  SO SHE -- THANK YOU.
```

4237

08:43AM   1        SO SHE SAYS I THINK AT 4493, PAGE 4493, I THINK SHE TALKS

08:43AM   2   ABOUT THE PRIOR INVESTMENT AND THAT WAS ALL IN ESSENCE RAISING

08:43AM   3   CASH, AND WE'VE NOW MOVED FROM THAT.  WE ARE NOW IN OPERATIONS.

08:43AM   4        AND THEN SHE STARTS TALKING ABOUT THE ASSOCIATIONS WITH

08:43AM   5   WALGREENS AND OTHERS.

08:43AM   6        AND FOR OPERATIONAL PURPOSES, WE NEED TO MOVE FORWARD

08:44AM   7   BECAUSE THERE ARE EXPENSES NECESSARY FOR BUILDOUTS, FOR ALL OF

08:44AM   8   THAT.

08:44AM   9        AND SHE'S -- IT SOUNDS LIKE SHE'S MOVING THAT TO A

08:44AM  10   DIFFERENT FUND RAISING.

08:44AM  11        SHE ACTUALLY SAYS -- WELL, I THINK SHE CALLS IT A AND

08:44AM  12   WE'RE NOW IN C, EXCUSE ME, AND A IS OPERATIONS AND WE'RE NOW

08:44AM  13   DONE WITH THAT AND FULL SPEED AHEAD AND $75 A SHARE.

08:44AM  14        AND MR. BALWANI MADE -- I THINK THE EVIDENCE IS GOING TO

08:44AM  15   SHOW, PER THE GOVERNMENT'S REPRESENTATION, THAT MR. BALWANI MAY

08:44AM  16   HAVE MADE SIMILAR OR HAD SIMILAR CONVERSATIONS WITH INVESTORS

08:44AM  17   TOUTING THIS, AND THAT'S WHAT I'M FOCUSSED HOW DOES, AND THAT'S

08:44AM  18   WHAT I'LL ASK MR. SCHENK IN A MINUTE, HOW DOES THAT

08:44AM  19   INFORMATION, IF AT ALL, HOW DOES THE 2006 INFORMATION COME IN

08:45AM  20   AS TO MR. BALWANI WITHOUT VIOLATING ANY OF VICARIOUS LIABILITY

08:45AM  21   LIMITATIONS?

08:45AM  22        MR. SCHENK, MAYBE IT'S TIME TO TURN TO YOU.

08:45AM  23             MR. SCHENK:  THANK YOU, YOUR HONOR.

08:45AM  24        THE COURT IS BEING ASKED TO EXCLUDE NOW JUST TESTIMONY, NO

08:45AM  25   LONGER EXHIBITS, BUT NOW TESTIMONY RELATED TO 2006.

08:45AM 1          THE COURT:  RIGHT.

08:45AM 2          MR. SCHENK:  AND IS BEING ASKED TO DO SO REALLY FOR

08:45AM 3   TWO REASONS, 401 AND 403.

08:45AM 4      ALLOW ME TO TAKE ACTUALLY 403 FIRST.

08:45AM 5      THERE IS NO CHANCE THAT THIS JURY WILL CONVICT MR. BALWANI

08:45AM 6   BECAUSE OF STATEMENTS MADE TO INVESTORS IN 2006, A TIME WHEN

08:45AM 7   MR. BALWANI DID NOT WORK AT THERANOS, AND THAT'S TRUE FOR A

08:45AM 8   COUPLE OF REASONS.

08:45AM 9      FIRST, THE GOVERNMENT DOESN'T INTEND TO ARGUE THAT

08:45AM 10  MR. BALWANI HAD ANY ROLE IN THOSE 2006 STATEMENTS;

08:45AM 11     SECOND, AS THE COURT JUST HEARD, MR. TOLBERT HAS, FRANKLY,

08:45AM 12  NEVER MET MR. BALWANI, SO HE'S NOT GOING TO TESTIFY THAT IN

08:45AM 13  2006 HE HAD INTERACTIONS WITH MR. BALWANI.  THAT FACT WILL HOLD

08:46AM 14  TRUE THROUGHOUT THE REMAINDER OF HIS TIME.

08:46AM 15     BUT REALLY THERE'S KIND OF MORE OF AN OVERARCHING ARGUMENT

08:46AM 16  HERE.  IMAGINE FOR A MOMENT THAT THE GOVERNMENT FAILED TO

08:46AM 17  DISCLOSE THIS 2006 EVIDENCE TO THE DEFENSE.  THEY WOULD NOW BE

08:46AM 18  STANDING UP BEFORE YOUR HONOR AND SAYING, JUDGE, THE GOVERNMENT

08:46AM 19  COMMITTED A BRADY VIOLATION, THIS IS EXCULPATORY INFORMATION.

08:46AM 20  THE INVESTORS INVESTED AT A TIME WHEN MR. BALWANI WASN'T EVEN

08:46AM 21  THERE.

08:46AM 22     AND THE REASON I RAISE THAT HYPOTHETICAL IS THAT IT SHOWS

08:46AM 23  THAT THERE IS NO 403 RISK HERE.  THERE IS NO CHANCE OF AN

08:46AM 24  UNFAIR PREJUDICE OCCURRING THROUGH THE ADMISSION OF THIS

08:46AM 25  EVIDENCE BECAUSE, IF ANYTHING, THE DEFENSE WOULD BE ARGUING TO

08:46AM 1    THE COURT IT IS EXCULPATORY.  INVESTORS INVESTED AND

08:46AM 2    MR. BALWANI WASN'T EVEN THERE.

08:46AM 3        THAT IS THE GREATER RISK THAT THE JURY -- THE GREATER

08:46AM 4    CONCLUSION, FRANKLY, THAT THE JURY IS LIKELY TO DRAW FROM THE

08:46AM 5    INTRODUCTION OF THIS EVIDENCE, NOT THAT MR. BALWANI SHOULD BE

08:46AM 6    CONVICTED BECAUSE FALSE STATEMENTS WERE TOLD TO INVESTORS IN

08:47AM 7    2006.

08:47AM 8        IT ALSO ISN'T THE GOVERNMENT'S INTENT TO ARGUE ABOUT THE

08:47AM 9    TRUTH OR FALSITY OF THE STATEMENTS THAT MR. TOLBERT HEARD IN

08:47AM 10   2006, BUT RATHER THOSE STATEMENTS ARE THE FOUNDATION FOR THE

08:47AM 11   2013 STATEMENTS THAT MR. TOLBERT HEARS, THINGS LIKE WE BUILT

08:47AM 12   THE BUSINESS FROM CASH FROM OPERATIONS; THINGS LIKE

08:47AM 13   MR. TOLBERT'S UNDERSTANDING THAT THERANOS WAS A STARTUP WITH

08:47AM 14   UNPROVEN TECHNOLOGY IN 2006, BUT HE HAD A DIFFERENT VIEW OF THE

08:47AM 15   TECHNOLOGY, OF ITS PLACE IN EVOLUTION OR HOW MATURE IT WAS IN

08:47AM 16   2013.

08:47AM 17       AND THE ONLY WAY FOR THAT STORY TO BE TOLD TO THE JURY IS

08:47AM 18   BY MR. TOLBERT DESCRIBING THE CIRCUMSTANCES OF HIS 2006

08:47AM 19   INVESTMENT.

08:47AM 20       IN 2006 HE HEARS STATEMENTS ABOUT THERANOS'S FINANCES,

08:47AM 21   ABOUT THE STATE OF THE TECHNOLOGY AT THE TIME.

08:47AM 22       MS. HOLMES, OVER A MEAL, SHOWS HIM A PART OF THE

08:48AM 23   TECHNOLOGY.  IT IS APPROPRIATE FOR THE JURY TO HEAR ALL OF THAT

08:48AM 24   BECAUSE UNDER 401, IT IS RELEVANT EVIDENCE BECAUSE IT FORMS THE

08:48AM 25   BASIS OF HIS UNDERSTANDING OF HIS 2013 DECISION TO INVEST.

08:48AM  1      AND TO DENY THE JURY THE CIRCUMSTANCES OF THE 2006

08:48AM  2    INVESTMENT LEAVES A SKEWED VIEW OF WHAT HE UNDERSTOOD IN 2013.

08:48AM  3      MR. TOLBERT, UNLIKE MS. PETERSON, WHO THE COURT RECENTLY

08:48AM  4    HEARD FROM, DIDN'T GET THE BINDERS, SO THE BASIS OF

08:48AM  5    MR. TOLBERT'S INVESTMENT WAS A COMBINATION OF THINGS HE HEARD

08:48AM  6    IN 2013 AND THINGS THAT HE HEARD IN 2006.

08:48AM  7      THAT'S WHAT MAKES 2006 RELEVANT, AND THERE IS NO CHANCE

08:48AM  8    THAT THE JURY CONVICTS MR. BALWANI BECAUSE OF STATEMENTS MADE

08:48AM  9    IN 2006 WHEN MR. BALWANI WASN'T THERE.

08:48AM  10         THE COURT:  THANK YOU.

08:48AM  11      SO I SEE THAT CONNECTION.  THAT'S WHAT I WAS SPEAKING TO

08:49AM  12    MS. MCDOWELL ABOUT.  IT SEEMS THAT IT WOULD BE RELEVANT TO

08:49AM  13    INFORM THE 2013 INVESTMENT DECISION.

08:49AM  14      I JUST WANT TO TELL YOU, THAT SEEMS PRETTY TRANSPARENT TO

08:49AM  15    ME THAT -- AND PARTICULARLY WHEN I REFERENCED THOSE PAGES.

08:49AM  16      I DON'T KNOW IF THAT TESTIMONY IS GOING TO COME IN OR NOT,

08:49AM  17    BUT, YOU KNOW, REFERENCING WHAT MS. HOLMES SAID ABOUT THAT WAS

08:49AM  18    THEN, THIS IS NOW, WE'VE MOVED TO A DIFFERENT STAGE, IT'S A

08:49AM  19    DIFFERENT ROUND OF FUNDING, DIFFERENT PURPOSE OF FUNDING, AND

08:49AM  20    WHICH SUGGESTS GROWTH AND READY TO LAUNCH.

08:49AM  21      BUT, MR. SCHENK, WHAT I HEAR YOU SAYING IS THAT WE'RE NOT

08:49AM  22    GOING TO OFFER THAT, WE DON'T SEEK TO INTRODUCE THAT FOR THE

08:49AM  23    TRUTH OF WHAT WAS SAID IN THE 2006 CONVERSATION, BUT RATHER IN

08:49AM  24    SOME WAY TO INFORM MR. TOLBERT'S INVESTMENT DECISION IN 2013,

08:50AM  25    AND IT'S THAT INFORMATIONAL DIFFERENCE, IF YOU WILL, GROWTH

08:50AM 1    FROM '06 TO '13 THAT IS RELEVANT AS TO WHY HE DECIDED AT THAT

08:50AM 2    POINT TO MAKE ANY INVESTMENT, IF HE DID.

08:50AM 3         IS THAT, IS THAT WHAT I SHOULD TELL THE JURY THEN?

08:50AM 4              MR. SCHENK:  SO TO ANSWER THE COURT'S FIRST

08:50AM 5    QUESTION, YES, THAT'S PRECISELY THE PURPOSE OF THIS EVIDENCE.

08:50AM 6         WE DO NOT INTEND TO INTRODUCE EVIDENCE OF THE EXACT DOLLAR

08:50AM 7    AMOUNT OF REVENUE TOLBERT UNDERSTOOD THERANOS WOULD GENERATE IN

08:50AM 8    2007 AND THEN INTRODUCE EVIDENCE TO PROVE THAT NUMBER WASN'T

08:50AM 9    TRUE, THAT NUMBER WASN'T REALIZED OR IT WAS FALSE AT THE TIME.

08:50AM 10   THE RELEVANCE OF THE EVIDENCE IS HOW IT INFORMS TOLBERT'S

08:50AM 11   2013 INVESTMENT DECISION.

08:50AM 12   IT SEEMS THE COURT IS NOW WONDERING WHETHER IT SHOULD GIVE

08:50AM 13   A LIMITING INSTRUCTION FOR THIS EVIDENCE, AND I HAD A SIMILAR

08:50AM 14   THOUGHT.

08:50AM 15   I THINK THE RIGHT ANSWER IS THAT WE WAIT AND SEE HOW THE

08:50AM 16   EVIDENCE COMES IN.  AND IT'S DIFFICULT AT THIS POINT TO SAY,

08:50AM 17   WITHOUT KNOWING PRECISELY WHAT THIS JURY HEARS, WHETHER THERE

08:51AM 18   IS SUCH AN EMPHASIS ON STATEMENTS MADE IN 2006, AND EVEN IN

08:51AM 19   PARTICULAR MS. HOLMES MAKING FALSE STATEMENTS TO MR. TOLBERT IN

08:51AM 20   2006.

08:51AM 21   YES, IF IT GETS CLOSE TO THAT, IF THE WAY THAT MR. TOLBERT

08:51AM 22   TESTIFIES OR THE WAY THAT I PHRASE QUESTIONS IS SUGGESTIVE TO

08:51AM 23   THE JURY THAT THERE IS SOME NEFARIOUS INTENT BY MS. HOLMES IN

08:51AM 24   THE FALSE STATEMENTS THAT MR. TOLBERT IS HEARING, I THINK WE

08:51AM 25   SHOULD HAVE A DISCUSSION ABOUT WHETHER THE COURT GIVES A

08:51AM 1    LIMITING INSTRUCTION ON THE PURPOSE FOR THE 2006 TESTIMONY.

08:51AM 2         BUT I DON'T THINK, AS WE'RE HAVING THE DISCUSSION NOW, IT

08:51AM 3    SO OBVIOUSLY RISES TO THAT LEVEL.  AND THE REASON I THINK THAT

08:51AM 4    IS BECAUSE OF THE 403 ARGUMENTS I MADE TO THE COURT A MOMENT

08:51AM 5    AGO.

08:51AM 6         THE RISK OF PREJUDICE FROM THESE STATEMENTS IS ALMOST

08:51AM 7    ZERO.

08:51AM 8              THE COURT:  WELL, IF, IF -- AND I TAKE YOU AT YOUR

08:51AM 9    WORD THAT YOU'RE NOT GOING TO ARGUE IN ANY WAY THAT THE JURY

08:51AM 10   SHOULD FIND MR. BALWANI GUILTY FOR STATEMENTS MADE IN 2006.

08:52AM 11   THE COURT WOULDN'T PERMIT YOU TO DO THAT AND YOU WOULDN'T

08:52AM 12   ADVANCE THAT.

08:52AM 13             MR. SCHENK:  YES, YOUR HONOR.

08:52AM 14             THE COURT:  BUT I THINK THAT'S THE DANGER HERE IS,

08:52AM 15   CAN THEY SOMEHOW GET THERE?

08:52AM 16        WILL WE HAVE TO AND WILL WE NEED AN INSTRUCTION, A FINAL

08:52AM 17   INSTRUCTION THAT LIMITS THE SCOPE?  I DON'T KNOW.  THAT'S

08:52AM 18   ANOTHER POTENTIAL REMEDY.  I DON'T WANT TO GET THERE YET,

08:52AM 19   BECAUSE AS YOU SAY, WE DON'T KNOW WHAT THE TESTIMONY IS.  WE'RE

08:52AM 20   TRYING TO FRAME THAT.

08:52AM 21             MS. MCDOWELL:  YES.  THANK YOU, YOUR HONOR.

08:52AM 22        I DID HEAR FROM THE GOVERNMENT -- WHAT I'M HEARING FROM

08:52AM 23   MR. SCHENK IS THAT THEY ARE NOT GOING TO ELICIT TESTIMONY FROM

08:52AM 24   MR. TOLBERT ABOUT PURPORTED, SPECIFIC PURPORTED

08:52AM 25   MISREPRESENTATIONS MS. HOLMES MADE IN 2006.

08:52AM   1          SO IF THAT'S THE CASE, I THINK WE MAY BE ON THE SAME PAGE.

08:52AM   2          BUT I DO THINK THAT A LIMITING INSTRUCTION BEFORE

08:52AM   3    MR. TOLBERT TESTIFIES WOULD BE APPROPRIATE HERE, AND WE

08:53AM   4    ACTUALLY HAVE ONE THAT WE HAVE DRAFTED HERE IF I COULD PASS IT

08:53AM   5    UP.

08:53AM   6              THE COURT:  IMAGINE THAT.

08:53AM   7              MS. MCDOWELL:  YEAH (HANDING.)

08:53AM   8              THE COURT:  YES.  I DON'T KNOW ABOUT A LIMITING

08:53AM   9    INSTRUCTION BEFORE THE WITNESS TESTIFIES.

08:53AM  10          YOU HAVE THIS, MR. SCHENK?

08:53AM  11              MR. SCHENK:  I DO.

08:53AM  12              MS. MCDOWELL:  AND SO WHAT WE'RE PROPOSING HERE IS

08:53AM  13    IF THERE'S A SIGNIFICANT FOCUS ON THE 2006 EVENTS AND

08:53AM  14    STATEMENTS, THAT THE JURY IS INSTRUCTED THAT HIS TESTIMONY

08:53AM  15    RELATED TO EVENTS IN 2006 OR STATEMENTS MADE BY MS. HOLMES OR

08:53AM  16    MATERIALS HE REVIEWED IN 2006 CANNOT BE USED TO INFER ANYTHING

08:53AM  17    ABOUT MR. BALWANI'S KNOWLEDGE OR INTENT IN THIS CASE, AND I

08:53AM  18    WOULD HOPE THAT THE GOVERNMENT WOULD FIND THIS NOT TO BE

08:53AM  19    CONTROVERSIAL.

08:53AM  20          THIS IS -- YOU KNOW, OBVIOUSLY UNDER BLACK LETTER

08:53AM  21    CONSPIRACY LAW, YOU CAN'T IMPUTE MS. HOLMES'S CRIMINAL INTENT

08:54AM  22    OUTSIDE OF ANY CONCEIVABLE CONSPIRACY TO MR. BALWANI, SO I

08:54AM  23    THINK THAT THIS SORT OF LIMITING INSTRUCTION WOULD HELP

08:54AM  24    MITIGATE THE RISK THAT FAR.

08:54AM  25              THE COURT:  OKAY.

08:54AM  1          MR. SCHENK.

08:54AM  2              MR. SCHENK:  TWO POINTS.

08:54AM  3          I JUST WANT TO BE CLEAR, IT SOUNDED LIKE MS. MCDOWELL WAS

08:54AM  4      SAYING THAT HER UNDERSTANDING IS THAT THE GOVERNMENT DOES NOT

08:54AM  5      INTEND TO ELICIT SPECIFIC FALSE MISREPRESENTATIONS THAT

08:54AM  6      MS. HOLMES MADE TO MR. TOLBERT IN 2006.

08:54AM  7          WE DO INTEND TO ELICIT MISREPRESENTATIONS THAT MS. HOLMES

08:54AM  8      MADE TO MR. TOLBERT IN 2006.

08:54AM  9          THE QUESTION OF FALSITY COMES THROUGH PIECES OF EVIDENCE

08:54AM  10     COMPARING WHAT MS. HOLMES SAID AND THE REALITY.  THE GOVERNMENT

08:54AM  11     DOES NOT INTEND TO DO THAT.

08:54AM  12             THE COURT:  THAT'S WHAT I HEARD YOU SAY.

08:54AM  13             MR. SCHENK:  YES.  BUT I DON'T WANT THERE TO BE

08:54AM  14     CONFUSION ABOUT REPRESENTATIONS THAT TOLBERT HEARD IN 2006.

08:54AM  15         I DO INTEND TO ASK HIM, WHEN YOU WENT TO PALO ALTO IN

08:54AM  16     2006, WHAT DID YOU HEAR AND WHAT DID YOU LEARN?

08:55AM  17             THE COURT:  AND THAT'S HOW I UNDERSTOOD IT,

08:55AM  18     MS. MCDOWELL, BECAUSE THAT DOES INFORM THEN A 2013, A 2013

08:55AM  19     INVESTMENT DECISION LOOKING BACK ON IT.

08:55AM  20         SO I -- MY SENSE IS NOW THAT THAT WOULD BE PERMITTED.

08:55AM  21             MS. MCDOWELL:  UNDERSTOOD, YOUR HONOR.

08:55AM  22         SO IN THAT CASE, WE DO THINK THAT, YOU KNOW, A LIMITING

08:55AM  23     INSTRUCTION JUST TO GIVE THE JURY SOME GUIDANCE ON THIS ISSUE,

08:55AM  24     EITHER BEFORE MR. TOLBERT TESTIFIES OR AS THIS TESTIMONY COMES

08:55AM  25     IN, WE THINK THAT WOULD BE APPROPRIATE TO GUIDE THE JURY AS TO

08:55AM 1       HOW THEY SHOULD BE CONSIDERING THAT SORT OF TESTIMONY.

08:55AM 2           AND JUST TO BRIEFLY PREVIEW THE ARGUMENT THAT MY

08:55AM 3       COLLEAGUE, MR. CAZARES, THE OTHER MATTER THAT WE'RE GOING TO

08:55AM 4       TAKE UP THIS MORNING HERE IS THAT IT'S TROUBLING THAT THE

08:55AM 5       GOVERNMENT PLANS TO OBJECT TO ANY PLAYING OF THE TAPE IN 2013

08:55AM 6       THAT MS. HOLMES -- THE MS. HOLMES CONFERENCE CALL WHERE

08:56AM 7       MR. TOLBERT WAS ON.

08:56AM 8           AND THAT TAPE IS WHAT SHE ACTUALLY SAID DURING THE CHARGED

08:56AM 9       CONSPIRACY, BUT THEN THEY'RE FOCUSSED ON WANTING TO INTRODUCE

08:56AM 10      REPRESENTATIONS THAT MS. HOLMES MADE OUTSIDE OF ANY CONCEIVABLE

08:56AM 11      CONSPIRACY.

08:56AM 12          SO THAT'S TROUBLING TO US, AND WE THINK THAT AT THE VERY

08:56AM 13      LEAST A LIMITING INSTRUCTION WOULD HELP MITIGATE THE RISK TO

08:56AM 14      MR. BALWANI HERE.

08:56AM 15              THE COURT:  OKAY.

08:56AM 16              MR. SCHENK:  I'M NOT SURE I GET THE CONNECTION

08:56AM 17      BETWEEN THE RECORDINGS AND THIS ISSUE.

08:56AM 18          I WOULD LIKE THE COURT TO DEFER ON THE LIMITING

08:56AM 19      INSTRUCTION AND ALLOW THE GOVERNMENT SOME TIME TO REVIEW IT,

08:56AM 20      AND LET'S SEE HOW THE TESTIMONY COMES IN.  BUT -- SORRY.

08:56AM 21              THE COURT:  AS I SAID, I'M NOT INCLINED TO GIVE A

08:56AM 22      LIMITING INSTRUCTION BEFORE ANY EVIDENCE COMES IN UNLESS I KNOW

08:56AM 23      WHAT IT IS.

08:56AM 24          IF THERE'S A TRANSCRIPT, AN AGREED UPON TRANSCRIPT THAT IS

08:56AM 25      GOING TO BE SUBMITTED TO THE JURY, THAT'S THE APPROPRIATE TIME

4246

08:56AM  1    TO GIVE A LIMITING INSTRUCTION, BUT HERE IT'S KIND OF FLUID.

08:56AM  2        SO I APPRECIATE THIS.  WE'LL HOLD ON TO THIS AND HOLD ON

08:57AM  3    TO OUR SEATS AND SEE WHERE THE EVIDENCE TAKES US.

08:57AM  4        BUT AT LEAST, JUST FOR CLARITY'S SAKE HERE, THE GOVERNMENT

08:57AM  5    HAS SAID THAT THEY'RE NOT GOING TO INTRODUCE THE 37, 90, AND

08:57AM  6    4871 --

08:57AM  7            MS. MCDOWELL:  CORRECT.

08:57AM  8            THE COURT:  -- AS EXHIBITS.  THAT WON'T COME IN.

08:57AM  9        TESTIMONY WILL COME IN AND THE COURT WILL PERMIT INQUIRY

08:57AM 10    OF MR. TOLBERT REGARDING, REGARDING STATEMENTS MADE BY

08:57AM 11    MS. HOLMES, I GUESS IT IS, ABOUT WHAT HE HEARD AND HOW THAT --

08:57AM 12    AND THE BASIS FOR THAT IS THE COURT FINDS IT IS RELEVANT FOR

08:57AM 13    HIS -- AND HE WILL TESTIFY, I ASSUME, ABOUT A 2013 INVESTMENT.

08:57AM 14    AND TO MATCH THOSE TWO TOGETHER, IT IS RELEVANT, THE COURT

08:57AM 15    FINDS, FOR HIM TO TESTIFY ABOUT THE 2013 DECISION.

08:57AM 16        AND I THINK WE KNOW HIS INITIAL INVESTMENT WAS $2 MILLION,

08:57AM 17    AND THAT WAS NOT AN INVESTMENT THAT WAS MADE DIRECTLY.  IT WAS

08:58AM 18    MADE THROUGH A THIRD PARTY AS I UNDERSTAND IT.

08:58AM 19        IT SEEMS TO BE RELEVANT AS TO WHY THAT INVESTMENT WAS

08:58AM 20    INCREASED TO $5 MILLION AND CHANGED FROM A THIRD PARTY CONDUIT

08:58AM 21    TO A DIRECT INVESTMENT, AND I THINK THE JURY IS ENTITLED TO

08:58AM 22    HEAR ANY RELEVANCE ABOUT THAT, WHY THAT DISTINCTION CAME UP OR

08:58AM 23    WHAT THAT WAS ABOUT.

08:58AM 24        SO I'LL PERMIT INQUIRY IN THAT REGARD.

08:58AM 25            MS. MCDOWELL:  THANK YOU.

08:58AM 1          UNDERSTOOD, YOUR HONOR.

08:58AM 2          I THINK THAT WHAT WE WOULD -- WHAT WE WERE FOCUSSING ON

08:58AM 3     WAS SPECIFICALLY THE FINANCIAL PROJECTIONS, DETAILS ABOUT THE

08:58AM 4     PHARMACEUTICAL COMPANIES, SO I GUESS WE'LL HAVE TO SEE HOW THE

08:58AM 5     TESTIMONY COMES IN, BUT WE WOULD SAY THAT WOULDN'T BE RELEVANT

08:58AM 6     TO INFORM THE 2013 INVESTMENT.  THAT WAS RELEVANT TO INFORM THE

08:58AM 7     2006 INVESTMENT.

08:58AM 8               THE COURT:  OKAY.

08:58AM 9               MS. MCDOWELL:  YES.

08:58AM 10              THE COURT:  ALL RIGHT.  THANK YOU.

08:58AM 11         ANYTHING FURTHER --

08:58AM 12              MS. MCDOWELL:  NO.

08:58AM 13              THE COURT:  -- ON THIS?

08:58AM 14              MS. MCDOWELL:  MY COLLEAGUE, MR. CAZARES, HAS

08:59AM 15    ANOTHER ISSUE TO TAKE UP.

08:59AM 16              THE COURT:  OKAY.  THERE'S SOMETHING ABOUT A TAPE?

08:59AM 17              MR. SCHENK:  YES, YOUR HONOR.

08:59AM 18              MR. CAZARES:  YES, YOUR HONOR.  GOOD MORNING,

08:59AM 19    YOUR HONOR.

08:59AM 20         STEPHEN CAZARES FOR MR. BALWANI.

08:59AM 21              THE COURT:  GOOD MORNING.

08:59AM 22              MR. CAZARES:  SO WE WANTED TO ADDRESS AN ISSUE WITH

08:59AM 23    THE COURT RELATING TO MR. TOLBERT'S TESTIMONY RELATING TO THE

08:59AM 24    DECEMBER 2013 CONFERENCE CALL THAT I KNOW THE COURT RECALLS

08:59AM 25    FROM THE PRIOR TRIAL.

4248

08:59AM   1    SO WHAT HAPPENED IN MS. HOLMES'S TRIAL WAS THE GOVERNMENT

08:59AM   2    IN ITS DIRECT EXAMINATION INTRODUCED EXCERPTS FROM THAT

08:59AM   3    12-20-2013 RECORDING OF MS. HOLMES SPEAKING TO INVESTORS.

08:59AM   4    THE DEFENSE INTRODUCED SOME SUPPLEMENTAL 106 PIECES ON THE

08:59AM   5    CROSS.

08:59AM   6    AND THEN THE PARTIES ARGUED IT OUT IN THE END.

08:59AM   7    WHAT I'M LEARNING FROM THE GOVERNMENT NOW IS THE

08:59AM   8    GOVERNMENT INTENDS, ON DIRECT EXAMINATION WITH MR. TOLBERT, TO

08:59AM   9    QUERY HIM ABOUT THAT CONFERENCE CALL, HIS RECOLLECTION OF A

08:59AM   10   CALL THAT TOOK PLACE ALMOST TEN YEARS AGO, USED SOME NOTES,

08:59AM   11   NON-VERBATIM NOTES THAT HE TOOK DURING THE CONFERENCE CALL AS

09:00AM   12   AN ANCHOR I GUESS AT SOME LEVEL FOR HIS RECOLLECTION.

09:00AM   13   BUT THEY DON'T INTEND TO INTRODUCE THE RECORDINGS

09:00AM   14   THEMSELVES OF WHAT MS. HOLMES ACTUALLY SAID, THE WORDS THAT THE

09:00AM   15   COURT KIND OF LEANED ON SOMEWHAT JUST NOW IN TALKING ABOUT THE

09:00AM   16   RELEVANCE OF THE 2006 STATEMENTS BY MS. HOLMES TO THE 2013

09:00AM   17   CONFERENCE CALL THAT LED TO MR. TOLBERT AND MR. HALL'S

09:00AM   18   INVESTMENT.

09:00AM   19   SO GIVEN THAT, THEY CAN TRY THEIR CASE HOW THEY WANT.  I

09:00AM   20   MEAN, IT'S A LITTLE SHOCKING TO ME THAT THE GOVERNMENT WOULD

09:00AM   21   NOT INTRODUCE A RECORDING IN A FRAUD CASE OF A DEFENDANT OR A

09:00AM   22   CODEFENDANT OF WHAT THE DEFENDANT ACTUALLY SAID TO AN INVESTOR.

09:00AM   23   AGAIN, IT'S THEIR CHOICE.

09:00AM   24   BUT I'M TOLD THE GOVERNMENT IS NOW GOING TO OBJECT TO THE

09:00AM   25   DEFENSE USING THE RECORDING IN CROSS-EXAMINATION WITH

09:00AM 1      MR. TOLBERT.

09:00AM 2           WE THINK THE RECORDING IS RELEVANT.

09:00AM 3                THE COURT:  TELL ME -- PARDON ME FOR INTERRUPTING

09:00AM 4      YOU.  TELL ME, WHAT DO YOU WISH TO DO THEN ON

09:01AM 5      CROSS-EXAMINATION?

09:01AM 6                MR. CAZARES:  TO PLAY THE RECORDING AND ASK HIM

09:01AM 7      QUESTIONS ABOUT WHAT MS. HOLMES SAID, WHAT HE THOUGHT ABOUT

09:01AM 8      THAT.

09:01AM 9           BECAUSE HE HAS ALREADY TESTIFIED, AND I'M ASSUMING HE'S

09:01AM 10     GOING TO TESTIFY AGAIN, THAT THIS RECORDING, THIS CONFERENCE

09:01AM 11     CALL, INFLUENCED HIS DECISION TO INVEST, WHICH IS A NONHEARSAY

09:01AM 12     PURPOSE.

09:01AM 13          THAT'S THE GOVERNMENT'S OWN THEORY FOR ELICITING THE

09:01AM 14     TESTIMONY FROM MR. TOLBERT REGARDING THE INVESTMENT, THAT IT

09:01AM 15     CAUSED HIM TO INVEST.

09:01AM 16               THE COURT:  SO, SO --

09:01AM 17               MR. CAZARES:  WE WANT TO RESPOND, CROSS-EXAMINE,

09:01AM 18     RELATING TO THE ACTUAL WORDS SHE SAID, NOT JUST HIS

09:01AM 19     RECOLLECTION OF WHAT SHE SAID.

09:01AM 20               THE COURT:  SO YOU WANT TO PLAY THE ENTIRETY OF THE

09:01AM 21     TAPE?

09:01AM 22               MR. CAZARES:  EXCERPTS, YOUR HONOR.  EXCERPTS, MUCH

09:01AM 23     LIKE WHAT HAPPENED IN THE HOLMES TRIAL.

09:01AM 24               THE COURT:  OKAY.  AND DO YOU HAVE THOSE IDENTIFIED?

09:01AM 25               MR. CAZARES:  THEY ARE MOSTLY ACTUALLY THE EXCERPTS

09:01AM   1    THAT THE GOVERNMENT USED THEMSELVES IN THE PRIOR TRIAL, ALONG

09:01AM   2    WITH ONE SUPPLEMENTAL THAT WE HAVE SHARED WITH THE GOVERNMENT.

09:01AM   3             THE COURT:  OKAY.

09:01AM   4             MR. SCHENK:  A FEW THOUGHTS.

09:01AM   5        IN THE HOLMES TRIAL, MS. HOLMES'S STATEMENTS ARE

09:02AM   6    ADMISSIONS.  THE GOVERNMENT HAS AN EXCEPTION TO THE HEARSAY

09:02AM   7    RULE TO ADMIT THEM, AND IT WAS ON THAT BASIS THAT MS. HOLMES'S

09:02AM   8    STATEMENTS ARE ADMISSIBLE.

09:02AM   9        IN THIS TRIAL, I DON'T BELIEVE THERE'S AN EXCEPTION FOR

09:02AM   10   THE DEFENSE TO PLAY MS. HOLMES'S STATEMENTS AND THEN ARGUE THAT

09:02AM   11   THE STATEMENTS WERE TRUE.

09:02AM   12       I DON'T THINK THE DEFENSE IS GOING TO ARGUE THAT THE

09:02AM   13   STATEMENTS THAT MS. HOLMES MADE WERE FALSE.

09:02AM   14       THE POINT OF PLAYING THEM, AND I CAN POINT TO EVEN

09:02AM   15   PARTICULAR EXCERPTS THAT THE DEFENSE HAS SUGGESTED TO THE

09:02AM   16   GOVERNMENT THAT THEY INTEND TO PLAY, LIKE THE ONE ABOUT THE

09:02AM   17   WORK THAT THERANOS DID TO PREPARE FOR A NATIONAL ROLLOUT.

09:02AM   18       THE DEFENSE WILL ARGUE THAT THAT'S TRUE.  THAT'S AN END

09:02AM   19   RUN AROUND THE HEARSAY RULES.

09:02AM   20       AND THEY ARE ADMITTING MS. HOLMES'S OUT-OF-COURT

09:02AM   21   STATEMENTS TO ESTABLISH THE TRUTH, BOTH THAT IT WAS RELEVANT --

09:02AM   22   I AGREE THAT THEY WILL ADMIT IT FOR THE PURPOSE OF ESTABLISHING

09:02AM   23   WHAT MATTERED TO TOLBERT.  THEY CAN DO THAT THROUGH

09:02AM   24   QUESTIONING.

09:02AM   25       TO ADMIT MS. HOLMES'S STATEMENTS IS A VIOLATION OF THE

HEARSAY RULES.

WE -- THE GOVERNMENT DID NOT INTEND TO OFFER THE RECORDINGS CASE-IN-CHIEF AND INTENDED RATHER TO ASK MR. TOLBERT HIS RECOLLECTION OF THE RECORDINGS AND WHAT -- I'M SORRY, HIS RECOLLECTION OF THE CALL AND THE INFLUENCE THAT THOSE STATEMENTS HAD ON HIM.

BUT I ALSO WANT TO BE CLEAR, IF MY UNDERSTANDING OF THE HEARSAY RULES IS INCORRECT AND, IN FACT, THE DEFENSE IS ALLOWED TO OFFER THESE, I'LL PLAY THEM IN DIRECT.

MR. CAZARES:  YOUR HONOR, FIRST OF ALL, THE NONHEARSAY PURPOSE IS FOR WHAT MS. HOLMES ACTUALLY SAID, THE ACT OF WHAT SHE SAID.

WE'RE NOT GOING TO ARGUE THAT WHAT SHE SAID WAS TRUE.

WHAT WE WANT TO PRESENT TO THE JURY SO THEY KNOW, WHAT DID MS. HOLMES ACTUALLY SAY THAT LED TO MR. TOLBERT'S INVESTMENT?

NOT HIS VAGUE RECOLLECTION OF HIS UNDERSTANDING OF WHAT IT MEANT, INTERPRETATIONS THAT HE'S PROBABLY GOING TO TESTIFY TO.

WHAT DID SHE ACTUALLY SAY, THE FACT OF WHAT SHE SAID? THAT'S WHAT WE'RE TRUE INTRODUCING IT FOR.

WE'RE NOT GOING TO SIT HERE AND ARGUE THAT X, Y, AND Z WAS TRUE IN THAT RECORDING.  SIMPLY, THAT'S WHAT SHE SAID.  IF YOU UNDERSTOOD SOMETHING ELSE, MAYBE THAT'S ON YOU.

MAYBE THERE WAS SOME OTHER INFLUENCE ON MR. TOLBERT THAT CAUSED HIM TO HAVE THAT UNDERSTANDING, BUT HER WORDS WERE IN THE TAPE.  THAT'S WHAT HE WAS TOLD.

09:04AM  1      THE OTHER NONHEARSAY PURPOSES IS OBVIOUSLY A ROUTINE

09:04AM  2  NONHEARSAY PURPOSE, EFFECT ON THE LISTENER, YOUR HONOR.

09:04AM  3  WHETHER IT IS A DEFENDANT OR NOT IS IRRELEVANT TO THAT RULE.

09:04AM  4  IT'S A COMMONLY HEARD HEARSAY EXCEPTION.  THE EFFECT ON THE

09:04AM  5  LISTENER.

09:04AM  6      MR. TOLBERT HAS ALREADY SAID IN THIS COURT, UNDER OATH, I

09:04AM  7  LISTENED TO THE CONFERENCE CALL, IT WAS INFLUENTIAL, WE

09:04AM  8  INVESTED.

09:04AM  9      THAT'S A NONHEARSAY PURPOSE.

09:04AM  10      IN ADDITION, WHEN THE DEFENSE -- I'M SORRY.  WHEN THE

09:04AM  11  GOVERNMENT INTRODUCES ITS TESTIMONY, AGAIN, BASED ON

09:04AM  12  RECOLLECTION OF THE CALL TEN YEARS AGO, AND NOTES, AGAIN, IT'S

09:04AM  13  AN IMPERFECT RECITATION OF WHAT MS. HOLMES SAID WHEN THE

09:04AM  14  GOVERNMENT ALREADY HAS THE TAPES.

09:04AM  15      THE RULE OF COMPLETENESS ALSO PERMITS THIS COURT TO

09:05AM  16  INTRODUCE -- TO ALLOW THE DEFENSE TO INTRODUCE THE RECORDING,

09:05AM  17  AGAIN, TO COMPLETE THE PICTURE OF WHAT SHE ACTUALLY SAID.

09:05AM  18      NOT HIS NOTES, WHICH ACTUALLY AREN'T EVEN THE ACTUAL

09:05AM  19  NOTES.  THEY'RE A TRANSCRIPT OR A RECITATION THAT HE TYPED UP

09:05AM  20  FROM THE NOTES THAT HE THEN THREW AWAY.  SO THERE ARE A COUPLE

09:05AM  21  OF LAYERS OF HEARSAY THERE AS WELL.

09:05AM  22      BUT THE POINT IS THAT HE'S GOING TO TESTIFY TO WHAT HE

09:05AM  23  THINKS SHE SAID, THE TAPES SHOW WHAT SHE ACTUALLY SAID, AND

09:05AM  24  THAT'S PERMITTED UNDER THE RULE OF COMPLETENESS AS WELL.

09:05AM  25          THE COURT:  I'M NOT SURE IT'S A RULE OF COMPLETENESS

4253

| | | |
|---|---|---|
| 09:05AM | 1 | ISSUE.  THAT'S MORE FOR WRITINGS AND -- |
| 09:05AM | 2 | MR. CAZARES:  NO, NO.  THERE'S NINTH CIRCUIT LAW, |
| 09:05AM | 3 | U.S. VERSUS LOPEZ -- |
| 09:05AM | 4 | THE COURT:  IF YOU'LL LET ME FINISH MY THOUGHTS. |
| 09:05AM | 5 | MR. CAZARES:  I APOLOGIZE. |
| 09:05AM | 6 | THE COURT:  THAT'S ALL RIGHT.  THAT'S OKAY. |
| 09:05AM | 7 | I UNDERSTAND LOPEZ AND I UNDERSTAND WHAT LOPEZ SAYS, BUT |
| 09:05AM | 8 | I'M NOT CERTAIN THAT THAT'S THE STRONGEST ARGUMENT HERE FOR |
| 09:05AM | 9 | ADMITTING THIS. |
| 09:05AM | 10 | YOU SAY EFFECT ON THE LISTENER, AND THAT IS THE EFFECT -- |
| 09:06AM | 11 | THE INVESTMENT DECISION IN 2013, THAT EFFECT? |
| 09:06AM | 12 | MR. CAZARES:  YES. |
| 09:06AM | 13 | THE COURT:  AND THE DELTA BETWEEN THE 2006, AS WE'VE |
| 09:06AM | 14 | BEEN TALKING ABOUT THIS MORNING, THE DELTA BETWEEN THAT AND THE |
| 09:06AM | 15 | 2013 INVESTMENT. |
| 09:06AM | 16 | MR. CAZARES:  YES, YOUR HONOR. |
| 09:06AM | 17 | BECAUSE THE COURT WAS READING THE TRANSCRIPT THAT THE |
| 09:06AM | 18 | GOVERNMENT PRESENTED TO YOU IN ITS RESPONSE TO OUR MOTION, AND |
| 09:06AM | 19 | THE DETAILS -- |
| 09:06AM | 20 | THE COURT:  I READ IT LAST NIGHT BEFORE I GOT THEIR |
| 09:06AM | 21 | RESPONSE. |
| 09:06AM | 22 | MR. CAZARES:  THE DETAILS THAT THE COURT WAS READING |
| 09:06AM | 23 | IS THE RECORDING. |
| 09:06AM | 24 | THOSE DETAILS ARE NOT NECESSARILY REFLECTED IN HIS NOTES. |
| 09:06AM | 25 | MAYBE HE'LL RECALL SOME OF THAT DETAIL, MAYBE HE WON'T. |

09:06AM 1      BUT THE POINT IS THAT WHAT SHE ACTUALLY SAID AND WHAT

09:06AM 2  APPARENTLY HAD SOME RELEVANCE TO WHAT SHE, MS. HOLMES, TOLD

09:06AM 3  MR. TOLBERT IN 2013, ARE NUANCES THAT AREN'T REFLECTED IN THE

09:06AM 4  NOTES.  HE MAY HAVE A RECOLLECTION OF IT, BUT THE RECORDING IS

09:06AM 5  THE BEST EVIDENCE OF WHAT SHE SAID.

09:06AM 6          THE COURT:  OKAY.  AND IT'S NOT OFFERED FOR THE

09:06AM 7  TRUTH OF --

09:06AM 8          MR. CAZARES:  ABSOLUTELY NOT.

09:07AM 9          THE COURT:  -- ANYTHING THAT MS. HOLMES SAID?

09:07AM 10         MR. CAZARES:  JUST WHAT SHE SAID, NOT THE

09:07AM 11 TRUTHFULNESS OR FALSITY OF WHAT SHE SAID.

09:07AM 12         THE COURT:  AND WHAT SHE SAID AND WHAT HE DID BASED

09:07AM 13 ON WHAT HE HEARD.

09:07AM 14         MR. CAZARES:  YES.

09:07AM 15         THE COURT:  AND HE CAN TESTIFY TO THAT WITHOUT THE

09:07AM 16 TAPE, CAN'T HE?

09:07AM 17         MR. CAZARES:  WELL, HE IS GOING TO TESTIFY IN DIRECT

09:07AM 18 BASED ON RECOLLECTION AND SOME NOTES.

09:07AM 19         THE COURT:  BUT, I MEAN, HE CAN TESTIFY ABOUT THAT

09:07AM 20 WITHOUT THE TAPE; RIGHT?

09:07AM 21         MR. CAZARES:  YES, HE CAN.

09:07AM 22         THE COURT:  SURE.

09:07AM 23         MR. CAZARES:  AND OUR RESPONSE IS THAT THE REST OF

09:07AM 24 THE RECORDING, WHAT HER ACTUAL WORDS, ARE ACTUALLY WHAT CAUSED

09:07AM 25 HIM TO INVEST, AND THE JURY SHOULD HEAR THAT OUT OF FUNDAMENTAL

09:07AM 1    FAIRNESS, YOUR HONOR.

09:07AM 2         THIS IS AN INVESTMENT FRAUD CASE.

09:07AM 3              THE COURT:  OKAY.

09:07AM 4              MR. CAZARES:  THE INVESTOR IS GOING TO COME HERE AND

09:07AM 5    TALK ABOUT WHAT CAUSED HIM TO INVEST.  SHOULDN'T THE JURY BE

09:07AM 6    PERMITTED TO HEAR THE WORDS THAT ACTUALLY CAUSED HIM TO INVEST?

09:07AM 7              THE COURT:  OKAY.  THANK YOU.

09:07AM 8              MR. SCHENK:  THANK YOU, YOUR HONOR.  A FEW THOUGHTS.

09:07AM 9         TOWARDS THE BEGINNING OF MR. CAZARES'S LAST INTERACTION

09:07AM 10   WITH THE COURT, HE TOLD THE COURT, AND WE MIGHT WANT TO GET

09:08AM 11   THIS TRANSCRIPT, THEY DO NOT INTEND TO ARGUE THE TRUTH OF THE

09:08AM 12   STATEMENTS THAT MS. HOLMES MADE ON THAT RECORDING.

09:08AM 13        ONE OF THE CLIPS THAT THEY TOLD THE GOVERNMENT THEY INTEND

09:08AM 14   TO PLAY IS 1348-4, AND IN DASH 4 MS. HOLMES SAYS, "OUR RETAIL

09:08AM 15   PARTNERS HAVE INVESTED HUNDREDS OF MILLIONS OF DOLLARS IN

09:08AM 16   BUILDING OUT THIS FRAMEWORK, AND WE, TOO, HAVE BEEN PREPARING

09:08AM 17   FOR THIS FOR MANY YEARS, AND THE GOAL IS TO BE ABLE TO BE

09:08AM 18   NATIONAL VERY, VERY, VERY, VERY QUICKLY."

09:08AM 19        IF THE DEFENSE IS ACTUALLY NOW TELLING THE COURT THEY DO

09:08AM 20   NOT INTEND IN CLOSING TO ARGUE THE TRUTH OF THAT AND OTHER

09:08AM 21   STATEMENTS THAT MS. HOLMES MADE, THAT IS NOT SOMETHING THAT I

09:08AM 22   THINK THEY'RE GOING TO WANT THE COURT TO HOLD THEM TO LATER ON

09:08AM 23   IN THE TRIAL.

09:08AM 24        AND THEY MIGHT WANT AN OPPORTUNITY TO REVISIT THAT

09:08AM 25   STATEMENT, BECAUSE I THINK THEY WILL ARGUE THE TRUTH OF THE

4256

09:08AM  1    STATEMENTS THAT MS. HOLMES MADE.

09:08AM  2         THAT'S WHY THEY WANT TO PLAY THEM, BECAUSE THEY WANT TO

09:08AM  3    ARGUE THAT THINGS THAT MS. HOLMES SAID TO MR. TOLBERT WERE, IN

09:09AM  4    FACT, TRUE.

09:09AM  5         AND IF THE ADMISSION OF THIS TAPE WILL LEAD TO PREVENTING

09:09AM  6    OR BARRING THEM FROM ARGUING THE TRUTH, IT'S GOING TO

09:09AM  7    SIGNIFICANTLY AFFECT THE KIND OF ARGUMENTS THAT THEY PREVIEWED

09:09AM  8    IN OPENING AND I ANTICIPATE THEY'LL BE MAKING IN CLOSING.

09:09AM  9              MR. CAZARES:  I CAN ADDRESS THAT, YOUR HONOR.

09:09AM  10        THE EVIDENCE -- OR EVIDENCE THAT WE BELIEVE THE DEFENSE

09:09AM  11   WILL BE ABLE TO USE TO ARGUE THAT RESOURCES AND PREPARATIONS

09:09AM  12   AND INTENT REGARDING A NATIONAL ROLLOUT ALL SUPPORTED

09:09AM  13   MR. BALWANI'S GOOD FAITH AND INTENT, THAT'S OUTSIDE OF THE

09:09AM  14   RECORDING.  WE DON'T NEED TO POINT TO THE RECORDING TO SAY,

09:09AM  15   LOOK, WHAT SHE SAID IS TRUE.

09:09AM  16        WE HAVE OTHER EVIDENCE THAT SUGGESTS MR. BALWANI'S GOOD

09:09AM  17   INTENT WITH RESPECT TO THE ROLLOUT AND THE RESOURCES SPENT AND

09:09AM  18   INTENT TO DO THE NATIONAL ROLLOUT.

09:09AM  19        WHETHER OR NOT MS. HOLMES SAID THAT IN THE RECORDING IS

09:09AM  20   IRRELEVANT.

09:09AM  21        OUR POINT IS MR. TOLBERT HAS THOUGHTS IN HIS HEAD --

09:09AM  22             THE COURT:  I UNDERSTAND YOUR ARGUMENT ABOUT

09:09AM  23   MR. TOLBERT, BUT I JUST WANT TO -- MR. SCHENK RAISES A POINT,

09:10AM  24   PERHAPS OF CAUTION DOWN THE ROAD, AND YOU'VE HEARD ME SAY

09:10AM  25   BEFORE, EVERYBODY PROCEEDS AT THEIR OWN PERIL.

```
09:10AM   1        IF I ALLOW THE TAPES TO BE PLAYED AND EXAMINATION TO BE

09:10AM   2   HAD ON THAT, AND BASED ON WHAT YOU SAID, YOU'RE NOT GOING TO

09:10AM   3   ARGUE THE TRUTH OF ANY OF THIS, THAT CUTS A BROAD PATH, AND IF

09:10AM   4   THAT'S WHAT YOU WOULD LIKE TO DO, SO BE IT.

09:10AM   5        MR. CAZARES:  WELL, IT'S NOT THE TRUTH -- POINTING

09:10AM   6   TO HER WORDS IN THE RECORDING THAT WHAT SHE'S TOLD MR. TOLBERT

09:10AM   7   WAS TRUE.

09:10AM   8        WE HAVE OTHER EVIDENCE TO SHOW MR. BALWANI'S GOOD INTENT

09:10AM   9   BECAUSE MR. BALWANI WAS NOT ON THE RECORDING.

09:10AM  10        THE COURT:  NO, I UNDERSTAND THAT.

09:10AM  11        MR. CAZARES:  HE WASN'T THERE, HE DIDN'T LISTEN, AND

09:10AM  12   HE WASN'T ASKED QUESTIONS.

09:10AM  13        THE COURT:  I UNDERSTAND.  I FEAR WE GET DOWN TO A

09:10AM  14   POINT WHERE THERE ARE INSTRUCTIONS OR ARGUMENT AND THIS ISSUE

09:10AM  15   COMES UP AT A FUTURE TIME THAT WE'RE ALL REMINDED OF THE

09:10AM  16   LIMITATIONS OF WHAT YOU'RE ASKING.

09:10AM  17        MR. CAZARES:  YOUR HONOR, YOUR HONOR, IT'S A FAIR

09:10AM  18   POINT.

09:10AM  19        BUT NONHEARSAY PURPOSE FOR HEARSAY INTRODUCED IN THIS

09:11AM  20   TRIAL ALREADY, AND I'M ASSUMING GOING FORWARD, IT'S BEEN PRETTY

09:11AM  21   ROUTINE, AND I THINK BOTH PARTIES ARE EXPERIENCED AND KNOW HOW

09:11AM  22   THEY CAN ARGUE THESE ISSUES AND THE GUARDRAILS, IF YOU WILL.

09:11AM  23        AND I KNOW THE COURT IS AWARE OF THAT IS AND IS GOING TO

09:11AM  24   HOLD US TO IT AND WE UNDERSTAND THAT.

09:11AM  25        MR. SCHENK:  YOUR HONOR, JUST A COUPLE MORE POINTS.
```

09:11AM 1          FIRST, THE DEFENSE SEEMS TO BE SAYING, WE'RE GOING TO PLAY

09:11AM 2    TAPES AND NOT ARGUE THAT THEY'RE TRUE, AND THEN IN CLOSING

09:11AM 3    ARGUE THAT MS. HOLMES'S STATEMENTS WERE TRUE.

09:11AM 4          THAT'S AN END RUN AROUND THE HEARSAY RULES.

09:11AM 5          SECOND, THE RULE OF COMPLETENESS DOES NOT APPLY HERE.  IF

09:11AM 6    I PLAY PORTIONS OF THE TAPES, THE DEFENSE GETS TO GO TO THE

09:11AM 7    COURT, OR TO THE GOVERNMENT, AND SAY, WE REQUEST, IF YOU PLAY

09:11AM 8    THIS PORTION AT THIS TIME, THAT IT IS APPROPRIATE AND FAIR FOR

09:11AM 9    YOU TO PLAY ANOTHER PORTION.

09:11AM 10          BUT TO SUGGEST THAT MY ASKING QUESTIONS OF TOLBERT ABOUT A

09:11AM 11    CALL REQUIRES, UNDER THE RULE OF COMPLETENESS, THAT THE CALL

09:12AM 12    THEN BE PLAYED IS NOT ACCURATE, AND THE GOVERNMENT WOULD NOT

09:12AM 13    OPEN THE DOOR TO THE PLAYING OF THE TAPE BY ASKING QUESTIONS

09:12AM 14    ABOUT A CALL ON DECEMBER 20TH.

09:12AM 15          MR. CAZARES:  AND ON THAT POINT, YOUR HONOR, THE

09:12AM 16    PROBLEM IS THAT RULE 611 KIND OF INTERRELATES WITH THE RULE OF

09:12AM 17    COMPLETENESS.

09:12AM 18          WHILE THE RULE OF COMPLETENESS MAY BE LIMITED AT SOME

09:12AM 19    LEVEL, RULE 611 IS NOT AND PERMITS THIS COURT TO MAKE

09:12AM 20    REASONABLE CONTROL OVER THE MODE AND ORDER OF INTERROGATING

09:12AM 21    WITNESSES AND PRESENTING EVIDENCE TO MAKE, AGAIN, THE

09:12AM 22    INTERROGATION AND PRESENTATION EFFECTIVE AND COMPLETE.

09:12AM 23          TO THE EXTENT THAT THEY'RE INTRODUCING EVIDENCE OF A

09:12AM 24    CONVERSATION AND A DISCUSSION AND A CONFERENCE CALL THAT IS

09:12AM 25    ALREADY RECORDED, THEY'RE ENTITLED TO DO IT.

4259

09:12AM  1     BUT RULE 611 CERTAINLY PERMITS THE COURT TO ALLOW THE

09:12AM  2   DEFENSE TO CLOSE THAT LOOP AND LET THE JURY HEAR THE REST OF

09:12AM  3   THE CONVERSATION THAT TOOK PLACE, THE WHOLE CONVERSATION, NOT

09:12AM  4   JUST SOMEONE'S RECOLLECTION.

09:12AM  5          THE COURT:  OKAY.  I UNDERSTAND THAT.

09:12AM  6        I'M RETURNING BACK TO THIS, AND I THINK MR. SCHENK RAISES

09:13AM  7   A GOOD POINT REGARDING MS. HOLMES'S TESTIMONY HERE AND WHAT YOU

09:13AM  8   MAY SEEK TO ARGUE.

09:13AM  9        AND I JUST WANT TO SAY, IT MAY BE THAT I WON'T LET YOU

09:13AM  10   ARGUE SOMETHING, SO I JUST WANT TO MAKE SURE THAT YOU'VE BEEN

09:13AM  11   ABLE TO CONSULT YOUR TEAM AND YOUR CLIENT TO UNDERSTAND THAT.

09:13AM  12          MR. CAZARES:  WELL, YOUR HONOR, WE UNDERSTAND THE

09:13AM  13   ISSUES, I GUESS, TO THE EXTENT THAT THE GOVERNMENT HAS ISSUES

09:13AM  14   WITH ARGUMENT ABOUT TRUTHFULNESS, IT RELATES TO THE ROLLOUT,

09:13AM  15   AND I GUESS IT'S GOING TO BE MIDDLE EAST WORK BY THERANOS, OR

09:13AM  16   INTENT TO HAVE ITS DEVICE SOMEHOW USED BY THE MILITARY IN THE

09:13AM  17   MIDDLE EAST.

09:13AM  18        THERE'S OTHER EVIDENCE OF THAT WHICH WE CAN POINT TO WHICH

09:13AM  19   IS NOT CONNECTED TO THE ACTUAL CONVERSATION THAT MS. HOLMES

09:13AM  20   MADE.

09:13AM  21        THAT EVIDENCE WE CERTAINLY CAN POINT TO, AND THERE'S NO

09:13AM  22   REASON WHY WE SHOULD BE LIMITED ON IT BECAUSE THE RECORDING IS

09:13AM  23   COMING IN FOR A NONHEARSAY PURPOSE.

09:13AM  24        AND AGAIN, YOUR HONOR, THERE'S ALSO -- THE CATCH-ALL

09:14AM  25   EXCEPTION TO THE HEARSAY RULE ALSO SHOULD PERMIT THE RECORDING

09:14AM   1    HERE AND THE JURY SHOULD BE PERMITTED TO HEAR WHAT MS. HOLMES

09:14AM   2    ACTUALLY SAID, PARTICULARLY GIVEN, AGAIN, THE GOVERNMENT IS

09:14AM   3    GOING TO INTRODUCE STATEMENTS BY HER IN 2006 TO ATTEMPT IN SOME

09:14AM   4    WAYS, IF NOT ARGUE MR. BALWANI IS RESPONSIBLE FOR THAT, THAT

09:14AM   5    MS. HOLMES ARGUABLY MAKES OR HAS A PATTERN OF MAKING STATEMENTS

09:14AM   6    THAT MAY OR MAY NOT BE ENTIRELY ACCURATE TO INVESTORS, AND

09:14AM   7    GIVEN THAT, THE JURY SHOULD HAVE THE ACTUAL WORDS, YOUR HONOR,

09:14AM   8    NOT JUST THIS INVESTOR'S RECOLLECTION.

09:14AM   9            THE COURT:  YOUR LAST STATEMENT GETS ME BACK TO SOME

09:14AM  10    CAUTION ABOUT WHAT ARE YOU GOING TO DO WITH THIS IF IT COMES

09:14AM  11    IN?  AND ARE YOU GOING TO ARGUE ITS TRUTH?

09:14AM  12            AND IF SO, THERE'S SOME CAUTIONS THAT COME WITH THAT EVEN

09:14AM  13    IF IT -- EVEN IF YOU HAVE THIS OTHER EVIDENCE.  I'M JUST SAYING

09:14AM  14    IT'S SOMETHING THAT WE HAVE TO LOOK AT VERY CAREFULLY, AND

09:14AM  15    THAT'S WHY I WAS PAUSING HERE TO MAYBE HAVE YOU -- IF YOU DON'T

09:15AM  16    NEED TO RETHINK THIS, THAT'S FINE.  IF YOU'VE MADE YOUR

09:15AM  17    DECISION, THAT'S FINE.

09:15AM  18            MR. SCHENK.

09:15AM  19            MR. SCHENK:  JUST TWO BRIEF THINGS.

09:15AM  20            THE LAST STATEMENT THAT MR. CAZARES MADE CERTAINLY SOUNDS

09:15AM  21    LIKE THE KIND OF ARGUMENT THAT THE GOVERNMENT WOULD MAKE BEFORE

09:15AM  22    IT WOULD ASK THE COURT TO ADMIT IT UNDER 801(D)(2)(E).

09:15AM  23    MS. HOLMES HAS A WAY OF SAYING THINGS THAT ARE FALSE, JUDGE,

09:15AM  24    YOU SHOULD ADMIT THIS BECAUSE IT'S A COCONSPIRATOR'S STATEMENT.

09:15AM  25            I WOULD BE VERY SURPRISED IF THE BASIS THAT THE DEFENSE IS

4261

09:15AM 1   SEEKING IS 801(D)(2)(E).  I THINK THERE ARE CASES THAT SAY THAT

09:15AM 2   THAT BASIS IS NOT AVAILABLE TO THE DEFENSE, 801(D)(2)(E).

09:15AM 3       SECOND, BY READING THAT ONE PORTION ABOUT THE ROLLOUT, I

09:15AM 4   WAS NOT LIMITING WHAT THE GOVERNMENT WILL SAY THE DEFENSE IS

09:15AM 5   PROHIBITED FROM ARGUING FOR THE TRUTH IN THE FUTURE.  I WAS

09:15AM 6   ONLY GIVING ONE EXAMPLE.

09:15AM 7       IF THE DEFENSE TRIES TO ADMIT THE TAPE, AND IF THE COURT

09:15AM 8   OVERRULES A HEARSAY OBJECTION AND ALLOWS IT TO BE PLAYED, I

09:16AM 9   WILL LISTEN VERY CAREFULLY TO WHAT THE DEFENSE PLAYS, AND THEN

09:16AM 10  I'LL EVALUATE WHETHER I'M GOING TO ARGUE TO THE COURT THAT EACH

09:16AM 11  OF THE DIFFERENT CATEGORIES OF STATEMENTS THAT THE JURY HEARD

09:16AM 12  CANNOT BE ARGUED FOR THE TRUTH BY THE DEFENSE, NOT JUST THE

09:16AM 13  ROLLOUT.

09:16AM 14       MR. CAZARES:  YOUR HONOR, LOOK, WE WOULD LIKE TO

09:16AM 15  THINK ABOUT IT.  I UNDERSTAND THE COURT'S CONCERNS.

09:16AM 16      I UNDERSTAND MR. TOLBERT IS COMING UP SECOND, SO MAYBE WE

09:16AM 17  CAN REVISIT THIS BEFORE HE ACTUALLY TAKES THE STAND.

09:16AM 18       THE COURT:  OKAY.  WELL, I THINK THAT'S A MEASURED

09:16AM 19  APPROACH.

09:16AM 20      THANK YOU FOR THE CONVERSATION THIS MORNING.  IT'S AN

09:16AM 21  IMPORTANT DECISION FOR THE COURT.

09:16AM 22      I THINK IT'S MORE IMPORTANT FOR THE PARTIES TO DECIDE HOW

09:16AM 23  THEY WANT THEIR CASE PRESENTED, AND THAT'S SOMETHING THAT I

09:16AM 24  THINK DESERVES SOME THOUGHT, SO THANK YOU FOR THAT.

09:16AM 25      SO WE'LL RESERVE DISCUSSION ON THIS UNTIL LATER.  THANK

09:16AM  1    YOU FOR TELLING ME THE TIMING OF THAT.

09:16AM  2         SO MOVING TO SCHEDULING.  THE FIRST WITNESS TODAY WILL BE?

09:16AM  3              MR. SCHENK:  MR. MENDENHALL.

09:16AM  4              THE COURT:  AND WHAT IS OUR TIMING WITH THAT?

09:17AM  5         MR. BOSTIC?

09:17AM  6              MR. BOSTIC:  YOUR HONOR, I THINK THE DIRECT FOR

09:17AM  7    MR. MENDENHALL WILL BE ABOUT AN HOUR.

09:17AM  8              THE COURT:  AND IS HE YOUR WITNESS?

09:17AM  9              MR. CAZARES:  HE IS.  PROBABLY SIMILAR IF NOT THAT

09:17AM 10    MUCH LONGER.  SO MAYBE UNTIL OUR FIRST BREAK, MAYBE A LITTLE

09:17AM 11    AFTER THE FIRST BREAK, BUT --

09:17AM 12              THE COURT:  OKAY.  AND THEN THE NEXT WITNESS WILL BE

09:17AM 13    MR. TOLBERT.  AND IS IT EXPECTED THAT WE WILL FINISH

09:17AM 14    MR. TOLBERT TODAY?

09:17AM 15              MR. SCHENK:  WE WOULD CERTAINLY FINISH THE DIRECT

09:17AM 16    TODAY IF WE'RE STARTING AROUND 11:30 OR SO.

09:17AM 17              THE COURT:  RIGHT, RIGHT.

09:17AM 18              MR. SCHENK:  THE DIRECT WOULD CERTAINLY FINISH, AND

09:17AM 19    FINISH I WOULD SAY WITH HOURS LEFT IN THE AFTERNOON.

09:17AM 20         THE TAPE ISSUE ASIDE --

09:17AM 21              THE COURT:  RIGHT.

09:17AM 22              MR. SCHENK:  OBVIOUSLY IT TAKES A LITTLE LONGER IF I

09:17AM 23    PLAY THE TAPES.

09:17AM 24              MR. CAZARES:  PROBABLY A GOOD CHANCE WE CAN FINISH

09:17AM 25    HIM, OR WE WILL MAKE OUR EFFORTS.

09:17AM 1          THE COURT:  YOU DO WHAT -- EACH SIDE DOES WHAT YOU

09:17AM 2    NEED TO DO.  THERE'S NO TIME RESTRICTIONS.  I'M JUST TRYING TO

09:17AM 3    SCHEDULE FOR OUR SCHEDULING PURPOSES.

09:17AM 4          REMIND ME AGAIN HOW LONG THE TAPE WAS.  I JUST DON'T

09:17AM 5    RECALL WHAT THAT WAS OFF THE TOP OF MY HEAD, JUST IN TOTAL WHAT

09:18AM 6    THAT TOOK.

09:18AM 7          IS THAT ABOUT A 20 MINUTE CONVERSATION?

09:18AM 8          MR. CAZARES:  THERE WERE SEVEN EXCERPTS.  AN

09:18AM 9    ESTIMATE OF THOSE SEVEN IS PROBABLY 30, 35 MINUTES, AND THEN I

09:18AM 10   THINK THE DEFENSE HAS AN ADDED EXCERPT.  SO MAYBE 35 MINUTES

09:18AM 11   TOTAL, 40 MINUTES.  THE ENTIRE RECORDING IS MUCH LONGER, BUT

09:18AM 12   THE TOTAL EXCERPTS I THINK FALL SOMEWHERE IN THAT RANGE.

09:18AM 13         THE COURT:  RIGHT.

09:18AM 14         MR. SCHENK:  WE STARTED THE TAPE AT 1:30 WITH

09:18AM 15   MR. TOLBERT AND WE FINISHED AT 3:00, BUT WE TOOK A HALF AN HOUR

09:18AM 16   BREAK.

09:18AM 17         THE COURT:  RIGHT.  AND THERE WERE MULTIPLE SEGMENTS

09:18AM 18   PLAYED AND QUESTIONS, ET CETERA.

09:18AM 19         MR. SCHENK:  THERE WERE, I THINK, A TOTAL OF EIGHT

09:18AM 20   CLIPS PLAYED ON THE DIRECT, AND THEN I THINK MR. DOWNEY PLAYED

09:18AM 21   TWO CLIPS IN CROSS.

09:18AM 22         THE COURT:  ALL RIGHT.  GREAT.  THANK YOU.

09:18AM 23         ALL RIGHT.  I'LL STEP DOWN.  WE'LL GET READY AND WE'LL

09:18AM 24   BRING OUR JURY IN.

09:19AM 25         MR. CAZARES:  THANK YOU.

09:19AM  1          MR. SCHENK:  THANK YOU.

09:19AM  2          (RECESS FROM 9:19 A.M. UNTIL 9:27 A.M.)

09:27AM  3          (JURY IN AT 9:27 A.M.)

09:27AM  4          THE COURT:  THANK YOU AGAIN FOR YOUR COURTESY.

09:27AM  5     WE ARE BACK ON THE RECORD.

09:28AM  6     ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

09:28AM  7     OUR JURY AND ALTERNATES ARE PRESENT.

09:28AM  8          GOOD MORNING, LADIES AND GENTLEMEN.  I HAD TO GET SOME

09:28AM  9     HELP FROM THE LAWYERS ON SOME MATTERS THIS MORNING, AND THAT'S

09:28AM 10     WHY WE WERE DELAYED THIS MORNING.  I APOLOGIZE FOR THAT.

09:28AM 11          BEFORE WE START, LET ME ASK YOU THAT QUESTION AGAIN.

09:28AM 12     DURING OUR BREAK, HAVE ANY OF YOU HAD CAUSE TO LEARN, LISTEN,

09:28AM 13     READ, OR DISCUSS ANYTHING ABOUT THIS CASE IN ANY WAY?

09:28AM 14          IF SO, COULD I JUST SEE YOUR HAND?

09:28AM 15          I SEE NO HANDS.  THANK YOU VERY MUCH.

09:28AM 16          DOES THE GOVERNMENT HAVE A WITNESS TO CALL?

09:28AM 17          MR. BOSTIC:  YES, YOUR HONOR.

09:28AM 18     THE UNITED STATES CALLED PATRICK MENDENHALL.

09:28AM 19          THE COURT:  THANK YOU.

09:28AM 20     SIR, IF YOU WOULD COME FORWARD, PLEASE.  LET ME INVITE YOU

09:28AM 21     TO STAND OVER HERE BY THE WITNESS STAND.

09:28AM 22     IF YOU WOULD RAISE YOUR RIGHT HAND WHILE YOU FACE OUR

09:29AM 23     COURTROOM DEPUTY, SHE HAS A QUESTION FOR YOU.

09:29AM 24          **(GOVERNMENT'S WITNESS, PATRICK MENDENHALL, WAS SWORN.)**

09:29AM 25          THE WITNESS:  YES, I DO.

09:29AM  1          THE COURT:  PLEASE HAVE A SEAT UP HERE, SIR.

09:29AM  2          I'LL INVITE YOU TO MAKE YOURSELF COMFORTABLE.

09:29AM  3          FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

09:29AM  4   NEED, AND YOU CAN BEND THAT DOWN.

09:29AM  5          WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:29AM  6   AND THEN SPELL IT PLEASE.

09:29AM  7          THE WITNESS:  MY NAME IS PATRICK MENDENHALL, THAT'S

09:29AM  8   P-A-T-R-I-C-K, M-E-N-D-E-N-H-A-L-L.

09:29AM  9          THE COURT:  THANK YOU.  COUNSEL.

09:29AM  10          MR. BOSTIC:  THANK YOU, YOUR HONOR.

09:29AM  11                       **DIRECT EXAMINATION**

09:29AM  12   BY MR. BOSTIC:

09:29AM  13   Q.   GOOD MORNING, MR. MENDENHALL.

09:29AM  14   A.   GOOD MORNING.

09:29AM  15   Q.   IF YOU ARE FULLY VACCINATED, THE COURT WILL ALLOW YOU TO

09:29AM  16   TESTIFY WITHOUT A MASK.

09:29AM  17   A.   I AM, THANK YOU.

09:29AM  18   Q.   MR. MENDENHALL, WHAT IS YOUR PROFESSION?

09:29AM  19   A.   I AM THE MANAGING PARTNER, CEO OF U.S. CAPITAL ADVISORS,

09:29AM  20   WHICH IS A WEALTH MANAGEMENT FIRM AND AN INVESTMENT BANKING

09:30AM  21   FIRM.

09:30AM  22   Q.   AND WAS THERE A TIME WHEN YOU WERE AN INVESTOR IN A

09:30AM  23   COMPANY CALLED THERANOS?

09:30AM  24   A.   YES.

09:30AM  25   Q.   WAS ONE OF THOSE INVESTMENTS IN LATE 2013, EARLY 2014?

09:30AM   1    A.   YES.

09:30AM   2    Q.   HAD THERE BEEN AN EARLIER INVESTMENT IN THE COMPANY?

09:30AM   3    A.   YES.

09:30AM   4    Q.   AND WHAT WAS THE APPROXIMATE TIMING OF THAT INVESTMENT?

09:30AM   5    A.   I BELIEVE THAT WAS IN 2005, 2006 RANGE.

09:30AM   6    Q.   FOR THE 2013, 2014 INVESTMENT, WHO WAS YOUR PRIMARY

09:30AM   7    CONTACT AT THERANOS?

09:30AM   8    A.   SUNNY BALWANI.

09:30AM   9    Q.   I WANT TO TALK WITH YOU A LITTLE LATER ABOUT WHAT LED YOU

09:30AM  10    TO INVEST, BUT FIRST LET ME ASK YOU SOME QUESTIONS ABOUT YOUR

09:30AM  11    BACKGROUND.

09:30AM  12         CAN YOU SUMMARIZE FOR US YOUR EDUCATION, PLEASE?

09:30AM  13    A.   YES.  I HAVE AN UNDERGRADUATE DEGREE FROM OREGON STATE

09:30AM  14    UNIVERSITY IN GENERAL BUSINESS.

09:30AM  15    Q.   AND CAN YOU GIVE US AN OVERVIEW OF YOUR WORK HISTORY

09:31AM  16    FOLLOWING OBTAINING YOUR DEGREE?

09:31AM  17    A.   YES.  I GRADUATED FROM OREGON STATE IN 1981.

09:31AM  18         IN 1982 I WAS HIRED BY MERRILL LYNCH IN HOUSTON, TEXAS.  I

09:31AM  19    SPENT A LITTLE -- AROUND A YEAR, A LITTLE OVER A YEAR THERE.

09:31AM  20         I WENT TO A FIRM CALLED LEHMAN BROTHERS; IT WAS BOUGHT OUT

09:31AM  21    BY SHEARSON; WENT TO DREXEL; IT WAS BOUGHT OUT BY SMITH BARNEY;

09:31AM  22    AND THEN I SPENT 20 YEARS AT PAINE WEBBER AND UBS AT WHICH I

09:31AM  23    WAS A MANAGING DIRECTOR, AND I RAN THEIR THIRD LARGEST WEALTH

09:31AM  24    MANAGEMENT IN THE COMPANY.

09:31AM  25         AND ALL OF THIS WAS BASED IN HOUSTON, TEXAS.

09:31AM  1    Q.   AND ARE YOU CURRENTLY BASED IN HOUSTON, TEXAS?

09:31AM  2    A.   YES.  WE ARE HEADQUARTERED -- U.S. CAPITAL ADVISORS, WHICH

09:31AM  3    I FOUNDED IN 2010 AFTER LEAVING UBS, IS BASED IN HOUSTON, TEXAS

09:31AM  4    WITH OFFICES IN AUSTIN AND DALLAS, TEXAS.

09:31AM  5    Q.   SO YOU WERE IN THAT ROLE AT U.S. CAPITAL ADVISORS IN THE

09:31AM  6    2013, 2014 TIME PERIOD?

09:32AM  7    A.   YES.

09:32AM  8    Q.   YOU MENTIONED THAT YOU FIRST INVESTED IN THERANOS IN

09:32AM  9    APPROXIMATELY 2005, 2006; IS THAT RIGHT?

09:32AM  10   A.   YES.

09:32AM  11   Q.   HOW DID YOU FIRST HEAR ABOUT THE COMPANY?

09:32AM  12   A.   I HAD ONE OF MY FINANCIAL ADVISORS WHO HAD KNOWN

09:32AM  13   ELIZABETH HOLMES'S FAMILY, AND THEY HAD BEEN COMMUNICATING AND

09:32AM  14   HE BROUGHT IT -- I HAD TO APPROVE IT AS A SUPERVISOR, AND THERE

09:32AM  15   WERE SEVERAL OF MY ADVISORS THAT WERE INVESTING IN THE EARLY

09:32AM  16   STAGE OF THERANOS.

09:32AM  17        AND WHEN IT CAME ACROSS MY DESK, I JUST THOUGHT THESE GUYS

09:32AM  18   WERE SMART GUYS, SO I WENT AND INVESTED A LITTLE BIT WITH THEM.

09:32AM  19   Q.   AND WHAT WAS THE APPROXIMATE AMOUNT OF YOUR FIRST

09:32AM  20   INVESTMENT BACK THEN?

09:32AM  21   A.   I BELIEVE IT WAS $54,000 OR $56,000, SOMETHING IN THAT

09:32AM  22   RANGE.  RIGHT AROUND $50,000, YEAH.

09:32AM  23   Q.   I'M SORRY FOR TALKING OVER YOU.

09:32AM  24        YOU MENTIONED THAT THERE WAS AN ADVISOR.  WAS THAT SOMEONE

09:32AM  25   WHO WORKED WITH YOU AT U.S. CAPITAL ADVISORS?

MENDENHALL DIRECT BY MR. BOSTIC

09:32AM 1    A.   YES, HE CURRENTLY WORKS WITH ME AT U.S. CAPITAL ADVISORS

09:33AM 2    AS WELL.

09:33AM 3    Q.   AND WHERE WERE YOU WORKING AT THE TIME?

09:33AM 4    A.   WE WERE AT UBS.

09:33AM 5    Q.   AND WHAT WAS THE NAME OF THAT INDIVIDUAL?

09:33AM 6    A.   DAVID HARRIS.

09:33AM 7    Q.   AND WAS THAT THE PERSON WHO HAD THE CONNECTION TO

09:33AM 8    MS. HOLMES'S FAMILY?

09:33AM 9    A.   YES.

09:33AM 10   Q.   BACK THEN AT THE TIME OF YOUR INITIAL INVESTMENT IN 2005,

09:33AM 11   2006, WHAT WAS YOUR UNDERSTANDING OF WHAT THE COMPANY WAS

09:33AM 12   DOING?  WHAT KIND OF BUSINESS WAS IT?

09:33AM 13   A.   INITIALLY I THOUGHT IT WAS -- I KNEW IT HAD SOMETHING TO

09:33AM 14   DO WITH BLOOD OR BLOOD DIAGNOSIS.  I THOUGHT IT WAS A -- MORE

09:33AM 15   OF A REALTIME EFFICACY TECHNOLOGY THAT -- SOME SORT OF A PATCH

09:33AM 16   OR SOMETHING THAT WOULD GIVE REALTIME RESULTS AND BE TRACKED BY

09:33AM 17   DOCTORS TO MONITOR THE EFFICACY OF WHATEVER MEDICATION THEY

09:33AM 18   WERE ON.

09:33AM 19   Q.   AND BACK THEN, WHERE WAS YOUR KNOWLEDGE ABOUT THERANOS

09:33AM 20   COMING FROM?

09:33AM 21   A.   PROBABLY FROM DAVID HARRIS.

09:33AM 22   Q.   HOW ABOUT -- SO YOU TALKED JUST NOW ABOUT WHAT KIND OF

09:34AM 23   TECHNOLOGY THE COMPANY WAS WORKING WITH.

09:34AM 24       WHAT WAS YOUR UNDERSTANDING BACK THEN ABOUT HOW FAR ALONG

09:34AM 25   THAT TECHNOLOGY WAS?

09:34AM 1    A.   IT WAS VERY EARLY STAGE AT THAT TIME.  I KNEW IT WAS A

09:34AM 2    VERY SPECULATIVE INVESTMENT.

09:34AM 3    Q.   AND THAT'S MY NEXT QUESTION.

09:34AM 4         CAN YOU TELL US MORE ABOUT THAT?  HOW DOES THE EARLY STAGE

09:34AM 5    OF THE TECHNOLOGY AFFECT YOUR VIEW OF THE KIND OF INVESTMENT?

09:34AM 6    A.   YES.  BASED ON THE AMOUNT OF DOLLARS THAT WE INVESTED, WE

09:34AM 7    VIEWED IT AS MORE VENTURE CAPITAL, WHICH IS EARLY STAGE, NO

09:34AM 8    EXPECTATION -- I MEAN, A GOOD IDEA, BUT NO REAL TECHNOLOGY YET

09:34AM 9    TO BACK IT UP, BUT MAYBE THE BEGINNING OF THOSE TECHNOLOGIES OR

09:34AM 10   SOME PATENTS OR SOMETHING TO BACK IT UP.

09:34AM 11        SO VERY SPECULATIVE, AGGRESSIVE INVESTMENT THAT YOU FULLY

09:34AM 12   EXPECT TO LOSE ALL OF YOUR MONEY AT THAT STAGE OF AN

09:34AM 13   INVESTMENT.

09:34AM 14   Q.   LEADING UP TO THAT FIRST INVESTMENT IN 2005, 2006, DID YOU

09:34AM 15   HAVE ANY OPPORTUNITIES TO SPEAK TO ELIZABETH HOLMES?

09:35AM 16   A.   I DON'T RECALL SPEAKING TO ELIZABETH HOLMES AT THAT TIME.

09:35AM 17   Q.   AFTER YOU MADE THAT INVESTMENT THAT YOU SAID WAS A LITTLE

09:35AM 18   MORE THAN $50,000 -- IS THAT RIGHT?

09:35AM 19   A.   YES.

09:35AM 20   Q.   AFTER YOU MADE THAT INVESTMENT, WHAT HAPPENED OVER THE

09:35AM 21   FOLLOWING YEARS?  DID YOU GET MORE INFORMATION ABOUT THE

09:35AM 22   COMPANY'S ACTIVITY?

09:35AM 23   A.   THERE WAS SOME SPORADIC COMMUNICATION FROM THE COMPANY,

09:35AM 24   BUT NOTHING CONCRETE AT ALL.  VERY LITTLE COMMUNICATION UP

09:35AM 25   UNTIL THAT 2013 RANGE.  SO, LIKE, SEVEN YEARS OF PRETTY MUCH

09:35AM   1    NOTHING.

09:35AM   2    Q.   SO LET ME ASK YOU ABOUT THAT TIME PERIOD, JUST A COUPLE

09:35AM   3    MORE QUESTIONS.

09:35AM   4         WE'RE TALKING ABOUT THEN 2006 THROUGH 2012 APPROXIMATELY?

09:35AM   5    A.   YES, THAT'S MY RECOLLECTION.

09:35AM   6    Q.   AND DURING THAT TIME PERIOD, DO YOU RECALL GETTING ANY

09:35AM   7    UPDATES FROM THE COMPANY ABOUT THE STATE OF THE TECHNOLOGY?

09:35AM   8    A.   I DON'T RECALL.   THERE'S -- THERE WAS A LITTLE BIT OF

09:35AM   9    COMMUNICATION, BUT I DON'T RECALL.

09:35AM   10   Q.   HOW ABOUT THE COMPANY'S BUSINESS ACTIVITY AND REVENUE?

09:36AM   11        DID YOU GET UPDATES THAT YOU REMEMBER BETWEEN 2006 AND

09:36AM   12   2012 ON THOSE TOPICS?

09:36AM   13   A.   NO.

09:36AM   14   Q.   GIVEN THE LACK OF INFORMATION, HOW WERE YOU FEELING ABOUT

09:36AM   15   YOUR INVESTMENT IN THERANOS TOWARDS THE END OF THAT PERIOD IN

09:36AM   16   2011 OR 2012?

09:36AM   17   A.   I HAD LITERALLY, I HAD SOME OTHER -- THE MARKETS WERE

09:36AM   18   GOOD, THE REGULAR STOCK MARKET WAS DOING WELL, AND I HAD

09:36AM   19   APPROACHED MY ACCOUNTANT TO JUST WRITE IT OFF, BUT HE SUGGESTED

09:36AM   20   UNTIL I GOT FORMAL NOTICE THAT IT WAS DEAD, THEN TO JUST KEEP

09:36AM   21   IT.   SO I DID.

09:36AM   22   Q.   AT SOME POINT DID YOU START TO HEAR MORE INFORMATION ABOUT

09:36AM   23   THERANOS?

09:36AM   24   A.   YES.   THERE WAS A -- SEEMED TO BE A FLURRY OF ACTIVITY IN

09:36AM   25   THE 2013 RANGE AND HEARING SOME POSITIVE THINGS.

09:36AM   1    Q.   I'D LIKE TO ASK YOU FIRST ABOUT MID-2013.

09:36AM   2         IN THE MIDDLE OF THAT YEAR, DO YOU RECALL BEING IN TOUCH

09:36AM   3    WITH MS. HOLMES ABOUT THE COMPANY?

09:36AM   4    A.   I BELIEVE I WAS.  I WOULD NEED TO REFRESH MYSELF, BUT I

09:37AM   5    THINK WE STARTED COMMUNICATING, OR MAYBE I TALKED TO HER FOR

09:37AM   6    THE FIRST TIME AT THE END OF 2013.

09:37AM   7    Q.   AND IN THAT INITIAL CONVERSATION OR CONVERSATIONS, DO YOU

09:37AM   8    RECALL RECEIVING SIGNIFICANT ADDITIONAL INFORMATION ABOUT THE

09:37AM   9    COMPANY?

09:37AM  10    A.   UM, THERE WAS -- I RECALL THAT INFORMATION WAS MORE

09:37AM  11    FORTHCOMING AT THAT TIME.

09:37AM  12    Q.   IN THOSE FIRST CONVERSATIONS WITH MS. HOLMES IN 2013, DID

09:37AM  13    YOU FEEL LIKE ALL OF YOUR QUESTIONS WERE ANSWERED ABOUT WHERE

09:37AM  14    THE COMPANY'S TECHNOLOGY AND BUSINESS WERE?

09:37AM  15    A.   I FELT I WAS GETTING MORE ANSWERS, YES.

09:37AM  16         MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

09:37AM  17         THE COURT:  YES.

09:37AM  18         MR. BOSTIC:  (HANDING.)

09:38AM  19    Q.   MR. MENDENHALL, I'VE HANDED YOU A BINDER OF DOCUMENTS, AND

09:38AM  20    THE COURT HAS A COPY AND SO DOES THE DEFENSE.

09:38AM  21         AND, MR. MENDENHALL, IF I COULD ASK YOU TO TURN TO 1102 IN

09:38AM  22    THE BINDER.  IT SHOULD BE THE FIRST ONE.

09:38AM  23    A.   YES.

09:38AM  24    Q.   AND DO YOU SEE AN EMAIL IN THERE FROM THERANOS TO A NUMBER

09:38AM  25    OF INDIVIDUALS DATED SEPTEMBER 7TH, 2013?

09:38AM    1         A.   YES.

09:38AM    2                   MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1102.

09:38AM    3                   MR. CAZARES:  NO OBJECTION.

09:38AM    4                   THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:38AM    5              (GOVERNMENT'S EXHIBIT 1102 WAS RECEIVED IN EVIDENCE.)

09:38AM    6         BY MR. BOSTIC:

09:38AM    7         Q.   MR. MENDENHALL, THAT EMAIL IS NOW ON THE SCREEN IN FRONT

09:38AM    8         OF YOU.

09:38AM    9              AND IF I COULD DIRECT YOUR ATTENTION TO -- DO YOU SEE AT

09:38AM   10         THE TOP THERE'S A LARGE BLOCK OF EMAIL ADDRESS IN THE BCC

09:38AM   11         FIELD.

09:38AM   12              DO YOU SEE THAT?

09:38AM   13         A.   YES.  YES, I DO.

09:38AM   14         Q.   AND APPROXIMATELY TWO-THIRDS OF THE WAY DOWN THAT BLOCK

09:39AM   15         AND ON THE RIGHT SIDE, DO YOU SEE THE EMAIL ADDRESS

09:39AM   16         PMENDENHALL@USCALLC.COM?

09:39AM   17         A.   YES, I DO.

09:39AM   18         Q.   IS THAT YOUR EMAIL ADDRESS?

09:39AM   19         A.   YES, IT IS.

09:39AM   20         Q.   AND IS THIS AN EMAIL THAT YOU RECEIVED IN SEPTEMBER OF

09:39AM   21         2013?

09:39AM   22         A.   YES.

09:39AM   23         Q.   AND LET'S ZOOM IN ON THE BOTTOM OF THAT PAGE AND SEE SOME

09:39AM   24         OF THAT CONTENT.

09:39AM   25              AND DO YOU SEE THAT THIS EMAIL IS WRITTEN TO THE THERANOS

09:39AM  1    SHAREHOLDERS?

09:39AM  2    A.   YES, IT IS.

09:39AM  3    Q.   AND THE EMAIL SAYS, "I AM DELIGHTED TO SHARE THAT WE HAVE

09:39AM  4    NOW BEGUN THE COMMERCIAL LAUNCH OF THE NEW PRODUCTS AND

09:39AM  5    SERVICES WE'VE BEEN WORKING ON FOR THE PAST YEARS."

09:39AM  6         DO YOU SEE THAT?

09:39AM  7    A.   YES.

09:39AM  8    Q.   FIRST OF ALL, A SIMPLE QUESTION.  DO YOU SEE ANYWHERE IN

09:39AM  9    THIS EMAIL, MR. MENDENHALL, A MENTION THAT THIS LAUNCH WAS ONLY

09:39AM  10   FOR FRIENDS AND FAMILY OF THERANOS?

09:39AM  11   A.   IT WAS TO SHAREHOLDERS.

09:39AM  12   Q.   OKAY.  AND MY QUESTION IS ABOUT THE SCOPE OF THE

09:40AM  13   COMMERCIAL LAUNCH.

09:40AM  14        DO YOU SEE ANYWHERE IN THE EMAIL THE STATEMENT THAT THE

09:40AM  15   COMMERCIAL LAUNCH WAS ONLY TO FRIENDS AND FAMILY?

09:40AM  16   A.   NO.

09:40AM  17   Q.   DO YOU REMEMBER RECEIVING THIS EMAIL IN SEPTEMBER OF 2013?

09:40AM  18   A.   I BELIEVE SO.

09:40AM  19   Q.   AS AN INVESTOR, WHAT WAS YOUR REACTION TO BEING TOLD ABOUT

09:40AM  20   THE COMMERCIAL LAUNCH OF THERANOS'S PRODUCTS AND SERVICES?

09:40AM  21   A.   THIS WAS GREAT NEWS.

09:40AM  22   Q.   WHY SO?

09:40AM  23   A.   WELL, BECAUSE I THOUGHT WE HAD NOTHING, SO IT WAS REALLY

09:40AM  24   GONE FROM SOMETHING THAT I HAD BASICALLY WAS GOING TO DISCARD

09:40AM  25   TO SOMETHING THAT WAS, WOW, THIS THING IS DOING WELL AND ALIVE.

09:40AM  1    Q.   AND THIS EMAIL IN SEPTEMBER OF 2013, IS IT YOUR

09:40AM  2    RECOLLECTION THAT YOU HAD HAD CONVERSATIONS WITH MS. HOLMES

09:40AM  3    EARLIER THAT SAME YEAR?

09:40AM  4    A.   I DON'T RECALL THE TIMING OF MY CONVERSATIONS WITH

09:40AM  5    MS. HOLMES, BUT I HAD COMMUNICATED WITH HER AROUND THIS TIME,

09:41AM  6    MAYBE A LITTLE BEFORE OR AFTER THIS.  I JUST DON'T RECALL

09:41AM  7    SPECIFICS.

09:41AM  8    Q.   OKAY.  DO YOU SEE IN THE SECOND PARAGRAPH TO THIS EMAIL TO

09:41AM  9    SHAREHOLDERS THERE IS A REFERENCE TO THERANOS'S NEW WEBSITE?

09:41AM 10    A.   YES, I DO.

09:41AM 11    Q.   AND AROUND THIS TIME PERIOD, DID YOU VISIT THE THERANOS

09:41AM 12    WEBSITE?

09:41AM 13    A.   YES, I DID.

09:41AM 14    Q.   AND FOR WHAT PURPOSE DID YOU GO TO THE WEBSITE?

09:41AM 15    A.   IT WAS JUST TO LEARN ABOUT WHAT THEY WERE POSTING TO THE

09:41AM 16    GENERAL PUBLIC, AND I WAS EXCITED TO LEARN AS MUCH AS I COULD.

09:41AM 17    Q.   AND DO YOU SEE FOLLOWING THAT THERE'S A LINK REFERRING

09:41AM 18    SHAREHOLDERS TO A "WALL STREET JOURNAL" ARTICLE THAT WAS

09:41AM 19    PUBLISHED AROUND THAT TIME?

09:41AM 20    A.   YES, I SEE THAT.

09:41AM 21    Q.   I'D LIKE TO SHOW YOU EXHIBIT 1106, WHICH IS ALREADY

09:41AM 22    ADMITTED.

09:41AM 23         MAY WE PUBLISH, YOUR HONOR?

09:41AM 24             THE COURT:  YES.

09:41AM 25    BY MR. BOSTIC:

09:41AM   1    Q.   AND, MR. MENDENHALL, THIS IS IN YOUR BINDER AND ON THE

09:42AM   2    SCREEN.

09:42AM   3         DO YOU SEE A "WALL STREET JOURNAL" ARTICLE ENTITLED

09:42AM   4    "ELIZABETH HOLMES:  THE BREAKTHROUGH OF INSTANT DIAGNOSIS"

09:42AM   5    DATED SEPTEMBER OF 2013?

09:42AM   6    A.   YES.

09:42AM   7    Q.   AND DO YOU REMEMBER READING THIS ARTICLE?

09:42AM   8    A.   YES, I DO.

09:42AM   9    Q.   I'D LIKE TO DRAW YOUR ATTENTION TO A FEW STATEMENTS HERE

09:42AM   10   ON THE FIRST PAGE IN THE FIRST INDENTED PARAGRAPH -- LET ME ASK

09:42AM   11   FIRST, PRIOR TO THIS DATE, HAD THERE BEEN MUCH PUBLIC

09:42AM   12   INFORMATION AVAILABLE ABOUT THERANOS, THE COMPANY?

09:42AM   13   A.   NO.

09:42AM   14   Q.   AND WAS IT SIGNIFICANT TO YOU TO SEE THIS INFORMATION IN

09:42AM   15   "THE WALL STREET JOURNAL"?

09:42AM   16   A.   YES.

09:42AM   17   Q.   AND WHY WAS THAT?

09:42AM   18   A.   WELL, WE WERE INVESTORS, MYSELF, SOME OF MY EMPLOYEES AND

09:42AM   19   FRIENDS, AND IT WAS PRETTY EXCITING NEWS THAT THIS WAS

09:42AM   20   MATERIALIZING, OR HAD MATERIALIZED FOR THAT MATTER.

09:42AM   21   Q.   OKAY.  IN THE LANGUAGE ON THE SCREEN, THE ARTICLE STATES,

09:42AM   22   "THE SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW REFINING

09:43AM   23   INVOLVES DEVICES THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000

09:43AM   24   LABORATORY TESTS, FROM ROUTINE BLOOD WORK TO ADVANCED GENETIC

09:43AM   25   ANALYSES."

09:43AM  1          DO YOU SEE THAT?

09:43AM  2     A.   YES.

09:43AM  3     Q.   AND CAN WE LOOK AT PAGE 2, AND ZOOM IN ON THE BOTTOM FEW

09:43AM  4     PARAGRAPHS THERE.

09:43AM  5          AND DO YOU SEE AT THE TOP OF THIS SELECTION THERE'S

09:43AM  6     LANGUAGE THAT SAYS, "ANOTHER THERANOS ADVANCE IS ITS TESTING'S

09:43AM  7     ACCURACY"?

09:43AM  8     A.   YES, I SEE THAT.

09:43AM  9     Q.   AND LET'S LOOK AT THE VERY BOTTOM OF THIS PAGE, AND YOU

09:43AM 10     SEE THERE'S A LINE THERE THAT SAYS, "THERANOS'S TECHNOLOGY IS

09:43AM 11     AUTOMATED, STANDARDIZED," AND LET'S GO TO THE NEXT PAGE, "AND

09:43AM 12     ATTEMPTS TO SUBTRACT HUMAN ERROR FROM THE PROCESS."

09:43AM 13          DO YOU SEE THAT?

09:43AM 14     A.   YES.

09:43AM 15     Q.   AND IT SAYS, "IT CAN THUS ACHIEVE MUCH LOWER VARIANCE

09:43AM 16     RANGES FOR A GIVEN TEST."

09:44AM 17          DID I READ THAT CORRECTLY?

09:44AM 18     A.   YES.

09:44AM 19     Q.   SEEING INFORMATION LIKE THIS IN THE ARTICLE, HOW DID THAT

09:44AM 20     AFFECT YOUR VIEW OF YOUR INVESTMENT IN THERANOS?

09:44AM 21     A.   IT'S VERY IMPACTFUL TO NOT ONLY AN INVESTMENT, BUT MAYBE

09:44AM 22     TO EVERYBODY ON THE PLANET IF IT'S TRUE.

09:44AM 23     Q.   LET ME BREAK THAT INTO TWO QUESTIONS THEN.

09:44AM 24          FIRST OF ALL, AS AN INVESTOR, WHY WAS THAT KIND OF

09:44AM 25     INFORMATION SIGNIFICANT TO YOU?

09:44AM 1    A.   BECAUSE IT DIDN'T EXIST, AND IF YOU THINK ABOUT WHAT THEY

09:44AM 2    WERE -- WHAT THIS ARTICLE INDICATED THEY WERE ACCOMPLISHING, IT

09:44AM 3    WAS TRULY MIRACULOUS STUFF.

09:44AM 4    Q.   AND WHY DOES THAT MATTER FOR A PERSON WHO HAS A STAKE IN

09:44AM 5    THE COMPANY?

09:44AM 6    A.   BECAUSE MY STAKE IN THE COMPANY, ALBEIT A NORMAL SIZED

09:44AM 7    ALLOCATION, WOULD BE WORTH, FINANCIALLY, SIGNIFICANT DOLLARS TO

09:44AM 8    MYSELF AND MY FAMILY.

09:44AM 9    Q.   SO BESIDES THE INVESTOR STANDPOINT, DID YOU ALSO HAVE A

09:44AM 10   REACTION TO THIS NEWS JUST AS A PERSON?

09:45AM 11   A.   YEAH.

09:45AM 12        MR. CAZARES:  OBJECTION.  RELEVANCE.

09:45AM 13        THE COURT:  OVERRULED.

09:45AM 14   YOU CAN ANSWER THE QUESTION.

09:45AM 15        THE WITNESS:  YES, BECAUSE I THINK THAT ANYBODY WHO

09:45AM 16   HAS GONE IN AND BEEN STABBED WITH A NEEDLE WOULD APPRECIATE

09:45AM 17   JUST HAVING A LITTLE FINGER PRICK.

09:45AM 18        SO IT WAS, IT WAS PSYCHOLOGICALLY AND FOR MOST AMERICAN --

09:45AM 19   PEOPLE AROUND THE WORLD, IT WAS GLOBALLY IMPACTFUL, AND IT WAS

09:45AM 20   REVOLUTIONARY.

09:45AM 21   BY MR. BOSTIC:

09:45AM 22   Q.   AND WERE STATEMENTS SPECIFICALLY ABOUT THE NUMBER OF TESTS

09:45AM 23   THAT COULD BE PERFORMED AND THE ACCURACY OF THE TESTS MATERIAL

09:45AM 24   TO YOU AS AN INVESTOR?

09:45AM 25   A.   YES.  I DID NOT KNOW THAT YOU COULD RUN 1,000 TESTS ON

09:45AM   1    BLOOD.  I DIDN'T KNOW THERE WAS ANY SUCH THING, SO -- BUT THEY

09:45AM   2    DID SAY GENETIC TESTING AND THINGS LIKE THAT.

09:45AM   3        SO I HAD NO KNOWLEDGE, BUT 1,000 TESTS, PRETTY WILD, YOU

09:45AM   4    KNOW.

09:45AM   5    Q.   YOU MENTIONED THAT YOU VIEWED THE THERANOS WEBSITE AROUND

09:45AM   6    THIS TIME; IS THAT RIGHT?

09:45AM   7    A.   YES.

09:45AM   8    Q.   AND IF I COULD ASK YOU TO TURN TO TAB 5805.

09:46AM   9        YOUR HONOR, THIS EXHIBIT IS ALSO ADMITTED.  MAY WE

09:46AM   10   DISPLAY?

09:46AM   11           THE COURT:  YES.

09:46AM   12   BY MR. BOSTIC:

09:46AM   13   Q.   AND LOOKING AT 5805, DO YOU RECOGNIZE THE THERANOS

09:46AM   14   WEBSITE?

09:46AM   15   A.   YES.

09:46AM   16   Q.   AND IS THIS SIMILAR TO THE VERSION OF THE WEBSITE THAT YOU

09:46AM   17   REVIEWED AROUND THE TIME THAT WE'RE DISCUSSING?

09:46AM   18   A.   YES, IT LOOKS LIKE THE WEBSITE.

09:46AM   19   Q.   LET'S LOOK AT PAGE 2 OF THIS EXHIBIT.  AND ON THE SCREEN,

09:46AM   20   LET'S ZOOM IN TO THE PORTION THAT SAYS, "A FULL RANGE OF TESTS,

09:46AM   21   A FRACTION OF THE COST."

09:46AM   22        AND DO YOU SEE THERE THERE'S LANGUAGE THAT SAYS, "WE OFFER

09:46AM   23   A FULL RANGE OF LABORATORY TESTS, FROM COMMON PANELS TO

09:46AM   24   SPECIALIZED TESTS.  ALL WITH SPEED AND THE HIGHEST LEVELS OF

09:46AM   25   QUALITY."

09:46AM 1        DO YOU SEE THAT?

09:46AM 2    A.   YES.

09:46AM 3    Q.   AND WAS THAT INFORMATION IMPORTANT TO YOU AS SOMEONE

09:46AM 4    INVESTING IN THE COMPANY?

09:46AM 5    A.   YES, VERY IMPORTANT.

09:46AM 6    Q.   LET'S LOOK AT PAGE 6.  LET'S ZOOM IN ON, YES,

09:47AM 7    COMPREHENSIVE TEST MENU.

09:47AM 8        AND, MR. MENDENHALL, DO YOU SEE HERE IT SAYS, "FROM COMMON

09:47AM 9    PANELS TO SPECIALIZED, THERANOS OFFERS A COMPREHENSIVE TESTING

09:47AM 10   MENU"?

09:47AM 11   A.   YES.

09:47AM 12   Q.   AND YOU TESTIFIED EARLIER THAT YOU CARED AS AN INVESTOR

09:47AM 13   ABOUT THE SCOPE OF THE TESTS AVAILABLE.

09:47AM 14   A.   OH, ABSOLUTELY, YES.

09:47AM 15   Q.   FINALLY, LET'S GO TO PAGE 22 IN THIS EXHIBIT.

09:47AM 16       AND LET'S LOOK AT THIS LANGUAGE TOWARDS THE TOP OF THE

09:47AM 17   PAGE THAT SAYS, "ONE TINY DROP.  THOUSANDS OF ANSWERS."

09:47AM 18       DO YOU SEE THAT?

09:47AM 19   A.   YES.

09:47AM 20   Q.   AND IT SAYS, "THERANOS CAN PERFORM A FULL RANGE OF TESTS

09:47AM 21   ON SAMPLES AS SMALL AS A FEW TINY DROPS."

09:48AM 22       DO YOU SEE THAT?

09:48AM 23   A.   YES.

09:48AM 24   Q.   AND IT GOES ON TO SAY, "OUR ASSAYS ARE VALIDATED UNDER

09:48AM 25   FDA, ICH, AND WHO GUIDELINES.  AND WE PROVIDE THE HIGHEST LEVEL

09:48AM  1    OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN BOTH OUR PRE-

09:48AM  2    AND POST-ANALYTIC PROCESSES, TO REALIZE THE HIGHEST LEVEL OF

09:48AM  3    ACCURACY AND PRECISION."

09:48AM  4        DO YOU SEE THAT?

09:48AM  5    A.   YES, I DO.

09:48AM  6    Q.   DO YOU RECALL SEEING THAT LANGUAGE OR SIMILAR LANGUAGE

09:48AM  7    WHEN YOU REVIEWED THE WEBSITE AROUND THE TIME OF THE LAUNCH?

09:48AM  8    A.   YES.

09:48AM  9    Q.   OKAY.  WE CAN PUT THAT EXHIBIT ASIDE.

09:48AM 10        AROUND THIS TIME IN LATE 2013, DID YOU BECOME AWARE OF

09:48AM 11    ANOTHER CHANCE TO INVEST IN THERANOS?

09:48AM 12    A.   YES, I DID.

09:48AM 13    Q.   AND HOW DID YOU FIND OUT ABOUT THAT, IF YOU RECALL?

09:48AM 14    A.   I THINK WE RECEIVED SOME SHAREHOLDER LETTERS AND

09:48AM 15    INFORMATION REGARDING STOCK SPLIT, CAPITAL RAISED, AND IT

09:48AM 16    LOOKED TO US -- IT LOOKED TO ME AT THE TIME THAT THEY WERE

09:49AM 17    PREPARING TO BRING IN INSTITUTIONAL CAPITAL AT THAT TIME.

09:49AM 18        I'M NOT SURE WHO THE INVESTORS WERE BESIDES MYSELF AND MY

09:49AM 19    FRIENDS UP UNTIL THAT POINT, BUT IT LOOKED LIKE THEY WERE

09:49AM 20    MAKING SOME INROADS INTO RAISING A SIGNIFICANT AMOUNT OF

09:49AM 21    CAPITAL.

09:49AM 22    Q.   AND YOU USED THE TERM "INSTITUTIONAL CAPITAL."  CAN YOU

09:49AM 23    BRIEFLY EXPLAIN WHAT THAT MEANS?

09:49AM 24    A.   IT WOULD BE MORE SOPHISTICATED.  IT COULD BE PRIVATE

09:49AM 25    EQUITY, HEDGE FUNDS, DIFFERENT CAPITAL MARKETS TYPE COMPANIES

09:49AM 1    AND ULTRA HIGH NET WORTH INDIVIDUALS.  FAMILY OFFICES I SHOULD

09:49AM 2    SAY.

09:49AM 3    Q.   OKAY.  LET ME ASK YOU TO TURN TO 5814 IN YOUR BINDER.

09:49AM 4         DO YOU SEE THERE AN EMAIL FROM THERANOS TO YOU IN

09:49AM 5    MID-DECEMBER 2013?

09:49AM 6    A.   I DO.

09:49AM 7              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5814.

09:50AM 8              MR. CAZARES:  NO OBJECTION.

09:50AM 9              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:50AM 10        (GOVERNMENT'S EXHIBIT 5814 WAS RECEIVED IN EVIDENCE.)

09:50AM 11   BY MR. BOSTIC:

09:50AM 12   Q.   AND DO YOU SEE, FIRST OF ALL, MR. MENDENHALL, AT THE TOP

09:50AM 13   THIS WAS SENT FROM THERANOS TO YOU ON DECEMBER 16TH, 2013?

09:50AM 14   A.   YES, I SEE THAT.

09:50AM 15   Q.   AND LET'S LOOK AT THE TEXT OF THE LETTER UNDER "THERANOS

09:50AM 16   CONFIDENTIAL."

09:50AM 17        IT SAYS, "DEAR THERANOS STOCKHOLDER."

09:50AM 18        AND DO YOU SEE AT THE TOP THERE'S LANGUAGE THAT SAYS,

09:50AM 19   "WITH OUR LAUNCH TO CONSUMER HEALTH CARE THIS YEAR, WE ARE

09:50AM 20   RAPIDLY SCALING TO ESTABLISH A NATIONAL FOOTPRINT AND CAPTURE

09:50AM 21   THE OPPORTUNITY WE HAVE TO SERVE AS THE ONLY CERTIFIED,

09:50AM 22   NATIONAL LABORATORY CAPABLE OF RUNNING ANY OF ITS LABORATORY

09:50AM 23   TESTS FROM A FEW TINY DROPLETS OF BLOOD."

09:50AM 24        DO YOU SEE THAT LANGUAGE?

09:50AM 25   A.   YES, I DO.

09:50AM  1    Q.   AND THIS LANGUAGE ABOUT SCALING TO ESTABLISH A NATIONAL

09:50AM  2    FOOTPRINT," WHAT DID THAT SIGNIFY TO YOU AS AN INVESTOR?

09:51AM  3    A.   IT SIGNALLED TO ME THAT THEY WERE RUNNING BLOOD TESTS AND

09:51AM  4    THAT THEY NEEDED TO MANUFACTURE AND GROW SALES AND GROW

09:51AM  5    LOCATIONS AND DISTRIBUTE THEIR PRODUCT AND GET IT OUT INTO THE

09:51AM  6    MARKET TO GENERATE REVENUE AS PART OF THEIR BUSINESS PLAN.

09:51AM  7         THAT WOULD BE MY ASSUMPTION.

09:51AM  8    Q.   AT THE BOTTOM OF THAT SAME PARAGRAPH IT SAYS, "AS WE

09:51AM  9    PREPARE FOR 2014 AND CLOSING YEAR END, WE ARE ACTIVELY

09:51AM  10   INVESTING IN INFRASTRUCTURE TO BUILD THIS NEW INDUSTRY WE HAVE

09:51AM  11   CREATED."

09:51AM  12        IS THAT LANGUAGE CONSISTENT WITH THE CONCEPT THAT YOU JUST

09:51AM  13   DESCRIBED?

09:51AM  14   A.   YES.

09:51AM  15   Q.   AROUND THIS TIME WHEN YOU FOUND OUT ABOUT THE OPPORTUNITY

09:51AM  16   TO INVEST MORE MONEY IN THERANOS, WERE YOU INTERESTED IN

09:51AM  17   POTENTIALLY PURSUING THAT?

09:51AM  18   A.   YES.

09:51AM  19   Q.   AND WHY WAS THAT?

09:51AM  20   A.   THIS IS, AGAIN, PROBABLY THE MOST INCREDIBLE INVESTMENT

09:52AM  21   OPPORTUNITY THAT ONE COULD SEE, AND IF YOU -- WHEN I DID JUST

09:52AM  22   BACK OF THE ENVELOPE MATH ON MY OWN, I THOUGHT, WOW, THIS THING

09:52AM  23   COULD REALLY BE A SIGNIFICANT OPPORTUNITY FOR INVESTORS LIKE

09:52AM  24   MYSELF.

09:52AM  25   Q.   AND WHAT WAS THE NEXT STEP THEN?  GIVEN THAT YOU WERE

09:52AM   1      INTERESTED IN POTENTIALLY PURSUING IT, WHAT DID YOU DO NEXT?

09:52AM   2      A.   I'M NOT SURE EXACTLY WHAT I DID, BUT THERE WAS SOME

09:52AM   3      OFFERING DOCUMENTS AND SOME MORE INFORMATION THAT CAME MY WAY

09:52AM   4      TO MAKE A DECISION.

09:52AM   5      Q.   DID YOU HAVE A CONVERSATION WITH MR. BALWANI IN DECEMBER

09:52AM   6      OF 2013 WHILE YOU WERE DECIDING WHETHER TO INVEST MORE?

09:52AM   7      A.   I DID.

09:52AM   8      Q.   IF I COULD ASK YOU TO LOOK AT TAB 5825.

09:53AM   9           AND DO YOU SEE AT 5825 AN EMAIL CHAIN BETWEEN YOU AND

09:53AM  10      MR. BALWANI IN THIS TIME PERIOD?

09:53AM  11      A.   I DO.

09:53AM  12              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5825.

09:53AM  13              MR. CAZARES:  NO OBJECTION.

09:53AM  14              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:53AM  15           (GOVERNMENT'S EXHIBIT 5825 WAS RECEIVED IN EVIDENCE.)

09:53AM  16      BY MR. BOSTIC:

09:53AM  17      Q.   OKAY.  LET'S ZOOM IN ON MR. BALWANI'S MESSAGE TO YOU.

09:53AM  18           DO YOU SEE THAT WE'RE LOOKING AT AN EMAIL FROM

09:53AM  19      DECEMBER 19TH, 2013?

09:53AM  20      A.   YES.

09:53AM  21      Q.   AND MR. BALWANI WRITES, "DEAR PAT.

09:53AM  22           "HOPE THIS EMAIL FINDS YOU WELL.

09:53AM  23           "I WAS INSTRUCTED BY ELIZABETH HOLMES, OUR CEO, TO REACH

09:53AM  24      OUT TO YOU IN REGARDS TO YOUR INTEREST IN PARTICIPATING IN THE

09:53AM  25      CURRENT ROUND OF EQUITY FINANCING FOR THE COMPANY."

09:53AM  1          DO YOU SEE THAT?

09:53AM  2     A.   YES.

09:53AM  3     Q.   AND DO YOU REMEMBER ANY CONVERSATIONS YOU HAD WITH

09:53AM  4     MS. HOLMES LEADING UP TO MR. BALWANI EMAILING YOU?

09:53AM  5     A.   YES.  I REMEMBER I DID TALK TO HER AND SHE SAID SHE WOULD

09:53AM  6     CONNECT ME WITH SUNNY AND HE WOULD ANSWER ALL OF THE QUESTIONS

09:54AM  7     THAT I WOULD HAVE ABOUT THE OFFERING AND THE BUSINESS AND THE

09:54AM  8     CURRENT STATUS OF THE BUSINESS.

09:54AM  9     Q.   WAS THAT MS. HOLMES'S IDEA TO CONNECT YOU WITH

09:54AM  10    MR. BALWANI, OR WAS IT IN RESPONSE TO QUESTIONS THAT YOU HAD

09:54AM  11    ABOUT THE COMPANY?

09:54AM  12    A.   IT WAS HER RESPONSE TO QUESTIONS THAT I HAD ABOUT THE

09:54AM  13    COMPANY.

09:54AM  14    Q.   DID SHE ALSO PROVIDE ANSWERS TO THOSE QUESTIONS, OR WAS

09:54AM  15    PUTTING YOU IN TOUCH WITH MR. BALWANI IN LIEU OF PROVIDING

09:54AM  16    THOSE ANSWERS HERSELF?

09:54AM  17    A.   MY RECOLLECTION IS THAT WE HAD A GENERAL CONVERSATION AND

09:54AM  18    I HAD A LOT OF SPECIFIC DETAILS THAT I WANTED, SO THIS WAS HER

09:54AM  19    ANSWER WAS TO CONNECT ME WITH MR. BALWANI.

09:54AM  20    Q.   AND DID YOU HAVE AN UNDERSTANDING AT THAT TIME ABOUT

09:54AM  21    MR. BALWANI'S ROLE IN THE COMPANY?

09:54AM  22    A.   YES.  AT THE TIME, HE WAS IDENTIFIED AS THE PRESIDENT AND

09:54AM  23    CHIEF OPERATING OFFICER OF THE COMPANY.

09:54AM  24    Q.   IN MR. BALWANI'S EMAIL HE SAID, "PLEASE ADVISE WHEN IS A

09:55AM  25    GOOD TIME TO CHAT," AND OFFERED TO CONNECT WITH YOU TO ANSWER

09:55AM 1    THOSE QUESTIONS.

09:55AM 2         DO YOU SEE THAT?

09:55AM 3    A.   YES.

09:55AM 4    Q.   AND DID YOU HAVE A CONVERSATION WITH MR. BALWANI SHORTLY

09:55AM 5    AFTER THIS?

09:55AM 6    A.   YES, I DID.

09:55AM 7    Q.   LET ME ASK YOU TO LOOK AT TAB 4059, PLEASE.

09:55AM 8    A.   OKAY.

09:55AM 9    Q.   DO YOU HAVE 4059?

09:55AM 10   A.   YES, I DO.

09:55AM 11   Q.   AND IS THAT AN EMAIL FROM YOU TO YOUR COWORKER,

09:55AM 12   DAVID HARRIS, ON DECEMBER 2ND, 2013?

09:56AM 13   A.   I SEEM TO -- OH, I HAVE IT.  THERE IT IS.

09:56AM 14   Q.   AND I DON'T WANT YOU TO READ ANY OF THE CONTENT OUT LOUD,

09:56AM 15   BUT COULD YOU JUST TELL US WHAT THE EMAIL WAS AND WHAT WAS THE

09:56AM 16   PURPOSE OF YOU SENDING IT?

09:56AM 17   A.   THIS EMAIL WAS A COMPLETE RECAP OF MY CONVERSATION WITH

09:56AM 18   MR. BALWANI ON THAT DAY.

09:56AM 19   Q.   AND WHAT WAS THE PURPOSE OF YOU SENDING THAT RECAP TO YOUR

09:56AM 20   COWORKER, DAVID HARRIS?

09:56AM 21   A.   DAVID WAS -- HAD INTRODUCED SEVERAL OF OUR CLIENTS, WELL,

09:56AM 22   BACK AT UBS, TO THIS INVESTMENT, AND IT -- SOME OF THESE

09:56AM 23   CLIENTS WERE SHAREHOLDERS IN MY COMPANY AND SOME OF THESE

09:56AM 24   CLIENTS WERE CLIENTS OF MY CURRENT FIRM, U.S. CAPITAL ADVISORS,

09:56AM 25   SO I WANTED TO PASS ON THE CURRENT UPDATE ON -- FOR THE

09:56AM  1    INVESTORS.

09:56AM  2    Q.   AND WAS THAT PART OF YOUR USUAL PRACTICE AT U.S. CAPITAL

09:57AM  3    ADVISORS, TO SEND UPDATES LIKE THIS TO PEOPLE LIKE MR. HARRIS?

09:57AM  4    A.   YES.

09:57AM  5    Q.   AND WAS IT PART OF YOUR REGULAR PRACTICE AT U.S. CAPITAL

09:57AM  6    ADVISORS TO HAVE CALLS OR CONVERSATIONS WITH PEOPLE

09:57AM  7    REPRESENTING THE COMPANIES YOU WERE CONSIDERING INVESTING IN?

09:57AM  8    A.   YES, COMPANIES THAT WE HAD INVESTED IN, AND THAT CERTAINLY

09:57AM  9    WHEN WE'RE CONSIDERING AN INVESTMENT, WE HAVE THESE TYPES OF

09:57AM  10   CALLS.

09:57AM  11   Q.   AND AROUND THAT TIME PERIOD AT U.S. CAPITAL ADVISORS, DID

09:57AM  12   YOU HAVE A SPECIFIC PRACTICE WHEN IT CAME TO TAKING NOTES OF

09:57AM  13   THOSE CONVERSATIONS, MEMORIALIZING THOSE NOTES?

09:57AM  14   A.   I'M, I'M A HABITUAL NOTE-TAKER, ESPECIALLY AS I GET OLDER,

09:57AM  15   AND, YES, I TAKE NOTES ALL OF THE TIME.

09:57AM  16   Q.   AND DESCRIBE FOR US WHAT YOUR USUAL PRACTICE WAS BETWEEN

09:57AM  17   THE CONTENT OF THE CALL AND SENDING AN EMAIL LIKE THIS?

09:57AM  18   A.   I JOT DOWN THE NOTES FROM THE CONVERSATION, AND THEN I

09:57AM  19   TRANSLATE THEM INTO AN EMAIL OR A WORD DOCUMENT SO PEOPLE CAN

09:58AM  20   UNDERSTAND MY NOTES AND I CAN DETAIL MY NOTES AND WHAT MY

09:58AM  21   TAKEAWAYS WERE FROM THE CONVERSATION, AND I'M VERY DETAILED AND

09:58AM  22   SPECIFIC IN THAT.

09:58AM  23   Q.   AND IN DOING THAT WITH YOUR CALL WITH MR. BALWANI, DID YOU

09:58AM  24   CREATE THIS RECORD SHORTLY AFTER THE CALL?

09:58AM  25   A.   I BELIEVE I LITERALLY HUNG UP AND THEN WITHIN A SHORT

09:58AM   1    PERIOD OF TIME I -- THAT DAY I STARTED TYPING OUT MY NOTES.

09:58AM   2    Q.   AND WAS IT IMPORTANT FOR YOU TO BE ACCURATE IN RELAYING

09:58AM   3    THIS INFORMATION TO MR. HARRIS?

09:58AM   4    A.   YES.

09:58AM   5    Q.   AND WAS THIS EMAIL AND WERE EMAILS LIKE IT PRESERVED SO

09:58AM   6    THAT THEY COULD BE REFERENCED LATER IF NEEDED?

09:58AM   7    A.   YES.  REGULATORILY WE PRESERVE OUR EMAILS FOR SIX YEARS,

09:58AM   8    NO MATTER WHAT I DO.  SO EVERYTHING THAT I WRITE IS PRESERVED

09:58AM   9    REGULLATORILY FOR UP TO SIX YEARS, I BELIEVE.

09:58AM  10         MR. BOSTIC:  OKAY.  YOUR HONOR, THE GOVERNMENT

09:58AM  11    OFFERS 5059 -- EXCUSE ME, 4059.

09:59AM  12         MR. CAZARES:  802, YOUR HONOR.

09:59AM  13         THE COURT:  IS THIS 803(6)?

09:59AM  14         MR. BOSTIC:  YES, YOUR HONOR.

09:59AM  15         THE COURT:  AND COULD YOU JUST INQUIRE, WAS -- AND

09:59AM  16    I'M NOT SURE I HEARD IT, MAYBE YOU DID -- BUT WHETHER OR NOT

09:59AM  17    HIS PROTOCOL WAS SOMETHING THAT WAS IN THE NORMAL COURSE AND

09:59AM  18    SCOPE OF HOW HE RAN THE BUSINESS.

09:59AM  19         MR. BOSTIC:  YES, YOUR HONOR.

09:59AM  20         THE COURT:  THAT PIECE OF IT, IF YOU COULD.

09:59AM  21         MR. BOSTIC:  YES, YOUR HONOR.

09:59AM  22    Q.   MR. MENDENHALL, WHAT WAS YOUR ROLE AT U.S. CAPITAL

09:59AM  23    ADVISORS AT THIS TIME IN 2013?

09:59AM  24    A.   IT'S THE SAME ROLE.  I'M THE FOUNDER AND MANAGING PARTNER

09:59AM  25    AND CEO OF THE FIRM.

09:59AM 1    Q.   OKAY.  AND THE SEQUENCE THAT YOU JUST DESCRIBED WHERE YOU

09:59AM 2    WOULD TAKE NOTES OF A CALL, TRANSCRIBE THOSE NOTES, AND THEN

09:59AM 3    EMAIL THE RECAPS TO OTHER INDIVIDUALS AT U.S. CAPITAL THAT

09:59AM 4    NEEDED THAT INFORMATION, WAS THAT PART OF YOUR STANDARD

09:59AM 5    PRACTICE AND THE WAY THAT YOU OPERATED THE BUSINESS AT THAT

09:59AM 6    TIME?

09:59AM 7    A.   YES, IT'S -- IT'S THE STANDARD PRACTICE ON HOW I DEAL NOT

09:59AM 8    ONLY WITH EMPLOYEE/EMPLOYER MATTERS, BUT WITH INVESTMENT AND

09:59AM 9    INVESTMENT MATTERS, INCLUDING CLIENTS OF THE FIRM.

10:00AM 10        WHEN I AM COMMUNICATING -- THIS WOULD BE SIMILAR TO A

10:00AM 11   COMMUNICATION THAT I KNEW WAS GOING TO GO TO CLIENTS OF THE

10:00AM 12   FIRM, ALTHOUGH THE FIRM HAD NOT -- WASN'T ASSOCIATED WITH

10:00AM 13   RAISING THE CAPITAL FOR THERANOS, I KNEW OUR SHAREHOLDERS HAD

10:00AM 14   OWNERSHIP OF THAT.

10:00AM 15        SO I KNEW THIS WAS GOING TO SHAREHOLDERS, SO I TREATED IT

10:00AM 16   AS SUCH, SHAREHOLDERS OF THERANOS AND CLIENTS OF THE FIRM.

10:00AM 17   Q.   OKAY.  THANK YOU.

10:00AM 18        YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 4059.

10:00AM 19             THE COURT:  IT'S ADMITTED PURSUANT TO 803(6).

10:00AM 20             MR. BOSTIC:  MAY I PUBLISH, YOUR HONOR?

10:00AM 21             THE COURT:  YES, YOU MAY PUBLISH.

10:00AM 22        (GOVERNMENT'S EXHIBIT 4059 WAS RECEIVED IN EVIDENCE.)

10:00AM 23             MR. BOSTIC:  LET'S ZOOM IN ON THE TOP THIRD OF THE

10:00AM 24   PAGE OR SO.

10:00AM 25   Q.   AND SO, MR. MENDENHALL, CAN YOU TELL US ONE MORE TIME WHAT

10:00AM   1    WE'RE LOOKING AT HERE, THIS EMAIL FROM DECEMBER 22ND, 2013.

10:00AM   2    A.   THIS IS A RECAP OF MY CONVERSATION WITH MR. BALWANI

10:00AM   3    SUMMARIZING THE FACTS AS HE GAVE THEM TO ME AND SENDING THEM TO

10:00AM   4    ONE OF MY EMPLOYEES, DAVID HARRIS, AND SOME OF HIS CLIENTS WHO

10:01AM   5    ARE ALSO CLIENTS OF U.S. CAPITAL.

10:01AM   6    Q.   AND BESIDES THE -- WELL, LET'S LOOK BRIEFLY AT PAGE 2 OF

10:01AM   7    THIS DOCUMENT, AND LET'S ZOOM IN ON WHAT YOU WRITE AFTER YOU

10:01AM   8    SIGN OFF FROM THE EMAIL.

10:01AM   9        DO YOU SEE THERE THERE'S LANGUAGE THAT SAYS, "I

10:01AM  10    TRANSCRIBED THIS EMAIL FROM MY NOTES AND I AM CONFIDENT I DID

10:01AM  11    SO ACCURATELY"?

10:01AM  12        DO YOU SEE THAT?

10:01AM  13    A.   YES.

10:01AM  14    Q.   WAS THAT TRUE?

10:01AM  15    A.   YES.

10:01AM  16    Q.   LET'S GO BACK TO PAGE 1 AND ZOOM IN ON THAT TOP PORTION

10:01AM  17    AGAIN.

10:01AM  18        THIS CALL WITH MR. BALWANI, WHAT WAS ITS PURPOSE IN

10:01AM  19    DECEMBER OF 2013?

10:01AM  20    A.   THE PURPOSE WAS WE HAD AN OPPORTUNITY AS CURRENT

10:01AM  21    SHAREHOLDERS TO ADD TO OUR THERANOS POSITION, AND I NEEDED TO

10:01AM  22    DETERMINE WHETHER WE WOULD DO THAT OR NOT.

10:01AM  23    Q.   AND AT THIS TIME WERE YOU INVESTIGATING THE COMPANY SOLELY

10:02AM  24    FOR YOURSELF, OR DID YOU ALSO REPRESENT OTHER INVESTORS WHO

10:02AM  25    WERE CONSIDERING INVESTING?

10:02AM  1    A.   I BELIEVE I WAS REPRESENTING MYSELF AND OTHER INVESTORS

10:02AM  2    THAT WERE INTERESTED IN KNOWING WHAT TO DO GOING FORWARD.

10:02AM  3    Q.   AND THE INFORMATION THAT YOU GAINED FROM MR. BALWANI

10:02AM  4    DURING THIS CALL ON DECEMBER 22ND, DID YOU PASS THAT

10:02AM  5    INFORMATION ALONG TO THOSE OTHER INDIVIDUALS?

10:02AM  6    A.   YES, EVENTUALLY.

10:02AM  7         WELL, SOME HERE, AND THEN MORE LATER.

10:02AM  8    Q.   OKAY.  BESIDES THE NOTES THAT WE'RE LOOKING AT, DO YOU

10:02AM  9    ALSO HAVE AN INDEPENDENT MEMORY OF YOUR CONVERSATION WITH

10:02AM  10   MR. BALWANI ON THAT DAY?

10:02AM  11   A.   YES, I REALLY DO.

10:02AM  12   Q.   OKAY.  AND I'D LIKE TO ASK YOU SOME QUESTIONS ABOUT THE

10:02AM  13   CONTENT OF THAT CONVERSATION AND WHAT YOU WROTE IN THE NOTES.

10:02AM  14        LET'S START WITH ITEMS 3, 4, AND 5 ON YOUR LIST.

10:02AM  15        DO YOU SEE THAT IN FRONT OF YOU?

10:02AM  16   A.   YES.

10:02AM  17   Q.   AND THOSE ITEMS READ, "THE 'SCIENCE' BEHIND THERANOS IS

10:03AM  18   COMPLETE;

10:03AM  19        "NO NEW 'SCIENCE' NEEDED;

10:03AM  20        "NO NEW INVENTION NEEDED."

10:03AM  21        DO YOU SEE THAT?

10:03AM  22   A.   YES, I DO.

10:03AM  23   Q.   AND WHAT DO YOU REMEMBER MR. BALWANI TELLING YOU ABOUT THE

10:03AM  24   STATE OF THE SCIENCE AND THE INVENTION AT THERANOS?

10:03AM  25   A.   IT WAS DONE AND THERE WAS SOME SPECIFICITY AROUND OUR

10:03AM 1    CONVERSATION WHERE, KNOWING THAT THE SCIENCE AND THE INVENTION

10:03AM 2    WAS COMPLETE, THE NEW CAPITAL HAD A SPECIFIC PURPOSE, AND

10:03AM 3    THAT'S WHAT THIS CONVERSATION -- ONCE I HEARD THAT, I WAS MORE

10:03AM 4    INTERESTED IN WHAT THEY WERE GOING TO DO WITH THE MONEY SINCE

10:03AM 5    EVERYTHING WAS COMPLETE, WHICH WAS VERY EXCITING NEWS.

10:03AM 6    Q.   OKAY.  AND I'LL ASK YOU SHORTLY ABOUT WHAT YOU HEARD ABOUT

10:03AM 7    THE PURPOSE OF THE MONEY.

10:03AM 8         BUT FOR NOW, WHEN IT CAME TO THE STATE OF THE TECHNOLOGY,

10:03AM 9    WHY DID THAT MATTER TO YOU AS AN INVESTOR, IF IT DID?

10:03AM 10   A.   THIS MEANS THAT THIS COMPANY WENT FROM BEING A SPECULATIVE

10:03AM 11   VENTURE COMPANY TO A COMPANY THAT HAD DEVELOPED AND CREATED

10:04AM 12   TECHNOLOGY THAT WORKED AND WAS IN THE -- WAS NOW A REAL

10:04AM 13   BUSINESS, AND IT WAS GOING TO -- IT WAS HAVING SUCCESS.

10:04AM 14        SO IT WENT FROM BEING SPECULATIVE AND AGGRESSIVE TO

10:04AM 15   PROBABLY A PRETTY DECENTLY CONSERVATIVE INVESTMENT WITH A LOT

10:04AM 16   OF UPSIDE.

10:04AM 17   Q.   AND DOES THAT MAKE THE INVESTMENT OPPORTUNITY MORE OR LESS

10:04AM 18   ATTRACTIVE TO YOU?

10:04AM 19   A.   MUCH MORE ATTRACTIVE.

10:04AM 20   Q.   IF YOU'RE LOOKING AT A TECHNOLOGY COMPANY, DO YOU VIEW AN

10:04AM 21   INVESTMENT OPPORTUNITY DIFFERENTLY IF THE COMPANY HAS COMPLETE

10:04AM 22   AND FINISHED TECHNOLOGY VERSUS IF THE COMPANY IS STILL WORKING

10:04AM 23   ON DEVELOPING IT?

10:04AM 24   A.   YEAH, YEAH -- YES, OF COURSE.  AND AGAIN, JUST BECAUSE

10:04AM 25   THIS IS WHAT I DO FOR A LIVING, WHEN WE ALLOCATE OUR

10:04AM 1    CLIENTS' -- WE MANAGE ABOUT EIGHT AND A HALF BILLION DOLLARS AS

10:04AM 2    A FIRM, SO WHEN WE ALLOCATE OUR CLIENTS' MONEY, DEPENDING ON

10:04AM 3    HOW MUCH MONEY THEY HAVE IN THEIR INVESTMENT OBJECTIVES, YOU

10:05AM 4    WOULD BE -- YOU WOULD DO SOME AGGRESSIVE, SPECULATIVE VENTURE,

10:05AM 5    BUT YOU WOULD ALLOCATE MORE MONEY TO A COMPANY THAT WAS NOW

10:05AM 6    ESTABLISHED WITH A LOT MORE UPSIDE.  IT WOULD BE CONSIDERED

10:05AM 7    MORE OF AN AGGRESSIVE GROWTH COMPANY.

10:05AM 8         IT'S NOT A VALUE COMPANY YET, WHICH IS MORE CONSERVATIVE.

10:05AM 9         IT WOULD BE CONSIDERED GOING FROM A VENTURE FIRM TO AN

10:05AM 10   AGGRESSIVE GROWTH COMPANY.

10:05AM 11        THAT WOULD BE -- YOU WOULD BE MORE MOTIVATED TO PUT MORE

10:05AM 12   MONEY IN THAT.

10:05AM 13   Q.   THE STATEMENTS IN YOUR EMAIL ARE QUITE DEFINITIVE.

10:05AM 14        DO YOU SEE THOSE STATEMENTS?

10:05AM 15   A.   YES.

10:05AM 16   Q.   HOW DOES THAT COMPARE TO WHAT MR. BALWANI WAS TELLING YOU?

10:05AM 17   WAS THERE ADDITIONAL HEDGING OR NUANCE IN WHAT YOU HEARD FROM

10:05AM 18   HIM ON THAT DAY?

10:05AM 19   A.   NO.  HE WAS 100 PERCENT CONFIDENT, FACTUAL, PRECISE.

10:05AM 20   Q.   WELL, LET'S LOOK NEXT AT ITEM 2 IN YOUR LIST.

10:05AM 21        AND DO YOU SEE THERE IT SAYS, "EMPLOYEE RAMP IS IN SALES

10:05AM 22   AND MANUFACTURING"?

10:05AM 23   A.   YES.

10:05AM 24   Q.   AND WHAT DID MR. BALWANI TELL YOU ABOUT THAT?

10:05AM 25   A.   THAT THEY WERE GOING TO EXPAND IN THEIR MANUFACTURING

10:06AM 1    CAPABILITY, AND THEY WERE RAMPING UP THEIR SALES FORCE TO DRIVE

10:06AM 2    REVENUE FOR THIS NEW TECHNOLOGY.

10:06AM 3    Q.   AND IF THAT MATTERED TO YOU AS AN INVESTOR, WHY DID IT?

10:06AM 4    A.   BECAUSE I LIKE -- THIS IS WHAT I WOULD CALL GROWTH

10:06AM 5    CAPITAL, NOT VENTURE CAPITAL.

10:06AM 6        SO CAPITAL GOING INTO GROWTH USUALLY RESULTS IN HIGHER

10:06AM 7    REVENUE AND MORE PROFITS.

10:06AM 8    Q.   LET'S LOOK AT ITEMS 6, 7, AND 8 IN YOUR NOTES OF YOUR CALL

10:06AM 9    WITH MR. BALWANI.

10:06AM 10       AND THERE IT READS, "THEY ARE COMPLETELY VERTICALLY

10:06AM 11   INTEGRATED -- THEY OWN THE LAB AND THE MANUFACTURING;

10:06AM 12       "100 PERCENT MANUFACTURING IN U.S.A. -- NO SUBCONTRACTING;

10:06AM 13       "FULLY OWNED AND PROTECTED MANUFACTURING ASSURES PRICING

10:06AM 14   AND PROFIT STABILITY."

10:06AM 15       DO YOU SEE THAT?

10:06AM 16   A.   YES.

10:06AM 17   Q.   AND WHAT DID MR. BALWANI TELL YOU ABOUT THIS TOPIC?

10:07AM 18   A.   THAT THESE WERE -- HE TOLD ME THESE THINGS SPECIFICALLY,

10:07AM 19   BUT THE CONVERSATION AROUND THAT IS THAT IF YOU CONTROL THAT,

10:07AM 20   THEN YOU'RE NOT AT THE MERCY OF YOUR SUPPLIERS.

10:07AM 21       A LOT OF THAT EXAMPLE IS GOING ON TODAY IN THE MARKETS

10:07AM 22   WITH SUPPLY CHAIN ISSUES FOR PUBLIC COMPANIES THAT ARE ALWAYS

10:07AM 23   COMPLAINING THEY DON'T ACCESS TO THIS THIS.  THIS ALLEVIATES

10:07AM 24   THOSE POTENTIAL THREATS TO YOUR BUSINESS AND INTERRUPTION TO

10:07AM 25   YOUR BUSINESS.

10:07AM  1     Q.   AND TALKING ABOUT MANUFACTURING, FROM YOUR CONVERSATION

10:07AM  2     WITH MR. BALWANI, WHAT DID YOU UNDERSTAND WAS ACTUALLY BEING

10:07AM  3     MANUFACTURED BY THERANOS?

10:07AM  4     A.   I BELIEVE THEY WERE MANUFACTURING THIS DIAGNOSTIC MACHINE.

10:07AM  5     IT MIGHT HAVE BEEN THE EDISON MACHINE.  I DON'T KNOW IF IT HAD

10:07AM  6     A NAME YET.

10:07AM  7          AND THEY WERE ALSO MANUFACTURING THE LITTLE NANO

10:07AM  8     CONTAINERS.

10:07AM  9     Q.   DID THE FACT THAT THERANOS WAS MANUFACTURING ITS OWN

10:07AM 10     ANALYZER MAKE THE INVESTMENT MORE OR LESS ATTRACTIVE TO YOU?

10:08AM 11     A.   AGAIN, IT MAKES IT MORE ATTRACTIVE.

10:08AM 12     Q.   AT ANY POINT DURING THAT CALL, DID MR. BALWANI TELL YOU

10:08AM 13     THAT THERANOS WAS DEPENDENT ON THIRD PARTY ANALYZERS FOR THE

10:08AM 14     MAJORITY OF ITS TESTS?

10:08AM 15     A.   NO.

10:08AM 16     Q.   WOULD THAT FACT HAVE BEEN IMPORTANT TO YOU AS SOMEONE

10:08AM 17     CONSIDERING AN INVESTMENT IN THE COMPANY?

10:08AM 18     A.   EXTREMELY IMPORTANT.

10:08AM 19     Q.   WHY IS THAT?

10:08AM 20     A.   WHY WOULD -- IF YOUR SCIENCE WORKS AND YOU DON'T NEED

10:08AM 21     TECHNOLOGY AND THIS IS WORKING, WHY WOULD YOU NEED TO USE THIRD

10:08AM 22     PARTY BIG VEIN DRAWS WHEN YOUR WHOLE PREMISE IS SMALL FINGERTIP

10:08AM 23     DROPS OF BLOOD?

10:08AM 24          WHY IS IT -- IS THIS A TEMPORARY THING?  IS IT A PERMANENT

10:08AM 25     THING?

10:08AM 1          THERE WOULD HAVE BEEN A LOT OF QUESTIONS I WOULD HAVE HAD

10:08AM 2    TO ASK AND IT WOULD HAVE DIALLED DOWN THE MONEY THAT I WOULD

10:08AM 3    HAVE BEEN INTERESTED IN INVESTING IF THEY STILL RELYING ON -- I

10:08AM 4    DIDN'T KNOW THEY EVER USED ANOTHER TEST.

10:08AM 5    Q.   AND BECAUSE YOU MENTIONED VEIN DRAWS, LET ME ASK, DURING

10:08AM 6    THAT CONVERSATION, DID MR. BALWANI EVER TELL YOU THAT THE

10:08AM 7    COMPANY NEEDED TO RELY ON VEIN DRAWS FOR A SIGNIFICANT

10:09AM 8    PERCENTAGE OF ITS TESTS?

10:09AM 9    A.   NO.

10:09AM 10   Q.   WOULD THAT HAVE BEEN AN IMPORTANT FACT FOR YOU TO KNOW?

10:09AM 11   A.   YES.

10:09AM 12   Q.   THOSE FACTS ABOUT THE USE OF THIRD PARTY DEVICES OR VEIN

10:09AM 13   DRAWS, DID MR. BALWANI EVER DISCLOSE THOSE FACTS TO YOU DURING

10:09AM 14   YOUR DEALINGS WITH THE COMPANY?

10:09AM 15   A.   NO.

10:09AM 16   Q.   OKAY.  LET'S ZOOM OUT AND ZOOM BACK IN TO ITEM 12 AND

10:09AM 17   BELOW.

10:09AM 18        AND DO YOU SEE THAT ITEM 12 ON YOUR LIST YOU REPORT,

10:09AM 19   "CURRENT CLINICAL TRIALS TAKE 6 VIALS AND CAN RUN 10 TO 12

10:09AM 20   TESTS.  THERANOS TAKES 3 DROPS AND CAN RUN 60 TO 70 TESTS."

10:09AM 21        DO YOU SEE THAT?

10:09AM 22   A.   YES.

10:09AM 23   Q.   AND WHAT DID MR. BALWANI TELL YOU ABOUT THE NUMBER OF

10:09AM 24   TESTS THAT THERANOS COULD RUN ON A SINGLE SAMPLE?

10:09AM 25   A.   EXACTLY WHAT I WROTE.

10:09AM 1    Q.   OKAY.  AND THE DIFFERENCE IN THIS REGARD IN ABILITY

10:10AM 2    BETWEEN THERANOS AND CURRENT CLINICAL TRIALS, DID THAT MATTER

10:10AM 3    TO YOU AS AN INVESTOR?

10:10AM 4    A.   YES, VERY MUCH SO.

10:10AM 5    Q.   LOOKING AT 17, YOU RELAY THAT YOU HEARD "THE COMPETITION

10:10AM 6    IS YEARS BEHIND ON TECHNOLOGY (MAYBE LONGER) AND WITH BLOATED

10:10AM 7    OVERHEADS AND BUREAUCRACY WOULD HAVE TO CHARGE THE SAME RATES

10:10AM 8    THEY CURRENTLY CHARGE OR HIGHER THEREFORE MAKING THEIR ABILITY

10:10AM 9    TO COMPETE LET ALONE CATCH UP VERY DIFFICULT IF NOT

10:10AM 10   IMPOSSIBLE."

10:10AM 11        IS THAT SOMETHING THAT YOU HEARD FROM MR. BALWANI?

10:10AM 12   A.   YES.

10:10AM 13   Q.   AND IN CONNECTION WITH DISCUSSING THE COMPETITION, DID

10:10AM 14   MR. BALWANI TELL YOU ABOUT THERANOS'S USE OF COMMERCIALLY

10:10AM 15   AVAILABLE ANALYZERS?

10:10AM 16   A.   NO.

10:10AM 17   Q.   LOOKING AT 21, THERE'S MENTION OF WHAT YOU HEARD ABOUT

10:10AM 18   PRICING.

10:10AM 19        DO YOU SEE THAT?

10:10AM 20   A.   YES.

10:10AM 21   Q.   AND IT SAYS, "THEIR PRICING COULD HAVE BEEN SIGNIFICANTLY

10:10AM 22   HIGHER BUT THEY DESIGNED IT TO BE PROFITABLE, EFFECTIVE, AND

10:10AM 23   DISRUPTIVE TO THE STATUS QUO.  IT IS ALL DESIGNED TO CRUSH THE

10:10AM 24   COMPETITION WHILE REVOLUTIONIZING THE HEALTH CARE INDUSTRY."

10:11AM 25        DO YOU SEE THAT?

10:11AM  1    A.   YES.

10:11AM  2    Q.   AND I WANT TO FOCUS ON THAT WORD "PROFITABLE."

10:11AM  3         WHAT, IF ANYTHING, DID MR. BALWANI TELL YOU ABOUT PRICING

10:11AM  4    AND PROFITABILITY AT THERANOS?

10:11AM  5    A.   I BELIEVE HE SAID THAT THEY WERE FULLY SELF-FUNDING AT

10:11AM  6    THIS POINT AND THAT THEY WERE EARNING ENOUGH MONEY TO PAY THEIR

10:11AM  7    OWN OPERATIONS, AND THAT THIS MONEY WAS JUST TO EXPAND THAT

10:11AM  8    WITH MORE RAPIDITY OR FASTER, AND THAT THEY WERE FREE CASH

10:11AM  9    FLOWING, OR CASH FLOWING THEIR OWN BUSINESSES AT THIS TIME.

10:11AM 10    Q.   AND FROM STATEMENTS LIKE THIS, WAS IT YOUR UNDERSTANDING

10:11AM 11    THAT THAT PROFITABILITY CAME FROM THE PRICING THAT THERANOS WAS

10:11AM 12    OFFERING ITS TESTS AT?

10:11AM 13    A.   YES.

10:11AM 14    Q.   LET'S LOOK AT SOME MORE INFORMATION THAT YOU OBTAINED

10:11AM 15    ABOUT THE FINANCIALS.

10:11AM 16         IF WE ZOOM IN ON THE BOTTOM OF THIS PAGE.

10:11AM 17         AND DO YOU SEE THERE UNDER ITEM 1 OF THIS NEW LIST IT

10:11AM 18    SAYS, "THEY PREFER TO KEEP THE COMPETITION GUESSING AS TO HOW

10:12AM 19    MUCH MONEY THEY HAVE AND WHAT THEIR CURRENT REVENUE, PROFIT

10:12AM 20    MARGINS, REVENUES SOURCES, ET CETERA, ARE."

10:12AM 21         DO YOU SEE THAT?

10:12AM 22    A.   YES.

10:12AM 23    Q.   AND TELL US ABOUT THIS PART OF THE CONVERSATION.  WAS THAT

10:12AM 24    INFORMATION FROM MR. BALWANI IN RESPONSE TO A QUESTION FROM

10:12AM 25    YOU?

10:12AM 1    A.   YES.  A STANDARD PART OF OUR INVESTING IN ANY COMPANY

10:12AM 2    WOULD BE TO REVIEW FINANCIALS, AUDITED FINANCIALS.

10:12AM 3         THERE WAS SECRECY AROUND THIS COMPANY FROM THE VERY

10:12AM 4    BEGINNING, AND WHEN ASKED, THIS IS WHAT THE RESPONSE WAS TO MY

10:12AM 5    REQUEST FOR FINANCIALS.

10:12AM 6    Q.   SO DURING THE CALL, AM I UNDERSTANDING CORRECTLY THAT YOU

10:12AM 7    ASKED MR. BALWANI FOR FINANCIAL RECORDS OF THE COMPANY?

10:12AM 8    A.   I AM -- YES.  I DON'T RECALL IN THIS SPECIFIC CALL.  I

10:12AM 9    ASKED ABOUT HOW THEY WERE DOING, IT WAS JUST, GIVE ME A HIGH

10:12AM 10   LEVEL REVENUE, PROFITABILITY, CASH, BALANCES.  JUST COMMON

10:13AM 11   BASIC THINGS THAT ONE MIGHT REQUIRE PRIOR TO INVESTING.

10:13AM 12        AND THIS WAS THE RESPONSE.

10:13AM 13   Q.   BESIDES THIS, WERE YOU GIVEN ANY INFORMATION, EVEN THAT

10:13AM 14   HIGH LEVEL INFORMATION, ABOUT THE COMPANY'S FINANCIAL

10:13AM 15   PERFORMANCE?

10:13AM 16   A.   NO, OTHER THAN THEY WERE -- WELL, I DON'T WANT TO --

10:13AM 17   Q.   OTHER THAN?

10:13AM 18   A.   I DON'T WANT TO READ DOWN MY OWN EMAIL, SO YEAH.

10:13AM 19   Q.   WELL, LET'S GO THERE THEN.  LET'S LOOK AT ITEMS 2 AND 3 ON

10:13AM 20   THIS LIST HERE.

10:13AM 21        YOU RELAY IN THIS EMAIL, "THEY CAN FUND GROWTH THROUGH

10:13AM 22   CURRENT OPERATIONS -- NO NEED FOR CAPITAL."

10:13AM 23        AND THEN NUMBER 3 SAYS, "THEY ARE RAISING MONEY ONLY TO

10:13AM 24   RAPIDLY ACCELERATE THE BUSINESS."

10:13AM 25        DO YOU SEE THAT?

10:13AM  1     A.   YES.

10:13AM  2     Q.   AND WHAT DID MR. BALWANI TELL YOU ABOUT THAT TOPIC?

10:13AM  3     A.   THAT THEY WERE SELF-FUNDING NOW, AND THEIR CURRENT

10:13AM  4     OPERATIONS WERE GROWING.  THEY WERE DOING CLINICAL TRIALS AND

10:13AM  5     GETTING PAID TO DO CLINICAL TRIALS AND RUNNING TESTS, AND THAT

10:13AM  6     THEY WERE JUST RAISING THIS ROUND OF CAPITAL TO GROW THEIR

10:14AM  7     BUSINESS.

10:14AM  8     Q.   AND DOES THAT MATTER TO YOU AS AN INVESTOR, HEARING THAT

10:14AM  9     ABOUT THE COMPANY'S FINANCIAL STATUS?

10:14AM  10    A.   OH, INCREDIBLY.

10:14AM  11    Q.   WHY?

10:14AM  12    A.   I MEAN, IT'S VERY IMPRESSIVE IF YOU'RE ALREADY

10:14AM  13    SELF-FUNDING AT THIS STAGE AND THE MONEY IS GOING PURELY TO

10:14AM  14    HIRE PEOPLE TO GROW YOUR REVENUE AND MANUFACTURE YOUR PRODUCT.

10:14AM  15         THEN, AGAIN, IT MAKES IT FEEL LIKE A MORE CONSERVATIVE

10:14AM  16    INVESTMENT THAN AN AGGRESSIVE, SPECULATIVE INVESTMENT.

10:14AM  17    Q.   AND DOES HEARING THAT MAKE THE INVESTMENT OPPORTUNITY MORE

10:14AM  18    OR LESS ATTRACTIVE TO YOU?

10:14AM  19    A.   YEAH, MUCH MORE ATTRACTIVE.

10:14AM  20    Q.   DURING THIS CONVERSATION, DID MR. BALWANI TELL YOU THAT

10:14AM  21    THE COMPANY WAS ACTUALLY DEPENDENT ON MONEY COMING IN FROM

10:14AM  22    INVESTORS IN ORDER TO CONTINUE OPERATING?

10:14AM  23    A.   IT WAS THE OPPOSITE.

10:14AM  24    Q.   WOULD THAT FACT HAVE BEEN IMPORTANT FOR YOU TO KNOW AS A

10:14AM  25    POTENTIAL INVESTOR?

10:14AM 1      A.   YES.

10:14AM 2      Q.   WOULD IT HAVE CHANGED YOUR VIEW OF THE INVESTMENT

10:14AM 3      OPPORTUNITY?

10:14AM 4      A.   OH, SURE.

10:14AM 5      Q.   AND DID MR. BALWANI TELL YOU AT ANY POINT DURING THAT CALL

10:15AM 6      THAT THERANOS HAD NO REVENUE GENERATING ACTIVITY WITH

10:15AM 7      PHARMACEUTICAL COMPANIES AT THIS TIME?

10:15AM 8      A.   HE DID NOT TELL ME THAT.

10:15AM 9      Q.   LET'S GO TO THE NEXT PAGE OF THIS EXHIBIT.  LET'S LOOK AT

10:15AM 10     ITEM 13 IN THE LIST.

10:15AM 11         AND DO YOU SEE HERE THERE'S MENTION OF LIQUIDITY AND A

10:15AM 12     POTENTIAL IPO?

10:15AM 13     A.   YES.

10:15AM 14     Q.   AND WHAT DO YOU RECALL MR. BALWANI SAYING ABOUT THAT?

10:15AM 15     A.   YOU KNOW, JUST THAT THEY KNEW THAT THE ORIGINAL

10:15AM 16     SHAREHOLDERS WERE IN FOR EIGHT YEARS AT THIS POINT, AND THAT

10:15AM 17     AROUND THE TEN YEAR MARK THEY FULLY PLANNED TO BE UP AND

10:15AM 18     RUNNING TO A DEGREE WHERE THEY COULD SUSTAIN A PUBLIC OFFERING

10:15AM 19     OR FIND OTHER SOURCES OF LIQUIDITY FOR THE EARLY INVESTORS.

10:15AM 20     Q.   AND DID THAT FACT OR THAT ASSERTION MAKE THE INVESTMENT

10:16AM 21     MORE OR LESS ATTRACTIVE TO YOU?

10:16AM 22     A.   YEAH.  WELL, GETTING LIQUIDITY AFTER 10 YEARS IS ALWAYS

10:16AM 23     ATTRACTIVE, AND MAYBE WITHIN 24 MONTHS OF THIS POTENTIAL NEW

10:16AM 24     INVESTMENT THAT WOULD BE ATTRACTIVE AS WELL.

10:16AM 25     Q.   SO WE'VE TALKED ABOUT THE SUBSTANCE OF YOUR CONVERSATION

10:16AM   1      WITH MR. BALWANI, OR SOME HIGH POINTS.

10:16AM   2          I'D LIKE TO ASK ABOUT THE TONE OF THE CONVERSATION.  WHAT

10:16AM   3      WAS MR. BALWANI'S DEMEANOR DURING YOUR CONVERSATION?

10:16AM   4      A.   HE WAS VERY ARTICULATE, VERY INTELLIGENT, VERY SPECIFIC,

10:16AM   5      AND I FELT LIKE HE HAD STRONG COMMAND OVER THE DETAILS.

10:16AM   6      Q.   AND WHEN YOU'RE TALKING ABOUT A STRONG COMMAND OVER THE

10:16AM   7      DETAILS, DOES THAT INCLUDE THE STATE OF THE COMPANY'S

10:16AM   8      TECHNOLOGY?

10:16AM   9      A.   YES.

10:16AM  10      Q.   DOES IT INCLUDE THE BUSINESS ACTIVITIES OF THE COMPANY?

10:16AM  11      A.   YES.

10:16AM  12      Q.   DID IT INCLUDE THE FINANCIAL STATE AND PERFORMANCE OF THE

10:17AM  13      COMPANY?

10:17AM  14      A.   YES.

10:17AM  15      Q.   DURING THAT CALL, DID YOU FIND MR. BALWANI PERSUASIVE?

10:17AM  16      A.   VERY.

10:17AM  17      Q.   WHAT ABOUT HIS PRESENTATION MADE HIM PERSUASIVE?

10:17AM  18      A.   THE DETAIL THAT CAME TO ME THROUGH THIS CONVERSATION WAS

10:17AM  19      SO DETAILED AND COMPELLING TO MAKE ANOTHER INVESTMENT THAT, YOU

10:17AM  20      KNOW, AND HE WAS EXTREMELY CREDIBLE.  HE KNEW THE BUSINESS, AND

10:17AM  21      I FELT HE WAS -- YOU KNOW, HE WAS PRESIDENT OF THE FIRM, CHIEF

10:17AM  22      OPERATING OFFICER, SO HE KNEW EVERYTHING.

10:17AM  23      Q.   AND DID YOU RELY ON THE INFORMATION THAT YOU GOT FROM

10:17AM  24      MR. BALWANI IN DECIDING WHETHER TO INVEST MORE MONEY IN

10:17AM  25      THERANOS?

10:17AM   1       A.   YES.

10:17AM   2       Q.   IF I COULD ASK YOU TO TURN TO THE NEXT TAB IN YOUR BINDER,

10:17AM   3       WHICH IS 4060, 4060.

10:18AM   4       A.   YES.

10:18AM   5       Q.   AND DO YOU SEE THAT THAT INCLUDES YOUR SAME EMAIL FROM

10:18AM   6       DECEMBER 22ND REPORTING ON YOUR CALL WITH MR. BALWANI?

10:18AM   7       A.   YES.

10:18AM   8       Q.   AND DO YOU SEE ABOVE THAT, THAT IT WAS FORWARDED ON?

10:18AM   9       A.   YES.

10:18AM  10            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 4060.

10:18AM  11            MR. CAZARES:  NO OBJECTION WITH THE REDACTION THAT I

10:18AM  12       DISCUSSED WITH THE GOVERNMENT.

10:18AM  13            MR. BOSTIC:  THAT REDACTION IS COMPLETE, YOUR HONOR.

10:18AM  14            THE COURT:  ALL RIGHT.  IT'S ADMITTED.  IT MAY BE

10:18AM  15       PUBLISHED WITH REDACTIONS.

10:18AM  16            (GOVERNMENT'S EXHIBIT 4060, WITH REDACTIONS, WAS RECEIVED

10:18AM  17       IN EVIDENCE.)

10:18AM  18       BY MR. BOSTIC:

10:18AM  19       Q.   MR. MENDENHALL, DO YOU SEE THAT YOUR EMAIL REPORTING ON

10:18AM  20       YOUR CALL WITH MR. BALWANI WAS FORWARDED TO DAVID HARRIS AND A

10:18AM  21       NUMBER OF PEOPLE, INCLUDING SOMEONE NAMED ALAN EISENMAN?

10:18AM  22       A.   YES.

10:18AM  23       Q.   AND WHO IS ALAN EISENMAN?

10:19AM  24       A.   ALAN EISENMAN IS AN INVESTOR IN A COUPLE OF THINGS, AT

10:19AM  25       LEAST ONE THING THAT U.S. CAPITAL HAS DONE, AND HE'S IN

10:19AM   1    HOUSTON, AND HE'S AN INVESTOR AND HE'S A FRIEND.

10:19AM   2    Q.   AND SKIPPING AHEAD IN TIME, DID MR. EISENMAN INVEST SOME

10:19AM   3    OF HIS MONEY IN THERANOS?

10:19AM   4    A.   YES, I BELIEVE SO.

10:19AM   5    Q.   OKAY.  AND IF WE CAN PUT THAT ASIDE.

10:19AM   6         LET'S GO NEXT TO TAB 5824.

10:19AM   7         BASED ON YOUR CALL WITH MR. BALWANI AND THE OTHER

10:19AM   8    INFORMATION THAT WE HAVE TALKED ABOUT, DID YOU DECIDE THAT YOU

10:19AM   9    WANTED TO INVEST MORE MONEY IN THERANOS?

10:19AM  10    A.   YES, WE DID.  I DID.

10:19AM  11    Q.   AND YOU SAID THAT "WE DID."

10:19AM  12         SO CAN YOU EXPLAIN WHAT GROUP WE'RE TALKING ABOUT HERE?

10:19AM  13    A.   I HAD SOME FAMILY AND FRIENDS AND CLIENTS THAT WANTED TO

10:20AM  14    PULL SOME CAPITAL TOGETHER TO MAKE ANOTHER INVESTMENT.

10:20AM  15    Q.   AND WAS THE DECISION TO INVEST MADE COLLECTIVELY BY YOU

10:20AM  16    AND THAT GROUP?  CAN YOU EXPLAIN THAT FOR US?

10:20AM  17    A.   THERE WAS -- I THINK IT WAS BASICALLY ME LEADING THAT

10:20AM  18    GROUP.

10:20AM  19    Q.   AND DID YOU MAKE THAT DECISION BASED ON THE INFORMATION

10:20AM  20    THAT YOU HAD RECEIVED?

10:20AM  21    A.   YES.

10:20AM  22    Q.   LOOKING AT 5824, DO YOU SEE AN EMAIL CHAIN BETWEEN YOU AND

10:20AM  23    MR. BALWANI RELATING TO THAT INVESTMENT?

10:20AM  24    A.   I DO.

10:20AM  25              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5824.

| | | |
|---|---|---|
| 10:20AM | 1 | MR. CAZARES:  NO OBJECTION. |
| 10:20AM | 2 | THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:20AM | 3 | (GOVERNMENT'S EXHIBIT 5824 WAS RECEIVED IN EVIDENCE.) |
| 10:20AM | 4 | BY MR. BOSTIC: |
| 10:20AM | 5 | Q.  AND LET'S START AT THE BOTTOM OF PAGE 1.  WE SEE -- WE'RE |
| 10:20AM | 6 | ABOUT TO LOOK AT AN EMAIL FROM MR. BALWANI ON DECEMBER 27TH. |
| 10:21AM | 7 | DO YOU SEE THAT? |
| 10:21AM | 8 | A.  YES. |
| 10:21AM | 9 | Q.  AND LET'S GO TO PAGE 2. |
| 10:21AM | 10 | AND DO YOU SEE THAT IN THIS EMAIL, MR. BALWANI IS SENDING |
| 10:21AM | 11 | YOU THE SIGNATURE PAGE FOR INVESTMENT? |
| 10:21AM | 12 | A.  YES. |
| 10:21AM | 13 | Q.  BY THIS TIME, HAD YOU MADE THE DECISION TO INVEST MORE IN |
| 10:21AM | 14 | THERANOS? |
| 10:21AM | 15 | A.  YES. |
| 10:21AM | 16 | Q.  LET'S LOOK AT PAGE 1, AND LET'S LOOK AT THE MIDDLE TWO |
| 10:21AM | 17 | MESSAGES IN THE PAGE. |
| 10:21AM | 18 | DO YOU SEE THAT YOU WRITE BACK ON JANUARY 9TH, A FEW DAYS |
| 10:21AM | 19 | AFTER MR. BALWANI'S EMAIL? |
| 10:21AM | 20 | A.  YES. |
| 10:21AM | 21 | Q.  AND YOU WRITE THAT YOU ARE INTERESTED IN MAKING AN |
| 10:21AM | 22 | INVESTMENT IF THE DEAL HASN'T CLOSED. |
| 10:21AM | 23 | DO YOU SEE THAT? |
| 10:21AM | 24 | A.  CORRECT, YES. |
| 10:21AM | 25 | Q.  AND MR. BALWANI RESPONDS ABOVE THAT INDICATING THAT THE |

| | | |
|---|---|---|
| 10:21AM | 1 | DEAL IS STILL ACCESSIBLE AS HE SAYS? |
| 10:21AM | 2 | A.   YES. |
| 10:21AM | 3 | Q.   LET'S GO TO 5823. |
| 10:22AM | 4 |      AND DO YOU SEE AT 5823 IN YOUR BINDER, THERE'S A SIMILAR |
| 10:22AM | 5 | EMAIL EXCHANGE BETWEEN YOU AND MR. BALWANI RELATING TO THAT |
| 10:22AM | 6 | INVESTMENT? |
| 10:22AM | 7 | A.   YES, I DO. |
| 10:22AM | 8 |           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5823. |
| 10:22AM | 9 |           MR. CAZARES:  NO OBJECTION. |
| 10:22AM | 10 |          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 10:22AM | 11 |      (GOVERNMENT'S EXHIBIT 5823 WAS RECEIVED IN EVIDENCE.) |
| 10:22AM | 12 | BY MR. BOSTIC: |
| 10:22AM | 13 | Q.   LET'S LOOK AT THE TOP MESSAGE HERE. |
| 10:22AM | 14 |      SO, MR. MENDENHALL, ARE YOU INFORMING MR. BALWANI HERE |
| 10:22AM | 15 | ABOUT THE AMOUNT OF YOUR INCOMING INVESTMENT FOR THERANOS? |
| 10:22AM | 16 | A.   YES. |
| 10:22AM | 17 | Q.   AND WHAT DID THE ACTUAL AMOUNT OF YOUR INVESTMENT END UP |
| 10:22AM | 18 | BEING, APPROXIMATELY? |
| 10:22AM | 19 | A.   IT WAS 1,300,000 AND CHANGE, I BELIEVE. |
| 10:22AM | 20 | Q.   AND AS PART OF THAT 1.3 MILLION, WAS YOUR PERSONAL MONEY |
| 10:22AM | 21 | INCLUDED IN THAT? |
| 10:22AM | 22 | A.   YES. |
| 10:22AM | 23 | Q.   WHAT FORM DID THAT TAKE? |
| 10:22AM | 24 | A.   I HAD ENTITIES AND INVESTORS AND SOME EMPLOYEES AT MY FIRM |
| 10:23AM | 25 | AND A BUNCH OF GROUPS, SO I PUT THE WHOLE -- I HIRED A LAWYER |

10:23AM  1    AND PUT THE PARTNERSHIP TOGETHER, WHICH IS WHY IT TOOK A LITTLE

10:23AM  2    BIT LONGER, AND AGREED TO PAY FOR ALL OF THE ACCOUNTING AND

10:23AM  3    STUFF.

10:23AM  4        SO I TOOK THAT AMOUNT OF MONEY, WHICH WAS $15,000 OR

10:23AM  5    $20,000 IN COSTS AND FUTURE COSTS, AND I TOOK SHARES FROM THAT

10:23AM  6    AMOUNT.

10:23AM  7    Q.   WAS THAT YOUR AGREEMENT WITH THE OTHER MEMBERS OF YOUR

10:23AM  8    INVESTING GROUP?

10:23AM  9    A.   YES.

10:23AM 10    Q.   LET'S LOOK AT 5822.

10:23AM 11        AND AT THAT TAB, DO YOU SEE ADDITIONAL CORRESPONDENCE

10:23AM 12    BETWEEN YOU AND MR. BALWANI ON THAT SAME TOPIC?

10:23AM 13    A.   YES, I DO.

10:23AM 14            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5822.

10:23AM 15            MR. CAZARES:  NO OBJECTION.

10:23AM 16            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:24AM 17        (GOVERNMENT'S EXHIBIT 5822 WAS RECEIVED IN EVIDENCE.)

10:24AM 18    BY MR. BOSTIC:

10:24AM 19    Q.   AND LET'S START ON PAGE 2 AT THE BOTTOM.

10:24AM 20        AND DO WE SEE HERE, MR. MENDENHALL, YOUR JANUARY 9TH EMAIL

10:24AM 21    ABOUT YOUR INTEREST IN MAKING THAT INVESTMENT IN 2014?

10:24AM 22    A.   YES.

10:24AM 23    Q.   AND THAT'S JANUARY 9TH.

10:24AM 24        LET'S GO TO PAGE 1 AND LOOK AT THE BOTTOM JUST BRIEFLY.

10:24AM 25        DO YOU SEE HERE WE'RE ABOUT TO LOOK AT AN EMAIL HERE FROM

10:24AM   1    MR. BALWANI TO YOU ABOUT THREE WEEKS LATER, THE END OF JANUARY?

10:24AM   2    A.   YES, CORRECT.

10:24AM   3    Q.   OKAY.  LET'S GO TO PAGE 2 AND LOOK AT THE CONTENT OF THAT

10:24AM   4    EMAIL.

10:24AM   5         AND AT THE TOP, CAN YOU EXPLAIN WHAT MR. BALWANI IS

10:24AM   6    WRITING ABOUT HERE A FEW WEEKS AFTER YOUR INVESTMENT?

10:24AM   7    A.   YES.  HE -- THEY WERE RAISING -- THERE WAS AN OPPORTUNITY

10:24AM   8    TO INVEST MORE CAPITAL.

10:24AM   9    Q.   SO WAS HE OFFERING YOU A CHANCE TO INVEST EVEN MORE IN

10:25AM  10    THERANOS A FEW WEEKS AFTER YOUR PREVIOUS INVESTMENT?

10:25AM  11    A.   YES.

10:25AM  12    Q.   LET'S LOOK AT PAGE 1, AND THE MESSAGE FROM YOU AT THE TOP

10:25AM  13    OF THE PAGE.

10:25AM  14         AND IS THIS YOUR RESPONSE TO THAT OFFER?

10:25AM  15    A.   YES.

10:25AM  16    Q.   YOU WRITE, "THE 1.3 PLUS MILLION I JUST INVESTED IS MONEY

10:25AM  17    I AM OWNER/TRUSTEE FOR MY KIDS ON."

10:25AM  18         DO YOU SEE THAT?

10:25AM  19    A.   YES.

10:25AM  20    Q.   "AND I AM COMFORTABLE WITH THE INFORMATION I HAVE RECEIVED

10:25AM  21    FROM U AND READ IN PUBLIC RECORDS IN MAKING THAT LEVEL OF

10:25AM  22    INVESTMENT."

10:25AM  23         WAS THAT TRUE AT THE TIME?

10:25AM  24    A.   YES.

10:25AM  25    Q.   AND YOU SAY, "I AM INTERESTED IN DOING A LARGER INVESTMENT

10:25AM 1    BUT AS A FIDUCIARY HAVE A DUTY TO COLLECT A LITTLE MORE

10:25AM 2    DILIGENCE.  IT IS RARE THAT I INVEST WITHOUT KNOWING MORE ABOUT

10:25AM 3    THE FIRM'S FINANCIALS."

10:25AM 4         CAN YOU EXPLAIN WHAT YOU MEANT BY THAT?

10:25AM 5    A.   THAT I HAD NOT EVER REALLY RECEIVED THE DETAILED

10:25AM 6    FINANCIALS THAT I WOULD NORMALLY REQUIRE FOR AN INVESTMENT OF

10:26AM 7    ANY LEVEL.

10:26AM 8    Q.   AND WOULD RECEIVING THOSE ADDITIONAL DETAILS BE A

10:26AM 9    PRE-CONDITION FOR YOU TO INVEST MORE MONEY IN THE COMPANY?

10:26AM 10   A.   IT WAS, YES.

10:26AM 11   Q.   AND WAS THIS YOU CONVEYING THAT TO MR. BALWANI?

10:26AM 12   A.   YES.

10:26AM 13   Q.   IN THE FOLLOWING SENTENCE, DO YOU SEE THAT YOU OFFER TO

10:26AM 14   SIGN A NONDISCLOSURE AGREEMENT SO YOU COULD RECEIVE THAT

10:26AM 15   INFORMATION?

10:26AM 16   A.   I DID, BECAUSE PRIOR CONVERSATIONS INDICATED THAT THEY

10:26AM 17   WANTED TO KEEP THE FINANCIALS CONFIDENTIAL TO PROHIBIT

10:26AM 18   COMPETITION FROM LEARNING ABOUT THEIR -- HOW THEY PRICE, AND

10:26AM 19   THEIR COSTS, AND THEIR INFRASTRUCTURE.

10:26AM 20   Q.   AND IN RESPONSE TO YOUR REQUESTING FOR INFORMATION, DID

10:26AM 21   MR. BALWANI EVER PROVIDE YOU ADDITIONAL DISCLOSURES ABOUT THE

10:26AM 22   COMPANY?

10:26AM 23   A.   NO.

10:26AM 24   Q.   FOLLOWING THIS, DID YOU PURSUE AN ADDITIONAL INVESTMENT IN

10:26AM 25   THE COMPANY?

10:26AM   1     A.   NO.

10:26AM   2     Q.   OKAY.  YOU CAN SET THAT ASIDE.

10:27AM   3          FOLLOWING YOUR INVESTMENT IN THERANOS IN JANUARY OF 2014,

10:27AM   4     DID YOU CONTINUE TO BE IN TOUCH WITH MR. BALWANI AND GET

10:27AM   5     INFORMATION ABOUT THE COMPANY?

10:27AM   6     A.   I BELIEVE THAT THAT LAST EMAIL THAT I SENT HIM REQUESTING

10:27AM   7     FINANCIALS IN ORDER TO LOOK AT DOING MORE INVESTING WAS THE

10:27AM   8     LAST TIME THAT I EVER COMMUNICATED WITH MR. BALWANI.

10:27AM   9     Q.   OKAY.  LET'S LOOK AT 5821, PLEASE.

10:27AM   10         LET ME KNOW ONCE YOU'RE THERE.

10:27AM   11    A.   I'M THERE.

10:27AM   12    Q.   AT 5821, DO YOU SEE AN EMAIL THAT YOU SENT TO MR. BALWANI

10:27AM   13    IN MID-MAY 2014?

10:27AM   14    A.   YES.

10:27AM   15              MR. BOSTIC:  YOUR HONOR, WE OFFER 5821.

10:27AM   16              MR. CAZARES:  NO OBJECTION.

10:27AM   17              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:28AM   18         (GOVERNMENT'S EXHIBIT 5821 WAS RECEIVED IN EVIDENCE.)

10:28AM   19    BY MR. BOSTIC:

10:28AM   20    Q.   SO, MR. MENDENHALL, WE'RE IN MID-MAY 2014, ABOUT FOUR

10:28AM   21    MONTHS AFTER YOUR INVESTMENT; IS THAT CORRECT?

10:28AM   22    A.   YES.

10:28AM   23    Q.   AND YOU WRITE TO MR. BALWANI, "HI SUNNY,

10:28AM   24         "I'M SURE U ARE VERY BUSY AND I HATE TO ASK BUT IS THERE

10:28AM   25    ANY WAY YOU COULD GIVE ME A HIGH LEVEL VERBAL UPDATE ON

10:28AM  1    THERANOS?"

10:28AM  2         DO YOU SEE THAT?

10:28AM  3    A.   YES.

10:28AM  4    Q.   WHY WERE YOU ASKING FOR INFORMATION ON THERANOS AT THIS

10:28AM  5    TIME?

10:28AM  6    A.   WITH THE PARTNERSHIP THAT I HAD FORMED AND OTHER FRIENDS

10:28AM  7    THAT HAD INVESTED, AND CLIENTS AND COLLEAGUES, WE WERE JUST

10:28AM  8    REALLY QUIET SINCE THE CAPITAL WAS RAISED, AND WE JUST WANTED

10:28AM  9    TO GET AN UPDATE AND SEE WHAT WAS GOING ON.

10:28AM  10   Q.   AND DO YOU SEE AT THE TOP OF THIS PAGE, MR. BALWANI

10:28AM  11   FORWARDS THIS EMAIL TO MS. HOLMES WITHOUT COMMENT?

10:28AM  12   A.   I DO SEE THAT, YEAH.

10:28AM  13   Q.   LET ME ASK YOU TO TURN NEXT TO 5820.

10:28AM  14        AND AT 5820, DO YOU SEE THAT SAME EMAIL WITH ADDITIONAL

10:29AM  15   FOLLOWUP?

10:29AM  16   A.   YES.

10:29AM  17          MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5820.

10:29AM  18          MR. CAZARES:  NO OBJECTION.

10:29AM  19          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:29AM  20        (GOVERNMENT'S EXHIBIT 5820 WAS RECEIVED IN EVIDENCE.)

10:29AM  21   BY MR. BOSTIC:

10:29AM  22   Q.   AND SO AT THE BOTTOM, MR. MENDENHALL, DO YOU SEE THIS SAME

10:29AM  23   EMAIL FROM YOU TO MR. BALWANI ASKING FOR A HIGH LEVEL VERBAL

10:29AM  24   UPDATE?

10:29AM  25   A.   YES.

10:29AM  1    Q.   OKAY.  ABOVE THAT, DO YOU SEE THAT MR. BALWANI FORWARDS

10:29AM  2    YOUR EMAIL ALSO TO SOMEONE NAMED DANISE YAM?

10:29AM  3    A.   YES.

10:29AM  4    Q.   AND HE ASKS, "CAN YOU TELL ME WHICH ROUND HE INVESTED IN

10:29AM  5    AND HOW MUCH?"

10:29AM  6         DO YOU SEE THAT?

10:29AM  7    A.   YES.

10:29AM  8    Q.   AND DO YOU SEE THAT ABOVE THAT MS. YAM WRITES BACK TO

10:29AM  9    MR. BALWANI AND PROVIDES THAT INFORMATION, INDICATING THAT

10:29AM  10   YOU'D INVESTED A TOTAL OF 1.3 SOMETHING MILLION DOLLARS.

10:29AM  11        DO YOU SEE THAT?

10:29AM  12   A.   YES.

10:29AM  13   Q.   AND FOLLOWING THIS, DID YOU GET FROM MR. BALWANI A HIGH

10:29AM  14   LEVEL UPDATE THAT YOU WERE ASKING FOR?

10:30AM  15   A.   NO.

10:30AM  16   Q.   LET ME ASK YOU TO TURN TO -- ACTUALLY, EXHIBIT 1776 IS

10:30AM  17   ALREADY ADMITTED.

10:30AM  18        MAY WE DISPLAY, YOUR HONOR?

10:30AM  19            THE COURT:  YES.

10:30AM  20   BY MR. BOSTIC:

10:30AM  21   Q.   MR. MENDENHALL, DO YOU RECALL READING AN ARTICLE ABOUT

10:30AM  22   THERANOS IN "FORTUNE" MAGAZINE IN JUNE 2014?

10:30AM  23   A.   YES.

10:30AM  24   Q.   AND GENERALLY SPEAKING, WAS THE ARTICLE FAVORABLE OR

10:30AM  25   NEGATIVE ABOUT THERANOS?

10:30AM   1    A.   IT WAS POSITIVE.

10:30AM   2    Q.   OKAY.  IF I COULD JUST DIRECT YOU TO A FEW OF THE POINTS

10:30AM   3    IN THIS ARTICLE.

10:30AM   4        FIRST, IF WE COULD LOOK AT PAGE 4 -- ACTUALLY, LET'S GO TO

10:30AM   5    PAGE 6.

10:30AM   6        AND BELOW THE INDENT, THE SECOND TO THE BOTTOM PARAGRAPH,

10:31AM   7    DO YOU SEE LANGUAGE THERE THAT SAYS, "THE COMPANY HAS PERFORMED

10:31AM   8    AS MANY AS 70 DIFFERENT TESTS FROM A SINGLE DRAW OF 25 TO 50

10:31AM   9    MICROLITERS"?

10:31AM  10    A.   YES, I SEE THAT.

10:31AM  11    Q.   AND DO YOU SEE THAT IT GOES ON TO SAY THAT THE SAMPLE IS

10:31AM  12    "COLLECTED IN A TINY VIAL THE SIZE OF AN ELECTRIC FUSE, WHICH

10:31AM  13    HOLMES HAS DUBBED THE 'NANOTAINER.'"

10:31AM  14        DO YOU SEE THAT?

10:31AM  15    A.   YES.

10:31AM  16    Q.   AND AROUND THIS TIME AS AN INVESTOR, WAS IT STILL

10:31AM  17    IMPORTANT TO YOU HOW MANY TESTS THERANOS COULD PURPORTEDLY RUN

10:31AM  18    FROM A SINGLE SAMPLE?

10:31AM  19    A.   YES.

10:31AM  20    Q.   LET'S GO TO PAGE 9 AND, AGAIN, THE SECOND TO THE BOTTOM

10:31AM  21    PARAGRAPH.

10:31AM  22        DO YOU SEE THERE IT SAYS, "IMPORTANTLY, IT'S NOT JUST THE

10:31AM  23    BLOOD DRAWS THAT ARE TINY.  IT'S ALSO THE ANALYTICAL SYSTEMS

10:31AM  24    THERANOS USES TO PERFORM THE TESTS."

10:31AM  25        DO YOU SEE THAT?

10:31AM  1    A.   YES.

10:31AM  2    Q.   AND WAS THIS LANGUAGE ABOUT THERANOS USING SMALL ANALYZERS

10:31AM  3    CONSISTENT WITH YOUR DISCUSSION WITH MR. BALWANI?

10:32AM  4    A.   YES.

10:32AM  5    Q.   FINALLY, LET'S GO TO PAGE 11.

10:32AM  6         AND IN THE SECOND FULL PARAGRAPH, DO YOU SEE THERE'S

10:32AM  7    LANGUAGE THAT SAYS, "THERANOS, WHICH DOES NOT BUY ANY ANALYZERS

10:32AM  8    FROM THIRD PARTIES, IS THEREFORE IN A UNIQUE POSITION"?

10:32AM  9    A.   YES.

10:32AM  10   Q.   AND WAS THAT CONSISTENT WITH WHAT MR. BALWANI HAD TOLD YOU

10:32AM  11   ABOUT WHAT DEVICES THE COMPANY WAS USING?

10:32AM  12   A.   YES.

10:32AM  13   Q.   YOU MENTIONED THAT THIS ARTICLE WAS FAVORABLE IN JUNE OF

10:32AM  14   2014; IS THAT RIGHT?

10:32AM  15   A.   YES, VERY.

10:32AM  16   Q.   AND AS AN INVESTOR READING THIS ARTICLE, WHAT EFFECT DID

10:32AM  17   CLAIMS LIKE THESE HAVE ON YOUR STATE OF MIND?

10:32AM  18   A.   WELL, I THINK IT CAME OUT AROUND THE SAME TIME THAT I WAS

10:32AM  19   ASKING FOR MORE INFORMATION, SO IT KIND OF ALLEVIATED SOME

10:32AM  20   CONCERNS THAT I WAS -- NOT CONCERNS, BUT IT SEEMED LIKE IT WAS

10:32AM  21   ANSWERING THE QUESTIONS THAT I MIGHT HAVE HAD AT THE TIME.

10:32AM  22   Q.   AND DID IT MAKE YOU MORE OR LESS LIKELY TO GET MORE

10:33AM  23   INSISTENT AND DEMANDING WITH THERANOS AND REQUESTING THAT

10:33AM  24   INFORMATION?

10:33AM  25   A.   WELL, THE ARTICLE WOULD PROBABLY MAKE ME LESS DEMANDING

10:33AM   1     THAN MORE DEMANDING.

10:33AM   2     Q.   AND DID IT HAVE THAT EFFECT ON YOU IN 2014?

10:33AM   3     A.   YES.

10:33AM   4     Q.   AND LET ME ASK YOU TO LOOK AT 5819 IN YOUR BINDER.

10:33AM   5          DO YOU SEE 5819?

10:33AM   6     A.   YES.

10:33AM   7     Q.   AND IS THAT ANOTHER MESSAGE THAT YOU SENT TO MR. BALWANI,

10:33AM   8     THIS TIME IN DECEMBER OF 2014?

10:33AM   9     A.   YES.

10:33AM  10              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 5819.

10:33AM  11              MR. CAZARES:  OBJECTION.  HEARSAY.  MIDDLE OF THE

10:33AM  12     MESSAGE.

10:34AM  13              THE COURT:  MR. BOSTIC.

10:34AM  14              MR. BOSTIC:  THIS IS NOT OFFERED FOR THE TRUTH,

10:34AM  15     YOUR HONOR.  THIS IS OFFERED TO SHOW WHAT QUESTIONS THIS

10:34AM  16     WITNESS WAS ASKING MR. BALWANI AT THE TIME.

10:34AM  17              MR. CAZARES:  SAME OBJECTION, YOUR HONOR.  THAT'S

10:34AM  18     THE TRUTH.

10:34AM  19              THE COURT:  1 THROUGH 4.

10:34AM  20              MR. BOSTIC:  YES, YOUR HONOR, 1 THROUGH 4.

10:34AM  21          NO, NOT OFFERED FOR THE TRUTH.  IT'S OFFERED TO SHOW THAT

10:34AM  22     MR. BALWANI WAS BEING POSED THESE QUESTIONS AT THE TIME.

10:34AM  23          I THINK THE DEFENDANT'S RECEIPT OF THESE QUESTIONS AND HIS

10:34AM  24     LACK OF RESPONSE IS APPROPRIATE.

10:34AM  25              THE COURT:  ALL RIGHT.  THANK YOU.

10:34AM  1        I WILL OVERRULE THE OBJECTION.

10:34AM  2        BUT, LADIES AND GENTLEMEN, I'LL ADMIT THIS.  YOU'LL SEE 1

10:34AM  3   THROUGH 4.  THOSE STATEMENTS ARE NOT OFFERED FOR THE TRUTH OF

10:34AM  4   THE MATTER ASSERTED, BUT ONLY AS TO ESTABLISH QUESTIONS POSED,

10:34AM  5   BUT NOT FOR THE TRUTH OF THE MATTER ASSERTED.

10:34AM  6        WITH THAT LIMITATION, IT MAY BE ADMITTED AND PUBLISHED.

10:35AM  7             MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:35AM  8        (GOVERNMENT'S EXHIBIT 5819 WAS RECEIVED IN EVIDENCE.)

10:35AM  9   BY MR. BOSTIC:

10:35AM  10  Q.  LOOKING AT 5819, LET'S ZOOM IN ON YOUR EMAIL TO

10:35AM  11  MR. BALWANI.

10:35AM  12       AND DO YOU SEE HERE NOW WE'RE IN DECEMBER OF 2014?

10:35AM  13  A.  YES.

10:35AM  14  Q.  AND YOU INVESTED AT THE VERY BEGINNING OF THIS YEAR; IS

10:35AM  15  THAT RIGHT?

10:35AM  16  A.  YES.

10:35AM  17  Q.  YOU WRITE AN EMAIL TO MR. BALWANI REPORTING THAT YOU'VE

10:35AM  18  BEEN ASKED BY SEVERAL OF YOUR SHAREHOLDERS -- OR SEVERAL

10:35AM  19  THERANOS SHAREHOLDERS TO ASK FOR AS MUCH OF AN UPDATE THAT HE

10:35AM  20  CAN PROVIDE.

10:35AM  21       DO YOU SEE THAT?

10:35AM  22  A.  YES.

10:35AM  23  Q.  AND YOU THEN SAY, "THERE HAS BEEN NO UPDATE SINCE THE LAST

10:35AM  24  ROUND OF CAPITAL SEVERAL US COMMITTED IN JANUARY."

10:35AM  25       IS THAT ACCURATE?

10:35AM  1    A.   YES.

10:35AM  2    Q.   AND YOU ALSO RELAY -- YOU SAY SOME THINGS THAT THE GROUP

10:35AM  3    WAS HEARING ABOUT THE COMPANY.

10:35AM  4         DO YOU SEE THAT?

10:35AM  5    A.   YES.

10:35AM  6    Q.   AND THERE'S A LIST THERE.

10:35AM  7         NUMBER 1 SAYS, "THERE IS A COMPETITOR THAT CAN PERFORM

10:35AM  8    OVER 100 TESTS ON A SINGLE DROP OF BLOOD."

10:35AM  9         DO YOU SEE THAT?

10:35AM  10   A.   YES.

10:35AM  11   Q.   AND WHY WERE YOU ASKING MR. BALWANI TO RESPOND ON THAT

10:36AM  12   TOPIC?

10:36AM  13   A.   THIS WAS A PRETTY ACTIVE GROUP OF INVESTORS, AND THERE WAS

10:36AM  14   VERY LITTLE COMMUNICATION FOR THAT -- DURING THAT PERIOD FROM

10:36AM  15   THE COMPANY, AND THEN THERE WERE RUMORS CIRCULATING AROUND THAT

10:36AM  16   WHILE --

10:36AM  17             MR. CAZARES:  OBJECTION.  HEARSAY.

10:36AM  18             THE WITNESS:  WELL, I'M JUST --

10:36AM  19             THE COURT:  NO, NO, NO.  THE OBJECTION IS SUSTAINED.

10:36AM  20   THAT LAST PORTION IS STRICKEN.

10:36AM  21        YOU CAN ASK ANOTHER QUESTION.

10:36AM  22   BY MR. BOSTIC:

10:36AM  23   Q.   SO, MR. MENDENHALL, WITHOUT DISCUSSING THE RUMORS, WHY WAS

10:36AM  24   IT IMPORTANT TO YOU AS AN INVESTOR THAT MR. BALWANI ANSWER

10:36AM  25   THESE QUESTIONS?

10:36AM  1    A.   BECAUSE THERE WERE RUMORS, AND WE JUST WANTED AN UPDATE.

10:36AM  2         AND AS THIS GROUP HAD INVESTED A LOT OF CAPITAL, THERE

10:36AM  3    WAS -- I WOULD SPECULATE, BUT THEY ALL HAD A LOT OF MONEY IN

10:36AM  4    THE DEAL, AND FORTUNATELY OR UNFORTUNATELY, THEY WERE ASKING ME

10:36AM  5    TO, BECAUSE IT LOOKED LIKE I HAD A RELATIONSHIP WITH

10:37AM  6    MR. BALWANI, TO REACH OUT AND SEE WHAT I COULD FIND OUT.

10:37AM  7    Q.   AND THE ITEMS IN THIS LIST, 1 THROUGH 4, WERE THESE FACTS

10:37AM  8    THAT, IF TRUE, WOULD HAVE MADE YOU AS AN INVESTOR FEEL MORE OR

10:37AM  9    LESS POSITIVE ABOUT YOUR INVESTMENT IN THE COMPANY?

10:37AM  10   A.   LESS POSITIVE.

10:37AM  11   Q.   IS THAT TRUE FOR ALL FOUR OF THESE ITEMS?

10:37AM  12   A.   YES.

10:37AM  13   Q.   AS TO ITEM 2, IT SAYS, "RESULTS FROM WALGREENS REQUIRE

10:37AM  14   SHIPPING BLOOD AND TAKE 24 TO 48 HOURS TO RECEIVE."

10:37AM  15        DO YOU SEE THAT?

10:37AM  16   A.   YES.

10:37AM  17   Q.   HAD MR. BALWANI EVER TOLD YOU THOSE FACTS BEFORE?

10:37AM  18   A.   NO.

10:37AM  19   Q.   AND 3 AND 4 ARE ALSO ABOUT THE STATUS OF THE WALGREENS

10:37AM  20   ROLLOUT.

10:37AM  21        DO YOU SEE THAT?

10:37AM  22   A.   YES.

10:37AM  23   Q.   AND WAS THE STATUS AND PACE OF THE WALGREENS ROLLOUT

10:37AM  24   SOMETHING THAT MATTERED TO YOU AS AN INVESTOR?

10:37AM  25   A.   VERY MUCH SO.

10:37AM  1    Q.   LET'S LOOK AT THE TOP OF THIS EMAIL AND SEE WHAT

10:37AM  2    MR. BALWANI DID AFTER RECEIVING IT.

10:38AM  3         DO YOU SEE THERE THAT HE AGAIN FORWARDED IT TO MS. HOLMES

10:38AM  4    WITHOUT COMMENT ON THE SAME DAY, DECEMBER 3RD, 2014?

10:38AM  5    A.   YES.

10:38AM  6    Q.   DID MR. BALWANI EVER GET BACK TO YOU AND ANSWER THESE

10:38AM  7    QUESTIONS THAT YOU POSED TO HIM?

10:38AM  8    A.   NO.

10:38AM  9    Q.   THE FOLLOWING YEAR IN 2015, DO YOU RECALL A NEGATIVE

10:38AM 10    ARTICLE ABOUT THERANOS BEING PUBLISHED BY "THE

10:38AM 11    WALL STREET JOURNAL"?

10:38AM 12    A.   YES.

10:38AM 13    Q.   DID THAT ARTICLE DISCUSS THE COMPANY'S USE OF THIRD PARTY

10:38AM 14    DEVICES?

10:38AM 15    A.   I BELIEVE SO, YES.

10:38AM 16    Q.   PRIOR TO READING THAT ARTICLE, HAD YOU KNOWN ABOUT

10:38AM 17    THERANOS'S USE OF NON-THERANOS ANALYZERS?

10:38AM 18    A.   NO.

10:38AM 19    Q.   UPON READING THAT ARTICLE, DID YOU IMMEDIATELY BELIEVE ALL

10:38AM 20    OF THE NEGATIVE REPORTING ABOUT THE COMPANY?

10:38AM 21    A.   NO.

10:38AM 22    Q.   FOLLOWING READING THAT ARTICLE, DID YOU HAVE ADDITIONAL

10:38AM 23    CONVERSATIONS WITH EITHER MR. BALWANI OR MS. HOLMES?

10:39AM 24    A.   MY COMMUNICATIONS WERE REVERTED TO MS. HOLMES AT THAT TIME

10:39AM 25    GOING FORWARD.

10:39AM 1    Q.   DURING THOSE COMMUNICATIONS WITH MS. HOLMES, DO YOU RECALL

10:39AM 2    HER ADMITTING ANY OF THE TRUTH OF THE ALLEGATIONS IN "THE

10:39AM 3    WALL STREET JOURNAL" ARTICLE?

10:39AM 4    A.   NOT IMMEDIATELY, OR NEVER TO ME I SHOULD SAY.

10:39AM 5    Q.   FOLLOWING READING THAT ARTICLE, DID YOUR ATTITUDE ABOUT

10:39AM 6    YOUR INVESTMENT IN THERANOS EVENTUALLY CHANGE?

10:39AM 7    A.   IT -- MY ATTITUDE -- I WAS CONCERNED, BUT TRYING TO BE

10:39AM 8    SUPPORTIVE.

10:39AM 9    Q.   AND DID THAT CONTINUE FOR SEVERAL MONTHS AFTERWARDS?

10:39AM 10   A.   YES.

10:39AM 11   Q.   WHAT IS THE CURRENT VALUE OF YOUR INVESTMENT IN THERANOS

10:39AM 12   AS YOU UNDERSTAND IT?

10:39AM 13   A.   IT'S ZERO.

10:39AM 14        MR. BOSTIC:  CAN I HAVE A MOMENT, YOUR HONOR?

10:40AM 15        THE COURT:  YES.

10:40AM 16   (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

10:40AM 17        MR. BOSTIC:  NO FURTHER QUESTIONS FOR NOW.  THANK

10:40AM 18   YOU.

10:40AM 19        THE COURT:  CROSS-EXAMINATION?

10:40AM 20        MR. CAZARES:  YES, YOUR HONOR.

10:40AM 21        THE COURT:  FOLKS, WHILE WE'RE WAITING, YOU CAN

10:40AM 22   STAND AND STRETCH.

10:40AM 23        SIR, IF YOU WOULD LIKE TO STAND AND STRETCH.

10:40AM 24        (STRETCHING.)

10:40AM 25        MR. CAZARES:  YOUR HONOR, MAY I APPROACH THE

10:40AM   1    WITNESS?

10:40AM   2              THE COURT:  YES.

10:40AM   3              MR. CAZARES:  (HANDING.)

10:41AM   4         YOUR HONOR, MAY I REMOVE MY MASK?

10:41AM   5              THE COURT:  YES.

10:41AM   6              MR. CAZARES:  THANK YOU.

10:41AM   7                        **CROSS-EXAMINATION**

10:41AM   8    BY MR. CAZARES:

10:41AM   9    Q.   GOOD MORNING, MR. MENDENHALL.

10:41AM   10   A.   GOOD MORNING.

10:41AM   11   Q.   MY NAME IS STEPHEN CAZARES, AND I REPRESENT MR. BALWANI.

10:41AM   12   AND I HAVE A FEW QUESTIONS FOR YOU REGARDING YOUR TESTIMONY

10:41AM   13   HERE THIS MORNING.

10:41AM   14        WOULD THAT BE OKAY?

10:41AM   15   A.   YES.

10:41AM   16   Q.   OKAY.  SO THIS MORNING YOU DESCRIBED YOUR BACKGROUND TO

10:41AM   17   THE JURY, AND I JUST WANTED TO CONFIRM SOME OF THAT.

10:41AM   18        SO YOU WERE A VERY EXPERIENCED INVESTOR AS OF 2013; IS

10:41AM   19   THAT CORRECT?

10:41AM   20   A.   I WOULD SAY SO.

10:41AM   21   Q.   OKAY.  THAT'S BOTH PRIMARILY RELATING TO PUBLIC

10:42AM   22   SECURITIES, BUT ALSO PRIVATE INVESTMENTS; CORRECT?

10:42AM   23   A.   YES.

10:42AM   24   Q.   OKAY.  AND THE COMPANIES THAT YOU WORKED AT THAT YOU

10:42AM   25   OUTLINED THROUGHOUT YOUR CAREER, MERRILL LYNCH,

10:42AM  1   LEHMAN BROTHERS, PAINE WEBBER, THESE AT RELEVANT TIMES WERE AT

10:42AM  2   THE FOREFRONT OF AMERICAN FINANCING; CORRECT?

10:42AM  3   A.   YES.

10:42AM  4   Q.   AND YOU'VE BEEN THE HEAD OF U.S. CAPITAL ADVISORS NOW FOR

10:42AM  5   MORE THAN A DECADE?

10:42AM  6   A.   YES.

10:42AM  7   Q.   AND U.S. CAPITAL ADVISORS HANDLES, YOU KNOW, CORPORATE

10:42AM  8   FINANCE, MONEY MANAGEMENT FOR INDIVIDUAL FAMILIES, AS WELL AS

10:42AM  9   INVESTMENT OPPORTUNITIES FOR THEIR CLIENTS; CORRECT?

10:42AM  10  A.   YES.

10:42AM  11  Q.   NOW, AT THE TIME THAT YOU INVESTED IN THERANOS, YOU WERE

10:42AM  12  STILL AT UBS; IS THAT CORRECT?

10:42AM  13  A.   THE FIRST ROUND, YES.

10:42AM  14  Q.   OKAY.  AND THAT'S BACK IN 2005, 2006 THAT YOU INDICATED?

10:43AM  15  A.   CORRECT.

10:43AM  16  Q.   OKAY.  AND YOU WERE ACTUALLY THE MANAGING DIRECTOR OF UBS;

10:43AM  17  IS THAT CORRECT?

10:43AM  18  A.   YES.

10:43AM  19  Q.   AND IT'S A HIGH RANKING POSITION?

10:43AM  20  A.   YES.

10:43AM  21  Q.   OKAY.  NOW, YOU DESCRIBED A COLLEAGUE OF YOURS AT U.S.

10:43AM  22  CAPITAL, A MR. DAVID HARRIS.

10:43AM  23       DO YOU REMEMBER THAT?

10:43AM  24  A.   YES.

10:43AM  25  Q.   AND MR. HARRIS WORKED FOR YOU AT U.S. CAPITAL?

| | | |
|---|---|---|
| 10:43AM | 1 | A.   HE REPORTED TO ME, YES. |
| 10:43AM | 2 | Q.   HE WAS -- |
| 10:43AM | 3 | A.   HE REPORTS TO ME. |
| 10:43AM | 4 | Q.   I APOLOGIZE.  I DON'T MEAN TO STEP OVER YOU. |
| 10:43AM | 5 | A.   NO, THAT'S OKAY. |
| 10:43AM | 6 | Q.   I APOLOGIZE. |
| 10:43AM | 7 | AND MR. HARRIS WAS AN INVESTMENT ADVISOR? |
| 10:43AM | 8 | A.   YES. |
| 10:43AM | 9 | Q.   SO A MONEY MANAGER FOR INDIVIDUALS AND COMPANIES? |
| 10:43AM | 10 | A.   YES. |
| 10:43AM | 11 | Q.   AND HE WAS A SENIOR ADVISOR AT UBS AT THE TIME? |
| 10:43AM | 12 | A.   STILL IS, YES. |
| 10:43AM | 13 | Q.   AND MR. HARRIS MANAGED THE FAMILY MONEY FOR MS. HOLMES'S |
| 10:43AM | 14 | FAMILY; IS THAT CORRECT? |
| 10:43AM | 15 | A.   AT SOME POINT I BELIEVE THAT'S TRUE. |
| 10:44AM | 16 | Q.   AND SO IT WAS MR. HARRIS WHO WAS KIND OF THE INTRO TO |
| 10:44AM | 17 | MS. HOLMES AND THERANOS; CORRECT? |
| 10:44AM | 18 | A.   YES. |
| 10:44AM | 19 | Q.   AND IS IT ACCURATE TO SAY THEN THAT MR. HARRIS WAS REALLY |
| 10:44AM | 20 | YOUR SOURCE OF INFORMATION RELATING TO THERANOS IN THOSE EARLY |
| 10:44AM | 21 | YEARS? |
| 10:44AM | 22 | A.   YES. |
| 10:44AM | 23 | Q.   AND BACK IN THAT EARLY TIME PERIOD, THE 2005, 2006 TIME |
| 10:44AM | 24 | PERIOD, WE'RE TALKING ABOUT YOUR INITIAL INVESTMENT OF ABOUT |
| 10:44AM | 25 | $50,000. |

10:44AM  1        TO THE EXTENT THAT YOU LEARNED ANYTHING ABOUT THERANOS'S

10:44AM  2   TECHNOLOGY, AGAIN, THAT CAME FROM MR. HARRIS?

10:44AM  3   A.   YES.

10:44AM  4   Q.   BUT YOU DID UNDERSTAND AT THAT TIME THAT THERANOS WAS

10:44AM  5   STILL A THE DEVELOPMENT STAGE COMPANY; IS THAT FAIR?

10:44AM  6   A.   YES.

10:44AM  7   Q.   AND AT THAT TIME BACK IN 2006, YOU RECEIVED NO WRITTEN

10:44AM  8   MATERIALS RELATING TO THE INVESTMENT; CORRECT?

10:44AM  9   A.   YES, NOT THAT I RECALL.

10:44AM  10  Q.   NO PROSPECTUS?

10:45AM  11  A.   IT'S POSSIBLE.  I JUST DON'T RECALL.

10:45AM  12  Q.   NO FINANCIAL DETAILS?

10:45AM  13  A.   NO REAL FINANCIALS.

10:45AM  14  Q.   AND IS IT FAIR TO SAY THAT YOU NEVER RECEIVED FINANCIAL

10:45AM  15  INFORMATION OR DETAILS FROM MS. HOLMES RELATING TO THERANOS?

10:45AM  16  A.   NOT THAT I RECALL.

10:45AM  17  Q.   OKAY.  AND BACK IN THAT TIME PERIOD, 2005 OR 2006, YOU

10:45AM  18  NEVER ASKED FOR IT; CORRECT?

10:45AM  19  A.   NO.  I HAD NO DIRECT COMMUNICATION WITH THE COMPANY.

10:45AM  20  Q.   AND BACK IN THAT EARLY TIME PERIOD, 2005, 2006, OF YOUR

10:45AM  21  INITIAL INVESTMENT, YOU NEVER RECEIVED ANY SORT OF, LIKE,

10:45AM  22  DEMONSTRATION OF THE TECHNOLOGY, THE STATUS OF THE TECHNOLOGY;

10:45AM  23  CORRECT?

10:45AM  24  A.   CORRECT.

10:45AM  25  Q.   AND JUST TO CONFIRM, SO PRIOR TO YOUR INVESTMENT OF THE

10:45AM   1   50-SOME THOUSAND DOLLARS IN 2006, YOU HAD NEVER SPOKEN TO

10:46AM   2   MS. HOLMES?

10:46AM   3   A.   CORRECT.

10:46AM   4   Q.   NEVER EMAILED MS. HOLMES?

10:46AM   5   A.   CORRECT.

10:46AM   6   Q.   AND NEVER COMMUNICATED WITH MS. HOLMES?

10:46AM   7   A.   CORRECT.

10:46AM   8   Q.   OR ANYONE AT THERANOS AT THAT TIME?

10:46AM   9   A.   CORRECT.

10:46AM   10  Q.   SO THE INVESTMENT WAS ENTIRELY RELIANT OF YOUR

10:46AM   11  UNDERSTANDING UPON MR. HARRIS AND WHAT HE TOLD YOU?

10:46AM   12  A.   YES.

10:46AM   13  Q.   AND IT WOULD BE ACCURATE, WOULD IT NOT, THAT IN THAT 2005

10:46AM   14  AND 2006 TIME PERIOD, YOU HAD NO IDEA WHO MR. BALWANI WAS;

10:46AM   15  CORRECT?

10:46AM   16  A.   CORRECT.

10:46AM   17  Q.   AND HAD NEVER COMMUNICATED WITH HIM?

10:46AM   18  A.   NO.

10:46AM   19  Q.   DIDN'T KNOW OF ANY RELATIONSHIP BETWEEN MR. BALWANI AND

10:46AM   20  MS. HOLMES?

10:46AM   21  A.   NO.

10:46AM   22  Q.   AND IS IT CORRECT THEN FROM THAT TIME PERIOD IN 2006 AND

10:46AM   23  UNTIL LATE 2012, 2013, YOU HEARD NOTHING FROM ANYONE AT

10:46AM   24  THERANOS?

10:46AM   25  A.   I BELIEVE I HEARD NOTHING OR NEXT TO NOTHING, YEAH.

10:46AM 1    Q.   BUT YOU DID --

10:46AM 2    A.   THERE WERE SOME NOTICES AND THINGS THAT WOULD COME, BUT

10:46AM 3    NOTHING SPECIFIC THAT I CAN RECALL.

10:47AM 4    Q.   AND YOU DID PERIODICALLY RECEIVE SOME INFORMATION FROM

10:47AM 5    MR. HARRIS THOUGH; CORRECT?

10:47AM 6    A.   UM, I BELIEVE JUST VERBALLY, WHATEVER HE WAS HEARING.

10:47AM 7    Q.   AND DID YOU TAKE ANY NOTES OF THOSE COMMUNICATIONS WITH

10:47AM 8    MR. HARRIS, THOSE UPDATES?

10:47AM 9    A.   NO.

10:47AM 10   Q.   AND YOU DON'T RECALL THE DETAILS, DO YOU?

10:47AM 11   A.   NO.

10:47AM 12   Q.   AND YOU HAVEN'T PROVIDED THOSE TO THE GOVERNMENT HERE IN

10:47AM 13   THIS CASE, HAVE YOU?

10:47AM 14   A.   NO.

10:47AM 15   Q.   NOW, IN 2006 WHEN YOU INVESTED IN THERANOS, IT WAS

10:47AM 16   EXCITING, THE IDEA, WAS IT NOT?

10:47AM 17   A.   YES, IT SOUNDED LIKE A GOOD IDEA.

10:47AM 18   Q.   AND AT THAT TIME, GIVEN THE DEVELOPMENT STAGE OF THE

10:48AM 19   COMPANY, YOU UNDERSTOOD IT WAS A LONG-TERM INVESTMENT; CORRECT?

10:48AM 20   A.   YES.  IT WAS -- I BELIEVE IT WAS MORE OF AN INVESTMENT IN

10:48AM 21   ELIZABETH HOLMES AND WHAT SHE WAS ATTEMPTING TO DO AT THAT

10:48AM 22   POINT.

10:48AM 23   Q.   AND GIVEN THAT, THERANOS WAS A PRIVATELY HELD COMPANY AT

10:48AM 24   THE TIME; CORRECT?

10:48AM 25   A.   YES.

10:48AM 1    Q.   AND WAS ALWAYS A PRIVATELY HELD COMPANY; CORRECT?

10:48AM 2    A.   YES.

10:48AM 3    Q.   AND GIVEN THAT, YOU UNDERSTOOD WHEN YOU WERE INVESTING IN

10:48AM 4    THERANOS THAT YOU WEREN'T NECESSARILY ENTITLED TO OBTAIN

10:48AM 5    FINANCIAL INFORMATION OR CORPORATE DETAILS AS ONE WOULD WHEN

10:48AM 6    ONE INVESTS IN A PUBLIC COMPANY; CORRECT?

10:48AM 7    A.   YES.

10:48AM 8    Q.   AND YOU UNDERSTAND THAT -- YOU UNDERSTOOD THAT BEFORE

10:48AM 9    INVESTING IN 2006?

10:48AM 10   A.   YOU KNOW, I WOULD -- A LOT OF TIMES THERE ARE DOCUMENTS

10:48AM 11   THAT YOU SIGN OUTLINING THE RESPONSIBILITY OF THE CORPORATION

10:48AM 12   TO REPORT TO YOU.

10:48AM 13       I JUST DON'T RECALL IN THE DOCUMENTS THAT I SIGNED TO

10:49AM 14   INITIALLY INVEST IF THEY HAD OUTLINED THAT THEY WOULD PROVIDE

10:49AM 15   QUARTERLY OR ANNUAL FINANCIALS.  I DON'T RECALL THAT.

10:49AM 16       BUT, YEAH, THEY DID NOT PROVIDE ANY.

10:49AM 17   Q.   SO AS A PRACTICAL MATTER, YOU UNDERSTOOD AT THE TIME THAT

10:49AM 18   YOU WEREN'T RECEIVING DETAILS; CORRECT?

10:49AM 19   A.   YES.

10:49AM 20   Q.   AND BY THE TIME OF THE 2013 INVESTMENT BY YOUR FRIENDS AND

10:49AM 21   FAMILY, YOU ALSO UNDERSTOOD THAT YOU WEREN'T RECEIVING

10:49AM 22   FINANCIAL DETAILS OR PROSPECTUSES OR A FINANCIAL REPORT BY THE

10:49AM 23   COMPANY; CORRECT?

10:49AM 24   A.   I HAD NOT RECEIVED ANY, CORRECT.

10:49AM 25   Q.   BUT YOU STILL INVESTED; CORRECT?

10:49AM   1    A.   YES.

10:49AM   2    Q.   MR. MENDENHALL -- I WAS GOING TO SAY MENDELSON.  SORRY.

10:49AM   3         MR. MENDENHALL, IF YOU COULD TAKE A LOOK AT THE BINDER

10:49AM   4    I'VE HANDED YOU, IT HAS SOME EXHIBITS IN THERE.  IF YOU COULD

10:50AM   5    TAKE A LOOK AT EXHIBIT 5814.

10:50AM   6         AND ACTUALLY 5814, I BELIEVE, IS ALREADY IN EVIDENCE.

10:50AM   7              THE COURT:  I DON'T BELIEVE IT'S IN THE BINDER.

10:50AM   8              THE WITNESS:  YEAH, I DON'T SEE IT IN THE BINDER.

10:50AM   9              MR. CAZARES:  AM I CORRECT THAT 5814 IS IN EVIDENCE?

10:50AM  10              THE CLERK:  IT IS.

10:50AM  11              MR. CAZARES:  MAY I PUBLISH, YOUR HONOR?

10:50AM  12              THE COURT:  YES.

10:50AM  13              THE WITNESS:  IS IT ON THE SCREEN OR --

10:50AM  14    BY MR. CAZARES:

10:50AM  15    Q.   IT IS.  IT IS BEING PUBLISHED FOR YOU.

10:50AM  16         SO 5814 YOU TALKED ABOUT A LITTLE BIT THIS MORNING IS THIS

10:50AM  17    DECEMBER 16TH, 2013 EMAIL FROM THERANOS TO YOURSELF, AND

10:50AM  18    THERE'S A DESCRIPTION, "BELOW FIND A MEMO TO STOCKHOLDERS

10:50AM  19    REGARDING CERTAIN DEALS AND TRANSACTIONS WE'RE WORKING TO CLOSE

10:51AM  20    BY YEAR END.  WE'VE ATTACHED YOUR SIGNATURE PAGES TO THE

10:51AM  21    ASSOCIATED SHAREHOLDER CONSENTS TO THIS EMAIL."

10:51AM  22         DO YOU SEE THAT?

10:51AM  23    A.   YES.

10:51AM  24    Q.   NOW, WHEN YOU RECEIVED THIS EMAIL, YOU HAD ALREADY

10:51AM  25    RECEIVED SOME UPDATES REGARDING THE COMPANY FROM MS. HOLMES AND

10:51AM  1    SOME PUBLIC REPORTING; CORRECT?

10:51AM  2    A.   I BELIEVE SO, YES.

10:51AM  3    Q.   SO YOU DESCRIBED, I THINK, A COUPLE OF CONVERSATIONS YOU

10:51AM  4    MAY HAVE HAD WITH MS. HOLMES IN 2013.

10:51AM  5    A.   YES.

10:51AM  6    Q.   OKAY.  AND THEN THERE WERE SOME PUBLIC ANNOUNCEMENTS

10:51AM  7    RELATING TO THE WALGREENS ROLLOUT.

10:51AM  8         YOU SAW THAT?

10:51AM  9    A.   YES.

10:51AM  10   Q.   AND YOU ALSO SAW "THE WALL STREET JOURNAL" ARTICLE THAT

10:51AM  11   YOU SPOKE ABOUT THIS MORNING?

10:51AM  12   A.   YES.

10:51AM  13   Q.   AND ALL OF THAT WAS EXCITING; CORRECT?

10:51AM  14   A.   YES.

10:51AM  15   Q.   AND GIVEN THE YEARS HAD PASSED AND YOU HEARD NOTHING AND

10:51AM  16   ALL OF A SUDDEN THE COMPANY THAT YOU PUT $50,000 INTO IN 2006

10:51AM  17   WAS NOW IN "THE WALL STREET JOURNAL" BEING COVERED, THAT WAS

10:51AM  18   EXCITING?

10:51AM  19   A.   YES.

10:51AM  20   Q.   AND THAT KIND OF BODED WELL FOR THE POTENTIAL FUTURE OF

10:51AM  21   THE COMPANY; CORRECT?

10:52AM  22   A.   YES.

10:52AM  23   Q.   NOW, YOU DESCRIBED THIS EMAIL AS INDICATING TO YOU THAT

10:52AM  24   THE COMPANY WAS GOING TO BE RAISING MORE FUNDS; CORRECT?

10:52AM  25   A.   YES.

10:52AM  1    Q.   AND THOSE FUNDS WERE LIKELY GOING TO BE COMING FROM LARGE

10:52AM  2    INSTITUTIONAL INVESTORS; CORRECT?

10:52AM  3    A.   I WASN'T SURE WHERE THEY WERE COMING FROM, BUT MY -- THE

10:52AM  4    THOUGHTS WERE THAT THEY WERE GOING TO BE COMING FROM LARGER

10:52AM  5    SOURCES, YES.

10:52AM  6    Q.   OKAY.  AND THAT ALSO WAS EXCITING, WAS IT NOT?

10:52AM  7    A.   YEAH.  IT VALIDATES YOUR VALUES WHEN MORE SOPHISTICATED

10:52AM  8    INVESTORS GET IN.

10:52AM  9    Q.   AND THE FACT THAT MORE SOPHISTICATED INVESTORS WERE COMING

10:52AM  10   IN WITH MORE FUNDS, AGAIN, BODED WELL FOR THE FUTURE OF THE

10:52AM  11   COMPANY TO GROW AND EXECUTE ON ITS BUSINESS PLAN; CORRECT?

10:52AM  12   A.   YES.

10:52AM  13   Q.   AND THAT ALSO CONTRIBUTED TO YOUR DECISION TO INVEST;

10:52AM  14   CORRECT?

10:52AM  15   A.   YES.

10:52AM  16   Q.   THE FACT THAT OTHER INVESTORS WERE REVIEWING THE SAME

10:52AM  17   COMPANY AND COMING TO SIMILAR CONCLUSIONS THAT YOU WERE;

10:53AM  18   CORRECT?

10:53AM  19   A.   YES.

10:53AM  20   Q.   AND I THINK YOU DESCRIBED WHEN YOU LEARNED ABOUT THIS

10:53AM  21   OPPORTUNITY TO POTENTIALLY INVEST COMBINED WITH THE COVERAGE

10:53AM  22   THAT THE COMPANY HAD BEEN GETTING, AGAIN, FROM

10:53AM  23   "THE WALL STREET JOURNAL," THE ANNOUNCEMENT OF THE WALGREENS

10:53AM  24   RELATIONSHIP, IN YOUR MIND YOU VIEWED THIS OPPORTUNITY TO

10:53AM  25   INVEST AS INCREDIBLE; CORRECT?

10:53AM  1    A.   YES.

10:53AM  2    Q.   NOW, THE FACT OF THIS PUBLIC COVERAGE OF THERANOS, AGAIN,

10:54AM  3    "WALL STREET JOURNAL," THE WALGREENS RELATIONSHIP, COMBINED

10:54AM  4    WITH THIS INFORMATION THAT YOU WERE RECEIVING THAT THEY WERE

10:54AM  5    GOING TO BE RECEIVING LIKELY SOME ADDITIONAL FUNDS TO GROW THE

10:54AM  6    BUSINESS, YOU UNDERSTOOD THAT THAT STILL DIDN'T MEAN A

10:54AM  7    GUARANTEE THAT THERANOS WAS GOING TO WORK OUT AND EXECUTE ON

10:54AM  8    THE BUSINESS PLAN; CORRECT?

10:54AM  9    A.   YES.

10:54AM  10   Q.   NOTWITHSTANDING YOUR OWN, YOU KNOW, ANALYSIS OF THE

10:54AM  11   COMPANY AND POSSIBLY THESE OTHER SOPHISTICATED INVESTORS

10:54AM  12   REVIEWING THE COMPANY POSITIVELY, THAT THERE ARE STILL

10:54AM  13   EXECUTION RISKS IN ANY BUSINESS PLAN; CORRECT?

10:54AM  14   A.   YES.

10:54AM  15   Q.   AND YOU UNDERSTOOD THAT?

10:54AM  16   A.   YES.

10:54AM  17   Q.   AND YOU ALSO UNDERSTOOD THAT IN THAT TIME PERIOD, AGAIN,

10:54AM  18   THIS IS LATE 2013, THE RETAIL BUSINESS OF THERANOS IS STARTING

10:54AM  19   TO OFFER BLOOD TESTING TO PATIENTS IN WALGREENS STORES, THAT

10:54AM  20   PART OF THE BUSINESS WAS BRAND NEW; CORRECT?

10:54AM  21   A.   YES.

10:54AM  22   Q.   AND GIVEN THAT IT WAS A BRAND NEW VENTURE REALLY FOR THE

10:55AM  23   COMPANY GOING FROM THIS KIND OF UNDERGROUND TIME PERIOD TO NOW

10:55AM  24   OFFERING A RETAIL PRODUCT TO PATIENTS, THAT AGAIN ADDED

10:55AM  25   ADDITIONAL RISKS TO THE BUSINESS THAT YOU UNDERSTOOD; CORRECT?

10:55AM  1    A.   YEAH.  I MEAN, THERE'S AN ELEMENT OF ASSUMPTION THAT A

10:55AM  2    PUBLIC COMPANY THE SIZE OF WALGREENS HAD DONE THEIR HOMEWORK,

10:55AM  3    TOO.

10:55AM  4    Q.   AND AGAIN, THAT ALSO KIND OF INFLUENCED AND CONTRIBUTED TO

10:55AM  5    YOUR DECISION TO INVEST WITH YOUR FRIENDS AND FAMILY; CORRECT?

10:55AM  6    A.   YES.

10:55AM  7    Q.   ABSENT THAT RELATIONSHIP WITH WALGREENS, THERE MAY NOT

10:55AM  8    HAVE BEEN A GOOD REASON TO INVEST IN THERANOS AT THAT TIME;

10:55AM  9    CORRECT?

10:55AM  10           MR. BOSTIC:  OBJECTION.  IT CALLS FOR SPECULATION.

10:55AM  11           THE COURT:  SUSTAINED.

10:55AM  12       YOU CAN REPHRASE THAT IF YOU WOULD LIKE.

10:55AM  13   BY MR. CAZARES:

10:55AM  14   Q.   THE RELATIONSHIP WITH WALGREENS WAS IMPORTANT TO YOUR

10:55AM  15   DECISION TO INVEST; CORRECT?

10:55AM  16   A.   IT CERTAINLY WAS A CONTRIBUTOR.

10:55AM  17   Q.   OKAY.  NOW, IN THIS -- IN THE TIME PERIOD BEFORE 2013 WHEN

10:56AM  18   YOU WERE NOT RECEIVING MUCH INFORMATION FROM MR. HARRIS, DID

10:56AM  19   YOU EVER LEARN ABOUT THERANOS RUNNING LOW ON FUNDS IN AROUND

10:56AM  20   2009?

10:56AM  21   A.   NOT THAT I CAN RECALL.

10:56AM  22   Q.   NOW, GIVEN YOU WERE IN FINANCE, IN 2009, THAT TIME PERIOD,

10:56AM  23   THESE WERE ROCKY TIMES IN AMERICAN FINANCE AND CORPORATE

10:56AM  24   AMERICA; CORRECT?

10:56AM  25   A.   YES.

10:56AM  1    Q.   WHAT WAS HAPPENING AT THAT TIME?

10:56AM  2    A.   WELL, THERE WAS A FINANCIAL CRISIS IN 2008 AND THE MARKETS

10:56AM  3    MELTED DOWN, AND THERE WAS A LOT OF CRAZINESS.

10:56AM  4    Q.   AND AMONG THE CRISES, ONE OF THE EFFECTS BECAME KIND OF A

10:56AM  5    LIQUIDITY CRISIS, WASN'T IT?  AN INABILITY OF CORPORATIONS TO

10:57AM  6    GAIN FINANCING, OR OBTAIN FINANCING EASILY ANYWAY?

10:57AM  7    A.   YES, IT BECAME MORE DIFFICULT.

10:57AM  8    Q.   OKAY.  AND IN THAT TIME PERIOD, DID MR. HARRIS LET YOU

10:57AM  9    KNOW THAT THERANOS WAS RUNNING INTO SIMILAR ISSUES WITH ACCESS

10:57AM  10   TO CAPITAL LIKE MANY IN CORPORATE AMERICA WERE AT THE TIME?

10:57AM  11   A.   NOT THAT I CAN RECALL.

10:57AM  12   Q.   DID YOU EVER LEARN THAT MR. BALWANI HIMSELF GUARANTEED A

10:57AM  13   $10 MILLION LINE OF CREDIT FOR THERANOS SO IT COULD STAY IN

10:57AM  14   OPERATION DURING THOSE ROCKY TIMES IN 2009?

10:57AM  15   A.   I DID NOT KNOW THAT.  I DID NOT KNOW THAT UNTIL TODAY.

10:57AM  16   Q.   AND IS IT ACCURATE TO SAY THAT PRIOR TO 2013, YOU HAD NO

10:57AM  17   IDEA OF MR. BALWANI'S ROLE IN THE COMPANY; CORRECT?

10:57AM  18   A.   CORRECT.  I'M NOT SURE WHEN I -- IT WAS AROUND THAT PERIOD

10:57AM  19   THAT I'M SURE I LEARNED ABOUT IT, BUT I DON'T KNOW EXACTLY -- I

10:57AM  20   CAN'T RECALL SPECIFICALLY WHEN I LEARNED ABOUT HIS ROLE.

10:58AM  21          MR. CAZARES:  YOUR HONOR, I BELIEVE EXHIBIT 1113 IS

10:58AM  22   IN EVIDENCE.

10:58AM  23       MAY I PUBLISH?

10:58AM  24          THE COURT:  YES.

10:58AM  25   BY MR. CAZARES:

10:58AM  1    Q.   MR. MENDENHALL, ON THE SCREEN IS A PRESS RELEASE, AN

10:58AM  2    ANNOUNCEMENT BY THERANOS AND WALGREENS RELATING TO A

10:58AM  3    PARTNERSHIP, THAT WAS ISSUED ON SEPTEMBER 9TH OF 2013.

10:58AM  4         DO YOU SEE THAT?

10:58AM  5    A.   YES.

10:58AM  6    Q.   AND IN THAT TIME PERIOD, ROUGHLY, WERE YOU AWARE OF THIS

10:58AM  7    PUBLIC ANNOUNCEMENT OF THE WALGREENS PARTNERSHIP?

10:58AM  8    A.   YES.

10:58AM  9    Q.   OKAY.  AND LIKE YOU SAID BEFORE, THAT WAS EXCITING?

10:58AM  10   A.   YES.

10:58AM  11   Q.   WALGREENS WAS ACTUALLY AN INTERNATIONAL RETAILER; CORRECT?

10:58AM  12   A.   YES.

10:58AM  13   Q.   AND YOU BELIEVED WALGREENS HAD THE ABILITY TO HELP A SMALL

10:59AM  14   COMPANY LIKE THERANOS SCALE ITS BUSINESS NATIONALLY; CORRECT?

10:59AM  15   A.   YES.

10:59AM  16   Q.   NOW, IN YOUR, IN YOUR TESTIMONY THIS MORNING IN RESPONSE

10:59AM  17   TO, I THINK, MULTIPLE QUESTIONS BY THE GOVERNMENT, YOU WERE

10:59AM  18   ASKED ABOUT YOUR UNDERSTANDING OF THERANOS'S TECHNOLOGY.

10:59AM  19        IS IT FAIR TO SAY THAT YOUR UNDERSTANDING OF THERANOS'S

10:59AM  20   TECHNOLOGY, ITS PROPRIETARY TECHNOLOGY, WAS THIS FINGERSTICK

10:59AM  21   TESTING; CORRECT?

10:59AM  22   A.   YES.

10:59AM  23   Q.   AND YOU UNDERSTAND THAT THEY HAD DEVELOPED THEIR OWN

10:59AM  24   ANALYZER OR DEVICE THAT WAS USED TO DO THE ANALYSIS OF BLOOD

10:59AM  25   SAMPLES FROM A FINGERSTICK?

10:59AM  1    A.   YES.

10:59AM  2    Q.   BUT YOU WERE NEVER AWARE IN THIS 2013 TIME PERIOD OF THE

10:59AM  3    DETAILS OF HOW THERANOS PERFORMED THE TESTING THAT THEY DID ON

10:59AM  4    FINGERSTICK SAMPLES; CORRECT?

10:59AM  5    A.   CORRECT.

10:59AM  6    Q.   NOW, YOU ALSO TESTIFIED, I THINK, IN RESPONSE TO THE

11:00AM  7    QUESTIONS BY THE GOVERNMENT, THAT YOU WERE UNAWARE OF THE FACT

11:00AM  8    THAT THERANOS, BY THE TIME IT STARTED TESTING PATIENT SAMPLES

11:00AM  9    THROUGH WALGREENS STORES, WAS STILL USING VENOUS DRAW OR

11:00AM  10   TRADITIONAL METHODS; CORRECT?

11:00AM  11   A.   YES.

11:00AM  12   Q.   AND I THINK WHAT YOU SAID WAS NO ONE TOLD YOU THAT FACT,

11:00AM  13   OR MR. BALWANI DIDN'T TELL YOU THAT FACT.

11:00AM  14        IS THAT WHAT YOU SAID THIS MORNING?

11:00AM  15   A.   YES.

11:00AM  16   Q.   NOW, IF WE TAKE A LOOK BACK AT EXHIBIT 1113, THE

11:00AM  17   ANNOUNCEMENT THAT YOU SAID YOU SAW, WOULD YOU TAKE A LOOK AT

11:00AM  18   THAT FIRST PARAGRAPH.

11:00AM  19        AND YOU SEE IN THE MIDDLE OF THAT FIRST PARAGRAPH THE

11:00AM  20   ANNOUNCEMENT SAYS, "AS THE SERVICE BECOMES AVAILABLE THROUGH

11:00AM  21   THERANOS WELLNESS CENTERS INSIDE WALGREENS STORES, CONSUMERS

11:00AM  22   WILL BE ABLE TO ACCESS LESS INVASIVE AND MORE AFFORDABLE

11:00AM  23   CLINICIAN-DIRECTED LAB TESTING."

11:01AM  24        DO YOU SEE THAT?

11:01AM  25   A.   YES.

11:01AM  1    Q.    AND THEN IT CONTINUES.

11:01AM  2          "FROM A BLOOD SAMPLE AS SMALL AS A FEW DROPS, OR 1/1,000

11:01AM  3    THE SIZE OF A TYPICAL BLOOD DRAW."

11:01AM  4          DO YOU SEE THAT?

11:01AM  5    A.    YES.

11:01AM  6    Q.    AND THEN IT SAYS, "THE SAMPLES ARE EITHER TAKEN FROM A

11:01AM  7    TINY FINGERSTICK OR A MICRO-SAMPLE TAKEN FROM TRADITIONAL

11:01AM  8    METHODS, ELIMINATING THE NEED FOR LARGER NEEDLES."

11:01AM  9          DO YOU SEE THAT?

11:01AM  10   A.    YES.

11:01AM  11   Q.    AND NOW, YOU UNDERSTOOD AT THE TIME IN THIS 2013 TIME

11:01AM  12   PERIOD THAT TRADITIONAL TESTING METHODS MEANS A VEIN DRAW;

11:01AM  13   CORRECT?

11:01AM  14   A.    YES.

11:01AM  15   Q.    NOW, I THINK YOU ALSO MENTIONED IN YOUR TESTIMONY THIS

11:01AM  16   MORNING THAT YOU WERE UNAWARE OF THE FACT THAT THERANOS, I

11:01AM  17   THINK THERE WERE SOME RUMORS -- LET ME BACK UP.

11:01AM  18         YOU HAD SOME QUESTIONS FOR MR. BALWANI ABOUT RUMORS AND

11:02AM  19   QUESTIONS THAT YOU HAD HEARD ABOUT THERANOS SHIPPING SAMPLES TO

11:02AM  20   A CENTRAL LAB AND TAKING, LIKE, 24 OR 48 HOURS TO REPORT

11:02AM  21   RESULTS.

11:02AM  22         DO YOU REMEMBER THAT?

11:02AM  23   A.    YES.

11:02AM  24   Q.    AND I THINK YOU SAID YOU WERE UNAWARE OF THAT FACT;

11:02AM  25   CORRECT?

11:02AM   1    A.   YES.

11:02AM   2    Q.   AND THAT'S WHY YOU WERE ASKING QUESTIONS?  YOU DIDN'T KNOW

11:02AM   3    IF IT WAS TRUE?  YOU KIND OF DIDN'T KNOW ONE WAY OR THE OTHER?

11:02AM   4    A.   YES.

11:02AM   5    Q.   NOW RETURNING BACK TO EXHIBIT 1113, THE PUBLIC

11:02AM   6    ANNOUNCEMENT OF THE RELATIONSHIP WITH WALGREENS AND THIS KIND

11:02AM   7    OF PARTNERSHIP TO OFFER BLOOD TESTING.

11:02AM   8         AND ON PAGE 2, THAT SECOND FULL PARAGRAPH, AROUND THE

11:02AM   9    MIDDLE OF THE PARAGRAPH TO THE BOTTOM STARTING "THERANOS

11:02AM  10    SEAMLESSLY."

11:02AM  11         DO YOU SEE THAT?

11:02AM  12    A.   YES.

11:02AM  13    Q.   AND SO THE ANNOUNCEMENT BY WALGREENS AND THERANOS HERE

11:02AM  14    REPORTS, "THERANOS SEAMLESSLY INTEGRATES WITH EXISTING PRACTICE

11:02AM  15    WORK FLOWS AND OFFERS A FULL SPECTRUM OF LABORATORY TESTS, FROM

11:03AM  16    THE MOST COMMON PANELS TO HIGHLY SPECIALIZED TESTS."

11:03AM  17         DO YOU SEE THAT?

11:03AM  18    A.   YES.

11:03AM  19    Q.   AND THEN IT CONTINUES.

11:03AM  20         "COLLECTION FOR THERANOS TESTS WILL BE PERFORMED IN

11:03AM  21    THERANOS WELLNESS CENTERS BY LICENSED PHLEBOTOMISTS OR

11:03AM  22    APPROPRIATELY STATE CERTIFIED PERSONNEL."

11:03AM  23         DO YOU SEE THAT?

11:03AM  24    A.   YES.

11:03AM  25    Q.   AND SO THE ANNOUNCEMENT REFERENCES COLLECTING SAMPLES

11:03AM  1    WITHIN THE STORES; CORRECT?

11:03AM  2    A.   YES.

11:03AM  3    Q.   BUT IT DOESN'T SAY THAT THEY'RE PERFORMING THE ANALYSIS IN

11:03AM  4    THE STORE; CORRECT?

11:03AM  5    A.   YES.

11:03AM  6    Q.   OKAY.  NOW, YOU HAD SOME EXPERIENCE INVESTING IN MEDICAL

11:03AM  7    TECHNOLOGY COMPANIES, PHARMACEUTICAL COMPANIES, LAB TESTING,

11:03AM  8    ANY OF THAT BY 2013?

11:03AM  9    A.   I HAD INVESTED IN FREESTANDING EMERGENCY ROOMS.

11:03AM  10   Q.   IN THE TIME PERIOD OF 2013, DID YOU UNDERSTAND THAT FOR

11:03AM  11   THERANOS TO PUT ITS DEVICE IN A WALGREENS STORE TO DO THE

11:03AM  12   ACTUAL TESTING, THEY NEEDED TO HAVE FDA APPROVAL TO ACTUALLY

11:04AM  13   PLACE THE DEVICE IN STORE TO TEST.

11:04AM  14        DID YOU UNDERSTAND THAT?

11:04AM  15             MR. BOSTIC:  CALLS FOR A LEGAL CONCLUSION.

11:04AM  16             MR. CAZARES:  I'M JUST ASKING FOR HIS UNDERSTANDING.

11:04AM  17             THE COURT:  ARE YOU ASKING HIM IF HE KNEW ABOUT ANY

11:04AM  18   REGULATION ABOUT THAT?

11:04AM  19        WHY DON'T YOU REPHRASE IT?

11:04AM  20             MR. CAZARES:  SURE.

11:04AM  21   Q.   MR. MENDENHALL, DID YOU HAVE ANY KNOWLEDGE OR

11:04AM  22   UNDERSTANDING RELATING TO FDA REGULATIONS REGARDING WHEN,

11:04AM  23   WHERE, AND HOW A MEDICAL DEVICE LIKE THERANOS BLOOD ANALYZER

11:04AM  24   COULD BE USED?

11:04AM  25   A.   I DID NOT HAVE KNOWLEDGE OF REGULATORY REQUIREMENTS.

11:04AM   1    Q.   FAIR ENOUGH.

11:04AM   2         BUT YOU WERE AWARE AT SOME POINT IN TIME, WHETHER IT WAS

11:04AM   3    BEFORE YOU INVESTED OR AFTER, THAT THERANOS INTENDED TO SEEK

11:04AM   4    FDA APPROVAL; CORRECT?

11:04AM   5    A.   YES.

11:04AM   6    Q.   BECAUSE ULTIMATELY IT HAPPENED; RIGHT?

11:04AM   7    A.   I BELIEVE THEY DID SEEK FDA APPROVAL.

11:04AM   8    Q.   OKAY.  AND YOU RECEIVED AN ANNOUNCEMENT THAT THEY OBTAINED

11:04AM   9    THE APPROVAL; CORRECT?

11:04AM  10    A.   I BELIEVE SO, YES.

11:04AM  11    Q.   OKAY.  AND THE ANNOUNCEMENT AT 1113 CONTINUES, ON THAT

11:05AM  12    SECOND PAGE NEAR THE BOTTOM, "AS THE NATION'S LARGEST RETAIL

11:05AM  13    PHARMACY CHAIN WITH MORE THAN 8,100 NEIGHBORHOOD PHARMACIES,

11:05AM  14    WALGREENS HAS THE INFRASTRUCTURE TO HELP BRING THERANOS TO

11:05AM  15    CONSUMERS NATIONWIDE."

11:05AM  16         DO YOU SEE THAT?

11:05AM  17    A.   YES.

11:05AM  18    Q.   AND YOU BELIEVED THAT WAS TRUE AT THE TIME; CORRECT?

11:05AM  19    A.   YES.

11:05AM  20    Q.   YOU CAN SET THAT ASIDE.

11:05AM  21         YOUR HONOR, I BELIEVE 1106 IS ALSO IN EVIDENCE.  MAY I

11:05AM  22    PUBLISH?

11:05AM  23              THE COURT:  YES.

11:05AM  24    BY MR. CAZARES:

11:05AM  25    Q.   AND DO YOU SEE, MR. MENDENHALL, 1106 IS THAT

11:05AM  1    "WALL STREET JOURNAL" ARTICLE THAT YOU REFERENCED THAT YOU

11:05AM  2    INDICATED THAT YOU SAW AND KIND OF GENERATED SOME EXCITEMENT ON

11:05AM  3    YOUR BEHALF AS AN INVESTOR IN THE COMPANY; CORRECT?

11:05AM  4    A.   YES.

11:05AM  5    Q.   AND THE GOVERNMENT REVIEWED SOME OF THIS WITH YOU THIS

11:05AM  6    MORNING; CORRECT?

11:05AM  7    A.   YES.

11:05AM  8    Q.   OKAY.  AND AGAIN, JUST TO CONFIRM, YOU REVIEWED THE

11:06AM  9    ARTICLE BACK WHEN IT WAS PUBLISHED AROUND THIS TIME?

11:06AM  10   A.   YES, I READ IT.

11:06AM  11   Q.   OKAY.  NOW, THE GOVERNMENT POINTED OUT A PARAGRAPH TO YOU

11:06AM  12   AT THE FOURTH PARAGRAPH BEGINNING "THE SECRET."

11:06AM  13        DO YOU SEE THAT?

11:06AM  14   A.   YES.

11:06AM  15   Q.   AND IT SAYS, "THE SECRET THAT HUNDREDS OF EMPLOYEES ARE

11:06AM  16   NOW REFINING INVOLVES DEVICES THAT AUTOMATE AND MINIATURIZE

11:06AM  17   MORE THAN 1,000 LABORATORY TESTS, FROM ROUTINE BLOOD WORK TO

11:06AM  18   ADVANCED GENETIC ANALYSES."

11:06AM  19        DO YOU SEE THAT?

11:06AM  20   A.   YES.

11:06AM  21   Q.   NOW, THE ARTICLE DESCRIBES REFINING THE DEVICES.

11:06AM  22        DO YOU SEE THAT?

11:06AM  23   A.   YES.

11:06AM  24   Q.   I THINK IN YOUR TESTIMONY THIS MORNING IN QUESTION -- IN

11:06AM  25   RESPONSE TO QUESTIONS FROM THE GOVERNMENT ABOUT YOUR

11:06AM  1    UNDERSTANDING OF HOW YOUR MONEY WOULD BE USED, THE 2013

11:06AM  2    INVESTOR MONEY, YOU HAD A SENSE AND UNDERSTANDING FROM

11:07AM  3    MR. BALWANI THAT THE SCIENCE OF THE TECHNOLOGY WAS COMPLETE, IT

11:07AM  4    WAS DONE?

11:07AM  5    A.   YEAH, THE SCIENCE AND THE TECHNOLOGY, YES.

11:07AM  6    Q.   OKAY.  AND YOU TOLD THE JURY HERE THIS MORNING THAT THAT

11:07AM  7    CAME FROM MR. BALWANI; CORRECT?

11:07AM  8    A.   YES.

11:07AM  9    Q.   OKAY.  THAT SAID, YOU, AS A SOPHISTICATED INVESTOR,

11:07AM  10   UNDERSTAND COMPANIES ARE ALWAYS TRYING TO IMPROVE AND PERFECT

11:07AM  11   THEIR PRODUCTS AND THEIR TECHNOLOGY; CORRECT?

11:07AM  12   A.   I, I WOULD BELIEVE SO.  I MEAN, THAT'S -- I WOULD THINK

11:07AM  13   THAT IF YOU CAN IMPROVE IT, YOU WOULD.

11:07AM  14   Q.   AND IF YOU HAD AN IPHONE 6 TO AN IPHONE 12, GREAT DEVICE

11:07AM  15   HERE, BUT NOT CLOSE TO THE DEVICE THAT YOU HAD YEARS LATER;

11:07AM  16   CORRECT?

11:07AM  17   A.   UNDERSTOOD.

11:07AM  18   Q.   AND YOU WOULD -- YOU EXPECTED THERANOS TO CONTINUE TO

11:07AM  19   PERFECT ITS TECHNOLOGY; CORRECT?

11:07AM  20   A.   I WAS JUST HAPPY THAT THEY HAD THE TECHNOLOGY DONE, YES.

11:07AM  21   Q.   OKAY.  AND YOU ALSO WOULD HAVE EXPECTED THERANOS TO USE

11:08AM  22   INVESTOR MONEY TO PERFORM RESEARCH AND DEVELOPMENT, TO PERFECT

11:08AM  23   ITS TECHNOLOGY TOWARDS THE GOAL OF FDA APPROVAL.

11:08AM  24        YOU THOUGHT THAT WAS APPROPRIATE; CORRECT?

11:08AM  25   A.   YES.  IT'S NOT NECESSARILY WHAT I WAS TOLD, BUT, YES, IF

11:08AM   1      THAT'S WHAT THEY THOUGHT THEY NEEDED TO DO TO IMPROVE THE

11:08AM   2      COMPANY.  BUT I WAS TOLD IT WAS FOR MARKETING AND

11:08AM   3      MANUFACTURING.

11:08AM   4      Q.   AND YOU BECAME AWARE OF THE FACT THAT AFTER YOU INVESTED,

11:08AM   5      THERANOS DID EXPAND ITS BUSINESS; CORRECT?

11:08AM   6      A.   WELL, THEY WERE TRYING TO ROLL OUT TO WALGREENS IS WHAT I

11:08AM   7      UNDERSTOOD.

11:08AM   8      Q.   AND THEY WENT FROM JUST A FEW STORES IN 2013 WHEN YOU

11:08AM   9      INVESTED WITH YOUR FRIENDS AND FAMILY, TO MANY MORE STORES --

11:08AM   10     A.   YES.

11:08AM   11     Q.   -- THE NEXT YEAR; CORRECT?

11:08AM   12     A.   YES, I BELIEVE SO.

11:08AM   13     Q.   AND AS A PART OF THAT, YOU UNDERSTOOD THAT THERANOS WAS

11:08AM   14     MARKETING ITS BUSINESS; CORRECT?

11:09AM   15     A.   YEAH, THEY WERE EXPANDING.

11:09AM   16     Q.   AND THAT WAS AN APPROPRIATE USE OF FUNDS; CORRECT?

11:09AM   17     A.   YEAH.

11:09AM   18     Q.   AND IN ADDITION TO USING FUNDS IN THAT MANNER, YOU

11:09AM   19     UNDERSTOOD THAT MS. HOLMES AND MR. BALWANI HAD OBLIGATIONS TO

11:09AM   20     YOU AS INVESTORS, AND TO ALL INVESTORS, TO USE INVESTOR MONEY

11:09AM   21     AS THEY SAW BEST TO GROW THE BUSINESS FOR INVESTORS; CORRECT?

11:09AM   22     A.   YES.

11:09AM   23     Q.   THAT'S WHAT YOU EXPECTED; RIGHT?

11:09AM   24     A.   YES.

11:09AM   25     Q.   AND SO THE FACT THAT THERANOS MAY HAVE BEEN REFINING ITS

11:09AM   1   TECHNOLOGY IN 2013 AND 2014, THERE'S NOTHING WRONG WITH THAT;

11:09AM   2   CORRECT?

11:09AM   3   A.   YEAH.   IT'S DIFFERENT THAN WHAT I WAS TOLD.   YOU KNOW, IT

11:09AM   4   WAS -- I MEAN, THE ARTICLE IS DIFFERENT THAN BEING TOLD

11:09AM   5   DIRECTLY FROM THE PRESIDENT AND CHIEF OPERATING OFFICER OF THE

11:09AM   6   COMPANY THAT THEY WERE DONE WITH THE TECHNOLOGY.

11:09AM   7        I WOULD HAVE HAD NO KNOWLEDGE ON WHETHER THEY NEEDED TO

11:09AM   8   REFINE IT FOR ANY SPECIFIC REASON.   I JUST REMEMBER WHAT I WAS

11:09AM   9   TOLD.

11:09AM  10   Q.   AND TO THE EXTENT THAT THE TECHNOLOGY WAS DONE IN LATE

11:09AM  11   2013 AND 2014 AND THAT SAME TECHNOLOGY WAS THE TECHNOLOGY USED

11:10AM  12   TO GET FDA APPROVAL, THAT'S WHAT YOU WOULD HAVE EXPECTED TO

11:10AM  13   HAVE HAPPEN; CORRECT?

11:10AM  14   A.   YES.

11:10AM  15   Q.   THE TECHNOLOGY THAT THEY HAD IN LATE 2013, 2014, WAS DONE

11:10AM  16   OR COMPLETE AND USED TO GET FDA APPROVAL.   THAT WAS -- THAT

11:10AM  17   COINCIDED WITH YOUR UNDERSTANDING; RIGHT?

11:10AM  18   A.   YES.

11:10AM  19   Q.   IS IT -- AM I CORRECT THAT YOU NEVER YOURSELF WENT AND

11:10AM  20   KIND OF TESTED OUT THERANOS'S BLOOD TESTING PRIOR TO INVESTING;

11:11AM  21   IS THAT RIGHT?

11:11AM  22   A.   CORRECT.

11:11AM  23   Q.   BECAUSE YOU LIVED IN HOUSTON AND THEY WERE IN PALO ALTO,

11:11AM  24   SO --

11:11AM  25   A.   YEAH.

11:11AM   1    Q.   -- IT WAS A LITTLE INCONVENIENT; RIGHT?

11:11AM   2    A.   YES.

11:11AM   3    Q.   AND THERE MAY HAVE BEEN A FEW STORES IN ARIZONA, BUT THAT

11:11AM   4    STILL IS NOT CONVENIENT FROM HOUSTON?

11:11AM   5    A.   YES.

11:11AM   6    Q.   OKAY.  BUT PRIOR TO YOUR INVESTMENT IN DECEMBER, LATE 2013

11:11AM   7    AND EARLY 2014 I GUESS IS WHEN THE FUNDS WERE ACTUALLY

11:11AM   8    SUBMITTED, YOU -- I THINK YOU SAID YOU KNEW OF THE WEBSITE;

11:11AM   9    CORRECT?

11:11AM   10   A.   YES.

11:11AM   11   Q.   AND YOU VISITED THE WEBSITE?

11:11AM   12   A.   YES.

11:11AM   13   Q.   REVIEWED IT?

11:11AM   14   A.   YES.

11:11AM   15   Q.   PRIOR TO INVESTING?

11:11AM   16   A.   I'M NOT SURE OF THE TIMING, BUT I DID -- I HAVE REVIEWED

11:11AM   17   THE WEBSITE.

11:11AM   18   Q.   OKAY.  IT WOULD HAVE BEEN YOUR HABIT, THOUGH, TO LOOK AT

11:11AM   19   WHATEVER PUBLIC INFORMATION WAS AVAILABLE PRIOR TO RECOMMENDING

11:11AM   20   FRIENDS AND FAMILY INVEST IN THERANOS; CORRECT?

11:11AM   21   A.   YES.  THERE WAS A BUNCH OF INFORMATION COMING OUT.  I JUST

11:12AM   22   DON'T KNOW WHEN THE WEBSITE WAS LIVE, IF IT WAS LIVE BEFORE OR

11:12AM   23   AFTER I INVESTED.

11:12AM   24   Q.   IF IT WAS LIVE, YOU LOOKED AT IT?

11:12AM   25   A.   SURE.

11:12AM  1    Q.   IF YOU COULD TAKE A LOOK AT EXHIBIT 5805.  I THINK YOU

11:12AM  2    LOOKED AT IT ALREADY THIS MORNING.  IT'S IN EVIDENCE.

11:12AM  3         AND WE CAN JUST PUT IT UP ON THE SCREEN.

11:12AM  4         AGAIN, THIS RESEMBLES THE WEBSITE AS YOU SAW IT BACK IN

11:12AM  5    2013, 2014?

11:12AM  6    A.   OKAY.  YEAH, I'VE SEEN IT.

11:12AM  7    Q.   OKAY.  AND IF YOU TAKE A LOOK -- THE GOVERNMENT REVIEWED A

11:12AM  8    FEW PASSAGES WITH YOU THIS MORNING; CORRECT?

11:12AM  9    A.   YES.

11:12AM  10   Q.   AND IF YOU TAKE A LOOK AT PAGE 2 ON THE WEBSITE THAT YOU

11:12AM  11   REVIEWED, NEAR THE MIDDLE, AND IT'S A LITTLE HARD TO READ, BUT

11:12AM  12   IF WE CAN BLOW THAT UP.

11:12AM  13        AMONG THE STATEMENTS IN THE WEBSITE MADE TO EVERYBODY, THE

11:12AM  14   PUBLIC, PATIENTS, INVESTORS, AND OTHERS, THE WEBSITE REPORTS,

11:12AM  15   "GOODBYE, BIG BAD NEEDLE."

11:13AM  16        DO YOU SEE THAT?

11:13AM  17   A.   YES.

11:13AM  18   Q.   AND IT SAYS, "INSTEAD OF A HUGE NEEDLE, WE CAN USE A TINY

11:13AM  19   FINGERSTICK OR COLLECT A MICRO-SAMPLE FROM A VENOUS DRAW."

11:13AM  20        DO YOU SEE THAT?

11:13AM  21   A.   YES.

11:13AM  22   Q.   "IT'S PRACTICALLY PAINLESS AND A LOT LESS SCARY.  IN FACT,

11:13AM  23   WE'VE MADE THE ENTIRE LAB TESTING PROCESS COMFORTABLE,

11:13AM  24   ACCOMMODATING, AND LESS INTIMIDATING -- FOR PEOPLE BIG AND

11:13AM  25   SMALL."

11:13AM 1          DID I READ THAT RIGHT?

11:13AM 2    A.   YES.

11:13AM 3    Q.   AND AGAIN, YOU UNDERSTAND THAT VENOUS DRAW IS A

11:13AM 4    TRADITIONAL VEIN DRAW USED IN BLOOD TESTING FOR DECADES; RIGHT?

11:13AM 5    A.   YES.

11:13AM 6    Q.   BUT YOU YOURSELF, IN YOUR OWN MIND, WERE KIND OF UNAWARE

11:13AM 7    OF THE FACT THAT THERANOS WAS USING VENOUS DRAW TESTING IN

11:13AM 8    CONJUNCTION WITH ITS FINGERSTICK TESTING; CORRECT?

11:13AM 9    A.   YES.

11:13AM 10   Q.   BUT YOU DID LOOK AT THE WEBSITE BEFORE YOU INVESTED?

11:13AM 11   A.   YES.

11:13AM 12   Q.   NOW, THAT ARTICLE THAT WE SAW, THE RAGO "WALL STREET

11:14AM 13   JOURNAL" ARTICLE THAT YOU LOOKED AT, THERE WAS A REFERENCE TO

11:14AM 14   1,000 TESTS WERE BEING REFINED I THINK WAS THE WORD.

11:14AM 15        DO YOU REMEMBER THAT?

11:14AM 16   A.   YES.

11:14AM 17   Q.   AND I THINK YOU TESTIFIED THAT YOU HAD SOME UNDERSTANDING

11:14AM 18   THAT THERANOS COULD PERFORM A LOT OF TESTS WITH ITS TECHNOLOGY;

11:14AM 19   CORRECT?

11:14AM 20   A.   YES.

11:14AM 21   Q.   AND MR. BALWANI DIDN'T TELL YOU IN ANY COMMUNICATION THAT

11:14AM 22   YOU HAD WITH HIM THAT EVERY TEST THERANOS OFFERED WAS BEING

11:14AM 23   TESTED USING ITS OWN PROPRIETARY DEVICE; CORRECT?

11:14AM 24   A.   HE DID NOT SAY THAT, NO.  YOU'RE RIGHT, HE DID NOT TELL ME

11:14AM 25   THAT.

11:14AM 1          HE JUST TOLD ME THAT THEY COULD DO 60 TO 70 TESTS.

11:14AM 2     Q.   THE CAPABILITIES OF THE TECHNOLOGY IS WHAT HE TOLD YOU;

11:14AM 3     RIGHT?

11:14AM 4     A.   YES, I BELIEVE SO.

11:14AM 5     Q.   WHAT IT WAS CAPABLE OF DOING?

11:14AM 6     A.   YES.

11:14AM 7     Q.   AND LOOKING BACK AT THE WEBSITE AT EXHIBIT 5805, YOU SEE

11:15AM 8     THERE'S A MENU STARTING AFTER PAGE 6 -- DO I HAVE IT RIGHT?

11:15AM 9     YEAH.  ONE, TWO, THREE, FOUR, FIVE -- THAT'S IT.  ABOUT FIVE

11:15AM 10    PAGES OF LISTS OF TESTS AND A PRICE.

11:15AM 11         DO YOU SEE THAT?

11:15AM 12    A.   YES.

11:15AM 13    Q.   AND YOU WERE GENERALLY AWARE OF THE MENU.  YOU SAW THAT?

11:15AM 14    A.   I'VE SEEN IT, YEAH.

11:15AM 15    Q.   OKAY.  BACK IN 2013?

11:15AM 16    A.   I SAW IT, YEAH.

11:15AM 17    Q.   OKAY.  AND I'M NOT GOING TO ASK YOU TO COUNT BECAUSE IT'S

11:15AM 18    A LOT OF TESTS, BUT IF YOU FLIP THROUGH THESE PAGES HERE,

11:15AM 19    YOU'RE LOOKING AT A COUPLE HUNDRED TESTS; CORRECT?

11:15AM 20    A.   YES.

11:15AM 21    Q.   AND SO WHEN YOU INVESTED IN 2013, OR LED YOUR FRIENDS AND

11:15AM 22    FAMILY TO INVEST, YOU DIDN'T HAVE IN YOUR MIND, WELL, THERANOS

11:15AM 23    WAS OFFERING A THOUSAND TESTS ON ITS FINGERSTICK TESTING TO THE

11:15AM 24    PUBLIC; CORRECT?

11:15AM 25    A.   CORRECT.

11:15AM 1    Q.   BUT YOU UNDERSTOOD IT HAD THE POTENTIAL.  THAT WAS THE

11:15AM 2    WHOLE POINT; RIGHT?

11:15AM 3    A.   I BELIEVE SO, YEAH.  I KNEW, I KNEW 60 TO 70 I WAS PRETTY

11:16AM 4    IMPRESSED WITH.

11:16AM 5    Q.   OKAY.  GETTING BACK TO THIS 2013 TIME PERIOD.

11:16AM 6         SO YOU SAW THE PUBLIC ANNOUNCEMENTS OF THE WALGREENS

11:16AM 7    RELATIONSHIP AND THE RAGO ARTICLE, "THE WALL STREET JOURNAL"

11:16AM 8    ARTICLE; RIGHT?

11:16AM 9    A.   YES.

11:16AM 10   Q.   AND YOU DID YOUR OWN KIND OF INQUIRY ON WHATEVER WAS

11:16AM 11   PUBLICLY AVAILABLE, INCLUDING ON THE WEBSITE; RIGHT?

11:16AM 12   A.   YES.

11:16AM 13   Q.   AND THEN WERE YOU SPEAKING TO DAVID HARRIS AT THE TIME?

11:16AM 14   A.   I BELIEVE SO, YES.

11:16AM 15   Q.   AND WAS HE PROVIDING YOU OTHER INFORMATION?

11:16AM 16   A.   NOT THAT I'M AWARE OF.  NOT THAT I CAN RECALL, I SHOULD

11:16AM 17   SAY.

11:16AM 18   Q.   FAIR ENOUGH.

11:16AM 19        AND THEN YOU RECEIVED THAT NOTICE FROM THE COMPANY ABOUT

11:16AM 20   GETTING CONSENTS BECAUSE THEY WERE DOING A 5-TO-1 SPLIT AND YOU

11:17AM 21   UNDERSTOOD THAT TO MEAN, WELL, THEY'RE GOING TO GET SOME

11:17AM 22   ADDITIONAL FINANCING IN THE NEXT YEAR; CORRECT?

11:17AM 23   A.   YES.

11:17AM 24   Q.   AND THAT TRIGGERED YOUR INTEREST IN EXPLORING A NEW

11:17AM 25   INVESTMENT; CORRECT?

11:17AM 1    A.   YES.

11:17AM 2    Q.   AND YOU FOLLOWED UP TO TRY TO MAKE IT HAPPEN; CORRECT?

11:17AM 3    A.   YES.

11:17AM 4    Q.   NOW, PRIOR TO SPEAKING WITH MR. BALWANI IN DECEMBER OF

11:17AM 5    2013, DO YOU RECALL HAVING A DISCUSSION WITH AN ATTORNEY AT

11:17AM 6    THERANOS ABOUT THIS OPPORTUNITY TO INVEST?

11:17AM 7    A.   YES.

11:17AM 8    Q.   OKAY.  AND IN THAT DISCUSSION YOU HAD WITH THE ATTORNEY,

11:18AM 9    DID YOU ESSENTIALLY EXPRESS JUST THAT, YOU WERE INTERESTED IN

11:18AM 10   INVESTING, YOU AND YOUR FRIENDS?

11:18AM 11   A.   YES, YES.  WE WERE INTERESTED IN GETTING MORE INVOLVED AND

11:18AM 12   INVESTING.

11:18AM 13   Q.   AND THAT WAS DUE IN PART TO SOME OF WHAT WE HAVE ALREADY

11:18AM 14   TALKED ABOUT, THE WALGREENS RELATIONSHIP?

11:18AM 15   A.   YES.

11:18AM 16   Q.   AND THE MEDIA COVERAGE AND "THE WALL STREET JOURNAL"?

11:18AM 17   A.   YES.

11:18AM 18   Q.   THE WEBSITE, THE FACT THAT THEY WERE GOING PUBLIC NOW WITH

11:18AM 19   THE BUSINESS?

11:18AM 20   A.   YES.

11:18AM 21   Q.   NOW, IN THAT DISCUSSION -- DO YOU RECALL ENTIRELY WHAT YOU

11:18AM 22   DISCUSSED WITH THE ATTORNEY?

11:18AM 23   A.   SOME OF IT.

11:18AM 24   Q.   OKAY.  AND IN THAT DISCUSSION WITH THE ATTORNEY, DID YOU

11:18AM 25   EXPRESS A DESIRE OR AN INTEREST IN EVEN HELPING THE COMPANY

11:18AM   1    RAISE MONEY?

11:18AM   2    A.   YES.

11:18AM   3    Q.   BECAUSE THAT'S -- IN SOME WAYS, THAT'S PART OF THE

11:18AM   4    BUSINESS OF U.S. CAPITAL; RIGHT?

11:18AM   5    A.   YES, YES.

11:18AM   6    Q.   YOU HAVE EXPERIENCE DOING FUND RAISING, PRIVATE FINANCING,

11:18AM   7    PRIVATE OFFERINGS, THAT SORT OF THING; CORRECT?

11:18AM   8    A.   YES, WE DID.

11:19AM   9    Q.   AND AS PART OF THAT CONVERSATION WITH THE ATTORNEY, AGAIN,

11:19AM   10   YOU TOLD HER OR EXPRESSED TO HER THAT YOU AND YOUR FRIENDS OR

11:19AM   11   FAMILY WERE INTERESTED IN INVESTING; CORRECT?

11:19AM   12   A.   YES.

11:19AM   13   Q.   AND DO YOU RECALL TELLING THE ATTORNEY THAT YOU WERE KIND

11:19AM   14   OF INTERESTED IN INVESTING REGARDLESS OF WHETHER OR NOT YOU GOT

11:19AM   15   FINANCIAL INFORMATION OR DETAILS?

11:19AM   16   A.   I DON'T, I DON'T RECALL SPECIFICALLY WHAT I SAID.

11:19AM   17        I WAS ALWAYS SEEKING AS MUCH INFORMATION AS POSSIBLE.

11:19AM   18   Q.   MIGHT IT HELP YOUR RECOLLECTION REGARDING WHAT YOU SAID TO

11:19AM   19   THE ATTORNEY IF YOU SAW SOME NOTES FROM THAT PHONE CALL?

11:19AM   20   A.   SURE.

11:19AM   21   Q.   OKAY.  IF YOU CAN TAKE A LOOK AT EXHIBIT 20594 IN THE

11:19AM   22   BINDER.

11:19AM   23        AND YOU CAN IGNORE THE FIRST PAGE.

11:19AM   24        IF YOU WOULD LOOK AT THE SECOND PAGE, THERE'S SOME TEXTS.

11:20AM   25        AGAIN, WE CAN'T READ THIS TO THE JURY, SO JUST READ IT TO

11:20AM  1     YOURSELF, UNDER WHERE IT SAYS CALL NUMBER 2.

11:20AM  2          DO YOU SEE THAT IN THE MIDDLE OF PAGE 2?

11:20AM  3     A.   YES.

11:20AM  4     Q.   AND IF YOU LOOK AT THE LAST PARAGRAPH OF THAT PASSAGE

11:20AM  5     BEGINNING ON PAGE 3 BEGINNING YOUR NAME AND THEN REQUESTED.

11:20AM  6          CAN YOU READ THAT PARAGRAPH TO YOURSELF?

11:20AM  7     A.   YES.

11:20AM  8     Q.   AND LET ME KNOW WHEN YOU'RE DONE.

11:20AM  9     A.   YOU WANT ME TO READ THE ONE AT THE BOTTOM OF PAGE 2 OR ON

11:20AM  10    THE --

11:20AM  11    Q.   TOP -- JUST THE TOP OF PAGE 3, THAT LAST PARAGRAPH.

11:20AM  12    A.   YES, I'M DONE.

11:20AM  13    Q.   OKAY.  AND DID YOU TELL THE ATTORNEY AT THERANOS, PRIOR TO

11:20AM  14    SPEAKING WITH MR. BALWANI, THAT YOU AND YOUR FRIENDS WERE

11:20AM  15    WILLING TO INVEST IN THERANOS BLINDLY?

11:21AM  16    A.   I NEVER SAID "BLINDLY."

11:21AM  17    Q.   YOU WERE WILLING TO INVEST WITHOUT GETTING FINANCIAL

11:21AM  18    INFORMATION; CORRECT?

11:21AM  19    A.   I ASKED THEM FOR A FINANCIAL UPDATE THEN, TOO.

11:21AM  20    Q.   BUT YOU DIDN'T GET A FINANCIAL UPDATE; CORRECT?

11:21AM  21    A.   NO.

11:21AM  22    Q.   BUT YOU STILL INVESTED?

11:21AM  23    A.   MY FIRM DID NOT RAISE CAPITAL FOR -- THIS CONVERSATION IS

11:21AM  24    AROUND MY FIRM RAISING CAPITAL.  MY FIRM COULD NEVER RAISE

11:21AM  25    CAPITAL FOR A COMPANY THAT DIDN'T PROVIDE FINANCIALS.

11:21AM  1        BUT I INVESTED PERSONALLY AND MY FRIENDS INVESTED

11:21AM  2    PERSONALLY THROUGH MY PARTNERSHIP.

11:21AM  3    Q.   BUT YOU TOLD THE ATTORNEY YOU WERE WILLING TO INVEST

11:21AM  4    BLINDLY FOR YOUR OWN SELF, NOT YOUR CLIENTS' --

11:21AM  5        MR. BOSTIC:  OBJECT TO THE QUESTION.  HE'S READING

11:21AM  6    FROM A DOCUMENT NOT IN EVIDENCE, AND ALSO ASKED AND ANSWERED.

11:21AM  7        THE COURT:  AS TO THAT ONE WORD, THAT WAS ASKED AND

11:22AM  8    ANSWERED.

11:22AM  9        MR. CAZARES:  UNDERSTOOD.

11:22AM  10   Q.   YOU TOLD THE ATTORNEY THAT YOU WERE WILLING TO INVEST

11:22AM  11   BECAUSE YOU BELIEVED IN THE SIGNIFICANT POTENTIAL OF THERANOS

11:22AM  12   PRIOR TO YOUR DISCUSSIONS WITH MR. BALWANI; CORRECT?

11:22AM  13   A.   AT THAT POINT I WAS BELIEVING THAT I WANTED TO INVEST,

11:22AM  14   YES.

11:22AM  15   Q.   OKAY.

11:22AM  16        YOUR HONOR, THIS MIGHT BE A GOOD PLACE TO TAKE A BREAK.

11:22AM  17        THE COURT:  IF YOU HAVE MORE, WE CAN --

11:22AM  18        MR. CAZARES:  I CAN KEEP GOING.  I WASN'T SURE WHAT

11:22AM  19   THE COURT WAS INTENDING.

11:22AM  20        THE COURT:  LET'S SEE IF WE CAN GO UNTIL NOON.

11:22AM  21        MR. CAZARES:  OKAY.  I DIDN'T WANT TO STRESS

11:22AM  22   ANYBODY.

11:22AM  23        THE COURT:  OKAY.  YES.

11:22AM  24   BY MR. CAZARES:

11:22AM  25   Q.   YOU CAN SET THAT ASIDE.

11:23AM   1          IF YOU CAN TAKE A LOOK AT EXHIBIT 20593.

11:23AM   2          DO YOU HAVE 20593?

11:23AM   3     A.   YES.

11:23AM   4     Q.   AND 20593 APPEARS TO BE AN EMAIL EXCHANGE INVOLVING

11:23AM   5     YOURSELF RELATING TO KIND OF THE BREAKDOWN OF THE INVESTMENT BY

11:23AM   6     YOUR FRIENDS AND FAMILY?

11:23AM   7     A.   YES.

11:23AM   8     Q.   AND IT'S A DOCUMENT THAT YOU PRODUCED IN THE COURSE OF ALL

11:23AM   9     OF THESE INVESTIGATIONS, OR YOUR COMPANY PRODUCED?

11:23AM   10    A.   YES, IT'S A DOCUMENT FROM ME INSTRUCTING MY ATTORNEY.

11:24AM   11             MR. CAZARES:  YOUR HONOR, MOVE THE ADMISSION OF

11:24AM   12    EXHIBIT 20593.

11:24AM   13             MR. BOSTIC:  NO OBJECTION.

11:24AM   14             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:24AM   15        (DEFENDANT'S EXHIBIT 20593 WAS RECEIVED IN EVIDENCE.)

11:24AM   16    BY MR. CAZARES:

11:24AM   17    Q.   AND FOCUSSING ON THE TOP PORTION OF THE MESSAGE, THIS IS

11:24AM   18    FEBRUARY 24TH, 2014.

11:24AM   19         DO YOU SEE THAT?

11:24AM   20    A.   YES.

11:24AM   21    Q.   AND THIS IS AFTER YOU AND YOUR FRIENDS AND FAMILY HAD

11:24AM   22    FUNDED THE INVESTMENT; CORRECT?

11:24AM   23    A.   YES.

11:24AM   24    Q.   AND IN THE MESSAGE YOU'RE PROVIDING KIND OF A BREAKDOWN OF

11:24AM   25    THE INVESTORS IN THERANOS; CORRECT?

11:24AM  1     A.   YES.

11:24AM  2     Q.   AND THAT FIRST INDIVIDUAL, RICHARD AAB?

11:24AM  3     A.   YES.

11:24AM  4     Q.   AM I SAYING THAT RIGHT?

11:24AM  5     A.   YES.

11:24AM  6     Q.   HE PROVIDED MOST OR THE MAJORITY OF THE FUNDS FOR THAT

11:24AM  7     $1.3 MILLION INVESTMENT; CORRECT?

11:24AM  8     A.   YES, $750,000.

11:24AM  9     Q.   OKAY.  AND MR. AAB LEARNED ABOUT THERANOS -- FIRST HE

11:25AM 10     LEARNED ABOUT YOUR RELATIONSHIP OR PARTICIPATION IN THERANOS;

11:25AM 11     CORRECT?

11:25AM 12     A.   YES.

11:25AM 13     Q.   YOU HAD DISCUSSED THAT WITH HIM IN THE PAST?

11:25AM 14     A.   YES.

11:25AM 15     Q.   BUT IN THIS TIME PERIOD WHEN YOU WERE INVESTING, MR. AAB

11:25AM 16     WAS STAYING WITH YOU AT YOUR HOME ONE TIME; CORRECT?

11:25AM 17     A.   YES.

11:25AM 18     Q.   AND SAW SOME DOCUMENTS OR SOMETHING ABOUT THERANOS?

11:25AM 19     A.   YES.

11:25AM 20     Q.   AND TOLD YOU HE WANTED TO INVEST?

11:25AM 21     A.   YES.

11:25AM 22     Q.   AND THAT WAS BEFORE YOU REPORTED TO HIM ANYTHING THAT

11:25AM 23     MR. BALWANI HAD TO SAY; CORRECT?

11:25AM 24     A.   UM, I'M NOT, I'M NOT QUITE SURE OF THE SEQUENCING.

11:25AM 25     Q.   WHEN MR. AAB TOLD YOU HE WANTED TO INVEST, YOU HAD NO

11:25AM  1    FINANCIAL STATEMENTS TO THERANOS; CORRECT?

11:25AM  2    A.   CORRECT.

11:25AM  3    Q.   NO PROSPECTUS; CORRECT?

11:25AM  4    A.   I HAD OFFERING DOCUMENTS I BELIEVE, YES.

11:25AM  5    Q.   AND OFFERING DOCUMENTS BEING THE SIGNATURE PAGES OF THE

11:25AM  6    FINAL AGREEMENTS?

11:25AM  7    A.   I'M NOT, I'M NOT -- I DON'T RECALL, BUT HE SAW THEM IN MY

11:25AM  8    HOME AND ASKED IF HE COULD READ THEM, AND I LET HIM.

11:26AM  9    Q.   AND THEN HE TOLD YOU HE WANTED TO INVEST?

11:26AM  10   A.   YES.

11:26AM  11   Q.   BASED ON READING THE OFFERING DOCUMENTS?

11:26AM  12   A.   WELL, BASED ON HIS KNOWLEDGE AND WHAT HE HAD HEARD ABOUT

11:26AM  13   THERANOS.

11:26AM  14   Q.   AND YOU'RE NOT AWARE OF ANY COMMUNICATIONS BETWEEN MR. AAB

11:26AM  15   AND MR. BALWANI; CORRECT?

11:26AM  16   A.   CORRECT.

11:26AM  17   Q.   OR ANY OF THE OTHER INVESTORS LISTED HERE IN

11:26AM  18   EXHIBIT 20593?

11:26AM  19   A.   CORRECT.

11:26AM  20   Q.   YOU CAN SET THAT ASIDE.

11:26AM  21        IF YOU COULD PUT UP ON THE SCREEN EXHIBIT 4059, WHICH IS

11:27AM  22   ALREADY IN EVIDENCE.

11:27AM  23        NOW, MR. MENDENHALL, DO YOU SEE UP ON THE SCREEN, THESE

11:27AM  24   ARE YOUR NOTES; CORRECT?

11:27AM  25   A.   YES.

11:27AM  1    Q.   AND I THINK YOU DESCRIBED YOURSELF AS A HABITUAL

11:27AM  2    NOTE-TAKER; CORRECT?

11:27AM  3    A.   I TAKE NOTES, YES.

11:27AM  4    Q.   YOU TAKE DETAILED AND SPECIFIC NOTES WERE YOUR WORDS THIS

11:27AM  5    MORNING; CORRECT?

11:27AM  6    A.   YEAH, SPECIFICALLY WHEN I'M TALKING TO A LEADERSHIP OF

11:27AM  7    COMPANIES THAT WE'RE INVESTING IN, YES, PUBLIC AND PRIVATE

11:27AM  8    COMPANIES.

11:27AM  9    Q.   AND I THINK YOU DESCRIBED THIS MORNING THAT YOU HUNG UP ON

11:27AM  10   THE PHONE WITH MR. BALWANI, TOOK YOUR HANDWRITTEN NOTES, AND

11:27AM  11   THEN TRANSMITTED THEM INTO A TYPEWRITTEN DOCUMENT; IS THAT

11:27AM  12   RIGHT?

11:27AM  13   A.   YES.

11:27AM  14   Q.   AND AT THAT TIME YOU KNEW IT WAS IMPORTANT TO BE ACCURATE;

11:27AM  15   CORRECT?

11:27AM  16   A.   YES.

11:27AM  17   Q.   SO WHILE YOU RECALL THE CONVERSATION WITH MR. BALWANI, THE

11:28AM  18   NOTES THEMSELVES ARE PROBABLY A BETTER INDICATION OF WHAT

11:28AM  19   MR. BALWANI ACTUALLY SAID; CORRECT?

11:28AM  20   A.   THESE ARE MY REGURGITATION OF MY NOTES, YES, IN THE EMAIL.

11:28AM  21   Q.   BUT CLOSER IN TIME TO THE COMMUNICATION WITH MR. BALWANI;

11:28AM  22   CORRECT?

11:28AM  23   A.   YES, I WOULD -- I THINK SO, YES.

11:28AM  24   Q.   OKAY.  SO THE GOVERNMENT REVIEWED THE NOTES WITH YOU AND

11:28AM  25   ASKED YOU ABOUT A FEW THINGS, AND I WANTED TO REVISIT A FEW OF

11:28AM  1    THE ITEMS.

11:28AM  2         AT NUMBERS 3, 4, AND 5, YOU TOOK DOWN NOTES INDICATING

11:28AM  3    THAT THE SCIENCE BEHIND THERANOS IS COMPLETE.

11:28AM  4         DO YOU SEE THAT?

11:29AM  5    A.   YES.

11:29AM  6    Q.   AND AGAIN, "NO NEW SCIENCE NEEDED"; CORRECT?

11:29AM  7    A.   YES, THAT'S CORRECT.

11:29AM  8    Q.   AND "NO NEW INVENTION"; CORRECT?

11:29AM  9    A.   YES.

11:29AM  10   Q.   AT THE TIME IN DECEMBER OF 2013, WERE YOU AWARE OF THE

11:29AM  11   FACT THAT THERANOS'S 4.0 DEVICE WAS ALREADY DEVELOPED?

11:29AM  12   A.   I'M NOT SURE WHAT THE DEVICE WAS CALLED OR WHAT -- HOW IT

11:29AM  13   WAS NUMBERED.

11:29AM  14        MY UNDERSTANDING IS THAT IT WAS, IT WAS DEVELOPED AND

11:29AM  15   FUNCTIONING, YEAH.

11:29AM  16   Q.   OKAY.  AND YOU HAD NO KNOWLEDGE OR UNDERSTANDING OF ANY

11:29AM  17   LATER DEVICE THAT THERANOS DEVELOPED BEYOND THE 4.0 SERIES THAT

11:29AM  18   THEY HAD AT THE TIME?

11:29AM  19   A.   I DON'T KNOW.  I KNOW THERE WAS A DEVICE CALLED EDISON,

11:29AM  20   BUT I DON'T KNOW WHAT THAT DEVICE WAS OR THE DIFFERENCE BETWEEN

11:29AM  21   4.0 AND EDISON.

11:29AM  22        I JUST KNEW IT GOT A NAME, THEIR DEVICE GOT A NAME AT SOME

11:30AM  23   POINT.

11:30AM  24   Q.   OKAY.  BUT YOU DON'T KNOW WHO GAVE IT THAT NAME; CORRECT?

11:30AM  25   A.   NO, I DON'T KNOW.

11:30AM  1    Q.    OKAY.  NOW, YOU ALSO WITH THE GOVERNMENT DISCUSSED ITEM

11:30AM  2    NUMBER 11 IN YOUR NOTES.

11:30AM  3    A.    YES, I SEE NUMBER 11.  I DON'T KNOW THAT THE GOVERNMENT

11:30AM  4    ASKED ME ANY QUESTIONS ABOUT NUMBER 11.

11:30AM  5    Q.    OKAY.  UNDER ITEM 11 YOU WROTE, "THEY CAN RUN A FULL BODY

11:30AM  6    RESPONSE TO MEDICATION WITH DROPS IN A DAY."

11:30AM  7          DO YOU SEE THAT?

11:30AM  8    A.    YES.

11:30AM  9    Q.    AND THAT'S IN RELATION TO KIND OF A PHARMACEUTICAL STUDY;

11:30AM  10   RIGHT?

11:30AM  11   A.    I'M NOT SURE WHAT IT'S IN RELATION TO.  THAT'S JUST WHAT I

11:30AM  12   WAS TOLD --

11:30AM  13   Q.    OKAY.

11:31AM  14   A.    -- ABOUT THEIR CAPABILITIES.

11:31AM  15   Q.    THAT WOULD MAKE SENSE, RIGHT?  A PHARMACEUTICAL COMPANY

11:31AM  16   TESTING THE IMPACT OF ITS MEDICATION ON A PATIENT, HAVING AN

11:31AM  17   ANALYZER THAT COULD MEASURE THAT IMPACT, THAT'S CONSISTENT WITH

11:31AM  18   WHAT MR. BALWANI TOLD YOU; RIGHT?

11:31AM  19   A.    YES.

11:31AM  20   Q.    AND AGAIN, ITEM 12 IN THE NOTES, YOU WROTE, "CURRENT

11:31AM  21   CLINICAL TRIALS TAKE 6 VIALS AND CAN RUN 10 TO 12 TESTS."

11:31AM  22         DO YOU SEE THAT?

11:31AM  23   A.    YES.

11:31AM  24   Q.    AND THAT'S MR. BALWANI TALKING ABOUT CLINICAL TRIALS USING

11:31AM  25   TECHNOLOGY AND NOT THERANOS; CORRECT?

11:31AM  1    A.   CORRECT.

11:31AM  2    Q.   BUT THEN HE DESCRIBES, "THERANOS TAKES 3 DROPS AND CAN RUN

11:31AM  3    60 TO 70 TESTS."

11:31AM  4         DO YOU SEE THAT?

11:31AM  5    A.   YES.

11:31AM  6    Q.   AND THIS IS MR. BALWANI EXPRESSING TO YOU AGAIN THE

11:31AM  7    CAPABILITIES OF THE TECHNOLOGY; RIGHT?

11:31AM  8    A.   WELL, HE SAID THAT THEY -- YEAH, THAT THEY CAN TAKE THREE

11:31AM  9    DROPS AND RUN 60, 70 TESTS.

11:31AM  10   Q.   AND THAT'S THE CAPABILITY OF THE TECHNOLOGY?

11:32AM  11   A.   YES.

11:32AM  12   Q.   NOW, ITEMS 6, 7, AND 8, I THINK YOU ALSO TALKED A LITTLE

11:32AM  13   BIT ABOUT THIS MORNING.

11:32AM  14        IN ITEM 6 YOU WROTE, "THEY ARE COMPLETELY VERTICALLY

11:32AM  15   INTEGRATED -- THEY OWN THE LAB AND THE MANUFACTURING."

11:32AM  16        DO YOU SEE THAT?

11:32AM  17   A.   YES.

11:32AM  18   Q.   OKAY.  AND YOU'RE AWARE OF THE FACT THAT THERANOS HAS A

11:32AM  19   LAB, OR HAD A LAB AT THE TIME; CORRECT?

11:32AM  20   A.   YES.

11:32AM  21   Q.   AND IN SOME OF THESE PUBLIC ANNOUNCEMENTS, THEY WOULD

11:32AM  22   INCLUDE A DESCRIPTION OF A CLIA LAB THAT THEY HAD; CORRECT?

11:32AM  23   A.   I BELIEVE SO.  I DON'T RECALL.

11:32AM  24   Q.   OKAY.  AND MR. BALWANI WAS TELLING YOU THAT THERANOS

11:32AM  25   MANUFACTURED ITS ANALYZER, THE EDISON YOU CALLED IT; CORRECT?

11:32AM   1    A.   YES.

11:32AM   2    Q.   AND THAT'S WHAT HE TOLD YOU?

11:32AM   3    A.   I BELIEVE SO, YEAH.  I BELIEVE THEY SAID THEY MANUFACTURED

11:33AM   4    ALL OF THEIR OWN COMPONENTS.

11:33AM   5    Q.   AND THE OTHER COMPONENT BEING KIND OF THE CONTAINER FOR

11:33AM   6    THE BLOOD?

11:33AM   7    A.   YEAH.

11:33AM   8    Q.   THAT LITTLE NANOTAINER?

11:33AM   9    A.   YES.

11:33AM   10   Q.   OKAY.  AND DO YOU UNDERSTAND THAT THE USE OF THAT

11:33AM   11   NANOTAINER WAS PART OF THIS FINGERSTICK TECHNOLOGY THAT

11:33AM   12   THERANOS WAS OFFERING TO PATIENTS; RIGHT?

11:33AM   13   A.   YES.

11:33AM   14   Q.   NOW, ITEM 21, I THINK THAT WAS DISCUSSED A LITTLE BIT THIS

11:33AM   15   MORNING IN YOUR NOTES.

11:33AM   16        ITEM 21 IN YOUR NOTES REFLECT "THEIR PRICING COULD HAVE

11:33AM   17   BEEN SIGNIFICANTLY HIGHER."

11:33AM   18        DO YOU SEE THAT?

11:33AM   19   A.   YES.

11:33AM   20   Q.   BUT THEN YOU WROTE, "BUT THEY DESIGNED IT TO BE

11:34AM   21   PROFITABLE, EFFECTIVE, AND DISRUPTIVE TO THE STATUS QUO."

11:34AM   22        DO YOU SEE THAT?

11:34AM   23   A.   YES.

11:34AM   24   Q.   AND SO MR. BALWANI DESCRIBED TO YOU THAT THEY TRIED TO SET

11:34AM   25   THEIR PRICING AT A LEVEL WHERE IT WOULD BE PROFITABLE; RIGHT?

11:34AM  1   A.   YES.

11:34AM  2   Q.   AND MAYBE CAPTURE SOME MARKET SHARE.

11:34AM  3        FAIR ENOUGH?

11:34AM  4   A.   YEAH, THAT MAKES SENSE.

11:34AM  5   Q.   BUT THIS LINE, ENTRY 21 IN THE NOTES, DOESN'T SAY THAT

11:34AM  6   THERANOS WAS NET INCOME PROFITABLE; CORRECT?

11:34AM  7   A.   NO, IT DOES NOT, NOT IN LINE 21.

11:34AM  8   Q.   NOW, YOU DESCRIBED IN YOUR TESTIMONY THIS MORNING THAT YOU

11:34AM  9   UNDERSTOOD FROM WHAT THERANOS TOLD -- YOU UNDERSTOOD FROM WHAT

11:34AM 10   MR. BALWANI TOLD YOU THAT THERANOS COULD FUND ITS OPERATIONS

11:35AM 11   FROM FREE CASH FLOW; CORRECT?

11:35AM 12   A.   YEAH, THAT THEY COULD FUND THEIR OPERATION FROM CASH FLOW,

11:35AM 13   YES.

11:35AM 14   Q.   BUT CONVERSELY, YOU KNEW THEY WERE RAISING NEW MONEY;

11:35AM 15   CORRECT?

11:35AM 16   A.   YES.

11:35AM 17   Q.   AND YOU ALSO KNEW OF THE WALGREENS RELATIONSHIP AT THE

11:35AM 18   TIME; CORRECT?

11:35AM 19   A.   YES.

11:35AM 20   Q.   WERE YOU AWARE OF THE FACT THAT, CONCURRENT WITH YOUR

11:35AM 21   INVESTMENT, THERANOS RECEIVED THE BALANCE OF $100 MILLION FROM

11:35AM 22   WALGREENS AS PART OF THEIR PARTNERSHIP?

11:35AM 23   A.   I KNEW THAT AT SOME POINT.  I DON'T KNOW THE SEQUENCING OF

11:35AM 24   WHEN I KNEW THAT.  BUT, YES, I KNEW THEY INVESTED.

11:35AM 25   Q.   AND YOU UNDERSTOOD THAT PAYMENT WAS PART OF THEIR

11:35AM   1    PARTNERSHIP?

11:35AM   2    A.   I BELIEVE SO.  I BELIEVE I KNEW THAT, YES.

11:35AM   3    Q.   OKAY.  CONTINUING WITH YOUR KIND OF SUMMARY AT THE BOTTOM

11:36AM   4    OF PAGE 1 INTO PAGE 2 AT 4059, YOU WROTE, "I WAS AND CONTINUE

11:36AM   5    TO BE VERY IMPRESSED WITH EVERYTHING I HEAR."

11:36AM   6         DO YOU SEE THAT?

11:36AM   7    A.   YES.

11:36AM   8    Q.   AND THEN THE PASSAGE CONTINUES ON THE NEXT PAGE.

11:36AM   9         "THEY ARE NOW DOING GENETIC AND HUMAN GENOME WORK THAT

11:36AM  10    WILL PUSH HEALTH CARE INTO AREAS NOT CURRENTLY ATTAINABLE."

11:36AM  11         DO YOU SEE THAT?

11:36AM  12    A.   YES.

11:36AM  13    Q.   AND THAT'S RELATING TO THIS KIND OF NUCLEIC ACID

11:37AM  14    AMPLIFICATION STYLE OF TESTING; CORRECT?

11:37AM  15    A.   I HAVE NO IDEA.

11:37AM  16    Q.   SO THE REFERENCE TO HUMAN GENOME WORK, YOU'RE NOT REALLY

11:37AM  17    SURE WHAT THAT MEANS?

11:37AM  18    A.   NOT REALLY.

11:37AM  19    Q.   OKAY.

11:37AM  20    A.   I MEAN, I UNDERSTAND HUMAN GENOME WORK IS BEING CONDUCTED,

11:37AM  21    BUT I DON'T -- TO WHAT END, I DON'T KNOW.  IT SOUNDED

11:37AM  22    IMPORTANT, THOUGH.

11:37AM  23    Q.   FAIR ENOUGH.

11:37AM  24         AND THEN YOU WROTE, "IT LOOKS AND SOUNDS LIKE EVEN AT

11:37AM  25    CURRENT LEVELS THIS IS AN INTERESTING STOCK.  OF COURSE THEY

11:37AM 1   NEED TO EXECUTE WHICH THEY ARE DOING NOW."

11:37AM 2        DO YOU SEE THAT?

11:37AM 3   A.   YES.

11:37AM 4   Q.   AND BY THAT YOU MEANT YOU UNDERSTOOD, OF COURSE,

11:37AM 5   ULTIMATELY THEY HAVE TO EXECUTE ON THIS BUSINESS PLAN TO ROLL

11:37AM 6   OUT THIS TESTING BUSINESS INTO WALGREENS OR OTHER STORES

11:37AM 7   NATIONWIDE; CORRECT?

11:37AM 8   A.   YES.

11:37AM 9   Q.   AND WHETHER THAT MAY OR MAY NOT HAPPEN, IT WAS UNCLEAR?

11:37AM 10  A.   YEAH.   YEAH.

11:37AM 11  Q.   YOU CAN TAKE THAT DOWN.

11:38AM 12       NOW, AGAIN, WHEN YOU SPOKE WITH MR. BALWANI, HE DESCRIBED

11:38AM 13  TO YOU KIND OF HIGH LEVEL DESCRIPTIONS OF THE BUSINESS AND THE

11:38AM 14  TECHNOLOGY.

11:38AM 15       IS THAT FAIR?

11:38AM 16  A.   NOT THE DETAIL OF THE TECHNOLOGY, JUST THAT THE TECHNOLOGY

11:38AM 17  WAS THERE AND COMPLETE.

11:38AM 18  Q.   OKAY.  AND THEN HIGH LEVEL DISCUSSION OF FINANCIALS, THEY

11:38AM 19  COULD FUND THEIR OPERATIONS, BUT THEY WERE RAISING MONEY TO

11:38AM 20  KIND OF ACCELERATE THIS BUSINESS; CORRECT?

11:38AM 21  A.   YES.

11:38AM 22  Q.   BUT THE DETAILS, THE DETAILS REGARDING THE TECHNOLOGY,

11:38AM 23  EXACTLY WHAT IT WAS, HOW EXTENSIVE IT WAS, WHAT MAY OR MAY NOT

11:39AM 24  HAVE BEEN USED, MR. BALWANI DIDN'T TELL YOU ANYTHING ABOUT

11:39AM 25  THAT; CORRECT?

11:39AM  1    A.   CORRECT.

11:39AM  2    Q.   AND THE DETAILS, YOU KNOW, THERANOS'S ACTUAL REVENUES AT

11:39AM  3    THE TIME, INCOME AT THE TIME, EXPENSES AT THE TIME, PROJECTED

11:39AM  4    REVENUE MAYBE OVER THE NEXT FEW YEARS, NONE OF THAT WAS

11:39AM  5    PROVIDED TO YOU?

11:39AM  6    A.   CORRECT.

11:39AM  7    Q.   AND NOTWITHSTANDING THAT FACT, YOU STILL DECIDED TO INVEST

11:39AM  8    WITH YOUR FRIENDS AND FAMILY AT THE TIME; CORRECT?

11:39AM  9    A.   YES.

11:39AM 10    Q.   NOW, I THINK YOU DESCRIBED -- SO YOU MADE THE INVESTMENT

11:39AM 11    ALONG WITH THE FRIENDS AND FAMILY AND POOLED MONEY TOGETHER AND

11:39AM 12    EVENTUALLY PUT IN THE 1.3 MILLION; CORRECT?

11:40AM 13    A.   YES.

11:40AM 14    Q.   AND THEN THERE WAS THAT MESSAGE THAT YOU SAW FROM

11:40AM 15    MR. BALWANI IN LATE JANUARY OF 2014 RELATING TO WHETHER YOU

11:40AM 16    MIGHT HAVE FURTHER INTEREST IN INVESTMENT; CORRECT?

11:40AM 17    A.   YES.

11:40AM 18    Q.   BUT TO DO THAT, YOU NEEDED SOME DETAILS; CORRECT?

11:40AM 19    A.   YES.

11:40AM 20    Q.   OKAY.  AND YOU SOUGHT FINANCIAL INFORMATION AND DETAILS

11:40AM 21    OVER THE ENSUING PERIOD; CORRECT?

11:40AM 22    A.   YES.

11:40AM 23    Q.   BUT NONE WAS PROVIDED?

11:40AM 24    A.   CORRECT.

11:40AM 25    Q.   BUT MR. BALWANI WAS NOT STILL SEEKING OR PITCHING AN

11:40AM  1    INVESTMENT FROM YOU AT THAT TIME, EITHER; CORRECT?

11:40AM  2    A.   NO, WE WERE NOT COMMUNICATING PAST THAT REQUEST.

11:40AM  3    Q.   YOUR ONLY VERBAL COMMUNICATION WITH MR. BALWANI WAS ON

11:40AM  4    THAT PHONE CALL; CORRECT?

11:40AM  5    A.   YES, TRUE.

11:40AM  6    Q.   OKAY.  THERE WERE SOME EMAIL EXCHANGES, BUT ACTUAL

11:40AM  7    DISCUSSION WAS JUST THE ONE PHONE CALL?

11:40AM  8    A.   YES.

11:40AM  9    Q.   NOW, IF YOU COULD TAKE A LOOK AT EXHIBIT 20596.  20596 IS

11:41AM  10   A SHORT EMAIL CHAIN, THE LATTER OF WHICH IS DATED JULY 30,

11:41AM  11   2015.

11:41AM  12        DO YOU SEE THAT?

11:41AM  13   A.   YES.

11:41AM  14   Q.   AND IT'S AN EXCHANGE AMONGST YOURSELF AND SOME OF YOUR

11:41AM  15   FRIENDS AND FAMILY INVESTORS IN THERANOS; CORRECT?

11:41AM  16   A.   YES.

11:41AM  17            MR. CAZARES:  MOVE TO ADMIT 20596, YOUR HONOR.

11:41AM  18            MR. BOSTIC:  YOUR HONOR, 802 AS TO THE MESSAGE FROM

11:41AM  19   THERANOS.

11:41AM  20            THE COURT:  COUNSEL, DO YOU HAVE ANOTHER USE FOR

11:41AM  21   THAT?

11:41AM  22            MR. CAZARES:  YOUR HONOR, I BELIEVE THERANOS'S

11:41AM  23   SHAREHOLDER INFORMATION AND COMMUNICATIONS HAVE BEEN

11:42AM  24   COMMUNICATED AND INTRODUCED IN EVIDENCE.

11:42AM  25        THE -- IT'S OFFERED HERE TO INDICATE WHAT THIS INVESTOR

11:42AM  1    RECEIVED.

11:42AM  2        CONTRARY TO HIS TESTIMONY THIS MORNING THAT HE WASN'T

11:42AM  3    GETTING UPDATES, HE IS GETTING UPDATES.  HE RECEIVED A

11:42AM  4    SIGNIFICANT UPDATE, AND I WANTED TO QUERY, WELL, WHAT DID YOU

11:42AM  5    DO WITH THAT INFORMATION.

11:42AM  6            MR. BOSTIC:  YOUR HONOR, ON THAT, FIRST, THIS IS

11:42AM  7    FROM MID-2015, WHICH IS LONG AFTER THE PERIOD DURING WHICH THE

11:42AM  8    WITNESS WAS SAYING HE WASN'T GETTING UPDATES.

11:42AM  9        AND IT SOUNDS LIKE COUNSEL IS EXPRESSING A NON FOR THE

11:42AM 10    TRUTH PURPOSE.

11:42AM 11        NO OBJECTION TO IT COMING IN IF IT'S NOT FOR THE TRUTH.

11:42AM 12        IT STILL MIGHT BE A 401 ISSUE, BUT SUBMIT IT.

11:42AM 13            THE COURT:  THAT'S WHAT I WAS ASKING YOU FOR.

11:42AM 14    WHAT'S --

11:42AM 15            MR. CAZARES:  I CAN WORK WITH THAT, YOUR HONOR.

11:42AM 16    THAT'S FINE.  I'LL JUST ASK QUESTIONS.

11:42AM 17            THE COURT:  OKAY.

11:42AM 18    BY MR. CAZARES:

11:42AM 19    Q.   SO AT SOME POINT IN TIME YOU LEARNED THAT THERANOS

11:43AM 20    OBTAINED FDA APPROVAL; CORRECT?

11:43AM 21    A.   YEAH.  IT WAS ON A SINGLE TEST, YES.

11:43AM 22    Q.   BUT THAT WAS STILL FDA APPROVAL; RIGHT?

11:43AM 23    A.   YEAH.

11:43AM 24    Q.   THAT WAS EXCITING?

11:43AM 25    A.   YEAH.

11:43AM 1    Q.   AND BASED ON YOUR JUST GENERAL UNDERSTANDING, THE FDA

11:43AM 2    STILL HAS REQUIREMENTS THAT DEVICE MAKERS HAVE TO MEET, AND IT

11:43AM 3    SOUNDS LIKE THERANOS SATISFIED THE FDA?

11:43AM 4    A.   YEAH, IT WAS A GOOD ANNOUNCEMENT.

11:43AM 5    Q.   NOW, IN YOUR TESTIMONY THIS MORNING IN RESPONSE TO

11:43AM 6    QUESTIONS, YOU DESCRIBED HAVING FURTHER COMMUNICATIONS WITH

11:43AM 7    MS. HOLMES IN 2015 AND MAYBE EVEN LATER; CORRECT?

11:43AM 8    A.   YES.

11:43AM 9    Q.   BUT YOU HAD NO DISCUSSIONS WITH MR. BALWANI; CORRECT?

11:43AM 10   A.   CORRECT.

11:43AM 11   Q.   AND YOU HAVE NO IDEA, KNOWLEDGE WHETHER OR NOT MR. BALWANI

11:43AM 12   WAS AWARE OF THE SUBSTANCE OF YOUR DISCUSSIONS WITH MS. HOLMES;

11:43AM 13   CORRECT?

11:43AM 14   A.   CORRECT.

11:44AM 15        MR. CAZARES:  YOUR HONOR, MAY I HAVE A MOMENT?

11:44AM 16        THE COURT:  YES.

11:44AM 17   (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

11:44AM 18        MR. CAZARES:  THANK YOU, MR. MENDENHALL.

11:44AM 19   YOUR HONOR, NO FURTHER QUESTIONS.

11:44AM 20        THE COURT:  REDIRECT?

11:44AM 21        MR. BOSTIC:  YES, YOUR HONOR.

11:44AM 22                    **REDIRECT EXAMINATION**

11:44AM 23   BY MR. BOSTIC:

11:45AM 24   Q.   GOOD MORNING AGAIN, MR. MENDENHALL.

11:45AM 25   A.   GOOD MORNING.

11:45AM   1    Q.  I'D LIKE TO JUST FOLLOW UP ON A FEW OF THE TOPICS THAT YOU

11:45AM   2    DISCUSSED WITH MR. CAZARES.

11:45AM   3        FIRST, MR. CAZARES ASKED YOU WHETHER YOU WERE AWARE EARLY

11:45AM   4    ON ABOUT THE RELATIONSHIP BETWEEN MS. HOLMES AND MR. BALWANI.

11:45AM   5        DO YOU REMEMBER THAT QUESTION?

11:45AM   6    A.  YES.

11:45AM   7    Q.  WHEN, IF EVER, DID YOU BECOME AWARE THAT MS. HOLMES AND

11:45AM   8    MR. BALWANI WERE ROMANTICALLY INVOLVED?

11:45AM   9    A.  IT CAME OUT PUBLICLY AT SOME POINT.  I'M NOT SURE WHEN I

11:45AM  10    WAS MADE AWARE, BUT I WAS NOT MADE AWARE OF THAT BY EITHER

11:45AM  11    MS. HOLMES OR MR. BALWANI.

11:45AM  12    Q.  WERE YOU AWARE OF THEIR ROMANTIC RELATIONSHIP WHEN YOU

11:45AM  13    MADE THE INVESTMENT IN THE COMPANY IN EARLY 2014?

11:45AM  14    A.  NO.

11:45AM  15    Q.  WOULD THAT HAVE BEEN AN IMPORTANT FACT FOR YOU TO CONSIDER

11:45AM  16    AS SOMEONE DECIDING WHETHER TO INVEST IN THE COMPANY?

11:46AM  17    A.  YES.

11:46AM  18    Q.  AND WHY IS THAT?

11:46AM  19    A.  I THINK FROM A GOVERNANCE PERSPECTIVE, WHEN YOU'RE RUNNING

11:46AM  20    A COMPANY LIKE THIS, OR ANY CORPORATION, THOSE TYPES OF

11:46AM  21    RELATIONSHIPS, BECAUSE THEY CAN BE CONFLICTING AND YOU DON'T

11:46AM  22    HAVE -- IT KIND OF REMOVES SOME OF THE INDEPENDENCE OF THE

11:46AM  23    LEADERSHIP, IT'S IMPORTANT FOR PEOPLE TO KNOW.  IT SHOULD BE

11:46AM  24    DISCLOSED TO THE BOARD, THROUGH GENERAL COUNSEL, IT SHOULD BE

11:46AM  25    JUST DISCLOSED AND COMMUNICATED TO LET US HAVE FULL VIEW OF --

11:46AM  1    I MEAN, THERE'S ALWAYS POTENTIAL CONFLICTS WHEN THE TWO LEADERS

11:46AM  2    OF A FIRM ARE ROMANTICALLY INVOLVED.

11:46AM  3    Q.   AND WOULD YOU HAVE WANTED TO KNOW ABOUT THEIR RELATIONSHIP

11:46AM  4    IN CONSIDERING THE THINGS THAT MR. BALWANI TOLD YOU DURING YOUR

11:46AM  5    45 MINUTE PHONE CALL?

11:46AM  6    A.   IT CAN HAVE INFLUENCE, YES.

11:46AM  7    Q.   I'D LIKE TO TALK TO YOU ABOUT WHAT MR. BALWANI TOLD YOU

11:47AM  8    ABOUT THE STATE OF THE TECHNOLOGY JUST BEFORE YOU INVESTED, AND

11:47AM  9    IF WE CAN PUT BACK UP EXHIBIT 4059.

11:47AM 10         IF WE CAN ZOOM IN ON THE TOP PORTION OF YOUR LIST, SO

11:47AM 11    AGAIN, WE'RE LOOKING AT ITEMS 3 THROUGH 5 WHERE IT SAYS NO --

11:47AM 12    OR SORRY.   "THE 'SCIENCE' BEHIND THERANOS IS COMPLETE;

11:47AM 13         "NO NEW SCIENCE NEEDED;

11:47AM 14         "NO NEW INVENTION NEEDED."

11:47AM 15         DO YOU SEE THAT?

11:47AM 16    A.   YES.

11:47AM 17    Q.   AND DURING CROSS-EXAMINATION MR. CAZARES SHOWED YOU SOME

11:47AM 18    LANGUAGE FROM "THE WALL STREET JOURNAL" THAT TALKED WITH THE

11:47AM 19    SECRET THAT EMPLOYEES ARE NOW REFINING INVOLVES DEVICES THAT

11:47AM 20    CAN PERFORM THOSE TESTS.

11:47AM 21         DO YOU RECALL THAT?

11:47AM 22    A.   YES.

11:47AM 23    Q.   FIRST OF ALL, DO YOU RECALL THE DATE OF THAT

11:47AM 24    "WALL STREET JOURNAL" ARTICLE?

11:47AM 25    A.   I DO NOT, BUT IT WAS, IT LOOKS LIKE, BEFORE I SENT THIS

11:47AM 1    EMAIL.  IT LOOKS LIKE THE 16TH.  I DON'T RECALL.

11:47AM 2    Q.   NO PROBLEM.

11:47AM 3         LET ME DIRECT YOUR ATTENTION TO, IN THE BINDER, TAB 1106

11:48AM 4    IN THE WHITE BINDER.

11:48AM 5    A.   OKAY.

11:48AM 6    Q.   AND DOES THAT REMIND YOU WHEN THAT "WALL STREET JOURNAL"

11:48AM 7    ARTICLE CAME OUT THAT TALKED ABOUT REFINING THAT SECRET

11:48AM 8    INVOLVING THE DEVICES?

11:48AM 9    A.   YES.  IT WAS SEPTEMBER OF 2013.

11:48AM 10   Q.   OKAY.  WAS THAT MORE THAN THREE MONTHS BEFORE YOUR

11:48AM 11   CONVERSATION WITH MR. BALWANI?

11:48AM 12   A.   YES.

11:48AM 13   Q.   THAT ARTICLE TALKS ABOUT -- WELL, FIRST OF ALL, DOES THE

11:48AM 14   ARTICLE SAY ANYTHING ABOUT REFINING THE DEVICES SPECIFICALLY?

11:48AM 15   A.   I WOULD HAVE TO REREAD IT, BUT --

11:48AM 16   Q.   TAKE A MOMENT AND REVIEW IT IF YOU WOULD LIKE.  IT'S ON

11:48AM 17   THE PAGE 1 OF THE ARTICLE IN THAT FIRST INDENTED PARAGRAPH.

11:48AM 18   A.   IT JUST SAYS THE SECRET THAT HUNDREDS OF EMPLOYEES ARE NOW

11:48AM 19   REFINING.  IT SOUNDS LIKE THEY'RE -- I DON'T KNOW IF THEY'RE

11:49AM 20   REFINING THEIR SECRET OR REFINING THEIR TECHNOLOGY.  IT

11:49AM 21   INVOLVES DEVICES.

11:49AM 22   Q.   OKAY.  IN ANY EVENT, IS THAT THE SAME THING THAT

11:49AM 23   MR. BALWANI TOLD YOU MONTHS LATER DURING YOUR ONE-ON-ONE

11:49AM 24   CONVERSATION WITH THE PRESIDENT ON DECEMBER 22ND?

11:49AM 25   A.   NO.  MY NOTES ARE CLEAR THAT NO NEW INVENTION OR NO NEW

11:49AM   1    SCIENCE WAS NEEDED IS WHAT I WAS TOLD.

11:49AM   2    Q.   MR. CAZARES ASKED YOU ABOUT WHETHER YOU WOULD EXPECT A

11:49AM   3    TECHNOLOGY COMPANY TO ALWAYS BE IMPROVING ITS TECHNOLOGY.

11:49AM   4        DO YOU REMEMBER THAT?

11:49AM   5    A.   YES.

11:49AM   6    Q.   AT THIS TIME WHEN MR. BALWANI SAID THE SCIENCE WAS

11:49AM   7    COMPLETE, NO NEW INVENTION NEEDED, DID YOU TAKE THAT TO MEAN

11:49AM   8    THE COMPANY WOULD NEVER DO ANY WORK TO IMPROVE ITS TECHNOLOGY?

11:49AM   9    A.   NO.

11:49AM  10    Q.   WHAT DID YOU THINK THAT MEANT?

11:49AM  11    A.   WELL, I THINK IT MEANT THAT THEY WERE FUNCTIONING AS A

11:49AM  12    BLOOD TESTING COMPANY ON SMALL DROPS OF BLOOD, FULLY

11:49AM  13    FUNCTIONING.

11:50AM  14    Q.   IF YOU HAD BEEN TOLD THAT THE COMPANY'S HOME BUILT

11:50AM  15    ANALYZER COULD NEVER DO MORE THAN A DOZEN OF THE MANY TESTS

11:50AM  16    THAT IT OFFERED, WOULD THAT --

11:50AM  17             MR. CAZARES:  LEADING.

11:50AM  18             MR. BOSTIC:  I HADN'T FINISHED THE QUESTION YET,

11:50AM  19    YOUR HONOR.

11:50AM  20             THE COURT:  GO AHEAD.

11:50AM  21    BY MR. BOSTIC:

11:50AM  22    Q.   IF YOU HAD BEEN TOLD THAT THE COMPANY'S HOME GROWN

11:50AM  23    ANALYZER COULD NEVER PERFORM MORE THAN A DOZEN TESTS OF THE

11:50AM  24    MANY TESTS THAT IT OFFERED, WOULD THAT HAVE BEEN CONSISTENT

11:50AM  25    WITH OR INCONSISTENT WITH WHAT MR. BALWANI TOLD YOU ABOUT THE

11:50AM   1    STATE OF THE TECHNOLOGY?

11:50AM   2              MR. CAZARES:  OBJECTION.  FOUNDATION AND LEADING.

11:50AM   3              THE COURT:  OVERRULED.

11:50AM   4         YOU CAN ANSWER THE QUESTION, SIR.

11:50AM   5              THE WITNESS:  IT WOULD BE INCONSISTENT WITH WHAT I

11:50AM   6    TOOK AWAY FROM THIS CONVERSATION.

11:50AM   7    BY MR. BOSTIC:

11:50AM   8    Q.   AND WHY IS THAT?

11:50AM   9    A.   BECAUSE I THOUGHT THEY HAD 60 TO 70 TESTS THAT THEY COULD

11:50AM  10    RUN SUCCESSFULLY.

11:50AM  11    Q.   AND LET'S LOOK ON YOUR LIST, SCROLLING DOWN A LITTLE BIT,

11:51AM  12    TO ITEM NUMBER 12.

11:51AM  13         IS THIS WHAT MR. BALWANI TOLD YOU ABOUT THESE 60 TO 70

11:51AM  14    TESTS?

11:51AM  15    A.   YES.

11:51AM  16    Q.   AND DO YOU SEE HERE IT INDICATES THAT "WHILE CURRENT

11:51AM  17    CLINICAL TRIALS CAN TAKE 6 VIALS AND CAN RUN 10 TO 12 TESTS.

11:51AM  18    THERANOS TAKES 3 DROPS AND CAN RUN 60 TO 70 TESTS.

11:51AM  19         DO YOU SEE THAT?

11:51AM  20    A.   YES.

11:51AM  21    Q.   AND DID YOU THINK AT THIS TIME THAT CONVENTIONAL

11:51AM  22    TECHNOLOGY WAS ONLY CAPABLE OF DOING 10 TO 12 BLOOD TESTS

11:51AM  23    OVERALL?

11:51AM  24    A.   I DIDN'T KNOW.  JUST FOR WHATEVER THE 10 OR 12 TESTS, HE

11:51AM  25    INDICATED IT WOULD TAKE 6 VIALS.

11:51AM 1      I THINK IT WAS MORE OF A SAMPLE OF WHAT THE THERANOS

11:51AM 2   CAPABILITIES WERE.

11:51AM 3   Q.   I SEE.

11:51AM 4      AND IS THIS LINE ITEM 12 ABOUT HOW MANY DIFFERENT KINDS OF

11:51AM 5   TESTS THE DEVICE CAN DO, OR HOW MANY DIFFERENT TESTS CAN BE

11:51AM 6   DONE ON A SINGLE SAMPLE AS YOU UNDERSTOOD IT?

11:51AM 7   A.   UM, MY UNDERSTANDING WAS THAT IT COULD TAKE 3 DROPS AND

11:52AM 8   RUN 60 OR 70 TESTS.

11:52AM 9   Q.   ON THAT SINGLE SAMPLE?

11:52AM 10  A.   YES.

11:52AM 11  Q.   LET'S GO BACK TO 2 -- OR, I'M SORRY, 3 THROUGH 5.

11:52AM 12     YOU ALSO WERE ASKED ABOUT THE USE OF INVESTOR MONEY AND

11:52AM 13  WHETHER IT WOULD BE USED FOR SCALING OR FOR RESEARCH AND

11:52AM 14  DEVELOPMENT.

11:52AM 15     DO YOU REMEMBER THAT?

11:52AM 16  A.   YES.

11:52AM 17  Q.   MR. CAZARES ASKED YOU WHETHER THERE WAS ANYTHING WRONG

11:52AM 18  WITH THE COMPANY USING INVESTOR MONEY FOR RESEARCH AND

11:52AM 19  DEVELOPMENT.

11:52AM 20     WHAT IS YOUR VIEW ON THAT?

11:52AM 21  A.   WELL, THERE'S NOTHING WRONG WITH IT.

11:52AM 22     BUT BASED ON MY CONVERSATION, INVESTMENT DECISIONS WERE

11:52AM 23  LARGELY MADE OR RELAYED REGARDING WHAT THIS MONEY WAS FOR.  I

11:52AM 24  RELAYED TO MY SHAREHOLDERS -- TO SHAREHOLDERS, INVESTORS,

11:52AM 25  FRIENDS, THAT THIS MONEY WAS USED FOR GROWTH.  IT WAS GROWTH

11:53AM 1    CAPITAL VERSUS MORE INVENTION.

11:53AM 2    Q.   OKAY.  SO JUST SO YOUR TESTIMONY IS CLEAR, ARE YOU SAYING

11:53AM 3    THAT, BY DEFINITION, IT'S IMPROPER FOR A COMPANY TO USE

11:53AM 4    INVESTOR MONEY FOR RESEARCH AND DEVELOPMENT?

11:53AM 5    A.   I, I THINK THAT A COMPANY, IF IT DETERMINED THAT IT HAD

11:53AM 6    ENOUGH CAPITAL TO INVEST AND IMPROVE UPON THE VALUE FOR THE

11:53AM 7    SHAREHOLDERS, THAT WOULD BE FINE.

11:53AM 8         I, I WAS UNDER THE IMPRESSION THAT THEY WERE ALREADY FREE

11:53AM 9    GENERATING CASH AND OPERATIONS AND THIS MONEY WAS JUST FOR

11:53AM 10   GROWTH, AND I UNDERSTAND FROM EXPERIENCE THAT GROWTH CAPITAL IS

11:53AM 11   FOR GROWING THE FIRM AND THERE WAS NO MORE VENTURE CAPITAL

11:53AM 12   NEEDED.  THAT'S MORE OF A VENTURE DEAL.

11:53AM 13        BUT THEY WOULD IMPROVE.  I MEAN, APPLE PUTS MONEY BACK

11:53AM 14   INTO THEIR IPHONE, SO I UNDERSTAND THE SAMPLE.

11:54AM 15        BUT IF THERE WAS A WAY TO IMPROVE UPON THEIR TECHNOLOGY

11:54AM 16   THAT MADE IT MORE EFFICIENT OR EXPANDED ITS CAPABILITIES, YEAH,

11:54AM 17   I WOULD SAY TO DO THAT SINCE THEY WERE CASH FLOWING.

11:54AM 18   Q.   BUT BASED ON WHAT MR. BALWANI TOLD YOU ABOUT HOW THE MONEY

11:54AM 19   WAS GOING TO BE USED, HOW DID THAT AFFECT YOUR VIEW OF YOUR

11:54AM 20   INVESTMENT DECISION?

11:54AM 21   A.   THAT THEY HAD NEW, STATE-OF-THE-ART TECHNOLOGY THAT THEY

11:54AM 22   HAD INVENTED AND THAT IT WAS VALUABLE, AND THEY WOULD BE

11:54AM 23   HARVESTING THE RETURNS FROM THAT TECHNOLOGY, AND THIS CAPITAL

11:54AM 24   WOULD HELP THEM EXPAND AND HARVEST THOSE RETURNS.

11:54AM 25   Q.   ON DIRECT I ASKED YOU ABOUT WHETHER YOU WERE AWARE OF

11:54AM  1    THERANOS'S RELIANCE ON VEIN DRAWS FOR ITS BLOOD TESTING.

11:54AM  2        DO YOU REMEMBER THAT QUESTION?

11:54AM  3    A.   YES.

11:54AM  4    Q.   ON CROSS, MR. CAZARES ASKED YOU A DIFFERENT QUESTION,

11:54AM  5    WHICH WAS WHETHER YOU WERE AWARE OF THE COMPANY'S USE OF VEIN

11:54AM  6    DRAWS.

11:54AM  7        DO YOU RECALL THAT DISCUSSION?

11:54AM  8    A.   YES.

11:54AM  9    Q.   AND HE SHOWED YOU SOME INSTANCES WHERE, ON THE WEBSITE AND

11:54AM  10   IN OTHER PUBLIC MATERIALS, VEIN DRAWS WERE REFERENCED.

11:54AM  11       DO YOU REMEMBER THAT?

11:54AM  12   A.   YES.

11:54AM  13   Q.   SO LET ME ASK YOU AGAIN, AT ANY POINT WERE YOU TOLD THAT

11:55AM  14   THE COMPANY NEEDED TO RELY ON VEIN DRAW SAMPLES BECAUSE ITS

11:55AM  15   TECHNOLOGY WAS NOT CAPABLE OF PERFORMING ALL OF ITS TESTS?

11:55AM  16            MR. CAZARES:  OBJECTION.  CALLS FOR SPECULATION.

11:55AM  17   FOUNDATION.  ALSO LEADING.

11:55AM  18            THE COURT:  OVERRULED.

11:55AM  19            MR. BOSTIC:  I'LL START THAT QUESTION AGAIN.  I'M

11:55AM  20   SORRY.

11:55AM  21   Q.   THE QUESTION WAS, AT ANY POINT, WERE YOU TOLD THAT THE

11:55AM  22   COMPANY NEEDED TO RELY ON VEIN SAMPLES BECAUSE ITS TECHNOLOGY

11:55AM  23   DID NOT PERFORM ALL OF THE TESTS ON A FINGERSTICK?

11:55AM  24   A.   NO.

11:55AM  25   Q.   WOULD THAT FACT HAVE BEEN IMPORTANT TO YOU AS SOMEONE

11:55AM  1    CONSIDERING AN INVESTMENT IN THE COMPANY?

11:55AM  2    A.    YES.

11:55AM  3    Q.    AND WHY WOULD THAT HAVE BEEN IMPORTANT?

11:55AM  4    A.    THE DISCLOSURE IS IMPORTANT TO UNDERSTAND WHAT THE

11:55AM  5    CAPABILITIES WE WERE INVESTING IN COULD DO.

11:55AM  6          SO THE DISCLOSURE IS IMPORTANT.

11:55AM  7          IF THEY WERE DRAWING FROM VEINS ON CERTAIN TESTS, IT

11:55AM  8    DOESN'T MEAN IT'S UNACCEPTABLE.  IT JUST MEANS THAT MY

11:55AM  9    UNDERSTANDING WAS THAT THE DROPS OF BLOOD WERE RUNNING 60 TO 70

11:56AM  10   TESTS, AND THAT WAS INCREDIBLE, YOU KNOW?  WE WERE EXCITED

11:56AM  11   ABOUT THAT.

11:56AM  12   Q.    DO YOU RECALL A DISCUSSION WITH MR. CAZARES ABOUT WHAT HE

11:56AM  13   CALLED AN FDA APPROVAL OF THE THERANOS TECHNOLOGY?

11:56AM  14   A.    YES.

11:56AM  15   Q.    SITTING HERE TODAY, DO YOU HAVE ANY KNOWLEDGE ABOUT ANY

11:56AM  16   IMPORTANT DIFFERENCES BETWEEN AN FDA APPROVAL VERSUS AN FDA

11:56AM  17   CLEARANCE?

11:56AM  18   A.    I DON'T REALLY HAVE A TREMENDOUS AMOUNT OF KNOWLEDGE ON

11:56AM  19   REGULATORY.

11:56AM  20   Q.    FOR THE FDA CLEARANCE THAT DID HAPPEN IN 2015, YOU

11:56AM  21   TESTIFIED THAT IT WAS RELATED TO A SINGLE TEST.

11:56AM  22         IS THAT YOUR UNDERSTANDING?

11:56AM  23   A.    YES, THE ANNOUNCEMENT HAD SOMETHING TO DO WITH HERPES.

11:56AM  24   Q.    MR. CAZARES ASKED YOU ABOUT WHETHER YOU KNEW WHETHER IT

11:56AM  25   WAS THE SAME TECHNOLOGY THAT GOT THAT CLEARANCE VERSUS WHAT WAS

11:56AM  1    BEING USED IN 2013.

11:56AM  2         DO YOU REMEMBER THAT?

11:56AM  3    A.   VAGUELY, YEAH.

11:56AM  4    Q.   DO YOU KNOW?  DO YOU HAVE KNOWLEDGE ABOUT WHETHER THAT

11:57AM  5    INVOLVED THE SAME TECHNOLOGY OR THE SAME DEVICE AT ALL AS TO

11:57AM  6    WHAT THERANOS WAS USING IN 2013?

11:57AM  7    A.   I HAVE NO KNOWLEDGE.

11:57AM  8    Q.   DO YOU KNOW WHETHER THE EDISON DEVICE THERANOS WAS USING

11:57AM  9    IN 2013 WAS EVEN CAPABLE OF RUNNING A HERPES TEST?

11:57AM  10   A.   I DON'T KNOW.

11:57AM  11   Q.   DO YOU ALSO REMEMBER MR. CAZARES MENTIONING THE 4.0 DEVICE

11:57AM  12   TO YOU?

11:57AM  13   A.   YES.

11:57AM  14   Q.   AND DO YOU KNOW WHETHER THERANOS EVER USED THE 4.0 DEVICE

11:57AM  15   FOR A SINGLE CLINICAL PATIENT TEST?

11:57AM  16   A.   I DON'T RECALL WHAT THE 4.0 WAS VERSUS ANY OTHER TESTING.

11:57AM  17   Q.   THERE WAS SOME DISCUSSION ABOUT THE AMOUNT OF FINANCIAL

11:57AM  18   DISCLOSURES THAT YOU RECEIVED FROM THERANOS, AND MR. CAZARES

11:57AM  19   ASKED YOU WHETHER YOU WERE -- WHETHER YOU UNDERSTOOD THAT YOU

11:57AM  20   WERE NOT LEGALLY ENTITLED TO MORE INFORMATION.

11:57AM  21        DO YOU RECALL THAT?

11:57AM  22   A.   YES.

11:57AM  23   Q.   WAS THE AMOUNT OF INFORMATION AND TRANSPARENCY THAT YOU

11:57AM  24   WERE GETTING FROM THERANOS NORMAL OR UNUSUAL BASED ON YOUR

11:58AM  25   PREVIOUS EXPERIENCE INVESTING IN COMPANIES?

11:58AM  1    A.   IT WAS UNUSUAL.  UNUSUALLY NONEXISTENT.

11:58AM  2    Q.   MR. CAZARES LISTED SOME THINGS THAT YOU DIDN'T HAVE, LIKE

11:58AM  3    FINANCIAL DETAILS AND OTHER WRITTEN MATERIALS.

11:58AM  4         DO YOU RECALL THAT?

11:58AM  5    A.   YES.

11:58AM  6    Q.   SO MY QUESTION IS, WHAT DID YOU RELY UPON INSTEAD IN

11:58AM  7    MAKING YOUR DECISION?  IF YOU DIDN'T HAVE THOSE THINGS, WHAT

11:58AM  8    DID YOU PLACE YOUR TRUST IN?

11:58AM  9    A.   WELL, I PLACED A LOT OF TRUST IN THE COMMUNICATION THAT I

11:58AM  10   HAD WITH THE SENIOR LEADERSHIP OF THE FIRM, ELIZABETH HOLMES

11:58AM  11   AND SUNNY, ON THIS CONVERSATION.

11:58AM  12        AND THEN I RELIED ON, YOU KNOW, CONTRACTS FROM WALGREENS,

11:58AM  13   ASSUMING THEY DID THEIR HOMEWORK; VERY LARGE INVESTORS THAT

11:58AM  14   CAME -- THE INVESTOR NAMES BECAME SOMEHOW PUBLIC AND THEY

11:58AM  15   SEEMED LIKE THEY WOULD DO THEIR HOMEWORK; THEIR BOARD OF

11:58AM  16   DIRECTORS WAS HIGHLY -- A HIGH QUALITY BUNCH OF PEOPLE,

11:58AM  17   SENATOR TRENT LOTT, THERE WAS A DOCTOR WHO INVOLVED OR AN

11:59AM  18   INVESTOR, LARRY ELLISON FROM ORACLE WAS AN INVESTOR.

11:59AM  19        SO WE RELIED ON THIS INCREDIBLE PEDIGREE OF ALL OF THESE

11:59AM  20   INVESTORS IN THIS THING, AND YOU KNOW, IT SEEMED LIKE SOME

11:59AM  21   PRETTY SMART PEOPLE, SO WE -- I DROPPED MY JUDGMENT A LITTLE

11:59AM  22   BIT TO INVEST ALONGSIDE THESE PEOPLE.

11:59AM  23        NOW, WE WERE IN AHEAD OF MOST OF THESE PEOPLE, BUT THEY

11:59AM  24   WERE EVALUATING WHAT THE COMPANY SAID AND WHAT WE LEARNED.

11:59AM  25   Q.   AND THE FIRST THING THAT YOU MENTIONED IN THAT LIST WERE

11:59AM  1    THE COMMUNICATIONS THAT YOU HAD WITH MS. HOLMES AND

11:59AM  2    MR. BALWANI; CORRECT?

11:59AM  3    A.   YES.

11:59AM  4    Q.   AND WOULD YOU HAVE INVESTED REGARDLESS OF WHAT MR. BALWANI

11:59AM  5    TOLD YOU IN THAT CALL, OR DID THE THINGS THAT HE TOLD YOU ABOUT

11:59AM  6    THE COMPANY MATTER TO YOUR DECISION?

11:59AM  7    A.   THESE WERE VERY, VERY SPECIFIC AND COMPELLING DETAILS, AND

11:59AM  8    THEY WERE WHAT I WAS SEEKING.

11:59AM  9        THE ONLY THING I DIDN'T GET WAS A BALANCE SHEET AND

12:00PM  10   REVENUE AND P&L.

12:00PM  11       BUT THESE WERE VERY SPECIFIC TO WHAT I NEEDED TO KNOW AND

12:00PM  12   WHAT I ASSUMED EVERYBODY KNEW, WHICH IS WHY THEY INVESTED.

12:00PM  13   Q.   THANK YOU.

12:00PM  14       NO FURTHER QUESTIONS.

12:00PM  15           THE COURT:   SURE.

12:00PM  16           MR. CAZARES:   BRIEFLY, YOUR HONOR.

12:00PM  17                    **RECROSS-EXAMINATION**

12:00PM  18   BY MR. CAZARES:

12:00PM  19   Q.   GOOD AFTERNOON NOW, MR. MENDENHALL.

12:00PM  20   A.   YES.

12:00PM  21   Q.   I THINK WE'RE ALMOST THERE.  JUST A FEW FOLLOW-UP

12:00PM  22   QUESTIONS.

12:00PM  23       YOU WERE ASKED SOME FOLLOWUP ABOUT YOUR KNOWLEDGE OF THE

12:00PM  24   RELATIONSHIP BETWEEN MR. BALWANI AND MS. HOLMES.

12:00PM  25       DO YOU RECALL THAT?

12:00PM  1      A.   YES.

12:00PM  2      Q.   AND YOU INDICATED YOU WERE UNAWARE OF ANY ROMANTIC

12:00PM  3      RELATIONSHIP PRIOR TO YOUR INVESTING; CORRECT?

12:00PM  4      A.   YES.

12:00PM  5      Q.   AND YOU INDICATED THAT IN YOUR MIND THAT RAISES SOME

12:00PM  6      GOVERNANCE QUESTIONS IN A CORPORATION; CORRECT?

12:01PM  7      A.   SURE.

12:01PM  8      Q.   GOVERNANCE MEANING POTENTIAL CONFLICT ISSUES MAYBE?

12:01PM  9      A.   YES.

12:01PM  10     Q.   BUT YOU DID UNDERSTAND, AS YOU INDICATED HERE JUST A

12:01PM  11     COUPLE MINUTES AGO, THERANOS HAD A QUITE NOTABLE BOARD OF

12:01PM  12     DIRECTORS; CORRECT?

12:01PM  13     A.   YES.

12:01PM  14     Q.   AND YOU HAD, GIVEN YOUR EXPERIENCE IN FINANCE, UNDERSTOOD

12:01PM  15     AT THE TIME OF ROLE OF A CORPORATE BOARD; CORRECT?

12:01PM  16     A.   YES.

12:01PM  17     Q.   AND YOU UNDERSTOOD THAT IN MANY AREAS OF THE GOVERNANCE IN

12:01PM  18     THE CORPORATION, INCLUDING EXECUTIVE HIRES, IT'S THE BOARD WHO

12:01PM  19     HAS THE FINAL SAY; CORRECT?

12:01PM  20     A.   YES.

12:01PM  21     Q.   I STEPPED OVER YOUR ANSWER.

12:01PM  22          WAS THAT RIGHT?

12:01PM  23     A.   YES.

12:01PM  24     Q.   OKAY.  AND AGAIN, YOU, AS YOU'VE JUST TOLD THE JURY, YOU

12:01PM  25     TRUSTED THE BOARD OF THERANOS, THAT THEY WERE OVERSEEING THINGS

12:01PM   1    AND WERE MAKING THE RIGHT DECISIONS; CORRECT?

12:01PM   2    A.   YES, IT WAS A VERY CREDIBLE BOARD.

12:01PM   3    Q.   INCLUDING THEIR APPROVAL OF THE ROLE OF MR. BALWANI WITHIN

12:01PM   4    THERANOS; CORRECT?

12:01PM   5    A.   I ASSUME SO, YEAH.

12:02PM   6    Q.   NOW, YOU WERE ASKED SOME QUESTIONS ABOUT THERANOS'S USE OF

12:02PM   7    TRADITIONAL VENOUS TESTING.

12:02PM   8         DO YOU RECALL THAT?

12:02PM   9    A.   YES.

12:02PM   10   Q.   AND YOU WERE ASKED SOME QUESTIONS, THE GIST OF WHICH, WERE

12:02PM   11   YOU AWARE OF THE FACT THAT THERANOS NEEDED TO USE VENOUS

12:02PM   12   TESTING BECAUSE ITS TECHNOLOGY COULDN'T PERFORM ALL TESTS.

12:02PM   13        DO YOU RECALL THAT?

12:02PM   14   A.   YES.

12:02PM   15   Q.   AND I THINK YOUR ANSWER WAS THAT YOU WERE UNAWARE OF THAT;

12:02PM   16   CORRECT?

12:02PM   17   A.   YES.

12:02PM   18   Q.   NOW, YOU UNDERSTAND, DON'T YOU, AS A SOPHISTICATED

12:02PM   19   INVESTOR, THAT THERE MIGHT BE SOME AREAS OF A BUSINESS, LIKE

12:02PM   20   BLOOD TESTING, WHERE IT MAY NOT MAKE ECONOMIC SENSE FOR

12:02PM   21   THERANOS TO DEVELOP, SPEND THE RESEARCH AND DEVELOPMENT,

12:02PM   22   SCIENTIFIC TIME, ET CETERA, TO DEVELOP A TEST AND SELL IT WHEN

12:03PM   23   SOMEBODY -- WHEN THERE'S NO MARKETS OR A VERY SMALL MARKET?

12:03PM   24        YOU UNDERSTAND THAT, RIGHT?

12:03PM   25             MR. BOSTIC:  FOUNDATION.  SPECULATION.

12:03PM 1              THE COURT:  ARE YOU ASKING THIS AS A GENERAL

12:03PM 2    BUSINESS PROP --

12:03PM 3              MR. CAZARES:  AS A GENERAL BUSINESS MATTER, YES.

12:03PM 4              THE COURT:  A GENERAL BUSINESS PROPOSITION BASED ON

12:03PM 5    HIS EXPERIENCE AS AN INVESTOR?

12:03PM 6              MR. CAZARES:  YES.

12:03PM 7              THE COURT:  CAN YOU ANSWER THAT QUESTION WITH THAT

12:03PM 8    CONTEXT?

12:03PM 9              THE WITNESS:  YEAH, IT DOES MAKE SENSE TO NOT

12:03PM 10   DEVELOP TESTING ON TESTS THAT WOULD NEVER BE USED OR THAT WERE

12:03PM 11   TOO EXPENSIVE TO PERFORM.

12:03PM 12   BY MR. CAZARES:

12:03PM 13   Q.   AND YOU WOULD EXPECT MS. HOLMES AND MR. BALWANI TO FOCUS

12:03PM 14   THEIR TECHNOLOGY, THEIR FINGERSTICK TESTING TECHNOLOGY ON THE

12:03PM 15   MOST COMMONLY USED TESTS; RIGHT?

12:03PM 16   A.   YES.

12:03PM 17   Q.   THAT'S WHERE THE MONEY IS GOING TO BE; RIGHT?

12:03PM 18   A.   YES.

12:03PM 19   Q.   SO THAT FEW PERCENTAGE, 1, 2, 3 PERCENT MAYBE OF TESTS

12:03PM 20   THAT DON'T GET SOLD THAT OFTEN, YOU WOULDN'T REALLY EXPECT THEM

12:04PM 21   TO SPEND A LOT OF TIME AND RESOURCES TO DEVELOP THOSE KIND OF

12:04PM 22   TESTS; CORRECT?

12:04PM 23   A.   THAT WOULD BE MY DESIRE, YES.

12:04PM 24   Q.   BECAUSE IT WOULD BE A WASTE OF YOUR MONEY AS AN INVESTOR;

12:04PM 25   RIGHT?

12:04PM  1    A.    YEP.  YES, I SHOULD SAY.

12:04PM  2    Q.    THANK YOU.  IT'S OKAY.  WE'RE ALMOST THERE.

12:04PM  3          NOW, YOU DESCRIBED, IN RESPONSE TO QUESTIONS FROM

12:04PM  4    MR. BOSTIC, YOUR EXPECTATION, BASED ON THE DISCUSSION WITH

12:04PM  5    MR. BALWANI, THAT THE FUND RAISING AT THE TIME IN DECEMBER OF

12:04PM  6    2013 WAS INTENDED TO FUEL GROWTH; CORRECT?

12:04PM  7    A.    YES, YES.

12:04PM  8    Q.    AND YOU HAVE NO KNOWLEDGE, DO YOU, THAT YOUR MONEY WAS

12:04PM  9    USED FOR ANYTHING OTHER THAN THE GROWTH OF THE COMPANY;

12:04PM 10    CORRECT?

12:04PM 11    A.    I HAVE NO KNOWLEDGE, RIGHT.

12:04PM 12    Q.    BUT YOU ARE AWARE OF THE FACT THAT THERANOS'S EXPANSION OF

12:04PM 13    PATIENT TESTING IN WALGREENS STORES, FROM THE TIME THAT YOU

12:04PM 14    INVESTED THROUGH 2014, EXPANDED; RIGHT?

12:04PM 15    A.    YES, I BELIEVE THEY GOT TO 48 STORES OR SOMETHING LIKE

12:05PM 16    THAT.

12:05PM 17    Q.    OKAY.  AND IN ORDER TO DO THAT, BASED ON WHAT YOU

12:05PM 18    OBSERVED, YOU SAW THE FACT THAT THE COMPANY GREW, EXPANDED THE

12:05PM 19    NUMBER OF STORES, YOU HAD TO HAVE KNOWN THAT THERANOS WAS

12:05PM 20    HIRING MORE PEOPLE TO HANDLE THAT AND INCREASE THE DEMAND;

12:05PM 21    CORRECT?

12:05PM 22          MR. BOSTIC:  CALLS FOR SPECULATION.

12:05PM 23          THE COURT:  I THINK -- AS A GENERAL BUSINESS

12:05PM 24    PROPOSITION, I THINK THE QUESTION IS, DOES GROWTH REQUIRE

12:05PM 25    ADDITIONAL EMPLOYMENT HIRING?

MENDENHALL RECROSS BY MR. CAZARES                                4383

12:05PM  1          IS THAT WHAT YOUR QUESTION IS?

12:05PM  2                 MR. CAZARES:  YES, YOUR HONOR, BETTER SAID.

12:05PM  3                 THE WITNESS:  I WOULD ASSUME SO.

12:05PM  4      BY MR. CAZARES:

12:05PM  5      Q.   OKAY.  AND DID YOU BECOME AWARE OF THE FACT, IN 2014,

12:05PM  6      THERANOS OPENED ANOTHER LAB IN ARIZONA TO HANDLE THE INCREASED

12:05PM  7      VOLUME?

12:05PM  8      A.   I BELIEVE I KNEW THAT, YES.

12:05PM  9      Q.   AND THAT WOULD HAVE TAKEN MONEY AS WELL; RIGHT?

12:05PM 10      A.   YES.

12:05PM 11      Q.   AND THAT WOULD HAVE BEEN CONSISTENT WITH YOUR

12:05PM 12      UNDERSTANDING OF HOW YOUR MONEY WAS BEING USED?

12:05PM 13      A.   CERTAINLY.  PARTIALLY, YES.

12:06PM 14      Q.   NOW, YOU WERE ASKED SOME QUESTIONS ABOUT THERANOS'S TESTS,

12:06PM 15      AND I THINK YOU WERE ASKED A QUESTION, DID YOU KNOW THAT

12:06PM 16      THERANOS'S TECHNOLOGY COULD ONLY DO 12 TESTS.

12:06PM 17          DO YOU REMEMBER THAT?

12:06PM 18      A.   YES.

12:06PM 19      Q.   AND YOU SAID THAT YOU WERE UNAWARE OF THAT FACT; CORRECT?

12:06PM 20      A.   YES.

12:06PM 21      Q.   NOW, WERE YOU AWARE OF THE FACT, WHETHER IT WAS FROM

12:06PM 22      MR. BALWANI OR ANYONE ELSE, THAT THERANOS'S SCIENTISTS HAD

12:06PM 23      DEVELOPED HUNDREDS OF TESTS THAT RAN ON ITS PROPRIETARY

12:06PM 24      TECHNOLOGY?

12:06PM 25      A.   I WAS UNAWARE.

12:06PM  1    Q.   OKAY.  BUT YOU WERE AWARE THAT THE FINGERSTICK TESTING WAS

12:06PM  2    REALLY THERANOS'S PRIMARY BUSINESS; CORRECT?

12:06PM  3    A.   YES.

12:06PM  4    Q.   THAT WAS THE GOAL OVER THE FUTURE, TO EXPAND THAT

12:06PM  5    OPERATION AND THE USE OF THEIR PROPRIETARY FINGERSTICK

12:06PM  6    TECHNOLOGY; CORRECT?

12:06PM  7    A.   YES.

12:06PM  8    Q.   WERE YOU AWARE IN THIS 2013, 2014 TIME PERIOD WHEN YOU

12:07PM  9    INVESTED THAT THERANOS SCIENTISTS HAD FIGURED OUT A WAY TO

12:07PM  10   MODIFY A COMMERCIAL DEVICE, LIKE A SIEMENS DEVICE, TO RUN

12:07PM  11   FINGERSTICK SAMPLES JUST LIKE ITS OWN EDISON?  WERE YOU AWARE

12:07PM  12   OF THAT?

12:07PM  13   A.   NO.

12:07PM  14   Q.   SETTING THAT ASIDE, WERE YOU AWARE OF THE FACT THAT

12:07PM  15   COMMERCIAL LAB EQUIPMENT, LIKE A SIEMENS DEVICE, HAD THE

12:07PM  16   CAPABILITY OF DOING KIND OF HIGH VOLUME TESTING IN ORDER TO

12:07PM  17   FILL KIND OF DEMAND?

12:07PM  18        DID YOU UNDERSTAND THAT?

12:07PM  19   A.   I DON'T HAVE A LOT OF KNOWLEDGE ON THE SYSTEMS AND THE

12:07PM  20   PROCESSES OF TESTING BLOOD.

12:07PM  21   Q.   OKAY.  PERIODICALLY, THOUGH, YOU WOULD KIND OF DO INTERNET

12:07PM  22   SEARCHES TO SEE WHAT YOU COULD LEARN ABOUT THERANOS'S BUSINESS

12:07PM  23   DURING THE TIME BEFORE AND AFTER WHEN YOU INVESTED; RIGHT?

12:07PM  24   A.   YES.

12:07PM  25   Q.   OKAY.  AND YOU WERE AWARE OF THE FACT THAT THERANOS

12:07PM   1    OBTAINED PATENTS FOR ITS TECHNOLOGY; RIGHT?  YOU KNEW THAT?

12:07PM   2    A.   I KNEW THEY HAD SOME PATENTS, YES.

12:07PM   3    Q.   DID YOU EVER READ THE PATENTS?

12:07PM   4    A.   NEVER READ A PATENT.

12:08PM   5    Q.   OKAY.  THEY'RE KIND OF TECHNICAL IN NATURE; RIGHT?

12:08PM   6    A.   YES.  I WENT TO OREGON STATE UNIVERSITY.

12:08PM   7    Q.   FINE SCHOOL, A GREAT BASKETBALL SCHOOL.

12:08PM   8         BUT YOU UNDERSTOOD THAT PATENT APPLICATIONS AND ACTUAL

12:08PM   9    PATENTS, THOSE ARE AVAILABLE ON THE INTERNET; RIGHT?

12:08PM  10    A.   I ASSUME SO.

12:08PM  11    Q.   YEAH, THE U.S. PTO, YOU CAN KIND OF GO AND DO A SEARCH AND

12:08PM  12    FIND PATENTS THERE?

12:08PM  13    A.   I'LL BELIEVE YOU.

12:08PM  14    Q.   OKAY.  BUT YOU UNDERSTAND THAT'S GENERALLY AVAILABLE;

12:08PM  15    RIGHT?

12:08PM  16    A.   SURE.  YEAH.

12:08PM  17    Q.   AND DID YOU KNOW THAT THERANOS HAD ACTUALLY SUBMITTED AND

12:08PM  18    FILED AND OBTAINED PATENT PROTECTION FOR ITS COMMERCIAL

12:08PM  19    MODIFICATION DEVICES TO RUN FINGERSTICK SAMPLES JUST LIKE THE

12:08PM  20    EDISON?

12:08PM  21    A.   I UNDERSTOOD THAT THEY HAD PATENTS, YES.

12:08PM  22    Q.   OKAY.  BUT YOU DIDN'T KNOW ABOUT THE FACT THAT THEY

12:08PM  23    PATENTED THIS ADDITIONAL TECHNIQUE THAT THEY DEVELOPED TO RUN

12:08PM  24    FINGERSTICK SAMPLES ON A COMMERCIAL DEVICE?

12:08PM  25    A.   NO, I WAS NOT AWARE.

12:08PM 1      Q.   BUT IF THEY DID SPEND TIME AND RESOURCES, INVESTOR MONEY

12:08PM 2      TO DEVELOP THAT SORT OF TECHNOLOGY AND SCIENCE TO RUN

12:09PM 3      FINGERSTICK SAMPLES ON A COMMERCIAL DEVICE, YOU WOULD HAVE

12:09PM 4      EXPECTED THERANOS TO TAKE STEPS TO PROTECT THAT TECHNOLOGY AS

12:09PM 5      WELL; RIGHT?

12:09PM 6      A.   SURE.

12:09PM 7      Q.   BECAUSE ULTIMATELY ANYTHING THAT IS THERANOS DEVELOPED

12:09PM 8      TECHNOLOGICALLY COULD BE IN FURTHERANCE OF THE COMPANY'S GROWTH

12:09PM 9      AND PROFITS IN THE FUTURE; RIGHT?

12:09PM 10     A.   YES.

12:09PM 11     Q.   AND YOU WOULD EXPECT THEM TO PURSUE ANY AVENUE THAT COULD

12:09PM 12     GROW THE BUSINESS; RIGHT?

12:09PM 13     A.   YES.

12:09PM 14          MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

12:09PM 15          THE COURT:  MR. BOSTIC, ANY QUESTIONS?

12:09PM 16          MR. BOSTIC:  TWO QUESTIONS, YOUR HONOR.

12:09PM 17                    **FURTHER REDIRECT EXAMINATION**

12:09PM 18     BY MR. BOSTIC:

12:09PM 19     Q.   MR. MENDENHALL, IN YOUR DISCUSSION WITH MR. BALWANI, DID

12:09PM 20     HE TELL YOU ABOUT ANY PART OF THERANOS'S TECHNOLOGY BESIDES THE

12:09PM 21     SMALL ANALYZER, THE EDISON?

12:09PM 22     A.   HE JUST TOLD ME THAT THE TECHNOLOGY WAS DONE AND THERE WAS

12:09PM 23     NO NEW SCIENCE NEEDED AND NO NEW TECHNOLOGY NEEDED.

12:09PM 24          SO I WASN'T -- I DIDN'T KNOW WHAT THAT APPLIED TO.  THAT'S

12:10PM 25     WHAT I KNEW WAS DONE, AND IT HAD THE CAPABILITIES OF RUNNING

12:10PM  1    SMALL SAMPLES SUCCESSFULLY ON WHATEVER THE TECHNOLOGY WAS,

12:10PM  2    YEAH.

12:10PM  3    Q.   AND BASED ON YOUR CONVERSATION WITH MR. BALWANI, DID YOU

12:10PM  4    HAVE AN UNDERSTANDING AS TO WHETHER THE THERANOS ANALYZER, THE

12:10PM  5    EDISON, WAS UP TO THE TASK OF HANDLING THE TESTING THAT

12:10PM  6    THERANOS WAS OFFERING TO THE PUBLIC?

12:10PM  7    A.   THAT WAS MY ASSUMPTION.

12:10PM  8    Q.   THAT WHAT?

12:10PM  9    A.   THAT THE THERANOS ANALYZER WAS RUNNING THE TEST.

12:10PM  10   Q.   THANK YOU.

12:10PM  11        NO FURTHER QUESTIONS.

12:10PM  12            THE COURT:  ANYTHING FURTHER?

12:10PM  13            MR. CAZARES:  VERY QUICKLY, YOUR HONOR.

12:10PM  14        (LAUGHTER.)

12:10PM  15            MR. CAZARES:  I PROMISE IT'S QUICK.

12:10PM  16              **FURTHER RECROSS-EXAMINATION**

12:10PM  17   BY MR. CAZARES:

12:10PM  18   Q.   IF WE CAN PUT UP ON THE SCREEN EXHIBIT 4059, WHICH ARE THE

12:11PM  19   NOTES.

12:11PM  20        THE SCREEN IS NOT WORKING?  THERE IT GOES.

12:11PM  21        DO YOU HAVE THE EXHIBIT ON YOUR SCREEN, SIR?

12:11PM  22   A.   YES.

12:11PM  23   Q.   AND AGAIN, YOU WROTE, "NO NEW SCIENCE IS NEEDED"; CORRECT?

12:11PM  24   A.   YES.

12:11PM  25   Q.   AND THEN "THE 'SCIENCE' BEHIND THERANOS IS COMPLETE";

12:11PM 1      CORRECT?

12:11PM 2      A.   YES.

12:11PM 3      Q.   AND YOU UNDERSTOOD THAT MEANS THEIR PROPRIETARY

12:11PM 4      TECHNOLOGY; CORRECT?

12:11PM 5      A.   THAT'S WHAT I FELT, YES.

12:11PM 6      Q.   BUT YOUR NOTES DON'T SAY, LIKE, "THE EDISON"; CORRECT?

12:11PM 7      A.   CORRECT.

12:11PM 8      Q.   AND WHATEVER THEIR PROPRIETARY FINGERSTICK TECHNOLOGY WAS,

12:11PM 9      THAT'S WHAT YOU WERE BEING TOLD?

12:11PM 10     A.   YES.

12:11PM 11                MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

12:11PM 12                MR. BOSTIC:  NOTHING FURTHER, YOUR HONOR.

12:11PM 13                THE COURT:  MAY THIS WITNESS BE EXCUSED?

12:11PM 14                MR. CAZARES:  YES, YOUR HONOR.

12:11PM 15                MR. BOSTIC:  YES, YOUR HONOR.

12:11PM 16                THE COURT:  SIR, YOU'RE EXCUSED.

12:11PM 17                THE WITNESS:  THANK YOU.

12:11PM 18                THE COURT:  YOU'RE WELCOME.

12:11PM 19          LADIES AND GENTLEMEN, THIS SEEMS LIKE A GOOD TIME TO TAKE

12:11PM 20     OUR BREAK, SO LET'S TAKE 30 MINUTES, 30 MINUTES PLEASE, AND

12:12PM 21     WE'LL SEE YOU BACK THEN.  THANK YOU.

12:12PM 22          (RECESS FROM 12:12 P.M. UNTIL 12:46 P.M.)

12:46PM 23          (JURY OUT AT 12:46 P.M.)

24

25

**AFTERNOON SESSION**

12:46PM  1

12:46PM  2          THE COURT:  LET'S GO ON THE RECORD.

12:46PM  3      WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  ALL COUNSEL

12:46PM  4  ARE PRESENT.  MR. BALWANI IS PRESENT.

12:46PM  5      SHOULD WE RETURN TO OUR CONVERSATION FROM THIS MORNING?

12:46PM  6  ARE THE MIKES ON?

12:46PM  7          THE CLERK:  SORRY.

12:46PM  8          MR. SCHENK:  YES, YOUR HONOR.

12:46PM  9          MR. CAZARES:  YES, YOUR HONOR.

12:46PM  10         THE COURT:  WHERE ARE WE?

12:46PM  11         MR. CAZARES:  WELL, YOUR HONOR, SO WHERE WE LEFT OFF

12:46PM  12  IS THIS QUESTION ABOUT WHETHER OR NOT, RAISED BY THE

12:46PM  13  GOVERNMENT, ABOUT WHETHER THE DEFENSE WOULD BE LIMITED IN ITS

12:46PM  14  CLOSING ARGUMENTS RELATING TO THE WALGREENS LAUNCH, THE

12:46PM  15  AFGHANISTAN ISSUE, MAYBE OTHER ISSUES, THROUGH INTRODUCTION OF

12:46PM  16  THE RECORDINGS FOR -- YOU KNOW, NOT FOR THE TRUTH, FOR SOME

12:47PM  17  EXCEPTION AND NOT FOR THE TRUTH.

12:47PM  18      BUT I THINK THE PLACE TO REALLY START IS WE BELIEVE THAT

12:47PM  19  THERE ARE EXCEPTIONS TO THE HEARSAY RULE THAT WOULD ADMIT THE

12:47PM  20  TAPES FOR THE TRUTH, AND I DON'T THINK THAT'S INCONSISTENT WITH

12:47PM  21  THE PRACTICE THAT HAS TAKEN PLACE IN THIS COURT UP UNTIL NOW,

12:47PM  22  BECAUSE WHAT IS GOING TO HAPPEN IS THAT THE RECORDINGS, WE KNOW

12:47PM  23  THEY'RE AUTHENTIC.  WE KNOW THAT MR. TOLBERT HAS TESTIFIED

12:47PM  24  ABOUT THEM BEFORE, SO THEY'RE CREDIBLE.

12:47PM  25      THE GOVERNMENT IS GOING TO INTRODUCE HIS RECOLLECTION

12:47PM 1    ABOUT THE VERY CONFERENCE CALL, AND, YOU KNOW, UNDER RULE 102,

12:47PM 2    UNDER THE BEST EVIDENCE RULE, THE TAPE IS THE ACTUAL BEST

12:47PM 3    EVIDENCE OF WHAT SHE SAID, THE TRUTH OF WHAT SHE SAID, NOT HIS

12:47PM 4    RECOLLECTION.

12:47PM 5         I DON'T THINK THAT'S A CONTROVERSIAL FACT, AND THAT ALONE

12:47PM 6    SHOULD ADMIT THE TAPES.

12:47PM 7         BUT IN ADDITION TO THAT, YOU KNOW, JUST, YOU KNOW, UNDER

12:47PM 8    THE RULE OF COMPLETENESS AND JUST FAIRNESS -- AND I'M NOT

12:47PM 9    SUGGESTING IN ANY WAY THAT THE COURT IS TRYING TO BE UNFAIR --

12:48PM 10   I THINK IT'S IMPORTANT FOR THE JURY TO BE ABLE TO HEAR THE

12:48PM 11   ACTUAL WORDS IF THAT'S WHAT THE GOVERNMENT IS GOING TO ASSERT

12:48PM 12   WERE MISLEADING AND FALSE RATHER THAN RECOLLECTION FROM AN

12:48PM 13   INDIVIDUAL CONVERSATION, YOU KNOW, 12 YEARS AGO OR 10 YEARS AGO

12:48PM 14   ALMOST.

12:48PM 15        SO THAT'S OUR POSITION, THEY SHOULD COME IN FOR THE TRUTH.

12:48PM 16        THE COURT:  FOR THE TRUTH?

12:48PM 17        MR. CAZARES:  FOR THE TRUTH.

12:48PM 18        THE COURT:  OKAY.  ALL RIGHT.

12:48PM 19        MR. SCHENK:  YOUR HONOR, THIS IS THE SECOND OR THIRD

12:48PM 20   TIME THE DEFENSE HAS CITED THE BEST EVIDENCE RULE TO THE COURT,

12:48PM 21   AND THE SECOND OR THIRD TIME THAT THEY HAVE CITED IT

12:48PM 22   INCORRECTLY.

12:48PM 23        THERE'S A CASE CALLED DIAZ-LOPEZ IN THE NINTH CIRCUIT THAT

12:48PM 24   DISCUSSES SOME OF THE HISTORY OF THE BEST EVIDENCE RULE, AND IT

12:48PM 25   MAKES CLEAR THAT THE BEST EVIDENCE RULE DOES NOT COMPARE TWO

12:48PM  1    DIFFERENT TYPES OF EVIDENCE, TOLBERT'S RECOLLECTION OF THE TAPE

12:48PM  2    WITH THE TAPE, AND THEN INSTRUCTS THE COURT THAT THE TAPE IS

12:48PM  3    THE BETTER OF THE TWO EVIDENCE, IT SHOULD ADMIT THAT ONE.

12:49PM  4    THAT'S NOT HOW THE BEST EVIDENCE RULE WORKS.

12:49PM  5        WHAT THE BEST EVIDENCE RULE IS IS PERMISSION TO ADMIT THE

12:49PM  6    ORIGINAL OF A DOCUMENT WHEN THERE'S A QUESTION ABOUT A COPY OF

12:49PM  7    THAT DOCUMENT.

12:49PM  8        IT DOES NOT COMPARE TWO DIFFERENT TYPES OF EVIDENCE AND

12:49PM  9    TELL THE COURT THAT IT MUST ADMIT THE TAPE BECAUSE THAT'S

12:49PM  10   BETTER THAN MR. TOLBERT'S RECOLLECTION OF IT.

12:49PM  11       SO ONE OF THE BASES THAT YOU JUST HEARD TO ADMIT THE

12:49PM  12   TOLBERT TAPES FOR THE TRUTH IS THE BEST EVIDENCE RULE, AND IT'S

12:49PM  13   DIAZ-LOPEZ, 625 F. 3D 1198, A NINTH CIRCUIT CASE FROM 2010.

12:49PM  14   BUT THIS CASE ALSO COLLECTS SOME OTHER NINTH CIRCUIT CASES THAT

12:49PM  15   CITE THE BEST EVIDENCE RULE FOR THIS SAME CONCEPT.

12:49PM  16       THE COURT, I THINK, ALSO HEARD THE RULE OF COMPLETENESS.

12:49PM  17   WE'VE DISCUSSED THIS MORNING IF THE GOVERNMENT OFFERED, FOR

12:49PM  18   INSTANCE, 1348-1 AND THE DEFENSE FELT THAT 1348-2 WAS NECESSARY

12:50PM  19   IN ORDER TO PROVIDE COMPLETE CONTEXT TO THE JURY, THE COURT

12:50PM  20   COULD ADMIT 1348-2 UNDER THE RULE OF COMPLETENESS.

12:50PM  21       IT DOES NOT SUGGEST THAT IF THE GOVERNMENT ASKS

12:50PM  22   MR. TOLBERT HIS RECOLLECTION OF THE TAPE, THE COURT MUST THEN,

12:50PM  23   FOR COMPLETENESS PURPOSES, ADMIT THE TAPE.

12:50PM  24       THE COURT HAS NOT HEARD A BASIS TO THE HEARSAY RULES THAT

12:50PM  25   ALLOW THE DEFENSE TO OFFER A CODEFENDANT'S STATEMENTS OUT OF

4392

12:50PM  1    COURT FOR THE TRUTH.

12:50PM  2         AND WHAT WE ORIGINALLY CAME TO YOUR HONOR TO DISCUSS THIS

12:50PM  3    MORNING WAS A HEARSAY OBJECTION TO THE DEFENSE PLAYING THE

12:50PM  4    TAPES, AND I STILL HAVEN'T HEARD AN EXCEPTION TO THE HEARSAY

12:50PM  5    RULE THAT PERMITS THE DEFENSE TO PLAY THE TOLBERT TAPES.

12:50PM  6         MR. CAZARES:  I MEAN -- I APPRECIATE THE

12:50PM  7    GOVERNMENT'S POSITION, BUT IT'S STILL KIND OF DODGING THE

12:50PM  8    ISSUE, WHICH IS WHY THIS JURY SHOULDN'T BE HEARING THE ACTUAL

12:50PM  9    WORDS OF MS. HOLMES AS OPPOSED TO MR. TOLBERT'S RECOLLECTION

12:51PM  10   BASED ON SOME NOTES OF THE SAME CONVERSATION, BECAUSE THE

12:51PM  11   INFORMATION THAT THE GOVERNMENT WANTS TO CONVEY TO THE JURY IS

12:51PM  12   PURPORTEDLY WHAT MS. HOLMES SAID, NOT HIS INTERPRETATION.

12:51PM  13        MAYBE THEY CAN ASK THAT QUESTION AFTERWARDS.  THAT'S

12:51PM  14   ALWAYS A FAIR FOLLOW-UP QUESTION.

12:51PM  15        BUT THE GOVERNMENT WANTS THIS JURY TO TAKE INFERENCES FROM

12:51PM  16   THE WORDS THAT MS. HOLMES MADE IN THAT CONFERENCE CALL AND THAT

12:51PM  17   INFLUENCED MR. TOLBERT AND HIS BOSS TO INVEST, BUT THE

12:51PM  18   GOVERNMENT DOESN'T WANT THE JURY TO HEAR THE ACTUAL WORDS,

12:51PM  19   YOUR HONOR.

12:51PM  20        AND THE RULE OF COMPLETENESS DOES APPLY, NOT ON ITS OWN,

12:51PM  21   BUT IN COMBINATION WITH, YOU KNOW, COMMON LAW 611(A)(1).

12:51PM  22        YOU KNOW, THE COURT IS NOT REQUIRED.  OF COURSE NOT.  THE

12:51PM  23   COURT ALWAYS HAS DISCRETION ON EVIDENTIARY MATTERS, YOUR HONOR.

12:51PM  24        BUT IT SEEMS IN A SITUATION LIKE THIS WHERE THE GOVERNMENT

12:51PM  25   KNOWS THE TAPES ARE AUTHENTIC, THE GOVERNMENT THEMSELVES EVEN

12:52PM  1    INTRODUCED THEM, OBVIOUSLY NOT BOUND, IN THE PRIOR TRIAL.

12:52PM  2         THE GOVERNMENT NOW WANTS TO LIMIT OR PREVENT THE JURY FROM

12:52PM  3    HEARING THE COMMUNICATION AND THE CONTEXT OF THE COMMUNICATION

12:52PM  4    AND THE DETAILS.  THEY WANT TO GIVE THE JURY SNIPPETS, AND THE

12:52PM  5    RULE OF COMPLETENESS AND RULE 611 PERMIT THIS COURT TO ALLOW

12:52PM  6    THE JURY TO SEE AND HEAR THE WHOLE PICTURE AND NOT JUST THE

12:52PM  7    SNIPPETS.

12:52PM  8         AND THAT'S WHAT WE THINK SHOULD HAPPEN HERE, AND THAT'S A

12:52PM  9    RULE THAT WOULD PERMIT THE FACTS TO COME IN FOR THEIR TRUTH.

12:52PM  10        THE GOVERNMENT CAN CONTINUE TO MAKE THEIR ARGUMENTS THAT

12:52PM  11   THEY'RE MISLEADING, AND WE CAN CONTINUE TO MAKE OUR ARGUMENTS

12:52PM  12   THAT WE THINK THERE IS OTHER EVIDENCE THAT SHOWS THOSE

12:52PM  13   STATEMENTS WERE ACCURATE AND CONSISTENT WITH OTHER EVIDENCE IN

12:52PM  14   THE CASE.

12:52PM  15        THE COURT:  OKAY.  MR. SCHENK, ARE YOU -- YOUR

12:52PM  16   EXAMINATION OF MR. TOLBERT, ARE YOU INTENDING TO INTRODUCE THE

12:52PM  17   TAPES IN YOUR CASE?

12:52PM  18        MR. SCHENK:  NOT IN DIRECT, YOUR HONOR.

12:52PM  19        THE COURT:  OKAY.

12:53PM  20        AND THEN WHAT IS THE -- YOU'RE SEEKING TO INTRODUCE THE

12:53PM  21   TAPES.  YOU WOULD LIKE TO GET THE TAPES IN IN YOUR

12:53PM  22   CROSS-EXAMINATION, WHICH IS YOUR CASE, AND I'M NOT CERTAIN I'VE

12:53PM  23   HEARD YOU TELL ME THE EXCEPTION TO THE HEARSAY RULE, WHY THOSE

12:53PM  24   TAPES SHOULD BE ADMITTED FOR THEIR TRUTH, PARTICULARLY IF

12:53PM  25   THEY'RE THE STATEMENT OF A CODEFENDANT IN THIS PARTICULAR CASE.

12:53PM 1        MR. CAZARES:  WELL, I JUST THINK I SAID THE RULE OF

12:53PM 2    COMPLETENESS AND FAIRNESS, YOUR HONOR.

12:53PM 3        THE RULE OF COMPLETENESS REBUTS THE HEARSAY RULE AND ISN'T

12:53PM 4    UNDERMINED BY THE HEARSAY RULE, IT ACTUALLY COMPLEMENTS IT, AND

12:53PM 5    ALLOWS THE JURY TO ACTUALLY HEAR THE WHOLE PICTURE, WHERE THE

12:53PM 6    INITIAL INTRODUCTION OF FACTS OR EVIDENCE DOESN'T NECESSARILY

12:53PM 7    TELL THE WHOLE PICTURE.

12:53PM 8        AND PARTICULARLY WHEN IT'S A FACT OF IMPORTANCE HERE, LIKE

12:54PM 9    MS. HOLMES'S WORDS THAT THE GOVERNMENT HAS CHARGED IN

12:54PM 10   EXECUTION, ONE OF THE COUNTS IS THE TOLBERT-HALL INVESTMENT,

12:54PM 11   THEY'RE POINTING TO HER WORDS BUT SAYING, NO, THE JURY

12:54PM 12   SHOULDN'T HEAR THOSE WORDS BECAUSE IT MIGHT BE HEARSAY AND

12:54PM 13   IGNORE THESE OTHER BASES THAT WOULD PERMIT THE JURY TO HEAR

12:54PM 14   THOSE FACTS.

12:54PM 15       WE JUST THINK THAT THAT'S NOT CONSISTENT WITH COMMON LAW

12:54PM 16   AND THE RULE OF COMPLETENESS.

12:54PM 17       YOU KNOW, THERE ARE HEARSAY EXCEPTIONS THAT WOULD NOT BE

12:54PM 18   FOR THE TRUTH.  WE DON'T THINK THOSE ARE APPROPRIATE, BUT TO BE

12:54PM 19   FRANK, YOUR HONOR, WE HAVE SOME CONCERNS THAT WE'RE SOMEHOW

12:54PM 20   GOING TO BE LIMITED IN OUR CLOSING ARGUMENT, WHICH WE DON'T

12:54PM 21   THINK WOULD BE APPROPRIATE, THAT KIND OF TIES OUR HANDS,

12:54PM 22   YOUR HONOR.

12:54PM 23       THE COURT:  WELL, I HAVEN'T SAID TODAY THAT I WOULD

12:54PM 24   LIMIT YOU IN ANY WAY.  I HAVE NOT SAID THAT.

12:54PM 25       BUT WHAT I SAID BEFORE WE STARTED THIS MORNING WAS, I

4395

12:54PM 1    THINK ALL PARTIES SHOULD LOOK AND TAKE A MEASURED VIEW AS TO

12:55PM 2    WHAT IT IS THE PARTIES SEEK TO INTRODUCE AND WHAT IMPACT, IF

12:55PM 3    ANY, THAT MIGHT HAVE.

12:55PM 4        I'M NOT SUGGESTING THE COURT HAS MADE ANY DECISION ON

12:55PM 5    ANYTHING IN THAT REGARD.  I'M JUST TRYING TO LET EVERYBODY

12:55PM 6    KNOW, CHECK YOURSELVES, CHECK YOUR CASES, MAKE SURE WHEN YOU

12:55PM 7    ASK FOR SOMETHING, YOU KNOW, IT'S WHAT YOU WANT AND YOU'VE

12:55PM 8    FULLY CONSIDERED IT.

12:55PM 9        I'M NOT LOOKING YOU AT AND THE DEFENSE.  I'M TALKING ABOUT

12:55PM 10   BOTH SIDES.

12:55PM 11           MR. CAZARES:  I UNDERSTAND, YOUR HONOR.

12:55PM 12           THE COURT:  RIGHT.

12:55PM 13       BOTH SIDES, WHEN YOU TAKE ACTIONS THERE ARE CONSEQUENCES

12:55PM 14   FOR THAT.

12:55PM 15       I JUST WANTED TO MAKE SURE EVERYBODY HAD A MEASURED

12:55PM 16   APPROACH AND HAD AN OPPORTUNITY TO REVIEW THAT.

12:55PM 17       I WAS NOT SAYING, IF YOU DO THIS, I'M GOING TO LIMIT YOU.

12:55PM 18       THE DISCUSSION WAS, WELL, IF THIS COMES IN AND IF IT COMES

12:55PM 19   IN IN THIS WAY, WE MIGHT BE ASKING THIS.  AND THAT -- FROM THE

12:55PM 20   GOVERNMENT'S PERSPECTIVE.  AND THAT MIGHT CAUSE SOME

12:55PM 21   LIMITATIONS.

12:55PM 22       MY POINT THIS MORNING WAS, LET'S ALL STEP BACK AND THINK

12:55PM 23   ABOUT WHERE WE ARE BEFORE WE CALL THE WITNESS IN TO MAKE SURE

12:55PM 24   THAT WE UNDERSTAND THE FULL, THE FULL RAMIFICATIONS OF WHAT WE

12:55PM 25   DO.

| | | |
|---|---|---|
| 12:55PM | 1 | I'M GLAD YOU'VE DONE THAT.  THANKS FOR THAT. |
| 12:56PM | 2 | ANYTHING FURTHER ON THIS? |
| 12:56PM | 3 | MR. SCHENK:  SUBMIT IT. |
| 12:56PM | 4 | MR. CAZARES:  SUBMIT IT. |
| 12:56PM | 5 | THE COURT:  OKAY.  THANK YOU. |
| 12:56PM | 6 | IF THERE'S -- IF THE GOVERNMENT IS NOT GOING TO PUT THESE |
| 12:56PM | 7 | IN, I DON'T SEE GROUNDS TO ALLOW THE DEFENSE AT THIS TIME TO |
| 12:56PM | 8 | PUT THESE IN.  SO I DON'T KNOW IF THAT WAS A REQUEST TO ADMIT |
| 12:56PM | 9 | AT THIS STAGE OR NOT. |
| 12:56PM | 10 | BUT I WOULD INDICATE, AS THE RECORD IS RIGHT NOW, I WOULD |
| 12:56PM | 11 | NOT PERMIT IT.  LET ME JUST INDICATE THAT. |
| 12:56PM | 12 | MR. CAZARES:  UNDERSTOOD, YOUR HONOR.  OKAY. |
| 12:56PM | 13 | THE COURT:  OKAY.  SO WE'RE READY FOR MR. TOLBERT I |
| 12:56PM | 14 | TAKE IT. |
| 12:56PM | 15 | MR. SCHENK:  YES. |
| 12:56PM | 16 | THE COURT:  OKAY. |
| 12:56PM | 17 | MR. COOPERSMITH:  YOUR HONOR, I HAVE ONE THING, ONE |
| 12:56PM | 18 | MINOR THING TO RAISE IF I CAN. |
| 12:56PM | 19 | THE COURT:  SURE. |
| 12:56PM | 20 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR.  I |
| 12:56PM | 21 | APPRECIATE IT. |
| 12:56PM | 22 | I WILL JUST SAY ONE THING.  I HAVE NEVER SEEN BEFORE IN A |
| 12:56PM | 23 | FRAUD CASE -- |
| 12:56PM | 24 | THE COURT:  YOU'RE GOING TO TALK ABOUT MY DECISION |
| 12:56PM | 25 | THAT I JUST MADE? |

12:56PM 1      MR. COOPERSMITH:  WELL, NO, YOUR HONOR.  I'LL HOLD

12:57PM 2    MY TONGUE ON THAT.

12:57PM 3      THE COURT:  OKAY.  YOU HAD ONE OTHER THING.

12:57PM 4      MR. COOPERSMITH:  YES, YOUR HONOR.

12:57PM 5      THE ONE OTHER THING IS THAT WE HAVE A CONCERN ABOUT SOME

12:57PM 6    OF THE QUESTIONING WE SAW WITH MR. MENDENHALL, AND WE'VE SEEN

12:57PM 7    IT WITH OTHER WITNESSES, AND I THINK IT'S IMPORTANT TO RAISE.

12:57PM 8      AND THE CONCERN WE HAVE IS THAT THE QUESTION TO

12:57PM 9    MR. MENDENHALL -- AND AGAIN, WITH OTHER WITNESSES, WE EXPECT

12:57PM 10   THERE WILL BE OTHER INVESTORS WHO TESTIFY, SO THE SAME ISSUE

12:57PM 11   MAY ARISE AGAIN -- IS THAT MR. BOSTIC ASKED THE WITNESS, DID

12:57PM 12   YOU KNOW THAT THE EDISON DEVICE COULD ONLY DO 12 TESTS?

12:57PM 13     AND IF MR. BOSTIC WANTS TO ASK, DID YOU KNOW IT WAS

12:57PM 14   ACTUALLY DOING 12 TESTS, THAT'S FAIR GAME, OKAY, BECAUSE THAT

12:57PM 15   IS TRUE.  THE EVIDENCE ESTABLISHES THAT THERANOS WAS RUNNING

12:57PM 16   THE EDISON FOR ABOUT 12 TESTS AT THE PEAK OF IT.

12:57PM 17     BUT IF THE QUESTION IS, COULD IT DO OR IS IT CAPABLE,

12:57PM 18   THERE IS NO QUESTION THAT THE EDISON -- I'M SORRY.  THERE IS NO

12:58PM 19   EVIDENCE THAT THE EDISON WAS NOT CAPABLE OF RUNNING ADDITIONAL

12:58PM 20   IMMUNOASSAYS.

12:58PM 21     IN FACT, THE EVIDENCE IS THAT IT COULD RUN IMMUNOASSAYS,

12:58PM 22   AND THERE'S FAR MORE IMMUNOASSAYS THAN JUST THE 12, AND THAT

12:58PM 23   CAME IN WITH MS. CHEUNG.

12:58PM 24     SO I THINK THE PROPER QUESTION THAT MR. BOSTIC COULD

12:58PM 25   ASK -- AGAIN, PUTTING ASIDE THE ISSUE OF OMISSIONS, WHICH IS

4398

```
12:58PM   1    ANOTHER ISSUE IN THE CASE -- BUT IN TERMS OF THE FAIR QUESTION

12:58PM   2    WITH A GOOD FAITH BASIS, IT'S, DID YOU KNOW THAT THE EDISON WAS

12:58PM   3    ONLY RUNNING 12 TESTS IN THE LAB?  NOT, DID YOU KNOW IT COULD

12:58PM   4    ONLY RUN?

12:58PM   5        I DON'T THINK THAT'S ESTABLISHED BY THE EVIDENCE, AND IT'S

12:58PM   6    NOT, IN OUR VIEW, A GOOD FAITH QUESTION, SO I WANTED TO RAISE

12:58PM   7    THAT.

12:58PM   8            THE COURT:  WAS THERE AN OBJECTION OF --

12:58PM   9            MR. COOPERSMITH:  THERE WAS.  A FOUNDATION

12:58PM  10    OBJECTION, YOUR HONOR.

12:58PM  11            THE COURT:  -- ASSUMING FACTS NOT IN EVIDENCE?

12:58PM  12            MR. COOPERSMITH:  I THINK IT WAS FOUNDATION, WHICH I

12:58PM  13    THINK AMOUNTS TO THE SAME THING.

12:58PM  14            MR. BOSTIC:  SO, YOUR HONOR, I DISAGREE WITH THE

12:58PM  15    DEFENSE'S INTERPRETATION OF THE QUESTION.

12:58PM  16        FIRST OF ALL, IT MAY BE THAT I ASKED THE QUESTION IN THE

12:59PM  17    WAY THAT MR. COOPERSMITH IS RECITING.

12:59PM  18        BUT I THINK, IN CASE IT MATTERS, IS THAT WHAT I ACTUALLY

12:59PM  19    ASKED IS, WERE YOU TOLD?

12:59PM  20        SO MY QUESTION ACTUALLY IS NOT, STRICTLY SPEAKING,

12:59PM  21    ASSUMING FACTS.  IT'S ASKING WHETHER MR. BALWANI MADE CERTAIN

12:59PM  22    REPRESENTATIONS TO HIM.

12:59PM  23        TO THE CENTRAL ISSUE, THOUGH, IT SOUNDS LIKE THIS COMES

12:59PM  24    DOWN TO A DEFINITION OF THE WORD "COULD," WHICH MIGHT BE A

12:59PM  25    LITTLE TOO SEMANTIC FOR PURPOSES OF SETTING UP GUARDRAILS FOR
```

4399

12:59PM 1    HOW QUESTIONS COULD BE FORMULATED.

12:59PM 2         THE FACT IS THAT, AND I THINK THE EVIDENCE SHOWS THIS,

12:59PM 3    THAT THERANOS WANTED TO RUN MORE TESTS ON THE EDISON, IT WORKED

12:59PM 4    TO PUT MORE TESTS ON ITS EDISON DEVICE, IT ONLY EVER GOT TO 12.

12:59PM 5         MY UNDERSTANDING IS THAT ONLY 12 TESTS WERE VALIDATED FOR

12:59PM 6    USE IN THE CLIA LAB.

12:59PM 7         WHETHER THE DEVICE COULD HAVE BEEN USED TO RUN ADDITIONAL

12:59PM 8    TESTS, WHETHER THERANOS MIGHT HAVE BEEN SUCCESSFUL HAD IT TRIED

01:00PM 9    HARDER TO VALIDATE ADDITIONAL TESTS I THINK IS A HYPOTHETICAL

01:00PM 10   THAT DOESN'T MAKE THAT QUESTION IMPROPER.

01:00PM 11        I THINK THE COMPANY WANTED TO USE ITS TECHNOLOGY, ITS

01:00PM 12   DEVICE FOR AS MUCH AS POSSIBLE, AND 12 WAS THE MAXIMUM THAT IT

01:00PM 13   ACHIEVED DURING THE RELEVANT TIME PERIOD.

01:00PM 14             THE COURT:  OKAY.  ALL RIGHT.

01:00PM 15             MR. COOPERSMITH:  YOUR HONOR, I'M SORRY.  I DON'T

01:00PM 16   THINK THERE'S ANY EVIDENCE THAT THE EVIDENCE COULD ONLY DO.

01:00PM 17        AT THE END OF THE DAY, OUR TOOL AS LAWYERS AND JUDGES IS

01:00PM 18   WORDS.  SO IT MAY WELL COME DOWN TO A DEFINITION OF THE WORD

01:00PM 19   "COULD," AND THAT'S IMPORTANT.

01:00PM 20        BUT THERE'S NO EVIDENCE, AGAIN, THAT THE EDISON COULD ONLY

01:00PM 21   DO 12 TESTS, MEANING IT WAS ONLY CAPABLE OF DOING 12 TESTS, AND

01:00PM 22   I JUST DON'T THINK THERE'S A GOOD FAITH BASIS FOR THAT

01:00PM 23   QUESTION, AND THAT'S OUR CONCERN AND WE WOULD ASK THE COURT TO

01:00PM 24   TELL THE GOVERNMENT NOT TO DO THAT.

01:00PM 25             MR. BOSTIC:  I'M HAPPY TO ANSWER ANY CONCERNS OR

01:00PM 1    QUESTIONS THAT THE COURT MIGHT HAVE, BUT I DISAGREE WITH THE

01:00PM 2    DEFENSE'S POSITION.

01:00PM 3              THE COURT:  OKAY.  LET'S SEE WHERE QUESTIONS GO, AND

01:00PM 4    IF THE OBJECTION IS MADE, THE COURT WILL RULE ON IT.

01:01PM 5         OKAY.  THANK YOU.

01:01PM 6              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

01:01PM 7              MR. BOSTIC:  THANK YOU, YOUR HONOR.

01:01PM 8         (RECESS FROM 1:01 P.M. UNTIL 1:04 P.M.)

01:04PM 9         (JURY IN AT 1:04 P.M.)

01:04PM 10             THE COURT:  WE'RE BACK ON THE RECORD.

01:04PM 11        ALL OF THE PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE

01:04PM 12   AGAIN.

01:04PM 13        DOES THE GOVERNMENT HAVE A WITNESS TO CALL?

01:05PM 14             MR. SCHENK:  YES, YOUR HONOR.

01:05PM 15        THE GOVERNMENT CALLS BRYAN TOLBERT.

01:05PM 16             THE COURT:  GOOD AFTERNOON, SIR.

01:05PM 17        IF YOU WOULD COME FORWARD, PLEASE.  JUST STAND RIGHT OVER

01:05PM 18   HERE BY THE WITNESS STAND.

01:05PM 19        IF YOU COULD FACE OUR COURTROOM DEPUTY WHILE YOU RAISE

01:05PM 20   YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

01:05PM 21        **(GOVERNMENT'S WITNESS, JOHN BRYAN TOLBERT, WAS SWORN.)**

01:05PM 22             THE WITNESS:  YES, MA'AM.

01:05PM 23             THE COURT:  PLEASE HAVE A SEAT HERE, SIR.

01:05PM 24        I'LL INVITE YOU TO MAKE YOURSELF COMFORTABLE.

01:05PM 25        FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

01:05PM  1    NEED.

01:05PM  2         WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

01:05PM  3    AND THEN SPELL IT, PLEASE.

01:05PM  4              THE WITNESS:  JOHN BRYAN TOLBERT.  J-O-H-N,

01:05PM  5    B-R-Y-A-N, T-O-L-B-E-R-T.

01:05PM  6              THE COURT:  THANK YOU.  COUNSEL.

01:05PM  7              MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR.

01:05PM  8                          **DIRECT EXAMINATION**

01:05PM  9    BY MR. SCHENK:

01:05PM 10    Q.   GOOD AFTERNOON, MR. TOLBERT.  IF YOU ARE FULLY VACCINATED,

01:05PM 11    I UNDERSTAND THE COURT WILL PERMIT YOU TO TESTIFY WITHOUT A

01:06PM 12    MASK ON.

01:06PM 13    A.   I AM FULLY VACCINATED.

01:06PM 14              THE COURT:  YES.  THANK YOU.

01:06PM 15              MR. SCHENK:  THANK YOU, YOUR HONOR.

01:06PM 16    Q.   MR. TOLBERT, DO YOU WORK FOR A COMPANY CALLED HALL GROUP?

01:06PM 17    A.   YES, SIR.

01:06PM 18    Q.   AND WHILE WORKING AT HALL, DID YOU BECOME FAMILIAR WITH A

01:06PM 19    COMPANY CALLED THERANOS?

01:06PM 20    A.   I DID.

01:06PM 21    Q.   DO YOU REMEMBER WHEN YOU INITIALLY BECAME FAMILIAR WITH

01:06PM 22    THERANOS?

01:06PM 23    A.   IN THE FALL OF 2006.

01:06PM 24    Q.   IN AROUND THAT TIME, DID THE HALL GROUP MAKE AN INVESTMENT

01:06PM 25    IN THERANOS?

01:06PM  1      A.   WE DID.

01:06PM  2      Q.   AND WAS THAT THE ONLY INVESTMENT THAT HALL MADE IN

01:06PM  3      THERANOS?

01:06PM  4      A.   IN 2006 IT WAS.  WE HAD INVESTED ABOUT $2 MILLION.

01:06PM  5           WE HAD A SUBSEQUENT INVESTMENT IN DECEMBER OF 2013.

01:06PM  6           THOSE WERE THE TWO INVESTMENTS THAT WE MADE.

01:06PM  7      Q.   SO HALL MADE TWO SEPARATE INVESTMENTS, ONE IN 2006 AND THE

01:06PM  8      OTHER IN DECEMBER OF 2013?

01:06PM  9      A.   CORRECT.

01:06PM  10     Q.   WOULD YOU DESCRIBE TO THE JURY FIRST WHAT WORK, OR WHAT

01:07PM  11     LINE OF WORK THE HALL GROUP IS INVOLVED IN?

01:07PM  12     A.   THE HALL GROUP IS A PRIVATE INVESTMENT COMPANY, SO WE DO A

01:07PM  13     LOT OF WORK AROUND REAL ESTATE, INVESTING IN REAL ESTATE

01:07PM  14     INVESTMENT.  WE HAVE WINE OPERATIONS IN NAPA VALLEY.

01:07PM  15          AND WE DO PRIVATE INVESTING IN COMPANIES, YOU KNOW, OF ALL

01:07PM  16     DIFFERENT KIND OF SHAPES AND SIZES.

01:07PM  17     Q.   WHERE IS HALL LOCATED?

01:07PM  18     A.   OUR HEADQUARTERS ARE IN DALLAS, TEXAS.

01:07PM  19     Q.   AND THEN HOW ABOUT YOUR JOB AT THE HALL GROUP?  WHAT DO

01:07PM  20     YOU DO THERE?

01:07PM  21     A.   SO MY JOB IS RELATED TO FINANCE.  SO I DO CORPORATE

01:07PM  22     FINANCE KIND OF WORK, BUDGETS AND CASH FLOWS.

01:07PM  23          I ALSO OVERSEE OUR VENTURE INVESTING, SO INVESTMENTS THAT

01:07PM  24     WE MAKE IN PUBLIC AND PRIVATE COMPANIES.

01:07PM  25     Q.   AND WHAT IS YOUR JOB TITLE?

01:07PM   1   A.   SENIOR VICE PRESIDENT AND TREASURER.

01:07PM   2   Q.   AND WHEN YOU SAY YOU OVERSEE VENTURE INVESTING, DID THE

01:08PM   3   TWO THERANOS INVESTMENTS THAT YOU TOLD US ABOUT FALL WITHIN

01:08PM   4   THAT PART OF YOUR JOB?

01:08PM   5   A.   THEY WOULD HAVE COME UNDER THAT UMBRELLA, YES.

01:08PM   6   Q.   SO DID YOU OVERSEE THE INVESTMENT THAT HALL MADE IN 2006

01:08PM   7   AND AGAIN IN 2013?

01:08PM   8   A.   I DID.

01:08PM   9   Q.   WOULD YOU BRIEFLY DESCRIBE FOR THE JURY YOUR EDUCATIONAL

01:08PM  10   BACKGROUND?

01:08PM  11   A.   SO I HAVE A BACHELOR'S DEGREE FROM THE UNIVERSITY OF

01:08PM  12   GEORGIA, AND A MASTER'S IN BUSINESS FROM BRIGHAM YOUNG IN

01:08PM  13   PROVO.

01:08PM  14   Q.   AND HOW LONG HAVE YOU WORKED AT HALL GROUP?

01:08PM  15   A.   I STARTED AT HALL GROUP IN 1999, SO 23 YEARS.

01:08PM  16   Q.   AND HAVE YOUR JOB RESPONSIBILITIES, HAVE THEY CHANGED IN

01:08PM  17   THAT PERIOD OF TIME?

01:08PM  18   A.   THEY HAVE.  SO I STARTED OFF AS A FINANCIAL ANALYST, AND,

01:08PM  19   YOU KNOW, HAVE BEEN THERE LONG ENOUGH THAT I HAVE HAD MORE

01:08PM  20   RESPONSIBILITY OVER TIME.

01:08PM  21   Q.   I'D LIKE TO NOW FOCUS YOUR ATTENTION ON THE 2006 TIME

01:08PM  22   PERIOD WHEN YOU SAID THAT HALL MADE THIS INITIAL INVESTMENT IN

01:09PM  23   THERANOS.

01:09PM  24        DO YOU REMEMBER HOW THERANOS CAME ON TO YOUR RADAR?

01:09PM  25   A.   SO MY BOSS, CRAIG HALL, HAD APPROACHED ME ONE DAY AND

01:09PM   1    SAID, YOU KNOW, I HAD A CONVERSATION WITH A FRIEND ABOUT A

01:09PM   2    POTENTIAL INVESTMENT IN A COMPANY NAMED THERANOS, HERE'S THE

01:09PM   3    INFORMATION THAT I HAVE.  I WOULD LIKE YOU TO REVIEW IT AND

01:09PM   4    LET'S HAVE MORE CONVERSATIONS ABOUT IT.

01:09PM   5         SO HE HAD, HE HAD BROUGHT IT TO ME AND SAID, LOOK, THIS IS

01:09PM   6    AN OPPORTUNITY THAT HAS PRESENTED ITSELF.

01:09PM   7    Q.   AND THEN DID YOU TAKE EFFORTS TO LEARN MORE ABOUT

01:09PM   8    THERANOS?

01:09PM   9    A.   WE DID.  I DID, YEAH.

01:09PM   10   Q.   AND WHAT WERE THOSE EFFORTS?

01:09PM   11   A.   OH, WHAT WERE THE EFFORTS?

01:09PM   12        WE HAD SCHEDULED A SERIES OF PHONE CALLS WITH THE PEOPLE

01:09PM   13   WHO HAD INTRODUCED US TO THE OPPORTUNITY, AS WELL AS WITH THE

01:09PM   14   COMPANY, WITH THERANOS AND ELIZABETH HOLMES, AS WELL AS DOING

01:09PM   15   SOME OTHER DUE DILIGENCE AROUND THAT TIME.

01:10PM   16   Q.   WHEN YOU SAID THAT THERE WERE SOME INDIVIDUALS OR I THINK

01:10PM   17   FRIENDS OF MR. HALL WHO BROUGHT THE OPPORTUNITY TO YOU, THOSE

01:10PM   18   INDIVIDUALS DID NOT WORK AT THERANOS, DID THEY?

01:10PM   19   A.   THEY DID NOT.

01:10PM   20   Q.   THEY WERE INDIVIDUALS THAT MR. HALL KNEW FROM OTHER PARTS

01:10PM   21   OF HIS LIFE; IS THAT CORRECT?

01:10PM   22   A.   THAT'S CORRECT.  IT WAS FROM A FRIEND WHO I THINK HAD BEEN

01:10PM   23   A PRIOR INVESTOR IN THERANOS AND WHO HAD REACHED OUT TO HIM AND

01:10PM   24   SAID, I KNOW ABOUT AN OPPORTUNITY TO MAKE AN INVESTMENT IN

01:10PM   25   THERANOS, AND SO THAT'S HOW THE OPPORTUNITY KIND OF CAME TO US.

01:10PM  1    Q.   DO YOU RECALL THAT INDIVIDUAL'S NAME?

01:10PM  2    A.   THAT INDIVIDUAL'S NAME IS GARY NORDHEIMER.

01:10PM  3    Q.   CAN YOU SPELL THAT LAST NAME FOR US?

01:10PM  4    A.   I BELIEVE IT'S N-O-R-D-H-E-I-M-E-R.

01:10PM  5    Q.   THANK YOU.

01:10PM  6         AND YOU DESCRIBED, I THINK -- IN ADDITION TO SPEAKING WITH

01:10PM  7    MR. NORDHEIMER, DID YOU ALSO SPEAK TO ELIZABETH HOLMES?

01:10PM  8    A.   WE DID.

01:10PM  9    Q.   AND WAS THAT ON THE TELEPHONE OR IN PERSON?  WHAT DO YOU

01:11PM  10   RECALL ABOUT THAT?

01:11PM  11   A.   IT WAS A TELEPHONE CALL.  WE HAD A CONFERENCE CALL WITH,

01:11PM  12   AS I REMEMBER, WITH ELIZABETH AND -- YOU KNOW, MAYBE A LITTLE

01:11PM  13   CONTEXT IS HELPFUL.

01:11PM  14        SO MR. NORDHEIMER HAD CALLED MR. HALL AND SAID THERE IS AN

01:11PM  15   OPPORTUNITY TO POTENTIALLY INVEST IN THIS COMPANY THAT I'M

01:11PM  16   AFFILIATED WITH NAMED THERANOS.

01:11PM  17        HE HAD INVESTED THROUGH A FRIEND OF HIS NAMED CHRIS LUCAS.

01:11PM  18        AND SO AS I RECALL, THOSE PHONE CALLS THAT WE HAD WITH THE

01:11PM  19   COMPANY, WITH THERANOS AND WITH ELIZABETH, WERE ALSO WITH

01:11PM  20   CHRIS LUCAS.  CHRIS IS THE ONE WHO WOULD HAVE ORGANIZED THESE

01:11PM  21   CALLS WITH US.

01:11PM  22   Q.   I SEE.  SO THIS INITIAL 2006 TIMEFRAME INCLUDED A PHONE

01:11PM  23   CONVERSATION WITH MR. NORDHEIMER, WITH MR. LUCAS, AND WHO ELSE?

01:11PM  24   A.   WELL, MR. NORDHEIMER WOULD NOT HAVE BEEN ON THE CALL.  HE

01:11PM  25   JUST MADE US AWARE OF THE OPPORTUNITY.

TOLBERT DIRECT BY MR. SCHENK

01:11PM 1       AND THEN MR. LUCAS WOULD HAVE ORGANIZED THE CALL WITH

01:12PM 2   ELIZABETH AND MR. HALL AND MYSELF.

01:12PM 3   Q.   SO DID YOU PARTICIPATE IN A PHONE CALL WITH

01:12PM 4   ELIZABETH HOLMES?

01:12PM 5   A.   I DID.

01:12PM 6   Q.   AND DID YOU ALSO GO OUT TO PALO ALTO TO VISIT THERANOS?

01:12PM 7   A.   AFTER THAT INITIAL PHONE CALL, THERE WAS ENOUGH INTEREST

01:12PM 8   ON OUR PART THAT I DID TAKE A TRIP OUT TO CALIFORNIA TO VISIT

01:12PM 9   WITH HER AND CHRIS LUCAS.

01:12PM 10   Q.   AND WAS THAT ALSO IN 2006?

01:12PM 11   A.   THAT WOULD HAVE BEEN IN PROBABLY NOVEMBER OF 2006.

01:12PM 12   Q.   ON THE PHONE AND WHEN YOU WENT IN PERSON, DID YOU EVER

01:12PM 13   SPEAK WITH SOMEONE NAMED SUNNY BALWANI?

01:12PM 14   A.   I DID NOT.

01:12PM 15   Q.   SO YOU DIDN'T MEET HIM, EXCUSE ME, WHEN YOU WENT TO

01:12PM 16   CALIFORNIA IN 2006?

01:12PM 17   A.   I DID NOT.

01:12PM 18   Q.   AND HOW ABOUT IN 2013?  YOU DESCRIBED TO THE JURY BRIEFLY

01:12PM 19   AN INVESTMENT THAT WAS MADE IN 2013.

01:12PM 20       DID YOU EVER SPEAK WITH MR. BALWANI AT THAT TIME?

01:12PM 21   A.   I HAVE NEVER SPOKEN WITH MR. BALWANI.

01:12PM 22   Q.   PERIOD?  NOT IN 2006 OR 2013 AT ANY POINT?

01:12PM 23   A.   NO, NEVER.  TODAY IS THE FIRST TIME THAT I HAVE EVER SEEN

01:13PM 24   MR. BALWANI IN PERSON.

01:13PM 25   Q.   THANK YOU.

TOLBERT DIRECT BY MR. SCHENK                                    4407

01:13PM  1        I WANT TO TALK ABOUT WHAT YOU LEARNED ABOUT THERANOS IN

01:13PM  2   2006, AND THEN I'LL ASK YOU TO COMPARE THAT TO WHAT YOU LEARNED

01:13PM  3   IN 2013.

01:13PM  4        SO LET'S START WITH 2006.  WHEN YOU WERE EITHER SPEAKING

01:13PM  5   TO MS. HOLMES ON THE PHONE OR IN PALO ALTO, DID YOU LEARN ABOUT

01:13PM  6   THE LINE OF BUSINESS THAT THERANOS WAS INVOLVED IN?

01:13PM  7   A.   I DID.  WE -- SO WHEN I CAME TO CALIFORNIA AND MET WITH

01:13PM  8   MS. HOLMES, WE HAD DINNER TOGETHER WITH MR. LUCAS AND WITH HIS

01:13PM  9   UNCLE, DON LUCAS, AND WE TALKED ABOUT THE COMPANY AND THE

01:13PM  10  VISION OF THE COMPANY AND, YOU KNOW, THE ABILITY OR THE VISION

01:13PM  11  TO TAKE DROPS OF BLOOD AND PERFORM TESTS ON THAT AND TO BE ABLE

01:13PM  12  TO HAVE RESULTS COME BACK AND, YOU KNOW, KIND OF IN REALTIME AS

01:13PM  13  IT WERE AND BE COMMUNICATED TO THE DOCTORS WHO HAD ORDERED

01:14PM  14  THOSE TESTS.

01:14PM  15  Q.   YOU HAVE USED THE WORD "VISION."

01:14PM  16       WHAT DO YOU MEAN BY THAT?

01:14PM  17  A.   WELL, IN 2006 IT WAS THE VERY BEGINNING AS THE OPERATIONS

01:14PM  18  OF THE COMPANY WERE JUST STARTING, AND SO THE VISION WAS THAT,

01:14PM  19  YOU KNOW, THERE WOULD BE A LOT OF THINGS THAT WOULD BE

01:14PM  20  DEVELOPED OVER TIME AROUND THIS INITIAL IDEA OF TAKING SMALL,

01:14PM  21  YOU KNOW, DROPS OF BLOOD AND DOING TESTS ON THEM.

01:14PM  22  Q.   AND YOU SAID THAT IT WAS EARLY ON.

01:14PM  23       WHAT DID YOU MEAN BY THAT?

01:14PM  24  A.   WELL, I THINK THE COMPANY WAS STILL, YOU KNOW, IN THE

01:14PM  25  BEGINNING STAGES.  I DON'T KNOW WHEN THE FIRST INVESTMENTS HAD

01:14PM  1    BEEN MADE.  YOU KNOW, I THINK A YEAR OR TWO PRIOR TO WHEN OUR

01:14PM  2    INVESTMENT WAS MADE IN 2006.

01:14PM  3        SO I THINK, YOU KNOW, THE COMPANY HAD COME TO A POINT AT

01:14PM  4    THAT TIME -- THIS WAS NOVEMBER, DECEMBER OF 2006 -- WHERE THEY

01:14PM  5    HAD SOME MACHINES THAT WERE BUILT, SOME CARTRIDGES THAT BLOOD

01:14PM  6    COULD GO ON, AND THEY WERE STARTING TO BE ABLE TO DO THAT KIND

01:14PM  7    OF TESTING.

01:15PM  8        AS WE INVESTED IN 2006, YOU KNOW, MY UNDERSTANDING WAS

01:15PM  9    THAT THEY WERE ABLE TO DO SOME OF THAT TESTING FOR

01:15PM 10    PHARMACEUTICAL COMPANIES.

01:15PM 11        AND SO THERE WAS A PRODUCT AND IT HAD BEEN DEVELOPED AND

01:15PM 12    IT WAS OPERATIONAL, BUT IT WASN'T PERFECTED, RIGHT?  THERE WAS

01:15PM 13    A LOT OF, A LOT OF KIND OF ADD ON THINGS OR DEVELOPMENT THAT

01:15PM 14    COULD -- IT WAS ANTICIPATED TO TAKE PLACE FROM THEN FORWARD.

01:15PM 15    Q.   THANK YOU.

01:15PM 16        SO YOU UNDERSTOOD IN 2006 THAT THE TECHNOLOGY WAS NOT

01:15PM 17    PERFECTED; IS THAT RIGHT?

01:15PM 18    A.   CORRECT.

01:15PM 19    Q.   AND THEN YOU'VE DESCRIBED TO THE JURY SOME OF WHAT YOU

01:15PM 20    UNDERSTOOD THE INVESTMENT IN THERANOS, OR AT LEAST WHAT

01:15PM 21    THERANOS WAS INVOLVED IN.

01:15PM 22        WHERE DID YOU GET THAT UNDERSTANDING?  FROM WHOM?

01:15PM 23    A.   SO THAT UNDERSTANDING WOULD HAVE COME FROM, YOU KNOW, MY

01:15PM 24    CONVERSATIONS WITH ELIZABETH AND FROM THE INFORMATION THAT SHE

01:15PM 25    AND CHRIS HAD PROVIDED ABOUT THE COMPANY.

01:15PM  1    Q.   AND WHEN IN 2006 WAS THE DECISION MADE TO INVEST?

01:16PM  2    A.   IT WAS MADE, AS I RECALL, IN NOVEMBER OR DECEMBER OF 2006.

01:16PM  3    Q.   AND I THINK YOU TOLD THE JURY THE AMOUNT, BUT PLEASE

01:16PM  4    REMIND US.

01:16PM  5    A.   YOU KNOW, HALL HAD INVESTED $2 MILLION.

01:16PM  6         YOU KNOW, SUBSEQUENTLY, THERE WERE A FEW PEOPLE WHO WERE

01:16PM  7    ALLOWED TO PARTICIPATE IN THAT ON OUR SIDE, SO I THINK HALL'S

01:16PM  8    ACTUAL INVESTMENT WAS LIKE A MILLION 875.

01:16PM  9    Q.   AND WHEN YOU SAY "HALL," DO YOU MEAN HALL GROUP?

01:16PM 10    A.   THAT'S CORRECT.

01:16PM 11    Q.   AND WAS THE INVESTMENT A DIRECT INVESTMENT IN THERANOS?

01:16PM 12    A.   IT WAS NOT.  SO, YOU KNOW, I HAD MENTIONED THAT

01:16PM 13    MR. NORDHEIMER HAD BROUGHT THIS OPPORTUNITY TO US THROUGH HIS

01:16PM 14    INVESTMENT IN CHRIS LUCAS'S COMPANY.

01:16PM 15         SO WHEN WE MADE THE DECISION TO INVEST, WE INVESTED IN AN

01:16PM 16    INVESTMENT VEHICLE THAT CHRIS LUCAS HAD ESTABLISHED TO INVEST

01:16PM 17    IN THERANOS, AND SO WE INVESTED THROUGH MR. LUCAS'S COMPANY.

01:17PM 18    Q.   SO YOU PROVIDED YOUR MONEY TO MR. LUCAS TO MAKE AN

01:17PM 19    INVESTMENT IN THERANOS; IS THAT RIGHT?

01:17PM 20    A.   CORRECT.

01:17PM 21    Q.   IS THAT DIFFERENT THAN THE STRUCTURE OF THE 2013

01:17PM 22    INVESTMENT?

01:17PM 23    A.   IT IS.

01:17PM 24         SO ULTIMATELY IN 2013, WHEN WE MADE THE DECISION TO MAKE A

01:17PM 25    FURTHER INVESTMENT, WE WANTED TO HAVE A DIRECT RELATIONSHIP

01:17PM   1    WITH THE COMPANY, NOT, YOU KNOW, NOT THROUGH AN INTERMEDIARY,

01:17PM   2    SO WE MADE A DIRECT INVESTMENT IN 2013.

01:17PM   3    Q.   IN 2006 WHEN YOU WERE DECIDING WHETHER TO INVEST, DID YOU

01:17PM   4    VIEW THE INVESTMENT AS A RISKY INVESTMENT?

01:17PM   5    A.   YOU KNOW, CERTAINLY BY NATURE OF INVESTING IN THOSE KINDS

01:17PM   6    OF COMPANIES, THERE WAS RISK ASSOCIATED WITH IT IN 2006.

01:17PM   7    Q.   TELL US ABOUT THAT.

01:17PM   8         WHAT DID YOU VIEW THE RISKS OF THE INVESTMENT IN 2006 TO

01:17PM   9    REALLY BE?

01:17PM  10    A.   SO, YOU KNOW, THERE WAS A MULTITUDE OF RISKS, RIGHT?

01:18PM  11    THERE WAS RISK THAT ONCE THE TESTS WERE DEVELOPED OR ONCE THE

01:18PM  12    TECHNOLOGIES WERE DEVELOPED, THAT THEY COULDN'T BE MANUFACTURED

01:18PM  13    COST EFFICIENTLY.

01:18PM  14         THERE WERE, YOU KNOW, RISKS THAT THE SCIENCE I GUESS

01:18PM  15    WOULDN'T WORK, THAT THE TESTS WOULDN'T BE ABLE TO BE PERFECTED,

01:18PM  16    OR THAT THE NUMBER OF TESTS THAT COULD BE DONE WOULDN'T BE ABLE

01:18PM  17    TO, YOU KNOW, DEVELOP IN A WAY THAT WOULD MAKE IT INTO A

01:18PM  18    PROFITABLE INVESTMENT.

01:18PM  19    Q.   AND WHEN YOU INVESTED IN 2013, DID YOU THINK THAT THE SAME

01:18PM  20    RISKS WERE PRESENT OR DIFFERENT?

01:18PM  21    A.   WE DID NOT.  WE FELT LIKE THE RISKS HAD BEEN MITIGATED A

01:18PM  22    LOT, THAT BETWEEN 2006 AND 2013, THERE WERE SEVEN YEARS WORTH

01:18PM  23    OF DEVELOPMENT AND THAT IT HAD HAPPENED.

01:18PM  24         OUR UNDERSTANDING WAS THAT THE COMMERCIAL APPLICATIONS OF

01:18PM  25    THE TECHNOLOGY HAD BEEN DEVELOPED IN A WAY THAT, YOU KNOW,

01:19PM  1    PRESENTED GREAT OPPORTUNITIES.

01:19PM  2         AND IN 2013, THE PRIMARY RISK WAS ONE OF ROLLING THE

01:19PM  3    TECHNOLOGY OUT AND COMMERCIALIZING IT, YOU KNOW, FOR A MASS

01:19PM  4    RETAILER CONSUMER AUDIENCE.

01:19PM  5         BUT IT FELT LIKE THE UNDERLYING SCIENCE AND THE ABILITY OF

01:19PM  6    THE TECHNOLOGY TO DO WHAT -- TO DO THE TESTS AND PERFORM

01:19PM  7    ACCURATE RESULTS HAD BEEN LARGELY ACCOMPLISHED.

01:19PM  8    Q.   DID YOU GET INFORMATION FROM SOMEONE AT THERANOS IN

01:19PM  9    ADVANCE OF YOUR 2013 INVESTMENT THAT MADE YOU EVALUATE THESE

01:19PM 10    RISKS DIFFERENTLY, THE 2006 VERSUS THE 2013 RISKS?

01:19PM 11    A.   YOU KNOW, I GUESS IF IT'S HELPFUL, A LITTLE CONTEXT.

01:19PM 12         SO BETWEEN 2006 AND 2013, YOU KNOW, I HAD MULTIPLE

01:19PM 13    CONVERSATIONS WITH MR. LUCAS EVERY YEAR TALKING ABOUT, YOU

01:19PM 14    KNOW, WHAT THE COMPANY WAS ACCOMPLISHING, YOU KNOW, WHAT

01:20PM 15    DEVELOPMENTS THERE HAD BEEN.

01:20PM 16         AND THEN IN 2013, YOU KNOW, WE WANTED TO BE A DIRECT

01:20PM 17    INVESTOR SO THAT WE WOULD HAVE AN ABILITY TO HAVE MORE DIRECT

01:20PM 18    COMMUNICATIONS FROM THE COMPANY.

01:20PM 19         AND SO, YOU KNOW, AS WE KIND OF CAME INTO THAT OPPORTUNITY

01:20PM 20    IN 2013, WE DID SEEK AN OPPORTUNITY TO VISIT WITH MS. HOLMES

01:20PM 21    DIRECTLY ABOUT THAT, AND SO WE HAD SOME DIRECT CONVERSATIONS

01:20PM 22    WITH HER ABOUT THE STATE OF THE BUSINESS AND WHAT WAS GOING ON.

01:20PM 23    Q.   SO THEN AGAIN, BEFORE YOU INVESTED IN 2013, YOU HAD

01:20PM 24    FURTHER CONVERSATIONS WITH MS. HOLMES; IS THAT RIGHT?

01:20PM 25    A.   CORRECT.

01:20PM  1    Q.   YOU MENTIONED IT BRIEFLY.  LET'S TALK ABOUT THAT A LITTLE

01:20PM  2    BIT MORE.

01:20PM  3         THE TIME PERIOD AFTER YOUR 2006 INVESTMENT LEADING UP TO

01:20PM  4    THE INVESTMENT IN 2013, DID YOU HAVE ANY COMMUNICATION WITH

01:20PM  5    MS. HOLMES DURING THAT PERIOD OF TIME?

01:20PM  6    A.   NOT DIRECTLY THAT I REMEMBER.

01:20PM  7    Q.   WERE YOU GETTING ANY INFORMATION ABOUT THERANOS AT THAT

01:21PM  8    TIME?

01:21PM  9    A.   YEAH.  LIKE I MENTIONED, I WOULD HAVE PERIODIC PHONE CALLS

01:21PM 10    WITH MR. LUCAS.  YOU KNOW, MY UNDERSTANDING WAS THAT HE WAS

01:21PM 11    GETTING REGULAR UPDATES FROM ELIZABETH AND FROM THE COMPANY.

01:21PM 12         AND SO ANY TIME IT FELT LIKE HE HAD RECEIVED THAT, HE

01:21PM 13    WOULD CALL ME AND WE WOULD TALK THROUGH THOSE, OR I WOULD

01:21PM 14    PROMPT HIM TO HAVE A PHONE CALL AND TALK ABOUT WHAT THE MOST

01:21PM 15    RECENT DEVELOPMENTS HAD BEEN.

01:21PM 16    Q.   SO IS IT FAIR TO SAY THAT CHRIS LUCAS, IN FACT, WAS YOUR

01:21PM 17    SOURCE OF INFORMATION ABOUT THERANOS BETWEEN THE TWO

01:21PM 18    INVESTMENTS?

01:21PM 19    A.   YEAH, DIRECT INFORMATION.

01:21PM 20         I MEAN, CERTAINLY KIND OF THROUGH THAT TIME WE TRIED TO

01:21PM 21    FIND OTHER WAYS TO VALIDATE WHAT HE WAS TELLING US, RIGHT?  WE

01:21PM 22    DID INTERNET SEARCHES AND OTHERWISE.

01:21PM 23         BUT HE WAS THE PRIMARY SOURCE OF INFORMATION DIRECT AT

01:21PM 24    THAT TIME.

01:21PM 25    Q.   GREAT.  SO NOW I'D LIKE TO BRING YOU UP TO 2013.

01:21PM   1        YOUR HONOR, MAY I APPROACH?

01:21PM   2              THE COURT:  YES.

01:21PM   3              MR. SCHENK:  (HANDING.)

01:22PM   4   Q.   MR. TOLBERT, IF I COULD DRAW YOUR ATTENTION TO TAB 3940 IN

01:22PM   5   THE BINDER IN FRONT OF YOU.

01:22PM   6        YOUR HONOR, THE DEFENSE AND I BELIEVE THE COURT HAVE A

01:22PM   7   COPY?

01:22PM   8              THE COURT:  THANK YOU.

01:22PM   9   BY MR. SCHENK:

01:22PM   10  Q.   MR. TOLBERT, DO YOU SEE THE EMAIL AT 3940?

01:22PM   11  A.   I DO.

01:22PM   12  Q.   AND IS THIS ONE OF THE COMMUNICATIONS YOU'VE DESCRIBED TO

01:22PM   13  THE JURY FROM MR. LUCAS TO YOU ABOUT THERANOS?

01:22PM   14  A.   IT IS.

01:22PM   15             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3940.

01:22PM   16             MR. CAZARES:  NO OBJECTION.

01:22PM   17             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:22PM   18        (GOVERNMENT'S EXHIBIT 3940 WAS RECEIVED IN EVIDENCE.)

01:23PM   19  BY MR. SCHENK:

01:23PM   20  Q.   MR. TOLBERT, DO YOU SEE THIS EMAIL IN JULY OF 2013 FROM

01:23PM   21  CHRIS LUCAS?

01:23PM   22  A.   I DO.

01:23PM   23  Q.   WAS JULY, THIS LATTER PART OF JULY 2013, THE BEGINNING OF

01:23PM   24  A PERIOD OF TIME WHEN YOU BEGAN TO RECEIVE MORE INFORMATION

01:23PM   25  FROM THERANOS?

TOLBERT DIRECT BY MR. SCHENK                                      4414

01:23PM  1    A.   IT WAS.  SO MR. LUCAS AND I HAD, YOU KNOW, CONVERSATIONS

01:23PM  2    COMING INTO 2013 AND KIND OF THROUGH THIS PERIOD THAT THE

01:23PM  3    COMPANY WAS IN A PLACE THAT IT WAS GOING TO BE MORE PUBLIC WITH

01:23PM  4    INFORMATION.

01:23PM  5         I THINK, YOU KNOW, THERE HAD BEEN SOME REFERENCE THAT THEY

01:23PM  6    WERE COMING OUT OF STEALTH MODE, AND SO THIS WAS THE FIRST

01:23PM  7    THING THAT I REMEMBER THAT WAS, YOU KNOW, KIND OF PUBLIC

01:23PM  8    INFORMATION THAT HE HAD SENT OVER.

01:23PM  9    Q.   AND YOU USED A PHRASE, "STEALTH MODE."

01:23PM  10        WHAT DOES THAT MEAN?

01:23PM  11   A.   WELL, JUST -- YOU KNOW, DURING THE PERIOD FROM 2006

01:24PM  12   ONWARD, WE KNEW THAT THE COMPANY WAS TRYING TO DO THINGS IN A

01:24PM  13   WAY THAT WOULDN'T ALERT COMPETITORS OR PROVOKE A COMPETITIVE

01:24PM  14   RESPONSE AND WOULD ALLOW THEM TO DEVELOP THIS TECHNOLOGY IN A

01:24PM  15   WAY THAT, YOU KNOW, THAT DIDN'T -- THAT KIND OF WASN'T PUBLIC

01:24PM  16   TO THE WORLD UNTIL IT WAS PERFECTED.

01:24PM  17        SO THAT'S WHAT I MEANT WHEN I SAID STEALTH MODE.

01:24PM  18   Q.   AND YOU, I THINK, DESCRIBED THAT THERANOS WAS COMING OUT

01:24PM  19   OF STEALTH MODE.

01:24PM  20   A.   THAT'S RIGHT.  SO WE HAD COME TO THIS PLACE WHERE THEY HAD

01:24PM  21   PUBLISHED ON THEIR WEBSITE AND CHRIS HAD INDICATED THAT THERE

01:24PM  22   WAS GOING TO BE KIND OF MORE AND MORE OF THAT COMING IN A

01:24PM  23   PUBLIC WAY.

01:24PM  24   Q.   DID LEAVING STEALTH MODE SAY ANYTHING TO YOU ABOUT THE

01:24PM  25   MATURITY OF THE TECHNOLOGY?

TOLBERT DIRECT BY MR. SCHENK

01:24PM  1    A.   IT CERTAINLY GAVE US CONFIDENCE THAT THE TECHNOLOGY HAD

01:24PM  2    BEEN, YOU KNOW, DEVELOPED AND PERFECTED IN A WAY THAT NOW IT

01:24PM  3    WAS READY TO KIND OF HAVE SCRUTINY FROM THE OUTSIDE WORLD.

01:25PM  4    Q.   IN THE EMAIL IT LOOKS LIKE MR. LUCAS MAKES REFERENCE TO

01:25PM  5    RECEIVING MORE COMMUNICATION FROM THE COMPANY.

01:25PM  6         DO YOU SEE THAT?

01:25PM  7    A.   CORRECT.

01:25PM  8    Q.   AND DID YOU SHARE THAT SENTIMENT?

01:25PM  9    A.   I DID.

01:25PM 10    Q.   WHY?

01:25PM 11    A.   WELL, YOU KNOW, THROUGH THOSE INTERVENING YEARS, 2006

01:25PM 12    UNTIL 2013, YOU KNOW, WE WERE EXCITED ABOUT THIS OPPORTUNITY,

01:25PM 13    AND IT FELT LIKE THERE WAS GREAT PROGRESS BEING MADE, SO, YOU

01:25PM 14    KNOW, IT FELT LIKE WE HAD REASON TO BELIEVE THAT THIS WAS GOING

01:25PM 15    TO BE A VERY SUCCESSFUL INVESTMENT.

01:25PM 16         ON TOP OF THE FACT THAT IT WAS, YOU KNOW -- THAT THE

01:25PM 17    INVESTMENT WAS BASED ON SOMETHING THAT WE FELT GOOD ABOUT.

01:25PM 18         YOU KNOW, I DON'T LIKE GOING TO THE DOCTOR AND HAVING BIG

01:25PM 19    VIALS OF BLOOD DRAWN, SO WE WERE EXCITED NOT ONLY ABOUT WHAT

01:26PM 20    THE COMPANY WAS GOING TO DO, BUT THE WAY THEY WERE DOING IT.

01:26PM 21         AND SO AS THINGS WERE BECOMING MORE AND MORE READY TO BE

01:26PM 22    ROLLED OUT, IT FELT LIKE THAT MEANT THAT THINGS WERE -- THAT

01:26PM 23    THEY WERE WORKING AND THAT WE WERE EXCITED TO BE ABLE TO HAVE

01:26PM 24    MORE VISIBILITY INTO THE PROGRESS.

01:26PM 25    Q.   THANK YOU.

TOLBERT DIRECT BY MR. SCHENK                                    4416

01:26PM   1          WOULD YOU NOW TURN TO THE FIRST TAB IN YOUR BINDER.  IT'S

01:26PM   2   949.

01:26PM   3          MR. TOLBERT, IS THIS A GROUP OF EMAILS FROM THERANOS TO

01:26PM   4   YOU THROUGH INDIVIDUALS THAT WORK WITH MR. LUCAS?

01:26PM   5   A.   IT IS.

01:26PM   6              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 949.

01:26PM   7              MR. CAZARES:  NO OBJECTION.

01:26PM   8              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:26PM   9          (GOVERNMENT'S EXHIBIT 949 WAS RECEIVED IN EVIDENCE.)

01:26PM  10   BY MR. SCHENK:

01:27PM  11   Q.   MR. TOLBERT, IF WE CAN START ON PAGE 2.

01:27PM  12          DO YOU SEE AN EMAIL FROM THERANOS TO THERANOS ON

01:27PM  13   JULY 29TH, 2013?

01:27PM  14   A.   I DO.

01:27PM  15   Q.   AND THE EMAIL IS FROM SOMETHING CALLED

01:27PM  16   SHAREHOLDERINFO@THERANOS.COM.

01:27PM  17          DO YOU SEE THAT?

01:27PM  18   A.   I DO.

01:27PM  19   Q.   WITHIN THE BODY IT LOOKS LIKE IT SAYS, "DEAR SHAREHOLDER,

01:27PM  20          "IT IS WITH GREAT PLEASURE THAT I WRITE TO INFORM YOU OF

01:27PM  21   OUR UPCOMING CONSUMER LAUNCH."

01:27PM  22          AND THEN IT CONTINUES.

01:27PM  23          "WE HAVE BEEN WORKING IN STEALTH MODE FOR SEVERAL YEARS TO

01:27PM  24   PREPARE FOR THIS."

01:27PM  25          AND THEN THE NEXT PARAGRAPH.

TOLBERT DIRECT BY MR. SCHENK

01:27PM 1          "WE WILL BEGIN SENDING INFORMATION TO OUR SHAREHOLDERS

01:27PM 2     THROUGH EMAIL BRIEFS."

01:27PM 3          DO YOU SEE THAT?

01:27PM 4     A.   I DO.

01:27PM 5     Q.   SO AFTER THIS TIME, JULY OF 2013, DID YOU, IN FACT, BEGIN

01:27PM 6     TO GET MORE INFORMATION FROM THERANOS OVER EMAIL?

01:27PM 7     A.   A LITTLE BIT MORE INFORMATION.  CERTAINLY MORE THAN WE HAD

01:28PM 8     PRIOR TO THIS.

01:28PM 9     Q.   MORE COMPARED TO 2006 THROUGH 2012?

01:28PM 10    A.   2006 THROUGH 2012, YEAH.  WE HAD NOTHING DIRECT IN THOSE

01:28PM 11    INTERVENING YEARS, AND SO, YES, THIS REPRESENTS THE FIRST KIND

01:28PM 12    OF TIME THAT WE HAD HEARD DIRECTLY FROM THE COMPANY.

01:28PM 13    Q.   THANK YOU.

01:28PM 14         AND THEN IN THE NEXT PARAGRAPH, DO YOU SEE THAT THERE'S A

01:28PM 15    REFERENCE TO THE FIRST NEW WEBSITE CONTENT IS UP TODAY?

01:28PM 16    A.   I DO.

01:28PM 17    Q.   AND THE COMPANY, IT LOOKS LIKE, IS ISSUING A PRESS

01:28PM 18    RELEASE.

01:28PM 19         DO YOU SEE THAT?

01:28PM 20    A.   I DO.

01:28PM 21    Q.   AND THEN IF WE TURN TO THE NEXT PAGE, PAGE 3, IT LOOKS

01:28PM 22    LIKE IT'S THEN SIGNED OFF BY ELIZABETH, ELIZABETH HOLMES.

01:28PM 23         DO YOU SEE THAT?

01:28PM 24    A.   I DO.

01:28PM 25    Q.   BELOW THAT IT LOOKS AS THOUGH IT SAYS, "THERANOS ANNOUNCED

01:28PM  1    TODAY THAT RICHARD M. KOVACEVICH AND GENERAL JAMES MATTIS WERE

01:29PM  2    APPOINTED TO ITS BOARD OF DIRECTORS."

01:29PM  3         WAS THIS THE PRESS RELEASE THAT WAS REFERENCED IN THE BODY

01:29PM  4    OF THE EMAIL?

01:29PM  5    A.   IT IS.

01:29PM  6    Q.   AND THEN BELOW A LITTLE FURTHER DOWN THERE'S A SECTION

01:29PM  7    THAT SAYS, "FOR ADDITIONAL PRESS LINKS," AND THEN THERE ARE

01:29PM  8    SOME CITATIONS TO ARTICLES, SOME CLICKABLE LINKS.

01:29PM  9         DO YOU SEE THAT?

01:29PM  10   A.   YES.

01:29PM  11   Q.   SOMETHING ON MARKET WATCH AND CNBC.

01:29PM  12        DO YOU HAVE A RECOLLECTION AS TO WHETHER YOU FOLLOWED

01:29PM  13   THOSE LINKS AND READ ARTICLES ABOUT THERANOS AT THE TIME?

01:29PM  14   A.   I CERTAINLY WOULD HAVE FOLLOWED THOSE AND READ THEM.

01:29PM  15   Q.   AND HOW ABOUT INFORMATION IN THE PRESS MORE GENERALLY, NOT

01:29PM  16   JUST THESE TWO CITATIONS, BUT LEADING UP TO AN INVESTMENT LATER

01:29PM  17   IN 2013, WAS INFORMATION IN THE PRESS ALSO SOMETHING THAT YOU

01:29PM  18   REVIEWED AND USED TO EVALUATE AN INVESTMENT DECISION?

01:29PM  19   A.   CERTAINLY IT WAS.  I MEAN, WE WERE -- YOU KNOW, I WAS

01:29PM  20   DOING GOOGLE SEARCHES EVERY FEW DAYS AT THIS POINT.

01:29PM  21   Q.   WHY?

01:29PM  22   A.   YOU KNOW, AS INFORMATION BECAME MORE PUBLIC AND MORE

01:30PM  23   AVAILABLE, WE WERE INTERESTED TO SEE HOW IT WAS RECEIVED AND

01:30PM  24   PORTRAYED, AND JUST TO HAVE AS MUCH VISIBILITY AS WE COULD INTO

01:30PM  25   WHAT WAS GOING ON.

TOLBERT DIRECT BY MR. SCHENK

01:30PM   1    Q.   THANK YOU.

01:30PM   2         NOW, IF YOU CAN GO TO THE FIRST PAGE OF THIS DOCUMENT,

01:30PM   3    949.  IT LOOKS LIKE THERE ARE A COUPLE OF EMAILS FROM SOMEONE

01:30PM   4    NAMED ANA QUINTANA.

01:30PM   5         DO YOU SEE THAT?

01:30PM   6    A.   I DO.

01:30PM   7    Q.   AND DO YOU KNOW WHO MS. QUINTANA IS?

01:30PM   8    A.   YEAH, SHE IS ONE OF THE PRINCIPALS AT BLACK DIAMOND

01:30PM   9    VENTURES, WHICH IS CHRIS LUCAS'S FUND.  SO SHE'S AN EMPLOYEE

01:30PM   10   WITH CHRIS AT BLACK DIAMOND VENTURES.

01:30PM   11   Q.   I SEE.  AND IT REFERENCES IN BOTH EMAILS INFORMATION ABOUT

01:30PM   12   SHAREHOLDER LETTERS, OR SHAREHOLDER UPDATES.

01:30PM   13        DO YOU SEE THAT?

01:30PM   14   A.   I DO.

01:30PM   15   Q.   AND WAS THAT INFORMATION PROVIDED TO YOU BECAUSE OF YOUR

01:30PM   16   INVESTMENT IN THERANOS, BUT THROUGH BLACK DIAMOND VENTURES?

01:31PM   17   A.   CORRECT.

01:31PM   18   Q.   THANK YOU.

01:31PM   19        IF WE CAN NOW TURN TO PAGE -- I'M SORRY, EXHIBIT 4030?

01:31PM   20        MR. TOLBERT, DO YOU SEE THE EMAIL AND ATTACHMENTS LOCATED

01:31PM   21   AT 4030?

01:31PM   22   A.   I DO.

01:31PM   23   Q.   AND IS THIS ALSO INFORMATION THAT YOU RECEIVED FROM

01:31PM   24   BLACK DIAMOND VENTURES REGARDING YOUR THERANOS INVESTMENT?

01:31PM   25   A.   YES.

01:31PM  1          MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4030.

01:31PM  2          MR. CAZARES:  NO OBJECTION.

01:31PM  3          THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:31PM  4      (GOVERNMENT'S EXHIBIT 4030 WAS RECEIVED IN EVIDENCE.)

01:31PM  5   BY MR. SCHENK:

01:31PM  6   Q.   IF WE CAN START ON PAGE 1.

01:32PM  7        DO YOU SEE THIS EMAIL?  IT LOOKS LIKE IT'S FROM SOMEONE

01:32PM  8   NAMED YASMIN IBARRA?

01:32PM  9   A.   I DO.

01:32PM  10  Q.   AND DOES SHE ALSO WORK FOR CHRIS LUCAS'S FUND,

01:32PM  11  BLACK DIAMOND?

01:32PM  12  A.   YEAH, SHE DID.

01:32PM  13  Q.   SHE DID?

01:32PM  14  A.   I DON'T KNOW IF SHE DOES NOW, BUT SHE DID.

01:32PM  15  Q.   THANK YOU.

01:32PM  16       SO WE'VE NOW MOVED INTO NOVEMBER OF 2013, AND IT -- IT'S

01:32PM  17  AN EMAIL SENT TO BLACK DIAMOND INVESTORS.

01:32PM  18       DO YOU SEE THAT?

01:32PM  19  A.   I DO.

01:32PM  20  Q.   AND IT LOOKS LIKE IT INCLUDES SOME INFORMATION ABOUT

01:32PM  21  THERANOS, SOME SLIDES; IS THAT RIGHT?

01:32PM  22  A.   YES.  SO EVERY YEAR BLACK DIAMOND VENTURES WOULD HAVE AN

01:32PM  23  INVESTOR UPDATE IN THE ANNUAL MEETING WHERE THEY WOULD UPDATE

01:32PM  24  THE INVESTORS ON ALL OF THE PORTFOLIO COMPANIES THAT THEY HAD,

01:32PM  25  AND THIS WAS, YOU KNOW, THE FIRST ONE THAT INCLUDED A

01:32PM   1   SUBSTANTIAL UPDATE ON THERANOS.

01:32PM   2   Q.   I WOULD LIKE TO ASK YOU SOME QUESTIONS ABOUT A FEW SLIDES.

01:32PM   3        WOULD YOU START WITH PAGE 6.

01:33PM   4        ON PAGE 6, DO YOU SEE -- AT THE VERY BOTTOM THERE'S SOME

01:33PM   5   TEXT THAT READS, "FOR THE FIRST TIME, THERANOS IS INTRODUCING

01:33PM   6   CLIA-CERTIFIED LABORATORY SERVICES WITH THE ABILITY TO RUN ITS

01:33PM   7   TESTS ON MICRO-SAMPLES."

01:33PM   8        DO YOU SEE THAT?

01:33PM   9   A.   I DO.

01:33PM  10   Q.   WAS THAT CONSISTENT WITH YOUR UNDERSTANDING OF THE

01:33PM  11   THERANOS TECHNOLOGY?

01:33PM  12   A.   IT IS.

01:33PM  13   Q.   AND TALK TO ME FOR A MOMENT ABOUT WHETHER THIS IS AN

01:33PM  14   EVOLUTION FROM YOUR UNDERSTANDING IN 2006.

01:33PM  15   A.   YEAH.  SO CERTAINLY IN 2006 WHEN WE INVESTED, WE KNEW

01:33PM  16   THAT, YOU KNOW, AS THE TECHNOLOGY DEVELOPED AND, YOU KNOW,

01:33PM  17   WANTED TO BE CONSUMER FACING, THAT THE FDA OR OTHER AGENCIES

01:33PM  18   WOULD HAVE TO CERTIFY IT.  THERE WOULD HAVE TO BE, YOU KNOW,

01:33PM  19   SOME BLESSINGS -- TESTING THAT WOULD HAVE BEEN RUN AND

01:34PM  20   BLESSINGS THAT WOULD HAVE BEEN GIVEN TO THE TECHNOLOGY.

01:34PM  21        AND SO THROUGH THOSE INTERVENING YEARS, CHRIS AND I TALKED

01:34PM  22   A LOT ABOUT, YOU KNOW, WHAT HAD BEEN SUBMITTED FOR FDA

01:34PM  23   APPROVAL, OR WHAT THE STATUS OF THAT WAS.

01:34PM  24        SO FOR THE FIRST TIME IN 2013, AS I REMEMBER, THIS WAS --

01:34PM  25   KIND OF AROUND THIS TIMEFRAME IS THE FIRST TIME THAT WE KNEW

01:34PM 1    THAT THAT HAD BEEN GRANTED AND THAT, YOU KNOW, IT MEANT THAT

01:34PM 2    THERE HAD BEEN SOME VALIDATION OF THE TECHNOLOGY AND THE

01:34PM 3    ABILITY TO KIND OF TRUST WHAT THE RESULTS WERE THAT WAS COMING

01:34PM 4    FROM THOSE TESTS.

01:34PM 5    Q.   I SEE.  AND WHEN YOU'RE TALKING ABOUT FDA GRANTING

01:34PM 6    SOMETHING, ARE YOU REFERRING TO THE PHRASE "CLIA-CERTIFIED" ON

01:34PM 7    THIS DOCUMENT?

01:34PM 8    A.   NO.  I'M SORRY.

01:34PM 9        SO MY UNDERSTANDING WAS THAT THE FDA COULD APPROVE

01:34PM 10   DIFFERENT TESTS, AND THAT THERE WAS ALSO A CLIA-CERTIFIED

01:34PM 11   LABORATORY -- THERE WAS A CLIA CERTIFICATION THAT COULD COME

01:35PM 12   FROM CMS, MEDICARE, MEDICAID, AN AGENCY THAT WOULD OFFER THAT

01:35PM 13   CERTIFICATION.

01:35PM 14       SO I THINK THIS WAS DIFFERENT FROM THE FDA, BUT IT WAS

01:35PM 15   STILL KIND OF -- YOU KNOW, WE SAW THOSE CERTIFICATIONS AS

01:35PM 16   VALIDATIONS AS TO WHAT THE TECHNOLOGY COULD DO.

01:35PM 17   Q.   I SEE.  SO THE CLIA CERTIFICATION THAT WAS BEING ANNOUNCED

01:35PM 18   HERE, BEING SHARED WITH YOU, YOU UNDERSTOOD WAS SOME SORT OF

01:35PM 19   VALIDATION OF THE THERANOS TECHNOLOGY?

01:35PM 20   A.   I DID.

01:35PM 21   Q.   AND I ASKED YOU TO COMPARE THAT TO WHAT YOU UNDERSTOOD IN

01:35PM 22   2006.  HOW DID THIS SLIDE INFLUENCE OR CAUSE YOUR THINKING TO

01:35PM 23   EVOLVE BASED ON WHAT YOU KNEW IN 2006?

01:35PM 24   A.   YEAH.  SO IN 2006, LIKE I INDICATED, WE -- THERE WEREN'T

01:35PM 25   ANY OF THESE IN PLACE, AND WE KNEW THAT THOSE WOULD BE, YOU

TOLBERT DIRECT BY MR. SCHENK

01:35PM 1    KNOW, SOUGHT AFTER AND GRANTED, THE CERTIFICATIONS FROM

01:36PM 2    DIFFERENT AGENCIES.

01:36PM 3        THE FACT THAT IT WAS NOW CERTIFIED IN 2013, YOU KNOW,

01:36PM 4    MEANT THAT THE TECHNOLOGY HAD PROGRESSED IN A WAY THAT IT

01:36PM 5    COULD, AS I UNDERSTOOD, GO OUT TO CONSUMERS.

01:36PM 6        AND SO, YOU KNOW, CERTAINLY IF THERANOS WOULD HAVE COME

01:36PM 7    OUT AND SAID, YOU KNOW, WE MADE AN APPLICATION FOR THESE

01:36PM 8    CERTIFICATIONS AND WE DIDN'T GET THEM, WE WERE DENIED, THEN,

01:36PM 9    YOU KNOW, WE WOULD NOT HAVE PURSUED AN INVESTMENT.

01:36PM 10       BUT, YOU KNOW, THIS VALIDATION KIND OF ENCOURAGED US THAT

01:36PM 11   THE TECHNOLOGY WAS, WAS CONSUMER READY.

01:36PM 12   Q.   THANK YOU.

01:36PM 13       IF YOU WOULD NOW TURN TO THE NEXT PAGE, PAGE 7.

01:36PM 14       DO YOU SEE HERE IN THE MIDDLE THE PHRASE "THE LAB TEST,

01:36PM 15   REINVENTED."

01:36PM 16       AND THEN AN IMAGE?

01:36PM 17   A.   I DO.

01:36PM 18   Q.   AND WHEN YOU SAW THE PHRASE "THE LAB TEST, REINVENTED,"

01:36PM 19   PAST TENSE, "REINVENTED," DID THAT CHANGE YOUR THINKING BASED

01:36PM 20   ON WHAT YOU UNDERSTOOD THERANOS TO BE DOING IN 2006 VERSUS NOW

01:37PM 21   IN 2013?

01:37PM 22   A.   I GUESS -- LET ME ANSWER THE QUESTION AND SAY, YOU KNOW,

01:37PM 23   WHEN I READ THIS, I DIDN'T THINK THAT THIS HAD BEEN REINVENTED

01:37PM 24   AT THIS MOMENT IN TIME.

01:37PM 25       I MEAN, WE HAD FELT LIKE THIS EVOLUTION THROUGH THE YEARS

01:37PM 1      WAS THE REINVENTION, THAT IT WAS NOW AT A POINT WHERE IT HAD

01:37PM 2      BEEN REINVENTED.

01:37PM 3          BUT IT WASN'T JUST THIS WEEK, BUT, YOU KNOW, IT HAD BEEN

01:37PM 4      THE PROCESS ALONG THE WAY.

01:37PM 5      Q.   I SEE.  YOU FELT -- I'M SORRY, GO AHEAD.

01:37PM 6      A.   BUT WHEN I READ THIS, YOU KNOW, IT FELT LIKE THAT

01:37PM 7      REINVENTION WAS COMPLETE, AND THEN CERTAINLY THERE WOULD BE

01:37PM 8      MORE EVOLUTIONS GOING FORWARD.

01:37PM 9          BUT THAT IT WAS, YOU KNOW, ABLE TO -- THAT THE TESTS WERE

01:37PM 10     ABLE TO BE DONE ON THESE SMALL SAMPLES.

01:37PM 11     Q.   AND WHEN YOU SAY "THE TESTS," YOU MEAN TESTING BLOOD --

01:37PM 12     A.   BLOOD TESTS.

01:37PM 13     Q.   THANK YOU.

01:37PM 14         IF YOU WOULD NOW TURN TO THE NEXT PAGE, PAGE 8.

01:37PM 15         AND UNDER "WELCOME TO THERANOS," THERE'S A PARAGRAPH THAT

01:38PM 16     I'D LIKE TO ASK YOU A QUESTION ABOUT.

01:38PM 17         DO YOU SEE THAT PARAGRAPH THAT BEGINS, "THERANOS'S

01:38PM 18     LABORATORY"?

01:38PM 19     A.   YES.

01:38PM 20     Q.   "THERANOS'S LABORATORY CAN ANALYZE SMALLER SAMPLES THAN

01:38PM 21     PREVIOUSLY POSSIBLE WITH SPEED AND THE HIGHEST LEVELS OF

01:38PM 22     ACCURACY.  IT IS EASIER ON YOUR PATIENTS.  AND HELPS YOU MAKE

01:38PM 23     THE BEST DIAGNOSIS AS FAST AS POSSIBLE."

01:38PM 24         THERE'S A REFERENCE HERE TO TESTING ON SMALLER SAMPLES

01:38PM 25     WITH SPEED AND THE HIGHEST LEVELS OF ACCURACY.

01:38PM   1        HOW ABOUT THAT PHRASE, "HIGHEST LEVELS OF ACCURACY"?  WAS

01:38PM   2   THAT SIGNIFICANT IN YOUR EVALUATION IN 2013 AS TO WHETHER TO

01:38PM   3   MAKE AN INVESTMENT?

01:38PM   4   A.   IT WAS.  GIVEN THAT THE TESTS WERE ABLE TO BE DONE

01:38PM   5   ACCURATELY OBVIOUSLY, YOU KNOW, WOULD HAVE FACTORED INTO THAT

01:38PM   6   INVESTMENT DECISION.

01:38PM   7        IF THE TEST WOULD HAVE BEEN INACCURATE OR WOULD HAVE ONLY

01:39PM   8   BEEN 50 PERCENT ACCURATE, THEN, YOU KNOW, IT PROBABLY WOULD

01:39PM   9   HAVE CAUSED A DIFFERENT INVESTMENT DECISION.

01:39PM   10       BUT THE FACT THAT THE TECHNOLOGY HERE CAN DO WHAT IT'S

01:39PM   11  BEEN DESIGNED TO DO ALL ALONG IS CERTAINLY SOMETHING THAT WAS

01:39PM   12  OF GREAT INTEREST TO US.

01:39PM   13  Q.   AND IN THE NEXT SENTENCE THERE'S A REFERENCE TO "YOUR

01:39PM   14  PATIENTS."

01:39PM   15       DO YOU SEE THAT?

01:39PM   16  A.   YES.

01:39PM   17  Q.   AND DO YOU THINK THAT THAT MEANS THAT THAT SLIDE WAS THERE

01:39PM   18  FOR DOCTORS OR FOR SOME OTHER MEDICAL PROFESSIONALS?  DID YOU

01:39PM   19  HAVE A THOUGHT ON THAT?

01:39PM   20            MR. CAZARES:  OBJECTION.  FOUNDATION.  CALLS FOR

01:39PM   21  SPECULATION.

01:39PM   22            THE COURT:  THE QUESTION WAS, DID HE HAVE A THOUGHT

01:39PM   23  ON THAT?

01:39PM   24       YES, YOU CAN ANSWER THAT QUESTION.

01:39PM   25            THE WITNESS:  YOU KNOW, I DON'T KNOW WHEN I READ

01:39PM 1    THIS SLIDE IF I THOUGHT IT WAS DESIGNED TO BE ONLY MARKETED TO

01:39PM 2    DOCTORS.

01:39PM 3        I DO KNOW THAT I TRIED TO CONVINCE MY DOCTOR SEVERAL TIMES

01:39PM 4    THAT HE NEEDED TO REACH OUT TO THE COMPANY AND SEE IF HE COULD,

01:39PM 5    YOU KNOW, HAVE THEIR TESTING IN HIS OFFICE.

01:40PM 6    BY MR. SCHENK:

01:40PM 7    Q.   I SEE.

01:40PM 8    A.   BUT, YOU KNOW, WHEN IT TALKS ABOUT PATIENTS, I WOULD HAVE

01:40PM 9    ALSO ASSUMED THAT -- JUST AN INTEREST OF COMPLETENESS, I GUESS,

01:40PM 10   I WOULD HAVE ALSO ASSUMED -- WELL, I KNEW YOU HAD TO HAVE

01:40PM 11   DOCTOR'S ORDERS TO HAVE THESE TESTS DONE IN LOTS OF PLACES, SO

01:40PM 12   IT'S LIKELY THAT THESE ORDERS WOULD HAVE COME FROM DOCTORS.

01:40PM 13   Q.   THANK YOU.

01:40PM 14       WOULD YOU NOW TURN TO SLIDE 10.

01:40PM 15       AT THE VERY BOTTOM, DO YOU SEE IT SAYS, "THERANOS WELLNESS

01:40PM 16   CENTERS WILL SOON BE LOCATED WITHIN WALGREENS STORES

01:40PM 17   NATIONWIDE"?

01:40PM 18   A.   I DO.

01:40PM 19   Q.   DID THAT REPRESENTATION HAVE SIGNIFICANCE TO YOU WHEN YOU

01:40PM 20   WERE MAKING A DECISION ABOUT WHETHER TO INVEST IN 2013?

01:41PM 21   A.   IT DID.

01:41PM 22       YOU KNOW, MY CONVERSATIONS WITH MR. LUCAS KIND OF THROUGH

01:41PM 23   THOSE YEARS LEADING UP TO 2013 WAS THAT, YOU KNOW, THAT

01:41PM 24   THERANOS WAS AIMING TOWARDS A ROLLOUT, A COMMERCIALIZATION OF

01:41PM 25   THIS TECHNOLOGY THAT WOULD PUT IT, YOU KNOW, KIND OF READILY

01:41PM  1    AVAILABLE THROUGH THE COUNTRY.

01:41PM  2         I KNOW WE HAD HAD SOME DISCUSSIONS, HE AND I, ABOUT WHAT

01:41PM  3    THOSE LOCATIONS MAY BE.

01:41PM  4         AND SO, YOU KNOW, FOR IT TO BE IN, IN ALL OF THE WALGREENS

01:41PM  5    STORES THROUGH THE COUNTRY REPRESENTED KIND OF A VALIDATION OF

01:41PM  6    WHAT I HAD TALKED WITH HIM ABOUT, WHAT HE HAD REFLECTED TO US

01:41PM  7    FROM THE COMPANY, AND WHAT HIS CONVERSATIONS WITH THERANOS HAD

01:41PM  8    BEEN.

01:41PM  9         BUT ALSO IT REPRESENTED THAT, HEY, LOOK, HERE'S AN

01:41PM  10   OPPORTUNITY TO KIND OF HAVE THIS BE A NEW INDUSTRY, AND SO IT

01:42PM  11   CERTAINLY WOULD HAVE, IT WOULD HAVE GIVEN LOTS OF MOMENTUM TO

01:42PM  12   OUR INVESTMENT DISCUSSIONS.

01:42PM  13   Q.   AND NOW DESCRIBE FOR ME HOW THIS COMPARED TO WHAT YOU

01:42PM  14   UNDERSTOOD WHEN YOU MADE THE 2006 INVESTMENT.

01:42PM  15   A.   SO WHEN WE MADE THE 2006 INVESTMENT, YOU KNOW, THE USE

01:42PM  16   CASE FOR THERANOS AND ITS TECHNOLOGY WAS MOSTLY CENTERED AROUND

01:42PM  17   PHARMACEUTICAL OPPORTUNITIES ABOUT HELPING, YOU KNOW, MAKE DRUG

01:42PM  18   TRIALS MORE EFFICIENT AND, YOU KNOW, EVENTUALLY GETTING HERE.

01:42PM  19        BUT IT WAS FOCUSSED ON KIND OF A LIMITED THING.

01:42PM  20        AND SO THIS WOULD REPRESENT AN EVOLUTION, YOU KNOW, THAT

01:42PM  21   WOULD MAKE IT, THAT WOULD MAKE THE COMMERCIAL OPPORTUNITIES FOR

01:42PM  22   THAT TECHNOLOGY KIND OF WIDELY AVAILABLE.

01:42PM  23        AND ON THE INVESTMENT SIDE, IT WOULD HAVE MADE IT A VERY

01:42PM  24   PROFITABLE INVESTMENT.

01:42PM  25   Q.   GREAT.  IF YOU'LL NOW TURN TO PAGE 11, I THINK IT'S THE

01:43PM   1    NEXT PAGE.

01:43PM   2         DO YOU SEE MORE CITATIONS TO MEDIA ABOUT THERANOS?

01:43PM   3    A.   I DO.

01:43PM   4    Q.   AND IN PARTICULAR THERE'S ONE THAT'S FOUR DOWN,

01:43PM   5    "ELIZABETH HOLMES:  THE BREAKTHROUGH OF INSTANT DIAGNOSIS."

01:43PM   6         IT'S IN "THE WALL STREET JOURNAL" IT LOOKS LIKE

01:43PM   7    SEPTEMBER 7TH, 2013.

01:43PM   8         DO YOU SEE THAT?

01:43PM   9    A.   I DO.

01:43PM  10    Q.   AND DO YOU KNOW WHETHER YOU READ THAT ARTICLE?

01:43PM  11    A.   I WOULD HAVE READ THAT ARTICLE.

01:43PM  12    Q.   AND WHY DO YOU SAY THAT?

01:43PM  13    A.   BECAUSE MY HABIT WAS TO READ EVERYTHING THAT I COULD FIND,

01:43PM  14    AND SO I'M SURE THAT I WOULD HAVE READ EACH ONE OF THOSE THINGS

01:43PM  15    REFERENCED HERE.

01:43PM  16    Q.   AND YOU'VE DESCRIBED SOME OF THE THINGS THAT INFLUENCED

01:43PM  17    THE DECISION TO INVEST IN 2013.

01:43PM  18         WAS INFORMATION YOU READ IN THE PRESS ALSO ONE OF THE

01:43PM  19    THINGS THAT INFLUENCED YOUR DECISION TO INVEST IN 2013?

01:43PM  20    A.   IT CERTAINLY WOULD HAVE BEEN AS TO THE VALIDATED THINGS

01:44PM  21    THAT I WAS ALREADY HEARING OR THINKING FROM OTHER SOURCES.

01:44PM  22    Q.   THANK YOU.

01:44PM  23         SO THIS EXHIBIT 4030 WAS ATTACHED TO AN EMAIL THAT WAS

01:44PM  24    SENT IN NOVEMBER, NOVEMBER 8TH, 2013.

01:44PM  25         DO YOU SEE THAT?

01:44PM 1    A.   CORRECT.

01:44PM 2    Q.   THE NEXT MONTH, IN DECEMBER OF 2013, DID YOU PARTICIPATE

01:44PM 3    IN A CALL WITH ELIZABETH HOLMES?

01:44PM 4    A.   I DID.

01:44PM 5    Q.   LET'S TALK ABOUT THE LEAD UP TO THAT.  IF YOU'LL TURN TO

01:44PM 6    EXHIBIT 1346.

01:44PM 7         IS EXHIBIT -- ARE YOU THERE, SIR?

01:44PM 8    A.   I AM.

01:44PM 9    Q.   IS EXHIBIT 1346 AN EMAIL FROM MS. QUINTANA TO OTHERS,

01:44PM 10   INCLUDING YOU, ANNOUNCING THAT CALL THAT WE JUST DISCUSSED?

01:44PM 11   A.   IT IS.

01:44PM 12        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 1346.

01:44PM 13        MR. CAZARES:  NO OBJECTION.

01:45PM 14        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:45PM 15        (GOVERNMENT'S EXHIBIT 1346 WAS RECEIVED IN EVIDENCE.)

01:45PM 16   BY MR. SCHENK:

01:45PM 17   Q.   SIR, THIS AGAIN REFERENCES BLACK DIAMOND VENTURES.  THAT'S

01:45PM 18   THE GROUP THAT YOU INVESTED THE 2006 INVESTMENT THROUGH; IS

01:45PM 19   THAT RIGHT?

01:45PM 20   A.   CORRECT.

01:45PM 21   Q.   AND IT READS, "AN INVESTOR CONFERENCE CALL HAS BEEN

01:45PM 22   SCHEDULED FOR THIS FRIDAY, DECEMBER 20TH, PROMPTLY STARTING AT

01:45PM 23   10:15 A.M. PACIFIC.  THE CONFIDENTIAL UPDATE WILL BE PRESENTED

01:45PM 24   BY THERANOS'S CEO ELIZABETH HOLMES."

01:45PM 25        DO YOU SEE THAT?

01:45PM  1    A.   I DO.

01:45PM  2    Q.   AND WAS THERE A CALL ON DECEMBER 20TH OF 2013?

01:45PM  3    A.   THERE WAS.

01:45PM  4    Q.   AND DID YOU PARTICIPATE IN THAT CALL?

01:45PM  5    A.   I DID.

01:45PM  6    Q.   YOU'VE MENTIONED ANOTHER INDIVIDUAL NAMED CRAIG HALL,

01:45PM  7    MR. HALL.

01:45PM  8         DO YOU KNOW IF HE ALSO PARTICIPATED?

01:45PM  9    A.   HE DID.

01:45PM  10   Q.   THE NEXT PARAGRAPH READS, "WITH THEIR LAUNCH TO CONSUMER

01:45PM  11   HEALTH CARE THIS YEAR, THEY ARE RAPIDLY SCALING TO ESTABLISH A

01:45PM  12   NATIONAL FOOTPRINT AND CAPTURE THE OPPORTUNITY WE HAVE TO SERVE

01:46PM  13   AS THE ONLY CERTIFIED, NATIONAL LABORATORY CAPABLE OF RUNNING

01:46PM  14   ANY OF ITS LABORATORY TESTS FROM A FEW TINY DROPLETS OF BLOOD."

01:46PM  15        THAT MAKES SOME REPRESENTATIONS ABOUT THE THERANOS

01:46PM  16   TECHNOLOGY.

01:46PM  17        I'M WONDERING IF THAT WAS CONSISTENT WITH YOUR

01:46PM  18   UNDERSTANDING OF THE THERANOS TECHNOLOGY WHEN YOU MADE THE 2013

01:46PM  19   INVESTMENT DECISION.

01:46PM  20   A.   IT IS.  I MEAN, IT'S -- YOU KNOW, I BELIEVE IN

01:46PM  21   SEPTEMBER -- SO THIS IS IN DECEMBER.

01:46PM  22        IN SEPTEMBER THEY HAD -- THERANOS HAD RELEASED THE PRESS

01:46PM  23   RELEASE ABOUT THE PARTNERSHIP WITH WALGREENS, AND SO THIS, YOU

01:46PM  24   KNOW, CERTAINLY KIND OF PULLED ALL OF THAT TOGETHER AND SAID,

01:46PM  25   LOOK, IT'S A REAL THING AND IT'S AN OPPORTUNITY TO ROLL IT OUT

01:46PM  1    IN A BIG WAY.

01:46PM  2    Q.   THANK YOU.

01:46PM  3         THE NEXT PARAGRAPH READS, "AS PART OF THIS INITIATIVE,

01:46PM  4    THEY ARE COMPLETING A SERIES OF FINANCIAL TRANSACTIONS WITH

01:47PM  5    STRATEGIC PARTNERS THAT PROVIDE ACCESS TO ADDITIONAL CAPITAL IN

01:47PM  6    ORDER TO ACCELERATE THEIR GROWTH."

01:47PM  7         AND THEN I THINK A SENTENCE LATER IT READS, "THE PRICE PER

01:47PM  8    SHARE OF THERANOS SERIES C-1 PREFERRED STOCK IN THE

01:47PM  9    TRANSACTIONS CLOSING BETWEEN NOW AND DECEMBER 31ST, 2013, IS

01:47PM  10   $75/PER SHARE (PRE-SPLIT)."

01:47PM  11        SO I WANT TO ASK YOU SOME QUESTIONS ABOUT THAT.

01:47PM  12        FIRST, WERE YOU INVESTORS BEFORE THIS C ROUND?

01:47PM  13   A.   YOU KNOW, SO I THINK OUR INVESTMENT IN 2006 WAS IN THE

01:47PM  14   SERIES C.

01:47PM  15   Q.   IT WAS --

01:47PM  16   A.   AND THIS WAS AN ADDITIONAL -- THIS WAS AN ADDITIONAL

01:47PM  17   SERIES C-1.

01:47PM  18   Q.   I SEE.  SO THERE WAS A C, AND THEN A C-1?

01:47PM  19   A.   I BELIEVE THAT'S CORRECT.

01:48PM  20   Q.   DO YOU REMEMBER WHAT THE SHARE PRICE WAS IN 2006?

01:48PM  21   A.   SO OUR INVESTMENT IN 2006 WAS A LITTLE LESS THAN $3 A

01:48PM  22   SHARE.  I THINK IT WAS LIKE 2.82 OR 2.83 A SHARE.

01:48PM  23   Q.   AND THE PRICE FOR C-1 STOCK WAS $75 PER SHARE ACCORDING TO

01:48PM  24   THIS?

01:48PM  25   A.   CORRECT.

TOLBERT DIRECT BY MR. SCHENK                                    4432

01:48PM   1    Q.   HOW ABOUT THAT FACT, LESS THAN $3, NOW $75.  HOW DID THAT

01:48PM   2    INFLUENCE, IF IT DID, YOUR THINKING ABOUT THE INVESTMENT OR

01:48PM   3    ABOUT THERANOS GENERALLY FROM 2006 UNTIL THIS TIME?

01:48PM   4    A.   SURE.  IT FELT LIKE WE HAD HIT A HOME RUN, RIGHT?  THAT

01:48PM   5    THE TECHNOLOGY HAD BEEN DEVELOPED AND HAD DONE EVERYTHING THAT

01:48PM   6    WE HAD THOUGHT WHEN WE FIRST INVESTED, AND THAT NOW IT WAS AT A

01:48PM   7    PLACE TO KIND OF HAVE A WIDE ROLLOUT AND BE COMMERCIALIZED.

01:48PM   8         IT FELT LIKE THERE WERE LOTS OF PEOPLE WHO WERE INVESTING

01:49PM   9    AT $75 A SHARE IN 2013 WHO WOULD NOT BE INVESTING TO JUST HAVE

01:49PM  10    THAT INVESTMENT STAY AT THE PLACE THAT THEY HAD INVESTED.

01:49PM  11         SO IT REALLY FELT LIKE, YOU KNOW, EVERYTHING WAS GOING

01:49PM  12    WELL AND THAT $75 A SHARE WAS A VALIDATION OF WHY WE SHOULD

01:49PM  13    INVEST MORE.

01:49PM  14    Q.   AND IT ALSO TALKS ABOUT CLOSING BETWEEN NOW -- THE DATE OF

01:49PM  15    THE EMAIL IS DECEMBER 18TH -- AND DECEMBER 31ST, 2013.

01:49PM  16         DID YOU HAVE ANY THOUGHTS ABOUT THE AMOUNT OF TIME THAT

01:49PM  17    YOU HAD TO MAKE A DECISION?

01:49PM  18    A.   YEAH.  WE HAD HAD SEVERAL CONVERSATIONS WITH MR. LUCAS

01:49PM  19    ABOUT A FOLLOW-ON INVESTMENT AND, YOU KNOW, AT SOME POINT

01:49PM  20    WANTED TO BE DIRECT WITH THE COMPANY.

01:49PM  21         CHRIS HAD INDICATED -- MR. LUCAS HAD INDICATED THAT, THAT

01:50PM  22    KIND OF THE OFFER TO INVEST ADDITIONAL FUNDS WAS GOOD THROUGH

01:50PM  23    DECEMBER 31ST, AND THAT AFTER THAT THERE WERE A FEW PEOPLE FOR

01:50PM  24    CONTRACTUAL REASONS, I THINK, WHO HAD TO INVEST A LITTLE LATER,

01:50PM  25    BUT THAT IT WOULD BE AT A HIGHER VALUATION, AND THAT, YOU KNOW,

01:50PM   1    OUR OPPORTUNITY TO INVEST MORE WOULD, WOULD KIND OF EXPIRE ON

01:50PM   2    DECEMBER 31ST.

01:50PM   3    Q.   SO YOU HAD A FEW WEEKS OR SO TO MAKE A DECISION ABOUT

01:50PM   4    INVESTING IN 2013?

01:50PM   5    A.   YEAH, THAT'S CORRECT.

01:50PM   6    Q.   I'D LIKE TO NOW TALK TO YOU ABOUT THE CALL ON

01:50PM   7    DECEMBER 20TH.

01:50PM   8         WHERE WERE YOU WHEN YOU PARTICIPATED IN THE CALL?

01:50PM   9    A.   I WAS IN FRISCO, TEXAS.

01:50PM   10   Q.   AND DO YOU KNOW WHERE MR. HALL WAS?

01:50PM   11   A.   YOU KNOW, I DIDN'T ON THAT DAY, BUT NOW I DO.  I BELIEVE

01:50PM   12   HE WAS IN CALIFORNIA, OR HE WAS TRAVELLING SOMEWHERE.

01:50PM   13   Q.   OKAY.  HE WASN'T WITH YOU IN TEXAS?

01:50PM   14   A.   HE WASN'T WITH ME IN TEXAS.

01:50PM   15   Q.   DO YOU REMEMBER ABOUT HOW LONG THE CALL WAS?

01:51PM   16   A.   I THINK IT WAS PROBABLY ABOUT AN HOUR, MAYBE A LITTLE

01:51PM   17   LONGER.

01:51PM   18   Q.   DID MS. HOLMES SPEAK?

01:51PM   19   A.   SHE DID.

01:51PM   20   Q.   DO YOU KNOW IF ANY OTHER EMPLOYEES FROM THERANOS SPOKE?

01:51PM   21   A.   NOT THAT I RECALL.  I ONLY RECALL HER.

01:51PM   22   Q.   I'D LIKE TO TALK TO YOU ABOUT A FEW DIFFERENT CATEGORIES

01:51PM   23   OF INFORMATION AND SEE IF, IF MS. HOLMES TALKED ABOUT THESE

01:51PM   24   CATEGORIES.

01:51PM   25        DO YOU HAVE A RECOLLECTION OF THE CALL?

01:51PM 1    A.   I DO.

01:51PM 2    Q.   THE FIRST I'D LIKE TO TALK TO YOU ABOUT IS THE THERANOS

01:51PM 3    BLOOD TESTING TECHNOLOGY GENERALLY.

01:51PM 4         DURING THE CALL, DID MS. HOLMES TALK TO YOU ABOUT THE

01:51PM 5    THERANOS BLOOD TESTING TECHNOLOGY?

01:51PM 6    A.   SHE DID.

01:51PM 7    Q.   AND WHAT DO YOU REMEMBER HER SAYING?

01:51PM 8    A.   YOU KNOW, AS I REMEMBER THAT CALL, I REMEMBER HER SAYING,

01:51PM 9    YOU KNOW, THAT THE TECHNOLOGY WAS DEVELOPED TO A POINT WHERE

01:51PM 10   THERE COULD BE LOTS AND LOTS OF TESTS THAT WOULD BE RUN ON A

01:51PM 11   SMALL DROP OF BLOOD, AND THAT IT WAS ABLE TO BE, YOU KNOW, KIND

01:52PM 12   OF DONE FROM ANY LOCATION SO THAT, YOU KNOW, THERE WASN'T A BIG

01:52PM 13   CENTRAL LAB THAT THOSE TESTS HAD TO BE FILTERED THROUGH.

01:52PM 14        AND I REMEMBER HER SAYING THAT -- I BELIEVE THAT THE

01:52PM 15   ECONOMICS OF THOSE TESTS WERE SUCH THAT IT MADE IT VERY COST

01:52PM 16   EFFICIENT FOR THE COMPANY TO DO THAT, AS OPPOSED TO SOME OTHER

01:52PM 17   COMPETITORS AND WHAT THEY WOULD CHARGE.

01:52PM 18   Q.   THANK YOU.

01:52PM 19        DO YOU REMEMBER WHETHER MS. HOLMES TALKED ABOUT THE KIND

01:52PM 20   OF TUBES OF BLOOD THAT THERANOS USED VERSUS WHAT TRADITIONAL

01:52PM 21   LAB TESTING INVOLVED?

01:52PM 22   A.   YOU KNOW, I WOULD HAVE TO LOOK BACK AT THE TRANSCRIPT OF

01:52PM 23   THE CALL, BUT I THINK THERE WAS SOME DISCUSSION ABOUT THE, YOU

01:52PM 24   KNOW, ABOUT THE SMALL NANOTAINERS OR CONTAINERS OF BLOOD THAT

01:52PM 25   WOULD TAKE JUST A FEW DROPS.

01:53PM 1    Q.   YOU REFERENCED A TRANSCRIPT OF THE CALL.

01:53PM 2         WHAT DO YOU MEAN?

01:53PM 3    A.   WELL, AT SOME POINT THAT PHONE CALL WAS RECORDED AND THERE

01:53PM 4    WAS A TRANSCRIPTION MADE OF IT.

01:53PM 5    Q.   I SEE.

01:53PM 6    A.   AND SO, YOU KNOW, I'VE -- SO I KNOW THERE'S A TRANSCRIPT

01:53PM 7    OF THAT CALL, AND I JUST HAVEN'T REVIEWED IT.

01:53PM 8    Q.   AND AS YOU'RE TESTIFYING TODAY, IS SOME OF YOUR MEMORY

01:53PM 9    BASED UPON HAVING REVIEWED THAT TRANSCRIPT AT SOME POINT SINCE

01:53PM 10   2013?

01:53PM 11   A.   CERTAINLY.

01:53PM 12        WHEN I SAY I HAVEN'T REVIEWED THE TRANSCRIPT, I HAVEN'T

01:53PM 13   REVIEWED IT ENOUGH TO MEMORIZE IT AND KNOW EXACTLY -- RECALL

01:53PM 14   EXACTLY WHAT WAS SAID.

01:53PM 15   Q.   I SEE.  BUT WHEN YOU'RE TESTIFYING TODAY ABOUT THE CALL,

01:53PM 16   YOU'RE SAYING THAT SOME OF THAT IS BASED ON HAVING REVIEWED THE

01:53PM 17   TRANSCRIPT SINCE THE CALL?

01:53PM 18   A.   CORRECT.

01:53PM 19   Q.   OKAY.  HOW ABOUT THE TOPIC OF THERANOS'S WORK WITH THE

01:53PM 20   MILITARY?  DID MS. HOLMES TALK ABOUT THAT?

01:53PM 21   A.   SHE DID TALK ABOUT MILITARY APPLICATIONS AND ABOUT, YOU

01:54PM 22   KNOW, THAT THERANOS DEVICES WERE EMPLOYED ON THE MEDEVAC

01:54PM 23   HELICOPTERS AND BEING USED TO KIND OF IMPROVE SURVIVAL RATES OF

01:54PM 24   MILITARY PERSONNEL WHO HAD BEEN INJURED IN COMBAT.

01:54PM 25   Q.   OKAY.  WE'LL COME BACK TO THAT IN A MOMENT.

TOLBERT DIRECT BY MR. SCHENK                                    4436

01:54PM  1       DID MS. HOLMES TALK ABOUT FINANCIALS, THE FINANCIAL HEALTH

01:54PM  2   OF THERANOS OR HOW IT WAS SPENDING THE MONEY THAT IT WAS

01:54PM  3   MAKING?

01:54PM  4   A.   I BELIEVE THERE WAS SOME DISCUSSION ABOUT FINANCIAL KIND

01:54PM  5   OF MATTERS.

01:54PM  6   Q.   AND WHAT DO YOU RECALL ABOUT THAT?

01:54PM  7   A.   I JUST RECALL THAT THERE WAS SOME GENERAL MENTION, YOU

01:54PM  8   KNOW, SOMETHING ABOUT KIND OF THE PRICING OF WHAT THOSE TESTS

01:54PM  9   WERE AND KIND OF THE USE OF THE FUNDS THAT WERE BEING RAISED

01:54PM  10  AND HOW THOSE WOULD FACTOR INTO THE FINANCIAL HEALTH OF THE

01:54PM  11  COMPANY.

01:54PM  12  Q.   AND WHAT ABOUT THE RETAIL LAUNCH?  DO YOU REMEMBER

01:54PM  13  MS. HOLMES SAYING ANYTHING ABOUT THE RETAIL LAUNCH?

01:54PM  14  A.   SO THERE WAS SOME DISCUSSION ABOUT THE RETAIL LAUNCH AND

01:55PM  15  ABOUT, YOU KNOW, THE TECHNOLOGY BEING READY TO BE ROLLED OUT TO

01:55PM  16  THE WALGREENS LOCATIONS AND HOW THAT WOULD BE OF BENEFIT TO THE

01:55PM  17  COMPANY.

01:55PM  18  Q.   SO LET'S TAKE EACH OF THOSE THEN.

01:55PM  19       THE STATEMENTS THAT YOU HEARD ABOUT THE THERANOS

01:55PM  20  TECHNOLOGY, I THINK YOU SAID LOTS AND LOTS OF TESTS FROM SMALL

01:55PM  21  SAMPLES.

01:55PM  22       DID THAT MATTER WHEN YOU WERE MAKING A DECISION TO INVEST

01:55PM  23  IN THERANOS IN 2013?

01:55PM  24  A.   IT DID.

01:55PM  25       YOU KNOW, CERTAINLY OUR, YOU KNOW, OUR UNDERSTANDING OF

01:55PM 1    WHAT THE TECHNOLOGY COULD DO IS THAT -- YOU KNOW, EVEN AS I

01:55PM 2    REMEMBER, THERE WAS A LISTING POSTED ON THE WEBSITE AT SOME

01:55PM 3    POINT ON ALL OF THE TESTS THAT COULD BE DONE AND THE PRICES

01:55PM 4    THAT WOULD BE CHARGED FOR THOSE.

01:55PM 5         SO OUR UNDERSTANDING WAS THAT WITH THIS MULTITUDE OF

01:55PM 6    TESTS, YOU KNOW, ANYBODY COULD REALLY GO GET A TEST AND HAVE

01:55PM 7    SOME VALUE OR BENEFIT FROM THAT, AND SO I THINK THERE WAS SOME

01:56PM 8    REFERENCE TO THAT ON THE CALL.

01:56PM 9    Q.   AND HOW DID THAT COMPARE TO YOUR UNDERSTANDING IN 2006?

01:56PM 10   A.   WHEN WE INVESTED IN 2006, THERE WAS A LIMITED AMOUNT OF

01:56PM 11   TESTS THAT COULD BE DONE.  WE KNEW THAT, YOU KNOW, THERE WERE

01:56PM 12   SOME CAPABILITIES, BUT THAT OVER TIME THAT THAT WOULD INCREASE.

01:56PM 13        AND SO IT FELT LIKE, YOU KNOW, AT THIS POINT THE

01:56PM 14   TECHNOLOGY HAD PROGRESSED TO A PLACE THAT THOSE TESTS REALLY

01:56PM 15   COULD BE DONE.

01:56PM 16   Q.   AND HOW ABOUT THE STATEMENTS THAT YOU DESCRIBED WITH

01:56PM 17   REGARD TO THE MILITARY WORK?  DID THOSE STATEMENTS MATTER IN

01:56PM 18   YOUR DECISION TO INVEST?

01:56PM 19   A.    THEY DID.  YOU KNOW, WE HAD WATCHED WITH GREAT INTEREST --

01:56PM 20   HER BOARD OF DIRECTORS WAS UNVEILED IN JULY, AND WE HAD SEEN,

01:56PM 21   YOU KNOW, KIND OF THE MEMBERS OF THAT BOARD, AND IN

01:56PM 22   CONVERSATIONS THAT I HAD HAD WITH CHRIS LUCAS OVER THAT YEAR,

01:57PM 23   YOU KNOW, THERE WAS REFERENCE TO GOVERNMENTAL CONTRACTS AND,

01:57PM 24   YOU KNOW, KIND OF SEEING THE MEMBERS OF HER BOARD OF DIRECTORS

01:57PM 25   WHO WERE PARTICIPATING IN HELPING THOSE GOVERNMENT CONTRACTS

01:57PM  1    ALONG THE WAY.

01:57PM  2         IT CERTAINLY FELT LIKE THAT REPRESENTED A GREAT

01:57PM  3    OPPORTUNITY FOR THE COMPANY AND ONE THAT WE WERE INTERESTED IN.

01:57PM  4    Q.   WAS THERE MENTION OF MILITARY WORK IN 2006?

01:57PM  5    A.   THERE WAS NOT.

01:57PM  6    Q.   SO HOW DOES THIS, THIS CONCEPT OR THIS AREA OF WORK

01:57PM  7    COMPARE WITH YOUR UNDERSTANDING OF WHAT THERANOS WAS DOING IN

01:57PM  8    2006?

01:57PM  9    A.   SO IT REPRESENTED A BROADENING OF THEIR BUSINESS

01:57PM 10    OPPORTUNITIES, ONE THAT WAS EXCITING, NOTWITHSTANDING THE FACT

01:57PM 11    THAT IT WAS HELPING PEOPLE THAT WERE INJURED, AND THAT'S NEVER

01:57PM 12    AN EXCITING THING.

01:57PM 13         BUT, YOU KNOW, I THINK IN A PERSONAL WAY, IT RESONATED.  I

01:57PM 14    HAVE A BROTHER WHO WAS IN THE MARINES AND WHO WAS IN

01:57PM 15    AFGHANISTAN FOR A PERIOD OF TIME, SO, YOU KNOW, THE THOUGHT

01:58PM 16    THAT THESE SERVICE MEN AND WOMEN WHO GET HURT CAN BE HELPED WAS

01:58PM 17    CERTAINLY SOMETHING THAT WE FELT, YOU KNOW, WHOLEHEARTED

01:58PM 18    SUPPORT FOR.

01:58PM 19    Q.   HOW ABOUT THE STATEMENTS THAT YOU HEARD ABOUT THE

01:58PM 20    FINANCIAL STATE OF THERANOS?  DID THOSE STATEMENTS MATTER IN

01:58PM 21    YOUR DECISION TO INVEST?

01:58PM 22    A.   THEY DID.

01:58PM 23         YOU KNOW, OUR UNDERSTANDING HAD BEEN ALONG THE WAY THAT

01:58PM 24    THERANOS WAS ABLE TO CAPTURE, YOU KNOW, SUBSTANTIAL REVENUE

01:58PM 25    FROM PHARMACEUTICAL CONTRACTS AND FROM OTHER SOURCES AND THAT,

01:58PM 1    YOU KNOW, AT SOME POINT HAD BEEN ABLE TO BE CASH FLOW POSITIVE

01:58PM 2    OR SUSTAIN ITSELF FROM KIND OF REVENUES FROM OPERATIONS.

01:58PM 3        SO TO HEAR HER TALK ABOUT FINANCIAL KINDS OF THINGS IN A

01:58PM 4    POSITIVE WAY WAS, WAS EXTREMELY HELPFUL.

01:58PM 5    Q.   AND HOW DID THAT COMPARE TO YOUR UNDERSTANDING IN 2006?

01:58PM 6    A.   IN 2006, YOU KNOW, WHEN WE MADE THE INVESTMENT, OUR

01:58PM 7    UNDERSTANDING WAS THAT THERE WERE LOTS OF THOSE PHARMACEUTICAL

01:59PM 8    CONTRACTS IN PLACE, AND THEN THERE WAS CONTRACTS THAT WERE IN

01:59PM 9    PLACE AT THE TIME THAT WE INVESTED THAT HAD BEEN SIGNED WOULD,

01:59PM 10   YOU KNOW, BE A SUBSTANTIAL SOURCE OF REVENUE.

01:59PM 11       SO, YOU KNOW, THE OPPORTUNITY IN 2013 FELT A LOT BIGGER

01:59PM 12   THAN IT DID IN 2006, LIKE IT HAD MATURED AND THE COMPANY WAS

01:59PM 13   GOING TO BE ABLE TO ADDRESS IT.

01:59PM 14   Q.   THANK YOU.

01:59PM 15       AND FINALLY, THE STATEMENTS THAT MS. HOLMES MADE ABOUT THE

01:59PM 16   WALGREENS ROLLOUT, DID THOSE HAVE SIGNIFICANCE IN YOUR DECISION

01:59PM 17   TO INVEST?

01:59PM 18   A.   THEY DID.

01:59PM 19       LIKE I HAD REFERENCED BEFORE, YOU KNOW, MR. LUCAS AND I

01:59PM 20   HAD CONVERSATIONS ABOUT A RETAIL ROLLOUT AND ABOUT THE

01:59PM 21   COMPANY'S, YOU KNOW, FOCUS ON DEVELOPING THESE KIND OF LOCAL

01:59PM 22   PLACES WHERE THE TESTS COULD BE ADMINISTERED.

01:59PM 23       WE HAD HAD CONVERSATIONS ABOUT SAFEWAY, ABOUT WAL-MART,

01:59PM 24   ABOUT WALGREENS, AND SO THE FACT THAT ONE OF THOSE HAD ACTUALLY

02:00PM 25   MATURED TO A PLACE WHERE THE TECHNOLOGY WAS EMBRACED AND

TOLBERT DIRECT BY MR. SCHENK

02:00PM  1    ADOPTED, YOU KNOW, CERTAINLY WAS SOMETHING THAT WAS PIVOTAL TO

02:00PM  2    OUR INVESTMENT.

02:00PM  3    Q.   YOU'VE DESCRIBED TO THE JURY THE RISKS THAT YOU SAW IN THE

02:00PM  4    2006 INVESTMENT.

02:00PM  5        DID YOUR VIEW OF THE RISKS OF A 2013 INVESTMENT, DID THEY

02:00PM  6    CHANGE?

02:00PM  7    A.   THEY DID.  IT FELT LIKE IN 2013 THE RISK WAS REALLY, YOU

02:00PM  8    KNOW, COULD THEY, COULD THEY ACTUALLY DO WHAT THEY NEEDED TO DO

02:00PM  9    BY WAY OF ROLLING THIS OUT?

02:00PM 10        IT WASN'T WHETHER THE TECHNOLOGY WORKED.  IT WASN'T

02:00PM 11    WHETHER THERE WAS A MARKET FOR IT.

02:00PM 12        IT WAS WHETHER THEY COULD, YOU KNOW, FINANCIALLY ROLL IT

02:00PM 13    OUT AND NOT HAVE A COMPETITIVE RESPONSE THAT WOULD, YOU KNOW,

02:00PM 14    BE ADVERSE TO THEM.

02:00PM 15    Q.   AFTER THE CALL, DID YOU, IN FACT, MAKE A DECISION TO

02:00PM 16    INVEST IN THERANOS?

02:00PM 17    A.   WE DID.

02:00PM 18    Q.   DESCRIBE THAT PROCESS, THE DECISION PROCESS.

02:00PM 19    A.   WELL, SO WE, WE HAD THIS CALL ON DECEMBER 20TH, AS I

02:01PM 20    UNDERSTAND.

02:01PM 21        YOU KNOW, MR. HALL HAD AN ADDITIONAL FURTHER CONVERSATION

02:01PM 22    WITH ELIZABETH.

02:01PM 23        A FEW DAYS LATER WE CONTINUED TO HAVE SOME DISCUSSIONS

02:01PM 24    WITH CHRIS LUCAS ABOUT THAT INVESTMENT AND WHETHER WE WOULD BE

02:01PM 25    ABLE TO INVEST IN THE COMPANY DIRECTLY.

TOLBERT DIRECT BY MR. SCHENK

02:01PM 1        AND ONCE THAT WAS SETTLED, WE, WE DECIDED TO INVEST AN

02:01PM 2    ADDITIONAL $5 MILLION, AND WE SENT THAT IN ON DECEMBER 31ST

02:01PM 3    TRYING TO GET IT IN BEFORE THE DEADLINE.

02:01PM 4    Q.   LET'S TALK ABOUT THAT PROCESS.  FIRST, YOU SAID YOU SENT

02:01PM 5    IT IN ON DECEMBER 31ST; IS THAT RIGHT?

02:01PM 6    A.   I BELIEVE THAT'S RIGHT.

02:01PM 7    Q.   WOULD YOU TURN IN YOUR BINDER TO TAB 5811.

02:02PM 8        I WANT TO ASK YOU QUESTIONS ABOUT THE TOP THREE EMAILS IN

02:02PM 9    THIS DOCUMENT.

02:02PM 10       DO YOU SEE THOSE?

02:02PM 11   A.   I DO.

02:02PM 12   Q.   SO THE FURTHEST ONE DOWN FROM THERANOS TO ANA, IS THAT

02:02PM 13   ANA QUINTANA AT BLACK DIAMOND VENTURES?

02:02PM 14   A.   THAT WOULD BE.

02:02PM 15   Q.   AND THEN ABOVE THAT IS ALSO MS. QUINTANA TO THERANOS.

02:02PM 16       DO YOU SEE THAT?

02:02PM 17   A.   I DO.

02:02PM 18   Q.   AND THE FINALLY THE ONE ABOVE THAT IS AN EMAIL FROM

02:02PM 19   MR. BALWANI TO MS. HOLMES.

02:02PM 20       DO YOU SEE THAT?

02:02PM 21   A.   I DO SEE THAT.

02:02PM 22           MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 5811

02:02PM 23   FOR NOTICE PURPOSES.

02:02PM 24           THE COURT:  ALL OF THE THREE PAGES?

02:02PM 25           MR. SCHENK:  NO, JUST THOSE THREE EMAILS, THE TOP

TOLBERT DIRECT BY MR. SCHENK

02:02PM 1    THREE EMAILS ON THE FIRST PAGE.

02:02PM 2              THE COURT:  SO NOT FOR THE TRUTH OF THE MATTER

02:02PM 3    ASSERTED, BUT SOLELY FOR NOTICE AS TO MR. BALWANI?

02:02PM 4              MR. SCHENK:  YES, SIR.

02:02PM 5              THE COURT:  COUNSEL?

02:03PM 6              MR. CAZARES:  NO OBJECTION.

02:03PM 7              THE COURT:  LADIES AND GENTLEMEN, THIS WILL BE

02:03PM 8    ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED, BUT SOLELY

02:03PM 9    FOR THE ISSUE AS TO NOTICE TO MR. BALWANI AS TO THE ISSUES

02:03PM 10   CONTAINED IN THESE EMAILS.

02:03PM 11        THERE'S THREE?

02:03PM 12             MR. SCHENK:  YES, YOUR HONOR.

02:03PM 13             THE COURT:  ALL RIGHT.  THEY MAY BE PUBLISHED.

02:03PM 14        (GOVERNMENT'S EXHIBIT 5811, TOP THREE EMAILS ON FIRST

02:03PM 15   PAGE, WAS RECEIVED IN EVIDENCE.)

02:03PM 16   BY MR. SCHENK:

02:03PM 17   Q.   MR. TOLBERT, DO YOU SEE ON THE SCREEN THOSE TOP THREE

02:03PM 18   EMAILS?

02:03PM 19   A.   I DO.

02:03PM 20   Q.   AND IF WE START WITH THE ONE ON THE VERY BOTTOM, IT'S FROM

02:03PM 21   AN EMAIL ACCOUNT THAT IS TITLED SHAREHOLDERINFO@THERANOS.COM.

02:03PM 22        DO YOU SEE THAT?

02:03PM 23   A.   YES.

02:03PM 24   Q.   AND THAT WAS SENT TO ANA@BDVENTURES.

02:03PM 25        WHO, AGAIN, IS SHE?

02:03PM 1    A.    SO ANA IS AN EMPLOYEE WITH CHRIS LUCAS AT BLACK DIAMOND

02:03PM 2    VENTURES, AND SHE WAS, YOU KNOW, ONE OF THE PRINCIPALS IN THAT

02:03PM 3    ENTERPRISE.

02:03PM 4    Q.    THANK YOU.

02:03PM 5          SO IF WE GO UP ONE EMAIL, MS. QUINTANA WRITES -- DO YOU

02:04PM 6    SEE THE PARAGRAPH THAT BEGINS "ADDITIONALLY"?

02:04PM 7    A.    I DO.

02:04PM 8    Q.    "PER CHRIS LUCAS'S CONVERSATION WITH ELIZABETH OVER THE

02:04PM 9    WEEKEND, CRAIG HALL WHO INITIALLY INVESTED THROUGH BLACK

02:04PM 10   DIAMOND VENTURES WILL NOW BE INVESTING DIRECTLY."

02:04PM 11         DO YOU SEE THAT?

02:04PM 12   A.    I DO.

02:04PM 13   Q.    AND WAS THAT, IN FACT, TRUE?  WAS THE INVESTMENT THAT THE

02:04PM 14   HALL GROUP, CRAIG HALL, MADE NOW DIRECTLY INTO THERANOS?

02:04PM 15   A.    IT WAS.  IT WAS.

02:04PM 16   Q.    IF WE LOOK AT THE DATE OF THIS EMAIL, IT'S DECEMBER 30TH.

02:04PM 17         WAS THAT THE DAY BEFORE THE WIRE TRANSFER THAT YOU TALKED

02:04PM 18   ABOUT A MOMENT AGO?

02:04PM 19   A.    THAT'S CORRECT.

02:04PM 20   Q.    NOW, IF WE LOOK AT THE VERY TOP EMAIL, DO YOU SEE

02:04PM 21   MR. BALWANI RECEIVING THIS EMAIL FROM -- I'M SORRY, MR. BALWANI

02:04PM 22   SENDING THIS EMAIL TO MS. HOLMES?

02:04PM 23   A.    I DO.

02:04PM 24   Q.    AND THE TEXT IS, "WANT TO MAKE SURE YOU SAW THIS."

02:04PM 25         IS THAT RIGHT?

02:05PM   1    A.   CORRECT.

02:05PM   2    Q.   AND NOW IF YOU COULD TURN TO 3530 IN YOUR BINDER.

02:05PM   3         IF YOU'LL LOOK AT PAGES 1 THROUGH 24 AND PAGE 32.

02:05PM   4         I'M GOING TO ASK IF YOU RECOGNIZE THOSE PAGES.

02:05PM   5    A.   I DO.

02:05PM   6    Q.   WHAT ARE THEY?

02:05PM   7    A.   SO THIS IS THE STOCK PURCHASE AGREEMENT THAT KIND OF

02:05PM   8    GOVERNED OUR INVESTMENT IN 2013.

02:05PM   9    Q.   INTO THERANOS?

02:05PM  10    A.   CORRECT.

02:05PM  11         MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3530,

02:05PM  12    PAGES 1 THROUGH 24 AND PAGE 32.

02:05PM  13         MR. CAZARES:  NO OBJECTION.

02:05PM  14         THE COURT:  THOSE PAGES ARE ADMITTED, AND THEY MAY

02:05PM  15    BE PUBLISHED.

02:05PM  16         MR. SCHENK:  THANK YOU.

02:05PM  17         (GOVERNMENT'S EXHIBIT 3530, PAGES 1-24 AND 32, WAS

02:05PM  18    RECEIVED IN EVIDENCE.)

02:05PM  19    BY MR. SCHENK:

02:05PM  20    Q.   YOU SAID THAT THIS IS THE PURCHASE AGREEMENT FOR THE STOCK

02:06PM  21    IN 2013; IS THAT RIGHT?

02:06PM  22    A.   CORRECT.

02:06PM  23    Q.   I'M GOING TO ASK YOU SOME QUESTIONS ABOUT A FEW PAGES.

02:06PM  24         WOULD YOU PLEASE TURN FIRST TO PAGE 11.

02:06PM  25         AT THE VERY BOTTOM THERE'S A SECTION 4.4, SPECULATIVE

02:06PM  1    NATURE OF INVESTMENT.

02:06PM  2         DO YOU SEE THAT?

02:06PM  3    A.   I DO.

02:06PM  4    Q.   AND IT CARRIES OVER TO THE NEXT PAGE.

02:06PM  5         DID ULTIMATELY YOU SIGN THIS AGREEMENT?

02:06PM  6    A.   I DID.

02:06PM  7    Q.   AND WHEN YOU SIGNED IT, WERE YOU ACKNOWLEDGING THAT YOU

02:06PM  8    UNDERSTOOD THAT THE INVESTMENT WAS SPECULATIVE?

02:06PM  9    A.   I DID.

02:06PM  10   Q.   AND WHAT DID THAT MEAN TO YOU?

02:06PM  11   A.   YOU KNOW, WITH ANY INVESTMENT THERE IS RISK, AND SO, YOU

02:06PM  12   KNOW, THERE'S ALWAYS THE OPPORTUNITY FOR THOSE RISKS TO BE KIND

02:06PM  13   OF SET FORTH, YOU KNOW, AND SO WE KNEW THAT THERE WOULD -- THAT

02:06PM  14   BECAUSE IT WAS AN INVESTMENT, THERE WOULD BE SOME RISK

02:06PM  15   ASSOCIATED WITH THAT, YOU KNOW, BUT THAT CAN TAKE LOTS OF

02:07PM  16   DIFFERENT FORMS, I GUESS.

02:07PM  17        BUT I UNDERSTOOD WHAT -- I UNDERSTOOD THAT, BY THE NATURE

02:07PM  18   OF MAKING AN INVESTMENT, THERE WAS SOME RISK ASSOCIATED WITH

02:07PM  19   THAT.

02:07PM  20   Q.   THANK YOU.

02:07PM  21        NOW, ON PAGE 12, 4.5 IS ACCESS TO DATA.

02:07PM  22        DO YOU SEE THAT?

02:07PM  23   A.   YES.

02:07PM  24   Q.   AND THIS PARAGRAPH DISCUSSES SOME OF THE INFORMATION THAT

02:07PM  25   YOU HAD ACCESS TO; IS THAT RIGHT?

02:07PM   1    A.   CORRECT.

02:07PM   2    Q.   WHEN YOU HAD THAT DECEMBER 20TH PHONE CALL WITH

02:07PM   3    MS. HOLMES, WAS THE INFORMATION THAT SHE COMMUNICATED TO YOU

02:07PM   4    PART OF THE INFORMATION THAT INFORMED YOUR DECISION TO INVEST?

02:07PM   5    A.   CERTAINLY IT WAS.

02:07PM   6    Q.   WOULD YOU NOW LOOK AT PARAGRAPH 4.6, ACCREDITED INVESTOR.

02:07PM   7         DO YOU SEE THAT?

02:07PM   8    A.   I DO.

02:07PM   9    Q.   IS IT TRUE THAT THE HALL GROUP WAS AN ACCREDITED INVESTOR?

02:07PM  10    A.   CORRECT.

02:07PM  11    Q.   WOULD YOU NOW TURN, PLEASE, TO PAGE 32.

02:08PM  12         ON PAGE 32, IS THAT YOUR SIGNATURE?

02:08PM  13    A.   THAT IS.

02:08PM  14    Q.   AND THE DATE IS --

02:08PM  15    A.   DECEMBER 31, 2013.

02:08PM  16    Q.   AND THEN BELOW THAT, DO YOU SEE A SIGNATURE ON A LINE, AND

02:08PM  17    THE LINE INCLUDES NAME, ELIZABETH HOLMES, CEO.

02:08PM  18         DO YOU SEE THAT?

02:08PM  19    A.   I DO.

02:08PM  20    Q.   AND SO WE'VE TALKED ABOUT THE FACT THAT YOU WORKED FOR THE

02:08PM  21    HALL GROUP AND THERE IS A PERSON NAMED CRAIG HALL, BUT YOU ARE

02:08PM  22    SIGNING THIS DOCUMENT; IS THAT RIGHT?

02:08PM  23    A.   CORRECT.

02:08PM  24    Q.   AND WHY DID THAT HAPPEN?  WHY WERE YOU THE ONE WHO SIGNED

02:08PM  25    THE SIGNATURE PAGE IF THE COMPANY IS CALLED HALL GROUP?

02:08PM 1    A.  BECAUSE I AM AN OFFICER OF THE COMPANY AND MR. HALL HAD

02:08PM 2    GIVEN ME THE AUTHORITY TO SIGN OFF ON THIS INVESTMENT.

02:08PM 3    Q.  OKAY.  AFTER YOU MADE THE DECISION TO INVEST, DID YOU WIRE

02:08PM 4    FUNDS TO THERANOS?

02:08PM 5    A.  WE DID.

02:08PM 6    Q.  AND WAS THAT ON THE SAME DATE, DECEMBER 31ST?

02:08PM 7    A.  IT WAS.

02:08PM 8    Q.  DO YOU REMEMBER THE AMOUNT?

02:08PM 9    A.  SO WE -- SO WE MADE AN INVESTMENT OF $5 MILLION.

02:09PM 10        AS PART OF OUR AGREEMENT, BASED ON CONVERSATIONS WITH

02:09PM 11   ELIZABETH HOLMES AND CHRIS LUCAS, AND NOT INVESTING THROUGH

02:09PM 12   CHRIS'S FUND, WE PAID A COMMISSION TO CHRIS, I BELIEVE, OF

02:09PM 13   $125,000.

02:09PM 14        SO THE WIRE WOULD HAVE BEEN IN THE AMOUNT OF 4 MILLION,

02:09PM 15   875, I BELIEVE.

02:09PM 16   Q.  4,875,000?

02:09PM 17   A.  YES.

02:09PM 18   Q.  OKAY.  DID YOU INITIATE THAT WIRE?

02:09PM 19   A.  I DID.

02:09PM 20   Q.  AND WHERE WERE YOU WHEN YOU INITIATED THAT WIRE?

02:09PM 21   A.  IN FRISCO, TEXAS.

02:09PM 22   Q.  AND DID YOU MAKE THE DOLLAR AMOUNT DECISION, 4.8 MILLION,

02:09PM 23   AS OPPOSED TO A DIFFERENT AMOUNT?

02:09PM 24   A.  SO WE HAD HAD A DISCUSSION ABOUT AN INVESTMENT ANYWHERE

02:09PM 25   FROM 0 UP TO $5 MILLION.

TOLBERT DIRECT BY MR. SCHENK                                    4448

02:09PM   1         SO BASED ON THE CONVERSATIONS AND THE THINGS THAT WE

02:10PM   2   LEARNED, I MADE A DECISION TO INVEST AN ADDITIONAL 5 MILLION.

02:10PM   3   Q.   YOU SAID WE HAD HAD DISCUSSIONS.

02:10PM   4        WHO IS THE "WE"?

02:10PM   5   A.   SO MR. HALL AND I HAD DISCUSSIONS ALONG THE WAY ABOUT

02:10PM   6   WHETHER TO INVEST MORE OR HOW MUCH TO INVEST, AND GIVEN THAT HE

02:10PM   7   WAS GOING TO BE TRAVELLING, HE GAVE ME THE ABILITY TO FINALIZE

02:10PM   8   WHATEVER THAT AMOUNT WAS GOING TO BE.

02:10PM   9   Q.   I SEE.  SO IN YOUR CONVERSATIONS WITH MR. HALL, YOU

02:10PM  10   DISCUSSED A RANGE, AND THEN YOU PICKED THE NUMBER WITHIN THE

02:10PM  11   RANGE?

02:10PM  12   A.   CORRECT.

02:10PM  13   Q.   AFTER DECEMBER 31ST, 2013, I WANT TO TALK TO YOU ABOUT THE

02:10PM  14   INFORMATION, IF ANY, YOU RECEIVED IN 2014 AND 2015.

02:10PM  15        DO YOU RECALL RECEIVING UPDATES FROM THERANOS DURING THAT

02:10PM  16   PERIOD OF TIME?

02:10PM  17   A.   I BELIEVE WE RECEIVED A FEW UPDATES FROM THE COMPANY ALONG

02:10PM  18   THE WAY, YOU KNOW, SO THERE WERE A FEW UPDATES.

02:10PM  19        I ALSO CONTINUED TO STAY -- BECAUSE WE HAD A CONTINUING

02:10PM  20   INVESTMENT WITH CHRIS THROUGH HIS FUND, I ALSO STAYED IN CLOSE

02:11PM  21   CONTACT WITH HIM ABOUT THE COMPANY AND WHAT WAS DEVELOPING.

02:11PM  22   Q.   GREAT.  THANK YOU.

02:11PM  23        DID YOU READ AN ARTICLE IN "THE WALL STREET JOURNAL" IN

02:11PM  24   2015, IN OCTOBER OF 2015?

02:11PM  25        DO YOU RECALL THAT?

02:11PM 1    A.   I DO.

02:11PM 2    Q.   AND GENERALLY SPEAKING, WAS THE ARTICLE NEGATIVE?

02:11PM 3    A.   IT WAS.  IT FELT LIKE THAT WAS THE FIRST TIME THAT

02:11PM 4    SOMETHING HAD POPPED UP ON OUR RADAR SCREEN THAT WASN'T KIND

02:11PM 5    OF -- THAT WASN'T EXTREMELY POSITIVE.

02:11PM 6    Q.   I'D LIKE TO ASK YOU IF, AFTER YOUR INVESTMENT IN 2013, THE

02:11PM 7    WIRE THAT WE'VE DISCUSSED, IF THERE WERE THINGS THAT YOU

02:11PM 8    LEARNED ABOUT THE THERANOS TECHNOLOGY THAT WERE DIFFERENT THAN

02:11PM 9    WHAT YOU UNDERSTOOD IT TO BE WHEN YOU MADE THE INVESTMENT.

02:11PM 10        DO YOU UNDERSTAND THAT?

02:11PM 11             MR. CAZARES:  OBJECTION.  FOUNDATION ABOUT THE

02:11PM 12   TECHNOLOGY.

02:11PM 13             THE COURT:  WELL, THIS IS A FOUNDATION FOR THE TOPIC

02:11PM 14   THAT YOU'RE GOING TO ASK?

02:11PM 15             MR. SCHENK:  YES.

02:12PM 16             THE COURT:  ALL RIGHT.

02:12PM 17        DID YOU UNDERSTAND THAT THIS WAS FOUNDATIONAL TO --

02:12PM 18             THE WITNESS:  I MAY GET HIM TO RE-ASK THE QUESTION?

02:12PM 19             THE COURT:  OKAY, LET'S DO THAT.

02:12PM 20   BY MR. SCHENK:

02:12PM 21   Q.   I'M WONDERING AFTER YOU MADE THIS WIRE TRANSFER

02:12PM 22   DECEMBER 31ST, 2013, IF AFTER THAT DATE YOU LEARNED ADDITIONAL

02:12PM 23   INFORMATION ABOUT THE TECHNOLOGY THAT WAS DIFFERENT THAN WHAT

02:12PM 24   YOU UNDERSTOOD IT TO BE WHEN YOU MADE YOUR INVESTMENT?

02:12PM 25   A.   YOU KNOW, AS I RECALL --

TOLBERT DIRECT BY MR. SCHENK                                    4450

02:12PM  1              THE COURT:  EXCUSE ME.  IS THAT A YES OR NO

02:12PM  2      QUESTION?

02:12PM  3              MR. SCHENK:  YES.

02:12PM  4              THE WITNESS:  OKAY.  I'M SORRY.

02:12PM  5          YES.

02:12PM  6      BY MR. SCHENK:

02:12PM  7      Q.  AND I WANT TO ASK YOU NOT WHAT IT IS YOU LEARNED, BUT THE

02:12PM  8      SOURCES.

02:12PM  9      A.  AND JUST TO BE CLEAR, SO 2015 IS THE FIRST TIME THAT I

02:12PM 10      LEARNED SOMETHING THAT FELT LIKE IT WAS DIFFERENT THAN WHAT I

02:12PM 11      HAD LEARNED ALONG THE WAY.

02:12PM 12      Q.  I SEE.  SO BY GIVING THAT ANSWER, ARE YOU SAYING THAT THE

02:12PM 13      SOURCES WERE THE MEDIA?

02:12PM 14      A.  CORRECT.

02:12PM 15      Q.  OKAY.  I WANT TO SHOW YOU ONE FINAL EXHIBIT.

02:12PM 16          WOULD YOU TURN TO 3086.

02:13PM 17          IS 3086 TWO EMAILS, ONE FROM THAT

02:13PM 18      SHAREHOLDERINFO@THERANOS.COM EMAIL ADDRESS, AND THEN ONE FROM

02:13PM 19      YOU AND INDIVIDUALS INCLUDING CRAIG HALL?

02:13PM 20      A.  CORRECT.

02:13PM 21              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3086.

02:13PM 22              MR. CAZARES:  NO OBJECTION.

02:13PM 23              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:13PM 24          (GOVERNMENT'S EXHIBIT 3086 WAS RECEIVED IN EVIDENCE.)

02:13PM 25      BY MR. SCHENK:

TOLBERT DIRECT BY MR. SCHENK                                    4451

02:13PM   1    Q.   MR. TOLBERT, I'M NOT GOING TO ASK YOU TO READ THE TWO PAGE

02:13PM   2    EMAIL, BUT DO YOU RECALL THIS?  DO YOU RECALL THIS EMAIL?

02:14PM   3    A.   I DO.

02:14PM   4    Q.   AND GENERALLY, WHAT WAS THERANOS INFORMING YOU?

02:14PM   5    A.   SO THERANOS WAS LETTING US KNOW THAT THERE HAD BEEN SOME

02:14PM   6    FINDINGS MADE FROM CMS BASED ON A VISIT THAT CMS HAD MADE TO

02:14PM   7    THEIR LAB.

02:14PM   8         AND THEN THERE HAD BEEN SOME ISSUES THAT HAD BEEN FOUND, I

02:14PM   9    THINK.

02:14PM   10   Q.   AND IN IT, DOES THERANOS ALSO DESCRIBE NEW LEADERSHIP IN

02:14PM   11   THE LAB?

02:14PM   12   A.   THEY DO.

02:14PM   13   Q.   AND THEN IT LOOKS LIKE AT THE VERY TOP YOU FORWARD THIS

02:14PM   14   ALONG TO INDIVIDUALS, INCLUDING CRAIG HALL.

02:14PM   15   A.   CORRECT.

02:14PM   16   Q.   AND WHY DID YOU DO THAT?

02:14PM   17   A.   YOU KNOW, CERTAINLY WE HAD GONE ON THIS INVESTMENT FROM

02:14PM   18   THE STATE OF FEELING LIKE EVERYTHING WAS GOING EXTREMELY WELL

02:14PM   19   TO, YOU KNOW, HAVING SOME QUESTIONS ABOUT IT IN THE LATER PART

02:14PM   20   OF 2015 UNTIL THIS TIME IN 2016.

02:15PM   21        AND SO, YOU KNOW, AS I FORWARDED THIS EMAIL, YOU CAN SEE

02:15PM   22   WHAT I WROTE TO MR. HALL, THAT, LOOK, HERE'S SOME MORE BAD

02:15PM   23   NEWS, AND THIS IS REALLY BAD, AND THE COMPANY HAS GOT TO FIND A

02:15PM   24   WAY TO GET IN FRONT OF THIS AND REBUT THESE ALLEGATIONS BEFORE

02:15PM   25   THINGS GET SO NEGATIVE IN THE PRESS.

02:15PM   1      Q.   THANK YOU.

02:15PM   2           YOUR HONOR, MAY I HAVE ONE MOMENT?

02:15PM   3                THE COURT:  YES.

02:15PM   4           (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:15PM   5                MR. SCHENK:  THANK YOU, MR. TOLBERT.

02:15PM   6                THE COURT:  CROSS-EXAMINATION?

02:15PM   7                MR. CAZARES:  YES, YOUR HONOR.

02:15PM   8           MAY I HAVE A SHORT COMFORT BREAK?

02:15PM   9                THE COURT:  SURE.  LET'S DO THAT.  LET'S TAKE ABOUT

02:15PM  10      10, 15 MINUTES, 15 MINUTE BREAK, LADIES AND GENTLEMEN.

02:15PM  11           YOU MAY STAND DOWN.

02:16PM  12           (JURY OUT AT 2:16 P.M.)

02:16PM  13                THE COURT:  YOU CAN STAND DOWN IF YOU WOULD LIKE.

02:16PM  14           PLEASE BE SEATED.  THANK YOU.  WE'LL BE IN RECESS FOR A

02:16PM  15      MOMENT.

02:16PM  16           (RECESS FROM 2:16 P.M. UNTIL 2:29 P.M.)

02:29PM  17           (JURY IN AT 2:29 P.M.)

02:29PM  18                THE COURT:  WE'RE BACK ON THE RECORD.

02:29PM  19           PLEASE BE SEATED.

02:29PM  20           ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

02:29PM  21           AND, COUNSEL, DO YOU HAVE CROSS-EXAMINATION?

02:29PM  22                MR. CAZARES:  YES, YOUR HONOR.  THANK YOU VERY MUCH.

02:30PM  23           MAY I REMOVE MY MASK, YOUR HONOR?

02:30PM  24                THE COURT:  YES, OF COURSE.

02:30PM  25                MR. CAZARES:  THANK YOU.

**CROSS-EXAMINATION**

BY MR. CAZARES:

Q.   MR. TOLBERT, GOOD AFTERNOON.

A.   HI.

Q.   MY NAME IS STEPHEN CAZARES AND I REPRESENT MR. BALWANI.

     I JUST HAVE A FEW QUESTIONS FOR YOU THIS AFTERNOON.

A.   OKAY.

Q.   SO I JUST WANT TO FIRST REVIEW KIND OF YOUR BACKGROUND AND

MR. HALL'S BACKGROUND.

     I UNDERSTAND THAT MR. HALL AND YOURSELF HAVE WORKED

TOGETHER SINCE 2000 -- SINCE 1999 OR SO?

A.   CORRECT.

Q.   AND THIS IS RUNNING THE HALL GROUP; CORRECT?

A.   CORRECT.  HE RUNS THE HALL GROUP.  I DON'T.

Q.   YOU HELP HIM DO IT?

A.   I'M NOT --

Q.   I'M SORRY.  AND THE PRINCIPAL BUSINESS OF THE HALL GROUP

IS REAL ESTATE INVESTING; IS THAT RIGHT?

A.   THAT'S ONE OF OUR PRINCIPAL BUSINESS LINES RIGHT NOW.

Q.   AS WELL AS OTHERS, INCLUDING I THINK THERE WAS A WINERY IN

NAPA?

A.   SO WE ALSO DO -- WE'RE IN THE WINE BUSINESS IN NAPA, AND

WE ALSO HAVE A BUSINESS THAT MAKES LOANS ON CONSTRUCTION

RELATED PROJECTS.

Q.   UH-HUH, OKAY.

02:31PM   1        AND IT WOULD BE FAIR TO DESCRIBE MR. HALL AS A SUCCESSFUL

02:31PM   2    BUSINESSMAN; CORRECT?

02:31PM   3    A.   CORRECT.

02:31PM   4    Q.   A SAVVY INVESTOR?

02:31PM   5    A.   CORRECT.

02:31PM   6    Q.   DOES HIS DUE DILIGENCE?

02:31PM   7    A.   CORRECT.

02:31PM   8    Q.   AND PART OF YOUR JOB IS TO HELP HIM DO THAT AND, YOU KNOW,

02:31PM   9    MAKE GOOD DECISIONS REGARDING HIS INVESTMENT PORTFOLIO?

02:31PM  10    A.   THAT'S CORRECT.

02:31PM  11    Q.   AND AM I CORRECT, I THINK YOU SAID THAT THE INTRODUCTION

02:31PM  12    TO THERANOS CAME FROM GARY NORDHEIMER?

02:31PM  13    A.   THAT'S CORRECT.

02:31PM  14    Q.   AND MR. NORDHEIMER WAS A COLLEAGUE OF MR. HALL?

02:31PM  15    A.   YEAH, THEY'RE FRIENDS, ACQUAINTANCES.  I'M NOT SURE OF THE

02:31PM  16    EXACT NATURE OF THEIR RELATIONSHIP, BUT, YEAH, FRIENDS.

02:31PM  17    Q.   OKAY.  AND ULTIMATELY MR. NORDHEIMER WOUND UP PUTTING

02:31PM  18    MR. HALL AND YOURSELF IN CONTACT WITH CHRIS LUCAS; IS THAT

02:32PM  19    RIGHT?

02:32PM  20    A.   THAT'S CORRECT.

02:32PM  21    Q.   AND AS YOU UNDERSTOOD IT, CHRIS LUCAS WAS ALREADY INVESTED

02:32PM  22    IN THERANOS PRIOR TO YOUR AND MR. HALL'S INITIAL INVESTMENT;

02:32PM  23    CORRECT?

02:32PM  24    A.   THAT'S CORRECT.

02:32PM  25    Q.   AND AS A PART OF THAT CONNECTION TO CHRIS LUCAS, YOU WERE

02:32PM  1    ULTIMATELY INTRODUCED TO DON LUCAS; CORRECT?

02:32PM  2    A.   THAT IS CORRECT.

02:32PM  3    Q.   AND WHEN YOU FIRST MET DON LUCAS IN THAT TIME PERIOD, THAT

02:32PM  4    EARLY 2006 TIME PERIOD --

02:32PM  5    A.   OR LATE 2006.

02:32PM  6    Q.   LATE -- THANK YOU FOR THE CORRECTION.  LATE 2006 TIME

02:32PM  7    PERIOD, AT THE TIME YOU REALLY DIDN'T KNOW WHO DON LUCAS WAS;

02:32PM  8    CORRECT?

02:32PM  9    A.   I DIDN'T.

02:32PM  10   Q.   BUT YOU LEARNED?

02:32PM  11   A.   I DID.

02:32PM  12   Q.   AND WHAT YOU LEARNED WAS THAT MR. LUCAS WAS AN EXTREMELY

02:32PM  13   SUCCESSFUL INVESTOR HERE IN SILICON VALLEY; CORRECT?

02:32PM  14   A.   THAT'S CORRECT.

02:32PM  15   Q.   OKAY.  AND HE WAS THE CHAIRMAN OF VERY SUCCESSFUL

02:32PM  16   COMPANIES AND ACTUALLY INVESTED EARLY IN MANY SUCCESSFUL

02:33PM  17   SILICON VALLEY COMPANIES?

02:33PM  18   A.   CORRECT.

02:33PM  19   Q.   AND YOU WOULD DEFINE DONE LUCAS AS A VERY SUCCESSFUL

02:33PM  20   PERSON?

02:33PM  21   A.   I WOULD.

02:33PM  22   Q.   AND HIS PARTICIPATION IN THERANOS HAD SOME INFLUENCE ON

02:33PM  23   YOURSELF AND MR. HALL'S WILLINGNESS TO INVEST IN THERANOS;

02:33PM  24   CORRECT?

02:33PM  25   A.   IT CERTAINLY WAS A POSITIVE.

02:33PM   1    Q.   SO, AGAIN, YOU SAID BACK IN THIS 2006 TIME PERIOD, I

02:33PM   2    THINK -- DO I HAVE IT RIGHT? -- YOU HAD SOME CALLS WITH

02:33PM   3    CHRIS LUCAS; CORRECT?

02:33PM   4    A.   CORRECT.

02:33PM   5    Q.   AND THIS RELATED TO MR. HALL'S INSTRUCTION TO LOOK INTO

02:33PM   6    THE THERANOS OPPORTUNITY; RIGHT?

02:33PM   7    A.   THAT'S RIGHT.

02:33PM   8    Q.   AND I THINK YOU SAID AT LEAST ONE OF THOSE CALLS WAS WITH

02:33PM   9    MS. HOLMES, OR INCLUDED MS. HOLMES?

02:33PM  10    A.   THAT'S CORRECT.

02:33PM  11    Q.   YOU VISITED CALIFORNIA?

02:33PM  12    A.   I DID.

02:33PM  13    Q.   BUT THE VISIT TO CALIFORNIA WASN'T JUST FOR THERANOS, YOU

02:33PM  14    ACTUALLY HAD OTHER BUSINESS HERE; CORRECT?

02:33PM  15    A.   THAT'S CORRECT.

02:33PM  16    Q.   BUT YOU KIND OF MADE A SIDE TRIP FOR THE THERANOS

02:33PM  17    BUSINESS?

02:33PM  18    A.   THAT'S CORRECT.

02:33PM  19    Q.   AND YOU ACTUALLY VISITED THERANOS'S FACILITIES?

02:33PM  20    A.   YOU KNOW, AS I RECALL, I DID.

02:33PM  21    Q.   AND THEN YOU ALSO HAD DINNER WITH CHRIS LUCAS, DON LUCAS,

02:34PM  22    AND MS. HOLMES?

02:34PM  23    A.   THAT'S CORRECT.

02:34PM  24    Q.   AND IN THAT DINNER, I'LL GET MY NUMBERS RIGHT, THE FOUR OF

02:34PM  25    YOU DISCUSSED THERANOS AND ITS BUSINESS?

TOLBERT CROSS BY MR. CAZARES                                    4457

02:34PM  1      A.   THAT'S RIGHT.

02:34PM  2      Q.   AND KIND OF ELIZABETH'S VISION FOR THE BUSINESS; CORRECT?

02:34PM  3      A.   CORRECT.

02:34PM  4      Q.   YOU DISCUSSED THE TECHNOLOGY; CORRECT?

02:34PM  5      A.   CORRECT.

02:34PM  6      Q.   AND EVERYONE WAS PARTICIPATING IN THIS; CORRECT?

02:34PM  7      A.   YES.

02:34PM  8      Q.   IT WASN'T JUST ELIZABETH, IT WAS DON AND CHRIS LUCAS?

02:34PM  9      A.   THAT'S CORRECT.  EVERYONE WAS PARTICIPATING.

02:34PM 10      Q.   BECAUSE CHRIS AND DON LUCAS ALREADY HAD EXPERIENCE WITH

02:34PM 11      THERANOS; CORRECT?

02:34PM 12      A.   THAT'S CORRECT.

02:34PM 13      Q.   AND YOU HAD DINNER AND LEARNED ABOUT THERANOS.

02:34PM 14           DID YOU TAKE ANY NOTES OF THE DISCUSSION THAT EVENING?

02:34PM 15      A.   I DID NOT.

02:34PM 16      Q.   YOU TRIED TO DO OTHER DUE DILIGENCE, MAYBE SEARCHING THE

02:34PM 17      INTERNET OR OTHER THINGS TO LEARN WHAT YOU COULD?

02:34PM 18      A.   YOU MEAN THAT NIGHT, OR?

02:34PM 19      Q.   AT THAT TIME, BEFORE THE INVESTMENT.

02:34PM 20      A.   AT THAT TIME?

02:35PM 21           SO I DID.  SO WE, YOU KNOW, SEARCHED THE INTERNET.

02:35PM 22           WE ALSO HAD SOME OTHER DUE DILIGENCE THAT WE UNDERTOOK.  I

02:35PM 23      DON'T KNOW HOW MUCH YOU WANT TO KNOW ABOUT WHAT WE DID.

02:35PM 24      Q.   WHAT ELSE DID YOU DO?

02:35PM 25      A.   YOU KNOW, WE HAD -- WE HAD REACHED OUT TO A PATENT

02:35PM  1    ATTORNEY, A FELLOW THAT WE KNEW WHO WAS A PATENT ATTORNEY, AND

02:35PM  2    ASKED HIM TO DO A BRIEF REVIEW OF THE INTELLECTUAL PROPERTY

02:35PM  3    THAT WAS IN PLACE AT THAT TIME.

02:35PM  4        WE REACHED OUT TO A FEW PEOPLE WHO WE KNEW WHO WERE IN

02:35PM  5    MEDICAL HEALTH CARE TECHNOLOGY COMPANIES TO HAVE SOME

02:35PM  6    THEORETICAL DISCUSSIONS ABOUT OPPORTUNITY, ABOUT IF SOMEBODY

02:35PM  7    WAS ABLE TO MEET THIS OPPORTUNITY, WHAT WOULD THAT LOOK LIKE.

02:35PM  8        SO WE HAD SOME ADDITIONAL CONVERSATIONS OUTSIDE OF JUST

02:35PM  9    THE DIRECT ONES THAT WE HAD WITH ELIZABETH.

02:35PM 10    Q.   AND THIS EXTRA DUE DILIGENCE THAT YOU DID ESTABLISHED, AT

02:36PM 11    LEAST TO YOUR AND MR. HALL'S SATISFACTION, THE VISION WAS

02:36PM 12    VIABLE; RIGHT?

02:36PM 13    A.   CORRECT.

02:36PM 14    Q.   THERE WERE SOME PATENTS ALREADY IN PLACE?

02:36PM 15    A.   THAT'S CORRECT.

02:36PM 16    Q.   AND THE PERSONS YOU SPOKE TO ABOUT THE INDUSTRY BELIEVED

02:36PM 17    THIS IS POSSIBLE; CORRECT?

02:36PM 18    A.   CORRECT.

02:36PM 19    Q.   OKAY.  AND THAT'S WHY YOU INVESTED; CORRECT?

02:36PM 20    A.   YES.  WELL, THAT'S NOT WHY WE INVESTED, BUT IT CERTAINLY

02:36PM 21    DIDN'T GIVE US A REASON NOT TO INVEST.

02:36PM 22    Q.   CONTRIBUTED TO THE DECISION?

02:36PM 23    A.   CORRECT.

02:36PM 24    Q.   OKAY.  BUT IT'S ALSO FAIR TO SAY THAT YOUR PRIMARY SOURCES

02:36PM 25    OF INFORMATION WERE CHRIS LUCAS, DON LUCAS, AND MS. HOLMES?

02:36PM    1       A.   THAT'S CORRECT.

02:36PM    2       Q.   AND AT THE TIME IN 2006, I THINK YOU ALREADY SAID IT, YOU

02:36PM    3       DIDN'T KNOW WHO MR. BALWANI WAS; CORRECT?

02:36PM    4       A.   I DID NOT.

02:36PM    5       Q.   AND YOU HAD NEVER SPOKEN TO MR. BALWANI?

02:36PM    6       A.   I HAD NOT.

02:36PM    7       Q.   OKAY.

02:36PM    8       A.   I STILL HAVE NEVER SPOKEN TO MR. BALWANI.

02:36PM    9       Q.   NOW, YOU DESCRIBED THE INTERIM PERIOD, I'LL CALL IT, FROM

02:37PM   10       LATE 2006 TO 2012 WHERE YOU DIDN'T REALLY GET ANY DIRECT

02:37PM   11       COMMUNICATIONS FROM THERANOS IN THE FORM OF UPDATES OR

02:37PM   12       FINANCIAL DETAILS, THAT SORT OF THING; CORRECT?

02:37PM   13       A.   THAT'S CORRECT.

02:37PM   14       Q.   BUT YOU DID GET PERIODIC UPDATES FROM CHRIS LUCAS?

02:37PM   15       A.   THAT'S CORRECT.

02:37PM   16       Q.   AND LUCAS, AT LEAST TO YOUR EYE, APPEARED TO BE

02:37PM   17       KNOWLEDGEABLE ABOUT THERANOS; CORRECT?

02:37PM   18       A.   HE DID.

02:37PM   19            MY UNDERSTANDING WAS THAT HE, YOU KNOW, BY HIS ACCOUNT TO

02:37PM   20       ME, HE SPENT SOME TIME VISITING THE HEADQUARTERS, INTERACTING

02:37PM   21       WITH ELIZABETH, INTERACTING WITH OTHER MEMBERS OF THE COMPANY,

02:37PM   22       AND SO IT FELT LIKE HIS REPORTS WERE CREDIBLE.

02:37PM   23       Q.   AND PERIODICALLY YOU WOULD GET UPDATES THAT SOUNDED LIKE

02:37PM   24       PROGRESS IN THE BUSINESS; CORRECT?

02:37PM   25       A.   YEAH.  I MEAN, REALLY EVERYONE SOUNDED LIKE PROGRESS

02:37PM   1    THROUGH THOSE YEARS.

02:37PM   2    Q.   YOU LEARNED A LITTLE BIT ABOUT THE PHARMACEUTICAL

02:37PM   3    RELATIONSHIPS; CORRECT?

02:37PM   4    A.   CORRECT.

02:37PM   5    Q.   ULTIMATELY YOU LEARNED, THROUGH CHRIS LUCAS, DURING THIS

02:38PM   6    TIME PERIOD THAT THERE WAS A RELATIONSHIP WITH A RETAILER,

02:38PM   7    MAYBE SAFEWAY?

02:38PM   8    A.   WELL, MR. LUCAS HAD REPRESENTED THAT THERE WAS

02:38PM   9    CONVERSATIONS WITH POTENTIAL RETAILERS.  AT FIRST THOSE WERE

02:38PM   10   UNNAMED.

02:38PM   11        LATER SAFEWAY WAS MENTIONED, AS WELL AS WAL-MART AND

02:38PM   12   WALGREENS WERE THE THREE THAT I REMEMBER BY NAME.

02:38PM   13   Q.   AND THAT WAS POSITIVE INFORMATION AS WELL?

02:38PM   14   A.   THAT'S CORRECT.

02:38PM   15   Q.   OKAY.  POSITIVE DEVELOPMENTS; IS THAT RIGHT?

02:38PM   16   A.   CORRECT.  SORRY.

02:38PM   17   Q.   SORRY.  I ASKED THE SAME QUESTION TWICE.  I'LL TRY NOT TO

02:38PM   18   DO THAT.

02:38PM   19        BUT CHRIS LUCAS, DURING THAT INTERIM PERIOD, WASN'T

02:38PM   20   PROVIDING YOU WITH FINANCIAL DETAILS; IS THAT CORRECT?

02:38PM   21   A.   HE WAS NOT.  WE HAD SEVERAL SPECIFIC CONVERSATIONS ABOUT

02:38PM   22   FINANCIAL INFORMATION AND, YOU KNOW, THERE WAS A LITTLE

02:38PM   23   FRUSTRATION ON OUR PART THAT THERE WASN'T MORE FINANCIAL

02:38PM   24   INFORMATION, OR ANY FINANCIAL INFORMATION, THAT CAME.

02:38PM   25        YOU KNOW, MY UNDERSTANDING WAS THAT CHRIS DIDN'T HAVE ANY

02:39PM   1    TO GIVE TO US.

02:39PM   2         YOU KNOW, AT ONE POINT IN MY NOTES, I THINK I REFERENCED

02:39PM   3    CHRIS BEING TIGHT FISTED WITH FINANCIAL INFORMATION, AND SO WE

02:39PM   4    DIDN'T HAVE A LOT OF VISIBILITY WITH FINANCIAL INFORMATION

02:39PM   5    ALONG THE WAY.

02:39PM   6    Q.   SO YOU WERE INTERESTED IN THE INFORMATION, IT JUST WASN'T

02:39PM   7    FORTHCOMING?

02:39PM   8    A.   CORRECT.

02:39PM   9    Q.   AND IN THAT TIME PERIOD, MR. LUCAS, DID HE EVER REPORT TO

02:39PM   10   YOU CASH FLOW ISSUES THAT THERANOS WAS HAVING IN 2009?

02:39PM   11   A.   NOT THAT I REMEMBER WITH ANY SPECIFICS OR WITH ANY

02:39PM   12   CLARITY.

02:39PM   13   Q.   SO WERE YOU AWARE OF THE FACT THAT MR. BALWANI GUARANTEED

02:39PM   14   A $10 MILLION LINE OF CREDIT FOR THERANOS IN AUGUST OF 2009 TO

02:39PM   15   HELP IT STAY IN BUSINESS?

02:39PM   16   A.   I WAS NOT.  I WAS NOT AT THAT TIME.

02:39PM   17   Q.   WERE YOU AWARE OF MR. BALWANI'S ROLE AT THERANOS IN 2009?

02:39PM   18   A.   YOU KNOW, MY ONLY RECOLLECTION OF MR. BALWANI IS MR. LUCAS

02:40PM   19   HAD REFERENCED AT SOME POINT THAT ELIZABETH HAD A BOYFRIEND WHO

02:40PM   20   HAD BEEN VERY SUCCESSFUL AND WHO IS NOW ENGAGED IN THE

02:40PM   21   BUSINESS.

02:40PM   22        AND THEN AT SOME POINT, YOU KNOW, IN ONE OF OUR NEXT

02:40PM   23   UPDATES, CHRIS HAD TOLD ME WHO -- WHAT HIS NAME WAS.

02:40PM   24        BUT I DIDN'T HAVE ANY UNDERSTANDING BEYOND THAT.

02:40PM   25   Q.   OKAY.  SO ULTIMATELY YOU LEARNED THAT IT WAS MR. BALWANI

02:40PM   1    WHO WAS MS. HOLMES'S BOYFRIEND WHO WORKED WITHIN THERANOS?

02:40PM   2    A.   CORRECT.

02:40PM   3    Q.   NOW, BUT AS YOU GOT INTO 2013, YOU BEGAN TO GET SOME

02:40PM   4    UPDATES THAT WERE HELPFUL AND NOTABLE; CORRECT?

02:40PM   5    A.   CORRECT.

02:40PM   6    Q.   INCLUDING, I THINK WE SAW THIS MORNING, THE ANNOUNCEMENT

02:40PM   7    RELATING TO DICK KOVACEVICH AND GENERAL MATTIS JOINING THE

02:40PM   8    BOARD.

02:40PM   9         DO YOU REMEMBER THAT?

02:40PM  10    A.   THAT'S CORRECT.  I'M GLAD YOU HAVE AS MUCH PROBLEM WITH

02:41PM  11    HIS NAME AS I DO.

02:41PM  12    Q.   I DO.  BUT THEY WERE BOTH IMPRESSIVE INDIVIDUALS JOINING

02:41PM  13    THE BOARD; CORRECT?

02:41PM  14    A.   THAT'S TRUE.

02:41PM  15    Q.   AND AS YOU GOT TOWARDS THE LATER 2013 TIME PERIOD WHEN YOU

02:41PM  16    INVESTED, YOU TOOK SOME COMFORT IN THE FACT THAT THERANOS HAD

02:41PM  17    AN EXPERIENCED BOARD OF DIRECTORS; CORRECT?

02:41PM  18    A.   I DID.  IN FACT, YOU KNOW IT WAS A VERY IMPRESSIVE BOARD.

02:41PM  19    NOT TO CAST ASPERSIONS OR BURST ANY BUBBLES OF HOW IMPORTANT

02:41PM  20    PEOPLE WERE, BUT I WAS FROM GEORGIA, I GREW UP IN GEORGIA AND

02:41PM  21    SAM NUNN WAS MY SENATOR, SO WHEN I SAW SAM NUNN'S NAME ON THE

02:41PM  22    BOARD OF DIRECTORS, I MEAN, THAT IS SOMEBODY THAT REALLY, OVER

02:41PM  23    AND ABOVE EVERYBODY ELSE, RESONATED WITH ME.

02:41PM  24    Q.   FORMER SECRETARY OF STATE SHULTZ ALSO?

02:41PM  25    A.   YES.

02:41PM  1    Q.   AND OTHER SIMILAR PERSONS?

02:41PM  2    A.   CORRECT.

02:41PM  3    Q.   AND AT THE TIME, OBVIOUSLY BEING IN THE BUSINESS THAT YOU

02:41PM  4    AND MR. HALL WERE IN, YOU UNDERSTOOD THE ROLE OF THE BOARD OF

02:42PM  5    DIRECTORS IN A COMPANY LIKE THERANOS?

02:42PM  6    A.   CORRECT.

02:42PM  7    Q.   BUT ULTIMATELY THE BOARD HAD THE FINAL SAY ON BUSINESS

02:42PM  8    MATTERS; CORRECT?

02:42PM  9    A.   YOU KNOW, THE BOARD'S PRIMARY RESPONSIBILITY, OBJECTIVE IS

02:42PM  10   OVERSIGHT OF THE MANAGEMENT OF THE COMPANY.

02:42PM  11   Q.   TO ENSURE THAT MANAGEMENT IS EXECUTING ON THE COMPANY'S

02:42PM  12   BUSINESS PLAN?

02:42PM  13   A.   CORRECT.

02:42PM  14   Q.   TO PROTECT INVESTORS; CORRECT?

02:42PM  15   A.   CORRECT.

02:42PM  16   Q.   IN THAT FALL OF 2019 TIME PERIOD, YOU LEARNED ABOUT THE

02:42PM  17   END OF STEALTH MODE AND PUBLIC ANNOUNCEMENTS ABOUT THERANOS IN

02:42PM  18   THE PARTNERSHIP WITH WALGREENS; CORRECT?

02:42PM  19   A.   THAT'S CORRECT.

02:42PM  20   Q.   AND THAT STEALTH MODE THAT THERANOS WAS KIND OF IN FOR ALL

02:42PM  21   OF THOSE YEARS AS IT WAS GROWING AND DEVELOPING, YOU DIDN'T

02:42PM  22   VIEW NECESSARILY THAT STRATEGY AS A NEGATIVE, DID YOU?

02:42PM  23   A.   ALONG THE WAY I DIDN'T, NO.  CERTAINLY IT FELT STRATEGIC

02:43PM  24   ALONG THE WAY TO STAY UNDER THE RADAR SCREEN.

02:43PM  25        LIKE I REFERENCED, I WISH WE HAD SEEN A LITTLE MORE

02:43PM 1   FINANCIAL INFORMATION ALONG THE WAY.

02:43PM 2       AND, YOU KNOW, WE HAD SOME INTERNAL DISCUSSIONS ABOUT

02:43PM 3   THAT, BUT, YOU KNOW, CERTAINLY IT FELT LIKE WAITING UNTIL

02:43PM 4   THINGS WERE READY TO BE ROLLED OUT COMMERCIALLY WAS A VIABLE

02:43PM 5   OPTION.

02:43PM 6   Q.   FAIR ENOUGH.

02:43PM 7       YOUR HONOR, I'D LIKE TO PUBLISH 1113.  I THINK IT'S

02:43PM 8   ALREADY IN EVIDENCE.

02:43PM 9           THE COURT:  SURE.

02:43PM 10          MR. CAZARES:  MAY I PUT IT UP ON THE SCREEN?

02:43PM 11          THE COURT:  YES.

02:43PM 12  BY MR. CAZARES:

02:43PM 13  Q.   SO, MR. TOLBERT, UP ON THE SCREEN IS THIS JOINT PUBLIC

02:43PM 14  ANNOUNCEMENT BY THERANOS AND WALGREENS RELATING TO THE

02:43PM 15  PARTNERSHIP.

02:43PM 16      DO YOU SEE THAT?

02:43PM 17  A.   I DO.

02:43PM 18  Q.   AND IT'S SEPTEMBER 9, 2013.

02:43PM 19      YOU'VE SEEN THIS BEFORE; CORRECT?

02:43PM 20  A.   I HAVE.

02:43PM 21  Q.   AND CONTEMPORANEOUS WITH THE RELEASE OF THE INFORMATION;

02:43PM 22  RIGHT?

02:43PM 23  A.   CORRECT.

02:43PM 24  Q.   OKAY.  AND THIS WAS GREAT NEWS FOR YOU AS AN INVESTOR AND

02:43PM 25  FOR MR. HALL AS AN INVESTOR IN THERANOS; RIGHT?

02:44PM    1      A.    THAT'S CORRECT.

02:44PM    2      Q.    AFTER YEARS OF SOMEWHAT SILENCE AND SLOWED DEVELOPMENTS,

02:44PM    3      NOW A PARTNERSHIP WITH A NATIONAL AND INTERNATIONAL RETAILER TO

02:44PM    4      EXPAND THE BUSINESS, THAT WAS GREAT NEWS?

02:44PM    5      A.    THAT WAS A VERY POSITIVE STEP.

02:44PM    6      Q.    AND THAT HAD SOME INFLUENCE ON YOUR DECISION TO INVEST IN

02:44PM    7      DECEMBER OF 2013; RIGHT?

02:44PM    8      A.    CORRECT.

02:44PM    9      Q.    BECAUSE IT MADE SENSE THAT A CORPORATION LIKE WALGREENS

02:44PM   10      AND THE RESOURCES THAT THEY HAVE WOULD SEEM TO BE THE PERFECT

02:44PM   11      PARTNER FOR SOMEONE LIKE THERANOS; RIGHT?

02:44PM   12      A.    THEY WERE CERTAINLY SOMEBODY THAT WAS VERY STRATEGIC.

02:44PM   13      Q.    AND YOU WOULD ALSO EXPECT THAT A LARGE CORPORATION LIKE

02:44PM   14      WALGREENS WOULD HAVE AT LEAST DONE SOME OF THEIR DUE DILIGENCE

02:44PM   15      REGARDING THERANOS AND ITS TECHNOLOGY TO AT LEAST GAIN SOME

02:44PM   16      COMFORT THAT IT WAS POSSIBLE TO TAKE IT NATIONAL; RIGHT?

02:44PM   17      A.    THAT'S CORRECT.

02:44PM   18      Q.    NOW, YOU ALSO TESTIFIED I THINK THAT YOU -- I DON'T WANT

02:45PM   19      TO SAY DEVELOPED THE HABIT -- BUT YOU ACTIVELY SEARCHED FOR

02:45PM   20      INFORMATION ABOUT THERANOS IN THIS LATE 2013 TIME PERIOD,

02:45PM   21      PARTICULARLY AFTER THESE PUBLIC ANNOUNCEMENTS STARTED TO

02:45PM   22      SURFACE; CORRECT?

02:45PM   23      A.    THAT'S CORRECT.

02:45PM   24      Q.    AND WHATEVER YOU COULD GET YOUR HANDS ON, I THINK YOU

02:45PM   25      SAID, YOU DID AND YOU READ; RIGHT?

02:45PM  1    A.   WHATEVER MY SEARCHS PRODUCED, I DID.

02:45PM  2    Q.   SURE.  AND THAT WOULD HAVE INCLUDED THERANOS'S WEBSITE;

02:45PM  3    RIGHT?

02:45PM  4    A.   THAT'S CORRECT.

02:45PM  5    Q.   AND SO WHATEVER WAS ON THE WEBSITE, FAIR TO SAY AT THAT

02:45PM  6    TIME YOU WOULD HAVE LOOKED AT IT?  AND THIS IS LATE 2013?

02:45PM  7    A.   THAT'S CORRECT.

02:45PM  8    Q.   SO WHATEVER WAS ON THAT WEBSITE WOULD HAVE BEEN KNOWN TO

02:45PM  9    YOU AT THE TIME THAT YOU INVESTED; CORRECT?

02:45PM  10   A.   THAT'S CORRECT.

02:45PM  11   Q.   OKAY.  AND IN THAT TIME PERIOD, THOUGH, YOU DID KNOW THAT

02:45PM  12   THIS ROLLOUT WITH WALGREENS WAS NEW, IT WAS NASCENT?

02:45PM  13   A.   YES.

02:45PM  14   Q.   JUST A FEW STORES?

02:45PM  15   A.   THAT'S CORRECT.  I THINK WHEN THIS ANNOUNCEMENT CAME OUT,

02:45PM  16   THERE WAS ONLY THE ONE LOCATION OPEN.

02:45PM  17   Q.   YEAH.  AND YOU DIDN'T HAVE A CHANCE TO VISIT THAT LOCATION

02:46PM  18   TO GET TESTED, DID YOU?

02:46PM  19   A.   NOT IN 2013.

02:46PM  20        I DID GO AND GET TESTED LATER ON, BUT NOT IN 2013.

02:46PM  21   Q.   AFTER YOUR INVESTMENT?

02:46PM  22   A.   CORRECT.

02:46PM  23   Q.   AND I THINK YOU HAD MENTIONED IN PRIOR STATEMENTS OR

02:46PM  24   TESTIMONY THAT --

02:46PM  25             MR. SCHENK:  OBJECTION.  INADMISSIBLE.  RELEVANCE.

02:46PM   1            THE COURT:  WHY DON'T YOU ASK A FOUNDATIONAL

02:46PM   2    QUESTION ABOUT THIS.

02:46PM   3    BY MR. CAZARES:

02:46PM   4    Q.   YOU GOT TESTED AT A THERANOS LOCATION; CORRECT?

02:46PM   5    A.   I DID GO TO THE PALO ALTO LOCATION TO GET TESTED.

02:46PM   6    Q.   BECAUSE YOU WANTED TO EXPERIENCE THE FINGERSTICK

02:46PM   7    TECHNOLOGY; CORRECT?

02:46PM   8    A.   CORRECT.

02:46PM   9    Q.   AND YOU DID EXPERIENCE THE FINGERSTICK TECHNOLOGY?

02:46PM  10    A.   I DID.

02:46PM  11    Q.   YEAH.  YOUR PHYSICIAN ORDERED SOME TESTS, OR A TEST THAT

02:46PM  12    WASN'T AVAILABLE ON THE FINGERSTICK, SO YOU SAID, DON'T GIVE ME

02:46PM  13    THAT ONE, I WANT TO DO THE FINGERSTICK?

02:46PM  14    A.   WELL, HE ORDERED TWO OR THREE OR FOUR TESTS, AND WHEN I

02:46PM  15    GOT THERE THEY SAID, LOOK, WE CAN DO THESE WITH THE FINGERSTICK

02:46PM  16    AND THESE WITH THE REGULAR BLOOD DRAW, AND I SAID SIGN ME UP

02:46PM  17    FOR THE FINGERSTICK.

02:46PM  18    Q.   AND THAT WAS COMMUNICATED TO YOU ON SITE AT THE WALGREENS?

02:47PM  19    A.   THAT'S CORRECT.

02:47PM  20    Q.   OKAY.  NOW, YOU DESCRIBED THE PHONE CALL THAT YOU HAD, OR

02:47PM  21    ACTUALLY IT WAS A LITTLE MORE OF A CONFERENCE CALL; IS THAT

02:47PM  22    FAIR?

02:47PM  23    A.   THAT'S CORRECT.

02:47PM  24    Q.   WITH MS. HOLMES IN DECEMBER OF 2013?

02:47PM  25    A.   IT WAS A CONFERENCE CALL.

02:47PM 1    Q.   AND ON THE CALL WAS MS. HOLMES, MR. LUCAS, CHRIS LUCAS?

02:47PM 2    A.   YEAH, MR. LUCAS HAD INVITED HIS INVESTOR GROUP, SO, YOU

02:47PM 3    KNOW, THE INDIVIDUALS WHO HAD INVESTED THROUGH HIS

02:47PM 4    BLACK DIAMOND ENTITY, TO HEAR FROM MS. HOLMES ON THAT DAY.

02:47PM 5    Q.   AND MR. HALL ATTENDED, OR LISTENED IN?

02:47PM 6    A.   HE WAS ON THE CALL.

02:47PM 7    Q.   OKAY.  AND YOU HAD MENTIONED ON DIRECT THAT YOU ACTUALLY

02:48PM 8    RECORDED THE CALL; CORRECT?

02:48PM 9    A.   THAT'S CORRECT.

02:48PM 10   Q.   AND YOU RECORDED IT BECAUSE YOU WANTED TO PRESERVE KIND OF

02:48PM 11   WHAT WAS SAID FOR FUTURE REFERENCE; RIGHT?

02:48PM 12   A.   WELL, I RECORDED IT BECAUSE MR. HALL AND I HAD SOME

02:48PM 13   DISCUSSIONS PRIOR TO THAT CALL ABOUT QUESTIONS THAT WE WANTED

02:48PM 14   TO HEAR ADDRESSED.

02:48PM 15       HE WAS GOING TO BE TRAVELLING, AND I KNEW HE WOULD, YOU

02:48PM 16   KNOW, CALL ME AFTER THAT CALL AND ASK EVERYTHING THAT WAS SAID.

02:48PM 17       AND SO I RECORDED IT TO MAKE SURE THAT I DIDN'T MISS ANY

02:48PM 18   OF THE SALIENT POINTS.

02:48PM 19   Q.   FAIR ENOUGH.

02:48PM 20       AND YOU'VE PRODUCED A COPY OF THAT RECORDING IN THE COURSE

02:48PM 21   OF THESE INVESTIGATIONS, HAVEN'T YOU?

02:48PM 22   A.   THAT'S CORRECT.

02:48PM 23   Q.   AND YOU'VE DISCUSSED THAT RECORDING WITH THE GOVERNMENT,

02:48PM 24   HAVEN'T YOU?

02:48PM 25   A.   I HAVE.

02:48PM   1   Q.   DID YOU LISTEN TO THE RECORDING BEFORE YOU TESTIFIED HERE

02:48PM   2   TODAY?

02:48PM   3   A.   YOU MEAN DID I LISTEN TO IT TODAY?

02:48PM   4   Q.   OR RECENTLY?

02:49PM   5   A.   I HAVE NOT.

02:49PM   6   Q.   IT'S BEEN, NOT TEN YEARS, BUT ABOUT NINE, NINE AND A THIRD

02:49PM   7   YEARS I GUESS SINCE THAT TELEPHONE CONVERSATION WITH

02:49PM   8   MS. HOLMES; RIGHT?   DECEMBER OF 2013?

02:49PM   9   A.   I GUESS THAT'S RIGHT.

02:49PM  10   Q.   OKAY.  I TRIED TO DO MY MATH.

02:49PM  11        YOU DON'T REMEMBER WORD FOR WORD WHAT MS. HOLMES SAID THAT

02:49PM  12   DAY?

02:49PM  13   A.   I DO NOT.

02:49PM  14   Q.   IT'S A ONE HOUR TELEPHONE CALL OR SO; RIGHT?

02:49PM  15   A.   I HAVE NEVER KNOWN WORD FOR WORD WHAT WAS ON THE TAPE.

02:49PM  16   Q.   OKAY.  WOULD IT HELP YOU TO RECALL WHAT WAS ON THE TAPE IF

02:49PM  17   YOU LOOKED AT A TRANSCRIPT OF THE TAPE?

02:49PM  18   A.   I'M CERTAIN.  I'M CERTAIN IT WOULD HELP ME REMEMBER.

02:49PM  19   Q.   OKAY.  BUT YOU DON'T --

02:49PM  20   A.   WHICH IS WHY I MADE THE RECORDING IN THE FIRST PLACE,

02:49PM  21   RIGHT?

02:49PM  22   Q.   YEAH.

02:49PM  23        NOW, MR. BALWANI WAS NOT ON THAT CONFERENCE CALL; CORRECT?

02:50PM  24   A.   HE WAS NOT.

02:50PM  25   Q.   HE DIDN'T SAY --

02:50PM  1     A.   AT LEAST TO MY KNOWLEDGE HE WAS NOT.

02:50PM  2     Q.   FAIR ENOUGH.

02:50PM  3          HE DIDN'T -- HE WASN'T A SPEAKER IN THE CALL AS FAR AS YOU

02:50PM  4     KNOW?

02:50PM  5     A.   HE WAS NOT.

02:50PM  6     Q.   AND YOU HAVE NO KNOWLEDGE YOURSELF THAT MR. BALWANI WAS

02:50PM  7     EVEN LISTENING IN ON THE CALL; CORRECT?

02:50PM  8     A.   I DON'T.

02:50PM  9     Q.   AND JUST TO MAKE CLEAR, MS. HOLMES WASN'T THE ONLY SPEAKER

02:50PM  10    ON THE CALL; RIGHT?

02:50PM  11    A.   SHE WAS THE ONLY OUTSIDE SPEAKER FROM THERANOS WHO WAS ON

02:50PM  12    THE CALL, BUT, I MEAN, A LOT OF THE PEOPLE ON THE CALL SPOKE AS

02:50PM  13    WELL.

02:50PM  14    Q.   AND CHRIS LUCAS ASKED QUESTIONS AS WELL?

02:50PM  15    A.   THAT'S CORRECT.

02:50PM  16    Q.   YOU DID NOT ASK QUESTIONS ON THE CALL?

02:50PM  17    A.   I DID NOT.

02:50PM  18    Q.   MR. HALL ASKED A COUPLE?

02:50PM  19    A.   AS I REMEMBER HE ASKED A COUPLE.

02:50PM  20    Q.   NOW, IN THAT LATE TIME PERIOD, YOU, YOU INDICATED THAT IN

02:51PM  21    THE PRIOR INVESTMENT, AND EVEN IN THAT DARK PERIOD BETWEEN 2006

02:51PM  22    AND '12, YOU KIND OF SOUGHT FINANCIAL INFORMATION, WOULD HAVE

02:51PM  23    LIKED TO GET IT, BUT IT WAS NEVER FORTHCOMING; CORRECT?

02:51PM  24    A.   THAT'S CORRECT.

02:51PM  25    Q.   AND PRIOR TO YOUR DECEMBER 2013 INVESTMENT, YOU STILL

02:51PM   1    DIDN'T GET ANY FINANCIAL DETAILS OR INFORMATION; CORRECT?

02:51PM   2    A.   WE DIDN'T.

02:51PM   3         WE ASKED FOR IT, BUT THAT WASN'T PROVIDED.

02:51PM   4    Q.   AND NOTWITHSTANDING THAT FACT, YOU STILL, YOU AND MR. HALL

02:51PM   5    DECIDED IT WAS WORTH IT TO INVEST; CORRECT?

02:51PM   6    A.   CORRECT.

02:51PM   7    Q.   AND YOU HAVE NO KNOWLEDGE OR INFORMATION THAT MR. HALL

02:51PM   8    EVER SPOKE TO MR. BALWANI EITHER; CORRECT?

02:51PM   9    A.   I DO NOT.

02:51PM  10    Q.   SO IT'S FAIR TO SAY THAT MR. BALWANI HAD NO RELATIONSHIP

02:51PM  11    OR CONNECTION TO YOUR 2006 INVESTMENT; CORRECT?

02:51PM  12    A.   CORRECT.

02:51PM  13    Q.   AND MR. BALWANI HIMSELF HAD NO INFLUENCE ON YOUR DECISION

02:52PM  14    TO INVEST IN 2013; CORRECT?

02:52PM  15    A.   CORRECT.

02:52PM  16         MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

02:52PM  17         THE COURT:  REDIRECT?

02:52PM  18         MR. SCHENK:  YES.  THANK YOU.

02:52PM  19                    **REDIRECT EXAMINATION**

02:52PM  20    BY MR. SCHENK:

02:52PM  21    Q.   GOOD AFTERNOON AGAIN, MR. TOLBERT.

02:52PM  22         THERE'S JUST ONE AREA I WANT TO FOLLOW UP ON, AND THAT WAS

02:52PM  23    THE RESPONSIBILITY OF THE BOARD OF DIRECTORS.  I THINK YOU WERE

02:52PM  24    ASKED SOME QUESTIONS ABOUT THAT?

02:52PM  25         DO YOU RECALL THOSE QUESTIONS?

02:52PM   1    A.   I DO.

02:52PM   2    Q.   AND I CAN'T REMEMBER IF YOU SAID OR MR. CAZARES SAID THAT

02:52PM   3    THEY HAD AN OBLIGATION TO PROTECT INVESTORS; IS THAT RIGHT?

02:52PM   4    A.   THAT'S CORRECT.  HE ASKED ME IF THEY HAD A RESPONSIBILITY

02:52PM   5    TO PROTECT INVESTORS.

02:53PM   6    Q.   AND ARE THERE DIFFERENT KINDS OF BOARDS OR DIRECTORS,

02:53PM   7    FIDUCIARY BOARDS, OR ADVISORY BOARDS, OR ARE ALL BOARD OF

02:53PM   8    DIRECTORS THE SAME?

02:53PM   9    A.   NO.   THERE ARE DIFFERENT BOARDS WITH DIFFERENT

02:53PM   10   RESPONSIBILITIES.

02:53PM   11   Q.   AND DO YOU KNOW WHICH KIND THERANOS HAD?

02:53PM   12   A.   YOU KNOW, I KNOW THERE WERE SOME CHANGES ALONG THE WAY,

02:53PM   13   SO, I MEAN, IT DEPENDS ON I GUESS WHAT EXACT MOMENT IN TIME.

02:53PM   14        YOU KNOW, IT'S ALSO THE CASE THAT A BOARD OF DIRECTORS,

02:53PM   15   YOU KNOW, HAS A, HAS A FIDUCIARY DUTY TO INVESTORS AND

02:53PM   16   STOCKHOLDERS AND BOND HOLDERS IN A DIFFERENT WAY WHEN, YOU

02:53PM   17   KNOW, THERE'S A CONCERN ABOUT A BUSINESS'S ONGOING VIABILITY.

02:53PM   18   Q.   WHEN YOU MADE THE DECISION TO INVEST IN 2013,

02:53PM   19   DECEMBER 31ST, 2013, DID YOU KNOW WHAT KIND OF BOARD OF

02:53PM   20   DIRECTORS THERANOS HAD?

02:53PM   21   A.   YOU KNOW, I THINK THEY HAD A FIDUCIARY BOARD AT THAT POINT

02:54PM   22   IS WHAT MY ASSUMPTION WOULD HAVE BEEN.

02:54PM   23   Q.   WHEN YOU SAID YOUR ASSUMPTION, I'M JUST WONDERING WHAT

02:54PM   24   THAT WAS BASED ON.  DO YOU REMEMBER?

02:54PM   25   A.   WELL, IN 2013 I HAD ONLY SEEN THE POSTING ON THE WEBSITE

02:54PM   1     ABOUT WHO WAS SERVING ON THE BOARD, SO THAT IS ALL OF THE

02:54PM   2     VISIBILITY I WOULD HAVE HAD INTO THE BOARD OR WHAT THEIR

02:54PM   3     RESPONSIBILITIES WERE.

02:54PM   4     Q.    OKAY.  THANK YOU VERY MUCH.

02:54PM   5           YOUR HONOR, NO FURTHER QUESTIONS.

02:54PM   6               MR. CAZARES:  JUST TWO QUESTIONS.

02:54PM   7               THE COURT:  SURE.

02:54PM   8                     **RECROSS-EXAMINATION**

02:54PM   9     BY MR. CAZARES:

02:54PM  10     Q.    MR. TOLBERT, IN THAT TIME PERIOD OF THE 2006 INVESTMENT

02:54PM  11     FORWARD AND INTO THOSE, I'LL CALL THEM, MORE SILENT YEARS INTO

02:54PM  12     2012, YOU UNDERSTOOD THAT DON LUCAS WAS AN INVESTOR IN

02:54PM  13     THERANOS; RIGHT?

02:54PM  14     A.    THAT'S CORRECT.

02:54PM  15     Q.    AND YOU UNDERSTOOD HE WAS A MEMBER OF THE BOARD OR

02:54PM  16     DIRECTORS; CORRECT?

02:54PM  17     A.    FOR A PERIOD OF TIME HE WAS.

02:54PM  18     Q.    AND HE WAS EVEN THE CHAIRMAN; CORRECT?

02:54PM  19     A.    CORRECT.

02:54PM  20     Q.    AND JUST TO BE CLEAR -- OH, GO AHEAD.

02:55PM  21     A.    I GUESS IT DEPENDS ON WHAT EXACT MOMENT IN TIME.  I KNOW

02:55PM  22     CHRIS HAD TOLD ME AT SOME POINT THAT HIS UNCLE HAD HEALTH

02:55PM  23     PROBLEMS THAT CAUSED HIM TO STEP OFF THE BOARD, AND I DON'T

02:55PM  24     REMEMBER EXACTLY WHAT MOMENT IN TIME THAT WAS.

02:55PM  25     Q.    FAIR ENOUGH.  AND NEW BOARD MEMBERS JOINED LATER ON?

02:55PM   1    A.   CORRECT.

02:55PM   2    Q.   AND JUST TO BE CLEAR, YOU PROVIDED A COPY OF THE RECORDING

02:55PM   3    OF THE CONFERENCE CALL WITH MS. HOLMES TO THE GOVERNMENT;

02:55PM   4    CORRECT?

02:55PM   5             MR. SCHENK:  OBJECTION.  BEYOND THE SCOPE.

02:55PM   6             THE COURT:  SUSTAINED.

02:55PM   7             MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

02:55PM   8             THE COURT:  ANYTHING FURTHER?

02:55PM   9             MR. SCHENK:  NO, YOUR HONOR.

02:55PM  10             MR. CAZARES:  NO, YOUR HONOR.

02:55PM  11             THE COURT:  MAY THIS WITNESS BE EXCUSED?

02:55PM  12             MR. SCHENK:  YES, YOUR HONOR.

02:55PM  13             MR. CAZARES:  YES, YOUR HONOR.

02:55PM  14             THE COURT:  YOU'RE EXCUSED.

02:55PM  15             THE WITNESS:  THANK YOU.

02:55PM  16             THE COURT:  DOES THE GOVERNMENT HAVE A WITNESS TO

02:55PM  17    FILL OUR LAST 65 MINUTES?

02:55PM  18             MR. SCHENK:  NO, NOT TODAY, YOUR HONOR.

02:55PM  19             THE COURT:  OKAY.

02:55PM  20        JUST LEAVE THAT THERE.  THEY'LL COLLECT IT.  THANK YOU.

02:55PM  21             THE WITNESS:  OKAY.

02:56PM  22             THE COURT:  SO WE HAVE -- LET'S SEE.  OUR NEXT TIME

02:56PM  23    TOGETHER, FOLKS, IS TUESDAY, TUESDAY.

02:56PM  24        AND I'M HOPING THAT WE CAN GO UNTIL 4:00 O'CLOCK ON

02:56PM  25    TUESDAY AND WE'LL HAVE WITNESSES AVAILABLE FOR US FOR TUESDAY.

02:56PM 1       AND THEN WEDNESDAY.  WE'RE ONLY IN SESSION TWO DAYS NEXT

02:56PM 2   WEEK.

02:56PM 3       LEST YOU HAVE ANY CONCERNS ABOUT THIS, IT'S NOT BECAUSE

02:56PM 4   CINCO DE MAYO FALLS NEXT WEEK, I JUST WANT YOU TO KNOW THAT.

02:56PM 5   THERE'S NO CONNECTION BETWEEN THE RECESSES FOR THAT PURPOSE.

02:56PM 6       SO WE WILL BREAK AGAIN TODAY, NOW.

02:56PM 7       ANY REASON WHY WE SHOULDN'T BREAK NOW FOR THE WEEKEND?

02:56PM 8           MR. SCHENK:  NO, YOUR HONOR.

02:56PM 9           MR. CAZARES:  NO, YOUR HONOR.

02:56PM 10          THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, I TOLD

02:56PM 11  YOU I'D KEEP YOU UNTIL 4:00 AND I JUST KEEP DISAPPOINTING YOU.

02:56PM 12  SO WE'RE GOING TO RECESS NOW FOR THE WEEKEND.

02:56PM 13      PLEASE -- I'LL REMIND YOU OF THE ADMONITION.  PLEASE DON'T

02:56PM 14  LEARN, DISCUSS, DO ANY INVESTIGATION, OR WATCH OR READ ANYTHING

02:56PM 15  ABOUT THIS CASE DURING THE WEEKEND.

02:57PM 16      ENJOY YOUR WEEKEND, AND WE'LL SEE YOU TUESDAY NEXT,

02:57PM 17  TUESDAY NEXT AT 9:00 A.M., PLEASE.

02:57PM 18          (JURY OUT AT 2:57 P.M.)

02:57PM 19          THE COURT:  THE JURY HAS LEFT FOR THE EVENING.

02:57PM 20      PLEASE BE SEATED.

02:57PM 21      JUST TO REVIEW SCHEDULE FOR NEXT WEEK IF WE COULD.

02:57PM 22          MR. SCHENK:  THANK YOU, YOUR HONOR.

02:57PM 23      THE GOVERNMENT DISCLOSED YESTERDAY TWO WITNESSES TO THE

02:57PM 24  DEFENSE.

02:57PM 25      WE ALSO REMINDED THE DEFENSE THAT ON WEDNESDAY WE ARE

02:58PM   1    RECALLING MR. JHAVERI.

02:58PM   2                 THE COURT:  RIGHT.

02:58PM   3                 MR. SCHENK:  WE HAVE MADE A REPRESENTATION TO

02:58PM   4    MR. JHAVERI THAT HE WOULD START AT 9:00 A.M. ON WEDNESDAY, EVEN

02:58PM   5    IF OUR 4:00 P.M. TUESDAY WITNESS IS STILL CARRYING OVER, TO

02:58PM   6    INCREASE THE LIKELIHOOD THAT MR. JHAVERI COMPLETES HIS

02:58PM   7    TESTIMONY ON WEDNESDAY.

02:58PM   8         WE ACTUALLY REACHED OUT TO THE DEFENSE TO HELP US

02:58PM   9    ESTABLISH A SCHEDULE FOR NEXT WEEK, TO GIVE US SOME INSIGHT

02:58PM  10    INTO HOW LONG THEIR REMAINING CROSS IS OF MR. JHAVERI, BUT WE

02:58PM  11    HAVE NOT HEARD.

02:58PM  12         THAT WOULD BE HELPFUL AS WE FILL OUT THE REST OF

02:58PM  13    WEDNESDAY.  WE DON'T KNOW HOW MUCH TIME WE HAVE TO FILL NEXT

02:58PM  14    TUESDAY AND WEDNESDAY GIVEN THAT MR. JHAVERI IS GOING TO BE

02:58PM  15    TAKEN POTENTIALLY OUT OF ORDER.

02:58PM  16                 THE COURT:  AND HE, MR. JHAVERI, IS AVAILABLE ALL

02:58PM  17    DAY ON WEDNESDAY?

02:58PM  18                 MR. SCHENK:  YES.

02:58PM  19                 THE COURT:  WE'RE NOT IN SESSION ANY OTHER DAYS NEXT

02:58PM  20    WEEK, SO LET'S SEE IF WE CAN -- DO YOU KNOW, JUST TALKING ABOUT

02:58PM  21    MR. JHAVERI, MR. COOPERSMITH, DO YOU KNOW IF WE'LL BE ABLE TO

02:59PM  22    FINISH HIM ON WEDNESDAY?

02:59PM  23                 MR. COOPERSMITH:  YES, YOUR HONOR.  HE'S NOT BEING

02:59PM  24    RECALLED.  HE'S STILL ON CROSS.

02:59PM  25                 THE COURT:  WELL, HIS TESTIMONY, WILL WE COMPLETE IT

02:59PM 1    ON WEDNESDAY?

02:59PM 2            MR. COOPERSMITH:  WE WILL CONTINUE WITH HIS CROSS,

02:59PM 3    AND I ANTICIPATE I WILL FINISH HIS EXAMINATION WITHIN A FEW

02:59PM 4    HOURS.  IT WILL DEFINITELY BE BEFORE THE END OF THE DAY.

02:59PM 5        I ANTICIPATE THERE WILL BE TIME FOR THE GOVERNMENT'S

02:59PM 6    REDIRECT AS WELL ON WEDNESDAY, BUT I WILL CHECK MY NOTES AND

02:59PM 7    CONFER WITH MR. SCHENK OVER THE WEEKEND SO THAT HE'S CLEAR ON

02:59PM 8    THAT.

02:59PM 9            THE COURT:  OKAY.  OKAY.  THAT'S HELPFUL.

02:59PM 10           MR. SCHENK:  IT IS.  THANK YOU.

02:59PM 11       YES, THAT'S HELPFUL.  THANK YOU.

02:59PM 12           THE COURT:  SO TUESDAY WE'LL HAVE A WITNESS, AND --

02:59PM 13           MR. SCHENK:  YES.  YES, YOUR HONOR.

02:59PM 14       (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:59PM 15           MR. SCHENK:  THE INDIVIDUALS THAT WE DISCLOSED ARE A

02:59PM 16   CMS EMPLOYEE AND A PFIZER EMPLOYEE.

03:00PM 17       I DON'T KNOW, WE MAY HAVE TO CONFER WITH THE DEFENSE,

03:00PM 18   WHETHER THOSE FILL TUESDAY.  I SUSPECT THAT THEY MIGHT.

03:00PM 19       BUT IT SOUNDS LIKE MR. JHAVERI MAY NOT FILL ALL OF

03:00PM 20   WEDNESDAY, ALTHOUGH I APPRECIATE THAT MR. COOPERSMITH WILL

03:00PM 21   PROVIDE ADDITIONAL INFORMATION TO US, ALL TO SAY IT SOUNDS LIKE

03:00PM 22   WE MAY NEED ANOTHER WITNESS IF WE'RE GOING 9:00 TO 4:00 ON TWO

03:00PM 23   DAYS NEXT WEEK, SO --

03:00PM 24           THE COURT:  RIGHT.

03:00PM 25           MR. SCHENK:  SO WE WILL MEET AND CONFER ON THAT.

4478

03:00PM  1          THE COURT:  OKAY.  THAT'S HELPFUL.

03:00PM  2        SO DO YOU THINK -- MAYBE I MISHEARD MR. COOPERSMITH.

03:00PM  3        SO DO YOU THINK MR. JHAVERI WILL FINISH BY THE END OF

03:00PM  4    WEDNESDAY?

03:00PM  5          MR. COOPERSMITH:  YES, I WOULD -- JUST ROUGHLY,

03:00PM  6    AGAIN, YOUR HONOR, I WILL TELL MR. SCHENK OVER THE WEEKEND.

03:00PM  7          THE COURT:  YES.

03:00PM  8          MR. COOPERSMITH:  BUT I'M THINKING MY ADDITIONAL

03:00PM  9    CROSS OF MR. JHAVERI COULD BE TWO AND A HALF HOURS, AROUND THAT

03:00PM  10   LENGTH, POSSIBLY A LITTLE LONGER.

03:00PM  11       AGAIN, I'LL CONFIRM THAT.

03:00PM  12          THE COURT:  YES.

03:01PM  13          MR. COOPERSMITH:  I THINK THAT'S WHAT WE'RE TALKING

03:01PM  14   ABOUT.

03:01PM  15          THE COURT:  GREAT.

03:01PM  16          MR. COOPERSMITH:  REDIRECT, I DON'T KNOW OBVIOUSLY

03:01PM  17   HOW LONG THAT IS GOING TO TAKE.  BUT THEY MIGHT WELL NEED

03:01PM  18   ANOTHER WITNESS.

03:01PM  19       IF MS. BENNETT IS THE CMS EMPLOYEE THAT MR. SCHENK IS

03:01PM  20   REFERRING TO, IF SHE TESTIFIES, THAT COULD TAKE A LITTLE WHILE

03:01PM  21   TO DEAL WITH HER.

03:01PM  22          THE COURT:  SURE.

03:01PM  23          MR. COOPERSMITH:  WE MAY HAVE SOME ADDITIONAL

03:01PM  24   MATTERS TO RAISE WITH THE COURT ABOUT MS. BENNETT.

03:01PM  25       AND FOR THAT MATTER, WE MAY HAVE SOME ADDITIONAL MATTERS

03:01PM   1    TO RAISE ABOUT MR. WEBER, WHO THE COURT MAY REMEMBER IS AN

03:01PM   2    EMPLOYEE OF PFIZER AND THERE'S SOME ISSUE AROUND THAT REPORT.

03:01PM   3         SO WE WILL ENDEAVOR TO BRING THOSE TO THE COURT'S

03:01PM   4    ATTENTION AT THE EARLIEST OPPORTUNITY, BUT THAT'S WHAT WE'VE

03:01PM   5    GOT.

03:01PM   6              THE COURT:  OKAY.  ALL RIGHT.  THANK YOU.

03:01PM   7         I WAS JUST CONCERNED ABOUT MR. JHAVERI HAVING TO STAY

03:01PM   8    ANOTHER WEEK.

03:01PM   9              MR. COOPERSMITH:  YOUR HONOR, THAT'S NOT MY PLAN,

03:01PM   10   YOUR HONOR.  I DON'T WANT TO DO THAT TO MR. JHAVERI.

03:01PM   11             THE COURT:  OKAY.  GREAT.  WELL, THANK YOU.

03:01PM   12        OKAY.  ANYTHING FURTHER THEN BEFORE WE BREAK TODAY?

03:01PM   13             MR. SCHENK:  NO.  THANK YOU VERY MUCH.

03:01PM   14             MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

03:01PM   15             THE COURT:  THANKS VERY MUCH.

03:01PM   16             MR. COOPERSMITH:  HAVE A NICE WEEKEND.

03:02PM   17             THE COURT:  YOU AS WELL.

03:02PM   18             THE CLERK:  COURT IS ADJOURNED.

03:02PM   19        (COURT ADJOURNED AT 3:02 P.M.)

          20

          21

          22

          23

          24

          25

1

2

3                      CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
17         CERTIFICATE NUMBER 8076

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
20         CERTIFICATE NUMBER 9595

21         DATED:  APRIL 29, 2022

22

23

24

25