1

2                  UNITED STATES DISTRICT COURT

3                 NORTHERN DISTRICT OF CALIFORNIA

4                       SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,          )
6                                      )  CR-18-00258-EJD
                    PLAINTIFF,         )
7                                      )  SAN JOSE, CALIFORNIA
            VS.                        )
8                                      )  MAY 3, 2022
    RAMESH "SUNNY" BALWANI,            )
9                                      )  VOLUME 25
                    DEFENDANT.         )
10  _____   )  PAGES 4481 - 4747

11

12              TRANSCRIPT OF TRIAL PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13               UNITED STATES DISTRICT JUDGE

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                          BY:  JOHN C. BOSTIC
16                             JEFFREY B. SCHENK
                          150 ALMADEN BOULEVARD, SUITE 900
17                        SAN JOSE, CALIFORNIA 95113

18                        BY:  ROBERT S. LEACH
                          1301 CLAY STREET, SUITE 340S
19                        OAKLAND, CALIFORNIA 94612

20       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21  OFFICIAL COURT REPORTERS:
                             IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                           CERTIFICATE NUMBER 8074
                             LEE-ANNE SHORTRIDGE, CSR, CRR
23                           CERTIFICATE NUMBER 9595

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
25

```
 1      A P P E A R A N C E S:  (CONT'D)

 2      FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                BY:  MOLLY MCCAFFERTY
 3                                   SHAWN ESTRADA
                                THE ORRICK BUILDING
 4                              405 HOWARD STREET
                                SAN FRANCISCO, CALIFORNIA 94105
 5
                                BY:  JEFFREY COOPERSMITH
 6                                   AARON BRECHER
                                     AMANDA MCDOWELL
 7                              701 FIFTH AVENUE, SUITE 5600
                                SEATTLE, WASHINGTON 98104
 8
                                BY:  STEPHEN CAZARES
 9                              77 SOUTH FIGUEROA STREET, SUITE 3200
                                LOS ANGELES, CALIFORNIA 90017
10
                                BY:  AMY WALSH
11                              51 W 52ND STREET
                                NEW YORK, NEW YORK 10019
12

13      ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                                BY:  MADDI WACHS, PARALEGAL
14                                   SARA SLATTERY, PARALEGAL

15                              ORRICK, HERRINGTON & SUTCLIFFE
                                JENNIFER CYGNOR, PARALEGAL
16
                                PROLUMINA
17                              BY:  COREY ALLEN
                                2200 SIXTH AVENUE, SUITE 425
18                              SEATTLE, WASHINGTON 98121

19                              UNITED STATES POSTAL INSPECTION SERVICE
                                BY:  CHRISTOPHER MCCOLLOW
20
                                FEDERAL BUREAU OF INVESTIGATION
21                              BY:  MARIO C. SCUSSEL

22                              UNITED STATES FOOD & DRUG
                                ADMINISTRATION
23                              BY:  GEORGE SCAVDIS

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:

**SHANE WEBER**
DIRECT EXAM BY MR. LEACH                    P. 4531
CROSS-EXAM BY MR. CAZARES                   P. 4570
REDIRECT EXAM BY MR. LEACH                  P. 4597


**SARAH BENNETT**
DIRECT EXAM BY MR. LEACH                    P. 4602
CROSS-EXAM BY MR. CAZARES                   P. 4693

INDEX OF EXHIBITS

IDENT.          EVIDENCE

GOVERNMENT'S

| | |
|---|---|
| 143 | 4537 |
| 159 | 4544 |
| 162 | 4551 |
| 167 | 4556 |
| 174 | 4564 |
| 5831 | 4626 |
| 5830 | 4633 |
| 5450 | 4640 |
| 5451 | 4644 |
| 5453 | 4646 |
| 4533 | 4651 |
| 4621 | 4662 |

DEFENDANT'S

| | |
|---|---|
| 10561 | 4585 |
| 15041 | 4597 |
| 7350 | 4697 |

4485

| | | |
|---|---|---|
| | 1 | SAN JOSE, CALIFORNIA                    MAY 3, 2022 |
| | 2 |          P R O C E E D I N G S |
| 08:41AM | 3 |      (COURT CONVENED AT 8:41 A.M.) |
| 08:41AM | 4 |      (JURY OUT AT 8:41 A.M.) |
| 08:41AM | 5 |          THE COURT:  WE'RE BACK ON THE RECORD IN THE BALWANI |
| 08:41AM | 6 | MATTER. |
| 08:41AM | 7 |      ALL COUNSEL ARE PRESENT.  MR. BALWANI IS ALSO PRESENT. |
| 08:41AM | 8 |      WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 08:41AM | 9 |      AND WE SHOULD TALK ABOUT DOCUMENT 1419 AND 1420, WHICH ARE |
| 08:41AM | 10 | MR. BALWANI'S MOTION AND THE GOVERNMENT'S OPPOSITION. |
| 08:41AM | 11 |      COULD I KNOW THE SCHEDULE TODAY OF WITNESSES?  DO WE KNOW |
| 08:41AM | 12 | THAT? |
| 08:41AM | 13 |      GOOD MORNING. |
| 08:41AM | 14 |          MR. LEACH:  YES, YOUR HONOR.  I'LL SPEAK TO THAT. |
| 08:41AM | 15 |      THE FIRST WITNESS IS SHANE WEBER, WHO YOU KNOW FROM THE |
| 08:41AM | 16 | FIRST TRIAL AND WHO IS THE SUBJECT OF THE FILINGS YESTERDAY. |
| 08:41AM | 17 |          THE COURT:  RIGHT. |
| 08:41AM | 18 |          MR. LEACH:  THE SECOND WITNESS IS SARAH BENNETT WHO |
| 08:42AM | 19 | IS AN EMPLOYEE OF CMS. |
| 08:42AM | 20 |          THE COURT:  RIGHT.  OKAY.  THANK YOU. |
| 08:42AM | 21 |      THIS IS THE DEFENSE MOTION TO PRECLUDE ANY MENTION OF THE |
| 08:42AM | 22 | LETTER, THE PFIZER LETTER, ITS SOURCES OR ANY ATTRIBUTION, I |
| 08:42AM | 23 | EXPECT, AS TO MR. BALWANI. |
| 08:42AM | 24 |      IS THAT IT, MR. BRECHER? |
| 08:42AM | 25 |          MR. BRECHER:  GOOD MORNING.  YES, YOUR HONOR. |

08:42AM 1      IT'S CLOSE.  I DON'T THINK WE'RE SAYING TO EXCLUDE THE

08:42AM 2  LETTER, OR A REPORT AS MS. VOLKAR WILL REMIND US A VERSION OF

08:42AM 3  THAT, THE ENHANCED VERSION IS ALREADY IN EVIDENCE AND IT CAME

08:42AM 4  INTO EVIDENCE THROUGH MS. PETERSON'S TESTIMONY.

08:42AM 5      WHAT WE ARE TALKING ABOUT IS THE LOGO, THE ATTRIBUTION

08:42AM 6  ISSUE THAT WE DESCRIBED.

08:42AM 7          THE COURT:  OKAY.

08:42AM 8          MR. BRECHER:  I JUST DO NOT WANT TO REPEAT BECAUSE I

08:42AM 9  KNOW WE DISCUSSED THIS SEVERAL TIMES.

08:42AM 10          THE COURT:  RIGHT.  RIGHT.

08:42AM 11          MR. BRECHER:  BUT I DO WANT TO FOCUS WHERE WE ARE

08:42AM 12  AND WHERE WE ARE NOT IN TERMS OF THE EVIDENCE YOU DID ALLOW ON

08:43AM 13  APRIL 6TH, EVIDENCE THROUGH DR. CULLEN, YOU DID ALLOW THAT

08:43AM 14  EVIDENCE TO COME IN AS TO THE ENHANCED OR THE ORIGINAL

08:43AM 15  UNALTERED REPORT.

08:43AM 16      BUT THE BASIS FOR THE COURT'S RULING THERE, AND THIS IS IN

08:43AM 17  OUR MOTION AND WE QUOTE THE COURT'S PRECISE LANGUAGE, WAS SOME

08:43AM 18  KNOWLEDGE, WHETHER ACTUAL OR CONSTRUCTIVE, THAT MR. BALWANI HAD

08:43AM 19  BY BEING THE RECIPIENT, ALBEIT AS A CC WITH BOTH VERSIONS OF

08:43AM 20  THE REPORT AT TWO DIFFERENT TIMES.

08:43AM 21      THAT'S NOT TRUE OF THE OTHER PHARMACEUTICAL REPORT.  IT'S

08:43AM 22  CERTAINLY NOT TRUE OF THE PFIZER REPORT.

08:43AM 23          THE COURT:  IN THAT HE'S NOT A RECIPIENT?

08:43AM 24          MR. BRECHER:  THAT'S CORRECT, YOUR HONOR.

08:43AM 25          THE COURT:  RIGHT.

08:43AM 1          MR. BRECHER:  THE ONLY VERSION OF THE PFIZER REPORT

08:43AM 2    THAT MR. BALWANI HAS EVER SEEN, AND THIS IS TRUE NOT ONLY OF

08:43AM 3    THE EVIDENCE THAT CAME IN THE HOLMES TRIAL, THE EVIDENCE THAT

08:44AM 4    IS IN SO FAR IN THIS TRIAL, BUT SO FAR AS I'M AWARE, AND I

08:44AM 5    THINK SO FAR AS THE GOVERNMENT IS AWARE, ALL OF THE EVIDENCE

08:44AM 6    THAT THE PARTIES HAVE EXCHANGED IN DISCOVERY HAS SHOWN THAT

08:44AM 7    MR. BALWANI HAS ONLY SEEN THAT ENHANCED VERSION.

08:44AM 8          SO THE PARTICULAR BASIS FOR THE COURT'S RULING VIS-À-VIS

08:44AM 9    DR. CULLEN IS NOT AVAILABLE HERE.

08:44AM 10         NOW, THE GOVERNMENT SUGGESTS, AND I THINK WE ACKNOWLEDGE

08:44AM 11   IN OUR BRIEF, THAT THERE MAY BE ANOTHER BASIS, AND THAT IS SOME

08:44AM 12   SORT OF VICARIOUS LIABILITY, WHETHER IT'S COCONSPIRATOR

08:44AM 13   LIABILITY OR COSCHEMER LIABILITY.

08:44AM 14         AND AGAIN, WITHOUT REPEATING THESE ARGUMENTS AD NAUSEAM,

08:44AM 15   THE CORE OF OUR ARGUMENT IS TWO-FOLD.  ONE IS THAT THIS

08:44AM 16   CONDUCT, THE UNAUTHORIZED USE OF THIS LOGO, THIS CHANGE WAS

08:44AM 17   MADE IN APRIL OF 2010, AND THE GOVERNMENT CANNOT SHOW BY A

08:44AM 18   PREPONDERANCE OF THE EVIDENCE THAT A CONSPIRACY OR A SCHEME TO

08:44AM 19   DEFRAUD EXISTED AT THAT POINT IN TIME.

08:44AM 20         SO THAT'S NUMBER ONE.

08:44AM 21         AND THEN NUMBER TWO IS THE 403 ARGUMENT, THIS FUNDAMENTAL

08:44AM 22   UNFAIRNESS THAT WE KNOW AND, FRANKLY, EVERYONE EXCEPT THE JURY

08:45AM 23   WILL KNOW THAT THERE IS THIS CONTEXT SURROUNDING WHO PUT THE

08:45AM 24   LOGO ON THAT PFIZER REPORT.

08:45AM 25         AND WITHOUT SERIOUSLY COMPROMISING MR. BALWANI'S TRIAL

08:45AM 1    RIGHTS, NOT ONLY WILL WE NOT BE ABLE TO PUT IN THAT CONTEXT IN

08:45AM 2    GENERAL, WE CERTAINLY WON'T BE ABLE TO FOLLOW UP ON IT AND SEEK

08:45AM 3    MORE ADMISSIONS THAT WOULD BE HELPFUL AND EXCULPATORY HERE.

08:45AM 4          THE COURT:  SURE.

08:45AM 5          MR. BRECHER:  SO THAT'S SORT OF WHERE WE ARE IN

08:45AM 6    TERMS OF THE LAY OF THE LAND.

08:45AM 7       I DO WANT TO RESPOND TO SOME POINTS THAT THE GOVERNMENT

08:45AM 8    RAISED IN ITS OPPOSITION BRIEF.

08:45AM 9       FIRST, THE POINT THAT MR. BALWANI DOES NOT ADDRESS BUT THE

08:45AM 10   GOVERNMENT MAY SEEK TO SEEK TO INTRODUCE THIS EVIDENCE TO SHOW

08:45AM 11   FALSITY.

08:45AM 12      I KNOW WHEN WE DISCUSSED THIS BEFORE, BOTH ON MARCH 11TH

08:45AM 13   AND ON APRIL 6TH, I ACKNOWLEDGED REPEATEDLY THAT THAT'S A

08:45AM 14   PERFECTLY FINE USE OF THE EVIDENCE OF THE PHARMACEUTICAL

08:45AM 15   RELATIONSHIPS.

08:45AM 16      MR. WEBER, I BELIEVE IT IS IN FACT DR. WEBER, BUT HE WENT

08:45AM 17   BY MR. WEBER IN THE HOLMES TRIAL, DID TESTIFY THERE, AND I

08:46AM 18   STRONGLY SUSPECT IS GOING TO TESTIFY THIS MORNING THAT PFIZER

08:46AM 19   DID NOT COMPREHENSIVELY VALIDATE THE TECHNOLOGY.

08:46AM 20         THE COURT:  YOU HAVE NO ISSUE WITH THAT.

08:46AM 21         MR. BRECHER:  I HAVE NO ISSUE WITH THAT, YOUR HONOR,

08:46AM 22   IN PART BECAUSE THAT WHOLE STUDY WAS DONE BEFORE MR. BALWANI

08:46AM 23   JOINED THE COMPANY, AND AS I THINK THE COURT KNOWS, MR. BALWANI

08:46AM 24   RECEIVED THESE EXACT SAME REPRESENTATIONS.

08:46AM 25         SO THERE'S JUST NO TETHER TO IT THERE.

08:46AM 1          AND IF THE GOVERNMENT WANTS HIM TO SAY THAT AGAIN, FINE.

08:46AM 2     THERE WON'T BE ANY OBJECTION.

08:46AM 3               THE COURT:  AND HE'LL TESTIFY ABOUT THE DOCUMENT AND

08:46AM 4     SAY, NO, THAT'S NOT WHAT WE DID.  WE DIDN'T GIVE OUR IMPRIMATUR

08:46AM 5     ON THIS.  NO, IT'S NOT -- WE DIDN'T PUT OUR LOGO ON THIS.  WE

08:47AM 6     DIDN'T AUTHORIZE THEM TO PUT OUR LOGO ON THAT.

08:47AM 7               MR. BRECHER:  THAT'S WHERE I GET OFF THE RAMP,

08:47AM 8     YOUR HONOR, IT'S THE LAST TWO POINTS ABOUT THE LOGO AND THE

08:47AM 9     UNAUTHORIZED USE OF THE LOGO.

08:47AM 10              THE COURT:  SO CAN'T HE SAY, AND YOU'LL TELL ME

08:47AM 11    RIGHT NOW, NO, TO MY KNOWLEDGE WE DID NOT PUT OUR LOGO ON THERE

08:47AM 12    AND THAT'S NOT AN AUTHORIZED PFIZER DOCUMENT WITH OUR APPROVAL?

08:47AM 13    WHY CAN'T HE SAY THAT?

08:47AM 14              MR. BRECHER:  WELL, I THINK, YOUR HONOR --

08:47AM 15              THE COURT:  I'M SORRY TO INTERRUPT YOU.

08:47AM 16              MR. BRECHER:  NO, NOT AT ALL.

08:47AM 17              THE COURT:  WITHOUT SAYING THAT IT, ACCUSING AND

08:47AM 18    POINTING A FINGER, BECAUSE HE DOESN'T KNOW THAT.

08:47AM 19              MR. BRECHER:  WELL, YOU'RE RIGHT, YOUR HONOR, HE

08:47AM 20    CERTAINLY DOESN'T KNOW THAT, AND I DON'T THINK THAT WILL BE HIS

08:47AM 21    TESTIMONY AND I DON'T THINK THE GOVERNMENT WILL ELICIT THAT

08:47AM 22    TESTIMONY.

08:47AM 23              THE COURT:  EXACTLY.  SO WHY CAN'T HE SAY, NOPE,

08:47AM 24    THIS IS NOT SOMETHING TO MY KNOWLEDGE IN MY CAPACITY AND

08:47AM 25    EMPLOYMENT AT PFIZER THAT WE EVER ENDORSED, AND THAT'S ALL, AND

08:47AM 1    I DON'T KNOW HOW IT HAPPENED AND IF IT'S A PRANK OR WHATEVER,

08:47AM 2    WE DIDN'T DO IT AND ENDORSE IT, AND THAT'S IT.

08:47AM 3            MR. BRECHER:  THE REASON WHY I DON'T THINK THAT GETS

08:47AM 4    US WHERE WE NEED TO BE, YOUR HONOR, IS PRECISELY BECAUSE

08:47AM 5    MR. BALWANI IS THE ONLY ONE HERE.  HE'S THE ONLY DEFENDANT IN

08:47AM 6    THE COURTROOM.

08:47AM 7        WHEN THERE'S EVIDENCE OF WRONGDOING AND UNAUTHORIZED USE

08:47AM 8    AND THE JURY HEARS THAT EVIDENCE, IN PARTICULAR WITH THE

08:47AM 9    CONTEXT THAT WE ALL KNOW EXISTS, WHICH COULD BE INCULPATORY IF

08:48AM 10   THE JURY CONCLUDES THAT THERE WAS A CONSPIRACY OR A SCHEME THAT

08:48AM 11   MR. BALWANI WAS A PART OF, OR COULD BE QUITE EXCULPATORY IF THE

08:48AM 12   JURY DOES NOT SO CONCLUDE, AND THAT'S THEIR PREROGATIVE,

08:48AM 13   YOUR HONOR.

08:48AM 14       WITHOUT THAT CONTEXT, THE ONLY NATURAL ASSUMPTION THAT THE

08:48AM 15   JURY HEARS, BOTH AS THEY'RE LISTENING TO THE TESTIMONY AND IN

08:48AM 16   PARTICULAR AS THEY'RE LISTENING TO CLOSING ARGUMENT, IS, WELL,

08:48AM 17   GOSH, SOMETHING REALLY FUNNY HAPPENED HERE.  THAT'S THE GUY

08:48AM 18   THAT WE'RE LOOKING AT.  THAT'S THE GUY WHOSE CONDUCT WE'RE HERE

08:48AM 19   TO ASSESS AND TO JUDGE.

08:48AM 20       I JUST DON'T THINK THAT YOU CAN GET OVER THAT FUNDAMENTAL

08:48AM 21   FAIRNESS POINT.

08:48AM 22       SO THAT'S THE 403 POINT.

08:48AM 23           THE COURT:  SO DOES THE INSTRUCTION, THE FINAL

08:48AM 24   INSTRUCTION CURE THAT IF THERE'S NO -- ASSUMING THAT THE

08:48AM 25   GOVERNMENT CANNOT MAKE A CONSPIRACY, PRIMA FACIE SHOWING OF A

08:48AM 1    CONSPIRACY THAT EXISTED DURING THE TIME PERIOD, APRIL, IS IT,

08:48AM 2    2010, SOMETHING LIKE THAT?

08:48AM 3            MR. BRECHER:  APRIL 14TH, 2010.  I BELIEVE IT WAS

08:49AM 4    APRIL 14TH OF 2010.

08:49AM 5        MS. HOLMES TESTIFIED THAT SHE ADDED THE LOGO, QUOTE, JUST

08:49AM 6    BEFORE.

08:49AM 7            THE COURT:  CORRECT, SENDING THEM.

08:49AM 8            MR. BRECHER:  I DON'T KNOW WHETHER THAT MEANS AN

08:49AM 9    HOUR BEFORE OR A DAY BEFORE.

08:49AM 10           THE COURT:  RIGHT.

08:49AM 11           MR. BRECHER:  THERE'S NOT A LOT OF CONTEXT THERE,

08:49AM 12   WHICH IS PART OF THE PROBLEM.

08:49AM 13           THE COURT:  RIGHT.  IF THE GOVERNMENT CANNOT, CANNOT

08:49AM 14   ESTABLISH A PRIMA FACIE -- WHICH DOESN'T TAKE MUCH, DOES IT?

08:49AM 15   IF THEY CAN'T ESTABLISH, EXCUSE ME, A PRIMA FACIE SHOWING OF A

08:49AM 16   CONSPIRACY AT THAT TIME PERIOD, THEN ISN'T THE REMEDY AN

08:49AM 17   INSTRUCTION, A FINAL INSTRUCTION TO THE JURY THAT THEY CANNOT

08:49AM 18   CONSIDER -- SOME LANGUAGE THAT I'M SURE YOU'LL BE VERY CREATIVE

08:49AM 19   ABOUT CREATING THAT SAYS THAT THEY CAN'T USE THAT AGAINST

08:49AM 20   MR. BALWANI BECAUSE THERE'S NO EVIDENCE PROOF?

08:49AM 21           MR. BRECHER:  YOUR HONOR, WE HAD DISCUSSED, I THINK

08:49AM 22   ON MARCH 11TH, THE POSSIBILITY OF AN INSTRUCTION.

08:49AM 23       I DON'T THINK AT THE TIME THAT THERE WAS LANGUAGE -- I

08:49AM 24   THINK WE KICKED SOME AROUND INFORMALLY WITH THE COURT.  I DON'T

08:50AM 25   THINK THERE WAS LANGUAGE THAT SATISFIED BOTH THE DEFENSE AND

4492

08:50AM  1    THE GOVERNMENT.

08:50AM  2         OBVIOUSLY YOUR HONOR MAY SETTLE ON SOMETHING THAT

08:50AM  3    SATISFIES BOTH OR NEITHER.  I THINK THAT'S POSSIBLE.

08:50AM  4         BUT I DON'T THINK THAT THAT'S GOING TO CURE THE ISSUE OF

08:50AM  5    THE PREJUDICE THAT IS GOING TO HAPPEN THIS MORNING WHEN THE

08:50AM  6    GOVERNMENT, AS I EXPECT IT WILL, ELICITS THAT TESTIMONY ABOUT

08:50AM  7    THE UNAUTHORIZED USE.

08:50AM  8              THE COURT:  SURE.

08:50AM  9              MR. BRECHER:  AND THEN THE SECOND POINT I JUST WANT

08:50AM  10   TO RESPOND VERY BRIEFLY, YOU'RE RIGHT THAT A PRIMA FACIE CASE

08:50AM  11   IS NOT AN ESPECIALLY HEAVY BURDEN.

08:50AM  12        BUT I THINK IT'S IMPORTANT TO PUT OUT WHAT THAT BURDEN IS

08:50AM  13   PRECISELY.  IT IS A PREPONDERANCE STANDARD.  AND THAT'S

08:50AM  14   BOURJAILY, AND I KNOW THAT THE BOURJAILY DECISION WAS NOT -- IT

08:50AM  15   SPOKE ABOUT COCONSPIRATOR STATEMENTS, BUT AS I THINK THE

08:50AM  16   ADVISORY COMMITTEE NOTES AS WE CITED IN OUR PAPERS POINT OUT,

08:50AM  17   THAT'S THE GENERAL STANDARD FOR ALL 104 PRELIMINARY QUESTIONS.

08:50AM  18        AND AS TO APRIL 2010, I DON'T THINK THAT THAT'S THERE.

08:50AM  19   AND PART OF THE REASON THAT I DON'T THINK THAT THAT'S THERE,

08:51AM  20   YOUR HONOR, IS IF YOU LOOK AT THE GOVERNMENT'S OPPOSITION, THEY

08:51AM  21   CITE ALL KINDS OF FACTS FROM 2013 AND 2014 AND 2015, BUT DATES

08:51AM  22   MATTER, OTHERWISE THE TEMPORAL RESTRICTIONS ON VICARIOUS

08:51AM  23   LIABILITY WOULD NOT HAVE ANY MEANING.

08:51AM  24              THE COURT:  WELL, I KNOW IT WILL SURPRISE YOU TO SAY

08:51AM  25   THAT I'M GOING TO TASK MS. VOLKAR, IN JUST A MOMENT, TO TELL ME

08:51AM  1    WHAT THE CONSPIRACY IS IN 2010, AND WE'LL SEE IF SHE'S UP TO

08:51AM  2    THE TASK.  I DON'T KNOW.

08:51AM  3              MR. BRECHER:  WELL, I WOULDN'T BE SURPRISED,

08:51AM  4    YOUR HONOR.

08:51AM  5        BUT I WOULD BE SURPRISED, GIVEN THE STATE OF THE EVIDENCE,

08:51AM  6    AND I THINK THAT THE ONLY OTHER THING THAT I WOULD POINT OUT

08:51AM  7    ABOUT THE DATES OF THIS EVIDENCE IS THAT I WANT TO MAKE SURE

08:51AM  8    THAT THERE'S NO CONFUSION HERE ON PAGE 3 OF THE GOVERNMENT'S

08:51AM  9    BRIEF, LINE 7 TO 8, THERE'S A STATEMENT, "DEFENDANT ALSO

08:51AM  10   REGULARLY SENT THE ALTERED PFIZER RELATED REPORT TO THE

08:51AM  11   INVESTORS AND DISCUSSED DOING SO WITH DEFENDANT HOLMES."

08:51AM  12       I JUST WANT TO MAKE SURE THAT THE RECORD IS COMPLETELY

08:52AM  13   CLEAR ON THAT POINT.  THE ALTERED VERSION OF THE REPORT IS THE

08:52AM  14   ONLY ONE THAT MR. BALWANI HAD, AND THE QUOTE WHICH THEY'RE

08:52AM  15   ALLUDING TO IS A TEXT WHICH SAYS I'M GOING TO SEND BDT THE

08:52AM  16   PFIZER REPORT AND MR. BALWANI SAYS GREAT.

08:52AM  17       IF I TELL MY SISTER I'M GOING TO SEND IN MY RESUME FOR

08:52AM  18   THIS GREAT NEW JOB AND SHE SAYS GREAT, UNLESS THERE'S SOME

08:52AM  19   SHOWING THAT SHE KNOWS THAT I HAVE SECRETLY ALTERED MY RESUME

08:52AM  20   TO BUMP UP MY CLASS RANKING, THAT'S A HYPOTHETICAL, YOUR HONOR.

08:52AM  21   I HAVEN'T DONE SO.

08:52AM  22             THE COURT:  YOU DON'T NEED TO DO THAT.  WE ALL KNOW

08:52AM  23   THAT.  WE ALL KNOW THAT.  IT DOESN'T GET ANY HIGHER THAN YOUR

08:52AM  24   RANK, MR. BRECHER.

08:52AM  25             MR. BRECHER:  FLATTERING, BUT FALSE, YOUR HONOR.

08:52AM   1        THAT DOESN'T IMPLICATE MY SISTER.  SHE'S NOT ON THE HOOK.

08:52AM   2   I WANT TO MAKE SURE THAT'S CLEAR FOR THE RECORD.

08:52AM   3        AND IF THE GOVERNMENT CANNOT ESTABLISH A PRIMA FACIE CASE

08:53AM   4   BY THE RELEVANT STANDARD, THAT PREPONDERANCE STANDARD AS OF

08:53AM   5   APRIL 2010, THEN THERE IS NO BASIS FOR THE JURY TO HEAR

08:53AM   6   EVIDENCE ABOUT DOCTORING OR ALTERING OF THIS REPORT OF WHICH

08:53AM   7   MR. BALWANI HAD NO KNOWLEDGE AND THERE'S NO SHOWING TO THE

08:53AM   8   CONTRARY.

08:53AM   9        THANK YOU.

08:53AM  10            THE COURT:  OKAY.  THANK YOU.

08:53AM  11        SO I JUST -- YOU KNOW, IN THE SPIRIT OF JUST FULL

08:53AM  12   DISCLOSURE, I LOOK AT -- I'M CONSIDERING THAT ARGUMENT,

08:53AM  13   CONSIDERING IT WHEN I READ THE PLEADINGS AND THOUGHT, YOU KNOW,

08:53AM  14   TO MYSELF, YOU KNOW, WHAT IS THE SHOWING IN APRIL OF 2010?

08:53AM  15        MS. VOLKAR IS EAGER TO TELL US ALL ABOUT THAT.

08:53AM  16        BUT IF THERE IS NO SHOWING, AT A MINIMUM IT SHOULD COME IN

08:53AM  17   AS WE DISCUSSED EARLIER FOR FALSITY.

08:53AM  18        WHAT IS THE RELEVANCE OF IT, JUDGE?  WHY SHOULD HE BE

08:53AM  19   ASKED ABOUT THIS LETTER?  BECAUSE IF IT'S NOT RELEVANT TO

08:53AM  20   MR. BALWANI, IF HE DIDN'T DO IT, THEN WHAT IS ITS PURPOSE IN

08:53AM  21   THIS CASE?  WHICH MS. VOLKAR WILL ALSO EDUCATE US ON AS WELL.

08:54AM  22        BUT IT SEEMS TO ME, IN READING THE PAPERS, IF NOTHING ELSE

08:54AM  23   IT COMES IN FOR FALSITY FOR PERHAPS PROPHYLACTIC LANGUAGE OR

08:54AM  24   SOMETHING ELSE FOR ITS PREPARATION.

08:54AM  25            MR. BRECHER:  I APPRECIATE THAT.

08:54AM 1      I WANT TO FLAG AGAIN THAT I HAVE NO PROBLEM WITH THE

08:54AM 2   TESTIMONY THAT PFIZER DID NOT, IN FACT, VALIDATE THE TECHNOLOGY

08:54AM 3   OR STAND BEHIND THE CONCLUSIONS IN THE REPORT.

08:54AM 4      I THINK THAT'S FINE, AND I THINK THAT'S ALL THE GOVERNMENT

08:54AM 5   NEEDS TO DO TO SHOW FALSITY.

08:54AM 6      BUT ANYTHING BEYOND THAT AND ANYTHING ABOUT DOCTORING

08:54AM 7   WOULD TRANSGRESS THESE BOUNDARIES THAT WE HAVE TALKED ABOUT

08:54AM 8   TODAY.

08:54AM 9            THE COURT:  OKAY.  GREAT.  THANK YOU.

08:54AM 10      SO, MS. VOLKAR, I -- MR. BRECHER INFORMS US OF HIS

08:54AM 11   DOCUMENT 1419 AND HE TALKS ABOUT ECF PAGE 5, AND IT'S LINES 11

08:54AM 12   THROUGH 15 AND 16 WHERE HE SUGGESTS THAT THE GOVERNMENT HAS NOT

08:54AM 13   MET THEIR BURDEN FOR CONSPIRACY PURPOSES, AND HE TALKS AND SAYS

08:55AM 14   IN HIS MEMO THAT THE EVIDENCE IS MR. BALWANI'S EMPLOYMENT,

08:55AM 15   ROMANTIC RELATIONSHIP, AND NEITHER OF WHICH INDEPENDENTLY OR

08:55AM 16   COLLECTIVELY ESTABLISH A CONSPIRACY OR A SCHEME, AND THAT

08:55AM 17   PREFACES MY QUESTION AND -- OF COURSE I WANT TO HEAR WHAT YOU

08:55AM 18   HAVE TO SAY, BUT WHAT IS THE EVIDENCE AT THIS TIME PERIOD THAT

08:55AM 19   WOULD ALLOW A SHOWING, A FINDING BY A PREPONDERANCE THAT A

08:55AM 20   CONSPIRACY OR A SCHEME EXISTED?

08:55AM 21      NOW, LET ME SAY, THERE IS OTHER EVIDENCE IN THE CASE THAT

08:55AM 22   WE HAVE HEARD, 2014, 2015, THAT THROUGH TEXTS, THROUGH EMAILS,

08:55AM 23   THROUGH WITNESS TESTIMONY THAT I BELIEVE DOES SHOW A PRIMA

08:55AM 24   FACIE, AT LEAST A PRIMA FACIE CONSPIRACY AS TO THOSE COUNTS IN

08:55AM 25   THE 2014, THE 2015 PERIOD REGARDING THOSE TRANSACTIONS.  WE'VE

08:55AM 1    SEEN THOSE FROM THE TEXTS THAT WERE EXCHANGED BETWEEN THE

08:56AM 2    PARTIES, TESTIMONY ABOUT CONDUCT OF THE PARTIES.  AND BY "THE

08:56AM 3    PARTIES" I MEAN MR. BALWANI, AND MS. HOLMES AS WELL.

08:56AM 4        AND FOR PURPOSES OF INFERENCE, AND I THINK THERE IS A

08:56AM 5    STRONG EVIDENCE, AND THE EVIDENCE ESTABLISHES FOR THE COURT'S

08:56AM 6    PURPOSE THAT A PRIMA FACIE SHOWING HAS BEEN MADE FOR CONSPIRACY

08:56AM 7    AS TO THOSE COUNTS.

08:56AM 8        BUT THE 2010 IS WHAT I'M CURIOUS ABOUT, AND MAYBE WE

08:56AM 9    HAVEN'T HEARD IT YET, WHICH THEN MIGHT HAVE TO PROVIDE ANOTHER

08:56AM 10   REMEDY OR SOLUTION TO OUR DILEMMA THIS MORNING.

08:56AM 11       MS. VOLKAR.

08:56AM 12           MS. VOLKAR:  THANK YOU, YOUR HONOR.

08:56AM 13       I WOULD LIKE TO DIRECTLY ANSWER YOUR QUESTION, BUT BEFORE

08:56AM 14   IT ESCAPES MY MIND, I WANT TO PICK UP ON THE LAST THING MY

08:56AM 15   COLLEAGUE, MR. BRECHER, SAID, WHICH IS WITH RESPECT TO THE

08:56AM 16   FALSITY, IT SOUNDS LIKE THEY DON'T CONTEST THE EVIDENCE COMING

08:56AM 17   IN FOR FALSITY, EXCEPT THEY DON'T WANT US TO BE ABLE TO ASK THE

08:57AM 18   WITNESS ABOUT WHETHER OR NOT HE AUTHORIZED THE LOGO BEING PUT

08:57AM 19   ON THE DOCUMENT.

08:57AM 20       AND I JUST WANT TO SAY THAT THERE IS NO LOGICAL BASIS FOR

08:57AM 21   PRECLUDING JUST THOSE QUESTIONS IF WE'RE TALKING ABOUT FALSITY.

08:57AM 22       THERE'S BEEN TESTIMONY FROM INVESTORS, INCLUDING

08:57AM 23   MS. PETERSON, THAT THE LOGO MATTERED TO THEM.  PART OF THE

08:57AM 24   GOVERNMENT PROVING THE FALSITY IS SHOWING THAT PFIZER ALSO

08:57AM 25   DIDN'T AUTHORIZE THAT LOGO TO BE PUT ON THERE.  SO I WANT TO

4497

```
08:57AM   1    MAKE SURE THAT I DON'T LOSE THAT POINT.
08:57AM   2              THE COURT:  LET ME STOP YOU THERE.
08:57AM   3         MR. BRECHER, ARE YOU OKAY WITH THAT?
08:57AM   4              MR. BRECHER:  WITH WHICH POINT, YOUR HONOR?
08:57AM   5              THE COURT:  WELL, WITH WHOEVER THE WITNESS IS
08:57AM   6    TESTIFYING THAT THEY DIDN'T AUTHORIZE THAT LOGO BEING PUT ON
08:57AM   7    THERE?
08:57AM   8              MR. BRECHER:  NO, YOUR HONOR.
08:57AM   9              THE COURT:  RIGHT.
08:57AM  10              MR. BRECHER:  AND I HAVE ANOTHER RESPONSE, BUT I
08:57AM  11    WANT TO MAKE SURE THAT MS. VOLKAR COMPLETES HER COMMENTS.
08:57AM  12              THE COURT:  OKAY.  SO I DIDN'T THINK THERE WAS AN
08:57AM  13    ISSUE WITH THAT, WITH THE WITNESS BEING ABLE TO SAY WE DIDN'T
08:57AM  14    DO IT, WE DIDN'T AUTHORIZE IT.
08:57AM  15              MS. VOLKAR:  I AGREE, YOUR HONOR, BUT THE PARTIES DO
08:57AM  16    NOT AGREE ON THAT POINT.  SO THANK YOU FOR THAT.
08:57AM  17         ON THE CONSPIRACY POINT, AND I WANT TO START BY SAYING
08:58AM  18    THAT EVERYBODY HERE AGREES THAT THE PRIMA FACIE BURDEN IS NOT
08:58AM  19    VERY HIGH.
08:58AM  20         BUT WHERE THE PARTIES DIFFER IS THAT THE DEFENSE WANTS THE
08:58AM  21    GOVERNMENT TO BE ABLE TO HAVE DIRECT EVIDENCE THAT BALWANI KNEW
08:58AM  22    OF THE UNALTERED REPORT IN 2010.  WE DID HAVE THAT FOR THE
08:58AM  23    SCHERING-PLOUGH REPORT.
08:58AM  24         I'M NOT HERE SAYING THAT WE HAVE EVIDENCE THAT HE HAD THE
08:58AM  25    UNALTERED PFIZER REPORT SAVED IN HIS COMPUTER FILES IN THE SAME
```

08:58AM 1    WAY, BUT OUR POSITION IS THAT THROUGH CIRCUMSTANTIAL EVIDENCE,

08:58AM 2    THERE IS PROOF OF A CONSPIRACY IN APRIL 2010.

08:58AM 3        INDEED, THE THIRD SUPERSEDING INDICTMENT ALLEGES A

08:58AM 4    CONSPIRACY PERIOD FOR INVESTORS, 2010 TO 2015.  AND WE DO

08:58AM 5    BELIEVE THAT WE'VE PROVIDED SOME EVIDENCE OF THAT.

08:58AM 6        THE MAIN EVIDENCE THAT GOES TO THAT IS I WILL -- WELL, LET

08:58AM 7    ME BACK UP AND SAY, I WILL ADMIT THAT THERE IS LESS EVIDENCE.

08:59AM 8        FOR EXAMPLE, THE TEXT MESSAGES ONLY GO BACK TO ABOUT 2012.

08:59AM 9        THAT'S JUST THE NATURE OF -- THE COLLECTION HAPPENED IN

08:59AM 10   2017.  PEOPLE GET NEW PHONES, PEOPLE DELETE OLD TEXT MESSAGES

08:59AM 11   TO MAKE MORE ROOM.

08:59AM 12       THERE JUST WASN'T THOSE OLDER TEXT MESSAGES AVAILABLE AT

08:59AM 13   THE TIME THE TEXT MESSAGES WERE COLLECTED.  THAT'S JUST A FACT.

08:59AM 14       SIMILARLY, WE HAVE THE DOCUMENTS THAT WE HAVE AND WE HAVE

08:59AM 15   TO BE ABLE TO DRAW INFERENCES FROM THEM.

08:59AM 16       SO I WANT TO TEMPER THE COURT'S EXPECTATIONS, WE DON'T

08:59AM 17   HAVE AS ROBUST OF EVIDENCE --

08:59AM 18               THE COURT:  RIGHT.

08:59AM 19               MS. VOLKAR:  -- AS WE DO FOR LATER TIME PERIODS.

08:59AM 20               THE COURT:  RIGHT.  THAT'S THE INQUIRY HERE IS, WHAT

08:59AM 21   WAS THE EVIDENCE?

08:59AM 22               MS. VOLKAR:  SO HERE'S WHAT WE DO HAVE, YOUR HONOR.

08:59AM 23   WHAT WE DO HAVE IS WE KNOW THEY WERE IN A ROMANTIC RELATIONSHIP

08:59AM 24   LONG BEFORE 2009 FOR SEVERAL YEARS.

08:59AM 25       WE KNOW THAT IN 2009 WHEN THE COMPANY IS RUNNING OUT OF

4499

08:59AM  1    MONEY, MR. BALWANI ESSENTIALLY COMES IN TO SAVE IT.  THEY'VE

08:59AM  2    ASKED SEVERAL WITNESSES ABOUT THIS, DID YOU KNOW THAT

09:00AM  3    MR. BALWANI GAVE A -- PERSONALLY GUARANTEED A LOAN TO THERANOS

09:00AM  4    IN 2009 WHEN THE COMPANY OTHERWISE WOULD HAVE GONE UNDER.

09:00AM  5         I'M SURE I AM NOT ASKING THE QUESTION AS WELL AS THEY DID

09:00AM  6    DURING CROSS, BUT THEY ASKED THAT MULTIPLE TIMES OF MULTIPLE

09:00AM  7    WITNESSES REPEATEDLY, THAT MR. BALWANI CAME IN AND SAVED THIS

09:00AM  8    COMPANY FROM FINANCIAL RUIN.

09:00AM  9         WHAT WAS THE BUSINESS OF THE COMPANY UP UNTIL THAT POINT?

09:00AM  10   PHARMACEUTICAL COMPANIES.

09:00AM  11        MR. BALWANI MAY HAVE RECEIVED THESE REPORTS AND THIS DUE

09:00AM  12   DILIGENCE FROM MS. HOLMES, BUT HE ALSO COMES IN KNOWING THAT

09:00AM  13   THE COMPANY IS NOT ABLE TO SUSTAIN ITSELF FROM THE REVENUES OF

09:00AM  14   THESE PHARMACEUTICAL COMPANIES.

09:00AM  15        THEN IN EARLY 2010, WHEN HE'S BOTH PERSONALLY INVESTED

09:00AM  16   THROUGH HIS RELATIONSHIP WITH MS. HOLMES AND PROFESSIONALLY

09:00AM  17   INVESTED BECAUSE HE'S GUARANTEED THIS LOAN OF $10 MILLION, HE

09:00AM  18   IS PUT IN CHARGE OF THE RETAIL, AND THAT INCLUDES THESE EMAILS

09:00AM  19   THAT GO TO WAL-MART, WALGREENS, AND SAFEWAY.

09:00AM  20        WHAT DO WE SEE AS THE DIFFERENCE BETWEEN THOSE?

09:00AM  21        FIRST EMAIL, THE MARCH 2010 EMAIL IS AN EMAIL THAT HAS THE

09:01AM  22   UNALTERED SCHERING-PLOUGH REPORT.  THAT RELATIONSHIP GOES

09:01AM  23   NOWHERE.

09:01AM  24        ONE MONTH LATER, APRIL 2010, MS. HOLMES SENDS, COPYING

09:01AM  25   BALWANI AGAIN, AN EMAIL TO WALGREENS AND SAFEWAY NOW INCLUDING

4500

09:01AM   1    THREE ALTERED PHARMACEUTICAL REPORTS.  AND BY "ALTERED" I MEAN

09:01AM   2    ADDING THE LOGOS OF THE PHARMACEUTICAL COMPANIES.

09:01AM   3            THE COURT:  THAT'S IN EVIDENCE?

09:01AM   4            MS. VOLKAR:  YES.

09:01AM   5        MY RECOLLECTION IS THAT DURING THE SCHERING-PLOUGH, BOTH

09:01AM   6    OF THESE EMAILS THAT I'M TALKING ABOUT WERE ADMITTED.  I'M NOT

09:01AM   7    SURE THE SAFEWAY EMAIL WAS YET ADMITTED, BUT THE WAL-MART AND

09:01AM   8    THE WALGREENS EMAIL WERE.

09:01AM   9        ONE MONTH LATER, THE REPORT IS SENT TO WALGREENS, AND THAT

09:01AM  10    RELATIONSHIP GOES SOMEWHERE.  AND OF COURSE THE WALGREENS

09:01AM  11    RELATIONSHIP IS ITS OWN PIECE OF THIS.

09:01AM  12        OUR ASSERTION IS BASED ON THE INFERENCE AND BASED ON -- I

09:02AM  13    KNOW THIS IS BASED ON MR. BALWANI'S TESTIMONY TO THE S.E.C.,

09:02AM  14    BUT HE TOOK CHARGE OF THE RETAIL RELATIONSHIP.

09:02AM  15        ONE CAN INFER AT THE VERY LEAST THAT HE WOULD HAVE ASKED

09:02AM  16    QUESTIONS, THAT HE WOULD HAVE TALKED TO MS. HOLMES.

09:02AM  17        AND DO WE HAVE THE EXACT TEXT MESSAGES BETWEEN THE TWO OF

09:02AM  18    THEM IN THIS 2010 TIME PERIOD?  WE DO NOT.

09:02AM  19        BUT WHAT WE DO HAVE, YOUR HONOR, IS A WEALTH OF EVIDENCE

09:02AM  20    IN THE 2013 AND 2014 TIME PERIOD THAT I WOULD SAY AT LEAST

09:02AM  21    SUPPORT THE INFERENCE, EVEN IF IT'S CIRCUMSTANTIAL EVIDENCE,

09:02AM  22    THAT SIMILAR COMMUNICATION WOULD HAVE OCCURRED IN APRIL 2010.

09:02AM  23        AND NOW I WANT TO CLEARLY SHIFT TO 2013, 2014 BECAUSE

09:02AM  24    THERE IS MUCH MORE, A WEALTH OF EVIDENCE THERE, AND I DON'T

09:02AM  25    WANT TO CONFUSE IN ANY WAY THAT I'M SAYING THAT THIS EVIDENCE

09:02AM 1    IS TETHERED EXACTLY TO APRIL OF 2010.

09:02AM 2         I'M JUST SAYING ONE CAN DRAW AN INFERENCE FROM IT.

09:02AM 3              THE COURT:  RIGHT.  THANK YOU.  THANKS FOR THAT

09:02AM 4    CLARITY.

09:02AM 5         BECAUSE I LOOKED AT THAT, AND AS I SAID EARLIER, THERE IS

09:02AM 6    ROBUST EVIDENCE FOR THE LATER PERIODS OF TIME, AND ARE WE

09:03AM 7    PERMITTED TO LOOK BACK AND SOMEHOW ATTRIBUTE THAT TO SEVEN

09:03AM 8    YEARS PREVIOUS?  HOW DOES THAT WORK?  AND IS THAT PERMITTED?

09:03AM 9    IS THAT POSSIBLE?

09:03AM 10        I KEEP ASKING MULTIPLE QUESTIONS, SO STAY WITH ME.

09:03AM 11        BUT IN 2010, IS THERE EVIDENCE THAT MR. BALWANI TOOK OVER

09:03AM 12   THE RETAIL, PARTICULARLY THE WALGREENS FUNCTION IN 2010?  AND

09:03AM 13   WHAT IS THE EVIDENCE OF THAT?

09:03AM 14        BECAUSE WE DO KNOW THAT THERE IS SOME CONNECTION WITH HIM.

09:03AM 15   MR. JHAVERI, WHO HAS NOT FINISHED HIS TESTIMONY, AND THAT MIGHT

09:03AM 16   SHED SOME LIGHT TO THIS AS WELL, ALTHOUGH I THINK HE'S ONLY

09:03AM 17   TESTIFIED ABOUT 2013, 2014 MATTERS.

09:03AM 18              MR. BRECHER:  THAT'S CORRECT, YOUR HONOR.

09:03AM 19              THE COURT:  SO THAT'S ANOTHER SIDE ISSUE HERE.

09:03AM 20        I DON'T KNOW IF HE'LL COME IN TOMORROW AND TELL US

09:03AM 21   ANYTHING MORE.

09:03AM 22        BUT -- SORRY, MS. VOLKAR.  THOSE ARE MY FEW QUESTIONS NOW.

09:04AM 23              MS. VOLKAR:  THANK YOU, YOUR HONOR.

09:04AM 24        I THINK WHAT THE COURT IS ASKING IS, IS THERE EVIDENCE IN

09:04AM 25   THIS TRIAL, BECAUSE I DON'T THINK THAT THERE IS ANY DISPUTE

09:04AM 1    THAT THERE IS CERTAINLY EVIDENCE AVAILABLE, NAMELY, MR. BALWANI

09:04AM 2    ADMITTED TO IT IN HIS S.E.C. TESTIMONY, THAT HE TOOK CHARGE IN

09:04AM 3    EARLY 2010 OF THE RETAIL RELATIONSHIP, AND THAT WAS WHAT WE

09:04AM 4    CITED IN OUR 1337.

09:04AM 5        I AM NOT AWARE OF TESTIMONY HAS THAT COME IN YET THROUGH

09:04AM 6    THIS TRIAL.

09:04AM 7        BUT I WOULD SAY FOR RULE 104 PURPOSES, IF THAT'S THE LAND

09:04AM 8    WE'RE IN FOR ADMISSIBILITY, IS CAN THE GOVERNMENT SHOW AND CAN

09:04AM 9    IT MEETS ITS BURDEN?

09:04AM 10       AND I WOULD POINT THE COURT TO THE S.E.C. TO SAY WE

09:04AM 11   ABSOLUTELY CAN MEET OUR BURDEN, AND IF WE NEED TO CALL ANY

09:04AM 12   WITNESSES IN DURING THIS TRIAL, WE HAVE MANY WITNESS WHO CAN DO

09:04AM 13   SO.  AND WE'RE TRYING TO PRESENT THE MOST STREAMLINED CASE THAT

09:04AM 14   WE CAN, AND THEREFORE, IT IS A DECENT CHUNK OF TIME, AND PEOPLE

09:05AM 15   COME AND GO AND FILL DIFFERENT ROLES IN DIFFERENT COMPANIES.

09:05AM 16       AND OF COURSE YOUR HONOR DID HEAR FROM WADE MIQUELON

09:05AM 17   DURING THE HOLMES TRIAL, WHO TESTIFIED THAT MR. BALWANI WAS HIS

09:05AM 18   MAIN POINT OF CONTACT THROUGHOUT THE RELATIONSHIP.

09:05AM 19          THE COURT:  RIGHT.  I DID NOTE THAT.

09:05AM 20       SO THAT WAS THE NATURE OF MY QUESTION, WHERE IS THE

09:05AM 21   EVIDENCE IN THIS TRIAL FOR A 2010 RELATIONSHIP?

09:05AM 22          MS. VOLKAR:  I WILL SAY, WITH AN ASSIST FROM MY

09:05AM 23   TEAMMATE, THAT JHAVERI ALSO TESTIFIED THAT HE GAVE A TOUR OF

09:05AM 24   THE WALGREENS STORE TO BOTH HOLMES AND BALWANI IN 2010.

09:05AM 25          THE COURT:  WAS THAT 2010 OR 2013?  I LOOKED AT MY

09:05AM  1      NOTES.  PERHAPS MY NOTES ARE INCORRECT.  IT WAS 2010, THE TOUR?

09:05AM  2              MS. VOLKAR:  MY ASSIST IS 2010, AND I'M HAPPY TO

09:05AM  3      PULL THE RECORD CITE FOR THAT, YOUR HONOR.

09:05AM  4              THE COURT:  I DID NOTE THAT IN HIS TESTIMONY, AT

09:05AM  5      LEAST MY NOTES.  I DIDN'T READ THE TRANSCRIPT.  I SHOULD HAVE.

09:06AM  6          OKAY.  THANK YOU.  THAT'S IMPORTANT.

09:06AM  7              MS. VOLKAR:  THANK YOU, YOUR HONOR.

09:06AM  8      I JUST WANT TO END, BECAUSE I DON'T WANT TO GET AWAY FROM

09:06AM  9      THIS POINT, I THINK WHAT THE DEFENSE IS TRYING TO HOLD THE

09:06AM  10     GOVERNMENT TO IS DIRECT EVIDENCE OF EACH PIECE JUST FOR THE

09:06AM  11     ADMISSIBILITY OF DOCUMENTS TO COME IN, AND AGAIN, THAT IS A LOW

09:06AM  12     BAR.  I THINK WE ALL AGREE THAT IT IS A LOW BAR.

09:06AM  13         AND WHAT THE GOVERNMENT IS SAYING IN RESPONSE IS THAT

09:06AM  14     THERE IS A LOT OF EVIDENCE FROM WHICH THE JURY CAN INFER THAT

09:06AM  15     BALWANI HAD KNOWLEDGE, AND, OF COURSE, THAT IS THE JURY'S

09:06AM  16     PROVINCE.

09:06AM  17         SO THE QUESTION REALLY BEFORE THE COURT IS ADMISSIBILITY.

09:06AM  18         AND AGAIN, GOING BACK TO FALSITY WHERE THERE IS MUCH LESS

09:06AM  19     OF A DISPUTE, I THINK THERE IS VERY LITTLE QUESTION ABOUT

09:06AM  20     WHETHER OR NOT THE DOCUMENTS ARE ADMISSIBLE.

09:06AM  21         IT'S REALLY COMING DOWN TO WHAT QUESTIONS CAN THE

09:06AM  22     GOVERNMENT ASK, AND THERE ARE NUMEROUS WAYS THAT THIS

09:06AM  23     INFORMATION CAN AND SHOULD BE BROUGHT OUT, BUT WHAT WE ARE

09:06AM  24     ARGUING IS THAT THERE REALLY SHOULDN'T BE ANY LIMITATION, IT

09:07AM  25     SHOULD BE AVAILABLE FOR USE FOR US TO ARGUE AS WE SEE FIT, IN

4504

09:07AM 1    LARGE PART BECAUSE THERE IS ALL OF THIS CIRCUMSTANTIAL EVIDENCE

09:07AM 2    FROM WHICH THE COURT AND THE JURY COULD MAKE THE REASONABLE

09:07AM 3    INFERENCE THAT BALWANI WAS PART OF THE CONSPIRACY STARTING IN

09:07AM 4    2010.

09:07AM 5            THE COURT:  OKAY.  SO LET'S REVIEW.

09:07AM 6        SO THERE'S A RELATIONSHIP.  HE IS A FINANCIAL SAVIOR.  HE

09:07AM 7    COMES IN.  HE GUARANTEES A SUBSTANTIAL AMOUNT OF MONEY.

09:07AM 8        HE IS, PERHAPS CONCURRENT WITH THAT, SHORTLY THEREAFTER

09:07AM 9    MADE COO.  WE KNOW THAT.  THERE'S NO DISPUTE ABOUT THAT, I TAKE

09:07AM 10   IT.

09:07AM 11       IS THAT RIGHT, MR. BRECHER?

09:07AM 12           MR. BRECHER:  ACTUALLY, YOUR HONOR, THERE IS A

09:07AM 13   RELEVANT DISPUTE, I DON'T KNOW IF IT'S A RELEVANT DISPUTE, BUT

09:07AM 14   THERE'S A FACTUAL CONTEXT THAT MR. BALWANI JOINS THE COMPANY IN

09:07AM 15   2009 AS A BOARD MEMBER AND EMPLOYEE AT LARGE.

09:07AM 16           THE COURT:  CORRECT.

09:07AM 17           MR. BRECHER:  HE BECOMES COO AND PRESIDENT IN JULY

09:07AM 18   OF 2010, MONTHS AFTER THIS ALTERATION, AND THAT CAME IN THROUGH

09:08AM 19   THE CROSS-EXAMINATION OF MS. SPIVEY.  I DON'T THINK IT IS

09:08AM 20   DISPUTED.

09:08AM 21           THE COURT:  BUT THERE IS SOME CONNECTION AT SOME

09:08AM 22   POINT IN TIME IN 2010 THAT HE DOES TAKE CHARGE OF RETAIL AND

09:08AM 23   MR. JHAVERI'S TESTIMONY ABOUT WHEN AND ALL OF THAT IS

09:08AM 24   INTERESTING.

09:08AM 25           MS. VOLKAR:  AND AGAIN, YOUR HONOR, JUST TO SPELL

09:08AM 1    OUT THE INFERENCE THAT CAN BE DRAWN FROM THE FACTS THAT

09:08AM 2    YOUR HONOR JUST POINTED OUT, HE INVESTED A LARGE AMOUNT OF

09:08AM 3    MONEY.  HE KNEW THAT THE COMPANY WAS FAILING.  THE PHARMA

09:08AM 4    REVENUE WAS NOT SUPPORTING THE COMPANY.

09:08AM 5        HE HAD KNOWLEDGE OF THAT BECAUSE HE WAS THAT SAVIOR AND

09:08AM 6    CAME IN AND HAD TO LOAN THAT MONEY.

09:08AM 7        WHAT DO THEY DO?  THEY PIVOT TO RETAIL, A NEW AREA TO

09:08AM 8    POTENTIALLY GENERATE MORE REVENUE.

09:08AM 9        HE'S ON THE EMAIL TO WAL-MART.  IT GOES NOWHERE.  THAT

09:08AM 10   CAME IN THROUGH DR. CULLEN.

09:08AM 11       HE'S ON THE EMAIL TO WALGREENS, AND THAT GOES SOMEWHERE.

09:08AM 12       AND AT THE VERY LEAST, IT APPEARS AT LEAST SOME TESTIMONY

09:08AM 13   FROM JHAVERI ABOUT HIS INVOLVEMENT IN 2010 WITH WALGREENS.

09:08AM 14       SO I THINK IT'S A FAIR INFERENCE FROM THOSE FACTS THAT HE

09:09AM 15   KNEW HE HAD TO DRIVE REVENUE SOMEHOW FOR THE COMPANY.  AND ONE

09:09AM 16   REPORT UNALTERED DIDN'T WORK.

09:09AM 17       ONE SET OF REPORTS ALTERED DID WORK.

09:09AM 18           THE COURT:  OKAY.  AND SO THE MOTIVATION FOR HIM IS

09:09AM 19   NOT JUST COMPANY LOYALTY, BUT HE HAS A PERSONAL STAKE BECAUSE

09:09AM 20   OF HIS GUARANTEEING FINANCIAL INTEREST IN THE COMPANY.

09:09AM 21           MS. VOLKAR:  THAT'S CORRECT, YOUR HONOR.

09:09AM 22           THE COURT:  OKAY.

09:09AM 23           MR. BRECHER:  SO, FIRST OF ALL, YOUR HONOR, JUST A

09:09AM 24   FACTUAL CLARIFICATION.

09:09AM 25       MS. PETERSON'S TESTIMONY THAT, QUOTE, THE LOGO MATTERED TO

09:09AM 1    HER, THAT WAS DURING THE HOLMES TRIAL.  SHE DID NOT SO TESTIFY

09:09AM 2    LAST WEEK, IN PART BECAUSE OF THE GUARDRAILS THAT YOUR HONOR

09:09AM 3    PUT IN PLACE BEFORE HER TESTIMONY.

09:09AM 4        AS FOR THE TEXT MESSAGES AND THE POINT ABOUT THEM

09:09AM 5    BEGINNING IN 2012 BECAUSE OF THE DATA COLLECTION AND, FRANKLY,

09:09AM 6    ALL OF THE EVIDENCE FROM 2013, 2014, 2015, HOW FAR CAN WE LOOK

09:09AM 7    BACK, WHAT INFERENCES CAN WE DRAW, I'M NOT AWARE OF ANY

09:10AM 8    AUTHORITY THAT BLESSES THE PROPOSITION THAT BECAUSE WE DON'T

09:10AM 9    HAVE EVIDENCE, WE SHOULD ASSUME THAT THERE'S SOME THAT EXISTS.

09:10AM 10   THAT JUST DOESN'T MAKE A LOT OF SENSE TO ME.

09:10AM 11       BUT I DON'T CONTEST THAT THE JURY IS FREE, AND THE COURT

09:10AM 12   IS FREE IN MAKING THIS THRESHOLD INQUIRY, TO DRAW SOME

09:10AM 13   INFERENCES FROM FACTS THAT ARE ESTABLISHED TO CLOSELY TETHERED

09:10AM 14   FACTS THAT MAYBE AREN'T, BUT WE CAN IMAGINE A TIE.

09:10AM 15       BUT I WANT TO MAKE SURE THAT WE'RE CLEAR ABOUT WHAT WE'RE

09:10AM 16   TALKING ABOUT HERE.  WHEN WE'RE TALKING ABOUT EVIDENCE FROM

09:10AM 17   THREE, FOUR, FIVE YEARS DOWN THE LINE, THAT'S NOT ASKING THE

09:10AM 18   COURT TO DRAW A LINE BETWEEN TWO DOTS.  THAT'S ASKING THE COURT

09:10AM 19   TO DRAW A FARMHOUSE AND A PICKET FENCE AND MAYBE A DOG.  THE

09:10AM 20   EVIDENCE ISN'T THERE IN APRIL 2010.

09:10AM 21       AND I WANT TO SPEAK BRIEFLY TO THE RETAIL RELATIONSHIP AS

09:10AM 22   WELL.  IN APRIL OF 2010 WHEN THESE MEMORANDA WERE SENT, THERE

09:10AM 23   WAS NO WALGREENS RELATIONSHIP.  IT WAS THE START OF

09:10AM 24   COMMUNICATIONS BETWEEN THE TWO COMPANIES.

09:10AM 25       THE WALGREENS RELATIONSHIP DIDN'T BECOME FORMALIZED UNTIL

4507

09:11AM   1    JULY OF 2010.  INVESTOR FUND RAISING DIDN'T COME INTO PLAY

09:11AM   2    UNTIL JULY OF 2010.  THE INVESTOR ACCOUNTS DON'T APPEAR UNTIL

09:11AM   3    2013 AND 2014.

09:11AM   4         SO WHETHER MR. BALWANI PLAYED A LEADING ROLE IN THE RETAIL

09:11AM   5    PARTNERSHIP, AND MR. JHAVERI'S TESTIMONY ABOUT TAKING A TOUR

09:11AM   6    DOESN'T ESTABLISH THAT, BUT I'LL PUT THAT ASIDE FOR A MOMENT,

09:11AM   7    DOESN'T CONTROL THIS QUESTION.

09:11AM   8         THIS QUESTION IS, ON APRIL 14TH, 2010, IS THERE EVIDENCE,

09:11AM   9    EITHER FROM FACTS THAT WE ALREADY KNEW TO BE THE CASE BEFORE

09:11AM  10    THEN OR FACTS THAT ARE SUFFICIENTLY CLOSE IN TIME OR

09:11AM  11    CONCEPTUALLY CLOSE THAT WE CAN REASONABLY LOOK BACK AND SAY,

09:11AM  12    YOU KNOW WHAT, BY A PREPONDERANCE OF THE EVIDENCE, THERE WAS A

09:11AM  13    CONSPIRACY IN APRIL OF 2010.

09:11AM  14         I BELIEVE, YOUR HONOR, THAT THE ANSWER IS NO.

09:11AM  15              THE COURT:  CAN WE LOOK TO THE CONDUCT THAT, THE

09:11AM  16    LATER CONDUCT?  DOES THAT INFORM US THEN ABOUT WHAT HAPPENED

09:11AM  17    EARLIER ULTIMATELY?  YOU KNOW, THEY DID THIS, THIS IS WHAT

09:11AM  18    HAPPENED, AND WHY DOESN'T THAT INFORM US AS TO CONDUCT IN 2010,

09:12AM  19    EARLIER CONDUCT, THAT THAT WAS FORMATIVE, AND THAT WAS THE

09:12AM  20    LATER TIME PERIOD, AND WHAT HAPPENED WAS THE END RESULT OF

09:12AM  21    THOSE ACTIONS?

09:12AM  22              MR. BRECHER:  I DON'T THINK, YOUR HONOR, THAT THERE

09:12AM  23    IS A CATEGORICAL BAR IN LOOKING TO LATER CONDUCT, OR EVEN

09:12AM  24    EVIDENCE THAT AROSE LATER.

09:12AM  25         FOR EXAMPLE, YOU COULD IMAGINE A TEXT MESSAGE, AND I SAY

4508

09:12AM 1    IT, AND AS YOUR HONOR KNOWS, THERE IS SOME CRIMINAL DEFENDANTS

09:12AM 2    FOR WHOM YOU DO SEE THIS KIND OF EVIDENCE WHERE A TEXT MESSAGE

09:12AM 3    SAYS, "HEY, REMEMBER TWO YEARS AGO WHEN WE DOCTORED THAT

09:12AM 4    REPORT," OR "I WAS THE ONE WHO HAD THE GUN, I HOPE YOU DON'T

09:12AM 5    TELL ANYBODY."  WE DO GET -- SEE THOSE TYPES OF EVIDENCE IN

09:12AM 6    CRIMINAL CASES.

09:12AM 7         THERE'S CERTAINLY NOTHING LIKE THAT.

09:12AM 8         BUT I WANT TO POINT OUT, YOUR HONOR, IT IS NOT OUR

09:12AM 9    POSITION THAT DIRECT EVIDENCE OF KNOWLEDGE OF THE ALTERATION OF

09:12AM 10   THE PFIZER REPORT IS REQUIRED FOR ADMISSIBILITY.  THAT IS

09:12AM 11   REQUIRED, I THINK, FOR ADMISSIBILITY IN TERMS OF MR. BALWANI'S

09:12AM 12   PERSONAL KNOWLEDGE BECAUSE THAT CAN'T BE IMPUTED.

09:13AM 13        BUT WHAT I AM SAYING IS THAT EVIDENCE, WHETHER DIRECT OR

09:13AM 14   CIRCUMSTANTIAL, HAS TO MEET THAT THRESHOLD SHOWING AS OF

09:13AM 15   APRIL 2010.

09:13AM 16        IF WE WERE TALKING ABOUT EVENTS IN JULY OF 2010, I WOULD

09:13AM 17   BE ON MUCH WEAKER FOOTING SAYING, NO, YOUR HONOR, WE CAN'T LOOK

09:13AM 18   BACK.

09:13AM 19        BUT WHEN WE'RE TALKING ABOUT EVENTS IN 2013, 2014, 2015,

09:13AM 20   VICARIOUS LIABILITY HAS TEMPORAL LIMITS PRECISELY BECAUSE IT IS

09:13AM 21   THE EXCEPTION UNDER THE LAW, NOT THE RULE.

09:13AM 22        IF WE'RE LOOKING BACK THREE OR FOUR YEARS BECAUSE WE CAN'T

09:13AM 23   OTHERWISE MAKE THE CASE, THEN THOSE TEMPORAL LIMITATIONS DON'T

09:13AM 24   MEAN ANYTHING.  I JUST DON'T THINK THAT THEY DO.

09:13AM 25             THE COURT:  NO, I -- AND I THINK MS. VOLKAR WOULD

09:13AM  1    CONCEDE, THERE'S SOME DANGER IN DOING THAT, HOW FAR BACK DO YOU

09:13AM  2    GO AND THE CONNECTION GETS DILUTED, I'LL JUST USE THAT PHRASE,

09:13AM  3    SOMETIMES.

09:13AM  4        MS. VOLKAR.

09:13AM  5            MS. VOLKAR:  YOUR HONOR, IF I MAY BE HEARD ON THAT

09:13AM  6    POINT?  I'D LIKE TO GIVE WHAT I THINK IS A VERY SPECIFIC

09:13AM  7    EXAMPLE.

09:13AM  8        WE'VE BEEN TALKING ABOUT THE MOTIVATION FOR BALWANI, AND I

09:14AM  9    DON'T THINK THAT THERE'S MUCH DISPUTE THAT BALWANI TOOK A

09:14AM  10   LARGER ROLE IN THE FINANCIALS AND THE PROJECTIONS THAT WERE

09:14AM  11   GIVEN OUT, SO I WANT TO FOCUS ON THAT FOR A MOMENT.

09:14AM  12       AS I SAID, HE HAD SOME MOTIVATION, WE THINK THE EVIDENCE

09:14AM  13   SHOWS, IN 2010 TO DRIVE REVENUE AT A COMPANY THAT WAS OTHERWISE

09:14AM  14   RUNNING OUT OF MONEY AND HE HAD TO GUARANTEE THIS PERSONAL

09:14AM  15   LOAN.

09:14AM  16       HE KNEW AT THAT POINT IN TIME, WE WOULD ARGUE, THAT PHARMA

09:14AM  17   WAS NOT PROVIDING SUFFICIENT REVENUE.  THAT'S WHY THEY RETURNED

09:14AM  18   TO RETAIL.  I DON'T WANT TO REPEAT WHAT I SAID BEFORE.

09:14AM  19       FAST FORWARD A COUPLE OF YEARS, THEY'RE STILL WORKING WITH

09:14AM  20   RETAIL.  NOW THEY'RE LOOKING TO OTHER SOURCES, OTHER INVESTORS

09:14AM  21   TO GET MORE MONEY.

09:14AM  22       AND WHAT IS MR. BALWANI TELLING THEM?  HE HAS TOLD

09:14AM  23   MR. MENDENHALL AND MS. PETERSON, IN TWO DIFFERENT WAYS, THAT

09:14AM  24   PHARMA WAS PROVIDING REVENUE AND KEEPING THE COMPANY AFLOAT.

09:14AM  25       HE KNEW FROM THE TIME HE JOINED THE COMPANY THAT THAT WAS

09:14AM 1    NEVER TRUE.  AND HE KNEW THAT THEY NEVER GOT, I DON'T THINK

09:14AM 2    EVEN THINK IT WAS A MILLION DOLLARS FROM PHARMA DURING THAT

09:15AM 3    INTERVENING PERIOD.  HE KNEW THERE WAS NO REVENUE FROM PHARMA

09:15AM 4    IN 2013 AT ALL, AND 2014, AND YET HE'S PROVIDING PROJECTIONS TO

09:15AM 5    MS. PETERSON THAT THEY'RE GOING TO, BY THE END OF 2014, HAVE

09:15AM 6    $40 MILLION IN REVENUE FROM PHARMACEUTICAL COMPANIES.

09:15AM 7            THE COURT:  AND THAT, THAT KNOWLEDGE COMES FROM

09:15AM 8    RECORDS THAT ARE IN EVIDENCE NOW FROM MS. YAM AND OTHERS?

09:15AM 9            MS. VOLKAR:  CORRECT.  AND I DID PROVIDE CITATIONS

09:15AM 10   TO THOSE IN ECF 1420 TO MAKE SURE THE COURT HAD EVIDENCE FROM

09:15AM 11   THIS TRIAL THAT COULD TIE THAT.

09:15AM 12       WHY IS THAT IMPORTANT?  WHAT DOES THAT HAVE TO DO WITH THE

09:15AM 13   ALTERING?

09:15AM 14       WHAT I WOULD SAY IS THAT THIS IS A BRICK, A FOUNDATION

09:15AM 15   FROM WHICH THE JURY CAN SEE THAT MR. BALWANI HAD KNOWLEDGE THAT

09:15AM 16   THE PHARMACEUTICAL CLINICAL TRIALS WERE NOT DRIVING REVENUE,

09:15AM 17   WERE NOT BRINGING IN, WERE NOT SUFFICIENT TO KEEP THE COMPANY

09:15AM 18   CASH FLOW NEUTRAL, LET ALONE CASH FLOW POSITIVE OR PROFITABLE,

09:15AM 19   AND THAT WOULD ALSO GIVE HIM, AT LEAST THERE'S AN INFERENCE,

09:16AM 20   SOME INDICATION THAT THE CLINICAL TRIALS WEREN'T AS SUCCESSFUL

09:16AM 21   AS THEY CLAIMED TO BE.

09:16AM 22       AND THAT, PLUS, AGAIN, IF WE GO BACK TO THAT MARCH 2010

09:16AM 23   EMAIL WHEN HE SAW AN UNALTERED REPORT OF THE SCHERING-PLOUGH

09:16AM 24   REPORT, WOULDN'T THAT LEAD A PERSON TO ASK QUESTIONS?  WOULDN'T

09:16AM 25   THAT LEAD SOMEONE TO SAY, WE KEEP SHARING THIS PFIZER REPORT,

4511

09:16AM 1    BUT PFIZER HASN'T GIVEN US A DIME SINCE 2009?  I'M TELLING

09:16AM 2    PEOPLE THAT PFIZER AND OTHER PHARMACEUTICAL COMPANIES ARE

09:16AM 3    BRINGING IN ENOUGH REVENUE FOR THIS COMPANY TO BE PROFITABLE.

09:16AM 4        THAT'S HOW THESE THINGS ARE TIED TOGETHER.

09:16AM 5        I KNOW THE DEFENSE WANTS TO PARSE EACH OF THEM APART, BUT

09:16AM 6    IT DOES ADD A BRICK BECAUSE THE PFIZER WITNESS IS GOING TO

09:16AM 7    TESTIFY THEY NEVER AUTHORIZED THAT, BUT MR. BALWANI IS ONLY

09:16AM 8    EVER SHARING THE ALTERED VERSION OF THE PFIZER REPORT WITH

09:16AM 9    INVESTORS.  HE'S TALKING ABOUT IT WITH MS. HOLMES, HE'S TALKING

09:16AM 10   TO THEM ABOUT --

09:16AM 11       THE COURT:  TELL ME THE EVIDENCE THAT I HAVE.  WHERE

09:16AM 12   IS THE EVIDENCE THAT HE SHOWED THE ALTERED ENHANCED VERSION AND

09:17AM 13   THAT HE TALKED WITH MS. HOLMES ABOUT THAT?

09:17AM 14       MS. VOLKAR:  YES, ABSOLUTELY, YOUR HONOR.

09:17AM 15       I WILL ADMIT A LOT OF THIS EVIDENCE WAS IN 1337, BUT I'LL

09:17AM 16   TRY TO UPDATE IT.

09:17AM 17       FIRST AND FOREMOST, THERE'S ECF 1338-4, SENDING THE

09:17AM 18   REPORTS TO POTENTIAL INVESTOR BDT.

09:17AM 19       THE COURT:  1338 OR 1337?

09:17AM 20       MS. VOLKAR:  IT WAS MY DECLARATION AND EXHIBIT, SO

09:17AM 21   1338.

09:17AM 22       THE COURT:  OKAY.

09:17AM 23       MS. VOLKAR:  BUT IN THIS TRIAL -- AND I APOLOGIZE, I

09:17AM 24   DON'T HAVE THE TRIAL EXHIBIT ON HAND -- BUT MS. PETERSON, WHEN

09:17AM 25   SHE WAS TESTIFYING AT THE TAIL END OF HER DEALINGS WITH

4512

09:17AM   1    THERANOS, MR. BALWANI SENT HER A SOFT COPY OF ALL OF THE DUE

09:18AM   2    DILIGENCE MATERIALS, WHICH INCLUDED THE PFIZER REPORT.

09:18AM   3        AND SO IN THIS TRIAL WE HAVE MR. BALWANI SENDING THESE

09:18AM   4    REPORTS, ALONG WITH OTHER MATERIALS.

09:18AM   5        WE HAVE, IN THE TEXT MESSAGES IN 2013, MS. HOLMES SAYING,

09:18AM   6    I'M GOING TO SEND THIS TO POTENTIAL INVESTORS, PLANNING TO

09:18AM   7    INCLUDE PFIZER REPORT.

09:18AM   8        AND MR. BALWANI SAYS, GREAT.

09:18AM   9        WE HAVE MR. BALWANI TALKING TO INVESTORS ABOUT, IN GREAT

09:18AM   10   DETAIL ACCORDING TO MR. MENDENHALL, ABOUT THE CLINICAL TRIALS

09:18AM   11   THAT WERE DONE AND THE TECHNOLOGY THAT WAS USED TO RUN THEM AND

09:18AM   12   THE FINANCIAL SUCCESS THAT CAME FROM THEN.  THAT'S ALL FROM

09:18AM   13   MR. MENDENHALL FROM FRIDAY, WHO TESTIFIED ABOUT THAT.

09:18AM   14       WE WILL HAVE GOVERNMENT PROFFERS AND WE WILL HAVE

09:18AM   15   INVESTORS TESTIFYING IN THE COMING WEEKS, INCLUDING

09:18AM   16   MR. GROSSMAN WHO, IN THE HOLMES TRIAL, TESTIFIED THAT BALWANI

09:18AM   17   PROVIDES THESE REPORTS, AND MR. MOSLEY.  I CAN'T RECALL IF THAT

09:19AM   18   WAS MR. BALWANI OR MS. HOLMES, SO I HESITATE TO MAKE THAT

09:19AM   19   REPRESENTATION RIGHT NOW.

09:19AM   20       AND THE LAST TWO THINGS I WANT TO MAKE SURE THE RECORD IS

09:19AM   21   CLEAR ON, MY COLLEAGUE SAID THAT THE INVESTOR COUNTS ARE IN

09:19AM   22   2013 AND 2014.

09:19AM   23       THE INDIVIDUAL WIRE FRAUD COUNTS, THAT IS TRUE.

09:19AM   24       BUT THE GOVERNMENT HAS ALLEGED A CONSPIRACY TO DEFRAUD

09:19AM   25   INVESTORS FROM 2010 TO 2015, AND I WANT TO MAKE SURE THAT

09:19AM 1    THAT'S NOT LOST, AND THE INDICTMENT LAYS OUT HOW A LARGE

09:19AM 2    PORTION OF THAT IS RELATED TO WALGREENS, AND THESE

09:19AM 3    PHARMACEUTICAL REPORTS ARE ONE OF THE KEY WAYS THAT THEY GOT

09:19AM 4    WALGREENS ON THE HOOK IN 2010.

09:19AM 5         MY COLLEAGUE, OR MY TEAMMATE GAVE ME ANOTHER ASSIST.  THE

09:19AM 6    JHAVERI TOUR IN 2010 IS PAGE 2883 --

09:19AM 7              THE COURT:  THANK YOU.

09:19AM 8              MS. VOLKAR:  -- OF THE TRIAL TRANSCRIPT, AND THAT

09:20AM 9    WAS ON APRIL 19TH.

09:20AM 10             THE COURT:  THANK YOU.

09:20AM 11        SO, MS. VOLKAR, WHAT IS IT YOU INTEND TO DO TODAY

09:20AM 12   REGARDING THE PFIZER DOCUMENT?  YOU HAVE HEARD ME TALK ABOUT

09:20AM 13   FALSITY, AND I DO BELIEVE I'M GOING TO ADMIT OR ALLOW THIS

09:20AM 14   TESTIMONY TO COME IN, AT LEAST NOW ON THE ISSUE OF FALSITY.

09:20AM 15        IS THIS YOUR WORK PRODUCT?  DID YOU AUTHORIZE?  HE'LL

09:20AM 16   ANSWER THOSE QUESTIONS.

09:20AM 17        WERE YOU INTENDING TO DO MORE FROM THIS WITNESS OTHER THAN

09:20AM 18   THAT, OR WAS IT THE INFERENCE THAT YOU WOULD LIKE TO BE ABLE TO

09:20AM 19   ARGUE IN THE FUTURE?

09:20AM 20             MS. VOLKAR:  YOUR HONOR, I THINK, AND I WILL TAKE A

09:20AM 21   MOMENT TO CONFER WITH MY COLLEAGUE, BUT I BELIEVE THAT WE WOULD

09:20AM 22   LIKE TO ADMIT THE UNALTERED REPORT THAT MS. HOLMES SENT TO

09:20AM 23   MR. WEBER, AND I BELIEVE IT'S ALREADY IN EVIDENCE, THE ALTERED

09:20AM 24   VERSION THAT WAS SENT TO WALGREENS.

09:20AM 25        AND I BELIEVE, AS WE DID IN THE HOLMES TRIAL, WE WOULD

09:21AM  1    LIKE TO BE ABLE TO SHOW HIM THE ALTERED VERSION AND ASK WHETHER

09:21AM  2    HE EVER AGREED WITH THE CONCLUSIONS, SUPPORTED.  OR IF HE

09:21AM  3    AGREED WITH THE CONCLUSIONS, IF HE PLACED THE LOGO ON THE

09:21AM  4    DOCUMENT, IF HE AUTHORIZED THE PLACEMENT OF THE LOGO ON THE

09:21AM  5    DOCUMENTS.

09:21AM  6        I REALLY DO THINK IT'S THOSE LAST COUPLE OF QUESTIONS

09:21AM  7    WHERE WE DIFFER FROM THE DEFENSE.  WE DO BELIEVE THAT HE SHOULD

09:21AM  8    BE ABLE TO SAY HE DID NOT AUTHORIZE THE LOGO ON THE DOCUMENT

09:21AM  9    THAT WAS SENT TO WALGREENS.

09:21AM 10            MR. LEACH:  YOUR HONOR, IF I MAY?  I DON'T MEAN TO

09:21AM 11    INTERRUPT.  I'M HANDLING MR. WEBER'S DIRECT.

09:21AM 12            THE COURT:  RIGHT.  MY QUESTIONS WERE RELATED TO HIS

09:21AM 13    TESTIMONY, RIGHT.

09:21AM 14            MR. LEACH:  YES, AND I THINK MS. VOLKAR'S SUMMARY IS

09:21AM 15    FAIR.

09:21AM 16        WE INTEND TO SHOW HIM THE REPORT THAT HE RECEIVED, NOTE

09:21AM 17    THE FACT THAT IT HAS ONLY THE THERANOS LOGO, ASK HIM IF PFIZER

09:21AM 18    OR ANYONE ELSE AGREED WITH THESE CONCLUSIONS, ASK HIM IF HE

09:21AM 19    APPROVED PROVIDING THE REPORT THAT THEY RECEIVED TO ANY THIRD

09:21AM 20    PARTIES.  I EXPECT THAT HE WILL SAY NO.

09:22AM 21        AND IF PERMITTED, WE WILL SHOW WHAT IS ALREADY IN EVIDENCE

09:22AM 22    THROUGH MS. PETERSON, A COPY OF THE PFIZER REPORT PROVIDED IN

09:22AM 23    2014 TO HER AND ASK IF HE HAS EVER SEEN THAT, IF HE APPROVED

09:22AM 24    IT.

09:22AM 25        I HAVE YET TO DECIDE WHETHER I WOULD REFER TO THE LOGO,

09:22AM 1    BUT I THINK IT WOULD BE APPROPRIATE TO DO THAT AND REALLY ASK

09:22AM 2    IF HE HAD ANYTHING TO DO WITH IT.

09:22AM 3        I EXPECT HIS ANSWER WOULD BE NO.

09:22AM 4        THAT GOES DIRECTLY TO WHETHER THE REPRESENTATIONS THAT

09:22AM 5    WERE PROVIDED TO MS. PETERSON WERE TRUE OR FALSE.

09:22AM 6        AND THAT WAS THE GOVERNMENT'S INTENTION THERE.

09:22AM 7        AND WHILE I HAVE THE MIKE, I JUST WANTED TO EMPHASIZE A

09:22AM 8    POINT.  I THINK THE GOVERNMENT HAS BEEN MAKING -- THE DATE OF

09:22AM 9    THE ALTERING IN 2010 IS REALLY NEITHER HERE OR THERE.

09:22AM 10        THE DECEPTIVE ACT IS WHEN THEY PROVIDE IT TO THE

09:22AM 11    INVESTORS, AND THAT IS HAPPENING IN 2014 WITH MS. PETERSON.

09:22AM 12        IT HAPPENS WITH MR. MOSLEY IN THE SAME TIME PERIOD.

09:22AM 13        MS. VOLKAR REFERRED TO EVIDENCE WHERE MR. BALWANI IS

09:23AM 14    PROVIDING THE DOCUMENT REPORT IN 2014 TO BDT, AND THAT IS THE

09:23AM 15    DECEPTIVE ACT.

09:23AM 16        AND IF THERE'S A CONSPIRACY IN 2013 TO 2015 -- YOU KNOW,

09:23AM 17    WHO KNOWS WHEN IT WAS ACTUALLY ALTERED.  THEY COULD HAVE DONE

09:23AM 18    IT, YOU KNOW, IN THEIR OWN OFFICES AND NOT GIVEN IT TO ANYBODY.

09:23AM 19    THAT'S NOT NECESSARILY THE CRIME.

09:23AM 20        THE DECEPTIVE ACT IS IN 2013 AND 2015 WHEN MS. HOLMES AND

09:23AM 21    MR. BALWANI PROVIDE IT TO INVESTORS, AND IF THERE'S A PRIMA

09:23AM 22    FACIE CASE OF CONSPIRACY IN 2013 AND 2014 AND 2015, THE

09:23AM 23    REASONABLY FORESEEABLE ACTS OF THE COCONSPIRATOR ARE ADMISSIBLE

09:23AM 24    AND HE'S ACCOUNTABLE FOR THOSE.

09:23AM 25        I THINK THE 2010 IS IMPORTANT, BUT THE DECEPTIVE ACT IS

09:23AM 1    WHENEVER IT'S PROVIDED TO THE INVESTORS.

09:23AM 2           THE COURT:  I UNDERSTOOD THAT.

09:23AM 3       AND MY QUESTION WAS, DO WE NEED TO LOOK BACK, AND HOW DO

09:23AM 4    WE LOOK BACK?

09:23AM 5       AND YOU'RE ABSOLUTELY RIGHT, AND I THINK MR. BRECHER WILL

09:23AM 6    AGREE, THEY'RE LIABLE FOR THE CONDUCT.  "THEY" MEANING THE

09:24AM 7    COCONSPIRATORS.

09:24AM 8       DO WE LOOK BACK THOUGH?  HERE WE'RE STARTING IN 2010 AND

09:24AM 9    GOING FORWARD TO CONDUCT THAT I THINK EVERYBODY IS

09:24AM 10   ACKNOWLEDGING OCCURRED, AND THE WITNESS WILL TESTIFY ABOUT

09:24AM 11   RECEIVING DOCUMENTS.

09:24AM 12          MR. LEACH:  I THINK THERE IS SOME LEVEL, YOU KNOW,

09:24AM 13   OF, DOES THE EVIDENCE IN 2013 AND 2014, DOES IT REASONABLY

09:24AM 14   CONNECT TO 2010?  IS THERE SOME CHANGE IN THE CIRCUMSTANCES?

09:24AM 15      AND I THINK WHAT THE GOVERNMENT IS SAYING IS THAT WE KNOW

09:24AM 16   THAT MR. BALWANI RECEIVED, YOU KNOW, THE UNALTERED

09:24AM 17   SCHERING-PLOUGH REPORT AND AN ALTERED SCHERING-PLOUGH REPORT.

09:24AM 18   HE KNEW THERE WAS -- AND WHEN I SAY "KNEW," I THINK THE

09:24AM 19   EVIDENCE SUPPORTS THE INFERENCE THAT HE KNEW AT LEAST ONE

09:24AM 20   REPORT WAS DOCTORED.

09:24AM 21      HE KNEW THAT MS. HOLMES WAS MAKING REPRESENTATIONS TO

09:24AM 22   WALGREENS AND OTHERS ABOUT THE PHARMA RELATIONSHIPS.  HE KNOWS

09:24AM 23   THAT IN 2010.

09:24AM 24      BY 2013 AND 2014, HE KNOWS THERE'S NO REVENUE FROM PFIZER.

09:25AM 25   HE KNOWS THERE HAS BEEN NO INTEREST FOR A NUMBER OF YEARS.  HE

4517

09:25AM   1    KNOWS THIS IS BEING HELD OUT TO INVESTORS AS COMPREHENSIVE

09:25AM   2    VALIDATION, AND IN ALL OF THEIR POWERPOINTS THEY'RE SAYING,

09:25AM   3    WE'VE BEEN COMPREHENSIVELY VALIDATED, YOU CAN COUNT ON THE

09:25AM   4    PHARMA COMPANIES.

09:25AM   5        ALL OF THAT PUT TOGETHER SUPPORTS THE INFERENCE THAT HE

09:25AM   6    KNOWS A SIGNIFICANT AMOUNT ABOUT THE PFIZER RELATIONSHIP, KNOWS

09:25AM   7    THAT THERE HAD BEEN SOME ALTERATION OF THE REPORTS IN THE PAST,

09:25AM   8    AND RAISES A FAIR INFERENCE THAT IF THERE'S A CONSPIRACY, WHICH

09:25AM   9    I THINK THERE'S A PRIMA FACIE CASE OF, THE KNOWLEDGE DOESN'T

09:25AM   10   NEED TO EXTEND, YOU KNOW, AS DIRECT EVIDENCE TO EACH PARTICULAR

09:25AM   11   GRAIN OF A MULTI PAGE POWERPOINT -- IT DOESN'T NEED TO EXPAND

09:25AM   12   GRANULARLY TO EVERY SINGLE PAGE OF THE POWERPOINT.  IF THEY'RE

09:25AM   13   IN FOR A PENNY TO DECEIVE INVESTORS ABOUT PHARMACEUTICAL

09:26AM   14   COMPANIES, THEY'RE IN FOR A POUND.

09:26AM   15       SO YOU NEED TO LOOK AT IT AS A WHOLE, BUT I ALSO DON'T

09:26AM   16   WANT TO EMPHASIZE TOO MUCH THE 2010 TIME PERIOD BECAUSE THE

09:26AM   17   DECEPTIVE ACT IS REALLY WHEN THE REPORT WAS GIVEN TO THE

09:26AM   18   PHARMACEUTICAL --

09:26AM   19       THE COURT:  SO THE 2010 IS THE GENESIS, THAT'S THE

09:26AM   20   GENESIS OF THE CONSPIRATORIAL ACTS, AND THE CONDUCT DEVELOPS AS

09:26AM   21   WE SEE IN 2013, 2014, 2015, THE OTHER GERMINATION, IF YOU WILL,

09:26AM   22   OF THE CONSPIRACY.

09:26AM   23       MR. LEACH:  YES.

09:26AM   24       MR. BRECHER:  THANK YOU, YOUR HONOR.

09:26AM   25       IT'S ALWAYS A PLEASURE TO DO BATTLE WITH TWO OF MY

09:26AM 1      COLLEAGUES.

09:26AM 2                  THE COURT:  WELL, YOU SHOULD BE HONORED.

09:26AM 3                  MR. BRECHER:  I AM INDEED, YOUR HONOR.

09:26AM 4          I WANT TO MAKE SURE THAT I KEEP THIS BRIEF, WHILE ALSO NOT

09:26AM 5      GOING TOO QUICKLY TO IMPOSE TOO MUCH ON MS. RODRIGUEZ.

09:26AM 6          SO I JUST NEED TO MARCH THROUGH A FEW THINGS JUST TO MAKE

09:26AM 7      SURE THAT WE'RE CLEAR.

09:27AM 8          FIRST, THERE WAS A CLAIM BY MY FRIEND THAT AT THE TAIL END

09:27AM 9      OF THE INVESTMENT NEGOTIATIONS WITH RDV, MR. BALWANI SENT A

09:27AM 10     SOFT COPY OF ALL OF THE INVESTOR DOCUMENTS TO MS. PETERSON,

09:27AM 11     INCLUDING THE PFIZER REPORT.  THAT IS NOT TRUE.

09:27AM 12         THE SOFT COPY OF THE MATERIALS THAT HE SENT INCLUDED ONLY

09:27AM 13     THE BLANK AGREEMENTS FOR SIGNATURE.  THERE IS NO -- MUCH TO THE

09:27AM 14     FRUSTRATION OF, FRANKLY, BOTH PARTIES, THERE IS NO SOFT COPY IN

09:27AM 15     EXISTENCE OF WHAT MS. PETERSON DESCRIBED AS THE DUE DILIGENCE

09:27AM 16     MATERIALS THAT WERE SENT BEFORE THE INVESTMENT.

09:27AM 17         AS TO THOSE MATERIALS THAT DID INCLUDE THE PFIZER REPORT,

09:27AM 18     YOUR HONOR ALLOWED THAT EVIDENCE TO COME IN BASED ON A

09:27AM 19     FOUNDATION THAT MR. BALWANI WAS THE SIGNATORY ON A

09:27AM 20     CONFIDENTIALITY AGREEMENT THAT HELPED FACILITATE THAT EXCHANGE.

09:27AM 21         BUT I WANT TO REMIND THE COURT, AND I THINK -- I CAN'T SAY

09:27AM 22     THAT MR. LEACH CONCEDED THE POINT, BUT I DIDN'T HEAR HIM

09:27AM 23     ADDRESS IT DIRECTLY THE OTHER DAY WHEN MS. PETERSON WAS ON THE

09:27AM 24     STAND.

09:27AM 25         THERE IS NO EVIDENCE WHATSOEVER THAT MR. BALWANI SENT

09:28AM   1    THOSE MATERIALS TO MS. PETERSON OR ANY ONE OF THE INVESTORS.

09:28AM   2        IN FACT, WHAT WE KNOW FROM MR. EDLIN'S TESTIMONY IS THAT

09:28AM   3    MR. EDLIN SENT THE MATERIALS AT THE DIRECTION OF MS. HOLMES,

09:28AM   4    WITH ONE EXCEPTION, AND THAT EXCEPTION WAS THE PROVISION OF THE

09:28AM   5    FINANCIAL DOCUMENTS.

09:28AM   6        SO I JUST WANT TO MAKE SURE THAT THE RECORD IS CLEAR ON

09:28AM   7    THAT POINT.

09:28AM   8        SECOND, MR. MENDENHALL DID SAY THAT MR. BALWANI -- AND

09:28AM   9    AGAIN, THIS IS A CONVERSATION IN LATE 2013, SO THE TIMING

09:28AM   10   MATTERS -- HAD A COMMAND OF THE FACTS IN GENERAL, BUT HE DID

09:28AM   11   NOT SAY THAT HE DESCRIBED THE CLINICAL TRIALS IN DETAIL.  THAT

09:28AM   12   WASN'T HIS TESTIMONY, AND THAT'S NOT WHAT HIS NOTES REFLECT.

09:28AM   13       INDEED, I DON'T RECALL THE EXHIBIT NUMBER OFFHAND,

09:28AM   14   YOUR HONOR, BUT AS THE COURT WILL KNOW FROM THE BOTTOM OF THAT

09:28AM   15   EXHIBIT, AND FROM HIS OWN TESTIMONY, MR. MENDENHALL DESCRIBED

09:28AM   16   HIMSELF AS A COMPULSIVE NOTE-TAKER AND SAID THAT I BELIEVE I

09:28AM   17   WROTE DOWN EVERYTHING THAT HE SAID.

09:28AM   18       HE DIDN'T WRITE THAT DOWN AND HE DIDN'T OFFER THAT

09:28AM   19   TESTIMONY LAST WEEK.

09:28AM   20       NUMBER THREE, I HEARD AN ARGUMENT ABOUT THE TIMING ALLEGED

09:29AM   21   IN THE INDICTMENT.

09:29AM   22       WELL, YES, THE INDICTMENT DOES ALLEGE THAT A CONSPIRACY

09:29AM   23   BEGAN IN 2010, BUT THAT'S WHAT WE'RE HERE TO PROVE.  THE

09:29AM   24   INDICTMENT IS NOT EVIDENCE.  IT DOESN'T PROVE ANYTHING.  THE

09:29AM   25   COURT HAS ALREADY INSTRUCTED THE JURY ON THAT POINT, AND WILL

09:29AM 1    DO SO AGAIN I EXPECT.

09:29AM 2         MORE RELEVANTLY, YOUR HONOR, IN TERMS OF THE 104 CONTEXT,

09:29AM 3    AN INDICTMENT IS, OF COURSE, ISSUED ON A PROBABLE CAUSE

09:29AM 4    STANDARD, NOT THE PREPONDERANCE STANDARD THAT APPLIES HERE.

09:29AM 5         IT'S ALSO ISSUED IN A PROCESS OVER WHICH THE GOVERNMENT

09:29AM 6    HAS UNIQUE CONTROL WITH WE'LL JUST SAY LIMITED PARTICIPATION BY

09:29AM 7    DEFENDANTS IN MOST INSTANCES.

09:29AM 8         NUMBER FIVE -- EXCUSE ME, NUMBER FOUR, I WANT TO TALK

09:29AM 9    ABOUT THE RETAIL RELATIONSHIP FOR JUST A MOMENT.

09:29AM 10        FIRST, THERE'S BEEN NO EVIDENCE TO DATE THAT WALGREENS DID

09:29AM 11   RELY PRIMARILY OR EVEN LARGELY, THERE'S ACTUALLY BEEN NO

09:29AM 12   TESTIMONY ON THIS AT ALL, BUT I'LL RECOGNIZE THAT THERE WAS

09:30AM 13   SOME TESTIMONY IN THIS DIRECTION IN THE HOLMES TRIAL, ON THE

09:30AM 14   PHARMA REPORTS.

09:30AM 15        IN FACT, THE TESTIMONY THAT IS ALREADY IN EVIDENCE IN BOTH

09:30AM 16   TRIALS ESTABLISHES THAT WALGREENS ENGAGED JOHNS HOPKINS AND A

09:30AM 17   TEAM THERE TO EVALUATE THE TECHNOLOGY, AND THAT ALSO HAPPENED

09:30AM 18   IN 2010.

09:30AM 19        THERE IS ALSO NO EVIDENCE THAT, QUOTE, THE

09:30AM 20   WALGREENS-WAL-MART RELATIONSHIP WENT NOWHERE.  I DON'T KNOW

09:30AM 21   WHAT THOSE ARGUMENTS ARE MEANT TO PROVE, BUT I DON'T THINK THEY

09:30AM 22   GET THE JOB DONE.

09:30AM 23        FIFTH IS THAT THE GOVERNMENT RAISES AN ARGUMENT THAT THEY

09:30AM 24   HAVE NOT BEFORE RAISED, AND I'M HAPPY TO ADDRESS IT, AND THAT

09:30AM 25   IS THAT IF THERE'S A PRIMA FACIE CASE IN THE 2014, 2015 TIME

09:30AM 1    PERIOD, THAT THE RELEVANT ACT OF WHICH VICARIOUS LIABILITY

09:30AM 2    WOULD ATTACH, THE RELEVANT DECEPTIVE ACT WOULD BE SENDING THE

09:30AM 3    PFIZER REPORT IN THOSE TIME PERIODS.

09:30AM 4         FIRST, JUST TO MAKE SURE THAT WE'RE CLEAR ON THE FACTS, IT

09:31AM 5    WOULD HAVE TO BE VICARIOUS LIABILITY THEN, BECAUSE AS THE COURT

09:31AM 6    KNOWS AND AS I'VE JUST STATED, THERE'S NO EVIDENCE THAT

09:31AM 7    MR. BALWANI DID THAT WITH ANY OF THE INVESTORS THAT HAVE BEEN

09:31AM 8    ADMITTED THUS FAR IN TRIAL.  I BELIEVE THERE WAS SOME EVIDENCE

09:31AM 9    THAT DIDN'T COME INTO EITHER TRIAL ABOUT HIM SENDING A REPORT.

09:31AM 10        I WANT TO EMPHASIZE, I HEARD A GREAT DEAL OF -- WELL, A

09:31AM 11   GREAT DEAL OF EMPHASIS PLACED ON THE PHRASE THAT MR. BALWANI

09:31AM 12   ONLY EVER SHARED THE ALTERED VERSION OF THE PFIZER REPORT.

09:31AM 13        AND, YES, YOUR HONOR, THAT'S KIND OF OUR POINT.  THAT'S

09:31AM 14   THE ONLY VERSION THAT HE EVER HAD, SO THERE'S NOTHING -- IT

09:31AM 15   PROVES TOO MUCH BECAUSE IT PROVES NOTHING.

09:31AM 16        BUT TURNING BACK TO THE ARGUMENT THAT AN ACT IN 2013 IS

09:31AM 17   WHAT IS RELEVANT AND WHAT MR. BALWANI IS POTENTIALLY ON THE

09:31AM 18   HOOK FOR, THAT FAILS.  IT FAILS FOR TWO REASONS.

09:31AM 19        FIRST, THE -- AS I'VE ALREADY SAID, IF THE GOVERNMENT

09:31AM 20   WANTS TO SAY THAT MS. HOLMES REPRESENTED, OR EVEN MR. BALWANI

09:32AM 21   REPRESENTED, IT'S FINE, THAT PHARMACEUTICAL COMPANIES HAD

09:32AM 22   COMPREHENSIVELY VALIDATED THE TECHNOLOGY, AND THE GOVERNMENT,

09:32AM 23   THEY PUT ON EVIDENCE ALREADY THROUGH DR. CULLEN, I SUSPECT THAT

09:32AM 24   THEY'RE GOING TO PUT ON MORE EVIDENCE THIS MORNING THROUGH

09:32AM 25   MR. WEBER, IF THE GOVERNMENT WANTS TO PUT ON EVIDENCE THAT THAT

4522

09:32AM 1    REPRESENTATION WAS FALSE, FINE.  FINE BY ME.

09:32AM 2         BUT THE ACT AT ISSUE IS THE ALTERATION OF THE REPORT, AND

09:32AM 3    THAT HAPPENED IN 2010, SO IT DOESN'T SURPRISE ME TO HEAR

09:32AM 4    MR. LEACH SAY TO THE COURT THAT THE GOVERNMENT DOESN'T WANT YOU

09:32AM 5    FOCUSSING ON 2010.  IT'S BECAUSE THAT'S WHERE THEIR CASE IS

09:32AM 6    PRETTY THIN AT THIS POINT.

09:32AM 7         SECOND, I HAVE TO MENTION FORESEEABILITY, YOUR HONOR, AND

09:32AM 8    I ALREADY KNOW WHAT THE COURT IS THINKING.  NORMALLY

09:32AM 9    FORESEEABILITY IS A LAY UP FOR THE GOVERNMENT.  I GET IT.

09:32AM 10        BUT HERE THE ANALYSIS IS QUITE DIFFERENT, EVEN IF YOU BUY

09:32AM 11   THE GOVERNMENT'S 2013, 2014 DECEPTIVE ACT THEORY.

09:32AM 12        AND THAT IS BECAUSE WHAT YOU HAVE TO BELIEVE IS THAT IT

09:33AM 13   WAS FORESEEABLE TO MR. BALWANI IN LATE 2014 THAT MS. HOLMES AND

09:33AM 14   OTHERS OF THE BOARD WHO SHARED WITH HIM THE INFORMATION THAT

09:33AM 15   THE COMPANY'S TECHNOLOGY HAD BEEN ROBUSTLY VALIDATED IN 2009

09:33AM 16   HAD DECEIVED HIM, HAD TRICKED HIM INTO JOINING THE COMPANY, AND

09:33AM 17   NOW FOUR YEARS LATER WE'RE GOING TO PLAY THAT SAME TRICK ON

09:33AM 18   SOMEONE ELSE, THIS TIME WITH MR. BALWANI'S KNOWING

09:33AM 19   PARTICIPATION.

09:33AM 20        IT'S, FRANKLY, SO CONVOLUTED, YOUR HONOR, I CAN'T EVEN

09:33AM 21   REALLY ARTICULATE IT.  BUT THAT'S WHAT I THINK IS GOING ON, AND

09:33AM 22   THAT'S WHAT I THINK THE GOVERNMENT HAS TO BE ARGUING.

09:33AM 23        SO LET'S RETURN TO WHERE WE ARE AND TO WHERE WE HAVE TO

09:33AM 24   BE.

09:33AM 25        THIS ALTERATION HAPPENED IN APRIL OF 2010, RIGHT AROUND

09:33AM   1    APRIL 14TH, 2010.

09:33AM   2        WE KNOW THAT SOMEONE ELSE HAS ADMITTED TO DOING IT.  WE

09:33AM   3    KNOW THAT MR. BALWANI IS NOT GOING TO BE ABLE TO GET THAT

09:33AM   4    EVIDENCE IN WITHOUT WAIVING HIS CONFRONTATION RIGHTS.

09:33AM   5        WE DON'T KNOW WHAT OTHER CIRCUMSTANCES SURROUNDED THAT

09:34AM   6    PERSON'S CONDUCT.  THE PERSON IS NOT LIKELY TO TESTIFY SO FAR

09:34AM   7    AS I'M AWARE, BUT MS. VOLKAR CAN FILL ME IN IF I'M WRONG.

09:34AM   8        IT IS FUNDAMENTALLY UNFAIR TO HAVE THE JURY SEE THE ONE

09:34AM   9    PERSON WHO IS SITTING THERE IN THE DOCS AND SAYING, OH GOSH,

09:34AM   10   SOMETHING REALLY UNTOWARD HAS HAPPENED HERE, I GUESS THIS GUY

09:34AM   11   DID IT.

09:34AM   12       AND INFORMATION FROM YEARS LATER ABOUT FINANCIALS DOESN'T

09:34AM   13   SAY ANYTHING ABOUT WHAT MR. BALWANI'S KNOWLEDGE AND INTENT WAS

09:34AM   14   IN APRIL OF 2010.  THAT IS WHAT MATTERS HERE.

09:34AM   15       THANK YOU.

09:34AM   16           THE COURT:  OKAY.  THANK YOU.

09:34AM   17           MS. VOLKAR:  YOUR HONOR, MAY I BE HEARD BRIEFLY,

09:34AM   18   VERY BRIEFLY?

09:34AM   19           THE COURT:  SURE.

09:34AM   20           MS. VOLKAR:  I THINK WE HEARD A LITTLE BIT OF A

09:34AM   21   PREVIEW OF THE DEFENSE'S CLOSING ARGUMENT, AND I DON'T WANT TO

09:34AM   22   REBUT ALL OF THE FACTUAL POINTS HERE.

09:34AM   23       THERE ARE JUST ONE OR TWO, PERHAPS MISTAKEN, BUT

09:34AM   24   MISCHARACTERIZATIONS OF THE RECORD THAT I DO THINK ARE

09:34AM   25   IMPORTANT TO FLAG.

09:34AM  1          THE FIRST WAS ABOUT PETERSON, WHAT MS. PETERSON TESTIFIED

09:35AM  2     TO WITH THE SOFT COPY.

09:35AM  3          ONE, I DON'T KNOW IF SHE -- I THOUGHT SHE REFERENCED THE

09:35AM  4     LOGO IN THIS TRIAL, BUT I KNOW SHE SAID SHE THOUGHT PFIZER

09:35AM  5     WROTE IT, SO THAT IS IN THE RECORD.

09:35AM  6          BUT SHE ALSO SAID THAT WHAT MR. BALWANI SENT TO HER IN

09:35AM  7     THAT ZIP FILE, WHICH IF WE DIDN'T RECEIVE THAT IN DISCOVERY,

09:35AM  8     THAT'S AN ENTIRELY DIFFERENT DISCUSSION WE DON'T NEED TO HAVE

09:35AM  9     TODAY, BUT SHE TESTIFIED THAT WHAT SHE RECEIVED IN THE ZIP FILE

09:35AM  10    FROM MR. BALWANI WAS THE SAME MATERIAL THAT SHE GOT IN THE

09:35AM  11    BINDER, AND THAT'S AT TRANSCRIPT PAGE 3884 TO 3897.  AND I

09:35AM  12    APOLOGIZE, I DON'T HAVE A MORE NARROWED PIN CITE THAN THAT.  I

09:35AM  13    DIDN'T HAVE THE PAGE NUMBERS WITH ME.

09:35AM  14         THERE IS ALSO A STATEMENT THAT THERE'S NO EVIDENCE THAT

09:35AM  15    THE WALGREENS RELATIONSHIP WENT NOWHERE.

09:35AM  16         I WOULD POINT THE COURT TO MR. JHAVERI'S TESTIMONY.  I

09:35AM  17    DON'T THINK WE NEED TO BELABOR THAT.  HE TALKED ABOUT HOW IT

09:35AM  18    FIZZLED OUT BECAUSE THEY COULDN'T BRING THE VEIN DROP

09:35AM  19    PERCENTAGE DOWN.

09:35AM  20         AND THE LAST THING IS THAT THE DEFENSE EMPHASIZES THIS IS

09:36AM  21    ABOUT THE ALTERATION THAT HAPPENED IN APRIL 2010.

09:36AM  22         I JUST WANT TO POINT OUT, WE'RE TRYING TO PARSE THROUGH

09:36AM  23    WHAT IS COMING IN THROUGH THIS TRIAL AND WHAT WE SORT OF KNOW

09:36AM  24    IN THE LARGER UNIVERSE.

09:36AM  25         THERE IS NO EVIDENCE IN THIS TRIAL THAT THE ALTERATION

09:36AM 1    HAPPENED IN APRIL OF 2010, AND I DO THINK THAT'S IMPORTANT.

09:36AM 2        MY COLLEAGUE IS SAYING THAT WE KNOW THAT BECAUSE

09:36AM 3    MS. HOLMES TESTIFIED TO IT.

09:36AM 4        THE GOVERNMENT DISPUTES THAT THAT'S SORT OF THE ULTIMATE

09:36AM 5    TRUTH.

09:36AM 6        REGARDLESS, THE JURY CERTAINLY HASN'T HEARD IT.

09:36AM 7        THAT'S ALL I HAVE TO SAY.

09:36AM 8            THE COURT:  THANK YOU.

09:36AM 9            MR. BRECHER:  YOUR HONOR, I HAVE TO RESPOND VERY

09:36AM 10   BRIEFLY.

09:36AM 11       FIRST OF ALL, AS TO WHAT MS. PETERSON SAID ABOUT RECEIVING

09:36AM 12   A SOFT COPY, I WANT TO BE CLEAR, WE HAVE THAT EMAIL.  WE HAVE

09:36AM 13   THAT EXHIBIT, IT CAME INTO EVIDENCE THE OTHER DAY, AND THE

09:36AM 14   COURT CAN SEE FOR ITSELF WHAT ALL WAS ATTACHED TO IT.  IT'S

09:36AM 15   JUST THE CONTRACTS.  IT IS NOT THE REST OF THE DUE DILIGENCE

09:36AM 16   MATERIALS, SO THAT IS AN UNDISPUTED FACT.

09:36AM 17       WELL, I HAD THOUGHT IT WAS AN UNDISPUTED FACT UNTIL A

09:36AM 18   MOMENT AGO.

09:36AM 19       SECOND, IF I MISSPOKE, I APOLOGIZE, YOUR HONOR.

09:36AM 20       WHAT I HAD MEANT TO SAY WAS THAT THERE WAS NOTICE EVIDENCE

09:36AM 21   THAT THE WAL-MART RELATIONSHIP WENT NOWHERE, EVEN IN THE LAST

09:37AM 22   TRIAL OR THIS ONE.

09:37AM 23       AS FOR THE WALGREENS RELATIONSHIP FIZZLING OUT, ALL I'LL

09:37AM 24   SAY WITHOUT SPOILING EVENTS IS THAT MR. JHAVERI IS STILL ON

09:37AM 25   CROSS.  WE'VE GOT MORE TO SAY.

09:37AM 1    BUT SECOND, THAT HAPPENED, AGAIN, IN 2014 AND 2015, AND

09:37AM 2    GOING INTO OCTOBER OF 2015 IS WHEN THINGS REALLY STALLED IN THE

09:37AM 3    WALGREENS RELATIONSHIP.

09:37AM 4        AND LAST, THE POINT IS THAT THERE IS NO EVIDENCE THAT IN

09:37AM 5    APRIL 2010 MR. BALWANI HAD ANY KNOWLEDGE OF THIS OR WHAT WAS

09:37AM 6    GOING ON, AND I THINK THAT THIS ISSUE HAS TO RISE AND FALL ON

09:37AM 7    THAT.

09:37AM 8        THANK YOU.

09:37AM 9        THE COURT:  OKAY.  THANK YOU VERY MUCH.

09:37AM 10    AND MS. VOLKAR, MR. BRECHER SUGGESTS THAT THE PRIMA FACIE

09:37AM 11    IS USUALLY A LAY UP FOR THE GOVERNMENT, AND HE SUGGESTS THAT

09:37AM 12    EVEN A YOUNG MAN NAMED STEPHEN CURRY MISSES A LAY UP EVERY NOW

09:38AM 13    AND THEN, AND SO THE EVIDENCE MAY FAIL IN THIS CASE IN THAT

09:38AM 14    REGARD.

09:38AM 15    I TO RECOGNIZE THAT MR. JHAVERI IS STILL A WITNESS AND WE

09:38AM 16    HAVEN'T COMPLETED HIS TESTIMONY, AND PART OF HIS RELATIONSHIP

09:38AM 17    WITH MR. BALWANI REFERENCES THE 2010 TIME PERIOD, AND AT LEAST

09:38AM 18    SOME OF HIS TESTIMONY, I THINK, TALKED ABOUT THAT.

09:38AM 19    I WANT TO LOOK BACK AT THE TRANSCRIPT REGARDING THE TOUR.

09:38AM 20    THAT COULD BE HELPFUL HERE.

09:38AM 21    THE SHOWING IS, AND WE ALL RECOGNIZE THE PRIMA FACIE

09:38AM 22    SHOWING IS THAT IT'S NOT A VERY HIGH BAR, AND THE LAW SUGGESTS

09:38AM 23    THAT.  ACTUALLY, THE LAW STATES THAT.  IT DOESN'T SUGGEST IT.

09:38AM 24    IT STATES THAT.  IT'S NOT A HIGH BAR.  IT'S A PREPONDERANCE

09:38AM 25    STANDARD, WHICH IS A STANDARD OF EVIDENCE THAT MUST BE MET.

09:38AM 1       BUT I WANT TO LOOK AT THESE THINGS THAT YOU'VE TALKED TO

09:38AM 2  ME ABOUT.

09:38AM 3       AS FAR AS THE WITNESS'S TESTIMONY TODAY, WE'LL GET STARTED

09:39AM 4  WITH HIS TESTIMONY IN JUST A MOMENT, AND I AM GOING TO PERMIT

09:39AM 5  HIM TO TESTIFY ABOUT, AS I SAID EARLIER, AT A MINIMUM AS TO THE

09:39AM 6  FALSITY ISSUE AND QUESTIONS REGARDING WHETHER PFIZER, WHETHER

09:39AM 7  HE'S AUTHORIZED TO TESTIFY ABOUT WHETHER OR NOT PFIZER DID WHAT

09:39AM 8  THE LETTER SAYS IT DID, WHETHER PFIZER CREATED IT, ENDORSED IT,

09:39AM 9  WHETHER THIS IS A PFIZER LETTER.

09:39AM 10      I'M GOING TO PERMIT HIM TO TESTIFY ABOUT THAT AS TO A

09:39AM 11 MINIMUM ON THE ISSUE, AS I SAID, OF FALSITY.

09:39AM 12      THE OTHER -- WHETHER OR NOT HE TESTIFIES THAT IT'S -- I

09:39AM 13 DON'T THINK HE CAN SAY IT'S AN ALTERATION, BUT HE CAN SAY WE

09:39AM 14 DIDN'T -- I DIDN'T AUTHORIZE THAT LOGO ON THERE.  THAT'S NOT

09:39AM 15 OUR WORK PRODUCT.  I DON'T KNOW WHO DID IT, BUT WE DIDN'T.

09:39AM 16      STANDING PREGNANT, I KNOW YOUR PROBLEM WITH THAT,

09:39AM 17 MR. BRECHER, IS THAT THE ONLY PERSON IN THE ROOM HERE WHO IS

09:39AM 18 ACCUSED IS MY CLIENT, AND, OF COURSE, ALL EYES WILL LOOK AND

09:40AM 19 SAY, WELL, HE MUST HAVE DONE IT.

09:40AM 20      I'VE TALKED TO YOU ABOUT THERE MAY BE, AS THE EVIDENCE

09:40AM 21 COMES OUT, THE COURT MAY, IN A FINAL INSTRUCTION, SAY THAT YOU

09:40AM 22 CAN'T CONSIDER THAT, AND THE COURT MAY INSTRUCT THE GOVERNMENT,

09:40AM 23 YOU CAN'T ARGUE THAT BECAUSE THERE'S NO EVIDENCE TO SUPPORT

09:40AM 24 THAT.

09:40AM 25      THAT MIGHT BE THE APPROPRIATE REMEDY, WHICH IS TO SAY, I

09:40AM 1    NEED TO HEAR A LITTLE MORE.

09:40AM 2        BUT I WILL PERMIT THAT TYPE OF TESTIMONY FROM OR QUESTIONS

09:40AM 3    TO COME FROM THE GOVERNMENT AS TO THOSE ISSUES.

09:40AM 4        MR. BRECHER:  WE'LL OBJECT AT THE MOMENT,

09:40AM 5    YOUR HONOR, AND STAND ON OUR ARGUMENTS, BUT I UNDERSTAND THE

09:40AM 6    COURT'S DIRECTION.  THANK YOU.

09:40AM 7        THE COURT:  OKAY.

09:40AM 8        MS. VOLKAR:  THANK YOU, YOUR HONOR.

09:40AM 9        THE COURT:  OKAY.  WHAT ELSE SHOULD WE DISCUSS THIS

09:40AM 10   MORNING BEFORE WE BRING OUR JURY IN?

09:40AM 11       MR. BRECHER:  YOUR HONOR, MR. COOPERSMITH HAD

09:40AM 12   ANOTHER MATTER FOR OUR NEXT WITNESS.

09:41AM 13       MR. LEACH:  YOUR HONOR, IF I MAY GO FIRST ON THIS

09:41AM 14   ONE?

09:41AM 15       THE COURT:  SURE.

09:41AM 16       MR. LEACH:  MR. COOPERSMITH EMAILED THE COURTROOM

09:41AM 17   DEPUTY LAST NIGHT ABOUT THREE PARTICULAR EXHIBITS THAT THE

09:41AM 18   GOVERNMENT HAS IDENTIFIED RELATING TO SARAH BENNETT.

09:41AM 19       IT'S NOT CURRENTLY OUR INTENTION TO OFFER THOSE EXHIBITS

09:41AM 20   INTO EVIDENCE.  WE'VE MARKED THEM AND DISCLOSED THEM AS

09:41AM 21   POTENTIAL USE WITH MS. BENNETT TO REFRESH HER ON DATES AND

09:41AM 22   TIMING, BUT I'M NOT -- THERE'S SOME POSSIBILITY THAT THE

09:41AM 23   DEFENSE COULD OPEN THE DOOR TO THE CONTENT OF THOSE EMAILS, BUT

09:41AM 24   IT'S NOT CURRENTLY OUR INTENTION TO ADMIT THE DOCUMENTS

09:41AM 25   REFERENCED.

09:41AM  1      I DON'T KNOW IF THAT ALLAYS THE DEFENSE'S CONCERNS, BUT I

09:41AM  2  THOUGHT I WOULD START WITH THAT.

09:41AM  3          THE COURT:  OKAY.  THANK YOU.

09:41AM  4          MR. COOPERSMITH:  YOUR HONOR, I THINK THAT ADDRESSES

09:41AM  5  THE ISSUE, AND I WILL JUST STAND ON THAT.  THANK YOU.

09:41AM  6          THE COURT:  OKAY.  GREAT.

09:41AM  7      WELL, LET'S SEE IF WE CAN EMULATE THIS.

09:42AM  8          MR. COOPERSMITH:  I'M ALWAYS HAPPY WHEN WE AGREE ON

09:42AM  9  SOMETHING, YOUR HONOR.

09:42AM 10          THE COURT:  ALL RIGHT.  THANK YOU.

09:42AM 11      I'LL STEP DOWN AND WE'LL BRING OUR JURY IN AND WE'LL START

09:42AM 12  OUR DAY OF TESTIMONY.

09:42AM 13          MR. LEACH:  THANK YOU, YOUR HONOR.

09:42AM 14          THE COURT:  AND WE'RE GOING UNTIL 4:00 TODAY, I

09:42AM 15  BELIEVE.

09:50AM 16      (RECESS TAKEN AT 9:43 A.M. UNTIL 9:50 A.M.)

09:50AM 17      (JURY IN AT 9:50 A.M.)

09:50AM 18          THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

09:50AM 19  RECORD IN MR. BALWANI'S MATTER.

09:50AM 20      ALL COUNSEL ARE PRESENT.  THE JURY IS PRESENT.

09:51AM 21      GOOD MORNING, LADIES AND GENTLEMEN.  I'M SORRY FOR THE

09:51AM 22  DELAY.

09:51AM 23      AS I TOLD YOU IN THE PRELIMINARY INSTRUCTIONS, THERE WILL

09:51AM 24  BE TIMES THAT I HAVE TO MEET WITH THE LAWYERS TO GET ADDITIONAL

09:51AM 25  INFORMATION FROM THEM.  YOU'VE EXPERIENCED THAT.

```
09:51AM   1          THERE MAY BE TIMES WHERE YOU EXPERIENCED THAT AND IT HAS

09:51AM   2   HAPPENED AND I APPRECIATE YOUR PATIENCE IN THAT REGARD.

09:51AM   3          SO BEFORE WE START, LET ME ASK YOU, DURING THE BREAK, DID

09:51AM   4   ANY OF YOU HAVE CAUSE TO READ, LISTEN, DISCUSS, OR IN ANY WAY

09:51AM   5   LEARN ANYTHING ABOUT THIS CASE OUTSIDE OF THIS COURTROOM?

09:51AM   6   PLEASE RAISE YOUR HAND IF THAT HAS HAPPENED.

09:51AM   7          I SEE NO HANDS.  THANK YOU.

09:51AM   8          I SEE YOU HAVE REVERSED YOUR SEATING AGAIN.

09:51AM   9          OKAY.  GOOD.  I HOPE THAT'S WORKING WELL FOR YOU.

09:51AM  10          WITH THAT, LET ME CALL ON THE GOVERNMENT TO CALL ANOTHER

09:51AM  11   WITNESS.

09:51AM  12              MR. LEACH:  THANK YOU, YOUR HONOR.

09:51AM  13          THE UNITED STATES CALLS SHANE WEBER.

09:52AM  14              THE COURT:  GOOD MORNING, SIR.

09:52AM  15          IF YOU WOULD STEP FORWARD AND FACE OUR COURTROOM DEPUTY

09:52AM  16   WHILE YOU RAISE YOUR RIGHT HAND, SHE HAS A QUESTION FOR YOU.

09:52AM  17          (GOVERNMENT'S WITNESS, SHANE WEBER, WAS SWORN.)

09:52AM  18              THE WITNESS:  I DO.

09:52AM  19              THE COURT:  PLEASE HAVE A SEAT UP HERE, SIR.

09:52AM  20          LET ME INVITE YOU TO MAKE YOURSELF COMFORTABLE.

09:52AM  21          FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

09:52AM  22   NEED.

09:52AM  23          AND WHEN YOU ARE COMFORTABLE, I'LL ASK YOU TO PLEASE STATE

09:52AM  24   YOUR NAME AND THEN SPELL IT, PLEASE.

09:52AM  25              THE WITNESS:  MY NAME IS SHANE WEBER.  S-H-A-N-E,
```

09:53AM  1      W-E-B-E-R.

09:53AM  2                  THE COURT:  THANK YOU.  COUNSEL.

09:53AM  3                  MR. LEACH:  THANK YOU, YOUR HONOR.

09:53AM  4                         **DIRECT EXAMINATION**

09:53AM  5      BY MR. LEACH:

09:53AM  6      Q.   GOOD MORNING, MR. WEBER.

09:53AM  7      A.   GOOD MORNING.

09:53AM  8      Q.   IF YOU ARE FULLY VACCINATED, SIR, AND COMFORTABLE, WITH

09:53AM  9      THE COURT'S PERMISSION, YOU CAN TESTIFY WITHOUT A MASK.

09:53AM  10     A.   I'M FULLY VACCINATED.

09:53AM  11     Q.   AND I'VE REMOVED MY MASK AS WELL.

09:53AM  12          WAS THERE A TIME WHEN YOU WORKED FOR A COMPANY CALLED

09:53AM  13     PFIZER?

09:53AM  14     A.   YES.

09:53AM  15     Q.   AND WHAT IS THE BUSINESS OF PFIZER?

09:53AM  16     A.   PFIZER IS A WORLDWIDE PHARMACEUTICAL DRUG COMPANY.

09:53AM  17     Q.   OKAY.  WHEN DID YOU WORK FOR PFIZER?

09:53AM  18     A.   I WORKED FOR PFIZER MID-2008 THROUGH MID-2014.

09:53AM  19     Q.   AT A HIGH LEVEL, WOULD YOU BRIEFLY DESCRIBE YOUR

09:53AM  20     EDUCATIONAL AND PROFESSIONAL BACKGROUND.

09:53AM  21     A.   YES.  EDUCATIONALLY, I DID AN UNDERGRADUATE IN MOLECULAR

09:53AM  22     BIOLOGY AND BIOCHEMISTRY AT NORTHWESTERN UNIVERSITY.

09:54AM  23          THEN I DID A DOCTORAL IN BIOPHYSICS AT OREGON STATE

09:54AM  24     UNIVERSITY.

09:54AM  25          AND FOLLOWING THAT, I DID A POST-DOCTORAL FELLOWSHIP IN

09:54AM   1    RADIATION BIOLOGY AND BIOPHYSICS AT THE UNIVERSITY OF

09:54AM   2    ROCHESTER.

09:54AM   3         FOLLOWING MY ACADEMIC TRAINING, I WORKED AT A NUMBER OF

09:54AM   4    CORPORATIONS.  FIRST I WORKED AT EASTMAN KODAK IN ROCHESTER,

09:54AM   5    NEW YORK FOR TEN YEARS AS A LIFE SCIENTIST.

09:54AM   6         FOLLOWING THAT, I WORKED AT CONNECTICUT AT AN EASTMAN

09:54AM   7    KODAK COMPANY CALLED SCIENTIFIC IMAGING.

09:54AM   8         THEN I WORKED AT PACKARD BIOSCIENCES IN CONNECTICUT.

09:55AM   9         AND THEN I MOVED TO BOSTON, MASSACHUSETTS AND WORKED WITH

09:55AM  10    MILLENNIUM PHARMACEUTICALS.

09:55AM  11         DURING THAT TIME, I ALSO DID SBIR, SMALL BUSINESS

09:55AM  12    INNOVATION REVIEW GRANTS FOR THE NATIONAL INSTITUTE OF HEALTH,

09:55AM  13    AND AT MILLENNIUM I WORKED AS A SCIENTIST.

09:55AM  14         FOLLOWING MILLENNIUM I MOVED TO NEW JERSEY AND WORKED AT

09:55AM  15    ORTHO CLINICAL DIAGNOSTICS, A JOHNSON & JOHNSON DIAGNOSTIC

09:55AM  16    COMPANY.

09:55AM  17         AND THEN AFTER THAT, I MOVED TO PFIZER TO WORK AS A

09:55AM  18    DIRECTOR OF DIAGNOSTICS.

09:55AM  19    Q.   THANK YOU, MR. WEBER.

09:55AM  20         LET ME ASK SOME FOLLOW-UP QUESTIONS ABOUT THAT.  WE

09:55AM  21    APPRECIATE THE DETAIL.

09:55AM  22         YOU HAVE A PH.D.?

09:55AM  23    A.   I DO.

09:55AM  24    Q.   AND WHAT IS YOUR PH.D. IN?

09:55AM  25    A.   IT'S IN BIOPHYSICS.

09:55AM 1    Q.   AND WHAT IS BIOPHYSICS?

09:55AM 2    A.   BIOPHYSICS IS THE USE OF THE STUDY OF BIOLOGICAL PROCESSES

09:56AM 3    USING PHYSICAL APPROACHES.

09:56AM 4    Q.   YOU ALSO DESCRIBED A NUMBER OF JOBS THAT YOU'VE HELD AT

09:56AM 5    PLACES LIKE EASTMAN KODAK AND JOHNSON & JOHNSON.

09:56AM 6         AT A HIGH LEVEL, COULD YOU BRIEFLY DESCRIBE YOUR JOB

09:56AM 7    RESPONSIBILITIES?  WHAT WERE YOUR AREAS OF FOCUS?

09:56AM 8    A.   AT EASTMAN KODAK I DEVELOPED MOLECULAR TECHNOLOGIES FOR

09:56AM 9    ASSAYS FOR BIOPOLYMER, AND I ALSO DID IMAGING SYSTEMS THAT WERE

09:56AM 10   COMMERCIALIZED FOR LABORATORY USE ACROSS THE COUNTRY AND THE

09:56AM 11   WORLD.

09:56AM 12        AT JOHNSON & JOHNSON I WORKED AT AN ORTHO CLINICAL

09:56AM 13   DIAGNOSTIC, WHICH IS A DIAGNOSTIC COMPANY THERE, AND I WAS A

09:56AM 14   WORLDWIDE DIRECTOR OF DIAGNOSTICS IDENTIFYING NEW ASSAYS AND

09:56AM 15   BUSINESS OPPORTUNITIES THAT COULD POTENTIALLY BE CONVERTED INTO

09:56AM 16   A POTENTIAL PRODUCT.

09:56AM 17   Q.   THANK YOU.

09:56AM 18        AND YOU JOINED PFIZER IN 2008?

09:56AM 19   A.   YES.

09:56AM 20   Q.   WHAT WERE YOU HIRED TO DO?

09:57AM 21   A.   I WAS HIRED AS A DIRECTOR OF DIAGNOSTICS IN THE NEWLY

09:57AM 22   FORMED DIAGNOSTIC GROUP OF PFIZER, AND I WAS HIRED TO IDENTIFY

09:57AM 23   NEW DIAGNOSTIC TECHNOLOGIES THAT WOULD ENABLE CLINICAL TRIALS.

09:57AM 24   Q.   WHAT DO YOU MEAN BY "DIAGNOSTIC TECHNOLOGY"?

09:57AM 25   A.   DIAGNOSTIC TECHNOLOGIES, OR DIAGNOSTICS, ARE, ACCORDING TO

09:57AM  1    THE FDA, THOSE ASSAYS, REAGENTS, INSTRUMENTS AND SYSTEMS FOR

09:57AM  2    THE USE OF THE DIAGNOSIS OF DISEASE OR CONDITIONS OF HEALTH FOR

09:57AM  3    THE PURPOSE OF TREATING, MITIGATING, CURING, OR PREVENTING

09:57AM  4    DISEASE.

09:57AM  5    Q.   AND YOU WERE LOOKING FOR A POTENTIAL DIAGNOSTIC TECHNOLOGY

09:57AM  6    THAT MIGHT BE OF INTEREST TO PFIZER?

09:57AM  7    A.   YES.

09:57AM  8    Q.   AND WHO DID YOU REPORT TO IN THIS 2008 TIME PERIOD?

09:57AM  9    A.   I REPORTED TO HAKAN SAKUL, THE DIRECTOR OF DIAGNOSTICS.

09:57AM 10    Q.   OKAY.  ARE YOU FAMILIAR WITH A COMPANY CALLED THERANOS?

09:58AM 11    A.   YES.

09:58AM 12    Q.   HOW DID YOU BECOME FAMILIAR WITH THERANOS?

09:58AM 13    A.   A NEW YORK CITY COLLEAGUE OF MINE IN MOLECULAR MEDICINES

09:58AM 14    ASKED ME TO EXAMINE SOME TECHNOLOGY OF A COMPANY CALLED

09:58AM 15    THERANOS.

09:58AM 16    Q.   AND WHO WAS THE COLLEAGUE?

09:58AM 17    A.   HIS NAME IS CRAIG LIPSET.

09:58AM 18    Q.   AND YOU MENTIONED SOMETHING CALLED MOLECULAR MEDICINE.

09:58AM 19    WHAT IS THAT?  CAN YOU DESCRIBE THAT PART AT PFIZER?

09:58AM 20    A.   YES.  MOLECULAR MEDICINE IS THE LARGER GROUP THAT HOUSED

09:58AM 21    THE UNIT OF DIAGNOSTICS THAT I WAS HIRED INTO.  MOLECULAR

09:58AM 22    MEDICINE, IT WAS A 140-PERSON UNIT IN THE RESEARCH UNIT OF

09:58AM 23    PFIZER.

09:58AM 24    Q.   AND WHAT DID MR. LIPSET ASK YOU TO DO?

09:58AM 25    A.   HE ASKED ME TO REVIEW SOME PACKAGES OF INFORMATION ON THE

09:58AM   1    THERANOS TECHNOLOGY THAT HE HAD RECEIVED.

09:59AM   2    Q.   TO WHAT END?

09:59AM   3    A.   I WAS ASKED TO ASSESS ITS CAPABILITY, ITS PLAUSIBILITY,

09:59AM   4    HOW IT POTENTIALLY COULD BE UTILIZED, IF THERE WAS A WAY TO

09:59AM   5    UTILIZE THAT AT PFIZER FOR ITS CLINICAL TRIALS.

09:59AM   6    Q.   AND WAS THIS PART OF YOUR JOB RESPONSIBILITIES AT PFIZER?

09:59AM   7    A.   YES.

09:59AM   8    Q.   AND OVER THE COURSE OF TIME, DID YOU DO THIS FOR OTHER

09:59AM   9    TECHNOLOGIES?

09:59AM   10   A.   YES.

09:59AM   11          MR. LEACH:   YOUR HONOR, MAY I APPROACH THE WITNESS?

09:59AM   12          THE COURT:   YES.

09:59AM   13          MR. LEACH:   (HANDING.)

09:59AM   14   Q.   MR. WEBER, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS

09:59AM   15   AND I'D LIKE YOU TO LOOK AT WHAT WE HAVE MARKED FOR

09:59AM   16   IDENTIFICATION PURPOSES AS TRIAL EXHIBIT 143, WHICH SHOULD BE

09:59AM   17   THE FIRST TAB IN YOUR BINDER.

09:59AM   18   A.   YES, I SEE THIS.

10:00AM   19   Q.   DOES THIS APPEAR TO BE AN EMAIL FROM ELIZABETH HOLMES TO

10:00AM   20   CRAIG LIPSET AND AIDAN POWER DATED OCTOBER 11TH, 2008?

10:00AM   21   A.   IT IS.

10:00AM   22   Q.   AND DO YOU RECOGNIZE MR. LIPSET'S EMAIL ADDRESS AT PFIZER?

10:00AM   23   A.   I DO.

10:00AM   24   Q.   AND WHO IS AIDAN POWER?

10:00AM   25   A.   AIDAN POWER WAS THE VICE PRESIDENT OF MOLECULAR MEDICINE.

10:00AM  1    Q.   SO WAS HE WITHIN MR. LIPSET AND MR. SAKUL'S ORGANIZATION?

10:00AM  2    A.   YES.  CRAIG LIPSET AND HAKAN SAKUL WERE PART OF THE TEAM

10:00AM  3    THAT REPORTED TO AIDAN POWER.

10:00AM  4    Q.   OKAY.  AND THE SUBJECT OF THIS EMAIL IS FOLLOW UP TO OUR

10:00AM  5    MEETING.

10:00AM  6         DO YOU SEE THAT?

10:00AM  7    A.   YES, I SEE THAT.

10:00AM  8    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 3.

10:00AM  9         DO YOU SEE AN ATTACHMENT TO THE EMAIL?

10:00AM 10    A.   I SEE THE THERANOS ATTACHMENT STUDY REPORT.

10:01AM 11    Q.   OKAY.  IN THE COURSE OF YOUR WORK IN EVALUATING THERANOS

10:01AM 12    TECHNOLOGY, WERE YOU ASKED TO REVIEW VARIOUS REPORTS PROVIDED

10:01AM 13    BY THERANOS?

10:01AM 14    A.   YES.

10:01AM 15    Q.   OKAY.

10:01AM 16         YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 143.

10:01AM 17              MR. CAZARES:  OBJECTION.  801, 104, 403.

10:01AM 18              MR. LEACH:  I'M NOT OFFERING THIS FOR THE TRUTH,

10:01AM 19    YOUR HONOR.

10:01AM 20              THE COURT:  IS THIS THE ENTIRETY OF THIS?  IT LOOKS

10:01AM 21    LIKE MULTIPLE PAGES, MR. LEACH.

10:01AM 22              MR. LEACH:  YES, YOUR HONOR, THE ENTIRE EXHIBIT.

10:01AM 23              THE COURT:  IT'S 27 PAGES?  29 PAGES?

10:01AM 24              MR. LEACH:  YES, YOUR HONOR.

10:01AM 25              THE COURT:  AND YOU'RE OFFERING THIS NOT FOR THE

10:01AM  1    TRUTH OF THE MATTER ASSERTED IN THESE DOCUMENTS?

10:01AM  2            MR. LEACH:  CORRECT, YOUR HONOR.

10:01AM  3            THE COURT:  BUT ONLY AS TO WHAT ISSUE?

10:01AM  4            MR. LEACH:  ONLY TO SHOW THE EXCHANGE OF INFORMATION

10:01AM  5    BETWEEN THERANOS AND PFIZER, NOT FOR THE TRUTH OF THE MATTERS

10:02AM  6    IN THE EMAIL OR THE REPORT, BUT SIMPLY WHAT WAS SAID AND WHEN

10:02AM  7    IT WAS SAID TO PFIZER.

10:02AM  8            THE COURT:  ALL RIGHT.  THANK YOU.

10:02AM  9        LADIES AND GENTLEMEN, THIS WILL BE ADMITTED.

10:02AM  10       AGAIN, THIS IS NOT ADMITTED -- THIS DOCUMENT, THE PAGES,

10:02AM  11   29 PAGES, WILL BE ADMITTED, BUT NOT FOR THE TRUTH OF THE MATTER

10:02AM  12   ASSERTED IN THE DOCUMENT, THE LETTER, THE REPORT, AND SOME

10:02AM  13   OTHER INFORMATION THAT YOU MAY SEE.  IT'S NOT OFFERED FOR THE

10:02AM  14   TRUTH OF ANY OF THAT, BUT RATHER TO SHOW THAT THERE WAS

10:02AM  15   COMMUNICATION BETWEEN THESE TWO PARTIES.

10:02AM  16       IT WILL BE ADMITTED FOR THAT LIMITED PURPOSE.

10:02AM  17           MR. LEACH:  THANK YOU, YOUR HONOR.

10:02AM  18           THE COURT:  AND IT MAY BE PUBLISHED.

10:02AM  19       (GOVERNMENT'S EXHIBIT 143 WAS RECEIVED IN EVIDENCE.)

10:02AM  20   BY MR. LEACH:

10:02AM  21   Q.   MR. WEBER, JUST TO ORIENT EVERYBODY --

10:02AM  22       AND, MS. WACHS, IF WE CAN ZOOM IN ON THE TOP PART OF THIS

10:02AM  23   EMAIL?

10:02AM  24       -- DO YOU SEE MS. HOLMES'S NAME IN THE FROM LINE?

10:02AM  25   A.   I DO.

10:02AM   1   Q.   AND YOU'RE NOT ON THIS PARTICULAR EMAIL, ARE YOU,

10:03AM   2   MR. WEBER?

10:03AM   3   A.   NO, I AM NOT.

10:03AM   4   Q.   BUT YOUR COLLEAGUES ARE?  MR. POWER AND MR. LIPSET ARE IN

10:03AM   5   THE TO LINE?

10:03AM   6   A.   YES.

10:03AM   7   Q.   AND DO YOU SEE WHERE IT SAYS THE SUBJECT IS THE FOLLOW UP

10:03AM   8   TO OUR MEETING?

10:03AM   9   A.   YES.

10:03AM  10   Q.   AND I DRAW YOUR ATTENTION TO THE SECOND PARAGRAPH, OR THE

10:03AM  11   THIRD PARAGRAPH WHERE IT SAYS, "I AM VERY PLEASED TO PRESENT

10:03AM  12   YOU WITH THE FINAL DATA -- SEE THE ATTACHED STUDY REPORT."

10:03AM  13        DO YOU SEE THAT LANGUAGE?

10:03AM  14   A.   I DO.

10:03AM  15   Q.   AND NOW IF WE CAN ZOOM OUT, MS. WACHS.

10:03AM  16        AND DO YOU SEE DOWN AT THE BOTTOM THIS IS SIGNED BY -- IT

10:03AM  17   APPEARS TO BE SIGNED BY MS. HOLMES.

10:03AM  18   A.   YES, I SEE THAT.

10:03AM  19   Q.   OKAY.  LET'S GO TO PAGE 3, PLEASE.

10:03AM  20        DO YOU SEE THE TITLE, "THERANOS ANGIOGENESIS STUDY

10:03AM  21   REPORT"?

10:03AM  22   A.   I DO.

10:03AM  23   Q.   AND DO YOU SEE THE THERANOS LOGO IN THE TOP LEFT CORNER?

10:04AM  24   A.   YES.

10:04AM  25   Q.   AND TO THE RIGHT THE HEADING CONFIDENTIAL?

10:04AM 1    A.   YES.

10:04AM 2    Q.   AND IN THE COURSE OF YOUR WORK, YOU WERE ASKED TO READ

10:04AM 3    MATERIALS AND UNDERSTAND INFORMATION ABOUT THIS ANGIOGENESIS

10:04AM 4    STUDY REPORT BY THERANOS?

10:04AM 5    A.   YES.

10:04AM 6    Q.   AND THERE'S A DOCUMENT OUTLINE?  DO YOU SEE THAT IN THE

10:04AM 7    TOP --

10:04AM 8    A.   YES, I SEE THE DOCUMENT OUTLINE.

10:04AM 9    Q.   AND THERE'S A BULLET, ANGIOGENESIS PROGRAM OVERVIEW.  WHAT

10:04AM 10   IS ANGIOGENESIS?

10:04AM 11   A.   ANGIOGENESIS IS THE PROCESS IN CANCER, AS A TUMOR GROWS,

10:04AM 12   IT EXTENDS OUT MICRO BLOOD VESSELS IN THE TUMOR TO FEED ITSELF.

10:04AM 13   Q.   AND IF WE CAN ZOOM OUT, MS. WACHS.

10:04AM 14        DO YOU SEE IN THE DOCUMENT OUTLINE THERE'S THREE BULLETS

10:04AM 15   FOR CONCLUSIONS?

10:04AM 16   A.   YES.

10:04AM 17   Q.   OKAY.  CONCLUSIONS INCLUDING GENERAL, TECHNICAL, AND

10:05AM 18   ECONOMIC?

10:05AM 19   A.   YES, I SEE THAT.

10:05AM 20   Q.   LET'S GO TO PAGE 5 OF THE EXHIBIT, MS. WACHS.  AND IF WE

10:05AM 21   CAN ZOOM IN ON THE TOP HALF.

10:05AM 22        DO YOU SEE THE HEADING "ANGIOGENESIS PROGRAM OVERVIEW"?

10:05AM 23   A.   YES, I SEE THAT.

10:05AM 24   Q.   AND IN THE SECOND PARAGRAPH IT SAYS, "FOR THIS PROGRAM,

10:05AM 25   THERANOS WAS ASKED TO DEVELOP MULTIPLEXED POINT-OF-CARE ASSAYS

10:05AM 1    FOR VEGF AND PLGF FOR USE IN MONITORING PATIENT'S

10:05AM 2    PHARMACODYNAMIC RESPONSE TO ANGIOGENESIS THERAPIES."

10:05AM 3        DO YOU SEE THAT?

10:05AM 4    A.   I DO.

10:05AM 5    Q.   IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF WHAT

10:05AM 6    THERANOS WAS DOING IN CONNECTION WITH PFIZER?

10:05AM 7    A.   YES, IT IS AS I REMEMBER IT.

10:05AM 8    Q.   OKAY.  WHAT IS VEGF?

10:06AM 9    A.   VEGF IS A PROTEIN CALLED -- I'LL GO SLOWER.

10:06AM 10       VEGF IS A PROTEIN MOLECULE.  IT'S THE ABBREVIATION FOR

10:06AM 11   VASCULAR EPIDEMIAL GROWTH FACTOR, AND IT'S ONE OF THE GROWTH

10:06AM 12   FACTORS THAT BINDS A RECEPTOR AND STIMULATES A CELL TO

10:06AM 13   INITIATE, OR A GROUP OF CELLS TO INITIATE THE DEVELOPMENT OF AN

10:06AM 14   EXTENSION OF BLOOD VESSELS TO RECRUIT BLOOD INTO A TUMOR.

10:06AM 15   Q.   AND PLGF, WHAT IS THAT?

10:06AM 16   A.   THAT STANDS FOR PLACENTAL GROWTH FACTOR.  IT IS ALSO ONE

10:06AM 17   OF THE GROWTH FACTORS THAT BINDS A RECEPTOR TO STIMULATE THE

10:06AM 18   GROWTH -- OUTGROWTH OF BLOOD VESSELS TO RECRUIT BLOOD VESSELS

10:06AM 19   TO GROW INTO THE TUMOR TO FEED ITSELF.

10:07AM 20   Q.   AND WAS IT YOUR UNDERSTANDING THAT THERANOS WAS DEVELOPING

10:07AM 21   ASSAYS TO MEASURE VEGF AND PLGF?

10:07AM 22   A.   YES.

10:07AM 23   Q.   IF WE CAN ZOOM OUT, MS. WACHS.

10:07AM 24       FURTHER DOWN THERE ARE SOME GOALS OF STUDY IN ITALICS.

10:07AM 25       DO YOU SEE THAT, MR. WEBER?

10:07AM   1    A.   I DO.

10:07AM   2    Q.   AND THE FIRST IS "GENERATE PRELIMINARY DATA ON VEGF AND

10:07AM   3    PLGF TRENDS IN CANCER PATIENTS WHILE ASSESSING THE USE OF

10:07AM   4    THERANOS SYSTEM IN THE HANDS OF CLINICIANS AND PATIENTS."

10:07AM   5         DO YOU SEE THAT LANGUAGE?

10:07AM   6    A.   I DO.

10:07AM   7    Q.   IS THAT CONSISTENT WITH YOUR UNDERSTANDING OF WHAT THE

10:07AM   8    GOAL OF THE STUDY BY THERANOS WAS?

10:07AM   9    A.   YES, AS I REMEMBER IT, YES IT IS HERE.

10:07AM  10    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 5.

10:07AM  11    A.   OKAY.  YES, I SEE PAGE 5 HERE.

10:07AM  12    Q.   I'M SORRY.

10:08AM  13    A.   WE WERE ON PAGE 5.

10:08AM  14    Q.   THIS IS PAGE 5 OF THE REPORT.  IT'S PAGE 7 OF THE TRIAL

10:08AM  15    EXHIBIT.

10:08AM  16         MY APOLOGIES, MS. WACHS.

10:08AM  17    A.   OKAY.  ALL RIGHT.  I SEE PAGE 7 HERE.

10:08AM  18    Q.   OKAY.  THERE'S AN IMAGE ROUGHLY HALFWAY DOWN THE PAGE.

10:08AM  19         DO YOU RECOGNIZE THAT?

10:08AM  20    A.   I RECOGNIZE IT.

10:08AM  21    Q.   OKAY.  WHAT DID YOU UNDERSTAND IT TO BE?

10:08AM  22    A.   I UNDERSTOOD IT TO BE, FROM THIS REPORT, TO BE THE

10:08AM  23    THERANOS ASSAY PLATFORM BOX.

10:08AM  24    Q.   AND WAS THAT THE ASSAY PLATFORM BOX THAT PFIZER WAS

10:08AM  25    EVALUATING?

10:08AM   1    A.   IT IS AS I UNDERSTOOD IT FROM THIS REPORT.

10:08AM   2    Q.   OKAY.  LET'S GO TO PAGE 26 OF THE EXHIBIT.

10:08AM   3         DO YOU SEE THERE'S A LISTING OF CONCLUSIONS, GENERAL,

10:08AM   4    TECHNICAL, AND ECONOMIC.

10:08AM   5         DO YOU SEE THOSE?

10:08AM   6    A.   I DO.

10:08AM   7    Q.   AND THIS IS ATTACHED TO AN EMAIL FROM MS. HOLMES TO

10:09AM   8    MR. LIPSET AND DR. POWER.

10:09AM   9         MY QUESTION TO YOU, MR. WEBER, IS, ARE THESE CONCLUSIONS

10:09AM   10   THAT YOU EVER REACHED IN YOUR REPORT?

10:09AM   11   A.   NO, I DID NOT, IN MY ROLE AS A DIAGNOSTIC EXPERT FOR

10:09AM   12   PFIZER, COME TO THESE CONCLUSIONS.

10:09AM   13   Q.   THESE WERE BEING HELD OUT TO YOU AS CONCLUSIONS THAT

10:09AM   14   THERANOS HAD REACHED?

10:09AM   15   A.   YES.

10:09AM   16   Q.   THANK YOU, MR. WEBER.

10:09AM   17        LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS 159.

10:09AM   18        DO YOU HAVE THAT EXHIBIT?

10:09AM   19   A.   I HAVE EXHIBIT 159, PAGE 1, IN FRONT OF ME HERE.

10:10AM   20   Q.   DO YOU SEE THERE APPEARS TO BE AN EMAIL FROM YOU TO AN

10:10AM   21   INDIVIDUAL NAMED GARY FRENZEL?

10:10AM   22   A.   I DO, YES.

10:10AM   23   Q.   AND WHO IS GARY FRENZEL?

10:10AM   24   A.   GARY FRENZEL WAS THE ASSAY DEVELOPMENT POINT PERSON AT

10:10AM   25   THERANOS THAT I WAS INTRODUCED TO BY EMAIL.

10:10AM 1    Q.   OKAY.  AND WHY WERE YOU EMAILING MR. FRENZEL ON OR ABOUT

10:10AM 2    NOVEMBER 10TH, 2008?

10:10AM 3    A.   AS CRAIG LIPSET HANDED ME THIS ASSESSMENT PROCESS, HE HAD

10:10AM 4    INTRODUCED ME BY EMAIL TO GARY FRENZEL, AND GARY FRENZEL AND I

10:10AM 5    WERE PICKING UP THE DIRECT INTERACTION TOGETHER.

10:10AM 6    Q.   AND WAS THIS PART OF YOUR EFFORT TO EVALUATE THERANOS

10:10AM 7    TECHNOLOGY?

10:10AM 8    A.   IT WAS.

10:10AM 9    Q.   AND DID YOU SEND THIS EMAIL IN THE ORDINARY COURSE OF

10:10AM 10   PFIZER'S BUSINESS?

10:10AM 11   A.   YES.

10:10AM 12   Q.   AND WAS IT KEPT IN THE ORDINARY COURSE OF PFIZER'S

10:10AM 13   BUSINESS?

10:10AM 14   A.   YES.

10:10AM 15            MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

10:10AM 16   EXHIBIT 159.

10:11AM 17            MR. CAZARES:  802, 104, 403.

10:11AM 18            THE COURT:  AND THIS IS THE ENTIRETY OF THIS

10:11AM 19   EXHIBIT?  IT LOOKS LIKE IT'S MULTIPLE PAGES?

10:11AM 20            MR. LEACH:  YES, YOUR HONOR.

10:11AM 21            THE COURT:  THERE'S NO STIPULATION TO THIS I TAKE

10:11AM 22   IT.

10:11AM 23            MR. LEACH:  THERE'S A STIPULATION FOR 901, AND

10:11AM 24   OBJECTIONS UNDER 802, 104, AND 403.

10:11AM 25            THE COURT:  RIGHT.  I'LL ADMIT THIS.  IT MAY BE

10:11AM 1      ADMITTED AND IT MAY BE PUBLISHED OVER OBJECTION.

10:11AM 2            (GOVERNMENT'S EXHIBIT 159 WAS RECEIVED IN EVIDENCE.)

10:11AM 3                  MR. LEACH:  THANK YOU.

10:11AM 4            MS. WACHS, IF WE CAN PLEASE ZOOM IN ON THE BOTTOM PORTION

10:11AM 5      OF THE EMAIL.

10:11AM 6      Q.   MR. WEBER, DO YOU SEE YOUR NAME IN THE FROM LINE?

10:11AM 7      A.   YES, I DO.

10:11AM 8      Q.   AND THE DATE IS NOVEMBER 10TH, 2008?

10:11AM 9      A.   IT IS.

10:12AM 10     Q.   IS THAT CONSISTENT WITH YOUR MEMORY OF THE TIME PERIOD

10:12AM 11     WHEN YOU WERE REVIEWING THERANOS TECHNOLOGY?

10:12AM 12     A.   IT IS AS I REMEMBER IT.

10:12AM 13     Q.   OKAY.  AND YOU WROTE TO -- AND I SEE THE SUBJECT OF THIS

10:12AM 14     EMAIL IS FOLLOW UP TO OUR MEETING.

10:12AM 15           DO YOU SEE THAT?

10:12AM 16     A.   YES.

10:12AM 17     Q.   I'D LIKE TO GO TO PAGE 4, IF WE COULD, OR PAGE 3.

10:12AM 18           DO YOU SEE DOWN AT THE BOTTOM THERE'S AN EMAIL FROM

10:12AM 19     MR. LIPSET TO ELIZABETH HOLMES, YOURSELF, AND GARY FRENZEL?

10:12AM 20     A.   I DO.

10:12AM 21     Q.   AND NOW IF WE CAN GO TO PAGE 4, MS. WACHS.

10:12AM 22           AT THE TOP IT SAYS, "GARY -- PLEASE COORDINATE WITH

10:12AM 23     SHANE WEBER WHO LEADS OUR DIAGNOSTICS GROUP HERE IN NY."

10:12AM 24           AND THEN AT THE BOTTOM, "ALL THE BEST, CRAIG."

10:13AM 25           DO YOU SEE THAT?

10:13AM 1     A.   I DO.

10:13AM 2     Q.   AND IS THAT MR. LIPSET GIVING YOU AND MR. FRENZEL

10:13AM 3     DIRECTION TO COORDINATE ABOUT THIS TECHNOLOGY?

10:13AM 4     A.   IT IS.

10:13AM 5     Q.   LET'S GO BACK TO PAGE 3.

10:13AM 6          DO YOU SEE IN THE MIDDLE THERE'S AN EMAIL FROM MR. FRENZEL

10:13AM 7     TO THE SAME GROUP WHERE HE WROTE, "HELLO SHANE,

10:13AM 8          "DO YOU THINK YOUR TEAM WILL BE AVAILABLE MONDAY THE

10:13AM 9     10TH?"

10:13AM 10         DO YOU SEE THAT LANGUAGE?

10:13AM 11    A.   YES.

10:13AM 12    Q.   AND AT SOME POINT DID YOU PARTICIPATE IN A CONFERENCE CALL

10:13AM 13    WITH FOLKS AT THERANOS ABOUT THE TECHNOLOGY?

10:13AM 14    A.   I DID.

10:13AM 15    Q.   WE'LL GET TO THAT IN A MINUTE, BUT LET'S COMPLETE OUR

10:13AM 16    REVIEW OF THE EMAIL IF WE COULD, GOING BACK TO PAGE 1.

10:13AM 17         IF WE CAN ZOOM IN ON THE BOTTOM HALF OF THE PAGE.

10:13AM 18         YOU WROTE TO MR. FRENZEL ON NOVEMBER 10TH.

10:14AM 19         "THANKS FOR YOUR PROMPT PHONE CALL TO ME ON FRIDAY.  YES,

10:14AM 20    THURSDAY," AND HE GOES ON, "WORKS FOR A TELECONF."

10:14AM 21         "I AM SORRY THAT THERE HAVE BEEN MULTIPLE PFIZER POINTS OF

10:14AM 22    CONTACT OVER THE YEARS FOR THERANOS."

10:14AM 23         DO YOU SEE THAT LANGUAGE?

10:14AM 24    A.   YES.

10:14AM 25    Q.   AND WHAT DID YOU MEAN BY THAT?

10:14AM 1    A.   WHAT I MEANT BY THAT IS HAVING WORKED AT LARGE

10:14AM 2    CORPORATIONS, AS WELL AS STARTUP COMPANIES, I'M SYMPATHETIC TO

10:14AM 3    SMALL COMPANIES INTERACTING WITH LARGE COMPANIES WHERE, OVER

10:14AM 4    TIME, THEIR POINTS OF CONTACTS CHANGE AND MOVE.

10:14AM 5        AND SO I'M JUST TRYING TO KIND OF SMOOTH THE WATER HERE

10:14AM 6    AND SAY, YOU KNOW, I'M FRIENDLY AND LET'S PICK UP THE

10:14AM 7    CONVERSATION AND SEE WHERE THIS GOES.

10:14AM 8    Q.   YOU THEN WROTE, "I AM INTERESTED MORE BROADLY AS TO WHAT

10:14AM 9    THE INSTRUMENT IS AND PLANNED TO BE AND NOT JUST IN

10:14AM 10   UNDERSTANDING THE PERFORMANCE AND UTILITY OF THE THERANOS

10:14AM 11   SYSTEM IN THE ONCOLOGY STUDY."

10:14AM 12       DO YOU SEE THAT LANGUAGE?

10:14AM 13   A.   I DO.

10:14AM 14   Q.   FIRST OF ALL, "THE INSTRUMENT," WHAT DID YOU MEAN BY THAT?

10:14AM 15   A.   THE INSTRUMENT, WHAT I MEANT BY THAT IS THE ASSAY BOX THAT

10:15AM 16   WAS SEEN IN THE EARLIER POWERPOINT SLIDE DECK OF THE REPORT

10:15AM 17   THAT WAS SENT TO ME BY THURSDAY THAT WE LOOKED AT TODAY.

10:15AM 18   Q.   AND THERE'S A REFERENCE TO AN ONCOLOGY STUDY.  WHAT DID

10:15AM 19   YOU MEAN BY THAT?

10:15AM 20   A.   THE ONCOLOGY STUDY WAS THE STUDY THAT HAD BEEN INITIATED

10:15AM 21   BY PFIZER WITH THERANOS TO LOOK AT THOSE ANGIOGENESIS

10:15AM 22   BIOMARKERS, THE PLGF AND VEGF.

10:15AM 23   Q.   AND BY ONCOLOGY STUDY, ARE YOU USING THAT SYNONYMOUSLY

10:15AM 24   WITH THE ANGIOGENESIS STUDY?

10:15AM 25   A.   YES, THAT SPECIFIC STUDY.

10:15AM   1     Q.   OKAY.  YOU THEN WROTE, "I AM RESPONSIBLE FOR PLATFORMS FOR

10:15AM   2     WHICH PFIZER HAS A DIAGNOSTIC INTEREST AND FOR WHICH THERE IS

10:15AM   3     CLINICAL VALIDATION."

10:15AM   4          IS THAT A FAIR SUMMARY OF YOUR RESPONSIBILITIES AT THE

10:15AM   5     TIME?

10:15AM   6     A.   IT IS.  IT WAS.

10:15AM   7     Q.   AND THEN YOU WROTE, "AS WE AGREED IN OUR DISCUSSION, I WAS

10:16AM   8     TO PROVIDE COPIES OF THE DOCUMENTS THAT I AM WORKING OFF OF SO

10:16AM   9     WE ARE ON THE SAME PAGE AND SOME QUESTIONS OF INTEREST TO START

10:16AM   10    OUR CONVERSATION ON THURSDAY."

10:16AM   11         DO YOU SEE THAT?

10:16AM   12    A.   I DO.

10:16AM   13    Q.   AND WHY WERE YOU -- AND THE REFERENCE TO THE CONVERSATION

10:16AM   14    ON THURSDAY, IS THAT THE PHONE CALL THAT YOU HAD WITH THE FOLKS

10:16AM   15    FROM THERANOS?

10:16AM   16    A.   THAT WOULD BE -- I'M REFERRING TO THE CONVERSATION THAT

10:16AM   17    WAS GOING TO FOLLOW THIS.

10:16AM   18    Q.   OKAY.  YOU THEN WROTE, "FOR ME, THE GOAL IS TO UNDERSTAND

10:16AM   19    THE THERANOS SYSTEM."

10:16AM   20         WAS THAT YOUR GOAL IN DECEMBER OF 2008?

10:16AM   21    A.   IT WAS.

10:16AM   22    Q.   BENEATH YOUR SIGNATURE YOU WROTE, "I HAVE THE THERANOS

10:16AM   23    SUMMARY TO AIDAN POWER, THE INTRODUCTION TO THERANOS SYSTEMS,

10:16AM   24    THE INFORMED CONSENT AND THE IRB SUBMISSION.  I HAVE READ THEM.

10:16AM   25    I ATTACH THESE SO WE ARE ALL WORKING OFF THE SAME VERSIONS OF

10:17AM   1    THE DOCUMENTS."

10:17AM   2         DO YOU SEE THAT LANGUAGE?

10:17AM   3    A.   I DO.

10:17AM   4    Q.   AND WHY WERE YOU ALERTING MR. FRENZEL TO THAT?

10:17AM   5    A.   WHAT I FOUND IN THE COURSE OF MY INITIAL INTERACTIONS WITH

10:17AM   6    OUTSIDE COMPANIES, IT'S ACTUALLY GOOD TO CONFIRM THAT WE'RE

10:17AM   7    ACTUALLY TALKING ABOUT THE SAME DOCUMENTS AND THE SAME DATA

10:17AM   8    SETS.  IT CREATES EFFICIENCY IN THE FUTURE DISCUSSIONS.

10:17AM   9    Q.   AND DID YOU, IN FACT, ATTACH THOSE TO THE EMAIL THAT YOU

10:17AM  10    SENT TO MR. FRENZEL?

10:17AM  11    A.   I DID AS I REMEMBER IT.

10:17AM  12    Q.   OKAY.  LET'S LOOK AT ONE OF THE ATTACHMENTS BEGINNING ON

10:17AM  13    PAGE 5.

10:17AM  14         DO YOU SEE THE HEADING, "THERANOS ANGIOGENESIS STUDY:

10:17AM  15         REPORT PREPARED FOR DR. AIDAN POWER"?

10:17AM  16    A.   I DO.

10:17AM  17    Q.   AND DOES THIS APPEAR TO BE SIMILAR TO THE REPORT THAT WE

10:17AM  18    REVIEWED IN EXHIBIT 143?

10:18AM  19    A.   IT'S A LONG DOCUMENT, BUT AS I SEE IT HERE, IT APPEARS TO

10:18AM  20    BE LIKE THE OTHER DOCUMENT THAT WE LOOKED AT, THE OTHER

10:18AM  21    THERANOS ANGIOGENESIS STUDY DOCUMENT.

10:18AM  22    Q.   AND DID YOU REVIEW THE ATTACHMENT TO EXHIBIT 159,

10:18AM  23    BEGINNING AT PAGE 5, WITH SOME CARE AT THE TIME?

10:18AM  24    A.   YES, I DID.  IT'S AN EXTENSIVE DOCUMENTATION.

10:18AM  25    Q.   OKAY.  AND WAS THIS PART OF YOUR REVIEW IN EVALUATING

10:18AM  1     THERANOS TECHNOLOGY?

10:18AM  2     A.   IT WAS.

10:18AM  3     Q.   LET ME DRAW YOUR ATTENTION TO PAGE 12 OF THE DOCUMENT.

10:19AM  4          DO YOU SEE AT THE BOTTOM THERE ARE A NUMBER OF

10:19AM  5     CONCLUSIONS?

10:19AM  6     A.   I DO.

10:19AM  7     Q.   AND THE FIRST ONE SAYS, "THE THERANOS SYSTEM PERFORMED

10:19AM  8     WITH EQUIVALENT OR SUPERIOR PERFORMANCE TO REFERENCE ASSAYS

10:19AM  9     WHILE RUNNING IN AN EXTREMELY RUGGED AMBULATORY ENVIRONMENT."

10:19AM 10          DO YOU SEE THAT?

10:19AM 11     A.   I DO.

10:19AM 12     Q.   WAS THAT YOUR CONCLUSION, MR. WEBER?

10:19AM 13     A.   NO, IT WAS NOT.

10:19AM 14     Q.   DID YOU EVER TELL THERANOS THAT THE THERANOS SYSTEM

10:19AM 15     PERFORMED WITH EQUIVALENT OR SUPERIOR PERFORMANCE?

10:19AM 16     A.   NO, I DID NOT.

10:19AM 17     Q.   IF WE CONTINUE ON THE -- ON PAGE 13, THERE'S A CONCLUSION,

10:19AM 18     "INTER-SYSTEM ACCURACY IS EXCELLENT."

10:19AM 19          DO YOU SEE THAT NUMBER 4?

10:19AM 20     A.   I DO.

10:19AM 21     Q.   AND IS THAT A CONCLUSION THAT YOU EVER REACHED IN THE

10:19AM 22     COURSE OF YOUR REVIEW?

10:19AM 23     A.   NO, I DID NOT.

10:19AM 24     Q.   IN NUMBER 5 IT SAYS, "VEGF ASSAY ACCURACY IS GOOD FOR SOME

10:20AM 25     CANCER PATIENT SUBJECTS, BUT SINCE THE SYSTEM RESPONDS TO TOTAL

10:20AM 1    VEGF BUT NOT FREE VEGF, WE WERE NOT ABLE TO VERIFY ACCURACY FOR

10:20AM 2    THE TNONC SAMPLES."

10:20AM 3        DO YOU SEE THAT?

10:20AM 4    A.  I DO.

10:20AM 5    Q.  IS THIS A CONCLUSION THAT YOU EVER REACHED?

10:20AM 6    A.  NO, I DID NOT.

10:20AM 7    Q.  AND THEN IN NUMBER 6 IT SAYS, "VEGFR2 ASSAY ACCURACY IS

10:20AM 8    QUITE GOOD FOR TNONC VENOUS SAMPLES."

10:20AM 9        DO YOU SEE THAT?

10:20AM 10   A.  I DO.

10:20AM 11   Q.  IS THAT A CONCLUSION THAT YOU EVER REACHED?

10:20AM 12   A.  NO, I DID NOT.

10:20AM 13   Q.  AT SOME POINT YOU HAD A PHONE CALL -- OR BEFORE WE GET TO

10:20AM 14   THE PHONE CALL, LET ME DRAW YOUR ATTENTION TO EXHIBIT 162.

10:21AM 15       MR. WEBER, DOES THIS APPEAR TO BE AN EMAIL FROM YOU TO

10:21AM 16   GARY FRENZEL WITH THE SUBJECT FINAL REPORT?

10:21AM 17   A.  IT DOES.

10:21AM 18   Q.  AND THE DATE OF THIS EMAIL IS NOVEMBER 13TH, 2008?

10:21AM 19   A.  YES.

10:21AM 20   Q.  THIS IS DURING THE TIME PERIOD WHERE YOU WERE REVIEWING

10:21AM 21   THERANOS TECHNOLOGY?

10:21AM 22   A.  YES.

10:21AM 23   Q.  OKAY.  AND DO YOU SEE THAT THERE'S AN ATTACHMENT BEGINNING

10:21AM 24   ON PAGE 3?

10:21AM 25   A.  YES, I SEE THIS.

10:21AM  1    Q.   DOES THIS APPEAR TO BE ANOTHER ITERATION OF A THERANOS

10:21AM  2    ANGIOGENESIS REPORT?

10:21AM  3    A.   IT DOES.

10:21AM  4    Q.   SITTING HERE TODAY, DO YOU HAVE A MEMORY OF RECEIVING THIS

10:21AM  5    EMAIL?

10:21AM  6    A.   NO, SITTING HERE TODAY, I DON'T REMEMBER RECEIVING THIS

10:21AM  7    EMAIL.  BUT CLEARLY I'M ON THIS EMAIL, AND IN THE COURSE OF MY

10:21AM  8    NORMAL PRACTICE, I WOULD HAVE LOOKED AT THIS.

10:21AM  9    Q.   DO YOU HAVE ANY REASON TO DOUBT THAT YOU LOOKED AT IT?

10:22AM  10   A.   NO.

10:22AM  11   Q.   AND DURING THE TIME PERIOD, DID YOU TAKE CARE TO REVIEW

10:22AM  12   ANY INFORMATION YOU COULD FIND ABOUT THERANOS DURING THE COURSE

10:22AM  13   OF YOUR REVIEW?

10:22AM  14   A.   YES.

10:22AM  15        MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

10:22AM  16   EXHIBIT 162.

10:22AM  17        MR. CAZARES:  OBJECTION.  104, 802 AND 403.

10:22AM  18        THE COURT:  THE OBJECTION IS OVERRULED.  IT'S

10:22AM  19   ADMITTED, AND IT MAY BE PUBLISHED.

10:22AM  20        (GOVERNMENT'S EXHIBIT 162 WAS RECEIVED IN EVIDENCE.)

10:22AM  21   BY MR. LEACH:

10:22AM  22   Q.   MR. WEBER, LET ME DRAW YOUR ATTENTION TO THE FIRST EMAIL

10:22AM  23   DOWN THE CHAIN.

10:22AM  24        IT SAYS, "HI SHANE, IT SEEMS THAT YOU DID NOT HAVE THE

10:22AM  25   FINAL REPORT.  I HAVE ATTACHED IT AND THE NDA TO THIS EMAIL.

10:22AM  1    ELIZABETH IS WORKING ON SOME OF THE OTHER DOCUMENTS AND WE WILL

10:22AM  2    BE GETTING THEM TO YOU SOON.  LOOKING FORWARD TO THE MEETING ON

10:22AM  3    THURSDAY.  GARY."

10:23AM  4         DO YOU SEE THAT LANGUAGE?

10:23AM  5    A.   YES.

10:23AM  6    Q.   AND THIS WAS DURING THE TIME PERIOD THAT YOU WERE

10:23AM  7    EVALUATING THERANOS TECHNOLOGY?

10:23AM  8    A.   YES.

10:23AM  9    Q.   AND THERE IS A REFERENCE TO AN NDA.  WHAT IS AN NDA?

10:23AM  10   A.   NDA STANDS FOR NONDISCLOSURE AGREEMENT.

10:23AM  11   Q.   OKAY.  AND IF WE CAN LOOK BRIEFLY AT PAGE 3.

10:23AM  12        I'M NOT GOING TO GO THROUGH THE ENTIRE DOCUMENT,

10:23AM  13   MR. WEBER, BUT DO YOU SEE THE HEADING "THERANOS ANGIOGENESIS

10:23AM  14   STUDY REPORT"?

10:23AM  15   A.   I DO.

10:23AM  16   Q.   AND DO YOU SEE "PREPARED BY DR. AIDAN POWER, PFIZER INC.?

10:23AM  17   A.   I DO.

10:23AM  18   Q.   AND THERE'S A LIST OF CONCLUSIONS IN THE DOCUMENT OUTLINE?

10:23AM  19   A.   YES, CONCLUSIONS.

10:23AM  20   Q.   LIKE WE HAVE SEEN IN SOME OF THE OTHER EXHIBITS?

10:23AM  21   A.   YES.

10:23AM  22   Q.   LET ME NOW ASK YOU ABOUT THE PHONE CALL THAT YOU HAD WITH

10:23AM  23   FOLKS FROM THERANOS.

10:23AM  24        DID MS. HOLMES PARTICIPATE IN THAT CALL?

10:23AM  25   A.   YES, MS. HOLMES DID.

10:23AM   1    Q.   OKAY.  WERE THERE OTHERS FROM THERANOS ON THE CALL?

10:23AM   2    A.   YES, THERE WERE OTHERS.

10:23AM   3    Q.   OKAY.  WAS MR. BALWANI ON THE CALL?

10:24AM   4    A.   I DON'T KNOW.

10:24AM   5    Q.   OKAY.  HAVE YOU EVER MET MR. BALWANI?

10:24AM   6    A.   NOT THAT I KNOW OF.

10:24AM   7    Q.   OKAY.  DURING THIS PHONE CALL WITH MS. HOLMES, DID YOU ASK

10:24AM   8    HER QUESTIONS ABOUT HER TECHNOLOGY AND WHAT IT COULD DO?

10:24AM   9    A.   I DID.

10:24AM  10    Q.   AND BRIEFLY DESCRIBE WHAT HAPPENED.

10:24AM  11    A.   IN A ONE HOUR CALL WHERE THERE WERE AT LEAST FIVE OR SIX

10:24AM  12    OTHER THERANOS ATTENDEES, ELIZABETH -- MS. ELIZABETH HOLMES

10:24AM  13    ONLY SPOKE AND NO ONE ELSE IN THE ROOM SPOKE.

10:24AM  14        AND SHE ANSWERED -- MS. ELIZABETH HOLMES ANSWERED A NUMBER

10:24AM  15    OF QUESTIONS AND MADE A NUMBER OF STATEMENTS TO ME.

10:24AM  16    Q.   OKAY.  WHAT DID SHE SAY?

10:24AM  17            MR. CAZARES:  OBJECTION.  HEARSAY.

10:24AM  18            MR. LEACH:  I'M NOT OFFERING THESE FOR THE TRUTH,

10:24AM  19    YOUR HONOR.  I'M OFFERING THEM FOR THE REPRESENTATIONS DURING

10:24AM  20    THE COURSE OF HIS EVALUATION, BUT NOT FOR THE TRUTH.

10:25AM  21            THE COURT:  SO THIS GOES AS TO HIS EVALUATIONS OF

10:25AM  22    THE REPORT THAT HE WAS TASKED TO ACCOMPLISH?

10:25AM  23            MR. LEACH:  YES, YOUR HONOR.

10:25AM  24            THE COURT:  ALL RIGHT.  SO I'LL ADMIT AND ALLOW

10:25AM  25    MR. WEBER, DR. WEBER TO TESTIFY AS TO THIS CONVERSATION.  THE

10:25AM   1    WORDS, HOWEVER, ARE NOT FOR THE TRUTH OF THE MATTER ASSERTED,

10:25AM   2    BUT ONLY AS TO INFORM THE DOCTOR AS TO HIS FINAL REPORT.

10:25AM   3         AND YOU CAN ASK THE QUESTION AGAIN.

10:25AM   4    BY MR. LEACH:

10:25AM   5    Q.   WHAT DO YOU RECALL MS. HOLMES SAYING ON THE CALL?

10:25AM   6    A.   SHE SAID MANY THINGS, YOU KNOW, MANY SWEEPING THINGS THAT

10:25AM   7    I DIDN'T FEEL WERE SUPPORTED BY THE DATA PACKAGES THAT HER AND

10:25AM   8    HER TEAM HAD SENT TO ME.

10:25AM   9    Q.   AND DID YOU USE THIS INFORMATION IN THE PHONE CALL IN THE

10:25AM   10   COURSE OF YOUR EVALUATION OF THERANOS'S TECHNOLOGY?

10:25AM   11   A.   I DID.  THERE WERE, LIKE, SIX BROAD QUESTIONS THAT I KEPT

10:25AM   12   REPEATEDLY ASKING TO INFORM MY ASSESSMENT.

10:26AM   13   Q.   OKAY.  DID YOU EVER RECEIVE SATISFACTORY ANSWERS?

10:26AM   14   A.   NO.

10:26AM   15   Q.   AT SOME POINT IN TIME, DID YOU PREPARE A REPORT FOR YOUR

10:26AM   16   COLLEAGUES AT PFIZER WITH RECOMMENDATIONS ABOUT WHAT TO DO

10:26AM   17   VIS-A-VIS THERANOS?

10:26AM   18   A.   I DID.

10:26AM   19   Q.   LET ME PLEASE DRAW YOUR ATTENTION TO EXHIBIT 167.

10:26AM   20        DO YOU RECOGNIZE THIS DOCUMENT?

10:26AM   21   A.   I DO RECOGNIZE THIS DOCUMENT.

10:26AM   22   Q.   WHAT IS IT?

10:26AM   23   A.   IT'S A SUMMARY REPORT THAT I PREPARED ON THE THERANOS

10:26AM   24   TECHNOLOGY TO SEND TO MY LINE MANAGERS, HAKAN SAKUL,

10:26AM   25   CRAIG LIPSET, AND DR. AIDAN POWER.

10:26AM  1    Q.   DID YOU PREPARE THIS IN THE ORDINARY COURSE OF PFIZER'S

10:26AM  2    BUSINESS?

10:26AM  3    A.   YES.

10:26AM  4    Q.   DID YOU PREPARE IT AT -- OR FROM INFORMATION PROVIDED TO

10:26AM  5    YOU BY THERANOS AT OR AROUND THE TIME OF THE REPORT?

10:26AM  6    A.   YES.

10:26AM  7    Q.   WAS THIS MAINTAINED IN THE ORDINARY COURSE OF PFIZER'S

10:27AM  8    BUSINESS?

10:27AM  9    A.   YES.

10:27AM  10   Q.   AND WAS IT YOUR PRACTICE TO PREPARE REPORTS AND KEEP THEM

10:27AM  11   IN THE COURSE OF YOUR TECHNOLOGY REVIEWS?

10:27AM  12   A.   YES.

10:27AM  13          MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

10:27AM  14   EXHIBIT 167.

10:27AM  15          MR. COOPERSMITH:  OBJECTION.  RELEVANCE.  702 AND

10:27AM  16   403 AS TO CONCLUSIONS, AND PEJORATIVE --

10:27AM  17          THE COURT:  SAY AGAIN.

10:27AM  18          MR. CAZARES:  403 AS TO CONCLUSIONS AND PEJORATIVE

10:27AM  19   ASSERTIONS IN THE REPORT.

10:27AM  20       (PAUSE IN PROCEEDINGS.)

10:28AM  21          THE COURT:  ALL RIGHT.  THANK YOU.

10:28AM  22    I WILL ADMIT THIS OVER OBJECTION.  IT MAY BE PUBLISHED.

10:28AM  23    THE PROBATIVE VALUE OF THIS OUTWEIGHS ANY UNFAIR

10:28AM  24   PREJUDICE, AND AS TO ANY PEJORATIVE NATURE, IT'S PART OF THE

10:28AM  25   REPORT AND THE OPINION AND THE REVIEW OF THE DOCTOR.

10:28AM   1                AND SO IT'S ADMITTED AND IT MAY BE PUBLISHED.

10:28AM   2                (GOVERNMENT'S EXHIBIT 167 WAS RECEIVED IN EVIDENCE.)

10:28AM   3                     MR. LEACH:  THANK YOU, YOUR HONOR.

10:29AM   4                MAY I HAVE A MOMENT, YOUR HONOR?

10:29AM   5                     THE COURT:  YES.

10:29AM   6                (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

10:29AM   7                     MR. LEACH:  YOUR HONOR, MAY I USE THE ELMO FOR THIS

10:29AM   8      PARTICULAR EXHIBIT?

10:29AM   9                     THE COURT:  YES.

10:29AM  10                     MR. LEACH:  AND, MS. ROBINSON, MAY I RETRIEVE YOUR

10:29AM  11      COPY?  MINE HAS MARKS THAT I DON'T THINK ARE APPROPRIATE FOR

10:29AM  12      THE JURY.

10:29AM  13                     THE CLERK:  (HANDING.)

10:29AM  14                     MR. LEACH:  THANK YOU SO MUCH.

10:29AM  15      Q.   MR. WEBER, ARE YOU ABLE TO SEE THAT ON THE SCREEN?

10:29AM  16      A.   I AM.

10:29AM  17      Q.   OKAY.  AND DO YOU SEE THE HEADING "DIAGNOSTICS REVIEW OF

10:29AM  18      THERANOS'S TECHNOLOGY AND FINAL RECOMMENDATIONS"?

10:29AM  19      A.   I DO.

10:29AM  20      Q.   AND IS THAT THE -- AND THIS IS SOMETHING THAT YOU

10:29AM  21      AUTHORED?

10:29AM  22      A.   YES, I WROTE THIS.

10:29AM  23      Q.   OKAY.  YOU WROTE IN THE OVERVIEW, "THERANOS SYSTEMS

10:30AM  24      PURPORTS TO HAVE A PATIENT HOME USE IMMUNOASSAY INVITRO

10:30AM  25      DIAGNOSTIC PLATFORM."

WEBER DIRECT BY MR. LEACH

10:30AM 1          DO YOU SEE THAT?

10:30AM 2     A.   I DO.

10:30AM 3     Q.   AND WAS THAT YOUR UNDERSTANDING OF WHAT THERANOS WAS

10:30AM 4     OFFERING AT THE TIME?

10:30AM 5     A.   YES, IT WAS.

10:30AM 6     Q.   YOU THEN WROTE, "THE PURPOSE OF THIS REVIEW WAS TO CLOSE

10:30AM 7     THE LOOP ON PREVIOUS EFFORTS FOR THERANOS TO LOOK FOR BUSINESS

10:30AM 8     OPPORTUNITIES WITH PFIZER."

10:30AM 9          DO YOU SEE THAT LANGUAGE?

10:30AM 10    A.   I DO.

10:30AM 11    Q.   "AND TO MAKE FINAL RECOMMENDATIONS REGARDING POTENTIAL

10:30AM 12    FUTURE ATTEMPT FOR THERANOS TO ENGAGE DIFFERENT PARTS OF PFIZER

10:30AM 13    IN THEIR PLATFORM."

10:30AM 14         IS THAT THE SUMMARY OF THE PURPOSE OF YOUR WORK?

10:30AM 15    A.   YES.

10:30AM 16    Q.   OKAY.  YOU THEN HAVE A NUMBER OF RECOMMENDATIONS.

10:30AM 17         DO YOU SEE THAT?

10:30AM 18    A.   I DO.

10:30AM 19    Q.   YOU WROTE, "THERANOS DOES NOT AT THIS TIME HAVE ANY

10:30AM 20    DIAGNOSTIC OR CLINICAL INTEREST TO PFIZER."

10:30AM 21         DO YOU SEE THAT LANGUAGE IN NUMBER 1?

10:30AM 22    A.   I DO.

10:30AM 23    Q.   WAS THAT YOUR RECOMMENDATION?

10:30AM 24    A.   IT WAS.

10:30AM 25    Q.   WHY WAS THAT YOUR RECOMMENDATION?

10:30AM   1   A.   IT WAS MY RECOMMENDATION THAT THEIR RESEARCH USE ONLY

10:31AM   2   CAPABILITY DID NOT HAVE PERFORMANCE CAPABILITY AND IT WAS NOT A

10:31AM   3   DIAGNOSTIC, AND IT WAS NOT ON THE CLINICAL INTEREST PATH FOR

10:31AM   4   THE PFIZER STUDIES IN ONCOLOGY THAT WE WERE SEARCHING FOR

10:31AM   5   DIAGNOSTICS FOR.

10:31AM   6   Q.   YOU THEN WROTE, "IT IS RECOMMENDED THAT NO FURTHER

10:31AM   7   FINANCIAL INVESTMENT OR CLINICAL SAMPLE RESOURCES BE EXTENDED

10:31AM   8   TO THERANOS."

10:31AM   9        DO YOU SEE THAT IN PARAGRAPH 2?

10:31AM   10  A.   I DO.

10:31AM   11  Q.   AND WAS THAT YOUR RECOMMENDATION?

10:31AM   12  A.   YES.

10:31AM   13  Q.   AND WHY WAS THAT YOUR RECOMMENDATION?

10:31AM   14  A.   IT WAS MY RECOMMENDATION BECAUSE IF THERE'S NO CLINICAL

10:31AM   15  INTEREST USE, NO DIAGNOSTIC INTEREST USE, THERE'S NO POINT

10:31AM   16  INVESTING FURTHER RESOURCES INTO A PLATFORM.

10:31AM   17  Q.   YOU THEN WROTE IN NUMBER 3, "GOING FORWARD, THERANOS

10:31AM   18  SHOULD BE MONITORED BY MOLECULAR MEDICINE'S DIAGNOSTIC GROUP."

10:31AM   19        DO YOU SEE THAT?

10:31AM   20  A.   I DO.

10:31AM   21  Q.   AND WHAT IS THE MOLECULAR MEDICINE'S DIAGNOSTIC GROUP?

10:32AM   22  A.   THE MOLECULAR MEDICINE DIAGNOSTIC GROUP IS THE GROUP OF

10:32AM   23  THE THREE OF US INSIDE OF MOLECULAR MEDICINE WHO HAD THE

10:32AM   24  AUTHORITY AND RESPONSIBILITY TO ACT ON ALL DIAGNOSTICS FOR

10:32AM   25  PFIZER.

WEBER DIRECT BY MR. LEACH

10:32AM  1    Q.   AND WHY WAS IT YOUR RECOMMENDATION THAT THERANOS SHOULD BE

10:32AM  2    MONITORED BY MOLECULAR MEDICINE'S DIAGNOSTIC GROUP GOING

10:32AM  3    FORWARD?

10:32AM  4    A.   IN SMALL RESEARCH COMPANIES, AS THEY WORK ON THEIR

10:32AM  5    PLATFORMS, THINGS EVOLVE, THINGS MIGHT CHANGE, SO WE WANT TO

10:32AM  6    KEEP IN TOUCH.

10:32AM  7    Q.   OKAY.  FURTHER BELOW IN YOUR MEMO, THERE'S A HEADING,

10:32AM  8    "REVIEW AND COMMENTS ON THERANOS PROVIDED INFORMATION."

10:32AM  9         DO YOU SEE THAT?

10:32AM  10   A.   I DO.

10:32AM  11   Q.   YOU THEN WROTE, "THE TECHNICAL ASSESSMENT REVIEW PROCESS

10:32AM  12   CONSISTED OF EXAMINING THERANOS CONFIDENTIAL SUMMARY REPORTS,

10:32AM  13   READING THEIR PUBLIC PATENT PUBLICATIONS, HEARING THEIR STORY

10:33AM  14   IN A ONE HOUR TELECONFERENCE WITH QUESTIONS AND ANSWERS,

10:33AM  15   READING THEIR ANSWERS TO A WRITTEN SET OF TECHNICAL DUE

10:33AM  16   DILIGENCE QUESTIONS SUBMITTED TO THEM, SURVEYING THE WEB FOR

10:33AM  17   PUBLIC INFORMATION," AND THEN IT CONTINUES.

10:33AM  18        DO YOU SEE THAT?

10:33AM  19   A.   YES.

10:33AM  20   Q.   IS THAT A FAIR SUMMARY OF THE INFORMATION THAT YOU

10:33AM  21   REVIEWED?

10:33AM  22   A.   YES.

10:33AM  23   Q.   LET'S GO TO PAGE 2 OF YOUR MEMO.

10:33AM  24        DO YOU SEE WHERE YOU WROTE, "THE INTRODUCTION TO THERANOS

10:33AM  25   SYSTEMS SLIDE DECK DOES NOT CONTAIN SUFFICIENT INFORMATION ON

10:33AM   1    THEIR PLATFORM TO DEMONSTRATE INVITRO DIAGNOSTIC ASSAY OR

10:33AM   2    PLATFORM CAPABILITY."

10:33AM   3         DO YOU SEE THAT?

10:33AM   4    A.   I DO.

10:33AM   5    Q.   WAS THAT YOUR ASSESSMENT AT THE TIME?

10:33AM   6    A.   YES.

10:33AM   7    Q.   YOU THEN WROTE, "THERANOS HAS PROVIDED A POORLY PREPARED

10:33AM   8    SUMMARY DOCUMENT OF THEIR PLATFORM FOR HOME PATIENT USE WITH

10:33AM   9    THE ANTI-ANTIGENIC THERAPIES."

10:34AM  10         DO YOU SEE THAT?

10:34AM  11    A.   I DO.

10:34AM  12    Q.   IS THAT A REFERENCE TO THE ANGIOGENESIS STUDY REPORT THAT

10:34AM  13    WE LOOKED AT PREVIOUSLY?

10:34AM  14    A.   IT IS.  IT WAS.

10:34AM  15    Q.   IN THE BULLETS YOU WROTE, "THERANOS SYSTEMS IN THE SLIDE

10:34AM  16    DECK STATES 'HUGE VARIATION BETWEEN SUBJECTS, BOTH ABSOLUTE

10:34AM  17    LEVELS AND CHANGES OVER TIME VARY GREATLY.'  NO DISCUSSION OR

10:34AM  18    RIGOROUS GRAPHICAL MULTI-PARAMETER QUANTITATIVE ANALYSIS OF THE

10:34AM  19    PATIENT COHORT WAS DONE."

10:34AM  20         DO YOU SEE THAT?

10:34AM  21    A.   I DO.

10:34AM  22    Q.   AND WAS THAT DONE?

10:34AM  23    A.   IT WAS.

10:34AM  24    Q.   AND YOU THEN WROTE, "THERANOS UNCONVINCINGLY ARGUES THE

10:34AM  25    CASE FOR HAVING ACCOMPLISHED TASKS OF INTEREST TO PFIZER."

WEBER DIRECT BY MR. LEACH

10:34AM  1           DO YOU SEE THAT?

10:34AM  2      A.  I DO.

10:34AM  3      Q.  AND WAS THAT A RECOMMENDATION TO YOUR BOSSES AT THE TIME?

10:34AM  4      A.  IT WAS.

10:34AM  5      Q.  AND WHY WAS THAT?

10:34AM  6      A.  THE DATA AND INFORMATION PROVIDED IN THE SUMMARY REPORT

10:35AM  7      DIDN'T SUPPORT THE LARGE CONCLUSIONS THAT THERANOS HAD LISTED

10:35AM  8      IN THEIR REPORT IN MY PROFESSIONAL DIAGNOSTIC OPINION.

10:35AM  9      Q.  YOU THEN WROTE IN 3, "THE NINE CONCLUSIONS IN THEIR

10:35AM  10     SUMMARY DOCUMENT ARE NOT BELIEVABLE BASED ON THE INFORMATION

10:35AM  11     PROVIDED."

10:35AM  12          DO YOU SEE THAT?

10:35AM  13     A.  I DO.

10:35AM  14     Q.  IS THAT IN REFERENCE TO SOME OF THE CONCLUSIONS THAT WE

10:35AM  15     HAVE REVIEWED PREVIOUSLY?

10:35AM  16     A.  YES, IT WAS.

10:35AM  17     Q.  LET ME DRAW YOUR ATTENTION TO THE THIRD PAGE.  DO YOU SEE

10:35AM  18     THE HEADING "DUE DILIGENCE QUESTIONS VERBALLY ASKED TO THERANOS

10:35AM  19     IN THE NOVEMBER 13TH TELECONFERENCE"?

10:35AM  20     A.  YES, I DO.

10:35AM  21     Q.  AND IS THAT IN REFERENCE TO THE TELEPHONE CALL THAT YOU

10:35AM  22     HAD WITH MS. HOLMES AND OTHERS ON HER TEAM?

10:35AM  23     A.  YES.

10:35AM  24     Q.  AND WHY WERE YOU INCLUDING THIS INFORMATION IN THE REPORT?

10:36AM  25     A.  I WAS INCLUDING THIS INFORMATION IN THE REPORT TO DOCUMENT

10:36AM  1    WHAT INFORMATION WE WERE SEARCHING FOR AND WHAT WE WERE NOT

10:36AM  2    GETTING IN THE INTERACTION.

10:36AM  3    Q.   FURTHER BELOW YOU WROTE, "DUE DILIGENCE QUESTIONS SENT

10:36AM  4    NOVEMBER 17TH TO THERANOS AND THEIR NOVEMBER 27TH ANSWERS."

10:36AM  5         DO YOU SEE THAT?

10:36AM  6    A.   YES, I DO.

10:36AM  7    Q.   OKAY.  AND DOES THIS ACCURATELY SUMMARIZE QUESTIONS THAT

10:36AM  8    YOU PUT TO FOLKS AT THERANOS ABOUT THEIR TECHNOLOGY?

10:36AM  9    A.   YES.  EACH QUESTION IS LISTED AS I SENT IT TO THEM, AND

10:36AM  10   THEN IMMEDIATELY BEHIND IT IS THE RESPONSE THAT I RECEIVED FROM

10:36AM  11   THERANOS.

10:36AM  12   Q.   SO USING THE FIRST QUESTION AS AN EXAMPLE, IN THE SUMMARY

10:36AM  13   DOCUMENT YOU REFER TO MEETING WITH THE PFIZER TEAM.

10:36AM  14        WHO WAS THE PFIZER TEAM?

10:36AM  15        DO YOU SEE THAT?

10:36AM  16   A.   I DO.

10:36AM  17   Q.   AND WAS THAT YOUR QUESTION?

10:36AM  18   A.   THAT WAS MY QUESTION.

10:36AM  19   Q.   AND THEN IT SAYS ANGELIKI KOSTIANTI.

10:37AM  20        DO YOU SEE THAT?

10:37AM  21   A.   YES, I DO.

10:37AM  22   Q.   AND WAS THAT THE ANSWER THAT YOU GOT TO THE QUESTION?

10:37AM  23   A.   THAT WAS THE ANSWER I GOT -- RECEIVED FOR THE QUESTION.

10:37AM  24   Q.   OKAY.  AND THAT ITERATION WOULD HOLD TRUE FOR THE

10:37AM  25   ADDITIONAL NUMBERS IN THIS REPORT?

10:37AM  1    A.   YES.

10:37AM  2    Q.   AFTER YOU SENT YOUR REPORT TO -- WELL, WHO DID YOU SEND

10:37AM  3    THIS REPORT TO?

10:37AM  4    A.   I SENT THIS REPORT TO CRAIG LIPSET, HAKAN SAKUL, AND

10:37AM  5    AIDAN POWER, THE HEAD OF MOLECULAR MEDICINE.

10:37AM  6    Q.   OKAY.  DID PFIZER FOLLOW YOUR RECOMMENDATION?

10:37AM  7    A.   YES, AS FAR AS I KNOW.

10:37AM  8    Q.   OKAY.  DID ANYBODY DISAGREE WITH THE CONCLUSIONS IN YOUR

10:37AM  9    REPORT?

10:37AM  10   A.   I RECEIVED NO DISAGREEMENT FROM THE THREE PEOPLE I SENT IT

10:37AM  11   TO.

10:37AM  12   Q.   LET ME DRAW YOUR ATTENTION, MR. WEBER, TO WHAT HAS BEEN

10:38AM  13   MARKED AS EXHIBIT 174.

10:38AM  14   A.   YES, I SEE THIS.

10:38AM  15   Q.   OKAY.  IS THIS AN EMAIL BETWEEN YOU AND AIDAN POWER, WITH

10:38AM  16   A COPY TO CRAIG LIPSET AND HAKAN SAKUL AT PFIZER?

10:38AM  17   A.   IT IS.

10:38AM  18   Q.   AND DO YOU SEE THE SUBJECT, THERANOS WRAP UP?

10:38AM  19   A.   YES.

10:38AM  20   Q.   AND ARE YOU REPORTING ON A CONVERSATION THAT YOU HAD WITH

10:38AM  21   MS. HOLMES IN OR AROUND JANUARY OF 2009?

10:38AM  22   A.   YES.

10:38AM  23   Q.   OKAY.  DID YOU SEND THIS EMAIL IN THE ORDINARY COURSE OF

10:38AM  24   PFIZER'S BUSINESS?

10:38AM  25   A.   YES.

10:38AM  1    Q.   DID YOU PREPARE IT AT OR FROM INFORMATION AVAILABLE TO YOU

10:38AM  2    AT THE TIME?

10:38AM  3    A.   YES.

10:38AM  4    Q.   AND WAS IT PFIZER'S PRACTICE TO KEEP AND RETAIN EMAILS

10:38AM  5    LIKE THIS IN THE ORDINARY COURSE OF ITS BUSINESS?

10:39AM  6    A.   YES, IT CLEARLY IS.

10:39AM  7              MR. LEACH:   OKAY.  YOUR HONOR, THE GOVERNMENT OFFERS

10:39AM  8    EXHIBIT 174.

10:39AM  9              MR. CAZARES:   OBJECTION.  DOUBLE HEARSAY AND 403,

10:39AM 10    PARTICULARLY AS TO PARAGRAPH 2.

10:39AM 11              MR. LEACH:   I THINK WE'VE LAID THE FOUNDATION UNDER

10:39AM 12    803(6), YOUR HONOR.

10:39AM 13              THE COURT:   YES, IT'S ADMITTED UNDER 803(6).  AND IT

10:39AM 14    MAY BE PUBLISHED.

10:39AM 15              MR. LEACH:   THANK YOU, YOUR HONOR.

10:39AM 16         (GOVERNMENT'S EXHIBIT 174 WAS RECEIVED IN EVIDENCE.)

10:39AM 17    BY MR. LEACH:

10:39AM 18    Q.   MR. WEBER, DO YOU SEE YOUR NAME IN THE FROM LINE?

10:39AM 19    A.   YES, I DO.

10:39AM 20    Q.   OKAY.  AND IF WE CAN ZOOM IN ON THE TOP HALF.  THAT'S

10:39AM 21    GREAT, MS. WACHS.

10:39AM 22         AND THIS IS AN EMAIL THAT YOU SENT TO AIDAN POWER WITH A

10:39AM 23    COPY TO MR. LIPSET AND A COPY TO HAKAN SAKUL?

10:40AM 24    A.   YES.

10:40AM 25    Q.   AND YOU WROTE, "HI AIDAN,

WEBER DIRECT BY MR. LEACH

10:40AM  1          "TODAY I SPOKE WITH ELIZABETH HOLMES, CEO" --

10:40AM  2          IS THAT WHAT YOU DID?

10:40AM  3     A.   YES.

10:40AM  4     Q.   -- "CEO THERANOS AND EXPLAINED TO HER THAT PFIZER DID NOT

10:40AM  5     HAVE AT THIS TIME A FORESEEABLE USE FOR THE THERANOS

10:40AM  6     IMMUNOASSAY DEVICE FOR AT PATIENT SELF USE AT HOME BUT SHE AND

10:40AM  7     I AGREED TO STAY IN TOUCH EVERY SIX MONTHS."

10:40AM  8          IS THAT A FAIR SUMMARY OF WHAT YOU CONVEYED TO MS. HOLMES?

10:40AM  9     A.   YES.

10:40AM  10    Q.   AND WAS MR. BALWANI ON THAT PHONE CALL?

10:40AM  11    A.   NOT AS FAR AS I KNOW, AND NOT AS FAR AS I REMEMBER.

10:40AM  12    Q.   OKAY.  AND YOU THEN WROTE, "I WAS POLITE, CLEAR, CRISP,

10:40AM  13    AND PATIENTLY FIRM AS SHE PUSHED BACK.  SHE ASKED FOR OTHER

10:40AM  14    NAMES AT PFIZER TO APPROACH AND I POLITELY DEFLECTED."

10:40AM  15         IS THAT A FAIR SUMMARY OF WHAT HAPPENED?

10:40AM  16    A.   YES.

10:40AM  17    Q.   "I DID RECEIVE HER CONFIRMATION THAT THERANOS HAD BEEN

10:40AM  18    PAID IN FULL FOR THE PREVIOUS ALLIANCE CONTRACT."

10:40AM  19         DO YOU SEE THAT?

10:40AM  20    A.   YES.

10:40AM  21    Q.   AND WHAT DID YOU MEAN BY "THE PREVIOUS ALLIANCE CONTRACT"?

10:41AM  22    A.   WHAT I MEANT BY THAT WAS THE FUNDING FOR THE STUDY THAT

10:41AM  23    THERANOS AND PFIZER HAD DONE WAS PAID BY A STRATEGIC ALLIANCE

10:41AM  24    FUND POOL AND THAT IT DID NOT COME FROM THE MOLECULAR MEDICINE

10:41AM  25    BUDGET.

10:41AM  1    Q.   AND YOU WROTE IN THE NEXT PARAGRAPH, "I HAD CONFIRMED THIS

10:41AM  2    BEFOREHAND AND THAT IT CAME OUT OF STRATEGIC ALLIANCE BUDGE,

10:41AM  3    AND NOT MM BUDGET."

10:41AM  4         WHY WAS THAT INFORMATION RELEVANT?

10:41AM  5    A.   WELL, ONCE AGAIN, HAVING WORKED AT SMALL COMPANIES, AS

10:41AM  6    WELL AS LARGE COMPANIES, I'M SYMPATHETIC TO SMALL COMPANIES

10:41AM  7    BEING PAID ON A TIMELY BASIS FOR THEIR WORK.

10:41AM  8         BUT I ALSO, IN A LARGE COMPANY WHERE MASSIVE

10:41AM  9    REORGANIZATION WAS ONGOING AT THIS TIME AND BUDGET WAS BEING

10:41AM 10    RESTRAINED, I WANTED TO BE RESPECTFUL OF MOLECULAR MEDICINE'S

10:41AM 11    BUDGET AND AIDAN POWER'S DIRECTION OF THAT.

10:42AM 12    Q.   AFTER THIS -- TO YOUR KNOWLEDGE, AFTER SENDING THIS EMAIL

10:42AM 13    IN OR AROUND JANUARY 3RD, 2009, PUTTING ASIDE THE ANGIOGENESIS

10:42AM 14    STUDY, TO YOUR KNOWLEDGE, DID PFIZER EVER PAY THERANOS MONEY IN

10:42AM 15    CONNECTION WITH ANY WORK?

10:42AM 16    A.   NOT TO MY KNOWLEDGE.

10:42AM 17    Q.   TO YOUR KNOWLEDGE, WERE THERE ANY OTHER STUDIES ANALOGOUS,

10:42AM 18    EXCUSE ME, TO THE ANGIOGENESIS STUDY?

10:42AM 19    A.   NOT TO MY KNOWLEDGE.

10:42AM 20    Q.   OKAY.  LET ME DRAW -- OR IF WE COULD PLEASE, WITH THE

10:42AM 21    COURT'S PERMISSION, DISPLAY WHAT IS IN EVIDENCE AS

10:42AM 22    EXHIBIT 4858.

10:42AM 23         MR. WEBER, DO YOU SEE THE TITLE THERANOS CONFIDENTIAL

10:43AM 24    OVERVIEW?

10:43AM 25    A.   UM --

10:43AM  1    Q.   IT'S NOT IN YOUR BINDER, SIR.  IT'S JUST ON THE SCREEN.

10:43AM  2    A.   OH, IT'S JUST ON THE SCREEN.

10:43AM  3          MR. CAZARES:  YOUR HONOR, I WAS GOING TO RAISE A

10:43AM  4    FOUNDATION ARGUMENT, OR OBJECTION, TO USE OF THIS EXHIBIT WITH

10:43AM  5    THIS WITNESS REGARDING WHERE I HAD BELIEVE MR. LEACH IS GOING.

10:43AM  6          THE COURT:  MR. LEACH, ARE YOU GOING TO ASK SOME

10:43AM  7    FOUNDATIONAL QUESTIONS ABOUT THIS?

10:43AM  8          MR. LEACH:  YES, YOUR HONOR.  I THINK THIS RELATES

10:43AM  9    TO AN EARLIER DISCUSSION WE HAD.

10:43AM 10          THE COURT:  YES.

10:43AM 11          MR. LEACH:  THIS IS IN EVIDENCE.  I INTEND TO ASK

10:43AM 12    HIM HIS KNOWLEDGE ABOUT PARTICULAR PORTIONS OF THIS.

10:43AM 13          MR. CAZARES:  AND I WOULD REITERATE THIS MORNING'S

10:43AM 14    OBJECTIONS, YOUR HONOR.

10:43AM 15          THE COURT:  NOTED.

10:43AM 16       YOU CAN CONTINUE.

10:43AM 17          MR. LEACH:  THANK YOU.

10:43AM 18       LET'S PLEASE GO TO PAGE 104.

10:43AM 19       IF WE CAN ZOOM IN AT THE TOP HALF CAPTURING THE PORTION,

10:43AM 20    CONCLUSIONS.

10:44AM 21    Q.   MR. WEBER, DO YOU SEE THE PFIZER LOGO IN THE TOP LEFT

10:44AM 22    CORNER OF THIS?

10:44AM 23    A.   I DO.

10:44AM 24    Q.   OKAY.  AT ANY POINT DID YOU AUTHORIZE THERANOS TO PUT A

10:44AM 25    PFIZER LOGO ON THE ANGIOGENESIS REPORT?

10:44AM  1    A.    NO, I DID NOT.

10:44AM  2              MR. CAZARES:  OBJECTION.

10:44AM  3              THE COURT:  I'M SORRY?

10:44AM  4              MR. CAZARES:  OBJECTION.

10:44AM  5              THE COURT:  OVERRULED.  THE ANSWER WILL REMAIN.

10:44AM  6              THE WITNESS:  NO, I DID NOT APPROVE THE USE OF THE

10:44AM  7    PFIZER LOGO ON THIS DOCUMENT.

10:44AM  8    BY MR. LEACH:

10:44AM  9    Q.    OKAY.  AT ANY POINT DID YOU APPROVE PROVIDING A THERANOS

10:44AM  10   ANGIOGENESIS STUDY REPORT TO THERANOS INVESTORS?

10:44AM  11             MR. CAZARES:  OBJECTION.

10:44AM  12             THE COURT:  OVERRULED.

10:44AM  13             THE WITNESS:  NO, I DID NOT.

10:44AM  14   BY MR. LEACH:

10:44AM  15   Q.    OKAY.  LET'S GO TO PAGE, ABOUT 20 PAGES FURTHER.  A LITTLE

10:44AM  16   MORE, PLEASE.  I THINK IT'S PAGE 26 OF THE REPORT.  A LITTLE

10:45AM  17   MORE.  THERE WE GO.

10:45AM  18       DO YOU SEE THE HEADING CONCLUSIONS?

10:45AM  19   A.    I DO.

10:45AM  20   Q.    NUMBER 1 SAYS, "THE THERANOS SYSTEM PERFORMED WITH

10:45AM  21   SUPERIOR PERFORMANCE TO REFERENCE ASSAYS WHILE RUNNING A

10:45AM  22   COMPLEX AMBULATORY ENVIRONMENT."

10:45AM  23       DO YOU SEE THAT?

10:45AM  24   A.    I DO.

10:45AM  25   Q.    WAS THAT A CONCLUSION THAT PFIZER REACHED?

10:45AM 1    A.   NO.

10:45AM 2    Q.   OKAY.  IN FACT, DID YOU REACH THE OPPOSITE CONCLUSION?

10:45AM 3    A.   I REACHED THE OPPOSITE CONCLUSION.

10:45AM 4    Q.   OKAY.  WERE ANY OF THE CONCLUSIONS LISTED HERE IN THIS

10:45AM 5    DOCUMENT CONCLUSIONS THAT PFIZER REACHED?

10:45AM 6    A.   NO.

10:45AM 7    Q.   OKAY.  DID YOU EVER TELL ANYBODY FROM THERANOS THAT IT HAD

10:45AM 8    REACHED THESE CONCLUSIONS, OR THAT PFIZER HAD REACHED THESE

10:46AM 9    CONCLUSIONS?

10:46AM 10   A.   NO, I DID NOT.

10:46AM 11   Q.   OKAY.  THANK YOU, MS. WACHS.  WE CAN TAKE THAT DOWN.

10:46AM 12        WE LOOKED EARLIER AT A REPORT THAT YOU PREPARED FOR

10:46AM 13   MR. LIPSET, MR. SAKUL, THE WORK ON YOUR REPORT RELATING TO

10:46AM 14   THERANOS TECHNOLOGY?

10:46AM 15   A.   YES.

10:46AM 16   Q.   AFTER YOUR REPORT, TO YOUR KNOWLEDGE, DID PFIZER EVER DO

10:46AM 17   ANY WORK WITH THERANOS?

10:46AM 18   A.   NOT TO MY KNOWLEDGE.

10:46AM 19   Q.   DID PFIZER EVER PAY MONEY TO THERANOS AFTER THAT REPORT?

10:46AM 20   A.   NOT THAT I WAS AWARE OF.

10:46AM 21   Q.   TO YOUR KNOWLEDGE, DID PFIZER EVER ENTER INTO ANY REVENUE

10:46AM 22   GENERATING ARRANGEMENTS WITH THERANOS?

10:46AM 23   A.   NOT THAT I WAS AWARE OF.

10:46AM 24   Q.   DID YOU EVER TELL ANYONE AT THERANOS THAT PFIZER VALIDATED

10:46AM 25   THERANOS'S TECHNOLOGY?

| | | |
|---|---|---|
| 10:46AM | 1 | A.   NO, I DID NOT. |
| 10:46AM | 2 | Q.   DO YOU AGREE WITH THE STATEMENT THAT PFIZER VALIDATED |
| 10:46AM | 3 | THERANOS'S TECHNOLOGY? |
| 10:46AM | 4 | A.   NO, I DO NOT. |
| 10:46AM | 5 | Q.   OKAY.  IN FACT, DID YOU COME TO THE OPPOSITE CONCLUSION? |
| 10:46AM | 6 | A.   I CONCLUDED THE OPPOSITE. |
| 10:47AM | 7 | MR. LEACH:  YOUR HONOR, MAY I HAVE A MOMENT? |
| 10:47AM | 8 | THE COURT:  YES. |
| 10:47AM | 9 | (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.) |
| 10:47AM | 10 | MR. LEACH:  I HAVE NO FURTHER QUESTIONS. |
| 10:47AM | 11 | THANK YOU, MR. WEBER. |
| 10:47AM | 12 | THE COURT:  CROSS-EXAMINATION? |
| 10:47AM | 13 | MR. CAZARES:  YES, YOUR HONOR. |
| 10:47AM | 14 | YOUR HONOR, MAY I REMOVE MY MASK? |
| 10:47AM | 15 | THE COURT:  YES. |
| 10:48AM | 16 | MR. CAZARES:  THANK YOU. |
| 10:48AM | 17 | **CROSS-EXAMINATION** |
| 10:48AM | 18 | BY MR. CAZARES: |
| 10:48AM | 19 | Q.   GOOD MORNING, MR. WEBER.  MY NAME IS STEPHEN CAZARES AND I |
| 10:48AM | 20 | REPRESENT MR. BALWANI.  I JUST HAVE A FEW QUESTIONS FOR YOU |
| 10:48AM | 21 | THIS MORNING.  WOULD THAT BE OKAY? |
| 10:48AM | 22 | A.   THAT WOULD BE OKAY. |
| 10:48AM | 23 | GOOD MORNING, STEVE. |
| 10:48AM | 24 | Q.   SO JUST TO REVERT BACK TO YOUR TESTIMONY THIS MORNING |
| 10:48AM | 25 | EARLIER ABOUT YOUR ROLE AT PFIZER DURING THIS TIME PERIOD, AND |

10:48AM 1    YOU INDICATED THAT YOU JOINED PFIZER IN MID-2008 OR SO;

10:48AM 2    CORRECT?

10:48AM 3    A.   YES.

10:48AM 4    Q.   OKAY.  AND AT THE TIME THAT YOU JOINED PFIZER, WAS IT

10:48AM 5    ALREADY IN THE PROCESS OF THIS KIND OF REORGANIZATION THAT I

10:48AM 6    THINK YOU DESCRIBED ALREADY?

10:48AM 7    A.   IT WAS JUST INITIATING.

10:48AM 8    Q.   SO IT WAS JUST STARTING AT THAT POINT?

10:48AM 9    A.   YES.

10:48AM 10   Q.   SO YOU WERE KIND OF PART OF THIS REORGANIZATION; IS THAT

10:48AM 11   RIGHT?

10:48AM 12   A.   YES.

10:48AM 13   Q.   OKAY.  AND THIS REORGANIZATION DIRECTLY RELATED TO I GUESS

10:48AM 14   SOME OF THE CLINICAL STUDY WORK THAT PFIZER ENGAGED IN ON A

10:49AM 15   KIND OF REGULAR BASIS; CORRECT?

10:49AM 16   A.   YES.

10:49AM 17   Q.   AND WHEN YOU JOINED THE COMPANY, YOU CAME AS THE DIRECTOR

10:49AM 18   OF DIAGNOSTICS; IS THAT RIGHT?

10:49AM 19   A.   I CAME AS THE DIRECTOR OF DIAGNOSTICS TO A DIAGNOSTIC

10:49AM 20   GROUP.

10:49AM 21   Q.   OKAY.  AND AT THE TIME THAT YOU JOINED, YOU REPORTED TO

10:49AM 22   MR. SAKUL?

10:49AM 23   A.   I DID.

10:49AM 24   Q.   OKAY.  AND JUST SO I'M RIGHT, MR. SAKUL REPORTED TO

10:49AM 25   MR. LIPSET?

10:49AM  1    A.    NO.  HE REPORTED TO AIDAN POWER.  SO HAKAN SAKUL WAS A

10:49AM  2    PEER OF CRAIG LIPSET.

10:49AM  3    Q.    GOT IT.  GOT IT.

10:49AM  4         NOW, WHEN YOU JOINED PFIZER, AS YOU CAME TO UNDERSTAND THE

10:49AM  5    RELATIONSHIP WITH THERANOS, THE WORK THAT THERANOS DID WITH

10:49AM  6    PFIZER TOOK PLACE A COUPLE OF YEARS BEFORE YOU JOINED; CORRECT?

10:49AM  7    A.    YES.

10:49AM  8    Q.    AND IN THE PROCESS OF DOING THAT WORK BETWEEN THERANOS AND

10:50AM  9    PFIZER, THERE WERE OTHER PFIZER SCIENTISTS AND DIRECTORS THAT

10:50AM  10   WERE INVOLVED IN THAT WORK; CORRECT?

10:50AM  11   A.    YES.

10:50AM  12   Q.    AND SO THOSE PERSONS ENGAGED IN CONTRACTS WITH THERANOS,

10:50AM  13   TO RETAIN THERANOS FOR THE PURPOSES OF PERFORMING THIS STUDY;

10:50AM  14   IS THAT CORRECT?

10:50AM  15   A.    YES, AS I UNDERSTOOD IT.  AS I REMEMBER IT.

10:50AM  16   Q.    I'M SORRY TO STEP OVER YOUR WORDS, SIR.  I'LL TRY NOT TO

10:50AM  17   DO IT.

10:50AM  18   A.    THAT'S FINE.

10:50AM  19   Q.    AND THE PURPOSE FOR THE PFIZER'S PERSPECTIVE WAS TO

10:50AM  20   DETERMINE WHETHER THERANOS TECHNOLOGY MIGHT BE USEFUL TO PFIZER

10:50AM  21   GOING FORWARD IN SOME OF ITS CLINICAL STUDY WORK; CORRECT?

10:50AM  22   A.    YES, AS I UNDERSTAND IT, YES.

10:50AM  23   Q.    AND TO THE EXTENT THAT SOMETHING WAS DISCOVERED DURING THE

10:50AM  24   COURSE OF THAT WORK AND PFIZER DEEMED THERANOS HAVING A

10:50AM  25   TECHNOLOGY THAT WAS USEFUL TO PFIZER, PFIZER MAY HAVE ENGAGED

10:50AM  1      IN FURTHER WORK WITH THERANOS; IS THAT FAIR?

10:50AM  2      A.   IN TERMS OF SOMETHING BEING DISCOVERED AS USEFUL, I'M NOT

10:51AM  3      SURE.

10:51AM  4           I DON'T REMEMBER ANYTHING ABOUT THE INTELLECTUAL PROPERTY

10:51AM  5      RIGHTS ARRANGEMENTS THAT WOULD HAVE BEEN SET UP.

10:51AM  6      Q.   OKAY.  THE POINT OF THE WORK WITH THERANOS, FROM PFIZER'S

10:51AM  7      PERSPECTIVE, WAS TO DETERMINE WHETHER THERANOS TECHNOLOGY MIGHT

10:51AM  8      BE USEFUL TO PFIZER GOING FORWARD; CORRECT?

10:51AM  9      A.   YES, AS I UNDERSTAND THE STUDY DESIGN FROM MY MEMORY.

10:51AM 10      Q.   AND IS THAT A, IS THAT A KIND OF CORPORATE RELATIONSHIP,

10:51AM 11      BUSINESS RELATIONSHIP THAT PFIZER WOULD HAVE ENGAGED WITH AT

10:51AM 12      THAT TIME ON A REGULAR BASIS, MEANING PFIZER, A LARGE

10:51AM 13      INTERNATIONAL PHARMACEUTICAL COMPANY, I THINK YOU MENTIONED

10:51AM 14      IT'S NOT UNCOMMON FOR SMALLER DIAGNOSTIC COMPANIES WHO ARE

10:51AM 15      DEVELOPING NEW TECHNOLOGY TO ENGAGE WITH COMPANIES LIKE PFIZER

10:52AM 16      TO TRY AND GENERATE BUSINESS AND TRY TO FIND OUT IF THEY CAN

10:52AM 17      WORK TOGETHER?

10:52AM 18      A.   YES, I THINK THAT WOULD BE A FAIR SUMMARY.

10:52AM 19      Q.   AND I THINK YOU DESCRIBED HAVING SOME SYMPATHY FOR THESE

10:52AM 20      SMALLER PLAYERS IN THEIR WORK WITH A LARGE COMPANY, YOU KNOW,

10:52AM 21      ONE, TO GET THE WORK, AND TWO, TO GET PAID; RIGHT?

10:52AM 22      A.   AND TO KEEP THE CONTACTS GOING.  YOU KNOW, I WAS, YOU

10:52AM 23      KNOW, THE FIRST EMPLOYEE OF A SMALL COMPANY AT ONE TIME, A

10:52AM 24      STARTUP.

10:52AM 25      Q.   FAIR ENOUGH.

10:52AM  1    AND SO YOU LEARNED ABOUT THIS RELATIONSHIP WITH THERANOS

10:52AM  2   FROM MR. LIPSET; IS THAT RIGHT?

10:52AM  3   A.   YES.

10:52AM  4   Q.   OKAY.  AND I GUESS MR. LIPSET'S REQUEST WAS THAT YOU

10:52AM  5   REVIEW SOME OF MATERIALS, ENGAGE IN DISCUSSION WITH THERANOS TO

10:52AM  6   COME TO SOME SORT OF A DETERMINATION AS TO WHETHER THERE WAS A

10:52AM  7   BUSINESS USE FOR PFIZER TO CONTINUE THIS RELATIONSHIP WITH

10:52AM  8   THERANOS; CORRECT?

10:52AM  9   A.   YES, AS I UNDERSTAND IT, YES.

10:52AM  10   Q.   OKAY.  AND THEN I THINK YOU DESCRIBED THAT JUST A COUPLE

10:53AM  11   OF MINUTES AGO, THIS KIND OF REORGANIZATION AT PFIZER INCLUDED

10:53AM  12   SOME BUDGETARY CONSTRAINTS AS WELL; CORRECT?

10:53AM  13   A.   YES.  IT WAS JUST THE BEGINNING.

10:53AM  14   Q.   UNDERSTOOD.  AND BUDGETARY CONSTRAINTS IN A LARGE

10:53AM  15   CORPORATION CAN INFLUENCE BUSINESS DECISIONS, WHETHER TO ENGAGE

10:53AM  16   WITH COUNTER-PARTIES BECAUSE, YOU KNOW, MONEY MAY NOT BE AS

10:53AM  17   AVAILABLE AS IT WAS AT OTHER TIMES; CORRECT?

10:53AM  18   A.   CORRECT.

10:53AM  19   Q.   AND THIS TIME PERIOD THAT WE'LL RECALL, 2008 LEADING INTO

10:53AM  20   2009, THIS WAS KIND OF A ROCKY TIME IN CORPORATE AMERICA.

10:53AM  21    DO YOU RECALL THAT?

10:53AM  22   A.   I DO.

10:53AM  23   Q.   AND THIS IS --

10:53AM  24   A.   THE CONTAINED DEPRESSION.

10:53AM  25   Q.   YES.  AND LIKE MANY IN CORPORATE AMERICA, PFIZER WAS

10:53AM   1        FEELING A LITTLE PRESSURE AS A RESULT OF THE FINANCIAL CRISIS

10:53AM   2        AS WELL; CORRECT?

10:53AM   3        A.   CORRECT.

10:53AM   4        Q.   AND BECAUSE OF THAT, THESE BUDGETARY ISSUES WERE IMPORTANT

10:54AM   5        TO PFIZER; CORRECT?

10:54AM   6                    MR. LEACH:  OBJECTION.  SPECULATION.

10:54AM   7                    THE COURT:  WITHIN YOUR PERSONAL KNOWLEDGE, YOU CAN

10:54AM   8        ANSWER THAT QUESTION, SIR.

10:54AM   9                    THE WITNESS:  IN TERMS OF A TECHNOLOGY ASSESSMENT

10:54AM  10        LIKE THIS, I WAS NOT PRIVY TO ANY FINANCIAL DOCUMENTATION OF

10:54AM  11        WHAT WAS BEING PAID AND SO FORTH.

10:54AM  12              SO ACTUALLY FOR MY ASSESSMENT, FINANCES, MONEY WAS NOT A

10:54AM  13        RELEVANT INPUT.

10:54AM  14              IT WAS WHETHER THE TECHNOLOGY WORKED AND WHETHER THE

10:54AM  15        TECHNOLOGY COULD BE UTILIZED, CONVERTED TO AN APPROVED

10:54AM  16        DIAGNOSTIC, AND THEN COULD IT ACTUALLY PLAY A ROLE IN ANY

10:54AM  17        CLINICAL TRIAL THAT WE NEEDED THAT KIND OF HELP.

10:54AM  18              SO THE MONETARY ISSUE IS MOOT FOR ME.

10:54AM  19        BY MR. CAZARES:

10:54AM  20        Q.   FAIR ENOUGH.

10:54AM  21              BUT AT THAT TIME I THINK YOU'VE DESCRIBED PFIZER'S NEED

10:55AM  22        WAS RELATING TO MOLECULAR NUCLEIC TESTING?  IS THAT --

10:55AM  23        A.   YES.

10:55AM  24        Q.   AND THAT'S A PARTICULAR CATEGORY OF TESTING; CORRECT?

10:55AM  25        A.   YES.

10:55AM 1    Q.   NUCLEIC ACID AMPLIFICATION, IS THAT THE CORRECT

10:55AM 2    DESCRIPTION?

10:55AM 3    A.   THERE'S A MULTITUDE OF PLATFORM TECHNOLOGIES, POLYMERASE

10:55AM 4    CHAIN REACTION, SMALL NUCLEOTIDE POLYMORPHISM -- SO POLYMERASE

10:55AM 5    CHAIN REACTION, ALSO KNOWN AS PCR, AND THEN SMALL NUCLEOTIDE

10:55AM 6    POLYMORPHISMS, ALSO KNOWN AS SNP'S, SO THESE ARE SEVERAL

10:55AM 7    DIFFERENT WAYS TO MEASURE GENETIC VARIATION AND THEN DETERMINE

10:55AM 8    IF IT'S CORRELATED WITH A CLINICAL OUTCOME.

10:55AM 9    Q.   AND SO THAT'S REALLY THE SCIENCE WITH RESPECT TO THIS KIND

10:55AM 10   OF TESTING THAT PFIZER WAS INTERESTED IN AT THE TIME?

10:55AM 11   A.   YES.

10:55AM 12   Q.   OKAY.  AND AS YOU MENTIONED ALREADY, THAT WASN'T THE TYPE

10:56AM 13   OF TESTING THAT THE THERANOS DEVICE WAS PERFORMING AT THE TIME;

10:56AM 14   CORRECT?

10:56AM 15   A.   YES.  AS I MENTIONED, AT THE TIME THAT WAS NOT THE -- IT'S

10:56AM 16   AN IMMUNOASSAY AT HOME PLATFORM, BUT THAT'S WHY I HAD ASKED THE

10:56AM 17   BROADER QUESTION OF, WHERE ARE YOU GOING?

10:56AM 18   Q.   BECAUSE THAT WAS ALWAYS OF INTEREST IF ULTIMATELY THE

10:56AM 19   TECHNOLOGY WAS CAPABLE OF PERFORMING THIS NUCLEIC ACID

10:56AM 20   AMPLIFICATION TESTING; CORRECT?

10:56AM 21   A.   BROADLY SO, YES.

10:56AM 22   Q.   AND THERANOS WERE ABLE TO ACHIEVE THAT, THERE MAY HAVE

10:56AM 23   BEEN A REASON FOR PFIZER TO BE INTERESTED IN THERANOS?

10:56AM 24   A.   IT WOULD HAVE AT LEAST STARTED THE CONVERSATION OF, DO YOU

10:56AM 25   HAVE A TECHNOLOGY THAT WORKS?  IS IT ACCURATE?  IS IT PRECISE?

10:56AM  1        AND MANY OF THESE TECHNOLOGIES HAVE SIGNIFICANT

10:56AM  2    INTELLECTUAL PROPERTY LANDSCAPES AROUND THEM, AND SO THERANOS

10:56AM  3    WOULD ACTUALLY HAVE HAD TO ACCESS ALL OF THAT AS WELL.

10:56AM  4    Q.   NOW, IN THE COURSE OF DOING THIS EVALUATION, YOU'VE

10:57AM  5    DESCRIBED USING SOME MATERIALS, AND I THINK ONE WAS THE

10:57AM  6    ANGIOGENESIS REPORT OR REPORTS; CORRECT?

10:57AM  7    A.   YES.

10:57AM  8    Q.   AND THE OTHER WAS -- WAS IT KIND OF LIKE A PRESENTATION OR

10:57AM  9    A POWERPOINT TYPE OF DECK?

10:57AM 10    A.   AS I REMEMBER IT, THERE WAS THIS LARGE, ONGOING VOLUMINOUS

10:57AM 11    REPORT AND SLIDE DECK.

10:57AM 12    Q.   OKAY.

10:57AM 13    A.   MAYBE 100 PAGES.

10:57AM 14    Q.   AND THAT WAS PROVIDED BY PERSONS AT THERANOS AT THE TIME?

10:57AM 15    A.   YES, AFTER CRAIG HAD INTRODUCED ME TO THEM.

10:57AM 16    Q.   OKAY.  AND THE PERSONS YOU WERE INTRODUCED -- OH, GO

10:57AM 17    AHEAD.

10:57AM 18    A.   YEAH, THAT WAS THE REPORT THAT WAS SENT TO ME INITIALLY BY

10:57AM 19    CRAIG AS I REMEMBER IT.

10:57AM 20    Q.   SO YOU LOOKED AT THE ANGIOGENESIS REPORT, THIS

10:57AM 21    PRESENTATION DECK I'LL CALL IT.

10:57AM 22        ANY OTHER DOCUMENTATION?

10:57AM 23    A.   IRB, WHICH IS THE INSTITUTIONAL REVIEW BOARD DOCUMENT THAT

10:58AM 24    ALLOWS AN INSTITUTE, ALLOWS AN ENTITY TO TAKE PATIENTS INTO A

10:58AM 25    STUDY.

10:58AM   1          AND THEN THERE WAS THE CLINICAL STUDY PROTOCOL AT THE TIME

10:58AM   2    THAT HAD BEEN WRITTEN BEFORE I ARRIVED.

10:58AM   3    Q.   AND YOU ALSO SPOKE TO MR. FRENZEL?

10:58AM   4    A.   I DID, YES.

10:58AM   5    Q.   AND THEN YOU HAD THIS CONFERENCE CALL, I THINK YOU

10:58AM   6    DESCRIBED IT AS BEING ALMOST AN HOUR --

10:58AM   7    A.   YES.

10:58AM   8    Q.   -- WITH PERSONS AT THERANOS, AS WELL AS MS. HOLMES?

10:58AM   9    A.   YES.

10:58AM  10    Q.   OKAY.  BUT YOU AGREE, I THINK YOU'VE CONCEDED, YOU'VE

10:58AM  11    NEVER SPOKEN TO MR. BALWANI; CORRECT?

10:58AM  12    A.   AS FAR AS I KNOW, NO, I HAVE NOT SPOKEN WITH MR. BALWANI.

10:58AM  13    Q.   NOW, IN ALL OF THE WORK THAT THERANOS PERFORMED WITH

10:58AM  14    PFIZER, THIS STUDY, THE ANGIOGENESIS STUDY I'LL CALL IT, AGAIN,

10:59AM  15    THAT WAS PERFORMED BEFORE YOU JOINED PFIZER; CORRECT?

10:59AM  16    A.   YES.

10:59AM  17    Q.   AND IT INVOLVED OTHERS AT PFIZER, NOT YOURSELF?

10:59AM  18    A.   YES.

10:59AM  19    Q.   OKAY.  AND AS YOU MENTIONED, YOU CONFIRMED IN YOUR

10:59AM  20    CONVERSATION WITH MS. HOLMES WHEN YOU WERE LETTING HER KNOW

10:59AM  21    THAT PFIZER HAD NO FURTHER KIND OF BUSINESS NEED TO WORK WITH

10:59AM  22    THERANOS, THAT YOU CONFIRMED THAT THERANOS WAS PAID FOR ITS

10:59AM  23    PRIOR WORK; CORRECT?

10:59AM  24    A.   YES, I CONFIRMED THAT, AS I REMEMBER IT, TO HER, AND THEN

10:59AM  25    ALSO TO AIDAN POWER AND HIS TEAM.

10:59AM  1    Q.   BECAUSE LIKE YOU SAID, YOU WERE SYMPATHETIC TO SMALL

10:59AM  2    COMPANIES.  YOU WANTED TO MAKE SURE THAT THEY GOT PAID FOR THE

10:59AM  3    WORK THAT THEY DID, AT LEAST UP UNTIL THAT TIME?

10:59AM  4    A.   YES.

10:59AM  5    Q.   OKAY.  AND ULTIMATELY YOU LEARNED THAT THE AMOUNT OF MONEY

11:00AM  6    THAT PFIZER PAID TO THERANOS WAS $900,000; CORRECT?

11:00AM  7    A.   I LEARNED THAT LATER FROM THE INTERACTION WITH THE FEDERAL

11:00AM  8    GOVERNMENT HERE.

11:00AM  9    Q.   BUT AT SOME POINT IN TIME YOU DID CONFIRM THAT?

11:00AM  10   A.   I DIDN'T CONFIRM THE DOLLAR AMOUNT, BUT I CONFIRMED THAT

11:00AM  11   IT HAD BEEN PAID.

11:00AM  12        AIDAN POWER AND THE MOLECULAR MEDICINE GROUP, BECAUSE IT'S

11:00AM  13   SUCH A LARGE ORGANIZATION, 140 PEOPLE, WE HAVE AN EXTENSIVE

11:00AM  14   MULTIMILLION DOLLAR BUDGET.  WE HAD AN IN-HOUSE, OR

11:00AM  15   IN-DEPARTMENT PROJECT MANAGER WHO KEPT TRACK OF ALL OF OUR

11:00AM  16   FUNDING AND STUDIES SO THAT WE DIDN'T GET CROSS BILLED BY OTHER

11:00AM  17   PARTS OF THE COMPANY ACCIDENTALLY, WHICH CAN HAPPEN.

11:00AM  18        I DON'T REMEMBER HER NAME, BUT SHE CONFIRMED, YEP, IT'S

11:00AM  19   ALL TAKEN CARE OF, IT'S NOT ON OUR BUDGET, IT CAME FROM THAT

11:01AM  20   POOL OF MONEY.

11:01AM  21        BUT I NEVER KNEW THE DOLLAR AMOUNT INVOLVED.

11:01AM  22   Q.   VERY GOOD.

11:01AM  23        NOW, YOUR ULTIMATE CONCLUSION, THOUGH, WAS THAT AT THE

11:01AM  24   TIME WHEN YOU WROTE THE REPORT, YOU DIDN'T BELIEVE THAT THERE

11:01AM  25   WAS ANY FURTHER KIND OF REASON FOR PFIZER TO ENGAGE WITH

11:01AM  1    THERANOS BASED ON THE CURRENT, THEN-CURRENT STATUS OF ITS

11:01AM  2    TECHNOLOGY; CORRECT?

11:01AM  3    A.   I DID BASED ON MY DIAGNOSTIC EXPERTISE.

11:01AM  4        BUT I ALSO SPOKE WITH MY PEERS IN MOLECULAR MEDICINE, THE

11:01AM  5    SO-CALLED TAMMLS WHO ARE OUR MOLECULAR MEDICINE PEOPLE WHO SIT

11:01AM  6    ON EACH OF THE CLINICAL TEAMS WORLDWIDE FOR EVERY DISEASE AREA

11:01AM  7    AND WHO ARE INJECTING TECHNOLOGY INTO THE CLINICAL TRIALS AND

11:01AM  8    WOULD BE AWARE OF WHAT THE CLINICAL TRIAL NEEDS WERE, NOT ONLY

11:01AM  9    EXISTING, BUT GOING FORWARD, AND THERE WAS NO INTEREST IN THE

11:01AM  10   ONCOLOGY TAMMLS FOR THIS TYPE OF APPROACH.

11:02AM  11   Q.   FOR IMMUNOASSAYS?

11:02AM  12   A.   FOR IMMUNOASSAYS.

11:02AM  13   Q.   BUT AS YOU MENTIONED THIS MORNING, IN YOUR DISCUSSION WITH

11:02AM  14   MS. HOLMES, YOU LEFT OPEN THE POSSIBILITY OF MAINTAINING

11:02AM  15   COMMUNICATIONS IN THE EVENT THAT THERANOS FURTHER DEVELOPED ITS

11:02AM  16   TECHNOLOGY TO A POINT WHERE IT MIGHT BE USEFUL TO PFIZER;

11:02AM  17   CORRECT?

11:02AM  18   A.   YES.  I LEFT OPEN THAT DOOR, BUT IT WAS A TWO-WAY DOOR.

11:02AM  19       MS. ELIZABETH HOLMES COULD REACH OUT TO ME AT SIX MONTH

11:02AM  20   INTERVALS, OR IF THINGS CHANGED I COULD REACH OUT TO HER AT SIX

11:02AM  21   MONTH INTERVALS.

11:02AM  22   Q.   NOW, THE SUMMARY THAT YOU WROTE AT EXHIBIT 167 THAT WAS

11:02AM  23   DISCUSSED THIS MORNING -- WE DON'T NEED TO PUT IT UP ON THE

11:02AM  24   SCREEN -- THAT WAS SOMETHING PUT TOGETHER BY YOURSELF; CORRECT?

11:02AM  25   A.   YES.

11:02AM  1    Q.   OKAY.  BASED ON THE INPUTS THAT WE HAVE ALREADY DESCRIBED,

11:03AM  2    YOUR REVIEW OF THE REPORT, THIS PRESENTATION DECK,

11:03AM  3    CONVERSATIONS WITH THERANOS PERSONNEL, AND THEN YOUR OWN KIND

11:03AM  4    OF REVIEW AND ANALYSIS?

11:03AM  5    A.   AND MY, YOU KNOW, OBTAINING PUBLIC INFORMATION, YOU KNOW,

11:03AM  6    NOT ONLY ON THE INTERNET, BUT ISSUED PATENTS OR PATENT

11:03AM  7    APPLICATIONS BY THERANOS.

11:03AM  8    Q.   AND THERE WERE PUBLICLY PUBLISHED PATENTS THAT THERANOS

11:03AM  9    HAD AT THE TIME; CORRECT?

11:03AM  10   A.   THERE WAS ONE AT THE TIME, AND I DOCUMENTED THAT IN MY

11:03AM  11   REPORT.

11:03AM  12   Q.   OKAY.  NOW, AND YOU TESTIFIED THAT THE REPORT WAS SHARED

11:03AM  13   WITH MR. SAKUL, MR. LIPSET, AND MR. POWER; CORRECT?

11:03AM  14   A.   YES.

11:03AM  15   Q.   AND THE REPORT, THE SUMMARY WHERE YOU ESSENTIALLY STATE

11:03AM  16   OUT YOUR OPINIONS REGARDING THERANOS AND ITS USEFULNESS TO

11:03AM  17   PFIZER, WAS NOT SHARED WITH MS. HOLMES?

11:03AM  18   A.   NO, IT WAS NOT SHARED WITH MS. HOLMES.

11:03AM  19   Q.   IT WAS NOT SHARED WITH ANYONE ELSE AT THERANOS; CORRECT?

11:03AM  20   A.   NO, IT WAS NOT.

11:04AM  21   Q.   AND IT WAS NOT SHARED WITH MR. BALWANI; CORRECT?

11:04AM  22   A.   NO, IT WAS NOT.

11:04AM  23        WELL, I HAD NEVER KNOWN MR. BALWANI AS FAR AS I'M AWARE

11:04AM  24   OF, AND FOR MY INTERACTIONS I DON'T REMEMBER SEEING HIS NAME.

11:04AM  25        SO AS FAR AS I KNOW IT WAS NOT SHARED WITH HIM.  I

WEBER CROSS BY MR. CAZARES

11:04AM 1 CERTAINLY DIDN'T.

11:04AM 2 Q.   FAIR ENOUGH.

11:04AM 3 AND IN THAT PHONE CALL THAT YOU HAD WITH MS. HOLMES THAT

11:04AM 4 IS REPORTED BY YOURSELF TO YOUR COLLEAGUES, IN THAT PHONE CALL,

11:04AM 5 YOU DIDN'T READ OR SUMMARIZE THE REPORT THAT YOU WROTE FOR YOUR

11:04AM 6 SUPERVISORS TO MS. HOLMES; CORRECT?

11:04AM 7 A.   NO, I DID NOT, BECAUSE THE REPORT ACTUALLY DIDN'T EXIST

11:04AM 8 YET.

11:04AM 9 Q.   SO IS IT CORRECT THEN THAT YOU ADVISED MS. HOLMES THAT

11:04AM 10 PFIZER HAD NO KIND OF CURRENT NEED OR USE FOR THERANOS

11:04AM 11 TECHNOLOGY PRIOR TO YOUR DRAFTING UP THE REPORT; CORRECT?

11:05AM 12 A.   PRIOR TO DRAFTING THE REPORT, I DID NOT COMMUNICATE ANY

11:05AM 13 LACK OF INTEREST BY PFIZER TO MS. ELIZABETH HOLMES BECAUSE I

11:05AM 14 WOULD NOT HAVE MADE THAT CONCLUSION UNTIL I GATHERED ALL OF THE

11:05AM 15 INFORMATION, INCLUDING THE ONE HOUR INTERACTION WITH HER.

11:05AM 16 YOU KNOW, UNTIL I HAVE ALL OF MY INTAKE, I HAVE A VERY

11:05AM 17 OPEN MIND ON THESE MATTERS.

11:05AM 18 Q.   I GUESS I MISUNDERSTOOD YOUR TESTIMONY.

11:05AM 19 SO YOU COMPLETED YOUR REPORT FIRST, AND THEN YOU SPOKE TO

11:05AM 20 MS. HOLMES ON THE PHONE; CORRECT?

11:05AM 21 A.   NO.  I SPOKE TO MS. HOLMES FIRST IN THAT HOUR, AND THEN

11:05AM 22 AFTER I RECEIVED -- I SPOKE WITH HER IN THAT ONE HOUR; THEN

11:05AM 23 LATER I RECEIVED, AS I REMEMBER IT THEN, THE ANSWERS TO THE

11:05AM 24 WRITTEN QUESTIONS THAT I HAD SENT DURING THE ONE HOUR THAT I

11:05AM 25 PROBED FOR THE ANSWERS FOR THE SIX QUESTIONS THAT I LISTED IN

WEBER CROSS BY MR. CAZARES

11:05AM 1     MY REPORT.

11:05AM 2         AND THEN AFTER REVIEWING ALL INFORMATION THAT I HAD

11:06AM 3     GATHERED OVER A PERIOD OF A COUPLE OF WEEKS AFTER THAT ONE

11:06AM 4     HOUR, THEN TOWARDS THE END OF DECEMBER THEN I WOULD HAVE

11:06AM 5     DRAFTED THAT REPORT ONCE I HAD ALL INPUT.

11:06AM 6     Q.   AND THEN LATER -- I GUESS I'M NOT STATING MY QUESTION VERY

11:06AM 7     CLEARLY.

11:06AM 8         THEN IN JANUARY OF 2009 YOU HAD THIS ULTIMATE CONVERSATION

11:06AM 9     WITH MS. HOLMES WHERE YOU ADVISED HER THAT PFIZER HAD NO NEED

11:06AM 10    FOR THERANOS'S TECHNOLOGY AT THAT TIME; CORRECT?

11:06AM 11    A.   YES, AS I UNDERSTOOD -- YES.

11:06AM 12    Q.   AND IN THAT CONVERSATION, THAT LAST CONVERSATION WITH

11:06AM 13    MS. HOLMES --

11:06AM 14    A.   UH-HUH.

11:06AM 15    Q.   -- YOU DID NOT READ OR RECITE THE CONCLUSIONS FROM YOUR

11:06AM 16    REPORT TO MS. HOLMES; CORRECT?

11:06AM 17    A.   NO, I DID NOT.

11:06AM 18    Q.   NOW, ONE OF YOUR -- I GUESS YOUR ULTIMATE CONCLUSION, I

11:06AM 19    GUESS AT THE TIME YOU DIDN'T BELIEVE THAT PFIZER HAD ANY NEED

11:06AM 20    FOR THERANOS'S TECHNOLOGY AS OF THAT MOMENT IN LATE 2008, EARLY

11:07AM 21    2009.

11:07AM 22        WERE YOU AWARE OF SUBSEQUENT CONTACTS, COMMUNICATIONS BY

11:07AM 23    YOUR SUPERVISORS, MR. SAKUL, MR. LIPSET, WITH MS. HOLMES AND

11:07AM 24    THERANOS SUBSEQUENT TO YOUR RECOMMENDATION?

11:07AM 25    A.   SUBSEQUENT?  NO, I'M NOT AWARE OF ANY CONTACTS.

11:07AM   1    Q.   WOULD YOU HAVE EXPECTED TO BE NOTIFIED OF ANY CONTACTS?

11:07AM   2    A.   OFTEN, BUT NOT ALWAYS.

11:07AM   3         IN AN ASSESSMENT LIKE THIS, OFTEN I WOULD BE INFORMED.

11:07AM   4         BUT IF THERE'S ALSO, YOU KNOW, A NEED TO KNOW BASIS OF

11:07AM   5    DOING BUSINESS INTERACTIONS, AT TIMES I MIGHT HAVE BEEN

11:07AM   6    BLINDED.  BUT I WAS NOT SURPRISED THAT I WAS NOT CONTACTED

11:07AM   7    FURTHER.

11:07AM   8         THIS WAS MY FINAL SUMMARY RECOMMENDATION THAT BECAME THE

11:07AM   9    PFIZER POSITION AT THAT POINT, AND --

11:08AM  10    Q.   FAIR ENOUGH.

11:08AM  11         YOUR HONOR, MAY I HAVE A MOMENT TO GET SOME BINDERS?

11:08AM  12              THE COURT:  YES.

11:08AM  13              MR. CAZARES:  (HANDING.)

11:08AM  14    Q.   MR. WEBER, I'VE JUST HANDED YOU A BINDER WITH SOME

11:08AM  15    DOCUMENTS IN THERE.

11:08AM  16         I WOULD ASK YOU TO TURN TO THE TAB THAT IS MARKED 10561.

11:08AM  17    A.   10561?

11:08AM  18    Q.   YES.

11:08AM  19    A.   OKAY.  YES, I SEE 10561.

11:09AM  20    Q.   AND 10561 APPEARS TO BE AN EMAIL CHAIN, THE LATTER OF

11:09AM  21    WHICH LOOKS LIKE IT'S FEBRUARY 21, 2009.

11:09AM  22         DO YOU SEE THAT?

11:09AM  23    A.   YES.

11:09AM  24    Q.   NOW, THAT ONE DOESN'T INVOLVE YOURSELF, BUT BELOW THAT

11:09AM  25    THERE'S AN EXCHANGE OF EMAILS BETWEEN YOURSELF AND MR. FRENZEL.

11:09AM  1          DO YOU SEE THAT?

11:09AM  2     A.   I DO.

11:09AM  3     Q.   AND IT RELATES TO MR. FRENZEL REACHING OUT TO YOU ABOUT I

11:09AM  4     GUESS AN OPPORTUNITY FROM THERANOS'S PERSPECTIVE.

11:09AM  5          DO YOU SEE THAT?

11:09AM  6     A.   YES, I DO.

11:09AM  7              MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT

11:09AM  8     EXHIBIT 10561.

11:09AM  9              MR. LEACH:  NO OBJECTION, YOUR HONOR.

11:09AM 10              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:09AM 11          (DEFENDANT'S EXHIBIT 10561 WAS RECEIVED IN EVIDENCE.)

11:09AM 12     BY MR. CAZARES:

11:09AM 13     Q.   AND IF YOU FOCUS ON THE LOWER PORTION OF THE MESSAGE, AT

11:09AM 14     LEAST AT THIS TIME YOU'LL SEE THE MESSAGE FROM MR. FRENZEL TO

11:10AM 15     YOURSELF DATED FEBRUARY 20TH.

11:10AM 16          DO YOU SEE THAT?

11:10AM 17     A.   I DO.

11:10AM 18     Q.   AND THE SUBJECT SAYS FERTILITY ASSAYS.

11:10AM 19          DO YOU SEE THAT?

11:10AM 20     A.   I DO.

11:10AM 21     Q.   AND IN THE MESSAGE MR. FRENZEL WRITES, "HELLO SHANE,

11:10AM 22          "WE ARE IN THE PROCESS OF RELEASING OUR FERTILITY PANELS

11:10AM 23     AND RECALLED OUR DISCUSSION ON PRE-ECLAMPSIA.  ARE YOU STILL

11:10AM 24     INTERESTED IN PURSUING THIS?  IF YOU HAVE ANY FURTHER THOUGHTS

11:10AM 25     AND WOULD LIKE TO DISCUSS, PLEASE LET ME KNOW.  THANKS, GARY."

11:10AM   1          DO YOU SEE THAT?

11:10AM   2     A.   I DO.

11:10AM   3     Q.   AND -- I APOLOGIZE.  LET ME SLOW DOWN.

11:10AM   4          MR. FRENZEL IS REACHING OUT TO YOU TO INQUIRE ABOUT

11:10AM   5     WHETHER OR NOT THERE'S ANY INTEREST IN PFIZER; CORRECT?

11:10AM   6     A.   I.

11:10AM   7     Q.   AND THEN YOU RESPOND "HI GARY,

11:10AM   8          "THANKS FOR CONTACTING ME.

11:10AM   9          "PFIZER HAS NO INTEREST IN PREECLAMPSIA.

11:10AM  10          "BEST OF LUCK, YOU ARE ON TO SOMETHING GOOD."

11:11AM  11          DO YOU SEE THAT?

11:11AM  12     A.   YES.

11:11AM  13     Q.   AND YOU WERE SINCERE IN THAT?

11:11AM  14     A.   I DO.  I WAS.

11:11AM  15     Q.   AND I'M NOT QUESTIONING THAT.  I'M JUST CONFIRMING.

11:11AM  16          THE, I GUESS, VISION FOR THERANOS'S TECHNOLOGY, A SMALL

11:11AM  17     DEVICE, THE IN VITRO DEVICE THAT COULD TEST BLOOD SAMPLES IN A

11:11AM  18     REMOTE LOCATION, WHETHER IT'S A HOME, WHETHER IT'S A DOCTOR'S

11:11AM  19     OFFICE, A PHYSICIAN'S OFFICE, A CLINIC, MAYBE EVEN A, YOU KNOW,

11:11AM  20     A PHARMACY, THAT COULD HAVE SOME USE IN KIND OF CLINICAL

11:11AM  21     STUDIES IF THE TECHNOLOGY ACTUALLY WORKED; CORRECT?

11:11AM  22     A.   IT COULD.

11:11AM  23     Q.   OKAY.  AND TECHNOLOGY LIKE THAT THAT COULD BE USED

11:11AM  24     REMOTELY COULD HAVE SOME ADVANTAGES IN CLINICAL STUDIES AND

11:11AM  25     RECRUITING PATIENTS FOR CLINICAL STUDIES TO MAKE THE PROCESS

WEBER CROSS BY MR. CAZARES

11:11AM 1    KIND OF EASIER FOR THEM?

11:11AM 2    A.   FOR THIS PARTICULAR DISEASE OF PREECLAMPSIA.

11:11AM 3        I AM A WORLDWIDE EXPERT IN DIAGNOSTICS FOR PREECLAMPSIA,

11:12AM 4    AND HERE I'M SIGNALLING THAT THEY HAD AN OPPORTUNITY, BUT NOT

11:12AM 5    WITH PFIZER.

11:12AM 6        WHEN I WAS WITH ORTHO CLINICAL DIAGNOSTICS, I WAS INVOLVED

11:12AM 7    IN THE IDENTIFICATION OF THE KEY BREAKING BIOMARKER ANALYTES

11:12AM 8    FOR PREECLAMPSIA, WHICH ARE PLGF, VEGF AND SFLIP1 AND WAS

11:12AM 9    INVOLVED IN THE LICENSING AND THE TECHNOLOGY ASSESSMENT FOR

11:12AM 10   THAT, AND AT THIS TIME I WAS UNDER A CONFIDENTIALITY WITH

11:12AM 11   JOHNSON & JOHNSON, SO I COULD NOT SPEAK FURTHER ON POINTING

11:12AM 12   THEM TO WHERE THE WATER WAS.

11:12AM 13       BUT THIS HAD NO INTEREST AND NO CLINICAL UTILITY FOR

11:12AM 14   PFIZER, BUT THERE COULD HAVE BEEN AN OPPORTUNITY, BUT I WAS NOT

11:12AM 15   ALLOWED -- MY HANDS WERE BOUND.  I COULD NOT TELL THEM WHO TO

11:13AM 16   TALK TO.

11:13AM 17       BUT IF THEY WERE WORKING IN FERTILITY, THEY KNEW WHO THEY

11:13AM 18   SHOULD BE TALKING TO.

11:13AM 19   Q.   UNDERSTOOD.

11:13AM 20       SO YOU WERE AWARE OF WHERE THE UTILITY MIGHT RESIDE, BUT

11:13AM 21   IT WASN'T WITH PFIZER?

11:13AM 22   A.   YES.

11:13AM 23   Q.   AND AGAIN, MR. FRENZEL WASN'T PROVIDED WITH A COPY OF THE

11:13AM 24   REPORT THAT YOU SHARED WITH YOUR COLLEAGUES WITHIN PFIZER WHERE

11:13AM 25   YOU REACHED YOUR CONCLUSIONS ABOUT THE IMMUNOASSAY DEVICE THAT

11:13AM   1    PFIZER WAS INTRODUCED TO BACK IN 2006 AND 2007; CORRECT?

11:13AM   2    A.   NO, I DID NOT COMMUNICATE MY DUE DILIGENCE REPORT TO GARY.

11:13AM   3    Q.   WITHIN THAT BINDER, IF YOU COULD TAKE A LOOK AT 15041?

11:14AM   4    A.   OKAY.  15041.  YES, I SEE THIS.

11:14AM   5    Q.   MAYBE YOU COULD TAKE A LOOK AT THE MESSAGES FOR A MOMENT

11:14AM   6    TO FAMILIARIZE YOURSELF WITH THE CHAIN.

11:14AM   7    A.   OKAY.  I'VE SCANNED THIS.

11:14AM   8    Q.   AND OBVIOUSLY YOU'RE FAMILIAR WITH MR. LIPSET, AND YOU'VE

11:14AM   9    ALREADY DESCRIBED HIM?

11:14AM  10    A.   YES.

11:14AM  11    Q.   HE WAS BY HIS NEW YORK OFFICE; CORRECT?

11:14AM  12    A.   YES.

11:14AM  13    Q.   AND ROOP UNNIKRISHNAN, DID I SAY THAT RIGHT?  DO YOU KNOW

11:14AM  14    WHO THAT IS?

11:14AM  15    A.   NO, I DON'T.  I'M NOT ON THESE EMAILS, SO I'M NOT AWARE OF

11:14AM  16    ANY OF THIS.

11:14AM  17    Q.   OKAY.  WERE YOU AWARE OF THE FACT, JUST TO CONFIRM, IN

11:15AM  18    AUGUST OF 2009, MR. LIPSET PUTTING PERSONS WITHIN PFIZER IN

11:15AM  19    CONNECTION WITH SETH MICHELSON AT THERANOS RELATING TO SOME

11:15AM  20    STUDY WORK?

11:15AM  21    A.   NO, I WAS NOT AWARE OF THIS.

11:15AM  22    Q.   NOW, MR. LIPSET, JUST TO CONFIRM, IS A PARALLEL OF

11:15AM  23    MR. SAKUL?

11:15AM  24    A.   YES.

11:15AM  25    Q.   SO THEY'RE LIKE ON THE SAME CORPORATE LEVEL?

11:15AM  1    A.   YES.

11:15AM  2    Q.   OKAY.  AND I DON'T SAY THIS IN ANY WAY TO INSULT YOU, BUT

11:15AM  3    MR. LIPSET WASN'T REQUIRED TO GET YOUR PERMISSION IN ORDER TO

11:15AM  4    REACH OUT TO COUNTER-PARTIES ABOUT POTENTIAL BUSINESS

11:15AM  5    OPPORTUNITIES.

11:15AM  6         WOULD THAT BE FAIR?

11:15AM  7    A.   YES, THAT WOULD BE FAIR.

11:15AM  8    Q.   OKAY.  IF YOU COULD STAY WITHIN THAT SAME BINDER, I

11:16AM  9    APOLOGIZE, TAKE A LOOK AT THE TAB THAT IS MARKED 4018.

11:16AM  10        ACTUALLY, 4018, YOUR HONOR, I BELIEVE IS ALREADY IN

11:16AM  11   EVIDENCE.

11:16AM  12            THE COURT:  IT IS, AND IT MAY BE PUBLISHED.

11:16AM  13            THE WITNESS:  4018.

11:16AM  14   BY MR. CAZARES:

11:16AM  15   Q.   4018.  IT WILL ALSO BE UP ON THE SCREEN.

11:16AM  16   A.   OH, OKAY.

11:16AM  17   Q.   SO YOU SEE 4018 IS A SHORT -- I'LL CALL IT AN OUTLOOK

11:16AM  18   INVITE FOR AN APPOINTMENT DATED OCTOBER 23TH, 2013.

11:17AM  19        DO YOU SEE THAT AT THE TOP?

11:17AM  20   A.   I DO, YES.

11:17AM  21   Q.   AND THE SUBJECT LINE SAYS THERANOS SITE VISIT.

11:17AM  22        DO YOU SEE THAT?

11:17AM  23   A.   YES, I SEE THAT.

11:17AM  24   Q.   AND THEN FOR THE APPOINTMENT THAT IS BEING SCHEDULED, IT'S

11:17AM  25   INDICATED IT AS OCTOBER 28TH, 2013.

11:17AM   1          DO YOU SEE THAT?

11:17AM   2     A.   YES, I DO.

11:17AM   3     Q.   AND THE MESSAGE IS TO, ON THE TO LIST IS MORTEN SOGAARD.

11:17AM   4          DO YOU SEE THAT?

11:17AM   5     A.   I DO.

11:17AM   6     Q.   AND WHO IS MR. SOGAARD?

11:17AM   7     A.   I DON'T REMEMBER AT THIS TIME.  HE WAS SOME NEW VICE

11:17AM   8     PRESIDENT THAT HAD COME INTO NEW YORK CITY' PFIZER OFFICE, BUT

11:17AM   9     I DON'T REMEMBER.  THE NAME IS VAGUELY FAMILIAR.

11:17AM   10    Q.   AND WHAT ABOUT GREGORY NAEVE OR NAEVE?

11:17AM   11    A.   I HAVE NO IDEA WHO THIS IS.

11:18AM   12    Q.   AND CRAIG LIPSET WE'VE SPOKEN ABOUT IN NEW YORK.

11:18AM   13         AND THEN CHRISTIAN HOLMES, HAD YOU EVER SPOKEN TO

11:18AM   14    CHRISTIAN HOLMES?

11:18AM   15    A.   NOT THAT I'M AWARE OF.

11:18AM   16    Q.   AND THEN THERE'S A LEONA GARRIOTT.

11:18AM   17         DO YOU SEE THAT?

11:18AM   18    A.   YES, I SEE THAT.

11:18AM   19    Q.   AND HAVE YOU EVER SPOKEN WITH GARRIOTT?

11:18AM   20    A.   NOT THAT I'M AWARE OF.

11:18AM   21    Q.   AND THEN FURTHER DOWN IN THE APPOINTMENT MESSAGE, IT SAYS

11:18AM   22    "PLEASE CONTACT HAKAN IF YOU NEED FURTHER ASSISTANCE.  HIS

11:18AM   23    CELL," AND THEN THERE'S A PHONE NUMBER.

11:18AM   24         AND THEN FOR THERANOS REPRESENTATIVES, IT'S

11:18AM   25    ELIZABETH HOLMES, CHRISTIAN HOLMES, AND DAN EDLIN.

11:18AM  1          DO YOU SEE THAT?

11:18AM  2     A.   I DO.

11:18AM  3     Q.   AND THEN THE PFIZER PERSON, MR. SAKUL, WHO WE JUST TALKED

11:18AM  4     ABOUT; THIS MORTEN SOGAARD WHO YOU JUST MENTIONED SOME

11:18AM  5     FAMILIARITY WITH; AND THEN GREGORY NAEVE.

11:18AM  6          DO YOU SEE THAT?

11:18AM  7     A.   I DO.

11:18AM  8     Q.   AND THEN CRAIG LIPSET WAS GOING TO PARTICIPATE BY

11:18AM  9     TELEPHONE CALL.

11:18AM 10          DO YOU SEE THAT?

11:18AM 11     A.   I SEE THAT.

11:18AM 12     Q.   WERE YOU AWARE OF THIS KIND OF MEETING BETWEEN THERANOS

11:19AM 13     AND PFIZER IN 2013?

11:19AM 14     A.   NO, I WAS NOT.

11:19AM 15     Q.   BUT YOU WERE STILL AT PFIZER AT THE TIME; RIGHT?

11:19AM 16     A.   YES.

11:19AM 17     Q.   AND SO MR. SAKUL AND MR. LIPSET, IT APPEARS, HAVE

11:19AM 18     REENGAGED WITH THERANOS, AT LEAST TO TALK, IN LATE 2013, BUT

11:19AM 19     DIDN'T -- APPEAR NOT TO HAVE INCLUDED YOU IN THOSE

11:19AM 20     CONVERSATIONS; CORRECT?

11:19AM 21     A.   I'M NOT INCLUDED IN THE CONVERSATION.  BUT I ACTUALLY

11:19AM 22     DON'T KNOW IF THEY ENGAGED WITH THERANOS, IF THERANOS ENGAGED

11:19AM 23     WITH THEM.

11:19AM 24          THE PURPOSE OF MY REPORT WAS TO CLOSE OFF THESE REPEATED

11:19AM 25     DISTRACTIVE BUSINESS INEFFICIENCIES.

11:19AM  1    Q.   AND THAT WAS INQUIRIES BY SMALL COMPANIES TO PFIZER.  WAS

11:19AM  2    THAT THE GIST, SIR?

11:19AM  3    A.   NO, IT'S NOT BY SMALL COMPANIES.  IT WAS REPEATED,

11:19AM  4    REPEATED CONTACTS LOOKING FOR A DOOR THAT IS WILLING TO PAY

11:19AM  5    MONEY.

11:19AM  6    Q.   YOU CAN TAKE THAT DOWN.

11:20AM  7         I THINK THIS IS ALREADY IN EVIDENCE.  THIS IS 20546.

11:20AM  8         MAY I PUBLISH, YOUR HONOR?

11:20AM  9              THE COURT:  YES.

11:20AM 10    BY MR. CAZARES:

11:20AM 11    Q.   YOU'LL SEE IT UP ON THE SCREEN, MR. WEBER, AN EMAIL CHAIN,

11:20AM 12    THE LATTER AT THE TOP WHICH IS NOVEMBER 25TH, 2013.  THAT'S NOT

11:20AM 13    A MESSAGE THAT ANYONE FROM PFIZER IS ON.

11:20AM 14         YOU SEE THE SUBJECT LINE IS PFIZER/THERANOS DISCUSSIONS.

11:20AM 15         BUT IF WE MAYBE FOCUS AT THE START OF THE CHAIN IN THE

11:20AM 16    LOWER PORTION.

11:21AM 17         DO YOU SEE THERE'S A MESSAGE FROM CHRISTIAN HOLMES TO

11:21AM 18    MORTEN SOGAARD, COPYING MR. SAKUL AND MS. HOLMES?

11:21AM 19         DO YOU SEE THAT?

11:21AM 20    A.   I DO.

11:21AM 21    Q.   AND IN THE MESSAGE FROM MR. HOLMES TO MR. SOGAARD, HE

11:21AM 22    WRITES, "MORTEN,

11:21AM 23         "THANK YOU FOR THIS NOTE.  WE CERTAINLY REMAIN VERY

11:21AM 24    INTERESTED IN MOVING FORWARD WITH OUR WORK TOGETHER.

11:21AM 25         "I SENT SOME PROPOSED EDITS ON THE PFIZER CDA BACK TO TINA

11:21AM 1    EARLY IN THE WEEK OF NOVEMBER 11TH, AND I JUST RESENT THAT NOTE

11:21AM 2    (ATTACHED) TO ENSURE IT DIDN'T GET HELD UP FOR SOME REASON."

11:21AM 3        DO YOU SEE THAT?

11:21AM 4    A.   I DO.

11:21AM 5    Q.   AND YOU UNDERSTOOD THAT A CDA REFERS TO A CONFIDENTIALITY

11:21AM 6    AGREEMENT; CORRECT?

11:21AM 7    A.   YES, CONFIDENTIALITY, CDA, NDA.

11:21AM 8    Q.   COMMONLY USED?

11:21AM 9    A.   COMMONLY USED.

11:21AM 10   Q.   AND THE REFERENCE IS TO A PFIZER CDA.

11:21AM 11       DO YOU SEE THAT?

11:21AM 12   A.   YES, I SEE THAT.

11:21AM 13   Q.   OKAY.  AND THEN THE MESSAGE IS, "I CHECKED THROUGH MY

11:22AM 14   INBOX AGAIN AND HAVE NOT SEEN A RESPONSE.  IN PARALLEL TO

11:22AM 15   EXECUTING THIS CDA, PERHAPS WE CAN LOOK TO SCHEDULE A

11:22AM 16   DISCUSSION REGARDING NEXT STEPS AND OUTLINING A PROCESS TO MOVE

11:22AM 17   FORWARD."

11:22AM 18       DO YOU SEE THAT?

11:22AM 19   A.   I DO.

11:22AM 20   Q.   AND AGAIN, AT THE TIME IN NOVEMBER OF 2013, WERE YOU AWARE

11:22AM 21   THAT PFIZER WAS ENGAGING WITH THERANOS TO ENTER INTO A

11:22AM 22   CONFIDENTIALITY AGREEMENT TO FACILITATE FURTHER DISCUSSIONS?

11:22AM 23   A.   NO, I WAS NOT.

11:22AM 24   Q.   AND IF WE CAN MOVE UP IN THE MESSAGE CHAIN.

11:22AM 25       IT APPEARS MR. SOGAARD RESPONDED TO MR. HOLMES, COPYING

11:22AM 1      MR. SAKUL AND MS. HOLMES.

11:22AM 2          "CHRISTIAN,

11:22AM 3          "MY SINCERE APOLOGIES.  I SHOULD HAVE CHECKED ON OUR SIDE

11:22AM 4      FIRST.  I WILL FOLLOW UP TO MOVE THINGS ALONG ON OUR SIDE.

11:22AM 5          "PLEASE TAKE MY EMAIL AS AN EXPRESSION OF INTEREST AND

11:22AM 6      EXCITEMENT WITH YOUR TECHNOLOGY AND ASPIRATIONS THAT WE CAN

11:22AM 7      MOVE FORWARD WITH DISCUSSIONS AND HOPEFULLY A PARTNERSHIP."

11:22AM 8          DO YOU SEE THAT?

11:22AM 9      A.   I DO.

11:22AM 10     Q.   OKAY.  IN THE COURSE OF YOUR EVALUATION OF THERANOS

11:23AM 11     TECHNOLOGY AND ITS USEFULNESS TO PFIZER, YOU DIDN'T ACTUALLY

11:23AM 12     RECEIVE OR EXAMINE THERANOS TESTING TECHNOLOGY IN PERSON;

11:23AM 13     CORRECT?

11:23AM 14     A.   I DID NOT PHYSICALLY TOUCH A TESTING BOX, BUT IT'S

11:23AM 15     ACTUALLY ONLY THE DATA SET THAT I NEED TO SEE.

11:23AM 16     Q.   OKAY.  AND YOU NEVER ACTUALLY -- AND I GUESS BY THAT YOU

11:24AM 17     MEAN YOU NEVER ACTUALLY USED THE DEVICE; CORRECT?

11:24AM 18     A.   NO, I HAVE NOT.

11:24AM 19     Q.   BUT YOU ARE AWARE OF THE FACT THAT THE UNDERLYING CLINICAL

11:24AM 20     STUDIES AND DATA THAT YOU EVALUATED, THERANOS'S DEVICE WAS

11:24AM 21     ACTUALLY PLACED IN CLINICAL PATIENTS' HOMES TO DO THE TESTING;

11:24AM 22     CORRECT?

11:24AM 23     A.   THAT IS MY UNDERSTANDING FROM THE STUDY REPORTS SENT TO

11:24AM 24     ME.

11:24AM 25     Q.   AND YOU HAVE NO REASON TO DISBELIEVE THAT THAT ACTUALLY

11:24AM  1    TOOK PLACE; CORRECT?

11:24AM  2    A.   NO, I DO NOT.

11:24AM  3    Q.   OKAY.

11:24AM  4         YOUR HONOR, MAY I HAVE A MOMENT?

11:24AM  5             THE COURT:  YES.

11:24AM  6         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

11:26AM  7             MR. CAZARES:  I APOLOGIZE, YOUR HONOR.  I WILL BE

11:26AM  8    DONE VERY SOON.

11:26AM  9             THE COURT:  OF COURSE.

11:26AM 10         (PAUSE IN PROCEEDINGS.)

11:26AM 11             MR. CAZARES:  I APOLOGIZE, YOUR HONOR.

11:26AM 12             THE COURT:  WE CAN STAND UP AND STRETCH FOR A

11:26AM 13    MOMENT, FOLKS.

11:26AM 14         YOU AS WELL, YES.

11:26AM 15         (STRETCHING.)

11:27AM 16             MR. CAZARES:  THANK YOU, YOUR HONOR.

11:27AM 17    Q.   MR. WEBER, IF YOU COULD TAKE A LOOK WITHIN THE BINDER THAT

11:27AM 18    YOU HAVE, THERE'S AN EMAIL CHAIN AT EXHIBIT 15048, 15048.  TAKE

11:27AM 19    A LOOK AT IT AND TAKE A LOOK AT THE ATTACHMENT.

11:27AM 20    A.   15048.

11:27AM 21    Q.   YES.

11:27AM 22    A.   15048.

11:27AM 23    Q.   YES.  AND DO YOU SEE THE EMAIL CHAIN, THE LATTER WHICH

11:27AM 24    LOOKS TO BE JANUARY 9, 2014.

11:27AM 25         DO YOU SEE THAT?

11:27AM   1      A.   I DO.

11:27AM   2      Q.   AND JANUARY 2014 YOU WERE STILL EMPLOYED AT PFIZER;

11:27AM   3      CORRECT?

11:27AM   4      A.   YES.

11:27AM   5      Q.   AND I THINK YOU TESTIFIED -- CAN YOU TAKE A LOOK AT THE

11:28AM   6      ATTACHMENT AS WELL.

11:28AM   7           DO YOU SEE THAT?

11:28AM   8      A.   I DO.

11:28AM   9      Q.   NOW, YOU'VE TESTIFIED THAT YOU, I GUESS YOURSELF, DIDN'T

11:28AM   10     AUTHORIZE THERANOS TO IN ANY WAY PLACE A PFIZER LOGO ON ANY

11:28AM   11     SORT OF DOCUMENTATION; CORRECT?

11:28AM   12     A.   CORRECT.  IT WOULD ONLY REALLY BE PFIZER LEGAL AND PFIZER

11:28AM   13     COMMERCIAL WHO COULD DO THAT.

11:28AM   14     Q.   OKAY.  AND YOU SEE IN THIS EXCHANGE AT 15048, MR. SOGAARD

11:28AM   15     AND MR. SAKUL ARE ENGAGED IN AN EMAIL EXCHANGE?

11:28AM   16          DO YOU SEE MR. SAKUL'S NAME AT THE TOP?

11:29AM   17     A.   THERE ARE THREE TO FOUR PAGES HERE OF EMAIL.  WHERE?

11:29AM   18     Q.   AT THE TOP OF THE FIRST PAGE.

11:29AM   19     A.   THE TOP OF THE FIRST PAGE.

11:29AM   20     Q.   THE CC LINE.

11:29AM   21     A.   THE CC LINE IS ELIZABETH HOLMES AND HAKAN SAKUL.

11:29AM   22     Q.   AND YOU SEE, WITH THE ATTACHMENT, IT LOOKS LIKE MR. SAKUL

11:29AM   23     RECEIVED A COPY OF THE THERANOS STUDY REPORT WITH BOTH PFIZER'S

11:29AM   24     LOGO AND THERANOS'S LOGO; CORRECT?

11:29AM   25     A.   IT APPEARS TO BE SO FROM THIS DOCUMENT.

11:29AM  1           MR. CAZARES:  NOTHING FURTHER, YOUR HONOR.

11:29AM  2           THE COURT:  REDIRECT?

11:30AM  3           MR. LEACH:  THANK YOU, YOUR HONOR.

11:30AM  4                      **REDIRECT EXAMINATION**

11:30AM  5   BY MR. LEACH:

11:30AM  6   Q.   GOOD MORNING AGAIN, MR. WEBER.  I JUST HAVE A FEW

11:30AM  7   FOLLOW-UP QUESTIONS.

11:30AM  8        YOU TESTIFIED ON EXAMINATION BY MR. CAZARES THAT MONEY

11:30AM  9   DIDN'T PLAY A ROLE IN YOUR EVALUATION OF THERANOS'S TECHNOLOGY.

11:30AM 10        DO YOU RECALL THAT TESTIMONY?

11:30AM 11   A.   YES.

11:30AM 12   Q.   WHAT DID YOU MEAN BY THAT?

11:30AM 13   A.   I MEANT THAT MY ASSESSMENT IS ALWAYS ABOUT THE ACTUAL

11:30AM 14   TECHNICAL CAPABILITY AND ITS UTILITY, AND THAT IF THERE WERE

11:30AM 15   LARGER OR SMALLER AMOUNTS OF MONEY, THAT THAT DID NOT SWAY MY

11:30AM 16   JUDGMENT IN ANY WAY.

11:30AM 17   Q.   MR. CAZARES ALSO ASKED YOU QUESTIONS ABOUT 15041.

11:30AM 18        I DON'T BELIEVE HE OFFERED IT INTO EVIDENCE.  I WOULD LIKE

11:30AM 19   TO OFFER IT INTO EVIDENCE.

11:31AM 20           THE COURT:  ANY OBJECTION?

11:31AM 21           MR. CAZARES:  NO, YOUR HONOR.

11:31AM 22           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:31AM 23        (DEFENDANT'S EXHIBIT 15041 WAS RECEIVED IN EVIDENCE.)

11:31AM 24   BY MR. LEACH:

11:31AM 25   Q.   MR. WEBER, DO YOU SEE AT THE TOP THERE'S AN EMAIL FROM

```
11:31AM   1      ELIZABETH HOLMES TO MR. LIPSET, A DAVID LESTER AT THERANOS,

11:31AM   2      SETH MICHELSON AT THERANOS, AND ANOTHER ONE OF YOUR COLLEAGUES

11:31AM   3      AT PFIZER.

11:31AM   4          DO YOU SEE THAT?

11:31AM   5      A.   I DO.

11:31AM   6      Q.   OKAY.  AND THIS RELATES TO SOMETHING CALLED MOMENTUM IL-6.

11:31AM   7          DO YOU SEE THAT?

11:31AM   8      A.   I DO.

11:31AM   9      Q.   OKAY.  AND THERE'S REFERENCE IN HERE TO SETTING UP A PHONE

11:31AM  10      CALL.

11:31AM  11          DO YOU SEE THAT?

11:31AM  12      A.   OH, IT'S ON THE SCREEN.  YES, I SEE THAT.  I APOLOGIZE.

11:32AM  13      Q.   OKAY.  DO YOU KNOW WHETHER ANYTHING EVER CAME OF THIS

11:32AM  14      PHONE CALL?

11:32AM  15      A.   I HAVE NO AWARENESS.

11:32AM  16      Q.   OKAY.  AND YOU WERE ALSO SHOWN EXHIBITS 4018 AND 20546

11:32AM  17      FROM SOME POINT AFTER OCTOBER 28TH, 2013.

11:32AM  18          AND THESE WERE EMAILS THAT YOU WEREN'T ON.

11:32AM  19          DO YOU RECALL QUESTIONS ABOUT THOSE?

11:32AM  20      A.   I DO.

11:32AM  21      Q.   OKAY.  AND DO YOU KNOW WHETHER, IN SEPTEMBER OF 2013,

11:32AM  22      THERANOS ANNOUNCED A PARTNERSHIP WITH WALGREENS?

11:32AM  23      A.   I HAVE A VAGUE AWARENESS OF THIS HAPPENING IN THE OUTSIDE

11:32AM  24      WORLD.

11:32AM  25      Q.   OKAY.  DO YOU KNOW IF IN THE FALL AND WINTER OF 2013 THERE
```

11:32AM  1    WERE PRESS ARTICLES ABOUT THERANOS AND ITS TECHNOLOGY?

11:32AM  2    A.   I'M NOT AWARE OF THOSE.

11:32AM  3    Q.   OKAY.  DO YOU KNOW WHETHER ANYTHING CAME FROM THOSE EMAILS

11:32AM  4    SETTING UP DISCUSSIONS?

11:32AM  5    A.   NO, I'M NOT AWARE OF ANYTHING HAPPENING.

11:32AM  6    Q.   OKAY.

11:33AM  7         IF WE COULD DISPLAY, YOUR HONOR, WHAT IS IN EVIDENCE AS

11:33AM  8    EXHIBIT 7753.

11:33AM  9              THE COURT:  ALL RIGHT.

11:33AM  10             MR. LEACH:  I BELIEVE IT'S ATTACHMENT 2, MS. WACHS.

11:33AM  11   Q.   ARE YOU ABLE TO SEE THE SPREADSHEET ON YOUR SCREEN,

11:33AM  12   MR. WEBER?

11:33AM  13   A.   YES, I DO.

11:33AM  14   Q.   AND DO YOU SEE A REFERENCE TO PFIZER IN LINE 12?

11:33AM  15   A.   I DO.

11:33AM  16   Q.   AND DO YOU SEE, AS YOU MOVE TO THE RIGHT, THERE'S TWO

11:33AM  17   AMOUNTS, 500,000 AND 400,000, WITH THE 400,000 NUMBER BEING IN

11:33AM  18   NOVEMBER OF 2008?

11:33AM  19   A.   YES.

11:33AM  20   Q.   OKAY.  AND YOU RECALL VERIFYING BEFORE YOUR PHONE CALL

11:33AM  21   WITH MS. HOLMES THAT PFIZER HAD PAID THERANOS FOR THE

11:33AM  22   ANGIOGENESIS STUDY?

11:33AM  23   A.   YES, I RECALL THAT PFIZER -- YOU KNOW, WE HAD CONFIRMED

11:33AM  24   THAT PFIZER HAD PAID FOR THE STUDY, BUT I WAS NOT EVER INFORMED

11:33AM  25   OF THE DOLLAR AMOUNT INVOLVED.

11:33AM   1    Q.   OKAY.  BUT THE TIMING THERE FOR 2008 IS CONSISTENT WITH

11:34AM   2    YOUR REVIEW AND THE ULTIMATE PHONE CALL WITH MS. HOLMES?

11:34AM   3    A.   YES.

11:34AM   4    Q.   OKAY.

11:34AM   5    A.   IT'S CONSISTENT TIME-WISE.

11:34AM   6    Q.   OKAY.  AND IF WE CAN MOVE FORWARD TO THE RIGHT, MS. WACHS,

11:34AM   7    THROUGH 2009, 2010, 2011, ALL OF THE WAY THROUGH 2014.

11:34AM   8         YOU DON'T SEE ANY OTHER AMOUNTS RELATING TO PFIZER, DO

11:34AM   9    YOU?

11:34AM  10    A.   I DO NOT.

11:34AM  11    Q.   OKAY.  AND YOU, SITTING HERE TODAY, YOU HAVE NO KNOWLEDGE

11:34AM  12    OF ANY REVENUE GENERATING CONTRACTS BETWEEN PFIZER AND THERANOS

11:34AM  13    AFTER YOUR REVIEW?

11:34AM  14    A.   I'M NOT AWARE OF ANY FURTHER CONTRACTS.

11:34AM  15    Q.   OKAY.  AND YOU'VE SEEN SOME EMAILS ABOUT DISCUSSIONS,

11:34AM  16    POSSIBILITIES.  YOU HAVE NO REASON, SITTING HERE TODAY, TO

11:34AM  17    THINK THAT ANYTHING EVER CAME OF THOSE?

11:34AM  18    A.   NO, I DO NOT THINK -- I'M NOT AWARE OF ANYTHING THAT CAME

11:34AM  19    FROM ANY OF THOSE DISCUSSIONS.

11:34AM  20    Q.   OKAY.

11:34AM  21         NO FURTHER QUESTIONS, YOUR HONOR.

11:34AM  22              THE COURT:  RECROSS?

11:35AM  23              MR. CAZARES:  ACTUALLY, NO FURTHER QUESTIONS,

11:35AM  24    YOUR HONOR.

11:35AM  25              THE COURT:  ALL RIGHT.  THANK YOU.

| | | |
|---|---|---|
| 11:35AM | 1 | MAY THIS WITNESS BE EXCUSED? |
| 11:35AM | 2 | MR. LEACH:  YES, YOUR HONOR. |
| 11:35AM | 3 | MR. CAZARES:  YES, YOUR HONOR. |
| 11:35AM | 4 | THE COURT:  YOU'RE EXCUSED, SIR.  YOU CAN JUST LEAVE |
| 11:35AM | 5 | THOSE BINDERS THERE.  THANK YOU SO MUCH. |
| 11:35AM | 6 | THE WITNESS:  THANK YOU. |
| 11:35AM | 7 | THE COURT:  YOU'RE WELCOME. |
| 11:35AM | 8 | DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL? |
| 11:35AM | 9 | MR. LEACH:  YES, YOUR HONOR. |
| 11:35AM | 10 | THE UNITED STATES CALLED SARAH BENNETT. |
| 11:35AM | 11 | THE COURT:  LADIES AND GENTLEMEN, WE'LL TAKE OUR |
| 11:35AM | 12 | BREAK AROUND NOON, MAYBE A LITTLE THEREAFTER.  I'D LIKE TO GET |
| 11:35AM | 13 | THE WITNESS STARTED. |
| 11:36AM | 14 | GOOD MORNING.  COME FORWARD, PLEASE. |
| 11:36AM | 15 | I'LL ASK YOU TO STAND OVER HERE WHILE YOU FACE OUR |
| 11:36AM | 16 | COURTROOM DEPUTY.  AND IF YOU RAISE YOUR RIGHT HAND, SHE HAS A |
| 11:36AM | 17 | QUESTION FOR YOU. |
| 11:36AM | 18 | **(GOVERNMENT'S WITNESS, SARAH BENNETT, WAS SWORN.)** |
| 11:36AM | 19 | THE WITNESS:  I DO. |
| 11:36AM | 20 | THE COURT:  PLEASE HAVE A SEAT UP HERE. |
| 11:36AM | 21 | PLEASE ADJUST THE CHAIR AND MICROPHONE AS YOU NEED. |
| 11:36AM | 22 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 11:36AM | 23 | AND SPELL IT. |
| 11:36AM | 24 | THE WITNESS:  SURE.  MY NAME IS SARAH BENNETT, |
| 11:36AM | 25 | S-A-R-A-H, B-E-N-N-E-T-T. |

11:36AM  1              THE COURT:  THANK YOU.

11:36AM  2         COUNSEL.

11:36AM  3              MR. LEACH:  THANK YOU, YOUR HONOR.

11:36AM  4         MAY I APPROACH THE COURTROOM DEPUTY?

11:37AM  5              THE COURT:  YES.

11:37AM  6              MR. LEACH:  (HANDING.)

11:37AM  7                    **DIRECT EXAMINATION**

11:37AM  8    BY MR. LEACH:

11:37AM  9    Q.   GOOD MORNING, MS. BENNETT.  HOW ARE YOU?

11:37AM  10   A.   I'M GOOD.

11:37AM  11   Q.   AND IF YOU ARE FULLY VACCINATED AND COMFORTABLE, YOU CAN

11:37AM  12   TAKE OFF YOUR MASK.  YOU CAN TAKE IT OFF.

11:37AM  13        AND I HAVE TAKEN OFF MINE AS WELL.

11:37AM  14        WHERE DO YOU WORK?

11:37AM  15   A.   I WORK FOR CMS, WHICH IS THE CENTER FOR MEDICARE AND

11:37AM  16   MEDICAID SERVICES.

11:37AM  17   Q.   AND WHAT IS CMS?

11:37AM  18   A.   CMS IS THE CENTER FOR MEDICARE AND MEDICAID SERVICES,

11:37AM  19   WHICH IS A DEPARTMENT UNDER THE DEPARTMENT OF HEALTH, AN AGENCY

11:37AM  20   UNDER THE DEPARTMENT OF HEALTH AND HUMAN SERVICES.

11:37AM  21   Q.   OKAY.  DO YOU WORK WITHIN A PARTICULAR DIVISION OF CMS?

11:37AM  22   A.   YES.  I WORK IN THE DIVISION OF CLINICAL LABORATORY

11:37AM  23   IMPROVEMENT AND QUALITY.

11:37AM  24   Q.   AND CAN YOU SAY THAT ONE MORE TIME SLOWLY, PLEASE?

11:37AM  25   A.   SURE.  DCLIQ, THE DIVISION OF CLINICAL LABORATORY

11:38AM  1    IMPROVEMENT AND QUALITY.

11:38AM  2    Q.   AND WHAT ARE THE RESPONSIBILITIES OF THAT DIVISION WITHIN

11:38AM  3    CMS?

11:38AM  4    A.   THAT DIVISION WITHIN CMS IS RESPONSIBLE FOR DETERMINING

11:38AM  5    NATIONAL POLICY RELATED TO CLINICAL LABORATORIES AND THE

11:38AM  6    OVERSIGHT OF LABORATORIES.

11:38AM  7    Q.   WHEN YOU SAY THE OVERSIGHT OF LABORATORIES, WHAT DO YOU

11:38AM  8    MEAN?

11:38AM  9    A.   WE SET NATIONAL POLICY FOR HOW LABORATORIES SHOULD BE

11:38AM  10   SURVEYED AND INTERPRET THE REGULATIONS.

11:38AM  11        WE ENSURE THAT THERE IS SURVEYOR CONSISTENCY AMONG OUR

11:38AM  12   SURVEYORS AS THEY'RE GOING INTO CLINICAL LABORATORIES.

11:38AM  13   Q.   WHEN DID YOU START WORKING FOR CMS?

11:38AM  14   A.   I STARTED WORKING FOR CMS IN 2011.

11:38AM  15   Q.   OKAY.  WE'LL FOLLOW UP ON THAT.

11:38AM  16        BUT FOR NOW, CAN YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL

11:38AM  17   BACKGROUND.

11:38AM  18   A.   SURE.

11:38AM  19        I HAVE A BACHELOR'S DEGREE FROM THE MEDICAL COLLEGE OF

11:38AM  20   VIRGINIA, VIRGINIA COMMONWEALTH UNIVERSITY.

11:38AM  21   Q.   OKAY.  AND WOULD YOU BRIEFLY DESCRIBE YOUR PROFESSIONAL

11:39AM  22   BACKGROUND AFTER OBTAINING YOUR DEGREE.

11:39AM  23   A.   SURE.

11:39AM  24        I -- AFTER I GRADUATED FROM COLLEGE, I STARTED WORKING AT

11:39AM  25   HOSPITAL LABORATORIES.

11:39AM   1          AFTER I WORKED IN HOSPITAL LABORATORIES, I WENT TO WORK AT

11:39AM   2   DOCTOR -- AT PHYSICIAN OFFICE LABORATORIES WHERE I OVERSAW THE

11:39AM   3   LABORATORY TESTING IN THOSE LABORATORIES.

11:39AM   4          IN 2007 I WENT TO THE MARYLAND STATE AGENCY WHERE I WAS

11:39AM   5   THE SUPERVISOR OF THE IMPLEMENTATION OF THE CLIA PROGRAM AND

11:39AM   6   THE STATE LICENSURE PROGRAM, AND I ALSO -- AND THE OVERSIGHT OF

11:39AM   7   THE LABORATORIES IN THE STATE OF MARYLAND, AND I ALSO SURVEYED

11:39AM   8   LABORATORIES IN THAT CAPACITY.

11:39AM   9   Q.   SO YOU WERE WORKING FOR THE STATE OF MARYLAND BETWEEN 2007

11:39AM  10   AND 2011?

11:39AM  11   A.   YES.

11:39AM  12   Q.   AND YOU SAID YOU HAD SOME RESPONSIBILITIES FOR SURVEYS?

11:39AM  13   A.   YES.

11:39AM  14   Q.   AND WHAT IS A SURVEY?

11:39AM  15   A.   A SURVEY IS WHERE -- WHEN WE TALK ABOUT SURVEY, WE USE

11:39AM  16   THAT WORD INTERCHANGEABLY WITH INSPECTION.  TO US IT MEANS THE

11:40AM  17   SAME THING.

11:40AM  18          AND WHAT WE DO IS WE GO INTO LABORATORIES AND WE LOOK AT

11:40AM  19   HOW THE LABORATORY IS PERFORMING TESTING, WHETHER THEY'RE

11:40AM  20   FOLLOWING THE MINIMAL STANDARDS THAT THEY'RE REQUIRED TO FOLLOW

11:40AM  21   TO ENSURE ACCURACY AND RELIABILITY AND TIMELINESS OF TEST

11:40AM  22   RESULTS.

11:40AM  23   Q.   YOU JOINED CMS IN 2011?

11:40AM  24   A.   YES.

11:40AM  25   Q.   AND WHAT WERE YOU HIRED TO DO?

11:40AM  1      A.   I WAS HIRED TO BE A MEDICAL TECHNOLOGIST, OR CLINICAL

11:40AM  2      LABORATORY SCIENTIST, AND I HAD CERTAIN AREAS OF EXPERTISE THAT

11:40AM  3      I WAS CONSIDERING A SUBJECT MATTER EXPERT IN.

11:40AM  4      Q.   AND WHAT AREAS WERE YOU CONSIDERED A SUBJECT MATTER EXPERT

11:40AM  5      IN?

11:40AM  6      A.   SURVEY, TRAINING, SURVEYOR TRAINING, ENFORCEMENT,

11:40AM  7      REVIEWING THE STATE AGENCY'S PERFORMANCE, PROFICIENCY TESTING,

11:40AM  8      PERSONNEL REQUIREMENTS.

11:40AM  9      Q.   HOW LONG DID YOU SERVE AS A MEDICAL TECHNOLOGIST?

11:40AM  10     A.   I WAS A MEDICAL TECHNOLOGIST AT CMS UNTIL 2018 WHEN I

11:41AM  11     BECAME A TECHNICAL DIRECTOR.

11:41AM  12     Q.   OKAY.  AND ARE YOU STILL AN EMPLOYEE OF CMS TODAY?

11:41AM  13     A.   I AM.

11:41AM  14     Q.   AND AT CMS, HAVE YOU PARTICIPATED IN SURVEYS OF

11:41AM  15     LABORATORIES THAT ARE REGISTERED OR CERTIFIED BY CMS?

11:41AM  16     A.   YES, I HAVE.

11:41AM  17     Q.   OKAY.  I'D LIKE TO TALK TO YOU A LITTLE BIT ABOUT THE ROLE

11:41AM  18     OF CMS AND WHAT IT DOES VIS-A-VIS LABORATORIES.

11:41AM  19          CAN YOU DESCRIBE TO ME WHAT CMS RESPONSIBILITIES ARE

11:41AM  20     RELATING TO LABORATORIES?

11:41AM  21     A.   CMS IS RESPONSIBLE FOR THE OVERSIGHT OF LABORATORIES.

11:41AM  22     WE'RE RESPONSIBLE -- OUR DIVISION AND THE SURVEYORS IN OUR

11:41AM  23     DIVISION AND THE STATE AGENCIES ARE RESPONSIBLE FOR ENSURING

11:41AM  24     THAT LABORATORIES FOLLOW THE STANDARD AND CONDITION LEVEL

11:41AM  25     REQUIREMENTS FOR COMPLIANCE.

11:41AM  1    Q.   APPROXIMATELY HOW MANY LABORATORIES DOES CMS REGULATE?

11:41AM  2    A.   APPROXIMATELY 323,000 LABORATORIES.

11:42AM  3    Q.   ARE YOU FAMILIAR WITH THE TERM "CLIA"?

11:42AM  4    A.   I AM.

11:42AM  5    Q.   WHAT DOES CLIA STAND FOR?

11:42AM  6    A.   THE CLINICAL LABORATORY IMPROVEMENT AMENDMENTS.  THAT'S

11:42AM  7    THE LAW AND THE REGULATIONS THAT SET THE MINIMAL STANDARDS FOR

11:42AM  8    LABORATORIES.

11:42AM  9    Q.   OKAY.  AND DO YOU HAVE FAMILIARITY WITH CMS'S CLIA

11:42AM  10   PROGRAM?

11:42AM  11   A.   I DO.  THAT'S WHERE I WORK.

11:42AM  12   Q.   OKAY.  WHAT IS THE OBJECTIVE OF CMS'S CLIA PROGRAM?

11:42AM  13           MR. CAZARES:  OBJECTION.  702 AND FOUNDATION.

11:42AM  14           THE COURT:  WELL, YOU CAN LAY A FOUNDATION FOR THAT

11:42AM  15   QUESTION.

11:42AM  16   BY MR. LEACH:

11:42AM  17   Q.   THROUGH YOUR RESPONSIBILITIES AS MEDICAL TECHNOLOGIST AND

11:42AM  18   NOW TECHNICAL DIRECTOR AT CMS, ARE YOU RESPONSIBLE FOR

11:42AM  19   IMPLEMENTING THE CLIA PROGRAM?  DO YOU HAVE RESPONSIBILITIES IN

11:42AM  20   THAT REGARD?

11:42AM  21   A.   YES, I DO.

11:42AM  22   Q.   OKAY.  AND DOES PART OF THAT INVOLVE TEACHING SURVEYORS

11:42AM  23   WHAT TO LOOK FOR IN INSPECTIONS?

11:42AM  24   A.   YES.

11:42AM  25   Q.   AND DOES PART OF THAT ACTUALLY INVOLVE DOING SURVEYS OF

11:42AM  1   LABORATORIES?

11:42AM  2   A.   YES.

11:42AM  3   Q.   AND BY VIRTUE OF YOUR WORK IN YOUR JOB, RELATING TO

11:43AM  4   SURVEYS, DO YOU HAVE SOME UNDERSTANDING OF WHAT THE GOAL OF THE

11:43AM  5   CLIA PROGRAM IS?

11:43AM  6   A.   YES.

11:43AM  7   Q.   WHAT IS THAT UNDERSTANDING?

11:43AM  8        MR. CAZARES:  OBJECTION.  702 AND CALLS FOR A LEGAL

11:43AM  9   CONCLUSION.

11:43AM  10       THE COURT:  OVERRULED.

11:43AM  11       YOU CAN ANSWER THE QUESTION.

11:43AM  12       THE WITNESS:  OKAY.  SO THE CLIA PROGRAM IS THE

11:43AM  13  PROGRAM IN THE FEDERAL GOVERNMENT THAT IS RESPONSIBLE FOR THE

11:43AM  14  OVERSIGHT OF LABORATORIES TO ENSURE THAT THEY ARE FOLLOWING THE

11:43AM  15  STANDARDS AND CONDITIONS THAT THEY ARE SUPPOSED TO FOLLOW IN

11:43AM  16  ORDER TO ALLOW LABORATORIES TO REPORT ACCURATE, RELIABLE, AND

11:43AM  17  TIMELY PATIENT TEST RESULTS.

11:43AM  18  BY MR. LEACH:

11:43AM  19  Q.   ARE THERE DIFFERENT LICENSES THAT LABORATORIES CAN OBTAIN

11:43AM  20  AS PART OF THE CLIA PROGRAM?

11:43AM  21  A.   THERE ARE DIFFERENT TYPES OF CLIA CERTIFICATES, YES.

11:43AM  22  Q.   WHAT ARE THE DIFFERENT TYPES OF CLIA CERTIFICATES?

11:43AM  23  A.   THERE ARE FOUR TYPES OF CLIA CERTIFICATES.  THERE'S A

11:43AM  24  CERTIFICATE OF A WAIVER; CERTIFICATE FOR PROVIDER PERFORMED

11:44AM  25  MICROSCOPY; CERTIFICATE OF COMPLIANCE; AND A CERTIFICATE OF

11:44AM  1      ACCREDITATION.

11:44AM  2      Q.   A CERTIFICATE OF WAIVER, WHAT IS THAT?

11:44AM  3      A.   THAT IS A CERTIFICATE THAT ALLOWS A LABORATORY TO PERFORM

11:44AM  4      ONLY WAIVED TESTS THAT THE FDA CATEGORIZES TESTS, AND THOSE

11:44AM  5      CERTIFICATES -- THOSE LABORATORIES CAN ONLY PERFORM THOSE TESTS

11:44AM  6      CLIA APPROVED AS WAIVED BY THE FDA.

11:44AM  7      Q.   AND WHEN YOU SAY A "WAIVED" TEST, CAN YOU GIVE US AN

11:44AM  8      EXAMPLE OF ONE OF THOSE?

11:44AM  9      A.   LIKE A BLOOD GLUCOSE METER THAT YOU WOULD USE, OR A URINE

11:44AM  10     PREGNANCY TEST, THINGS THAT YOU CAN BUY -- AND ONE OF THE WAYS

11:44AM  11     THE TESTS CAN BE BECOME WAIVED IS BY BEING SOLD OVER THE

11:44AM  12     COUNTER.

11:44AM  13     Q.   AND YOU ALSO MENTIONED SOMETHING CALLED A CERTIFICATE OF

11:44AM  14     PROVIDER MICROSCOPY PROCEDURE?

11:44AM  15     A.   YES.   THAT'S A VERY LIMITED CERTIFICATE WHERE THERE ARE --

11:44AM  16     THEY CAN PERFORM NINE TESTS THAT ARE CONSIDERED PROVIDER

11:45AM  17     PERFORMED MICROSCOPY AND WAIVED TESTS, AND THOSE ARE TESTS LIKE

11:45AM  18     YOU TAKE URINE AND YOU SPIN IT DOWN AND YOU GET SOME SEDIMENT

11:45AM  19     IN THE BOTTOM, AND THEN YOU LOOK AT IT UNDER A MICROSCOPE.

11:45AM  20          THOSE ARE TESTS THAT ARE USUALLY PERFORMED VERY CLOSE TO

11:45AM  21     THE PATIENT BEDSIDE, AND YOU NEED TO PERFORM THEM RIGHT AWAY OR

11:45AM  22     THE TESTS MAY NOT NECESSARILY GIVE YOU RESULTS.

11:45AM  23     Q.   YOU ALSO MENTIONED TWO CERTIFICATES CALLED A CERTIFICATE

11:45AM  24     OF COMPLIANCE AND A CERTIFICATE OF ACCREDITATION.

11:45AM  25          WHAT ARE THOSE?

11:45AM 1    A.   CERTIFICATE OF COMPLIANCE AND CERTIFICATE OF ACCREDITATION

11:45AM 2    ALLOW LABORATORIES TO PERFORM WAIVED, MODERATE, AND HIGH

11:45AM 3    COMPLEXITY TESTING AS LONG AS THEY MEET THE REQUIREMENTS FOR

11:45AM 4    THOSE, WHATEVER COMPLEXITY THEY'RE TESTING.

11:45AM 5         THE CERTIFICATE OF COMPLIANCE LABORATORY IS TYPICALLY

11:45AM 6    SURVEYED BY THE STATE AGENCY, BUT MAY ALSO BE INSPECTED BY

11:45AM 7    FEDERAL SURVEYORS.

11:45AM 8         AND THE CERTIFICATE OF ACCREDITATION, THE SURVEYS ARE

11:46AM 9    NORMALLY PERFORMED BY AN HHS APPROVED ACCREDITED ORGANIZATION.

11:46AM 10   Q.   YOU MENTIONED SOMETHING CALLED HIGH COMPLEXITY AND

11:46AM 11   MODERATE COMPLEXITY TESTS, AND I THINK YOU EARLIER MENTIONED

11:46AM 12   WAIVED TESTS.

11:46AM 13        CAN YOU EXPLAIN WHAT THOSE ARE?

11:46AM 14   A.   SURE.  WAIVED TESTS ARE TESTS THAT ARE GENERALLY EASY TO

11:46AM 15   PERFORM, AND IF THERE'S AN ERRONEOUS RESULT, THERE'S NOT

11:46AM 16   NECESSARILY A HIGH RISK TO THE PATIENT IF THE RESULT IS

11:46AM 17   INCORRECT.

11:46AM 18        MODERATE AND HIGH ARE CONSIDERED NON-WAIVED TESTS, AND THE

11:46AM 19   DIFFERENCE BETWEEN MODERATE AND HIGH IS THAT HIGH COMPLEXITY

11:46AM 20   TESTS USUALLY REQUIRE HIGHER QUALIFICATIONS FOR PERSONNEL IN

11:46AM 21   THE LABORATORY.  THEY REQUIRE ADDITIONAL STEPS TO BE ABLE TO

11:46AM 22   PERFORM THOSE TESTS.  THEY'RE USUALLY MORE COMPLICATED AND MAY

11:46AM 23   HAVE MORE STEPS THAN A MODERATE COMPLEXITY TEST.

11:46AM 24   Q.   YOU -- ARE YOU FAMILIAR WITH THE TERM LDT, OR LABORATORY

11:47AM 25   DEVELOPED TEST?

11:47AM 1     A.   I AM.

11:47AM 2     Q.   IS THAT A TERM OF ART IN THE CMS WORLD?

11:47AM 3     A.   IT IS NOT.  WE --

11:47AM 4     Q.   IS THAT A TERM OF ART IN THE FDA WORLD?

11:47AM 5     A.   YES, IT IS.  BUT MOST PEOPLE UNDERSTAND, WHEN WE SAY LDT,

11:47AM 6     OR LABORATORY DEVELOPED TESTS, WHEN WE TALK ABOUT THOSE.

11:47AM 7          IN THE CLIA WORLD WE HAVE TESTS THAT ARE APPROVED.

11:47AM 8     THEY'RE CLEARED BY THE FDA OR THEY'RE NOT.  THOSE THAT ARE NOT

11:47AM 9     APPROVED BY THE FDA, WE GENERALLY CONSIDER THOSE TO BE LDT'S.

11:47AM 10    Q.   AND WHAT TYPES OF LABS ARE PERMITTED TO PERFORM LDT'S?

11:47AM 11    A.   HIGH COMPLEXITY LABORATORIES THAT HAVE QUALIFIED PERSONNEL

11:47AM 12    TO PERFORM HIGH COMPLEXITY TESTS.

11:47AM 13    Q.   CAN LDT'S BE PERFORMED IN A MODERATE COMPLEXITY LAB?

11:47AM 14    A.   THEY CANNOT.

11:47AM 15    Q.   YOU MENTIONED SOMETHING CALLED FDA CLEARANCE.

11:47AM 16         WHAT IS THAT?

11:47AM 17    A.   TESTS THAT ARE PUT OUT INTO THE MARKET ARE -- THEY HAVE

11:47AM 18    SEVERAL PROCESSES THEY CAN GO THROUGH THE FDA, WHETHER THEY'RE

11:48AM 19    CLEAR OR APPROVED, AND THEN THE FDA IS THE ONE THAT ASSIGNS THE

11:48AM 20    CLIA COMPLEXITY SO WE KNOW WHETHER IT'S HIGH, MODERATE, OR

11:48AM 21    WAIVED.

11:48AM 22    Q.   AND FDA IS THE U.S. FOOD AND DRUG ADMINISTRATION?

11:48AM 23    A.   YES.

11:48AM 24    Q.   AND DOES THEIR AUTHORITY OVERLAP WITH CMS'S IN TERMS OF

11:48AM 25    LAB REGULATION?

11:48AM   1    A.   THEY HAVE A DIFFERENT FOCUS THAN WHAT CLIA HAS.

11:48AM   2         THE CLIA PROGRAM IS ACTUALLY IMPLEMENTED BY THREE

11:48AM   3    DIFFERENT AGENCIES, CMS, THE FDA, AND THE CDC.

11:48AM   4         CMS IS RESPONSIBLE FOR THE OVERSIGHT OF THE LABORATORIES.

11:48AM   5    WE WRITE THE REGULATIONS, WE COLLECT ALL OF THE FEES.

11:48AM   6         THE FDA CATEGORIZES TESTS FOR US, AND THE CDC ARE OUR

11:48AM   7    TECHNICAL -- THEY GIVE US TECHNICAL ADVICE.

11:48AM   8         BUT FOR LABORATORIES, CMS USUALLY DEALS SPECIFICALLY WITH

11:48AM   9    LABORATORIES.  THE FDA DEALS MORE WITH MANUFACTURERS.

11:49AM  10    Q.   WHEN YOU SAY CMS DEALS WITH LABORATORIES AND THE FDA DEALS

11:49AM  11    WITH MANUFACTURERS, WHAT DO YOU MEAN BY THAT?

11:49AM  12    A.   CLIA DEALS -- CLIA IS LOOKING AT SPECIFIC LABORATORIES AND

11:49AM  13    THE PRACTICES WITHIN A SPECIFIC LABORATORY WHEN WE GO IN TO

11:49AM  14    INSPECT OR SURVEY A LABORATORY.

11:49AM  15         THE FDA IS --

11:49AM  16              MR. CAZARES:  OBJECTION.  FOUNDATION AS TO THE FDA.

11:49AM  17              THE COURT:  IS THIS BASED ON THIS WITNESS'S

11:49AM  18    KNOWLEDGE?

11:49AM  19              MR. LEACH:  YES, YOUR HONOR.  I CAN ASK SOME MORE

11:49AM  20    QUESTIONS ON THIS.

11:49AM  21              THE COURT:  SURE.

11:49AM  22    BY MR. LEACH:

11:49AM  23    Q.   IN THE COURSE OF YOUR CAREER WITHIN THE -- MY APOLOGIES,

11:49AM  24    MS. RODRIGUEZ.  I'LL GO SLOWER.

11:49AM  25         IN YOUR EXPERIENCE AS A MEDICAL TECHNOLOGIST AT CMS, HAVE

11:49AM 1    YOU HAD MEETINGS WITH THE FDA?

11:49AM 2    A.   YES.

11:49AM 3    Q.   HAVE YOU HAD MEETINGS WITH THE FDA DIRECTLY RELATED TO

11:49AM 4    THERANOS?

11:49AM 5    A.   NO.

11:49AM 6    Q.   DID YOU PARTICIPATE IN A MEETING WITH THE FDA WHERE --

11:50AM 7    WITH THERANOS WHERE THE FDA WAS ON THE PHONE?

11:50AM 8    A.   OH, YES, SORRY.  I DID, YES.

11:50AM 9    Q.   AND PUTTING ASIDE THAT INTERACTION, IN THE COURSE, HAVE

11:50AM 10   YOU HAD CONVERSATIONS WITH THE FDA ABOUT HOW CMS REGULATES

11:50AM 11   LABORATORIES AND THE FDA REGULATES MEDICAL DEVICE

11:50AM 12   MANUFACTURERS?

11:50AM 13   A.   YES.

11:50AM 14   Q.   AND WHAT IS THAT DISTINCTION?  CAN YOU EXPLAIN WHAT YOU

11:50AM 15   MEAN BY THAT?

11:50AM 16         MR. CAZARES:  SAME OBJECTION.

11:50AM 17         THE COURT:  OVERRULED.

11:50AM 18      YOU CAN ANSWER THE QUESTION.

11:50AM 19         THE WITNESS:  OKAY.  SO CMS, LIKE I SAID, WE DEAL

11:50AM 20   SPECIFICALLY WITH LABORATORIES AND OVERSIGHT AND IMPLEMENTING

11:50AM 21   AND MAKING SURE THAT LABORATORIES ARE FOLLOWING THE CLIA

11:50AM 22   REQUIREMENTS, THE STANDARDS AND CONDITIONS OF THE CLIA

11:50AM 23   REQUIREMENTS.

11:50AM 24      THE FDA DEALS WITH MANUFACTURERS WHO ARE TRYING TO

11:50AM 25   MANUFACTURE THE PRODUCTS TO OTHER LABORATORIES OR TO ANY

11:50AM   1    LABORATORY.

11:50AM   2    BY MR. LEACH:

11:50AM   3    Q.   WHEN YOU SAY "MARKET TO OTHERS," WHAT DO YOU MEAN BY THAT?

11:50AM   4    A.   ONCE THE -- ONCE A TEST GOES THROUGH THE FDA PROCESS, THEN

11:51AM   5    THEY'RE ABLE TO MARKET THAT TO WHICHEVER LABORATORY THAT -- THE

11:51AM   6    MANUFACTURER OR DISTRIBUTOR IS ALLOWED TO DISTRIBUTE THAT TEST

11:51AM   7    OR SELL THAT TEST TO ANY LABORATORY THAT WANTS IT.

11:51AM   8           THE COURT:   MS. BENNETT, I'M GOING TO ASK YOU TO

11:51AM   9    SLOW DOWN JUST A LITTLE BIT.

11:51AM   10          THE WITNESS:   THANK YOU.

11:51AM   11   BY MR. LEACH:

11:51AM   12   Q.   WE NEED TO MAKE SURE WE'RE SPEAKING ONE AT A TIME,

11:51AM   13   MS. BENNETT, AND ALSO MAKE SURE THAT THE COURT REPORTER IS ABLE

11:51AM   14   TO GET ALL OF OUR DIALOGUE.

11:51AM   15       YOU TALKED EARLIER ABOUT SURVEYS THAT CMS CONDUCTS.

11:51AM   16       WHAT IS INVOLVED IN A SURVEY?

11:51AM   17   A.   PRIOR TO GOING ON THE SURVEY, WE DO A LITTLE BIT OF LEG

11:51AM   18   WORK.  WE LOOK AT SOME REPORTS.  WE LOOK AT, LIKE, A PREVIOUS

11:51AM   19   REPORT FROM THE LAST SURVEY TO SEE WHAT THE ISSUES WERE,

11:51AM   20   BECAUSE WE WANT TO MAKE SURE THAT WHEN WE GO ONSITE TO DO A

11:51AM   21   SURVEY THAT THEY ACTUALLY CORRECTED WHAT THEY -- WHAT WAS FOUND

11:51AM   22   IN A PREVIOUS SURVEY IF THERE IS ONE.

11:51AM   23       WHAT I DO IS THAT I PULL PROFICIENCY TESTING RECORDS AND

11:52AM   24   REPORTS TO SEE HOW THEIR PROFICIENCY TESTING LOOKS.

11:52AM   25       AND WE CAN ALSO PULL A SUMMARY REPORT SO THAT WE KNOW

11:52AM   1    APPROXIMATELY WHAT TYPES OF TESTING, NOT SPECIFIC TESTS, BUT IN

11:52AM   2    WHAT AREAS THEY'RE TESTING.

11:52AM   3    Q.   AND WHEN YOU GO ONSITE FOR A SURVEY, DO YOU REQUEST

11:52AM   4    DOCUMENTS?

11:52AM   5    A.   WE DO.

11:52AM   6    Q.   IS THE LABORATORY REQUIRED TO PROVIDE DOCUMENTS TO YOU?

11:52AM   7    A.   THEY ARE REQUIRED TO SUPPLY TO US WHATEVER DOCUMENTS WE

11:52AM   8    REQUEST.

11:52AM   9    Q.   AND DO YOU ALSO CONDUCT INTERVIEWS?

11:52AM  10    A.   YES.

11:52AM  11    Q.   AND WHY DO YOU CONDUCT INTERVIEWS?

11:52AM  12    A.   WE HAVE THREE MECHANISMS BY WHICH WE COLLECT INFORMATION.

11:52AM  13    ONE IS BY RECORDS REVIEW OR DOCUMENTS, AND THE SECOND IS

11:52AM  14    INTERVIEW, AND THE THIRD IS OBSERVATION.

11:52AM  15         SO IT'S A WAY FOR US TO COLLECT INFORMATION, AND ALSO

11:52AM  16    VERIFY INFORMATION THAT WE FIND OR ARE TOLD.

11:52AM  17    Q.   ARE YOU FAMILIAR WITH A COMPANY CALLED THERANOS?

11:52AM  18    A.   YES, I AM.

11:52AM  19    Q.   AND HOW DID YOU BECOME FAMILIAR WITH THERANOS?

11:52AM  20    A.   THERANOS CAME TO CMS I BELIEVE IN JANUARY OF 2014 TO SHOW

11:53AM  21    US AND TALK TO US ABOUT THEIR TECHNOLOGY.

11:53AM  22         AND THEN I WAS ASKED TO PARTICIPATE IN A SURVEY OF THE

11:53AM  23    CALIFORNIA AND THE ARIZONA FACILITIES.

11:53AM  24    Q.   I'D LIKE TO FOCUS ON THE MEETING THAT YOU JUST DESCRIBED

11:53AM  25    AND TALK ABOUT THE SURVEY A LITTLE BIT LATER.

11:53AM  1    A.   SURE.

11:53AM  2    Q.   SO FOCUSSING ON THE MEETING THAT YOU JUST DESCRIBED, YOU

11:53AM  3    SAID THAT WAS AT SOME POINT IN 2014?

11:53AM  4    A.   I BELIEVE IT WAS JANUARY OF 2014.

11:53AM  5    Q.   OKAY.  AND WHERE WAS THIS MEETING?

11:53AM  6    A.   IT WAS AT CMS.

11:53AM  7    Q.   OKAY.  WHO ATTENDED FROM CMS TO THE BEST OF YOUR

11:53AM  8    KNOWLEDGE?

11:53AM  9    A.   AS BEST I CAN RECALL, KAREN DYER, PENNY FULLER,

11:53AM  10   PENNY MYERS, MYSELF, I BELIEVE JUDY YOST WAS THERE.

11:53AM  11   Q.   AND WHO IS KAREN DYER?

11:54AM  12   A.   KAREN DYER WAS THE PREVIOUS DIRECTOR OF THE CLIA PROGRAM.

11:54AM  13   Q.   SOMEONE YOU REPORTED TO?

11:54AM  14   A.   YES.

11:54AM  15   Q.   AND KAREN FULLER, WHO IS THAT?

11:54AM  16   A.   KAREN FULLER WAS THE MANAGER IN THE SAN FRANCISCO REGIONAL

11:54AM  17   OFFICE.

11:54AM  18   Q.   AND WHAT ARE THE RESPONSIBILITIES OF THE SAN FRANCISCO

11:54AM  19   REGIONAL OFFICE?

11:54AM  20   A.   THE -- WHAT WE CALL THE CENTRAL OFFICE, OR CMS BALTIMORE,

11:54AM  21   IS THE AREA OF THE CLIA PROGRAM WE USUALLY DEVELOP POLICY FOR

11:54AM  22   LABORATORIES AND FOR OUR SURVEYORS.

11:54AM  23        THE REGIONAL OFFICE, LIKE CMS SAN FRANCISCO, THEY'RE

11:54AM  24   USUALLY RESPONSIBLE FOR PERFORMING SURVEYS AND THE DIRECT

11:54AM  25   OVERSIGHT OF LABORATORIES IN THE STATES.

11:54AM 1   Q.   AND ARE THERE OTHER OFFICES BESIDES THE SAN FRANCISCO ONE

11:54AM 2   THAT DO THE SURVEYS, OR IS THAT JUST THE ONE THAT HAPPENS TO BE

11:54AM 3   HERE IN OUR NECK OF THE WOODS?

11:54AM 4   A.   THAT'S HERE IN YOUR NECK OF THE WOODS.

11:54AM 5   Q.   OKAY.

11:54AM 6   A.   WE HAVE TEN REGIONAL OFFICES AROUND THE UNITED STATES.

11:54AM 7   Q.   SO MS. DYER WAS THERE, MS. FULLER WAS THERE?

11:55AM 8   A.   I DON'T KNOW WHETHER MS. FULLER WAS AT THAT MEETING.

11:55AM 9   Q.   OKAY.  WHO FROM THERANOS WAS THERE?

11:55AM 10  A.   I BELIEVE MS. HOLMES AND MR. BALWANI WERE THERE.

11:55AM 11  Q.   OKAY.  AND DID ANY INDIVIDUALS FROM THE FDA PARTICIPATE?

11:55AM 12  A.   I BELIEVE THEY WERE ON THE PHONE.

11:55AM 13  Q.   OKAY.  AND WHAT WAS THE PURPOSE OF THE MEETING?

11:55AM 14  A.   MY UNDERSTANDING OF THE PURPOSE OF THE MEETING WAS THAT

11:55AM 15  THERANOS WAS COMING TO SHOW US THEIR TECHNOLOGY.  THEY WANTED

11:55AM 16  TO TRY TO PUT THE DEVICES IN A LOT OF -- IN MULTIPLE FACILITIES

11:55AM 17  WITHOUT A CLIA CERTIFICATE, AND WE TOLD THEM THAT THEY WOULD

11:55AM 18  NEED CLIA CERTIFICATES AT EACH OF THE FACILITIES.

11:55AM 19  Q.   AND WHEN YOU SAY "PUT THE DEVICES IN A LOT OF FACILITIES,"

11:55AM 20  WHAT DO YOU MEAN BY "DEVICES"?

11:55AM 21  A.   THE LITTLE BLACK BOX.

11:55AM 22  Q.   AND DID THEY BRING A BLACK BOX WITH THEM?

11:55AM 23  A.   NOT THAT I RECALL.

11:55AM 24  Q.   BUT WHAT WERE THEY TELLING YOU THAT THEY WANTED TO DO WITH

11:55AM 25  THE BLACK BOX?

11:55AM   1      A.   THEY WANTED TO BE ABLE TO PUT THE PATIENT SPECIMEN INTO

11:56AM   2      THE BOX, AND THEN THE INFORMATION WOULD GO BACK TO CALIFORNIA,

11:56AM   3      AND THEN THE RESULTS WOULD BE LOOKED AT AND REPORTED OUT FROM

11:56AM   4      CALIFORNIA.

11:56AM   5      Q.   AND WHAT DID CMS TELL THERANOS AT THIS MEETING?

11:56AM   6      A.   WE TOLD THEM THAT THEY WOULD NEED TO HAVE A CLIA

11:56AM   7      CERTIFICATE AT EACH PLACE THAT THE BLACK BOX WAS --

11:56AM   8      Q.   OKAY.

11:56AM   9      A.   -- LOCATED.

11:56AM   10     Q.   AND BY "CLIA CERTIFICATE," IS THAT A CERTIFICATE OF

11:56AM   11     COMPLIANCE?  A CERTIFICATE OF WAIVER?  WHAT TYPE OF CERTIFICATE

11:56AM   12     WOULD BE REQUIRED?

11:56AM   13     A.   IN THIS PARTICULAR INSTANCE, IT WOULD HAVE BEEN A

11:56AM   14     CERTIFICATE OF COMPLIANCE OR A CERTIFICATE OF ACCREDITATION

11:56AM   15     BECAUSE IT WAS NOT FDA APPROVED OR CLEARED, SO IT WOULD BE HIGH

11:56AM   16     COMPLEXITY.

11:56AM   17     Q.   OKAY.  AND WHEN YOU SAY "NOT FDA APPROVED OR CLEARED,"

11:56AM   18     WHAT IS THE DIFFERENCE BETWEEN APPROVAL AND CLEARANCE?

11:56AM   19     A.   THERE'S A DIFFERENCE IN THE PROCESS DEPENDING ON THE TEST.

11:56AM   20     THE FDA HAS SEVERAL PATHWAYS THAT TESTS CAN BE APPROVED OR

11:56AM   21     CLEARED, AND DEPENDING ON THE PATHWAY, IT'S EITHER APPROVED OR

11:56AM   22     CLEARED.

11:56AM   23     Q.   AND IS ONE OF THEM MORE RIGOROUS THAN THE OTHER?

11:57AM   24     A.   I DON'T KNOW.

11:57AM   25     Q.   AND IS YOUR NEXT INTERACTION WITH THERANOS AT SOME POINT

11:57AM   1    IN CONNECTION WITH A SURVEY THAT YOU CONDUCTED?

11:57AM   2    A.   YES.

11:57AM   3    Q.   WAS THAT IN 2015?

11:57AM   4    A.   YES.

11:57AM   5         MR. LEACH:  YOUR HONOR, I'M ABOUT TO MOVE INTO

11:57AM   6    ANOTHER TOPIC.  THIS MIGHT BE A CONVENIENT TIME TO BREAK.

11:57AM   7         THE COURT:  ALL RIGHT.  LET'S DO THAT THEN.

11:57AM   8    WE'LL TAKE OUR NOON BREAK.  IT'S 30 MINUTES, 30 MINUTES.

11:57AM   9    AND WE'LL COME BACK AND FINISH YOUR TESTIMONY.

11:57AM   10   THANK YOU.

11:57AM   11        MR. LEACH:  THANK YOU.

12:12PM   12        (RECESS FROM 12:12 P.M. UNTIL 12:33 P.M.)

12:34PM   13        (JURY IN AT 12:34 P.M.)

12:34PM   14        THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

12:34PM   15   OUR JURY IS PRESENT.  ALL PARTIES PREVIOUSLY PRESENT ARE

12:34PM   16   PRESENT AGAIN.

12:35PM   17        MR. LEACH, YOU'D LIKE TO CONTINUE?

12:35PM   18        MR. LEACH:  I WOULD, YOUR HONOR.  THANK YOU.

12:35PM   19   Q.   MS. BENNETT, BEFORE WE BROKE, WE WERE ABOUT TO GET INTO A

12:35PM   20   SURVEY THAT YOU PERFORMED OR PARTICIPATED IN WITH RESPECT TO

12:35PM   21   THERANOS IN 2015.

12:35PM   22        DO YOU RECALL STARTING TO TALK ABOUT THAT?

12:35PM   23   A.   YES.

12:35PM   24   Q.   OKAY.  HOW DID YOU FIRST LEARN THAT -- HOW DID IT COME

12:35PM   25   ABOUT THAT YOU WERE TO PARTICIPATE IN A SURVEY OF THERANOS?

12:35PM  1    A.   MY SUPERVISOR, KAREN DYER, ASKED ME IF I WOULD

12:35PM  2    PARTICIPATE.

12:35PM  3    Q.   AND YOU WORK IN THE HOME OFFICE, OR THE CENTRAL OFFICE OF

12:35PM  4    CMS?

12:35PM  5    A.   YES.

12:35PM  6    Q.   WAS IT COMMON OR UNUSUAL FOR YOU TO PARTICIPATE IN SURVEYS

12:35PM  7    IN YOUR ROLE?

12:35PM  8    A.   I PARTICIPATED IN SEVERAL SURVEYS SINCE I CAME TO THE

12:35PM  9    CENTRAL OFFICE IN BALTIMORE.

12:35PM 10    Q.   AND WERE YOU ASKED TO PARTNER WITH ANY PARTICULAR PERSON

12:36PM 11    ON THIS SURVEY?

12:36PM 12    A.   YES.

12:36PM 13    Q.   WHO WAS THAT?

12:36PM 14    A.   GARY YAMAMOTO.

12:36PM 15    Q.   AND MR. YAMAMOTO WORKS IN SAN FRANCISCO OFFICE?

12:36PM 16    A.   HE DOES.

12:36PM 17    Q.   AND WHAT WAS YOUR UNDERSTANDING OF WHY YOU WERE CONDUCTING

12:36PM 18    A SURVEY OF THERANOS?

12:36PM 19    A.   MY UNDERSTANDING, BECAUSE OF MY SURVEY BACKGROUND, I WAS

12:36PM 20    ASKED TO PARTICIPATE AND HELP OUT.

12:36PM 21    Q.   LET ME ASK A DIFFERENT QUESTION.  WHY WAS CMS SURVEYING

12:36PM 22    THERANOS AT SOME POINT IN 2015?

12:36PM 23    A.   I DON'T KNOW THE EXACT REASON.  IT COULD HAVE BEEN THAT

12:36PM 24    THEY WERE SHORT OF SURVEYORS IN CALIFORNIA, OR IT WAS JUST THAT

12:36PM 25    THEY WANTED US TO PERFORM THAT SURVEY.

12:36PM  1    Q.   AT THE TIME THAT YOU -- WHEN DID YOU ACTUALLY CONDUCT THE

12:36PM  2    SURVEY?

12:36PM  3    A.   THE FIRST VISIT WAS SEPTEMBER OF 2015, AND THEN WE WENT

12:36PM  4    BACK TO COMPLETE THE SURVEY IN NOVEMBER OF 2015.

12:37PM  5    Q.   PRIOR TO SEPTEMBER OF 2015, DID YOU HAVE AN UNDERSTANDING

12:37PM  6    OF WHEN IN THE SURVEY CYCLE THERANOS WOULD FALL?

12:37PM  7    A.   YES.

12:37PM  8    Q.   AND WHEN WAS THAT?

12:37PM  9    A.   WE KNEW THAT THE SURVEY NEEDED TO BE PERFORMED LATE

12:37PM  10   SUMMER, EARLY FALL BECAUSE WE NEEDED TO PERFORM THE

12:37PM  11   RECERTIFICATION SURVEY, AND WE RECEIVED A COMPLAINT, AND SO

12:37PM  12   WE -- THE DECISION WAS MADE TO PERFORM THOSE TWO SURVEYS

12:37PM  13   TOGETHER AS ONE.

12:37PM  14   Q.   OKAY.  THE RECERTIFICATION SURVEY, WHAT DO YOU MEAN BY

12:37PM  15   THAT?

12:37PM  16   A.   EVERY LABORATORY THAT HAS A CERTIFICATE OF COMPLIANCE

12:37PM  17   EVERY OTHER YEAR HAS TO BE SURVEYED FOR -- TO MAKE SURE THAT

12:37PM  18   THEY'RE FOLLOWING THE STANDARDS AND CONDITIONS THAT THEY ARE

12:37PM  19   REQUIRED TO FOLLOW.

12:37PM  20   Q.   AND THERANOS WAS DUE FOR THAT AT SOME POINT AT THE END OF

12:37PM  21   2015?

12:37PM  22   A.   YES.

12:37PM  23   Q.   OKAY.  YOU ALSO MENTIONED THAT IT CAME TO YOUR ATTENTION

12:37PM  24   THAT THERE HAD BEEN A COMPLAINT ABOUT THERANOS?

12:38PM  25   A.   YES.

12:38PM   1    Q.   OKAY.  WITHOUT TALKING ABOUT THE SUBSTANCE OF THE

12:38PM   2    COMPLAINT, DID THAT INFORM SOME OF THE TOPIC AREAS THAT YOU

12:38PM   3    ELECTED TO FOCUS ON IN YOUR SURVEY?

12:38PM   4    A.   IT DID.

12:38PM   5    Q.   OKAY.  AND WHAT TOPIC AREAS WERE THOSE?

12:38PM   6    A.   IT WAS THAT THIS PARTICULAR COMPLAINT WAS RELATED TO --

12:38PM   7              MR. CAZARES:  OBJECTION.  HEARSAY AND 403.

12:38PM   8              THE COURT:  SUSTAINED.

12:38PM   9         IF YOU COULD JUST GET THE, I THINK, THE AREAS.

12:38PM   10   BY MR. LEACH:

12:38PM   11   Q.   OKAY.  AS A RESULT OF THE COMPLAINT, MS. BENNETT, DID YOU

12:38PM   12   MAKE A DECISION TO FOCUS ON PARTICULAR AREAS WITHIN THE CMS

12:38PM   13   SURVEY?

12:38PM   14   A.   YES.

12:38PM   15   Q.   AND WHAT AREAS DID YOU ELECT TO FOCUS ON?

12:38PM   16   A.   PROFICIENCY TESTING.

12:38PM   17   Q.   OKAY.  DID YOU ALSO ELECT TO FOCUS ON QUALITY CONTROL?

12:38PM   18   A.   WE DID.

12:38PM   19   Q.   OKAY.  WITHOUT DESCRIBING THE SUBSTANCE OF THE COMPLAINTS,

12:38PM   20   DID YOU HAVE AN UNDERSTANDING OF WHERE THE COMPLAINTS WERE

12:38PM   21   COMING FROM?

12:38PM   22   A.   WE, WE KNEW THAT THE COMPLAINTS HAD COME FROM INDIVIDUALS.

12:39PM   23   Q.   OKAY.  INDIVIDUALS OUTSIDE OF THE COMPANY OR INSIDE OF THE

12:39PM   24   COMPANY?

12:39PM   25   A.   ONE COMPLAINT WE KNEW WAS INSIDE OF THE COMPANY.  THE

12:39PM  1    OTHER ONE WE DID NOT KNOW -- I DID NOT KNOW.

12:39PM  2    Q.   OKAY.  AT SOME POINT IN TIME DID YOU BECOME AWARE THAT A

12:39PM  3    REPORTER FROM "THE WALL STREET JOURNAL" WAS ASKING CMS

12:39PM  4    QUESTIONS ABOUT THERANOS?

12:39PM  5    A.   I DID.

12:39PM  6    Q.   OKAY.  AND DID THAT HAPPEN BEFORE YOUR SURVEY IN SEPTEMBER

12:39PM  7    OF 2015?

12:39PM  8    A.   IT DID.

12:39PM  9    Q.   DID THAT IN ANY WAY AFFECT HOW YOU WENT ABOUT CONDUCTING

12:39PM  10   THE SURVEY?

12:39PM  11   A.   IT DID NOT.

12:39PM  12   Q.   PRIOR TO CONDUCTING THE SURVEY BEGINNING AT THE END OF

12:39PM  13   SEPTEMBER 2015, WHAT DID YOU DO?  HOW DID YOU PREPARE FOR THE

12:39PM  14   SURVEY?

12:39PM  15   A.   I REQUESTED THE PREVIOUS SURVEY REPORT FROM THE LAST

12:39PM  16   SURVEY THAT HAD BEEN PERFORMED ON THERANOS; I LOOKED AT THE

12:40PM  17   PROFICIENCY TESTING INFORMATION; AND I ALSO PULLED A REPORT

12:40PM  18   THAT SUMMARIZED INFORMATION ABOUT THE LABORATORY.

12:40PM  19   Q.   OKAY.  DID YOU LOOK AT THE RESULTS OF PRIOR INSPECTIONS OF

12:40PM  20   THERANOS?

12:40PM  21   A.   I DID.

12:40PM  22   Q.   OKAY.  AND WHEN YOU SAY YOU PULLED PROFICIENCY TESTING,

12:40PM  23   HOW DID YOU DO THAT?  WHAT DID YOU DO?

12:40PM  24   A.   WE HAVE AN INTERNAL REPORT WHERE WE CAN PUT IN THE

12:40PM  25   LABORATORY NAME OR CLIA NUMBER, AND IT PULLS UP THEIR

12:40PM 1    PROFICIENCY TESTING HISTORY.

12:40PM 2    Q.   AND THE PROFICIENCY TESTING THAT YOU REVIEWED, WAS THIS --

12:40PM 3    WERE THESE RESULTS PROVIDED BY A THIRD PARTY PROVIDER, OR WERE

12:40PM 4    THEY SOME OTHER FORM OF PROFICIENCY TESTING?

12:40PM 5    A.   THE INFORMATION IS PUT INTO OUR SYSTEM BY THE PT PROGRAMS.

12:40PM 6    WHEN THEY GRADE THE RESULTS, THEY ENTER IT INTO THE SYSTEM, AND

12:40PM 7    THEN WE CAN PULL THE REPORT.

12:40PM 8    Q.   SO IF A LAB IS PERFORMING ALTERNATE ASSESSMENT OF

12:41PM 9    PROFICIENCIES, IS THAT SOMETHING THAT IS AVAILABLE TO YOU

12:41PM 10   BEFORE YOU GO IN TO DO YOUR SURVEY?

12:41PM 11   A.   NO.

12:41PM 12   Q.   DO YOU KNOW THE NAME ERIKA CHEUNG?

12:41PM 13   A.   I DO.

12:41PM 14   Q.   AND WHO IS ERIKA CHEUNG?

12:41PM 15   A.   SHE WAS A COMPLAINANT.  SHE WAS ONE OF THE COMPLAINTS THAT

12:41PM 16   WE RECEIVED.

12:41PM 17   Q.   AND PRIOR TO GOING IN TO CONDUCT YOUR SURVEY, DID YOU HAVE

12:41PM 18   AN UNDERSTANDING OF SOME OF THE THINGS THAT MS. CHEUNG WAS

12:41PM 19   ALLEGING?

12:41PM 20   A.   I DID.

12:41PM 21   Q.   AND DID YOU CONDUCT THE SURVEY WITH AN EYE TOWARDS SOME OF

12:41PM 22   THOSE ALLEGATIONS?

12:41PM 23   A.   YES.

12:41PM 24   Q.   LET ME PLEASE DRAW YOUR ATTENTION TO EXHIBIT 5831.

12:41PM 25        BEFORE I DO THAT, MAY I APPROACH, YOUR HONOR?

12:41PM   1                    THE COURT:  YES.

12:42PM   2                    MR. LEACH:  (HANDING.)

12:42PM   3       Q.   MS. BENNETT, I'VE PLACED BEFORE YOU A BINDER OF DOCUMENTS.

12:42PM   4       IF YOU COULD TURN TO THE LAST TAB, EXHIBIT 5831?

12:42PM   5       A.   OKAY.

12:42PM   6       Q.   OKAY.  DO YOU SEE AT THE TOP THERE APPEARS TO BE AN EMAIL

12:42PM   7       FROM LANGLY GEE?

12:42PM   8       A.   I DO.

12:42PM   9       Q.   OKAY.  DO YOU KNOW MR. GEE?

12:42PM  10       A.   I DO.

12:42PM  11       Q.   OKAY.  IS HE SOMEONE THAT YOU INTERACTED WITH IN THE

12:42PM  12       SURVEY?

12:42PM  13       A.   YES.

12:42PM  14       Q.   AND DID YOU UNDERSTAND THAT HE HAD RESPONSIBILITY FOR

12:42PM  15       QUALITY CONTROL AT THERANOS?

12:42PM  16       A.   YES.

12:42PM  17       Q.   AND THIS APPEARS TO BE AN EMAIL FROM MR. GEE TO

12:42PM  18       SUNNY BALWANI AND SOMEONE NAMED BRAD ARINGTON.

12:43PM  19            DO YOU SEE THAT?

12:43PM  20       A.   YES.

12:43PM  21       Q.   AND THE DATE OF THIS EMAIL IS JUNE 13TH, 2015.

12:43PM  22            DO YOU SEE THAT?

12:43PM  23       A.   I DO.

12:43PM  24       Q.   AND IS THAT BEFORE YOU ACTUALLY WENT IN TO CONDUCT THE

12:43PM  25       SURVEY?

12:43PM  1      A.   YES.

12:43PM  2      Q.   OKAY.   THERE'S AN ATTACHMENT TO THIS EMAIL TO MR. BALWANI

12:43PM  3   BEGINNING ON PAGE 2.

12:43PM  4        DO YOU SEE THAT?

12:43PM  5      A.   YES.

12:43PM  6      Q.   AND YOU SEE THERE APPEARS TO BE A LETTER WITH A FORM

12:43PM  7   BEGINNING ON PAGE 5?

12:43PM  8      A.   YES.

12:43PM  9      Q.   DOWN AT THE BOTTOM OF PAGE 5 IS A LINE FORM CMS-2567.

12:43PM 10        DO YOU SEE THAT?

12:43PM 11      A.   YES.

12:43PM 12      Q.   AND ARE YOU FAMILIAR WITH THAT TYPE OF FORM?

12:43PM 13      A.   YES.

12:43PM 14      Q.   AND WHAT IS THAT FORM?

12:43PM 15      A.   FORM CMS-2567, IT IS THE STATEMENT OF DEFICIENCIES FORM.

12:44PM 16      Q.   IS THIS SOMETHING THAT YOU -- IS THE STATEMENT OF

12:44PM 17   DEFICIENCIES ATTACHED TO EXHIBIT 5831 SOMETHING THAT YOU

12:44PM 18   REVIEWED PRIOR TO YOUR SURVEY?

12:44PM 19      A.   IT IS.

12:44PM 20           MR. LEACH:   YOUR HONOR, THE GOVERNMENT OFFERS 5831.

12:44PM 21           MR. CAZARES:   OBJECTION.   HEARSAY AS TO THE EMAIL,

12:44PM 22   AS TO THE LETTER; DOUBLE HEARSAY AND FOUNDATION ON THE

12:44PM 23   ATTACHMENT TO THE LETTER, ATTACHMENTS; ALSO 403.

12:44PM 24           MR. LEACH:   I'M OFFERING THIS FOR THE PURPOSE OF

12:44PM 25   NOTICE TO MR. BALWANI.

12:44PM   1              THE COURT:  AND NOT FOR THE TRUTH OF THE MATTER

12:44PM   2    ASSERTED?

12:44PM   3              MR. LEACH:  CORRECT.

12:44PM   4              THE COURT:  IN ANY OF THESE DOCUMENTS, INCLUDING THE

12:44PM   5    ATTACHMENT?

12:44PM   6              MR. LEACH:  CORRECT.

12:44PM   7              THE COURT:  ALL RIGHT.  THANK YOU.

12:44PM   8         LADIES AND GENTLEMEN, THE OBJECTION IS OVERRULED.  THIS

12:45PM   9    WILL BE ADMITTED NOT FOR THE TRUTH OF THE MATTER ASSERTED IN

12:45PM   10   THE EMAILS NOR THE ATTACHMENTS, BUT ONLY AS TO THE ISSUE OF

12:45PM   11   NOTICE, NOTICE AS TO MR. BALWANI, AND FOR THAT PURPOSE THE

12:45PM   12   PROBATIVE VALUE OUTWEIGHS ANY PREJUDICIAL EFFECT.

12:45PM   13        SO IT CAN BE ADMITTED, AND IT MAY BE PUBLISHED FOR THAT

12:45PM   14   LIMITED PURPOSE.

12:45PM   15             MR. LEACH:  THANK YOU, YOUR HONOR.

12:45PM   16        (GOVERNMENT'S EXHIBIT 5831 WAS RECEIVED IN EVIDENCE.)

12:45PM   17   BY MR. LEACH:

12:45PM   18   Q.   IF WE CAN PLEASE ZOOM IN ON THE BOTTOM PORTION OF THIS

12:45PM   19   EMAIL, MS. WACHS.

12:45PM   20        MS. BENNETT, DO YOU SEE AT THE BOTTOM WHERE MR. BALWANI IS

12:45PM   21   EMAILING LANGLY GEE AND BRAD ARINGTON, "LANGLY.

12:45PM   22        "CAN YOU PLEASE EMAIL ME A COPY OF ALL OF OUR AUDIT

12:45PM   23   REPORTS."

12:45PM   24        DO YOU SEE THAT?

12:45PM   25   A.   I DO.

12:45PM   1    Q.   OKAY.  AND IF WE CAN GO TO THE TOP, DO YOU SEE WHERE

12:45PM   2    MR. GEE WRITES, "SUNNY:

12:45PM   3        "ATTACHED ARE THE CLIA INSPECTION REPORT FOR 2013 AND THE

12:46PM   4    CORRECTIVE ACTIONS."

12:46PM   5        DO YOU SEE THAT?

12:46PM   6    A.   I DO.

12:46PM   7    Q.   AND PRIOR INSPECTION REPORTS ARE SOMETHING THAT YOU WOULD

12:46PM   8    REVIEW TO INFORM THE SURVEY THAT YOU WERE ABOUT TO CONDUCT IN

12:46PM   9    2015?

12:46PM  10    A.   YES.

12:46PM  11    Q.   LET'S LOOK AT PAGE 2.

12:46PM  12        DO YOU SEE ON PAGE 2 THERE'S A LETTER DATED DECEMBER 10TH,

12:46PM  13    2013?

12:46PM  14    A.   YES.

12:46PM  15    Q.   IF YOU WERE CONDUCTING YOUR SURVEY AT THE END OF 2015, IS

12:46PM  16    THAT CONSISTENT WITH THE TIME PERIOD WHEN THERANOS WOULD HAVE

12:46PM  17    BEEN -- HAD ITS MOST RECENT RECERTIFICATION INSPECTION?

12:46PM  18    A.   YES.

12:46PM  19    Q.   AND DID CMS CONDUCT THAT 2013 INSPECTION?

12:46PM  20    A.   I BELIEVE THAT THE STATE AGENCY PERFORMED THAT SURVEY.

12:46PM  21    Q.   OKAY.  IS -- ARE THERE OCCASIONS WHEN THE STATE WILL

12:46PM  22    PERFORM INSPECTIONS RATHER THAN CMS?

12:46PM  23    A.   YES.

12:46PM  24    Q.   CAN YOU EXPLAIN THAT?

12:46PM  25    A.   GENERALLY LABORATORIES THAT DON'T HAVE ANY CONFLICT OF

12:47PM 1      INTEREST OR ARE NOT FEDERAL LABORATORIES WOULD BE INSPECTED BY

12:47PM 2      THE STATE.

12:47PM 3          IT'S JUST -- IT'S DONE ON A CASE-BY-CASE BASIS.  THERE ARE

12:47PM 4      SITUATIONS WHERE WE WOULD GO IN AND PERFORM A SURVEY, OR GO IN

12:47PM 5      JOINTLY WITH THE STATE TO PERFORM A SURVEY.

12:47PM 6      Q.   OKAY.  SO THERE ARE TIMES WHEN CMS WILL DO AN INSPECTION

12:47PM 7      ON ITS OWN?

12:47PM 8      A.   YES.

12:47PM 9      Q.   AND THERE ARE TIMES WHEN THE STATE MIGHT DO AN INSPECTION?

12:47PM 10     A.   YES.

12:47PM 11     Q.   AND THERE ARE TIMES WHEN THE STATE AND CMS MIGHT DO IT

12:47PM 12     TOGETHER?

12:47PM 13     A.   YES.

12:47PM 14     Q.   OKAY.  DO YOU SEE THAT THIS LETTER IS ADDRESSED TO

12:47PM 15     DR. ROSENDORFF?

12:47PM 16     A.   I DO.

12:47PM 17     Q.   DO YOU KNOW SOMEONE NAMED ADAM ROSENDORFF?

12:47PM 18     A.   I DO NOT.

12:47PM 19     Q.   OKAY.  AND IF WE COULD -- IF I COULD DRAW YOUR ATTENTION

12:47PM 20     TO PAGE 4, DO YOU SEE THAT THERE'S A SIGNATURE FROM SOMEONE

12:48PM 21     NAMED EILEEN NORKIN?

12:48PM 22     A.   I DO.

12:48PM 23     Q.   OKAY.  DID SHE PARTICIPATE IN THE 2015 INSPECTION?

12:48PM 24     A.   SHE DID NOT.

12:48PM 25     Q.   AND THERE'S AN ENCLOSURE TO THIS LETTER "CMS-2567,

12:48PM   1    STATEMENT OF DEFICIENCIES."

12:48PM   2         IS THAT A FORM THAT YOU USE REGULARLY IN SURVEYS?

12:48PM   3    A.   YES.

12:48PM   4    Q.   AND LET'S LOOK AT THE NEXT PAGE OF 5831.

12:48PM   5         DO YOU SEE IN THE UPPER RIGHT CORNER THERE'S DATE SURVEY

12:48PM   6    COMPLETED, DECEMBER 3RD, 2013?

12:48PM   7    A.   I DO.

12:48PM   8    Q.   AND IS THAT CONSISTENT WITH THE TIME PERIOD WHEN

12:48PM   9    THERANOS'S RECERTIFICATION WOULD HAVE OCCURRED BACK THEN?

12:48PM  10    A.   YES.

12:48PM  11    Q.   AND TO THE RIGHT THERE'S A NUMBER OF -- TO THE RIGHT

12:48PM  12    THERE'S SOMETHING CALLED AN I.D. PREFIX TAG AND D5215.

12:49PM  13         DO YOU SEE THAT?

12:49PM  14    A.   I DO.

12:49PM  15    Q.   AND ARE YOU FAMILIAR WITH SOMETHING CALLED AN I.D. PREFIX

12:49PM  16    TAG?

12:49PM  17    A.   YES.  WE CALL THEM D-TAGS.

12:49PM  18    Q.   AND WHAT IS A D-TAG?

12:49PM  19    A.   THE D-TAG IS THE DEFICIENCY TAG, AND THE DEFICIENCY TAG IS

12:49PM  20    SPECIFICALLY ASSIGNED TO A REGULATION.

12:49PM  21    Q.   AND WHAT IS THE PURPOSE OF THE 2567?

12:49PM  22    A.   THE PURPOSE OF THE 2567 IS TO ALLOW THE LABORATORY TO KNOW

12:49PM  23    WHAT STANDARDS AND/OR CONDITIONS HAVE NOT BEEN MET SO THEY CAN

12:49PM  24    CORRECT THE DEFICIENCIES THAT WERE CITED.

12:49PM  25    Q.   AND THE DEFICIENCY THAT IS LISTED HERE IS EVALUATION OF

12:49PM  1    PROFICIENCY PERFORMANCE.

12:49PM  2         DO YOU SEE THAT?

12:49PM  3    A.   I DO.

12:49PM  4    Q.   AND IS THIS SOMETHING THAT YOU REVIEWED PRIOR TO GOING

12:49PM  5    INTO THE LAB IN -- GOING INTO THERANOS'S LAB IN 2015?

12:49PM  6    A.   IT IS.

12:49PM  7              THE COURT:  AND, MR. LEACH, THIS IS PAGE 5 OF THE

12:49PM  8    EXHIBIT?

12:50PM  9              MR. LEACH:  YES, YOUR HONOR.

12:50PM  10             THE COURT:  OKAY.  THANK YOU.

12:50PM  11   BY MR. LEACH:

12:50PM  12   Q.   OKAY.  WE CAN PUT THAT TO THE SIDE.

12:50PM  13        AND LET ME ASK YOU ABOUT, I WANT TO FOCUS ON THE TIME

12:50PM  14   PERIOD AT THE END OF SEPTEMBER OF 2015 WHEN YOU TRAVELLED TO

12:50PM  15   CALIFORNIA FOR THE INSPECTION.

12:50PM  16        DO YOU HAVE THAT TIME PERIOD IN MIND?

12:50PM  17   A.   I DO.

12:50PM  18   Q.   OKAY.  HOW DID THE INSPECTION START?  TELL US WHAT

12:50PM  19   HAPPENED.

12:50PM  20   A.   WHEN WE GO IN TO DO AN INSPECTION, WE GENERALLY MEET WITH

12:50PM  21   THE REPRESENTATIVES OF THE LABORATORY THAT ARE INVOLVED WITH

12:50PM  22   THE SURVEY.  WE CALL THAT THE ENTRANCE CONFERENCE.

12:50PM  23        TYPICALLY AFTER THAT -- TYPICALLY AFTER THAT WE ASK TO

12:50PM  24   TOUR THE LABORATORY.

12:50PM  25        AND ONCE WE TOUR THE LABORATORY, WE COME BACK AND WE START

12:50PM  1    LOOKING AT THE LABORATORY'S DOCUMENTS AND INTERVIEW STAFF AND

12:51PM  2    OBSERVE HOW TESTING IS OCCURRING, OR HOW EMPLOYEES ARE

12:51PM  3    PERFORMING TESTING.

12:51PM  4         AND WE THEN WILL, YOU KNOW, JUST ASSESS WHETHER THEY'VE

12:51PM  5    MET THE MINIMUM STANDARDS AND CONDITIONS THAT THEY'RE REQUIRED

12:51PM  6    TO MEET.

12:51PM  7    Q.   AND ON THIS OCCASION WITH THERANOS, WAS THERE AN ENTRANCE

12:51PM  8    INTERVIEW?

12:51PM  9    A.   THERE WAS.

12:51PM  10   Q.   OKAY.  WHO WAS PRESENT FOR THAT?

12:51PM  11   A.   MR. BALWANI WAS THERE, DR. YOUNG WAS THERE, MR. SAKSENA.

12:51PM  12   I CAN'T REMEMBER HOW TO SAY IT.  MS. -- THERE WAS SEVERAL OTHER

12:51PM  13   STAFF.  LANGLY GEE WAS THERE.  THE GENERAL SUPERVISOR, GURBIR;

12:51PM  14   THE TECHNICAL CONSULTANT, HODA -- I'M SORRY I DON'T REMEMBER

12:52PM  15   THEIR LAST NAMES -- AND SEVERAL OTHER STAFF.

12:52PM  16        AND THERE WERE TWO ATTORNEYS THERE, HEATHER KING, AND I

12:52PM  17   DON'T REMEMBER THE NAME OF THE OTHER ATTORNEY.

12:52PM  18   Q.   AND WHO WAS LEADING FROM THE THERANOS SIDE?

12:52PM  19   A.   MR. BALWANI.

12:52PM  20   Q.   AND WHY DO YOU SAY THAT?

12:52PM  21   A.   BECAUSE HE TOOK CHARGE OF THE CONFERENCE, HE PRESENTED THE

12:52PM  22   POWERPOINT, THE STAFF DEFERRED TO HIM AND ALLOWED HIM TO TAKE

12:52PM  23   THE LEAD.

12:52PM  24   Q.   WERE THERE OCCASIONS WHERE MR. BALWANI DIRECTED THERANOS

12:52PM  25   STAFF IN FRONT OF YOU TO PROVIDE DOCUMENTS?

12:52PM  1     A.   YES.

12:52PM  2     Q.   OKAY.  WHAT DID HE SAY?

12:52PM  3     A.   HE ASKED THEM TO GO FIND DOCUMENTS THAT WE WERE

12:52PM  4     REQUESTING.

12:52PM  5     Q.   OKAY.  AND YOU MENTIONED A POWERPOINT.  WHAT DO YOU MEAN

12:52PM  6     BY THAT?

12:52PM  7     A.   AS PART OF THE ENTRANCE, MR. BALWANI GAVE US A POWERPOINT

12:52PM  8     THAT WAS AN OVERVIEW OF THERANOS AND THE STAFF, THE TECHNICAL

12:53PM  9     STAFF, LIKE THE DIRECTOR OF ASSAYS, THE TECHNICAL CONSULT AT

12:53PM  10    ANY TIME, THE QA/QC QUALITY CONTROL MANAGER.

12:53PM  11    Q.   LET ME PLEASE DIRECT YOUR ATTENTION TO TAB 5830.

12:53PM  12         DOES THIS APPEAR TO BE AN EMAIL FROM SUNNY BALWANI TO

12:53PM  13    OTHERS AT THERANOS DATED SEPTEMBER 22ND, 2015?

12:53PM  14    A.   IT DOES.

12:53PM  15    Q.   AND SEPTEMBER 22ND, 2015, IS THAT THE FIRST DAY OF YOUR

12:53PM  16    SURVEY?

12:53PM  17    A.   YES.

12:53PM  18    Q.   THERE'S AN ATTACHMENT TO THIS.  IF I COULD DRAW YOUR

12:53PM  19    ATTENTION TO PAGE 2.

12:53PM  20         DO YOU SEE THAT?

12:53PM  21    A.   YES.

12:53PM  22    Q.   AND DOES THIS APPEAR TO BE A POWERPOINT?

12:53PM  23    A.   YES.

12:54PM  24    Q.   DOES THIS APPEAR TO BE A COPY OF THE POWERPOINT

12:54PM  25    PRESENTATION THAT MR. BALWANI MADE TO YOU AT THE OUTSET OF THE

12:54PM  1    SURVEY?

12:54PM  2    A.   IT DOES.

12:54PM  3            MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

12:54PM  4    EXHIBIT 5830.

12:54PM  5            MR. CAZARES:  OBJECTION.  HEARSAY AND FOUNDATION AS

12:54PM  6    TO THE EMAIL.

12:54PM  7            MR. LEACH:  901 IS SATISFIED BY THE BATES NUMBER.

12:54PM  8        IT'S NOT HEARSAY BECAUSE IT'S A STATEMENT BY A PARTY

12:54PM  9    OPPONENT, AND THE WITNESS HAS JUST TESTIFIED THAT SHE RECEIVED

12:54PM  10   AN ITERATION OF THIS DIRECTLY FROM THE DEFENDANT.

12:54PM  11           THE COURT:  THIS IS SUBJECT TO THE STIPULATION OF

12:54PM  12   THE PARTIES AS TO THE BATES NUMBERS?

12:54PM  13           MR. LEACH:  YES.

12:55PM  14           THE COURT:  ALL RIGHT.  THANK YOU.

12:55PM  15       THE OBJECTION IS OVERRULED.  AND THIS MAY BE ADMITTED AND

12:55PM  16   PUBLISHED.

12:55PM  17       (GOVERNMENT'S EXHIBIT 5830 WAS RECEIVED IN EVIDENCE.)

12:56PM  18           MR. LEACH:  THERE WE GO.  THANK YOU, MS. WACHS.

12:56PM  19       IF WE CAN ZOOM IN AT THE TOP BRIEFLY, MS. WACHS.

12:56PM  20   Q.   DO YOU SEE AT THE TOP IN THE FROM LINE MR. BALWANI'S NAME?

12:56PM  21   A.   I DO.

12:56PM  22   Q.   AND IN THE TO LINE, THERE'S SOMEONE NAMED HEATHER KING.

12:56PM  23        DO YOU SEE THAT?

12:56PM  24   A.   YES.

12:56PM  25   Q.   AND DO YOU KNOW WHO MS. KING WAS?

12:56PM  1    A.   I DO.

12:56PM  2    Q.   AND WHO IS SHE?

12:56PM  3    A.   SHE WAS AN ATTORNEY WHO WAS PRESENT AT THE SURVEY.

12:56PM  4    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 2.

12:56PM  5         DO YOU SEE THE HEADING THERANOS CLIA LABORATORY OVERVIEW,

12:56PM  6    9-22-15?

12:56PM  7    A.   I DO.

12:56PM  8    Q.   OKAY.  LET'S GO TO PAGE 3, PLEASE.

12:56PM  9         DO YOU SEE THE HEADING NEWARK, CA, CLIA LABORATORY?

12:56PM  10   A.   I DO.

12:56PM  11   Q.   AND THIS SAYS, "THERANOS'S NEWARK CLIA LABORATORY

12:56PM  12   PROCESSES AN AVERAGE OF" 2,000 "PATIENT SAMPLES PER DAY."

12:56PM  13        IS THAT CONSISTENT WITH STATEMENTS THAT MR. BALWANI MADE

12:57PM  14   TO YOU DURING THE INSPECTION?

12:57PM  15   A.   I SEE 200.

12:57PM  16   Q.   200, EXCUSE ME.  I MISSPOKE.

12:57PM  17        IS THE 200 PATIENT SAMPLES PER DAY CONSISTENT WITH WHAT

12:57PM  18   MR. BALWANI TOLD YOU DURING THE INSPECTION?

12:57PM  19   A.   I WOULD SAY, YES, IT'S IN THE POWERPOINT.  THAT'S HOW IT

12:57PM  20   WAS PRESENTED.

12:57PM  21   Q.   OKAY.  TO THE RIGHT THERE'S A COPY OF A STATE OF

12:57PM  22   CALIFORNIA DEPARTMENT OF PUBLIC HEALTH CLINICAL LABORATORY

12:57PM  23   LICENSE.

12:57PM  24        DO YOU SEE THAT?

12:57PM  25   A.   I DO.

12:57PM  1     Q.   AND THERE'S TWO DIRECTORS LISTED, SUNIL DHAWAN AND

12:57PM  2     LYNETTE SAWYER.

12:57PM  3          DO YOU SEE THAT?

12:57PM  4     A.   I DO.

12:57PM  5     Q.   AND HAVE YOU EVER MET LYNETTE SAWYER?

12:57PM  6     A.   I HAVE NOT.

12:57PM  7     Q.   AND WAS SUNIL DHAWAN PRESENT FOR THE SURVEY?

12:57PM  8     A.   FOR A SHORT PERIOD OF TIME.

12:57PM  9     Q.   WHAT DO YOU MEAN, "A SHORT PERIOD OF TIME"?

12:57PM  10    A.   HE WAS THERE I WOULD SAY AN HOUR OR TWO ONE OF THE DAYS.

12:57PM  11    Q.   OKAY.  DID HE SAY ANYTHING?

12:57PM  12    A.   NO.

12:57PM  13    Q.   OKAY.  LET'S LOOK AT THE NEXT PAGE, PLEASE.

12:58PM  14         DO YOU SEE THE HEADING CLIA LABORATORY -- NEWARK, CA?

12:58PM  15    A.   I DO.

12:58PM  16    Q.   AND IN THE LAST TWO BULLET POINTS IT SAYS, "HIGH

12:58PM  17    COMPLEXITY LABORATORY.

12:58PM  18         "ALL TESTS PROCESSED ON FDA-CLEARED AND APPROVED ANALYZERS

12:58PM  19    AND VALIDATED LDT'S."

12:58PM  20         DO YOU SEE THAT LANGUAGE?

12:58PM  21    A.   I DO.

12:58PM  22    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

12:58PM  23    A.   I UNDERSTOOD THAT TO MEAN THAT THE LABORATORY WAS USING

12:58PM  24    ANY -- THE TESTS THAT THEY WERE USING WERE BEING USED ON

12:58PM  25    COMMERCIAL INSTRUMENTS, AND THAT THEY ALSO HAD LDT'S.

12:58PM   1    Q.   AND THE REFERENCE TO "HIGH COMPLEXITY LABORATORY," DID YOU

12:58PM   2    UNDERSTAND THAT THE NEWARK LABORATORY WAS PERFORMING LDT'S?

12:58PM   3    A.   I DID.

12:58PM   4    Q.   OKAY.  WERE YOU ALSO AWARE THAT THERANOS HAD ANOTHER

12:58PM   5    LABORATORY IN ARIZONA?

12:59PM   6    A.   I WAS.

12:59PM   7    Q.   OKAY.  AND WAS THAT LABORATORY HIGH COMPLEXITY?  MODERATE

12:59PM   8    COMPLEXITY?  OR SOMETHING ELSE?

12:59PM   9    A.   MY UNDERSTANDING WAS THAT THEY ONLY PERFORMED UP TO

12:59PM  10    MODERATE COMPLEXITY TESTS, NO HIGH COMPLEXITY TESTS.

12:59PM  11    Q.   AND WHAT DOES THAT MEAN?

12:59PM  12    A.   THAT MEANS THAT THEY WERE PERFORMING NON-WAIVED TESTS THAT

12:59PM  13    WERE MODERATE COMPLEXITY AND WAIVED TESTS.

12:59PM  14    Q.   OKAY.  DID YOU HAVE AN UNDERSTANDING THAT LDT'S WERE BEING

12:59PM  15    PERFORMED IN THE ARIZONA LAB?

12:59PM  16    A.   I DID NOT.

12:59PM  17    Q.   AND AN LDT IS IF YOU'RE USING YOUR OWN NON-FDA APPROVED

12:59PM  18    DEVICE, LIKE THE EDISON, OR MODIFYING AN FDA APPROVED DEVICE,

12:59PM  19    LIKE A SIEMENS ANALYZER?

12:59PM  20    A.   YES.

12:59PM  21    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 10.

01:00PM  22         DO YOU SEE THE HEAD CLIA LABORATORY -- NEWARK, CALIFORNIA.

01:00PM  23         "ANALYZERS WE USE"?

01:00PM  24    A.   YES.

01:00PM  25    Q.   OKAY.  AND ARE YOU GENERALLY FAMILIAR WITH THE ANALYZERS

01:00PM  1    THAT ARE LISTED ON THIS PAGE?

01:00PM  2    A.   YES.

01:00PM  3    Q.   ARE THESE ANALYZERS THAT ARE APPROVED BY THE FDA?

01:00PM  4    A.   YES.

01:00PM  5    Q.   AND DO YOU SEE ANY REFERENCE TO THE EDISON OR A DEVICE

01:00PM  6    MANUFACTURED BY THERANOS?

01:00PM  7    A.   I DO NOT.

01:00PM  8    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 20.

01:00PM  9         DO YOU SEE THE NAME LANGLY GEE WITH A TITLE TO THE LEFT

01:00PM  10   AND A DESCRIPTION TO THE RIGHT?

01:00PM  11   A.   I DO.

01:00PM  12   Q.   AND MR. GEE, THAT'S SOMEONE THAT YOU INTERACTED WITH

01:01PM  13   DURING THE SURVEY?

01:01PM  14   A.   YES.

01:01PM  15   Q.   YOU HAD A NUMBER OF REQUESTS OF DOCUMENTS FOR HIM?

01:01PM  16   A.   YES, I DID.

01:01PM  17   Q.   WAS IT EASY TO GET INFORMATION FROM MR. GEE?

01:01PM  18   A.   IT WAS NOT.

01:01PM  19   Q.   WHAT DO YOU MEAN BY THAT?

01:01PM  20   A.   MR. GEE DID NOT APPEAR TO BE ABLE TO ANSWER THE QUESTIONS

01:01PM  21   THAT I ASKED.  HE WAS NOT ABLE TO BRING US DOCUMENTS IN A

01:01PM  22   TIMELY MANNER.  AND WHEN THE DOCUMENTS WERE GIVEN TO US, OFTEN

01:01PM  23   THEY WERE NOT WHAT WE HAD REQUESTED.

01:01PM  24   Q.   OKAY.  AND IF WE COULD GO TO THE NEXT PAGE, PLEASE,

01:01PM  25   THERE'S A BIOGRAPHY FOR MR. BALWANI.

BENNETT DIRECT BY MR. LEACH

01:01PM  1            DO YOU SEE THAT?

01:01PM  2     A.   IS I DO.

01:01PM  3     Q.   AND DO YOU SEE THAT HE'S LISTED AS PRESIDENT AND COO OF

01:01PM  4     THERANOS, INC.?

01:01PM  5     A.   I DO.

01:01PM  6     Q.   AND DO YOU SEE IN THE UPPER RIGHT-HAND CORNER WHERE IT

01:01PM  7     SAYS, "RESPONSIBLE FOR ALL CLIA LAB BUSINESS OPERATIONS."

01:02PM  8            DO YOU SEE THAT?

01:02PM  9     A.   I DO.

01:02PM 10     Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

01:02PM 11     A.   I UNDERSTOOD THAT TO MEAN THAT MR. BALWANI WAS RESPONSIBLE

01:02PM 12     FOR ALL OF THE BUSINESS THAT THE -- THAT THERANOS DID,

01:02PM 13     INCLUDING THE LABORATORY.

01:02PM 14     Q.   AND WAS THAT CONSISTENT WITH THE ROLE THAT MR. BALWANI WAS

01:02PM 15     PLAYING IN THIS ENTRANCE INTERVIEW THAT YOU WERE PARTICIPATING

01:02PM 16     IN?

01:02PM 17     A.   IT WAS.

01:02PM 18     Q.   OKAY.  AND LET'S ALSO LOOK BRIEFLY AT PAGE 12.

01:02PM 19            DOES THIS APPEAR TO BE AN ORG CHART FOR THE CLIA

01:02PM 20     LABORATORIES?

01:02PM 21     A.   YES.

01:02PM 22     Q.   AND DO YOU SEE MR. BALWANI AS PRESIDENT AND COO AT THE TOP

01:02PM 23     ON THE RIGHT?

01:02PM 24     A.   I DO.

01:02PM 25     Q.   OKAY.  AND THEN BENEATH HIM IS DR. DHAWAN?

BENNETT DIRECT BY MR. LEACH

01:02PM  1    A.   YES.

01:02PM  2    Q.   AND THEN TO THE RIGHT DO YOU SEE LANGLY GEE'S NAME?

01:02PM  3    A.   YES.

01:02PM  4    Q.   AND THERE'S A BOX FOR CLINICAL LABORATORY ASSISTANTS, BUT

01:03PM  5    THERE'S -- NOBODY'S NAME IS LISTED THERE.

01:03PM  6         DO YOU SEE THAT?

01:03PM  7    A.   YES.

01:03PM  8    Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 5450.

01:03PM  9         DO YOU RECOGNIZE THIS DOCUMENT?

01:03PM 10    A.   YES.

01:03PM 11    Q.   AND WHAT IS THIS?

01:03PM 12    A.   THIS IS A FORM CMS 116, WHICH IS THE CLIA APPLICATION.

01:03PM 13    Q.   AND HOW DID YOU GET THIS?

01:03PM 14    A.   EVERY TIME A SURVEYOR GOES ON AN INSPECTION, THE

01:03PM 15    LABORATORY NEEDS TO FILL OUT THIS DOCUMENT SO THAT WE HAVE

01:03PM 16    UPDATED INFORMATION FOR THE LABORATORY.

01:03PM 17    Q.   OKAY.  SO IS THIS SOMETHING THAT YOU RECEIVED AT OR AROUND

01:03PM 18    THE TIME OF THE INSPECTION?

01:03PM 19    A.   YES.

01:03PM 20    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 7.

01:04PM 21         DO YOU SEE A SIGNATURE IN THE LINE FOR SIGNATURE OF

01:04PM 22    OWNER/DIRECTOR OF LABORATORY?

01:04PM 23    A.   I DO.

01:04PM 24    Q.   AND DO YOU SEE A DATE OF SEPTEMBER 22ND, 2015?

01:04PM 25    A.   YES.

01:04PM   1    Q.   AND YOU BELIEVE THIS WAS PROVIDED TO YOU AT OR AROUND THE

01:04PM   2    START OF THE INSPECTION?

01:04PM   3    A.   YES.

01:04PM   4    Q.   OKAY.

01:04PM   5         YOUR HONOR, THE GOVERNMENT --

01:04PM   6         AND IS THIS SOMETHING THAT YOU CONSIDERED IN THE COURSE OF

01:04PM   7    YOUR INSPECTION?

01:04PM   8    A.   YES.

01:04PM   9              MR. LEACH:   YOUR HONOR, THE GOVERNMENT OFFERS

01:04PM   10   EXHIBIT 5450.

01:04PM   11             MR. CAZARES:   NO OBJECTION.

01:04PM   12             THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

01:04PM   13        (GOVERNMENT'S EXHIBIT 5450 WAS RECEIVED IN EVIDENCE.)

01:04PM   14   BY MR. LEACH:

01:04PM   15   Q.   IF WE COULD PLEASE ZOOM IN ON THE TOP HALF, MS. WACHS.

01:04PM   16        DO YOU SEE THE HEADING CLINICAL LABORATORY IMPROVEMENT

01:04PM   17   AMENDMENTS APPLICATION FOR CERTIFICATION?

01:04PM   18   A.   YES.

01:04PM   19   Q.   AND NUMBER 1, GENERAL INFORMATION, THERE'S A NUMBER OF

01:05PM   20   BOXES:   INITIAL APPLICATION, SURVEY, CHANGE INSERT TYPE.

01:05PM   21        WHAT IS THIS FORM GETTING AT THERE?

01:05PM   22   A.   THIS FORM INDICATES THAT THIS WAS FILLED -- THAT THIS

01:05PM   23   PARTICULAR APPLICATION WAS FILLED OUT AS A RESULT OF A SURVEY.

01:05PM   24   Q.   AS OPPOSED TO THE INITIAL APPLICATION TO BE A LABORATORY?

01:05PM   25   A.   YES.

01:05PM  1    Q.   OKAY.  AND IF WE COULD ZOOM DOWN.

01:05PM  2         DO YOU SEE THE NAME OF THE DIRECTOR AS SUNIL DHAWAN?

01:05PM  3    A.   I DO.

01:05PM  4    Q.   OKAY.  IF WE CAN GO DOWN FURTHER TO THE TYPE OF

01:05PM  5    CERTIFICATE REQUESTED.

01:05PM  6         DO YOU SEE THERE'S FOUR BOXES, BEGINNING CERTIFICATE OF

01:05PM  7    WAIVER AND ENDING INSERT OF ACCREDITATION?

01:05PM  8    A.   YES.

01:05PM  9    Q.   AND THOSE ARE THE CERTIFICATES THAT YOU TALKED ABOUT

01:05PM 10    EARLIER?

01:05PM 11    A.   YES.

01:05PM 12    Q.   OKAY.  AND IN THIS CASE THERANOS WAS APPLYING, OR

01:05PM 13    RECERTIFYING A CERTIFICATE OF COMPLIANCE?

01:05PM 14    A.   CORRECT.

01:05PM 15    Q.   OKAY.  LET'S GO TO PAGE 5.

01:06PM 16         UP AT THE TOP THERE'S A PROVISION FOR WAIVED TESTING.

01:06PM 17         DO YOU SEE THAT?

01:06PM 18    A.   I DO.

01:06PM 19    Q.   AND IF WE COULD -- ACTUALLY, MS. WACHS, IF WE CAN CAPTURE

01:06PM 20    THE WHOLE PART OF SECTION 6.  PERFECT.  THANK YOU.

01:06PM 21         WHAT IS WAIVED TESTING?

01:06PM 22    A.   THOSE WAIVED TESTS ARE TESTS THAT ARE EASY TO PERFORM AND

01:06PM 23    THERE'S A LOW RISK, IF THERE'S AN ERRONEOUS RESULT, IN PATIENT

01:06PM 24    HARM.

01:06PM 25    Q.   AND THERE'S AN EXAMPLE, ACME HOME GLUCOSE METER.

01:06PM  1          DO YOU SEE THAT?

01:06PM  2     A.   YES.

01:06PM  3     Q.   AND IS THAT INDICATIVE OF WHAT A WAIVED TEST IS?

01:06PM  4     A.   YES.

01:06PM  5     Q.   AND THERE'S A LINE, "INDICATE THE ESTIMATED TOTAL ANNUAL

01:06PM  6     TEST VOLUME OF ALL WAIVED TESTS PERFORMED."

01:06PM  7          THERE'S THE NUMBER 776.

01:06PM  8          DO YOU SEE THAT?

01:06PM  9     A.   I DO.

01:06PM  10    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

01:07PM  11    A.   THAT THERANOS WAS PERFORMING 776 TOTAL TEST VOLUME OF ALL

01:07PM  12    WAIVED TESTS.

01:07PM  13    Q.   IF WE CAN NOW PLEASE ZOOM DOWN TO SECTION 8, THERE'S A

01:07PM  14    HEADING, NON-WAIVED TESTING.  IF WE CAN GET THE ENTIRE PORTION

01:07PM  15    DOWN TO THE BOTTOM.

01:07PM  16         AND IT SAYS -- WHAT IS A NON-WAIVED TEST?

01:07PM  17    A.   IT'S A TEST THAT IS EITHER MODERATE OR HIGH COMPLEXITY.

01:07PM  18    IT IS NOT WAIVED.

01:07PM  19    Q.   OKAY.  AND THERE ARE SOME NUMBERS LISTED ON THIS CHART.

01:07PM  20    17,170 FOR MICROBIOLOGY; 280,763 DIAGNOSTIC IMMUNOLOGY; 683,939

01:07PM  21    FOR CHEMISTRY.

01:07PM  22         DO YOU SEE THOSE NUMBERS?

01:07PM  23    A.   I DO.

01:07PM  24    Q.   AND WHAT DO YOU UNDERSTAND THOSE TO REPRESENT?

01:07PM  25    A.   THAT IS THE NUMBER THAT IS THE LABORATORY'S ANNUAL TEST

BENNETT DIRECT BY MR. LEACH

01:08PM 1    VOLUME.

01:08PM 2         SO THEY'RE PERFORMING -- IF YOU LOOK AT MICROBIOLOGY,

01:08PM 3    THEIR ANNUAL TEST VOLUME FOR MICROBIOLOGY IS 17,170 TESTS.

01:08PM 4         IF YOU LOOK AT MICROBIOLOGY, THE TOTAL TEST VOLUME, NUMBER

01:08PM 5    OF MICROBIOLOGY TESTS THAT THEY PERFORM IN A YEAR IS 17,170.

01:08PM 6    THAT'S A SELF-REPORTED NUMBER.

01:08PM 7    Q.   SO THAT'S A NUMBER THAT THERANOS GIVES YOU?

01:08PM 8    A.   YES.

01:08PM 9    Q.   OKAY.  AND IF WE LOOK IN THE BOTTOM RIGHT CORNER, IT SAYS,

01:08PM 10   "TOTAL ESTIMATE ANNUAL TEST VOLUME," AND THERE'S A NUMBER

01:08PM 11   894,782.

01:08PM 12        DO YOU SEE THAT NUMBER?

01:08PM 13   A.   I DO.

01:08PM 14   Q.   AND WHAT DID YOU UNDERSTAND THAT TO BE?

01:08PM 15   A.   THAT IS THE TOTAL NUMBER OF TESTS ACROSS ALL OF THE

01:08PM 16   SPECIALTIES AND SUBSPECIALTIES THAT THERANOS PERFORMED IN A

01:09PM 17   YEAR, ONE YEAR.

01:09PM 18   Q.   LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 5451.

01:09PM 19        ARE YOU FAMILIAR WITH THIS DOCUMENT?

01:09PM 20   A.   YES.

01:09PM 21   Q.   AND WHAT IS THIS?

01:09PM 22   A.   THIS IS A LIST OF THE TESTS THAT THERANOS PERFORMED AND

01:09PM 23   THE NAME OF THE INSTRUMENT OR DEVICE -- "INSTRUMENT" AND

01:09PM 24   "DEVICE" WE USE INTERCHANGEABLY -- ON WHICH THEY PERFORM THOSE

01:09PM 25   TESTS.

01:09PM  1    Q.   AND IS THIS SOMETHING THAT WAS PROVIDED TO YOU DURING THE

01:09PM  2    INSPECTION?

01:09PM  3    A.   YES.

01:09PM  4    Q.   OKAY.  AND WAS THIS SOMETHING THAT YOU RELIED ON IN THE

01:09PM  5    COURSE OF CONDUCTING YOUR WORK?

01:09PM  6    A.   WE DID.

01:09PM  7    Q.   OKAY.

01:09PM  8         YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 5451.

01:09PM  9              MR. CAZARES:  NO OBJECTION.

01:09PM  10             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:09PM  11        (GOVERNMENT'S EXHIBIT 5451 WAS RECEIVED IN EVIDENCE.)

01:10PM  12   BY MR. LEACH:

01:10PM  13   Q.   MS. BENNETT, I DRAW YOUR ATTENTION TO THE LEFT COLUMN.

01:10PM  14   THERE'S A HEADING DEVICE NAMES.

01:10PM  15        DO YOU SEE THAT?

01:10PM  16   A.   I DO.

01:10PM  17   Q.   AND TO THE RIGHT THERE'S A COLUMN ASSAY NAME.

01:10PM  18        DO YOU SEE THAT?

01:10PM  19   A.   YES.

01:10PM  20   Q.   AND UNDER THE COLUMN DEVICE NAMES, THERE'S SOMETHING

01:10PM  21   CALLED ABBOTT M2000, CARDTEST, EVOLVIS, VITEK MASS SPEC,

01:10PM  22   SIEMENS ADVIA XPT.

01:10PM  23        DO YOU SEE THAT?

01:10PM  24   A.   YES.

01:10PM  25   Q.   ARE THOSE FDA APPROVED DEVICES?

01:10PM  1    A.   YES, THOSE ARE COMMERCIAL DEVICES.

01:10PM  2    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 3.

01:10PM  3         THERE'S AN ADDITIONAL LISTING OF SIEMENS ADVIA AND BCSXP

01:10PM  4    DEVICES.

01:10PM  5         DO YOU SEE THAT?

01:10PM  6    A.   I DO, THE BCSXP.

01:10PM  7    Q.   OKAY.  ARE THOSE COMMERCIALLY AVAILABLE DEVICES?

01:10PM  8    A.   YES.

01:10PM  9    Q.   AND LET'S LOOK AT PAGE 5, PLEASE.

01:11PM  10        DO YOU SEE AN ADDITIONAL LISTING OF COMMERCIALLY AVAILABLE

01:11PM  11   DEVICES IN THE LEFT-HAND CORNER UNDER DEVICE NAME?

01:11PM  12   A.   YES.

01:11PM  13   Q.   AND SAME QUESTION ON PAGE 7.

01:11PM  14   A.   YES.

01:11PM  15   Q.   SAME QUESTION ON PAGE 9.

01:11PM  16   A.   YES.

01:11PM  17   Q.   THANK YOU.  WE CAN TAKE THAT DOWN, MS. WACHS.

01:11PM  18        AND LET ME DRAW YOUR ATTENTION TO EXHIBIT 5453.

01:11PM  19        ARE YOU FAMILIAR WITH THIS DOCUMENT?

01:11PM  20   A.   YES.

01:11PM  21   Q.   AND WHAT IS IT?

01:11PM  22   A.   THIS IS ALSO A LIST OF TESTS THAT WERE PROVIDED TO US AT

01:12PM  23   THE SURVEY OF THE LAB, TESTS THAT THERANOS WAS PERFORMING AS OF

01:12PM  24   JUNE 12TH, 2015.

01:12PM  25   Q.   AND WAS THIS SOMETHING THAT WAS PROVIDED TO YOU DURING THE

01:12PM  1        INSPECTION?

01:12PM  2        A.   YES.

01:12PM  3        Q.   IS IT SOMETHING THAT YOU RELIED ON?

01:12PM  4        A.   YES.

01:12PM  5               MR. LEACH:   YOUR HONOR, THE GOVERNMENT OFFERS

01:12PM  6        EXHIBIT 5453.

01:12PM  7               MR. CAZARES:   NO OBJECTION.

01:12PM  8               THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

01:12PM  9          (GOVERNMENT'S EXHIBIT 5453 WAS RECEIVED IN EVIDENCE.)

01:12PM  10       BY MR. LEACH:

01:12PM  11       Q.   MS. BENNETT, DO YOU SEE THE HEADING THERANOS CLINICAL LAB

01:12PM  12       TESTS AS OF JUNE 12TH, 2015?

01:12PM  13       A.   YES.

01:12PM  14       Q.   OKAY.   AND THIS WAS SOMETHING THAT THERANOS PROVIDED --

01:12PM  15       PREPARED AND PROVIDED TO YOU; CORRECT?

01:12PM  16       A.   YES.

01:12PM  17       Q.   OKAY.   AND THERE'S A COLUMN CALLED ASSAY NAME.

01:12PM  18            DO YOU SEE THAT?

01:12PM  19       A.   I DO.

01:12PM  20       Q.   AND DO YOU HAVE HIGH LEVEL FAMILIARITY WITH THE ASSAYS

01:12PM  21       THAT ARE LISTED HERE?

01:12PM  22       A.   THE MAJORITY OF THEM, YES.

01:12PM  23       Q.   AND TO THE RIGHT THERE'S A COLUMN TEST CLASSIFICATION.

01:12PM  24            DO YOU SEE THAT?

01:12PM  25       A.   I DO.

01:12PM 1    Q.   AND THE FIRST FOUR LINES, OR THREE LINES, SAY FDA CLEARED

01:12PM 2    OR APPROVED.

01:12PM 3         DO YOU SEE THAT?

01:13PM 4    A.   I DO.

01:13PM 5    Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

01:13PM 6    A.   I UNDERSTOOD THAT TO MEAN THAT THESE WERE BEING PERFORMED

01:13PM 7    ON COMMERCIALLY AVAILABLE DEVICES.

01:13PM 8    Q.   THAT HAD NO MODIFICATIONS?

01:13PM 9    A.   NO MODIFICATIONS.

01:13PM 10   Q.   OKAY.  THAT WERE BEING RUN THE WAY THE MANUFACTURER HAD

01:13PM 11   PROVIDED FOR?

01:13PM 12   A.   YES, THAT THE LABORATORY WAS FOLLOWING THE MANUFACTURER'S

01:13PM 13   INSTRUCTIONS.

01:13PM 14   Q.   OKAY.  IN THE FOURTH ROW TO THE RIGHT OF ALANINE AMINO, IT

01:13PM 15   SAYS LDT.

01:13PM 16        DO YOU SEE THAT?

01:13PM 17   A.   I DO.

01:13PM 18   Q.   AND WHAT DID YOU UNDERSTAND THAT TO MEAN?

01:13PM 19   A.   I UNDERSTOOD THAT TO MEAN THAT IF THEY WERE USING AN FDA

01:13PM 20   CLEARED OR APPROVED DEVICE, THAT IT HAD BEEN MODIFIED.

01:13PM 21   Q.   AND IF WE COUNT UP THE NUMBER OF LDT'S IN THE ROWS, BY MY

01:13PM 22   COUNT I GET ABOUT EIGHT.  AM I COUNTING THOSE RIGHT?

01:13PM 23   A.   I GET EIGHT AS WELL.

01:13PM 24   Q.   OKAY.  AND THE MAJORITY ON THIS PAGE ARE FDA CLEARED OR

01:14PM 25   APPROVED TESTS?

01:14PM   1      A.    YES.

01:14PM   2      Q.    OKAY.  LET'S LOOK AT THE NEXT PAGE, PLEASE.  THIS IS

01:14PM   3      PAGE 2.

01:14PM   4            DO YOU SEE ADDITIONAL LISTING OF TESTS TO THE LEFT AND THE

01:14PM   5      FDA CLEARED OR APPROVED LDT ON THE RIGHT?

01:14PM   6      A.    YES.

01:14PM   7      Q.    AND IF I COUNT THE NUMBER OF LDT'S, I'M ALSO GETTING EIGHT

01:14PM   8      ON THIS PAGE.

01:14PM   9            AM I COUNTING THAT CORRECTLY?

01:14PM  10      A.    YES.

01:14PM  11      Q.    SO A TOTAL OF 16 SO FAR?

01:14PM  12      A.    YES.

01:14PM  13      Q.    AND THE MAJORITY OF THE TESTS ON THIS PAGE ARE BEING

01:14PM  14      LISTED AS BEING FDA CLEARED OR APPROVED; IS THAT CORRECT?

01:14PM  15      A.    YES.

01:14PM  16      Q.    LET'S LOOK AT PAGE 3, PLEASE.  DO YOU SEE THAT THERE ARE

01:14PM  17      TWO LDT'S ON THIS PAGE?

01:14PM  18      A.    I DO.

01:14PM  19      Q.    AND SO NOW WE'RE UP TO 18 TOTAL ON THE THREE PAGES?

01:14PM  20      A.    YES.

01:14PM  21      Q.    AND THE MAJORITY ON THIS PAGE ARE LISTED AS BEING FDA

01:15PM  22      CLEARED OR APPROVED TESTS?

01:15PM  23      A.    YES.

01:15PM  24      Q.    IF WE CAN LOOK AT PAGE 4.

01:15PM  25            DO YOU SEE AN ADDITIONAL LISTING OF ASSAYS AND A COLUMN

01:15PM 1    FOR FDA CLEARED OR APPROVED FOR LDT'S?

01:15PM 2    A.   YES.

01:15PM 3    Q.   AND BY MY COUNT I HAVE 12 LDT'S ON THIS PAGE.

01:15PM 4    A.   YES.

01:15PM 5    Q.   AND ARE THE MAJORITY ON THIS PAGE FDA CLEARED OR APPROVED

01:15PM 6    ASSAYS?

01:15PM 7    A.   YES.

01:15PM 8    Q.   AND BY MY COUNT WE'RE UP TO 28.

01:16PM 9    A.   YES.

01:16PM 10   Q.   LET'S LOOK AT PAGE 5, PLEASE.

01:16PM 11        DO YOU SEE SEVEN LDT'S LISTED ON THIS PAGE?

01:16PM 12   A.   I DO.

01:16PM 13   Q.   AND ARE THE MAJORITY FDA CLEARED OR APPROVED ASSAYS?

01:16PM 14   A.   YES.

01:16PM 15   Q.   AND ARE WE UP TO 35 LDT'S?

01:16PM 16   A.   YES.

01:16PM 17   Q.   LET'S LOOK AT PAGE 6.

01:16PM 18        DO YOU SEE FOUR ADDITIONAL LDT'S?

01:16PM 19   A.   I DO.

01:16PM 20   Q.   AND THE MAJORITY ON THIS PAGE ARE FDA CLEARED OR APPROVED

01:16PM 21   ASSAYS?

01:16PM 22   A.   YES.

01:16PM 23   Q.   AND SO NOW WE'RE UP TO 39 LDT'S AS OF JUNE 12TH, 2015?

01:16PM 24   A.   YES.

01:16PM 25   Q.   THANK YOU.  WE CAN TAKE THAT DOWN, MS. WACHS.

01:21PM  1          IN YOUR ENTRANCE INTERVIEW WITH MR. BALWANI, DID YOU ASK

01:21PM  2   QUESTIONS AROUND OR DID MR. BALWANI MAKE STATEMENTS ABOUT WHAT

01:21PM  3   ASSAYS THERANOS WAS PERFORMING IN ITS LAB?

01:21PM  4   A.   I DON'T RECALL IF HE MADE A SPECIFIC STATEMENT.

01:21PM  5   Q.   OKAY.  AT THE START OF THE ENTRANCE EXAM, DID MR. BALWANI

01:21PM  6   VOLUNTEER THE FACT THAT THERANOS HAD BEEN USING AN FDA APPROVED

01:21PM  7   DEVICE THAT IT HAD MANUFACTURED?

01:21PM  8   A.   YES.

01:21PM  9   Q.   AND HOW DID THAT COME UP?

01:21PM 10   A.   AS A RESULT OF ONE OF THE COMPLAINTS, IT WAS RELATED TO

01:21PM 11   THE EDISON DEVICE, AND SO I ASKED FOR A LIST OF THE TESTS THAT

01:21PM 12   WERE BEING RUN ON THE EDISON DEVICE.

01:21PM 13   Q.   OKAY.  WAS THAT SOMETHING THAT YOU SPECIFICALLY HAD TO ASK

01:21PM 14   MR. BALWANI FOR?

01:21PM 15   A.   YES.

01:21PM 16   Q.   AND WHAT DO YOU MEAN BY THAT?  LIKE HOW DID IT COME ABOUT?

01:21PM 17   A.   AS A RESULT OF THE COMPLAINT, WE HAD TO LOOK INTO TESTING

01:21PM 18   ON THE EDISON AND WHETHER IT WAS ACCURATE OR RELIABLE.

01:21PM 19          SO I ASKED FOR A LIST, AND MR. BALWANI TOLD ME THAT THEY

01:21PM 20   WERE NO LONGER USING THE EDISON DEVICE.

01:21PM 21   Q.   AND WAS THAT EXPLANATION SATISFACTORY TO YOU?

01:21PM 22   A.   NO.

01:21PM 23   Q.   WHY NOT?

01:21PM 24   A.   I NEEDED TO KNOW, BECAUSE OF THE COMPLAINT, WHEN THEY

01:21PM 25   STARTED USING THE EDISON DEVICE AND WHEN THEY STOPPED USING THE

01:21PM   1    EDISON DEVICE, SO I REQUESTED THAT INFORMATION.

01:21PM   2    Q.   AND DID MR. BALWANI ULTIMATELY PROVIDE YOU A LIST OF WHAT

01:21PM   3    HAD BEEN TESTED ON THE EDISON DEVICE?

01:21PM   4    A.   HE DID.

01:21PM   5    Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO EXHIBIT 4533.

01:21PM   6         DO YOU RECOGNIZE THIS DOCUMENT?

01:21PM   7    A.   I DO.

01:21PM   8    Q.   AND WHAT IS THIS?

01:21PM   9    A.   THIS IS THE DOCUMENT THAT MR. BALWANI PROVIDED ME AS A

01:21PM  10    RESULT OF MY REQUEST.

01:21PM  11    Q.   AND THERE'S A DATE, SEPTEMBER 23RD, 2015.

01:21PM  12         DO YOU SEE THAT?

01:21PM  13    A.   I DO.

01:21PM  14    Q.   WAS THAT THE SECOND DAY OF YOUR SURVEY?

01:21PM  15    A.   IT WAS.

01:21PM  16    Q.   AND WAS THIS SOMETHING THAT YOU HAD TO SPECIFICALLY ASK

01:21PM  17    FOR?

01:21PM  18    A.   YES.

01:21PM  19    Q.   OKAY.

01:21PM  20         MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

01:21PM  21    EXHIBIT 4533.

01:21PM  22         MR. CAZARES:  NO OBJECTION.

01:21PM  23         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:21PM  24    (GOVERNMENT'S EXHIBIT 4533 WAS RECEIVED IN EVIDENCE.)

01:21PM  25         MR. LEACH:  IF WE COULD PLEASE ZOOM IN ON THE TOP

01:21PM   1     HALF OF THIS, MS. WACHS.

01:21PM   2     Q.   DO YOU SEE THE DATE SEPTEMBER 23RD, 2015?

01:21PM   3     A.   YES.

01:21PM   4     Q.   AND THIS SAYS "TO WHOM IT MAY CONCERN"?

01:21PM   5     A.   YES.

01:21PM   6     Q.   "YOU REQUESTED A CURRENT LIST OF THE PLATFORMS ON WHICH

01:21PM   7     ALL OF OUR TESTS ARE RUNNING AS OF SEPTEMBER 22ND, 2015.  WE

01:21PM   8     ARE PROVIDING THAT INFORMATION TO YOU UNDER SEPARATE COVER."

01:21PM   9          HAD YOU ASKED FOR A CURRENT LIST OF ALL OF THE PLATFORMS

01:21PM  10     UNDER WHICH TESTS WERE BEING RUN?

01:21PM  11     A.   YES.

01:21PM  12     Q.   AND YOU ALSO SPECIFICALLY ASKED FOR HISTORICAL INFORMATION

01:21PM  13     ABOUT THE EDISON?

01:21PM  14     A.   YES.

01:21PM  15     Q.   OKAY.  BECAUSE THAT WAS INFORMATION THAT WASN'T

01:21PM  16     VOLUNTEERED TO YOU?

01:21PM  17     A.   CORRECT.

01:21PM  18     Q.   IT THEN READS, "ADDITIONALLY, THE FOLLOWING IS THE LIST OF

01:21PM  19     LABORATORY DEVELOPED TESTS (LDT'S) THAT THERANOS TESTED ON

01:21PM  20     THERANOS DEVICES, ALSO CALLED THERANOS SAMPLE PROCESSING UNITS,

01:21PM  21     (TSPU'S) ALONG WITH THE TIME PERIODS WHEN THOSE TESTS WERE

01:21PM  22     RUN."

01:21PM  23          DO YOU SEE THAT LANGUAGE?

01:21PM  24     A.   I DO.

01:21PM  25     Q.   AND IT THEN SAYS, "THERANOS RECENTLY RECEIVED FDA

01:21PM 1    CLEARANCE FOR ITS THERANOS SYSTEM -- INCLUDING THE DEVICE, THE

01:21PM 2    THERANOS SAMPLE COLLECTION DEVICE (INCLUDING THE NANOTAINERS)

01:21PM 3    AND OTHER COMPONENTS OF THE SYSTEM."

01:21PM 4        DID YOU HAVE AN UNDERSTANDING OF WHAT THAT WAS REFERRING

01:21PM 5    TO?

01:21PM 6    A.   YES.

01:21PM 7    Q.   AND WHAT WAS YOUR UNDERSTANDING?

01:21PM 8    A.   SO THEY HAD A SEPARATE DEVICE THAT THEY ACTUALLY COLLECTED

01:21PM 9    THE FINGERSTICK SPECIMEN IN.  IT WAS PART OF THE WHOLE TEST

01:21PM 10   SYSTEM.

01:21PM 11   Q.   BUT THE FDA CLEARANCE THAT WAS BEING REFERRED TO THERE,

01:21PM 12   WERE YOU FAMILIAR WITH THAT?

01:21PM 13   A.   I WAS FAMILIAR THAT THE FDA HAD CLEARED, I BELIEVE, A

01:21PM 14   STREP TEST, I BELIEVE IT WAS STREP, BUT I WAS NOT SURE IF THE

01:21PM 15   COLLECTION DEVICE HAD ALSO BEEN CLEARED.

01:21PM 16   Q.   OKAY.  DID YOU HAVE AN UNDERSTANDING WHETHER IT WAS

01:21PM 17   CLEARED FOR ONE ASSAY OR MORE THAN ONE ASSAY?

01:21PM 18          MR. CAZARES:  OBJECTION.  LEADING.

01:21PM 19          THE COURT:  WHY DON'T YOU ASK IT IN A DIFFERENT

01:21PM 20   FORM?

01:21PM 21   BY MR. LEACH:

01:21PM 22   Q.   DID YOU HAVE AN UNDERSTANDING OF HOW MANY ASSAYS THE FDA

01:21PM 23   CLEARANCE RELATED TO?

01:21PM 24   A.   YES.  ONE.

01:21PM 25   Q.   LET'S ZOOM OUT, PLEASE.

01:21PM    1            THERE'S A TABLE AT THE BOTTOM OF THIS WITH THREE COLUMNS:

01:21PM    2    TEST, INITIAL, AND END.

01:21PM    3            DO YOU SEE THAT?

01:21PM    4    A.   I DO.

01:21PM    5    Q.   AND THERE ARE 12 ASSAYS HERE, BEGINNING WITH VIT D AND

01:21PM    6    ENDING WITH PROLACTIN.

01:21PM    7            DO YOU SEE THAT?

01:21PM    8    A.   I DO.

01:21PM    9    Q.   AND WHAT DO YOU UNDERSTAND THOSE TO BE?

01:21PM   10    A.   THOSE WERE THE TESTS THAT THERANOS USED THE EDISON TO

01:22PM   11    PERFORM.

01:22PM   12            FOR EXAMPLE, THE VITAMIN D, THEY STARTED USING THE EDISON

01:22PM   13    DEVICE TO TEST VITAMIN D ON NOVEMBER 6TH, 2013, AND STOPPED

01:22PM   14    USING IT ON MARCH 10TH, 2015.

01:22PM   15    Q.   AND DOES IT APPEAR FROM THIS LISTING THAT MR. BALWANI

01:22PM   16    PROVIDED YOU THAT THE LAST EDISON TEST FOR ANY OF THESE ASSAYS

01:22PM   17    WAS JUNE 25TH, 2015?

01:22PM   18            AND I DRAW YOUR ATTENTION TO TPSA AND HCG.

01:22PM   19    A.   YES.

01:22PM   20    Q.   AND WITH RESPECT TO ESTRADIOL AND PROLACTIN, DO YOU SEE

01:22PM   21    THAT AT THE BOTTOM?

01:22PM   22    A.   I DO.

01:22PM   23    Q.   AND DOES IT APPEAR THAT THOSE ASSAYS WERE IN USE ON THE

01:22PM   24    THERANOS DEVICE FOR A COUPLE OF MONTHS BETWEEN SEPTEMBER OF

01:22PM   25    2014 AND DECEMBER OF 2014?

01:22PM   1    A.   YES.

01:23PM   2    Q.   OKAY.  DURING YOUR SURVEY, DID YOU MAKE DOCUMENT

01:23PM   3    REQUESTS -- FIRST OF ALL, LET ME BACK UP.

01:23PM   4        FOR THE ENTRANCE INTERVIEW THAT MR. BALWANI WAS LEADING,

01:23PM   5    DID THAT EVOLVE INTO YOU ACTUALLY REVIEWING DOCUMENTS AND

01:23PM   6    CONDUCTING THE SURVEY?

01:23PM   7    A.   YES.

01:23PM   8    Q.   AND WHERE DID THAT TAKE PLACE?

01:23PM   9    A.   IT WAS IN A CONFERENCE ROOM OFF THE MAIN LOBBY.

01:23PM   10   Q.   WHO WAS IN THAT CONFERENCE ROOM?

01:23PM   11   A.   GARY AND I WERE IN THERE, VARIOUS OTHER STAFF, MR. GEE WAS

01:23PM   12   THERE, SUNNY WAS THERE, MR. BALWANI WAS THERE, THE TECHNICAL

01:23PM   13   CONSULTANTS, TECHNICAL SUPERVISORS, HEATHER KING, AND ANOTHER

01:23PM   14   ATTORNEY.

01:23PM   15   Q.   AND DURING THE COURSE OF YOUR SURVEY, DID YOU REQUEST

01:24PM   16   DOCUMENTS OF MR. BALWANI AND MR. GEE AND OTHERS?

01:24PM   17   A.   YES.

01:24PM   18   Q.   AND WAS IT EASY TO GET DOCUMENTS DURING THE SURVEY?

01:24PM   19   A.   IT WAS NOT.

01:24PM   20   Q.   WHY DO YOU SAY THAT?

01:24PM   21   A.   WE WOULD REQUEST DOCUMENTS AND THEY WOULD GO AND TRY -- OR

01:24PM   22   GO LOOK FOR THE DOCUMENTS OR FIND THE DOCUMENTS, AND IT WOULD

01:24PM   23   BE SEVERAL HOURS BEFORE WE WOULD GET THE DOCUMENTS, OR WE WOULD

01:24PM   24   NEVER GET THE DOCUMENTS BECAUSE THEY COULDN'T FIND THEM, OR

01:24PM   25   THEY WOULD BRING DOCUMENTS BACK THAT WERE NOT WHAT WE ASKED

01:24PM  1    FOR.

01:24PM  2    Q.   OKAY.  WERE THERE ALSO OCCASIONS WHERE YOU REQUESTED

01:24PM  3    INTERVIEWS OF EMPLOYEES?

01:24PM  4    A.   YES.

01:24PM  5    Q.   AND DID YOU REQUEST TO INTERVIEW EMPLOYEES CONFIDENTIALLY?

01:24PM  6    A.   YES.

01:24PM  7    Q.   AND WHAT HAPPENED WHEN YOU DID THAT?

01:24PM  8    A.   I WAS TOLD THAT I COULD NOT CONFIDENTIALLY INTERVIEW

01:24PM  9    STAFF, THAT THERE HAD TO BE AN ATTORNEY PRESENT.

01:24PM  10        AND WHEN I SAID THAT I COULD INTERVIEW STAFF

01:25PM  11    CONFIDENTIALLY, I WAS PUT INTO A ROOM TO WAIT UNTIL THEY WORKED

01:25PM  12    OUT THE LOGISTICS OF THAT.

01:25PM  13        AND THEY CAME AND GOT ME SOME TIME LATER AND BROUGHT ME UP

01:25PM  14    TO AN OFFICE WHERE THIS EMPLOYEE WAS, AND BOTH ATTORNEYS WERE

01:25PM  15    IN THE ROOM, AND BEFORE I COULD GET STARTED, THE EMPLOYEE SAID

01:25PM  16    THAT SHE WANTED THE ATTORNEYS PRESENT.

01:25PM  17    Q.   HOW LONG WERE YOU WAITING BEFORE YOU GOT TO MEET WITH THE

01:25PM  18    EMPLOYEE?

01:25PM  19    A.   I WOULD SAY PROBABLY AN HOUR OR TWO.

01:25PM  20    Q.   AND WHERE WERE YOU WAITING?

01:25PM  21    A.   I WAS IN A SMALL ROOM WITH NO WINDOWS.

01:25PM  22    Q.   YOU MENTIONED THAT HEATHER KING WAS INVOLVED IN RESPONDING

01:25PM  23    TO SOME INFORMATION IN THE SURVEY.

01:25PM  24    A.   SHE WAS.

01:25PM  25    Q.   AND SHE'S A LAWYER?

BENNETT DIRECT BY MR. LEACH

01:25PM 1   A.   YES.

01:25PM 2   Q.   OKAY.  AND IN YOUR EXPERIENCE THROUGH SURVEYS, HOW DO YOU

01:25PM 3   COMPARE THE LEVEL OF LAWYER INVOLVEMENT IN THIS SURVEY?

01:26PM 4           MR. CAZARES:  OBJECTION.  RELEVANCE.

01:26PM 5           THE COURT:  OVERRULED.

01:26PM 6           THE WITNESS:  THE AMOUNT AND INTERACTION WITH

01:26PM 7   ATTORNEYS ON THEIR SURVEY WAS VERY UNUSUAL.  I HAD NEVER

01:26PM 8   EXPERIENCED IT BEFORE.

01:26PM 9   BY MR. LEACH:

01:26PM 10  Q.   DURING THE FIRST PART OF -- HOW LONG DID THE SURVEY LAST

01:26PM 11  IN SEPTEMBER?

01:26PM 12  A.   I BELIEVE WE WERE THERE FOR THREE DAYS.

01:26PM 13  Q.   OKAY.  AND WHAT TYPES OF DOCUMENTS DID YOU REQUEST AND

01:26PM 14  REVIEW?

01:26PM 15  A.   PROFICIENCY TESTING DOCUMENTATION, DOCUMENT RELATED TO

01:26PM 16  COAGULATION TESTING, PT INR, WHICH IS THE COAGULATION TEST.

01:26PM 17      I BELIEVE I ALSO ASKED FOR PERSONNEL FOLDERS, BUT I'M NOT

01:27PM 18  SURE IF THAT WAS SEPTEMBER OR NOVEMBER.

01:27PM 19  Q.   YOU SAY YOU'RE NOT SURE WHETHER IT WAS SEPTEMBER OR

01:27PM 20  NOVEMBER.

01:27PM 21      WERE YOU ABLE TO FINISH YOUR SURVEY IN SEPTEMBER?

01:27PM 22  A.   WE WERE NOT.

01:27PM 23  Q.   WHY WERE YOU UNABLE TO FINISH?

01:27PM 24  A.   ONCE WE STARTED THE SURVEY, WE REALIZED THAT WE WERE GOING

01:27PM 25  TO NEED MORE THAN THE ALLOTTED THREE DAYS, AND THE DELAY IN

01:27PM  1     GETTING US THE DOCUMENTATION THAT WE ASKED FOR CREATED PROBLEMS

01:27PM  2     FOR US TO BE ABLE TO COMPLETE THE SURVEY.

01:27PM  3     Q.   AND DID YOU ULTIMATELY COME BACK IN NOVEMBER?

01:27PM  4     A.   WE DID.

01:27PM  5     Q.   AND HOW MANY DAYS -- AND YOU WERE OUT HERE IN CALIFORNIA

01:27PM  6     FOR THAT?

01:27PM  7     A.   YES.

01:27PM  8     Q.   AND AT A HIGH LEVEL, DESCRIBE FOR US WHAT YOU DID IN

01:27PM  9     CONNECTION WITH YOUR SURVEY.

01:27PM  10    A.   WE CONTINUED THE SURVEY, INVESTIGATING THE COMPLAINTS, AND

01:28PM  11    PERFORMING THE RECERTIFICATION SURVEY.

01:28PM  12         WE LOOKED AT THE EDISON INFORMATION, OR REQUESTED THE

01:28PM  13    EDISON INFORMATION.

01:28PM  14    Q.   WHEN YOU SAY YOU REQUESTED THE EDISON INFORMATION, WHAT DO

01:28PM  15    YOU MEAN?

01:28PM  16    A.   THE QUALITY CONTROL INFORMATION AND THE VALIDATION OF THE

01:28PM  17    TESTS.

01:28PM  18    Q.   WHY WERE YOU ASKED FOR QUALITY CONTROL INFORMATION?

01:28PM  19    A.   WELL, WE WOULD NORMALLY ASK FOR QUALITY CONTROL

01:28PM  20    INFORMATION.

01:28PM  21         IN THIS PARTICULAR CASE, IT WAS PART OF A SPECIFIC -- IT

01:28PM  22    WAS A SPECIFIC AREA THAT WE HAD RECEIVED A COMPLAINT ABOUT.

01:28PM  23    Q.   OKAY.  AND WHY DID YOU ASK FOR VALIDATION REPORTS?

01:28PM  24    A.   WE RECEIVED THE SAME -- IT WAS PART OF THE SAME COMPLAINT,

01:28PM  25    BUT WE ALSO ALWAYS LOOK AT THOSE, THAT TYPE OF INFORMATION WHEN

01:28PM  1    WE SURVEY LABORATORIES.

01:28PM  2    Q.   AT THE END OF NOVEMBER OF 2015, AT THE END OF YOUR ONSITE

01:28PM  3    SURVEY, DID MS. HOLMES AND MR. BALWANI REQUEST TO MEET WITH

01:29PM  4    YOU?

01:29PM  5    A.   THEY DID.

01:29PM  6    Q.   OKAY.  DID THEY ASK TO DO THAT EVERY DAY OF THE

01:29PM  7    INSPECTION?

01:29PM  8    A.   THEY DID.

01:29PM  9    Q.   AND WOULD YOU DESCRIBE TO THEM WHAT YOU WERE FINDING IN

01:29PM  10   TERMS OF YOUR INSPECTION?

01:29PM  11   A.   YES.  MR. BALWANI REQUESTED THAT WE MEET WITH THEM EVERY

01:29PM  12   DAY AT THE END OF THE SURVEY FOR THAT PARTICULAR DAY SO WE

01:29PM  13   COULD LET THEM KNOW WHAT KIND OF DEFICIENT PRACTICES THAT WE

01:29PM  14   HAD FOUND, SO WE DID THAT EVERY SINGLE DAY.

01:29PM  15   Q.   I WANT TO DRAW YOUR ATTENTION TO THE END OF THE ONSITE

01:29PM  16   SURVEY IN NOVEMBER OF 2015.

01:29PM  17        WHAT DID YOU TELL MS. HOLMES AND MR. BALWANI?

01:29PM  18   A.   WE SUMMARIZED OUR FINDINGS FROM BOTH SEPTEMBER AND

01:29PM  19   NOVEMBER, AND SO THEY WERE AWARE OF THE DEFICIENCIES THAT WE

01:29PM  20   HAD FOUND.

01:29PM  21        WE TOLD THEM WHAT WOULD COME NEXT, THAT THEY WOULD BE

01:29PM  22   RECEIVING A LETTER AND A STATEMENT OF DEFICIENCIES THAT THEY

01:29PM  23   WOULD HAVE TO RESPOND TO.

01:29PM  24        WE TOLD THEM AT THE TIME THAT WE WERE CONSIDERING

01:30PM  25   IMMEDIATE JEOPARDY, BUT WE HADN'T MADE A DECISION ABOUT THAT

01:30PM  1    YET.

01:30PM  2         BUT WE WANTED TO MAKE SURE THAT THEY WERE AWARE THAT THAT

01:30PM  3    COULD HAPPEN.

01:30PM  4         AND THEN WHAT THEY WOULD NEED TO DO SPECIFICALLY TO

01:30PM  5    RESPOND TO THE DEFICIENCIES.

01:30PM  6    Q.   AND WHAT DO YOU MEAN BY "IMMEDIATE JEOPARDY"?

01:30PM  7    A.   IMMEDIATE JEOPARDY IS A SITUATION WHERE THE LAB PRACTICES

01:30PM  8    HAVE THE POTENTIAL TO CAUSE HARM, OR HAVE CAUSED HARM, OR COULD

01:30PM  9    CAUSE DEATH TO PATIENTS.

01:30PM  10   Q.   AND DID MS. HOLMES OR MR. BALWANI ATTEMPT TO DISSUADE YOU

01:30PM  11   FROM MAKING THAT FINDING?

01:30PM  12   A.   THEY DID.

01:30PM  13   Q.   AND TELL US WHAT WAS SAID.

01:30PM  14   A.   THEY WERE TRYING TO CONVINCE US THAT, YOU KNOW, PERHAPS WE

01:30PM  15   DIDN'T NEED TO CITE THIS, OR COULD WE DO THIS ANOTHER WAY SO

01:31PM  16   THAT IT DIDN'T LOOK QUITE SO BAD.  BUT WE CITE WHAT WE SEE THE

01:31PM  17   WAY WE SEE IT.

01:31PM  18   Q.   AND AT SOME POINT IN TIME, DID YOU DELIVER A 2567

01:31PM  19   STATEMENT OF DEFICIENCIES TO THERANOS SUMMARIZING THE RESULTS

01:31PM  20   OF YOUR SURVEY?

01:31PM  21   A.   WE DID.

01:31PM  22   Q.   LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

01:31PM  23   EXHIBIT 4621.

01:31PM  24        DO YOU RECOGNIZE THIS DOCUMENT?

01:31PM  25   A.   YES.

01:31PM 1    Q.   THE FIRST FOUR PAGES OF EXHIBIT 4621 APPEAR TO BE A LETTER

01:31PM 2    DATED JANUARY 25TH, 2006.

01:31PM 3         DO YOU SEE THAT?

01:31PM 4    A.   I DO.

01:31PM 5    Q.   AND DID YOU HAVE A HAND IN DRAFTING THIS LETTER?

01:31PM 6    A.   I REVIEWED IT.

01:31PM 7    Q.   YOU REVIEWED IT.

01:32PM 8         AND BEGINNING ON PAGE 5 THERE IS A FORM WITH THE NUMBER

01:32PM 9    FORM 2567 DOWN IN THE BOTTOM LEFT.

01:32PM 10        DO YOU SEE THAT?

01:32PM 11   A.   I DO.

01:32PM 12   Q.   AND DO YOU SEE TO THE RIGHT THAT THIS IS 121 PAGES?

01:32PM 13   A.   YES.

01:32PM 14   Q.   WITH RESPECT TO THE FORM BEGINNING ON PAGE 5 AND

01:32PM 15   CONTINUING TO PAGE 125 OF THE TRIAL EXHIBIT, IS THIS SOMETHING

01:32PM 16   THAT YOU HAD A HAND IN PREPARING?

01:32PM 17   A.   YES.

01:32PM 18   Q.   AND WHAT WAS YOUR ROLE IN PREPARING THIS?

01:32PM 19   A.   MY ROLE WAS TO WRITE UP THE CITATIONS BASED ON THE AREAS

01:32PM 20   THAT I HAD LOOKED AT AND FOUND DEFICIENT PRACTICES.

01:32PM 21   Q.   OKAY.  AND IS THIS A REPORT OF MATTERS THAT YOU AND

01:32PM 22   MR. YAMAMOTO OBSERVED WHILE UNDER A LEGAL DUTY TO REPORT?

01:33PM 23   A.   YES.

01:33PM 24   Q.   DOES IT ACCURATELY DESCRIBE THE OBSERVATIONS YOU AND

01:33PM 25   MR. YAMAMOTO MADE DURING THE INSPECTION?

01:33PM   1    A.   YES, IT DOES.

01:33PM   2    Q.   WAS THIS PREPARED IN THE ORDINARY COURSE OF CMS'S

01:33PM   3    BUSINESS?

01:33PM   4    A.   YES.

01:33PM   5    Q.   OKAY.  AND WAS IT PREPARED AT OR AROUND THE TIME OF THE

01:33PM   6    MATTERS THAT YOU INSPECTED?

01:33PM   7    A.   YES.

01:33PM   8    Q.   AND WITH RESPECT TO THE LETTER, IS THE PURPOSE OF THIS

01:33PM   9    LETTER TO PROVIDE NOTICE TO THERANOS OF WHAT YOU HAVE FOUND?

01:33PM   10   A.   YES.

01:33PM   11   Q.   OKAY.

01:33PM   12        YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 4621.

01:33PM   13             MR. CAZARES:  OBJECTION, YOUR HONOR.  HEARSAY, 403,

01:33PM   14   702, AND I REFERENCE OUR MOTIONS IN LIMINE.

01:33PM   15             THE COURT:  ALL RIGHT.  THANK YOU.

01:33PM   16        ANYTHING FURTHER ON THIS, MR. LEACH?

01:33PM   17             MR. LEACH:  NO, YOUR HONOR.

01:33PM   18             THE COURT:  ALL RIGHT.  THANK YOU.

01:33PM   19        THE OBJECTION IS OVERRULED.  THIS WILL BE ADMITTED, AND IT

01:33PM   20   MAY BE PUBLISHED.

01:33PM   21        (GOVERNMENT'S EXHIBIT 4621 WAS RECEIVED IN EVIDENCE.)

01:34PM   22   BY MR. LEACH:

01:34PM   23   Q.   MR. BALWANI, I WANT TO DRAW YOUR ATTENTION TO THE TOP

01:34PM   24   PORTION OF THE LETTER.

01:34PM   25        DO YOU SEE THE DATE JANUARY 25TH, 2016?

01:34PM 1    A.   YES.

01:34PM 2    Q.   AND THIS IS ADDRESSED TO SUNIL DHAWAN, M.D., DIRECTOR.

01:34PM 3         DO YOU SEE THAT?

01:34PM 4    A.   I DO.

01:34PM 5    Q.   WHY IS THIS ADDRESSED TO DR. DHAWAN?

01:34PM 6    A.   IT'S USUALLY -- THESE ENFORCEMENT LETTERS ARE USUALLY SENT

01:34PM 7    TO THE LABORATORY DIRECTOR.

01:34PM 8    Q.   THE SUBJECT LINE IS RE:  CONDITION LEVEL DEFICIENCIES --

01:34PM 9    IMMEDIATE JEOPARDY.

01:34PM 10        DO YOU SEE THAT?

01:34PM 11   A.   I DO.

01:34PM 12   Q.   AND IS THAT A REFERENCE TO THE TERMINOLOGY THAT YOU WERE

01:34PM 13   EXPRESSING TO MS. HOLMES AND MR. BALWANI IN THE EXIT INTERVIEW?

01:34PM 14   A.   YES.

01:34PM 15   Q.   LET'S LOOK AT THE FIRST PARAGRAPH.

01:34PM 16        THE LAST SENTENCE SAYS, "FEDERAL REGULATIONS REQUIRE

01:34PM 17   ONSITE SURVEYS TO DETERMINE WHETHER OR NOT A LABORATORY IS IN

01:34PM 18   COMPLIANCE WITH THE APPLICABLE REGULATIONS.  COMPLIANCE WITH

01:34PM 19   THESE REGULATIONS IS A CONDITION OF CERTIFICATION OF THE CLIA

01:34PM 20   PROGRAM."

01:34PM 21        DO YOU SEE THAT?

01:34PM 22   A.   I DO.

01:34PM 23   Q.   AND IS THAT A FAIR SUMMARY OF WHAT YOU DID IN YOUR WORK AS

01:35PM 24   A SURVEYOR?

01:35PM 25   A.   IT IS.

01:35PM  1    Q.   OKAY.  THIS SAYS, "THE" -- IN THE NEXT PARAGRAPH IT SAYS,

01:35PM  2    "THE CENTERS FOR MEDICARE AND MEDICAID SERVICE (CMS) CONDUCTED

01:35PM  3    A CLIA RECERTIFICATION AND COMPLAINT SURVEY OF THE LABORATORY."

01:35PM  4         IS THAT ACCURATE?

01:35PM  5    A.   YES.

01:35PM  6    Q.   "THE ONSITE SURVEY WAS COMPLETED ON NOVEMBER 20TH, 2015."

01:35PM  7         IS THAT CORRECT?

01:35PM  8    A.   YES.

01:35PM  9    Q.   AND IT THEN SAYS, "AS A RESULT OF THE SURVEY, IT WAS

01:35PM 10    DETERMINED THAT YOUR FACILITY IS NOT IN COMPLIANCE WITH ALL OF

01:35PM 11    THE CONDITIONS REQUIRED FOR CERTIFICATION IN THE CLIA PROGRAM."

01:35PM 12         DO YOU SEE THAT?

01:35PM 13    A.   I DO.

01:35PM 14    Q.   AND CONDITIONS IS CAPITALIZED THERE.  IS THAT A TERM OF

01:35PM 15    ART?

01:35PM 16    A.   YES.

01:35PM 17    Q.   OKAY.  WHAT IS A CONDITION?

01:35PM 18    A.   CLIA REQUIREMENTS ARE DIVIDED INTO TWO LEVELS, STANDARD

01:35PM 19    LEVEL AND CONDITION LEVEL.

01:35PM 20         CONDITION LEVEL NONCOMPLIANCE IS MORE SERIOUS THAN A

01:36PM 21    DEFICIENCY FOUND AT THE STANDARD LEVEL.

01:36PM 22    Q.   OKAY.  AND THIS SAYS, "IN ADDITION, BASED ON THE

01:36PM 23    CONDITION-LEVEL REQUIREMENT, HEMATOLOGY, IT WAS DETERMINED THAT

01:36PM 24    THE DEFICIENT PRACTICES OF THE LABORATORY POSE IMMEDIATE

01:36PM 25    JEOPARDY TO PATIENT HEALTH AND SAFETY."

01:36PM  1        DO YOU SEE THAT LANGUAGE?

01:36PM  2   A.  I DO.

01:36PM  3   Q.  AND THAT'S WHAT YOU WERE EXPRESSING TO MS. HOLMES AND

01:36PM  4   MR. BALWANI IN YOUR NOVEMBER EXIT INTERVIEW?

01:36PM  5   A.  YES.

01:36PM  6   Q.  OKAY.  LET'S GO TO PAGE 2, PLEASE.

01:36PM  7        DO YOU SEE AT THE TOP WHERE IT SAYS, "ENCLOSED IS FORM

01:36PM  8   CMS-2567, STATEMENT OF DEFICIENCIES, LISTING ALL DEFICIENCIES

01:36PM  9   FOUND DURING THE SURVEY"?

01:36PM  10  A.  YES.

01:36PM  11  Q.  AND THAT'S THE FORM THAT IS ATTACHED TO THIS DOCUMENT?

01:36PM  12  A.  YES.

01:36PM  13  Q.  OKAY.  LET'S LOOK AT THE FORM, PLEASE, PAGE 5.

01:37PM  14        AND IF WE CAN ZOOM IN ON THE TOP, MS. WACHS, ALL OF THE

01:37PM  15  WAY TO THE LINE WHERE IT SAYS, "THIS STANDARD IS NOT MET."

01:37PM  16        THANK YOU.

01:37PM  17        I JUST WANT TO ORIENT US ON THE FORM, MS. BENNETT.  DO YOU

01:37PM  18  SEE THERE'S A BOX FOR A PROVIDER NUMBER AND IT BEGINS 05D?

01:37PM  19  A.  YES.

01:37PM  20  Q.  IS THAT THE PROVIDER NUMBER THAT IS ASSIGNED TO THERANOS?

01:37PM  21  A.  YES, THAT'S THE CLIA NUMBER.

01:37PM  22  Q.  OKAY.  AND THEN TO THE FAR RIGHT DO YOU LIST THE DATE THAT

01:37PM  23  THE SURVEY WAS COMPLETED?

01:37PM  24  A.  YES.

01:37PM  25  Q.  AND THEN THERE'S AN ADDRESS 7333 GATEWAY BOULEVARD.

01:37PM    1              IS THAT WHERE THE LAB WAS LOCATED?

01:37PM    2         A.   YES.

01:37PM    3         Q.   AND THEN YOU MENTION THAT THERE'S -- BELOW THAT TO THE

01:37PM    4    LEFT THERE'S D2094.

01:37PM    5              DO YOU SEE THAT?

01:37PM    6         A.   I DO.

01:37PM    7         Q.   AND YOU MENTIONED SOMETHING CALLED D-TAGS EARLIER?

01:38PM    8         A.   WE CALL THEM D-TAGS, DEFICIENCY TAGS.

01:38PM    9         Q.   OKAY.  AND IT THEN HAS SOME LANGUAGE RELATING TO ROUTINE

01:38PM   10    CHEMISTRY, 1, 2.

01:38PM   11              DO YOU SEE THAT?

01:38PM   12         A.   I DO.

01:38PM   13         Q.   IS THAT A DESCRIPTION OF THE STANDARD OR THE CONDITION

01:38PM   14    THAT YOU'RE CONSIDERING WHEN DOING THE SURVEY?

01:38PM   15         A.   NO.  THAT IS THE ACTUAL REGULATORY LANGUAGE.

01:38PM   16         Q.   OKAY.  AND THEN IT SAYS, "THIS STANDARD IS NOT MET AS

01:38PM   17    EVIDENCED BY."

01:38PM   18              AND DOES IT LIST WHAT YOU SAW IN THE SURVEY?

01:38PM   19         A.   IT DOES.

01:38PM   20         Q.   AND DO YOU USE THIS FORMAT THROUGHOUT 2567?

01:38PM   21         A.   YES.

01:38PM   22         Q.   AND THEN THERE'S SPACE FOR THE RIGHT.

01:38PM   23              DO YOU SEE WHERE IT SAYS PROVIDER'S PLAN OF CORRECTION?

01:38PM   24         A.   YES.

01:38PM   25         Q.   AND IS THIS THE SPACE THAT THE LABORATORY IS SUPPOSED TO

01:39PM 1    USE TO DESCRIBE TO YOU WHAT IT'S DOING TO ADDRESS THE

01:39PM 2    DEFICIENCIES?

01:39PM 3    A.   THEY CAN PUT IT IN THAT RIGHT-HAND COLUMN OR THEY CAN

01:39PM 4    ATTACH DOCUMENTS.

01:39PM 5    Q.   OKAY.

01:39PM 6         LET ME PLEASE DRAW YOUR ATTENTION TO PAGE 47 -- OR EXCUSE

01:39PM 7    ME, 51 OF THE TRIAL EXHIBIT.

01:39PM 8         DO YOU HAVE PAGE 51 IN FRONT OF YOU?

01:39PM 9    A.   I DO.

01:39PM 10   Q.   AND ARE YOU ABLE TO SEE IT ON THE SCREEN AS WELL?

01:40PM 11   A.   YES.

01:40PM 12   Q.   OKAY.  DOWN TOWARDS THE BOTTOM THERE'S THE NUMBER D5791.

01:40PM 13        DO YOU SEE THAT?

01:40PM 14   A.   I DO.

01:40PM 15   Q.   IS THAT A REFERENCE TO A PARTICULAR DEFICIENCY RELATING TO

01:40PM 16   ANALYTICAL SYSTEMS QUALITY ASSESSMENT?

01:40PM 17   A.   IT IS.

01:40PM 18   Q.   AND WHAT IS ANALYTICAL SYSTEMS QUALITY ASSESSMENT?

01:40PM 19   A.   SO TESTING IS DIVIDED INTO THREE AREAS:  PRE-ANALYTIC,

01:40PM 20   WHICH IS WHEN YOU RECEIVE THE SPECIMEN AND YOU'RE LOOKING AT

01:40PM 21   THE SPECIMEN BEFORE YOU BEGIN TESTING; THE ANALYTIC PORTION IS

01:40PM 22   THE ACTUAL TESTING OF THE SPECIMEN; AND THEN POST-ANALYTIC IS

01:40PM 23   WHERE YOU'RE ACTUALLY REPORTING OUT THE PATIENT RESULT.

01:40PM 24   Q.   SO ANALYTIC SYSTEMS QUALITY WOULD RELATE TO THE ACTUAL

01:40PM 25   PERFORMANCE OF THE DEVICE?

01:40PM 1    A.   YES.

01:40PM 2    Q.   OKAY.  AND YOU FOUND THAT THIS STANDARD WAS NOT BEING MET;

01:41PM 3    IS THAT CORRECT?

01:41PM 4    A.   YES.

01:41PM 5    Q.   AND LET ME LOOK AT SOME OF YOUR OBSERVATIONS BEGINNING ON

01:41PM 6    PAGE 53.

01:41PM 7         DO YOU SEE AT THE BOTTOM NUMBER 2, "BASED ON REVIEW OF

01:41PM 8    QUALITY CONTROL (QC) DATA AND MONTHLY QC REPORTS, THE

01:41PM 9    LABORATORY FAILED TO HAVE A QUALITY ASSESSMENT (QA) PROCEDURE

01:41PM 10   TO IDENTIFY AND CORRECT PROBLEM WITH THE QC VALUES FOR THE

01:41PM 11   THERANOS PROPRIETARY SYSTEM (TPS) WHEN PRECISION DID NOT MEET

01:41PM 12   THE LABORATORY'S REQUIREMENT FOR PRECISION."

01:41PM 13        DO YOU SEE THAT LANGUAGE?

01:41PM 14   A.   I DO.

01:41PM 15   Q.   AND WHAT DID YOU MEAN BY THAT?

01:41PM 16   A.   WHAT I MEANT WAS THAT THERANOS HAD A PROCEDURE THAT THEY

01:41PM 17   WERE SUPPOSED TO BE FOLLOWING.

01:41PM 18        ACTUALLY, THEY DIDN'T HAVE A PROCEDURE, I APOLOGIZE, TO

01:42PM 19   IDENTIFY AND CORRECT PROBLEMS THAT I HAD OBSERVED THAT THE

01:42PM 20   PRECISION FOR THE THERANOS PROPRIETARY SYSTEM OR EDISON DID NOT

01:42PM 21   MEET WHAT THEY HAD SAID HOW PRECISE IT SHOULD BE.

01:42PM 22   Q.   AND WHAT IS PRECISION?

01:42PM 23   A.   PRECISION IS THE ABILITY TO TEST THE SAME SPECIMEN FROM

01:42PM 24   WITHIN ONE TEST, TESTING TIME, AND AS WELL AS ON DIFFERENT RUNS

01:42PM 25   OF THE TESTS, AS WELL AS FROM DIFFERENT DAYS AND DIFFERENT

01:42PM   1    OPERATORS, AND YOU SHOULD BE ABLE TO RUN THE SPECIMEN AND GET

01:42PM   2    THE SAME RESULT EVERY SINGLE TIME, OR WITHIN A CERTAIN

01:42PM   3    PERCENTAGE YOU SHOULD BE ABLE TO DO THAT.

01:42PM   4    Q.   OKAY.  AND THEN FURTHER BELOW IN -- BENEATH 2, YOU WROTE

01:42PM   5    A, "CL PLN-14003 REVISION A:  MASTER VALIDATION PLAN FOR

01:42PM   6    ROUTINE CHEMISTRY ASSAYS FOR THERANOS."

01:43PM   7         AND THEN IT CONTINUES ON THE NEXT PAGE.

01:43PM   8         "DEVICES IN SECTION 13.4.5 REQUIRES THE PERCENTAGE CV OF

01:43PM   9    THE REPLICATES TO BE NOT MORE THAN 15 PERCENT (20 PERCENT AT

01:43PM   10   THE LOWER AND UPPER LIMITS OF DETECTION)."

01:43PM   11        WHAT WERE YOU GETTING AT THERE?

01:43PM   12   A.   THE SMALL -- A COEFFICENT OF VARIATION IS A RELATIONSHIP

01:43PM   13   BETWEEN THE MEAN, THE KNOWN MEAN, AND HOW FAR A STANDARD

01:43PM   14   DEVIATION FOR THAT MEAN IS.  AND IT'S A WAY TO EVALUATE THE

01:43PM   15   ACCURACY AND PRECISION OF A TEST.  YOU WANT A LOWER -- IN MOST

01:43PM   16   CASES YOU WANT A LOWER CV.  IT MEANS THE TEST IS MORE ACCURATE

01:43PM   17   AND PRECISE.

01:43PM   18   Q.   AND IS THIS SAYING THAT THERANOS'S MASTER VALIDATION PLAN

01:43PM   19   REQUIRED THAT THE PERCENTAGE OF CV'S BE NOT MORE THAN

01:43PM   20   15 PERCENT FOR CERTAIN ASSAYS?

01:44PM   21   A.   THAT'S CORRECT.

01:44PM   22   Q.   AND DID YOU OBSERVE THROUGH YOUR REVIEW OF DOCUMENTS THAT

01:44PM   23   IT WAS GREATER THAN THAT IN CERTAIN CIRCUMSTANCES?

01:44PM   24   A.   I DID.

01:44PM   25   Q.   LET'S ZOOM OUT, MS. WACHS, AND IF WE CAN CAPTURE B

01:44PM  1    THROUGH E.

01:44PM  2         YOU WROTE, "QC RESULTS WERE REVIEWED FROM JUNE 2014

01:44PM  3    THROUGH NOVEMBER 2014 AND JANUARY THROUGH FEBRUARY 2015 FOR

01:44PM  4    VITAMIN B12, VITAMIN D, AND SEX HORMONE BINDING GLOBULIN, WHICH

01:44PM  5    WERE USED FOR PATIENT TESTING ON TPS DEVICES."

01:44PM  6         DO YOU SEE THAT?

01:44PM  7    A.   I DO.

01:44PM  8    Q.   AND SO YOU UNDERSTOOD THOSE TO BE EDISON DEVICES?

01:44PM  9    A.   YES.

01:44PM  10   Q.   AND HOW DID YOU GO ABOUT PICKING THESE TIME PERIODS FOR

01:44PM  11   REVIEWING QC RESULTS?

01:44PM  12   A.   IT WAS JUST A RANDOM SELECTION, EXCEPT FOR THE VITAMIN D

01:44PM  13   WHICH WAS TARGETED BECAUSE OF A COMPLAINT.

01:44PM  14   Q.   SO THIS IS A SUMMARY OF THE QC RESULTS THAT YOU WERE

01:45PM  15   REVIEWING?

01:45PM  16   A.   YES.

01:45PM  17   Q.   AND COMPARING THOSE AGAINST THE VALIDATION PLAN?

01:45PM  18   A.   YES.

01:45PM  19   Q.   YOU THEN WRITE IN C, "VB12 QC LEVEL 1 AND LEVEL 3."

01:45PM  20        WHAT ARE LEVEL 1 AND LEVEL 3?

01:45PM  21   A.   QUALITY CONTROL HAS DIFFERENT LEVELS.  IT COULD BE

01:45PM  22   LEVEL 1, LEVEL 2, LEVEL 3.

01:45PM  23        IN THIS PARTICULAR CASE THEY WERE USING LEVEL 1 AND

01:45PM  24   LEVEL 3.

01:45PM  25   Q.   ON DEVICE E00110, IS THAT A REFERENCE TO A PARTICULAR

01:45PM  1    EDISON DEVICE?

01:45PM  2    A.    IT IS.

01:45PM  3    Q.    THAT WAS BEING USED IN THE CLIA LAB?

01:45PM  4    A.    IT IS.

01:45PM  5    Q.    "REVEALED THE FOLLOWING PERCENTAGE CV (COEFFICENT OF

01:45PM  6    VARIATION):  34.3 PERCENT AND 48.5 PERCENT RESPECTIVELY FROM

01:46PM  7    JANUARY 5TH, 2015 THROUGH JANUARY 30TH, 2015."

01:46PM  8          DO YOU SEE THAT LANGUAGE?

01:46PM  9    A.    I DO.

01:46PM  10   Q.    AND THAT WAS OUTSIDE OF WHAT WAS PROVIDED FOR IN THE

01:46PM  11   VALIDATION REPORT?  WHY DO YOU HIGHLIGHT THOSE NUMBERS?

01:46PM  12   A.    BECAUSE THEY WERE MORE THAN THE 15 AND THE 20 PERCENT.

01:46PM  13   Q.    OKAY.  ARE THOSE DESIRABLE RESULTS FOR A LABORATORY?

01:46PM  14   A.    THEY ARE NOT.

01:46PM  15   Q.    THERE'S AN ADDITIONAL ENTRY IN D FOR "VITAMIN B12 QC 1 AND

01:46PM  16   QC 3 ON DEVICE E001085."

01:46PM  17         DO YOU SEE THAT?

01:46PM  18   A.    YES.

01:46PM  19   Q.    AND IS THAT ANOTHER EDISON DEVICE?

01:46PM  20   A.    IT IS.

01:46PM  21   Q.    AND "REVEALED FOLLOWING CV'S:  52.5 PERCENT AND

01:46PM  22   35.2 PERCENT."

01:46PM  23         DO YOU SEE THAT?

01:46PM  24   A.    I DO.

01:46PM  25   Q.    AND ARE THOSE DESIRABLE CV'S?

BENNETT DIRECT BY MR. LEACH

01:46PM  1    A.   THEY ARE NOT.

01:46PM  2    Q.   AND WHY ARE YOU CALLING OUT THE INFORMATION?

01:46PM  3    A.   I AM CALLING OUT THE INFORMATION BECAUSE IT DID NOT MEET

01:46PM  4    THEIR APPROVED PROCEDURE OF 15 PERCENT AND 20 PERCENT AT THE

01:47PM  5    HIGH/LOW END.

01:47PM  6    Q.   THERE'S AN ADDITIONAL ENTRY IN E FOR "VITAMIN B12 QC 1 AND

01:47PM  7    QC 3 ON DEVICE E001102."

01:47PM  8         DO YOU SEE THAT?

01:47PM  9    A.   I DO.

01:47PM  10   Q.   IS THAT A REFERENCE TO ANOTHER EDISON DEVICE?

01:47PM  11   A.   YES.

01:47PM  12   Q.   AND THIS IS DESCRIBING PERCENTAGE CV'S OF 39 PERCENT AND

01:47PM  13   20 PERCENT FOR A TIME PERIOD IN FEBRUARY OF 2015.

01:47PM  14        DO YOU SEE THAT?

01:47PM  15   A.   I DO.

01:47PM  16   Q.   ARE THOSE DESIRABLE CV'S FOR A LAB?

01:47PM  17   A.   THEY ARE NOT.

01:47PM  18   Q.   OKAY.  WE CAN ZOOM OUT, MS. WACHS.

01:48PM  19        COULD WE GO TO THE BOTTOM PORTION FOR F, G, H AND I.

01:48PM  20        DOES THIS RELATE TO CV'S RELATING TO VITAMIN B12 AND

01:48PM  21   VITAMIN D?

01:48PM  22   A.   YES.

01:48PM  23   Q.   AND ARE THESE DESIRABLE CV'S OR UNDESIRABLE CV'S?

01:48PM  24   A.   THEY ARE UNDESIRABLE.

01:48PM  25   Q.   LET'S ZOOM OUT, MS. WACHS, AND GO TO PAGE 55.

01:48PM  1          AND IF WE CAN ZOOM OUT TO THE TOP PORTION UNTIL NUMBER 3.

01:48PM  2          WHAT IS BEING SUMMARIZED HERE ON J, K, AND L, MS. BENNETT?

01:48PM  3   A.   I'M POINTING OUT THAT THEY -- THE CV'S ARE HIGHER THAN ARE

01:48PM  4   ACCEPTABLE FOR THESE TESTS ON THESE DEVICES.

01:49PM  5   Q.   OKAY.  AND THESE ASSAYS ARE VITAMIN D AND SHBG?

01:49PM  6   A.   YES.

01:49PM  7   Q.   AND THOSE ARE ASSAYS RUN ON EDISON?

01:49PM  8   A.   YES.

01:49PM  9   Q.   AND THIS IS INFORMATION FOR THE TIME PERIOD JUNE 2014 TO

01:49PM 10   JULY 2015, SEPTEMBER 30TH THROUGH NOVEMBER 2014, AND JULY

01:49PM 11   THROUGH AUGUST OF 2014?

01:49PM 12   A.   WITH THE EXCEPTION OF THE FIRST ONE, IT WAS JUNE OF '14

01:49PM 13   THROUGH JULY OF 2014.

01:49PM 14   Q.   THANK YOU.  MY APOLOGIZE.

01:49PM 15          LET'S ZOOM OUT, MS. WACHS.

01:49PM 16          THOSE CV'S THAT WE WERE LOOKING AT, WERE THOSE DESIRABLE

01:49PM 17   OR UNDESIRABLE?

01:49PM 18   A.   UNDESIRABLE.

01:49PM 19   Q.   LET'S ZOOM IN ON NUMBER 3.

01:49PM 20          YOU WROTE IN 3, "BASED ON REVIEW OF QUALITY ASSESSMENT

01:50PM 21   (QA) DOCUMENTATION AND QA PROCEDURES, THE LABORATORY FAILED TO

01:50PM 22   HAVE A QUALITY ASSESSMENT (QA) PROCEDURE ESTABLISHED TO

01:50PM 23   IDENTIFY AND CORRECT PROBLEMS WITH THE QUALITY CONTROL PROGRAM

01:50PM 24   FOR THE THERANOS PROPRIETARY SYSTEM (TPS)."

01:50PM 25          DO YOU SEE THAT?

01:50PM  1    A.   I DO.

01:50PM  2    Q.   AND WHEN YOU'RE USING TPS, IS THAT A REFERENCE TO THE

01:50PM  3    EDISON?

01:50PM  4    A.   IT IS.

01:50PM  5    Q.   OR THE TSPU?

01:50PM  6    A.   WE CALLED -- IN OUR SURVEY REPORT, WE CALLED THE EDISON

01:50PM  7    THE TPS.

01:50PM  8    Q.   OKAY.  AND THIS SAYS -- WHAT IS A QUALITY ASSESSMENT

01:50PM  9    PROCEDURE?

01:50PM 10    A.   QUALITY ASSESSMENT PROCEDURE DESCRIBES HOW THE LABORATORY

01:50PM 11    LOOKS AT THE OVERALL FUNCTIONING OF THE LABORATORY TO IDENTIFY

01:50PM 12    ANY ISSUES WITH TESTING, AND THEN THEY HAVE TO CORRECT, FIND --

01:50PM 13    THEY HAVE TO BE ABLE TO IDENTIFY AND CORRECT PROBLEMS WITH THE

01:51PM 14    TESTING SO THAT IT DOESN'T KEEP GOING ON AND ON AND ON.

01:51PM 15    Q.   BENEATH THE 3 YOU WROTE, "MONTHLY QC REPORTS WERE REVIEWED

01:51PM 16    FOR JULY 2014, OCTOBER 2014, AND FEBRUARY THROUGH JUNE OF

01:51PM 17    2015."

01:51PM 18         DO YOU SEE THAT?

01:51PM 19    A.   I DO.

01:51PM 20    Q.   AND WHAT ARE MONTHLY QC REPORTS?

01:51PM 21    A.   THOSE WERE REPORTS THAT THERANOS PROVIDED US THAT

01:51PM 22    SHOWED -- THAT THEY WERE LIKE SUMMARY REPORTS OF THE QUALITY

01:51PM 23    CONTROL WHERE YOU COULD SEE IF THEY MET THEIR CV'S THAT THEY

01:51PM 24    WERE SUPPOSED TO.  IT INCLUDED ALL OF THEIR STATISTICS ABOUT

01:51PM 25    THE TESTING.

01:51PM  1    Q.   AND IN PARAGRAPH C YOU WROTE, "THE TOTAL PERCENTAGE OF QC

01:51PM  2    VALUES GREATER THAN 2 STANDARD DEVIATIONS (SD'S) WAS REVIEWED

01:51PM  3    BY THE SURVEYOR."

01:51PM  4         DO YOU SEE THAT?

01:51PM  5    A.   I DO.

01:51PM  6    Q.   AND WHY WERE YOU LOOKING FOR THAT INFORMATION?

01:52PM  7    A.   I WAS LOOKING FOR THAT INFORMATION BECAUSE THE PROCEDURE

01:52PM  8    TALKED ABOUT USING TWO STANDARD DEVIATIONS -- PART OF THEIR

01:52PM  9    PROCEDURE TALKED ABOUT USING TWO STANDARD DEVIATIONS AS A WAY

01:52PM  10   TO EVALUATE WHETHER THE QUALITY CONTROL WAS ACCEPTABLE OR NOT.

01:52PM  11   IT WAS ONE OF THE MEASURES THAT THEY USED.

01:52PM  12   Q.   AND THAT WAS THERANOS'S OWN METRIC?  THAT WAS THERANOS'S

01:52PM  13   OWN METRIC?

01:52PM  14   A.   YES.

01:52PM  15   Q.   OKAY.  AND WHAT IS A STANDARD DEVIATION?

01:52PM  16   A.   THAT EVERY TEST HAS A MEAN, WHICH IS THE AVERAGE NUMBER,

01:52PM  17   AVERAGE VALUE OF THAT TEST.

01:52PM  18        AND THEN BASED ON THE RESULTS THAT YOU GET FROM RUNNING

01:52PM  19   THE QUALITY CONTROL, YOU HAVE TO DETERMINE HOW FAR YOU DEVIATE

01:52PM  20   FROM THE MEAN.

01:52PM  21        SO ONE DEVIATION, THE STATISTICS OF ONE DEVIATION WOULD BE

01:53PM  22   THAT WHATEVER VALUE DETERMINED IT CAN BE AWAY FROM THE MEAN,

01:53PM  23   ONE IS ONE STANDARD DEVIATION, TWO IS JUST ONE STANDARD

01:53PM  24   DEVIATION DOUBLED.

01:53PM  25   Q.   SO YOU'RE LOOKING FOR INFORMATION OUTSIDE OF TWO STANDARD

01:53PM  1    DEVIATIONS?

01:53PM  2    A.   YES.

01:53PM  3    Q.   OKAY.  AND THAT WAS THE STANDARD THAT THERANOS WAS

01:53PM  4    EMPLOYING?

01:53PM  5    A.   YES.

01:53PM  6    Q.   LET'S GO TO THE NEXT PAGE, PAGE 56.

01:53PM  7         YOU WROTE IN -- AND IF WE CAN ZOOM IN ON E AND F,

01:53PM  8    MS. WACHS.

01:53PM  9         YOU WROTE, "IN JULY 2014, THE DATA REVEALED THE FOLLOWING

01:53PM 10    TESTS SHOWED PERCENTAGE OF QC SAMPLES WITH MORE THAN 15 PERCENT

01:53PM 11    OF VALUES GREATER THAN 2 SD."

01:53PM 12         AND THEN YOU LIST NUMBERS FOR TESTOSTERONE, TOTAL T4, AND

01:53PM 13    VITAMIN D.

01:53PM 14         DO YOU SEE THAT?

01:53PM 15    A.   I DO.

01:53PM 16    Q.   AND THOSE WERE ASSAYS RUN ON THE EDISON?

01:54PM 17    A.   YES.

01:54PM 18    Q.   AND ARE THESE NUMBERS DESIRABLE OR UNDESIRABLE?

01:54PM 19    A.   THEY ARE UNDESIRABLE.

01:54PM 20    Q.   "OVERALL 16 PERCENT OF QC SAMPLES ON ALL TESTS ON ALL

01:54PM 21    DEVICES HAD VALUES GREATER THAN 2 SD'S."

01:54PM 22         WHY ARE YOU CALLING THAT INFORMATION OUT?

01:54PM 23    A.   I CALLED THAT INFORMATION OUT BECAUSE I GAVE SOME SPECIFIC

01:54PM 24    EXAMPLES WITH TESTOSTERONE, TOTAL T4, AND VITAMIN D TO SHOW

01:54PM 25    THAT THEY WERE OVER THE 15 PERCENT.

01:54PM  1          BUT I ALSO INCLUDED THIS INFORMATION SO THERANOS WOULD

01:54PM  2     KNOW THAT EVEN THOUGH I HAD SAMPLED SOME TESTS, I WAS REFERRING

01:54PM  3     TO ALL OF THE TESTS AS WELL.

01:54PM  4     Q.   IN F YOU WROTE, "IN OCTOBER 2014, THE DATA REVEALED THE

01:54PM  5     FOLLOWING TESTS SHOWED PERCENTAGE OF QC SAMPLES WITH MORE THAN

01:54PM  6     15 PERCENT OF VALUES GREATER THAN 2 SD."

01:55PM  7          AND YOU LIST "ESTRADIOL, FREE T4, PROLACTIN, SHBG, TSH,

01:55PM  8     TST, TOTAL T3, TT4, AND VITAMIN D, AND VITAMIN B12."

01:55PM  9          DO YOU SEE THAT?

01:55PM  10    A.   I DO.

01:55PM  11    Q.   ARE THESE NUMBERS DESIRABLE OR UNDESIRABLE?

01:55PM  12    A.   THEY ARE UNDESIRABLE.

01:55PM  13    Q.   YOU THEN WROTE, "OVERALL 29 PERCENT OF QC SAMPLES ON ALL

01:55PM  14    TESTS ON ALL DEVICES HAD VALUES GREATER THAN 2 SD'S."

01:55PM  15         DO YOU SEE THAT LANGUAGE?

01:55PM  16    A.   I DO.

01:55PM  17    Q.   AND THAT WAS BASED ON YOUR REVIEW OF THERANOS'S OWN

01:55PM  18    DOCUMENTS?

01:55PM  19    A.   YES.

01:55PM  20    Q.   AND WHY WERE YOU CALLING OUT THIS 29 PERCENT FIGURE?

01:55PM  21    A.   FOR THE SAME REASON I DID IN E.  IT'S JUST A DIFFERENT

01:55PM  22    TIMEFRAME.  ONE WAS JULY OF 2014 AND THE OTHER IS OCTOBER OF

01:55PM  23    2014.

01:55PM  24         SO IT SHOWS THAT THE QUALITY ASSURANCE PROGRAM WAS NOT

01:55PM  25    IDENTIFYING THE ISSUES AND THE ISSUES CONTINUED TO EXIST.

01:56PM 1    Q.   THE ISSUES THAT YOU OBSERVED, WERE THEY ISOLATED?

01:56PM 2    A.   THEY WERE NOT.

01:56PM 3    Q.   OKAY.  WERE THEY SYSTEMIC?

01:56PM 4    A.   THEY WERE SYSTEMIC ISSUES.

01:56PM 5    Q.   AND IF WE CAN ZOOM OUT, MS. WACHS, AND LOOK AT G

01:56PM 6    THROUGH I.

01:56PM 7         ARE THESE ADDITIONAL EXAMPLES WHERE YOU'RE SUMMARIZING QC

01:56PM 8    DATA FOR DIFFERENT PERIODS RELATING TO EDISON ASSAYS WHERE THE

01:56PM 9    STANDARD DEVIATION IS MORE THAN 15 PERCENT?

01:56PM 10   A.   YES.

01:56PM 11   Q.   AND IT APPEARS THAT THIS IS CONTINUED -- OR YOUR

01:56PM 12   OBSERVATIONS CONTINUE THROUGH APRIL OF 2015 ON THIS PAGE?

01:56PM 13   A.   YES.

01:56PM 14   Q.   OKAY.  LET'S GO TO THE NEXT PAGE, PLEASE.

01:56PM 15        THEN IF WE CAN ZOOM IN ON EVERYTHING DOWN THROUGH K.

01:57PM 16        ARE YOU REPORTING HERE QC SAMPLING FOR MAY AND JUNE OF

01:57PM 17   2015 FOR PARTICULAR EDISON ASSAYS?

01:57PM 18   A.   YES.

01:57PM 19   Q.   AND IS THIS SIMILAR DATA TO WHAT WE SAW IN THE PRIOR PAGE?

01:57PM 20   A.   IT IS.

01:57PM 21   Q.   OKAY.  LET ME NEXT -- I WANT TO MOVE TO A DIFFERENT

01:57PM 22   PORTION OF THE 2567.

01:57PM 23        AND IF I COULD DRAW YOUR ATTENTION, PLEASE, TO PAGE 58.

01:57PM 24        DO YOU SEE THAT THERE'S A D-TAG, D5793?

01:57PM 25   A.   YES.

01:57PM   1    Q.   AND DOES THIS D-TAG RELATE TO ANALYTICAL SYSTEMS QUALITY

01:57PM   2    ASSESSMENT?

01:57PM   3    A.   YES.

01:57PM   4    Q.   AND WHAT DOES ANALYTICAL SYSTEMS QUALITY ASSESSMENT MEAN?

01:58PM   5    A.   ANALYTIC SYSTEMS IS THE PORTION OF THE TESTING WHERE THE

01:58PM   6    TESTING IS ACTUALLY BEING PERFORMED.

01:58PM   7         QUALITY ASSESSMENT, THEY'RE REQUIRED TO, IF THEY HAVE

01:58PM   8    IDENTIFIED AN ISSUE AND PUT INTO PLACE CORRECTIVE ACTION, THEY

01:58PM   9    HAVE TO MAKE SURE THAT THE CORRECTIVE ACTION IS WORKING SO THAT

01:58PM  10    THE ISSUE DOES NOT CONTINUE.

01:58PM  11    Q.   AND YOUR FINDING WAS THIS STANDARD RELATING TO ANALYTIC

01:58PM  12    SYSTEMS QUALITY WAS NOT BEING MET BASED ON THE EVIDENCE THAT

01:58PM  13    YOU WERE REVIEWING?

01:58PM  14    A.   THAT'S CORRECT.

01:58PM  15    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 67, AND KEEP THAT D-TAG

01:58PM  16    5793 IN MIND.

01:58PM  17         DO YOU SEE --

01:59PM  18         AND IF WE CAN ZOOM IN, MS. WACHS, ON NUMBER 7.  I'M SORRY,

01:59PM  19    ALL OF THE WAY DOWN TO THE BOTTOM.

01:59PM  20         DOES THIS -- IN NUMBER 7 IT SAYS, "BASED ON LABORATORY

01:59PM  21    PERSONNEL INTERVIEWS AND THE LABORATORY'S ALTERNATIVE

01:59PM  22    ASSESSMENT PROGRAM RECORD REVIEW ON NOVEMBER 20TH, THE

01:59PM  23    LABORATORY FAILED TO HAVE AN ANALYTIC SYSTEMS QUALITY

01:59PM  24    ASSESSMENT MECHANISM THAT INCLUDED THE TIMELY REVIEW OF THE

01:59PM  25    EFFECTIVENESS OF ACTIONS TAKEN."

01:59PM  1            DO YOU SEE THAT?

01:59PM  2       A.   I DO.

01:59PM  3       Q.   AND WHAT IS THAT GETTING AT?

01:59PM  4       A.   THE LABORATORY DID NOT HAVE A MECHANISM IN THEIR QUALITY

01:59PM  5       ASSESSMENT PROGRAM THAT ALLOWED THEM TO IDENTIFY ISSUES IN A

01:59PM  6       TIMELY MANNER, AND THEY COULD NOT THEN IDENTIFY THOSE ISSUES IN

01:59PM  7       A TIMELY MANNER SO THAT THEY COULD NOT CORRECT THEM IN A TIMELY

02:00PM  8       MANNER.

02:00PM  9       Q.   OKAY.  WHAT IS MEANT BY ALTERNATIVE ASSESSMENT PROGRAM?

02:00PM  10      A.   SO FOR PROFICIENCY TESTING, WE HAVE A SECTION IN OUR

02:00PM  11      REGULATIONS THAT, WITH CERTAIN ANALYTES, THAT THE LABORATORY

02:00PM  12      HAS TO ENROLL AND PARTICIPATE IN PROFICIENCY TESTING.

02:00PM  13           IF THE ANALYTE OR THE TEST IS NOT IN THAT SECTION, THEN

02:00PM  14      THEY HAVE TO DO SOMETHING CALLED ALTERNATIVE PT, PROFICIENCY

02:00PM  15      TESTING, WHERE THEY HAVE TO EVALUATE THE ACCURACY OF TESTS

02:00PM  16      TWICE A YEAR.

02:00PM  17           IT'S COMMONLY KNOWN AS ALTERNATIVE PT.

02:00PM  18      Q.   AND DID CMS REVIEW THERANOS'S ALTERNATIVE PT RECORDS?

02:00PM  19      A.   YES.  MR. YAMAMOTO DID THOSE FOR THE CHEMISTRY AND I DID

02:00PM  20      THEM FOR THE EDISON.

02:00PM  21      Q.   AND WHAT DID YOU OBSERVE WITH RESPECT TO THE EDISON?

02:00PM  22      A.   I OBSERVED THAT THEY HAD NOT DONE THEM ACCORDING TO THEIR

02:01PM  23      PROCEDURE.  THEY HAD NOT DONE THEM IN THE INTERVAL THAT THEY

02:01PM  24      SAID THEY WOULD DO THEM, THAT THEY HAD IN SOME CASES NOT BEEN

02:01PM  25      REVIEWED, AND IN OTHER CASES THEY HAD BEEN REVIEWED RIGHT

02:01PM  1    BEFORE WE GOT THERE IN SEPTEMBER, EVEN THOUGH SOME OF THE

02:01PM  2    TESTING WAS DONE MONTHS TO A YEAR BEFORE WE WERE THERE.

02:01PM  3    Q.   AND THAT WAS BASED ON YOUR REVIEW OF RECORDS PROVIDED BY

02:01PM  4    THERANOS?

02:01PM  5    A.   YES.

02:01PM  6    Q.   LET ME DRAW YOUR ATTENTION TO PAGE 79.

02:02PM  7         IF WE CAN ZOOM IN ON THE D-TAG, D6085, ALL OF THE WAY AT

02:02PM  8    THE BOTTOM.

02:02PM  9         THIS IS A D-TAG RELATING TO LABORATORY DIRECTOR

02:02PM 10    RESPONSIBILITIES.

02:02PM 11         DO YOU SEE THAT?

02:02PM 12    A.   I DO.

02:02PM 13    Q.   AND DO YOU SEE THE PARAGRAPH WHERE IT SAYS, "BASED ON

02:02PM 14    REVIEW OF VALIDATION DOCUMENTS ON THE THERANOS PROPRIETARY

02:02PM 15    SYSTEM, THE LABORATORY DIRECTOR FAILED TO ENSURE THAT THE

02:02PM 16    QUALITY OF RESULTS ON THE TPS; FAILED TO ENSURE THE

02:02PM 17    ESTABLISHMENT OF PERFORMANCE SPECIFICATIONS FOLLOWED THE

02:02PM 18    LABORATORY'S PROCEDURES TO ESTABLISH ACCURACY, PRECISION,

02:02PM 19    REPORTABLE RANGE AND/OR REFERENCE RANGE."

02:02PM 20         DO YOU SEE THAT?

02:02PM 21    A.   I DO.

02:02PM 22    Q.   WHAT DID YOU MEAN BY THAT?

02:02PM 23    A.   WHAT I HAD MEANT BY THAT IS THAT THE LABORATORY DIRECTOR

02:02PM 24    DID NOT FULFILL HIS RESPONSIBILITIES TO ENSURE THAT THE RESULTS

02:03PM 25    ON THE EDISON WERE ACCURATE AND RELIABLE.

02:03PM   1          THE LABORATORY DIRECTOR DID NOT ENSURE THAT THE

02:03PM   2   PERFORMANCE SPECIFICATIONS WERE -- THE ESTABLISHMENT OF THE

02:03PM   3   PERFORMANCE SPECIFICATIONS, THEY DID NOT FOLLOW THE

02:03PM   4   LABORATORY'S PROCEDURE ON HOW TO DO THAT FOR ALL OF THE AREAS

02:03PM   5   THAT THEY HAD TO ESTABLISH THOSE PERFORMANCE SPECIFICATIONS

02:03PM   6   FOR.

02:03PM   7   Q.   WHEN YOU SAY "ESTABLISHMENT OF PERFORMANCE

02:03PM   8   SPECIFICATIONS," WHAT DOES THAT MEAN?

02:03PM   9   A.   SO LABORATORIES THAT PERFORM NON-WAIVED TESTING, MODERATE

02:03PM   10  OR HIGH COMPLEXITY TESTING, EITHER HAVE TO VERIFY THEIR

02:03PM   11  PERFORMANCE SPECIFICATIONS OR THEY HAVE TO ESTABLISH

02:03PM   12  PERFORMANCE SPECIFICATIONS.

02:03PM   13         SO IF A TEST IS FDA CLEARED OR APPROVED, THE MANUFACTURER

02:03PM   14  PROVIDES VALUES FOR ACCURACY AND PRECISION OF THE TESTS, THE

02:04PM   15  REPORTABLE RANGE, WHICH IS THE HIGHEST NUMBER THAT THE TEST CAN

02:04PM   16  MEASURE, AND THE LOWEST NUMBER.

02:04PM   17         THESE ARE ALL INFORMATION THAT ARE PUBLISHED IN AND

02:04PM   18  APPROVED BY THE FDA.

02:04PM   19         SO THE LABORATORY SIMPLY HAS TO VERIFY THE NUMBERS THAT

02:04PM   20  THE MANUFACTURER PROVIDES.

02:04PM   21         BUT IF YOU HAVE A TEST THAT IS NOT APPROVED OR CLEARED BY

02:04PM   22  THE FDA, OR IT'S A LABORATORY DEVELOPED TEST BECAUSE THERE'S NO

02:04PM   23  MANUFACTURER GIVING YOU THESE VALUES, THEN THE LABORATORY HAS

02:04PM   24  TO ESTABLISH THEIR OWN.  THEY HAVE TO SHOW THAT THE TEST IS

02:04PM   25  ACCURATE, PRECISE, THE HIGHEST AND LOWEST NUMBER THAT THEY CAN

02:04PM   1    REPORT OUT FOR THAT TEST, WHAT THE NORMAL VALUE IS, THE

02:04PM   2    REFERENCE RANGE.

02:04PM   3         AND THEY ALSO HAVE TO DO TWO ADDITIONAL STEPS IN

02:05PM   4    ESTABLISHING.  THEY HAVE TO DO -- DETERMINE THE ANALYTIC

02:05PM   5    SENSITIVITY AND THE ANALYTIC SPECIFICITY.

02:05PM   6         AND WHAT THE SENSITIVITY IS, IS BASICALLY HOW LOW CAN YOU

02:05PM   7    GO.  HOW -- WHAT IS THE LOWEST AMOUNT THAT YOU CAN FIND OF WHAT

02:05PM   8    YOU'RE LOOKING FOR.

02:05PM   9         THE ANALYTIC SPECIFICITY IS, IS THE TEST ACTUALLY

02:05PM  10    MEASURING WHAT YOU'RE LOOKING FOR AND IS THERE ANYTHING THAT IS

02:05PM  11    GOING TO INTERFERE WITH THAT?  IN OTHER WORDS, IF AN INDIVIDUAL

02:05PM  12    IS TAKING A SPECIFIC MEDICATION, IS THE MEDICATION GOING TO

02:05PM  13    INTERFERE WITH THE RESULTS AND MAKE THE RESULT APPEARING HIGHER

02:05PM  14    OR LOWER?

02:05PM  15    Q.   ARE YOU FAMILIAR WITH THE TERM "VALIDATION REPORT"?

02:05PM  16    A.   YES.

02:05PM  17    Q.   AND HOW DOES ESTABLISHMENT OF PERFORMANCE SPECIFICATIONS

02:05PM  18    RELATE TO A VALIDATION REPORT?

02:05PM  19    A.   WHEN WE'RE TALKING ABOUT VERIFYING OR ESTABLISHING

02:06PM  20    PERFORMANCE SPECIFICATIONS, THAT'S WHAT MOST PEOPLE CALL THE

02:06PM  21    VALIDATION, SO IT'S KIND OF AN INTERCHANGEABLE TERM.

02:06PM  22         AGAIN, VALIDATION IS NOT REALLY A CLIA TERM.  WE TALK

02:06PM  23    ABOUT PERFORMANCE SPECIFICATIONS.

02:06PM  24    Q.   OKAY.  AND IN A IT SAYS, "VALIDATIONS REPORTS FOR

02:06PM  25    VITAMIN D, TOTAL T3, HUMAN CHORIONIC GONADOTROPIN, AND SEX

02:06PM  1    HORMONE BINDING GLOBULIN WERE REVIEWED."

02:06PM  2         DO YOU SEE THAT LANGUAGE?

02:06PM  3    A.   I DO.

02:06PM  4    Q.   AND THOSE ARE VALIDATION REPORTS THAT YOU REVIEWED?

02:06PM  5    A.   I DID.

02:06PM  6    Q.   AND THEN IN D, DOES THIS REFLECT THAT YOU ALSO REVIEWED

02:06PM  7    THE MASTER VALIDATION PLAN FOR ROUTINE CHEMISTRY ASSAY?

02:06PM  8    A.   I DID.

02:06PM  9    Q.   AND IF WE CAN CONTINUE, MS. WACHS, ON TO PAGE 80.

02:06PM  10         DO YOU SEE WHERE IT SAYS, "ACCURACY FOR VITAMIN D, TT3,

02:06PM  11   HCG, AND SHBG WAS NOT DETERMINED FOLLOWING CL PLN-14003."

02:07PM  12         DO YOU SEE THAT LANGUAGE?

02:07PM  13   A.   I DO.

02:07PM  14   Q.   AND THERE'S PRECISION AND REPORTABLE RANGE.

02:07PM  15         WHAT ARE YOU GETTING AT HERE?

02:07PM  16   A.   WHAT I'M REPORTING HERE IS THAT THE LABORATORY HAD A

02:07PM  17   PROCEDURE THAT THEY WERE SUPPOSED TO FOLLOW, AND THEY DID NOT.

02:07PM  18   Q.   OKAY.  DOES MORE DETAIL ABOUT THIS DEFICIENCY CONTINUE IN

02:07PM  19   ANOTHER D-TAG -- IF WE CAN ZOOM OUT, MS. WACHS -- IT SAYS

02:07PM  20   D60 -- LET ME START OVER.

02:07PM  21         IT SAYS REFER TO D6115.

02:07PM  22         IS THAT A REFERENCE TO ANOTHER DEFICIENCY TAG?

02:07PM  23   A.   YES.

02:07PM  24   Q.   DURING YOUR SURVEY, DID YOU ALSO OBSERVE INSTANCES WHERE

02:08PM  25   THERANOS REPORTED PATIENT RESULTS AFTER FAILING QUALITY

BENNETT DIRECT BY MR. LEACH

02:08PM  1    CONTROL?

02:08PM  2    A.   YES, I DID.

02:08PM  3    Q.   WHAT DID YOU OBSERVE?

02:08PM  4    A.   BASED ON THE INFORMATION AND THE PRINTOUTS THAT THEY GAVE

02:08PM  5    ME FOR QUALITY CONTROL, THERE WERE -- AFTER QUALITY CONTROL ON

02:08PM  6    ONE DEVICE FAILED, THEY, PERHAPS THE NEXT DAY OR A DAY LATER,

02:08PM  7    RAN IT ON THAT SAME DEVICE, AND THE CONTROL WAS IN, BUT IN

02:08PM  8    BETWEEN THAT TIME, THERE WERE PATIENTS RUNNING REPORTED AFTER

02:08PM  9    THE QUALITY CONTROL WAS UNACCEPTABLE AND BEFORE THE QUALITY

02:08PM  10   CONTROL WAS ACCEPTABLE.

02:08PM  11        IN OTHER INSTANCES THEY WOULD -- IF THE QUALITY CONTROL

02:08PM  12   WAS NOT ACCEPTABLE ON ONE DEVICE, THEY WOULD SIMPLY RUN IT ON

02:08PM  13   ANOTHER DEVICE.

02:08PM  14   Q.   AND WAS THAT AN ISSUE?

02:08PM  15   A.   IT WAS AN ISSUE, YES.

02:08PM  16   Q.   WHY?

02:09PM  17   A.   QUALITY CONTROL IS REQUIRED TO BE ACCEPTABLE BEFORE YOU

02:09PM  18   REPORT PATIENT TEST RESULTS.

02:09PM  19   Q.   DID YOU ALSO OBSERVE ISSUES WITH THERANOS'S TESTING OF

02:09PM  20   SOMETHING CALLED PT INR?

02:09PM  21   A.   YES.

02:09PM  22   Q.   AND WHAT IS PT INR?

02:09PM  23   A.   PT INR IS A TEST THAT IS USED FOR COAGULATION.  IT'S

02:09PM  24   USUALLY USED ON PATIENTS WHO ARE ON WARFARIN, AND WARFARIN IS

02:09PM  25   ALSO KNOWN AS COUMADIN THERAPY, WHICH IS A BLOOD THINNER.

02:09PM    1    Q.   AND WHAT DID YOU OBSERVE IN YOUR SURVEY?

02:09PM    2    A.   WHEN I WENT TO LOOK AT THE REAGENTS, THERE WERE SEVERAL

02:09PM    3    THINGS.   IN THE REAGENT BOX WHERE ALL OF THE CHEMICALS ARE TO

02:09PM    4    PERFORM THE TESTS, THERE WAS A PINK STUFFER.

02:09PM    5         NORMALLY THE PACKAGE INSERTS ARE WHITE, AND IN THIS

02:10PM    6    PARTICULAR CASE, THE LOT NUMBER THAT I WAS LOOKING AT THAT THEY

02:10PM    7    WERE USING WAS PINK, AND THERE WAS A NOTIFICATION FROM THE

02:10PM    8    MANUFACTURER THAT THE STABILITY OF THE REAGENT, INSTEAD OF

02:10PM    9    BEING TEN DAYS, WAS TWO DAYS.

02:10PM   10         THEY -- THEIR PROCEDURE REQUIRED THAT THEY LOOK FOR THIS.

02:10PM   11         THEY DID NOT LOOK FOR THIS.   THEY DID NOT FIND IT.

02:10PM   12         AND THEY WERE DATING THE REAGENT FOR FIVE DAYS, SO WHEN IT

02:10PM   13    ONLY SHOULD HAVE BEEN USED IT FOR TWO, THEY WERE USING IT FOR

02:10PM   14    FIVE.

02:10PM   15         THE OTHER ISSUE, WHEN YOU'RE RUNNING PT INR, YOU HAVE TO

02:10PM   16    HAVE -- IN ORDER TO CALCULATE THE INR, YOU HAVE TO MAKE SURE

02:10PM   17    THAT ALL OF THE NUMBERS USED TO CALCULATE IT ARE ACCURATE, AND

02:11PM   18    ACCURATE FOR A SPECIFIC LOT NUMBER OF REAGENT.

02:11PM   19    Q.   DID YOU ALERT MR. BALWANI TO THE PROBLEMS WITH PT INR IN

02:11PM   20    THE SEPTEMBER PORTION OF THE EXAM?

02:11PM   21    A.   YES.

02:11PM   22    Q.   AND WHEN YOU CAME BACK IN NOVEMBER, WHAT HAD HAPPENED?

02:11PM   23    A.   NOTHING.

02:11PM   24         WELL, THEY HAD NOTIFIED -- EVEN THOUGH WE HAD NOTIFIED

02:11PM   25    THEM THAT THERE WAS A PROBLEM WITH THE PT INR, THEY HAD WAITED

02:11PM  1    TO NOTIFY PATIENTS OF CORRECTED RESULTS UNTIL RIGHT BEFORE WHEN

02:11PM  2    WE RETURNED IN NOVEMBER.

02:11PM  3    Q.   DID YOU ALSO OBSERVE INSTANCES IN YOUR SURVEY WHERE

02:11PM  4    THERANOS FAILED TO HAVE A QUALITY CONTROL PROCEDURE AT ALL

02:11PM  5    PRIOR TO A PARTICULAR DATE THAT YOU WERE LOOKING FOR?

02:11PM  6    A.   YES.

02:11PM  7    Q.   IS THAT AN ISSUE?

02:11PM  8    A.   THAT'S AN ISSUE, YES.

02:11PM  9    Q.   HOW SO?

02:11PM  10   A.   THE PEOPLE WHO ARE PERFORMING THE TESTING NEED TO KNOW

02:12PM  11   WHAT THE PROCEDURE IS THAT HAS BEEN APPROVED BY THE LABORATORY

02:12PM  12   DIRECTOR SO THEY CAN PERFORM THE TEST.

02:12PM  13        THEY NEED TO BE ABLE TO KNOW WHAT AN ACCEPTABLE QUALITY

02:12PM  14   CONTROL VALUE IS TO MAKE A DETERMINATION WHETHER THE PARTICULAR

02:12PM  15   RUN OF PATIENT TESTING IS ACCEPTABLE OR NOT BEFORE THEY REPORT

02:12PM  16   OUT PATIENT RESULTS.

02:12PM  17   Q.   MS. BENNETT, THE DATE OF THE STATEMENT OF DEFICIENCIES,

02:12PM  18   THE FORM 2567, IS JANUARY 25TH, 2016.  WAS THERANOS EVER ABLE

02:12PM  19   TO RESOLVE THE DEFICIENCIES TO YOUR SATISFACTION?

02:12PM  20   A.   THEY WERE NOT.

02:12PM  21   Q.   DO YOU KNOW WHETHER THE NEWARK LAB ULTIMATELY CLOSED?

02:12PM  22   A.   THEY DID.

02:12PM  23   Q.   I'D LIKE TO DRAW YOUR ATTENTION, PLEASE, TO WHAT IS

02:12PM  24   ALREADY AS EXHIBIT 5387H.

02:12PM  25        MAY WE DISPLAY, YOUR HONOR?

02:12PM 1                    THE COURT:  YES.

02:13PM 2      BY MR. LEACH:

02:13PM 3      Q.   AND I'M DISPLAYING, MS. BENNETT, A SERIES OF TEXT MESSAGES

02:13PM 4      BETWEEN ELIZABETH HOLMES AND SUNNY BALWANI.

02:13PM 5           PLEASE DON'T TRY TO READ THIS PAGE QUITE YET.

02:13PM 6           BUT YOU'VE NEVER SEEN THESE BEFORE; CORRECT?

02:13PM 7      A.   I HAVE NOT.

02:13PM 8      Q.   OKAY.  I'D LIKE TO GO TO PAGE 26, PLEASE.

02:13PM 9           ONE MOMENT, YOUR HONOR.

02:13PM 10          IF WE CAN PLEASE ZOOM IN ON THE TOP HALF ALL OF THE WAY

02:13PM 11     DOWN TO THE TEXT READING "NEED PROFESSIONALS ACROSS THE BOARD,"

02:14PM 12     MS. WACHS.

02:14PM 13          I'M SORRY, ARE WE ON PAGE 26?  YEAH.  OKAY.  MY APOLOGIES.

02:14PM 14          ALL OF THE WAY DOWN TO "WE CAN'T SCALE WITH WAG."

02:14PM 15          DO YOU SEE THE DATE OF THESE MESSAGES, MS. BENNETT,

02:14PM 16     NOVEMBER 19TH, 2014, IN THE LEFT COLUMN?

02:14PM 17     A.   I DO.

02:14PM 18     Q.   OKAY.  THAT'S ALMOST -- YOUR SURVEY WAS IN SEPTEMBER OF

02:15PM 19     2015?

02:15PM 20     A.   YES.

02:15PM 21     Q.   OKAY.  SO A NUMBER OF MONTHS AFTER THESE TEXT EXCHANGES?

02:15PM 22     A.   YES.

02:15PM 23     Q.   OKAY.  AND DO YOU SEE WHERE MR. BALWANI WROTE,

02:15PM 24     "FUNDAMENTALLY, WE NEED TO STOP FIGHTING FIRES BY NOT CREATING

02:15PM 25     THEM"?

02:15PM  1    A.   I DO.

02:15PM  2    Q.   OKAY.  DO YOU SEE FURTHER DOWN HE WROTE, "REBUILD"?

02:15PM  3    A.   YES.

02:15PM  4    Q.   DO YOU SEE WHERE HE WROTE, "NEW LAB DIRS"?

02:15PM  5    A.   YES.

02:15PM  6    Q.   AND DO YOU SEE WHERE MS. HOLMES WROTE, "NEED TO FIX ROOT

02:15PM  7    CAUSE HERE"?

02:15PM  8    A.   YES.

02:15PM  9    Q.   AND THEN IT ENDS WITH, "WE CAN'T SCALE WITH WAG"?

02:15PM  10   A.   YES.

02:15PM  11   Q.   IN THE COURSE OF YOUR INSPECTION, DID YOU EVER SPEAK TO

02:15PM  12   ANYBODY FROM WALGREENS?

02:15PM  13   A.   NO.

02:15PM  14   Q.   OKAY.  THAT WASN'T PART OF YOUR RESPONSIBILITIES?

02:15PM  15   A.   NO.

02:15PM  16   Q.   OKAY.  LET'S GO TO PAGE 31.

02:16PM  17        DO YOU SEE THE DATE OF NOVEMBER 28TH, 2014 --

02:16PM  18   A.   I DO.

02:16PM  19   Q.   -- FOR THESE MESSAGES?

02:16PM  20   A.   I DO.

02:16PM  21   Q.   AND DO YOU SEE THE TOP TEXT SAYS, "NORMANDY LAB IS A," AND

02:16PM  22   THEN THERE'S AN EXPLETIVE.  "GLAD I CAME HERE.  WILL WORK ON

02:16PM  23   FIXING THIS."

02:16PM  24        DO YOU SEE THAT?

02:16PM  25   A.   I DO.

02:16PM    1    Q.   DO YOU KNOW WHAT NORMANDY IS?

02:16PM    2    A.   I'M TRYING TO REMEMBER.  THE LABS HAD DIFFERENT NAMES

02:16PM    3    DEPENDING ON WHAT TYPE OF TESTING WAS BEING DONE.  I'M

02:16PM    4    TRYING -- I DON'T REMEMBER IF NORMANDY WAS ONE OF THE NAMES.

02:16PM    5    Q.   OKAY.  THAT'S NOT A TERM THAT MR. BALWANI USED WITH YOU?

02:16PM    6    A.   HE DID USE THE NAMES OF THE LABS, THE DIFFERENT LABS, BUT

02:17PM    7    I DON'T REMEMBER WHAT THEY ARE.

02:17PM    8    Q.   WAS IT SOMETHING WITHIN NEWARK OR WAS IT SOMETHING

02:17PM    9    ELSEWHERE?

02:17PM   10    A.   NEWARK.

02:17PM   11    Q.   AND THIS IS FROM NOVEMBER 28TH, 2014, SEVERAL MONTHS

02:17PM   12    BEFORE YOUR INSPECTION?

02:17PM   13    A.   YES.

02:17PM   14    Q.   OKAY.  IF WE CAN PLEASE GO TO PAGE 106.

02:17PM   15         AND IF WE CAN ZOOM IN ON THE TOP HALF, MS. WACHS, ALL OF

02:17PM   16    THE WAY DOWN TO THE TEXT, "WE CAN DEFINITELY RUN CIRCLES."

02:17PM   17         DO YOU SEE UP AT THE TOP THERE'S A DATE SEPTEMBER 2ND,

02:17PM   18    2015?

02:17PM   19    A.   YES.

02:17PM   20    Q.   AND THIS IS A FEW WEEKS BEFORE THE CMS INSPECTION?

02:17PM   21    A.   YES.

02:17PM   22    Q.   WHEN YOU CONDUCTED THE CMS INSPECTION, WERE YOU AWARE THAT

02:18PM   23    THE FDA HAD CONDUCTED AN INSPECTION OF THERANOS?

02:18PM   24    A.   I WAS.

02:18PM   25    Q.   OKAY.  AND THAT WAS BEFORE YOUR INSPECTION?

02:18PM   1    A.   YES.

02:18PM   2    Q.   AND DO YOU SEE DOWN TOWARDS THE BOTTOM MR. BALWANI WROTE,

02:18PM   3    "WE CAN BUILD THIS BUSINESS THEY SOFTWARE AND JP AND RUN

02:18PM   4    CIRCLES AROUND OTHERS AND FDA BY MANIPULATING THEIR GAME"?

02:18PM   5         DO YOU SEE THAT LANGUAGE?

02:18PM   6    A.   I DO.

02:18PM   7    Q.   AND DO YOU SEE WHERE MS. HOLMES RESPONDS, "WE CAN

02:18PM   8    DEFINITELY RUN CIRCLES"?

02:18PM   9    A.   I DO.

02:18PM   10   Q.   AND LAST, IF WE COULD PLEASE LOOK AT PAGE 111.

02:18PM   11        DO YOU SEE THE DATE SEPTEMBER 22ND, 2015?

02:18PM   12   A.   I DO.

02:18PM   13   Q.   THAT'S THE DATE THAT YOUR SURVEY STARTED?

02:18PM   14   A.   YES.

02:18PM   15   Q.   AND MR. BALWANI WROTE, "VERY HOSTILE SO FAR.  THEY HAVE

02:19PM   16   COMPLAINTS"?

02:19PM   17   A.   YES.

02:19PM   18   Q.   WERE YOU BEING HOSTILE?

02:19PM   19   A.   NO, I WOULDN'T HAVE CHARACTERIZED IT AS HOSTILE.

02:19PM   20   Q.   YOU WERE DOING YOUR JOB?

02:19PM   21   A.   I WAS DOING MY JOB.  I DIDN'T THINK THE OVERALL WHOLE

02:19PM   22   PROCESS WAS HOSTILE.

02:19PM   23   Q.   AND THEN FURTHER DOWN MS. HOLMES WRITES -- THERE'S A

02:19PM   24   REFERENCE BY MS. HOLMES, "JC HIMSELF PLAYING LITERALLY OFF LAB

02:19PM   25   COMMENTS IS LIKELY THE OTHER."

BENNETT DIRECT BY MR. LEACH

02:19PM   1          DO YOU SEE THAT?

02:19PM   2     A.   I DO.

02:19PM   3     Q.   AND ARE YOU FAMILIAR WITH SOMEONE NAMED JOHN CARREYROU?

02:19PM   4     A.   I AM.

02:19PM   5     Q.   AND WHO IS?

02:19PM   6     A.   HE'S A REPORTER FROM "THE WALL STREET JOURNAL."

02:19PM   7     Q.   AND THEN DO YOU SEE MS. HOLMES, "PRAYING LITERALLY

02:19PM   8     NONSTOP"?

02:19PM   9     A.   I DO.

02:19PM  10          MR. LEACH:  MAY I HAVE A MOMENT, YOUR HONOR?

02:19PM  11          THE COURT:  YES.

02:20PM  12     (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:20PM  13          MR. LEACH:  MS. WACHS, IF WE CAN PLEASE GO TO PAGE

02:20PM  14     65.

02:21PM  15          I'M SORRY, PAGE 61.  MY APOLOGIES.

02:21PM  16     Q.   DO YOU SEE SOME ADDITIONAL TEXTS, MS. BENNETT, FROM THE

02:21PM  17     TIME PERIOD APRIL 28TH, 2015?

02:21PM  18     A.   YES.

02:21PM  19     Q.   AND DO YOU SEE MR. BALWANI WRITING, "IT IS MOST MADDENING

02:21PM  20     THERE IS NO FOCUS IN ANY CHEM TEAMS AND NO PRODUCT COMING OUT"?

02:21PM  21     A.   I DO.

02:21PM  22     Q.   AND DO YOU SEE AT THE BOTTOM HE WROTE, "MOST DISAPPOINTING

02:21PM  23     HOW BAD THESE PEOPLE ARE"?

02:21PM  24     A.   I DO.

02:21PM  25          MR. LEACH:  THANK YOU, YOUR HONOR.

02:21PM 1              I HAVE NO FURTHER QUESTIONS.

02:21PM 2              THANK YOU, MS. BENNETT.

02:21PM 3                   THE COURT:  WILL THERE BE CROSS-EXAMINATION?

02:21PM 4                   MR. CAZARES:  THERE WILL BE, YOUR HONOR.

02:21PM 5                   THE COURT:  ALL RIGHT.  LET'S TAKE OUR BREAK RIGHT

02:21PM 6      NOW, LADIES AND GENTLEMEN.  WE'LL TAKE ABOUT 25 MINUTES, AND

02:22PM 7      THEN WE'LL DO CROSS-EXAMINATION.

02:22PM 8              (RECESS FROM 2:22 P.M. UNTIL 2:49 P.M.)

02:50PM 9                   THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

02:50PM 10             ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

02:50PM 11             AND COUNSEL, DO YOU HAVE CROSS-EXAMINATION?

02:50PM 12                  MR. CAZARES:  YES, YOUR HONOR.  THANK YOU,

02:50PM 13     YOUR HONOR.

02:50PM 14             YOUR HONOR, MAY I REMOVE MY MASK?

02:50PM 15                  THE COURT:  YES.  YES.

02:50PM 16                        **CROSS-EXAMINATION**

02:50PM 17     BY MR. CAZARES:

02:50PM 18     Q.   GOOD AFTERNOON, MS. BENNETT.

02:50PM 19     A.   GOOD AFTERNOON.

02:50PM 20     Q.   I'M STEVE CAZARES, AND I REPRESENT MR. BALWANI IN THIS

02:50PM 21     CASE.  I HAVE A FEW QUESTIONS ABOUT YOUR TESTIMONY TODAY.

02:50PM 22          WOULD THAT BE OKAY?

02:50PM 23     A.   SURE.

02:50PM 24     Q.   OKAY.  SO I WANTED TO START BACK IN THIS LATE 2013 TIME

02:50PM 25     PERIOD, IT SOUNDS LIKE, WHEN YOU MAY HAVE INITIALLY BECOME

02:51PM   1    FAMILIAR WITH THERANOS.

02:51PM   2         AND I THINK YOU TESTIFIED THAT THERE WERE SOME MEETINGS IN

02:51PM   3    LATE '13 AND EARLY '14 BETWEEN AND AMONGST THERANOS, CMS, AND

02:51PM   4    THE FDA; IS THAT RIGHT?

02:51PM   5    A.   I CAN SAY THAT I WAS INVOLVED IN JANUARY 2014.  I WASN'T

02:51PM   6    AWARE OF ANY OTHER MEETINGS THAT OCCURRED.

02:51PM   7    Q.   OKAY.  SO YOU DIDN'T ATTEND AN EARLIER MEETING --

02:51PM   8    A.   I DID NOT.

02:51PM   9    Q.   -- PRIOR TO JANUARY 2014?

02:51PM  10         BUT YOU DID PARTICIPATE IN THE JANUARY 2014 MEETING; IS

02:51PM  11    THAT RIGHT?

02:51PM  12    A.   I ATTENDED IT, YES.

02:51PM  13    Q.   IF YOU COULD TAKE A LOOK -- OH, ACTUALLY, I HAVE BINDERS

02:51PM  14    FIRST.

02:51PM  15         YOUR HONOR, MAY I HAVE A MOMENT?  I HAVE BINDERS.

02:51PM  16              THE COURT:  YES.

02:51PM  17              MR. CAZARES:  (HANDING.)

02:52PM  18    Q.   MS. BENNETT, I'VE JUST HANDED YOU A BINDER, AND I WOULD

02:52PM  19    ASK IF YOU COULD TAKE A LOOK AT THE TAB MARKED 7350, 7350.

02:52PM  20         ARE YOU THERE AT 7350?

02:52PM  21    A.   I AM, YES.

02:52PM  22    Q.   OKAY.  AND 7350 APPEARS TO BE AN EMAIL CHAIN, THE LATTER

02:52PM  23    OF WHICH AT THE TOP OF THE FIRST PAGE LOOKS TO BE FROM A

02:53PM  24    PENNY KELLER TO YOURSELF, SOME OTHER INDIVIDUALS, ON

02:53PM  25    OCTOBER 25, 2013.

BENNETT CROSS BY MR. CAZARES

02:53PM 1          DO YOU SEE THAT?

02:53PM 2   A.   I SEE THE DATE, YES.

02:53PM 3   Q.   AND THERE'S A REFERENCE TO BACKGROUND INFORMATION AND

02:53PM 4   DISCUSSION REGARDING THERANOS.

02:53PM 5          DO YOU SEE THAT AS WELL?

02:53PM 6   A.   YEAH, THAT'S THE ATTACHMENT, YEP, AND THE SUBJECT.

02:53PM 7   Q.   OKAY.  AND THEN BENEATH THAT LAST MESSAGE, THERE'S A TWO

02:53PM 8   EMAIL CHAIN STARTING WITH SOME INDIVIDUALS FROM THE FDA, AND

02:53PM 9   THEN A MESSAGE FROM FDA TO A PENNY KELLER AT CMS.

02:53PM 10         DO YOU SEE THAT?

02:53PM 11  A.   I DO.

02:53PM 12  Q.   AND THEN MS. KELLER APPEARS TO HAVE FORWARDED THE MESSAGE

02:53PM 13  AND DOCUMENTS TO YOURSELF; CORRECT?

02:53PM 14  A.   YES, I APPEAR TO BE ON THE TO LINE.

02:53PM 15  Q.   OKAY.  AND I THINK YOU DESCRIBED PREVIOUSLY THAT IN THE

02:53PM 16  COURSE OF YOUR WORK AND IN RELATION TO THERANOS, IT WAS -- YOU

02:54PM 17  KNOW, EMAIL WAS USED TO COMMUNICATE AMONGST YOURSELVES AT CMS,

02:54PM 18  AS WELL AS COMMUNICATION WITH FDA PERSONNEL; CORRECT?

02:54PM 19  A.   I DON'T BELIEVE I SAID THAT, BUT EMAIL WAS ONE OF THE

02:54PM 20  MECHANISMS THAT WE USED, YES.

02:54PM 21  Q.   OKAY.  WITHIN CMS?

02:54PM 22  A.   WITHIN CMS.

02:54PM 23  Q.   AND WHEN YOU USED EMAIL TO COMMUNICATE ABOUT BUSINESS

02:54PM 24  MATTERS, YOU MAKE WHATEVER EFFORTS YOU CAN TO BE ACCURATE AND

02:54PM 25  PRECISE IN YOUR EXCHANGES; CORRECT?

02:54PM   1      A.   WE DO.

02:54PM   2      Q.   AND IT WAS THE PRACTICE AT CMS TO PRESERVE THOSE MESSAGES;

02:54PM   3      CORRECT?

02:54PM   4      A.   YES.  AS LONG AS THEY WERE CONSIDERED RECORDS, THEY ARE

02:54PM   5      PRESERVED, YES.

02:54PM   6      Q.   BECAUSE THERE ARE CERTAIN REQUIREMENTS TO MAINTAIN RECORDS

02:54PM   7      AT CMS; RIGHT?

02:54PM   8      A.   YES.  WE HAVE RECORDS RETENTION REQUIREMENTS.

02:54PM   9      Q.   AND IT WAS YOUR REGULAR PRACTICE TO REVIEW EMAIL MESSAGES

02:54PM  10      RECEIVED WHEN THE MESSAGES CONCERN CMS BUSINESS; CORRECT?

02:55PM  11      A.   IF THE EMAIL WAS ADDRESSED TO ME, YES.

02:55PM  12              MR. CAZARES:  YOUR HONOR, MOVE TO ADMIT 7350.

02:55PM  13              THE COURT:  INCLUDING THE ATTACHMENT?

02:55PM  14              MR. CAZARES:  YES, YOUR HONOR.

02:55PM  15              MR. LEACH:  YOUR HONOR, HEARSAY AS TO THE

02:55PM  16      ATTACHMENTS.

02:55PM  17          IF THE PROFFER FOR THE EMAIL ITSELF IS 803(6), I HAVE NO

02:55PM  18      OBJECTION TO THAT.

02:55PM  19              THE COURT:  IS THE ATTACHMENT BEING OFFERED FOR A

02:55PM  20      PURPOSE OTHER THAN ITS TRUTH?

02:55PM  21              MR. CAZARES:  NO.  I THINK IT'S BACKGROUND FOR THIS

02:55PM  22      INDIVIDUAL WHO HAS ALREADY NOW TESTIFIED ABOUT A SERIES OF

02:55PM  23      ENGAGEMENTS IN THE ULTIMATE INSPECTION OF THERANOS.

02:55PM  24          SO IT'S NOTICE TO THIS WITNESS OF THERANOS MATTERS,

02:55PM  25      CORRECT.

02:55PM  1                  THE COURT:  TO MS. BENNETT.

02:55PM  2                  MR. CAZARES:  CORRECT.

02:56PM  3                  THE COURT:  ALL RIGHT.  I WILL ADMIT THE EMAIL CHAIN

02:56PM  4       PURSUANT TO 803(6).

02:56PM  5            THE ATTACHMENTS WILL BE ADMITTED NOT FOR THE TRUTH OF THE

02:56PM  6       MATTER ASSERTED IN THE ATTACHMENTS THAT YOU'LL SEE, LADIES AND

02:56PM  7       GENTLEMEN, BUT THEY WILL BE ADMITTED ONLY AS TO NOTICE AND

02:56PM  8       BACKGROUND FOR THIS WITNESS'S PARTICIPATION, IF ANY, IN REGARDS

02:56PM  9       TO THE ATTACHMENTS AND HER WORK DONE.

02:56PM  10           SO FOR THAT LIMITED PURPOSE, THEY'RE ADMITTED AND MAY BE

02:56PM  11      PUBLISHED.

02:56PM  12                 MR. CAZARES:  THANK YOU, YOUR HONOR.

02:56PM  13           (DEFENDANT'S EXHIBIT 7350 WAS RECEIVED IN EVIDENCE.)

02:56PM  14                 MR. CAZARES:  IF WE CAN PUBLISH THE BOTTOM HALF OF

02:56PM  15      THE EMAIL FOR NOW AND THE LOWER HALF OF THE MESSAGE.

02:56PM  16      Q.   MS. BENNETT, DO YOU SEE UP ON THE SCREEN THERE'S THE LOWER

02:56PM  17      HALF OF EXHIBIT 7350.

02:56PM  18           DO YOU SEE THAT?

02:56PM  19      A.   I DO.

02:56PM  20      Q.   AND IT APPEARS TO BE A MESSAGE FROM JOHN HOBSON TO

02:56PM  21      JUDITH YOST, ALBERTO GUTIERREZ, WITH A COPY TO A SALLY HOJVAT.

02:57PM  22           DO YOU SEE THAT?

02:57PM  23      A.   I DO.

02:57PM  24      Q.   AND ARE YOU FAMILIAR WITH MR. HOBSON?

02:57PM  25      A.   NO.

02:57PM  1    Q.   AND HOW ABOUT MS. YOST AND MR. GUTIERREZ?

02:57PM  2    A.   JUDY YOST IN 2013 WAS THE DIRECTOR OF THE CLIA PROGRAM AND

02:57PM  3    ALBERT GUTIERREZ WAS HER COUNTERPART AT THE FDA.

02:57PM  4    Q.   SO THESE WERE PEOPLE WHO YOU INTERACTED WITH IN YOUR

02:57PM  5    PROFESSIONAL CAPACITY?

02:57PM  6    A.   YES.

02:57PM  7    Q.   AND HOW ABOUT MS. HOJVAT?

02:57PM  8    A.   I DON'T KNOW HER.

02:57PM  9    Q.   OKAY.  AND MS. YOST'S POSITION AT THAT TIME, WAS SHE --

02:57PM 10    WHERE WAS SHE IN THE CMS HIERARCHY RELATIVE TO YOU?

02:57PM 11    A.   SHE WAS THE DIRECTOR OF THE CLIA PROGRAM, AND I WAS A

02:57PM 12    TECHNOLOGIST IN THE CLIA PROGRAM.

02:57PM 13    Q.   OKAY.  AND SO MR. HOBSON IS SENDING TO MS. YOST A MESSAGE

02:57PM 14    AND HE WRITES, "ATTACHED TO THIS EMAIL ARE DOCUMENTS THAT

02:57PM 15    OUTLINE THE PROPOSED BUSINESS MODEL OF THERANOS."

02:57PM 16         DO YOU SEE THAT?

02:57PM 17    A.   I DO.

02:57PM 18    Q.   AND THEN HE CONTINUES.

02:57PM 19         "PLEASE FIND A SET OF SLIDES DEPICTING THE PROPOSED

02:57PM 20    PHASE I AND PHASE II PROPOSALS AS WELL AS A DESCRIPTION OF THE

02:58PM 21    TSPU AND THE TLAS?"

02:58PM 22         DID I READ THAT RIGHT?

02:58PM 23    A.   YES.

02:58PM 24    Q.   OKAY.  AND THEN HE CONTINUES.

02:58PM 25         "IN ADDITION THERE IS A SHORT NARRATIVE DESCRIBING THE

02:58PM  1    PROPOSED PHASES.  IN PREPARATION FOR THE MEETING ON

02:58PM  2    NOVEMBER 4TH, I WOULD LIKE TO REQUEST A BRIEF TELECONFERENCE

02:58PM  3    WITH YOU AND ALBERTO TO GO OVER THE SALIENT POINTS OF THE

02:58PM  4    SUBMISSION, ANSWER ANY QUESTIONS THAT YOU MAY HAVE, AS WELL AS

02:58PM  5    GET YOUR FEEDBACK REGARDING THE THERANOS PHASE II MODEL?"

02:58PM  6         DO YOU SEE THAT?

02:58PM  7    A.   I DO.

02:58PM  8    Q.   AND THEN MR. HOBSON CONTINUES.

02:58PM  9         "SPECIFICALLY WHAT ARE ANY OF THE CONCERNS OR REGULATORY

02:58PM  10   HURDLES WITH REGARD TO PLACING AN INSTRUMENT INTO PATIENT

02:58PM  11   SERVICE CENTER."

02:58PM  12        DO YOU SEE THAT?

02:58PM  13   A.   I DO.

02:58PM  14   Q.   AND THEN THE MESSAGE GETS FORWARDED FROM MR. GUTIERREZ TO

02:58PM  15   MS. KELLER AND THEN FROM MS. KELLER TO YOURSELF IN THE LATTER

02:58PM  16   THREE MESSAGES.

02:58PM  17        DO YOU SEE THAT?

02:58PM  18   A.   I DO.

02:58PM  19   Q.   NOW, IF WE CAN TURN TO THE NEXT PAGE OF THE EXHIBIT.  IT'S

02:58PM  20   ACTUALLY 7357A, THE ATTACHMENT, PAGE 1 OF THE ATTACHMENT.

02:59PM  21        AT THE TOP IT APPEARS TO BE A TYPEWRITTEN KIND OF SUMMARY.

02:59PM  22        DO YOU SEE THAT?

02:59PM  23   A.   I DO.

02:59PM  24   Q.   AND THEN IT DESCRIBES THERANOS BACKGROUND.

02:59PM  25        AGAIN, WOULD IT HAVE BEEN YOUR PRACTICE AT THE TIME TO

02:59PM  1    REVIEW THE MESSAGE AND THE ATTACHMENTS?

02:59PM  2    A.   I MAY HAVE.  I DON'T REMEMBER IN THIS PARTICULAR CASE OR

02:59PM  3    NOT.

02:59PM  4    Q.   OKAY.  WHEN YOU HAD THE MEETING IN JANUARY OF 2014, WOULD

02:59PM  5    YOU HAVE DONE A LITTLE BIT OF DUE DILIGENCE OR INVESTIGATION TO

02:59PM  6    PREP FOR THE MEETING?

02:59PM  7    A.   IF ANY DOCUMENTS HAD BEEN GIVEN TO ME TO PREPARE FOR THE

02:59PM  8    MEETING, I WOULD HAVE LOOKED AT THOSE DOCUMENTS, YES.

02:59PM  9    Q.   FAIR ENOUGH.  THANK YOU.

02:59PM  10       NOW, GETTING BACK TO THIS 7350A AT THE TOP.  THE DOCUMENT

02:59PM  11   STARTS, "PHASE I: CURRENT MODEL.

02:59PM  12       "THERANOS IS CURRENTLY OPERATING A CLIA CERTIFIED HIGH

03:00PM  13   COMPLEXITY LABORATORY IN PALO ALTO, CALIFORNIA AND IS USING FDA

03:00PM  14   CLEARED/APPROVED COMMERCIAL PLATFORMS, AND A THERANOS DEVELOPED

03:00PM  15   DIAGNOSTIC SYSTEM THAT INCLUDES A UNIT TO PROCESS THE SPECIMEN

03:00PM  16   AND GENERATE THE TEST SIGNALS."

03:00PM  17       DO YOU SEE THAT?

03:00PM  18   A.   I DO.

03:00PM  19   Q.   AND DO YOU UNDERSTAND THAT LATTER REFERENCE TO BE TO

03:00PM  20   THERANOS'S PROPRIETARY ANALYZER, SOME OF WHICH YOU REVIEWED

03:00PM  21   DOCUMENTATION FOR IN YOUR 2013 SURVEY OF THERANOS?

03:00PM  22   A.   I DO.

03:00PM  23   Q.   AND THEN, OF COURSE, YOU AND MR. YAMAMOTO REVIEWED RECORDS

03:00PM  24   RELATING TO THERANOS'S USE OF FDA CLEARED MACHINES IN 2015 AS

03:00PM  25   WELL; CORRECT?

03:00PM  1    A.   YES.

03:00PM  2    Q.   OKAY.  WE WON'T REVIEW THIS WHOLE THING BUT CONTINUING

03:00PM  3    TOWARD THE BOTTOM QUARTILE OF THAT PARAGRAPH BEGINNING,

03:00PM  4    "THERANOS HAS EXPRESSED."

03:00PM  5         THE SUMMARY CONTINUES, "THERANOS HAS EXPRESSED ITS

03:01PM  6    INTENTION TO PURSUE FDA REGULATORY APPROVAL OR CLEARANCE OF ALL

03:01PM  7    ASSAYS RUN AT THE THERANOS CLIA CERTIFIED LABORATORY ON THE

03:01PM  8    THERANOS DEVICE SYSTEM AND HAS SENT IN THEIR FIRST

03:01PM  9    PRE-SUBMISSION FOR REVIEW OF THEIR TSPU/TLAS PLUS A PANEL OF

03:01PM 10    MOLECULAR AND SEROLOGICAL INFLUENZA ASSAYS."

03:01PM 11         DO YOU SEE THAT?

03:01PM 12    A.   I DO.

03:01PM 13    Q.   NOW, THAT ISSUE OF OBTAINING FDA REGULATORY APPROVAL OR

03:01PM 14    CLEARANCE FOR ALL ASSAYS, WOULD THERANOS REQUIRE OR NEED FDA

03:01PM 15    APPROVAL OR CLEARANCE OF ITS TECHNOLOGY TO USE THE DEVICE IN

03:01PM 16    ITS CLIA LAB?

03:01PM 17    A.   FROM A CLIA PERSPECTIVE, NO.

03:01PM 18    Q.   OKAY.  SO LONG AS THEY PERFORM THIS VALIDATION WORK AND

03:01PM 19    STUDIES I THINK THAT YOU DISCUSSED ALREADY A LITTLE BIT TODAY;

03:02PM 20    CORRECT?

03:02PM 21    A.   AS LONG AS THEY MEET THE REQUIREMENTS FOR THOSE TYPES OF

03:02PM 22    TESTS LIKE VALIDATION AND APPROPRIATE PERSONNEL.

03:02PM 23    Q.   OKAY.  NOW, THE DOCUMENT CONTINUES.

03:02PM 24         "IN PHASE I THERANOS IS USING EITHER THEIR OWN

03:02PM 25    MANUFACTURED CAPILLARY COLLECTION TUBES OR OTHERS THAT ARE

03:02PM  1    COMMERCIALLY AVAILABLE."

03:02PM  2        AND THEN THERE'S A DESCRIPTION OF THE BLOOD COLLECTION

03:02PM  3    PROCESS.

03:02PM  4        DO YOU SEE THAT?

03:02PM  5    A.   I DO.

03:02PM  6    Q.   AND AT THIS TIME PERIOD IN LATE 2013, EARLY 2014, YOU AT

03:02PM  7    LEAST CAME TO LEARN BY JANUARY OF 2014 THAT THERANOS HAD A CLIA

03:02PM  8    CERTIFIED LAB IN CALIFORNIA; CORRECT?

03:02PM  9    A.   CERTAINLY BY JANUARY OF 2014, YES.

03:02PM  10   Q.   OKAY.  AND BY THAT TIME THEY WERE RUNNING OR USING FDA

03:02PM  11   APPROVED MACHINES AS WELL AS SOME OF THEIR PROPRIETARY

03:02PM  12   EQUIPMENT; CORRECT?

03:02PM  13   A.   I WAS AWARE THAT THEY HAD A LABORATORY.  I WAS NOT AWARE

03:03PM  14   OF THE SPECIFICS OF EXACTLY WHAT TESTING THEY WERE DOING.

03:03PM  15   Q.   NOW, THE SUMMARY, THE BACKGROUND SUMMARY THAT YOU RECEIVED

03:03PM  16   CONTINUES AT THE BOTTOM OF PAGE 1.

03:03PM  17       IT SAYS, "PHASE II:  PROPOSED MODEL AFTER 510(K)

03:03PM  18   CLEARANCE."

03:03PM  19       DO YOU SEE THAT?

03:03PM  20   A.   I DO.

03:03PM  21   Q.   AND 510(K) CLEARANCE IS ONE OF THE METHODS TO OBTAIN SOME

03:03PM  22   SORT OF FDA APPROVAL OF YOUR TECHNOLOGY; IS THAT RIGHT?

03:03PM  23   A.   NOT OF MY TECHNOLOGY, BUT OF DEVICES.

03:03PM  24   Q.   OF A MANUFACTURER'S TECHNOLOGY?

03:03PM  25   A.   YES.

03:03PM 1    Q.   510(K) IS ONE PATH?

03:03PM 2    A.   YES.

03:03PM 3    Q.   THERE'S ANOTHER PATH AS WELL?

03:03PM 4    A.   YES.

03:03PM 5    Q.   OKAY.  NOW, AT THE TOP OF PAGE 2 OF 7350A, THE BACKGROUND

03:03PM 6    SUMMARY CONTINUES.

03:03PM 7         "THE THERANOS PROPOSED MODEL IS BASED ON PLACING TSPU IN

03:04PM 8    DEDICATED SPACES IN CONVENIENT SERVICE CENTERS (SUCH AS

03:04PM 9    SELECTED WALGREENS), WHICH THERANOS HAS CALLED WELLNESS CENTERS

03:04PM 10   OR PATIENT SERVICE CENTERS, WITH TESTING OPERATED UNDER THE

03:04PM 11   DIRECT OVERSIGHT OF THE PALO ALTO LABORATORY."

03:04PM 12        DO YOU SEE THAT?

03:04PM 13   A.   I DO.

03:04PM 14   Q.   AND THEN IT DESCRIBES, "ONE OF THESE SITES HAS ALREADY

03:04PM 15   BEEN SET UP AS A SPECIMEN COLLECTION CENTER WITH SAMPLES BEING

03:04PM 16   SENT BACK TO THE CLIA CERTIFIED THERANOS LABORATORY."

03:04PM 17        DO YOU SEE THAT AS WELL?

03:04PM 18   A.   I DO.

03:04PM 19   Q.   SO IT WOULD BE FAIR TO SAY THAT AT LEAST BY THIS TIME, AND

03:04PM 20   I UNDERSTAND YOU DON'T RECALL NECESSARILY REVIEWING THIS

03:04PM 21   BACKGROUND SUMMARY IN OCTOBER OF 2013, BUT THERE WERE OTHER CMS

03:04PM 22   COLLEAGUES ON THE EXCHANGE, MS. KELLER.

03:04PM 23        SO AT LEAST SOME INFORMATION RELATING TO THERANOS'S USE OF

03:04PM 24   ITS PROPRIETARY EQUIPMENT, AS WELL AS FDA APPROVED EQUIPMENT,

03:04PM 25   HAD BEEN SOMEHOW REPORTED TO THE FDA AND CMS; CORRECT?

03:04PM   1    A.   I CAN ONLY SPEAK TO WHAT I LOOKED AT.  I CAN'T SPEAK TO

03:05PM   2    WHETHER THEY LOOKED AT THE INFORMATION AND WHAT THEY DID WITH

03:05PM   3    THAT INFORMATION.

03:05PM   4    Q.   OKAY.  BUT THE DOCUMENT 7350 REFLECTS A BACKGROUND

03:05PM   5    MATERIAL PROVIDED TO YOU BY YOUR COLLEAGUE AT CMS; CORRECT?

03:05PM   6    A.   IT DOES.

03:05PM   7    Q.   OKAY.  AND PAGE 2 ALSO CONTINUES IN THE MIDDLE OF THAT TOP

03:05PM   8    PARAGRAPH.

03:05PM   9        "UPON REGULATORY CLEARANCE OR APPROVAL OF THEIR DEVICE,

03:05PM   10   AND ASSAYS, THERANOS WOULD LIKE TO PLACE THE DEVICE IN THE

03:05PM   11   WELLNESS CENTERS FOR DIAGNOSTIC USE.  THIS SETTING COULD ALSO

03:05PM   12   BE USED TO CONDUCT CLINICAL STUDIES OF THEIR INVESTIGATIONAL

03:05PM   13   USE ONLY LABELLED DEVICES."

03:05PM   14       DO YOU SEE THAT?

03:05PM   15   A.   I DO.

03:05PM   16   Q.   AND I THINK YOU TOUCHED UPON THIS A LITTLE BIT.

03:05PM   17       IN ORDER TO USE THERANOS'S PROPRIETARY TECHNOLOGY, FOR

03:05PM   18   EXAMPLE, AT A WALGREENS PHARMACY OF SOME SORT, SOME SORT OF

03:05PM   19   REGULATORY APPROVAL OF THE USE OF THE DEVICE AT THAT LOCATION

03:05PM   20   WAS REQUIRED; CORRECT?

03:06PM   21   A.   WE DON'T GIVE PERMISSION FOR REGULATORY USE OF A DEVICE.

03:06PM   22       WHAT WE DO IS WE DETERMINE WHETHER CLIA IS APPLICABLE FOR

03:06PM   23   A CERTAIN FACILITY AND IF IT IS APPLICABLE, IF THE CLIA

03:06PM   24   REGULATIONS COVER WHAT THAT TESTING IS BEING USED FOR, THEN

03:06PM   25   THEY WOULD BE REQUIRED TO HAVE A CLIA CERTIFICATE.

03:06PM 1    Q.   AND YOU TOUCHED UPON THAT A LITTLE BIT, ABOUT THAT

03:06PM 2    JANUARY 2014 MEETING.

03:06PM 3    A.   YES, I DID.

03:06PM 4    Q.   I APOLOGIZE.  I WON'T TALK OVER YOUR WORDS.

03:06PM 5    A.   SORRY.

03:06PM 6    Q.   YOU TOUCHED UPON THAT ISSUE OF NEEDING A CLIA CERTIFICATE

03:06PM 7    TO USE THE THERANOS TECHNOLOGY IN SOME SORT OF DISTRIBUTED

03:06PM 8    ENVIRONMENT, FOR EXAMPLE, IN A WALGREENS STORE?

03:06PM 9    A.   YES.  IF THE DEVICES WERE GOING TO BE USED IN A FACILITY,

03:06PM 10   THEY NEEDED TO HAVE A CLIA CERTIFICATE.

03:06PM 11   Q.   OKAY.  HOWEVER, IF THE DEVICE WAS FDA APPROVED, WHETHER

03:06PM 12   510(K) OR PREMARKET APPROVAL, THE DEVICE COULD ALSO BE USED IN

03:07PM 13   A WALGREENS STORE FOR WHATEVER THE APPROVED TEST OR ASSAY WAS;

03:07PM 14   CORRECT?

03:07PM 15   A.   YES.  BUT FDA APPROVAL IS NOT REQUIRED UNDER CLIA.

03:07PM 16       SO REGARDLESS OF WHETHER IT WAS FDA APPROVED OR CLEARED,

03:07PM 17   OR NOT, THEY WOULD HAVE REQUIRED TO HAVE A CLIA CERTIFICATE.

03:07PM 18   Q.   AND WHAT IF AN FDA CLEARANCE -- OR AN FDA WAIVER WAS

03:07PM 19   OBTAINED?

03:07PM 20   A.   I'M NOT FAMILIAR WITH WHAT YOU'RE TALKING ABOUT AN "FDA

03:07PM 21   WAIVER."

03:07PM 22   Q.   ARE YOU FAMILIAR WITH THE FACT THAT SOMETIMES TESTS IN

03:07PM 23   MEDICAL DEVICES CAN BE WAIVED BY THE FDA?

03:07PM 24   A.   I NEED YOU TO CLARIFY BECAUSE THEY CATEGORIZE TESTS AS

03:07PM 25   WAIVED FOR CLIA PURPOSES.

03:07PM  1          ARE YOU TALKING ABOUT A DIFFERENT PROCESS?

03:07PM  2     Q.   NO.  I'M TALKING ABOUT WAIVED FOR CLIA PURPOSES.

03:07PM  3     A.   OKAY.  YES, THE FDA IS RESPONSIBLE FOR CATEGORIZING THE

03:07PM  4     TEST AS WAIVED, MODERATE OR HIGH COMPLEXITY.

03:08PM  5     Q.   AND A WAIVED TEST COULD BE USED OUTSIDE OF A CLIA LAB;

03:08PM  6     CORRECT?

03:08PM  7     A.   NO, IT CANNOT.

03:08PM  8          IF THE TEST -- IF A TEST IS DETERMINED BY THE FDA TO BE A

03:08PM  9     WAIVED TEST, AND THE FACILITY THAT IS PERFORMING THE TEST MEETS

03:08PM  10    THE DEFINITION OF A LABORATORY UNDER CLIA, THEN THEY'RE

03:08PM  11    REQUIRED TO HAVE A CLIA CERTIFICATE.

03:08PM  12    Q.   OKAY.  YOU CAN RETURN BACK TO 7350A.

03:08PM  13         NOW, WITHIN -- ACTUALLY, LET'S GO TO 7350C, THE DECK.  IT

03:08PM  14    STARTS OFF, "THERANOS OVERVIEW OF SAMPLE PROCESSING WORKFLOW

03:08PM  15    PREPARED FOR FDA:

03:08PM  16         "PHASE I AND PHASE II OF THERANOS BUSINESS OPERATIONS."

03:08PM  17         DO YOU SEE THAT?

03:08PM  18    A.   I DO.

03:08PM  19    Q.   AND THEN PAGE 2 AND 3 KIND OF DESCRIBE WORKFLOW FOR THE

03:09PM  20    PROPOSED BUSINESS MODEL.

03:09PM  21         DO YOU SEE THAT?

03:09PM  22    A.   I DO.

03:09PM  23    Q.   AND THE PHASE I WITH A THERANOS SITE OPERATED BY THERANOS

03:09PM  24    CLIA LAB.  A THERANOS PSC OPERATED BY THERANOS'S CLIA LAB.

03:09PM  25         DO YOU SEE THAT?

03:09PM   1    A.   I DO.

03:09PM   2    Q.   AND THEN WITH SAMPLES BEING COURIERED TO THE HIGH

03:09PM   3    COMPLEXITY LAB FOR PROCESSING.

03:09PM   4         DO YOU SEE THAT?

03:09PM   5    A.   YEAH, I SEE THAT.

03:09PM   6    Q.   OKAY.  AND THEN THE PHASE II THAT WAS AT LEAST DESCRIBED

03:09PM   7    IN THE BACKGROUND MATERIAL SHARED WITH YOU DESCRIBES THERANOS

03:09PM   8    PSC, THERANOS SITE OPERATED BY THERANOS CLIA LAB.

03:10PM   9         "WITH SAMPLE COLLECTION PERFORMED IN A DEDICATED THERANOS

03:10PM  10    PATIENT SERVICE CENTER."

03:10PM  11         DO YOU SEE THAT?

03:10PM  12    A.   YES.

03:10PM  13    Q.   "AND COLLECTION AND PROCESSING PERFORMED BY THERANOS

03:10PM  14    LICENSED PHLEBOTOMISTS."

03:10PM  15         DO YOU SEE THAT?

03:10PM  16    A.   YEAH.

03:10PM  17    Q.   AND THEN AGAIN, THERE'S A DESCRIPTION OF THERANOS COURIER

03:10PM  18    PHYSICALLY TRANSPORTS SAMPLE TO THE LAB FOR ANALYSIS.

03:10PM  19         DO YOU SEE THAT?

03:10PM  20    A.   I DO.

03:10PM  21    Q.   OKAY.  AND THIS IS ASSUMING A POST-FDA CLEARANCE.

03:10PM  22         DO YOU SEE THAT?

03:10PM  23    A.   YES.

03:10PM  24    Q.   YOU CAN SET THAT ASIDE.

03:10PM  25         SO THE MEETING THAT TOOK PLACE IN JANUARY OF 2014,

03:10PM   1      MR. BALWANI WAS PRESENT?

03:10PM   2      A.   YES.

03:10PM   3      Q.   AND MS. HOLMES WAS PRESENT?

03:10PM   4      A.   YES.

03:10PM   5      Q.   AND YOU DESCRIBED YOU WERE THERE?

03:10PM   6      A.   I WAS.

03:10PM   7      Q.   THE FDA WAS ON THE PHONE?

03:11PM   8      A.   I BELIEVE SO.

03:11PM   9      Q.   OKAY.  TO THE BEST OF YOUR RECOLLECTION?

03:11PM   10     A.   TO THE BEST OF MY RECOLLECTION, YES.

03:11PM   11     Q.   AND WAS MS. KELLER OR YOST THERE?

03:11PM   12     A.   I BELIEVE THAT THEY WERE BOTH THERE.

03:11PM   13     Q.   AND THEN MS. DYER?

03:11PM   14     A.   YES, TO THE BEST OF MY RECOLLECTION, YES.

03:11PM   15     Q.   NOW, THIS MEETING WAS REQUESTED BY THERANOS; CORRECT?

03:11PM   16     A.   THAT'S MY UNDERSTANDING.

03:11PM   17     Q.   OKAY.  AND THAT'S UNUSUAL THAT A SMALL CLINICAL LABORATORY

03:11PM   18     AT THE TIME WOULD REQUEST A MEETING WITH CMS TO DISCUSS ITS

03:11PM   19     BUSINESS MODEL; CORRECT?

03:11PM   20     A.   IT IS NOT UNUSUAL.

03:11PM   21     Q.   IT'S NOT UNUSUAL?

03:11PM   22     A.   IT IS NOT.

03:11PM   23     Q.   YOU HAVE EXPERIENCED THAT BEFORE IN YOUR CAREER?

03:11PM   24     A.   WE HAVE.

03:11PM   25     Q.   AND WHAT ABOUT WITH A MANUFACTURER OF A TESTING DEVICE,

03:11PM  1    WAS IT UNUSUAL FOR A MANUFACTURER TO BE REQUESTING MEETINGS

03:11PM  2    WITH CMS?

03:11PM  3    A.   I DON'T KNOW IF IT'S UNUSUAL, BUT WE HAVE HAD OTHER

03:11PM  4    MEETINGS WITH OTHER MANUFACTURERS OF NEW TECHNOLOGY.

03:12PM  5    Q.   OKAY.  AND THEN YOU HAD ONE WITH THERANOS; CORRECT?

03:12PM  6    A.   WE DID.

03:12PM  7    Q.   NOW, AT SOME POINT IN TIME YOU DESCRIBED LEARNING THAT --

03:12PM  8    WELL, NOT LEARNING -- YOU WERE REQUESTED BY MS. DYER TO

03:12PM  9    PARTICIPATE IN THE THERANOS SURVEY THAT TOOK PLACE IN 2013;

03:12PM  10   CORRECT?

03:12PM  11   A.   I WAS.

03:12PM  12   Q.   OKAY.  BUT THAT WASN'T THE NORMAL PROCESS.

03:12PM  13        THE NORMAL PROCESS WAS FOR STATE REGULATORS TO PERFORM

03:12PM  14   THESE TWICE OR BIANNUAL RECERTIFICATION SURVEYS; CORRECT?

03:12PM  15   A.   IN A LOT OF CASES THE STATE DOES THEM.

03:12PM  16        BUT DEPENDING ON THE ACTUAL SPECIFICS OR THE RESOURCES

03:12PM  17   THAT THE STATE HAVE, WE MAY PERFORM THE SURVEYS, CMS MAY

03:13PM  18   PERFORM THEM IN CONJUNCTION WITH THE STATE OR BY JUST THE

03:13PM  19   FEDERAL SURVEYORS.

03:13PM  20   Q.   OKAY.  AND PRIOR TO 2015, THERANOS HAD BEEN SURVEYED BY

03:13PM  21   STATE REGULATORS ON AT LEAST TWO OCCASIONS; CORRECT?

03:13PM  22   A.   I KNOW THEY HAD BEEN INSPECTED IN 2013.

03:13PM  23        I DON'T KNOW IF THEY HAD BEEN OFFICIALLY INSPECTED PRIOR

03:13PM  24   TO 2013.

03:13PM  25   Q.   OKAY.  BUT IN ORDER TO OBTAIN THE CERTIFICATE THAT THEY

03:13PM 1    OBTAINED, THEY WOULD HAVE HAD TO HAVE BEEN INSPECTED AT SOME

03:13PM 2    POINT IN TIME?

03:13PM 3    A.   YES.  BUT THE CLIA CERTIFICATE IS ISSUED BEFORE WE INSPECT

03:13PM 4    THE LABORATORY.

03:13PM 5    Q.   UNDERSTOOD.

03:13PM 6         WOULD YOU TAKE A LOOK AT WITHIN THE GOVERNMENT'S EXHIBIT

03:14PM 7    BINDER THAT I THINK YOU STILL HAVE, ALTHOUGH IT IS ALSO IN

03:14PM 8    EVIDENCE.

03:14PM 9         IF WE CAN PUT UP ON THE SCREEN, EXHIBIT 5831.

03:14PM 10        AND YOU'LL RECALL THAT 5831, YOU WERE ASKED SOME QUESTIONS

03:14PM 11   ABOUT THE BACKGROUND, THE DOCUMENTS BEHIND THE EMAIL THAT IS

03:14PM 12   DATED 6-13-2015 FROM LANGLY GEE TO MR. BALWANI AND OTHERS

03:14PM 13   RELATING TO SUBJECT AUDIT REPORTS.

03:14PM 14        DO YOU SEE THAT?

03:14PM 15   A.   I DO.

03:14PM 16   Q.   OKAY.  AND MR. GEE WAS THE QUALITY ASSURANCE/QUALITY

03:14PM 17   CONTROL MANAGER AT THERANOS THAT YOU ENGAGED WITH AND MENTIONED

03:14PM 18   IN YOUR TESTIMONY ALREADY TODAY; CORRECT?

03:14PM 19   A.   HE WAS.

03:14PM 20   Q.   OKAY.  AND AT PAGE 2 OF THE EXHIBIT IS THAT COVER LETTER

03:14PM 21   THAT YOU WERE ASKED SOME QUESTIONS ABOUT BY MR. LEACH DATED

03:15PM 22   DECEMBER 10TH, 2013 ADDRESSED TO DR. ROSENDORFF REGARDING

03:15PM 23   STANDARD-LEVEL DEFICIENCIES.

03:15PM 24        DO YOU SEE THAT?

03:15PM 25   A.   I DO.

03:15PM   1    Q.   AND THIS IS -- ATTACHED IS A LETTER AND A SURVEY REPORT

03:15PM   2    FROM THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH; IS THAT RIGHT?

03:15PM   3    A.   YES.  THIS IS THE COVER LETTER THAT GOES WITH THE SURVEY

03:15PM   4    THAT WAS PERFORMED IN DECEMBER OF 2013.

03:15PM   5    Q.   AND I THINK YOU DESCRIBED IN YOUR TESTIMONY THAT UNDER

03:15PM   6    CLIA, THERE ARE DIFFERENT LEVELS OF DEFICIENCIES.

03:15PM   7         STANDARD IS ONE AND CONDITION IS ANOTHER; CORRECT?

03:15PM   8    A.   YES.

03:15PM   9    Q.   AND STANDARD IS A LESS SERIOUS LEVEL OF DEFICIENCY, AND

03:15PM   10   CONDITION LEVEL IS A MORE SERIOUS DEFICIENCY?

03:15PM   11   A.   THAT'S CORRECT.

03:15PM   12   Q.   OKAY.  AND IS IT ACCURATE THAT SOMETIMES AN ACCUMULATION

03:15PM   13   OF MULTIPLE STANDARD LEVEL DEFICIENCIES CAN CONTRIBUTE OR

03:15PM   14   SUPPORT A CONDITION LEVEL DEFICIENCY?

03:15PM   15   A.   YES.  BUT THE NUMBER OF STANDARDS, THERE DOES NOT HAVE TO

03:16PM   16   BE A LEVEL OF STANDARD IN ORDER TO CALL IT A CONDITION LEVEL.

03:16PM   17   Q.   AND JUST SO I UNDERSTAND THAT RIGHT, JUST BECAUSE THERE

03:16PM   18   MAY BE, LET'S SAY HYPOTHETICALLY, NUMEROUS STANDARD LEVEL

03:16PM   19   DEFICIENCIES, WOULDN'T NECESSARILY MEAN THAT THAT WOULD RISE TO

03:16PM   20   THE LEVEL OF CONDITION LEVEL DEFICIENCIES; IS THAT RIGHT?

03:16PM   21   A.   THAT'S CORRECT.

03:16PM   22        BUT THAT ALSO MEANS THAT YOU COULD HAVE ONE STANDARD THAT

03:16PM   23   WOULD RISE TO THE CONDITION LEVEL AS WELL.

03:16PM   24   Q.   BECAUSE IT MAY BE A REALLY SERIOUS SPECIFIC STANDARD?

03:16PM   25   A.   YES.

03:16PM   1    Q.   OKAY.  OR THE FINDINGS THAT SUPPORT THE STANDARD LEVEL

03:16PM   2    VIOLATION MAY BE SERIOUS?

03:16PM   3    A.   YES.

03:16PM   4    Q.   OKAY.  AND IF WE CAN TAKE A LOOK AT PAGE 2 OF THE COVER

03:16PM   5    LETTER ANYWAY.  NEAR THE BOTTOM THERE'S A PARAGRAPH THAT SAYS

03:16PM   6    "PLEASE NOTE."

03:16PM   7         AT PAGE 2, SORRY.

03:17PM   8         AND THE LETTER READS, "PLEASE NOTE THAT THE ROUTINE SURVEY

03:17PM   9    TAKES AN OVERVIEW OF THE LABORATORY THROUGH RANDOM SAMPLING.

03:17PM  10    BY ITS NATURE, THE ROUTINE SURVEY MAY NOT FIND EVERY VIOLATION

03:17PM  11    THAT THE LABORATORY MAY HAVE COMMITTED.  IT REMAINS THE

03:17PM  12    RESPONSIBILITY OF THE LABORATORY AND ITS DIRECTOR TO ENSURE

03:17PM  13    THAT THE LABORATORY IS AT ALL TIMES FOLLOWING ALL CLIA

03:17PM  14    REQUIREMENTS."

03:17PM  15         DO YOU SEE THAT?

03:17PM  16    A.   I DO.

03:17PM  17    Q.   OKAY.  AND THE DESCRIPTION OF "RANDOM SAMPLING," THAT'S

03:17PM  18    ESSENTIALLY THE METHODS SURVEYORS USE IN ORDER TO TEST

03:17PM  19    COMPLIANCE IN A CLIA LABORATORY; CORRECT?

03:17PM  20    A.   WE USE RANDOM SAMPLING, BUT WE ALSO -- THE OVERARCHING WAY

03:17PM  21    THAT WE SURVEY IS THE OUTCOME ORIENTED SURVEY PROCESS.

03:17PM  22    Q.   OKAY.  AND PART OF THE REASON THAT YOU USE THESE PROCESSES

03:17PM  23    IS BECAUSE YOU CAN'T LOOK AT EVERYTHING; IS THAT FAIR?

03:18PM  24    A.   THAT DEPENDS ON THE LABORATORY.

03:18PM  25    Q.   OKAY.

03:18PM  1    A.   HOW MUCH WE ARE ABLE TO REVIEW.

03:18PM  2    Q.   OKAY.  AND BY ITS NATURE, THOUGH, TYPICALLY SURVEYS ARE

03:18PM  3    CONDUCTED ON THIS SAMPLING METHOD; CORRECT?

03:18PM  4    A.   AGAIN, IT DEPENDS ON THE LABORATORY, HOW BIG THE

03:18PM  5    LABORATORY IS, AND HOW MUCH TESTING THEY'RE DOING.

03:18PM  6    Q.   OKAY.  AND YOUR SURVEY -- IN YOUR SURVEY OF THERANOS'S

03:18PM  7    LABORATORY, YOU USED BOTH A SAMPLING METHOD AND THIS OUTCOME

03:18PM  8    METHOD?

03:18PM  9    A.   YES.

03:18PM  10   Q.   OKAY.  AND THEN THE LETTER THAT WAS SENT TO DR. ROSENDORFF

03:18PM  11   IN 2013 REFERENCED THE FACT THAT "IT IS THE RESPONSIBILITY OF

03:18PM  12   THE LABORATORY AND ITS DIRECTOR TO ENSURE THAT THE LABORATORY

03:18PM  13   IS IT AT ALL TIMES FOLLOWING ALL CLIA REQUIREMENTS."

03:18PM  14        DO YOU SEE THAT?

03:18PM  15   A.   I DO.

03:18PM  16   Q.   AND THAT IS ACCURATE; CORRECT?

03:18PM  17   A.   THAT IS ACCURATE.

03:19PM  18   Q.   NOW, CONTINUING WITH THIS EXHIBIT, YOU WERE SHOWN IT

03:19PM  19   BRIEFLY, BUT I DON'T THINK YOU DISCUSSED ANY DETAILS AT 5831.

03:19PM  20        AND I WANTED TO ASK YOU A FEW QUESTIONS ABOUT WHAT IS

03:19PM  21   REFLECTED IN THE SURVEY REPORT HERE.

03:19PM  22        SO TURNING TO PAGE 5 OF 5831, YOU WERE ASKED SOME

03:19PM  23   QUESTIONS ABOUT THE FIRST D-TAG.  I THINK YOU CALLED IT D5215.

03:19PM  24        DO YOU SEE THAT?

03:19PM  25   A.   I DO.

03:19PM   1       Q.   AND DO I HAVE THAT RIGHT, IT'S A D-TAG?

03:19PM   2       A.   YES.

03:19PM   3       Q.   IS THAT HOW YOU RELATE OR REFER TO IT?

03:19PM   4       A.   YES.

03:19PM   5       Q.   SO I'LL USE THAT PHRASE.  SO D-TAG D5215, IN THIS SURVEY

03:19PM   6   REPORT FROM DECEMBER 3RD, 2013, CONCERNS EVALUATION OF

03:19PM   7   PROFICIENCY TESTING PERFORMANCE.

03:19PM   8       DID I GET THAT RIGHT?

03:19PM   9       A.   YOU DID.

03:19PM  10       Q.   OKAY.  AND THEN YOU DESCRIBE THERE'S A DESCRIPTION OF THE

03:19PM  11   REGULATION?

03:19PM  12       A.   YES.

03:19PM  13       Q.   OKAY.  AND THEN BELOW THAT IS THE KIND OF SURVEYOR'S

03:19PM  14   FINDINGS.

03:20PM  15       IS THAT FAIR?

03:20PM  16       A.   YES.

03:20PM  17       Q.   OKAY.  AND THEN HERE THE SURVEYOR WROTE, "THIS STANDARD IS

03:20PM  18   NOT MET AS EVIDENCED BY," AND THEN, "BASED ON REVIEW OF

03:20PM  19   AMERICAN PROFICIENCY INSTITUTE PROFICIENCY TESTING DOCUMENTS

03:20PM  20   (FROM THE 2ND TESTING EVENT OF 2013 TO THE 3RD TESTING EVENT OF

03:20PM  21   2013), LACK OF CORRECTIVE ACTION DOCUMENTS, AND INTERVIEW WITH

03:20PM  22   THE LABORATORY DIRECTOR, IT WAS DETERMINED THAT THE LABORATORY

03:20PM  23   DIRECTOR FAILED TO ENSURE THAT CORRECTIVE ACTIONS WERE

03:20PM  24   PERFORMED WHEN THE LABORATORY RECEIVED UNGRADED PROFICIENCY

03:20PM  25   TESTING RESULTS."

03:20PM  1        AND THEN THERE'S A DESCRIPTION OF SOME FINDINGS.

03:20PM  2        DID I READ THAT RIGHT?

03:20PM  3   A.   YOU DID.

03:20PM  4   Q.   NOW, "UNGRADED PROFICIENCY TESTING RESULTS," THAT MEANS

03:20PM  5   THAT THE RESULT THAT THE LAB REPORTED TO, IN THIS CASE IT WAS

03:20PM  6   API, WASN'T INACCURATE OR INCONSISTENT WITH PEERS, IT SIMPLY

03:21PM  7   WASN'T GRADED OR IT WASN'T SCORED; IS THAT RIGHT?

03:21PM  8   A.   WHEN THE LABORATORY SUBMITTED THEIR RESULTS, AND THEN THE

03:21PM  9   RESULTS WERE SUBMITTED TO THE LABORATORY, THE PROFICIENCY

03:21PM  10  TESTING PROGRAM HAD NOT GRADED THE RESULTS BECAUSE THEY WERE

03:21PM  11  UNABLE TO DO SO.

03:21PM  12  Q.   OKAY.  AND THAT CAN HAPPEN WHEN THERE ARE NOT ENOUGH PEER

03:21PM  13  PARTICIPANTS IN A PROFICIENCY TESTING CHALLENGE; CORRECT?

03:21PM  14  A.   IT CAN.

03:21PM  15  Q.   OKAY.  SO RESULTS GO OUT TO THE API, API MAY NOT BE IN A

03:21PM  16  SITUATION WHERE THEY DON'T HAVE ENOUGH COMPARATIVE LABS, SO

03:21PM  17  THEY SEND THE RESULT BACK UNGRADED TO THE LAB.

03:21PM  18        AT THAT POINT THE LAB ISN'T BEING TOLD THAT THE RESULT IS

03:21PM  19  WRONG.

03:21PM  20        IS THAT FAIR?

03:21PM  21  A.   THEY'RE NOT BEING TOLD WHETHER IT'S RIGHT OR WRONG.

03:21PM  22  Q.   OKAY.  BUT AT THAT POINT THE LAB HAS SOME RESPONSIBILITIES

03:21PM  23  TO DO SOME FOLLOW-UP?

03:21PM  24  A.   THEY DO.

03:21PM  25  Q.   OKAY.  AND IS THAT WHAT THE DEFICIENCY IS HERE, THAT THE

03:22PM   1    LAB DIRECTOR FAILED TO ENSURE THAT THE LAB FOLLOWED UP ON THIS

03:22PM   2    UNGRADED EVENT?

03:22PM   3    A.   WELL, I DID NOT WRITE THIS, THIS SURVEY REPORT.  IT

03:22PM   4    APPEARS THAT THEY DID NOT MEET THE REQUIREMENT TO EVALUATE

03:22PM   5    THEIR UNGRADED RESULTS.

03:22PM   6    Q.   OKAY.  OKAY.  AND EVALUATING AN UNGRADED RESULT WOULD

03:22PM   7    INVOLVE DOING SOME INVESTIGATIVE WORK IN ORDER TO REACH SOME

03:22PM   8    ASSURANCE OR DEMONSTRATE THAT THE RESULTS THAT WERE ARRIVED AT

03:22PM   9    WERE ACCURATE; CORRECT?

03:22PM   10   A.   THE LABORATORY HAS TO DETERMINE HOW THEY'RE GOING TO

03:22PM   11   FIGURE OUT THE UNGRADED RESULTS ARE ACCEPTABLE OR ACCURATE.

03:22PM   12   Q.   AND IT'S UP TO THE LABORATORY TO MAKE THAT DECISION?

03:22PM   13   A.   IT IS.

03:22PM   14   Q.   ALL RIGHT.

03:22PM   15   A.   AND THEY HAVE TO SHOW THE DOCUMENTATION OF HOW THEY DID

03:22PM   16   THAT AND HOW THEY DETERMINED THAT IT WAS AN ACCURATE RESULT.

03:22PM   17   Q.   AND SOME OF THE DOCUMENTATION A LAB OR A LABORATORY

03:23PM   18   DIRECTOR MAY LOOK TO IN ORDER TO PERFORM THIS CORRECTIVE ACTION

03:23PM   19   MAY BE TO LOOK AT QUALITY CONTROL RECORDS?

03:23PM   20   A.   IN MY EXPERIENCE, THAT'S ONE OF THE THINGS THAT THE

03:23PM   21   LABORATORY CAN LOOK AT WHEN THEY GET UNGRADED RESULTS TO ENSURE

03:23PM   22   THAT THE QUALITY CONTROL WAS OKAY THAT DAY.

03:23PM   23   Q.   A LAB COULD ALSO LOOK AT MAYBE HISTORICAL PROFICIENCY

03:23PM   24   TESTING RESULTS?  WOULD THAT HELP?

03:23PM   25   A.   WE DON'T HAVE ANY REQUIREMENTS IN CLIA OF WHAT THEY HAVE

03:23PM  1    TO LOOK AT.

03:23PM  2          THEY HAVE TO LOOK AT WHAT THEY NEED, THE DOCUMENTATION AND

03:23PM  3    THE INFORMATION, TO DETERMINE IF THE UNGRADED RESULT MEETS THE

03:23PM  4    REQUIREMENTS.

03:23PM  5    Q.   FAIR ENOUGH.

03:23PM  6          BUT YOU DO HAVE EXPERIENCE IN EVALUATING -- YOU DO HAVE

03:23PM  7    SOME EXPERIENCE IN REVIEWING AND EVALUATING CORRECTIVE ACTION,

03:24PM  8    RECORDS OR DOCUMENTS THAT LABS PRESENT TO CMS TO TRY TO SATISFY

03:24PM  9    THEIR OBLIGATIONS; CORRECT?

03:24PM 10    A.   YES.

03:24PM 11    Q.   OKAY.  AND SO SOMETIMES THEY LOOK AT QC RECORDS?

03:24PM 12    A.   UH-HUH, YES.

03:24PM 13    Q.   AND SOMETIMES THEY MIGHT LOOK AT MAYBE QC AND PATIENT

03:24PM 14    RECORDS TOGETHER TO FIGURE OUT WHETHER THERE MIGHT BE SOME

03:24PM 15    INDICATIONS OF SOME ISSUES?

03:24PM 16    A.   THEY CAN LOOK AT BOTH QC AND PATIENT RECORDS.

03:24PM 17    Q.   AND WHAT OTHER TYPES OF RECORDS ARE YOU AWARE OF OR ARE

03:24PM 18    YOU FAMILIAR WITH THAT LABS MIGHT HAVE PRESENTED IN PRIOR

03:24PM 19    SURVEYS THAT YOU'VE DONE TO SATISFY THIS DOCUMENTATION ISSUE

03:24PM 20    REGARDING UNGRADED PROFICIENCY TESTING EVENTS?

03:24PM 21    A.   LIKE YOU SAID, THEY WILL LOOK AT QUALITY CONTROL RECORDS,

03:24PM 22    THEY WILL LOOK AT PATIENT RECORDS, THEY WOULD -- THEY COULD

03:24PM 23    CHECK TO SEE IF THERE WERE ANY QUALITY ASSESSMENT ISSUES DURING

03:24PM 24    THAT TIME, IF THEY HAD ANY ISSUES WITH THE TEST.  THEY CAN

03:24PM 25    REACH OUT TO THE MANUFACTURER TO SEE IF THERE WERE ANY PROBLEMS

03:25PM  1    WITH THE TESTING, THE REAGENTS.

03:25PM  2         THEY CAN ALSO REACH OUT TO THE PROFICIENCY TESTING PROGRAM

03:25PM  3    TO SEE IF THEY HAD IDENTIFIED ANY ISSUES WITH THE PT SAMPLES.

03:25PM  4    Q.   THANK YOU.

03:25PM  5         NOW, CONTINUING WITH THIS SURVEY REPORT FROM 2016 TO THE

03:25PM  6    SECOND -- I'M SORRY, PAGE 6.  PAGE 2 OF 8 OF THE REPORT ITSELF.

03:25PM  7         AND CONTINUING ON THIS DEFICIENCY OF FAILURES TO TAKE

03:25PM  8    CORRECTIVE ACTION REGARDING THIS PROFICIENCY TESTING

03:25PM  9    CHALLENGES.

03:25PM  10        DO I HAVE IT RIGHT, THAT ON PAGE 6, EACH OF THE ISSUES

03:25PM  11   RAISED BETWEEN D, E, F, G, H, AND I, THEY'RE ALL OF THESE

03:25PM  12   SIMILARLY UNGRADED PROFICIENCY TESTING CHALLENGES; CORRECT?

03:26PM  13   A.   IT WOULD APPEAR THAT THE SURVEYOR CITED THERANOS FOR NOT

03:26PM  14   TAKING ANY CORRECTIVE ACTIONS WHEN THERE WERE UNGRADED RESULTS.

03:26PM  15   Q.   ALTHOUGH IF WE GO TO PAGE 7, IT LOOKS LIKE AT ITEM K IT

03:26PM  16   READS, "THERE WAS NO CORRECTIVE ACTION DOCUMENTED FOR THE

03:26PM  17   UNACCEPTABLE FOLATE PROFICIENCY TEST RESULT FOR 1 OF 2

03:26PM  18   PROFICIENCY TEST CHALLENGES FOR THE API 3RD TESTING EVENT OF

03:26PM  19   2013."

03:26PM  20        DO YOU SEE THAT?

03:26PM  21   A.   I DO.

03:26PM  22   Q.   SO IT SEEMS LIKE WHEN THERE'S AN UNACCEPTABLE SCORE

03:26PM  23   RETURNED TO THE LAB, THE LAB NEEDS TO TAKE CORRECTIVE ACTION

03:26PM  24   AND INVESTIGATE WHAT HAPPENED AND DEMONSTRATE THAT THEY HAVE

03:26PM  25   SOLVED WHATEVER ISSUE MAY HAVE ARISEN?

03:27PM  1    A.    THAT'S TRUE.

03:27PM  2    Q.    OKAY.  AND THEN CONTINUING ON THAT SAME PAGE 7.  I CAN'T

03:27PM  3    READ -- I THINK IT'S LETTER L.  "ON 12/3/13 THE LABORATORY

03:27PM  4    DIRECTOR AFFIRMED THAT NO INVESTIGATION WAS PERFORMED TO

03:27PM  5    DETERMINE IF RESULTS SUCCESSFULLY DEMONSTRATED TEST ACCURACY

03:27PM  6    USING LABORATORY QC DATA AND RESULTS DISTRIBUTION DATA SUPPLIED

03:27PM  7    BY THE PT ORGANIZATION, AS PER THE LABORATORY'S POLICY."

03:27PM  8         DO YOU SEE THAT?

03:27PM  9    A.    I DO.

03:27PM  10   Q.    AND SO IT LOOKS LIKE THE LABORATORY DIRECTOR KIND OF

03:27PM  11   ADMITTED THAT THEY DIDN'T DO WHAT THEY WERE SUPPOSED TO DO AND

03:27PM  12   FOLLOWED THE LAB'S OWN PROCEDURE; CORRECT?

03:27PM  13             MR. LEACH:  YOUR HONOR, OBJECTION.  THIS DOCUMENT IS

03:27PM  14   IN FOR A LIMITED PURPOSE, NOT A HEARSAY PURPOSE.

03:27PM  15        IF THE DEFENSE WANTS IT IN FOR ITS TRUTH, WE CAN DO THAT,

03:27PM  16   TOO.

03:27PM  17             THE COURT:  COUNSEL, THIS WAS IN NOT FOR THE TRUTH

03:28PM  18   OF THE MATTER ASSERTED BUT TO INFORM AS TO ANY ACTION TAKEN.

03:28PM  19             MR. CAZARES:  I UNDERSTOOD THAT, YOUR HONOR, TO

03:28PM  20   MR. BALWANI.

03:28PM  21        I'M ASKING THE WITNESS QUESTIONS ABOUT WHAT ACTUALLY DOES

03:28PM  22   THIS MEAN, THAT MR. BALWANI IS RECEIVING NOTICE OF, AND WHO IS

03:28PM  23   INVOLVED IN IT, BECAUSE THE GOVERNMENT THREW THIS IN THE RECORD

03:28PM  24   AND KIND OF DIDN'T ASK ANY QUESTIONS ABOUT IT, AND SO I THINK

03:28PM  25   THE JURY NEEDS TO SEE SOME DETAIL.

03:28PM   1                    THE COURT:  WELL, IT'S OFFERED FOR THE TRUTH OF WHAT

03:28PM   2        IS IN HERE.  THIS IS BACKGROUND FOR HER CONDUCT.

03:28PM   3                    MR. CAZARES:  YES, YOUR HONOR.  UNDERSTOOD,

03:28PM   4        YOUR HONOR.

03:28PM   5                    THE COURT:  YOU CAN GO THAT WAY.

03:28PM   6                    MR. CAZARES:  OKAY.

03:28PM   7        Q.   AND THEN -- I WON'T BELABOR THIS TOO MUCH, BUT LOOK AT THE

03:28PM   8        NEXT D-TAG D5217.

03:28PM   9             DO YOU SEE THAT --

03:28PM  10        A.   I DO.

03:28PM  11        Q.   ON PAGE 7?

03:28PM  12             AND THIS IS TITLED EVALUATION OF PROFICIENCY PERFORMANCE?

03:28PM  13             DO YOU SEE THAT?

03:28PM  14        A.   I DO.

03:28PM  15        Q.   AND THEN THE REQUIREMENT READS, "AT LEAST TWICE ANNUALLY,

03:29PM  16        THE LABORATORY MUST VERIFY THE ACCURACY OF ANY TEST OR

03:29PM  17        PROCEDURE IT PERFORMS THAT IS NOT INCLUDED IN SUBPART I OF THIS

03:29PM  18        PART."

03:29PM  19             DO YOU SEE THAT?

03:29PM  20        A.   I DO.

03:29PM  21        Q.   AND NOW THIS REFERENCE TO "SUBPART I OF THIS PART," THAT

03:29PM  22        IS RELATING TO CLIA; CORRECT?

03:29PM  23        A.   IT IS.

03:29PM  24        Q.   OKAY.  AND THEN CONTINUING.

03:29PM  25             THE REPORT READS, "THIS STANDARD IS NOT MET AS EVIDENCED

03:29PM  1    BY:

03:29PM  2         "BASED INTERVIEW WITH THE LABORATORY DIRECTOR AND TESTING

03:29PM  3    PERSONNEL, LACK OF VERIFICATION OF ACCURACY DOCUMENTATION FOR

03:29PM  4    AMMONIA (NH3), AND REVIEW OF TESTING LOGS.  IT WAS DETERMINED

03:29PM  5    THAT FROM 2012 TO 2013 THE LABORATORY FAILED TO VERIFY THE

03:29PM  6    ACCURACY OF NH3 TESTING AT LEAST TWICE ANNUALLY."

03:30PM  7         DO YOU SEE THAT?

03:30PM  8    A.   I DO.

03:30PM  9    Q.   AND SO SEPARATE AND ASIDE FROM THIS VALIDATION OF TESTS OR

03:30PM  10   VERIFICATION OF FDA APPROVED TESTS USED IN THE LAB, IT SOUNDS

03:30PM  11   LIKE THE LAB NEEDS TO TWICE ANNUALLY PERFORM THIS ADDITIONAL

03:30PM  12   ASSURANCE PROTOCOL?

03:30PM  13   A.   YES.  THIS IS WHAT I WAS TALKING ABOUT WHEN I SPOKE

03:30PM  14   EARLIER TO WHAT WE WOULD CALL ALTERNATIVE PT.

03:30PM  15        SUBPART I IS A LIST OF ANALYTES THAT LABORATORIES ARE

03:30PM  16   REQUIRED TO ENROLL AND PARTICIPATE FOR PROFICIENCY TESTING.

03:30PM  17        SO IF THEY ARE NOT IN SUBPART I OR IT'S AN ADDITIONAL

03:30PM  18   METHOD OF THE SAME, THEN THEY HAVE TO DO THIS TWICE ANNUAL

03:30PM  19   VERIFICATION.

03:30PM  20        IT'S NOT VALIDATION, IT'S NOT PERFORMING VERIFICATION OF

03:30PM  21   PERFORMANCE SPECIFICATIONS.  IT'S COMPLETELY A SEPARATE

03:31PM  22   REQUIREMENT FROM THAT.

03:31PM  23   Q.   IT'S A SEPARATE REQUIREMENT AND IN LIEU OF COMMERCIAL

03:31PM  24   PROFICIENCY TESTING; IS THAT RIGHT?

03:31PM  25   A.   THEY MAY ENROLL IN PROFICIENCY TESTING FOR THESE, BUT

BENNETT CROSS BY MR. CAZARES

03:31PM 1    THEY'RE NOT REQUIRED TO DO IT.

03:31PM 2         I'M NOT SURE IT WOULD REALLY BE IN LIEU OF.  YOU KNOW,

03:31PM 3    THEY'RE REQUIRED TO ENROLL AND PARTICIPATE FOR THOSE TESTS IN

03:31PM 4    SUBPART I, AND THEY CAN EITHER ENROLL OR DO THE TWICE ANNUAL

03:31PM 5    ACCURACY INSTEAD OF ENROLLING.

03:31PM 6    Q.   FAIR ENOUGH.

03:31PM 7         AND THEN CONTINUING ON WITH THE EXHIBIT ON 5831 ON

03:31PM 8    PAGE 11, THERE'S A DESCRIPTION OF A PLAN OF CORRECTION.

03:31PM 9         DO YOU SEE THAT?

03:31PM 10   A.   I DO.

03:31PM 11   Q.   AND THEN THERE'S A DESCRIPTION FOR SURVEY OF THERANOS

03:32PM 12   COMPLETED 12-3-2013.

03:32PM 13        DID I GET THAT RIGHT?

03:32PM 14   A.   YOU DID.

03:32PM 15   Q.   AND THEN THERE'S A DESCRIPTION OF RESPONSE AND PLAN TO

03:32PM 16   D-TAG 5215; 310B.

03:32PM 17        DID I GET THAT RIGHT?

03:32PM 18   A.   YES.

03:32PM 19   Q.   OKAY.  AND THEN THE RESPONSE AND PLAN READS, "WE HAVE

03:32PM 20   COMPARED OUR REPORTED RESULT TO THAT PART OF OUR PEER GROUP

03:32PM 21   (DIASORIN, 4 PEERS) FOR THAT EVENT AND FOR THAT SPECIMEN.  OUR

03:32PM 22   RESULT (POSITIVE) MATCHED THAT OF OUR ENTIRE PEER GROUP FOR

03:32PM 23   THAT CHALLENGE.  COMPLETION DATE COMPLETED 12-19."

03:32PM 24        DO YOU SEE THAT?

03:32PM 25   A.   I DO.

03:32PM   1    Q.   NOW -- SO THE ISSUE HERE WAS THE RESULT MATCHED THE PEERS,

03:32PM   2    THAT'S GREAT, BUT THEY SHOULD HAVE DONE THE WORK BEFORE; IS

03:32PM   3    THAT FAIR?

03:32PM   4    A.   THAT'S CORRECT.

03:32PM   5                MR. LEACH:  OBJECTION, YOUR HONOR.  CALLS FOR

03:32PM   6    HEARSAY.

03:33PM   7                THE COURT:  THIS IS NOT IN FOR THE TRUTH OF THE

03:33PM   8    MATTER ASSERTED.

03:33PM   9                MR. CAZARES:  NOTICE TO MR. BALWANI WHO THIS IS

03:33PM  10    BEING SENT TO.

03:33PM  11                THE COURT:  THAT'S CORRECT.

03:33PM  12        SO YOU CAN ASK HER WHAT CONDUCT SHE ENGAGED IN.  WHAT DID

03:33PM  13    SHE DO?  WHAT IS HER RESPONSE TO THIS?  WHAT DID SHE DO?

03:33PM  14        BUT THE DOCUMENT ITSELF IS NOT OFFERED FOR THE TRUTH OF

03:33PM  15    THE MATTER ASSERTED.

03:33PM  16                MR. CAZARES:  I BELIEVE IT WAS BEING OFFERED FOR

03:33PM  17    NOTICE TO MR. BALWANI.

03:33PM  18                THE COURT:  YES.

03:33PM  19                MR. CAZARES:  AND I'M ASKING HER TO DESCRIBE OR

03:33PM  20    EXPLAIN WHAT THIS MEANS THAT MR. BALWANI IS RECEIVING REGARDING

03:33PM  21    THE OUTCOME OF THE INVESTIGATION.

03:33PM  22                THE COURT:  WELL, I THINK YOU CAN ASK HER WHAT DOES

03:33PM  23    THIS MEAN TO HER.

03:33PM  24                MR. CAZARES:  FAIR ENOUGH, YOUR HONOR.  I APOLOGIZE.

03:33PM  25    I DIDN'T QUITE UNDERSTAND.

BENNETT CROSS BY MR. CAZARES

03:33PM   1    Q.   SO, MS. BENNETT, LOOKING AT ITEM 1, "WE HAVE COMPARED OUR

03:33PM   2    REPORTED RESULT TO THAT OF OUR PEER GROUP FOR THAT EVENT AND

03:33PM   3    FOR THAT SPECIMEN.  OUR RESULT (POSITIVE) MATCHED THAT OF OUR

03:34PM   4    ENTIRE PEER GROUP FOR THAT CHALLENGE."

03:34PM   5         AND THEN THERE'S A COMPLETION DATE.

03:34PM   6         DO YOU SEE THAT?

03:34PM   7    A.   I DO.

03:34PM   8    Q.   OKAY.  AND IS THAT THE TYPE OF INVESTIGATIVE WORK THAT YOU

03:34PM   9    WOULD EXPECT TO SEE RELATED TO PROFICIENCY TESTING UNGRADED

03:34PM  10    CHALLENGES?

03:34PM  11    A.   I WOULD EXPECT THAT TO BE PART, BUT NOT THE TOTALITY OF

03:34PM  12    WHAT THEY WOULD DO.

03:34PM  13    Q.   OKAY.  WHAT ELSE WOULD YOU EXPECT THEM TO DO?

03:34PM  14    A.   I WOULD EXPECT THEM TO SHOW THAT THE RESULTS THAT THEY

03:34PM  15    ACTUALLY GOT WERE ACCURATE BY GIVING -- BY SUBMITTING

03:34PM  16    DOCUMENTATION TO SUPPORT THAT INVESTIGATION.

03:34PM  17    Q.   SO JUST CAN -- AND JUST SO I UNDERSTAND IT, AND JUST

03:34PM  18    REPORTING A RESULT THAT MATCHED PEER GROUPS, THAT'S NOT ENOUGH?

03:35PM  19    A.   IT IS NOT.

03:35PM  20    Q.   OKAY.  SO THE FACT THAT THERANOS'S RESULT MATCHED OTHER

03:35PM  21    LABS USING, FOR EXAMPLE, DIASORIN EQUIPMENT, IN YOUR MIND AND

03:35PM  22    EXPERIENCE, THAT'S INSUFFICIENT, YOU NEED TO DO MORE WORK?

03:35PM  23    A.   I WOULD EXPECT TO SEE MORE, YES.

03:35PM  24    Q.   OKAY.  AND IF WE CAN TURN TO PAGE 12, THERE'S A RESPONSE

03:35PM  25    TO THE DEFICIENCY.

03:35PM  1          "THERE WAS NO CORRECTIVE ACTION DOCUMENTED FOR THE

03:35PM  2    UNGRADED ANTI-RNP," I CAN'T SEE IF THAT IS AN S OR 5N,

03:35PM  3    "PROFICIENCY TEST RESULT FOR 1 OF 5 PROFICIENCY TEST CHALLENGES

03:35PM  4    FOR THE 2ND TESTING EVENT FOR 2013."

03:35PM  5          DO YOU SEE THAT?

03:35PM  6    A.   I DO.  AND IT'S SN.

03:35PM  7    Q.   AND THEN THE RESPONSE AND PLAN STARTS, "WE HAVE COMPARED

03:36PM  8    OUR REPORTED RESULT TO THAT OF OUR PEER GROUP FOR THAT EVENT

03:36PM  9    AND FOR THAT SPECIMEN (DIASORIN, 3 PEERS).  OUR RESULT

03:36PM  10    (NEGATIVE) MATCHED THAT OF OUR ENTIRE PEER GROUP FOR THAT

03:36PM  11    CHALLENGE.  COMPLETION DATE 12-19."

03:36PM  12          DO YOU SEE THAT?

03:36PM  13    A.   I DO.

03:36PM  14    Q.   AND THE RESPONSE AND PLAN CONTINUES.

03:36PM  15          ITEM 2, "WE HAVE REVIEWED THE QC DATA FROM THE

03:36PM  16    INSTRUMENTATION?"

03:36PM  17          THAT IS SOMETHING THAT YOU WOULD EXPECT THE LAB TO DO?

03:36PM  18    A.   I WOULD EXPECT THEM TO DO THAT, YES.

03:36PM  19    Q.   OKAY.  AND THEN ITEM 3 THERE'S A DESCRIPTION OF, "WE HAVE

03:36PM  20    REVIEWED THE FAILURE OF THE FOLLOW-UP OF THE UNGRADED RESULT

03:36PM  21    WITH SUPERVISORIAL STAFF TO REINFORCE THE NEED TO FOLLOW THE

03:36PM  22    PROTOCOL WHICH INCLUDES TO EVALUATE ALL UNGRADED PT RESULTS."

03:36PM  23          DO YOU SEE THAT?

03:36PM  24    A.   I DO.

03:36PM  25    Q.   AND IS THAT SOMETHING THAT YOU WOULD HAVE EXPECTED THE LAB

03:36PM 1    TO DO IN THE FIRST PLACE?

03:36PM 2    A.   I WOULD HAVE EXPECTED THEM TO DO THAT, BUT I WOULD HAVE

03:37PM 3    ALSO EXPECTED THEM TO SHOW DOCUMENTATION THAT THAT HAD

03:37PM 4    OCCURRED.

03:37PM 5    Q.   OKAY.  LASTLY, ON ITEM 4 IN RESPONSE TO THIS DEFICIENCY

03:37PM 6    THE DOCUMENT READS, "THE LABORATORY HAS HIRED A QA/QC DIRECTOR

03:37PM 7    WHOSE RESPONSIBILITIES INCLUDE REVIEWING ALL PT EVENTS AND

03:37PM 8    GENERATING REMINDERS TO LABORATORY STAFF TO FOLLOW UP ON ALL

03:37PM 9    UNGRADED PT RESPONSES."

03:37PM 10        DO YOU SEE THAT?

03:37PM 11   A.   I DO.

03:37PM 12   Q.   AND WOULD YOU, AS A CLIA SURVEYOR, REQUIRE SOME SORT OF

03:37PM 13   DOCUMENTATION OF THAT IN ORDER TO SATISFY THIS KIND OF UNGRADED

03:37PM 14   PT CHALLENGE?

03:37PM 15        IS JUST REPORTING THAT THE LAB HAS HIRED SOMEBODY TO

03:37PM 16   OVERSEE QUALITY CONTROL ENOUGH OR WOULD YOU REQUIRE SOME SORT

03:37PM 17   OF DOCUMENTATION?

03:37PM 18   A.   I PROBABLY WOULD HAVE EXPECTED THE STATEMENT AND THEN

03:37PM 19   CHECKED IT ON THE NEXT SURVEY.

03:38PM 20   Q.   FAIR ENOUGH.

03:38PM 21        AND PRIOR TO THE 2015 SURVEY OF THERANOS, YOU REVIEWED AND

03:38PM 22   LOOKED BACK AT THE SURVEY REPORT THAT WE JUST LOOKED AT FROM

03:38PM 23   2013; CORRECT?

03:38PM 24   A.   I DID.

03:38PM 25   Q.   AND DID YOU LOOK AT THE PLAN OF CORRECTION SUBMITTED BY

03:38PM  1       THE LAB?

03:38PM  2       A.   I DID.

03:38PM  3       Q.   AND ULTIMATELY THAT PLAN OF CORRECTION WAS ACCEPTED AND

03:38PM  4       THE CERTIFICATE WAS REISSUED; CORRECT?

03:38PM  5       A.   ARE YOU ASKING ABOUT THE 23 --

03:38PM  6       Q.   THE 2013.

03:38PM  7       A.   THE 2013?

03:38PM  8       Q.   YES.

03:38PM  9       A.   I CAN'T SPEAK TO CALIFORNIA, BUT IT APPEARS TO ME THAT IT

03:38PM  10      WAS ACCEPTED OR THERE WOULD HAVE BEEN NO NEED FOR A 2015

03:38PM  11      SURVEY, RECERTIFICATION SURVEY.

03:38PM  12      Q.   BECAUSE THEY WOULDN'T HAVE HAD A LICENSE; CORRECT?

03:38PM  13      A.   YES.

03:38PM  14      Q.   IS THAT RIGHT?

03:38PM  15      A.   YES.

03:38PM  16      Q.   OKAY.

03:39PM  17           YOUR HONOR, IF I COULD PUT UP ON THE SCREEN, I BELIEVE

03:39PM  18      IT'S ALREADY IN EVIDENCE, EXHIBIT 7386, 7386?

03:39PM  19               THE COURT:  ALL RIGHT.

03:39PM  20      BY MR. CAZARES:

03:39PM  21      Q.   DO YOU SEE UP ON THE SCREEN, MS. BENNETT, 7386 APPEARS TO

03:39PM  22      BE CENTERS FOR MEDICARE AND MEDICAID SERVICES CLINICAL

03:39PM  23      LABORATORY IMPROVEMENT AMENDMENTS, CERTIFICATE OF COMPLIANCE.

03:39PM  24           DO YOU SEE THAT?

03:39PM  25      A.   I DO.

BENNETT CROSS BY MR. CAZARES

03:39PM 1    Q.   AND YOU'RE FAMILIAR WITH THE DOCUMENT?

03:39PM 2    A.   I AM.

03:39PM 3    Q.   AND IT IS DATED JANUARY 9, 2014.

03:39PM 4         DO YOU SEE THAT?

03:39PM 5    A.   YES, THAT'S THE EFFECTIVE DATE OF THE CERTIFICATE.

03:39PM 6    Q.   AFTER THE LAB RESPONDED TO THE DEFICIENCIES CITED IN THE

03:39PM 7    REPORT THAT WE JUST TALKED ABOUT; CORRECT?

03:39PM 8    A.   AFTER THE LAB IS DETERMINED TO BE IN COMPLIANCE, THEN A

03:40PM 9    NEW CERTIFICATE IS GENERATED ONCE THE LABORATORY PAYS THE

03:40PM 10   CERTIFICATE FEE.

03:40PM 11   Q.   FAIR ENOUGH.

03:40PM 12        THANK YOU.  YOU CAN TAKE THAT DOWN.

03:40PM 13        NOW, IN THE LEAD UP TO THE 2015 SURVEY YOU DESCRIBED

03:40PM 14   PREPARATION OR SOME WORK DONE PRIOR TO ACTUALLY GOING ON SITE

03:40PM 15   AND BEGINNING THE SURVEY; CORRECT?

03:40PM 16   A.   YES.

03:40PM 17   Q.   YOU REQUESTED SOME DOCUMENTS TO REVIEW SO YOU COULD BECOME

03:40PM 18   FAMILIAR WITH THE TEST MENU AND WHAT TESTING THERANOS WAS

03:40PM 19   OFFERING AT THE TIME?

03:40PM 20   A.   I DON'T KNOW IF I REQUESTED THE TEST MENU, BUT I REQUESTED

03:40PM 21   THE SURVEY REPORT AND THE PLAN CORRECTION.

03:40PM 22   Q.   FAIR ENOUGH.

03:40PM 23        IF YOU COULD TAKE A LOOK AT 5450.  I THINK IT IS ALREADY

03:40PM 24   IN EVIDENCE.  AND IT WAS USED ON DIRECT, SO YOU CAN PUT IT UP

03:41PM 25   ON THE SCREEN.

03:41PM   1          AND YOU SEE UP ON THE SCREEN IS THE CLINICAL LABORATORY

03:41PM   2    IMPROVEMENT AMENDMENTS APPLICATION FOR CERTIFICATION?

03:41PM   3          DO YOU SEE THAT?

03:41PM   4    A.   I DO.

03:41PM   5    Q.   AND IT'S FOR THERANOS FOR THE RECERTIFICATION SURVEY THAT

03:41PM   6    YOU ULTIMATELY PARTICIPATED IN; CORRECT?

03:41PM   7    A.   YES.

03:41PM   8    Q.   OKAY.  AND YOU DESCRIBED PREVIOUSLY THAT THIS IS MANDATORY

03:41PM   9    EACH TIME THESE RECERTIFICATION SURVEYS COME UP?

03:41PM   10   A.   THAT'S CORRECT.

03:41PM   11   Q.   AND A LAB IS KIND OF TRUTHFULLY REQUIRED TO DISCLOSE ITS

03:41PM   12   TESTING DETAILS AS REQUESTED IN THE APPLICATION; IS THAT RIGHT?

03:41PM   13   A.   THE INFORMATION THAT IS PUT ON THIS MUST BE ACCURATE AND

03:41PM   14   CORRECT.

03:42PM   15   Q.   ON PAGE 5 OF THE APPLICATION FOR THERANOS FOR 2015 THERE'S

03:42PM   16   A DESCRIPTION AT THE KIND OF LOWER HALF OF THE PAGE OF THE

03:42PM   17   NON-WAIVED TESTING, AND THEN THERE IS IDENTIFICATION OF TESTING

03:42PM   18   THAT THE LAB ENGAGES IN.

03:42PM   19          DO YOU SEE THAT?

03:42PM   20   A.   I DO.

03:42PM   21   Q.   OKAY.  AND YOU WENT OVER SOME OF THIS WITH THE GOVERNMENT,

03:42PM   22   BUT THERE'S A DESCRIPTION OF MICROBIOLOGY, DIAGNOSTIC

03:42PM   23   IMMUNOLOGY.

03:42PM   24          DO YOU SEE THAT?

03:42PM   25   A.   YES.

03:42PM   1    Q.   AND THERE'S A NUMBER OF TESTS THAT THE LAB PERFORMS UNDER

03:42PM   2    THOSE.

03:42PM   3         DO YOU SEE THAT?

03:42PM   4    A.   YES.

03:42PM   5    Q.   AND THEN THE TOTAL ESTIMATED ANNUAL TEST VOLUME AT THE

03:42PM   6    TIME WAS ESTIMATED AT 894,782 TESTS.

03:42PM   7         DO YOU SEE THAT?

03:42PM   8    A.   I DO.

03:42PM   9    Q.   NOW, THAT NUMBER, 894,000 TESTS, THAT'S LIKE A TEST WOULD

03:43PM  10    BE A COMPLETE BLOOD COUNT.

03:43PM  11         WOULD THAT BE AN EXAMPLE OF A TEST?

03:43PM  12    A.   NO.  A COMPLETE BLOOD COUNT ACTUALLY HAS FIVE TESTS WITHIN

03:43PM  13    IT.

03:43PM  14    Q.   OKAY.

03:43PM  15    A.   A CHEMISTRY PROFILE MAY HAVE 8, 12, 24 WITHIN IT.  SO EACH

03:43PM  16    OF THOSE TESTS IS COUNTED INDIVIDUALLY.

03:43PM  17    Q.   SO WOULD IT BE FAIR TO CALL IT COMPLETE BLOOD COUNT, THE

03:43PM  18    PANEL?

03:43PM  19    A.   I GUESS IF YOU WANT TO CALL IT A PANEL, YES.

03:43PM  20         WE DON'T CALL IT A PANEL, BUT THE LABORATORY CERTAINLY

03:43PM  21    CAN.

03:43PM  22    Q.   FAIR ENOUGH.  FAIR ENOUGH.

03:43PM  23         AND WHEN YOU REQUEST THIS INFORMATION REGARDING THE

03:43PM  24    TESTING PROFILE OF THE LAB, WHAT DO YOU USE THAT FOR?

03:43PM  25    A.   THE TOTAL TEST VOLUME IS USED TO DETERMINE THE COST FOR

03:43PM  1    THE LABORATORY FOR THEIR, FOR THEIR COMPLIANCE FEE, HOW MUCH

03:44PM  2    IT'S GOING TO COST TO PERFORM THE SURVEY.

03:44PM  3    Q.   SO THE LARGER THE LAB, THE MORE HIGHER THE TESTING, THE

03:44PM  4    HIGHER THE PRICE?

03:44PM  5    A.   THAT'S CORRECT.

03:44PM  6    Q.   OKAY.  IF WE CAN TAKE A LOOK AT EXHIBIT 5453.

03:44PM  7         AND 5453 IS UP ON THE SCREEN.

03:44PM  8         AND YOU WERE ASKED SOME QUESTIONS ON DIRECT ABOUT THIS

03:44PM  9    TEST LIST THAT WAS DATED AS OF JUNE 12, 2015.

03:44PM  10        DO YOU SEE THAT?

03:44PM  11   A.   I DO.

03:44PM  12   Q.   AND WAS THIS LIST REQUESTED OF THERANOS AT THE TIME THAT

03:44PM  13   THE SURVEY WAS SCHEDULED?

03:44PM  14   A.   YES, IT WAS.

03:44PM  15   Q.   OKAY.  AND SO THIS INFORMATION WAS DISCLOSED BY THERANOS

03:44PM  16   TO THE REQUESTOR AT CMS?

03:44PM  17   A.   YES.

03:44PM  18   Q.   OKAY.  WAS THAT MR. YAMAMOTO?

03:44PM  19   A.   I DON'T KNOW IF HE OR I REQUESTED IT.  I DON'T RECALL.

03:45PM  20   Q.   FAIR ENOUGH.

03:45PM  21        AND THEN YOU REVIEWED SOME OF THE LISTS AND THE NUMBER OF

03:45PM  22   FDA APPROVED, CLEARED OR APPROVED TESTS AND LDT'S.

03:45PM  23        DO YOU SEE THAT?

03:45PM  24   A.   I SEE THAT.

03:45PM  25   Q.   OKAY.  NOW, FOR SOME OF THESE TESTS, FOR EXAMPLE, ON

03:45PM 1    PAGE 1 YOU'LL LOOK AT AND YOU'LL SEE AT THE TOP 10 OR 15

03:45PM 2    ASSAYS, ALBUMIN.

03:45PM 3        DO YOU SEE THAT?

03:45PM 4    A.   I DO.

03:45PM 5    Q.   AND ALBUMIN IS LISTED WITH TWO METHODS, THERE'S AN FDA

03:45PM 6    CLEARED OR APPROVED AND AS WELL AS AN LDT?

03:45PM 7    A.   YES.

03:45PM 8    Q.   AND THERE'S NOTHING UNUSUAL ABOUT THAT, A LAB USING TWO

03:45PM 9    DIFFERENT METHODS?

03:45PM 10   A.   IT'S NOT UNUSUAL FOR A LABORATORY TO USE TWO DIFFERENT

03:45PM 11   METHODS.

03:45PM 12       WE TYPICALLY DON'T SEE ONE ON AN FDA APPROVED DEVICE AND

03:45PM 13   AN LDT.

03:45PM 14   Q.   OKAY.  BUT THE FACT THAT A LAB USES TWO DIFFERENT METHODS

03:45PM 15   FOR THE SAME TESTS ON ITS OWN IS NOT UNUSUAL?

03:45PM 16   A.   IT DEPENDS ON THE SIZE OF THE LAB AND THE TESTING THAT THE

03:46PM 17   LAB IS DOING.

03:46PM 18   Q.   FAIR ENOUGH.

03:46PM 19       AND THEN YOU SEE ON THE SAME FIRST PAGE, AUTOMATED

03:46PM 20   PLATELET COUNT.

03:46PM 21       DO YOU SEE THAT?

03:46PM 22   A.   YES.

03:46PM 23   Q.   AND SIMILARLY, THERANOS USED BOTH AN LDT METHOD AS WELL AS

03:46PM 24   AN FDA APPROVED METHOD?

03:46PM 25   A.   YES.

03:46PM   1     Q.   AND THEN YOU WERE ASKED QUESTIONS BY MR. LEACH IDENTIFYING

03:46PM   2     THE NUMBER OF LDT'S ON THE PAGES AND OBVIOUSLY JUST BY LOOKING

03:46PM   3     AT THE PAGES, YOU CAN SEE THE NUMBER OF LDT'S IS FAR LESS THAN

03:46PM   4     THE NUMBER OF FDA APPROVED TESTS AT THE TIME; CORRECT?

03:46PM   5     A.   ACCORDING TO THIS DOCUMENT, YES.

03:46PM   6     Q.   OKAY.  HOWEVER, SOME OF THE LDT'S -- FOR EXAMPLE, CALCIUM,

03:46PM   7     AT THE BOTTOM OF PAGE 1, CALCIUM WAS A RELATIVELY COMMONLY USED

03:46PM   8     TEST; CORRECT?

03:46PM   9     A.   IT IS.

03:46PM   10    Q.   SO THERE MIGHT BE A LOT OF CALCIUM TESTS ORDERED IN THE

03:46PM   11    LAB RELATIVE TO SOME OF THE OTHER TESTS IDENTIFIED IN THE LIST

03:46PM   12    THAT MAY BE LESS COMMONLY USED; IS THAT FAIR?

03:46PM   13    A.   YES.

03:47PM   14    Q.   OKAY.  AGAIN, I WON'T BELABOR THEM ALL, BUT ON PAGE 2, FOR

03:47PM   15    EXAMPLE, CHLORIDE IS IDENTIFIED AS BEING FDA APPROVED AS WELL

03:47PM   16    AS LDT.

03:47PM   17         DO YOU SEE THAT?

03:47PM   18    A.   YES.

03:47PM   19    Q.   AND CHLORIDE IS ANOTHER RELATIVELY COMMONLY USED TEST;

03:47PM   20    CORRECT?

03:47PM   21    A.   YES.  NOT TYPICALLY AN LDT.

03:47PM   22    Q.   BUT HERE IT WAS AN LDT?

03:47PM   23    A.   IT WAS IDENTIFIED ON THIS LIST AS AN LDT.

03:47PM   24    Q.   FOR EXAMPLE, ON PAGE 3 OF THE LIST AGAIN, HEMOGLOBIN IN

03:47PM   25    THE MIDDLE OF THE PAGE, BOTH LDT AND FDA APPROVED.

03:47PM 1          DO YOU SEE THAT?

03:47PM 2     A.   YES.

03:47PM 3     Q.   WHEREAS THERE WERE SOME TESTS THAT THERANOS DID NOT HAVE

03:47PM 4     LDT'S FOR.  FOR EXAMPLE, HIV, ABOUT TWO-THIRDS OF THE WAY DOWN,

03:47PM 5     DO YOU SEE THOSE ARE ALL FDA APPROVED?

03:48PM 6     A.   I DO.

03:48PM 7     Q.   AND TOP OF PAGE 4, AGAIN, FEWER LDT'S.

03:48PM 8          BUT HDL AND LDL TESTS, THOSE ARE COMMONLY USED TESTS;

03:48PM 9     CORRECT?

03:48PM 10    A.   THEY ARE COMMON TESTS, YES.

03:48PM 11    Q.   OKAY.  YOU CAN SET THAT ASIDE.

03:48PM 12         IF WE COULD TAKE A LOOK AT EXHIBIT 5830.  YOU WERE ALSO

03:48PM 13    ASKED SOME QUESTIONS ABOUT THAT BY MR. LEACH.

03:48PM 14         5830 IS AN EMAIL FROM HEATHER KING TO MR. BALWANI BEING

03:49PM 15    ASKED A QUESTION ABOUT THE POWERPOINT PRESENTATION.

03:49PM 16         DO YOU REMEMBER BEING ASKED QUESTIONS ABOUT THAT?

03:49PM 17    A.   ABOUT THE POWERPOINT?  YES.

03:49PM 18    Q.   AND THEN AGAIN, TURNING TO PAGE 3 OF THE EXHIBIT LOOKING

03:49PM 19    AT THE PRESENTATION, YOU WERE ASKED SOME QUESTIONS BY MR. LEACH

03:49PM 20    ABOUT THE NUMBER OF PATIENT SAMPLES PER DAY THAT WAS

03:49PM 21    REPRESENTED TO YOU AT THE OPENING OF THE SURVEY.

03:49PM 22         DO YOU REMEMBER THAT?

03:49PM 23    A.   I DO.

03:49PM 24    Q.   AND THE NUMBER WAS REPRESENTED ABOUT 200 SAMPLES A DAY AT

03:49PM 25    THE TIME ANYWAY.

03:49PM  1           DO YOU SEE THAT?

03:49PM  2    A.   I DO.

03:49PM  3    Q.   AND NOW NEXT TO THAT IS THE -- IT LOOKS LIKE TO BE AN

03:49PM  4    IMAGE OF THE CLINICAL LABORATORY LICENSE FOR THERANOS.

03:49PM  5           DO YOU SEE THAT?

03:49PM  6    A.   I DO.

03:49PM  7    Q.   AND MR. LEACH POINTED OUT THERE WERE TWO DIRECTORS

03:49PM  8    IDENTIFIED IN THE LICENSE.

03:49PM  9           DO YOU SEE THAT?

03:49PM 10    A.   I DO.

03:49PM 11    Q.   AND THERE WAS NOTHING WRONG WITH THAT; CORRECT?

03:49PM 12    A.   THAT'S A CALIFORNIA STATE LICENSE.

03:49PM 13           A CLIA CERTIFICATE IS ONLY ALLOWED TO HAVE ONE DIRECTOR.

03:50PM 14    Q.   OKAY.  SO UNDER STATE LAW THEY WERE ALLOWED TO HAVE TWO,

03:50PM 15    BUT FOR PURPOSES OF THE CLIA CERTIFICATE, THERE IS ONE

03:50PM 16    LABORATORY DIRECTOR WHO IS RESPONSIBLE?

03:50PM 17    A.   I CAN'T REALLY SPEAK TO THE STATE REQUIREMENTS, BUT I CAN

03:50PM 18    TELL YOU FOR CLIA THEY'RE ALLOWED TO HAVE ONE DESIGNATED

03:50PM 19    LABORATORY DIRECTOR.

03:50PM 20    Q.   AND THAT PERSON IS THE ULTIMATE RESPONSIBLE PERSON AT THE

03:50PM 21    LAB; CORRECT?

03:50PM 22    A.   THAT PERSON IS RESPONSIBLE FOR THE OVERALL ADMINISTRATION

03:50PM 23    AND OPERATION OF THE LABORATORY.

03:50PM 24    Q.   I'M SORRY.  WE'RE BOTH DRIFTING FROM OUR MICROPHONES.

03:50PM 25    I'LL TRY TO DO BETTER MYSELF.  I'M SORRY.

03:50PM   1        IF WE CAN GO TO PAGE 14 OF THE DECK.

03:50PM   2        SO YOU MENTIONED INDIVIDUALS WHO WERE PRESENT ON THAT

03:51PM   3   FIRST DAY OF THE SURVEY.

03:51PM   4        DO YOU HAVE A RECOLLECTION OF THAT?

03:51PM   5   A.   YES.

03:51PM   6   Q.   AND I THINK YOU DESCRIBED MR. BALWANI WAS PRESENT AT THE

03:51PM   7   TIME?

03:51PM   8   A.   YES.

03:51PM   9   Q.   DR. DANIEL YOUNG WAS PRESENT?

03:51PM  10   A.   YES.

03:51PM  11   Q.   DR. SURAJ SAKSENA WAS PRESENT?

03:51PM  12   A.   YES.

03:51PM  13   Q.   LANGLY GEE WAS PRESENT?

03:51PM  14   A.   YES.

03:51PM  15   Q.   YOU DESCRIBED GURBIR SIDHU, ONE OF THE -- THE GENERAL

03:51PM  16   SUPERVISOR OR A TECHNICAL SUPERVISOR?

03:51PM  17   A.   GURBIR SIDHU WAS THERE, YES.

03:51PM  18   Q.   OKAY.  AND MS. ALAMDAR, HODA ALAMDAR --

03:51PM  19   A.   YES.

03:51PM  20   Q.   -- WAS ALSO PRESENT?

03:51PM  21        AND AT THE TIME, YOU RECALL IT WAS REPRESENTED TO YOU,

03:51PM  22   THAT MR. SAKSENA WAS EXPECTED TO BECOME THE NEXT LAB DIRECTOR

03:51PM  23   AT THERANOS; CORRECT?

03:51PM  24   A.   I DON'T RECALL THAT.

03:51PM  25   Q.   YOU DON'T RECALL THAT BEING MENTIONED?

03:51PM 1      A.   I DON'T.

03:51PM 2      Q.   OKAY.  BUT YOU DO RECALL ENGAGING WITH DR. SAKSENA DURING

03:51PM 3      THE COURSE OF THE LABORATORY -- THE SURVEY AND THE TWO VISITS

03:51PM 4      IN SEPTEMBER AND NOVEMBER OF 2015?

03:51PM 5      A.   I DEFINITELY REMEMBER SEPTEMBER, YES.

03:52PM 6      Q.   NOW, YOU DESCRIBED FRUSTRATION THAT YOU HAD A BIT IN THE

03:52PM 7      SURVEY, KIND OF -- I'LL SPEAK LARGELY, I GUESS, AND TRY TO GET

03:52PM 8      IT CORRECT -- THAT YOU WERE REQUESTING DOCUMENTATION AS YOU

03:52PM 9      NORMALLY WOULD FOR THE SURVEY, AND THERANOS'S STAFF,

03:52PM 10     PARTICULARLY MR. GEE, WERE NOT AS RESPONSIVE AS YOU WOULD HAVE

03:52PM 11     EXPECTED?

03:52PM 12          IS THAT FAIR?

03:52PM 13     A.   I WOULD SAY IT WAS VERY FRUSTRATING WHEN WE WOULD REQUEST

03:52PM 14     DOCUMENTS AND THERE WOULD BE A LONG DELAY BEFORE WE GOT THEM,

03:52PM 15     IF WE GOT THEM AT ALL.

03:52PM 16     Q.   AND MR. GEE WAS ONE OF THE LAB STAFF OR PERSONNEL WHO WERE

03:52PM 17     ENGAGED OR INVOLVED IN THIS, LET'S SAY NOT ALWAYS SUCCESSFUL

03:52PM 18     EFFORT, TO OBTAIN THE DOCUMENTATION THAT YOU WERE REQUESTING;

03:52PM 19     IS THAT RIGHT?

03:52PM 20     A.   YES.

03:52PM 21     Q.   OKAY.  BUT YOU DESCRIBED TODAY THAT MR. BALWANI WAS

03:53PM 22     TELLING HIS STAFF, TELLING THE TEAM TO GET THE DOCUMENTS THAT

03:53PM 23     YOU WERE REQUESTING; IS THAT RIGHT?

03:53PM 24     A.   YES.

03:53PM 25     Q.   BECAUSE YOU DESCRIBED MR. BALWANI AS, YOU KNOW, SOMEWHAT

4738

03:53PM 1    BEING THE LEAD AND BEING IN CHARGE; IS THAT FAIR?

03:53PM 2    A.   I WOULD SAY THAT HE APPEARED TO BE THE ONE WHO WAS IN

03:53PM 3    CHARGE, YES.

03:53PM 4    Q.   OKAY.  AND HE WAS TELLING HIS TEAM TO GET MS. BENNETT THE

03:53PM 5    DOCUMENTS THAT SHE'S ASKING FOR; RIGHT?

03:53PM 6    A.   CORRECT.

03:53PM 7            MR. CAZARES:  YOUR HONOR, THIS MIGHT BE A GOOD PLACE

03:53PM 8    BECAUSE I'LL BE SHIFTING INTO SOME PRETTY DENSE MATERIAL.

03:53PM 9            THE COURT:  OKAY.  WE'RE NOT GOING TO FINISH THIS

03:53PM 10   WITNESS TODAY.

03:53PM 11       DO YOU ANTICIPATE ANOTHER LENGTHY PERIOD OF TIME DO YOU

03:53PM 12   THINK?

03:53PM 13           MR. CAZARES:  I EXPECT TO FINISH MS. BENNETT

03:53PM 14   TOMORROW.  I CAN'T PROMISE BECAUSE I DON'T KNOW HOW LONG THE

03:53PM 15   FIRST WITNESS TOMORROW IS GOING TO GO, BUT I WILL DO EVERYTHING

03:53PM 16   I CAN.

03:53PM 17           THE COURT:  NO, NO.  I'M JUST MAKING AN INQUIRY.

03:53PM 18       SO, LADIES AND GENTLEMEN, LET'S TAKE OUR RECESS NOW.

03:53PM 19       I SHOULD TELL YOU, TOMORROW, AS I UNDERSTAND IT, WE'RE

03:53PM 20   GOING TO RESUME WITH MR. JHAVERI'S TESTIMONY IN THE MORNING,

03:54PM 21   AND YOU'LL SEE -- PLEASE RECALL THAT MR. JHAVERI'S TESTIMONY

03:54PM 22   WAS INTERRUPTED BECAUSE OF SCHEDULING, SO MS. BENNETT WILL HAVE

03:54PM 23   TO WAIT UNTIL THAT WITNESS'S TESTIMONY IS FINISHED.

03:54PM 24       AND THEN, MS. BENNETT, YOU'LL BE RECALLED TO COMPLETE YOUR

03:54PM 25   TESTIMONY.  I'M SURE YOU CAN OCCUPY YOUR TIME IN THE MEANTIME.

4739

03:54PM 1          SO LET'S TAKE OUR BREAK, LADIES AND GENTLEMEN.  I'LL

03:54PM 2    REMIND YOU OF THE ADMONITION.  DO NOT DO ANY INDEPENDENT

03:54PM 3    RESEARCH, DISCUSS, READ, LISTEN TO, OR IN ANY WAY LEARN

03:54PM 4    ANYTHING ABOUT THIS CASE.

03:54PM 5          9:00 O'CLOCK IS OUR ANTICIPATED START TIME TOMORROW

03:54PM 6    MORNING.  I'M SURE WE'LL BE ABLE TO KEEP TO THAT.

03:54PM 7          HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW.

03:54PM 8          MS. BENNETT, YOU CAN JUST BE ON STANDBY.  YOU WILL BE ON

03:54PM 9    THE STAND TOMORROW.  I'M QUITE CONFIDENT OF THAT.  THANK YOU.

03:55PM 10          (JURY OUT AT 3:55 P.M.)

03:55PM 11          THE COURT:  THE RECORD SHOULD REFLECT THAT OUR JURY

03:55PM 12   HAS LEFT FOR THE DAY.

03:55PM 13          MS. BENNETT HAS LEFT THE COURTROOM.

03:55PM 14          ALL COUNSEL AND MR. BALWANI REMAIN.

03:55PM 15          SO JUST SCHEDULING TOMORROW?  MR. BOSTIC AND

03:55PM 16   MR. COOPERSMITH?

03:55PM 17          MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

03:55PM 18          I THINK IT IS A GOOD IDEA TO TOUCH BASE BRIEFLY JUST ON

03:56PM 19   SCHEDULING TOMORROW.

03:56PM 20          WE'RE BEGINNING WITH MR. JHAVERI AND THEN WE CAN CONTINUE

03:56PM 21   WITH THE CROSS-EXAMINATION OF MS. BENNETT.

03:56PM 22          AFTER THAT, THE GOVERNMENT WILL HAVE DR. SAWYER READY TO

03:56PM 23   TESTIFY, IF NECESSARY.  I UNDERSTAND THAT HER DIRECT

03:56PM 24   EXAMINATION WILL BE SIGNIFICANTLY LESS THAN HALF AN HOUR,

03:56PM 25   15 MINUTES TO HALF AN HOUR.

4740

```
03:56PM   1        THE GOVERNMENT IS TRYING TO DECIDE WHETHER TO FLY IN AN
03:56PM   2    ADDITIONAL WITNESS FOR TOMORROW.  WE'RE AT THE POINT NOW IN THE
03:56PM   3    TRIAL WHERE THE MAJORITY OF OUR REMAINING WITNESSES, ALMOST ALL
03:56PM   4    OF THEM, ARE OUT-OF-TOWN WITNESSES.  AND WE REALLY DO WANT TO
03:56PM   5    MINIMIZE OCCASIONS WHERE THE JURY IS HERE AND WE DON'T HAVE A
03:56PM   6    WITNESS TO PUT ON AT THE END OF THE DAY.  WE'RE TRYING TO
03:56PM   7    BALANCE THAT AGAINST NOT INCONVENIENCING WITNESSES AND HAVING
03:56PM   8    THEM FLY OUT UNNECESSARILY.
03:56PM   9            THE COURT:  SURE.
03:56PM  10            MR. BOSTIC:  SO IT WOULD BE HELPFUL TO GET SOME
03:56PM  11    GUIDANCE FROM THE COURT AND THE DEFENSE ON WHAT THE SCHEDULE
03:56PM  12    TOMORROW LOOKS LIKE AND WHAT THE COURT'S PREFERENCE IS IN THAT
03:56PM  13    REGARD.
03:56PM  14            THE COURT:  SURE.  WELL, LET ME SAY WE'RE --
03:57PM  15    TOMORROW IS OUR LAST DAY FOR THE WEEK AS I RECALL.
03:57PM  16        SO I -- MY SENSE IS THAT IF WE GET THROUGH MR. JHAVERI AND
03:57PM  17    MS. BENNETT, I THINK WE'LL BE FORTUNATE, TOMORROW.  JUST BASED
03:57PM  18    ON WHAT I'M TOLD --
03:57PM  19            MR. COOPERSMITH:  YES, YOUR HONOR, I THINK THAT'S
03:57PM  20    ACCURATE.
03:57PM  21        WE CONFERRED WITH THE GOVERNMENT AND GAVE THEM THE REST
03:57PM  22    FOR MR. JHAVERI WOULD BE TWO AND A HALF TO THREE HOURS, AND
03:57PM  23    OBVIOUSLY I DON'T KNOW WHAT THE REDIRECT WOULD BE, IF ANY.
03:57PM  24        AS YOU JUST HEARD MR. CAZARES, HE EXPECTS TO HAVE TO SPEND
03:57PM  25    SOME TIME WITH MS. BENNETT.
```

03:57PM  1          SO I WOULD, FRANKLY, BE SURPRISED IF, AS THE COURT JUST

03:57PM  2   SAID, WE EVEN HAD TIME FOR ANOTHER WITNESS BEYOND THOSE TWO.

03:57PM  3          OBVIOUSLY THINGS COULD GO REALLY, YOU KNOW, SMOOTHLY AND

03:57PM  4   MAYBE THAT WOULD HAPPEN.

03:57PM  5          BUT IT SOUNDS LIKE THE GOVERNMENT HAS ONE ADDITIONAL

03:57PM  6   WITNESS AND THEY'RE, IF I'M RIGHT, IF I HEARD MR. BOSTIC RIGHT,

03:57PM  7   HIS QUESTION WAS WHETHER THEY WOULD EVEN HAVE A FOURTH WITNESS

03:58PM  8   FOR TOMORROW?

03:58PM  9          IS THAT --

03:58PM 10          MR. BOSTIC:  THAT'S RIGHT.

03:58PM 11          DR. SAWYER IS LOCAL, SO SHE CAN BE AVAILABLE.  THE OTHER

03:58PM 12   WITNESS WE WOULD NEED TO FLY IN THIS EVENING.

03:58PM 13          THE COURT:  MAY I JUST SAY AND MAKE AN OBSERVATION,

03:58PM 14   I DON'T THINK WE SHOULD FLY IN THE WITNESS THIS EVENING.

03:58PM 15          DO YOU JOIN IN THAT?  DO YOU WANT TO TALK TO YOUR TEAM

03:58PM 16   ABOUT THAT?

03:58PM 17          MR. COOPERSMITH:  NO.  I THINK THAT SOUNDS RIGHT,

03:58PM 18   YOUR HONOR.

03:58PM 19          THE COURT:  YES.

03:58PM 20          MR. COOPERSMITH:  AND, LOOK, I THINK OUR GOAL, ALL

03:58PM 21   OF OUR GOALS IS TO FILL ALL OF THE TIME THAT IS AVAILABLE.

03:58PM 22          THE COURT:  SURE.

03:58PM 23          MR. COOPERSMITH:  BUT IF IT WERE 15 OR 20 MINUTES,

03:58PM 24   I'M NOT SURE THAT WOULD JUSTIFY FLYING THE WITNESS IN FOR THAT.

03:58PM 25          THE COURT:  RIGHT.  I JUST DON'T SEE THE VALUE IN

4742

03:58PM  1    HAVING A WITNESS COME OUT, SIT ALL DAY WAITING, AND THEN

03:58PM  2    PERHAPS HAVE HIS OR HER TESTIMONY, HAVE TO FLY BACK TO COMPLETE

03:58PM  3    LATER TESTIMONY.  THAT'S JUST -- IF WE HAVE TO BURN 30 MINUTES,

03:58PM  4    SO BE IT.  THERE ARE A LOT OF THINGS THAT WE CAN TALK ABOUT IN

03:58PM  5    THAT REGARD.

03:58PM  6        SO I WOULD -- I CAN'T DIRECT YOU WHAT TO DO WITH YOUR

03:58PM  7    CASE, BUT AS FAR AS AN ADDITIONAL WITNESS, OUT-OF-TOWN WITNESS,

03:59PM  8    I DON'T THINK THAT WE'LL GET TO THEM TOMORROW.

03:59PM  9        AND IF WE RUN OUT OF TIME AND YOU DON'T FLY THIS WITNESS

03:59PM  10   IN, YOU ARE NOT GOING TO INCUR THE WRATH OF THIS COURT -- THIS

03:59PM  11   COURT DOESN'T HAVE WRATH -- BUT I'M NOT GOING TO GET UPSET WITH

03:59PM  12   YOU ABOUT ANYTHING.

03:59PM  13       AND I THINK, MR. COOPERSMITH, YOU'RE NOT GOING TO ASK THAT

03:59PM  14   THE CASE BE DISMISSED BECAUSE THEY CAN'T GO FORWARD.  FOR OTHER

03:59PM  15   REASONS YOU MIGHT, BUT NOT FOR THAT REASON.

03:59PM  16           MR. COOPERSMITH:  IF THAT'S WHAT HAPPENS TOMORROW, I

03:59PM  17   WON'T ASK FOR IT ON THAT BASIS.

03:59PM  18           THE COURT:  ALL RIGHT.

03:59PM  19           MR. BOSTIC:  THANK YOU, YOUR HONOR.  THAT'S HELPFUL.

03:59PM  20       BASED ON THE DEFENSE'S PREDICTIONS AND THE COURT'S

03:59PM  21   EXPECTATIONS, WE'LL HOLD OFF ON FLYING THAT WITNESS OUT.

03:59PM  22           THE COURT:  GREAT.  OKAY.  ALL RIGHT.

03:59PM  23       AND THEN I THINK OUR GOAL SHOULD BE FOCUSSED, IF WE CAN,

03:59PM  24   WE CAN, BUT IF WE CAN'T, WE CAN'T, TO FINISH THE TWO WITNESSES,

03:59PM  25   THAT IS, MR. JHAVERI AND MS. BENNETT.  SHE'S FROM OUT OF TOWN.

4743

03:59PM 1          MR. BOSTIC:  YES, YOUR HONOR.

03:59PM 2          THE COURT:  WELL, THEY BOTH ARE, AREN'T THEY?

03:59PM 3          MR. BOSTIC:  YES, YOUR HONOR.

03:59PM 4          THE COURT:  IT WOULD BE NICE TO GET THEM ON PLANES

03:59PM 5  TOMORROW IF WE CAN.  AND, OF COURSE, THE DEFENSE HAS TO DO WHAT

04:00PM 6  YOU HAVE TO DO.

04:00PM 7          MR. COOPERSMITH:  I APPRECIATE THAT, YOUR HONOR.

04:00PM 8      OBVIOUSLY WE WILL DO THAT, BUT IF AT THE SAME TIME WE CAN

04:00PM 9  GET THE WITNESSES OUT OF HERE, THEN THAT'S ALSO FINE.

04:00PM 10          THE COURT:  RIGHT.

04:00PM 11          MR. COOPERSMITH:  RIGHT.

04:00PM 12          MR. BOSTIC:  YOUR HONOR, JUST ONE VERY BRIEF

04:00PM 13  HOUSEKEEPING MATTER.

04:00PM 14      DURING THE DIRECT EXAM OF MR. MENDENHALL, I PUBLISHED TO

04:00PM 15  THE JURY EXHIBIT 1776.  MY MISTAKE, IT TURNS OUT THAT HAD NOT

04:00PM 16  BEEN ADMITTED.  IT WAS A DIFFERENT VERSION OF THE

04:00PM 17  "FORTUNE" ARTICLE FROM JUNE 2014.

04:00PM 18      THE ARTICLE HAD BEEN ADMITTED AS AN ATTACHMENT TO AN EMAIL

04:00PM 19  UNDER A DIFFERENT EXHIBIT NUMBER.

04:00PM 20      1776 IS THE SAME CONTENT, IT'S THE SAME ARTICLE, JUST

04:00PM 21  UNDER A DIFFERENT EXHIBIT NUMBER.

04:00PM 22      A COUPLE OF WAYS WE CAN HANDLE THIS.  I PROPOSE THAT THE

04:00PM 23  PARTIES STIPULATE TO THE ADMISSION OF 1776, BUT I JUST WANTED

04:00PM 24  TO RAISE IT WITH THE COURT.  I'LL GIVE MR. COOPERSMITH A CHANCE

04:00PM 25  TO RESPOND, OR WE CAN COME BACK AND TAKE CARE OF THAT --

4744

```
04:00PM   1              THE COURT:  AND I JUST --

04:00PM   2              MR. BOSTIC:  -- OR TOMORROW MORNING.

04:00PM   3              THE COURT:  I JUST TOLD MR. COOPERSMITH, THERE WILL

04:01PM   4    BE ANOTHER GROUNDS FOR HIM TO ASK FOR DISMISSAL AND PERHAPS

04:01PM   5    THIS IS IT.

04:01PM   6              MR. COOPERSMITH:  I'M NOT SURE THAT'S GOING TO BE IT

04:01PM   7    EITHER, YOUR HONOR.

04:01PM   8         BUT I DID NOTICE THAT, AND I AM AWARE THAT THIS IS THE

04:01PM   9    ROGER PARLOFF ARTICLE IN "FORTUNE."

04:01PM  10              THE COURT:  RIGHT.

04:01PM  11              MR. COOPERSMITH:  IT WAS, AS MR. BOSTIC SAID, IT WAS

04:01PM  12    ADMITTED AS AN ATTACHMENT.  EXHIBIT 1776 IS THE SAME ARTICLE.

04:01PM  13         WE HAD OBJECTIONS TO THE FIRST ONE.  I DON'T HAVE THE

04:01PM  14    EXHIBIT NUMBER OF THE FIRST ONE HANDY.  MAYBE MR. BOSTIC HAS

04:01PM  15    IT.

04:01PM  16              MR. BOSTIC:  I DON'T HAVE IT HANDY.

04:01PM  17              MR. COOPERSMITH:  YOU DON'T?  OKAY.  BUT THE FIRST

04:01PM  18    ONE THAT WAS ACTUALLY ADMITTED, THAT WAS ADMITTED OVER THE

04:01PM  19    DEFENSE OBJECTION.

04:01PM  20         SO WE HAVE THE SAME OBJECTIONS TO 1776.

04:01PM  21              THE COURT:  SURE.

04:01PM  22              MR. COOPERSMITH:  BUT GIVEN THE COURT'S RULING --

04:01PM  23              THE COURT:  PARDON ME FOR INTERRUPTING YOU.

04:01PM  24         I DON'T WANT YOU TO HAVE TO STIPULATE TO SOMETHING THAT

04:01PM  25    YOU OBJECTED TO.  I'M NOT GOING TO HAVE YOU DO THAT --
```

04:01PM  1          MR. COOPERSMITH:  RIGHT.

04:01PM  2          THE COURT:  -- IF YOU DON'T WANT TO DO THAT OR IF

04:01PM  3     IT'S AWKWARD FOR YOU TO DO THAT, AND IT MIGHT BE FOR THE RECORD

04:01PM  4     CANDIDLY, AND SO I'M NOT GOING TO ASK YOU TO DO THAT.

04:01PM  5          BUT I CAN MAKE A STATEMENT TO THE JURY THAT INDICATES THAT

04:02PM  6     THIS -- WE'LL GET THE NUMBERS, AND I CAN TELL THEM TOMORROW,

04:02PM  7     YOU KNOW, WHEN I INVITE YOU TO SUGGEST LANGUAGE, AND 1776 WAS

04:02PM  8     THE SAME DOCUMENT, IT WAS ALSO ADMITTED, AND I CAN INDICATE

04:02PM  9     THAT THE DEFENSE OBJECTED IF YOU WANT ME TO, OR NOT.

04:02PM 10          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

04:02PM 11          I THINK THAT IS FINE.  I WOULD ASK THE COURT, IT'S NOT

04:02PM 12     NECESSARY TO TELL THE JURY "AND THE DEFENSE ALSO OBJECTS TO

04:02PM 13     1776" AS LONG AS THE COURT NOTES THAT THAT IS THE DEFENSE

04:02PM 14     OBJECTION FOR THE RECORD.

04:02PM 15          THE COURT:  I SAID THAT PROPHYLACTICALLY.  IF YOU

04:02PM 16     WANT ME TO PUT THAT ON THE RECORD IN FRONT OF THE JURY, I WILL

04:02PM 17     DO THAT.

04:02PM 18          IF YOU DON'T, I CAN UNDERSTAND WHY YOU WOULDN'T, I WON'T.

04:02PM 19     AND YOUR OBJECTION WILL REMAIN FOR BOTH ITERATIONS OF THE

04:02PM 20     DOCUMENT.

04:02PM 21          MR. COOPERSMITH:  THAT SOUNDS EXACTLY RIGHT,

04:02PM 22     YOUR HONOR.  THANK YOU.

04:02PM 23          THE COURT:  RIGHT.

04:02PM 24          MR. BOSTIC:  SO ARE WE ADMITTING 1776 BUT WITH THE

04:02PM 25     UNDERSTANDING THAT THE DEFENSE PRESERVES ITS OBJECTION, OR DO

04:03PM    1       WE PLAN TO -- OR WILL THE COURT INSTRUCT THE JURY THAT WHAT WAS

04:03PM    2       PUBLISHED AS 1776 WAS ADMITTED UNDER A DIFFERENT EXHIBIT

04:03PM    3       NUMBER?

04:03PM    4              EITHER IS FINE FOR THE GOVERNMENT, YOUR HONOR.

04:03PM    5                   THE COURT:  WELL, IT WAS ADMITTED, AND I THINK IT

04:03PM    6       SHOULD, AT THE RISK OF BEING DUPLICATIVE, IT'S ADMITTED.  AND

04:03PM    7       SO I SHOULD TELL THEM THAT 1776 IS THE SAME AS WHATEVER THE

04:03PM    8       OTHER NUMBER IS.  IT WAS ADMITTED IN A DIFFERENT -- 1994 --

04:03PM    9       1944, EXCUSE ME.

04:03PM   10          1944 WAS ADMITTED AS AN EMAIL.  1776 -- THE ARTICLE

04:03PM   11       IDENTIFIED IN 1776 WAS AN ATTACHMENT.  THAT WAS --

04:03PM   12                   MR. BOSTIC:  YES, YOUR HONOR, THE SAME ARTICLE WAS

04:03PM   13       ATTACHED TO THE EMAIL.

04:03PM   14                   THE COURT:  RIGHT.  SO 1776 WAS ALSO ADMITTED.  IT'S

04:03PM   15       THE ATTACHMENT TO 1944, LADIES AND GENTLEMEN.  I JUST TELL YOU

04:03PM   16       THAT FOR YOUR INFORMATION.

04:03PM   17                   MR. COOPERSMITH:  AND OUR OBJECTION IS NOTED FOR

04:03PM   18       BOTH AND THAT SOUNDS JUST FINE, YOUR HONOR.

04:03PM   19                   THE COURT:  ALL RIGHT.  I'LL DO THAT TOMORROW

04:04PM   20       MORNING.

04:04PM   21                   MR. BOSTIC:  THANK YOU, YOUR HONOR.  I APOLOGIZE FOR

04:04PM   22       THE CONFUSION.

04:04PM   23                   THE COURT:  NO.  I'M SORRY I LET THAT SLIP.

04:04PM   24          OKAY.  RIGHT.  AND THEN TOMORROW IS OUR LAST DAY FOR THE

04:04PM   25       WEEK.  WE'LL SEE IF WE CAN -- I EXPECT IF WE'RE CLOSE TO

04:04PM  1        FINISHING, THIS JURY IS NOT GOING TO OBJECT TO US GOING OVER

04:04PM  2    4:00 O'CLOCK A LITTLE BIT TOMORROW.

04:04PM  3              MR. COOPERSMITH:  OKAY, YOUR HONOR.  FINE.

04:04PM  4              THE COURT:  THEY SEEM TO BE ENGAGED.

04:04PM  5         THANK YOU.  HAVE A GOOD EVENING.

04:04PM  6              MR. BOSTIC:  THANK YOU, YOUR HONOR.

04:04PM  7              THE CLERK:  COURT IS ADJOURNED.

04:04PM  8         (COURT ADJOURNED AT 4:04 P.M.)

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                       CERTIFICATE OF REPORTERS

4

5

6

7            WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11           THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16           IRENE RODRIGUEZ, CSR, CRR
             CERTIFICATE NUMBER 8076

17

18

19           LEE-ANNE SHORTRIDGE, CSR, CRR
             CERTIFICATE NUMBER 9595

20

21           DATED:  MAY 3, 2022

22

23

24

25