1

2                     UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,        )
6                                      )  CR-18-00258-EJD
                     PLAINTIFF,        )
7                                      )  SAN JOSE, CALIFORNIA
                VS.                    )
8                                      )  MAY 4, 2022
      RAMESH "SUNNY" BALWANI,          )
9                                      )  VOLUME 26
                     DEFENDANT.        )
10    _____    )  PAGES 4748 - 5022

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                  BEFORE THE HONORABLE EDWARD J. DAVILA
13                   UNITED STATES DISTRICT JUDGE

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                            BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                            150 ALMADEN BOULEVARD, SUITE 900
17                          SAN JOSE, CALIFORNIA 95113

18                          BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                          1301 CLAY STREET, SUITE 340S
                            OAKLAND, CALIFORNIA 94612
20
             (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
      OFFICIAL COURT REPORTERS:
22                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                              CERTIFICATE NUMBER 8074
23                            LEE-ANNE SHORTRIDGE, CSR, CRR
                              CERTIFICATE NUMBER 9595
24
             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                TRANSCRIPT PRODUCED WITH COMPUTER

```
 1      A P P E A R A N C E S: (CONT'D)

 2      FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                BY:  MOLLY MCCAFFERTY
 3                                   SHAWN ESTRADA
                                THE ORRICK BUILDING
 4                              405 HOWARD STREET
                                SAN FRANCISCO, CALIFORNIA 94105
 5
                                BY:  JEFFREY COOPERSMITH
 6                                   AARON BRECHER
                                     AMANDA MCDOWELL
 7                              701 FIFTH AVENUE, SUITE 5600
                                SEATTLE, WASHINGTON 98104
 8
                                BY:  STEPHEN CAZARES
 9                              77 SOUTH FIGUEROA STREET, SUITE 3200
                                LOS ANGELES, CALIFORNIA 90017
10
                                BY:  AMY WALSH
11                              51 W 52ND STREET
                                NEW YORK, NEW YORK 10019
12

13      ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                                BY:  MADDI WACHS, PARALEGAL
14                                   SARA SLATTERY, PARALEGAL

15                              ORRICK, HERRINGTON & SUTCLIFFE
                                JENNIFER CYGNOR, PARALEGAL
16
                                PROLUMINA
17                              BY:  COREY ALLEN
                                2200 SIXTH AVENUE, SUITE 425
18                              SEATTLE, WASHINGTON 98121

19                              UNITED STATES POSTAL INSPECTION SERVICE
                                BY:  CHRISTOPHER MCCOLLOW
20
                                FEDERAL BUREAU OF INVESTIGATION
21                              BY:  MARIO C. SCUSSEL

22                              UNITED STATES FOOD & DRUG
                                ADMINISTRATION
23                              BY:  GEORGE SCAVDIS

24

25
```

1

                    INDEX OF PROCEEDINGS

2

        GOVERNMENT'S:

3

4       **NIMESH JHAVERI**
        CROSS-EXAM BY MR. COOPERSMITH (RES.)      P. 4754

5       REDIRECT EXAM BY MR. SCHENK               P. 4899
        RECROSS-EXAM BY MR. COOPERSMITH           P. 4932

6

7       **SARAH BENNETT**
        CROSS-EXAM BY MR. CAZARES (RES.)          P. 4950

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                               INDEX OF EXHIBITS

3                               IDENT.        EVIDENCE

4        GOVERNMENT'S

5        2280                                  4820
         2339                                  4826
6        2394                                  4840
         2449                                  4844
7        2859                                  4868
         273                                   4922

8

9

10

11

12

13

14       DEFENDANT'S

15       20631                                 4759
         20229                                 4774
16       20231                                 4777
         20235                                 4780
17       20566                                 4794
         20567                                 4800
18       20568                                 4804
         20542                                 4813
19       20237                                 4822
         20238                                 4832
20       20242                                 4842
         20244                                 4850
21       20247                                 4861
         20233                                 4864
22       20553                                 4944
         20442                                 4947
23       20633                                 4997
         20619                                 5001

24

25

1      SAN JOSE, CALIFORNIA                          MAY 4, 2022

09:07AM    2                    P R O C E E D I N G S

09:07AM    3           (COURT CONVENED AT 9:07 A.M.)

09:07AM    4           (JURY IN AT 9:07 A.M.)

09:07AM    5               THE COURT:  THANK YOU FOR YOUR COURTESY.  PLEASE BE

09:07AM    6      SEATED.

09:07AM    7           WE ARE BACK ON THE RECORD IN THE BALWANI MATTER.  ALL

09:07AM    8      COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

09:07AM    9           OUR JURY AND ALTERNATES ARE PRESENT.

09:07AM   10           GOOD MORNING, LADIES AND GENTLEMEN.

09:07AM   11           FIRST OF ALL, LET ME ASK YOU, DURING OUR BREAK, HAS ANYONE

09:08AM   12      HAD OCCASION TO READ, DISCUSS, WATCH, OR LEARN ANYTHING ABOUT

09:08AM   13      THIS CASE OUTSIDE OF THIS COURTROOM?

09:08AM   14           IF SO, PLEASE RAISE YOUR HAND.

09:08AM   15           THANK YOU AGAIN.

09:08AM   16           I SEE NO HANDS.  THANK YOU.

09:08AM   17           LADIES AND GENTLEMEN, THIS MORNING WE ARE GOING TO RESUME

09:08AM   18      THE TESTIMONY OF MR. JHAVERI I THINK IT IS.

09:08AM   19           IS THAT RIGHT, COUNSEL?  CROSS-EXAMINATION?  YOU'LL

09:08AM   20      CONTINUE WITH YOUR CROSS-EXAMINATION?

09:08AM   21               MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

09:08AM   22               THE COURT:  GREAT.

09:08AM   23           MY SENSE IS THAT, AFTER SPEAKING WITH COUNSEL, THAT WE

09:08AM   24      SHOULD FINISH HIS TESTIMONY PERHAPS THIS MORNING, PERHAPS BY

09:08AM   25      OUR BREAK.  WHEN THAT OCCURS, WHENEVER THAT IS, WE WILL THEN

09:08AM 1    RETURN TO THE PREVIOUS WITNESS, MS. BENNETT.

09:08AM 2         THAT'S THE PLAN THEN, COUNSEL?

09:08AM 3              MR. COOPERSMITH:  THAT IS MY UNDERSTANDING, YES.

09:08AM 4              MR. SCHENK:  YES, YOUR HONOR.

09:08AM 5              THE COURT:  GREAT.  THANK YOU.

09:08AM 6         BEFORE WE BEGIN, I WANTED TO CALL ATTENTION TO A

09:08AM 7    HOUSEKEEPING MATTER THAT I NEGLECTED TO MENTION.  THERE ARE TWO

09:09AM 8    EXHIBITS.  I THINK IT'S 1776.

09:09AM 9         IS THAT CORRECT, MR. BOSTIC?

09:09AM 10             MR. BOSTIC:  YES, YOUR HONOR.

09:09AM 11             THE COURT:  EXHIBIT 1776, WHICH WAS ADMITTED, AS

09:09AM 12   WELL AS EXHIBIT 1944, 1944, WHICH WAS AN EMAIL WITH AN

09:09AM 13   ATTACHMENT.

09:09AM 14        1776 IS THE SAME AS THE ATTACHMENT TO 1944, AND THIS IS

09:09AM 15   THE ROGER PARLOFF ARTICLE.

09:09AM 16        I JUST WANT YOU TO KNOW THOSE TWO CAME IN.  AND I'M SURE

09:09AM 17   YOU'RE ON TOP OF THAT, YOU NOTICED THAT.  I SEE SOME HEADS

09:09AM 18   NODDING.

09:09AM 19        BUT I NEGLECTED TO TELL YOU THAT THOSE EXHIBITS, THEY WERE

09:09AM 20   AN ANOMALY.  IT WAS THE SAME EXHIBIT, BUT THEY WERE INTRODUCED

09:09AM 21   IN DIFFERENT FORMATS.

09:09AM 22        ANY COMMENTS FROM THE COURT REGARDING LIMITATIONS OR HOW

09:09AM 23   THOSE EXHIBITS MAY BE USED APPLY TO BOTH OF THOSE EXHIBITS.  SO

09:10AM 24   I WANTED TO CLARIFY THAT FOR YOU.

09:10AM 25             MR. BOSTIC, ANYTHING FURTHER ON THAT?

09:10AM   1          MR. BOSTIC:  NO, YOUR HONOR.  THANK YOU.

09:10AM   2          MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

09:10AM   3          THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

09:10AM   4     SHOULD WE ASK THE WITNESS TO RETURN THEN?

09:10AM   5          MR. COOPERSMITH:  YES, YOUR HONOR.

09:10AM   6          THE COURT:  OKAY.  LET'S DO THAT.  THANK YOU.

09:10AM   7     SIR, IF YOU WOULD RESUME THE STAND.  AGAIN, MAKE YOURSELF

09:10AM   8     COMFORTABLE.  ADJUST THE CHAIR AND THE MICROPHONE AS YOU NEED.

09:10AM   9     I'LL REMIND YOU THAT YOU'RE STILL UNDER OATH.

09:10AM  10     WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

09:10AM  11     AGAIN, PLEASE.

09:10AM  12          THE WITNESS:  NIMESH JHAVERI.  N-I-M-E-S-H, LAST

09:10AM  13     NAME JHAVERI, J-H-A-V-E-R-I.

09:11AM  14          THE COURT:  THANK YOU.  COUNSEL.

09:11AM  15     **(GOVERNMENT'S WITNESS, NIMESH JHAVERI, PREVIOUSLY WAS**

09:11AM  16     **SWORN.)**

09:11AM  17          MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:11AM  18                    **CROSS-EXAMINATION (RESUMED)**

09:11AM  19     BY MR. COOPERSMITH:

09:11AM  20     Q.   AND, MR. JHAVERI, I THINK LAST TIME YOU CONFIRMED YOU WERE

09:11AM  21     FULLY VACCINATED, AND SO IF YOU'RE COMFORTABLE TAKING OFF YOUR

09:11AM  22     MASK, THAT WOULD BE FINE.

09:11AM  23     A.   THANK YOU.

09:11AM  24     Q.   AND I'LL DO THE SAME.

09:11AM  25          AND, OF COURSE, WELCOME BACK TO SAN JOSE.

09:11AM 1    A.   THANK YOU.

09:11AM 2    Q.   YOU'RE WELCOME.

09:11AM 3         SO, MR. JHAVERI, I KNOW IT'S BEEN A COUPLE OF WEEKS, SO

09:11AM 4    JUST TO GET ORIENTED AGAIN AND CONTINUE WHERE WE LEFT OFF, I

09:11AM 5    JUST WANT TO GO BACK TO AN EXHIBIT THAT WE WERE TALKING ABOUT

09:11AM 6    THE LAST TIME.  OKAY?

09:11AM 7         I THINK YOU CAN SEE IT ON YOUR SCREEN.

09:11AM 8         YOU SHOULD HAVE BINDERS UP THERE.  AM I RIGHT ABOUT THAT?

09:11AM 9    YOU ALSO HAVE PAPER BINDERS?

09:11AM 10   A.   YES.  THERE'S NOTHING ON MY SCREEN.

09:11AM 11   Q.   YES.  IT WILL BE IN A SECOND.  I JUST HAVE TO TELL MY

09:11AM 12   ASSISTANT THE NUMBER.

09:11AM 13        SO IT'S EXHIBIT 1891.  YOU REMEMBER THIS WAS AN EMAIL

09:11AM 14   STRING THAT YOU EXCHANGED WITH MR. BALWANI ON AUGUST 12TH AND

09:12AM 15   13TH OF 2014?

09:12AM 16   A.   YES, SIR.

09:12AM 17   Q.   OKAY.  MY INITIAL QUESTION IS THERE'S A REFERENCE -- AND I

09:12AM 18   KNOW WE DISCUSSED THIS THE LAST TIME THAT WE MET -- THERE'S A

09:12AM 19   REFERENCE TO GOLD STORES.

09:12AM 20        DO YOU SEE THAT?

09:12AM 21        OR GOLD LEVEL STORES?

09:12AM 22   A.   YES, SIR.

09:12AM 23   Q.   AND WE TALKED ABOUT WHAT THAT WAS; RIGHT?

09:12AM 24   A.   CORRECT.

09:12AM 25   Q.   AND IT IS THE THERANOS STORES THAT HAVE A -- BASICALLY TWO

09:12AM 1    ROOMS?

09:12AM 2    A.   THAT'S CORRECT.

09:12AM 3    Q.   A ROOM FOR THE BLOOD DRAW?

09:12AM 4    A.   A ROOM FOR THE BLOOD DRAW, AND ALSO A SEPARATE BATHROOM.

09:12AM 5    Q.   THE BATHROOM IS THE SECOND ROOM?

09:12AM 6    A.   THAT'S CORRECT.

09:12AM 7    Q.   AND DO YOU REMEMBER THERE WAS SOME DIALOGUE BETWEEN YOU

09:12AM 8    AND MR. BALWANI ABOUT HOW, IN ONE OF THE CONTRACTS THAT WE

09:12AM 9    LOOKED AT LAST TIME, THERE WAS A REQUIREMENT THAT 40 PERCENT OF

09:12AM 10   THE STORES BE GOLD STORES; RIGHT?

09:12AM 11   A.   THAT'S CORRECT.

09:12AM 12   Q.   OKAY.  AND YOU REFERENCE THAT IN THIS EMAIL; RIGHT?

09:12AM 13   A.   YES.

09:12AM 14   Q.   AND I JUST WANT TO MAKE SURE WE'RE ALL LOOKING AT THE SAME

09:13AM 15   THING, AND I JUST WANT TO SHOW YOU SOME PHOTOS OF WHAT A GOLD

09:13AM 16   STORE LOOKS LIKE, BUT YOU CAN CONFIRM.

09:13AM 17       THE FIRST EXHIBIT I WOULD LIKE TO SHOW IS AN EXHIBIT

09:13AM 18   ALREADY IN EVIDENCE, AND THAT'S EXHIBIT 4858.

09:13AM 19       MR. ALLEN, IF YOU COULD PUT UP PAGE 43 OF EXHIBIT 4858.

09:13AM 20   AGAIN, IT'S ALREADY IN EVIDENCE.

09:13AM 21       AND YOU'LL SEE IT ON THE SCREEN, MR. JHAVERI.

09:13AM 22       OKAY.  DO YOU SEE THE ROOM THAT IS PICTURED IN

09:13AM 23   EXHIBIT 4858?

09:13AM 24   A.   I DO.

09:13AM 25   Q.   AND THAT'S THE INSIDE OF WHAT A GOLD STORE IS SUPPOSED TO

09:13AM  1    LOOK LIKE; CORRECT?

09:13AM  2    A.   YES.   THIS IS SIMILAR.   THIS IS ACTUALLY A PICTURE OF THE

09:13AM  3    PALO ALTO STORE.

09:13AM  4    Q.   RIGHT.

09:13AM  5    A.   SO IT WOULD BE SIMILAR TO THIS TYPE OF A SET UP.

09:13AM  6    Q.   OKAY.   THE OTHER STORES WOULD FOLLOW THIS SAME FORMAT?

09:13AM  7    A.   THAT'S CORRECT.

09:13AM  8    Q.   OKAY.   AND IF YOU COULD GO TO PAGE 44, MR. ALLEN.

09:13AM  9         JUST MORE PICTURES OF THE PALO ALTO STORE; CORRECT?

09:14AM  10   A.   THAT'S CORRECT.

09:14AM  11   Q.   AND IT'S THE THERANOS SPACE WITHIN THE PALO ALTO STORE;

09:14AM  12   CORRECT?

09:14AM  13   A.   THAT'S RIGHT.   THIS IS A SEPARATE AREA WITHIN THE STORE

09:14AM  14   NEXT TO THE PHARMACY THAT IS WHAT WE CALL THERANOS WELLNESS

09:14AM  15   CENTERS, ONLY FOR THERANOS SERVICES.

09:14AM  16   Q.   THANK YOU.

09:14AM  17        AND THEN ONE MORE PICTURE ON THIS EXHIBIT, PAGE 45.   THANK

09:14AM  18   YOU.

09:14AM  19        AND THEN THIS IS A PICTURE OF THE SEPARATE BATHROOM;

09:14AM  20   CORRECT?

09:14AM  21   A.   THAT'S CORRECT.

09:14AM  22   Q.   OKAY.   AND IN ORDER TO HAVE THIS TYPE OF STORE SUCH AS IT

09:14AM  23   EXISTED IN PALO ALTO THAT YOU'VE JUST CONFIRMED, THAT WOULD BE

09:14AM  24   THE CONSTRUCTION THAT WOULD HAVE TO OCCUR IN THE STORE TO

09:14AM  25   ACCOMPLISH THIS FORMAT; RIGHT?

09:14AM   1    A.   YES.  WE WOULD HAVE TO HAVE EXTENSIVE CONSTRUCTION TO HAVE

09:14AM   2    THIS TYPE OF A SEPARATE ROOM PLUS BATHROOM.

09:14AM   3    Q.   RIGHT.  OKAY.

09:14AM   4         AND WE TALKED ABOUT THE CONSTRUCTION ISSUES I THINK THE

09:14AM   5    LAST TIME THAT WE MET.

09:14AM   6         DO YOU REMEMBER THAT?

09:14AM   7    A.   I DO.

09:14AM   8              MR. COOPERSMITH:  OKAY.  YOUR HONOR, I HAVE ANOTHER

09:14AM   9    EXHIBIT THAT I DON'T THINK IS IN THE BINDER, BUT I CAN HAND IT

09:14AM  10    UP.

09:14AM  11         IF I CAN APPROACH THE WITNESS?

09:15AM  12              THE COURT:  SURE.

09:15AM  13              MR. COOPERSMITH:  AND I'LL GIVE THE COURT A COPY

09:15AM  14    (HANDING.)

09:15AM  15         THANK YOU.

09:15AM  16    Q.   SO, MR. JHAVERI, I'VE SHOWN YOU EXHIBIT 20631.

09:15AM  17         DO YOU HAVE THAT IN FRONT OF YOU?

09:15AM  18    A.   I DO.

09:15AM  19    Q.   AND THAT'S A PHOTO OF THE OUTSIDE OF THE THERANOS SPACE

09:15AM  20    WITHIN THE PALO ALTO STORE; CORRECT?

09:15AM  21    A.   THAT'S CORRECT.

09:15AM  22    Q.   OKAY.

09:15AM  23         AND, YOUR HONOR, IF WE -- I WOULD OFFER 20631.

09:15AM  24              MR. SCHENK:  NO OBJECTION.

09:15AM  25              THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

09:15AM   1          (DEFENDANT'S EXHIBIT 20631 WAS RECEIVED IN EVIDENCE.)

09:15AM   2     BY MR. COOPERSMITH:

09:15AM   3     Q.   OKAY.  AND SO WHAT WE'RE SEEING HERE IS THE WALGREENS

09:15AM   4     STORE, AND IN FACT, THE COSMETICS SECTION THERE ON THE RIGHT,

09:15AM   5     THAT'S JUST PART OF THE REGULAR WALGREENS STORE; RIGHT?

09:15AM   6     A.   THAT'S CORRECT.

09:15AM   7     Q.   AND THEN THIS IS THE ENTRANCE TO THE THERANOS GOLD STORE;

09:16AM   8     CORRECT?

09:16AM   9     A.   THAT'S RIGHT.

09:16AM  10     Q.   AND THEN IT HAS THE THERANOS BRAND THERE AT THE TOP;

09:16AM  11     RIGHT?

09:16AM  12     A.   THAT'S CORRECT.

09:16AM  13     Q.   OKAY.  YOU CAN PUT THAT ASIDE, MR. JHAVERI.  THANKS.

09:16AM  14          OKAY.  LET'S GO BACK TO EXHIBIT 1891.  THAT'S THAT EMAIL

09:16AM  15     STRING.

09:16AM  16     A.   YES.

09:16AM  17     Q.   AND I JUST WANT TO MAKE SURE I UNDERSTAND YOUR TESTIMONY,

09:16AM  18     MR. JHAVERI.  IN THE DOCUMENT YOU SAY, "WE ARE GOING TO TOUCH

09:16AM  19     2,000 STORES IN 2015 AND WOULD LIKE TO MAKE SURE WE PLACE 2

09:16AM  20     ROOMS IN THE STORES THAT WE WANT TO SELECT FOR GOLD LEVEL."

09:16AM  21          DO YOU SEE THAT?

09:16AM  22     A.   YES, I DO.

09:16AM  23     Q.   AND IF I UNDERSTAND YOUR TESTIMONY FROM A COUPLE OF WEEKS

09:16AM  24     AGO, YOU'RE SAYING THAT YOUR REFERENCE TO THE 2,000 STORES IN

09:16AM  25     THE EMAIL IS A REFERENCE TO THE WALGREENS WELL EXPERIENCE

09:16AM   1    STORES; IS THAT YOUR TESTIMONY, SIR?

09:16AM   2    A.   THAT'S CORRECT.

09:16AM   3    Q.   OKAY.

09:16AM   4         YOUR HONOR, I WOULD LIKE TO --

09:17AM   5         WELL, LET ME JUST SHOW YOU ANOTHER EXHIBIT FIRST, IT'S

09:17AM   6    28033, WHICH SHOULD BE IN YOUR BINDER.

09:17AM   7              THE COURT:  IS THERE A PAGE?

09:17AM   8              MR. COOPERSMITH:  YES, YOUR HONOR.  IT'S PAGE 174,

09:17AM   9    AND SPECIFICALLY PAGE 174, LINE 19, THROUGH PAGE 176, LINE 6.

09:17AM  10              THE WITNESS:  WOULD YOU SAY THE NUMBER AGAIN,

09:17AM  11    PLEASE?

09:17AM  12    BY MR. COOPERSMITH:

09:17AM  13    Q.   SURE.  IT'S EXHIBIT 28033.

09:17AM  14    A.   OKAY.  I HAVE IT.

09:18AM  15    Q.   THANK YOU.  AND IF YOU COULD GO TO PAGE 174.

09:18AM  16    A.   YES, SIR.

09:18AM  17    Q.   THIS IS TESTIMONY THAT YOU GAVE UNDER OATH IN A PRIOR

09:18AM  18    PROCEEDING?

09:18AM  19    A.   YES, THAT'S WHAT IT LOOKS LIKE.

09:18AM  20    Q.   RIGHT.  AND IN THAT PROCEEDING, YOU REMEMBER RAISING YOUR

09:18AM  21    RIGHT HAND AND TAKING AN OATH TO TELL THE TRUTH, JUST LIKE YOU

09:18AM  22    DID IN COURT --

09:18AM  23    A.   YES, SIR.

09:18AM  24    Q.   -- HERE; RIGHT?

09:18AM  25         AND YOU WERE TELLING THE TRUTH; RIGHT?

09:18AM 1      A.   YES.

09:18AM 2      Q.   BECAUSE YOU KNEW THAT WAS IMPORTANT?

09:18AM 3      A.   YES.

09:18AM 4      Q.   RIGHT.  YOU WERE ASKED QUESTIONS ABOUT THIS VERY SAME

09:18AM 5      EMAIL ON PAGE 174, STARTING ON LINE 19?

09:19AM 6      A.   THAT'S CORRECT.

09:19AM 7               MR. COOPERSMITH:  YOUR HONOR, I'D LIKE TO PLAY A

09:19AM 8      VIDEOTAPE FOR THE JURY OF MR. JHAVERI'S TESTIMONY THAT IS GOING

09:19AM 9      TO COVER PAGE 174, LINE 19, THROUGH 176, LINE 6.

09:19AM 10              THE COURT:  COUNSEL?

09:19AM 11              MR. SCHENK:  NO OBJECTION.

09:19AM 12              THE COURT:  DO YOU HAVE THIS MARKED OUT ALREADY?

09:19AM 13              MR. COOPERSMITH:  THERE'S A VIDEO CLIP OF EXACTLY

09:19AM 14     THAT TESTIMONY THAT I JUST REFERENCED.

09:19AM 15              THE COURT:  OKAY.

09:19AM 16              MR. COOPERSMITH:  AND, MR. ALLEN, IF YOU COULD PLAY

09:19AM 17     THE -- ONE MOMENT, YOUR HONOR.

09:19AM 18          (VIDEOTAPE DEPOSITION OF MR. JHAVERI PLAYED IN OPEN COURT

09:20AM 19     OFF THE RECORD.)

09:21AM 20     BY MR. COOPERSMITH:

09:21AM 21     Q.   OKAY.  AND, MR. JHAVERI, IN THAT VIDEO CLIP THAT WE JUST

09:21AM 22     LISTENED TO, YOU NEVER TALK ABOUT WELL EXPERIENCE; CORRECT?

09:21AM 23     A.   THAT'S CORRECT.  WHAT --

09:21AM 24     Q.   THAT'S MY QUESTION, SIR.

09:21AM 25     A.   YES, THAT'S CORRECT.

09:21AM   1    Q.   YOU DON'T MENTION WELL EXPERIENCE?

09:21AM   2    A.   I DO NOT.

09:21AM   3    Q.   OKAY.  LET'S GO BACK TO AN EXHIBIT THAT WE WERE LOOKING AT

09:21AM   4    LAST TIME, WHICH IS EXHIBIT 1884.  AND THIS IS THE DOCUMENT

09:21AM   5    THAT WE WERE LOOKING AT THE LAST TIME, WHICH IS A PARTNERSHIP

09:21AM   6    MEETING MINUTES AND POWERPOINT FROM AUGUST 11TH, 2014.

09:22AM   7         DO YOU SEE THE FIRST PAGE OF IT ON THE SCREEN?

09:22AM   8    A.   I DO.

09:22AM   9    Q.   AND JUST TO REORIENT HERE, THIS WAS, IN THE COVER EMAIL,

09:22AM   10   AN EMAIL FROM PATTY HAWORTH.

09:22AM   11        DO YOU SEE THAT?

09:22AM   12   A.   YES, I DO.

09:22AM   13   Q.   AND SHE WORKS FOR WALGREENS?

09:22AM   14   A.   CORRECT.

09:22AM   15   Q.   AND SHE SENT THE PARTNERSHIP MEETING MINUTES AND THE SLIDE

09:22AM   16   DECK TO THE GROUP WHO WERE INVOLVED WITH THE PARTNERSHIP AT

09:22AM   17   THERANOS AND WALGREENS; IS THAT CORRECT?

09:22AM   18   A.   THAT'S CORRECT.

09:22AM   19   Q.   AND I THINK WE DISCUSSED QUITE A LOT OF THIS, BUT I WANT

09:22AM   20   TO MOVE TO THE POWERPOINT.  WE'VE LOOKED AT THE MINUTES LAST

09:22AM   21   TIME.

09:22AM   22        IN PARTICULAR, IF YOU COULD TURN TO, IT'S RIGHT AFTER

09:22AM   23   PAGE 16, MR. ALLEN.  I DON'T KNOW IF THE PAGES ARE NUMBERED,

09:22AM   24   BUT THEY START WITH THE POWERPOINT DECK RIGHT AFTER PAGE 16.

09:23AM   25        IT WOULD BE THE NEXT PAGE.  ONE MORE PAGE, MR. ALLEN.

09:23AM   1          RIGHT.  THANK YOU.

09:23AM   2          AND THIS IS I GUESS NUMBERED PAGE 17.

09:23AM   3          DO YOU SEE THAT IS THE FIRST PAGE OF THIS EXHIBIT THAT IS

09:23AM   4   THE BEGINNING OF THE POWERPOINT SLIDE DECK?

09:23AM   5   A.   I DO.

09:23AM   6   Q.   SO WITH THESE MEETINGS, IN ADDITION TO MS. HAWORTH KEEPING

09:23AM   7   THE MINUTES, THERE WAS ALSO A POWERPOINT PREPARED; RIGHT?

09:23AM   8   A.   NOT ALL OF THE TIME, BUT WHENEVER WE NEEDED TO DISCUSS ANY

09:23AM   9   DETAILS, THINGS OF THAT NATURE.

09:23AM  10          SO WHETHER IT WAS THE WALGREENS TEAM, THE THERANOS TEAM,

09:23AM  11   OR IN COLLABORATION WITH EACH OTHER, WE WOULD PRESENT SOME

09:23AM  12   SLIDES ON SOME DETAILS.

09:23AM  13   Q.   OKAY.  AND IN THIS CASE THAT HAPPENED AT THE AUGUST

09:23AM  14   MEETING; RIGHT?

09:23AM  15   A.   YES.

09:23AM  16   Q.   AND MS. HAWORTH SENT THE POWERPOINT SLIDE DECK AFTER THE

09:23AM  17   MEETING?

09:23AM  18   A.   THAT'S CORRECT.

09:23AM  19   Q.   SO WE'RE SEEING THE FIRST PAGE.

09:23AM  20          IF YOU COULD GO TO PAGE 20, MR. ALLEN.

09:24AM  21   A.   YES.

09:24AM  22   Q.   OKAY.  AND THIS HAS THE THERANOS EXPERIENCE SURVEY

09:24AM  23   SUMMARY.

09:24AM  24          DO YOU SEE THAT?

09:24AM  25   A.   THAT'S CORRECT.

09:24AM  1    Q.   AND IT SAYS THERE WERE 650 UNIQUE RESPONDENTS; RIGHT?

09:24AM  2    A.   THAT'S CORRECT.

09:24AM  3    Q.   AND THOSE WERE THE PEOPLE WHO WERE GETTING THEIR BLOOD

09:24AM  4    COLLECTED AT WALGREENS STORES; CORRECT?

09:24AM  5    A.   THAT'S CORRECT.

09:24AM  6    Q.   IN PALO ALTO AND ARIZONA?

09:24AM  7    A.   YEAH.  I DON'T KNOW WHICH STORES WERE INVOLVED IN THIS,

09:24AM  8    BUT, YES, THESE WERE THE 650 RESPONDENTS THAT RECEIVED THEIR

09:24AM  9    BLOOD DRAW THROUGH A THERANOS SERVICE AND THEN THEY WERE GIVEN

09:24AM 10    THAT IPAD THAT I SPOKE ABOUT A COUPLE WEEKS AGO.

09:24AM 11    Q.   RIGHT.  AND THAT WAS FOR A PERIOD OF JULY 2ND THROUGH

09:24AM 12    AUGUST 4TH; RIGHT?

09:24AM 13    A.   THAT'S CORRECT.

09:24AM 14    Q.   BECAUSE THAT WAS THE PERIOD JUST PRIOR TO THE PARTNERSHIP

09:24AM 15    MEETING?

09:24AM 16    A.   THAT'S CORRECT.

09:24AM 17    Q.   RIGHT.  AND AS I SAID, 650 UNIQUE RESPONDENTS, AND THEN IT

09:24AM 18    HAS THE AVERAGE QUALITY/EXPERIENCE SCORES.

09:24AM 19         DO YOU SEE THAT?

09:24AM 20    A.   I DO.

09:24AM 21    Q.   AND THEY'RE ALL REALLY GOOD; RIGHT?

09:24AM 22    A.   THEY ARE.

09:24AM 23    Q.   AND THEN IF YOU GO TO THE NEXT PAGE, PAGE 21, THEN THERE

09:25AM 24    ARE SOME BAR GRAPHS, YOU KNOW, THAT FURTHER BREAK THAT DOWN;

09:25AM 25    RIGHT?

09:25AM    1      A.   YES.

09:25AM    2      Q.   AND THE OVERALL EXPERIENCE, THE BAR GRAPH SHOWS THERE WERE

09:25AM    3      MANY MORE 5'S THAN PEOPLE WHO RATED THE OVERALL EXPERIENCE 1,

09:25AM    4      2, 3 OR 4.

09:25AM    5           DO YOU SEE THAT?

09:25AM    6      A.   THAT'S CORRECT.

09:25AM    7      Q.   AND IN FACT, NO ONE RATED THE EXPERIENCE 0; RIGHT?

09:25AM    8      A.   IT WAS ONE PERSON IT LOOKS LIKE.

09:25AM    9      Q.   ONE PERSON RATED THE EXPERIENCE 0; RIGHT?

09:25AM   10      A.   CORRECT.

09:25AM   11      Q.   SO THAT 1 PERSON OUT OF 650 MUST HAVE HAD A BAD

09:25AM   12      EXPERIENCE; RIGHT?

09:25AM   13      A.   YEAH.  I DON'T KNOW.

09:25AM   14      Q.   AND 556 PEOPLE RATED IT A 5; RIGHT?

09:25AM   15      A.   THAT'S RIGHT.

09:25AM   16      Q.   OKAY.  AND JUST TO BE CLEAR, 5 IS THE BEST THAT THEY COULD

09:25AM   17      RATE THE EXPERIENCE; RIGHT?

09:25AM   18      A.   THAT'S CORRECT.  0 TO 5 IS THE SCALE, 5 BEING THE BEST

09:26AM   19      ACROSS ALL OF THESE DIMENSIONS THAT WE ASKED QUESTIONS OF.

09:26AM   20      Q.   THANK YOU.  AND THEN THERE ARE OTHER METRICS.  CHECK IN

09:26AM   21      PROCESS, PEOPLE RATED THAT, FOR THE MOST PART, 5'S, OR MORE

09:26AM   22      PEOPLE RATED THAT 5; RIGHT?

09:26AM   23      A.   THAT'S CORRECT.

09:26AM   24      Q.   AND SAME WITH LOCATING THERANOS; RIGHT?

09:26AM   25      A.   CORRECT.

09:26AM    1    Q.   AND THEN FACILITIES.

09:26AM    2         DO YOU SEE THAT?

09:26AM    3    A.   THAT'S RIGHT.

09:26AM    4    Q.   AND IF YOU GO TO THE NEXT PAGE, PAGE 22, SAMPLE COLLECTION

09:26AM    5    PROCESS, 558 PEOPLE OF THE 650 GAVE IT A 5; RIGHT?

09:26AM    6    A.   THAT'S CORRECT.

09:26AM    7    Q.   AND THIS WAS AT A TIME WHEN THERE WERE APPROXIMATELY

09:26AM    8    40 PERCENT VENIPUNCTURE, AROUND 60 PERCENT FINGERSTICK; RIGHT?

09:26AM    9    A.   APPROXIMATELY, CORRECT.

09:26AM   10    Q.   OKAY.  THEN SKILLED TECHNICIAN, DO YOU SEE THAT?

09:26AM   11    A.   YES.

09:26AM   12    Q.   OKAY.  LET'S GO TO THE NEXT PAGE, PAGE 23.

09:26AM   13         AND THIS IS A PIE CHART.  AND THE QUESTION IS, "WHERE DO

09:27AM   14    YOU TYPICALLY GET YOUR PRESCRIPTIONS FILLED?"

09:27AM   15         DO YOU SEE THAT?

09:27AM   16    A.   YES.

09:27AM   17    Q.   AND THE GREEN, 53 PERCENT, IS WALGREENS; RIGHT?

09:27AM   18    A.   THAT'S CORRECT.

09:27AM   19    Q.   AND THEN I GUESS IT WOULD BE THE REMAINING 47 PERCENT ARE

09:27AM   20    AT THESE OTHER COMPETITORS OF WALGREENS; RIGHT?

09:27AM   21    A.   THAT'S CORRECT.

09:27AM   22    Q.   LIKE CVS?

09:27AM   23    A.   YES.

09:27AM   24    Q.   AND WAL-MART?

09:27AM   25    A.   YES.

09:27AM  1    Q.   OR COSTCO; RIGHT?

09:27AM  2    A.   YES.

09:27AM  3    Q.   AND SO FORTH?

09:27AM  4    A.   YES.

09:27AM  5    Q.   OKAY.  AND THEN THE NEXT GRAPH OR PIE CHART ON PAGE 24, IT

09:27AM  6    SAYS, "BASED ON YOUR RECENT VISIT, WHAT IS THE LIKELIHOOD THAT

09:27AM  7    YOU WILL RETURN TO A THERANOS WELLNESS CENTER?"

09:27AM  8         DO YOU SEE THAT?

09:27AM  9    A.   I DO.

09:27AM  10   Q.   AND THERE ARE 82 PERCENT IN THIS PIE CHART WHO SAID THEY

09:27AM  11   WOULD DEFINITELY COME BACK; RIGHT?

09:27AM  12   A.   THAT'S RIGHT.

09:27AM  13   Q.   AND THEN 17 PERCENT SAID THEY WOULD LIKELY -- THEY WERE

09:27AM  14   LIKELY TO RETURN; RIGHT?

09:27AM  15   A.   THAT'S CORRECT.

09:27AM  16   Q.   AND THEN ONLY 1 PERCENT SAID THAT THEY ARE NOT SURE IF

09:28AM  17   THEY WILL RETURN; RIGHT?

09:28AM  18   A.   THAT'S RIGHT.

09:28AM  19   Q.   AND THAT'S REALLY GOOD?

09:28AM  20   A.   YES, THAT'S GOOD.

09:28AM  21   Q.   OKAY.  AND THEN IF YOU GO TO THE NEXT PAGE, YOU SEE THAT

09:28AM  22   THERE'S A -- I WON'T READ ALL OF THESE, BUT THERE'S A SECTION

09:28AM  23   ON SOME COMMENTS THAT PEOPLE HAD ABOUT THEIR EXPERIENCE AT THE

09:28AM  24   THERANOS COLLECTION CENTER AT WALGREENS.

09:28AM  25        DO YOU SEE THAT?

09:28AM   1     A.   YES, SIR.

09:28AM   2     Q.   AND THEN THAT'S PAGE 25.

09:28AM   3          NOW, IF WE FLIP TO PAGE 41 OF THE SLIDE DECK.

09:28AM   4          THIS IS A SECTION OF THE POWERPOINT SLIDES THAT SAY

09:28AM   5     "DIAGNOSTIC TESTING -- THERANOS PARTNERSHIP PROGRAM MEASURES OF

09:28AM   6     SUCCESS (SMART GOALS)."

09:29AM   7          DO YOU SEE THAT?

09:29AM   8     A.   YES.

09:29AM   9     Q.   AND THEN IF YOU GO TO THE NEXT PAGE, IT ACTUALLY DEFINES

09:29AM   10    WHAT SMART GOALS ARE; RIGHT?

09:29AM   11    A.   CORRECT.

09:29AM   12    Q.   I THINK WE WERE BOTH HAVING TROUBLE REMEMBERING WHAT THAT

09:29AM   13    WAS, BUT NOW WE SEE IT; RIGHT?

09:29AM   14    A.   YES.

09:29AM   15    Q.   AND THIS IS -- I THINK YOU SAID THIS IS NOT SOMETHING THAT

09:29AM   16    JUST EXISTS IN WALGREENS, BUT IT IS A COMMON BUSINESS -- A

09:29AM   17    COMMON WAY IN BUSINESS TO SORT OF MEASURE METRICS; IS THAT

09:29AM   18    CORRECT?

09:29AM   19    A.   IT'S A -- YES, IT'S A GUIDELINE OF HOW WE LOOK AT GOALS

09:29AM   20    FOR BUSINESS OR FOR HR OR DETERMINING ANYTHING THAT WE'RE

09:29AM   21    TRYING TO ACHIEVE.

09:29AM   22    Q.   OKAY.  SO IF YOU GO TO THE NEXT PAGE, WHICH IS 43, NOW

09:29AM   23    WE'RE -- THERE'S THE BEGINNING OF THE DIFFERENT CATEGORIES AND

09:29AM   24    SOME COMMENTS ABOUT THEM.

09:29AM   25          DO YOU SEE THAT?

09:29AM   1        A.   I DO.

09:29AM   2        Q.   AND THEN THE FIRST ONE IS OPERATIONAL?

09:29AM   3        A.   YES.

09:29AM   4        Q.   AND IT SAYS, "ACHIEVE ACCEPTABLE LABOR MODEL," AND THEN

09:30AM   5        THE SUCCESS CRITERIA IS "20 STORES WITH WALGREENS EMPLOYED

09:30AM   6        PHLEBOTOMIST/HEALTH GUIDE BY 3/31/15."

09:30AM   7             RIGHT?

09:30AM   8        A.   THAT'S RIGHT.

09:30AM   9        Q.   SO THAT DATE OF 3/31/15, THAT WOULD BE SEVEN MONTHS LATER

09:30AM   10       COMPARED TO THE TIME THAT THIS IS BEING PRESENTED AT THE

09:30AM   11       MEETING IN AUGUST '14?

09:30AM   12       A.   THAT'S RIGHT.

09:30AM   13       Q.   OKAY.  AND THAT'S WHERE WALGREENS WOULD START EMPLOYING

09:30AM   14       THE PHLEBOTOMIST, AT LEAST FOR THE 20 STORES MENTIONED THERE?

09:30AM   15       A.   THAT'S RIGHT.

09:30AM   16       Q.   OKAY.  AND THEN IT HAS ANOTHER CATEGORY OF PATIENT

09:30AM   17       EXPERIENCE.

09:30AM   18            DO YOU SEE THAT?

09:30AM   19       A.   YES, I DO.

09:30AM   20       Q.   AND THE GOAL IS "LIKELIHOOD TO COME BACK BY 8/31/15."

09:30AM   21            AND THE GOAL IS GREATER THAN 90 PERCENT?

09:30AM   22       A.   THAT'S CORRECT.

09:30AM   23       Q.   AND ACTUALLY, FROM THE PIE CHARTS THAT WE ALREADY LOOKED

09:31AM   24       AT, THE PROGRAM WAS ALREADY THERE FOR THE STORES THAT WERE

09:31AM   25       OPENED AT THAT TIME; RIGHT?

09:31AM   1    A.   YEAH, I THINK WE WERE 82 OR 83 ALREADY LIKELY TO COME

09:31AM   2    BACK -- OR I DON'T REMEMBER.  SORRY.

09:31AM   3         98 PERCENT.

09:31AM   4    Q.   98 PERCENT; RIGHT?

09:31AM   5         SO THAT GOAL HAD ALREADY BEEN MET AS OF AUGUST OF '14;

09:31AM   6    RIGHT?

09:31AM   7    A.   THAT'S RIGHT.

09:31AM   8    Q.   EVEN THOUGH THE DEADLINE WAS AUGUST 31ST, '15?

09:31AM   9    A.   CORRECT.

09:31AM   10   Q.   OKAY.  AND THEN IT HAS -- I WON'T READ ALL OF THESE, BUT

09:31AM   11   IT HAS THE OTHER GOALS UNDER PATIENT EXPERIENCE.

09:31AM   12        DO YOU SEE THAT?

09:31AM   13   A.   YES, I DO.

09:31AM   14   Q.   OKAY.  IF YOU GO TO THE NEXT PAGE, THERE'S A GOAL UNDER

09:31AM   15   THE FINANCIAL SECTION TO ACHIEVE 15 PATIENTS PER STORE PER DAY

09:31AM   16   FOR A STORE THAT HAS BEEN OPENED AT LEAST THREE MONTHS BY AT

09:31AM   17   LEAST AUGUST 31ST, '15.

09:31AM   18        DO YOU SEE THAT?

09:31AM   19   A.   YES.

09:31AM   20   Q.   I THINK WE LOOKED AT IT LAST TIME AND I THINK WE'LL SEE,

09:32AM   21   BUT THE PATIENT NUMBERS HAD ACTUALLY BEEN GROWING; RIGHT?

09:32AM   22   A.   YES, THE PATIENT NUMBERS HAD BEEN GROWING, AND THE STORE

09:32AM   23   COUNT HAD ALSO BEEN GROWING, SO THAT WAS A GOOD THING.

09:32AM   24        WE WERE SEEING GROWTH NOT JUST ON THE TOTAL NUMBER OF

09:32AM   25   PATIENTS, BUT PER AVERAGE PER STORE PER DAY, WHICH IS GOOD AS

09:32AM  1    WELL.

09:32AM  2    Q.   OKAY.  AND THEN ON THE SAME PAGE THERE'S A GOAL TO DEAL

09:32AM  3    WITH SOME I.T. ISSUES.

09:32AM  4         DO YOU SEE THAT?

09:32AM  5    A.   YES, I DO.

09:32AM  6    Q.   AND YOU REMEMBER THAT THE I.T. ISSUES, THE INTEGRATION

09:32AM  7    BETWEEN THERANOS AND WALGREENS, THIS WAS, YOU KNOW, SOMETHING

09:32AM  8    THAT MAYBE WAS HARDER THAN IT FIRST APPEARED; IS THAT FAIR?

09:32AM  9    A.   IT WAS.  THERE WAS CERTAIN THINGS THAT WE NEEDED TO DO.

09:32AM  10        WE WANTED TO MAKE SURE THAT THERE WAS AN INTERNET

09:32AM  11   CONNECTION, DSL AS IT REFERS TO, THAT WAS PRIVATE, THAT WE CAN

09:32AM  12   HAVE UNINTERRUPTED.  SO THAT WAS ONE.

09:32AM  13        OTHER THINGS THAT WE HAD TO DO WAS TO INTEGRATE INTO OUR

09:32AM  14   WALGREENS PLATFORM SO THAT THEY COULD ACCESS THE THERANOS CHECK

09:33AM  15   IN PROCESS.

09:33AM  16        SO THERE WERE THINGS THAT WE WERE DOING FROM BOTH A

09:33AM  17   WALGREENS STANDPOINT, AS WELL AS FROM A THERANOS STANDPOINT

09:33AM  18   THAT WE HAD TO GET COMPLETED, JUST TO MAKE SURE THE EXPERIENCE

09:33AM  19   WAS CORRECT AND THAT WE HAD, AS BEST AS POSSIBLE, A GROUP

09:33AM  20   INTEGRATION, A SEAMLESS PROCESS.

09:33AM  21   Q.   AND THERE WERE A LOT OF PEOPLE WORKING ON THAT PARTICULAR

09:33AM  22   PROJECT; RIGHT?

09:33AM  23   A.   ON BOTH SIDES.

09:33AM  24   Q.   ON BOTH SIDES.  IS THIS A SILICON VALLEY MEETS CHICAGO

09:33AM  25   TYPE OF THING?

09:33AM   1      A.   I CAN'T ANSWER THAT.

09:33AM   2           BUT I WILL TELL YOU THAT WE HAD FOLKS ON BOTH SIDES THAT

09:33AM   3      WERE CONTINUING TO WORK ON FIGURING OUT THE TECHNOLOGY.

09:33AM   4      Q.   OKAY.  LET'S GO A LITTLE FURTHER INTO THE SLIDE DECK.

09:33AM   5           AND THEN IF YOU GO TO PAGE 46, YOU SEE THERE'S A PATIENT

09:33AM   6      EXPERIENCE SECTION?

09:33AM   7      A.   YES, SIR.

09:33AM   8      Q.   AND THAT DEALS WITH THINGS LIKE CHECK IN TIME; RIGHT?

09:33AM   9      A.   THAT'S CORRECT.

09:33AM  10      Q.   AND THE OTHER CATEGORIES OR GOALS THAT WERE MENTIONED

09:34AM  11      THERE, THOSE ARE ALSO PART OF THE PATIENT EXPERIENCE; RIGHT?

09:34AM  12      A.   THAT'S RIGHT.

09:34AM  13      Q.   OKAY.  AND THEN THE NEXT PAGE IS PATIENT (NON-EXPERIENCE),

09:34AM  14      AND THAT'S PAGE 47.

09:34AM  15           DO YOU SEE THAT?

09:34AM  16      A.   YES.

09:34AM  17      Q.   AND SO THE PATIENT VOLUME AND THE PERCENTAGE OF VENOUS

09:34AM  18      DRAWS THAT ARE LISTED THERE, NET NEW VERSUS EXISTING PATIENTS,

09:34AM  19      THESE ARE IN THE CATEGORY OF PATIENTS, BUT NOT PART OF THE

09:34AM  20      PATIENT EXPERIENCE; IS THAT CORRECT?

09:34AM  21      A.   YES, THAT'S HOW WE CATEGORIZED IT AT THE TIME, YES.

09:34AM  22      Q.   OKAY.  AND THEN DO YOU SEE WHERE IT SAYS PERCENT VENOUS

09:34AM  23      DRAWS?

09:34AM  24      A.   YES.

09:34AM  25      Q.   AND THE GOAL IS -- I'M SORRY.  THE GOAL IS PERCENT VENOUS

09:34AM   1    DRAWS.

09:34AM   2         AND THEN THE SUCCESS CRITERIA IS LESS THAN OR EQUAL

09:34AM   3    10 PERCENT VENOUS DRAWS BY AUGUST 31ST, 2015.

09:34AM   4         AM I READING THAT RIGHT?

09:35AM   5    A.   THAT'S CORRECT.

09:35AM   6    Q.   OKAY.  YOU CAN PUT THAT EXHIBIT ASIDE, MR. JHAVERI.  THANK

09:35AM   7    YOU.

09:35AM   8         OKAY.  IF YOU COULD PULL UP, MR. ALLEN, JUST FOR

09:35AM   9    MR. JHAVERI, EXHIBIT 20229.

09:36AM  10    A.   I HAVE IT.

09:36AM  11    Q.   OKAY.  AND DO YOU SEE THIS IS AN EMAIL STRING WHERE IN THE

09:36AM  12    BOTTOM EMAIL MR. BALWANI SENT AN EMAIL TO YOU AND OTHERS ON

09:36AM  13    AUGUST 14TH, AND THEN YOU RESPOND WITHIN WALGREENS ON

09:36AM  14    AUGUST 15TH, 2014.

09:36AM  15         DO YOU SEE THAT?

09:36AM  16    A.   I DO.

09:36AM  17    Q.   AND THIS WAS IN CONNECTION WITH THE PARTNERSHIP BETWEEN

09:36AM  18    WALGREENS AND THERANOS; RIGHT?

09:36AM  19    A.   YES.

09:36AM  20    Q.   AND THAT YOU WERE CONVEYING INFORMATION TO YOUR COLLEAGUES

09:36AM  21    AT WALGREENS TO TELL THEM SOME INFORMATION ABOUT THE

09:36AM  22    PARTNERSHIP; RIGHT?

09:36AM  23    A.   THAT'S CORRECT.

09:36AM  24    Q.   AND YOU WERE TRYING TO CONVEY THAT INFORMATION ACCURATELY?

09:36AM  25    A.   YES.

09:36AM   1    Q.   AND YOU WERE DOING THAT ON AN EMAIL IN THIS CASE; CORRECT?

09:36AM   2    A.   CORRECT.

09:36AM   3    Q.   AND THIS WAS A COMMON WAY THAT YOU COMMUNICATED

09:36AM   4    INFORMATION TO YOUR COLLEAGUES WITHIN WALGREENS; CORRECT?

09:36AM   5    A.   YES.

09:36AM   6    Q.   AND YOU -- WHEN YOU SENT AN EMAIL SUCH AS THIS, IF YOU

09:36AM   7    EVER NEEDED TO REFER BACK TO IT, WALGREENS HAD A SYSTEM WHERE

09:36AM   8    YOU COULD GO BACK AND DO THAT TO REVIEW THE INFORMATION IF YOU

09:37AM   9    WANTED TO; IS THAT RIGHT?

09:37AM   10   A.   THAT'S CORRECT.

09:37AM   11            MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20229.

09:37AM   12            MR. SCHENK:  NO OBJECTION.

09:37AM   13            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:37AM   14        (DEFENDANT'S EXHIBIT 20229 WAS RECEIVED IN EVIDENCE.)

09:37AM   15   BY MR. COOPERSMITH:

09:37AM   16   Q.   OKAY.  MR. JHAVERI, JUST TO GO TO THE BOTTOM EMAIL FROM

09:37AM   17   MR. BALWANI.  HE WROTE, "TODAY'S DATA.  I THOUGHT I WOULD SHARE

09:37AM   18   TODAY'S DATA WITH YOU.  THESE VISITS ARE FOR PAYING CUSTOMERS

09:37AM   19   (NO COUPONS OR OTHER FREE VISITS)."

09:37AM   20        DO YOU SEE THAT?

09:37AM   21   A.   I DO.

09:37AM   22   Q.   AND THEN ABOVE THAT YOU THEN SENT THIS EMAIL TO

09:37AM   23   BRAD FLUEGEL AND BRAD WASSON; IS THAT RIGHT?

09:37AM   24   A.   YES, THAT'S CORRECT.

09:37AM   25   Q.   OKAY.  AND CAN YOU JUST REMIND US, WHO ARE MR. FLUEGEL AND

09:37AM 1    MR. WASSON LISTED ON THIS EMAIL AT THE TIME?

09:37AM 2    A.   AT THE TIME STEWART WASSON, OR ALSO KNOWN AS BRAD WASSON,

09:37AM 3    WAS MY DIRECT MANAGER; AND THEN BRADLEY FLUEGEL WAS HIS DIRECT

09:38AM 4    MANAGER.

09:38AM 5    Q.   OKAY.  AND DO YOU KNOW WHO BRAD FLUEGEL REPORTED TO?

09:38AM 6    A.   BRAD FLUEGEL REPORTED TO ALEX GOURLAY, WHO WAS THE ACTING,

09:38AM 7    OR THE CO-COO OF WALGREENS BOOTS ALLIANCE.

09:38AM 8    Q.   SO WHEN YOU GET TO THE LEVEL OF BRAD FLUEGEL, YOU'RE

09:38AM 9    GETTING INTO THE UPPER ECHELONS OF WALGREENS MANAGEMENT; IS

09:38AM 10   THAT CORRECT?

09:38AM 11   A.   THAT'S CORRECT.

09:38AM 12   Q.   AT THE NATIONAL LEVEL?

09:38AM 13   A.   THAT'S CORRECT.

09:38AM 14   Q.   SO LET'S JUST LOOK AT WHAT YOU SAID.  YOU WROTE IN THE TOP

09:38AM 15   EMAIL, "HI BRAD -- JUST WANTED YOU TO KNOW THE REAL PROGRESS WE

09:38AM 16   HAVE MADE WITH THERANOS.  THERE IS STILL MUCH WORK TO BE

09:38AM 17   DONE... HOWEVER, ATTACHED ARE THE NUMBERS FROM WEDNESDAY -- 142

09:38AM 18   PATIENTS TOTAL FOR ONE DAY -- ALMOST 5 PATIENTS PER STORE.

09:38AM 19   SINCE WE LAST PRESENTED TO YOU AND THE EXEC TEAM IN MARCH, HERE

09:38AM 20   ARE SOME HIGHLIGHTS FOR YOU."

09:38AM 21       DO YOU SEE THAT?

09:38AM 22   A.   YES.

09:38AM 23   Q.   AND THEN -- SO YOU'RE REPORTING THE PROGRESS; RIGHT?

09:38AM 24   A.   THAT'S RIGHT.

09:38AM 25   Q.   AND THEN YOUR -- IN THE DATA, YOU'RE SHOWING THAT BETWEEN

09:39AM   1    FEBRUARY AND JULY, THE NUMBER OF STORES WENT FROM 3 TO 31;

09:39AM   2    RIGHT?

09:39AM   3    A.   THAT'S CORRECT.

09:39AM   4    Q.   AND THE AVERAGE PATIENTS PER STORE WENT FROM .8 TO 3.05;

09:39AM   5    RIGHT?

09:39AM   6    A.   THAT'S CORRECT.

09:39AM   7    Q.   AND THE CHECK IN TIME WAS GOING DOWN; RIGHT?

09:39AM   8    A.   CORRECT.

09:39AM   9    Q.   WAIT TIME WAS GOING DOWN?

09:39AM  10    A.   CORRECT.

09:39AM  11    Q.   VENOUS DRAWS WERE GOING DOWN; RIGHT?

09:39AM  12    A.   THAT'S CORRECT.

09:39AM  13    Q.   AND THAT WAS GOOD?

09:39AM  14    A.   ALL OF IT IS GOOD SO FAR.

09:39AM  15    Q.   OKAY.  AND THEN IT HAS OTHER INFORMATION ABOUT TRAINING

09:39AM  16    DAYS AND SKILL OF TECHNICIAN.

09:39AM  17         DO YOU SEE THAT?

09:39AM  18    A.   YES.

09:39AM  19    Q.   OKAY.  YOU CAN PUT THAT ASIDE.

09:39AM  20         LET'S GO TO THE NEXT EXHIBIT, WHICH IS 20231.

09:39AM  21         AND DO YOU SEE THAT IN THE BOTTOM HALF OF THE EMAIL ON

09:39AM  22    EXHIBIT 20231 IS THE SAME EMAIL THAT WE JUST LOOKED AT; RIGHT?

09:39AM  23    A.   YES, SIR.

09:40AM  24    Q.   AND THEN THERE'S A RESPONSE FROM BRAD, OR STEWART,

09:40AM  25    WASSON -- ACTUALLY TWO RESPONSES FROM HIM.

09:40AM  1          DO YOU SEE THAT?

09:40AM  2     A.   YES.

09:40AM  3     Q.   AND THAT'S ON AUGUST 15TH OF 2014 AS WELL?

09:40AM  4     A.   YES.

09:40AM  5          MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20231.

09:40AM  6          MR. SCHENK:  NO OBJECTION.

09:40AM  7          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:40AM  8     (DEFENDANT'S EXHIBIT 20231 WAS RECEIVED IN EVIDENCE.)

09:40AM  9     BY MR. COOPERSMITH:

09:40AM  10    Q.   OKAY.  JUST TO GET STARTED.

09:40AM  11         DO YOU SEE IN THE BOTTOM THAT'S THE SAME EMAIL THAT WE

09:40AM  12    JUST LOOKED AT THAT WE READ; CORRECT?

09:40AM  13    A.   YES.

09:40AM  14    Q.   WITH THE SAME DATA; CORRECT?

09:40AM  15    A.   CORRECT.

09:40AM  16    Q.   AND THEN MR. WASSON, BRAD WASSON -- GOES BY BRAD, I

09:40AM  17    GUESS -- IT SAYS, "NICE NICE NICE WORK EVERYONE.  THANKS,

09:40AM  18    BRAD."

09:40AM  19         DO YOU SEE THAT?

09:40AM  20    A.   YES.

09:40AM  21    Q.   SO HE WAS PLEASED?

09:40AM  22    A.   CORRECT.

09:40AM  23    Q.   AND THEN ABOVE THAT IT SAYS, "FYI" -- HE SENDS ANOTHER

09:41AM  24    RESPONSE.

09:41AM  25         DO YOU SEE THAT?

09:41AM   1    A.   YES.

09:41AM   2    Q.   AND I GUESS HE INCLUDES MORE PEOPLE ON THIS RESPONSE.

09:41AM   3         DO YOU SEE THAT?

09:41AM   4    A.   YES.

09:41AM   5    Q.   AND THEN IN THAT RESPONSE HE SAYS, "FYI NICE JOB AND

09:41AM   6    SENDING AS AN FYI -- I LIKE THESE KINDS OF SUMMARIES EQUALS IT

09:41AM   7    ARMS MY BRAIN WITH THE CORRECT STUFF SO I CAN GO TO WAR IF I

09:41AM   8    HAVE TOO."

09:41AM   9         DO YOU SEE THAT?

09:41AM  10    A.   YES.

09:41AM  11    Q.   AND I JUST WANT TO TALK ABOUT THE WAR REFERENCE.  I'M NOT

09:41AM  12    SURE YOU KNOW, BUT AT THIS TIME WALGREENS WAS GOING THROUGH A

09:41AM  13    MERGER WITH THIS EUROPEAN COMPANY.

09:41AM  14         DO YOU REMEMBER THAT?

09:41AM  15    A.   CORRECT.

09:41AM  16    Q.   AND THAT'S THE BOOTS ALLIANCE?

09:41AM  17    A.   THAT'S RIGHT.

09:41AM  18    Q.   AND WE TALKED ABOUT IT LAST TIME YOU WERE HERE?

09:41AM  19    A.   WE DID.

09:41AM  20    Q.   OKAY.  SO THE NEW PEOPLE WHO WERE KIND OF JOINING THE TEAM

09:41AM  21    FROM EUROPE, THEY WERE GOING TO HAVE TO UNDERSTAND THIS PROGRAM

09:41AM  22    AS WELL; RIGHT?

09:41AM  23    A.   YES.  IF I CAN JUST CLARIFY -- I SHOULDN'T SAY CLARIFY --

09:42AM  24    JUST DIVE IN A LITTLE DEEPER AS TO WHO BRAD WAS SENDING THIS

09:42AM  25    EMAIL TO.

09:42AM  1          HE WAS SENDING IT TO HIS DIRECT REPORTS, SO ALL OF THOSE

09:42AM  2     FOLKS THAT YOU SEE ON THAT TO ARE MY PEERS THAT REPORTED TO

09:42AM  3     BRAD.

09:42AM  4          AND WHAT HE IS BASICALLY STATING IS THAT HE LIKES THESE

09:42AM  5     TYPES OF SUMMARIES ON PROJECTS THAT WE'RE WORKING ON, SO IF HE

09:42AM  6     HAS TO GO AND EXPLAIN IT ON THE PROGRESS OF THOSE PROJECTS, HE

09:42AM  7     CAN DO SO TO ANY TYPE OF AUDIENCE, AND THAT'S WHAT HE'S TALKING

09:42AM  8     ABOUT HERE.

09:42AM  9     Q.   OKAY.  THANK YOU, MR. JHAVERI.

09:42AM  10    A.   YOU BET.

09:42AM  11    Q.   IF YOU CAN GO TO THE NEXT EXHIBIT, WHICH IS 20235.

09:42AM  12         AND YOU SEE THIS IS ANOTHER EMAIL INTERNAL TO WALGREENS;

09:42AM  13    CORRECT?

09:42AM  14    A.   YES, SIR.

09:42AM  15    Q.   AND THIS IS AN EMAIL STRING BETWEEN YOU AND WADE MIQUELON;

09:42AM  16    CORRECT?

09:42AM  17    A.   THAT'S CORRECT.

09:43AM  18    Q.   AND I THINK WE TALKED ABOUT HIM LAST TIME.  HE'S THE CHIEF

09:43AM  19    FINANCIAL OFFICER?

09:43AM  20    A.   THAT'S CORRECT.

09:43AM  21    Q.   SO ANOTHER PERSON AT THE TOP ECHELONS OF THE WALGREENS

09:43AM  22    LEADERSHIP; RIGHT?

09:43AM  23    A.   YES.

09:43AM  24    Q.   OKAY.  AND THIS IS ON AUGUST 14TH, 2015 AS WELL?

09:43AM  25    A.   YES, IT WAS.

09:43AM   1     Q.   AND YOU'RE ALSO CONVEYING THE SAME DATA IN THIS CASE TO

09:43AM   2     MR. MIQUELON?

09:43AM   3     A.   YES.

09:43AM   4             MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20235.

09:43AM   5             MR. SCHENK:  NO OBJECTION.

09:43AM   6             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

09:43AM   7         (DEFENDANT'S EXHIBIT 20235 WAS RECEIVED IN EVIDENCE.)

09:43AM   8     BY MR. COOPERSMITH:

09:43AM   9     Q.   OKAY.  LET'S GO TO THE BOTTOM EMAIL.

09:43AM  10         SO ON AUGUST 14TH YOU WROTE, "HI WADE -- I HEARD THE NEWS

09:43AM  11     OF YOU LEAVING AND WANTED TO REACH OUT TO YOU JUST TO SAY THANK

09:43AM  12     YOU.  YOUR HELP AND GUIDANCE OVER THE YEARS WAS MUCH

09:43AM  13     APPRECIATED AND I CANNOT THANK YOU ENOUGH.

09:43AM  14         "I HOPE OUR PATHS CROSS AGAIN -- TAKE CARE AND ALL THE

09:43AM  15     BEST SIR."

09:43AM  16         DO YOU SEE THAT?

09:43AM  17     A.   YES.

09:43AM  18     Q.   AND SO ALL OF THE BEST TO MR. MIQUELON --

09:44AM  19     A.   YES.

09:44AM  20     Q.   -- WHO WAS LEAVING?

09:44AM  21     A.   YES.

09:44AM  22     Q.   DO YOU KNOW WHY HE WAS LEAVING?

09:44AM  23             MR. SCHENK:  OBJECTION.  RELEVANCE.

09:44AM  24             THE COURT:  SUSTAINED.

09:44AM  25     BY MR. COOPERSMITH:

09:44AM  1    Q.   BUT HE WAS LEAVING?

09:44AM  2    A.   HE WAS LEAVING.

09:44AM  3    Q.   AND IF YOU GO UP THE CHAIN HERE, YOU THEN WROTE ON

09:44AM  4    AUGUST 14TH AT 9:02 P.M., "THANK YOU AND ABSOLUTELY WILL STAY

09:44AM  5    IN TOUCH.  ALSO, WANTED TO LET YOU KNOW WHAT WE ARE DOING WITH

09:44AM  6    THERANOS.  THE PROGRESS HAS BEEN GREAT SINCE WE PRESENTED TO

09:44AM  7    YOU IN MARCH.  I PROMISED YOU WE WILL GET THIS DONE.  SEE

09:44AM  8    BELOW."

09:44AM  9         DO YOU SEE THAT?

09:44AM  10   A.   YES.

09:44AM  11   Q.   AND THEN YOU ATTACH THAT SAME DATA THAT WE WERE LOOKING AT

09:44AM  12   BEFORE; RIGHT?

09:44AM  13   A.   YES, SIR.

09:44AM  14   Q.   AND THEN MR. MIQUELON, HE WAS WORKING ON -- LET ME STEP

09:44AM  15   BACK.

09:44AM  16        HE WAS WORKING ON THIS PROJECT FOR A WHILE; RIGHT?

09:44AM  17   A.   PRIOR TO ME EVEN GETTING INVOLVED.

09:44AM  18   Q.   RIGHT.  IN FACT, YEARS PRIOR TO YOU GETTING INVOLVED;

09:44AM  19   RIGHT?

09:44AM  20   A.   THAT'S CORRECT.

09:44AM  21   Q.   BECAUSE HE HAD BEEN THE CFO?

09:45AM  22   A.   THAT'S RIGHT.

09:45AM  23   Q.   AND SO YOU WERE SENDING THIS TO HIM BECAUSE YOU KNEW HE

09:45AM  24   MIGHT BE INTERESTED IN THE STATUS OF THE THERANOS-WALGREENS

09:45AM  25   RELATIONSHIP?

09:45AM   1    A.   YES.  HE ASKED ME TO KEEP HIM IN THE LOOP AS TO WHAT WAS

09:45AM   2    GOING ON AND THE PROGRESS THAT WE WERE MAKING.

09:45AM   3    Q.   AND THAT'S WHAT YOU WERE DOING?

09:45AM   4    A.   THAT'S WHAT I WAS DOING.

09:45AM   5    Q.   AND THEN YOU DID THAT IN PART BY SENDING HIM THIS DATA;

09:45AM   6    RIGHT?

09:45AM   7    A.   YES, SIR.

09:45AM   8    Q.   AND THEN HE RESPONDED, IF YOU LOOK AT THE TOP EMAIL, HE

09:45AM   9    SAYS, "WOW!!!!"

09:45AM  10         MAYBE I SHOULD YELL THE WORD "WOW."  THERE ARE SEVERAL

09:45AM  11    EXCLAMATION POINTS.

09:45AM  12         DO YOU SEE THAT?

09:45AM  13    A.   I DO.

09:45AM  14    Q.   AND THEN HE SAYS, "KEEP ROCKIN IT.  WADE."

09:45AM  15         DO YOU SEE THAT?

09:45AM  16    A.   YES.

09:45AM  17    Q.   AND THAT'S WHAT MR. WADE TOLD YOU IN RESPONSE TO YOUR

09:45AM  18    TRANSMISSION OF THIS DATA; RIGHT?

09:45AM  19    A.   THAT'S RIGHT.

09:45AM  20    Q.   LET'S GO TO THE NEXT EXHIBIT, 2214.

09:46AM  21         AND, YOUR HONOR, THIS IS ALREADY IN EVIDENCE, SO IF WE CAN

09:46AM  22    PUT IT UP ON THE SCREEN WITH YOUR PERMISSION?

09:46AM  23              THE COURT:  ALL RIGHT.

09:46AM  24    BY MR. COOPERSMITH:

09:46AM  25    Q.   SO LOOKING AT EXHIBIT 2214, THIS IS ANOTHER EMAIL FROM

09:46AM  1      PATTY HAWORTH TRANSMITTING AN AGENDA AND SLIDE DECK FOR A

09:46AM  2      PARTNERSHIP MEETING WITH THERANOS; CORRECT?

09:46AM  3      A.   YES, SIR.

09:46AM  4      Q.   AND THAT'S ON NOVEMBER 18TH, 2014?

09:46AM  5      A.   YES.

09:46AM  6      Q.   SO THIS IS NOW A FEW MONTHS AFTER THE LAST PARTNERSHIP

09:46AM  7      MEETING THAT WE LOOKED AT, WHICH WAS IN MID-AUGUST; CORRECT?

09:46AM  8      A.   THAT'S CORRECT.

09:46AM  9      Q.   OKAY.  AND IF WE GO TO PAGE 8 FOR STARTERS.

09:47AM  10         THIS IS THAT SAME TYPE OF CHART FOR THERANOS EXPERIENCE

09:47AM  11     SURVEY SUMMARY.

09:47AM  12         DO YOU SEE THAT?

09:47AM  13     A.   YES, I DO.

09:47AM  14     Q.   BUT THIS TIME IT'S FOR A DIFFERENT TIME PERIOD.  IN THIS

09:47AM  15     CASE IT'S OCTOBER OF '14; CORRECT?

09:47AM  16     A.   CORRECT.

09:47AM  17     Q.   OKAY.  AND THEN THE NUMBERS ARE STILL REALLY GOOD; RIGHT?

09:47AM  18     A.   YES, THE NUMBERS ARE GOOD.

09:47AM  19     Q.   AND THEN IF YOU GO TO THE NEXT PAGE, PAGE 9, THAT HAS THAT

09:47AM  20     BREAKDOWN THAT WE WERE TALKING ABOUT WITH THE OTHER EXHIBIT,

09:47AM  21     BUT AGAIN IN THIS CASE FOR THE OCTOBER 2014 TIME PERIOD; RIGHT?

09:47AM  22     A.   CORRECT.

09:47AM  23     Q.   AND WE'RE STILL SEEING, LIKE, FAR AND AWAY PEOPLE ARE

09:47AM  24     GIVING THIS SERVICE A 5 COMPARED TO ANY OTHER NUMBER; RIGHT?

09:47AM  25     A.   YES.

09:47AM  1    Q.   OKAY.  GO TO THE NEXT PAGE, 10.  SAME THING WITH SAMPLE

09:47AM  2    COLLECTION AND SKILL OF TECHNICIAN?

09:47AM  3    A.   YES.

09:47AM  4    Q.   AND THE SAMPLE COLLECTION METRIC THAT WE ARE LOOKING AT

09:48AM  5    HERE, THAT WAS AT A TIME WHEN THE VENOUS DRAW PERCENTAGE WAS

09:48AM  6    STILL AROUND 40 PERCENT; RIGHT?

09:48AM  7    A.   THAT'S CORRECT.

09:48AM  8    Q.   AND IF YOU GO TO THE NEXT PAGE, PAGE 11, YOU SEE THE PIE

09:48AM  9    CHART THAT HAS THAT INFORMATION THAT WE LOOKED AT BEFORE ABOUT

09:48AM  10   WHERE THE PEOPLE GOT THEIR PRESCRIPTIONS FILLED.

09:48AM  11        DO YOU SEE THAT?

09:48AM  12   A.   YES.

09:48AM  13   Q.   AND THE NEXT PAGE IS LIKELIHOOD OF RETURNING ON PAGE 12,

09:48AM  14   AND THAT'S STILL REALLY GOOD; RIGHT?

09:48AM  15   A.   YES.

09:48AM  16   Q.   AND THEN WE HAVE AFTER THAT, IF YOU QUICKLY GO THROUGH

09:48AM  17   THESE WITHOUT READING THEM, YOU SEE -- I'M SORRY, MR. ALLEN.

09:48AM  18   STARTING ON PAGE 14.

09:48AM  19        IT HAS WHAT PEOPLE ARE SAYING.  SO THERE'S POSITIVE

09:48AM  20   COMMENTS FROM CERTAIN PEOPLE WHO RESPONDED ON THE IPAD?

09:48AM  21   A.   YES.

09:48AM  22   Q.   AND THEN ALSO ON PAGE 16, THERE'S AN INCLUSION OF WHAT

09:49AM  23   PEOPLE ARE COMPLAINING ABOUT; RIGHT?

09:49AM  24   A.   YES, THAT'S CORRECT.

09:49AM  25   Q.   AND SO, FOR EXAMPLE, THE FIRST ONE, THE PERSON WANTED

09:49AM   1    BETTER DIRECTIONS ABOUT WHERE TO CHECK IN; RIGHT?

09:49AM   2    A.   YES.

09:49AM   3    Q.   AND WAS SAYING THAT THERE SHOULD BE SOME BATHROOM REPAIRS;

09:49AM   4    RIGHT?

09:49AM   5    A.   THAT'S CORRECT.

09:49AM   6    Q.   AND THEN OTHER PEOPLE WERE COMPLAINING THAT THEY HAD TO

09:49AM   7    WAIT TOO LONG; RIGHT?

09:49AM   8    A.   THAT'S CORRECT.

09:49AM   9    Q.   OKAY.  AND THEN PAGE 17 HAS SOME ADDITIONAL COMPLAINTS; IS

09:49AM   10   THAT RIGHT?

09:49AM   11   A.   YES.

09:49AM   12   Q.   SO, FOR EXAMPLE, IN THE MIDDLE OF THAT PAGE, SOMEONE

09:49AM   13   COMPLAINED ABOUT WANTING TO HAVE A MORE PRIVATE AREA TO WAIT.

09:49AM   14        DO YOU SEE THAT?

09:49AM   15   A.   THAT'S CORRECT.

09:49AM   16   Q.   AND SO THESE ARE THE KINDS OF THINGS THAT WALGREENS AND

09:49AM   17   THERANOS WOULD HAVE TO TAKE INTO ACCOUNT IN ORDER TO CONTINUE

09:49AM   18   TO IMPROVE THE PROGRAM; RIGHT?

09:49AM   19   A.   CORRECT.  WE WOULD EVALUATE ALL OF THE COMPLIMENTS, AS

09:49AM   20   WELL AS THE COMPLAINTS, COLLABORATIVELY IN A PARTNERSHIP AND

09:50AM   21   DETERMINE WHICH WERE ACTUALLY NECESSARY, AND THAT'S WHAT WE

09:50AM   22   WOULD USE THIS FOR.

09:50AM   23   Q.   OKAY.  IF YOU GO TO PAGE 20, MR. JHAVERI.

09:50AM   24        THIS PAGE TALKS ABOUT HCC THERANOS INTEGRATION.

09:50AM   25        DO YOU SEE THAT?

09:50AM  1    A.   I'M SORRY, WHAT WAS IT?

09:50AM  2    Q.   IT'S PAGE 20 OF THE EXHIBIT.

09:50AM  3    A.   I HAVE IT.

09:50AM  4    Q.   OKAY.  THANK YOU.

09:50AM  5         DO YOU SEE IT HAS A HEADING HCC-THERANOS INTEGRATION?

09:50AM  6    A.   YES.

09:50AM  7    Q.   AND THAT'S THOSE HEALTH CARE CLINICS THAT WE TALKED ABOUT

09:50AM  8    LAST TIME YOU WERE HERE; RIGHT?

09:50AM  9    A.   CORRECT.

09:50AM  10   Q.   AND ALSO THE PHARMACY THERANOS INTEGRATION?

09:50AM  11        DO YOU SEE THAT?

09:50AM  12   A.   THAT'S RIGHT.

09:50AM  13   Q.   AND PART OF THAT IS I.T. INTEGRATION?

09:50AM  14   A.   CORRECT.  THIS ENTIRE SLIDE IS FOR I.T. OVERVIEW.

09:50AM  15   Q.   RIGHT.

09:50AM  16   A.   RIGHT.

09:50AM  17   Q.   AND THEN IF YOU GO TO THE NEXT PAGE, PAGE 21, THERE'S AN

09:50AM  18   ISSUE THAT IS BEING WORKED ON CALLED THE VENDOR SECURITY

09:51AM  19   AGREEMENT?

09:51AM  20   A.   YES.

09:51AM  21   Q.   AND CAN YOU JUST BRIEFLY TELL US WHAT THE VENDOR SECURITY

09:51AM  22   AGREEMENT WAS?

09:51AM  23   A.   THE VENDOR SECURITY ASSESSMENT WAS ALL OF THE VENDORS THAT

09:51AM  24   WE USE TO DELIVER LET'S SAY INTERNET SERVICE OR THINGS OF THAT

09:51AM  25   NATURE ARE GOING THROUGH A SECURITY ASSESSMENT BY OUR I.T.

09:51AM  1    DEPARTMENT, MAKE SURE IT'S PRIVATE, MAKE SURE THERE AREN'T ANY

09:51AM  2    HOLES IN WHAT THEY'RE DELIVERING TO US.

09:51AM  3         AND SO THAT'S WHAT THIS IS REFERRING TO.

09:51AM  4    Q.   OKAY.  SO THAT WAS AN ONGOING PROJECT AT THIS TIME?

09:51AM  5    A.   WE DO THIS FOR EVERY VENDOR.

09:51AM  6    Q.   OKAY.  IF WE GO A FEW PAGES MORE, THEN WE HAVE ON 25, DO

09:51AM  7    YOU SEE WE HAVE A SLIDE THAT STARTS THE SECTION CALLED

09:51AM  8    DIAGNOSTIC TESTING -- PRIVATE HEALTH ROOM ALIGNMENT?

09:51AM  9    A.   YES.

09:51AM  10   Q.   AND SOMETIMES THAT'S REFERRED TO AS PHR'S?

09:51AM  11   A.   YES.

09:51AM  12   Q.   AND THAT'S THE ROOM THAT COULD BE USED FOR THERANOS BLOOD

09:51AM  13   TESTS; RIGHT?

09:51AM  14   A.   CORRECT.  THIS IS THE ROOM THAT I REFERENCED THE LAST

09:52AM  15   TIME, THE MULTI-USE ROOM.  PHARMACISTS CAN USE IT FOR

09:52AM  16   CONSULTATION, YOU MAY GET YOUR VACCINES THERE, OR YOU CAN DO

09:52AM  17   ANOTHER SERVICE SUCH AS THERANOS.

09:52AM  18   Q.   OKAY.  IF YOU GO TO THE NEXT PAGE, PAGE 26, THERE'S A

09:52AM  19   SLIDE CALLED PHR (PRIVATE HEALTH ROOM) PRIOR TO REDESIGN;

09:52AM  20   RIGHT?

09:52AM  21   A.   YES.

09:52AM  22   Q.   AND SO THERE'S A DISCUSSION AT THIS MEETING IN NOVEMBER OF

09:52AM  23   2014 ABOUT REDESIGN OF THE PRIVATE HEALTH ROOMS; CORRECT?

09:52AM  24   A.   CORRECT.

09:52AM  25        AND JUST TO RECALL, THIS WAS ALL PART OF THE REDESIGN OF

09:52AM    1    OUR STORES, THE WELLNESS EXPERIENCE PROJECT, AND SO WE ARE

09:52AM    2    ALWAYS LOOKING AT WHAT CAN WE IMPROVE.

09:52AM    3        WHAT YOU'RE SEEING IS LEARNINGS THAT WE WERE TAKING INTO

09:52AM    4    CONSIDERATION TO MAKE IT BETTER, TO MAKE THE DESIGN A LITTLE

09:52AM    5    BIT MORE USABLE.

09:52AM    6    Q.   OKAY.  THE NEXT PAGE HAS -- IT'S A LITTLE HARD TO SEE, BUT

09:52AM    7    YOU CAN SEE IT'S A PHR (PRIVATE HEALTH ROOM), AND IT HAS A

09:52AM    8    DRAWING OF WHAT THE ROOM WOULD LOOK LIKE PRIOR TO REDESIGN;

09:53AM    9    RIGHT?

09:53AM   10    A.   YES.

09:53AM   11    Q.   AND THEN IF YOU GO TO THE NEXT PAGE IT HAS PHR (PRIVATE

09:53AM   12    HEALTH ROOM) REDESIGNED; RIGHT?

09:53AM   13    A.   YES.

09:53AM   14    Q.   AND THEN THE NEXT PAGE IS A DRAWING OF WHAT THAT WOULD

09:53AM   15    LOOK LIKE; RIGHT?

09:53AM   16    A.   THAT'S CORRECT.

09:53AM   17    Q.   OKAY.  AND THEN IF YOU GO TO THE NEXT PAGE, WHICH IS

09:53AM   18    PAGE 30 OF THIS EXHIBIT, IT HAS PHR (PRIVATE HEALTH ROOM)

09:53AM   19    SHARED SERVICES; RIGHT?

09:53AM   20    A.   THAT'S CORRECT.

09:53AM   21    Q.   AND THEN THERE'S A DRAWING ON PAGE 31 OF WHAT THAT PHR

09:53AM   22    WOULD LOOK LIKE WITH THE SHARED SERVICES; RIGHT?

09:53AM   23    A.   THAT'S CORRECT.

09:53AM   24    Q.   AND THEN ONE ADDITION TO THAT REDESIGN IS IF YOU GO TO THE

09:53AM   25    BOTTOM, IT SAYS THERE WOULD BE A CENTRIFUGE ON COUNTER; IS THAT

09:53AM  1    RIGHT?

09:53AM  2    A.    YES.   WHAT WE WERE MAKING SURE THAT WE HAD ACCOUNTED FOR

09:53AM  3    WAS ANY TYPE OF EQUIPMENT THAT WAS NECESSARY BECAUSE IT WOULD

09:53AM  4    DETERMINE WHAT KIND OF DESIGN, WHAT KIND OF TABLES, WHAT KIND

09:53AM  5    OF TABLE TOPS THAT WE WOULD NEED, AND SO WE NEEDED TO MAKE SURE

09:54AM  6    IF THERE WAS A CENTRIFUGE IN THIS CASE INVOLVED IN THAT SHARED

09:54AM  7    SERVICES, THAT WE ACCOUNTED FOR IT.

09:54AM  8    Q.    AND A CENTRIFUGE IS SOMETHING THAT IS USED IN THE PROCESS

09:54AM  9    OF COLLECTING BLOOD; CORRECT?

09:54AM  10   A.    CORRECT, RIGHT AFTER THE COLLECTION.

09:54AM  11   Q.    RIGHT.

09:54AM  12        YOU CAN SET THAT ASIDE.

09:54AM  13        IF YOU CAN GO TO EXHIBIT 2275, WHICH IS ALREADY IN

09:54AM  14   EVIDENCE.

09:54AM  15        MR. JHAVERI, THIS IS AN EMAIL FROM YOU TO MR. BALWANI WITH

09:54AM  16   A COPY TO OTHER PEOPLE AT WALGREENS ON DECEMBER 8TH, 2014;

09:54AM  17   CORRECT?

09:54AM  18   A.    YES, SIR.

09:54AM  19   Q.    AND I JUST WANT TO START WITH ITEM 1, AND THAT SAYS

09:54AM  20   CONTRACT.

09:54AM  21        DO YOU SEE THAT?

09:54AM  22   A.    YES.

09:55AM  23   Q.    AND IT SAYS, "I HAVE ATTACHED A HIGH LEVEL ONE SLIDE

09:55AM  24   POWERPOINT ON THE TOPICS OF DISCUSSION."

09:55AM  25        DO YOU SEE THAT?

09:55AM  1    A.   YES, SIR.

09:55AM  2    Q.   "THE EXECUTIVE TEAM AT WALGREENS IS IN THE LOOP AND HAVE

09:55AM  3    ENDORSED THE POINTS."

09:55AM  4         DO YOU SEE THAT?

09:55AM  5    A.   I DO.

09:55AM  6    Q.   AND SO AT THIS TIME THERE WAS DISCUSSION BETWEEN THE

09:55AM  7    WALGREENS TEAM AND THE THERANOS TEAM ABOUT MODIFYING THE

09:55AM  8    CONTRACT?

09:55AM  9    A.   THAT'S CORRECT.

09:55AM 10    Q.   AND AS WE DISCUSSED LAST TIME YOU WERE HERE, THERE HAD

09:55AM 11    BEEN OTHER MODIFICATIONS DURING THE LIFE OF THE

09:55AM 12    THERANOS-WALGREENS PARTNERSHIP; RIGHT?

09:55AM 13    A.   YES.

09:55AM 14    Q.   AND THE RELATIONSHIP HAD BEEN EVOLVING, ACTUALLY, SINCE

09:55AM 15    2010?

09:55AM 16    A.   THAT'S CORRECT.

09:55AM 17    Q.   AND THIS WAS ANOTHER DISCUSSION ABOUT AMENDING OR

09:55AM 18    MODIFYING THE CONTRACT; RIGHT?

09:55AM 19    A.   THAT'S CORRECT.

09:55AM 20    Q.   OKAY.  AND THEN ON THE SECOND PAGE OF THE EXHIBIT, IF WE

09:55AM 21    CAN JUST QUICKLY GO TO THAT, THAT'S THE ONE SLIDE POWERPOINT;

09:55AM 22    RIGHT?

09:55AM 23    A.   CORRECT.

09:55AM 24    Q.   AND WALGREENS'S PROPOSAL IS THAT THE SERVICE FEE FOR

09:56AM 25    WALGREENS WOULD BE A LITTLE HIGHER; RIGHT?

09:56AM    1    A.    THAT'S CORRECT.

09:56AM    2    Q.    AND THAT WOULD HELP WALGREENS OFFSET SOME OF THE COSTS OF

09:56AM    3    THE PROGRAM; RIGHT?

09:56AM    4    A.    CORRECT.

09:56AM    5          AT THIS POINT THE COST THAT WE'RE PUTTING IN WAS GREATER

09:56AM    6    THAN WHAT WE WERE BEING REIMBURSED FOR THE TEST, SO WE WERE

09:56AM    7    TRYING TO MAKE SURE THAT WE WERE ABLE TO ACCOMMODATE ALL OF THE

09:56AM    8    COSTS THAT WE WERE INCURRING.

09:56AM    9    Q.    AND THAT WOULD BE ONE WAY TO DO IT IS TO RECOVER SOME

09:56AM   10    COSTS BY RAISING THE AMOUNT OF MONEY THAT THERANOS WOULD GET;

09:56AM   11    RIGHT?

09:56AM   12    A.    FROM THERANOS, RIGHT.

09:56AM   13    Q.    RIGHT.

09:56AM   14    A.    CORRECT.

09:56AM   15    Q.    ANOTHER WAY TO DO IT WOULD BE TO SHIFT SOME COSTS TO

09:56AM   16    THERANOS; RIGHT?

09:56AM   17    A.    OR TO REDUCE THE OVERALL COSTS.

09:56AM   18    Q.    RIGHT.  THOSE THREE WAYS ARE WAYS THAT YOU COULD DEAL WITH

09:56AM   19    THAT COST ISSUE; RIGHT?

09:56AM   20    A.    CORRECT.

09:56AM   21    Q.    AND BUSINESSES LIKE WALGREENS, AND YOU AS AN EXECUTIVE AT

09:56AM   22    WALGREENS AT THE TIME, YOU'RE ALWAYS THINKING ABOUT HOW TO DEAL

09:56AM   23    WITH COST ISSUES AND HOW TO PROVIDE GOOD SERVICE, BUT STILL AT

09:56AM   24    A COST THAT YOU COULD -- THAT MAKES SENSE FOR THE BUSINESS;

09:56AM   25    RIGHT?

09:56AM 1      A.    ABSOLUTELY.

09:56AM 2      Q.    AND THAT'S WHAT YOU ARE DOING HERE?

09:57AM 3      A.    YES.

09:57AM 4      Q.    OKAY.  AND THIS WAS, LIKE, STARTED A DISCUSSION THAT WENT

09:57AM 5      ON FOR MANY MONTHS ABOUT HOW THE CONTRACT BETWEEN WALGREENS AND

09:57AM 6      THERANOS MIGHT BE AMENDED; RIGHT?

09:57AM 7      A.    CORRECT.

09:57AM 8            SO IF I COULD JUST TOUCH ON THESE FOUR BUCKETS HERE, THE

09:57AM 9      SERVICE FEE; THE BUILD OUT MIX WAS THE TYPE OF BUILD OUT; AND

09:57AM 10     THE TRAINING, OF COURSE WHO WAS BEING TRAINED AND HOW; AND THEN

09:57AM 11     THE SLA'S WERE SERVICE LEVEL AGREEMENTS, SO METRICS THAT WE

09:57AM 12     WOULD CLEARLY DEFINE AS PART OF THE CONTRACT SO THERE WAS NO

09:57AM 13     AMBIGUITY AS TO WHAT WE WERE TRYING TO DRIVE TOWARDS.

09:57AM 14     Q.    OKAY.  AND SLA'S ARE SERVICE LEVEL AGREEMENTS?

09:57AM 15     A.    YES, SIR.

09:57AM 16     Q.    AND IN THE CONTRACT THAT EXISTED AT THE TIME, THERE WAS NO

09:57AM 17     SLA; CORRECT?

09:57AM 18     A.    CORRECT.

09:57AM 19     Q.    LET'S GO BACK TO THE EMAIL ON THE FIRST PAGE.

09:58AM 20           IN THE FIRST SENTENCE AFTER YOU SAY "HELLO SUNNY," YOU

09:58AM 21     WROTE, "FIRST, THANK YOU AGAIN FOR HANDLING THE GENENTECH

09:58AM 22     MEETING LAST WEEK -- MUCH APPRECIATED.  AS PROMISED, THE

09:58AM 23     FOLLOWING ARE THE ITEMS WE SHOULD CONTINUE TO DISCUSS TODAY."

09:58AM 24           DO YOU SEE THAT?

09:58AM 25     A.    YES, SIR.

09:58AM   1    Q.   AND GENENTECH IS A PHARMACEUTICAL COMPANY?

09:58AM   2    A.   CORRECT.

09:58AM   3    Q.   AND WALGREENS WAS IN DISCUSSION WITH GENENTECH ABOUT A

09:58AM   4    PROGRAM WITH GENENTECH; RIGHT?

09:58AM   5    A.   I DON'T REMEMBER THE SPECIFIC OF THE GENENTECH

09:58AM   6    DISCUSSIONS.

09:58AM   7    Q.   OKAY.  LET'S GO TO EXHIBIT 20566.

09:59AM   8         LET ME KNOW WHEN YOU GET THERE, MR. JHAVERI.

09:59AM   9    A.   YES.

09:59AM  10    Q.   THANK YOU.

09:59AM  11         DO YOU SEE ON THE FIRST PAGE OF EXHIBIT 20566 THERE'S AN

09:59AM  12    EMAIL FROM YOU TO MR. BALWANI?

09:59AM  13    A.   YES, SIR.

09:59AM  14    Q.   ON OCTOBER 21ST, 2014?

09:59AM  15    A.   YES.

09:59AM  16    Q.   AND THEN ON THE BOTTOM EMAIL IS AN EMAIL TO YOU FROM

09:59AM  17    ANOTHER COLLEAGUE AT WALGREENS NAMED JENNIFER LAPKIN; CORRECT?

09:59AM  18    A.   YES.

09:59AM  19              MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20566.

09:59AM  20              MR. SCHENK:  YOUR HONOR, RELEVANCE.

09:59AM  21              THE COURT:  ARE YOU OFFERING -- IT LOOKS LIKE IT'S

09:59AM  22    NINE PAGES.

09:59AM  23              MR. COOPERSMITH:  YES, YOUR HONOR.

10:00AM  24         (PAUSE IN PROCEEDINGS.)

10:00AM  25              THE COURT:  IS THIS RELATED TO RELATIONSHIPS WITH

10:01AM 1    OTHER LABORATORIES?

10:01AM 2            MR. COOPERSMITH:  NOT LABORATORIES, YOUR HONOR.

10:01AM 3        THE GOVERNMENT HAS PUT THE ISSUE OF PHARMACEUTICAL WORK

10:01AM 4    THAT WALGREENS MIGHT DO DIRECTLY AT ISSUE, AND THIS GOES TO

10:01AM 5    DISCUSSIONS AMONG THE VARIOUS BUSINESS PARTIES ABOUT MOVING

10:01AM 6    FORWARD WITH THE PHARMACEUTICAL PROGRAM.

10:01AM 7            THE COURT:  YOU WANT THAT IN?

10:01AM 8            MR. COOPERSMITH:  YES, YOUR HONOR.

10:01AM 9            THE COURT:  OKAY.  I'LL ADMIT IT.

10:01AM 10            MR. COOPERSMITH:  THANK YOU.

10:01AM 11        (DEFENDANT'S EXHIBIT 20566 WAS RECEIVED IN EVIDENCE.)

10:01AM 12    BY MR. COOPERSMITH:

10:01AM 13    Q.   OKAY.  MR. JHAVERI, NOW THAT WE HAVE THE EXHIBIT, LET'S

10:01AM 14    TAKE A LOOK AT IT.

10:01AM 15        SO IF WE GO TO PAGE 9, AND I THINK EVERYONE CAN SEE IT

10:01AM 16    NOW -- ACTUALLY LET'S START WITH PAGE 8, THE EARLIEST EMAIL IN

10:01AM 17    TIME.

10:01AM 18        THIS IS FROM SOMEBODY NAMED STEM KOMATHI.

10:01AM 19        DO YOU SEE THAT?

10:01AM 20    A.   I DO.

10:01AM 21    Q.   AND THIS WAS A PERSON AT GENENTECH; RIGHT?

10:01AM 22    A.   I DON'T KNOW.

10:01AM 23    Q.   YOU SEE THAT SHE HAS THIS GENE.COM EMAIL?

10:02AM 24    A.   CORRECT.

10:02AM 25    Q.   AND THEN SHE WRITES TO JENNIFER LAPKIN, "HI JENNIFER.

10:02AM  1        "I HOPE YOU ARE DOING WELL.  I AM BACK FROM SABBATICAL, I

10:02AM  2   WANT TO PICK UP ON OUR CONVERSATION ON HOW GENENTECH/ROCHE AND

10:02AM  3   WALGREENS CAN COLLABORATE ON THE CLINICAL TRIAL SPACE.  DO YOU

10:02AM  4   THINK WE SHOULD JUST PLAN AN EXPLORATORY WORKSHOP WHERE WE

10:02AM  5   BRING OUR TEAMS TOGETHER TO DISCUSS POSSIBILITIES?  OR MAYBE A

10:02AM  6   FIELD TRIP TO YOUR WALGREENS CLINIC IN PALO ALTO?"

10:02AM  7        AND IT GOES ON, "ON ANOTHER NOTE, WOULD YOU BE ABLE TO GET

10:02AM  8   MYSELF AND SEVERAL OTHER SENIOR LEADERS FROM GENENTECH AN INTRO

10:02AM  9   TO ELIZABETH HOLMES AND A VISIT TO THERANOS?"

10:02AM 10        DO YOU SEE THAT?

10:02AM 11   A.   YES, I DO.

10:02AM 12   Q.   AND RIGHT ABOVE THAT EMAIL MS. LAPKIN RESPONDS; RIGHT?

10:02AM 13   AND SHE TALKS ABOUT SPENDING THE MORNING POTENTIALLY IN

10:03AM 14   PALO ALTO AT THE FACILITY THAT SUPPORTS THERANOS; RIGHT?

10:03AM 15   A.   YES.

10:03AM 16   Q.   AND THAT WOULD BE THE PALO ALTO STORE THAT WE LOOKED AT A

10:03AM 17   FEW MINUTES AGO?

10:03AM 18   A.   CORRECT.

10:03AM 19   Q.   OKAY.  IF YOU GO TO PAGE 6 OF THE EXHIBIT, THERE'S AN

10:03AM 20   EMAIL FROM GERALD GLEESON ON AUGUST 26TH, 2014; RIGHT?

10:03AM 21   A.   YES.

10:03AM 22   Q.   DO YOU SEE THAT?

10:03AM 23   A.   YES.

10:03AM 24   Q.   AND HE HAS A SIGNATURE LINE; RIGHT?  AND IF YOU GO DOWN,

10:03AM 25   IT SAYS HE'S THE GROUP VICE PRESIDENT -- BIOPHARMACEUTICAL

10:03AM   1    DEVELOPMENT AND PAYER STRATEGY.

10:03AM   2         DO YOU SEE THAT?

10:03AM   3    A.   YES.

10:03AM   4    Q.   AND MR. GLEESON WROTE IN HIS EMAIL, "BRAD -- I KNOW YOU

10:03AM   5    AND NIM ARE PRIMARY IN THE OPERATING RELATIONSHIP WITH THERANOS

10:03AM   6    AND ELIZABETH HOLMES, TO THAT END ROCHE/GENENTECH IS VERY

10:04AM   7    INTERESTED IN WORKING WITH US TO COLLABORATE ON EXPLORING

10:04AM   8    POTENTIAL BUSINESS OPPORTUNITIES."

10:04AM   9         DO YOU SEE THAT?

10:04AM  10    A.   YES.

10:04AM  11    Q.   AND THEN THERE ARE VARIOUS SCHEDULING EMAILS BACK AND

10:04AM  12    FORTH.

10:04AM  13         THEN IF YOU GO TO THE TOP OF PAGE 2, YOU WROTE AN EMAIL TO

10:04AM  14    MS. LAPKIN.

10:04AM  15         DO YOU SEE THAT?

10:04AM  16    A.   YES, I DO.

10:04AM  17    Q.   AND YOU WROTE, "HI JENNIFER,

10:04AM  18         "WE HAVE AN EXECUTIVE MEETING IN ARIZONA ON OCTOBER 23/24.

10:04AM  19    LET ME SPEAK WITH SUNNY BALWANI, THEIR COO.  IT MAY BE

10:04AM  20    DIFFICULT TO MEET WITH ELIZABETH AS SHE IS ON THE ROAD QUITE A

10:04AM  21    BIT."

10:04AM  22         DO YOU SEE THAT?

10:04AM  23    A.   YES.

10:04AM  24    Q.   AND THEN IF YOU GO TO THE FIRST PAGE, YOU SEE THERE'S A

10:04AM  25    RESPONSE FROM MS. LAPKIN TO YOU?

10:04AM  1    A.   YES, SIR.

10:04AM  2    Q.   AND SHE WRITES, "HOPE ALL IS WELL.  AFTER MUCH NIGHTMARE

10:04AM  3    SCHEDULING CONFLICTS WE FINALLY HAVE A DATE FOR A TRIP OUT TO

10:05AM  4    GENENTECH."

10:05AM  5        DO YOU SEE THAT?

10:05AM  6    A.   YES.

10:05AM  7    Q.   AND GOING DOWN TO THE SECOND ONE.  "WE HAVEN'T LAID OUT

10:05AM  8    THE AGENDA YET BUT HOWIE WILL BE GIVING A CLINICAL TRIALS

10:05AM  9    OVERVIEW AND THEN WE'D LIKE TO SEE THE PALO ALTO STORE WITH

10:05AM 10    THERANOS.  CURIOUS, IS THIS STORE A W.E. FORMAT AS WELL?"

10:05AM 11        DO YOU SEE THAT?

10:05AM 12    A.   YES.

10:05AM 13    Q.   AND IT GOES ON.

10:05AM 14        DO YOU SEE THAT?

10:05AM 15    A.   YES.

10:05AM 16    Q.   AND THEN DO YOU REMEMBER THE LAST TIME WE MET,

10:05AM 17    MR. JHAVERI, WE LOOKED AT THE CONTRACT BETWEEN WALGREENS AND

10:05AM 18    THERANOS?

10:05AM 19    A.   YEAH, WE LOOKED AT SEVERAL.

10:05AM 20    Q.   WE LOOKED AT SEVERAL?

10:05AM 21    A.   YEAH.

10:05AM 22    Q.   AND IN THOSE CONTRACTS, IT HAD A CLAUSE THAT ONE THING

10:05AM 23    THAT COULD HAPPEN IN THE FUTURE WAS THAT PATIENTS INVOLVED WITH

10:05AM 24    CLINICAL TRIALS AT PHARMACEUTICAL COMPANIES COULD GO TO A

10:05AM 25    WALGREENS STORE AND GET THEIR BLOOD TESTED FOR WHATEVER TEST

10:05AM   1    THEY NEEDED AS PART OF THE CLINICAL TRIAL.

10:05AM   2         DO YOU REMEMBER THAT?

10:05AM   3    A.   YES.

10:05AM   4    Q.   OKAY.  AND THEN JUST TO FINISH THIS EMAIL, AT THE VERY

10:05AM   5    TOP, YOU SAY, "HI SUNNY -- WOULD YOU BE AVAILABLE DECEMBER 4TH?

10:06AM   6    THIS IS AN IMPORTANT MEETING WITH GENENTECH."

10:06AM   7         RIGHT?

10:06AM   8    A.   YES.

10:06AM   9    Q.   OKAY.  LET'S GO TO THE NEXT EXHIBIT, 20567.

10:06AM   10        AND LOOKING AT THAT EXHIBIT -- WELL, I'LL WAIT UNTIL YOU

10:06AM   11   GET THERE, MR. JHAVERI.

10:06AM   12   A.   YES, I HAVE IT.

10:06AM   13   Q.   OKAY.  AND YOU SEE THIS IS ANOTHER EMAIL STRING FROM EARLY

10:06AM   14   JANUARY 2015?

10:06AM   15   A.   YES.

10:06AM   16   Q.   AND IT'S AN EMAIL INTERNAL TO WALGREENS; RIGHT?

10:06AM   17   A.   YES, IT IS.

10:06AM   18   Q.   AND IT IS -- THE SUBJECT IS ABOUT THE GNE CLINICAL TRIALS

10:07AM   19   FOLLOW UP?

10:07AM   20   A.   YES.

10:07AM   21   Q.   AND SO WE'RE TALKING ABOUT THE SAME SUBJECT THAT WE JUST

10:07AM   22   DISCUSSED IN THE LAST EXHIBIT; RIGHT?

10:07AM   23   A.   THAT'S CORRECT.

10:07AM   24   Q.   OKAY.  AND YOU'RE DISCUSSING HOW TO GO ABOUT THIS WITH

10:07AM   25   SOME OF YOUR COLLEAGUES WITHIN WALGREENS; RIGHT?

| | | |
|---|---|---|
| 10:07AM | 1 | A.   YES, SIR. |
| 10:07AM | 2 | JUROR:  CAN WE TAKE A BREAK? |
| 10:07AM | 3 | THE COURT:  TAKE A BREAK? |
| 10:07AM | 4 | JUROR:  YES. |
| 10:07AM | 5 | THE COURT:  YES, LET'S DO THAT.  LET'S TAKE A BREAK |
| 10:07AM | 6 | OF ABOUT TEN MINUTES, PLEASE. |
| 10:07AM | 7 | MR. COOPERSMITH:  YES, YOUR HONOR. |
| 10:18AM | 8 | (RECESS FROM 10:17 A.M. UNTIL 10:22 A.M.) |
| 10:22AM | 9 | THE COURT:  WE'RE BACK ON THE RECORD.  THE JURY IS |
| 10:22AM | 10 | PRESENT.  THE WITNESS IS PRESENT. |
| 10:22AM | 11 | ALL COUNSEL AND MR. BALWANI ARE PRESENT. |
| 10:22AM | 12 | MR. COOPERSMITH. |
| 10:22AM | 13 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR. |
| 10:22AM | 14 | Q.   OKAY.  MR. JHAVERI, BEFORE THE BREAK WE WERE TALKING ABOUT |
| 10:22AM | 15 | EXHIBIT 20567. |
| 10:22AM | 16 | DO YOU STILL HAVE THAT? |
| 10:22AM | 17 | A.   I DO. |
| 10:22AM | 18 | Q.   THANK YOU. |
| 10:22AM | 19 | AND THIS IS ON THE SUBJECT OF GENENTECH? |
| 10:22AM | 20 | A.   THAT'S CORRECT. |
| 10:22AM | 21 | Q.   THE PHARMACEUTICAL COMPANY? |
| 10:22AM | 22 | A.   YES. |
| 10:22AM | 23 | Q.   AND THIS IS AN EMAIL STRING THAT YOU EXCHANGED WITH |
| 10:22AM | 24 | COLLEAGUES INSIDE OF WALGREENS ABOUT CLINICAL TRIAL WORK WITH |
| 10:23AM | 25 | THAT COMPANY? |

10:23AM 1     A.    THAT'S CORRECT.

10:23AM 2     Q.    AND INVOLVING THERANOS AS WELL POTENTIALLY?

10:23AM 3     A.    YES, SIR.

10:23AM 4     Q.    OKAY.  AND AGAIN, THIS IS EARLY JANUARY 2015?

10:23AM 5     A.    YES.

10:23AM 6           MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20567.

10:23AM 7           MR. SCHENK:  NO OBJECTION.

10:23AM 8           THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:23AM 9     (DEFENDANT'S EXHIBIT 20567 WAS RECEIVED IN EVIDENCE.)

10:23AM 10    BY MR. COOPERSMITH:

10:23AM 11    Q.    OKAY.  MR. JHAVERI, LET'S START FROM THE EARLIEST ONE ON

10:23AM 12    PAGE 2.

10:23AM 13          THIS IS JENNIFER GREEN WRITING TO A GROUP OF PEOPLE,

10:23AM 14    COPYING YOURSELF.

10:23AM 15          DO YOU SEE THAT?

10:23AM 16    A.    YES, SIR.

10:23AM 17    Q.    AND JENNIFER GREEN IS THE WALGREENS DIRECTOR OF NATIONAL

10:23AM 18    ACCOUNTS; IS THAT RIGHT?

10:23AM 19    A.    YES.

10:23AM 20    Q.    AND SHE WROTE, "TEAM,

10:23AM 21          "HOPE EVERYONE IS HAVING A WONDERFUL HOLIDAY WITH FAMILY

10:23AM 22    AND FRIENDS.  I WANTED TO SHARE A ROUGH DOCUMENT DAVID ZHANG

10:23AM 23    AND I HAVE BEEN WORKING ON OUTLINING THE MEETING AND OUR NEXT

10:23AM 24    STEPS FOR 2015."

10:23AM 25          DO YOU SEE THAT?

10:23AM  1      A.   YES.

10:24AM  2      Q.   AND SHE SAYS, "DAVID AND I WILL BE SETTING UP A CALL."

10:24AM  3           AND THEN THERE'S A RESPONSE FROM HOWARD GOLUB.  AM I

10:24AM  4      SAYING THAT RIGHT?

10:24AM  5      A.   GOLUB.

10:24AM  6      Q.   AND HE WRITES ON PAGE 1 ON JANUARY 2ND, "JEN,

10:24AM  7           "PLEASE FIND MY EDITS/COMMENTS.  I THINK THE ULTIMATE

10:24AM  8      OUTCOME OF THAT MEETING THAT BENEFITS US THE MOST SHOULD BE

10:24AM  9      THAT THEY SEND US REAL STUDY PROTOCOLS THAT ARE A GOOD MATCH

10:24AM 10      FOR US, AND FOR WHICH WE WOULD THEN SEND THEM BACK PROTOCOLS."

10:24AM 11           DO YOU SEE THAT?

10:24AM 12      A.   YES, SIR.

10:24AM 13      Q.   AND IF YOU GO TO THE NEXT PAGE, DR. GOLUB WRITES, "ANOTHER

10:24AM 14      ISSUE IS WHETHER THEY CAN WORK WITH THERANOS DIRECTLY WITHOUT

10:24AM 15      WAG?  I DON'T BELIEVE I GOT A GOOD ANSWER FOR THIS.  AS WE

10:24AM 16      DISCUSSED, IT WAS MY IMPRESSION THAT THEY WERE CONSIDERING THIS

10:24AM 17      DURING THE VISIT TO OUR STORE."

10:24AM 18           DO YOU SEE THAT?

10:24AM 19      A.   YES, SIR.

10:24AM 20      Q.   AND SO DO YOU UNDERSTAND THAT DR. GOLUB IS TALKING ABOUT

10:24AM 21      HOW GENENTECH, WHETHER THEY SHOULD BE WORKING DIRECTLY WITH

10:25AM 22      THERANOS OR INCLUDING WALGREENS AS WELL; CORRECT?

10:25AM 23      A.   CORRECT.

10:25AM 24      Q.   AND THEN YOU RESPONDED TO THAT EMAIL ALSO ON JANUARY 2ND.

10:25AM 25           DO YOU SEE THAT?

10:25AM  1    A.   YES.

10:25AM  2    Q.   AND YOU WROTE, "THANKS HOWARD.  WE SHOULD NOT HAVE

10:25AM  3    THERANOS AND GNE WORK WITHOUT US.  THERE IS A REVENUE STREAM

10:25AM  4    THAT WE WILL LOSE IF THE PATIENTS ARE NOT COMING TO THE STORES

10:25AM  5    FOR THE THERANOS SERVICE."

10:25AM  6         RIGHT?

10:25AM  7    A.   YES.

10:25AM  8    Q.   AND THEN MS. GREEN RESPONDS ABOVE THAT AND SAYS, "NIM --

10:25AM  9    CASEY SENT A GREAT EMAIL TO THE THERANOS TEAM INDICATING WE

10:25AM 10    NEEDED TO BE INCLUDED IN ANY DISCUSSIONS RIGHT AFTER THE

10:25AM 11    MEETING IN DECEMBER.  I ALSO HAVEN'T GIVEN THE GNE TEAM AND

10:25AM 12    DIRECT CONTACT INFORMATION FOR THERANOS."

10:25AM 13         DO YOU SEE THAT?

10:25AM 14    A.   YES, SIR.

10:25AM 15    Q.   SO WALGREENS WANTS TO MAKE SURE THAT IF THIS CLINICAL

10:25AM 16    TRIAL WORK FOR THIS COMPANY, GENENTECH, GOES FORWARD, THAT

10:26AM 17    WALGREENS IS NOT GOING TO BE SOMEHOW CUT OUT OF THE LOOP;

10:26AM 18    RIGHT?

10:26AM 19    A.   CORRECT.

10:26AM 20    Q.   AND THAT IF THERE'S A REVENUE STREAM FROM THE CLINICAL

10:26AM 21    TRIAL PATIENTS GETTING THEIR BLOOD TESTS, WALGREENS WAS GOING

10:26AM 22    TO CAPTURE SOME OF THAT FEE?

10:26AM 23    A.   THAT'S CORRECT.

10:26AM 24    Q.   OKAY.  AND THAT'S IN EARLY JANUARY '15; RIGHT?

10:26AM 25    A.   THAT IS.

10:26AM  1    Q.   OKAY.  AND LET'S CONTINUE ON THE SUBJECT OF PHARMACEUTICAL

10:26AM  2    COMPANIES.  LET'S GO TO 20568.

10:26AM  3         AND YOU SEE 20568 IS AN EMAIL BETWEEN CASEY KOZLOWSKI AND

10:26AM  4    JEFF BLICKMAN.

10:26AM  5         DO YOU SEE THAT?

10:26AM  6    A.   YES, SIR.

10:26AM  7    Q.   AND IT'S REGARDING A MEETING WITH ABBOTT?

10:26AM  8    A.   YES.

10:26AM  9    Q.   AND DO YOU UNDERSTAND THAT ABBOTT IS ANOTHER

10:26AM  10   PHARMACEUTICAL COMPANY?

10:26AM  11   A.   YES.

10:26AM  12   Q.   AND WE TALKED ABOUT MR. KOZLOWSKI THE LAST TIME WE WERE

10:26AM  13   HERE?

10:26AM  14   A.   MS. KOZLOWSKI.

10:26AM  15   Q.   MS. KOZLOWSKI, I'M SORRY.

10:27AM  16        WELL, WE TALKED ABOUT HER THE LAST TIME; RIGHT?

10:27AM  17        AND SHE WAS SOMEONE WHO WORKED FOR YOU ON THE

10:27AM  18   THERANOS-WALGREENS PROJECT; RIGHT?

10:27AM  19   A.   CORRECT.  SHE REPORTED TO ME AND WAS DIRECTLY RESPONSIBLE

10:27AM  20   FOR THE OPERATIONS OF THERANOS.

10:27AM  21   Q.   OKAY.  AND IN THIS CASE SHE'S SENDING AN EMAIL TO

10:27AM  22   MR. BLICKMAN; RIGHT?

10:27AM  23   A.   YES, SIR.

10:27AM  24   Q.   AND DURING THIS TIME, THERE WERE LOTS OF EMAILS EXCHANGED

10:27AM  25   BETWEEN PEOPLE WHO WORKED FOR YOU, LIKE CASEY KOZLOWSKI, AND

10:27AM  1    PEOPLE AT THERANOS, LIKE MR. BLICKMAN; RIGHT?

10:27AM  2    A.   CORRECT.

10:27AM  3    Q.   AND AT THE TIME THERE WAS THIS ONGOING RELATIONSHIP ON

10:27AM  4    BUILDING OUT STORES; RIGHT?

10:27AM  5    A.   CORRECT.  AT THIS POINT IN TIME WE, YOU KNOW, HAD HAD A

10:27AM  6    PARTNERSHIP THAT WE WERE CONTINUING TO BUILD OUT AND THE ENTIRE

10:27AM  7    THERANOS OPERATION.

10:27AM  8    Q.   OKAY.

10:27AM  9         YOUR HONOR, WE OFFER EXHIBIT 20568.

10:27AM  10             MR. SCHENK:  NO OBJECTION.

10:27AM  11             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:27AM  12    (DEFENDANT'S EXHIBIT 20568 WAS RECEIVED IN EVIDENCE.)

10:27AM  13    BY MR. COOPERSMITH:

10:27AM  14    Q.   AND THIS EMAIL FROM MS. KOZLOWSKI TO MR. BLICKMAN IS

10:28AM  15    JANUARY 30TH, 2015.

10:28AM  16         DO YOU SEE THAT?

10:28AM  17    A.   YES, SIR.

10:28AM  18    Q.   AND AGAIN THE SUBJECT IS MEETING WITH ABBOTT.

10:28AM  19         AND SHE WROTE, "HI JEFF,

10:28AM  20         "I KNOW YOU PARTICIPATED IN THE GENENTECH MEETING A WHILE

10:28AM  21    BACK.  THERE'S ANOTHER ONE COMING UP (DATE TO BE DETERMINED),

10:28AM  22    AS WELL AS ONE WITH ABBOTT ON FEBRUARY 13TH TO TALK ABOUT USING

10:28AM  23    THERANOS STORES FOR A TEST TRIAL."

10:28AM  24         DO YOU SEE THAT?

10:28AM  25    A.   YES.

10:28AM  1   Q.   "WOULD THOSE BE MEETINGS YOU WOULD LIKE TO ATTEND OR WOULD

10:28AM  2   IT BE SOMEONE ELSE FROM THE THERANOS TEAM?"

10:28AM  3        DO YOU SEE THAT?

10:28AM  4   A.   YES.

10:28AM  5   Q.   AND SO THIS IS TRYING TO GET ANOTHER MEETING GOING WITH

10:28AM  6   REGARD TO MORE CLINICAL TRIAL WORK, THIS TIME WITH A DIFFERENT

10:28AM  7   COMPANY CALLED ABBOTT; CORRECT?

10:28AM  8   A.   JUST TO HELP EVERYONE UNDERSTAND, AT WALGREENS WE'RE

10:28AM  9   CONTINUALLY WORKING WITH MANUFACTURERS, PHARMA COMPANIES, AND

10:28AM  10  NOT ONLY BECAUSE WE PURCHASE MEDICATION FROM THEM, BUT ALSO

10:28AM  11  WE'RE TRYING TO FIGURE OUT HOW WE CAN WORK MORE CLOSELY WITH

10:28AM  12  THEM IN PARTNERSHIP FOR BETTER PATIENT CARE.

10:28AM  13       SO IN THIS PARTICULAR INSTANCE, IT'S WITH ABBOTT, AND THE

10:29AM  14  TEAM THAT OVERSEES THIS IS THAT BIOPHARMACEUTICAL TEAM THAT WE

10:29AM  15  REFERRED TO BEFORE.

10:29AM  16       BUT THESE WERE DISCUSSIONS THAT WERE ONGOING WITH

10:29AM  17  DIFFERENT MANUFACTURERS, AND IN THIS CASE GENENTECH, ABBOTT,

10:29AM  18  AND IN THOSE DISCUSSIONS THE THERANOS PROJECT HAS BEEN

10:29AM  19  DISCUSSED.

10:29AM  20  Q.   OKAY.  THANK YOU.

10:29AM  21       YOUR HONOR, I HAVE ANOTHER EXHIBIT AGAIN ON THE SAME

10:29AM  22  TOPIC, BUT I DON'T KNOW IF IT'S IN THE BINDERS, SO CAN I HAND

10:29AM  23  IT UP AND ALSO APPROACH THE WITNESS?

10:29AM  24            THE COURT:  SURE.

10:29AM  25       WHAT NUMBER IS IT?

```
10:29AM   1            MR. COOPERSMITH:  OH, SORRY, YOUR HONOR.  IT'S

10:29AM   2     20542.

10:29AM   3            (HANDING.)

10:30AM   4     Q.   OKAY.  MR. JHAVERI, LOOKING AT THE EXHIBIT THAT I'VE JUST

10:30AM   5     HANDED YOU, EXHIBIT 20542, DO YOU SEE THIS IS AN EMAIL STRING

10:30AM   6     FROM FEBRUARY OF 2015?

10:30AM   7     A.   YES.

10:30AM   8     Q.   AND AT THE VERY FIRST EMAIL ON THE FIRST PAGE, THE EMAIL

10:30AM   9     IS ACTUALLY A MEETING INVITE, AND IT GOES TO SOMEONE NAMED

10:30AM  10     CHRISTIAN HOLMES.

10:30AM  11            DO YOU SEE THAT?

10:30AM  12     A.   YES, I DO.

10:30AM  13     Q.   AND YOU KNOW WHO MR. HOLMES WAS; RIGHT?

10:30AM  14     A.   YES.

10:30AM  15     Q.   HE WORKED AT THERANOS?

10:30AM  16     A.   CORRECT.

10:30AM  17     Q.   AND HE WAS INVOLVED, ALONG WITH OTHERS, IN THE

10:30AM  18     THERANOS-WALGREENS RELATIONSHIP; RIGHT?

10:30AM  19     A.   YES.

10:30AM  20     Q.   AND THEN IF WE GO TO THE EMAIL BELOW THAT, WE SEE

10:30AM  21     MR. BLICKMAN AGAIN; RIGHT?

10:30AM  22     A.   YES, I DO.

10:30AM  23     Q.   AND ANOTHER PERSON WHO WE DISCUSSED WAS INVOLVED IN THAT

10:31AM  24     SAME RELATIONSHIP; RIGHT?

10:31AM  25     A.   I'M SORRY.  WHO ARE YOU REFERRING TO?
```

| | | |
|---|---|---|
| 10:31AM | 1 | Q.   OH, IT'S THE SECOND EMAIL ON THE FIRST PAGE, MR. JHAVERI. |
| 10:31AM | 2 | A.   OKAY. |
| 10:31AM | 3 | Q.   DO YOU SEE MR. BLICKMAN'S NAME THERE? |
| 10:31AM | 4 | A.   YES, I DO. |
| 10:31AM | 5 | Q.   AND THAT'S ANOTHER PERSON WHO YOU UNDERSTAND WORKED AT |
| 10:31AM | 6 | THERANOS AND WAS INVOLVED WITH THIS RELATIONSHIP; RIGHT? |
| 10:31AM | 7 | A.   YES. |
| 10:31AM | 8 | Q.   AND THEN THERE'S OTHER PEOPLE FROM WALGREENS SUCH AS |
| 10:31AM | 9 | ANTHONY BROGNO. |
| 10:31AM | 10 | DO YOU SEE THAT? |
| 10:31AM | 11 | A.   YES, I DO. |
| 10:31AM | 12 | Q.   AND MR. BROGNO WAS A CLINICAL RESEARCH MANAGER AT |
| 10:31AM | 13 | WALGREENS? |
| 10:31AM | 14 | A.   YES. |
| 10:31AM | 15 | Q.   AND THIS RELATES TO ANOTHER OPPORTUNITY INVOLVING PFIZER; |
| 10:31AM | 16 | CORRECT? |
| 10:31AM | 17 | A.   YES, IT DOES. |
| 10:31AM | 18 | MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20542. |
| 10:31AM | 19 | MR. SCHENK:  YOUR HONOR, OBJECTION.  HEARSAY. |
| 10:31AM | 20 | I DON'T THINK THIS IS A BUSINESS RECORD, AND THE |
| 10:31AM | 21 | FEBRUARY 9TH EMAIL, THE BOTTOM ONE ON THE FIRST PAGE CONTAINS |
| 10:31AM | 22 | ADDITIONAL HEARSAY. |
| 10:31AM | 23 | THE COURT:  DID YOU WANT TO REDACT THIS OR -- |
| 10:32AM | 24 | MR. COOPERSMITH:  WELL, YOUR HONOR, I'D LIKE TO |
| 10:32AM | 25 | OFFER IT AS AN 803(6) BUSINESS RECORD.  IT GOES AMONG PEOPLE |

10:32AM  1    INVOLVED IN THIS PARTNERSHIP.

10:32AM  2              THE COURT:  WELL, WHY DON'T YOU LAY A FOUNDATION IF

10:32AM  3    YOU CAN.

10:32AM  4              MR. COOPERSMITH:  I CAN DO THAT, YOUR HONOR.  I'LL

10:32AM  5    TRY.  THANK YOU.

10:32AM  6    Q.   OKAY.  SO, MR. JHAVERI, AS WE'VE DISCUSSED, IN THIS TIME

10:32AM  7    PERIOD, IN THIS CASE FEBRUARY 2015, THERE'S AN ONGOING

10:32AM  8    PARTNERSHIP BETWEEN WALGREENS AND THERANOS; CORRECT?

10:32AM  9    A.   YES.

10:32AM 10    Q.   AND IN THE COURSE OF THAT PARTNERSHIP, THERE WERE A LOT OF

10:32AM 11    EMAILS EXCHANGED AMONG DIFFERENT PEOPLE TO TRY TO MOVE THE

10:32AM 12    PROJECT FORWARD; CORRECT?

10:32AM 13    A.   YES.

10:32AM 14    Q.   AND WHEN OPPORTUNITIES AROSE IN CONNECTION WITH THINGS

10:32AM 15    RELEVANT TO THE PARTNERSHIP, INFORMATION ABOUT THAT OPPORTUNITY

10:32AM 16    MIGHT BE TRANSMITTED BY EMAIL; CORRECT?

10:32AM 17    A.   YES.

10:32AM 18    Q.   AND IN THIS CASE THAT'S WHAT WAS GOING ON; RIGHT?

10:32AM 19    A.   YES.

10:32AM 20    Q.   AND IN THOSE DISCUSSIONS FROM -- WELL, IN THOSE

10:32AM 21    DISCUSSIONS, IT WAS IMPORTANT, AS YOU UNDERSTOOD IT, FOR

10:33AM 22    EVERYONE TO BE ACCURATE AS THEY COULD BE, TO CONVEY INFORMATION

10:33AM 23    SO THAT PEOPLE COULD ACT ON IT IF APPROPRIATE?

10:33AM 24    A.   THAT'S CORRECT.

10:33AM 25    Q.   AND THE EMAILS WERE STORED IN THE NORMAL COURSE SO THAT IF

10:33AM  1    ANYONE NEEDED TO REFER TO SOMETHING THAT WAS INCLUDED IN AN

10:33AM  2    EMAIL, SUCH AS THE ONE THAT WE'RE LOOKING AT, THAT COULD BE

10:33AM  3    DONE; CORRECT?

10:33AM  4    A.   YES.

10:33AM  5              MR. COOPERSMITH:  YOUR HONOR, AGAIN, WE OFFER 20542.

10:33AM  6              MR. SCHENK:  YOUR HONOR, SAME OBJECTION.

10:33AM  7         THERE'S A THIRD PARTY ON THIS CHAIN AND THERE ARE

10:33AM  8    REPRESENTATIONS ABOUT THE THIRD PARTY ON THIS CHAIN.  THAT IS

10:33AM  9    NOT PART OF THE BUSINESS RECORDS FOUNDATION THAT MR. JHAVERI

10:33AM 10    CAN LAY.

10:33AM 11              MR. COOPERSMITH:  YOUR HONOR, THERE'S BEEN NUMEROUS,

10:33AM 12    NUMEROUS EXHIBITS ADMITTED DURING THIS TRIAL WITH THIRD

10:33AM 13    PARTIES, OVER OBJECTION OR WITHOUT OBJECTION.

10:33AM 14         I'M NOT SURE I UNDERSTAND THAT OBJECTION AT ALL, AND WE

10:33AM 15    WOULD --

10:33AM 16              THE COURT:  WELL, LET ME ASK THIS QUESTION:  YOU

10:33AM 17    ASKED THIS WITNESS REGARDING THE COMMUNICATIONS BETWEEN

10:33AM 18    THERANOS AND WALGREENS, AND THIS IS NOT RELATED TO THAT

10:34AM 19    RELATIONSHIP, IS IT?

10:34AM 20              MR. COOPERSMITH:  I CAN ASK HIM THAT QUESTION,

10:34AM 21    YOUR HONOR, IF THAT WOULD HELP.

10:34AM 22         I THINK IT IS.

10:34AM 23              THE COURT:  WELL, IN YOUR PREFACE, YOU SAID -- YOU

10:34AM 24    TALKED WITH THE WITNESS ABOUT THE ONGOING RELATIONSHIP.

10:34AM 25         THIS SEEMS TO SPEAK OF A RELATIONSHIP WITH ANOTHER

10:34AM 1    COMPANY.

10:34AM 2            MR. COOPERSMITH:  YOUR HONOR, I THINK IT'S NO

10:34AM 3    DIFFERENT THAN THE ABBOTT AND GENENTECH SITUATIONS, BUT I THINK

10:34AM 4    I CAN ASK A FEW MORE QUESTIONS.

10:34AM 5            THE COURT:  SURE.  WHY DON'T YOU?  WHY DON'T YOU?

10:34AM 6            MR. COOPERSMITH:  SURE, YOUR HONOR.  I'M HAPPY TO.

10:34AM 7    Q.   MR. JHAVERI, I THINK WE TALKED EARLIER, AND EVEN THE LAST

10:34AM 8    TIME WE MET TWO WEEKS AGO, ABOUT THE CONTRACTS BETWEEN

10:34AM 9    WALGREENS AND THERANOS; RIGHT?

10:34AM 10   A.   YES.

10:34AM 11   Q.   AND ONE OF THE THINGS IN THE CONTRACT, AS WE'VE DISCUSSED,

10:34AM 12   WAS THIS POSSIBILITY THAT CLINICAL TRIAL PATIENTS COULD HAVE

10:34AM 13   THEIR BLOOD TESTED AT THERANOS STORES THAT WERE -- OR WALGREENS

10:34AM 14   STORES THAT HAD THERANOS COLLECTION SITES; RIGHT?

10:35AM 15   A.   CORRECT.

10:35AM 16   Q.   AND THAT WAS ANOTHER, AS WE SAW IN THE EXHIBIT THAT WAS

10:35AM 17   PREVIOUSLY ADMITTED, THAT WAS ANOTHER POTENTIAL REVENUE

10:35AM 18   OPPORTUNITY; CORRECT?

10:35AM 19   A.   YES.

10:35AM 20   Q.   FOR WALGREENS?

10:35AM 21   A.   YES.

10:35AM 22   Q.   AND FOR THERANOS?

10:35AM 23   A.   CORRECT.

10:35AM 24   Q.   AND THAT WHEN OPPORTUNITIES AROSE WITH COMPANIES LIKE

10:35AM 25   PFIZER THAT MIGHT NEED TO DO CLINICAL TRIAL WORK USING THIS

10:35AM  1    SERVICE, THAT WOULD BE OF INTEREST TO THE PARTNERSHIP; RIGHT?

10:35AM  2    A.   YES.  IF WE HAD DISCUSSIONS WITH A PHARMACEUTICAL COMPANY,

10:35AM  3    OR ANY PARTNER FOR THAT MATTER, OTHER THAN THERANOS, AND THERE

10:35AM  4    WAS AN OPPORTUNITY FOR ALL OF US TO WORK TOGETHER, WHATEVER

10:35AM  5    THAT COULD BE, IN THIS CASE CLINICAL TRIAL, CERTAINLY WE WOULD

10:35AM  6    MAKE THAT INTRODUCTION AND HAVE THAT DISCUSSION TO SEE IF

10:35AM  7    THERE'S AN OPPORTUNITY.

10:35AM  8    Q.   RIGHT.  AND IN THIS CASE, LOOKING AT EXHIBIT 20542, THIS

10:35AM  9    IS ONE OF THOSE OPPORTUNITIES, IT HAPPENS TO BE WITH PFIZER,

10:35AM  10   WHERE WALGREENS IS BRINGING THIS TO THE ATTENTION OF THERANOS

10:35AM  11   TO SEE THERE IS AN OPPORTUNITY FOR THERANOS AND WALGREENS TO

10:35AM  12   GET INVOLVED WITH A PFIZER PROJECT; CORRECT?

10:35AM  13   A.   CORRECT.  WHAT THIS IS IN REFERENCE TO IS, YOU KNOW, IS

10:36AM  14   THERE A POSSIBILITY FOR PFIZER, THERANOS, AND WALGREENS

10:36AM  15   REPRESENTATIVES TO WHITE BOARD, TO BRAINSTORM, SEE IF THERE WAS

10:36AM  16   AN IDEA THAT POTENTIALLY WE CAN DO TOGETHER, AND THAT'S WHAT

10:36AM  17   THIS IS IN REFERENCE TO.

10:36AM  18   Q.   OKAY.  AND PART OF THE EMAIL THAT WE'RE LOOKING AT, 20542,

10:36AM  19   IS IF THERE WAS INFORMATION COMING FROM PFIZER IN THE COURSE OF

10:36AM  20   THE BUSINESS RELATIONSHIP WITH THERANOS, WALGREENS WOULD WANT

10:36AM  21   TO PASS THAT INFORMATION ON TO THERANOS SO THAT WALGREENS AND

10:36AM  22   THERANOS COULD DISCUSS HOW BEST TO PROCEED, IF AT ALL; RIGHT?

10:36AM  23   A.   YES.

10:36AM  24        JUST, AGAIN, TO REEXPLAIN.

10:36AM  25        ANTHONY BROGNO WAS PART OF THE PHARMACEUTICAL,

10:36AM 1    BIOPHARMACEUTICAL TEAM THAT INTERACTS WITH PHARMACEUTICAL

10:36AM 2    COMPANIES ON A DAILY BASIS.

10:36AM 3         AND IN THOSE DISCUSSIONS, IF THERE WAS AN OPPORTUNITY TO

10:36AM 4    WORK WITH OTHER PARTS OF WALGREENS WITH OTHER PARTNERS THAT WE

10:36AM 5    HAVE, THEY WOULD BRING IT TO THE APPROPRIATE INDIVIDUAL'S

10:36AM 6    ATTENTION.

10:36AM 7         AND SO THAT'S WHAT THIS IS IN REFERENCE TO.

10:37AM 8    Q.   OKAY.  THANK YOU.

10:37AM 9         AND YOU KNOW MR. BROGNO, IN THE COURSE OF HIS DUTIES, HE

10:37AM 10   WOULD HAVE TO INTERACT FREQUENTLY WITH PHARMACEUTICAL

10:37AM 11   COMPANIES; CORRECT?

10:37AM 12   A.   WHATEVER IS IN HIS RESPONSIBILITIES, CORRECT.

10:37AM 13   Q.   RIGHT.  AND JUST LIKE PERHAPS EVERYONE ELSE IN THE MODERN

10:37AM 14   WORLD, HE WOULD DO THAT OFTEN BY EMAIL; RIGHT?

10:37AM 15   A.   YES.

10:37AM 16   Q.   AND THIS IS ONE EXAMPLE OF HIM SENDING AN EMAIL; RIGHT?

10:37AM 17   A.   CORRECT.

10:37AM 18   Q.   AND THAT IT'S ALSO -- WHEN -- YOU UNDERSTAND THAT WHEN

10:37AM 19   ANYBODY AT WALGREENS WHO HAS A JOB TO DO, IN THIS CASE

10:37AM 20   MR. BROGNO INTERACTING WITH PHARMACEUTICAL COMPANIES, THEY

10:37AM 21   WOULD NEED TO BE AS ACCURATE AS THEY CAN BE IN THEIR BUSINESS

10:37AM 22   DEALINGS SO THAT THEY COULD MAKE SURE THAT PEOPLE ACT ON

10:37AM 23   ACCURATE INFORMATION AS OPPOSED TO SOMETHING ELSE; RIGHT?

10:37AM 24   A.   I WOULD CERTAINLY HOPE SO, YES.

10:37AM 25   Q.   AND THESE RECORDS ARE MAINTAINED AT WALGREENS SO THAT

10:37AM  1    PEOPLE CAN REFER BACK TO IT IF NECESSARY; RIGHT?

10:38AM  2    A.   IN REFERENCE TO THE EMAILS, CORRECT.

10:38AM  3              MR. COOPERSMITH:  YOUR HONOR, AGAIN, WE OFFER 20542.

10:38AM  4              MR. SCHENK:  SAME HEARSAY OBJECTION.

10:38AM  5              THE COURT:  I'LL ALLOW THIS TO COME IN OVER

10:38AM  6    OBJECTION.

10:38AM  7         IT'S ADMITTED, AND IT MAY BE PUBLISHED.

10:38AM  8         (DEFENDANT'S EXHIBIT 20542 WAS RECEIVED IN EVIDENCE.)

10:38AM  9    BY MR. COOPERSMITH:

10:38AM  10   Q.   OKAY.  MR. JHAVERI, LET'S START WITH THE EARLIEST ONE IN

10:38AM  11   TIME, WHICH I THINK APPEARS ON PAGE 2.

10:38AM  12        YOU SEE THAT THIS IS AN EMAIL FROM MAYA HARDIGAN AT

10:38AM  13   PFIZER; IS THAT RIGHT?

10:38AM  14   A.   YES.

10:38AM  15   Q.   AND IT'S DATED JANUARY 22ND, 2015; RIGHT?

10:38AM  16   A.   YES.

10:38AM  17   Q.   AND SHE INCLUDES A NUMBER OF PEOPLE ON THE EMAIL, AND ONE

10:38AM  18   OF THEM, I THINK IT'S THE LAST PERSON ON THE TO LINE, IS

10:38AM  19   CASEY KOZLOWSKI.

10:38AM  20        DO YOU SEE THAT?

10:38AM  21   A.   YES, I DO.

10:38AM  22   Q.   AND THAT'S THE PERSON THAT WORKED FOR YOU THAT WE

10:38AM  23   DISCUSSED EARLIER; RIGHT?

10:39AM  24   A.   YES.

10:39AM  25   Q.   AND THEN IF YOU GO -- DO YOU SEE THE NAME CRAIG LIPSET?

10:39AM   1      A.   YES.

10:39AM   2      Q.   AND DO YOU SEE ANYWHERE ON THIS EMAIL THE NAME

10:39AM   3      SHANE WEBER?

10:39AM   4      A.   ONE SECOND.  I'M JUST REVIEWING IT.

10:39AM   5      Q.   SURE.

10:39AM   6           (PAUSE IN PROCEEDINGS.)

10:39AM   7                THE WITNESS:  I DO NOT.

10:39AM   8      BY MR. COOPERSMITH:

10:39AM   9      Q.   OKAY.  IF YOU GO TO THE SUBJECT OF THE EMAIL, THE SUBJECT

10:39AM   10     IS WALGREENS/PFIZER WHITE BOARD SESSION.

10:39AM   11          DO YOU SEE THAT?

10:39AM   12     A.   YES, I DO.

10:39AM   13     Q.   AND WHAT WE'RE LOOKING AT IS ONE OF THESE CALENDAR NOTICES

10:39AM   14     OR MEETING NOTICES; RIGHT?

10:39AM   15     A.   YES, CORRECT.

10:39AM   16     Q.   AND IT SAYS, "DEAR ALL,

10:39AM   17          "I AM HOLDING THIS TIME FOR A PFIZER/WALGREENS/THERANOS

10:40AM   18     WHITE BOARD SESSION, TO FOCUS ON THE FOLLOWING TOPICS."

10:40AM   19          DO YOU SEE THAT?

10:40AM   20     A.   I DO.

10:40AM   21     Q.   AND THIS IS COMING FROM MS. HARDIGAN, WHO IS SOMEONE WHO

10:40AM   22     WORKS FOR PFIZER; CORRECT?

10:40AM   23     A.   CORRECT, AT THAT TIME.

10:40AM   24     Q.   RIGHT.  AND SHE HAS SOME BULLET POINTS UNDER THAT, AND THE

10:40AM   25     FIRST ONE SAYS, "REVIEWING PFIZER'S PROPOSED SCOPE AND MODEL

10:40AM  1    FOR THE WALGREENS PILOT."

10:40AM  2         DO YOU SEE THAT?

10:40AM  3    A.   YES.

10:40AM  4    Q.   "MAPPING A PATIENT FLOW AGAINST THE PILOT STRUCTURE."

10:40AM  5         AND THEN, "FURTHER UNDERSTANDING WALGREENS'S CAPABILITIES

10:40AM  6    AGAINST DESIRED PATIENT FLOW (EG, WHAT ABILITY DOES WALGREENS

10:40AM  7    HAVE TO PULL BACK PATIENT MEDICAL HISTORIES TO VALIDATE

10:40AM  8    INCLUSION CRITERIA," AND THEN IT GOES ON.

10:40AM  9         DO YOU SEE THAT?

10:40AM 10    A.   YES, I DO.

10:40AM 11    Q.   AND THEN THE LAST ONE IS, "BRAINSTORM OF KEY METRICS TO BE

10:40AM 12    CAPTURED AND MEASURED -- AS A BASIS FOR COMPARISON TO OUR

10:40AM 13    TRADITIONAL CLINIC-BASED STUDY APPROACH."

10:41AM 14         DO YOU SEE THAT?

10:41AM 15    A.   YES, I DO.

10:41AM 16    Q.   AND SO THIS IS A MEETING NOTICE.  IT DISCUSSES THE IDEA OF

10:41AM 17    DOING SOME CLINICAL TRIAL STUDY WORK USING THE

10:41AM 18    THERANOS-WALGREENS SERVICES; RIGHT?

10:41AM 19    A.   THAT'S WHAT IT SEEMS LIKE, YES.

10:41AM 20    Q.   RIGHT.  AND IF YOU GO TO THE FIRST PAGE, YOU SEE THAT

10:41AM 21    THERE'S A -- I'M SORRY.

10:41AM 22         I JUST WANT TO CORRECT SOMETHING BECAUSE I MISREAD IT.  I

10:41AM 23    DON'T WANT TO BE INACCURATE IN ANY WAY.

10:41AM 24         DO YOU SEE ON PAGE 2, GOING BACK TO THAT, DO YOU SEE THAT

10:41AM 25    MS. HARDIGAN, MAYA HARDIGAN, DO YOU SEE THAT?

10:41AM  1    A.   YES.

10:41AM  2    Q.   AND SHE HAS AN EMAIL ADDRESS THAT SAYS MAIL TO:

10:41AM  3    MAYADHARDIGAN@PFIZER.COM?

10:41AM  4    A.   YES.

10:41AM  5    Q.   OKAY.  AND IF YOU GO TO THE FIRST PAGE, IT SAYS FROM

10:42AM  6    ANTHONYBROGNO@WALGREENS.COM; RIGHT?

10:42AM  7    A.   THAT'S CORRECT.

10:42AM  8    Q.   OKAY.  AND THEN IT SAYS, THOUGH, ON BEHALF OF HARDIGAN,

10:42AM  9    MAYA; RIGHT?

10:42AM  10   A.   CORRECT.

10:42AM  11   Q.   AND MAYBE THERE'S NO EXPLANATION HERE, BUT MR. BROGNO

10:42AM  12   WORKS AT WALGREENS; RIGHT?

10:42AM  13   A.   YES.

10:42AM  14   Q.   BUT MS. HARDIGAN WORKS AT PFIZER?

10:42AM  15   A.   THAT'S CORRECT.

10:42AM  16   Q.   OKAY.

10:42AM  17   A.   THIS IS ACTUALLY, JUST TO CLARIFY, IT'S A FORWARD OF THE

10:42AM  18   INVITE, WHICH IS WHY IT READS THAT WAY.

10:42AM  19   Q.   I SEE.  OKAY.  THANK YOU FOR CLARIFYING THAT.

10:42AM  20        AND THEN YOU GO DOWN BELOW THAT AND MR. BROGNO WRITES, "HI

10:42AM  21   JEFF,

10:42AM  22        "ALLOW ME TO INTRODUCE MYSELF.  MY NAME IS ANTHONY BROGNO,

10:42AM  23   I AM A CLINICAL RESEARCH MANAGER WITH WALGREENS.  I'VE WORKED

10:42AM  24   CLOSELY WITH CASEY KOZLOWSKI WHILE IMPLEMENTING CLINICAL TRIALS

10:42AM  25   WITHIN OUR STORES.  FRIDAY, FEBRUARY 13TH, WALGREENS AND PFIZER

10:42AM   1    ARE MEETING FACE-TO-FACE TO DISCUSS POTENTIAL OPPORTUNITIES TO

10:43AM   2    COLLABORATE AND BRING CLINICAL TRIALS TO OUR STORES."

10:43AM   3        DO YOU SEE THAT?

10:43AM   4    A.   YES, SIR.

10:43AM   5    Q.   AND THEN IF YOU GO ON TO THE NEXT PARAGRAPH, THE SECOND

10:43AM   6    SENTENCE READS, "THEY" MEANING PFIZER "ARE VERY INTERESTED IN

10:43AM   7    THE THERANOS TECHNOLOGY AND WOULD LIKE FOR YOU TO JOIN TO

10:43AM   8    PROVIDE SOME INSIGHT TO THE TECHNOLOGY/ABILITY TO UTILIZE THE

10:43AM   9    TECHNOLOGY FOR THIS TRIAL."

10:43AM   10        DO YOU SEE THAT?

10:43AM   11   A.   YES.

10:43AM   12   Q.   AND THAT'S MR. BROGNO REPORTING TO THERANOS ABOUT PFIZER'S

10:43AM   13   INTEREST; CORRECT?

10:43AM   14   A.   YES.

10:43AM   15   Q.   OKAY.  OKAY.  LET'S RETURN TO THE EXHIBIT WHERE WE

10:43AM   16   STARTED, WHICH IS 2275, GOING BACK TO THE ONGOING PARTNERSHIP

10:43AM   17   WITH THERANOS AND WALGREENS.

10:44AM   18        OKAY.  I THINK WE'RE ABOUT DONE WITH THIS EXHIBIT, BUT I

10:44AM   19   JUST WANT TO NOTE THAT THE REFERENCE TO GENENTECH IN THE FIRST

10:44AM   20   SENTENCE, THAT HAS TO DO WITH THE DISCUSSION THAT WE HAVE JUST

10:44AM   21   GONE THROUGH ABOUT THESE PHARMACEUTICAL TRIALS; RIGHT?

10:44AM   22   A.   YES.

10:44AM   23   Q.   AND THIS WAS AN EMAIL THAT YOU WERE SENDING TO MR. BALWANI

10:44AM   24   IN DECEMBER OF 2014; RIGHT?

10:44AM   25   A.   YES.

10:44AM   1    Q.   OKAY.  LET'S GO TO ANOTHER ISSUE THAT WE TALKED ABOUT

10:44AM   2    EARLIER, AND THAT WAS -- THERE WAS, AS WE DISCUSSED, IN THIS

10:44AM   3    FALL OF 2014 TIME PERIOD, A DISCUSSION THAT WAS BEGINNING TO

10:44AM   4    CHANGE THE BUSINESS MODEL TO SOME EXTENT BETWEEN WALGREENS AND

10:44AM   5    THERANOS; RIGHT?

10:44AM   6    A.   AROUND WHICH TIMEFRAME?

10:44AM   7    Q.   AROUND THE FALL OF '14.

10:44AM   8    A.   AROUND THE FALL OF '14, YES.

10:44AM   9         AGAIN, AS WE WERE LEARNING MORE AND WE WERE CONTINUING TO

10:44AM  10    LEARN MORE THROUGHOUT THIS PILOT, WE PIVOTED, WE CHANGED, WE

10:45AM  11    IMPROVED, AND THAT'S WHAT WE WERE DOING, WE WERE CONSTANTLY

10:45AM  12    DOING THAT.

10:45AM  13    Q.   RIGHT.  AND DO YOU REMEMBER WE LOOKED AT A DOCUMENT

10:45AM  14    EARLIER WHERE ONE WAY THAT WALGREENS HAD PROPOSED TO DEAL WITH

10:45AM  15    A COST ISSUE WAS TO RAISE THE FEE THAT WALGREENS WOULD GET FROM

10:45AM  16    $10 TO $15; RIGHT?

10:45AM  17    A.   RIGHT.  SO I JUST WANT TO BE CLEAR ABOUT RAISING THE FEE.

10:45AM  18    THAT WAS PART OF THE CONTRACT WITH THERANOS.

10:45AM  19         AND SO THE RAISING OF THE FEE WOULD BE WHAT WE WOULD GET

10:45AM  20    REMUNERATED FROM THERANOS PER PATIENT.

10:45AM  21    Q.   RIGHT.  SO, FOR EXAMPLE, IF SOMEONE CAME IN TO THERANOS

10:45AM  22    AND GOT BLOOD DRAWS AND IT COST $50, UNDER THE EXISTING

10:45AM  23    CONTRACT, WALGREENS WOULD GET $10 PER PATIENT; RIGHT?

10:45AM  24    A.   CORRECT.

10:45AM  25    Q.   AND UNDER THE PROPOSAL WE LOOKED AT EARLIER, WALGREENS

JHAVERI CROSS BY MR. COOPERSMITH (RES.)

| | | |
|---|---|---|
| 10:45AM | 1 | WOULD GET $15 INSTEAD OF $10; RIGHT? |
| 10:45AM | 2 | A.   THAT'S RIGHT. |
| 10:45AM | 3 | Q.   BUT WE TALKED ABOUT THERE ARE OTHER WAYS TO DEAL WITH THAT |
| 10:45AM | 4 | COST ISSUE; RIGHT? |
| 10:45AM | 5 | A.   RIGHT.  WHAT WE WERE DEALING WITH WAS -- COST WAS A |
| 10:46AM | 6 | VARIABLE, AND WHAT WE WERE DEALING WITH WAS TO MAKE SURE THAT |
| 10:46AM | 7 | THIS PARTICULAR PROJECT IS PROFITABLE, OR AT LEAST BREAK EVEN, |
| 10:46AM | 8 | FOR BOTH ORGANIZATIONS. |
| 10:46AM | 9 | AND SO COST WAS ONE OF THOSE DRIVERS. |
| 10:46AM | 10 | OF COURSE REVENUE WAS ANOTHER DRIVER. |
| 10:46AM | 11 | SO WE WERE TRYING TO MANAGE ALL OF THAT. |
| 10:46AM | 12 | Q.   OKAY.  AND THEN THERE WERE SOME MEETINGS WITHIN WALGREENS |
| 10:46AM | 13 | AT A VERY HIGH LEVEL TO DISCUSS THE NEW, POTENTIAL NEW BUSINESS |
| 10:46AM | 14 | MODEL WITH THERANOS; RIGHT? |
| 10:46AM | 15 | A.   YES. |
| 10:46AM | 16 | Q.   AND IF YOU TAKE A LOOK AT EXHIBIT 2280, THAT'S A MEETING |
| 10:46AM | 17 | NOTICE THAT YOU RECEIVED ON DECEMBER 10TH, 2014; RIGHT? |
| 10:46AM | 18 | A.   YES, SIR. |
| 10:46AM | 19 | Q.   AND IT'S A MEETING NOTICE THAT INCLUDES A NUMBER OF PEOPLE |
| 10:46AM | 20 | IN LEADERSHIP AT WALGREENS? |
| 10:46AM | 21 | A.   YES. |
| 10:46AM | 22 | Q.   AND ALSO AT THERANOS? |
| 10:46AM | 23 | A.   THAT'S CORRECT. |
| 10:46AM | 24 | Q.   AND THAT INCLUDES MR. FLUEGEL; RIGHT? |
| 10:47AM | 25 | A.   YES. |

10:47AM   1    Q.   AND BRAD WASSON?

10:47AM   2    A.   YES, SIR.

10:47AM   3    Q.   AND YOURSELF?

10:47AM   4    A.   CORRECT.

10:47AM   5    Q.   AND ALEX GOURLAY?

10:47AM   6    A.   YES.

10:47AM   7    Q.   AND ALSO MR. BALWANI AND MS. HOLMES?

10:47AM   8    A.   YES.

10:47AM   9    Q.   OKAY.

10:47AM   10        YOUR HONOR, WE OFFER 2280.

10:47AM   11            MR. SCHENK:  NO OBJECTION.

10:47AM   12            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:47AM   13        (GOVERNMENT'S EXHIBIT 2280 WAS RECEIVED IN EVIDENCE.)

10:47AM   14    BY MR. COOPERSMITH:

10:47AM   15    Q.   DO YOU SEE THAT THE SUBJECT IS COPY:  8:00 A.M. PT --

10:47AM   16    WALGREENS/THERANOS MEETING?

10:47AM   17    A.   YES.

10:47AM   18    Q.   AND DO YOU SEE SOME OF THE PEOPLE WHO WE JUST TALKED ABOUT

10:47AM   19    WHO ARE ON THE TO LINE AND SO FORTH?

10:47AM   20    A.   YES.

10:47AM   21    Q.   OKAY.  AND THEN YOU SEE YOUR NAME THERE, TOO; RIGHT?

10:47AM   22    A.   YES.

10:47AM   23    Q.   I'M SORRY?

10:47AM   24    A.   YES.

10:47AM   25    Q.   THANK YOU.

```
10:47AM   1            AND THEN THERE ARE PEOPLE WHO ARE REQUIRED; RIGHT?  AND

10:47AM   2     THAT'S STEWART WASSON, OR BRAD WASSON; CORRECT?

10:47AM   3     A.   YES.

10:47AM   4     Q.   AND YOURSELF?

10:48AM   5     A.   CORRECT.

10:48AM   6     Q.   AND THEN RICHARD ASHWORTH; RIGHT?

10:48AM   7     A.   CORRECT.

10:48AM   8     Q.   ALEX GOURLAY?

10:48AM   9     A.   YES.

10:48AM  10     Q.   AND THEN MR. BALWANI?

10:48AM  11     A.   YES.

10:48AM  12     Q.   AND MS. HOLMES?

10:48AM  13     A.   CORRECT.

10:48AM  14     Q.   OKAY.  AND THEN THIS IS A MEETING THAT YOU ATTENDED;

10:48AM  15     RIGHT?

10:48AM  16     A.   YES.

10:48AM  17     Q.   AND THE MEETING WAS TO DISCUSS POTENTIAL NEW

10:48AM  18     RELATIONSHIP -- A NEW WAY TO HAVE A CONTRACT RELATIONSHIP

10:48AM  19     BETWEEN THERANOS AND WALGREENS; RIGHT?

10:48AM  20     A.   CORRECT.  WE WERE DISCUSSING, YOU KNOW, WHAT THE NEW

10:48AM  21     CONTRACT WOULD LOOK LIKE, WHAT ARE THE SPECIFICS OF THE

10:48AM  22     CONTRACT, AND OF COURSE WHAT THE MODEL WOULD LOOK LIKE AS WELL.

10:48AM  23     Q.   OKAY.  THIS WAS DECEMBER 10TH, 2014?

10:48AM  24     A.   YES, SIR.

10:48AM  25     Q.   HOW TO MOVE FORWARD WITH THERANOS?
```

10:48AM   1    A.   CORRECT.

10:48AM   2    Q.   ON THE SAME TOPIC, LET'S LOOK AT EXHIBIT 20237.

10:49AM   3         OKAY.   IF YOU LOOK AT EXHIBIT 20237, YOU SEE THAT IT'S

10:49AM   4    FROM BRAD FLUEGEL?

10:49AM   5    A.   YES, SIR.

10:49AM   6    Q.   SENIOR VICE PRESIDENT CHIEF STRATEGY AND BUSINESS

10:49AM   7    DEVELOPMENT OFFICER; RIGHT?

10:49AM   8    A.   YES.

10:49AM   9    Q.   AT WALGREENS?

10:49AM  10    A.   THAT'S CORRECT.

10:49AM  11    Q.   AND IT'S TO MR. BALWANI WITH A COPY TO MS. HOLMES?

10:49AM  12    A.   YES.

10:49AM  13    Q.   AND IT'S DATED DECEMBER 15TH, 2014; RIGHT?

10:49AM  14    A.   YES.

10:49AM  15    Q.   AND SO THIS IS JUST FIVE DAYS AFTER THAT MEETING THAT WE

10:49AM  16    JUST DISCUSSED; RIGHT?

10:49AM  17    A.   CORRECT.

10:49AM  18    Q.   AND THIS IS ABOUT REPORTING OUT BY MR. FLUEGEL ABOUT SORT

10:49AM  19    OF AFTERMATH OF THE MEETING; CORRECT?

10:49AM  20    A.   YES, SIR.

10:49AM  21    Q.   OKAY.

10:49AM  22         YOUR HONOR, WE OFFER EXHIBIT 20237.

10:49AM  23              MR. SCHENK:  NO OBJECTION.

10:49AM  24              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:49AM  25         (DEFENDANT'S EXHIBIT 20237 WAS RECEIVED IN EVIDENCE.)

10:50AM  1    BY MR. COOPERSMITH:

10:50AM  2    Q.   OKAY.  JUST TO ORIENT HERE, WE SEE THE HEADER WITH THE

10:50AM  3    PEOPLE THAT WE JUST DISCUSSED; RIGHT?

10:50AM  4    A.   CORRECT.

10:50AM  5    Q.   AND THEN DECEMBER 15TH, 2014.

10:50AM  6         AND THEN THE SUBJECT IS FOLLOW UP; RIGHT?

10:50AM  7    A.   YES.

10:50AM  8    Q.   AND MR. FLUEGEL WRITES, "THANKS AGAIN FOR HOSTING US LAST

10:50AM  9    WEEK -- WE FOUND IT VERY PRODUCTIVE AND IT WAS GREAT TO SPEND

10:50AM  10   TIME WITH YOU BOTH."

10:50AM  11        DO YOU SEE THAT?

10:50AM  12   A.   YES.

10:50AM  13   Q.   AND IT SAYS, "AS ALEX MENTIONED" -- AND ALEX IS

10:50AM  14   ALEX GOURLAY; RIGHT?

10:50AM  15   A.   CORRECT.

10:50AM  16   Q.   AND THAT'S MR. FLUEGEL'S BOSS?

10:50AM  17   A.   I BELIEVE SO AT THE TIME, YES.

10:50AM  18   Q.   OKAY.  "AS ALEX MENTIONED AT THE CLOSE OF THE MEETING, WE

10:50AM  19   WANTED TO CHECK IN WITH GREG AND STEFANO ON THE REVISED ROLLOUT

10:50AM  20   APPROACH WE LAID OUT AT THE MEETING."

10:50AM  21        DO YOU SEE THAT?

10:50AM  22   A.   YES.

10:50AM  23   Q.   AND GREG DO YOU UNDERSTAND IS A REFERENCE TO GREG WASSON?

10:50AM  24   A.   YES, THAT'S CORRECT.

10:50AM  25   Q.   AND HE'S THE CEO OF WALGREENS?

10:50AM  1    A.   HE WAS THE CEO AT THE TIME.

10:50AM  2    Q.   AND STEFANO, YOU KNOW WHO THAT IS, TOO, RIGHT?

10:50AM  3    A.   YES.

10:50AM  4    Q.   AND THAT'S THE PERSON WHO IS COMING IN TO BE CEO OF THE

10:51AM  5    ENTIRE OPERATION, THE BOOTS WALGREENS ALLIANCE; CORRECT?

10:51AM  6    A.   YES.

10:51AM  7    Q.   AND DO YOU REMEMBER STEFANO'S LAST NAME?

10:51AM  8    A.   PESSINA, P-E-S-S-I-N-A.

10:51AM  9    Q.   AND SO STEFANO PESSINA WAS GOING TO BE COMING IN AS THE

10:51AM 10    NEW CEO OF THE GOLD OPERATION; CORRECT?

10:51AM 11    A.   CORRECT.

10:51AM 12    Q.   AND HE'S BASED IN ITALY; CORRECT?

10:51AM 13    A.   I'M NOT SURE EXACTLY WHERE HE IS BASED.

10:51AM 14    Q.   OKAY.  BUT THIS IS AS HIGH OF A LEVEL AT WALGREENS AS YOU

10:51AM 15    COULD POSSIBLY GET; RIGHT?

10:51AM 16    A.   YES, SIR.

10:51AM 17    Q.   AND TO GO ON, IT SAYS THAT -- MR. FLUEGEL WROTE, "WE

10:51AM 18    WANTED TO CHECK IN WITH GREG AND STEFANO ON THE REVISED ROLLOUT

10:51AM 19    APPROACH WE LAID OUT AT THE MEETING."

10:51AM 20        AND IT GOES ON, "THAT HAPPENED THIS WEEKEND AND THEY ARE

10:51AM 21    BOTH IN AGREEMENT WITH THE APPROACH WE DISCUSSED LAST WEEK."

10:51AM 22        DO YOU SEE THAT?

10:51AM 23    A.   YES.

10:51AM 24    Q.   AND SO MR. FLUEGEL IS REPORTING THAT BOTH CEO'S, IF YOU

10:51AM 25    WILL, WERE ON BOARD BASICALLY WITH THE APPROACH; RIGHT?

10:52AM   1    A.   CORRECT.

10:52AM   2    Q.   AND IT SAYS, "HAPPY TO TALK THIS THROUGH FURTHER, AS WELL

10:52AM   3    AS THE NEWS ON GREG'S DEPARTURE."

10:52AM   4         DO YOU SEE THAT?

10:52AM   5    A.   YES.

10:52AM   6    Q.   AND THE DEPARTURE IS THAT GREG WASSON WAS LEAVING

10:52AM   7    WALGREENS; RIGHT?

10:52AM   8    A.   RIGHT.

10:52AM   9    Q.   AND HE WASN'T GOING TO BE THE CEO ANYMORE?

10:52AM  10    A.   THAT'S CORRECT.

10:52AM  11    Q.   AND STEFANO WOULD BE THE CEO; RIGHT?

10:52AM  12    A.   AT THAT TIME, YES.

10:52AM  13    Q.   OKAY.  NOW, LET'S TALK ABOUT WHAT THAT NEW BUSINESS

10:52AM  14    RELATIONSHIP WAS GOING TO LOOK LIKE, AND THE FIRST ONE I WANT

10:52AM  15    TO SHOW YOU ABOUT THAT IS EXHIBIT 2239, 2239.

10:53AM  16    A.   2239?

10:53AM  17    Q.   I MISSPOKE.  IT'S 2339.  I MISSPOKE.

10:53AM  18         OKAY.  AND YOU SEE THIS IS ANOTHER ONE OF THOSE

10:53AM  19    PARTNERSHIP MEETING SLIDE DECKS THAT WE'VE SEEN SOME EXAMPLES

10:53AM  20    OF BEFORE?

10:53AM  21    A.   YES, SIR.

10:53AM  22    Q.   AND THIS ONE IS FROM JANUARY 14TH, 2015?

10:53AM  23    A.   YES.

10:53AM  24    Q.   AND AGAIN, THE EMAIL, THE COVER PAGE, COMES FROM THE SAME

10:53AM  25    PERSON, PATTY HAWORTH; RIGHT?

10:53AM  1    A.   YES, SIR.

10:53AM  2              MR. COOPERSMITH:  YOUR HONOR, WE OFFER EXHIBIT 2339.

10:53AM  3              MR. SCHENK:  NO OBJECTION.

10:53AM  4              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:53AM  5         (GOVERNMENT'S EXHIBIT 2339 WAS RECEIVED IN EVIDENCE.)

10:53AM  6    BY MR. COOPERSMITH:

10:53AM  7    Q.   OKAY.  SO, MR. JHAVERI, THIS IS ACTUALLY THE FIRST MEETING

10:53AM  8    AFTER THAT MEETING WITH BRAD FLUEGEL AND OTHERS THAT WE JUST

10:53AM  9    DISCUSSED BEFORE THIS EXHIBIT; RIGHT?

10:54AM 10    A.   YES, I BELIEVE SO.

10:54AM 11    Q.   THE FIRST THERANOS PARTNERSHIP MEETING?

10:54AM 12    A.   THE FIRST, RIGHT.

10:54AM 13    Q.   OKAY.  AND WE CAN SEE THE COVER PAGE, AND I THINK THE DATE

10:54AM 14    IS HIGHLIGHTED ON THE SCREEN.

10:54AM 15         AND AS USUAL, IT'S FROM PATTY HAWORTH TO A GROUP OF PEOPLE

10:54AM 16    WHO WERE WORKING ON THIS PROJECT; RIGHT?

10:54AM 17    A.   THAT'S RIGHT.

10:54AM 18    Q.   OKAY.  AND THEN IF YOU GO TO PAGE 5, IT LOOKS LIKE THERE'S

10:54AM 19    AN AGENDA.

10:54AM 20         IF YOU BACK UP TWO PAGES, MR. ALLEN, THAT WOULD BE

10:54AM 21    HELPFUL.  THERE YOU GO.  IT LOOKS LIKE IT'S PAGE 3.

10:54AM 22         THIS IS THE AGENDA?

10:54AM 23    A.   YES.

10:54AM 24    Q.   DO YOU SEE THAT?

10:54AM 25         AND THERE'S GOING TO BE, AMONG OTHER THINGS, AN OPS MODEL

10:54AM   1    DISCUSSION.

10:54AM   2         DO YOU SEE THAT?

10:54AM   3    A.   I DO.

10:54AM   4    Q.   AND A CALIFORNIA UPDATE?

10:54AM   5    A.   YES.

10:54AM   6    Q.   AND THEN THIS STI INITIATIVE UPDATE; RIGHT?

10:55AM   7    A.   CORRECT.

10:55AM   8    Q.   OKAY.  IF YOU GO TO THE NEXT PAGE, THERE'S A CURRENT

10:55AM   9    STATUS.

10:55AM  10         DO YOU SEE THAT?

10:55AM  11    A.   I DO.

10:55AM  12    Q.   AND IT LOOKED LIKE AVERAGE VISITS WERE UP 11 PERCENT;

10:55AM  13    RIGHT?

10:55AM  14    A.   YES.

10:55AM  15    Q.   NEXT PAGE HAS SOME HIGHLIGHTS.

10:55AM  16         DO YOU SEE THAT?

10:55AM  17         AND THE GUEST VOLUME IS INCREASING, AND SOME STORES ARE

10:55AM  18    MANAGING THIS WELL.

10:55AM  19         DO YOU SEE THAT?

10:55AM  20    A.   YES.

10:55AM  21    Q.   THEN IF YOU GO TO PAGE 8 -- I'M SORRY.  MY PAGINATION IS A

10:55AM  22    LITTLE OFF, SO I THINK IT'S PAGE 7.

10:55AM  23    A.   YES.

10:55AM  24    Q.   YES.  OKAY.  THESE ARE SOME OF THE CHALLENGES AT THE

10:56AM  25    OPERATIONS LEVEL; RIGHT?

10:56AM  1    A.   THAT'S CORRECT.

10:56AM  2    Q.   SO LONG LINES WAS ONE OF THE PROBLEMS; RIGHT?

10:56AM  3    A.   CORRECT.

10:56AM  4    Q.   AND, YOU KNOW, THERE'S A CONCERN, RIGHT, THAT IF YOU HAVE

10:56AM  5    LINES THAT ARE TOO LONG, PEOPLE MIGHT JUST GIVE UP AND LEAVE,

10:56AM  6    NOT GET THEIR BLOOD DRAWN; RIGHT?

10:56AM  7    A.   CORRECT.

10:56AM  8         THESE LONG LINES -- JUST TO AGAIN GIVE SOME CLARITY HERE,

10:56AM  9    ALL PATIENTS THAT CAME IN FOR EITHER THE THERANOS SERVICE OR

10:56AM  10   FOR THEIR PRESCRIPTIONS WERE IN THE SAME LINE, AND SO THAT WAS

10:56AM  11   CAUSING A LONGER LINE, OR A LONGER WAIT TO CHECK IN.

10:56AM  12   Q.   RIGHT.  AND THIS IS SOMETHING THAT WAS UNDER DISCUSSION IN

10:56AM  13   THESE PARTNERSHIP MEETINGS, BECAUSE IF YOU COULD REDUCE THE

10:56AM  14   LINE WITH THE MORE STREAMLINED CHECK IN PROCESS, YOU COULD

10:56AM  15   POTENTIALLY SERVE MORE PATIENTS; RIGHT?

10:56AM  16   A.   AND CREATE A BETTER EXPERIENCE.

10:56AM  17   Q.   RIGHT.  OKAY.

10:56AM  18        AND THEN IT GOES ON TO SOME OF THE OTHER ISSUES THAT THE

10:56AM  19   TEAM IS ADDRESSING; RIGHT?

10:57AM  20   A.   YES.

10:57AM  21   Q.   OKAY.  AND THEN IF YOU GO TO THE NEXT PAGE, YOU SEE THAT

10:57AM  22   THERE'S A -- WE'VE SEEN THIS TYPE OF CHART BEFORE.  THIS IS THE

10:57AM  23   THERANOS EXPERIENCE SURVEY SUMMARY?

10:57AM  24   A.   YES, SIR.

10:57AM  25   Q.   AND IT HAS THE AVERAGE FOR THE PERIOD WE'RE TALKING ABOUT,

10:57AM  1    WHICH WAS DECEMBER 2014, AND THEN IT HAS THE AVERAGE STARS AND

10:57AM  2    THE CHANGE FROM THE PREVIOUS MONTH; RIGHT?

10:57AM  3    A.   YES.

10:57AM  4    Q.   AND ALL OF THEM, EXCEPT FOR THE NO CHANGE FOR SKILL OF

10:57AM  5    TECHNICIAN, ARE ALL A LITTLE BIT UP; RIGHT?

10:57AM  6    A.   CORRECT.

10:57AM  7    Q.   OKAY.  INCLUDING THE SAMPLE COLLECTION PROCESS; RIGHT?

10:57AM  8    A.   CORRECT.

10:57AM  9    Q.   OKAY.  AND THEN IF YOU GO JUST THROUGH THE NEXT PAGES,

10:57AM  10   THERE'S THOSE SAME TYPES OF PIE CHARTS THAT WE HAVE SEEN BEFORE

10:57AM  11   IN OTHER EXHIBITS; RIGHT?  AND THESE ARE ALL CONTINUING TO LOOK

10:57AM  12   POSITIVE; RIGHT?

10:57AM  13   A.   YES.

10:58AM  14   Q.   OKAY.  SO ONE OF THE THINGS IN THE AGENDA WAS THIS

10:58AM  15   CALIFORNIA UPDATE.

10:58AM  16       DO YOU REMEMBER THAT?

10:58AM  17   A.   YES, SIR.

10:58AM  18   Q.   AND IF YOU GO TO PAGE -- I THINK IT WAS PAGE 21,

10:58AM  19   MR. ALLEN.  RIGHT.

10:58AM  20       THAT'S THE BEGINNING OF THE SECTION OF THE SLIDE DECK

10:58AM  21   ABOUT CALIFORNIA UPDATE.

10:58AM  22       DO YOU SEE THAT?

10:58AM  23   A.   YES.

10:58AM  24   Q.   AND THEN IF YOU GO TO THE NEXT PAGE, IT TALKS ABOUT

10:58AM  25   CONSTRUCTION OF CERTAIN STORES; RIGHT?

10:58AM  1    A.   CORRECT.

10:58AM  2    Q.   AND THOSE NUMBERS LIKE 625 AND 689, THE OTHERS WITH THE

10:58AM  3    NUMBER SIGN, THOSE ARE REFERRING TO SPECIFIC WALGREENS STORES;

10:58AM  4    RIGHT?

10:58AM  5    A.   CORRECT.  EACH WALGREENS STORE IS ASSIGNED A STORE NUMBER,

10:58AM  6    AND THAT'S WHAT THIS IS REFERRING TO.

10:58AM  7    Q.   RIGHT.  SO THEN IF YOU GO TO THE NEXT PAGE, THEN IT HAS A

10:59AM  8    SECTION ON VARIOUS STORES.

10:59AM  9         SO, FOR EXAMPLE, THE FIRST ONE IS STORE 689; RIGHT?

10:59AM 10    A.   YES, THAT'S CORRECT.

10:59AM 11    Q.   AND THEN IF YOU GO TO THE NEXT PAGE AFTER THAT, IT

10:59AM 12    ACTUALLY HAS A DRAWING, IT'S A LITTLE HARD TO MAKE OUT, BUT

10:59AM 13    THAT'S A DRAWING OF WHAT THIS STORE WOULD LOOK LIKE; RIGHT?

10:59AM 14    A.   RIGHT.  IT'S ACTUALLY A DRAWING OF THE PHARMACY AREA, AND

10:59AM 15    THE WAITING AREA, AND THE CONSULTATION ROOM OF THE STORE.

10:59AM 16         SO IT'S NOT THE FULL STORE.  IT'S ONLY THE BACK PART OF

10:59AM 17    THE STORE WHERE THE PHARMACY IS.

10:59AM 18    Q.   RIGHT.  AND THAT HAPPENS TO BE STORE 689 IN MOUNTAIN VIEW,

10:59AM 19    CALIFORNIA; RIGHT?

10:59AM 20    A.   YES.

10:59AM 21    Q.   AND IF WE GO TO THE NEXT PAGE, WE'RE STILL ON THE

10:59AM 22    MOUNTAIN VIEW STORE.  BUT AFTER THAT WE'RE TALKING ABOUT THE

10:59AM 23    MILBRAE, CALIFORNIA STORE 625.

10:59AM 24         GO TO THE NEXT ONE, MR. ALLEN.

10:59AM 25         DO YOU SEE THAT?

10:59AM   1    A.   THAT'S CORRECT.

10:59AM   2    Q.   AND THEN IF YOU GO TO THE NEXT STORE, THERE'S A

11:00AM   3    SAN CARLOS, CALIFORNIA STORE?

11:00AM   4    A.   THAT'S RIGHT.

11:00AM   5    Q.   AND A FREMONT, CALIFORNIA STORE?

11:00AM   6    A.   CORRECT.

11:00AM   7    Q.   AND SO THIS IS ACTUAL PLANNING TO OPEN THESE STORES GOING

11:00AM   8    FORWARD; RIGHT?

11:00AM   9    A.   CORRECT.

11:00AM   10        SO, AGAIN, AS WE START TO PLAN FOR STORES, WE HAVE TO

11:00AM   11   REDESIGN, WE HAVE TO START CONSTRUCTION, JUST LIKE A HOME OR

11:00AM   12   ANYTHING ELSE, AND THESE ARE THE DRAWINGS OF WHAT THIS SPACE

11:00AM   13   WOULD LOOK LIKE.

11:00AM   14   Q.   OKAY.  IF YOU GO TO PAGE 32, MR. ALLEN, THERE'S A SECTION

11:00AM   15   ON DIAGNOSTIC TESTING - STI INITIATIVE UPDATE.

11:00AM   16        SO THAT WAS ANOTHER AGENDA ITEM; RIGHT?

11:00AM   17   A.   CORRECT.

11:00AM   18   Q.   AND THEN AFTER THAT, THERE ARE SOME MORE DRAWINGS, WHICH

11:00AM   19   ARE HARD TO READ, INVOLVING THAT TOPIC; RIGHT?

11:00AM   20   A.   YEAH, THESE DRAWINGS ARE OF THE ENTIRE STORE IN THIS CASE.

11:01AM   21   Q.   OKAY.  THANK YOU.  YOU CAN PUT THAT EXHIBIT ASIDE.

11:01AM   22        THE NEXT EXHIBIT IS 20238.

11:01AM   23        AND YOU SEE 20238, MR. JHAVERI?

11:01AM   24   A.   YES, SIR.

11:01AM   25   Q.   AND THIS IS ANOTHER EMAIL FROM PATTY HAWORTH?

11:01AM   1    A.   IT IS.

11:01AM   2    Q.   TO A GROUP OF PEOPLE AT THERANOS AND WALGREENS WHO WERE

11:01AM   3    WORKING ON THE PROGRAM BETWEEN THE TWO COMPANIES; RIGHT?

11:01AM   4    A.   THAT'S CORRECT.

11:01AM   5    Q.   AND THIS ONE IS FROM JANUARY 21ST, 2015; RIGHT?

11:01AM   6    A.   YES.

11:01AM   7    Q.   AND SO THIS TIME SHE'S ACTUALLY SENDING THE MINUTES FROM

11:01AM   8    THE MEETING THAT HAPPENED ON JANUARY 14TH; RIGHT?

11:02AM   9    A.   YEAH.  CORRECT.  THE USUAL CADENCE WAS WE WOULD HAVE THE

11:02AM  10    MEETING, SHE WOULD TAKE THE NOTES AND MAKE SURE THAT SHE'S

11:02AM  11    CAPTURED ALL OF THE DECISIONS, AND THEN THOSE AGAIN, IN THIS

11:02AM  12    PARTICULAR CASE, ARE BEING REPORTED OUT.

11:02AM  13    Q.   OKAY.

11:02AM  14         YOUR HONOR, WE OFFER 20238.

11:02AM  15              MR. SCHENK:  NO OBJECTION.

11:02AM  16              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:02AM  17         (DEFENDANT'S EXHIBIT 20238 WAS RECEIVED IN EVIDENCE.)

11:02AM  18    BY MR. COOPERSMITH:

11:02AM  19    Q.   ON THE FIRST PAGE, MR. JHAVERI, YOU SEE AFTER THE EMAIL

11:02AM  20    INFORMATION WE'VE JUST DISCUSSED, THERE'S A SECTION CALLED

11:02AM  21    ACTION ITEMS.

11:02AM  22         DO YOU SEE THAT?

11:02AM  23    A.   YES, I DO.

11:02AM  24    Q.   AND NUMBER 6 IS "ACTIVATE NEW BUSINESS MODEL."

11:02AM  25         RIGHT?

11:02AM  1    A.   CORRECT.

11:02AM  2    Q.   AND THAT REFERS TO THIS TOPIC THAT CAME OUT OF THAT

11:02AM  3    MEETING WITH THE HIGH LEVEL WALGREENS PEOPLE TO AMEND OR REVISE

11:02AM  4    THE RELATIONSHIP GOING FORWARD; RIGHT?

11:02AM  5    A.   CORRECT.

11:02AM  6    Q.   OKAY.  AND NUMBER 8 IS "DETERMINE PHASED ROLLOUT FOR NEW

11:03AM  7    BUSINESS MODEL."

11:03AM  8         CORRECT?

11:03AM  9    A.   THAT'S CORRECT.

11:03AM  10   Q.   LET'S GO TO THE MINUTES THEMSELVES, SO STARTING ON PAGE 4

11:03AM  11   OF THE EXHIBIT.

11:03AM  12        AND THIS FIRST PAGE HAS THE AGENDA; RIGHT?

11:03AM  13   A.   YES.

11:03AM  14   Q.   AND THEN IF YOU GO TO THE NEXT PAGE OF THE MEETING

11:03AM  15   MINUTES, YOU SEE AT THE BOTTOM IT SAYS, "SIGNED ACO CONTRACT

11:03AM  16   WITH COMMONWEALTH THIS MONTH."

11:03AM  17        DO YOU SEE THAT?

11:03AM  18   A.   YES.

11:03AM  19   Q.   AND THAT'S A HEALTH CARE INSURANCE COMPANY?

11:03AM  20   A.   CORRECT.

11:03AM  21   Q.   AND THEN IF YOU GO TO THE -- THERE'S A BULLET THERE THAT

11:03AM  22   SAYS, "180-200 PHYSICIANS USING THERANOS EXCLUSIVELY."

11:03AM  23        RIGHT?

11:03AM  24   A.   CORRECT.

11:03AM  25   Q.   AND THAT'S ONE OF THE THINGS DISCUSSED AT THE MEETING?

11:03AM   1    A.   YES.

11:03AM   2    Q.   OKAY.  IF YOU GO TO THE NEXT PAGE, PAGE 6, IT SAYS

11:04AM   3    HIGHLIGHTS, RIGHT?

11:04AM   4         AND THEN THERE'S A "GUEST VOLUME INCREASING AND SOME

11:04AM   5    STORES ARE MANAGING THIS WELL."

11:04AM   6         RIGHT?

11:04AM   7    A.   YES.

11:04AM   8    Q.   AND THEN "CURRENT PARTNERING CHALLENGES."

11:04AM   9         RIGHT?

11:04AM   10   A.   CORRECT.

11:04AM   11   Q.   OKAY.  LET'S GO TO PAGE 8.

11:04AM   12        OKAY.  SO AT THE TOP THERE'S A PIE CHART, RIGHT, ABOUT

11:04AM   13   LIKELIHOOD OF RETURNING TO A THERANOS WELLNESS CENTER?

11:04AM   14   A.   YES.

11:04AM   15   Q.   AND THE PIE CHART STILL SHOWS THAT'S TRENDING REALLY WELL;

11:04AM   16   RIGHT?

11:04AM   17   A.   CORRECT.

11:04AM   18   Q.   AND THEN IF YOU GO DOWN, THERE'S THIS OPS MODEL DISCUSSION

11:04AM   19   HEADING.

11:04AM   20        AND THEN THE FIRST BULLET SAYS, "ALL SERVICES, INCLUDING

11:05AM   21   FINGERSTICK AND VENIPUNCTURE TO BE PERFORMED BY THERANOS."

11:05AM   22        DO YOU SEE THAT?

11:05AM   23   A.   YES.

11:05AM   24   Q.   AND THAT'S PART OF THE NEW BUSINESS MODEL THAT WAS BEING

11:05AM   25   DISCUSSED WAS THAT THERANOS WOULD TAKE OVER THAT COLLECTION;

11:05AM   1      RIGHT?

11:05AM   2      A.   CORRECT.

11:05AM   3      Q.   AND THAT WOULD REDUCE THE COST TO WALGREENS; RIGHT?

11:05AM   4      A.   JUST ON TRAINING.  THE EMPLOYEE BASE WOULD STILL BE THE

11:05AM   5      SAME BECAUSE IT WAS THE TECHNICIANS THAT WERE ALREADY ON STAFF.

11:05AM   6      Q.   RIGHT.  BUT IT SAYS, "ALL SERVICES, INCLUDING FINGERSTICK

11:05AM   7      AND VENIPUNCTURE TO BE PERFORMED BY THERANOS."

11:05AM   8           RIGHT?

11:05AM   9      A.   CORRECT.

11:05AM   10     Q.   AND THEN IT GOES ON THE NEXT PAGE, PAGE 9, THERE'S A THIRD

11:05AM   11     BULLET POINT DOWN THAT SAYS, "NIMESH JHAVERI WOULD LIKE TO

11:05AM   12     FLUSH OUT MODELS IN THE ARIZONA MARKET DURING CONTRACT

11:05AM   13     RENEGOTIATION.  IT IS IMPORTANT TO TRULY UNDERSTAND WHAT THE

11:05AM   14     PARTNERSHIP WILL LOOK LIKE IN THE NEXT MARKET."

11:05AM   15           DO YOU SEE THAT?

11:05AM   16     A.   YES.

11:05AM   17     Q.   AND THAT'S SOMETHING THAT YOU DISCUSSED AT THE MEETING;

11:05AM   18     RIGHT?

11:05AM   19     A.   YES.

11:05AM   20     Q.   AND THEN IT SAYS, "NIMESH JHAVERI STATED THAT THIS NEW

11:06AM   21     MODEL WILL ALLOW US TO MOVE FASTER."

11:06AM   22           DO YOU SEE THAT?

11:06AM   23     A.   YES.

11:06AM   24     Q.   AND THAT'S SOMETHING THAT YOU DISCUSSED AT THE MEETING?

11:06AM   25     A.   YES.

11:06AM  1    Q.   AND THEN BELOW THAT IT SAYS THAT "SUNNY BALWANI COMMENTED

11:06AM  2    THAT THERANOS'S BIGGEST LEARNING WAS TO PUT INFRASTRUCTURE IN

11:06AM  3    PLACE, INCLUDING SALES TEAM, LABORATORY, ET CETERA, BEFORE

11:06AM  4    TURNING ON THE NEXT MARKET."

11:06AM  5         DO YOU SEE THAT?

11:06AM  6    A.   YES.

11:06AM  7    Q.   AND SOMETHING THAT WAS DISCUSSED AT THE MEETING?

11:06AM  8    A.   YES, IT WAS.

11:06AM  9    Q.   AND THEN IF YOU GO DOWN THERE'S A BULLET POINT THAT READS,

11:06AM  10   "RESPECTIVE TEAMS ARE ALIGNED, STORES WILL BE TRANSITIONED TO

11:06AM  11   THE NEW MODEL ONCE 100 PERCENT OF THERANOS PHLEBOTOMISTS CAN

11:06AM  12   CONDUCT THE PERFORM PART OF THE WORKFLOW AND 100 PERCENT OF

11:06AM  13   WALGREENS RESOURCES CAN PERFORM CHECK IN DURING ALL THERANOS

11:06AM  14   HOURS OF OPERATION."

11:06AM  15        RIGHT?

11:06AM  16   A.   YES.

11:06AM  17   Q.   AND WALGREENS PERSONNEL WERE GOING TO DO THE CHECK IN;

11:07AM  18   RIGHT?

11:07AM  19   A.   THAT'S RIGHT.

11:07AM  20   Q.   AND THEN THE THERANOS PHLEBOTOMIST WOULD CONDUCT THE --

11:07AM  21   PERFORM PART OF THE WORKFLOW?  THAT'S WHAT IT SAYS; RIGHT?

11:07AM  22   A.   YEAH, THEY WOULD PERFORM THE BLOOD DRAW.

11:07AM  23   Q.   RIGHT.

11:07AM  24   A.   AND WALGREENS WOULD PERFORM THE CHECK IN OF ALL PATIENTS

11:07AM  25   COMING IN.

11:07AM  1    Q.   THIS IS PART OF THE NEW BUSINESS MODEL GOING FORWARD?

11:07AM  2    A.   THAT'S RIGHT.

11:07AM  3    Q.   AND THEN IT HAS BELOW THAT, "NIMESH JHAVERI GAVE THE TEAM

11:07AM  4    A GOAL TO ACTIVATE THE NEW BUSINESS MODEL BY FEBRUARY 1ST."

11:07AM  5         RIGHT?

11:07AM  6    A.   THAT'S CORRECT.

11:07AM  7    Q.   OKAY.  BELOW THAT IT TALKS ABOUT "TRACY MASSON," DO YOU

11:07AM  8    SEE THAT, "TO DETERMINE PHASED ROLLOUT BY EARLY NEXT WEEK."

11:07AM  9         RIGHT?

11:07AM  10   A.   YES.

11:07AM  11   Q.   THAT WAS DISCUSSED AT THE MEETING; CORRECT?

11:07AM  12   A.   CORRECT.

11:07AM  13   Q.   OKAY.  AND THEN THERE'S A LINE THAT SAYS, "SUNNY BALWANI

11:07AM  14   GAVE THE TEAM 30-60 DAYS TO CUT OVER TO THE NEW BUSINESS

11:08AM  15   MODEL."

11:08AM  16        RIGHT?

11:08AM  17   A.   YES.

11:08AM  18   Q.   IF YOU GO TO PAGE 10, THE NEXT PAGE, THERE'S A BULLET

11:08AM  19   POINT THERE RIGHT BEFORE THE HEADING THAT SAYS, "NIMESH JHAVERI

11:08AM  20   STATED THAT THE TEAM HAD LEARNED A LOT IN THE PAST 4 YEARS.  WE

11:08AM  21   ARE ABSOLUTELY ALIGNED ON THE APPROACH TO THE NEXT PHASE OF THE

11:08AM  22   AGREEMENT."

11:08AM  23        DO YOU SEE THAT?

11:08AM  24   A.   YES.

11:08AM  25   Q.   "NEED TO AGREE ON SIGNAGE, ET CETERA, IN ADVANCE.  THERE

11:08AM  1    IS A MEETING SCHEDULED NEXT MONDAY WITH WORK STREAM EXECUTIVES

11:08AM  2    TO DRIVE OPERATING MODEL CHANGES.  THIS MESSAGE NEEDS TO COME

11:08AM  3    FROM THE TOP DOWN," AND THEN IT GOES ON.

11:08AM  4         DO YOU SEE THAT?

11:08AM  5    A.   YES.

11:08AM  6    Q.   AND IT ACTUALLY TALKS ABOUT SOMEONE NAMED "ABHI DHAR IS

11:08AM  7    THE HEAD OF WALGREENS I.T. INFRASTRUCTURE."

11:08AM  8         RIGHT?

11:08AM  9    A.   YES.

11:08AM 10    Q.   THAT PIECE WOULD ALSO BE NECESSARY AS THE PARTNERSHIP

11:08AM 11    CONTINUED; RIGHT?

11:08AM 12    A.   CORRECT.

11:08AM 13    Q.   OKAY.  DURING THIS TIME, THERE HAD BEEN DISCUSSION OF A

11:09AM 14    NEW BUSINESS MODEL, BUT A CONTRACT HADN'T BEEN SIGNED; RIGHT?

11:09AM 15    A.   PART OF THIS IS WE WERE STARTING TO WORK ON A NEW

11:09AM 16    CONTRACT, BUT AT THAT MEETING WE AGREED WE WOULD START TO

11:09AM 17    TRANSITION OVER TO THIS NEW MODEL CONCURRENTLY WITH A NEW

11:09AM 18    CONTRACT.

11:09AM 19    Q.   OKAY.  BUT YOU WANTED TO ACTUALLY HAVE THE CONTRACT IN

11:09AM 20    PLACE BEFORE THE ACTUAL BUILDING OF STORES AND ACTIVITY LIKE

11:09AM 21    THAT WOULD CONTINUE; RIGHT?

11:09AM 22    A.   OF COURSE.

11:09AM 23    Q.   AND THAT'S REFLECTED, FOR EXAMPLE, ON PAGE 12 IN THE

11:09AM 24    BULLET THAT WE CAN HIGHLIGHT RIGHT BEFORE THE SECOND HEADING.

11:09AM 25         DO YOU SEE, "PER CASEY KOZLOWSKI, THIS IS ON HOLD UNTIL

11:09AM  1    CONTRACT IS RENEGOTIATED."

11:09AM  2         DO YOU SEE THAT?

11:10AM  3    A.   YES.

11:10AM  4    Q.   AND THAT'S THAT CONCEPT; RIGHT?

11:10AM  5    A.   WELL, IN THIS PARTICULAR BULLET POINT, WHAT SHE'S

11:10AM  6    REFERRING TO IS THE STI PLANS IN TUCSON.  THAT'S WHAT THIS IS

11:10AM  7    IN REFERENCE TO.

11:10AM  8         REMEMBER, AS WE DISCUSSED, THE WORK WAS ALREADY STARTING

11:10AM  9    TO TRANSITION TO THE NEW MODEL, AND AS I STATED, THAT WE WOULD

11:10AM  10   START TO TRANSITION BY FEBRUARY 1ST, WHICH WAS ABOUT TWO WEEKS

11:10AM  11   FROM THERE.

11:10AM  12   Q.   OKAY.  THANK YOU.

11:10AM  13        YOU CAN PUT THAT EXHIBIT ASIDE.

11:10AM  14        THE NEXT ONE IS 2394.

11:10AM  15        DO YOU HAVE THAT, MR. JHAVERI?

11:10AM  16   A.   I DO, SIR.

11:10AM  17   Q.   THIS IS ANOTHER PARTNERSHIP MEETING SLIDE DECK, THIS TIME

11:11AM  18   FROM FEBRUARY 17TH, 2015?

11:11AM  19   A.   YES.

11:11AM  20   Q.   AGAIN, MS. HAWORTH?

11:11AM  21   A.   CORRECT.

11:11AM  22   Q.   OKAY.

11:11AM  23        YOUR HONOR, WE OFFER 2394.

11:11AM  24             MR. SCHENK:  NO OBJECTION.

11:11AM  25             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:11AM   1            (DEFENDANT'S EXHIBIT 2394 WAS RECEIVED IN EVIDENCE.)

11:11AM   2    BY MR. COOPERSMITH:

11:11AM   3    Q.   OKAY.  SO THIS IS A MEETING ABOUT A MONTH AFTER THE LAST

11:11AM   4    ONE WE LOOKED AT; RIGHT?

11:11AM   5    A.   CORRECT.

11:11AM   6    Q.   AND IF YOU GO TO THE SECOND PAGE, IT JUST HAS THE TITLE

11:11AM   7    AND THE DATE.

11:11AM   8         DO YOU SEE THAT?

11:11AM   9    A.   YES.

11:11AM  10    Q.   AND THEN IF YOU GO TO PAGE 4, IT HAS A CURRENT STATUS

11:11AM  11    SLIDE; RIGHT?

11:11AM  12    A.   YES, IT DOES.

11:11AM  13    Q.   PATIENT VISITS CONTINUE TO GO UP; RIGHT?

11:11AM  14    A.   YES, SIR.

11:11AM  15    Q.   AND THEN THERE'S THE SAME SORT OF CATEGORIES ON PAGE 6

11:12AM  16    THAT HAS THE CURRENT PARTNERING CHALLENGES.

11:12AM  17         DO YOU SEE THAT?

11:12AM  18    A.   YES.

11:12AM  19    Q.   AND IT LISTS WHAT THOSE ARE AT THE TIME; RIGHT?

11:12AM  20    A.   YES, SIR.

11:12AM  21    Q.   AND THEN THE NEXT PAGE, THE EXPERIENCE SUMMARY CHART THAT

11:12AM  22    WE HAVE SEEN BEFORE; RIGHT?

11:12AM  23    A.   YES.

11:12AM  24    Q.   AND THIS TIME FOR JANUARY 15TH; RIGHT?

11:12AM  25    A.   CORRECT.

11:12AM   1    Q.   AND THEN IF YOU GO TO PAGE 8 FIRST, MORE OF THOSE BAR

11:12AM   2    GRAPHS; RIGHT?

11:12AM   3    A.   YES.

11:12AM   4    Q.   AND THEN ON PAGE 9, THE LAST TWO BAR GRAPHS; RIGHT?

11:12AM   5    A.   YES.

11:12AM   6    Q.   AND ONE OF THEM IS A SAMPLE COLLECTION PROCESS; RIGHT?

11:12AM   7    A.   YES.

11:12AM   8    Q.   AND THAT WAS STILL OVERWHELMINGLY PEOPLE PUTTING DOWN 5'S;

11:12AM   9    RIGHT?

11:12AM  10    A.   YES.

11:12AM  11    Q.   OKAY.  YOU CAN PUT THAT ASIDE.

11:13AM  12         OKAY.  LET'S GO TO -- WE WERE TALKING ABOUT THE CONTRACT

11:13AM  13    ISSUE, SO TO TALK MORE ABOUT THAT TOPIC, LET'S GO TO 20242.

11:13AM  14         DO YOU SEE THIS IS AN EMAIL STRING?  AT THE TOP IT'S AN

11:13AM  15    EMAIL FROM YOU TO MR. BALWANI, AND BELOW THAT IT'S AN EMAIL

11:13AM  16    FROM MS. KOZLOWSKI.

11:13AM  17         DO YOU SEE THAT?

11:13AM  18    A.   YES.

11:13AM  19    Q.   AND THIS RELATES TO THE ONGOING CONTRACT DISCUSSION

11:13AM  20    BETWEEN THERANOS AND WALGREENS; CORRECT?

11:13AM  21    A.   THAT'S CORRECT.

11:13AM  22    Q.   AND THIS IS DATED IN MARCH HAD OF 2015?

11:14AM  23    A.   YES.

11:14AM  24            MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20242.

11:14AM  25            MR. SCHENK:  NO OBJECTION.

11:14AM  1          THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:14AM  2          (DEFENDANT'S EXHIBIT 20242 WAS RECEIVED IN EVIDENCE.)

11:14AM  3     BY MR. COOPERSMITH:

11:14AM  4     Q.   OKAY.  THE EMAIL, STARTING WITH THE BOTTOM ONE, THIS IS

11:14AM  5     FROM MS. KOZLOWSKI TO A GROUP OF PEOPLE, INCLUDING YOURSELF.

11:14AM  6          IT SAYS, "ALL,

11:14AM  7          "THANKS FOR YOUR TIME YESTERDAY.  ALTHOUGH THERE'S STILL A

11:14AM  8     LOT TO DO, I THINK WE MADE SOME GREAT PROGRESS.  HERE'S WHAT I

11:14AM  9     HAVE AS DELIVERABLES FOR OUR NEXT MEETING ON 3/20.  LET ME KNOW

11:14AM  10    IF I'VE MISSED ANYTHING."

11:14AM  11         RIGHT?

11:14AM  12    A.   YES.

11:14AM  13    Q.   AND SO THERE HAD BEEN A MEETING ON FEBRUARY 17TH?

11:14AM  14    A.   YES.

11:14AM  15    Q.   AND THEN THERE WAS GOING TO BE ANOTHER MEETING ON

11:14AM  16    MARCH 20TH; RIGHT?

11:14AM  17    A.   YES.

11:14AM  18    Q.   RIGHT.  SO WE SAW SOME EXAMPLES OF MEETINGS BEING SPACED

11:14AM  19    SEVERAL MONTHS APART EARLIER; RIGHT?

11:14AM  20    A.   CORRECT.

11:14AM  21    Q.   AND NOW WE'RE SEATING IN THIS EARLY 2015 TIMEFRAME MONTHLY

11:15AM  22    MEETINGS, AT LEAST IN JANUARY, FEBRUARY, AND MARCH; IS THAT

11:15AM  23    RIGHT?

11:15AM  24    A.   CORRECT.

11:15AM  25    Q.   OKAY.  IF YOU GO TO THE SAME EMAIL WE WERE JUST LOOKING

11:15AM  1      AT, IT SAYS, "PUT TOGETHER 18-MONTH EXECUTION PLAN AND 3-YEAR

11:15AM  2      LONG-RANGE PLAN."

11:15AM  3          DO YOU SEE THAT?

11:15AM  4      A.  YES, I DO.

11:15AM  5      Q.  AND THAT WAS GOING TO BE ONE OF THE ITEMS FOR DISCUSSION;

11:15AM  6      RIGHT?

11:15AM  7      A.  CORRECT.

11:15AM  8      Q.  AND THEN NOT TO READ EVERY ONE, BUT IF YOU GO TO THE LAST

11:15AM  9      BULLET, IT SAYS, "DETERMINE STORE LIST FOR SOCAL, ARIZONA (20

11:15AM  10     MORE) AND CENTRAL PENNSYLVANIA (ALLENTOWN)" -- AND THEN,

11:15AM  11     "CASEY/DAVE MILLER (SUNNY TO SEND LIST OF THEIR REQUEST.)"

11:15AM  12         DO YOU SEE THAT?

11:15AM  13     A.  I DO.

11:15AM  14     Q.  AND THEN THE EMAIL ON TOP, YOUR RESPONSE WAS -- WELL, YOU

11:15AM  15     SENT THIS ON TO SUNNY; RIGHT?

11:15AM  16     A.  I DID.

11:15AM  17     Q.  YOU SAY, "HELLO SUNNY -

11:15AM  18         "THANK YOU AGAIN FOR YOUR TIME AND SCOTT'S TIME.

11:15AM  19     APPRECIATE THE CANDOR AND DISCUSSION.  I DO BELIEVE WE MADE

11:16AM  20     GOOD PROGRESS YESTERDAY.  WE HAVE A FEW THINGS TO TIE UP --

11:16AM  21     I'VE ASKED THAT WE HAVE OUR 'ALMOST' READY NEXT VERSION BY

11:16AM  22     EARLY NEXT WEEK IN ANTICIPATION OF NEXT FRIDAY'S MEETING.

11:16AM  23     LOOKING FORWARD TO COMPLETING THE AGREEMENT."

11:16AM  24         DO YOU SEE THAT?

11:16AM  25     A.  YES.

11:16AM  1    Q.   AND SO YOU'RE TRYING TO DRIVE THIS CONTRACT PROCESS AND

11:16AM  2    FINALIZATION OF IT FORWARD; RIGHT?

11:16AM  3    A.   YES.

11:16AM  4    Q.   LET'S LOOK AT EXHIBIT 2449 NEXT ON THE SAME TOPIC OF THE

11:16AM  5    CONTRACT.

11:17AM  6         (PAUSE IN PROCEEDINGS.)

11:17AM  7              THE WITNESS:  I HAVE IT.

11:17AM  8    BY MR. COOPERSMITH:

11:17AM  9    Q.   OKAY.  THANK YOU.

11:17AM 10         THIS EXHIBIT 2449 IS AN EMAIL, AND ON THE FIRST PAGE IS AN

11:17AM 11    EMAIL FROM JONATHAN SPITZER OF WALGREENS TO YOU AND THEN OTHERS

11:17AM 12    WITHIN WALGREENS; IS THAT CORRECT?

11:17AM 13    A.   YES.

11:17AM 14    Q.   OKAY.  AND IT'S IN CONNECTION WITH THE THERANOS

11:17AM 15    PARTNERSHIP; CORRECT?

11:17AM 16    A.   YES, IT WAS.

11:17AM 17              MR. COOPERSMITH:  YOUR HONOR, WE OFFER 2449.

11:17AM 18              MR. SCHENK:  NO OBJECTION.

11:17AM 19              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:18AM 20         (GOVERNMENT'S EXHIBIT 2449 WAS RECEIVED IN EVIDENCE.)

11:18AM 21    BY MR. COOPERSMITH:

11:18AM 22    Q.   OKAY.  SO, MR. JHAVERI, THIS IS FROM JONATHAN SPITZER;

11:18AM 23    RIGHT?

11:18AM 24    A.   YES.

11:18AM 25    Q.   IT'S ON MARCH 30TH, 2015; RIGHT?

11:18AM   1    A.   YES.

11:18AM   2    Q.   AND DOES JONATHAN SPITZER GO BY JAY SPITZER SOMETIMES?

11:18AM   3    A.   YES.

11:18AM   4    Q.   AND CAN YOU TELL US WHO THAT IS?

11:18AM   5    A.   JAY SPITZER WAS MY FINANCE OFFICER AND HE SUPPORTED ALL OF

11:18AM   6    THE PROJECTS AND PROGRAMS THAT ROLLED UP INTO MY TEAM.

11:18AM   7    Q.   OKAY.  IF YOU GO UP TO THE NEXT PAGE, PAGE 2, YOU CAN SEE

11:18AM   8    THE SIGNATURE BLOCK THERE; RIGHT?

11:18AM   9    A.   YES.

11:18AM   10   Q.   AND SO THAT'S ACCURATE; RIGHT?

11:18AM   11   A.   THAT IS ACCURATE.

11:18AM   12   Q.   ALL RIGHT.  SO LET'S GO BACK TO THE FIRST PAGE, AND

11:18AM   13   MR. SPITZER WRITES, "TEAM LET ME KNOW ANY REVISIONS YOU WOULD

11:18AM   14   LIKE BEFORE SENDING OVER TO ALAN TOMORROW MORNING.  THE BELOW

11:18AM   15   WRITE UP IS DETAILED, BUT I WANT TO MAKE SURE ALAN HAS ALL

11:19AM   16   INFORMATION UP-FRONT."

11:19AM   17        DO YOU SEE THAT?

11:19AM   18   A.   I DO.

11:19AM   19   Q.   AND WHO IS ALAN?

11:19AM   20   A.   ALAN NIELSEN, WHO HE WAS REFERRING TO, WAS THE CHIEF

11:19AM   21   FINANCE OFFICER FOR WALGREENS COMPANY, THE U.S. BASED WALGREENS

11:19AM   22   COMPANY.

11:19AM   23   Q.   OKAY.  LET'S GO TO THE SUBSTANCE OF IT.

11:19AM   24        MR. SPITZER WROTE, "PLEASE FIND ATTACHED A QUICK SNAPSHOT

11:19AM   25   OF THE FINANCIAL AND OPERATIONAL PERFORMANCE OF THE THERANOS

11:19AM 1      PILOT."

11:19AM 2           DO YOU SEE THAT?

11:19AM 3      A.   YES.

11:19AM 4      Q.   AND THEN IT GOES ON, "NOTE THAT THE FINANCIALS ATTACHED

11:19AM 5      REFLECT THE CURRENT CONTRACT IN PLACE IN WHICH WALGREENS IS

11:19AM 6      REIMBURSED $10 PER PATIENT AS WELL AS RESPONSIBLE FOR BUILD OUT

11:19AM 7      COST AND PROVIDING LABOR FOR THE SERVICE START TO FINISH."

11:19AM 8           DO YOU SEE THAT?

11:19AM 9      A.   YES.

11:19AM 10     Q.   AND SO HE'S DESCRIBING THE EXISTING CONTRACT; RIGHT?

11:19AM 11     A.   THAT'S CORRECT.

11:19AM 12     Q.   OKAY.  AND THEN IT SAYS, "STARTING IN FEBRUARY THERANOS

11:19AM 13     HIRED AND STAFFED 40/41 LOCATIONS WITH THEIR PHLEBOTOMISTS AND

11:19AM 14     WALGREENS LABOR HAS BEEN REMOVED FROM THE STORES."

11:19AM 15          DO YOU SEE THAT?

11:19AM 16     A.   YES.

11:19AM 17     Q.   AND SO THAT'S DESCRIBING WHAT WAS ACTUALLY GOING ON IN THE

11:19AM 18     PARTNERSHIP AT THAT TIME; RIGHT?

11:20AM 19     A.   YEAH.

11:20AM 20          JUST ONE CLARIFICATION.  I JUST WANT TO MAKE SURE THAT IT

11:20AM 21     IS CLEAR.

11:20AM 22          WHEN JAY REFERS TO WALGREENS LABOR BEING REMOVED FROM THE

11:20AM 23     STORES, THEY WEREN'T REMOVED FROM THE STORES.  THEY WERE

11:20AM 24     REMOVED FROM THE THERANOS SERVICES.

11:20AM 25     Q.   RIGHT.  WELL, WALGREENS STILL HAS TO MAN ITS OWN STORES;

11:20AM    1    RIGHT?

11:20AM    2    A.   CORRECT.

11:20AM    3    Q.   SOMEONE HAS TO STEER THE SHIP.

11:20AM    4    A.   THE TEAM MEMBERS ARE STILL IN THE STORES, BUT THEY ARE NO

11:20AM    5    LONGER RESPONSIBLE FOR THE THERANOS SERVICES.

11:20AM    6    Q.   THE BLOOD COLLECTION SERVICES?

11:20AM    7    A.   CORRECT.

11:20AM    8    Q.   RIGHT.  SO WALGREENS -- I'M SORRY, THERANOS IS GOING TO

11:20AM    9    PROVIDE THOSE IN THE NEW MODEL.

11:20AM   10    A.   THAT'S RIGHT.

11:20AM   11    Q.   AND THEN IT SAYS, GOING ON, MR. SPITZER WROTE, "WE ARE

11:20AM   12    STILL PERFORMING CHECK IN FOR EACH OF THE THERANOS DIAGNOSTIC

11:20AM   13    PATIENTS WHICH TAKES ON AVERAGE 6 TO 7 MINUTES.

11:20AM   14        DO YOU SEE THAT?

11:20AM   15    A.   YES.

11:20AM   16    Q.   "I HAVE NOT FORESTED" -- MAYBE THAT'S FORECASTED -- "THE

11:21AM   17    CHANGE IN LABOR AT THIS TIME, BUT WE SHOULD EXPECT THE PROJECT

11:21AM   18    OPERATIONAL EXPENSES TO GO FROM ABOUT $100,000 A MONTH TO ABOUT

11:21AM   19    20 TO $40,000 PER MONTH."

11:21AM   20        RIGHT?

11:21AM   21    A.   CORRECT.

11:21AM   22    Q.   THAT'S BECAUSE WALGREENS IS BASICALLY GOING TO OFF-LOAD

11:21AM   23    SOME COSTS, SO IT'S GOING TO HAVE LESS COSTS FOR THESE

11:21AM   24    EMPLOYEES; RIGHT?

11:21AM   25    A.   THAT'S CORRECT.

11:21AM  1    Q.   AND THEN IT SAYS, "THE NEW CONTRACT RENEGOTIATIONS ARE

11:21AM  2    TAKING PLACE AND I HAVE PROVIDED AN EXECUTIVE SUMMARY BELOW."

11:21AM  3         DO YOU SEE THAT?

11:21AM  4    A.   YES.

11:21AM  5    Q.   OKAY.  IT GOES ON.  IN THE NEXT PARAGRAPH, MR. SPITZER

11:21AM  6    WRITES, "PATIENTS PER DAY ACTUALS VERSUS EXPECTED RAMP IS

11:21AM  7    TRENDING SLIGHTLY BELOW BUDGET THE LAST COUPLE OF MONTHS.

11:21AM  8    FEBRUARY WAS AT 6.4 VERSUS 6.6 PATIENTS PER DAY AND YEAR TO

11:21AM  9    DATE AVERAGE IS 4.9 VERSUS 4.9."

11:21AM  10        DO YOU SEE THAT?

11:21AM  11   A.   YES.

11:21AM  12   Q.   AND THEN HE SAYS, "THE BUSINESS TEAM BELIEVES THIS IS DUE

11:21AM  13   TO THE HOLIDAY SYSTEM NATIONAL IMPACT IS TO THE DIAGNOSTIC

11:22AM  14   TESTING INDUSTRY"?

11:22AM  15   A.   YES.

11:22AM  16   Q.   "WE SHOULD SEE THE PATIENTS PER DAY TREND UP AS THERANOS

11:22AM  17   JUST SIGNED A LAB TESTING DEAL WITH A MAJOR HEALTH SYSTEM IN

11:22AM  18   ARIZONA."

11:22AM  19        DO YOU SEE THAT?

11:22AM  20   A.   YES.

11:22AM  21   Q.   AND THEN IT SAYS, "TOTAL PATIENTS YEAR TO DATE FEBRUARY"

11:22AM  22   AND THEN IT HAS THE NUMBERS FOR THAT.

11:22AM  23        DO YOU SEE THAT?

11:22AM  24   A.   YES.

11:22AM  25   Q.   AND THEN IT HAS SOME REVENUE NUMBERS AFTER THAT; CORRECT?

11:22AM  1    A.   YES.

11:22AM  2    Q.   OKAY.  AND THEN IN THE NEXT -- OR THE PARAGRAPH RIGHT

11:22AM  3    AFTER THAT, IT TALKS ABOUT WHAT THE NEW MODEL MIGHT LOOK LIKE

11:22AM  4    FROM A FINANCIAL PERSPECTIVE FOR WALGREENS; RIGHT?

11:22AM  5    A.   CORRECT.

11:22AM  6    Q.   OKAY.  AND MR. SPITZER'S JOB WAS TO SORT OF THINK ABOUT

11:22AM  7    HOW TO SORT OF PLAN THAT OUT GOING FORWARD; RIGHT?

11:22AM  8    A.   YES, MR. SPITZER'S JOB WAS TO PROVIDE THE FINANCIAL IMPACT

11:23AM  9    FOR ANY TYPE OF PROJECT, IN THIS CASE THE THERANOS PARTNERSHIP.

11:23AM  10   Q.   RIGHT.  AND THEN IN THAT LAST PARAGRAPH, HE SAYS "WHAT I

11:23AM  11   DO FEEL IS HELPFUL IS SOME CONTEXT AROUND FUTURE THERANOS,

11:23AM  12   WALGREENS BOOTS ALLIANCE RELATIONSHIP."

11:23AM  13        DO YOU SEE THAT?

11:23AM  14   A.   YES.

11:23AM  15   Q.   "WITH THERANOS TAKING ON BUILD OUT CAPITAL COSTS AND

11:23AM  16   STAFFING PHLEBOTOMIST WITH WALGREENS BEING LIABLE FOR CHECK IN

11:23AM  17   LABOR OUR GOAL WOULD BE TO RECEIVE 3 TIMES RENT AND MINIMUM

11:23AM  18   ABOUT $8 PER PATIENT WHICH WOULD TRANSLATE TO AN EBIT OF TO

11:23AM  19   ABOUT 125 MILLION A YEAR."

11:23AM  20        DO YOU SEE THAT?

11:23AM  21   A.   YES.

11:23AM  22   Q.   AND IT GOES ON, "AT SCALE (2,501 LOCATIONS AND 22.5

11:23AM  23   PATIENTS PER DAY)."

11:23AM  24        DO YOU SEE THAT?

11:23AM  25   A.   YES.

11:23AM   1    Q.   SO HE'S TALKING ABOUT WHAT THOSE NUMBERS LIKE AT THAT TYPE

11:23AM   2    OF SCALE; RIGHT?

11:23AM   3    A.   CORRECT.

11:23AM   4    Q.   AND THAT'S ON MARCH 30TH, 2015?

11:24AM   5    A.   YES, SIR.

11:24AM   6    Q.   OKAY.  LET'S LOOK AT EXHIBIT 20244.

11:24AM   7         20244 IS AN EMAIL STRING AT THE TOP, INCLUDING YOU AND

11:24AM   8    MR. BALWANI, FROM APRIL 8TH, 2015.

11:24AM   9         DO YOU SEE THAT?

11:24AM  10    A.   YES.

11:24AM  11    Q.   AND THEN THERE ARE -- BELOW THAT THERE'S REPORTS ON A

11:24AM  12    MATTER AFFECTING THERANOS AND WALGREENS RELATIONSHIP BY

11:24AM  13    MS. HAWORTH AND MS. ALPHONSO AND SO FORTH.

11:24AM  14         DO YOU SEE THAT?

11:24AM  15    A.   YES, I DO.

11:24AM  16    Q.   OKAY.

11:24AM  17         YOUR HONOR, WE OFFER EXHIBIT 20244.

11:24AM  18              MR. SCHENK:  NO OBJECTION.

11:24AM  19              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:24AM  20         (DEFENDANT'S EXHIBIT 20244 WAS RECEIVED IN EVIDENCE.)

11:25AM  21    BY MR. COOPERSMITH:

11:25AM  22    Q.   OKAY.  LET'S GO TO THE EARLIEST EMAIL IN TIME.  AND JUST

11:25AM  23    TO ORIENT OURSELF, THIS IS APRIL 7TH, 2015; CORRECT?

11:25AM  24    A.   YES.

11:25AM  25    Q.   AND THAT EMAIL READS FROM PATTY HAWORTH "HI TRACY/KIM.

JHAVERI CROSS BY MR. COOPERSMITH (RES.)

11:25AM 1          "WE'VE BEEN NOTICING HIGH PATIENT VOLUME AT THE FOLLOWING

11:25AM 2     STORES."

11:25AM 3          AND THEN IT HAS SOME FIGURES FOR FIVE DIFFERENT WALGREENS

11:25AM 4     STORES; CORRECT?

11:25AM 5     A.   YES.

11:25AM 6     Q.   AND THAT WAS, FOR EXAMPLE, AT STORE NUMBER 13596 THERE

11:25AM 7     WERE 21 PATIENTS?

11:25AM 8     A.   CORRECT, FOR THAT DAY.

11:25AM 9     Q.   FOR THAT DAY?

11:25AM 10    A.   CORRECT.

11:25AM 11    Q.   SO THESE ARE GOOD NUMBERS FOR AT LEAST THOSE STORES;

11:25AM 12    RIGHT?

11:25AM 13    A.   YES.

11:25AM 14    Q.   AND THEN BELOW THAT IT SAYS, "ALSO, MULTIPLE OTHER STORES

11:25AM 15    HIT 20 PLUS PATIENTS PER DAY BETWEEN 3/23 AND 4/3."

11:25AM 16         RIGHT?

11:25AM 17    A.   YES.

11:25AM 18    Q.   AND THEN MS. HAWORTH WRITES, "IS THERE AN EXPLANATION

11:25AM 19    BEHIND THIS, SUCH AS MARKETING AND SALES CAMPAIGN."

11:26AM 20         DO YOU SEE THAT?

11:26AM 21    A.   YES.

11:26AM 22    Q.   "PLEASE LET US KNOW ASAP.  INQUIRING MINDS WANT TO KNOW,"

11:26AM 23    WITH A SMILEY EMOJI.

11:26AM 24         RIGHT?

11:26AM 25    A.   YES.

11:26AM  1    Q.   AND THEN ABOVE THAT, MS. ALPHONSO FROM THERANOS WRITES,

11:26AM  2    "THIS HAS BEEN THE GOAL ALL ALONG FOR SURE.

11:26AM  3         "I EXPECT MORE CONSISTENT AND STRONGER GROWTH AS WELL."

11:26AM  4         DO YOU SEE THAT?

11:26AM  5    A.   YES.

11:26AM  6    Q.   AND YOU FORWARD THE EMAIL TO MR. BALWANI; RIGHT?

11:26AM  7    A.   YES.

11:26AM  8    Q.   AND YOU SAID, "THOUGHTS?"  YOU WANTED TO KNOW

11:26AM  9    MR. BALWANI'S THOUGHTS?

11:26AM  10   A.   YES.

11:26AM  11   Q.   AND THEN MR. BALWANI RESPONDED ABOVE THAT AND HE SAYS,

11:26AM  12   "PLAIN OLD MARKET TRACTION."

11:26AM  13        DO YOU SEE THAT?

11:26AM  14   A.   YES.

11:26AM  15   Q.   AND HE SAYS, "THE REASON IT HAS TAKEN LONGER IS BECAUSE

11:26AM  16   OUR COMPETITION IS DESPERATELY DOING EVERYTHING AND ANYTHING TO

11:26AM  17   STOP OUR GROWTH IN THIS MARKET."

11:26AM  18        DO YOU SEE THAT?

11:26AM  19   A.   YES.

11:26AM  20   Q.   "THIS WAS ANTICIPATED IN ALL PLANNING AND WAR-GAMING

11:26AM  21   SESSIONS WE DID WITH WALGREENS.  FOR INSTANCE, SONORAQUEST HAS

11:26AM  22   BEEN REACHING OUT TO DOCS TO OFFER THEM THERANOS LIKE PRICES IF

11:27AM  23   THEY STOPPED SENDING US PATIENTS."

11:27AM  24        DO YOU SEE THAT?

11:27AM  25   A.   YES.

JHAVERI CROSS BY MR. COOPERSMITH (RES.)

11:27AM   1    Q.   AND HE'S TALKING ABOUT THERE ONE OF THE COMPETITORS, WHICH

11:27AM   2    IS A LABORATORY CALLED SONORAQUEST; RIGHT?

11:27AM   3    A.   YES.

11:27AM   4    Q.   AND THAT'S A PART OF QUEST DIAGNOSTICS THAT OPERATES IN

11:27AM   5    ARIZONA; RIGHT?

11:27AM   6    A.   CORRECT.

11:27AM   7    Q.   AND THEN IF YOU GO BELOW, IT SAYS, "ONCE WE HAVE OUR

11:27AM   8    DEDICATED SPACES OR EVEN 40 PERCENT PLUS GOLD SPACES, WE WILL

11:27AM   9    BEGIN OUR MARKETING AND ADVERTISING CAMPAIGN WHICH HAS BEEN ON

11:27AM  10    HOLD UNTIL WE GET THE BUILD OUT DONE."

11:27AM  11         DO YOU SEE THAT?

11:27AM  12    A.   YES.

11:27AM  13    Q.   AND THAT'S WHAT MR. BALWANI WAS TELLING YOU ON APRIL 8TH,

11:27AM  14    2015?

11:27AM  15    A.   CORRECT.

11:27AM  16    Q.   AND HE SAID, "IN ADDITION, WE ANTICIPATE SIGNIFICANT

11:27AM  17    VOLUME FROM SEVERAL OTHER DEALS WE ARE WORKING ON."

11:27AM  18         RIGHT?

11:27AM  19    A.   YES.

11:27AM  20    Q.   "WE EXPECT 20 PLUS GUESTS IN EVERY STORE EVERY WORKDAY IN

11:27AM  21    A FEW MONTHS."

11:27AM  22         DO YOU SEE THAT?

11:27AM  23    A.   I DO.

11:27AM  24    Q.   ALL RIGHT.  SO, MR. JHAVERI, IN CONNECTION WITH POTENTIAL

11:27AM  25    STORE BUILD OUTS AND SELECTION OF STORES, YOU'RE AWARE, RIGHT,

11:28AM   1    THAT WALGREENS HAD TO SEND THERANOS CERTAIN DATA REGARDING ALL

11:28AM   2    OF THEIR STORES AND THE DEMOGRAPHICS OF THOSE STORES; CORRECT?

11:28AM   3    A.   CORRECT.

11:28AM   4    Q.   AND THERE WAS A PERSON AT WALGREENS WHO WAS ACTUALLY

11:28AM   5    RESPONSIBLE FOR THAT TYPE OF THING; RIGHT?

11:28AM   6    A.   THAT'S CORRECT.

11:28AM   7    Q.   AND THAT WAS SOMEONE NAMED JASON BURKE?

11:28AM   8    A.   CORRECT.

11:28AM   9    Q.   AND YOU'RE AWARE THAT MR. BURKE SENT A LENGTHY SPREADSHEET

11:28AM   10   THAT HAD A LOT OF DEMOGRAPHICS ABOUT ALL OF WALGREENS STORES

11:28AM   11   NATIONWIDE; RIGHT?

11:28AM   12   A.   I DIDN'T SEE ANY OF THE SPREADSHEETS, BUT I CAN TELL YOU

11:28AM   13   THERE WAS INFORMATION SHARED SO WE COULD SELECT THE RIGHT

11:28AM   14   STORES.

11:28AM   15   Q.   OKAY.  WELL, LET ME SHOW YOU EXHIBIT 206 -- LET ME GET THE

11:28AM   16   NUMBER RIGHT HERE -- EXHIBIT 20618.

11:28AM   17        MR. JHAVERI, YOU'RE NOT GOING TO FIND THESE IN YOUR

11:29AM   18   BINDERS BECAUSE IT WOULD BE MAYBE 2,000 PAGES IF WE PRINTED IT

11:29AM   19   OUT, SO I THINK WE WILL STICK TO THE SCREEN ON THIS ONE.  I

11:29AM   20   THINK EVERYONE WOULD THANK ME.

11:29AM   21        IT'S EXHIBIT 20618, AND IT'S ON YOUR SCREEN AND IT'S NOT

11:29AM   22   IN EVIDENCE YET, SO LET'S JUST TALK ABOUT IT FIRST.

11:29AM   23        OKAY.  YOU SEE THIS IS A LIST OF THOUSANDS AND THOUSANDS

11:29AM   24   OF WALGREENS STORES; RIGHT?

11:29AM   25   A.   YES.

11:29AM   1    Q.   AND IF YOU KIND OF SCROLL OVER TO THE RIGHT, YOU CAN SEE

11:29AM   2    SOME OF THE COLUMNS THERE.  DO YOU SEE IT HAS ALL KINDS OF

11:29AM   3    SALES AND DEMOGRAPHICS FOR ALL KINDS OF STORES?

11:29AM   4    A.   YES.

11:29AM   5    Q.   AND THE PURPOSE OF THIS WAS TO MAKE SURE THAT THERANOS HAD

11:29AM   6    THIS DATA SO THAT THEY COULD ASSIST IN SELECTING WHICH STORES

11:29AM   7    COULD BE BUILT OUT; RIGHT?

11:29AM   8    A.   CORRECT.  WE, WE USE THIS DATA TO DETERMINE WHICH STORES

11:30AM   9    WE GO TO, WHICH LOCATIONS WE GO TO FOR NEW STORES, AND

11:30AM   10   REVIEWING EXISTING STORES, AND SO WE'RE USING THE SAME DATA TO

11:30AM   11   HELP THE THERANOS TEAM UNDERSTAND IN WHICH STORES WE SHOULD BE

11:30AM   12   OPENING A THERANOS WELLNESS CENTER.

11:30AM   13   Q.   OKAY.  AND, MR. ALLEN, IF YOU WOULD GO -- THIS IS WHAT IS

11:30AM   14   CALLED IN NATIVE FORM, SO IT'S THE ORIGINAL SPREADSHEET.

11:30AM   15        MR. ALLEN, IF YOU GO TO THE FILE TAB, AND YOU SEE THERE'S

11:30AM   16   AN INFO.

11:30AM   17        DO YOU SEE IT HAS SOME INFORMATION THERE ABOUT THE

11:30AM   18   CREATION OF THE DOCUMENT?

11:30AM   19   A.   YES.

11:30AM   20   Q.   AND DO YOU SEE MR. BURKE'S NAME?

11:30AM   21   A.   YES, I DO.

11:30AM   22        MR. COOPERSMITH:  YOUR HONOR, WE OFFER

11:30AM   23   EXHIBIT 20618.

11:30AM   24        THE COURT:  HOW MANY PAGES IS THIS EXHIBIT?

11:30AM   25        MR. COOPERSMITH:  I THINK, PRINTED OUT, IT WOULD

11:30AM   1    PROBABLY BE 2,000 PAGES, YOUR HONOR.

11:30AM   2              THE COURT:  YOU WOULD LIKE TO INTRODUCE 2,000 PAGES?

11:30AM   3              MR. COOPERSMITH:  UNFORTUNATELY, YES.

11:30AM   4              MR. SCHENK:  OBJECTION.  FOUNDATION, 401, AND 403.

11:31AM   5              THE COURT:  I THINK I WILL NEED A LITTLE MORE

11:31AM   6    INFORMATION ABOUT THIS, MR. COOPERSMITH.

11:31AM   7              MR. COOPERSMITH:  OKAY.  SURE, YOUR HONOR.

11:31AM   8              THE COURT:  SO I'LL SUSTAIN THE OBJECTION.

11:31AM   9              MR. COOPERSMITH:  OKAY.  WELL, I'LL ASK A FEW MORE

11:31AM  10    QUESTIONS IF THAT'S OKAY?

11:31AM  11              THE COURT:  SURE.

11:31AM  12              MR. COOPERSMITH:  THANK YOU.

11:31AM  13    Q.  SO, MR. JHAVERI, THIS -- DO YOU UNDERSTAND THAT THIS DATA

11:31AM  14    WAS ASSEMBLED BY MR. BURKE?

11:31AM  15    A.  I'M NOT SURE WHO IT WAS ASSEMBLED BY.  WE HAVE A DATABASE

11:31AM  16    OF THAT.

11:31AM  17    Q.  RIGHT.

11:31AM  18    A.  SO HE'S EXTRACTING THIS TYPE OF INFORMATION FROM THE

11:31AM  19    DATABASE.

11:31AM  20    Q.  AND MR. BURKE WOULD BE EXTRACTING INFORMATION FROM THE

11:31AM  21    DATABASE?

11:31AM  22    A.  CORRECT.

11:31AM  23    Q.  AND THEN HE WOULD ASSEMBLING A SPREADSHEET WITH ALL OF

11:31AM  24    THAT INFORMATION FROM THE DATABASE; CORRECT?

11:31AM  25              MR. SCHENK:  OBJECTION.  SPECULATION.

11:31AM 1          MR. COOPERSMITH:  WELL, I'LL JUST ASK IF YOU KNOW.

11:31AM 2     DO YOU KNOW IF THAT'S WHAT MR. BURKE'S JOB WAS?

11:31AM 3          THE WITNESS:  MR. BURKE'S JOB WAS NOT TO SIMPLY

11:31AM 4     EXTRACT DATA.  HE WAS PART OF OUR MARKET PLANNING AND RESEARCH

11:31AM 5     DEPARTMENT, AND SO HE ASSISTED IN ANY TYPE OF ASSESSMENT THAT

11:31AM 6     NEEDED TO BE DONE FOR A STORE LOCATION OR A POTENTIAL LOCATION.

11:32AM 7     AND SO THAT'S WHAT HE DOES.

11:32AM 8     BY MR. COOPERSMITH:

11:32AM 9     Q.   OKAY.  SO HE WASN'T LIKE A DATA ENTRY PERSON IN OTHER

11:32AM 10    WORDS?

11:32AM 11    A.   NOT THAT I REMEMBER, NO.

11:32AM 12    Q.   RIGHT.  BUT HE COULD ACCESS THE DATABASE; CORRECT?

11:32AM 13    A.   CORRECT.

11:32AM 14    Q.   AND IN THE DATABASE HE COULD FIND INFORMATION ABOUT EVERY

11:32AM 15    WALGREENS STORE IF HE WANTED TO; RIGHT?

11:32AM 16    A.   CORRECT.  THIS IS EXTREMELY CONFIDENTIAL INFORMATION, AND

11:32AM 17    SO WE MADE SURE THAT IT WAS ACCESSIBLE BY ONLY CERTAIN

11:32AM 18    INDIVIDUALS OR CERTAIN DEPARTMENTS THAT ACTUALLY REQUIRED IT TO

11:32AM 19    BE USED, AND SO THAT'S WHAT THIS INFORMATION IS ABOUT.

11:32AM 20    Q.   OKAY.  SO THIS EXTREMELY CONFIDENTIAL, SENSITIVE

11:32AM 21    INFORMATION, MR. BURKE HAD ACCESS TO; RIGHT?

11:32AM 22    A.   IT SEEMS THAT WAY.

11:32AM 23    Q.   RIGHT.  BECAUSE HE CREATED THE SPREADSHEET?

11:32AM 24    A.   CORRECT.

11:32AM 25    Q.   AND MR. BURKE -- NORMALLY WALGREENS WOULD NOT SHARE THIS

11:32AM  1    INFORMATION WITH OTHER OUTSIDE PARTIES; RIGHT?

11:32AM  2    A.   IT'S HARD TO SAY WHO WE WOULD SHARE IT WITH.  WHEN IT

11:32AM  3    WOULD BE APPROPRIATE, THERE WOULD BE AN AGREEMENT IN PLACE, AN

11:33AM  4    NDA IN PLACE OF COURSE WITH A PARTNER, AND IF IT WAS

11:33AM  5    APPROPRIATE, WE WOULD SHARE WHAT WAS NECESSARY.

11:33AM  6    Q.   OKAY.  SO, FOR EXAMPLE, WALGREENS WOULD NOT WANT TO SHARE

11:33AM  7    THIS INFORMATION WITH THE CVS DRUG STORE CHAIN?

11:33AM  8    A.   NO, WE WOULD NOT.

11:33AM  9    Q.   OKAY.  BUT IF YOU HAD A NONDISCLOSURE AGREEMENT, AN NDA,

11:33AM  10   THEN YOU MIGHT SHARE IT; RIGHT?

11:33AM  11   A.   AND IF THERE WAS A BUSINESS PURPOSE TO SHARING IT.

11:33AM  12   Q.   OKAY.  AND THERE WAS AN NDA WITH THERANOS; RIGHT?

11:33AM  13   A.   YES, THERE WAS.

11:33AM  14   Q.   AND THIS DATA WAS SHARED WITH THERANOS PURSUANT TO AN NDA?

11:33AM  15   A.   CORRECT.

11:33AM  16   Q.   AND IF YOU LOOK BACK AT THAT FILE TAB, DO YOU SEE THAT IN

11:33AM  17   ADDITION TO THE AUTHOR, THERE'S ALSO A LAST MODIFIED?

11:33AM  18   A.   YES, I DO.

11:33AM  19   Q.   AND DO YOU SEE, WITHOUT SAYING IT OUT LOUD, DO YOU SEE

11:33AM  20   THAT THERE ARE SOME INITIALS NEXT TO THAT?

11:33AM  21   A.   YES.

11:33AM  22   Q.   AND YOU RECOGNIZE THOSE INITIALS; RIGHT?

11:33AM  23   A.   I DO NOT.

11:33AM  24   Q.   YOU DON'T?  OKAY.

11:33AM  25        OKAY.  ARE YOU AWARE THAT THE DEFENDANT ON TRIAL IS

11:34AM   1   SUNNY BALWANI?

11:34AM   2              MR. SCHENK:  OBJECTION.  COUNSEL IS TESTIFYING NOW.

11:34AM   3              MR. COOPERSMITH:  I'LL ASK A DIFFERENT QUESTION,

11:34AM   4   YOUR HONOR.

11:34AM   5   Q.   MR. JHAVERI, DO YOU UNDERSTAND THAT MR. BALWANI'S INITIALS

11:34AM   6   WOULD BE S.B.?

11:34AM   7   A.   IT WOULD BE, YES.

11:34AM   8   Q.   OKAY.  AND YOU SEE THOSE LETTERS IN THE DOCUMENT?

11:34AM   9   A.   CORRECT.

11:34AM  10   Q.   OKAY.

11:34AM  11              YOUR HONOR, AGAIN, I OFFER THIS DOCUMENT.  IT'S APPARENTLY

11:34AM  12   DATA TRANSMITTED TO THERANOS REGARDING THOUSANDS AND THOUSANDS

11:34AM  13   OF WALGREENS STORES, AND WE WOULD LIKE TO OFFER THAT INTO

11:34AM  14   EVIDENCE AT THIS TIME.

11:34AM  15              MR. SCHENK:  YOUR HONOR, THE SAME OBJECTION,

11:34AM  16   FOUNDATION, 401, 403, AND ALSO NOW I HAVE A CONCERN ABOUT

11:34AM  17   ADMITTING A DOCUMENT THAT APPARENTLY CONTAINS CONFIDENTIAL

11:34AM  18   BUSINESS INFORMATION WITHOUT LIMITATION.

11:34AM  19              THE COURT:  MR. COOPERSMITH, I THINK THERE ARE SOME

11:34AM  20   FOUNDATIONAL ISSUES HERE AND SOME OTHER ISSUES, AND I'M GOING

11:35AM  21   TO SUSTAIN THE OBJECTION.

11:35AM  22              IF YOU WANT TO TALK ABOUT IT LATER, I'M HAPPY TO DO THAT.

11:35AM  23   BUT FOR NOW I'M GOING TO SUSTAIN THE OBJECTION.

11:35AM  24              MR. COOPERSMITH:  YEAH.  YOUR HONOR, I UNDERSTAND.

11:35AM  25   IF WE CAN TAKE IT UP LATER, WE WOULD APPRECIATE THAT.  THANK

11:35AM 1    YOU.

11:35AM 2    Q.   MR. JHAVERI, LET'S -- WITHOUT REFERENCE TO THE EXHIBIT,

11:35AM 3    OKAY, IN 2015 WE HAVE JUST SEEN THAT THERE ARE THESE ONGOING

11:35AM 4    PARTNERSHIP MEETINGS; RIGHT?

11:35AM 5    A.   YES.

11:35AM 6    Q.   OKAY.  LET'S GO TO EXHIBIT 20247 ON THAT TOPIC.

11:36AM 7         OKAY.  MR. JHAVERI, DO YOU SEE THAT EXHIBIT 20247 IS AN

11:36AM 8    EMAIL STRING AMONG YOU AND MR. BALWANI RELATING TO PHX, OR

11:36AM 9    PHOENIX EXPANSION?

11:36AM 10        DO YOU SEE THAT?

11:36AM 11   A.   YES.

11:36AM 12   Q.   AND THIS IS PART OF THE ONGOING WORK AT THERANOS?

11:36AM 13   A.   CORRECT.  WELL, THIS IS IN REFERENCE TO BOTH EXISTING AND

11:36AM 14   POTENTIAL NEW SITES THAT WE ARE LOOKING TO EITHER REMODEL OR

11:36AM 15   OPEN.

11:36AM 16   Q.   OKAY.  THIS IS FROM JUNE 4TH, 2015?

11:36AM 17   A.   YES.

11:36AM 18        MR. COOPERSMITH:  YOUR HONOR, WE OFFER

11:36AM 19   EXHIBIT 20247.

11:36AM 20        MR. SCHENK:  NO OBJECTION.

11:36AM 21   BUT I WONDER IF, IN LIGHT OF MR. JHAVERI'S RECENT

11:36AM 22   TESTIMONY, THE CHART ON PAGES 2 AND 3 SHOULD BE REDACTED.

11:37AM 23        MR. COOPERSMITH:  I DON'T KNOW IF THIS PARTICULAR

11:37AM 24   CHART CONTAINS ANY CONFIDENTIAL SENSITIVE BUSINESS INFORMATION,

11:37AM 25   BUT I GUESS MR. JHAVERI CAN PROBABLY TELL US THAT.

11:37AM  1              THE COURT:  WHY DON'T WE ASK?

11:37AM  2              MR. COOPERSMITH:  YEAH.  THAT'S GREAT.

11:37AM  3   Q.   MR. JHAVERI, JUST TO BE CAREFUL WITH WALGREENS'S SENSITIVE

11:37AM  4   CONFIDENTIAL INFORMATION, DO YOU SEE ON THE CHART ON PAGE 2

11:37AM  5   AND 3 THAT YOU'RE LOOKING AT?  IS ANY OF THIS CONFIDENTIAL OR

11:37AM  6   SENSITIVE IN TERMS OF WALGREENS BUSINESS INFORMATION?  YOU

11:37AM  7   KNOW, IT HAS ADDRESSES AND ZIP CODES AND THINGS, BUT, PLEASE,

11:37AM  8   TELL US IF YOU'RE AWARE OF ANYTHING.

11:37AM  9   A.   WELL, I CAN'T SEE THE ENTIRE CHART, SO THERE OBVIOUSLY IS

11:37AM  10  A CHART THAT IS CUT OFF, PART OF THE CHART IS CUT OFF, SO I

11:37AM  11  DON'T KNOW WHAT IS IN THE INFORMATION.

11:37AM  12       IF IT'S THE SAME INFORMATION BASED ON THE PREVIOUS EXHIBIT

11:37AM  13  THAT YOU SHOWED, THEN I WOULD SAY, YES, IT DOES CONTAIN

11:37AM  14  CONFIDENTIAL INFORMATION, BUT IT'S OBVIOUSLY CUT OFF.

11:37AM  15  Q.   OKAY.  SO JUST TO CLARIFY, THIS EXHIBIT, IF IT WERE GOING

11:38AM  16  TO BE DISPLAYED TO THE JURY, IF THE JUDGE ALLOWED THAT, IT

11:38AM  17  WOULD ONLY BE THIS EXHIBIT.  IT'S A STANDALONE EXHIBIT.

11:38AM  18  NOTHING ELSE WOULD COME IN OTHER THAN WHAT YOU SEE ON THE PAPER

11:38AM  19  IN FRONT IT OF YOU.

11:38AM  20       SO JUST LOOKING AT THAT INFORMATION, DOES ANYTHING STRIKE

11:38AM  21  YOU AS CONFIDENTIAL OR SENSITIVE?

11:38AM  22  A.   NO.

11:38AM  23              THE COURT:  ALL RIGHT.  I'LL ADMIT IT AND IT MAY BE

11:38AM  24  PUBLISHED.

11:38AM  25       (DEFENDANT'S EXHIBIT 20247 WAS RECEIVED IN EVIDENCE.)

11:38AM   1    BY MR. COOPERSMITH:

11:38AM   2    Q.   LET'S GO TO THE FIRST EMAIL IN TIME, WHICH IS THE BOTTOM

11:38AM   3    OF PAGE 1, FROM MR. BLICKMAN.  AND DO YOU SEE IT HAS PHOENIX

11:38AM   4    EXPANSION LIST TO PROCEED?

11:38AM   5        DO YOU SEE THAT?

11:38AM   6    A.   YES.

11:38AM   7    Q.   AND THEN IF YOU GO TO THE NEXT PAGE, IT SAYS, "HI

11:38AM   8    CASEY/PATTY -- PER RECENT CONVERSATIONS, WE NEED TO MOVE

11:38AM   9    FORWARD ASAP WITH THE MUTUALLY AGREED UPON LOCATIONS, GET D1'S

11:38AM  10    FINALIZED, REVIEWED, AND APPROVED TO BEGIN CONSTRUCTION."

11:39AM  11        DO YOU SEE THAT?

11:39AM  12    A.   YES.

11:39AM  13    Q.   AND THEN IT SAYS, "BELOW IS AN EXTRACTED LIST OF THE 34

11:39AM  14    PHX-AREA LOCATIONS (EXISTING AND NEW) THAT ARE APPROVED."

11:39AM  15        DO YOU SEE THAT?

11:39AM  16    A.   YES.

11:39AM  17    Q.   AND THEN IT HAS A LIST OF VARIOUS LOCATIONS; RIGHT?

11:39AM  18    A.   YES.

11:39AM  19    Q.   WALGREENS LOCATIONS?

11:39AM  20    A.   THESE ARE WALGREENS LOCATIONS.

11:39AM  21    Q.   RIGHT.  AND THEN IF YOU GO TO THE PAGE -- I'M SORRY, THE

11:39AM  22    EMAIL ON PAGE 1 FROM MR. BALWANI AT THE BOTTOM.

11:39AM  23        HE SAYS, "NIM.

11:39AM  24        "FYI.  THESE 34 STORES IN THE PHOENIX METRO AREAS ARE

11:39AM  25    FINALIZED, BUT BOTH OUR TEAMS ARE FINAL."

11:39AM  1            DO YOU SEE THAT?

11:39AM  2     A.   YES.

11:39AM  3     Q.   AND THEN YOU WROTE BACK, "TERRIFIC.  THANK YOU.  I AM

11:39AM  4     DRIVING HARD TO GET THE TEAMS TO NAIL DOWN THE STORES AS SOON

11:39AM  5     AS POSSIBLE.  CAN YOU DO ME A FAVOR AND PUSH ON YOUR SIDE AS

11:39AM  6     WELL?"

11:39AM  7            DO YOU SEE THAT?

11:39AM  8     A.   YES.

11:39AM  9     Q.   AND THEN SUNNY BALWANI WROTE, "NIM.

11:39AM 10            "SINCE WE WON'T BE ABLE TO GET EVERYTHING DONE IN

11:39AM 11     PARALLEL, IS IT POSSIBLE TO GET STARTED WITH THESE 34 SO WE

11:40AM 12     HAVE THESE READY WHILE WE WORK THE REST OF THE 10-12 IN

11:40AM 13     PHOENIX?"

11:40AM 14            DO YOU SEE THAT?

11:40AM 15     A.   YES.

11:40AM 16     Q.   AND YOU WROTE, "YES, WE ARE ON THE SAME PAGE.  I SENT THE

11:40AM 17     NOTE TO ALL AREAS TO BEGIN WORK ON THE 34 IMMEDIATELY AS WE

11:40AM 18     ALIGN AROUND THE NEXT 31."

11:40AM 19            DO YOU SEE THAT?

11:40AM 20     A.   YES.

11:40AM 21     Q.   AND THEN MR. BALWANI RESPONDED, "AWESOME.  THANKS."

11:40AM 22            RIGHT?

11:40AM 23     A.   YES.

11:40AM 24     Q.   AND YOU CAN PUT THAT ASIDE.

11:40AM 25            LET'S GO REGARDING THE CONTRACT THAT WE'VE BEEN

11:40AM  1    DISCUSSING, 20233.

11:40AM  2         DO YOU SEE THIS IS ANOTHER EMAIL STRING BETWEEN YOU AND

11:40AM  3    MR. BALWANI AND OTHERS AT WALGREENS?

11:40AM  4    A.   YES, IT IS.

11:40AM  5    Q.   AND THIS IS FROM JUNE 8TH AND 9TH, 2015?

11:41AM  6    A.   YES.

11:41AM  7    Q.   AND IT CONCERNS THE RECAP OF THE MEETING CONCERNING THE

11:41AM  8    PARTNERSHIP; CORRECT?

11:41AM  9    A.   YES.

11:41AM  10   Q.   OKAY.

11:41AM  11        YOUR HONOR, WE OFFER 20233.

11:41AM  12             MR. SCHENK:  NO OBJECTION.

11:41AM  13             THE COURT:  IT'S ADMITTED AND IT MAY BE PUBLISHED.

11:41AM  14        (DEFENDANT'S EXHIBIT 20233 WAS RECEIVED IN EVIDENCE.)

11:41AM  15   BY MR. COOPERSMITH:

11:41AM  16   Q.   MR. JHAVERI, AT THE BOTTOM YOU SEE THERE'S AN EMAIL FROM

11:41AM  17   YOU DATED JUNE 8TH TO MR. BALWANI WITH A COPY TO OTHERS.

11:41AM  18        DO YOU SEE THAT?

11:41AM  19   A.   YES.

11:41AM  20   Q.   AND IT SAYS, "GOOD MORNING, SUNNY,

11:41AM  21        "THANK YOU FOR THE PRODUCTIVE MEETING FRIDAY AFTERNOON.

11:41AM  22   BELOW IS THE RECAP OF THE MEETING."

11:41AM  23        AND THEN IT SAYS, "THERANOS WILL PAY WALGREENS $6 SQUARE

11:41AM  24   FOOT IN MONTHLY RENT (NATIONAL AVERAGE)."

11:41AM  25        DO YOU SEE THAT?

11:41AM  1      A.   YES.

11:41AM  2      Q.   AND THEN "THERANOS WILL PAY WALGREENS A $4 PATIENT SERVICE

11:41AM  3      FEE."

11:41AM  4           RIGHT?

11:41AM  5      A.   YES.

11:41AM  6      Q.   AND THIS WAS PART OF THE RENEGOTIATION OF THE CONTRACT

11:42AM  7      BETWEEN WALGREENS AND THERANOS; CORRECT?

11:42AM  8      A.   CORRECT.

11:42AM  9      Q.   AND THAT THE FEE IN THE EMAIL THAT WE JUST LOOKED AT, THE

11:42AM  10     FEE THAT WAS $10 PER PATIENT IF THE CONTRACT WERE SIGNED IN

11:42AM  11     THIS FASHION, THE FEE WOULD GO DOWN TO $4; RIGHT?

11:42AM  12     A.   CORRECT.

11:42AM  13          THE FEE WOULD GO DOWN TO $4, AND THEN YOU'LL NOTICE THAT

11:42AM  14     THERE'S AN ADDITION OF $6 PER SQUARE FOOT FOR MONTHLY RENT.

11:42AM  15     Q.   RIGHT.  BUT THAT AMOUNT FOR THE AMOUNT OF SQUARE FOOTAGE

11:42AM  16     THAT THERANOS WOULD BE TAKING UP IN THE STORE, THAT WOULD BE A

11:42AM  17     RELATIVELY LOW AMOUNT COMPARED TO THE FEE; RIGHT?

11:42AM  18     A.   IT'S ALL BASED ON THE SQUARE FOOTAGE OF THAT SPACE.

11:42AM  19     Q.   SO IF THE SQUARE FOOTAGE WAS EVEN 1,000 FEET, THAT WOULD

11:42AM  20     BE -- GOT IT.  THANK YOU.  SORRY ABOUT THAT.

11:42AM  21          IF THERE WAS 1,000 SQUARE FEET, IT WOULD BE $6,000 A MONTH

11:42AM  22     IN RENT; RIGHT?

11:42AM  23     A.   THAT'S CORRECT.

11:42AM  24     Q.   AND IF IT WAS 100 SQUARE FEET, IT WOULD BE $600 A MONTH;

11:43AM  25     RIGHT?

11:43AM  1     A.   THAT'S CORRECT.

11:43AM  2     Q.   BUT THE OTHER PART OF IT, THE $4 PER PATIENT, THAT WOULD

11:43AM  3     BE EVERY PATIENT THAT WOULD COME IN, WALGREENS WOULD CAPTURE

11:43AM  4     $4; RIGHTS?

11:43AM  5     A.   FOR THERANOS SERVICES, RIGHT.

11:43AM  6     Q.   RIGHT.  AND THAT WOULD BE DIFFERENT FROM THE PREVIOUS

11:43AM  7     AGREEMENT, WHICH WAS $10; RIGHT?

11:43AM  8     A.   THAT'S CORRECT.

11:43AM  9     Q.   BUT THEN THERE WOULD BE OTHER THINGS THAT WOULD HAPPEN IN

11:43AM  10    EXCHANGE, LIKE WE TALKED ABOUT ALREADY, THERANOS WOULD BE

11:43AM  11    TAKING OVER PROVIDING THE PHLEBOTOMISTS AND PROVIDING THE

11:43AM  12    ACTUAL SERVICES; RIGHT?

11:43AM  13    A.   CORRECT.

11:43AM  14    Q.   AND WALGREENS MIGHT STILL PROVIDE SOME CHECK IN SERVICES?

11:43AM  15    A.   WE WOULD -- WE WOULD STILL BE PROVIDING THE CHECK IN

11:43AM  16    SERVICES.

11:43AM  17    Q.   AND THAT WAS THE NEW RELATIONSHIP THAT YOU WERE -- AND YOU

11:43AM  18    AND YOUR COLLEAGUES WERE TALKING ABOUT WITH THERANOS AT THE

11:43AM  19    TIME IN 2015; RIGHT?

11:43AM  20    A.   CORRECT.  THESE WERE THE BULLET POINTS FROM THAT

11:43AM  21    DISCUSSION, CORRECT.

11:43AM  22    Q.   OKAY.  AND THEN MR. BALWANI RESPONDED TO YOUR EMAIL AND HE

11:43AM  23    WROTE, "NIM.

11:43AM  24         "THANKS FOR THE EMAIL.

11:43AM  25         "CONFIRMING THIS IS WHAT WE DISCUSSED.  WE LOOK FORWARD TO

11:43AM  1    THE CONTRACT DRAFT FROM GREG."

11:43AM  2        RIGHT?

11:44AM  3    A.   YES.

11:44AM  4    Q.   AND THEN IT SAYS -- YOU WROTE BACK, "THANK YOU SUNNY.  WE

11:44AM  5    ARE VERY EXCITED TO MOVE OUR RELATIONSHIP TO THE NEXT LEVEL.  I

11:44AM  6    HAVE NO DOUBT THAT WE WILL DRIVE SUCCESS FOR BOTH OF OUR

11:44AM  7    ORGANIZATIONS AND MORE IMPORTANTLY, OUR PATIENTS."

11:44AM  8        DO YOU SEE THAT?

11:44AM  9    A.   YES.

11:44AM  10   Q.   AND YOU WERE SINCERE WHEN YOU WROTE THAT; RIGHT?

11:44AM  11   A.   YES, I WAS.

11:44AM  12   Q.   OKAY.

11:44AM  13       YOUR HONOR, I'M JUST GOING TO INQUIRE, WE HAVE MADE GOOD

11:44AM  14   PROGRESS, AND I THINK THERE'S MAYBE ANOTHER HALF HOUR OR SO

11:44AM  15   LEFT.

11:44AM  16       WOULD THE COURT PREFER THAT WE CONTINUE, OR TO TAKE A

11:44AM  17   BREAK?  OR WHATEVER THE COURT PREFERS?

11:44AM  18           THE COURT:  IF WE COULD GO FORWARD AND FINISH.

11:44AM  19       WHY DON'T WE HAVE FOLKS TAKE A STANDING BREAK NOW, IF YOU

11:44AM  20   DON'T MIND, AND THEN IF WE CAN BREAK -- IF YOU'RE GOING TO

11:44AM  21   FINISH IN ABOUT 30 MINUTES.

11:44AM  22           MR. COOPERSMITH:  I'M ESTIMATING, YOUR HONOR, YES.

11:44AM  23           THE COURT:  OKAY.  FOLKS, ANY OBJECTION TO GOING 30

11:44AM  24   MORE MINUTES?

11:44AM  25       OKAY.  OUR GOOD JURORS AGREE WITH THAT.

11:45AM   1        SO GO AHEAD AND STAND UP FOR A MINUTE, FOLKS, EVERYONE,

11:45AM   2   AND TAKE A BREAK.  THANK YOU.

11:45AM   3        (STRETCHING.)

11:45AM   4            THE COURT:  ALL RIGHT.  THANK YOU, MR. COOPERSMITH.

11:45AM   5            MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:45AM   6   Q.   OKAY.  MR. JHAVERI, LET'S LOOK AT ONE MORE OF THESE

11:45AM   7   PARTNERSHIP MEETING DOCUMENTS, AND THAT'S EXHIBIT 2859.

11:46AM   8   A.   I HAVE IT.

11:46AM   9   Q.   AND THIS IS AN EXECUTIVE THERANOS SUMMARY PARTNERSHIP.

11:46AM  10        DO YOU SEE THAT?

11:46AM  11   A.   I DO.

11:46AM  12   Q.   AND IT'S DATED OCTOBER 15TH, 2015; RIGHT?

11:46AM  13   A.   YES.

11:46AM  14   Q.   AND IT'S FROM THE DIAGNOSTIC TESTING TEAM TO YOU.

11:46AM  15        DO YOU SEE THAT?

11:46AM  16   A.   YES.

11:46AM  17   Q.   AND IT HAS SOME MORE METRICS, SOME DATA ABOUT THE THERANOS

11:46AM  18   STORES?

11:46AM  19   A.   YES.

11:46AM  20   Q.   OKAY.

11:46AM  21        YOUR HONOR, WE OFFER 2859.

11:46AM  22            MR. SCHENK:  NO OBJECTION.

11:46AM  23            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:46AM  24        (GOVERNMENT'S EXHIBIT 2859 WAS RECEIVED IN EVIDENCE.)

11:46AM  25   BY MR. COOPERSMITH:

11:46AM  1    Q.   MR. JHAVERI, YOU SEE AT THE TOP THE DATE AND THE

11:47AM  2    INFORMATION THAT I JUST WENT OVER; RIGHT?

11:47AM  3    A.   YES.

11:47AM  4    Q.   AND THEN THE CURRENT STATUS, IT SAYS 40 STORES CURRENTLY

11:47AM  5    RUNNING OLD MODEL IN ARIZONA (WAG CHECK IN AT PHARMACY)."

11:47AM  6         DO YOU SEE THAT?

11:47AM  7    A.   YES.

11:47AM  8    Q.   "THERANOS USING PHR AS PRIMARY SPACE)."

11:47AM  9         DO YOU SEE THAT?

11:47AM  10   A.   YES, I DO.

11:47AM  11   Q.   AND IF YOU GO TO THE LAST BULLET THERE IN THAT SECTION, IT

11:47AM  12   SAYS "CONTRACT BEING REVIEWED INTERNALLY BY M & A AND SHOULD BE

11:47AM  13   SIGNED SOON."

11:47AM  14   A.   YES.

11:47AM  15   Q.   AND M & A STANDS FOR MERGERS AND ACQUISITIONS?

11:47AM  16   A.   IT DOES.

11:47AM  17   Q.   AND THAT'S A DEPARTMENT IN WALGREENS; RIGHT?

11:47AM  18   A.   CORRECT, ALL OF OUR PARTNERSHIPS ARE WRITTEN BY THAT TEAM.

11:47AM  19   Q.   THEY HAVE TO REVIEW IT AND SIGN OFF BEFORE IT CAN BE SENT

11:47AM  20   OUT FOR SIGNATURE; CORRECT?

11:47AM  21   A.   CORRECT.

11:47AM  22   Q.   AND THEN IT HAS THE NEW MODEL ROLLOUT BELOW THAT.

11:47AM  23   A.   YES.

11:47AM  24   Q.   AND IT HAS SOME INFORMATION ABOUT ARIZONA PILOT RELAUNCH;

11:48AM  25   RIGHT?

11:48AM  1    A.   YES.

11:48AM  2    Q.   AND THAT WOULD BE WITH THE NEW BUSINESS MODEL THAT WE HAVE

11:48AM  3    BEEN DISCUSSING; RIGHT?

11:48AM  4    A.   CORRECT.

11:48AM  5    Q.   AND THEN SEVEN CENTRAL PENNSYLVANIA STORES, AND IT HAS AN

11:48AM  6    ESTIMATED DATE; RIGHT?

11:48AM  7    A.   YES.

11:48AM  8    Q.   AND TENNESSEE STORE.

11:48AM  9         DO YOU SEE THAT?

11:48AM  10   A.   YES.

11:48AM  11   Q.   AND THEN ILLINOIS, WISCONSIN WILL LIKELY BE THE NEXT

11:48AM  12   MARKETS AFTER THAT; RIGHT?

11:48AM  13   A.   YES.

11:48AM  14   Q.   AND THEN BELOW IT HAS CURRENT FINANCIAL INFORMATION, AND

11:48AM  15   AT THIS POINT THE WEEKLY AVERAGE IS UP TO 13.5 PATIENTS PER DAY

11:48AM  16   PER STORE?

11:48AM  17   A.   YES.

11:48AM  18   Q.   AND IT'S GETTING CLOSER TO THAT 15 PATIENTS PER DAY PER

11:48AM  19   STORE; RIGHT?

11:48AM  20   A.   YES.

11:48AM  21   Q.   AND THEN THERE ARE SOME METRICS ABOUT THE SORT OF THINGS

11:48AM  22   WE LOOKED AT BEFORE, LIKE THE CUSTOMER FEEDBACK; RIGHT?

11:48AM  23   A.   YES.

11:48AM  24   Q.   OKAY.  SO, MR. JHAVERI, THE DATE OF THIS DOCUMENT IS

11:49AM  25   OCTOBER 15TH, 2015; RIGHT?

11:49AM  1     A.   YES.

11:49AM  2     Q.   AND DO YOU RECALL THAT ON THAT VERY DAY THERE WAS A

11:49AM  3     NEGATIVE "WALL STREET JOURNAL" ARTICLE THAT CAME OUT; RIGHT?

11:49AM  4     A.   CORRECT.

11:49AM  5     Q.   AND UP UNTIL THAT DAY, THERE WAS STILL -- THERE WAS THIS

11:49AM  6     ONGOING RELATIONSHIP TALKING ABOUT PLANNING FOR THE FUTURE

11:49AM  7     BETWEEN WALGREENS AND THERANOS; RIGHT?

11:49AM  8     A.   THAT'S CORRECT.

11:49AM  9     Q.   AND THAT ARTICLE CHANGED THINGS; RIGHT?

11:49AM  10    A.   IT DID.

11:49AM  11    Q.   OKAY.  AND EVEN THOUGH M & A WAS REVIEWING THE CONTRACT,

11:49AM  12    ACTUALLY, AS IT TURNED OUT, THAT NEW CONTRACT NEVER GOT SIGNED;

11:49AM  13    RIGHT?

11:49AM  14    A.   IT NEVER DID GET SIGNED.

11:49AM  15    Q.   RIGHT.  OKAY.  LET'S PUT THAT ASIDE, MR. JHAVERI, AND TALK

11:49AM  16    ABOUT A DIFFERENT TOPIC REAL BRIEFLY.

11:49AM  17         SO WALGREENS -- YOU NO LONGER WORK FOR WALGREENS; RIGHT?

11:49AM  18    A.   I DO NOT.

11:49AM  19    Q.   BUT YOU'RE STILL AWARE OF SOME THINGS ABOUT WALGREENS THAT

11:50AM  20    YOU SEE AND HEAR; RIGHT?

11:50AM  21    A.    IT DEPENDS ON WHAT YOU'RE REFERRING TO.

11:50AM  22    Q.   SURE.  WELL, WHAT I'LL ASK YOU ABOUT IN PARTICULAR IS THAT

11:50AM  23    YOU'RE AWARE THAT WALGREENS PUT, AT SOME POINT, BLOOD TESTING

11:50AM  24    SERVICES IN THEIR STORES; RIGHT?

11:50AM  25              MR. SCHENK:  OBJECTION.  RELEVANCE.

11:50AM  1          THE COURT:  ARE YOU TALKING POST?  CAN YOU TIME

11:50AM  2    STAMP THAT FOR US?

11:50AM  3          MR. COOPERSMITH:  SURE.  LET ME STEP BACK FOR A

11:50AM  4    MINUTE, YOUR HONOR, AND MR. JHAVERI.

11:50AM  5    Q.   SO REMEMBER THAT IN THE COURSE OF OUR DISCUSSION, AND ALSO

11:50AM  6    WITH MR. SCHENK, WE HAD BEEN TALKING ABOUT THIS ISSUE OF

11:50AM  7    VENIPUNCTURE AND FINGERSTICK; RIGHT?

11:50AM  8    A.   YES.

11:50AM  9    Q.   AND THE PERCENTAGES; RIGHT?

11:50AM  10   A.   YES.

11:50AM  11   Q.   AND WE SAW SOME DOCUMENTS THAT DISCUSSED THAT TOPIC;

11:50AM  12   RIGHT?

11:50AM  13   A.   CORRECT.

11:50AM  14   Q.   AND YOU'RE AWARE THAT OTHER COMPETITORS OF THERANOS USED

11:50AM  15   TRADITIONAL VENOUS DRAWS EXCLUSIVELY; RIGHT?

11:50AM  16   A.   YES.

11:50AM  17   Q.   AND ONE OF THOSE COMPETITORS WAS LABCORP?

11:50AM  18   A.   YES.

11:50AM  19   Q.   AND LABCORP IS A GIANT LAB CORPORATION THAT HAS SITES ALL

11:51AM  20   OVER THE UNITED STATES; RIGHT?

11:51AM  21   A.   CORRECT.

11:51AM  22   Q.   AND THEY DO ALL VENOUS DRAW?

11:51AM  23   A.   AS FAR AS I KNOW, YES.

11:51AM  24   Q.   AND YOU'RE AWARE THAT LABCORP IS ACTUALLY IN WALGREENS

11:51AM  25   STORES TO THIS DAY?

11:51AM   1           MR. SCHENK:  OBJECTION.  RELEVANCE.

11:51AM   2           THE COURT:  SUSTAINED.

11:51AM   3    BY MR. COOPERSMITH:

11:51AM   4    Q.  OKAY.  LET'S GO ON, MR. JHAVERI, TO A DIFFERENT TOPIC, AND

11:51AM   5    THAT IS SOME THINGS THAT MR. SCHENK ASKED YOU A COUPLE WEEKS

11:51AM   6    AGO WHEN YOU WERE LAST HERE, AND THAT IS WITH REGARD TO A VISIT

11:51AM   7    THAT YOU TOOK TO THERANOS IN AUGUST OF 2013.

11:51AM   8         DO YOU REMEMBER THAT?

11:51AM   9    A.  YES, I DO.

11:51AM   10   Q.  AND THAT WAS ACTUALLY BEFORE YOU GOT HEAVILY INVOLVED IN

11:51AM   11   THE PARTNERSHIP WORK THAT WE'VE BEEN DISCUSSING FOR A LITTLE

11:51AM   12   WHILE NOW; RIGHT?

11:51AM   13   A.  YES.

11:51AM   14   Q.  OKAY.  AND IN THAT MEETING AT THERANOS, YOU ACTUALLY HAD

11:51AM   15   YOUR BLOOD DRAWN; CORRECT?

11:51AM   16   A.  YES.

11:51AM   17   Q.  IT WAS AT THERANOS'S HEADQUARTERS; RIGHT?

11:52AM   18   A.  IT WAS.

11:52AM   19   Q.  AND YOU GOT YOUR BLOOD DRAWN BY A FINGERSTICK; RIGHT?

11:52AM   20   A.  YES.

11:52AM   21   Q.  AND THEN THERANOS RAN TESTS?

11:52AM   22   A.  ON MY BLOOD SAMPLE, YES.

11:52AM   23   Q.  AND YOU HAD OTHER COLLEAGUES WITH YOU; RIGHT?

11:52AM   24   A.  YES.

11:52AM   25   Q.  AND THEY GOT BLOOD TESTS AS WELL?

| | | |
|--|--|--|
| 11:52AM | 1 | A.   SOME OF THEM DID.  NOT ALL OF THEM. |
| 11:52AM | 2 | Q.   BUT YOU DID? |
| 11:52AM | 3 | A.   YES, I DID. |
| 11:52AM | 4 | Q.   AND WHEN YOU GOT BACK TO CHICAGO, YOU GOT RESULTS; RIGHT? |
| 11:52AM | 5 | A.   I DID. |
| 11:52AM | 6 | Q.   AND YOU RECEIVED A COPY OF THE RESULTS; RIGHT? |
| 11:52AM | 7 | A.   I RECEIVED AN EMAIL WITH MY RESULT. |
| 11:52AM | 8 | Q.   OKAY.  AND IF WE CAN TAKE A LOOK AT EXHIBIT 966. |
| 11:52AM | 9 | AND IF YOU GO TO THE NEXT PAGE, MR. ALLEN. |
| 11:52AM | 10 | DO YOU SEE THAT THERE'S YOUR NAME AT THE TOP THERE? |
| 11:53AM | 11 | A.   I'M SORRY.  THIS IS 966B? |
| 11:53AM | 12 | Q.   WE ARE GOING TO LOOK AT 966B IN A MINUTE, MR. JHAVERI. |
| 11:53AM | 13 | BUT FOR NOW, LET'S JUST LOOK AT 966, IF THAT HELPS. |
| 11:53AM | 14 | THE COURT:  I DON'T BELIEVE IT'S IN THE BINDER. |
| 11:53AM | 15 | THE WITNESS:  IT'S NOT. |
| 11:53AM | 16 | THE COURT:  IT'S NOT IN MY BINDER.  I'M CERTAIN IT'S |
| 11:53AM | 17 | NOT IN THE OTHERS. |
| 11:53AM | 18 | MR. COOPERSMITH:  OKAY.  IT'S NOT IN THE BINDERS. |
| 11:53AM | 19 | CAN WE LOOK AT IT ON THE SCREEN? |
| 11:53AM | 20 | THE COURT:  YES.  IT'S NOT IN EVIDENCE? |
| 11:53AM | 21 | MR. COOPERSMITH:  I THINK IT IS IN EVIDENCE. |
| 11:53AM | 22 | THE COURT:  ALL RIGHT.  THEN IT CAN BE DISPLAYED TO |
| 11:53AM | 23 | THE JURY. |
| 11:53AM | 24 | BY MR. COOPERSMITH: |
| 11:53AM | 25 | Q.   THEN WE'RE LOOKING AT PAGE 7 OF 966. |

11:53AM   1          DO YOU SEE THAT ON THE SCREEN NOW?

11:53AM   2     A.   I DO.

11:53AM   3     Q.   AND DO YOU SEE THAT THAT'S YOUR NAME AT THE TOP?

11:53AM   4     A.   YES, SIR.

11:53AM   5     Q.   AND THEN AT THE TOP ABOVE THAT, IT'S THERANOS TEST REPORT

11:53AM   6     TECHNOLOGY DEMONSTRATION; RIGHT?

11:53AM   7     A.   YES, SIR.

11:53AM   8     Q.   AND DO YOU REMEMBER MR. SCHENK ASKED YOU SOME QUESTIONS

11:53AM   9     ABOUT THIS?

11:53AM  10     A.   I DO.

11:53AM  11     Q.   OKAY.  NOW, IF YOU GO DOWN BELOW, YOU SEE THERE'S, LIKE,

11:54AM  12     PATIENT RESULTS AND REFERENCE RANGE.

11:54AM  13          NOTHING APPEARS THERE; RIGHT?

11:54AM  14     A.   NO.

11:54AM  15     Q.   OKAY.  WELL, LET'S GO TO 966B, THAT ONE THAT YOU JUST

11:54AM  16     MENTIONED.

11:54AM  17          AND THIS ONE IS NOT IN EVIDENCE YET.

11:54AM  18     A.   I HAVE IT.

11:54AM  19     Q.   THANK YOU.

11:54AM  20     A.   SORRY.

11:54AM  21     Q.   YOU SEE THAT 966B IS THE SAME EMAIL ON THE COVER AS 966,

11:54AM  22     AND THEN AT PAGE 7, IT'S THE SAME RESULTS PAGE THAT WE HAVE ON

11:54AM  23     THE SCREEN, BUT IT ACTUALLY HAS THE RESULTS FILLED IN.

11:54AM  24          DO YOU SEE THAT?

11:54AM  25     A.   YES, I DO.

11:55AM  1    Q.   OKAY.  AND SO WHEN YOU GOT THAT EMAIL THAT YOU TALKED

11:55AM  2    ABOUT A FEW MINUTES AGO FROM THERANOS AFTER YOU GOT THE

11:55AM  3    FINGERSTICK TEST AT THEIR HEADQUARTERS IN AUGUST OF '13, YOU

11:55AM  4    ACTUALLY GOT THE RESULTS IN THIS FORM FROM THERANOS; CORRECT?

11:55AM  5    A.   YES, I DID.

11:55AM  6    Q.   AND WHAT YOU'RE LOOKING AT IN 966B IS ACTUALLY WHAT YOU

11:55AM  7    RECEIVED; RIGHT?

11:55AM  8    A.   YES.

11:55AM  9    Q.   OKAY.  AND THE REASON I'M DOING IT THIS WAY, MR. JHAVERI,

11:55AM  10   IS THAT I DON'T WANT TO SHOW YOUR PRIVATE HEALTH INFORMATION

11:55AM  11   OUT FOR THE WHOLE WORLD TO SEE.  OKAY?

11:55AM  12        BUT JUST SO WE'RE CLEAR, 966B DOES HAVE RESULTS FOR ALL OF

11:55AM  13   THE ASSAYS LISTED THERE ON PAGES 7 AND 8 ACTUALLY FILLED IN;

11:55AM  14   CORRECT?

11:55AM  15   A.   YES, IT DOES.

11:55AM  16   Q.   WITH THE REFERENCE RANGES?

11:55AM  17   A.   THAT'S CORRECT.

11:55AM  18   Q.   OKAY.  AND WHEN YOU GOT BACK -- YOU ACTUALLY ARE MARRIED

11:55AM  19   TO A NURSE PRACTITIONER; RIGHT?

11:55AM  20   A.   I AM.

11:55AM  21   Q.   AND HER NAME IS SAGE?

11:55AM  22   A.   THAT'S CORRECT.

11:55AM  23   Q.   AND YOU AND YOUR WIFE LOOKED AT THE RESULTS TOGETHER;

11:56AM  24   RIGHT?

11:56AM  25   A.   WE DID.

11:56AM  1          MR. SCHENK:  OBJECTION.  702 AND RELEVANCE.

11:56AM  2          THE COURT:  I'LL ALLOW THAT ANSWER TO REMAIN.

11:56AM  3          MR. COOPERSMITH:  OKAY.  THANK YOU, YOUR HONOR.

11:56AM  4  Q.   SO YOU LOOKED AT THE RESULTS, AND MR. JHAVERI, YOU HAD

11:56AM  5  OBTAINED OTHER RESULTS FROM A DIFFERENT LAB FOR MANY OF THE

11:56AM  6  SAME BLOOD TESTS; RIGHT?

11:56AM  7  A.   I HAD HAD -- I HAD MY ANNUAL PHYSICAL, AND THAT'S WHEN I

11:56AM  8  HAD MY TEST DONE.

11:56AM  9  Q.   RIGHT.  AND I THINK YOU GOT THOSE OTHER RESULTS FROM A LAB

11:56AM  10  CALLED QUEST?

11:56AM  11  A.   I DON'T REMEMBER WHO THEY WERE FROM, BUT THE PROVIDER THAT

11:56AM  12  WE GO TO TAKES THOSE LABS.

11:56AM  13  Q.   OKAY.  AND YOU, WHEN YOU SAW THE THERANOS RESULTS, SAW

11:56AM  14  THAT THE ASSAYS, THE RESULTS THAT THERANOS REPORTED WERE

11:56AM  15  IDENTICAL TO THE LAB TESTS THAT YOU HAD AT THE OTHER LAB;

11:56AM  16  CORRECT?

11:56AM  17  A.   THEY WERE.

11:56AM  18  Q.   OKAY.  EVERY SINGLE ONE?

11:56AM  19  A.   YES.

11:56AM  20  Q.   OKAY.  AND THERANOS DIDN'T -- TO YOUR KNOWLEDGE, THERANOS

11:57AM  21  DIDN'T HAVE ANY INFORMATION ABOUT WHAT YOUR RESULTS WERE FROM

11:57AM  22  YOUR OTHER LAB THAT YOU HAD FROM YOUR ANNUAL CHECKUP, DID

11:57AM  23  THEY?

11:57AM  24  A.   I DON'T BELIEVE SO.

11:57AM  25  Q.   YOU DIDN'T PROVIDE THERANOS WITH YOUR TESTING FROM THE

11:57AM  1     OTHER CHECKUP OR ANYTHING LIKE THAT; RIGHT?

11:57AM  2     A.   I DID NOT.

11:57AM  3     Q.   OKAY.  MR. JHAVERI, DURING YOUR DIRECT EXAMINATION BY

11:57AM  4     MR. SCHENK, YOU WERE SHOWN A NUMBER OF TEXT MESSAGES BY

11:57AM  5     MR. BALWANI AND MS. HOLMES.

11:57AM  6          DO YOU REMEMBER THAT?

11:57AM  7     A.   YES, SIR.

11:57AM  8     Q.   AND OBVIOUSLY YOU WERE NOT PART OF THOSE TEXT MESSAGES;

11:57AM  9     RIGHT?

11:57AM  10    A.   I WAS NOT.

11:57AM  11    Q.   AND YOU WEREN'T -- YOU DON'T KNOW, DO YOU, LIKE, EXACTLY

11:57AM  12    THE CONTEXT OF WHAT THEY WERE TALKING ABOUT IN ALL CASES;

11:57AM  13    RIGHT?

11:57AM  14    A.   NOT IN ALL CASES.  BUT IN SOME CASES I COULD SORT OF

11:57AM  15    EXTRACT WHAT THEY WERE TALKING ABOUT BASED ON WHAT WAS

11:57AM  16    HAPPENING WITH THE PARTNERSHIP.

11:57AM  17    Q.   SO YOU COULD INTERPRET SOME OF THAT?

11:57AM  18    A.   SURE.

11:57AM  19    Q.   BASED ON THE INFORMATION THAT YOU HAD; RIGHT?

11:57AM  20    A.   CORRECT.

11:57AM  21    Q.   BUT YOU WEREN'T PART OF THOSE TEXT MESSAGES?

11:58AM  22    A.   I WAS NOT PART OF THOSE TEXT MESSAGES.

11:58AM  23    Q.   SO YOU DON'T KNOW WHAT OTHER COMMUNICATIONS WERE IN AND

11:58AM  24    AROUND THOSE THINGS THAT MR. SCHENK SHOWED YOU; RIGHT?

11:58AM  25    A.   I DO NOT.

11:58AM   1    Q.   OKAY.  LET'S GO TO EXHIBIT 7660.

11:58AM   2    A.   I HAVE IT.

11:58AM   3    Q.   AND THAT'S AN ARTICLE FROM "THE ECONOMIST"?

11:58AM   4    A.   YES.

11:58AM   5    Q.   FROM APRIL OF 2016?

11:58AM   6    A.   CORRECT.

11:58AM   7    Q.   OKAY.  SO, MR. JHAVERI, IN JUNE OF 2015, YOU BELIEVED IF

11:59AM   8    THERE WAS A PROBLEM WITH THE THERANOS RESULTS, YOU WOULD HAVE

11:59AM   9    HEARD IT; RIGHT?

11:59AM  10    A.   BASED ON MY STATEMENT, YES.

11:59AM  11         IF I CAN CLARIFY?

11:59AM  12    Q.   WELL, NO.  I JUST WANT TO ASK THE QUESTIONS.  YOU MIGHT

11:59AM  13    HAVE A CHANCE TO CLARIFY LATER.

11:59AM  14         YOU BELIEVED, AND YOU GAVE A QUOTE, THAT IF THE RESULTS

11:59AM  15    WERE NOT THERE AT THERANOS, YOU WOULD HAVE HEARD IT?

11:59AM  16    A.   CORRECT.

11:59AM  17    Q.   OKAY.  AND THEN IN ADDITION, YOU ALSO SAID AT THE TIME

11:59AM  18    THAT WALGREENS CHIEF MEDICAL OFFICER HAD REVIEWED THE

11:59AM  19    TECHNOLOGY AND THE DATA BEFORE IT INTRODUCED THE SERVICE;

11:59AM  20    CORRECT?

11:59AM  21    A.   CORRECT.

11:59AM  22    Q.   THAT WAS YOUR STATEMENT?

11:59AM  23    A.   WAS IT IN THE ARTICLE?

11:59AM  24    Q.   PAGE 3, TOP.

11:59AM  25              MR. SCHENK:  OBJECTION.  RELEVANCE.  IT'S A PRIOR

11:59AM  1      INCONSISTENT STATEMENT THAT COUNSEL IS TRYING TO ADMIT.

12:00PM  2              THE COURT:  COUNSEL?

12:00PM  3              MR. COOPERSMITH:  YOU KNOW, I'M GOING TO ASK A

12:00PM  4      DIFFERENT QUESTION, YOUR HONOR.

12:00PM  5      Q.  MR. JHAVERI, APART FROM THE ARTICLE, YOU ACTUALLY SAID

12:00PM  6      THAT THE CHIEF MEDICAL OFFICER OF WALGREENS HAD REVIEWED

12:00PM  7      THERANOS TECHNOLOGY BEFORE IT INTRODUCED THE SERVICE; CORRECT?

12:00PM  8      A.  CORRECT.

12:00PM  9      Q.  OKAY.

12:00PM 10          MAY I HAVE A MOMENT, YOUR HONOR?

12:00PM 11              THE COURT:  YES.

12:00PM 12          (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

12:01PM 13              MR. COOPERSMITH:  YOUR HONOR, I THANK YOU FOR THE

12:01PM 14      COURT'S INDULGENCE.

12:01PM 15          I HAVE NO FURTHER QUESTIONS ON CROSS AT THIS TIME.

12:01PM 16          I ONLY WOULD MENTION WE DID WANT TO RESERVE A FURTHER

12:01PM 17      DISCUSSION WITH THE COURT ABOUT EXHIBIT 20618, WHICH DID NOT

12:01PM 18      COME INTO EVIDENCE.

12:01PM 19          MAYBE WE CAN DO THAT AT A CONVENIENT TIME FOR THE COURT

12:01PM 20      AND PERHAPS REVISIT THAT, EVEN IF IT ENDS UP BEING BEYOND THE

12:01PM 21      SCOPE OF MR. SCHENK'S REDIRECT, IF HE HAS ANY.

12:01PM 22              THE COURT:  ALL RIGHT.  THANK YOU.

12:01PM 23              MR. COOPERSMITH:  OKAY.  SIT DOWN?

12:01PM 24          (LAUGHTER.)

12:01PM 25              MR. COOPERSMITH:  I GOT IT.

4881

```
12:01PM   1              THE COURT:  MR. SCHENK, DO YOU HAVE REDIRECT?

12:01PM   2              MR. SCHENK:  YES, I DO.

12:01PM   3              THE COURT:  AND SHOULD WE START THAT NOW OR SHOULD

12:02PM   4    WE TAKE OUR BREAK NOW?

12:02PM   5              MR. SCHENK:  WHATEVER THE COURT'S PREFERENCE IS.  A

12:02PM   6    BREAK NOW WOULD BE GREAT.

12:02PM   7              THE COURT:  OKAY.  I TOLD THE JURY WE WOULD TAKE

12:02PM   8    30 MINUTES, BUT IT'S BEEN 15.

12:02PM   9         SO THANK YOU, MR. COOPERSMITH, FOR COMING IN UNDER, UNDER

12:02PM  10    ESTIMATE.  I APPRECIATE THAT.

12:02PM  11         (LAUGHTER.)

12:02PM  12              THE COURT:  LET'S TAKE OUR LUNCH BREAK NOW, LADIES

12:02PM  13    AND GENTLEMEN.  WE'LL TAKE 30 MINUTES, 30 MINUTES, AND THEN

12:02PM  14    WE'LL COME BACK AND RESUME.

12:02PM  15         YOU CAN STAND DOWN, SIR.

12:02PM  16              THE WITNESS:  THANK YOU.

12:02PM  17         (JURY OUT AT 12:02 P.M.)

12:02PM  18              THE COURT:  PLEASE BE SEATED.  THANK YOU.

12:03PM  19         THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR OUR

12:03PM  20    NOON BREAK.

12:03PM  21         OUR WITNESS, MR. JHAVERI, HAS LEFT THE COURTROOM.

12:03PM  22         ALL COUNSEL REMAIN.  MR. BALWANI REMAINS.

12:03PM  23         SHOULD WE DISCUSS THIS EXHIBIT?  WHAT WAS THE EXHIBIT

12:03PM  24    NUMBER?

12:03PM  25              MR. COOPERSMITH:  IT WAS EXHIBIT 20618, YOUR HONOR.
```

4882

```
12:03PM   1              THE COURT:  YES.  YES.

12:03PM   2         AND YOU WOULD LIKE TO ADMIT THAT.

12:03PM   3         MR. SCHENK, DO YOU WANT TO BE HEARD ON THIS?

12:03PM   4              MR. SCHENK:  YES.  THANK YOU VERY MUCH, YOUR HONOR.

12:03PM   5         YOUR HONOR, THERE'S NO REASON TO ADMIT A 2,000 PAGE

12:03PM   6    SPREADSHEET WHEN THE VERY NEXT EXHIBIT, I THINK IT WAS 20247,

12:03PM   7    CONTAINED WHAT MR. JHAVERI TESTIFIED WAS SOME INFORMATION FROM

12:03PM   8    THAT SPREADSHEET.

12:03PM   9         AND MR. COOPERSMITH ASKED ZERO QUESTIONS ABOUT THAT

12:03PM  10    PORTION OF THE EXHIBIT.

12:04PM  11         IT IS NOT NECESSARY.  FOR WHATEVER POINT THAT

12:04PM  12    MR. COOPERSMITH IS TRYING TO MAKE THROUGH THAT DOCUMENT, I

12:04PM  13    THINK HE'S ABLE TO MAKE THROUGH THE QUESTIONS THAT HE ASKED

12:04PM  14    MR. JHAVERI.

12:04PM  15         BUT TO ADMIT THAT SPREADSHEET IS UNNECESSARY.  IT SEEMS

12:04PM  16    QUITE VOLUMINOUS, AND IT DOES NOT HAVE ANY ADDITIONAL RELEVANCE

12:04PM  17    THAT THE QUESTIONS THAT MR. COOPERSMITH ASKED WERE UNABLE TO

12:04PM  18    ACHIEVE.

12:04PM  19         WE HAVE ADDITIONAL QUESTIONS ABOUT FOUNDATION, THE

12:04PM  20    SPECULATION THAT WAS REQUIRED BY MR. JHAVERI, IN FACT,

12:04PM  21    ACCEPTING THE TRUTH OF SOME META DATA THAT MR. COOPERSMITH

12:04PM  22    TESTIFIED SHOWED THAT I THINK HIS NAME WAS BURKE CREATED THE

12:04PM  23    DOCUMENT, THAT S.B. MEANT SUNNY BALWANI, THERE WERE A LOT OF

12:04PM  24    ASSUMPTIONS NECESSARY ON THE FOUNDATION SIDE OF THE DOCUMENT.

12:04PM  25         BUT I'M NOT SURE THAT THE COURT EVEN NEEDS TO GET TO THAT
```

12:04PM   1    PORTION OF THE ANALYSIS.

12:04PM   2         I THINK THE COURT SAW THE LIMITED PROBATIVE VALUE OF THIS

12:04PM   3    SPREADSHEET BY THE FAILURE TO USE THE CONTENT OF THE

12:05PM   4    SPREADSHEET IN THE VERY NEXT EXHIBIT.

12:05PM   5              THE COURT:  ALL RIGHT.  THANK YOU.

12:05PM   6         MR. COOPERSMITH.

12:05PM   7              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

12:05PM   8         SO, FIRST OF ALL, THE COMPARISON WITH THE NEXT EXHIBIT IS

12:05PM   9    APPLES AND, I DON'T KNOW, GRAPEFRUITS OR SOMETHING.

12:05PM  10         SO THE SPREADSHEET, WHICH IS THE LONG SPREADSHEET, IS WHAT

12:05PM  11    IT IS.  IT'S 2,000 PAGES IF IT WAS PRESENTED.

12:05PM  12         THAT HAS A LOT OF DEMOGRAPHIC INFORMATION OF EVERY SINGLE

12:05PM  13    WALGREENS STORE, WHICH MR. JHAVERI SAID IS CONFIDENTIAL

12:05PM  14    WALGREENS INFORMATION, BUT WE HAVE IT IN THIS TRIAL.

12:05PM  15         AND THE OTHER SPREADSHEET, WHICH WAS JUST A LITTLE EXCERPT

12:05PM  16    WHICH DIDN'T CONTAIN ANYTHING CONFIDENTIAL, THAT HAS JUST

12:05PM  17    BASICALLY A STORE, ADDRESS, AND A ZIP CODE, AND IT'S A SMALL

12:05PM  18    SUBSET OF THAT.

12:05PM  19         AND THE LONGER EXHIBIT -- AND WE HAVE AN ELECTRONIC FORM.

12:05PM  20    I'M NOT PLANNING TO HAVE ANYONE TOTE AROUND 2,000 PAGES, BUT WE

12:06PM  21    HAVE IT IN ELECTRONIC FORM.

12:06PM  22         WHAT IT DOES IS IT SHOWS THAT -- ONE OF THE GOVERNMENT'S

12:06PM  23    THEMES HERE HAS BEEN THAT THE WALGREENS PARTNERSHIP WITH

12:06PM  24    THERANOS BASICALLY DIED IN THE SUMMER OF 2014, AROUND AUGUST.

12:06PM  25         AND, IN FACT, WHAT THIS EXHIBIT SHOWS IS EVEN AS LATE AS

12:06PM 1    MAY 2015, WALGREENS IS SENDING THIS CONFIDENTIAL PROPRIETARY

12:06PM 2    DATA FOR 8,000 STORES TO THERANOS SO THAT THERANOS CAN GO ABOUT

12:06PM 3    SELECTING HOW THEY'RE GOING TO BUILD OUT WITH WALGREENS, YOU

12:06PM 4    KNOW, THE NEXT TRANCHE OF STORES.

12:06PM 5        SO I THINK THAT THIS IS RELEVANT TO WHAT THE GOVERNMENT

12:06PM 6    HAS PUT FORWARD IN THIS CASE.

12:06PM 7        I APOLOGIZE TO THE COURT THAT IT'S LONG, BUT OBVIOUSLY I

12:06PM 8    DIDN'T CREATE IT.  WE THINK IT'S RELEVANT FOR THAT PURPOSE.

12:06PM 9        I THINK WE WANT TO PUT THIS INTO EVIDENCE SO THAT AT

12:06PM 10   CLOSING ARGUMENT WE CAN SHOW EXACTLY HOW CLOSE THIS

12:06PM 11   RELATIONSHIP WAS AND HOW WALGREENS WAS COMMUNICATING WITH

12:06PM 12   THERANOS, THEIR TRUSTED PARTNER AT THE TIME, ALL OF THIS HIGHLY

12:07PM 13   SENSITIVE DATA SO THAT THERANOS COULD GO ABOUT BUILDING STORES.

12:07PM 14       THE GOVERNMENT'S CASE IS GOING TO BE, AS I UNDERSTAND IT,

12:07PM 15   THAT MR. BALWANI WAS NOT STRAIGHT WITH THE INVESTORS IN THE

12:07PM 16   FALL OF 2014 ABOUT THE NATURE OF THIS RELATIONSHIP AND ITS

12:07PM 17   PROSPECTS FOR EXPANSION.

12:07PM 18       SO I THINK IT'S A RELEVANT EXHIBIT.

12:07PM 19       I THINK IN TERMS OF THE AUTHENTICITY AND FOUNDATION, I

12:07PM 20   DON'T THINK THOSE ARE SERIOUS OBJECTIONS.  I THINK, FRANKLY,

12:07PM 21   THE GOVERNMENT ITSELF HAS SHOWN META DATA IN THE VERY SAME FORM

12:07PM 22   IN THIS TRIAL --

12:07PM 23           THE COURT:  WELL, LET'S TALK ABOUT THIS ONE.

12:07PM 24           MR. COOPERSMITH:  SURE, YOUR HONOR.

12:07PM 25           THE COURT:  THIS ONE, YOU ASKED THE WITNESS ABOUT

```
12:07PM   1    THE INITIALS S.B.  THE INITIALS S.B. APPEAR ON AT LEAST THE

12:07PM   2    PAGE YOU SHOWED, AND IT SAID MODIFIED BY.  AND I THINK YOU

12:07PM   3    SEEMED TO SUGGEST WITH YOUR QUESTION THAT THAT WAS YOUR CLIENT

12:07PM   4    THAT DID THAT, ALTHOUGH THIS WITNESS HAD NO KNOWLEDGE OF THAT.

12:07PM   5            MR. COOPERSMITH:  NO.

12:07PM   6            THE COURT:  SO ARE THERE SOME AUTHENTICATION ISSUES

12:07PM   7    REGARDING THAT?

12:07PM   8            MR. COOPERSMITH:  YEAH.  THANK YOU, YOUR HONOR.

12:07PM   9        I DON'T THINK SO.  I AGREE WITH YOUR HONOR THAT THE

12:08PM  10    INITIALS S.B., THEY DO HAPPEN TO BE THE INITIALS OF

12:08PM  11    SUNNY BALWANI, BUT THERE ARE MANY OTHER PEOPLE IN THE WORLD

12:08PM  12    WITH THE INITIALS S.B.

12:08PM  13        BUT HE DID RECOGNIZE THE NAME, IN RESPONSE TO MY

12:08PM  14    QUESTIONS, OF JASON BURKE, AND JASON BURKE HE DID RECOGNIZE AS

12:08PM  15    A PERSON AT WALGREENS WHO DEALS WITH THIS TYPE OF DATA.

12:08PM  16            THE COURT:  REMIND ME.  DID HE SAY THAT HE KNOWS

12:08PM  17    THAT JASON BURKE PREPARED THIS?

12:08PM  18            MR. COOPERSMITH:  HE KNOWS THAT JASON BURKE HAD

12:08PM  19    ACCESS TO THE DATA AND WAS WORKING WITH THERANOS.  THAT'S OUR

12:08PM  20    MEMORY OF THE TESTIMONY.

12:08PM  21            THE COURT:  MY QUESTION IS, DID HE TESTIFY THAT HE

12:08PM  22    KNEW THAT JASON BURKE PREPARED THE DOCUMENT?

12:08PM  23            MR. COOPERSMITH:  THAT'S THE WAY I HEARD IT.

12:08PM  24        WELL, PREPARED THE DOCUMENT?  I DON'T THINK HE SAID HIS

12:08PM  25    JOB WAS TO PREPARE SPREADSHEETS.  HIS JOB IS TO ASSEMBLE
```

12:08PM  1    DEMOGRAPHIC INFORMATION, AND IN THE COURSE OF THAT JOB, HE HAS

12:08PM  2    ACCESS TO THE DATABASE, HE TESTIFIED, THAT WOULD CONTAIN ALL OF

12:08PM  3    THIS.

12:08PM  4              THE COURT:  I DIDN'T ASK THAT APPROPRIATELY.

12:08PM  5         DID HE TESTIFY THAT HE HAS KNOWLEDGE THAT JASON BURKE

12:08PM  6    CREATED, PREPARED, OR SOMEHOW HAD SOMETHING TO DO WITH THIS

12:08PM  7    DOCUMENT?

12:08PM  8              MR. COOPERSMITH:  THAT'S WHAT I HEARD, YOUR HONOR.

12:08PM  9         AND NOT ONLY THAT, BUT IN THAT META DATA -- AND OBVIOUSLY

12:09PM  10   IF MR. SCHENK HAS SOME EVIDENCE THAT IT'S NOT AUTHENTIC, HE CAN

12:09PM  11   INTRODUCE THAT EVIDENCE.

12:09PM  12        BUT IN THE META DATA THAT WE SHOWED THE WITNESS, AND THE

12:09PM  13   GOVERNMENT, AND THE COURT, IT HAS AUTHORED BY, CREATED BY

12:09PM  14   JASON BURKE, WHO HE RECOGNIZED, AND IT HAS THIS CONFIDENTIAL

12:09PM  15   DATA, SO WHERE ELSE WOULD IT HAVE COME FROM?

12:09PM  16        WE THINK IT'S AUTHENTIC, WE THINK IT'S ADMISSIBLE, AND WE

12:09PM  17   THINK IT'S RELEVANT.

12:09PM  18              THE COURT:  CAN YOU ACCOMPLISH WHAT YOU SEEK TO

12:09PM  19   ACCOMPLISH WITHOUT INTRODUCING THIS CUMULATIVE INFORMATION?

12:09PM  20        MY SENSE IS MANY OF THE STORES THAT ARE LISTED IN THESE

12:09PM  21   2,000 PAGES WERE NOT PART OF THE ADDITIONAL OUTREACH.

12:09PM  22        YOU SEEK TO PUT THIS IN TO SAY THERE WAS STILL A

12:09PM  23   RELATIONSHIP SUCH THAT CONFIDENTIAL INFORMATION WAS BEING

12:09PM  24   EXCHANGED SO THEY COULD FORECAST WHAT IS NEXT, WHAT STORES ARE

12:09PM  25   NEXT?  IS THAT THE PURPOSE?

4887

12:09PM   1          MR. COOPERSMITH:  YOUR HONOR, I THINK IT'S GOING TO

12:09PM   2     BE A JURY QUESTION AS TO WHAT ALL OF THIS MEANS AND WHAT

12:10PM   3     EXACTLY THE EXPANSION PLANS WERE OR WEREN'T.  I THINK THAT'S A

12:10PM   4     JURY QUESTION.

12:10PM   5          BUT FROM OUR STANDPOINT FOR NOW, WE DO WANT TO MAKE SURE

12:10PM   6     THAT THE JURY UNDERSTANDS THE TYPE OF DATA WALGREENS WAS

12:10PM   7     COMMUNICATING.

12:10PM   8          IS THERE ANOTHER WAY TO DO IT?

12:10PM   9          I'M CERTAINLY OPEN TO OTHER WAYS THAT MIGHT BE EFFICIENT.

12:10PM  10          SO, FOR EXAMPLE, YOUR HONOR, IF I WAS ABLE TO ASK

12:10PM  11     QUESTIONS ABOUT WHAT THE DIFFERENT FIELDS WERE AND HOW MANY

12:10PM  12     STORES THERE WERE, THAT MIGHT ACCOMPLISH IT WITHOUT ADMITTING

12:10PM  13     THE EXHIBIT, I'LL GRANT THAT.

12:10PM  14          THE COURT:  WELL, IS THE POINT -- CAN THIS WITNESS

12:10PM  15     TESTIFY THAT THERE WAS INFORMATION THAT WAS EXCHANGED THAT

12:10PM  16     RELATED TO ADDITIONAL STORES THAT SUGGESTS THERE WAS STILL A

12:10PM  17     CONVERSATION GOING ON ABOUT BUILDING THAT?

12:10PM  18          ISN'T THAT THE INFORMATION THAT YOU WANT?

12:10PM  19          MR. COOPERSMITH:  YEAH, HE CAN, AND I THINK HE DID

12:10PM  20     SAY THAT.

12:10PM  21          BUT I ALSO WOULD LIKE TO MAKE SURE THAT IT'S CLEAR EXACTLY

12:10PM  22     WHAT TYPE OF INFORMATION IS BEING TRANSMITTED, BECAUSE IT'S AT

12:10PM  23     LEAST IMPORTANT TO US THAT THE JURY UNDERSTANDS THIS IS THIS

12:11PM  24     CROWN JEWELS, YOU KNOW, HIGHLY SENSITIVE INFORMATION.

12:11PM  25          THE COURT:  RIGHT.  SO IT'S CONFIDENTIAL INFORMATION

```
12:11PM    1    ABOUT STORES, LOCATIONS, INGRESS, EGRESS, EBIT INFORMATION, ALL

12:11PM    2    OF THAT.  IT'S CONFIDENTIAL.

12:11PM    3              MR. COOPERSMITH:  SURE.

12:11PM    4              THE COURT:  AND THAT INFORMATION IS CONTAINED.

12:11PM    5         I THINK YOU CAN ASK THAT QUESTION, I'M NOT SAYING I'M

12:11PM    6    GOING TO PERMIT IT, BUT AS AN ALTERNATIVE TO GETTING THE ENTIRE

12:11PM    7    DOCUMENT IN.

12:11PM    8         SOME OF THE INFORMATION MIGHT NOT BE RELEVANT TO THAT

12:11PM    9    POINT.

12:11PM   10         MR. SCHENK.

12:11PM   11              MR. SCHENK:  YOUR HONOR, MR. COOPERSMITH IS ARGUING

12:11PM   12    TO THE COURT THAT THIS DOCUMENT IS SOMETHING THAT IT IS NOT.

12:11PM   13         IMAGINE AN EMAIL BEING SENT FROM WALGREENS TO THERANOS

12:11PM   14    WITH THIS AS AN ATTACHMENT.

12:11PM   15         WE COULD EXCLUDE THE ATTACHMENT AND SAY THE CONTENT IS

12:11PM   16    UNNECESSARY.

12:11PM   17         THE POINT HE WANTS TO MAKE IS THAT THIS INFORMATION WAS

12:11PM   18    SHARED.

12:11PM   19         AND THEN WE WOULD BE IN A WORLD WHERE WE LEAVE OUT THE

12:11PM   20    ATTACHMENT AND WE ADMIT THE EMAIL.

12:11PM   21         WHAT MR. COOPERSMITH IS DOING, THOUGH, WITH 20618 IS JUST

12:11PM   22    TRYING TO PUT THE EXCEL SPREADSHEET IN FRONT OF THE WITNESS,

12:12PM   23    NOT MR. BURKE, A DIFFERENT WITNESS, AND SAY, IS THIS THE KIND

12:12PM   24    OF INFORMATION THAT SOME OTHER EMPLOYEE AT THERANOS -- AT

12:12PM   25    WALGREENS HAD ACCESS TO, AND IS IT CONFIDENTIAL INFORMATION?
```

4889

12:12PM 1      BUT THIS WITNESS CANNOT PROVIDE THE TESTIMONY THAT ON A

12:12PM 2    CERTAIN DATE THIS SPREADSHEET WAS SHARED WITH THERANOS OR THAT

12:12PM 3    HE CAN DESCRIBE THE GATHERING PROCESS, THE DATA COLLECTION

12:12PM 4    PROCESS.

12:12PM 5      SO WHAT YOU'VE NOW HEARD AS THE BASIS TO ADMIT IT, IN

12:12PM 6    FACT, IS NOT ON ALL FOURS WITH WHAT THIS DOCUMENT IS, AND

12:12PM 7    BECAUSE IT ISN'T, WE'RE IN THIS POSITION WHERE WE HAVE TO

12:12PM 8    DECIDE WHETHER THE SPREADSHEET COMES IN OR THE SPREADSHEET

12:12PM 9    DOESN'T COME IN.

12:12PM 10      ORDINARILY WE COULD ADMIT THE EMAIL AND EXCLUDE THE

12:12PM 11    SPREADSHEET.

12:12PM 12          THE COURT:  WELL, THAT'S WHAT I WAS TRYING TO PROBE.

12:12PM 13        DO YOU HAVE SOMETHING ELSE, MR. COOPERSMITH?

12:12PM 14          MR. COOPERSMITH:  ON THIS TOPIC?

12:12PM 15      WELL, SO, YOUR HONOR, THERE IS NOT AN EMAIL THAT I'M AWARE

12:12PM 16    OF, BUT THAT'S SOMETIMES THE WAY IT GOES.

12:12PM 17      WHAT -- FIRST OF ALL, MR. JHAVERI, I BELIEVE -- I'M NOT

12:13PM 18    SURE I ASKED HIM THIS EXACT QUESTION, BUT I BELIEVE HE WOULD

12:13PM 19    SAY, IF I ASKED HIM, THAT THIS WAS A DATABASE -- IN FACT, HE

12:13PM 20    DID SAY THIS, IT IS DATABASE INFORMATION WITHIN WALGREENS, AND

12:13PM 21    IT'S KEPT IN THE ORDINARY COURSE OF BUSINESS.

12:13PM 22      SO CERTAINLY THE WHOLE SPREADSHEET WITH ALL OF THE

12:13PM 23    DEMOGRAPHICS WITH ABOUT 8,000 STORES, ALL OF THAT DATA IS

12:13PM 24    BUSINESS RECORDS OF WALGREENS.

12:13PM 25      I DON'T THINK THERE COULD BE ANY DISPUTE ABOUT THAT.

12:13PM 1      AS TO WHETHER IT WAS TRANSMITTED, WHAT WE SEE, AND HERE IS

12:13PM 2   THE INDICIA, HE, I THINK, HAS TESTIFIED THAT THIS IS

12:13PM 3   INFORMATION THAT THEY WERE SHARING WITH THERANOS FOR THE

12:13PM 4   PURPOSE OF THERANOS PICKING STORES.

12:13PM 5      THE COURT:  DID HE SAY THAT ABOUT THIS DOCUMENT?

12:13PM 6      MR. COOPERSMITH:  THAT'S WHAT I RECALL, YOUR HONOR.

12:13PM 7   I DON'T HAVE A PHOTOGRAPHIC MEMORY, BUT THAT'S WHAT I HEARD IN

12:13PM 8   THE TESTIMONY.

12:13PM 9      AND THEN IN ADDITION, YOUR HONOR, I KNOW THAT IT'S ONLY

12:13PM 10  EMAILS IN PARTICULAR THAT ARE WITHIN THE PARTIES' STIPULATION

12:13PM 11  IN TERMS OF BATES NUMBERS, BUT THIS ONE DOES HAVE THESE TS

12:13PM 12  BATES NUMBERS, WE'RE SHOWING A NATIVE VERSION, BUT THE DOCUMENT

12:14PM 13  IS THAT WAY.

12:14PM 14     AND SO I DON'T REALLY THINK THAT THERE IS ANY SERIOUS

12:14PM 15  AUTHENTICITY ISSUE, INCLUDING BECAUSE OF THE META DATA, AND

12:14PM 16  WHAT MR. JHAVERI IDENTIFIED.

12:14PM 17     I THINK WHAT MR. SCHENK SEEMS TO BE OBJECTING TO, WHAT I'M

12:14PM 18  HEARING IS NOT THAT WE'RE DISPUTING THAT THIS IS REAL DATA FROM

12:14PM 19  WALGREENS, BUT HE'S TRYING TO CHALLENGE THE IDEA THAT IT WENT

12:14PM 20  TO THERANOS.

12:14PM 21     BUT I THINK MR. JHAVERI ALREADY SAID THAT THIS WAS DATA

12:14PM 22  THAT THEY WERE SHARING WITH THERANOS FOR THE PURPOSE OF THIS

12:14PM 23  PARTNERSHIP SO THEY COULD PICK STORES, AND IF I NEED TO CLARIFY

12:14PM 24  THAT WITH MR. JHAVERI, I CAN CERTAINLY ASK QUESTIONS.

12:14PM 25     I DON'T UNDERSTAND WHY THIS DOCUMENT IS NOT ADMISSIBLE

4891

12:14PM  1    BASED ON ALL OF THE THINGS THAT I HAVE JUST DESCRIBED TO THE

12:14PM  2    COURT.

12:14PM  3              THE COURT:  OKAY.

12:14PM  4              MR. SCHENK:  YOUR HONOR, MR. JHAVERI -- MY

12:14PM  5    RECOLLECTION IS THAT MR. JHAVERI TESTIFIED ABOUT WALGREENS'S

12:14PM  6    USE OF THIS DATA FOR SOMETHING I THINK HE SAID WAS MARKET

12:14PM  7    PLANNING PURPOSES.

12:14PM  8         AND WHETHER MR. JHAVERI CAN SAY THAT THIS INFORMATION IN

12:15PM  9    THE SPREADSHEET WAS COMMUNICATED TO THERANOS FOR STORE

12:15PM 10    SELECTION PURPOSES, I DON'T KNOW IF THAT TESTIMONY ALREADY

12:15PM 11    HAPPENED OR IF THAT WAS SOMETHING THAT MR. JHAVERI COULD

12:15PM 12    PROVIDE, BUT THE POINT IS THAT THAT IS THE ONLY THING THAT

12:15PM 13    WOULD BE RELEVANT.  THAT'S THE EMAIL.  THIS IS THE ATTACHMENT.

12:15PM 14         THERE IS NO NEED TO INCLUDE THIS TYPE OF INFORMATION WHEN

12:15PM 15    I THINK THE POINT IS CORRECT, AND THAT IS, THIS TYPE OF

12:15PM 16    INFORMATION APPEARED IN THE VERY NEXT EXHIBIT, AND THE DEFENSE

12:15PM 17    ASKED NO QUESTIONS ABOUT IT.

12:15PM 18         THE SPECIFIC CELLS AND THE DATA WITHIN THE CELLS IS NOT

12:15PM 19    RELEVANT IN THE TRIAL.

12:15PM 20         EVEN AS MR. COOPERSMITH IS NOW ARGUING IT TO THE COURT,

12:15PM 21    HE'S SAYING IT'S THE TRANSMISSION OF IT THAT MATTERS, SO THEN

12:15PM 22    WE SHOULD KNOW THINGS ABOUT THE DATE IT WAS TRANSMITTED AND BY

12:15PM 23    WHOM.

12:15PM 24         WE DON'T HAVE THAT INFORMATION, BECAUSE ALL WE HAVE IS THE

12:15PM 25    SPREADSHEET.

4892

12:15PM 1    SO THE RELEVANT BASIS THAT MR. COOPERSMITH IS ADVOCATING

12:15PM 2    IS FOR AN EMAIL THAT DOESN'T EXIST, OR AT LEAST HASN'T BEEN

12:15PM 3    PROFFERED.

12:16PM 4    IT'S NOW BEING USED OR BEING APPLIED TO A SPREADSHEET THAT

12:16PM 5    IT ACTUALLY DOESN'T SUPPORT, AND THAT'S WHY THIS DOCUMENT

12:16PM 6    SHOULD NOT BE ADMITTED, BECAUSE THIS DOCUMENT DOES NOT SUPPORT

12:16PM 7    THE RELEVANT BASES THAT MR. COOPERSMITH PROVIDED.

12:16PM 8        THE COURT:  THIS IS WHAT I WAS TALKING ABOUT

12:16PM 9    EARLIER -- THANK YOU, MR. SCHENK -- EARLIER ABOUT WHETHER OR

12:16PM 10   NOT THIS WITNESS CAN TESTIFY ABOUT WAS INFORMATION EXCHANGED

12:16PM 11   WITH YOUR CLIENT AND THE COMPANY WHILE THIS WAS ONGOING.

12:16PM 12   AND IF HE CAN TESTIFY ABOUT THAT TO HIS KNOWLEDGE, I'LL

12:16PM 13   ALLOW HIM TO TESTIFY ABOUT IT.

12:16PM 14   BUT GETTING THIS DOCUMENT IN, I DON'T THINK IT

12:16PM 15   ACCOMPLISHES THAT.

12:16PM 16   IF HE WERE TO SAY, OH, YES, WE CONTINUED TO SHARE THIS AND

12:16PM 17   THE INFORMATION WAS TO FORECAST, TO LOOK AND CONTINUE A

12:16PM 18   BUSINESS RELATIONSHIP, THAT'S HIS UNDERSTANDING, THAT'S FINE.

12:16PM 19   BUT THEN -- AND I THINK THE ANALOGY WITH AN EMAIL AND AN

12:16PM 20   ATTACHMENT IS A GOOD ONE HERE.  THIS IS JUST THE ATTACHMENT,

12:17PM 21   AND HE CAN TESTIFY THAT, YES, I KNOW THIS NAME, AND, YES,

12:17PM 22   MR. COOPERSMITH, S.B., SOMEHOW WERE THE INITIALS OF YOUR

12:17PM 23   CLIENT, OR WHATEVER PURPOSE THAT SERVES.

12:17PM 24   BUT CAN HE TESTIFY THAT THIS WAS SENT, THIS DOCUMENT WAS

12:17PM 25   SENT?

12:17PM  1          MR. COOPERSMITH:  I THINK IT'S SUFFICIENT,

12:17PM  2     YOUR HONOR, IF HE'S ABLE TO TESTIFY, WHICH I THINK HE DID AND

12:17PM  3     HE CAN, THAT THIS TYPE OF INFORMATION WAS SENT, THAT MR. BURKE

12:17PM  4     IS THE PERSON --

12:17PM  5          THE COURT:  WAS SENT?  WAS SENT?

12:17PM  6          MR. COOPERSMITH:  THAT'S WHAT I HEARD HIM SAY,

12:17PM  7     YOUR HONOR, THAT IT'S BECAUSE THEY HAD THIS RELATIONSHIP, THERE

12:17PM  8     WAS A NONDISCLOSURE AGREEMENT, I ASKED THAT QUESTION, AND THEY

12:17PM  9     NORMALLY WOULDN'T SHARE IT WITH COMPETITORS, BUT THEY WOULD

12:17PM  10    SHARE IT WITH A PARTY LIKE THERANOS WHO IS UNDER AN NDA.

12:17PM  11         HE'S AWARE THAT THEY DID.  HE'S AWARE THAT THAT IS

12:17PM  12    MR. BURKE'S JOB.

12:17PM  13         MR. BURKE IS THE PERSON WHO APPEARS TO BE THE AUTHOR OF

12:17PM  14    THE DOCUMENT.

12:17PM  15         I THINK WHAT MR. SCHENK MAY BE GETTING AT IS CAN HE SAY

12:17PM  16    THAT THIS EXACT DOCUMENT, RIGHT, WAS TRANSMITTED ON A CERTAIN

12:18PM  17    DAY TO THERANOS?

12:18PM  18         I DON'T THINK THAT'S REQUIRED FOR ADMISSIBILITY OF THE

12:18PM  19    DOCUMENT GIVEN ALL OF THE OTHER INDICIA THAT WE KNOW THE DATE

12:18PM  20    OF THE CREATION, WE KNOW IT'S AT A RELEVANT TIME, WE KNOW WHO

12:18PM  21    MR. BURKE IS, WE KNOW THIS DATA CAN ONLY COME FROM WALGREENS

12:18PM  22    SECRET DATABASE, WE KNOW THAT THEY SHARE THIS WITH CERTAIN

12:18PM  23    COUNTERPARTIES WHERE THEY HAVE NDA'S, AND HE'S TESTIFIED ALL

12:18PM  24    AROUND THOSE SUBJECTS.

12:18PM  25         SO I DON'T KNOW -- I THINK WE HAVE EVERYTHING WE NEED.

4894

12:18PM   1          AND THE FACT THAT THERE'S NOT AN EMAIL -- IT'S ALWAYS NICE

12:18PM   2     IF THERE'S A COVER EMAIL LAYING OUT EXACTLY WHAT THE ATTACHMENT

12:18PM   3     IS.  THAT'S NOT REQUIRED FOR ADMISSIBILITY.  THERE'S NO RULE

12:18PM   4     THAT SAYS THAT.  THAT OFTEN HAPPENS, BUT IT DIDN'T HAPPEN HERE

12:18PM   5     APPARENTLY, AS FAR AS WE KNOW.

12:18PM   6          SO I THINK IT SHOULD COME IN.

12:18PM   7          AT A MINIMUM, YOUR HONOR, EVEN IF THE COURT IS NOT WILLING

12:18PM   8     TO PERMIT THE DOCUMENT TO COME INTO EVIDENCE, AND I HAD TO SORT

12:18PM   9     OF STOP BECAUSE I DIDN'T WANT TO RUN AFOUL OF THE COURT'S

12:19PM  10     RULINGS, BUT I DO THINK THAT AT A MINIMUM I SHOULD BE ABLE TO

12:19PM  11     ASK A FEW QUESTIONS OF MR. JHAVERI ABOUT THE NATURE OF THE DATA

12:19PM  12     AND THEN TO CLARIFY THAT THIS IS THE TYPE OF DATA THAT THEY

12:19PM  13     WERE SHARING WITH THERANOS IN ORDER FOR THERANOS TO SELECT

12:19PM  14     STORES, AND THAT THE DATE OF THE DOCUMENT IS IN FACT AUTHORED

12:19PM  15     ACCORDING TO THE META DATA ON MAY 14TH, 2015.

12:19PM  16          MR. SCHENK:  MR. COOPERSMITH TOLD THE COURT A MOMENT

12:19PM  17     AGO THAT THE DATE THAT MR. JHAVERI, NOT KNOWING THE DATE WHEN

12:19PM  18     THE INFORMATION WAS SHARED, ISN'T RELEVANT.

12:19PM  19          THAT SIMPLY ISN'T TRUE.

12:19PM  20          IF MR. JHAVERI WAS AWARE THAT THIS TYPE OF DATA WAS

12:19PM  21     TRANSMITTED IN, LET'S SAY, 2014, AND THE SPREADSHEET IS IN

12:19PM  22     2015, MR. JHAVERI'S TESTIMONY DOESN'T SUPPORT THE ADMISSION OF

12:19PM  23     THIS DOCUMENT.

12:19PM  24          FURTHERMORE, YOU COULD STILL ADMIT IN THE FORM OF

12:19PM  25     TESTIMONY THE CONCEPT OF THE EMAIL.  IN OTHER WORDS,

12:19PM 1    MR. JHAVERI IS SAYING I'M AWARE THAT THIS TYPE OF INFORMATION

12:19PM 2    WAS TRANSMITTED FROM WALGREENS TO THERANOS, IS TESTIMONY THAT

12:19PM 3    THE COURT COULD ALLOW.  THAT STILL DOESN'T OPEN THE DOOR TO THE

12:20PM 4    ADMISSION OF THIS PARTICULAR --

12:20PM 5         THE COURT:  LET ME STOP YOU.  PARDON ME.  I THINK

12:20PM 6    I'VE SAID THAT.

12:20PM 7    I'M INCLINED TO ALLOW YOU TO ASK THAT TYPE OF QUESTION

12:20PM 8    WITHOUT ADMITTING THE DOCUMENT.  I DON'T THINK THE DOCUMENT IS

12:20PM 9    NECESSARY.

12:20PM 10   I DO THINK THAT THERE ARE SOME ISSUES THAT CREATE 403

12:20PM 11   ISSUES.  PARTICULARLY, YOUR EXAMINATION ASKING ABOUT THE

12:20PM 12   LETTERS, THE INITIALS S.B.

12:20PM 13   AND THE JURY HAS HEARD HIS ANSWERS TO THAT.  THEY HEARD

12:20PM 14   YOUR QUESTION, AND THEY HEARD THE ANSWER.

12:20PM 15   ADMITTING THE DOCUMENT WITH THAT, I THINK WOULD CAUSE SOME

12:20PM 16   CONFUSION WITH THE JURY.  THERE MIGHT BE SUPPOSITION THAT YOUR

12:20PM 17   CLIENT MAY BE PREPARED THIS OR IN SOME WAY HAD A HAND TO IT

12:20PM 18   THAT MIGHT CAUSE A JUROR TO THINK NEGATIVE ABOUT YOUR CLIENT

12:20PM 19   FOR SOME WAY.

12:20PM 20   I JUST, I JUST --

12:20PM 21        MR. COOPERSMITH:  YOU KNOW, I APPRECIATE THAT,

12:20PM 22   YOUR HONOR.

12:20PM 23        THE COURT:  ALL THINGS ARE POSSIBLE WITH THAT.

12:20PM 24        MR. COOPERSMITH:  AND I --

12:20PM 25        THE COURT:  AND I DON'T THINK THAT'S FAIR TO YOUR

12:20PM 1    CLIENT TO HAVE THAT UNANSWERED.

12:20PM 2        AND, OF COURSE, YOU KNOW, HE HAS CERTAIN RIGHTS THAT HE

12:21PM 3    DOESN'T HAVE TO TESTIFY ABOUT TO CLEAR UP ANY AMBIGUITY ABOUT

12:21PM 4    THAT.  AND I DON'T WANT TO PUT HIM IN A POSITION, NOR YOU, IN A

12:21PM 5    POSITION WHERE YOU FEEL LIKE MAYBE WE HAVE TO PUT TESTIMONY ON

12:21PM 6    ABOUT THAT.

12:21PM 7        THAT'S STRETCHING IT TO THE EXTREME PERHAPS.  BUT STILL,

12:21PM 8    PROPHYLACTICALLY, I WANT TO MAKE SURE YOUR CLIENT GETS A FAIR

12:21PM 9    TRIAL.  AND I DON'T WANT TO CAUSE JEOPARDY TO THAT FOR HIM IN

12:21PM 10   ANY WAY.  THAT'S WHAT 403 IS FOR.

12:21PM 11       SO I DO THINK THAT YOU CAN ACCOMPLISH WHAT YOU SEEK TO

12:21PM 12   ACCOMPLISH WITHOUT INTRODUCTION OF THE DOCUMENT, ASKING

12:21PM 13   MR. JHAVERI QUESTIONS ABOUT INFORMATION THAT MIGHT HAVE BEEN

12:21PM 14   SHARED, CONFIDENTIAL INFORMATION, THE NATURE OF WHEN YOU DO THE

12:21PM 15   STORES, YOU LOOK AT PLANNING, YOU LOOK LOGISTICALLY AT WHERE IS

12:21PM 16   THE BEST LOCATION.  DO WE WANT TO PUT A STORE IN THE MIDDLE OF

12:21PM 17   DEATH VALLEY AS OPPOSED TO IN THE MIDDLE OF PALM SPRINGS?

12:21PM 18   WHICH WOULD BE MORE COST EFFECTIVE AND MORE -- PRODUCE BETTER

12:21PM 19   INCOME?

12:21PM 20       THOSE TYPES OF QUESTIONS, PERHAPS HE CAN ANSWER THOSE.

12:22PM 21   AND WAS THIS THE TYPE OF INFORMATION THAT WOULD BE SHARED?  DO

12:22PM 22   YOU HAVE KNOWLEDGE THAT THIS WAS SHARED AT THAT PARTICULAR

12:22PM 23   TIME, WITHOUT GETTING INTO THE PARTICULARLY DOCUMENT?

12:22PM 24       AND I'LL PERMIT YOU TO DO THAT, BEFORE YOU DO YOUR CROSS--

12:22PM 25   OR EXCUSE ME, REDIRECT, MR. SCHENK.

12:22PM   1       I'LL ALLOW YOU TO CONTINUE WITH YOUR EXAMINATION.

12:22PM   2           MR. COOPERSMITH:  THANK YOU, YOUR HONOR.  I

12:22PM   3   UNDERSTAND.

12:22PM   4       THE ONE THING THAT I WOULD LIKE TO KNOW, IF I WOULD BE

12:22PM   5   ALLOWED TO DO, IS THAT -- YES, I CAN CERTAINLY, AS I UNDERSTAND

12:22PM   6   THE COURT'S RULING, I CAN GO OVER THE FACT THAT THERE IS DATA,

12:22PM   7   THERE IS A DOCUMENT.  WE'RE NOT GOING TO ADMIT THE DOCUMENT,

12:22PM   8   BUT THAT MR. BURKE HAS ACCESS TO THAT TYPE OF DATA.  IT WAS THE

12:22PM   9   TYPE OF DATA THAT WAS SHARED WITH THERANOS.  IT HAS CERTAIN

12:22PM   10   DEMOGRAPHIC INFORMATION, ALL OF THAT WITHOUT ADMITTING THE

12:22PM   11   DOCUMENT.

12:22PM   12       BUT I ALSO THINK IT WOULD BE IMPORTANT FOR THE JURY TO

12:22PM   13   KNOW, THAT THIS PARTICULAR DOCUMENT, EVEN WITHOUT ADMITTING IT,

12:22PM   14   HAS A CREATION DATE OF MAY 14TH, 2015, AND HAS A MODIFIED DATE

12:22PM   15   BY A PERSON WITH THE INITIALS S.B. IN AUGUST OF 2015, AND THAT

12:23PM   16   THAT KIND OF CABINS THE TIME.

12:23PM   17       AS TO THE COURT'S CONCERN, OF COURSE I SHARE THE COURT'S

12:23PM   18   CONCERN.  WE CERTAINLY WANT A FAIR TRIAL FOR OUR CLIENT.

12:23PM   19       THERE'S NOTHING THAT I'M CONCERNED ABOUT THAT IS UNTOWARD

12:23PM   20   ABOUT MR. BALWANI GETTING A SPREADSHEET FROM WALGREENS IN THIS

12:23PM   21   TIMEFRAME AND WORKING WITH THE SPREADSHEET.

12:23PM   22       SO --

12:23PM   23           THE COURT:  YOU'RE NOT A JUROR.

12:23PM   24           MR. COOPERSMITH:  WELL, I MEAN, WE HAVE TO MAKE

12:23PM   25   JUDGMENTS EVERY MINUTE ABOUT WHAT JURORS MIGHT OR MIGHT NOT

12:23PM   1        THINK.

12:23PM   2              SO THAT WAS OUR JUDGMENT IN THIS CASE.

12:23PM   3                    THE COURT:  RIGHT.

12:23PM   4              MR. SCHENK.

12:23PM   5                    MR. SCHENK:  I WOULD OBJECT TO THAT LAST LINE OF

12:23PM   6        QUESTIONING.  I DON'T THINK THERE'S A FOUNDATION FOR THIS

12:23PM   7        WITNESS TO PROVIDE THAT TESTIMONY.

12:23PM   8              IT'S MR. COOPERSMITH TESTIFYING THROUGH THOSE QUESTIONS.

12:23PM   9                    THE COURT:  I'LL ALLOW YOU TO ASK THE QUESTIONS, BUT

12:23PM  10        ASK HIM THE DATE AND THE CREATOR AND ALL OF THAT.  I DON'T

12:23PM  11        THINK THERE'S A FOUNDATION FOR THAT.

12:23PM  12              BUT YOU CAN ASK ABOUT WHETHER OR NOT THIS WAS THE TYPE OF

12:23PM  13        INFORMATION THAT WOULD HAVE BEEN EXCHANGED AND WHETHER OR NOT

12:23PM  14        HE HAS PERSONAL KNOWLEDGE OF THAT EXCHANGE TOOK PLACE BETWEEN

12:24PM  15        WALGREENS AND YOUR CLIENT OR THERANOS AT THIS TIME PERIOD.  YOU

12:24PM  16        CAN TIME STAMP THAT, AND LET'S SEE WHAT HE SAYS.  HE MAY HAVE

12:24PM  17        PERSONAL KNOWLEDGE, I DON'T KNOW.

12:24PM  18                    MR. COOPERSMITH:  HE MIGHT, YOUR HONOR.  OKAY.  I

12:24PM  19        UNDERSTAND.  THANK YOU.

12:24PM  20                    THE COURT:  OKAY.  THANK YOU.

12:24PM  21              (RECESS FROM 12:24 P.M. UNTIL 12:49 P.M.)

         22

         23

         24

         25

| | |
|---|---|
| 1 | **AFTERNOON SESSION** |
| 2 | (COURT CONVENED AT 12:49 P.M.) |
| 12:49PM 3 | THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE |
| 12:49PM 4 | BACK ON THE RECORD.  ALL COUNSEL AND THE PARTIES ARE PRESENT. |
| 12:49PM 5 | OUR JURY AND ALTERNATES ARE PRESENT. |
| 12:49PM 6 | MR. COOPERSMITH:  YOUR HONOR, MR. BALWANI WENT TO |
| 12:49PM 7 | THE BATHROOM. |
| 12:49PM 8 | THE COURT:  OKAY.  LET'S WAIT BEFORE WE GO FORWARD. |
| 12:50PM 9 | (PAUSE IN PROCEEDINGS.) |
| 12:50PM 10 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 12:50PM 11 | MR. BALWANI IS PRESENT. |
| 12:50PM 12 | MR. SCHENK, BEFORE YOU BEGIN, MR. COOPERSMITH, YOU HAD |
| 12:50PM 13 | SOME QUESTIONS, I THINK, I WANTED TO LET YOU FINISH UP WITH. |
| 12:50PM 14 | MR. COOPERSMITH:  YOUR HONOR, WE HAVE NOTHING |
| 12:50PM 15 | FURTHER. |
| 12:50PM 16 | THE COURT:  OKAY.  THANK YOU. |
| 12:50PM 17 | MR. SCHENK. |
| 12:50PM 18 | MR. SCHENK:  YES.  THANK YOU. |
| 12:51PM 19 | YOUR HONOR, MAY I APPROACH? |
| 12:51PM 20 | THE COURT:  YES. |
| 12:51PM 21 | MR. SCHENK:  (HANDING.) |
| 12:51PM 22 | **REDIRECT EXAMINATION** |
| 12:51PM 23 | BY MR. SCHENK: |
| 12:51PM 24 | Q.   GOOD AFTERNOON, MR. JHAVERI. |
| 12:51PM 25 | A.   GOOD AFTERNOON. |

12:51PM 1   Q.   NICE TO SEE YOU AGAIN.

12:51PM 2       I'VE GIVEN YOU BACK THE BINDER OF GOVERNMENT EXHIBITS THAT

12:51PM 3   YOU AND I TALKED ABOUT A FEW WEEKS AGO WHEN YOU TESTIFIED

12:51PM 4   ORIGINALLY.  I MAY ASK YOU SOME QUESTIONS, AND IT WILL BE

12:51PM 5   HELPFUL TO REFER TO THOSE EXHIBITS, SO THEY'RE NOW IN FRONT OF

12:51PM 6   YOU.

12:51PM 7   A.   THANK YOU.

12:51PM 8   Q.   I'M GOING TO ASK YOU QUESTIONS THAT FOLLOW UP ON

12:51PM 9   CROSS-EXAMINATION QUESTIONS THAT MR. COOPERSMITH ASKED YOU,

12:51PM 10  BOTH FROM THE PORTION OF THE CROSS-EXAMINATION FROM A COUPLE

12:51PM 11  WEEKS AGO, AND ALSO FROM THIS MORNING IF THAT'S OKAY?

12:51PM 12  A.   YES.

12:51PM 13  Q.   I'LL START WITH QUESTIONS FROM THE CROSS-EXAMINATION FROM

12:51PM 14  THE PAST, FROM A COUPLE OF WEEKS AGO.

12:51PM 15  A.   SURE.

12:51PM 16  Q.   AND THE FIRST TOPIC THAT I WOULD LIKE TO TALK TO YOU ABOUT

12:52PM 17  IS THE CONCEPT OF EXECUTION RISK.

12:52PM 18      DO YOU RECALL THAT LINE OF QUESTIONS FROM MR. COOPERSMITH?

12:52PM 19  A.   YES, SIR.

12:52PM 20  Q.   I THINK YOU WERE ASKED QUESTIONS ABOUT EXECUTION RISKS

12:52PM 21  BEING COMMON IN BUSINESS.

12:52PM 22      DO YOU RECALL THAT?

12:52PM 23  A.   YES, SIR.

12:52PM 24  Q.   WHEN YOU WERE WORKING ON THE THERANOS PROGRAM ON BEHALF OF

12:52PM 25  WALGREENS, DID YOU EXPECT THAT THERE WOULD BE SOME EXECUTION

12:52PM  1    RISKS?

12:52PM  2    A.   SURE.   ABSOLUTELY.

12:52PM  3    Q.   WHAT KIND OF RISKS WERE YOU CONCERNED ABOUT OR DID YOU

12:52PM  4    PLAN FOR?

12:52PM  5    A.   WELL, WE EXPECTED RISKS ACROSS THE BOARD ON THE PROJECT,

12:52PM  6    WHETHER IT WAS OPERATIONAL ISSUES, TECHNICAL ISSUES, WE HEARD A

12:52PM  7    LOT ABOUT TECHNOLOGY INTEGRATION, SO WE KNEW THAT THERE WERE

12:52PM  8    RISKS THERE.

12:52PM  9         YOU KNOW, WILL THE PARTNERSHIP WORK?  SO THERE'S A RISK IN

12:52PM  10   THE PARTNERSHIP AS WELL, IN EVERY PARTNERSHIP.

12:53PM  11        WILL THE SERVICE ACTUALLY WORK THE WAY THAT WE DESIGN BY

12:53PM  12   BOTH PARTNERS?

12:53PM  13        THERE'S FINANCIAL RISK.  WE'RE INVESTING A LOT OF DOLLARS

12:53PM  14   AND ARE WE GOING TO GET A RETURN BACK?

12:53PM  15        AND SO THERE IS AN ENORMOUS TYPE OF LEVELS OF RISK THAT

12:53PM  16   ARE ALWAYS GOING TO BE PRESENT, AND WE MAKE -- YOU KNOW, WE

12:53PM  17   MAKE GOOD, PRUDENT DECISIONS TO MAKE SURE THAT WE CAN MITIGATE

12:53PM  18   THEM.

12:53PM  19   Q.   DID YOU THINK THAT ONE OF THE RISKS WAS THAT THE THERANOS

12:53PM  20   DEVICE COULD ONLY RUN 12 TESTS?

12:53PM  21        MR. COOPERSMITH:  OBJECTION.  LACKS FOUNDATION.

12:53PM  22   MISSTATES THE EVIDENCE.

12:53PM  23        THE COURT:  DO YOU WANT TO ASK SOME FOUNDATIONAL

12:53PM  24   QUESTIONS, MR. SCHENK?

12:53PM  25        MR. SCHENK:  YES.

12:53PM  1    Q.    WHAT YEAR, IF YOU CAN REMIND THE JURY, DID YOU GET

12:53PM  2    INVOLVED IN THE THERANOS PROGRAM?

12:53PM  3    A.    I WAS EXPOSED TO IT IN 2010, '11, I THINK AROUND THAT

12:53PM  4    TIME.  AND THEN '13, AND THEN I STARTED TO TAKE MORE OWNERSHIP

12:53PM  5    OF THE PARTNERSHIP IN 2014.

12:53PM  6    Q.    SO LET'S TIME STAMP 2014 WHEN YOU STARTED TO TAKE MORE

12:54PM  7    OWNERSHIP OF IT.

12:54PM  8        AT THAT POINT, DID YOU HAVE AN UNDERSTANDING CONCERNING

12:54PM  9    THE NUMBER OF TESTS THAT YOU THOUGHT THERANOS COULD PERFORM ON

12:54PM  10   THERANOS DEVICES?

12:54PM  11   A.    YES.

12:54PM  12   Q.    AND WHAT WAS THAT UNDERSTANDING?

12:54PM  13   A.    MR. BALWANI AND I DISCUSSED A NUMBER OF TESTS THAT COULD

12:54PM  14   BE PERFORMED, AND HE REFERRED ME TO THE THERANOS WEBSITE, AND I

12:54PM  15   FORGET THE EXACT NUMBER, BUT THERE WERE SEVERAL HUNDREDS OF

12:54PM  16   TESTS THAT COULD BE PERFORMED THROUGH THE THERANOS TECHNOLOGY.

12:54PM  17   Q.    SO DID YOU THINK THAT ONE OF THE RISKS WAS, WHEN

12:54PM  18   MR. BALWANI REFERRED YOU TO THE WEBSITE AND TOLD YOU THAT

12:54PM  19   THERANOS COULD RUN THOSE TESTS, THAT THAT WASN'T, TRUE?

12:54PM  20           MR. COOPERSMITH:  OBJECTION.

12:54PM  21   BY MR. SCHENK:

12:54PM  22   Q.    DID YOU THINK THAT THAT WAS A RISK?

12:54PM  23           MR. COOPERSMITH:  OBJECTION.  LEADING.

12:54PM  24           THE COURT:  OVERRULED.

12:54PM  25           DID YOU UNDERSTAND THE QUESTION, SIR?

12:54PM  1        THE WITNESS:  CAN YOU PLEASE ASK THE QUESTION?

12:54PM  2   BY MR. SCHENK:

12:54PM  3   Q.   SURE.  YOU TOLD ME MR. BALWANI REFERRED YOU TO THE WEBSITE

12:54PM  4   AND YOU DIDN'T KNOW HOW MANY TESTS WERE ON IT, BUT I THINK YOU

12:54PM  5   SAID A COUPLE HUNDRED; IS THAT RIGHT?

12:54PM  6   A.   THAT'S CORRECT.

12:54PM  7   Q.   SO I WANT TO KNOW WHETHER THAT NOT BEING TRUE WAS A RISK

12:55PM  8   THAT YOU ANALYZED.  WAS THAT A RISK THAT YOU PREPARED FOR?

12:55PM  9        MR. COOPERSMITH:  OBJECTION.  LACKS FOUNDATION.

12:55PM 10   LEADING.

12:55PM 11        THE COURT:  YOU'RE ASKING HIM, IF THAT WASN'T TRUE,

12:55PM 12   WHETHER THAT WAS A RISK.

12:55PM 13        MR. SCHENK:  PRECISELY.

12:55PM 14        THE COURT:  DID YOU UNDERSTAND THAT QUESTION?

12:55PM 15        THE WITNESS:  RIGHT.

12:55PM 16        THE COURT:  YOU CAN ANSWER THAT QUESTION.

12:55PM 17        THE WITNESS:  NO, I DIDN'T THINK THAT THAT WAS A

12:55PM 18   RISK.

12:55PM 19        YOU KNOW, IT WAS A PARTNERSHIP.  WE, WE TRUSTED EACH OTHER

12:55PM 20   TO MAKE THE PARTNERSHIP WORK, SO WHEN MR. BALWANI TOLD ME THESE

12:55PM 21   ARE THE TESTS AND HERE'S WHICH ONES WITH NUMBERS AND THEY'RE

12:55PM 22   AVAILABLE ON THE WEBSITE FOR ANY PUBLIC CONSUMPTION, I ASSUMED

12:55PM 23   THAT THAT WAS WHAT THEY COULD DELIVER.

12:55PM 24   BY MR. SCHENK:

12:55PM 25   Q.   DID YOU HAVE AN UNDERSTANDING ABOUT WHETHER THERANOS COULD

12:55PM   1    GENERATE ACCURATE BLOOD TEST RESULTS?

12:55PM   2    A.   THAT WAS MY ASSUMPTION, THAT THEY WERE ACCURATE.  IT'S A

12:55PM   3    LAB TEST.  IT HAS TO BE ACCURATE.

12:55PM   4    Q.   AND WAS THAT A RISK THAT YOU ANALYZED, THAT MAYBE THAT

12:55PM   5    ASSUMPTION WAS WRONG?

12:55PM   6    A.   NO.  AT THAT TIME IN 2014 WHEN I STARTED ASSUMING

12:56PM   7    RESPONSIBILITY, I DID NOT ASSUME THAT THAT WAS A RISK.

12:56PM   8    Q.   AND WHY NOT?

12:56PM   9    A.   THE PARTNERSHIP WAS BASED ON THAT.  IT WAS BASED ON

12:56PM   10   THERANOS'S NEW PROPRIETARY TECHNOLOGY, FINGERSTICK TECHNOLOGY

12:56PM   11   THAT CAN DO THESE HUNDREDS AND HUNDREDS OF THOUSANDS OF

12:56PM   12   TESTS -- HUNDREDS OF TESTS ACCURATELY.  THAT'S WHAT LABS DO.

12:56PM   13        MEDICAL DECISIONS ARE BASED ON LABS, AND SO THE ASSUMPTION

12:56PM   14   THAT THAT WOULD BE INACCURATE WAS NEVER, WAS NEVER IN MY MIND.

12:56PM   15   Q.   THE NEXT TOPIC I WANT TO TALK TO YOU A LITTLE BIT ABOUT

12:56PM   16   WAS THE WORK THAT JOHNS HOPKINS WAS DOING FOR WALGREENS.

12:56PM   17        DO YOU RECALL THAT LINE OF QUESTIONS?

12:56PM   18   A.   YES, SIR.

12:56PM   19   Q.   AND IF WE COULD BRING UP EXHIBIT 20532.

12:56PM   20        YOUR HONOR, THIS EXHIBIT WAS PREVIOUSLY ADMITTED.

12:57PM   21             THE COURT:  IT MAY BE PUBLISHED.

12:57PM   22             THE WITNESS:  2052?

12:57PM   23   BY MR. SCHENK:

12:57PM   24   Q.   20532.  IT ACTUALLY -- I THINK I MIGHT HAVE WRITTEN THE

12:57PM   25   WRONG NUMBER DOWN.

12:57PM  1            IT'S PAGE 3 OF EXHIBIT 20532.  IT'S IN, I BELIEVE, THE

12:57PM  2   FIRST DEFENSE BINDER THAT YOU RECEIVED.

12:57PM  3   A.   OH.

12:57PM  4   Q.   BUT IT'S ALSO ON THE SCREEN IN FRONT OF YOU IF THAT'S

12:57PM  5   EASIER.

12:57PM  6   A.   OH, I SEE IT.

12:57PM  7   Q.   DO YOU REMEMBER DISCUSSING THIS DOCUMENT WITH

12:57PM  8   MR. COOPERSMITH DURING YOUR CROSS-EXAMINATION?

12:57PM  9   A.   I DO.

12:57PM  10  Q.   AND I THINK THAT THE QUESTIONS, OR THE CONVERSATION THAT

12:57PM  11  YOU HAD WITH MR. COOPERSMITH WAS AROUND THE IDEA THAT WALGREENS

12:57PM  12  HAD A BUSINESS RELATIONSHIP WITH JOHNS HOPKINS; IS THAT RIGHT?

12:57PM  13  A.   CORRECT.

12:57PM  14  Q.   AND DO YOU KNOW WHAT ROLE JOHNS HOPKINS PLAYED IN THE

12:58PM  15  THERANOS RELATIONSHIP?

12:58PM  16  A.   AGAIN, I WAS NOT INVOLVED IN THIS WORK.

12:58PM  17       MY UNDERSTANDING WAS THAT JOHNS HOPKINS WAS ASKED BY US,

12:58PM  18  WALGREENS, TO TAKE A LOOK AT THE THERANOS TECHNOLOGY AND ASSESS

12:58PM  19  IT.

12:58PM  20  Q.   AND DO YOU KNOW WHAT JOHNS HOPKINS WAS PROVIDED TO REACH

12:58PM  21  ITS CONCLUSIONS?

12:58PM  22  A.   I DO NOT KNOW THAT.

12:58PM  23  Q.   DO YOU KNOW WHETHER THEY WERE GIVEN A DEVICE?

12:58PM  24  A.   I'M NOT AWARE OF THAT.

12:58PM  25  Q.   DO YOU KNOW WHAT DATA THEY WERE PROVIDED?

12:58PM  1    A.   NO, SIR.

12:58PM  2    Q.   IF YOU'LL TURN TO PAGE 4 OF THIS EXHIBIT, THE NEXT PAGE.

12:58PM  3         AND AT THE VERY BOTTOM, IF WE CAN HIGHLIGHT THE SECTION

12:58PM  4    UNDER DISCLAIMER.

12:58PM  5         DO YOU SEE THAT?

12:58PM  6         MAYBE WE CAN ZOOM IN ON THAT AS WELL.

12:58PM  7         MR. JHAVERI, DO YOU SEE WHERE IT SAYS, "THIS INFORMATION

12:58PM  8    IS BEING PROVIDED SOLELY FOR THE BENEFIT OF WALGREENS AND SHALL

12:59PM  9    BE USED BY WALGREENS FOR ITS INTERNAL PURPOSES ONLY.  IN

12:59PM  10   ADDITION, THE MATERIALS PROVIDED IN NO WAY SIGNIFY AN

12:59PM  11   ENDORSEMENT BY JOHNS HOPKINS MEDICINE TO ANY PRODUCT OR

12:59PM  12   SERVICE."

12:59PM  13        DID I READ THAT CORRECTLY?

12:59PM  14   A.   YES, SIR.

12:59PM  15   Q.   MR. JHAVERI, DID YOU EVER GIVE ANYBODY AT THERANOS

12:59PM  16   PERMISSION TO SHARE THIS INFORMATION WITH INVESTORS OF

12:59PM  17   THERANOS?

12:59PM  18            MR. COOPERSMITH:  OBJECTION.  IN LIGHT OF OTHER

12:59PM  19   EXHIBITS, THE QUESTION LACKS FOUNDATION AND LACKS A BASIS.

12:59PM  20            THE COURT:  OVERRULED.

12:59PM  21        YOU CAN ANSWER THE QUESTION.

12:59PM  22            THE WITNESS:  I DID NOT.

12:59PM  23            MR. SCHENK:  IF WE CAN NOW SHOW EXHIBIT 1708,

12:59PM  24   PLEASE.

12:59PM  25        YOUR HONOR, I BELIEVE THIS HAS ALREADY BEEN PREVIOUSLY

12:59PM  1    ADMITTED.

12:59PM  2              THE COURT:  IT MAY BE DISPLAYED.

01:00PM  3    BY MR. SCHENK:

01:00PM  4    Q.   DO YOU REMEMBER DISCUSSING THIS EXHIBIT WITH

01:00PM  5    MR. COOPERSMITH?

01:00PM  6    A.   YES, SIR.

01:00PM  7    Q.   AND IN IT, IT LOOKS LIKE MR. BALWANI IS EMAILING YOU AND

01:00PM  8    MAKES A COMMENT ABOUT, EXCUSE ME, PATIENTS NOT COMPLAINING

01:00PM  9    ABOUT THE VEIN DRAW PERCENT.

01:00PM 10         DO YOU SEE THAT?

01:00PM 11    A.   YES, SIR.

01:00PM 12    Q.   HOW WOULD A PATIENT KNOW WHAT PERCENT OF DRAWS AT A

01:00PM 13    WALGREENS STORE ARE VENOUS OR FINGERSTICK?

01:00PM 14    A.   THE PATIENTS WOULD NOT KNOW WHAT PERCENTAGE WE'RE DOING IN

01:00PM 15    TERMS OF VENOUS DRAW.

01:00PM 16         IN FACT, THE PATIENT WOULD NOT KNOW, COMING IN, WHETHER OR

01:00PM 17    NOT THEY WERE GOING TO GET A FINGERSTICK OR A VENIPUNCTURE.

01:00PM 18    THAT WAS DONE AT THE TIME OF CHECK IN.

01:00PM 19    Q.   DID MR. BALWANI TELL YOU THAT THE NUMBER OF VEIN DRAWS

01:00PM 20    WOULD GO DOWN RAPIDLY IN 2014?

01:00PM 21    A.   YES, SIR.

01:01PM 22    Q.   AND, IN FACT, DID THAT, DID THAT BECOME TRUE?  DID VEIN

01:01PM 23    DRAWS GO DOWN RAPIDLY IN 2014?

01:01PM 24    A.   IT DID NOT.

01:01PM 25    Q.   AND WE'LL TALK ABOUT THIS A LITTLE BIT MORE IN A MOMENT.

01:01PM  1          BUT DO YOU RECALL ON DIRECT YOU AND I HAD A CONVERSATION

01:01PM  2     ABOUT SOME METRICS THAT WALGREENS WAS TRACKING?

01:01PM  3     A.   YES.

01:01PM  4     Q.   AND WAS VEIN DRAW ONE OF THOSE METRICS?

01:01PM  5     A.   YES, IT WAS.

01:01PM  6     Q.   AND WHAT WAS THE POINT OF THOSE METRICS?  WHAT ROLE DID

01:01PM  7     THEY PLAY IN WALGREENS'S EVALUATION?

01:01PM  8     A.   WELL, IT WAS GOING -- THOSE METRICS BASICALLY DEFINE THE

01:01PM  9     SUCCESS OF THE PARTICULAR PROJECT IN THE PARTNERSHIP, AND SO WE

01:01PM 10     HAD OPERATIONAL METRICS, TRAINING METRICS, AND THEN METRICS

01:01PM 11     THAT DEFINED THE PATIENT EXPERIENCE.

01:01PM 12          SO THOSE CONSTITUTED FOR US HOW WE WOULD MAKE THE DECISION

01:01PM 13     WHETHER OR NOT THIS WAS SUCCESSFUL.

01:01PM 14     Q.   RIGHT.  THANK YOU.

01:01PM 15          IF WE CAN NOW GO TO EXHIBIT 1711.

01:01PM 16          YOUR HONOR, THIS IS ALSO AN ADMITTED EXHIBIT.

01:02PM 17          IF WE CAN GO TO PAGE 10 OF EXHIBIT 1711.

01:02PM 18          MR. JHAVERI, DO YOU RECALL DISCUSSING THIS EXHIBIT?

01:02PM 19     A.   YES, SIR.

01:02PM 20     Q.   AND REMIND THE JURY WHO PROVIDED THIS INFORMATION TO

01:02PM 21     WALGREENS.

01:02PM 22     A.   YEAH.  THIS WAS BY MR. BALWANI AND THE THERANOS TEAM THAT

01:02PM 23     PROVIDED THIS INFORMATION.

01:02PM 24          WALGREENS WOULD NOT HAVE THIS INFORMATION, NOR WOULD WE BE

01:02PM 25     ABLE TO MAKE ANY TYPE OF PREDICTIONS AS TO HOW AND WHAT THE

01:02PM   1    PERCENTAGE WOULD BE.

01:02PM   2         AGAIN, THERANOS IS THE LAB.  THEY ARE THE EXPERTS AT THIS,

01:02PM   3    SO THEY WOULD PROVIDE THIS TYPE OF INFORMATION.

01:02PM   4    Q.   AND DO YOU RECALL ON CROSS-EXAMINATION MR. COOPERSMITH

01:02PM   5    ASKED YOU A QUESTION ABOUT A HYPOTHETICAL LAB FORM THAT HAD TEN

01:02PM   6    TESTS ON IT, AND IF ONE OF THOSE TESTS REQUIRED A VEIN DRAW,

01:02PM   7    ALL OF THE TESTS WOULD BE PERFORMED WITH A VEIN DRAW.

01:02PM   8         DO YOU RECALL THAT?

01:02PM   9    A.   YES, SIR.

01:02PM   10   Q.   WHERE DID YOU LEARN THAT FROM?  WHO TOLD YOU ABOUT THAT

01:03PM   11   PRACTICE, THAT IF ONE TEST REQUIRED A VEIN DRAW, ALL OF THE

01:03PM   12   TESTS WOULD BE CONVERTED TO A VEIN DRAW?

01:03PM   13   A.   THAT WAS IN THE DISCUSSION WITH MR. BALWANI.

01:03PM   14   Q.   SO THE SAME PERSON WHO TOLD YOU THAT, ALSO TOLD YOU THAT

01:03PM   15   THE VEIN DRAWS WOULD GET BELOW 20 PERCENT BY THE END OF AUGUST?

01:03PM   16   A.   THAT'S CORRECT.

01:03PM   17   Q.   AND DID THAT END UP BEING TRUE?

01:03PM   18   A.   NO, SIR.

01:03PM   19   Q.   HOW ABOUT THAT IT WOULD GET BELOW 10 PERCENT BY THE END OF

01:03PM   20   OCTOBER?  WAS THAT TRUE?

01:03PM   21   A.   NO, THAT DID NOT COME TO FRUITION.

01:03PM   22   Q.   AND HOW ABOUT THE NEXT ONE, BELOW 5 PERCENT BY THE END OF

01:03PM   23   THE YEAR, 2014?  DID THAT END UP COMING TO FRUITION?

01:03PM   24   A.   NO, SIR.

01:03PM   25   Q.   IF WE COULD TURN TO PAGE 16 OF THIS EXHIBIT, 1711, PAGE

01:03PM  1     16.

01:03PM  2          DO YOU RECALL DISCUSSING PATIENT FEEDBACK WITH

01:03PM  3     MR. COOPERSMITH?

01:03PM  4     A.   YES, SIR.

01:03PM  5     Q.   WHO CURATED THIS LIST OF FEEDBACK?

01:03PM  6     A.   THAT WAS FROM IT THE THERANOS TEAM.

01:03PM  7     Q.   SO THERANOS DECIDED WHICH PATIENT FEEDBACK QUOTES TO

01:04PM  8     SHARE; IS THAT CORRECT?

01:04PM  9     A.   CORRECT.

01:04PM 10          BECAUSE, IF I CAN EXPAND ON THAT, THIS WAS ALL THROUGH THE

01:04PM 11     IPAD THAT WAS PROVIDED AT THE END OF THE SESSION OR THE BLOOD

01:04PM 12     DRAW, AND SO THE PATIENTS ALSO HAD AN OPPORTUNITY TO PUT IT IN

01:04PM 13     FREE FORM INTO THAT IPAD.

01:04PM 14          SO THIS WAS INFORMATION THAT WE, AS WALGREENS, DID NOT

01:04PM 15     RECEIVE.  IT WENT DIRECTLY TO THERANOS, AND THEN IT WOULD RECAP

01:04PM 16     THE RESULTS.

01:04PM 17     Q.   AND IF WE CAN ENLARGE OR ZOOM IN ON THE ONE ON THE SCREEN

01:04PM 18     IN FRONT OF YOU.

01:04PM 19          I'M JUST WONDERING IF EVERY SINGLE ONE OF THESE IS ABOUT

01:04PM 20     PRICE?

01:04PM 21     A.   YES, IT IS.

01:04PM 22     Q.   I'D LIKE TO NOW TALK TO YOU ABOUT A TOPIC THAT YOU

01:04PM 23     DISCUSSED WITH MR. COOPERSMITH, BOTH THIS MORNING AND A FEW

01:04PM 24     WEEKS AGO, AND THAT'S THIS 2,000 VERSUS 200 ISSUE.

01:05PM 25          DO YOU KNOW WHAT I'M TALKING ABOUT WHEN I SAY THAT?

01:05PM  1    A.   YES, SIR.

01:05PM  2    Q.   AND SO I WANT TO FIRST BRING UP A COUPLE OF EXHIBITS AND

01:05PM  3    THEN WALK THROUGH THIS AND SEE IF YOU CAN HELP ME UNDERSTAND

01:05PM  4    THIS CONFUSION.

01:05PM  5         COULD WE START WITH EXHIBIT 1884, PAGE 1.

01:05PM  6         DO YOU RECOGNIZE THIS DOCUMENT?

01:05PM  7    A.   YES, SIR.

01:05PM  8    Q.   SO FIRST LET'S NOTE THE DATE.  THE DATE IS AUGUST 11,

01:05PM  9    2014.

01:05PM 10         DO YOU SEE THAT?

01:05PM 11    A.   YES.

01:05PM 12    Q.   AND IF WE CAN LOOK AT PAGE 4.

01:05PM 13         THIS IS FOR THE PARTNERSHIP MEETING.

01:05PM 14         DO YOU SEE UP AT THE TOP A DATE FOR THE PARTNERSHIP

01:05PM 15    MEETING?

01:05PM 16    A.   YES.

01:05PM 17    Q.   AND WHAT IS THE DATE?

01:05PM 18    A.   AUGUST 6TH.

01:05PM 19    Q.   SO ON AUGUST 6TH THERE WAS ONE OF THESE PERIODIC MEETINGS

01:05PM 20    BETWEEN THERANOS AND WALGREENS?

01:05PM 21    A.   YES, SIR.

01:05PM 22    Q.   AND COULD WE NOW LOOK AT PAGE 9.

01:06PM 23         MR. JHAVERI, DO YOU SEE THIS CHART ON PAGE 9?

01:06PM 24    A.   YES.

01:06PM 25    Q.   AND COULD YOU EXPLAIN TO THE JURY THE SECOND AND THE THIRD

01:06PM  1    ROW, AND THEN THE COLUMN UNDER 2015?  COULD YOU EXPLAIN WHAT

01:06PM  2    INFORMATION IS BEING DEPICTED THERE?

01:06PM  3    A.   SURE.

01:06PM  4         SO THERE WERE -- EACH OF THESE -- IN THE FIRST COLUMN

01:06PM  5    THERE'S THREE DIFFERENT ROWS, WELL EXPERIENCE, THERANOS, AND

01:06PM  6    THEN STD PROGRAM AT THE HEALTH CARE CLINICS.  EACH OF THEM WERE

01:06PM  7    THREE DISTINCT PRODUCTS.

01:06PM  8         AT WELL EXPERIENCE, WE WERE DESIGNING ALL OF OUR STORES TO

01:06PM  9    BE CONSUMER CENTRIC, PATIENT CENTRIC IN NEWER UPDATED MODELS,

01:06PM  10   AND SO THE 2,000, IN THE NEXT COLUMN DOWN IN 2015, REPRESENTED

01:06PM  11   THE NUMBER OF STORES THAT WE WERE PLANNING TO TOUCH IN 2015 FOR

01:07PM  12   A REMODEL.

01:07PM  13        THE NEXT ROW DOWN IS THERANOS, WHICH REPRESENTS THE

01:07PM  14   THERANOS SERVICES, THE THERANOS WELLNESS CENTERS.

01:07PM  15        AND THE 200, IN THE SECOND COLUMN, REPRESENTS THE NUMBER

01:07PM  16   OF STORES THAT WE WERE PLANNING TO HAVE THERANOS SERVICES IN.

01:07PM  17        AND THE LAST ROW IS THE STD PROGRAM, WHICH WAS BASICALLY

01:07PM  18   SEXUALLY TRANSMITTED DISEASE TESTS THAT WOULD BE DONE AT THE

01:07PM  19   HEALTH CARE CLINICS.

01:07PM  20        SO THE SECOND COLUMN THEN REPRESENTS THE NUMBER OF STORES

01:07PM  21   THAT WE WOULD INCORPORATE THAT SERVICE INTO THE HEALTH CARE

01:07PM  22   CLINIC.

01:07PM  23        AND SO THE PURPOSE OF THIS CHART IS REALLY TO SHOW HOW WE

01:07PM  24   WOULD PLAN TOUCHING THE STORES AND COMBINE EFFORTS WHEREVER WE

01:07PM  25   CAN.

JHAVERI REDIRECT BY MR. SCHENK                                    4913

01:07PM  1          SO IF WE HAVE 2,000 STORES THAT WE ARE GOING TO GO TO, THE

01:08PM  2     DISCUSSION WAS, WELL, IF WE'RE GOING TO HAVE 200 STORES THAT

01:08PM  3     HAVE THERANOS IN IT, LET'S PLAN FOR IT NOW SO WE DON'T HAVE TO

01:08PM  4     TOUCH THE STORES MULTIPLE TIMES, WE CAN TOUCH IT ONCE, GET IT

01:08PM  5     DONE, AND GET IT OUT AND SO CUSTOMERS CAN START USING THOSE

01:08PM  6     STORES.

01:08PM  7          AND THE SAME THING WITH THE STD PROGRAM AT THE HEALTH CARE

01:08PM  8     CLINIC.

01:08PM  9          IN 2016 THAT WAS THE NEXT LEVEL NUMBER OF STORES.

01:08PM  10          AND THEN IN 2017, THE NEXT NUMBER OF STORES.

01:08PM  11          AND THAT'S HOW WE PLANNED.

01:08PM  12     Q.   IN THIS MEETING IN AUGUST, DID YOU TELL INDIVIDUALS FROM

01:08PM  13     THERANOS THAT WALGREENS WAS GOING TO OPEN 2,000 THERANOS

01:08PM  14     LOCATIONS INSIDE OF WALGREENS STORES?

01:08PM  15     A.   NO.

01:08PM  16          WHENEVER WE DID SUBSTITUTIONS ON STORES, YOU KNOW, IT WAS

01:08PM  17     A COLLABORATIVE, IT WAS A PARTNERSHIP DISCUSSION, AND SO WE

01:08PM  18     BOTH AGREED TO WHATEVER STORES THAT WE WOULD GO TO.

01:08PM  19          AND THIS IS THE CHART THAT WE HAD AGREED TO AT THAT

01:08PM  20     MEETING.

01:08PM  21     Q.   DID, IN FACT, YOU HAVE TO REDEFINE THE NUMBER OF STORES

01:09PM  22     THAT WALGREENS INTENDED TO OPEN WITH THERANOS LOCATIONS AT THIS

01:09PM  23     MEETING?

01:09PM  24     A.   WE DID.  I THINK I TALKED ABOUT IT EARLIER.

01:09PM  25          INITIALLY WE HAD ANTICIPATED THAT WE WOULD GO TO 500

01:09PM  1   STORES, AND FOR VARIOUS REASONS -- REMEMBER, AGAIN, THIS WAS A

01:09PM  2   PILOT.  WE WERE STILL LEARNING.  WE WERE MAKING SURE THAT OUR

01:09PM  3   CAPABILITIES EXIST ON BOTH COMPANIES' SIDE.

01:09PM  4       SO WE HAD REDUCED THAT NUMBER DOWN TO 200, WHICH WAS THE

01:09PM  5   NUMBER THAT WE ALL FELT COMFORTABLE.

01:09PM  6       AND WHEN I SAY "WE," BOTH ORGANIZATIONS, BOTH TEAMS FELT

01:09PM  7   COMFORTABLE.

01:09PM  8   Q.   IF WE CAN NOW LOOK AT EXHIBIT 1891.

01:09PM  9       YOUR HONOR, 1891 HAS BEEN PREVIOUSLY ADMITTED.

01:09PM 10       MR. JHAVERI, 1891 IS NOW ON THE SCREEN IN FRONT OF YOU.

01:09PM 11       DO YOU RECOGNIZE THIS DOCUMENT?

01:09PM 12   A.   YES, SIR.

01:09PM 13   Q.   AND IN THIS EMAIL, DO YOU SEE WHERE YOU TELL MR. BALWANI

01:10PM 14   THAT WE'RE GOING TO TOUCH 2,000 STORES IN 2015?

01:10PM 15   A.   YES.

01:10PM 16   Q.   AND WHAT WERE YOU REFERRING TO WHEN YOU TOLD MR. BALWANI

01:10PM 17   THAT YOU WERE GOING TO TOUCH 2,000 STORES?

01:10PM 18   A.   EXACTLY WHAT WAS DISCUSSED IN THAT -- IN THE PREVIOUS

01:10PM 19   DOCUMENT, WHICH IS, HEY, YOU KNOW, JUST REITERATING, 2,000

01:10PM 20   STORES ARE GOING TO GET TOUCHED.

01:10PM 21       LET'S -- AND OF THOSE 2,000 STORES, WE HAD COMMITTED TO

01:10PM 22   200 STORES THAT WILL HAVE THERANOS.  LET'S START PLANNING.

01:10PM 23   LET'S GET WHATEVER INFORMATION THAT WE NEED AND DEFINE WHICH

01:10PM 24   STORES ARE THE 200, AND THAT'S WHAT I'M ASKING FOR HERE.

01:10PM 25   Q.   AND DID YOU TELL ME THAT THE MEETING TOOK PLACE ON

01:10PM   1    AUGUST 6TH?

01:10PM   2    A.   YES.

01:10PM   3    Q.   AND WHAT IS THE DATE OF THIS EMAIL?

01:10PM   4    A.   AUGUST 13TH.

01:10PM   5    Q.   SO YOU FOLLOWED UP WITH MR. BALWANI AFTER THE MEETING TO

01:10PM   6    FURTHER DISCUSS THIS TOPIC OF TOUCHING 2,000 WELL EXPERIENCE

01:10PM   7    STORES?

01:10PM   8    A.   CORRECT.

01:10PM   9    Q.   DO YOU RECALL THIS MORNING WHEN MR. COOPERSMITH PLAYED,

01:11PM   10   PLAYED A VIDEO OF SOME OF YOUR PRIOR TESTIMONY?

01:11PM   11   A.   YES, SIR.

01:11PM   12   Q.   I'D LIKE YOU TO TAKE A LOOK IN THE -- I THINK IT'S THE

01:11PM   13   SECOND DEFENSE BINDER.

01:11PM   14        THE EXHIBIT NUMBER IS 28033.  I BELIEVE THE PAGE NUMBER IS

01:11PM   15   218.

01:11PM   16   A.   I HAVE IT.

01:11PM   17   Q.   YOU'RE THERE?

01:11PM   18   A.   YES, SIR.

01:11PM   19   Q.   FIRST, DID MR. COOPERSMITH ASK YOU TO LOOK AT THIS SECTION

01:11PM   20   THIS MORNING?

01:12PM   21   A.   NO.

01:12PM   22   Q.   DID HE PLAY THIS SECTION THIS MORNING?

01:12PM   23   A.   NO, SIR.

01:12PM   24   Q.   SO I'M GOING TO ASK YOU FIRST TO READ TO YOURSELF

01:12PM   25   BEGINNING ON LINE 9 OF 218 THROUGH PAGE 220, LINE 14.  SO A

01:12PM   1    COUPLE OF PAGES.

01:12PM   2          JUST READ IT TO YOURSELF AND LET ME KNOW WHEN YOU'RE DONE.

01:12PM   3    A.   OKAY.

01:13PM   4          (PAUSE IN PROCEEDINGS.)

01:13PM   5              THE WITNESS:  OKAY.

01:13PM   6    BY MR. SCHENK:

01:13PM   7    Q.   HAVE YOU FINISHED READING THAT?

01:13PM   8    A.   YES, SIR.

01:13PM   9    Q.   WAS THE SAME TOPIC, THAT IS, WHETHER 2,000 STORES REFERRED

01:13PM   10   TO WELL EXPERIENCE STORES, WAS THAT DISCUSSED LATER ON IN THE

01:13PM   11   SAME DEPOSITION THAT YOU SAW THE RECORDING FROM EARLIER?

01:13PM   12              MR. COOPERSMITH:  OBJECTION TO THE QUESTION.  IT IS

01:13PM   13   MISCHARACTERIZING THE TESTIMONY, AND IT'S READING FROM THE

01:13PM   14   DOCUMENT.

01:13PM   15              THE COURT:  OVERRULED.

01:13PM   16        YOU CAN ANSWER THE QUESTION.

01:13PM   17              THE WITNESS:  WOULD YOU PLEASE ASK THE QUESTION

01:13PM   18   AGAIN?

01:13PM   19   BY MR. SCHENK:

01:13PM   20   Q.   YES.  IS WHAT I JUST ASKED YOU TO READ LATER IN THE

01:13PM   21   TRANSCRIPT FROM THE SAME DEPO THAT YOU SAW PLAYED THIS MORNING?

01:13PM   22   A.   YES.

01:13PM   23   Q.   AND DOES IT COVER THE SAME TOPIC, THE 2,000 STORES?

01:13PM   24   A.   YES, IT DOES.

01:13PM   25              MR. SCHENK:  YOUR HONOR, UNDER 801(D)(1)(B),

01:13PM   1    PERMISSION TO READ ON PAGE 220, LINE 2 THROUGH LINE 14,

01:14PM   2    OMITTING LINE 8.

01:14PM   3            MR. COOPERSMITH:  ONE MOMENT, YOUR HONOR.

01:14PM   4            THE COURT:  YES.

01:14PM   5         (PAUSE IN PROCEEDINGS.)

01:15PM   6            MR. COOPERSMITH:  YOUR HONOR, I OBJECT.  I DON'T

01:15PM   7    THINK THIS QUALIFIES UNDER THE SUBSECTION OF 801 THAT

01:15PM   8    MR. SCHENK CITED.

01:15PM   9         IT'S NOT A PRIOR CONSISTENT STATEMENT.

01:15PM  10         IF YOU LOOK AT THE TEXT CLOSELY, IT DOESN'T COMPUTE, AND

01:15PM  11    IT'S NOT A PROPER STATEMENT UNDER THAT RULE.

01:15PM  12         THAT'S OUR OBJECTION.

01:15PM  13            THE COURT:  OKAY.  THANK YOU.

01:15PM  14         I WILL ALLOW IT UNDER 801(D)(1)(B)(I) AND (II), AND IT

01:15PM  15    DOES APPEAR TO ADD CLARIFICATION AND THAT RULE OF EVIDENCE

01:15PM  16    APPLIES, SO I WILL ALLOW THAT TO BE READ.

01:15PM  17            MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR.

01:16PM  18    Q.  MR. JHAVERI, IF YOU'LL JUST FOLLOW ALONG AND TELL ME IF

01:16PM  19    I'VE READ IT CORRECTLY.

01:16PM  20         "QUESTION:  AND WHEN YOU CONSIDER THIS DOCUMENT,

01:16PM  21    EXHIBIT 953, TOGETHER WITH EXHIBIT 952, DOES THAT GIVE YOU AN

01:16PM  22    UNDERSTANDING THAT THE 2,000 STORES YOU WERE REFERENCING TO

01:16PM  23    MR. BALWANI WERE THE 2,000 WELL EXPERIENCE STORES THAT

01:16PM  24    WALGREENS WAS GOING TO BE WORKING ON IN 2015?

01:16PM  25         "ANSWER:  YEAH.  BASED ON, BASED ON LOOKING AT THIS BOTH

01:16PM   1    TOGETHER NOW, YEAH, THAT IS CORRECT.

01:16PM   2        "QUESTION:  AND THE NUMBER OF THERANOS STORES THAT WAS

01:16PM   3    UNDER DISCUSSION FOR 2015, AS OF AT LEAST THIS DATE,

01:16PM   4    AUGUST 11TH, 2014, WAS 200 ACCORDING TO THIS CHART?

01:16PM   5        "ANSWER:  THAT IS CORRECT."

01:16PM   6        MR. JHAVERI, DID I READ THAT CORRECTLY?

01:16PM   7    A.   YES.

01:16PM   8    Q.   SO IN THE DEPOSITION THAT YOU HAD PLAYED FOR YOU THIS

01:17PM   9    MORNING, DO YOU RECALL THAT?

01:17PM  10    A.   YES, SIR.

01:17PM  11    Q.   WERE YOU GIVEN AN OPPORTUNITY LATER IN THAT TRANSCRIPT,

01:17PM  12    LATER THAT DAY, TO FURTHER EXPLAIN WHAT YOU MEANT BETWEEN 2,000

01:17PM  13    WELL EXPERIENCE STORES AND 200 THERANOS STORES?

01:17PM  14    A.   YES, I WAS.

01:17PM  15        AFTER I GAVE THAT TESTIMONY, I REALIZED THAT I HAD GOTTEN

01:17PM  16    SOME OF THE DOCUMENTS CONFUSED, AND SO I DID ASK TO HAVE IT

01:17PM  17    CLARIFIED, AND I BELIEVE THAT IT WAS ALL CORRECTED IN THE

01:17PM  18    TESTIMONY.

01:17PM  19    Q.   AND TODAY WHAT IS YOUR BELIEF REGARDING 2,000 STORES?

01:17PM  20    WERE THE 2,000 STORES THERANOS STORES, OR WERE THEY WELL

01:17PM  21    EXPERIENCE STORES?

01:17PM  22    A.   THEY WERE WELL EXPERIENCE STORES.

01:17PM  23        MR. BALWANI AND I HAD A, YOU KNOW, A DISCUSSION ABOUT

01:17PM  24    THIS.  HE WAS CERTAINLY WELL AWARE OF IT, AND THAT WAS THE PLAN

01:17PM  25    IS TO GO TO 2,000 STORES FOR WELL EXPERIENCE, AND THE 200

01:17PM   1    STORES FOR THERANOS ALONG WITH IT, AND WE WERE IN THE PROCESS

01:18PM   2    OF DETERMINING WHAT THOSE STORES WERE, AND THAT WAS WHAT THE

01:18PM   3    GOAL WAS.

01:18PM   4    Q.   THANK YOU.

01:18PM   5         THE NEXT TOPIC I WOULD LIKE TO TALK TO YOU ABOUT IS SOME

01:18PM   6    OF THE WORK THAT OCCURRED IN 2010, AND THEN I THINK YOU SAID

01:18PM   7    YOU REVIEWED MATERIALS WHEN YOU BECAME MORE INVOLVED IN THE

01:18PM   8    LATER PART OF 2013 AND 2014.

01:18PM   9         DO YOU RECALL THAT TESTIMONY?

01:18PM  10    A.   YES, SIR.

01:18PM  11    Q.   IN 2010, DID YOU TAKE MR. BALWANI AND MS. HOLMES ON A

01:18PM  12    TOUR?

01:18PM  13    A.   I DID.

01:18PM  14    Q.   AND REMIND THE JURY WHAT WAS INVOLVED IN THAT, PLEASE.

01:18PM  15    A.   YES.   I ACTUALLY RECEIVED -- IN 2010 I RECEIVED A PHONE

01:18PM  16    CALL FROM DR. ROSAN WHO WAS MEETING WITH MR. BALWANI AND

01:18PM  17    MS. HOLMES AT THE TIME.   THEY HAD A TOP-TO-TOP MEETING TO

01:18PM  18    DISCUSS THE PARTNERSHIP, AND DR. ROSAN ASKED ME TO GIVE A TOUR

01:18PM  19    TO MS. HOLMES AND MR. BALWANI OF OUR NEW WELL EXPERIENCE STORE

01:18PM  20    THAT WAS LOCATED IN WHEELING, ILLINOIS WHICH IS ABOUT 15

01:19PM  21    MINUTES FROM THE CORPORATE HEADQUARTERS OF WALGREENS.

01:19PM  22         I SAID I WOULD BE MORE THAN HAPPY TO DO THAT.   CERTAINLY I

01:19PM  23    HAD HEARD ABOUT THERANOS AND THE POTENTIAL PARTNERSHIP THAT WAS

01:19PM  24    COMING.

01:19PM  25         SO I MET BOTH MR. BALWANI AND MS. HOLMES AT THE STORE.

01:19PM  1      AND WHAT I PROVIDED THEM WITH IS A TOUR OF THE NEW

01:19PM  2    REMODELLED STORE IN WHEELING, NEW WAITING AREA, NEW PHARMACY,

01:19PM  3    NEW CONSULTATION ROOM OR PRIVATE HEALTH ROOM, AND THEN A NEW

01:19PM  4    SPACE CALLED THE COMMUNITY ROOM.  AND WE BUILT THAT ROOM

01:19PM  5    BASICALLY TO PROVIDE ANY TYPE OF FUTURE SERVICES.

01:19PM  6      SO WHAT I WAS SHOWING MR. BALWANI AND MS. HOLMES WAS THAT

01:19PM  7    THIS SPACE COULD BE USED FOR ANYTHING FROM DIABETES EDUCATION

01:19PM  8    TO LAB SERVICES, AND THAT WAS THE PURPOSE OF THE VISIT.

01:19PM  9      IT WAS ABOUT 15 OR 20 MINUTES LONG.  THEY WERE CERTAINLY

01:19PM  10   VERY EXCITED ABOUT THE NEW MODEL, BECAUSE IT ALLOWED US TO

01:20PM  11   REALLY EXPAND INTO THE HEALTH CARE SPACE THROUGH DIFFERENT

01:20PM  12   SERVICES.

01:20PM  13   Q.   THANK YOU.

01:20PM  14      AND REMIND US ALSO ABOUT, I'LL CALL IT DUE DILIGENCE, THE

01:20PM  15   WORK THAT YOU DID IN THE 2013, 2014 TIME PERIOD TO GET UP TO

01:20PM  16   SPEED ON THE THERANOS PROJECT.

01:20PM  17      WHAT DID YOU DO AT THAT POINT?

01:20PM  18   A.   YEAH, YOU KNOW, SO I CERTAINLY MET WITH ALL OF MY NEW TEAM

01:20PM  19   TO UNDERSTAND, YOU KNOW, WHERE THEY WERE AT, WHAT WAS GOING ON.

01:20PM  20      I MET WITH THE EXECUTIVES, WADE MIQUELON, DR. JAY ROSAN,

01:20PM  21   TO REALLY UNDERSTAND WHAT IS THE ACTUAL PROJECT, WHAT ARE WE

01:20PM  22   TRYING TO DO, WHO WAS THE PARTNER, AND WHO IS MY COUNTERPART AT

01:20PM  23   THERANOS, AND THEN WHERE DO WE NEED TO GO?

01:20PM  24      AND SO ONCE I HAD THAT UNDERSTANDING, THEN I COULD HELP

01:20PM  25   SHEPHERD THIS PROJECT TOWARDS THAT GOAL.

01:20PM   1    Q.   AND I'M NOT ASKING WHAT DR. ROSAN TOLD YOU, I'M JUST

01:20PM   2    WONDERING, DID DR. ROSAN COMMUNICATE INFORMATION TO YOU?

01:21PM   3         YOU SAID YOU MET WITH PEOPLE LIKE WADE MIQUELON AND

01:21PM   4    JAY ROSAN.  SO WERE THEY SOURCES FOR YOU WHEN YOU WERE

01:21PM   5    REENGAGING IN THE PROJECT IN 2013 AND 2014?

01:21PM   6    A.   YES, SIR.

01:21PM   7              MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

01:21PM   8              THE COURT:  YES.

01:21PM   9              MR. SCHENK:  (HANDING.)

01:21PM  10    Q.   MR. JHAVERI, I'VE HANDED YOU EXHIBIT 273.

01:21PM  11         DO YOU SEE THAT DOCUMENT?

01:21PM  12    A.   YES, SIR.

01:21PM  13    Q.   AND 273 HAS TWO EMAILS ON THE FIRST PAGE AND THEN

01:21PM  14    ATTACHMENTS AFTERWARDS.

01:21PM  15         DO YOU SEE THAT?

01:21PM  16    A.   YES, I DO.

01:21PM  17    Q.   IS THE 2010 EMAIL FROM MS. HOLMES TO DR. ROSAN AND

01:22PM  18    MR. BALWANI?

01:22PM  19    A.   YES, IT IS.

01:22PM  20    Q.   AND IS THE EMAIL ON TOP A FORWARD FROM MS. HOLMES TO

01:22PM  21    MR. BALWANI ABOUT TWO YEARS LATER?

01:22PM  22    A.   YES.

01:22PM  23              MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 273.

01:22PM  24              MR. COOPERSMITH:  YOUR HONOR, 401 AND 802.

01:22PM  25              MR. SCHENK:  IT'S HIGHLY RELEVANT, AND IT'S A

01:22PM  1    BUSINESS RECORD.

01:22PM  2                THE COURT:  THE OBJECTION IS OVERRULED.

01:22PM  3        IT'S ADMITTED, AND IT MAY BE PUBLISHED.

01:22PM  4        (GOVERNMENT'S EXHIBIT 273 WAS RECEIVED IN EVIDENCE.)

01:22PM  5                MR. SCHENK:  THANK YOU.

01:22PM  6    Q.   MR. JHAVERI, IF WE CAN START WITH THE EMAIL FROM

01:22PM  7    MS. HOLMES TO DR. ROSAN AND MR. BALWANI.

01:22PM  8        DO YOU SEE THAT?

01:22PM  9    A.   YES, SIR.

01:22PM  10   Q.   AND WHAT IS THE DATE OF THAT EMAIL?

01:22PM  11   A.   MARCH 15TH, 2010.

01:22PM  12   Q.   AND IT LOOKS LIKE IN THE SECOND LINE OF THE EMAIL FROM

01:23PM  13   MS. HOLMES, SHE WRITES, "PLEASE FIND THE MATERIALS DISCUSSED ON

01:23PM  14   OUR LAST CALL ATTACHED TO THIS EMAIL FOR YOUR INTERNAL USE AND

01:23PM  15   CIRCULATION."

01:23PM  16       DO YOU SEE THAT?

01:23PM  17   A.   YES, SIR.

01:23PM  18   Q.   AND THEN ABOVE THE EMAIL, THE EMAIL ABOVE ON THIS SCREEN

01:23PM  19   AT THE VERY TOP, DO YOU SEE WHERE MS. HOLMES FORWARDS THIS

01:23PM  20   AGAIN TO MR. BALWANI, BUT THIS TIME IN AUGUST OF 2012?

01:23PM  21   A.   YES.

01:23PM  22   Q.   AND DO YOU SEE THAT THERE ARE SOME ATTACHMENTS?

01:23PM  23   A.   YES.

01:23PM  24   Q.   I'D LIKE TO ASK YOU ABOUT A COUPLE OF LINES IN THE

01:23PM  25   ATTACHMENTS.

01:23PM   1          ON PAGE 11 OF EXHIBIT 273, DO YOU SEE, UNDER VALIDATION OF

01:23PM   2     THERANOS SYSTEMS, "THERANOS SYSTEMS HAVE BEEN COMPREHENSIVELY

01:23PM   3     VALIDATED OVER THE COURSE OF THE LAST SEVEN YEARS BY TEN OF THE

01:23PM   4     FIFTEEN LARGEST PHARMACEUTICAL COMPANIES"?

01:23PM   5     A.   YES.

01:23PM   6     Q.   AND DOES IT APPEAR THAT THAT INFORMATION WAS COMMUNICATED

01:24PM   7     IN MARCH OF 2010 FROM MS. HOLMES TO DR. ROSAN?

01:24PM   8     A.   YES.

01:24PM   9     Q.   IF YOU'LL NOW TURN TO PAGE 31.

01:24PM   10          ON PAGE 31, IF WE CAN ZOOM IN ON THE FIRST PARAGRAPH.  DO

01:24PM   11    YOU SEE WHERE THERE'S A DESCRIPTION OF THERANOS AS "A

01:24PM   12    SILICON VALLEY, CALIFORNIA COMPANY THAT FOR THE FIRST TIME CAN

01:24PM   13    RUN ANY BLOOD TEST IN REAL-TIME FOR LESS THAN HALF THE COST OF

01:24PM   14    CENTRAL LAB TESTS"?

01:24PM   15    A.   YES, I DO.

01:24PM   16    Q.   AND IF YOU'LL NOW LOOK AT THE PARAGRAPH THAT BEGINS, "THE

01:24PM   17    ABILITY."

01:24PM   18          IT'S ABOUT HALFWAY DOWN THE PAGE.

01:24PM   19          "THE ABILITY TO RUN BLOOD TESTS FROM A FINGERSTICK IN LESS

01:24PM   20    THAN AN HOUR AT WALGREENS CREATES A NEW WORKFLOW FOR HEALTH

01:24PM   21    CARE."

01:24PM   22          DO YOU SEE THAT?

01:25PM   23    A.   YES.

01:25PM   24    Q.   AND WAS THAT ALSO SHARED BY MS. HOLMES WITH DR. ROSAN AND

01:25PM   25    MR. BALWANI IN MARCH OF 2010?

01:25PM   1      A.   YES, IT APPEARS SO.

01:25PM   2      Q.   I'D LIKE TO COVER A COUPLE OF TOPICS THAT YOU COVERED WITH

01:25PM   3      MR. COOPERSMITH THIS MORNING.  THE FIRST ONE IS EXHIBIT 2214.

01:25PM   4           YOUR HONOR, 2214 HAS BEEN PREVIOUSLY ADMITTED.  PERMISSION

01:25PM   5      TO PUBLISH?

01:25PM   6                THE COURT:  YES.

01:25PM   7                MR. SCHENK:  THANK YOU.

01:25PM   8      Q.   IF WE CAN GO TO PAGE 6 ON 2214.

01:25PM   9           DO YOU RECALL A DISCUSSION WITH MR. COOPERSMITH THIS

01:25PM   10     MORNING WHERE YOU SAW THE VEIN DRAW PERCENT GO TO ABOUT I THINK

01:25PM   11     IT WAS 34 PERCENT?

01:25PM   12          DO YOU RECALL THAT?

01:25PM   13     A.   I DO.

01:25PM   14     Q.   AND WAS THAT IN JULY OF 2014?

01:26PM   15     A.   I BELIEVE SO.

01:26PM   16     Q.   DOES THIS DOCUMENT, EXHIBIT 2214, SHOW US THAT THE VEIN

01:26PM   17     DRAW PERCENT THROUGHOUT THE ENTIRE YEAR OF 2014 WAS 40 PERCENT?

01:26PM   18     A.   YES, IT DOES.

01:26PM   19     Q.   AND DID THAT VEIN DRAW PERCENT INFLUENCE WALGREENS'S

01:26PM   20     DECISION ABOUT WHETHER OR NOT TO HAVE ADDITIONAL STORES

01:26PM   21     BEYOND 40 IN ARIZONA?

01:26PM   22     A.   YES.

01:26PM   23     Q.   WHY?

01:26PM   24     A.   THIS WAS ONE OF THE REASONS WHY WE HAD THE PARTNERSHIP

01:26PM   25     WITH THERANOS.  IT WAS THE TECHNOLOGY THAT THEY HAD DEVELOPED

01:26PM  1     TO BE ABLE TO RUN ALL OF THE TESTS ON A FINGERSTICK.  THE IDEA

01:26PM  2     WAS IT WAS LESS PAINFUL, IT WAS FASTER, IT WAS CHEAPER, AND

01:26PM  3     PATIENTS THAT WOULD OTHERWISE NOT WANT TO GET THEIR LAB TEST

01:26PM  4     DONE THROUGH A NORMAL MEANS WOULD OTHERWISE NOW GET IT DONE

01:27PM  5     BECAUSE IT'S NOT AS PAINFUL AND IT'S QUICK.

01:27PM  6          SO FOR US, THIS WAS -- THIS WAS THE, YOU KNOW, THE SELLING

01:27PM  7     POINT OF THE PARTNERSHIP WITH THERANOS, AND THAT'S WHY THIS WAS

01:27PM  8     A BIG METRIC THAT WE MONITORED.

01:27PM  9     Q.  AND WAS THE IMPORTANCE OF VEIN DRAW PERCENT SOMETHING THAT

01:27PM 10     YOU COMMUNICATED TO MR. BALWANI?

01:27PM 11     A.  YES.

01:27PM 12     Q.  WOULD YOU NOW LOOK AT EXHIBIT 2275.

01:27PM 13          YOUR HONOR, THIS HAS ALREADY BEEN PREVIOUSLY ADMITTED.

01:27PM 14          ON THIS DOCUMENT, MR. JHAVERI, DO YOU TALK ABOUT AN

01:27PM 15     ACCEPTABLE VENOUS DRAW PERCENT FOR SOMETHING CALLED THE HUB AND

01:27PM 16     SPOKE MODEL?

01:27PM 17     A.  YES.

01:27PM 18     Q.  AND WAS THIS COMMUNICATED DIRECTLY TO MR. BALWANI?

01:27PM 19     A.  YES, SIR.

01:27PM 20     Q.  I'D LIKE TO TALK TO YOU ABOUT THREE COMPANIES THAT CAME UP

01:27PM 21     THIS MORNING:  GENENTECH, ABBOTT, AND PFIZER.

01:27PM 22          DO YOU RECALL THAT LINE OF QUESTIONING?

01:27PM 23     A.  YES, SIR.

01:27PM 24     Q.  AND DO YOU KNOW IF ANYTHING EVER CAME OF THE RELATIONSHIP

01:28PM 25     BETWEEN THERANOS, WALGREENS, AND GENENTECH?

01:28PM  1    A.    I'M NOT AWARE OF ANY.

01:28PM  2    Q.    SAME QUESTION FOR ABBOTT.  DO YOU KNOW IF ANYTHING EVER

01:28PM  3    CAME OF THAT?

01:28PM  4    A.    NO, SIR.

01:28PM  5    Q.    SAME QUESTION FOR PFIZER IN 2015.  DO YOU KNOW IF ANYTHING

01:28PM  6    EVER CAME OF THAT?

01:28PM  7    A.    NO, SIR.

01:28PM  8    Q.    WOULD THE TYPE OF DRAW THAT A PATIENT RECEIVES EFFECT WAIT

01:28PM  9    TIME?  IN OTHER WORDS, IF A PATIENT GOES INTO A WALGREENS STORE

01:28PM 10    AND THEY RECEIVED A VENOUS DRAW OR THEY RECEIVED A FINGERSTICK

01:28PM 11    DRAW, WOULD THAT HAVE AN EFFECT ON WAIT TIME?

01:28PM 12    A.    NOT THE WAIT TIME, BUT THE PROCESS TIME.

01:28PM 13          SO WHEN THEY'RE IN THE ROOM HAVING THEIR BLOOD EXTRACTED,

01:28PM 14    THAT'S WHEN THE TIME WOULD BE IMPACTED.

01:28PM 15    Q.    I SEE.  SO WHEN THERE WAS DISCUSSION ABOUT THE PROCESSING

01:28PM 16    TIME, WAS THAT ANOTHER WAY TO TALK ABOUT THE IMPORTANCE OF

01:28PM 17    FINGERSTICK OVER VENOUS DRAW?

01:29PM 18    A.    YES, BECAUSE THE WAIT TIME -- THE WAIT TIME, THE TIME TO

01:29PM 19    DO THE PROCESS IS MUCH LESS FOR A FINGERSTICK THAN A

01:29PM 20    VENOUS DRAW.

01:29PM 21    Q.    THANK YOU.  IF WE CAN NOW BRING UP EXHIBIT 20244.

01:29PM 22          THIS HAS ALSO BEEN PREVIOUSLY ADMITTED, YOUR HONOR.

01:29PM 23          DO YOU REMEMBER DISCUSSING THIS EXHIBIT WITH

01:29PM 24    MR. COOPERSMITH THIS MORNING?

01:29PM 25    A.    YES, SIR.

01:29PM  1    Q.   IN IT I THINK MR. BALWANI MAKES REFERENCE TO "PLAIN OLD

01:29PM  2    MARKET TRACTION."

01:29PM  3         DO YOU SEE THAT?

01:29PM  4    A.   YES, SIR.

01:29PM  5    Q.   AFTER THERE WERE SOME STATEMENTS ABOUT INCREASED PATIENTS

01:29PM  6    OR CUSTOMERS IN STORES?

01:29PM  7    A.   CORRECT.

01:29PM  8    Q.   WOULD YOU TELL THE JURY THE DATE OF THE VERY TOP EMAIL

01:29PM  9    WHERE MR. BALWANI MAKES REFERENCE TO MARKET TRACTION?

01:29PM  10   A.   APRIL 8TH, 2015.

01:29PM  11   Q.   COULD WE NOW BRING UP 5387H.

01:29PM  12        PERMISSION TO PUBLISH, YOUR HONOR, PAGE 42?  IT'S BEEN

01:30PM  13   PREVIOUSLY ADMITTED.

01:30PM  14             THE COURT:  YES.

01:30PM  15   BY MR. SCHENK:

01:30PM  16   Q.   AND ABOUT HALFWAY DOWN THE PAGE, MR. JHAVERI, DO YOU SEE A

01:30PM  17   TEXT MESSAGE WHERE MR. BALWANI WRITES, "GOING THRU CVS

01:30PM  18   CONTRACT.  WE CAN'T WORK WITH WAG OR CVS.  BOTH ARE SAME."

01:30PM  19        DO YOU SEE THAT?

01:30PM  20   A.   YES.

01:30PM  21   Q.   AND WHAT IS THE DATE OF THIS TEXT MESSAGE?

01:30PM  22   A.   APRIL 9TH, 2015.

01:30PM  23   Q.   AND IS THAT ONE DAY AFTER THE EMAIL THAT YOU AND I JUST

01:30PM  24   LOOKED AT?

01:30PM  25   A.   YES.

01:30PM  1    Q.   YOU AND I HAVE SPOKEN ABOUT THE METRICS THAT WALGREENS WAS

01:30PM  2    TRACKING, AND I THINK YOU SAID THAT WAS USEFUL IN DETERMINING

01:30PM  3    FURTHER EXPANSION; IS THAT RIGHT?

01:30PM  4    A.   CORRECT.

01:30PM  5    Q.   COULD WE BRING UP EXHIBIT 1896.  IN 1896 -- DO YOU

01:30PM  6    RECOGNIZE THIS DOCUMENT?

01:31PM  7    A.   YES, I DO.

01:31PM  8    Q.   IN THE DOCUMENT, YOU INFORM MR. BALWANI THAT IT WOULD BE

01:31PM  9    DIFFICULT TO CONVINCE MANAGEMENT TO EXPAND BEYOND ARIZONA FOR A

01:31PM 10    COUPLE OF REASONS.

01:31PM 11        DO YOU SEE THAT?

01:31PM 12    A.   YES.

01:31PM 13    Q.   AND WHY WAS THAT?  WHY MIGHT IT BE DIFFICULT TO CONVINCE

01:31PM 14    MANAGEMENT TO EXPAND BEYOND ARIZONA?

01:31PM 15    A.   WELL, AGAIN, WE WERE DOING THE PILOT, AND TWO OF THE

01:31PM 16    METRICS THAT WE WERE LOOKING AT, OF MANY, AS I EXPLAINED

01:31PM 17    BEFORE, WAS, OF COURSE, PATIENTS PER DAY WITH A GREAT

01:31PM 18    EXPERIENCE BEING NOT ONLY THE NUMBER OF PATIENTS, BUT WERE THEY

01:31PM 19    RECEIVING A GREAT EXPERIENCE; AND THEN THE SECOND WAS THE

01:31PM 20    VENOUS PERCENT GOING BELOW 10 PERCENT RANGE.

01:31PM 21    Q.   TODAY I THINK YOU AND MR. COOPERSMITH REVIEWED SEVERAL

01:31PM 22    EMAILS IN THE 2015 TIMEFRAME.

01:31PM 23        DO YOU RECALL THAT?

01:31PM 24    A.   YES.

01:31PM 25    Q.   AND EMAILS TALKING ABOUT THE NUMBER OF STORES THAT

01:31PM   1    THERANOS AND WALGREENS WERE PLANNING FOR; IS THAT RIGHT?

01:32PM   2    A.   YES.

01:32PM   3    Q.   AND IN EXHIBIT 1896 -- CAN YOU REMIND THE JURY THE DATE OF

01:32PM   4    THIS EMAIL?

01:32PM   5    A.   AUGUST 15TH, 2014.

01:32PM   6    Q.   DID WALGREENS EVER OPEN MORE THAN 40 STORES IN ARIZONA?

01:32PM   7    A.   NO, SIR.

01:32PM   8    Q.   DID WALGREENS EVER OPEN MORE THAN ONE STORE, THE PALO ALTO

01:32PM   9    STORE, WITH THERANOS SERVICES IN CALIFORNIA?

01:32PM  10    A.   NO, SIR.

01:32PM  11    Q.   SO ALL OF THE EMAILS THAT YOU SAW TALKING ABOUT PLANS FOR

01:32PM  12    2015, DID ANY OF THEM EVER COME TO FRUITION?

01:32PM  13    A.   NO, SIR.

01:32PM  14    Q.   WAS THE VENOUS DRAW PERCENT ONE OF THE REASONS WHY?

01:32PM  15    A.   IT WAS ONE OF THE REASONS, CORRECT.

01:32PM  16    Q.   AMONG THE REASONS, YOU COVERED ONE WITH MR. COOPERSMITH,

01:32PM  17    HE ASKED YOU ABOUT A "WALL STREET JOURNAL" ARTICLE.

01:32PM  18        DO YOU RECALL THAT?

01:32PM  19    A.   YES, SIR.

01:32PM  20    Q.   AND I THINK HIS QUESTION TO YOU WAS, DID THINGS CHANGE

01:32PM  21    AFTER "THE WALL STREET JOURNAL" ARTICLE?

01:32PM  22        DO YOU RECALL THAT?

01:32PM  23    A.   YES, SIR.

01:32PM  24    Q.   AND WHAT WAS YOUR ANSWER?

01:32PM  25    A.   THINGS DID CHANGE.

01:32PM   1    Q.   DID THE RELATIONSHIP END BECAUSE OF NEGATIVE MEDIA

01:33PM   2    COVERAGE?

01:33PM   3    A.   NO.   THE RELATIONSHIP ENDED -- OF COURSE WE HAD A LOT OF

01:33PM   4    QUESTIONS WHEN THAT ARTICLE CAME OUT.   THERE WAS A LOT OF

01:33PM   5    INFORMATION IN THAT ARTICLE THAT WE WERE JUST NOT AWARE OF, AND

01:33PM   6    SO WE WERE TRYING TO FIGURE OUT WHAT WAS THE TRUTH.

01:33PM   7         AND SO I HAD REACHED OUT TO MR. BALWANI, AND THEN

01:33PM   8    SUBSEQUENTLY OUR CHIEF MEDICAL OFFICER BECAME VERY INVOLVED,

01:33PM   9    OUR COUNSEL BECAME INVOLVED, AND WE TRIED TO UNDERSTAND WHAT

01:33PM  10    WAS TRULY GOING ON.

01:33PM  11         WHEN WE REALIZED THAT PATIENTS WERE NOW POTENTIALLY BEING

01:33PM  12    HARMED AND ALL OF THE TESTS WERE VOIDED IS WHEN WE COMPLETELY

01:33PM  13    STOPPED ALL OF THE OPERATION.

01:33PM  14              MR. COOPERSMITH:   OBJECTION, YOUR HONOR.   MOVE TO

01:33PM  15    STRIKE.   IT'S NONRESPONSIVE AND IT'S PREJUDICIAL, 403.

01:33PM  16              THE COURT:   I THINK THIS WAS THIS WITNESS'S OPINION

01:33PM  17    OF THAT.   WHETHER OR NOT IT'S ACCURATE OR NOT IS SUBJECT TO

01:34PM  18    QUESTIONING, BUT IT WAS HIS OPINION.

01:34PM  19         SO I'LL OVERRULE THE OBJECTION.   THE ANSWER CAN REMAIN.

01:34PM  20              MR. SCHENK:   THANK YOU.

01:34PM  21    Q.   MR. JHAVERI, WAS THERANOS EVER ABLE TO PROVIDE

01:34PM  22    SATISFACTORY ANSWERS TO WALGREENS'S QUESTIONS AT THIS TIME?

01:34PM  23    A.   NO.

01:34PM  24    Q.   FINALLY, I'D LIKE TO TALK TO YOU ABOUT YOUR BLOOD TEST

01:34PM  25    RESULTS.   DO YOU RECALL I THINK IT WAS EXHIBIT 966?

01:34PM   1    A.   YES, SIR.

01:34PM   2    Q.   DO YOU RECALL REVIEWING THAT WITH MR. COOPERSMITH?

01:34PM   3    A.   YES, SIR.

01:34PM   4    Q.   AND I THINK THE LINE OF QUESTIONING WAS YOUR RESULTS WITH

01:34PM   5    THERANOS WERE THE SAME AS A DIFFERENT BUT SIMULTANEOUS BLOOD

01:34PM   6    TEST THAT YOU HAD; IS THAT RIGHT?

01:34PM   7    A.   CORRECT.

01:34PM   8    Q.   COULD WE BRING UP EXHIBIT 957.  THAT ALSO HAS BEEN

01:34PM   9    PREVIOUSLY ADMITTED.

01:34PM  10         MR. JHAVERI, DO YOU REMEMBER ON DIRECT SEEING THIS

01:34PM  11    EXHIBIT?

01:34PM  12    A.   YES.

01:34PM  13    Q.   AND THIS IS AN EXHIBIT THAT YOU ARE NOT ON; IS THAT

01:35PM  14    CORRECT?

01:35PM  15    A.   CORRECT.

01:35PM  16    Q.   IN THIS EXHIBIT, THOUGH, DID YOU SEE THAT YOUR BLOOD TEST

01:35PM  17    AND OTHERS FROM WALGREENS WERE ACTUALLY RUN ON ADVIA MACHINES?

01:35PM  18    A.   YES.

01:35PM  19    Q.   SO WAS THERANOS ABLE TO MATCH A DIFFERENT LAB ACCORDING TO

01:35PM  20    MR. COOPERSMITH, BUT USING AN ADVIA MACHINE?

01:35PM  21    A.   YES, ACCORDING TO THIS EMAIL.

01:35PM  22    Q.   THANK YOU.

01:35PM  23         NO FURTHER QUESTIONS.

01:35PM  24              THE COURT:  RECROSS.

         25

01:36PM  1                    **RECROSS-EXAMINATION**

01:36PM  2    BY MR. COOPERSMITH:

01:36PM  3    Q.   HELLO, MR. JHAVERI.

01:36PM  4    A.   HI.  HOW ARE YOU?

01:36PM  5    Q.   JUST SWELL.  THANK YOU.

01:36PM  6         SO I JUST WANT TO FOLLOW UP ON A FEW THINGS THAT YOU WERE

01:36PM  7    JUST QUESTIONED ABOUT BY MR. SCHENK.

01:36PM  8         SO LET'S JUST START WHERE WE LEFT OFF ABOUT THE TESTS THAT

01:36PM  9    YOU HAD AT THERANOS IN AUGUST OF 2013.

01:36PM  10   A.   YES.

01:36PM  11   Q.   AND MR. SCHENK JUST POINTED YOU TO AN EMAIL THAT SHOWED

01:36PM  12   THAT THE TESTING WAS ON SOMETHING CALLED THE ADVIA.

01:36PM  13        DO YOU REMEMBER THAT?

01:36PM  14   A.   CORRECT.

01:36PM  15   Q.   CORRECT.  BUT DURING THE TESTS, I THINK YOU SAID THIS

01:36PM  16   ALREADY, BUT I JUST WANT TO CONFIRM, YOU ACTUALLY HAD A

01:36PM  17   FINGERSTICK TEST?

01:36PM  18   A.   THE BLOOD TESTS -- YEAH, THE BLOOD WAS DRAWN BY A

01:37PM  19   FINGERSTICK.

01:37PM  20   Q.   RIGHT.  NOT A VENOUS DRAW?

01:37PM  21   A.   NOT A VENOUS DRAW.

01:37PM  22   Q.   RIGHT.  SO THEY TOOK THE FINGERSTICK TEST, AND THAT

01:37PM  23   FINGERSTICK TEST IS WHAT -- THE ONLY SAMPLE THAT YOU GAVE THAT

01:37PM  24   GAVE THE RESULTS THAT YOU WERE THEN EMAILED AND WE DISCUSSED

01:37PM  25   EARLIER WHEN I WAS QUESTIONING YOU; RIGHT?

01:37PM  1      A.   THAT'S CORRECT.

01:37PM  2      Q.   OKAY.  AND YOU'RE AWARE THAT AN ADVIA MACHINE, IF YOU BUY

01:37PM  3      IT FROM SIEMENS, CANNOT DO FINGERSTICK TESTING; RIGHT?

01:37PM  4      A.   THAT IS MY UNDERSTANDING, YES, CORRECT.

01:37PM  5      Q.   OKAY.  AND YOU UNDERSTAND THAT THERANOS USED ITS OWN

01:37PM  6      SCIENTIFIC TECHNOLOGY TO MODIFY THAT MACHINE SO IT COULD DO

01:37PM  7      FINGERSTICK TESTING; RIGHT?

01:37PM  8      A.   I'M NOT FULLY AWARE OF THE DETAILS OF THAT, SIR, OF WHAT

01:37PM  9      WAS DONE.

01:37PM  10     Q.   OKAY.

01:37PM  11     A.   SO I CAN'T REALLY ANSWER THAT QUESTION.

01:37PM  12     Q.   OKAY.  I WANT TO GO BACK TO A POINT THAT MR. SCHENK WAS

01:37PM  13     MAKING, AND YOU REMEMBER THERE WAS A DISCUSSION ABOUT A

01:38PM  14     PARTICULAR VIDEO THAT I PLAYED TO YOU?

01:38PM  15     A.   YES.

01:38PM  16     Q.   OF SOME PRIOR TESTIMONY?

01:38PM  17     A.   YES.

01:38PM  18     Q.   AND HE SHOWED YOU SOME OTHER TESTIMONY; RIGHT?

01:38PM  19     A.   YES, SIR.

01:38PM  20     Q.   OR AT LEAST HE READ IT.  AND THAT RELATED TO THE SUBJECT

01:38PM  21     OF WHETHER THE 2,000 STORES WERE WELL EXPERIENCE STORES OR

01:38PM  22     WALGREENS STORES?

01:38PM  23     A.   YES, SIR.

01:38PM  24     Q.   RIGHT.  BUT I'D LIKE TO POINT YOU TO OTHER TESTIMONY THAT

01:38PM  25     MR. SCHENK DID NOT REVIEW WITH YOU, AND THAT IS IF YOU TAKE A

01:38PM   1    LOOK AT, IT WOULD BE IN THE SECOND BINDER, THE SAME ONE YOU

01:38PM   2    WERE LOOKING AT WITH MR. SCHENK, AND IT'S EXHIBIT 28407.  OKAY?

01:38PM   3    A.   YES, SIR.

01:38PM   4    Q.   AND IF YOU GO TO THE PAGE 3670.

01:39PM   5         AND YOU SEE ON THAT PAGE THERE'S A DISCUSSION ABOUT THE

01:39PM   6    GOAL OF 500 STORES VERSUS 2,000 OR 2,500 STORES.

01:39PM   7         DO YOU SEE THAT?

01:39PM   8    A.   YES, SIR.

01:39PM   9    Q.   OKAY.

01:39PM   10        YOUR HONOR, I'D LIKE TO PUT UP ON THE SCREEN AN EXHIBIT

01:39PM   11   THAT WE HAVE NUMBERED 28407A.  AND IT WOULD BE PAGE 3670 OF

01:39PM   12   EXHIBIT 28407, LINE 7, THROUGH 3671 AT LINE 23.

01:40PM   13        (PAUSE IN PROCEEDINGS.)

01:40PM   14        MR. SCHENK:  OBJECTION.  WE DIRECT THE COURT TO THE

01:40PM   15   QUESTION THAT IS BEING ASKED OF MR. JHAVERI.

01:40PM   16        (PAUSE IN PROCEEDINGS.)

01:40PM   17        THE COURT:  IS THIS RESPONSIVE TO MR. SCHENK'S

01:41PM   18   QUESTION?

01:41PM   19        MR. COOPERSMITH:  DIRECTLY, YOUR HONOR.  IT TALKS

01:41PM   20   ABOUT WHAT THE GOAL WAS IN AUGUST OF 2014, HOW MANY STORES

01:41PM   21   BASED ON MR. JHAVERI'S TESTIMONY.

01:41PM   22        AND I POINT THE COURT IN PARTICULAR TO PAGE 3671, LINES

01:41PM   23   THROUGH 23.

01:41PM   24        THE COURT:  THE QUESTION IS AT LINE 5.

01:41PM   25        MR. COOPERSMITH:  OF 3670?  THAT'S THE INITIAL

01:41PM   1    QUESTION, YES, YOUR HONOR.

01:41PM   2              THE COURT:  3671.

01:41PM   3              MR. COOPERSMITH:  THAT IS THAT QUESTION ASKED AT

01:41PM   4    THAT PAGE, BUT THE REST OF IT, GOING BACK TO 3670 ON LINE 7, IS

01:41PM   5    ALL OF THE TOPIC THAT THEY'RE DISCUSSING.

01:41PM   6         BUT YOUR HONOR IS RIGHT, THERE IS A QUESTION ON LINE 5 OF

01:42PM   7    THAT 3671.

01:42PM   8              (PAUSE IN PROCEEDINGS.)

01:42PM   9              THE COURT:  I'M CERTAIN THIS MATCHES EXACTLY WHAT

01:42PM  10    WAS ASKED, BUT I'M GOING TO ALLOW IT TO COME IN.

01:42PM  11         I DON'T WANT THIS TO GET A 403.  I THINK WE'RE SPENDING A

01:42PM  12    LOT OF TIME ON THIS THAT MAY NOT BE NECESSARY AND THAT MIGHT

01:42PM  13    OTHERWISE MIGHT CONFUSE THE JURY.

01:42PM  14         BUT I'LL ALLOW THIS TO COME IN.

01:42PM  15              MR. COOPERSMITH:  OKAY.  THANK YOU, YOUR HONOR.

01:43PM  16         IF WE CAN PUT UP THAT TESTIMONY.

01:43PM  17    Q.   DO YOU HAVE IT IN FRONT OF YOU, MR. JHAVERI?

01:43PM  18    A.   YES, SIR.

01:43PM  19    Q.   JUST SO YOU CAN FOLLOW ALONG.

01:43PM  20         LET'S START WITH LINE 7 ON PAGE 3670.

01:43PM  21         AND THE QUESTION YOU ARE ASKED IS, "OKAY.  LET ME ASK YOU

01:43PM  22    TO LOOK ON PAGE 9, WHICH IS A CONTINUATION OF THAT SECTION.

01:43PM  23    AND I'D ASK YOU TO LOOK AT THE BULLET POINT THAT BEGINS,

01:43PM  24    INITIAL GOAL FOR FISCAL YEAR WAS 500 STORES."

01:43PM  25         DO YOU SEE THAT?

01:43PM  1    A.   YES, SIR.

01:43PM  2    Q.   AND ACTUALLY, JUST TO BE CLEAR, THE QUESTION IS REFERRING

01:43PM  3    TO THE PARTNERSHIP MEETING MINUTES, WHICH IS EXHIBIT 1884.

01:43PM  4    A.   THAT'S CORRECT.

01:43PM  5    Q.   RIGHT?

01:43PM  6         AND, IN FACT, THAT'S THE DOCUMENT THAT HAS THE CHART THAT

01:43PM  7    YOU REVIEWED WITH MR. SCHENK DURING HIS REDIRECT?

01:43PM  8    A.   YES, SIR.

01:43PM  9    Q.   OKAY.  AND HE ONLY SHOWED YOU THE CHART; RIGHT?

01:43PM  10        BUT IN THAT SAME EXHIBIT, IT TALKS ABOUT REDEFINING THE

01:43PM  11   GOAL WHEN THE INITIAL GOAL HAD BEEN 500; CORRECT?

01:43PM  12   A.   CORRECT.

01:43PM  13   Q.   AND THEN WHEN I WAS QUESTIONING YOU A COUPLE OF WEEKS AGO,

01:44PM  14   WE HAD LOOKED AT A MAY 2014 PARTNERSHIP MEETING MINUTES WHERE

01:44PM  15   THE GOAL AT THAT POINT IN MAY HAD BEEN 500 STORES.

01:44PM  16        DO YOU REMEMBER THAT?

01:44PM  17   A.   YES.

01:44PM  18   Q.   AND THEN IN THE AUGUST 6TH PARTNERSHIP MEETING MINUTES,

01:44PM  19   THE GOAL WAS GOING TO BE REDEFINED; RIGHT?

01:44PM  20   A.   CORRECT.

01:44PM  21   Q.   OKAY.  AND SO THE QUESTION WE'RE LOOKING AT, JUST TO

01:44PM  22   PROVIDE THE CONTEXT, IS THE INITIAL GOAL WAS REFERRING TO THAT

01:44PM  23   EARLIER MAY PERIOD WHERE THE GOAL WAS 500 STORES; CORRECT?

01:44PM  24   A.   THE INITIAL GOAL FOR THAT FISCAL YEAR WAS 500.

01:44PM  25   Q.   RIGHT.

01:44PM 1    A.   RIGHT.

01:44PM 2    Q.   AND IT WAS GOING TO BE REDEFINED AT THIS PARTNERSHIP

01:44PM 3    MEETING IN AUGUST; RIGHT?

01:44PM 4    A.   CORRECT.

01:44PM 5    Q.   OKAY.  AND LET'S JUST GO ON.

01:44PM 6         AND THEN LINE 11, "DO YOU SEE THAT?"

01:44PM 7         AND YOU SAY, "YES, SIR."

01:44PM 8         "QUESTION:  AND UNDERNEATH THAT, IT SAYS WE NEED TO

01:44PM 9    REDEFINE THIS GOAL."

01:44PM 10        DO YOU SEE THAT?

01:44PM 11   A.   YES, SIR.

01:44PM 12   Q.   AND THEN YES.

01:44PM 13        "QUESTION:  AND THEN UNDER THAT THERE'S A BULLET POINT

01:45PM 14   THAT TALKS ABOUT A NATIONWIDE GOAL."

01:45PM 15        DO YOU SEE THAT?

01:45PM 16   A.   YES.

01:45PM 17   Q.   AND THEN THAT INDICATES THE GOAL -- A GOAL MIGHT BE 2,000

01:45PM 18   TO 2,500 STORES NATIONWIDE.

01:45PM 19        DO YOU SEE THAT?

01:45PM 20        YES?

01:45PM 21   A.   YES.

01:45PM 22   Q.   I WILL START AGAIN.

01:45PM 23        I'M LOOKING AT LINE 25 ON PAGE 3670, EXHIBIT 28407.

01:45PM 24        THE QUESTION YOU'RE ASKED IS, "AND DO YOU RECALL IN THE

01:45PM 25   ORIGINAL AGREEMENT, OR ACTUALLY IN THE AGREEMENT THAT WAS

01:45PM  1    SIGNED AT THE END OF DECEMBER 2013, THE PROPOSAL WAS THAT THERE

01:45PM  2    WOULD BE 3,000 STORES ROLLED OUT?

01:45PM  3         "DO YOU RECALL THAT?"

01:45PM  4         AND YOUR ANSWER IS, "I DON'T RECALL THAT, BUT, YES."

01:45PM  5         DO YOU SEE THAT?

01:45PM  6    A.   YES.

01:45PM  7    Q.   AND THEN THE QUESTION IS, "OKAY.  SO THE PROJECTION OF

01:45PM  8    2,000 TO 2,500 STORES WAS A REDUCTION IN WHAT WAS DESCRIBED IN

01:45PM  9    THAT DECEMBER 2013 AGREEMENT; CORRECT?"

01:46PM  10        AND YOUR ANSWER IS AS FOLLOWS:  "IF THE NUMBER WAS

01:46PM  11   REDUCED, YES.

01:46PM  12        "AGAIN, AS I MENTIONED EARLIER, WHENEVER DISCUSSIONS OF

01:46PM  13   LAUNCH ARE HAD, WE LOOK AT ALL OF THE VARIABLES OF BOTH

01:46PM  14   PARTIES, IN THIS CASE THERANOS AS WELL AS WALGREENS, AND WE

01:46PM  15   CHANGE THOSE NUMBERS BASED ON WHAT WE'RE SEEING, THE RESULTS

01:46PM  16   THAT WE'RE EXPERIENCING, THE PATIENT EXPERIENCE THAT YOU TALKED

01:46PM  17   ABOUT THAT WE ARE SEEING.

01:46PM  18        "SO WHAT YOU ARE SEEING IS REALLY THOSE TYPES OF INPUTS

01:46PM  19   GOING INTO WHAT THE NUMBER OF LAUNCHES SHOULD BE.

01:46PM  20        "NATIONWIDE LAUNCH?  YES.  WE HAD EVERY INTENTION AS

01:46PM  21   WALGREENS TO LAUNCH NATIONWIDE.

01:46PM  22        "BUT AGAIN, HOW WE LAUNCH, WHAT WE DO, HOW WAS WE GO IS

01:46PM  23   DEPENDENT ON MANY, MANY VARIABLES THAT I SPOKE ABOUT EARLIER."

01:46PM  24        DO YOU SEE THAT?

01:46PM  25   A.   YES, SIR.

01:46PM   1    Q.   AND THEN GOING ON LINE 21 ON PAGE 3671, IT'S ACTUALLY

01:46PM   2    PAGE 134 OF THE EXHIBIT IN THOSE NUMBERS, LINE 21, THE QUESTION

01:46PM   3    YOU WERE ASKED IS, "OKAY.  BUT AS OF AUGUST 2014, THIS 2500 WAS

01:47PM   4    YOUR PROJECTION; CORRECT?"

01:47PM   5         DO YOU SEE THAT?

01:47PM   6    A.   YES, SIR.

01:47PM   7    Q.   AND YOUR ANSWER WAS, "CORRECT."

01:47PM   8         AM I READING THAT CORRECTLY?

01:47PM   9    A.   YOU ARE.

01:47PM   10   Q.   AND THAT WAS TESTIMONY THAT YOU GAVE UNDER OATH IN A PRIOR

01:47PM   11   PROCEEDING; RIGHT?

01:47PM   12   A.   YES.

01:47PM   13   Q.   AND MR. SCHENK DIDN'T SHOW YOU THAT ON HIS REDIRECT, DID

01:47PM   14   HE?

01:47PM   15   A.   RIGHT NOW, NO.

01:47PM   16   Q.   MR. JHAVERI, LET'S GO TO A DIFFERENT TOPIC.

01:47PM   17        MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT PERCENTAGE OF

01:47PM   18   VENIPUNCTURE NUMBERS.

01:47PM   19        DO YOU REMEMBER THAT?

01:47PM   20   A.   YES, SIR.

01:47PM   21   Q.   AND HE TALKED ABOUT SOME OF THE CUSTOMER FEEDBACK.

01:47PM   22        DO YOU REMEMBER?

01:47PM   23   A.   YES, SIR.

01:47PM   24   Q.   AND THAT HE ASKED, I THINK, THE QUESTION ABOUT WHETHER THE

01:47PM   25   CUSTOMER FEEDBACK THAT WAS ON A PARTICULAR PAGE HE SHOWED YOU

01:47PM  1    WAS ALL ABOUT PRICE.

01:48PM  2         DO YOU REMEMBER THAT QUESTION?

01:48PM  3    A.   CORRECT, YES.

01:48PM  4    Q.   AND I THINK YOU SAID YES.

01:48PM  5    A.   YES.

01:48PM  6    Q.   BUT, ACTUALLY, WE TALKED EARLIER ABOUT SOME BAR GRAPHS

01:48PM  7    WHERE IT TRACKED SOME PATIENTS EVERY SINGLE TIME AND HOW MANY

01:48PM  8    PATIENTS RESPONDED WITH 1, 2, 3, 4, 5'S BASED ON THEIR RATINGS

01:48PM  9    OF THE SERVICE; RIGHT?

01:48PM  10   A.   WE DID.

01:48PM  11   Q.   AND ONE OF THOSE BAR GRAPHS HAD TO DO WITH SAMPLE

01:48PM  12   COLLECTIONS; RIGHT?

01:48PM  13   A.   YES.

01:48PM  14   Q.   AND YOU REMEMBER OVERWHELMINGLY PATIENT WERE PUTTING 5'S,

01:48PM  15   THE BEST RATING FOR SAMPLE COLLECTION; RIGHT?

01:48PM  16   A.   YES.

01:48PM  17   Q.   AND THEY WERE NOT OVERWHELMINGLY SAYING NO, WE WERE REALLY

01:48PM  18   UPSET BECAUSE WE DIDN'T GET FINGERSTICK; RIGHT?

01:48PM  19   A.   THAT'S THE ASSUMPTION BASED ON THE METRICS.

01:48PM  20   Q.   OKAY.  LET'S TALK ABOUT A DIFFERENT TOPIC, AND THAT IS,

01:49PM  21   MR. SCHENK ASKED YOU SOME QUESTIONS ABOUT THE JOHNS HOPKINS

01:49PM  22   REPORT.

01:49PM  23   A.   YES, SIR.

01:49PM  24   Q.   AND HE ASKED YOU SOME QUESTIONS IN PARTICULAR ABOUT

01:49PM  25   WHETHER THE DISCLAIMER AT THE BOTTOM WAS AN ISSUE.

01:49PM  1        DO YOU REMEMBER THOSE QUESTIONS?

01:49PM  2   A.   YES.

01:49PM  3   Q.   AND THE DISCLAIMER SAID SOMETHING ABOUT HOW THIS WAS

01:49PM  4   INFORMATION TRANSMITTED FOR THE USE OF WALGREENS ONLY.

01:49PM  5        DO YOU REMEMBER THAT?

01:49PM  6   A.   YES, SIR.

01:49PM  7   Q.   AND IT WENT ON ABOUT WHETHER JOHNS HOPKINS WAS ENDORSING A

01:49PM  8   PRODUCT OR SERVICE?

01:49PM  9   A.   YES, I REMEMBER THAT.

01:49PM  10  Q.   OKAY.  SO LET'S JUST START WITH THE EXHIBIT THAT

01:49PM  11  MR. SCHENK SHOWED YOU, WHICH IS 20532.

01:49PM  12       I BELIEVE THAT'S IT.  RIGHT.

01:50PM  13       SO THIS IS EXHIBIT 20532 THAT WE'RE LOOKING AT, AND IT'S

01:50PM  14  THE THIRD AND FOURTH PAGES.

01:50PM  15       SO WE'RE AT THE THIRD PAGE NOW UP ON THE SCREEN.

01:50PM  16       AND PUTTING ASIDE THE DISCLAIMER AT THE VERY BOTTOM, IN

01:50PM  17  FACT, IF WE LOOK AT THE VERY BOTTOM OF THE PAGE, DO YOU SEE

01:50PM  18  THAT THERE'S THAT -- I'M SORRY.  IT'S THE DISCLAIMER ON PAGE 4

01:50PM  19  THAT IS BEING HIGHLIGHTED NOW.

01:50PM  20       THAT'S A DISCLAIMER THAT MR. SCHENK ASKED YOU ABOUT?

01:50PM  21  A.   YES, SIR.

01:50PM  22  Q.   OKAY.  AND NOTWITHSTANDING THE DISCLAIMER ABOUT NOT

01:50PM  23  ENDORSING, THE TEXT OF THE REPORT HAS, FOR EXAMPLE, NO MAJOR

01:50PM  24  WEAKNESSES WERE IDENTIFIED; RIGHT?

01:50PM  25  A.   YES.

01:50PM  1    Q.   RIGHT.  SO WHATEVER THE DISCLAIMER SAYS, JOHNS HOPKINS

01:50PM  2    PHYSICIANS ARE GIVING THEIR VIEWS ABOUT THE THERANOS

01:50PM  3    TECHNOLOGY; RIGHT?

01:50PM  4               MR. SCHENK:  OBJECTION.  CALLS FOR SPECULATION.

01:51PM  5               THE COURT:  WITHOUT A FOUNDATION.

01:51PM  6    BY MR. COOPERSMITH:

01:51PM  7    Q.   OKAY.  JUST STICKING TO THE REPORT ITSELF, DO YOU SEE THAT

01:51PM  8    ON THE FIRST PAGE THERE ARE JOHNS HOPKINS PHYSICIANS ON THE

01:51PM  9    FIRST PAGE?

01:51PM  10   A.   YES.

01:51PM  11   Q.   AND IT HAS THREE OF THEM LISTED THERE?

01:51PM  12   A.   YES.

01:51PM  13   Q.   OKAY.  AND THEN IF YOU GO TO PAGE 4, YOU SEE IT SAYS KEY

01:51PM  14   FINDINGS?

01:51PM  15   A.   I DO.

01:51PM  16   Q.   AND IT SAYS, "BASED ON THIS EVALUATION, THE CONSENSUS OF

01:51PM  17   THE HOPKINS TEAM WAS AS FOLLOWS"; RIGHT?

01:51PM  18   A.   YES.

01:51PM  19   Q.   AND IT GIVES BULLET POINTS, BUT WE DISCUSSED THEM A COUPLE

01:51PM  20   WEEKS AGO; RIGHT?

01:51PM  21   A.   YES.

01:51PM  22   Q.   AND GOING TO THE DISCLAIMER, IT WAS -- THERE WAS A

01:51PM  23   RELATIONSHIP BETWEEN WALGREENS AND JOHNS HOPKINS; RIGHT?

01:51PM  24   A.   WE DID HAVE A BUSINESS RELATIONSHIP, YES.

01:51PM  25   Q.   RIGHT.  AND THAT'S WHY WALGREENS USED JOHNS HOPKINS TO

01:51PM  1    HELP EVALUATE THIS TECHNOLOGY; RIGHT?

01:51PM  2    A.   CORRECT.

01:51PM  3    Q.   OKAY.  AND JUST ON THE POINT OF, YOU KNOW, THE DISCLAIMER

01:52PM  4    AND TRANSMITTING INFORMATION OR WHETHER IT WAS FOR THE SOLE

01:52PM  5    BENEFIT OF WALGREENS, I'D LIKE TO HAVE YOU TAKE A LOOK AT

01:52PM  6    EXHIBIT 20533.

01:52PM  7         I'M SORRY, 20553.  20553.

01:52PM  8         AND DO YOU SEE THIS IS AN EMAIL FROM --

01:52PM  9         AND IT'S NOT IN EVIDENCE, YOUR HONOR.

01:52PM  10        MR. JHAVERI, WE'LL JUST DISCUSS IT FOR A MINUTE, BUT DO

01:52PM  11   YOU SEE IT'S AN EMAIL FROM MR. JAY ROSAN TO ELIZABETH HOLMES

01:52PM  12   AND OTHERS?

01:52PM  13   A.   SIR, I JUST NEED TO FIND IT.

01:52PM  14   Q.   OH, OF COURSE.  I'M SORRY.

01:53PM  15        (PAUSE IN PROCEEDINGS.)

01:53PM  16            THE WITNESS:  I HAVE IT.

01:53PM  17   BY MR. COOPERSMITH:

01:53PM  18   Q.   OKAY.  THANK YOU.

01:53PM  19        WE'RE EXHIBIT 20553.

01:53PM  20        DO YOU SEE IN THE MIDDLE THERE'S AN EMAIL FROM JAY ROSAN

01:53PM  21   TO ELIZABETH HOLMES AND SOME OTHER PEOPLE WERE COPIED?

01:53PM  22   A.   YES, SIR.

01:53PM  23   Q.   AND THEN ABOVE THAT YOU SEE THAT THERE'S A FORWARDING OF

01:53PM  24   THE SAME EMAIL FROM ELIZABETH HOLMES TO SUNNY BALWANI AND

01:53PM  25   DANIEL YOUNG?

01:53PM  1    A.   YES, I DO.

01:53PM  2    Q.   AND WE TALKED ABOUT JAY ROSAN; RIGHT?

01:53PM  3    A.   YES.

01:53PM  4    Q.   HE WAS THE MEDICAL DOCTOR --

01:53PM  5    A.   YES.

01:53PM  6    Q.   -- WHO WORKED FOR WALGREENS; RIGHT?

01:53PM  7    A.   CORRECT.

01:53PM  8    Q.   AND HE WAS THE VICE PRESIDENT OF HEALTH INNOVATION?

01:53PM  9    A.   THAT'S CORRECT.

01:53PM  10   Q.   OKAY.  AND HE WAS SENDING THIS EMAIL TO MS. HOLMES; RIGHT?

01:54PM  11   A.   YES, ACCORDING TO THIS.

01:54PM  12   Q.   RIGHT.  WITH AN ATTACHMENT?

01:54PM  13   A.   YES.

01:54PM  14        MR. COOPERSMITH:  YOUR HONOR, WE OFFER 20553.  I

01:54PM  15   THINK THE GOVERNMENT OPENED THE DOOR TO THIS BY TALKING ABOUT

01:54PM  16   THE DISCLAIMER INFORMATION THAT THEY HIGHLIGHTED WITH

01:54PM  17   MR. JHAVERI.

01:54PM  18        MR. SCHENK:  NO OBJECTION.

01:54PM  19        THE COURT:  IT'S ADMITTED.

01:54PM  20   (DEFENDANT'S EXHIBIT 20553 WAS RECEIVED IN EVIDENCE.)

01:54PM  21        MR. COOPERSMITH:  YES.  MAY WE PUBLISH IT?

01:54PM  22        THE COURT:  YES.

01:54PM  23   BY MR. COOPERSMITH:

01:54PM  24   Q.   SO YOU SEE, MR. JHAVERI, THERE WAS THAT EMAIL THAT WE JUST

01:54PM  25   TALKED ABOUT FROM JAY ROSAN?

01:54PM  1    A.   YES.

01:54PM  2    Q.   AND THEN THERE'S ABOVE THAT YOU SEE THE FORWARDING OF THE

01:54PM  3    EMAIL TO --

01:54PM  4    A.   I DO.

01:54PM  5    Q.   AND THAT'S ON SEPTEMBER 10TH, 2010; RIGHT?

01:54PM  6    A.   CORRECT.

01:54PM  7    Q.   AND THEN IF YOU GO TO THE ATTACHMENT, THAT'S PAGE 2 OF THE

01:54PM  8    EXHIBIT, YOU SEE THAT'S THE SAME REPORT, SUMMARY OF THE

01:55PM  9    HOLMES/WALGREENS/THERANOS MEETING THAT WE WERE JUST LOOKING AT?

01:55PM  10   A.   YES.

01:55PM  11   Q.   AND THEN IF YOU GO TO THE NEXT PAGE, IT'S THE SAME SECOND

01:55PM  12   PAGE AS WELL WITH THE KEY FINDINGS AND EVEN THE DISCLAIMER;

01:55PM  13   RIGHT?

01:55PM  14   A.   CORRECT.

01:55PM  15   Q.   SO BASED ON WHAT WE'RE SEEING IN FRONT OF US,

01:55PM  16   NOTWITHSTANDING THE DISCLAIMER, SOMEONE AT WALGREENS, A GUY

01:55PM  17   NAMED JAY ROSAN, ACTUALLY TRANSMITTED THE INFORMATION TO

01:55PM  18   THERANOS; RIGHT?

01:55PM  19   A.   RIGHT, ACCORDING TO THIS.

01:55PM  20   Q.   ALL RIGHT.  WHILE WE'RE ON THE SUBJECT OF JAY ROSAN, I'D

01:55PM  21   LIKE TO HAVE YOU TAKE A LOOK AT EXHIBIT 20442.

01:56PM  22   A.   I HAVE IT.

01:56PM  23   Q.   OKAY.  AND DO YOU SEE THAT EXHIBIT 20442 IS AN EMAIL FROM

01:56PM  24   PATTY HAWORTH AT THE TOP TO DANIEL YOUNG?

01:56PM  25   A.   I DO.

01:56PM   1    Q.   AND THERE'S A COPY TO DR. ROSAN FROM WALGREENS AND

01:56PM   2    SUNNY BALWANI.

01:56PM   3         DO YOU SEE THAT?

01:56PM   4    A.   YES.

01:56PM   5    Q.   AND THIS RELATES TO -- THE SUBJECT LINE IS ASTHMA TEST,

01:56PM   6    PATTY HAWORTH?

01:56PM   7    A.   YES.

01:56PM   8    Q.   AND WE TALKED EARLIER ABOUT PATTY HAWORTH; RIGHT?

01:56PM   9    A.   YES, WE DID.

01:56PM  10    Q.   SHE WAS THE EMPLOYEE AT WALGREENS WHO WAS RESPONSIBLE FOR

01:56PM  11    KEEPING THE PARTNERSHIP MEETING MINUTES?

01:56PM  12    A.   HER TITLE WAS THE PROJECT MANAGER.

01:56PM  13    Q.   AND YOU SEE THE EMAIL IS DATED IN APRIL OF 2011?

01:56PM  14    A.   YES.

01:56PM  15    Q.   OKAY.

01:57PM  16         YOUR HONOR, WE OFFER EXHIBIT 20442?

01:57PM  17              MR. SCHENK:   OBJECTION.   BEYOND THE SCOPE.

01:57PM  18              MR. COOPERSMITH:   WE THINK THAT, YOUR HONOR, WITH

01:57PM  19    THAT OBJECTION, IT WAS MR. SCHENK HAD MADE A POINT ABOUT

01:57PM  20    DR. ROSAN, AND I THINK THIS IS RELEVANT TO THE ISSUES ABOUT

01:57PM  21    WHAT WALGREENS WAS DOING AND WHAT THEY HAD.

01:57PM  22         IN FACT, MR. SCHENK ASKED A QUESTION ABOUT THE ACCURACY OF

01:57PM  23    THE DEVICES, AND THE TOPICS ADDRESSED IN THE EMAIL GO DIRECTLY

01:57PM  24    TO WALGREENS'S ABILITY TO OBSERVE THAT BEFORE THEY STARTED

01:57PM  25    LAUNCHING WITH THERANOS.

01:57PM   1              THE COURT:  THIS IS IN 2011?

01:58PM   2              MR. COOPERSMITH:  YES, YOUR HONOR.

01:58PM   3              THE COURT:  AND THIS IS ABOUT MS. HAWORTH.

01:58PM   4         WAS SHE TALKED ABOUT IN PREVIOUS TESTING?

01:58PM   5              MR. COOPERSMITH:  OH, YES.  SHE WAS THE ONE WHO KEPT

01:58PM   6    THE PARTNERSHIP MEETING MINUTES.

01:58PM   7              THE COURT:  I KNOW SHE WAS.

01:58PM   8         BUT WAS THERE DISCUSSION ABOUT HER TESTING IN ANY WAY?  I

01:58PM   9    DON'T RECALL THAT.

01:58PM  10              MR. COOPERSMITH:  YOU MEAN DURING REDIRECT,

01:58PM  11    YOUR HONOR?

01:58PM  12              THE COURT:  RIGHT.

01:58PM  13              MR. COOPERSMITH:  I DON'T REMEMBER A REFERENCE TO

01:58PM  14    MS. HAWORTH IN PARTICULAR.

01:58PM  15         BUT WHAT MR. SCHENK ASKED WERE QUESTIONS ABOUT THE

01:58PM  16    ACCURACY AND RELIABILITY OF THE TESTING, AND THIS GOES DIRECTLY

01:58PM  17    TO WALGREENS'S OPPORTUNITY TO OBSERVE THAT FIRST HAND.

01:58PM  18         (PAUSE IN PROCEEDINGS.)

01:58PM  19              THE COURT:  I'LL ALLOW IT.

01:58PM  20              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

01:58PM  21         (DEFENDANT'S EXHIBIT 20442 WAS RECEIVED IN EVIDENCE.)

01:59PM  22    BY MR. COOPERSMITH:

01:59PM  23    Q.   MR. JHAVERI, TAKE A LOOK AT EXHIBIT 20442.

01:59PM  24         AND YOU SEE, IF WE GO TO THE EARLIEST EMAIL IN TIME,

01:59PM  25    THERE'S AN EMAIL FROM PATTY HAWORTH TO JAY ROSAN WITH A COPY TO

01:59PM   1    BARBARA FLOHR.

01:59PM   2        DO YOU SEE THAT?

01:59PM   3    A.   YES.

01:59PM   4    Q.   AND SHE SAYS, "DR. JAY,

01:59PM   5        "I JUST DID A TEST ON MYSELF TODAY TO MAKE SURE THE

01:59PM   6    MACHINE IS STILL WORKING.  THE I.D.," AND IT HAS AN I.D.

01:59PM   7    NUMBER.

01:59PM   8        DO YOU SEE THAT?

01:59PM   9    A.   YES.

01:59PM  10    Q.   AND IT SAYS, "IT WAS MY ASTHMA TEST.  MY CELL NUMBER IS

01:59PM  11    LISTED BELOW.

01:59PM  12        "ALSO PLEASE LET ME KNOW IF YOU NEED ANY INFORMATION ABOUT

01:59PM  13    THIS."

01:59PM  14        AND THEN THERE'S A RESPONSE FROM JAY ROSAN RIGHT ABOVE

01:59PM  15    THAT, AND HE'S SENDING IT TO DANIEL YOUNG WITH A COPY TO

01:59PM  16    MS. HAWORTH.

01:59PM  17        AND HE SAYS, "PATTY HAWORTH, DAN, I DID NOT GET ANY

01:59PM  18    RESULTS ON THIS.  DID YOU GET THIS AND IF NOT ARE YOU GETTING A

02:00PM  19    HEARTBEAT?"

02:00PM  20        SO DR. ROSAN IS ASKING DR. YOUNG ABOUT THAT; RIGHT?

02:00PM  21    A.   YES.

02:00PM  22    Q.   ABOVE THAT, A FEW DAYS LATER MS. HAWORTH WRITES, "HI

02:00PM  23    DANIEL.

02:00PM  24        "ANY NEWS?"

02:00PM  25        DO YOU SEE THAT?

02:00PM  1    A.   YEP.

02:00PM  2    Q.   AND THEN HE RESPONDS, "THESE DATA WERE SENT TO DR. JAY ON

02:00PM  3    TUESDAY.  DR. JAY HAS CONFIRMED THAT HE RECEIVED THE DATA.

02:00PM  4         "PLEASE LET ME KNOW IF YOU HAVE ANY FURTHER QUESTIONS."

02:00PM  5         DO YOU SEE THAT?

02:00PM  6    A.   I DO.

02:00PM  7    Q.   AND THEN MS. HAWORTH WRITES, "NO FURTHER QUESTIONS.  JUST

02:00PM  8    WANTED TO MAKE SURE THE DEVICE WAS WORKING AS EXPECTED.

02:00PM  9         "THANK YOU FOR YOUR QUICK RESPONSE."

02:00PM  10        SO DR. ROSAN AND MS. HAWORTH, THEY ACTUALLY HAD A THERANOS

02:00PM  11   DEVICE THAT THEY WERE USING FOR MS. HAWORTH TO RUN TESTS ON

02:00PM  12   HERSELF AT WALGREENS; RIGHT?

02:01PM  13   A.   ACCORDING TO THIS.

02:01PM  14        AGAIN, I HAVE NO KNOWLEDGE OF THIS.  I WAS NOT PART OF

02:01PM  15   THIS.

02:01PM  16   Q.   OKAY.  BUT THAT'S WHAT THE EMAIL SAYS?

02:01PM  17   A.   THAT'S WHAT THE EMAIL SAYS.

02:01PM  18   Q.   OKAY.

02:01PM  19        (PAUSE IN PROCEEDINGS.)

02:01PM  20             MR. COOPERSMITH:  NOTHING FURTHER, YOUR HONOR.

02:01PM  21             THE COURT:  ANYTHING FURTHER?

02:02PM  22             MR. SCHENK:  NO, YOUR HONOR.

02:02PM  23             THE COURT:  MAY THIS WITNESS BE EXCUSED?

02:02PM  24             MR. COOPERSMITH:  YES, YOUR HONOR.

02:02PM  25             MR. SCHENK:  YES, YOUR HONOR.

02:02PM  1        THE COURT:  YOU MAY BE EXCUSED.

02:02PM  2        DOES THE GOVERNMENT HAVE ANOTHER WITNESS?

02:02PM  3        IS THIS MS. BENNETT?

02:02PM  4        ALL RIGHT.  FOLKS, WHY DON'T YOU STAND UP AND STRETCH FOR

02:02PM  5   A MOMENT.

02:02PM  6        (STRETCHING.)

02:03PM  7        THE COURT:  THANK YOU.  WE ARE ON THE RECORD AGAIN.

02:03PM  8        MS. BENNETT, DR. BENNETT IS ON THE STAND.

02:03PM  9        YOU WOULD LIKE TO CONTINUE WITH YOUR EXAMINATION?

02:03PM 10        MR. CAZARES:  YES, YOUR HONOR.

02:03PM 11        THE COURT:  PLEASE PROCEED.

02:03PM 12        MR. CAZARES:  THANK YOU, YOUR HONOR.

02:03PM 13                    **CROSS-EXAMINATION (RESUMED)**

02:03PM 14   BY MR. CAZARES:

02:03PM 15   Q.   GOOD AFTERNOON, MS. BENNETT.

02:03PM 16   A.   GOOD AFTERNOON.

02:03PM 17   Q.   SO I WANT TO KIND OF RETURN BACK TO KIND OF THE BIGGER

02:04PM 18   PICTURE ABOUT SOME OF YOUR TESTIMONY FROM YESTERDAY AND GET

02:04PM 19   BACK TO -- SO BEGINNING IN SEPTEMBER OF 2015, YOURSELF AND

02:04PM 20   MR. YAMAMOTO VISITED THERANOS'S LABORATORY TO BEGIN A

02:04PM 21   RECERTIFICATION SURVEY; CORRECT?

02:04PM 22   A.   YES, RECERTIFICATION, AND A COMPLAINT.

02:04PM 23   Q.   YES, THERE WAS A COMPLAINT YOU MENTIONED.

02:04PM 24        AND THAT SURVEY CONTINUED WITH A FOLLOW-UP VISIT IN

02:04PM 25   NOVEMBER OF 2015?

02:04PM  1    A.   IT WAS A CONTINUATION OF THE SAME SURVEY.

02:04PM  2    Q.   AND REVIEW AND EXAMINATION OF DOCUMENTATION CONTINUED INTO

02:04PM  3    JANUARY OF 2016; CORRECT?

02:04PM  4    A.   DECEMBER OR JANUARY, YES.

02:04PM  5    Q.   OKAY.  AND THEN THE REPORT WAS ULTIMATELY ISSUED IN

02:04PM  6    JANUARY OF 2016; CORRECT?

02:04PM  7    A.   I BELIEVE IT WAS JANUARY.

02:04PM  8    Q.   OKAY.  AND WHEN YOU PERFORMED THE SURVEY, WHAT YOU WERE

02:04PM  9    LOOKING FOR IN THIS SURVEY OF THERANOS'S LABORATORY WAS

02:05PM  10   EVIDENCE OF COMPLIANCE WITH THE CLIA REGULATIONS; CORRECT?

02:05PM  11   A.   YES.

02:05PM  12   Q.   SO YOU WERE LOOKING TO ENSURE THAT THE LABORATORY WAS

02:05PM  13   FOLLOWING THE RULES; IS THAT FAIR?

02:05PM  14   A.   THAT THEY WERE MEETING THE REQUIREMENTS, YES.

02:05PM  15   Q.   NOW, PRIOR TO BEGINNING THE SURVEY, YOU DESCRIBED

02:05PM  16   YESTERDAY SOME PRELIMINARY WORK; IS THAT RIGHT?

02:05PM  17   A.   YES.

02:05PM  18   Q.   AND SOME OF THAT WORK INCLUDED LOOKING BACK AT A PRIOR

02:05PM  19   SURVEY THAT TOOK PLACE A COUPLE OF YEARS PRIOR IN DECEMBER OF

02:05PM  20   2013; CORRECT?

02:05PM  21   A.   YES.

02:05PM  22   Q.   YOU ALSO OBTAINED SOME INFORMATION REGARDING THERANOS,

02:05PM  23   INCLUDING THEIR PROFICIENCY TESTING RECORDS OR DATA; CORRECT?

02:05PM  24   A.   I PULLED THE REPORTS ABOUT THE PROFICIENCY TESTING.

02:05PM  25   Q.   OKAY.  AND YOU REQUESTED INFORMATION FROM THERANOS, OR AT

02:05PM   1    LEAST YOURSELF OR MR. YAMAMOTO DID; CORRECT?

02:05PM   2    A.   PRIOR TO THE SURVEY?  I'M NOT SURE.

02:05PM   3    Q.   DO YOU REMEMBER YESTERDAY WITH MR. LEACH YOU WERE SHOWN

02:06PM   4    SOME LISTS OF TESTS DURING YOUR DIRECT EXAMINATION?

02:06PM   5         DO YOU REMEMBER THAT?

02:06PM   6    A.   YES.

02:06PM   7    Q.   AND ONE OF THOSE WAS DATED AROUND JUNE OF 2015.

02:06PM   8         DO YOU REMEMBER THAT?

02:06PM   9    A.   OH, OKAY.  SURE, YES.

02:06PM   10   Q.   AND THAT IDENTIFIED LDT'S VERSUS FDA APPROVED.

02:06PM   11        DO YOU REMEMBER THAT?

02:06PM   12   A.   I REMEMBER THE LIST.  I THOUGHT WE GOT THAT ON SURVEY.

02:06PM   13   Q.   OKAY.  BUT ULTIMATELY YOU DID RECEIVE THAT BEFORE THE

02:06PM   14   SURVEY COMPLETED.

02:06PM   15        FAIR ENOUGH?

02:06PM   16   A.   YES.

02:06PM   17   Q.   OKAY.  NOW, IN THE COURSE OF THE SURVEY, YOU OBVIOUSLY

02:06PM   18   REQUESTED INFORMATION FROM THE LAB WHILE YOU WERE DOING THE

02:06PM   19   WORK; CORRECT?

02:06PM   20   A.   YES.

02:06PM   21   Q.   AND YOU DESCRIBED SOME OF THAT BACK AND FORTH WITH

02:06PM   22   INDIVIDUALS WITHIN THE LAB, INCLUDING LANGLY GEE.

02:06PM   23        DO YOU REMEMBER THAT?

02:06PM   24   A.   I DO.

02:06PM   25   Q.   OKAY.  AND IN ADDITION, YOU WERE PROVIDED WITH A LETTER

02:06PM  1    FROM THE LABORATORY RELATING TO I THINK THE TESTING TIME

02:06PM  2    PERIODS THAT THE LAB WAS USING ITS PROPRIETARY DEVICE, THE

02:06PM  3    EDISON.

02:06PM  4        DO YOU REMEMBER THAT?

02:06PM  5    A.  I DO.

02:06PM  6    Q.  AND I THINK THIS IS ALREADY IN EVIDENCE, AND IF I COULD

02:07PM  7    PUT IT UP ON THE SCREEN.  IT'S EXHIBIT 4533.

02:07PM  8        AND YOU'LL SEE UP ON THE SCREEN, MS. BENNETT, 4533 IS

02:07PM  9    DATED SEPTEMBER 23RD, 2015.

02:07PM  10       DO YOU SEE THAT?

02:07PM  11   A.  I DO.

02:07PM  12   Q.  AND THAT WAS THE TIME PERIOD WHEN YOU WERE ACTUALLY ON

02:07PM  13   SITE; CORRECT?

02:07PM  14   A.  YES.

02:07PM  15   Q.  AND YOU INDICATED THAT, BECAUSE OF THE COMPLAINT, YOU

02:07PM  16   WANTED TO FIGURE OUT, OR AT LEAST GET INFORMATION RELATING TO

02:07PM  17   THE TIME PERIODS OF USE OF THE EDISON DEVICES AT THERANOS;

02:07PM  18   CORRECT?

02:07PM  19   A.  YES.

02:07PM  20   Q.  OKAY.  AND THIS WAS THE LAB'S RESPONSE TO YOU; CORRECT?

02:07PM  21   A.  THIS WAS MR. BALWANI'S RESPONSE TO ME.

02:07PM  22   Q.  OKAY.  SO YOU GOT IT FROM MR. BALWANI?

02:07PM  23   A.  YES.

02:07PM  24   Q.  OKAY.  AND IN THAT LETTER MR. BALWANI DISCLOSED TO YOU THE

02:07PM  25   TIME PERIODS WHEN THE EDISON WAS USED, THE START DATES AND THE

02:07PM  1    END DATES; CORRECT?

02:07PM  2    A.   YES.

02:07PM  3    Q.   OKAY.  NOW, IF WE FOCUS UP ON THE FIRST PARAGRAPH OF THE

02:07PM  4    LETTER THAT YOU INDICATED CAME FROM MR. BALWANI, YOU'LL NOTICE

02:08PM  5    THAT MR. BALWANI WROTE AROUND THE MIDDLE OF THE PARAGRAPH

02:08PM  6    STARTING, "THERANOS RECENTLY RECEIVED FDA CLEARANCE FOR ITS

02:08PM  7    THERANOS SYSTEM -- INCLUDING THE DEVICE, THE THERANOS SAMPLE

02:08PM  8    COLLECTION DEVICE (INCLUDING THE NANOTAINERS) AND OTHER

02:08PM  9    COMPONENTS OF THE SYSTEM."

02:08PM  10        DO YOU SEE THAT?

02:08PM  11   A.   I DO.

02:08PM  12   Q.   AND THEN MR. BALWANI REPORTED TO YOU THAT "THE LAB PLANS

02:08PM  13   TO BRING THESE UNITS LIVE AGAIN IN THE LAB AS 510K-CLEARED

02:08PM  14   ANALYZERS RATHER THAN LDT'S ONCE ADDITIONAL CLEARANCES ARE

02:08PM  15   OBTAINED."

02:08PM  16        DO YOU SEE THAT?

02:08PM  17   A.   I DO.

02:08PM  18   Q.   OKAY.  SO THIS CAME FROM MR. BALWANI; CORRECT?

02:08PM  19   A.   IT DID.

02:08PM  20   Q.   OKAY.  AND THEN FURTHER DOWN, THE NEXT PARAGRAPH,

02:08PM  21   MR. BALWANI EXPLAINED TO YOU THAT "THERANOS CHANGES THE

02:08PM  22   PLATFORMS ON WHICH IT RUNS TESTS FROM TIME TO TIME."

02:08PM  23        DO YOU SEE THAT?

02:08PM  24   A.   I DO.

02:08PM  25   Q.   AND IN YOUR SURVEY, YOU SAW EVIDENCE OF THAT, DIDN'T YOU?

02:08PM   1    YOU SAW FOR SOME ASSAYS AND TESTS, THERANOS WAS USING MULTIPLE

02:09PM   2    DEVICES; CORRECT?

02:09PM   3    A.   THAT IS TRUE, YES.

02:09PM   4    Q.   AND SOMETIMES THE TIME PERIODS CHANGED PERIODICALLY;

02:09PM   5    CORRECT?

02:09PM   6    A.   THE --

02:09PM   7    Q.   WHAT I MEAN -- I'LL CLARIFY.

02:09PM   8         THE EVIDENCE THAT YOU SAW DIDN'T SHOW THERANOS USING TWO

02:09PM   9    DEVICES CONCURRENTLY FOR THE ENTIRETY OF THE TIME IT WAS

02:09PM  10    OPERATING?

02:09PM  11         FAIR ENOUGH?

02:09PM  12    A.   THERANOS WAS USING TWO DIFFERENT METHODS FOR THE SAME TYPE

02:09PM  13    OF TESTING.

02:09PM  14    Q.   AT VARIOUS TIMES?

02:09PM  15    A.   AT VARIOUS TIMES AND AT THE SAME TIME.

02:09PM  16    Q.   FAIR ENOUGH.  THANK YOU.

02:09PM  17         AND MR. BALWANI CONTINUES, "THE DECISION TO MOVE TESTING

02:09PM  18    OFF OF TSPU'S AND ON TO OTHER PLATFORMS IN THIS CASE WAS A

02:09PM  19    BUSINESS DECISION TO TRANSITION TO THE MANUFACTURING QUALITY

02:09PM  20    SYSTEMS TO QSR COMPLIANCE UNDER FDA GUIDELINES."

02:10PM  21         DO YOU SEE THAT?

02:10PM  22    A.   I DO.

02:10PM  23    Q.   SO CLIA HAS ITS OWN REGULATORY REQUIREMENTS FOR QUALITY

02:10PM  24    CONTROL AND QUALITY ASSURANCE.

02:10PM  25         YOU TESTIFIED ABOUT THAT QUITE A BIT YESTERDAY; CORRECT?

02:10PM   1      A.   YES.

02:10PM   2      Q.   AND CLIA'S REQUIREMENTS FOR QUALITY ASSURANCE AND QUALITY

02:10PM   3      CONTROL ARE DIFFERENT THAN FDA'S QUALITY KIND OF MANUFACTURING

02:10PM   4      REQUIREMENTS; CORRECT?

02:10PM   5      A.   FDA HAS SEPARATE QUALITY SYSTEMS REQUIREMENTS FROM CLIA.

02:10PM   6      THEY'RE COMPLETELY DIFFERENT SETS OF REGULATIONS.

02:10PM   7      Q.   THANK YOU.

02:10PM   8           AND THEN MR. BALWANI CONTINUED IN THE LETTER, "AND DOES

02:10PM   9      NOT REFLECT ON THE RELIABILITY OR ACCURACY OF ANY PLATFORM."

02:10PM   10          DO YOU SEE THAT?

02:10PM   11     A.   I DO.

02:10PM   12     Q.   AND THAT'S WHAT HE REPRESENTED TO YOU.

02:10PM   13          AND THEN FURTHER DOWN IN THE LETTER THERE'S THE CHART WITH

02:10PM   14     START AND END DATES FOR THE VARIOUS TESTS RUN ON THE EDISON.

02:10PM   15          DO YOU SEE THAT?

02:10PM   16     A.   I DO.

02:10PM   17     Q.   AND MOST OF THESE STOPPED USE WELL BEFORE YOU ARRIVED;

02:11PM   18     CORRECT?

02:11PM   19     A.   YES.

02:11PM   20     Q.   AND EVEN WELL BEFORE THE SURVEY WAS SCHEDULED IN THE

02:11PM   21     SUMMER OF 2015; CORRECT?

02:11PM   22     A.   YES.

02:11PM   23     Q.   YOU CAN TAKE THAT DOWN.

02:11PM   24          NOW, IN THE COURSE OF THE SURVEY IN SEPTEMBER, I'LL JUST

02:11PM   25     FOCUS ON THAT TIME PERIOD, YOU DESCRIBED THE INITIAL MEETING,

02:11PM   1    THE CONFERENCE; IS THAT CORRECT?

02:11PM   2    A.   YES.

02:11PM   3    Q.   AND DURING THAT CONFERENCE MR. BALWANI WAS PRESENT,

02:11PM   4    DR. YOUNG, AND OTHER STAFF MANAGERS AND STAFF, AS YOU'VE TOLD

02:11PM   5    US YESTERDAY; CORRECT?

02:11PM   6    A.   YES.

02:11PM   7    Q.   AND THEN THERE WAS THE TOURS?

02:11PM   8    A.   YES.

02:11PM   9    Q.   AND ON THE TOURS, AM I RIGHT THAT MR. BALWANI ACCOMPANIED

02:11PM   10   MR. YAMAMOTO?

02:11PM   11   A.   I BELIEVE, IF I REMEMBER CORRECTLY, WE STARTED OUT

02:12PM   12   TOGETHER, AND THEN MR. BALWANI WAS WITH MR. YAMAMOTO.

02:12PM   13   Q.   OKAY.  SO IS IT FAIR TO SAY THAT IN THE SEPTEMBER TIME

02:12PM   14   PERIOD OF THE SURVEY, MR. YAMAMOTO SPENT MORE TIME WITH

02:12PM   15   MR. BALWANI THAN YOURSELF?

02:12PM   16   A.   THAT'S FAIR TO SAY.

02:12PM   17   Q.   NOW, DURING THE TIME PERIOD OF THE LABORATORY SURVEY, YOU

02:12PM   18   HAD SOME OPPORTUNITY TO INTERVIEW SOME OR -- I WON'T CALL THEM

02:12PM   19   FORMAL, BUT SOME FORMAL INTERVIEWS OR SOME DISCUSSIONS OR

02:12PM   20   QUESTIONS TO LAB PERSONNEL; CORRECT?

02:12PM   21   A.   YES.

02:12PM   22   Q.   AND YOU DESCRIBED THE PRESENCE OF SOME LAWYERS FOR SOME OF

02:12PM   23   THOSE AND THERE WAS SOME CONCERN, I GUESS, ON YOUR PART ABOUT

02:12PM   24   THAT?

02:12PM   25   A.   YES, I WAS CONCERNED.

02:12PM  1    Q.   OKAY.  IN THE COURSE OF YOUR SURVEY, THOUGH, YOU NEVER

02:12PM  2    INTERVIEWED MR. BALWANI; CORRECT?

02:12PM  3    A.   I DID NOT, NOT A FORMAL INTERVIEW.

02:12PM  4    Q.   AND YOU NEVER INTERVIEWED MR. BALWANI ABOUT LABORATORY

02:12PM  5    NONCOMPLIANCE ISSUES; CORRECT?

02:13PM  6    A.   THERE WERE DISCUSSIONS, BUT I DID NOT DIRECTLY INTERVIEW

02:13PM  7    HIM ABOUT THAT.

02:13PM  8    Q.   NOW, YESTERDAY IN YOUR TESTIMONY, PARTICULARLY ON DIRECT,

02:13PM  9    YOU WERE ASKED QUESTIONS ABOUT THE COAGULATION TESTING AT

02:13PM 10    THERANOS, THE PT INR TESTING.

02:13PM 11         DO YOU REMEMBER THAT?

02:13PM 12    A.   I DO.

02:13PM 13    Q.   AND THE PT INR TESTING, ALONG WITH RELATED HEMATOLOGY, WAS

02:13PM 14    THE SUBJECT OF ONE OF THOSE CONDITION LEVEL DEFICIENCIES;

02:13PM 15    CORRECT?

02:13PM 16    A.   YES.

02:13PM 17    Q.   OKAY.  AND CONDITION LEVEL DEFICIENCY, THAT'S ONE TYPE OF

02:13PM 18    DEFICIENCY, MORE SERIOUS THAN THE STANDARD LEVEL; CORRECT?

02:13PM 19    A.   THAT'S CORRECT.

02:13PM 20    Q.   OKAY.  AND YOU IDENTIFIED SOME OF THE ISSUES WITH THE

02:13PM 21    PT INR TESTING IN THOSE FIRST TWO DAYS IN SEPTEMBER OF 2015;

02:13PM 22    CORRECT?

02:13PM 23    A.   I DID.

02:13PM 24    Q.   OKAY.  AND IT'S THOSE ISSUES THAT YOU NOTIFIED THE

02:14PM 25    LABORATORY ABOUT; CORRECT?

02:14PM  1    A.   THE LABORATORY AND THE STAFF THAT WAS IN THE DISCUSSION AT

02:14PM  2    THE END OF THE DAY, YES.

02:14PM  3    Q.   OKAY.  AND IT WOULD BE FAIR TO SAY THAT YOUR ANALYSIS AND

02:14PM  4    CONCLUSIONS REGARDING THE LAB'S TESTING ON PT INR DIDN'T END

02:14PM  5    THERE, YOU CONTINUED EVALUATING THAT TESTING WITH RECORDS

02:14PM  6    REVIEW, ET CETERA; CORRECT?

02:14PM  7    A.   I CONTINUED REVIEWING IT, YES.

02:14PM  8    Q.   NOW, IN RESPONSE TO SOME QUESTIONS FROM MR. LEACH

02:14PM  9    YESTERDAY, YOU WERE ASKED, DID YOU ALERT MR. BALWANI TO THE

02:14PM 10    PROBLEMS WITH PT INR IN THE SEPTEMBER PORTION OF THE EXAM.

02:14PM 11         DO YOU REMEMBER THAT?

02:14PM 12    A.   I DO.

02:14PM 13    Q.   AND YOU ANSWERED YES?

02:14PM 14    A.   THAT IS CORRECT.

02:14PM 15    Q.   OKAY.  AND THEN MR. LEACH ASKED YOU, WELL, WHAT HAPPENED

02:14PM 16    WHEN YOU CAME BACK IN NOVEMBER?

02:14PM 17         DO YOU REMEMBER THAT?

02:14PM 18    A.   I DO.

02:14PM 19    Q.   AND YOU STARTED OUT ANSWERING NOTHING.

02:14PM 20         DO YOU REMEMBER THAT?

02:14PM 21    A.   I DO.

02:14PM 22    Q.   BUT YOU STOPPED YOURSELF?

02:14PM 23    A.   I DID.

02:15PM 24    Q.   AND THEN YOU FOLLOWED UP AND SAID, WELL, THE LAB DID

02:15PM 25    NOTIFY THE PATIENTS OF THE ISSUE WITH THE PT INR; CORRECT?

02:15PM  1      A.   YES.

02:15PM  2      Q.   OKAY.  BUT THERE WAS AN ISSUE WITH, IN YOUR MIND, THE

02:15PM  3   TIMING OF THAT NOTICE, THAT THEY TOOK SEVEN WEEKS TO ACTUALLY

02:15PM  4   DO THAT NOTICE TO THE PATIENTS; CORRECT?

02:15PM  5      A.   YES.

02:15PM  6      Q.   AND IN YOUR MIND THAT WAS A CONCERN?

02:15PM  7      A.   THAT WAS A CONCERN, YES.

02:15PM  8      Q.   OKAY.  BUT THEY DID NOTIFY THE PATIENTS AS FAR AS YOU WERE

02:15PM  9   MADE AWARE WHEN YOU CAME BACK IN NOVEMBER; CORRECT?

02:15PM  10     A.   THEY PROVIDED DOCUMENTATION THAT THEY HAD PROVIDED SOME,

02:15PM  11   THAT THEY HAD NOTIFIED SOME, BUT NOT ALL, PATIENTS.

02:15PM  12     Q.   OKAY.  AND THE TOTALITY OF THE PATIENTS INVOLVED, THERE

02:15PM  13   WAS ABOUT 81 PATIENTS; CORRECT?

02:15PM  14     A.   YES.

02:15PM  15     Q.   NOW, DO YOU RECALL LEARNING, PRIOR TO YOUR TESTIMONY

02:15PM  16   YESTERDAY -- PRIOR TO YOUR TESTIMONY, DO YOU RECALL LEARNING

02:15PM  17   THAT UPON YOUR NOTICE OF THESE ISSUES WITH PT INR, THERANOS

02:16PM  18   ACTUALLY STOPPED, PAUSED FURTHER TESTING OF PT INR?

02:16PM  19          DO YOU REMEMBER LEARNING THAT PRIOR TO YOUR TESTIMONY

02:16PM  20   YESTERDAY?

02:16PM  21     A.   I DON'T RECALL.

02:16PM  22     Q.   OKAY.  IN THIS LABORATORY SURVEY PROCESS WHERE -- WITH

02:16PM  23   THERANOS WHERE YOU ISSUED YOUR SURVEY REPORT, THERE WERE SOME

02:16PM  24   EXCHANGES BACK AND FORTH WITH THE LABORATORY; CORRECT?

02:16PM  25     A.   YES.

02:16PM  1    Q.   WHERE THE LABORATORY MADE EFFORTS AT LEAST TO RESPOND TO

02:16PM  2    YOUR IDENTIFIED DEFICIENCIES; CORRECT?

02:16PM  3    A.   YES.

02:16PM  4    Q.   AND YOU SAW THOSE AND REVIEWED THOSE; CORRECT?

02:16PM  5    A.   YES.

02:16PM  6    Q.   BECAUSE THAT WAS YOUR JOB?

02:16PM  7    A.   THAT'S MY JOB.

02:16PM  8    Q.   OKAY.  AND ULTIMATELY YOU WEREN'T SATISFIED WITH

02:16PM  9    THERANOS'S RESPONSES; CORRECT?

02:16PM  10   A.   THAT'S CORRECT.

02:16PM  11   Q.   IF WE COULD TAKE A LOOK AT, I THINK YOU HAVE THE DEFENSE

02:16PM  12   BINDERS THERE, EXHIBIT 5257.

02:17PM  13   A.   I DO NOT HAVE A 5257.

02:17PM  14        MR. CAZARES:  MAY I APPROACH, YOUR HONOR?

02:17PM  15        THE COURT:  YES.

02:17PM  16        MR. CAZARES:  YOU DON'T HAVE IT BECAUSE I HAVE IT.

02:17PM  17   LET ME GET IT TO YOU.

02:17PM  18        WHOOPS, THAT IS THE WRONG ONE.  I HAVE NOTES ON THAT.

02:17PM  19        (HANDING.)

02:18PM  20   Q.   AND I'M NOT GOING TO ASK YOU QUESTIONS ABOUT THE ENTIRE

02:18PM  21   DOCUMENT, BUT IF YOU COULD TAKE A LOOK AT PAGE -- NOW, YOU'RE

02:18PM  22   FAMILIAR WITH THE DOCUMENT; CORRECT?

02:18PM  23   A.   I AM.

02:18PM  24   Q.   OKAY.  THIS IS THERANOS'S RESPONSE TO THE SURVEY REPORT;

02:18PM  25   CORRECT?

02:18PM  1    A.   IT'S A RESPONSE, YES.

02:18PM  2    Q.   THERE WERE MULTIPLE?

02:18PM  3    A.   YES.

02:18PM  4    Q.   OKAY.  IF YOU WOULD TURN TO PAGE 19, THE EXHIBIT PAGE IN

02:18PM  5    THE MIDDLE OF THE BOTTOM OF THE DOCUMENT.

02:18PM  6         DO YOU SEE THAT?

02:18PM  7    A.   I DO.

02:18PM  8    Q.   OKAY.  AND THEN ON THE RIGHT-HAND COLUMN, THIS IS DEALING

02:18PM  9    WITH D-TAG 5413.

02:18PM  10        DO YOU SEE THAT?

02:18PM  11   A.   I DO.

02:18PM  12   Q.   AND JUST READ THAT FIRST PARAGRAPH TO YOURSELF.

02:19PM  13        DOES THAT REFRESH YOUR RECOLLECTION THAT PRIOR TO YOUR

02:19PM  14   TESTIMONY YESTERDAY YOU LEARNED THAT THERANOS PAUSED ITS

02:19PM  15   TESTING ON PT INR?

02:19PM  16   A.   YES.

02:19PM  17   Q.   OKAY.  YOU CAN SET THAT ASIDE.

02:19PM  18        NOW, THE PT INR TESTING, THE ONE YOU DESCRIBED, WAS ONE OF

02:19PM  19   THE CONDITION LEVEL DEFICIENCIES; CORRECT?

02:19PM  20   A.   IT WAS.

02:19PM  21   Q.   AND THE FACT THAT THERANOS STOPPED THE TESTING FIRST WAS A

02:19PM  22   GOOD FIRST STEP; CORRECT?

02:19PM  23   A.   IT'S A GOOD STEP.

02:19PM  24   Q.   AND YOU WOULD EXPECT MORE, BUT THAT'S A GOOD FIRST STEP?

02:19PM  25   A.   YES.

02:19PM  1      Q.   AND WHAT YOU WOULD EXPECT THE LAB TO DO IS INVESTIGATE

02:19PM  2      WHAT HAPPENED?

02:19PM  3      A.   THAT'S CORRECT.

02:19PM  4      Q.   BECAUSE IN ORDER TO DETERMINE, LIKE, WHY THEY HAD THESE

02:20PM  5      PROBLEMS; CORRECT?

02:20PM  6      A.   YES.

02:20PM  7      Q.   AND THE NEXT STEP YOU WOULD ALSO EXPECT WAS TO NOTIFY THE

02:20PM  8      PATIENTS; CORRECT?

02:20PM  9      A.   THAT'S ONE OF THE REQUIREMENTS IS TO NOTIFY THE PATIENTS,

02:20PM  10     YES.

02:20PM  11     Q.   AND ULTIMATELY THE LAB DID NOTIFY THE PATIENTS; CORRECT?

02:20PM  12     A.   WE WERE NEVER ABLE TO DETERMINE IF THEY NOTIFIED ALL OF

02:20PM  13     THE PATIENTS.

02:20PM  14     Q.   OKAY.  YOU RECEIVED EVIDENCE OF AT LEAST SOME OF THE

02:20PM  15     NOTIFICATIONS; CORRECT?

02:20PM  16     A.   YES.

02:20PM  17     Q.   SORRY.  JUST GETTING THE TRANSCRIPT RIGHT.

02:20PM  18          NOW, ONE OF THE OTHER ISSUES YOU TESTIFIED YESTERDAY ABOUT

02:20PM  19     WAS THE ULTIMATE FINDING, YOU KNOW, THERE WERE SOME STANDARD

02:20PM  20     LEVEL DEFICIENCIES THAT WERE IDENTIFIED, THERE WERE SOME

02:20PM  21     CONDITION LEVEL NONCOMPLIANCE THAT YOU IDENTIFIED, AND THEN FOR

02:20PM  22     THE HEMATOLOGY AREA, I'LL CALL IT, THERE WAS ALSO AN IMMEDIATE

02:21PM  23     JEOPARDY FINDING; CORRECT?

02:21PM  24     A.   CORRECT.

02:21PM  25     Q.   OKAY.  AND AGAIN, THAT DETERMINATION WAS NOT MADE UNTIL

02:21PM  1    MONTHS AFTER THE SURVEY BEGAN; CORRECT?

02:21PM  2    A.   THAT DETERMINATION WAS MADE WHEN THE SURVEY WAS COMPLETED,

02:21PM  3    BUT THE LABORATORY HAD BEEN NOTIFIED THAT WE WERE CONSIDERING

02:21PM  4    IT IN SEPTEMBER.

02:21PM  5    Q.   ARE YOU SURE ABOUT THAT?

02:21PM  6    A.   THAT'S MY RECOLLECTION.

02:21PM  7    Q.   OKAY.  LET MET GET YOU -- YOUR HONOR, I'M NOT SURE.  DID

02:21PM  8    THE COURT GET A TRANSCRIPT BINDER?  I'M NOT SURE WE HANDED

02:21PM  9    THOSE OUT.  NO?  LET ME GET IT.

02:22PM  10        (HANDING.)

02:22PM  11        AND WITHIN THE BINDER, THE TESTIMONY BINDER,

02:22PM  12   EXHIBIT 28009, YOUR HONOR, AT PAGE 25, LINES 7 TO 24.

02:23PM  13             THE COURT:  WOULD YOU LIKE THIS WITNESS TO READ THEM

02:23PM  14   TO HERSELF?

02:23PM  15             MR. CAZARES:  NO.  I HAVE A VIDEO, YOUR HONOR.

02:23PM  16             THE COURT:  MR. LEACH.

02:23PM  17             MR. LEACH:  OBJECTION.  THIS IS NOT PROPER 611, AND

02:23PM  18   IT'S HEARSAY.

02:23PM  19             MR. CAZARES:  PRIOR SWORN TESTIMONY.

02:23PM  20             THE COURT:  I'M NOT SURE WHAT THIS RELATES TO.

02:23PM  21        WHAT QUESTION DOES THIS RELATE TO?

02:24PM  22             MR. CAZARES:  RELATING TO THE TIMING OF

02:24PM  23   DETERMINATION OF IMMEDIATE JEOPARDY AND NOTICE TO THE LAB.

02:24PM  24             MR. LEACH:  THAT IS NOT HIS QUESTION, YOUR HONOR.

02:24PM  25             THE QUESTION WAS WHETHER SHE WAS CONSIDERING IT IN

02:24PM   1    SEPTEMBER --

02:24PM   2              MR. CAZARES:  I DIDN'T SAY CONSIDER.

02:24PM   3              THE COURT:  ONE AT A TIME, PLEASE.

02:24PM   4         THIS IS RELATED TO YOUR QUESTION, "THE DETERMINATION WAS

02:24PM   5    NOT MADE UNTIL MONTHS AFTER THE SURVEY BEGAN"?

02:24PM   6              MR. CAZARES:  AND THE WITNESS JUST TESTIFIED THAT

02:24PM   7    THE LAB WAS NOTIFIED IN SEPTEMBER, AND IF YOU LOOK AT LINE 17

02:24PM   8    TO 21 IN PARTICULAR --

02:24PM   9              THE COURT:  I'M SORRY, 17 TO?

02:24PM   10             MR. CAZARES:  17 TO 21, AND YOU CAN EVEN CONTINUE

02:24PM   11   UNTIL 24.

02:25PM   12             THE COURT:  THIS LOOKS A LITTLE DIFFERENT.

02:25PM   13             MR. CAZARES:  I CAN RESET IT UP, YOUR HONOR.

02:25PM   14             THE COURT:  LINE 18 REFERENCES COMPLIANCE ABOUT A

02:25PM   15   SPECIFIC ISSUE.

02:25PM   16             MR. CAZARES:  THAT ISSUE IS THE SAME ISSUE.  IT'S A

02:25PM   17   DIFFERENT WORD.  COAGULATION, PT INR, IT'S THE SAME TEST.

02:25PM   18             THE COURT:  WELL, I THINK IT -- YOU NEED TO LAY A

02:25PM   19   FOUNDATION.

02:25PM   20             MR. CAZARES:  OKAY.

02:25PM   21   Q.   SO, MS. BENNETT, I THINK YOU ALREADY TESTIFIED THAT THE

02:25PM   22   PT INR TEST IS A COAGULATION TEST; CORRECT?

02:25PM   23   A.   YES, IT'S A TYPE OF COAGULATION TEST.

02:25PM   24   Q.   AND THE PT INR COAGULATION TEST IS THE TEST AT ISSUE IN

02:26PM   25   RELATION TO THE CONDITION LEVEL NONCOMPLIANCE THAT YOU FOUND;

02:26PM  1    CORRECT?

02:26PM  2    A.   THE PT INR WAS PART OF THE CONDITION LEVEL NONCOMPLIANCE,

02:26PM  3    YES.

02:26PM  4    Q.   AND ALSO PART OF THE ULTIMATE IMMEDIATE JEOPARDY ISSUE AS

02:26PM  5    WELL; CORRECT?

02:26PM  6    A.   YES.

02:26PM  7    Q.   OKAY.  AND YOU JUST TESTIFIED, I BELIEVE RIGHT NOW, THAT

02:26PM  8    IN SEPTEMBER OF 2015, YOU NOTIFIED THE LAB THAT YOU WERE

02:26PM  9    CONSIDERING IMMEDIATE JEOPARDY REGARDING PT INR; CORRECT?

02:26PM  10   A.   WE NOTIFIED THE LAB THAT WE WERE CONSIDERING IT, BUT THAT

02:26PM  11   A FINAL DETERMINATION HAD NOT BEEN MADE.

02:26PM  12   Q.   AND SO WAS THAT MADE CLEAR TO MR. BALWANI, THAT YOU HAD

02:26PM  13   NOT MADE A DETERMINATION OF IMMEDIATE JEOPARDY IN SEPTEMBER OF

02:26PM  14   2015?

02:26PM  15   A.   IT WAS MADE CLEAR.

02:26PM  16   Q.   OKAY.  AND THAT DETERMINATION REGARDING IMMEDIATE JEOPARDY

02:27PM  17   WAS NOT CONCLUDED AND DETERMINED FINALLY IN NOVEMBER OF 2015

02:27PM  18   EITHER; CORRECT?

02:27PM  19   A.   WE HAD NOT MADE A DECISION, A FINAL DECISION WHETHER WE

02:27PM  20   WERE GOING TO CALL I.J. BY THE END OF SEPTEMBER, IMMEDIATE

02:27PM  21   JEOPARDY.

02:27PM  22   Q.   UNTIL THE END --

02:27PM  23        THE COURT:  PULL THAT MICROPHONE CLOSER TO YOU.

02:27PM  24   BY MR. CAZARES:

02:27PM  25   Q.   JUST SO THE TRANSCRIPT IS CLEAR, THAT CONCLUSION REGARDING

02:27PM   1      IMMEDIATE JEOPARDY WAS NOT MADE UNTIL THE CONCLUSION OF THE

02:27PM   2      SURVEY; CORRECT?

02:27PM   3      A.   THAT IS CORRECT.

02:27PM   4      Q.   AND THE SURVEY DIDN'T CONCLUDE ULTIMATELY UNTIL THE SURVEY

02:27PM   5      REPORT WAS ISSUED; CORRECT?

02:27PM   6      A.   THE SURVEY CONCLUDES ON THE EXIT DAY OF THE CONFERENCE,

02:27PM   7      WHICH I BELIEVE WAS NOVEMBER 20TH, AND THEN WE NOTIFIED THE

02:27PM   8      LABORATORY IN WRITING ABOUT IMMEDIATE JEOPARDY.

02:28PM   9      Q.   OKAY.  IS IT CORRECT THAT THERE IS NO PARTICULAR AMOUNT OF

02:28PM   10     EVIDENCE REQUIRED UNDER CLIA IN ORDER TO MAKE A CONDITION LEVEL

02:28PM   11     FINDING?

02:28PM   12     A.   THAT IS CORRECT, ALTHOUGH WE DO HAVE SOME --

02:28PM   13     Q.   THERE'S NO QUESTION PENDING HERE, MS. BENNETT.  MR. LEACH

02:28PM   14     WILL HAVE A CHANCE TO ASK FOLLOWUPS IF HE DECIDES TO.

02:28PM   15          I DON'T MEAN TO BE RUDE.  THAT'S NOT MY INTENT.

02:28PM   16     A.   SURE.

02:28PM   17     Q.   MY NEXT QUESTION IS, I GUESS A FINDING OF NONCOMPLIANCE IN

02:28PM   18     THE LABORATORY BY YOU DID NOT REQUIRE EVIDENCE THAT THE LAB

02:29PM   19     DIRECTOR WAS AWARE OF THE DEFICIENT PRACTICES; CORRECT?

02:29PM   20     A.   I'M SORRY.  CAN YOU RE-ASK THE QUESTION?

02:29PM   21     Q.   YOUR FINDINGS OF NONCOMPLIANCE WITH CLIA AT THERANOS DID

02:29PM   22     NOT REQUIRE EVIDENCE IDENTIFIED BY YOURSELF THAT THE LAB

02:29PM   23     DIRECTOR EVEN KNEW ABOUT THE NONCOMPLIANT PRACTICES?

02:29PM   24     A.   THAT'S TRUE.

02:29PM   25     Q.   SAME GOES FOR THE STAFF?  THE LAB STAFF?

02:29PM   1    A.   RIGHT.  THAT'S TRUE.

02:29PM   2    Q.   SAME FOR THE OWNERS OF THE LAB?

02:29PM   3    A.   THAT'S TRUE.

02:29PM   4    Q.   NOW, YOU DESCRIBED SOME ISSUES AGAIN, AGAIN, WE'RE TALKING

02:29PM   5    ABOUT THE PT INR AND THE COAGULATION TESTING, ISSUES RELATING

02:29PM   6    TO THE STABILITY TIME PERIOD FOR THE REAGENT, THE INNOVANT.

02:30PM   7         DO YOU REMEMBER THAT?

02:30PM   8    A.   YES.

02:30PM   9    Q.   AND THAT WAS ONE OF THE MAJOR ISSUES THAT YOU IDENTIFIED;

02:30PM   10   CORRECT?

02:30PM   11   A.   YES.

02:30PM   12   Q.   BECAUSE YOU, AND I'LL GET INTO MORE DETAIL LATER, BUT AT

02:30PM   13   LEAST TO START, YOU LOOKED INTO THE ISSUE AND SAW BOTTLES, I

02:30PM   14   GUESS, OF THE INNOVANT WITH A STABILITY TIME PERIOD OR

02:30PM   15   EXPIRATION DATE OF FIVE DAYS, BUT YOU WENT AND LOOKED AT THE

02:30PM   16   PACKAGING AND THERE WAS LIKE A LITTLE PINK INSERT IN THE

02:30PM   17   PACKAGE, AND IT HAD CHANGED.  IT WAS ONLY STABLE FOR TWO DAYS;

02:30PM   18   IS THAT RIGHT?

02:30PM   19   A.   THAT'S CORRECT.

02:30PM   20   Q.   OKAY.  AND THE LAB STAFF WAS SURPRISED AT YOUR FINDING;

02:30PM   21   CORRECT?

02:30PM   22        MR. LEACH:  OBJECTION.  SPECULATION.

02:30PM   23        THE COURT:  YOU CAN ANSWER THE QUESTION IF YOU HAVE

02:30PM   24   PERSONAL KNOWLEDGE OF THEIR DEMEANOR.

02:30PM   25        THE WITNESS:  OKAY.  THEY WERE UNAWARE OF THE

02:30PM 1    CHANGE.

02:31PM 2    BY MR. CAZARES:

02:31PM 3    Q.   NOW, IN THE COURSE OF THE SURVEY, YOU IDENTIFIED SOME

02:31PM 4    ISSUES RELATING TO, SOME TRAINING ISSUES I'LL CALL IT, RELATING

02:31PM 5    TO SOME OF THE STAFF, AND EVEN SOME OF THE MANAGEMENT; CORRECT?

02:31PM 6    A.   I BELIEVE I LOOKED AT STAFF.

02:31PM 7    Q.   AND PART OF THIS PROCESS IS LOOKING FOR DOCUMENTATION IN

02:31PM 8    THE EMPLOYEE'S FILES TO DEMONSTRATE TO YOU THAT THE EMPLOYEE

02:31PM 9    HAS THE REQUIRED MINIMUM KIND OF EDUCATIONAL AND TRAINING

02:31PM 10   EXPERIENCE; CORRECT?

02:31PM 11   A.   YES.

02:31PM 12   Q.   AND IN THE COURSE OF THE SURVEY, YOU IDENTIFIED SOME LAB

02:31PM 13   STAFF IN WHICH THEIR FILES DIDN'T HAVE THE REQUIRED

02:31PM 14   DOCUMENTATION TO DEMONSTRATE EITHER THEIR EDUCATION OR TRAINING

02:31PM 15   REQUIREMENTS; CORRECT?

02:31PM 16   A.   YES.

02:31PM 17   Q.   AND YOU WOULD AGREE WITH ME THAT YOU IDENTIFIED NO

02:31PM 18   EVIDENCE THAT MR. BALWANI WAS AWARE OF THE FACT THAT THE LAB

02:32PM 19   HAD INSUFFICIENT DOCUMENTATION OF TRAINING OR EXPERIENCE FOR

02:32PM 20   SOME OF THE LABORATORY STAFF?

02:32PM 21   A.   I CAN'T SPEAK TO WHAT MR. BALWANI UNDERSTOOD.

02:32PM 22   Q.   THAT WASN'T EXACTLY MY QUESTION.

02:32PM 23   A.   OKAY.

02:32PM 24   Q.   MY QUESTION WAS, YOU IDENTIFIED NO EVIDENCE THAT

02:32PM 25   MR. BALWANI WAS AWARE OF THE FACT THAT THERE WAS INSUFFICIENT

02:32PM   1      DOCUMENTATION FOR EDUCATION AND TRAINING FOR SOME OF THE LAB

02:32PM   2      STAFF?

02:32PM   3      A.   NOT THAT I RECALL.

02:32PM   4      Q.   NOW, AGAIN, GETTING BACK TO THESE ISSUES OF THE CONDITION

02:32PM   5      LEVEL NONCOMPLIANCE, THERE WERE DIFFERENT ISSUES THAT SUPPORTED

02:32PM   6      THE CONDITION LEVEL NONCOMPLIANCE.

02:32PM   7           ONE WAS, LIKE WE SAID, THE HEMATOLOGY, AND PT INR.

02:33PM   8           AND JUST TO MAKE IT CLEAR, THE TESTING BY THERANOS FOR

02:33PM   9      PT INR, THAT WAS NOT PERFORMED ON THERANOS'S EDISON DEVICE;

02:33PM   10     CORRECT?

02:33PM   11     A.   IT WAS NOT.

02:33PM   12     Q.   NOW, IN THE COURSE OF A SURVEY, ACTUALLY THERANOS'S

02:33PM   13     SURVEY -- IN THE COURSE OF YOUR SURVEY OF THERANOS, IS IT

02:33PM   14     CORRECT THAT YOU, AS A CMS SURVEYOR, WERE UNABLE TO DETERMINE

02:33PM   15     WHETHER OR NOT ANY PATIENTS WERE ACTUALLY AFFECTED BY THE

02:33PM   16     NONCOMPLIANCE YOU FOUND?

02:33PM   17     A.   WE -- I'M SORRY.  CAN YOU ASK THE QUESTION AGAIN?

02:33PM   18     Q.   AS A CMS SURVEYOR --

02:33PM   19     A.   UH-HUH.

02:33PM   20     Q.   -- IN RELATION TO YOUR SURVEY OF THERANOS, YOU WERE UNABLE

02:34PM   21     TO DETERMINE WHETHER ANY PATIENTS WERE ACTUALLY AFFECTED BY THE

02:34PM   22     NONCOMPLIANCE YOU IDENTIFIED IN THE SURVEY?

02:34PM   23     A.   ARE YOU TALKING ABOUT PT INR?

02:34PM   24     Q.   NO.  I'M TALKING ABOUT OTHER TESTING.

02:34PM   25     A.   OKAY.  WE CAN IDENTIFY IF PATIENTS HAVE THE POTENTIAL TO

02:34PM   1    BE AFFECTED, AND SOMETIMES WE CAN DETERMINE THAT SPECIFIC

02:34PM   2    PATIENTS MAY HAVE BEEN AFFECTED.

02:34PM   3    Q.   BUT, AGAIN, IT'S POTENTIAL OR MAY, CORRECT, WHAT YOU JUST

02:34PM   4    TESTIFIED TO?

02:34PM   5    A.   YES.  WE ALSO --

02:34PM   6    Q.   WELL, I'M NOT ASKING ANOTHER QUESTION RIGHT NOW.

02:34PM   7    A.   OKAY.

02:34PM   8    Q.   BUT MY QUESTION TO YOU IS A LITTLE BIT DIFFERENT.  AND MY

02:34PM   9    QUESTION IS, IN YOUR SURVEY OF THERANOS, YOU DID NOT IDENTIFY

02:34PM   10   PATIENTS WHO WERE ACTUALLY AFFECTED BY THE NONCOMPLIANCE YOU

02:34PM   11   IDENTIFIED; CORRECT?

02:34PM   12   A.   I DID IN PT INR.

02:34PM   13   Q.   AND WE'LL TALK ABOUT THAT.  LET'S SET PT INR ASIDE --

02:35PM   14   A.   OKAY.

02:35PM   15   Q.   -- BECAUSE THAT'S A UNIQUE CATEGORY.  WE'LL TALK ABOUT

02:35PM   16   THAT.

02:35PM   17        SETTING THAT ONE ASIDE, THAT WASN'T ON THE EDISON;

02:35PM   18   CORRECT?

02:35PM   19   A.   CORRECT.

02:35PM   20   Q.   AND ALL OF THE OTHER NONCOMPLIANCE THAT YOU IDENTIFIED,

02:35PM   21   YOU WERE NOT ABLE TO IDENTIFY OR CONFIRM WHETHER ANY PATIENT

02:35PM   22   WAS ACTUALLY AFFECTED BY THE NONCOMPLIANCE YOU IDENTIFIED IN

02:35PM   23   YOUR SURVEY REPORT?

02:35PM   24   A.   WE CAN IDENTIFY PATIENTS BY THEIR UNIQUE SPECIMEN

02:35PM   25   IDENTIFIER, AND IF THERE WAS A NONCOMPLIANCE THAT OCCURRED,

02:35PM  1    THEN WE CAN IDENTIFY THAT THOSE PATIENTS MAY, COULD HAVE BEEN,

02:35PM  2    OR MAY HAVE BEEN AFFECTED, YES.

02:35PM  3    Q.   OKAY.  AND JUST TO BE CLEAR SO WE KNOW WHAT WE'RE TALKING

02:35PM  4    ABOUT --

02:35PM  5    A.   RIGHT.

02:35PM  6    Q.   -- THERE MAY BE A TIME PERIOD OF NONCOMPLIANCE THAT IS

02:35PM  7    CALLED QC FAILURES, FOR EXAMPLE, YOU COULD IDENTIFY PATIENTS

02:35PM  8    WHO RECEIVED RESULTS MAYBE DURING THAT TIME OF NONCOMPLIANCE.

02:35PM  9         IS THAT WHAT YOU JUST DESCRIBED TO ME?

02:36PM  10   A.   YES.

02:36PM  11   Q.   AND MY QUESTION IS GOING A LITTLE FURTHER THAN THAT.

02:36PM  12        AS A SURVEYOR OF CMS -- AS A CMS SURVEYOR OF THERANOS'S

02:36PM  13   LABORATORY, YOU DID NOT IDENTIFY PATIENTS WHO WERE ACTUALLY

02:36PM  14   AFFECTED BY POTENTIALLY INACCURATE RESULTS OR THE NONCOMPLIANCE

02:36PM  15   YOU IDENTIFIED, SETTING APART THE PT INR.

02:36PM  16   A.   THAT WOULD BE FOR THE PATIENT'S PROVIDER TO DETERMINE IF A

02:36PM  17   PATIENT WAS SPECIFICALLY AFFECTED.

02:36PM  18   Q.   BECAUSE TO THE EXTENT THAT THERE MAY HAVE BEEN SOME ISSUE

02:36PM  19   WITH A PATIENT RESULT, IT'S REALLY A MEDICAL DOCTOR WHO IS IN

02:36PM  20   THE BEST POSITION TO DETERMINE WHETHER OR NOT THAT RESULT,

02:36PM  21   VARIANCE, OR SOME OTHER ISSUE, MAY HAVE HAD SOME MEDICAL

02:36PM  22   SIGNIFICANCE; CORRECT?

02:36PM  23   A.   CLIA DOES NOT GET INTO THE CLINICAL USE OF THE TEST

02:36PM  24   RESULTS.  THAT'S NOT UNDER OUR PURVIEW.

02:36PM  25   Q.   AND MEDICAL DOCTORS WOULD BE IN A BETTER POSITION TO

02:36PM   1    DETERMINE THAT; CORRECT?

02:36PM   2    A.   IT WOULD BE THEIR CALL.

02:37PM   3    Q.   LET'S GO TO THE ACTUAL PT INR.  WE'LL TALK ABOUT THAT.

02:37PM   4         WITH RESPECT TO THE CONDITION LEVEL NONCOMPLIANCE AND

02:37PM   5    IMMEDIATE JEOPARDY RELATED TO THE PT INR TESTING, THE CLIA

02:37PM   6    RULES AND REGULATIONS DO NOT REQUIRE A FINDING BY YOU OF ACTUAL

02:37PM   7    PATIENT IMPACT OR AFFECT DUE TO THE NONCOMPLIANCE; CORRECT?

02:37PM   8    A.   THAT'S CORRECT.

02:37PM   9    Q.   THERE WAS A LITTLE BIT OF DISCUSSION -- ACTUALLY, VERY

02:37PM  10    LITTLE DISCUSSION -- ABOUT DR. DHAWAN, WHO WAS THE LAB DIRECTOR

02:37PM  11    WHO WAS IN PLACE DURING YOUR TIME PERIOD OF 2015.

02:38PM  12         DO YOU RECALL THAT?

02:38PM  13    A.   I DO.

02:38PM  14    Q.   SO, DR. DHAWAN, I THINK YOU RECALL HIM BEING PRESENT IN

02:38PM  15    SEPTEMBER, OR MAYBE THE FIRST DAY OF THE SEPTEMBER 2015 VISIT;

02:38PM  16    IS THAT RIGHT?

02:38PM  17    A.   HE WAS PRESENT AT ONE POINT.  I'M NOT SURE EXACTLY WHICH

02:38PM  18    DAY.

02:38PM  19    Q.   OKAY.  AND THE ABSENCE OF A LAB DIRECTOR DURING A SURVEY

02:38PM  20    BY YOURSELF OR CMS OF A LABORATORY, THAT ON ITS OWN IS NOT

02:38PM  21    UNUSUAL; CORRECT?

02:38PM  22    A.   IT IS NOT UNUSUAL.

02:38PM  23    Q.   TYPICALLY YOU'LL HAVE ACCESS TO LAB STAFF OR PEOPLE WHO

02:38PM  24    ARE DOING MORE HANDS-ON WORK; IS THAT FAIR?

02:38PM  25    A.   WE'LL HAVE ACCESS TO THE STAFF AND THE LABORATORY

02:38PM  1    DIRECTOR, THEY JUST MAY NOT BE ACTUALLY PRESENT.

02:38PM  2    Q.   FAIR ENOUGH.

02:38PM  3         NOW, WITH RESPECT TO DR. DHAWAN, HE WAS QUALIFIED UNDER

02:38PM  4    CLIA TO BE THE LAB DIRECTOR OF THERANOS'S HIGH COMPLEXITY LAB;

02:38PM  5    CORRECT?

02:38PM  6    A.   HE WAS.

02:38PM  7    Q.   NOW, WE TALKED A LITTLE BIT ABOUT THE KIND OF BACK AND

02:39PM  8    FORTH THAT TOOK PLACE BETWEEN CMS AND THERANOS IN THIS CASE,

02:39PM  9    BUT EVEN STEPPING BACK FROM THAT SPECIFIC TO TALK ABOUT JUST

02:39PM  10   LABORATORY'S RESPONSE TO DEFICIENCY FINDINGS OR NONCOMPLIANCE

02:39PM  11   BY CMS, OR MAYBE IT'S A STATE REGULATOR, THE LAB IS REQUIRED TO

02:39PM  12   TAKE SOME SORT OF CORRECTIVE ACTION AND DEMONSTRATE THAT THEY

02:39PM  13   FIXED THE NONCOMPLIANCE.

02:39PM  14        IS THAT FAIR?

02:39PM  15   A.   THAT IS FAIR.

02:39PM  16   Q.   AND I THINK WE TALKED ABOUT THIS A LITTLE BIT YESTERDAY,

02:39PM  17   YOU KNOW, ONE TYPE OF RESPONSE A LAB MAY HAVE IS TO PROVIDE

02:39PM  18   DOCUMENTATION TO CMS OF SOME SORT OF COMPARISON OF PATIENT

02:39PM  19   RESULTS WITH THE NONCOMPLIANCE TIME PERIOD, SAYING IT'S QUALITY

02:39PM  20   CONTROL, SO SOME SORT OF COMPARISON COULD BE DONE.

02:39PM  21        IS THAT FAIR?

02:39PM  22   A.   IT WOULD DEPEND ON WHAT THE DEFICIENCY WAS.  THE

02:40PM  23   DEFICIENCY THAT WAS CITED WOULD BE WHAT THEY WOULD SUBMIT.

02:40PM  24   Q.   OKAY.  AND IF THE DEFICIENCIES RELATED TO ISSUES WITH

02:40PM  25   QUALITY CONTROL OR FAILURES TO FOLLOW PROCEDURES WITH RESPECT

02:40PM   1    TO QUALITY CONTROL, ONE CORRECTIVE ACTION A LAB MAY TAKE IS TO

02:40PM   2    PROVIDE DOCUMENTATION SHOWING PATIENT RESULTS AND TRENDS IN

02:40PM   3    COMPARISON TO THAT PERIOD OF NONCOMPLIANCE; CORRECT?

02:40PM   4    A.   PATIENT TRENDS COMPARED TO WHAT?

02:40PM   5    Q.   PATIENT RESULTS AND TRENDS DURING THE TIME PERIOD OF

02:40PM   6    NONCOMPLIANCE?

02:40PM   7    A.   THAT COULD BE PART OF WHAT THEY SUBMIT.

02:40PM   8    Q.   ALONG WITH SOME EVALUATION OR ANALYSIS OF THOSE RECORDS;

02:40PM   9    CORRECT?

02:40PM   10   A.   YES, YES.

02:40PM   11   Q.   FOR EXAMPLE, IF A LAB -- IF YOU IDENTIFIED NONCOMPLIANCE

02:40PM   12   IN THE AREA OF PROFICIENCY TESTING, AGAIN, A LABORATORY MAY

02:40PM   13   PROVIDE OR SUBMIT EVIDENCE OF ANALYSIS OF PATIENT RESULTS

02:41PM   14   COMPARED WITH THE TIME PERIOD WHEN THERE WAS THIS NONCOMPLIANCE

02:41PM   15   WITH PROFICIENCY TESTING; CORRECT?

02:41PM   16   A.   I GUESS I'M NOT UNDERSTANDING WHAT YOU MEAN BY PATIENT

02:41PM   17   COMPARISON.  I'M NOT UNDERSTANDING WHAT YOU'RE COMPARING IT TO.

02:41PM   18   Q.   TO THE TIME PERIOD OF NONCOMPLIANCE IN ORDER TO DETERMINE

02:41PM   19   WHETHER THE PATIENT RESULTS APPEAR TO HAVE ANY IMPACT FROM THE

02:41PM   20   NONCOMPLIANCE.

02:41PM   21   A.   YES, THEY HAVE TO LOOK TO SEE IF PATIENTS TESTED DURING

02:41PM   22   THE NONCOMPLIANCE COULD HAVE BEEN AFFECTED BY THEIR DEFICIENT

02:41PM   23   PRACTICE, YES.

02:41PM   24   Q.   AND TO DO THAT, YOU HAVE TO -- THE LAB, ANYWAY, WOULD HAVE

02:41PM   25   TO LOOK AT THE PATIENT RESULTS AND RECORDS; CORRECT?

BENNETT CROSS BY MR. CAZARES (RES.)                    4976

```
02:41PM  1    A.   YES, AS PART OF THEIR INVESTIGATION.

02:41PM  2    Q.   AND THEY COULD ALSO, FOR EXAMPLE, EVEN IF THERE WAS AN

02:41PM  3    ISSUE WITH A PATIENT RESULT DURING A PERIOD OF NONCOMPLIANCE,

02:42PM  4    THE LAB COULD COMPARE THAT PATIENT'S RESULTS WITH THE QUALITY

02:42PM  5    CONTROL RESULTS THAT RAN ON THAT PARTICULAR DEVICE DURING THE

02:42PM  6    RELEVANT TIME PERIOD; CORRECT?

02:42PM  7    A.   WE WOULD EXPECT THEM TO DO THAT.

02:42PM  8    Q.   OKAY.  AND THE LAB COULD ALSO POSSIBLY COMPARE THAT OWN

02:42PM  9    PATIENT'S HISTORY OF TEST RESULTS AGAINST THE RESULT THAT TOOK

02:42PM 10    PLACE DURING THE PERIOD OF NONCOMPLIANCE MIGHT BE ANOTHER

02:42PM 11    EFFORT TO DO ANALYSIS; CORRECT?

02:42PM 12    A.   THEY CAN LOOK AT PATIENT HISTORICAL INFORMATION.

02:42PM 13    Q.   OKAY.  NOW, IN THE COURSE OF THE SURVEY, AGAIN, I THINK WE

02:42PM 14    DESCRIBED IT YESTERDAY, YOU WERE REQUESTING RECORDS,

02:42PM 15    MR. BALWANI WAS -- CORRECT?

02:42PM 16    A.   I WAS, YES.

02:42PM 17    Q.   OKAY.  YOU DESCRIBED MR. BALWANI WAS TELLING HIS STAFF TO

02:42PM 18    RESPOND TO YOUR REQUESTS; CORRECT?

02:42PM 19    A.   YES.

02:42PM 20    Q.   AND YOU DESCRIBED SOME ISSUES WITH THE TIMELINESS AND

02:43PM 21    THOROUGHNESS OF THE RESPONSES FROM SOME OF THE STAFF; CORRECT?

02:43PM 22    A.   YES.

02:43PM 23    Q.   OKAY.  AND I THINK YOU DESCRIBED ONE INDIVIDUAL, MR. GEE,

02:43PM 24    AS SOMEWHAT LOOKING LIKE A DEER IN THE HEADLIGHTS IN RESPONSE

02:43PM 25    TO SOME OF YOUR QUESTIONS AND REQUESTS; CORRECT?
```

02:43PM   1    A.    YES.

02:43PM   2    Q.    AND HE WAS THE QUALITY ASSURANCE/QUALITY CONTROL MANAGER?

02:43PM   3    A.    YES.

02:43PM   4    Q.    AND SOME OF THE RECORDS THAT YOU WERE REQUESTING RELATED

02:43PM   5    TO TESTING ON THE EDISON; CORRECT?

02:43PM   6    A.    MOST.  NOT MR. GEE.

02:43PM   7    Q.    YOUR REQUEST FROM OTHER INDIVIDUALS?

02:43PM   8    A.    YES.

02:43PM   9    Q.    OKAY.  BUT YOU DID REQUEST THOSE KIND OF RECORDS?

02:43PM  10    A.    I DID.

02:43PM  11    Q.    AND THEN QUALITY CONTROL WAS ONE OF THOSE SETS OF RECORDS?

02:43PM  12    A.    YES.

02:43PM  13    Q.    AND IS IT CORRECT THAT YOU UNDERSTOOD THAT SOME OF THE

02:44PM  14    INFORMATION, SOME OF WHAT YOU WERE REQUESTING RELATING TO

02:44PM  15    EDISON QUALITY CONTROL RECORDS, THAT DATA WENT STRAIGHT TO

02:44PM  16    THERANOS'S LABORATORY INFORMATION SYSTEMS, THAT'S WHERE THE

02:44PM  17    INFORMATION WAS PULLED FROM; CORRECT?

02:44PM  18    A.    IT WAS MY UNDERSTANDING THAT THEY HAD TO PULL THE

02:44PM  19    INFORMATION FROM SOMEWHERE.

02:44PM  20         I DON'T RECALL WHERE THEY HAD TO PULL IT FROM.

02:44PM  21    Q.    OKAY.  IN YOUR WORK AS A CMS SUPERVISOR AND SENIOR

02:44PM  22    EXECUTIVE NOW, BUT ALSO AS A SURVEYOR IN THE PAST, YOU

02:44PM  23    UNDERSTAND THAT LABORATORIES MAINTAIN RECORDS IN SOME SORT OF

02:44PM  24    DATABASE OF SOME SORT; CORRECT?

02:44PM  25    A.    SOME LABORATORIES DO.  SOME LABORATORIES DO NOT.

02:44PM  1    Q.   SOME LABS DO IT OLD SCHOOL PAPER RECORDS; CORRECT?

02:44PM  2    A.   THAT'S CORRECT.

02:44PM  3    Q.   THERANOS KEPT THEIR RECORDS PRINCIPALLY ELECTRONIC;

02:44PM  4    CORRECT?

02:44PM  5    A.   I CANNOT SPEAK TO HOW THEY KEPT THEIR RECORDS.

02:44PM  6    Q.   YOU RECEIVED ELECTRONIC RECORDS; CORRECT?

02:44PM  7    A.   I RECEIVED PRINTOUTS, YES.

02:44PM  8    Q.   OKAY.  NOW TO GET BACK TO THE SURVEY REPORT THAT YOU WERE

02:45PM  9    ASKED QUESTIONS ABOUT BY MR. LEACH YESTERDAY.

02:45PM  10        SO THAT SURVEY REPORT IS QUITE LONG.  IT'S ABOUT 20 PAGES

02:45PM  11   OR SO.

02:45PM  12        DO YOU RECALL THAT?

02:45PM  13   A.   I DO.

02:45PM  14   Q.   AND THE SURVEY REPORT INCLUDES, I GUESS, DESCRIPTIONS, OR

02:45PM  15   ACTUALLY MAYBE QUOTATIONS OF THE RELEVANT REGULATORY

02:45PM  16   REQUIREMENTS; CORRECT?

02:45PM  17   A.   YES.

02:45PM  18   Q.   AND THEN RECITATION OF THE FACTS OR EVIDENCE THAT YOU OR

02:45PM  19   MR. YAMAMOTO IDENTIFIED TO SUPPORT YOUR FINDINGS; CORRECT?

02:45PM  20   A.   YES, TO SUPPORT THE NONCOMPLIANCE.

02:45PM  21   Q.   OKAY.  SO IS IT FAIR TO SAY THAT THAT SURVEY REPORT IS THE

02:45PM  22   BEST EVIDENCE OF YOUR FINDINGS OF THE NONCOMPLIANCE BY THERANOS

02:45PM  23   IN YOUR SURVEY?

02:45PM  24   A.   THAT IS THE SURVEY REPORT THAT LISTS THE DEFICIENT

02:45PM  25   PRACTICES FOR THE INFORMATION THAT WE LOOKED AT DURING THE

02:45PM 1    SURVEY.

02:45PM 2    Q.   OKAY.  AND SO THE SURVEY REPORT CONTAINS ALL OF THE

02:46PM 3    EVIDENCE THAT YOU IDENTIFIED TO SUPPORT YOUR FINDINGS OF

02:46PM 4    NONCOMPLIANCE?

02:46PM 5    A.   YES.

02:46PM 6    Q.   DO YOU HAVE A BINDER UP THERE THAT -- I SHOULD HAVE SAID

02:46PM 7    THE GOVERNMENT'S BINDER?

02:46PM 8    A.   YES.

02:46PM 9    Q.   THE WHITE ONE.  YES, I THINK THAT'S IT.

02:46PM 10        AND IF YOU COULD TAKE A LOOK AT EXHIBIT 4621.

02:46PM 11        AND 4621 IS THE JANUARY 25TH, 2016 SURVEY REPORT; CORRECT?

02:46PM 12   A.   THE -- THAT'S THE DATE OF THE LETTER.  THE SURVEY IS DATED

02:47PM 13   NOVEMBER 20TH, 2015.

02:47PM 14   Q.   OKAY.  THE LETTER IS I GUESS ATTACHED TO THE -- THE SURVEY

02:47PM 15   REPORT IS ATTACHED TO THE LETTER?

02:47PM 16   A.   THAT'S CORRECT.

02:47PM 17   Q.   OKAY.  AND IF WE CAN TURN TO -- AND IT WILL BE UP ON THE

02:47PM 18   SCREEN AS WELL.  THE SCREEN MAY BE EASIER FOR YOU THAN FLIPPING

02:47PM 19   THROUGH THE BOOK.

02:47PM 20        BUT IF WE CAN TAKE A LOOK STARTING AT PAGE 41, AND I'M

02:47PM 21   LOOKING AT THE EXHIBIT PAGE, NOT THE DOCUMENT PAGE.  SO THE

02:47PM 22   PAGE AT THE BOTTOM OF THE DOCUMENT.

02:47PM 23        AND WE'RE AT D-TAG 5481.

02:47PM 24        DO YOU SEE THAT?

02:47PM 25   A.   I DO.

02:47PM  1    Q.   AND IF YOU LOOK AT PAGE 40, ABOUT MOST OF THE WAY UP,

02:47PM  2    D-TAG 5481, THAT'S CONTROL PROCEDURES.

02:47PM  3         DO YOU SEE THAT?

02:47PM  4    A.   I DO.

02:47PM  5    Q.   OKAY.  AND THEN THIS IS A STANDARD LEVEL NONCOMPLIANCE;

02:48PM  6    CORRECT?

02:48PM  7    A.   YES.

02:48PM  8    Q.   OKAY.

02:48PM  9    A.   IT'S CITED AS A STANDARD.

02:48PM  10   Q.   AND THEN IF WE TAKE A LOOK AT NUMBER 2, WHICH AGAIN IS ON

02:48PM  11   PAGE 41, THAT FIRST PARAGRAPH OF THE REPORT SAYS, "BASED ON

02:48PM  12   REVIEW OF THE QUALITY CONTROL PROCEDURE RECORDS AND RAW DATA

02:48PM  13   FROM PATIENT TEST RUNS AND INTERVIEW WITH THE GENERAL

02:48PM  14   SUPERVISOR, THE LABORATORY FAILED TO ENSURE THAT THE QC WAS

02:48PM  15   ACCEPTABLE FOR THE THERANOS PROPRIETARY SYSTEM PRIOR TO

02:48PM  16   REPORTING PATIENT RESULTS."

02:48PM  17        DO YOU SEE THAT?

02:48PM  18   A.   I DO.

02:48PM  19   Q.   OKAY.  AND SO THIS IS ONE OF THE CONTROL PROCEDURES

02:48PM  20   STANDARD LEVEL NONCOMPLIANCE; CORRECT?

02:48PM  21   A.   YES.

02:48PM  22   Q.   AND THE NEXT PARAGRAPH I'M NOT GOING TO READ IT ALL, BUT

02:48PM  23   THE NEXT PARAGRAPH, JUST TO ORIENT US A BIT, THE NEXT PARAGRAPH

02:49PM  24   SUB A READS, "CL SOP-15026 REVISION A, EDISON 3.5 THERANOS

02:49PM  25   SYSTEM DAILY QC PROCEDURES, STATED THE FOLLOWING:  FOR ANY

02:49PM  1    SINGLE EDISON INSTRUMENT, REJECT QC IF EITHER LEVEL IS GREATER

02:49PM  2    THAN 2 SD OR IF EITHER LEVEL FALLS ON THE SAME SIDE OF THE MEAN

02:49PM  3    FOR 10 CONSECUTIVE DAYS."

02:49PM  4        DO YOU SEE THAT?

02:49PM  5    A.   I DO.

02:49PM  6    Q.   AND THEN ON THE NEXT PAGE, ON PAGE 42 THERE'S A

02:49PM  7    DESCRIPTION OF YOUR FINDINGS.

02:49PM  8        DO YOU SEE THAT?

02:49PM  9    A.   YES.

02:49PM 10    Q.   OKAY.  AND, FOR EXAMPLE, IN SUB C THE REPORT SAYS, "THE

02:49PM 11    GENERAL SUPERVISOR STATED THAT WHEN THE QC WAS UNACCEPTABLE,

02:49PM 12    THE TPS DEVICE LOCKED OUT PATIENT TESTING FOR 24 HOURS OR UNTIL

02:49PM 13    THE QC WAS ACCEPTABLE, AND IF THE QC WAS UNACCEPTABLE, ANOTHER

02:50PM 14    DEVICE WOULD BE USED FOR TESTING."

02:50PM 15        DO YOU SEE THAT?

02:50PM 16    A.   I DO.

02:50PM 17    Q.   OKAY.  AND THEN YOU IDENTIFY SOME EVIDENCE SHOWING

02:50PM 18    THERANOS'S NONCOMPLIANCE WITH ITS QC POLICY; CORRECT?

02:50PM 19    A.   YES.

02:50PM 20    Q.   AND JUST TO BE CLEAR, IT'S THE FAILURE TO FOLLOW THE

02:50PM 21    POLICY THAT'S THE VIOLATION; CORRECT?

02:50PM 22    A.   THE VIOLATION IS THAT THEY DID NOT HAVE ACCEPTABLE CONTROL

02:50PM 23    VALUES BEFORE THEY RELEASED PATIENT TEST RESULTS.

02:50PM 24    Q.   WHICH WAS IN VIOLATION OF THE LAB'S POLICY; CORRECT?

02:50PM 25    A.   IT'S A REQUIREMENT THAT QUALITY CONTROL BE ACCEPTABLE

02:50PM  1    PRIOR TO RELEASING PATIENT TEST RESULTS.

02:50PM  2    Q.   AND --

02:50PM  3    A.   AND THEY DIDN'T FOLLOW THEIR PROCEDURE.

02:50PM  4         BUT THEY DIDN'T MEET THE REQUIREMENT FOR ACCEPTABLE

02:51PM  5    CONTROLS BEFORE REPORTING PATIENT RESULTS.

02:51PM  6    Q.   CORRECT.  AND WE'LL LOOK AT SOME OF THESE.

02:51PM  7         SO IF YOU LOOK AT SUB D.  UNDER SUB D THERE'S AN

02:51PM  8    IDENTIFICATION "QC RECORDS FOR SEX HORMONE BINDING GLOBULIN."

02:51PM  9         DO YOU SEE THAT?

02:51PM  10   A.   I DO.

02:51PM  11   Q.   "SHOWED ON A DEVICE," AND THERE'S A DEVICE NUMBER.

02:51PM  12        DO YOU SEE THAT?

02:51PM  13   A.   I DO.

02:51PM  14   Q.   "QC LEVEL 2'S 24-HOUR EXPIRATION WAS ON 8/14/14 AT 18:54

02:51PM  15   AND WAS NOT RUN AGAIN UNTIL 8/15/2014 AT 05."

02:51PM  16        DO YOU SEE THAT?

02:51PM  17   A.   YES.

02:51PM  18   Q.   AND SO IT LOOKS LIKE THE 24-HOUR EXPIRATION PERIOD ON THE

02:51PM  19   PRIOR QC EXPIRED AT, WHAT IS THAT, 6:54 P.M.?

02:51PM  20   A.   YES.

02:51PM  21   Q.   I GUESS THAT'S MILITARY TIME, OR SOMETHING LIKE THAT.

02:51PM  22        IT'S 6:54 P.M.?

02:51PM  23   A.   THAT'S HOW IT WAS REFLECTED ON THE QC PRINTOUT.

02:51PM  24   Q.   OKAY.  AND IT WASN'T RUN AGAIN UNTIL IT LOOKS LIKE JUST

02:52PM  25   AFTER MIDNIGHT; CORRECT?

02:52PM   1      A.   YES.

02:52PM   2      Q.   BUT A PATIENT'S RESULT WAS RUN SOMEWHERE AROUND 7:09 P.M.

02:52PM   3           DO YOU SEE THAT?

02:52PM   4      A.   I DO.

02:52PM   5      Q.   SO THAT PATIENT RUN SHOULDN'T HAVE HAPPENED UNTIL AFTER

02:52PM   6      THE NEXT QC PASSED; CORRECT?

02:52PM   7      A.   YES.

02:52PM   8      Q.   SO THE RUNNING OF IT AFTER THE EXPIRATION OF THE PRIOR QC,

02:52PM   9      THAT WAS THE VIOLATION; CORRECT?

02:52PM   10     A.   THE VIOLATION WAS THAT THEY DIDN'T HAVE ACCEPTABLE QC

02:52PM   11     BEFORE THEY RAN THE REPORTED PATIENT RESULTS.

02:52PM   12     Q.   AND IN THIS INSTANCE IT WAS THE PRIOR QC PASSED, BUT IT

02:52PM   13     EXPIRED AND THEY DIDN'T RUN ANOTHER QC BEFORE RUNNING THIS

02:52PM   14     PATIENT SAMPLE; CORRECT?

02:52PM   15     A.   I DO NOT KNOW IF THE 24-HOUR -- 24-HOUR QUALITY CONTROL

02:52PM   16     WAS ACCEPTABLE OR NOT BECAUSE IT'S NOT IN THE 2567.

02:52PM   17          THE VIOLATION WAS THAT THEY REPORTED PATIENT TEST RESULTS

02:52PM   18     WITHOUT ACCEPTABLE QUALITY CONTROL.

02:52PM   19     Q.   SO IN THIS INSTANCE THEN, YOU DON'T KNOW, OR YOU'RE NOT

02:53PM   20     REPORTING THAT A PATIENT RESULT WAS ISSUED AFTER A FAILED QC;

02:53PM   21     CORRECT?

02:53PM   22     A.   NOT IN THIS PARTICULAR CITATION.

02:53PM   23     Q.   OKAY.  BUT IN OTHER CITATIONS, THERE WERE FAILED QC'S AND

02:53PM   24     RESULTS?

02:53PM   25     A.   I BELIEVE SO.  I BELIEVE SO.

02:53PM  1    Q.   OKAY.  NOW, IN THIS SECTION THAT WE'RE TALKING ABOUT, THIS

02:53PM  2    QC POLICY NONCOMPLIANCE RELATING TO THE EDISON TESTING, IT'S

02:53PM  3    CORRECT THAT THE REPORT IDENTIFIES NO EVIDENCE THAT PATIENTS

02:53PM  4    ACTUALLY RECEIVED INACCURATE RESULTS; CORRECT?

02:53PM  5    A.   THAT'S NOT WHAT THIS CITATION IS ABOUT, AND I CAN'T SPEAK

02:53PM  6    TO THAT, WHETHER THEY RECEIVED INACCURATE RESULTS OR NOT.

02:53PM  7    Q.   OKAY.  BECAUSE THAT'S NOT WHAT THE CITATION IS ABOUT?

02:53PM  8    A.   THAT'S NOT WHAT THE CITATION IS ABOUT.

02:53PM  9    Q.   OKAY.

02:53PM  10        AND THIS CITATION IDENTIFIES NO EVIDENCE THAT PATIENTS

02:53PM  11   WERE ACTUALLY AFFECTED BY THE DEFICIENCY; CORRECT?

02:53PM  12   A.   I CAN SAY THAT THERE WAS POTENTIAL FOR THEM TO BE

02:54PM  13   AFFECTED, BUT I CANNOT SPECIFICALLY SAY THAT A SPECIFIC PATIENT

02:54PM  14   WAS AFFECTED.

02:54PM  15   Q.   AND THE REPORT IDENTIFIES NO PATIENTS AFFECTED BY THE

02:54PM  16   NONCOMPLIANCE; CORRECT?

02:54PM  17   A.   THE CITATIONS INCLUDE A PATIENT IDENTIFIER TO IDENTIFY THE

02:54PM  18   PATIENT THAT WOULD HAVE BEEN -- COULD HAVE BEEN AFFECTED BY

02:54PM  19   THIS DEFICIENT PRACTICE.

02:54PM  20   Q.   BUT MY POINT IS THAT YOUR WORK DID NOT REACH ANY

02:54PM  21   CONCLUSION THAT THE PATIENT IDENTIFIED WAS ACTUALLY AFFECTED BY

02:54PM  22   THE NONCOMPLIANCE; CORRECT?

02:54PM  23   A.   NO, BECAUSE THAT'S NOT WHAT THE CITATION IS ABOUT.

02:54PM  24   Q.   OKAY.  NOW, FOR EXAMPLE, THIS ISSUE TOOK PLACE THAT WE

02:54PM  25   JUST TALKED ABOUT ON SUB D ON PAGE 42 IN AUGUST OF 2014.

BENNETT CROSS BY MR. CAZARES (RES.)                              4985

02:54PM   1          DO YOU SEE THAT?

02:54PM   2     A.   I DO.

02:54PM   3     Q.   NOW, WITHIN THE LABORATORY AT THAT TIME, THE CLINICAL

02:55PM   4     LABORATORY, THE LABORATORY DIRECTOR ULTIMATELY HAS

02:55PM   5     RESPONSIBILITY TO ENSURE THAT HIS STAFF IS FOLLOWING CLIA AND

02:55PM   6     THE POLICIES OF THE LAB; CORRECT?

02:55PM   7     A.   YES.

02:55PM   8     Q.   AND THE LAB DIRECTOR MAY EVEN DELEGATE SOME OF THOSE

02:55PM   9     RESPONSIBILITIES TO OTHER QUALIFIED PERSONS; CORRECT?

02:55PM   10    A.   CORRECT.

02:55PM   11    Q.   OKAY.  IN ADDITION, IN THIS PASSAGE THAT WE'RE LOOKING AT

02:55PM   12    RIGHT HERE UNDER D-TAG 5481 RELATING TO THE QC NONCOMPLIANCE

02:55PM   13    THAT WE JUST TALKED ABOUT, THE REPORT IDENTIFIES NO EVIDENCE

02:55PM   14    THAT MR. BALWANI WAS AWARE OF THIS QC NONCOMPLIANCE PRIOR TO

02:55PM   15    THE SURVEY; CORRECT?

02:55PM   16    A.   IT DOES NOT.

02:55PM   17    Q.   IF WE CAN TURN TO PAGE 9, OR PUT THAT UP ON THE SCREEN.

02:56PM   18         AND THAT PAGE 9 IS D-TAG 5311.

02:56PM   19         AND AT THE TOP OF THE SCREEN AND THE PAGE, 5311 IS

02:56PM   20    DESCRIBED AS SPECIMEN SUBMISSION HANDLING AND REFERRAL.

02:56PM   21         DO YOU SEE THAT?

02:56PM   22    A.   I DO.

02:56PM   23    Q.   AND THIS IS ALSO A STANDARD LEVEL DEFICIENCY LIKE THE LAST

02:56PM   24    ONE WE TALKED ABOUT; CORRECT?

02:56PM   25    A.   IT IS.

| | | |
|---|---|---|
| 02:56PM | 1 | Q.   AND HERE THE NONCOMPLIANCE IS DESCRIBED AS THIS STANDARD |
| 02:56PM | 2 | IS NOT MET AS EVIDENCED BY:  PREANALYTIC POLICIES AND |
| 02:57PM | 3 | PROCEDURES -- I'M SORRY.  LET ME BACK UP. |
| 02:57PM | 4 | "THIS STANDARD IS NOT MET AS EVIDENCED BY," AND THEN, |
| 02:57PM | 5 | "BASED ON LABORATORY PERSONNEL INTERVIEWS, AND PREANALYTIC |
| 02:57PM | 6 | POLICIES AND PROCEDURES RECORD REVIEW.  ON SEPTEMBER 23RD, |
| 02:57PM | 7 | 2015, THE LABORATORY FAILED TO ESTABLISH WRITTEN POLICIES AND |
| 02:57PM | 8 | PROCEDURES FOR PATIENT SPECIMEN HANDLING," AND THEN IT |
| 02:57PM | 9 | DESCRIBES THE FINDINGS INCLUDED. |
| 02:57PM | 10 | "IT WAS THE PRACTICE OF THE LABORATORY TO REQUIRE THAT ALL |
| 02:57PM | 11 | PATIENT SPECIMENS RECEIVED BE LABELLED WITH LABORATORY |
| 02:57PM | 12 | GENERATED BAR CODES THAT WERE ISSUED AT THE POINT OF SPECIMEN |
| 02:57PM | 13 | COLLECTION." |
| 02:57PM | 14 | SO I GUESS IT WAS DESCRIBED TO YOU THAT THE LAB HAD A |
| 02:57PM | 15 | PRACTICE OF LABELLING SPECIMENS UPON RECEIPT IN THIS |
| 02:57PM | 16 | PREANALYTIC TIME PERIOD; CORRECT? |
| 02:57PM | 17 | A.   THIS IS MR. YAMAMOTO'S CITATION, NOT MINE. |
| 02:57PM | 18 | Q.   OKAY.  SO YOU'RE NOT FAMILIAR WITH THE DETAILS? |
| 02:57PM | 19 | A.   I DID NOT CITE THIS.  HE CITED THIS. |
| 02:57PM | 20 | Q.   BUT THE BOTH OF YOU KIND OF WORKED TOGETHER ON THE |
| 02:57PM | 21 | ULTIMATE FINAL PRODUCT OF THE SURVEY REPORT; CORRECT? |
| 02:58PM | 22 | A.   WE WORKED ON EACH OF OUR PARTS AND COMBINED THEM INTO ONE, |
| 02:58PM | 23 | YES. |
| 02:58PM | 24 | Q.   OKAY.  BUT THIS PART ISN'T YOURS? |
| 02:58PM | 25 | A.   THAT IS NOT. |

02:58PM   1    Q.   OKAY.  THEN THE REPORT CONTINUES, "THE LABORATORY

02:58PM   2    MAINTAINED NO WRITTEN POLICIES AND PROCEDURES DETAILING THIS

02:58PM   3    PATIENT SPECIMEN LABELLING POLICY AND PROCEDURE."

02:58PM   4        DO YOU SEE THAT?

02:58PM   5    A.   I DO.

02:58PM   6    Q.   SO IT SOUNDS LIKE THEY HAD A PRACTICE, BUT NOT ACTUALLY A

02:58PM   7    WRITTEN POLICY TO GOVERN THE PRACTICE; IS THAT A FAIR READING?

02:58PM   8    A.   IT APPEARS FROM SUB B THAT THEY DID NOT HAVE A WRITTEN

02:58PM   9    POLICY, A PROCEDURE ABOUT PATIENT SPECIMEN LABELLING.

02:58PM  10    Q.   OKAY.  AND THEN THAT SECTION OF THE REPORT CONTINUED,

02:58PM  11    "ACCORDING TO LABORATORY RECORDS, THE LABORATORY PERFORMED

02:58PM  12    APPROXIMATELY 890,000 PATIENT TESTS ANNUALLY."

02:59PM  13        DO YOU SEE THAT?

02:59PM  14    A.   I DO.

02:59PM  15    Q.   AND THAT'S CONSISTENT WITH SOME OF THE DOCUMENTS OR THE

02:59PM  16    RECORDS THAT WE LOOKED AT YESTERDAY RELATING TO THE APPLICATION

02:59PM  17    FOR RENEWAL BY THE LAB; CORRECT?

02:59PM  18    A.   YES.

02:59PM  19    Q.   OKAY.  IF WE CAN TURN TO PAGE 51.

02:59PM  20        51 RELATES TO WHAT IS D-TAG 5791, ANALYTIC SYSTEMS QUALITY

02:59PM  21    ASSESSMENT.

02:59PM  22        DO YOU SEE THAT?

02:59PM  23    A.   I DO.

02:59PM  24    Q.   AND THIS ISSUE IS DESCRIBED AS, "THE LABORATORY MUST

02:59PM  25    ESTABLISH AND FOLLOW WRITTEN POLICIES AND PROCEDURES FOR AN

02:59PM   1    ONGOING MECHANISM TO MONITOR, ASSESS, AND WHEN INDICATED,

02:59PM   2    CORRECT PROBLEMS IDENTIFIED IN THE ANALYTICAL SYSTEMS SPECIFIED

03:00PM   3    IN," AND I'M NOT SURE IF THE NEXT PAGE CONTINUES THAT SENTENCE

03:00PM   4    FULLY, BUT I'LL CONTINUE WITH THE NEXT PAGE.

03:00PM   5         THIS ISSUE, IS, AGAIN, IDENTIFIED AS A STANDARD LEVEL

03:00PM   6    DEFICIENCY; CORRECT?

03:00PM   7    A.   YES.

03:00PM   8    Q.   AND THIS DEFICIENCY, IF WE CONTINUE ON PAGE 2, I THINK YOU

03:00PM   9    REVIEWED THIS WITH THE GOVERNMENT, RELATES TO, AGAIN, QUALITY

03:00PM  10    CONTROL RELATING TO THE EDISON.

03:00PM  11         DO YOU SEE THAT AT THE BOTTOM OF PAGE 53?

03:00PM  12    A.   YES.

03:00PM  13    Q.   AND AGAIN, IF YOU TURN TO THE NEXT PAGE.

03:00PM  14         THIS IS THE ISSUE WHERE IT LOOKS LIKE -- AND I THINK THIS

03:00PM  15    IS YOUR PORTION OF THE SURVEY; CORRECT?  THIS IS YOUR WORK?

03:00PM  16    A.   THIS IS MY WORK.

03:00PM  17    Q.   OKAY.  AND YOU REVIEWED THE MASTER VALIDATION PLAN FOR

03:00PM  18    ROUTINE CHEMISTRY ASSAYS ON THERANOS'S DEVICES AS DESCRIBED IN

03:00PM  19    THE REPORT?

03:00PM  20    A.   YES.

03:00PM  21    Q.   AND THAT PLAN REQUIRED PERCENT CV OF REPLICATES TO BE NOT

03:01PM  22    MORE THAN 15 PERCENT; IS THAT RIGHT?

03:01PM  23    A.   THAT'S TRUE.

03:01PM  24    Q.   AND THEN AS YOU DESCRIBED WITH MR. LEACH, YOU IDENTIFIED

03:01PM  25    INSTANCES WHERE THE QC WAS NOT MEETING THAT REQUIREMENT;

03:01PM 1    CORRECT?

03:01PM 2    A.   YES.

03:01PM 3    Q.   AND THAT WAS, AGAIN, THE QC NOT MEETING THE LAB'S OWN PLAN

03:01PM 4    FOR THESE ASSAYS; CORRECT?

03:01PM 5    A.   YES.

03:01PM 6    Q.   AND THAT'S THE NONCOMPLIANCE; CORRECT?

03:01PM 7    A.   THE NONCOMPLIANCE IS THAT THEY DID NOT IDENTIFY THE

03:01PM 8    PROBLEM WITH THE HIGH CV'S AND COME UP WITH A PLAN TO

03:01PM 9    INVESTIGATE IT AND CORRECT THE PROBLEM.

03:01PM 10        THEY HAD NOTHING IN THEIR QUALITY ASSESSMENT PLAN THAT

03:01PM 11   WOULD IDENTIFY AND CORRECT THIS ISSUE, SO IT CONTINUED.

03:02PM 12   Q.   AND AS YOU DESCRIBED TO MR. LEACH, THESE ARE UNDESIRABLE

03:02PM 13   RESULTS, THE CV NUMBERS THAT YOU SEE ON THE PAGE; CORRECT?

03:02PM 14   A.   YES.

03:02PM 15   Q.   BUT THE SURVEY REPORT IDENTIFIES NO EVIDENCE THAT

03:02PM 16   MR. BALWANI WAS AWARE OF THIS SPECIFIC QC NONCOMPLIANCE PRIOR

03:02PM 17   TO YOUR SURVEY; CORRECT?

03:02PM 18   A.   NOT THAT I'M AWARE.

03:02PM 19   Q.   JUST TO CONFIRM HERE.  SO THE VIOLATION IS NOT HAVING A

03:02PM 20   QUALITY ASSURANCE PLAN?

03:02PM 21   A.   THEY HAVE TO HAVE A QUALITY ASSURANCE PLAN THAT WILL

03:02PM 22   IDENTIFY ISSUES.  THEY HAVE TO HAVE POLICIES AND PROCEDURES TO

03:02PM 23   IDENTIFY PROBLEMS, CORRECT THE PROBLEMS, AND MAKE SURE THAT

03:02PM 24   THEY DON'T RECUR.

03:02PM 25   Q.   AND THAT'S THE LAB DIRECTOR'S RESPONSIBILITY; RIGHT?

03:02PM  1    A.   THAT'S A LABORATORY -- IT'S A REQUIREMENT FOR THE

03:03PM  2    LABORATORY.

03:03PM  3    Q.   AND THE LAB DIRECTOR IS RESPONSIBLE FOR THE LAB; CORRECT?

03:03PM  4    A.   YES.

03:03PM  5    Q.   AND ANY SUCH PLANS THAT YOU DESCRIBED THAT THIS LAB

03:03PM  6    APPARENTLY DIDN'T HAVE, THE LAB DIRECTOR WOULD NEED TO

03:03PM  7    IMPLEMENT AND APPROVE THOSE PLANS; CORRECT?

03:03PM  8    A.   YES, THE LABORATORY DIRECTOR HAS TO APPROVE OF THE

03:03PM  9    PROCEDURES.

03:03PM  10   Q.   IF WE CAN GO TO PAGE 16.

03:03PM  11        THE COURT:  WHY DON'T WE TAKE A BREAK NOW?  CAN WE

03:03PM  12   TAKE 15 MINUTES, FOLKS?  CAN WE TAKE 15 MINUTES?  AND THEN

03:03PM  13   WE'LL RETURN TO PAGE 16.

03:03PM  14        (RECESS FROM 3:03 P.M. UNTIL 3:20 P.M.)

03:20PM  15        THE COURT:  PLEASE BE SEATED.  WE'RE BACK ON THE

03:20PM  16   RECORD.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

03:20PM  17        MS. BENNETT, I FAILED TO ASK YOU TO STATE YOUR NAME WHEN

03:20PM  18   YOU SAT DOWN EARLIER THIS AFTERNOON.

03:20PM  19        WE KNOW WHO YOU ARE NOW.  I JUST WANT TO REMIND YOU, AND I

03:20PM  20   FAILED TO TELL YOU, YOU ARE STILL UNDER OATH.  AND YOU

03:20PM  21   RECOGNIZED THAT WHEN YOU BEGAN YOUR TESTIMONY TODAY, DID YOU?

03:20PM  22        THE WITNESS:  I DID.

03:20PM  23        THE COURT:  THANK YOU VERY MUCH.  I APOLOGIZE FOR

03:20PM  24   THAT INCONVENIENCE.

03:20PM  25        COUNSEL.

03:20PM  1          MR. CAZARES:  THANK YOU, YOUR HONOR.

03:20PM  2     Q.   MS. BENNETT, I HAVE SOME FURTHER QUESTIONS AGAIN RELATING

03:20PM  3     TO THE SURVEY REPORT THAT WE WERE JUST TALKING ABOUT.

03:20PM  4          IF WE CAN PUT UP ON THE SCREEN AND START WITH PAGE 58 AT

03:21PM  5     D-TAG 5793.

03:21PM  6          AND I THINK YOU TALKED A LITTLE BIT ABOUT THIS TOPIC WITH

03:21PM  7     THE GOVERNMENT YESTERDAY.

03:21PM  8          AND SO D-TAG 5793 IS THE SUBJECT OF ANALYTIC SYSTEMS

03:21PM  9     QUALITY ASSESSMENT.

03:21PM  10         DO YOU SEE THAT?

03:21PM  11    A.   I DO.

03:21PM  12    Q.   AND THEN, AGAIN, ONE OF THE STANDARD LEVEL NONCOMPLIANCE;

03:21PM  13    CORRECT?

03:22PM  14    A.   YES.

03:22PM  15    Q.   AND THE DESCRIPTION OF THE REQUIREMENT IS "THE ANALYTIC

03:22PM  16    SYSTEMS QUALITY ASSESSMENT MUST INCLUDE A REVIEW OF THE

03:22PM  17    EFFECTIVENESS OF CORRECTIVE ACTIONS TAKEN TO RESOLVE PROBLEMS,

03:22PM  18    REVISION OF POLICIES AND PROCEDURES NECESSARY TO PREVENT

03:22PM  19    REOCCURRENCE OF PROBLEMS AND DISCUSSION OF ANALYTIC SYSTEMS

03:22PM  20    QUALITY ASSESSMENT REVIEWS WITH APPROPRIATE STAFF."

03:22PM  21         DO YOU SEE THAT?

03:22PM  22    A.   I DO.

03:22PM  23    Q.   AND THEN IF WE TURN TO PAGE 71 AT ITEM 9 NEAR THE BOTTOM

03:22PM  24    OF 71.

03:22PM  25         DO YOU SEE THAT?

03:22PM  1    A.   I DO.

03:22PM  2    Q.   AND ITEM 9 READS, "BASED ON REVIEW OF THE ALTERNATIVE

03:22PM  3    ASSESSMENT PROCEDURE AND RESULTS OF AAP FROM AUGUST 2014

03:22PM  4    THROUGH MARCH 2015, THE LABORATORY FAILED TO IDENTIFY THROUGH

03:22PM  5    THE QUALITY ASSESSMENT ACTIVITIES THAT THE AAP FOR THE THERANOS

03:22PM  6    PROPRIETARY SYSTEM WAS NOT PERFORMED EVERY 6 MONTHS AND WAS NOT

03:22PM  7    REVIEWED AND APPROVED BY THE LABORATORY DIRECTOR IN A TIMELY

03:22PM  8    MANNER AS REQUIRED BY THE LABORATORY'S PROCEDURES, AND

03:22PM  9    THEREFORE, INEFFECTIVE."

03:22PM  10       DO YOU SEE THAT?

03:22PM  11   A.   I DO.

03:23PM  12   Q.   AND WAS THIS ONE OF YOUR -- YOUR WORK PRODUCT OR

03:23PM  13   MR. YAMAMOTO?

03:23PM  14   A.   THIS IS MINE.

03:23PM  15   Q.   OKAY.  AND THE FINDINGS ARE DESCRIBED AS, A, "CL SOP-00020

03:23PM  16   REVISION B PROFICIENCY TESTING FOR THERANOS LAB-DEVELOPED TESTS

03:23PM  17   EFFECTIVE JANUARY 1, 2014, STATED IN SECTION 3.1 THAT THE

03:23PM  18   TECHNICAL SUPERVISOR WAS RESPONSIBLE FOR ENSURING THAT THE AAP

03:23PM  19   WAS CONDUCTED EVERY 6 MONTHS FOR ALL ANALYTES."

03:23PM  20       DO YOU SEE THAT?

03:23PM  21   A.   I DO.

03:23PM  22   Q.   AND THEN THE NEXT PARAGRAPH, SUB B, DESCRIBES THE

03:23PM  23   TECHNICAL SUPERVISOR RESPONSIBLE FOR EVALUATING.

03:23PM  24       DO YOU SEE THAT?

03:23PM  25   A.   I DO.

03:23PM   1    Q.   OKAY.  AND THEN BELOW THAT ON SUB C, THERE'S A DESCRIPTION

03:23PM   2    OF "REVIEW OF THE AAP RESULT FORMS," AND THERE'S A DOCUMENT

03:23PM   3    I.D., "REVEALED THAT THE AAP WAS PERFORMED ON AUGUST 18TH,

03:24PM   4    2014, OCTOBER 21ST, 2014, AND MARCH 13TH, 2015."

03:24PM   5         DO YOU SEE THAT?

03:24PM   6    A.   I DO.

03:24PM   7    Q.   AND THE CITATION HERE, DOES THAT INDICATE THAT YOU

03:24PM   8    ACTUALLY RECEIVED THE RECORDS FOR THAT; CORRECT?

03:24PM   9    A.   I DID.

03:24PM   10   Q.   OKAY.  AND SO THE LAB ACTUALLY PERFORMED THE AAP

03:24PM   11   PROCEDURE; CORRECT?

03:24PM   12   A.   ON THOSE DATES.

03:24PM   13   Q.   AS REFLECTED IN THE EVIDENCE THAT YOU WERE GIVEN?

03:24PM   14   A.   YES.

03:24PM   15   Q.   AND THEN YOU CONTINUE, "ALL THREE RESULT FORMS DID NOT

03:24PM   16   INCLUDE A DOCUMENTED EVALUATION BY THE TECHNICAL SUPERVISOR."

03:24PM   17        DO YOU SEE THAT?

03:24PM   18   A.   I DO.

03:24PM   19   Q.   AND THEN THE SECTION CONTINUES, "THE RESULT DOCUMENTS FROM

03:24PM   20   AUGUST 18, 2014, AND MARCH 15, 2015, WERE NOT SIGNED BY THE

03:24PM   21   LABORATORY DIRECTOR UNTIL NOVEMBER 15TH, 2015, AND THE RESULT

03:24PM   22   FORM FROM OCTOBER 12TH, 2014, WAS NOT SIGNED BY THE LAB

03:25PM   23   DIRECTOR."

03:25PM   24        DO YOU SEE THAT?

03:25PM   25   A.   I DO.

03:25PM  1    Q.   AND SO ONE OF THE ISSUES HERE IS THAT THE TECHNICAL

03:25PM  2    SUPERVISOR, THERE WAS NO DOCUMENTATION THAT THE TECHNICAL

03:25PM  3    SUPERVISOR EVALUATED THE AAP RESULTS; CORRECT?

03:25PM  4    A.   THAT'S TRUE.

03:25PM  5    Q.   AND THEN THE SIGNATURES AND APPROVAL BY THE LAB DIRECTOR

03:25PM  6    WERE MISSING FOR ONE AND WERE NOT SIGNED UNTIL 2015 FOR OTHERS;

03:25PM  7    CORRECT?

03:25PM  8    A.   CORRECT, RIGHT BEFORE WE CAME BACK IN NOVEMBER.

03:25PM  9    Q.   BUT, AGAIN, IT DOES APPEAR THAT THE LAB PERFORMED THE AAP

03:25PM 10    PROCEDURE; CORRECT?

03:25PM 11    A.   IT DOES.

03:25PM 12    Q.   AND IN THIS PASSAGE OF THE SURVEY REPORT RELATING TO THIS

03:25PM 13    AAP ISSUE, I GUESS IS THE ISSUE THEN THAT THE LAB DIDN'T MEET

03:26PM 14    THE SIX MONTH REQUIREMENT; IS THAT CORRECT?

03:26PM 15    A.   THE ISSUE IS THAT THEIR QUALITY ASSESSMENT PROCESS DID NOT

03:26PM 16    IDENTIFY THAT THEY WERE NOT PERFORMING THE AAP AS THEY WERE

03:26PM 17    SUPPOSED TO.

03:26PM 18         THEY WERE --

03:26PM 19    Q.   AND THAT WAS A SIX MONTH REQUIREMENT; CORRECT?

03:26PM 20    A.   YEAH, THAT WAS THEIR REQUIREMENT.

03:26PM 21    Q.   OKAY.  AND --

03:26PM 22         MR. LEACH:  YOUR HONOR, MAY THE WITNESS BE PERMITTED

03:26PM 23    TO FINISH HER ANSWER?

03:26PM 24         THE COURT:  YEAH, SHE WAS IN THE MIDDLE OF HER

03:26PM 25    ANSWER.

03:26PM   1            MR. CAZARES:  I WILL NOT STEP OVER HER STATEMENT.

03:26PM   2            THE COURT:  DID YOU FINISH YOUR ANSWER?

03:26PM   3            THE WITNESS:  NOT QUITE.

03:26PM   4            THE COURT:  WHY DON'T YOU FINISH YOUR ANSWER.

03:26PM   5            THE WITNESS:  AND THE REST OF THE ISSUE WAS THAT

03:26PM   6    THEY HAD NOT PERFORMED IT ON -- PERFORMED THE AAP ON TESTS THAT

03:26PM   7    WERE INITIALLY STARTED IN NOVEMBER OF 2013.

03:26PM   8    BY MR. CAZARES:

03:26PM   9    Q.   BECAUSE SUB F DESCRIBES "FOUR TESTS (VITAMIN D, THYROID

03:27PM  10    STIMULATING HORMONE, FREE T4, AND TOTAL PROSTATE SPECIFIC

03:27PM  11    ANTIGEN) WERE INITIALLY IMPLEMENTED IN NOVEMBER OF 2013."

03:27PM  12         DO YOU SEE THAT?

03:27PM  13    A.   I DO.

03:27PM  14    Q.   SO YOU RECEIVED SOME RECORDS SHOWING THAT THEY STARTED

03:27PM  15    THAT TESTING IN NOVEMBER OF 2013; RIGHT?

03:27PM  16    A.   THAT WAS THE LETTER FROM MR. BALWANI.

03:27PM  17    Q.   AND THEN THE INITIAL AAP PROCEDURE OR CHALLENGE DIDN'T

03:27PM  18    TAKE PLACE UNTIL AUGUST 18TH OF 2014 ACCORDING TO THE RECORDS;

03:27PM  19    CORRECT?

03:27PM  20    A.   THAT'S -- YES.

03:27PM  21    Q.   AND AUGUST 18TH, 2014 IS MORE THAN SIX MONTHS BEYOND

03:27PM  22    NOVEMBER 2013?

03:27PM  23    A.   THAT'S CORRECT.

03:27PM  24    Q.   OKAY.  SO IF THEY HAD DONE IT A COUPLE MONTHS EARLIER,

03:27PM  25    THEY AT LEAST MAY HAVE SATISFIED THAT SIX MONTH REQUIREMENT;

03:27PM  1     CORRECT?

03:27PM  2     A.   YES.  BUT THEY DID NOT.

03:27PM  3     Q.   OKAY.  AND YOU IDENTIFY NO EVIDENCE IN THE SURVEY REPORT

03:28PM  4     THAT THIS FAILURE TO MEET THE SIX MONTH REQUIREMENT FOR THE AAP

03:28PM  5     ACTUALLY AFFECTED PATIENT RESULTS; CORRECT?

03:28PM  6     A.   THAT'S NOT THE PURPOSE OF THIS.  SO I GUESS THE ANSWER

03:28PM  7     WOULD BE NO.

03:28PM  8     Q.   THANK YOU.

03:28PM  9          IN THE BINDER OF DOCUMENTS THAT YOU HAVE, THERE SHOULD BE

03:28PM  10    A DOCUMENT IDENTIFIED AS 26 -- OH, NO, IT'S NOT.  I HAVE IT.

03:28PM  11         YOUR HONOR, MAY I APPROACH?

03:28PM  12             THE COURT:  YES.

03:28PM  13             MR. CAZARES:  (HANDING.)

03:29PM  14    Q.   MS. BENNETT, I'M HANDING YOU A DOCUMENT MARKED 20633.

03:29PM  15         ARE YOU LOOKING AT EXHIBIT 20633?

03:29PM  16    A.   YES.

03:29PM  17    Q.   OKAY.  AND YOU SEE AT THE TOP IT'S TITLED STANDARD

03:29PM  18    OPERATING PROCEDURE, ALTHOUGH THE TYPING IS A LITTLE UNCLEAR?

03:29PM  19    A.   YES.

03:29PM  20    Q.   AND THE DOCUMENT APPEARS TO BE EFFECTIVE JANUARY 1, 2014?

03:29PM  21    A.   YES.

03:29PM  22    Q.   AND IT'S TITLED PROFICIENCY TESTING FOR THERANOS

03:29PM  23    LAB-DEVELOPED TESTS IMMUNOASSAYS.

03:29PM  24         DO YOU SEE THAT?

03:29PM  25    A.   I DO.

03:29PM  1     Q.   AND IF YOU LOOK AT THE DOCUMENT --

03:29PM  2          WELL, MR. ALLEN, IF WE CAN PUT UP ON THE SCREEN ON

03:30PM  3     PAGE 72 --

03:30PM  4               THE COURT:  IS THIS IN EVIDENCE?

03:30PM  5               MR. CAZARES:  OH, NOT THIS DOCUMENT.  A PRIOR

03:30PM  6     EXHIBIT.  I WAS GOING TO ASK HIM TO PUT UP A PRIOR EXHIBIT,

03:30PM  7     YOUR HONOR.  I'M SORRY.

03:30PM  8          EXHIBIT 4621, SUB A ON THE LEFT-HAND SIDE.

03:30PM  9     Q.   AND DO YOU SEE THE DOCUMENT NUMBER ON EXHIBIT 20633?

03:30PM 10     A.   I DO.

03:30PM 11     Q.   AND DOES THAT APPEAR TO BE THE SAME DOCUMENT NUMBER THAT

03:30PM 12     YOU'VE IDENTIFIED IN THE REPORT, CORRECT, CL SOP-00020,

03:30PM 13     REVISION B?

03:30PM 14     A.   IT APPEARS TO BE THE SAME DOCUMENT.

03:30PM 15               MR. CAZARES:  OKAY.  YOUR HONOR, MOVE TO ADMIT

03:30PM 16     26333.

03:30PM 17               THE COURT:  IT'S 20633.

03:30PM 18               MR. CAZARES:  YES, YOUR HONOR.

03:30PM 19               MR. LEACH:  NO OBJECTION.

03:30PM 20               THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

03:30PM 21          (DEFENDANT'S EXHIBIT 20633 WAS RECEIVED IN EVIDENCE.)

03:30PM 22     BY MR. CAZARES:

03:30PM 23     Q.   AND JUST TO LOOK AT THE FIRST PAGE OF EXHIBIT 20633,

03:30PM 24     AGAIN, IT APPEARS TO BE THE PROFICIENCY TESTING FOR THERANOS

03:30PM 25     LAB-DEVELOPED TESTS (IMMUNOASSAYS).

03:31PM  1          DO YOU SEE THAT?

03:31PM  2     A.   I DO.

03:31PM  3     Q.   AND THIS IS THE DOCUMENT YOU REVIEWED IN WRITING UP THIS

03:31PM  4     NONCOMPLIANCE IN AAP FOR THE EDISON; CORRECT?

03:31PM  5     A.   IT APPEARS SO, YES.

03:31PM  6     Q.   AND IF YOU TURN TO THE THIRD PAGE OF THE DOCUMENT UNDER

03:31PM  7     PURPOSE, IF WE CAN BLOW THAT UP.

03:31PM  8          THE SOP READS, "THE PURPOSE OF THIS PROPOSAL IS TO DEVISE

03:31PM  9     AN ALTERNATIVE ASSESSMENT PROTOCOL FOR LABORATORY-DEVELOPED

03:31PM 10     TESTS ON THE EDISON 3.5 IMMUNOASSAY INSTRUMENT."

03:31PM 11          DO YOU SEE THAT?

03:31PM 12     A.   I DO.

03:31PM 13     Q.   AND THEN 1.2 READS, "GUIDELINE:  FOR NON-CMS-REGULATED

03:31PM 14     TESTS OR THOSE WHICH LACK FDA CLEARANCE, COMMERCIAL OR EXTERNAL

03:31PM 15     PT PROGRAMS MAY NOT BE AVAILABLE FOR CERTAIN ANALYTES."

03:31PM 16          DO YOU SEE THAT?

03:31PM 17     A.   YES.

03:31PM 18     Q.   AND THEN IT CONTINUES.

03:32PM 19          "IN SUCH INSTANCES, AN AAP WILL BE USED TO ENSURE ACCURACY

03:32PM 20     OF THE ONGOING TEST SYSTEM PERFORMANCE."

03:32PM 21          DO YOU SEE THAT?

03:32PM 22     A.   I DO.

03:32PM 23     Q.   AND IT IS WITHIN THE PURVIEW OF THE LAB DIRECTOR'S

03:32PM 24     AUTHORITY TO IMPLEMENT AN AAP PROGRAM AS REFLECTED IN 20633;

03:32PM 25     CORRECT?

03:32PM  1    A.    IT IS.

03:32PM  2    Q.    AND THEN UNDER .2, SCOPE, THE AAP READS, "THE ALTERNATIVE

03:32PM  3    ASSESSMENT PROTOCOL APPLIES TO ALL LABORATORY DEVELOPED TESTS

03:32PM  4    ON THE EDISON 3.5 INSTRUMENT, AND WILL BE CONDUCTED EVERY

03:32PM  5    6 MONTHS."

03:32PM  6          DO YOU SEE THAT?

03:32PM  7    A.    I DO.

03:32PM  8    Q.    AND THAT WAS ONE OF THE ISSUES THAT YOU FOUND IN THAT THE

03:32PM  9    TESTING STARTED IN NOVEMBER OF 2014, BUT THE AAP PROCEDURES

03:32PM 10    DIDN'T START UNTIL AUGUST OF 2014; CORRECT?

03:32PM 11    A.    THAT'S CORRECT.

03:32PM 12          THE OTHER, THE OTHER ISSUE WITH THIS IS THAT --

03:32PM 13    Q.    I WAS JUST ASKING IF IT WAS CORRECT.

03:32PM 14          THANK YOU.

03:32PM 15    A.    SURE.

03:32PM 16    Q.    AND THEN IF WE TURN TO PAGE 6 OF THE SOP, YOU SEE THERE'S

03:33PM 17    A REVISION HISTORY?

03:33PM 18    A.    YES.

03:33PM 19    Q.    AND IT APPEARS THAT THE SOP DATES BACK TO NOVEMBER OF

03:33PM 20    2013.

03:33PM 21          DO YOU SEE THAT?

03:33PM 22    A.    I DO.

03:33PM 23    Q.    WE CAN SET THAT ASIDE.

03:33PM 24          AND, MR. ALLEN, IF WE CAN LEAVE UP ON THE SCREEN PAGE --

03:33PM 25    ON DOCUMENT 4621, PAGE 72, SUB B -- NO, SUB C ON THAT PAGE.

BENNETT CROSS BY MR. CAZARES (RES.)

03:33PM 1          AND IN THE BINDER YOU HAVE, MS. BENNETT, IF YOU COULD TAKE

03:33PM 2     A LOOK AT EXHIBIT 20619, 20619.

03:34PM 3          ARE YOU LOOKING AT 20619?

03:34PM 4     A.   I AM.

03:34PM 5     Q.   OKAY.  SO THE FIRST PAGE OF 20619 APPEARS TO BE AN EMAIL

03:34PM 6     FROM YOURSELF TO MR. YAMAMOTO.

03:34PM 7          DO YOU SEE THAT?

03:34PM 8     A.   I DO.

03:34PM 9     Q.   AND IT APPEARS TO BE DATED OCTOBER 31, 2016.

03:34PM 10         DO YOU SEE THAT?

03:34PM 11    A.   I DO.

03:34PM 12    Q.   AND THEN THE SUBJECT APPEARS TO SAY EVIDENCE HASH TAG 7.

03:34PM 13         DO YOU SEE THAT?

03:34PM 14    A.   I DO.

03:34PM 15    Q.   AND THEN THERE ARE SOME ATTACHMENTS REFLECTED IN THE

03:34PM 16    EMAIL.

03:34PM 17         DO YOU SEE THAT?

03:34PM 18    A.   I DO.

03:34PM 19    Q.   OKAY.  AND THEN IF YOU FLIP, THERE ARE SOME ATTACHMENTS,

03:35PM 20    INCLUDING DOCUMENTS THAT APPEAR TO BE TITLED ALTERNATIVE

03:35PM 21    ASSESSMENT PROGRAM, THERANOS AT THE TOP?

03:35PM 22    A.   YES.

03:35PM 23    Q.   OKAY.  AND BEHIND THAT THERE ARE SOME OTHER DOCUMENTATION.

03:35PM 24         DO YOU SEE THAT?

03:35PM 25    A.   I DO.

03:35PM  1    Q.   OKAY.  AND AGAIN, IN YOUR WORK AT CMS, WHILE YOU WERE

03:35PM  2    DOING THE SURVEY WITH MR. YAMAMOTO AND THE WORK INVOLVED IN

03:35PM  3    SURVEYING THERANOS'S LABORATORY, YOU USED EMAIL TO COMMUNICATE

03:35PM  4    WITH MR. YAMAMOTO?

03:35PM  5    A.   WE DID.

03:35PM  6    Q.   OKAY.  AND INCLUDING EXCHANGING DOCUMENTS?

03:35PM  7    A.   YES.

03:35PM  8    Q.   OKAY.

03:35PM  9         MOVE TO ADMIT 20619, YOUR HONOR.

03:35PM  10             MR. LEACH:  NO OBJECTION.

03:35PM  11             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:35PM  12        (DEFENDANT'S EXHIBIT 20619 WAS RECEIVED IN EVIDENCE.)

03:35PM  13   BY MR. CAZARES:

03:35PM  14   Q.   OKAY.  SO THE FIRST PAGE, AGAIN, THIS IS AN EXCHANGE

03:35PM  15   BETWEEN YOURSELF AND MR. YAMAMOTO.

03:35PM  16        DO YOU SEE THAT?

03:35PM  17   A.   I DO.

03:35PM  18   Q.   AND THIS IS OCTOBER 31, 2016?

03:35PM  19   A.   YES.

03:35PM  20   Q.   AND THEN IF WE FLIP TO THE FIRST PAGE -- THE SECOND PAGE,

03:36PM  21   SORRY.

03:36PM  22        THERE'S A DOCUMENT AT THE TOP THAT SAYS, "THERANOS

03:36PM  23   ALTERNATIVE ASSESSMENT PROGRAM.

03:36PM  24        DO YOU SEE THAT?

03:36PM  25   A.   I DO.

03:36PM   1    Q.   AND THEN THERE'S A DOCUMENT IDENTIFICATION NUMBER THERE

03:36PM   2    THAT SAYS CL FRM-00022-F3?

03:36PM   3    A.   YES.

03:36PM   4    Q.   OKAY.  AND DOES THAT APPEAR TO BE THE SAME DOCUMENT

03:36PM   5    REFLECTED IN THE SURVEY REPORT PASSAGE UP ON THE SCREEN AS WELL

03:36PM   6    THAT WE WERE LOOKING AT RELATING TO THERANOS AAP?

03:36PM   7    A.   IT DOES.

03:36PM   8    Q.   SO THIS APPEARS TO BE EVIDENCE THAT YOU REVIEWED IN

03:36PM   9    REACHING THOSE FINDINGS FOR THE AAP NONCOMPLIANCE DESCRIBED IN

03:36PM  10    THE SURVEY REPORT?

03:36PM  11    A.   IT DOES.

03:36PM  12    Q.   OKAY.  AND WE CAN SET ASIDE FOR NOW ON THE SCREEN THE

03:36PM  13    SURVEY REPORT, MR. ALLEN.

03:36PM  14         STICKING WITH PAGE 2 OF THE AAP DATA, AND YOU'LL SEE IF WE

03:37PM  15    FOCUS ON THE FIRST SECTION, THE FIRST COLUMN, OR I'LL SAY THE

03:37PM  16    FIRST ROWS, IT DESCRIBES AAP PROGRAM TESTING DATE AUGUST 18,

03:37PM  17    2014.

03:37PM  18         DO YOU SEE THAT?

03:37PM  19    A.   I DO.

03:37PM  20    Q.   AND THAT'S THE FIRST CHALLENGED EVENT DESCRIBED IN YOUR

03:37PM  21    SURVEY REPORT RELATING TO THE AAP; CORRECT?

03:37PM  22    A.   IT IS.

03:37PM  23    Q.   AND THEN YOU'LL SEE IN THIS FIRST SECTION THERE ARE ONE,

03:37PM  24    TWO, THREE, FOUR, FIVE SAMPLES TESTED REFLECTED IN THE

03:37PM  25    DOCUMENT?

03:37PM   1    A.   YES.

03:37PM   2    Q.   AND THIS APPEARS TO BE FOR THYROXINE.

03:37PM   3         DO YOU SEE THAT?

03:37PM   4    A.   YES.

03:37PM   5    Q.   AND AGAIN, THIS IS RUN ON THE EDISON; CORRECT?

03:37PM   6         AS WE DESCRIBED IN YOUR SURVEY REPORT, THE AAP

03:37PM   7    NONCOMPLIANCE RELATED TO AAP ON THE EDISON; CORRECT?

03:37PM   8    A.   YES, THERE'S - THE EDISON DEVICE APPEARS TO BE IN HERE.

03:38PM   9    Q.   OKAY.  AND THEN ON THE -- FIVE ROWS DOWN ON THE FIRST

03:38PM  10    COLUMN, TAE.

03:38PM  11         DO YOU SEE THAT?

03:38PM  12    A.   YES.

03:38PM  13    Q.   AND THAT'S AN ACRONYM FOR TOTAL ALLOWABLE ERROR.

03:38PM  14         DO YOU SEE THAT?

03:38PM  15    A.   YES.

03:38PM  16    Q.   OKAY.  AND THEN FOR THIS AAP CHALLENGE, THE TOTAL

03:38PM  17    ALLOWABLE ERROR'S PLUS/MINUS 20 PERCENT.

03:38PM  18         DO YOU SEE THAT?

03:38PM  19    A.   I DO.

03:38PM  20    Q.   AND THEN THE LAST ROW FOR THIS SECTION READS, PREDICATE

03:38PM  21    VALUE, ANALYTE PREDICATE VALUE, PERCENT.

03:38PM  22         DO YOU SEE THAT?

03:38PM  23    A.   I DO.

03:38PM  24    Q.   AND THEN THE DATA REFLECTS A DIFFERENCE IN THE RESULT

03:38PM  25    BETWEEN THE PREDICATE DEVICE AND THE THERANOS DEVICE; CORRECT?

BENNETT CROSS BY MR. CAZARES (RES.)                              5004

03:38PM  1    A.   YES.

03:38PM  2    Q.   AT LEAST THAT'S HOW YOU READ IT; CORRECT?

03:38PM  3    A.   THAT'S HOW I READ IT.

03:38PM  4    Q.   AND THEN IF YOU GO ACROSS THAT LAST ROW WITH THE PREDICATE

03:38PM  5    VALUE, THE PERCENTAGES APPEAR TO BE 16 PERCENT -- MINUS

03:38PM  6    16 PERCENT, THE FIRST ONE.

03:38PM  7         DO YOU SEE THAT?

03:38PM  8    A.   I DO.

03:38PM  9    Q.   AND THEN MINUS 2 FOR SAMPLE 2?

03:38PM 10    A.   YES.

03:39PM 11    Q.   AND THEN 8 PERCENT FOR SAMPLE 3?

03:39PM 12    A.   YES.

03:39PM 13    Q.   AND THEN FOR SAMPLE 4, MINUS 16 PERCENT?

03:39PM 14    A.   YES.

03:39PM 15    Q.   AND THEN FOR SAMPLE 5, 0 PERCENT; CORRECT?

03:39PM 16    A.   YES.

03:39PM 17    Q.   AND THEN THE DOCUMENT DESCRIBES THE SCORE FOR THAT

03:39PM 18    CHALLENGE TO BE 100 PERCENT.

03:39PM 19         DO YOU SEE THAT?

03:39PM 20    A.   I DO.

03:39PM 21    Q.   OKAY.  AND THEN CONTINUING WITH THE NEXT SET OF DATA

03:39PM 22    BELOW, THAT DESCRIBES 8/17/2014.

03:39PM 23         DO YOU SEE THAT?

03:39PM 24    A.   YES.

03:39PM 25    Q.   AND THIS IS FOR PSA, A DIFFERENT ASSAY; CORRECT?

03:39PM  1     A.   YES.

03:39PM  2     Q.   ALSO RUN ON THE EDISON; CORRECT?

03:39PM  3     A.   YES.

03:39PM  4     Q.   AND THEN AGAIN, IN THIS CHALLENGE THERE'S A PSA TOTAL

03:39PM  5     PREDICATE, AND THEN PSA TOTAL THERANOS.

03:39PM  6          DO YOU SEE THAT?

03:39PM  7     A.   I DO.

03:39PM  8     Q.   AND, AGAIN, THIS IS COMPARING THE PREDICATE RESULT WITH

03:39PM  9     THE EDISON RESULT; CORRECT?

03:39PM  10    A.   YES.

03:39PM  11    Q.   AND THEN, AGAIN, THE TOTAL ALLOWABLE ERROR HERE IS AGAIN

03:40PM  12    20 PERCENT.

03:40PM  13         DO YOU SEE THAT?

03:40PM  14    A.   YES.

03:40PM  15    Q.   AND THEN THE PREDICATE VALUE VERSUS THE -- THE PREDICATE

03:40PM  16    VALUE VERSUS THE ANALYTE PREDICATE YOU SEE IN THE LAST ROW,

03:40PM  17    AGAIN, MINUS 16 PERCENT FOR THE FIRST SAMPLE.

03:40PM  18         DO YOU SEE THAT?

03:40PM  19    A.   I DO.

03:40PM  20    Q.   AND THEN 0 PERCENT FOR THE NEXT SAMPLE?

03:40PM  21         DO YOU SEE THAT?

03:40PM  22    A.   I DO.

03:40PM  23    Q.   AND THEN 8 PERCENT FOR SAMPLE 3?

03:40PM  24         DO YOU SEE THAT?

03:40PM  25    A.   I DO.

03:40PM  1    Q.   AND THEN MINUS 9 PERCENT FOR SAMPLE 4.

03:40PM  2         DO YOU SEE THAT?

03:40PM  3    A.   I DO.

03:40PM  4    Q.   AND THEN MINUS 18 PERCENT FOR SAMPLE 5.

03:40PM  5         DO YOU SEE THAT?

03:40PM  6    A.   YES.

03:40PM  7    Q.   SO AT LEAST FOR THIS AAP CHALLENGE, THE PERFORMANCE OF THE

03:40PM  8    EDISON AGAINST THE PREDICATE IS FALLING WITHIN THE TOTAL

03:40PM  9    ALLOWABLE ERROR; CORRECT?

03:40PM  10   A.   YES.

03:40PM  11   Q.   OKAY.  AND, AGAIN, THE SCORE FOR THIS CHALLENGE IS

03:40PM  12   100 PERCENT.

03:40PM  13        DO YOU SEE THAT?

03:40PM  14   A.   I DO.

03:40PM  15   Q.   AND THEN IF WE GO TO THE NEXT ASSAY, THIS IS THYROID

03:40PM  16   STIMULATING HORMONE, TSH.

03:41PM  17        DO YOU SEE THAT?

03:41PM  18   A.   I DO.

03:41PM  19   Q.   AND, AGAIN, COMPARING THE PREDICATE RESULTS VERSUS THE

03:41PM  20   THERANOS RESULTS.

03:41PM  21        DO YOU SEE THAT?

03:41PM  22   A.   I DO.

03:41PM  23   Q.   AND, AGAIN, THE LAST ROW, THE PERCENTAGE BEING 4 PERCENT,

03:41PM  24   9 PERCENT, DO YOU SEE THOSE, FOR SAMPLES 1 AND 2?

03:41PM  25   A.   I DO.

BENNETT CROSS BY MR. CAZARES (RES.)

03:41PM 1    Q.   AND THEN FOR SAMPLES 3 AND 4, 17 AND 12 PERCENT.

03:41PM 2         DO YOU SEE THAT?

03:41PM 3    A.   I DO.

03:41PM 4    Q.   AND THEN FOR SAMPLE 5, 10 PERCENT.

03:41PM 5         DO YOU SEE THAT?

03:41PM 6    A.   I DO.  MINUS 10 PERCENT.

03:41PM 7    Q.   MINUS 10 PERCENT.  THANK YOU.

03:41PM 8         AGAIN, ALL WITHIN THE TOTAL ALLOWABLE ERROR WITHIN THE

03:41PM 9    PREDICATE VERSUS THE EDISON DEVICE; CORRECT?

03:41PM 10   A.   YES.

03:41PM 11   Q.   AND, AGAIN, THE SCORE BEING 100 PERCENT.

03:41PM 12        DO YOU SEE THAT?

03:41PM 13   A.   I DO.

03:41PM 14   Q.   AND THEN IF WE CONTINUE WITH VITAMIN D, AGAIN, COMPARING

03:41PM 15   PREDICATE VERSUS THERANOS.

03:41PM 16        DO YOU SEE THAT?

03:41PM 17   A.   I DO.

03:41PM 18   Q.   SAME TOTAL ALLOWABLE ERROR.

03:41PM 19        DO YOU SEE THAT?

03:41PM 20   A.   I DO.

03:41PM 21   Q.   AND THEN EACH OF THE RESULTS FALLING WITHIN THE ALLOWABLE

03:41PM 22   ERROR; CORRECT?

03:41PM 23   A.   I DO.

03:41PM 24   Q.   AND SOME PRETTY CLOSE.

03:41PM 25        FOR EXAMPLE, SAMPLE 4 ON THE VITAMIN D CHALLENGE WITHIN

03:42PM  1        1 PERCENT OF EACH OTHER; CORRECT?

03:42PM  2        A.   I SEE THAT.

03:42PM  3        Q.   OKAY.  NOW, EACH OF THE SCORES WERE 100 PERCENT, BUT THE

03:42PM  4        SIGNATURES FOR REVIEW BY LAB MANAGEMENT APPEAR TO BE IN 2015.

03:42PM  5             DO YOU SEE THAT?

03:42PM  6        A.   I DO.

03:42PM  7        Q.   OKAY.  NOW, IF YOU TURN TO PAGE 3 OF THE SAME EXHIBIT,

03:42PM  8        THIS APPEARS TO BE THE CHALLENGE FOR OCTOBER 21, 2014,

03:42PM  9        REFLECTED IN YOUR SURVEY REPORT.

03:42PM 10             DO YOU SEE THAT?

03:42PM 11        A.   YES.

03:42PM 12        Q.   OKAY.  AND THE ASSAYS AT ISSUE HERE APPEAR TO BE

03:42PM 13        ESTRADIOL.

03:42PM 14             DO YOU SEE THAT?

03:42PM 15        A.   I DO.

03:42PM 16        Q.   AND THEN THYROXINE.

03:42PM 17             DO YOU SEE THAT?

03:42PM 18        A.   I DO.

03:42PM 19        Q.   AND THEN HUMAN CHORIONIC GONADOTROPIN, HCG?

03:42PM 20        A.   YES.

03:42PM 21        Q.   AND THEN THE LAST BEING PROLACTIN.

03:42PM 22             DO YOU SEE THAT?

03:42PM 23        A.   I DO.

03:42PM 24        Q.   AND THEN AGAIN, THIS AAP PROCEDURE IN OCTOBER OF 2014 IS

03:43PM 25        AGAIN COMPARING THE EDISON DEVICE VERSUS THE PREDICATE.

BENNETT CROSS BY MR. CAZARES (RES.)

03:43PM   1        DO YOU SEE THAT?

03:43PM   2   A.   I DO.

03:43PM   3   Q.   AND THEN FOR EACH OF THE CHALLENGES REFLECTED FOR PAGE 3

03:43PM   4   FOR OCTOBER OF 2013 FOR ESTRADIOL, AGAIN, TOTAL ALLOWABLE ERROR

03:43PM   5   BEING 20 PERCENT.

03:43PM   6        DO YOU SEE THAT?

03:43PM   7   A.   I DO.

03:43PM   8   Q.   AND THEN FOR ESTRADIOL THERE ARE SOME NOT APPLICABLE

03:43PM   9   RESULTS REFLECTED IN THE SHEET.

03:43PM  10        DO YOU SEE THAT?

03:43PM  11   A.   I DO.

03:43PM  12   Q.   OKAY.  AND THEN FOR THYROXINE, DO YOU SEE EACH OF THE

03:43PM  13   RESULTS BEING WITHIN THE 20 PERCENT TOTAL ALLOWABLE ERROR?

03:43PM  14   A.   I DO.

03:43PM  15   Q.   AND DO YOU SEE PROLACTIN ALL BEING WITHIN THE TOTAL

03:43PM  16   ALLOWABLE ERROR?

03:43PM  17   A.   I DO.

03:43PM  18   Q.   OKAY.  AND THAT OCTOBER CHALLENGE SHEET APPEARS TO

03:44PM  19   CONTINUE ON PAGE 4 REFLECTING SOME CHALLENGES IN NOVEMBER AND

03:44PM  20   OCTOBER OF 2014.

03:44PM  21        DO YOU SEE THAT?

03:44PM  22   A.   I DO.

03:44PM  23   Q.   OKAY.  AGAIN FOR T3.

03:44PM  24        DO YOU SEE THAT FOR TRIIODOTHYRONINE?

03:44PM  25        DO YOU SEE THAT?

03:44PM    1      A.   YES, THAT IS T3.

03:44PM    2      Q.   I THOUGHT SO.  AND THYROXINE?

03:44PM    3      A.   YES.

03:44PM    4      Q.   VITAMIN B12?

03:44PM    5      A.   YES.

03:44PM    6      Q.   AND VITAMIN D?

03:44PM    7      A.   YES.

03:44PM    8      Q.   AND AGAIN, EACH OF THE CHALLENGED SCORES APPEARS TO BE

03:44PM    9      WITHIN THE TOTAL ALLOWABLE ERROR AND 100 PERCENT SCORES;

03:44PM   10      CORRECT?

03:44PM   11      A.   YES.

03:44PM   12      Q.   BUT, AGAIN, WE HAD THIS ISSUE OF LAB MANAGEMENT FAILING TO

03:44PM   13      REVIEW IN A TIMELY MANNER; CORRECT?

03:44PM   14      A.   RUNNING IN THE INTERVAL THAT THEIR PROCEDURE SAID AND

03:44PM   15      REVIEWING IT IN A TIMELY MANNER, YES.

03:44PM   16      Q.   AND THEN IF WE CONTINUE WITH THE LAST PAGE THAT I'LL ASK

03:44PM   17      YOU ABOUT, ON PAGE 5 THERE ARE SOME CHALLENGES IN MARCH OF

03:45PM   18      2015.

03:45PM   19           DO YOU SEE THAT?

03:45PM   20      A.   YES.

03:45PM   21      Q.   AND THEN THIS IS RELATING TO SHGB; CORRECT?

03:45PM   22      A.   YES.

03:45PM   23      Q.   AND THE OTHER IS PSA TOTAL?

03:45PM   24      A.   YES, SHBG.

03:45PM   25      Q.   SHBG.  THANK YOU.

BENNETT CROSS BY MR. CAZARES (RES.)

03:45PM 1          AND THE TOTAL ALLOWABLE ERROR IS 20 PERCENT FOR EACH OF

03:45PM 2     THE CHALLENGES?

03:45PM 3     A.   I DO.

03:45PM 4     Q.   AND EACH OF THE COMPARISONS OF THE EDISON VERSUS THE

03:45PM 5     PREDICATE ARE ALL WITHIN THE TOTAL ALLOWABLE ERROR; CORRECT?

03:45PM 6     A.   THEY ARE.

03:45PM 7     Q.   YOU CAN SET THAT ASIDE.

03:45PM 8          IF WE CAN GO BACK TO EXHIBIT 4621, THE SURVEY REPORT.

03:46PM 9          IF WE GO TO PAGE 67.

03:46PM 10         ACTUALLY START AT -- YES, 67.  SORRY.  ABOUT MID-PAGE,

03:46PM 11    ITEM 7, THE REPORT READS, "BASED ON LABORATORY PERSONNEL

03:46PM 12    INTERVIEWS AND LABORATORY'S ALTERNATIVE ASSESSMENT PROGRAM

03:46PM 13    RECORD REVIEW ON NOVEMBER 20, 2015, THE LABORATORY FAILED TO

03:46PM 14    HAVE AN ANALYTIC SYSTEMS QUALITY ASSESSMENT MECHANISM THAT

03:46PM 15    INCLUDED THE TIMELY REVIEW OF THE EFFECTIVENESS OF ACTIONS

03:47PM 16    TAKEN."

03:47PM 17         AND THEN "FINDINGS INCLUDED TO COMPLY WITH THE CLIA

03:47PM 18    REQUIREMENT AT 42 C.F.R. 493.1281(A), THE LABORATORY MAINTAINED

03:47PM 19    A PROTOCOL TITLED PROFICIENCY TESTING FOR THERANOS

03:47PM 20    LAB-DEVELOPED TESTS, THAT INCLUDED A LABORATORY PROCESS CALLED

03:47PM 21    AAP IN WHICH TESTS PERFORMED USING THE ADVIA 1800 WOULD BE

03:47PM 22    EVALUATED AND DEFINED IN RELATIONSHIP TO THE ADVIA XPT."

03:47PM 23         DO YOU SEE THAT?

03:47PM 24    A.   I DO.

03:47PM 25    Q.   OKAY.  SO THIS IS ANOTHER ISSUE RELATING TO THERANOS'S

03:47PM  1    EXECUTION OF ITS AAP PROGRAM; CORRECT?

03:47PM  2    A.   THIS IS MR. YAMAMOTO'S CITATION.

03:47PM  3    Q.   OKAY.  SO YOU'RE NOT FAMILIAR WITH THIS ISSUE?

03:47PM  4    A.   I DID NOT CITE THIS, SO HE WOULD HAVE PUT ALL OF THE

03:47PM  5    FINDINGS IN HERE.

03:47PM  6    Q.   NOW, THE ADVIA 1800, THAT'S A COMMERCIAL DEVICE?

03:47PM  7    A.   IT IS.

03:47PM  8    Q.   AND THE ADVIA XPT IS ALSO A COMMERCIAL DEVICE?

03:48PM  9    A.   IT IS.

03:48PM  10   Q.   BUT IN THE COURSE OF YOUR SURVEY YOU LEARNED THAT -- IN

03:48PM  11   THE COURSE OF YOUR SURVEY OF THERANOS, YOU LEARNED THAT

03:48PM  12   THERANOS HAD MODIFIED ADVIA 1800 SYSTEMS TO RUN FINGERSTICK

03:48PM  13   SAMPLES; CORRECT?

03:48PM  14   A.   YES.

03:48PM  15   Q.   OKAY.  AND SO IT APPEARS THAT THIS CHALLENGE, THIS

03:48PM  16   NONCOMPLIANCE BEING WRITTEN UP IN THE REPORT DESCRIBES AN AAP

03:48PM  17   PROCESS COMPARING THE 1800 TO THE XPT; CORRECT?

03:48PM  18   A.   I DID NOT SURVEY THE FINGERSTICK PART OF THE LABORATORY,

03:48PM  19   SO I CANNOT SPEAK TO THIS CITATION.

03:48PM  20   Q.   AND SO JUST TO BE CLEAR THEN, THE PORTIONS OF THE SURVEY

03:48PM  21   THAT YOU YOURSELF HANDLED INCLUDED REVIEW OF EDISON QC;

03:48PM  22   CORRECT?

03:48PM  23   A.   I REVIEWED EDISON QC.

03:48PM  24   Q.   EDISON VALIDATION REPORTS; CORRECT?

03:48PM  25   A.   YES.

03:48PM   1    Q.   COAGULATION ISSUE?

03:49PM   2    A.   YES.

03:49PM   3    Q.   PERSONNEL TRAINING RECORDS?

03:49PM   4    A.   YES.

03:49PM   5    Q.   AND THEN BEYOND THAT YOU ALSO HAD RESPONSIBILITY FOR I

03:49PM   6    THINK I'LL CALL IT THE JURASSIC PARK, THE TRADITIONAL VENOUS

03:49PM   7    BLOOD TESTING LAB?

03:49PM   8    A.   THE ONLY PART OF THAT THAT I REVIEWED WAS THE COAGULATION,

03:49PM   9    THE PT INR.

03:49PM  10    Q.   OKAY.  AND YOU SAID YOU DID NOT EXAMINE YOURSELF ANY OF

03:49PM  11    THE MODIFIED PREDICATE TESTING AT THERANOS?

03:49PM  12    A.   IN THE FINGERSTICK LABORATORY, I DID NOT.

03:49PM  13    Q.   OKAY.  MR. ALLEN, IF WE COULD TAKE A LOOK AT PAGE 68.

03:50PM  14         AT THE BOTTOM OF PAGE 68 THERE'S A DESCRIPTION OF, AT

03:50PM  15    SUB 8, "BASED ON THE REVIEW OF THE QUALITY CONTROL PROCEDURE,

03:50PM  16    LEVEY-JENNING REPORTS FOR THE ADVIA 1800 AND THE ADVIA XPT

03:50PM  17    PROFICIENCY TESTING RESULTS AND QUALITY ASSESSMENT

03:50PM  18    DOCUMENTATION THE LABORATORY FAILED TO TAKE CORRECTIVE ACTIONS

03:50PM  19    WHEN CHEMISTRY QC IN THE VENIPUNCTURE LABORATORY WAS OBSERVED

03:50PM  20    TEN CONSECUTIVE TIMES ON THE SAME SIDE OF THE MEAN."

03:50PM  21         DO YOU SEE THAT?

03:50PM  22    A.   I DO.

03:50PM  23    Q.   AND THEN AFTER THAT THE REPORT READS, "CL QOP-00013

03:50PM  24    REVISION D QUALITY CONTROL IN CHEMISTRY STATED IS SEEMED TO

03:51PM  25    HAVE PASSED WHEN... WESTGARD RULES HAVE NOT BEEN VIOLATED."

BENNETT CROSS BY MR. CAZARES (RES.)                              5014

03:51PM  1          DO YOU SEE THAT?

03:51PM  2      A.   I DO.

03:51PM  3      Q.   AND THEN BEYOND THAT, "CL QOP-00013 REVISION D ALSO STATED

03:51PM  4      IN SECTION 6.3.2.5 THAT TEN CONSECUTIVE OBSERVATIONS ON THE

03:51PM  5      SAME SIDE OF THE MEAN SHOULD BE MONITORED."

03:51PM  6          CORRECT?

03:51PM  7      A.   YES.

03:51PM  8      Q.   NOW, THAT MONITORING IS SUPPOSED TO BE SUPERVISED BY THE

03:51PM  9      LABORATORY DIRECTOR; CORRECT?

03:51PM  10     A.   HE HAS THE OVERALL RESPONSIBILITY, BUT HE CAN DELEGATE

03:51PM  11     THAT TO AN INDIVIDUAL.

03:51PM  12     Q.   FAIR ENOUGH.

03:51PM  13          AND THIS PACKAGE OF THE SURVEY REPORT REGARDING QC

03:51PM  14     COMPLIANCE, WAS THIS YOUR WORK OR MR. YAMAMOTO'S?

03:51PM  15     A.   IT'S MINE.

03:51PM  16     Q.   OKAY.  IF YOU GO DOWN ALBUMIN.

03:52PM  17          "REVIEW OF THE PT RESULTS FOR ALBUMIN FOR THE FIRST AND

03:52PM  18     SECOND EVENTS OF 2015 REVEALED THAT THE SUBMITTED RESULTS

03:52PM  19     SHOWED A NEGATIVE BIAS RANGING FROM NEGATIVE 3 TO NEGATIVE 4.9

03:52PM  20     AND NEGATIVE 1.8 TO NEGATIVE 3.5, RESPECTIVELY."

03:52PM  21          DO YOU SEE THAT?

03:52PM  22     A.   I DO.

03:52PM  23     Q.   AND THEN IT CONTINUES, "REVIEW OF LEVEY-JENNING REPORTS

03:52PM  24     FROM APRIL 2014 AND SEPTEMBER 2014, REVEALED THAT THE MULTI

03:52PM  25     QUAL LEVEL 1 AND MULTI QUAL LEVEL 2 HAD AT LEAST 10 CONSECUTIVE

03:52PM  1     RESULTS BELOW THE MEAN BUT WITHIN 2 STANDARD DEVIATIONS."

03:52PM  2         DO YOU SEE THAT?

03:52PM  3     A.   YES.

03:52PM  4     Q.   AND THEN THE NEXT PASSAGE READS, "REVIEW OF THE

03:53PM  5     LEVEY-JENNING REPORTS FOR JANUARY 2015 THROUGH APRIL 2015

03:53PM  6     REVEALED THAT MQ1 (LOT NUMBER) HAD 10 CONSECUTIVE RESULTS BELOW

03:53PM  7     THE MEAN AND MULTIQUAL LEVEL 3 HAD 10 CONSECUTIVE RESULTS BELOW

03:53PM  8     THE MEAN BUT WITHIN 2 STANDARD DEVIATIONS FOR ALL FOUR MONTHS."

03:53PM  9         DO YOU SEE THAT?

03:53PM  10    A.   I DO.

03:53PM  11    Q.   AND THIS RELATES TO TESTING ON PREDICATE DEVICES

03:53PM  12    COMMERCIAL DEVICES; CORRECT?

03:53PM  13    A.   YES.

03:53PM  14    Q.   AND SO WHAT YOU'RE DESCRIBING IS PT RESULTS WERE SHOWING A

03:53PM  15    BIAS WHEN RUN ON THE COMMERCIAL DEVICE; CORRECT?

03:53PM  16    A.   BOTH THE PT AND THE QUALITY CONTROL.

03:53PM  17    Q.   OKAY.  AND THE NONCOMPLIANCE IDENTIFIED HERE IS THE LAB

03:54PM  18    DIRECTOR'S FAILURE TO MONITOR AND OVERSEE AND IDENTIFY THE BIAS

03:54PM  19    YOU IDENTIFIED IN THE PT AND QUALITY CONTROL RESULTS; CORRECT?

03:54PM  20    A.   THE NONCOMPLIANCE HERE IS THAT THE QUALITY ASSESSMENT

03:54PM  21    PROGRAM DID NOT IDENTIFY THIS SO THAT NO CORRECTIVE ACTION WAS

03:54PM  22    EVER TAKEN.

03:54PM  23    Q.   AND THE LAB DIRECTOR HAD RESPONSIBILITY FOR THAT; CORRECT?

03:54PM  24    A.   THE LAB DIRECTOR OR WHOMEVER HE DELEGATED THAT

03:54PM  25    RESPONSIBILITY TO.

03:54PM   1    Q.   AND IN YOUR FINDINGS RELATED TO THIS NONCOMPLIANCE, YOU

03:54PM   2    DIDN'T IDENTIFY ANY EVIDENCE THAT SUGGESTS PATIENTS WERE

03:54PM   3    ACTUALLY AFFECTED BY THE NONCOMPLIANCE YOU IDENTIFIED RIGHT

03:54PM   4    HERE; CORRECT?

03:54PM   5    A.   AGAIN, THAT'S NOT REALLY WHAT THE CITATION IS ABOUT, BUT I

03:54PM   6    GUESS THE ANSWER IS NO.

03:55PM   7    Q.   WITHIN THE -- I BELIEVE IT'S IN THE BINDER -- OH, NO.

03:55PM   8         ACTUALLY, MR. ALLEN, CAN WE GO TO PAGE 79 OF 4621.

03:55PM   9         MS. BENNETT, WE PUT UP ON THE SCREEN D-TAG 6085,

03:55PM  10    LABORATORY DIRECTOR RESPONSIBILITIES.

03:55PM  11         DO YOU SEE THAT?

03:55PM  12    A.   I DO.

03:55PM  13    Q.   AND AGAIN, THIS IS A STANDARD LEVEL NONCOMPLIANCE;

03:55PM  14    CORRECT?

03:55PM  15    A.   YES.

03:55PM  16    Q.   AND THE ISSUE HERE IS IDENTIFIED, "BASED ON REVIEW OF

03:55PM  17    VALIDATION DOCUMENTS ON THE THERANOS PROPRIETARY SYSTEM (TPS)

03:56PM  18    THE LABORATORY DIRECTOR FAILED TO ENSURE THAT THE QUALITY OF

03:56PM  19    RESULTS ON THE TPS; FAILED TO ENSURE THE ESTABLISHMENT OF

03:56PM  20    PERFORMANCE SPECIFICATIONS FOLLOWED THE LABORATORY'S PROCEDURES

03:56PM  21    TO ESTABLISH ACCURACY, PRECISION, REPORTABLE RANGE, AND/OR

03:56PM  22    REFERENCE RANGE.  FINDINGS INCLUDE."

03:56PM  23         AND THERE'S A DESCRIPTION OF YOUR FINDINGS; CORRECT?

03:56PM  24    A.   YES.

03:56PM  25    Q.   AND THIS IS YOUR WORK; CORRECT?

03:56PM   1    A.   YES.

03:56PM   2    Q.   AND I THINK YOU DISCUSSED SOME OF THIS YESTERDAY WITH

03:56PM   3    MR. LEACH; CORRECT?

03:56PM   4    A.   YES.

03:56PM   5    Q.   AND THE REPORT DESCRIBES SUB A, "VALIDATION REPORTS FOR

03:56PM   6    VITD, T3, HCG, AND SHBG WERE REVIEWED."

03:56PM   7         DO YOU SEE THAT?

03:56PM   8    A.   YES.

03:56PM   9    Q.   AND YOU PERFORMED THAT REVIEW; CORRECT?

03:56PM  10    A.   I DID.

03:56PM  11    Q.   AND AS A PART OF THIS WORK, IN SUB B THERE'S A DESCRIPTION

03:56PM  12    OF THE MASTER VALIDATION PLAN FOR THE ROUTINE CHEMISTRY ASSAYS

03:56PM  13    ON THERANOS DEVICES.

03:56PM  14         DO YOU SEE THAT?

03:56PM  15    A.   I DO.

03:56PM  16    Q.   AND YOU REVIEWED THAT PLAN AS PART OF THE WORK; CORRECT?

03:57PM  17    A.   YES.

03:57PM  18    Q.   AND THEN AT SUB C, AND THERE'S A DESCRIPTION IN THE REPORT

03:57PM  19    THAT "VITD, HCG, AND SHBG VALIDATION REPORTS INCLUDED

03:57PM  20    THERANOS-CORRECTED RESULTS WITHOUT AN EXPLANATION AS TO HOW THE

03:57PM  21    THERANOS RESULT WAS CORRECTED OR WHICH RESULT WAS REPORTED."

03:57PM  22         DO YOU SEE THAT?

03:57PM  23    A.   I DO.

03:57PM  24    Q.   AND THEN IF WE CONTINUE, ON PAGE 80 THERE'S A DESCRIPTION

03:57PM  25    OF FINDINGS.

03:57PM 1          ACCURACY FOR ALL FOUR ASSAYS WAS NOT DETERMINED FOLLOWING

03:57PM 2     THE PLAN.

03:57PM 3          DO YOU SEE THAT?

03:57PM 4     A.   I DO.

03:57PM 5     Q.   AND THEN PRECISION ALSO WAS NOT DETERMINED FOLLOWING THE

03:57PM 6     PLAN.

03:57PM 7          DO YOU SEE THAT?

03:57PM 8     A.   I DO.

03:57PM 9     Q.   AND THEN REPORTABLE RANGE WAS NOT DETERMINED FOLLOWING THE

03:57PM 10    PLAN.

03:57PM 11         AND THEN THE PERCENT RECOVERY DID NOT MEET THE ACCEPTABLE

03:57PM 12    CRITERIA FOR VITD, TT3, AND SHBG.

03:58PM 13         DO YOU SEE THAT?

03:58PM 14    A.   YES.

03:58PM 15    Q.   AND THEN "ALLOWABLE BIAS DID NOT MEET THE LABORATORY'S

03:58PM 16    ACCEPTABLE CRITERIA FOR VITAMIN D, TT3, AND SHBG."

03:58PM 17         DO YOU SEE THAT?

03:58PM 18    A.   I DO.

03:58PM 19    Q.   AND THEN IN ORDER TO DRAFT AND -- IN ORDER TO DO THIS WORK

03:58PM 20    RELATING TO THIS NONCOMPLIANCE RELATING TO LABORATORY DIRECTOR

03:58PM 21    RESPONSIBILITIES, YOU ACTUALLY AGAIN LOOKED AT THE VALIDATION

03:58PM 22    REPORTS THEMSELVES; CORRECT?

03:58PM 23    A.   I DID.

03:58PM 24    Q.   AND YOU COMPARED IT WITH THE PLAN AND SAW THAT THE REPORT

03:58PM 25    WASN'T FOLLOWING THE PLAN; CORRECT?

03:58PM   1     A.   THAT'S CORRECT.

03:58PM   2     Q.   AND IN YOUR WORK YOU IDENTIFIED NO EVIDENCE THAT

03:58PM   3     MR. BALWANI WAS AWARE OF THE FACT THAT THE VALIDATION REPORTS

03:58PM   4     YOU LOOKED AT FAILED TO FOLLOW THE PLANS YOU LOOKED AT;

03:58PM   5     CORRECT?

03:58PM   6     A.   NOT PRIOR TO THE SURVEY.

03:58PM   7     Q.   WITHIN YOUR BINDER THERE SHOULD BE A DOCUMENT,

03:59PM   8     EXHIBIT 9384.

03:59PM   9          MR. ALLEN, YOU CAN TAKE THE SURVEY REPORT DOWN.

03:59PM   10    A.   WHICH BINDER?

03:59PM   11    Q.   THE GOVERNMENT'S BINDER.  THERE SHOULD BE A WHITE BINDER

03:59PM   12    WITH A GREEN AND WHITE LABEL.

03:59PM   13              THE COURT:  9384?

03:59PM   14              MR. CAZARES:  9384.

03:59PM   15              THE COURT:  THAT'S IN YOUR BINDER.  VOLUME 1, I

03:59PM   16    BELIEVE.

03:59PM   17              MR. CAZARES:  YOU KNOW, YOUR HONOR, MAYBE I SHOULD

03:59PM   18    FIND THAT DOCUMENT.

03:59PM   19         I'M NOT GOING TO FINISH THIS WITNESS TODAY, YOUR HONOR.  I

03:59PM   20    SEE IT'S 4:00 O'CLOCK.

04:00PM   21              THE COURT:  HOW MUCH TIME DO YOU THINK YOU HAVE?

04:00PM   22              MR. CAZARES:  UP TO AN HOUR, SOMEWHERE IN THAT

04:00PM   23    RANGE, HOUR, HOUR AND A HALF.  SOMEWHERE AROUND THERE.

04:00PM   24              THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, LET'S

04:00PM   25    TAKE OUR BREAK.

5020

04:00PM 1      PLEASE RECALL THAT WE'RE GOING TO HAVE A LONG BREAK.  WE

04:00PM 2  WON'T SEE YOU BACK UNTIL I THINK IT'S TUESDAY NEXT.

04:00PM 3      IS THAT RIGHT, MS. ROBINSON?

04:00PM 4          THE CLERK:  YES.

04:00PM 5          THE COURT:  TUESDAY NEXT AT 9:00 A.M.  SO WE'LL TAKE

04:00PM 6  OUR LONG BREAK.  I THINK IT'S GOING TO BE WARM AND THEN COLD

04:00PM 7  AGAIN.  IMAGINE THAT.

04:00PM 8      SO ENJOY YOUR WEEKEND.

04:00PM 9      LET ME REMIND YOU OF THE ADMONITION.  PLEASE DO NOT DO ANY

04:00PM 10 INVESTIGATION.  DO NOT SPEAK OR LEARN ABOUT ANYTHING ABOUT THIS

04:00PM 11 CASE OR LISTEN OR WATCH ANYTHING TO DO WITH IT.

04:00PM 12     HAVE A PLEASANT WEEKEND, AND WE'LL SEE YOU NEXT WEEK,

04:00PM 13 PLEASE.  THANK YOU.

04:01PM 14         (JURY OUT AT 4:01 P.M.)

04:01PM 15         THE COURT:  MS. BENNETT, I'M AFRAID I'M GOING TO

04:01PM 16 HAVE TO HAVE YOU COME BACK NEXT WEEK, MONDAY -- EXCUSE ME,

04:01PM 17 TUESDAY NEXT AT 9:00 A.M., PLEASE.

04:01PM 18             THE WITNESS:  OKAY.

04:01PM 19         THE COURT:  THANK YOU.

04:01PM 20     PLEASE BE SEATED.  THANK YOU.

04:01PM 21     THE RECORD SHOULD REFLECT THAT THE JURY HAS LEFT FOR THE

04:01PM 22 WEEKEND.

04:01PM 23     MS. BENNETT HAS LEFT THE COURTROOM.

04:01PM 24     SO, COUNSEL, YOU'VE GOT, DID YOU SAY, ABOUT AN HOUR AND A

04:01PM 25 HALF LEFT?

5021

04:01PM  1           MR. CAZARES:  I'M HOPING NOT THAT MUCH, YOUR HONOR.

04:02PM  2      I'M GATHERING MYSELF THIS WEEKEND.  HOPEFULLY I CAN MAKE IT

04:02PM  3      SHORTER.

04:02PM  4           THE COURT:  WELL, WHATEVER YOU NEED.

04:02PM  5           MR. CAZARES:  YES, YOUR HONOR.

04:02PM  6           THE COURT:  SO JUST SCHEDULING FOR THE GOVERNMENT

04:02PM  7      THEN, WE'LL HAVE -- WE'LL FINISH THIS WITNESS.

04:02PM  8         MR. SCHENK?

04:02PM  9           MR. SCHENK:  YES.  THANK YOU, YOUR HONOR.

04:02PM 10      I SURE HOPE THAT WE'RE ON THE PATH TO FINISHING

04:02PM 11      MS. BENNETT ON TUESDAY.

04:02PM 12      AND OUR DISCLOSURES ARE DUE TO THE DEFENSE TOMORROW

04:02PM 13      EVENING, THURSDAY EVENING.  WE WILL MEET THAT DEADLINE.  WE

04:02PM 14      HAVE TO LOOK AND SEE WHICH WITNESSES WE WILL FLY INTO TOWN.

04:02PM 15           THE COURT:  SURE.

04:02PM 16           MR. SCHENK:  BUT WE WILL PROVIDE THAT TIMELY.

04:03PM 17           THE COURT:  OKAY.  THAT'S FINE.  THANK YOU.

04:03PM 18           MR. COOPERSMITH:  THAT SOUNDS GOOD, YOUR HONOR.

04:03PM 19      THANK YOU.

04:03PM 20           THE COURT:  OKAY.  ANYTHING FURTHER BEFORE WE BREAK?

04:03PM 21           MR. SCHENK:  NO, YOUR HONOR.

04:03PM 22           MR. COOPERSMITH:  NOT FROM THE DEFENSE, YOUR HONOR.

04:03PM 23      THANK YOU.

04:03PM 24           THE COURT:  OKAY.  THANK YOU.  SAFE TRAVELS.

04:03PM 25           MR. COOPERSMITH:  THANK YOU.  I APPRECIATE IT.

04:03PM 1          THE CLERK:  COURT IS ADJOURNED.

04:03PM 2          (COURT ADJOURNED AT 4:03 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16         _____
           IRENE RODRIGUEZ, CSR, CRR
17         CERTIFICATE NUMBER 8076

18

19         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
20         CERTIFICATE NUMBER 9595

21         DATED:  MAY 4, 2022

22

23

24

25