1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

UNITED STATES OF AMERICA,          )
6                                   )  CR-18-00258-EJD
                    PLAINTIFF,      )
7                                   )  SAN JOSE, CALIFORNIA
            VS.                     )
8                                   )  MAY 10, 2022
RAMESH "SUNNY" BALWANI,            )
9                                   )  VOLUME 27
                    DEFENDANT.      )
10  _____ )  PAGES 5023 - 5286

11

12               TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE EDWARD J. DAVILA
13                UNITED STATES DISTRICT JUDGE

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                                KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
    OFFICIAL COURT REPORTERS:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23                         LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

```
1      A P P E A R A N C E S:  (CONT'D)

2      FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                               BY:  MOLLY MCCAFFERTY
3                                   SHAWN ESTRADA
                               THE ORRICK BUILDING
4                              405 HOWARD STREET
                               SAN FRANCISCO, CALIFORNIA 94105
5
                               BY:  JEFFREY COOPERSMITH
6                                   AARON BRECHER
                                    AMANDA MCDOWELL
7                              701 FIFTH AVENUE, SUITE 5600
                               SEATTLE, WASHINGTON 98104
8
                               BY:  STEPHEN CAZARES
9                              77 SOUTH FIGUEROA STREET, SUITE 3200
                               LOS ANGELES, CALIFORNIA 90017
10
                               BY:  AMY WALSH
11                             51 W 52ND STREET
                               NEW YORK, NEW YORK 10019
12

13     ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                               BY:  MADDI WACHS, PARALEGAL
14                                  SARA SLATTERY, PARALEGAL

15                             ORRICK, HERRINGTON & SUTCLIFFE
                               JENNIFER CYGNOR, PARALEGAL
16
                               PROLUMINA
17                             BY:  COREY ALLEN
                               2200 SIXTH AVENUE, SUITE 425
18                             SEATTLE, WASHINGTON 98121

19                             UNITED STATES POSTAL INSPECTION SERVICE
                               BY:  CHRISTOPHER MCCOLLOW
20
                               FEDERAL BUREAU OF INVESTIGATION
21                             BY:  MARIO C. SCUSSEL

22                             UNITED STATES FOOD & DRUG
                               ADMINISTRATION
23                             BY:  GEORGE SCAVDIS

24

25
```

1
2
3

INDEX OF PROCEEDINGS

GOVERNMENT'S:

4
**SARAH BENNETT**
CROSS-EXAM BY MR. CAZARES (RES.)          P. 5029
5  REDIRECT EXAM BY MR. LEACH              P. 5074
RECROSS-EXAM BY MR. CAZARES              P. 5135
6

7  **DANIEL MOSLEY**
DIRECT EXAM BY MR. SCHENK                P. 5139
8  CROSS-EXAM BY MR. CAZARES               P. 5227

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5026

1

2                          INDEX OF EXHIBITS

3                              IDENT.        EVIDENCE

4        GOVERNMENT'S

5        4600                               5046
         4163                               5143
6        4173                               5147
         3387 AND 3392                      5156
7        3844                               5184
         4202                               5185
8        4197                               5188
         4221                               5200
9        4284                               5207
         4286                               5212
10       4303                               5215
         2172                               5217
11       2065                               5220

12

13

14

15

16

17       DEFENDANT'S

18       20620                             5062
         14118                             5256
19       14119                             5275

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    MAY 10, 2022

 2                   P R O C E E D I N G S

 3         (COURT CONVENED AT 9:08 A.M.)

 4         (JURY OUT AT 9:08 A.M.)

 5             THE COURT:  WE'RE ON THE RECORD IN THE BALWANI

 6    MATTER.

 7         ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

 8         WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

 9         I UNDERSTAND -- WERE THERE SOME THINGS WE SHOULD RAISE

10    BEFORE WE CONTINUE WITH MS. BENNETT?  SHE'S NOT IN THE

11    COURTROOM NOW, IS SHE, THE WITNESS?  I DON'T SEE HER.  NO.

12             MR. LEACH:  SHE IS NOT, YOUR HONOR.

13             THE COURT:  GREAT.  THANK YOU.

14         I THINK OUR JURY IS HERE AND WE'RE READY TO START.

15             ANYTHING WE SHOULD TOUCH ON BEFORE WE BEGIN?

16             MR. CAZARES:  YOUR HONOR, THERE'S ONE ISSUE

17    REGARDING AN EXHIBIT THAT WE EXPECT THE GOVERNMENT TO USE WITH

18    MR. MOSLEY LATER TODAY, AND WE THINK WE DO HAVE SOME OBJECTIONS

19    WE WOULD LIKE TO RAISE WITH THE COURT BEFORE MR. MOSLEY TAKES

20    THE STAND.

21         WE CAN DO THAT NOW, OR WE CAN DO IT AFTER MS. BENNETT

22    CONCLUDES.  I DON'T FEEL STRONGLY EITHER WAY.

23             THE COURT:  OKAY.  MR. LEACH OR MR. SCHENK?

24             MR. SCHENK:  AT THE COURT'S PLEASURE.

25         MR. MOSLEY WILL BE THE NEXT GOVERNMENT WITNESS, AND I'M
```

09:09AM   1    NOT SURE EXACTLY HOW LONG THE DEFENSE'S CROSS WILL TAKE.

09:09AM   2            THE COURT:  RIGHT.  I THINK WHEN WE WERE TOGETHER

09:09AM   3    LAST WEEK, COUNSEL SAID HE HAD ABOUT 12 MINUTES TO GO.

09:09AM   4            MR. CAZARES:  I'M SHOOTING FOR IT, YOUR HONOR.

09:09AM   5        BUT I SUSPECT MAYBE LESS THAN AN HOUR WITH MS. BENNETT.

09:09AM   6            THE COURT:  OKAY.  WELL, WHY DON'T WE GET STARTED

09:09AM   7    WITH MS. BENNETT?  WE'RE ALREADY A LITTLE LATE BECAUSE OF SOME

09:10AM   8    OTHER MATTERS I HAD TO HANDLE.

09:10AM   9        SO WHY DON'T WE HAVE MS. BENNETT COME ON.  WE'LL START HER

09:10AM   10   TESTIMONY AND SEE WHERE WE ARE AS FAR AS BREAKING, AND THEN WE

09:10AM   11   CAN TOUCH ON WHAT'S NEXT.

09:10AM   12           MR. CAZARES:  YES, YOUR HONOR.

09:10AM   13           THE COURT:  GREAT.  OKAY.

09:10AM   14       SO CHECK AND SEE IF THEY'RE HERE.

09:10AM   15           THE CLERK:  THEY'RE ALL HERE.

09:10AM   16           THE COURT:  THEY'RE HERE.

09:14AM   17       (PAUSE IN PROCEEDINGS.)

09:14AM   18       (JURY IN AT 9:14 A.M.)

09:14AM   19           THE COURT:  THANK YOU FOR YOUR COURTESY.  PLEASE BE

09:14AM   20   SEATED.  GOOD MORNING EVERYONE.

09:15AM   21       WELCOME BACK, LADIES AND GENTLEMEN OF THE JURY.

09:15AM   22       ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

09:15AM   23       OUR JURY IS PRESENT.

09:15AM   24       I HOPE EVERYONE HAD A PLEASANT WEEKEND.

09:15AM   25       BEFORE WE RESUME THE TESTIMONY OF MS. BENNETT, LET ME ASK

| | |
|---|---|
| 09:15AM | 1 | OUR JURORS, DURING THE BREAK, DID ANY OF YOU HAVE CAUSE TO |
| 09:15AM | 2 | READ, LEARN, DISCUSS, VIEW, OR DO ANYTHING IN REGARDS TO |
| 09:15AM | 3 | LEARNING ANYTHING ABOUT THIS CASE? |
| 09:15AM | 4 | IF SO, PLEASE RAISE YOUR HANDS. |
| 09:15AM | 5 | ONCE AGAIN, I SEE NO HANDS.  THANK YOU VERY MUCH.  I |
| 09:15AM | 6 | APPRECIATE THAT. |
| 09:15AM | 7 | AND IS MS. BENNETT HERE?  LET'S HAVE HER RETURN. |
| 09:15AM | 8 | GOOD MORNING, MS. BENNETT. |
| 09:15AM | 9 | THE WITNESS:  GOOD MORNING. |
| 09:15AM | 10 | THE COURT:  THANKS FOR COMING BACK. |
| 09:15AM | 11 | PLEASE FEEL FREE TO MAKE YOURSELF COMFORTABLE. |
| 09:16AM | 12 | I'LL JUST REMIND YOU THAT YOU'RE STILL UNDER OATH. |
| 09:16AM | 13 | WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME |
| 09:16AM | 14 | AGAIN, PLEASE. |
| 09:16AM | 15 | THE WITNESS:  MY NAME IS SARAH BENNETT. |
| 09:16AM | 16 | THE COURT:  THANK YOU. |
| 09:16AM | 17 | **(GOVERNMENT'S WITNESS, SARAH BENNETT, WAS PREVIOUSLY** |
| 09:16AM | 18 | **SWORN.)** |
| 09:16AM | 19 | THE COURT:  THANK YOU.  COUNSEL. |
| 09:16AM | 20 | MR. CAZARES:  THANK YOU, YOUR HONOR. |
| 09:16AM | 21 | **CROSS-EXAMINATION (RESUMED)** |
| 09:16AM | 22 | BY MR. CAZARES: |
| 09:16AM | 23 | Q.   GOOD MORNING. |
| 09:16AM | 24 | A.   GOOD MORNING. |
| 09:16AM | 25 | Q.   SO I WANTED TO REMIND THE JURY WHERE WE ARE WHEN WE LEFT |

09:16AM   1    OFF LAST WEEK, AND WE TALKED ABOUT THIS DIVISION OF LABOR

09:16AM   2    BETWEEN YOURSELF AND MR. YAMAMOTO WITH RESECT TO THE SURVEY.

09:16AM   3        DO YOU RECALL THOSE DISCUSSIONS?

09:16AM   4    A.   YES.

09:16AM   5    Q.   OKAY.  AND I THINK YOU MENTIONED THAT, WITH RESPECT TO THE

09:16AM   6    WORK THAT YOU DID IN THE SURVEY AND REFLECTED IN THE SURVEY

09:16AM   7    REPORT, THAT YOU DID NOT SURVEY THE FINGERSTICK PART OF THE

09:16AM   8    LABORATORY; IS THAT CORRECT?

09:16AM   9    A.   I DID NOT.

09:16AM  10    Q.   AND THAT WOULD INCLUDE THEN THAT YOU DID NOT EXAMINE ANY

09:16AM  11    OF THE FINGERSTICK TESTING ON THE MODIFIED PREDICATE DEVICES;

09:16AM  12    IS THAT RIGHT?

09:16AM  13    A.   CORRECT.

09:16AM  14    Q.   OKAY.  NOW, YOU DID EXAMINE TESTING RELATING TO THE

09:17AM  15    PT INR, THE COAGULATION TEST; CORRECT?

09:17AM  16    A.   I DID.

09:17AM  17    Q.   BUT OTHER THAN THAT, YOU DIDN'T EXAMINE ANY OF THE

09:17AM  18    TRADITIONAL VENOUS BLOOD TESTING; CORRECT?

09:17AM  19    A.   I MAY HAVE, IF I REMEMBER CORRECTLY, REVIEWED SOME OF THE

09:17AM  20    QUALITY CONTROL DATA AND THE PERFORMANCE SPECIFICATIONS.

09:17AM  21    Q.   OKAY.  NOW, GETTING BACK TO THAT PT INR TEST, THAT WAS THE

09:17AM  22    TEST THAT WAS THE SUBJECT OF A CONDITION LEVEL NONCOMPLIANCE;

09:17AM  23    CORRECT?

09:17AM  24    A.   YES.

09:17AM  25    Q.   AND THE PT INR WAS ALSO THE SUBJECT OF THE IMMEDIATE

09:17AM   1      JEOPARDY FINDING; CORRECT?

09:17AM   2      A.   IT WAS PART OF THE IMMEDIATE JEOPARDY, YES.

09:17AM   3      Q.   OKAY.  AND THAT PT INR TEST, THE ISSUES FOR THAT TEST WERE

09:17AM   4      THERE WAS A REAGENT STABILITY ISSUE; CORRECT?

09:17AM   5      A.   YES.

09:17AM   6      Q.   THERE WERE SOME QUALITY CONTROL ISSUES; CORRECT?

09:17AM   7      A.   YES.

09:17AM   8      Q.   AND THEN THERE WAS AN ISSUE RELATING TO THE CALCULATION OF

09:17AM   9      THE RESULTS; CORRECT?

09:17AM  10      A.   YES.

09:18AM  11      Q.   AND THAT PT INR TEST, THAT WAS RUN ON A SIEMENS MACHINE;

09:18AM  12      CORRECT?

09:18AM  13      A.   I BELIEVE IT WAS A SIEMENS, YES.

09:18AM  14      Q.   OKAY.  AND THAT'S AN FDA APPROVED COMMERCIAL DEVICE;

09:18AM  15      CORRECT?

09:18AM  16      A.   YES.

09:18AM  17      Q.   AND THEN THE REAGENT, THAT STABILITY ISSUE, THAT REAGENT

09:18AM  18      WAS MADE BY A COMPANY, NOT THERANOS; CORRECT?

09:18AM  19      A.   THAT IS CORRECT.

09:18AM  20      Q.   OKAY.  YOU SHOULD HAVE SOME BINDERS THERE IN FRONT OF YOU.

09:18AM  21           IF YOU COULD TAKE A LOOK AT THE GOVERNMENT'S BINDER, THE

09:18AM  22      WHITE BINDER, AT 4621.

09:18AM  23           WE CAN ALSO PUT IT UP ON THE SCREEN.  IF WE CAN LOOK AT

09:18AM  24      PAGE 16, UNDER D-TAG 5413.

09:18AM  25           AND YOU CAN LOOK ON THE BINDER OR ON THE SCREEN,

09:18AM  1    MS. BENNETT.  IT WILL BE IN BOTH.

09:18AM  2        AND I WANT TO DRAW YOUR ATTENTION TO, AT THE BOTTOM OF

09:18AM  3    PAGE -- WELL, ACTUALLY, AT THE BOTTOM OF PAGE 17, SO THE BOTTOM

09:19AM  4    OF PAGE 17 THERE'S D5413.

09:19AM  5        DO YOU SEE THAT?

09:19AM  6    A.  I DO.

09:19AM  7    Q.  AND IT RELATES TO TEST SYSTEMS, EQUIPMENT, INSTRUMENTS,

09:19AM  8    REAGENT.

09:19AM  9        DO YOU SEE THAT?

09:19AM  10   A.  I DO.

09:19AM  11   Q.  AND THEN THERE'S A DESCRIPTION OF THE REQUIREMENT, "THE

09:19AM  12   LABORATORY MUST DEFINE CRITERIA FOR THOSE CONDITIONS THAT ARE

09:19AM  13   ESSENTIAL FOR PROPER STORAGE OF REAGENTS AND SPECIMENS,

09:19AM  14   ACCURATE AND RELIABLE TEST SYSTEM OPERATION, AND TEST RESULT

09:19AM  15   REPORTING."

09:19AM  16       DO YOU SEE THAT?

09:19AM  17   A.  I DO.

09:19AM  18   Q.  AND THEN THE SURVEY REPORT CONTINUES.  "THE CRITERIA MUST

09:19AM  19   BE CONSISTENT WITH THE MANUFACTURER'S INSTRUCTIONS, IF

09:19AM  20   PROVIDED.  THESE CONDITIONS MUST BE MONITORED AND DOCUMENTED

09:19AM  21   AND, IF APPLICABLE, INCLUDE THE FOLLOWING," AND THERE'S A LIST

09:19AM  22   OF CONDITIONS THAT HAVE TO BE MONITORED.

09:19AM  23       DO YOU SEE THAT?

09:19AM  24   A.  I DO.

09:19AM  25   Q.  AND THEN ON THE NEXT PAGE, PAGE 18, THIS ISSUE IS

09:19AM   1    IDENTIFIED AS A STANDARD LEVEL NONCOMPLIANCE.

09:19AM   2        DO YOU SEE THAT?

09:19AM   3    A.   I DO.

09:19AM   4    Q.   AND THEN IF WE CONTINUE ONTO PAGE, AT THE BOTTOM, PAGE 18,

09:20AM   5    ITEM 2.

09:20AM   6        DO YOU SEE THAT?

09:20AM   7    A.   I DO.

09:20AM   8    Q.   AND IS THIS THE PT INR REAGENT STABILITY ISSUE THAT YOU

09:20AM   9    IDENTIFY?

09:22AM   10   A.   YES.

09:22AM   11   Q.   AND JUST SO THE JURY UNDERSTANDS, SO YOU WROTE THAT

09:22AM   12   REVIEW, "BASED ON REVIEW OF THE PROCEDURE, MANUFACTURE PACKAGE

09:22AM   13   INSERT AND OBSERVATION, THE LABORATORY FAILED TO FOLLOW THE

09:22AM   14   MANUFACTURER INSTRUCTIONS FOR EXPIRATION DATE OF INNOVIN USED

09:22AM   15   FOR PROTHROMBIN TIME/INTERNATIONAL NORMALIZED RATIO TESTING."

09:22AM   16       DO YOU SEE THAT?

09:22AM   17   A.   I DO.

09:22AM   18   Q.   AND INNOVIN, THAT'S THE REAGENT; CORRECT?

09:22AM   19   A.   YES.

09:22AM   20   Q.   AND IT'S MADE BY A COMPANY CALLED DADE; IS THAT RIGHT?

09:22AM   21   A.   I BELIEVE SO, YES.

09:22AM   22   Q.   AND THAT'S A COMMERCIALLY MADE REAGENT?

09:22AM   23   A.   IT IS.

09:22AM   24   Q.   AND AT SUB A, YOU IDENTIFIED HERE IN THE SURVEY REPORT

09:22AM   25   THAT "DADE INNOVIN LOT NUMBER 539280 WAS PUT INTO USE BY THE

09:22AM 1    LABORATORY AT THE END OF MARCH 2015."

09:22AM 2        DO YOU SEE THAT?

09:22AM 3    A.  I DO.

09:22AM 4    Q.  AND SO YOU IDENTIFY SOME RECORDS THAT SHOWED THE LAB

09:22AM 5    STARTED TO USE THIS LOT OF REAGENT IN MARCH OF 2015; IS THAT

09:22AM 6    CORRECT?

09:22AM 7    A.  YES.

09:22AM 8    Q.  AND THEN AT SUB B, THE REPORT READS, "THE GENERAL

09:22AM 9    SUPERVISOR STATED THAT THE PACKAGE INSERTS WERE USUALLY WHITE."

09:22AM 10       WAS THAT YOUR FINDING?

09:22AM 11   A.  YES.

09:22AM 12   Q.  AND THEN SUB C READS, "THE PACKAGE INSERT FOR LOT NUMBER

09:22AM 13   539280 WAS PINK WHICH INDICATED THAT THE MANUFACTURER HAD

09:22AM 14   INCLUDED SPECIAL INSTRUCTIONS FOR THE SPECIFIC LOT NUMBER OF

09:22AM 15   INNOVIN."

09:22AM 16       DO YOU SEE THAT?

09:22AM 17   A.  I DO.

09:22AM 18   Q.  OKAY.  AND THEN AT SUB D, THE SURVEY REPORT READS, "SURVEY

09:22AM 19   REVIEW OF THE PI REVEALED AN IMPORTANT NOTE THAT THIS SPECIFIC

09:22AM 20   LOT NUMBER WAS ONLY STABLE FOR 2 DAYS INSTEAD OF 10 DAYS AFTER

09:22AM 21   RECONSTITUTION."

09:22AM 22       DO YOU SEE THAT?

09:22AM 23   A.  I DO.

09:22AM 24   Q.  SO DOES THAT MEAN PRIOR TO THE COMPANY'S INSTITUTION OF

09:22AM 25   THIS LOT NUMBER REAGENT, THE STABILITY OF THE INNOVIN WAS TEN

09:22AM   1    DAYS?

09:22AM   2    A.   I CAN'T SAY IF THE PREVIOUS LOT NUMBERS WERE FOR TEN DAYS

09:22AM   3    UNLESS I WOULD SEE THE PACKAGE INSERT.

09:22AM   4    Q.   OKAY.  BUT HERE IN YOUR REPORT YOU WROTE THAT "THIS

09:22AM   5    SPECIFIC LOT NUMBER WAS ONLY STABLE FOR 2 DAYS INSTEAD OF

09:22AM   6    10 DAYS."

09:22AM   7    A.   CORRECT.

09:22AM   8    Q.   OKAY.

09:22AM   9         SO FOR THIS LOT, INSTEAD OF TEN, IT WAS DOWN TO TWO; IS

09:22AM   10   THAT CORRECT?

09:22AM   11   A.   YES.

09:22AM   12   Q.   AND THAT'S BECAUSE THE COMPANY CHANGED THE TIME PERIOD FOR

09:22AM   13   THE STABILITY FOR THE USE OF THIS REAGENT; CORRECT?

09:22AM   14   A.   YES.

09:22AM   15   Q.   AND THAT'S NOT EXACTLY THE SAME, BUT SOMETHING LIKE THE

09:22AM   16   MILK EXPIRATION DATE, DON'T USE IT AFTER X DATE; CORRECT?

09:22AM   17   A.   FOR REAGENTS, IF AN EXPIRATION DATE IS DEFINED BY THE

09:23AM   18   MANUFACTURER OR THE LABORATORY, THEY CANNOT USE IT PAST THE

09:23AM   19   DATE.

09:23AM   20        I PERSONALLY DO USE MILK PAST THE EXPIRATION DATE

09:23AM   21   SOMETIMES.

09:23AM   22        (LAUGHTER.)

09:23AM   23   BY MR. CAZARES:

09:23AM   24   Q.   BUT IN SOME INSTANCES A LAB COULD USE THE REAGENT AFTER

09:23AM   25   THE EXPIRATION DATE IF THEY DID SOME STUDIES TO DETERMINE

09:23AM  1    WHETHER OR NOT THE STABILITY MIGHT BE LONGER THAN THE

09:23AM  2    MANUFACTURER IDENTIFIED, COULDN'T THEY?

09:23AM  3    A.   THEY CAN.

09:23AM  4    Q.   SO IT'S NOT NECESSARILY A HARD DATE, BUT IT'S A HARD DATE

09:23AM  5    UNLESS YOU'VE DONE SOME WORK TO DETERMINE THAT THE REAGENT MAY

09:23AM  6    BE STABLE BEYOND WHAT THE MANUFACTURER SAID; CORRECT?

09:23AM  7    A.   YES, IT IS A HARD DATE UNLESS THEY DO THE EXTRA WORK.

09:23AM  8    Q.   FAIR ENOUGH.

09:23AM  9         AND IN THIS INSTANCE, THE INSERT IS A DIFFERENT COLOR?

09:23AM  10   IT'S PINK INSTEAD OF WHITE; CORRECT?

09:23AM  11   A.   YES.

09:23AM  12   Q.   AND THEN YOU IDENTIFY THAT THE "THE CURRENT VIAL OF

09:23AM  13   INNOVIN REAGENT WAS OBSERVED IN THE 2-8 CELSIUS REFRIGERATOR

09:24AM  14   WITH A 5 DAY EXPIRATION DATE."

09:24AM  15        DO YOU SEE THAT?

09:24AM  16   A.   I DO.

09:24AM  17   Q.   SO DID YOU YOURSELF GO IN THE REFRIGERATOR AND SEE THE

09:24AM  18   INNOVIN IN THE FRIDGE?

09:24AM  19   A.   I DID.

09:24AM  20   Q.   AND THERE WAS A TYPEWRITTEN LABEL?

09:24AM  21   A.   IT WAS A HANDWRITTEN LABEL.

09:24AM  22   Q.   AND THE LABEL YOU SAW WAS FIVE DAYS?

09:24AM  23   A.   IT WAS FIVE DAYS.  THE EXPIRATION ON THE VIAL WAS WRITTEN

09:24AM  24   FIVE DAYS AFTER THE OPEN DAY WAS WRITTEN ON THE BOTTOM.

09:24AM  25   Q.   AND THE STABILITY INDICATED CHANGED FROM TEN TO TWO DAYS;

09:24AM  1      CORRECT?

09:24AM  2      A.   YES.

09:24AM  3      Q.   PER THAT PINK LITTLE SHEET?

09:24AM  4      A.   YES.

09:24AM  5      Q.   OKAY.  AND THEN AT SUB F, IN THIS SECTION YOU WROTE, "CL

09:24AM  6      SOP-10001 REVISION A, 'MEASURING PROTHROMBIN TIME' STATED ON

09:24AM  7      PAGE 2 SECTION 12.1 THAT THE PACKAGE INSERT FOR NEW LOT MUST BE

09:24AM  8      REVIEWED FOR ANY CHANGES BEFORE USE."

09:24AM  9           DO YOU SEE THAT?

09:24AM  10     A.   YES.

09:24AM  11     Q.   AND SO THAT'S THE LAB'S POLICY; RIGHT?

09:25AM  12     A.   YES.

09:25AM  13     Q.   IS THAT RIGHT?

09:25AM  14     A.   YES.

09:25AM  15     Q.   OKAY.  AND AT SUB G YOU WROTE, "THE GENERAL SUPERVISOR

09:25AM  16     CONFIRMED ON 9/23/15 THAT THE CHANGE IN STORAGE AND STABILITY

09:25AM  17     OF THE INNOVIN REAGENT HAD NOT BEEN IDENTIFIED FROM MARCH 2015

09:25AM  18     THROUGH SEPTEMBER 2015."

09:25AM  19           DO YOU SEE THAT?

09:25AM  20     A.   I DO.

09:25AM  21     Q.   AND SO THE GENERAL SUPERVISOR WAS ONE OF THE LAB PERSONNEL

09:25AM  22     YOU SPOKE WITH?

09:25AM  23     A.   YES, I INTERVIEWED THE GENERAL SUPERVISOR.

09:25AM  24     Q.   AND THE GENERAL SUPERVISOR INDICATED TO YOU THAT THE LAB

09:25AM  25     STAFF WERE UNAWARE OF THE CHANGE IN STABILITY; CORRECT?

09:25AM   1      A.   FROM MARCH 2015 THROUGH SEPTEMBER 2015.

09:25AM   2      Q.   OKAY.  AND THAT VIOLATED THE LAB'S POLICY?

09:25AM   3      A.   YES, AND THE REGULATIONS.

09:25AM   4      Q.   IF YOU TAKE A LOOK AT PAGE 40.  ON PAGE 40, THREE QUARTERS

09:26AM   5      OF THE WAY UP, THERE'S A D-TAG 5481.

09:26AM   6           DO YOU SEE THAT?

09:26AM   7      A.   I DO.

09:26AM   8      Q.   AND IT SAYS CONTROL PROCEDURES.

09:26AM   9           DO YOU SEE THAT?

09:26AM  10      A.   YES.

09:26AM  11      Q.   AND THEN THIS REQUIREMENT STATES, "RESULTS OF CONTROL

09:26AM  12      MATERIALS MUST MEET THE LABORATORY'S AND AS APPLICABLE THE

09:26AM  13      MANUFACTURER'S TEST SYSTEM CRITERIA FOR ACCEPTABILITY BEFORE

09:26AM  14      REPORTING PATIENT TEST RESULTS."

09:26AM  15           DO YOU SEE THAT?

09:26AM  16      A.   I DO.

09:26AM  17      Q.   AND SO DOES THAT MEAN ESSENTIALLY QUALITY CONTROL NEEDS TO

09:26AM  18      PASS BEFORE PATIENT RESULTS ARE REPORTED?

09:26AM  19      A.   YES.

09:26AM  20      Q.   AND THIS IS ANOTHER STANDARD LEVEL DEFICIENCY; CORRECT?

09:26AM  21      A.   IT IS.

09:26AM  22      Q.   AND THEN UNDER ITEM 1, IT SAYS, "BASED ON THE REVIEW OF

09:26AM  23      THE PROTHROMBIN TIME/INTERNATIONAL NORMALIZED RATIO PROCEDURE,

09:26AM  24      QUALITY CONTROL RECORDS, PATIENT RESULTS AND INTERVIEW WITH THE

09:26AM  25      GENERAL SUPERVISOR, THE LABORATORY FAILED TO ENSURE THAT THE QC

09:27AM  1    FOR PT INR WAS ACCEPTABLE PRIOR TO REPORTING PATIENT RESULTS

09:27AM  2    FROM APRIL 2015 THROUGH SEPTEMBER 2015."

09:27AM  3        DO YOU SEE THAT?

09:27AM  4    A.   I DO.

09:27AM  5    Q.   OKAY.  THEN THE NEXT SUB A, THERE'S A "CL SOP-1001

09:27AM  6    REVISION A MEASURING PROTHROMBIN TIME-INNOVIN (TP ON THE

09:27AM  7    SIEMENS BCS XP INSTRUMENT)."

09:27AM  8        DO YOU SEE THAT?

09:27AM  9    A.   I DO.

09:27AM 10    Q.   AND IT SAYS, "AS STATED ON THE PAGE 6, SECTION 8.6 THAT IF

09:27AM 11    CONTROL VALUES ARE OUTSIDE OF THE DETERMINED RANGE, THE

09:27AM 12    CONTROLS, REAGENTS, AND INSTRUMENT PERFORMANCE SHOULD BE

09:27AM 13    CHECKED AND THAT IDENTIFICATION AND CORRECTION OF THE PROBLEM

09:27AM 14    SHOULD BE DOCUMENTED PRIOR TO REPORTING PATIENT RESULTS."

09:27AM 15        DO YOU SEE THAT?

09:27AM 16    A.   I DO.

09:27AM 17    Q.   AND SO, AGAIN, THIS IS A TEST RUN ON THE SIEMENS BCS XP

09:27AM 18    DEVICE; CORRECT?

09:27AM 19    A.   IT IS.

09:27AM 20    Q.   AND THEN IT LOOKS LIKE AT SUB B, C, AND THEN CONTINUE ON

09:28AM 21    THE NEXT PAGE, YOU REVIEWED QC RECORDS FOR CITROL IN THAT APRIL

09:28AM 22    TO SEPTEMBER TIME PERIOD; IS THAT RIGHT?

09:28AM 23    A.   YES.

09:28AM 24    Q.   AND CITROL IS A COMMERCIALLY AVAILABLE QUALITY CONTROL

09:28AM 25    MATERIAL?

BENNETT CROSS BY MR. CAZARES (RES.)                         5040

09:28AM   1    A.   IT IS.

09:28AM   2    Q.   AND THEN AT SUB C YOU WROTE THAT "THE GENERAL SUPERVISOR

09:28AM   3    STATED THAT QC WAS ACCEPTABLE IF THE VALUES WERE PLUS MINUS 2

09:28AM   4    SD FROM THE MEAN."

09:28AM   5        DO YOU SEE THAT?

09:28AM   6    A.   I DO.

09:28AM   7    Q.   AND THEN IT LOOKS LIKE YOU IDENTIFIED D, E, F, AND G,

09:28AM   8    INSTANCES WHERE THAT REQUIREMENT WASN'T MET; IS THAT FAIR?

09:28AM   9    A.   YES.

09:28AM   10   Q.   AND THEN AT SUB I YOU IDENTIFIED THAT THERE WERE 81

09:28AM   11   PATIENTS REPORTED DURING THAT TIME PERIOD WHEN QUALITY CONTROL

09:28AM   12   WAS NOT PASSING ON THE SIEMENS DEVICE; CORRECT?

09:28AM   13   A.   YES.

09:28AM   14   Q.   AND THIS CONTRIBUTED TO THAT CONDITION LEVEL DEFICIENCY?

09:28AM   15   A.   IT DID.

09:29AM   16   Q.   AND THEN IF WE CAN TAKE A LOOK AT PAGE 73.

09:29AM   17        AT 73 THERE'S A D-TAG 5801.

09:29AM   18        DO YOU SEE THAT?

09:29AM   19   A.   YES.

09:29AM   20   Q.   AND IT SAYS, "THE LABORATORY MUST HAVE AN ADEQUATE MANUAL

09:29AM   21   OR ELECTRONIC SYSTEMS IN PLACE TO ENSURE TEST RESULTS AND OTHER

09:29AM   22   PATIENT-SPECIFIC DATA ARE ACCURATELY AND RELIABLY SENT FROM THE

09:29AM   23   POINT OF DATA ENTRY (WHETHER INTERFACED OR ENTERED MANUALLY) TO

09:29AM   24   FINAL REPORT DESTINATION, IN A TIMELY MANNER.  THIS INCLUDES

09:29AM   25   THE FOLLOWING."

09:29AM   1         AND THEN THERE ARE SOME DESCRIPTIONS.

09:29AM   2         "RESULTS REPORTED FROM CALCULATED DATA.

09:29AM   3         "RESULTS TO NETWORK OR INTERFACED SYSTEMS."

09:29AM   4         AND THEN THE LAST ITEM SAYS, "MANUALLY TRANSCRIBED OR

09:30AM   5    ELECTRONICALLY TRANSMITTED RESULTS AND PATIENT-SPECIFIC

09:30AM   6    INFORMATION REPORTED DIRECTLY OR UPON RECEIPT FROM OUTSIDE

09:30AM   7    REFERRAL LABORATORIES, SATELLITE OR POINT-OF-CARE TESTING

09:30AM   8    LOCATIONS."

09:30AM   9         DO YOU SEE THAT?

09:30AM   10   A.   YES, TESTING LOCATIONS, YES.

09:30AM   11   Q.   AND THEN THIS IS ANOTHER STANDARD LEVEL NONCOMPLIANCE?

09:30AM   12   A.   YES.

09:30AM   13   Q.   AND THIS RELATES TO THE CALCULATION OF THE PT INR RESULTS;

09:30AM   14   IS THAT RIGHT?

09:30AM   15   A.   YES.

09:30AM   16   Q.   NOW, IN THE REPORT UNDER THE STANDARD YOU WROTE, "BASED ON

09:30AM   17   REVIEW OF THE PATIENT RESULTS, MANUFACTURER INTERNATIONAL

09:30AM   18   SENSITIVITY INDEX NUMBER," I'LL STOP RIGHT THERE.

09:30AM   19         WHAT IS THAT?

09:30AM   20   A.   THAT IS A NUMBER THAT THE MANUFACTURER PROVIDED FOR EACH

09:30AM   21   LOT NUMBER OF THROMBOPLASTIN, WHICH IS ALSO INNOVIN.

09:30AM   22   Q.   AND THIS NUMBER, THIS ISI NUMBER, YOU SAID IS DETERMINED

09:31AM   23   BY THE MANUFACTURER?

09:31AM   24   A.   IT IS.

09:31AM   25   Q.   SO HERE THAT WOULD BE SIEMENS?

BENNETT CROSS BY MR. CAZARES (RES.)

09:31AM  1    A.   YES.

09:31AM  2    Q.   OKAY.  AND THAT'S DETERMINED BY THE MANUFACTURER DOING

09:31AM  3    SOME SORT OF A STUDY?

09:31AM  4    A.   IT WOULD BE BY DADE.  THEY'RE THE ONES THAT MAKE IT.

09:31AM  5         SORRY.

09:31AM  6    Q.   I LED YOU TO THAT.

09:31AM  7    A.   SORRY.

09:31AM  8    Q.   SO THE ISI NUMBERS ARE PROVIDED BY DADE, THE MANUFACTURER

09:31AM  9    OF THE REAGENT?

09:31AM  10   A.   YES.

09:31AM  11   Q.   OKAY.  AND THAT'S DETERMINED USING A STUDY?

09:31AM  12   A.   I DON'T KNOW HOW THE MANUFACTURER DETERMINES THE ISI.

09:31AM  13   Q.   OKAY.  BUT IT'S PROVIDED BY THE MANUFACTURER?

09:31AM  14   A.   YES.

09:31AM  15   Q.   AND THAT'S SPECIFIC TO EACH LOT NUMBER; CORRECT?

09:31AM  16   A.   IT IS.

09:31AM  17   Q.   AND THAT NUMBER NEEDS TO BE ENTERED INTO THE SIEMENS

09:31AM  18   DEVICE BEFORE RUNNING THE PATIENT TEST, OR THE PATIENT RESULTS;

09:31AM  19   CORRECT?

09:31AM  20   A.   YES.

09:31AM  21   Q.   AND THEN GETTING BACK TO THE REPORT YOU WROTE, "AND THE

09:31AM  22   LABORATORY'S MEAN NORMAL PROTHROMBIN TIME, THE LABORATORY

09:31AM  23   FAILED TO ENSURE THAT THE REPORTED INTERNATIONAL NORMALIZED

09:31AM  24   RATIO WAS CALCULATED ACCURATELY PRIOR TO REPORTING FINAL

09:31AM  25   PATIENT TEST RESULTS."

09:32AM  1        SO IN YOUR SURVEY RELATING TO THIS ISSUE, DID YOU NOT FIND

09:32AM  2    EVIDENCE THAT THERANOS'S LAB PERSONNEL HAD DOCUMENTED AND

09:32AM  3    ENTERED THE CORRECT ISI VALUE INTO THE MACHINE BEFORE RUNNING

09:32AM  4    THE TEST?

09:32AM  5    A.   I BELIEVE THAT I DID.

09:32AM  6    Q.   OKAY.  SO THEY SHOULD HAVE HAD DOCUMENTATION BACK FROM

09:32AM  7    MARCH OF 2015, BUT WHAT THEY GAVE YOU WAS SOME DOCUMENTATION I

09:32AM  8    THINK IT WAS FROM SEPTEMBER OF 2015; CORRECT?

09:32AM  9    A.   THE DOCUMENTATION THAT THE LABORATORY HAS TO RUN IS THE

09:32AM  10   MEAN NORMAL PROTHROMBIN TIME, AND THEY WERE UNABLE TO PRODUCE

09:32AM  11   THAT DOCUMENTATION UNTIL SEPTEMBER, AND IT SHOULD HAVE BEEN RUN

09:32AM  12   PRIOR TO MARCH BEFORE THEY STARTED.

09:32AM  13   Q.   AND JUST TO BE CLEAR, THEY DIDN'T HAVE DOCUMENTATION OF

09:32AM  14   RUNNING IT IN MARCH OF 2015; CORRECT?

09:32AM  15   A.   THEY DID NOT.

09:32AM  16   Q.   OKAY.  IT COULD HAVE HAPPENED, BUT THEY'RE SUPPOSED TO

09:32AM  17   HAVE DOCUMENTATION; CORRECT?

09:32AM  18   A.   IF IT'S NOT DOCUMENTED, IT'S NOT DONE.

09:32AM  19   Q.   ACCORDING TO THE REGULATIONS?

09:32AM  20   A.   WELL, IN ORDER TO BE ABLE TO SUPPORT THAT IT'S BEEN DONE,

09:33AM  21   THEY HAD TO BE ABLE TO PROVIDE THE DOCUMENTATION AND THEY COULD

09:33AM  22   NOT.

09:33AM  23   Q.   FAIR ENOUGH.

09:33AM  24        AND YOU USED THIS NUMBER YOU WERE PROVIDED IN SEPTEMBER OF

09:33AM  25   2015 RELATING TO THE ISI NUMBER, AND YOU RECALCULATED THE

09:33AM 1    PATIENT RESULTS YOURSELF; CORRECT?

09:33AM 2    A.   I USED THE ISI NUMBER AND THE DOCUMENTATION FROM SEPTEMBER

09:33AM 3    TO RECALCULATE THE INR'S, YES.

09:33AM 4    Q.   AND YOU DID THAT MANUALLY; CORRECT?

09:33AM 5    A.   I DID.

09:33AM 6    Q.   NOW, ORDINARILY WHEN THE ISI VALUE IS ENTERED INTO THE

09:33AM 7    MACHINE AND THE PATIENT SAMPLE IS RUN AND PROCESSED, THE

09:33AM 8    CALCULATION IS DONE INSIDE OF THE MACHINE; CORRECT?

09:33AM 9    A.   YES.

09:33AM 10   Q.   SO THIS WOULD ALL BE DONE WITHIN THE MACHINE?  LAB STAFF

09:33AM 11   WOULDN'T BE CALCULATING OR DOING THE MATH THEMSELVES; CORRECT?

09:33AM 12   A.   THEY WOULD NOT.

09:33AM 13   Q.   WHAT IS THE CALCULATION?

09:33AM 14   A.   I DON'T KNOW THE EXACT CALCULATION FOR IT.  YOU CAN

09:34AM 15   CERTAINLY GOOGLE IT AND FIND IT.

09:34AM 16   Q.   BUT YOU DID THE CALCULATION YOURSELF THOUGH?

09:34AM 17   A.   RIGHT.  I USED A PROGRAM TO PLUG THE NUMBERS IN AND

09:34AM 18   RECALCULATE, YES.

09:34AM 19   Q.   OKAY.  AND AS A RESULT OF THE WORK THAT YOU DID, YOU CAME

09:34AM 20   UP WITH A NUMBER THAT WAS DIFFERENT THAN WHAT WAS REPORTED TO

09:34AM 21   PATIENTS; IS THAT RIGHT?

09:34AM 22   A.   THAT'S CORRECT.

09:34AM 23   Q.   AND I THINK AT SUB C YOU ITEMIZED, GETTING BACK TO

09:34AM 24   PAGE 74, YOU SAID, "THE FINAL REPORTED RESULTS VARIED FROM THE

09:34AM 25   TRUE RESULTS BY .1 TO .5 UNITS."

BENNETT CROSS BY MR. CAZARES (RES.)                      5045

09:34AM  1        DO YOU SEE THAT?

09:34AM  2   A.   I DO.

09:34AM  3   Q.   AND THAT WAS THEIR CALCULATION AND WHAT THE LAB REPORTED;

09:34AM  4   CORRECT?

09:34AM  5   A.   YES.

09:34AM  6   Q.   NOW, I THINK ON WEDNESDAY WE WERE TALKING ABOUT THIS ISSUE

09:34AM  7   ABOUT WHEN IT WAS DETERMINED BY YOURSELF AND MR. YAMAMOTO THAT

09:34AM  8   YOU WERE GOING TO CITE AN IMMEDIATE JEOPARDY FINDING.

09:34AM  9        DO YOU REMEMBER THAT?

09:34AM  10  A.   I DO.

09:34AM  11  Q.   AND I THINK YOU PUT THE TIME PERIOD AROUND THE END OF THE

09:35AM  12  NOVEMBER 2015 VISIT; CORRECT?

09:35AM  13  A.   IT WAS -- YES, IT WAS AFTER WE FINISHED THE ENTIRE SURVEY,

09:35AM  14  YES.

09:35AM  15  Q.   AND I GUESS, DOES IT MEAN THAT THE IJ FINDING WAS MADE

09:35AM  16  WHEN YOU LEFT THE LABORATORY IN NOVEMBER OF 2015, OR WAS THERE

09:35AM  17  FURTHER WORK TO BE DONE?

09:35AM  18  A.   IT WAS MADE AFTER WE LEFT THE LABORATORY IN NOVEMBER.

09:35AM  19  Q.   OKAY.  BECAUSE YOU WERE STILL REVIEWING DOCUMENTATION;

09:35AM  20  CORRECT?

09:35AM  21  A.   YES.

09:35AM  22  Q.   WITHIN THE BINDER THAT YOU SHOULD HAVE THERE IN FRONT OF

09:35AM  23  YOU, IF YOU COULD TAKE A LOOK AT EXHIBIT OR TAB NUMBER 4600.

09:36AM  24       DO YOU HAVE 4600 UP THERE IN FRONT OF YOU?

09:36AM  25  A.   I DO.

09:36AM  1   Q.   OKAY.  AND 4600 APPEARS TO BE AN INTERNAL EMAIL EXCHANGE

09:36AM  2   BETWEEN YOURSELF AND SOME OF YOUR COLLEAGUES AT CMS?

09:36AM  3   A.   YES.

09:36AM  4   Q.   OKAY.  AND THE LATER OF THE TWO MESSAGES LOOKED TO BE

09:36AM  5   DATED DECEMBER 8TH, 2015.

09:36AM  6        DO YOU SEE THAT?

09:36AM  7   A.   I DO.

09:36AM  8   Q.   OKAY.  AND THIS LATTER MESSAGE IS FROM YOURSELF TO A

09:36AM  9   THOMAS HAMILTON.

09:36AM  10       DO YOU SEE THAT?

09:36AM  11  A.   I DO.

09:36AM  12  Q.   AND THEN COPIES TO MS. DYER AND MR. YAMAMOTO; CORRECT?

09:36AM  13  A.   YES.

09:36AM  14           MR. CAZARES:  MOVE TO ADMIT 4600, YOUR HONOR.

09:36AM  15           MR. LEACH:  IS THIS COMING IN AS A BUSINESS RECORD?

09:36AM  16           MR. CAZARES:  YES.

09:36AM  17           MR. LEACH:  NO OBJECTION.

09:36AM  18           THE COURT:  IT WILL BE ADMITTED, 4600, AND IT MAY BE

09:36AM  19  PUBLISHED.

09:36AM  20       (GOVERNMENT'S EXHIBIT 4600 WAS RECEIVED IN EVIDENCE.)

09:36AM  21  BY MR. CAZARES:

09:36AM  22  Q.   IF YOU TAKE A LOOK AT THE LOWER TWO MESSAGES, THERE

09:36AM  23  APPEARS TO BE AN EMAIL AT THE BOTTOM HALF FROM MR. HAMILTON TO

09:36AM  24  YOURSELF.

09:36AM  25           DO YOU SEE THAT?

09:36AM  1    A.   I DO.

09:36AM  2    Q.   AND THAT'S DECEMBER 8TH, 2015?

09:37AM  3         (PAUSE IN PROCEEDINGS.)

09:37AM  4              THE COURT:  IS IT ON THE SCREEN?

09:37AM  5              JUROR:  NO.

09:37AM  6              THE COURT:  ALL RIGHT.  IT SEEMS LIKE IT'S UP NOW.

09:37AM  7    BY MR. CAZARES:

09:37AM  8    Q.   ALL RIGHT.  BACK TO 4600.  THE LOWER PORTION OF THE

09:37AM  9    MESSAGE, IT SHOULD BE UP ON THE SCREEN.

09:37AM 10         DO YOU SEE THAT?

09:37AM 11    A.   I DO.

09:37AM 12    Q.   AND THIS IS FROM MR. HAMILTON TO YOURSELF?

09:37AM 13    A.   YES.

09:37AM 14    Q.   AND THEN MR. HAMILTON WROTE, "NICE PRESENTATION TODAY.  I

09:37AM 15    THINK IT DID GOOD, TRIPLE DUTY:  PROVIDING A CLEAR EXAMPLE OF

09:37AM 16    CLIA'S APPLICATION TO A SPECIFIC TEST, EXEMPLIFYING HOW A

09:37AM 17    SURVEY PROCESS WOULD LOOK AT THINGS, AND THEN UPDATING ON

09:37AM 18    THERANOS."

09:37AM 19         DO YOU SEE THAT?

09:37AM 20    A.   I DO.

09:37AM 21    Q.   SO IT LOOKS LIKE THIS IS IN RELATION TO A PRESENTATION YOU

09:37AM 22    MADE RELATING TO THE THERANOS SURVEY?

09:37AM 23    A.   RELATED TO PT INR.

09:37AM 24    Q.   OKAY.  AND THEN MR. HAMILTON WROTE, "IN YOUR OPINION, IS

09:38AM 25    THERE ANYTHING THAT THE RO OR WE COULD DO TO FREE UP ANY OF

09:38AM 1    GARY'S TIME."

09:38AM 2         JUST TO STOP THERE, R-O IS, IS THAT THE REGIONAL OFFICE?

09:38AM 3    A.   YES.

09:38AM 4    Q.   IS THAT MR. YAMAMOTO'S OFFICE WITHIN CMS?

09:38AM 5    A.   YES.

09:38AM 6    Q.   AND THEN "OF GARY'S TIME SO HE COULD EXPEDITE HIS PART OF

09:38AM 7    THE 2567?"

09:38AM 8         DO YOU SEE THAT?

09:38AM 9    A.   I DO.

09:38AM 10   Q.   AND SO BY THIS TIME, DECEMBER 8TH, 2015, THE SURVEY REPORT

09:38AM 11   HAD NOT BEEN COMPLETED; CORRECT?

09:38AM 12   A.   CORRECT.

09:38AM 13   Q.   AND FINAL DECISIONS HAD NOT YET BEEN MADE; CORRECT?

09:38AM 14   A.   CORRECT.

09:38AM 15   Q.   AND THEN MR. HAMILTON WROTE, "ESPECIALLY IF THE FINDING IS

09:38AM 16   IN IJ, THE TIME LAG BECOMES A LITTLE PROBLEMATIC."

09:38AM 17        DO YOU SEE THAT?

09:38AM 18   A.   I DO.

09:38AM 19   Q.   AND WHAT MR. HAMILTON IS GETTING AT, YOU WOULD AGREE, THAT

09:38AM 20   THE SURVEY STARTED IN SEPTEMBER OF 2015 AND IT'S NOW DECEMBER,

09:38AM 21   AND THE FINAL DETERMINATION OF IJ HAD NOT YET BEEN MADE; IS

09:38AM 22   THAT RIGHT?

09:38AM 23   A.   IT HAD NOT BEEN MADE BECAUSE WE WERE STILL REVIEWING

09:38AM 24   DOCUMENTS.

09:39AM 25   Q.   AND THEN IF WE FOCUS ON THE UPPER HALF OF THE MESSAGE, YOU

09:39AM  1    WROTE BACK TO MR. HAMILTON, "I CHECKED WITH GARY.  WE ARE NOW

09:39AM  2    IN THE PROCESS OF GOING THROUGH THE MANY DOCUMENTS COLLECTED ON

09:39AM  3    THE SURVEY TO DETERMINE COMPLIANCE -- GIVEN THE VOLUME AND THE

09:39AM  4    TECHNICAL NATURE OF THE DOCUMENTS, IT IS A TIME-CONSUMING

09:39AM  5    PROCESS."

09:39AM  6        DO YOU SEE THAT?

09:39AM  7    A.   YES.

09:39AM  8    Q.   IS THAT ACCURATE?

09:39AM  9    A.   IT IS ACCURATE.

09:39AM  10   Q.   AND THEN YOU WROTE, "WE FEEL THAT THE EARLIEST WE CAN HAVE

09:39AM  11   A 2567 READY IS JANUARY."

09:39AM  12       DO YOU SEE THAT?

09:39AM  13   A.   YES.

09:39AM  14   Q.   AND THEN YOU WROTE, "WE BOTH NEED TO WRITE OUR

09:39AM  15   DEFICIENCIES THEN COME TOGETHER TO DISCUSS THE DEFICIENCIES AS

09:39AM  16   WELL AS WHAT LEVEL OF NONCOMPLIANCE (NON-IJ VERSUS IJ) THE

09:39AM  17   DEFICIENCIES RISE TO."

09:39AM  18       DO YOU SEE THAT?

09:39AM  19   A.   I DO.

09:39AM  20   Q.   AND IS THAT AN ACCURATE DESCRIPTION OF THE KIND OF

09:39AM  21   DIVISION OF LABOR BETWEEN YOURSELF AND MR. YAMAMOTO?  HE WROTE

09:39AM  22   HIS PORTION, YOU WROTE YOURS, AND THEN YOU CAME TOGETHER AND

09:39AM  23   DISCUSSED?

09:39AM  24   A.   YES.

09:39AM  25   Q.   OKAY.  "OUR PLAN IS TO HAVE THE DISCUSSION THE WEEK OF

09:40AM   1    JANUARY 11TH SO THAT THE 2567 CAN BE RELEASED ASAP AFTER IT IS

09:40AM   2    FINALIZED."

09:40AM   3         DO YOU SEE THAT?

09:40AM   4    A.   I DO.

09:40AM   5    Q.   OKAY.  AND THEN AT THE BOTTOM PORTION OF THE MESSAGE YOU

09:40AM   6    WROTE, "IT IS OUR UNDERSTANDING THAT THE FINGERSTICK TESTING

09:40AM   7    HAS BEEN STOPPED; HOWEVER, THE VENIPUNCTURE TESTING CONTINUES."

09:40AM   8         DO YOU SEE THAT?

09:40AM   9    A.   I DO.

09:40AM   10   Q.   OKAY.  YOU CAN SET THAT ASIDE.

09:40AM   11        IF YOU COULD GO BACK TO THE 4621, THE SURVEY REPORT.

09:40AM   12        AND IF YOU CAN LOOK AT PAGE 67.  AND YOU CAN LOOK AT IT,

09:40AM   13   MS. BENNETT, IN THE BINDER OR UP ON THE SCREEN.

09:41AM   14        NOW, AT PAGE 67, AT ITEM 7, THIS IS RELATING TO D-TAG

09:41AM   15   5793.

09:41AM   16        DO YOU SEE THAT?

09:41AM   17   A.   I DO.

09:41AM   18   Q.   AND THEN ITEM 7 IN THE REPORT READS, "BASED ON LABORATORY

09:41AM   19   PERSONNEL INTERVIEWS AND THE LABORATORY'S ALTERNATIVE

09:41AM   20   ASSESSMENT PROGRAM RECORD REVIEW ON NOVEMBER 20, 2015, THE

09:41AM   21   LABORATORY FAILED TO HAVE AN ANALYTIC SYSTEMS QUALITY

09:41AM   22   ASSESSMENT MECHANISM THAT INCLUDED THE TIMELY REVIEW OF THE

09:41AM   23   EFFECTIVENESS OF ACTIONS TAKEN."

09:41AM   24        DO YOU SEE THAT?

09:41AM   25   A.   I DO.

09:41AM   1    Q.   AND THEN THE NEXT PARAGRAPH THERE'S A DESCRIPTION, "TO

09:41AM   2    COMPLY WITH THE CLIA REQUIREMENT," A CITATION TO THE

09:41AM   3    REGULATION, "THE LABORATORY MAINTAINED A PROTOCOL TITLED

09:41AM   4    PROFICIENCY FOR THERANOS LAB-DEVELOPED TESTS THAT INCLUDED A

09:41AM   5    LABORATORY PROCESS CALLED AAP IN WHICH TESTS PERFORMED USING

09:41AM   6    THE ADVIA 1800 WOULD BE EVALUATED AND DEFINED IN RELATIONSHIP

09:41AM   7    TO THE ADVIA XPT."

09:42AM   8         DO YOU SEE THAT?

09:42AM   9    A.   YES.

09:42AM  10    Q.   AND THOSE ARE TWO COMMERCIAL DEVICES; CORRECT?

09:42AM  11    A.   THEY ARE.

09:42AM  12    Q.   AND THEN AT SUB B THERE'S A DESCRIPTION, "A REVIEW OF

09:42AM  13    LABORATORY DOCUMENTS INDICATED THAT FOR THE FOLLOWING AAP

09:42AM  14    EVENTS, THE LABORATORY'S EVALUATION WAS NOT TIMELY AND,

09:42AM  15    THEREFORE, INEFFECTIVE."

09:42AM  16         DO YOU SEE THAT?

09:42AM  17    A.   I DO, AND THIS IS MR. YAMAMOTO'S CITATION.

09:42AM  18    Q.   I THINK YOU MENTIONED THAT BEFORE, YES, ON WEDNESDAY.

09:42AM  19         SO THIS IS RELATING TO THE MODIFIED PREDICATE FINGERSTICK

09:42AM  20    TESTING?

09:42AM  21    A.   I'M NOT SURE.

09:42AM  22    Q.   OKAY.  CONTINUING WITH THE REPORT THOUGH, AT THE NEXT

09:42AM  23    ITEM, THE REPORT READS, "ON APRIL 1, 2014, THE LABORATORY

09:42AM  24    COMPLETED TESTING FOR 18 ROUTINE CHEMISTRY ANALYTES."

09:42AM  25         DO YOU SEE THAT?

09:42AM  1      A.   I DO.

09:42AM  2      Q.   AND THEN ON THE NEXT PAGE IT CONTINUES, "THE LAB RECORDS

09:42AM  3      INDICATED THAT REVIEW OF THIS AAP WAS NOT COMPLETED UNTIL

09:43AM  4      NOVEMBER 16, 2015.

09:43AM  5           DO YOU SEE THAT?

09:43AM  6      A.   YES.

09:43AM  7      Q.   AND THAT'S THE ISSUE, THE REVIEW WAS NOT DONE TIMELY?

09:43AM  8      A.   THIS IS MR. YAMAMOTO'S CITATION.

09:43AM  9      Q.   BUT THE REPORT INDICATES THAT THE LAB DID NOT REVIEW THE

09:43AM 10      AAP RESULTS IN A TIMELY MANNER; IS THAT RIGHT?

09:43AM 11      A.   IF THEY DON'T REVIEW THE INFORMATION IN A TIMELY MANNER,

09:43AM 12      THEN THE QUALITY ASSESSMENT PROGRAM IS REALLY NOT EFFECTIVE.

09:43AM 13      Q.   AND THAT'S NECESSARY TO COMPLY WITH THE REGULATION;

09:43AM 14      CORRECT?

09:43AM 15      A.   IT IS.

09:43AM 16      Q.   OKAY.  AND THEN THE NEXT PARAGRAPH READS, "ON MAY 15TH,

09:43AM 17      2014, THE LABORATORY COMPLETED TESTING FOR 14 ROUTINE CHEMISTRY

09:43AM 18      ANALYTES."

09:43AM 19           DO YOU SEE THAT?

09:43AM 20      A.   I DO.

09:43AM 21      Q.   AND THEN, AGAIN, THE RECORDS INDICATED THAT THE LAB

09:43AM 22      DIRECTOR OR MANAGEMENT DID NOT TIMELY REVIEW THE RESULTS.

09:44AM 23           DO YOU SEE THAT?

09:44AM 24      A.   THAT'S WHAT THE CITATION SAYS.

09:44AM 25      Q.   OKAY.  AND THEN ON THE NEXT PARAGRAPH THE REPORT INDICATES

09:44AM  1    THAT "ON JULY 31, 2014, THE LABORATORY COMPLETED TESTING FOR

09:44AM  2    18 ROUTINE CHEMISTRY ANALYTES."

09:44AM  3         DO YOU SEE THAT?

09:44AM  4    A.   I DO.

09:44AM  5    Q.   AND THEN THE RECORDS REVEAL THAT THE LABORATORY AND

09:44AM  6    MANAGEMENT DID NOT REVIEW THEM IN A TIMELY MANNER; CORRECT?

09:44AM  7    A.   YES.

09:44AM  8    Q.   AND THEN ON THE SAME ISSUE FOR SUB IV, "ON NOVEMBER 20,

09:44AM  9    2014, THE LABORATORY COMPLETED TESTING FOR 14 ROUTINE CHEMISTRY

09:44AM  10   ANALYTES," AND AGAIN THE LAB DIRECTOR DIDN'T APPEAR TO HAVE

09:44AM  11   REVIEWED IT IN A TIMELY MANNER; CORRECT?

09:44AM  12   A.   IT SAYS THAT THE AAP WAS NOT COMPLETED UNTIL NOVEMBER 15TH

09:45AM  13   BY THE APPROPRIATE LABORATORY PERSONNEL.

09:45AM  14   Q.   CORRECT.  THANK YOU.

09:45AM  15        NOW, IF WE CAN LEAVE THAT UP ON THE SCREEN, AND IF YOU CAN

09:45AM  16   TAKE A LOOK WITHIN THE BINDER YOU HAVE AT TAB 20620, 20620.

09:45AM  17   A.   IT'S IN A DIFFERENT BINDER.

09:45AM  18        THE COURT:  IT'S IN THE BLACK BINDER, VOLUME 1.

09:45AM  19        THE WITNESS:  RIGHT.  YEAH.

09:45AM  20   BY MR. CAZARES:

09:45AM  21   Q.   DO YOU HAVE 20620?

09:45AM  22   A.   I DO.

09:45AM  23   Q.   OKAY.

09:46AM  24        AND UP ON THE SCREEN, MR. ALLEN, IF YOU COULD TURN TO THE

09:46AM  25   BOTTOM OF PAGE 67.

BENNETT CROSS BY MR. CAZARES (RES.)                    5054

09:46AM  1        NOW, IN THE EXHIBIT THAT YOU HAVE IN FRONT OF YOU, 20627,

09:46AM  2   THAT APPEARS TO BE AN ALTERNATIVE ASSESSMENT PROGRAM REPORT;

09:46AM  3   CORRECT?

09:46AM  4   A.   YES.

09:46AM  5   Q.   AND YOU'LL SEE IN THE BOTTOM RIGHT-HAND CORNER THERE'S A

09:46AM  6   LITTLE MARK, A STAMP THAT SAYS CMS 2 DASH AND THEN A PAGE

09:46AM  7   NUMBER.

09:46AM  8        DO YOU SEE THAT?

09:46AM  9   A.   002886?

09:46AM  10  Q.   YES.

09:46AM  11  A.   YES.

09:46AM  12  Q.   OKAY.  AND THEN ON THIS FIRST PAGE OF 20620, THE TESTING

09:46AM  13  DATE APPEARS TO BE 4-1-2014.

09:46AM  14       DO YOU SEE THAT?

09:46AM  15  A.   I DO.

09:46AM  16  Q.   AND THAT'S THE SAME AS WHAT IS REFLECTED IN THE SURVEY

09:46AM  17  REPORT AT THE BOTTOM OF PAGE 67; CORRECT?

09:46AM  18  A.   YES.

09:47AM  19  Q.   OKAY.  AND THEN AT THE BOTTOM OF PAGE 67, THE ITEM

09:47AM  20  REFLECTED IN THE SURVEY REPORT IDENTIFIES COMPLETED TESTING FOR

09:47AM  21  18 ROUTINE CHEMISTRY ANALYTES USING THE ADVIA 1800.

09:47AM  22       DO YOU SEE THAT?

09:47AM  23  A.   I DO.

09:47AM  24  Q.   AND THEN ON PAGES 1, 2, AND 3 OF 260, THESE ARE GENERAL

09:47AM  25  CHEMISTRY ANALYTES; CORRECT?

BENNETT CROSS BY MR. CAZARES (RES.)                              5055

```
09:47AM   1    A.   YES.

09:47AM   2    Q.   AND IF YOU COUNT THEM UP FROM PAGE 1 TO 3, THAT'S 18;

09:47AM   3    CORRECT?

09:47AM   4    A.   YES.

09:47AM   5    Q.   OKAY.  AND CONTINUING ON THE SCREEN, MR. ALLEN, IF YOU

09:48AM   6    COULD TURN THE PAGE TO THE TOP OF PAGE 68, THE DATE IN THE

09:48AM   7    SURVEY REPORT INDICATES THAT THE REVIEW OF THE APRIL 1ST

09:48AM   8    CHALLENGE WAS NOVEMBER 16, 2015.

09:48AM   9         DO YOU SEE THAT ON THE SCREEN?

09:48AM  10    A.   I DO.

09:48AM  11    Q.   OKAY.  AND THE DATE ON PAGE 3 OF EXHIBIT 262, THE

09:48AM  12    HANDWRITTEN DATES ARE 11-16-2015; CORRECT?

09:48AM  13    A.   YES.

09:48AM  14    Q.   OKAY.  AND THEN IF YOU COULD TURN TO THE NEXT PAGE OF

09:48AM  15    20620, THE CHALLENGES HERE ARE DATED MAY 15TH, 2014; CORRECT?

09:48AM  16    A.   YES.

09:48AM  17    Q.   AND THE SAME AS SUB II ON PAGE 68 OF THE SURVEY REPORT?

09:48AM  18    A.   YES.

09:48AM  19    Q.   AND THE SURVEY REPORT SAYS "14 ROUTINE CHEMISTRY

09:48AM  20    ANALYTES."

09:48AM  21         DO YOU SEE THAT?

09:48AM  22    A.   I DO.

09:48AM  23    Q.   AND THEN ON PAGES 4 AND 5 OF 20620, THOSE ARE ROUTINE

09:48AM  24    CHEMISTRY ANALYTES; CORRECT?

09:49AM  25    A.   YES.
```

09:49AM  1     Q.   AND IT'S 14?

09:49AM  2     A.   YES.

09:49AM  3     Q.   OKAY.  AND AGAIN, THE SIGNATURE DATE BY THE LAB MANAGEMENT

09:49AM  4     ON EXHIBIT 20620 SAYS ON MAY 15, 2014; CORRECT?

09:49AM  5     A.   YES.

09:49AM  6     Q.   SAME AS THE OF REPORT ON SUB II?

09:49AM  7     A.   YES.

09:49AM  8     Q.   AND IF YOU TOOK TO 20620, THE NEXT CHALLENGE IS 731, 2014.

09:49AM  9          DO YOU SEE THAT?

09:49AM  10    A.   I DO.

09:49AM  11    Q.   SAME AS SUB III IN THE SURVEY REPORT?

09:49AM  12    A.   YES.

09:49AM  13    Q.   AND THE SURVEY REPORT REFLECTS AGAIN 18 ROUTINE CHEMISTRY

09:49AM  14    ANALYTES IN THIS CHALLENGE; CORRECT?

09:49AM  15    A.   YES.

09:49AM  16    Q.   AND THE REVIEW DATE IN 20620, THE HANDWRITTEN DATE BY THE

09:49AM  17    LAB STAFF APPEARS TO BE 11-16-15?

09:49AM  18    A.   YES.

09:49AM  19    Q.   SAME AS IN THE SURVEY REPORT?

09:50AM  20    A.   YES.

09:50AM  21    Q.   OKAY.  AND THEN THE LAST OF THE CHALLENGES REFLECTED HERE

09:50AM  22    IN 20620 IS DATED 11-20-2014.

09:50AM  23          DO YOU SEE THAT?

09:50AM  24    A.   YES.

09:50AM  25    Q.   AND SAME AS SUB IV IN THE SURVEY REPORT?

09:50AM  1    A.   YES.

09:50AM  2    Q.   AND 14 ROUTINE CHEMISTRY ANALYTES REFLECTED IN THE SURVEY

09:50AM  3    REPORT, ARE WE DEALING WITH THE SAME IN 20620?

09:50AM  4    A.   YES.

09:50AM  5    Q.   AND THE REVIEW FOR 20620 ON PAGE 10 IS 11-15-2015;

09:50AM  6    CORRECT?

09:50AM  7    A.   YES.

09:50AM  8    Q.   SAME AS THE WHAT IS REFLECTED IN SUB IV OF THE SURVEY

09:50AM  9    REPORT?

09:50AM  10   A.   YES.

09:50AM  11   Q.   AND SO WHAT WE'RE LOOKING AT APPEARS TO BE THE LAB RECORD

09:50AM  12   THAT IS CITED IN THE LAB REPORT HERE; CORRECT?

09:50AM  13   A.   YES.

09:50AM  14          MR. CAZARES:  MOVE TO ADMIT 20620, YOUR HONOR.

09:50AM  15          MR. LEACH:  HEARSAY, YOUR HONOR.

09:50AM  16          THE COURT:  ARE YOU OFFERING THIS FOR THE TRUTH?

09:50AM  17          MR. CAZARES:  AS A BUSINESS RECORD, YOUR HONOR.

09:50AM  18   IT'S A BUSINESS RECORD.  I CAN ASK MS. BENNETT --

09:50AM  19          THE COURT:  LAY A FOUNDATION.

09:50AM  20          MR. CAZARES:  I APOLOGIZE.  YES.

09:51AM  21   Q.   MS. BENNETT, IN THE COURSE OF THE SURVEY, YOU REQUESTED

09:51AM  22   MATERIALS OF THERANOS TO PERFORM THE SURVEY WORK; CORRECT?

09:51AM  23   A.   YES.

09:51AM  24   Q.   AND MR. YAMAMOTO DID THE SAME; CORRECT?

09:51AM  25   A.   YES.

09:51AM   1      Q.   AND IT'S THE PRACTICE AT CMS TO MAINTAIN THE RECORDS

09:51AM   2      OBTAINED FROM LABORATORIES USED TO DOCUMENT THE SURVEY;

09:51AM   3      CORRECT?

09:51AM   4      A.   YES.

09:51AM   5      Q.   OKAY.

09:51AM   6            MR. CAZARES:  MOVE TO ADMIT 20620, YOUR HONOR.

09:51AM   7            MR. LEACH:  OBJECTION.

09:51AM   8            THE COURT:  I'M NOT SURE A FOUNDATION HAS BEEN MET.

09:51AM   9        MR. LEACH?

09:51AM  10            MR. LEACH:  SAME OBJECTION.

09:51AM  11            THE COURT:  I'M NOT SURE THIS WITNESS CAN LAY THE

09:51AM  12      FOUNDATION.

09:51AM  13      BY MR. CAZARES:

09:51AM  14      Q.   DO LABORATORIES HAVE REQUIREMENTS TO MAINTAIN THEIR OWN

09:51AM  15      RECORDS SO THAT CMS HAS THE ABILITY TO REVIEW THOSE RECORDS?

09:51AM  16      A.   YES.

09:51AM  17      Q.   AND THAT'S A REQUIREMENT UNDER CLIA; CORRECT?

09:51AM  18      A.   YES.

09:51AM  19      Q.   AND WHEN YOU DO YOUR SURVEY REVIEW, YOU REQUEST THESE

09:51AM  20      REQUIRED RECORDS OF THE LAB IN ORDER TO PERFORM YOUR OWN WORK;

09:51AM  21      CORRECT?

09:51AM  22      A.   I REQUEST THE RECORDS THAT I NEED TO PERFORM THE PART OF

09:51AM  23      THE SURVEY THAT I'M RESPONSIBLE FOR.

09:51AM  24      Q.   AND THE LAB IS REQUIRED TO MAINTAIN THOSE RECORDS;

09:52AM  25      CORRECT?

09:52AM   1      A.   THEY ARE.

09:52AM   2      Q.   OKAY.  IF THEY DON'T HAVE THE RECORDS, THAT'S A VIOLATION

09:52AM   3      AS WELL; CORRECT?

09:52AM   4      A.   YES.

09:52AM   5      Q.   AND, IN FACT, CMS HAS ITS OWN POLICIES TO MAINTAIN THE

09:52AM   6      RECORDS THAT IT OBTAINS IN THE SURVEYS BECAUSE CMS RELIES UPON

09:52AM   7      THOSE RECORDS TO PERFORM ITS OWN WORK; CORRECT?

09:52AM   8      A.   WE HAVE A RECORD RETENTION REQUIREMENT, YES.  I'M NOT SURE

09:52AM   9      IT'S POLICY.  I THINK IT'S A LITTLE STRONGER THAN THAT.

09:52AM  10      Q.   UNDERSTOOD.

09:52AM  11           AND WHEN YOU COMPLETE THE SURVEY REPORTS IDENTIFYING

09:52AM  12      NONCOMPLIANCE, THERE'S AN EFFORT TO ACCURATELY REFLECT THE

09:52AM  13      ITEMS IN THE LAB RECORDS THAT ARE IDENTIFIED IN THE SURVEY

09:52AM  14      REPORT; CORRECT?

09:52AM  15      A.   YES.

09:52AM  16              MR. CAZARES:  MOVE TO ADMIT 20260, YOUR HONOR.

09:52AM  17              MR. LEACH:  SAME OBJECTION.

09:52AM  18              THE COURT:  I NEVER HEARD HER SAY SHE HAS KNOWLEDGE

09:52AM  19      ABOUT THIS.

09:52AM  20      BY MR. CAZARES:

09:52AM  21      Q.   THIS APPEARS TO BE THE ITEM, THE LAB RECORDS CITED IN THE

09:53AM  22      SURVEY REPORT; CORRECT?

09:53AM  23      A.   THIS IS THE FIRST TIME THAT I'VE SEEN THE DOCUMENT, BUT,

09:53AM  24      YES, IT DOES.

09:53AM  25      Q.   OKAY.  AND YOU AND MR. YAMAMOTO, HE WROTE HIS PORTION OF

09:53AM   1    THE REPORT, AND YOU WROTE YOUR PORTION; CORRECT?

09:53AM   2    A.   YES.

09:53AM   3    Q.   AND YOU CAME TOGETHER TO DISCUSS THE ULTIMATE CONCLUSIONS

09:53AM   4    THAT ARE REFLECTED IN THE SURVEY REPORT; CORRECT?

09:53AM   5    A.   WE DID, BUT WE DIDN'T DISCUSS THE DOCUMENTS PARTICULARLY.

09:53AM   6    Q.   HOWEVER, YOU MADE YOUR BEST EFFORTS TO ACCURATELY REFLECT

09:53AM   7    THE DOCUMENTS THAT YOU RELIED UPON IN DRAFTING YOUR PORTION OF

09:53AM   8    THE SURVEY REPORT; CORRECT?

09:53AM   9    A.   I DID.

09:53AM  10    Q.   AND YOU BELIEVE THAT MR. YAMAMOTO DID THE SAME; CORRECT?

09:53AM  11    A.   YES.

09:53AM  12    Q.   HE'S A KNOWLEDGEABLE, SKILLED SURVEYOR; CORRECT?

09:53AM  13    A.   YES.

09:53AM  14         MR. CAZARES:  MOVE TO ADMIT 20620, YOUR HONOR.

09:53AM  15         THE COURT:  IS THERE TESTIMONY THAT THESE WERE GIVEN

09:53AM  16    TO HER BY THE COMPANY?

09:53AM  17         MR. CAZARES:  THIS WITNESS HAS BEEN INTRODUCED INTO

09:53AM  18    THIS TRIAL TO TESTIFY ABOUT THE ENTIRETY OF THE 121 PAGE SURVEY

09:54AM  19    REPORT THAT HAS BEEN ENTERED INTO EVIDENCE.

09:54AM  20         I ALSO THINK THAT THE LAB RECORD ITSELF IS EVIDENCE OF

09:54AM  21    NOTICE TO CMS OF THE UNDERLYING EVENTS AND LAB POLICIES AND

09:54AM  22    PRACTICES THAT CMS THEN RELIED UPON IN PERFORMING ITS WORK.

09:54AM  23         THE COURT:  SO YOU WOULD LIKE IT INTRODUCED FOR

09:54AM  24    NOTICE ONLY, AS OPPOSED TO FOR THE TRUTH OF THE MATTER

09:54AM  25    ASSERTED?

09:54AM 1        MR. CAZARES:  WELL, I'D LIKE IT FOR BOTH,

09:54AM 2   YOUR HONOR, BUT I'LL TAKE NOTICE.

09:54AM 3        THE COURT:  WELL, MY PROBLEM IS THAT I UNDERSTAND

09:54AM 4   THAT THESE RECORDS ARE PART OF THE WORK THAT WAS DONE, BUT I

09:54AM 5   HAVEN'T HEARD HER SAY THAT SHE -- SHE HAS TOLD US THIS IS THE

09:54AM 6   FIRST TIME THAT SHE HAS SEEN THIS.

09:54AM 7        I DON'T KNOW THAT THIS WITNESS CAN SAY THAT THIS WAS PART

09:54AM 8   OF -- GIVEN TO HER AS PART OF THE INVESTIGATION, AND THEN IT

09:54AM 9   WAS THEN KEPT AS PART OF THE RECORD.

09:54AM 10       MR. CAZARES:  BUT SHE'S DESCRIBED IT AS APPEARING TO

09:54AM 11  BE THE DOCUMENT CITED IN THE REPORT GIVEN TO HER COLLEAGUE IN

09:54AM 12  THE PERFORMANCE OF THE SAME SURVEY CONCURRENTLY WITH HER OWN

09:54AM 13  WORK, AND THAT ITS THEIR PRACTICE TO REQUEST SUCH RECORDS,

09:55AM 14  MAINTAIN SUCH RECORDS, RELY UPON SUCH RECORDS, AND IT'S CLEARLY

09:55AM 15  THE DOCUMENT CITED IN THE SURVEY REPORT THAT IS ALREADY IN

09:55AM 16  EVIDENCE.

09:55AM 17       THE COURT:  I THINK YOU'RE CORRECT ON ALL OF THOSE.

09:55AM 18       BUT WHETHER IT'S A BUSINESS RECORD IS WHAT I THINK THERE

09:55AM 19  IS STILL A DEFICIT ON.

09:55AM 20       I'LL ADMIT IT FOR NOTICE, AND IT CAN BE, IT CAN BE

09:55AM 21  PUBLISHED.

09:55AM 22       LADIES AND GENTLEMEN, THE DOCUMENT IS ADMITTED, NOT FOR

09:55AM 23  THE TRUTH OF THE MATTER ASSERTED, BUT FOR NOTICE AS TO CMS AS

09:55AM 24  THEY CONDUCTED THEIR INVESTIGATION.

09:55AM 25       YOU CAN INQUIRE ON THAT.

BENNETT CROSS BY MR. CAZARES (RES.)

| | | |
|---|---|---|
| 09:55AM | 1 | MR. CAZARES:  THANK YOU, YOUR HONOR. |
| 09:55AM | 2 | (DEFENDANT'S EXHIBIT 20620 WAS RECEIVED IN EVIDENCE.) |
| 09:55AM | 3 | MR. CAZARES:  IF YOU CAN PUT UP 20620 UP ON THE |
| 09:55AM | 4 | SCREEN, AND TAKE DOWN THE SURVEY REPORT, MR. ALLEN. |
| 09:55AM | 5 | Q.  IF YOU LOOK AT THE PAGE 1 OF THE 20620 UP ON THE SCREEN, |
| 09:55AM | 6 | DO YOU SEE IT'S ENTITLED ALTERNATIVE ASSESSMENT PROGRAM? |
| 09:55AM | 7 | A.  I DO. |
| 09:55AM | 8 | Q.  AND THIS IS THE AAP PROFICIENCY PROCEDURE AT THERANOS; |
| 09:56AM | 9 | CORRECT? |
| 09:56AM | 10 | A.  YES. |
| 09:56AM | 11 | Q.  AND THE FIRST CHALLENGE IDENTIFIED ON PAGE 1 LOOKS TO BE |
| 09:56AM | 12 | ALBUMIN; CORRECT? |
| 09:56AM | 13 | A.  YES. |
| 09:56AM | 14 | Q.  AND THAT'S A GENERAL CHEMISTRY ANALYTE? |
| 09:56AM | 15 | A.  YES. |
| 09:56AM | 16 | Q.  AND THIS APRIL 1ST, 2014 CHALLENGE IDENTIFIES FIVE |
| 09:56AM | 17 | SAMPLES. |
| 09:56AM | 18 | DO YOU SEE THAT? |
| 09:56AM | 19 | A.  YES. |
| 09:56AM | 20 | Q.  AND THEN THE TOTAL ALLOWABLE ERROR FOR THIS TEST IS PLUS |
| 09:56AM | 21 | OR MINUS 10 PERCENT. |
| 09:56AM | 22 | DO YOU SEE THAT? |
| 09:56AM | 23 | A.  I DO. |
| 09:56AM | 24 | Q.  AND THEN THE ROW BELOW TAE, THE DOCUMENT IDENTIFIES AS |
| 09:56AM | 25 | COMPARING THE ANALYTE PREDICATE VALUE. |

BENNETT CROSS BY MR. CAZARES (RES.)                                      5063

09:56AM  1              DO YOU SEE THAT?

09:56AM  2      A.   I DO.

09:56AM  3      Q.   AND THEN THERE ARE NUMBERS AND COMPARISONS FOR EACH OF THE

09:56AM  4      SAMPLES.

09:56AM  5              SAMPLE 1, FOR EXAMPLE, ALBUMIN PREDICATE 4.5, ALBUMIN LDT

09:56AM  6      4.8.

09:56AM  7              DO YOU SEE THAT?

09:56AM  8      A.   YES.

09:56AM  9      Q.   SO THE PREDICATE YOU'D UNDERSTAND TO BE A COMMERCIAL

09:57AM  10     DEVICE; CORRECT?

09:57AM  11     A.   YES.

09:57AM  12     Q.   AND THEN THE LDT IS THERANOS'S OWN LAB DEVELOPED TEST FOR

09:57AM  13     THIS ASSAY; CORRECT?

09:57AM  14     A.   THAT'S WHAT I WOULD ASSUME, YES.

09:57AM  15     Q.   OKAY.  AND THEN THE NUMBERS ARE 4.5 VERSUS 4.8.

09:57AM  16             DO YOU SEE THAT?

09:57AM  17     A.   I DO.

09:57AM  18     Q.   AND IT'S WITHIN THE TOTAL ALLOWABLE ERROR.

09:57AM  19             DO YOU SEE THAT AS WELL?

09:57AM  20     A.   I DO.

09:57AM  21     Q.   AND THEN FOR EACH OF THE NEXT FOUR SAMPLES, AGAIN, THE

09:57AM  22     NUMBERS FOR SAMPLE 2, 4.48 VERSUS 4.5 FOR THERANOS'S TEST.

09:57AM  23             DO YOU SEE THAT?

09:57AM  24     A.   YES.

09:57AM  25     Q.   AND FOR SAMPLE 3, 4.5 VERSUS 4.9 FOR THERANOS'S TEST.

BENNETT CROSS BY MR. CAZARES (RES.)

09:57AM   1          DO YOU SEE THAT?

09:57AM   2     A.   I DO.

09:57AM   3     Q.   AND THEN FOR SAMPLE 5, AGAIN, 4.2 VERSUS 4.1 -- SORRY, FOR

09:57AM   4     SAMPLE 4, 4.2 VERSUS 4.1.

09:57AM   5          DO YOU SEE THAT?

09:57AM   6     A.   I DO.

09:57AM   7     Q.   AND THEN FOR SAMPLE 5, IT'S 4.6 VERSUS 4.8.

09:57AM   8          DO YOU SEE THAT?

09:57AM   9     A.   YES.

09:57AM   10    Q.   AND ALL ARE WITHIN THE 10 PERCENT TOTAL ALLOWABLE ERROR?

09:57AM   11    A.   YES.

09:57AM   12    Q.   WHICH REFLECTS A PASS FOR THIS AAP?

09:58AM   13    A.   YES.

09:58AM   14    Q.   OKAY.  BUT, AGAIN, THE FACT THAT IT PASSED WASN'T THE

09:58AM   15    ISSUE FOR CMS.

09:58AM   16         THE ISSUE WAS APPARENTLY SOMEONE IN THE LAB DIDN'T REVIEW,

09:58AM   17    OR THE LAB DIRECTOR DIDN'T REVIEW THESE RECORDS UNTIL NOVEMBER

09:58AM   18    OF 2015, AT LEAST ACCORDING TO THE DOCUMENTATION THAT YOU SAW?

09:58AM   19    A.   COULD I LOOK BACK TO THE -- I HAVE TO LOOK AT THE SURVEY

09:58AM   20    REPORT BECAUSE IT'S NOT MY CITATION.

09:58AM   21    Q.   OKAY.  FAIR ENOUGH.

09:58AM   22         AND LOOKING AT THE NEXT ASSAY, SO IT'S ALKALINE

09:58AM   23    PHOSPHATASE.

09:58AM   24         DO YOU SEE THAT?

09:58AM   25    A.   I DO.

BENNETT CROSS BY MR. CAZARES (RES.)

09:58AM   1    Q.   AND THEN AGAIN WE HAVE FIVE SAMPLES.

09:58AM   2         DO YOU SEE THAT?

09:58AM   3    A.   YES.

09:58AM   4    Q.   AND FOR THIS TEST, THE TOTAL ALLOWABLE ERROR IS PLUS OR

09:58AM   5    MINUS 30 PERCENT.

09:58AM   6         DO YOU SEE THAT?

09:58AM   7    A.   I DO.

09:58AM   8    Q.   AND SO IT'S DIFFERENT THAN THE ALBUMIN TOTAL ALLOWABLE

09:58AM   9    ERROR.

09:58AM  10         DO YOU SEE THAT?

09:58AM  11    A.   I DO.

09:58AM  12    Q.   AND IS THAT SOMETHING THAT YOU'RE FAMILIAR WITH, DIFFERENT

09:58AM  13    TESTS, DIFFERENT ASSAYS, DIFFERENT ANALYTES CAN HAVE DIFFERENT

09:58AM  14    TOTAL ALLOWABLE ERRORS BASED ON THE LAB'S OWN WORK IN

09:58AM  15    VALIDATION OR VERIFICATION OF SUCH TESTS?

09:59AM  16    A.   DIFFERENT TESTS CAN HAVE DIFFERENT TOTAL ALLOWABLE ERRORS.

09:59AM  17    IT'S DEPENDENT ON CERTAIN THINGS, EVEN THE TEST ITSELF.

09:59AM  18    Q.   FAIR ENOUGH.

09:59AM  19         AND FOR THIS ONE IT'S 30 PERCENT, AT LEAST ACCORDING TO

09:59AM  20    THERANOS; CORRECT?

09:59AM  21    A.   YES.

09:59AM  22    Q.   AND THEN FOR ALKALINE PHOSPHATASE FOR SAMPLES, THE FIVE

09:59AM  23    SAMPLES, THE NUMBERS, SAMPLE 1, 48.2 VERSUS 50.

09:59AM  24         DO YOU SEE THAT?

09:59AM  25    A.   YES.

09:59AM   1    Q.   AND THEN FOR SAMPLE 2, 73.8 VERSUS 73.

09:59AM   2         DO YOU SEE THAT?

09:59AM   3    A.   I DO.

09:59AM   4    Q.   AND THEN FOR SAMPLE 3, THE PREDICATE HAD 49.2 AND THERANOS

09:59AM   5    HAD 52.

09:59AM   6         DO YOU SEE THAT?

09:59AM   7    A.   I DO.

09:59AM   8    Q.   AND THEN FOR SAMPLE 4, THE PREDICATE HAD 90.5 WHERE

09:59AM   9    THERANOS CAME UP WITH 95.

09:59AM  10         DO YOU SEE THAT?

09:59AM  11    A.   I DO.

09:59AM  12    Q.   AND THEN SAMPLE 5, 85.8 VERSUS 87.

09:59AM  13         DO YOU SEE THAT?

09:59AM  14    A.   I DO.

09:59AM  15    Q.   AND EACH WITHIN THE TOTAL ALLOWABLE ERROR?

10:00AM  16    A.   THEY ARE, BUT IT'S ALSO WITHIN THE NARROW RANGE OF TEST

10:00AM  17    VALUES.  IT DOESN'T CHALLENGE THE LOWER END OF THE REPORTABLE

10:00AM  18    RANGE OR THE UPPER END OF THE REPORTABLE RANGE.

10:00AM  19    Q.   WELL, AT LEAST ACCORDING TO THIS REPORT, THOUGH, THE

10:00AM  20    RESULTS WERE WITHIN THE TOTAL ALLOWABLE ERROR; CORRECT?

10:00AM  21    A.   THEY WERE FOR NORMAL PATIENTS.

10:00AM  22    Q.   OKAY.  IF WE GO FURTHER DOWN, MR. ALLEN.  WE SEE, AGAIN,

10:00AM  23    THREE MORE ASSAYS HERE:  ALANINE AMINOTRANSFERASE.

10:00AM  24         DO YOU SEE THAT?

10:00AM  25    A.   I DO.

10:00AM  1    Q.   AND THIS IS, AGAIN, APRIL 1ST OF 2014.

10:00AM  2         AND THEN THERE'S AN ASPARTATE AMINOTRANSFERASE.

10:00AM  3         DO YOU SEE THAT?

10:00AM  4    A.   YES.

10:00AM  5    Q.   AND BELOW THAT IS BICARBONATE?

10:00AM  6    A.   YES.

10:00AM  7    Q.   AND THEN FOR THE ALAMINE AMINOTRANSFERASE, THE TOTAL

10:01AM  8    ALLOWABLE ERROR IS 20 PERCENT.

10:01AM  9         DO YOU SEE THAT?

10:01AM  10   A.   I DO.

10:01AM  11   Q.   AND THE SAME FOR THE OTHER TWO?

10:01AM  12   A.   YES.

10:01AM  13   Q.   AND FOR EACH OF THESE THREE CHALLENGES, YOU'LL SEE THE

10:01AM  14   TOTAL ALLOWABLE ERRORS ARE MET FOR ALL OF THE SAMPLES SCORED;

10:01AM  15   CORRECT?

10:01AM  16   A.   AGAIN, THEY'RE ALL NORMAL VALUES.  THEY'RE NOT ABNORMAL

10:01AM  17   VALUES AT ALL.

10:01AM  18   Q.   BUT ACCORDING TO THE CITATION HERE CITED BY MR. YAMAMOTO

10:01AM  19   WAS THAT THE LAB DIRECTOR DID NOT APPEAR TO REVIEW THE AAP

10:01AM  20   PROCEDURE TIMELY; CORRECT?

10:01AM  21   A.   YES.

10:01AM  22   Q.   OKAY.  IF WE CAN GO TO THE BOTTOM OF THAT FIRST PAGE,

10:01AM  23   MR. ALLEN.

10:01AM  24        WE HAVE TWO MORE ASSAYS, CALCIUM AND CHOLESTEROL.

10:01AM  25        DO YOU SEE THAT?

10:01AM   1    A.   I DO.

10:01AM   2    Q.   AND THEN EACH OF THEM -- I GUESS FOR CALCIUM THERE'S A

10:01AM   3    TOTAL ALLOWABLE ERROR OF PLUS/MINUS 1.

10:01AM   4         DO YOU SEE THAT?

10:01AM   5    A.   YES.

10:01AM   6    Q.   AND THEN FOR CHOLESTEROL, THE TOTAL ALLOWABLE ERROR IS

10:02AM   7    PLUS/MINUS 10.

10:02AM   8         DO YOU SEE THAT?

10:02AM   9    A.   I DO.

10:02AM  10    Q.   AND THEN FOR EACH OF THE FIVE CHALLENGED SAMPLES, HERE

10:02AM  11    AGAIN THE LAB APPEARS TO HAVE PASSED; CORRECT?

10:02AM  12              MR. LEACH:  OBJECTION, YOUR HONOR.  CALLS FOR

10:02AM  13    HEARSAY.

10:02AM  14              MR. CAZARES:  ACCORDING TO THE DOCUMENT.

10:02AM  15              THE COURT:  IT SAYS WHAT IT SAYS.

10:02AM  16              MR. CAZARES:  YEAH.

10:02AM  17              THE COURT:  YOU CAN ANSWER THE QUESTION.

10:02AM  18              THE WITNESS:  OKAY.  YES, THEY CERTAINLY SEEM TO BE

10:02AM  19    100 PERCENT RIGHT AROUND 9.

10:02AM  20              MR. CAZARES:  OKAY.

10:02AM  21    Q.   OKAY.  IF WE CAN SKIP NOW TO PAGE 4.

10:02AM  22         SO PAGE 4, THIS IS ANOTHER CHALLENGE ON MAY 15, 2014.

10:02AM  23         DO YOU SEE THAT?

10:02AM  24    A.   I DO.

10:02AM  25    Q.   AND HERE WE'RE LOOKING AT -- THE ASSAY IS AMYLASE,

| | | |
|---|---|---|
| 10:02AM | 1 | BILIRUBIN, AND CREATINE KINASE. |
| 10:02AM | 2 | DO YOU SEE THAT? |
| 10:03AM | 3 | A.   I DO. |
| 10:03AM | 4 | Q.   AND AGAIN, THESE ARE ALL GENERAL CHEMISTRY TESTS? |
| 10:03AM | 5 | A.   YES. |
| 10:03AM | 6 | Q.   AND THE TOTAL ALLOWABLE ERROR FOR AMYLASE IS 30 PERCENT |
| 10:03AM | 7 | PLUS OR MINUS? |
| 10:03AM | 8 | A.   YES. |
| 10:03AM | 9 | Q.   AND THEN BILIRUBIN, 20 PERCENT PLUS OR MINUS? |
| 10:03AM | 10 | A.   YES. |
| 10:03AM | 11 | Q.   AND THE CREATINE, AGAIN, 30 PERCENT? |
| 10:03AM | 12 | DO YOU SEE THAT? |
| 10:03AM | 13 | A.   YES. |
| 10:03AM | 14 | Q.   AND EACH OF THE FIVE CHALLENGES FOR EACH OF THOSE THREE |
| 10:03AM | 15 | ASSAYS APPEARS TO HAVE FALLEN WITHIN THE TOTAL ALLOWABLE ERROR; |
| 10:03AM | 16 | CORRECT? |
| 10:03AM | 17 | A.   IT DOES, YES. |
| 10:03AM | 18 | Q.   AND THIS IS AGAIN COMPARING THERANOS'S TEST VERSUS THE |
| 10:03AM | 19 | PREDICATE COMMERCIAL DEVICE; CORRECT? |
| 10:03AM | 20 | A.   THAT WOULD HAVE BEEN WHAT MR. YAMAMOTO WAS COMPARING. |
| 10:03AM | 21 | Q.   OKAY.  AND IF WE CAN TURN TO PAGE 6, MR. ALLEN.  AND WE'LL |
| 10:03AM | 22 | LOOK AT THE TOP OF THE PAGE. |
| 10:03AM | 23 | THESE ARE CHALLENGES ON JULY 31ST, 2014. |
| 10:03AM | 24 | DO YOU SEE THAT? |
| 10:03AM | 25 | A.   I DO. |

10:03AM   1    Q.   AND HERE AGAIN WE'RE DEALING WITH ALBUMIN, ALKALINE

10:03AM   2    PHOSPHATASE, AND ALANINE AMINOTRANSFERASE.

10:04AM   3         DO YOU SEE THAT?

10:04AM   4    A.   I DO.

10:04AM   5    Q.   AND THE TOTAL ALLOWABLE ERROR WAS PLUS 10 OR MINUS 10 FOR

10:04AM   6    ALBUMIN.

10:04AM   7         DO YOU SEE THAT?

10:04AM   8    A.   I DO.

10:04AM   9    Q.   AND THE OTHER TWO ASSAYS, 20 PERCENT AND 30 PERCENT PLUS

10:04AM  10    OR MINUS.

10:04AM  11         DO YOU SEE THAT?

10:04AM  12    A.   I DO.

10:04AM  13    Q.   AND THEN FOR EACH OF THESE THREE ASSAYS, FOR EACH OF THE

10:04AM  14    FIVE SAMPLES, THE RESULTS APPEAR TO FALL WITHIN THE TOTAL

10:04AM  15    ALLOWABLE ERROR; CORRECT?

10:04AM  16    A.   YES.  BUT, AGAIN, THEY DID NOT CHALLENGE THEIR WHOLE

10:04AM  17    REPORTABLE RANGE, WHICH WE WOULD EXPECT TO SEE.

10:04AM  18    Q.   BUT THAT'S NOT WHAT'S CITED BY MR. YAMAMOTO.

10:04AM  19    A.   I KNOW.

10:04AM  20    Q.   THE ISSUE MR. YAMAMOTO CITED HERE WAS THE LAB DIRECTOR

10:04AM  21    APPEARS NOT TO HAVE REVIEWED THE RESULTS IN A TIMELY MANNER;

10:04AM  22    CORRECT?

10:04AM  23    A.   YES, HE CITED THEM FOR TIMELY REVIEW.

10:04AM  24    Q.   OKAY.  AND IF WE CAN GO TO PAGE 9, MR. ALLEN.

10:05AM  25         ON PAGE 9, THESE ARE CHALLENGES ON NOVEMBER 20TH, 2014.

BENNETT CROSS BY MR. CAZARES (RES.)                    5071

10:05AM   1          DO YOU SEE THAT?

10:05AM   2     A.   I DO.

10:05AM   3     Q.   AND THEN AGAIN HERE THE THREE ASSAYS ARE AMYLASE,

10:05AM   4     BILIRUBIN, AND CREATINE AGAIN.

10:05AM   5          DO YOU SEE THAT?

10:05AM   6     A.   I DO.

10:05AM   7     Q.   AND THEN FOR EACH OF THE FIVE SAMPLES FOR EACH OF THE

10:05AM   8     THREE ASSAYS, THE LAB APPEARS TO HAVE OBTAINED RESULTS WITHIN

10:05AM   9     THE TOTAL ALLOWABLE ERROR; CORRECT?

10:05AM  10     A.   THAT'S WHAT IT APPEARS.

10:05AM  11     Q.   AND THAT'S COMPARING THE THERANOS TESTS TO THE COMMERCIAL

10:05AM  12     DEVICE; CORRECT?

10:05AM  13     A.   THE COMMERCIAL DEVICE VERSUS I BELIEVE THE FINGERSTICK

10:05AM  14     LDT, NOT THE EDISON.

10:05AM  15     Q.   OKAY.  YOU CAN TAKE THAT DOWN, MR. ALLEN.

10:05AM  16          IF WE CAN TAKE A LOOK AT PAGE 31 OF EXHIBIT 4621, THE

10:06AM  17     SURVEY REPORT.

10:06AM  18          ON PAGE 31 THERE'S A D-TAG 5429.

10:06AM  19          DO YOU SEE THAT?

10:06AM  20     A.   I DO.

10:06AM  21     Q.   AND THIS IS RELATING TO MAINTENANCE AND FUNCTION CHECKS.

10:06AM  22          DO YOU SEE THAT?

10:06AM  23     A.   I DO.

10:06AM  24     Q.   AND THEN THIS IS A STANDARD LEVEL NONCOMPLIANCE; CORRECT?

10:06AM  25     A.   IT IS.

BENNETT CROSS BY MR. CAZARES (RES.)

10:06AM 1    Q.   AND THEN HERE THE ISSUE IS "FOR UNMODIFIED MANUFACTURER'S

10:06AM 2    EQUIPMENT, INSTRUMENTS OR TEST SYSTEMS, THE LABORATORY MUST

10:06AM 3    PERFORM AND DOCUMENT MAINTENANCE AS DEFINED BY THE MANUFACTURER

10:06AM 4    AND WITH AT LEAST THE FREQUENCY SPECIFIED BY THE MANUFACTURER."

10:06AM 5         DO YOU SEE THAT?

10:06AM 6    A.   I DO.

10:06AM 7    Q.   OKAY.  AND IS THIS MR. YAMAMOTO'S WORK OR YOURS?

10:07AM 8    A.   IT'S MR. YAMAMOTO'S WORK.

10:07AM 9    Q.   AND THEN THE REPORT READS, "THIS STANDARD IS NOT MET AS

10:07AM 10   EVIDENCED BY:

10:07AM 11        "BASED ON TECHNICAL SUPERVISOR INTERVIEWS AND EVOLIS

10:07AM 12   MAINTENANCE LOG RECORD REVIEW ON NOVEMBER 17TH, 2015, THE

10:07AM 13   LABORATORY FAILED TO PERFORM WEEKLY EVOLIS MAINTENANCE AS

10:07AM 14   DEFINED BY THE MANUFACTURER.  FINDINGS INCLUDED:"

10:07AM 15        AND THEN IT DESCRIBES, "IN GENERAL IMMUNOLOGY, IT WAS THE

10:07AM 16   PRACTICE OF THE LABORATORY TO TEST PATIENT ANA, HIV, AND

10:07AM 17   QUANTIFERON USING THE BIORAD EVOLIS SYSTEM."

10:07AM 18        DO YOU SEE THAT?

10:07AM 19   A.   YES.

10:07AM 20   Q.   SO THESE ARE THREE TESTS, ANA, HIV, AND QUANTIFERON; IS

10:07AM 21   THAT RIGHT?

10:07AM 22   A.   YES.

10:07AM 23   Q.   AND THEN THE BIORAD EVOLIS, THAT'S AN FDA APPROVED

10:07AM 24   COMMERCIAL DEVICE; CORRECT?

10:07AM 25   A.   I BELIEVE SO.  I'M NOT FAMILIAR WITH IT.

BENNETT CROSS BY MR. CAZARES (RES.)                    5073

10:08AM  1    Q.   IF WE TAKE A LOOK AT PAGE 32, D-TAG 5437.

10:08AM  2         THIS IS CALIBRATION AND CALIBRATION VERIFICATION.

10:08AM  3         DO YOU SEE THAT?

10:08AM  4    A.   I DO.

10:08AM  5    Q.   AND THIS IS ALSO A STANDARD LEVEL NONCOMPLIANCE; CORRECT?

10:08AM  6    A.   YES.

10:08AM  7    Q.   AND THEN AT ITEM 1 AT THE BOTTOM OF PAGE 32, THE REPORT

10:08AM  8    READS, "BASED ON LABORATORY PERSONNEL INTERVIEWS AND COMPLETE

10:08AM  9    BLOOD COUNTS CALIBRATION DOCUMENTATION RECORD REVIEWS ON

10:08AM  10   SEPTEMBER 23RD, 2015, THE LABORATORY FAILED TO DOCUMENT ALL CBC

10:08AM  11   INSTRUMENT CALIBRATIONS PERFORMED USING THE DREW3 INSTRUMENTS."

10:08AM  12        DO YOU SEE THAT?

10:08AM  13   A.   I DO.

10:08AM  14   Q.   AND IS THIS MR. YAMAMOTO'S WORK OR YOURS?

10:08AM  15   A.   IT'S MR. YAMAMOTO'S WORK.

10:08AM  16   Q.   AND THAT'S BECAUSE THE DREW3 IS A COMMERCIAL DEVICE?

10:08AM  17   A.   YES.

10:08AM  18   Q.   AND NOT THERANOS EQUIPMENT?

10:08AM  19   A.   IT'S A COMMERCIAL DEVICE.

10:08AM  20   Q.   OKAY.  CONTINUED AT SUB A, "IT WAS THE PRACTICE OF THE

10:09AM  21   LABORATORY TO TEST PATIENT CAPILLARY CBC SPECIMENS USING TWO

10:09AM  22   DREW3 INSTRUMENTS THE LABORATORY DESIGNATED AS DREW NUMBER 2

10:09AM  23   AND DREW NUMBER 3."

10:09AM  24        DO YOU SEE THAT?

10:09AM  25   A.   YES, I DO.

10:09AM 1    Q.   AND SO THE ISSUE HERE IS THE LABORATORY DOES NOT HAVE

10:09AM 2    RECORDS OF THE MAINTENANCE THEY WERE REQUIRED TO DO; CORRECT?

10:09AM 3    A.   THEY FAILED TO DOCUMENT THE CALIBRATION.

10:09AM 4    Q.   FAIR ENOUGH.  YOU DON'T HAVE ANY IDEA OR INFORMATION THAT

10:09AM 5    MR. BALWANI WAS AWARE OF THIS PRIOR TO THE NONCOMPLIANCE OF THE

10:09AM 6    SURVEY; IS THAT CORRECT?

10:09AM 7    A.   I DO NOT.

10:09AM 8    Q.   YOU HAVE NO EVIDENCE THAT MR. BALWANI WAS AWARE OF ANY OF

10:09AM 9    THE NONCOMPLIANCE PRIOR TO THE BEGINNING OF THE SURVEY;

10:10AM 10   CORRECT?

10:10AM 11   A.   TO SEPTEMBER.

10:10AM 12   Q.   SEPTEMBER OF 2015; CORRECT?

10:10AM 13   A.   YES.

10:10AM 14          MR. CAZARES:  YOUR HONOR, MAY I HAVE A MOMENT?

10:10AM 15          THE COURT:  YES.

10:10AM 16      (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:10AM 17          MR. CAZARES:  NO FURTHER QUESTIONS.

10:11AM 18          THE COURT:  REDIRECT?

10:11AM 19          MR. LEACH:  YES, YOUR HONOR.

10:11AM 20          THE COURT:  FOLKS, YOU MAY STAND AND STRETCH YOUR

10:11AM 21   LEGS FOR A MOMENT.

10:11AM 22      (STRETCHING.)

10:11AM 23                      **REDIRECT EXAMINATION**

10:11AM 24   BY MR. LEACH:

10:11AM 25   Q.   GOOD MORNING, MS. BENNETT.  HOW ARE YOU?

10:11AM  1    A.   I'M GOOD.  HOW ARE YOU?

10:11AM  2    Q.   I'M GOOD.  THANK YOU.

10:11AM  3         I HAVE A FEW FOLLOW-UP QUESTIONS THAT I'D LIKE TO GO OVER

10:11AM  4    WITH YOU.

10:11AM  5         FIRST I'D LIKE TO START WHERE MR. CAZARES ENDED.  YOU WERE

10:11AM  6    ASKED SOME QUESTIONS ABOUT MR. BALWANI'S KNOWLEDGE OF

10:11AM  7    PARTICULAR CONDITIONS THAT YOU OBSERVED IN THE LAB.

10:11AM  8         DO YOU RECALL THOSE QUESTIONS?

10:11AM  9    A.   I DO.

10:11AM  10   Q.   IS THAT SOMETHING THAT YOU INSPECT FOR?

10:11AM  11   A.   INSPECT?

10:11AM  12   Q.   IS THAT SOMETHING THAT YOU LOOK FOR IN THE SURVEY, WHETHER

10:12AM  13   THE COO KNOWS OF A PARTICULAR CONDITION?

10:12AM  14   A.   NO.

10:12AM  15   Q.   OKAY.  DID YOU ASK FOR INTERNAL EMAILS OF THERANOS BETWEEN

10:12AM  16   MS. HOLMES AND MR. BALWANI?

10:12AM  17   A.   WE DID NOT.

10:12AM  18   Q.   OKAY.  DID YOU ASK FOR TEXT MESSAGES BETWEEN MS. HOLMES

10:12AM  19   AND MR. BALWANI?

10:12AM  20   A.   WE DID NOT.

10:12AM  21   Q.   IS THAT SOMETHING THAT YOU ORDINARILY ASK FOR IN AN

10:12AM  22   INSPECTION?

10:12AM  23   A.   IT IS NOT.

10:12AM  24   Q.   OKAY.  AND DID YOU INTERVIEW ERIKA CHEUNG?

10:12AM  25   A.   NO.

| | | |
|---|---|---|
| 10:12AM | 1 | Q.   DID YOU INTERVIEW DR. ADAM ROSENDORFF? |
| 10:12AM | 2 | A.   NO. |
| 10:12AM | 3 | Q.   DID YOU INTERVIEW DR. MARK PANDORI? |
| 10:12AM | 4 | A.   NO. |
| 10:12AM | 5 | Q.   AND THEY WERE WITH THE LAB AT THE TIME; IS THAT YOUR |
| 10:12AM | 6 | UNDERSTANDING? |
| 10:12AM | 7 | MR. CAZARES:  OBJECTION.  FOUNDATION. |
| 10:12AM | 8 | BY MR. LEACH: |
| 10:12AM | 9 | Q.   WERE THEY IN THE -- |
| 10:12AM | 10 | THE COURT:  YOU'RE ASKING A NEW QUESTION? |
| 10:12AM | 11 | MR. LEACH:  I'LL ASK A DIFFERENT QUESTION, |
| 10:12AM | 12 | YOUR HONOR. |
| 10:12AM | 13 | Q.   AT ANY POINT IN TIME, DID YOU SEE MS. CHEUNG OR |
| 10:12AM | 14 | DR. ROSENDORFF OR DR. PANDORI IN THE LAB WHILE YOU WERE DOING |
| 10:12AM | 15 | YOUR INSPECTION? |
| 10:12AM | 16 | A.   NO. |
| 10:12AM | 17 | Q.   OKAY.  YOU WERE ASKED SOME QUESTIONS ABOUT EXHIBIT 4533. |
| 10:13AM | 18 | DO YOU HAVE THAT HANDY? |
| 10:13AM | 19 | A.   YES. |
| 10:13AM | 20 | Q.   AND THIS IS A LIST OF THE EDISON ASSAYS AND A TIME |
| 10:13AM | 21 | PERIOD -- |
| 10:13AM | 22 | AND THIS IS IN EVIDENCE, MS. WACHS.  WE CAN DISPLAY IT. |
| 10:13AM | 23 | THIS IS THE LISTING OF THE 12 EDISON TESTS THAT WERE RUN |
| 10:13AM | 24 | IN THE CLIA LAB? |
| 10:13AM | 25 | A.   YES. |

10:13AM 1    Q.   AND THIS IS SOMETHING THAT YOU HAD TO ASK FOR?

10:13AM 2    A.   YES.

10:13AM 3    Q.   AND MR. BALWANI WASN'T VOLUNTEERING THIS TO YOU IN YOUR

10:13AM 4    INITIAL MEETING?

10:13AM 5    A.   THAT'S CORRECT.

10:13AM 6    Q.   OKAY.  AND MR. CAZARES DREW YOUR ATTENTION TO THE LANGUAGE

10:13AM 7    IN THE SECOND PARAGRAPH ABOUT THE CHANGES IN THE PLATFORMS NOT

10:13AM 8    REFLECTING ON THE RELIABILITY OR ACCURACY OF ANY PLATFORM.

10:13AM 9        DO YOU SEE THAT LANGUAGE?

10:13AM 10   A.   I DO.

10:13AM 11   Q.   DID YOU BELIEVE THAT?

10:14AM 12           MR. CAZARES:  OBJECTION.  FOUNDATION.

10:14AM 13           THE COURT:  DID SHE BELIEVE WHAT THE DOCUMENT SAYS?

10:14AM 14   BY MR. LEACH:

10:14AM 15   Q.   YES.  DID YOU BELIEVE THAT STATEMENT IN THE SECOND

10:14AM 16   PARAGRAPH, THAT MR. BALWANI --

10:14AM 17           MR. CAZARES:  AND RELEVANCE.

10:14AM 18           THE COURT:  OVERRULED.

10:14AM 19       YOU CAN ANSWER THE QUESTION.

10:14AM 20           THE WITNESS:  I DID NOT.

10:14AM 21   BY MR. LEACH:

10:14AM 22   Q.   YOU WERE ALSO --

10:14AM 23       THANK YOU, MS. WACHS.  WE CAN TAKE THAT DOWN.

10:14AM 24       YOU WERE ALSO ASKED SOME QUESTIONS ABOUT WHETHER YOU

10:14AM 25   INTERVIEWED MR. BALWANI FORMALLY IN CONNECTION WITH THE

10:14AM  1    INSPECTION.

10:14AM  2         DO YOU RECALL THOSE QUESTIONS?

10:14AM  3    A.   I DO.

10:14AM  4    Q.   AND DO YOU NORMALLY INTERVIEW THE CHIEF OPERATING OFFICER?

10:14AM  5    A.   NOT NORMALLY.

10:14AM  6    Q.   OKAY.  AND I BELIEVE YOU TESTIFIED THAT EACH DAY OF THE

10:14AM  7    INSPECTION YOU WOULD PROVIDE AN UPDATE TO MR. BALWANI ABOUT

10:14AM  8    WHAT CMS WAS FINDING; IS THAT CORRECT?

10:14AM  9    A.   THAT'S CORRECT.

10:14AM  10   Q.   SO IF YOU SAW SOMETHING THAT IS REPORTED IN THE 2567,

10:14AM  11   THAT'S SOMETHING THAT YOU WOULD BRING TO MR. BALWANI'S

10:14AM  12   ATTENTION EACH DAY OF THE SURVEY?

10:14AM  13   A.   WE TOLD MR. BALWANI EVERY DAY WHAT DEFICIENCIES WE FOUND.

10:15AM  14   Q.   YOU WERE ALSO ASKED SOME QUESTIONS ABOUT THE TIMELINESS OF

10:15AM  15   THE NOTIFICATIONS RELATING TO PT INR.

10:15AM  16        DO YOU RECALL SOME QUESTIONS ABOUT THAT?

10:15AM  17   A.   I DO.

10:15AM  18   Q.   AND I THINK YOU SAID THAT YOU WERE SURPRISED THAT THE LAB

10:15AM  19   WAS JUST GETTING AROUND TO NOTIFYING PATIENTS AT THE END OF

10:15AM  20   NOVEMBER.

10:15AM  21   A.   YES.

10:15AM  22   Q.   AND WHY WERE YOU SURPRISED?

10:15AM  23   A.   I WAS SURPRISED BECAUSE WE HAD MADE THEM AWARE OF THE

10:15AM  24   ISSUES WITH PT INR IN SEPTEMBER, AND I WOULD HAVE EXPECTED THAT

10:15AM  25   THEY WOULD HAVE NOTIFIED THE AUTHORIZED PERSON, THE PERSON WHO

BENNETT REDIRECT BY MR. LEACH                                    5079

10:15AM   1    ORDERED THE TEST, AS SOON AS POSSIBLE SO THAT THE AUTHORIZED

10:15AM   2    PERSON OR THE PHYSICIAN COULD HAVE USED THAT INFORMATION FOR

10:15AM   3    PATIENT CARE.

10:15AM   4    Q.   AND WHAT ABOUT THAT TIMELINESS?  I GUESS WHY DID YOU THINK

10:15AM   5    THAT?

10:15AM   6              MR. CAZARES:  OBJECTION.  FOUNDATION AND 702.

10:16AM   7              THE COURT:  IF YOU COULD LAY A FOUNDATION FOR THAT

10:16AM   8    QUESTION.

10:16AM   9              MR. LEACH:  OKAY.

10:16AM  10    Q.   WHY WERE YOU HIGHLIGHTING THE PT INR ISSUE TO MR. BALWANI?

10:16AM  11    A.   PT INR IS A TEST THAT IS RELATED TO CLOTTING AND WHETHER A

10:16AM  12    PERSON'S BLOOD CLOTS APPROPRIATELY, AND ON CERTAIN DRUGS IT HAS

10:16AM  13    TO BE IN A THERAPEUTIC RANGE, AND IF IT'S NOT, THE PATIENT'S

10:16AM  14    HEALTH CAN BE AFFECTED.

10:16AM  15    Q.   AND WAS THAT KNOWLEDGE PART OF THE REASON WHY YOU WERE

10:16AM  16    RAISING THIS AS A DEFICIENCY IN YOUR INSPECTION?

10:16AM  17    A.   THAT'S PART OF IT.

10:16AM  18    Q.   WHAT IS THE OTHER PART?

10:16AM  19    A.   THE ISSUES WITH THE PT INR WERE, YOU KNOW, AS WE TALKED

10:16AM  20    ABOUT THE REAGENT, THE FACT THAT THEY DIDN'T HAVE DOCUMENTATION

10:17AM  21    TO SUPPORT HOW THEY CALCULATED THEIR INR, AND THE FACT THAT

10:17AM  22    EVEN WHEN THE CONTROLS WERE OUT AND KEPT GOING DOWN, ALL THEY

10:17AM  23    DID WAS CHANGE THE ACCEPTABLE RANGE OF THE CONTROL.  THEY NEVER

10:17AM  24    INVESTIGATED WHAT THE PROBLEM WITH THE CONTROLS WERE.

10:17AM  25    Q.   THANK YOU.

BENNETT REDIRECT BY MR. LEACH

10:17AM  1        YOU WERE ALSO SHOWN EXHIBIT 4600, WHICH WAS -- I THINK

10:17AM  2   THIS WILL BE IN THE BLACK BINDER.  THIS IS AN EMAIL FROM

10:17AM  3   DECEMBER OF 2015.

10:17AM  4        DO YOU RECALL QUESTIONS ABOUT THAT?

10:17AM  5   A.   I DO.

10:17AM  6   Q.   AND YOU WROTE IN THAT EMAIL "FINGERSTICK TESTING HAS BEEN

10:17AM  7   STOPPED."

10:17AM  8        WHAT DID YOU MEAN BY THAT?

10:17AM  9   A.   THAT AT THAT POINT IT WAS MY UNDERSTANDING THAT THE

10:17AM 10   TESTING THAT WAS USING THE FINGERSTICK SAMPLES HAD -- WAS NO

10:17AM 11   LONGER BEING PERFORMED.

10:17AM 12   Q.   HOW DID YOU COME TO HAVE THAT UNDERSTANDING?

10:17AM 13   A.   OH.  I DON'T RECALL.

10:18AM 14   Q.   OKAY.  YOU WERE ALSO ASKED QUESTIONS ABOUT THE DIFFERENCE

10:18AM 15   BETWEEN A STANDARD LEVEL AND A CONDITION LEVEL DEFICIENCY.

10:18AM 16        DO YOU RECALL QUESTIONS ABOUT THAT?

10:18AM 17   A.   I DO.

10:18AM 18   Q.   AND HOW DO THE STANDARD LEVEL CONDITIONS RELATE TO

10:18AM 19   CONDITIONS?  DO THE STANDARD LEVEL CONDITIONS FEED INTO THE

10:18AM 20   CONDITION LEVEL OBSERVATIONS?

10:18AM 21   A.   YES.  WHAT WE DO IS THAT WE LOOK AT ALL OF THE

10:18AM 22   DEFICIENCIES THAT THE LABORATORY HAD IN SPECIFIC AREAS, AND IF

10:18AM 23   IT'S SERIOUS ENOUGH, THEN THE STANDARDS WILL GET WRAPPED UP

10:18AM 24   INTO THE CONDITION LEVEL, AND THE CONDITION LEVEL IS MORE

10:18AM 25   SERIOUS THAN THE STANDARD LEVEL.

10:18AM 1   Q.   AND AM I RIGHT NO SINGLE STANDARD LEVEL OBSERVATION

10:18AM 2   MEANS -- WELL, CAN YOU HAVE A CONDITION LEVEL OBSERVATION WITH

10:19AM 3   ONLY ONE STANDARD LEVEL OBSERVATION?

10:19AM 4   A.   YOU CAN.

10:19AM 5   Q.   AND CAN YOU HAVE A CONDITION LEVEL OBSERVATION IF THERE'S

10:19AM 6   MULTIPLE STANDARD LEVEL VIOLATIONS?

10:19AM 7   A.   YOU CAN.

10:19AM 8   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 7 OF

10:19AM 9   EXHIBIT 4621.

10:19AM 10       THIS IS IN EVIDENCE, MS. WACHS.  YOU CAN DISPLAY THAT.

10:19AM 11       DO YOU SEE WHERE IT SAYS D5024 AND THEN HEMATOLOGY?

10:19AM 12  A.   YES.

10:19AM 13  Q.   AND THAT'S A D-TAG RELATING TO HEMATOLOGY?

10:19AM 14  A.   IT'S THE CONDITION LEVEL D-TAG FOR HEMATOLOGY.

10:19AM 15  Q.   OKAY.  AND YOU WROTE, "THIS CONDITION HAS NOT BEEN MET AS

10:19AM 16  EVIDENCED BY," AND THEN YOU LIST YOUR OBSERVATIONS.

10:20AM 17       DO YOU SEE THAT?

10:20AM 18  A.   YES.

10:20AM 19  Q.   AND THEN WITHIN THE DESCRIPTION THERE ARE SOME D-TAGS IN

10:20AM 20  PARENTHESES, (SEE D5403), (SEE D5437) AND (SEE D5447) AND THERE

10:20AM 21  ARE ADDITION ONES.

10:20AM 22       DO YOU SEE THAT?

10:20AM 23  A.   YES.

10:20AM 24  Q.   ARE THOSE EXAMPLES OF HOW STANDARD LEVEL OBSERVATIONS CAN

10:20AM 25  FEED INTO A CONDITION LEVEL OBSERVATION?

10:20AM   1    A.   YES.  WHEN WE CITE A CONDITION, ANY OF THESE STANDARDS,

10:20AM   2    INCLUDING THAT CONDITION, ARE LISTED IN THE CONDITION LEVEL

10:20AM   3    CITATION.

10:20AM   4    Q.   YOU WERE ASKED SOME QUESTIONS ABOUT SOME DOCUMENTS THAT

10:20AM   5    THERANOS PROVIDED TO MR. YAMAMOTO RELATING TO PROFICIENCY

10:21AM   6    TESTING RESULTS.

10:21AM   7         DO YOU RECALL THOSE QUESTIONS?

10:21AM   8    A.   I DO.

10:21AM   9    Q.   AND THOSE ARE FROM DOCUMENTS THAT THERANOS GAVE YOU;

10:21AM  10    CORRECT?

10:21AM  11    A.   YES.

10:21AM  12    Q.   AND DID YOU -- DID CMS DO ANYTHING TO VERIFY OR

10:21AM  13    CORROBORATE ANY OF THE NUMBERS IN THOSE ALTERNATIVE ASSESSMENT

10:21AM  14    PROGRAM DOCUMENTS?

10:21AM  15         MR. CAZARES:  OBJECTION.  FOUNDATION RELATING TO HER

10:21AM  16    TESTIMONY ABOUT HER ROLE.

10:21AM  17         THE COURT:  IS THIS SPECIFIC TO HER, WHAT SHE DID?

10:21AM  18    DID SHE DO THE INVESTIGATION TO CORROBORATE OR VERIFY?

10:21AM  19         MR. LEACH:  HE ASKED A LOT OF QUESTIONS ABOUT WHAT

10:21AM  20    MR. YAMAMOTO DID.

10:21AM  21         THE COURT:  RIGHT.

10:21AM  22         MR. LEACH:  I'M FOLLOWING UP ON THAT LINE OF

10:21AM  23    QUESTIONING, YOUR HONOR.

10:21AM  24         I CAN FRAME IT IN TERMS OF INDIVIDUALS.

10:21AM  25         THE COURT:  SURE.  WHY DON'T YOU START WITH THAT?

BENNETT REDIRECT BY MR. LEACH                          5083

10:21AM  1    BY MR. LEACH:

10:21AM  2    Q.   OKAY.  DID YOU DO ANYTHING TO VERIFY OR CORROBORATE THE

10:22AM  3    NUMBERS THAT WERE PROVIDED TO CMS IN THE ALTERNATIVE ASSESSMENT

10:22AM  4    PROGRAM DOCUMENT?

10:22AM  5    A.   NOT RELATED TO THE ROUTINE CHEMISTRIES.

10:22AM  6    Q.   OKAY.  TO YOUR KNOWLEDGE DID MR. YAMAMOTO DO ANY OF THAT?

10:22AM  7    A.   I DON'T KNOW.

10:22AM  8            MR. CAZARES:  OBJECTION.  FOUNDATION.

10:22AM  9            THE COURT:  OVERRULED.

10:22AM  10            THE WITNESS:  I DO NOT.

10:22AM  11    BY MR. LEACH:

10:22AM  12    Q.   OKAY.  DID CMS, TO YOUR KNOWLEDGE, DO ANYTHING TO ASSESS

10:22AM  13    OR DO ANYTHING WITH RESPECT TO THE TOTAL ALLOWABLE ERROR THAT

10:22AM  14    IS INCLUDED IN THE PROFICIENCY TESTING RESULTS?

10:22AM  15            MR. CAZARES:  OBJECTION.  FOUNDATION.

10:22AM  16            THE COURT:  CAN YOU LAY A FOUNDATION AS TO WHETHER

10:22AM  17    OR NOT THAT'S PART OF HER -- THE INVESTIGATION AND THE SCOPE OF

10:22AM  18    THE INVESTIGATION.

10:22AM  19            MR. LEACH:  SURE.

10:23AM  20    Q.   TO YOUR KNOWLEDGE, MS. BENNETT, IS IT WITHIN THE SCOPE OF

10:23AM  21    CMS'S INVESTIGATION TO ASSESS THE TOTAL ALLOWABLE ERROR THAT

10:23AM  22    THE LAB IS USING IN ITS PROFICIENCY TESTING?

10:23AM  23    A.   WHAT WE DO IS WE LOOK AT WHAT THE LAB ALLOWS FOR THE TOTAL

10:23AM  24    ALLOWABLE ERROR, AND THEN WE ASSESS WHETHER THEY'RE

10:23AM  25    COMPLIANT -- WHETHER THEY'RE DEFICIENT WITH THEIR REQUIREMENTS

10:23AM  1    FOR TOTAL ALLOWABLE ERROR.

10:23AM  2    Q.   SO THE LAB SETS THE TOTAL ALLOWABLE ERROR?

10:23AM  3    A.   YES.

10:23AM  4    Q.   AND YOU DON'T COMPARE THAT TO SOMEBODY ELSE'S TOTAL

10:23AM  5    ALLOWABLE ERROR?

10:23AM  6    A.   WE DO NOT.

10:23AM  7    Q.   OKAY.  AND WITH RESPECT TO EXHIBIT -- I WANT TO DRAW YOUR

10:23AM  8    ATTENTION TO EXHIBIT 20620.

10:24AM  9         DO YOU RECALL BEING ASKED SOME QUESTIONS ABOUT THIS?

10:24AM  10   A.   I DO.

10:24AM  11   Q.   AND AGAIN, THIS ISN'T A DOCUMENT THAT YOU WERE PROVIDED AS

10:24AM  12   PART OF YOUR WORK?

10:24AM  13   A.   THIS WAS PROVIDED TO MR. YAMAMOTO, NOT TO ME.

10:24AM  14   Q.   OKAY.  AND YOU HAVE NO KNOWLEDGE ABOUT HOW THESE NUMBERS

10:24AM  15   WERE DERIVED AT?

10:24AM  16   A.   I DO NOT.

10:24AM  17   Q.   YOU HAVE NO KNOWLEDGE ABOUT WHEN THEY WERE DERIVED?

10:24AM  18   A.   I DO NOT.

10:24AM  19   Q.   YOU HAVE NO KNOWLEDGE ABOUT WHETHER ANY OF THE NUMBERS IN

10:24AM  20   THERE WERE CHANGED OR MODIFIED OVER THE COURSE OF TIME?

10:24AM  21   A.   I DO NOT.

10:24AM  22   Q.   OKAY.

10:24AM  23        MAY I APPROACH, YOUR HONOR?

10:24AM  24             THE COURT:  YES.

10:24AM  25             MR. LEACH:  (HANDING.)

| | | |
|---|---|---|
| 10:25AM | 1 | YOUR HONOR, MAY I HAND THE DOCUMENTS UP TO THE COURT? |
| 10:25AM | 2 | THE COURT:  YES.  DOES THE DEFENSE HAVE THEM? |
| 10:25AM | 3 | MR. LEACH:  I'M ABOUT TO GIVE THEM TO THEM. |
| 10:25AM | 4 | (HANDING.) |
| 10:25AM | 5 | Q.  I'VE PLACED BEFORE YOU, MS. BENNETT, WHAT WE'VE MARKED AS |
| 10:25AM | 6 | EXHIBIT 5834. |
| 10:25AM | 7 | DO YOU SEE THAT NUMBER DOWN AT THE BOTTOM? |
| 10:25AM | 8 | A.  I DO. |
| 10:25AM | 9 | Q.  AND DOES THIS APPEAR TO BE AN EMAIL FROM SURAJ SAKSENA TO |
| 10:25AM | 10 | DANIEL YOUNG AND LANGLY GEE DATED MAY 29TH, 2015? |
| 10:25AM | 11 | A.  IT DOES. |
| 10:25AM | 12 | Q.  OKAY.  AND YOU MET MR. SAKSENA, OR DR. SAKSENA, DURING THE |
| 10:25AM | 13 | INSPECTION? |
| 10:25AM | 14 | A.  YES. |
| 10:25AM | 15 | Q.  AND YOU ALSO REVIEWED SOME DOCUMENTS EXECUTED BY |
| 10:26AM | 16 | DR. SAKSENA IN THE COURSE OF YOUR WORK? |
| 10:26AM | 17 | OR DID YOU HAVE INTERACTIONS WITH DR. SAKSENA DURING THE |
| 10:26AM | 18 | INSPECTION? |
| 10:26AM | 19 | A.  YES. |
| 10:26AM | 20 | Q.  AND DID DR. SAKSENA PROVIDE INFORMATION TO YOU FROM TIME |
| 10:26AM | 21 | TO TIME? |
| 10:26AM | 22 | A.  YES. |
| 10:26AM | 23 | Q.  I ALSO DRAW YOUR ATTENTION TO PAGE 21 OF THIS DOCUMENT. |
| 10:26AM | 24 | DO YOU SEE THAT THERE IS SOME METADATA LISTED ABOUT SOME |
| 10:26AM | 25 | OF THE BATES NUMBERS AND THE CUSTODIAN FOR THIS DOCUMENT? |

10:26AM  1    A.    YES.

10:26AM  2    Q.    AND DO YOU SEE SOME NAMES LISTED IN THE CUSTODIAN ROW

10:26AM  3    ASSOCIATED WITH THIS PARTICULAR DOCUMENT?

10:26AM  4    A.    I DO.

10:26AM  5    Q.    AND DO YOU SEE THAT THE SUBJECT OF THIS EMAIL IS AAP

10:26AM  6    REPORT?

10:26AM  7          DO YOU SEE THAT?

10:26AM  8    A.    I DO.

10:27AM  9    Q.    OKAY.

10:27AM  10         YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 5384.

10:27AM  11              MR. CAZARES:  OBJECTION.  HEARSAY AND FOUNDATION.

10:27AM  12              MR. LEACH:  YOUR HONOR, I THINK THE BUSINESS RECORDS

10:27AM  13   FOUNDATION HAS BEEN LAID THROUGH OTHER WITNESSES, AND AT A

10:27AM  14   MINIMUM I OFFER THIS AS NOTICE TO THE DEFENDANT.

10:27AM  15              THE COURT:  WELL, THIS IS A SIMILAR -- THANK YOU.

10:27AM  16         THIS IS A SIMILAR EMAIL AS THE OTHER DOCUMENT, THE 20620.

10:27AM  17   I DON'T THINK THIS WITNESS CAN LAY A PROPER BUSINESS FOUNDATION

10:27AM  18   UNDER 803(6).

10:27AM  19         I WILL ADMIT IT NOT FOR THE TRUTH OF THE MATTER ASSERTED,

10:27AM  20   LADIES AND GENTLEMEN, BUT PURELY FOR ANY NOTICE, NOTICE ISSUES.

10:27AM  21              MR. CAZARES:  AND JUST FOR THE RECORD, YOUR HONOR,

10:27AM  22   WE OBJECT TO THE NOTICE ADMISSION BECAUSE MR. BALWANI IS NOT

10:27AM  23   REFLECTED IN THE EMAIL EXCHANGE AT ALL.

10:27AM  24              THE COURT:  WELL, THIS IS NOTICE AS TO THIS WITNESS.

10:27AM  25   IS THAT WHO IT'S GOING FOR?

10:27AM 1          MR. CAZARES:  IT'S ALSO NOT REFLECTED --

10:27AM 2          MR. LEACH:  IT'S NOTICE TO MR. BALWANI, YOUR HONOR,

10:27AM 3    AND I'M DRAWING YOUR ATTENTION TO THE BOX FOR THE CUSTODIAN.

10:28AM 4    IT APPEARS THAT MR. BALWANI DID HAVE POSSESSION OF THIS

10:28AM 5    DOCUMENT, SO IT WOULD BE OFFERED FOR NOTICE TO HIM.

10:28AM 6          THE COURT:  WELL, I'M NOT SURE THAT THE -- THE EMAIL

10:28AM 7    IS CERTAINLY NOT ADDRESSED TO HIM.  THIS IS A METADATA BOX, AS

10:28AM 8    YOU SAID, AND WITHOUT FOUNDATION AS TO THIS WITNESS'S KNOWLEDGE

10:28AM 9    OF THE METADATA AND WHAT THIS MEANS, I DON'T THINK IT SHOWS,

10:28AM 10   THAT BOX SHOWS NOTICE DIRECTLY WITHOUT SOME FURTHER FOUNDATION.

10:28AM 11         MR. LEACH:  OKAY, YOUR HONOR.

10:28AM 12   Q.  MS. BENNETT, YOU -- WITH RESPECT TO EXHIBIT 20620, AM I

10:28AM 13   RIGHT, YOU HAVE NO IDEA WHERE THAT DATA COMES FROM; CORRECT?

10:28AM 14   A.  I DO NOT.

10:28AM 15   Q.  AND YOU DON'T KNOW WHEN IT WAS PREPARED?

10:28AM 16   A.  I DO NOT.

10:28AM 17   Q.  AND YOU DON'T KNOW HOW IT WAS PREPARED?

10:29AM 18   A.  I DO NOT.

10:29AM 19   Q.  AND YOU DON'T KNOW WHETHER CERTAIN CHALLENGES ON CERTAIN

10:29AM 20   EVENTS --

10:29AM 21         MR. CAZARES:  OBJECTION.

10:29AM 22         THE COURT:  OVERRULED.

10:29AM 23   BY MR. LEACH:

10:29AM 24   Q.  YOU DON'T KNOW WHETHER ANY OF THE CHALLENGES WERE CHANGED

10:29AM 25   FROM PASS TO FAIL PRIOR TO CMS BEING PROVIDED THAT DOCUMENT?

10:29AM  1                  MR. CAZARES:  OBJECTION.  FOUNDATION.  403.

10:29AM  2                  THE COURT:  IS THE QUESTION SHE HAS NO IDEA ABOUT

10:29AM  3       KNOWLEDGE OF HOW THAT WAS CREATED, ALTERED IN ANY WAY?

10:29AM  4                  MR. LEACH:  CORRECT.

10:29AM  5                  THE COURT:  OKAY.  WHY DON'T YOU ASK THAT QUESTION?

10:29AM  6       BY MR. LEACH:

10:29AM  7       Q.   OKAY.  YOU HAVE NO KNOWLEDGE ABOUT WHETHER ANY OF THE

10:29AM  8       NUMBERS IN 20620, OR THE 100 PERCENT PASS/FAIL, WHETHER ANY OF

10:29AM  9       THAT CHANGED PRIOR TO THE DOCUMENT BEING PROVIDED TO CMS?  YOU

10:29AM  10      HAVE NO KNOWLEDGE OF THAT?

10:29AM  11                 MR. CAZARES:  OBJECTION.  FOUNDATION.  403.

10:29AM  12                 THE COURT:  OVERRULED.

10:29AM  13          YOU CAN ANSWER THE QUESTION.

10:29AM  14                 THE WITNESS:  I DO NOT.

10:29AM  15      BY MR. LEACH:

10:29AM  16      Q.   YOU WERE ALSO ASKED A NUMBER OF QUESTIONS ABOUT WHETHER

10:29AM  17      THE 2567 IDENTIFIES ANY ACTUAL PATIENT HARM.

10:30AM  18          DO YOU RECALL THOSE QUESTIONS?

10:30AM  19      A.   I DO.

10:30AM  20      Q.   AND DO YOU RECALL BEING ASKED, IN YOUR FINDINGS YOU DIDN'T

10:30AM  21      IDENTIFY ANY EVIDENCE THAT SUGGESTS PATIENTS WERE ACTUALLY

10:30AM  22      AFFECTED BY THE NONCOMPLIANCE YOU IDENTIFIED.

10:30AM  23          DO YOU RECALL BEING ASKED A NUMBER OF QUESTIONS ALONG

10:30AM  24      THOSE LINES?

10:30AM  25      A.   I DO.

10:30AM  1    Q.   AND YOU WERE ASKED WHETHER CMS DID ANY TYPE OF PATIENT

10:30AM  2    IMPACT ASSESSMENTS.

10:30AM  3         DO YOU RECALL QUESTIONS ALONG THOSE LINES?

10:30AM  4    A.   I DO.

10:30AM  5    Q.   AND IS THAT SOMETHING THAT YOU WOULD EXPECT THE LABORATORY

10:30AM  6    TO DO?

10:30AM  7    A.   WE DO.

10:30AM  8    Q.   WHY DO YOU EXPECT THAT?

10:30AM  9    A.   WE EXPECT THE LABORATORIES TO LOOK AT ANY PATIENT THAT HAS

10:30AM  10   BEEN OR HAS POTENTIALLY BEEN AFFECTED BY A DEFICIENT PRACTICE

10:30AM  11   THAT THE LABORATORY DOES.  IT'S THEIR RESPONSIBILITY TO MAKE

10:30AM  12   SURE THAT PATIENTS WERE NOT AFFECTED OR HAD THE POTENTIAL TO BE

10:30AM  13   AFFECTED WHEN THEY HAD DEFICIENCIES THAT -- DEFICIENCIES IN

10:31AM  14   WHAT THEY WERE SUPPOSED TO BE DOING TO ENSURE ACCURATE AND

10:31AM  15   RELIABLE TESTING.

10:31AM  16   Q.   AND THAT'S SOMETHING THAT YOU WOULD EXPECT THE LABORATORY

10:31AM  17   TO DO; CORRECT?

10:31AM  18   A.   YES.

10:31AM  19   Q.   OKAY.

10:31AM  20        MAY I APPROACH, YOUR HONOR?

10:31AM  21            THE COURT:  YES.

10:31AM  22            MR. LEACH:  (HANDING.)

10:32AM  23   Q.   MS. BENNETT, I'VE PLACED BEFORE YOU EXHIBIT 4943.

10:32AM  24        DO YOU HAVE THAT IN FRONT OF YOU?

10:32AM  25   A.   I DO.

BENNETT REDIRECT BY MR. LEACH

10:32AM 1    Q.   AND DO YOU SEE THAT THERE'S A CMS BATES LABEL TO THE

10:32AM 2    RIGHT?

10:32AM 3    A.   YES.

10:32AM 4    Q.   AND DO YOU SEE ON THE FIRST PAGE THERE'S A TABLE OF

10:32AM 5    CONTENTS WITH A TABLE OF BINDER LETTERS AND A SUMMARY?

10:32AM 6    A.   I DO.

10:32AM 7    Q.   OKAY.  IS THIS SOMETHING THAT THERANOS PROVIDED TO YOU IN

10:32AM 8    THE COURSE OF CMS'S INSPECTION?

10:32AM 9    A.   THIS APPEARS TO BE PART OF THEIR RESPONSE TO US, TO THE

10:32AM 10   SURVEY.

10:32AM 11   Q.   OKAY.  LET ME DRAW YOUR ATTENTION TO PAGE 9 OF THE

10:33AM 12   EXHIBIT.

10:33AM 13       DO YOU SEE A HEADING AT THE TOP RELATING TO A TPS 3.5?

10:33AM 14   A.   YES.

10:33AM 15   Q.   AND THAT'S A REFERENCE TO THE EDISON DEVICE?

10:33AM 16   A.   YES.

10:33AM 17   Q.   AND THIS IS A DOCUMENT THAT THERANOS PROVIDED TO YOU?

10:33AM 18   A.   YES.

10:33AM 19   Q.   AND DO YOU SEE A PARAGRAPH, THE FOURTH FULL PARAGRAPH

10:33AM 20   UNDER THE HEADING PATIENT IMPACT?

10:33AM 21       DO YOU SEE THAT PARAGRAPH?

10:33AM 22   A.   I DO.

10:33AM 23   Q.   AND DO YOU SEE THAT THERE IS ALSO -- AND DOES THIS RELATE

10:33AM 24   TO WHAT THE COMPANY WAS TELLING YOU ABOUT POTENTIAL IMPACT TO

10:33AM 25   PATIENTS FOR DEFICIENCIES IDENTIFIED DURING YOUR SURVEY?

10:33AM  1    A.   YES.

10:33AM  2    Q.   AND DO YOU SEE THAT THERE'S A PARAGRAPH DOWN AT THE BOTTOM

10:33AM  3    WITH SOME ADDITIONAL INFORMATION ABOUT WHAT THERANOS IS DOING?

10:33AM  4    A.   UNDER CORRECTIVE ACTION?

10:34AM  5    Q.   YES.

10:34AM  6    A.   YES.

10:34AM  7         MR. LEACH:  YOUR HONOR, THE GOVERNMENT OFFERS

10:34AM  8    EXHIBIT 4943.

10:34AM  9         MR. CAZARES:  OBJECTION.  FOUNDATION.  HEARSAY.

10:34AM  10   403.

10:34AM  11        THE COURT:  GO AHEAD, MR. LEACH.

10:34AM  12        MR. LEACH:  HE OPENED THE DOOR TO THIS, YOUR HONOR,

10:34AM  13   BY ASKING, YOU KNOW, DOES CMS IDENTIFY PATIENT IMPACT IN THE

10:34AM  14   2567.

10:34AM  15        MR. CAZARES:  IT'S STILL HEARSAY, AND THIS ITEM IS

10:34AM  16   NOT IDENTIFIED IN THE SURVEY REPORT AT 4621, WHICH IS IN

10:34AM  17   EVIDENCE.

10:34AM  18        THE COURT:  WELL, WHY DON'T YOU LAY SOME ADDITIONAL

10:34AM  19   FOUNDATION AS TO WHAT THIS INFORMATION IS AND WHETHER SHE HAS

10:34AM  20   KNOWLEDGE OF IT?

10:34AM  21   BY MR. LEACH:

10:34AM  22   Q.   DO YOU HAVE KNOWLEDGE OF THIS DOCUMENT, MS. BENNETT?

10:34AM  23   A.   YES.

10:34AM  24   Q.   AND IS THIS SOMETHING THAT THERANOS PROVIDED TO YOU?

10:34AM  25   A.   YES.

10:34AM  1    Q.   AND IS THIS SOMETHING THAT THERANOS PROVIDED TO YOU IN

10:34AM  2    RELATION TO A DETERMINATION OF WHETHER THERE WAS OR WASN'T AN

10:34AM  3    IMPACT TO PATIENTS?

10:34AM  4    A.   YES.

10:34AM  5    Q.   AND DID YOU RELY ON THIS IN THE COURSE OF YOUR WORK IN

10:35AM  6    EVALUATING THERANOS'S RESPONSE TO THE 2567?

10:35AM  7    A.   YES.

10:35AM  8    Q.   AND WHEN YOU'RE PREPARING A 2567 AND LISTING PARTICULAR

10:35AM  9    OBSERVATIONS, YOU EXPECT THE LAB TO RESPOND TO THOSE; CORRECT?

10:35AM  10   A.   YES.

10:35AM  11   Q.   AND IS THIS PART OF YOUR WORK IN EVALUATING WHETHER OR NOT

10:35AM  12   THE COMPANY HAS RESPONDED TO OR NOT RESPONDED TO THE

10:35AM  13   DEFICIENCIES?

10:35AM  14   A.   YES.

10:35AM  15   Q.   AND THIS WAS PROVIDED TO YOU AT SOME POINT IN EARLY 2016?

10:35AM  16   A.   I BELIEVE SO.

10:35AM  17   Q.   OKAY.

10:35AM  18        YOUR HONOR, THE GOVERNMENT OFFERS EXHIBIT 4943.

10:35AM  19            MR. CAZARES:   OBJECTION.   I APOLOGIZE.

10:35AM  20        OBJECTION.   FOUNDATION.   HEARSAY.

10:35AM  21        THERE'S ALSO A RELEVANCE ISSUE DUE TO THE TIMING OF THE

10:35AM  22   ITEM AND THE AUTHOR OF THE ITEM THAT IS REFLECTED IN THIS

10:36AM  23   EXHIBIT.

10:36AM  24            THE COURT:   FIRST OF ALL, MR. LEACH, ARE YOU ASKING

10:36AM  25   FOR THE ENTIRETY OF THIS DOCUMENT, OR JUST THIS PAGE THAT

| | | |
|---|---|---|
| 10:36AM | 1 | YOU'RE REFERENCING? |
| 10:36AM | 2 | MR. LEACH:  JUST PAGE 1 AND PAGE 9, YOUR HONOR. |
| 10:36AM | 3 | THE COURT:  PAGE 1 IS THE TABLE OF CONTENTS? |
| 10:36AM | 4 | MR. LEACH:  YES. |
| 10:36AM | 5 | THE COURT:  AND CAN YOU TIME STAMP THIS PAGE 9? |
| 10:36AM | 6 | MR. LEACH:  YES, YOUR HONOR. |
| 10:36AM | 7 | Q.  MS. BENNETT, LET ME DRAW YOUR ATTENTION TO PAGE 1 OF THE |
| 10:36AM | 8 | DOCUMENT. |
| 10:36AM | 9 | DO YOU SEE SOME BINDER LETTERS IN THE LEFT COLUMN? |
| 10:37AM | 10 | A.  YES. |
| 10:37AM | 11 | Q.  AND THOSE LETTERS ARE AA? |
| 10:37AM | 12 | A.  YES. |
| 10:37AM | 13 | Q.  LET ME NEXT DRAW YOUR ATTENTION TO EXHIBIT 5471. |
| 10:37AM | 14 | IS THIS A LETTER DATED APRIL 1ST, 2016? |
| 10:37AM | 15 | A.  YES. |
| 10:37AM | 16 | Q.  ROUGHLY THREE MONTHS AFTER THE 2567 WAS ISSUED? |
| 10:37AM | 17 | A.  YES. |
| 10:37AM | 18 | Q.  OKAY.  AND IN THE RE LINE, DO YOU SEE MR. BALWANI'S NAME |
| 10:37AM | 19 | IN THE RE LINE? |
| 10:37AM | 20 | A.  YES. |
| 10:37AM | 21 | Q.  SITTING HERE TODAY, DO YOU KNOW IF HE WAS OR WAS NOT WITH |
| 10:37AM | 22 | THE COMPANY IN APRIL OF 2016? |
| 10:37AM | 23 | A.  I DON'T KNOW. |
| 10:37AM | 24 | Q.  OKAY.  AND IF I DRAW YOUR ATTENTION TO PAGE 50. |
| 10:38AM | 25 | IN THE FIRST FULL PARAGRAPH OF PAGE 50, DO YOU SEE A |

10:38AM   1    REFERENCE TO EXHIBIT AA?

10:38AM   2    A.   YES.

10:38AM   3    Q.   AND BASED ON THE SUBJECT MATTER IN THIS PARAGRAPH AND THE

10:38AM   4    REFERENCE TO AA, DO YOU BELIEVE THAT YOU RECEIVED 4943 AT SOME

10:38AM   5    POINT PRIOR TO APRIL OF 2016?

10:38AM   6    A.   YES.

10:38AM   7              THE COURT:  ALL RIGHT.

10:38AM   8              MR. LEACH:  WE OFFER PAGES 1 AND 9 OF 4943.

10:38AM   9              MR. CAZARES:  MY OBJECTION IS RELEVANCE DUE TO

10:38AM  10    TIMING AND SUBJECT MATTER; HEARSAY DUE TO THE TRUTH OF THE

10:38AM  11    MATTER IN THE ITEM; 403; AS WELL AS THIS IS THE SUBJECT OF THE

10:38AM  12    COURT'S ORDER REGARDING MOTIONS IN LIMINE AT DOCKET 1326,

10:38AM  13    PAGES 9 TO 12 RELATING TO ANOTHER WITNESS, THE AUTHOR,

10:39AM  14    YOUR HONOR.

10:39AM  15              THE COURT:  MR. LEACH.

10:39AM  16              MR. LEACH:  THEY OPENED THE DOOR, YOUR HONOR, BY

10:39AM  17    ASKING ABOUT WHY PATIENT IMPACT ISN'T IDENTIFIED IN THE 2667.

10:39AM  18        THIS IS DURING THE TIME PERIOD WHEN MR. BALWANI IS STILL

10:39AM  19    THE COO.  IT'S AN AUTHORIZED ADMISSION.  IT SHOULD COME IN.

10:39AM  20              THE COURT:  WELL, WHAT I'LL DO IS I'LL LOOK AT -- I

10:39AM  21    WANT TO LOOK AT THE MIL ORDER AND REFERENCE THOSE PARAGRAPHS.

10:39AM  22        LET'S TAKE A BREAK, LADIES AND GENTLEMEN, SO WE CAN LOOK

10:39AM  23    AT THIS.  LET'S TAKE ABOUT A -- WELL, LET'S TAKE OUR 30 MINUTE

10:39AM  24    BREAK NOW.  MAYBE WE'LL TAKE THAT NOW.

10:40AM  25        (JURY OUT AT 10:40 A.M.)

BENNETT REDIRECT BY MR. LEACH                                                5095

| | | |
|---|---|---|
| 10:40AM | 1 | THE COURT:  YOU CAN STAND DOWN.  THANK YOU. |
| 10:40AM | 2 | (RECESS FROM 10:40 A.M. UNTIL 11:13 A.M.) |
| 11:13AM | 3 | THE COURT:  ALL RIGHT.  THANK YOU. |
| 11:13AM | 4 | WE'RE BACK ON THE RECORD.  ALL PARTIES PREVIOUSLY PRESENT |
| 11:13AM | 5 | ARE PRESENT ONCE AGAIN. |
| 11:13AM | 6 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 11:13AM | 7 | THE COURT DID, DURING THE RECESS, REVIEW DOCUMENT 1236 AND |
| 11:13AM | 8 | THE PAGES CITED BY COUNSEL, 9 TO 12, AS WELL AS OTHER ITEMS, |
| 11:13AM | 9 | PAGE 26 REGARDING THE COURT'S ORDER IN REGARDS TO THE RELEASE |
| 11:13AM | 10 | OF THE -- I GUESS IT'S THE 3.5 AND THE VOIDING OF THE TESTS. |
| 11:14AM | 11 | WHAT WOULD THE PARTIES LIKE ME TO KNOW ABOUT THIS? |
| 11:14AM | 12 | MR. CAZARES:  YOUR HONOR, AS I SAID BEFORE, |
| 11:14AM | 13 | MR. LEACH'S THEORY IS THAT THE GOVERNMENT -- THE DEFENSE HAS |
| 11:14AM | 14 | OPENED DOOR TO VOIDING BY ASKING ABOUT PATIENT IMPACT OR EFFECT |
| 11:14AM | 15 | OF THE NONCOMPLIANCE ON THE PATIENTS WHO WERE TESTED DURING THE |
| 11:14AM | 16 | RELEVANT TIME PERIOD. |
| 11:14AM | 17 | THE PROBLEM IS THAT EVEN IF THAT'S SO, AND I'M NOT SURE IT |
| 11:14AM | 18 | IS, THAT'S NOT AN EXCEPTION TO HEARSAY OR 702 EXPERT TESTIMONY |
| 11:14AM | 19 | OR OPINION TESTIMONY, WHICH IS ESSENTIALLY WHAT THIS DOCUMENT |
| 11:14AM | 20 | IS. |
| 11:14AM | 21 | THE COURT WILL RECALL THAT DR. DAS AUTHORED A LETTER TO |
| 11:14AM | 22 | CMS DATED APRIL 1, 2016, INDICATING HIS CONCLUSIONS, INCLUDING |
| 11:14AM | 23 | HIS DECISION TO VOID ALL TESTS RUN ON THE THERANOS DEVICE. |
| 11:14AM | 24 | THIS PATIENT IMPACT ASSESSMENT AT 4943 IS THE UNDERLYING |
| 11:15AM | 25 | WORK PRODUCT, IF YOU WILL, THAT DR. DAS PUT TOGETHER AND HIS |

11:15AM  1    TEAM PUT TOGETHER OVER MONTHS OF ANALYSIS TO REACH THAT

11:15AM  2    OPINION.  THIS DOCUMENT ITSELF IS HEARSAY.  IT'S 702 OPINION

11:15AM  3    AFTER THE FACT, AFTER THE FACT OF THE UNDERLYING TESTING THAT

11:15AM  4    TOOK PLACE.

11:15AM  5         AND I DON'T SEE HOW THIS WITNESS CAN TESTIFY TO ANYTHING

11:15AM  6    ABOUT THIS DOCUMENT SIMPLY BECAUSE CMS MAY HAVE RECEIVED A

11:15AM  7    LETTER THAT REFERENCED THE FACT THAT TESTS WERE VOIDED WITHOUT

11:15AM  8    HAVING ANY FOUNDATION AS TO WHY, WHEN, WHO DID IT, AND WHAT WAS

11:15AM  9    THE BASIS FOR THAT VOIDING.

11:15AM  10        AGAIN, SHE DOESN'T KNOW.  SHE'LL OFFER SOME OPINIONS ABOUT

11:15AM  11   HOW TERRIBLE THE DEVICE WAS IN HER OPINION, BUT, AGAIN, THAT'S

11:15AM  12   NOT ADMISSIBLE EITHER.  SHE'S NOT AN EXPERT WITNESS.

11:15AM  13        SO I DON'T SEE HOW THE GOVERNMENT GETS THIS DOCUMENT IN IN

11:15AM  14   RELATION TO THIS ISSUE BASED ON THIS OPENING THE DOOR THEORY.

11:15AM  15             THE COURT:  THROUGH THIS WITNESS?

11:16AM  16             MR. CAZARES:  THROUGH THIS WITNESS.

11:16AM  17             THE COURT:  DR. DAS IS A DIFFERENT DISCUSSION.

11:16AM  18             MR. CAZARES:  DIFFERENT ISSUE TOTALLY.

11:16AM  19             THE COURT:  MR. LEACH.

11:16AM  20             MR. LEACH:  THANK YOU, YOUR HONOR.

11:16AM  21        THE DEFENSE ASKED NO FEWER THAN SIX TIMES AT PAGES 4970,

11:16AM  22   5016, 4971, 4972, 4984, AND 4996 OF THE TRANSCRIPT, NO FEWER

11:16AM  23   THAN SIX TIMES WHETHER CMS IDENTIFIED ANY ACTUAL PATIENT

11:16AM  24   IMPACT.

11:16AM  25        IT HAS CREATED THE IMPRESSION WITH THE JURY THAT ALL OF

11:16AM 1    THE OBSERVATIONS BY CMS DON'T MATTER EITHER BECAUSE THEY'RE

11:16AM 2    TECHNICAL OR IT DEALS WITH THE REFRIGERATOR OR THEY DON'T HAVE

11:16AM 3    ANY REAL WORLD IMPACT, WHEN THE CONCLUSION -- WHEN THE OPPOSITE

11:16AM 4    IS TRUE.

11:16AM 5        THERANOS ITSELF, IN A PATIENT IMPACT ASSESSMENT TO CMS,

11:16AM 6    SAID, "THERE'S A POSSIBLE PATIENT IMPACT FOR EVERY TEST

11:16AM 7    REPORTED FROM THE LABORATORY'S TPS 3.5 DEVICE."

11:17AM 8        THIS IS NECESSARY TO DISPEL THE IMPRESSION THAT THE

11:17AM 9    DEFENSE HAS CREATED THROUGH ITS LINE OF QUESTIONING.  IT'S NOT

11:17AM 10   HEARSAY.  IT'S A STATEMENT BY A PARTY OPPONENT.  IT'S EITHER AN

11:17AM 11   ADOPTED ADMISSION, AN AUTHORIZED ADMISSION, OR A STATEMENT OF

11:17AM 12   AN AGENT.

11:17AM 13       MR. BALWANI WAS THE COO OF THE COMPANY AT THE TIME.

11:17AM 14   MS. BENNETT HAS TESTIFIED THAT HE LED THE TEAM THAT WAS

11:17AM 15   RESPONDING TO THE CMS INSPECTION, SO IT'S NOT HEARSAY.

11:17AM 16       THE VOIDING OF THE TEST, THERE'S BEEN EXTENSIVE LITIGATION

11:17AM 17   OVER THIS.  IT'S NOT AN EXPERT OPINION.  IT'S AN ACTION BY THE

11:17AM 18   COMPANY DURING THE TIME PERIOD WHEN MR. BALWANI WAS THE COO.

11:17AM 19       AND IT'S NECESSARY TO DISPEL THE IMPRESSION THAT THE

11:17AM 20   DEFENSE HAS CREATED THAT THERE WAS NO POTENTIAL IMPACT TO

11:17AM 21   PATIENTS BASED ON CMS'S OBSERVATIONS.

11:17AM 22       IT'S NOT HEARSAY UNDER 801(D)(2), AND THEY HAVE OPENED THE

11:18AM 23   DOOR TO THIS.

11:18AM 24       IF THE ISSUE IS THE VOIDING AS OPPOSED TO THE STATEMENTS

11:18AM 25   THAT THERANOS IS MAKING TO CMS AND EVIDENCE OF WHY CMS WOULD

11:18AM   1    NOT CITE POSSIBLE PATIENT IMPACT BECAUSE THAT'S THE

11:18AM   2    LABORATORY'S JOB, I THINK THAT COULD BE CURED BY REDACTING THE

11:18AM   3    LAST PARAGRAPH OF PAGE 9 UNDER CORRECTIVE ACTION WHERE IT

11:18AM   4    REFERS TO THE VOIDING.

11:18AM   5         WHAT I'M MOST FOCUSSED ON IS THE PARAGRAPH ABOVE THAT

11:18AM   6    TALKING ABOUT PATIENT IMPACT.

11:18AM   7              THE COURT:  THANK YOU.

11:18AM   8         I DON'T KNOW IF THAT CHANGES YOUR RATIONALE AT ALL.  THERE

11:18AM   9    WAS TESTIMONY FROM THIS WITNESS, MS. BENNETT, ABOUT REASONS FOR

11:18AM   10   IMPACT ON PATIENTS AND HOW IT MIGHT -- CMS'S OPINION ON HOW

11:18AM   11   THAT MIGHT AFFECT AND REASONS FOR WHY THEY DID CERTAIN THINGS.

11:18AM   12             MR. CAZARES:  IN HER DIRECT EXAMINATION IN RESPONSE

11:18AM   13   TO THE GOVERNMENT'S QUESTIONS, SHE DESCRIBED IMMEDIATE JEOPARDY

11:18AM   14   AND THE POTENTIAL -- ACTUAL HARM, POTENTIAL HARM, POSSIBILITY

11:19AM   15   OF HARM.

11:19AM   16        THAT WAS THE GOVERNMENT.  THAT WASN'T ME.  THAT WAS THEM

11:19AM   17   ELICITING TESTIMONY FROM HER ABOUT WHAT IMMEDIATE JEOPARDY

11:19AM   18   MEANT.

11:19AM   19        I, IN CROSS, RAISED THE SAME ISSUE CONFIRMING WHERE WITHIN

11:19AM   20   THAT SPECTRUM SHE HAD EVIDENCE OF, AND SHE DID NOT HAVE

11:19AM   21   EVIDENCE OF ACTUAL HARM, JUST POSSIBILITIES, WAS THE CROSS

11:19AM   22   RESPONSE TO THOSE QUESTIONS.

11:19AM   23        THE -- GETTING BACK TO THE DOCUMENT, THOUGH, THIS IS ABOUT

11:19AM   24   TWO OR THREE LAYERS OF HEARSAY, EVEN FROM THE LETTER, BECAUSE

11:19AM   25   THE APRIL 1ST LETTER, WHICH THE GOVERNMENT ISN'T TRYING TO

11:19AM 1    INTRODUCE RIGHT NOW, THEY'RE TRYING TO INTRODUCE THE WORK

11:19AM 2    PRODUCT UNDERLYING IT.

11:19AM 3         THESE ARE LIKE A COLLECTIVE WORK PRODUCT OF MULTIPLE

11:19AM 4    PARTIES, NOT JUST DR. DAS HIMSELF -- WHO, BY THE WAY, IS NOT

11:19AM 5    HERE TESTIFYING.  HE'S ALSO NOT AN AGENT OF MR. BALWANI.

11:19AM 6         THERANOS ISN'T A DEFENDANT IN THIS CASE.  DR. DAS WAS AN

11:19AM 7    AGENT OF THERANOS ON APRIL 1, 2016, AND BY THAT TIME I THINK

11:20AM 8    DR. DAS TESTIFIED IN THIS COURTROOM HE HAD HAD ALMOST LITTLE OR

11:20AM 9    NO CONTACT WITH MR. BALWANI EVEN WHEN MR. BALWANI WAS THERE.

11:20AM 10        SO I'M NOT SURE THERE'S ANY AGENCY THEORY THAT IS GOING TO

11:20AM 11   SOMEHOW UNDERMINE A HEARSAY OBJECTION.

11:20AM 12             THE COURT:  SO I DON'T KNOW IF DR. DAS IS GOING TO

11:20AM 13   TESTIFY IN THIS TRIAL.  ASSUMING HE DOES AND HE TESTIFIES ABOUT

11:20AM 14   VOIDING, ACTIONS TAKEN, HE MAY DO THAT, I DON'T KNOW.  HE WOULD

11:20AM 15   CERTAINLY BE ASKED, IF HE WERE -- MY SENSE IS THAT HE WOULD BE

11:20AM 16   ASKED ABOUT HIS WORK THAT HE DID, AND I GUESS WHAT I'M SAYING

11:20AM 17   IS THAT, MR. LEACH, IS IT LIKELY THAT THIS IS GOING TO COME IN

11:20AM 18   THROUGH DR. DAS?  OR CAN YOU REVEAL THAT NOW?

11:20AM 19             MR. LEACH:  I DON'T THINK IT RISES OR FALLS,

11:20AM 20   YOUR HONOR, ON WHETHER DR. DAS ACTUALLY TESTIFIES.

11:20AM 21             THE COURT:  I AGREE.  I AGREE.

11:20AM 22             MR. LEACH:  YEAH.  AND THE GOVERNMENT HAS NOT MADE A

11:20AM 23   FINAL DECISION IN THAT REGARD.

11:20AM 24             THE COURT:  OKAY.

11:20AM 25             MR. LEACH:  IT WAS NOT MY INTENTION TO OFFER THIS

11:20AM  1    EXHIBIT THROUGH MS. BENNETT UNTIL THE DEFENDANT STARTED ASKING

11:20AM  2    QUESTIONS ABOUT POSSIBLE PATIENT IMPACT, AND WE THINK IT'S

11:21AM  3    RELEVANT FOR THOSE PURPOSES.

11:21AM  4         BUT WE HAVE NOT MADE A FINAL DECISION ON DR. DAS.

11:21AM  5            THE COURT:  OKAY.  OKAY.  FAIR ENOUGH.

11:21AM  6         WELL, THE ISSUE OF PATIENT IMPACT IS COMING IN, AND THE

11:21AM  7    CORRECTIVE ACTION, AND I APPRECIATE MR. LEACH'S REPRESENTATION

11:21AM  8    THAT THAT'S -- HE'S NOT PUSHING THAT THAT COME IN.

11:21AM  9         AND I THINK THAT'S -- THAT MIGHT BE A BRIDGE TOO FAR FOR

11:21AM  10   THIS PURPOSE, THAT IS THE CORRECTIVE ACTION PARAGRAPH.

11:21AM  11        ABOVE IT IS THE PARAGRAPH PATIENT IMPACT.  AND WE HAVE

11:21AM  12   HEARD TESTIMONY, BOTH ON DIRECT AND CROSS, REGARDING CMS'S AND

11:21AM  13   THIS WITNESS'S THOUGHTS AND OPINIONS ABOUT PATIENT IMPACT.

11:21AM  14        I HAVEN'T REVIEWED THE TRANSCRIPT JUST RECENTLY, BUT I DO

11:21AM  15   REMEMBER HER TESTIFYING, SOME OF HER LAST TESTIMONY WAS

11:21AM  16   REGARDING PATIENT IMPACT FROM BOTH OF YOU.

11:21AM  17            MR. CAZARES:  WELL, BUT THAT'S THE POINT,

11:21AM  18   YOUR HONOR.

11:21AM  19        THE GOVERNMENT'S THEORY RIGHT NOW IS I HAVE OPENED THE

11:21AM  20   DOOR, THE DEFENSE HAS OPENED THE DOOR.

11:21AM  21        THEY ASKED THE QUESTIONS ABOUT WHETHER IMMEDIATE JEOPARDY

11:22AM  22   RELATES TO ACTUAL HARM, POTENTIAL HARM, AND MS. BENNETT

11:22AM  23   RESPONDED AND DEFINED WHAT ALL OF THAT MEANT, WHICH INCLUDED

11:22AM  24   ACTUAL OR POTENTIAL HARM, AND I FOLLOWED UP.

11:22AM  25        AGAIN, TO CABIN THAT, I DIDN'T INTRODUCE A NEW CONCEPT,

11:22AM   1    JUST THE FACT THAT SHE DIDN'T HAVE EVIDENCE OF ONE PORTION OF

11:22AM   2    THE DEFINITION OF IMMEDIATE JEOPARDY, SO THERE'S NO OPENING THE

11:22AM   3    DOOR BY THE DEFENSE HERE.

11:22AM   4         AND AGAIN, WHILE I APPRECIATE THAT THE CORRECTIVE ACTION

11:22AM   5    LANGUAGE MAY BE OMITTED, BUT THERE'S OTHER DESCRIPTIONS OF WORK

11:22AM   6    AND ANALYSIS BY DR. DAS AND HIS TEAM, IT'S NOT JUST HIM, DOING

11:22AM   7    ANALYSIS OF PATIENT RESULTS.

11:22AM   8         MS. BENNETT HAS TESTIFIED RIGHT NOW, SHE DIDN'T DO ANY

11:22AM   9    ANALYSIS OF PATIENT RESULTS, JUST THE TIME PERIODS WHEN

11:22AM   10   PATIENTS WERE TESTED RELATIVE TO NONCOMPLIANCE.

11:22AM   11        IT'S NOT THE SAME THING.

11:22AM   12        AGAIN, THIS IS TESTIMONY ESSENTIALLY THAT THEORETICALLY

11:22AM   13   WOULD NEED TO COME FROM SOMEBODY, DR. DAS OR SOMEONE AT THE

11:22AM   14   LAB, ABOUT THIS WORK DONE TO REACH THIS CONCLUSION THAT THERE

11:23AM   15   MAY HAVE BEEN SOME PATIENT IMPACT, THEREFORE, THERANOS WAS

11:23AM   16   GOING TO DO SOMETHING, TAKE SOME ACTION, WHICH MS. BENNETT HAS

11:23AM   17   ALREADY MADE CLEAR, CMS DOESN'T DO THAT, THE LAB IS RESPONSIBLE

11:23AM   18   FOR THAT.

11:23AM   19            THE COURT:  HAS SHE TESTIFIED THAT -- ABOUT THE

11:23AM   20   POTENTIAL FOR PATIENT IMPACT FOR EVERY TEST FROM THE 3.5, FROM

11:23AM   21   THE EDISON?  WHAT HAS SHE TESTIFIED ABOUT THAT?

11:23AM   22            MR. LEACH:  DURING HER DIRECT EXAMINATION,

11:23AM   23   YOUR HONOR, THE GOVERNMENT SHOWED QUALITY CONTROL RESULTS

11:23AM   24   RELATING TO THE EDISON 3.5 AND ASKED HER WHETHER THESE WERE

11:23AM   25   DESIRABLE OR UNDESIRABLE RESULTS.  SHE SAID THEY WERE

11:23AM  1    UNDESIRABLE.

11:23AM  2         I DON'T THINK I ASKED IN THE MOMENT, DO THESE QUALITY

11:23AM  3    CONTROL RESULTS HAVE IMPLICATION FOR PATIENTS, BUT I ANTICIPATE

11:23AM  4    HER ANSWER WOULD BE ABSOLUTELY.

11:23AM  5              MR. CAZARES:  THE SURVEY REPORT ITSELF, THOUGH,

11:23AM  6    WHICH IS IN EVIDENCE, IDENTIFIES PATIENT NUMBERS, ASCENSION

11:24AM  7    NUMBERS IN RELATION TO THE QC ISSUES THAT THE GOVERNMENT

11:24AM  8    POINTED OUT WITH MS. BENNETT.

11:24AM  9         SO THE IMPLICATION IS ALREADY THERE.  VIOLATION, PATIENT

11:24AM  10   RESULTS WERE RELEASED CONTEMPORANEOUSLY.  THAT WAS IN THE

11:24AM  11   PORTIONS OF THE SURVEY REPORT THAT THE GOVERNMENT REVIEWED.

11:24AM  12        SO THEY HAVE ALREADY KIND OF SHOWN THAT AND GOTTEN INTO IT

11:24AM  13   WITHOUT HAVING HER TO ELABORATE.

11:24AM  14             THE COURT:  AND WE DON'T KNOW WHETHER SHE HAS SEEN

11:24AM  15   THIS OR NOT?  OR SHE HAS SEEN THIS?

11:24AM  16             MR. LEACH:  SHE HAS SEEN THIS.

11:24AM  17             THE COURT:  SHE HAS SEEN THIS?

11:24AM  18             MR. LEACH:  YES.

11:24AM  19             THE COURT:  AND DID THIS FORM -- HAS IT BEEN ASKED,

11:24AM  20   DID THIS FORM THE BASIS OF ANY OF HER REPORTS OR HER FINDINGS?

11:24AM  21             MR. LEACH:  I DON'T THINK IT CONTRIBUTES TO THE 2567

11:24AM  22   ITSELF, YOUR HONOR, BECAUSE THAT'S CAME IN JANUARY.

11:24AM  23        BUT I DO ANTICIPATE, I THINK SHE SAID SOMETHING TO THIS

11:24AM  24   EFFECT, AND IF NOT, I CAN CLEAR THAT UP, THAT SHE DID REVIEW

11:24AM  25   THIS, THAT SHE DID EVALUATE IT, THAT IT WAS PART OF HER

11:24AM  1      ASSESSMENT OF WHETHER THE LAB APPROPRIATELY RESPONDED TO THE

11:25AM  2      DEFICIENCIES THAT THEY IDENTIFIED.

11:25AM  3          SO THIS IS IMPORTANT INFORMATION FOR HER WORK, BUT I'M NOT

11:25AM  4      SURE THAT I HAVE ASKED THAT PRECISE QUESTION.

11:25AM  5              MR. CAZARES:  AND, YOUR HONOR, WHAT IT TIES INTO IS,

11:25AM  6      AGAIN, MR. BALWANI'S RELATIONSHIP.

11:25AM  7          SO THE ANALYSIS AND THE INFORMATION SHARED BY DR. DAS AND

11:25AM  8      HIS TEAM IN RELATION TO THIS PATIENT IMPACT ASSESSMENT WAS THEN

11:25AM  9      TRANSMITTED TO CMS, THEY USED IT OVER THE SPRING AND SUMMER OF

11:25AM 10      2016 TO REACH THEIR CONCLUSIONS THAT MR. LEACH DOESN'T WANT TO

11:25AM 11      REFERENCE BECAUSE THAT'S OUT IN JULY OF 2016 WHEN MR. BALWANI

11:25AM 12      IS GONE AND WHEN MR. BALWANI IS NOT INVOLVED IN ANY DECISION

11:25AM 13      MAKING AT THAT TIME.

11:25AM 14          SO THERE'S NO CONNECTION TO ANY DECISION CMS MADE OR ANY

11:25AM 15      DECISION THAT MS. BENNETT MADE FROM THIS DOCUMENT BECAUSE IT

11:25AM 16      DOESN'T RELATE TO MR. BALWANI'S WORK.

11:25AM 17              THE COURT:  WELL, I WANT TO TIME STAMP IT, TOO.  HE

11:25AM 18      LEFT IN JULY OF 2016, SOMETIME IN 2016.

11:25AM 19              MR. CAZARES:  YES.

11:25AM 20              THE COURT:  THE LAB IN MS. BENNETT'S WORK WAS WHEN?

11:26AM 21              MR. LEACH:  THE INSPECTION BEGINS IN SEPTEMBER OF

11:26AM 22      2015 AND THE REPORT IS JANUARY OF 2016, AND THIS IS PROVIDED

11:26AM 23      SOMETIME BEFORE APRIL OF 2016.

11:26AM 24              THE COURT:  RIGHT.  RIGHT.

11:26AM 25          SO I LOOKED AT THAT AND IT SEEMED TO ME THAT IT CABINS

11:26AM 1     WITH MR. BALWANI'S TENURE AT THE COMPANY.

11:26AM 2          MR. CAZARES:  WELL, HE WAS STILL -- I GUESS YOU

11:26AM 3     COULD SAY HE WAS AN EMPLOYEE --

11:26AM 4          THE COURT:  RIGHT.

11:26AM 5          MR. CAZARES:  -- OF CMS.  HE WAS NOT DR. DAS'S

11:26AM 6     SUPERVISOR.

11:26AM 7          THE COURT:  OF THERANOS.

11:26AM 8          MR. CAZARES:  DR. DAS WAS NOT MR. BALWANI'S AGENT.

11:26AM 9       MR. BALWANI LEFT, HE RESIGNED IN MAY.

11:26AM 10      HE CONTINUED ON ESSENTIALLY IN A KIND OF CONSULTANT MANNER

11:26AM 11    TO RESPOND TO QUESTIONS AS THE TRANSITION TO FILL WHATEVER HE

11:26AM 12    DID AT THE COMPANY CONTINUED.

11:26AM 13      AND, YES, HIS EFFECTIVE LAST DATE IN THE DOOR I THINK WAS

11:26AM 14    THE SECOND WEEK OR THE THIRD WEEK OF JULY.

11:26AM 15          THE COURT:  JULY 7TH, I BELIEVE.

11:26AM 16          MR. CAZARES:  JULY 7TH.

11:26AM 17      BUT HE WAS GONE BY MAY AND HAD NO IMPACT OR NO ROLE IN THE

11:26AM 18    INTERACTIONS WITH CMS AFTER THE APRIL 1, 2016 LETTER BY DAS.

11:27AM 19          THE COURT:  BUT THIS DOCUMENT IS DATED?

11:27AM 20          MR. LEACH:  SOMETIME BETWEEN JANUARY OF 2016 AND

11:27AM 21    APRIL OF 2016.

11:27AM 22          THE COURT:  SO WHILE HE'S STILL THERE IN SOME

11:27AM 23    CAPACITY.

11:27AM 24          MR. CAZARES:  THEORETICALLY, YEAH.

11:27AM 25          THE COURT:  RIGHT.  AND THE TABLE OF CONTENTS, WHY

11:27AM   1      IS THAT RELEVANT, MR. LEACH?

11:27AM   2                MR. LEACH:  JUST TO --

11:27AM   3                THE COURT:  WHAT DOES THAT SHOW?

11:27AM   4                MR. LEACH:  JUST TO ORIENT.  JUST FOR CONTEXT FOR

11:27AM   5      PAGE 9.  I'M HAPPY TO LIVE WITHOUT PAGE 1, YOUR HONOR.

11:27AM   6                THE COURT:  WELL, I THINK -- I THOUGHT THAT THAT

11:27AM   7      MIGHT BE WHAT IT'S FOR.

11:27AM   8           AS TO LAYING A FOUNDATION FOR THIS PATIENT IMPACT, PAGE 9,

11:27AM   9      I'M GOING TO ALLOW YOU TO MAKE SOME INQUIRY INTO THIS FROM THIS

11:27AM  10      WITNESS AND FOLLOW UP ON THIS.

11:27AM  11           THERE HAS BEEN DISCUSSION ABOUT PATIENT IMPACT.  BOTH OF

11:27AM  12      YOU HAVE ASKED HER QUESTIONS AS TO WHETHER OR NOT THAT IMPACT

11:27AM  13      WOULD BE THERE.

11:27AM  14           I RECALL, I THINK, HER MOST RECENT TESTIMONY WAS THAT SHE

11:27AM  15      TALKED ABOUT PATIENT IMPACT AND THE NEGATIVE EFFECT IT WOULD

11:28AM  16      HAVE ON PATIENTS BASED ON AN INCORRECT RESULT.

11:28AM  17           I THINK YOU GOT THAT IN.  THAT WAS ONE OF THE LAST THINGS

11:28AM  18      THAT YOU WERE ASKING HER BEFORE WE TOOK OUR BREAK.

11:28AM  19           SO I'LL ALLOW YOU TO CONTINUE TO EXAMINE THAT.

11:28AM  20           AS FAR AS THE TIME STAMPING AND THE REFERENCE TO THE

11:28AM  21      PAGES 9 THROUGH 12 OF 1326, LOOKING AT THAT, YOU CAN SEE THAT

11:28AM  22      THE COURT DEFERRED ANY RULING ON THAT CONTINGENT ON A

11:28AM  23      CONNECTION WITH MR. BALWANI AND HIS EMPLOYMENT WITH THE

11:28AM  24      COMPANY.

11:28AM  25           IT APPEARS, BASED ON OUR CONVERSATION HERE, THAT THE

11:28AM   1    REPORT, THE INSPECTION CERTAINLY OCCURRED WHILE HE WAS THERE.

11:28AM   2        THE -- THIS REPORT, IF IT'S TIME STAMPED, AND I DON'T KNOW

11:28AM   3    HOW YOU DO THAT, BUT IF IT'S TIME STAMPED IN THAT SAME PERIOD,

11:28AM   4    I WILL ALLOW SOME DISCUSSION ON IT.

11:28AM   5        WHETHER OR NOT I'M GOING TO ALLOW YOU TO DISPLAY JUST THE

11:29AM   6    PATIENT IMPACT, WE WON'T DO THE CORRECTIVE ACTION THROUGH THIS

11:29AM   7    WITNESS, BUT WHETHER OR NOT JUST THAT PATIENT IMPACT PORTION IS

11:29AM   8    ADMITTED WILL REMAIN TO BE SEEN.

11:29AM   9        BUT I'LL LET YOU EXAMINE SOME MORE ON THIS ON YOUR

11:29AM  10    REDIRECT, AND, OF COURSE, THERE WILL BE RECROSS ON THIS AS

11:29AM  11    WELL.

11:29AM  12            MR. CAZARES:  AND, YOUR HONOR, WITH RESPECT TO THE

11:29AM  13    PATIENT IMPACT, AGAIN, WE BELIEVE IT'S ALSO AN OPINION OF A

11:29AM  14    WITNESS, NOT MS. BENNETT, BASED ON EXPERT ANALYSIS.

11:29AM  15        AND EVEN IF NOT, IT'S A LAY OPINION FROM SOMEONE WHO IS

11:29AM  16    NOT HERE TESTIFYING.

11:29AM  17            THE COURT:  SURE.

11:29AM  18            MR. CAZARES:  SO EITHER WAY IT'S OPINION.

11:29AM  19        IT'S NOT SOME SORT OF BUSINESS RECORD IN THE REGULARLY

11:29AM  20    CONDUCTED COURSE OF BUSINESS, BECAUSE THIS WAS ANYTHING BUT

11:29AM  21    REGULAR, THE CMS INSPECTION, WHAT HAPPENED AT THERANOS.

11:29AM  22            THE COURT:  WELL, WE'LL SEE WHAT FOUNDATION IS LAID.

11:29AM  23        I UNDERSTAND.  I UNDERSTAND THAT.

11:29AM  24        IT MAY BE THAT SHE'LL TESTIFY ABOUT THIS, AND THE DOCUMENT

11:29AM  25    MAY NOT BE NEEDED.  I DON'T KNOW.  WE'LL SEE.

11:29AM 1      BUT THANK YOU FOR THAT.  I APPRECIATE YOU RAISING THAT.

11:29AM 2      SHOULD WE TALK ABOUT SOMETHING ELSE NOW WHILE WE -- WAS

11:30AM 3  THERE SOMETHING ELSE ABOUT THE NEXT WITNESS?

11:30AM 4          MR. LEACH:  THERE IS ANOTHER ISSUE WITH RESPECT TO

11:30AM 5  THE NEXT WITNESS, YOUR HONOR.

11:30AM 6          THE COURT:  WHY DON'T WE PREVIEW THAT NOW?

11:30AM 7          MR. LEACH:  I'LL PASS THE MIKE.

11:30AM 8          MR. CAZARES:  THANK YOU, YOUR HONOR.

11:30AM 9      IT'S RELATING TO AN EXHIBIT THAT THE GOVERNMENT NOTICED IT

11:30AM 10 INTENDED TO USE WITH MR. MOSLEY, AND MS. ESTRADA IS GOING TO

11:30AM 11 ADDRESS THIS ISSUE FOR MR. BALWANI.

11:30AM 12         THE COURT:  ALL RIGHT.  THANK YOU.

11:30AM 13         MS. ESTRADA:  GOOD MORNING, YOUR HONOR.

11:30AM 14     SHAWN ESTRADA ON BEHALF OF MR. BALWANI.

11:30AM 15     MAY I REMOVE MY MASK?

11:30AM 16         THE COURT:  YES.  THANK YOU.

11:30AM 17         MS. ESTRADA:  THANK YOU.

11:30AM 18     THE ISSUE WE WOULD LIKE TO ADDRESS BEFORE THE COURT

11:30AM 19 BRIEFLY TODAY RELATES TO EXHIBIT 2065.  I HAVE COPIES I CAN

11:30AM 20 PASS UP TO THE COURT.

11:30AM 21         THE COURT:  THANK YOU.

11:30AM 22         MS. ESTRADA:  I ASSUME THE GOVERNMENT HAS ONE.

11:30AM 23     (HANDING.)

11:31AM 24     EXHIBIT 2065 IS AN EMAIL CHAIN FROM OCTOBER OF 2014

11:31AM 25 BETWEEN MR. BALWANI, MS. HOLMES, AND MR. HOLMES.

11:31AM  1      AND THE GOVERNMENT INTENDS TO OFFER IT THROUGH MR. MOSLEY,

11:31AM  2   WHO IS NOT A PARTY TO THIS EMAIL.

11:31AM  3      AND THIS IS AN EMAIL CHAIN REGARDING ACTION PLANNING IS

11:31AM  4   THE WORDS THAT MR. HOLMES USES, REGARDING BLOOD TESTING THAT

11:31AM  5   WAS GOING TO OCCUR FOR A PRIVATE EQUITY FIRM, BDT AT WALGREENS

11:31AM  6   IN RELATION TO A VIP MEETING THAT WAS GOING TO TAKE PLACE

11:31AM  7   BETWEEN BDT AND THERANOS.

11:31AM  8      AND WE WOULD OBJECT ON THE GROUNDS OF FOUNDATION, 403, AND

11:31AM  9   HEARSAY.

11:31AM 10      THERE ARE SOME STATEMENTS PARTICULARLY TOWARDS THE BOTTOM

11:31AM 11   OF PAGE 1 UNDERNEATH THE HEADER SCENARIO 1, THE LAST BULLET

11:31AM 12   POINT, THAT CONTAINS AN OFFHAND COMMENT MADE BY MR. HOLMES THAT

11:32AM 13   THE JURY COULD INFER SOMETHING NEFARIOUS THAT MR. BALWANI

11:32AM 14   EITHER CONDONED OR TOOK PART IN, AND WITHOUT ANY CONTEXT FROM

11:32AM 15   MR. MOSLEY, THAT -- THIS EMAIL IS INADMISSIBLE UNDER RULE 403,

11:32AM 16   AND I CAN ADDRESS THE HEARSAY ISSUE IN A MOMENT.

11:32AM 17           THE COURT:  I'M SORRY.  THIS IS UNDER THE NEGATIVES,

11:32AM 18   AND IT'S THE SECOND BULLET UNDER NEGATIVES?

11:32AM 19           MS. ESTRADA:  THAT'S CORRECT, YOUR HONOR.

11:32AM 20           THE COURT:  OKAY.

11:32AM 21           MS. ESTRADA:  SO THAT BULLET POINT IN PARTICULAR IS

11:32AM 22   PROBLEMATIC UNDER RULE 403, BUT ALSO FOR THE EMAIL CHAIN IN ITS

11:32AM 23   ENTIRETY.  MR. MOSLEY SIMPLY DOESN'T HAVE PERSONAL KNOWLEDGE OF

11:32AM 24   THIS EMAIL.

11:32AM 25      AND SO IF I CAN SPEAK A LITTLE MORE SPECIFICALLY ABOUT

11:32AM 1      MR. MOSLEY'S LACK OF ANY RELATIONSHIP TO THIS EMAIL?

11:32AM 2          SO AS I MENTIONED, THIS IS AN EMAIL FROM MR. HOLMES SENT

11:32AM 3      TO MR. BALWANI AND MS. HOLMES.  THIS IS NOT WORDS OR LANGUAGE

11:33AM 4      THAT MR. BALWANI USED.  THESE ARE MR. HOLMES'S WORDS.

11:33AM 5          AND NOTHING FROM THE FACE OF THE EMAIL SHOWS WHETHER

11:33AM 6      MR. BALWANI RESPONDED; WHETHER MR. BALWANI CONDONED WHAT

11:33AM 7      MR. HOLMES SUGGESTED HERE; WHAT, IF ANYTHING, MR. BALWANI SAID

11:33AM 8      IN A CONVERSATION EITHER BEFORE THE EMAIL OR AFTER THE EMAIL.

11:33AM 9          THERE'S NO CONTEXT THAT THE FACE OF THIS EMAIL CAN PROVIDE

11:33AM 10     BASED ON WHAT REACTION THAT MR. BALWANI, IF ANY, HAD TO THAT

11:33AM 11     PARTICULAR COMMENT OR TO THE EMAIL AS A WHOLE.

11:33AM 12         AND MR. MOSLEY, WHO IS NOT A PARTY TO THIS EMAIL, IS NOT

11:33AM 13     AN EMPLOYEE OF THERANOS, CERTAINLY CAN'T PROVIDE THAT CONTEXT.

11:33AM 14         AND FOR THAT PARTICULAR STATEMENT, AND THIS EMAIL AS A

11:33AM 15     WHOLE, TO BE PLACED BEFORE THE JURY WITHOUT ANY CONTEXT IS

11:34AM 16     PREJUDICIAL UNDER RULE 403.

11:34AM 17         AND IN ADDITION, YOUR HONOR, BECAUSE MR. MOSLEY LACKS

11:34AM 18     PERSONAL KNOWLEDGE OF THIS EMAIL IN PARTICULAR, AND ALSO THE

11:34AM 19     INNER WORKINGS OF THE BLOOD TESTS AND DEMO PROCESS AT THERANOS,

11:34AM 20     WE WOULDN'T HAVE ANY WAY OF MEANINGFULLY CROSS-EXAMINING HIM TO

11:34AM 21     PROVIDE THAT CONTEXT.  WE WOULDN'T BE ABLE TO ASK MR. MOSLEY,

11:34AM 22     WELL, DO YOU KNOW ANYTHING ABOUT WHAT HAPPENED IN THIS

11:34AM 23     CONVERSATION?

11:34AM 24         DO YOU KNOW ANYTHING ABOUT WHAT HAPPENED IN THIS

11:34AM 25     PARTICULAR DEMO?

11:34AM   1        DO YOU KNOW ANYTHING ABOUT WHAT HAPPENED AT WALGREENS?

11:34AM   2        DO YOU KNOW ANYTHING ABOUT WHAT MR. BALWANI MAY HAVE SAID

11:34AM   3   IN RESPONSE TO THIS, EITHER VIA EMAIL OR IN PERSON?

11:34AM   4        MR. MOSLEY JUST SIMPLY WOULDN'T KNOW THAT.

11:34AM   5        AND SO THAT LACK OF PERSONAL KNOWLEDGE MEANS THAT IT'S NOT

11:34AM   6   APPROPRIATE FOR THIS EXHIBIT TO COME IN THROUGH HIM.

11:34AM   7             THE COURT:  OKAY.  THANK YOU.

11:35AM   8        SO MR. MOSLEY WAS AN INVESTOR, I BELIEVE.  IS THAT RIGHT?

11:35AM   9             MS. ESTRADA:  THAT'S CORRECT, YOUR HONOR.

11:35AM   10            THE COURT:  AND HE WAS PART OF THE BDT GROUP THAT

11:35AM   11  WAS -- THE EVIDENCE MAY SHOW THIS -- THAT WAS GOING TO BE

11:35AM   12  TESTED?  THIS VIP, HE'S PART OF THE VIP TOUR?

11:35AM   13            MS. ESTRADA:  SO ACTUALLY, YOUR HONOR, WHAT IS

11:35AM   14  CONFUSING ABOUT THIS IS THAT MR. MOSLEY WORKS AT BDT CURRENTLY,

11:35AM   15  BUT AT THE TIME HE DID NOT.

11:35AM   16       HE WAS AN ATTORNEY AT THE CRAVATH FIRM.  I EXPECT THAT

11:35AM   17  MR. MOSLEY WILL TESTIFY THAT HE HAD MANY CONVERSATIONS WITH HIS

11:35AM   18  CLIENTS WHO INVESTED IN THERANOS, OR AT THE VERY LEAST WERE

11:35AM   19  INVOLVED IN CONVERSATIONS AND MEETINGS WITH MS. HOLMES, BUT

11:35AM   20  BDT -- IT'S MY UNDERSTANDING THAT WHAT MR. MOSLEY WILL TESTIFY

11:35AM   21  TO IS THAT HE DOESN'T KNOW WHETHER OR NOT BDT TESTIFIED.  BDT

11:36AM   22  WAS NOT ONE OF HIS CLIENTS.

11:36AM   23       AS FAR AS I'M AWARE, THE ONLY CONNECTION BETWEEN

11:36AM   24  MR. MOSLEY AND BDT AND THERANOS IS THAT HE ATTENDED A

11:36AM   25  CONFERENCE PRIOR TO, AND THAT'S HOW HE MET MS. HOLMES.

11:36AM 1    BUT THERE'S NO FOUNDATION THAT I THINK THAT MR. MOSLEY

11:36AM 2    WILL BE ABLE TO LAY LINKING HIS KNOWING MR. TROTT, KNOWING

11:36AM 3    PEOPLE THAT WORKED AT BDT, ATTENDING THAT CONFERENCE, TO THIS

11:36AM 4    PARTICULAR EMAIL ABOUT BLOOD TESTING THAT WAS DONE AT

11:36AM 5    WALGREENS.

11:36AM 6         THE COURT:  OKAY.  AND SO HE WASN'T A VIP WHO

11:36AM 7    ATTENDED THIS?

11:36AM 8         MS. ESTRADA:  NOT THIS -- MR. MOSLEY IS A VIP WHO

11:36AM 9    HAD ATTENDED MEETINGS OF HIS OWN, BUT NOT THIS ONE, NO.

11:36AM 10        THE COURT:  I SEE.

11:36AM 11        MS. ESTRADA:  AND MR. MOSLEY HAD -- I EXPECT THAT HE

11:36AM 12   WILL TESTIFY THAT HE RECEIVED BLOOD TESTING FROM WALGREENS

11:36AM 13   HIMSELF, BUT IN JUNE OF 2015, AND THIS IS IN OCTOBER OF 2014.

11:36AM 14        THE COURT:  OKAY.  THANK YOU.

11:37AM 15    ON THE BOTTOM OF THE SHEET THAT I HAVE, IT SAYS FROM

11:37AM 16   SUNNY BALWANI.  IS THAT AN EMAIL?

11:37AM 17        MS. ESTRADA:  OH, THAT'S AN EMAIL --

11:37AM 18        THE COURT:  NEXT TO THE TOP.

11:37AM 19        MS. ESTRADA:  -- ON THE SECOND PAGE, YOUR HONOR.

11:37AM 20        THE COURT:  IS THAT RELATED TO THIS CHAIN?

11:37AM 21        MS. ESTRADA:  SO AS I UNDERSTAND IT, THIS CHAIN

11:37AM 22   CONTAINS ON PAGE 2 AN EMAIL FROM CHRISTIAN HOLMES, AND THEN

11:37AM 23   MR. BALWANI WRITES THE NEXT EMAIL UP THAT SAYS, "DIANA, CAN YOU

11:37AM 24   SEND CHRISTIAN," AND SO ON.

11:37AM 25        AND THEN MR. HOLMES -- THIS EMAIL THAT TAKES UP PRETTY

11:37AM  1    MUCH THE WHOLE FIRST PAGE IS FROM MR. HOLMES.

11:37AM  2           THE COURT:  OKAY.  DOES THAT HAVE ANYTHING TO DO

11:37AM  3    WITH THE ANALYSIS, THAT IS, THAT MR. BALWANI IS IN THE MIDDLE

11:37AM  4    OF THE CHAIN?

11:37AM  5           MS. ESTRADA:  I DON'T THINK SO, YOUR HONOR, BECAUSE

11:37AM  6    IN THIS CHAIN -- OR IN THIS EMAIL THAT MR. BALWANI SENDS, IT

11:37AM  7    APPEARS THAT HE'S JUST SIMPLY ASKING HIS ASSISTANT, DIANA LEE,

11:37AM  8    TO SEND PLAINTIFF A LIST OF PEOPLE FROM BDT WHO VISITED A FEW

11:37AM  9    DAYS BACK.

11:38AM  10           AND SO MR. HOLMES THEN RESPONDS WITH -- I'M READING FROM

11:38AM  11    THE BEGINNING OF THE EMAIL, "SEND ALONG OUR THOUGHTS FOR HOW TO

11:38AM  12    ACCOMPLISH," AND THEN HE CONTINUES WITH BASICALLY HOW TO

11:38AM  13    ACCOMPLISH THE PLAN, AND WHAT HE LAYS OUT AS DIFFERENT

11:38AM  14    SCENARIOS FOR BLOOD TESTING AT WALGREENS THAT BDT IS TO

11:38AM  15    EXPERIENCE.

11:38AM  16           SO THOSE REALLY AREN'T RELATED.

11:38AM  17           THE COURT:  OKAY.  THANK YOU.

11:38AM  18           MR. SCHENK.

11:38AM  19           MR. SCHENK:  YES, YOUR HONOR, A FEW THOUGHTS.

11:38AM  20           FIRST, LET ME START WHERE THE COURT FINISHED, AND THAT IS

11:38AM  21    THAT MR. BALWANI IS ON THIS EMAIL CHAIN WHERE MS. HOLMES,

11:38AM  22    MR. HOLMES, AND THE DEFENDANT ARE DISCUSSING HOW TO DECEIVE

11:38AM  23    FOLKS FROM BDT.

11:38AM  24           AT THE VERY LEAST, THIS EXHIBIT, 2065, IS ADMISSIBLE FOR

11:38AM  25    NOTICE TO MR. BALWANI, THAT IS, FOR KNOWLEDGE AND INTENT TO

11:38AM  1    MR. BALWANI.

11:38AM  2        IT IS ADMISSIBLE, THOUGH, BEYOND THAT.  IT IS ADMISSIBLE

11:38AM  3    FOR ITS TRUTH, AND IT IS ADMISSIBLE FOR THAT REASON UNDER

11:39AM  4    803(6), THE BUSINESS RECORD EXCEPTION.

11:39AM  5        AND LET ME EXPLAIN.  FIRST, THE COURT -- I AGREE WITH THE

11:39AM  6    FACTUAL RECITATION THAT THE COURT JUST HEARD ABOUT WHAT

11:39AM  7    MR. MOSLEY WOULD LIKELY SAY ABOUT THIS EMAIL, AND THAT IS, I

11:39AM  8    DIDN'T WORK AT BDT AT THE TIME, AND I WAS NOT A PART OF THE

11:39AM  9    GROUP OF INDIVIDUALS REFERENCED IN THIS EMAIL THAT WERE GOING

11:39AM 10    TO VISIT A WALGREENS STORE.

11:39AM 11        HE WASN'T PART OF THAT GROUP.

11:39AM 12        MR. MOSLEY RECEIVED A SEPARATE PITCH AND A SEPARATE TEST,

11:39AM 13    THE DEFENSE IS CORRECT, ON DIFFERENT DATES.

11:39AM 14        BUT IT IS STILL ADMISSIBLE AS A BUSINESS RECORD, AND THAT

11:39AM 15    IS BECAUSE THE COURT HAS HEARD SUFFICIENT BUSINESS RECORD

11:39AM 16    FOUNDATION ON THIS EXACT ISSUE FROM PRIOR WITNESSES.

11:39AM 17        THE DEFENSE THEMSELVES HAVE ESTABLISHED THE BUSINESS

11:39AM 18    RECORD FOUNDATION THROUGH DAN EDLIN ON APRIL 13TH.  THAT'S AT

11:39AM 19    PAGE 2598 OF THE TRANSCRIPT.

11:39AM 20        THE GOVERNMENT ESTABLISHED BUSINESS RECORD -- I'M SORRY.

11:40AM 21        THE DEFENSE ESTABLISHED BUSINESS RECORD FOUNDATION THROUGH

11:40AM 22    DR. ROSENDORFF ON APRIL 22ND ON PAGE 3546 OF THE TRANSCRIPT.

11:40AM 23        SO TWO INSTANCES, EDLIN AND ROSENDORFF, THE COURT HAS

11:40AM 24    ALREADY HEARD THE BUSINESS RECORDS FOUNDATION THROUGH THE

11:40AM 25    DEFENSE.

11:40AM  1       THERE ARE SEVERAL OTHER CITES THAT THE GOVERNMENT PROVIDED

11:40AM  2   BUSINESS RECORDS FOUNDATION, AND THAT WAS EDLIN ON THE 6TH OF

11:40AM  3   APRIL, PAGES 2379 THROUGH 2380.

11:40AM  4       THE GOVERNMENT ALSO PROVIDED BUSINESS RECORD FOUNDATION

11:40AM  5   THROUGH DR. ROSENDORFF ON APRIL 20TH ON PAGE 3273 OF THE

11:40AM  6   TRANSCRIPT.

11:40AM  7       SO FOUR INSTANCES THE COURT HAS ALREADY HEARD BUSINESS

11:40AM  8   RECORD FOUNDATION FOR THIS TYPE OF EMAIL.

11:40AM  9       I CAN GO FURTHER, THOUGH.

11:40AM 10       THIS EXACT SITUATION, THAT IS, AN INTERNAL THERANOS EMAIL

11:40AM 11   BEING OFFERED TO A WITNESS WHO IS NOT ON THAT EMAIL, WAS DONE

11:41AM 12   BY THE DEFENSE.  I CAN PASS UP THE EXHIBIT, AND I'LL PASS UP

11:41AM 13   THE TRANSCRIPT.

11:41AM 14       THE DEFENSE DID THAT THROUGH DR. ROSENDORFF ON APRIL 22ND.

11:41AM 15   THE EXHIBIT NUMBER WAS 7314, AND IT'S ON PAGE 3559 OF THE

11:41AM 16   TRANSCRIPT.

11:41AM 17       SO I'M HANDING UP NOW -- (HANDING.)

11:41AM 18       I'M PASSING UP TO THE COURT A PORTION OF THE TRANSCRIPT

11:41AM 19   AND THE EXHIBIT WHERE MR. COOPERSMITH, DURING DR. ROSENDORFF'S

11:41AM 20   TESTIMONY, ADMITTED EXHIBIT 7314.  THE COURT HAS A COPY NOW OF

11:41AM 21   7314.  THAT IS ONE EMAIL.  IT'S TWO PAGES.

11:41AM 22       THE RECIPIENTS ON THE EMAIL ARE MS. HOLMES AND

11:41AM 23   MR. BALWANI.  THE SENDER WAS DR. YOUNG.

11:41AM 24       DR. ROSENDORFF WAS ON THE STAND.  AND YOU CAN SEE FROM THE

11:42AM 25   PORTION OF THE TRANSCRIPT THAT I PASSED UP MR. COOPERSMITH'S

BENNETT  REDIRECT BY MR. LEACH

11:42AM 1    ARGUMENTS TO THE COURT ARE PRECISELY WHAT WE'RE DEALING WITH

11:42AM 2    RIGHT NOW, AND THAT IS, IT DOESN'T MATTER THAT THE WITNESS WHO

11:42AM 3    IS ON THE STAND WASN'T ON THE EMAIL, THE EMAIL ITSELF APPEARS

11:42AM 4    TO BE A BUSINESS RECORD.

11:42AM 5         AND THE COURT OVERRULED THE GOVERNMENT'S OBJECTION AND

11:42AM 6    ADMITTED THE DOCUMENT AS A BUSINESS RECORD.

11:42AM 7         SO THE COURT SHOULD ADMIT 2065, THE EMAIL WE'RE NOW

11:42AM 8    DISCUSSING, AS A BUSINESS RECORD BECAUSE IT'S HEARD SUFFICIENT

11:42AM 9    FOUNDATION THROUGH TWO PRIOR WITNESSES, AND A PARTICULAR

11:42AM 10   WITNESS ON THE STAND IS NOT RELEVANT TO THE ANALYSIS, PURSUANT

11:42AM 11   TO THIS PRIOR INSTANCE THAT I'VE PROVIDED TO THE COURT,

11:42AM 12   DR. ROSENDORFF AND AN EMAIL THAT DR. ROSENDORFF WASN'T ON.

11:42AM 13        THE DEFENSE'S ARGUMENT TO THE COURT JUST A MOMENT AGO WHEN

11:42AM 14   SHE DESCRIBED THE CONTENT OF THE EMAIL WAS THESE ARE VIP'S

11:42AM 15   GETTING A BLOOD TEST, AND THAT'S PRECISELY WHAT SOME OF THE

11:43AM 16   BUSINESS RECORD CITATIONS I'VE PROVIDED TO THE COURT DEALT

11:43AM 17   WITH; THAT IS, EDLIN AND ROSENDORFF EXPLAIN TO THIS JURY THAT

11:43AM 18   EMAILS WITHIN THERANOS WERE USED TO ARRANGE AND PROVIDE THE

11:43AM 19   CIRCUMSTANCES AND SETUPS FOR THESE KIND OF VIP DEMOS.

11:43AM 20        SO THE COURT HAS AND THIS JURY ALSO HAS A SUFFICIENT BASIS

11:43AM 21   TO ADMIT THIS EMAIL AS A BUSINESS RECORD.

11:43AM 22        LET ME TOUCH JUST BRIEFLY ON THE 403 QUESTION.  THE COURT

11:43AM 23   SHOULD ADMIT IT AS NONHEARSAY, BUT ALSO IT HAS TO APPRECIATE

11:43AM 24   WHETHER THE EMAIL IS TOO PREJUDICIAL.

11:43AM 25        AND THE FACT OF THE MATTER IS THAT IT IS NOT TOO

11:43AM 1    PREJUDICIAL.  IT GOES TO THE HEART OF THE ISSUE THAT THE TWO

11:43AM 2    SIDES HAVE BEEN ASKING THIS JURY TO WRESTLE WITH, AND THAT IS,

11:43AM 3    WHAT DO INDIVIDUALS KNOW WHEN THEY RECEIVE DEMONSTRATIONS, WHEN

11:43AM 4    VIP'S RECEIVE BLOOD TESTS?

11:43AM 5         AND WHEN MR. BALWANI IS ON THIS EMAIL CHAIN WHERE IT

11:44AM 6    APPEARS WHAT MR. HOLMES WRITES PURSUANT TO INSTRUCTIONS FROM

11:44AM 7    ELIZABETH HOLMES, WE KNOW THAT THESE INDIVIDUALS MUST RECEIVE A

11:44AM 8    FINGERSTICK, AND IF CERTAIN TESTS NEED TO BE REMOVED IN ORDER

11:44AM 9    TO GENERATE A FINGERSTICK, FINE, SO BE IT, DO THAT, BUT LET'S

11:44AM 10   ANALYZE THE WAYS IN WHICH THE RECIPIENTS OF THE FINGERSTICK

11:44AM 11   MIGHT BECOME AWARE OF THE FACT THAT CERTAIN TESTS WERE REMOVED

11:44AM 12   IN ORDER TO GENERATE THE FINGERSTICK TEST.

11:44AM 13        AND THE ADVICE HERE, THERE'S A FEW OF THEM, THE COURT SEES

11:44AM 14   UNDER SCENARIO 1 THERE'S CASE A AND CASE B.  AND WHAT IS

11:44AM 15   ANALYZED IS THE BENEFITS OR THE ADVANTAGES AND DISADVANTAGES TO

11:44AM 16   EACH APPROACH, AND ONE OF THE RISKS OR NEGATIVES TO ONE OF THE

11:44AM 17   APPROACHES IS THAT THEY MIGHT ACTUALLY HAVE TO PHYSICALLY

11:44AM 18   DISTRACT BDT FROM LOOKING AT THE RECEIPT SO THAT THEY DON'T

11:44AM 19   NOTICE THAT CERTAIN TESTS WERE REMOVED.

11:44AM 20        I AGREE IT'S PREJUDICIAL, BUT THAT'S WHAT MAKES IT

11:44AM 21   RELEVANT.

11:44AM 22        IT IS NOT UNFAIRLY PREJUDICIAL BECAUSE, AGAIN, THIS IS THE

11:45AM 23   HEART OF ONE OF THE ISSUES THAT THE PARTIES HAVE BEEN ASKING

11:45AM 24   THIS JURY TO WRESTLE WITH, AND THAT JUST MAKES THIS EMAIL MORE

11:45AM 25   RELEVANT.

11:45AM  1          THE COURT:  THANK YOU.

11:45AM  2      MS. ESTRADA.

11:45AM  3          MS. ESTRADA:  YES, YOUR HONOR.

11:45AM  4      SO THE DIFFERENCE BETWEEN WHAT MR. SCHENK JUST DESCRIBED

11:45AM  5  AND THIS EMAIL IS EXHIBIT 7314 AS ADMITTED THROUGH

11:45AM  6  DR. ROSENDORFF IS THAT DR. ROSENDORFF WAS A THERANOS EMPLOYEE.

11:45AM  7      WE -- THE GOVERNMENT WOULD HAVE BEEN ABLE, AFTER WE

11:45AM  8  ADMITTED THIS EXHIBIT, TO ASK QUESTIONS OF DR. ROSENDORFF ABOUT

11:45AM  9  WHAT WAS CONTAINED IN THIS EMAIL.

11:45AM  10      BUT MR. MOSLEY IS NOT AN EMPLOYEE OF THERANOS, AND SO HE

11:45AM  11  DOESN'T HAVE THE PERSONAL KNOWLEDGE TO ALLOW ANY MEANINGFUL

11:45AM  12  CROSS-EXAMINATION OF EXHIBIT 2065.

11:45AM  13      AND IN ADDITION TO THAT, YOUR HONOR, THE WITNESS ON THE

11:45AM  14  STAND HAS TO BE ABLE TO LAY THE FOUNDATION FOR A BUSINESS

11:45AM  15  RECORD.

11:45AM  16      MR. EDLIN WAS ABLE TO LAY THE FOUNDATION WITH RESPECT TO

11:46AM  17  BUSINESS RECORDS THAT -- BECAUSE HE WORKED AT THE COMPANY.  HE

11:46AM  18  WAS FAMILIAR WITH HOW EMAIL WAS USED WITH RESPECT TO VIP DEMOS.

11:46AM  19      SAME WITH DR. ROSENDORFF.

11:46AM  20      BUT MR. MOSLEY IS NOT AN EMPLOYEE OF THERANOS, AND HE

11:46AM  21  HAS -- HE'S NOT ABLE TO LAY THAT FOUNDATION.  HE DOESN'T HAVE

11:46AM  22  THE PERSONAL KNOWLEDGE.

11:46AM  23          THE COURT:  SO, SO LET ME STOP YOU THERE AND ASK

11:46AM  24  MR. SCHENK THAT.

11:46AM  25      THAT WAS A THOUGHT THAT I HAD.  IRRESPECTIVE OF THE FACT

11:46AM   1    THAT PREVIOUS SCENARIOS LIKE THIS HAVE COME UP AND THE COURT

11:46AM   2    HAS ADMITTED OTHER DOCUMENTS UNDER THE 803(6) EXCEPTION, HOW,

11:46AM   3    HOW WOULD THAT WORK WITH THIS WITNESS IF HE LACKS THAT

11:46AM   4    KNOWLEDGE, OR WHAT FOUNDATION WOULD YOU LAY FOR THAT?

11:46AM   5              MR. SCHENK:  I WOULD LAY NO FOUNDATION FOR THE EMAIL

11:46AM   6    THROUGH MR. MOSLEY.  HE COULD NOT PROVIDE THAT FOUNDATION.

11:46AM   7         SO IF THE DEFENSE IS CORRECT THAT EVERY TIME YOU ADMIT A

11:46AM   8    BUSINESS RECORD, THE WITNESS ON THE STAND MUST BE REQUIRED TO

11:46AM   9    LAY THE BUSINESS RECORD FOUNDATION, I FAIL THAT TEST AND THE

11:47AM  10    COURT SHOULD EXCLUDE THIS EMAIL.

11:47AM  11         THAT'S NOT THE TEST, THOUGH.  THAT IS A DISTINCTION

11:47AM  12    WITHOUT A DIFFERENCE.

11:47AM  13         THE DEFENSE'S ARGUMENT IS BASED ON THE ABILITY TO

11:47AM  14    MEANINGFULLY CROSS THE WITNESS ON THE CONTENT OF THIS EMAIL

11:47AM  15    AND, FRANKLY, IT'S A DISTINCTION WITHOUT A DIFFERENCE THAT

11:47AM  16    ADAM ROSENDORFF WORKED AT THERANOS AND, THEREFORE, AN EMAIL

11:47AM  17    SENT AMONG OTHER INDIVIDUALS STILL GAVE HIM THE OPPORTUNITY TO

11:47AM  18    MEANINGFULLY CROSS OR EXAMINE DR. ROSENDORFF ABOUT THE EMAIL

11:47AM  19    BECAUSE HE ALSO WORKED AT THERANOS -- NO, IT DOES NOT WORK THAT

11:47AM  20    WAY.

11:47AM  21         EITHER YOU MEET THE HEARSAY EXCEPTION AND THE EMAIL COMES

11:47AM  22    IN, OR IT DOESN'T.

11:47AM  23         BUT THE TEST IS NOT WHETHER MEANINGFUL CROSS CAN BE

11:47AM  24    CONDUCTED BASED UPON WHO'S ON THE STAND.

11:47AM  25         AND I THINK THAT BECAUSE THE COURT HAS HEARD SUFFICIENT

11:47AM 1    EVIDENCE REGARDING THE WAY THERANOS EMAILS WERE USED, AND IN

11:47AM 2    PARTICULAR FOR ARRANGING VIP BLOOD TESTS, IT CAN ADMIT THE

11:47AM 3    EMAIL AS A BUSINESS RECORD.

11:48AM 4        IT DOES NOT NEED, EACH TIME THAT AN EMAIL IS PROFFERED,

11:48AM 5    THE PARTICULAR WITNESS TO RE-LAY THAT BUSINESS RECORD

11:48AM 6    FOUNDATION BECAUSE WE HAVE THE AUTHENTICITY STIP.

11:48AM 7            THE COURT:  YES, THAT'S RIGHT.  THERE'S AN

11:48AM 8    AUTHENTICITY STIP AS TO THIS -- THAT WAS MY NEXT QUESTION --

11:48AM 9    AND THIS FALLS UNDER THAT STIPULATION THAT THE PARTIES MADE.

11:48AM 10   THERE'S A BATE STAMP AND THE AUTHENTICITY IS THERE.

11:48AM 11       THE NEXT STEP, I THINK, MR. SCHENK, YOU'RE SAYING IS THAT,

11:48AM 12   NO, CERTAINLY THIS WITNESS CAN'T LAY A FOUNDATION FOR THIS.

11:48AM 13   HE'S NOT ALLOWED TO DO THAT.

11:48AM 14       BUT THE COURT SHOULD LOOK AT PRIOR TESTIMONY, PRIOR

11:48AM 15   SIMILAR TESTIMONY ABOUT SIMILAR EMAILS.

11:48AM 16       AND WHAT IS WRONG WITH THAT PROCESS, MS. ESTRADA?  WHY

11:48AM 17   CAN'T THE COURT DO THAT?

11:48AM 18           MS. ESTRADA:  I THINK BECAUSE THIS IS A SLIGHTLY

11:48AM 19   DIFFERENT EMAIL ALSO FROM THE EMAILS THAT MR. SCHENK HAS

11:48AM 20   REFERENCED.

11:48AM 21       MR. EDLIN TESTIFIED ABOUT VIP DEMONSTRATIONS THAT TOOK

11:48AM 22   PLACE AT THERANOS, OR IN SOME CASES HE TALKED ABOUT VIP

11:49AM 23   DEMONSTRATIONS THAT OCCURRED IN NEW YORK AND CHICAGO.

11:49AM 24       BUT FOR THE MOST PART, HE TALKED ABOUT VIP DEMONSTRATIONS

11:49AM 25   WHERE A VIP CAME TO THERANOS AND HAD THEIR BLOOD TESTED THERE,

11:49AM  1    OR IN SOME CASES JUST SAW THE TECHNOLOGY BEING DEMONSTRATED.

11:49AM  2         AND THEN THIS EMAIL FROM DR. ROSENDORFF IS RELATED TO

11:49AM  3    PATIENTS, NON-VIP'S, WHO MAY HAVE GONE TO WALGREENS ON THEIR

11:49AM  4    OWN.

11:49AM  5         BUT THIS IS SLIGHTLY DIFFERENT.  THIS IS A MIXTURE OF SORT

11:49AM  6    OF THE TWO, A VIP WHO WAS IN COMMUNICATIONS WITH MS. HOLMES

11:49AM  7    GOING TO WALGREENS AND HAD THEIR -- HAVING THEIR BLOOD TESTED

11:49AM  8    THERE.

11:49AM  9         AND SO WITH RESPECT TO THIS PARTICULAR EMAIL, I'M NOT

11:49AM 10    HEARING FROM THE GOVERNMENT WHY THIS SHOULD BE ADMITTED THROUGH

11:49AM 11    MR. MOSLEY, WHO DOES NOT HAVE PERSONAL KNOWLEDGE.

11:49AM 12         AND IN ADDITION TO THAT, YOUR HONOR, IF THIS EMAIL IS

11:49AM 13    ADMITTED THROUGH MR. MOSLEY AND NOT THROUGH SOMEONE, SAY,

11:50AM 14    MR. HOLMES, WHO WAS THE WRITER OF THIS EMAIL WHO HAS THE MOST

11:50AM 15    PERSONAL KNOWLEDGE ABOUT WHAT TOOK PLACE, IT WOULD SHIFT THE

11:50AM 16    BURDEN TO THE DEFENSE TO CALL A WITNESS TO PROVIDE CONTEXT, AND

11:50AM 17    IT WOULD JUST LEAVE THE JURY WITH THIS MISIMPRESSION THAT THIS

11:50AM 18    OFF-HAND COMMENT FROM MR. HOLMES WAS IMPUTED ON TO MR. BALWANI.

11:50AM 19              THE COURT:  WELL, THANK YOU.

11:50AM 20         BUT THERE IS EVIDENCE ABOUT TESTS AND VIP TESTING.

11:50AM 21         AND MR. SCHENK TELLS US THAT THE RECORD SHOWS THAT, THAT

11:50AM 22    THAT WAS SOMETHING THAT WAS NOT UNCOMMON FOR THE COMPANY TO

11:50AM 23    ENGAGE IN, AND THIS IS JUST ANOTHER ONE OF THOSE.

11:50AM 24         AND HE SUGGESTS THAT IT SHOULD COME IN AS A BUSINESS

11:50AM 25    RECORD BECAUSE IT SPEAKS TO THAT, THAT CONTINUED COURSE OF

11:50AM  1    CONDUCT.

11:50AM  2           SO THERE'S THAT.

11:50AM  3           AND THEN MR. SCHENK SAYS, AT A MINIMUM, IF IT DOESN'T COME

11:51AM  4    IN UNDER 803(6), IT SHOULD COME IN AS TO NOTICE OF YOUR CLIENT.

11:51AM  5           AND WHAT IS YOUR THOUGHT ON THAT?

11:51AM  6           MS. ESTRADA:  YES, YOUR HONOR.

11:51AM  7           IF I MAY, JUST ONE MORE THING ABOUT THE BUSINESS RECORD

11:51AM  8    EXCEPTION.

11:51AM  9           THE FOUNDATION HAS TO BE LAID FOR EACH DOCUMENT THROUGH

11:51AM  10   EACH WITNESS THAT IT IS PROVIDED, AND MR. MOSLEY SIMPLY WON'T

11:51AM  11   BE ABLE TO LAY THAT FOUNDATION.

11:51AM  12          AND WITH REGARD TO NOTICE TO MR. BALWANI, I THINK THE ONLY

11:51AM  13   WAY THAT THIS PARTICULAR EMAIL, THESE WORDS FROM MR. HOLMES,

11:51AM  14   FOR THAT TO BE RELEVANT TO NOTICE TO MR. BALWANI, IT HAS TO BE

11:51AM  15   OFFERED FOR THE TRUTH OF THE MATTER ASSERTED, THAT, IN FACT,

11:51AM  16   THIS IS WHAT OCCURRED DURING THIS VIP DEMO AT WALGREENS WITH

11:51AM  17   BDT.

11:51AM  18          AND SO FOR THIS PLAN THAT MR. HOLMES PUTS FORTH, WITHOUT

11:51AM  19   ANY CONTEXT REGARDING WHAT MR. BALWANI'S RESPONSE WAS OR WHAT

11:52AM  20   ACTUALLY HAPPENED, BECAUSE MR. MOSLEY WON'T BE ABLE TO TESTIFY

11:52AM  21   TO THAT, THAT -- THEN THESE STATEMENTS WOULD BE TAKEN FOR THE

11:52AM  22   TRUTH OF THE MATTER ASSERTED, THAT THIS IS WHAT MR. HOLMES

11:52AM  23   COMMUNICATED TO MR. BALWANI, THIS IS THE PLAN THAT SHOULD TAKE

11:52AM  24   PLACE, AND THAT'S IMPERMISSIBLE.

11:52AM  25          THE COURT:  WELL, IT'S MR. HOLMES SAYING TO

11:52AM  1    MR. BALWANI, HERE'S HOW WE'LL DO THIS, HERE'S OUR THOUGHTS ON

11:52AM  2    HOW TO DO THIS.

11:52AM  3        SHOULDN'T THAT COME IN, AT A MINIMUM, FOR NOTICE TO

11:52AM  4    MR. BALWANI THAT MR. HOLMES, WHO IS IN CHARGE OF THE VIP

11:52AM  5    TESTINGS, OR WHATEVER, VISITS, WAS PLANNING THIS SCENARIO FOR

11:52AM  6    THIS PARTICULAR VISIT, AND HE'S REPORTING TO HIS COO?

11:52AM  7        MS. ESTRADA:  BUT WITHOUT ANY ABILITY TO

11:52AM  8    MEANINGFULLY CROSS-EXAMINE THE WITNESS WHO IS THE PROPONENT OF

11:53AM  9    THIS EXHIBIT AS TO WHETHER OR NOT MR. BALWANI RESPONDED TO THIS

11:53AM  10   PLAN FROM MR. HOLMES THAT SOUNDS NEFARIOUS, TO DISTRACT THE

11:53AM  11   VIP'S FROM LOOKING AT THE RECEIPT, WITHOUT ANY ABILITY TO

11:53AM  12   MEANINGFULLY CROSS-EXAMINE ON THAT, THAT'S PREJUDICIAL.  THAT

11:53AM  13   WOULD LEAVE THE JURY WITH A MISIMPRESSION ABOUT WHAT MAY HAVE

11:53AM  14   OCCURRED AFTER THIS EMAIL.

11:53AM  15       THE COURT:  OKAY.

11:53AM  16     MR. SCHENK.

11:53AM  17       MR. SCHENK:  YES.  A FEW THOUGHTS, THANK YOU,

11:53AM  18   YOUR HONOR.

11:53AM  19       FIRST, EVERY EMAIL, BY THAT LOGIC, REQUIRES THE

11:53AM  20   OPPORTUNITY TO ASK THE WITNESS IF FURTHER EMAILS WERE SENT.

11:53AM  21   EVERY SINGLE EMAIL SUFFERS FROM THAT SAME CRITIQUE.

11:53AM  22       SECOND, THERE IS NO BURDEN SHIFTING THAT IS OCCURRING

11:53AM  23   HERE.

11:53AM  24       THE DEFENSE IS FREE TO STAND ON WHETHER THE GOVERNMENT MET

11:53AM  25   ITS BURDEN, AND IN ORDER TO MEET OUR BURDEN, WE GET TO OFFER

11:53AM  1    ADMISSIBLE RELEVANT EVIDENCE SUCH AS THIS.

11:53AM  2         THE DEFENSE DOES NOT HAVE AN OBLIGATION TO RESPOND TO

11:53AM  3    THIS, TO EXPLAIN HOW MR. BALWANI FELT ABOUT THIS.  NONE OF

11:54AM  4    THOSE THINGS ARE REQUIRED THROUGH THE ADMISSION OF THIS

11:54AM  5    DOCUMENT.

11:54AM  6         AGAIN, THE SAME LOGIC WOULD APPLY TO THE TEXT MESSAGES.

11:54AM  7         THE GOVERNMENT, THE COURT HAS SEEN, INTRODUCES TEXT

11:54AM  8    MESSAGES THROUGH WITNESSES WHO ARE NOT A PART OF THOSE TEXT

11:54AM  9    MESSAGES, A PREVIOUSLY ADMITTED EXHIBIT, BUT ASKS QUESTIONS OF

11:54AM  10   WITNESSES WHO WERE NOT A PART OF THAT TEXT MESSAGE.

11:54AM  11        AND BY THAT SAME LOGIC THE DEFENSE JUST PROPOUNDED, THE

11:54AM  12   GOVERNMENT SHOULD NOT BE ALLOWED TO DO THAT BECAUSE THEY CANNOT

11:54AM  13   MEANINGFULLY ASK MR. MOSLEY OR MR. JHAVERI WHAT WAS MEANT BY

11:54AM  14   SOME TEXT MESSAGE THAT THEY WEREN'T A PARTY TO.

11:54AM  15        SO FOLLOW-UP MEANINGFUL CROSS IS NOT THE LITMUS TEST.

11:54AM  16   IT'S NOT THE MEASURE OF WHETHER THE COURT SHOULD ADMIT A

11:54AM  17   PARTICULAR DOCUMENT.

11:54AM  18        AND FINALLY, THE COURT IS RIGHT, AT A MINIMUM, THE

11:54AM  19   DOCUMENT COMES IN BECAUSE IT IS NOTICE TO THE DEFENDANT, AND IT

11:54AM  20   DOESN'T NEED TO COME IN FOR ITS TRUTH IN ORDER TO ACCOMPLISH

11:54AM  21   THAT.

11:54AM  22        IN FACT, WE DON'T KNOW WHETHER BDT WENT TO WALGREENS AND

11:55AM  23   HAD THE TEST.

11:55AM  24        SO EVEN IF THE COURT ADMITTED THIS AS A BUSINESS RECORD,

11:55AM  25   THE GOVERNMENT COULDN'T MAKE ARGUMENTS WITHOUT FURTHER EVIDENCE

11:55AM   1    THAT THE EVENTS IN THIS EMAIL CAME TO PASS.

11:55AM   2         THE RELEVANCE OF THE EMAIL IS THE FACT THAT THIS IS BEING

11:55AM   3    DISCUSSED, THAT DECEPTION IS BEING DISCUSSED.  THAT'S WHAT IS

11:55AM   4    RELEVANT, NOT THAT BDT WENT TO WALGREENS AND THAT THEY WERE

11:55AM   5    THEN DISTRACTED AND THEN HOW DID THEY FEEL ABOUT THAT?

11:55AM   6         THE GOVERNMENT WOULD HAVE TO, I ACKNOWLEDGE, CALL

11:55AM   7    ADDITIONAL WITNESSES, EVEN IF THE COURT ADMITTED THIS AS A

11:55AM   8    BUSINESS RECORD.  ITS RELEVANCE DOES NOT TURN ON THE COURT

11:55AM   9    ADMITTING IT FOR THE TRUTH.

11:55AM   10        THERE IS THE NONHEARSAY PURPOSE THAT I JUST ARTICULATED TO

11:55AM   11   THE COURT.

11:55AM   12             MS. ESTRADA:  IF I MAY JUST REMIND THE COURT

11:55AM   13   BRIEFLY?

11:55AM   14        THIS EMAIL WAS ACTUALLY THE SUBJECT OF A SIMILAR COLLOQUY

11:55AM   15   DURING THE HOLMES TRIAL, DURING THE REDIRECT EXAMINATION OF

11:56AM   16   MS. PETERSON.

11:56AM   17        AND I MENTION THAT BOTH TO JUST REMIND THE COURT THAT THE

11:56AM   18   COURT ACTUALLY DID EXCLUDE THIS EXHIBIT FOR SIMILAR REASONS TO

11:56AM   19   WHAT I'M RAISING, BUT IN ADDITION TO THAT -- AND OF COURSE THE

11:56AM   20   GOVERNMENT MAY OR MAY NOT MAKE THIS SAME ARGUMENT -- BUT WHAT

11:56AM   21   IS TROUBLING ABOUT THIS EMAIL IS THAT THE GOVERNMENT MIGHT USE

11:56AM   22   THIS EMAIL TO ARGUE TO THE JURY THAT BECAUSE THIS NEFARIOUS ACT

11:56AM   23   WAS TAKING PLACE AT BLOOD TESTING OCCURRING WITH BDT, IT MUST

11:56AM   24   HAVE BEEN TAKING PLACE WITH OTHER INVESTORS.

11:56AM   25        AND IF THAT IS HOW THEY INTEND TO USE IT WITH, FOR

11:56AM   1    EXAMPLE, MR. MOSLEY, WHO WAS AN INVESTOR WHO DID RECEIVE BLOOD

11:56AM   2    TESTING AT WALGREENS, THEN THAT IS SUBSTANTIALLY MORE

11:56AM   3    PREJUDICIAL THAN IT IS PROBATIVE GIVEN THAT WE DON'T HAVE THE

11:56AM   4    CONTEXT OF THE RESPONSE FROM MR. BALWANI, IF ANY, TO THIS

11:57AM   5    OFF-HAND COMMENT FROM MR. HOLMES.

11:57AM   6         IN ADDITION TO THAT, I HAVE HEARD MR. SCHENK SAY THAT

11:57AM   7    EVERY EMAIL WOULD NEED TO HAVE CROSS-EXAMINATION ABOUT WHETHER

11:57AM   8    THERE WAS A RESPONSE.  THAT'S NOT MY ARGUMENT.

11:57AM   9         IT'S SIMPLY THAT WHEN EVIDENCE IS OFFERED THROUGH THE

11:57AM  10    WITNESS, THAT WITNESS HAS TO HAVE PERSONAL KNOWLEDGE, AT LEAST

11:57AM  11    A BASELINE PERSONAL KNOWLEDGE.

11:57AM  12         BUT IN THIS CASE MR. MOSLEY IS NOT A THERANOS EMPLOYEE, HE

11:57AM  13    WAS NOT A PARTY TO THIS CONVERSATION, HE DOESN'T WORK WITH BDT,

11:57AM  14    HE RECEIVED HIS BLOOD TESTING NINE MONTHS LATER.

11:57AM  15         FINALLY, ONE THING I'LL SAY, YOUR HONOR, IS THAT I THINK

11:57AM  16    THERE IS A DIFFERENCE BETWEEN WHAT MR. SCHENK SUGGESTS WITH

11:57AM  17    RESPECT TO THE TEXT MESSAGES.  THERE'S A DIFFERENCE BETWEEN

11:57AM  18    DISCUSSING AN EXHIBIT THAT IS ALREADY IN EVIDENCE WITH THE

11:57AM  19    WITNESS AND OFFERING TO ADMIT IT THROUGH A WITNESS WHO LACKS

11:58AM  20    PERSONAL KNOWLEDGE.

11:58AM  21         THE COURT:  ALL RIGHT.  THANK YOU.

11:58AM  22    MR. SCHENK, I THINK, TOLD US THAT HE WOULD NEED ADDITIONAL

11:58AM  23    EVIDENCE TO PROVE THAT THIS ACTUALLY HAPPENED, AND THAT ABSENT

11:58AM  24    THAT, JUST BASED ON HIS STATEMENT, HE WOULDN'T BE ARGUING THAT

11:58AM  25    UNLESS HE HAD THE EVIDENCE TO SUPPORT THAT.

11:58AM  1        SO I DON'T THINK THAT -- UNLESS THERE'S ADDITIONAL

11:58AM  2   EVIDENCE, I THINK YOUR CONCERN ABOUT THAT ARGUMENT IS SOMETHING

11:58AM  3   THAT YOU NEEDN'T BE CONCERNED ABOUT BECAUSE HE'S NOT GOING TO

11:58AM  4   BE ABLE TO MAKE THAT ARGUMENT UNLESS THE EVIDENCE SUPPORTS IT.

11:58AM  5        MS. ESTRADA:  UNDERSTOOD, YOUR HONOR.

11:58AM  6        THE COURT:  I DO FIND THAT AT A MINIMUM, THIS SHOULD

11:58AM  7   COME IN FOR NOTICE.

11:58AM  8        I SEE MR. BALWANI'S NAME ON IT.  HE'S IN THE MIDDLE OF THE

11:58AM  9   EMAIL CHAIN, AND HE'S A RECIPIENT AT THE TOP.

11:58AM  10       AND WHETHER OR NOT THIS HAPPENED, WHETHER OR NOT THIS CAME

11:58AM  11  TO FRUITION OR WHAT HAD HAPPENED, AT LEAST THE PLAN, THIS PLAN,

11:58AM  12  THIS OUTLINE WAS EMAILED TO HIM, ACCORDING TO THIS EMAIL, ON

11:59AM  13  OCTOBER 10TH OF 2014, AND SO IT DOES SHOW THAT HE WAS ON NOTICE

11:59AM  14  OF AT LEAST MR. HOLMES'S PLAN OF THE BDT VIP PROTOCOL.

11:59AM  15       AND AT A MINIMUM, I'M GOING TO ALLOW IT TO COME IN FOR

11:59AM  16  THAT PURPOSE, MR. SCHENK.

11:59AM  17       I'M NOT -- I STILL HAVE SOME DISCOMFORT ABOUT --

11:59AM  18  NOTWITHSTANDING YOUR ARGUMENTS -- ABOUT HAVING IT COME IN AS A

11:59AM  19  PURE BUSINESS RECORD.

11:59AM  20       AND I THINK I UNDERSTAND, WELL, WE'VE DONE IT BEFORE AND

11:59AM  21  THERE ARE SIMILAR CIRCUMSTANCES AND THIS SHOULD FALL UNDER THAT

11:59AM  22  SAME UMBRELLA.

11:59AM  23       I'LL LOOK AT THESE CITES THAT YOU GAVE ME, BUT AT LEAST

11:59AM  24  FOR NOW, FOR PURPOSES OF NOW, I WILL, OVER THE DEFENDANT'S

11:59AM  25  OBJECTION, ALLOW THIS TO COME IN FOR NOTICE, NOTICE AS TO

11:59AM   1          MR. BALWANI OF THE ACTIONS TAKEN.

11:59AM   2          AND I UNDERSTAND YOUR ARGUMENT, MS. ESTRADA, THAT THIS

11:59AM   3   WITNESS, OR THE WITNESS WHO TESTIFIES ABOUT THIS, WASN'T HERE

11:59AM   4   AND DIDN'T KNOW ANYTHING ABOUT IT, HE JUST HAPPENS TO HAVE THE

12:00PM   5   GOOD FORTUNE TO BE ON THE STAND TESTIFYING AT THE TIME THAT

12:00PM   6   THIS EMAIL IS GOING TO COME UP.  I DO UNDERSTAND THAT.

12:00PM   7          I DO THINK IT HAS VALUE FOR THE NOTICE, OR VALUE, I SHOULD

12:00PM   8   SAY RELEVANCE, FOR THE NOTICE ISSUE.

12:00PM   9          ANY PREJUDICE THAT IT MAY CONTAIN IS NOT UNFAIR PREJUDICE.

12:00PM  10          AND OF COURSE WE HAVE SAID THIS BEFORE SOMEWHAT TONGUE IN

12:00PM  11   CHEEK, BUT WE ALL RECOGNIZE THAT, MORE OFTEN THAN NOT, ANY

12:00PM  12   EVIDENCE THAT COMES FROM THE GOVERNMENT AGAINST THE DEFENDANT

12:00PM  13   IS PREJUDICIAL TO THE DEFENDANT.

12:00PM  14          THE QUESTION IS, IS IT UNFAIR PREJUDICE?

12:00PM  15          AND FOR THE PURPOSES OF NOTICE, THE COURT FINDS THAT THIS

12:00PM  16   IS NOT UNFAIR, UNFAIRLY PREJUDICIAL TO MR. BALWANI.

12:00PM  17          SO I'LL ADMIT IT AT A MINIMUM FOR THE NOTICE PURPOSE, AND

12:00PM  18   THEN I'LL REVIEW THESE OTHER TRANSCRIPT CITES AND SEE IF THAT

12:00PM  19   HELPS ANY FURTHER.

12:00PM  20          MR. SCHENK:  THANK YOU.

12:00PM  21          MS. ESTRADA:  UNDERSTOOD.

12:01PM  22          I WILL JUST NOTE THAT MY COLLEAGUE, MR. CAZARES, WILL BE

12:01PM  23   CONDUCTING THE CROSS-EXAMINATION, AND WILL LIKELY RERAISE OUR

12:01PM  24   OBJECTIONS, BUT WITH THESE COMMENTS IN MIND.

12:01PM  25          THE COURT:  SURE.  YOU CAN DO THAT DURING THAT

12:01PM  1    EXAMINATION, OR PRESERVE THEM, WHATEVER YOU WOULD LIKE TO DO.

12:01PM  2    THAT'S FINE.

12:01PM  3         OKAY.  WHERE ARE WE NOW?  WE'RE FURTHER IN THE DAY THAN WE

12:01PM  4    THOUGHT.

12:01PM  5         DID COUNSEL NEED A COUPLE MORE MINUTES?  SHOULD WE TAKE

12:01PM  6    ABOUT ANOTHER FIVE, SEVEN MINUTES, AND THEN WE'LL BRING THE

12:01PM  7    JURY IN?

12:01PM  8         LET ME ASK ABOUT OUR SCHEDULE.  I'M ASKING TOO MANY

12:01PM  9    QUESTIONS IN SUCCESSION.  I'M SORRY.

12:01PM  10        MY SENSE IS THAT WE'LL FINISH MS. BENNETT IN THE NEXT HOUR

12:01PM  11   OR SO I GUESS.

12:01PM  12        AND THEN WE'LL MOVE ON TO THE GOVERNMENT'S NEXT WITNESS?

12:01PM  13             MR. SCHENK:  I WOULD EXPECT THAT WE'LL FINISH

12:01PM  14   MS. BENNETT EVEN SOONER, IN LESS TIME THAN THAT.

12:01PM  15        AND YES, THEN MR. MOSLEY.  I ANTICIPATE THE DIRECT FOR

12:01PM  16   MR. MOSLEY BEING ABOUT 90 MINUTES, BETWEEN AN HOUR AND AN HOUR

12:01PM  17   AND A HALF.

12:01PM  18             THE COURT:  OKAY.

12:02PM  19             MR. SCHENK:  IN THAT WINDOW.

12:02PM  20             THE COURT:  GOTCHA.

12:02PM  21             MR. CAZARES:  CROSS WILL PROBABLY ROLL INTO

12:02PM  22   TOMORROW.

12:02PM  23             THE COURT:  OKAY.  GOOD TO KNOW.

12:02PM  24        I THINK WE'RE ENDING AT 4:00 TODAY.  I THINK THAT'S WHAT

12:02PM  25   WE'VE ADVERTISED.

BENNETT REDIRECT BY MR. LEACH

12:02PM   1          MR. CAZARES:  THAT'S MY EXPECTATION, YOUR HONOR.  I

12:02PM   2    THINK WE'LL ROLL INTO TOMORROW.

12:02PM   3          THE COURT:  GREAT.  OKAY.  WE'LL TAKE ABOUT ANOTHER

12:02PM   4    SEVEN MINUTES, AND THEN WE'LL CALL OUR JURY IN.

12:02PM   5          MR. SCHENK:  THANK YOU.

12:02PM   6          THE COURT:  THANK YOU.

12:02PM   7       (RECESS FROM 12:02 P.M. UNTIL 12:15 P.M.)

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

12:15PM   1                        **AFTERNOON SESSION**

12:15PM   2              (JURY IN AT 12:15 P.M.)

12:15PM   3                  THE COURT:  ALL RIGHT.  THANK YOU.  WE'RE BACK ON

12:15PM   4      THE RECORD.

12:15PM   5          ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

12:15PM   6          MS. BENNETT IS ON THE STAND.

12:15PM   7          LADIES AND GENTLEMEN, THANK YOU FOR THE LONG BREAK.  I

12:15PM   8      HOPE YOU ENJOYED IT.  I NEEDED SOME OF THESE LAWYERS' TIME TO

12:15PM   9      HELP ME OUT ON SOME ISSUES.

12:15PM  10          BUT I THINK WE'RE READY TO GO NOW.

12:15PM  11          MR. LEACH.

12:15PM  12                  MR. LEACH:  WE ARE, YOUR HONOR.  THANK YOU.

12:15PM  13                  THE COURT:  YES.

12:15PM  14      BY MR. LEACH:

12:15PM  15      Q.   GOOD AFTERNOON, MS. BENNETT.

12:16PM  16          WHEN WE BROKE, WE WERE DISCUSSING EXHIBIT 4943.

12:16PM  17          DO YOU STILL HAVE THAT IN FRONT OF YOU?

12:16PM  18      A.   YES.

12:16PM  19      Q.   OKAY.  AND THIS WAS A DOCUMENT THAT WAS PROVIDED TO YOU BY

12:16PM  20      THERANOS?

12:16PM  21      A.   YES.

12:16PM  22      Q.   AND YOU BELIEVE THIS WAS DONE SO AT SOME POINT PRIOR TO

12:16PM  23      APRIL OF 2016?

12:16PM  24      A.   YES.

12:16PM  25      Q.   AND THIS IS SOMETHING THAT YOU REVIEWED?

12:16PM  1      A.   YES.

12:16PM  2      Q.   IS THIS SOMETHING THAT YOU REVIEWED FOR THE PURPOSE OF

12:16PM  3      ASSESSING THERANOS'S RESPONSE AND ACTION TO 2567?

12:16PM  4      A.   YES.

12:16PM  5      Q.   AND DID YOU HAVE CONVERSATIONS WITH ANYBODY WITHIN CMS

12:16PM  6      ABOUT WHAT THERANOS WAS REPORTING TO YOU?

12:16PM  7      A.   PROBABLY DISCUSSED IT WITH MR. YAMAMOTO.

12:16PM  8      Q.   OKAY.  AND IF I COULD DRAW YOUR ATTENTION, PLEASE, TO

12:16PM  9      PAGE 9.

12:16PM  10          DO YOU SEE THE TITLE PATIENT IMPACT ASSESSMENT, TPS 3.5?

12:17PM  11     A.   YES.

12:17PM  12     Q.   AND BENEATH THAT THERE'S A REFERENCE TO D5403, D5481.

12:17PM  13     THERE ARE OTHER NUMBERS THERE.

12:17PM  14          DO YOU SEE THAT?

12:17PM  15     A.   YES.

12:17PM  16     Q.   AND ARE THOSE A REFERENCE TO THE D-TAGS WITHIN THE 2567?

12:17PM  17     A.   THEY ARE.

12:17PM  18     Q.   AND THIS PATIENT IMPACT ASSESSMENT RELATES TO THE EDISON

12:17PM  19     DEVICE THAT YOU REVIEWED AND CONSIDERED?

12:17PM  20     A.   YES.

12:17PM  21     Q.   AND FURTHER BELOW, DO YOU SEE A PARAGRAPH UNDER PATIENT

12:17PM  22     IMPACT?

12:17PM  23     A.   YES.

12:17PM  24     Q.   AND IN THAT LAST LINE, DID THERANOS PROVIDE --

12:17PM  25               MR. CAZARES:  OBJECTION.  HEARSAY.

12:17PM   1                  THE COURT:  WHY DON'T YOU FINISH THE QUESTION?

12:17PM   2       BY MR. LEACH:

12:17PM   3       Q.   DID THERANOS PROVIDE YOU INFORMATION ABOUT WHAT IT

12:17PM   4       PERCEIVED THE POSSIBLE PATIENT IMPACT FOR EDISON 3.5 TEST WAS?

12:17PM   5       A.   YES.

12:17PM   6       Q.   AND WHAT DID THERANOS TELL YOU?

12:17PM   7                  MR. CAZARES:  OBJECTION.  HEARSAY.  702.

12:17PM   8            THERE IS ALSO A TEMPORAL RELEVANCE ISSUE.

12:18PM   9                  THE COURT:  I DON'T THINK IT'S 702.

12:18PM  10            BUT ARE YOU OFFERING THIS FOR THE TRUTH?

12:18PM  11                  MR. LEACH:  I'M NOT OFFERING IT FOR THE TRUTH,

12:18PM  12       YOUR HONOR.  I WAS ASKING HER ABOUT THE DOCUMENTS.  I THINK

12:18PM  13       IT'S A -- I AM OFFERING THE STATEMENT UNDER 801(D)(2), SO --

12:18PM  14                  MR. CAZARES:  ALSO FOUNDATION RELATING TO THE

12:18PM  15       SUBSTANCE OF THE DOCUMENT.

12:18PM  16                  THE COURT:  WELL, I WAS GOING TO ASK YOU TO LAY A

12:18PM  17       LITTLE MORE FOUNDATION FOR THIS, IF YOU WOULD, MR. LEACH, AS TO

12:18PM  18       THIS WITNESS'S KNOWLEDGE.

12:18PM  19       BY MR. LEACH:

12:18PM  20       Q.   OKAY.  AND IS THIS PATIENT IMPACT ASSESSMENT SOMETHING

12:18PM  21       THAT YOU CONSIDERED AS PART OF YOUR WORK, MS. BENNETT?

12:18PM  22       A.   YES.

12:18PM  23       Q.   WHEN THERANOS MADE STATEMENTS TO YOU ABOUT WHAT IT

12:18PM  24       PERCEIVED THE PATIENT IMPACT TO BE, DID YOU EVALUATE THAT AND

12:18PM  25       CONSIDER IT IN CONNECTION WITH FOLLOWUP IN CONNECTION WITH THE

BENNETT REDIRECT BY MR. LEACH

12:19PM 1    2567?

12:19PM 2    A.   YES.

12:19PM 3    Q.   AND IN YOUR 2567 FOR EACH CONDITION OR STANDARD, DO YOU

12:19PM 4    ALWAYS REPORT IN THAT PART OF THE DOCUMENT WHAT PATIENT IMPACT

12:19PM 5    WAS?

12:19PM 6            MR. CAZARES:  OBJECTION.  FOUNDATION.  CMS DOESN'T

12:19PM 7    DO A PATIENT IMPACT REPORT.

12:19PM 8            THE COURT:  THIS IS ASKING WHAT SHE DOES IN HER

12:19PM 9    REPORT?

12:19PM 10           MR. LEACH:  YES.

12:19PM 11           THE COURT:  OBJECTION IS OVERRULED.

12:19PM 12       YOU CAN ANSWER THE QUESTION.

12:19PM 13           THE WITNESS:  WHEN WE RECEIVE A RESPONSE FROM THE

12:19PM 14   LABORATORY, WE LOOK TO ENSURE THAT THEY HAVE ADDRESSED PATIENT

12:19PM 15   IMPACT.

12:19PM 16   BY MR. LEACH:

12:19PM 17   Q.   OKAY.  AND DID YOU DO THAT HERE?

12:19PM 18   A.   YES.

12:19PM 19   Q.   IN CONNECTION WITH THIS DOCUMENT?

12:19PM 20   A.   YES.

12:19PM 21   Q.   AND WHAT DID THERANOS TELL YOU IN CONNECTION WITH ANY

12:19PM 22   POSSIBLE PATIENT IMPACT?

12:19PM 23           MR. CAZARES:  OBJECTION.  HEARSAY, RELEVANCE,

12:19PM 24   FOUNDATION, AND THE 702 ISSUE.

12:19PM 25           THE COURT:  OVERRULED.

12:19PM   1           YOU CAN ANSWER THE QUESTION.

12:20PM   2               THE WITNESS:   THERANOS SAID THAT THE LABORATORY HAD

12:20PM   3    CONCLUDED THAT THERE IS POSSIBLE PATIENT IMPACT FOR EVERY TEST

12:20PM   4    REPORTED FROM THE LABORATORY'S TPS 3.5 INSTRUMENT.

12:20PM   5    BY MR. LEACH:

12:20PM   6    Q.   GOING BACK TO THE 2567, MS. BENNETT, I'D LIKE TO DRAW YOUR

12:20PM   7    ATTENTION TO PAGE 46.

12:20PM   8           IF WE COULD DISPLAY.

12:20PM   9           IS THIS THE PORTION OF THE 2567 WHERE YOU DISCUSS YOUR

12:20PM  10    REVIEW OF THERANOS'S QUALITY CONTROL FOR THE EDISON DEVICE?

12:20PM  11    A.   THIS IS WHERE I'M TALKING ABOUT THAT THEY DID NOT HAVE A

12:21PM  12    SYSTEM THAT TWICE A YEAR EVALUATED AND DEFINED THE RELATIONSHIP

12:21PM  13    BETWEEN THE EDISON AND THE PREDICATE INSTRUMENT, THE COMMERCIAL

12:21PM  14    INSTRUMENT.

12:21PM  15    Q.   OKAY.   AND IF WE CAN NOW GO TO PAGE 54 OF THE EXHIBIT.

12:21PM  16           IS THIS THE PORTION OF THE 2567 WHERE YOU DISCUSS THE

12:21PM  17    PERCENTAGE OF CV YOU OBSERVED ON EDISON DEVICES WITH RESPECT TO

12:21PM  18    PARTICULAR ASSAYS THROUGHOUT 2014 AND 2015?

12:21PM  19    A.   YES.

12:21PM  20    Q.   AND ON PAGE 56 AND 57, DO YOU FURTHER DISCUSS WHAT YOU

12:21PM  21    OBSERVED WITH RESPECT TO THERANOS'S QUALITY CONTROL FOR THE

12:21PM  22    EDISON DEVICE IN THE 2014 THROUGH JUNE OF 2015 TIME PERIOD?

12:22PM  23    A.   YES.

12:22PM  24    Q.   AND WERE THESE ISSUES SYSTEMIC IN YOUR MIND?

12:22PM  25    A.   YES.

12:22PM  1    Q.   WERE THEY ONE-OFFS?

12:22PM  2            MR. CAZARES:  OBJECTION.  FOUNDATION.

12:22PM  3            THE COURT:  SUSTAINED.

12:22PM  4            MR. LEACH:  OKAY.

12:22PM  5        MAY I HAVE A MOMENT, YOUR HONOR?

12:22PM  6            THE COURT:  YES.

12:22PM  7        (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

12:22PM  8            MR. LEACH:  NO FURTHER QUESTIONS, YOUR HONOR.

12:22PM  9        THANK YOU.

12:22PM  10       THANK YOU, MS. BENNETT.

12:22PM  11           THE COURT:  RECROSS?

12:22PM  12           MR. CAZARES:  YES, YOUR HONOR.

12:22PM  13                        **RECROSS-EXAMINATION**

12:22PM  14   BY MR. CAZARES:

12:22PM  15   Q.   GOOD AFTERNOON, MS. BENNETT.

12:22PM  16   A.   HELLO.

12:22PM  17   Q.   MS. BENNETT, YOU WOULD AGREE THAT CMS WAS NOT RESPONSIBLE,

12:22PM  18   IN RELATION TO THERANOS, FOR DETERMINING WHETHER THERE WAS A

12:22PM  19   PATIENT IMPACT FROM ANY IDENTIFIED NONCOMPLIANCE; CORRECT?

12:23PM  20       YOU DID NOT DETERMINE PATIENT IMPACT; CORRECT?

12:23PM  21   A.   CORRECT.

12:23PM  22   Q.   THE LAB AND THE LAB DIRECTOR HAVE RESPONSIBILITY FOR

12:23PM  23   INVESTIGATING AND DETERMINING PATIENT IMPACT; CORRECT?

12:23PM  24   A.   YES.

12:23PM  25   Q.   NOW, IN RESPONSE TO SOME QUESTIONS MR. LEACH ASKED YOU

12:23PM  1    ABOUT THOSE AAP DATA AT EXHIBIT 20620, DO YOU RECALL THAT?

12:23PM  2    A.   YES.

12:23PM  3    Q.   OKAY.  AND MR. LEACH ASKED YOU SOME QUESTIONS ABOUT THE

12:23PM  4    SUBSTANCE OF THOSE REPORTS.

12:23PM  5         DO YOU REMEMBER?

12:23PM  6    A.   YES.

12:23PM  7    Q.   OKAY.  AND YOU HAVE NO EVIDENCE THAT THE DATA IN THE AAP

12:23PM  8    EXHIBITS THAT YOU WERE ASKED ABOUT HERE IN THIS COURT WERE

12:23PM  9    WRONG; CORRECT?

12:23PM  10   A.   NO.

12:23PM  11   Q.   YOU HAVE NO EVIDENCE THAT THERE WAS ANYTHING INACCURATE --

12:24PM  12   YOU HAVE NO EVIDENCE THAT THE AAP WAS NOT DONE AT THE TIME

12:24PM  13   PERIOD REFLECTED IN THOSE DOCUMENTS; CORRECT?

12:24PM  14   A.   NO.

12:24PM  15   Q.   NOW, YOU WERE ASKED SOME QUESTIONS BY MR. LEACH, AGAIN,

12:24PM  16   ABOUT THE TIMELINESS OF THE REPORTING TO PATIENTS WITH THE

12:24PM  17   CORRECTED RESULTS RELATING TO PT INR.

12:24PM  18        DO YOU REMEMBER THAT?

12:24PM  19   A.   I DO.

12:24PM  20   Q.   OKAY.  AND THE ISSUE THERE AGAIN WAS THE SEVEN WEEK DELAY

12:24PM  21   BETWEEN YOUR CONCLUSION OF THE SEPTEMBER VISIT IN 2015, WHICH

12:24PM  22   WAS SEPTEMBER 23RD, 2015, AND UNTIL MID-NOVEMBER OF 2015;

12:24PM  23   CORRECT?

12:24PM  24   A.   YES.

12:24PM  25   Q.   AND, AGAIN, THE PT INR TEST WAS DONE ON AN FDA APPROVED

```
12:24PM   1    COMMERCIAL DEVICE; CORRECT?

12:24PM   2    A.   YES.

12:24PM   3    Q.   AND IT'S NOT THERANOS FINGERSTICK TECHNOLOGY; CORRECT?

12:24PM   4    A.   CORRECT.

12:24PM   5    Q.   AND YOU CITED OTHER LABS FOR NONCOMPLIANCE RELATING TO

12:24PM   6    PT INR; CORRECT?

12:24PM   7              MR. LEACH:  OBJECTION.  RELEVANCE.

12:25PM   8              THE COURT:  I'LL ALLOW IT.

12:25PM   9         YOU CAN ANSWER THAT QUESTION.

12:25PM  10              THE WITNESS:  YES, I HAVE CITED OTHER LABS.

12:25PM  11              MR. CAZARES:  NO FURTHER QUESTIONS, YOUR HONOR.

12:25PM  12              THE COURT:  ANY REDIRECT?

12:25PM  13              MR. LEACH:  NO, YOUR HONOR.  THANK YOU.

12:25PM  14              THE COURT:  MAY THIS WITNESS BE EXCUSED?

12:25PM  15              MR. LEACH:  YES.

12:25PM  16              MR. CAZARES:  YES, YOUR HONOR.

12:25PM  17              THE COURT:  YOU'RE EXCUSED.  THANK YOU, MS. BENNETT.

12:25PM  18              THE WITNESS:  THANK YOU.

12:25PM  19              THE COURT:  DOES THE GOVERNMENT HAVE ANOTHER WITNESS

12:25PM  20    TO CALL?

12:25PM  21              MR. SCHENK:  YES, WE DO, YOUR HONOR.

12:25PM  22         THE UNITED STATES CALLS DANIEL MOSLEY.

12:27PM  23         (PAUSE IN PROCEEDINGS.)

12:27PM  24              THE COURT:  GOOD AFTERNOON, SIR.  IF YOU WOULD COME

12:27PM  25    FORWARD, PLEASE.
```

| | | |
|---|---|---|
| 12:27PM | 1 | I'LL ASK YOU TO STAND HERE AND FACE OUR COURTROOM DEPUTY |
| 12:27PM | 2 | WHILE YOU RAISE YOUR RIGHT HAND.  SHE HAS A QUESTION FOR YOU. |
| 12:27PM | 3 | **(GOVERNMENT'S WITNESS, DANIEL MOSLEY, WAS SWORN.)** |
| 12:27PM | 4 | THE WITNESS:  I DO. |
| 12:27PM | 5 | THE CLERK:  THANK YOU. |
| 12:27PM | 6 | THE COURT:  PLEASE HAVE A SEAT HERE, SIR.  MAKE |
| 12:27PM | 7 | YOURSELF COMFORTABLE. |
| 12:27PM | 8 | FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU |
| 12:27PM | 9 | NEED. |
| 12:27PM | 10 | AND THERE'S SOME WATER THERE FOR REFRESHMENT SHOULD YOU |
| 12:27PM | 11 | NEED IT.  HELP YOURSELF. |
| 12:27PM | 12 | THE WITNESS:  THANK YOU. |
| 12:27PM | 13 | THE COURT:  YOU'RE WELCOME. |
| 12:27PM | 14 | AND WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR |
| 12:27PM | 15 | NAME AND THEN SPELL IT, PLEASE. |
| 12:27PM | 16 | THE WITNESS:  OKAY.  SHOULD I LEAVE MY MASK ON? |
| 12:27PM | 17 | THE COURT:  ARE YOU FULLY VACCINATED? |
| 12:27PM | 18 | THE WITNESS:  I AM. |
| 12:27PM | 19 | THE COURT:  ALL RIGHT.  YOU MAY REMOVE IT.  THANK |
| 12:27PM | 20 | YOU. |
| 12:27PM | 21 | THE WITNESS:  DANIEL LYNN MOSTLY.  LAST NAME |
| 12:28PM | 22 | M-O-S-L-E-Y. |
| 12:28PM | 23 | THE COURT:  THANK YOU.  COUNSEL. |
| 12:28PM | 24 | MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR.  I |
| 12:28PM | 25 | WILL ALSO REMOVE MY MASK. |

**DIRECT EXAMINATION**

BY MR. SCHENK:

Q.   GOOD AFTERNOON, MR. MOSLEY.

A.   GOOD AFTERNOON.

Q.   MR. MOSLEY, HAVE YOU HEARD OF A COMPANY CALLED THERANOS?

A.   YES, I HAVE.

Q.   HOW DID YOU BECOME FAMILIAR WITH THAT COMPANY?

A.   I FIRST BECAME FAMILIAR WITH IT FROM SOMEBODY I KNEW,

DR. KISSINGER, WHO MENTIONED THE NAME OF THE COMPANY TO ME.

Q.   AND YOU SAID YOU BECAME FAMILIAR WITH IT WITH AN

INDIVIDUAL -- I'M SORRY, FROM AN INDIVIDUAL NAMED

DR. KISSINGER?

A.   THAT IS CORRECT.

Q.   AND HOW DID YOU KNOW DR. KISSINGER?

A.   HE HAD BEEN A LONG-TERM CLIENT OF MINE, A LONG-TERM CLIENT

AND A FRIEND.

Q.   AND WE'LL COVER THIS MORE A LITTLE BIT LATER, BUT DID YOU

INVEST MONEY IN THERANOS?

A.   YES, I DID.

Q.   DO YOU KNOW ROUGHLY HOW MUCH?

A.   IT WAS ALMOST 6 MILLION.  JUST SLIGHTLY UNDER $6 MILLION.

Q.   AND DO YOU KNOW ROUGHLY WHEN?

A.   IT WOULD HAVE BEEN IN OCTOBER OF 2014.

Q.   THANK YOU.

     LET'S GO BACK TO THE CONVERSATION THAT YOU SAID YOU HAD

12:29PM  1    WITH DR. KISSINGER.  WAS THAT YOUR FIRST EXPOSURE TO THERANOS?

12:29PM  2    A.   YES.

12:29PM  3    Q.   AND DID DR. KISSINGER ASK YOU TO DO SOMETHING THAT LED TO

12:29PM  4    YOUR EXPOSURE?

12:29PM  5    A.   YES.

12:29PM  6    Q.   AND WHAT WAS THAT?

12:29PM  7    A.   HE ASKED ME TO SORT OF FAMILIARIZE MYSELF WITH THE COMPANY

12:29PM  8    AND TO GIVE HIM MY VIEWS ON THE COMPANY.

12:29PM  9    Q.   WE'LL COVER THAT IN A MOMENT.

12:29PM  10        I THINK YOU TOLD THE JURY THAT DR. KISSINGER WAS A CLIENT;

12:29PM  11   IS THAT RIGHT?

12:29PM  12   A.   THAT IS CORRECT.

12:29PM  13   Q.   AT THE TIME -- FIRST, COULD YOU GIVE US A YEAR?  WHEN WAS

12:29PM  14   THAT?

12:29PM  15   A.   THIS WOULD HAVE BEEN IN 2014.

12:29PM  16   Q.   WAS THAT BEFORE OR AFTER YOUR INVESTMENT?

12:29PM  17   A.   BEFORE.

12:29PM  18   Q.   AND WHAT WERE YOU DOING FOR A LIVING IN 2014?

12:29PM  19   A.   I WAS PRACTICING LAW.

12:29PM  20   Q.   WHERE?

12:29PM  21   A.   IN NEW YORK CITY.

12:29PM  22   Q.   FOR A -- FOR THE GOVERNMENT?  FOR A PRIVATE FIRM?  FOR?

12:29PM  23   A.   FOR A PRIVATE FIRM.

12:29PM  24   Q.   AND WHAT IS THE NAME OF THAT FIRM?

12:29PM  25   A.   CRAVATH, SWAINE & MOORE.

12:29PM  1    Q.   AND HOW LONG DID YOU WORK AT THE LAW FIRM OF CRAVATH?

12:29PM  2    A.   FROM 20 -- 1984 UNTIL 2018.

12:30PM  3    Q.   AND WHAT AREAS DID YOU PRACTICE?

12:30PM  4    A.   TRUSTS AND ESTATES.

12:30PM  5    Q.   AND WAS IT THROUGH YOUR WORK IN THAT AREA THAT YOU MET

12:30PM  6    DR. KISSINGER?

12:30PM  7    A.   YES.

12:30PM  8    Q.   DO YOU STILL WORK AT CRAVATH?

12:30PM  9    A.   NO.

12:30PM  10   Q.   ARE YOU EMPLOYED NOW?

12:30PM  11   A.   YES.

12:30PM  12   Q.   HOW ARE YOU EMPLOYED?

12:30PM  13   A.   I WORK FOR A FIRM CALLED BDT & COMPANY.

12:30PM  14   Q.   AND WHAT LINE OF WORK IS BDT & COMPANY IN?

12:30PM  15   A.   WE'RE A MERCHANT BANK FOR CLOSELY HELD COMPANIES AND

12:30PM  16   FAMILIES.

12:30PM  17   Q.   YOU SAID A MERCHANT BANK?

12:30PM  18   A.   MERCHANT BANK.

12:30PM  19   Q.   AND WHAT DO YOU DO FOR BDT?

12:30PM  20   A.   I'M INVOLVED IN THE MANAGEMENT, AND I'M ALSO -- AND I

12:30PM  21   ADVISE CLIENTS IN OUR NETWORK.

12:30PM  22   Q.   YOU SAID THAT YOU INVESTED IN 2014 IN THERANOS; IS THAT

12:30PM  23   RIGHT?

12:30PM  24   A.   THAT'S CORRECT.

12:30PM  25   Q.   WERE YOU LIVING IN NEW YORK CITY AT THE TIME?

12:30PM    1        A.   HUH --

12:30PM    2        Q.   LET ME REPHRASE.  WERE YOU WORKING IN NEW YORK CITY AT THE

12:30PM    3        TIME?

12:30PM    4        A.   YES.

12:30PM    5        Q.   AND CURRENTLY, WHILE YOU'RE DOING WORK FOR BDT, DO YOU

12:31PM    6        ALSO WORK IN NEW YORK?

12:31PM    7        A.   YES.

12:31PM    8        Q.   LET'S NOW GO TO THAT PERIOD OF TIME IN 2014 WHERE YOU SAID

12:31PM    9        THAT DR. KISSINGER ASKED YOU TO BECOME MORE FAMILIAR WITH

12:31PM   10        THERANOS.

12:31PM   11             DO YOU HAVE THAT TIME PERIOD IN MIND?

12:31PM   12        A.   YES.

12:31PM   13        Q.   AND WHAT WAS THE FIRST STEP OR TWO THAT YOU TOOK TO GET

12:31PM   14        FAMILIAR WITH THERANOS?

12:31PM   15        A.   HE INTRODUCED ME TO ELIZABETH HOLMES, AND I BEGAN TO HAVE

12:31PM   16        CONVERSATIONS WITH HER.

12:31PM   17        Q.   WITH MS. HOLMES?

12:31PM   18        A.   CORRECT.

12:31PM   19                 MR. SCHENK:  YOUR HONOR, MAY I APPROACH?

12:31PM   20                 THE COURT:  YES.

12:31PM   21                 MR. SCHENK:  THANK YOU.

12:31PM   22             (HANDING.)

12:32PM   23        Q.   MR. MOSLEY, I'VE HANDED YOU TWO BINDERS OF EXHIBITS, AND

12:32PM   24        THEY'RE LABELLED 1 OF 2 AND 2 OF 2.

12:32PM   25             AND I'D LIKE TO START IN THE FIRST BINDER.

12:32PM   1           IF YOU WOULD, PLEASE, TURN TO TAB 4163.

12:32PM   2           AND IF YOU WOULD, LET ME KNOW WHEN YOU ARE THERE?

12:32PM   3   A.   I'M THERE.

12:32PM   4   Q.   MR. MOSLEY, ARE YOU FAMILIAR WITH THE DOCUMENT LOCATED AT

12:32PM   5   TAB 4163?

12:32PM   6   A.   YES, I AM.

12:32PM   7   Q.   IS THIS AN EMAIL BETWEEN YOU AND MS. HOLMES IN JULY OF

12:32PM   8   2014?

12:32PM   9   A.   IT IS.

12:32PM  10           MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4163.

12:32PM  11           MR. CAZARES:  NO OBJECTION.

12:32PM  12           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:32PM  13       (GOVERNMENT'S EXHIBIT 4163 WAS RECEIVED IN EVIDENCE.)

12:33PM  14           THE COURT:  JUST GIVE US A MOMENT HERE.

12:33PM  15       IT'S STILL NOT ON IN THE JURY BOX I THINK.

12:33PM  16       I THINK THE TUBES HAVE WARMED UP, AND I THINK IT'S ON IN

12:33PM  17   THE JURY BOX.

12:33PM  18           MR. SCHENK:  THANK YOU, YOUR HONOR.

12:33PM  19   Q.   MR. MOSLEY, DO YOU SEE AN EXHIBIT NOW ON THE SCREEN IN

12:33PM  20   FRONT OF YOU?

12:33PM  21   A.   I DO.

12:33PM  22   Q.   SO FEEL FREE TO USE EITHER THE PAPER COPY OR THE SCREEN,

12:33PM  23   WHICHEVER IS EASIER FOR YOU.

12:33PM  24       THIS EMAIL IS DATED JULY 22ND OF 2014.

12:33PM  25       MY FIRST QUESTION IS, IS THAT RIGHT AROUND THE TIME THAT

12:33PM 1    DR. KISSINGER ASKED YOU TO BEGIN TO BECOME FAMILIAR WITH

12:33PM 2    THERANOS?

12:33PM 3    A.   YES.

12:33PM 4    Q.   AND I THINK YOU TOLD THE JURY THAT IN OCTOBER OF 2014 YOU

12:33PM 5    MADE AN INVESTMENT; IS THAT CORRECT?

12:34PM 6    A.   YES.

12:34PM 7    Q.   AND SO I'D LIKE TO FOCUS OUR QUESTIONS FOR MUCH OF THE

12:34PM 8    TIME NOW BETWEEN THESE FEW MONTHS, JULY AND OCTOBER OF 2014, IF

12:34PM 9    THAT WOULD BE OKAY WITH YOU.

12:34PM 10       IN THIS EMAIL, DO YOU SEE IN THE FIRST LINE IT APPEARS

12:34PM 11   THAT YOU'RE INFORMING MS. HOLMES THAT IT WAS A PLEASURE

12:34PM 12   SPEAKING WITH YOU YESTERDAY.

12:34PM 13       DO YOU SEE THAT?

12:34PM 14   A.   YES.

12:34PM 15   Q.   AND DID YOU, IN FACT, HAVE A PHONE CALL WITH MS. HOLMES ON

12:34PM 16   OR AROUND THE 21ST OF JULY?

12:34PM 17   A.   I DID.

12:34PM 18   Q.   YOU ALSO SAY, ONCE YOU RECEIVE THE PRIVATE PLACEMENT

12:34PM 19   MEMORANDUM, YOU WILL GIVE HER A CALL OR AN EMAIL TO GET A

12:34PM 20   FURTHER BRIEFING.

12:34PM 21       DO YOU SEE THAT?

12:34PM 22   A.   I DO.

12:34PM 23   Q.   AND WHAT IS A PRIVATE PLACEMENT MEMORANDUM?

12:34PM 24   A.   IT IS A DOCUMENT THAT IS SOMETIMES PREPARED IN CONNECTION

12:34PM 25   WITH A PRIVATELY HELD COMPANY THAT IS RAISING CAPITAL.

12:34PM 1    Q.   IN YOUR DISCUSSIONS THE DAY PRIOR WITH MS. HOLMES, DID YOU

12:34PM 2    DISCUSS MS. HOLMES SENDING YOU CERTAIN DOCUMENTS?

12:35PM 3    A.   YES.

12:35PM 4    Q.   AND FOR WHAT PURPOSE?

12:35PM 5    A.   FOR THE PURPOSE OF FAMILIARIZING MYSELF WITH THE COMPANY

12:35PM 6    PURSUANT TO DR. KISSINGER'S REQUEST.

12:35PM 7    Q.   AND AT THIS TIME ON JULY 22ND, 2014, WERE YOU YOURSELF

12:35PM 8    THINKING OF BECOMING AN INVESTOR IN THERANOS?

12:35PM 9    A.   NO.

12:35PM 10   Q.   SO THE MATERIAL WAS BEING SENT TO YOU SORT OF ON BEHALF OF

12:35PM 11   THE WORK THAT YOU WERE DOING FOR DR. KISSINGER; IS THAT FAIR?

12:35PM 12   A.   THAT IS CORRECT.

12:35PM 13   Q.   THANK YOU.

12:35PM 14        AND THEN THE NEXT PARAGRAPH AND BELOW, WE SEE A REFERENCE

12:35PM 15   TO AN INDIVIDUAL NAMED GREG PENNER.

12:35PM 16        DO YOU SEE THAT?

12:35PM 17   A.   I DO.

12:35PM 18   Q.   AND IT APPEARS THAT HE'S ROB WALTON'S SON-IN-LAW.

12:35PM 19        CAN YOU EXPLAIN TO THE JURY WHAT THAT IS DISCUSSING?

12:35PM 20   A.   IT'S DISCUSSING ANOTHER CLIENT OF MINE THAT I THOUGHT SHE

12:35PM 21   MIGHT LIKE TO TALK TO, ELIZABETH.

12:35PM 22   Q.   I'M SORRY?

12:35PM 23   A.   SORRY.

12:35PM 24   Q.   AND "SHE" IS MS. HOLMES?

12:35PM 25   A.   YEAH.

12:35PM  1    Q.   AND WHY DID YOU THINK THAT MS. HOLMES WOULD BE INTERESTED

12:35PM  2    IN THIS CONNECTION?

12:35PM  3    A.   I BELIEVE SHE MENTIONED TO ME ON THE CALL THAT SHE WAS

12:36PM  4    LOOKING FOR OTHER LARGE INVESTORS.

12:36PM  5    Q.   ON THE CALL ON THE 21ST OF JULY, DID YOU DISCUSS WITH

12:36PM  6    MS. HOLMES THE FACT THAT MS. HOLMES WAS RAISING FUNDS OR

12:36PM  7    SEEKING INVESTORS FOR THERANOS?

12:36PM  8    A.   YES.

12:36PM  9    Q.   I'D LIKE TO NOW HAVE YOU TURN TO TAB 4173.

12:36PM  10        IT SHOULD BE THE NEXT TAB IN YOUR BINDER.

12:36PM  11        DO YOU RECOGNIZE THE DOCUMENT AT 4173?

12:36PM  12   A.   I DO.

12:36PM  13   Q.   WHAT IS THIS DOCUMENT?

12:36PM  14   A.   IT'S A LETTER FROM ELIZABETH HOLMES TO ME.

12:36PM  15   Q.   AND IS IT DATED AUGUST 18TH, 2014?

12:36PM  16   A.   IT IS.

12:36PM  17            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4173.

12:36PM  18            MR. CAZARES:  OBJECTION.  HEARSAY.

12:37PM  19            THE COURT:  MR. SCHENK.

12:37PM  20            MR. SCHENK:  I COULD LAY ADDITIONAL FOUNDATION.

12:37PM  21            THE COURT:  SURE.  WHY DON'T YOU?

12:37PM  22   BY MR. SCHENK:

12:37PM  23   Q.   MR. MOSLEY, DO YOU RECALL RECEIVING THIS LETTER?

12:37PM  24   A.   I DO.

12:37PM  25   Q.   AND DID THIS LETTER ACCOMPANY FURTHER DOCUMENTS,

12:37PM  1    ADDITIONAL MATERIALS?

12:37PM  2    A.   YES, IT DID.

12:37PM  3    Q.   AND WHAT WERE THOSE MATERIALS?

12:37PM  4    A.   UM, A LARGE, A LARGE STACK OF PAPERS ABOUT THE COMPANY.

12:37PM  5    Q.   AND DID YOU REQUEST THAT MS. HOLMES SEND THIS MATERIAL TO

12:37PM  6    YOU?

12:37PM  7    A.   I DON'T KNOW WHETHER I REQUESTED IT OR SHE VOLUNTEERED TO

12:37PM  8    SEND IT.

12:37PM  9    Q.   WAS, WAS THIS MATERIAL DISCUSSED ON YOUR PHONE CALL IN

12:37PM  10   JULY WITH MS. HOLMES?

12:37PM  11   A.   YES.

12:37PM  12   Q.   AND WE SAW AN EMAIL A MOMENT AGO THAT INCLUDED A REFERENCE

12:37PM  13   TO A DOCUMENT CALLED A PRIVATE PLACEMENT MEMORANDUM.

12:37PM  14        DO YOU RECALL THAT?

12:37PM  15   A.   I DO.

12:37PM  16   Q.   AND WAS THIS LETTER, 4173, A COVER LETTER TO A STACK OF

12:37PM  17   DOCUMENTS, INCLUDING THE PRIVATE PLACEMENT MEMORANDUM?

12:37PM  18   A.   IT WAS.

12:38PM  19            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4173.

12:38PM  20            MR. CAZARES:  SAME OBJECTION.

12:38PM  21            THE COURT:  THE OBJECTION IS OVERRULED.

12:38PM  22        IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:38PM  23        (GOVERNMENT'S EXHIBIT 4173 WAS RECEIVED IN EVIDENCE.)

12:38PM  24            MR. SCHENK:  THANK YOU.

12:38PM  25   Q.   MR. MOSLEY, I FIRST WANT TO ASK YOU ABOUT THE DATE.  IT

12:38PM  1    LOOKS LIKE IT WAS SENT ON AUGUST 18TH, 2014.

12:38PM  2        YOU TOLD THE JURY A MOMENT AGO THAT YOU HAD A PHONE CALL

12:38PM  3    WITH MS. HOLMES AROUND THE 21ST OF JULY; IS THAT RIGHT?

12:38PM  4    A.   YES.

12:38PM  5    Q.   DO YOU RECALL WHETHER YOU DID MUCH WORK ON THERANOS IN

12:38PM  6    THOSE INTERVENING FEW WEEKS, OR DID YOU HAVE THE CALL WITH

12:38PM  7    MS. HOLMES AND THEN A FEW WEEKS LATER YOU RECEIVED THESE

12:38PM  8    DOCUMENTS?

12:38PM  9    A.   I BELIEVE I HAD THE CALL AND THEN RECEIVED THESE DOCUMENTS

12:38PM  10   A FEW WEEKS LATER.

12:38PM  11   Q.   OKAY.  AND NOW I'D LIKE TO ASK YOU ABOUT SOME OF THE

12:38PM  12   CONTENT OF THE LETTER.

12:38PM  13       IN THE FIRST LINE IT SAYS, "DEAR DAN,

12:38PM  14       "IT IS WITH GREAT PLEASURE I WRITE THIS LETTER AND ENCLOSE

12:38PM  15   THIS PACKAGE FOR YOU."

12:38PM  16       DO YOU SEE THAT?

12:38PM  17   A.   I DO.

12:38PM  18   Q.   ENCLOSED WITH THIS LETTER, DID YOU RECEIVE ADDITIONAL

12:39PM  19   DOCUMENTS?

12:39PM  20   A.   I DID.

12:39PM  21   Q.   CAN YOU DESCRIBE FOR THE JURY THE VOLUME?  WAS IT A LARGE

12:39PM  22   VOLUME OF DOCUMENTS?

12:39PM  23   A.   IT WAS A LARGE VOLUME.  I THINK IT WAS, YOU KNOW, THREE,

12:39PM  24   FOUR INCHES WORTH AT LEAST.

12:39PM  25   Q.   GREAT.

12:39PM  1          IN THE NEXT PARAGRAPH, IT LOOKS LIKE MS. HOLMES WRITES,

12:39PM  2   "BY WAY OF BACKGROUND," AND THEN IT CONTINUES.

12:39PM  3          DO YOU SEE A DESCRIPTION ABOUT THERANOS IN THAT PARAGRAPH?

12:39PM  4   A.   I THINK IT'S ALL ABOUT THERANOS.

12:39PM  5   Q.   WHEN YOU HAD SAY THAT, DO YOU MEAN THE WHOLE LETTER?

12:39PM  6   A.   WELL, THE WHOLE PARAGRAPH THAT YOU'VE HIGHLIGHTED.

12:39PM  7   Q.   YES, SIR, THANK YOU.

12:39PM  8          DO YOU SEE HER WRITING THAT "THERANOS HAS A VERY LONG-TERM

12:39PM  9   MISSION."

12:39PM 10          THAT'S IN THE THIRD LINE OF THE PARAGRAPH?

12:39PM 11   A.   I SEE THAT, YES.

12:39PM 12   Q.   AND THEN FURTHER DOWN A COUPLE LINES BELOW THAT IT SAYS,

12:40PM 13   "WE HAVE BENEFITTED."

12:40PM 14          DO YOU SEE THAT?

12:40PM 15   A.   YES.

12:40PM 16   Q.   "WE HAVE BENEFITED GREATLY FROM THE ABILITY TO EXECUTE,

12:40PM 17   KEEP A LASER FOCUS ON OUR OPERATIONS, AND SHIP TRANSFORMATIONAL

12:40PM 18   AND DISRUPTIVE TECHNOLOGY, AS WE'VE JUST DONE," EXCUSE ME,

12:40PM 19   "WITHOUT HAVING TO TALK IT UP WITH ANALYSTS OR OTHERS BEFORE

12:40PM 20   IT'S DONE."

12:40PM 21          DO YOU SEE THAT?

12:40PM 22   A.   I DO.

12:40PM 23   Q.   AND IN THE NEXT PARAGRAPH, MS. HOLMES WRITES THAT

12:40PM 24   "THERANOS HAS RAISED OVER $400 MILLION IN EQUITY CAPITAL."

12:40PM 25          AND THEN IN A SENTENCE -- TWO SENTENCES FURTHER IT

12:40PM   1    CONTINUES, "THERE ARE MANY INDUSTRIES IN WHICH THE COMPANY'S

12:40PM   2    EXISTING PRODUCTS HAVE THE POTENTIAL TO PLAY A SIGNIFICANT ROLE

12:40PM   3    LONG TERM, RANGING FROM CHEMICAL AND WATER TESTING TO

12:40PM   4    ANIMAL/PET AND LIVESTOCK TESTING TO THE REPLACEMENT OF INVASIVE

12:40PM   5    MEDICAL DIAGNOSTIC PROCEDURES WITH TESTING."

12:41PM   6         DO YOU SEE THAT?

12:41PM   7    A.   I DO.

12:41PM   8    Q.   WHEN YOU HAD THE PHONE CALL IN JULY WITH MS. HOLMES, DID

12:41PM   9    YOU TALK ABOUT THE THERANOS TECHNOLOGY, THAT IS, WHAT LINE OF

12:41PM  10    BUSINESS THERANOS WAS IN?

12:41PM  11    A.   WE DID.

12:41PM  12    Q.   AND WHAT DID SHE TELL YOU?

12:41PM  13    A.   AS I REMEMBER, SHE JUST TOLD ME THAT THE COMPANY WAS

12:41PM  14    DISRUPTIVE AND IN BLOOD TESTING.

12:41PM  15    Q.   AND DID SHE DESCRIBE ANY TECHNOLOGY THAT THERANOS HAD

12:41PM  16    DEVELOPED?

12:41PM  17    A.   NOT IN ANY, NOT IN ANY DETAIL.

12:41PM  18    Q.   NOT ON THAT PHONE CALL?

12:41PM  19    A.   NOT ON THAT PHONE CALL.

12:41PM  20    Q.   OKAY.  DID YOU LATER LEARN ABOUT TECHNOLOGY THAT THERANOS

12:41PM  21    HAD DEVELOPED?

12:41PM  22    A.   I DID.

12:41PM  23    Q.   AND WHAT WERE THE SOURCES OF THAT INFORMATION?

12:41PM  24    A.   LARGELY THE DOCUMENTS THAT ELIZABETH HAD SENT ME AND

12:41PM  25    SUBSEQUENT PHONE CALLS.

12:41PM  1    Q.   AND WHEN YOU SAY "THE DOCUMENTS SHE SENT YOU," DO YOU MEAN

12:41PM  2    THE ONES THAT WERE ATTACHED TO THIS COVER LETTER THAT YOU AND I

12:42PM  3    ARE REVIEWING?

12:42PM  4    A.   YES.

12:42PM  5    Q.   IF YOU NOW GO TO THE NEXT PARAGRAPH, THE ONE THAT BEGINS

12:42PM  6    "HISTORICALLY."

12:42PM  7         "HISTORICALLY, THERANOS'S WORK WAS FOCUSSED ON CONTRACTS

12:42PM  8    WITH PHARMACEUTICAL AND MILITARY CLIENTS."

12:42PM  9         DO YOU SEE THAT?

12:42PM  10   A.   I DO.

12:42PM  11   Q.   AND THEN THE NEXT PARAGRAPH, "THERANOS HAS NOT ONLY

12:42PM  12   REDUCED TO PRACTICE AND PATENTED ITS COMPREHENSIVE

12:42PM  13   TECHNOLOGICAL AND OPERATIONAL INFRASTRUCTURE OVER THE PAST TEN

12:42PM  14   YEARS, BUT HAS ALSO HAD REGULATORY CERTIFICATIONS TO OPERATE

12:42PM  15   COMMERCIALLY, INCLUDING AS A CLIA-CERTIFIED LABORATORY (THE

12:42PM  16   REGULATORY CERTIFICATION FOR LABS) SINCE 2011."

12:42PM  17        DO YOU SEE THAT?

12:42PM  18   A.   I DO.

12:42PM  19   Q.   AND THEN THE NEXT PARAGRAPH BEGINS, "ONCE THE COMPANY WAS

12:42PM  20   READY TO LAUNCH ITS COMMERCIAL LABORATORY AND ANNOUNCED ITS

12:42PM  21   NATIONAL CONTRACT WITH WALGREENS IN FALL OF 2013, THERANOS

12:42PM  22   BEGAN OPERATING IN THE CONSUMER, PHYSICIAN, AND HOSPITAL

12:43PM  23   LABORATORY TESTING BUSINESS IN THE U.S., WITH PLANS FOR

12:43PM  24   INTERNATIONAL EXPANSION."

12:43PM  25        MR. MOSLEY, WHEN YOU WERE DOING THIS WORK IN ABOUT AUGUST

12:43PM  1    OF 2014, WERE YOU AWARE OF THERANOS'S BUSINESS RELATIONSHIP

12:43PM  2    WITH WALGREENS?

12:43PM  3    A.   I WAS.

12:43PM  4    Q.   DO YOU REMEMBER HOW YOU BECAME FAMILIAR WITH THAT OR

12:43PM  5    BECAME AWARE OF IT?

12:43PM  6    A.   I BELIEVE I WAS FIRST TOLD IT BY ELIZABETH, TO THE BEST OF

12:43PM  7    MY RECOLLECTION.

12:43PM  8    Q.   THAT'S YOUR RECOLLECTION?

12:43PM  9    A.   YES.

12:43PM  10   Q.   IF YOU'LL NOW TURN TO THE SECOND PAGE OF THIS EXHIBIT.

12:43PM  11        DO YOU SEE THE PARAGRAPH THAT BEGINS, "THERANOS HAS

12:43PM  12   GROWN," THE SECOND ONE DOWN?

12:43PM  13   A.   I SEE IT.

12:43PM  14   Q.   THE FIRST LINE READS, "THERANOS HAS GROWN FROM CASH FROM

12:43PM  15   ITS CONTRACTS FOR SOME TIME."

12:43PM  16        WITHIN THE MATERIALS THAT MS. HOLMES SENT YOU, WAS THERE A

12:43PM  17   DISCUSSION OF THE FINANCIAL STATE OF THERANOS?

12:44PM  18   A.   THERE WAS.

12:44PM  19   Q.   I'D NOW LIKE TO ASK YOU ABOUT TWO PARAGRAPHS BELOW THAT,

12:44PM  20   THE ONE THAT BEGINS "THERANOS IS INSTEAD."

12:44PM  21        "THERANOS IS INSTEAD, AS ABOVE, VERY SELECTIVELY AND

12:44PM  22   METHODICALLY SELECTING THE SHAREHOLDERS IT WISHES TO BE OWNERS

12:44PM  23   OF THE COMPANY LONG TERM, AND CONSIDERING THEIR PARTICIPATION

12:44PM  24   IN A FINAL EQUITY TRANSACTION."

12:44PM  25        DO YOU SEE THAT?

MOSLEY DIRECT BY MR. SCHENK

12:44PM  1    A.   I DO.

12:44PM  2    Q.   AND IT USES THE PHRASE "SELECTING THE SHAREHOLDERS."

12:44PM  3         LATER ON WHEN YOU BEGAN TO CONSIDER AN INVESTMENT ON YOUR

12:44PM  4    OWN, DID YOU FEEL THAT THERANOS WAS SELECTING YOU?

12:44PM  5    A.   YES.

12:44PM  6    Q.   WHAT DO YOU MEAN?

12:44PM  7    A.   WELL, BY THAT I MEAN THAT THEY WERE WILLING TO LET ME

12:44PM  8    INVEST, SELECT ME AS ONE OF THEIR INVESTORS, PERMIT ME TO

12:44PM  9    INVEST.

12:44PM  10   Q.   I'M CURIOUS ABOUT THE PHRASE "PERMIT YOU" OR "LET YOU" TO

12:45PM  11   INVEST.

12:45PM  12        WHEN YOU -- DO YOU HAVE EXPERIENCE BUYING PUBLICLY TRADED

12:45PM  13   STOCK?

12:45PM  14   A.   I DO.

12:45PM  15   Q.   AND WHEN YOU DO THAT, DOES THE COMPANY HAVE TO ALLOW YOU

12:45PM  16   TO BUY IT?

12:45PM  17   A.   NO.

12:45PM  18   Q.   SO EXPLAIN THAT DIFFERENCE.  WHY DID YOU FEEL IN THIS

12:45PM  19   INVESTMENT YOU WERE BEING ALLOWED TO, OR LET TO INVEST?

12:45PM  20   A.   WELL, WITH A CLOSELY HELD COMPANY, YOU'RE BUYING STOCK IN

12:45PM  21   THIS KIND OF A SITUATION FROM THE COMPANY, AND THE COMPANY

12:45PM  22   COULD EITHER CHOOSE TO SELL IT TO YOU OR NOT SELL IT TO YOU.

12:45PM  23   Q.   THANK YOU.

12:45PM  24        IF WE COULD NOW GO TO THE NEXT PARAGRAPH, THE ONE THAT

12:45PM  25   BEGINS "WITH."

12:45PM  1          THE FIRST LINE READS, "WITH THIS LETTER AND AS PROMISED ON

12:45PM  2   OUR CALL, I WOULD LIKE TO FORMALLY EXTEND TO YOU THE INVITATION

12:45PM  3   TO PARTICIPATE IN THIS EQUITY TRANSACTION TO WHATEVER EXTENT

12:45PM  4   YOU ARE INTERESTED."

12:45PM  5          I THINK YOU MENTIONED THAT INITIALLY YOU WERE DOING WORK

12:45PM  6   FOR DR. KISSINGER, AND AT SOME POINT IT TRANSITIONED TO

12:45PM  7   EVALUATING AN INVESTMENT OPPORTUNITY FOR YOURSELF.

12:46PM  8          IS THAT CORRECT?

12:46PM  9   A.   IT EVOLVED TO BEING BOTH OF THOSE.

12:46PM  10  Q.   WAS THERE A CLEAR MOMENT WHEN IT EXPANDED FROM ORIGINALLY

12:46PM  11  JUST BEING WORK ON BEHALF OF DR. KISSINGER TO ALSO AN

12:46PM  12  EVALUATION OF A PERSONAL INVESTMENT?

12:46PM  13  A.   I DON'T HAVE A CLEAR DATE IN MIND.

12:46PM  14  Q.   SO DID IT -- COULD YOU DESCRIBE THAT TO THE JURY, THE

12:46PM  15  PROCESS OF THE EVOLUTION?

12:46PM  16  A.   WELL, IN THE COURSE OF LOOKING AT IT, I THOUGHT IT WAS A

12:46PM  17  VERY INTERESTING COMPANY AND DEVELOPED A PERSONAL INTEREST IN

12:46PM  18  THINKING ABOUT IT AS AN INVESTMENT.

12:46PM  19  Q.   THANK YOU.

12:46PM  20         NOW I'D LIKE TO ASK YOU ABOUT THE VERY LAST LINE OF THE

12:46PM  21  LETTER AT THE BOTTOM OF THIS PAGE.

12:46PM  22         DO YOU SEE WHERE MS. HOLMES WRITES, "THE ADDITIONAL

12:46PM  23  MATERIALS FOCUS ON THE INFRASTRUCTURE THERANOS HAS DEVELOPED

12:46PM  24  AND INITIAL MARKET OF COMMERCIAL LABORATORY TESTING THAT

12:46PM  25  THERANOS HAS ENTERED."

12:47PM  1    A.   I DO.

12:47PM  2    Q.   I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THE MATERIALS

12:47PM  3    THAT MS. HOLMES PROVIDED, BUT GENERALLY SPEAKING, DID YOU THINK

12:47PM  4    THAT THE MATERIALS DESCRIBED THERANOS'S CURRENT CAPABILITIES OR

12:47PM  5    FUTURE ASPIRATIONS?

12:47PM  6    A.   I BELIEVED IT DESCRIBED CURRENT CAPABILITIES.

12:47PM  7    Q.   WOULD YOU NOW TURN IN THIS SAME BINDER TO EXHIBIT 3387.

12:47PM  8         DO YOU SEE THE EXHIBIT AT 3387?

12:47PM  9    A.   I DO.

12:47PM  10   Q.   THIS EXHIBIT APPEARS TO BE ABOUT 524 PAGES.

12:47PM  11        DO YOU SEE THAT?

12:47PM  12   A.   IT'S VERY LONG.

12:48PM  13   Q.   AND AT THE SAME TIME, I'M GOING TO ASK YOU ALSO TO GRAB

12:48PM  14   THAT SECOND BINDER THAT I HANDED TO YOU.

12:48PM  15        IN THAT BINDER YOU'LL FIND EXHIBIT 3392.

12:48PM  16   A.   UH-HUH.

12:48PM  17   Q.   DO YOU RECOGNIZE 3387 AND 3392?

12:48PM  18   A.   I DO.

12:48PM  19   Q.   AND WHAT ARE THEY?

12:48PM  20   A.   I BELIEVE THEY WERE IN THE PACKAGE OF MATERIALS THAT I WAS

12:48PM  21   SENT BY ELIZABETH HOLMES.

12:48PM  22   Q.   THE MATERIALS THAT YOU DESCRIBED AS BEING SEVERAL INCHES A

12:48PM  23   MOMENT AGO?

12:48PM  24   A.   THAT'S CORRECT.

12:48PM  25             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3387

12:48PM  1    AND 3392.

12:48PM  2              MR. CAZARES:  OBJECTION.

12:48PM  3              THE COURT:  OVERRULED.

12:48PM  4         IT'S ADMITTED.  IT MAY BE PUBLISHED.

12:48PM  5         (GOVERNMENT'S EXHIBITS 3387 AND 3392 WERE RECEIVED IN

12:48PM  6    EVIDENCE.)

12:48PM  7              MR. SCHENK:  THANK YOU.

12:48PM  8    Q.   MR. MOSLEY, LET'S START WITH EXHIBIT 3387.  YOU CAN PUT

12:48PM  9    THE OTHER BINDER AWAY FOR A MOMENT.

12:49PM  10        IN 3387, IF YOU COULD TURN TO PAGE 128.  AGAIN, IT WILL BE

12:49PM  11   ON THE SCREEN IN FRONT OF YOU OR THE PAPER COPY, WHICHEVER IS

12:49PM  12   EASIER FOR YOU.

12:49PM  13   A.   I HAVE IT.

12:49PM  14   Q.   DO YOU SEE ON PAGE 128 OF THIS EXHIBIT IT LOOKS LIKE THERE

12:49PM  15   IS SOME UNDERLINING, SOME HANDWRITTEN UNDERLINES?

12:49PM  16   A.   I SEE IT.

12:49PM  17   Q.   ARE THOSE MARKINGS FAMILIAR TO YOU?

12:49PM  18   A.   THEY ARE.

12:49PM  19   Q.   AND WHO MADE THOSE, DO YOU KNOW?

12:49PM  20   A.   I MADE THOSE UNDERLININGS.

12:49PM  21   Q.   AND WHEN DID YOU DO THAT?

12:49PM  22   A.   SOME TIME AFTER I RECEIVED THE DOCUMENTS AND WAS READING

12:49PM  23   THE DOCUMENTS.

12:49PM  24   Q.   AS YOU WERE REVIEWING THE MATERIALS THAT YOU WERE SENT,

12:49PM  25   YOU WROTE ON THE DOCUMENTS?

MOSLEY DIRECT BY MR. SCHENK

12:49PM   1    A.   YES.

12:49PM   2    Q.   LET'S START WITH PARAGRAPH 2, LIQUIDATION RIGHTS.

12:50PM   3         DO YOU SEE THAT?

12:50PM   4    A.   I DO.

12:50PM   5    Q.   AND DO YOU HAVE A RECOLLECTION OF LIQUIDATION RIGHTS

12:50PM   6    WITHIN THIS DOCUMENT?

12:50PM   7    A.   I DO.

12:50PM   8    Q.   AND THIS IS WITHIN A DOCUMENT THAT IS CALLED THE

12:50PM   9    DESIGNATION OF SERIES C-2 PREFERRED STOCK.

12:50PM  10         DO YOU SEE THAT?

12:50PM  11    A.   YES.

12:50PM  12    Q.   AND WHAT IS THAT?  WHAT IS THE DESIGNATION OR THE

12:50PM  13    CERTIFICATE OF DESIGNATION OF C-2 STOCK?

12:50PM  14    A.   WELL, IT IS GENERALLY A DOCUMENT THAT IS ADOPTED BY THE

12:50PM  15    BOARD OF DIRECTORS DESIGNATING THE TERMS AND CONDITIONS OF THE

12:50PM  16    NEW CLASS OF STOCK.

12:50PM  17    Q.   AND THIS ONE IS CALLED C-2; IS THAT RIGHT?

12:50PM  18    A.   THAT'S CORRECT.

12:50PM  19    Q.   WHEN YOU EVENTUALLY MADE YOUR INVESTMENT IN THERANOS,

12:50PM  20    WHICH CLASS OF STOCK DID YOU PURCHASE?

12:50PM  21    A.   IT WAS C-2 PREFERRED STOCK.

12:50PM  22    Q.   AND IT USES THE WORD "PREFERRED."

12:50PM  23         ARE YOU FAMILIAR WITH THAT TERM?

12:50PM  24    A.   YES, I AM.

12:50PM  25    Q.   AND WHAT DOES THAT TERM MEAN TO YOU?

12:50PM  1    A.   IT MEANS THAT IT HAS A PREFERENCE -- IN THE EVENT THE

12:51PM  2    COMPANY WAS EVER LIQUIDATED, IT HAS A PREFERENCE FOR GETTING

12:51PM  3    BACK THE MONEY THAT YOU HAD INVESTED BEFORE THE COMMON STOCK.

12:51PM  4    Q.   IS THAT ADVANTAGEOUS?

12:51PM  5    A.   IT IS.

12:51PM  6    Q.   WHY?

12:51PM  7    A.   WELL, BECAUSE IF THERE IS EVER A PROBLEM WITH THE COMPANY,

12:51PM  8    YOU WOULD GET YOUR MONEY BACK BEFORE SOMEBODY THAT OWNED COMMON

12:51PM  9    STOCK, SO YOU WOULD COME EARLIER IN THE RETURN OF YOUR CAPITAL.

12:51PM  10   Q.   AND WHEN YOU USE THE WORD "YOU" IN THAT --

12:51PM  11   A.   THE OWNER OF THE C-2.  I'M SORRY.

12:51PM  12   Q.   AND BY "OWNER OF THE C-2," DO YOU MEAN THE INVESTORS?

12:51PM  13   A.   THE INVESTORS THAT BOUGHT C-2 SHARES.

12:51PM  14   Q.   GOT IT.

12:51PM  15        SO NOW THE LIQUIDATION RIGHTS PARAGRAPH, WHY DID YOU FIND

12:51PM  16   IT NECESSARY TO UNDERLINE INFORMATION IN THIS PARAGRAPH?  WHAT

12:51PM  17   WAS SIGNIFICANT?

12:51PM  18   A.   ONLY THAT IT SAID WHAT I WOULD HAVE EXPECTED IT TO SAY,

12:52PM  19   WHICH IS THAT THE C-2 SHARES HAD A PREFERENCE OVER ALL COMMON

12:52PM  20   STOCK AND PREVIOUS CLASSES OF PREFERRED STOCK BEFORE THE C-2.

12:52PM  21   Q.   I SEE.  SO THIS IS THE PART OF THE DOCUMENT THAT CONTAINS

12:52PM  22   WHAT YOU WERE JUST EXPLAINING TO ME, THAT IS, THE PREFERENCE OF

12:52PM  23   C-2 OVER COMMON?

12:52PM  24   A.   THAT'S CORRECT.

12:52PM  25   Q.   OKAY.  IF YOU'LL NOW TURN TO THE NEXT PAGE, PAGE 129.

12:52PM   1          DO YOU SEE SECTION 6, A SECTION CALLED MANDATORY

12:52PM   2   REDEMPTION?

12:52PM   3   A.   I DO.

12:52PM   4   Q.   IT ALSO APPEARS THAT YOU MADE SOME UNDERLINES IN THIS

12:52PM   5   PARAGRAPH; IS THAT RIGHT?

12:52PM   6   A.   YES.

12:52PM   7   Q.   WHAT WAS SIGNIFICANT ABOUT THE MANDATORY REDEMPTION

12:52PM   8   SECTION?

12:52PM   9   A.   IT WAS AN UNUSUAL PROVISION THAT I HAD NEVER SEEN, OR

12:52PM  10   DIDN'T RECOLLECT THAT I HAD EVER SEEN IN A DOCUMENT LIKE THIS

12:52PM  11   BEFORE.

12:52PM  12   Q.   AND WHAT WAS UNUSUAL ABOUT IT?

12:52PM  13   A.   IT PROVIDED THAT THE COMPANY COULD DECIDE -- LET ME LOOK

12:53PM  14   AT THE SPECIFIC WORDING OF IT.

12:53PM  15          THE COMPANY COULD DECIDE TO REDEEM ANY SHARES OF STOCK

12:53PM  16   THAT IT WISHED TO REDEEM AT WHATEVER THE BOARD DETERMINED THE

12:53PM  17   FAIR MARKET VALUE OF THE SHARES TO BE AT THAT TIME.

12:53PM  18   Q.   DID YOU THINK THAT THAT WAS AN ADVANTAGEOUS PROVISION FOR

12:53PM  19   AN INVESTOR?

12:53PM  20   A.   I THOUGHT IT WAS A DISADVANTAGEOUS PROVISION.

12:53PM  21   Q.   AND AS A RESULT, DID YOU TAKE ANY ACTION WITH REGARD TO

12:53PM  22   THIS SECTION BEFORE INVESTING?

12:53PM  23   A.   I DID.

12:53PM  24   Q.   AND WHAT WAS THAT?

12:53PM  25   A.   I RAISED THE QUESTION WITH ELIZABETH THAT I DIDN'T

12:53PM 1    UNDERSTAND THE PURPOSE FOR THIS PROVISION, AND I THOUGHT IT WAS

12:53PM 2    NOT A FAIR PROVISION TO INVESTORS.

12:53PM 3    Q.   AND DID, DID THERANOS MAKE SOME ACCOMMODATION FOR YOU?

12:53PM 4    A.   IT DID.

12:53PM 5    Q.   AND WHAT WAS THAT?

12:53PM 6    A.   IT GAVE ME A SHORT COMMITMENT THAT IT WOULD NOT EXERCISE

12:54PM 7    THIS PROVISION TO EVER BUY BACK STOCK FROM ME AT A PRICE LESS

12:54PM 8    THAN I PAID FOR THE STOCK.

12:54PM 9    Q.   AND WAS THAT COMMITMENT THAT THERANOS MADE LIMITED TO YOU?

12:54PM 10   A.   NO, IT WAS NOT.

12:54PM 11   Q.   WHO ALSO RECEIVED THAT BENEFIT?

12:54PM 12   A.   IT SAID BROADLY THAT ANY OF MY CLIENTS THAT HAD ALSO

12:54PM 13   INVESTED WOULD HAVE THE BENEFIT OF THAT SAME COMMITMENT.

12:54PM 14   Q.   AND DID YOU ASK FOR THE EXPANSION OF THAT COMMITMENT

12:54PM 15   BEYOND JUST YOU TO INCLUDE YOUR CLIENTS?

12:54PM 16   A.   I DID.

12:54PM 17   Q.   WHY?

12:54PM 18   A.   WELL, AS A LAWYER, YOU HAVE A FIDUCIARY OBLIGATION TO ALL

12:54PM 19   OF YOUR CLIENTS.

12:54PM 20       AND KNOWING THAT SOME OF MY CLIENTS WERE LOOKING AT IT AS

12:54PM 21   A POSSIBLE INVESTMENT, I WOULD NEVER HAVE BEEN COMFORTABLE

12:54PM 22   SECURING SOME PROVISION THAT WAS FAVORABLE TO ME WITHOUT

12:54PM 23   SECURING IT FOR THEM AS WELL.

12:54PM 24   Q.   YOU SAID "KNOWING THAT SOME OF YOUR CLIENTS WERE LOOKING

12:54PM 25   AT INVESTING."

12:54PM   1            WHAT DID YOU MEAN BY THAT?

12:54PM   2      A.   WELL, I KNEW THAT SOME OF MY CLIENTS WERE THINKING --

12:54PM   3      LOOKING AND DOING THEIR OWN DUE DILIGENCE AND THINKING ABOUT

12:55PM   4      INVESTING IN THE COMPANY.

12:55PM   5      Q.   WAS THAT A REFERENCE TO INDIVIDUALS BEYOND DR. KISSINGER?

12:55PM   6      WAS THIS OTHER CLIENTS THAT YOU'RE TALKING ABOUT?

12:55PM   7      A.   IT WAS OTHER CLIENTS.

12:55PM   8      Q.   AND WHAT WAS YOUR ROLE, IF ANY, IN THESE OTHER CLIENTS'

12:55PM   9      INTEREST OR DECISIONS REGARDING INVESTING IN THERANOS?

12:55PM  10      A.   WELL, SOME OF THEM MET ME -- MET HER THROUGH ME, BUT THAT

12:55PM  11      WAS THE EXTENT OF MY ROLE WAS AN INTRODUCTION OR -- EITHER AT

12:55PM  12      THEIR REQUEST OR AT MY SUGGESTION.

12:55PM  13      Q.   AND WHEN YOU SAID "HER," DO YOU MEAN MS. HOLMES?

12:55PM  14      A.   YES.

12:55PM  15      Q.   DID YOU ENCOURAGE THESE INDIVIDUALS, THESE CLIENTS, TO

12:55PM  16      INVEST IN THERANOS?

12:55PM  17      A.   NO.

12:55PM  18      Q.   WOULD YOU NOW TURN TO PAGE 144 OF THIS EXHIBIT.

12:55PM  19            SIR, ARE WE LOOKING AT SOME HANDWRITTEN NOTES NOW?

12:55PM  20      A.   YES.

12:55PM  21      Q.   AND DO YOU RECOGNIZE THE HANDWRITING?

12:56PM  22      A.   I DO.

12:56PM  23      Q.   AND WHOSE HANDWRITING IS IT?

12:56PM  24      A.   IT'S MY HANDWRITING.

12:56PM  25      Q.   AND IF WE COULD ZOOM IN ON IT.

MOSLEY DIRECT BY MR. SCHENK

12:56PM 1     I GUESS WHAT I'LL FIRST ASK YOU TO DO, IF YOU CAN, JUST

12:56PM 2  READ THE ENTIRE DOCUMENT TO THE JURY.

12:56PM 3  A.   OKAY.

12:56PM 4     NUMBER 1.  "PENETRATION ASSUMED IN 2015 NUMBERS."

12:56PM 5     BELOW THAT, DASH, "FIRST LOCATION IN PALO ALTO IN 2012."

12:56PM 6     BELOW THAT, DASH, "NOW."

12:56PM 7     BELOW THAT, DASH, "PARTNERSHIP WITH WALGREENS FALL 2013."

12:56PM 8     BELOW THAT, DASH, "NOW IN 30 WALGREENS, 29 IN ARIZONA AND

12:56PM 9  1 IN PALO ALTO."

12:56PM 10     BELOW THAT, DASH, "WELL 11,000 STORE IN 10 COUNTRIES."

12:56PM 11     BELOW THAT, DASH, "COLLABORATIONS WITH 3 HOSPITAL GROUPS

12:57PM 12  AS REFERENCE LABS."

12:57PM 13     AND THEN IN QUOTES, "MASSIVE UNDERTAKING," END QUOTE.

12:57PM 14  Q.   ARE THESE SOME NOTES THAT YOU TOOK?

12:57PM 15  A.   THEY ARE.

12:57PM 16  Q.   AND NOTES FROM WHAT?

12:57PM 17  A.   I BELIEVE THEY WERE BASED ON A TELEPHONE CONVERSATION WITH

12:57PM 18  ELIZABETH HOLMES.

12:57PM 19  Q.   AND WOULD THIS HAVE BEEN A CONVERSATION AFTER THE

12:57PM 20  JULY 21ST CONVERSATION THAT YOU AND I SPOKE ABOUT?

12:57PM 21  A.   THAT IS CORRECT.

12:57PM 22  Q.   DO YOU KNOW IF THIS CONVERSATION WOULD HAVE OCCURRED AFTER

12:57PM 23  YOU HAD RECEIVED THIS BINDER OF MATERIALS?

12:57PM 24  A.   IT WAS AFTER.

12:57PM 25  Q.   AND HOW DO YOU KNOW THAT?

12:57PM  1    A.   AMONG OTHER THINGS, I THINK IT WAS WRITTEN ON ONE OF THE

12:57PM  2    PAGES THAT WAS PART OF THE PACKAGE.

12:57PM  3    Q.   SO YOU THINK YOU RECEIVED THE BINDER, AND THEN HAD ANOTHER

12:57PM  4    CALL WITH MS. HOLMES AND WROTE NOTES IN THE BINDER?

12:57PM  5    A.   I THINK THAT IS CORRECT.

12:57PM  6    Q.   IN NUMBER 1 YOU SAID THAT THAT READ, "PENETRATION ASSUMED

12:58PM  7    IN 2015 NUMBERS."

12:58PM  8         IS THAT CORRECT?

12:58PM  9    A.   THAT'S CORRECT.

12:58PM  10   Q.   AND DO YOU KNOW WHAT THAT MEANT?

12:58PM  11   A.   IT WAS REFERRING TO THE THERANOS LABS THAT WERE LOCATED IN

12:58PM  12   THE WALGREENS DRUG STORES.

12:58PM  13   Q.   AND WHEN YOU SAY "IT WAS REFERRING TO," I'M SORRY, WHAT DO

12:58PM  14   YOU MEAN?

12:58PM  15   A.   WELL, THE SENTENCE SAYS, "PENETRATION."

12:58PM  16        I WAS REFERRING TO WHAT EXTENT, TO WHAT NUMBERS OF

12:58PM  17   WALGREENS STORES WERE THERE THERANOS FACILITIES LOCATED IN.

12:58PM  18   Q.   I SEE.

12:58PM  19        IT WAS SIGNIFICANT -- THE NUMBER OF THERANOS STORES

12:58PM  20   LOCATED WITHIN A WALGREENS WAS A SIGNIFICANT NUMBER; IS THAT

12:58PM  21   RIGHT?

12:58PM  22   A.   YES.

12:58PM  23   Q.   DO YOU KNOW WHAT IT WAS SIGNIFICANT TO, OR WHAT INFLUENCE

12:58PM  24   IT HAD ON OTHER INFORMATION?

12:58PM  25   A.   WELL, IT WOULD HAVE IMPACTED THE LEVEL OF REVENUE.

12:58PM  1    Q.   I SEE.

12:58PM  2         AND DID YOU LEARN THAT INFORMATION ON THIS PHONE CALL WITH

12:59PM  3    MS. HOLMES?

12:59PM  4    A.   I BELIEVE I DID, AND IT MIGHT HAVE BEEN ALSO THE CALL AND

12:59PM  5    THE ADDITIONAL MATERIALS.

12:59PM  6    Q.   THANK YOU.

12:59PM  7         IF YOU'LL NOW TURN TO PAGE 275 OF THIS EXHIBIT.

12:59PM  8         DO YOU SEE THE FIRST PARAGRAPH IN THIS DOCUMENT THAT

12:59PM  9    READS, "HEADQUARTERED IN PALO ALTO, THERANOS IS A CONSUMER

12:59PM 10    HEALTH CARE TECHNOLOGY COMPANY.  THERANOS'S CLINICAL LABORATORY

12:59PM 11    OFFERS COMPREHENSIVE LABORATORY TESTS FROM SAMPLES AS SMALL AS

12:59PM 12    A FEW DROPS OF BLOOD AT UNPRECEDENTED LOW PRICES."

12:59PM 13         DO YOU SEE THAT?

12:59PM 14    A.   I DO.

12:59PM 15    Q.   AND DID YOU RECEIVE THIS ALSO BEFORE MAKING A DECISION TO

01:00PM 16    INVEST?

01:00PM 17    A.   I DID.

01:00PM 18    Q.   THE REFERENCE THERE TO THERANOS'S CLINICAL LAB OFFERING

01:00PM 19    COMPREHENSIVE LAB TESTS, WAS THAT CONSISTENT WITH YOUR

01:00PM 20    UNDERSTANDING OF THE CURRENT CAPABILITIES OF THERANOS'S

01:00PM 21    TECHNOLOGY?

01:00PM 22    A.   IT WAS.

01:00PM 23    Q.   WOULD YOU NOW TURN TO PAGE 278.

01:00PM 24         THE NEXT SEVERAL SLIDES THAT I'M GOING TO DISCUSS WITH YOU

01:00PM 25    LOOK LIKE, LOOK LIKE SLIDES OR POWERPOINT SLIDES.

01:00PM  1          DO YOU RECALL THESE?

01:00PM  2     A.   I DO.

01:00PM  3     Q.   AND WAS THE CONTENT OF THESE SLIDES ALSO IMPORTANT IN YOUR

01:00PM  4     EVENTUAL DECISION TO INVEST?

01:00PM  5     A.   THEY WERE.

01:00PM  6     Q.   IF YOU'LL TURN TO THE NEXT PAGE, PAGE 279, THERE'S AN

01:00PM  7     IMAGE OF A CHILD AND THE PHRASE "GOODBYE, BIG BAD NEEDLE."

01:01PM  8          DO YOU SEE THAT?

01:01PM  9     A.   NOT ON WHAT IS MY -- OH, MAYBE I'M ON THE WRONG PAGE.

01:01PM 10     HOLD IT.  I MAY BE -- I WAS LOOKING AT THE WRONG PAGE.  I WAS

01:01PM 11     LOOKING AT ANOTHER STAMP OF NUMBERS ON THE BOTTOM OF THE PAGE.

01:01PM 12     Q.   I'M SORRY.  THE BOTTOM MIDDLE?

01:01PM 13     A.   YES.

01:01PM 14     Q.   IT SHOULD SAY PAGE -- THREE LEAD ZEROS AND THEN 279.

01:01PM 15     A.   I HAVE IT NOW.

01:01PM 16     Q.   SO ON THIS PAGE, DO YOU SEE THE PHRASE "GOODBYE, BIG BAD

01:01PM 17     NEEDLE"?

01:01PM 18     A.   I SEE IT.

01:01PM 19     Q.   AND DID YOU UNDERSTAND WHAT THAT MEANS?  DID YOU

01:01PM 20     UNDERSTAND WHAT THAT WAS A REFERENCE TO?

01:01PM 21     A.   I DID.

01:01PM 22     Q.   AND WHAT DID THAT MEAN?

01:01PM 23     A.   TO ME IT MEANT IT WAS GOING TO BE TAKING BLOOD SAMPLES BY

01:01PM 24     A FINGERPRICK AND, THEREFORE, WOULD NOT NEED A BIG NEEDLE TO

01:01PM 25     DRAW BLOOD FROM A VEIN.

MOSLEY DIRECT BY MR. SCHENK

01:01PM   1   Q.   AND WAS THAT YOUR UNDERSTANDING BEFORE INVESTING IN

01:02PM   2   THERANOS?

01:02PM   3   A.   IT WAS.

01:02PM   4   Q.   WOULD YOU NOW TURN TO THE NEXT PAGE, PAGE 280.

01:02PM   5       ON THIS SLIDE, THE FIRST INTENDED PARAGRAPH READS,

01:02PM   6   "THERANOS'S PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE

01:02PM   7   BLOOD TESTS FROM A FINGERSTICK AND TESTS FROM MICRO-SAMPLES OF

01:02PM   8   OTHER MATRICES AND GENERATES SIGNIFICANTLY HIGHER INTEGRITY

01:02PM   9   DATA THAN CURRENTLY POSSIBLE."

01:02PM  10       DO YOU SEE THAT?

01:02PM  11   A.   I DO.

01:02PM  12   Q.   AND WAS THAT REPRESENTATION SIGNIFICANT TO YOU WHEN YOU

01:02PM  13   MADE A DECISION TO INVEST?

01:02PM  14   A.   IT WAS.

01:02PM  15   Q.   WHY?

01:02PM  16   A.   WELL, THAT WAS -- AS IT SAYS, I UNDERSTAND IT TO BE

01:02PM  17   PROPRIETARY, I UNDERSTOOD IT TO BE PATENTED, AND THAT WAS AN

01:02PM  18   IMPORTANT DEVELOPMENT.

01:02PM  19   Q.   AND DID YOU, DID YOU BELIEVE THAT YOU WERE INVESTING IN A

01:02PM  20   COMPANY THAT RAN BLOOD TESTS?

01:02PM  21   A.   I DID.

01:02PM  22   Q.   DID YOU BELIEVE THAT YOU WERE INVESTING IN A COMPANY THAT

01:03PM  23   RAN BLOOD TESTS USING ITS OWN DEVICES OR USING DEVICES THAT IT

01:03PM  24   PURCHASED FROM THIRD PARTY MANUFACTURERS?

01:03PM  25   A.   USING ITS OWN DEVICES.

01:03PM   1    Q.   AND WAS THIS SENTENCE THAT I JUST READ TO YOU AT LEAST ONE

01:03PM   2    OF THE SOURCES WHERE YOU REACHED THAT CONCLUSION?

01:03PM   3    A.   YES.

01:03PM   4    Q.   IF YOU WILL LOOK NOW AT THE NEXT LINE, "THERANOS IS THE

01:03PM   5    WORLD'S FIRST AND ONLY CLIA-CERTIFIED LABORATORY RUNNING ITS

01:03PM   6    TESTS ON MICRO-SAMPLES."

01:03PM   7    A.   I SEE THAT.

01:03PM   8    Q.   YOU SEE THAT?

01:03PM   9         AND WAS THAT REPRESENTATION SIGNIFICANT IN YOUR DECISION

01:03PM   10   TO INVEST?

01:03PM   11   A.   IT WAS.

01:03PM   12   Q.   WHY?

01:03PM   13   A.   WELL, IT INDICATED THAT THE LABORATORY HAD BEEN CERTIFIED

01:03PM   14   AND THAT IT WAS RUNNING TESTS ON MICRO SAMPLES.

01:03PM   15   Q.   THE NEXT PARAGRAPH READS, "CURRENT AND PAST CLIENTS

01:03PM   16   INCLUDE 10 OF THE TOP 15 MAJOR PHARMACEUTICAL COMPANIES,

01:03PM   17   MIDSIZED BIO-PHARMAS, PROMINENT RESEARCH INSTITUTIONS, HEALTH

01:04PM   18   CARE PAYORS, AND U.S. AND FOREIGN GOVERNMENT HEALTH AND

01:04PM   19   MILITARY ORGANIZATIONS."

01:04PM   20        I WANT TO ASK YOU IN PARTICULAR ABOUT THAT FIRST PART, "10

01:04PM   21   OF THE TOP 15 MAJOR PHARMACEUTICAL COMPANIES."

01:04PM   22   A.   UH-HUH.

01:04PM   23   Q.   WAS THAT REPRESENTATION SIGNIFICANT TO YOU IN YOUR

01:04PM   24   DECISION TO INVEST?

01:04PM   25   A.   YES.

01:04PM  1    Q.   WHY?

01:04PM  2    A.   WELL, BECAUSE THE PHARMACEUTICAL COMPANIES ARE LARGE --

01:04PM  3    THE TOP 15 OR TOP 10 WERE VERY LARGE COMPANIES THAT WERE VERY

01:04PM  4    SOPHISTICATED.

01:04PM  5    Q.   IN FACT, DID YOU AT SOME POINT REVIEW A REPORT FROM A

01:04PM  6    COMPANY CALLED PFIZER?

01:04PM  7    A.   YES, I DID.

01:04PM  8    Q.   AND WAS THAT PARTICULAR REPORT SIGNIFICANT TO YOU?

01:04PM  9    A.   IT WAS.

01:04PM  10   Q.   WHY?

01:04PM  11   A.   WELL, IT WAS A VERY DETAILED, LONG REPORT ABOUT THE USE OF

01:04PM  12   THE EQUIPMENT, AND IT WAS HIGHLY COMPLIMENTARY.

01:04PM  13   Q.   IF YOU'LL NOW TURN TO PAGE 85, I'M SORRY, 285.

01:05PM  14        DO YOU SEE THE SLIDE ENTITLED VALIDATION OF THERANOS

01:05PM  15   TESTS?

01:05PM  16   A.   I SEE IT.

01:05PM  17   Q.   THE FIRST PARAGRAPH READS, "THERANOS HAS BEEN

01:05PM  18   COMPREHENSIVELY VALIDATED OVER THE COURSE OF THE LAST SEVEN

01:05PM  19   YEARS BY TEN OF THE FIFTEEN LARGEST PHARMACEUTICAL COMPANIES,

01:05PM  20   WITH HUNDREDS OF THOUSANDS OF ASSAYS PROCESSED."

01:05PM  21        DO YOU SEE THAT LINE?

01:05PM  22   A.   I DO.

01:05PM  23   Q.   WAS THAT REPRESENTATION SIGNIFICANT IN YOUR DECISION TO

01:05PM  24   INVEST?

01:05PM  25   A.   IT WAS.

01:05PM   1    Q.   WHY?

01:05PM   2    A.   BECAUSE IT WAS REFERRING TO PHARMACEUTICAL COMPANIES WHICH

01:05PM   3    WERE INDICATED TO BE HIGHLY SOPHISTICATED, AND IT WAS

01:05PM   4    INDICATING THAT, ONCE AGAIN, 10 OF THE 15 LARGEST

01:05PM   5    PHARMACEUTICAL COMPANIES HAD WORKED WITH THERANOS AND IT

01:05PM   6    INVOLVES HUNDREDS OF THOUSANDS OF ASSAYS.

01:05PM   7    Q.   AND FURTHER DOWN, DO YOU SEE THE IMAGE OR THE LOGO FROM

01:06PM   8    JOHNS HOPKINS MEDICINE?

01:06PM   9    A.   I DO.

01:06PM   10   Q.   DID YOU THINK THAT JOHNS HOPKINS HAD VALIDATED THERANOS

01:06PM   11   TESTS?

01:06PM   12   A.   YES.

01:06PM   13   Q.   IF YOU'LL NOW TURN TO PAGE 299.

01:06PM   14   A.   OKAY.

01:06PM   15   Q.   ON 299, DO YOU SEE WHERE IT SAYS "SAME TESTS, A WHOLE NEW

01:06PM   16   APPROACH"?

01:06PM   17   A.   I DO.

01:06PM   18   Q.   AND BELOW THAT, "THE ACTIONABLE INFORMATION YOU NEED,

01:06PM   19   1/1,000 THE SIZE OF A TYPICAL BLOOD DRAW?"

01:07PM   20        DO YOU SEE THAT?

01:07PM   21   A.   I DO.

01:07PM   22   Q.   AND IT APPEARS THERE ARE THREE IMAGES BELOW THAT ON THE

01:07PM   23   SLIDE.

01:07PM   24        DO YOU SEE THAT?

01:07PM   25   A.   I DO.

01:07PM  1    Q.   AND THEN, "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL

01:07PM  2    LABORATORIES, AND PROCESSES ALL SAMPLE TYPES."

01:07PM  3         AND THEN AT THE VERY END IT READS, "THERANOS PROVIDES THE

01:07PM  4    HIGHEST LEVEL OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN

01:07PM  5    OUR PRE AND POST-ANALYTIC PROCESSES, ENSURING THE HIGHEST

01:07PM  6    LEVELS OF ACCURACY AND PRECISION."

01:07PM  7         AGAIN, MR. MOSLEY, DID YOU RECEIVE THIS SLIDE BEFORE

01:07PM  8    INVESTING?

01:07PM  9    A.   YES, I DID.

01:07PM  10   Q.   WAS THIS SIGNIFICANT IN YOUR DECISION TO INVEST?

01:07PM  11   A.   IT WAS.

01:07PM  12   Q.   WHY?

01:07PM  13   A.   WELL, BECAUSE IT PROVIDED THAT THEY CAN RUN ALL OF THE

01:07PM  14   TESTS, RUN IT WITH A SMALL SAMPLE SIZE, AND AS IT SAYS, IT SAYS

01:07PM  15   THAT OVERSIGHT, AUTOMATION AND STANDARDIZATION AND THE HIGHEST

01:07PM  16   LEVELS OF ACCURACY AND PRECISION?

01:07PM  17   Q.   AND I APPRECIATE IT MAY BE OBVIOUS, BUT WHY IS ACCURACY

01:07PM  18   AND PRECISION IMPORTANT IN YOUR DECISION TO INVEST?

01:07PM  19   A.   WELL, YOU KNOW, BLOOD TESTING OBVIOUSLY INVOLVES HUMAN

01:08PM  20   HEALTH AND ACCURACY IS CRITICAL IN DETERMINING WHETHER, YOU

01:08PM  21   KNOW, A TEST IS APPROPRIATE AND RELIABLE.

01:08PM  22   Q.   AT THE VERY TOP WHERE IT SAYS "SAME TESTS, A WHOLE NEW

01:08PM  23   APPROACH," WHAT DID THAT MEAN TO YOU IN PARTICULAR, "A WHOLE

01:08PM  24   NEW APPROACH"?

01:08PM  25   A.   MY UNDERSTANDING WAS THAT IT WAS COMPLETELY NEW TECHNOLOGY

01:08PM   1    THAT ALLOWED THIS TO BE DONE WITH SMALL SAMPLE SIZES.

01:08PM   2    Q.   THANK YOU.

01:08PM   3         IF YOU'LL NOW TURN TO PAGE 301, TWO PAGES FORWARD.

01:08PM   4    A.   OKAY.

01:08PM   5    Q.   DO YOU SEE A SLIDE TITLED "A NEW STANDARD IN QUALITY"?

01:08PM   6    A.   I DO.

01:08PM   7    Q.   AND IT READS, "THE HIGHEST LEVELS OF ACCURACY.

01:08PM   8         "BY SYSTEMATICALLY CONTROLLING AND STANDARDIZING OUR

01:08PM   9    PROCESSES, THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF

01:08PM  10    ACCURACY."

01:08PM  11         DO YOU SEE THAT?

01:08PM  12    A.   I DO.

01:08PM  13    Q.   AND AGAIN, WAS THE ACCURACY OF THERANOS TESTS IMPORTANT IN

01:08PM  14    YOUR DECISION TO INVEST?

01:08PM  15    A.   IT WAS.

01:08PM  16    Q.   IF YOU'LL TURN NOW TWO PAGES FORWARD AGAIN TO PAGE 303.

01:09PM  17    A.   OKAY.

01:09PM  18    Q.   DO YOU SEE THE SLIDE TITLED "NEW POSSIBILITIES IN LAB"?

01:09PM  19    A.   I DO.

01:09PM  20    Q.   AND ON THE LEFT SIDE THE FIRST BULLET READS, "ALL 1,000

01:09PM  21    PLUS CURRENTLY RUN TESTS/CPT CODES ARE AVAILABLE THROUGH

01:09PM  22    THERANOS."

01:09PM  23         AND THE SECOND BULLET READS, "THERANOS RUNS ANY TEST

01:09PM  24    AVAILABLE IN CENTRAL LABORATORIES."

01:09PM  25         WAS THE VOLUME OF TESTS THAT THERANOS WAS OFFERING, WAS

01:09PM   1    THAT SIGNIFICANT IN YOUR DECISION TO INVEST?

01:09PM   2    A.   IT WAS.

01:09PM   3    Q.   AND WHY DID THE VOLUME OF TESTS MATTER?

01:09PM   4    A.   WELL, BECAUSE IT WOULD -- IF YOU WERE GOING TO HAVE A

01:09PM   5    TESTING DEVICE, IT WAS IMPORTANT THAT IT COULD RUN THE FULL

01:09PM   6    RANGE OF TESTS THAT YOU WOULD EXPECT TO BE ABLE TO OBTAIN.

01:09PM   7    Q.   THANK YOU.

01:09PM   8         IF YOU'LL NOW TURN TO THE NEXT PAGE, PAGE 304.

01:10PM   9         DO YOU SEE "FASTER RESULTS.  FASTER ANSWERS."

01:10PM  10         AND BELOW THAT, "THERANOS'S MICRO-SAMPLE ANALYSIS IS

01:10PM  11    PERFORMED AT AMAZING SPEED, SO WE CAN REPORT RESULTS FASTER

01:10PM  12    THAN PREVIOUSLY POSSIBLE."

01:10PM  13         WHAT I'M WONDERING IS WHAT DID "FASTER THAN PREVIOUS

01:10PM  14    POSSIBLE," THAT COMPARATIVE, WHAT DID THAT MEAN TO YOU?

01:10PM  15    A.   TO ME IT MEANT THAT RATHER THAN HAVING A BLOOD DRAW AND

01:10PM  16    WAITING A DAY OR TWO OR THREE DAYS TO GET BLOOD TESTS, OR

01:10PM  17    LONGER, THAT YOU WOULD GET THE RESULTS BACK MUCH FASTER.

01:10PM  18    Q.   DID YOU THINK THAT THERANOS BLOOD TESTING TECHNOLOGY WAS

01:10PM  19    THEREFORE ABLE TO GENERATE ITS RESULTS FASTER THAN WHAT WAS

01:10PM  20    CURRENTLY AVAILABLE IN THE MARKET?

01:10PM  21    A.   YES.

01:10PM  22    Q.   AND WAS THAT ADVANTAGE IMPORTANT TO YOUR INVESTMENT

01:11PM  23    DECISION?

01:11PM  24    A.   IT WAS.

01:11PM  25    Q.   WHY?

01:11PM  1    A.   WELL, BECAUSE, YOU KNOW, ANY TECHNOLOGY THAT WOULD ALLOW

01:11PM  2    SOMETHING TO BE DONE FASTER WOULD MAKE IT HIGHLY DESIRABLE AND

01:11PM  3    HIGHLY COMMERCIAL.

01:11PM  4    Q.   THANK YOU.

01:11PM  5         IF YOU'LL NOW TURN TO PAGE 320.

01:11PM  6         DO YOU SEE THE SLIDE THAT IS ENTITLED "RECENT PRESS"?

01:11PM  7    A.   ONE -- PAGE 330 DID YOU SAY?

01:11PM  8    Q.   320.

01:11PM  9    A.   320.

01:11PM  10   Q.   OKAY.

01:11PM  11        DO YOU SEE THE SECOND IMAGE DOWN ON THE LEFT THE WORD

01:11PM  12   "FORTUNE"?

01:11PM  13   A.   I DO.

01:11PM  14   Q.   AND THEN ACROSS FROM THAT, "THIS CEO IS OUT FOR BLOOD,"

01:12PM  15   FOLLOWED BY AN IMAGE OF A "FORTUNE" MAGAZINE COVER.

01:12PM  16        DO YOU SEE THAT?

01:12PM  17   A.   I DO.

01:12PM  18   Q.   AND WHAT DID IT MEAN TO YOU THAT WITHIN THIS PACKAGE

01:12PM  19   YOU'RE RECEIVING IMAGES FROM MAGAZINES, OR IMAGES FROM THE NAME

01:12PM  20   OF A PERIODICAL, EVEN A SLIDE CALLED "RECENT PRESS," WHAT DID

01:12PM  21   THAT MEAN TO YOU?

01:12PM  22   A.   WELL, IT MEANT THIS TECHNOLOGY WAS BEING RECOGNIZED BY THE

01:12PM  23   PRESS.

01:12PM  24   Q.   WAS THAT SIGNIFICANT?

01:12PM  25   A.   IT WAS.

01:12PM  1    Q.   WHY?

01:12PM  2    A.   WELL, BECAUSE IT WAS A FURTHER VALIDATION AND GOOD

01:12PM  3    MARKETING.

01:12PM  4    Q.   AFTER YOU RECEIVED THIS, DO YOU KNOW WHETHER YOU LOOKED AT

01:12PM  5    ANY OF THE PRESS?

01:12PM  6    A.   I DON'T REMEMBER SPECIFICALLY, BUT I DO REMEMBER I READ

01:12PM  7    THE "FORTUNE" -- I CERTAINLY READ THE "FORTUNE" ARTICLE, AND I

01:13PM  8    PROBABLY READ ONE OR MORE OTHER ARTICLES.

01:13PM  9    Q.   YOU SAID YOU HAD A SPECIFIC RECOLLECTION OF READING THE

01:13PM 10    "FORTUNE" ARTICLE?

01:13PM 11    A.   I DO.  I KNOW I READ THE "FORTUNE" ARTICLE.

01:13PM 12    Q.   THANK YOU.

01:13PM 13         IF YOU'LL NOW TURN TO PAGE 419.

01:13PM 14    A.   I HAVE IT.

01:13PM 15    Q.   PAGE 419 THROUGH PAGE 445, I'M WONDERING IF YOU'RE

01:13PM 16    FAMILIAR WITH THE DOCUMENTS LOCATED THERE?

01:13PM 17    A.   I AM.

01:13PM 18    Q.   AND WHAT ARE THOSE DOCUMENTS?

01:13PM 19    A.   THIS IS A REPORT BY PFIZER OF A STUDY USING THERANOS'S

01:13PM 20    TECHNOLOGY.

01:13PM 21    Q.   AND IN THE COPY IN THE BINDER AND ON THE SCREEN, IT LOOKS

01:13PM 22    LIKE SOME PARAGRAPHS CONTAIN HIGHLIGHTING; IS THAT RIGHT?

01:14PM 23    A.   THEY DO.

01:14PM 24    Q.   AND DO YOU RECOGNIZE THAT HIGHLIGHTING ON THE DOCUMENT?

01:14PM 25    A.   I DID IT.

01:14PM 1    Q.   YOU DID THE HIGHLIGHTING?

01:14PM 2    A.   I DID THE HIGHLIGHTING, YES.

01:14PM 3    Q.   I'M SORRY TO TALK OVER YOU.

01:14PM 4         YOU DID THE HIGHLIGHTING?

01:14PM 5    A.   YES.

01:14PM 6    Q.   WHEN YOU WERE REVIEWING THIS PFIZER REPORT, WERE THE

01:14PM 7    CONCLUSIONS OR THE REPRESENTATIONS IN IT, WERE THEY SIGNIFICANT

01:14PM 8    TO YOU?

01:14PM 9    A.   YES.

01:14PM 10   Q.   WHY?

01:14PM 11   A.   PFIZER IS A LARGE, VERY SOPHISTICATED PHARMACEUTICAL

01:14PM 12   COMPANY THAT WOULD HAVE HAD A LOT OF KNOWLEDGE AND EXPERIENCE

01:14PM 13   IN THIS AREA, AND THE CONCLUSIONS WERE VERY POSITIVE ABOUT THE

01:14PM 14   TECHNOLOGY.

01:14PM 15   Q.   THANK YOU.

01:14PM 16        YOUR HONOR, PERMISSION TO PUBLISH 5387H, PAGE 17.

01:14PM 17   PREVIOUSLY ADMITTED.

01:14PM 18           THE COURT:  IT CAN BE PUBLISHED.

01:14PM 19   BY MR. SCHENK:

01:14PM 20   Q.   SO, MR. MOSLEY, I'M SHOWING YOU A GROUP OF TEXT MESSAGES.

01:15PM 21   YOU'RE NOT ON THESE TEXT MESSAGES; IS THAT CORRECT?

01:15PM 22   A.   NO, I'M NOT.

01:15PM 23   Q.   SO IF WE CAN ZOOM IN ON THE TEXT MESSAGES, THE SECOND ONE

01:15PM 24   FROM THE BOTTOM.  PRECISELY.  THANK YOU.

01:15PM 25        DO YOU SEE THAT ON NOVEMBER 20TH, 2013, MS. HOLMES WRITES

01:15PM  1    TO MR. BALWANI, "AM PLANNING ON INCLUDING ALL WE SENT DST,

01:15PM  2    INCLUDING THE PFIZER REPORT.  LET ME KNOW IF U DISAGREE."

01:15PM  3         DO YOU SEE THAT?

01:15PM  4    A.   I DO.

01:15PM  5    Q.   AND, MR. MOSLEY, I THINK YOU TOLD THE JURY YOU RECEIVED

01:15PM  6    THIS BINDER IN AROUND AUGUST OF 2014; IS THAT CORRECT?

01:15PM  7    A.   THAT IS CORRECT.

01:15PM  8    Q.   I'D LIKE TO NOW RETURN TO THE BINDER.  IF YOU'LL TURN TO

01:15PM  9    PAGE 445.

01:15PM  10        THIS PAGE APPEARS TO BE A LIST OF SELECT ANCHOR HOSPITAL

01:15PM  11   PARTNERS.

01:16PM  12        DO YOU SEE THAT?

01:16PM  13   A.   I DO.

01:16PM  14   Q.   AND DID YOU HAVE AN UNDERSTANDING OF WHAT WAS BEING

01:16PM  15   REPRESENTED OR WHAT WAS BEING DISCUSSED HERE?

01:16PM  16   A.   I BELIEVE THESE WERE HOSPITALS THAT THERANOS WAS ALREADY

01:16PM  17   WORKING WITH.

01:16PM  18   Q.   THANK YOU.

01:16PM  19        IF YOU'LL NOW TURN TO PAGE 510.

01:16PM  20        DO YOU RECOGNIZE THE DOCUMENT ON PAGE 510?

01:16PM  21   A.   I DO.

01:16PM  22   Q.   AND WHAT IS THIS?

01:16PM  23   A.   IT'S TYPICALLY REFERRED TO AS A CAP TABLE.

01:16PM  24   Q.   WHAT IS A CAP TABLE?

01:16PM  25   A.   A CAP TABLE SHOWS THE DIFFERENT SERIES OF STOCK THAT HAS

01:16PM  1    BEEN ISSUED BY VARIOUS -- BY A PARTICULAR COMPANY, AND THE

01:16PM  2    PRICE, AND THE DATE OF ISSUANCE, AND THE TOTAL PROCEEDS.

01:16PM  3    Q.   SO WE SEE THERE'S A LINE FOR SERIES C-2.

01:16PM  4         DO YOU SEE THAT?

01:16PM  5    A.   I DO.

01:16PM  6    Q.   AND I THINK YOU SAID EARLIER THAT WHEN YOU INVESTED IN

01:17PM  7    THERANOS YOU PURCHASED C-2 STOCK; IS THAT RIGHT?

01:17PM  8    A.   THAT IS CORRECT.

01:17PM  9    Q.   AND DID YOU PAY $17 PER SHARE?

01:17PM  10   A.   I DID.

01:17PM  11   Q.   AND IT LOOKS LIKE LISTED HERE THERE IS AN AMOUNT ABOUT

01:17PM  12   $194 MILLION.

01:17PM  13        DO YOU SEE THAT?

01:17PM  14   A.   I DO.

01:17PM  15   Q.   AND WHAT DOES THAT MEAN?

01:17PM  16   A.   THAT WOULD HAVE BEEN THE TOTAL DOLLARS RAISED BY SELLING

01:17PM  17   C-2 SHARES AS OF THAT DATE.

01:17PM  18   Q.   SO BECAUSE YOU RECEIVED THIS DOCUMENT BEFORE YOU HAD

01:17PM  19   INVESTED, IT WOULD NOT INCLUDE YOUR INVESTMENT, FOR INSTANCE?

01:17PM  20   A.   THAT IS CORRECT.

01:17PM  21   Q.   SO THE -- IS THE CAP TABLE SORT OF A MOMENT IN TIME?

01:17PM  22   A.   YES.

01:17PM  23   Q.   IF YOU'LL NOW TURN TO PAGE 512.

01:17PM  24        DO YOU RECOGNIZE THE DOCUMENT ON PAGE 512?

01:17PM  25   A.   I DO.

01:17PM   1    Q.   WHAT IS THIS DOCUMENT?

01:17PM   2    A.   IT WAS A PROJECTED STATEMENT OF INCOME.

01:17PM   3    Q.   AND DO YOU SEE THE LINE FOR TOTAL REVENUE?

01:18PM   4    A.   I DO.

01:18PM   5    Q.   AND WHAT WAS THE TOTAL REVENUE PROJECTED FOR THE END OF

01:18PM   6    2014?

01:18PM   7    A.   $140 MILLION.

01:18PM   8    Q.   AND DO WE KNOW THAT IT'S THE END OF 2014 BECAUSE OF THE

01:18PM   9    PERIOD ENDING DATE?

01:18PM  10    A.   I SEE THE PERIOD ENDING DATE, YES.

01:18PM  11    Q.   THE PERIOD ENDING DATE APPEARS TO BE THE LAST DAY OF THE

01:18PM  12    YEAR, DECEMBER 31ST OF 2014; IS THAT RIGHT?

01:18PM  13    A.   THAT'S CORRECT.

01:18PM  14    Q.   AND YOU SAID THAT THE PROJECTED REVENUE WAS $140 MILLION

01:18PM  15    FOR 2014; IS THAT RIGHT?

01:18PM  16    A.   CORRECT.

01:18PM  17    Q.   WHEN DID YOU RECEIVE THIS PROJECTION?

01:18PM  18    A.   I BELIEVE I RECEIVED IT AS PART OF THE INITIAL PACKET OF

01:18PM  19    DOCUMENTS.

01:18PM  20    Q.   WITH THE AUGUST COVER LETTER?

01:18PM  21    A.   CORRECT.

01:18PM  22    Q.   SO IN AUGUST OF 2014 WERE YOU BEING TOLD THAT THERANOS WAS

01:18PM  23    PROJECTING $140 MILLION OF REVENUE BY THE END OF THAT YEAR?

01:18PM  24    A.   YES.

01:18PM  25    Q.   AND HOW ABOUT THE SAME FOR 2015?

01:18PM  1        WHAT IS THE TOTAL REVENUE PROJECTED FOR 2015?

01:19PM  2    A.   990 MILLION.

01:19PM  3    Q.   AND I WANT TO ASK ABOUT A FEW OF THE LINE ENTRIES.

01:19PM  4        DO YOU SEE LAB SERVICES FOR U.S. RETAIL PHARMACIES?

01:19PM  5    A.   I DO.

01:19PM  6    Q.   AND WHAT WAS THE PROJECTED REVENUE FOR '14, 2014?

01:19PM  7    A.   42 MILLION.

01:19PM  8    Q.   AND HOW ABOUT FOR 2015?

01:19PM  9    A.   470 MILLION.

01:19PM 10    Q.   WERE THOSE PROJECTIONS SIGNIFICANT IN YOUR DECISION TO

01:19PM 11    INVEST?

01:19PM 12        AND TO BE CLEAR, WHAT I MEAN IS THE PROJECTIONS AS A

01:19PM 13    WHOLE, THE TOTAL AMOUNT OF 2014 AND THE TOTAL AMOUNT FOR 2015?

01:19PM 14    A.   WAS IT SIGNIFICANT?

01:19PM 15    Q.   YES.

01:19PM 16    A.   YES.

01:19PM 17    Q.   WHY?

01:19PM 18    A.   IT OBVIOUSLY SHOWED INCREDIBLE GROWTH IN THE REVENUES,

01:19PM 19    INCREDIBLE PROJECTED GROWTH IN THE REVENUES OF THE COMPANY.

01:19PM 20    Q.   TALK TO ME FOR A MOMENT ABOUT THAT PHRASE "PROJECTED."

01:19PM 21        YOU RECEIVED IT IN AUGUST OF 2014.

01:19PM 22    A.   RIGHT.

01:19PM 23    Q.   AND IT'S PROJECTED REVENUE FOR THE REST OF THE YEAR.

01:19PM 24        WHEN YOU'RE EVALUATING THE SIGNIFICANCE OF THE

01:20PM 25    PROJECTIONS, HOW DO YOU, HOW DO YOU QUANTIFY, OR HOW IS IT

01:20PM  1    RELEVANT TO YOU THAT THESE NUMBERS ARE PROJECTIONS?

01:20PM  2    A.   WELL, IT'S -- WHEN YOU'RE IN THE MIDDLE OF THE YEAR AND

01:20PM  3    YOU GET A PROJECTED STATEMENT FOR THE ENTIRE YEAR, YOU WOULD

01:20PM  4    EXPECT THAT IT WOULD BE ACTUAL NUMBERS UP UNTIL THAT POINT IN

01:20PM  5    TIME, AND THE PROJECTION WOULD BE THE PORTION OF THE YEAR THAT

01:20PM  6    HAD NOT YET ELAPSED.

01:20PM  7    Q.   SO -- AND THEN TELL ME ABOUT 2015.

01:20PM  8    A.   AND SO FOR 2015 IT WOULD HAVE BEEN A PROJECTION FOR THE

01:20PM  9    WHOLE YEAR.

01:20PM  10   Q.   AND DOES WHAT YOU JUST SAID SAY SOMETHING ABOUT HOW

01:20PM  11   ACCURATE YOU PERSONALLY EXPECTED EACH OF THESE PROJECTIONS TO

01:20PM  12   BE?

01:20PM  13   A.   YES.

01:20PM  14   Q.   AND WHAT IS THAT?

01:20PM  15   A.   MORE ACCURATE FOR 2014 SINCE IT WOULD HAVE HAD ACTUAL

01:20PM  16   NUMBERS FOR A PERIOD OF TIME AND PROJECTED FOR THE BALANCE.

01:20PM  17        AND, BY DEFINITION, LESS ACCURATE FOR 2015 BECAUSE IT WAS

01:21PM  18   A PROJECTION FOR THE ENTIRE YEAR.

01:21PM  19   Q.   IF THE REVENUE FOR 2015 WAS NEGLIGIBLE, A FEW HUNDRED

01:21PM  20   THOUSAND DOLLARS OR LESS, TELL ME HOW THAT WOULD FACTOR INTO

01:21PM  21   YOUR ANALYSIS OF IT BEING A PROJECTION IN 2015.

01:21PM  22   A.   I'M NOT SURE WHAT YOU MEAN.

01:21PM  23   Q.   YOU -- I THINK YOU SAID A MOMENT AGO THAT YOU EXPECTED THE

01:21PM  24   2015 NUMBERS TO JUST BE A PROJECTION BECAUSE NO PORTION OF THAT

01:21PM  25   YEAR HAD OCCURRED.

01:21PM  1    A.   CORRECT.

01:21PM  2    Q.   SO HOW ACCURATE DO THE NUMBERS HAVE TO BE THEN?

01:21PM  3    A.   WELL, YOU WOULD EXPECT THEM TO HAVE A CERTAIN DEGREE OF

01:21PM  4    ACCURACY BECAUSE THEY WOULD BE BASED ON -- THE REVENUES THAT

01:21PM  5    ARE BEING REALIZED IN 2014 HAD ALREADY BEEN REALIZED UP UNTIL

01:21PM  6    THAT DATE, AND WHAT THEY COULD REASONABLY FORESEE THEREAFTER

01:21PM  7    FOR THE BALANCE OF THE YEAR.

01:21PM  8         SO IT WOULD BE -- THEY'RE VERY MEANINGFUL BECAUSE IT'S

01:21PM  9    ONLY ANOTHER 18 MONTHS OR 17 MONTHS AFTER THE DATE I RECEIVED

01:22PM  10   THEM.

01:22PM  11   Q.   AND WHEN YOU SAID "THEY ARE VERY MEANINGFUL," DO YOU MEAN

01:22PM  12   THE 2015 PROJECTIONS?

01:22PM  13   A.   YEAH, THE 2015 NUMBERS ARE MEANINGFUL.

01:22PM  14   Q.   GREAT.  THANK YOU VERY MUCH.

01:22PM  15        IF YOU'LL NOW TURN TO PAGE 516.

01:22PM  16        DO YOU SEE THE DOCUMENT ON PAGE 516?

01:22PM  17   A.   I DO.

01:22PM  18   Q.   ON THIS PAGE, WERE YOU BEING PROVIDED AN ACTUAL NEWSPAPER

01:22PM  19   ARTICLE?

01:22PM  20   A.   YES.

01:22PM  21   Q.   AND DO YOU RECALL WHETHER YOU READ THIS AT THE TIME?

01:22PM  22   A.   I DID READ IT.

01:22PM  23   Q.   DO YOU ALSO SEE ON THIS DOCUMENT SOME, IT LOOKS LIKE, SOME

01:22PM  24   HIGHLIGHTING?

01:22PM  25   A.   I DO.

01:22PM   1      Q.   IS THAT YOUR HIGHLIGHTING?

01:22PM   2      A.   IT IS.

01:22PM   3      Q.   I'M GOING TO ASK YOU ABOUT ONE PORTION OF IT IF IT CAN BE

01:22PM   4      ZOOMED TO A LEGIBLE STAGE.

01:22PM   5           DO YOU SEE THE PARAGRAPH THAT IS NOW ZOOMED IN THAT

01:22PM   6      BEGINS, "THERANOS'S TECHNOLOGY"?

01:23PM   7      A.   I SEE IT.

01:23PM   8      Q.   IT READS, "THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE LAB

01:23PM   9      TRIPS BECAUSE IT CAN 'RUN ANY COMBINATION OF TESTS, INCLUDING

01:23PM   10     SETS OF FOLLOW-ON TESTS,' AT ONCE, VERY QUICKLY, ALL FROM A

01:23PM   11     SINGLE MICROSAMPLE."

01:23PM   12          DO YOU SEE THAT?

01:23PM   13     A.   I DO.

01:23PM   14     Q.   AND WAS THAT STATEMENT CONSISTENT WITH YOUR UNDERSTANDING

01:23PM   15     OF THE PRESENT CAPABILITIES OF THE THERANOS TECHNOLOGY WHEN YOU

01:23PM   16     WERE DECIDING TO INVEST?

01:23PM   17     A.   IT WAS.

01:23PM   18     Q.   WOULD YOU NOW PLEASE TURN TO PAGE 523.

01:23PM   19          MR. MOSLEY, WAS THE "FORTUNE" ARTICLE THAT YOU REFERENCED

01:23PM   20     A MOMENT AGO ALSO INCLUDED IN THE BINDER?  DO YOU RECALL?

01:23PM   21     A.   I DON'T REMEMBER.

01:23PM   22     Q.   YOU DON'T REMEMBER IF YOU RECEIVED THE -- JUST THE COVER

01:24PM   23     OR THE ENTIRE ARTICLE?

01:24PM   24     A.   I DON'T REMEMBER WHETHER IT WAS JUST THE COVER OR THE

01:24PM   25     ENTIRE ARTICLE.

01:24PM  1    Q.   DID YOU MAKE EFFORTS TO OBTAIN THE ARTICLE?

01:24PM  2    A.   IF IT WASN'T IN THE PACKAGE, THEN I OBTAINED THE ARTICLE

01:24PM  3    AND READ IT.

01:24PM  4    Q.   THANK YOU.

01:24PM  5         AND DO YOU KNOW IF YOU READ IT BEFORE INVESTING?

01:24PM  6    A.   I DID.

01:24PM  7    Q.   NOW, IF YOU'LL GRAB THAT SECOND BINDER THAT I HANDED YOU.

01:24PM  8         IN THE SECOND BINDER, WHICH IS EXHIBIT 3392, WOULD YOU

01:24PM  9    JUST TURN TO PAGE 2 OF THAT.

01:24PM 10         AND THIS WAS ALSO ADMITTED, YOUR HONOR.  PERMISSION TO

01:24PM 11    PUBLISH?

01:24PM 12              THE COURT:  YES.

01:24PM 13              MR. SCHENK:  THANK YOU.

01:24PM 14    Q.   DO YOU SEE THE SECOND LINE ON THE SCREEN NOW IN FRONT OF

01:24PM 15    YOU THAT READS, "THERANOS TECHNOLOGY IS ABLE TO PERFORM THE

01:25PM 16    FULL MENU OF LABORATORY TESTS"?

01:25PM 17         DO YOU SEE THAT?

01:25PM 18    A.   I DO.

01:25PM 19    Q.   AND WAS THAT REPRESENTATION SIGNIFICANT IN YOUR DECISION

01:25PM 20    TO INVEST?

01:25PM 21    A.   IT WAS.

01:25PM 22    Q.   AND WAS THAT STATEMENT, WHAT YOU AND I WERE TALKING ABOUT

01:25PM 23    A MOMENT AGO, THE IMPORTANCE OF A VOLUME OF TESTS THAT THERANOS

01:25PM 24    WAS CAPABLE OF DOING?

01:25PM 25    A.   YES.

01:25PM 1    Q.   WOULD YOU NOW TURN TO EXHIBIT 3844.

01:25PM 2         I'M SORRY, THIS WILL BE BACK IN THAT FIRST BINDER.  YOU

01:25PM 3    CAN PUT THE SECOND BINDER ASIDE.

01:25PM 4    A.   DID YOU SAY 3844?

01:25PM 5    Q.   YES, SIR.

01:25PM 6    A.   OKAY.

01:26PM 7    Q.   DO YOU RECOGNIZE THE DOCUMENT AT 3844?

01:26PM 8    A.   I DO.

01:26PM 9    Q.   DID YOU REVIEW THIS DOCUMENT BEFORE INVESTING?

01:26PM 10   A.   YES, I DID.

01:26PM 11        MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 3844.

01:26PM 12        MR. CAZARES:  NO OBJECTION.

01:26PM 13        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:26PM 14   (GOVERNMENT'S EXHIBIT 3844 WAS RECEIVED IN EVIDENCE.)

01:26PM 15   BY MR. SCHENK:

01:26PM 16   Q.   MR. MOSLEY, WHAT DID YOU UNDERSTAND THIS DOCUMENT TO BE?

01:26PM 17   A.   I UNDERSTOOD IT TO BE A SUMMARY OF THE TECHNOLOGY AS

01:26PM 18   REVIEWED BY JOHNS HOPKINS.

01:26PM 19   Q.   AND DID YOU UNDERSTAND THIS TO BE A VALIDATION OF

01:26PM 20   THERANOS'S TECHNOLOGY BY JOHNS HOPKINS?

01:26PM 21   A.   I DID.

01:26PM 22   Q.   IF YOU'LL NOW TURN TO -- I'M SORRY.

01:26PM 23        WAS THAT SIGNIFICANT IN YOUR DECISION TO INVEST?

01:26PM 24   A.   IT WAS.

01:26PM 25   Q.   WHY?

01:26PM   1    A.   JOHNS HOPKINS IS A LARGE, VERY HIGHLY RESPECTED HOSPITAL,

01:27PM   2    AND I THOUGHT IT WOULD BE VERY CAPABLE OF MAKING A JUDGMENT OF

01:27PM   3    THIS TYPE.

01:27PM   4    Q.   THANK YOU.

01:27PM   5         IF YOU'LL NOW TURN TO TAB 4202.

01:27PM   6         IS 4202 AN EMAIL THREAD BETWEEN YOU AND MS. HOLMES?

01:27PM   7    A.   IT IS.

01:27PM   8    Q.   IN SEPTEMBER OF 2014?

01:27PM   9    A.   YES.

01:27PM   10            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4202.

01:27PM   11            MR. CAZARES:  NO OBJECTION.

01:27PM   12            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:27PM   13        (GOVERNMENT'S EXHIBIT 4202 WAS RECEIVED IN EVIDENCE.)

01:27PM   14            MR. SCHENK:  THANK YOU.

01:27PM   15    Q.   MR. MOSLEY, IF WE CAN START ON THE SECOND PAGE OF THIS

01:27PM   16    DOCUMENT, THE EMAIL THAT IS SENT FROM YOU TO MS. HOLMES ON

01:28PM   17    SEPTEMBER 2ND, 2014.

01:28PM   18         DO YOU SEE THAT EMAIL?

01:28PM   19    A.   I DO.

01:28PM   20    Q.   IN IT, IT LOOKS LIKE YOU'RE THANKING MS. HOLMES FOR THE

01:28PM   21    EXTENSIVE MATERIALS ON THERANOS.

01:28PM   22         WAS THAT AT LEAST SOME OF -- WAS AT LEAST SOME OF THAT THE

01:28PM   23    MATERIAL THAT YOU AND I JUST REVIEWED?

01:28PM   24    A.   IT WAS.

01:28PM   25    Q.   THOSE TWO LARGE STACKS OF DOCUMENTS?

01:28PM  1    A.   IT WAS.

01:28PM  2    Q.   YOU TELL HER THAT YOU ENJOYED READING THEM AND YOU ARE

01:28PM  3    APPRECIATIVE OF THE OPPORTUNITY TO BECOME A SHAREHOLDER.

01:28PM  4         DO YOU SEE THAT?

01:28PM  5    A.   I DO.

01:28PM  6    Q.   AND THEN A SENTENCE OR TWO LATER, YOU WRITE THAT YOU

01:28PM  7    PREPARED AN OUTLINE OVER THE WEEKEND WITH YOUR THOUGHTS AND

01:28PM  8    ANALYSIS THAT YOU ARE SENDING TO DR. KISSINGER.

01:28PM  9         DO YOU SEE THAT?

01:28PM 10    A.   I DO.

01:28PM 11    Q.   WHAT IS THAT DOCUMENT, THE OUTLINE?  WHAT ARE YOU

01:28PM 12    REFERRING TO?

01:28PM 13    A.   AN OUTLINE THAT I WROTE WITH SORT OF MY THOUGHTS AND SORT

01:28PM 14    OF PULLING TOGETHER THE INFORMATION THAT I HAD ABOUT THE

01:28PM 15    COMPANY.

01:28PM 16    Q.   AND WHAT WAS THE PURPOSE OF THAT?  WHY DID YOU PUT YOUR

01:29PM 17    THOUGHTS INTO AN OUTLINE?

01:29PM 18    A.   REALLY PRIMARILY BECAUSE, AS I THINK I MENTIONED,

01:29PM 19    DR. KISSINGER HAD ASKED ME TO LOOK AT THE COMPANY AND MEET

01:29PM 20    ELIZABETH AND GIVE HIM MY VIEWS.  AND IT WAS A WAY OF DOING

01:29PM 21    THAT.

01:29PM 22    Q.   WHEN DR. KISSINGER MADE THAT REQUEST, DID YOU KNOW WHETHER

01:29PM 23    DR. KISSINGER HAD A POSITION AT THERANOS AT THE TIME?

01:29PM 24    A.   I DID.

01:29PM 25    Q.   AND WHAT POSITION WAS THAT?

01:29PM  1    A.   HE WAS ON THE BOARD OF DIRECTORS.

01:29PM  2    Q.   AND THEN ABOVE THIS EMAIL, YOU FOLLOW UP WITH MS. HOLMES,

01:29PM  3    IT LOOKS LIKE ONE DAY LATER, WITH A REFERENCE TO AN UPCOMING

01:29PM  4    BYRON TROTT CONFERENCE.

01:29PM  5         DO YOU SEE THAT?

01:29PM  6    A.   I DO.

01:29PM  7    Q.   THAT CONFERENCE APPEARS TO BE LATER THAT SEPTEMBER IN

01:29PM  8    CHICAGO; IS THAT RIGHT?

01:29PM  9    A.   THAT'S CORRECT.

01:29PM  10   Q.   IS THIS -- WHO IS BYRON TROTT?

01:29PM  11   A.   BYRON TROTT WAS AN INVESTMENT BANKER AT GOLDMAN SACHS THAT

01:29PM  12   LEFT TO START HIS OWN FIRM.

01:29PM  13   Q.   AND WHAT FIRM IS THAT?

01:29PM  14   A.   IT'S BDT & COMPANY.

01:30PM  15   Q.   WHERE YOU CURRENTLY WORK?

01:30PM  16   A.   THAT IS CORRECT.

01:30PM  17   Q.   AND DID YOU GO TO THIS CHICAGO CONFERENCE?

01:30PM  18   A.   YES, I DID.

01:30PM  19   Q.   AND DID YOU SEE MS. HOLMES THERE?

01:30PM  20   A.   I DID.

01:30PM  21   Q.   AND DID YOU DISCUSS YOUR POSSIBLE INVESTMENT IN THERANOS

01:30PM  22   WHILE YOU WERE AT THE BDT CONFERENCE IN CHICAGO?

01:30PM  23   A.   I DON'T REMEMBER WHETHER WE SPECIFICALLY DISCUSSED IT AT

01:30PM  24   THAT TIME OR NOT.

01:30PM  25   Q.   DID YOU DISCUSS THERANOS MORE GENERALLY, NOT SPECIFICALLY

01:30PM   1    YOUR INVESTMENT?

01:30PM   2    A.   YES.

01:30PM   3    Q.   IN THOSE DISCUSSIONS, DID MS. HOLMES SAY ANYTHING

01:30PM   4    DIFFERENT OR CONTRADICTORY TO THE MATERIALS THAT YOU AND I JUST

01:30PM   5    REVIEWED?

01:30PM   6    A.   NO.

01:30PM   7    Q.   DID YOU LEAVE WITH A DIFFERENT IMPRESSION OF WHAT THE

01:30PM   8    THERANOS TECHNOLOGY WAS THAN YOU HAD AFTER REVIEWING THE

01:30PM   9    MATERIALS?

01:30PM  10    A.   NO.

01:30PM  11    Q.   WOULD YOU NOW TURN TO 4197.

01:31PM  12         DO YOU RECOGNIZE THE DOCUMENT AT 4197?

01:31PM  13    A.   I DO.

01:31PM  14    Q.   AND WHAT IS THIS DOCUMENT?

01:31PM  15    A.   IT IS A LETTER FROM ME TO DR. KISSINGER.

01:31PM  16    Q.   AND WHAT IS THE DOCUMENT AFTER THE LETTER?

01:31PM  17         AFTER PAGE 1 THERE'S SOME FURTHER PAGES.  DO YOU RECOGNIZE

01:31PM  18    THOSE PAGES?

01:31PM  19    A.   IT'S THE OUTLINE THAT I PREPARED.

01:31PM  20    Q.   THAT YOU JUST REFERENCED A MOMENT AGO IN THAT EMAIL?

01:31PM  21    A.   YES.

01:31PM  22         MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4197.

01:31PM  23         MR. CAZARES:  NO OBJECTION.

01:31PM  24         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:31PM  25         (GOVERNMENT'S EXHIBIT 4197 WAS RECEIVED IN EVIDENCE.)

01:31PM   1      BY MR. SCHENK:

01:31PM   2      Q.   MR. MOSLEY, IT LOOKS LIKE IN THE COVER LETTER YOU'RE

01:31PM   3      WRITING TO DR. KISSINGER TO INFORM HIM THAT YOU'RE ENCLOSING A

01:31PM   4      COPY OF THE OUTLINE; IS THAT CORRECT?

01:31PM   5      A.   YES.

01:31PM   6      Q.   AND YOU'VE DESCRIBED TO THE JURY SORT OF A DUAL PURPOSE

01:32PM   7      REVIEW OF THERANOS, TO PROVIDE SOME INFORMATION TO

01:32PM   8      DR. KISSINGER, AND ALSO TO EVALUATE A PERSONAL INVESTMENT

01:32PM   9      OPPORTUNITY; IS THAT CORRECT?

01:32PM   10     A.   YES.

01:32PM   11     Q.   WHICH OF THOSE TWO, OR BOTH, DID THIS OUTLINE SERVE?

01:32PM   12     A.   THE FORMER, PROVIDING THE INFORMATION TO DR. KISSINGER.

01:32PM   13     Q.   LET'S LOOK NOW ON PAGE 2 OF THE EXHIBIT, THE FIRST PAGE OF

01:32PM   14     YOUR OUTLINE.

01:32PM   15          FIRST, IF YOU'LL DESCRIBE FOR THE JURY GENERALLY WHAT THIS

01:32PM   16     DOCUMENT IS AND WHAT IT CONTAINS.

01:32PM   17     A.   AS I SAID, IT WAS A SUMMARY OF ALL OF THE INFORMATION AND

01:32PM   18     MY THOUGHT WITH REGARD TO THE INFORMATION THAT I HAD RECEIVED

01:32PM   19     ABOUT THE COMPANY.

01:32PM   20     Q.   THE SUMMARY OF THE INFORMATION INCLUDING THE LARGE STACKS

01:32PM   21     OF DOCUMENTS THAT YOU AND I LOOKED THROUGH?

01:32PM   22     A.   CORRECT.

01:32PM   23     Q.   IF YOU'LL NOW LOOK UNDER 1A.  WE SEE SOME -- ON THE SCREEN

01:32PM   24     IT LOOKS RED.

01:32PM   25          DO YOU SEE THAT UNDERLINING?

01:33PM  1    A.   I DO.

01:33PM  2    Q.   AND DO YOU RECOGNIZE THAT UNDERLINING?

01:33PM  3    A.   I BELIEVE IT WAS MY UNDERLINING.

01:33PM  4    Q.   I WOULD LIKE TO ASK YOU FIRST ABOUT A.  YOU WRITE, "THERE

01:33PM  5    IS SUBSTANTIAL DATA AND OTHER INFORMATION ATTESTING TO THE

01:33PM  6    QUALITY, PERFORMANCE AND RELIABILITY OF THE THERANOS TECHNOLOGY

01:33PM  7    AND EQUIPMENT.  THERE DOES NOT APPEAR TO BE ANY SIGN OF ANY

01:33PM  8    QUESTION ABOUT THE QUALITY, ACCURACY, OR RELIABILITY OF

01:33PM  9    THERANOS'S BLOOD TESTING TECHNOLOGY."

01:33PM  10       DO YOU SEE THAT?

01:33PM  11   A.   I DO.

01:33PM  12   Q.   AND WAS THIS YOUR CONCLUSION?

01:33PM  13   A.   BASED ON EVERYTHING I HAD READ, YES.

01:33PM  14   Q.   I WAS JUST GOING TO ASK, WHAT IS THIS BASED ON?

01:33PM  15   A.   THE MATERIALS THAT I RECEIVED.

01:33PM  16   Q.   AND YOU SAID THE PURPOSE OF THIS DOCUMENT WAS TO PROVIDE

01:33PM  17   INFORMATION TO DR. KISSINGER; IS THAT RIGHT?

01:33PM  18   A.   THAT'S CORRECT.

01:33PM  19   Q.   IS THIS ALSO TRUE, THOUGH, OF YOUR UNDERSTANDING WHEN YOU

01:33PM  20   WERE MAKING A DECISION TO INVEST?

01:33PM  21   A.   IT WAS.

01:33PM  22   Q.   DID YOU THINK THAT THERE WAS ANY QUESTION ABOUT THE

01:34PM  23   QUALITY, ACCURACY, OR RELIABILITY OF THERANOS'S TECHNOLOGY?

01:34PM  24   A.   I DID NOT.

01:34PM  25   Q.   IF YOU'LL NOW TURN TO PAGE 3 OF THE EXHIBIT.  DO YOU

01:34PM  1      SEE -- AND IF IT'S HELPFUL, YOU CAN TURN BACK TO THE FIRST

01:34PM  2      PAGE TO SEE THE CARRY-OVER -- THE DUE DILIGENCE AND TECHNOLOGY

01:34PM  3      REVIEW PREPARED BY JOHNS HOPKINS?

01:34PM  4          DO YOU SEE THAT?

01:34PM  5      A.   YES.

01:34PM  6      Q.   IT LOOKS LIKE THAT YOU PULLED SOME QUOTES FROM THE

01:34PM  7      JOHNS HOPKINS DOCUMENT; IS THAT RIGHT?

01:34PM  8      A.   I DID.

01:34PM  9      Q.   AND DID YOU THINK THAT THIS DOCUMENT, THE JOHNS HOPKINS

01:34PM 10      DOCUMENT, SUPPORTED THE CONCLUSION THAT YOU AND I JUST READ

01:34PM 11      TOGETHER, THAT THERE DOESN'T APPEAR TO BE A QUESTION ABOUT THE

01:34PM 12      QUALITY, ACCURACY, OR RELIABILITY OF THERANOS'S BLOOD TESTING

01:34PM 13      TECHNOLOGY?

01:34PM 14      A.   I BELIEVED THAT IT DID.

01:34PM 15      Q.   YOU BELIEVED THAT THE JOHNS HOPKINS REPORT SUPPORTED THAT?

01:34PM 16      A.   YES.

01:34PM 17      Q.   AND THEN THE SECOND BULLET DOWN ON THE SCREEN IS ABOUT THE

01:35PM 18      PFIZER REPORT.

01:35PM 19          DO YOU SEE THAT?

01:35PM 20      A.   I DO.

01:35PM 21      Q.   AND YOU WROTE, "THE MOST EXTENSIVE EVIDENCE SUPPLIED

01:35PM 22      REGARDING THE RELIABILITY OF THE THERANOS TECHNOLOGY AND ITS

01:35PM 23      APPLICATION IS A STUDY REPORT PREPARED BY PFIZER BASED ON A

01:35PM 24      CLINICAL CANCER TREATMENT TRIAL."

01:35PM 25          DO YOU SEE THAT?

01:35PM 1      A.   I DO.

01:35PM 2      Q.   AND DID YOU THINK THAT THE REPORT YOU AND I LOOKED AT A

01:35PM 3      MOMENT AGO, THE PFIZER REPORT, WAS PREPARED BY PFIZER?

01:35PM 4      A.   I DID.

01:35PM 5      Q.   WHY DID YOU THINK THAT?

01:35PM 6      A.   IT HAD THE PFIZER LOGO ON EVERY SINGLE PAGE OF IT, AND IT

01:35PM 7      WAS TALKING ABOUT A PFIZER STUDY.

01:35PM 8      Q.   AND DID YOU, DID YOU READ THE CONTENT OF THE PFIZER

01:35PM 9      REPORT?

01:35PM 10     A.   YES, I DID.

01:35PM 11     Q.   WERE THE CONCLUSIONS WITHIN IT SIGNIFICANT TO YOU?

01:35PM 12     A.   THEY WERE.

01:35PM 13     Q.   WHY?

01:35PM 14     A.   THEY WERE HIGHLY, HIGHLY COMPLIMENTARY OF THE RELIABILITY

01:35PM 15     AND EASE OF USE OF THE EQUIPMENT.

01:35PM 16     Q.   THANK YOU.

01:35PM 17          AND THEN IF WE LOOK A LITTLE FURTHER DOWN, IT LOOKS LIKE

01:36PM 18     YOU WROTE THAT HERE.

01:36PM 19          DO YOU SEE THE PARAGRAPH BEGINNING, "THE CONCLUSIONS,"

01:36PM 20     TOWARDS THE BOTTOM OF THE PAGE?

01:36PM 21     A.   I DO.

01:36PM 22     Q.   "THE CONCLUSIONS IN THE PFIZER STUDY REPORT ARE

01:36PM 23     EXTRAORDINARILY COMPLIMENTARY AND VALIDATE THE THERANOS

01:36PM 24     TECHNOLOGY AND ITS APPLICATIONS."

01:36PM 25          MR. MOSLEY, DID YOU THINK THAT THE PFIZER REPORT VALIDATED

01:36PM 1      THE THERANOS TECHNOLOGY?

01:36PM 2      A.   I DID.

01:36PM 3      Q.   AND SAME QUESTION.  WAS THAT SOMETHING THAT YOU BOTH WERE

01:36PM 4      PROVIDING TO DR. KISSINGER, BUT THAT YOU ALSO PERSONALLY

01:36PM 5      BELIEVED WHEN YOU MADE YOUR INVESTMENT DECISION?

01:36PM 6      A.   THAT IS CORRECT.

01:36PM 7      Q.   AND THEN BELOW THAT ON THE NEXT PAGE AND A HALF, DID YOU

01:36PM 8      ACTUALLY PULL QUOTES FROM THE PFIZER REPORT AND PUT IT INTO

01:36PM 9      THIS OUTLINE?

01:36PM 10     A.   I DID.

01:36PM 11     Q.   IF YOU'LL NOW TURN TO PAGE 4 UNDER THE THERANOS BUSINESS

01:36PM 12     APPROACH.

01:36PM 13          IN THAT FIRST BULLET, YOU'RE DESCRIBING HOW MS. HOLMES AND

01:36PM 14     THERANOS STAYED WELL BELOW THE RADAR SCREEN AND SORT OF SOME OF

01:37PM 15     THE ADVANTAGES, IT GAVE THERANOS TIME TO, AND THEN YOU LIST

01:37PM 16     SOME ADVANTAGES; IS THAT RIGHT?

01:37PM 17     A.   YES.

01:37PM 18     Q.   DID YOU THINK THAT THERANOS MADE A CONSCIOUS DECISION TO

01:37PM 19     LEAVE THIS UNDER THE RADAR PERIOD OF TIME?

01:37PM 20     A.   I DID.

01:37PM 21     Q.   AND WHAT WAS YOUR UNDERSTANDING ABOUT THAT DECISION?  DID

01:37PM 22     YOU THINK THAT THERANOS WAS READY WHEN IT DECIDED TO LEAVE?

01:37PM 23     A.   I THOUGHT THEY WERE READY TO HAVE IT MORE PUBLIC.

01:37PM 24     Q.   AND HOW DID YOU REACH THAT CONCLUSION?

01:37PM 25     A.   OBVIOUSLY THEY ENTERED INTO THE PARTNERSHIP WITH

01:37PM  1    WALGREENS, WHICH WAS PUBLICLY ANNOUNCED IN "THE

01:37PM  2    WALL STREET JOURNAL."

01:37PM  3    Q.   IF YOU'LL TURN TO PAGE 5, WHICH CONTINUES SOME OF YOUR

01:37PM  4    LISTS OF ADVANTAGES THAT THERANOS HAD TIME TO.

01:37PM  5         THE SECOND BULLET DOWN READS, "THE WORK WITH THE PHARMA

01:38PM  6    COMPANIES (WHICH WERE UNDOUBTEDLY REQUIRED TO SIGN

01:38PM  7    CONFIDENTIALITY AGREEMENTS) PROVIDED VALIDATION OF THE

01:38PM  8    TECHNOLOGY AND APPROACH."

01:38PM  9         DO YOU SEE THAT ONE?

01:38PM 10    A.   I DO.

01:38PM 11    Q.   AND DID YOU THINK THAT THE WORK THAT THERANOS HAD DONE

01:38PM 12    WITH SOME OF THE PHARMACEUTICAL COMPANIES PROVIDED VALIDATION

01:38PM 13    FOR THE THERANOS TECHNOLOGY?

01:38PM 14    A.   I DID.

01:38PM 15    Q.   WHY DID YOU REACH THAT CONCLUSION?

01:38PM 16    A.   WELL, BECAUSE OBVIOUSLY PFIZER IS ONE OF THE PHARMA

01:38PM 17    COMPANIES AND THEY WROTE A REPORT THAT WAS HIGHLY

01:38PM 18    COMPLIMENTARY.

01:38PM 19    Q.   THE NEXT BULLET READS "A COMBINATION OF," AND THEN YOU

01:38PM 20    LIST FIVE SUBPARTS, "THE PRICE OF TESTS BY THERANOS; THE SPEED

01:38PM 21    OF THE DELIVERY OF THE RESULTS; THE RELIABILITY OF THE TEST

01:38PM 22    RESULTS; THE ABILITY TO PERFORM A VAST ARRAY OF TESTS; AND THE

01:38PM 23    ABILITY TO PERFORM A VAST NUMBER OF TESTS WITH ONLY A FEW DROPS

01:38PM 24    OF BLOOD REQUIRING JUST A FINGER PRICK."

01:38PM 25         DO YOU SEE THAT?

01:39PM   1      A.   I DO.

01:39PM   2      Q.   AND DID YOU UNDERSTAND THAT ALL OF THESE ITEMS THAT YOU

01:39PM   3      LISTED WERE CURRENT CAPABILITIES OF THERANOS TECHNOLOGY?

01:39PM   4      A.   I DID.

01:39PM   5      Q.   WHY DID YOU REACH THAT CONCLUSION?

01:39PM   6      A.   WELL, BASED ON ALL OF THE MATERIALS, THAT WAS MY

01:39PM   7      UNDERSTANDING, THAT IT WAS AT THAT LEVEL, STAGE.

01:39PM   8      Q.   I'M SORRY.  THANK YOU.

01:39PM   9           IF YOU'LL NOW TURN TO PAGE 7 OF THIS EXHIBIT.

01:39PM  10           UNDER NUMBER 4, DO YOU SEE CURRENT AND PROJECTED FINANCIAL

01:39PM  11      RESULTS?

01:39PM  12      A.   I DO.

01:39PM  13      Q.   A INCLUDES THE 2014 CALENDAR YEAR.

01:39PM  14           DID YOU WRITE THAT "THERANOS WAS PROJECTING $140 MILLION

01:39PM  15      OF REVENUE WITH A NET LOSS OF $3 MILLION"?

01:39PM  16      A.   I DID.

01:39PM  17      Q.   AND THEN DO YOU ACTUALLY INCLUDE THE BREAKDOWN FROM THAT

01:39PM  18      DOCUMENT THAT YOU AND I LOOKED AT A MOMENT AGO?

01:39PM  19      A.   YES.

01:39PM  20      Q.   AND YOU DO THE SAME FOR 2015, THE PROJECTING OF

01:40PM  21      $990 MILLION OF REVENUE?

01:40PM  22      A.   YES.

01:40PM  23      Q.   WITH A BREAKDOWN.

01:40PM  24           AND WAS THIS ALSO RELEVANT FOR BOTH THE WORK YOU WERE

01:40PM  25      DOING WITH DR. KISSINGER, BUT ALSO FOR YOUR PERSONAL

01:40PM 1     INVESTMENT?

01:40PM 2     A.   IT WAS.

01:40PM 3     Q.   FINALLY, IF YOU'LL TURN TO 5B TOWARDS THE BOTTOM, THE

01:40PM 4     PARAGRAPH THAT BEGINS, "ELIZABETH HOLMES."

01:40PM 5          IT'S AT THE BOTTOM OF PAGE 7.

01:40PM 6     A.   OKAY, I'M THERE.

01:40PM 7     Q.   THE PARAGRAPH THAT DESCRIBES THE SHARES THAT MS. HOLMES

01:40PM 8     OWNS.

01:40PM 9          DO YOU SEE THAT?

01:40PM 10    A.   I DO.

01:40PM 11    Q.   AND WHAT WAS THE POINT HERE?  WHY WERE YOU SORT OF DOING

01:40PM 12    ANALYSIS OF THE OWNERSHIP OF SHARES?

01:40PM 13    A.   IT WAS FOR PURPOSES OF INDICATING THAT SHE HAD ABSOLUTE

01:40PM 14    COMPLETE CONTROL OF THE COMPANY.

01:40PM 15    Q.   AND IS THAT SIGNIFICANT BOTH FOR THE WORK THAT YOU WERE

01:40PM 16    DOING FOR DR. KISSINGER, AND ALSO FOR YOUR PERSONAL INVESTMENT?

01:40PM 17    A.   IT WAS.

01:40PM 18    Q.   HOW SO?

01:41PM 19    A.   WELL, IF SHE WAS THE PERSON RESPONSIBLE FOR HAVING

01:41PM 20    DEVELOPED THE TECHNOLOGY, YOU WOULD WANT TO BE SURE THAT SHE

01:41PM 21    WOULD BE IN CONTROL OF THE COMPANY THAT WOULD THEN ROLL OUT

01:41PM 22    THAT TECHNOLOGY.

01:41PM 23    Q.   UNDERSTOOD.

01:41PM 24         IF YOU'LL NOW TURN TO PAGE 9 OF THIS EXHIBIT.

01:41PM 25         YOU HAVE A SECTION ENTITLED QUESTIONS, CONCERNS, AND

01:41PM  1      RISKS.

01:41PM  2           DO YOU SEE THAT?

01:41PM  3      A.   I DO.

01:41PM  4      Q.   AND THE RISKS IN B INCLUDE THE REVENUE PROJECTIONS BEING

01:41PM  5      SUBSTANTIAL; IS THAT RIGHT?

01:41PM  6      A.   CORRECT.

01:41PM  7      Q.   AND THE -- THERE'S A REFERENCE TO THE NUMBER OF THERANOS

01:41PM  8      LOCATIONS WITHIN WALGREENS AT THE TIME, AND I THINK YOU WRITE

01:41PM  9      THAT IT WOULD BE HELPFUL TO KNOW HOW MANY LOCATIONS ARE ASSUMED

01:41PM 10      IN THE 2015 PROJECTIONS; IS THAT RIGHT?

01:41PM 11      A.   YES.

01:41PM 12      Q.   AND IN C YOU WRITE, "AN IMPORTANT QUESTION IS WHY THERANOS

01:41PM 13      IS NOW WILLING TO SELL ADDITIONAL SHARES AND WISHES TO RAISE

01:42PM 14      ADDITIONAL CASH."

01:42PM 15           WAS THAT ANOTHER QUESTION OR A CONCERN?

01:42PM 16      A.   IT WAS A QUESTION.

01:42PM 17      Q.   AND THEN IN D YOU WRITE ABOUT THE FAIRLY UNUSUAL

01:42PM 18      PROVISION.

01:42PM 19           IS THIS THE PROVISION YOU AND I SPOKE ABOUT EARLIER ABOUT

01:42PM 20      REDEEMING YOUR SHARES?

01:42PM 21      A.   YES, IT IS.

01:42PM 22      Q.   AMONG THE RISKS THAT YOU IDENTIFY, WERE ANY ABOUT THE

01:42PM 23      TECHNOLOGY, THE ACCURACY, RELIABILITY OF THE TECHNOLOGY?

01:42PM 24      A.   THEY WERE NOT.

01:42PM 25      Q.   WHY?

01:42PM  1    A.   BECAUSE I BELIEVED EVERYTHING I HAD READ AND SEEN AND THAT

01:42PM  2    IT WAS VERY RELIABLE.

01:42PM  3    Q.   WERE ANY OF THE RISKS THAT YOU IDENTIFIED RECEIVING FALSE

01:42PM  4    STATEMENTS OR FALSE INFORMATION FROM INDIVIDUALS AT THERANOS?

01:42PM  5              MR. CAZARES:  OBJECTION.  FOUNDATION.

01:42PM  6              THE COURT:  WOULD YOU ASK THAT AGAIN?  I'M NOT SURE

01:42PM  7    I UNDERSTAND THAT QUESTION.

01:42PM  8              MR. SCHENK:  YES, YOUR HONOR.

01:42PM  9    Q.   MR. MOSLEY, YOU'VE IDENTIFIED SOME RISKS HERE THAT INCLUDE

01:43PM 10    THE NUMBER OF STORES THAT THERANOS HAS ENTERED INTO WITH

01:43PM 11    WALGREENS, WHY THEY'RE SELLING SHARES, AND THIS UNUSUAL

01:43PM 12    PROVISION, AMONG OTHERS; IS THAT RIGHT?

01:43PM 13    A.   YES.

01:43PM 14    Q.   AND I'M ASKING YOU ABOUT SOME RISKS THAT YOU DID NOT

01:43PM 15    IDENTIFY, THINGS THAT YOU DIDN'T THINK WERE A RISK.  IS THAT --

01:43PM 16    DO YOU UNDERSTAND THAT LINE OF QUESTIONING?

01:43PM 17    A.   I DO.

01:43PM 18    Q.   AND I ASKED YOU A MOMENT AGO IF ONE OF THE RISKS YOU

01:43PM 19    IDENTIFIED WAS A RISK ASSOCIATED WITH THE TECHNOLOGY, WHETHER

01:43PM 20    IT PROVIDED ACCURATE RESULTS.

01:43PM 21       DO YOU UNDERSTAND THAT QUESTION?

01:43PM 22    A.   I DO.

01:43PM 23    Q.   AND WHAT WAS YOUR ANSWER ON THAT ONE?

01:43PM 24    A.   MY ANSWER WAS THAT I DID NOT CONSIDER THAT A RISK.

01:43PM 25    Q.   WHY NOT?

01:43PM   1    A.   BECAUSE I THOUGHT EVERYTHING I HAD READ AND RECEIVED

01:43PM   2    INDICATED THAT THE TECHNOLOGY WAS SOUND.

01:43PM   3    Q.   AND TO FOLLOW UP ON THAT, YOU SAID THAT EVERYTHING THAT

01:43PM   4    YOU RECEIVED SAID THE TECHNOLOGY WAS SOUND.

01:43PM   5         I'M WONDERING IF YOU IDENTIFIED AS A RISK THAT THE THINGS

01:43PM   6    THAT YOU RECEIVED MIGHT NOT BE ACCURATE?  THE FOUNDATION OF THE

01:44PM   7    INFORMATION YOU RECEIVED, DID YOU EVER CALL INTO QUESTION THAT

01:44PM   8    ACCURACY?

01:44PM   9              MR. CAZARES:  OBJECTION.  FOUNDATION AND RELEVANCE.

01:44PM   10             THE COURT:  OVERRULED.

01:44PM   11        YOU CAN ANSWER THE QUESTION.

01:44PM   12             THE WITNESS:  I DID NOT FACTOR IN SOME POSSIBILITY

01:44PM   13   THAT THINGS THAT I RECEIVED WERE NOT ACCURATE.

01:44PM   14   BY MR. SCHENK:

01:44PM   15   Q.   WHY NOT?

01:44PM   16   A.   BECAUSE I BELIEVED THEY WERE ACCURATE.

01:44PM   17   Q.   FAIR ENOUGH.  THANK YOU.

01:44PM   18        IF YOU'LL TURN TO TAB 4221.

01:44PM   19        MR. MOSLEY, IS THIS ALSO AN EMAIL THREAD THAT CONTAINS

01:44PM   20   SEVERAL EMAILS BETWEEN YOU AND MS. HOLMES?

01:44PM   21   A.   IT IS.

01:44PM   22   Q.   IS THIS ONE ALSO IN SEPTEMBER, A LITTLE BIT LATER,

01:44PM   23   SEPTEMBER OF 2014?

01:44PM   24   A.   THEY ARE.

01:44PM   25             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4221.

01:44PM  1              MR. CAZARES:  NO OBJECTION.

01:45PM  2              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:45PM  3              (GOVERNMENT'S EXHIBIT 4221 WAS RECEIVED IN EVIDENCE.)

01:45PM  4     BY MR. SCHENK:

01:45PM  5     Q.   MR. MOSLEY, ON THE FIRST PAGE, DO YOU SEE THE EMAIL FROM

01:45PM  6     THURSDAY, THE 25TH OF SEPTEMBER, FROM YOU TO MS. HOLMES?

01:45PM  7     A.   I DO.

01:45PM  8     Q.   AND IN IT YOU WRITE THAT YOU'RE LOOKING FORWARD TO GETTING

01:45PM  9     OUT TO CALIFORNIA TO SEE MS. HOLMES AND MEET HER TEAM.

01:45PM  10             AND THERE'S A REFERENCE TO THE NIARCHOS FOUNDATION.

01:45PM  11             DO YOU SEE THAT?

01:45PM  12    A.   I DO.

01:45PM  13    Q.   DID YOU COME OUT TO CALIFORNIA AND MEET WITH MS. HOLMES AT

01:45PM  14    SOME POINT FOLLOWING THIS EMAIL?

01:45PM  15    A.   I DID.

01:45PM  16    Q.   A LITTLE FURTHER DOWN IN THAT EMAIL YOU REFERENCE THE

01:45PM  17    DR. KISSINGER MEMO OR SUMMARY.

01:45PM  18             DO YOU SEE THAT?

01:45PM  19    A.   YES, I DO.

01:45PM  20    Q.   AND IT LOOKS LIKE YOU'RE ASKING ABOUT MS. HOLMES'S COMFORT

01:45PM  21    LEVEL IN SHARING THE MEMO; IS THAT RIGHT?

01:46PM  22             I'M SORRY, LET ME REPHRASE THAT.

01:46PM  23             I THINK YOU'RE SAYING THAT DR. KISSINGER IS WONDERING

01:46PM  24    ABOUT AN ABILITY TO SHARE THE MEMO; IS THAT CORRECT?

01:46PM  25    A.   THAT IS CORRECT.

01:46PM   1    Q.   AND WHAT WAS -- WHAT WAS HAPPENING THERE?  CAN YOU EXPLAIN

01:46PM   2    TO THE JURY THAT?

01:46PM   3    A.   WELL, HE OBVIOUSLY, AS IT SAYS HERE, ASKED ME IF I WAS

01:46PM   4    COMFORTABLE SENDING THE MEMO THAT I PREPARED TO OTHERS THAT HE

01:46PM   5    KNEW THAT MIGHT BE INTERESTED IN THE COMPANY.

01:46PM   6    Q.   AND DO YOU KNOW WHETHER -- FIRST, LET ME ASK YOU, DID YOU

01:46PM   7    SHARE THAT MEMO WITH OTHER INDIVIDUALS WHO WERE CONSIDERING AN

01:46PM   8    INVESTMENT IN THERANOS?

01:46PM   9    A.   I BELIEVE THAT I DID.

01:46PM  10    Q.   DO YOU KNOW WHETHER DR. KISSINGER DID?

01:46PM  11    A.   I SUSPECT THAT HE DID, BUT I DON'T KNOW FOR SURE.

01:46PM  12    Q.   OKAY.  AND TO BE CLEAR, THAT WAS THE MEMO THAT YOU AND I

01:46PM  13    LOOKED AT A MOMENT AGO?  I THINK IT WAS 4197.

01:46PM  14    A.   YES.

01:46PM  15    Q.   THERE'S THE REFERENCE TO GOING OUT TO CALIFORNIA.  LET'S

01:46PM  16    TALK ABOUT THAT FOR A MOMENT.

01:46PM  17         DID YOU MAKE A TRIP OUT TO CALIFORNIA IN THIS TIMEFRAME,

01:47PM  18    SEPTEMBER OR OCTOBER OF 2014?

01:47PM  19    A.   I DID.

01:47PM  20    Q.   HOW MANY TRIPS?

01:47PM  21    A.   I BELIEVE TWO.

01:47PM  22    Q.   AND DID YOU HAVE MEETINGS?  WAS ONE OF THEM IN REFERENCE

01:47PM  23    TO THE NIARCHOS FOUNDATION?

01:47PM  24    A.   YES.

01:47PM  25    Q.   AND WHAT WAS THE OTHER ONE?

01:47PM 1    A.   SOME INDIVIDUALS FROM COX.

01:47PM 2    Q.   IS THAT C-O-X?

01:47PM 3    A.   C-O-X.

01:47PM 4    Q.   AND LET'S TALK FIRST ABOUT THE NIARCHOS MEETING.

01:47PM 5         FIRST, WHAT WAS THE PURPOSE OF THAT MEETING?  DO YOU

01:47PM 6    RECALL?

01:47PM 7    A.   THE PURPOSE OF IT WAS TO LET INDIVIDUALS FROM THE NIARCHOS

01:47PM 8    FOUNDATION THAT RAN THEIR INVESTMENT OPERATIONS TO GET TO KNOW

01:47PM 9    THE COMPANY AND SEE WHETHER THEY HAD ANY INTEREST IN IT.

01:47PM 10   Q.   AND WHY DID YOU GO?

01:47PM 11   A.   ANDREAS, WHO IS REFERRED TO HERE, IS A FRIEND OF MINE AND

01:47PM 12   A CLIENT, AND HE HAD SUGGESTED THAT IT WOULD BE NICE IF I WENT

01:48PM 13   WITH THEM.

01:48PM 14   Q.   AND DID YOU HAVE A MEETING WITH MS. HOLMES?

01:48PM 15   A.   WE DID.

01:48PM 16   Q.   DO YOU KNOW, WERE ANY OTHER PEOPLE FROM THERANOS PRESENT

01:48PM 17   FOR THE MEETING?

01:48PM 18   A.   YES.

01:48PM 19   Q.   WHO?

01:48PM 20   A.   MR. BALWANI WAS PRESENT.

01:48PM 21   Q.   DO YOU KNOW HOW LONG THE MEETING LASTED?

01:48PM 22   A.   I DON'T REMEMBER FOR SURE, BUT IT WAS A RELATIVELY LENGTHY

01:48PM 23   MEETING.  I BELIEVE IT WAS AT LEAST AN HOUR AND A HALF.

01:48PM 24   Q.   AND WAS THIS MEETING BEFORE YOU INVESTED IN THERANOS?

01:48PM 25   A.   YES, IT WAS.

01:48PM  1    Q.   AND THE MEETING I'LL TALK TO YOU ABOUT IN A MOMENT, THE

01:48PM  2    COX MEETING, WAS THAT ALSO BEFORE YOU INVESTED IN THERANOS?

01:48PM  3    A.   YES, IT WAS.

01:48PM  4    Q.   DO YOU HAVE A RECOLLECTION OF THE TOPICS THAT WERE

01:48PM  5    DISCUSSED DURING THIS NIARCHOS MEETING?

01:48PM  6    A.   NOT SPECIFICALLY, JUST A WHOLE RANGE OF TOPICS ABOUT THE

01:48PM  7    COMPANY.

01:48PM  8    Q.   YOU DON'T HAVE A SPECIFIC RECOLLECTION OF SPECIFIC TOPICS,

01:48PM  9    BUT RATHER JUST A GENERAL RECOLLECTION THAT THE MEETING

01:48PM  10   OCCURRED?

01:48PM  11   A.   JUST A GENERAL RECOLLECTION, THE FACT THAT WE DISCUSSED A

01:48PM  12   LOT OF ASPECTS OF THE COMPANY.

01:48PM  13   Q.   DO YOU RECALL THE TOPICS THAT MS. HOLMES SPOKE ABOUT, THE

01:49PM  14   SPECIFIC TOPICS THAT MS. HOLMES SPOKE ABOUT?

01:49PM  15   A.   NO, NOT IN PARTICULAR, NO.

01:49PM  16   Q.   DO YOU RECALL WHETHER MR. BALWANI SPOKE DURING THE

01:49PM  17   MEETING?

01:49PM  18   A.   I BELIEVE HE DID.

01:49PM  19   Q.   DO YOU REMEMBER THE SPECIFIC TOPICS THAT MR. BALWANI SPOKE

01:49PM  20   ABOUT?

01:49PM  21   A.   I DON'T HAVE A SPECIFIC MEMORY.

01:49PM  22   Q.   YOU AND I HAVE REVIEWED THE BINDER, THE STACKS OF

01:49PM  23   DOCUMENTS THAT YOU RECEIVED FROM THERANOS.

01:49PM  24        DO YOU RECALL THAT?

01:49PM  25   A.   YES.

01:49PM   1    Q.   AND YOU DESCRIBED TO THE JURY AN UNDERSTANDING OF THE

01:49PM   2    TECHNOLOGY THAT YOU RECEIVED FROM REVIEWING THOSE MATERIALS; IS

01:49PM   3    THAT RIGHT?

01:49PM   4    A.   RIGHT.

01:49PM   5    Q.   I'M WONDERING IF ANYTHING IN THIS NIARCHOS MEETING CHANGED

01:49PM   6    YOUR UNDERSTANDING OF THE TECHNOLOGY?

01:49PM   7    A.   IT DID NOT.

01:49PM   8    Q.   DID ANYTHING OCCUR DURING THIS MEETING THAT DISCOURAGED

01:49PM   9    YOU FROM INVESTING?

01:49PM  10    A.   NO.

01:49PM  11    Q.   WERE THERE ANY REVISIONS?  WERE THERE ANY CORRECTIONS OR

01:49PM  12    AMENDMENTS TO MATERIAL THAT YOU RECEIVED IN THOSE STACKS THAT

01:49PM  13    YOU AND I REVIEWED?

01:49PM  14    A.   NO.

01:49PM  15    Q.   WERE THERE ANY INSTANCES WHEN MS. HOLMES SAID SOMETHING TO

01:49PM  16    YOU AND MR. BALWANI CORRECTED HER?

01:49PM  17    A.   NO.

01:49PM  18    Q.   HOW ABOUT THE REVERSE?  WERE THERE ANY INSTANCES WHERE

01:50PM  19    MR. BALWANI SAID SOMETHING TO YOU AND MS. HOLMES CORRECTED HIM?

01:50PM  20    A.   NO.

01:50PM  21    Q.   THE COX MEETING, DO YOU REMEMBER HOW LONG AFTER THE

01:50PM  22    NIARCHOS MEETING THAT ONE HAPPENED?

01:50PM  23    A.   I BELIEVE IT PREDATED.

01:50PM  24    Q.   OH, I'M SORRY.  I DID THE ORDER INCORRECTLY?

01:50PM  25    A.   RIGHT.  I THINK IT PREDATED THE NIARCHOS MEETING.

01:50PM 1    Q.   AND DO YOU KNOW WHETHER THE COX MEETING WAS IN SEPTEMBER

01:50PM 2    OR OCTOBER?

01:50PM 3    A.   IT WAS IN OCTOBER.

01:50PM 4    Q.   AND WAS THE NIARCHOS MEETING ALSO IN OCTOBER?

01:50PM 5    A.   IN OCTOBER AS WELL.

01:50PM 6    Q.   WERE THEY BOTH IN PERSON IN PALO ALTO?

01:50PM 7    A.   THEY WERE.

01:50PM 8    Q.   AND DO YOU REMEMBER WHETHER MS. HOLMES WAS PRESENT FOR THE

01:50PM 9    COX MEETING?

01:50PM 10   A.   SHE WAS.

01:50PM 11   Q.   WAS ANYBODY ELSE FROM THERANOS PRESENT?

01:50PM 12   A.   MR. BALWANI WAS PRESENT.

01:50PM 13   Q.   DO YOU RECALL WHETHER THERE WAS ANY THIRD PERSON?  ANYBODY

01:50PM 14   ELSE AT THAT MEETING?

01:50PM 15   A.   NOT THAT I REMEMBER.

01:50PM 16   Q.   I'M NOT SURE IF I ASKED YOU THAT QUESTION FOR NIARCHOS.

01:50PM 17        WAS THERE A THIRD PERSON FROM THERANOS AT THE NIARCHOS

01:50PM 18   MEETING?

01:50PM 19   A.   NOT THAT I REMEMBER.

01:51PM 20   Q.   SO SAME QUESTIONS FOR THE COX MEETING.

01:51PM 21        THE BINDERS OF THE DOCUMENTS THAT YOU RECEIVED GAVE YOU AN

01:51PM 22   UNDERSTANDING OF THERANOS.

01:51PM 23        DID THAT UNDERSTANDING CHANGE DURING THE COURSE OF THE COX

01:51PM 24   MEETING?

01:51PM 25   A.   IT DID NOT.

01:51PM  1    Q.   WERE THERE ANY AMENDMENTS OR CORRECTIONS THAT WERE MADE

01:51PM  2    DURING THAT MEETING, THINGS LIKE IN THE BINDER OF DOCUMENTS YOU

01:51PM  3    RECEIVED A DOCUMENT THAT SAID THE FOLLOWING, BUT I WANT TO

01:51PM  4    REFINE OR ALTER THAT?

01:51PM  5         DID THAT EVER HAPPEN DURING THE MEETING?

01:51PM  6    A.   IT DID NOT.

01:51PM  7    Q.   DO YOU REMEMBER THE TOPICS THAT MS. HOLMES ADDRESSED IN

01:51PM  8    THE COX MEETING?

01:51PM  9    A.   NOT SPECIFICALLY.

01:51PM  10   Q.   DO YOU REMEMBER WHETHER SHE SPOKE DURING THE COX MEETING?

01:51PM  11   A.   YES.

01:51PM  12   Q.   AND WHAT DO YOU RECALL?

01:51PM  13   A.   SHE -- I RECALL THAT SHE SPOKE AT GREAT LENGTH ABOUT THE

01:51PM  14   COMPANY.

01:51PM  15   Q.   AND DO YOU RECALL THE LENGTH OF THE COX MEETING?

01:51PM  16   A.   AGAIN, I BELIEVE IT WAS WELL WITHIN -- CERTAINLY IN EXCESS

01:51PM  17   OF AN HOUR AND A HALF.  IT COULD HAVE BEEN SUBSTANTIALLY MORE

01:51PM  18   THAN THAT.

01:51PM  19   Q.   DO YOU RECALL WHETHER MR. BALWANI SPOKE IN THE COX

01:52PM  20   MEETING?

01:52PM  21   A.   I BELIEVE HE DID.

01:52PM  22   Q.   DO YOU RECALL ANY SPECIFIC TOPICS THAT MR. BALWANI

01:52PM  23   ADDRESSED DURING THAT MEETING?

01:52PM  24   A.   I DON'T.

01:52PM  25   Q.   WERE THERE ANY INSTANCES WHEN MS. HOLMES WAS SPEAKING AND

01:52PM  1    MR. BALWANI CORRECTED HER DURING THE COX MEETING?

01:52PM  2    A.   NO.

01:52PM  3    Q.   WERE THERE ANY INSTANCES WHEN MR. BALWANI WAS SPEAKING AND

01:52PM  4    MS. HOLMES CORRECTED HIM?

01:52PM  5    A.   I DON'T REMEMBER ANY.

01:52PM  6    Q.   BY THE END OF THE COX MEETING, WERE THERE -- DID YOU HAVE

01:52PM  7    A DIFFERENT EXCITEMENT LEVEL ABOUT INVESTING?  WERE YOU LESS

01:52PM  8    INTERESTED IN INVESTING AT THE END OF THE MEETING?

01:52PM  9    A.   NO.

01:52PM  10   Q.   AND I THINK I ASKED THAT QUESTION, BUT JUST TO BE SURE, IS

01:52PM  11   THE SAME TRUE FOR NIARCHOS?  DID YOU LEAVE THE MEETING WITH THE

01:52PM  12   SAME LEVEL OF INVESTMENT ENTHUSIASM?

01:52PM  13   A.   I DID.

01:52PM  14   Q.   WOULD YOU NOW PLEASE TURN TO EXHIBIT 4284.

01:53PM  15       MR. MOSLEY, IS THIS AN EMAIL FROM YOU TO MS. HOLMES, AND

01:53PM  16   THEN A RESPONSE FROM MS. HOLMES TO YOU IN OCTOBER OF 2014?

01:53PM  17   A.   YES.

01:53PM  18           MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4284.

01:53PM  19           MR. CAZARES:  NO OBJECTION.

01:53PM  20           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:53PM  21       (GOVERNMENT'S EXHIBIT 4284 WAS RECEIVED IN EVIDENCE.)

01:53PM  22   BY MR. SCHENK:

01:53PM  23   Q.   MR. MOSLEY, THE EMAIL ON THE BOTTOM, THE ONE FROM YOU TO

01:53PM  24   MS. HOLMES, IS SENT ON MONDAY, OCTOBER 20TH OF 2014; IS THAT

01:53PM  25   RIGHT?

01:53PM 1    A.   CORRECT.

01:53PM 2    Q.   AND YOU BEGIN BY SAYING, "ELIZABETH,

01:53PM 3         "IT WAS GOOD TO SEE YOU ON FRIDAY."

01:53PM 4         DO YOU SEE THAT?

01:53PM 5    A.   I DO.

01:53PM 6    Q.   AND SO WOULD AT LEAST ONE OF THOSE TWO MEETINGS THAT YOU

01:53PM 7    AND I JUST DISCUSSED HAVE OCCURRED THE FRIDAY BEFORE YOU SENT

01:53PM 8    THIS EMAIL?

01:53PM 9    A.   IT DID.

01:53PM 10   Q.   YOU WERE OUT IN PALO ALTO IN PERSON AT THAT POINT?

01:54PM 11   A.   THAT IS CORRECT.

01:54PM 12   Q.   AND THEN IF YOU'LL LOOK SEVERAL PARAGRAPHS DOWN, THERE'S A

01:54PM 13   PARAGRAPH THAT BEGINS, "AS WE DISCUSSED, I WILL SPEAK."

01:54PM 14        DO YOU SEE THAT ONE?

01:54PM 15   A.   YES.

01:54PM 16   Q.   YOU WILL SPEAK WITH DAVID ABOUT THE CONCERN WITH THE

01:54PM 17   MANDATORY REDEMPTION CLAUSE.

01:54PM 18        DO YOU SEE THAT?

01:54PM 19   A.   I DO.

01:54PM 20   Q.   AND IS THAT THE SECTION THAT YOU AND I TALKED ABOUT AT THE

01:54PM 21   BEGINNING OF YOUR TESTIMONY WHERE THE BOARD COULD BUY BACK

01:54PM 22   SHARES?

01:54PM 23   A.   THAT'S CORRECT.

01:54PM 24   Q.   AND THERE'S A REFERENCE TO DAVID.  AND WHO IS THAT?

01:54PM 25   A.   DAVID BOIES.

01:54PM  1    Q.    AND WHO IS THAT?

01:54PM  2    A.    DAVID BOIES WAS A FORMER PARTNER OF MINE AT

01:54PM  3    CRAVATH, SWAINE & MOORE WHO, BY THIS POINT, HAD RETIRED FROM

01:54PM  4    CRAVATH AND WAS WORKING AND STARTED HIS OWN FIRM.

01:54PM  5    Q.    AND YOU MENTIONED TO MS. HOLMES THAT YOU'RE GOING TO

01:54PM  6    DISCUSS THAT PROVISION WITH MR. BOIES.  WHY WOULD HE BE THE

01:54PM  7    PERSON THAT YOU'RE GOING TO TALK TO ABOUT THIS PROVISION?

01:54PM  8    A.    I BELIEVE AT THE TIME HE WAS DOING LEGAL WORK FOR THE

01:54PM  9    COMPANY.

01:55PM  10   Q.    FOR THE COMPANY?

01:55PM  11   A.    FOR THE COMPANY OR THE BOARD.  I DIDN'T SPECIFICALLY KNOW.

01:55PM  12   BUT DOING LEGAL WORK IN CONNECTION WITH THE COMPANY.

01:55PM  13   Q.    AND YOU REFERENCE THAT YOU WILL SPEAK TO HIM.

01:55PM  14        DID YOU, IN FACT, THEN SPEAK TO MR. BOIES ABOUT THIS

01:55PM  15   PROVISION?

01:55PM  16   A.    I DID.

01:55PM  17   Q.    AND THEN YOU WRITE AT THE VERY END, "PERSONALLY, I WOULD

01:55PM  18   BE DELIGHTED AND HONORED TO BE PART OF YOUR FIRST CLOSING.  MY

01:55PM  19   HOPE WOULD BE TO INVEST $6 MILLION, WHICH I WOULD PROPOSE TO

01:55PM  20   INVEST THROUGH AN LLC WHOLLY OWNED BY ME AND TRUSTS FOR MY

01:55PM  21   THREE DAUGHTERS, SO THAT IT WILL LIMIT THE NUMBER OF YOUR

01:55PM  22   SEPARATE SHAREHOLDERS RESULTING FROM MY INVESTMENT TO ONE."

01:55PM  23        MR. MOSLEY, IS THIS THE INSTANCE WHEN YOU INFORMED

01:55PM  24   MS. HOLMES OF YOUR DECISION TO INVEST?

01:55PM  25   A.    I BELIEVE IT IS.

01:55PM 1    Q.   AND HOW ABOUT THE DOLLAR AMOUNT?  HOW DID YOU COME UP WITH

01:55PM 2    THAT DOLLAR AMOUNT?  WHY DID YOU INVEST $6 MILLION?

01:55PM 3    A.   IT WAS, IT WAS JUST A LEVEL OF INVESTMENT THAT I WAS

01:55PM 4    COMFORTABLE WITH UNDER THE CIRCUMSTANCES.

01:56PM 5    Q.   AND ABOVE MS. HOLMES RESPONDS TO YOU ON THE 23RD OF

01:56PM 6    OCTOBER, AND IN IT, IN THE THIRD LINE, SHE WRITES, "WE HAVE

01:56PM 7    SPENT A LOT OF TIME ON HOW WE'RE SIZING THIS TRANSACTION AND

01:56PM 8    WHO WE'RE BRINGING IN AND I CAN HEREIN CONFIRM THE ALLOCATIONS

01:56PM 9    FOR YOU, ANDREAS, AND THE COXES, IN ADDITION TO THE DEVOS

01:56PM 10   COMMITMENT AT THE NUMBERS BELOW.  WE WILL FOLLOW UP TOMORROW ON

01:56PM 11   PAPERWORK THERE."

01:56PM 12       DO YOU SEE THAT?

01:56PM 13   A.   I DO.

01:56PM 14   Q.   AND THERE'S A REFERENCE TO A FEW OTHER INDIVIDUALS,

01:56PM 15   ANDREAS, THE COXES, AND DEVOS?

01:56PM 16   A.   RIGHT.

01:56PM 17   Q.   GO THROUGH THOSE WITH ME.  WHO IS ANDREAS?

01:56PM 18   A.   ANDREAS WAS A PERSONAL FRIEND OF MINE AND A CLIENT AT THE

01:56PM 19   TIME.

01:56PM 20   Q.   AND COX, IS THAT -- WE WERE TALKING ABOUT --

01:56PM 21   A.   COX WAS A CLIENT, RIGHT, WHO WAS INDEPENDENTLY LOOKING AT

01:56PM 22   THIS AS AN INVESTMENT.

01:56PM 23       AND THE DEVOS FAMILY WAS A CLIENT OF MINE THAT WAS ALSO

01:57PM 24   INDEPENDENTLY LOOKING AT THIS AS A POSSIBLE INVESTMENT.

01:57PM 25   Q.   OKAY.  I'M NOT SURE IF I MISSED IT.  WAS ANDREAS A CLIENT

01:57PM   1    OF YOURS?

01:57PM   2    A.   HE WAS.  HE WAS A CLIENT.

01:57PM   3    Q.   I SEE.  SO ALL THREE OF THESE INDIVIDUALS ARE CURRENT

01:57PM   4    CLIENTS AT THE TIME?

01:57PM   5    A.   THAT'S CORRECT.

01:57PM   6    Q.   DID YOU PLAY A ROLE IN THEIR INVESTMENT DECISION?

01:57PM   7    MS. HOLMES IS CONFIRMING THEIR ALLOCATIONS, THEIR INVESTMENT

01:57PM   8    ALLOCATIONS.  I'M WONDERING IF YOU PLAYED A ROLE IN THEIR

01:57PM   9    INVESTMENT DECISION PROCESS.

01:57PM   10            MR. CAZARES:  OBJECTION.  FOUNDATION.

01:57PM   11            THE COURT:  YOU'RE ASKING IF HE HAD ANYTHING TO DO

01:57PM   12    WITH THEIR DECISION?

01:57PM   13            MR. SCHENK:  YES.

01:57PM   14            THE COURT:  OVERRULED.

01:57PM   15       YOU CAN ANSWER.

01:57PM   16            THE WITNESS:  I DID NOT.

01:57PM   17    BY MR. SCHENK:

01:57PM   18    Q.   WOULD YOU NOW TURN TO TAB 4286.

01:58PM   19        MR. MOSLEY, IS 4286 AN EMAIL FROM MR. BALWANI TO YOU AND A

01:58PM   20    CC TO MS. HOLMES?

01:58PM   21    A.   YES.

01:58PM   22    Q.   AND IS IT DATED OCTOBER 24TH, 2014?

01:58PM   23    A.   IT IS.

01:58PM   24            MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4286.

01:58PM   25            MR. CAZARES:  NO OBJECTION.

01:58PM   1                  THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:58PM   2                  (GOVERNMENT'S EXHIBIT 4286 WAS RECEIVED IN EVIDENCE.)

01:58PM   3       BY MR. SCHENK:

01:58PM   4       Q.   MR. MOSLEY, DOES MR. BALWANI WRITE TO YOU, "DEAR DAN.

01:58PM   5            "I HOPE YOU ARE DOING WELL.

01:58PM   6            "FOLLOWING ELIZABETH'S EMAIL, PLEASE FIND THE DOCUMENTS

01:58PM   7       ATTACHED FOR THE THERANOS SHARE ALLOCATIONS FOR YOU, ANDREAS,

01:58PM   8       AND THE COX FAMILY."

01:58PM   9            AND THEN IT CONTINUES WITH SOME DISCUSSION OF SIGNATURE

01:58PM  10       PAGES.

01:58PM  11            DO YOU SEE THAT?

01:58PM  12       A.   I DO.

01:58PM  13       Q.   AND THEN TWO PARAGRAPHS DOWN IT INCLUDES FILE NAMES AND IT

01:59PM  14       REFERENCES SOFT COPIES OF INVESTMENT DOCUMENTS YOU ALREADY HAVE

01:59PM  15       IN THE INVESTMENT BINDER ALONG WITH SIGNATURE PAGES.

01:59PM  16            DO YOU SEE THAT?

01:59PM  17       A.   I DO.

01:59PM  18       Q.   AND THEN AFTER THIS PAGE OF THE EXHIBIT, DO YOU SEE SOME

01:59PM  19       PRINTED MATERIALS THAT WERE ATTACHED BEGINNING, IT LOOKS LIKE,

01:59PM  20       ON PAGE 3?

01:59PM  21       A.   I SEE THE TERMS.

01:59PM  22       Q.   YOU SEE THEM?

01:59PM  23       A.   YES.

01:59PM  24       Q.   AND WHAT ARE THESE?

01:59PM  25       A.   THE FIRST ONE IS THE AMENDED AND RESTATED INVESTORS'

01:59PM   1    RIGHTS AGREEMENT DATED FEBRUARY 7TH, 2014.

01:59PM   2    Q.   AND THEN IF YOU'LL TURN -- I HAVE A QUESTION ON PAGE 60.

01:59PM   3    THIS IS SORT OF IN THE MIDDLE OF THE DOCUMENT.

01:59PM   4         DO YOU KNOW WHAT, IF YOU LOOK AT PAGE 54, THAT IS?

02:00PM   5    A.   I SEE IT.

02:00PM   6    Q.   WHAT IS PAGE 54 THE BEGINNING OF?

02:00PM   7    A.   IT'S THE BEGINNING OF A STOCK PURCHASE AGREEMENT INVOLVING

02:00PM   8    SERIES C-2 PREFERRED STOCK.

02:00PM   9    Q.   AND DID YOU REVIEW THIS AGREEMENT BEFORE PURCHASING SERIES

02:00PM   10   C-2 STOCK?

02:00PM   11   A.   I DID.

02:00PM   12   Q.   AND IF YOU'LL TURN TO PAGE 60, I HAVE A COUPLE OF

02:00PM   13   QUESTIONS ON SECTION IN THE PURCHASE AGREEMENT?

02:00PM   14   A.   OKAY.

02:00PM   15   Q.   4.3 IS ENTITLED INVESTMENT EXPERIENCE.

02:00PM   16        DO YOU SEE THAT?

02:00PM   17   A.   I DO.

02:00PM   18   Q.   AND DID YOU HAVE THE INVESTMENT EXPERIENCE THAT WAS

02:00PM   19   NECESSARY TO MAKE THIS INVESTMENT?

02:00PM   20   A.   I DID.

02:00PM   21   Q.   4.4 REFERS TO THE SPECULATIVE NATURE OF THE INVESTMENT.

02:00PM   22        DO YOU SEE THAT?

02:00PM   23   A.   I DO.

02:00PM   24   Q.   AND DID YOU UNDERSTAND THAT THIS INVESTMENT WAS

02:00PM   25   SPECULATIVE?

02:00PM  1      A.   I DID.

02:00PM  2      Q.   AND IT SAYS IT INVOLVED SUBSTANTIAL RISKS.

02:00PM  3           DID YOU SEE THAT ALSO?

02:00PM  4      A.   I DID.

02:00PM  5      Q.   IN FACT, IN YOUR OUTLINE FOR DR. KISSINGER, DID YOU

02:01PM  6      OUTLINE SOME OF THE RISKS THAT YOU SAW IN THE INVESTMENT?

02:01PM  7      A.   I DID.

02:01PM  8      Q.   4.5 IS A SECTION THAT INVOLVES ACCESS TO DATA.

02:01PM  9           DO YOU SEE THAT?

02:01PM  10     A.   I DO.

02:01PM  11     Q.   AND DID YOU THINK THAT THIS WAS TRUE?  IN OTHER WORDS, DID

02:01PM  12     YOU HAVE ACCESS TO CERTAIN DATA, BUT NOT ALL DATA, WHEN YOU

02:01PM  13     MADE THE INVESTMENT DECISION?

02:01PM  14     A.   I DID.

02:01PM  15     Q.   WHEN YOU RECEIVED THE BINDERS OF INFORMATION THAT YOU AND

02:01PM  16     I LOOKED THROUGH, DID YOU THINK THAT THAT WAS SOME OF THE

02:01PM  17     INFORMATION OR SOME OF THE DATA THAT WAS PART OF THE

02:01PM  18     INFORMATION THAT THE COMPANY WAS PROVIDING FOR YOU TO EVALUATE

02:01PM  19     WHEN MAKING AN INVESTMENT DECISION?

02:01PM  20     A.   I DID.

02:01PM  21     Q.   4.6 IS CALLED ACCREDITED INVESTOR.

02:01PM  22          ARE YOU FAMILIAR WITH THAT TERM?

02:01PM  23     A.   I AM.

02:01PM  24     Q.   AND WERE YOU AN ACCREDITED INVESTOR WHEN YOU MADE THE

02:01PM  25     INVESTMENT?

02:01PM   1     A.   YES, I WAS.

02:01PM   2     Q.   WOULD YOU TURN TO PAGE 73.

02:02PM   3          ON PAGE 73, ABOVE TWO LINES THAT HAVE THE PRINTED NAME

02:02PM   4     ELIZABETH HOLMES, DO YOU SEE SIGNATURES?

02:02PM   5     A.   I DO.

02:02PM   6     Q.   AND DID YOU RECEIVE THESE SIGNED VERSIONS FROM MS. HOLMES

02:02PM   7     BEFORE YOU MADE YOUR INVESTMENT DECISION?

02:02PM   8     A.   I BELIEVE I DID.

02:02PM   9     Q.   IF YOU'LL NOW TURN TO PAGE -- I'M SORRY, EXHIBIT 4303.

02:02PM   10         MR. MOSLEY, IS 4303 AN EMAIL FROM YOU TO MS. HOLMES AND

02:02PM   11    MR. BALWANI?

02:02PM   12    A.   YES, IT IS.

02:02PM   13    Q.   WITH SOME ATTACHMENTS?

02:02PM   14    A.   CORRECT.

02:02PM   15             MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 4303.

02:02PM   16             MR. CAZARES:  NO OBJECTION.

02:02PM   17             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:02PM   18         (GOVERNMENT'S EXHIBIT 4303 WAS RECEIVED IN EVIDENCE.)

02:02PM   19             MR. SCHENK:  THANK YOU.

02:02PM   20    Q.   MR. MOSLEY, IT LOOKS LIKE NOW ON OCTOBER 30TH OF 2014

02:03PM   21    YOU'RE SENDING MS. HOLMES AND MR. BALWANI WHAT ARE CALLED

02:03PM   22    MASTER SIGNATURE PAGES.

02:03PM   23         DO YOU SEE THAT?

02:03PM   24    A.   I DO.

02:03PM   25    Q.   AND WHY DID YOU SEND THEM THESE DOCUMENTS?

02:03PM  1    A.   WELL, THESE WERE DOCUMENTS THAT WERE NECESSARY IN ORDER TO

02:03PM  2    MAKE THE INVESTMENT.

02:03PM  3    Q.   IF YOU'LL TURN TO PAGE 2 OF THE EXHIBIT.

02:03PM  4         IS THIS YOUR SIGNATURE PAGE?

02:03PM  5    A.   YES.  WELL, IT'S A SIGNATURE PAGE FOR THE ENTITY THROUGH

02:03PM  6    WHICH I INVESTED.

02:03PM  7    Q.   THANK YOU.  THE LLC THROUGH WHICH YOU MADE THE INVESTMENT?

02:03PM  8    A.   THAT'S CORRECT.

02:03PM  9    Q.   AND TO BE CLEAR, THERE'S AN ADDRESS HERE.  THAT'S A WORK

02:03PM 10    ADDRESS; RIGHT?

02:03PM 11    A.   YES, IT IS.

02:03PM 12    Q.   AND THEN THE NEXT PAGE IS ANOTHER SIGNATURE PAGE.

02:03PM 13         WHY WERE YOU SENDING MR. DRACOPOULOS'S SIGNATURE PAGE TO

02:03PM 14    MS. HOLMES AND MR. BALWANI?

02:03PM 15    A.   HE ASKED ME, ARE YOU SENDING YOUR PAGE?

02:03PM 16         AND I SAID YES.

02:03PM 17         AND HE SAID, DO YOU MIND SENDING MINE AT THE SAME TIME?

02:04PM 18         AND I SAID I WOULD BE HAPPY TO.

02:04PM 19    Q.   AND SO YOU DID HIM THAT FAVOR?

02:04PM 20    A.   RIGHT.

02:04PM 21    Q.   I WANT YOU TO TURN TO TAB 2172.  IT'S TOWARDS THE FRONT OF

02:04PM 22    YOUR BINDER.

02:04PM 23    A.   I'M THERE.

02:04PM 24    Q.   MR. MOSLEY, DO YOU RECOGNIZE THIS DOCUMENT?

02:04PM 25    A.   I DO.

02:04PM  1    Q.   AND WHAT IS THIS DOCUMENT?

02:04PM  2    A.   THIS IS THE DOCUMENT THAT I REFERRED TO DEALING WITH THAT

02:04PM  3    PARTICULAR PROVISION IN THE CERTIFICATE OF INCORPORATION OF THE

02:04PM  4    COMPANY RELATING TO THE RIGHT TO REDEEM PREFERRED STOCK, OR

02:04PM  5    REDEEM STOCK PERIOD.

02:04PM  6    Q.   AND THE DATE ON THIS DOCUMENT?

02:05PM  7    A.   OCTOBER 31, 2014.

02:05PM  8    Q.   AND IS THAT THE DATE OF THE ELECTRONIC WIRE THAT YOU SENT

02:05PM  9    FUNDS?

02:05PM 10    A.   IT WAS THAT DATE.

02:05PM 11    Q.   I'M SORRY, THE ANSWER?

02:05PM 12    A.   IT WAS THAT DATE.

02:05PM 13           MR. SCHENK:  THANK YOU.

02:05PM 14       YOUR HONOR, THE GOVERNMENT OFFERS 2172.

02:05PM 15           MR. CAZARES:  NO OBJECTION.

02:05PM 16           THE COURT:  IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:05PM 17       (GOVERNMENT'S EXHIBIT 2172 WAS RECEIVED IN EVIDENCE.)

02:05PM 18           MR. SCHENK:  THANK YOU.

02:05PM 19    Q.   MR. MOSLEY, THE LETTER MAKES REFERENCE TO YOUR CLIENTS.

02:05PM 20       DO YOU SEE THAT?

02:05PM 21    A.   YES.

02:05PM 22    Q.   AND I THINK YOU MAY HAVE DESCRIBED THIS EARLIER.

02:05PM 23       WHY DID YOU HAVE THIS AGREEMENT COVER NOT JUST YOURSELF,

02:05PM 24    BUT ALSO YOUR CLIENTS?

02:05PM 25    A.   AS I POINTED OUT, I KNEW THAT SOME OF MY CLIENTS WERE

02:05PM   1    LOOKING AT THE COMPANY AS A POSSIBLE INVESTMENT AND CONSIDERING

02:05PM   2    IT.

02:05PM   3        I CERTAINLY NEVER WOULD HAVE BEEN COMFORTABLE OBTAINING

02:05PM   4    THIS KIND OF COMFORT FOR MYSELF PERSONALLY WITHOUT IT HAVING --

02:05PM   5    EXTENDING TO EVERYBODY ELSE THAT I KNEW MIGHT BE LOOKING AT THE

02:06PM   6    COMPANY.

02:06PM   7    Q.   THANK YOU.

02:06PM   8        ON OCTOBER 31ST OF 2014, DID YOU WIRE, DID YOU

02:06PM   9    ELECTRONICALLY WIRE FUNDS TO THERANOS?

02:06PM  10    A.   I DID.

02:06PM  11    Q.   DO YOU RECALL THE AMOUNT?

02:06PM  12    A.   IT WAS JUST SLIGHTLY UNDER $6 MILLION.

02:06PM  13    Q.   AND WHEN YOU INITIATED THAT WIRE, WHERE WERE YOU?

02:06PM  14    PHYSICALLY, WHERE WERE YOU?

02:06PM  15    A.   I BELIEVE I WAS IN NEW YORK CITY.

02:06PM  16    Q.   AND YOU SENT THAT TO THERANOS; IS THAT RIGHT?

02:06PM  17    A.   I DID.

02:06PM  18        WELL, THE WIRE WAS TO THEIR BANK, WHICH I THINK WAS

02:06PM  19    SILICON VALLEY OR SOMETHING LIKE THAT.

02:06PM  20    Q.   THE WIRE WAS FROM YOUR BANK TO THERANOS'S --

02:06PM  21    A.   YES.

02:06PM  22    Q.   -- BANK?

02:06PM  23        THANK YOU.

02:06PM  24        IF YOU'LL NOW TURN, I THINK IT'S ONE TAB BEFORE THAT, IN

02:06PM  25    YOUR BINDER TO 2065.

02:06PM   1          DO YOU SEE THAT EXHIBIT?

02:06PM   2     A.   I DO.

02:06PM   3     Q.   MR. MOSLEY, YOU'RE NOT ON THIS EMAIL; IS THAT CORRECT?

02:06PM   4     A.   I AM NOT.

02:07PM   5     Q.   DO YOU KNOW -- THERE'S AN INDIVIDUAL HERE LISTED,

02:07PM   6     CHRISTIAN HOLMES.

02:07PM   7          DO YOU KNOW WHO THAT IS?

02:07PM   8     A.   I DO.

02:07PM   9     Q.   AND WHO WAS THAT?

02:07PM  10     A.   THAT WAS ELIZABETH HOLMES'S BROTHER.

02:07PM  11     Q.   AND DO YOU KNOW WHERE HE WORKED?

02:07PM  12     A.   I BELIEVE HE WORKED AT THERANOS, BUT I DON'T KNOW FOR

02:07PM  13     SURE, BUT I BELIEVE HE DID.

02:07PM  14     Q.   AND DO YOU KNOW -- DO YOU RECALL WHETHER YOU EVER HAD

02:07PM  15     INTERACTIONS WITH MR. HOLMES?

02:07PM  16     A.   CHRISTIAN HOLMES?

02:07PM  17     Q.   YES.

02:07PM  18     A.   I DID MEET HIM ON ONE OR MORE OCCASIONS, MAYBE JUST ONE

02:07PM  19     OCCASION.

02:07PM  20     Q.   AND WHEN WAS THAT?

02:07PM  21     A.   IT WAS AT THE BDT CONFERENCE I ATTENDED AND WHICH

02:07PM  22     ELIZABETH ATTENDED.

02:07PM  23     Q.   THE ONE IN CHICAGO THAT WE SAW THE EMAIL ABOUT?

02:07PM  24     A.   THAT'S CORRECT.

02:07PM  25               MR. SCHENK:  YOUR HONOR, THE GOVERNMENT OFFERS 2065.

02:07PM  1              MR. CAZARES:  OBJECTION.  FOUNDATION, HEARSAY, 403.

02:07PM  2              THE COURT:  THIS WOULD BE ADMITTED FOR NOTICE

02:07PM  3      PURPOSES ONLY, NOT FOR THE TRUTH OF THE MATTER ASSERTED,

02:07PM  4      MR. SCHENK?

02:08PM  5              MR. SCHENK:  YES, YOUR HONOR.

02:08PM  6              THE COURT:  ALL RIGHT.  THANK YOU.

02:08PM  7          I'LL OVERRULE THE OBJECTIONS.

02:08PM  8          LADIES AND GENTLEMEN, THIS DOCUMENT WILL BE ADMITTED,

02:08PM  9      AGAIN, ONLY AS TO THE ISSUE OF NOTICE, NOTICE AS TO THE

02:08PM 10      INDIVIDUALS MENTIONED ON THE EMAIL, THAT IS, TO/FROM, AND NOT

02:08PM 11      FOR THE TRUTH OF THE MATTERS ASSERTED IN THE EMAIL.

02:08PM 12          IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:08PM 13          (GOVERNMENT'S EXHIBIT 2065 WAS RECEIVED IN EVIDENCE.)

02:08PM 14              MR. SCHENK:  THANK YOU VERY MUCH, YOUR HONOR.

02:08PM 15      Q.  MR. MOSLEY, I'D LIKE TO START ON PAGE 2, AND THEN WE'LL

02:08PM 16      WORK OUR WAY UP THROUGH THE EMAIL.

02:08PM 17          DO YOU SEE ON PAGE 2 AN EMAIL FROM CHRISTIAN HOLMES TO

02:08PM 18      ELIZABETH HOLMES AND SUNNY BALWANI?

02:08PM 19      A.  I DO.

02:08PM 20      Q.  AND THIS EMAIL IS DATED OCTOBER 9TH, 2014.

02:08PM 21          SO A MOMENT AGO YOU AND I WERE TALKING ABOUT YOUR

02:08PM 22      INVESTMENT ON OCTOBER 31ST; IS THAT CORRECT?

02:08PM 23      A.  THAT'S CORRECT.

02:08PM 24      Q.  AND THIS EMAIL WAS SENT, IT APPEARS, A FEW WEEKS BEFORE

02:08PM 25      THAT?

02:08PM  1      A.   CORRECT.

02:08PM  2      Q.   DO YOU SEE THAT MR. HOLMES WRITES, "WHERE CAN I FIND THE

02:08PM  3      LIST OF NAMES YOU MENTIONED FROM BDT WHO COULD COME INTO WAG ON

02:09PM  4      SATURDAY?"

02:09PM  5           DO YOU SEE THAT?

02:09PM  6      A.   I SEE THAT.

02:09PM  7      Q.   AND THEN IT CONTINUES.  "WE WILL SEND OVER THE DIFFERENT

02:09PM  8      WORK FLOWS FOR HOW WE WILL ACCOMMODATE FINGERSTICK REGARDLESS

02:09PM  9      OF WHAT'S ON THE ORDER, AND POSSIBLE ISSUES ASSOCIATED, AS

02:09PM  10     REQUESTED."

02:09PM  11          DID I READ THAT CORRECTLY?

02:09PM  12     A.   YES, YOU DID.

02:09PM  13     Q.   AND THEN I WOULD LIKE TO GO UP ONE EMAIL, BUT CAN YOU SEE

02:09PM  14     THE SCREEN -- THE FROM LINE IS CUT OFF ON THE TOP OF THIS

02:09PM  15     EMAIL?  IT INCLUDES A SENT TO AND A CC, BUT NO FROM LINE?

02:09PM  16     A.   I SEE THAT.

02:09PM  17     Q.   IF YOU'LL TURN TO THE FIRST PAGE AT THE VERY BOTTOM, DO

02:09PM  18     YOU SEE ON THE FIRST PAGE AT THE VERY BOTTOM, DO YOU SEE A FROM

02:09PM  19     LINE?

02:09PM  20     A.   I DO.

02:09PM  21     Q.   THE EMAIL APPEARS TO BE FROM MR. BALWANI; IS THAT RIGHT?

02:09PM  22     A.   CORRECT.

02:09PM  23     Q.   IF NOW WE CAN TURN BACK TO THAT SECOND PAGE.

02:09PM  24          THAT SAME DAY, OCTOBER 9TH, MR. BALWANI WRITES, "DIANA.

02:09PM  25     CAN YOU SEND CHRISTIAN LIST OF 4 PEOPLE FROM BDT WHO VISITED US

02:10PM  1    FEW DAYS BACK THIS WAS BYRON TROTT AND HIS TEAM."

02:10PM  2        DO YOU SEE THAT?

02:10PM  3    A.   I DO.

02:10PM  4    Q.   AND NOW IF WE CAN GO TO THE FIRST PAGE AND LOOK AT THE

02:10PM  5    LENGTHY EMAIL IN RESPONSE.

02:10PM  6        AT THE VERY TOP, MR. HOLMES WRITES TO MR. BALWANI AND

02:10PM  7    ELIZABETH HOLMES IT APPEARS ON THE NEXT DAY, ON OCTOBER 10TH.

02:10PM  8        DO YOU SEE THAT?

02:10PM  9    A.   I DO.

02:10PM  10   Q.   AND MR. HOLMES WRITES, "ALSO WANTED TO SEND ALONG OUR

02:10PM  11   THOUGHTS FOR HOW TO ACCOMPLISH THE FS IN" THIS SCENARIO, THEIR

02:10PM  12   ORDERS PROMPT VENOUS.

02:10PM  13       I'M SORRY.  LET ME REREAD THAT.

02:10PM  14       "ALSO WANTED TO SEND ALONG OUR THOUGHTS FOR HOW TO

02:10PM  15   ACCOMPLISH THE FS IN THE SCENARIO THEIR ORDERS PROMPT VENOUS.

02:10PM  16   ASSUMPTIONS HERE FROM EAH ARE THAT WE MUST NOT DO VENOUS DRAW

02:10PM  17   AND WE CANNOT TELL THEM THAT THEIR ORDER PROMPTS VENOUS IF IT

02:11PM  18   DOES.  THE FOLLOWING IS THE ACTION PLANNING TO ACCOMPLISH

02:11PM  19   THIS."

02:11PM  20       DO YOU SEE THAT, MR. MOSLEY?

02:11PM  21   A.   I DO.

02:11PM  22   Q.   AND NOW IF YOU'LL LOOK DOWN WITH ME, THERE'S A SECTION

02:11PM  23   CALLED PREP ACTIONS.

02:11PM  24       THE FIRST BULLET OR DASH, "ANAM/ROBIN HAVE LIST OF NAMES

02:11PM  25   WHICH INCLUDES POSSIBLE PATIENTS FROM BDT."

02:11PM  1          DO YOU SEE THAT?

02:11PM  2     A.   I DO.

02:11PM  3     Q.   AND NOW IF WE LOOK AT SCENARIO 1, THE NEXT SECTION, IT

02:11PM  4     READS, "SCENARIO 1:  SCANNED ORDER FROM BDT VIP CONTAINS TESTS

02:11PM  5     THAT PROMPT FOR VENOUS DRAW."

02:11PM  6          THE SECOND DASH, "USE CASE A:  VENOUS IS PROMPTED DUE TO

02:11PM  7     SOME TESTS NOT YET BEING ON FS, BUT WOULD OTHERWISE PROMPT FS.

02:12PM  8          "REMOVE TESTS THAT ARE NOT YET ON FS AND COMPLETE

02:12PM  9     TRANSCRIPTION.

02:12PM  10          "VISIT IS COMPLETED PER SOP."

02:12PM  11          AND THEN A SECTION CALLED "NEGATIVES."

02:12PM  12          THE FIRST BULLET, "NEED TO EITHER TELL THE PATIENT AT THE

02:12PM  13     STORE THAT WE WILL NOT RUN A FEW TESTS, OR TELL THEM ON THE

02:12PM  14     BACK END THAT WE COULD NOT RUN CERTAIN TESTS."

02:12PM  15          DO YOU SEE THAT, SIR?

02:12PM  16     A.   I DO.

02:12PM  17     Q.   AND NOW IF WE LOOK FURTHER DOWN, "USE CASE B:  VENOUS IS

02:12PM  18     PROMPTED DUE TO VOLUME OF TESTS BUT TESTS WOULD PROMPT FS IF

02:12PM  19     ORDERED INDIVIDUALLY."

02:12PM  20          THE FIRST DASH, "REMOVE ENOUGH TESTS IN SM TO ALLOW THE

02:12PM  21     PATIENT TO PROCEED WITH FS."

02:12PM  22          AND IF YOU LOOK AT NEGATIVES, THE SECOND BULLET READS, "IF

02:12PM  23     THEY NOTICE MISSING TESTS ON THE RECEIPT, THEY MAY ASK THE WAG

02:12PM  24     TECH ABOUT IT.  WORST CASE THEY WOULD MAKE A CALL TO CS AND

02:13PM  25     ANAM WOULD TELL THEM EVERYTHING IS FINE.  CIARA WILL ALSO BE

02:13PM  1    ABLE TO COME OUT OF THE DRAW ROOM ONCE CHECK-IN IS COMPLETE TO

02:13PM  2    WELCOME THEM INTO THE ROOM AND DISTRACT FROM LOOKING AT THE

02:13PM  3    RECEIPT."

02:13PM  4        DID I READ THAT CORRECTLY?

02:13PM  5    A.   YOU DID.

02:13PM  6    Q.   MR. MOSLEY, I WANT TO ASK YOU ONE QUESTION ABOUT

02:13PM  7    EXHIBIT 3387 -- THIS HAS BEEN PREVIOUSLY ADMITTED,

02:13PM  8    YOUR HONOR -- PAGE 512.

02:13PM  9        PERMISSION TO PUBLISH?

02:13PM 10          THE COURT:  YES.

02:13PM 11    BY MR. SCHENK:

02:13PM 12    Q.   MR. MOSLEY, DO YOU RECALL THIS EXHIBIT THAT YOU AND I

02:13PM 13    SPOKE ABOUT A MOMENT AGO?

02:13PM 14    A.   I DO.

02:13PM 15    Q.   WE TALKED ABOUT TWO MEETINGS THAT YOU HAD IN AROUND

02:13PM 16    OCTOBER OF 2014 IN PALO ALTO.

02:13PM 17        DO YOU RECALL THAT?

02:13PM 18    A.   YES.

02:13PM 19    Q.   DO YOU WANT ME TO GIVE YOU A MOMENT TO GET TO THE PAGE?

02:13PM 20    A.   NO.  I CAN SEE IT ON THE SCREEN.  THAT'S FINE.

02:13PM 21    Q.   OKAY.  I WONDER IF, AFTER THAT, AFTER OCTOBER OF 2014, DID

02:14PM 22    YOU HAVE THE OCCASION TO BE ON A CONFERENCE CALL WHERE

02:14PM 23    MS. HOLMES AND MR. BALWANI WERE PRESENT IN 2015?

02:14PM 24    A.   NOT THAT I RECALL WHERE THEY WERE BOTH PRESENT ON A

02:14PM 25    PARTICULAR CALL.

02:14PM  1    Q.   WERE THERE INSTANCES WHEN YOU WERE ON A CONFERENCE CALL

02:14PM  2    WITH JUST MR. BALWANI?

02:14PM  3    A.   WELL, JUST WITH MR. BALWANI FROM THE COMPANY AND OTHER

02:14PM  4    INDIVIDUALS, YES.

02:14PM  5    Q.   THANK YOU.

02:14PM  6         IN 2015, WERE YOU ON A CONFERENCE CALL WHERE THE ONLY

02:14PM  7    REPRESENTATIVE THAT YOU WERE AWARE OF FROM THERANOS WAS

02:14PM  8    MR. BALWANI?

02:14PM  9    A.   THAT'S CORRECT.

02:14PM  10   Q.   AND IN 2015 WHEN YOU WERE HAVING THIS CALL, DID

02:14PM  11   MR. BALWANI MAKE ANY STATEMENTS TO YOU THAT THE NUMBERS IN

02:14PM  12   2014, WHAT LOOKS TO BE TOTAL REVENUE OF $140 MILLION, DID NOT

02:14PM  13   COME THROUGH?

02:14PM  14   A.   HE DID NOT.

02:14PM  15   Q.   SO IN 2015 WHEN YOU WERE ON A CONFERENCE CALL WITH

02:15PM  16   MR. BALWANI, DID YOU DISCUSS THE FINANCES, THE FINANCIAL

02:15PM  17   SITUATION AT THERANOS?

02:15PM  18   A.   I BELIEVE THE FINANCES WERE DISCUSSED, BUT I DON'T HAVE

02:15PM  19   ANY SPECIFIC RECOLLECTION OF DETAILS.

02:15PM  20   Q.   YOU DON'T HAVE A RECOLLECTION OF THE SPECIFIC DETAILS

02:15PM  21   DISCUSSED?

02:15PM  22   A.   RIGHT.

02:15PM  23   Q.   DO YOU HAVE A RECOLLECTION THAT MR. BALWANI SAID, I NEED

02:15PM  24   TO REFINE THE NUMBER THAT WE PROVIDED TO YOU IN 2014, AND NOW

02:15PM  25   THAT IT IS 2015, WE DIDN'T HIT 100 MILLION IN REVENUE?

02:15PM  1          MR. CAZARES:  OBJECTION.  LEADING, ASKED AND

02:15PM  2     ANSWERED.

02:15PM  3          THE COURT:  OVERRULED.

02:15PM  4       WHY DON'T YOU ASK THE QUESTION AGAIN?

02:15PM  5          THE WITNESS:  I SAID THANKS FOR READING THE QUESTION

02:15PM  6     AGAIN.

02:15PM  7     BY MR. SCHENK:

02:15PM  8     Q.  IN 2015 ON THIS CALL WHERE MR. BALWANI WAS PRESENT, I

02:15PM  9     THINK YOU SAID THAT FINANCES WERE DISCUSSED.

02:15PM  10    A.  YES.

02:15PM  11    Q.  AND I'M WONDERING IF THERE WAS AN OCCASION ON THE CALL

02:15PM  12    WHEN MR. BALWANI SAID, THE FINANCIAL PROJECTIONS WE HAVE

02:15PM  13    PROVIDED TO YOU IN 2014 REGARDING 2014 NEED TO BE REFINED OR

02:16PM  14    CORRECTED.

02:16PM  15         DID THAT EVER HAPPEN?

02:16PM  16         MR. CAZARES:  OBJECTION.  ASKED AND ANSWERED.

02:16PM  17         THE COURT:  OVERRULED.

02:16PM  18         THE WITNESS:  NO.

02:16PM  19    BY MR. SCHENK:

02:16PM  20    Q.  AND THEN SAME QUESTION FOR 2015.  YOU'RE HAVING THIS CALL

02:16PM  21    IN 2015.  DID MR. BALWANI SAY, OUR 2015 PROJECTIONS, THE ONE

02:16PM  22    THAT PREDICTS ABOUT A BILLION DOLLARS IN REVENUE, DID THAT GET

02:16PM  23    REFINED?

02:16PM  24         MR. CAZARES:  OBJECTION.  FOUNDATION.

02:16PM  25         THE COURT:  DURING THE CONVERSATION?

02:16PM  1                    MR. SCHENK:  YES, YOUR HONOR.

02:16PM  2                    THE COURT:  ALL RIGHT.

02:16PM  3              YOU CAN ANSWER THE QUESTION.

02:16PM  4                    THE WITNESS:  NO.

02:16PM  5                    MR. SCHENK:  YOUR HONOR, MAY I HAVE ONE MOMENT?

02:16PM  6                    THE COURT:  YES.

02:16PM  7              (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

02:16PM  8                    MR. LEACH:  THANK YOU VERY MUCH, YOUR HONOR.  NO

02:16PM  9         FURTHER QUESTIONS.

02:16PM  10                    THE COURT:  WHY DON'T WE TAKE OUR BREAK, LADIES AND

02:16PM  11         GENTLEMEN, ABOUT 20, 25 MINUTES, AND THEN YOU'LL HAVE

02:16PM  12         CROSS-EXAMINATION.

02:16PM  13                    MR. CAZARES:  YES, YOUR HONOR.

02:16PM  14                    THE COURT:  ALL RIGHT.  WE'LL TAKE OUR SECOND BREAK,

02:16PM  15         SIR, AND THEN WE'LL ENGAGE AGAIN.

02:17PM  16              (RECESS FROM 2:17 P.M. UNTIL 2:47 P.M.)

02:49PM  17                    THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES

02:49PM  18         PREVIOUSLY PRESENT ARE PRESENT AGAIN.

02:49PM  19              COUNSEL, YOU HAVE CROSS-EXAMINATION?

02:49PM  20                    MR. CAZARES:  YES, YOUR HONOR.  THANK YOU VERY MUCH,

02:49PM  21         YOUR HONOR.

02:49PM  22                         **CROSS-EXAMINATION**

02:49PM  23         BY MR. CAZARES:

02:49PM  24         Q.  GOOD AFTERNOON, MR. MOSLEY.  MY NAME IS STEVE CAZARES, AND

02:49PM  25         I REPRESENT MR. BALWANI.

02:49PM  1         I JUST HAVE A FEW QUESTIONS FOR YOU THIS AFTERNOON.

02:49PM  2    A.   OKAY.

02:49PM  3    Q.   WILL THAT BE OKAY?

02:49PM  4         JUST TO GET BACK TO A LITTLE BIT OF BACKGROUND FOR

02:49PM  5    CONTEXT.

02:49PM  6         SO YOU CURRENTLY WORK AT THE INVESTMENT FIRM BDT; IS THAT

02:49PM  7    RIGHT?

02:49PM  8    A.   THAT'S CORRECT.

02:49PM  9    Q.   AND YOU'VE BEEN AT BDT NOW FOR A FEW YEARS; CORRECT?

02:49PM 10    A.   A LITTLE OVER FOUR YEARS.

02:49PM 11    Q.   AT BDT, YOU WORK WITH MR. TROTT; IS THAT CORRECT?

02:49PM 12    A.   YES, I DO.

02:49PM 13    Q.   AND MR. TROTT HAS DECADES OF EXPERIENCE IN INVESTMENT AND

02:49PM 14    FINANCE; CORRECT?

02:50PM 15    A.   YES, HE DOES.

02:50PM 16    Q.   OKAY.  AND YOU YOURSELF HAVE YEARS OF EXPERIENCE RELATING

02:50PM 17    TO INVESTMENTS BOTH ON BEHALF OF YOURSELF AND YOUR FAMILY;

02:50PM 18    CORRECT?

02:50PM 19    A.   I DO.

02:50PM 20    Q.   INCLUDING PUBLIC COMPANY INVESTING?

02:50PM 21    A.   YES.

02:50PM 22    Q.   AS WELL AS PRIVATE COMPANY INVESTING PRIOR TO YOUR

02:50PM 23    INTRODUCTION TO THERANOS; IS THAT RIGHT?

02:50PM 24    A.   THAT'S CORRECT.

02:50PM 25    Q.   AND INVESTING IN PUBLIC COMPANIES VERSUS PRIVATE

02:50PM 1    COMPANIES, THEY'RE QUITE DIFFERENT; IS THAT FAIR?

02:50PM 2    A.   YES.

02:50PM 3    Q.   AND IN A PUBLIC COMPANY SETTING, YOU KNOW, PUBLIC

02:50PM 4    COMPANIES ARE REQUIRED TO FILE REPORTS, FINANCIAL INFORMATION,

02:50PM 5    OTHER DETAILS WITH THE SECURITIES AND EXCHANGE COMMISSION.

02:50PM 6         YOU'RE FAMILIAR WITH THAT?

02:50PM 7    A.   I AM.

02:50PM 8    Q.   WHEREAS IN A PRIVATE SETTING, PRIVATE COMPANIES, BY

02:50PM 9    DEFINITION, DON'T HAVE TO DISCLOSE OR REPORT ANYTHING; IS THAT

02:50PM 10   FAIR?

02:50PM 11   A.   THAT IS CORRECT.

02:50PM 12   Q.   OKAY.  AND YOU ALSO DESCRIBED THE CIRCUMSTANCES WHERE, YOU

02:50PM 13   KNOW, YOU MAY REQUEST INFORMATION FROM THE PRIVATE COMPANY, YOU

02:50PM 14   MAY GET A RESPONSE, OR YOU MAY GET NOTHING; IS THAT ACCURATE?

02:51PM 15   A.   THAT IS CORRECT.

02:51PM 16   Q.   AND THEN THE PRIVATE COMPANY MAY INVITE YOUR INTEREST TO

02:51PM 17   INVEST IN A COMPANY, BUT THEY MAY DECLINE YOUR INVESTMENT; IS

02:51PM 18   THAT FAIR AS WELL?

02:51PM 19   A.   THAT'S FAIR.

02:51PM 20   Q.   NOW, DURING THE RELEVANT TIME PERIOD IN THIS 2014 TIME

02:51PM 21   PERIOD THAT YOU TALKED ABOUT IN YOUR CONNECTION WITH THERANOS,

02:51PM 22   YOU WERE STILL WORKING AT THE CRAVATH LAW FIRM; CORRECT?

02:51PM 23   A.   I WAS.

02:51PM 24   Q.   AND BY THAT TIME YOU HAD BEEN A PARTNER AT CRAVATH FOR

02:51PM 25   30 YEARS?

02:51PM    1    A.   OH, I BECAME A PARTNER IN 1987.  SO --

02:51PM    2    Q.   ALMOST?

02:51PM    3    A.   ALMOST.

02:51PM    4    Q.   OKAY.  AND FOR THOSE WHO DON'T KNOW, CRAVATH IS QUITE A

02:51PM    5    PRESTIGIOUS LAW FIRM; CORRECT?

02:51PM    6    A.   YES.

02:51PM    7    Q.   BOTH IN THE UNITED STATES AND WORLDWIDE; CORRECT?

02:51PM    8    A.   THAT'S CORRECT.

02:51PM    9    Q.   IT REPRESENTS SOME OF THE LARGEST, MOST SOPHISTICATED

02:51PM   10    CORPORATIONS IN THE WORLD; CORRECT?

02:51PM   11    A.   THAT'S CORRECT.

02:52PM   12    Q.   AND YOUR ROLE AT CRAVATH WAS IN TRUSTS AND ESTATES; IS

02:52PM   13    THAT CORRECT?

02:52PM   14    A.   CORRECT.

02:52PM   15    Q.   BECAUSE YOU ALSO HAD A TAX BACKGROUND AS I RECALL?

02:52PM   16    A.   I DID, OR I DO.

02:52PM   17    Q.   YOU RECEIVED AN LLM, OR A MASTER'S IN, LIKE, TAXATION LAW;

02:52PM   18    IS THAT CORRECT?

02:52PM   19    A.   THAT IS CORRECT.

02:52PM   20    Q.   AND SO PART OF YOUR WORK WAS HELPING WEALTHY FAMILIES,

02:52PM   21    COMPANIES, KIND OF MANAGE THEIR ESTATES AND THEIR FINANCES;

02:52PM   22    CORRECT?

02:52PM   23    A.   FAMILIES AND INDIVIDUALS, NOT COMPANIES.

02:52PM   24    Q.   FAIR ENOUGH.

02:52PM   25         AND AMONGST YOUR CLIENTS, FAIR TO SAY SOME OF THE MOST

02:52PM  1    PROMINENT, KIND OF INDUSTRIAL FAMILIES IN AMERICA; IS THAT

02:52PM  2    FAIR?

02:52PM  3    A.   THEY WERE PROMINENT FAMILIES, YES.

02:52PM  4    Q.   INCLUDING, I THINK YOU MENTIONED A FEW OF THEM, THE WALTON

02:52PM  5    FAMILY?

02:52PM  6    A.   YES.

02:52PM  7    Q.   WHO ARE RELATED TO WAL-MART?

02:52PM  8    A.   YES.

02:52PM  9    Q.   AND I THINK YOU MENTIONED MORE THAN A FEW TIMES THE

02:52PM  10   DEVOS FAMILY; CORRECT?

02:52PM  11   A.   I DID.

02:52PM  12   Q.   AND THE DEVOS FAMILY WAS CONNECTED TO THE AMWAY BUSINESS;

02:52PM  13   IS THAT CORRECT?

02:52PM  14   A.   THAT'S CORRECT.

02:52PM  15   Q.   AND THEN YOU MENTIONED THE COX COMMUNICATIONS FAMILY, I'LL

02:53PM  16   CALL IT?

02:53PM  17   A.   RIGHT.

02:53PM  18   Q.   OKAY.  AND THERE'S A MR. ALEX TAYLOR, AT LEAST CURRENTLY

02:53PM  19   AT THE HEAD OF COX; CORRECT?

02:53PM  20   A.   THAT IS CORRECT.

02:53PM  21   Q.   AND THOSE ARE ALL CLIENTS OF YOURS, OR WERE AT THE TIME?

02:53PM  22   A.   YES, THEY WERE.

02:53PM  23   Q.   AND THEN THERE'S A REFERENCE TO, IN YOUR TESTIMONY, THE

02:53PM  24   NIARCHOS FAMILY.

02:53PM  25        DO YOU REMEMBER THAT?

02:53PM   1    A.   TO THE NIARCHOS FOUNDATION, YES.

02:53PM   2    Q.   FOUNDATION.  AND YOU DID SOME WORK FOR THE NIARCHOS

02:53PM   3    FOUNDATION?

02:53PM   4    A.   I DID.

02:53PM   5    Q.   AND I THINK YOU INDICATED THAT YOU WERE KIND OF A

02:53PM   6    FRIENDSHIP WITH MR. ANDREAS DRACOPOULOS; CORRECT?

02:53PM   7    A.   YES, I DID.

02:53PM   8    Q.   AND HE WAS RELATED TO THE NIARCHOS FAMILY I THINK BY

02:53PM   9    MARRIAGE?

02:53PM  10    A.   NO.  HE'S RELATED BY BLOOD.

02:53PM  11    Q.   OKAY.  SO HE'S A MEMBER OF THE FAMILY?

02:53PM  12    A.   HE'S A MEMBER OF THE FAMILY.

02:53PM  13    Q.   AND THEN YOU ALSO INDICATED THAT DR. KISSINGER WAS A

02:53PM  14    FRIEND AND A CLIENT OF YOURS AS WELL?

02:53PM  15    A.   THAT IS CORRECT.

02:53PM  16    Q.   OKAY.  AND IN RELATION TO THESE CLIENTS OF YOURS, WHEN YOU

02:53PM  17    WERE AT THE CRAVATH LAW FIRM IN THE 2014 TIME PERIOD, YOU

02:54PM  18    DESCRIBED VARIOUS COMMUNICATIONS BETWEEN YOURSELF, MS. HOLMES,

02:54PM  19    AND SOME OF THESE CLIENTS OF YOURS FOR THE PURPOSES OF

02:54PM  20    INTRODUCING THE CLIENTS TO THERANOS; CORRECT?

02:54PM  21    A.   YES.  I MEAN, SOME WERE INTRODUCED BY ME AND SOME WERE

02:54PM  22    INTRODUCED BY OTHERS, YES.

02:54PM  23    Q.   OKAY.  AND SOME OF THOSE CLIENTS ENDED UP INVESTING;

02:54PM  24    CORRECT?

02:54PM  25    A.   YES.

02:54PM 1    Q.   NOW, YOU DESCRIBED YOUR FIRST INTRODUCTION TO THERANOS AS

02:54PM 2    COMING FROM DR. KISSINGER; RIGHT?

02:54PM 3    A.   THAT'S CORRECT.

02:54PM 4    Q.   AND DR. KISSINGER WAS ALREADY ON THE BOARD OF DIRECTORS OF

02:54PM 5    THERANOS; RIGHT?

02:54PM 6    A.   THAT'S CORRECT.

02:54PM 7    Q.   AND UNDERSTANDING THAT YOU HAVE AN ATTORNEY-CLIENT

02:54PM 8    RELATIONSHIP WITH DR. KISSINGER, I -- MY QUESTIONS ARE NOT

02:54PM 9    MEANING OR INTENDING TO INTERFERE WITH THAT, SO IF I'M STARTING

02:54PM 10   TO STEP ON THAT WITH MY QUESTIONS, PLEASE JUST LET ME KNOW.

02:54PM 11   A.   OKAY.

02:54PM 12   Q.   PRIOR TO DR. KISSINGER ASKING YOU TO LOOK INTO THERANOS,

02:55PM 13   WERE YOU ALREADY AWARE OF DR. KISSINGER'S RELATIONSHIP WITH

02:55PM 14   THERANOS?

02:55PM 15   A.   I WAS.

02:55PM 16   Q.   OKAY.  AND WOULD THAT BE, AT A HIGH LEVEL, SOMEWHAT IN

02:55PM 17   RELATIONSHIP TO YOUR TRUSTS AND ESTATES WORK FOR MR. KISSINGER?

02:55PM 18   A.   IT WOULD HAVE BEEN IN RELATIONSHIP TO MY WORK WITH HIM AS

02:55PM 19   A CLIENT.

02:55PM 20   Q.   OKAY.  AND THE FACT THAT DR. KISSINGER HIMSELF WAS ON THE

02:55PM 21   BOARD OF DIRECTORS PIQUED YOUR INTEREST IN THERANOS; RIGHT?

02:55PM 22   A.   PERHAPS.

02:55PM 23   Q.   YOU TRUST DR. KISSINGER'S JUDGMENT; CORRECT?

02:55PM 24   A.   I DO.

02:55PM 25   Q.   I THINK A LOT OF PEOPLE HAVE TRUSTED DR. KISSINGER'S

02:55PM   1    JUDGMENT IN THE LAST 40 TO 50 YEARS; RIGHT?

02:55PM   2    A.   RIGHT.

02:55PM   3    Q.   AND SO DR. KISSINGER ASKED YOU TO KIND OF LOOK INTO AND

02:55PM   4    LEARN ABOUT THERANOS AND TO ADVISE HIM ON YOUR VIEWS; RIGHT?

02:55PM   5    A.   HE ASKED ME TO LOOK INTO IT AND GIVE HIM MY VIEWS.

02:55PM   6    Q.   OKAY.  BUT HE ALREADY HAD A CONNECTION TO THERANOS; RIGHT?

02:56PM   7    A.   HE DID.

02:56PM   8    Q.   OKAY.  AND AS A RESULT OF THAT REQUEST, YOU REACHED OUT TO

02:56PM   9    MS. HOLMES; IS THAT RIGHT?

02:56PM  10    A.   I DON'T KNOW HOW THE CONTACT WAS ORIGINALLY MADE, WHETHER

02:56PM  11    HE CALLED HER OR -- I DON'T REMEMBER SPECIFICALLY.

02:56PM  12    Q.   FAIR ENOUGH TO SAY THAT IN SOME WAY, AS A RESULT OF

02:56PM  13    DR. KISSINGER'S REQUEST, YOU WERE PUT INTO CONNECTION WITH

02:56PM  14    MS. HOLMES?

02:56PM  15    A.   THAT IS CORRECT.

02:56PM  16    Q.   OKAY.  AND THAT ULTIMATELY LED TO A PHONE CALL THAT YOU

02:56PM  17    TESTIFIED ABOUT?

02:56PM  18    A.   YES.

02:56PM  19    Q.   AND IN THAT PHONE CALL, THAT WAS JUST YOURSELF AND

02:56PM  20    MS. HOLMES?

02:56PM  21    A.   THAT'S CORRECT.

02:56PM  22    Q.   AND WOULD THIS HAVE BEEN IN THIS JULY 2014 TIME PERIOD?

02:56PM  23    A.   IT WOULD HAVE BEEN, YES.

02:56PM  24    Q.   OKAY.  AND HOW LONG DID THE PHONE CALL LAST?

02:56PM  25    A.   I DON'T REMEMBER.

02:56PM   1    Q.   OKAY.  AND YOU DON'T REMEMBER SIGNIFICANT DETAILS FROM

02:56PM   2    THAT PHONE CALL?

02:56PM   3    A.   I REMEMBER THAT WE HAD A CONVERSATION ABOUT THE COMPANY

02:56PM   4    AND SHE GAVE ME A GENERAL SUMMARY OF WHAT THE COMPANY WAS

02:56PM   5    DOING, AND THAT KIND OF INFORMATION.

02:56PM   6    Q.   OKAY.  AND THEN AFTER THAT PHONE CALL, MS. HOLMES CAUSED

02:57PM   7    SOME MATERIALS TO BE SENT TO YOU; IS THAT RIGHT?

02:57PM   8    A.   THAT'S CORRECT.

02:57PM   9    Q.   AND THAT WAS THE COVER LETTER THAT WE SAW, AND THEN THE

02:57PM  10    SUBSTANTIAL STACK OF DOCUMENTS, SOME OF WHICH YOU REVIEWED WITH

02:57PM  11    MR. SCHENK; RIGHT?

02:57PM  12    A.   THAT'S CORRECT.

02:57PM  13    Q.   IS IT FAIR TO SAY THAT YOU BASED YOUR DECISION ULTIMATELY

02:57PM  14    TO INVEST IN THERANOS IN PART UPON YOUR COMMUNICATIONS WITH

02:57PM  15    MS. HOLMES AND IN PART UPON THE DOCUMENTATION THAT YOU RECEIVED

02:57PM  16    FROM MS. HOLMES?

02:57PM  17    A.   THAT'S CORRECT.

02:57PM  18    Q.   AND IF WE CAN PUT UP ON THE SCREEN, I THINK IT'S ALREADY

02:57PM  19    IN EVIDENCE, EXHIBIT 4173.

02:57PM  20         IT'S IN THE GOVERNMENT'S BINDER, AND ALSO UP ON THE

02:58PM  21    SCREEN, SIR.

02:58PM  22    A.   UH-HUH.

02:58PM  23    Q.   ARE YOU THERE?

02:58PM  24    A.   I'M THERE.

02:58PM  25    Q.   OKAY.  SO 4173 IS THE AUGUST 18, 2014 LETTER, TWO PAGES,

02:58PM   1      FROM MS. HOLMES TO YOURSELF.

02:58PM   2          DO YOU SEE THAT?

02:58PM   3      A.   I DO.

02:58PM   4      Q.   OKAY.  AND SOME OF THIS YOU REVIEWED WITH MR. SCHENK, AND

02:58PM   5      I JUST HAD A FEW QUESTIONS ABOUT SOME OF THE -- SOME OF

02:58PM   6      MS. HOLMES'S LETTER TO YOU.

02:58PM   7          NOW, IN THE FIRST PARAGRAPH OF THE LETTER BEGINNING, "BY

02:58PM   8      WAY OF BACKGROUND," DO YOU SEE MS. HOLMES WROTE, "I FOUNDED

02:58PM   9      THIS COMPANY TO MAKE A DIFFERENCE IN THE WORLD, AND HAVE

02:58PM   10     RETAINED MAJORITY CONTROL OF THE SHARES IN ORDER TO REALIZE

02:58PM   11     THAT VISION FOR THE LONG TERM."

02:58PM   12         DO YOU SEE THAT?

02:58PM   13     A.   I DO.

02:58PM   14     Q.   AND THAT WAS ATTRACTIVE TO YOU; CORRECT?

02:58PM   15     A.   IT WAS.

02:59PM   16     Q.   THE FACT THAT MS. HOLMES LOOKED TO MAKE A DIFFERENCE IN

02:59PM   17     THE WORLD, BUT ALSO SHE MAINTAINED CONTROL OF THE COMPANY SO

02:59PM   18     THAT SHE COULD, YOU KNOW, PURSUE THAT VISION AS OPPOSED TO,

02:59PM   19     LET'S SAY, MAKING BUSINESS DECISIONS THAT MAY HAVE HAD

02:59PM   20     SHORT-TERM BENEFIT, BUT NOT SO LONG TERM; IS THAT FAIR?

02:59PM   21     A.   THAT'S FAIR.

02:59PM   22     Q.   AND YOU HAVE OTHER CLIENTS WHO OPERATE THEIR BUSINESSES

02:59PM   23     PRIVATELY AS OPPOSED TO PUBLICLY FOR THAT VERY REASON; RIGHT?

02:59PM   24     A.   THAT'S CORRECT.

02:59PM   25     Q.   AND THEN SHE WROTE, "WE HAVE A VERY LONG TERM MISSION, AND

02:59PM  1    ARE DEEPLY COMMITTED TO REALIZING THAT MISSION BY BUILDING A

02:59PM  2    COMPANY THAT ESTABLISHES A NEW INDUSTRY, AND STANDARD IN THE

02:59PM  3    MARKETPLACE, NOT JUST OVER THE COMING YEARS BUT OVER THE COMING

02:59PM  4    DECADES."

02:59PM  5        DO YOU SEE THAT?

02:59PM  6    A.   I DO.

02:59PM  7    Q.   AND YOU UNDERSTAND THAT TO BE MS. HOLMES'S VISION OF,

02:59PM  8    AGAIN, SEEKING LONG-TERM SUCCESS AS OPPOSED TO SHORT-TERM

02:59PM  9    PROFIT OR GAINS; CORRECT?

02:59PM  10   A.   THAT'S THE WAY I UNDERSTOOD IT.

02:59PM  11   Q.   AND THAT'S WHAT YOU WERE INTERESTED IN; RIGHT?

03:00PM  12   A.   YES.

03:00PM  13   Q.   AND AT THE BOTTOM OF THAT PARAGRAPH SHE WROTE, "WE ALSO

03:00PM  14   BELIEVE IN THE ABILITY TO CREATE THE GREATEST RETURN ON

03:00PM  15   INVESTMENT FOR OUR SHAREHOLDERS BY REALIZING OUR LONG TERM

03:00PM  16   VISION AND NOT BEING SUBJECT TO THE WHIMS OF THE PUBLIC MARKET.

03:00PM  17   AS SUCH, THE COMPANY PLANS TO BE PRIVATE FOR THE LONG TERM."

03:00PM  18       DO YOU SEE THAT?

03:00PM  19   A.   I DO.

03:00PM  20   Q.   AND YOU UNDERSTOOD AT THE TIME THAT THERANOS HAD NO INTENT

03:00PM  21   TO ENGAGE IN SOME SORT OF LIQUIDITY EVENT, LIKE GOING PUBLIC IN

03:00PM  22   AN IPO?  YOU UNDERSTOOD THAT?

03:00PM  23   A.   I DID.

03:00PM  24   Q.   AND THAT WAS FINE WITH YOU; CORRECT?

03:00PM  25   A.   THAT WAS FINE.

03:00PM   1    Q.   NOW, IN THE LETTER MS. HOLMES CONTINUES ABOUT MIDWAY DOWN,

03:00PM   2    "HISTORICALLY, THERANOS'S WORK WAS FOCUSSED ON CONTRACTS WITH

03:00PM   3    PHARMACEUTICAL AND MILITARY CLIENTS."

03:00PM   4         DO YOU SEE THAT?

03:00PM   5    A.   I DO.

03:00PM   6    Q.   AND I THINK YOU INDICATED EARLIER TODAY THAT THAT WAS

03:01PM   7    SIGNIFICANT TO YOU; CORRECT?

03:01PM   8    A.   YES.

03:01PM   9    Q.   AND I THINK YOU MENTIONED THAT PHARMACEUTICAL COMPANIES

03:01PM  10    YOU UNDERSTOOD TO BE QUITE SOPHISTICATED IN THEIR AREAS OF

03:01PM  11    BUSINESS; IS THAT CORRECT?

03:01PM  12    A.   THAT'S CORRECT.

03:01PM  13    Q.   AND OBVIOUSLY HAVING MILITARY CLIENTS, THERE'S A POTENTIAL

03:01PM  14    SCALE THERE IF YOU'RE TALKING ABOUT THE U.S. MILITARY; CORRECT?

03:01PM  15    A.   YES.

03:01PM  16    Q.   AND YOU WOULD HAVE EXPECTED ANY PHARMACEUTICAL CLIENTS WHO

03:01PM  17    WERE DOING BUSINESS WITH THERANOS TO BE, YOU KNOW, SATISFIED

03:01PM  18    WITH THE WORK AND WOULD HAVE PAID FOR THE WORK; CORRECT?

03:01PM  19    A.   YES.

03:01PM  20    Q.   AND IT WAS REALLY THE RELATIONSHIPS WITH THE

03:01PM  21    PHARMACEUTICAL COMPANIES AT THERANOS THAT WAS ATTRACTIVE.  IS

03:01PM  22    THAT FAIR TO SAY?

03:01PM  23    A.   YES.

03:01PM  24    Q.   PARTICULARLY IF A COMPANY CAME BACK AND DID ADDITIONAL

03:01PM  25    WORK WITH THERANOS MORE THAN ONCE, THAT WOULD HAVE BEEN

03:01PM   1     ATTRACTIVE TO YOU; RIGHT?

03:01PM   2     A.   YES.

03:01PM   3     Q.   BECAUSE IT SUGGESTS THE WORK WAS VALID AND LEGIT; CORRECT?

03:01PM   4     A.   RIGHT.

03:01PM   5     Q.   NOW, YOU ALSO KNEW AT THE TIME IN THIS TIME PERIOD WHEN

03:02PM   6     YOU WERE INTRODUCED TO THERANOS THAT THEY HAD SUBSTANTIAL

03:02PM   7     MILITARY PRESENCE ON THE BOARD OF DIRECTORS AS WELL; RIGHT?

03:02PM   8     A.   I WAS AWARE OF THAT, YES.

03:02PM   9     Q.   OKAY.  AND THAT THEORETICALLY COULD HAVE FACILITATED

03:02PM   10    FUTURE BUSINESS MAYBE WITH THE MILITARY; CORRECT?

03:02PM   11    A.   CORRECT.

03:02PM   12    Q.   AND THAT'S SOMETHING THAT YOU WOULD HAVE HAD IN THE BACK

03:02PM   13    OF YOUR MIND?

03:02PM   14    A.   YES.

03:02PM   15    Q.   NOW, THIS LETTER, AGAIN, THIS IS AUGUST 18TH, 2014, THE

03:02PM   16    FOURTH FULL PARAGRAPH DOWN, "THERANOS HAS NOT ONLY REDUCED TO

03:02PM   17    PRACTICE AND PATENTED ITS COMPREHENSIVE TECHNOLOGICAL AND

03:02PM   18    OPERATIONAL INFRASTRUCTURE OVER THE PAST TEN YEARS."

03:02PM   19         WE'LL STOP THERE.

03:02PM   20         I THINK YOU MENTIONED EARLIER IN YOUR TESTIMONY ON DIRECT

03:02PM   21    THAT YOU'RE AWARE THAT THERANOS HAD SUBSTANTIAL PATENTS

03:02PM   22    PROTECTING ITS PROPRIETARY TECHNOLOGY?

03:02PM   23    A.   I WAS AWARE OF THAT.

03:02PM   24    Q.   AND THAT WAS SOMETHING THAT YOU WOULD HAVE EXPECTED;

03:02PM   25    RIGHT?

03:02PM  1    A.   RIGHT.

03:02PM  2    Q.   AND IT WAS ATTRACTIVE TO YOU THAT THE COMPANY WAS TAKING

03:03PM  3    SERIOUSLY ITS TECHNOLOGY AND TRYING TO PROTECT IT FROM

03:03PM  4    COMPETITORS?

03:03PM  5    A.   YES.

03:03PM  6    Q.   NOW, THAT PARAGRAPH CONTINUES.

03:03PM  7         "BUT ALSO HAD REGULATORY CERTIFICATIONS TO OPERATE

03:03PM  8    COMMERCIALLY, INCLUDING A CLIA-CERTIFIED LABORATORY (THE

03:03PM  9    REGULATORY CERTIFICATION FOR LABS) SINCE 2011."

03:03PM  10        DO YOU SEE THAT?

03:03PM  11   A.   I SEE IT.

03:03PM  12   Q.   AT THE TIME DID YOU UNDERSTAND WHAT CLIA-CERTIFIED

03:03PM  13   LABORATORY MEANT?

03:03PM  14   A.   PROBABLY NOT COMPLETELY.

03:03PM  15   Q.   BUT DID YOU UNDERSTAND THAT IT WAS SOME SORT OF FEDERAL

03:03PM  16   REGULATORY REGIME?

03:03PM  17   A.   I DID.

03:03PM  18   Q.   OKAY.  AND DID THAT GIVE YOU SOME CONFIDENCE THAT THERE

03:03PM  19   WAS A REGULATOR OVERSEEING SOME ELEMENT AT LEAST OF THERANOS'S

03:03PM  20   BUSINESS?

03:03PM  21   A.   CORRECT.

03:03PM  22   Q.   AND THAT ALSO KIND OF VALIDATED THE TECHNOLOGY IN YOUR

03:03PM  23   MIND; CORRECT?

03:03PM  24   A.   YES.

03:03PM  25   Q.   THEN THE LETTER CONTINUES.

03:03PM  1                  "ONCE THE COMPANY WAS READY TO LAUNCH ITS COMMERCIAL

03:03PM  2       LABORATORY AND ANNOUNCED ITS NATIONAL CONTRACT WITH WALGREENS

03:04PM  3       IN THE FALL OF 2013, THERANOS BEGAN OPERATING IN THE CONSUMER,

03:04PM  4       PHYSICIAN, AND HOSPITAL LABORATORY TESTING BUSINESS IN THE

03:04PM  5       U.S."

03:04PM  6            DO YOU SEE THAT?

03:04PM  7       A.   I SEE THAT.

03:04PM  8       Q.   AND I THINK YOU TESTIFIED THAT YOU WERE AWARE WHEN

03:04PM  9       THERANOS LAUNCHED ITS KIND OF COMMERCIAL OFFERING OF BLOOD

03:04PM  10      TESTING IN WALGREENS STORES; CORRECT?

03:04PM  11      A.   YES.

03:04PM  12      Q.   AND THAT WOULD HAVE BEEN THE PRIOR FALL OF 2013; RIGHT?

03:04PM  13      A.   THAT IS CORRECT.

03:04PM  14      Q.   AND WERE YOU MADE AWARE OF THAT AT THE TIME THAT YOU WERE

03:04PM  15      LOOKING INTO THERANOS FOR DR. KISSINGER, OR WERE YOU

03:04PM  16      INDEPENDENTLY AWARE OF SOME OF THE COVERAGE OF THERANOS?

03:04PM  17      A.   I BELIEVE I BECAME AWARE OF IT AFTER I WAS LOOKING AT THE

03:04PM  18      COMPANY AFTER HAVING BEEN INTRODUCED BY DR. KISSINGER.

03:04PM  19      Q.   OKAY.  AND WHEN YOU LEARNED ABOUT THE RELATIONSHIP WITH

03:04PM  20      WALGREENS AND THE PUBLIC LAUNCH, THAT WAS IMPORTANT TO YOUR

03:04PM  21      ULTIMATE DECISION TO INVEST; CORRECT?

03:04PM  22      A.   IT WAS.

03:04PM  23      Q.   AND THE REASON THAT WAS IMPORTANT WAS BECAUSE, ONE, YOU

03:05PM  24      KNEW THAT WALGREENS WAS A SIGNIFICANT NATIONAL AND EVEN

03:05PM  25      INTERNATIONAL RETAILER; CORRECT?

03:05PM   1    A.   THAT'S CORRECT.

03:05PM   2    Q.   WHICH SUGGESTED THAT THEY MAY HAVE HAD THE RESOURCES TO

03:05PM   3    REALLY HELP THERANOS TAKE ITS BUSINESS NATIONWIDE; CORRECT?

03:05PM   4    A.   THAT IS CORRECT.

03:05PM   5    Q.   AND AT THE TIME, DUE TO THAT RELATIONSHIP WITH WALGREENS,

03:05PM   6    YOU WOULD HAVE BELIEVED ANYWAY THAT WALGREENS DID SOME DUE

03:05PM   7    DILIGENCE INTO THERANOS BEFORE ENTERING INTO A CONTRACTUAL

03:05PM   8    RELATIONSHIP?

03:05PM   9         MR. SCHENK:   OBJECTION.   RELEVANCE.

03:05PM   10        THE COURT:   WHY DON'T YOU REPHRASE THAT QUESTION?

03:05PM   11   I'LL SUSTAIN THE OBJECTION.

03:05PM   12   BY MR. CAZARES:

03:05PM   13   Q.   THE RELATIONSHIP WITH WALGREENS WAS IMPORTANT TO YOUR

03:05PM   14   INVESTMENT; RIGHT?

03:05PM   15   A.   YES.

03:05PM   16   Q.   AND ONE ELEMENT WAS BECAUSE YOU BELIEVED THAT A COMPANY

03:05PM   17   LIKE WALGREENS, A LARGE, SOPHISTICATED CORPORATION, WOULD HAVE

03:05PM   18   DONE SOME DUE DILIGENCE BEFORE ENTERING INTO BUSINESS WITH

03:05PM   19   THERANOS; RIGHT?

03:05PM   20        MR. SCHENK:   OBJECTION.   RELEVANCE.

03:05PM   21        THE COURT:   SUSTAINED.

03:05PM   22   YOU CAN ASK ANOTHER QUESTION.

03:06PM   23   BY MR. CAZARES:

03:06PM   24   Q.   NOW, GETTING BACK TO THE LETTER, THIS NEXT TO THE LAST

03:06PM   25   PARAGRAPH, MS. HOLMES WROTE, "ALL CURRENT RESOURCES ARE

03:06PM  1    FOCUSSED ON THIS COMMERCIAL LABORATORY BUSINESS."

03:06PM  2        DO YOU SEE THAT?

03:06PM  3    A.   I DO SEE IT.

03:06PM  4    Q.   "ALL CURRENT RESOURCES ARE FOCUSSED."

03:06PM  5        SO IT WAS FAIR TO SAY THAT MS. HOLMES WAS UP-FRONT

03:06PM  6    REPORTING TO YOU AT THE TIME THAT THERANOS WAS ENTIRELY

03:06PM  7    FOCUSSED ON THE RETAIL ELEMENT OF THEIR BUSINESS; CORRECT?

03:06PM  8    A.   I WOULD NOT HAVE INTERPRETED IT THAT WAY.

03:06PM  9    Q.   OKAY.  BUT THE LETTER SAYS "ALL CURRENT RESOURCES."

03:06PM 10        YOU SEE THAT; RIGHT?

03:06PM 11    A.   BUT THERE'S THE REST OF THE SENTENCE THAT FOLLOWS, "AND

03:06PM 12    FUTURE GROWTH IN PHARMACEUTICAL, MILITARY, AND OTHER BUSINESS."

03:06PM 13    Q.   YEAH, I WAS GOING TO GET TO THAT.

03:06PM 14        THE FIRST PART -- ANYWAY, SHE WRITES, "ALL CURRENT

03:06PM 15    RESOURCES ARE FOCUSSED ON THIS COMMERCIAL LABORATORY BUSINESS."

03:06PM 16        YOU SEE THAT; RIGHT?

03:07PM 17    A.   I DO SEE THOSE WORDS, YES.

03:07PM 18    Q.   AND THEN THE SENTENCE CONTINUES, "AND FUTURE GROWTH IN

03:07PM 19    PHARMACEUTICAL, MILITARY, AND OTHER BUSINESS WILL FOLLOW THE

03:07PM 20    SUCCESSFUL ESTABLISHMENT OF THERANOS'S COMMERCIAL LABORATORY

03:07PM 21    INFRASTRUCTURE."

03:07PM 22        DO YOU SEE THAT?

03:07PM 23    A.   I DO.

03:07PM 24    Q.   OKAY.  NOW, ULTIMATELY I THINK YOU ALREADY TESTIFIED THAT

03:07PM 25    IN THIS LATE SUMMER, EARLY FALL 2013 TIME PERIOD THAT THERANOS

03:07PM 1    HAD 29 RETAIL LOCATIONS IN ARIZONA AND 1 IN CALIFORNIA;

03:07PM 2    CORRECT?

03:07PM 3    A.   CORRECT.

03:07PM 4    Q.   SO THE KIND OF NATIONAL LABORATORY INFRASTRUCTURE HAD NOT

03:07PM 5    YET BEEN ESTABLISHED; CORRECT?

03:07PM 6    A.   SAY THAT AGAIN.

03:07PM 7    Q.   YOU KNEW AT THE TIME THAT THERANOS DID NOT HAVE A NATIONAL

03:07PM 8    FOOTPRINT WITH ITS RETAIL OPERATIONS ACROSS THE UNITED STATES?

03:07PM 9    A.   I UNDERSTOOD THAT WITH RESPECT TO WALGREENS, THEY WERE

03:07PM 10   LOCATED IN 29 IN ARIZONA AND 1 IN PALO ALTO.

03:07PM 11   Q.   AND YOU SEE THAT MS. HOLMES WROTE, "AND FUTURE GROWTH IN

03:08PM 12   PHARMACEUTICAL, MILITARY, AND OTHER BUSINESS WILL FOLLOW THE

03:08PM 13   SUCCESSFUL ESTABLISHMENT OF THERANOS'S COMMERCIAL LABORATORY

03:08PM 14   INFRASTRUCTURE NATIONWIDE."

03:08PM 15        DO YOU SEE THAT?

03:08PM 16   A.   I DO.

03:08PM 17   Q.   AND FAIR TO INTERPRET THAT PHARMACEUTICAL, MILITARY, AND

03:08PM 18   OTHER BUSINESS GROWTH IS GOING TO COME AFTER THE WALGREENS

03:08PM 19   ROLLOUT?

03:08PM 20   A.   OR GROWTH FROM WHERE IT IS TODAY WOULD COME AFTERWARDS,

03:08PM 21   YES.

03:08PM 22   Q.   FAIR ENOUGH.

03:08PM 23        TURNING TO THE TOP OF THE SECOND PAGE, THE PARAGRAPH

03:08PM 24   READS, FROM MS. HOLMES TO YOU, "IN ADDITION TO ITS WALGREENS

03:08PM 25   CONTRACT, THERANOS HAS ENTERED INTO LONG TERM CONTRACTS WITH

03:08PM 1      INSURANCE PROVIDERS, MEDICARE, MEDICAID PROGRAMS, HOSPITAL

03:08PM 2      SYSTEMS AND PHYSICIAN GROUPS."

03:08PM 3          DO YOU SEE THAT?

03:08PM 4      A.   I DO.

03:08PM 5      Q.   DID MS. HOLMES TELL YOU THAT THERANOS HAD ENTERED INTO A

03:08PM 6      CONTRACT TO PROVIDE SERVICES TO UNITED HEALTH PATIENTS?

03:09PM 7      A.   I DON'T REMEMBER THAT SPECIFICALLY.

03:09PM 8      Q.   OKAY.  DID MS. HOLMES TELL YOU THAT THERANOS HAD ENTERED

03:09PM 9      INTO AGREEMENTS WITH THE BLUE CROSS, BLUE SHIELD BUSINESSES TO

03:09PM 10     PROVIDE SERVICES TO INSURED PATIENTS OF THOSE ORGANIZATIONS?

03:09PM 11     A.   I HAVE SOME KNOWLEDGE OF THAT, BUT I DON'T KNOW WHERE IN

03:09PM 12     THE PROCESS SHE TOLD ME THAT.

03:09PM 13     Q.   NOW, YOUR COMMUNICATIONS WITH MS. HOLMES WERE THE PHONE

03:09PM 14     CALL, THE DOCUMENTS, AND I THINK THERE WERE TWO MEETINGS IN

03:09PM 15     OCTOBER OF 2014; IS THAT RIGHT?

03:09PM 16     A.   THAT'S CORRECT.

03:09PM 17     Q.   SO IF YOU LEARNED ABOUT THE BLUE CROSS, BLUE SHIELD

03:09PM 18     RELATIONSHIP, IT WOULD HAVE TAKEN PLACE IN THAT TIME PERIOD?

03:09PM 19     A.   WELL, I OBVIOUSLY KNEW HER AND FOLLOWED THE COMPANY EVEN

03:09PM 20     AFTER THAT PERIOD OF TIME, SO IT COULD HAVE COME AT A LATER

03:09PM 21     DATE.

03:09PM 22     Q.   NOW, AT THE BOTTOM OF THE SECOND PAGE MS. HOLMES WROTE, "I

03:09PM 23     AM HAPPY TO PROVIDE MORE BACKGROUND ON ANY OF THE ABOVE, OR ANY

03:10PM 24     OF THE MATERIALS ENCLOSED IN THIS PACKAGE.  THERANOS'S

03:10PM 25     INVESTMENT DOCUMENTS ARE ENCLOSED HEREIN.  THE ADDITIONAL

03:10PM  1    MATERIALS FOCUS ON THE INFRASTRUCTURE THERANOS HAS DEVELOPED

03:10PM  2    AND INITIAL MARKET OF COMMERCIAL LABORATORY TESTING THAT

03:10PM  3    THERANOS HAS ENTERED."

03:10PM  4        DO YOU SEE THAT?

03:10PM  5    A.   I DO.

03:10PM  6    Q.   SO IT'S FAIR TO SAY THAT MS. HOLMES INVITED YOU TO ASK

03:10PM  7    QUESTIONS RELATING TO THE MATERIALS THAT SHE WAS PROVIDING;

03:10PM  8    CORRECT?

03:10PM  9    A.   YES.

03:10PM  10   Q.   AND YOU FELT FREE TO DO SO?

03:10PM  11   A.   I DID.

03:10PM  12   Q.   AND, IN FACT, IN RELATION TO SOME ISSUES THAT WERE

03:10PM  13   IMPORTANT TO YOU, YOU DID FOLLOW UP; RIGHT?

03:10PM  14   A.   I DID.

03:10PM  15   Q.   IF WE CAN PUT UP ON THE SCREEN -- I THINK IT'S ALREADY IN

03:11PM  16   EVIDENCE, YOUR HONOR -- EXHIBIT 7753?

03:11PM  17             THE COURT:  ALL RIGHT.

03:11PM  18             MR. CAZARES:  7753.  THERE'S AN ATTACHMENT,

03:11PM  19   NUMBER 1.

03:11PM  20   Q.   THIS ISN'T SOMETHING THAT IS GOING TO BE IN YOUR BINDER,

03:11PM  21   MR. MOSLEY.  I APOLOGIZE.  BUT IT WILL BE UP ON THE SCREEN.

03:11PM  22       HOPEFULLY IT'S BLOWN UP LARGE ENOUGH FOR YOU TO SEE THAT.

03:11PM  23       AND YOU SEE UP ON THE SCREEN THERE'S A SPREADSHEET, AN

03:11PM  24   EXCEL SPREADSHEET IDENTIFYING SOME CUSTOMERS ON THE LEFT-HAND

03:11PM  25   COLUMN.

MOSLEY CROSS BY MR. CAZARES

03:11PM  1          DO YOU SEE THAT?

03:11PM  2     A.   I DO.

03:11PM  3     Q.   AND SOME OF THESE NAMES IN THIS COLUMN, THESE ARE FAMILIAR

03:11PM  4     TO YOU; RIGHT?

03:11PM  5     A.   MOST OF THEM ARE, YES.

03:11PM  6     Q.   OKAY.  THESE ARE SOME RELATIVELY LARGE PHARMACEUTICAL

03:11PM  7     COMPANIES IN THE U.S. AND ELSEWHERE; CORRECT?

03:11PM  8     A.   CORRECT.

03:11PM  9     Q.   AND IS IT FAIR TO SAY THAT THIS LIST HERE IS REFLECTIVE OF

03:11PM 10     THE PHARMACEUTICAL RELATIONSHIPS THAT MS. HOLMES DESCRIBED TO

03:11PM 11     YOU?

03:11PM 12     A.   I DON'T REMEMBER WHETHER SHE GAVE ME A SPECIFIC LIST, BUT

03:12PM 13     THESE ARE SIMILAR COMPANIES.  THEY WERE THE COMPANIES THAT I

03:12PM 14     WOULD EXPECT TO BE ON SUCH A REPORT, SUCH A LIST.

03:12PM 15     Q.   AND I THINK BECAUSE YOU INDICATED THAT MS. HOLMES TOLD YOU

03:12PM 16     10 OF THE 15 LARGEST PHARMACEUTICAL COMPANIES; CORRECT?

03:12PM 17     A.   THAT'S CORRECT.

03:12PM 18     Q.   AND MANY OF THESE ARE VERY -- ARE COMPANIES THAT ARE

03:12PM 19     FAMILIAR TO YOU; RIGHT?

03:12PM 20     A.   YES.

03:12PM 21     Q.   FOR EXAMPLE, PFIZER?

03:12PM 22     A.   I DON'T THINK I SEE PFIZER ON THIS LIST.

03:12PM 23     Q.   OKAY.  NOVARTIS?

03:12PM 24     A.   NOVARTIS IS A LARGE PHARMACEUTICAL.

03:12PM 25     Q.   ASTRAZENECA?

03:12PM  1      A.   YES.  SCHERING-PLOUGH.

03:12PM  2      Q.   CELGENE.  OKAY.

03:12PM  3           AND AGAIN, THE RELATIONSHIPS WITH THESE PHARMACEUTICAL

03:12PM  4      COMPANIES WAS IMPORTANT TO YOU; CORRECT?

03:12PM  5      A.   YES.

03:12PM  6      Q.   IN YOUR REVIEW OF MATERIALS RELATING TO THERANOS, YOU HAD

03:13PM  7      A CHANCE TO TAKE A LOOK AT THERANOS'S WEBSITE; CORRECT?

03:13PM  8      A.   I DID, YES.

03:13PM  9      Q.   OKAY.  SO AT SOME POINT PRIOR TO THE TIME OF INVESTING,

03:13PM  10     YOU TOOK A LOOK AROUND JUST TO GATHER WHATEVER INFORMATION YOU

03:13PM  11     COULD GATHER; RIGHT?

03:13PM  12     A.   YES.

03:13PM  13     Q.   IS IT FAIR TO SAY WHATEVER IS IN THE WEBSITE, YOU PROBABLY

03:13PM  14     SAW?  FAIR?

03:13PM  15     A.   I THINK THAT'S LIKELY.

03:13PM  16     Q.   IF YOU CAN TAKE A LOOK AT EXHIBIT 5805.

03:13PM  17          AGAIN, THIS IS ONE OF THOSE ONES ON THE SCREEN.  I KNOW

03:13PM  18     THE HARD COPY MAY BE EASIER, BUT THIS IS WHAT I'VE GOT RIGHT

03:13PM  19     NOW.

03:13PM  20          SO ON THE SCREEN IS AN IMAGE OF THERANOS'S WEBSITE.

03:13PM  21          DO YOU SEE THAT?

03:13PM  22     A.   I SEE IT.

03:13PM  23     Q.   DOES IT LOOK FAMILIAR?

03:13PM  24     A.   IT CERTAINLY LOOKS LIKE THE WEBSITE.

03:13PM  25     Q.   OKAY.  NOW, IF WE GO TO PAGE 2 UNDER THE "GOODBYE, BIG BAD

03:14PM   1    NEEDLE" -- AND YOU REMEMBER MR. SCHENK SHOWED YOU SOME IMAGES

03:14PM   2    FROM THE BINDER THAT YOU WERE SEEING THAT ALSO REFERENCED

03:14PM   3    "GOODBYE, BIG BAD NEEDLE," AND THERE WAS SOME REFERENCE TO A

03:14PM   4    CHILD.

03:14PM   5         DO YOU REMEMBER THAT?

03:14PM   6    A.   I DO.

03:14PM   7    Q.   AND NOW ON THE WEBSITE IT INDICATES, "INSTEAD OF A HUGE

03:14PM   8    NEEDLE, WE CAN USE A TINY FINGERSTICK OR COLLECT A MICRO-SAMPLE

03:14PM   9    FROM A VENOUS DRAW."

03:14PM   10        DO YOU SEE THAT?

03:14PM   11   A.   I SEE THAT.

03:14PM   12   Q.   NOW, YOU INDICATED THAT YOU UNDERSTOOD THERANOS'S CORE

03:14PM   13   BUSINESS TO BE THIS FINGERSTICK TECHNOLOGY; RIGHT?

03:14PM   14   A.   I DID.

03:14PM   15   Q.   OKAY.  BUT YOU ALSO UNDERSTOOD THAT THERE WERE SOME TESTS

03:14PM   16   THAT THERANOS COULD NOT DO YET ON ITS FINGERSTICK TECHNOLOGY;

03:14PM   17   RIGHT?

03:14PM   18   A.   I DID NOT KNOW THAT.

03:14PM   19   Q.   ON THE WEBSITE IT INDICATES THAT SOME TESTS WILL BE RUN

03:14PM   20   USING A VENOUS DRAW.

03:14PM   21        DO YOU SEE THAT?

03:14PM   22   A.   I DO SEE IT.

03:14PM   23   Q.   OKAY.  AND YOU DID LOOK AT THE WEBSITE AT THE TIME;

03:14PM   24   CORRECT?

03:14PM   25   A.   I SAID I DID, YES.

03:14PM   1    Q.   OKAY.  IF WE CAN CONTINUE ON TO PAGE 7 OF THE WEBSITE.

03:15PM   2         AT THE TIME DID YOU HAVE A CHANCE TO TAKE A LOOK AT THE

03:15PM   3    TEST MENU THAT THERANOS POSTED ON ITS WEBSITE?

03:15PM   4    A.   I MAY HAVE, BUT I DON'T REMEMBER IT SPECIFICALLY.

03:15PM   5    Q.   OKAY.  AND YOU SEE THE TESTS, THE PRICING RANGES,

03:15PM   6    SOMETIMES FROM THE SINGLE DOLLAR FIGURES INTO THE 10, $20 RANGE

03:15PM   7    FOR MANY OF THEM.

03:15PM   8         DO YOU SEE THAT?

03:15PM   9    A.   I SEE THAT.

03:15PM   10   Q.   AND ONE OF THE BUSINESS PROPOSITIONS AND VISIONS THAT

03:15PM   11   ELIZABETH COMMUNICATED TO YOU WAS THIS KIND OF PRICING POWER

03:15PM   12   THAT THERANOS WAS GOING TO HAVE COMPARED TO THEIR COMPETITORS,

03:15PM   13   LOWER PRICE, HOPEFULLY LARGER VOLUME OF WORK; RIGHT?

03:15PM   14   A.   CORRECT.

03:15PM   15   Q.   OKAY.  AND IN ORDER TO REALIZE THAT, THE NATIONAL ROLLOUT

03:15PM   16   WOULD REALLY HAVE TO GAIN PENETRATION THROUGH THE WALGREENS

03:16PM   17   STORES, I THINK AS YOU SAID EARLIER TODAY; CORRECT?

03:16PM   18   A.   I SAID THAT, OR HOSPITALS, OR ALL OF THE OTHER PLACES THAT

03:16PM   19   THEY INTENDED TO ROLL OUT.

03:16PM   20   Q.   OKAY.  I THINK YOU SAID YOU UNDERSTOOD THAT THE 2015

03:16PM   21   PROJECTIONS THAT YOU RECEIVED IN THAT BINDER OF DOCUMENTS

03:16PM   22   ASSUMED A SIGNIFICANT PENETRATION IN THE WALGREENS STORES;

03:16PM   23   CORRECT?

03:16PM   24   A.   YEAH.  THERE WAS ONE, ONE REVENUE LINE THAT WAS FOR

03:16PM   25   PHARMACEUTICAL, NOT PHARMACEUTICAL, BUT DRUG STORES, WALGREENS.

03:16PM  1    Q.   OKAY.  AND AGAIN, YOU UNDERSTOOD THAT THAT WAS DEPENDENT

03:16PM  2    UPON NATIONWIDE PENETRATION IN WALGREENS STORES; CORRECT?

03:16PM  3    A.   AGAIN, I HAD NO PARTICULAR KNOWLEDGE CERTAINLY AT THE TIME

03:16PM  4    WHAT LEVEL OF PENETRATION THAT REQUIRED.  I DID NOT KNOW THAT.

03:16PM  5    Q.   BUT YOU COULD HAVE ASKED; RIGHT?

03:16PM  6    A.   YES.

03:16PM  7    Q.   BUT YOU DID KNOW THERE WERE ABOUT 30 STORES IN OCTOBER OF

03:17PM  8    2013; RIGHT?

03:17PM  9    A.   I DID.

03:17PM  10   Q.   YOU CAN TAKE THAT DOWN, MR. ALLEN.

03:17PM  11       NOW, ONE OF THE ITEMS THAT MR. SCHENK SHOWED YOU IN YOUR

03:17PM  12   DIRECT WAS THIS JOHNS HOPKINS REPORT.

03:17PM  13       DO YOU REMEMBER THAT?

03:17PM  14   A.   I DO.

03:17PM  15   Q.   AND IF YOU COULD PUT UP ON THE SCREEN 20553, WHICH IS

03:17PM  16   ALREADY IN EVIDENCE.

03:17PM  17       AND IF WE CAN GO TO PAGE 2.

03:17PM  18       THIS IS A COPY OF THE JOHNS HOPKINS REPORT THAT YOU

03:17PM  19   TESTIFIED ABOUT EARLIER TODAY; RIGHT?

03:17PM  20   A.   IT IS.

03:17PM  21   Q.   OKAY.  AND YOU'RE VERY FAMILIAR WITH WHAT JOHNS HOPKINS

03:17PM  22   IS, ONE OF THE FOREMOST MEDICAL INSTITUTIONS IN THE COUNTRY;

03:18PM  23   RIGHT?

03:18PM  24   A.   I'M FAMILIAR WITH IT, YES.

03:18PM  25   Q.   OKAY.  AND YOU KNEW FROM EXPERIENCE THAT A COMPANY LIKE

03:18PM   1    WALGREENS WOULD DO EXTENSIVE DUE DILIGENCE BEFORE ENGAGING IN

03:18PM   2    BUSINESS WITH THERANOS; RIGHT?

03:18PM   3              MR. SCHENK:  YOUR HONOR, OBJECTION.  RELEVANCE.

03:18PM   4              THE COURT:  SUSTAINED.

03:18PM   5    BY MR. CAZARES:

03:18PM   6    Q.  YOU WERE AWARE THAT WALGREENS HAD ENGAGED JOHNS HOPKINS TO

03:18PM   7    EVALUATE THERANOS; CORRECT?

03:18PM   8    A.  I HAD CERTAINLY READ THIS REPORT, CORRECT.

03:18PM   9    Q.  NOW, IF WE GO TO THE BOTTOM OF THE REPORT, THE SECOND

03:18PM  10    PAGE, UNDER DISCLAIMER, DO YOU SEE THE DISCLAIMER ON THIS

03:18PM  11    REPORT SAYS, "THIS INFORMATION IS BEING PROVIDED SOLELY FOR THE

03:18PM  12    BENEFIT OF WALGREENS AND SHALL BE USED BY WALGREENS FOR ITS

03:18PM  13    INTERNAL PURPOSES ONLY.  IN ADDITION, THE MATERIALS PROVIDED IN

03:18PM  14    NO WAY SIGNIFY AN ENDORSEMENT BY JOHNS HOPKINS TO ANY PRODUCT

03:18PM  15    OR SERVICE."

03:18PM  16        DO YOU SEE THAT?

03:18PM  17    A.  I DO.

03:18PM  18    Q.  AND THAT'S HOW YOU LEARNED THAT THE REPORT WAS PREPARED

03:18PM  19    FOR WALGREENS AND NOT FOR THERANOS; CORRECT?

03:19PM  20    A.  I'M NOT SURE THAT'S HOW I CAME TO BELIEVE IT WAS PREPARED

03:19PM  21    FOR WALGREENS.  I MEAN, I SEE THE DISCLAIMER, BUT I DON'T THINK

03:19PM  22    I WOULD HAVE FOCUSSED ON THAT WORDING AND MADE THAT CONCLUSION

03:19PM  23    FROM THAT WORDING.

03:19PM  24    Q.  OKAY.  BUT THE DOCUMENT, I'M READING IT CORRECTLY, RIGHT?

03:19PM  25    IT SAYS, "THIS INFORMATION IS BEING PROVIDED SOLELY FOR THE

03:19PM 1      BENEFIT OF WALGREENS"?

03:19PM 2      A.   IT DOES SAY THAT, YES.

03:19PM 3      Q.   OKAY.  AND THEN GETTING BACK TO THE FIRST PAGE OF THE

03:19PM 4      REPORT UNDER MEETING OBJECTIVES, DO YOU SEE THE REPORT THAT YOU

03:19PM 5      READ SAID, "HOPKINS TEAM WAS ASKED TO COMMENT ON VALIDITY AND

03:19PM 6      USEFULNESS OF THERANOS'S PRODUCT."

03:19PM 7           DO YOU SEE THAT?

03:19PM 8      A.   I DO.

03:19PM 9      Q.   AND IT SAYS, "SPECIFICALLY RELATED TO THE SCIENCE THAT

03:19PM 10     SUPPORTS THE TECHNOLOGY AND THE APPLICATION OF THE TECHNOLOGY."

03:20PM 11          DO YOU SEE THAT?

03:20PM 12     A.   I DO.

03:20PM 13     Q.   AND IT SAYS, "IN A VARIETY OF SETTINGS INCLUDING HOSPITAL,

03:20PM 14     CLINIC, LABORATORY, AND POTENTIALLY WITHIN WALGREENS AS AN ADD

03:20PM 15     ON TO THE CLINICAL PROGRAMS AND RETAIL PHARMACY BUSINESS."

03:20PM 16          DO YOU SEE THAT?

03:20PM 17     A.   I DO.

03:20PM 18     Q.   NOW, THE DATE OF THE REPORT IS APRIL 27, 2010.

03:20PM 19          DID YOU NOTICE THAT WHEN YOU REVIEWED IT?

03:20PM 20     A.   I MAY OR MAY NOT.  I DON'T REMEMBER.

03:20PM 21     Q.   OKAY.  BUT APRIL 2010, THAT WAS MORE THAN FOUR YEARS

03:20PM 22     BEFORE YOU HAD YOUR INTRODUCTION TO THERANOS IN THE SUMMER OF

03:20PM 23     2014; RIGHT?

03:20PM 24     A.   THAT IS CORRECT.

03:20PM 25     Q.   OKAY.  AND YOU WOULD HAVE EXPECTED THERANOS TO DEVELOP

03:20PM 1    ADDITIONAL TECHNOLOGY AND FURTHER ADVANCE ITS TECHNOLOGY SINCE

03:20PM 2    2010; RIGHT?

03:20PM 3    A.   I PROBABLY WOULD HAVE ASSUMED IT WAS LIKELY.

03:20PM 4    Q.   IN ORDER FOR THERE ULTIMATELY TO BE A ROLLOUT WITH

03:20PM 5    WALGREENS STORES; RIGHT?

03:20PM 6    A.   I DIDN'T HAVE ANY PARTICULAR KNOWLEDGE ABOUT THAT.

03:20PM 7    Q.   OKAY.  AND THEN THE JOHNS HOPKINS REPORT CONTINUES.

03:20PM 8        UNDER METHODOLOGY, IT DESCRIBES, "THE HOPKINS TEAM

03:21PM 9    REVIEWED PROPRIETARY DATA ON TEST PERFORMANCE FOR ROUTINE TESTS

03:21PM 10   (CLINICAL PATHOLOGY, HEMATOLOGY, AND SPECIAL TESTS)."

03:21PM 11       DO YOU SEE THAT?

03:21PM 12   A.   I DO.

03:21PM 13   Q.   AND THEN "THERANOS PRESENTED ADDITIONAL DATA ON

03:21PM 14   TECHNOLOGY, TEST PERFORMANCE, AND BUSINESS VISION -- AND

03:21PM 15   DEMONSTRATED TECHNOLOGY ON SITE."

03:21PM 16       DO YOU SEE THAT?

03:21PM 17   A.   I DO.

03:21PM 18   Q.   AND, AGAIN, THE OPINIONS STATED IN THE REPORT WERE

03:21PM 19   IMPORTANT TO YOUR INVESTMENT DECISION; RIGHT?

03:21PM 20   A.   THEY WERE.

03:21PM 21   Q.   AND THEN YOU SEE ON THE NEXT BULLET ON THE REPORT IT

03:21PM 22   STATES, "DR. ROSAN COMMENTED ON WALGREENS PRELIMINARY STRATEGY

03:21PM 23   TO EXPLORE EXPANDING INTO THE LABORATORY SPACE, EXPANDING ITS

03:21PM 24   HEALTH SERVICES OFFERINGS TO INCLUDE LAB AND PATHOLOGY TESTING

03:21PM 25   WITHIN WALGREENS RETAIL SPACE."

03:21PM   1          DO YOU SEE THAT?

03:21PM   2     A.   I DO.

03:21PM   3     Q.   AND SOME OF THIS INFORMATION IN THE WALGREENS REPORT YOU

03:22PM   4     IDENTIFIED IN THAT MEMO THAT YOU SENT TO DR. KISSINGER;

03:22PM   5     CORRECT?

03:22PM   6     A.   I DID.

03:22PM   7     Q.   AND YOU QUOTED SOME OF THE JOHNS HOPKINS REPORT TO

03:22PM   8     DR. KISSINGER, AGAIN, BECAUSE YOU RECOGNIZED JOHNS HOPKINS IS A

03:22PM   9     WELL RESPECTED MEDICAL INSTITUTION; CORRECT?

03:22PM   10    A.   THAT IS CORRECT.

03:22PM   11    Q.   AND AN EXTERNAL PARTY TO THERANOS; CORRECT?

03:22PM   12    A.   CORRECT.

03:22PM   13    Q.   IF WE CAN TAKE A LOOK AT EXHIBIT 14118, AND THAT SHOULD BE

03:23PM   14    IN THE DARKER BINDER THAT I SET ON THE TABLE WITH A GREEN AND

03:23PM   15    WHITE LABEL, 14118.

03:23PM   16          THE COURT:  IS THIS A NEW BINDER?

03:23PM   17          MR. CAZARES:  OH, NO.  DID I NOT GIVE YOU YOUR

03:23PM   18    BINDER, YOUR HONOR?  I APOLOGIZE.  SORRY ABOUT THAT.

03:23PM   19          THE COURT:  YES.  SURE.

03:23PM   20          MR. CAZARES:  (HANDING.)

03:23PM   21    Q.   HAVE YOU HAD A CHANCE TO TAKE A LOOK AT 14118, MR. MOSLEY?

03:24PM   22    A.   I HAVE.

03:24PM   23    Q.   AND IT APPEARS TO BE AN EMAIL CHAIN, THE LATTER OF WHICH

03:24PM   24    IS DATED 8-21-2014.

03:24PM   25          DO YOU SEE THAT AT THE TOP OF THE PAGE?

03:24PM  1    A.   I DO.

03:24PM  2    Q.   AND THIS LAST MESSAGE IS FROM MS. HOLMES TO YOURSELF,

03:24PM  3    COPYING A DAN EDLIN.

03:24PM  4         DO YOU SEE THAT?

03:24PM  5    A.   I DO.

03:24PM  6    Q.   AND THE SUBJECT MATTER IS BLANK CDA.

03:24PM  7         DO YOU SEE THAT?

03:24PM  8    A.   I DO.

03:24PM  9              MR. CAZARES:  MOVE TO ADMIT 14118, YOUR HONOR.

03:24PM  10             MR. SCHENK:  NO OBJECTION.

03:24PM  11             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:24PM  12        (DEFENDANT'S EXHIBIT 14118 WAS RECEIVED IN EVIDENCE.)

03:24PM  13   BY MR. CAZARES:

03:24PM  14   Q.   SO TAKING A LOOK AT THE EARLIEST OF THE MESSAGES IN THE

03:24PM  15   CHAIN ON PAGE 2 AT THE TOP OF THE SECOND PAGE.

03:24PM  16        AND IT'S ALSO UP ON THE SCREEN, MR. MOSLEY.

03:24PM  17        AND IT'S A MESSAGE DATED 8-19-2014.  THIS ONE ACTUALLY

03:25PM  18   STARTS ON THE BOTTOM OF THE FIRST PAGE -- I APOLOGIZE -- FROM

03:25PM  19   MS. HOLMES TO YOURSELF AND COPYING MR. EDLIN.

03:25PM  20        DO YOU SEE THAT?

03:25PM  21   A.   I SEE IT.

03:25PM  22   Q.   OKAY.  AND MS. HOLMES WROTE, "DAN:  IT WAS GREAT TO

03:25PM  23   CONNECT YESTERDAY.

03:25PM  24        "PLEASE FIND OUR CDA ATTACHED.  MATERIALS ARE FOLLOWING BY

03:25PM  25   MAIL.

MOSLEY CROSS BY MR. CAZARES

03:25PM 1          "I'M LOOKING FORWARD TO OUR NEXT CONVERSATION."

03:25PM 2          DO YOU SEE THAT?

03:25PM 3     A.   I DO.

03:25PM 4     Q.   AND DO YOU UNDERSTAND THE CDA TO BE A CONFIDENTIAL

03:25PM 5     DISCLOSURE AGREEMENT?

03:25PM 6     A.   I DO.

03:25PM 7     Q.   AND PRIOR TO YOUR RELATIONSHIP WITH THERANOS, YOU HAD

03:25PM 8     ENGAGED IN EXECUTING CONFIDENTIALITY AGREEMENTS IN RELATIONSHIP

03:25PM 9     WITH BUSINESS IN THE PAST; RIGHT?

03:25PM 10    A.   YES.

03:25PM 11    Q.   AND WHEN YOU SIGNED THE CDA, YOU'RE KIND OF AGREEING TO

03:25PM 12    KEEP THINGS CONFIDENTIAL; CORRECT?

03:25PM 13    A.   THAT IS CORRECT.

03:25PM 14    Q.   FOR THE BENEFIT OF THE PARTIES; CORRECT?

03:25PM 15    A.   YES.

03:25PM 16    Q.   AND CONTINUING IN THE EMAIL CHAIN ON THE BOTTOM OF PAGE 1,

03:26PM 17    IT LOOKS LIKE YOU RESPONDED ON AUGUST 20TH OF 2014.

03:26PM 18         DO YOU SEE THAT?

03:26PM 19    A.   I DO.

03:26PM 20    Q.   AND IT APPEARS THAT YOU WROTE, "IT WAS GREAT TO CONNECT

03:26PM 21    WITH YOU AS WELL.

03:26PM 22         "I FULLY UNDERSTAND THE IMPORTANCE OF THE CDA."

03:26PM 23         AND THAT WAS CORRECT; RIGHT?

03:26PM 24    A.   THAT'S WHAT IT SAYS.

03:26PM 25    Q.   YOU UNDERSTOOD THAT AT THE TIME; RIGHT?

03:26PM  1    A.   I UNDERSTOOD THE IMPORTANCE OF THE CDA?  YES, I DID.

03:26PM  2    Q.   OKAY.  AND YOU WROTE, "IT IS A VERY BALANCED AND

03:26PM  3    REASONABLE DOCUMENT."

03:26PM  4         RIGHT?

03:26PM  5    A.   YES.

03:26PM  6    Q.   AND YOU DIDN'T SEE ANYTHING UNUSUAL ABOUT THERANOS

03:26PM  7    REQUESTING A CDA FROM YOU?

03:26PM  8    A.   I DID NOT.

03:26PM  9    Q.   AND THEN YOU CONTINUE THAT YOU WILL PROCEED TO GET IT

03:26PM  10   SIGNED BY THE STAVROS NIARCHOS FOUNDATION, AND ANYONE AT THAT

03:26PM  11   ORGANIZATION WILL HAVE A CHANCE TO REVIEW THE MATERIALS AND

03:26PM  12   GREG PENNER AND ANYONE ELSE IN OR WITH THE WALTON FAMILY WHO

03:26PM  13   WILL SEE THE MATERIALS.

03:26PM  14        AND YOU SAID YOU WOULD SIGN IT YOURSELF; CORRECT?

03:26PM  15   A.   I DID.

03:26PM  16   Q.   AND YOU ULTIMATELY DID SIGN THE CDA; RIGHT?

03:27PM  17   A.   YES, I DID.

03:27PM  18   Q.   AND THE CDA FACILITATED YOUR RECEIPT OF INFORMATION FROM

03:27PM  19   THERANOS; RIGHT?

03:27PM  20   A.   THAT IS CORRECT.

03:27PM  21   Q.   AND UP UNTIL THIS POINT, AUGUST OF 2014, YOU HAD NO

03:27PM  22   CONVERSATIONS OR COMMUNICATIONS WITH MR. BALWANI; CORRECT?

03:27PM  23   A.   I HAD NOT.

03:27PM  24   Q.   AND THEN IT LOOKS LIKE, CONTINUING ON THE CHAIN, IT LOOKS

03:27PM  25   LIKE YOU RETURNED THE CDA'S SIGNED BY SOME OF YOUR CLIENTS AND

03:27PM   1    YOURSELF, AND THEN MS. HOLMES WROTE SHE "LOOKS FORWARD TO OUR

03:27PM   2    NEXT CONVERSATION."

03:27PM   3         DO YOU SEE THAT?

03:27PM   4    A.   I DO.

03:27PM   5    Q.   AND AS A RESULT OF SIGNING THE CDA, YOU ALSO RECEIVED THAT

03:27PM   6    BINDER OF DOCUMENTS FROM MS. HOLMES; CORRECT?

03:27PM   7    A.   THAT IS CORRECT.

03:27PM   8    Q.   AND THAT'S SOME OF WHAT YOU DISCUSSED WITH MR. SCHENK

03:27PM   9    EARLIER TODAY; RIGHT?

03:27PM   10   A.   I DID.

03:27PM   11   Q.   NOW, IF WE CAN TAKE A LOOK AT EXHIBIT 3387, WHICH IS THE

03:28PM   12   PACKET OF DOCUMENTS FROM THE INVESTOR BINDER.

03:28PM   13   A.   OKAY.

03:28PM   14   Q.   AND IF WE CAN TAKE A LOOK AT PAGE 280, WHICH IS THE PAGE

03:28PM   15   AT THE BOTTOM OF THE DOCUMENT.  IT'S ALSO UP ON THE SCREEN,

03:28PM   16   SIR.

03:29PM   17   A.   OKAY.  I HAVE IT.

03:29PM   18   Q.   AND, AGAIN, THE DOCUMENT IN THE INVESTOR PACKET THAT YOU

03:29PM   19   RECEIVED ON THIS PAGE, 280, APPEARS TO READ, "THERANOS'S

03:29PM   20   PROPRIETARY, PATENTED TECHNOLOGY RUNS COMPREHENSIVE BLOOD TESTS

03:29PM   21   FROM A FINGERSTICK AND TESTS FROM MICRO-SAMPLES OF OTHER

03:29PM   22   MATRICES AND GENERATES SIGNIFICANTLY HIGHER INTEGRITY DATA THAN

03:29PM   23   CURRENTLY POSSIBLE."

03:29PM   24        DO YOU SEE THAT?

03:29PM   25   A.   I DO.

03:29PM 1    Q.   AND YOU REVIEWED THE INVESTOR MATERIALS YOU RECEIVED;

03:29PM 2    RIGHT?

03:29PM 3    A.   YES, I DID.

03:29PM 4    Q.   AND YOU EVEN CITED MUCH OF IT IN THE MEMO YOU WROTE TO

03:29PM 5    DR. KISSINGER; RIGHT?

03:29PM 6    A.   I CITED SOME PARTS OF IT, YES.

03:29PM 7    Q.   AND THE DOCUMENTATION INDICATES THAT THERANOS RUNS

03:29PM 8    COMPREHENSIVE BLOOD TESTS FROM FINGERSTICK AND TESTS FROM

03:29PM 9    OTHER -- FROM MICRO-SAMPLES OF OTHER MATRICES.

03:29PM 10        DO YOU SEE THAT?

03:29PM 11   A.   I DO.

03:29PM 12   Q.   AND SO FINGERSTICK WAS NOT THE ONLY MATRICES THAT THERANOS

03:29PM 13   TESTED WITH ITS DEVICES; RIGHT?

03:29PM 14           MR. SCHENK:  OBJECTION.  MISSTATES THE DOCUMENT.

03:29PM 15           THE COURT:  YOU'RE ASKING IF HE HAS KNOWLEDGE OF

03:29PM 16   THAT, PERSONAL KNOWLEDGE?

03:30PM 17   BY MR. CAZARES:

03:30PM 18   Q.   DID YOU UNDERSTAND THE DISCLOSURE INDICATED ON PAGE 280 TO

03:30PM 19   BE INFORMING THE READER THAT THERANOS'S ANALYZERS TEST

03:30PM 20   DIFFERENT MATRICES BEYOND JUST A FINGERSTICK?

03:30PM 21   A.   I DID UNDERSTAND THAT THEY COULD TEST OTHER TYPES OF

03:30PM 22   SAMPLES, YES.

03:30PM 23   Q.   AND IF WE CAN TURN TO PAGE 281 OF 3387.

03:30PM 24        NOW, 281 ON EXHIBIT 3387 IDENTIFIES THE MEMBERS OF THE

03:30PM 25   BOARD OF DIRECTORS FOR THERANOS AT THE TIME.

03:30PM   1        DO YOU SEE THAT?

03:30PM   2   A.   I SEE IT.

03:30PM   3   Q.   AND WHEN YOU LEARNED ABOUT -- WELL, LET ME STOP YOU.

03:30PM   4        BEFORE YOU RECEIVED THE DOCUMENTATION FROM MS. HOLMES

03:30PM   5   REFLECTED IN THIS EXHIBIT, DID YOU KNOW WHO THE MEMBERS OF THE

03:31PM   6   BOARD OF DIRECTORS AT THERANOS WERE, BEYOND DR. KISSINGER?

03:31PM   7   A.   I THINK I WAS AWARE OF SOME OF THESE MEMBERS, BUT I

03:31PM   8   PROBABLY WASN'T AWARE OF ALL OF THEM.

03:31PM   9   Q.   OKAY.  AND CORRECT ME IF I'M WRONG, BUT EACH OF THE

03:31PM  10   INDIVIDUALS ON THIS LIST YOU WERE FAMILIAR WITH SEPARATE AND

03:31PM  11   APART FROM THERANOS; CORRECT?

03:31PM  12   A.   MOST ALL OF THEM, YES.

03:31PM  13   Q.   OKAY.  GEORGE SHULTZ, FORMER SECRETARY OF STATE, YOU WERE

03:31PM  14   FAMILIAR WITH HIM?

03:31PM  15   A.   YES.

03:31PM  16   Q.   AND GARY ROUGHEAD, FORMER UNITED STATES ADMIRAL AND CHIEF

03:31PM  17   OF NAVAL OPERATIONS?

03:31PM  18   A.   I'M NOT SURE I WAS FAMILIAR WITH HIM.

03:31PM  19   Q.   BUT SENIOR OFFICER IN THE U.S. MILITARY, THAT WAS A

03:31PM  20   POSITIVE; CORRECT?

03:31PM  21   A.   YES.

03:31PM  22   Q.   DUE TO THE POTENTIAL DOD RELATIONSHIPS?

03:31PM  23   A.   YES.

03:31PM  24   Q.   AND THEN WILLIAM J. PERRY, MICHAEL AND BARBARA BERBERIAN

03:31PM  25   PROFESSOR AT STANFORD, FORMER U.S. SECRETARY OF DEFENSE?  WERE

03:31PM 1     YOU FAMILIAR WITH MR. PERRY?

03:31PM 2     A.   YES, I WAS.

03:32PM 3     Q.   AND SAM NUNN?

03:32PM 4     A.   YES.

03:32PM 5     Q.   YOU'RE FAMILIAR WITH HIM AS WELL?

03:32PM 6     A.   YES.

03:32PM 7     Q.   RICHARD KOVACEVICH?

03:32PM 8     A.   KOVACEVICH.

03:32PM 9     Q.   KOVACEVICH.  THANK YOU FOR CORRECTING ME.

03:32PM 10         GENERAL MATTIS?

03:32PM 11    A.   YES.

03:32PM 12    Q.   FAIR TO SAY IT WAS AN IMPRESSIVE BOARD OF DIRECTORS?

03:32PM 13    A.   IT WAS.

03:32PM 14    Q.   AND THAT ALSO CONTRIBUTED TO YOUR DECISION TO INVEST;

03:32PM 15    CORRECT?

03:32PM 16    A.   YES.

03:32PM 17    Q.   AND AT THE TIME YOU RECEIVED THESE INVESTOR MATERIALS, YOU

03:32PM 18    REALLY DIDN'T KNOW ANYTHING ABOUT MR. BALWANI'S BACKGROUND;

03:32PM 19    CORRECT?

03:32PM 20    A.   I DID NOT.

03:32PM 21    Q.   AND IF WE CAN TURN TO PAGE 289 OF 3387.

03:32PM 22         NOW, AT THIS PAGE OF THE INVESTOR MATERIALS YOU RECEIVED,

03:33PM 23    THERE'S A DESCRIPTION OF OVERVIEW OF CURRENT LABORATORY MARKET.

03:33PM 24         DO YOU SEE THAT?

03:33PM 25    A.   I SEE IT.

03:33PM   1    Q.   AND AGAIN, THERE'S A DESCRIPTION OF THE FIRST BULLET,

03:33PM   2    "DECADES OLD BUSINESS PROCESSES -- AND TECHNOLOGY INVESTMENTS

03:33PM   3    AROUND THOSE BUSINESS PROCESSES -- WITH VERY LITTLE MOTIVATION

03:33PM   4    TO INNOVATE, HAS CREATED A DUOPOLY OF BUSINESSES BURDENED WITH

03:33PM   5    INFRASTRUCTURE COSTS AND LITTLE TO NO R&D."

03:33PM   6         DO YOU SEE THAT?

03:33PM   7    A.   I SEE THE STATEMENT, YES.

03:33PM   8    Q.   AT THE TIME THAT YOU WERE DOING THIS REVIEW AND LEARNING

03:33PM   9    ABOUT THERANOS PRIOR TO INVESTING, YOU CAME TO UNDERSTAND THAT

03:33PM   10   THE PRIMARY PLAYERS IN THE U.S. LAB MARKET WERE LABCORP AND

03:33PM   11   QUEST; CORRECT?

03:33PM   12   A.   YES, I DID.

03:33PM   13   Q.   AND THOSE WERE LARGE PUBLIC COMPANIES; CORRECT?

03:33PM   14   A.   YES.

03:33PM   15   Q.   AND YOU VIEWED AS ATTRACTIVE THERANOS'S OPPORTUNITY TO

03:33PM   16   POSSIBLY TAKE MARKET SHARE FROM LABCORP AND QUEST; CORRECT?

03:34PM   17   A.   YES.

03:34PM   18   Q.   AND THAT MOTIVATED THE INVESTMENT?

03:34PM   19   A.   IT WAS A FACTOR.

03:34PM   20   Q.   IN PARTICULAR, DUE TO THIS PRICING OPPORTUNITY THAT

03:34PM   21   THERANOS INTENDED TO PURSUE; IS THAT RIGHT?

03:34PM   22   A.   YES.

03:34PM   23   Q.   NOW IF YOU CAN TURN TO PAGE 299 OF THE PRESENTATION.

03:34PM   24        299 OF EXHIBIT 3387.

03:34PM   25        I THINK YOU WERE SHOWN SOME OF THIS BY MR. SCHENK.

MOSLEY CROSS BY MR. CAZARES

03:34PM   1          AND, YOU KNOW, IT DESCRIBES "SAME TESTS, A WHOLE NEW

03:34PM   2    APPROACH."

03:34PM   3          DO YOU SEE THAT?

03:35PM   4          PAGE 299?

03:35PM   5    A.   I SEE IT, YES.

03:35PM   6    Q.   AND ON THIS PAGE OF THE DOCUMENT MATERIALS, IT SAYS,

03:35PM   7    "THERANOS RUNS ANY TEST AVAILABLE IN CENTRAL LABORATORIES, AND

03:35PM   8    PROCESSES ALL SAMPLE TYPES."

03:35PM   9          DO YOU SEE THAT?

03:35PM   10   A.   I DO.

03:35PM   11   Q.   NOW, DO YOU RECALL BEING TOLD AT VARIOUS TIMES BY

03:35PM   12   MS. HOLMES THAT THERANOS COULD NOT DO ALL TESTS ON ITS OWN

03:35PM   13   TECHNOLOGY?

03:35PM   14   A.   I DO NOT RECALL BEING TOLD THAT.

03:35PM   15   Q.   IF YOU COULD TAKE A LOOK IN -- I LEFT ANOTHER BINDER NEAR

03:35PM   16   YOUR FEET, I THINK TO THE RIGHT THERE.

03:35PM   17   A.   YEAH, THIS ONE?  VOLUME 2 (INDICATING)?

03:35PM   18   Q.   YES.

03:35PM   19          IF YOU COULD TAKE A LOOK AT EXHIBIT 28040, 28040.  IF YOU

03:36PM   20   COULD LOOK AT PAGE 132.

03:36PM   21   A.   OKAY.

03:36PM   22   Q.   AND DO YOU RECALL BEING DEPOSED IN SOME LITIGATION RELATED

03:36PM   23   TO THIS INVESTIGATION AND THERANOS?

03:36PM   24   A.   I DO.

03:36PM   25   Q.   AND AT THE TIME YOU WERE DEPOSED, YOU WERE ASKED QUESTIONS

03:36PM   1    ABOUT THERANOS; CORRECT?

03:36PM   2    A.   I WAS.

03:36PM   3    Q.   AND THE QUESTIONS -- YOU WERE DEPOSED UNDER OATH; CORRECT?

03:36PM   4    A.   I WAS.

03:36PM   5    Q.   AND YOU DID YOUR BEST TO TELL THE TRUTH AT THE TIME?

03:36PM   6    A.   YES, I DID.

03:36PM   7    Q.   AND IF YOU COULD TAKE A LOOK AT LINES 16 TO 23 AT

03:36PM   8    PAGE 132.

03:37PM   9    A.   I SEE IT.

03:37PM   10   Q.   AND DOES THAT REFRESH YOUR RECOLLECTION THAT YOU WERE TOLD

03:37PM   11   THAT THERANOS COULD NOT DO ALL TESTS ON ITS OWN FINGERSTICK

03:37PM   12   TECHNOLOGY?

03:37PM   13   A.   I DON'T BELIEVE IT SAYS THAT.

03:37PM   14   Q.   AND YOU DON'T RECALL BEING TOLD THAT?

03:37PM   15   A.   I DO RECALL BEING TOLD THIS, BUT -- I DO RECALL BEING TOLD

03:37PM   16   WHAT I SAID RIGHT HERE, BUT I DON'T -- I DON'T INTERPRET WHAT

03:37PM   17   YOU'RE SAYING TO BE CONSISTENT WITH IT.

03:37PM   18   Q.   SO YOU WERE TOLD THAT THERANOS AT VARIOUS TIMES --

03:37PM   19             MR. SCHENK:  EXCUSE ME.  OBJECTION.

03:37PM   20             THE COURT:  EXCUSE ME.  ARE WE ON THE SAME PAGE?

03:37PM   21             MR. CAZARES:  YES, SIR.

03:37PM   22             THE WITNESS:  MAYBE WE'RE NOT.  PAGE 132?

03:37PM   23             MR. CAZARES:  132, LINES 16 TO 23.

03:37PM   24             THE COURT:  28040?

03:38PM   25             MR. CAZARES:  YES.  I'M NOT SURE I HAVE THE RIGHT

03:38PM   1    CITE.  I'LL MOVE ON, YOUR HONOR.

03:38PM   2              MR. SCHENK:  YOUR HONOR, I WOULD MOVE THEN TO STRIKE

03:38PM   3    THE PRIOR QUESTIONS ABOUT PRIOR TESTIMONY.

03:38PM   4              MR. CAZARES:  NO OBJECTION.

03:38PM   5              THE COURT:  THE PRIOR QUESTION AND ANY ANSWER,

03:38PM   6    COLLOQUY, IS STRICKEN, LADIES AND GENTLEMEN.

03:38PM   7    BY MR. CAZARES:

03:38PM   8    Q.  IF YOU COULD PUT UP ON THE SCREEN PAGE 310 OF 3387.

03:39PM   9         NOW, IN THE SAME INVESTMENT BINDER THAT YOU WERE PROVIDED

03:39PM  10    BY MS. HOLMES ON THIS PAGE WAS A DESCRIPTION OF "NATIONAL

03:39PM  11    RETAIL FOOTPRINT AND HEALTH PLAN PARTNERSHIPS THROUGHOUT THE

03:39PM  12    UNITED STATES FOR AN UNPRECEDENTED INFRASTRUCTURE WHICH EXCEEDS

03:39PM  13    THAT OF ANY COMMERCIAL LABORATORY IN TODAY'S MARKET."

03:39PM  14         DO YOU SEE THAT?

03:39PM  15    A.  I SEE IT BUT I'M NOT SURE WHAT BOOK WE'RE IN.

03:39PM  16    Q.  IT'S 3387.  I'M NO LONGER IN THE STATEMENTS BOOK, SIR.

03:39PM  17    A.  OH, OKAY.

03:39PM  18    Q.  SORRY ABOUT THAT.  I DIDN'T MEAN TO RUSH YOU.

03:39PM  19         SO WE'RE BACK INTO DOCUMENT 3387 --

03:39PM  20    A.  YES.

03:39PM  21    Q.  -- WHICH IS THE INVESTOR BINDER?

03:39PM  22    A.  WHAT PAGE?

03:39PM  23    Q.  AND WE ARE AT PAGE 310.

03:39PM  24    A.  I SEE IT.

03:39PM  25    Q.  AND IT'S ALSO UP ON THE SCREEN.

MOSLEY CROSS BY MR. CAZARES

03:39PM  1          AND ON THIS PAGE IT DESCRIBES "NATIONAL RETAIL FOOTPRINT

03:40PM  2     AND HEALTH PLAN PARTNERSHIPS THROUGHOUT THE UNITED STATES FOR

03:40PM  3     AN UNPRECEDENTED INFRASTRUCTURE WHICH EXCEEDS THAT OF ANY

03:40PM  4     COMMERCIAL LABORATORY IN TODAY'S MARKET."

03:40PM  5          DO YOU SEE THAT?

03:40PM  6     A.   I DO.

03:40PM  7     Q.   AND NOW, YOU UNDERSTAND THIS WAS FUTURE LOOKING

03:40PM  8     PERSPECTIVE AND IT WASN'T A DESCRIPTION OF THERANOS'S THEN

03:40PM  9     BUSINESS; CORRECT?

03:40PM  10    A.   THAT'S THE WAY I WOULD HAVE UNDERSTOOD IT, YES.

03:40PM  11    Q.   IS IT FAIR TO SAY THAT YOU UNDERSTOOD THAT THERANOS'S

03:40PM  12    RELATIONSHIP WITH WALGREENS WAS EVOLVING AND THE ROLLOUT INTO

03:40PM  13    WALGREENS STORES BEYOND THE THEN 30 STORES WAS GOING TO EVOLVE

03:40PM  14    OVER TIME; CORRECT?

03:40PM  15    A.   YES.

03:40PM  16    Q.   AND FAIR TO SAY THAT YOU UNDERSTOOD THAT THE SPEED OF THAT

03:40PM  17    ROLLOUT WAS KIND OF DEPENDENT IN PART ON WALGREENS AS WELL AS

03:40PM  18    THERANOS; CORRECT?

03:40PM  19    A.   I WOULD HAVE UNDERSTOOD THAT, YES.

03:40PM  20    Q.   AND YOU UNDERSTOOD AT THE TIME THAT IN THIS SORT OF

03:40PM  21    UNDERTAKING, THIS MASSIVE UNDERTAKING, THERE IS EXECUTION RISK?

03:41PM  22    A.   YES.

03:41PM  23    Q.   AND SOME OF THAT EXECUTION RISK CAN RELATE TO THE ABILITY

03:41PM  24    OF THE PARTNERS TO ACTUALLY BUILD OUT THESE STORES BEYOND THE

03:41PM  25    ARIZONA MARKET; CORRECT?

03:41PM   1      A.   I WOULD HAVE UNDERSTOOD THAT, YES.

03:41PM   2      Q.   AND PART OF THE EXECUTION RISK WOULD ALSO RELATE TO THE

03:41PM   3      ABILITY TO HIRE PERSONNEL TO ACTUALLY DO THIS WORK?

03:41PM   4      A.   YES.

03:41PM   5      Q.   AND PART OF THE EXECUTION RISK WOULD ALSO IN SOME WAY

03:41PM   6      RELATE TO, AGAIN, THERANOS'S ABILITY TO PERFORM THE TESTS;

03:41PM   7      CORRECT?

03:41PM   8      A.   I GUESS.

03:41PM   9      Q.   OKAY.

03:41PM  10      A.   BUT THAT -- NO.  I GUESS.  I MEAN, I DIDN'T UNDERSTAND

03:41PM  11      THAT TO BE PART OF THE RISK, BUT --

03:41PM  12      Q.   WHEN YOU INVESTED, YOU UNDERSTOOD THAT THERANOS WAS IN 30

03:41PM  13      STORES; RIGHT?

03:41PM  14      A.   THAT'S CORRECT.

03:41PM  15      Q.   AND YOU UNDERSTAND THAT THERE'S A SIGNIFICANT DIFFERENCE

03:41PM  16      IN SCALE IN SELLING A PRODUCT FROM 30 STORES TO, LET'S SAY,

03:41PM  17      8,000 NATIONWIDE; RIGHT?

03:41PM  18      A.   YES.

03:41PM  19      Q.   SO EVEN IF, EVEN IF YOUR PRODUCT WORKS NICELY IN A SMALL,

03:42PM  20      COMPACT MARKET, SCALING IT NATIONWIDE MAY BE A DIFFERENT STORY;

03:42PM  21      RIGHT?

03:42PM  22      A.   IT COULD BE, YES.

03:42PM  23      Q.   OKAY.  AND YOU UNDERSTOOD THAT AT THE TIME?

03:42PM  24      A.   YES.

03:42PM  25      Q.   NOW IF YOU COULD PUT UP PAGE 354 FROM THE INVESTOR BINDER.

03:42PM  1          I'M SORRY, 454.

03:42PM  2          AND 454, OVER THE NEXT COUPLE OF PAGES, REFLECTS REFERENCE

03:42PM  3     TO PATENTS HELD BY THERANOS; CORRECT?

03:42PM  4     A.   YES.

03:42PM  5     Q.   AND AGAIN, THIS WAS PART OF WHY YOU WERE INTERESTED IN

03:43PM  6     THERANOS, THE FACT THAT THEY APPEARED TO HAVE A SUBSTANTIAL

03:43PM  7     PATENT PORTFOLIO SUPPORTING ITS TECHNOLOGY; RIGHT?

03:43PM  8     A.   I WAS INTERESTED BECAUSE OF THE TECHNOLOGY, AND CERTAINLY

03:43PM  9     YOU WOULD EXPECT THE PATENTS TO FOLLOW.

03:43PM  10    Q.   AND YOU UNDERSTOOD THAT MUCH OF THE R&D WORK THAT THERANOS

03:43PM  11    DID TO DEVELOP ITS TECHNOLOGY WAS PERFORMED IN THE KIND OF

03:43PM  12    STEALTH MODE BEFORE THEY WENT PUBLIC WITH THEIR RETAIL

03:43PM  13    RELATIONSHIP WITH WALGREENS; CORRECT?

03:43PM  14    A.   THAT IS CORRECT.

03:43PM  15    Q.   AND THAT SEEMED NORMAL TO YOU; RIGHT?

03:43PM  16    A.   YES.

03:43PM  17    Q.   AND YOU UNDERSTOOD THERANOS'S EFFORTS TO MAINTAIN THE

03:43PM  18    CONFIDENTIALITY OF ITS TECHNOLOGY WAS APPROPRIATE; CORRECT?

03:43PM  19    A.   YES.

03:43PM  20    Q.   BECAUSE SOMETIMES COMPETITORS, FORMER EMPLOYEES CAN LEAK

03:44PM  21    INFORMATION THAT COULD PUT THERANOS AT A COMPETITIVE

03:44PM  22    DISADVANTAGE; CORRECT?

03:44PM  23    A.   CORRECT.

03:44PM  24    Q.   NOW, IF YOU COULD TAKE A LOOK AT PAGE 510 OF THE INVESTOR

03:44PM  25    BINDER.

03:44PM   1            NOW, 510 IS THE START OF ABOUT THREE OR FOUR PAGES OF SOME

03:44PM   2    FINANCIAL INFORMATION.

03:44PM   3            DO YOU RECALL THAT?

03:44PM   4    A.   I DO.

03:44PM   5    Q.   AND YOU WERE ASKED SOME QUESTIONS BY MR. SCHENK ABOUT

03:44PM   6    THESE (INDICATING).

03:44PM   7            DO YOU RECALL THAT?

03:44PM   8    A.   I DO.

03:44PM   9    Q.   AND THE FIRST PAGE AT 510 REFLECTS THE SUMMARY

03:44PM  10    CAPITALIZATION; IS THAT CORRECT?

03:44PM  11    A.   THAT'S CORRECT.

03:44PM  12    Q.   AND ESSENTIALLY THIS IS THE CAPITALIZATION INVESTED IN

03:44PM  13    THERANOS BY ITS INVESTOR BASE; CORRECT?

03:44PM  14    A.   THAT IS CORRECT.

03:44PM  15    Q.   AND YOU UNDERSTOOD THIS CAP TABLE IS GOING UP TO 2013;

03:44PM  16    RIGHT?

03:44PM  17    A.   YES, THAT'S WHAT IT INDICATES.

03:45PM  18    Q.   BUT BY THE TIME THAT YOU WERE TALKING WITH MS. HOLMES AND

03:45PM  19    RECEIVING THESE MATERIALS, THERANOS WAS ENGAGING IN A NEW ROUND

03:45PM  20    OF FUNDING; CORRECT?

03:45PM  21    A.   THAT IS CORRECT.

03:45PM  22    Q.   WHICH WOULD INDICATE TO YOU THAT THERANOS REQUIRED,

03:45PM  23    DESIRED ADDITIONAL FUNDS IN ORDER TO EXECUTE ON THIS NATIONAL

03:45PM  24    RETAIL ROLLOUT; CORRECT?

03:45PM  25    A.   YOU KNOW, I CERTAINLY ASSUMED THEY WOULDN'T BE RAISING

03:45PM   1       FUNDS UNLESS THEY NEEDED FUNDS.

03:45PM   2       Q.   AND IF YOU COULD TAKE A LOOK AT 511.

03:45PM   3            WELL, ACTUALLY SKIP THAT.  512.

03:45PM   4            AND 512 IS THE PROJECTED STATEMENT OF INCOME.

03:45PM   5            DO YOU SEE THAT?

03:45PM   6       A.   I DO.

03:45PM   7       Q.   AND YOU WERE ASKED SOME QUESTIONS BY MR. SCHENK ABOUT THE

03:45PM   8       PROJECTED STATEMENT OF INCOME; CORRECT?

03:45PM   9       A.   YES.

03:45PM   10      Q.   AND YOU UNDERSTOOD THAT THESE ARE PROJECTIONS; RIGHT?

03:45PM   11      A.   YES.

03:45PM   12      Q.   THESE WERE NOT ACTUAL FINANCIAL RETURN FINANCIAL

03:46PM   13      STATEMENTS; CORRECT?

03:46PM   14      A.   THAT IS CORRECT.

03:46PM   15      Q.   THESE ARE NOT AUDITED FINANCIAL STATEMENTS; CORRECT?

03:46PM   16      A.   THAT IS CORRECT.

03:46PM   17      Q.   THE KIND OF FINANCIAL STATEMENTS THAT YOU MIGHT GET IF YOU

03:46PM   18      INVESTED IN A PUBLIC COMPANY; CORRECT?

03:46PM   19      A.   CAN YOU REPHRASE THE QUESTION?  I DIDN'T QUITE UNDERSTAND

03:46PM   20      THAT.

03:46PM   21      Q.   NO PROBLEM.

03:46PM   22           YOU'RE AWARE THAT TWICE -- OR ANNUALLY PUBLIC COMPANIES

03:46PM   23      ARE REQUIRED TO REPORT, DISCLOSE KIND OF AUDITED FINANCIAL

03:46PM   24      STATEMENTS; CORRECT?

03:46PM   25      A.   CORRECT.

03:46PM  1    Q.   WHEREAS A PRIVATE COMPANY ISN'T IN THAT SITUATION; DIRECT?

03:46PM  2    A.   THAT'S CORRECT.

03:46PM  3    Q.   AND YOU UNDERSTOOD THAT THIS PROJECTED STATEMENT OF INCOME

03:46PM  4    WAS NOT AN ACTUAL FINANCIAL STATEMENT; CORRECT?  YOU UNDERSTOOD

03:46PM  5    THAT AT THE TIME?

03:46PM  6    A.   I UNDERSTAND IT -- I UNDERSTOOD IT WAS A FINANCIAL

03:46PM  7    STATEMENT.  IT WAS A PROJECTION FINANCIAL STATEMENT, BUT IT IS

03:46PM  8    A FINANCIAL STATEMENT.

03:46PM  9    Q.   OKAY.  BUT A PROJECTION?

03:46PM 10    A.   IT'S A PROJECTION.

03:46PM 11    Q.   OKAY.  AND IF WE CAN TURN TO THE NEXT PAGE.

03:46PM 12         I DON'T THINK YOU WERE ASKED QUESTIONS ABOUT THIS, BUT

03:46PM 13    THIS IS THE PRO FORMA STATEMENT OF CASH FLOW.

03:47PM 14         DO YOU SEE THAT?

03:47PM 15    A.   I DO.

03:47PM 16    Q.   AND PRO FORMA, YOU UNDERSTAND THAT PRO FORMA IS KIND OF

03:47PM 17    ANOTHER WORD FOR PROJECTION; RIGHT?

03:47PM 18    A.   GENERALLY, YES.

03:47PM 19    Q.   AND THEN IF WE CAN GO TO THE NEXT PAGE, 514 IN THE

03:47PM 20    DOCUMENTS THAT YOU WERE PROVIDED.

03:47PM 21         HERE WE'RE LOOKING AT THE BALANCE SHEET; IS THAT RIGHT?

03:47PM 22    CURRENT ASSETS, TOTAL ASSETS?

03:47PM 23    A.   YES, THAT IS CORRECT.

03:47PM 24    Q.   AND THE DOCUMENT INDICATES THAT IT'S THE BALANCE SHEET FOR

03:47PM 25    THE PERIOD ENDING JULY 14TH, 2014; RIGHT?

03:47PM  1    A.   THAT IS CORRECT.

03:47PM  2    Q.   WHICH IS ABOUT A MONTH BEFORE YOU RECEIVED THE INVESTOR

03:47PM  3    PACKET FROM MS. HOLMES; RIGHT?

03:47PM  4    A.   THAT IS CORRECT.

03:47PM  5    Q.   OKAY.  AND DO YOU SEE AT THE TIME THERANOS HAD TOTAL

03:47PM  6    CURRENT ASSETS OF APPROXIMATELY $196 MILLION?

03:48PM  7         DO YOU SEE THAT?

03:48PM  8    A.   I DO.

03:48PM  9    Q.   WITH ABOUT 162 MILLION IN CASH AND INVESTMENTS.

03:48PM  10        DO YOU SEE THAT?

03:48PM  11   A.   I DO.

03:48PM  12   Q.   AND TOTAL ASSETS OF ABOUT 245 MILLION.

03:48PM  13        DO YOU SEE THAT?

03:48PM  14   A.   TOTAL ASSETS ARE 245 MILLION, YES.

03:48PM  15   Q.   OKAY.  AND I THINK YOU INDICATED IN YOUR NOTES THAT YOU

03:48PM  16   DIDN'T BELIEVE THERANOS HAD ANY OUTSTANDING DEBT; CORRECT?

03:48PM  17   A.   I SAID NO MEANINGFUL DEBT.

03:48PM  18   Q.   NO MEANINGFUL DEBT, SO NO SIGNIFICANT DEBT; CORRECT?

03:48PM  19   A.   YES.

03:48PM  20   Q.   YOU CAN TAKE THAT DOWN, MR. ALLEN.

03:48PM  21        IF YOU COULD TAKE A LOOK AT EXHIBIT 14119 IN THE

03:48PM  22   GOVERNMENT BINDER OF DOCUMENTS THAT YOU HAVE.

03:49PM  23   A.   14119?

03:49PM  24   Q.   YES, 14119.

03:49PM  25   A.   I DON'T SEEM TO HAVE SUCH A -- IN VOLUME 1?  IN VOLUME 1?

03:49PM   1      Q.   IT SHOULD BE IN THE BLACK BINDER?

03:49PM   2      A.   OH, YOU --

03:49PM   3      Q.   SORRY ABOUT THAT.

03:49PM   4      A.   THESE WERE THE DOCUMENTS THAT WERE GIVEN TO ME BY THE

03:49PM   5      GOVERNMENT.

03:49PM   6           YOU'RE TALKING ABOUT THIS BLACK BINDER (INDICATING)?

03:49PM   7      Q.   YES.  SORRY ABOUT THAT.

03:49PM   8      A.   THIS BINDER (INDICATING)?

03:49PM   9      Q.   YES, THAT'S CORRECT.  THE BLACK BINDER.  I APOLOGIZE.

03:49PM   10     A.   NO PROBLEM.

03:49PM   11          WHAT WAS THAT?

03:49PM   12     Q.   14119.

03:50PM   13          ARE WE THERE?

03:50PM   14     A.   YEP.

03:50PM   15     Q.   SO 14119 IS A SHORT EMAIL CHAIN, THE LATTER OF WHICH AT

03:50PM   16     THE TOP PAGE APPEARS TO BE FROM YOURSELF, I'M SORRY, FROM

03:50PM   17     MS. HOLMES TO YOU DATED SEPTEMBER 4, 2014.

03:50PM   18          DO YOU SEE THAT?

03:50PM   19     A.   YES.

03:50PM   20     Q.   AND BELOW THAT THERE IS ANOTHER MESSAGE FROM YOURSELF TO

03:50PM   21     MS. HOLMES.

03:50PM   22          DO YOU SEE THAT AS WELL?

03:50PM   23     A.   THAT IS CORRECT.

03:50PM   24     Q.   AND THE EARLIER MESSAGE IS SEPTEMBER 22ND, 2014?

03:50PM   25     A.   CORRECT.

03:50PM  1    Q.   AND THIS IS SUBSEQUENT TO YOUR RECEIPT OF THE INVESTOR

03:50PM  2    MATERIALS THAT WE JUST TALKED ABOUT; RIGHT?

03:50PM  3    A.   THAT'S CORRECT.

03:50PM  4    Q.   OKAY.

03:50PM  5         MOVE TO ADMIT 14119, YOUR HONOR.

03:50PM  6              MR. SCHENK:  NO OBJECTION.

03:50PM  7              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

03:50PM  8         (DEFENDANT'S EXHIBIT 14119 WAS RECEIVED IN EVIDENCE.)

03:50PM  9    BY MR. CAZARES:

03:50PM  10   Q.   AND IF YOU LOOK AT THE LOWER PORTION OF THE EXHIBIT,

03:50PM  11   YOU'LL SEE THE MESSAGE ON SEPTEMBER 2ND FROM YOURSELF TO

03:50PM  12   MS. HOLMES, AND IT APPEARS THAT YOU WROTE, "ELIZABETH,

03:51PM  13        "THANK YOU FOR THE EXTENSIVE MATERIALS ON THERANOS.  I

03:51PM  14   THOROUGHLY ENJOYED READING THE MATERIALS AND CAN'T TELL YOU HOW

03:51PM  15   APPRECIATIVE AND THANKFUL I AM FOR THE OPPORTUNITY TO BECOME

03:51PM  16   ONE OF YOUR SHAREHOLDERS."

03:51PM  17        DO YOU SEE THAT?

03:51PM  18   A.   I DO.

03:51PM  19   Q.   AND YOU WERE SINCERE WHEN YOU WROTE THAT TO MS. HOLMES;

03:51PM  20   RIGHT?

03:51PM  21   A.   YES, I WAS.

03:51PM  22   Q.   BECAUSE YOU WERE IMPRESSED WITH THE WRITTEN MATERIALS?

03:51PM  23   A.   I WAS.

03:51PM  24   Q.   OKAY.  AND YOU SAID, "I COULD NOT BE MORE IMPRESSED WITH

03:51PM  25   WHAT YOU HAVE ACCOMPLISHED AND WHAT LIES AHEAD FOR THERANOS."

03:51PM  1          DO YOU SEE THAT?

03:51PM  2     A.   I DO.

03:51PM  3     Q.   AND BY "WHAT LIES AHEAD," SOME OF THAT WAS THIS WALGREENS

03:51PM  4     RELATIONSHIP AND THE POTENTIAL OPPORTUNITY; RIGHT?

03:51PM  5     A.   YES.

03:51PM  6     Q.   YOU WROTE, "I SPOKE TO DR. KISSINGER EARLIER TODAY AND

03:51PM  7     GAVE HIM MY THOUGHTS ON THE MATERIALS.  I ALSO PREPARED AN

03:51PM  8     OUTLINE OVER THE WEEKEND WITH MY THOUGHTS AND ANALYSIS, WHICH I

03:51PM  9     AM SENDING TO HIM BY HAND AND HAVE ALSO SENT ALONG TO THE

03:51PM 10     NIARCHOS FOUNDATION."

03:51PM 11          DO YOU SEE THAT?

03:51PM 12     A.   I DO.

03:51PM 13     Q.   AND THIS IS THAT DOCUMENT THAT YOU REVIEWED WITH

03:51PM 14     MR. SCHENK, THE OUTLINE?

03:52PM 15     A.   YES, THAT IS CORRECT.

03:52PM 16     Q.   AND THEN YOU WROTE, "I HAVE A FEW QUESTIONS AND WANT TO

03:52PM 17     FOLLOW UP ON YOUR OFFER OF A BRIEFING BUT THOUGHT I WOULD WAIT

03:52PM 18     UNTIL I HAVE ANY FURTHER QUESTIONS THAT MIGHT BE RAISED BY THE

03:52PM 19     NIARCHOS FOUNDATION PEOPLE AFTER THEY HAVE HAD A CHANCE TO

03:52PM 20     REVIEW THE MATERIALS AND MY OUTLINE."

03:52PM 21          DO YOU SEE THAT?

03:52PM 22     A.   I SEE THAT.

03:52PM 23     Q.   AND THIS IS YOU KIND OF RESPONDING TO MS. HOLMES'S

03:52PM 24     INVITATION TO ASK QUESTIONS; RIGHT?

03:52PM 25     A.   CORRECT.

03:52PM   1    Q.   AND THEN YOU WROTE, "WITH RESPECT TO THE WALTON FAMILY, I

03:52PM   2    CHECKED IN WITH GREG PENNER BUT HE HAS NOT YET RECEIVED THE

03:52PM   3    MATERIALS.  HE HAS SIGNED THE CDA AND I WANTED TO CHECK TO BE

03:52PM   4    SURE THAT ONE OF THE COPIES OF THE MATERIALS THAT CAME TO ME

03:52PM   5    WAS NOT INTENDED TO BE FOR HIM.  I HAVE ENCLOSED A COPY OF HIS

03:52PM   6    ADDRESS CARD TO CONFIRM HIS ADDRESS."

03:52PM   7         DO YOU SEE THAT?

03:52PM   8    A.   I DO.

03:52PM   9    Q.   AND YOU'RE AWARE THAT ULTIMATELY MATERIALS WERE SENT TO

03:52PM  10    MR. PENNER AS WELL?

03:52PM  11    A.   I BELIEVE THEY WERE.

03:52PM  12    Q.   AND IS IT CORRECT, SIR, WOULD YOU AGREE BY THIS TIME,

03:53PM  13    SEPTEMBER 2ND, 2014, YOU HAD NEVER SPOKEN TO MR. BALWANI;

03:53PM  14    CORRECT?

03:53PM  15    A.   I HAD NOT TO MY KNOWLEDGE.

03:53PM  16    Q.   IF WE CAN PUT UP ON THE SCREEN EXHIBIT 4197.  I BELIEVE

03:53PM  17    THIS IS ALREADY IN EVIDENCE FROM EARLIER TODAY.

03:53PM  18              THE COURT:  IT IS.

03:53PM  19              MR. CAZARES:  THANK YOU, YOUR HONOR.

03:53PM  20    Q.   4197 IS THE COVER LETTER AND MEMO TO DR. KISSINGER.

03:53PM  21         DO YOU RECALL THAT, MR. MOSLEY?

03:53PM  22    A.   I DO.

03:53PM  23    Q.   OKAY.  AND IN THE COVER LETTER ANYWAY, YOU REFERENCE THE

03:53PM  24    FACT THAT MS. HOLMES WAS CAREFUL ABOUT OBTAINING NONDISCLOSURE

03:54PM  25    AGREEMENTS BEFORE PROVIDING ANY IN DEPTH INFORMATION ABOUT

03:54PM   1    THERANOS.

03:54PM   2         DO YOU RECALL THAT?

03:54PM   3    A.   YES.

03:54PM   4    Q.   AND I WON'T GO OVER THE REST OF THE LETTER, BUT BASICALLY

03:54PM   5    YOU INDICATED THAT YOU WERE GOING TO GET CDA'S FROM ANYONE YOU

03:54PM   6    SHARED THE MEMO WITH; CORRECT?

03:54PM   7    A.   THAT IS CORRECT.

03:54PM   8    Q.   AND YOU DID SO; CORRECT?

03:54PM   9    A.   AND I DID SO.

03:54PM   10   Q.   OKAY.  IF WE CAN GO TO PAGE 2 OF THE EXHIBIT.

03:54PM   11        AND SOME OF THIS YOU REVIEWED WITH MR. SCHENK, BUT ON

03:54PM   12   PAGE 2 UNDER THE HEADER "QUALITY OF THE TECHNOLOGY/APPLICATION

03:55PM   13   AND PERFORMANCE."

03:55PM   14        DO YOU SEE THAT?

03:55PM   15   A.   I DO.

03:55PM   16   Q.   AND IN THE MEMO, I THINK YOU DESCRIBED EARLIER TODAY, BUT

03:55PM   17   YOU WROTE, "THERE IS SUBSTANTIAL DATA AND OTHER INFORMATION

03:55PM   18   ATTESTING TO THE QUALITY, PERFORMANCE, AND RELIABILITY OF THE

03:55PM   19   THERANOS TECHNOLOGY AND EQUIPMENT."

03:55PM   20        DO YOU SEE THAT?

03:55PM   21   A.   I DO.

03:55PM   22   Q.   OKAY.  AND YOU WROTE, "THERE DOES NOT APPEAR TO BE ANY

03:55PM   23   SIGN OF ANY QUESTION ABOUT THE QUALITY, ACCURACY AND

03:55PM   24   RELIABILITY OF THERANOS'S BLOOD TESTING TECHNOLOGY.  THE

03:55PM   25   INFORMATION SUPPORTING THESE CONCLUSIONS IS SUBSTANTIAL," AND

03:55PM  1    THEN YOU LIST SOME OF THE BASES FOR THE CONCLUSION; CORRECT?

03:55PM  2    A.   I DO.

03:55PM  3    Q.   OKAY.  AND SOME OF THESE WE REVIEWED, BUT IN THE MEMO THE

03:55PM  4    FIRST ITEM THAT YOU IDENTIFY AS SUPPORTING THE BELIEF THAT THE

03:55PM  5    TECHNOLOGY WORKED WAS THE FACT THAT CMS WAS THE KIND OF

03:55PM  6    OVERSEER, REGULATOR, FOR THE CLIA LABORATORY; CORRECT?

03:56PM  7    A.   THAT'S MY UNDERSTANDING, YES.

03:56PM  8    Q.   AND THAT GAVE YOU SOME COMFORT IN MAKING THE INVESTMENT;

03:56PM  9    CORRECT?

03:56PM  10   A.   YES, IT DID.

03:56PM  11   Q.   AND IN THIS TIME PERIOD, THE LATE SUMMER, EARLY FALL 2014,

03:56PM  12   YOU'RE NOT AWARE OF ANY INDICATIONS OF PROBLEMS WITH RESPECT TO

03:56PM  13   THERANOS'S CLINICAL LAB; CORRECT?

03:56PM  14   A.   I WAS NOT AWARE.

03:56PM  15   Q.   AND THEN THE NEXT ENTRY, IN SUPPORT OF YOUR CONCLUSIONS,

03:56PM  16   YOU WROTE, "THERANOS HAS SUCCESSFULLY COMPLETE THE INSPECTIONS

03:56PM  17   BY THE NEW YORK DEPARTMENT OF HEALTH AND BY A NUMBER OF OTHER

03:56PM  18   NATIONALLY RECOGNIZED AGENCIES, ALL WITH THE HIGHEST POSSIBLE

03:56PM  19   RATINGS."

03:56PM  20       DO YOU SEE THAT?

03:56PM  21   A.   I DO.

03:56PM  22   Q.   AND THAT'S A REFERENCE TO SOMETHING THAT YOU SAW IN THE

03:56PM  23   MATERIALS; CORRECT?

03:56PM  24   A.   CORRECT.

03:56PM  25   Q.   AND AT THE TIME WERE YOU AWARE THAT CLINICAL LABS

03:56PM   1       SOMETIMES HAVE DUAL REGULATORS, THEY HAVE CMS AND THEN STATE

03:56PM   2       REGULATORY AGENCIES?

03:56PM   3       A.   I WAS NOT AWARE OF THAT.

03:56PM   4       Q.   OKAY.  BUT YOU CITED THE FACT THAT THE NEW YORK DEPARTMENT

03:57PM   5       OF HEALTH AND OTHERS HAD COMPLETED INSPECTIONS AT THERANOS;

03:57PM   6       CORRECT?

03:57PM   7       A.   CORRECT.

03:57PM   8       Q.   AND SO THAT WAS NEW INFORMATION TO YOU AT THE TIME?

03:57PM   9       A.   WHEN I GOT THE MATERIALS, YES.

03:57PM  10       Q.   AND THEN YOU FOLLOWED WITH CITING THE PHARMACEUTICAL

03:57PM  11       RELATIONSHIPS, 10 OF 15.

03:57PM  12            DO YOU SEE THAT?

03:57PM  13       A.   I DO.

03:57PM  14       Q.   AND THEN AGAIN WE GET TO YOU WROTE, "THERANOS HAS WORKED

03:57PM  15       WITH A NUMBER OF HOSPITAL GROUPS.  THESE INCLUDE CEDARS-SINAI."

03:57PM  16       AND YOU'RE FAMILIAR WITH CEDARS-SINAI?

03:57PM  17       A.   YES.

03:57PM  18       Q.   A RENOWNED INSTITUTION; CORRECT?

03:57PM  19       A.   CORRECT.

03:57PM  20       Q.   HOSPITAL CORP OF AMERICA, HOSPITAL FOR SPECIAL SURGERY,

03:57PM  21       AND THEN JOHNS HOPKINS, WHICH WE TALKED ABOUT EARLIER.

03:57PM  22            DO YOU SEE THAT?

03:57PM  23       A.   I DO.

03:57PM  24       Q.   AND IT'S THE RELATIONSHIPS IDENTIFIED IN THESE FOUR

03:57PM  25       BULLETS TO THERANOS THAT GAVE YOU COMFORT; CORRECT?

03:57PM  1      A.   THEY DID.

03:57PM  2              MR. CAZARES:  YOUR HONOR, I'M AT A SPOT WHERE I'M

03:57PM  3      GOING TO BE VEERING INTO OTHER MATERIALS.  IT MIGHT BE A GOOD

03:57PM  4      TIME.

03:57PM  5              THE COURT:  THANK YOU.  LET'S DO THAT.

03:57PM  6          LET'S TAKE OUR EVENING BREAK NOW, LADIES AND GENTLEMEN.

03:57PM  7      WE'LL START AGAIN AT 9:00 O'CLOCK.

03:57PM  8          I MIGHT HAVE SOME QUESTIONS FOR THE LAWYERS, SO WE MIGHT

03:58PM  9      NOT START UNTIL 9:30, JUST FAIR WARNING.  BUT I'LL TRY TO KEEP

03:58PM 10      MY QUESTIONS BRIEF FOR THEM.  BUT 9:00 O'CLOCK.

03:58PM 11          SIR, 9:00 O'CLOCK TOMORROW TO RETURN.

03:58PM 12              THE WITNESS:  THANK YOU.

03:58PM 13              THE COURT:  PLEASE REMEMBER THE ADMONITION.  DON'T

03:58PM 14      TRY TO LEARN ANYTHING ABOUT THIS CASE, LISTEN, READ OR DISCUSS

03:58PM 15      THIS CASE WITH ANYONE.

03:58PM 16          HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW.  THANK YOU.

03:58PM 17          (JURY OUT AT 3:58 P.M.)

03:59PM 18              THE COURT:  PLEASE BE SEATED.  THANK YOU.

03:59PM 19              THE WITNESS:  SHOULD I STAY?

03:59PM 20              THE COURT:  OH, NOT YOU, SIR.  SORRY.  YOU'RE FREE

03:59PM 21      TO GO.  SORRY.

03:59PM 22          ALL RIGHT.  THANK YOU.  THE RECORD SHOULD REFLECT THAT OUR

03:59PM 23      JURY HAS LEFT FOR THE EVENING.

03:59PM 24          MR. MOSLEY HAS LEFT THE COURTROOM.

03:59PM 25          ALL COUNSEL AND MR. BALWANI ARE PRESENT.

5282

03:59PM  1          ANYTHING FURTHER BEFORE WE BREAK FOR THE NIGHT?

03:59PM  2          MR. BOSTIC.

03:59PM  3              MR. BOSTIC:  IF THE COURT HAS A MOMENT JUST TO

03:59PM  4     DISCUSS THE SCHEDULE FOR TOMORROW?

03:59PM  5              THE COURT:  SURE.

03:59PM  6              MR. BOSTIC:  WE ARE CONSIDERING WHICH WITNESSES TO

03:59PM  7     CALL TOMORROW, AND WE HAVE A TRAVEL DECISION TO MAKE ABOUT AN

03:59PM  8     OUT OF TOWN WITNESS.  ONCE BEFORE I ASKED THE COURT AND THE

03:59PM  9     DEFENSE TO HELP US MAKE THE DECISION, AND I WAS WONDERING IF I

03:59PM 10     COULD DO THE SAME THING.

03:59PM 11              THE COURT:  SURE.

03:59PM 12              MR. BOSTIC:  SO MR. MOSLEY NEEDS TO FINISH HIS

03:59PM 13     CROSS-EXAMINATION, THERE MAY BE REDIRECT.

04:00PM 14          AND THEN TOMORROW THE GOVERNMENT IS CONSIDERING CALLING

04:00PM 15     DR. LYNETTE SAWYER, CHRIS LUCAS, AND ALAN EISENMAN.

04:00PM 16          MR. LUCAS IS NOT YET IN TOWN AND IS CONSIDERING WHETHER TO

04:00PM 17     FLY IN FIRST THING TOMORROW MORNING.

04:00PM 18          SO I THINK THE QUESTION IS, WILL WE NEED MR. LUCAS TO FLY

04:00PM 19     IN IN THE MORNING TO BE AVAILABLE TO TESTIFY IN THE AFTERNOON,

04:00PM 20     OR NOT?

04:00PM 21          I THINK IT WOULD BE HELPFUL TO KNOW HOW MUCH MORE

04:00PM 22     CROSS-EXAMINATION IS STILL ON DECK FOR THE PENDING WITNESS, AND

04:00PM 23     IF THE DEFENSE COULD LET US KNOW HOW MUCH TIME THEY EXPECT TO

04:00PM 24     TAKE WITH THE OTHER WITNESSES AS WELL.

04:00PM 25              THE COURT:  OKAY.

5283

04:00PM  1          MR. COOPERSMITH, YOU'RE IN THE DRIVER'S SEAT HERE.

04:00PM  2              MR. COOPERSMITH:  WELL, THAT'S ALWAYS NICE,

04:00PM  3      YOUR HONOR.  THANK YOU.

04:00PM  4          SO WITH REGARD TO -- IT SOUNDS LIKE, FROM MR. BOSTIC, THE

04:00PM  5      NEXT WITNESS AFTER MR. MOSLEY IS CHRIS LUCAS.

04:00PM  6          DID I HEAR THAT CORRECTLY?

04:00PM  7              MR. BOSTIC:  IT DEPENDS, YOUR HONOR.  IT COULD BE

04:00PM  8      MR. LUCAS OR DR. SAWYER.

04:01PM  9              THE COURT:  IS DR. SAWYER LOCAL?

04:01PM 10              MR. BOSTIC:  SHE'S LOCAL.

04:01PM 11              THE COURT:  RIGHT, RIGHT.

04:01PM 12              MR. COOPERSMITH:  I JUST WANT TO MAKE SURE I

04:01PM 13      UNDERSTAND THE QUESTION, WHICH WE'RE HAPPY TO TRY TO ANSWER, IS

04:01PM 14      THAT IF MR. MOSLEY IS GOING TO GO THE WHOLE DAY TOMORROW, THEY

04:01PM 15      WOULD NOT BRING MR. LUCAS IN FROM OUT OF TOWN, OR IF --

04:01PM 16              MR. BOSTIC:  SO IF MR. MOSLEY WOULD TAKE UP -- IF

04:01PM 17      THE COMBINATION OF MR. MOSLEY AND MR. EISENMAN, FOR EXAMPLE,

04:01PM 18      WOULD TAKE UP ALL OF THE DAY TOMORROW, THEN WE MIGHT TELL

04:01PM 19      MR. LUCAS NOT TO FLY INTO TOWN, AND WE MIGHT TELL DR. SAWYER

04:01PM 20      NOT TO TRAVEL TO THE COURTHOUSE.

04:01PM 21              MR. COOPERSMITH:  I SEE, YOUR HONOR.  THAT'S

04:01PM 22      HELPFUL.

04:01PM 23          SO I'LL -- MR. CAZARES, I'M SURE, WILL JUMP UP AND YELL AT

04:01PM 24      ME IF I'M SPEAKING OUT OF TURN, BUT I DON'T BELIEVE THAT

04:01PM 25      MR. MOSLEY IS GOING TO OCCUPY THE ENTIRE DAY.  I SUSPECT IT

04:01PM 1    WILL BE SOME OF THE MORNING.

04:01PM 2        I SEE NODDING IN THE REFLECTIVE GLASS HERE, SO THAT SOUNDS

04:01PM 3    RIGHT.

04:01PM 4        SO THEN MS. SAWYER, I BELIEVE -- WELL, OBVIOUSLY WE HAVE

04:02PM 5    NOT SEEN THE GOVERNMENT'S DIRECT, AND I THINK MS. WALSH WILL BE

04:02PM 6    TAKING THAT WITNESS.  I DON'T EXPECT THAT TO BE A LENGTHY

04:02PM 7    EXAMINATION.  I SUSPECT IT WON'T BE LENGTHY ON EITHER SIDE, BUT

04:02PM 8    MR. BOSTIC CAN SPEAK TO THAT.

04:02PM 9        SO I THINK IT'S LIKELY THE GOVERNMENT WILL NEED TO FILL UP

04:02PM 10   THE TIME WITH ANOTHER WITNESS, AND IF IT'S MR. EISENMAN, IT'S

04:02PM 11   LIKELY THAT WE WOULDN'T GET TO YET EVEN ANOTHER WITNESS AFTER

04:02PM 12   THAT, IF THAT ANSWERS MR. BOSTIC'S QUESTION.  I HOPE IT DOES.

04:02PM 13            THE COURT:  RIGHT.  MY SENSE IS DR. SAWYER -- THIS

04:02PM 14   IS FROM PAST EXPERIENCE -- WILL NOT BE AN EXTENSIVE WITNESS.  I

04:02PM 15   DON'T THINK SHE WILL BE HOURS.

04:02PM 16            MR. COOPERSMITH:  I THINK THAT'S RIGHT, YOUR HONOR.

04:02PM 17            THE COURT:  AND THEN THE QUESTION IS, DO YOU PUT

04:02PM 18   MR. EISENMAN ON NEXT OR FLY OUT MR. LUCAS?

04:02PM 19            MR. BOSTIC:  AND I THINK IN THAT CASE, BECAUSE

04:02PM 20   MR. EISENMAN WILL BE IN TOWN, WE'LL CALL MR. EISENMAN AND SAVE

04:02PM 21   MR. LUCAS THE TRIP.

04:02PM 22        AND JUST TO CONFIRM, I THINK THE DIRECT EXAM FOR

04:03PM 23   DR. SAWYER WILL BE ABOUT HALF AN HOUR OR LESS, SO IF THE CROSS

04:03PM 24   IS ON THAT SAME SCALE, THEN I THINK WE'RE ON THE SAME PAGE.

04:03PM 25            THE COURT:  AND MR. EISENMAN, MY SENSE IS THAT HIS

5285

04:03PM 1     EXAMINATION WILL PROBABLY REQUIRE A LITTLE MORE TIME, I THINK,

04:03PM 2     CERTAINLY MORE THAN DR. SAWYER'S.

04:03PM 3                MR. BOSTIC:  YES, YOUR HONOR.  HIS DIRECT WILL BE

04:03PM 4     ABOUT 90 MINUTES, SIMILAR TO WHAT WAS OBSERVED IN THE HOLMES

04:03PM 5     TRIAL.

04:03PM 6                THE COURT:  RIGHT.  SO HE PROBABLY WILL BE -- IF WE

04:03PM 7     GET THROUGH SAWYER TOMORROW -- WE FINISH MR. MOSLEY TOMORROW

04:03PM 8     MORNING, I'M THINKING MID-MORNING OR SOMETHING, MAYBE BY OUR

04:03PM 9     FIRST BREAK, DOES THAT SOUND REASONABLE?

04:03PM 10        I SEE HIS LAWYER HERE.  HE WOULD LIKE TO KNOW, TOO.

04:03PM 11               MR. CAZARES:  I THINK IT'S VERY POSSIBLE WE WILL

04:03PM 12    FINISH BOTH SIDES BY THE FIRST BREAK.

04:03PM 13               THE COURT:  OKAY.  GREAT.  THANK YOU.  THAT'S

04:03PM 14    HELPFUL.

04:03PM 15        AND THEN THE DECISION IS, IS IT DR. SAWYER OR EISENMAN?

04:03PM 16               MR. BOSTIC:  I'M NOT SURE IT MATTERS BETWEEN THOSE

04:03PM 17    TWO, YOUR HONOR, WHO IS NEXT IF THOSE TWO ARE BOTH CONFIRMED

04:03PM 18    FOR TOMORROW.

04:03PM 19               THE COURT:  I THINK THAT WILL FILL OUR DAY TOMORROW.

04:04PM 20               MR. BOSTIC:  IT SOUNDS LIKE THAT'S WHERE WE'RE

04:04PM 21    LANDING.

04:04PM 22               MR. COOPERSMITH:  THAT SOUNDS RIGHT.  OBVIOUSLY WITH

04:04PM 23    ALL OF THE UNUSUAL CAVEATS, BECAUSE TESTIMONY IS UNPREDICTABLE,

04:04PM 24    BUT I DO AGREE THAT THAT'S THE LIKELY WAY.

04:04PM 25               THE COURT:  JUST FROM MY PERSPECTIVE, I DON'T SEE

5286

04:04PM  1    ANY REASON TO HAVE THE GOVERNMENT FLY MR. LUCAS IN TONIGHT, OR

04:04PM  2    TOMORROW MORNING FOR THAT LATER.

04:04PM  3              MR. COOPERSMITH:  THAT SOUNDS RIGHT, ESPECIALLY

04:04PM  4    SINCE, IF HE GOT ON AT ALL, WHICH IS DOUBTFUL, IT WOULD BE

04:04PM  5    PRETTY BRIEF.  SO TO MAKE A SPECIAL TRIP FOR HALF AN HOUR OR

04:04PM  6    SOMETHING DOESN'T SOUND REASONABLE.

04:04PM  7              MR. BOSTIC:  UNDERSTOOD.  THAT'S HELPFUL.

04:04PM  8         THANK YOU, YOUR HONOR.

04:04PM  9              THE COURT:  OKAY.  HAVE WE ANSWERED -- OR HAVE WE

04:04PM  10   SOLVED ALL OF THE WORLD'S PROBLEMS?

04:04PM  11             MR. BOSTIC:  ALL OF MY QUESTIONS, YOUR HONOR.

04:04PM  12             MR. COOPERSMITH:  AND WE'LL SEE YOUR HONOR AT 8:30

04:04PM  13   TOMORROW?

04:04PM  14             THE COURT:  I HOPE SO.  WHAT HAVE YOU HEARD?

04:04PM  15             MR. COOPERSMITH:  I'M THINKING YES, SO THAT'S GOOD

04:04PM  16   TO HEAR.  THANK YOU.

04:04PM  17             THE COURT:  ALL RIGHT.  WE'LL SEE YOU THEN.  THANK

04:04PM  18   YOU.

04:04PM  19             MR. BOSTIC:  THANK YOU.

04:04PM  20        (COURT ADJOURNED AT 4:04 P.M.)

        21

        22

        23

        24

        25

1

2

3                  CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      IRENE RODRIGUEZ, CSR, CRR
17    CERTIFICATE NUMBER 8076

18

19    _____
      LEE-ANNE SHORTRIDGE, CSR, CRR
20    CERTIFICATE NUMBER 9595

21         DATED:  MAY 10, 2022

22

23

24

25