1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

       UNITED STATES OF AMERICA,        )
6                                       )  CR-18-00258-EJD
                      PLAINTIFF,        )
7                                       )  SAN JOSE, CALIFORNIA
                 VS.                    )
8                                       )  MAY 11, 2022
       RAMESH "SUNNY" BALWANI,          )
9                                       )  VOLUME 28
                      DEFENDANT.        )
10     _____ )  PAGES 5287 - 5562

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                 BEFORE THE HONORABLE EDWARD J. DAVILA
13                   UNITED STATES DISTRICT JUDGE

14     A P P E A R A N C E S :

15     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                              BY:  JOHN C. BOSTIC
16                                 JEFFREY B. SCHENK
                              150 ALMADEN BOULEVARD, SUITE 900
17                            SAN JOSE, CALIFORNIA 95113

18                            BY:  ROBERT S. LEACH
                                   KELLY VOLKAR
19                            1301 CLAY STREET, SUITE 340S
                              OAKLAND, CALIFORNIA 94612
20
             (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
       OFFICIAL COURT REPORTERS:
22                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                              CERTIFICATE NUMBER 8074
23                            LEE-ANNE SHORTRIDGE, CSR, CRR
                              CERTIFICATE NUMBER 9595
24
             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25              TRANSCRIPT PRODUCED WITH COMPUTER

```
 1     A P P E A R A N C E S: (CONT'D)

 2     FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                                BY:  MOLLY MCCAFFERTY
 3                                   SHAWN ESTRADA
                                THE ORRICK BUILDING
 4                              405 HOWARD STREET
                                SAN FRANCISCO, CALIFORNIA 94105
 5
                                BY:  JEFFREY COOPERSMITH
 6                                   AARON BRECHER
                                     AMANDA MCDOWELL
 7                              701 FIFTH AVENUE, SUITE 5600
                                SEATTLE, WASHINGTON 98104
 8
                                BY:  STEPHEN CAZARES
 9                              77 SOUTH FIGUEROA STREET, SUITE 3200
                                LOS ANGELES, CALIFORNIA 90017
10
                                BY:  AMY WALSH
11                              51 W 52ND STREET
                                NEW YORK, NEW YORK 10019
12

13     ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                                BY:  MADDI WACHS, PARALEGAL
14                                   SARA SLATTERY, PARALEGAL

15                              ORRICK, HERRINGTON & SUTCLIFFE
                                JENNIFER CYGNOR, PARALEGAL
16
                                PROLUMINA
17                              BY:  COREY ALLEN
                                2200 SIXTH AVENUE, SUITE 425
18                              SEATTLE, WASHINGTON 98121

19                              UNITED STATES POSTAL INSPECTION SERVICE
                                BY:  CHRISTOPHER MCCOLLOW
20
                                FEDERAL BUREAU OF INVESTIGATION
21                              BY:  MARIO C. SCUSSEL

22                              UNITED STATES FOOD & DRUG
                                ADMINISTRATION
23                              BY:  GEORGE SCAVDIS

24

25
```

INDEX OF PROCEEDINGS

GOVERNMENT'S:


**DANIEL MOSLEY**
CROSS-EXAM BY MR. CAZARES (RES.)        P. 5336
REDIRECT EXAM BY MR. SCHENK             P. 5357


**ALAN EISENMAN**
DIRECT EXAM BY MR. BOSTIC               P. 5362
CROSS-EXAM BY MS. WALSH                 P. 5425
REDIRECT EXAM BY MR. BOSTIC             P. 5502
RECROSS-EXAM BY MS. WALSH               P. 5514
FURTHER REDIRECT EXAM BY MR. BOSTIC     P. 5527


**LYNETTE SAWYER**
DIRECT EXAM BY MR. LEACH                P. 5531
CROSS-EXAM BY MS. WALSH                 P. 5547

```
1
2                          INDEX OF EXHIBITS
3                          IDENT.        EVIDENCE
4      GOVERNMENT'S
5      663                                5378
       1334                               5396
6      1371, PAGES 1-8                    5406
       2057                               5414
7      2468, REDACTED                     5419
       713                                5464
8      1362                               5469
9
10
11
12
13
14     DEFENDANT'S
15     14124                              5343
       14135                              5353
16     14103                              5441
       12285, REDACTED                    5451
17     14224                              5453
       14225                              5455
18     14226                              5459
       12185                              5461
19     12252                              5463
       12999                              5485
20     13150                              5493
       13191                              5497
21
22
23
24
25
```

5291

| | | |
|---|---|---|
| | 1 | SAN JOSE, CALIFORNIA                              MAY 11, 2022 |
| | 2 | P R O C E E D I N G S |
| 08:36AM | 3 | (COURT CONVENED AT 8:36 A.M.) |
| 08:36AM | 4 | (JURY OUT AT 8:36 A.M.) |
| 08:36AM | 5 | THE COURT:  LET'S GO ON THE RECORD IN THE BALWANI |
| 08:36AM | 6 | MATTER. |
| 08:36AM | 7 | ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT. |
| 08:36AM | 8 | WE'RE OUTSIDE OF THE PRESENCE OF THE JURY. |
| 08:36AM | 9 | WE'RE GOING TO HAVE A DISCUSSION ABOUT, LET'S SEE, IT'S |
| 08:36AM | 10 | 1425 I BELIEVE IT IS. |
| 08:36AM | 11 | DOCKET 1425 WAS MR. BALWANI'S MOTION TO COMPEL LIS |
| 08:36AM | 12 | EVIDENCE.  I'VE READ THAT. |
| 08:36AM | 13 | 1426 WAS THE GOVERNMENT'S OPPOSITION TO MR. BALWANI'S |
| 08:36AM | 14 | MOTION. |
| 08:36AM | 15 | 1431 WAS MR. BALWANI'S REPLY. |
| 08:37AM | 16 | I THINK THAT'S ALL OF THE DOCUMENTS RELATED FOR DISCUSSION |
| 08:37AM | 17 | THIS MORNING. |
| 08:37AM | 18 | ARE THERE ANY OTHERS, ANY OTHER FILINGS THAT I SHOULD BE |
| 08:37AM | 19 | AWARE OF IN REGARDS TO THIS MOTION? |
| 08:37AM | 20 | MR. COOPERSMITH:  JUST THE DECLARATION ACCOMPANYING |
| 08:37AM | 21 | OUR MOTION, YOUR HONOR.  YOU PROBABLY HAVE THAT AS WELL. |
| 08:37AM | 22 | THE COURT:  I DO. |
| 08:37AM | 23 | MR. COOPERSMITH:  THANK YOU. |
| 08:37AM | 24 | THE COURT:  ALL RIGHT.  LET ME HEAR FROM THE |
| 08:37AM | 25 | PARTIES. |

08:37AM 1              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.  AS THE

08:37AM 2    COURT HAS READ, THIS IS A MOTION TO COMPEL CERTAIN DISCOVERY

08:37AM 3    UNDER RULE 16 AND BRADY.

08:37AM 4              AND JUST -- I THINK THE COURT IS VERY FAMILIAR WITH THIS

08:37AM 5    ISSUE FROM PRIOR MOTION PRACTICE, BUT JUST TO JUMP INTO IT,

08:37AM 6    THERE'S A BRADY LETTER THAT THE GOVERNMENT SENT THE DEFENSE ON

08:37AM 7    OCTOBER 29TH, 2020.  SO I KNOW THAT THE LETTER IS PHRASED IN

08:37AM 8    TERMS OF, WELL, THE DEFENSE MAY THINK THIS IS BRADY, SO HERE

08:38AM 9    YOU GO.

08:38AM 10             BUT THE GOVERNMENT WAS OBVIOUSLY CONCERNED ENOUGH ABOUT IT

08:38AM 11   THAT THEY THOUGHT THAT THE CONTENT FELL WITHIN THEIR BRADY

08:38AM 12   OBLIGATIONS, SO THEY WROTE A RATHER LENGTHY LETTER.

08:38AM 13             AND WE'RE NOT ASKING FOR -- AS YOU MAY HAVE SEEN IN PRIOR

08:38AM 14   PRACTICE IN CONNECTION WITH THE MOTION TO SUPPRESS, WE'RE NOT

08:38AM 15   ASKING FOR EVERYTHING UNDER THE SUN THAT RELATES TO THIS

08:38AM 16   LETTER.

08:38AM 17             WE'RE SIMPLY ASKING FOR VERY PARTICULAR THINGS REFERENCING

08:38AM 18   CERTAIN PARAGRAPHS IN THE BRADY LETTER, AND THOSE ARE SET FORTH

08:38AM 19   ON THE LAST PAGE OF DOCUMENT 1425 EXACTLY WHAT THOSE NUMBERS

08:38AM 20   ARE.

08:38AM 21             SO WHY ARE WE ENTITLED TO THIS?

08:38AM 22             FIRST OF ALL, AS THE COURT KNOWS, IN THE RULING ON THE

08:38AM 23   MOTION IN LIMINE, THIS IS DOCKET 1326 AT PAGE 39, IT WAS IN THE

08:38AM 24   CONTEXT OF A DIFFERENT MOTION ABOUT COORDINATION WITH

08:38AM 25   JOURNALISTS, BUT THE LANGUAGE THAT THIS COURT USED, AND BASED

08:39AM 1    ON NINTH CIRCUIT LAW, WAS THAT NOTHING IN THIS ORDER, MEANING

08:39AM 2    THE MIL ORDER, IS INTENDED TO PRECLUDE BALWANI FROM PRESENTING

08:39AM 3    EVIDENCE OR ARGUMENT CONCERNING THE DETAILS, THOROUGHNESS OR

08:39AM 4    GOOD FAITH OF THE CRIMINAL INVESTIGATION.

08:39AM 5        AND THAT LANGUAGE THAT THIS COURT USED, THAT'S AT DOCKET

08:39AM 6    1326 AT PAGE 39, IS SQUARELY IN LINE WITH THE NINTH CIRCUIT

08:39AM 7    PRECEDENT ON THIS ISSUE.

08:39AM 8        WHAT IS THAT?

08:39AM 9        SO WE CITED THOSE CASES IN OUR BRIEF.  ONE OF THE CASES,

08:39AM 10   OF COURSE, IS CROSBY AND THERE'S THE SUPREME COURT CASE KYLES

08:39AM 11   VERSUS WHITLEY.

08:39AM 12       AND THEN IF YOU LOOK, YOUR HONOR, IN PARTICULAR AT

08:39AM 13   DOCUMENT 1431, THIS IS OUR REPLY BRIEF, AT PAGE 4, WE COLLECT

08:39AM 14   THOSE AUTHORITIES AND THERE'S SOMETHING VERY IMPORTANT THAT I

08:39AM 15   WANT TO NOTE ABOUT THESE, AND THAT IS THAT THOSE CASES DO NOT

08:40AM 16   REQUIRE THAT THE EVIDENCE BE ACTUALLY EXCULPATORY.

08:40AM 17       I KNOW FROM THE COURT'S PRIOR RULINGS THE COURT VIEWED

08:40AM 18   THIS LIS EVIDENCE AS, WELL, IT'S SPECULATIVE.  WE'RE NOT SURE

08:40AM 19   WHETHER IT HELPS THE DEFENSE OR HELPS THE GOVERNMENT.  IT COULD

08:40AM 20   HELP THE GOVERNMENT, IT COULD HELP THE DEFENSE.  WE JUST DON'T

08:40AM 21   KNOW BECAUSE NO ONE HAS IT.

08:40AM 22       THAT DOESN'T MATTER, YOUR HONOR.  I WOULD POINT THE COURT

08:40AM 23   IN PARTICULAR TO THE HOWELL CASE THAT WE CITED.  THE HOWELL

08:40AM 24   CASE IS 231 F.3D 615, AND THAT'S INSTRUCTIVE FOR THE FOLLOWING

08:40AM 25   REASON:  AND HOWELL, WHAT ACTUALLY HAPPENED WAS THE POLICE

08:40AM 1      INVESTIGATION, THERE WERE CERTAIN REPORTS THAT WERE INCORRECT.

08:40AM 2           THE INTERESTING THING ABOUT IT, THOUGH, IS THE INCORRECT

08:40AM 3      NATURE OF THE REPORTS WAS THAT IT SHOWED THAT THE CASH AT ISSUE

08:40AM 4      WAS IN THE POSSESSION OF THE DEFENDANT, THAT WAS REALLY THE

08:40AM 5      TRUTH, AND THE POLICE REPORT SAID IT WAS IN THE POSSESSION OF

08:40AM 6      SOME OTHER PERSON.

08:40AM 7           SO ACTUALLY IF THE REPORTS HAD BEEN CORRECT, THEY WOULD

08:40AM 8      HAVE BEEN INCULPATORY, NOT EXCULPATORY.  BUT STILL THE

08:41AM 9      NINTH CIRCUIT IN HOWELL SAID THE DEFENSE STILL SHOULD HAVE

08:41AM 10     GOTTEN THE EVIDENCE BECAUSE EVEN IF IT'S INCULPATORY, IT BEARS

08:41AM 11     ON THE SLOPPINESS AND THOROUGHNESS AND SO FORTH OF THE POLICE

08:41AM 12     INVESTIGATION.

08:41AM 13          I WILL SAY ONE WORD ABOUT THE GOVERNMENT'S ATTEMPT TO

08:41AM 14     DISTINGUISH THESE CASES.  I JUST DON'T SEE IT.

08:41AM 15          THEY'VE SAID, WELL, YOU KNOW, THAT WAS THE POLICE, THIS IS

08:41AM 16     THE PROSECUTION.

08:41AM 17          THAT MAKES NO DIFFERENCE UNDER BRADY AND ITS PROGENY,

08:41AM 18     WHETHER WHICH PARTICULAR LAW ENFORCEMENT PERSONNEL OR AGENCY IS

08:41AM 19     INVOLVED, IT'S ALL THE SAME.

08:41AM 20          NOW, GOING A LITTLE BIT FURTHER, YOUR HONOR, THERE'S

08:41AM 21     OBVIOUSLY A FACTUAL DISPUTE ABOUT WHAT THE GOVERNMENT COULD

08:41AM 22     HAVE DONE, IF ANYTHING, ABOUT RESTORING THE LIS.

08:41AM 23          AND WE SAY, THROUGH OUR EXPERT THAT WE'VE PRESENTED, AND

08:41AM 24     THE COURT HAS I THINK REVIEWED HIS DECLARATION, WHICH I BELIEVE

08:41AM 25     IS DOCKET 1158, DOCKET 1158.  THROUGH OUR EXPERT, WE CONTEND

5295

08:42AM 1   THAT THE GOVERNMENT COULD HAVE RESTORED THE LIS IF IT HAD

08:42AM 2   SIMPLY FOLLOWED THE ADVICE OF ITS OWN ALS SUPERVISOR AND

08:42AM 3   RECOVERED THE SERVERS.

08:42AM 4       THE GOVERNMENT SAYS THAT'S NOT CORRECT.  THEY POINT TO

08:42AM 5   OTHER WITNESSES AND OTHER EVIDENCE THAT THEY SAY IS CONTRARY TO

08:42AM 6   THAT.

08:42AM 7       THE COURT LOOKED AT THESE FACTUAL ISSUES IN THE CONTEXT OF

08:42AM 8   THE MOTION TO SUPPRESS, AND THE COURT IN THAT CONTEXT FOUND

08:42AM 9   THAT WHILE -- RESOLVED THAT FACTUAL DISPUTE IN FAVOR OF THE

08:42AM 10  GOVERNMENT, RIGHT?  THAT BASED ON THE 302'S AND THE

08:42AM 11  GOVERNMENT'S REPRESENTATIONS, AND REVIEWING OUR EXPERT'S

08:42AM 12  DECLARATION, THE COURT THOUGHT, WELL, YEAH, I THINK ON BALANCE

08:42AM 13  THE GOVERNMENT IS RIGHT AND I WON'T SUPPRESS THE EVIDENCE.

08:42AM 14      AND THE COURT REMARKED THAT, WELL, AT MOST, MAYBE THE

08:42AM 15  GOVERNMENT WAS NEGLIGENT.  IT DIDN'T FIND THAT IT WAS

08:42AM 16  NEGLIGENT, BUT SAID AT MOST THAT COULD BE THE CASE.

08:43AM 17      THAT WHOLE EPISODE, YOUR HONOR, IS INTERESTING FOR THE

08:43AM 18  MOTION TO SUPPRESS.

08:43AM 19      BUT THAT HAS NO BEARING ON THE CURRENT ISSUE, WHICH IS

08:43AM 20  SIMPLY GETTING THE MATERIAL THAT WE'RE ASKING FOR UNDER THESE

08:43AM 21  PARAGRAPHS, BECAUSE AS WE'VE POINTED OUT IN OUR BRIEF, THESE

08:43AM 22  KINDS OF FACTUAL DISPUTES ULTIMATELY ARE FOR THE JURY.

08:43AM 23      AND AS I'VE POINTED TO BASED ON THIS COURT'S RULING AND

08:43AM 24  THE NINTH CIRCUIT PRECEDENT, WE HAVE A RIGHT TO PRESENT THIS

08:43AM 25  DEFENSE IN RELIANCE ON THOSE RULINGS.  WE MENTIONED THIS IN

08:43AM 1    OPENING STATEMENT, AND THAT'S CONSISTENT WITH THE LAW.

08:43AM 2        AND THEN ONCE WE PRESENT THE DEFENSE, IT'S GOING TO BE A

08:43AM 3    JURY QUESTION.

08:43AM 4        THE GOVERNMENT IS CERTAINLY FREE TO CALL WITNESSES OR

08:43AM 5    CROSS-EXAMINE OUR WITNESSES TO SAY THAT THEY'RE RIGHT AND THEY

08:43AM 6    COULD HAVE DONE NOTHING, AND WE'LL SAY, WELL, THAT'S NOT THE

08:43AM 7    CASE.

08:43AM 8        SAME AS THESE OTHER CASES WHERE WE'VE GOT, YOU KNOW, OTHER

08:43AM 9    INDICATIONS OF LACK OF THOROUGHNESS OR SLOPPINESS OF POLICE OR

08:43AM 10   OTHER GOVERNMENT INVESTIGATIONS.

08:43AM 11       SO, YOUR HONOR, ONE OF THE OTHER POINTS I THINK THAT IS

08:44AM 12   WORTH MENTIONING IS THAT THE GOVERNMENT HAS SAID, WELL, WE PUT

08:44AM 13   THIS IN A BRADY LETTER, SO THAT'S ALL YOU'RE ENTITLED TO.

08:44AM 14       WELL, THAT'S JUST NOT THE CASE.

08:44AM 15       FIRST OF ALL, IN THEIR OPPOSITION BRIEF, THAT IS DOCKET

08:44AM 16   1426, THE ONLY THING THAT THEY CITE FOR THAT PROPOSITION AT

08:44AM 17   PAGE 9 IS THE JUSTICE MANUAL, THE DEPARTMENT OF JUSTICE'S OWN

08:44AM 18   MANUAL, THAT SAYS IN SOME CASES IT MIGHT BE APPROPRIATE TO PUT

08:44AM 19   SOMETHING IN A LETTER RATHER THAN DISCLOSE THE UNDERLYING

08:44AM 20   EVIDENCE.

08:44AM 21       WELL, IF -- I KNOW WHAT WOULD HAPPEN, BECAUSE I'VE BEEN

08:44AM 22   THERE, WHEN WE CITE THE JUSTICE MANUAL FOR SOMETHING AND WE'RE

08:44AM 23   REMINDED THAT'S NOT LAW AND THAT'S NOT PRECEDENT, AND FOR THEM

08:44AM 24   TO CITE THEIR OWN DEPARTMENT'S MANUAL FOR SOMETHING RATHER THAN

08:44AM 25   CASE LAW I DON'T THINK IS PERSUASIVE.

08:44AM  1       THAT SAID, YOUR HONOR, I THINK WE'RE TALKING ABOUT WHETHER

08:44AM  2   WE GET THE EVIDENCE THAT ACTUALLY UNDERLIES THEIR PARAGRAPH.

08:44AM  3       SO IF THERE'S AN EMAIL COMMUNICATION FROM THEIR ALS

08:45AM  4   SUPERVISOR THAT LAYS OUT WHAT THEY SHOULD DO, IF THERE'S AN

08:45AM  5   EMAIL FROM THAT PERSON, THEY HAVE ALREADY TOLD US THAT THAT

08:45AM  6   EMAIL EXISTS, WE'RE ASKING FOR THE EMAIL, NOT THEIR CRAFTED

08:45AM  7   VERSION OF WHAT HAPPENED IN THEIR LETTER.

08:45AM  8       AND THERE'S NO REASON WE SHOULDN'T GET THAT.

08:45AM  9       FIRST OF ALL, THAT TYPE OF THING IS NOT MENTAL

08:45AM 10   IMPRESSIONS, IT'S NOT PROSECUTION STRATEGY, IT'S NOT THE

08:45AM 11   GOVERNMENT TEAM'S VIEW OF WHAT EVIDENCE THEY SHOULD PRESENT AND

08:45AM 12   WHY AND HOW THEY SHOULD PROSECUTE.  IT'S SIMPLY A FACTUAL EMAIL

08:45AM 13   SAYING, YOU KNOW, GO GET THE SUPERVISOR.

08:45AM 14       AND IN ADDITION, YOUR HONOR, THEY HAVE ALREADY PUT IT IN A

08:45AM 15   BRADY LETTER.

08:45AM 16       AND SO FOR THEM TO SAY, WELL, YOU'RE ENTITLED TO THE

08:45AM 17   INFORMATION, WE'RE BASICALLY WAIVING WHATEVER WORK PRODUCT

08:45AM 18   COULD OTHERWISE EXIST, WHICH WE THINK IS NONE, BUT THEY'RE

08:45AM 19   PUTTING IT IN A LETTER, THEN TO SAY, WELL, YOU CAN'T GET THE

08:45AM 20   ACTUAL EMAIL DOESN'T MAKE ANY SENSE.

08:45AM 21       AND, OF COURSE, THERE ARE OTHER PARTS OF THEIR BRADY

08:46AM 22   LETTER, IN PARTICULAR PARAGRAPHS 48, 50, AND 51, THAT ARE

08:46AM 23   ACTUALLY COMMUNICATIONS WITH THIRD PARTIES, SO THERE'S

08:46AM 24   OBVIOUSLY NO WORK PRODUCT THAT APPLIES TO THOSE.

08:46AM 25       SO THE WORK PRODUCT ARGUMENT, YOUR HONOR, IS A RED

5298

08:46AM  1     HERRING.  IT DOESN'T APPLY, AND WE SHOULD GET THE UNDERLYING

08:46AM  2     EVIDENCE.

08:46AM  3         THE OTHER THING I'LL SAY ABOUT THAT, YOUR HONOR, IS THAT

08:46AM  4     WHEN WE PRESENT THIS EVIDENCE TO THE JURY, WE SHOULD BE

08:46AM  5     ENTITLED TO PRESENT THE ACTUAL EVIDENCE AND NOT HAVE TO RELY ON

08:46AM  6     THE GOVERNMENT'S BRADY LETTER AS A PIECE OF EVIDENCE, BECAUSE I

08:46AM  7     DON'T THINK THAT IT'S APPROPRIATE FOR THE JURY TO SEE, WELL,

08:46AM  8     THE GOVERNMENT GAVE US THESE DISCLOSURES AND MAYBE THEY WERE

08:46AM  9     BEING, YOU KNOW, LIKE -- THE JURY DOESN'T KNOW ANYTHING ABOUT

08:46AM  10    BRADY OBLIGATIONS OR WHY THE GOVERNMENT WOULD DO SOMETHING LIKE

08:46AM  11    THAT.  I THINK THE LAYPERSON DOESN'T UNDERSTAND THAT THE

08:46AM  12    GOVERNMENT HAS CERTAIN OBLIGATIONS.

08:46AM  13        WE THINK WE SHOULD BE ABLE TO PRESENT THE EVIDENCE AND THE

08:46AM  14    ISSUE OF BRADY, AND THE GOVERNMENT DISCLOSING IT SHOULDN'T BE A

08:46AM  15    PART OF THE JURY'S THINKING ON THIS.

08:46AM  16        SO, YOUR HONOR, I THINK THAT'S WHAT REALLY, IN SUM,

08:47AM  17    ENTITLES US TO THIS INFORMATION.

08:47AM  18        AND I JUST WANT TO ALSO POINT OUT IN CLOSING, YOUR HONOR,

08:47AM  19    THAT WE'RE TALKING ABOUT DISCOVERY RIGHT NOW.  AND, YOU KNOW,

08:47AM  20    THE GOVERNMENT MAY HAVE ALL SORTS OF OTHER OBJECTIONS TO

08:47AM  21    ADMISSIBILITY OR WHATEVER THEY WANT TO SAY, THEY'RE OBVIOUSLY

08:47AM  22    ENTITLED TO DO THAT, BUT RIGHT NOW WE'RE TALKING ABOUT OUR

08:47AM  23    ABILITY TO GET THIS EVIDENCE, AND THE CASE LAW AND THIS COURT'S

08:47AM  24    PRIOR RULINGS ALLOW US TO DO THAT.

08:47AM  25        THANK YOU.

5299

08:47AM 1           THE COURT:  THANK YOU.

08:47AM 2       SO WHAT IS IT YOU WANT?  THANK YOU FOR TELLING ME ALL OF

08:47AM 3  THAT.  YOU'VE IDENTIFIED THE PARAGRAPHS, PARAGRAPHS IN YOUR

08:47AM 4  1425-3, THERE'S ABOUT FIVE PARAGRAPHS, I THINK, MAYBE SIX, AND

08:47AM 5  YOU SAY THOSE ARE -- MAYBE EIGHT.  AND THE BRADY LETTER TELLS A

08:47AM 6  STORY ABOUT THIS LIS, THIS EVIDENCE.

08:47AM 7       AND FOR PURPOSES OF INFORMING ME ABOUT JUST OUR TRIAL AND

08:48AM 8  THE SCHEDULING OF THIS, I'M INTERESTED IN KNOWING, FROM BOTH

08:48AM 9  YOU AND THE GOVERNMENT, WHERE THIS IS GOING TO GO, AND TRYING

08:48AM 10  TO DISCERN IS ONE THING -- ONE THING I'M GOING TO DO THIS

08:48AM 11  MORNING IS TRY TO DISCERN WHAT IS IT THAT YOU WANT, FIRST OF

08:48AM 12  ALL, AND WHAT IS THE NET RESULT OF THAT SUCH THAT WE CAN

08:48AM 13  DISCUSS IT THIS MORNING?

08:48AM 14       AND I RECOGNIZE THAT I'M NOT -- NONE OF THE QUESTIONS THAT

08:48AM 15  I HAVE ARE INTENDED TO REVEAL, NOR AM I ASKING, NOR WILL I

08:48AM 16  PERMIT YOU TO REVEAL ANYTHING ABOUT WHAT YOUR DEFENSE IS.  I

08:48AM 17  DON'T WANT TO KNOW THAT, AND IT'S NOT MY QUESTIONS.

08:48AM 18       BUT I DO WANT TO KNOW AS BEST AS I CAN TO BE INFORMED

08:48AM 19  ABOUT THE SCHEDULING AND WHAT IS THIS GOING TO ENTAIL.

08:48AM 20           MR. COOPERSMITH:  SURE.

08:48AM 21           THE COURT:  SO YOU'VE IDENTIFIED THESE PARAGRAPHS IN

08:48AM 22  THE BRADY LETTER.  AND YOU SAY YOU WANT MORE INFORMATION.  YOU

08:48AM 23  TALKED A MOMENT AGO ABOUT THE EVIDENCE.

08:49AM 24       DO YOU MEAN THE EMAILS THEMSELVES?  IS THAT WHAT YOU WANT?

08:49AM 25           MR. COOPERSMITH:  YES, YOUR HONOR, EXACTLY.

5300

08:49AM   1          AND IF YOU GO TO DOCKET 1425-2, WHICH IS MY DECLARATION,

08:49AM   2     THAT'S WHERE WE ATTACH THE EXCERPTS OF THE BRADY LETTER.

08:49AM   3          AND JUST, YOU KNOW, TO GIVE YOU AN EXAMPLE, IN

08:49AM   4     PARAGRAPH 46 THERE'S A DISCUSSION OF WHAT THE ALS SUPERVISOR

08:49AM   5     SAID, RIGHT?

08:49AM   6          AND THEN IT SAYS --

08:49AM   7               THE COURT:  IT SAYS -- PARAGRAPH 46 SAYS?

08:49AM   8               MR. COOPERSMITH:  YEAH.  WELL, IF YOU LOOK AT

08:49AM   9     PARAGRAPH 46, THERE'S A WHOLE -- I WON'T READ IT.  THERE'S A

08:49AM  10     LENGTHY DISCUSSION ABOUT WHAT THIS ALS SUPERVISOR ACTUALLY

08:49AM  11     ADVISED THE ATTORNEYS FOR THE GOVERNMENT.

08:49AM  12          AND SO --

08:49AM  13               THE COURT:  AND MY QUESTION IS, WHAT DO YOU WANT?

08:49AM  14               MR. COOPERSMITH:  SO OUR REQUEST WAS IF THIS IS

08:49AM  15     CAPTURED IN A WRITING, SUCH AS AN EMAIL, WE WANT THE EMAIL.

08:49AM  16          AND IF IT'S NOT, THEN THERE'S NO -- THERE'S NOTHING TO

08:50AM  17     PRODUCE IF THERE'S NO DOCUMENT.

08:50AM  18          BUT THERE ARE OTHER EXAMPLES, YOUR HONOR, WHERE IT

08:50AM  19     ACTUALLY IS DESCRIBED THAT THERE'S AN EMAIL, SO WE WANT THE

08:50AM  20     UNDERLYING EMAIL.

08:50AM  21               THE COURT:  OKAY.  DON'T -- I JUST WANT TO KNOW WHAT

08:50AM  22     IT IS YOU WANT.

08:50AM  23               MR. COOPERSMITH:  THAT'S IT.

08:50AM  24               THE COURT:  BECAUSE I'M CURIOUS, WHAT I'D LIKE TO

08:50AM  25     KNOW -- I KNOW YOU'VE GIVEN ME A BROAD -- IN YOUR PLEADINGS,

5301

08:50AM 1   YOU HAVE GIVEN ME A BROAD, AND YOU SAY IT'S A BROAD REQUEST.

08:50AM 2   BUT IT MIGHT BE HELPFUL -- WE MIGHT NOT RESOLVE THIS THIS

08:50AM 3   MORNING.  IT MAY BE THAT I'LL TASK BOTH SIDES TO BE A LITTLE

08:50AM 4   MORE SPECIFIC.

08:50AM 5       IF YOU WANT EMAILS FROM THESE PARAGRAPHS, OR TELL ME WHAT

08:50AM 6   IT IS.  I RECOGNIZE THAT IT'S A BROAD BRADY LETTER.  ONE OF

08:50AM 7   YOUR COLLEAGUES, BEFORE THE CASE WAS SEVERED, SAID HE HAD NEVER

08:50AM 8   SEEN SUCH AN EXPANSIVE BRADY LETTER, I THINK.  SO THAT'S JUST

08:50AM 9   HIS OPINION.

08:50AM 10      BUT WHAT I MIGHT NEED FROM YOU, YOU KNOW, IS A LITTLE BIT

08:50AM 11  MORE INFORMATION TO INFORM ABOUT EMAILS.  IS THIS GOING TO

08:51AM 12  RESULT IN LIVE TESTIMONY FROM INDIVIDUALS?

08:51AM 13      AND THIS IS PROBABLY FOR THE GOVERNMENT, WHAT DO WE --

08:51AM 14  DEPENDENT ON WHAT INFORMATION COMES OUT, WILL THERE BE THEN A

08:51AM 15  MINI TRIAL, WE'VE USED THAT PHRASE BEFORE, ON THIS PARTICULAR

08:51AM 16  ISSUE?

08:51AM 17      THE LIS IS -- IT'S PART OF THE CASE.  YOU'VE CONCEDED THAT

08:51AM 18  IN YOUR PLEADINGS THAT YOU RAISED IT STRATEGICALLY IN YOUR

08:51AM 19  OPENING STATEMENT BECAUSE IT'S PART OF YOUR DEFENSE, AND WHAT

08:51AM 20  IS THE NET RESULT OF THAT?

08:51AM 21      DOES THE LIS COMING INTO EVIDENCE HERE, DOES THAT THEN

08:51AM 22  MEAN THAT ANCILLARY EVIDENCE IS GOING TO COME IN ABOUT ITS

08:51AM 23  CONSTRUCTION?  WHO CONSTRUCTED IT?  WHO HIRED THE PERSON WHO

08:51AM 24  CONSTRUCTED IT?  AND IS THERE ANYTHING WE NEED TO BE CONCERNED

08:51AM 25  ABOUT THAT INFORMATION COMING IN THAT WILL AFFECT THIS TRIAL?

08:52AM 1     AND WE NEED TO CONSIDER THAT.  IS THAT PART OF THE MINI

08:52AM 2  TRIAL THAT WE GET INTO ANY RELATIONSHIPS THAT MIGHT EXIST WITH

08:52AM 3  THE CREATOR OF THE LIS?  AND IS THAT PERSON, OR PERSONS,

08:52AM 4  WHOEVER THAT GROUP IS, IS THAT GOING TO COME INTO EVIDENCE IN

08:52AM 5  THIS CASE?

08:52AM 6     AND THIS IS MORE FOR SCHEDULING, AND CANDIDLY FOR 403

08:52AM 7  PURPOSES, IS HOW FAR ARE WE GOING TO GO WITH THAT?

08:52AM 8     MR. COOPERSMITH:  SURE.

08:52AM 9     THE COURT:  THESE ARE BROAD QUESTIONS.  I'M NOT

08:52AM 10  GOING TO ASK YOU TO ANSWER RIGHT NOW BECAUSE YOU PROBABLY DON'T

08:52AM 11  HAVE AN ANSWER FOR ME.

08:52AM 12     MR. COOPERSMITH:  WELL, I HAVE SOME ANSWERS AND I

08:52AM 13  THINK I CAN PROVIDE SOME GUIDANCE ON THAT AND TRY TO ANSWER THE

08:52AM 14  COURT'S QUESTIONS.

08:52AM 15     THE COURT:  SURE.

08:52AM 16     MR. COOPERSMITH:  SO, FIRST OF ALL, JUST IN TERMS TO

08:52AM 17  START WITH THE INITIAL QUESTION OF WHAT EXACTLY DO WE WANT?

08:52AM 18     AND IF YOU GO TO THE SAME DECLARATION, WHICH IS DOCKET

08:52AM 19  1425-3, THAT'S THE VERY SHORT LETTER THAT I SENT TO THE

08:52AM 20  GOVERNMENT MAKING THE REQUEST.

08:52AM 21     AND AS THE COURT MIGHT REMEMBER, EARLIER IN THE MOTION TO

08:52AM 22  SUPPRESS CONTEXT, THERE WAS A MUCH BROADER REQUEST.  IN FACT,

08:53AM 23  IT WAS MS. HOLMES'S ORIGINAL DRAFT OF THAT AND THEN WE ADOPTED

08:53AM 24  THAT.

08:53AM 25     THIS IS A MUCH MORE NARROW REQUEST.  ALL WE'RE ASKING FOR

08:53AM 1    IS COMMUNICATIONS, IF THEY EXIST IN WRITTEN FORM, THAT

08:53AM 2    SPECIFICALLY -- THAT ARE SPECIFICALLY REFERENCED IN CERTAIN

08:53AM 3    PARAGRAPHS.

08:53AM 4         AND WE'VE EVEN CUT THAT DOWN EVEN MORE FOR PURPOSES OF THE

08:53AM 5    MOTION.  AND IF YOU GO TO THE LAST PAGE OF DOCKET 1425, YOU'LL

08:53AM 6    SEE THAT WE ONLY HAVE, YOU KNOW, A FEW PARAGRAPHS.

08:53AM 7         SO WE ARE ASKING FOR -- YOU KNOW, MOST PEOPLE COMMUNICATE

08:53AM 8    BY EMAILS THESE DAYS, AND IF SOMEONE IN THE GOVERNMENT SENDS

08:53AM 9    ANOTHER PERSON IN THE GOVERNMENT A LETTER, THAT WOULD BE A

08:53AM 10   COMMUNICATION, BUT PROBABLY IT'S EMAILS.

08:53AM 11        SO IF THERE'S AN EMAIL UNDERLYING ANY OF THE INFORMATION

08:53AM 12   IN THE PARAGRAPHS THAT WE'VE MENTIONED, WHICH ARE NOT THE

08:53AM 13   ENTIRE BRADY LETTER, IT'S JUST VERY SPECIFIC PARTS, WE TRIED TO

08:53AM 14   BE VERY SELECTIVE, WE WANT THE EMAIL.

08:53AM 15        SO THAT'S WHAT WE WANT.  OKAY?

08:53AM 16        SO I THINK IT'S NOT AS BROAD AS A BRADY LETTER MIGHT BE.

08:53AM 17   OUR REQUEST IS NOT BROAD.

08:53AM 18        MOVING FORWARD, YOUR HONOR, IN TERMS OF WHERE THIS GOES,

08:54AM 19   FIRST OF ALL, RIGHT NOW WE'RE ASKING FOR THE DISCOVERY.  AND AS

08:54AM 20   THE CASE LAW INDICATES, THE PURPOSE OF DISCOVERY IS FOR US TO

08:54AM 21   DECIDE, LIKE, WHAT WE'RE DOING.

08:54AM 22        IN FACT, THERE ARE CASES THAT WE HAVE CITED THAT SAY EVEN

08:54AM 23   IF THE EVIDENCE, LIKE, MAKES THE DEFENSE GO IN A DIFFERENT

08:54AM 24   DIRECTION, THAT'S STILL RULE 16 AND SO FORTH.

08:54AM 25             THE COURT:  RIGHT, RIGHT, RIGHT.

5304

08:54AM  1        MR. COOPERSMITH:  SO RIGHT NOW IT COULD BE WE GET

08:54AM  2   THESE MATERIALS AND WE SAY, YOU KNOW, HAVING REVIEWED THE

08:54AM  3   MATERIALS, WE'RE NOT PRESENTING A DEFENSE AT ALL.  I MEAN, WE

08:54AM  4   CAN MAKE THAT DECISION.

08:54AM  5        THE COURT:  I UNDERSTAND THAT.  I UNDERSTAND ALL OF

08:54AM  6   THAT.

08:54AM  7        MR. COOPERSMITH:  RIGHT.

08:54AM  8     BUT IF WE DO, RIGHT, AND THIS IS NO SECRET BECAUSE WE'VE

08:54AM  9   ALREADY DISCLOSED MR. SONNIER, S-O-N-N-I-E-R, THE EXPERT.

08:54AM 10     IF WE WERE TO GO THAT ROUTE, WE WOULD ANTICIPATE

08:54AM 11   PRESENTING AN EXPERT, MR. SONNIER, WHO WOULD TALK ABOUT THE

08:54AM 12   MICROSOFT SQL SERVER DATABASE SYSTEM AND WHAT HE KNOWS ABOUT

08:54AM 13   THAT, AND HE WOULD LOOK AT THE TERMS THAT ARE AVAILABLE TO HIM.

08:55AM 14        THE COURT:  AND I DON'T NEED HIS ENTIRE TESTIMONY

08:55AM 15   RIGHT NOW.

08:55AM 16        MR. COOPERSMITH:  SURE.

08:55AM 17        THE COURT:  BUT WHAT HE WOULD DO THEN IS WHAT YOUR

08:55AM 18   DESIGN WOULD BE IS TO CHALLENGE THE GOVERNMENT'S

08:55AM 19   REPRESENTATION, OR AT LEAST ONE EMPLOYEE'S REPRESENTATION TO

08:55AM 20   THE TEAM THAT YOU SHOULD GO DO X, AND THEY DIDN'T DO X, AND

08:55AM 21   YOUR EXPERT WOULD SAY THEY SHOULD HAVE DONE X BECAUSE THEY

08:55AM 22   WOULD HAVE HAD IT.

08:55AM 23     AND THEN THE POINT OF THAT IS THEN TO BLAME THE GOVERNMENT

08:55AM 24   FOR NOT -- FOR DESTROYING IT?  FOR BEING THE CAUSE OF THE

08:55AM 25   INACCESSIBILITY OF THE LIS?  IS THAT THE PURPOSE?

08:55AM 1          MR. COOPERSMITH:  RIGHT.  IF THEY HAD CONDUCTED A

08:55AM 2    PROPER INVESTIGATION, WHICH IS WHAT THE CASE LAW SAYS WE CAN

08:55AM 3    DO --

08:55AM 4          THE COURT:  I UNDERSTAND.

08:55AM 5          MR. COOPERSMITH:  -- THEN WE, THEN WE WOULD HAVE HAD

08:55AM 6    EVIDENCE THAT WE CONTEND WOULD ADD TO THE BODY OF EXCULPATORY

08:55AM 7    EVIDENCE.

08:55AM 8        AND THE GOVERNMENT OBVIOUSLY WOULD BE FREE TO SAY, WELL,

08:55AM 9    NO, IT WOULD BE INCULPATORY OR, NO, LIKE MR. SONNIER IS WRONG

08:55AM 10   AND THE GOVERNMENT COULD HAVE DONE ANYTHING.

08:56AM 11       THAT'S ALL FAIR GAME ONCE WE PRESENT THAT EVIDENCE IF WE

08:56AM 12   WERE TO DO THAT.

08:56AM 13       BUT WE ARE GOING INTO -- LIKE, OUR VIEW IS THAT ALL OF THE

08:56AM 14   INFORMATION IN THE LIS WE BELIEVE IS EXCULPATORY, WE WOULD

08:56AM 15   PRESENT THAT CASE, AND THE ISSUES WITH THE GOVERNMENT NOT

08:56AM 16   HAVING OBTAINED IT, IN OUR VIEW WHEN THEY COULD HAVE, IS PART

08:56AM 17   OF THAT PROCESS THAT THE CASE LAW ALLOWS US TO PRESENT.

08:56AM 18          THE COURT:  SO HOW MUCH, HOW MUCH OF THE STORY OF

08:56AM 19   THE DESTRUCTION OF THE LIS -- WHICH WAS NOT DONE BY THE

08:56AM 20   GOVERNMENT.  I THINK YOU WOULD AGREE WITH THAT.

08:56AM 21          MR. COOPERSMITH:  SO, YOUR HONOR --

08:56AM 22          THE COURT:  OH, YOU DON'T?  YOU DON'T?

08:56AM 23          MR. COOPERSMITH:  NO, NO, NO.  I WANT TO MAKE SURE I

08:56AM 24   UNDERSTAND THE COURT'S QUESTION.

08:56AM 25          THE COURT:  MY QUESTION IS, ARE YOU SAYING THAT THE

08:56AM 1    GOVERNMENT DESTROYED THE LIS WHEN THEY -- THE GOVERNMENT

08:56AM 2    DECOMMISSIONED THE SERVERS?

08:56AM 3              MR. COOPERSMITH:  WE KNOW, AND I DON'T THINK IT'S

08:56AM 4    DISPUTED, YOUR HONOR, THAT THE DECOMMISSIONING OF THE SERVERS

08:56AM 5    WAS DONE BY THERANOS.

08:56AM 6              THE COURT:  RIGHT.

08:56AM 7              MR. COOPERSMITH:  MR. BALWANI WASN'T THERE, RIGHT.

08:57AM 8              THE COURT:  SO YOU'RE NOT SAYING THAT THE GOVERNMENT

08:57AM 9    DID THAT?

08:57AM 10             MR. COOPERSMITH:  I'M NOT SAYING THAT THE GOVERNMENT

08:57AM 11   DECOMMISSIONED THE SERVERS.

08:57AM 12             THE COURT:  RIGHT.

08:57AM 13             MR. COOPERSMITH:  BUT IT IS TRUE, AND IT'S IN THE

08:57AM 14   BRADY LETTERS AS WELL --

08:57AM 15             THE COURT:  LET ME -- HANG ON.  YOU'LL HAVE A

08:57AM 16   CHANCE.

08:57AM 17             MR. COOPERSMITH:  SURE, YOUR HONOR.  I'M SORRY.

08:57AM 18   PLEASE.

08:57AM 19             THE COURT:  FOLLOW MY QUESTIONS, PLEASE.

08:57AM 20             MR. COOPERSMITH:  OF COURSE.

08:57AM 21             THE COURT:  SO IS PART OF YOUR CASE THEN NOT TO

08:57AM 22   BLAME THE GOVERNMENT FOR DECOMMISSIONING THE SERVERS, BUT WHAT

08:57AM 23   YOU WANT TO CHALLENGE IS BUT FOR THE GOVERNMENT'S LACK OF

08:57AM 24   ATTENTION TO DETAIL, WE WOULD HAVE HAD THE LIS AND THAT WOULD

08:57AM 25   HAVE PERHAPS ALLOWED US TO PROVIDE EXCULPATORY EVIDENCE BECAUSE

08:57AM 1    WE WOULD HAVE THEN BEEN ABLE TO DO SOMETHING MAGICAL WITH THE

08:57AM 2    CONTENTS THAT WOULD HAVE SHOWN THAT THE MACHINES WERE RELIABLE?

08:57AM 3    IS THAT WHAT YOU'RE SAYING?

08:57AM 4         MR. COOPERSMITH:  YOUR HONOR, THAT'S ESSENTIALLY

08:57AM 5    RIGHT, JUST WITH A FEW TWEAKS IF I MAY.

08:58AM 6         THE COURT:  UH-HUH, SURE.

08:58AM 7         MR. COOPERSMITH:  AND THAT IS THAT THIS CASE IS

08:58AM 8    ABOUT, FROM THE GOVERNMENT'S STANDPOINT AS I UNDERSTAND THE

08:58AM 9    CASE AS IT'S UNRAVELED SO FAR, IS THAT THEY'RE SAYING THAT THE

08:58AM 10   TECHNOLOGY, THAT LAB TESTING FOR THAT MATTER, IS UNRELIABLE AND

08:58AM 11   INACCURATE AND THERANOS WAS NOT CAPABLE OF DOING THAT.

08:58AM 12       JUST THE OTHER DAY, JUST THE OTHER DAY WITH MS. BENNETT ON

08:58AM 13   THE STAND, THE GOVERNMENT, AFTER A LITTLE BIT OF AN EVIDENTIARY

08:58AM 14   FIGHT, PRESENTED A DOCUMENT, A PATIENT IMPACT ASSESSMENT

08:58AM 15   DOCUMENT THAT -- WHERE -- YOU HAVE KNOW, IT WAS HEARSAY, BUT IN

08:58AM 16   ANY EVENT, IT CAME IN AS -- THEY ASKED QUESTIONS OF MS. BENNETT

08:58AM 17   ABOUT ISN'T IT THE CASE THAT EVERY -- THAT THERANOS CONCLUDED

08:58AM 18   THAT EVERY SINGLE TEST HAD A POTENTIAL PATIENT IMPACT, RIGHT?

08:58AM 19   AND THAT WAS WITH THE THERANOS DEVICES.

08:58AM 20       BUT AS THE COURT KNOWS, THERE ARE SOMETHING LIKE, YOU

08:58AM 21   KNOW, 9 MILLION TESTS THAT WERE CONDUCTED HERE.

08:58AM 22       IF WE HAD THE LIS, OUR VIEW OF THE WORLD IS THAT WE COULD

08:59AM 23   HAVE DELVED INTO THAT.  AS DR. ROSENDORFF SAID, YOU DO AN

08:59AM 24   INVESTIGATION WITH EACH AND EVERY PATIENT AND YOU COULD FIND

08:59AM 25   LOTS OF EXCULPATORY INFORMATION IN THE FORM OF ACCURATE TESTS,

5308

08:59AM  1    OR EVEN --

08:59AM  2              THE COURT:  DR. ROSENDORFF SAID THAT?

08:59AM  3              MR. COOPERSMITH:  YEAH.  HE SAID THAT IF HE GOT A

08:59AM  4    PHYSICIAN INQUIRY -- THIS WAS HIS TESTIMONY -- IF HE GOT A

08:59AM  5    PHYSICIAN INQUIRY, ONE OF THE THINGS HE WOULD DO, HE DIDN'T SAY

08:59AM  6    THE ONLY THING HE WOULD DO, BUT ONE OF THE TOOLS HE WOULD USE

08:59AM  7    IS LIS AND HE WOULD DO AN INVESTIGATION, HE WOULD LOOK AT THE

08:59AM  8    PATIENT TRENDS, HE WOULD LOOK AT THE QC DATA, AND HE WOULD USE

08:59AM  9    THAT IN PART TO HELP DETERMINE WHAT WAS GOING ON, RIGHT?

08:59AM 10              THE COURT:  OH, I SEE.

08:59AM 11              MR. COOPERSMITH:  AND IT ALSO MIGHT BE THE CASE --

08:59AM 12              THE COURT:  HE DIDN'T USE THE WORD "EXCULPATORY."

08:59AM 13              MR. COOPERSMITH:  WELL, OF COURSE.  HE SAID HE WOULD

08:59AM 14    DO AN INVESTIGATIONS TO DETERMINE -- TO GET TO THE BOTTOM OF

08:59AM 15    THINGS.

08:59AM 16         AND BY THE SAME TOKEN, OUR POSITION IS THAT WE WOULD BE

08:59AM 17    ABLE TO USE IT TO SHOW, IF WE HAD IT -- WELL, LET'S JUST TAKE

08:59AM 18    ONE EXAMPLE, RIGHT?

08:59AM 19              THE COURT:  LET ME --

08:59AM 20              MR. COOPERSMITH:  SURE, YOUR HONOR.

08:59AM 21              THE COURT:  YOU KNOW, THAT'S ANOTHER QUESTION I HAD

09:00AM 22    IS, IS THERE EVIDENCE THAT OBTAINING THE LIS, HAVING THE LIS,

09:00AM 23    BOTH SIDES, IF WE HAD THE LIS, IT COULD DO WHAT YOU SAY IT

09:00AM 24    COULD DO?

09:00AM 25         NOW, I KNOW THERE HAVE BEEN SOME BROAD STATEMENTS.

5309

| | | |
|---|---|---|
| 09:00AM | 1 | DR. ROSENDORFF TESTIFIED ABOUT ALL OF THE TEST RESULTS GO INTO |
| 09:00AM | 2 | THIS LIS. |
| 09:00AM | 3 | AND THEN HE SAID, OH, YEAH, YOU CAN COMPARE -- I THINK THE |
| 09:00AM | 4 | QUESTIONS WERE, DID YOU THEN PULL BACK THE TESTING DATE AND WHO |
| 09:00AM | 5 | THE PATIENT WAS, WHAT THE TESTS WERE, AND ALL OF THAT RAW DATA. |
| 09:00AM | 6 | BUT IS THERE ANY EVIDENCE HOW THAT COMPARISON WOULD TAKE |
| 09:00AM | 7 | PLACE? |
| 09:00AM | 8 | IN OTHER WORDS, IS THERE ANY EVIDENCE THAT YOU COULD, FROM |
| 09:00AM | 9 | THIS INFORMATION, DO A TEST TO SEE -- TO TEST THE ACCURACY |
| 09:00AM | 10 | OTHER THAN JUST RETRIEVING THE INFORMATION? |
| 09:00AM | 11 | MAYBE I'M NOT BEING ARTICULATE. |
| 09:00AM | 12 | MR. COOPERSMITH:  I THINK I UNDERSTAND THE COURT'S |
| 09:01AM | 13 | QUESTION, AND THE ANSWER IS YES. |
| 09:01AM | 14 | AND THE REASON THE ANSWER IS YES IS THAT, AND JUST |
| 09:01AM | 15 | STICKING TO DR. ROSENDORFF, ALTHOUGH MS. CHEUNG SAID SOME |
| 09:01AM | 16 | THINGS ABOUT THIS TOO, AND DR. PANDORI -- |
| 09:01AM | 17 | THE COURT:  I'M SORRY.  THIS IS ONE THING I MIGHT |
| 09:01AM | 18 | TASK YOU TO DO.  I MIGHT ASK THE PARTIES TO IDENTIFY ON THE |
| 09:01AM | 19 | RECORD WHERE THAT IS.  AND YOU DON'T HAVE TO DO IT RIGHT NOW. |
| 09:01AM | 20 | DON'T TAKE ME LITERALLY. |
| 09:01AM | 21 | BUT THIS IS SOMETHING THAT MIGHT BE HELPFUL FOR OUR FUTURE |
| 09:01AM | 22 | DISCUSSION ON THIS IS, WHAT IN THE RECORD ACTUALLY SAYS THAT |
| 09:01AM | 23 | THE LIS, AT LEAST WHERE WE HAVE IT NOW AND THESE WITNESSES WHO |
| 09:01AM | 24 | HAVE TESTIFIED ON THESE, HAVE SAID, YES, YOU CAN ACTUALLY DO AN |
| 09:01AM | 25 | ANALYSIS OF THIS? |

5310

09:01AM 1                    MR. COOPERSMITH:  YES, YOUR HONOR.

09:01AM 2                    THE COURT:  AS OPPOSED TO JUST RETRIEVING THE

09:01AM 3        INFORMATION.

09:01AM 4                    MR. COOPERSMITH:  SURE, YOUR HONOR.

09:01AM 5                    THE COURT:  RIGHT.

09:01AM 6                    MR. COOPERSMITH:  AND I CAN CERTAINLY PROVIDE THE

09:01AM 7        COURT AND THE GOVERNMENT WITH A MUCH MORE THOROUGH LIST, BUT

09:01AM 8        FOR THE MOMENT, I'LL JUST POINT THE COURT TO FOOTNOTE 3 IN

09:01AM 9        DOCKET 1425 WHERE WE CITE THE TRANSCRIPT OF THIS TRIAL AT 3599

09:02AM 10       TO 3604, AND THEN WE HAVE A PARENTHETICAL WHERE WE EXPLAIN WHAT

09:02AM 11       THAT IS.

09:02AM 12           AND THERE ARE OTHER -- THAT'S ONE EXAMPLE.  THERE ARE

09:02AM 13       OTHER EXAMPLES THAT WE CAN GIVE THE COURT, YOU KNOW, IN A MORE

09:02AM 14       THOROUGH WAY.

09:02AM 15                   THE COURT:  FOOTNOTE?  I'M SORRY.

09:02AM 16                   MR. COOPERSMITH:  FOOTNOTE 3 ON PAGE 3 OF DOCKET

09:02AM 17       1425.

09:02AM 18                   THE COURT:  RIGHT.  THIS IS WHAT WE JUST SAID -- I

09:02AM 19       JUST SAID.  CONFIRMING THE LIS COULD BE USED TO LOOK UP PATIENT

09:02AM 20       RESULT, TREND, DATA, DEVICE, SAMPLE TESTED, AND ALL OF THAT

09:02AM 21       INFORMATION.

09:02AM 22           BUT THAT TELLS US -- PARDON ME FOR USING A SPORTS, YOU

09:02AM 23       KNOW, ANALOGY HERE -- BUT THAT TELLS ME, YEAH, I COULD GO BACK

09:02AM 24       TO THE RECORDS AND FIND OUT HOW MANY AT BATS, HOW MANY STRIKE

09:02AM 25       OUTS, HOW MANY GROUND OUTS TO SECOND BASE AS OPPOSED TO THIRD

09:02AM   1      BASE, HOW MANY HOME RUNS, ET CETERA, ET CETERA.  WE CAN GET ALL

09:02AM   2      OF THAT SABER INFORMATION -- YOU KNOW WHAT SABER IS?

09:02AM   3                  MR. COOPERSMITH:  I DO, YES.

09:02AM   4                  THE COURT:  AND WE CAN GET ALL OF THAT SABER

09:02AM   5      INFORMATION.

09:02AM   6          BUT SO WHAT?  WHAT I HAVEN'T HEARD IS WHERE IS THE

09:03AM   7      INFORMATION IN THE RECORD THAT SAYS WE GET THAT INFORMATION AND

09:03AM   8      WE CAN COMPARE IT WITH ONE PLAYER ON ONE TEAM AND COMPARE THAT

09:03AM   9      TO MANY ANOTHER PLAYER ON ANOTHER TEAM.  I'M NOT SURE WE HAVE

09:03AM  10      THAT.

09:03AM  11                  MR. COOPERSMITH:  FIRST OF ALL, TO STEP BACK, THAT'S

09:03AM  12      NOT THIS MOTION.  WE'RE TALKING ABOUT DISCOVERY RIGHT NOW.

09:03AM  13                  THE COURT:  RIGHT.

09:03AM  14                  MR. COOPERSMITH:  BUT TO ANSWER THE COURT'S QUESTION

09:03AM  15      AND TO USE THE BASEBALL ANALOGY, WHICH I WOULD LIKE TO DO AS

09:03AM  16      WELL, ALL OF THAT SABER INFORMATION THAT THE COURT REFERENCED,

09:03AM  17      ALL OF THOSE STATS, WHILE LOOKING AT ALL OF THAT, WE CAN

09:03AM  18      DETERMINE WHETHER WE'VE GOT A GOOD TEAM OR NOT.  WE CAN

09:03AM  19      DETERMINE SOMETHING ABOUT THAT, RIGHT?

09:03AM  20                  THE COURT:  HERE COMES THE RELIEF PITCHER COMING

09:03AM  21      BEHIND YOU HERE.

09:03AM  22                  MR. COOPERSMITH:  THAT'S ALWAYS HELPFUL, YOUR HONOR,

09:03AM  23      EXCEPT WHEN YOU'RE PITCHING A NO HITTER.

09:03AM  24          (LAUGHTER.)

09:03AM  25                  THE COURT:  YOU'RE SAYING YOU'RE KNOCKING IT OUT OF

09:03AM     1     THE PARK?

09:03AM     2               MR. COOPERSMITH:  I ALWAYS GO FOR THAT, YOUR HONOR,

09:03AM     3     SINCE WE'RE ON BASEBALL, RIGHT?

09:03AM     4               THE COURT:  YES.  WELL, OKAY.

09:04AM     5               MR. COOPERSMITH:  SO, YOUR HONOR, WE DO HAVE THAT.

09:04AM     6          AND THE REASON IS, IS THAT WHEN WE HAVE THE GOVERNMENT

09:04AM     7     PRESENTING A PARTICULAR, WE WOULD SAY AN ANECDOTAL CASE, LET'S

09:04AM     8     SAY IT'S A WOMAN WHO SAID SHE GOT AN INACCURATE HCG TEST,

09:04AM     9     RIGHT?

09:04AM    10          WELL, THAT'S UNFORTUNATE FOR THAT INDIVIDUAL.  BUT WE

09:04AM    11     WOULD WANT TO KNOW, WHAT ARE THE OTHER PATIENTS WHO ARE ON THAT

09:04AM    12     DAY OR ON THAT WEEK HAD HCG TESTS?  AND WHAT DO THOSE RESULTS

09:04AM    13     LOOK LIKE?  AND WHAT DO THE TRENDS LOOK LIKE FOR THE MONTH?

09:04AM    14          AND IF WE'RE TALKING ABOUT HDL, FOR EXAMPLE, ONE OF THE

09:04AM    15     FORMS OF CHOLESTEROL, WELL, WE KIND OF KNOW THAT IN THE GENERAL

09:04AM    16     POPULATION, WE SHOULD GET A CERTAIN PERCENTAGE OF PEOPLE WHO

09:04AM    17     HAVE REALLY HIGH HDL OR REALLY LOW HDL, AND ARE WE SEEING SOME

09:04AM    18     SPIKE IN THAT OVER THE MONTH OR THREE MONTHS?

09:04AM    19          AND THIS IS THE TYPE OF THING THAT DR. ROSENDORFF SAID HE

09:04AM    20     WOULD DO TO INVESTIGATE.

09:04AM    21          HE ALSO SAID THAT THERE ARE TIMES WHERE TO REALLY

09:05AM    22     UNDERSTAND WHETHER A PARTICULAR RESULT IS ACCURATE OR NOT, YOU

09:05AM    23     WOULD ALSO HAVE TO KNOW SOMETHING ABOUT THE PATIENT, RIGHT?

09:05AM    24     YOU WOULD HAVE TO GET SOME MEDICAL RECORDS.

09:05AM    25          IF WE KNEW WHO THE PATIENTS WERE AND WE KNEW WHAT WE WERE

5313

09:05AM 1    LOOKING FOR, WE COULD SUBPOENA MEDICAL RECORDS, AND SO COULD

09:05AM 2    THE GOVERNMENT.

09:05AM 3         SO ALL OF THIS IS POTENTIALLY EXCULPATORY, YOUR HONOR.

09:05AM 4         AND I'M NOT GOING TO SAY WE KNOW IT'S EXCULPATORY.  IT'S

09:05AM 5    POTENTIALLY EXCULPATORY.  THERE ARE WAYS THAT THIS COULD BE

09:05AM 6    USED.

09:05AM 7         FRANKLY, THERE ARE PROBABLY WAYS THAT THE GOVERNMENT COULD

09:05AM 8    ARGUE THAT IT'S INCULPATORY, RIGHT, BUT THAT DOESN'T MATTER.

09:05AM 9         THE COURT:  SO HAVE WE GONE FULL CIRCLE THEN?  ISN'T

09:05AM 10   THAT WHERE WE ARE NOW?

09:05AM 11        MR. COOPERSMITH:  IT DOESN'T EVEN MATTER.

09:05AM 12        THE COURT:  BECAUSE I THINK THIS COURT HAS OBSERVED,

09:05AM 13   IN ITS MIL ORDERS AND OTHERS, THAT IT'S JUST AS LIKELY TO BE

09:05AM 14   INCULPATORY IN THE PRESENT STATE BECAUSE WE JUST DON'T KNOW,

09:05AM 15   WHICH AS I UNDERSTAND IS THE BASIS OF YOUR DISCOVERY MOTION,

09:05AM 16   YOU WANT TO KNOW.

09:05AM 17        BUT I THINK IT'S PRETTY CLEAR WE'RE NOT GOING TO KNOW

09:05AM 18   BECAUSE IT DOESN'T EXIST ANYMORE.

09:06AM 19        MR. COOPERSMITH:  AND THAT HAS NO BEARING,

09:06AM 20   YOUR HONOR, ON EITHER THE DISCOVERY MOTION, WHICH IS BEFORE THE

09:06AM 21   COURT RIGHT NOW --

09:06AM 22        THE COURT:  RIGHT.

09:06AM 23        MR. COOPERSMITH:  -- OR ON THE ABILITY TO PRESENT

09:06AM 24   THE DEFENSE, BECAUSE THAT'S JUST A FACTUAL DISPUTE.

09:06AM 25        AND AS WE POINTED OUT, WE, OF COURSE, RESPECT THE COURT'S

09:06AM  1    RULING, BUT THAT DOES NOT BIND THE PARTIES --

09:06AM  2           THE COURT:  I --

09:06AM  3           MR. COOPERSMITH:  -- IN TERMS OF PRESENTING

09:06AM  4    SOMETHING TO THE JURY.

09:06AM  5      IT'S ALL A FACTUAL ISSUE, WHAT IT MEANS AND WHETHER IT'S

09:06AM  6    EXCULPATORY.

09:06AM  7           THE COURT:  SO WHAT YOU WOULD LIKE TO DO IS YOU

09:06AM  8    WOULD LIKE TO BE ABLE TO SAY TO THE JURY, WE WOULD HAVE LIKED

09:06AM  9    TO HAVE PRESENTED THIS EVIDENCE, BECAUSE WE BELIEVE THAT THAT

09:06AM  10   EVIDENCE WOULD HAVE SHOWN SOMETHING DIFFERENT THAN WHAT THE

09:06AM  11   GOVERNMENT ARGUES.

09:06AM  12     WE CAN'T DO THAT BECAUSE FOR SOME REASON THE GOVERNMENT

09:06AM  13   DIDN'T PRESERVE IT, DIDN'T DO ANY OF THIS, AND THEREFORE, IT'S

09:06AM  14   NOT OUR FAULT.  MAYBE IT'S THE GOVERNMENT'S FAULT.

09:06AM  15     YOU MIGHT ASK FOR AN INSTRUCTION.  WE'RE NOT GOING TO GET

09:06AM  16   INTO THAT RIGHT NOW.

09:06AM  17     BUT THAT'S WHAT YOU WANT TO DO, IT SOUNDS LIKE.  YOU WANT

09:07AM  18   TO RAISE THAT IN FRONT IT OF THE JURY.

09:07AM  19          MR. COOPERSMITH:  YOUR HONOR, AND JUST TO BE BLUNT

09:07AM  20   FOR A MINUTE, NOT ONLY IS THAT WHAT WE WANT TO DO, UNDER THE

09:07AM  21   NINTH CIRCUIT LAW AND IN LIGHT OF THIS COURT'S RULING, WE ARE

09:07AM  22   ENTITLED TO DO THAT.

09:07AM  23          THE COURT:  OKAY.

09:07AM  24          MR. COOPERSMITH:  SO THAT'S OUR POINT.

09:07AM  25          THE COURT:  YES.  I READ YOUR BRIEFING AND YOU CITED

5315

09:07AM 1    THE COURT'S MILS AND THE MOTIONS, AND I THINK YOU WENT A LITTLE

09:07AM 2    BIT BROAD WITH WHAT THE COURT SAID.  THE COURT DIDN'T SAY --

09:07AM 3    THE COURT SAID, I RECOGNIZE THE DEFENSE CAN ALWAYS CHALLENGE

09:07AM 4    THE GOVERNMENT'S CASE.  THAT'S YOUR JOB, AND I RESPECT THAT,

09:07AM 5    AND WE ALL RESPECT THAT.

09:07AM 6        CHALLENGING THE SUFFICIENCY OF THE EVIDENCE AS TO THE

09:07AM 7    GOVERNMENT'S MEETING THEIR BURDEN IS THE JOB OF THE DEFENSE,

09:07AM 8    AND I OBVIOUSLY RESPECT THAT.

09:07AM 9        BUT MAYBE YOU DIDN'T SAY THIS IN YOUR PLEADINGS, BUT IT

09:07AM 10   SEEMED TO HAVE THE FLAVOR OF, AND THE COURT SAID WE COULD DO

09:07AM 11   THIS.  THE COURT HAS ALREADY FOUND THAT WE CAN CHALLENGE THE

09:07AM 12   LIS.  THE COURT HAS DONE THIS.

09:08AM 13       AND THAT'S NOT --

09:08AM 14           MR. COOPERSMITH:  WELL, YOUR HONOR, I JUST -- YOU

09:08AM 15   KNOW, I'M NOT TRYING TO PLAY GOTCHA HERE, BUT I JUST WANT TO

09:08AM 16   MAKE SURE --

09:08AM 17           THE COURT:  THERE'S BEEN A LOT OF THAT.

09:08AM 18           MR. COOPERSMITH:  WELL, I DON'T INTEND THAT,

09:08AM 19   YOUR HONOR.

09:08AM 20       I JUST WANT TO MAKE SURE THAT WE'RE CLEAR OF WHAT THE

09:08AM 21   RECORD IS, BECAUSE I NEED TO MAKE A RECORD ON BEHALF OF MY

09:08AM 22   CLIENT.

09:08AM 23       AND THAT IS, AGAIN, AT DOCKET 1326, PAGE 39, THE COURT

09:08AM 24   SAID MORE THAN JUST WE CAN CHALLENGE THE SUFFICIENCY OF THE

09:08AM 25   GOVERNMENT'S CASE.

5316

09:08AM  1      THE COURT SAID THAT "NOTHING IN THIS ORDER IS INTENDED TO

09:08AM  2   PRECLUDE BALWANI FROM PRESENTING EVIDENCE OR ARGUMENT

09:08AM  3   CONCERNING THE DETAILS, THOROUGHNESS, OR GOOD FAITH OF THE

09:08AM  4   CRIMINAL INVESTIGATION."

09:08AM  5      THAT'S THE SPECIFIC LANGUAGE, "NOTHING IN THIS ORDER."

09:08AM  6      AND IN ADDITION, YOUR HONOR, IN OTHER PARTS OF THE

09:08AM  7   ORDER -- AND I'M GOING TO POINT THE COURT IN PARTICULAR TO THE

09:08AM  8   EVIDENCE OF FAULT DISCUSSION IN DOCKET 1326 AT PAGE 21 THROUGH

09:08AM  9   22 -- THE COURT IN THOSE PAGES, PAGES 21 THROUGH 22, TALKS

09:09AM  10  ABOUT THE ABILITY OF THE DEFENSE TO PRESENT THIS EVIDENCE OF

09:09AM  11  FAULT.

09:09AM  12     AND THE COURT NEVER SAID IN THIS DISCUSSION, OH, WE CAN'T

09:09AM  13  DO IT.

09:09AM  14     WHAT THE COURT DID SAY IS THAT PRESENTING THIS TYPE OF

09:09AM  15  EVIDENCE MIGHT OPEN THE DOOR TO SOMETHING, AND WE NEED TO BE

09:09AM  16  PREPARED FOR THAT.  WE UNDERSTAND THAT.

09:09AM  17     AND AT SOME POINT, IF APPROPRIATE, WE CAN HAVE A

09:09AM  18  DISCUSSION ABOUT WHAT WE OPENED THE DOOR TO.

09:09AM  19     BUT THAT'S WHAT THE COURT WAS SAYING, NOT THAT WE CAN'T

09:09AM  20  USE THE EVIDENCE AT ALL.

09:09AM  21     SO, YOUR HONOR, WHEN YOU LOOK AT THIS ORDER -- AND, YOU

09:09AM  22  KNOW, I THINK THE COURT WAS JUST FOLLOWING THE LAW HERE, THE

09:09AM  23  NINTH CIRCUIT LAW SAYS THIS, IS THE COURT IS SAYING WE'RE

09:09AM  24  ALLOWED TO PRESENT THIS EVIDENCE OF FAULT BECAUSE NOTHING IN

09:09AM  25  THIS ORDER PREVENTS US FROM, AGAIN, PRESENTING EVIDENCE OR

09:09AM 1    ARGUMENT CONCERNING THE DETAILS, THOROUGHNESS, OR GOOD FAITH OF

09:09AM 2    THE CRIMINAL INVESTIGATION.

09:09AM 3         AND THAT'S WHAT THIS IS, AND THAT'S WHAT HAPPENED IN THESE

09:09AM 4    OTHER CASES.

09:09AM 5             THE COURT:  OKAY.  I THINK I UNDERSTAND YOUR

09:09AM 6    RELIANCE, YOUR INTERPRETATION OF THE COURT'S WORDS IN THE MIL,

09:10AM 7    SO THAT'S HELPFUL FOR ME TO KNOW HOW YOU READ THINGS.

09:10AM 8             MR. COOPERSMITH:  SURE, YOUR HONOR.

09:10AM 9             THE COURT:  OKAY.

09:10AM 10        MS. VOLKAR, YOU'VE BEEN PATIENT.  WHAT WOULD YOU LIKE TO

09:10AM 11   SAY?

09:10AM 12            MS. VOLKAR:  YOUR HONOR, I DON'T HAVE MUCH TO ADD.

09:10AM 13        WE ARE HERE TO TALK ABOUT DISCOVERY.  I IMAGINE WE'LL BE

09:10AM 14   BACK UP HERE PROBABLY IN THE NOT TOO DISTANT FUTURE TO DISCUSS

09:10AM 15   THE MERITS JUST BASED ON HOW THIS DISCUSSION IS TRENDING.

09:10AM 16        BUT WE ARE HERE TO TALK ABOUT DISCOVERY, AND THE KEY THING

09:10AM 17   IS THAT THE DEFENSE HAS NOT SHOWN ANY REASON TO DEPART FROM THE

09:10AM 18   COURT'S PRIOR RULINGS DENYING THE EXACT SAME MOTION TO COMPEL

09:10AM 19   NOT JUST THESE DOCUMENTS, BUT A BROADER SUBSET.

09:10AM 20        THEY'RE ESSENTIALLY SAYING, WELL, NOW THAT WE'RE ASKING

09:10AM 21   FOR A NARROWER SUBSET, YOU SHOULD RECONSIDER.  AND THE ONLY

09:10AM 22   THING THAT HAS CHANGED IS THEIR OPENING STATEMENT.

09:10AM 23        BUT THE DEFENSE'S DECISION AND TRIAL STRATEGY ABOUT WHAT

09:10AM 24   TO SAY IN THEIR OPENING STATEMENT, ABOUT WHAT TO PROMISE TO THE

09:11AM 25   JURY THE EVIDENCE WILL SHOW, DOES NOT CHANGE THE GOVERNMENT'S

5318

09:11AM  1    DISCOVERY OBLIGATIONS.  IT DOES NOT CHANGE THE COURT'S PRIOR

09:11AM  2    RULINGS ABOUT THOSE DISCOVERY OBLIGATIONS.

09:11AM  3        WE ARE HERE TO TALK ABOUT DISCOVERY.  WE'RE NOT HERE TO

09:11AM  4    TALK ABOUT WHAT CASE THE DEFENSE CAN PRESENT.

09:11AM  5        THE DEFENSE IN THEIR BRIEFS BLUR THE MERITS OF THOSE TWO

09:11AM  6    THINGS PRETTY HEAVILY.

09:11AM  7        SO IF WE LOOK AT THE DISCOVERY OBLIGATIONS, THE GOVERNMENT

09:11AM  8    HAS MET THOSE.  THE COURT HAS ANALYZED THEM MULTIPLE TIMES

09:11AM  9    BEFORE AND, IN OUR VIEW, CORRECTLY FOUND THAT WE'VE MADE ALL OF

09:11AM  10   THE DISCLOSURE WE NEED TO MAKE, AND NOTHING FURTHER IS REQUIRED

09:11AM  11   OF THE GOVERNMENT.

09:11AM  12       WE DO NOT NEED TO PROVIDE OUR INTERNAL EMAILS BETWEEN THE

09:11AM  13   ATTORNEYS IN OUR OFFICE AND THE SUPPORT STAFF HELPING US AND

09:11AM  14   DETERMINE HOW TO PROCESS DISCOVERY IN THIS CASE AND ACCESSIBLE

09:11AM  15   DISCOVERY THAT WE RECEIVE FROM THE COMPANY IN THE FALL OF 2018.

09:11AM  16       THERE ARE SEVERAL OTHER ARGUMENTS THAT I COULD MAKE, AND I

09:12AM  17   KNOW YOUR HONOR HAD QUESTIONS, BUT I REALLY JUST WANTED TO

09:12AM  18   FOCUS ON THE DISCOVERY OBLIGATIONS AND LEAVE THE ARGUMENT ABOUT

09:12AM  19   THE MERITS FOR LATER, UNLESS YOUR HONOR WANTS TO SPEND MORE

09:12AM  20   TIME ON THAT, AND I THINK THE KEY HERE IS THAT THIS IS WHERE

09:12AM  21   THE TIMING BECOMES CRITICAL.

09:12AM  22       THEY'VE KNOWN ABOUT THIS BRADY LETTER SINCE OCTOBER OF

09:12AM  23   2020.  WE HAVE LITIGATED THIS BEFORE, MANY, MANY MONTHS BEFORE.

09:12AM  24       THEY GAVE THEIR OPENING STATEMENT, AND THEN THEY SENT THIS

09:12AM  25   LETTER THAT WE'RE CURRENTLY LITIGATING TO THE GOVERNMENT.

09:12AM 1      WHAT DOES THAT SAY?  THAT SAYS THAT THE ONLY FACT THAT

09:12AM 2   CHANGED FROM YOUR HONOR'S PRIOR RULING UNTIL NOW WAS THE

09:12AM 3   OPENING STATEMENT.

09:12AM 4      AND THE DEFENSE IS SAYING, NOW THAT WE SAID IT IN OUR

09:12AM 5   OPENING STATEMENT, YOU HAVE TO GIVE US THE EMAILS.

09:12AM 6      THERE'S NO LOGIC THERE.  THERE'S NO CASE THAT SAYS THAT.

09:12AM 7      WE'RE NOT STANDING HERE SAYING THAT A DEFENDANT CANNOT

09:12AM 8   CHALLENGE THE THOROUGHNESS OF AN INVESTIGATION.

09:12AM 9      WE AGREE THAT THE NINTH CIRCUIT CASES SHOW A PLETHORA OF

09:13AM 10  EXAMPLES OF SHOWING CHALLENGING THE THOROUGHNESS OF A POLICE

09:13AM 11  INVESTIGATION.

09:13AM 12     I DO THINK THAT THERE'S A DIFFERENCE WHEN THEY'RE TRYING

09:13AM 13  TO GET INTERNAL EMAILS FROM A PROSECUTOR'S OFFICE, AND I ASK

09:13AM 14  YOUR HONOR -- PERHAPS YOU OR THE DEFENSE CAN POINT ME TO ONE.

09:13AM 15  I READ ALL OF THE CASES THAT THEY CITE.  I DIDN'T SEE A SINGLE

09:13AM 16  ONE THAT AUTHORIZED DOCUMENTS THAT WERE INTERNAL EMAILS IN A

09:13AM 17  PROSECUTOR'S OFFICE.

09:13AM 18     AND I DO THINK IF THE SITUATION WERE REVERSED, IF WE WERE

09:13AM 19  ASKING FOR EMAILS BETWEEN DEFENSE COUNSEL AND THEIR PARALEGALS

09:13AM 20  ABOUT HOW THEY PROCESSED DISCOVERY, THEY WOULD CERTAINLY BE

09:13AM 21  CLAIMING WORK PRODUCT PROTECTION OVER THAT.

09:13AM 22     SO I THINK FOR THE REASONS STATED IN OUR BRIEF, THIS IS

09:13AM 23  WORK PRODUCT.  WE HAVE MET OUR DISCOVERY OBLIGATIONS.  THERE'S

09:13AM 24  NO REASON NOW, STANDING HERE TODAY, THAT THE GOVERNMENT'S

09:13AM 25  DISCOVERY OBLIGATIONS ARE ANY DIFFERENT THAN THEY HAVE BEEN FOR

09:13AM   1     THE PAST YEAR AND THE PAST TWO TIMES YOUR HONOR RULED ON THIS

09:13AM   2     EXACT SAME ISSUE, AND THERE'S NO REASON TO COMPEL THE

09:13AM   3     GOVERNMENT TO PROVIDE FURTHER INFORMATION.

09:13AM   4          THE COURT:  OKAY.  THANK YOU.

09:14AM   5          MR. COOPERSMITH:  YOUR HONOR, JUST TO RESPOND TO A

09:14AM   6     FEW POINTS THAT MS. VOLKAR MADE.

09:14AM   7          FIRST OF ALL, I THINK WHAT THE GOVERNMENT HAS DONE IN

09:14AM   8     THEIR BRIEFING, AND I THINK IN PART OF MS. VOLKAR'S COMMENTS,

09:14AM   9     IS THAT THEY'RE BLURRING AND MISSING THE ISSUE OF FACTUAL

09:14AM  10     DISPUTES ABOUT WHAT THIS EVIDENCE MEANS AND WHAT THEY COULD

09:14AM  11     HAVE DONE OR COULDN'T HAVE DONE WITH WHAT, FIRST OF ALL, WE'RE

09:14AM  12     ALLOWED TO GET IN DISCOVERY, AND SECOND, WHAT WE MAY BE

09:14AM  13     ALLOWED, IF WE SO CHOOSE, TO PRESENT TO THE JURY.

09:14AM  14          I THINK THESE ARE TWO DIFFERENT THINGS, AND ARGUING THE

09:14AM  15     FACTS ABOUT WHETHER THE WITNESSES THEY INTERVIEWED ARE RIGHT OR

09:14AM  16     WHETHER MR. SONNIER IS RIGHT DOESN'T HAVE ANY BEARING ON THE

09:14AM  17     CURRENT MOTION, OR EVEN ON FACTUAL DISPUTE THAT MIGHT BE SET UP

09:14AM  18     FOR THE JURY.

09:14AM  19          SECOND, I THINK THE GOVERNMENT'S POSITION IS UNTENABLE IN

09:14AM  20     THE SENSE THAT THEY CHOSE, THEY THOUGHT IT WAS NECESSARY FOR

09:14AM  21     THEM TO WRITE A BRADY LETTER TELLING US THE THINGS THAT THEY

09:14AM  22     TOLD US ABOUT WHAT HAPPENED.

09:14AM  23          AND THAT'S GREAT THAT THEY WROTE IT.  WE COMMEND THEM FOR

09:14AM  24     IT.

09:14AM  25          BUT WE SHOULD NOT BE THEN LIMITED TO THEIR DESCRIPTION OF

5321

09:15AM 1      EMAILS THAT EXIST.  WE SHOULD BE ABLE TO GET THE ACTUAL EMAILS.

09:15AM 2          SOME OF THEM ARE, AS I POINTED OUT EARLIER, WITH THIRD

09:15AM 3      PARTIES, LIKE THE DORSEY & WHITNEY FIRM THAT REPRESENTED THE

09:15AM 4      ASSIGNEE AT THERANOS, ESSENTIALLY LIKE A RECEIVERSHIP.

09:15AM 5          THOSE COMMUNICATIONS ARE NOT WORK PRODUCT.

09:15AM 6          AND BY THE SAME TOKEN, EVEN THE EMAILS FROM THEIR OWN

09:15AM 7      PERSONNEL WHERE IT'S JUST SAYING, WE SHOULD GET THE SERVERS,

09:15AM 8      THESE ARE NOT MENTAL IMPRESSIONS.  THERE'S NOTHING LIKE THAT.

09:15AM 9          AND THAT KIND OF GOES TO THE LAST POINT THAT I WANT TO

09:15AM 10     ADDRESS FROM MS. VOLKAR'S COMMENTS, AND THAT IS THIS

09:15AM 11     DISTINCTION THAT THE GOVERNMENT CONTINUES TO MAKE BETWEEN

09:15AM 12     POLICE INVESTIGATIONS AND PROSECUTION.

09:15AM 13         SO LET ME JUST PRESENT THIS BRIEF HYPOTHETICAL TO THE

09:15AM 14     COURT.  THE POLICE OR THE FBI OR THE POSTAL INSPECTION SERVICE,

09:15AM 15     ANY OF THESE AGENCIES, THEY CAN HAVE PEOPLE THAT DEAL WITH

09:15AM 16     FORENSICS AS WELL.  SO WHEN YOU'RE INVESTIGATING A FORENSIC

09:15AM 17     ISSUE OR A DATABASE ISSUE LIKE THE LIS, YOU COULD HAVE

09:16AM 18     PERSONNEL WHO WORK FOR THE POLICE DEPARTMENT OR WORK FOR THE

09:16AM 19     FBI OR THE POSTAL SERVICE.  YOU COULD HAVE THOSE PEOPLE DOING

09:16AM 20     THE WORK, AND THEN THE GOVERNMENT WOULDN'T HAVE THAT ARGUMENT,

09:16AM 21     RIGHT, BECAUSE THEY WOULD HAVE, WELL, IT'S A POLICE

09:16AM 22     INVESTIGATION.

09:16AM 23         THE FACT THAT THEY CHOSE, IN THE STRUCTURE THAT THEY SET

09:16AM 24     UP, TO HAVE AN ALS SUPERVISOR OR A PARALEGAL, YOU KNOW, DO WORK

09:16AM 25     THAT THE POLICE OR THE FBI COULD JUST AS WELL DO, THAT HAS NO

09:16AM  1    BEARING ON THE ISSUES HERE.

09:16AM  2        SO THIS IS A DISTINCTION THAT MAKES NO DIFFERENCE, AND

09:16AM  3    THERE'S NO LOGICAL REASON WHY THE FACT THAT WE'RE TALKING ABOUT

09:16AM  4    COMMUNICATIONS FROM A GOVERNMENT DOJ EMPLOYEE VERSUS AN FBI

09:16AM  5    EMPLOYEE, WHY THAT WOULD MAKE ANY DIFFERENCE HERE.

09:16AM  6        SO I THINK THE GOVERNMENT DISCLOSED THESE THINGS.  WE WANT

09:16AM  7    THE ACTUAL EVIDENCE.  WE WANT TO MAKE SURE OUR EXPERT, IF WE SO

09:16AM  8    CHOOSE TO USE HIM, AND THE JURY SEES THE ACTUAL EVIDENCE, NOT

09:16AM  9    THE GOVERNMENT'S DESCRIPTION OF IT.

09:16AM  10       I'M NOT ACCUSING THE GOVERNMENT OF BEING DISHONEST.  THEY

09:17AM  11   WROTE DOWN THE BRADY LETTER.

09:17AM  12       BUT THERE'S ALWAYS A DIFFERENCE BETWEEN VERY GOOD LAWYERS

09:17AM  13   WHO ARE CRAFTING SOMETHING TO TRY TO MEET THEIR OBLIGATIONS AND

09:17AM  14   GETTING THE ACTUAL EVIDENCE.

09:17AM  15       AS I SAID BEFORE, THAT'S THE EVIDENCE THAT WE SHOULD BE

09:17AM  16   ABLE TO PRESENT TO THE JURY, NOT, OH, WE'RE RELYING ON A

09:17AM  17   GOVERNMENT LETTER AND GET INTO THAT REAL CAN OF WORMS WITH THE

09:17AM  18   JURY AS TO WHY DO WE HAVE A GOVERNMENT LETTER.

09:17AM  19           THE COURT:  SO IT'S THE EMAILS RELATED TO THE

09:17AM  20   PARAGRAPHS IN YOUR MOTION?

09:17AM  21           MR. COOPERSMITH:  THE SPECIFIC PARAGRAPHS THAT WE

09:17AM  22   IDENTIFIED ON THE LAST PAGE OF DOCKET 1425, AND THAT'S IT,

09:17AM  23   YOUR HONOR.

09:17AM  24           THE COURT:  HANG ON A SECOND.  1425?

09:17AM  25           MR. COOPERSMITH:  YES, YOUR HONOR.

5323

09:17AM 1          THE COURT:  AT LINE 8?

09:17AM 2          MR. COOPERSMITH:  LET ME CHECK THAT, YOUR HONOR.

09:17AM 3   HANG ON.

09:17AM 4       YES, IT'S LINE 8.

09:17AM 5          THE COURT:  AND IT'S THE EMAILS RELATED TO THOSE

09:17AM 6   PARAGRAPHS?

09:17AM 7          MR. COOPERSMITH:  YES, YOUR HONOR.

09:17AM 8          THE COURT:  ALL RIGHT.  THANK YOU.

09:17AM 9       MS. VOLKAR, ANYTHING FURTHER ON THIS?

09:17AM 10         MS. VOLKAR:  YOUR HONOR, I'M HAPPY TO ANSWER

09:18AM 11  QUESTIONS.

09:18AM 12      I DO HAVE THE CASE CITE FOR THE POLICE VERSUS THE

09:18AM 13  PROSECUTION DISTINCTION IF YOU WOULD LIKE IT.

09:18AM 14         THE COURT:  SURE.  SURE.

09:18AM 15         MS. VOLKAR:  SO IN THE NINTH CIRCUIT CASE

09:18AM 16  UNITED STATES VERSUS SELLERS, 906 F.3D 848, NINTH CIRCUIT 2018

09:18AM 17  OPINION AT PINCITE 852 TO 853.

09:18AM 18      THE NINTH CIRCUIT IN THE DISCOVERY DISPUTE -- THIS IS IN

09:18AM 19  THE CONTEXT OF THE SELECTIVE PROSECUTION, SELECTIVE

09:18AM 20  ENFORCEMENT -- TALKS ABOUT THE ARMSTRONG DECISION AND WHY THE

09:18AM 21  MENTAL PROCESSES OF PROSECUTORS ARE REALLY IN A DIFFERENT

09:18AM 22  CATEGORY THAN WHAT AGENTS AND LAW ENFORCEMENT DO WHEN THEY'RE

09:18AM 23  INVESTIGATING THE CASE.

09:18AM 24      SO THERE IS SUPPORT FOR THAT, AND I DID NOT SEE A CITE TO

09:18AM 25  THE CONTRARY IN MY COLLEAGUE'S BRIEFS.

5324

09:18AM 1            THE COURT:  OKAY.

09:18AM 2            MR. COOPERSMITH:  YOUR HONOR, JUST TO BRIEFLY

09:18AM 3     ADDRESS THAT.

09:18AM 4          I JUST GOT THE CITE, THAT'S NOT IN THEIR BRIEF, AND SO

09:18AM 5     I'LL CERTAINLY LOOK AT THE SELLERS CASE.  THIS WAS NOT

09:19AM 6     SOMETHING CITED IN THE GOVERNMENT'S BRIEF.

09:19AM 7          IT DOES APPARENTLY RELY ON ARMSTRONG, ACCORDING TO

09:19AM 8     MS. VOLKAR, AND I AM FAMILIAR WITH THAT CASE.

09:19AM 9          AND I WILL JUST SAY ONE WORD ABOUT THIS ISSUE OF SELECTIVE

09:19AM 10    PROSECUTION.

09:19AM 11         WHEN YOU'RE GETTING INTO THAT WHERE YOU'RE TRYING TO SAY,

09:19AM 12    WELL, THE GOVERNMENT HAS PROSECUTED MY CLIENT, LIKE IN

09:19AM 13    ARMSTRONG I THINK IT WAS BECAUSE THE FACTS WERE THEY WERE

09:19AM 14    PROSECUTING THIS DEFENDANT THAT WAS AFRICAN AMERICAN, BUT THEY

09:19AM 15    DIDN'T PROSECUTE ALL OF THESE OTHER PEOPLE, NOW YOU'RE GETTING

09:19AM 16    INTO GOVERNMENT PROSECUTORIAL DISCRETION AND WHAT IS IT THAT

09:19AM 17    MAKES THEM PROSECUTE ONE PERSON OR THE OTHER?

09:19AM 18         THOSE ARE CORE WORK PRODUCT ISSUES, AND THAT HAS NOTHING

09:19AM 19    TO DO WITH A FACTUAL ISSUE, SOMEONE SAYS GET A SERVER, THAT

09:19AM 20    WOULD BE A GOOD THING TO DO.

09:19AM 21         THESE SELECTIVE PROSECUTION CASES, AS WE POINTED OUT IN

09:19AM 22    OUR REPLY BRIEF, HAVE NO BEARING ON THE ISSUES BECAUSE THOSE

09:19AM 23    ARE NOT RELATED TO THE CASE AT HAND.  THEY'RE, WELL, WHAT ABOUT

09:19AM 24    SOME OTHER CASE WHERE THE GOVERNMENT DECIDED TO PROSECUTE

09:20AM 25    SOMEONE ELSE OR NOT PROSECUTE SOMEBODY ELSE?

5325

09:20AM 1      SO I DON'T THINK THOSE CASES MEAN ANYTHING, AND THEY

09:20AM 2  CERTAINLY DON'T MEAN ANYTHING IN TERMS OF WHAT WE SAY IS A

09:20AM 3  MEANINGLESS DISTINCTION BETWEEN THE POLICE AND PROSECUTION, WHO

09:20AM 4  WORKS FOR WHICH AGENCY.

09:20AM 5      THE COURT:  OKAY.  THANK YOU.

09:20AM 6      SECONDARILY, STILL ON THE DISCOVERY ASPECT, IT SEEMS LIKE

09:20AM 7  IF THE COURT IS GOING TO REVIEW THIS FOR THE REQUEST THAT YOU

09:20AM 8  MADE, PERHAPS THE COURT SHOULD LOOK AT DOCUMENTS IN CAMERA

09:20AM 9  BEFORE IT MAKES ANY RELEASE AND DETERMINES WHAT IS APPROPRIATE.

09:20AM 10      WOULD YOU OBJECT TO THAT PROCEDURE?

09:20AM 11      MR. COOPERSMITH:  NO, YOUR HONOR.  IF THE COURT

09:20AM 12  WANTS TO DO THAT, YOU COULD LOOK AT THAT.

09:20AM 13      I SUPPOSE THE EXERCISE FOR THE COURT WOULD BE TO LOOK AT

09:20AM 14  WHETHER, YOU KNOW, IT REVEALS SOME KIND OF PROSECUTORIAL

09:20AM 15  STRATEGY THAT WOULD BE IN THE REALM OF WORK PRODUCT.  I SUPPOSE

09:20AM 16  THAT WOULD BE THE POINT.

09:20AM 17      IS THAT RIGHT, YOUR HONOR?

09:20AM 18      THE COURT:  WHAT WOULD THE POINT BE, MS. VOLKAR, IF

09:20AM 19  THE COURT WERE TO REVIEW IN CAMERA DOCUMENTS FROM THE

09:21AM 20  GOVERNMENT?

09:21AM 21      MS. VOLKAR:  YOUR HONOR, I'M HESITANT TO TASK THE

09:21AM 22  COURT WITH MORE WORK, PARTICULARLY WHEN WE HAVE THE SUBSTANCE

09:21AM 23  OF WHAT -- AND THIS IS WHY THE DEFENSE IS ABLE TO BRING THIS

09:21AM 24  MOTION.  WE HAVE THE SUBSTANCE OF WHAT THOSE DOCUMENTS WOULD

09:21AM 25  SHOW.  THE INFORMATION IS IN THE GOVERNMENT'S OCTOBER 2020

09:21AM  1      LETTER AT THE PARAGRAPHS IDENTIFIED.

09:21AM  2           ALL THEY'RE ASKING FOR IS THE UNDERLYING EMAILS, I PRESUME

09:21AM  3      SO THAT THEY COULD TRY TO PRESENT IT TO THEIR EXPERT OR TO SOME

09:21AM  4      OTHER WITNESS ON THE STAND.  AGAIN, I'M TRYING NOT TO GO INTO

09:21AM  5      THE MERITS RIGHT NOW.

09:21AM  6           WE KNOW WHAT THE SUBSTANCE OF THOSE DOCUMENTS ARE AND WHY

09:21AM  7      THEY WANT THEM, BECAUSE THEY'RE IN THE GOVERNMENT'S

09:21AM  8      OCTOBER 2020 LETTER.

09:21AM  9           SO I'M HESITANT -- OR I FAIL TO SEE HOW PROVIDING

09:21AM  10     ADDITIONAL DOCUMENTATION TO THE COURT IN CAMERA WILL MOVE THE

09:21AM  11     NEEDLE ON DECIDING WHETHER OR NOT THESE MATERIALS ARE WORK

09:21AM  12     PRODUCT.

09:21AM  13           THE COURT:  I'M NOT GETTING AHEAD OF MYSELF.

09:21AM  14     PERHAPS I AM, THOUGH.

09:21AM  15           BUT IF THE COURT WERE TO SAY, WELL, MAYBE MR. COOPERSMITH

09:22AM  16     IS IN THE NINTH INNING AND HE'S PITCHING A NO HITTER AND HE'S

09:22AM  17     GOING TO COMPLETE THAT, AND MAYBE I WILL ORDER THAT THAT BE

09:22AM  18     REVEALED.

09:22AM  19           SHOULD I LOOK AT THOSE BEFORE?  MY COMFORT LEVEL WOULD BE

09:22AM  20     GREATER IF I DID HAVE AN OPPORTUNITY TO REVIEW AN EMAIL JUST TO

09:22AM  21     MAKE SURE THAT THERE'S NOTHING THAT YOU MIGHT WISH TO -- OR IF

09:22AM  22     YOU WANT TO CHALLENGE ANYTHING THAT YOU'VE INDICATED IN YOUR

09:22AM  23     PLEADINGS IN REGARDS TO ANY TYPE OF PRIVILEGES AND THOSE TYPES

09:22AM  24     OF THINGS.

09:22AM  25           I JUST THROW THAT OUT THERE.

5327

09:22AM 1      I'M NOT SUGGESTING THAT I'VE MADE A DECISION ON THIS, BUT

09:22AM 2    I'M JUST TRYING TO FORECAST AHEAD, LIKE, WHERE ARE WE GOING

09:22AM 3    WITH THIS?

09:22AM 4      AND THEN I WANT TO MOVE TO A MERITS DISCUSSION, WHICH IS

09:22AM 5    NOT RELATED TO AND WILL NOT BE RELATED TO THE COURT'S DECISION

09:22AM 6    ON THE DISCOVERY ISSUE, BUT I THINK IT IS FAIR TO INFORM THE

09:22AM 7    COURT AS TO WHAT DOES THIS DO TO OUR SCHEDULE AND THOSE THINGS.

09:22AM 8      MS. VOLKAR:  YOUR HONOR, THE GOVERNMENT'S POSITION

09:22AM 9    IS THAT THE DEFENSE HAS NOT SHOWN THAT THEY ARE ENTITLED TO

09:23AM 10   THIS DISCOVERY.  THEY ARE NOT ENTITLED TO ANYTHING FURTHER IN

09:23AM 11   THE INFORMATION.

09:23AM 12     IF THE COURT IS INCLINED, WE WOULD PREFER TO PROVIDE THE

09:23AM 13   DOCUMENT IN CAMERA BEFORE MAKING A FURTHER PRODUCTION.  THAT

09:23AM 14   WOULD BE OUR ALTERNATIVE ARGUMENT.

09:23AM 15     BUT I DO THINK, FOR THE REASONS STATED IN OUR BRIEF, THAT

09:23AM 16   THE COURT WOULD BE WELL WITHIN THE CASE LAW TO DENY THIS

09:23AM 17   OUTRIGHT FOR THE REASONS THAT IT HAS IN THE PAST.

09:23AM 18     THE COURT:  SO LET'S PUT THAT ASIDE FOR A MOMENT.

09:23AM 19     I DO WANT TO TALK A LITTLE BIT ABOUT, NOT NECESSARILY

09:23AM 20   MERITS, BUT SCHEDULING, AND WHERE DO WE ANTICIPATE -- AND

09:23AM 21   AGAIN, I WANT TO SEPARATE THIS DISCUSSION FROM THE COURT'S

09:23AM 22   DECISION MAKING ON THE MOTION.  THEY'RE TWO SEPARATE THINGS AND

09:23AM 23   THEY'RE NOT GUIDED BY ONE OR THE OTHER.

09:23AM 24     BUT I DO THINK IT'S APPROPRIATE FOR THE COURT TO LOOK AND

09:23AM 25   SEE, WHAT DOES THIS PORTEND FOR SCHEDULING, IF ANYTHING?  IT

09:24AM   1    MIGHT NOT CHANGE ANYTHING.

09:24AM   2            MR. COOPERSMITH:  YOUR HONOR, OBVIOUSLY I DON'T KNOW

09:24AM   3    WHAT THE GOVERNMENT PLANS FOR THE REST OF THEIR CASE.  I HAVE

09:24AM   4    THEIR SECOND HALF WITNESS LIST, SO I HAVE A SENSE OF WHAT THE

09:24AM   5    UNIVERSE OF WITNESSES ARE.

09:24AM   6        THE GOVERNMENT COULD GIVE AN ESTIMATE, PERHAPS, OF HOW

09:24AM   7    LONG THEY THINK THEIR CASE IS GOING TO GO ON UNTIL THEY REST.

09:24AM   8        BUT WHAT I THINK THE COURT IS ASKING IS, WHAT WOULD HAPPEN

09:24AM   9    IF THE DEFENSE PRESENTED A CASE?

09:24AM   10       AS I SAID, WE DON'T KNOW IF WE WILL PRESENT A CASE.  PART

09:24AM   11   OF THE REASON FOR DISCOVERY IS SO WE CAN MAKE THOSE KINDS OF

09:24AM   12   DECISIONS.

09:24AM   13       SO I WILL HONOR OUR AGREEMENT WITH THE GOVERNMENT TO GIVE

09:24AM   14   THEM, YOU KNOW, THE SO-CALLED "THURSDAY NIGHT LIST" AND ALL OF

09:24AM   15   THAT WHEN THE TIME COMES FOR THAT.

09:24AM   16       OBVIOUSLY AT SOME POINT I EXPECT THAT THEY WILL TELL ME

09:24AM   17   THAT THEY'RE RESTING AT A CERTAIN POINT AND THEN WE'LL START

09:24AM   18   TALKING ABOUT THOSE ISSUES.

09:24AM   19       IF WE DO PUT ON A CASE, I'M NOT SURE THAT THIS ISSUE WOULD

09:24AM   20   NECESSARILY DELAY THINGS INORDINATELY, BUT OBVIOUSLY WHEN YOU

09:25AM   21   PUT ON A WITNESS THERE'S SOME TIME REQUIRED.

09:25AM   22       BUT WE HAVE AN EXPERT.

09:25AM   23       I DON'T KNOW WHAT THE GOVERNMENT IS GOING TO DO.  THEY

09:25AM   24   COULD POTENTIALLY CALL SOME WITNESSES.

09:25AM   25           THE COURT:  RIGHT.  AND, AGAIN, I'M NOT ASKING YOU

09:25AM 1    TO REVEAL, OBVIOUSLY, AND YOU MAY NOT HAVE DECIDED, SO YOU

09:25AM 2    CAN'T.

09:25AM 3              MR. COOPERSMITH:  YEAH.

09:25AM 4              THE COURT:  BUT YOU HAVE USED YOUR EXPERT'S NAME

09:25AM 5    THREE OR FOUR TIMES THIS MORNING.

09:25AM 6        MY SENSE IS THAT WE SHOULD EXPECT AT A MINIMUM, I'M NOT

09:25AM 7    ASKING YOU TO CONFIRM, BUT THERE MIGHT BE EXPERT TESTIMONY

09:25AM 8    REGARDING THE LIS AND THAT, AND THEN THE GOVERNMENT MIGHT BE

09:25AM 9    COMPELLED TO ANSWER, RESPOND.

09:25AM 10       MR. SCHENK.

09:25AM 11             MR. SCHENK:  YES, YOUR HONOR.  THANK YOU.

09:25AM 12       I RISE JUST TO SPEAK ON THE SCHEDULING ISSUES THAT THE

09:25AM 13   COURT HAS INDICATED --

09:25AM 14             THE COURT:  RIGHT.

09:25AM 15             MR. SCHENK:  -- IT WOULD LIKE TO HEAR FURTHER

09:25AM 16   COMMENT ON.

09:25AM 17       YOUR HONOR, I THINK AT THE END OF COURT TODAY, THE

09:25AM 18   GOVERNMENT WILL PROBABLY BE IN A POSITION TO INFORM THE COURT

09:25AM 19   THAT WE MAY NOT HAVE ENOUGH WITNESSES REMAINING TO FILL NEXT

09:25AM 20   WEEK.

09:25AM 21       SO WE HAVE 9:00 TO 4:00, OR THEREABOUTS, TODAY, FRIDAY,

09:26AM 22   AND I BELIEVE THREE DAYS NEXT WEEK THAT WOULD MIRROR THIS WEEK,

09:26AM 23   9:00 TO 4:00, TUESDAY, WEDNESDAY, AND FRIDAY.

09:26AM 24       AND AT ABOUT THE PACE THAT WE'RE GOING, I THINK THAT THERE

09:26AM 25   MIGHT NOT BE ENOUGH WITNESSES LEFT ON THE GOVERNMENT'S PLAN OR

09:26AM  1    SCHEDULE TO FILL THE WEEK.

09:26AM  2         AND AS A RESULT, WHAT MR. COOPERSMITH JUST REFERENCED,

09:26AM  3    THAT IS, THE THURSDAY NIGHT DISCLOSURES, WE WILL EXPECT THAT

09:26AM  4    THE DEFENSE WILL PROVIDE TO US TOMORROW EVENING BY 7:00 O'CLOCK

09:26AM  5    THEIR WITNESSES, WHO THEY INTEND TO CALL, BECAUSE I THINK

09:26AM  6    THERE'S A GOOD CHANCE THAT THE DEFENSE IS GOING TO HAVE TO PUT

09:26AM  7    WITNESSES ON TOWARDS THE END OF NEXT WEEK.

09:26AM  8         THE COURT:  I SEE.

09:26AM  9         MR. SCHENK:  THERE IS ONE ISSUE THAT I SHOULD INFORM

09:26AM  10   THE COURT ABOUT, AND THAT IS ONE OF THE WITNESSES THAT WE

09:26AM  11   DISCLOSED TO THE DEFENSE THAT MAY TESTIFY THIS WEEK TESTED

09:26AM  12   POSITIVE FOR COVID THIS MORNING.

09:27AM  13        THAT WITNESS IS, THEREFORE, NOT GOING TO TESTIFY THIS

09:27AM  14   WEEK.

09:27AM  15        I REVIEWED THE CDC ADVICE OR GUIDELINES ON THIS ISSUE, AND

09:27AM  16   I THINK AS LONG AS THE WITNESS IS NOT DISPLAYING SYMPTOMS, THE

09:27AM  17   WITNESS CAN END ISOLATION IN FIVE DAYS, WHICH WOULD BE -- FIVE

09:27AM  18   DAYS FROM A POSITIVE TEST, WHICH WOULD BE NEXT TUESDAY.

09:27AM  19        SO WE MAY HAVE TO HAVE DISCUSSIONS ABOUT HOW WE'RE GOING

09:27AM  20   TO FILL FRIDAY NOW.  THIS IS A WITNESS THAT WE ANTICIPATED

09:27AM  21   WOULD TESTIFY ON FRIDAY.

09:27AM  22        I THINK WE CAN MOVE SOME WITNESSES THAT WE THOUGHT WOULD

09:27AM  23   TESTIFY NEXT WEEK TO THIS FRIDAY, AND THEN THIS WITNESS NEXT

09:27AM  24   WEEK.

09:27AM  25        SO I DON'T KNOW THAT ULTIMATELY IT WILL AFFECT WHEN WE

5331

```
09:27AM   1    WILL FINISH, BUT THERE'S SOME NOW MOVING PARTS THAT I DIDN'T
09:27AM   2    ANTICIPATE BEFORE ABOUT 8:00 A.M. THIS MORNING.
09:27AM   3         ALL OF THAT TO SAY, THOUGH, I THINK THE GOVERNMENT IS
09:27AM   4    PRETTY CLOSE TO RESTING AND, AS I SAID, MAYBE THREE, FOUR OR SO
09:27AM   5    FULL TRIAL DAYS AND WE'LL BE THERE.
09:27AM   6              THE COURT:  OKAY.  SO THAT -- THANK YOU.
09:28AM   7         SO IT COULD BE -- IT SOUNDS LIKE THE GOVERNMENT NEXT WEEK
09:28AM   8    WOULD BE RESTING SOMETIME.
09:28AM   9              MR. SCHENK:  YES, YOUR HONOR, I THINK THAT'S A FAIR
09:28AM   10   ESTIMATE.
09:28AM   11             THE COURT:  RIGHT.  RIGHT.
09:28AM   12             MR. COOPERSMITH:  THAT'S GOOD TO KNOW, YOUR HONOR,
09:28AM   13   SO I APPRECIATE MR. SCHENK'S COMMENTS.
09:28AM   14        IF MR. SCHENK DOES NOT WANT TO SAY THIS IN OPEN COURT,
09:28AM   15   THAT'S FINE.  IT WOULD BE GOOD TO KNOW WHICH WITNESS WE'RE
09:28AM   16   TALKING ABOUT.  I DON'T KNOW WHETHER WE CAN MEET AND CONFER
09:28AM   17   ABOUT THAT.
09:28AM   18             THE COURT:  YOU CAN DISCUSS THAT.  YOU CAN DISCUSS
09:28AM   19   THAT WHEN WE'RE FINISHED HERE.
09:28AM   20        SO IT SOUNDS LIKE WE'LL HAVE -- WILL WE HAVE GAPS THIS
09:28AM   21   WEEK, TODAY AND FRIDAY?  IT DOESN'T SOUND LIKE IT.
09:28AM   22             MR. SCHENK:  I DON'T ANTICIPATE WE'LL HAVE ANY GAPS
09:28AM   23   TODAY.  I THINK OUR DISCUSSION AT THE END OF THE DAY YESTERDAY
09:28AM   24   WAS VERY HELPFUL, THANK YOU, AND I THINK WE HAVE SUFFICIENT
09:28AM   25   WITNESSES TO FILL TODAY.
```

09:28AM   1          AND I STILL HOPE THAT WE WILL HAVE SUFFICIENT WITNESSES TO

09:28AM   2    FILL FRIDAY EVEN IN LIGHT OF THIS CHANGE.

09:28AM   3          BUT, YES, I INTEND TO REVEAL THE NAME TO MR. COOPERSMITH.

09:28AM   4              THE COURT:  SURE, SURE.

09:28AM   5              MR. SCHENK:  AND WE'LL WORK WITH HIM ON PROVIDING

09:28AM   6    NEW NAMES OF WITNESSES WHO WILL REPLACE THIS WITNESS.

09:29AM   7              THE COURT:  OKAY.  GREAT.

09:29AM   8              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

09:29AM   9              THE COURT:  I GUESS I DIDN'T, MR. SCHENK, ASK FOR

09:29AM  10    FOLLOW-UP ON WHAT HAPPENS IF THERE'S A LIS DEFENSE.  LET ME

09:29AM  11    JUST PUT IT THAT WAY THEN.

09:29AM  12          IT COULD BE A REBUTTAL CASE FOR THE GOVERNMENT, AND YOU'LL

09:29AM  13    HAVE TO ANALYZE THAT, I PRESUME.

09:29AM  14              MR. SCHENK:  YES, YOUR HONOR.

09:29AM  15          I THINK IF THE DEFENSE, AT LEAST IF I'M READING THE TEA

09:29AM  16    LEAVES CORRECTLY, SOME OF THE COMMENTS WERE PUTTING THE OCTOBER

09:29AM  17    LETTER IN FRONT OF THE JURY IS AWKWARD BECAUSE THE JURY DOESN'T

09:29AM  18    UNDERSTAND WHY THE GOVERNMENT WOULD WRITE SUCH A LETTER, SO WE

09:29AM  19    WANT THE EMAILS TO PUT IN FRONT OF THE JURY.

09:29AM  20          THERE'S GOING TO BE A FIGHT, AND THERE'S GOING TO BE

09:29AM  21    DISAGREEMENT, ABOUT WHETHER THAT'S APPROPRIATE.  THE COURT WILL

09:29AM  22    RESOLVE THAT DISPUTE.

09:29AM  23          AND I CERTAINLY FORESEE, IF SOME OF THOSE DOCUMENTS ARE

09:30AM  24    ADMITTED, THE GOVERNMENT WANTING TO CALL ADDITIONAL WITNESSES

09:30AM  25    FOLLOWING THAT KIND OF DEFENSE CASE IN A REBUTTAL CASE.

09:30AM 1      AND WE TALKED ABOUT THIS JUST AFTER THE DEFENSE OPENING.

09:30AM 2    THE DOOR WAS OPENED QUITE WIDE BY THE STATEMENTS THAT THE

09:30AM 3    DEFENSE MADE ALREADY, AND I -- THE GOVERNMENT IS GOING TO ASK

09:30AM 4    FOR WIDE BERTH FROM THE COURT TO RESPOND WITH A LOT OF EVIDENCE

09:30AM 5    REGARDING THE DESTRUCTION OF LIS IF THE DEFENSE IS GOING TO

09:30AM 6    SUGGEST THAT THE JURY SHOULD DRAW ANY CONCLUSIONS ABOUT THE

09:30AM 7    DESTRUCTION OF LIS.

09:30AM 8      AND IT SEEMS, BY THE SUGGESTIONS THAT MR. COOPERSMITH IS

09:30AM 9    MAKING, THAT IS, EITHER THE BRADY LETTER OR THE UNDERLYING

09:30AM 10   EMAILS, THAT THERE IS GOING TO BE FINGER POINTING, AND THE

09:30AM 11   GOVERNMENT IS ENTITLED TO RESPOND TO THAT INACCURATE FINGER

09:30AM 12   POINTING.

09:30AM 13         THE COURT:  THIS IS WHAT THE COURT REFERENCED IN

09:30AM 14   1326, PAGE 22 AT I THINK IT WAS LINE 8 --

09:31AM 15         MR. COOPERSMITH:  YES, YOUR HONOR.

09:31AM 16         THE COURT:  -- OPENING THE DOOR IF THIS COMES UP.  I

09:31AM 17   THINK IT WAS LINES 13 OR 14 OR SOMETHING LIKE THAT.

09:31AM 18         MR. COOPERSMITH:  I THINK ALL I CAN DO IS TAKE IT AS

09:31AM 19   IT COMES.  IF THE GOVERNMENT WISHES TO PRESENT EVIDENCE IN

09:31AM 20   THEIR REBUTTAL CASE, THEY CAN DO THAT.

09:31AM 21      AS TO WHICH WITNESSES THEY CAN CALL AND WHAT THOSE

09:31AM 22   WITNESSES WILL SAY, I LOOK FORWARD TO FURTHER DISCUSSIONS ABOUT

09:31AM 23   THAT.

09:31AM 24      WE HAVE SOME VIEWS ABOUT WHAT, GIVEN THE CASE WE MIGHT

09:31AM 25   PRESENT.  WE HAVEN'T DECIDED ON THAT.  BUT WHAT WE MIGHT

5334

09:31AM 1    PRESENT, WHAT WE OPEN THE DOOR TO AND WHAT WE DON'T OPEN THE

09:31AM 2    DOOR TO, I IMAGINE MR. SCHENK WILL HAVE A DIFFERENT VIEW.

09:31AM 3         THAT'S SOMETHING THAT WE LOOK FORWARD TO DISCUSSING.  THAT

09:31AM 4    REMAINS TO BE SEEN.

09:31AM 5              THE COURT:  I THINK WE'RE ALL AWARE OF THE NUANCES

09:32AM 6    OF THE LIS AND, SHALL I SAY, WHAT LURKS BEHIND THE DOOR.

09:32AM 7         ALL RIGHT.  THANK YOU.

09:32AM 8              MR. COOPERSMITH:  COULD WE HAVE FIVE MINUTES FOR A

09:32AM 9    BREAK?

09:32AM 10             THE COURT:  YES.  IT'S 9:32.  WE'LL TAKE ABOUT TEN

09:32AM 11   MINUTES.

09:32AM 12             MR. SCHENK:  MAY I ASK A QUESTION ON THE UPCOMING

09:32AM 13   SCHEDULE?

09:32AM 14        MY RECOLLECTION IS THAT THE WEEK OF THE 23RD, WE HAVE

09:32AM 15   TRIAL ON FRIDAY, THE 27TH.

09:32AM 16        THE WEEK OF THE 30TH WE HAVE NO TRIAL.

09:32AM 17             THE COURT:  THAT'S CORRECT.

09:32AM 18             MR. SCHENK:  THANK YOU.

09:32AM 19             THE COURT:  THAT'S CORRECT.

09:32AM 20             MR. SCHENK:  I KNOW THERE WAS AN EFFORT TO INQUIRE

09:32AM 21   ABOUT ADDING DAYS.  MY UNDERSTANDING IS THAT THAT WAS

09:32AM 22   UNSUCCESSFUL.  I JUST WANTED TO CONFIRM THAT.

09:32AM 23             THE COURT:  SO THE WEEK OF THE 30TH WE'LL BE DARK.

09:32AM 24             MR. COOPERSMITH:  AND THE SCHEDULE NEXT WEEK IS

09:32AM 25   THREE DAYS NEXT WEEK?

| | | |
|---|---|---|
| 09:32AM | 1 | THE COURT:  YES. |
| 09:33AM | 2 | (DISCUSSION OFF THE RECORD.) |
| 09:33AM | 3 | THE COURT:  RIGHT, IT'S 17TH, 18TH, AND 20TH. |
| 09:33AM | 4 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR. |
| 09:33AM | 5 | MR. SCHENK:  THANK YOU. |
| 09:33AM | 6 | (RECESS FROM 9:33 A.M. UNTIL 9:49 A.M.) |
| 09:49AM | 7 | THE COURT:  PLEASE BE SEATED.  THANK YOU AGAIN FOR |
| 09:49AM | 8 | YOUR COURTESY. |
| 09:49AM | 9 | WE'RE BACK ON THE RECORD IN THE BALWANI MATTER. |
| 09:49AM | 10 | ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT. |
| 09:49AM | 11 | OUR JURY IS PRESENT. |
| 09:49AM | 12 | GOOD MORNING, LADIES AND GENTLEMEN.  I WAS ALMOST ACCURATE |
| 09:49AM | 13 | IN MY PREDICTION OF WHEN WE WOULD START. |
| 09:49AM | 14 | THANK YOU FOR YOUR PATIENCE. |
| 09:49AM | 15 | LET ME ASK YOU AGAIN, DURING THE BREAK, DID ANY OF YOU, |
| 09:49AM | 16 | MEMBERS OF THE JURY, HAVE CAUSE TO LEARN, LISTEN, SEE, OR |
| 09:49AM | 17 | DISCUSS ANYTHING ABOUT THIS CASE?  IF SO, MAY I SEE YOUR HANDS? |
| 09:49AM | 18 | I SEE NO HANDS.  THANK YOU VERY MUCH. |
| 09:49AM | 19 | SHALL WE CONTINUE WITH OUR WITNESS THEN, MR. MOSLEY, I |
| 09:49AM | 20 | THINK? |
| 09:50AM | 21 | GOOD MORNING, SIR. |
| 09:50AM | 22 | THE WITNESS:  GOOD MORNING. |
| 09:50AM | 23 | THE COURT:  PLEASE MAKE YOURSELF COMFORTABLE. |
| 09:50AM | 24 | TAKE YOUR MASK OFF IF YOU WOULD LIKE. |
| 09:50AM | 25 | THE WITNESS:  OH.  THANK YOU. |

09:50AM   1          THE COURT:  YOU'RE WELCOME.

09:50AM   2       I REMIND YOU YOU'RE STILL UNDER OATH.

09:50AM   3       AND WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE JUST STATE

09:50AM   4    YOUR NAME AGAIN.

09:50AM   5          THE WITNESS:  YES, SIR.

09:50AM   6       DANIEL LYNN MOSTLY.

09:50AM   7       **(GOVERNMENT'S WITNESS, DANIEL MOSLEY, WAS PREVIOUSLY**

09:50AM   8    **SWORN.)**

09:50AM   9          THE COURT:  THANK YOU.  COUNSEL.

09:50AM  10          MR. CAZARES:  THANK YOU, YOUR HONOR.

09:50AM  11                 **CROSS-EXAMINATION (RESUMED)**

09:50AM  12    BY MR. CAZARES:

09:50AM  13    Q.   GOOD MORNING, MR. MOSLEY.

09:50AM  14    A.   GOOD MORNING.

09:50AM  15    Q.   AND I WANT TO PICK OFF WHERE WE LEFT OFF YESTERDAY, AND

09:50AM  16    WHERE WE LEFT OFF WAS I THINK YOUR LETTER AND MEMO TO

09:50AM  17    DR. KISSINGER DATED SEPTEMBER 2ND, 2014.

09:50AM  18       COULD WE PUT UP ON THE SCREEN EXHIBIT 4197.

09:50AM  19       JUST TO CONFIRM, THE DATE OF THE COVER LETTER IN THE MEMO

09:50AM  20    IS SEPTEMBER 2ND, 2014; IS THAT RIGHT?

09:50AM  21    A.   YES.

09:50AM  22    Q.   AND JUST TO CONFIRM, YOU DRAFTED THIS MEMO PRIOR TO EVER

09:51AM  23    HAVING ANY COMMUNICATIONS WITH MR. BALWANI; CORRECT?

09:51AM  24    A.   THAT IS CORRECT.

09:51AM  25    Q.   OKAY.  NOW, IF WE GO TO PAGE 4 OF THE MEMO UNDER THE

09:51AM  1      SECTION TITLED BUSINESS APPROACH.

09:51AM  2          DO YOU SEE THAT?

09:51AM  3      A.   I DO.

09:51AM  4      Q.   AND SOME OF THIS WE HAVE ALREADY SPOKEN ABOUT.  I DON'T

09:51AM  5      WANT TO REVISIT ALL OF THIS.

09:51AM  6          BUT IN THIS SECTION, ESSENTIALLY YOU HAVE IDENTIFIED

09:51AM  7      FACTORS CONFIRMING KIND OF THERANOS'S BUSINESS STRATEGY AND

09:51AM  8      APPROACH AS YOU UNDERSTOOD IT FROM THE MATERIALS; IS THAT FAIR?

09:51AM  9      A.   THAT IS CORRECT.

09:51AM  10     Q.   OKAY.  AND YOU THOUGHT THESE WERE ALL NOTABLE FACTORS IN

09:51AM  11     THERANOS'S BUSINESS APPROACH ACCORDING TO YOUR OWN ANALYSIS;

09:51AM  12     CORRECT?

09:51AM  13     A.   YES.

09:51AM  14     Q.   OKAY.  AND THAT INCLUDED THE FACT OF THE PATENTS AND

09:51AM  15     PATENT PORTFOLIO THAT THERANOS HAD; IS THAT CORRECT?

09:51AM  16     A.   CORRECT.

09:51AM  17     Q.   TRADEMARKS THAT THE COMPANY OWNED; CORRECT?

09:51AM  18     A.   CORRECT.

09:51AM  19     Q.   THE PHARMACEUTICAL RELATIONSHIPS, AS WE TALKED ABOUT

09:52AM  20     BEFORE; CORRECT?

09:52AM  21     A.   RIGHT.

09:52AM  22     Q.   AND ARE YOU AWARE OF THE FACT THAT THE PHARMACEUTICAL

09:52AM  23     RELATIONSHIPS BETWEEN THERANOS AND THE PHARMACEUTICAL

09:52AM  24     COMPANIES, THAT MUCH OF THAT TOOK PLACE PRIOR TO MR. BALWANI

09:52AM  25     EVER JOINING THERANOS?

09:52AM   1    A.   I HAVE NO KNOWLEDGE ABOUT WHEN HE JOINED OR ANYTHING ELSE,

09:52AM   2    SO I DON'T KNOW HOW I CAN ANSWER THAT QUESTION.

09:52AM   3    Q.   I THINK YOU JUST DID.  THANK YOU.

09:52AM   4         AND YOU CALLED THE PARTNERSHIP WITH WALGREENS BRILLIANT IN

09:52AM   5    YOUR MEMO TO DR. KISSINGER; CORRECT?

09:52AM   6    A.   I DID.

09:52AM   7    Q.   AND YOU BELIEVED THAT AT THE TIME?

09:52AM   8    A.   YES, I DID.

09:52AM   9    Q.   AND THAT WAS, AGAIN, RELATED TO THIS KIND OF STRATEGY FOR

09:52AM  10    A SMALLER COMPANY LIKE THERANOS TO HAVE THE AVAILABLE

09:52AM  11    RESOURCES, I GUESS I COULD SAY, OF WALGREENS TO HELP TAKE IT

09:52AM  12    NATIONAL; CORRECT?

09:52AM  13    A.   CORRECT.

09:52AM  14    Q.   AND YOU THOUGHT WALGREENS WAS A CAPABLE PARTNER TO HELP A

09:52AM  15    SMALL COMPANY LIKE THERANOS TO COMPETE WITH LABCORP AND QUEST;

09:53AM  16    CORRECT?

09:53AM  17    A.   I DID.

09:53AM  18    Q.   AND CONTINUING ON THE BUSINESS APPROACH AGAIN.  YOU SAID

09:53AM  19    YESTERDAY THAT THE HIGH POWERED BOARD OF DIRECTORS OF THERANOS

09:53AM  20    ALSO CONTRIBUTED TO YOUR DECISION TO INVEST; CORRECT?

09:53AM  21    A.   YES.

09:53AM  22    Q.   NOW, IF WE COULD TURN TO PAGE 9 OF THE MEMO.

09:53AM  23         AND THIS IS THE -- THIS PORTION THAT YOU REVIEWED WITH

09:53AM  24    MR. SCHENK CONCERNING RISKS THAT YOU YOURSELF IDENTIFIED AFTER

09:53AM  25    YOUR OWN REVIEW OF THE MATERIALS; IS THAT FAIR?

09:53AM  1      A.   THAT'S CORRECT.

09:53AM  2      Q.   AND AMONG THE RISKS THAT YOU IDENTIFIED IN SUB A, YOU

09:53AM  3      INDICATE THAT THE RELATIONSHIP DEPENDS UPON -- THE BUSINESS

09:53AM  4      STRATEGY DEPENDS UPON WALGREENS; CORRECT?

09:53AM  5      A.   CORRECT.

09:53AM  6      Q.   AND, AND YOU --

09:53AM  7      A.   IT'S AN IMPORTANT PART OF THE BUSINESS PLAN THAT DEPENDS

09:53AM  8      ON THE RELATIONSHIP WITH WALGREENS.

09:54AM  9      Q.   AND YOU NOTE THAT IT WILL BE HELPFUL TO KNOW WALGREENS'S

09:54AM 10      PERSPECTIVE ON THIS RELATIONSHIP AND HOW IT IS CURRENTLY

09:54AM 11      WORKING OUT?

09:54AM 12      A.   CORRECT.

09:54AM 13      Q.   AND THESE ARE QUESTIONS THAT YOU COULD HAVE PUT TO

09:54AM 14      MS. HOLMES; CORRECT?

09:54AM 15              MR. SCHENK:  OBJECTION.  RELEVANCE.

09:54AM 16              THE COURT:  SUSTAINED.

09:54AM 17      BY MR. CAZARES:

09:54AM 18      Q.   AND YOU ALSO INDICATE, "IT WOULD ALSO BE HELPFUL TO KNOW

09:54AM 19      SOME ADDITIONAL DETAILS OF THE STRUCTURE AND TERMS OF THE

09:54AM 20      PARTNERSHIP BETWEEN WALGREENS AND THERANOS."

09:54AM 21          DO YOU SEE THAT?

09:54AM 22      A.   CORRECT.

09:54AM 23      Q.   AND DID YOU EVER GET ANSWERS TO THE QUESTIONS THAT YOU

09:54AM 24      RAISED IN THIS PORTION OF YOUR MEMO?

09:54AM 25      A.   YOU KNOW, I BELIEVE OVER TIME I DID GET MORE INSIGHT INTO

09:54AM 1    THE STRUCTURE OF THE TERMS OF THE AGREEMENT, BUT I DIDN'T AT

09:54AM 2    THIS TIME.

09:54AM 3    Q.   AND IF YOU CONTINUE UNDER THE RISK PORTION TO THE NEXT

09:54AM 4    SECTION.

09:54AM 5        AND YOU NOTE, FROM SOME OF THE FINANCIAL NUMBERS THAT WERE

09:54AM 6    WITHIN THE INVESTOR MATERIALS, SOME OF THOSE PROJECTION

09:54AM 7    NUMBERS.

09:54AM 8        DO YOU SEE THAT?

09:54AM 9    A.   I SEE IT.

09:54AM 10   Q.   OKAY.  AND YOU ALSO NOTE THAT AT THE TIME THAT YOU WERE

09:55AM 11   AWARE OF THE FACT THAT THERANOS WAS IN 30 WALGREENS PHARMACIES;

09:55AM 12   CORRECT?

09:55AM 13   A.   YES.

09:55AM 14   Q.   AND THAT IT WOULD BE HELPFUL TO KNOW HOW MANY PHARMACY

09:55AM 15   LOCATIONS ARE ASSUMED FOR THOSE 2015 PROJECTIONS; CORRECT?

09:55AM 16   A.   CORRECT.

09:55AM 17   Q.   SO YOU UNDERSTOOD THAT THE 2015 PROJECTIONS WERE DEPENDENT

09:55AM 18   ON THE EXECUTION OF THE WALGREENS ROLLOUT; CORRECT?

09:55AM 19   A.   UM, WOULD YOU READ THAT AGAIN, PLEASE?

09:55AM 20   Q.   I CAN RESTATE IT.

09:55AM 21   A.   YES, PLEASE.

09:55AM 22   Q.   YOUR, YOUR -- YOU WROTE THAT IT WOULD BE HELPFUL TO KNOW

09:55AM 23   HOW MANY PHARMACY LOCATIONS ARE ASSUMED IN THE 2015

09:55AM 24   PROJECTIONS.

09:55AM 25       DO YOU SEE THAT?

09:55AM 1    A.   I DO.

09:55AM 2    Q.   OKAY.  AND SO THAT YOU UNDERSTOOD AT THE TIME THAT THOSE

09:55AM 3    2015 PROJECTIONS WERE DEPENDENT UPON THE ABILITY TO ROLL OUT

09:55AM 4    THERANOS TESTING IN WALGREENS STORES OVER THE NEXT YEAR;

09:55AM 5    CORRECT?

09:55AM 6    A.   YES.  IT ASSUMED SOME LEVEL OF ROLLOUT, ABSOLUTELY.

09:55AM 7    Q.   AND YOU UNDERSTOOD THAT THERE WAS SOME RISK THAT MAYBE THE

09:55AM 8    PARTIES WOULDN'T AGREE ON THE TERMS AND MAYBE IT MIGHT NEVER

09:56AM 9    HAPPEN?

09:56AM 10   A.   YES.

09:56AM 11   Q.   AND IF WE CAN GO DOWN TO SUB C.

09:56AM 12        YOU IDENTIFY FINANCIAL CIRCUMSTANCE OF THERANOS CASH ON

09:56AM 13   HAND; CORRECT?

09:56AM 14   A.   CORRECT.

09:56AM 15   Q.   YOU ASKED A QUESTION ABOUT WHY THERANOS WAS RAISING FUNDS;

09:56AM 16   CORRECT?

09:56AM 17   A.   CORRECT.

09:56AM 18   Q.   AND WHY THERANOS DIDN'T SIMPLY BORROW FUNDS TO EXPAND THE

09:56AM 19   BUSINESS; RIGHT?

09:56AM 20   A.   CORRECT.

09:56AM 21   Q.   OKAY.  AND THEN IN SUB D YOU NOTE SOME OF THE CORPORATE

09:56AM 22   DOCUMENTS AND THE REDEMPTION ISSUE THAT YOU RAISED WITH

09:56AM 23   MS. HOLMES; CORRECT?

09:56AM 24   A.   CORRECT.

09:56AM 25   Q.   AND YOU DID GET RESOLUTION ON THAT AS YOU DISCUSSED

09:56AM  1      YESTERDAY?

09:56AM  2      A.   YES, I DID.

09:56AM  3      Q.   AND THAT WAS IMPORTANT TO YOU?

09:56AM  4      A.   IT WAS.

09:56AM  5      Q.   TO PROTECT YOURSELF AND YOUR CLIENT INVESTORS RELATING TO

09:56AM  6      THIS ISSUE OF REDEMPTION RIGHTS; CORRECT?

09:56AM  7      A.   THAT IS CORRECT.

09:56AM  8      Q.   AND IF WE CAN GO DOWN TO SUB C.  THAT'S THE LAST SUB.

09:57AM  9           NOW, IF I CAN JUST CONFIRM, SO YOU SHARED THE MEMO WITH

09:57AM 10      DR. KISSINGER; CORRECT?

09:57AM 11      A.   I DID.

09:57AM 12      Q.   YOU SHARED IT WITH SOME OF YOUR INVESTOR CLIENTS?

09:57AM 13      A.   YOU KNOW, I DON'T KNOW WHO I SHARED IT WITH.

09:57AM 14           I DO KNOW IT WAS GIVEN TO THE PEOPLE AT THE NIARCHOS

09:57AM 15      FOUNDATION.

09:57AM 16      Q.   OKAY.  YOU DID NOT SHARE IT WITH MS. HOLMES?

09:57AM 17      A.   I DID NOT.

09:57AM 18      Q.   AND YOU DID NOT SHARE IT WITH MR. BALWANI?

09:57AM 19      A.   I DID NOT.

09:57AM 20           AND I'M NOT SURE I SHARED IT WITH ANY OTHER PERSON I KNEW

09:57AM 21      THAT WAS LOOKING AT THE COMPANY.

09:57AM 22      Q.   FAIR ENOUGH.  THANK YOU.

09:57AM 23           NOW, WITHIN THE -- I THINK THE BINDERS ARE STILL THERE.

09:57AM 24      WITHIN THE DARK BINDER --

09:57AM 25      A.   UH-HUH, I'VE GOT IT.

| | | |
|---|---|---|
| 09:57AM | 1 | Q.   -- THERE SHOULD BE A DOCUMENT TAB 14124.  SO 14124. |
| 09:58AM | 2 | A.   I HAVE IT. |
| 09:58AM | 3 | Q.   AND 14124 APPEARS TO BE AN EMAIL EXCHANGE BETWEEN YOURSELF |
| 09:58AM | 4 | AND MS. HOLMES. |
| 09:58AM | 5 |      DO YOU SEE THAT? |
| 09:58AM | 6 | A.   I DO. |
| 09:58AM | 7 | Q.   AND IT'S DATED OCTOBER 6TH, 2014? |
| 09:58AM | 8 | A.   CORRECT. |
| 09:58AM | 9 |           MR. CAZARES:  MOVE TO ADMIT 14124, YOUR HONOR. |
| 09:58AM | 10 |           MR. SCHENK:  NO OBJECTION. |
| 09:58AM | 11 |           THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED. |
| 09:58AM | 12 |      (DEFENDANT'S EXHIBIT 14124 WAS RECEIVED IN EVIDENCE.) |
| 09:58AM | 13 | BY MR. CAZARES: |
| 09:58AM | 14 | Q.   OKAY.  IF WE CAN FOCUS ON THE TWO MESSAGES IN THE LOWER |
| 09:58AM | 15 | PORTION OF THE EXHIBIT.  THIS WAS OCTOBER 6TH, 2014. |
| 09:58AM | 16 |      THIS WAS AROUND THE TIME THAT YOU WERE TO VISIT THERANOS |
| 09:58AM | 17 | AND YOU HAD SOME MEETINGS; CORRECT? |
| 09:58AM | 18 | A.   THAT'S CORRECT. |
| 09:58AM | 19 | Q.   AND IN THE FIRST OF THE MESSAGES IN THIS EXHIBIT FROM |
| 09:58AM | 20 | YOURSELF TO MS. HOLMES ON OCTOBER 6TH, 2014, YOU WROTE, |
| 09:58AM | 21 | "ELIZABETH, |
| 09:58AM | 22 |      "I HOPE ALL IS WELL.  I AM HAPPY THAT EACH OF THE |
| 09:58AM | 23 | POTENTIAL INVESTORS FROM THE WALTON, COX, DEVOS AND THE |
| 09:59AM | 24 | NIARCHOS FAMILIES ARE PROCEEDING VERY WELL AS I WOULD EXPECT." |
| 09:59AM | 25 |      DO YOU SEE THAT? |

09:59AM 1    A.   I DO SEE THAT.

09:59AM 2    Q.   AND YOU INDICATED "GREG BROUGHT ME UP TO SPEED ON WHERE

09:59AM 3    THE WALTONS STAND."

09:59AM 4        DO YOU SEE THAT?

09:59AM 5    A.   I DO.

09:59AM 6    Q.   AND THEN THE NEXT PARAGRAPH, "I KNOW JERRY TUBERGEN IS SET

09:59AM 7    TO MEET WITH YOU IN PALO ALTO ON THE 14TH AND HE IS BRINGING

09:59AM 8    SEVERAL FAMILY MEMBERS, INCLUDING DOUG, WHO RUNS AMWAY, WHO I

09:59AM 9    THINK YOU WILL ENJOY MEETING.  THEY ARE VERY ENTHUSIASTIC ABOUT

09:59AM 10   BEING IN YOUR CORE GROUP GOING FORWARD."

09:59AM 11       DO YOU SEE THAT?

09:59AM 12   A.   I DO.

09:59AM 13   Q.   AND WERE YOU REPORTING TO MS. HOLMES COMMUNICATIONS THAT

09:59AM 14   YOU HAD WITH MR. TUBERGEN?

09:59AM 15   A.   WELL, THAT'S WHERE I WOULD HAVE GOT THAT INFORMATION WOULD

09:59AM 16   BE FROM JERRY TUBERGEN.

09:59AM 17   Q.   FAIR ENOUGH.  THANK YOU.

09:59AM 18       AND THEN YOU SAY, "I WILL SEE YOU ON THE 17TH WITH AT

09:59AM 19   LEAST TWO OR MORE OF THE NIARCHOS FOUNDATION.  ONCE I KNOW WHO

09:59AM 20   WILL BE COMING, I WILL LET YOU KNOW AND WILL SEND YOU THE

09:59AM 21   TOPICS THAT THEY WOULD LIKE TO COVER.  AGAIN, VERY ENTHUSIASTIC

10:00AM 22   ABOUT THE OPPORTUNITY."

10:00AM 23       DO YOU SEE THAT?

10:00AM 24   A.   I DO.

10:00AM 25   Q.   AND, AGAIN, WERE YOU INDICATING ENTHUSIASM THAT YOU WERE

10:00AM 1    HEARING FROM MEMBERS OF THE NIARCHOS FOUNDATION?

10:00AM 2    A.   I'M NOT SURE WHAT I'M SAYING THERE.  I JUST SAY, "AGAIN,

10:00AM 3    VERY ENTHUSIASTIC ABOUT THE OPPORTUNITY."

10:00AM 4        I DON'T KNOW WHETHER THAT IS SOMETHING THAT I GOT FROM THE

10:00AM 5    NIARCHOS FOUNDATION OR NOT.  IT'S NOT REFERRING TO ANY

10:00AM 6    PARTICULAR PERSON.

10:00AM 7    Q.   OKAY.

10:00AM 8    A.   AND I DIDN'T, I DIDN'T REALLY KNOW THE TWO INDIVIDUALS WHO

10:00AM 9    WERE DOING THE DUE DILIGENCE FOR THE NIARCHOS FOUNDATION.

10:00AM 10   Q.   FAIR ENOUGH.  THANK YOU.

10:00AM 11       AND THE NEXT LINE IN THE EMAIL YOU WROTE, "ON THE COX

10:00AM 12   FAMILY, IT SOUNDS LIKE YOU HAD A VERY GOOD MEETING WITH

10:00AM 13   ALEX TAYLOR WHO REALLY ENJOYED THE OPPORTUNITY TO MEET WITH

10:00AM 14   YOU.  IF YOU CAN MAKE IT WORK, ALEX, JOHN DYER (CEO OF COX

10:00AM 15   ENTERPRISES) HOPE TO MEET WITH YOU FRIDAY.  AGAIN, VERY

10:00AM 16   ENTHUSIASTIC AND EXCITED ABOUT BEING PART OF YOUR CORE GROUP."

10:00AM 17       DO YOU SEE THAT?

10:00AM 18   A.   I DO.

10:00AM 19   Q.   AND THAT MEETING DID TAKE PLACE?

10:00AM 20   A.   YES, IT DID.

10:00AM 21   Q.   AND YOU PARTICIPATED IN THAT MEETING; RIGHT?

10:01AM 22   A.   YES, I DID.

10:01AM 23   Q.   THAT'S ONE OF THE TWO MEETINGS THAT YOU HAD?

10:01AM 24   A.   YES.

10:01AM 25   Q.   AND THEN MS. HOLMES RESPONDED BACK THANKING YOU FOR THE

10:01AM   1    NOTE AND YOUR COMMENTS.

10:01AM   2         DO YOU SEE THAT?

10:01AM   3    A.   I DO SEE THAT.

10:01AM   4    Q.   AND THAT SHE WAS GOING TO GIVE YOU A CALL TO CONNECT

10:01AM   5    RE GREG.

10:01AM   6         AND THAT'S MR. PENNER?

10:01AM   7    A.   THAT IS CORRECT.

10:01AM   8    Q.   AND MS. HOLMES REPORTED BACK TO YOU ABOUT A CALL SHE HAD

10:01AM   9    WITH JERRY AND A WOMAN ON HIS TEAM.

10:01AM   10        DO YOU SEE THAT?

10:01AM   11   A.   YES, I DO.

10:01AM   12   Q.   AND THAT'S A REFERENCE TO JERRY TUBERGEN?

10:01AM   13   A.   YES, IT IS.

10:01AM   14   Q.   AND THEN MS. HOLMES CONFIRMS A FRIDAY MEETING WITH ALEX.

10:01AM   15        DO YOU SEE THAT?

10:01AM   16   A.   YES, I DO SEE THAT.

10:01AM   17   Q.   AND THAT'S ALEX TAYLOR OF THE COX FAMILY?

10:01AM   18   A.   THAT IS CORRECT.

10:01AM   19   Q.   SO JUST TO CONFIRM, SO YOU TRAVELLED TO CALIFORNIA TO MEET

10:02AM   20   WITH MS. HOLMES TWICE, ONCE ON THE 10TH OF OCTOBER, AND THEN

10:02AM   21   THE SECOND TIME WITH THE NIARCHOS FOUNDATION PERSON A WEEK

10:02AM   22   LATER; CORRECT?

10:02AM   23   A.   THAT IS CORRECT.

10:02AM   24   Q.   AND ON ONE OF THOSE TWO VISITS TO CALIFORNIA, YOU WERE

10:02AM   25   GIVEN A TOUR OF THERANOS'S LAB; CORRECT?

10:02AM   1    A.   I THINK I WAS GIVEN A TOUR, YES.

10:02AM   2    Q.   OKAY.  AND ON THE TOUR OF THE LAB IN OCTOBER OF 2014, YOU

10:02AM   3    SAW ONE VERY LARGE MACHINE; CORRECT?

10:02AM   4    A.   I DID SEE ONE VERY LARGE MACHINE, YES.

10:02AM   5    Q.   AND THIS WAS A LARGE MACHINE, NOT ONE OF THE SMALL

10:03AM   6    THERANOS DEVICES; CORRECT?

10:03AM   7    A.   AS I REMEMBER, IT WAS JUST A LONG, LONG, LARGE MACHINE.

10:03AM   8    Q.   LIKE A COMMERCIAL MACHINE OF SOME SORT?

10:03AM   9    A.   IT WAS A LARGE MACHINE.

10:03AM  10    Q.   OKAY.  AND THAT MACHINE WAS REFERRED TO AS A HIGH

10:03AM  11    THROUGHPUT; CORRECT?

10:03AM  12    A.   IT, IT MAY HAVE BEEN.  I DON'T REMEMBER SPECIFICALLY.

10:03AM  13    Q.   OKAY.  NOW, IN THE COURSE OF YOUR MEETINGS WITH

10:03AM  14    MS. HOLMES, YOU REVIEWED THESE MATERIALS, YOU ALSO HAD SOME

10:03AM  15    COMMUNICATIONS WITH DAVID BOIES, DID YOU NOT?

10:03AM  16    A.   YES, I DID.

10:03AM  17    Q.   AND MR. BOIES WAS, AGAIN, A PARTNER OF YOURS AT CRAVATH?

10:03AM  18    A.   HE WAS NOT A PARTNER OF MINE AT THE TIME, BUT HE HAD BEEN

10:03AM  19    A PARTNER, YES.

10:03AM  20    Q.   A FORMER PARTNER?

10:03AM  21    A.   FORMER PARTNER.

10:03AM  22    Q.   AND YOU UNDERSTOOD THAT MR. BOIES WAS DOING LEGAL WORK FOR

10:03AM  23    THERANOS AT THAT TIME?

10:04AM  24    A.   I KNEW HE WAS DOING LEGAL WORK IN CONNECTION WITH

10:04AM  25    THERANOS.

10:04AM  1          I DON'T KNOW WHO HE WAS REPRESENTING PARTICULARLY.

10:04AM  2     Q.   OKAY.  NOW, IS IT CORRECT THAT YOU UNDERSTOOD AT THIS TIME

10:04AM  3     IN THE FALL OF 2014 THAT THERANOS DEVICES, THEIR TESTING

10:04AM  4     ANALYZERS, WERE NOT ACTUALLY IN WALGREENS STORES FOR THE

10:04AM  5     PURPOSE OF PERFORMING THE TESTS?

10:04AM  6     A.   I DID REALIZE THAT THEY WERE NOT CURRENTLY IN THE STORES,

10:04AM  7     YES.

10:04AM  8     Q.   OKAY.  AND SO YOU UNDERSTOOD THAT THE TESTING WAS BEING

10:04AM  9     DONE OFFSITE, NOT IN THE STORES?

10:04AM  10    A.   I DID.

10:04AM  11    Q.   WITHIN THAT SAME BINDER -- ACTUALLY I THINK IT'S ALREADY

10:04AM  12    ADMITTED, 4284.

10:04AM  13         IF WE CAN PUT THAT UP ON THE SCREEN, MR. ALLEN.

10:04AM  14         4284 IS PROBABLY IN BOTH BINDERS.

10:04AM  15    A.   I'VE GOT IT.

10:04AM  16    Q.   OKAY.  AND 4284 IS AN EMAIL CHAIN -- YOU CAN ALSO SEE IT

10:05AM  17    UP ON THE SCREEN -- THE LATTER OF WHICH IS DATED

10:05AM  18    OCTOBER 23RD, 2014.

10:05AM  19         THAT'S A MESSAGE FROM MS. HOLMES TO YOURSELF.

10:05AM  20         DO YOU SEE THAT?

10:05AM  21    A.   I DO.

10:05AM  22    Q.   AND BELOW THAT IS A MESSAGE FROM YOU TO MS. HOLMES, AND

10:05AM  23    THE SUBJECT IS MEETING LAST FRIDAY.

10:05AM  24         DO YOU SEE THAT?

10:05AM  25    A.   I DO SEE THAT.

10:05AM  1    Q.   AND IN THE MESSAGE YOU WROTE TO MS. HOLMES, "IT WAS GOOD

10:05AM  2    TO SEE YOU ON FRIDAY.

10:05AM  3         "OVER THE WEEKEND I HAD A CHANCE TO FILL ANDREAS IN ON THE

10:05AM  4    MEETING."

10:05AM  5         THE REFERENCE TO ANDREAS, IS THAT MR. DRACOPOULOS?

10:05AM  6    A.   YES, IT IS.

10:05AM  7    Q.   AND THEN YOU CONTINUED, "HOWEVER, BEFORE I HAD A CHANCE TO

10:05AM  8    DESCRIBE THE MEETING, ANDREAS STATED THAT HE SUSPECTED THAT

10:05AM  9    THREE FOUNDATION STAFF MEMBERS WHO WERE THERE WITH ME WERE NOT

10:05AM 10    ABLE TO SEE THE TRUE OPPORTUNITY AND INSTEAD WERE FOCUSSED ON

10:05AM 11    DOTTING EVERY 'I' AND CROSSING EVERY 'T.'"

10:06AM 12         DO YOU SEE THAT?

10:06AM 13    A.   I DO SEE THAT.

10:06AM 14    Q.   AND THIS WAS BEING -- THIS WAS REPORTED TO YOU BY

10:06AM 15    MR. DRACOPOULOS?

10:06AM 16    A.   YES, IT WAS.

10:06AM 17    Q.   AND YOU OBSERVED THAT IN THE MEETING; CORRECT?

10:06AM 18    A.   I'M NOT, I'M NOT SURE WHAT I OBSERVED IN THE MEETING.

10:06AM 19    Q.   OKAY.  AND THEN YOU CONTINUED.

10:06AM 20         "NEEDLESS TO SAY, I TOLD HIM THAT WAS EXACTLY HOW IT

10:06AM 21    PROCEEDED.  HE ASKED ME TO APOLOGIZE FOR NOT BEING THERE TO CUT

10:06AM 22    THROUGH THE NONSENSE."

10:06AM 23         DO YOU SEE THAT?

10:06AM 24    A.   I DO SEE THAT.

10:06AM 25    Q.   AND, AGAIN, THAT CAME FROM MR. DRACOPOULOS?

MOSLEY CROSS BY MR. CAZARES (RES.)                                    5350

10:06AM   1    A.   YES, IT DID.

10:06AM   2    Q.   "I HAVE TO FIND A WAY FOR THE TWO OF YOU TO MEET.  YOU

10:06AM   3    WOULD ENJOY GETTING TO KNOW HIM AND WOULD UNDOUBTEDLY FIND HIS

10:06AM   4    CANDOR REFRESHING."

10:06AM   5         DO YOU SEE THAT?

10:06AM   6    A.   I SEE THAT.

10:06AM   7    Q.   AND NOW, ULTIMATELY MR. DRACOPOULOS DID INVEST HIMSELF;

10:06AM   8    CORRECT?

10:06AM   9    A.   YES, HE DID.

10:06AM  10    Q.   PERSONALLY?

10:06AM  11    A.   YES.

10:06AM  12    Q.   AND THE FOUNDATION, WHICH WAS REPRESENTED BY THESE OTHER

10:06AM  13    INDIVIDUALS, DECIDED NOT TO INVEST; CORRECT?

10:06AM  14    A.   THAT IS CORRECT.

10:06AM  15    Q.   AND IS IT CORRECT THAT THE REPRESENTATIVES OF THE

10:07AM  16    FOUNDATION HAD QUESTIONS REGARDING FINANCIAL DETAILS; CORRECT?

10:07AM  17    A.   THEY HAD A LOT OF QUESTIONS.

10:07AM  18    Q.   OKAY.  AND NOT ALL OF THOSE QUESTIONS WERE ANSWERED TO

10:07AM  19    THEIR SATISFACTION; IS THAT FAIR?

10:07AM  20    A.   THAT IS CORRECT.

10:07AM  21    Q.   AND MR. DRACOPOULOS INVESTED IN THERANOS BEFORE EVER

10:07AM  22    VISITING AND MEETING MS. HOLMES; IS THAT CORRECT?

10:07AM  23    A.   THAT'S CORRECT.

10:07AM  24    Q.   AND YOU'RE NOT AWARE OF ANY MEETING BETWEEN

10:07AM  25    MR. DRACOPOULOS AND MR. BALWANI; CORRECT?

| | | |
|---|---|---|
| 10:07AM | 1 | A.   I AM NOT. |
| 10:07AM | 2 | Q.   NOW, WE CAN PUT UP ON THE SCREEN EXHIBIT 2065. |
| 10:07AM | 3 | NOW, 2065 IS AN OCTOBER 10, 2014 EMAIL EXCHANGE, |
| 10:08AM | 4 | MR. MOSLEY, THAT YOU WERE NOT A PARTY TO, INCLUDING |
| 10:08AM | 5 | CHRISTIAN HOLMES RELATING TO BDT VISITORS TO WAG SATURDAY. |
| 10:08AM | 6 | DO YOU SEE THAT? |
| 10:08AM | 7 | A.   THAT'S WHAT IT INDICATES, YES. |
| 10:08AM | 8 | Q.   AND DO YOU REMEMBER YOU WERE SHOWN THIS EMAIL IN YOUR |
| 10:08AM | 9 | DIRECT EXAMINATION BY MR. SCHENK? |
| 10:08AM | 10 | DO YOU RECALL THAT? |
| 10:08AM | 11 | A.   YES, I WAS. |
| 10:08AM | 12 | Q.   OKAY.  NOW, MR. MOSLEY, YOU HAVE NO IDEA WHETHER |
| 10:08AM | 13 | MR. BALWANI AGREED TO ANY OF THE PROPOSALS BY MR. HOLMES |
| 10:08AM | 14 | REFLECTED IN THE EMAIL; CORRECT? |
| 10:08AM | 15 | A.   I DO NOT. |
| 10:08AM | 16 | Q.   OKAY.  AND YOU ALSO HAVE NO IDEA WHETHER ANYTHING |
| 10:08AM | 17 | REFLECTED IN THE EMAIL ACTUALLY HAPPENED OR TOOK PLACE; |
| 10:08AM | 18 | CORRECT? |
| 10:08AM | 19 | A.   I DO NOT. |
| 10:08AM | 20 | Q.   YOU CAN TAKE THAT DOWN, MR. ALLEN. |
| 10:08AM | 21 | NOW, MR. MOSLEY, I THINK YOU TESTIFIED YESTERDAY THAT YOU |
| 10:08AM | 22 | DID NOT ENCOURAGE YOUR CLIENTS TO INVEST IN THERANOS; IS THAT |
| 10:08AM | 23 | RIGHT? |
| 10:08AM | 24 | A.   I DID NOT.  I DID TESTIFY TO THAT EFFECT, YES. |
| 10:08AM | 25 | Q.   OKAY.  AND DOES THAT MEAN THAT YOU YOURSELF DID NOT |

10:09AM  1    RECOMMEND TO YOUR CLIENTS THAT THEY INVEST IN THERANOS?

10:09AM  2    A.   THAT IS CORRECT.

10:09AM  3    Q.   IF YOU COULD TAKE A LOOK AT THE BINDER IN FRONT OF YOU,

10:09AM  4    AGAIN, EXHIBIT 14135.  14135.

10:09AM  5    A.   I DON'T SEEM TO HAVE THAT.  I DON'T HAVE AN EXHIBIT WITH

10:09AM  6    THAT NUMBER ON IT.

10:09AM  7              MR. CAZARES:  YOUR HONOR, DOES YOUR HONOR HAVE THE

10:09AM  8    DOCUMENT?

10:09AM  9              THE COURT:  NOT IN MY BINDER.

10:09AM 10              MR. CAZARES:  IS IT POSSIBLE TO SHOW MR. MOSLEY JUST

10:09AM 11    THE SCREEN OF 14135?

10:09AM 12              THE COURT:  DOES THE GOVERNMENT HAVE THIS?

10:09AM 13              MR. SCHENK:  I DO NOT.

10:09AM 14              MR. CAZARES:  HERE (HANDING).  I HAVE ONE COPY.

10:10AM 15              THE COURT:  THIS IS ON DISPLAY FOR THE WITNESS ONLY?

10:10AM 16              MR. CAZARES:  YES.

10:10AM 17         YOUR HONOR, SHOULD I HAND UP A COPY OR DOES YOUR HONOR

10:10AM 18    HAVE THE SCREEN?

10:10AM 19              THE COURT:  I HAVE THE SCREEN AS WELL.

10:10AM 20              MR. CAZARES:  OKAY.  I APOLOGIZE, YOUR HONOR.

10:10AM 21    Q.   HAVE YOU HAD A CHANCE TO LOOK AT THE EXCHANGE, MR. MOSLEY?

10:10AM 22    A.   I HAVE.

10:10AM 23    Q.   OKAY.  THE EXHIBIT 14135 IS AN EMAIL CHAIN, THE LATTER OF

10:10AM 24    WHICH APPEARS TO BE DATED OCTOBER 31, 2014.

10:10AM 25              THAT'S A MESSAGE FROM MS. HOLMES TO YOURSELF.

10:10AM 1          DO YOU SEE THAT?

10:10AM 2     A.   I DO SEE THAT.

10:10AM 3     Q.   AND THEN WITHIN THE CHAIN, THERE'S A PRIOR EXCHANGE

10:10AM 4     BETWEEN YOURSELF AND MR. CHRISTOPHER BOIES.

10:10AM 5          DO YOU SEE THAT?

10:10AM 6     A.   I DO SEE THAT.

10:10AM 7     Q.   AND YOUR EXCHANGE WITH MR. CHRISTOPHER BOIES RELATES TO

10:11AM 8     THAT REDEMPTION RIGHTS ISSUE; CORRECT?

10:11AM 9     A.   YES, IT DOES.

10:11AM 10         MR. CAZARES:  MOVE TO ADMIT 14135, YOUR HONOR.

10:11AM 11         MR. SCHENK:  NO OBJECTION.

10:11AM 12         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

10:11AM 13         (DEFENDANT'S EXHIBIT 14135 WAS RECEIVED IN EVIDENCE.)

10:11AM 14    BY MR. CAZARES:

10:11AM 15    Q.   NOW, YOU DON'T SEE MR. BALWANI COPIED ON THIS MESSAGE;

10:11AM 16    CORRECT?

10:11AM 17    A.   I DO NOT.

10:11AM 18    Q.   OKAY.  IT'S JUST YOURSELF AND MS. HOLMES IN THE LATTER

10:11AM 19    MESSAGES?

10:11AM 20    A.   AND CHRISTOPHER BOIES.

10:11AM 21    Q.   OKAY.  AND FOCUSSING ON THE SECOND MESSAGE FROM THE TOP

10:11AM 22    FROM YOURSELF TO MR. BOIES, YOU WROTE, "CHRIS,

10:11AM 23         "I AM MORE THAN OKAY WITHOUT IT AND HOPE ELIZABETH DOES

10:11AM 24    NOT THINK IT NECESSARY."

10:11AM 25         THAT'S RELATING TO THE REDEMPTION RIGHTS ISSUE; IS THAT

10:11AM 1    CORRECT?

10:11AM 2    A.   THAT IS CORRECT.

10:11AM 3    Q.   AND THEN I WROTE, "IF I DO NOT HAVE DEEP TRUST AND FAITH

10:11AM 4    IN ELIZABETH, I WOULD NOT BE INVOLVED WITH THERANOS AND

10:12AM 5    RECOMMENDING AN INVESTMENT BY MY CLIENTS."

10:12AM 6         DO YOU SEE THAT?

10:12AM 7    A.   I DO SEE THAT.

10:12AM 8    Q.   AND THOSE ARE YOUR WORDS?

10:12AM 9    A.   THOSE ARE MY WORDS.

10:12AM 10   Q.   THEN YOU WROTE, "I TOLD ELIZABETH EARLY ON THAT I WAS

10:12AM 11   INCREDIBLY APPRECIATIVE TO HAVE AN OPPORTUNITY TO BE INVOLVED

10:12AM 12   WITH HER AND THERANOS AND I FEEL EVEN MORE SO AT THIS POINT."

10:12AM 13        DO YOU SEE THAT?

10:12AM 14   A.   I DO SEE THAT.

10:12AM 15   Q.   YOU CAN SET THAT ASIDE.

10:12AM 16        NOW, MR. MOSLEY, YESTERDAY YOU TESTIFIED THAT YOU DID NOT

10:12AM 17   KNOW THAT THERE WERE SOME TESTS THAT THERANOS COULD NOT YET RUN

10:12AM 18   ON ITS FINGERSTICK TECHNOLOGY; CORRECT?

10:12AM 19   A.   I DID.

10:12AM 20   Q.   OKAY.  NOW -- BUT AT SOME POINT MS. HOLMES TOLD YOU THAT

10:13AM 21   THERANOS COULD NOT DO ALL OF THE TESTS THAT PATIENTS MIGHT

10:13AM 22   ORDER; IS THAT RIGHT?

10:13AM 23   A.   I DON'T REMEMBER.  I DON'T REMEMBER WHETHER SHE TOLD ME,

10:13AM 24   AND IF SHE DID, I DON'T KNOW WHEN SHE WOULD HAVE TOLD ME.

10:13AM 25        BUT CERTAINLY AT THIS POINT I DID NOT KNOW THAT.

10:13AM  1    Q.   AND YOU WERE TOLD BY MS. HOLMES THAT AT VARIOUS TIMES IT

10:13AM  2    COULD NOT DO ALL OF THE TESTS; CORRECT?

10:13AM  3    A.   I WAS NOT TOLD THAT.

10:13AM  4    Q.   OKAY.  IF YOU CAN TAKE OUT THE STATEMENTS BINDER, THERE

10:13AM  5    SHOULD BE A WHITE BINDER THERE WITH -- IT'S VOLUME 2.

10:13AM  6    A.   YOU MEAN FROM THE GOVERNMENT?

10:13AM  7    Q.   FROM THE DEFENSE?

10:13AM  8    A.   I HAVE A VOLUME 2.  IT DOESN'T --

10:13AM  9    Q.   OKAY.

10:13AM  10   A.   -- SAY STATEMENTS, BUT --

10:14AM  11   Q.   LOOK AT EXHIBIT 28040, 28040.

10:14AM  12   A.   I HAVE IT.

10:14AM  13   Q.   AND GO TO PAGE 134.

10:14AM  14        YOUR HONOR, 134 AT LINES 16 TO 23.

10:14AM  15        DO YOU SEE THAT, MR. MOSLEY?

10:14AM  16   A.   I DO.

10:14AM  17             MR. CAZARES:  YOUR HONOR, I'D LIKE TO PUBLISH.

10:14AM  18             THE COURT:  WHY DON'T YOU LAY A FOUNDATION FOR HIM?

10:14AM  19             MR. CAZARES:  YES, YOUR HONOR.

10:14AM  20   Q.   MR. MOSLEY, YOU TESTIFIED YESTERDAY THAT YOU RECALL

10:14AM  21   TESTIFYING IN A DEPOSITION RELATING TO THERANOS A COUPLE OF

10:14AM  22   YEARS AGO; CORRECT?

10:14AM  23   A.   YES, I DID.

10:14AM  24   Q.   AND IN THE DEPOSITION, OF COURSE, YOU SWORE TO TELL THE

10:14AM  25   TRUTH; CORRECT?

10:14AM 1    A.   I DID.

10:14AM 2    Q.   AND YOU DID YOUR BEST TO TELL THE TRUTH AT THE TIME;

10:14AM 3    CORRECT?

10:14AM 4    A.   I DID.

10:15AM 5    Q.   AND WHAT YOU'RE LOOKING AT HERE IN THE TRANSCRIPT, THIS IS

10:15AM 6    A TRANSCRIPT FROM YOUR DEPOSITION; CORRECT?

10:15AM 7    A.   YES.

10:15AM 8    Q.   OKAY.

10:15AM 9         YOUR HONOR, I'D LIKE TO PUBLISH.

10:15AM 10             THE COURT:  LINES?

10:15AM 11             MR. CAZARES:  16 TO 23, AND THAT'S ALL.

10:15AM 12             THE COURT:  ALL RIGHT.

10:15AM 13             MR. CAZARES:  THANK YOU, YOUR HONOR.

10:15AM 14   Q.   SO, MR. MOSLEY, FROM YOUR DEPOSITION YOU'LL SEE THE

10:15AM 15   QUESTION PUT TO YOU AT THE TIME WAS:  "SO AT SOME POINT

10:15AM 16   ELIZABETH TOLD YOU THAT THERANOS COULDN'T DO ALL OF THE TESTS

10:15AM 17   THAT PATIENTS MIGHT ORDER; IS THAT RIGHT?"

10:15AM 18        DO YOU SEE THAT?

10:15AM 19   A.   I DO SEE THAT.

10:15AM 20   Q.   AND THEN YOU ANSWER:  "I BELIEVE I WAS TOLD THAT AT

10:15AM 21   THAT -- AT VARIOUS TIMES IT COULD NOT DO ALL THE TESTS."

10:15AM 22        DO YOU SEE THAT?

10:15AM 23   A.   YES, I DO.

10:15AM 24   Q.   AND THOSE ARE YOUR WORDS?

10:15AM 25   A.   THOSE ARE MY WORDS.

10:16AM  1     Q.   YOU CAN TAKE THAT DOWN.

10:16AM  2          JUST ONE MOMENT, YOUR HONOR.

10:16AM  3          MAY I HAVE A MOMENT TO CONFER, YOUR HONOR?

10:16AM  4               THE COURT:   YES.

10:16AM  5          (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

10:16AM  6               MR. CAZARES:   NO FURTHER QUESTIONS, YOUR HONOR.

10:16AM  7          THANK YOU, MR. MOSLEY.

10:16AM  8               THE COURT:   REDIRECT.

10:16AM  9                    **REDIRECT EXAMINATION**

10:17AM  10    BY MR. SCHENK:

10:17AM  11    Q.   GOOD MORNING, MR. MOSLEY.

10:17AM  12    A.   GOOD MORNING.

10:17AM  13    Q.   I WANT TO FOLLOW UP ON JUST TWO LINES OF QUESTIONING THAT

10:17AM  14    THE DEFENSE COVERED WITH YOU ON CROSS-EXAMINATION.

10:17AM  15         THE FIRST -- IF WE COULD BRING UP EXHIBIT 3387.

10:17AM  16         YOUR HONOR, THIS WAS ADMITTED PREVIOUSLY.

10:17AM  17         AND PAGE 280.

10:17AM  18               THE COURT:   YES.

10:17AM  19               MR. SCHENK:   THANK YOU.

10:17AM  20    Q.   MR. MOSLEY, DO YOU RECALL THIS BEING ONE OF THE SLIDES

10:17AM  21    THAT WAS LOCATED WITHIN THE BINDER OF MATERIAL THAT YOU

10:17AM  22    RECEIVED FROM MS. HOLMES UNDER THE COVER LETTER THAT YOU AND I

10:17AM  23    DISCUSSED?

10:17AM  24    A.   YES, I DO.

10:17AM  25    Q.   AND MR. CAZARES JUST SHOWED YOU SOME PRIOR TESTIMONY ABOUT

10:17AM  1    THIS ISSUE OF SORT OF KNOWING THE NUMBER OF TESTS THAT THERANOS

10:17AM  2    WAS CAPABLE OF RUNNING.

10:17AM  3         DO YOU RECALL THAT LINE OF QUESTIONING?

10:17AM  4    A.   I DO.

10:17AM  5    Q.   DID THE MATERIAL THAT YOU REVIEWED BEFORE MAKING A

10:17AM  6    DISCUSSION TO INVEST INFORM YOU THAT THERANOS COULD RUN

10:18AM  7    COMPREHENSIVE TESTS?

10:18AM  8    A.   YES, IT DID.

10:18AM  9    Q.   EXPLAIN TO THE JURY THEN, IF YOU WOULD, WHAT YOUR

10:18AM 10    UNDERSTANDING WAS REGARDING THE CURRENT TESTING CAPABILITY OF

10:18AM 11    THERANOS BEFORE YOU MADE A DECISION TO INVEST?

10:18AM 12    A.   YOU KNOW, IT WAS MY UNDERSTANDING THAT IT COULD RUN ALL OF

10:18AM 13    THE TESTS THAT WERE NORMALLY PERFORMED BY VARIOUS LABS.

10:18AM 14         SO IT WAS CAPABLE OF RUNNING THE FULL SET OF TESTS THAT

10:18AM 15    LABS WERE RUNNING.

10:18AM 16    Q.   AND THIS WAS WITHIN THE BINDER OF MATERIAL THAT YOU

10:18AM 17    RECEIVED; IS THAT CORRECT?

10:18AM 18    A.   THAT IS CORRECT.

10:18AM 19    Q.   AND I WANT TO TALK JUST BRIEFLY WITH YOU ABOUT THE SOURCES

10:18AM 20    OF INFORMATION, THAT SORT OF THE BUCKET OF INFORMATION THAT YOU

10:18AM 21    HAD WHEN YOU MADE THE DECISION TO INVEST AT THE END OF OCTOBER.

10:18AM 22    A.   RIGHT.

10:18AM 23    Q.   WAS THE BINDER OF MATERIAL AMONG THE INFORMATION THAT YOU

10:18AM 24    RELIED ON WHEN YOU MADE THE INVESTMENT DECISION?

10:18AM 25    A.   ABSOLUTELY.

10:18AM 1    Q.   AND THEN YOU COVERED WITH MR. CAZARES TWO IN-PERSON

10:18AM 2    MEETINGS IN PALO ALTO IN OCTOBER.

10:19AM 3    A.   YES.

10:19AM 4    Q.   WAS THE CONTENT OF THOSE MEETINGS AS WELL A SOURCE OF

10:19AM 5    INFORMATION WHEN YOU DECIDED TO INVEST?

10:19AM 6    A.   YES, ABSOLUTELY.

10:19AM 7    Q.   AND WAS MS. HOLMES PRESENT FOR THOSE TWO MEETINGS?

10:19AM 8    A.   YES, SHE WAS.

10:19AM 9    Q.   AND WAS MR. BALWANI PRESENT FOR THOSE TWO MEETINGS?

10:19AM 10   A.   YES, HE WAS.

10:19AM 11   Q.   YOU ALSO LOOKED AT A DOCUMENT -- I DON'T HAVE A COPY TO

10:19AM 12   SHOW YOU, I DON'T THINK YOU HAVE A COPY -- IF YOU COULD DO IT

10:19AM 13   FROM MEMORY, IT WAS 14135, THE ONE WITH CHRISTOPHER BOIES.

10:19AM 14   A.   YES.

10:19AM 15   Q.   YOU RECALL YOU USED THE PHRASE "RECOMMENDING INVESTMENT"?

10:19AM 16   A.   YES.

10:19AM 17   Q.   DO YOU RECALL THAT?

10:19AM 18   A.   YES, I DID.

10:19AM 19   Q.   AND SO I THINK YOU TESTIFIED, BOTH ON DIRECT AND CROSS,

10:19AM 20   THAT YOU DID NOT RECOMMEND AN INVESTMENT TO YOUR CLIENTS, AN

10:19AM 21   INVESTMENT IN THERANOS TO YOUR CLIENTS.

10:19AM 22       DO YOU RECALL THAT TESTIMONY?

10:19AM 23   A.   YES, I DO.

10:19AM 24   Q.   BUT IN THAT EMAIL WE SAW THE WORD "RECOMMENDING."

10:19AM 25   A.   RIGHT.

10:19AM 1    Q.   EXPLAIN WHAT IS GOING ON HERE?

10:19AM 2    A.   YOU KNOW, OBVIOUSLY IT WASN'T A GOOD USE OF WORDS BECAUSE

10:19AM 3    I THINK, AS I'VE TESTIFIED, VARIOUS OF MY CLIENTS HAD BEEN

10:19AM 4    INTRODUCED TO THERANOS AND TO ELIZABETH HOLMES, AND THEY WERE

10:20AM 5    OFF DOING THEIR OWN DUE DILIGENCE AS EVIDENCED BY ALL OF THE

10:20AM 6    OTHER EMAILS ABOUT THEIR TRIPS OUT THERE.

10:20AM 7         YOU KNOW, CLEARLY I WAS DISCUSSING THERANOS WITH THOSE

10:20AM 8    CLIENTS.  THEY WERE GOOD CLIENTS, AND PEOPLE I KNEW WELL, SO I

10:20AM 9    WAS CLEARLY DISCUSSING IT WITH THEM.

10:20AM 10        BUT, YOU KNOW, I'M A LAWYER.  I'M NOT AN INVESTMENT

10:20AM 11   ADVISOR.

10:20AM 12        I DON'T THINK ANY RECOMMENDATION I WOULD MAKE WOULD -- I

10:20AM 13   WOULD NOT MAKE A RECOMMENDATION ON AN INVESTMENT.

10:20AM 14   Q.   THANK YOU.

10:20AM 15        SO, BOTTOM LINE, DID YOU RECOMMEND THAT YOUR CLIENTS

10:20AM 16   INVEST IN THERANOS?

10:20AM 17   A.   I DID NOT.

10:20AM 18   Q.   THANK YOU.

10:20AM 19        NO FURTHER QUESTIONS, YOUR HONOR.

10:20AM 20             THE COURT:  RECROSS?

10:20AM 21             MR. CAZARES:  NO.  THANK YOU, YOUR HONOR.

10:20AM 22             THE COURT:  MAY THIS WITNESS BE EXCUSED?

10:20AM 23             MR. CAZARES:  YES, YOUR HONOR.

10:20AM 24             MR. SCHENK:  YES, YOUR HONOR.

10:20AM 25             THE COURT:  THANK YOU, SIR.  YOU MAY BE EXCUSED.

10:20AM 1          THE WITNESS:  THANK YOU.  I APPRECIATE IT.

10:20AM 2          THE COURT:  YOU'RE WELCOME.

10:21AM 3      DOES THE GOVERNMENT HAVE AN ADDITIONAL WITNESS TO CALL?

10:21AM 4          MR. BOSTIC:  YES, YOUR HONOR.

10:21AM 5      THE UNITED STATES CALLED ALAN EISENMAN.

10:21AM 6          THE COURT:  SIR, IF YOU WOULD COME FORWARD AND STAND

10:21AM 7  JUST THERE WHILE YOU FACE OUR COURTROOM DEPUTY WITH YOUR RIGHT

10:22AM 8  HAND RAISED, SHE HAS A QUESTION FOR YOU.

10:22AM 9      **(GOVERNMENT'S WITNESS, ALAN EISENMAN, WAS SWORN.)**

10:22AM 10         THE WITNESS:  YES, I DO.

10:22AM 11         THE CLERK:  THANK YOU.

10:22AM 12         THE WITNESS:  YOU'RE WELCOME.

10:22AM 13         THE COURT:  PLEASE HAVE A SEAT HERE, SIR, AND MAKE

10:22AM 14  YOURSELF COMFORTABLE.

10:22AM 15      FEEL FREE TO ADJUST THE CHAIR AND THE MICROPHONE AS YOU

10:22AM 16  NEED.

10:22AM 17      WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

10:22AM 18  AND THEN SPELL IT, PLEASE.

10:22AM 19         THE WITNESS:  MASK ON OR OFF?

10:22AM 20         THE COURT:  ARE YOU FULLY VACCINATED, SIR?

10:22AM 21         THE WITNESS:  I AM.

10:22AM 22         THE COURT:  YOU MAY TAKE IT OFF.

10:22AM 23         THE WITNESS:  THANK YOU.

10:22AM 24      ALAN JAY EISENMAN.

10:22AM 25         THE COURT:  AND IF YOU WOULD SPELL IT, PLEASE.

10:22AM  1          THE WITNESS:  A-L-A-N, J-A-Y, E-I-S-E-N-M-A-N.

10:22AM  2          THE COURT:  THANK YOU.  COUNSEL.

10:23AM  3          MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:23AM  4                    **DIRECT EXAMINATION**

10:23AM  5     BY MR. BOSTIC:

10:23AM  6     Q.   GOOD MORNING, MR. EISENMAN.

10:23AM  7     A.   GOOD MORNING.

10:23AM  8          MR. BOSTIC:  MAY I APPROACH, YOUR HONOR?

10:23AM  9          THE COURT:  YES.

10:23AM  10         MR. BOSTIC:  (HANDING.)

10:23AM  11    Q.   MR. EISENMAN, I'VE JUST HANDED YOU A DOCUMENT OF SOME

10:23AM  12    MATERIALS THAT I WOULD LIKE TO DISCUSS WITH YOU THIS MORNING.

10:23AM  13         BUT FIRST LET ME ASK YOU SOME PRELIMINARY QUESTIONS.

10:23AM  14         WERE YOU AT ONE TIME AN INVESTOR IN A COMPANY CALLED

10:23AM  15    THERANOS?

10:23AM  16    A.   YES.

10:23AM  17    Q.   LET ME GET SOME BACKGROUND ABOUT YOU BEFORE WE TALK ABOUT

10:23AM  18    YOUR DEALINGS WITH THE COMPANY.

10:23AM  19         FIRST OF ALL, WHERE DO YOU LIVE?

10:23AM  20    A.   HOUSTON, TEXAS.

10:23AM  21    Q.   AND ARE YOU CURRENTLY EMPLOYED?

10:23AM  22    A.   I'M NOT.

10:23AM  23    Q.   WHEN YOU WERE EMPLOYED, WHAT WAS YOUR PROFESSION?

10:23AM  24    A.   EARLY IN MY CAREER I DID SOME ESTATE AND TAX LEGAL WORK; I

10:23AM  25    DID SOME ACCOUNTING WORK.

```
10:23AM   1          LATER IN MY CAREER I GOT A SERIES 7 AND BECAME A WEALTH

10:23AM   2    MANAGER AND WAS INVOLVED IN SECURITIES WITH CLIENTS WITH

10:24AM   3    INVESTMENTS, PUBLIC -- I'M SORRY, PUBLIC INVESTMENTS WITH

10:24AM   4    CLIENTS.

10:24AM   5    Q.   AND WERE YOU AN INVESTMENT ADVISOR?

10:24AM   6    A.   NO, I WAS NOT AN RIA, REGISTERED INVESTMENT ADVISOR, BUT I

10:24AM   7    WAS A CFP, A CERTIFIED FINANCIAL PLANNER.

10:24AM   8    Q.   AND WHEN DID YOU RETIRE FROM THAT WORK?

10:24AM   9    A.   ABOUT FIVE OR SIX YEARS AGO.

10:24AM  10    Q.   CAN YOU GIVE US A BRIEF SUMMARY OF YOUR EDUCATIONAL

10:24AM  11    BACKGROUND BEFORE YOU STARTED WORKING IN THOSE ROLES?

10:24AM  12    A.   SURE.

10:24AM  13          I DID MY UNDERGRADUATE WORK AT UNIVERSITY OF TEXAS AT

10:24AM  14    AUSTIN.

10:24AM  15          MY DEGREE WAS IN A PROGRAM CALLED PLAN 2, WHICH IS A

10:24AM  16    LIBERAL ARTS HONORS PROGRAM, AND IT WAS PRIMARILY FOR PEOPLE

10:24AM  17    WHO WERE DOING PRELAW, PREMED.

10:24AM  18          I WAS PRELAW AT THE TIME.

10:24AM  19          I WENT TO LAW SCHOOL IN 1977 TO 1980 AT UNIVERSITY OF

10:24AM  20    HOUSTON LAW SCHOOL.

10:24AM  21          THAT THE EXTENT OF MY EDUCATION.

10:24AM  22    Q.   AND YOU MENTIONED THAT YOU HAD DONE SOME LEGAL WORK.  DID

10:25AM  23    YOU EVER PRACTICE AS A LAWYER?

10:25AM  24    A.   YES, I DID.

10:25AM  25    Q.   AND APPROXIMATELY FOR HOW LONG?
```

10:25AM  1    A.   JUST MY FIRST FEW YEARS OUT OF LAW SCHOOL I DID SOME

10:25AM  2    ESTATE PLANNING AND TAX WORK, TRUSTS, WILLS, TAX RETURNS.

10:25AM  3         BY THE WAY, MY FIRST YEAR OUT OF LAW SCHOOL, I DID A YEAR

10:25AM  4    OF TAX WORK AT COOPERS & LYBRAND.  THEY WERE WHAT WAS CALLED

10:25AM  5    THE BIG EIGHT ACCOUNTING FIRMS.  THAT WAS ONE OF THE BIG EIGHT

10:25AM  6    ACCOUNTING FIRMS.

10:25AM  7    Q.   AND IN THAT ROLE, WERE YOU WORKING AS AN ACCOUNTANT?

10:25AM  8    A.   I WAS WORKING AS AN ACCOUNTANT, BUT NOT A CPA, BECAUSE THE

10:25AM  9    REQUIREMENT IN TEXAS IS THAT YOU HAD TO HAVE A YEAR OF

10:25AM 10    EXPERIENCE BEFORE YOU COULD SIT FOR THE CPA EXAM.

10:25AM 11    Q.   DID YOU EVER BECOME A CPA?

10:25AM 12    A.   I DID.

10:25AM 13    Q.   IN THE 2005, 2006 TIME PERIOD, WHERE WERE YOU EMPLOYED?

10:25AM 14    A.   I WAS SELF-EMPLOYED AT THAT TIME PERIOD.

10:26AM 15    Q.   AND WHAT KIND OF WORK WERE YOU DOING IN 2005, 2006?

10:26AM 16    A.   I WAS PRIMARILY INVESTING IN LISTED SECURITIES FOR

10:26AM 17    CLIENTS.

10:26AM 18    Q.   IN ADDITION TO THAT, DID YOU ALSO ENGAGE IN SOME

10:26AM 19    INVESTMENT ACTIVITY OF PERSONAL OR FAMILY MONEY?

10:26AM 20    A.   YES, I DID.

10:26AM 21    Q.   AND WHEN DID YOU FIRST BECOME AWARE OF A COMPANY CALLED

10:26AM 22    THERANOS?

10:26AM 23    A.   IT WAS IN THAT 2005, 2006 PERIOD.

10:26AM 24    Q.   PRIOR TO THAT TIME PERIOD, HAD YOU HAD ANY EXPERIENCE IN

10:26AM 25    INVESTING IN SCIENCE OR BIOTECHNOLOGY COMPANIES?

10:26AM  1    A.   NO.

10:26AM  2    Q.   AND HOW DID YOU FIRST HEAR ABOUT THERANOS?

10:26AM  3    A.   I HAD A FRIEND THAT WAS THE WEALTH MANAGER FOR ELIZABETH'S

10:26AM  4    PARENTS AND THEY WERE DOING AN EARLY ROUND.  THIS WAS THEIR

10:27AM  5    SECOND SEED ROUND.

10:27AM  6         HE HAD PARTICIPATED IN THE FIRST, AND HE HAD A GROUP OF

10:27AM  7    FRIENDS THAT WERE INVESTING IN THE EARLY SEED ROUNDS.

10:27AM  8    Q.   AND JUST TO FOLLOW UP ON TWO THINGS.

10:27AM  9         YOU SAID ELIZABETH.  ARE YOU REFERRING TO

10:27AM  10   ELIZABETH HOLMES?

10:27AM  11   A.   YES.

10:27AM  12   Q.   AND YOU SAID THAT AT THE TIME THAT YOU UNDERSTOOD THE

10:27AM  13   COMPANY WAS DOING A ROUND.

10:27AM  14        CAN YOU EXPLAIN WHAT THAT MEANS?

10:27AM  15   A.   YES.  COMPANIES HAVE TO DO FUND RAISING TO EXIST, AND THEY

10:27AM  16   HAD RAISED MONEY I BELIEVE IN 2004.  I WASN'T AWARE OF THE

10:27AM  17   COMPANY AT THAT POINT.

10:27AM  18        BUT THEY WERE DOING A SECOND ROUND, RAISING MORE MONEY TO

10:27AM  19   GIVE THEM MORE WHAT IS CALLED RUNWAY.  IT GIVES THEM MORE TIME

10:27AM  20   TO DEVELOP.

10:27AM  21        AND I WAS MADE AWARE OF THE COMPANY AND INVESTED IN THE

10:27AM  22   SECOND ROUND IN 2006.

10:27AM  23   Q.   BEFORE YOU INVESTED IN THERANOS IN 2006, DID YOU HAVE THE

10:27AM  24   OPPORTUNITY TO HAVE ANY CONVERSATIONS WITH ELIZABETH HOLMES?

10:27AM  25   A.   YES, I DID.

10:27AM  1    Q.   AND WHAT DO YOU RECALL ABOUT THOSE CONVERSATIONS

10:28AM  2    GENERALLY?

10:28AM  3    A.   AT THE TIME --

10:28AM  4            MS. WALSH:  OBJECTION, YOUR HONOR.  THIS GOES -- WE

10:28AM  5    PREVIOUSLY DISCUSSED THIS, THIS TIME PERIOD THAT IS OUTSIDE OF

10:28AM  6    THE RELEVANT TIME PERIOD.

10:28AM  7        WE HAVE -- WE WILL BE OBJECTING TO THOSE QUESTIONS, OR

10:28AM  8    MAYBE WE CAN LODGE A STANDING OBJECTION TO THIS TIME PERIOD.

10:28AM  9            THE COURT:  ALL RIGHT.  THANK YOU.

10:28AM 10        MR. BOSTIC, IS THIS FOUNDATIONAL?

10:28AM 11            MR. BOSTIC:  IT IS, YOUR HONOR.

10:28AM 12        I THINK ALL OF THE INFORMATION THAT HE GAINED LEADING UP

10:28AM 13    TO THE SECOND INVESTMENT THAT WE'RE GOING TO TALK ABOUT IS

10:28AM 14    RELEVANT TO HIS DECISION MAKING.

10:28AM 15            THE COURT:  THE OBJECTION IS NOTED.  IT'S OVERRULED.

10:28AM 16        AND THIS IS FOUNDATIONAL FOR SUBSEQUENT CONDUCT.

10:28AM 17            MR. BOSTIC:  THANK YOU, YOUR HONOR.

10:28AM 18            THE COURT:  SO WHY DON'T YOU ASK THE QUESTION AGAIN?

10:28AM 19    BY MR. BOSTIC:

10:28AM 20    Q.   THE QUESTION WAS, MR. EISENMAN, YOU REFERRED TO

10:28AM 21    CONVERSATIONS THAT YOU HAD WITH MS. HOLMES AROUND THE TIME OF

10:28AM 22    THAT 2006 INVESTMENT.

10:28AM 23        DO YOU RECALL THOSE CONVERSATIONS?

10:28AM 24    A.   I DO, YES.

10:28AM 25    Q.   AND GENERALLY SPEAKING, WHAT DID MS. HOLMES TELL YOU ABOUT

10:28AM 1    THERANOS AT THAT TIME?

10:28AM 2    A.   SHE TOLD ME THAT THEY CURRENTLY HAD CONTRACTS WITH FOUR

10:29AM 3    MAJOR INTERNATIONAL PHARMACEUTICAL COMPANIES.

10:29AM 4        SHE TOLD ME THAT THEY WERE GOING TO HAVE SIGNIFICANCE

10:29AM 5    REVENUE GROWTH OVER THE NEXT TWO YEARS, I BELIEVE IT WAS

10:29AM 6    SOMEWHERE IN THE NEIGHBORHOOD OF 40 TO $50 MILLION IN REVENUE

10:29AM 7    THE VERY NEXT YEAR AFTER THIS ROUND, AND SHE ANTICIPATED $200

10:29AM 8    TO $300 MILLION IN REVENUE THE SECOND YEAR AFTER THIS ROUND.

10:29AM 9        SHE ALSO SAID THAT LARRY ELLISON, WHO WAS A CREDIBLE

10:29AM 10   BUSINESS PERSON, WAS HER ADVISOR, WAS INVESTING IN THESE

10:29AM 11   ROUNDS, AND THAT HE WAS ONE OF HER MENTORS.

10:29AM 12   Q.   AND AROUND THAT TIME PERIOD, DID YOU CONTINUE TO HAVE

10:29AM 13   ADDITIONAL CONVERSATIONS WITH MS. HOLMES?

10:29AM 14   A.   YES.

10:29AM 15   Q.   HOW ACCESSIBLE WAS MS. HOLMES TO YOU AROUND THAT TIME

10:29AM 16   PERIOD?

10:29AM 17   A.   VERY ACCESSIBLE.

10:29AM 18       FOR THE FIRST TWO OR THREE YEARS, WE SCHEDULED AND HAD A

10:30AM 19   QUARTERLY UPDATE CALL.  SOMETIMES IT WAS ME.  SOMETIMES IT WAS

10:30AM 20   OUR GROUP OF HOUSTON INVESTORS.

10:30AM 21       OCCASIONALLY THERE WOULD BE AN ISSUE WHERE WE WOULD REACH

10:30AM 22   OUT TO HER IN ADDITION TO THE QUARTERLY CALLS, AND SHE WAS VERY

10:30AM 23   ACCESSIBLE.

10:30AM 24   Q.   AND HOW DID YOU CONTACT MS. HOLMES?  WHAT CONTACT

10:30AM 25   INFORMATION DID YOU HAVE FOR HER?

10:30AM  1       A.   WE HAD HER PERSONAL CELL NUMBER.

10:30AM  2       Q.   AND, GENERALLY SPEAKING, WAS SHE RESPONSIVE TO YOUR

10:30AM  3   INQUIRIES DURING THAT TIME PERIOD?

10:30AM  4       A.   YES, SHE WAS.

10:30AM  5       Q.   WHAT CAN YOU TELL ME ABOUT, FROM YOUR CONVERSATIONS WITH

10:30AM  6   MS. HOLMES, WHAT WAS YOUR UNDERSTANDING OF THE BUSINESS THAT

10:30AM  7   THE COMPANY WAS IN AND WHAT KIND OF TECHNOLOGY THE COMPANY HAD?

10:30AM  8            AND THIS IS, AGAIN, BACK IN THE 2006 TIMEFRAME.

10:30AM  9       A.   THEY HAD A TECHNOLOGY THAT WOULD TAKE A MUCH SMALLER

10:30AM 10   SAMPLE OF BLOOD THAN CONVENTIONAL TECHNOLOGY, COULD RUN A

10:30AM 11   MULTIPLE OF TESTS AT THE SAME TIME, AND GET RESULTS BACK WITHIN

10:30AM 12   A PERIOD OF HOURS.

10:30AM 13       Q.   AND FROM YOUR DISCUSSIONS WITH MS. HOLMES, WHAT DID YOU

10:31AM 14   UNDERSTAND ABOUT THE STATE OF THE TECHNOLOGY, HOW FAR ALONG IT

10:31AM 15   WAS?

10:31AM 16       A.   WE UNDERSTOOD THAT THE TECHNOLOGY WORKED AT THE EARLY

10:31AM 17   STAGE; THAT IT WAS BEING ACCEPTED IN THE MARKETPLACE.

10:31AM 18            THERE WAS SOME TESTING GOING ON WITH PHARMACEUTICAL

10:31AM 19   COMPANIES.  IT WAS BEING USED FOR BLOOD TESTING, BLOOD DOSING,

10:31AM 20   CHECKING ADVERSE REACTIONS WHEN YOU HAVE MULTIPLE PRODUCTS IN A

10:31AM 21   BODY.

10:31AM 22       Q.   WHAT WAS YOUR UNDERSTANDING ABOUT ANY DEVELOPMENT THAT

10:31AM 23   STILL HAD TO HAPPEN WITH THE TECHNOLOGY, IF YOU HAD AN

10:31AM 24   UNDERSTANDING?

10:31AM 25       A.   YEAH.  WELL, LIKE ANYTHING ELSE, LIKE THE IPHONE OR

10:31AM 1      ANYTHING ELSE, IT WAS AN EARLY STAGE, BUT APPARENTLY IT WAS AT

10:31AM 2      A STAGE WHERE IT WAS SUCCESSFUL IN WORKING, BUT IT WAS GOING TO

10:31AM 3      BE DEVELOPED AND IMPROVED.

10:31AM 4      Q.   AND AS AN INVESTOR LOOKING INTO A COMPANY LIKE THIS, WAS

10:31AM 5      THE STATE OF THE TECHNOLOGY AN IMPORTANT FACT FOR YOU?

10:32AM 6      A.   YES.

10:32AM 7      Q.   HOW DID YOUR UNDERSTANDING THAT THIS WAS EARLY STAGE

10:32AM 8      TECHNOLOGY AFFECT YOUR VIEW OF THE RISK OF THE INVESTMENT?

10:32AM 9      A.   UM, FOR AN EARLY STAGE COMPANY, I ASSESSED THE RISK BEING

10:32AM 10     LOWER THAN MOST EARLY STAGE COMPANIES BECAUSE THEY HAD A

10:32AM 11     TECHNOLOGY, IT HAD MARKET ACCEPTANCE, IT WAS BEING USED BY FOUR

10:32AM 12     INTERNATIONAL PHARMACEUTICAL COMPANIES.

10:32AM 13          THERE WAS THE CREDIBLE BOARD MEMBER ADVISOR,

10:32AM 14     LARRY ELLISON.

10:32AM 15          AND IN THAT EARLY CONVERSATION BEFORE WE MADE OUR FIRST

10:32AM 16     INVESTMENT, A PROJECTION OF $200 TO $300 MILLION IN REVENUES,

10:32AM 17     ONLY TWO YEARS AFTER WE WERE PUTTING -- MAKING OUR INVESTMENT.

10:32AM 18          AND THE WHOLE VALUE OF THE COMPANY AT THIS STAGE WAS

10:32AM 19     $150 MILLION, AND IN TWO YEARS WE WERE UNDER THE IMPRESSION,

10:33AM 20     FROM OUR CONVERSATION WITH ELIZABETH, THAT SHE THOUGHT THEY

10:33AM 21     WERE GOING TO GENERATE $200 TO $300 MILLION IN REVENUES IN TWO

10:33AM 22     YEARS.  THAT WAS A VERY, VERY RARE INVESTMENT OPPORTUNITY.

10:33AM 23     Q.   YOU'RE TALKING ABOUT FACTS YOU BELIEVED TO BE TRUE AT THE

10:33AM 24     TIME ABOUT THE COMPANY?

10:33AM 25     A.   YES.

10:33AM 1    Q.   AND WHAT WAS YOUR SOURCE OF INFORMATION ABOUT THE COMPANY

10:33AM 2    DURING THIS TIME PERIOD?

10:33AM 3    A.   ELIZABETH HOLMES.

10:33AM 4    Q.   DURING YOUR CONVERSATIONS WITH MS. HOLMES, DID YOU TAKE

10:33AM 5    NOTES?

10:33AM 6    A.   I DID.

10:33AM 7    Q.   AND HAVE YOU REVIEWED THOSE NOTES SUBSEQUENT, IN BETWEEN

10:33AM 8    WHEN THOSE CONVERSATIONS HAPPENED AND TESTIFYING TODAY?

10:33AM 9    A.   YES, I HAVE.

10:33AM 10   Q.   DO YOU REMEMBER MS. HOLMES TELLING YOU DURING THAT TIME

10:33AM 11   PERIOD ANYTHING ABOUT THE COMPANY AND ITS PROFITABILITY?

10:33AM 12   A.   WHICH TIME PERIOD?  ARE YOU TALKING ABOUT BEFORE MY FIRST

10:33AM 13   INVESTMENT OR THE 2006, '07, '08?

10:34AM 14   Q.   LET'S TALK GENERALLY ABOUT THE 2006 TO 2008 TIME PERIOD.

10:34AM 15   A.   OKAY.  YES, I DO.

10:34AM 16        I RECALL THAT THEY HAD ONE ANNUAL MEETING IN THE WHOLE

10:34AM 17   HISTORY OF THE COMPANY THAT I TOOK NOTES, AND IN THAT ANNUAL

10:34AM 18   MEETING THEY WERE DOING SOME MULTIPLE TESTS WITH BRISTOL MYERS

10:34AM 19   I REMEMBER, QUOTE-UNQUOTE; THE TESTS WERE FLAWLESS, IT WAS LIKE

10:34AM 20   A 747 TAKING OFF.

10:34AM 21        THERE WAS AN IMPRESSION AFTER THAT ANNUAL MEETING, THE

10:34AM 22   YEAR OR SO AFTER WE INVESTED, THAT THEY WERE GAINING MARKET

10:34AM 23   ACCEPTANCE.

10:34AM 24        THE OTHER THING THAT CAME FROM THAT MEETING AND OTHER

10:34AM 25   CONVERSATIONS WAS THAT THEY WERE ALSO CAPTURING VALUABLE DATA

10:34AM  1    DOING THESE STUDIES WITH PHARMACEUTICAL COMPANIES, AND THEY

10:34AM  2    WERE GOING TO HAVE A SECOND SOURCE OF REVENUE, NOT ONLY THE

10:34AM  3    TESTING ITSELF, BUT THE DATA THAT THEY WERE CAPTURING, THEY

10:34AM  4    WOULD BE ABLE TO SELL THAT AND THAT WOULD POTENTIALLY BE

10:34AM  5    ANOTHER EQUAL SOURCE OF REVENUE.

10:34AM  6    Q.   AND I THINK I FORGOT TO ASK YOU, WHEN YOU DID INVEST IN

10:34AM  7    2006, WHAT WAS THE APPROXIMATE AMOUNT OF THAT INVESTMENT?

10:34AM  8    A.   ABOUT $1,200,000.

10:35AM  9    Q.   IN THE TIME PERIOD WE'RE TALKING ABOUT FOLLOWING THAT

10:35AM 10    FIRST INVESTMENT, APPROXIMATELY HOW FREQUENTLY DID YOU HAVE

10:35AM 11    CALLS WITH MS. HOLMES?

10:35AM 12    A.   I'M SORRY, IN WHICH TIME PERIOD?

10:35AM 13    Q.   SO FOLLOWING YOUR 2006 INVESTMENT.  SO LET'S TALK ABOUT

10:35AM 14    2006 THROUGH 2010.

10:35AM 15    A.   WE WOULD HAVE QUARTERLY UPDATE CALLS, FOR THE FIRST TWO OR

10:35AM 16    THREE YEARS, EVERY QUARTER.  AND OCCASIONALLY WE WOULD REACH

10:35AM 17    OUT TO HER AND GET AN UPDATE ON SOMETHING THAT CAME TO OUR

10:35AM 18    ATTENTION.

10:35AM 19         AND THEN THERE WAS ALSO ONE PERSONAL VISIT A COUPLE OF

10:35AM 20    YEARS AFTER WE INVESTED.  WE WERE IN CALIFORNIA FOR MY HIGH

10:35AM 21    SCHOOL SON'S SPRING BREAK TRIP AND WE PAID A VISIT TO HER AND

10:35AM 22    HER HEADQUARTERS.

10:35AM 23    Q.   AND APPROXIMATELY WHAT YEAR WOULD THAT HAVE BEEN?

10:35AM 24    A.   2008, 2009.

10:35AM 25    Q.   DURING THOSE DISCUSSIONS, WHAT DO YOU REMEMBER MS. HOLMES

10:36AM 1    TELLING YOU ABOUT PRODUCT DEVELOPMENT AND THE STATE OF THE

10:36AM 2    COMPANY'S ANALYZER DEVICE?

10:36AM 3    A.   WE WERE ALWAYS LEFT WITH THE IMPRESSION THAT THE

10:36AM 4    TECHNOLOGY WORKED; THAT IT HAD MARKET ACCEPTANCE,

10:36AM 5    PHARMACEUTICAL COMPANIES WERE USING THIS TECHNOLOGY.

10:36AM 6        SO WE WERE ALWAYS LEFT WITH THE IMPRESSION THAT THIS WAS A

10:36AM 7    TECHNOLOGY THAT WAS WORKING.

10:36AM 8    Q.   AND WHEN YOU VISITED THERANOS HEADQUARTERS DURING THE

10:36AM 9    SPRING BREAK TRIP, DO YOU RECALL THAT VISIT GENERALLY?

10:36AM 10   A.   YES.

10:36AM 11   Q.   WHAT DO YOU REMEMBER SEEING WITHIN THE COMPANY AT THAT

10:36AM 12   TIME?

10:36AM 13   A.   I REMEMBER SEEING THE READERS THAT THEY WOULD PUT THE

10:36AM 14   BLOOD SAMPLES IN, AND I REMEMBER SEEING THE MACHINES THAT THE

10:36AM 15   READERS WOULD GO IN THAT WOULD READ THE BLOOD SAMPLES.

10:36AM 16   Q.   AND CAN YOU DESCRIBE THE APPEARANCE OF WHAT YOU SAW.  HOW

10:36AM 17   BIG WAS IT?  WHAT DID IT LOOK LIKE?

10:36AM 18   A.   MY RECOLLECTION, IF I CAN USE MY HANDS, WERE THE READERS

10:36AM 19   WERE SO BIG, AND IT HAD SPOTS TO, YOU KNOW, PUT THE BLOOD IN,

10:37AM 20   AND MY RECOLLECTION THAT THE MACHINE THAT READ THE READERS WERE

10:37AM 21   THE SIZE OF COMPUTERS AT THAT TIME (INDICATING).

10:37AM 22   Q.   OKAY.  SO JUST FOR THE RECORD, I THINK THE DEVICE THAT THE

10:37AM 23   BLOOD WENT IN YOU DESCRIBED AS BEING MAYBE FOUR INCHES OR SO;

10:37AM 24   IS THAT CORRECT?

10:37AM 25   A.   THE SAMPLE WENT INTO SOMETHING THAT WAS MAYBE

10:37AM 1    THREE-QUARTERS OF AN INCH TO AN INCH BY THREE OR FOUR INCHES

10:37AM 2    AND THIN.

10:37AM 3    Q.   AND THIN YOU SAID?

10:37AM 4    A.   AND THIN.

10:37AM 5    Q.   AND THE ANALYZER DEVICE ITSELF WAS THE SIZE OF A COMPUTER.

10:37AM 6    CAN YOU ESTIMATE THE DIMENSIONS FOR US, PLEASE?

10:37AM 7    A.   MAYBE TWO, TWO AND A HALF FEET BY TWO, TWO AND A HALF

10:37AM 8    FEET.

10:37AM 9    Q.   AND WHAT DID MS. HOLMES TELL YOU ABOUT WHO HAD DEVELOPED

10:37AM 10   AND MANUFACTURED THAT ANALYZER THAT YOU WERE LOOKING AT?

10:37AM 11   A.   I DON'T RECALL IF SHE SPECIFICALLY SAID WHO DEVELOPED IT,

10:38AM 12   BUT WE WERE UNDER THE IMPRESSION THAT THAT WAS PROPRIETARY

10:38AM 13   TECHNOLOGY, THAT IT WAS ALL DEVELOPED IN HOUSE.

10:38AM 14   Q.   AT ANY TIME DURING THAT VISIT, DID MS. HOLMES SHOW YOU OR

10:38AM 15   MENTION A THIRD PARTY, NON-THERANOS BLOOD ANALYZER?

10:38AM 16   A.   NO.

10:38AM 17   Q.   DURING THOSE CONVERSATIONS IN 2006 THROUGH 2010 OR SO, DID

10:38AM 18   MS. HOLMES EVER MENTION TO YOU THE POSSIBILITY OF AN IPO AT THE

10:38AM 19   COMPANY?

10:38AM 20   A.   YES.

10:38AM 21   Q.   AND WHAT DID SHE --

10:38AM 22   A.   I RECALL THAT.

10:38AM 23   Q.   I'M SORRY.  I DON'T MEAN TO TALK OVER YOU.

10:38AM 24          MS. WALSH:  OBJECTION.  RELEVANCE.

10:38AM 25          THE COURT:  EXCUSE ME.  EXCUSE ME.

10:38AM 1                    THE WITNESS:  OH.

10:38AM 2                    MS. WALSH:  OBJECTION.  RELEVANCE.

10:38AM 3                    MR. BOSTIC:  SO THE DEFENSE HAS ASKED I THINK A

10:38AM 4    COUPLE OF WITNESSES NOW ABOUT STATEMENTS AND THEIR INTENTIONS

10:38AM 5    ABOUT BEING LONG-TERM PARTNERS.

10:38AM 6        I THINK THE DEFENDANT'S STATEMENTS ABOUT THE IPO

10:38AM 7    POSSIBILITY AND THE LIQUIDITY EVENT ARE RELEVANT.

10:39AM 8                    THE COURT:  ALL RIGHT.  I'LL OVERRULE THE OBJECTION.

10:39AM 9        DID YOU UNDERSTAND THE QUESTION?

10:39AM 10                   THE WITNESS:  YES.

10:39AM 11       WE WERE TOLD BEFORE OUR FIRST INVESTMENT THAT AN IPO WAS A

10:39AM 12   REASONABLE ASSUMPTION A FEW YEARS DOWN THE ROAD, AND IN THE

10:39AM 13   EARLY YEARS, 2006, 2007, 2008, WE WERE TOLD THAT AN IPO WAS A

10:39AM 14   REASONABLE ASSUMPTION WITHIN A YEAR OR TWO.

10:39AM 15       AND WHEN THAT YEAR OR TWO PASSED, WE WERE TOLD THAT IT'S A

10:39AM 16   REASONABLE ASSUMPTION WITHIN A YEAR OR TWO.

10:39AM 17       AND IN MY NOTES THERE WAS, THERE WAS, THERE WAS ONE TIME

10:39AM 18   WHEN IT WAS SUPPOSED TO BE POTENTIALLY 2008 AND THEN 2009, AND

10:39AM 19   IN ONE CONVERSATION DEFINITELY BY 2011.

10:39AM 20   BY MR. BOSTIC:

10:39AM 21   Q.   AND THESE WERE ALL STATEMENTS BY WHOM?

10:39AM 22   A.   BY MS. HOLMES.

10:39AM 23   Q.   AND WAS THE POSSIBILITY AND TIMING OF AN IPO SOMETHING

10:39AM 24   THAT MATTERED TO YOU AS AN INVESTOR?

10:39AM 25   A.   YES.

10:39AM 1    Q.   AND WHY IS THAT?

10:39AM 2    A.   BECAUSE YOU -- AT SOME POINT YOU WANT TO HARVEST YOUR

10:40AM 3    INVESTMENTS, AND WITH AN IPO THAT MEANS THAT THERE'S A PUBLIC

10:40AM 4    MARKET AND YOU CAN MAKE A DECISION THERE THEN TO POSSIBLY SELL

10:40AM 5    SOME OR ALL OF THE INVESTMENT.

10:40AM 6    Q.   GOING BACK TO THE STATE OF THE TECHNOLOGY OVER THOSE YEARS

10:40AM 7    AND WHAT MS. HOLMES SAID ON THAT.

10:40AM 8         DO YOU RECALL HER MENTIONING CARTRIDGES TO YOU AT ANY

10:40AM 9    POINT?

10:40AM 10   A.   YES.

10:40AM 11   Q.   AND WHAT WAS YOUR UNDERSTANDING OF WHAT A CARTRIDGE MEANT

10:40AM 12   IN CONNECTION WITH THERANOS?

10:40AM 13   A.   A CARTRIDGE WAS THE DEVICE WHERE YOU WOULD PUT THE BLOOD

10:40AM 14   SAMPLE AND THEN YOU WOULD PUT THE CARTRIDGE IN THE READER.

10:40AM 15   Q.   AND DURING THE YEARS WE'RE TALKING ABOUT, 2006 THROUGH

10:40AM 16   2010 OR SO, DID MS. HOLMES MAKE ANY STATEMENTS TO YOU ABOUT THE

10:40AM 17   NUMBERS OF CARTRIDGES THAT THERANOS WAS PRODUCING?

10:40AM 18   A.   YES, SHE DID.

10:40AM 19   Q.   WHAT DO YOU REMEMBER ABOUT THAT?

10:40AM 20   A.   THEY WERE PRODUCING ABOUT 400,000 CARTRIDGES A MONTH,

10:40AM 21   BECAUSE THAT WAS THE -- THE DEMAND WAS A MILLION CARTRIDGES A

10:40AM 22   MONTH.

10:40AM 23        THEY WERE GEARING UP, BY THE END OF THE YEAR, TO PRODUCE A

10:41AM 24   MILLION CARTRIDGES A MONTH.

10:41AM 25        AND SHE TOLD ME THAT THEY EXPECTED THE DEMAND TO GROW TO

10:41AM 1    TWO MILLION CARTRIDGES A MONTH THE VERY NEXT YEAR.

10:41AM 2         EACH OF THOSE CARTRIDGES COULD DO I BELIEVE IT WAS FIVE

10:41AM 3    TESTS, AND EACH OF THOSE TESTS WOULD SELL FOR ABOUT $30.

10:41AM 4         SO WHETHER YOU PUT A PEN TO INK AND DO THE CALCULATION,

10:41AM 5    THE CURRENT DEMAND AND THE DEMAND THAT SHE SAID WAS HAPPENING

10:41AM 6    THIS YEAR AND THE NEXT YEAR WAS POTENTIALLY TENS OR HUNDREDS OF

10:41AM 7    MILLIONS OF DOLLARS OF REVENUE.

10:41AM 8    Q.   AND WHEN MS. HOLMES WAS TELLING YOU ABOUT THESE CARTRIDGE

10:41AM 9    NUMBERS, WERE THOSE STATEMENTS LIMITED TO PROJECTIONS ABOUT THE

10:41AM 10   FUTURE, OR DID THEY INCLUDE STATEMENTS ABOUT WHAT THE COMPANY

10:41AM 11   WAS DOING AT THAT MOMENT?

10:41AM 12   A.   NO, THEY WERE BOTH CURRENT AND FUTURE.  AND I BELIEVE I'VE

10:41AM 13   GOT ONE IN MY NOTES THAT IT WAS CURRENT PRODUCTION AND DEMAND

10:41AM 14   FOR 400,000 GROWING TO A MILLION.  THE 400,000 WAS CURRENT.

10:41AM 15   Q.   I'D LIKE TO SHIFT NOW TO THE TIME PERIOD OF 2010 AND THE

10:42AM 16   YEARS FOLLOWING THAT.  OKAY?

10:42AM 17        IN EARLY 2010, DO YOU RECALL A CONVERSATION WITH

10:42AM 18   MS. HOLMES ABOUT WHETHER THE COMPANY WAS SCALING OR NOT?

10:42AM 19   A.   I WOULD HAVE TO CHECK MY NOTES.

10:42AM 20   Q.   OKAY.  I'LL DIRECT YOUR ATTENTION TO THE NOTES IN FRONT OF

10:42AM 21   YOU.  WOULD REVIEWING THOSE NOTES HELP REFRESH YOUR

10:42AM 22   RECOLLECTION?

10:42AM 23   A.   YES.

10:42AM 24   Q.   IN THE BINDER IN FRONT OF YOU, IF YOU'LL TURN TO TAB 14,

10:42AM 25   AND I'LL DIRECT YOUR ATTENTION TO PAGE 15.  THEY'RE NUMBERED AT

10:42AM 1      THE BOTTOM.

10:42AM 2           WHEN YOU GET TO PAGE 15, TAKE A MOMENT TO REVIEW THAT PAGE

10:42AM 3      AND READ IT TO YOURSELF, PLEASE, AND THEN I'LL ASK YOU IF IT

10:42AM 4      REFRESHES YOUR MEMORY.

10:43AM 5           (PAUSE IN PROCEEDINGS.)

10:43AM 6                THE WITNESS:  OKAY.

10:43AM 7      BY MR. BOSTIC:

10:43AM 8      Q.   HAS REVIEWING THOSE NOTES REFRESHED YOUR MEMORY ABOUT A

10:43AM 9      CONVERSATION THAT YOU HAD WITH MS. HOLMES ABOUT SCALING?

10:43AM 10     A.   YES.

10:43AM 11     Q.   AND WHAT DO YOU REMEMBER MS. HOLMES TELLING YOU ABOUT

10:43AM 12     WHETHER THE COMPANY WAS SCALING IN 2010?

10:43AM 13     A.   THAT THEY WERE HAVING CONVERSATIONS WITH RETAILERS; THAT

10:43AM 14     THERE WAS A POTENTIAL TO HAVE LABS, MINILABS, I DON'T KNOW WHAT

10:43AM 15     THEY CALLED THEM AT THE TIME, IN RETAILERS; THAT THE MARKET WAS

10:44AM 16     HUGE; THAT THEY HAD A BETTER PRODUCT THAN THE TWO LEADING

10:44AM 17     COMPANIES, QUEST AND LABCORP; THAT THEY WERE GOING TO GO AFTER

10:44AM 18     THE QUEST AND LABCORP BUSINESS.

10:44AM 19          THEY WERE ALSO HAVING CONVERSATIONS WITH DIFFERENT

10:44AM 20     GOVERNMENTS THAT WERE HAVING DIFFERENT ISSUES; THEY WERE HAVING

10:44AM 21     CONVERSATIONS WITH THE MEXICAN GOVERNMENT.

10:44AM 22          AND THERE WERE DIFFERENT TYPES OF DISEASES IN DIFFERENT

10:44AM 23     PARTS OF THE COUNTRY AND THEY WERE STARTING TO LOOK AT THE

10:44AM 24     EMERGING MARKETS, TAKING THEIR TECHNOLOGY TO SOLVE NEW AND

10:44AM 25     ADDITIONAL PROBLEMS WITH DIFFERENT KINDS OF DISEASES IN OTHER

10:44AM  1    PARTS OF THE WORLD.

10:44AM  2    Q.   AND WAS THIS POSITIVE NEWS TO YOU AS AN INVESTOR IN THE

10:44AM  3    COMPANY?

10:44AM  4    A.   YES, IT WAS.

10:44AM  5    Q.   IN 2010, DID YOU CONTINUE TO DISCUSS WITH MS. HOLMES THE

10:44AM  6    POSSIBILITY OF AN IPO AT THERANOS?

10:44AM  7    A.   YES, WE DISCUSSED THE POSSIBILITY OF AN IPO IN MOST

10:45AM  8    CONVERSATIONS AND EVERY YEAR.

10:45AM  9    Q.   AND AT THAT TIME WAS MS. HOLMES STILL TELLING YOU THAT AN

10:45AM  10   IPO WAS STILL IN THERANOS'S FUTURE?

10:45AM  11   A.   YES.

10:45AM  12   Q.   IF I COULD ASK YOU TO TURN TO TAB 663 IN YOUR BINDER.

10:45AM  13   A.   OKAY.

10:45AM  14   Q.   IN 663, DO YOU SEE AN EMAIL CHAIN THAT INCLUDES MESSAGES

10:45AM  15   BETWEEN YOU AND MS. HOLMES?

10:45AM  16   A.   YES.

10:45AM  17           MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 663.

10:45AM  18           MS. WALSH:  YOUR HONOR, OTHER THAN THE STANDING

10:45AM  19   OBJECTION REGARDING THE TIME PERIOD, NO OBJECTION BEYOND THAT.

10:45AM  20           THE COURT:  ALL RIGHT.  THANK YOU.  THAT'S NOTED.

10:45AM  21       THIS IS ADMITTED, AND IT MAY BE PUBLISHED.

10:45AM  22       (GOVERNMENT'S EXHIBIT 663 WAS RECEIVED IN EVIDENCE.)

10:46AM  23   BY MR. BOSTIC:

10:46AM  24   Q.   LET'S START ON PAGE 4 AT THE VERY BOTTOM.

10:46AM  25           DO YOU SEE -- MR. EISENMAN, WE'RE ABOUT TO SEE AN EMAIL

10:46AM   1    FROM YOU TO MS. HOLMES.

10:46AM   2         DO YOU SEE THAT?

10:46AM   3    A.   YES.

10:46AM   4    Q.   AND LET'S GO TO PAGE 5 AND ZOOM IN ON THE TOP HALF OF THE

10:46AM   5    PAGE OR SO.

10:46AM   6         DO YOU SEE THIS IS A MESSAGE FROM MAY 3RD, 2010?

10:46AM   7    A.   YES.

10:46AM   8    Q.   SO A FEW YEARS AFTER YOUR FIRST INVESTMENT IN THE COMPANY;

10:46AM   9    CORRECT?

10:46AM  10    A.   CORRECT.

10:46AM  11    Q.   YOU WRITE TO MS. HOLMES, "CAN WE SCHEDULE OUR QUARTERLY

10:46AM  12    UPDATE THE WEEK OF JUNE 1ST THROUGH JUNE 4TH?"

10:46AM  13         DO YOU SEE THAT?

10:46AM  14    A.   YES.

10:46AM  15    Q.   AND THEN YOU PROVIDE A NUMBERED LIST OF SOME QUESTIONS

10:46AM  16    THAT YOU HAVE TO MS. HOLMES ABOUT THERANOS; IS THAT RIGHT?

10:46AM  17    A.   CORRECT.

10:46AM  18    Q.   AND UNDER NUMBER 1 YOU WRITE, "YOU SAID THAT IN MARCH, YOU

10:46AM  19    WERE MANUFACTURING ABOUT 500,000 CARTRIDGES, AND SELLING ABOUT

10:46AM  20    400,000 AT ABOUT $80 PER CARTRIDGE."

10:46AM  21         DO YOU REMEMBER MS. HOLMES MAKING THAT REPRESENTATION TO

10:46AM  22    YOU?

10:46AM  23    A.   YES, I DO.

10:46AM  24    Q.   YOU ASK, "CAN YOU SHARE THE SAME STATISTICS FOR APRIL, AND

10:47AM  25    AN ESTIMATE FOR MAY?"

EISENMAN DIRECT BY MR. BOSTIC                                5380

10:47AM 1          DO YOU SEE THAT?

10:47AM 2     A.   YES.

10:47AM 3     Q.   WHY WERE YOU INTERESTED IN HAVING THAT INFORMATION?

10:47AM 4     A.   BECAUSE SHE TOLD ME THAT THERE WAS A DEMAND FOR A MILLION

10:47AM 5     CARTRIDGES CURRENTLY AND THEY WERE SCALING UP TO PRODUCE A

10:47AM 6     MILLION CARTRIDGES BY THE END OF THE YEAR, AND IF THEY'RE

10:47AM 7     SELLING HUNDREDS OF THOUSANDS OF CARTRIDGES AT $80 PER

10:47AM 8     CARTRIDGE, THAT'S A LOT OF REVENUE FOR THE COMPANY.

10:47AM 9     Q.   UNDER ITEM 3 IN THE LIST, DO YOU SEE THAT THERE'S A

10:47AM 10    QUESTION ABOUT AN IPO AS WE'VE BEEN DISCUSSING?

10:47AM 11    A.   YES.

10:47AM 12    Q.   LET'S GO TO PAGE 4.  SO MOVING FORWARD IN TIME.

10:47AM 13         THERE'S A MESSAGE IN THE MIDDLE OF THE PAGE FROM YOU DATED

10:47AM 14    MAY 10TH.  IS THAT A WEEK AFTER YOUR FIRST EMAIL?

10:47AM 15    A.   YES.

10:47AM 16    Q.   AND YOU'RE ASKING FOR A RESPONSE; IS THAT RIGHT?

10:47AM 17    A.   YES.

10:47AM 18    Q.   LET'S GO TO PAGE 3 AND SEE MS. HOLMES'S RESPONSE.

10:48AM 19    A.   OKAY.

10:48AM 20    Q.   JUST GIVE US A SECOND FOR TECHNOLOGY TO CATCH UP.

10:48AM 21         OKAY.  ON PAGE 3, LET'S ZOOM IN ON THE MIDDLE OF THE PAGE

10:48AM 22    TO MS. HOLMES'S RESPONSE.

10:48AM 23         DO YOU SEE SHE WRITES TO YOU NEAR THE TOP OF HER MESSAGE,

10:48AM 24    "JUNE IS A TOUGH MONTH FOR US AND I DON'T KNOW WHEN WE CAN DO

10:48AM 25    OUR NEXT CALL"?

10:48AM 1    A.   YES.

10:48AM 2    Q.   SHE THEN SAYS IN THE PARAGRAPH BELOW, "AS I DISCUSSED IN

10:48AM 3    OUR CALL IN MARCH, WE CANNOT PROVIDE THE LEVEL OF COMMUNICATION

10:48AM 4    YOU KEEP REQUESTING."

10:48AM 5        DO YOU SEE THAT?

10:48AM 6    A.   YES.

10:48AM 7    Q.   WHAT WAS HAPPENING AROUND THIS TIME WITH THE LEVEL OF

10:48AM 8    COMMUNICATION AND INFORMATION THAT YOU WERE GETTING FROM

10:49AM 9    THERANOS?

10:49AM 10   A.   IT WAS DIMINISHING.

10:49AM 11   Q.   AND WAS THAT A SUBJECT OF CONVERSATION BETWEEN YOU AND

10:49AM 12   MS. HOLMES?

10:49AM 13   A.   I'M SORRY.  COULD YOU REPEAT THE QUESTION?

10:49AM 14   Q.   WAS THE FACT THAT COMMUNICATION WAS DIMINISHING SOMETHING

10:49AM 15   THAT YOU TALKED ABOUT WITH MS. HOLMES?

10:49AM 16   A.   I CAN'T REALLY ANSWER THAT BECAUSE IT WAS SOMETHING THAT I

10:49AM 17   WAS AWARE OF AND I WAS TRYING TO REMEDY, BUT THERE WAS -- THERE

10:49AM 18   WAS LESS COMMUNICATION SO IT WAS -- IT WAS MORE ONE-SIDED

10:49AM 19   THINKING THAT THIS IS -- THAT THE COMMUNICATION IS DIMINISHING.

10:49AM 20       I DON'T KNOW IF I'M ANSWERING THE QUESTION.  YOU MAY WANT

10:49AM 21   TO RE-ASK IT.

10:49AM 22   Q.   UNDERSTOOD.

10:49AM 23   A.   OKAY.

10:49AM 24   Q.   GOING BACK TO MS. HOLMES'S EMAIL, DO YOU SEE THAT SHE

10:49AM 25   SAYS, "WITH THE DEALS WE ARE FORMALIZING WITH RETAILERS, WE ARE

10:49AM  1    NOW OBLIGATED NOT TO DISCLOSE OUR PRODUCTION VOLUMES AND

10:50AM  2    CARTRIDGE SALE PRICES."

10:50AM  3        DO YOU SEE THAT?

10:50AM  4    A.   YES.

10:50AM  5    Q.   AT ANY POINT IN YOUR DEALINGS WITH THERANOS, DID YOU SIGN

10:50AM  6    A NONDISCLOSURE AGREEMENT SO THAT YOU COULD RECEIVE

10:50AM  7    CONFIDENTIAL INFORMATION FROM THE COMPANY?

10:50AM  8    A.   NO.

10:50AM  9    Q.   DID MS. HOLMES OR MR. BALWANI EVER ASK YOU TO SIGN A

10:50AM  10   NONDISCLOSURE AGREEMENT FOR THAT PURPOSE?

10:50AM  11   A.   NO.

10:50AM  12   Q.   WOULD YOU HAVE BEEN WILLING TO SIGN A NONDISCLOSURE

10:50AM  13   AGREEMENT IN ORDER TO GET MORE INFORMATION ABOUT THE COMPANY?

10:50AM  14   A.   YES.

10:50AM  15   Q.   DO YOU SEE THAT MS. HOLMES'S EMAIL ALSO SAYS, "AT THIS

10:50AM  16   POINT, WE ALSO DON'T HAVE ANY PLANS TO DO AN IPO ANY TIME

10:50AM  17   SOON"?

10:50AM  18   A.   YES.

10:50AM  19   Q.   WAS THAT DIFFERENT FROM WHAT SHE PREVIOUSLY TOLD YOU?

10:50AM  20   A.   YES, 180 DEGREES.

10:50AM  21   Q.   HOW SO?

10:50AM  22       AT THE BOTTOM OF THAT PAGE, SHE SAYS, "GIVEN YOUR

10:50AM  23   FRUSTRATION LEVEL AND OUR FRUSTRATION LEVEL WITH THIS

10:50AM  24   INTERACTION, I STRONGLY ENCOURAGE YOU TO RE-CONSIDER THE

10:50AM  25   OPPORTUNITY I PRESENTED ON OUR LAST CALL TO REALIZE THE RETURN

10:50AM  1     ON YOUR INVESTMENT."

10:50AM  2          WHAT IS THAT REFERRING TO?

10:50AM  3     A.   WE WERE ON A CALL WHERE SHE SAID THAT THEY WERE TRYING TO

10:51AM  4     ARRANGE A FACILITY TO BUY OUR STOCK AT A LITTLE GREATER THAN

10:51AM  5     FIVE TIMES OUR ORIGINAL COST.

10:51AM  6     Q.   AND AROUND THIS TIME PERIOD, DID YOU MAKE A DECISION ABOUT

10:51AM  7     WHETHER TO PURSUE THAT OPPORTUNITY OR NOT?

10:51AM  8     A.   WE, WE DID PURSUE THAT OPPORTUNITY.

10:51AM  9     Q.   DID YOU END UP SELLING YOUR SHARES AT THAT FIVE TIMES

10:51AM  10    RETURN?

10:51AM  11    A.   NO.  BECAUSE AS WE PURSUED THE OPPORTUNITY, THE COMPANY

10:51AM  12    WENT SILENT.  THEY DID NOT FOLLOW THROUGH ON THEIR

10:51AM  13    COMMUNICATION.

10:51AM  14    Q.   OKAY.  LET'S GO TO PAGE 2 AND SEE YOUR RESPONSE TO

10:51AM  15    MS. HOLMES.

10:52AM  16         JUST GIVE US ONE MOMENT.

10:52AM  17         AND ON PAGE 2, LET'S ZOOM IN ON THE TOP HALF OF THE PAGE.

10:52AM  18         MR. EISENMAN, IS THIS YOUR RESPONSE TO MS. HOLMES?

10:52AM  19    A.   YES, YES, IT IS.

10:52AM  20    Q.   YOU WRITE THAT YOUR QUESTIONS WERE MERELY A FOLLOW-UP FROM

10:52AM  21    YOUR DECEMBER CALL.

10:52AM  22         DO YOU SEE THAT?

10:52AM  23    A.   YES.

10:52AM  24    Q.   AND YOU SAY THAT MS. HOLMES SAID THAT THERANOS WAS CLOSE

10:52AM  25    TO ACHIEVING $200 MILLION IN SALES FOR 2009 IN THAT DECEMBER

10:52AM 1    CALL.

10:52AM 2         DO YOU REMEMBER HER SAYING THAT?

10:52AM 3    A.   I DO.

10:52AM 4    Q.   UNDER ITEM NUMBER 2, DO YOU SEE THAT YOU'RE ASKING FOR 20

10:52AM 5    TO 30 MINUTES FOR AN UPDATE CALL?

10:52AM 6    A.   YES.

10:52AM 7    Q.   AND GOING DOWN IN THAT SAME EMAIL, DO YOU SEE UNDER ITEM 3

10:53AM 8    AND 4, THERE'S DISCUSSION ABOUT THE MILLION CARTRIDGES PER

10:53AM 9    MONTH FIGURE THAT WE DISCUSSED PREVIOUSLY?

10:53AM 10   A.   YES.

10:53AM 11   Q.   AND YOU ALSO RELAY TO HER HER PREVIOUS STATEMENT THAT

10:53AM 12   THERE WAS A HIGH LIKELIHOOD OF AN IPO BY THE END OF 2010.

10:53AM 13        DO YOU SEE THAT?

10:53AM 14   A.   YES.

10:53AM 15   Q.   LET'S LOOK AT ITEM 6 HERE.

10:53AM 16        YOU SAY, "BOTTOM LINE -- IN OUR PRIOR CONVERSATIONS, YOU

10:53AM 17   SET CERTAIN EXPECTATIONS ABOUT AN INVESTORS MEETING, AN IPO,

10:53AM 18   AND SALES AND PRODUCTION FIGURES.  I DON'T MIND IF THESE ITEMS

10:53AM 19   CHANGE, BUT I WOULD LIKE TO KNOW WHY THEY CHANGE."

10:53AM 20        DO YOU SEE THAT?

10:53AM 21   A.   YES.

10:53AM 22   Q.   AND DID THAT ACCURATELY REFLECT YOUR ATTITUDE AT THE TIME?

10:53AM 23   A.   YES.

10:53AM 24   Q.   AND WHY DID THESE THINGS MATTER TO YOU AS SOMEONE WHO HAD

10:53AM 25   MONEY INVESTED IN THE COMPANY?

EISENMAN DIRECT BY MR. BOSTIC

10:53AM  1  A.  BECAUSE THESE ARE METRICS THAT INCREASE VALUE, AND THESE

10:54AM  2  ARE ALL IMPORTANT METRICS.

10:54AM  3      SO IT'S A FINANCIAL -- IT'S OF IMPORTANCE FINANCIALLY.

10:54AM  4      IT'S ALSO IMPORTANT AS FAR AS CREDIBILITY, BECAUSE WHEN

10:54AM  5  SOMEONE COMMUNICATES INFORMATION AND THEY DON'T MEET A DEADLINE

10:54AM  6  AND THEY COMMUNICATE ADDITIONAL INFORMATION AND THEY DON'T MEET

10:54AM  7  A DEADLINE AND THIS BECOMES A PATTERN, THEN THERE'S A

10:54AM  8  CREDIBILITY ISSUE.

10:54AM  9  Q.  SO YOU TESTIFIED THAT EVEN AFTER DISCUSSION OF A POTENTIAL

10:54AM 10  BUYOUT OF YOUR SHARES, YOU ENDED UP REMAINING AN INVESTOR IN

10:54AM 11  THERANOS; IS THAT RIGHT?

10:54AM 12  A.  I HAD NO CHOICE.  THERE WAS NO OPPORTUNITY TO SELL SHARES.

10:54AM 13  Q.  AFTER THIS COMMUNICATION FROM MS. HOLMES ABOUT NOT BEING

10:54AM 14  ABLE TO GIVE YOU THE LEVEL OF COMMUNICATION THAT YOU WERE

10:54AM 15  REQUESTING, DID YOU CONTINUE TO HAVE SOME CALLS WITH HER?

10:54AM 16  A.  YES, ATTEMPTED.  ATTEMPTED CALLS.

10:55AM 17  Q.  AND DID SOME OF THOSE CALLS ACTUALLY TAKE PLACE?

10:55AM 18  A.  NO.

10:55AM 19  Q.  DID YOU HAVE A CONVERSATION WITH MS. HOLMES IN DECEMBER OF

10:55AM 20  THE FOLLOWING YEAR, 2011?

10:55AM 21  A.  I WOULD HAVE TO LOOK AT THE NOTES.

10:55AM 22  Q.  DO YOU HAVE THE NOTES?

10:55AM 23  A.  YES.

10:55AM 24  Q.  WOULD LOOKING AT THE NOTES REFRESH YOUR RECOLLECTION?

10:55AM 25  A.  YES.

10:55AM 1   Q.   YES.   LOOK AT IN TAB 14 OF THE BINDER, PAGE 28 NUMBER ON

10:55AM 2   THE BOTTOM.

10:55AM 3    ACTUALLY, PAGE 27 ACCORDING TO THE NUMBERS ON THE BOTTOM.

10:55AM 4   SORRY.

10:55AM 5    (PAUSE IN PROCEEDINGS.)

10:55AM 6    THE WITNESS:   UM -- WELL, I'VE GOT ONE THAT SAYS

10:56AM 7   PAGE 28 AT THE TOP AND PAGE 27 AT THE BOTTOM.   IS THAT THE ONE

10:56AM 8   YOU WANT ME TO LOOK AT?

10:56AM 9   BY MR. BOSTIC:

10:56AM 10   Q.   THAT'S CORRECT.

10:56AM 11   A.   OKAY.

10:56AM 12   Q.   TAKE A MOMENT TO REVIEW THAT TO YOURSELF AND LET ME KNOW

10:56AM 13   IF THAT REFRESHES YOUR MEMORY.

10:56AM 14   A.   OKAY.   YES.

10:56AM 15   Q.   DID YOU HAVE A CONVERSATION WITH MS. HOLMES AT THE END OF

10:56AM 16   2011?

10:56AM 17   A.   YES.

10:56AM 18   Q.   AND WHAT DID MS. HOLMES TELL YOU THEN ABOUT THE REVENUE OF

10:56AM 19   THERANOS, IF ANYTHING?

10:56AM 20   A.   ANTICIPATED $500 MILLION IN REVENUE NEXT YEAR.

10:56AM 21   Q.   THAT $500 MILLION REVENUE NUMBER IS SIGNIFICANTLY HIGHER

10:56AM 22   THAN THE $200 MILLION REVENUE NUMBER THAT WE PREVIOUSLY

10:56AM 23   DISCUSSED.

10:56AM 24   A.   YES.

10:56AM 25   Q.   DO YOU KNOW WHETHER THERANOS EVER REACHED THAT

EISENMAN DIRECT BY MR. BOSTIC

10:56AM  1    $200 MILLION ANNUAL REVENUE NUMBER?

10:56AM  2    A.   NOT TO MY KNOWLEDGE.

10:56AM  3    Q.   FOLLOWING THAT CALL, WHAT HAPPENED GENERALLY WITH THE

10:56AM  4    FREQUENCY OF CONTACT WITH MS. HOLMES?

10:56AM  5    A.   IT DROPPED OFF.

10:57AM  6    Q.   DID YOU MAKE MORE ATTEMPTS TO GET INFORMATION FROM THE

10:57AM  7    COMPANY AND HER DURING THAT SILENT TIME PERIOD?

10:57AM  8    A.   YES, I DID.

10:57AM  9    Q.   AND, GENERALLY SPEAKING, HOW DID YOU GO ABOUT TRYING TO

10:57AM  10   GET MORE INFORMATION FROM THE COMPANY?

10:57AM  11   A.   EMAILS TO ELIZABETH, I REACHED OUT TO DIRECTORS, CHAIRMAN

10:57AM  12   OF THE BOARD OF THE COMPANY, ATTEMPTED.

10:57AM  13   Q.   AND WERE THOSE ATTEMPTS SUCCESSFUL IN GETTING SOME MORE

10:57AM  14   CONCRETE INFORMATION ABOUT WHAT THE COMPANY WAS DOING?

10:57AM  15   A.   NO.

10:57AM  16   Q.   DID THERE COME A TIME AFTER THIS WHEN YOU CONSIDERED A

10:57AM  17   SECOND INVESTMENT IN THERANOS?

10:57AM  18   A.   YES.

10:57AM  19   Q.   DID YOU END UP MAKING A SECOND INVESTMENT IN THE COMPANY?

10:57AM  20   A.   YES.

10:57AM  21   Q.   APPROXIMATELY WHEN DID THAT SECOND INVESTMENT HAPPEN?

10:57AM  22   A.   THE END OF IT WAS EITHER 2013 OR 2015.

10:57AM  23   Q.   OKAY.  I CAN SHOW YOU SOME DOCUMENTS THAT MIGHT REFRESH

10:57AM  24   YOUR MEMORY ON THAT.

10:57AM  25        LET ME ASK YOU FIRST ABOUT SUNNY BALWANI.

10:58AM 1        DO YOU RECALL AT SOME POINT BEING INTRODUCED TO

10:58AM 2   MR. BALWANI?

10:58AM 3   A.   UM, I'VE HAD A FEW PHONE CONVERSATIONS AND A FEW EMAIL

10:58AM 4   EXCHANGES.

10:58AM 5   Q.   DO YOU RECALL WHEN THAT BEGAN?  WHEN DID YOU FIRST BECOME

10:58AM 6   ACQUAINTED WITH MR. BALWANI IN CONNECTION WITH THERANOS?

10:58AM 7   A.   I'D HAVE TO LOOK AT THE NOTES.

10:58AM 8   Q.   LET ME DIRECT YOUR ATTENTION TO THE PAGE NUMBER 23 IN

10:58AM 9   TAB 14.

10:58AM 10       TAKE A MOMENT TO REVIEW PAGE 23 TO YOURSELF.

10:58AM 11  A.   OKAY.

10:58AM 12  Q.   DOES THAT REFRESH YOUR MEMORY ABOUT THE TIMING OF AT LEAST

10:58AM 13  ONE CONVERSATION YOU HAD WITH MR. BALWANI?

10:58AM 14  A.   YES, I WROTE THE DATE DOWN.

10:58AM 15  Q.   AND WHEN DO YOU REMEMBER SPEAKING TO MR. BALWANI IN

10:59AM 16  MID-2013?

10:59AM 17  A.   THIS WAS DATED JUNE 17TH, SO THAT'S WHEN THE CONVERSATION

10:59AM 18  TOOK PLACE.

10:59AM 19  Q.   AND DO YOU RECALL THAT CONVERSATION GENERALLY?

10:59AM 20  A.   I DO.

10:59AM 21  Q.   AND WHAT WAS THE PURPOSE OF SPEAKING WITH MR. BALWANI IN

10:59AM 22  JUNE OF 2013?

10:59AM 23  A.   THE PURPOSE WAS TO DETERMINE WHERE THE COMPANY WAS, WHAT

10:59AM 24  KIND OF PROGRESS THAT THEY WERE MAKING.

10:59AM 25  Q.   AND DO YOU REMEMBER WHETHER MR. BALWANI WAS SOMEONE THAT

10:59AM  1    MS. HOLMES PUT YOU IN TOUCH WITH?

10:59AM  2    A.   I DON'T RECALL.

10:59AM  3    Q.   DURING YOUR CONVERSATION WITH MR. BALWANI, DID HE TELL YOU

10:59AM  4    ANYTHING ABOUT THE STATE OF THE COMPANY'S BUSINESS AND THE

10:59AM  5    PRODUCT ROLLOUT?

10:59AM  6    A.   YES, JUST READING FROM MY NOTES WHICH I --

10:59AM  7            MS. WALSH:  OBJECTION, YOUR HONOR.

10:59AM  8    BY MR. BOSTIC:

10:59AM  9    Q.   SO, MR. EISENMAN, WHAT I'LL ASK YOU TO DO IS REVIEW YOUR

10:59AM 10    NOTES TO YOURSELF, AND TELL ME IF THE NOTES REFRESH YOUR MEMORY

10:59AM 11    OF THAT CONVERSATION.

10:59AM 12    A.   OKAY.

10:59AM 13    Q.   AND THEN I'LL ASK YOU QUESTIONS ABOUT WHAT YOU REMEMBER

10:59AM 14    FROM THAT CONVERSATION.

10:59AM 15    A.   OKAY.  I REMEMBER THE CONVERSATION GENERALLY, AND THE

10:59AM 16    NOTES REFRESH MY MEMORY OF THE CONVERSATION.

10:59AM 17    Q.   OKAY.  SO TESTIFYING FROM YOUR MEMORY OF THAT

11:00AM 18    CONVERSATION, WHAT DO YOU REMEMBER MR. BALWANI SAYING TO YOU

11:00AM 19    ABOUT THE STATE OF THE COMPANY'S BUSINESS AND ITS PRODUCTS?

11:00AM 20    A.   THAT THE COMPANY WAS GEARING UP; THAT THERE WAS MARKET

11:00AM 21    ACCEPTANCE; THAT THEY HAD A HEAD COUNT OF 340 PEOPLE; THEY WERE

11:00AM 22    TRYING TO HIRE 150 TO 200 PEOPLE; THERE WAS A PRODUCT ROLLOUT

11:00AM 23    THAT WAS GOING TO OCCUR WITHIN THE NEXT MONTH OR TWO.

11:00AM 24    Q.   AND FROM YOUR CONVERSATION WITH MR. BALWANI, DID YOU HAVE

11:00AM 25    AN UNDERSTANDING ABOUT WHAT THAT PRODUCT ROLLOUT MEANT?  WHAT

11:00AM   1    DID IT MEAN FOR THIS COMPANY TO ROLL OUT ITS PRODUCT?

11:00AM   2    A.   IT MEANT THAT IT WAS GAINING WIDER MARKET ACCEPTANCE, AND

11:00AM   3    IT WAS, IT WAS KIND OF THE ROAD TO ADDITIONAL SUCCESS.

11:00AM   4    Q.   OKAY.  DURING THAT CONVERSATION, DID MR. BALWANI TELL YOU

11:00AM   5    ANYTHING ABOUT THE STATE OF THE COMPANY'S TECHNOLOGY?

11:00AM   6    A.   NOT TO MY RECOLLECTION.

11:00AM   7    Q.   DID MR. BALWANI TELL YOU, DURING THAT CONVERSATION, THAT

11:01AM   8    THE THERANOS EDISON ANALYZER ONLY HAD THE COMPONENTS TO DO ONE

11:01AM   9    CATEGORY OF BLOOD TESTS?

11:01AM   10   A.   UM --

11:01AM   11        MS. WALSH:  OBJECTION.  HE SAID HE DIDN'T RECALL, HE

11:01AM   12   DIDN'T RECALL ANYTHING ABOUT THE TECHNOLOGY.

11:01AM   13        THE COURT:  OVERRULED.

11:01AM   14   BY MR. BOSTIC:

11:01AM   15   Q.   WOULD YOU LIKE THE QUESTION?

11:01AM   16   A.   NO.  IN THE CONVERSATION, THEY WERE WAITING FOR THEIR

11:01AM   17   PARTNER TO PULL THE TRIGGER ON THEIR AGREEMENT WITH THEM.

11:01AM   18        AND IT'S KIND OF ASSUMED THAT IF A PARTNER IS GOING TO GET

11:01AM   19   INVOLVED IN A PRODUCT ROLLOUT, THAT THERE IS MARKET ACCEPTANCE,

11:01AM   20   THAT IT'S A PRODUCT THAT IS A VALUABLE PRODUCT THAT WORKS.

11:01AM   21   Q.   AND WHEN IT CAME TO THE ACTUAL TECHNOLOGICAL READINESS OF

11:01AM   22   THE THERANOS ANALYZER, DID MR. BALWANI TELL YOU ANYTHING ABOUT

11:01AM   23   THE LIMITATIONS OF WHAT THAT PRODUCT COULD DO OR HOW FAR ALONG

11:02AM   24   IT WAS IN DEVELOPMENT?

11:02AM   25   A.   NO.

11:02AM   1   Q.   OKAY.   WOULD THOSE FACTORS HAVE MATTERED TO YOU IF THERE

11:02AM   2   HAD BEEN LIMITATIONS ABOUT WHAT THE PRODUCT COULD DO?

11:02AM   3   A.   WELL, IT WOULD HAVE, IT WOULD HAVE WEIGHED ON -- IT WOULD

11:02AM   4   HAVE CONTRADICTED ANYTHING AND EVERYTHING THAT I LEARNED TO

11:02AM   5   THAT POINT.

11:02AM   6        TO THAT POINT THE PRODUCT WAS SUCCESSFUL, IT WORKED, IT

11:02AM   7   WAS BEING IMPROVED, AND ANYTHING TO THE CONTRARY WOULD HAVE

11:02AM   8   KIND OF NEGATED KIND OF THE NARRATIVE TO THAT POINT IN TIME.

11:02AM   9   Q.   LATER IN 2013, AFTER YOUR CONVERSATION WITH MR. BALWANI,

11:02AM   10  DID YOU BEGIN TO SEE PUBLIC NEWS COVERAGE ABOUT THERANOS?

11:02AM   11  A.   YES.

11:02AM   12  Q.   AND DID THAT REPRESENT A CHANGE FROM HOW THINGS HAD BEEN

11:02AM   13  IN THE PAST?

11:02AM   14  A.   WELL, IT WAS KIND OF A VALIDATION OF MARKET ACCEPTANCE.

11:02AM   15       THERE WERE REPORTS ABOUT THERANOS TECHNOLOGY IN CREDIBLE

11:03AM   16  FINANCIAL PUBLICATIONS.

11:03AM   17       AND IT WAS, IT WAS JUST ANOTHER, ANOTHER -- I GUESS

11:03AM   18  ANOTHER RATIFICATION OF A PRODUCT THAT WAS WORKING, EFFECTIVE,

11:03AM   19  THERE WAS A NEED.

11:03AM   20  Q.   LET ME SHOW YOU AN EXAMPLE OF THE NEWS COVERAGE THAT WE'RE

11:03AM   21  TALKING ABOUT.

11:03AM   22       YOUR HONOR, EXHIBIT 1106 IS ALREADY ADMITTED.

11:03AM   23       MAY WE PUBLISH?

11:03AM   24            THE COURT:   YES.

11:03AM   25  BY MR. BOSTIC:

11:03AM 1    Q.   AND, MR. EISENMAN, DO YOU SEE ON YOUR SCREEN -- AND IT'S

11:03AM 2    ALSO AT TAB 1106 -- AN EMAIL -- I'M SORRY, AN ARTICLE IN "THE

11:03AM 3    WALL STREET JOURNAL" DATED SEPTEMBER 8TH, 2013 ENTITLED,

11:03AM 4    "ELIZABETH HOLMES:  THE BREAKTHROUGH OF INSTANT DIAGNOSIS"?

11:03AM 5    A.   I DO SEE THAT.

11:03AM 6    Q.   DO YOU REMEMBER READING THIS ARTICLE IN "THE

11:03AM 7    WALL STREET JOURNAL" IN SEPTEMBER 2013?

11:03AM 8    A.   YES, I DO RECALL READING THE ARTICLE.

11:03AM 9    Q.   AND DO YOU REMEMBER WHAT YOUR REACTION WAS TO SEEING THIS

11:03AM 10   ARTICLE?

11:03AM 11   A.   ELATION.

11:03AM 12   Q.   EXPLAIN THAT.  WHY WERE YOU ELATED TO SEE THIS ARTICLE

11:04AM 13   COME OUT?

11:04AM 14   A.   BECAUSE IT RATIFIED TO WHAT WE HAD BEEN LED TO BELIEVE ALL

11:04AM 15   ALONG, THAT THIS WAS A SUCCESSFUL TECHNOLOGY THAT HAD WIDE

11:04AM 16   ACCEPTANCE, AND THE COMPANY HAD THE POTENTIAL TO BE HUGELY

11:04AM 17   PROFITABLE.

11:04AM 18       AND "THE WALL STREET JOURNAL" IS A VERY CREDIBLE SOURCE OF

11:04AM 19   INFORMATION, SO WHEN WE, WHEN WE READ THIS ARTICLE, IT WAS JUST

11:04AM 20   A VERY SIGNIFICANT STAMP OF APPROVAL.

11:04AM 21   Q.   IF I COULD DRAW YOUR ATTENTION TO THE FIRST INDENTED

11:04AM 22   PARAGRAPH ON PAGE 1.

11:04AM 23       DO YOU SEE THERE THERE IS SOME LANGUAGE ABOUT "DEVICES

11:04AM 24   THAT AUTOMATE AND MINIATURIZE MORE THAN 1,000 LABORATORY

11:04AM 25   TESTS."

11:04AM 1          DO YOU SEE THAT?

11:04AM 2     A.   YES.

11:04AM 3     Q.   IS THAT CONSISTENT WITH THE DESCRIPTIONS OF THE TECHNOLOGY

11:04AM 4     THAT YOU HAD HEARD FROM MS. HOLMES AND MR. BALWANI PREVIOUSLY?

11:04AM 5     A.   YES.

11:04AM 6     Q.   AND DO YOU SEE THAT THERE'S A CLAIM, "THERANOS'S PROCESSES

11:04AM 7     ARE FASTER, CHEAPER, AND MORE ACCURATE THAN THE CONVENTIONAL

11:04AM 8     METHODS."

11:04AM 9          DO YOU SEE THAT?

11:05AM 10    A.   YES.

11:05AM 11    Q.   WAS THAT CONSISTENT WITH WHAT YOU HAD HEARD FROM HOLMES

11:05AM 12    AND BALWANI PREVIOUSLY?

11:05AM 13    A.   YES, I HAD HEARD THE SAME CLAIMS.

11:05AM 14              MS. WALSH:  OBJECTION.

11:05AM 15              THE COURT:  PARDON ME, SIR.  JUST A MOMENT.

11:05AM 16              THE WITNESS:  OH, SORRY.

11:05AM 17              MS. WALSH:  OBJECTION.  FOUNDATION.  THE WITNESS HAS

11:05AM 18    TESTIFIED THAT MR. BALWANI DIDN'T HAVE ANY CONVERSATIONS WITH

11:05AM 19    HIM ABOUT THE TECHNOLOGY.

11:05AM 20       THESE ARE FROM MS. HOLMES.

11:05AM 21              THE COURT:  DO YOU WANT TO ASK YOUR QUESTION AGAIN

11:05AM 22    AS TO THIS?

11:05AM 23    BY MR. BOSTIC:

11:05AM 24    Q.   SO, MR. EISENMAN, LET ME ASK, DURING YOUR CONVERSATION

11:05AM 25    WITH MR. BALWANI, DID HE DISCUSS WITH YOU A ROLLOUT OF A

11:05AM   1    COMPANY PRODUCT?

11:05AM   2    A.    CAN I GO BACK TO THE OTHER TAB?

11:05AM   3          IT WAS IN THAT CONVERSATION THAT THERE WAS A PRODUCT

11:05AM   4    ROLLOUT WITHIN 30 TO 60 DAYS, THEY WERE WAITING FOR THEIR

11:05AM   5    PARTNER TO PULL THE TRIGGER.

11:05AM   6          ACTUALLY, I DON'T KNOW IF WE NEED TO GO BACK.  I RECALL

11:05AM   7    THAT.

11:05AM   8    Q.    LET ME ASK YOU THEN, WHEN MR. BALWANI WAS DISCUSSING THE

11:05AM   9    ROLLOUT OF THAT PRODUCT, DID HE SAY ANYTHING INCONSISTENT WITH

11:05AM   10   THE CLAIMS IN "THE WALL STREET JOURNAL" ARTICLE THAT YOU'RE

11:05AM   11   LOOKING AT?

11:05AM   12   A.    NO.

11:05AM   13   Q.    LET'S LOOK AT PAGE 2 OF THE ARTICLE.

11:06AM   14         ABOUT HALFWAY DOWN THE PAGE, THERE'S A PARAGRAPH THAT

11:06AM   15   BEGINS, "THERANOS'S TECHNOLOGY."

11:06AM   16         DO YOU SEE THAT?

11:06AM   17   A.    YES.

11:06AM   18   Q.    AND IT SAYS, "THERANOS'S TECHNOLOGY ELIMINATES MULTIPLE

11:06AM   19   LAB TRIPS BECAUSE IT CAN 'RUN ANY COMBINATION OF TESTS,

11:06AM   20   INCLUDING SETS OF FOLLOW-ON TESTS,' AT ONCE, VERY QUICKLY, ALL

11:06AM   21   FROM A SINGLE MICRO-SAMPLE."

11:06AM   22         DO YOU SEE THAT?

11:06AM   23   A.    YES.

11:06AM   24   Q.    WAS THIS FACT SOMETHING THAT WAS IMPORTANT TO YOU AS

11:06AM   25   SOMEONE WHO HAD INVESTED IN THE COMPANY?

11:06AM  1    A.   YES.

11:06AM  2    Q.   AND WHY WAS THAT?

11:06AM  3    A.   BECAUSE THIS WAS A BETTER PRODUCT THAN THEIR TWO

11:06AM  4    COMPETITORS THAT THEY WERE TRYING TO CAPTURE THEIR MARKET,

11:06AM  5    LABCORP AND QUEST.  AND LABCORP AND QUEST ARE BOTH

11:06AM  6    MULTI-BILLION DOLLAR COMPANIES, AND THIS IS BASICALLY DOING

11:06AM  7    WHAT THEY'RE DOING, BUT BETTER, CHEAPER, QUICKER, FASTER, MORE

11:07AM  8    ACCURATE.

11:07AM  9    Q.   AND A LITTLE FURTHER DOWN THAT PAGE THERE'S A PARAGRAPH

11:07AM  10   THAT BEGINS, "ANOTHER THERANOS ADVANCE."

11:07AM  11        AND DO YOU SEE IT SAYS, "ANOTHER THERANOS ADVANCE IS ITS

11:07AM  12   TESTING'S ACCURACY"?

11:07AM  13   A.   YES.

11:07AM  14   Q.   AND WE SAW ON THE PREVIOUS PAGE SOME CLAIMS ABOUT ACCURACY

11:07AM  15   AS WELL.

11:07AM  16        DO YOU REMEMBER THAT?

11:07AM  17   A.   YES.

11:07AM  18   Q.   AS AN INVESTOR IN THE COMPANY, WERE THE ACCURACY OF THE

11:07AM  19   TESTS SOMETHING THAT MATTERED TO YOU?

11:07AM  20   A.   OF UTMOST IMPORTANCE.

11:07AM  21   Q.   WHY IS THAT?

11:07AM  22   A.   BECAUSE YOU'RE DEALING WITH PEOPLE'S HEALTH, AND IF, IF

11:07AM  23   YOUR TESTS ARE NOT AS ACCURATE AS SCIENTIFICALLY POSSIBLE, THEN

11:07AM  24   YOU'RE COMPROMISING SOMEONE'S HEALTH.

11:07AM  25   Q.   ALL RIGHT.  THANK YOU.

EISENMAN DIRECT BY MR. BOSTIC

11:07AM 1          LET ME ASK YOU TO TURN NEXT TO TAB 1334.

11:07AM 2          AND IN YOUR BINDER, ONCE YOU'RE THERE, DO YOU RECOGNIZE

11:07AM 3     THE DOCUMENT THAT IS AT TAB 1334?

11:08AM 4     A.   YES.

11:08AM 5     Q.   AND IS THAT AN EMAIL CHAIN BETWEEN YOU AND THERANOS

11:08AM 6     RELATING TO SHAREHOLDER CONSENTS?

11:08AM 7     A.   YES.

11:08AM 8              MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 1334.

11:08AM 9              MS. WALSH:  NO OBJECTION.

11:08AM 10             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:08AM 11         (GOVERNMENT'S EXHIBIT 1334 WAS RECEIVED IN EVIDENCE.)

11:08AM 12    BY MR. BOSTIC:

11:08AM 13    Q.   AND LET'S START AT THE BOTTOM OF PAGE 1.

11:08AM 14         DO YOU SEE, MR. EISENMAN, THIS IS AN EMAIL FROM THERANOS

11:08AM 15    TO YOU IN MID-DECEMBER 2013?

11:08AM 16    A.   YES.

11:08AM 17    Q.   AND IT INCLUDES A MEMO TO STOCKHOLDERS, IT SAYS, REGARDING

11:08AM 18    CERTAIN DEALS AND TRANSACTIONS.

11:08AM 19         DO YOU SEE THAT?

11:08AM 20    A.   YES.

11:08AM 21    Q.   AND IF WE TURN TO THE FOLLOWING PAGE, PAGE 2, DO YOU SEE

11:08AM 22    THAT THERE IS A MEMO SENT TO YOU AS A THERANOS STOCKHOLDER?

11:09AM 23    A.   YES.

11:09AM 24    Q.   OKAY.  LET'S LOOK AT THE TOP PARAGRAPH THERE.

11:09AM 25         AND DO YOU SEE THERANOS TELLS YOU, "WITH OUR LAUNCH TO

EISENMAN DIRECT BY MR. BOSTIC

11:09AM 1     CONSUMER HEALTH CARE THIS YEAR, WE ARE RAPIDLY SCALING TO

11:09AM 2     ESTABLISH A NATIONAL FOOTPRINT AND CAPTURE THE OPPORTUNITY WE

11:09AM 3     HAVE TO SERVE AS THE ONLY CERTIFIED, NATIONAL LABORATORY

11:09AM 4     CAPABLE OF RUNNING ANY OF ITS LABORATORY TESTS FROM A FEW TINY

11:09AM 5     DROPLETS OF BLOOD."

11:09AM 6         DO YOU SEE THAT?

11:09AM 7     A.   YES.

11:09AM 8     Q.   WAS THAT CONSISTENT WITH WHAT YOU HAD COME TO UNDERSTAND

11:09AM 9     OF THE CAPABILITIES OF THE THERANOS ANALYZER?

11:09AM 10    A.   YES.

11:09AM 11    Q.   AND AT THE BOTTOM OF THAT PARAGRAPH, DO YOU SEE THAT

11:09AM 12    THERE'S A CLAIM THAT, "WE ARE ACTIVELY INVESTING IN

11:09AM 13    INFRASTRUCTURE TO BUILD THIS NEW INDUSTRY WE HAVE CREATED"?

11:09AM 14    A.   YES.

11:09AM 15    Q.   WAS THIS GOOD NEWS TO YOU AS AN INVESTOR?

11:09AM 16    A.   THIS WAS GREAT NEWS.

11:09AM 17    Q.   THAT LANGUAGE AT THE TOP OF THE MEMO ABOUT RAPIDLY

11:10AM 18    SCALING, DID THAT SIGNAL ANYTHING TO YOU AS AN INVESTOR IN THE

11:10AM 19    COMPANY?

11:10AM 20    A.   YES.

11:10AM 21    Q.   AND WHAT DID THAT MEAN TO YOU?

11:10AM 22    A.   IT MEANS THAT THE TECHNOLOGY WAS ACCEPTED IN THE

11:10AM 23    MARKETPLACE AND THEY WERE RAISING MONEY TO MEET THE POTENTIAL

11:10AM 24    INCREASED AND GROWING DEMAND.

11:10AM 25    Q.   AND AS SOMEONE CONSIDERING WHETHER TO INVEST ADDITIONAL

11:10AM  1    MONEY IN THE COMPANY, HOW DID THAT FACT AFFECT YOUR VIEW OF THE

11:10AM  2    RISK INVOLVED?

11:10AM  3    A.   THAT THIS WAS DERISKED.  THE RISK HAD BEEN TAKEN OUT OF

11:10AM  4    THIS INVESTMENT.

11:10AM  5    Q.   AND EXPLAIN WHY THAT IS THE CASE.

11:10AM  6    A.   BECAUSE IT HAS ACCEPTANCE IN THE MARKETPLACE.  IT'S

11:10AM  7    MEETING A HEALTH CARE PROBLEM.  THEIR SOLUTION WAS BETTER THAN

11:10AM  8    CURRENT SOLUTIONS.

11:11AM  9         BASICALLY WE DON'T HAVE THE RISK OF AN EARLY STAGE COMPANY

11:11AM 10    THAT IS TRYING TO PROVE ITSELF.  THIS INFERS THAT THE COMPANY

11:11AM 11    HAS ALREADY PROVEN ITSELF, AND IT'S AN OPPORTUNITY FOR THE

11:11AM 12    COMPANY TO NOW GROW ON THEIR PROVEN SUCCESS.

11:11AM 13    Q.   LOOKING DOWN A LITTLE FURTHER ON THAT SAME PAGE, THERE'S A

11:11AM 14    PARAGRAPH THAT BEGINS, "IN LINE WITH PAST COMMUNICATIONS."

11:11AM 15         AND DO YOU SEE THERE THAT THERE'S A REFERENCE REFERRING

11:11AM 16    INVESTORS TO THERANOS'S WEBSITE AT WWW.THERANOS.COM?

11:11AM 17    A.   YES.

11:11AM 18    Q.   DID YOU VISIT THE THERANOS WEBSITE AROUND THIS TIME IN

11:11AM 19    LATE FEBRUARY 2013?

11:11AM 20    A.   YES.

11:11AM 21    Q.   AND WHAT WAS THE PURPOSE OF VISITING THE WEBSITE?

11:11AM 22    A.   JUST TO GAIN ANY ADDITIONAL INSIGHTS OR INFORMATION THAT,

11:11AM 23    THAT I WASN'T GAINING ELSEWHERE.

11:12AM 24         AND, YOU KNOW, IT'S ALWAYS IMPORTANT TO SEE THE

11:12AM 25    INFORMATION THAT THE COMPANY PUTS OUT DIRECTLY VERSUS A THIRD

11:12AM 1    PARTY FINANCIAL PRESS THAT WRITES ABOUT THEM.

11:12AM 2    Q.   AND DID YOU RELY ON THE INFORMATION YOU SAW ON THE WEBSITE

11:12AM 3    IN DECIDING WHETHER TO INVEST MORE MONEY IN THE COMPANY?

11:12AM 4    A.   UM, GENERAL RECOLLECTION IS THAT I LOOKED AT THEIR WEBSITE

11:12AM 5    BEFORE AND AFTER THIS SECOND ROUND, AND IT WAS ONE OF MANY

11:12AM 6    FACTORS THAT I LOOKED TO TO MAKE AN ADDITIONAL INVESTMENT.

11:12AM 7    Q.   AND SPECIFICALLY DID THE CONTENT OF THE WEBSITE MATTER TO

11:12AM 8    YOU AS SOMEONE CONSIDERING WHETHER TO INVEST MORE?

11:12AM 9    A.   NO.  IT WAS ONE OF MANY FACTORS THAT MATTERED TO ME.

11:12AM 10   Q.   IF I COULD DRAW YOUR ATTENTION TO TAB 4060.

11:12AM 11        YOUR HONOR, I BELIEVE THIS IS ALREADY IN EVIDENCE.

11:12AM 12        MAY WE PUBLISH?

11:13AM 13             THE COURT:  YES.

11:13AM 14   BY MR. BOSTIC:

11:13AM 15   Q.   YOU MENTIONED MANY FACTORS THAT INFLUENCED YOUR DECISION

11:13AM 16   TO INVEST; IS THAT RIGHT, MR. EISENMAN?

11:13AM 17   A.   YES.

11:13AM 18   Q.   LOOKING AT EXHIBIT 4060, DO YOU SEE AT THE BOTTOM THAT

11:13AM 19   THERE'S AN EMAIL FROM SOMEONE NAMED PAT MENDENHALL?

11:13AM 20   A.   YES.

11:13AM 21   Q.   AND IT SAYS "I JUST SPENT 45 MINUTES SPEAKING WITH

11:13AM 22   SUNNY BALWANI, PRESIDENT AND COO OF THERANOS."

11:13AM 23   A.   YES.

11:13AM 24   Q.   AND WHO WAS PAT MENDENHALL TO YOU AT THIS TIME?

11:13AM 25   A.   PAT MENDENHALL WAS A PARTNER OF THE FINANCIAL ADVISOR THAT

11:13AM   1    WAS MY FRIEND THAT WAS ELIZABETH'S FINANCIAL ADVISOR.

11:13AM   2    Q.   AND WHAT WAS THE NAME OF THAT FINANCIAL ADVISOR, IF YOU

11:13AM   3    CAN REMIND US?

11:13AM   4    A.   DAVID HARRIS.

11:13AM   5    Q.   AND DO YOU SEE HERE THAT MR. MENDENHALL HAD EMAILED SOME

11:13AM   6    INFORMATION TO DAVID HARRIS ON DECEMBER 22ND, 2013?

11:13AM   7    A.   YES.

11:13AM   8    Q.   OKAY.  AND LOOKING ABOVE THAT, DO YOU SEE THAT MR. HARRIS

11:14AM   9    THEN FORWARDED THAT INFORMATION TO YOU THAT SAME DAY,

11:14AM  10    DECEMBER 22ND?

11:14AM  11    A.   YES.

11:14AM  12    Q.   OKAY.  LET'S LOOK AT THE INFORMATION THAT YOU GOT ON

11:14AM  13    DECEMBER 22ND.

11:14AM  14         LET'S TURN TO PAGE 2.

11:14AM  15         SO, MR. EISENMAN, LET ME ASK, FIRST OF ALL, WHEN YOU

11:14AM  16    RECEIVED THIS EMAIL ON DECEMBER 22ND, DO YOU REMEMBER REVIEWING

11:14AM  17    IT?

11:14AM  18    A.   YES.

11:14AM  19    Q.   AND FOR WHAT PURPOSE WERE YOU INTERESTED IN WHAT

11:14AM  20    MR. BALWANI HAD SAID ABOUT THERANOS?

11:14AM  21    A.   WELL, THIS WAS A CONVERSATION THAT OCCURRED RIGHT BEFORE

11:14AM  22    WE MADE A DECISION TO INVEST IN THE FOLLOW-UP INVESTMENT ROUND

11:14AM  23    IN THERANOS.

11:14AM  24    Q.   AND HOW DID THAT RELATE TO YOUR INTEREST IN STATEMENTS BY

11:14AM  25    MR. BALWANI?

11:14AM 1   A.   IT WAS VERY IMPORTANT.

11:14AM 2   Q.   AND WHY IS THAT?

11:14AM 3   A.   BECAUSE IF, IF YOU'RE GOING TO INVEST MORE MONEY IN A

11:15AM 4   COMPANY, YOU WANT TO HAVE ALL OF THE INFORMATION THAT IS

11:15AM 5   AVAILABLE, AND THIS WAS CRITICAL AND IMPORTANT INFORMATION THAT

11:15AM 6   WAS MADE AVAILABLE RIGHT BEFORE WE, WE MADE THE FINAL DECISION

11:15AM 7   TO INVEST AGAIN.

11:15AM 8   Q.   AND I'D LIKE TO ASK YOU ABOUT SOME OF THE SPECIFIC CLAIMS

11:15AM 9   THAT WERE RELAYED TO YOU FROM MR. BALWANI JUST BEFORE YOU MADE

11:15AM 10  THAT DECISION TO INVEST.

11:15AM 11       AND IF WE COULD START WITH ITEMS 3, 4, AND 5 ON THIS

11:15AM 12  NUMBERED LIST.

11:15AM 13       DO YOU SEE THOSE ITEMS?

11:15AM 14  A.   YES.

11:15AM 15  Q.   IT WAS RELAYED TO YOU THAT MR. BALWANI SAID THAT "THE

11:15AM 16  'SCIENCE' BEHIND THERANOS IS COMPLETE.

11:15AM 17       "NO NEW SCIENCE NEEDED.

11:15AM 18       "NO NEW INVENTION NEEDED."

11:15AM 19       DO YOU SEE THAT?

11:15AM 20  A.   YES.

11:15AM 21  Q.   AND WAS THAT AN IMPORTANT FACT FOR YOU IN DETERMINING

11:15AM 22  WHETHER TO INVEST MORE MONEY IN THE COMPANY?

11:15AM 23  A.   YES, IT WAS.

11:15AM 24  Q.   AND CAN YOU EXPLAIN WHY?

11:15AM 25  A.   WE HAD BEEN LED TO BELIEVE THAT THE SCIENCE WAS PERFECTED

11:16AM   1    AT MANY POINTS BEFORE THIS, BUT THIS WAS ANOTHER STATEMENT --

11:16AM   2    AND LET ME GO BACK.  A LOT OF OUR CONVERSATIONS AND

11:16AM   3    COMMUNICATION EARLY ON WERE WITH MS. HOLMES.

11:16AM   4        THIS WAS WITH ANOTHER TOP EXECUTIVE WITH THE COMPANY, AND

11:16AM   5    AGAIN, TIMING WISE, THIS WAS BEFORE WE DECIDED TO INVEST MORE

11:16AM   6    MONEY, AND THIS RATIFIED THAT THERE IS NO, NO RISK IN THIS

11:16AM   7    COMPANY NOT BEING ABLE TO DO WHAT THE MARKET IS, IS

11:16AM   8    ANTICIPATING THEM DOING, THAT THE TECHNOLOGY WAS PROVEN.

11:16AM   9    Q.   LET'S LOOK AT ITEMS 6, 7, AND 8 IN THAT SAME LIST.

11:16AM  10        AND AGAIN, SO SOME ADDITIONAL INFORMATION THAT WAS RELAYED

11:16AM  11    TO YOU AS HAVING COME FROM MR. BALWANI; CORRECT?

11:16AM  12    A.   YES.

11:16AM  13    Q.   AND HERE WE SEE CLAIMS THAT THERANOS IS "COMPLETELY

11:17AM  14    VERTICALLY INTEGRATED -- THEY OWN THE LAB AND THE

11:17AM  15    MANUFACTURING."

11:17AM  16        DO YOU SEE THAT?

11:17AM  17    A.   YES.

11:17AM  18    Q.   IT SAYS, "100 PERCENT MANUFACTURING IN THE U.S.A.

11:17AM  19        "FULLY OWNED AND PROTECTED MANUFACTURING ASSURES PRICING

11:17AM  20    AND PROFIT STABILITY."

11:17AM  21        DO YOU SEE THAT?

11:17AM  22    A.   YES.

11:17AM  23    Q.   AND DURING ANY OF YOUR CONVERSATIONS WITH MS. HOLMES OR

11:17AM  24    MR. BALWANI BEFORE YOUR 2013 INVESTMENT, DID EITHER OF THEM

11:17AM  25    TELL YOU ABOUT THE COMPANY'S DEPENDENCE ON NON-THERANOS THIRD

11:17AM   1    PARTY ANALYZERS?

11:17AM   2    A.   NO.

11:17AM   3              MS. WALSH:  OBJECTION.  LEADING.

11:17AM   4              THE COURT:  OVERRULED.  THE ANSWER WILL REMAIN.

11:17AM   5    BY MR. BOSTIC:

11:17AM   6    Q.   MR. EISENMAN, YOUR ANSWER TO THAT QUESTION?

11:17AM   7    A.   NO.

11:17AM   8    Q.   WOULD A FACT LIKE THAT HAVE BEEN AN IMPORTANT THING FOR

11:17AM   9    YOU TO KNOW AS SOMEONE CONSIDERING AN INVESTMENT?

11:17AM  10    A.   THE FACT THAT SOME OF THE MANUFACTURING IS DONE OUTSIDE

11:17AM  11    UNITED STATES.

11:17AM  12    Q.   LET ME ASK, IF YOU HAD BEEN ASKED OR BEEN TOLD THAT THE

11:18AM  13    COMPANY WAS DEPENDENT OR RELIANT ON NON-THERANOS THIRD PARTY

11:18AM  14    ANALYZERS FOR MANY OF ITS TESTS, WOULD THAT HAVE BEEN A

11:18AM  15    RELEVANT FACT FOR YOU?

11:18AM  16    A.   YES.

11:18AM  17    Q.   AND WHY WAS THAT?

11:18AM  18    A.   WE WERE UNDER THE UNDERSTANDING THAT IT WAS PROPRIETARY

11:18AM  19    TECHNOLOGY, THAT THEY HAD DEVELOPED THIS IN HOUSE, AND THIS IS

11:18AM  20    WHAT THEY WERE USING EXCLUSIVELY.

11:18AM  21    Q.   CONTINUING IN THAT SAME THEME, LET'S LOOK AT ITEM 17 ON

11:18AM  22    THE LIST, AND DO YOU SEE THERE THAT THE CLAIM IS "THE

11:18AM  23    COMPETITION IS YEARS BEHIND TECHNOLOGY (MAYBE LONGER)."

11:18AM  24        DO YOU SEE THAT?

11:18AM  25    A.   YES.

11:18AM    1    Q.    DID THAT MATTER TO YOU AS AN INVESTOR?

11:18AM    2    A.    YES.

11:18AM    3    Q.    AND LET'S LOOK UNDER FINANCIALS IN THIS LIST OF CLAIMS

11:18AM    4    THAT MR. BALWANI RELAYED TO YOU.  AND UNDER FINANCIALS, DO YOU

11:18AM    5    SEE ITEM 1 SAYS, "THEY PREFER TO KEEP THE COMPETITION GUESSING

11:18AM    6    AS TO HOW MUCH MONEY THEY HAVE AND WHAT THEIR CURRENT REVENUE,

11:19AM    7    PROFIT MARGINS, REVENUES SOURCES, ET CETERA, ARE"?

11:19AM    8    A.    YES.

11:19AM    9    Q.    AND DO YOU SEE ITEMS 2 AND 3 SAY, "THEY CAN FUND GROWTH

11:19AM   10    THRU CURRENT OPERATIONS -- NO NEED FOR CAPITAL 3 -- THEY ARE

11:19AM   11    RAISING MONEY ONLY TO RAPIDLY ACCELERATE THE BUSINESS."

11:19AM   12          DO YOU SEE THAT?

11:19AM   13    A.    YES.

11:19AM   14    Q.    AND WAS THAT AN IMPORTANT THING FOR YOU TO KNOW AS AN

11:19AM   15    INVESTOR?

11:19AM   16    A.    YES.

11:19AM   17    Q.    AND WHAT DID THAT MEAN AS SOMEONE DECIDING TO INVEST MORE?

11:19AM   18    A.    THAT MEANT THE TECHNOLOGY WORKED, THEY WERE SUCCESSFUL,

11:19AM   19    THEY WERE GAINING MARKET ACCEPTANCE, AND THIS CAPITAL RAISE WAS

11:19AM   20    TO HELP THEM GROW FASTER.

11:19AM   21    Q.    AND FINALLY LET'S LOOK AT ITEM 13 UNDER FINANCIALS.

11:19AM   22          DO YOU SEE THERE'S A STATEMENT ATTRIBUTED TO MR. BALWANI,

11:19AM   23    THAT "THEY ARE AWARE THEY RAISED MONEY IN 2005 AND ARE

11:19AM   24    CONSCIOUS ABOUT NEEDING TO OFFER LIQUIDITY TO SHAREHOLDERS."

11:19AM   25          DO YOU SEE THAT?

11:19AM  1    A.   YES.

11:19AM  2    Q.   AND IT SAYS, "THIS CAN HAPPEN IN A TRADITIONAL WAY LIKE

11:20AM  3    IPO OR NONTRADITIONAL WAY LIKE FACEBOOK IN PRIVATE ROUND

11:20AM  4    TRANSACTIONS."

11:20AM  5         DO YOU SEE THAT?

11:20AM  6    A.   YES.

11:20AM  7    Q.   AND DID THAT SIGNAL TO YOU THAT AN IPO WAS STILL A

11:20AM  8    POSSIBILITY IN THE NEAR FUTURE?

11:20AM  9    A.   YES.

11:20AM  10   Q.   OKAY.  WE CAN SET THAT ASIDE.

11:20AM  11        LET'S LOOK NEXT AT TAB 1371 IN YOUR BINDER.

11:20AM  12            THE COURT:  WHILE WE'RE DOING THAT, WHY DON'T WE

11:20AM  13   STAND UP AND STRETCH FOR A MOMENT, LADIES AND GENTLEMEN.

11:20AM  14        1371, MR. BOSTIC?

11:20AM  15            MR. BOSTIC:  1371.

11:21AM  16        (STRETCHING.)

11:21AM  17   BY MR. BOSTIC:

11:21AM  18   Q.   MR. EISENMAN, DO YOU HAVE 1371 IN FRONT OF YOU?

11:21AM  19   A.   YES.

11:21AM  20   Q.   IS THIS AN EMAIL CHAIN BETWEEN YOU AND MR. BALWANI

11:21AM  21   RELATING TO YOUR INVESTMENT IN 2013?

11:21AM  22   A.   YES.

11:21AM  23            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS PAGES

11:21AM  24   1 THROUGH 8 OF 1371.

11:21AM  25            MS. WALSH:  NO OBJECTION.

EISENMAN DIRECT BY MR. BOSTIC

11:21AM  1         THE COURT:  THEY'RE ADMITTED, AND THEY MAY BE

11:21AM  2    PUBLISHED.

11:21AM  3         (GOVERNMENT'S EXHIBIT 1371, PAGES 1-8, WAS RECEIVED IN

11:21AM  4    EVIDENCE.)

11:21AM  5    BY MR. BOSTIC:

11:21AM  6    Q.   LET'S START ON PAGE 6.

11:21AM  7         AND DO YOU SEE ON PAGE 6, THIS BEGINS WITH THE EMAIL THAT

11:21AM  8    YOU GOT FROM THERANOS ATTACHING THAT MEMO TO STOCKHOLDERS?

11:21AM  9    A.   YES.

11:21AM  10   Q.   AND LET'S CONTINUE UP THAT CHAIN AND GO TO PAGE 3, AND ON

11:21AM  11   PAGE 3 AT THE BOTTOM, DO YOU SEE THAT YOU WRITE AN EMAIL TO

11:21AM  12   THERANOS ASKING FOR A CALL TO INQUIRE ABOUT HOW MUCH ADDITIONAL

11:21AM  13   INVESTMENT IS AVAILABLE AND WHAT THE TIMING IS FOR PAPERWORK.

11:22AM  14        DO YOU SEE THAT?

11:22AM  15   A.   YES.

11:22AM  16   Q.   AND IT SAYS, "WE MAY BE INTERESTED IN $1 MILLION."

11:22AM  17        DO YOU SEE THAT?

11:22AM  18   A.   YES.

11:22AM  19   Q.   AND THE DATE OF THIS EMAIL WAS DECEMBER 23RD; IS THAT

11:22AM  20   RIGHT?

11:22AM  21   A.   YES.

11:22AM  22   Q.   WAS THAT THE DAY AFTER YOU RECEIVED THE REPORT ABOUT

11:22AM  23   MR. MENDENHALL'S CALL WITH SUNNY BALWANI?

11:22AM  24   A.   YES.

11:22AM  25   Q.   LET'S LOOK AT THE EMAIL ABOUT THAT.  SO YOU EMAILED

EISENMAN DIRECT BY MR. BOSTIC

11:22AM  1    THERANOS'S EMAIL ADDRESS; CORRECT?

11:22AM  2    A.   YES.

11:22AM  3    Q.   AND YOU GET A RESPONSE BACK FROM SUNNY BALWANI.

11:22AM  4         DO YOU SEE THAT?

11:22AM  5    A.   YES.

11:22AM  6    Q.   AND ON THAT SAME DAY HE WRITES YOU, "LET ME KNOW WHAT TIME

11:22AM  7    WOULD BE GOOD TO TALK AND I CAN CALL AND DISCUSS THIS."

11:22AM  8         DO YOU SEE THAT?

11:22AM  9    A.   YES.

11:22AM  10   Q.   AND AFTER SOME FOLLOW-UP COMMUNICATIONS ABOUT THE CALL AND

11:22AM  11   TIMING, DID YOU END UP SPEAKING TO MR. BALWANI ON THAT DATE?

11:22AM  12   A.   YES.

11:22AM  13   Q.   AND DO YOU REMEMBER ANYTHING SPECIFIC ABOUT WHAT YOU

11:23AM  14   LEARNED DURING THAT CALL?

11:23AM  15   A.   DO YOU HAVE A NOTE THAT I CAN --

11:23AM  16   Q.   NO.  I'M JUST ASKING YOU IF YOU REMEMBER RECEIVING ANY

11:23AM  17   IMPORTANT FACTS ABOUT THE COMPANY DURING THAT PARTICULAR CALL

11:23AM  18   WITH THE COMPANY?

11:23AM  19   A.   MY RECOLLECTION IS IT WAS A GENERAL CALL JUST RATIFYING

11:23AM  20   ALL OF THESE THINGS THAT I HAD LEARNED FROM PAT MENDENHALL AND

11:23AM  21   FROM THE EMAIL THAT I GOT FROM THE COMPANY GENERALLY; THAT THE

11:23AM  22   TECHNOLOGY WORKED; THAT THIS WAS FOR GROWTH CAPITAL.

11:23AM  23        AND THEN ONE OTHER FACTOR THAT I LEARNED IS THAT THIS IS

11:23AM  24   WHAT IS CALLED A FRIENDS AND FAMILY ROUND; THAT THESE WERE FOR

11:23AM  25   EXISTING SHAREHOLDERS; IT WAS A SMALL FINANCIAL RAISE AT THE

11:23AM 1   EQUIVALENT OF $15 A SHARE.  THEY WERE GOING TO CLOSE THIS OUT

11:23AM 2   AND RIGHT AFTER THE FIRST OF THE YEAR THERE WAS A MUCH LARGER

11:24AM 3   INSTITUTIONAL RAISE THAT PRESUMABLY WAS GOING TO BE AT A HIGHER

11:24AM 4   PLACE, IT WAS MENTIONED MAYBE $17 PER SHARE, AND THE

11:24AM 5   INSTITUTIONAL ROUND WAS OVERSUBSCRIBED.

11:24AM 6   Q.   AND DURING THAT CONVERSATION WITH MR. BALWANI, DID

11:24AM 7   ANYTHING THAT HE SAID CHANGE THE PREVIOUS UNDERSTANDING YOU HAD

11:24AM 8   HAD ABOUT THE COMPANY'S TECHNOLOGY, WHAT IT COULD DO OR THINGS

11:24AM 9   LIKE THAT?

11:24AM 10  A.   NO.

11:24AM 11  Q.   AFTER SPEAKING WITH MR. BALWANI, DID YOU DECIDE TO INVEST

11:24AM 12  MORE MONEY IN THERANOS?

11:24AM 13  A.   YES.

11:24AM 14  Q.   APPROXIMATELY HOW MUCH MORE DID YOU INVEST IN THE COMPANY

11:24AM 15  IN 2013?

11:24AM 16  A.   $100,000.

11:24AM 17  Q.   IN CONNECTION WITH THAT INVESTMENT, DID YOU SIGN A STOCK

11:24AM 18  PURCHASE AGREEMENT?

11:24AM 19  A.   YES.

11:24AM 20  Q.   IF I COULD ASK YOU TO GO BACK TO 1334.

11:24AM 21       LET'S DISPLAY PAGE 59.

11:25AM 22       AND, MR. EISENMAN, IS THIS THE FIRST PAGE OF THE STOCK

11:25AM 23  PURCHASE AGREEMENT THAT YOU EXECUTED?  IT'S ALSO ON THE SCREEN

11:25AM 24  IF THAT'S EASIER.

11:25AM 25  A.   YES.  YES.

EISENMAN DIRECT BY MR. BOSTIC

11:25AM 1    Q.   LET'S LOOK AT A FEW PROVISIONS HERE ON PAGE 65.

11:25AM 2         DO YOU SEE UNDER SECTION 4 HERE THERE'S A TITLE

11:25AM 3    REPRESENTATIONS AND WARRANTIES OF THE INVESTORS?

11:25AM 4    A.   YES.

11:25AM 5    Q.   UNDER 4.3 IT TALKS ABOUT INVESTMENT EXPERIENCE AND THE

11:25AM 6    INVESTOR HAVING SUBSTANTIAL EXPERIENCE IN EVALUATING AND

11:25AM 7    INVESTING IN PRIVATE PLACEMENT TRANSACTIONS OF SECURITIES AND

11:25AM 8    COMPANIES SIMILAR TO THE COMPANY.

11:25AM 9         DO YOU SEE THAT?

11:25AM 10   A.   YES.

11:25AM 11   Q.   AND LET'S GO TO THE NEXT PAGE, TO PAGE 4.6.

11:25AM 12        LET ME ASK YOU, WERE YOU AN EXPERIENCED INVESTOR AT THIS

11:25AM 13   TIME?

11:25AM 14   A.   YES.

11:26AM 15   Q.   UNDER 4.6, DO YOU SEE THERE'S A REPRESENTATION THAT THE

11:26AM 16   INVESTOR IS AN ACCREDITED INVESTOR UNDER A CERTAIN REGULATION?

11:26AM 17   A.   YES.

11:26AM 18   Q.   AND WAS THAT TRUE FOR YOU AT THE TIME?

11:26AM 19   A.   YES.

11:26AM 20   Q.   LET'S GO TO THE NEXT PAGE, 4.9.

11:26AM 21        DO YOU SEE THERE IT SAYS, "THE INVESTOR UNDERSTANDS AND

11:26AM 22   ACKNOWLEDGES THAT NO PUBLIC MARKET NOW EXISTS FOR ANY OF THE

11:26AM 23   SECURITIES ISSUED BY THE COMPANY"?

11:26AM 24   A.   YES.

11:26AM 25   Q.   AND DID YOU UNDERSTAND THAT AT THE TIME?

11:26AM  1    A.    YES.

11:26AM  2    Q.    LET'S GO BACK TO PAGE 65 AND LOOK AT SECTION 4.4 AT THE

11:26AM  3    BOTTOM.

11:26AM  4          AND THAT'S TITLED SPECULATIVE NATURE OF INVESTMENT.

11:26AM  5          DO YOU SEE THAT?

11:26AM  6    A.    YES.

11:26AM  7    Q.    AND HERE IT SAYS, "THE INVESTOR UNDERSTANDS AND

11:26AM  8    ACKNOWLEDGES THAT THE COMPANY HAS A LIMITED FINANCIAL AND

11:26AM  9    OPERATING HISTORY AND THAT AN INVESTMENT IN THE COMPANY IS

11:26AM 10    HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS."

11:26AM 11          DO YOU SEE THAT?

11:26AM 12    A.    YES.

11:26AM 13    Q.    AND DID YOU AGREE WITH THAT LANGUAGE AT THE TIME?

11:27AM 14    A.    NO.

11:27AM 15    Q.    YOU ENTERED INTO THIS AGREEMENT; CORRECT?

11:27AM 16    A.    YES.

11:27AM 17    Q.    AND CAN YOU EXPLAIN WHAT YOU MEAN WHEN YOU SAY YOU DIDN'T

11:27AM 18    AGREE WITH THAT PARTICULAR LANGUAGE?

11:27AM 19    A.    BECAUSE THE INFORMATION THAT I HAD AT THAT POINT IN TIME,

11:27AM 20    THIS WAS NOT A SPECULATIVE AND RISKY INVESTMENT.  THE RISK HAD

11:27AM 21    BEEN TAKEN OUT.

11:27AM 22    Q.    AND YOU SAY THE INFORMATION THAT YOU HAD AT THE TIME.

11:27AM 23          WHAT INFORMATION ARE YOU REFERRING TO?

11:27AM 24    A.    THE EMAIL THAT I GOT FROM PAT MENDENHALL OF HIS

11:27AM 25    CONVERSATION WITH MR. BALWANI, THE INFORMATION THAT CAME

11:27AM   1    DIRECTLY FROM THE THERANOS WEBSITE, FINANCIAL PRESS, BUT

11:27AM   2    PRIMARILY THE COMMUNICATION DIRECTLY FROM THE COMPANY AND

11:27AM   3    MR. BALWANI WERE OF PRIMARY IMPORTANCE.

11:27AM   4    Q.   LET'S LOOK AT 4.5, AND IT SAYS ACCESS TO DATA.

11:27AM   5         "SUCH AN INVESTOR HAS HAD AN OPPORTUNITY TO ASK QUESTIONS

11:28AM   6    OF, AND RECEIVE ANSWERS FROM, THE OFFICERS OF THE COMPANY

11:28AM   7    CONCERNING AGREEMENTS," AND OTHER ITEMS.

11:28AM   8         AND IT SAYS, "SUCH INVESTOR BELIEVES THAT IT HAS RECEIVED

11:28AM   9    ALL OF THE INFORMATION SUCH INVESTOR CONSIDERS NECESSARY OR

11:28AM  10    APPROPRIATE FOR DECIDING WHETHER TO PURCHASE THE SHARES."

11:28AM  11         DO YOU SEE THAT?

11:28AM  12    A.   YES.

11:28AM  13    Q.   DID YOU AGREE WITH THAT LANGUAGE AT THE TIME?

11:28AM  14    A.   NO.

11:28AM  15    Q.   WHY NOT?

11:28AM  16    A.   BECAUSE I HAD ALSO REQUESTED FINANCIAL INFORMATION, AND

11:28AM  17    THE OTHER CIRCUMSTANCE WAS THAT I INVESTED IN OTHER COMPANIES

11:28AM  18    AT VARIOUS STAGES, THEY PROVIDE EITHER -- THEY PROVIDE HISTORIC

11:28AM  19    FINANCIAL DATA, AND SOMETIMES THEY HAVE WHAT IS CALLED A PRO

11:28AM  20    FORMA, SOME FUTURE LOOKING ESTIMATES OF WHAT THEY THINK IS

11:28AM  21    GOING TO HAPPEN IN THE NEXT YEAR OR TWO.

11:28AM  22         I HAD REQUESTED THAT INFORMATION, BUT I NEVER RECEIVED IT.

11:28AM  23    Q.   OKAY.  SO I WANT YOU TO THINK ABOUT YOUR DECISION TO

11:28AM  24    INVEST IN 2013.

11:28AM  25         SO FAR WE HAVE DISCUSSED ATTEMPTS THAT YOU HAVE MADE TO

EISENMAN DIRECT BY MR. BOSTIC

GET MORE INFORMATION ABOUT THE COMPANY AND HOW THOSE ATTEMPTS

WERE UNSUCCESSFUL; IS THAT RIGHT?

A.   YES.

Q.   WE ALSO SAW SOME COMMUNICATION, AT LEAST WITH MS. HOLMES,

THAT INDICATED SOME TENSION IN THE RELATIONSHIP; IS THAT FAIR

TO SAY?

A.   YES.

Q.   GIVEN THOSE ISSUES, WHY DID YOU MAKE THE DECISION TO

INVEST MORE MONEY IN THE COMPANY IN 2013?

A.   BECAUSE THIS WAS WHAT'S CALLED A SEAT AT THE TABLE.  WHEN

YOU INVEST IN AN EARLY STAGE COMPANY, A LOT OF TIMES YOU'RE

GIVEN THE OPPORTUNITY TO INVEST IN LATER ROUNDS BEFORE THE

GENERAL PUBLIC OR BEFORE INSTITUTIONS, AS WAS THE CASE IN THIS

SITUATION.

     WHEN WE HAD THE OPPORTUNITY TO INVEST IN THIS LATER ROUND,

WE WERE PRIVY TO A LOT MORE INFORMATION; WE WERE PRIVY TO

INFORMATION DIRECTLY FROM MR. BALWANI AND THE FINANCIAL PRESS

THAT THIS WAS TECHNOLOGY THAT WAS PROVEN, THAT WAS SUCCESSFUL,

THAT WAS WORKING; THERE WAS A LARGE MARKETPLACE THAT WAS

ALREADY ESTABLISHED BY THEIR COMPETITORS.

     THEY HAD GIVEN US AN INDICATION THAT THIS WAS A BETTER

TECHNOLOGY FOR VARIOUS REASONS THAN THEIR COMPETITORS, AND THEY

WERE GOING TO CAPTURE A LOT OF THAT MULTI, MULTI BILLION DOLLAR

MARKET.

     SO IN SPITE OF THE FACT THAT I DID NOT HAVE EVERY PIECE OF

EISENMAN DIRECT BY MR. BOSTIC

11:30AM  1    INFORMATION THAT I REQUESTED, I.E., THE FINANCIAL INFORMATION,

11:30AM  2    I HAD ENOUGH INFORMATION TO ASSURE ME THAT THIS WAS A VERY,

11:30AM  3    VERY GOOD INVESTMENT IN TERMS OF RISK AND REWARD.

11:30AM  4        AND THE OTHER CARROT, EVEN THOUGH IT WAS A SMALLER CARROT

11:30AM  5    WAS THIS WAS A FAVOR TO EXISTING SHAREHOLDERS TO INVEST AT A

11:30AM  6    MORE FAVORABLE PRICE BECAUSE THERE WAS OVERSUBSCRIBED DEMAND TO

11:30AM  7    INSTANTLY CLOSE THIS ROUND, MARK THE PRICE UP, AND RAISE A LOT

11:30AM  8    MORE MONEY FROM INSTITUTIONS.

11:30AM  9    Q.   LET ME ASK ABOUT THE TONE OF YOUR COMMUNICATIONS WITH

11:30AM  10   MR. BALWANI AROUND THE TIME OF YOUR INVESTMENT IN 2013.

11:31AM  11       AFTER YOU EMAILED AND INDICATED THAT YOU MIGHT BE

11:31AM  12   INTERESTED IN INVESTING ANOTHER MILLION DOLLARS, WHAT WAS THE

11:31AM  13   TONE OF YOUR CONVERSATION WITH MR. BALWANI LIKE?

11:31AM  14   A.   VERY CORDIAL.

11:31AM  15   Q.   YOU CAN PUT THAT EXHIBIT ASIDE, AND LET'S LOOK AT

11:31AM  16   EXHIBIT 2057 IN YOUR BINDER.  LET ME KNOW WHEN YOU'RE THERE.

11:31AM  17   A.   YES.

11:31AM  18   Q.   AFTER YOU INVESTED MORE MONEY IN THERANOS, DID YOU

11:31AM  19   CONTINUE TO TRY TO GET MORE INFORMATION ABOUT THE COMPANY?

11:31AM  20   A.   YES.

11:31AM  21   Q.   AND HOW DID YOU GO ABOUT DOING THAT?

11:31AM  22   A.   CALLS, EMAILS.

11:31AM  23   Q.   AND WAS THE COMPANY -- LET ME ASK SPECIFICALLY.  WERE

11:31AM  24   MS. HOLMES AND MR. BALWANI FORTHCOMING WITH YOU, FOLLOWING YOUR

11:31AM  25   INVESTMENT, ABOUT ADDITIONAL INFORMATION ABOUT THE COMPANY?

11:32AM 1    A.   NO.

11:32AM 2    Q.   DID YOU REVIEW PUBLICLY AVAILABLE INFORMATION ABOUT

11:32AM 3    THERANOS?

11:32AM 4    A.   YES.

11:32AM 5    Q.   AT 2057, DO YOU SEE AN EMAIL EXCHANGE BETWEEN YOU AND

11:32AM 6    MR. BALWANI RELATING TO SOME PUBLIC INFORMATION THAT YOU FOUND?

11:32AM 7    A.   YES.

11:32AM 8         MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 2057.

11:32AM 9         MS. WALSH:  NO OBJECTION.

11:32AM 10        THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

11:32AM 11        (GOVERNMENT'S EXHIBIT 2057 WAS RECEIVED IN EVIDENCE.)

11:32AM 12   BY MR. BOSTIC:

11:32AM 13   Q.   LET'S START ON PAGE 1 -- ACTUALLY, JUST THE BOTTOM HALF.

11:32AM 14        DO YOU SEE, MR. EISENMAN, THAT THIS BEGINS WITH AN

11:32AM 15   OCTOBER 8TH, 2014 EMAIL FROM YOU TO MR. BALWANI AND

11:32AM 16   MS. HOLMES?

11:32AM 17   A.   YES.

11:32AM 18   Q.   AND THE SUBJECT IS NEGATIVE REPORT ON THERANOS FROM UBS.

11:32AM 19        DO YOU SEE THAT?

11:32AM 20   A.   YES.

11:32AM 21   Q.   AND WHAT WAS THIS ABOUT?

11:32AM 22   A.   UBS IS A WALL STREET FIRM, A CREDIBLE FIRM, LARGE

11:33AM 23   WALL STREET FIRM, AND THEY PUT OUT A RESEARCH REPORT WITH --

11:33AM 24   CASTING DOUBT ON SOME OF THERANOS'S CLAIMS.

11:33AM 25   Q.   LET'S LOOK AT THAT REPORT BRIEFLY ON PAGE 2 OF YOUR EMAIL.

EISENMAN DIRECT BY MR. BOSTIC

11:33AM  1    AND AT THE TOP OF THE PAGE THERE, DO YOU SEE THAT THERE'S

11:33AM  2   A HEADING "THERANOS REMAINS A FOCUS FOR INVESTORS"?

11:33AM  3   A.   YES.

11:33AM  4   Q.   AND DO YOU SEE THAT IN THE MIDDLE OF THAT PARAGRAPH IT

11:33AM  5   SAYS, "THE MODEL, AS SEEN IN A HANDFUL OF WALGREENS LOCATIONS,

11:33AM  6   HAS EVOLVED INTO A TRADITIONAL REFERENCE LAB OFFERING WHERE

11:33AM  7   BLOOD IS DRAWN MOSTLY THROUGH VENIPUNCTURE AND SENT TO A

11:33AM  8   REGIONAL LAB LOCATION WITH A 24 PLUS HOUR TURN AROUND."

11:33AM  9    DO YOU SEE THAT?

11:33AM  10  A.   YES.

11:33AM  11  Q.   AND AT THE BOTTOM OF THE PARAGRAPH IT SAYS, "OUR

11:33AM  12  CONSULTANT BELIEVES IT IS HIGHLY UNLIKELY THAT ALL OF THESE

11:33AM  13  TESTS ARE BEING DONE ON ONE MACHINE."

11:33AM  14   DO YOU SEE THAT?

11:33AM  15  A.   YES.

11:33AM  16  Q.   WAS THAT INFORMATION CONCERNING TO YOU AT THE TIME?

11:34AM  17  A.   TREMENDOUSLY.

11:34AM  18  Q.   WHY?

11:34AM  19  A.   BECAUSE WE WERE UNDER THE IMPRESSION THAT THE TECHNOLOGY

11:34AM  20  WORKED, IT WORKED ON SITE, IT WAS A SMALL BLOOD DRAW, IT WAS

11:34AM  21  ANALYZED WITHIN A PERIOD OF A FEW HOURS ON SITE, AND THIS

11:34AM  22  CONTRADICTED ALL OF THE COMPETITIVE ADVANTAGES THAT WE WERE LED

11:34AM  23  TO BELIEVE THAT THERANOS HAD.

11:34AM  24  Q.   LET'S GO BACK TO PAGE 1 AND SEE YOUR EMAIL AND

11:34AM  25  MR. BALWANI'S RESPONSE.

11:34AM  1      ACTUALLY, JUST BELOW THAT.

11:34AM  2      SORRY, MS. WACHS.  CAPTURING THE ORIGINAL EMAIL.  THANK

11:34AM  3  YOU.

11:34AM  4      DO YOU SEE AT THE BOTTOM OF THAT SECTION YOU WRITE ABOUT

11:34AM  5  THE UBS REPORT, "THEY CLAIM THAT THE BLOOD SAMPLES HAVE TO BE

11:34AM  6  SENT TO PALO ALTO, THEY ARE LESS RELIABLE THAN TRADITIONAL

11:35AM  7  TESTS, AND THE TURN-AROUND TIME IS OVER 24 HOURS"?

11:35AM  8  A.  YES.

11:35AM  9  Q.  WERE YOU RAISING THESE CONCERNS ASKING FOR A RESPONSE FROM

11:35AM  10  MR. BALWANI AND MS. HOLMES?

11:35AM  11  A.  YES.

11:35AM  12  Q.  LET'S SEE MR. BALWANI'S RESPONSE JUST ABOVE THAT.

11:35AM  13      AND DO YOU SEE THAT HE WRITES BACK, "DOESN'T SURPRISE US.

11:35AM  14  SOUNDS LIKE AN UNINFORMED CONSULTANT."

11:35AM  15      DO YOU SEE THAT?

11:35AM  16  A.  YES.

11:35AM  17  Q.  AND WHAT DID THAT RESPONSE SIGNAL TO YOU?

11:35AM  18  A.  IT SIGNALLED THEY WERE HEDGING BECAUSE HE DID NOT DENY

11:35AM  19  WHAT WE HAD BEEN LED TO BELIEVE.

11:35AM  20  Q.  YOU RESPONDED TO THAT EMAIL FROM MR. BALWANI WRITING, "THE

11:35AM  21  BLOOD SAMPLES CAN BE ANALYZED ON SITE, AND DON'T HAVE TO BE

11:35AM  22  SENT TO A LAB, CORRECT?"

11:35AM  23      DO YOU SEE THAT?

11:35AM  24  A.  YES.

11:35AM  25  Q.  AND MR. BALWANI WRITES BACK, "WE HAVEN'T ANNOUNCED THESE

EISENMAN DIRECT BY MR. BOSTIC

11:35AM 1    DETAILS ABOUT WHAT CAN BE DONE.  THANKS."

11:35AM 2         DO YOU SEE THAT?

11:35AM 3    A.   YES.

11:35AM 4    Q.   AND THEN AT THE TOP YOU WRITE, "I THOUGHT ELIZABETH SAID

11:35AM 5    THE RESULTS WERE AVAILABLE IN 2-4 HOURS, WHICH IMPLIES THE

11:36AM 6    SAMPLES ARE TESTED LOCALLY."

11:36AM 7         YOU THEN SAY A COUPLE OF SENTENCES LATER, "IF THIS IS

11:36AM 8    PROPRIETARY INFO, I WILL STOP ASKING.  I HAVE ALSO NOT RECEIVED

11:36AM 9    ANY INFORMATION ON HOW I CAN RECEIVE MY STOCK SPLIT SHARES."

11:36AM 10        DO YOU SEE THAT?

11:36AM 11   A.   YES.

11:36AM 12   Q.   DID MR. BALWANI OR MS. HOLMES EVER GET BACK TO YOU TO

11:36AM 13   EXPLAIN TO YOU HOW THERANOS WAS ACTUALLY OPERATING IN TERMS OF

11:36AM 14   WHAT YOU READ IN THE UBS REPORT?

11:36AM 15   A.   NO.

11:36AM 16   Q.   OKAY.  WE CAN SET THAT ASIDE.

11:36AM 17        LET'S LOOK AT 2468 IN YOUR BINDER.

11:36AM 18        LET'S MOVE FORWARD INTO 2015.  LET ME ASK YOU, DURING THAT

11:36AM 19   TIME PERIOD, DID YOU CONTINUE TO HAVE COMMUNICATIONS WITH

11:36AM 20   MR. BALWANI AND MS. HOLMES?

11:36AM 21   A.   ATTEMPTED.

11:36AM 22   Q.   AND WAS THE SUBJECT OF SOME OF THOSE ATTEMPTED

11:37AM 23   COMMUNICATIONS A POSSIBILITY OF GETTING RID OF YOUR SHARES IN

11:37AM 24   THERANOS?

11:37AM 25   A.   YES.

11:37AM  1    Q.   CAN YOU EXPLAIN HOW THAT CAME TO HAPPEN AND WHAT THE

11:37AM  2    CIRCUMSTANCES WERE?

11:37AM  3    A.   I WAS ALWAYS LOOKING FOR LIQUIDITY EVENTS, WHETHER IT BE

11:37AM  4    BY IPO OR PRIVATE TRANSACTION OR A COMPANY BUYING BACK STOCK,

11:37AM  5    SO IT WAS JUST A CONSTANT ATTEMPT TO FIND OUT IF ANY OF THOSE

11:37AM  6    AVENUES WERE AVAILABLE.

11:37AM  7    Q.   LOOKING AT TAB 2468, DO YOU SEE AN EMAIL EXCHANGE BETWEEN

11:37AM  8    YOU, MS. HOLMES, AND MR. BALWANI IN APRIL OF 2015 ON THAT

11:37AM  9    TOPIC?

11:37AM  10   A.   YES.

11:37AM  11            MR. BOSTIC:  YOUR HONOR, THE GOVERNMENT OFFERS 2468.

11:37AM  12            MS. WALSH:  NO OBJECTION, YOUR HONOR, EXCEPT THAT

11:37AM  13   THERE IS A REDACTION THAT WE WOULD REQUEST ON PAGE 2.  IT'S THE

11:38AM  14   REFERENCE IN THE FIRST SENTENCE OF -- AT THE TOP OF PAGE 2.

11:38AM  15            MR. BOSTIC:  YOUR HONOR, I'M NOT SURE THAT THE

11:38AM  16   REDACTION IS NECESSARY, BUT WE'LL, WE'LL ABIDE BY THE COURT'S

11:38AM  17   ORDER.

11:38AM  18            MS. WALSH:  JUST THE PERSONAL CIRCUMSTANCES.

11:38AM  19            THE COURT:  YES.  I SEE THAT.

11:38AM  20       CAN THAT BE REDACTED?

11:38AM  21            MR. BOSTIC:  IT CAN BE, YOUR HONOR.

11:38AM  22            THE COURT:  THIS IS FOLLOWING "RETIRING"?

11:38AM  23            MR. BOSTIC:  THE REST OF THE SENTENCE FOLLOWING THE

11:38AM  24   WORD "RETIRING"?

11:38AM  25            THE COURT:  JUST TO THE WORD "AND."  I THINK THAT

11:38AM 1    CENTER PIECE THERE, IF YOU FOLLOW THAT.

11:38AM 2                MR. BOSTIC:  JUST THE CLAUSE BETWEEN THE COMMAS?

11:38AM 3                THE COURT:  CORRECT.

11:38AM 4                MR. BOSTIC:  ONE MOMENT, YOUR HONOR, IF I COULD?

11:38AM 5                THE COURT:  SURE.

11:38AM 6                MR. BOSTIC:  YOUR HONOR, WITH THAT REDACTION, MAY WE

11:39AM 7    PUBLISH?

11:39AM 8                THE COURT:  YES, SURE.

11:39AM 9                MR. BOSTIC:  AND IS THIS EXHIBIT ADMITTED,

11:39AM 10   YOUR HONOR?

11:39AM 11               THE COURT:  IT IS.

11:39AM 12               MR. BOSTIC:  APOLOGIES.

11:39AM 13         (GOVERNMENT'S EXHIBIT 2468, REDACTED, WAS RECEIVED IN

11:39AM 14   EVIDENCE.)

11:39AM 15   BY MR. BOSTIC:

11:39AM 16   Q.   LOOKING AT THIS CHAIN, MR. EISENMAN, DO YOU SEE THAT WE'RE

11:39AM 17   LOOKING AT THIS EMAIL BETWEEN YOU, MR. BALWANI, AND MS. HOLMES

11:39AM 18   IN MARCH OF 2015?

11:39AM 19   A.   YES.

11:39AM 20   Q.   AND LET'S LOOK AT PAGE 2, AND AT THE BOTTOM OF THE PAGE

11:39AM 21   YOU WRITE IN MARCH OF 2015 JUST TO MR. BALWANI.

11:39AM 22        DO YOU SEE THAT?

11:39AM 23   A.   YES.

11:39AM 24   Q.   AND YOU SAY, "SUNNY,

11:39AM 25        "WE HAVE BEEN INFORMED OF AN OPPORTUNITY TO SELL THERANOS

11:39AM  1    STOCK.  BEFORE WE DO, WE WANTED TO GET SOME NARRATIVE FROM YOU,

11:39AM  2    TO GET A SENSE WHETHER OUR VALUE HAS GROWN IN THE YEAR AND

11:39AM  3    3 MONTHS SINCE THE ROUND VALUING THE COMPANY AT 9 BILLION WAS

11:39AM  4    PRICED."

11:39AM  5        DO YOU SEE THAT?

11:39AM  6    A.   YES.

11:39AM  7    Q.   WHY WERE YOU REACHING OUT TO MR. BALWANI TO GET THIS

11:39AM  8    INFORMATION?

11:39AM  9    A.   BECAUSE MR. BALWANI WAS ONE OF THE KEY EXECUTIVES AT THE

11:39AM 10    COMPANY AND WOULD BE PRIVY TO THE TYPE OF INFORMATION AN

11:39AM 11    INVESTOR WOULD WANT TO HAVE BEFORE MAKING A DECISION TO SELL

11:40AM 12    STOCK.

11:40AM 13    Q.   OKAY.  LET'S LOOK AT MR. BALWANI'S RESPONSE TO YOUR

11:40AM 14    REQUEST.

11:40AM 15        AND JUST ABOVE THAT THERE'S AN EMAIL FROM HIM TO YOU.

11:40AM 16        HE SAYS, "THE LAST TRANSACTION WAS AT $17 PER SHARE AS YOU

11:40AM 17    ALREADY KNOW.

11:40AM 18        "I DID NOT SAY WE WILL HAVE, OR CONSIDER A LIQUIDITY EVENT

11:40AM 19    IN 2015.

11:40AM 20        "WE DON'T KNOW ANYTHING OF THIS TRANSACTION BELOW."

11:40AM 21        DO YOU SEE THAT?

11:40AM 22    A.   YES.

11:40AM 23    Q.   IN THAT RESPONSE, DID HE PROVIDE YOU ANY OF THE

11:40AM 24    INFORMATION THAT YOU REQUESTED ABOUT WHERE THINGS STOOD WITH

11:40AM 25    THE COMPANY IN ITS VALUE?

11:40AM 1      A.   NO.

11:40AM 2      Q.   LET'S GO JUST ABOVE THAT TO THE TOP OF PAGE 2 AND SEE YOUR

11:40AM 3      MESSAGE.

11:40AM 4           IN RESPONSE, DO YOU SEE THAT YOU PROVIDE MR. BALWANI WHAT

11:40AM 5      YOU SAY ARE A FEW FACTS?

11:40AM 6      A.   YES.

11:40AM 7      Q.   AND YOU SAY WHEN YOU FIRST SPOKE TO ELIZABETH OVER NINE

11:41AM 8      YEARS AGO AND MADE YOUR INVESTMENT, SHE THOUGHT THE COMPANY

11:41AM 9      WOULD IPO IN THREE TO FIVE YEARS.

11:41AM 10          DO YOU REMEMBER SAYING THAT?

11:41AM 11     A.   YES.

11:41AM 12     Q.   AND UNDER ITEM 2 YOU WRITE, "WHEN I SPOKE TO YOU IN THE

11:41AM 13     LAST QUARTER OF 2014, YOU DID SAY THAT YOU UNDERSTOOD THAT SOME

11:41AM 14     INVESTORS WOULD LIKE AN EXIT AFTER 10 YEARS, AND THAT THERE MAY

11:41AM 15     BE A PRIVATE TRANSACTION TO FACILITATE THIS."

11:41AM 16          DO YOU REMEMBER MR. BALWANI SAYING THAT?

11:41AM 17     A.   YES.

11:41AM 18     Q.   LET'S GO TO PAGE 1.

11:41AM 19          AND DO YOU SEE AT THE BOTTOM OF PAGE 1 YOU'RE STILL TRYING

11:41AM 20     TO GET ANSWERS TO YOUR QUESTIONS?

11:41AM 21     A.   YES.

11:41AM 22     Q.   AND DO YOU SEE THAT MR. BALWANI WRITES BACK TO YOU IN THE

11:41AM 23     MIDDLE OF THE PAGE, "I ALREADY RESPONDED TO YOUR QUESTION ABOUT

11:41AM 24     YOU WANTING TO SELL YOUR SHARES TO SOMEONE WHO WANTS TO BUY

11:41AM 25     YOUR SHARES."

11:41AM  1          DO YOU SEE THAT?

11:41AM  2    A.  YES.

11:41AM  3    Q.  HAD YOU ACTUALLY GOTTEN A RESPONSE FROM MR. BALWANI

11:42AM  4   ANSWERING YOUR QUESTIONS?

11:42AM  5    A.  NO.

11:42AM  6    Q.  AROUND THIS TIME PERIOD, WERE MR. BALWANI AND MS. HOLMES

11:42AM  7   GIVING YOU ANY SUBSTANTIVE INFORMATION ABOUT THE COMPANY'S

11:42AM  8   ACTIVITIES OR ITS BUSINESS?

11:42AM  9    A.  NO.

11:42AM 10    Q.  GOING UP THE PAGE, LOOKING AT YOUR RESPONSE TO

11:42AM 11   MR. BALWANI, AND YOU INCLUDE MS. HOLMES AGAIN.

11:42AM 12          DO YOU SEE THAT?

11:42AM 13    A.  YES.

11:42AM 14    Q.  YOU SAY, "THE RESPONSE I AM LOOKING FOR FROM YOU OR

11:42AM 15   ELIZABETH IS A BUSINESS UPDATE LIKE YOU PROVIDED LAST YEAR WHEN

11:42AM 16   WE DISCUSSED THE COMPANY'S TIMETABLE FOR A PRIVATE OR PUBLIC

11:42AM 17   LIQUIDITY EVENT," AND OTHER ITEMS.

11:42AM 18          DO YOU SEE THAT?

11:42AM 19    A.  YES.

11:42AM 20    Q.  AND IN THE ABOVE PARAGRAPH YOU WRITE, "IT IS REALLY UNFAIR

11:42AM 21   FOR YOU TO PLAY THIS CAT AND MOUSE GAME WITH ME.  I HAVE BEEN A

11:42AM 22   SHAREHOLDER FOR OVER 9 YEARS AND I, AS WELL AS MY DAUGHTER,

11:42AM 23   ALSO AS A SHAREHOLDER, ARE IN A DIFFERENT STAGE OF LIFE.  I

11:42AM 24   CAN'T MAKE A RATIONALE DECISION TO SELL OR HOLD MY STOCK WITH

11:42AM 25   THE LACK OF INFORMATION YOU HAVE PROVIDED."

EISENMAN DIRECT BY MR. BOSTIC                                    5423

11:43AM   1        DOES THAT ACCURATELY REFLECT HOW YOU FELT AT THE TIME?

11:43AM   2   A.   YES.

11:43AM   3   Q.   AND YOU WRITE, "I AM REALLY HOPING FOR A MEANINGFUL

11:43AM   4   DIALOGUE ADDRESSING THE ISSUES ABOVE."

11:43AM   5        FOLLOWING THIS, DID YOU EVER GET A MEANINGFUL DIALOGUE

11:43AM   6   WITH MS. HOLMES OR MR. BALWANI ABOUT THE ACTIVITIES OF

11:43AM   7   THERANOS?

11:43AM   8   A.   NO.

11:43AM   9   Q.   LET'S LOOK AT MR. BALWANI'S RESPONSE TO YOU AT THE TOP OF

11:43AM  10   THE PAGE.  DO YOU SEE HE WRITES, "ALAN.

11:43AM  11        "YOUR EMAILS ARE INSULTING, FULL OF INACCURATE STATEMENTS

11:43AM  12   AND WASTEFUL OF OUR TIME.

11:43AM  13        "OUR NEXT RESPONSE TO THIS EMAIL AND ALL OF YOUR FUTURE

11:43AM  14   EMAILS WILL COME FROM OUR COUNSEL."

11:43AM  15        DO YOU SEE THAT?

11:43AM  16   A.   YES.

11:43AM  17   Q.   DID YOU END UP SELLING YOUR THERANOS SHARES TO A THIRD

11:43AM  18   PART OR ANYONE ELSE?

11:43AM  19   A.   NO.

11:43AM  20   Q.   DID YOU EVER REALIZE ANY PROFIT ON YOUR PURCHASE OF EQUITY

11:43AM  21   IN THERANOS?

11:43AM  22   A.   NO.

11:43AM  23   Q.   AND WHAT IS YOUR UNDERSTANDING OF THE CURRENT VALUE OF

11:44AM  24   YOUR HOLDING IN THERANOS?

11:44AM  25   A.   IT'S WORTHLESS.

EISENMAN DIRECT BY MR. BOSTIC

11:44AM 1    MR. BOSTIC:  MAY I HAVE A MOMENT, YOUR HONOR?

11:44AM 2    THE COURT:  YES.

11:44AM 3    (DISCUSSION AMONGST GOVERNMENT COUNSEL OFF THE RECORD.)

11:44AM 4    BY MR. BOSTIC:

11:44AM 5    Q.   MR. EISENMAN, MY LAST KIND OF CLEAN-UP QUESTION FOR YOU IS

11:44AM 6    THE TIMING OF YOUR INVESTMENT IN 2013.  DO YOU REMEMBER WHEN

11:44AM 7    THAT TOOK PLACE, THE ACTUAL INVESTMENT?

11:44AM 8    A.   IT WAS END OF DECEMBER.

11:44AM 9    Q.   END OF DECEMBER 2013?

11:44AM 10   A.   YES.

11:44AM 11   Q.   THANK YOU.

11:44AM 12       NO FURTHER QUESTIONS, YOUR HONOR.

11:44AM 13       THE COURT:  YOU WILL HAVE CROSS-EXAMINATION?

11:44AM 14       MS. WALSH:  I WILL, YOUR HONOR.

11:44AM 15       THE COURT:  SHOULD WE TAKE OUR BREAK NOW, LADIES AND

11:44AM 16   GENTLEMEN?

11:44AM 17       WHY DON'T WE DO THAT?  LET'S TAKE ABOUT 30 MINUTES, AND

11:44AM 18   THEN WE'LL RESUME WITH CROSS-EXAMINATION.

11:44AM 19       THE WITNESS:  OKAY.  THANK YOU.

11:44AM 20       (RECESS FROM 11:44 A.M. UNTIL 12:46 P.M.)

21

22

23

24

25

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | **AFTERNOON SESSION**                                    |
| 12:46PM | 2  | (JURY IN AT 12:46 P.M.)                                  |
| 12:46PM | 3  | THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.       |
| 12:46PM | 4  | ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.  |
| 12:46PM | 5  | OUR JURY IS BACK.                                       |
| 12:46PM | 6  | MR. EISENMAN IS ON THE STAND.                           |
| 12:46PM | 7  | I APOLOGIZE FOR THE DELAY, LADIES AND GENTLEMEN.        |
| 12:46PM | 8  | MS. WALSH, YOU HAVE CROSS-EXAMINATION?                  |
| 12:46PM | 9  | MS. WALSH:  I DO, YOUR HONOR.  THANK YOU.              |
| 12:47PM | 10 | MAY I APPROACH THE WITNESS, YOUR HONOR?                 |
| 12:47PM | 11 | THE COURT:  OH, YES.  THANK YOU.                       |
| 12:47PM | 12 | MS. WALSH:  (HANDING.)                                  |
| 12:47PM | 13 | THE COURT:  DO I GET ONE?                               |
| 12:47PM | 14 | MS. WALSH:  YES.  IT'S RIGHT OVER HERE (INDICATING).   |
| 12:47PM | 15 | THE COURT:  THANK YOU.                                  |
| 12:47PM | 16 | MS. WALSH:  AND THE GOVERNMENT HAS ONE.                |
| 12:47PM | 17 | **CROSS-EXAMINATION**                                  |
| 12:47PM | 18 | BY MS. WALSH:                                           |
| 12:47PM | 19 | Q.   GOOD AFTERNOON, MR. EISENMAN.                      |
| 12:47PM | 20 | A.   GOOD AFTERNOON.                                    |
| 12:47PM | 21 | Q.   MY NAME IS AMY WALSH, AND I REPRESENT MR. BALWANI. |
| 12:47PM | 22 | I'M GOING TO ASK YOU A FEW QUESTIONS ABOUT YOUR TESTIMONY |
| 12:47PM | 23 | TODAY.                                                  |
| 12:47PM | 24 | I'D LIKE TO START WITH YOUR BACKGROUND.                 |
| 12:47PM | 25 | YOU HAVE A LAW DEGREE; CORRECT?                         |

EISENMAN CROSS BY MS. WALSH

12:47PM 1    A.   I DID.

12:47PM 2    Q.   YOU DID?

12:47PM 3    A.   I DID.  I DON'T HAVE ANY ACTIVE LICENSES NOW.  I RETIRED

12:47PM 4    ABOUT FIVE OR SIX YEARS AGO.

12:47PM 5    Q.   OKAY.  BUT AT SOME POINT YOU BRIEFLY PRACTICED LAW;

12:47PM 6    CORRECT?

12:47PM 7    A.   CORRECT.

12:47PM 8    Q.   AND THE TYPE OF LAW THAT YOU PRACTICED WAS TRUSTS AND

12:48PM 9    ESTATES; IS THAT RIGHT?

12:48PM 10   A.   YES.

12:48PM 11   Q.   YOU WERE ALSO LICENSED AS A CPA; CORRECT?

12:48PM 12   A.   CORRECT.

12:48PM 13   Q.   AND THAT'S A CERTIFIED PUBLIC ACCOUNTANT?

12:48PM 14   A.   CORRECT.

12:48PM 15   Q.   AND YOU, IN ADDITION TO BEING LICENSED, YOU WORKED AS AN

12:48PM 16   ACCOUNTANT; RIGHT?

12:48PM 17   A.   YES.

12:48PM 18   Q.   AND DURING YOUR WORK AS AN ACCOUNTANT, YOU FOCUSSED ON TAX

12:48PM 19   ISSUES; IS THAT CORRECT?

12:48PM 20   A.   PRIMARILY DID TAX RETURNS.

12:48PM 21   Q.   SO IS THE ANSWER YES TO MY QUESTION, YOU FOCUSSED ON TAX

12:48PM 22   ISSUES?

12:48PM 23   A.   IT'S A LITTLE, IT'S A LITTLE NUANCED BECAUSE I WAS

12:48PM 24   PREPARING TAX RETURNS.  I WASN'T REALLY RESEARCHING OR INVOLVED

12:48PM 25   IN TAX ISSUES.

EISENMAN CROSS BY MS. WALSH

12:48PM   1    Q.   SO YOU WERE PREPARING TAX RETURNS; IS THAT RIGHT?

12:48PM   2    A.   CORRECT.

12:48PM   3    Q.   AND YOU WERE ALSO A CERTIFIED FINANCIAL PLANNER AT SOME

12:48PM   4    POINT IN TIME; CORRECT?

12:48PM   5    A.   CORRECT.

12:48PM   6    Q.   AND IN THAT WORK, YOU ADVISE PEOPLE ON HOW TO MANAGE THEIR

12:49PM   7    MONEY; IS THAT RIGHT?

12:49PM   8    A.   THAT'S ONE OF THE AREAS.  IT'S INSURANCE PLANNING,

12:49PM   9    RETIREMENT PLANNING, INVESTMENT PLANNING.

12:49PM  10    Q.   SO YOU ADVISE PEOPLE ON HOW TO MANAGE THEIR MONEY; IS THAT

12:49PM  11    RIGHT?

12:49PM  12    A.   YES.

12:49PM  13    Q.   YOU WERE ALSO LICENSED TO TRADE SECURITIES; CORRECT?

12:49PM  14    A.   CORRECT.

12:49PM  15    Q.   AND YOU GOT YOUR LICENSE TO DO THAT IN AROUND 1980; IS

12:49PM  16    THAT RIGHT?

12:49PM  17    A.   MY RECOLLECTION IS THAT IT WAS IN THE EARLY '80S.

12:49PM  18         I DON'T REMEMBER SPECIFICALLY.

12:49PM  19    Q.   OKAY.  AND ONCE YOU WERE LICENSED TO TRADE SECURITIES, YOU

12:49PM  20    ADVISED CLIENTS ON HOW THEY SHOULD INVEST THEIR MONEY; IS THAT

12:49PM  21    RIGHT?

12:49PM  22    A.   CORRECT.

12:49PM  23    Q.   YOU WERE A WEALTH MANAGER DURING THE COURSE OF YOUR

12:49PM  24    CAREER; IS THAT RIGHT?

12:49PM  25    A.   YES.

12:49PM  1    Q.    AND WHAT THAT MEANS IS THAT YOU ADVISE YOUR CLIENTS ON HOW

12:49PM  2    TO POSITION THEIR ASSETS; IS THAT RIGHT?

12:50PM  3    A.    YES.

12:50PM  4    Q.    AND HOW TO -- WITHDRAWN.

12:50PM  5          YOU ALSO ADVISE THEM ON DIFFERENT THINGS TO INVEST IN; IS

12:50PM  6    THAT RIGHT?

12:50PM  7    A.    YES.

12:50PM  8    Q.    AND YOU, THROUGH THE COURSE OF YOUR CAREER, YOU'VE HAD

12:50PM  9    EXTENSIVE EXPERIENCE IN INVESTING; IS THAT FAIR?

12:50PM  10   A.    YES.

12:50PM  11   Q.    YOU HAVE INVESTED IN PUBLIC COMPANIES; RIGHT?

12:50PM  12   A.    YES.

12:50PM  13   Q.    AND PRIVATE COMPANIES?

12:50PM  14   A.    YES.

12:50PM  15   Q.    AND IN START-UP COMPANIES; CORRECT?

12:50PM  16   A.    YES.

12:50PM  17   Q.    AND YOU'VE DONE THAT WORK FOR, BEFORE YOU RETIRED, FOR 30

12:50PM  18   OR 40 YEARS; RIGHT?

12:50PM  19   A.    YES.

12:50PM  20   Q.    NOW, YOU ALSO, YOU ALSO LOOK AT DEALS IN CONNECTION WITH

12:50PM  21   YOUR WIFE'S FAMILY OFFICE; IS THAT RIGHT?

12:50PM  22   A.    UM, AGAIN, IT'S A LITTLE MORE NUANCED.

12:51PM  23         WE ALL INDEPENDENTLY LOOK FOR OPPORTUNITIES, AND WHEN WE

12:51PM  24   SEE OPPORTUNITIES THAT WE THINK ARE INTERESTING, WE SHARE.

12:51PM  25   Q.    OKAY.  SO YOU DISCUSS DEALS WITH PEOPLE WHO ARE INVOLVED

12:51PM 1    IN YOUR WIFE'S FAMILY OFFICE; IS THAT RIGHT?

12:51PM 2    A.   YES.

12:51PM 3    Q.   AND A FAMILY OFFICE IS A PRIVATE COMPANY; RIGHT?

12:51PM 4    A.   IT'S NOT REALLY A COMPANY.  IT'S JUST, IT'S JUST AN

12:51PM 5    ARRANGEMENT WHERE THEY SHARE OFFICE SPACE AND SHARE IDEAS.

12:51PM 6    Q.   WELL, A FAMILY OFFICE IS AN ORGANIZATION, IS IT NOT?

12:51PM 7    A.   I DON'T KNOW IF OUR PARTICULAR FAMILY OFFICE IS AN

12:51PM 8    ORGANIZATION.

12:51PM 9    Q.   OKAY.  WHETHER IT'S AN ORGANIZATION OR NOT, THE -- THERE

12:51PM 10   IS AN OFFICE; RIGHT?

12:51PM 11   A.   YES.

12:51PM 12   Q.   AND THE OFFICE EMPLOYS EMPLOYEES; RIGHT?

12:51PM 13   A.   THERE IS ONE EMPLOYEE.

12:51PM 14   Q.   THERE'S ONE EMPLOYEE.  OKAY.

12:51PM 15        AND THE --

12:52PM 16   A.   ACTUALLY, CORRECT.

12:52PM 17        THERE'S A RECEPTIONIST AND ONE EMPLOYEE.

12:52PM 18   Q.   OKAY.  AND THE PURPOSE OF THE FAMILY OFFICE IS TO INCREASE

12:52PM 19   THE WEALTH OF WHATEVER FAMILY IT PERTAINS TO; IS THAT FAIR?

12:52PM 20   A.   INCREASE, AND ALSO JUST TO MANAGE WHAT ASSETS ARE UNDER

12:52PM 21   MANAGEMENT.

12:52PM 22   Q.   OKAY.  SO ONE OF THE PURPOSES IS TO INCREASE THE WEALTH OF

12:52PM 23   THE FAMILY; IS THAT RIGHT?

12:52PM 24   A.   YES.

12:52PM 25            MR. BOSTIC:  ASKED AND ANSWERED.

12:52PM  1              THE COURT:  I'LL LET THE ANSWER REMAIN.

12:52PM  2          YOU CAN ASK ANOTHER QUESTION.

12:52PM  3      BY MS. WALSH:

12:52PM  4      Q.   AND IS ANOTHER PURPOSE THAT YOU JUST MENTIONED TO MANAGE

12:52PM  5      THE INVESTMENTS OF THE FAMILY OFFICE?

12:52PM  6      A.   YES.

12:52PM  7      Q.   AND ANOTHER PURPOSE IS TO TRANSFER WHATEVER WEALTH IS

12:52PM  8      CREATED ACROSS GENERATIONS OF THE FAMILY; IS THAT RIGHT?

12:52PM  9      A.   THAT CAN BE A PURPOSE.

12:52PM 10      Q.   AND SO YOU AND YOUR WIFE -- THIS IS YOUR WIFE'S FAMILY

12:53PM 11      OFFICE; CORRECT?

12:53PM 12      A.   YES.

12:53PM 13      Q.   AND YOU AND YOUR WIFE AND HER SIBLINGS LOOK AT POTENTIAL

12:53PM 14      DEALS THAT COME ALONG; RIGHT?

12:53PM 15      A.   YES.

12:53PM 16      Q.   AND YOU DECIDE WHETHER TO INVEST IN THOSE DEALS; CORRECT?

12:53PM 17      A.   YES.

12:53PM 18      Q.   AND YOU MIGHT DECIDE TO INVEST TOGETHER; RIGHT?

12:53PM 19      A.   RIGHT.

12:53PM 20      Q.   OR SEPARATELY; CORRECT?

12:53PM 21      A.   CORRECT.

12:53PM 22      Q.   OR NOT AT ALL; RIGHT?

12:53PM 23      A.   CORRECT.

12:53PM 24      Q.   IS THAT --

12:53PM 25      A.   CORRECT.  CORRECT.

12:53PM  1    Q.   OKAY.  AND AT THE HEIGHT OF YOUR INVESTMENT CAREER, YOU

12:53PM  2    MANAGED ABOUT $20 MILLION IN ASSETS; IS THAT CORRECT?

12:53PM  3    A.   I DON'T RECALL, BUT THAT SOUNDS ABOUT CORRECT.  THAT

12:53PM  4    SOUNDS ABOUT RIGHT.

12:53PM  5    Q.   OKAY.  SO TO THE BEST OF YOUR RECOLLECTION SITTING HERE

12:53PM  6    TODAY --

12:53PM  7    A.   YES.

12:53PM  8    Q.   -- THAT'S CORRECT; IS THAT RIGHT?

12:53PM  9    A.   YES.

12:53PM  10   Q.   AND YOU UNDERSTOOD THROUGHOUT YOUR CAREER THAT INVESTING

12:54PM  11   IN PRIVATE COMPANIES IS HIGHER RISK THAN INVESTING IN PUBLIC

12:54PM  12   COMPANIES; IS THAT RIGHT?

12:54PM  13   A.   GENERALLY SPEAKING, THAT'S A FAIR STATEMENT.

12:54PM  14   Q.   AND, IN FACT, YOU NEVER INVESTED YOUR CLIENTS' FUNDS IN

12:54PM  15   PRIVATE COMPANIES; IS THAT RIGHT?

12:54PM  16   A.   THAT'S CORRECT.

12:54PM  17   Q.   ONLY YOUR OWN MONEY; RIGHT?

12:54PM  18   A.   YES.

12:54PM  19   Q.   AND THAT'S BECAUSE IT'S HIGHER RISK; IS THAT RIGHT?

12:54PM  20   A.   IT'S BECAUSE IT'S HIGHER RISK, AND THERE WOULD ALSO

12:54PM  21   POTENTIALLY BE COMPLIANCE ISSUES.

12:54PM  22   Q.   SO ONE OF THE REASONS THAT YOU DIDN'T INVEST YOUR CLIENTS'

12:54PM  23   MONEY IN PRIVATE COMPANIES IS BECAUSE THEY'RE HIGHER RISK; IS

12:54PM  24   THAT RIGHT?

12:54PM  25   A.   THAT IS ONE OF THE PRIMARY REASONS, CORRECT.

12:54PM   1    Q.   NOW, YOU TESTIFIED DURING YOUR DIRECT TESTIMONY THAT YOU

12:54PM   2    LEARNED ABOUT THERANOS FROM DAVID HARRIS; IS THAT CORRECT?

12:54PM   3    A.   YES.

12:54PM   4    Q.   AND HE WAS A FRIEND OF YOURS; IS THAT RIGHT?

12:55PM   5    A.   YES.

12:55PM   6    Q.   AND HE WAS ALSO THE WEALTH MANAGER FOR ELIZABETH HOLMES'S

12:55PM   7    PARENTS; IS THAT CORRECT?

12:55PM   8    A.   THAT'S CORRECT.

12:55PM   9    Q.   AND HE TOLD YOU AT THE TIME THAT HE HAD INVESTED IN A

12:55PM  10    COMPANY IN CALIFORNIA NAMED THERANOS; RIGHT?

12:55PM  11    A.   YES.

12:55PM  12    Q.   AND HE TOLD YOU ABOUT THE FOUNDER OF THE COMPANY; RIGHT?

12:55PM  13    A.   YES.

12:55PM  14    Q.   THAT WAS MS. HOLMES; CORRECT?

12:55PM  15    A.   CORRECT.

12:55PM  16    Q.   AND HE TOLD YOU THAT SHE HAD INVENTED A NEW TECHNOLOGY;

12:55PM  17    RIGHT?

12:55PM  18    A.   CORRECT.

12:55PM  19    Q.   AND THAT TECHNOLOGY RELATED TO BLOOD TESTING; IS THAT

12:55PM  20    RIGHT?

12:55PM  21    A.   YES.

12:55PM  22    Q.   AND HE ALSO TOLD YOU, DID HE NOT, THAT MS. HOLMES ACTUALLY

12:55PM  23    HAD ROOTS IN HOUSTON; RIGHT?

12:55PM  24    A.   YES.

12:55PM  25    Q.   AND THAT'S WHERE YOU'RE FROM; CORRECT?

EISENMAN CROSS BY MS. WALSH

12:55PM   1    A.   THAT'S WHERE I'VE BEEN LIVING SINCE 1977.

12:55PM   2    Q.   OKAY.  AND HE TOLD YOU THAT MS. HOLMES WENT TO HIGH SCHOOL

12:55PM   3    IN HOUSTON; RIGHT?

12:56PM   4    A.   CORRECT.

12:56PM   5    Q.   AND THEN SHE WENT ON TO ATTEND STANFORD UNIVERSITY; RIGHT?

12:56PM   6    A.   YES.

12:56PM   7    Q.   MR. HARRIS ALSO TOLD YOU THAT WHILE MS. HOLMES WAS AT

12:56PM   8    STANFORD, SHE HAD COME UP WITH AN IDEA FOR AN INVENTION AND SHE

12:56PM   9    APPLIED FOR A PATENT; IS THAT RIGHT?

12:56PM   10   A.   YES.

12:56PM   11   Q.   AND MR. HARRIS TOLD YOU AT THE TIME AS WELL THAT HE VIEWED

12:56PM   12   MS. HOLMES AS A GENIUS; IS THAT CORRECT?

12:56PM   13   A.   YES.

12:56PM   14   Q.   AND YOU BELIEVED HIM; RIGHT?

12:56PM   15   A.   YES.

12:56PM   16   Q.   AND HE SAID NOT ONLY IS SHE A GENIUS, BUT HE HIMSELF HAD A

12:56PM   17   LOT OF CONFIDENCE IN HER; IS THAT RIGHT?

12:56PM   18   A.   YES.

12:56PM   19   Q.   AND SO IS IT FAIR TO SAY THAT MR. HARRIS'S CONFIDENCE IN

12:56PM   20   MS. HOLMES WAS A MAJOR FACTOR FOR YOU WHEN YOU INVESTED BACK IN

12:56PM   21   2006?

12:56PM   22   A.   IT WAS A FACTOR.  I WOULDN'T SAY IT WAS A MAJOR FACTOR.

12:56PM   23   Q.   OKAY.  AND IT WAS MR. HARRIS'S CONTINUED CONFIDENCE IN

12:57PM   24   MS. HOLMES THAT WAS A FACTOR LEADING TO YOUR INVESTMENT IN

12:57PM   25   THERANOS IN 2013; IS THAT FAIR?

12:57PM  1    A.   NO.  I WOULD HAVE TO DISAGREE.

12:57PM  2    Q.   OKAY.  I'M GOING TO ASK YOU TO TURN TO AN EXHIBIT IN YOUR

12:57PM  3    BINDER.  IT'S 20601.  IT'S PROBABLY TOWARDS THE BACK.

12:57PM  4    A.   OKAY.

12:58PM  5    Q.   DO YOU SEE IT?

12:58PM  6    A.   YES.

12:58PM  7    Q.   OKAY.  I'M GOING TO DIRECT YOUR ATTENTION TO THE MIDDLE

12:58PM  8    PARAGRAPH WHERE THERE'S A DATE AND THEN YOUR NAME, AND THEN

12:58PM  9    MOST, AND THE LAST SENTENCE OF THAT PARAGRAPH.

12:58PM 10         DO YOU SEE THAT?

12:58PM 11    A.   YES.

12:58PM 12    Q.   HAVE YOU READ IT?

12:58PM 13    A.   ARE YOU TALKING ABOUT THIS SENTENCE THAT STARTS WITH

12:58PM 14    "MOST"?

12:58PM 15    Q.   YES.

12:58PM 16    A.   YES.  BY THE WAY, WILL THIS BE ON THE SCREEN, TOO?

12:58PM 17    Q.   NO.

12:58PM 18    A.   NO?  JUST TO --

12:58PM 19    Q.   CAN YOU READ IT OKAY?

12:58PM 20         THE COURT:  DO YOU WANT HIM TO READ IT TO HIMSELF?

12:58PM 21    BY MS. WALSH:

12:58PM 22    Q.   JUST TO YOURSELF.

12:58PM 23    A.   OKAY.

12:58PM 24         YES, I READ IT.

12:58PM 25    Q.   OKAY.  SO IT'S TRUE, IS IT NOT, THAT ONE FACTOR IN YOUR

12:58PM   1      INVESTMENT IN 2013 WAS MR. HARRIS'S CONTINUED CONFIDENCE IN

12:59PM   2      MS. HOLMES?

12:59PM   3      A.   I WOULD SAY THAT'S FAIR TO SAY THAT THAT'S ONE FACTOR.

12:59PM   4      Q.   ALL RIGHT.  NOW TURNING BACK TO YOUR 2006 INVESTMENT.

12:59PM   5           YOU ALSO BECAME AWARE PRIOR TO THAT INVESTMENT THAT

12:59PM   6      LARRY ELLISON HAD A SIGNIFICANT STAKE IN THERANOS; IS THAT

12:59PM   7      RIGHT?

12:59PM   8      A.   YES.

12:59PM   9      Q.   AND YOU KNEW WHO LARRY ELLISON WAS; RIGHT?

12:59PM  10      A.   YES.

12:59PM  11      Q.   HE -- PARDON ME?

12:59PM  12      A.   I SAID YES.

12:59PM  13      Q.   HE WAS THE PERSON WHO BUILT ORACLE; CORRECT?

12:59PM  14      A.   CORRECT.

12:59PM  15      Q.   AND PRIOR TO YOUR 2006 INVESTMENT, YOU ALSO LEARNED THAT A

12:59PM  16      PERSON NAMED DON LUCAS WAS ON THERANOS'S BOARD OF DIRECTORS;

12:59PM  17      CORRECT?

12:59PM  18      A.   CORRECT.

12:59PM  19      Q.   AND YOU LEARNED THAT MR. LUCAS HAD A GOOD REPUTATION IN

12:59PM  20      SILICON VALLEY; CORRECT?

12:59PM  21      A.   CORRECT.

12:59PM  22      Q.   AND THAT REPUTATION WAS AS A SUCCESSFUL INVESTOR IN

12:59PM  23      START-UP COMPANIES; RIGHT?

12:59PM  24      A.   I KNEW OF HIS INVOLVEMENT WITH ORACLE, BUT I DIDN'T KNOW

12:59PM  25      HIS OTHER HISTORY.

EISENMAN CROSS BY MS. WALSH

01:00PM 1    Q.   OKAY.  AND YOU ALSO KNEW THAT HE WAS CHAIRMAN OF THE BOARD

01:00PM 2    OF ORACLE; RIGHT?

01:00PM 3    A.   YES.

01:00PM 4    Q.   OKAY.  AND THE PRESENCE OF MR. LUCAS ON THE BOARD AT

01:00PM 5    THERANOS AND MR. ELLISON'S STAKE IN THERANOS, THEY WERE ALSO

01:00PM 6    FACTORS IN YOUR DECISION TO INVEST IN THERANOS IN 2006; IS THAT

01:00PM 7    RIGHT?

01:00PM 8    A.   YES.

01:00PM 9    Q.   AND PRIOR TO YOUR INVESTMENT IN THERANOS IN 2006, THE ONLY

01:00PM 10   PERSON THAT YOU WERE INTERACTING WITH FROM THERANOS AT THE TIME

01:00PM 11   WAS ELIZABETH HOLMES; IS THAT RIGHT?

01:00PM 12   A.   YES.

01:00PM 13   Q.   YOU HAD NOT HEARD OF SUNNY BALWANI AT THAT POINT; CORRECT?

01:00PM 14   A.   CORRECT.

01:00PM 15   Q.   YOU DIDN'T EVEN KNOW WHEN HE STARTED AT THE COMPANY;

01:00PM 16   CORRECT?

01:00PM 17   A.   CORRECT.

01:00PM 18   Q.   YOU HAD NO COMMUNICATIONS WITH HIM AT THE TIME?

01:00PM 19   A.   CORRECT.

01:00PM 20   Q.   AND WHEN YOU MADE THE INVESTMENT IN 2006, YOU UNDERSTOOD

01:00PM 21   AT THE TIME THAT THERANOS WAS A PRIVATE COMPANY; CORRECT?

01:00PM 22   A.   CORRECT.

01:00PM 23   Q.   AND BECAUSE OF THAT, YOU UNDERSTOOD THAT THERE WAS NO

01:01PM 24   PUBLIC MARKET WHERE YOU COULD SELL YOUR SHARES OF THERANOS; IS

01:01PM 25   THAT RIGHT?

01:01PM   1    A.   CORRECT.

01:01PM   2    Q.   AND, IN FACT, THERANOS NEVER GUARANTEED THAT THERE WOULD

01:01PM   3    BE ANY PUBLIC MARKET WHERE YOU COULD SELL YOUR THERANOS SHARES;

01:01PM   4    CORRECT?

01:01PM   5    A.   IT'S NOT SOMETHING THAT A PRIVATE COMPANY WOULD GUARANTEE

01:01PM   6    TO A SHAREHOLDER.

01:01PM   7    Q.   SO THE ANSWER TO MY QUESTION IS YES, THERANOS NEVER

01:01PM   8    GUARANTEED THAT THERE WOULD BE A PUBLIC MARKET FOR YOUR SHARES?

01:01PM   9    A.   WELL, AGAIN, IT'S NUANCED.

01:01PM   10       WE HAD COMMUNICATION AT EVERY STAGE THAT THEY WERE

01:01PM   11   PLANNING AN IPO AND THEY GAVE US A TIMETABLE AT SEVERAL STAGES.

01:01PM   12   FIRST IT WAS THREE TO FIVE YEARS, AND THEN THEY SPECIFICALLY

01:01PM   13   OUTLINED YEARS IT WAS GOING TO HAPPEN IN 2011 AT THE LATEST.

01:01PM   14       SO THERE WERE A SERIES OF STATEMENTS WHERE THEY GAVE

01:01PM   15   STRONG INDICATION THAT THEY WOULD PURSUE AN IPO.

01:02PM   16   Q.   RIGHT.  BUT THAT'S NOT MY QUESTION, MR. EISENMAN.

01:02PM   17       MY QUESTION, MR. EISENMAN, IS, DID THERANOS EVER GUARANTEE

01:02PM   18   TO YOU THAT THERE WOULD BE A PUBLIC MARKET WHERE YOU COULD SELL

01:02PM   19   YOUR SHARES?  YES OR NO?

01:02PM   20   A.   NO.

01:02PM   21   Q.   NOW, YOU ALSO KNEW THAT TO BUY THERANOS STOCK, YOU HAD TO

01:02PM   22   BE AN ACCREDITED INVESTOR; IS THAT RIGHT?

01:02PM   23   A.   YES.

01:02PM   24   Q.   AND WHAT THAT MEANS IS THAT YOU NEEDED TO HAVE A CERTAIN

01:02PM   25   LEVEL OF NET WORTH; RIGHT?

EISENMAN CROSS BY MS. WALSH

01:02PM   1    A.   CORRECT.

01:02PM   2    Q.   AND YOU REPRESENTED, WHEN YOU ENTERED INTO THE AGREEMENT

01:02PM   3    TO BUY THERANOS SHARES, THAT YOU COULD BEAR THE RISK OF LOSING

01:02PM   4    THAT INVESTMENT; IS THAT RIGHT?

01:02PM   5    A.   YES.

01:02PM   6    Q.   AND THAT IT WOULDN'T IMPAIR YOUR FINANCIAL CONDITION IF

01:02PM   7    YOU LOST YOUR INVESTMENT; CORRECT?

01:02PM   8    A.   CORRECT.

01:02PM   9    Q.   AND WHEN YOU SIGNED THAT SHARE PURCHASE AGREEMENT IN 2006,

01:03PM   10   YOU MADE THOSE REPRESENTATIONS; RIGHT?

01:03PM   11   A.   YES.

01:03PM   12   Q.   OKAY.  AND FOR YOUR 2006 INVESTMENT, YOU ALSO REPRESENTED

01:03PM   13   THAT YOU WERE AWARE THAT THIS WAS A SPECULATIVE INVESTMENT;

01:03PM   14   CORRECT?

01:03PM   15   A.   WELL, AGAIN, THAT'S NUANCED.  THAT'S WHAT THE LANGUAGE

01:03PM   16   SAYS IN THE PRIVATE PLACEMENT, OR THE AGREEMENT THAT I SIGNED,

01:03PM   17   WHICH IS SIMILAR TO AGREEMENTS THAT YOU ARE REQUESTED TO SIGN

01:03PM   18   ANY TIME YOU INVEST IN AN EARLY STAGE COMPANY, BUT IT SOMEWHAT

01:03PM   19   CONTRADICTED THE INFORMATION FLOW THAT I GOT BEFORE I MADE MY

01:03PM   20   INVESTMENT.

01:03PM   21   Q.   OKAY.  SO WITH REGARD TO THE 2006 AGREEMENT, IT WAS AN

01:03PM   22   AGREEMENT TO BUY SHARES; RIGHT?

01:03PM   23   A.   YES.

01:03PM   24   Q.   AND YOU SIGNED THE AGREEMENT; RIGHT?

01:03PM   25   A.   YES.

01:03PM    1      Q.   AND THERE WAS A PARAGRAPH IN THE AGREEMENT THAT SAID THIS

01:03PM    2      IS A SPECULATIVE INVESTMENT; IS THAT CORRECT?   YES OR NO?

01:03PM    3      A.   YES, CORRECT.

01:03PM    4      Q.   REGARDING YOUR 2006 INVESTMENT, YOU INVESTED A TOTAL OF

01:04PM    5      $1,134,243; IS THAT RIGHT?

01:04PM    6      A.   YES.

01:04PM    7      Q.   AND THE NUMBER OF SHARES THAT YOU BOUGHT WAS 402,214

01:04PM    8      SHARES?

01:04PM    9      A.   YES.

01:04PM   10      Q.   OKAY.   AND THE PRICE PER SHARE IN 2006 WAS $2.82; IS THAT

01:04PM   11      RIGHT?

01:04PM   12      A.   YES.

01:04PM   13      Q.   OKAY.   SO AFTER YOUR 2006 INVESTMENT, YOU TESTIFIED THAT

01:04PM   14      YOU GOT QUARTERLY UPDATES FROM THE COMPANY; CORRECT?

01:04PM   15      A.   CORRECT.

01:04PM   16      Q.   AND YOU GOT THOSE FROM MS. HOLMES; RIGHT?

01:04PM   17      A.   CORRECT.

01:04PM   18      Q.   AND THEY, AGAIN, THEY WERE EXCLUSIVELY FROM MS. HOLMES;

01:04PM   19      RIGHT?

01:04PM   20      A.   CORRECT.

01:04PM   21      Q.   AND YOU UNDERSTOOD, OR YOU NOW UNDERSTAND THAT MR. BALWANI

01:05PM   22      DID NOT EVEN JOIN THERANOS UNTIL 2009; IS THAT RIGHT?

01:05PM   23      A.   I DON'T RECALL WHEN HE JOINED.

01:05PM   24      Q.   OKAY.   BUT YOU KNOW HE WASN'T THERE IN 2006; RIGHT?

01:05PM   25      A.   I DON'T KNOW THAT FOR A FACT, BUT I PRESUME SO.

01:05PM   1    Q.   BECAUSE YOU NEVER COMMUNICATED WITH HIM AT THAT TIME;

01:05PM   2    CORRECT?

01:05PM   3    A.   THAT IS CORRECT.

01:05PM   4    Q.   AND YOU NEVER EVEN HEARD OF HIM AT THAT TIME; RIGHT?

01:05PM   5    A.   CORRECT.

01:05PM   6    Q.   YOU ALSO UNDERSTOOD, MR. EISENMAN, DIDN'T YOU, THAT YOU

01:05PM   7    HAD NO LEGAL RIGHT TO ADDITIONAL INFORMATION ABOUT THE COMPANY;

01:05PM   8    CORRECT?

01:05PM   9    A.   CORRECT.

01:05PM   10   Q.   ALL RIGHT.  SO NOW LET'S TURN TO THE TIME PERIOD 2010 TO

01:05PM   11   2013.

01:05PM   12        AND I'M GOING TO ASK YOU TO TURN IN YOUR BINDER TO

01:05PM   13   EXHIBIT 4 -- SORRY.  EXHIBIT 14103.

01:06PM   14   A.   OKAY.

01:06PM   15   Q.   OKAY.  LET ME JUST GET THERE.

01:06PM   16        ALL RIGHT.  14103 IS AN EMAIL CHAIN BETWEEN YOU AND

01:06PM   17   MS. HOLMES, IS IT NOT?

01:06PM   18   A.   YES.

01:06PM   19   Q.   AND THE DATE OF THE CHAIN RANGES FROM MAY 3RD TO MAY 11TH,

01:06PM   20   2010; RIGHT?

01:06PM   21   A.   YES.

01:06PM   22   Q.   AND THIS IS ABOUT YOU ATTEMPTING TO GET UPDATES FROM

01:06PM   23   MS. HOLMES ABOUT THERANOS; RIGHT?

01:06PM   24   A.   RIGHT.

01:06PM   25             MS. WALSH:  YOUR HONOR, WE OFFER 14103.

01:06PM   1            MR. BOSTIC:  NO OBJECTION.

01:06PM   2            THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:06PM   3        (DEFENDANT'S EXHIBIT 14103 WAS RECEIVED IN EVIDENCE.)

01:06PM   4    BY MS. WALSH:

01:06PM   5    Q.   OKAY.  SO LET'S GO TO THE FIRST EMAIL IN TIME.

01:07PM   6        (DISCUSSION OFF THE RECORD.)

01:07PM   7            THE CLERK:  I DON'T KNOW WHAT IS WRONG WITH THE

01:07PM   8    SCREEN.

01:07PM   9            MS. WALSH:  I THINK IT'S JUST MINE.

01:07PM  10            THE COURT:  ARE THE JUROR'S SCREENS UP?

01:07PM  11        YES.  ALL RIGHT.

01:07PM  12            MS. WALSH:  I CAN USE MY HARD COPY UNTIL WE FIX IT.

01:07PM  13            THE COURT:  THANK YOU.

01:07PM  14    BY MS. WALSH:

01:07PM  15    Q.   OKAY.  SO TURNING TO THE FIRST EMAIL IN TIME, THAT'S ON

01:07PM  16    MAY 3RD, 2010; RIGHT?

01:08PM  17    A.   YES.

01:08PM  18    Q.   DO YOU SEE THAT, MR. EISENMAN?

01:08PM  19    A.   YES.

01:08PM  20    Q.   OKAY.  AND IT'S FROM YOU TO ELIZABETH HOLMES; RIGHT?

01:08PM  21    A.   YES.

01:08PM  22    Q.   AND YOU'RE CC'ING CAROLYN BALKENHOL; RIGHT?

01:08PM  23    A.   YES.

01:08PM  24    Q.   AND WHO WAS CAROLYN BALKENHOL?

01:08PM  25    A.   ELIZABETH'S ADMINISTRATIVE ASSISTANT.

EISENMAN CROSS BY MS. WALSH

01:08PM 1   Q.   OKAY.  AND THE SUBJECT LINE IS JUNE QUARTERLY UPDATE.

01:08PM 2        DO YOU SEE THAT?

01:08PM 3   A.   YES.

01:08PM 4   Q.   AND WHAT YOU SAY IS, "ELIZABETH,

01:08PM 5        "CAN WE SCHEDULE OUR QUARTERLY UPDATE THE WEEK OF JUNE 1ST

01:08PM 6   THROUGH JUNE 4TH?

01:08PM 7        "SINCE IT HAS BEEN 2 MONTHS SINCE WE TALKED, AND WILL

01:08PM 8   PROBABLY BE ANOTHER MONTH UNTIL WE TALK AGAIN, I WAS WONDERING

01:08PM 9   IF YOU COULD EMAIL ME A RESPONSE TO THE FOLLOWING ITEMS?"

01:08PM 10       AND THEN YOU LIST ITEMS THAT YOU WANT INFORMATION ON?

01:08PM 11  A.   YES.

01:08PM 12  Q.   DO YOU SEE THAT?

01:08PM 13  A.   YES.

01:08PM 14  Q.   AND THE FIRST ITEM, YOU SAY, "YOU SAID THAT IN MARCH, YOU

01:08PM 15  WERE MANUFACTURING ABOUT 500,000 CARTRIDGES AND SELLING ABOUT

01:08PM 16  400,000 AT ABOUT $80 PER CARTRIDGE.  CAN YOU SHARE THE SAME

01:09PM 17  STATISTICS FOR APRIL, AND AN ESTIMATE FOR MAY?"

01:09PM 18       DO YOU SEE THAT?

01:09PM 19  A.   YES.

01:09PM 20  Q.   AND THE SECOND QUESTION YOU ASK IS, "ARE YOU ENTERTAINING

01:09PM 21  ANY THOUGHTS OF A SHAREHOLDER'S MEETING?  IF SO, WHEN?"

01:09PM 22       AND THE THIRD QUESTION IS, "IS THERE A POSSIBILITY OF AN

01:09PM 23  IPO IN THE FORESEEABLE FUTURE.  IF SO, WHEN?"

01:09PM 24       DO YOU SEE THAT?

01:09PM 25  A.   YES.

EISENMAN CROSS BY MS. WALSH

01:09PM 1    Q.   OKAY.  AND THEN THE NEXT EMAIL UP IS AGAIN FROM YOU TO

01:09PM 2    MS. HOLMES AND YOU SAY, "WOULD IT BE POSSIBLE TO GET A RESPONSE

01:09PM 3    TODAY?  I HAVE BEEN TRYING SINCE LAST MONDAY."

01:09PM 4        DO YOU SEE THAT?

01:09PM 5    A.   YES.

01:09PM 6    Q.   AND THEN IT LOOKS LIKE YOU EMAIL AGAIN JUST WITH NO TEXT;

01:09PM 7    RIGHT?

01:09PM 8        DO YOU SEE THAT IN THE MIDDLE AT 8:12 A.M.?

01:09PM 9    A.   YES.

01:09PM 10   Q.   OKAY.  AND THEN LET'S GO TO THE NEXT EMAIL UP.  AND THIS

01:09PM 11   IS FROM MS. HOLMES TO YOU AND SHE SAYS, "ALAN,

01:09PM 12       "I RECEIVED YOUR EMAILS, AND CAROLYN JUST RELAYED TO ME

01:10PM 13   THE VOICEMAIL YOU LEFT TODAY.  JUNE IS A TOUGH MONTH FOR US AND

01:10PM 14   I DON'T KNOW WHEN WE CAN DO OUR NEXT CALL.  AS YOU KNOW, WE

01:10PM 15   DON'T DO QUARTERLY CALLS WITH OUR OTHER INVESTORS, MANY OF WHOM

01:10PM 16   INVESTED MUCH GREATER AMOUNTS THAN YOU DID, AND I CANNOT COMMIT

01:10PM 17   TO AN EXACT QUARTERLY SCHEDULE GOING FORWARD."

01:10PM 18       DO YOU SEE THAT?

01:10PM 19   A.   YES.

01:10PM 20   Q.   AND THE NEXT PARAGRAPH SAYS, "AS DISCUSSED IN OUR CALL IN

01:10PM 21   MARCH, WE CANNOT PROVIDE THE LEVEL OF COMMUNICATION YOU KEEP

01:10PM 22   REQUESTING."

01:10PM 23       DO YOU SEE THAT?

01:10PM 24   A.   YES.

01:10PM 25   Q.   AND THEN SHE CONTINUES.

EISENMAN CROSS BY MS. WALSH

01:10PM 1    "WITH THE DEALS WE ARE FORMALIZING WITH RETAILERS, WE ARE

01:10PM 2    NOW OBLIGATED NOT TO DISCLOSE OUR PRODUCTION VOLUMES AND

01:10PM 3    CARTRIDGE SALE PRICES.  I CANNOT PROVIDE THE METRICS YOU ARE

01:10PM 4    REQUESTING IN YOUR EMAIL."

01:10PM 5        AND THEN SHE GOES ON.

01:10PM 6        "AT THIS POINT, WE ALSO DON'T HAVE ANY PLANS TO DO AN IPO

01:10PM 7    ANY TIME SOON.  IN LINE WITH MY COMMENT ABOVE, WE CURRENTLY DO

01:11PM 8    NOT HAVE A SHAREHOLDERS MEETING ON THE CALENDAR.  I WILL BE

01:11PM 9    REACHING OUT TO ALL SHAREHOLDERS IN THE COMING WEEKS TO

01:11PM 10   CIRCULATE THE OPPORTUNITY FOR LIQUIDATION I REFERENCED ON OUR

01:11PM 11   LAST CALL WITH EVERYONE."

01:11PM 12       DO YOU SEE THAT?

01:11PM 13   A.   YES.

01:11PM 14   Q.   AND THIS IS IN MAY 2010; RIGHT?

01:11PM 15   A.   YES.

01:11PM 16   Q.   OKAY.

01:11PM 17       THE LAST PARAGRAPH SAYS, "GIVEN YOUR FRUSTRATION LEVEL AND

01:11PM 18   OUR FRUSTRATION LEVEL WITH THIS INTERACTION, I STRONGLY

01:11PM 19   ENCOURAGE YOU TO RE-CONSIDER THE OPPORTUNITY I PRESENTED ON OUR

01:11PM 20   LAST CALL TO REALIZE THE RETURN ON YOUR INVESTMENT.  WE

01:11PM 21   RECOGNIZE YOU HAVE BEEN AN INVESTOR FOR SOME TIME, AND IF WE

01:11PM 22   PROCEED WITH THE TRANSACTION WE ARE PROPOSING WE CAN PROVIDE

01:11PM 23   YOU WITH A GREATER THAN 5 TIMES RETURN ON YOUR INVESTMENT IN

01:11PM 24   THERANOS.

01:11PM 25       "PLEASE LET ME KNOW."

EISENMAN CROSS BY MS. WALSH

01:11PM   1        DO YOU SEE THAT?

01:11PM   2   A.   YES.

01:11PM   3   Q.   OKAY.  AND AT THE TIME YOU GOT THIS EMAIL, YOU HAD NOT

01:12PM   4   SEEN ANY DOCUMENTS AT THE TIME RELATED TO ANY RETAIL

01:12PM   5   RELATIONSHIPS THERANOS WAS ENGAGING IN; IS THAT RIGHT?

01:12PM   6   A.   YES.

01:12PM   7   Q.   AND YOU WERE NOT AWARE AT THE TIME IF THERE WERE ANY

01:12PM   8   RESTRICTIONS PLACED ON THERANOS BY THE RETAIL RELATIONSHIPS ON

01:12PM   9   THE INFORMATION THEY COULD PROVIDE TO SHAREHOLDERS; IS THAT

01:12PM   10  RIGHT?

01:12PM   11  A.   YES.

01:12PM   12  Q.   AND YOU ALSO DON'T KNOW WHETHER THE FINAL AGREEMENT --

01:12PM   13  WHETHER IN THE FINAL AGREEMENT THERE WAS ANY RESTRICTION ON THE

01:12PM   14  INFORMATION THAT THERANOS COULD PROVIDE; CORRECT?

01:12PM   15  A.   CORRECT.

01:12PM   16  Q.   BECAUSE YOU NEVER SAW THE FINAL AGREEMENT; IS THAT RIGHT?

01:12PM   17  A.   YES.

01:12PM   18  Q.   OKAY.  OKAY.  NOW IF YOU CAN TURN IN YOUR BINDER TO

01:12PM   19  EXHIBIT 12285.

01:13PM   20       DO YOU HAVE THAT IN FRONT OF YOU?

01:13PM   21  A.   YES.

01:13PM   22  Q.   OKAY.  AND SO THIS IS AN EMAIL CHAIN BETWEEN YOU AND

01:13PM   23  MS. HOLMES; CORRECT?

01:13PM   24  A.   YES.

01:13PM   25  Q.   AND IT IS ON -- OR IT SPANS JUNE 8TH TO JUNE 18TH, 2010;

01:13PM   1    RIGHT?

01:13PM   2    A.   YES.

01:13PM   3    Q.   AND, AGAIN, IT RELATES TO YOUR SEEKING INFORMATION FROM

01:13PM   4    THERANOS; IS THAT RIGHT?

01:13PM   5    A.   YES.

01:13PM   6         MS. WALSH:  YOUR HONOR, WE OFFER 12285.

01:13PM   7         MR. BOSTIC:  801, YOUR HONOR.

01:13PM   8         MS. WALSH:  SO, YOUR HONOR, THIS AT LEAST GOES TO

01:14PM   9    MR. EISENMAN'S STATE OF MIND AS HE'S CONSIDERING INVESTING IN

01:14PM   10   THERANOS.

01:14PM   11        THE COURT:  SO NOT FOR THE TRUTH OF THE MATTER

01:14PM   12   ASSERTED IN THE EMAIL?  IS THAT WHAT YOU'RE SAYING?

01:14PM   13        MS. WALSH:  I MEAN, I DON'T THINK IT'S AN 801

01:14PM   14   PROBLEM, BUT TO THE EXTENT THAT THE COURT HAS ANY RESERVATION,

01:14PM   15   IT CERTAINLY IS RELEVANT AND NOT HEARSAY AS TO MR. EISENMAN'S

01:14PM   16   STATE OF MIND.

01:14PM   17        (PAUSE IN PROCEEDINGS.)

01:14PM   18        MR. BOSTIC:  ON THAT POINT, YOUR HONOR, I'M NOT SURE

01:14PM   19   THE FOUNDATION HAS BEEN LAID, BUT THIS ACTUALLY IMPACTED THIS

01:14PM   20   WITNESS'S STATE OF MIND.

01:15PM   21        THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR THE

01:15PM   22   STATE OF MIND ISSUE IF YOU CAN?

01:15PM   23        MS. WALSH:  SURE.  SURE, YOUR HONOR.

01:15PM   24   Q.   SO OVER THE COURSE OF THE YEARS, MR. EISENMAN, YOU WERE

01:15PM   25   TRYING TO GET INFORMATION FROM THERANOS; RIGHT?

EISENMAN CROSS BY MS. WALSH

01:15PM  1    A.   YES.

01:15PM  2    Q.   AND YOU SENT MANY EMAILS TO TRY TO DO THAT; CORRECT?

01:15PM  3    A.   CORRECT.

01:15PM  4    Q.   AND YOU ENGAGED IN EMAIL CORRESPONDENCE WITH MS. HOLMES

01:15PM  5    ESPECIALLY TO TRY TO GET INFORMATION FROM HER; RIGHT?

01:15PM  6    A.   YES.

01:15PM  7    Q.   AND IT WAS IMPORTANT FOR YOU TO GET INFORMATION FROM

01:15PM  8    THERANOS; CORRECT?

01:15PM  9    A.   CORRECT.

01:15PM 10    Q.   AND YOU HAD A LOT OF BACK AND FORTH WITH MS. HOLMES ABOUT

01:15PM 11    QUESTIONS YOU HAD AND RESPONSES THAT SHE GAVE; CORRECT?

01:15PM 12    A.   CORRECT.

01:15PM 13    Q.   AND IT WAS IMPORTANT TO YOUR DECISION TO INVEST AS TO THE

01:15PM 14    LEVEL OF INFORMATION THAT YOU WERE GETTING; RIGHT?

01:15PM 15    A.   WELL, THIS IS 2010.  I INVESTED IN 2006 AND AGAIN IN 2013.

01:16PM 16         SO THIS DIDN'T DIRECTLY RELATE TO MY DECISION TO INVEST.

01:16PM 17    Q.   RIGHT.  BUT OVER THE COURSE OF TIME, MR. EISENMAN, YOU

01:16PM 18    WERE EMAILING QUITE FREQUENTLY TO GET INFORMATION FROM

01:16PM 19    THERANOS, WERE YOU NOT?

01:16PM 20    A.   CORRECT.

01:16PM 21    Q.   AND THIS IS ONE OF THOSE EMAILS; RIGHT?

01:16PM 22    A.   YES.

01:16PM 23    Q.   AND GENERALLY GETTING INFORMATION FROM THERANOS WAS

01:16PM 24    IMPORTANT TO YOUR DECISION, TO YOUR INVESTMENT DECISIONS;

01:16PM 25    CORRECT?

01:16PM   1    A.   WELL, AGAIN, THIS IS 2010 AND I INVESTED FOUR YEARS BEFORE

01:16PM   2    AND MY NEXT INVESTMENT WAS THREE YEARS LATER.

01:16PM   3         SO IT DID NOT DIRECTLY RELATE TO A DECISION TO INVEST.

01:16PM   4    Q.   RIGHT.  BUT IT WAS IMPORTANT GENERALLY FOR YOU TO GET

01:16PM   5    INFORMATION FROM THERANOS, WASN'T IT?

01:16PM   6    A.   YES.

01:16PM   7              MS. WALSH:  YOUR HONOR, WE OFFER 12285.

01:16PM   8              MR. BOSTIC:  801, 403.

01:16PM   9              MS. WALSH:  YOUR HONOR, THIS WITNESS HAS TESTIFIED

01:16PM  10    ABOUT TRYING TO GET INFORMATION FROM THERANOS, AND THIS IS JUST

01:16PM  11    ANOTHER EXAMPLE OF HIM TRYING TO DO THIS.

01:17PM  12              MR. BOSTIC:  YOUR HONOR, NO OBJECTION TO THE

01:17PM  13    COMMUNICATION FROM THE WITNESS THAT SHOWS THAT.

01:17PM  14              MS. WALSH:  YOUR HONOR, THIS WITNESS HAS ALSO

01:17PM  15    TESTIFIED ABOUT THE IMPORTANCE OF LIQUIDATION EVENTS AND THIS

01:17PM  16    EMAIL DIRECTLY RESPONDS TO THAT.

01:17PM  17         AND EVEN IF WHAT IS IN IT IS TRUE OR NOT TRUE, IT GOES TO

01:17PM  18    HIS STATE OF MIND REGARDING THE OPPORTUNITIES TO LIQUIDATE.

01:17PM  19              THE COURT:  DO YOU WANT TO ASK HIM ABOUT THAT?

01:17PM  20              MS. WALSH:  SURE.

01:17PM  21    Q.   SO, MR. EISENMAN, SINCE YOU INVESTED IN 2006, YOU ASKED

01:17PM  22    MANY QUESTIONS ABOUT WHEN IT WAS THAT THERE WOULD BE AN

01:17PM  23    OPPORTUNITY TO LIQUIDATE YOUR INVESTMENT IN THERANOS; IS THAT

01:18PM  24    RIGHT?

01:18PM  25    A.   NOT EXACTLY.

01:18PM 1        I, I QUESTIONED THE COMPANY, OR ELIZABETH, ALONG THE WAY

01:18PM 2    ABOUT THE POTENTIAL FOR IPO, AND UPON AN IPO, THAT DOESN'T

01:18PM 3    NECESSARILY MEAN THAT I WOULD LIQUIDATE, BUT THERE WOULD BE AN

01:18PM 4    OPPORTUNITY IF THERE WAS A PUBLIC MARKET.

01:18PM 5    Q.   SO YOU QUESTIONED MS. HOLMES ABOUT OPPORTUNITIES TO

01:18PM 6    LIQUIDATE; IS THAT RIGHT?

01:18PM 7    A.   NO.  I QUESTIONED HER ABOUT OPPORTUNITIES ABOUT THE

01:18PM 8    POTENTIAL TIMING FOR AN IPO.

01:18PM 9    Q.   AND AN IPO IS AN OPPORTUNITY TO LIQUIDATE, ISN'T IT?

01:18PM 10   A.   IT MEANS THAT THERE IS A PUBLIC MARKET AND THEN YOU MAKE A

01:18PM 11   DECISION WHETHER TO LIQUIDATE.

01:18PM 12       I WAS NOT CONTEMPLATING A LIQUIDATION IN ANY OF THESE

01:18PM 13   CONVERSATIONS.  I WAS TRYING TO DETERMINE IF AND WHEN THERE

01:18PM 14   WOULD BE AN IPO.

01:18PM 15       SO, YES, THAT OPPORTUNITY WOULD BE THERE.  BUT THAT

01:18PM 16   DOESN'T NECESSARILY MEAN THAT I WOULD TAKE ADVANTAGE OF THAT

01:18PM 17   OPPORTUNITY.

01:18PM 18   Q.   RIGHT.

01:18PM 19       SO AN IPO GIVES YOU THE OPPORTUNITY TO LIQUIDATE YOUR

01:19PM 20   THERANOS SHARES; IS THAT RIGHT?

01:19PM 21   A.   THAT'S CORRECT.

01:19PM 22            MS. WALSH:  YOUR HONOR, WE OFFER 12285.

01:19PM 23            THE COURT:  YOU KNOW, IT SEEMS TO ME THAT THIS

01:19PM 24   INFORMATION IS ALREADY IN FRONT OF THE JURY THROUGH ANOTHER --

01:19PM 25   I DO SEE SOME 801 ISSUES WITH THE FIRST PAGE, PAGE 1.

01:19PM 1    LET ME JUST SUSTAIN THE OBJECTION AT THIS POINT, AND IF

01:19PM 2  YOU WANT TO LAY A FOUNDATION TO CHANGE THAT?

01:19PM 3    MS. WALSH:  OKAY.  AND, YOUR HONOR, ON THE HEARSAY

01:19PM 4  ISSUE, EVEN IF IT'S NOT COMING IN FOR THE TRUTH, SO THERE

01:19PM 5  WOULDN'T BE ANY 801 ISSUE.

01:19PM 6    THE COURT:  WELL, I SUPPOSE THEN IT'S A 104 ISSUE.

01:19PM 7  WHAT IS THE RELEVANCE OF SOME OF THIS OTHER -- THE COLLOQUY

01:19PM 8  HERE?

01:19PM 9    MS. WALSH:  JUST THE OPPORTUNITIES TO LIQUIDATE AND

01:19PM 10  THE QUESTIONS ABOUT --

01:19PM 11    THE COURT:  I'M SORRY TO INTERRUPT YOU.

01:20PM 12    THE SECOND PARAGRAPH MIGHT HAVE 403 ISSUES.

01:20PM 13    MS. WALSH:  THE SECOND PARAGRAPH OF MS. HOLMES'S

01:20PM 14  EMAIL?

01:20PM 15    THE COURT:  YES.

01:20PM 16    MS. WALSH:  I SEE.

01:20PM 17    WE CAN REDACT THAT PARAGRAPH.

01:20PM 18    I'M REALLY INTERESTED IN ONE SENTENCE IN THE FIRST

01:20PM 19  PARAGRAPH, THE THIRD PARAGRAPH, AND SOME OF THE BULLETS.

01:20PM 20    THAT SECOND PARAGRAPH, I'M HAPPY TO REDACT THAT.

01:20PM 21    THE COURT:  OKAY.  ALL RIGHT.

01:20PM 22    IF YOU COULD REDACT THE SECOND PARAGRAPH IN MS. HOLMES'S

01:20PM 23  EMAIL --

01:20PM 24    MS. WALSH:  GREAT.

01:20PM 25    THE COURT:  -- THEN I'LL ALLOW THIS TO COME IN.

01:20PM  1          MS. WALSH:  OKAY.  THANK YOU.

01:20PM  2       AND CAN IT BE PUBLISHED WITH THAT REDACTION?

01:20PM  3          THE COURT:  YES.  YES.

01:20PM  4          MS. WALSH:  GREAT.

01:20PM  5       (DEFENDANT'S EXHIBIT 12285, REDACTED, WAS RECEIVED IN

01:20PM  6   EVIDENCE.)

01:20PM  7   BY MS. WALSH:

01:20PM  8   Q.  SO TURNING TO THE FIRST EMAIL IN TIME, MR. EISENMAN, THIS

01:20PM  9   IS TUESDAY, JUNE 8TH, 2010, FROM YOU TO MS. HOLMES REGARDING A

01:20PM 10   JUNE CALL.

01:20PM 11       AND YOU SAY, "ELIZABETH,

01:21PM 12       I HAVE BEEN TRYING TO CONTACT YOU OR CAROLYN" --

01:21PM 13       THAT'S MS. HOLMES'S ASSISTANT; RIGHT?

01:21PM 14   A.  YES.

01:21PM 15   Q.  -- "FOR THE PAST WEEK BY EMAIL AND PHONE TO SCHEDULE OUR

01:21PM 16   JUNE CALL, AND A JULY MEETING.  IN MY 23 YEARS IN THE

01:21PM 17   INVESTMENT BUSINESS, I HAVE NEVER BEEN TREATED WITH SUCH

01:21PM 18   DISREGARD.  MY INVESTMENT MAY PALE IN COMPARISON TO SOME OF

01:21PM 19   YOUR OTHER INVESTORS, BUT IT IS EXTREMELY MATERIAL TO ME.  WILL

01:21PM 20   YOU OR CAROLYN PLEASE RESPOND REGARDING THE JUNE CALL AND THE

01:21PM 21   JULY MEETING."

01:21PM 22       AND THEN MS. HOLMES RESPONDS TO YOU AND SHE SAYS, "ALAN,

01:21PM 23       "AS I HAVE COMMUNICATED MULTIPLE TIMES, WE CANNOT COMMIT

01:21PM 24   TO QUARTERLY INVESTOR UPDATES, ESPECIALLY ON AN EXACT SCHEDULE.

01:21PM 25   WE ARE WORKING ON PROCESSING YOUR REQUEST TO GET YOU THE PAPERS

01:21PM 1    ON THE TRANSACTION TO SELL YOUR SHARES.  WE NEED TO PROCESS

01:21PM 2    THAT BEFORE SCHEDULING ANY MEETING AT THERANOS -- WHICH WOULD

01:21PM 3    NOT BE NECESSARY AT THAT POINT."

01:21PM 4        AND THEN GOING DOWN TO THE PARAGRAPH STARTING WITH "AS YOU

01:21PM 5    HAVE ACKNOWLEDGED, THERANOS IS AN EARLY STAGE LIFE SCIENCES

01:22PM 6    STARTUP AND BY IT'S VERY NATURE CARRIES IMMENSE RISK AND

01:22PM 7    UNPREDICTABILITY AS YOU ALREADY KNOW AS A SAVVY INVESTOR.  THIS

01:22PM 8    MAY NOT CHANGE FOR YEARS TO COME."

01:22PM 9        DO YOU SEE THAT, MR. EISENMAN?

01:22PM 10   A.   YES.

01:22PM 11   Q.   OKAY.  AND THEN GOING DOWN TO THE SECOND BULLET WHERE SHE

01:22PM 12   SAYS, "I HAVE INCLUDED ANSWERS TO YOUR QUESTIONS FROM YOUR

01:22PM 13   VARIOUS EMAILS BELOW."

01:22PM 14       THE SECOND BULLET SAYS, "PER YOUR QUESTION, WE DID NOT

01:22PM 15   ACHIEVE $200 MILLION IN SALES IN 2009."

01:22PM 16       DO YOU SEE THAT?

01:22PM 17   A.   YES.

01:22PM 18   Q.   SO SHE'S TELLING YOU WHAT THERANOS DID NOT ACHIEVE; RIGHT?

01:22PM 19   A.   RIGHT.

01:22PM 20   Q.   AND THEN IF WE GO DOWN TO THE FOURTH BULLET, SHE SAYS, "WE

01:22PM 21   CURRENTLY DO NOT HAVE PLANS TO GO IPO BY THE END OF 2011 AND DO

01:22PM 22   NOT HAVE 'A NEW WINDOW' PER YOUR EMAIL."

01:22PM 23       DO YOU SEE THAT?

01:22PM 24   A.   YES.

01:22PM 25   Q.   OKAY.  WE CAN TAKE THAT DOWN.

01:23PM   1          IF YOU CAN TURN IN YOUR BINDER TO 14224.

01:23PM   2     A.   OKAY.

01:23PM   3     Q.   IS THAT AN EMAIL BETWEEN YOU AND MS. HOLMES, CC'ING

01:23PM   4     DAVID HARRIS AND CAROLYN BALKENHOL?

01:23PM   5     A.   YES.

01:23PM   6     Q.   AND THAT'S -- THE DATE OF THE EMAIL IS JULY 1ST, 2010; IS

01:23PM   7     THAT RIGHT?

01:23PM   8     A.   YES.

01:23PM   9     Q.   AND IT RELATES TO A DECISION TO SELL STOCK; CORRECT?

01:23PM   10    A.   YES.

01:23PM   11         MS. WALSH:   YOUR HONOR, WE OFFER 14224.

01:23PM   12         MR. BOSTIC:   NO OBJECTION.

01:23PM   13         THE COURT:   IT'S ADMITTED.   IT MAY BE PUBLISHED.

01:23PM   14         (DEFENDANT'S EXHIBIT 14224 WAS RECEIVED IN EVIDENCE.)

01:23PM   15    BY MS. WALSH:

01:23PM   16    Q.   OKAY.  SO THIS EMAIL, MR. EISENMAN, IS ABOUT A MONTH AFTER

01:23PM   17    THE EMAIL THAT WE LAST -- JUST SAW FROM MS. HOLMES WHERE SHE

01:23PM   18    WAS TALKING ABOUT AN OFFER TO -- SO THAT YOU COULD SELL YOUR

01:24PM   19    STOCK; RIGHT?

01:24PM   20    A.   RIGHT.

01:24PM   21    Q.   AND WHAT YOU SAY IN THIS EMAIL IS, "ELIZABETH,

01:24PM   22         "I HAVEN'T MADE A DECISION WHETHER TO SELL STOCK."

01:24PM   23         AND THEN, "ACCORDINGLY, I WOULD GREATLY APPRECIATE IF YOU

01:24PM   24    WOULD TRY TO SCHEDULE OUR QUARTERLY UPDATE," AND SO FORTH.

01:24PM   25         DO YOU SEE THAT?

01:24PM  1    A.   YES.

01:24PM  2    Q.   AND SO YOU HADN'T DECIDED WHETHER YOU WERE GOING TO SELL

01:24PM  3    YOUR STOCK; RIGHT?

01:24PM  4    A.   CORRECT.

01:24PM  5    Q.   OKAY.  LET'S TURN TO 14225.

01:24PM  6    A.   OKAY.

01:24PM  7    Q.   OKAY.  AND THIS IS AN EMAIL CHAIN BETWEEN YOU AND

01:24PM  8    MS. HOLMES AND MS. BALKENHOL IN JULY 2010 ALSO TALKING ABOUT

01:24PM  9    TRYING TO GET INFORMATION REGARDING THERANOS.

01:24PM  10       DO YOU SEE THAT?

01:24PM  11   A.   YES.

01:24PM  12   Q.   OKAY.  AND IT'S -- YOU WANT TO KNOW VARIOUS PIECES OF

01:25PM  13   INFORMATION.

01:25PM  14       YOU'RE EMAILING THEM TRYING TO GET THIS INFORMATION AS A

01:25PM  15   PART OF JUST KEEPING UP WITH WHAT THERANOS WAS DOING; RIGHT?

01:25PM  16   A.   YES.

01:25PM  17   Q.   MONITORING YOUR INVESTMENT; CORRECT?

01:25PM  18   A.   IT WAS, IT WAS MONITORING THE INVESTMENT GENERALLY.

01:25PM  19       BUT SPECIFICALLY IT WAS POTENTIALLY AN OFFER TO BUY STOCK,

01:25PM  20   SO I WAS PURSUING THAT OFFER, AND ALSO TRYING TO PURSUE WHAT

01:25PM  21   INFORMATION THEY WOULD SHARE TO MAKE AN INTELLIGENT DECISION

01:25PM  22   WHETHER OR NOT TO SELL STOCK.

01:25PM  23   Q.   OKAY.  SO YOU WERE MAKING IT -- YOU WANTED INFORMATION TO

01:25PM  24   MAKE AN ASSESSMENT; CORRECT?

01:25PM  25   A.   CORRECT.

01:25PM  1      Q.   OKAY.

01:25PM  2           YOUR HONOR, WE OFFER 14225.

01:25PM  3             MR. BOSTIC:  NO OBJECTION.

01:25PM  4             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:25PM  5           (DEFENDANT'S EXHIBIT 14225 WAS RECEIVED IN EVIDENCE.)

01:25PM  6      BY MS. WALSH:

01:25PM  7      Q.   LET'S TURN TO THE FIRST EMAIL IN TIME.

01:25PM  8           THIS IS FROM YOU TO ELIZABETH HOLMES, CC'ING DAVID HARRIS

01:25PM  9      AND CAROLYN BALKENHOL, AND THAT'S ON JULY 13TH, 2010.

01:26PM  10          AND YOU SAY, "ELIZABETH,

01:26PM  11          "I HEARD YESTERDAY THAT YOU COMPLETED AN EQUITY OFFERING.

01:26PM  12     I ALSO HEARD FROM DAVID THAT THE OFFER TO BUY STOCK MAY NOT

01:26PM  13     COME UNTIL YEAR END, INSTEAD OF BY THE END OF THE SUMMER."

01:26PM  14          AND THEN YOU SAY AT THE END, "ALSO, CAN YOU PLEASE TELL ME

01:26PM  15     WHAT VALUATION THIS EQUITY ROUND WAS PRICED?"

01:26PM  16          SO YOU WANT TO KNOW THE PRICE; RIGHT?

01:26PM  17     A.   RIGHT.

01:26PM  18     Q.   AND THEN IN RESPONSE MS. HOLMES SAYS, "ALAN,

01:26PM  19          "PER MY PREVIOUS EMAIL I WILL CALL YOU WHEN WE HAVE

01:26PM  20     SOMETHING CONCRETE."

01:26PM  21          DO YOU SEE THAT?

01:26PM  22     A.   YES.

01:26PM  23     Q.   AND THEN YOU SAY, "ELIZABETH,

01:26PM  24          "I AM REALLY TRYING TO KEEP MY EMAILS TO A MINIMUM.  CAN

01:26PM  25     YOU RESPOND TO MY INQUIRY BELOW ABOUT THE PRICING OF THE EQUITY

01:26PM 1    ROUND AND IF THE OFFER TO BUY OUR STOCK IS DELAYED UNTIL YEAR

01:26PM 2    END?

01:26PM 3         "ALSO, YOUR RESPONSE TO AN UPDATE CALL IS VAGUE.  DO YOU

01:27PM 4    THINK YOU CAN SCHEDULE A MEETING?"

01:27PM 5         DO YOU SEE THAT?

01:27PM 6    A.   YES.

01:27PM 7    Q.   AND LET'S GO TO THE NEXT ONE UP IN THE EMAIL CHAIN.  THIS

01:27PM 8    ONE YOU TOOK MS. HOLMES OFF OF THE CHAIN; RIGHT?  THIS IS THE

01:27PM 9    ONE AT 1:14 P.M.?

01:27PM 10   A.   AGAIN, I DON'T RECALL -- THIS MAY HAVE BEEN INTENDING TO

01:27PM 11   GO TO ELIZABETH AND FOR SOME REASON IT ONLY GOT SENT TO HER

01:27PM 12   ADMINISTRATIVE ASSISTANT.

01:27PM 13   Q.   OKAY.  BUT ELIZABETH HOLMES DOES NOT APPEAR ON THIS EMAIL;

01:27PM 14   RIGHT?

01:27PM 15   A.   RIGHT.

01:27PM 16   Q.   AND SO YOU'RE EMAILING HER ASSISTANT; CORRECT?

01:27PM 17   A.   YES.

01:27PM 18   Q.   AND THEN YOU SAY, "AS YOU CAN SEE, THIS WAS SENT ON

01:27PM 19   JULY 13TH, AND AGAIN ON JULY 16TH WITH NO RESPONSE.  CAN YOU,"

01:27PM 20   THEN IN ALL CAPS, "PLEASE RESPOND TODAY?"

01:27PM 21        DO YOU SEE THAT?

01:27PM 22   A.   YES.

01:27PM 23   Q.   AND YOU WERE AWARE, MR. EISENMAN, THAT PUTTING ALL CAPS IN

01:27PM 24   EMAILS IS YELLING IN AN EMAIL.

01:27PM 25        WERE YOU AWARE OF THAT?

01:27PM  1    A.   NO.

01:27PM  2    Q.   LET'S GO TO THE NEXT PART OF THE CHAIN.

01:28PM  3         THIS IS FROM MS. HOLMES'S ASSISTANT TO YOU AND SHE SAYS,

01:28PM  4    "ALAN,

01:28PM  5         "I HAVEN'T BEEN RESPONDING, BECAUSE I DON'T HAVE ANY NEW

01:28PM  6    INFORMATION FOR YOU, AND I ASSUMED THAT WOULD ONLY FRUSTRATE

01:28PM  7    YOU.  I ASSURE YOU THAT AS SOON AS I HAVE NEW INFORMATION, YOU

01:28PM  8    WILL BE THE VERY FIRST TO KNOW."

01:28PM  9         DO YOU SEE THAT?

01:28PM 10    A.   YES.

01:28PM 11    Q.   AND THEN LET'S GO UP TO THE NEXT PART OF THE CHAIN, WHICH

01:28PM 12    IS YOUR RESPONSE TO, AGAIN, MS. HOLMES'S ASSISTANT.

01:28PM 13         AND YOU SAY, "SURELY YOU CAN TELL ME THE PRICING OF THE

01:28PM 14    EQUITY OFFERING.  IF YOU DON'T KNOW, PLEASE ASK ELIZABETH.  SHE

01:28PM 15    SHOULD ALSO BE ABLE TO LET ME KNOW IF THE OFFERING MATERIALS

01:28PM 16    HAVE BEEN DELAYED.  IN HER ORIGINAL COMMUNICATION TO ME, SHE

01:28PM 17    SAID WE WOULD RECEIVE THEM THIS SUMMER.  IN HER COMMUNICATION

01:28PM 18    TO DAVID, SHE SAID WE WOULD RECEIVE THEM BY THE END OF THE

01:28PM 19    YEAR.  IF ELIZABETH WOULD SCHEDULE OUR CALL, SHE COULD CLEAR UP

01:29PM 20    A LOT OF THIS CONFUSION.  WE ARE ALMOST INTO AUGUST FOR OUR

01:29PM 21    JUNE CALL.  MY WIFE IS A PARTNER IN THIS INVESTMENT, AND THE

01:29PM 22    TWO OF US REALLY DON'T APPRECIATE THE COMMUNICATION BREAKDOWN."

01:29PM 23         DO YOU SEE THAT?

01:29PM 24    A.   YES.

01:29PM 25    Q.   AND THEN YOU EMAIL AGAIN, I GUESS THIS IS AN HOUR LATER ON

01:29PM  1    THE SAME DAY, TO MS. HOLMES'S ASSISTANT.

01:29PM  2         "I WOULD GREATLY APPRECIATE AN ANSWER TODAY.  THANKS

01:29PM  3    AGAIN, ALAN."

01:29PM  4         DO YOU SEE THAT?

01:29PM  5    A.   YES.

01:29PM  6    Q.   AND THEN YOU EMAIL AGAIN A COUPLE OF DAYS LATER AND YOU

01:29PM  7    SAY, "NEITHER OF US WANTS TO HAVE MULTIPLE EMAILS FOR WHAT

01:29PM  8    SHOULD BE A STRAIGHTFORWARD AND SIMPLE REQUEST FOR INFORMATION.

01:29PM  9    IS THERE A REASON YOU HAVEN'T ANSWERED THE EMAIL BELOW?  I

01:29PM  10   WOULD GREATLY APPRECIATE A RESPONSE TODAY."

01:29PM  11        DO YOU SEE THAT?

01:29PM  12   A.   YES.

01:29PM  13   Q.   AND THEN THE NEXT EMAIL UP IS THE NEXT DAY, AND YOU EMAIL

01:29PM  14   MS. HOLMES'S ASSISTANT, COPYING MS. HOLMES AGAIN, YOU PUT HER

01:29PM  15   BACK INTO THE CHAIN, AND YOU SAY, "IS THERE A REASON MY EMAILS

01:29PM  16   ARE NOT GETTING A RESPONSE?  THIS IS UPSETTING TO BOTH ME AND

01:30PM  17   MY WIFE.  PLEASE CALL OR EMAIL TODAY."

01:30PM  18        DO YOU SEE THAT?

01:30PM  19   A.   YES.

01:30PM  20   Q.   AND THEN MS. HOLMES FINALLY RESPONDS AT THE END OF THE

01:30PM  21   CHAIN AND SHE SAYS, "ALAN,

01:30PM  22        "YOUR CONTINUED DAILY CALLS AND EMAILS AFTER WE'VE ALREADY

01:30PM  23   TOLD YOU MULTIPLE TIMES THAT WE DO NOT HAVE ADDITIONAL

01:30PM  24   INFORMATION WE CAN DISCLOSE BEYOND WHAT WE'VE ALREADY SHARED

01:30PM  25   WITH DAVID ARE UPSETTING TO US.  ONCE WE HAVE ADDITIONAL

01:30PM   1       INFORMATION WE CAN SHARE WITH YOU WE WILL CONTACT YOU AS

01:30PM   2       MENTIONED MULTIPLE TIMES BEFORE -- YOU'RE NOT GETTING A

01:30PM   3       RESPONSE BECAUSE IT IS NOT AN EFFECTIVE USE OF OUR TIME TO KEEP

01:30PM   4       REPEATING THIS."

01:30PM   5           DO YOU SEE THAT?

01:30PM   6       A.   YES.

01:30PM   7       Q.   OKAY.  WE CAN TAKE THAT DOWN.

01:30PM   8           NOW, IF YOU COULD TURN TO 14226 IN YOUR BINDER.

01:31PM   9           DO YOU SEE THAT?

01:31PM  10       A.   YES.

01:31PM  11       Q.   AND IS THIS ANOTHER EMAIL CHAIN BETWEEN YOU AND MS. HOLMES

01:31PM  12       TRYING TO GET INFORMATION ABOUT THERANOS?

01:31PM  13       A.   YES.

01:31PM  14       Q.   AND THIS IS IN SEPTEMBER 2010; IS THAT RIGHT?

01:31PM  15       A.   YES.

01:31PM  16               MS. WALSH:  YOUR HONOR, WE OFFER 14226.

01:31PM  17               MR. BOSTIC:  NO OBJECTION.

01:31PM  18               THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:31PM  19           (DEFENDANT'S EXHIBIT 14226 WAS RECEIVED IN EVIDENCE.)

01:31PM  20       BY MS. WALSH:

01:31PM  21       Q.   OKAY.  TURNING TO THE FIRST EMAIL IN TIME FROM YOU TO

01:31PM  22       MS. HOLMES ON SEPTEMBER 27TH, 2010, THE SUBJECT LINE IS

01:31PM  23       LARRY ELLISON.

01:31PM  24           "ELIZABETH,

01:31PM  25           "I NOTICED THAT LARRY IS NOT CURRENTLY LISTED AS A

EISENMAN CROSS BY MS. WALSH

| | |
|---|---|
| 01:31PM 1 | DIRECTOR.  DID HE GO OFF THE BOARD?  IF SO, WHY?  ALSO, DO YOU |
| 01:31PM 2 | HAVE ANY VISIBILITY WHEN WE WILL RECEIVE INFORMATION ABOUT THE |
| 01:31PM 3 | DUTCH OFFER?" |
| 01:31PM 4 | DO YOU SEE THAT? |
| 01:31PM 5 | A.   YES. |
| 01:31PM 6 | Q.   OKAY.  AND THEN SHE RESPONDS, "ALAN, |
| 01:31PM 7 | "I RECEIVED THIS EMAIL FROM SATURDAY AS WELL -- AT THIS |
| 01:31PM 8 | POINT, PER OUR CALL, THERE IS NO NEW INFORMATION TO BE SHARED |
| 01:31PM 9 | WITH OUR INVESTOR BASE.  AS DISCUSSED, WHEN WE COMMUNICATE |
| 01:32PM 10 | ANYTHING WITH OUR INVESTOR BASE, YOU WILL BE INCLUDED ON THOSE |
| 01:32PM 11 | COMMUNICATIONS AS WELL." |
| 01:32PM 12 | DO YOU SEE THAT? |
| 01:32PM 13 | A.   YES. |
| 01:32PM 14 | Q.   OKAY.  WE CAN TAKE THAT DOWN. |
| 01:32PM 15 | LET'S GO TO 12185. |
| 01:32PM 16 | DO YOU SEE THAT? |
| 01:32PM 17 | A.   YES. |
| 01:32PM 18 | Q.   OKAY.  THIS IS AN EMAIL IN FEBRUARY 2011.  SO WE'RE |
| 01:32PM 19 | MARCHING FORWARD IN TIME THROUGH THE YEARS.  WE'RE NOW IN 2011. |
| 01:32PM 20 | AND IT'S BETWEEN YOU AND MS. HOLMES AND MR. BALWANI. |
| 01:32PM 21 | DO YOU SEE THAT? |
| 01:32PM 22 | A.   YES. |
| 01:32PM 23 | Q.   AND THIS IS ANOTHER EXAMPLE OF YOUR TRYING TO GET |
| 01:33PM 24 | INFORMATION ABOUT THE COMPANY AGAIN; CORRECT? |
| 01:33PM 25 | A.   CORRECT. |

01:33PM 1    Q.   AND IT RELATES TO A POSSIBLE TENDER AND THE BUSINESS;

01:33PM 2    CORRECT?

01:33PM 3    A.   CORRECT.

01:33PM 4         MS. WALSH:  YOUR HONOR, WE OFFER 12185.

01:33PM 5         MR. BOSTIC:  NO OBJECTION.

01:33PM 6         THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:33PM 7         (DEFENDANT'S EXHIBIT 12185 WAS RECEIVED IN EVIDENCE.)

01:33PM 8    BY MS. WALSH:

01:33PM 9    Q.   ALL RIGHT.  LET'S START WITH THE FIRST EMAIL IN TIME.

01:33PM 10        ON JANUARY 31ST, MR. EISENMAN, YOU EMAIL MS. HOLMES AND

01:33PM 11   MR. BALWANI.

01:33PM 12        AND WHAT YOU SAY IS "ANOTHER 2 MONTHS HAVE PASSED WITHOUT

01:33PM 13   ANY UPDATES ON THE TENDER OR THE BUSINESS.  CAN WE SCHEDULE A

01:33PM 14   CALL SOMETIME OVER THE NEXT COUPLE OF WEEKS?"

01:33PM 15        AND THEN MR. BALWANI REPLIES ON FEBRUARY 1ST AND HE SAYS,

01:33PM 16   "THERE IS NO QUARTERLY UPDATE WE PROVIDE.  AS MENTIONED TO YOU

01:33PM 17   BEFORE, WE WILL SEND UPDATES TO ALL INVESTORS AT THE SAME

01:33PM 18   TIME."

01:33PM 19        DO YOU SEE THAT?

01:33PM 20   A.   YES.

01:34PM 21   Q.   AND THEN YOU RESPOND IN THE NEXT PART OF THE CHAIN.

01:34PM 22        AND YOU'RE SENDING IT TO MR. BALWANI, BUT YOU SAY

01:34PM 23   "ELIZABETH,

01:34PM 24        "YOU HAVE PROVIDED A QUARTERLY UPDATE TO ME, AND SOMETIMES

01:34PM 25   TO OTHER INVESTORS, FROM THE TIME I INVESTED IN THERANOS OVER

EISENMAN CROSS BY MS. WALSH

01:34PM 1      4 YEARS AGO, UNTIL THE MIDDLE OF LAST YEAR.  YOU ALSO INDICATED

01:34PM 2      THAT THERE WOULD BE THE KIND OF INFORMATION I WAS LOOKING FOR

01:34PM 3      WHEN THE TENDER MATERIALS WERE TO BE CIRCULATED.  NOW, YOU HAVE

01:34PM 4      LEFT US TOTALLY CLUELESS IF AND WHEN THESE MATERIALS WILL BE

01:34PM 5      CIRCULATED.  I UNDERSTAND YOU DON'T HAVE AN OBLIGATION TO

01:34PM 6      UPDATE US, BUT IT WOULD BE APPRECIATED IF YOU WOULD ARRANGE A

01:34PM 7      CALL."

01:34PM 8          DO YOU SEE THAT?

01:34PM 9      A.   YES.

01:34PM 10     Q.   AND THEN YOU EMAIL AGAIN A FEW DAYS LATER, I GUESS THREE

01:34PM 11     DAYS LATER, SAYING, "ELIZABETH,

01:34PM 12         "SENT 3 DAYS AGO WITH NO RESPONSE.  CAN YOU PLEASE EMAIL

01:34PM 13     OR CALL THIS WEEKEND IF YOU ARE TOO BUSY TODAY."

01:35PM 14         AND THEN MR. BALWANI RESPONDS, "ALAN.

01:35PM 15         WE HAVE ALREADY RESPONDED TO YOUR EMAILS.  NOTHING MORE TO

01:35PM 16     ADD."

01:35PM 17         DO YOU SEE THAT?

01:35PM 18     A.   YES.

01:35PM 19     Q.   WE CAN TAKE THAT DOWN.

01:35PM 20         LET'S GO TO 12252.  AGAIN, WE ARE GOING FORWARD IN TIME.

01:35PM 21         I'LL WAIT UNTIL YOU GET THERE.  OKAY.

01:35PM 22         IS THIS AN EMAIL ON MAY 16TH, 2012?

01:35PM 23     A.   YES.

01:35PM 24     Q.   AND IT'S FROM -- IT'S BETWEEN YOU AND A PERSON NAMED

01:35PM 25     NANCY MINNIG; CORRECT?

01:35PM   1      A.   CORRECT.

01:35PM   2      Q.   AND NANCY MINNIG WAS THE ASSISTANT FOR DON LUCAS; CORRECT?

01:35PM   3      A.   CORRECT.

01:35PM   4      Q.   AND DON LUCAS WAS ON THE BOARD OF THERANOS; RIGHT?

01:35PM   5      A.   RIGHT.

01:35PM   6      Q.   AND THIS IS ANOTHER EMAIL OF YOU TRYING TO GET INFORMATION

01:35PM   7      ABOUT THERANOS; CORRECT?

01:35PM   8      A.   CORRECT.

01:35PM   9              MS. WALSH:  YOUR HONOR, WE OFFER 12252.

01:36PM  10              MR. BOSTIC:  NO OBJECTION.

01:36PM  11              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:36PM  12         (DEFENDANT'S EXHIBIT 12252 WAS RECEIVED IN EVIDENCE.)

01:36PM  13      BY MS. WALSH:

01:36PM  14      Q.   SO ON THE BOTTOM EMAIL, MS. MINNIG SAYS, "HI ALAN,

01:36PM  15         "MY APOLOGIES FOR NOT GETTING BACK TO YOU.  I SPOKE TO DON

01:36PM  16      AND HE DOESN'T HAVE ANY FURTHER INFORMATION AT THIS TIME.

01:36PM  17      THERE HAVE BEEN ARTICLES IN THE NEWS AS YOU HAD MENTIONED YOU

01:36PM  18      WERE AWARE OF AND DON SUGGESTED THAT YOU CONTINUE TO FOLLOW THE

01:36PM  19      COMPANY IN THIS MANNER.  WHEN THERE IS INFORMATION THAT DON CAN

01:36PM  20      SHARE WITH YOU WE WILL BE IN TOUCH."

01:36PM  21         AND THEN YOU RESPOND, "THANKS NANCY.  CAN YOU ASK DON IF

01:36PM  22      IT IS REASONABLE TO EXPECT SOME TYPE OF UPDATE THIS YEAR?"

01:36PM  23         DO YOU SEE THAT?

01:36PM  24      A.   YES.

01:36PM  25      Q.   AND AT SOME POINT AFTER THIS EMAIL, YOU LEARNED THAT

01:36PM  1      MR. LUCAS RELAYED TO MS. HOLMES THAT YOU HAD TRIED TO CONTACT

01:36PM  2      HIM; IS THAT RIGHT?

01:36PM  3      A.   YES.

01:36PM  4      Q.   OKAY.  SO LET'S TURN TO 713 IN YOUR BINDER.

01:37PM  5           I THINK THIS IS IN EVIDENCE, 713?

01:37PM  6                THE COURT:  DO YOU SHOW IT IN EVIDENCE, CHERE?

01:37PM  7                THE CLERK:  NO.

01:37PM  8                THE COURT:  OKAY.

01:37PM  9      BY MS. WALSH:

01:37PM  10     Q.   DO YOU HAVE 713 IN FRONT OF YOU?

01:37PM  11     A.   YES.

01:37PM  12     Q.   AND THIS IS ANOTHER EMAIL CHAIN WITH MS. MINNIG; RIGHT?

01:37PM  13     A.   RIGHT.

01:37PM  14     Q.   AND THAT IS NOVEMBER 2012; CORRECT?

01:37PM  15     A.   CORRECT.

01:37PM  16     Q.   AND THIS IS MORE COMMUNICATIONS OF YOU TRYING TO GET

01:37PM  17     INFORMATION FROM MR. LUCAS; RIGHT?

01:37PM  18     A.   CORRECT.

01:37PM  19                MS. WALSH:  YOUR HONOR, WE OFFER 713.

01:37PM  20                MR. BOSTIC:  NO OBJECTION.

01:37PM  21                THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:37PM  22          (GOVERNMENT'S EXHIBIT 713 WAS RECEIVED IN EVIDENCE.)

01:38PM  23     BY MS. WALSH:

01:38PM  24     Q.   LET'S GO TO PAGE 3.

01:38PM  25                AND THIS IS FROM MS. MINNIG TO MS. HOLMES ON

01:38PM 1    NOVEMBER 19TH, 2012.

01:38PM 2          AND SHE SAYS, "HELLO ELIZABETH,

01:38PM 3          "PLEASE SEE THE NOTE BELOW FROM ALAN EISENMAN.  WOULD YOU

01:38PM 4    PLEASE HAVE THE APPROPRIATE PERSON GET IN TOUCH WITH HIM TO

01:38PM 5    PROVIDE A STATUS REPORT?  DON DOES NOT WANT TO GET INVOLVED IN

01:38PM 6    COMMUNICATIONS REGARDING THERANOS WITH ANY OF ITS

01:38PM 7    SHAREHOLDERS."

01:38PM 8          DO YOU SEE THAT?

01:38PM 9    A.    YES.

01:38PM 10   Q.    AND THEN SHE EMAILS YOU AND SAYS, "ALAN," -- "SHE" BEING

01:38PM 11   MS. HOLMES; RIGHT?  MS. HOLMES EMAILS YOU; RIGHT?

01:38PM 12   A.    RIGHT.

01:38PM 13   Q.    AND SHE SAYS, "ALAN,

01:38PM 14         "WE HAVE COMMUNICATED ABOUT THIS MULTIPLE TIMES BEFORE,

01:38PM 15   YET YOU CHOOSE TO CONTINUE TO GO DOWN THIS PATH."

01:38PM 16         DO YOU SEE THIS?

01:38PM 17   A.    YES.

01:39PM 18   Q.    AND THEN YOU REPLY TO HER, "ELIZABETH,

01:39PM 19         "IT HAS BEEN OVER 2 YEARS SINCE YOU HAVE COMMUNICATED WITH

01:39PM 20   YOUR INVESTORS.  I EMAILED YOU ONE WEEK AGO, FOLLOWING YOUR

01:39PM 21   INSTRUCTIONS TO DAVID HARRIS THAT INVESTORS SHOULD COMMUNICATE

01:39PM 22   DIRECTLY WITH THE COMPANY FOR AN UPDATE.  WHEN I DIDN'T GET A

01:39PM 23   RESPONSE SIX DAYS LATER, I REACHED OUT TO YOUR CHAIRMAN.  I DO

01:39PM 24   NOT UNDERSTAND YOUR EMAIL.  DOES THIS MEAN THAT YOU CAN OR

01:39PM 25   WON'T COMMUNICATE WITH ME OR THE OTHER INVESTORS?  I WAS LED TO

01:39PM   1    BELIEVE THAT THERE WOULD BE EVENTS HAPPENING BEFORE THE END OF

01:39PM   2    2012 THAT WOULD BE PUBLICLY COMMUNICATED.  HAS THIS CHANGED?"

01:39PM   3         DO YOU SEE THAT?

01:39PM   4    A.   YES.

01:39PM   5    Q.   AND THEN MS. HOLMES EMAILS YOU BACK SAYING, "NO, ALAN, IT

01:39PM   6    HAS BEEN ABOUT THAT LONG SINCE YOU DECIDED TO START HARASSING

01:39PM   7    OUR CHAIRMAN, DESPITE THE FACT THAT WE COMMUNICATED MULTIPLE

01:39PM   8    TIMES THAT IF YOU DID SO, WE WOULD NO LONGER RESPOND TO YOUR

01:39PM   9    REQUESTS TO TALK WITH YOU IN LIGHT OF ALL OF OUR PAST

01:39PM  10    INTERACTIONS.  TO THE COMPANY'S AMAZEMENT, YOU HAVE CONTINUED

01:39PM  11    TO DO SO ON AN ONGOING BASIS EVER SINCE WE HAD THOSE

01:40PM  12    CONVERSATIONS WITH YOU."

01:40PM  13         DO YOU SEE THAT?

01:40PM  14    A.   YES.

01:40PM  15    Q.   OKAY.  THEN YOU EMAIL MS. MINNIG AGAIN AND YOU SAY, I

01:40PM  16    DON'T KNOW HOW TO REACT TO ELIZABETH'S EMAIL, AND YOU APOLOGIZE

01:40PM  17    IF YOU WERE OUT OF LINE.

01:40PM  18         AND YOU ASK HER, IS THERE A HAPPY MEDIUM THAT YOU OR DON

01:40PM  19    CAN SUGGEST?

01:40PM  20         AND SHE EMAILS YOU BACK SAYING, "HELLO ALAN,

01:40PM  21         "OUR OFFICE DOES NOT HAVE ANY FURTHER SUGGESTIONS TO OFFER

01:40PM  22    YOU."

01:40PM  23         DO YOU SEE THAT?

01:40PM  24    A.   YES.

01:40PM  25    Q.   OKAY.  AND THEN AFTER MR. LUCAS DECLINED TO COMMUNICATE

01:40PM 1    WITH YOU, YOU TRIED CONTACTING OTHER THERANOS BOARD MEMBERS; IS

01:40PM 2    THAT RIGHT?

01:40PM 3    A.   CAN YOU BE MORE SPECIFIC?

01:40PM 4    Q.   SURE.  YOU REACHED OUT TO BILL FRIST; IS THAT RIGHT?

01:40PM 5    A.   THAT IS A BOARD MEMBER, NOT MEMBERS.

01:40PM 6    Q.   SURE.  DID YOU REACH OUT TO BILL FRIST?

01:41PM 7    A.   YES, I DID.

01:41PM 8    Q.   OKAY.  AND HE'S A FORMER SENATOR; RIGHT?

01:41PM 9    A.   YES.

01:41PM 10   Q.   AND HE WAS THE FORMER MAJORITY LEADER IN THE U.S. SENATE;

01:41PM 11   IS THAT CORRECT?

01:41PM 12   A.   THAT'S CORRECT.

01:41PM 13   Q.   AND HE WAS A WELL RESPECTED SURGEON; IS THAT RIGHT?

01:41PM 14   A.   CORRECT.

01:41PM 15   Q.   AND YOU DIDN'T KNOW HIM PERSONALLY; RIGHT?

01:41PM 16   A.   CORRECT.

01:41PM 17   Q.   BUT HE WAS A FAMILY FRIEND; RIGHT?

01:41PM 18   A.   CORRECT.

01:41PM 19   Q.   HE WAS A FRIEND OF YOUR FATHER-IN-LAW'S; CORRECT?

01:41PM 20   A.   CORRECT.

01:41PM 21   Q.   AND YOUR FATHER-IN-LAW IS FROM TENNESSEE; CORRECT?

01:41PM 22   A.   CORRECT.

01:41PM 23   Q.   AND SENATOR FRIST REPRESENTED THE STATE OF TENNESSEE;

01:41PM 24   RIGHT?

01:41PM 25   A.   YES.

EISENMAN CROSS BY MS. WALSH

01:41PM 1    Q.   OKAY.  AND YOU SUCCEEDED IN CONTACTING DR. FRIST; RIGHT?

01:41PM 2    A.   YES.

01:41PM 3    Q.   AND YOU ASKED HIM SOME QUESTIONS ABOUT THERANOS; RIGHT?

01:41PM 4    A.   YES.

01:41PM 5    Q.   BUT ULTIMATELY SENATOR FRIST STOPPED COMMUNICATING WITH

01:41PM 6    YOU ABOUT THERANOS; IS THAT RIGHT?

01:41PM 7    A.   YES.

01:41PM 8    Q.   SO WE'VE GONE THROUGH A LOT OF EMAILS.  IT'S FAIR TO SAY

01:42PM 9    THAT YOU BECAME VERY FRUSTRATED WITH THE LEVEL OF COMMUNICATION

01:42PM 10   YOU WERE GETTING ABOUT DETAILS FROM THERANOS; RIGHT?

01:42PM 11   A.   YES.

01:42PM 12   Q.   YOU FELT YOU WERE NOT GETTING THE LEVEL OF COMMUNICATION

01:42PM 13   THAT YOU WANTED; RIGHT?

01:42PM 14   A.   YES.

01:42PM 15   Q.   OR THE INFORMATION THAT YOU SOUGHT; CORRECT?

01:42PM 16   A.   CORRECT.

01:42PM 17   Q.   BUT ULTIMATELY YOU DECIDED TO ULTIMATELY INCREASE YOUR

01:42PM 18   STAKE IN THERANOS IN 2013; RIGHT?

01:42PM 19   A.   YES.

01:42PM 20   Q.   NOW, YOU TESTIFIED THAT YOU LOOKED AT THE THERANOS WEBSITE

01:42PM 21   BEFORE YOUR INVESTMENT IN 2013; RIGHT?

01:42PM 22   A.   YES.

01:42PM 23   Q.   AND YOU BECAME AWARE THAT THERANOS WAS LAUNCHING ITS

01:42PM 24   SERVICES IN WALGREENS; RIGHT?

01:42PM 25   A.   YES.

01:42PM   1    Q.   AND YOU READ PUBLICITY AT THE TIME ABOUT THE WALGREENS

01:42PM   2    LAUNCH; CORRECT?

01:42PM   3    A.   CORRECT.

01:42PM   4    Q.   AND THEN THERE CAME A TIME IN DECEMBER OF 2013 WHERE YOU

01:42PM   5    BECAME AWARE OF THE OPPORTUNITY TO INCREASE YOUR STAKE IN

01:42PM   6    THERANOS; RIGHT?

01:42PM   7    A.   YES.

01:42PM   8    Q.   OKAY.  SO LET'S TURN TO 16 -- 1363.  1363.

01:43PM   9    A.   MY BINDER GOES FROM 1362 TO 1370.

01:43PM  10    Q.   YEP.  OKAY.

01:43PM  11         TAKE A LOOK AT 1362.

01:43PM  12    A.   OKAY.

01:43PM  13    Q.   OKAY.  DO YOU HAVE THAT IN FRONT IT OF YOU?

01:44PM  14    A.   YES.

01:44PM  15    Q.   ALL RIGHT.  AND IS THIS AN EMAIL CHAIN IN DECEMBER OF 2013

01:44PM  16    BETWEEN YOU AND MR. BALWANI ABOUT INVESTING IN THERANOS IN

01:44PM  17    2013?

01:44PM  18    A.   YES.

01:44PM  19              MS. WALSH:  YOUR HONOR, WE OFFER 1362.

01:44PM  20              MR. BOSTIC:  NO OBJECTION.

01:44PM  21              THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

01:44PM  22         (GOVERNMENT'S EXHIBIT 1362 WAS RECEIVED IN EVIDENCE.)

01:44PM  23    BY MS. WALSH:

01:44PM  24    Q.   OKAY.  AND IN THIS EMAIL IN THE MIDDLE OF PAGE 1

01:44PM  25    MR. BALWANI SAYS TO YOU, "ALAN.

EISENMAN CROSS BY MS. WALSH

01:44PM    1          "I CHECKED WITH OUR LEGAL ABOUT YOUR QUESTION ABOUT

01:44PM    2     INVESTING THROUGH A NEW ENTITY.  THIS SHOULDN'T BE AN ISSUE."

01:44PM    3          RIGHT?

01:44PM    4     A.   YES.

01:44PM    5     Q.   AND YOU REPLY TO HIM, "SUNNY,

01:44PM    6          "WE WOULD LIKE TO MAKE THE FOLLOWING INVESTMENTS."

01:45PM    7          AND THEN YOU LIST THE DIFFERENT PEOPLE AND DIFFERENT

01:45PM    8     INVESTMENTS; CORRECT?

01:45PM    9     A.   YES.

01:45PM   10     Q.   WITH THE DIFFERENT AMOUNTS?

01:45PM   11     A.   RIGHT.

01:45PM   12     Q.   AND THAT WAS ON DECEMBER 24TH, 2013; RIGHT?

01:45PM   13     A.   YES.

01:45PM   14     Q.   AND THEN VERY CLOSE IN TIME TO THAT -- LET'S TURN TO

01:45PM   15     EXHIBIT 1371.

01:45PM   16     A.   I DON'T HAVE A 1371.

01:45PM   17               THE COURT:  70?

01:45PM   18               MS. WALSH:  ACTUALLY, 1371 IS IN EVIDENCE.  IF WE

01:45PM   19     COULD JUST DOUBLE-CHECK THAT.

01:45PM   20          I THINK IT'S THE FIRST EIGHT PAGES.

01:45PM   21               THE CLERK:  IT IS.

01:45PM   22               MS. WALSH:  YEAH.

01:45PM   23          SO IF WE COULD PUBLISH THAT, YOUR HONOR?

01:45PM   24               THE COURT:  YES.

01:45PM   25     BY MS. WALSH:

01:45PM  1    Q.   IT WILL BE ON YOUR SCREEN, MR. EISENMAN.

01:45PM  2    A.   YEAH.

01:45PM  3    Q.   AND WHAT I WANT TO DIRECT YOUR ATTENTION TO PAGE 1.

01:46PM  4         THE BOTTOM OF PAGE 1, YOU EMAIL MR. BALWANI; RIGHT?

01:46PM  5    A.   RIGHT.

01:46PM  6    Q.   DO YOU SEE THAT?

01:46PM  7    A.   YES.

01:46PM  8    Q.   OKAY.  THAT'S ON DECEMBER 29TH, 2013, AT 9:09 A.M.; RIGHT?

01:46PM  9    A.   RIGHT.

01:46PM  10   Q.   OKAY.  AND YOU'RE ASKING, "DID YOU GET MY MESSAGE LAST

01:46PM  11   THURSDAY?"

01:46PM  12        YOU'VE BEEN OUT OF THE COUNTRY.

01:46PM  13        AND THEN YOU POSE THREE QUESTIONS TO HIM:

01:46PM  14        "WHAT IS THE SIZE OF THIS ROUND?"

01:46PM  15        RIGHT?

01:46PM  16   A.   RIGHT.

01:46PM  17   Q.   "ARE ANY DIRECTORS PARTICIPATING IN THIS ROUND?

01:46PM  18        AND "AM I CORRECT THAT THERE WILL BE ANOTHER ROUND OF

01:46PM  19   APPROXIMATELY 200 MILLION IN JANUARY AT A HIGHER PRICE?"

01:46PM  20        DO YOU SEE THAT?

01:46PM  21   A.   YES.

01:46PM  22   Q.   AND MR. BALWANI RESPONDS.

01:46PM  23        AND THIS IS BEFORE YOU ACTUALLY INVESTED IN 2013; RIGHT?

01:46PM  24   A.   RIGHT.

01:46PM  25   Q.   AND MR. BALWANI RESPONDS:

01:46PM 1          "ALAN.

01:46PM 2          "WE CAN'T ANSWER YOUR QUESTIONS ABOUT DIRECTORS, OTHER

01:47PM 3     INVESTORS AND CERTAINLY NOT ABOUT ANY FUTURE INVESTMENT ROUNDS

01:47PM 4     AND SPECULATE ON WHAT THOSE VALUATIONS MAY BE.  THOSE MAY OR

01:47PM 5     MAY NOT HAPPEN."

01:47PM 6          DO YOU SEE THAT?

01:47PM 7     A.   YES.

01:47PM 8     Q.   AND THEN HE SAYS, "SECONDLY, MY PERSONAL ASSISTANTS ARE

01:47PM 9     NOT PRIVY TO CONFIDENTIAL FINANCIAL INFORMATION SO PLEASE DON'T

01:47PM 10    LEAVE MESSAGES WITH THEM ABOUT COMPANY'S FINANCIAL DETAILS AND

01:47PM 11    ACTIVITIES."

01:47PM 12         DO YOU SEE THAT?

01:47PM 13    A.   YES.

01:47PM 14    Q.   SO MR. BALWANI WAS SAYING TO YOU ON DECEMBER 29TH, I'M NOT

01:47PM 15    GOING TO ANSWER THE QUESTIONS THAT YOU POSED TO ME; RIGHT?

01:47PM 16    A.   YES.

01:47PM 17    Q.   OKAY.  OKAY.  SO YOU TESTIFIED THAT YOU HAD A PHONE CALL

01:48PM 18    WITH MR. BALWANI LEADING UP TO YOUR INVESTMENT IN 2013; IS THAT

01:48PM 19    RIGHT?

01:48PM 20    A.   YES.

01:48PM 21    Q.   AND THAT HE TOLD YOU ABOUT THE ACTIVITIES OF THERANOS; IS

01:48PM 22    THAT RIGHT?  IS THAT WHAT YOU TESTIFIED TO?

01:48PM 23    A.   I DON'T UNDERSTAND YOUR QUESTION.

01:48PM 24    Q.   YOU TESTIFIED ABOUT A PHONE CALL THAT YOU HAD WITH

01:48PM 25    MR. BALWANI; CORRECT?

01:48PM 1    A.   CORRECT.

01:48PM 2    Q.   AND DURING THAT PHONE CALL, HE TOLD YOU ABOUT WHAT

01:48PM 3    THERANOS WAS DOING AT THE TIME; IS THAT RIGHT?

01:49PM 4    A.   CAN YOU CLARIFY THAT?  WHAT DO YOU MEAN WHAT --

01:49PM 5    Q.   WELL, I'M ASKING, YOU TESTIFIED ABOUT THAT PHONE CALL;

01:49PM 6    RIGHT?

01:49PM 7    A.   YES.

01:49PM 8    Q.   AND YOU TESTIFIED THAT THE PHONE CALL WAS ABOUT THERANOS'S

01:49PM 9    ACTIVITIES AND TECHNOLOGY AND OTHER ITEMS ABOUT THERANOS DURING

01:49PM 10   THIS PHONE CALL?  THAT'S WHAT YOU TESTIFIED TO?

01:49PM 11   A.   OKAY.

01:49PM 12   Q.   OKAY.  BUT DURING THAT PHONE CALL, MR. EISENMAN, LEADING

01:49PM 13   UP TO YOUR INVESTMENT, THAT PHONE CALL WAS JUST ABOUT THE

01:49PM 14   ADMINISTRATIVE MATTERS OF GETTING YOUR INVESTMENT -- FILLING

01:49PM 15   OUT THE RIGHT FORMS AND THE RIGHT NUMBERS FOR THE DIFFERENT

01:49PM 16   ENTITIES THAT YOU WERE INVESTING THROUGH; ISN'T THAT RIGHT?

01:49PM 17   A.   NO.  THE PHONE CALL WAS MORE DETAILED THAN THAT.

01:49PM 18   Q.   UH-HUH.  OKAY.

01:49PM 19        AND YOU TESTIFIED THAT -- SO -- WITHDRAWN.

01:49PM 20        SO THE PHONE CALL WAS MORE DETAILED?  IS THAT WHAT YOUR

01:49PM 21   TESTIMONY IS?

01:49PM 22   A.   YES.

01:49PM 23   Q.   AND YOU'VE TESTIFIED BEFORE THAT YOU TAKE DETAILED NOTES

01:50PM 24   OF PHONE CALLS; RIGHT?

01:50PM 25   A.   YES.

01:50PM   1     Q.   AND YOU TAKE NOTES OF PHONE CALLS TO KEEP TRACK OF WHAT

01:50PM   2     PEOPLE SAY; RIGHT?

01:50PM   3     A.   RIGHT.

01:50PM   4     Q.   AND IT'S IMPORTANT TO DO THAT TO MAKE SURE THAT YOU GET

01:50PM   5     THEIR WORDS DOWN RIGHT; CORRECT?

01:50PM   6     A.   CORRECT.

01:50PM   7     Q.   BECAUSE YOU'VE SAID SOMETIMES PEOPLE EXAGGERATE; RIGHT?

01:50PM   8     A.   CORRECT.

01:50PM   9     Q.   OKAY.  SO I WANT YOU TO LOOK IN THE WHITE BINDER AT YOUR

01:50PM   10    NOTES OF ALL OF THE DIFFERENT PHONE CALLS THAT YOU'VE HAD WITH

01:50PM   11    THERANOS -- WITH MS. HOLMES AND MR. BALWANI.

01:50PM   12         I'M GOING TO GIVE YOU THE NUMBER IN A SECOND.  OKAY?

01:50PM   13              MR. BOSTIC:  OBJECTION.  MISSTATES THE NATURE OF

01:50PM   14    EXHIBIT 14.

01:50PM   15              THE COURT:  WELL, --

01:50PM   16              MS. WALSH:  I CAN REPHRASE.

01:50PM   17              THE COURT:  -- YOU'RE GOING TO ASK HIM TO DO

01:50PM   18    SOMETHING?

01:50PM   19              MS. WALSH:  YEAH.

01:50PM   20              THE COURT:  ALL RIGHT.

01:50PM   21    BY MS. WALSH:

01:50PM   22    Q.   SO IN THE WHITE BINDER, MR. EISENMAN, PLEASE TURN TO

01:50PM   23    EXHIBIT 14.

01:50PM   24    A.   OKAY.

01:50PM   25    Q.   DO YOU HAVE IT?

01:51PM  1    A.   YES.

01:51PM  2    Q.   EXHIBIT 14 CONTAINS THE NOTES OF CONVERSATIONS THAT YOU'VE

01:51PM  3    HAD WITH VARIOUS PEOPLE ABOUT THERANOS OVER THE YEARS; CORRECT?

01:51PM  4    A.   CORRECT.

01:51PM  5    Q.   AND THIS CONTAINS ALL OF YOUR NOTES OF YOUR CONVERSATIONS;

01:51PM  6    RIGHT?

01:51PM  7    A.   RIGHT.

01:51PM  8    Q.   THERE ISN'T ANYTHING MISSING FROM IT; RIGHT?

01:51PM  9    A.   RIGHT.

01:51PM  10   Q.   BECAUSE YOU TURNED ALL OF THOSE OVER TO THE GOVERNMENT;

01:51PM  11   RIGHT?

01:51PM  12   A.   RIGHT.

01:51PM  13   Q.   OKAY.  AND YOU TESTIFIED ABOUT WHAT YOU SAY NOW IS A

01:51PM  14   DETAILED CONVERSATION WITH MR. BALWANI AT THE END OF DECEMBER,

01:51PM  15   RIGHT BEFORE YOU INVESTED, THAT CONTAINED DETAILS ABOUT

01:51PM  16   THERANOS; IS THAT YOUR TESTIMONY?

01:51PM  17   A.   MY TESTIMONY IS THAT WE -- THERE WERE SOME QUESTIONS

01:51PM  18   ASKED.  I DON'T RECALL THAT IT WAS A DETAILED CONVERSATION, BUT

01:51PM  19   I DO RECALL THAT THERE WERE QUESTIONS ASKED BEFORE WE MADE THE

01:51PM  20   FINAL DECISION TO INVEST.

01:51PM  21   Q.   DIDN'T YOU JUST TESTIFY THAT IT WAS A DETAILED

01:51PM  22   CONVERSATION?  YOU JUST TESTIFIED TO THAT.

01:51PM  23   A.   THEN I STAND CORRECTED.

01:52PM  24   Q.   OKAY.  SO IT WASN'T, IT WASN'T A CONVERSATION ABOUT THE

01:52PM  25   DETAILS OF THERANOS, WAS IT?

01:52PM  1   A.   NO.  NO.

01:52PM  2        YOU'RE TWISTING MY WORDS.  I'M SORRY.

01:52PM  3        THERE WERE SOME ELEMENTS IN THAT CONVERSATION ABOUT THE

01:52PM  4   DETAILS OF THERANOS, BUT IT WASN'T A DETAILED CONVERSATION.

01:52PM  5        THERE WERE A FEW BULLETS POINTS THAT WERE DISCUSSED IN

01:52PM  6   THAT CONVERSATION.

01:52PM  7   Q.   OKAY.  WHAT WERE THOSE BULLET POINTS?

01:52PM  8   A.   IF THE TECHNOLOGY WORKED AND CONFIRMING THAT THIS WAS A

01:52PM  9   ROUND THAT WAS GOING TO CLOSE, AND THERE WAS GOING TO BE A

01:52PM 10   LARGER ROUND THAT WAS GOING TO OCCUR RIGHT AFTER THIS ROUND

01:52PM 11   CLOSED, AN INSTITUTIONAL ROUND.  THAT'S WHAT I WAS TOLD.

01:52PM 12   Q.   OKAY.  SO ON THE SECOND POINT, WHETHER THERE WAS GOING TO

01:52PM 13   BE A LARGER ROUND, IF YOU LOOK AT EXHIBIT 1371, WHICH IS THE

01:52PM 14   EMAIL THAT YOU HAVE WITH MR. BALWANI, HE SPECIFICALLY DECLINES

01:52PM 15   TO ANSWER THAT QUESTION; RIGHT?

01:52PM 16   A.   THE -- ARE YOU TALKING ABOUT WHAT I LOOKED AT A MINUTE

01:52PM 17   AGO?

01:52PM 18   Q.   YEAH, 13 --

01:53PM 19   A.   OKAY.  BUT THAT CONTRADICTED WHAT HE TOLD ME IN THAT

01:53PM 20   CONVERSATION BEFORE WE INVESTED.

01:53PM 21   Q.   I SEE.  SO YOUR TESTIMONY IS THAT YOU HAD A PHONE CALL

01:53PM 22   WITH MR. BALWANI WHERE YOU ASKED HIM, HOW BIG IS THE NEXT ROUND

01:53PM 23   GOING TO BE?  IS THAT RIGHT?  IS THAT YOUR TESTIMONY?

01:53PM 24   A.   I DON'T THINK THAT WAS IN THE PHONE CALL.  THAT WAS IN THE

01:53PM 25   EMAIL, HOW LARGE WAS THE NEXT ROUND.  I WAS CONFIRMING -- I

EISENMAN CROSS BY MS. WALSH

01:53PM   1    DON'T REMEMBER THE SOURCE, BUT SOMEWHERE THERE WAS INFORMATION

01:53PM   2    THAT THE INSTITUTIONAL ROUND WAS $200 MILLION DOLLARS, AND I

01:53PM   3    WAS TRYING TO CONFIRM THAT THAT WAS ACCURATE.

01:53PM   4    Q.   RIGHT.  AND IN THE EMAIL, HE WON'T CONFIRM THAT; RIGHT?

01:53PM   5    A.   IN THE EMAIL, YOU'RE CORRECT, HE DID NOT CONFIRM WHAT HE

01:53PM   6    SAID TO ME IN THE CONVERSATION BEFORE I INVESTED IN DECEMBER.

01:53PM   7    Q.   SO YOUR TESTIMONY IS THAT YOU HAD A PHONE CALL WITH

01:53PM   8    MR. BALWANI WHERE HE CONFIRMED THE SIZE OF THE ROUND?  IS THAT

01:53PM   9    YOUR TESTIMONY?  YOU REMEMBER THAT?

01:53PM   10   A.   NO.  MY TESTIMONY IS THAT HE CONFIRMED GETTING THE

01:54PM   11   INFORMATION THAT THIS WAS A FRIENDS AND FAMILY ROUND -- I'M

01:54PM   12   SORRY.  LET ME START OVER.

01:54PM   13        HE CONFIRMED THAT THIS WAS A SMALLER FUND RAISING ROUND

01:54PM   14   FOR EXISTING SHAREHOLDERS, THEY CALLED IT FRIENDS AND FAMILY

01:54PM   15   ROUND, AND IT WAS GOING TO BE PRICED AT $15 A SHARE; THEY WERE

01:54PM   16   GOING TO CLOSE THIS ROUND BY THE END OF THE YEAR; THEY

01:54PM   17   IMMEDIATELY HAD TEED UP OR LINED UP A MUCH LARGER INSTITUTIONAL

01:54PM   18   ROUND AT A HIGHER PRICE, AT $17 A SHARE.

01:54PM   19   Q.   SO YOUR TESTIMONY IS THAT'S WHAT MR. BALWANI TOLD YOU IN

01:54PM   20   DECEMBER 2013?

01:54PM   21   A.   YES.

01:54PM   22   Q.   IS THAT YOUR TESTIMONY?

01:54PM   23   A.   YES.

01:54PM   24   Q.   AND YOUR TESTIMONY IS THAT HE TOLD YOU THAT ON THE PHONE,

01:54PM   25   EVEN THOUGH HE'S REFUSING TO TELL YOU THAT IN THE EMAIL; IS

01:54PM   1    THAT RIGHT?

01:54PM   2    A.   YES.

01:54PM   3    Q.   OKAY.  AND WHERE -- SO TURNING BACK TO YOUR NOTES, WHICH

01:54PM   4    IS EXHIBIT 14, THAT CONTAINS ALL OF YOUR NOTES OF ALL OF THE

01:54PM   5    CONVERSATIONS THAT YOU'VE HAD ABOUT THERANOS; RIGHT?

01:55PM   6         MR. BOSTIC:  MISSTATES THE TESTIMONY AND THE

01:55PM   7    EXHIBIT.

01:55PM   8         MS. WALSH:  WELL, LET ME ASK AGAIN.

01:55PM   9    Q.   YOU SEE EXHIBIT 14; RIGHT?

01:55PM  10    A.   YES.

01:55PM  11    Q.   AND EXHIBIT 14 CONTAINS YOUR NOTES OF CONVERSATIONS THAT

01:55PM  12    YOU'VE HAD WITH OTHERS ABOUT THERANOS OVER THE YEARS, DOES IT

01:55PM  13    NOT?

01:55PM  14    A.   IT DOES NOT CONTAIN EVERY BIT OF CONVERSATION THAT I HAD

01:55PM  15    WITH EVERY -- IN EVERY ONE OF THOSE SITUATIONS.

01:55PM  16    Q.   BUT IT CONTAINS ALL OF YOUR NOTES OF CONVERSATIONS; RIGHT?

01:55PM  17    A.   YES, IT CONTAINS ALL OF MY NOTES OF CONVERSATIONS, THAT IS

01:55PM  18    CORRECT.

01:55PM  19    Q.   RIGHT.  AND SO I WOULD LIKE YOU TO LOOK THROUGH EXHIBIT 14

01:55PM  20    FOR WHERE THERE IS A NOTE REFLECTING THE TELEPHONE CALL WITH

01:55PM  21    MR. BALWANI IN LATE DECEMBER 2013 THAT YOU JUST TESTIFIED

01:55PM  22    ABOUT.

01:56PM  23         (PAUSE IN PROCEEDINGS.)

01:56PM  24         THE WITNESS:  IT'S APPARENTLY NOT WRITTEN DOWN IN MY

01:56PM  25    NOTES.

01:56PM   1    BY MS. WALSH:

01:56PM   2    Q.   THERE IS NO NOTE REFLECTING THAT CONVERSATION; CORRECT?

01:56PM   3    A.   NO.  IT'S JUST A RECOLLECTION.

01:57PM   4         (PAUSE IN PROCEEDINGS.)

01:57PM   5         MS. WALSH:  MAY I HAVE A MOMENT, YOUR HONOR?

01:57PM   6         THE COURT:  YES.

01:57PM   7         (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

01:58PM   8         MS. WALSH:  SORRY, YOUR HONOR.

01:58PM   9    Q.   OKAY.  MR. EISENMAN, THE CONVERSATION THAT YOU JUST

01:58PM  10    TESTIFIED ABOUT IS NOT IN YOUR NOTES; RIGHT?

01:58PM  11    A.   RIGHT.

01:58PM  12    Q.   YOU'RE SAYING THAT IT'S JUST YOUR RECOLLECTION SITTING

01:58PM  13    HERE TODAY; CORRECT?

01:58PM  14    A.   CORRECT.

01:58PM  15    Q.   BUT YOU'VE SPOKEN ON MANY DIFFERENT OCCASIONS WITH THE

01:58PM  16    GOVERNMENT ABOUT YOUR RECOLLECTION OF THE CONVERSATIONS THAT

01:58PM  17    YOU HAD WITH MR. BALWANI IN DECEMBER 2013; ISN'T THAT RIGHT?

01:58PM  18    A.   I DON'T RECALL THAT.  IT'S VERY VAGUE.

01:58PM  19    Q.   WELL, YOU'VE SPOKEN WITH THE GOVERNMENT ABOUT THIS CASE,

01:58PM  20    HAVEN'T YOU?

01:58PM  21    A.   YES.

01:58PM  22    Q.   AND IN THOSE MEETINGS YOU WERE ASKED QUESTIONS ABOUT YOUR

01:58PM  23    COMMUNICATIONS WITH MR. BALWANI; RIGHT?

01:58PM  24    A.   PRESUMABLY SO.  I DON'T RECALL.

01:58PM  25    Q.   OKAY.  LET ME DIRECT YOUR ATTENTION TO 28198.

| | | |
|---|---|---|
| 01:59PM | 1 | DO YOU HAVE 28198? |
| 01:59PM | 2 | A.   YES. |
| 01:59PM | 3 | Q.   WHY DON'T YOU TURN TO PAGE 4 OF THAT EXHIBIT. |
| 01:59PM | 4 | A.   OKAY. |
| 01:59PM | 5 | Q.   AND 28198 REFLECTS A MEETING THAT YOU HAD WITH THE |
| 01:59PM | 6 | GOVERNMENT; RIGHT? |
| 01:59PM | 7 | A.   OKAY. |
| 01:59PM | 8 | Q.   AND THAT WAS BACK IN 2018; RIGHT? |
| 01:59PM | 9 | A.   YES. |
| 01:59PM | 10 | Q.   IF YOU LOOK AT THE TOP RIGHT OF THE DOCUMENT? |
| 01:59PM | 11 | A.   YES. |
| 01:59PM | 12 | Q.   DO YOU SEE THAT DATE? |
| 02:00PM | 13 | AND 2018 WAS MUCH CLOSER IN TIME TO THE EVENTS IN |
| 02:00PM | 14 | QUESTION; CORRECT? |
| 02:00PM | 15 | A.   CORRECT. |
| 02:00PM | 16 | Q.   AND IF YOU LOOK AT THE TOP TWO PARAGRAPHS, JUST READ THE |
| 02:00PM | 17 | TOP PARAGRAPH AND THEN THE FIRST SENTENCE OF THE FIRST FULL |
| 02:00PM | 18 | PARAGRAPH ON THAT PAGE. |
| 02:00PM | 19 | DO YOU SEE THAT? |
| 02:00PM | 20 | A.   YES. |
| 02:00PM | 21 | Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. BALWANI DID |
| 02:00PM | 22 | NOT -- |
| 02:00PM | 23 | A.   I'M STILL READING. |
| 02:00PM | 24 | Q.   SURE. |
| 02:01PM | 25 | (PAUSE IN PROCEEDINGS.) |

02:01PM  1    BY MS. WALSH:

02:01PM  2    Q.   HAVE YOU FINISHED READING, MR. EISENMAN?

02:01PM  3    A.   NOT YET.

02:01PM  4         (PAUSE IN PROCEEDINGS.)

02:01PM  5              THE WITNESS:  I'VE FINISHED READING.

02:01PM  6    BY MS. WALSH:

02:01PM  7    Q.   OKAY.  SO I WANT TO FOCUS YOU ON THE FIRST SENTENCE OF THE

02:01PM  8    FIRST FULL PARAGRAPH ON PAGE 4.

02:01PM  9    A.   OKAY.

02:01PM  10   Q.   DOES THAT REFRESH YOUR RECOLLECTION THAT MR. BALWANI DID

02:01PM  11   NOT DESCRIBE THERANOS'S ACTIVITIES DURING HIS CALLS WITH YOU

02:01PM  12   REGARDING THE 2013 INVESTMENT?

02:01PM  13   A.   WELL, IT CLARIFIES THAT HE DID NOT DISCUSS THE BUSINESS OF

02:01PM  14   THERANOS.

02:01PM  15        BUT I HAVE A RECOLLECTION THAT I WAS TOLD THAT THIS WAS A

02:02PM  16   FRIENDS AND FAMILY ROUND; IT WAS A $15 ROUND; THAT THIS WAS AN

02:02PM  17   INCENTIVE TO INVEST AT THIS POINT IN TIME BECAUSE THERE WAS A

02:02PM  18   FOLLOW-UP ROUND IMMEDIATELY AFTER THIS CLOSED AT $17.

02:02PM  19   Q.   BUT MR. BALWANI DID NOT TALK ABOUT THERANOS'S ACTIVITIES

02:02PM  20   DURING THIS CONVERSATION; ISN'T THAT RIGHT?

02:02PM  21   A.   DID NOT TALK -- NO, HE DID NOT TALK ABOUT THE ACTUAL

02:02PM  22   BUSINESS ACTIVITIES.

02:02PM  23        AND IT'S BEEN A LONG TIME AGO, BUT I SEEM TO RECALL THAT I

02:02PM  24   ASKED THE SAME QUESTION THAT I ASKED EVERY TIME.  I TRIED, TO

02:02PM  25   EITHER ELIZABETH OR SUNNY, DOES THE TECHNOLOGY WORK?

02:02PM  1        AND MY RECOLLECTION IS, WHETHER IT WAS FROM THIS

02:02PM  2   CONVERSATION OR WHETHER IT WAS FROM A CONVERSATION THAT

02:02PM  3   MR. BALWANI HAD A WEEK EARLIER WITH PAT MENDENHALL THAT WE

02:02PM  4   TALKED ABOUT EARLIER IN COURT, THAT HE VERBALLY COMMUNICATED

02:02PM  5   THAT THE SCIENCE WAS PROVEN, THAT THE TECHNOLOGY WORKED, AND

02:02PM  6   THAT WAS A VERY IMPORTANT FACTOR THAT I HAD IN FRONT OF ME A

02:02PM  7   WEEK BEFORE, OR AT THAT POINT IN TIME BEFORE I DECIDED TO MAKE

02:02PM  8   MY INVESTMENT.

02:02PM  9   Q.   RIGHT.  AND I'M NOT ASKING ABOUT MR. MENDENHALL.

02:03PM 10        I'M ASKING ABOUT WHAT MR. BALWANI TOLD YOU, YOU PERSONALLY

02:03PM 11   IN THE CONVERSATION IN LATE DECEMBER 2013.

02:03PM 12   A.   OKAY.

02:03PM 13   Q.   AND I WANT TO BE REALLY CLEAR ABOUT THIS:  YOU DON'T HAVE

02:03PM 14   A SPECIFIC RECOLLECTION THAT HE TALKED TO YOU ABOUT THE

02:03PM 15   THERANOS TECHNOLOGY OR THE THERANOS BUSINESS IN THAT TELEPHONE

02:03PM 16   CALL; IS THAT RIGHT?

02:03PM 17   A.   IT IS CORRECT THAT I DON'T HAVE A SPECIFIC RECOLLECTION.

02:03PM 18        I KNOW WHEN I DO BUSINESS --

02:03PM 19   Q.   I'M JUST ASKING ABOUT YOUR RECOLLECTION, NOT THE WAY YOU

02:03PM 20   DO BUSINESS.

02:03PM 21        SO IF THAT'S A "NO, I DON'T HAVE A SPECIFIC RECOLLECTION,"

02:03PM 22   THAT WILL SUFFICE.

02:03PM 23   A.   OKAY.

02:03PM 24        MR. BOSTIC:  YOUR HONOR, I ASK THAT THE WITNESS BE

02:03PM 25   ALLOWED TO COMPLETE HIS ANSWER.

02:03PM  1            THE COURT:  HAVE YOU COMPLETED YOUR ANSWER, SIR?

02:03PM  2            THE WITNESS:  NO.

02:03PM  3            THE COURT:  OKAY.  YOU CAN COMPLETE IT.

02:03PM  4            THE WITNESS:  OKAY.  EVERY OPPORTUNITY THAT I HAVE,

02:03PM  5    ESPECIALLY BEFORE I INVEST MONEY, I ASK AS MANY QUESTIONS AS I

02:03PM  6    CAN THAT I THINK WILL BE ANSWERED.

02:03PM  7        AND I DON'T HAVE A CLEAR RECOLLECTION IF I ASKED

02:04PM  8    MR. BALWANI IF THE TECHNOLOGY WORKED.

02:04PM  9        I THINK I -- I THINK I DID, BUT I DON'T HAVE A CLEAR

02:04PM 10    RECOLLECTION.

02:04PM 11        BUT I DID BASICALLY HAVE MR. BALWANI TELLING OUR GROUP,

02:04PM 12    THROUGH PAT MENDENHALL, IN AN EMAIL ONE WEEK EARLIER, THAT THE

02:04PM 13    SCIENCE WORKED, THAT IT WAS, IT WAS -- THERE WAS NO DOUBT THAT

02:04PM 14    THE TECHNOLOGY WORKED.

02:04PM 15        AND THAT WAS INFORMATION THAT CAME DIRECTLY TO ME, AND

02:04PM 16    THAT WAS ONE OF THE KEY FACTORS IN MY MAKING A DECISION TO

02:04PM 17    INVEST MORE MONEY.

02:04PM 18    BY MS. WALSH:

02:04PM 19    Q.   AND I JUST WANT TO MAKE SURE THAT MY QUESTION WAS

02:04PM 20    ANSWERED.

02:04PM 21        DO YOU HAVE A SPECIFIC RECOLLECTION OF MR. BALWANI TELLING

02:04PM 22    YOU IN THAT PHONE CALL IN DECEMBER OF 2013 ANYTHING ABOUT

02:04PM 23    THERANOS TECHNOLOGY OR THERANOS ACTIVITIES?

02:04PM 24    A.   I DO NOT HAVE A SPECIFIC RECOLLECTION.

02:04PM 25    Q.   OKAY.  LET'S TURN TO EXHIBIT 12999.

02:05PM   1    A.   OKAY.

02:05PM   2    Q.   OKAY.  THIS IS AN EMAIL BETWEEN YOU AND MS. HOLMES AND

02:05PM   3    MR. BALWANI IN JANUARY 2015; CORRECT?

02:05PM   4    A.   CORRECT.

02:05PM   5    Q.   AND IT'S ABOUT INFORMATION YOU HAD RECEIVED THROUGH A

02:05PM   6    GOOGLE ALERT ABOUT THERANOS; RIGHT?

02:05PM   7    A.   RIGHT.

02:05PM   8    Q.   AND YOU'RE FOLLOWING UP WITH THEM TO ASK QUESTIONS ABOUT

02:05PM   9    IT; CORRECT?

02:05PM   10   A.   CORRECT.

02:05PM   11        MS. WALSH:  YOUR HONOR, WE OFFER 12999.

02:05PM   12        MR. BOSTIC:  801, YOUR HONOR.

02:06PM   13     (PAUSE IN PROCEEDINGS.)

02:06PM   14        THE COURT:  MS. WALSH.

02:06PM   15        MS. WALSH:  YES, YOUR HONOR.

02:06PM   16     IT'S COMING IN, AGAIN, FOR MR. EISENMAN'S STATE OF MIND.

02:06PM   17   HE'S CONTINUING TO FOLLOW UP WITH MR. BALWANI AND MS. HOLMES

02:06PM   18   ABOUT THE STATUS OF THERANOS.

02:06PM   19     AND THE GOVERNMENT, I THINK, OFFERED ANOTHER EMAIL OUTSIDE

02:06PM   20   OF THE TIME PERIOD FOR THE SAME PURPOSE, SO THIS IS IN THE SAME

02:06PM   21   CATEGORY.

02:06PM   22        THE COURT:  YOU'RE ASKING THAT THE ENTIRE DOCUMENT,

02:06PM   23   INCLUDING THE PAGE 8769?

02:06PM   24        MS. WALSH:  LET ME JUST TAKE A LOOK.

02:06PM   25        THE COURT:  IT'S THE LAST PAGE OF THIS.

02:06PM   1          MS. WALSH:  I WAS, YOUR HONOR.

02:07PM   2     BUT IF THAT'S -- IF THE COURT WOULD PREFER, WE CAN REDACT

02:07PM   3     THAT.

02:07PM   4          THE COURT:  NO, THAT'S FINE.  I JUST WANTED TO KNOW

02:07PM   5     HOW MUCH OF THIS.

02:07PM   6     ALL RIGHT.  I'LL ADMIT IT, AND IT MAY BE PUBLISHED.

02:07PM   7     (DEFENDANT'S EXHIBIT 12999 WAS RECEIVED IN EVIDENCE.)

02:07PM   8     BY MS. WALSH:

02:07PM   9     Q.   OKAY.  LET'S LOOK AT PAGE 1.

02:07PM  10     ACTUALLY, LET'S LOOK AT -- IT'S NOT -- THERE ARE NO PAGE

02:07PM  11     NUMBERS, SO LET'S LOOK AT THE PAGE ENDING WITH BATES STAMP

02:07PM  12     8768.

02:07PM  13     OKAY.  MR. EISENMAN, THIS IS AN EMAIL FROM YOU ON

02:07PM  14     JANUARY 21ST, 2015.  IT'S TO MS. HOLMES AND MR. BALWANI

02:07PM  15     REGARDING A GOOGLE ALERT THAT YOU GOT; CORRECT?

02:07PM  16     A.   CORRECT.

02:07PM  17     Q.   OKAY.  AND YOU SAY, "ELIZABETH AND SUNNY,

02:07PM  18     "THIS IS THE SECOND GOOGLE ALERT I HAVE RECEIVED RECENTLY

02:07PM  19     THAT CLAIMS THAT THERANOS COULD BECOME OBSOLETE.  CAN WE HAVE A

02:07PM  20     BRIEF CATCH UP CALL THIS WEEK?  PLEASE DON'T IGNORE THIS

02:08PM  21     REQUEST."

02:08PM  22     AND MR. BALWANI RESPONDS, "ALAN.

02:08PM  23     "I THINK THESE EMAILS ARE BEYOND RIDICULOUS.  YES,

02:08PM  24     THERANOS LIKE ANY OTHER COMPANY, CAN BECOME OBSOLETE.  THIS

02:08PM  25     DOES NOT WARRANT INVESTOR CALLS AND UPDATES BECAUSE SOMEONE

EISENMAN CROSS BY MS. WALSH

02:08PM 1    WROTE AN ARTICLE THAT THERANOS CAN BECOME OBSOLETE.

02:08PM 2        "YOU CONTINUE TO BOMBARD US WITH EMAILS AND PHONE CALLS

02:08PM 3    EVEN THOUGH JUST 12 SHORT MONTHS AGO I SPOKE WITH YOU IN DETAIL

02:08PM 4    THAT YOU WILL NOT GET UPDATES, THAT YOU SHOULDN'T INVEST AND

02:08PM 5    THAT MANAGEMENT WILL NOT BE SPENDING ANY TIME WITH YOU

02:08PM 6    PROVIDING YOU UPDATES AND RESPONDING TO YOUR EMAILS ABOUT

02:08PM 7    BUSINESS OPERATIONS, STRATEGY AND DETAILS.

02:08PM 8        "YOU WILL GET UPDATES ALONG WITH OTHER INVESTORS."

02:08PM 9        DO YOU SEE THAT?

02:08PM 10   A.   YES.

02:08PM 11   Q.   AND YOU RESPOND "SUNNY,

02:08PM 12       "WHEN WE SPOKE SEVERAL MONTHS AGO, YOU SAID THAT WE COULD

02:08PM 13   HAVE A SHORT QUARTERLY CALL.  I DON'T THINK THIS IS AN

02:08PM 14   UNREASONABLE REQUEST."

02:08PM 15       AND THEN MR. BALWANI RESPONDS, "ALAN.

02:08PM 16       "NO ONE FROM THIS COMPANY HAS EVER COMMITTED TO A SHORT

02:09PM 17   QUARTERLY CALL WITH YOU OR ANY OTHER INVESTOR SELECTIVELY.  I

02:09PM 18   WAS VERY EXPLICITLY DISCOURAGING YOU FROM INVESTING IN JANUARY

02:09PM 19   OF 2014 AND NO INFORMATION HAS BEEN DISSEMINATED."

02:09PM 20       DO YOU SEE THAT?

02:09PM 21   A.   YES.

02:09PM 22   Q.   WE CAN TAKE THAT DOWN.

02:09PM 23       OKAY.  LET'S TURN NOW TO 3530.

02:09PM 24   A.   OKAY.

02:09PM 25   Q.   OKAY.  AND THIS SHOULD BE 3550.

02:09PM   1           IS THAT WHAT YOU HAVE, MR. EISENMAN?

02:09PM   2      A.   THE AMENDED RESTATED --

02:09PM   3      Q.   YEAH.

02:09PM   4      A.   IT SAYS 3530 IN MY BOOK.

02:10PM   5      Q.   OKAY.  OKAY.  SO THIS IS A -- LET ME FIRST DIRECT YOUR

02:10PM   6      ATTENTION TO PAGE 1 WHICH SAYS, AMENDED AND RESTATED SERIES C-1

02:10PM   7      PREFERRED STOCK PURCHASE AGREEMENT, INITIAL CLOSING DATE

02:10PM   8      JULY 1ST, 2010.

02:10PM   9           DO YOU SEE THAT?

02:10PM   10     A.   YES.

02:10PM   11     Q.   AND THEN I'M GOING TO DIRECT YOUR ATTENTION --

02:10PM   12           MR. BOSTIC:  I APOLOGIZE.  THIS IS NOT IN EVIDENCE,

02:10PM   13     YOUR HONOR.

02:10PM   14           THE CLERK:  IT IS IN EVIDENCE.

02:10PM   15           MS. WALSH:  IT IS IN EVIDENCE?

02:10PM   16           THE CLERK:  3530 IS IN EVIDENCE.

02:10PM   17           MR. BOSTIC:  MY APOLOGIES.

02:10PM   18           THE COURT:  THANK YOU.

02:10PM   19     BY MS. WALSH:

02:10PM   20     Q.   OKAY.  SO, MR. EISENMAN, LET ME DIRECT YOUR ATTENTION TO

02:10PM   21     PAGE 29 OF THIS DOCUMENT.

02:10PM   22           THAT'S YOUR SIGNATURE; RIGHT?

02:10PM   23     A.   YES.

02:10PM   24     Q.   AND IT'S DATED 12/30/13; RIGHT?

02:11PM   25     A.   RIGHT.

02:11PM 1    Q.   AND THEN PAGE 11 OF THE DOCUMENT, SECTION 4.4, THIS

02:11PM 2    STATES, "THE SPECULATIVE NATURE OF THE AGREEMENT."

02:11PM 3         DO YOU SEE THAT?

02:11PM 4    A.   YES.

02:11PM 5    Q.   AND I KNOW YOU TESTIFIED BEFORE THAT YOU DISAGREED WITH

02:11PM 6    THIS.

02:11PM 7    A.   YES.

02:11PM 8    Q.   BUT YOU SIGNED THIS AGREEMENT; RIGHT?

02:11PM 9    A.   YES.

02:11PM 10   Q.   AND IT CONTAINS THIS PROVISION; CORRECT?

02:11PM 11   A.   CORRECT.

02:11PM 12   Q.   AND WHAT THE PROVISION SAYS IS, "SUCH INVESTOR UNDERSTANDS

02:11PM 13   AND ACKNOWLEDGES THAT THE COMPANY HAS A LIMITED FINANCIAL AND

02:11PM 14   OPERATING HISTORY AND THAT AN INVESTMENT IN THE COMPANY IS

02:11PM 15   HIGHLY SPECULATIVE AND INVOLVES SUBSTANTIAL RISKS."

02:11PM 16        CORRECT?  THAT'S WHAT IT SAYS; RIGHT?

02:11PM 17   A.   THAT'S WHAT IT SAYS.

02:11PM 18   Q.   AND THEN LET'S GO TO PAGE 42 OF THE EXHIBIT.

02:12PM 19        IT SHOWS THE NUMBER OF SHARES YOU'RE PURCHASING; IS THAT

02:12PM 20   RIGHT?

02:12PM 21   A.   RIGHT.

02:12PM 22   Q.   AND THAT'S 6,666; IS THAT CORRECT?

02:12PM 23   A.   CORRECT.

02:12PM 24   Q.   AND FOR A TOTAL DOLLAR AMOUNT OF 99,990; CORRECT?

02:12PM 25   A.   CORRECT.

EISENMAN CROSS BY MS. WALSH

02:12PM  1    Q.   AND THE PURCHASE PRICE WAS $15 PER SHARE; RIGHT?

02:12PM  2    A.   RIGHT.

02:12PM  3    Q.   SO THE TOTAL AMOUNT THAT YOU INVESTED IN THERANOS AFTER

02:12PM  4    2013 WAS $1,234,233; CORRECT?

02:12PM  5    A.   CORRECT.

02:12PM  6    Q.   AND YOU HAD 408,880 SHARES; CORRECT?

02:12PM  7    A.   I DON'T RECALL THE NUMBER OF SHARES.

02:12PM  8    Q.   BUT IF YOU, IF YOU ADD YOUR 2006 INVESTMENT WITH THE 2013,

02:12PM  9    DOES THAT SOUND ABOUT RIGHT?

02:12PM  10   A.   IT SOUNDS REASONABLE.

02:12PM  11   Q.   YEAH.   OKAY.   LET'S GO TO 14103.

02:13PM  12   A.   OKAY.

02:13PM  13   Q.   OKAY.   ALL RIGHT.   14103 IS IN EVIDENCE.

02:13PM  14        AND I WANT TO DRAW YOUR ATTENTION TO MS. HOLMES'S -- THE

02:13PM  15   TOP EMAIL, HER LAST PARAGRAPH ABOUT THE FRUSTRATION WITH THE

02:13PM  16   LEVEL OF INTERACTION.

02:13PM  17        DO YOU SEE THAT?

02:13PM  18   A.   YES.

02:13PM  19   Q.   AND SHE WAS STRONGLY ENCOURAGING YOU TO RECONSIDER THE

02:13PM  20   OPPORTUNITY TO SELL YOUR SHARES; RIGHT?

02:13PM  21   A.   RIGHT.

02:13PM  22   Q.   AND SHE WAS SAYING THAT WE CAN PROVIDE YOU WITH A GREATER

02:14PM  23   THAN FIVE TIMES RETURN ON YOUR INVESTMENT; CORRECT?

02:14PM  24   A.   THAT'S WHAT SHE PROPOSED.

02:14PM  25   Q.   OKAY.   AND THAT WAS IN 2010; RIGHT?

02:14PM 1      A.  RIGHT.  BUT AS YOU KNOW, THIS NEVER CAME TO FRUITION.

02:14PM 2      Q.  OKAY.  LET'S GO TO 2468.

02:14PM 3          2468 IS IN EVIDENCE.

02:14PM 4          AND IF WE LOOK AT PAGE 2.

02:14PM 5          THIS IS IN 2015, MARCH OF 2015.

02:14PM 6          DO YOU SEE THAT?

02:14PM 7      A.  YES.

02:14PM 8      Q.  OKAY.  AND YOU'RE DESCRIBING AN OFFER FROM BROADMARK TO

02:14PM 9      PURCHASE THERANOS STOCK; IS THAT RIGHT?

02:14PM 10     A.  NO, IT WASN'T AN OFFER.

02:14PM 11     Q.  WELL, AN OPPORTUNITY TO SELL THERANOS STOCK; IS THAT

02:14PM 12     RIGHT?

02:14PM 13     A.  IT WAS A POTENTIAL OPPORTUNITY.  THERE WERE OPPORTUNITIES

02:15PM 14     THAT CAME ALONG THAT WEREN'T LEGITIMATE.

02:15PM 15     Q.  OKAY.  THIS WAS, AS YOU STATE IN THE EMAIL, YOU STATE, "WE

02:15PM 16     HAVE BEEN INFORMED OF AN OPPORTUNITY TO SELL THERANOS STOCK."

02:15PM 17         IS THAT WHAT YOU SAY IN THE EMAIL?

02:15PM 18     A.  IT WAS A POTENTIAL OPPORTUNITY.  I DIDN'T KNOW WHETHER IT

02:15PM 19     WAS LEGITIMATE OR NOT.

02:15PM 20     Q.  DO YOU SEE IN THE EMAIL, "WE HAVE BEEN INFORMED OF AN

02:15PM 21     OPPORTUNITY TO SELL THERANOS STOCK"?

02:15PM 22     A.  YES.

02:15PM 23     Q.  ARE THOSE YOUR WORDS?

02:15PM 24     A.  YES.

02:15PM 25     Q.  OKAY.  AND MR. BALWANI RESPONDS SAYING, "THE LAST

02:15PM  1    TRANSACTION WAS AT $17 PER SHARE AS YOU ALREADY KNOW"; RIGHT?

02:15PM  2    A.   I DIDN'T KNOW.  THAT WAS INFORMATION THAT WAS PUT OUT

02:15PM  3    THERE, BUT NEVER CONFIRMED.

02:15PM  4    Q.   WELL, I THOUGHT YOU JUST SAID THAT YOU HAD A PHONE CALL

02:15PM  5    WITH MR. BALWANI WHERE HE TOLD YOU THAT?  WASN'T THAT YOUR

02:15PM  6    TESTIMONY EARLIER?

02:15PM  7    A.   THE TESTIMONY IS WHEN WE INVESTED AT 15, THAT THEY WERE

02:15PM  8    GOING TO DO ANOTHER LARGER INSTITUTIONAL ROUND AT 17.  BUT I

02:16PM  9    NEVER GOT CONFIRMATION ABOUT THE SIZE OF THE ROUND.

02:16PM  10        THERE MIGHT HAVE BEEN A LATER EMAIL.  THIS MIGHT BE THE

02:16PM  11   ONLY CONFIRMATION THAT THERE WAS A $17 A SHARE ROUND.

02:16PM  12   Q.   OKAY.  PUTTING ASIDE THAT, AT $17 A SHARE, YOU WOULD HAVE

02:16PM  13   MADE MONEY ON YOUR INVESTMENT; CORRECT?

02:16PM  14   A.   WELL, THE KEY WORD IS "WOULD."

02:16PM  15        THERE WAS NEVER --

02:16PM  16   Q.   IF YOU SOLD YOUR SHARES --

02:16PM  17   A.   CAN I FINISH?

02:16PM  18        THERE WAS NEVER A LEGITIMATE OPPORTUNITY FROM THE COMPANY

02:16PM  19   OR FROM A THIRD PARTY TO BUY MY STOCK.  I PURSUED MANY

02:16PM  20   OPPORTUNITIES, BUT NONE OF THEM WERE LEGITIMATE OPPORTUNITIES.

02:16PM  21   Q.   WELL, MS. HOLMES EMAILED YOU ABOUT AN OPPORTUNITY TO SELL

02:16PM  22   YOUR STOCK AT FIVE TIMES THE VALUE; RIGHT?  WE SAW THAT IN

02:16PM  23   2010?  WE JUST SAW THAT EMAIL; CORRECT?

02:16PM  24   A.   AND WHEN I FOLLOWED UP TO PURSUE THAT OPPORTUNITY, SHE

02:17PM  25   STOPPED COMMUNICATING.  SO THAT OPPORTUNITY WAS EITHER NEVER

EISENMAN CROSS BY MS. WALSH

02:17PM 1    LEGITIMATE, OR IF IT MAY HAVE BEEN LEGITIMATE IN THE EARLY

02:17PM 2    STAGES, SHE DROPPED THE BALL.

02:17PM 3    Q.   AND LET'S TURN NOW TO 13150.

02:17PM 4         THIS IS AN EMAIL BETWEEN YOU AND CHRIS BOIES; RIGHT?

02:17PM 5    A.   YES.

02:17PM 6    Q.   AND IT'S ON AUGUST 18TH, 2015; CORRECT?

02:17PM 7    A.   CORRECT.

02:17PM 8    Q.   AND THE SUBJECT IS THERANOS FOLLOW UP FROM OUR

02:17PM 9    CONVERSATION TODAY; RIGHT?

02:17PM 10   A.   RIGHT.

02:17PM 11   Q.   AND CHRIS BOIES WAS THE SON OF DAVID BOIES; RIGHT?

02:17PM 12   A.   YES.

02:17PM 13   Q.   WHO WAS THE LAWYER FOR THERANOS; RIGHT?

02:17PM 14   A.   DAVID BOIES WAS THE LAWYER FOR THERANOS.  FOR THERANOS.

02:17PM 15        CHRIS APPARENTLY WAS DOING SOME THERANOS WORK BECAUSE HE'S

02:17PM 16   THE ONE THAT APPROACHED ME.

02:17PM 17   Q.   OKAY.  AND IN THIS EMAIL HE SAYS -- I'M SORRY.

02:18PM 18        YOU SAY, "CHRIS,

02:18PM 19        "I CIRCLE BACK WITH SOME OF THE" --

02:18PM 20        I'M SORRY, YOUR HONOR.  THIS IS NOT IN EVIDENCE.

02:18PM 21        I OFFER 13150.

02:18PM 22             MR. BOSTIC:  NO OBJECTION.

02:18PM 23             THE COURT:  IT'S ADMITTED.  IT MAY BE PUBLISHED.

02:18PM 24        (DEFENDANT'S EXHIBIT 13150 WAS RECEIVED IN EVIDENCE.)

02:18PM 25             MS. WALSH:  SORRY.  NOW I CAN READ THE EMAIL.

02:18PM  1    Q.   "CHRIS,

02:18PM  2         "I CIRCLED BACK WITH SOME OF THE EARLY STAGE CO-INVESTORS

02:18PM  3    TODAY."

02:18PM  4         DO YOU SEE THAT?

02:18PM  5    A.   YES.

02:18PM  6    Q.   "FIRST OF ALL, THEY THOUGHT THERE WAS A POST MONEY ROUND

02:18PM  7    AT $19?  IS THIS TRUE?  THEY ALSO FELT THAT CURRENT VALUATION

02:18PM  8    IS PROBABLY WELL IN EXCESS OF THE $15 OFFERED BY THE COMPANY."

02:18PM  9         DO YOU SEE THAT?

02:18PM  10   A.   YES.

02:18PM  11   Q.   OKAY.  AND SO THIS IS AN EMAIL ABOUT A POTENTIAL BUYOUT;

02:18PM  12   RIGHT?

02:18PM  13   A.   YES.

02:18PM  14   Q.   AND IT'S A BUYOUT AT $15 PER SHARE; RIGHT?

02:18PM  15   A.   POTENTIAL.

02:18PM  16   Q.   AND THAT WOULD HAVE BEEN, TO YOU, BASED ON THE VALUATION

02:18PM  17   OF THE COMPANY AT THE TIME, WORTH ABOUT $25 MILLION; IS THAT

02:19PM  18   RIGHT?

02:19PM  19   A.   POTENTIAL.  IT'S NOT A DONE DEAL UNTIL BOTH PARTIES AGREE,

02:19PM  20   AND THIS IS ANOTHER OFFER THAT CHRIS BOIES DID NOT FOLLOW

02:19PM  21   THROUGH.

02:19PM  22   Q.   BUT IF IT HAD COME TO FRUITION, IT WOULD HAVE BEEN

02:19PM  23   $25 MILLION FOR YOU; RIGHT?

02:19PM  24   A.   IF IT HAD.  THAT'S SPECULATIVE.  THIS WAS ANOTHER OFFER AS

02:19PM  25   THE FIRST OFFER AT THE GREATER THAN FIVE TIMES THAT WAS PUT OUT

02:19PM 1    THERE, BUT THERE WAS NO FOLLOW THROUGH.

02:19PM 2         I FOLLOWED THROUGH.  I WAS PURSUING THIS OFFER AND IT WENT

02:19PM 3    AWAY.

02:19PM 4         CHRIS BOIES STOPPED COMMUNICATING WITH ME WHEN I WAS

02:19PM 5    TRYING TO PURSUE THIS OFFER.

02:19PM 6    Q.   SO IT'S CLEAR THAT A SALE DIDN'T HAPPEN.

02:19PM 7         MY QUESTION IS JUST ABOUT THE MATH.

02:19PM 8         IF YOU HAD SOLD YOUR STOCK PURSUANT TO THIS OFFER, YOU

02:19PM 9    WOULD HAVE MADE ABOUT $25 MILLION; IS THAT RIGHT?  JUST THE

02:20PM 10   MATH?  IS THAT RIGHT?

02:20PM 11   A.   I DON'T SEE WHERE THAT IS RELEVANT.  I'M SORRY.

02:20PM 12   Q.   IS THE MATH RIGHT?

02:20PM 13            THE COURT:  CAN YOU ANSWER HER QUESTION?

02:20PM 14            THE WITNESS:  OKAY.

02:20PM 15        IF THIS OFFER WAS LEGITIMATE, AND THEY FOLLOWED THROUGH ON

02:20PM 16   THIS OFFER, THAT IS THE POTENTIAL.

02:20PM 17        BUT MY TESTIMONY IS THAT THIS WAS ANOTHER ILLEGITIMATE

02:20PM 18   OFFER.  THEY DID NOT FOLLOW THROUGH WITH THIS OFFER, AND I

02:20PM 19   DON'T KNOW WHY BECAUSE I'VE PURSUED THE OFFER AND CHRIS BOIES

02:20PM 20   DROPPED THE BALL.  HE STOPPED COMMUNICATING.

02:20PM 21   BY MS. WALSH:

02:20PM 22   Q.   OKAY.  SO PUT ASIDE LEGITIMATE, NOT LEGITIMATE, I'M JUST

02:20PM 23   FOCUSSED ON THE MATH.

02:20PM 24        IF YOU HAD ACCEPTED THIS OFFER AND THE DEAL HAD GONE

02:20PM 25   THROUGH, YOU WOULD HAVE MADE $25 MILLION BASED ON THE VALUATION

02:20PM   1    OF THERANOS AT THE TIME.  IS THAT MATH CORRECT?

02:20PM   2    A.   IT'S HARD TO ANSWER BECAUSE IT WAS NOT AN OFFER.  IT WAS

02:20PM   3    NOT A LEGITIMATE OFFER.

02:20PM   4    Q.   IS THE MATH CORRECT?

02:20PM   5    A.   IF THAT WAS A LEGITIMATE OFFER AND I HAD ACCEPTED IT, THE

02:21PM   6    MATH IS CORRECT.

02:21PM   7    Q.   SO THE ANSWER IS YES, THE MATH IS CORRECT?  IS THAT YOUR

02:21PM   8    ANSWER?

02:21PM   9    A.   YES.

02:21PM   10   Q.   LET'S TURN TO 13191.

02:21PM   11        DO YOU SEE THAT?

02:21PM   12   A.   YES.

02:21PM   13   Q.   THIS IS AN EMAIL BETWEEN YOU AND SOME INDIVIDUALS AT A

02:21PM   14   PLACE CALLED SHARES POST.

02:21PM   15        DO YOU SEE THAT?

02:21PM   16   A.   YES.

02:21PM   17   Q.   AND IT'S IN SEPTEMBER 2015; CORRECT?

02:21PM   18   A.   YES.

02:21PM   19   Q.   AND THIS EMAIL RELATED TO YOU PURSUING OR TRYING TO SELL

02:22PM   20   YOUR STOCK; IS THAT RIGHT?

02:22PM   21   A.   YES.

02:22PM   22   Q.   OKAY.

02:22PM   23        YOUR HONOR, WE OFFER 13191.

02:22PM   24        MR. BOSTIC:  801, YOUR HONOR.

02:22PM   25        (PAUSE IN PROCEEDINGS.)

02:22PM  1          MS. WALSH:  MR. EISENMAN HAS TESTIFIED THAT HIS

02:22PM  2     INVESTMENT IS NOW WORTHLESS, AND THIS GOES TO ANOTHER INSTANCE

02:22PM  3     OF HIM BEING GIVEN AN OPPORTUNITY TO SELL AND HIM NOT SELLING.

02:22PM  4          MR. BOSTIC:  THAT SOUNDS LIKE IT'S BEING OFFERED FOR

02:22PM  5     THE TRUTH, YOUR HONOR.

02:22PM  6          THE COURT:  IS IT?

02:22PM  7          MS. WALSH:  IT GOES TO HIS STATE OF MIND.

02:22PM  8          THE COURT:  SO IS IT OFFERED FOR THE TRUTH OF THE

02:22PM  9     MATTER ASSERTED?

02:22PM  10          MS. WALSH:  NO.

02:22PM  11          THE COURT:  ALL RIGHT.

02:22PM  12          MR. BOSTIC:  YOUR HONOR, THE WITNESS'S STATE OF MIND

02:22PM  13     POST-INVESTMENT IS NOT AN ISSUE IN THIS CASE.

02:22PM  14          MS. WALSH:  WELL, IT --

02:22PM  15          THE COURT:  WELL, THAT WAS MY NEXT QUESTION.

02:22PM  16       GO AHEAD.

02:22PM  17          MS. WALSH:  WELL, IT IS AN ISSUE IF MR. EISENMAN

02:22PM  18     TESTIFIED ABOUT WHAT HAPPENED WITH HIS STOCK AT THE END OF THE

02:23PM  19     DAY OR WHAT WAS THE VALUE OF HIS SHARES AT THE END OF THE DAY.

02:23PM  20          THE COURT:  I'M NOT CERTAIN I CAPTURE THAT.

02:23PM  21       THIS IS POST-INVESTMENT?

02:23PM  22          MS. WALSH:  IT IS POST-INVESTMENT.

02:23PM  23       THE OTHER THING I WOULD JUST POINT OUT IS THAT THE TOP

02:23PM  24     EMAIL IS A SERIES OF QUESTIONS.  SO THEY'RE NOT FACTUAL

02:23PM  25     ASSERTIONS, THEY'RE JUST QUESTIONS BEING POSED.

02:23PM   1          THE COURT:  WELL, IT ALSO CREATES SOME 403 TYPE

02:23PM   2     ISSUES, DOES IT?  IT SEEMS IT MIGHT.

02:23PM   3          MS. WALSH:  IT IS PROBATIVE OF MR. EISENMAN'S

02:24PM   4     OPPORTUNITIES TO SELL HIS STOCK.

02:24PM   5      I DON'T THINK THERE ARE ANY ASSERTIONS IN HERE THAT GO TO

02:24PM   6     THE TRUTH.  THERE'S NO ASSERTION THAT IS BEING MADE.  THERE ARE

02:24PM   7     QUESTIONS BEING POSED.

02:24PM   8          THE COURT:  ALL RIGHT.  THERE HAVE BEEN DISCUSSIONS

02:24PM   9     ABOUT THIS.

02:24PM  10      I'LL PERMIT THIS TO BE ADMITTED, BUT NOT FOR THE TRUTH OF

02:24PM  11     THE MATTER ASSERTED, LADIES AND GENTLEMEN, NOT FOR THE TRUTH OF

02:24PM  12     ANY OF THE ITEMS, INCLUDING NUMBERS AND THOSE THINGS THAT ARE

02:24PM  13     ASSERTED IN THESE DOCUMENTS.

02:24PM  14      THIS JUST GOES TO THE WITNESS'S STATE OF MIND IN REGARDS

02:24PM  15     TO HIS FORMER TESTIMONY ABOUT HIS THOUGHTS ABOUT VALUATION AND

02:24PM  16     SELLING AND FOR THAT LIMITED PURPOSE.

02:24PM  17      IT'S ADMITTED, AND IT MAY BE PUBLISHED.

02:24PM  18          MS. WALSH:  THANK YOU.

02:24PM  19      (DEFENDANT'S EXHIBIT 13191 WAS RECEIVED IN EVIDENCE.)

02:24PM  20     BY MS. WALSH:

02:24PM  21     Q.   OKAY.  IF WE CAN GO TO THE EMAIL FIRST IN TIME,

02:24PM  22     SEPTEMBER 3RD, 2015.

02:24PM  23      MR. EISENMAN, YOU WRITE TO A FELLOW NAMED BRYSON TOMBRIDGE

02:24PM  24     AT SHARES POST; RIGHT?

02:24PM  25     A.   YES.

EISENMAN CROSS BY MS. WALSH

02:25PM  1    Q.   AND WHAT IS SHARES POST?

02:25PM  2    A.   IT IS A MARKET MAKER THAT TRIES TO MATCH BUYERS AND

02:25PM  3    SELLERS WITH NONPUBLIC STOCKS, NONPUBLIC SECURITIES.

02:25PM  4    Q.   OKAY.  AND WHAT YOU SAY TO MR. TOMBRIDGE IS, "BRYSON,

02:25PM  5         "I WANTED TO MAKE SURE YOU RECEIVED ALL DOCUMENTATION TO

02:25PM  6    LIST MY THERANOS FOR SALE.  COULD YOU UPDATE ME ON THE CURRENT

02:25PM  7    MARKET... WHERE STOCK HAS BEEN TRADING, BOTH GROSS SALES PRICE

02:25PM  8    AND NET OF COMMISSIONS, AND ALSO HOW MUCH STOCK IS IN FRONT OF

02:25PM  9    ME AND AT WHAT PRICE."

02:25PM  10        DO YOU SEE THAT?

02:25PM  11   A.   YES.

02:25PM  12   Q.   AND THEN MR. TOMBRIDGE WRITES BACK SAYING "HI ALAN,

02:25PM  13        "YES, WE RECEIVED YOUR DOCUMENTATION."

02:25PM  14        AND HE SAYS SOME MORE THINGS.

02:25PM  15        "WE COMPLETED A TRANSACTION AT THE PRICE OF 14.75.

02:25PM  16        "IN TERMS OF THE MARKET, WE HAVE A LARGE BLOCK OF SELLERS

02:26PM  17   AT $19 PER SHARE."

02:26PM  18        AND THEN YOU WRITE, "HI BRYSON,

02:26PM  19        "THIS CONFLICTS WITH MY CONVERSATION WITH GENO.  I THOUGHT

02:26PM  20   HE SAID THAT YOUR FIRM HAD DONE SEVERAL TRANSACTIONS IN

02:26PM  21   THERANOS STOCK, AND CURRENT TRANSACTIONS WERE SELLING IN THE

02:26PM  22   $17 TO $19 PRICE RANGE BEFORE COMMISSION.  HE ALSO SAID THAT

02:26PM  23   THE COMPANY HAD EXERCISED ITS FIRST RIGHT OF REFUSAL ON SOME OF

02:26PM  24   THE TRANSACTIONS AND PURCHASED STOCK FOR AS MUCH AS $17.40.  I

02:26PM  25   NEED CURRENT AND ACCURATE INFORMATION, SO I CAN SET MY PRICES

02:26PM 1    AND QUANTITIES.  CAN YOU CONFIRM WITH ZENO AND RESPOND TODAY?"

02:26PM 2        I THINK IT'S ACTUALLY GENO.

02:26PM 3        AND GENO RESPONDS SAYING "HI ALAN,

02:26PM 4        "SORRY, I HAVE JUST RETURNED FROM A WEEK LONG VACATION AND

02:26PM 5    I ACTUALLY WAS UNPLUGGED FOR ONCE.  NO RUSH AS WE HAVE SEVERAL

02:26PM 6    LARGE BLOCKS TO FILL IN THE NEXT FEW MONTHS BEFORE WE GET TO

02:26PM 7    YOUR PRICE LEVEL."

02:26PM 8        DO YOU SEE THAT?

02:26PM 9    A.   YES.

02:26PM 10   Q.   AND YOU RESPOND, "GENO,

02:26PM 11       "I NEED ACCURATE INFORMATION.  PLEASE LET ME KNOW THE

02:27PM 12   TOTAL DOLLAR AMOUNT OF THERANOS YOUR FIRM HAS CROSSED SINCE

02:27PM 13   INCEPTION."

02:27PM 14       AND BY "CROSS" YOU MEAN?

02:27PM 15   A.   MATCHING BUYERS AND SELLERS.

02:27PM 16   Q.   BY "CROSS" YOU MEAN MATCHING BUYERS AND SELLERS?

02:27PM 17   A.   YES.

02:27PM 18   Q.   "WHAT ARE THE DOLLAR AMOUNTS OF LARGER TRADE?  WHAT ARE

02:27PM 19   THE GROSS AND NET PRICES OF THE MOST RECENT TRADES?  WHAT NET

02:27PM 20   PRICE CAN I EXPECT FOR MY STOCK IF I WANT TO SELL 100,000, A

02:27PM 21   MILLION, OR 10 MILLION?  IS THE MARKET LIQUID ENOUGH TO ABSORB

02:27PM 22   $10 MILLION WITHOUT LOWERING MY PRICE?"

02:27PM 23       DO YOU SEE THAT?

02:27PM 24   A.   YES.

02:27PM 25   Q.   AND WE CAN TAKE THAT DOWN.

EISENMAN CROSS BY MS. WALSH

02:27PM  1          OKAY.  SO YOU'VE TESTIFIED TODAY ABOUT INFORMATION THAT

02:28PM  2     YOU WANTED TO GET FROM THERANOS THAT YOU DID NOT GET.  IS THAT

02:28PM  3     FAIR?

02:28PM  4     A.   YES.

02:28PM  5     Q.   AND THAT'S INFORMATION THAT YOU ASKED FROM MS. HOLMES AND

02:28PM  6     MR. BALWANI; RIGHT?

02:28PM  7     A.   YES.

02:28PM  8     Q.   AND SO LET'S TALK ABOUT OTHER INFORMATION THAT MR. BALWANI

02:28PM  9     MAY NOT HAVE GIVEN YOU.  OKAY?

02:28PM  10    A.   OKAY.

02:28PM  11    Q.   DID MR. BALWANI TELL YOU THAT HE GUARANTEED A LINE OF

02:28PM  12    CREDIT FOR THERANOS FOR $10 MILLION?

02:28PM  13    A.   NO.

02:28PM  14    Q.   DID HE TELL YOU THAT THAT WAS IN 2009 DURING THE HEIGHT OF

02:28PM  15    THE FINANCIAL CRISIS?

02:28PM  16    A.   NO.

02:28PM  17    Q.   DID HE TELL YOU THAT HE USED HIS PERSONAL MONEY TO DO

02:28PM  18    THAT?

02:28PM  19    A.   NO.

02:28PM  20    Q.   AND DID HE TELL YOU THAT HE DIDN'T CHARGE INTEREST ON

02:28PM  21    HAVING HIS MONEY TIED UP IN THAT WAY?

02:28PM  22    A.   NO.

02:28PM  23    Q.   OKAY.  DID MR. BALWANI TELL YOU THAT HE MADE NO MORE THAN

02:28PM  24    $99,000 A YEAR AS A CEO AT A COMPANY THAT WAS VALUED AT

02:28PM  25    $9 BILLION?

02:28PM  1    A.   NO.

02:29PM  2    Q.   AND DID HE TELL YOU THAT HE NEVER ASKED FOR ANY OTHER

02:29PM  3    COMPENSATION FROM THE COMPANY?

02:29PM  4    A.   NO.

02:29PM  5    Q.   DID HE TELL YOU THAT WALGREENS MADE A COMMITMENT TO

02:29PM  6    THERANOS AT THE END OF DECEMBER OF 2013 TO DO A NATIONAL

02:29PM  7    ROLLOUT OF THERANOS TECHNOLOGY?

02:29PM  8    A.   I'M SORRY.  DID HE TELL ME?

02:29PM  9    Q.   DID MR. BALWANI TELL YOU THAT?

02:29PM 10    A.   I DON'T THINK I GOT THAT INFORMATION FROM MR. BALWANI.

02:29PM 11    Q.   OKAY.  AND DID MR. BALWANI TELL YOU THAT WALGREENS AGREED

02:29PM 12    TO PAY, IN DECEMBER OF 2013, $75 MILLION TO THERANOS?  DID HE

02:29PM 13    TELL YOU THAT?

02:29PM 14    A.   NO.

02:29PM 15              MS. WALSH:  MAY I HAVE A MOMENT, YOUR HONOR?

02:29PM 16              THE COURT:  YES.

02:29PM 17        (DISCUSSION AMONGST DEFENSE COUNSEL OFF THE RECORD.)

02:29PM 18              MS. WALSH:  I DON'T HAVE ANY FURTHER QUESTIONS.

02:29PM 19              THE COURT:  WILL YOU HAVE REDIRECT?

02:29PM 20              MR. BOSTIC:  I WILL, YOUR HONOR.

02:30PM 21              THE COURT:  I WONDER IF WE SHOULD TAKE OUR BREAK NOW

02:30PM 22    BEFORE YOUR REDIRECT, OR DO YOU THINK WE SHOULD GO FORWARD WITH

02:30PM 23    THAT?

02:30PM 24              MR. BOSTIC:  I THINK NOW MAY BE A GOOD TIME FOR A

02:30PM 25    BREAK, YOUR HONOR.

02:30PM 1          THE COURT:  WELL, LET'S DO THAT NOW, LADIES AND

02:30PM 2     GENTLEMEN.  LET'S TAKE A BREAK NOW.  WE'LL TAKE ABOUT 25 OR

02:30PM 3     30 MINUTES, AND THEN WE'LL RESUME.

02:30PM 4          (RECESS FROM 2:30 P.M. UNTIL 3:01 P.M.)

03:07PM 5          THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

03:07PM 6     SORRY FOR THE DELAY.

03:07PM 7          THE PARTIES WHO WERE PREVIOUSLY PRESENT ARE PRESENT ONCE

03:07PM 8     AGAIN.

03:07PM 9          MR. BOSTIC, YOU HAVE QUESTIONS?

03:07PM 10          MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

03:07PM 11                    **REDIRECT EXAMINATION**

03:07PM 12     BY MR. BOSTIC:

03:07PM 13     Q.   GOOD AFTERNOON, MR. EISENMAN.

03:07PM 14     A.   GOOD AFTERNOON.

03:07PM 15     Q.   I'D LIKE TO START ON THE TOPIC OF THE EFFORTS THAT YOU

03:07PM 16     MADE TO EXPLORE POTENTIAL SALES OF YOUR THERANOS SHARES IN

03:07PM 17     2015.

03:07PM 18          DO YOU HAVE THAT IN MIND?

03:07PM 19     A.   YES.

03:07PM 20     Q.   LET ME START BY ASKING, WHY WERE YOU INTERESTED IN

03:08PM 21     POTENTIAL OPPORTUNITIES TO SELL YOUR THERANOS SHARES IN 2015?

03:08PM 22     A.   BECAUSE I HAD AN OVERWEIGHTED POSITION IF THE MARKET WAS

03:08PM 23     AS IT WAS PRESENTED IN FINANCIAL PRESS, AND PARTIALLY A

03:08PM 24     FRUSTRATION BECAUSE I HAD NO TANGIBLE FINANCIAL INFORMATION TO

03:08PM 25     BASE THE VALUE OF MY SHARES.

03:08PM   1    Q.   SO DID YOUR LACK OF INFORMATION FROM MR. BALWANI AND

03:08PM   2    MS. HOLMES CONTRIBUTE TO YOUR INTEREST IN POTENTIALLY PARTING

03:08PM   3    WAYS WITH THE COMPANY?

03:08PM   4    A.   YES, IT DID.

03:08PM   5    Q.   JUST SO THE RECORD IS CLEAR, AT ANY POINT AFTER YOU

03:08PM   6    INVESTED IN 2013, WAS THERE A COMPLETE OFFER TO SELL YOUR

03:08PM   7    SHARES THAT YOU COULD HAVE ACCEPTED?

03:08PM   8    A.   NO.

03:08PM   9    Q.   IF THERE HAD BEEN AN OFFER TO SELL YOUR SHARES THAT YOU

03:08PM  10    COULD HAVE ACCEPTED, DID YOU HAVE THE INFORMATION THAT YOU

03:09PM  11    WOULD HAVE NEEDED TO EVALUATE THAT OFFER?

03:09PM  12    A.   NO, I DIDN'T.

03:09PM  13    Q.   AND WHAT DO YOU MEAN BY THAT?

03:09PM  14    A.   I HAD NO EVEN BASIC FINANCIAL INFORMATION ABOUT REVENUES

03:09PM  15    THAT THE COMPANY HAD DONE HISTORICALLY, WHAT THEY WERE

03:09PM  16    CURRENTLY DOING.  THERE WAS BASICALLY NO -- DESPITE MY MANY

03:09PM  17    ATTEMPTS, THERE WAS NO RELEVANT OR MATERIAL INFORMATION THAT I

03:09PM  18    COULD OBTAIN FROM ANY SOURCE.

03:09PM  19    Q.   LET'S TALK SOME MORE ABOUT THOSE ATTEMPTS THAT YOU MADE TO

03:09PM  20    GET INFORMATION, AND LET'S GO BACK TO 2010.

03:09PM  21         DO YOU RECALL MS. WALSH SHOWING YOU SOME EMAILS DURING THE

03:09PM  22    SUMMER OF 2010 WHERE YOU WERE CONTACTING MS. HOLMES AND

03:09PM  23    MR. BALWANI TRYING TO GET MORE INFORMATION ABOUT THE COMPANY?

03:09PM  24    A.   YES.

03:09PM  25    Q.   AND WERE THOSE EFFORTS, GENERALLY SPEAKING, SUCCESSFUL OR

03:09PM   1    UNSUCCESSFUL IN GETTING INFORMATION?

03:09PM   2    A.   UNSUCCESSFUL.

03:09PM   3    Q.   AT THAT TIME IN MID-2010, HOW MUCH OF YOUR MONEY WAS

03:10PM   4    INVESTED IN THE COMPANY?

03:10PM   5    A.   ARE YOU TALKING ABOUT DOLLARS?

03:10PM   6    Q.   DOLLARS, YES.

03:10PM   7    A.   IN 2010?  OF THE FAMILY INVESTMENTS, MY PERSONAL

03:10PM   8    INVESTMENT WAS APPROXIMATELY $450,000.

03:10PM   9    Q.   AND OF THE TOTAL AMOUNT, INCLUDING INDIVIDUALS ASSOCIATED

03:10PM  10    WITH YOU, WHAT WAS THE TOTAL THAT YOU HAD INVESTED?

03:10PM  11    A.   THE TOTAL AMOUNT FOR MY IMMEDIATE FAMILY WAS APPROXIMATELY

03:10PM  12    A MILLION -- BETWEEN 1 MILLION 1 AND 1 MILLION 2.

03:10PM  13    Q.   YOU TESTIFIED EARLIER ABOUT QUARTERLY CALLS THAT YOU HAD

03:10PM  14    PREVIOUSLY HAD WITH MS. HOLMES.

03:10PM  15         DO YOU RECALL THAT?

03:10PM  16    A.   YES.

03:10PM  17    Q.   AND HOW LONG WERE THOSE QUARTERLY CALLS?

03:10PM  18    A.   HOW LONG WAS THE DURATION OF EACH CALL?

03:10PM  19    Q.   ON AVERAGE, YES.

03:10PM  20    A.   ON AVERAGE, 5 TO 15 MINUTES.

03:10PM  21    Q.   SO ARE WE TALKING ABOUT APPROXIMATELY ONE HOUR PER YEAR OF

03:10PM  22    PHONE CONVERSATIONS BETWEEN YOU AND MS. HOLMES DURING THAT TIME

03:10PM  23    PERIOD?

03:10PM  24    A.   YES, YES.

03:11PM  25    Q.   AND AT THE TIME THAT YOU WERE MAKING THESE REQUESTS FOR

03:11PM 1    INFORMATION, DID YOU THINK IT WAS REASONABLE THAT YOUR MILLION

03:11PM 2    DOLLAR INVESTMENT IN THE COMPANY WOULD ENTITLE YOU TO AN HOUR A

03:11PM 3    YEAR OF THE CEO'S TIME?

03:11PM 4    A.   YES.

03:11PM 5    Q.   DO YOU RECALL SEEING IN SOME OF THE COMMUNICATIONS FROM

03:11PM 6    THERANOS THAT IF INFORMATION WAS PROVIDED TO OTHER

03:11PM 7    SHAREHOLDERS, YOU WOULD RECEIVE THAT INFORMATION AS WELL?

03:11PM 8    A.   YES.

03:11PM 9    Q.   DO YOU HAVE ANY KNOWLEDGE OF OTHER SHAREHOLDERS OR

03:11PM 10   POTENTIAL SHAREHOLDERS OF THERANOS RECEIVING MORE DETAILED

03:11PM 11   INFORMATION THAN WHAT YOU WERE GIVEN?

03:11PM 12   A.   WE HAD SOME COMMUNICATION THROUGH DAVID HARRIS THAT THERE

03:11PM 13   WERE OTHER SHAREHOLDERS THAT, THAT WERE PRIVY TO FINANCIAL

03:11PM 14   INFORMATION.

03:11PM 15   Q.   IS THAT ONE OF THE REASONS WHY YOU WERE PRESSING THERANOS

03:11PM 16   TO GET THOSE DISCLOSURES YOURSELF?

03:11PM 17   A.   THAT WAS ONE OF MANY REASONS.

03:12PM 18   Q.   AT ANY POINT WHEN YOU WERE ASKING FOR MORE INFORMATION

03:12PM 19   FROM THERANOS, WAS YOUR GOAL TO GET INFORMATION THAT WAS NOT

03:12PM 20   GOING TO BE SHARED WITH OTHER INVESTORS?

03:12PM 21   A.   I'M SORRY.  COULD YOU RESTATE THE QUESTION?

03:12PM 22   Q.   LET ME ASK IT A DIFFERENT WAY.

03:12PM 23        AT ANY POINT WAS YOUR GOAL TO GET AN ADVANTAGE, AS

03:12PM 24   COMPARED TO OTHER INVESTORS, BY GETTING INFORMATION THAT THEY

03:12PM 25   DID NOT HAVE?

03:12PM  1      A.   NO.

03:12PM  2                   MS. WALSH:  OBJECTION.  LEADING.

03:12PM  3                   THE COURT:  OVERRULED.  THE ANSWER CAN REMAIN.

03:12PM  4      BY MR. BOSTIC:

03:12PM  5      Q.   AND YOUR ANSWER, MR. EISENMAN?

03:12PM  6      A.   NO.

03:12PM  7                   MR. BOSTIC:  YOUR HONOR, EXHIBIT 3387 WAS PREVIOUSLY

03:12PM  8      ADMITTED.

03:12PM  9           MAY WE PUBLISH?

03:12PM  10                  THE COURT:  YES.

03:12PM  11     BY MR. BOSTIC:

03:12PM  12     Q.   LET'S START WITH PAGE 143.

03:12PM  13          MR. EISENMAN, DO YOU SEE ON THE SCREEN A DOCUMENT THAT IS

03:12PM  14     LABELLED CONFIDENTIAL INVESTMENT MATERIALS FOR DANIEL MOSLEY?

03:12PM  15     A.   YES.

03:12PM  16     Q.   AND DO YOU KNOW THE NAME DANIEL MOSLEY?

03:12PM  17     A.   NO.

03:12PM  18     Q.   DO YOU SEE THE THERANOS LOGO AT THE TOP?

03:13PM  19     A.   YES.

03:13PM  20     Q.   LET'S LOOK AT PAGE 277 NEXT.

03:13PM  21          AND DO YOU SEE NOW THAT WE'RE LOOKING AT A PAGE LABELLED

03:13PM  22     CONFIDENTIAL THERANOS BRIEFING?

03:13PM  23     A.   YES.

03:13PM  24     Q.   LET'S LOOK AT THE FOLLOWING PAGE, 278.

03:13PM  25          DO YOU SEE HERE THERE'S THE BEGINNING OF A DOCUMENT THAT

03:13PM   1      IS LABELLED THERANOS CONFIDENTIAL OVERVIEW?

03:13PM   2      A.   YES.

03:13PM   3      Q.   AT ANY POINT DID YOU RECEIVE THIS DOCUMENT OR A DOCUMENT

03:13PM   4      LIKE IT FROM MR. BALWANI OR MS. HOLMES?

03:13PM   5      A.   NO.

03:13PM   6      Q.   DID ANYONE AT THERANOS EVER SEND YOU THE THERANOS

03:13PM   7      CONFIDENTIAL OVERVIEW?

03:13PM   8      A.   NO.

03:13PM   9      Q.   IN YOUR COMMUNICATIONS WITH MR. BALWANI AND MS. HOLMES,

03:13PM  10      WAS ONE THING THAT YOU WERE ASKING FOR CONCRETE FINANCIAL

03:13PM  11      INFORMATION ABOUT THE COMPANY?

03:13PM  12      A.   YES.

03:13PM  13      Q.   LET'S LOOK IN THIS SAME EXHIBIT AT PAGE 513.

03:13PM  14           DO YOU SEE ON THE SCREEN IN FRONT OF YOU IN THE MATERIALS

03:14PM  15      PROVIDED TO DANIEL MOSLEY SOMETHING LABELED THERANOS

03:14PM  16      CONFIDENTIAL PRO FORMA STATEMENT OF CASH FLOW?

03:14PM  17      A.   YES.

03:14PM  18      Q.   WERE YOU EVER PROVIDED THIS INFORMATION BY THERANOS?

03:14PM  19      A.   NO (LAUGHTER).

03:14PM  20      Q.   WERE YOU EVER PROVIDED ANY SIMILAR FINANCIAL INFORMATION

03:14PM  21      IN RESPONSE TO YOUR REQUEST?

03:14PM  22      A.   NONE WHATSOEVER.

03:14PM  23      Q.   LET'S LOOK AT THE FOLLOWING PAGE.

03:14PM  24           DO YOU SEE ON THE SCREEN ADDITIONAL INFORMATION FOR THE

03:14PM  25      BALANCE SHEET FOR THERANOS FOR THE PERIOD ENDING

03:14PM    1      JULY 14TH, 2014?

03:14PM    2      A.   YES.

03:14PM    3      Q.   DID YOU EVER RECEIVE ANYTHING LIKE THIS IN RESPONSE TO

03:14PM    4      YOUR REQUEST FROM MR. BALWANI AND MS. HOLMES?

03:14PM    5      A.   NO.

03:14PM    6      Q.   THE ANSWER, SIR?

03:14PM    7      A.   NO.

03:14PM    8      Q.   AND FINALLY, LET'S LOOK AT THE NEXT PAGE.

03:14PM    9           AND THE PAGE AFTER THAT.

03:14PM   10           OKAY.  WE CAN SET THAT ASIDE.

03:14PM   11           DO YOU RECALL LOOKING WITH MS. WALSH AT AN EMAIL WHERE

03:15PM   12      MS. HOLMES INFORMED YOU THAT THERANOS WAS AN EARLY STAGE LIFE

03:15PM   13      SCIENCES COMPANY?

03:15PM   14      A.   YES.

03:15PM   15      Q.   AND DO YOU RECALL HER SAYING IN THAT EMAIL THAT BY ITS

03:15PM   16      VERY NATURE, THE COMPANY CARRIED IMMENSE RISK AND

03:15PM   17      UNPREDICTABILITY AS YOU KNOW AS A SAVVY INVESTOR?

03:15PM   18      A.   I RECALL.

03:15PM   19      Q.   DO YOU RECALL THAT THAT EMAIL WAS FROM JUNE OF 2010?

03:15PM   20      A.   YES.

03:15PM   21      Q.   AND MS. HOLMES SAID IN THAT EMAIL, "THIS MAY NOT CHANGE

03:15PM   22      FOR YEARS TO COME."

03:15PM   23           DO YOU REMEMBER THAT?

03:15PM   24      A.   YES.

03:15PM   25      Q.   FOLLOWING JUNE 2010, DID YOUR UNDERSTANDING OF THE RISK

03:15PM   1    INHERENT IN THE INVESTMENT CHANGE BASED ON WHAT MR. BALWANI AND

03:15PM   2    MS. HOLMES SAID?

03:15PM   3    A.   I'M SORRY.  COULD YOU RESTATE THE QUESTION?

03:15PM   4    Q.   SURE.  I CAN TRY TO ASK IT BETTER.

03:15PM   5    A.   OKAY.

03:15PM   6    Q.   MS. HOLMES SAID IN JUNE OF 2010 THAT THERANOS WAS AN EARLY

03:16PM   7    STAGE LIFE SCIENCES STARTUP AND, BY ITS VERY NATURE, CARRIES

03:16PM   8    IMMENSE RISK.  "THIS MAY NOT CHANGE FOR YEARS TO COME."

03:16PM   9        IN YOUR VIEW, HAD THAT CHANGED BY THE TIME THAT YOU MADE

03:16PM  10    THE INVESTMENT IN 2013?

03:16PM  11    A.   YES.

03:16PM  12    Q.   AND WHAT MADE YOU UNDERSTAND THAT THIS HAD CHANGED AND IT

03:16PM  13    WAS NO LONGER THE CASE IN 2013?

03:16PM  14    A.   RELYING ON SEVERAL PIECES OF INFORMATION, PRIMARILY THE

03:16PM  15    PHONE CONVERSATION A WEEK BEFORE THE ROUND CLOSED WITH

03:16PM  16    PAT MENDENHALL THAT HE SHARED WITH ALL OF US THAT THE RISK HAD

03:16PM  17    TAKEN OUT, THE SCIENCE HAD PROVEN, IT WAS AN ACCEPTABLE

03:16PM  18    SCIENCE, AND THIS ROUND WAS NOT REALLY FOR THE COMPANY TO

03:16PM  19    DEVELOP.  THE COMPANY HAD ALREADY DEVELOPED.  THEY WERE RAISING

03:16PM  20    MONEY TO GROW THE COMPANY.

03:16PM  21    Q.   LEADING UP TO YOUR INVESTMENT IN 2013, YOU HAD

03:16PM  22    CONVERSATIONS WITH MR. BALWANI AND MS. HOLMES; CORRECT?

03:16PM  23    A.   CORRECT.

03:16PM  24    Q.   IN ANY OF THOSE CONVERSATIONS PRIOR TO YOUR 2013

03:17PM  25    INVESTMENT, AROUND THAT TIME PERIOD, DID EITHER OF THEM SAY

03:17PM  1      ANYTHING LIKE WHAT MS. HOLMES HAD SAID IN 2010, THAT THE

03:17PM  2      INVESTMENT CARRIED IMMENSE RISK?

03:17PM  3      A.   COULD YOU RESTATE THE QUESTION?

03:17PM  4      Q.   SURE.  WE SAW THE STATEMENT FROM 2010 WHEN MS. HOLMES TOLD

03:17PM  5      YOU THE INVESTMENT CARRIED IMMENSE RISK.

03:17PM  6      A.   HIGH RISK, YES.

03:17PM  7      Q.   DID EITHER MR. BALWANI OR MS. HOLMES SAY THAT TO YOU

03:17PM  8      LEADING UP TO YOUR 2013 INVESTMENT?

03:17PM  9      A.   OKAY.  IN, IN PHONE CONVERSATION OR EMAIL OR EITHER?

03:17PM  10     Q.   EITHER.

03:17PM  11     A.   OKAY.  I DON'T RECALL.

03:17PM  12     Q.   IF THEY HAD TOLD YOU, LEADING UP TO YOUR 2013 INVESTMENT,

03:17PM  13     THAT THERE WAS IMMENSE RISK INVOLVED, WOULD THAT HAVE CHANGED

03:17PM  14     YOUR UNDERSTANDING ABOUT THE 2013 INVESTMENT?

03:17PM  15     A.   YES.

03:17PM  16             MS. WALSH:  OBJECTION.

03:17PM  17             THE COURT:  OVERRULED.

03:17PM  18             THE WITNESS:  YES.

03:17PM  19     BY MR. BOSTIC:

03:17PM  20     Q.   YOU TESTIFIED EARLIER THAT YOU HAVE YEARS OF EXPERIENCE

03:18PM  21     INVESTING IN PRIVATE AND PUBLIC COMPANIES; CORRECT?

03:18PM  22     A.   THAT'S CORRECT.

03:18PM  23     Q.   WHEN IT COMES TO INVESTING IN A PRIVATE COMPANY, DOES THE

03:18PM  24     COMPANY ITSELF HAVE A SAY OVER WHO IS ABLE TO PURCHASE SHARES

03:18PM  25     IN THE COMPANY?

EISENMAN REDIRECT BY MR. BOSTIC

03:18PM  1    A.   IN A PRIVATE COMPANY?

03:18PM  2    Q.   YES.

03:18PM  3    A.   DID THEY DETERMINE WHO IS ALLOWED TO BUY STOCK?

03:18PM  4    Q.   YES.

03:18PM  5    A.   YES.

03:18PM  6    Q.   SO WHEN YOU INVESTED IN 2013, COULD THERANOS HAVE SAID,

03:18PM  7    NO, THANK YOU, WE DON'T WANT YOUR INVESTMENT?

03:18PM  8    A.   YES.

03:18PM  9    Q.   THAT WAS YOUR UNDERSTANDING AT THE TIME?

03:18PM  10   A.   YES.

03:18PM  11   Q.   IN 2013 WHEN YOU WERE DISCUSSING THAT INVESTMENT WITH

03:18PM  12   MR. BALWANI AND MS. HOLMES, DID THEY AT ANY POINT REFUSE THE

03:18PM  13   ADDITIONAL MONEY THAT YOU WERE OFFERING?

03:18PM  14   A.   NO, QUITE TO THE CONTRARY.

03:18PM  15        MR. BALWANI WAS UNUSUALLY CORDIAL AND FRIENDLY AND

03:18PM  16   RESPONSIVE TO A RETURN CALL, WHICH WAS VERY DIFFERENT THAN OUR

03:18PM  17   HISTORY FOR THE PRIOR FEW YEARS.

03:18PM  18   Q.   DO YOU RECALL SEEING, DURING CROSS-EXAMINATION, SOME

03:19PM  19   EMAILS THAT MR. BALWANI SENT YOU LATER WHERE HE CLAIMED THAT HE

03:19PM  20   TOLD YOU NOT TO INVEST IN LATE 2013, EARLY 2014?

03:19PM  21   A.   I SAW THOSE.

03:19PM  22   Q.   WERE THOSE STATEMENTS TRUE?

03:19PM  23   A.   NO.

03:19PM  24   Q.   DID HE ACTUALLY SAY THAT TO YOU?

03:19PM  25   A.   NO, HE DIDN'T.

03:19PM   1    Q.   WAS MR. BALWANI, IN YOUR VIEW, WELCOMING OF YOUR

03:19PM   2    INVESTMENT IN THERANOS IN 2013?

03:19PM   3    A.   YES, HE WAS.

03:19PM   4    Q.   MS. WALSH ALSO ASKED YOU WHETHER MR. BALWANI OR MS. HOLMES

03:19PM   5    EVER GUARANTEED THAT THERE WOULD BE A PUBLIC MARKET FOR

03:19PM   6    THERANOS SHARES.

03:19PM   7        DO YOU RECALL THAT?

03:19PM   8    A.   YES.

03:19PM   9    Q.   AND YOU ANSWERED THAT YOU NEVER RECEIVED AN EXPLICIT

03:19PM   10   GUARANTEE; IS THAT RIGHT?

03:19PM   11   A.   THAT'S CORRECT.

03:19PM   12   Q.   AS SOMEONE INVESTING IN A COMPANY, OR CONSIDERING AN

03:19PM   13   INVESTMENT, DO YOU RELY ON STATEMENTS MADE BY EXECUTIVES EVEN

03:19PM   14   WHEN THEY'RE NOT STYLED AS EXPLICIT GUARANTEES?

03:19PM   15   A.   YES.

03:19PM   16   Q.   AND DO YOU RELY ON THE TRUTH OF THE STATEMENTS EVEN WHEN

03:20PM   17   THEY'RE NOT EXPLICIT GUARANTEES?

03:20PM   18   A.   YES.

03:20PM   19   Q.   MS. WALSH ALSO ASKED YOU ABOUT SOME OF THE OTHER FACTORS

03:20PM   20   THAT INFLUENCED YOUR DECISION TO INVEST IN 2013.

03:20PM   21        DO YOU RECALL THOSE QUESTIONS?

03:20PM   22   A.   YES.

03:20PM   23   Q.   AND SHE DISCUSSED THINGS LIKE THE CONFIDENCE THAT

03:20PM   24   DAVID HARRIS HAD IN THE COMPANY.

03:20PM   25        DO YOU REMEMBER THAT?

03:20PM  1    A.   YES.

03:20PM  2    Q.   AND SHE DISCUSSED THE PRESENCE OF DON LUCAS ON THE BOARD;

03:20PM  3    IS THAT RIGHT?

03:20PM  4    A.   YES.

03:20PM  5    Q.   AND THE FACT THAT LARRY ELLISON HAD INVESTED IN THE

03:20PM  6    COMPANY?

03:20PM  7    A.   YES.

03:20PM  8    Q.   AND YOU WERE ALSO AWARE OF THE WALGREENS PARTNERSHIP WITH

03:20PM  9    THERANOS WHEN YOU INVESTED IN 2013; RIGHT?

03:20PM  10   A.   YES.

03:20PM  11   Q.   AND DID ALL OF THOSE THINGS INFLUENCE YOUR DECISION TO

03:20PM  12   INVEST?

03:20PM  13   A.   YES, THEY DID.

03:20PM  14   Q.   SO LET ME ASK THEN, WHEN IT CAME TO THE STATEMENTS THAT

03:20PM  15   YOU RECEIVED FROM MS. HOLMES ABOUT THE COMPANY, IN LIGHT OF ALL

03:20PM  16   OF THE OTHER INFORMATION THAT ALSO INFLUENCED YOUR DECISION,

03:20PM  17   DID THE THINGS THAT MS. HOLMES SAID MATTER TO YOU IN MAKING

03:20PM  18   YOUR DECISION TO INVEST MORE MONEY IN THE COMPANY IN 2013?

03:21PM  19   A.   YES.

03:21PM  20   Q.   AND HOW ABOUT FOR MR. BALWANI?

03:21PM  21        DID HIS STATEMENTS, BOTH DIRECTLY TO YOU AND THROUGH

03:21PM  22   MR. MENDENHALL, MAKE A DIFFERENCE TO YOU IN YOUR DECISION TO

03:21PM  23   INVEST IN THE COMPANY IN 2013?

03:21PM  24   A.   YES.   IT GAVE ME A GREATER DEGREE OF CONFIDENCE THAT, THAT

03:21PM  25   THE COMPANY HAD DEVELOPED A SUCCESSFUL TECHNOLOGY AND THE RISK

03:21PM  1    WAS SUBSTANTIALLY TAKEN OUT OF THIS INVESTMENT.

03:21PM  2    Q.   AND IN MAKING THAT INVESTMENT, WERE YOU ASSUMING THE TRUTH

03:21PM  3    OF THE THINGS THAT MR. BALWANI HAD SAID?

03:21PM  4    A.   YES.

03:21PM  5    Q.   THANK YOU.

03:21PM  6         NO FURTHER QUESTIONS.

03:21PM  7              THE COURT:  RECROSS.

03:21PM  8                    **RECROSS-EXAMINATION**

03:21PM  9    BY MS. WALSH:

03:22PM  10   Q.   GOOD AFTERNOON, MR. EISENMAN.

03:22PM  11   A.   GOOD AFTERNOON.

03:22PM  12   Q.   LET ME TAKE OFF MY MASK.

03:22PM  13        MR. EISENMAN, YOU TESTIFIED ON REDIRECT THAT NEITHER

03:22PM  14   MR. BALWANI NOR MS. HOLMES TOLD YOU IN AN EMAIL OR A PHONE CALL

03:23PM  15   THAT THERANOS, YOUR THERANOS INVESTMENT IN 2013 CARRIED GREAT

03:23PM  16   RISK.

03:23PM  17        CORRECT?

03:23PM  18   A.   I'M SORRY.  COULD YOU RESTATE THE QUESTION?

03:23PM  19   Q.   SURE.  YOU JUST TESTIFIED -- MR. BOSTIC JUST ASKED YOU IF

03:23PM  20   THERE WAS ANY PHONE CALL OR EMAIL WITH MR. BALWANI OR

03:23PM  21   MS. HOLMES LEADING UP TO YOUR 2013 INVESTMENT WHERE THEY TOLD

03:23PM  22   YOU THERANOS IS A RISKY INVESTMENT; IS THAT RIGHT?

03:23PM  23   A.   ARE YOU TALKING ABOUT JUST BEFORE THE 2013, OR ARE YOU

03:23PM  24   TALKING ABOUT THE PERIOD OF 2010 TO 2013?  WHAT TIME PERIOD ARE

03:23PM  25   YOU REFERRING TO?

EISENMAN RECROSS BY MS. WALSH

03:23PM   1    Q.   SO LET'S FOCUS ON THE TIME PERIOD JUST BEFORE THE 2013

03:23PM   2    INVESTMENT LEADING UP TO THAT INVESTMENT.

03:23PM   3    A.   YES.

03:23PM   4    Q.   I THINK YOU JUST TESTIFIED IN RESPONSE TO MR. BOSTIC'S

03:23PM   5    QUESTIONS THAT YOU DON'T REMEMBER HAVING A PHONE CALL OR AN

03:23PM   6    EMAIL WITH MR. BALWANI OR MS. HOLMES ABOUT YOUR INVESTMENT IN

03:24PM   7    THERANOS BEING A SPECULATIVE INVESTMENT?

03:24PM   8    A.   NO.

03:24PM   9    Q.   DO YOU REMEMBER THAT TESTIMONY?

03:24PM  10    A.   IF YOU'RE ASKING ME IF I HAD AN EMAIL OR CONVERSATION WITH

03:24PM  11    MS. HOLMES OR MR. BALWANI IMMEDIATELY PRIOR TO MY 2013

03:24PM  12    INVESTMENT WHERE THEY TOLD ME IT WAS A SPECULATIVE INVESTMENT,

03:24PM  13    NO, I DON'T RECALL HAVING ANY COMMUNICATION.

03:24PM  14        TO THE CONTRARY.  EVERYTHING LEADING UP TO THAT 2013

03:24PM  15    INVESTMENT WAS THE SCIENCE HAS BEEN PROVEN, THE RISK HAS BEEN

03:24PM  16    TAKEN OUT, AND THIS WAS MONEY TO HELP THE COMPANY GROW FASTER

03:24PM  17    TO CAPTURE A MARKET OPPORTUNITY AT A QUICKER PACE.

03:24PM  18    Q.   RIGHT.  AND YOU HAVE A LAW DEGREE, DON'T YOU,

03:24PM  19    MR. EISENMAN?

03:24PM  20    A.   YES.

03:24PM  21    Q.   AND YOU'RE A CPA; RIGHT?

03:24PM  22    A.   I WAS.

03:24PM  23    Q.   YOU WERE BEFORE YOU RETIRED; RIGHT?

03:24PM  24    A.   RIGHT.

03:24PM  25    Q.   AND YOU HAVE BEEN INVESTING IN COMPANIES FOR 20 TO

03:25PM 1    30 YEARS; RIGHT?

03:25PM 2    A.   CORRECT.

03:25PM 3    Q.   AND FOR THE THERANOS INVESTMENT IN 2013, YOU SIGNED A

03:25PM 4    SHAREHOLDER AGREEMENT, DID YOU NOT?

03:25PM 5    A.   I DID.

03:25PM 6    Q.   AND THAT AGREEMENT SPECIFICALLY SAID THAT THE INVESTMENT

03:25PM 7    IN THERANOS IS OF A SPECULATIVE NATURE.  THAT AGREEMENT SAID

03:25PM 8    THAT, DIDN'T IT?

03:25PM 9    A.   I THINK WE'VE ALREADY TALKED ABOUT THIS EARLIER.  THAT IS

03:25PM 10   WHAT IS CALLED BOILERPLATE, AND THAT IS LANGUAGE THAT IS PUT IN

03:25PM 11   ALL DOCUMENTATION, OR MOST OR ALL DOCUMENTATION ON ANY PRIVATE

03:25PM 12   EQUITY OFFERING.

03:25PM 13        AND AS A PRACTICAL MATTER, THAT'S, THAT'S PUT IN THE

03:25PM 14   DOCUMENTS TO REDUCE POTENTIAL LIABILITY OF A COMPANY.

03:25PM 15        BUT AS A PRACTICAL MATTER, THAT TOTALLY CONTRADICTED WHAT

03:25PM 16   I HAD BEEN LED TO BELIEVE BY THE, THE COMMUNICATION WITH

03:25PM 17   MR. MENDENHALL AND OTHER COMMUNICATION, AND I RELIED MORE ON

03:25PM 18   THAT COMMUNICATION THAN A MULTIPAGE LEGAL DOCUMENT THAT

03:26PM 19   BASICALLY HAS THE SAME TYPE OF DISCLAIMERS THAT EVERY OTHER

03:26PM 20   DOCUMENT OF ITS ILK HAS.

03:26PM 21   Q.   SO THE AGREEMENT SAID IT WAS A SPECULATIVE INVESTMENT, DID

03:26PM 22   IT NOT?

03:26PM 23   A.   THE AGREEMENT SAID IT WAS A SPECULATIVE INVESTMENT, BUT

03:26PM 24   THAT CONTRADICTED WHAT WAS MORE IMPORTANT, THE INFORMATION THAT

03:26PM 25   I GOT DIRECTLY FROM THE TOP PEOPLE IN THE COMPANY.

03:26PM  1    Q.   THE AGREEMENT SAID IT WAS A SPECULATIVE INVESTMENT, DID IT

03:26PM  2    NOT?

03:26PM  3    A.   YES, THE AGREEMENT SAID IT WAS A SPECULATIVE INVESTMENT.

03:26PM  4    Q.   OKAY.  OKAY.  SO LET'S GO TO -- MR. BOSTIC ASKED YOU ABOUT

03:26PM  5    THIS EMAIL IN 2015, WHICH IS EXHIBIT 12999.

03:27PM  6         SO CAN WE PULL THAT EXHIBIT UP.

03:27PM  7         OKAY.  LET'S GO TO -- DO YOU SEE THAT, MR. EISENMAN, ON

03:27PM  8    YOUR SCREEN?

03:27PM  9    A.   YES.  YES.

03:27PM  10   Q.   LET'S GO TO PAGE 2 OF THAT EXHIBIT.

03:27PM  11   A.   OKAY.

03:27PM  12   Q.   SO I CAN READ IT.  OKAY.

03:27PM  13        SO IN THE MIDDLE OF THE PAGE, MR. BALWANI SAYS TO YOU IN

03:27PM  14   THAT MIDDLE PARAGRAPH STARTING WITH "YOU CONTINUE TO BOMBARD

03:27PM  15   US."

03:27PM  16        DO YOU SEE THAT PARAGRAPH?

03:27PM  17   A.   YES.

03:27PM  18   Q.   "JUST 12 SHORT MONTHS AGO I SPOKE WITH YOU IN DETAIL THAT

03:27PM  19   YOU WILL NOT GET ANY UPDATES, THAT YOU SHOULD NOT INVEST."

03:27PM  20        DO YOU SEE THAT?

03:28PM  21   A.   YES.  BUT IF THIS TIMELINE WAS CORRECT, THIS WAS AFTER I

03:28PM  22   HAD ALREADY INVESTED.

03:28PM  23   Q.   YES.  DO YOU SEE THAT LANGUAGE IN THE EMAIL?

03:28PM  24   A.   YES.  BUT THAT CONTRADICTS WHAT, WHAT I WAS TOLD BEFORE I

03:28PM  25   INVESTED.

03:28PM   1    Q.   RIGHT.  AND SO WHEN YOU RESPOND TO MR. BALWANI ON

03:28PM   2    PAGE 1 -- DO YOU SEE YOUR RESPONSE ON PAGE 1?

03:28PM   3    A.   YES.

03:28PM   4    Q.   YOU DON'T SAY TO MR. BALWANI "THAT'S NOT TRUE," DO YOU?

03:28PM   5    A.   NO, I DO NOT SAY THAT IN THIS EMAIL.

03:28PM   6    Q.   YOU DON'T SAY "THAT'S A LIE, MR. BALWANI," DO YOU?

03:28PM   7    A.   UM, IN THIS EMAIL I, I DID NOT SAY THAT, BUT I WAS

03:28PM   8    PROBABLY THINKING THAT.

03:28PM   9    Q.   BUT YOU DIDN'T SAY IT; RIGHT?

03:28PM  10    A.   I DID NOT SAY THAT IN THIS SHORT AND SWEET EMAIL, NO, I

03:29PM  11    DIDN'T.

03:29PM  12    Q.   OKAY.  AND LET'S GO UP THE CHAIN ONE MORE.

03:29PM  13         MR. BALWANI SAYS "ALAN.

03:29PM  14         "NO ONE FROM THIS COMPANY HAS EVER COMMITTED TO A SHORT

03:29PM  15    QUARTERLY CALL WITH YOU OR ANY OTHER INVESTOR SELECTIVELY.  I

03:29PM  16    WAS VERY EXPLICITLY DISCOURAGING YOU FROM INVESTING IN JANUARY

03:29PM  17    OF 2014."

03:29PM  18         DO YOU SEE THAT LANGUAGE?

03:29PM  19    A.   YES.  BUT I DON'T UNDERSTAND BECAUSE THE INVESTMENT WAS IN

03:29PM  20    DECEMBER OF 2013, AND HE DID NOT DISCOURAGE ME IN ANY WAY FROM

03:29PM  21    INVESTING IN 2013.

03:29PM  22    Q.   DO YOU SEE THAT LANGUAGE IN THE EMAIL?

03:29PM  23    A.   I DO SEE THE LANGUAGE.

03:29PM  24    Q.   AND THEN LET'S GO UP THE CHAIN TO YOUR RESPONSE.

03:29PM  25         DO YOU SEE YOUR RESPONSE?

03:29PM 1    A.   YES.

03:29PM 2    Q.   THERE'S NOTHING IN YOUR RESPONSE SAYING, "NO, SUNNY,

03:29PM 3    THAT'S NOT TRUE."  CORRECT?

03:29PM 4    A.   IF YOU WANT TO, IF YOU WANT TO SAY SPECIFICALLY, YES, IN A

03:29PM 5    SHORT EMAIL, EVEN THOUGH I FELT THAT THIS WAS NOT TRUE, I DID

03:29PM 6    NOT STATE IT IN THIS PARTICULAR EMAIL.

03:30PM 7    Q.   SO YOU DON'T SAY THAT IN THE EMAIL; RIGHT?

03:30PM 8    A.   I DO NOT SAY THAT IN THIS EMAIL.

03:30PM 9    Q.   OKAY.  SO IN THIS EMAIL CHAIN, MR. BALWANI SAYS TO YOU TWO

03:30PM 10   DIFFERENT TIMES THAT HE TOLD YOU THAT YOU SHOULDN'T INVEST, AND

03:30PM 11   HE WAS DISCOURAGING YOU FROM INVESTING; CORRECT?

03:30PM 12   A.   UH --

03:30PM 13   Q.   IN THIS EMAIL?

03:30PM 14   A.   IN THIS EMAIL.

03:30PM 15        BUT AS I JUST SAID, THE EMAILS ARE MISLEADING BECAUSE

03:30PM 16   THAT'S NOT WHAT HE -- THAT'S NOT THE WAY HE RESPONDED WHEN I

03:30PM 17   WAS INVESTING IN DECEMBER OF 2013.  HE WAS ENCOURAGING.

03:30PM 18        THESE TWO EMAILS CONTRADICT THE, THE INFORMATION AND THE

03:30PM 19   MANNER THAT INFORMATION WAS PRESENTED BEFORE WE INVESTED IN

03:30PM 20   THAT 2013 ROUND.

03:30PM 21   Q.   AND IN THIS EMAIL HE SAYS TWO DIFFERENT TIMES HE WAS

03:30PM 22   DISCOURAGING YOU FROM INVESTING; CORRECT?

03:30PM 23        YES OR NO?

03:30PM 24   A.   IF YOU WANT THE SPECIFIC ANSWER, HE IS DISCOURAGING ME IN

03:31PM 25   THIS EMAIL.

03:31PM  1          BUT YOU HAVE TO TAKE IT WITH A GRAIN OF SALT.  THIS IS NOT

03:31PM  2    ACCURATE, AND IT'S NOT TRUTHFUL.

03:31PM  3    Q.   SO THE ANSWER TO MY QUESTION ABOUT WHETHER HE SAID HE

03:31PM  4    DISCOURAGED YOU TWICE IN THIS EMAIL IS, YES, THAT'S CORRECT?

03:31PM  5    A.   THE ANSWER THAT HE STATED THAT HE DISCOURAGED ME FROM

03:31PM  6    INVESTING AFTER I HAD INVESTED, YES, IT'S TRUE THAT HE SAID

03:31PM  7    THAT HE DISCOURAGED ME.

03:31PM  8          BUT THAT'S NOT TRUE.

03:31PM  9    Q.   SO IT'S IN THE EMAIL THAT HE SAID HE DISCOURAGED YOU TWO

03:31PM 10    DIFFERENT TIMES; IS THAT RIGHT?  YES OR NO.

03:31PM 11          IT'S A YES OR NO QUESTION, YOUR HONOR.

03:31PM 12              MR. BOSTIC:  OBJECTION.  ASKED AND ANSWERED.

03:31PM 13    ARGUMENTATIVE.

03:31PM 14              THE COURT:  WELL, CAN YOU ANSWER THE QUESTION YES OR

03:31PM 15    NO?

03:31PM 16              THE WITNESS:  YES, I CAN.

03:31PM 17              THE COURT:  YES OR NO.

03:31PM 18              THE WITNESS:  SO IS THE QUESTION, DID HE DISCOURAGE

03:31PM 19    ME FROM --

03:31PM 20              THE COURT:  EXCUSE ME, SIR.

03:31PM 21              THE WITNESS:  I'M SORRY.

03:31PM 22              THE COURT:  WOULD YOU ASK THE QUESTION ONE MORE

03:31PM 23    TIME?

03:31PM 24          I BELIEVE THIS IS GOING TO BE A YES OR NO QUESTION.

03:31PM 25              THE WITNESS:  OKAY.

03:31PM   1                    THE COURT:  SO YOU CAN ASK THE QUESTION ONE MORE

03:31PM   2       TIME.

03:31PM   3                    THE WITNESS:  OKAY.

03:31PM   4       BY MS. WALSH:

03:31PM   5       Q.   IN EXHIBIT 12999, THE EMAIL CHAIN THAT WE'RE LOOKING AT,

03:32PM   6       DID MR. BALWANI SAY IN THAT EMAIL CHAIN, ON TWO DIFFERENT

03:32PM   7       OCCASIONS, THAT HE DISCOURAGED YOU FROM INVESTING?

03:32PM   8       A.   YES, HE DID SAY THAT.

03:32PM   9       Q.   OKAY.  AND IN THAT SAME EMAIL CHAIN, YOU DO NOT SAY IN

03:32PM  10       RESPONSE TO EITHER OF THOSE STATEMENTS, "NO, SUNNY, THAT IS NOT

03:32PM  11       ACCURATE."

03:32PM  12            IS THAT RIGHT?

03:32PM  13       A.   THAT IS RIGHT.

03:32PM  14       Q.   MR. BOSTIC ALSO ASKED YOU ABOUT OFFERS FOR YOU TO SELL

03:32PM  15       YOUR THERANOS STOCK.

03:32PM  16            DO YOU REMEMBER THAT?

03:32PM  17       A.   YES.

03:32PM  18       Q.   OKAY.  AND YOUR TESTIMONY WAS THAT THE OFFERS NEVER CAME

03:32PM  19       TO FRUITION; RIGHT?

03:32PM  20       A.   THAT IS CORRECT.  NONE OF THE OFFERS WERE -- EITHER THEY

03:33PM  21       WEREN'T LEGITIMATE OR THEY NEVER CAME TO FRUITION.  NONE,

03:33PM  22       NONE -- I PURSUED EVERY OFFER THAT WAS MADE TO ME, AND I COULD

03:33PM  23       NOT GET TO THE FINISH LINE ON ANY OF THE OFFERS THAT WERE

03:33PM  24       PRESENTED.

03:33PM  25       Q.   OKAY.  YOU ARE A PERSISTENT SHAREHOLDER; IS THAT FAIR TO

03:33PM   1    SAY, MR. EISENMAN?

03:33PM   2    A.   THAT'S FAIR.

03:33PM   3    Q.   YOU FOLLOW UP ON EVERY QUESTION THAT YOU DO NOT GET

03:33PM   4    ANSWERED; IS THAT RIGHT?

03:33PM   5    A.   I ATTEMPT.

03:33PM   6    Q.   YOU TRY TO DO THAT; RIGHT?

03:33PM   7    A.   YES.

03:33PM   8    Q.   OKAY.  AND WHEN YOU DON'T GET AN ANSWER OR WHEN YOU DON'T

03:33PM   9    GET A RESPONSE FROM SOMEONE, YOU FOLLOW UP WITH AN EMAIL;

03:33PM  10    CORRECT?

03:33PM  11    A.   SOMETIMES.

03:33PM  12    Q.   YOU DO THAT MOST OF THE TIME, DON'T YOU?

03:33PM  13    A.   IT DEPENDS ON THE CIRCUMSTANCE.

03:33PM  14    Q.   WELL, YOU DID THAT HERE WITH THERANOS.  WE JUST WENT

03:33PM  15    THROUGH DOZENS OF EMAILS WHERE YOU'RE FOLLOWING UP FOR

03:33PM  16    INFORMATION OVER AND OVER AGAIN; RIGHT?

03:33PM  17    A.   THERANOS WAS A UNIQUE SITUATION.

03:33PM  18        I HAD SIGNIFICANTLY MORE INVESTED IN THIS THAN ANY OTHER

03:34PM  19    EARLY STAGE COMPANY, AND TYPICALLY WHERE THERE'S SMOKE, THERE'S

03:34PM  20    FIRE, AND THERE WAS A LOT OF SMOKE THROUGH THE YEARS.  THERE

03:34PM  21    WAS A LOT OF INFORMATION THAT REALLY WAS NOT MAKING SENSE.

03:34PM  22    Q.   SO LET'S TALK ABOUT THERANOS.

03:34PM  23        REGARDING THERANOS, YOU FOLLOWED UP EVERY TIME YOU DIDN'T

03:34PM  24    GET THE INFORMATION THAT YOU WERE LOOKING FOR; ISN'T THAT

03:34PM  25    RIGHT?

03:34PM   1    A.   I WOULD SAY THAT I FOLLOWED UP A LOT.   I DON'T KNOW IF IT

03:34PM   2    WAS EVERY SINGLE TIME.

03:34PM   3    Q.   QUITE A BIT; RIGHT?

03:34PM   4    A.   WITH SOME FREQUENCY.

03:34PM   5    Q.   WE JUST SAW A LOT OF EMAILS ABOUT THAT; RIGHT?

03:34PM   6    A.   THIS WAS OVER A, A 10, 11 YEAR PERIOD OF TIME.

03:34PM   7    Q.   SO WE JUST SAW A LOT OF EMAILS ABOUT THAT; CORRECT?

03:34PM   8    A.   RIGHT.   BUT IT WAS EMAILS OVER A 10 OR 11 YEAR PERIOD OF

03:34PM   9    TIME.

03:34PM  10    Q.   AND WHEN YOU DON'T GET A RESPONSE FROM SOMEONE AT

03:34PM  11    THERANOS, YOU FOLLOW UP TO GET AN ANSWER; RIGHT?

03:34PM  12    A.   I DO MY BEST.

03:34PM  13    Q.   OKAY.  AND WE DIDN'T SEE ANY EMAILS IN THE EMAILS THAT THE

03:34PM  14    GOVERNMENT SHOWED YOU OR I SHOWED YOU WHERE YOU SAY, "HEY, WHAT

03:34PM  15    ABOUT THAT OFFER FOR ME TO SELL MY SHARES?  I WANT OUT OF

03:35PM  16    THERANOS."

03:35PM  17         WE DIDN'T SEE AN EMAIL TO THAT EFFECT; RIGHT?

03:35PM  18    A.   I'M SORRY.  ARE YOU TALKING ABOUT THE GREATER THAN FIVE

03:35PM  19    TIMES OFFER, OR ARE YOU TALKING ABOUT THE CHRIS BOIES OFFER?

03:35PM  20    Q.   ANY OFFER AT ALL.

03:35PM  21    A.   I FOLLOWED UP WITH ANY OFFER AS AGGRESSIVELY AS I COULD,

03:35PM  22    AND THEY WENT AWAY.  THEY WERE FICTION.

03:35PM  23    Q.   AND WE DON'T SEE ANY EMAILS REFLECTING THAT, DO WE,

03:35PM  24    MR. EISENMAN?

03:35PM  25    A.   I DON'T KNOW.  I COULD GO THROUGH MY INFORMATION.  I DON'T

03:35PM 1    HAVE IT AT MY FINGERTIPS.

03:35PM 2        BUT IF YOU FOLLOW THE EMAIL CHAIN, I FOLLOWED UP AS

03:35PM 3    AGGRESSIVELY AS I COULD TO BRING ANY OF THOSE OFFERS TO THE

03:35PM 4    FINISH LINE, AND IN THE FIRST OFFER THERANOS TOTALLY DROPPED

03:35PM 5    THE BALL AND THEY REFUSED TO COMMUNICATE WITH ME.

03:35PM 6        THE SECOND OFFER, THE SAME THING HAPPENED.  THEY DROPPED

03:35PM 7    THE BALL AND THEY REFUSED TO COMMUNICATE WITH ME.

03:35PM 8    Q.   BUT WE HAVEN'T SEEN A SINGLE EMAIL TODAY WHERE YOU SAY, "I

03:35PM 9    WANT TO SELL MY SHARES.  MAKE IT HAPPEN."  YOU DON'T SAY

03:35PM 10   ANYTHING OR WORDS TO THAT EFFECT, DO YOU?

03:35PM 11   A.   WE WEREN'T IN THAT PART OF THE DEAL.

03:36PM 12       WE WERE IN THE PART OF THE DEAL WHERE I WAS MADE AN OFFER

03:36PM 13   AND I WAS TRYING TO PURSUE THAT.  THEY NEVER MADE A FIRM OFFER.

03:36PM 14   NONE OF THOSE OFFERS WERE FIRM.  THEY WERE JUST COMMUNICATION

03:36PM 15   TO ME ABOUT WE'RE TRYING.  IT WAS NEVER A FIRM OFFER.  THERE

03:36PM 16   WAS NOTHING THAT WAS FIRM OR ESTABLISHED.

03:36PM 17   Q.   AND WE DON'T SEE ANY EMAILS FROM YOU SAYING, "HEY, WHERE

03:36PM 18   IS MY FIRM OFFER," DO WE?

03:36PM 19   A.   I THINK IF YOU SEE MY EMAILS, I PURSUED THEM AS

03:36PM 20   AGGRESSIVELY AS I COULD.

03:36PM 21       WHAT HAPPENED TO THE FIRST OFFER?  WHERE IS IT?  WHEN ARE

03:36PM 22   YOU GOING TO COMMUNICATE?

03:36PM 23       IT WAS SUPPOSED TO BE BY THE END OF THE SUMMER.  THEN IT

03:36PM 24   WAS SUPPOSED TO BE BY THE END OF THE YEAR.

03:36PM 25       YES, I DID FOLLOW UP.

03:36PM 1          AND THEN ON THE SECOND OFFER, I HAVE A WHOLE CHAIN OF

03:36PM 2     COMMUNICATION WITH CHRIS BOIES AND HE WENT SILENT FOR A PERIOD

03:36PM 3     OF MONTHS AFTER HE BROUGHT THAT OFFER TO ME.

03:36PM 4     Q.   AND WHEN HE WENT SILENT, YOU DIDN'T SEND ANY EMAILS TO

03:36PM 5     FOLLOW UP AS TO, WHERE IS MY FIRM OFFER, DID YOU?

03:36PM 6     A.   I DON'T KNOW IF THEY WERE EMAILS OR CALLS, BUT I FOLLOWED

03:37PM 7     UP AGGRESSIVELY WITH CHRIS BOIES.

03:37PM 8     Q.   AND THE ONLY EMAIL THAT WE HAVE SEEN TODAY REGARDING AN

03:37PM 9     OFFER FOR YOU TO SELL YOUR SHARES IS YOU TELLING

03:37PM 10    ELIZABETH HOLMES THAT YOU HAVEN'T DECIDED WHETHER YOU WANT TO

03:37PM 11    SELL YOUR SHARES?

03:37PM 12    A.   THAT'S NOT TRUE.

03:37PM 13    Q.   WELL, WE SAW THAT EMAIL; RIGHT?

03:37PM 14    A.   NO.  SHOW ME THE EMAIL.

03:37PM 15         THERE WAS A PERIOD WHEN --

03:37PM 16    Q.   THERE'S NO QUESTION PENDING.

03:37PM 17    A.   OKAY.

03:37PM 18    Q.   TURN TO EXHIBIT, I THINK THIS IS IN EVIDENCE, 14224.

03:37PM 19         MS. ROBINSON, CAN YOU JUST CONFIRM?

03:37PM 20              THE CLERK:  CAN YOU REPEAT THAT?

03:37PM 21              MS. WALSH:  I'M SORRY.  14224.

03:37PM 22              THE CLERK:  YES, THAT IS IN EVIDENCE.

03:37PM 23              MS. WALSH:  OKAY.  WE CAN BRING THAT UP?

03:37PM 24              THE COURT:  YES.

03:37PM 25    BY MS. WALSH:

03:37PM    1    Q.   THIS IS AN EMAIL, ISN'T IT, MR. EISENMAN?

03:37PM    2    A.   YES.

03:37PM    3    Q.   AND IT'S FROM YOU TO ELIZABETH HOLMES; CORRECT?

03:38PM    4    A.   CORRECT.

03:38PM    5    Q.   AND IT'S ON JULY 1ST, 2010; RIGHT?

03:38PM    6    A.   CORRECT.

03:38PM    7    Q.   AND YOU SAY "ELIZABETH,

03:38PM    8         "I HAVEN'T MADE A DECISION WHETHER TO SELL STOCK."

03:38PM    9         RIGHT?

03:38PM   10    A.   CAN I EXPLAIN THAT?

03:38PM   11    Q.   JUST DO THE WORDS ON THIS EMAIL SAY "I HAVEN'T MADE A

03:38PM   12    DECISION WHETHER TO SELL STOCK"?

03:38PM   13         YES OR NO?

03:38PM   14    A.   THAT IS WHAT THE WORDS SAY.

03:38PM   15         BUT IT'S NUANCED AND I'D LIKE AN OPPORTUNITY TO EXPLAIN

03:38PM   16    THAT IF POSSIBLE.

03:38PM   17    Q.   OKAY.  WELL, MR. BOSTIC WILL HAVE AN OPPORTUNITY TO ASK

03:38PM   18    YOU THOSE QUESTIONS.

03:38PM   19         I JUST WANTED TO KNOW AND TO CONFIRM THAT THAT WAS AN

03:38PM   20    EMAIL FROM YOU TELLING ELIZABETH HOLMES THAT YOU HADN'T DECIDED

03:38PM   21    WHETHER TO SELL YOUR STOCK.

03:38PM   22         THAT'S THE CASE; RIGHT?

03:38PM   23    A.   IF YOU LOOK AT THE WORDS ON THE PAGE, YES, THOSE ARE THE

03:38PM   24    WORDS ON THE PAGE.

03:38PM   25         BUT SOMETIMES THEY NEED A LITTLE ADDITIONAL EXPLANATION.

03:38PM 1    Q.   SO THE WORDS ON THE PAGE SAY "I HAVEN'T MADE A DECISION

03:38PM 2    WHETHER TO SELL STOCK"; CORRECT?

03:38PM 3    A.   YES, THAT'S WHAT THE WORDS ON THE PAGE SAY.

03:38PM 4    Q.   OKAY.

03:38PM 5         I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

03:38PM 6             THE COURT:   RECROSS?

03:38PM 7             MR. BOSTIC:   VERY BRIEFLY, YOUR HONOR.

03:39PM 8                **FURTHER REDIRECT EXAMINATION**

03:39PM 9    BY MR. BOSTIC:

03:39PM 10   Q.   MR. EISENMAN, MS. WALSH WAS JUST ASKING YOU ABOUT AN EMAIL

03:39PM 11   WHERE YOU SAID THAT YOU HADN'T MADE A DECISION WHETHER TO SELL

03:39PM 12   STOCK.

03:39PM 13   A.   CORRECT.

03:39PM 14   Q.   I JUST WANTED TO GIVE YOU AN OPPORTUNITY TO EXPLAIN THAT

03:39PM 15   SENTENCE THAT YOU SAID THERE WAS MORE TO THAT SITUATION.

03:39PM 16        TELL US WHAT THAT WAS.

03:39PM 17   A.   THEY HAD MADE AN OFFER TO BUY OUR STOCK POTENTIALLY AT

03:39PM 18   GREATER THAN FIVE TIMES OUR ORIGINAL INVESTMENT, AND IT WAS

03:39PM 19   PENDING APPROVALS, WHATEVER THAT MEANT.   THEY DIDN'T EXPLAIN

03:39PM 20   WHAT THAT MEANT.

03:39PM 21        THAT OFFER WAS SUPPOSED TO COME BEFORE THE SUMMER, AND

03:39PM 22   THEN THAT OFFER WAS EXTENDED AND WE'RE STILL WORKING ON IT AND

03:39PM 23   MAYBE IT WILL COME BY THE END OF THE YEAR AND MAYBE IT WILL GO

03:39PM 24   AWAY.

03:39PM 25        BUT IN THE MEANTIME, LIKE ANY REASONABLE INVESTOR, I HAD

03:39PM  1    REQUESTED WHATEVER FINANCIAL INFORMATION THAT THEY COULD SHARE

03:39PM  2    BECAUSE THIS WAS BY FAR THE LARGEST INVESTMENT IN MY PORTFOLIO

03:39PM  3    AND ONE OF THE MOST POTENTIAL SUCCESSFUL INVESTMENTS THAT I

03:39PM  4    COULD EVER MAKE IN MY LIFE.

03:39PM  5        AND BEFORE I ACCEPT AN OFFER FROM THE COMPANY, IT WOULD

03:40PM  6    ONLY BE FAIR TO SHARE SOME FINANCIAL INFORMATION TO KNOW IF

03:40PM  7    THIS WAS A REASONABLE TRANSACTION.

03:40PM  8        AND ONE OF THE WAYS THAT, IF THERE WAS SOME CONFIDENTIAL

03:40PM  9    INFORMATION, I COULD HAVE SIGNED A NONDISCLOSURE AGREEMENT,

03:40PM 10    WHICH MEANS THAT I WAS FORBIDDEN TO DISCUSS ANY OF THE DETAILS

03:40PM 11    OF THIS WITH ANYONE.

03:40PM 12        THERE WAS, THERE WAS A CHANCE I MIGHT HAVE TAKEN THAT

03:40PM 13    OFFER ANYWAY BECAUSE I WAS SO FRUSTRATED WITH THE COMPANY THAT

03:40PM 14    I WAS REQUESTING MORE FINANCIAL INFORMATION TO MAKE AN

03:40PM 15    INTELLIGENT DECISION.

03:40PM 16        BUT THE POINT IS MOOT BECAUSE THAT OFFER NEVER CAME TO

03:40PM 17    FRUITION.  I PURSUED THAT OFFER, AND THEY JUST, THEY JUST

03:40PM 18    REFUSED TO COMMUNICATE.

03:40PM 19    Q.   MS. WALSH ALSO ASKED YOU ABOUT YOUR EFFORTS TO FOLLOW UP

03:40PM 20    ON OFFERS TO SELL YOUR SHARES.

03:40PM 21        DO YOU RECALL THAT?

03:40PM 22    A.   YES.

03:40PM 23    Q.   AND SHE ASKED YOU ABOUT THE EMAILS THAT WE HAD SEEN IN

03:40PM 24    COURT TODAY.

03:40PM 25        DO YOU RECALL THAT QUESTION?

03:40PM 1    A.   YES.

03:40PM 2    Q.   DID THE EMAILS THAT WERE INTRODUCED INTO EVIDENCE TODAY IN

03:41PM 3    COURT INCLUDE ALL OF THE COMMUNICATIONS YOU HAD WITH THERANOS

03:41PM 4    OR OTHERS ABOUT SELLING YOUR STOCK?

03:41PM 5    A.   PROBABLY NOT.

03:41PM 6          MR. BOSTIC:  NO FURTHER QUESTIONS.  THANK YOU.

03:41PM 7          THE COURT:  MS. WALSH.

03:41PM 8        (PAUSE IN PROCEEDINGS.)

03:41PM 9          MS. WALSH:  NOTHING FURTHER, YOUR HONOR.

03:41PM 10          THE COURT:  MAY THIS WITNESS BE EXCUSED?

03:41PM 11          MR. BOSTIC:  YES, YOUR HONOR.

03:41PM 12          MS. WALSH:  YES, YOUR HONOR.

03:41PM 13          THE COURT:  YOU MAY BE EXCUSED.

03:41PM 14        WE HAVE SOME TIME LEFT IN OUR DAY.  DO YOU HAVE A WITNESS

03:41PM 15    HERE WE COULD START?

03:41PM 16          MR. LEACH:  WE DO, YOUR HONOR.

03:41PM 17          THE COURT:  GREAT.

03:41PM 18          MR. LEACH:  THE GOVERNMENT CALLS LYNETTE SAWYER.

03:41PM 19          THE COURT:  PLEASE FEEL FREE TO STAND AND STRETCH.

03:41PM 20        LET ME ASK THE JURY COLLECTIVELY ALSO, MY SENSE IS THAT

03:41PM 21    THIS WITNESS MIGHT BE BRIEF.  I DON'T THINK WE'LL COMPLETE THIS

03:42PM 22    WITNESS BY 4:00 O'CLOCK.

03:42PM 23        IS THAT LIKELY?

03:42PM 24          MR. LEACH:  YOUR HONOR, I THINK I CAN COMPLETE THE

03:42PM 25    DIRECT EXAMINATION BY 4:00 O'CLOCK, BUT I'M ASSUMING THERE IS

5530

03:42PM 1    CROSS-EXAMINATION AND I DON'T THINK WE WILL BE FINISHED BY

03:42PM 2    THEN.

03:42PM 3         MS. WALSH:  THERE WILL BE CROSS-EXAMINATION.

03:42PM 4         THE COURT:  RIGHT, RIGHT.

03:42PM 5    DO YOU THINK IT WOULD TAKE US TO THE BOTTOM OF THE HOUR,

03:42PM 6    OR WOULD IT BE LONGER?

03:42PM 7    I'M WONDERING IF I COULD ASK THE JURY IF THEY HAVE THE

03:42PM 8    ABILITY TO STAY A LITTLE LATER TO COMPLETE THE WITNESS.

03:42PM 9         MS. WALSH:  I THINK IT WILL GO BEYOND THE BOTTOM OF

03:42PM 10   THE HOUR.

03:42PM 11        THE COURT:  OKAY.  HOW CLOSE TO 5:00 O'CLOCK WOULD

03:42PM 12   THAT BE?

03:42PM 13   IF YOU CAN'T TELL ME, THAT'S FINE.  I DON'T WANT TO PUT

03:42PM 14   ANY CONSTRAINTS.

03:42PM 15   I JUST -- IF WE CAN FINISH THE WITNESS AND IF THE JURY IS

03:42PM 16   WILLING TO STAY UNTIL SOMETIME CLOSE TO 5:00 O'CLOCK, WE CAN

03:42PM 17   MAYBE PRESS ON.

03:42PM 18        MS. WALSH:  IT WOULDN'T GO PAST 5:00, I DON'T THINK.

03:43PM 19   IT'S HARD TO SAY.

03:43PM 20        THE COURT:  OKAY.  ALL RIGHT.

03:43PM 21   WELL, LET'S JUST CALL THE WITNESS AND SEE WHERE WE GO.

03:43PM 22   THANK YOU.

03:43PM 23        MR. LEACH:  VERY WELL, YOUR HONOR.  THANK YOU.

03:43PM 24        THE COURT:  IF YOU CAN STAND BY THE COURTROOM DEPUTY

03:43PM 25   AND RAISE YOUR RIGHT HAND.

SAWYER DIRECT BY MR. LEACH

03:43PM  1        **(GOVERNMENT'S WITNESS, LYNETTE SAWYER, WAS SWORN.)**

03:43PM  2              THE WITNESS:  I DO.

03:43PM  3              THE COURT:  PLEASE HAVE A SEAT HERE AND MAKE

03:43PM  4     YOURSELF COMFORTABLE.

03:43PM  5          FEEL FREE TO ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.

03:43PM  6          IF YOU'RE FULLY VACCINATED --

03:43PM  7              THE WITNESS:  I AM.

03:43PM  8              THE COURT:  -- WHICH MEANS BOOSTED AS WELL, YOU CAN

03:43PM  9     REMOVE YOUR MASK.

03:43PM  10         WOULD YOU PLEASE STATE YOUR NAME AND THEN SPELL IT,

03:43PM  11    PLEASE.

03:43PM  12             THE WITNESS:  MY NAME IS LYNETTE SAWYER.

03:43PM  13    L-Y-N-E-T-T-E, S-A-W-Y-E-R.

03:44PM  14             THE COURT:  THANK YOU.

03:44PM  15         COUNSEL.

03:44PM  16             MR. LEACH:  THANK YOU, YOUR HONOR.

03:44PM  17                    **DIRECT EXAMINATION**

03:44PM  18    BY MR. LEACH:

03:44PM  19    Q.   GOOD AFTERNOON, MS. SAWYER.

03:44PM  20    A.   GOOD AFTERNOON.

03:44PM  21    Q.   EXCUSE ME, DR. SAWYER.

03:44PM  22         I'LL REMOVE MY MASK AS WELL?

03:44PM  23         IN THE FOURTH QUARTER OF 2014, DID SUNNY BALWANI ASK YOU

03:44PM  24    TO SERVE AS THE CO-DIRECTOR OF THERANOS'S CALIFORNIA CLINICAL

03:44PM  25    LAB?

SAWYER DIRECT BY MR. LEACH

03:44PM 1   A.   NOT DIRECTLY.  HE ASKED ME THROUGH LABORATORY CONSULTING

03:44PM 2   SERVICES.

03:44PM 3   Q.   AND DID YOU ULTIMATELY AGREE TO BECOME THE CO-DIRECTOR OF

03:44PM 4   THERANOS CLINICAL LAB?

03:44PM 5   A.   YES.

03:44PM 6   Q.   AND WERE YOU THE CO-DIRECTOR OF THERANOS'S CLINICAL

03:44PM 7   LABORATORY FROM LATE 2014 UNTIL APPROXIMATELY JUNE OF 2015?

03:44PM 8   A.   YES.

03:44PM 9   Q.   WHY DID YOU STOP BEING A CO-DIRECTOR FOR THERANOS'S

03:44PM 10  CALIFORNIA CLINICAL LABORATORY?

03:44PM 11  A.   BECAUSE I HAD SIGNED ON TO DO IT AS A VERY TEMPORARY

03:44PM 12  POSITION.  IT WAS PROPOSED TO ME AS A TWO TO THREE MONTHS

03:44PM 13  DIRECTORSHIP, AT WHICH POINT THEIR NEW DIRECTOR WOULD COME ON.

03:45PM 14     WE MADE THE CONTRACT FOR SIX MONTHS SO THAT I WOULD BE A

03:45PM 15  CO-DIRECTOR WITH THEIR NEW DIRECTOR.  WE WOULDN'T SWITCH OUT

03:45PM 16  DIRECTORS TOO FREQUENTLY.  LAB FIELD SERVICES DOESN'T LIKE

03:45PM 17  THAT.

03:45PM 18  Q.   OKAY.  AT THE TIME THAT YOU RESIGNED IN JUNE OF 2015, WERE

03:45PM 19  YOU COMFORTABLE WITH THE LEVEL OF INFORMATION THAT YOU WERE

03:45PM 20  GETTING FROM THERANOS?

03:45PM 21  A.   NO.

03:45PM 22  Q.   LET'S TALK A LITTLE BIT ABOUT YOUR EDUCATIONAL AND

03:45PM 23  PROFESSIONAL BACKGROUND.

03:45PM 24     DO YOU HAVE A COLLEGE DEGREE?

03:45PM 25  A.   I DO.  I HAVE A BACHELORS IN MICROBIOLOGY.

03:45PM 1    Q.   AND WHERE IS THAT FROM?

03:45PM 2    A.   SAN DIEGO STATE UNIVERSITY.

03:45PM 3    Q.   AT SOME POINT DID YOU OBTAIN A MASTER DEGREE?

03:45PM 4    A.   I DID OBTAINED A MASTERS IN PUBLIC HEALTH FROM BERKELEY.

03:45PM 5    Q.   AND DID YOU ALSO OBTAIN A PH.D. IN PUBLIC HEALTH FROM

03:45PM 6    U.C. BERKELEY?

03:45PM 7    A.   TECHNICALLY IT'S A D.PH., BUT I DID.

03:45PM 8    Q.   THANK YOU FOR THAT PRECISION.

03:45PM 9         CAN YOU TALK BRIEFLY ABOUT YOUR WORK HISTORY AFTER

03:46PM 10   OBTAINING YOUR LAST DEGREE FROM BERKELEY?

03:46PM 11   A.   SURE.  I WORKED AS A DIRECTOR FOR A BIOTECH COMPANY

03:46PM 12   LABORATORY FOR A FEW YEARS.

03:46PM 13        THEN I WORKED AS A DIRECTOR FOR SEVERAL SMALL CLINICAL

03:46PM 14   LABORATORIES.  I'VE BEEN DOING THAT FOR -- SINCE THE EARLY

03:46PM 15   '90S.

03:46PM 16        AND I ALSO WORKED AS A DIRECTOR OF DEVELOPMENT FOR A

03:46PM 17   BIOTECH COMPANY IN THE EAST BAY.

03:46PM 18   Q.   OKAY.  DID YOU WORK FOR A -- AS A LAB DIRECTOR AT A

03:46PM 19   COMPANY CALLED UNILAB?

03:46PM 20   A.   I DID.

03:46PM 21   Q.   AND WERE YOU THE LABORATORY DIRECTOR AT BAYER REFERENCE

03:46PM 22   TESTING IN THE LATE 1990S?

03:46PM 23   A.   YES.

03:46PM 24   Q.   AND DID YOU SERVE AS A LABORATORY DIRECTOR AT A COMPANY

03:46PM 25   CALL TETHYS BIOSCIENCES?

SAWYER DIRECT BY MR. LEACH

03:46PM 1      A.   I DID.

03:46PM 2      Q.   AND FROM 2000 TO 2015, DID YOU WORK AS A SENIOR DIRECTOR

03:47PM 3      AT A COMPANY CALLED CERUS?

03:47PM 4      A.   I DID.

03:47PM 5      Q.   HOW DID YOU LEARN ABOUT THERANOS?

03:47PM 6      A.   I WAS ASKED BY JERRY HURST, WHO OWNS LABORATORY CONSULTING

03:47PM 7      SERVICES, IF I WOULD BE INTERESTED IN DOING A DIRECTORSHIP FOR

03:47PM 8      THEM.

03:47PM 9      Q.   AND AT SOME POINT DID YOU SPEAK WITH SOMEBODY FROM

03:47PM 10     THERANOS ABOUT THAT OPPORTUNITY?

03:47PM 11     A.   I DID.

03:47PM 12     Q.   AND WHO DID YOU SPEAK WITH?

03:47PM 13     A.   I SPOKE WITH SUNNY.

03:47PM 14     Q.   OKAY.  TELL US ABOUT THAT CONVERSATION, PLEASE.

03:47PM 15     A.   IT WAS A LOT OF YEARS AGO AND I DON'T REMEMBER VERY

03:47PM 16     CLEARLY, BUT BASICALLY HE DESCRIBED WHAT THEY WANTED IN THE WAY

03:47PM 17     OF A LAB DIRECTOR AND THAT IT WAS A TEMPORARY POSITION.  THEY

03:47PM 18     HAD SOMEONE IN MIND WHO WOULD BECOME DIRECTOR IN TWO TO THREE

03:47PM 19     MONTHS.

03:47PM 20     Q.   AND WHAT DID HE SAY ABOUT WHAT THEY WERE LOOKING FOR IN A

03:47PM 21     LAB DIRECTOR?

03:47PM 22     A.   IT WAS VERY PART-TIME.  IT WAS, LIKE I SAID, VERY

03:47PM 23     TEMPORARY, VERY PART-TIME.

03:47PM 24          AS WITH ANY LAB DIRECTOR, I WOULD NEED TO GO THROUGH AND

03:47PM 25     REVIEW AND APPROVE DOCUMENTS, ALL OF THE SOP'S, ET CETERA.

SAWYER DIRECT BY MR. LEACH

03:47PM 1          IT WAS LARGELY -- IF WAS NOT EVER BILLED TO BE AN

03:48PM 2     IN-PERSON JOB.

03:48PM 3     Q.   OKAY.  DID HE MENTION ANYBODY NAMED ADAM ROSENDORFF?

03:48PM 4     A.   I DO NOT BELIEVE SO.

03:48PM 5     Q.   OKAY.  DID MR. BALWANI DESCRIBE ANYTHING ABOUT THE

03:48PM 6     CIRCUMSTANCES OF DR. ROSENDORFF'S DEPARTURE FROM THERANOS?

03:48PM 7     A.   NO.

03:48PM 8     Q.   OKAY.  DID HE IN ANY WAY SUGGEST THAT DR. ROSENDORFF HAD

03:48PM 9     CONCERNS ABOUT THERANOS'S LABORATORY TESTING OR THE PERFORMANCE

03:48PM 10    OF ITS DEVICES?

03:48PM 11    A.   NO.

03:48PM 12              MS. WALSH:  OBJECTION.  LEADING.

03:48PM 13              THE COURT:  OVERRULED.

03:48PM 14    BY MR. LEACH:

03:48PM 15    Q.   YOUR ANSWER WAS NO?

03:48PM 16    A.   CORRECT.

03:48PM 17    Q.   OKAY.  AFTER SPEAKING WITH MR. BALWANI, DID YOU AGREE TO

03:48PM 18    BECOME THE CO-DIRECTOR OF THERANOS'S LAB?

03:48PM 19    A.   YES.

03:48PM 20    Q.   AND DID THAT HAPPEN IN LATE 2014?

03:48PM 21    A.   YES.

03:48PM 22    Q.   WERE YOU EVER ASKED TO VISIT THE LAB?

03:48PM 23    A.   NO.

03:48PM 24    Q.   DID YOU EVER SET FOOT IN THE LABORATORY?

03:48PM 25    A.   NO.

SAWYER DIRECT BY MR. LEACH

03:48PM  1    Q.   DID YOU EVER SEE SOMETHING CALLED AN EDISON DEVICE?

03:48PM  2    A.   NO.

03:48PM  3    Q.   DID YOU EVER REVIEW ANY DATA GENERATED BY AN EDISON

03:48PM  4    DEVICE?

03:48PM  5    A.   NO.

03:48PM  6    Q.   DID YOU EVER SEE DATA GENERATED FROM A THERANOS

03:49PM  7    MANUFACTURED BLOOD ANALYZER?

03:49PM  8    A.   NO.

03:49PM  9    Q.   DID YOU EVER REVIEW ANY DATA GENERATED FROM A THERANOS

03:49PM  10   MANUFACTURED BLOOD ANALYZER?

03:49PM  11   A.   NO.

03:49PM  12   Q.   IN YOUR INITIAL CALL WITH MR. BALWANI, DID HE TELL YOU

03:49PM  13   THAT THERANOS WAS USING AN ANALYZER THAT IT HAD MANUFACTURED?

03:49PM  14   A.   I DO NOT BELIEVE SO.

03:49PM  15   Q.   DID HE EVER TELL YOU THAT THEY WERE USING ANY THERANOS

03:49PM  16   MANUFACTURED ANALYZER IN THE CLINICAL LAB?

03:49PM  17   A.   NOT THAT I RECALL, NO.

03:49PM  18   Q.   IN THIS TIME PERIOD, END OF 2014 THROUGH JUNE OF 2015 WHEN

03:49PM  19   YOU RESIGNED, CAN YOU SUMMARIZE FOR US WHAT YOU WERE CALLED TO

03:49PM  20   DO?

03:49PM  21   A.   ALMOST EXCLUSIVELY I WAS CALLED ON TO REVIEW AND APPROVE

03:49PM  22   DOCUMENTS.

03:49PM  23   Q.   OKAY.  AND DID THOSE DOCUMENTS INCLUDE SOP'S?

03:49PM  24   A.   YES.

03:49PM  25   Q.   IS THAT STANDARD OPERATING PROCEDURES?

SAWYER DIRECT BY MR. LEACH

03:49PM  1    A.   CORRECT.

03:49PM  2    Q.   AND DID YOU REVIEW ANY SOP'S RELATING TO THE EDISON?

03:50PM  3    A.   NO.

03:50PM  4    Q.   DID YOU REVIEW ANY SOP'S RELATING TO ANY OTHER THERANOS

03:50PM  5    MANUFACTURED ANALYZER?

03:50PM  6    A.   NOT ANALYZER, NO.

03:50PM  7    Q.   DID YOU REVIEW ANY VALIDATION DOCUMENTS RELATING TO THE

03:50PM  8    EDISON?

03:50PM  9    A.   NO.

03:50PM  10   Q.   DID YOU REVIEW ANY VERIFICATION DOCUMENTS RELATING TO THE

03:50PM  11   EDISON?

03:50PM  12   A.   NO.

03:50PM  13   Q.   DID YOU REVIEW ANY VALIDATION OR VERIFICATION DOCUMENTS

03:50PM  14   FOR ANY OTHER THERANOS MANUFACTURED ANALYZER?

03:50PM  15   A.   NO.

03:50PM  16   Q.   BASED ON THE SOP'S THAT YOU WERE GIVEN, DID THEY RELATE

03:50PM  17   EXCLUSIVELY TO FDA APPROVED DEVICES?

03:50PM  18   A.   THE VAST MAJORITY OF THEM DID.  THERE WERE A FEW LAB

03:50PM  19   DEVELOPED TESTS FOR MICROBIOLOGICAL THINGS, ID'ING BACTERIA IN

03:50PM  20   STOOLS AND A SENSITIVITY ASSAY, I BELIEVE.

03:50PM  21   Q.   IS THAT A RELATIVELY SMALL CATEGORY THAT YOU'RE

03:51PM  22   DESCRIBING?

03:51PM  23   A.   YES.

03:51PM  24   Q.   PUTTING ASIDE THAT RELATIVELY SMALL CATEGORY, DID YOU

03:51PM  25   REVIEW ANY SOP'S RELATING TO -- WERE THE SOP'S THAT YOU

03:51PM   1    REVIEWED RELATED EXCLUSIVELY TO FDA APPROVED ANALYZERS?

03:51PM   2    A.   YES.

03:51PM   3    Q.   AND BASED ON THE SOP'S THAT YOU WERE GIVEN, DID YOU HAVE

03:51PM   4    THE IMPRESSION THAT THERANOS WAS DOING ANYTHING OTHER THAN

03:51PM   5    RUNNING BLOOD TESTS ON FDA APPROVED ANALYZERS?

03:51PM   6    A.   NO.

03:51PM   7    Q.   WHAT -- IN WHAT FORM DID YOU RECEIVE THE SOP'S?  HOW DID

03:51PM   8    THEY COME TO YOU?

03:51PM   9    A.   ELECTRONICALLY VIA DOCUSIGN.

03:51PM   10   Q.   AND WERE YOU ABLE TO EDIT THEM?

03:51PM   11   A.   NO.

03:51PM   12   Q.   WAS IT ESSENTIALLY, HERE'S THE DOCUMENT, SIGN HERE?

03:51PM   13   A.   UH-HUH.

03:51PM   14           THE COURT:  IS THAT YES?

03:51PM   15           THE WITNESS:  YES.  SORRY.

03:51PM   16           MR. LEACH:  THANK YOU, YOUR HONOR.

03:51PM   17   Q.   WE NEED AUDIBLE RESPONSES SO WE HAVE A GOOD RECORD.

03:51PM   18   A.   SORRY.

03:51PM   19   Q.   DID YOU EXERCISE ANY DECISION MAKING IN WHAT WAS SENT TO

03:51PM   20   YOU?

03:51PM   21   A.   NO.

03:51PM   22   Q.   IN THIS TIME PERIOD, LATE 2014 THROUGH JUNE OF 2015, WHO

03:52PM   23   AT THERANOS DID YOU HAVE CONTACT WITH?

03:52PM   24   A.   BASICALLY I HAD CONTACT WITH THE WOMAN WHO SENT ME THE

03:52PM   25   DOCUMENTS, MICHELLE LEE.

03:52PM 1     Q.   IS THAT YOUR MEMORY?

03:52PM 2     A.   THAT'S MY MEMORY.  IT MIGHT BE NOT EXACTLY CORRECT.

03:52PM 3     Q.   OKAY.  OTHER THAN MICHELLE LEE WHO SENT YOU THE DOCUMENTS,

03:52PM 4     DID YOU HAVE --

03:52PM 5     A.   NO.

03:52PM 6     Q.   -- CONTACT WITH ANYBODY -- WE NEED TO SPEAK ONE AT A TIME.

03:52PM 7     A.   NO.

03:52PM 8     Q.   AND LET ME JUST GET MY FULL QUESTION OUT IF I COULD.

03:52PM 9          OTHER THAN MS. LEE, DID YOU SPEAK TO ANYBODY ELSE AT

03:52PM 10    THERANOS?

03:52PM 11    A.   NO.

03:52PM 12    Q.   YOU HAD A PHONE CALL WITH MR. BALWANI BEFORE YOU TOOK THE

03:52PM 13    POSITION?

03:52PM 14    A.   YES.

03:52PM 15    Q.   OKAY.  AT SOME POINT DID YOU HAVE SOME ADDITIONAL CONTACT

03:52PM 16    WITH HIM?

03:52PM 17    A.   I DO NOT BELIEVE SO.  NOT DIRECTLY.

03:53PM 18    Q.   OKAY.  DID HE EXPLAIN TO YOU ANY ISSUES THAT HAD COME UP

03:53PM 19    IN THE CLINICAL LABORATORY BEFORE YOU HAD ARRIVED?

03:53PM 20    A.   NO, JUST THAT THEY WERE IN TEMPORARY NEED OF A DIRECTOR.

03:53PM 21    Q.   OKAY.  BESIDES MR. BALWANI AND MS. LEE, DID YOU HAVE

03:53PM 22    CONTACT WITH ANYBODY ELSE AT THERANOS?

03:53PM 23    A.   NO.

03:53PM 24    Q.   PRIOR TO RESIGNED IN JUNE OF 2015, DID YOU HAVE ANY

03:53PM 25    CONTACT WITH SUNIL DHAWAN?

SAWYER DIRECT BY MR. LEACH

03:53PM   1    A.   NO.

03:53PM   2    Q.   DO YOU KNOW WHO HE IS?

03:53PM   3    A.   ONLY FROM HEARING HIS NAME PREVIOUSLY.

03:53PM   4    Q.   OKAY.  PRIOR TO, LET'S SAY ABOUT A YEAR AGO --

03:53PM   5    A.   NO.

03:53PM   6    Q.   -- HAD YOU HEARD OF SUNIL DHAWAN?

03:53PM   7    A.   NO.

03:53PM   8    Q.   OKAY.  DID YOU HAVE ANY CONTACT WITH YOUR CO-LABORATORY

03:53PM   9    DIRECTOR?

03:53PM   10   A.   NO.

03:53PM   11   Q.   DID YOU HAVE ANY DISCUSSIONS ABOUT HOW TO DIVIDE

03:53PM   12   RESPONSIBILITIES WITH YOUR CO-LAB DIRECTOR?

03:53PM   13   A.   NO.

03:53PM   14   Q.   DID YOU HAVE ANY CONTACT WITH ELIZABETH HOLMES?

03:53PM   15   A.   NO.

03:53PM   16   Q.   DID YOU EVER MEET ELIZABETH HOLMES?

03:53PM   17   A.   NO.

03:53PM   18   Q.   DID YOU HAVE ANY CONTACT WITH THE TECHNICAL SUPERVISOR?

03:53PM   19   A.   NO.

03:53PM   20   Q.   OKAY.  YOU'RE FAMILIAR WITH THE TERM "TECHNICAL

03:54PM   21   SUPERVISOR"?

03:54PM   22   A.   YES.

03:54PM   23   Q.   OKAY.  BUT YOU DIDN'T HAVE ANY CONTACT WITH THE TECHNICAL

03:54PM   24   SUPERVISOR AT THERANOS?

03:54PM   25   A.   NO, I DID NOT.

03:54PM 1   Q.   OKAY.  AND DID YOU HAVE ANY CONTACT WITH THE GENERAL

03:54PM 2   SUPERVISOR?

03:54PM 3   A.   NO, I DID NOT.

03:54PM 4   Q.   OKAY.  DID YOU DELEGATE ANY RESPONSIBILITIES TO ANYBODY?

03:54PM 5   A.   I DID SIGN ONE DELEGATION OF RESPONSIBILITIES FOR A

03:54PM 6   QUALITY MANAGER.

03:54PM 7   Q.   OKAY.  AND PUTTING ASIDE THAT ONE DELEGATION, DID YOU

03:54PM 8   DELEGATE RESPONSIBILITIES TO ANYBODY ELSE?

03:54PM 9   A.   NO.

03:54PM 10  Q.   OKAY.  DID YOU EVER SPEAK TO ANY DOCTORS?

03:54PM 11  A.   NO.

03:54PM 12  Q.   DID YOU EVER SPEAK TO ANY PATIENTS?

03:54PM 13  A.   NO.

03:54PM 14  Q.   WERE YOU EVER ALERTED TO ANY CLINICAL OR CRITICAL VALUES?

03:54PM 15  A.   NO, I WAS NOT.

03:54PM 16  Q.   OKAY.  WHAT IS A CRITICAL VALUE?

03:54PM 17  A.   IT'S A VALUE THAT IS OUTSIDE OF THE NORMAL RANGE.

03:54PM 18  Q.   WERE YOU EVER ALERTED TO OR DID YOU REVIEW ANY QUALITY

03:54PM 19  CONTROL DATA?

03:54PM 20  A.   NO.

03:54PM 21  Q.   DID YOU RECEIVE ANY REPORTS ABOUT THE ACTIVITIES OF THE

03:54PM 22  LAB?

03:54PM 23  A.   NO.

03:54PM 24  Q.   DID YOU ORDER ANY TESTING BE BROUGHT UP ON A PARTICULAR

03:55PM 25  THERANOS DEVICE?

SAWYER DIRECT BY MR. LEACH

03:55PM 1    A.   NO.

03:55PM 2    Q.   AND DID YOU EVER ORDER THAT TESTING BE DISCONTINUED ON A

03:55PM 3    THERANOS MANUFACTURED DEVICE?

03:55PM 4    A.   NO.

03:55PM 5    Q.   DID YOU REVIEW ANY PROFICIENCY TESTING FOR LDT'S?

03:55PM 6    A.   NOT THAT I RECALL.

03:55PM 7    Q.   OKAY.  DID YOU REVIEW ANY PROFICIENCY TESTING FOR TESTS

03:55PM 8    RUN ON THE THERANOS MANUFACTURED ANALYZER?

03:55PM 9    A.   NO.

03:55PM 10   Q.   DID YOU EVER DISCUSS THE CONCEPT OF ALTERNATIVE ASSESSMENT

03:55PM 11   OF PROFICIENCY WITH ANYBODY AT THERANOS?

03:55PM 12   A.   NO.

03:55PM 13   Q.   DID YOU KNOW THAT THERANOS HAD AN AAP PROGRAM?

03:55PM 14   A.   NO, NOT THAT I RECALL SEEING.

03:55PM 15   Q.   I'D LIKE TO DISPLAY FOR YOU WHAT IS IN EVIDENCE, WITH THE

03:55PM 16   COURT'S PERMISSION, AS EXHIBIT 4533.

03:55PM 17            THE COURT:  YES.

03:55PM 18   BY MR. LEACH:

03:55PM 19   Q.   DO YOU SEE THIS APPEARS TO BE A MEMO DATED

03:55PM 20   SEPTEMBER 23RD, 2015 --

03:55PM 21   A.   YES.

03:55PM 22   Q.   -- DR. SAWYER?

03:56PM 23   A.   YES.

03:56PM 24   Q.   AND THIS IS NOT SOMETHING THAT YOU REVIEWED DURING YOUR

03:56PM 25   TIME AT THERANOS?

SAWYER DIRECT BY MR. LEACH

03:56PM 1    A.   NO.  IT HAD TO BE AFTER MY TIME AT THERANOS.

03:56PM 2    Q.   OKAY.  SOMETIME WITHIN THE LAST YEAR IS THE FIRST TIME

03:56PM 3    THAT YOU SAW THIS DOCUMENT?

03:56PM 4    A.   YES.

03:56PM 5    Q.   OKAY.  AND THERE'S A LINE AT THE TOP THAT SAYS,

03:56PM 6    "ADDITIONALLY, THE FOLLOWING IS THE LIST OF THE LABORATORY

03:56PM 7    DEVELOPED TESTS THAT THERANOS TESTED ON THERANOS DEVICE, ALSO

03:56PM 8    CALLED THE THERANOS SAMPLE PROCESSING UNITS, ALONG WITH THE

03:56PM 9    TIME PERIODS WHEN THOSE TESTS WERE RUN."

03:56PM 10        DO YOU SEE THAT LANGUAGE?

03:56PM 11   A.   I DO.

03:56PM 12   Q.   AND THEN THERE'S A LIST OF 12 ASSAYS DOWN AT THE BOTTOM.

03:56PM 13        DO YOU SEE THOSE?

03:56PM 14   A.   I DO.

03:56PM 15   Q.   AND THERE'S SOME DATES THAT COVER YOUR TENURE, AT LEAST IN

03:56PM 16   THE END DATES.

03:56PM 17        DO YOU SEE THE FIRST ONE, VITAMIN D, THERE'S THE DATE

03:56PM 18   MARCH 10TH, 2015 IN THE ROW AT THE TOP?

03:56PM 19   A.   I DO.

03:56PM 20   Q.   OKAY.  AND YOU HAD NO UNDERSTANDING THAT THERANOS WAS

03:56PM 21   RUNNING AN LDT RELATING TO VITAMIN D; CORRECT?

03:56PM 22   A.   NO, I DID NOT.

03:57PM 23   Q.   AND YOU HAD NO UNDERSTANDING THAT THERANOS WAS USING ITS

03:57PM 24   OWN MANUFACTURED ANALYZER FOR VITAMIN D DURING YOUR TENURE?

03:57PM 25   A.   CORRECT.

03:57PM  1    Q.   AND WOULD THAT ALSO APPLY TO ALL OF THE OTHER ASSAYS

03:57PM  2    LISTED IN THIS DOCUMENT?

03:57PM  3    A.   YES, IT WOULD.

03:57PM  4    Q.   OKAY.  AND DID ANYBODY CONSULT YOU ABOUT DISCONTINUING USE

03:57PM  5    OF A THERANOS MANUFACTURED ANALYZER FOR THESE ASSAYS?

03:57PM  6    A.   NO.

03:57PM  7    Q.   LET ME DISPLAY FOR YOU WHAT IS IN EVIDENCE AS

03:57PM  8    EXHIBIT 20575.

03:57PM  9         WITH THE COURT'S PERMISSION?

03:57PM  10              THE COURT:  YES.

03:57PM  11   BY MR. LEACH:

03:57PM  12   Q.   DO YOU SEE THE TITLE OF THIS DOCUMENT, DR. SAWYER, USE AND

03:57PM  13   MAINTENANCE OF THE IDAHO TECHNOLOGY (BIOFIRE) FILM ARRAY SYSTEM

03:57PM  14   FOR THE IDENTIFICATION OF MICROORGANISMS BY MULTIPLEX PCR."

03:57PM  15        DO YOU SEE THAT LANGUAGE?

03:57PM  16   A.   I DO.

03:57PM  17   Q.   AND DO YOU SEE YOUR SIGNATURE HALFWAY DOWN THE PAGE?

03:58PM  18   A.   I DO.

03:58PM  19   Q.   AND THERE'S A DATE OF MAY 5TH, 2015?

03:58PM  20   A.   UH-HUH, YES.

03:58PM  21   Q.   AND DOES THIS HAVE ANYTHING TO DO WITH A THERANOS

03:58PM  22   MANUFACTURED ANALYZER?

03:58PM  23   A.   I DO NOT BELIEVE SO.

03:58PM  24   Q.   OKAY.  LET ME DISPLAY FOR YOU WHAT IS IN EVIDENCE AS

03:58PM  25   EXHIBIT 10525.

SAWYER DIRECT BY MR. LEACH

03:58PM 1          DO YOU SEE YOUR SIGNATURE DOWN AT THE BOTTOM, DR. SAWYER?

03:58PM 2     A.   I DO.

03:58PM 3     Q.   OKAY.  AND THE DATE IS JANUARY 11TH, 2015?

03:58PM 4     A.   YES.

03:58PM 5     Q.   AND DO YOU SEE THE TITLE IS MVP SUMMARY ADVIA 2400?

03:58PM 6     A.   YES.

03:58PM 7     Q.   IS THAT AN FDA APPROVED DEVICE?

03:58PM 8     A.   YES.

03:58PM 9     Q.   AND DO YOU BELIEVE THAT THIS DOCUMENT RELATES TO

03:58PM 10    THERANOS'S USE OF TECHNOLOGY APPROVED BY THE FDA?

03:58PM 11    A.   YES.

03:58PM 12    Q.   LET'S LOOK BRIEFLY AT 10526, WHICH IS IN EVIDENCE.

03:59PM 13         DO YOU SEE YOUR SIGNATURE ON THIS DOCUMENT?

03:59PM 14    A.   YES.

03:59PM 15    Q.   AND DID YOU HAVE ANY CONVERSATIONS WITH DR. DHAWAN ABOUT

03:59PM 16    THIS PARTICULAR DOCUMENT?

03:59PM 17    A.   NO.

03:59PM 18    Q.   OKAY.  YOU DIDN'T KNOW WHO DR. DHAWAN WAS AT THE TIME?

03:59PM 19    A.   CORRECT.

03:59PM 20    Q.   AND YOU HAD NO CONVERSATIONS WITH HIM ABOUT HOW TO DIVIDE

03:59PM 21    RESPONSIBILITIES?

03:59PM 22    A.   CORRECT.

03:59PM 23    Q.   OKAY.  AND THE TITLE OF THIS IS ROCHE LIGHTCYCLER

03:59PM 24    SIMPLIFIED PROTOCOL.

03:59PM 25         DO YOU SEE THAT?

SAWYER DIRECT BY MR. LEACH

03:59PM 1    A.   YES.

03:59PM 2    Q.   AND IS THAT A DEVICE APPROVED BY THE FDA?

03:59PM 3    A.   YES.

03:59PM 4    Q.   AND DID YOU EVER --

03:59PM 5         WE CAN TAKE THAT DOWN, MS. WACHS.

03:59PM 6         DID YOU EVER ASK FOR A LIST OF LAB PERSONNEL WITHIN

03:59PM 7    THERANOS?

03:59PM 8    A.   I DID.

03:59PM 9    Q.   OKAY.  DID YOU EVER GET THAT?

03:59PM 10   A.   NO.

03:59PM 11   Q.   WAS THAT A MATTER OF FRUSTRATION TO YOU?

03:59PM 12   A.   IT WAS, YES.

03:59PM 13   Q.   OKAY.  EXPLAIN THAT.

03:59PM 14   A.   I FELT THAT I NEEDED TO KNOW WHO -- IT WOULD BE HELPFUL TO

03:59PM 15   KNOW WHO THE TECHNICAL SUPERVISOR WAS, WHO THE GENERAL

04:00PM 16   SUPERVISOR WAS, ET CETERA.

04:00PM 17   Q.   AND YOU RESIGNED IN JUNE OF 2015?

04:00PM 18   A.   YES.

04:00PM 19   Q.   AT THE TIME THAT YOU RESIGNED, WERE YOU SATISFIED WITH THE

04:00PM 20   LEVEL OF INFORMATION THAT YOU WERE GETTING?

04:00PM 21   A.   NO, I REALLY WASN'T.

04:00PM 22   Q.   OKAY.  EXPLAIN THAT.

04:00PM 23   A.   IF I WERE GOING TO CONTINUE -- THE LEVEL OF INFORMATION I

04:00PM 24   WAS GETTING WAS FINE FOR SOMETHING THAT I WAS GOING TO DO FOR

04:00PM 25   TWO MONTHS BASICALLY JUST TO KEEP THE LAB LEGAL.

SAWYER CROSS BY MS. WALSH

04:00PM 1    BUT IF I WAS GOING TO CONTINUE DOING THIS, I NEEDED A MUCH

04:00PM 2    BETTER CONNECTION TO THE PEOPLE WHO WERE ACTUALLY DOING THE LAB

04:00PM 3    WORK.

04:00PM 4    Q.   AND THE INFORMATION THAT YOU WERE GETTING RELATED

04:00PM 5    VIRTUALLY EXCLUSIVELY TO FDA APPROVED DEVICES?

04:00PM 6    A.   YES.

04:00PM 7    Q.   THANK YOU DR. SAWYER.

04:00PM 8        THANK YOU, YOUR HONOR.  I HAVE NO FURTHER QUESTIONS.

04:00PM 9        THE COURT:  MS. WALSH, DO YOU WANT TO START YOUR

04:00PM 10   EXAMINATION?

04:00PM 11       MS. WALSH:  I CAN START, YOUR HONOR.

04:01PM 12       THE COURT:  SURE.

04:01PM 13       MS. WALSH:  MAY I APPROACH, YOUR HONOR?

04:01PM 14       THE COURT:  YES.

04:01PM 15       MS. WALSH:  (HANDING.)

04:01PM 16   MAY I APPROACH DR. SAWYER AS WELL?

04:01PM 17       THE COURT:  YES.  YES.  THANK YOU.

04:02PM 18                     **CROSS-EXAMINATION**

04:02PM 19   BY MS. WALSH:

04:02PM 20   Q.   ALL RIGHT.  GOOD AFTERNOON, DR. SAWYER.

04:02PM 21   A.   GOOD AFTERNOON.

04:02PM 22   Q.   I JUST WANT TO FIRST START WITH YOUR PROFESSIONAL

04:02PM 23   BACKGROUND.

04:02PM 24   A.   UH-HUH.

04:02PM 25   Q.   YOU ARE A PROFESSIONAL LAB DIRECTOR; RIGHT?

SAWYER CROSS BY MS. WALSH

04:02PM  1   A.   YES.

04:02PM  2   Q.   AND BEFORE WORKING AT THERANOS, YOU SERVED AS A LAB

04:02PM  3   DIRECTOR IN MULTIPLE LABS; RIGHT?

04:02PM  4   A.   CORRECT.

04:02PM  5   Q.   AND SOMETIMES YOU WERE A LAB DIRECTOR FOR SEVERAL

04:02PM  6   DIFFERENT LABS AT ONCE; CORRECT?

04:02PM  7   A.   YES.

04:02PM  8   Q.   AND YOU SERVED -- I THINK MR. LEACH ASKED YOU ABOUT THIS.

04:02PM  9   YOU SERVED AS A LAB DIRECTOR FOR SEVERAL SMALL CLINICAL LABS IN

04:02PM  10  SAN JOSE AT SOME POINT IN YOUR CAREER; IS THAT RIGHT?

04:02PM  11  A.   CORRECT.

04:02PM  12  Q.   YEAH.  AND YOU WORKED AS A PUBLIC HEALTH MICROBIOLOGIST

04:02PM  13  FOR CADPH; CORRECT?

04:03PM  14  A.   YES.

04:03PM  15  Q.   AND YOU SERVED AS A LAB DIRECTOR FOR BAYER DIAGNOSTICS; IS

04:03PM  16  THAT RIGHT?

04:03PM  17  A.   YES.

04:03PM  18  Q.   AND YOU'RE QUALIFIED TO SERVE AS A LAB DIRECTOR; RIGHT?

04:03PM  19  A.   YES.

04:03PM  20  Q.   YOU HAVE A -- YOU SAID YOU HAVE A BACHELOR'S IN

04:03PM  21  MICROBIOLOGY; RIGHT?

04:03PM  22  A.   YES.

04:03PM  23  Q.   AND A MASTERS IN PUBLIC HEALTH?

04:03PM  24  A.   YES.

04:03PM  25  Q.   AND A PH.D. PUBLIC HEALTH AS WELL?

SAWYER CROSS BY MS. WALSH

04:03PM 1   A.   YES.

04:03PM 2   Q.   AND YOU'RE LICENSED AS A CLINICAL LAB SCIENTIST; IS THAT

04:03PM 3   RIGHT?

04:03PM 4   A.   ACTUALLY I'M LICENSED AS A BIOANALYST, WHICH SUPERSEDES A

04:03PM 5   CLINICAL LABORATORY SCIENTIST LICENSE, AND WHICH IS WHAT ALLOWS

04:03PM 6   ME TO DIRECT LABS.

04:03PM 7   Q.   OKAY.  AND YOU TESTIFIED DURING YOUR DIRECT EXAMINATION

04:03PM 8   THAT YOU LEARNED ABOUT THERANOS THROUGH JERRY HURST; IS THAT

04:04PM 9   RIGHT?

04:04PM 10  A.   YES.

04:04PM 11  Q.   AND YOU STARTED WORKING WITH MR. HURST IN 2013; IS THAT

04:04PM 12  CORRECT?

04:04PM 13  A.   ACTUALLY, I STARTED WORKING WITH MR. HURST IN 1988.

04:04PM 14  Q.   OKAY.

04:04PM 15  A.   I STARTED DIRECTING LABS IN ASSOCIATION WITH HIM IN

04:04PM 16  PROBABLY 2013, YEAH.

04:04PM 17  Q.   SO YOU'VE KNOWN HIM FOR A LONG TIME?

04:04PM 18  A.   YES.

04:04PM 19  Q.   AND MR. HURST RUNS A LAB CONSULTING COMPANY; RIGHT?

04:04PM 20  A.   YES.

04:04PM 21  Q.   AND THAT -- AND YOU MENTIONED THIS ON YOUR DIRECT AS WELL.

04:04PM 22  THE NAME OF THAT COMPANY IS LABORATORY CONSULTING SERVICES; IS

04:04PM 23  THAT RIGHT?

04:04PM 24  A.   YES.

04:04PM 25  Q.   AND SO COMPANIES HIRE MR. HURST TO HELP THEM SET UP THEIR

04:04PM 1    LAB SOMETIMES; RIGHT?

04:04PM 2    A.   YES.

04:04PM 3    Q.   AND HE CAN ALSO HELP THEM WITH THE LAB LICENSING PROCESS;

04:04PM 4    CORRECT?

04:04PM 5    A.   YES.

04:04PM 6    Q.   AND HE ALSO PROVIDES CONSULTING SERVICES IN KEEPING LABS

04:04PM 7    COMPLIANT WITH THE REGULATIONS; IS THAT RIGHT?

04:04PM 8    A.   YES.

04:04PM 9    Q.   AND HE'S BEEN DOING THAT CONSULTING WORK FOR QUITE A

04:05PM 10   WHILE; IS THAT FAIR TO SAY?

04:05PM 11   A.   YES.  I DON'T REMEMBER WHEN HE STARTED EXACTLY.

04:05PM 12   Q.   OKAY.  AND IT'S BEEN FOR DECADES THOUGH, HASN'T IT?

04:05PM 13   A.   AT THIS POINT PROBABLY, YEAH.

04:05PM 14   Q.   OKAY.  AND HE CONSULTS WITH A LOT OF DIFFERENT LABS IN THE

04:05PM 15   AREA; RIGHT?

04:05PM 16   A.   TO THE BEST OF MY KNOWLEDGE.

04:05PM 17   Q.   OKAY.  AND HE'S CONSIDERED AN EXPERT IN THE FIELD OF LAB

04:05PM 18   CONSULTING SERVICES, ISN'T HE?

04:05PM 19           MR. LEACH:  OBJECTION.  SPECULATION.

04:05PM 20           MS. WALSH:  WELL, I CAN LAY SOME FOUNDATION IF YOU

04:05PM 21   WANT.

04:05PM 22           THE COURT:  SURE.

04:05PM 23   BY MS. WALSH:

04:05PM 24   Q.   YOU'VE WORKED CLOSELY WITH MR. HURST; RIGHT?

04:05PM 25   A.   I HAVE IN CERTAIN ASPECTS OF HIS BUSINESS, YES.

04:05PM  1    Q.   AND HIS BUSINESS IS ADVISING LABS ON HOW TO BE COMPLIANT;

04:05PM  2    RIGHT?

04:05PM  3    A.   YES.

04:05PM  4    Q.   HOW TO GET LICENSES; RIGHT?

04:05PM  5    A.   YES, THAT'S PART OF IT, YEAH.

04:05PM  6    Q.   YEAH.  AND HOW TO PREPARE FOR AUDITS; CORRECT?

04:05PM  7    A.   CORRECT.

04:05PM  8    Q.   AND YOU HAVE GREAT RESPECT FOR MR. HURST'S ABILITIES TO DO

04:06PM  9    THAT; RIGHT?

04:06PM  10   A.   I DO.

04:06PM  11   Q.   HE HAS ENORMOUS EXPERIENCE IN THIS FIELD?

04:06PM  12   A.   YES.

04:06PM  13   Q.   AND IS IT FAIR TO SAY THAT YOU WOULD CONSIDER HIM AN

04:06PM  14   EXPERT IN THAT AREA?

04:06PM  15   A.   I WOULD.

04:06PM  16   Q.   IN FACT, HE WAS -- BEFORE HE STARTED THIS BUSINESS, HE WAS

04:06PM  17   PREVIOUSLY A CALIFORNIA DEPARTMENT OF HEALTH INSPECTOR, WASN'T

04:06PM  18   HE?

04:06PM  19   A.   YES, HE WAS.

04:06PM  20   Q.   AND YOU BOTH WORKED TOGETHER AT THE CALIFORNIA DEPARTMENT

04:06PM  21   OF HEALTH?

04:06PM  22   A.   YES, BUT NOT IN THE LABORATORY FIELD SERVICES DIVISION.  I

04:06PM  23   HAVE NEVER WORKED FOR THEM.

04:06PM  24   Q.   OKAY.  AND PART OF WHAT MR. HURST ALSO DOES IS THAT HE

04:06PM  25   HELPS LABS WHO HAVE A NEED FOR PART-TIME LAB DIRECTORS; IS THAT

04:06PM  1    RIGHT?

04:06PM  2    A.   HE DOES, YES.

04:06PM  3    Q.   AND HE IS SOMEONE THAT LABS CALL IF THEY NEED A LAB

04:07PM  4    DIRECTOR ON A TEMPORARY BASIS; CORRECT?

04:07PM  5    A.   OR A PERMANENT BASIS, YES.

04:07PM  6    Q.   OR A PERMANENT.  OKAY.

04:07PM  7         AND THAT'S HOW YOU GOT THE POSITION AT THERANOS; CORRECT?

04:07PM  8    A.   CORRECT.  CORRECT.

04:07PM  9    Q.   AND YOU KNEW, DIDN'T YOU, AT THE TIME THAT THERANOS HAD

04:07PM  10   WORKED WITH MR. HURST'S COMPANY PRIOR TO YOUR JOINING THERANOS;

04:07PM  11   IS THAT RIGHT?

04:07PM  12   A.   I DID.

04:07PM  13   Q.   MR. HURST HAD HELPED THERANOS IN THE PAST; CORRECT?

04:07PM  14   A.   I DID NOT KNOW WHAT HE DID, NO.

04:07PM  15        I JUST KNEW THAT HE HAD WORKED WITH THEM.

04:07PM  16   Q.   IN THE, IN THE AREAS THAT YOU'VE DESCRIBED WERE HIS

04:07PM  17   EXPERTISE; IS THAT FAIR?

04:07PM  18   A.   I SUPPOSE IT IS.  I REALLY DON'T HAVE ANY IDEA WHAT HE DID

04:07PM  19   WITH THEM.

04:07PM  20   Q.   OKAY.  BUT YOU KNEW MR. HURST WORKED WITH THERANOS --

04:07PM  21   A.   YES.

04:07PM  22   Q.   -- AND MR. HURST'S LABORATORY CONSULTING SERVICES COMPANY;

04:07PM  23   RIGHT?

04:07PM  24   A.   YEAH.

04:07PM  25             MR. LEACH:  OBJECTION, YOUR HONOR.  602, 801.

04:08PM   1                    THE COURT:  WELL, YOU'RE ASKING IF SHE JUST HAS

04:08PM   2    KNOWLEDGE IF HE WAS CONNECTED OR WORKED WITH THEM?

04:08PM   3                    MS. WALSH:  YES, YOUR HONOR.

04:08PM   4                    THE COURT:  HER ANSWER WAS YES.  THAT CAN REMAIN.

04:08PM   5         YOU CAN ASK ANOTHER QUESTION.

04:08PM   6         WE'RE GOING TO BREAK AT A QUARTER PAST THE HOUR, LADIES

04:08PM   7    AND GENTLEMEN.

04:08PM   8    BY MS. WALSH:

04:08PM   9    Q.   OKAY.  SO MR. HURST CONTACTED YOU; CORRECT?

04:08PM   10   A.   YES, HE DID.

04:08PM   11   Q.   AND HE SAID, IN ESSENCE, THAT THERE'S A PART-TIME POSITION

04:08PM   12   THAT I WANT TO SEE IF YOU'RE INTERESTED IN; RIGHT?

04:08PM   13   A.   HE DID.  HE ACTUALLY CONTACTED TWO OF US AND ASKED IF

04:08PM   14   EITHER ONE OF US WAS INTERESTED.

04:08PM   15   Q.   OKAY.  AND YOU SAID YOU WERE INTERESTED; RIGHT?

04:08PM   16   A.   I SAID I WOULD DO IT IF THE OTHER PERSON DIDN'T WANT TO.

04:08PM   17   Q.   OKAY.  OKAY.

04:08PM   18        SO WHEN YOU CAME ON BOARD TO THERANOS, YOU WERE HIRED

04:08PM   19   PURSUANT TO A CONSULTING AGREEMENT; RIGHT?

04:08PM   20   A.   YES.

04:08PM   21   Q.   AND THAT AGREEMENT WAS BETWEEN THERANOS AND MR. HURST'S

04:08PM   22   COMPANY; CORRECT?

04:08PM   23   A.   CORRECT.

04:08PM   24   Q.   AND SO YOU WERE A CONSULTANT, NOT A FULL-TIME EMPLOYEE;

04:09PM   25   RIGHT?

SAWYER CROSS BY MS. WALSH

04:09PM 1    A.   CORRECT.

04:09PM 2    Q.   AND THE DATE OF THE CONSULTING AGREEMENT WAS

04:09PM 3    NOVEMBER 19TH, 2014.

04:09PM 4         DOES THAT SOUND RIGHT?

04:09PM 5    A.   THAT SOUNDS APPROXIMATELY CORRECT, YES.

04:09PM 6    Q.   OKAY.  AND YOU TESTIFIED ON DIRECT THAT YOU KNEW IT WAS A

04:09PM 7    PART-TIME POSITION; RIGHT?

04:09PM 8    A.   CORRECT.

04:09PM 9    Q.   AND IT WAS GOING TO BE TEMPORARY FOR A FEW MONTHS; RIGHT?

04:09PM 10   A.   CORRECT.

04:09PM 11   Q.   OKAY.  OKAY.

04:10PM 12        SO YOU TESTIFIED ABOUT A CONVERSATION THAT YOU HAD WITH

04:10PM 13   MR. BALWANI ABOUT THE POSITION BEFORE YOU TOOK THE POSITION;

04:10PM 14   RIGHT?

04:10PM 15   A.   YES.

04:10PM 16   Q.   AND YOU SAID DURING THAT CONVERSATION -- YOU UNDERSTOOD

04:10PM 17   FROM THE CONVERSATION THAT THE ROLE WAS VERY TEMPORARY; RIGHT?

04:10PM 18   A.   CORRECT.

04:10PM 19   Q.   AND IT WAS PART -- IT WAS TWO TO THREE MONTHS.  THAT'S

04:10PM 20   WHAT YOU ANTICIPATED; RIGHT?

04:10PM 21   A.   YES.

04:10PM 22   Q.   AND ALSO THAT MR. BALWANI HAD A NEW LAB DIRECTOR WHO WAS

04:10PM 23   GOING TO COME ON BOARD; RIGHT?

04:10PM 24   A.   CORRECT.

04:10PM 25   Q.   AND THAT NEW LAB DIRECTOR WAS GOING TO COME ON BOARD IN

04:10PM   1    THE SPRING OF 2015; RIGHT?

04:10PM   2    A.   MY UNDERSTANDING WAS THAT THE NEW LAB DIRECTOR WOULD COME

04:10PM   3    ON BOARD IN TWO TO THREE MONTHS.

04:10PM   4    Q.   OKAY.

04:10PM   5    A.   SO THAT WOULD --

04:10PM   6    Q.   TWO --

04:10PM   7    A.   TWO TO THREE MONTHS.  SO THAT WOULD MAKE IT LATE WINTER,

04:10PM   8    EARLY SPRING.

04:10PM   9    Q.   OKAY.  AND MR. BALWANI SAID THAT NEW LAB DIRECTOR WAS A

04:10PM  10    PERSON NAMED SURAJ SAKSENA; CORRECT?

04:10PM  11    A.   NO.  I DID NOT HAVE A NAME.

04:10PM  12    Q.   YOU JUST KNEW THERE WAS GOING TO BE A NEW LAB DIRECTOR?

04:11PM  13    A.   YES.

04:11PM  14    Q.   OKAY.  AND THE NUMBER OF HOURS YOU WERE GOING TO WORK WAS

04:11PM  15    GOING TO BE ABOUT FIVE HOURS PER WEEK?

04:11PM  16         DOES THAT SOUND RIGHT?

04:11PM  17    A.   IT COULD BE.  HOWEVER MANY IT TAKES TO GET THROUGH

04:11PM  18    DOCUMENTS.  THAT'S PROBABLY WHAT I SPENT, FIVE TO TEN.

04:11PM  19    Q.   OKAY.  AND THAT WAS COMMUNICATED TO YOU BY MR. BALWANI IN

04:11PM  20    THAT INITIAL CALL?

04:11PM  21    A.   I DON'T RECALL ONE WAY OR THE OTHER.

04:11PM  22    Q.   OKAY.  AND YOU KNEW THAT YOU WERE NOT GOING TO BE REQUIRED

04:11PM  23    TO BE ON SITE AT THERANOS; RIGHT?

04:11PM  24    A.   CORRECT.

04:11PM  25    Q.   AND YOU HAD DONE THAT BEFORE, WORKED NOT ON SITE AT

SAWYER CROSS BY MS. WALSH

```
04:11PM   1    DIFFERENT LABS; RIGHT?
04:11PM   2    A.   THIS WAS THE FIRST TIME THAT I HAD NOT EVER BEEN ON SITE.
04:11PM   3        I HAVE CERTAINLY WORKED NOT ON SITE.  MOST DOCUMENT REVIEW
04:11PM   4    IS DONE OFF SITE.
04:11PM   5        BUT I AM GENERALLY ALSO ON SITE AT THE LABS PART-TIME.
04:11PM   6    Q.   OKAY.  AND YOU, AS YOU SAID, I THINK EARLIER, YOU HAD
04:12PM   7    WORKED AT MULTIPLE LABS BEFORE; RIGHT?
04:12PM   8    A.   CORRECT.
04:12PM   9    Q.   AND YOU HAD WORKED PART-TIME AT DIFFERENT LABS; CORRECT?
04:12PM  10    A.   CORRECT.
04:12PM  11    Q.   AND THERE'S NOTHING WRONG WITH DOING THAT; RIGHT?
04:12PM  12    A.   TRUE.
04:12PM  13    Q.   THE REGULATIONS ALLOW LAB DIRECTORS TO DO THAT; RIGHT?
04:12PM  14    A.   YES.
04:12PM  15    Q.   OKAY.  OKAY.
04:12PM  16        AND THEN YOU MENTIONED A DELEGATION THAT YOU MADE.  YOU
04:12PM  17    SAID THAT YOU, YOU MADE ONE DELEGATION DURING YOUR TIME AT
04:12PM  18    THERANOS; IS THAT RIGHT?
04:12PM  19    A.   CORRECT.
04:12PM  20    Q.   AND A DELEGATION IS IMPORTANT FOR A LAB DIRECTOR
04:12PM  21    BECAUSE -- ESPECIALLY IF YOU CAN'T BE THERE ALL OF THE TIME; IS
04:12PM  22    THAT FAIR?
04:12PM  23    A.   YES.  IT'S EFFECTIVELY A JOB DESCRIPTION, DELEGATING THE
04:12PM  24    AUTHORITIES WITHIN THAT JOB DESCRIPTION TO THE PERSON.
04:12PM  25    Q.   OKAY.  AND SO YOU, AS LAB DIRECTOR, DELEGATE WHATEVER IS
```

04:12PM   1    DESCRIBED TO ANOTHER INDIVIDUAL WHO WORKED AT THE LAB; CORRECT?

04:12PM   2    A.   YES.

04:12PM   3    Q.   AND YOU SAID THAT YOU DELEGATED TO A QC MANAGER; RIGHT?

04:13PM   4    A.   YES.

04:13PM   5    Q.   AND THAT PERSON'S NAME WAS LANGLY GEE, WAS IT NOT?

04:13PM   6    A.   YES.

04:13PM   7    Q.   OKAY.  AND SO MR. GEE WAS RESPONSIBLE FOR REVIEWING AND

04:13PM   8    ANALYZING ALL OF THE QC WORK THAT WAS DONE WITHIN THE LAB;

04:13PM   9    CORRECT?

04:13PM   10   A.   CORRECT.

04:13PM   11   Q.   AND AS A LAB DIRECTOR, YOU UNDERSTAND THE IMPORTANCE OF

04:13PM   12   QC; RIGHT?

04:13PM   13   A.   YES.

04:13PM   14   Q.   QC IS PERFORMED TO MAKE SURE THAT THE INSTRUMENT IS

04:13PM   15   OPERATING RELIABLY; RIGHT?

04:13PM   16   A.   YES.

04:13PM   17   Q.   AND QC TESTS THE PRECISION ON THE DEVICE; RIGHT?

04:13PM   18   A.   IT DEPENDS ON WHAT KIND OF TEST IT IS.  IT MIGHT.

04:13PM   19   Q.   OKAY.  BUT IT'S IMPORTANT IN THE OPERATION OF THE LAB;

04:13PM   20   RIGHT?

04:13PM   21   A.   YES.

04:13PM   22   Q.   AND THAT WAS DELEGATED TO MR. GEE; CORRECT?

04:13PM   23   A.   YES.

04:13PM   24        THE COURT:  SHOULD WE BREAK NOW?

04:13PM   25        MS. WALSH:  PROBABLY, YEAH.

5558

| | | |
|---|---|---|
| 04:13PM | 1 | THE COURT:  LET'S DO THAT.  LET'S TAKE OUR AFTERNOON |
| 04:13PM | 2 | BREAK, LADIES AND GENTLEMEN. |
| 04:13PM | 3 | WE'LL SEE YOU NEXT FRIDAY, PLEASE -- NOT NEXT FRIDAY, THIS |
| 04:14PM | 4 | COMING FRIDAY. |
| 04:14PM | 5 | (LAUGHTER.) |
| 04:14PM | 6 | THE COURT:  LANGUAGE IS SO IMPORTANT, ISN'T IT? |
| 04:14PM | 7 | WE'LL SEE YOU FRIDAY NEXT, WHICH MEANS THIS FRIDAY.  AT |
| 04:14PM | 8 | 9:00 O'CLOCK WE'LL START, LADIES AND GENTLEMEN. |
| 04:14PM | 9 | LET ME REMIND YOU OF THE ADMONITION.  IT'S STILL IN PLACE. |
| 04:14PM | 10 | DO NOT DISCUSS OR IN ANY WAY ATTEMPT TO LEARN ANYTHING ABOUT |
| 04:14PM | 11 | THIS CASE. |
| 04:14PM | 12 | HAVE A GOOD DAY OFF, AND WE'LL SEE YOU FRIDAY MORNING. |
| 04:14PM | 13 | THANK YOU. |
| 04:14PM | 14 | AND WE'LL SEE YOU BACK FRIDAY MORNING, DOCTOR. |
| 04:14PM | 15 | THANK YOU. |
| 04:14PM | 16 | (JURY OUT AT 4:14 P.M.) |
| 04:14PM | 17 | THE COURT:  PLEASE BE SEATED.  THANK YOU. |
| 04:14PM | 18 | THE RECORD SHOULD REFLECT THAT OUR JURY HAS LEFT FOR THE |
| 04:14PM | 19 | DAY.  DR. SAWYER HAS LEFT THE COURTROOM. |
| 04:14PM | 20 | COUNSEL, SCHEDULING FOR FRIDAY? |
| 04:15PM | 21 | MS. WALSH, I EXPECT THAT YOU'LL FINISH YOUR CROSS BY THE |
| 04:15PM | 22 | BREAK DO YOU THINK, OUR MORNING BREAK? |
| 04:15PM | 23 | MS. WALSH:  YES, I THINK SO. |
| 04:15PM | 24 | THE COURT:  RIGHT. |
| 04:15PM | 25 | MR. SCHENK:  YES.  THANK YOU, YOUR HONOR. |

5559

04:15PM 1        WE HAVE ONE MORE INVESTOR TO CALL AFTER DR. SAWYER.

04:15PM 2        AND I MENTIONED THE COVID ISSUE WITH ANOTHER WITNESS.

04:15PM 3        WE'VE ALREADY GIVEN NOTICE TO THE DEFENSE OF THE WITNESSES

04:15PM 4   THAT WE'LL CALL IN PLACE OR INSTEAD OF THAT WITNESS.

04:15PM 5              THE COURT:  OKAY.

04:15PM 6              MR. SCHENK:  SO WE'VE MADE TRAVEL ARRANGEMENTS FOR

04:15PM 7   THEM.  WE'RE GOING TO FLY IN SEVERAL ADDITIONAL WITNESSES THAT

04:15PM 8   WE THINK SHOULD COVER A GOOD CHUNK OF FRIDAY.  IT'S A LITTLE

04:15PM 9   BIT HARD TO PREDICT EXACTLY HOW MUCH, BUT WE'LL CERTAINLY MAKE

04:15PM 10  USE OF AS MUCH TIME AS POSSIBLE ON FRIDAY.

04:15PM 11             THE COURT:  OKAY.  THAT SOUNDS GREAT.

04:15PM 12             MS. WALSH:  THANK YOU.

04:15PM 13             THE COURT:  THANKS.  WE'LL SEE YOU --

04:15PM 14             MR. BOSTIC:  YOUR HONOR --

04:15PM 15             THE COURT:  MR. BOSTIC.

04:15PM 16             MR. BOSTIC:  JUST A BRIEF HOUSEKEEPING ISSUE BEFORE

04:16PM 17  I FORGET.

04:16PM 18       DURING THE CROSS-EXAMINATION OF MR. EISENMAN, EXHIBIT 3530

04:16PM 19  WAS DISCUSSED AND I JUMPED UP AND SAID THAT IT WASN'T IN

04:16PM 20  EVIDENCE.

04:16PM 21       I WAS CORRECTED THAT IT WAS.

04:16PM 22       AND AT THE RISK OF BEING CORRECTED A SECOND TIME, I THINK

04:16PM 23  THAT WHAT WAS PREVIOUSLY ADMITTED WERE PAGES 1 THROUGH 24 AND

04:16PM 24  32.

04:16PM 25       AND TODAY I THINK PAGE 42 WAS ALSO PUBLISHED.

5560

04:16PM  1          THAT'S NO PROBLEM, AND THE GOVERNMENT DOESN'T OBJECT TO

04:16PM  2   PAGE 42 BEING ADMITTED INTO EVIDENCE IF I'M RIGHT ABOUT THAT,

04:16PM  3   BUT IT MIGHT BE SOMETHING THAT WE NEED TO CLARIFY FOR THE

04:16PM  4   RECORD.

04:16PM  5          THE COURT:  OKAY.  THANK YOU.

04:16PM  6          MS. WALSH:  CAN YOU REMIND ME OF THE NUMBER?  35 --

04:16PM  7          MR. BOSTIC:  3530.

04:16PM  8          THE COURT:  THIS WAS THE STOCK PURCHASE AGREEMENT I

04:16PM  9   BELIEVE.

04:16PM 10          MS. WALSH:  RIGHT.

04:16PM 11          MR. BOSTIC:  IT HAS SIGNATURE PAGES FOR MULTIPLE

04:17PM 12   INVESTORS.

04:17PM 13          THE COURT:  RIGHT.

04:17PM 14          MR. BOSTIC:  I THINK ONLY ONE OF THOSE SIGNATURE

04:17PM 15   PAGES WAS PREVIOUSLY ADMITTED.

04:17PM 16          THE COURT:  RIGHT.  AS I RECALL, THE DOCUMENT DOES

04:17PM 17   HAVE SIGNATURE PAGES FOR MANY OF THE INVESTORS.  GEORGE SHULTZ

04:17PM 18   WAS ON THERE, AND OTHERS, I THINK.

04:17PM 19      BUT NOT --

04:17PM 20          MS. WALSH:  YES, YOUR HONOR.

04:17PM 21      MY ONLY INTENT REALLY WAS TO GET IN MR. EISENMAN'S

04:17PM 22   SIGNATURE, AND THEN THE PAGE 42 SHOWING THE NUMBER OF SHARES

04:17PM 23   AND THE TOTAL AMOUNT PAID FOR THOSE SHARES.

04:17PM 24          THE COURT:  OKAY.

04:17PM 25          MS. WALSH:  SO I'M NOT SURE.  WE CAN PREPARE A NEW

5561

04:17PM  1    EXHIBIT, AND MAYBE REOFFER THE NEW EXHIBIT.  I'M NOT SURE HOW

04:17PM  2    TO CURE THE ISSUE.

04:17PM  3         THE COURT:  WELL, IF JUST THOSE PAGES WERE ADMITTED,

04:17PM  4    I DON'T THINK WE NEED TO -- WE CAN PULL THOSE PAGES OUT.

04:17PM  5    WHATEVER THE JURY GETS ELECTRONICALLY, IT WILL BE JUST THOSE

04:17PM  6    PARTICULAR PAGES, IF THAT'S ALL RIGHT WITH YOU.

04:17PM  7         MS. WALSH:  THAT'S FINE WITH US.

04:17PM  8         MR. BOSTIC:  YES, YOUR HONOR.  AS LONG AS THE RECORD

04:18PM  9    REFLECTS WHICH PAGES WERE ADMITTED, THEN WE'LL MAKE SURE THAT

04:18PM  10   THE FINAL VERSION THAT GOES BACK TO THE JURY HAS THOSE PAGES.

04:18PM  11        THE COURT:  RIGHT.  RIGHT.

04:18PM  12        MS. WALSH:  I GUESS I -- I'M NOT SURE IF MR. BOSTIC

04:18PM  13   SAID PAGE 42 WAS NOT ADMITTED OR IT WAS.

04:18PM  14        MR. BOSTIC:  MY UNDERSTANDING WAS THAT IT WAS NOT

04:18PM  15   PREVIOUSLY ADMITTED, AND IT WAS NOT ADMITTED TODAY FORMALLY.

04:18PM  16        MS. WALSH:  SO I WOULD LIKE TO ADMIT THAT PAGE.

04:18PM  17        THE COURT:  OKAY.

04:18PM  18        MS. WALSH:  WE CAN DO THAT IN THE PRESENCE OF THE

04:18PM  19   JURY.

04:18PM  20        THE COURT:  RIGHT.  I THINK WE SHOULD.  WE'LL DO

04:18PM  21   THAT TOMORROW MORNING, OR EXCUSE ME, FRIDAY NEXT MORNING.

04:18PM  22        MS. WALSH:  SURE.

04:18PM  23        THE COURT:  WE'LL DO THAT.  JUST REMIND ME OF THAT

04:18PM  24   AND WE'LL JUST TAKE CARE OF THAT HOUSEKEEPING.

04:18PM  25        MS. WALSH:  YES.

5562

04:18PM  1          THE COURT:  AND THEN FOR THE JURY EXHIBITS THEN,

04:18PM  2     WHENEVER THEY GO BACK, THEY WILL BE THE ELECTRONIC VERSION,

04:18PM  3     WHATEVER THOSE PAGES ARE, FOUR OR FIVE PAGES.

04:18PM  4          MR. BOSTIC:  YES, YOUR HONOR.

04:18PM  5          THE COURT:  OKAY.  GREAT.

04:18PM  6          MS. WALSH:  THANK YOU.

04:18PM  7          THE COURT:  THANK YOU.

04:18PM  8       (COURT ADJOURNED AT 4:18 P.M.)

         9

        10

        11

        12

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   IRENE RODRIGUEZ, CSR, CRR
     CERTIFICATE NUMBER 8076

17

18

19   LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595

20

21         DATED:  MAY 11, 2022

22

23

24

25