1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                        SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,        )
6                                    )  CR-18-00258-EJD
                    PLAINTIFF,       )
7                                    )  SAN JOSE, CALIFORNIA
              VS.                    )
8                                    )  JUNE 24, 2022
    RAMESH "SUNNY" BALWANI,          )
9                                    )  VOLUME 41
                    DEFENDANT.       )
10   _____ )  PAGES 7557 - 7733

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
                BEFORE THE HONORABLE EDWARD J. DAVILA
13                  UNITED STATES DISTRICT JUDGE

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                              JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                                KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612
20
           (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
     OFFICIAL COURT REPORTER:
22                         IRENE L. RODRIGUEZ, CSR, RMR, CRR
                           CERTIFICATE NUMBER 8074
23

24        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                TRANSCRIPT PRODUCED WITH COMPUTER
25

```
1        A P P E A R A N C E S: (CONT'D)

2     FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                              BY:  MOLLY MCCAFFERTY
3                                  SHAWN ESTRADA
                              THE ORRICK BUILDING
4                             405 HOWARD STREET
                              SAN FRANCISCO, CALIFORNIA 94105
5
                              BY:  JEFFREY COOPERSMITH
6                                  AARON BRECHER
                                   AMANDA MCDOWELL
7                             701 FIFTH AVENUE, SUITE 5600
                              SEATTLE, WASHINGTON 98104
8
                              BY:  STEPHEN CAZARES
9                             77 SOUTH FIGUEROA STREET, SUITE 3200
                              LOS ANGELES, CALIFORNIA 90017
10
                              BY:  AMY WALSH
11                            51 W 52ND STREET
                              NEW YORK, NEW YORK 10019
12

13    ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                              BY:  MADDI WACHS, PARALEGAL
14                                 SARA SLATTERY, PARALEGAL

15                            ORRICK, HERRINGTON & SUTCLIFFE
                              JENNIFER CYGNOR, PARALEGAL
16
                              PROLUMINA
17                            BY:  COREY ALLEN
                              2200 SIXTH AVENUE, SUITE 425
18                            SEATTLE, WASHINGTON 98121

19                            UNITED STATES POSTAL INSPECTION SERVICE
                              BY:  CHRISTOPHER MCCOLLOW
20
                              FEDERAL BUREAU OF INVESTIGATION
21                            BY:  MARIO C. SCUSSEL

22                            UNITED STATES FOOD & DRUG
                              ADMINISTRATION
23                            BY:  GEORGE SCAVDIS

24

25
```

1

<u>INDEX OF PROCEEDINGS</u>

2

3

GOVERNMENT'S REBUTTAL ARGUMENT BY MR. BOSTIC    P. 7573

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SAN JOSE, CALIFORNIA                    JUNE 24, 2022

 2                    P R O C E E D I N G S

 3        (COURT CONVENED AT 9:05 A.M.)

 4        (JURY OUT AT 9:05 A.M.)

 5            THE COURT:  THANK YOU.  PLEASE BE SEATED.  THANK YOU

 6    AGAIN FOR YOUR COURTESY.

 7        WE'RE BACK ON THE RECORD.

 8        ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

 9        WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

10        I JUST WANTED TO CHECK WITH COUNSEL BEFORE WE BRING THE

11    JURY IN, IF THERE'S ANYTHING EITHER SIDE WANTED TO TALK ABOUT

12    BEFORE WE BRING OUR JURY IN?

13            MR. COOPERSMITH:  YOUR HONOR, IF WE COULD BRIEFLY

14    TALK ABOUT THE JUROR NUMBER 10 AND THE --

15            THE COURT:  YES.  THIS IS JUROR NUMBER 10, YES.

16            MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

17        AND SO I GUESS A COUPLE OF THINGS.

18        FIRST OF ALL, IF SHE'S GOING TO BE -- IT SOUNDS LIKE SHE

19    IS GOING TO START HER VACATION ON THIS SUNDAY, THE 26TH OF

20    JUNE, THEN MAYBE THIS IS OBVIOUS, BUT THEN SHE WOULD NOT -- IF

21    THERE'S DELIBERATION TIME TODAY, IT SEEMS LIKE SHE WOULD NOT BE

22    ABLE TO PARTICIPATE IN THOSE DELIBERATIONS BECAUSE OTHERWISE

23    THEY WOULD HAVE TO START AGAIN, ASSUMING THEY DIDN'T REACH A

24    VERDICT THIS AFTERNOON.  THAT'S ONE THING.

25            AND THEN SECOND, WE THOUGHT MORE ABOUT THIS QUESTION OF
```

09:06AM 1   WHETHER JUROR NUMBER 10 COULD BE, JUST IN CASE IT'S EVER NEEDED

09:06AM 2   AS A FAILSAFE AS WELL, BASICALLY BEING DESIGNATED AS AN

09:06AM 3   ALTERNATE.  SO IF SOMETHING WENT HAYWIRE, WHEN SHE GOT BACK

09:06AM 4   FROM HER VACATION, THE JURY COULD START AGAIN, IF THERE'S ANY

09:06AM 5   NEED TO DO THAT.  IT PROBABLY WOULDN'T BE NECESSARY, BUT YOU

09:06AM 6   NEVER KNOW.

09:06AM 7        WE THINK THAT -- WE DO SUPPORT THAT PLAN.  MR. BALWANI IS

09:06AM 8   PREPARED TO WAIVE ANY OBJECTION TO THAT.  HE WOULD DO THAT ON

09:06AM 9   THE RECORD.

09:06AM 10            THE COURT:  OKAY.

09:06AM 11            MR. COOPERSMITH:  I WANT TO BE CAUTIOUS HERE BECAUSE

09:06AM 12  IT'S BEEN A LONG TRIAL, THE COURT AND THE PARTIES HAVE WORKED

09:06AM 13  VERY HARD, AND WE WANT TO MAKE SURE EVERYTHING IS IN PLACE TO

09:06AM 14  GET TO THE CONCLUSION HERE.

09:06AM 15            THE COURT:  SURE.  OKAY.

09:06AM 16       MR. SCHENK.

09:06AM 17            MR. SCHENK:  YES, YOUR HONOR.  THANK YOU.

09:06AM 18       I HAVE THOUGHTS ON BOTH OF THOSE SUBJECTS.  THE FIRST, I

09:06AM 19  THINK WE NEED TO WAIT AND SEE WHAT TIME THE JURY GETS THE CASE

09:07AM 20  TO DECIDE WHEN IT WOULD BE APPROPRIATE TO EXCUSE THIS JUROR.

09:07AM 21       I THINK IF THEY HAVE FOUR HOURS OF DELIBERATION TIME

09:07AM 22  TODAY, WE SHOULD CONSIDER ALLOWING THIS JUROR TO PARTICIPATE IN

09:07AM 23  THE DELIBERATIONS.

09:07AM 24       BUT, YES, OF COURSE IF IT'S 3:00 OR 4:00 O'CLOCK, AT SOME

09:07AM 25  POINT IT DOESN'T MAKE SENSE WE EXCUSE HER AND PROMOTE THE

09:07AM  1    ALTERNATE, AND I THINK WE SHOULD JUST HOLD ON THAT PARTICULAR

09:07AM  2    DECISION UNTIL WE HAVE A SENSE OF HOW MUCH DELIBERATION TIME

09:07AM  3    THE JURY WOULD HAVE THIS AFTERNOON.

09:07AM  4         ON THE QUESTION OF NOT EXCUSING THIS JUROR BUT CONVERTING

09:07AM  5    HER TO AN ALTERNATE, I WAS UNABLE TO FIND ANY CASES THAT

09:07AM  6    ADDRESS THIS ISSUE.  I DON'T THINK THAT'S SURPRISING.

09:07AM  7         IF YOU LOOK AT RULE 24, THOUGH, WHICH IS THE RULE THAT

09:07AM  8    GOVERNS THE IMPANELMENT OF ALTERNATES AND TRIAL JURORS --

09:07AM  9              THE COURT:  FEDERAL RULES OF CRIMINAL PROCEDURE 24.

09:07AM 10              MR. SCHENK:  YES, YOUR HONOR.

09:07AM 11         IT INDICATES THERE'S A MAXIMUM OF SIX ALTERNATES THAT THE

09:08AM 12    COURT CAN SELECT AND IMPANEL, AND THEN IT SAYS THEY SHOULD BE

09:08AM 13    ELEVATED IN ORDER.

09:08AM 14         IF WE CONVERT THIS JUROR TO ALTERNATE STATUS, SHE WOULD BE

09:08AM 15    OUR SEVENTH ALTERNATE.  SO I HAVE A CONCERN THAT THE RULES

09:08AM 16    DON'T CONTEMPLATE THIS NUMBER OF ALTERNATES THROUGHOUT THE

09:08AM 17    COURSE OF THE TRIAL.

09:08AM 18         THE RULES ALSO SUGGEST THAT ONCE THE COURT SETS THE ORDER

09:08AM 19    OF ALTERNATES, THEY GET ELEVATED IN THAT ORDER IN THIS TRIAL AS

09:08AM 20    ONE THROUGH SIX, AND CONVERTING AN INDIVIDUAL JUROR AT THIS

09:08AM 21    STAGE TO ALTERNATE STATUS WOULD ADD HER, PRESUMABLY, TO THE END

09:08AM 22    OF THAT LINE, BUT ALSO THAT IS NOT SOMETHING CONTEMPLATED BY

09:08AM 23    THE RULES.

09:08AM 24         AND I APPRECIATE THE DEFENDANT'S WILLINGNESS TO WAIVE HIS

09:08AM 25    RIGHTS TO THE EXTENT THAT THE DEFENDANT HAS PARTICULAR RIGHTS

09:08AM 1    UNDER RULE 24.  I REMAIN A LITTLE BIT CONCERNED THAT THIS IS

09:08AM 2    NOT SOMETHING THAT IS CONTEMPLATED BY THE RULES.  AND BECAUSE

09:08AM 3    WE'RE TALKING ABOUT TAKING THIS STEP ONCE THE JURY HAS THE

09:09AM 4    CASE, I THINK THAT THE RISK IS SIGNIFICANTLY LESSENED AT THAT

09:09AM 5    POINT THAT WE WON'T HAVE ENOUGH JURORS TO FINISH THE TRIAL.

09:09AM 6        WE STILL HAVE ONE ALTERNATE LEFT, AND AS THE COURT KNOWS,

09:09AM 7    WE CAN GO DOWN TO 11 ONCE DELIBERATIONS HAVE BEGUN.  SO WE HAVE

09:09AM 8    TWO EXTRA JURORS ONCE THE DELIBERATIONS BEGIN EVEN IF WE EXCUSE

09:09AM 9    THIS JUROR AND DO NOT SAVE HER AS AN ALTERNATE.

09:09AM 10       AND IN LIGHT OF THE LACK OF CLARITY IN CASE LAW ON THIS

09:09AM 11   ISSUE AND IN LIGHT OF THE TEXT OF THE RULE, I THINK THE SAFER

09:09AM 12   APPROACH IS TO EXCUSE THE JUROR AND NOT CONVERT HER TO

09:09AM 13   ALTERNATE STATUS.

09:09AM 14            THE COURT:  ALL RIGHT.  THANK YOU.

09:09AM 15            MR. COOPERSMITH:  AND, YOUR HONOR, I DON'T DISAGREE

09:09AM 16   WITH MR. SCHENK THAT IT'S NOT SOMETHING THAT IS DIRECTLY

09:09AM 17   CONTEMPLATED BY RULE 24.  I THINK MR. SCHENK IS READING THAT

09:09AM 18   CORRECTLY.

09:09AM 19       THE CONCERN I HAVE, THOUGH, IS TO GO DOWN TO 11 JURORS, IF

09:09AM 20   IT EVER CAME TO THAT, THAT IS DONE WITH GOOD CAUSE.  AND I

09:10AM 21   THINK THAT IF WE DIDN'T TAKE THIS STEP, WHICH IS I THINK A

09:10AM 22   PRUDENT STEP OF DESIGNATING THIS JUROR AS AN ALTERNATE,

09:10AM 23   OBVIOUSLY WITH MR. BALWANI'S CONSENT AND WAIVER, THEN AT THE

09:10AM 24   POINT WHERE IF IT EVER HAPPENED AND WE WOULD HAVE TO GO DOWN TO

09:10AM 25   11, WE WOULD HAVE SOME SERIOUS ISSUES OF GOING DOWN TO 11

09:10AM 1    BECAUSE WE THINK THE PREFERENCE IS THE CASE TO BE DECIDED BY 12

09:10AM 2    JURORS.

09:10AM 3        WE THINK IT'S A PRUDENT STEP.  WE DON'T KNOW WHAT HARM

09:10AM 4    COULD BE DONE, ESPECIALLY WITH A WAIVER BY THE DEFENDANT.  AND

09:10AM 5    I DON'T THINK IT CREATES AN APPELLATE ISSUE OR ANYTHING OF THAT

09:10AM 6    NATURE.

09:10AM 7        THAT'S OUR REQUEST.

09:10AM 8        SWITCHING TO THE JURY DELIBERATIONS.  OF COURSE IT'S

09:10AM 9    ALWAYS POSSIBLE THAT THE JURY WILL HAVE SOME HOURS IN THIS

09:10AM 10   AFTERNOON TODAY TO DELIBERATE AND COME UP WITH A QUICK VERDICT.

09:10AM 11   THAT'S ALWAYS POSSIBLE.

09:10AM 12       I JUST DON'T THINK THAT IT'S RIGHT TO START THAT PROCESS

09:10AM 13   WITH A JUROR WHO WE KNOW WON'T BE AVAILABLE AFTER THIS

09:10AM 14   AFTERNOON.

09:10AM 15           THE COURT:  SHOULD WE EXCUSE HER NOW?

09:10AM 16           MR. COOPERSMITH:  WELL, EXCUSING HER AND MAKING HER

09:11AM 17   AN ALTERNATE, WHICH MEANS SHE WOULD HAVE TO SIT.

09:11AM 18           THE COURT:  WELL, I WASN'T TALKING ABOUT THAT.  I

09:11AM 19   WAS SAYING SHOULD WE EXCUSE HER NOW KNOWING THAT SHE WON'T BE

09:11AM 20   AVAILABLE?

09:11AM 21       I'LL ANSWER MY OWN QUESTION.  NO, I DON'T THINK WE SHOULD.

09:11AM 22   I DO THINK -- PARDON ME FOR INTERRUPTING YOU, MR. COOPERSMITH,

09:11AM 23   BUT I DO THINK I CAPTURE THE SENTIMENT.

09:11AM 24           MR. COOPERSMITH:  SURE.

09:11AM 25           THE COURT:  AND IT'S A VERY NOVEL SITUATION, ONE OF,

09:11AM  1    I THINK, FIRST IMPRESSION FOR ALL OF US.

09:11AM  2         I APPRECIATE THE SUGGESTION.  IT'S A CREATIVE ONE.

09:11AM  3         I DON'T BELIEVE THAT YOUR SUGGESTION WOULD CREATE ANY

09:11AM  4    STRUCTURAL ERROR, I DON'T SEE THAT AS A STRUCTURAL ISSUE, BUT

09:11AM  5    NONETHELESS IT'S ONE THAT IS -- I DO HAVE SOME RETICENCE TO

09:11AM  6    PROCEED.  SHE'S A SEATED JUROR NOW AND -- AND LET ME JUST

09:11AM  7    STATE, IF WE'RE GOING TO ANY OF THIS CHANGE, I WOULD PREFER TO

09:11AM  8    DO IT BEFORE THE JURY GETS THE CASE.  I JUST THINK THAT SHE'S A

09:11AM  9    SEATED JUROR NOW, AND TO CHANGE HER ROLE IN SOME WAY I THINK IS

09:12AM 10    A LITTLE DISRUPTIVE.  SO I'M NOT INCLINED TO DO THAT, TO CHANGE

09:12AM 11    HER OR ADVANCE HER FROM SEATED JUROR TO ALTERNATE STATUS.

09:12AM 12         I RECOGNIZE THE PATH HERE IS -- WE'RE DOWN TO TWO

09:12AM 13    ALTERNATES, AND THE PATH HERE IS TO CONTINUE TO PROVIDE

09:12AM 14    INTEGRITY TO THE WHOLE PROCESS WITH A FULSOME JURY.  AND I

09:12AM 15    APPRECIATE THAT, AND I JOIN IN EVERYONE'S SENTIMENT TO

09:12AM 16    ACCOMPLISH THAT, PARTICULARLY WHEN WE'RE SO CLOSE AND THE JURY

09:12AM 17    IS SO CLOSE TO HAVING THE CASE.

09:12AM 18         WE DO HAVE A FULL COMPLEMENT NOW.  WE HAVE 12 JURORS

09:12AM 19    SEATED WHO HEAR THE CASE.  WE RECOGNIZE THAT THIS JUROR HAS

09:12AM 20    TOLD US OF TRAVEL PLANS THAT MAKE IT SUCH THAT SHE'S

09:12AM 21    UNAVAILABLE FOR THIS TIME PERIOD.

09:12AM 22         OF COURSE, THE UNKNOWN WAS OUR COVID SITUATION WHICH

09:12AM 23    DISRUPTED THIS CASE FOR AT LEAST TWO WEEKS, IF NOT MORE, AND

09:13AM 24    OTHER INTERRUPTIONS AND THAT CAUSED SOME CHAOS WITH OUR

09:13AM 25    SCHEDULE, AND WE JUST HAD TO WORK AROUND IT.

09:13AM 1    BUT AS I SEE IT NOW, WE HAVE 12.  WE HAVE ALTERNATES WHO

09:13AM 2    ARE AVAILABLE TO CAUSE RELIEF SHOULD THAT BE NEEDED, AND MY

09:13AM 3    SENSE IS TO PROCEED AS WE GO FORWARD.

09:13AM 4        MY HOPE IS THAT THE JURY WILL GET THE CASE TODAY, THIS

09:13AM 5    AFTERNOON SOME TIME.

09:13AM 6        BEFORE THEY, THE JURY, LEAVES, AND THEY'LL TELL US WHAT

09:13AM 7    THEIR SCHEDULE IS THOUGH, WE SHOULD TAKE CARE OF JUROR NUMBER

09:13AM 8    10'S ISSUE.  AND I'D LIKE TO BRING HER IN.  PERHAPS YOU CAN

09:13AM 9    GIVE THIS SOME THOUGHT, BUT BEFORE THE END OF THE DAY, BEFORE

09:13AM 10   THE JURY LEAVES, SHE SHOULD KNOW WHETHER OR NOT SHE'S UNDER

09:13AM 11   COURT ORDER TO COME BACK NEXT WEEK OR WHETHER SHE CAN TAKE THE

09:13AM 12   TIME THAT SHE HAS PREVIOUSLY PLANNED.  AND I THINK SHE HASN'T

09:14AM 13   TOLD US ANYTHING THAT HER PLANS HAVE CHANGED.  SO I'D LIKE TO

09:14AM 14   BRING HER IN BEFORE THAT.

09:14AM 15       IF THAT -- IF IT OCCURS THAT WE'RE GOING TO REPLACE JUROR

09:14AM 16   NUMBER 10 WITH AN ALTERNATE, WE'LL DO THAT NEXT WEEK, AND

09:14AM 17   FORMALLY REPLACE.  WE'LL RELIEVE HER AND FORMALLY REPLACE AND

09:14AM 18   INFORM THE ALTERNATE, AND I'LL HAVE TO INSTRUCT THE JURY AGAIN

09:14AM 19   ABOUT STARTING THEIR DELIBERATIONS ANEW IF THEY HAVEN'T

09:14AM 20   REACHED --

09:14AM 21       MR. COOPERSMITH:  RIGHT, YOUR HONOR.  I UNDERSTAND

09:14AM 22   ALL OF THAT.  THANK YOU.

09:14AM 23       THE THING THAT -- OUR POSITION IS THAT PUTTING ASIDE THE

09:14AM 24   SWITCHING HER TO ALTERNATE, SO THAT'S NOT GOING TO HAPPEN,

09:14AM 25   THAT'S THE COURT'S DECISION.

7567

09:14AM 1          THE COURT:  RIGHT.

09:14AM 2          MR. COOPERSMITH:  BUT WITH REGARD TO DELIBERATIONS,

09:14AM 3    OUR POSITION IS THAT IF WE KNOW -- IF THE JURORS SHOULD BE

09:14AM 4    SPOKEN TO BEFORE THE JURY STARTS DELIBERATION, SO AFTER THE

09:14AM 5    REBUTTAL THERE SHOULD BE AN INQUIRY.

09:14AM 6          IF SHE'S GOING ON HER TRIP AND THE COURT IS NOT GOING TO

09:15AM 7    RELIEVE HER OF HER OBLIGATIONS -- I MEAN IS GOING TO RELIEVE

09:15AM 8    HER AND ALLOW HER TO GO ON HER VACATION, THEN AT THAT POINT WE

09:15AM 9    THINK THE JURY SHOULD NOT BEGIN THE DELIBERATIONS WITH THE

09:15AM 10   JURY.  THE ALTERNATE SHOULD BE SLOTTED IN RIGHT AWAY, AND THEN

09:15AM 11   DELIBERATIONS COULD START SO THEY WOULDN'T HAVE TO START ANEW,

09:15AM 12   ASSUMING THERE'S NO VERDICT TODAY.

09:15AM 13         WE'RE VERY CONCERNED THAT A JUROR WHO IS NOW STARTING

09:15AM 14   DELIBERATIONS, THERE'S SOMEHOW PRESSURE TO COME UP WITH

09:15AM 15   DECISIONS AS SHE'S THERE, RIGHT?

09:15AM 16         AND IT SEEMS LIKE FOR A FEW HOURS, I THINK ALL OF OUR

09:15AM 17   EXPERIENCES WITH COMPLEX CASES, NO QUESTION IT'S POSSIBLE THAT

09:15AM 18   THE JURY COMES BACK VERY QUICKLY, BUT USUALLY THAT'S NOT THE

09:15AM 19   CASE IN A LONG TRIAL LIKE THIS.

09:15AM 20         AND I JUST THINK IT WOULD BE MUCH BETTER IF THE COURT

09:15AM 21   ADDRESSES THIS ONE JUROR, NUMBER 10, IF SHE'S GOING TO GO ON

09:15AM 22   HER VACATION THEN SHE'S EXCUSED BEFORE DELIBERATIONS START, AND

09:15AM 23   THEN THERE'S NO NEED TO RESTART DELIBERATIONS.

09:15AM 24         THE COURT:  SO THAT WOULD MEAN THAT SHE WOULD HAVE

09:15AM 25   SAT THROUGH THE ENTIRETY OF THE TRIAL -- AND THERE WILL BE SOME

09:15AM   1    TIME FOR DELIBERATIONS TODAY.  AND YOU'RE SAYING WE SHOULD

09:16AM   2    DISENFRANCHISE HER FROM THAT JUST BECAUSE WE KNOW NEXT WEEK

09:16AM   3    SHE'S NOT AVAILABLE?

09:16AM   4              MR. COOPERSMITH:  RIGHT.

09:16AM   5              THE COURT:  MR. SCHENK.

09:16AM   6              MR. SCHENK:  YOUR HONOR, I DISAGREE WITH THAT

09:16AM   7    APPROACH.  I THINK THAT THIS JUROR SAT THROUGH THE TRIAL AND

09:16AM   8    ALL OF THE ARGUMENTS AS THE COURT JUST NOTED, AND THERE

09:16AM   9    PRESUMABLY WILL BE SEVERAL HOURS OF DELIBERATION TIME FOR THE

09:16AM  10    JURY THIS AFTERNOON.

09:16AM  11        AND IT PRESUPPOSES THE AMOUNT OF TIME THE JURY WILL NEED

09:16AM  12    TO SAY IT ISN'T WORTH IT TO HAVE HER PARTICIPATE IN ONE PART OF

09:16AM  13    THE PROCESS THAT SHE QUALIFIED FOR, AND THAT IS THE

09:16AM  14    DELIBERATIONS.

09:16AM  15        AND IT'S PREMATURE TO EXCUSE HER AT NOON OR 1:00 OR

09:16AM  16    WHATEVER TIME THE CASE EVENTUALLY GETS TO THE JURY JUST BECAUSE

09:16AM  17    WE SEVERAL WEEKS AGO HEARD SHE HAD A VACATION.

09:16AM  18              THE COURT:  ALL RIGHT.  WELL, THANK YOU.  ANYTHING

09:16AM  19    FURTHER?

09:16AM  20              MR. COOPERSMITH:  NO.  WE UNDERSTAND THE

09:16AM  21    GOVERNMENT'S POSITION.  WE OBJECT TO THAT.  WE THINK THE JUROR

09:16AM  22    SHOULD BE EXCUSED.  WE THINK IT CREATES UNDUE PRESSURE FOR THE

09:16AM  23    JURY TO REACH A QUICKER VERDICT WHEN THEY KNOW ONE OF THEIR

09:17AM  24    COLLEAGUES IS GOING TO BE NOT AVAILABLE AFTER TODAY.

09:17AM  25              SO I THINK OUR POSITION IS CLEAR, AND THAT'S HOW WE WOULD

09:17AM 1    LIKE TO DO IT.

09:17AM 2         THE COURT:  SURE.  NO, I APPRECIATE THAT.  YOU KNOW,

09:17AM 3    WE DON'T KNOW WHAT THE VERDICT COULD BE.  YOU MIGHT -- YOU

09:17AM 4    MIGHT GET A QUICK VERDICT THAT YOU'RE VERY HAPPY WITH.

09:17AM 5         MR. COOPERSMITH:  THAT COULD HAPPEN, RIGHT.

09:17AM 6         THE COURT:  AND I DON'T MEAN TO BE FLIP, BUT I DO

09:17AM 7    THINK THAT THE -- THIS JUROR HAS SAT THROUGH THE ENTIRETY OF

09:17AM 8    THE CASE, SHE'S HEARD THE EVIDENCE, AND -- BUT FOR THE

09:17AM 9    REBUTTAL, SHE'S HEARD ALL OF THE ARGUMENTS IN THE CASE.

09:17AM 10   THERE WILL BE TIME FOR DELIBERATION.  I JUST THINK IT'S --

09:17AM 11   I APPRECIATE THE FACT THAT, MR. COOPERSMITH, YOUR OBSERVATION

09:17AM 12   IS THAT THE JURY MAY, KNOWING THAT SHE IS -- HAS TIME

09:17AM 13   CONSTRAINTS AND WON'T BE HERE NEXT WEEK, THAT MIGHT INFLUENCE

09:17AM 14   THEIR DISCUSSIONS AND PERHAPS EVEN THEIR DECISIONS.

09:17AM 15   BUT PLEASE RECALL THAT THE JURY ALSO KNOWS THAT THERE ARE

09:17AM 16   TWO ALTERNATES.  THEY WERE HERE.  I IDENTIFIED THEM AS SUCH.

09:18AM 17   THEY KNOW THAT THERE ARE ALTERNATES HERE.  I'VE TALKED ABOUT

09:18AM 18   THAT PROCESS, WHAT HAPPENS WHEN THERE'S REPLACEMENT DURING THE

09:18AM 19   VOIR DIRE AND EXPLAINED THAT TO THEM.

09:18AM 20   SO MY SENSE IS THAT THE JURY IS AWARE THAT ALTERNATES

09:18AM 21   EXIST FOR A REASON.  THE LOU GEHRIG ANALOGY, YOU KNOW,

09:18AM 22   WALLY PIPP HAD A HEADACHE, AND HE NEVER PLAYED FOR THE YANKEES

09:18AM 23   AGAIN AND LOU GEHRIG DID.  THAT'S WHAT THEY'RE THERE FOR.  I

09:18AM 24   APPRECIATE YOUR COMMENTS.

09:18AM 25        MR. COOPERSMITH:  THANK YOU, YOUR HONOR.  WE

7570

09:18AM  1    UNDERSTAND THE COURT'S DECISION.

09:18AM  2         THE OTHER REQUEST I WOULD HAVE, IF THAT'S -- SINCE THAT'S

09:18AM  3    THE WAY IT'S GOING TO BE, IS THAT I THINK THE JURY SHOULD BE

09:18AM  4    TOLD THAT THEY HAVE THIS AFTERNOON TO DELIBERATE, AND ONE OF

09:18AM  5    THEIR COLLEAGUES WILL NOT BE AVAILABLE, AND WE HAVE ALTERNATES,

09:18AM  6    AND THAT THEY -- IF THEY DON'T REACH A VERDICT TODAY, THAT'S

09:18AM  7    THEIR PREROGATIVE.  THE NEXT TIME THEY MEET ON MONDAY, THERE

09:19AM  8    WOULD BE DELIBERATIONS STARTING ANEW BECAUSE I WANT TO MAKE

09:19AM  9    SURE THAT THEY UNDERSTAND HOW THE PROCESS IS GOING TO WORK.

09:19AM 10         THE COURT:  YOU KNOW, MY CONCERN ABOUT THAT IS THAT

09:19AM 11    IT SEEMS TO HAVE THE COURT ENTER THEIR DELIBERATION SCHEDULE

09:19AM 12    AND TRY TO DIRECT THEM IN SOME MANNER, WHICH I THINK IS

09:19AM 13    INAPPROPRIATE TO DO.  I JUST DON'T WANT TO INFLUENCE OR HAVE A

09:19AM 14    SUGGESTION THAT THE COURT HAS AN OPINION OF HOW THEY SHOULD

09:19AM 15    DELIBERATE.

09:19AM 16         MR. SCHENK.

09:19AM 17         MR. SCHENK:  I THINK YOU SHOULD READ THE JURY

09:19AM 18    INSTRUCTIONS THAT THE PARTIES HAVE ALREADY ARGUED OVER AND THAT

09:19AM 19    THE COURT HAS APPROVED AND IS PLANNING TO READ TO THE JURY.

09:19AM 20         THE COURT:  YES.

09:19AM 21         MR. COOPERSMITH:  ONE LAST THING, YOUR HONOR.

09:19AM 22         I DON'T KNOW WHETHER THE JUROR NUMBER 10 HAS ALREADY TOLD

09:19AM 23    HER COLLEAGUES THAT SHE'S GOING ON VACATION, BUT THERE'S A

09:19AM 24    CHANCE THAT SHE HASN'T.  AND AT A MINIMUM, I THINK SHE SHOULD

09:20AM 25    NOT -- SHE SHOULD BE INSTRUCTED INDIVIDUALLY NOT TO REVEAL THAT

09:20AM  1    SO THAT NO ONE HAS LIKE THIS SENSE OF TIME PRESSURE BECAUSE

09:20AM  2    THEY'RE GOING TO LOSE HER AFTER TODAY.

09:20AM  3         AND I'M JUST VERY, VERY CONCERNED, AS YOU CAN SEE, FROM MY

09:20AM  4    VARIOUS SUGGESTIONS ABOUT THIS PRESSURE ISSUE.

09:20AM  5              MR. SCHENK:  YOUR HONOR, THERE'S ANOTHER JUROR WHO

09:20AM  6    HAS SOME TRAVEL PLANS.  I THINK IT'S NEXT WEEK OR THE WEEK

09:20AM  7    AFTER.  I'M LOSING MY WEEKS AT THIS POINT.

09:20AM  8         ARE WE ALSO GOING TO INSTRUCT THAT JUROR THAT THAT JUROR

09:20AM  9    SHOULD NOT REVEAL TRAVEL PLANS BECAUSE THE JURY IS GOING TO

09:20AM  10   FEEL THAT THEY HAVE TO REACH A VERDICT BY WEDNESDAY BECAUSE THE

09:20AM  11   JUROR BECOMES UNAVAILABLE ON THURSDAY.

09:20AM  12        IT'S NOT NECESSARY -- THE COURT TELLS THE JURY ABOUT THE

09:20AM  13   TOPICS THAT THEY'RE NOT ALLOWED TO DISCUSS, THAT IS,

09:20AM  14   DELIBERATIONS RELATED TO THE CASE UNTIL THEY GET THE CASE.

09:20AM  15        BUT THE COURT DOES NOT GAG OTHER TOPICS LIKE PERSONAL

09:20AM  16   UPCOMING TRAVEL PLANS, AND IT IS NOT NECESSARY TO BEGIN SUCH A

09:20AM  17   PRACTICE.

09:20AM  18              THE COURT:  THANK YOU.  ANYTHING FURTHER,

09:20AM  19   MR. COOPERSMITH?

09:20AM  20              MR. COOPERSMITH:  NO, YOUR HONOR.

09:20AM  21              THE COURT:  OKAY.  I THINK WE'VE BEEN WITH THIS JURY

09:21AM  22   SINCE MARCH -- HAS IT BEEN SINCE MARCH?  I THINK WE HAVE

09:21AM  23   RECOGNIZED THEIR HARD WORK AND THEIR DILIGENCE.  I'VE USED THE

09:21AM  24   WORD "FIDELITY" TO THE ADMONITION, AND THEY'VE DONE THAT IN

09:21AM  25   VERY ARDUOUS CIRCUMSTANCES, AND THEY CONTINUE TO DO THAT.  I

09:21AM  1    THINK IT'S A GOOD JURY.  THEY'VE LISTENED ATTENDANTLY, AND

09:21AM  2    THEY'VE PUT PEN TO PAPER DURING THE TRIAL, AND THEY'VE TAKEN

09:21AM  3    NOTES, I'VE OBSERVED THAT.  I THINK THEY'RE UP TO THE TASK, AND

09:21AM  4    THEY'RE RESPONSIBLE, AND I HAVE GREAT CONFIDENCE THAT THEY'LL

09:21AM  5    CONTINUE TO CARRY OUT THEIR DUTIES AS JURORS IN THIS CASE.

09:21AM  6         SO I DON'T THINK IT'S NECESSARY TO PARSE THEM OUT AND MAKE

09:21AM  7    COMMENT LIKE YOU'RE SUGGESTING.  I JUST THINK THAT THAT

09:21AM  8    INTERFERES INTO THE DELIBERATIVE PROCESS IN AN INAPPROPRIATE

09:21AM  9    WAY FOR THE COURT.

09:21AM 10         BUT I APPRECIATE IT.  OKAY.

09:21AM 11         ANYTHING?

09:21AM 12             MR. COOPERSMITH:  NO, YOUR HONOR.

09:21AM 13             MR. SCHENK:  NOTHING FURTHER.

09:21AM 14             MR. COOPERSMITH:  NOTHING FURTHER.

09:21AM 15             THE COURT:  ALL RIGHT.  WE'LL BRING OUR JURY IN.

09:22AM 16         (JURY IN AT 9:22 A.M.)

09:22AM 17             THE COURT:  WE'RE BACK IN THE BALWANI MATTER.  ALL

09:22AM 18    COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

09:22AM 19         OUR JURORS AND ALTERNATES ARE PRESENT.  GOOD MORNING,

09:23AM 20    LADIES AND GENTLEMEN.

09:23AM 21         BEFORE I ASK MR. BOSTIC TO BEGIN ANY REBUTTAL ARGUMENT

09:23AM 22    THAT THE GOVERNMENT MAY HAVE, MAY I ASK YOU THAT QUESTION ONE

09:23AM 23    MORE TIME.

09:23AM 24         DURING OUR BREAK AND BETWEEN OUR BREAK AND TODAY, HAVE ANY

09:23AM 25    OF YOU HAD CAUSE TO LEARN ANYTHING ABOUT THIS CASE, DO ANY

09:23AM 1    RESEARCH, DISCUSS, READ, OR LISTEN TO ANYTHING THAT HAD

09:23AM 2    ANYTHING TO DO WITH THIS CASE OR ANYONE ATTACHED TO IT?

09:23AM 3         IF SO, WOULD YOU RAISE YOUR HAND, PLEASE.

09:23AM 4         I SEE NO HANDS.  THANK YOU AGAIN FOR FOLLOWING THE

09:23AM 5    ADMONITION.  I'M GRATEFUL FOR THAT AS ARE THE LAWYERS.

09:23AM 6         MR. BOSTIC, DOES THE GOVERNMENT HAVE A REBUTTAL?

09:23AM 7              MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

09:23AM 8              THE COURT:  PLEASE.

09:24AM 9         **(MR. BOSTIC ON BEHALF OF THE GOVERNMENT GAVE HIS REBUTTAL**

09:24AM 10   **ARGUMENT.)**

09:24AM 11             MR. BOSTIC:  MEMBERS OF THE JURY, GOOD MORNING.  IT

09:24AM 12   OCCURS TO ME THAT BEFORE I GET STARTED, THE FIRST THING ON YOUR

09:24AM 13   MIND MIGHT BE HOW LONG AM I GOING TO TAKE.

09:24AM 14        LET ME JUST LET YOU KNOW THAT THESE ARE THE MATERIALS THAT

09:24AM 15   I WILL DISCUSS WITH YOU TODAY.  WE WILL FINISH TODAY, AND I'M

09:24AM 16   GOING TO PROCEED AS EFFICIENTLY AS I CAN, ALTHOUGH THERE'S A

09:24AM 17   LOT TO COVER, SO PLEASE BEAR WITH ME.

09:24AM 18        AFTER MY REMARKS TODAY, THE COURT IS GOING TO INSTRUCT YOU

09:24AM 19   ON THE LAW THAT YOU SHOULD FOLLOW DURING YOUR DELIBERATIONS,

09:24AM 20   AND AT THAT POINT YOU'LL BE ABLE TO BEGIN DELIBERATING THE

09:24AM 21   VERDICT IN THIS CASE.  AND YOU'LL BE READY FOR THAT BECAUSE

09:24AM 22   YOU'VE BEEN SPENDING THE LAST FEW WEEKS LEARNING IN DEPTH ABOUT

09:24AM 23   A COMPANY CALLED THERANOS, WHICH WAS A BLOOD TESTING COMPANY

09:24AM 24   RUN BY THE DEFENDANT RAMESH BALWANI, AND HIS PARTNER,

09:24AM 25   ELIZABETH HOLMES.

REBUTTAL ARGUMENT BY MR. BOSTIC

09:24AM 1      IF YOU HAD BEEN LEARNING ABOUT THE COMPANY FROM THEM WHEN

09:24AM 2   THEY WERE RUNNING THE COMPANY, YOU WOULD HAVE HEARD A VERY

09:24AM 3   DIFFERENT PICTURE OF THINGS.

09:24AM 4      YOU WOULD HAVE HEARD THAT THIS WAS A COMPANY THAT HAD

09:24AM 5   DEVELOPED A TECHNOLOGY THAT COULD RUN THE FULL RANGE OF BLOOD

09:25AM 6   TESTS FROM A SINGLE DROP OF BLOOD FROM A FINGERTIP;

09:25AM 7      YOU WOULD HAVE HEARD THAT THE COMPANY'S TECHNOLOGY COULD

09:25AM 8   RUN MANY, MANY TESTS ALL AT ONCE FROM THAT TINY SINGLE SAMPLE;

09:25AM 9      THEY WOULD HAVE TOLD YOU THAT THE COMPANY'S ANALYZER WAS

09:25AM 10   FAR SMALLER THAN THE COMMERCIAL ANALYZERS THAT HAD PREVIOUSLY

09:25AM 11   USED, AND THAT IT COULD BE USED ALMOST ANYWHERE.

09:25AM 12      THEY WOULD HAVE TOLD YOU THAT THE SPEED AND ACCURACY OF

09:25AM 13   THEIR TECHNOLOGY WAS SUPERIOR TO WHAT ELSE WAS OUT THERE IN THE

09:25AM 14   INDUSTRY;

09:25AM 15      YOU WOULD HAVE HEARD FROM THEM THAT THE COMPANY'S

09:25AM 16   TECHNOLOGY HAD BEEN COMPREHENSIVELY VALIDATED BY MULTIPLE

09:25AM 17   PHARMACEUTICAL COMPANIES, INCLUDING GIANTS LIKE PFIZER AND

09:25AM 18   SCHERING-PLOUGH;

09:25AM 19      THEY WOULD HAVE TOLD YOU THAT THE WORLD'S MOST POWERFUL

09:25AM 20   AND WELL-EQUIPPED MILITARY HAD EVEN STARTED USING THE COMPANY'S

09:25AM 21   TECHNOLOGY, AND THAT THE TECHNOLOGY WAS BEING USED ON THE

09:25AM 22   BATTLEFIELD, AND THAT IT WAS ACTUALLY SAVING THE LIVES OF

09:25AM 23   SOLDIERS FIGHTING FOR THIS COUNTRY;

09:25AM 24      YOU WOULD HAVE HEARD THAT THE COMPANY GENERATED

09:25AM 25   SIGNIFICANT REVENUES EARLY ON, AND THAT IT WAS POISED TO GO

09:26AM 1    NATIONAL AND GENERATE EVEN LARGER NUMBERS;

09:26AM 2        THEY WOULD HAVE TOLD YOU THAT THE COMPANY WAS RAISING

09:26AM 3    MONEY NOT TO CONTINUE R&D WORK, BUT TO SCALE, TO TAKE THAT

09:26AM 4    INVENTION THAT WAS FINISHED AND TO BUILD A GIANT MONOPOLY OUT

09:26AM 5    OF IT.

09:26AM 6        SO THAT WAS THE THERANOS THAT MR. BALWANI AND MS. HOLMES

09:26AM 7    WERE DESCRIBING TO PEOPLE WHEN THEY WERE RUNNING THE COMPANY.

09:26AM 8    THE PROBLEM IS, YOU KNOW NOW AFTER LISTENING TO PEOPLE WITH

09:26AM 9    FIRST HAND KNOWLEDGE, THAT THAT VERSION OF THE COMPANY NEVER

09:26AM 10   EXISTED.

09:26AM 11       YOU KNOW THAT BECAUSE YOU HEARD FROM PEOPLE WHO WORKED AT

09:26AM 12   THE COMPANY.  YOU WILL HEARD FROM PEOPLE WHO PARTNERED WITH THE

09:26AM 13   COMPANY WORKING FROM OUTSIDE OF THE COMPANY.  AND YOU HEARD

09:26AM 14   ABOUT THE TRUTH OF THERANOS, NOT HAVING TO RELY ON MR. BALWANI

09:26AM 15   AND MS. HOLMES LIKE THE VICTIMS IN THIS CASE DID.

09:26AM 16       AT THIS POINT, AFTER HEARING ALL OF THAT TESTIMONY, IT

09:26AM 17   MIGHT HAVE BEEN SURPRISING FOR YOU OVER THE LAST FEW DAYS TO

09:26AM 18   HEAR A LAWYER FOR THE DEFENSE DISAGREE WITH A LOT OF WHAT THOSE

09:27AM 19   WITNESSES HAD SAID IN THEIR SWORN TESTIMONY ABOUT EVENTS AND

09:27AM 20   CONVERSATIONS THAT THEY PERSONALLY WITNESSED.

09:27AM 21       I'D LIKE TO START WITH A GUIDING PRINCIPLE THAT YOU SHOULD

09:27AM 22   KEEP IN MIND.  AND THIS ISN'T FROM ME.  THIS IS WHAT I

09:27AM 23   ANTICIPATE THE COURT WILL INSTRUCT YOU ABOUT THE LAW.

09:27AM 24       AND THIS WILL BE JURY INSTRUCTION NUMBER 7.  AND IT

09:27AM 25   CONCERNS WHAT IS NOT EVIDENCE?

09:27AM 1      AND NOTICE IT SAYS, "IN REACHING YOUR VERDICT, YOU MAY

09:27AM 2    CONSIDER ONLY THE TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE.

09:27AM 3    THE FOLLOWING THINGS ARE NOT EVIDENCE."

09:27AM 4      NUMBER 1 IS "QUESTIONS, STATEMENTS, OBJECTIONS, AND

09:27AM 5    ARGUMENTS BY THE LAWYERS, THOSE ARE NOT EVIDENCE."

09:27AM 6      IT ALSO SAYS, "WHAT THE LAWYERS HAVE SAID IN THEIR OPENING

09:27AM 7    STATEMENTS, CLOSING ARGUMENTS, AND AT OTHER TIMES IS INTENDED

09:27AM 8    TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE."

09:27AM 9      SO THIS GOES FOR WHAT I SAY AS WELL.  IT CERTAINLY GOES

09:27AM 10   FOR WHAT YOU HEARD IN THE DEFENSE CLOSING.  THAT WAS NOT

09:27AM 11   EVIDENCE.  WHAT THE WITNESSES SAID WAS EVIDENCE.

09:27AM 12     THE LAWYER'S JOB HERE IS TO POINT OUT THE SIGNIFICANT

09:28AM 13   EVIDENCE TO YOU AND EXPLAIN HOW IT FITS INTO THE LARGER

09:28AM 14   PICTURE, NOT TO SUBSTITUTE THEIR VERSION OF THINGS FOR THE

09:28AM 15   WITNESSES WHO ARE ACTUALLY TESTIFYING BASED ON THEIR KNOWLEDGE.

09:28AM 16     SO WHAT DOES THE ACTUAL EVIDENCE SHOW IN THIS CASE?

09:28AM 17     WELL, ONE THING YOU SAW PLENTY OF, WAS EVIDENCE OF VERY

09:28AM 18   SERIOUS PROBLEMS WITH THE ACCURACY AND RELIABILITY OF

09:28AM 19   THERANOS'S TESTING.

09:28AM 20     THE SIMPLEST EVIDENCE ON THIS TOPIC WAS TESTIMONY FROM AT

09:28AM 21   LEAST THREE INDIVIDUALS WHO WORKED WITHIN THERANOS WORKING IN

09:28AM 22   THE LAB.  THAT WAS, OF COURSE, ERIKA CHEUNG AND THEN

09:28AM 23   DRS.  MARK PANDORI AND ADAM ROSENDORFF.  THROUGH THEIR ROLES,

09:28AM 24   THEY HAD FIRST HAND KNOWLEDGE AND FIRST HAND EXPERIENCE WITH

09:28AM 25   THE THERANOS TESTING, AND THEY SAW THE SERIOUS PROBLEMS THAT

09:28AM  1    WERE PLAGUING THAT TECHNOLOGY AND THAT TESTING AT THAT TIME.

09:28AM  2        IN FACT, YOU HEARD THAT ALL OF THOSE EMPLOYEES ACTUALLY

09:28AM  3    QUIT THEIR JOBS AT THERANOS OVER THE CONCERNS THAT THEY HAD

09:28AM  4    WITH THE UNRELIABILITY OF THE RESULTS THAT THERANOS WAS

09:29AM  5    PROVIDING TO PATIENTS.

09:29AM  6        NOW, MR. COOPERSMITH HAD SOME REMARKS ABOUT ALL THREE OF

09:29AM  7    THESE WITNESSES.  WHEN IT CAME TO DR. ROSENDORFF,

09:29AM  8    MR. COOPERSMITH ACCUSED HIM OF BEING BIASSED.  HE SUGGESTED

09:29AM  9    THAT DR. ROSENDORFF'S COMPLAINTS ABOUT THERANOS HAD BEEN

09:29AM  10   MANUFACTURED AFTER THE FACT BECAUSE WE'RE HERE IN FEDERAL

09:29AM  11   CRIMINAL COURT.  THAT WAS A THEME THAT YOU HEARD MULTIPLE TIMES

09:29AM  12   DURING THE DEFENSE CLOSING.

09:29AM  13       BUT DOES THAT SQUARE WITH THE EVIDENCE?  IS THAT

09:29AM  14   CONSISTENT WITH THE ACTUAL EVIDENCE THAT YOU HEARD IN COURT?

09:29AM  15       AND I'LL REMIND YOU THAT DURING DR. ROSENDORFF'S

09:29AM  16   TESTIMONY, YOU SAW NUMEROUS EXAMPLES OF SITUATIONS WHERE HE

09:29AM  17   RAISED HIS GRAVE CONCERNS WHILE HE WAS LAB DIRECTOR AT

09:29AM  18   THERANOS.

09:29AM  19       YOU HEARD TESTIMONY ABOUT WHY HE LEFT HIS JOB THERE.  AND

09:29AM  20   YOU ALSO SAW, IN PARTICULAR, THAT HE HAD A PRACTICE FOR A

09:29AM  21   SIGNIFICANT PORTION OF HIS TIME AT THE COMPANY WHERE HE WOULD

09:29AM  22   ACTUALLY FORWARD EMAILS TO HIS PERSONAL GMAIL ACCOUNT.

09:30AM  23       NOW, THAT MAY BE SOMETHING THAT HE WAS NOT ALLOWED TO DO,

09:30AM  24   SHOULDN'T HAVE DONE PER COMPANY POLICY.  BUT HE TOLD YOU THE

09:30AM  25   REASON THAT HE WAS DOING THAT WAS BECAUSE HE WAS SO TROUBLED BY

09:30AM 1    WHAT HE WAS SEEING AT THE COMPANY, THE COMPANY WHERE HE WAS LAB

09:30AM 2    DIRECTOR, THAT HE WAS WORRIED ABOUT A FUTURE INVESTIGATION.  HE

09:30AM 3    FORWARDED INCRIMINATING EMAILS TO HIS PERSONAL EMAIL ACCOUNT SO

09:30AM 4    THAT HE WOULD HAVE ACCESS TO THOSE IN CASE HE NEEDED THEM TO

09:30AM 5    RESPOND TO AN INVESTIGATION IN THE FUTURE, AND SURE ENOUGH,

09:30AM 6    THERE WAS ONE RESULTING IN THIS TRIAL.

09:30AM 7        SO THERE IS NO REASON TO BELIEVE, AND EVERY REASON NOT TO

09:30AM 8    BELIEVE, THAT DR. ROSENDORFF'S CONCERNS ARE SOMETHING THAT HE

09:30AM 9    CAME UP WITH AFTER THE FACT.  YOU KNOW THAT THOSE ARE THINGS

09:30AM 10   THAT WEIGHED HEAVILY ON HIS MIND WHILE HE WAS AT THE COMPANY.

09:30AM 11       MR. COOPERSMITH DURING HIS REMARKS WAS ALSO QUICK TO POINT

09:30AM 12   OUT DR. ROSENDORFF'S TESTIMONY THAT HE NEVER KNOWINGLY RELEASED

09:30AM 13   AN INACCURATE RESULT, AND THAT HE WAS NEVER DIRECTED TO RELEASE

09:30AM 14   A RESULT THAT HE KNEW WAS INACCURATE.

09:31AM 15       I WANT YOU TO THINK ABOUT HOW THAT QUESTION IS PHRASED

09:31AM 16   BECAUSE YOU HEARD DR. ROSENDORFF'S TESTIMONY THAT WHEN A RESULT

09:31AM 17   COMES OUT, IT'S VERY DIFFICULT, AND OFTEN IMPOSSIBLE, TO JUST

09:31AM 18   LOOK AT IT AND KNOW WHETHER IT'S ACCURATE OR NOT.

09:31AM 19       FREQUENTLY YOU NEED TO KNOW OTHER INFORMATION ABOUT THE

09:31AM 20   WAY THE PATIENT IS PRESENTING, THEIR HEALTH RECORDS TO

09:31AM 21   UNDERSTAND WHETHER THAT RESULT IS ACCURATE OR NOT.  SO YOU

09:31AM 22   SHOULDN'T BE SURPRISED TO HEAR THAT IN THIS LAB THAT HAD MANY

09:31AM 23   ACCURACY PROBLEMS, THE LAB DIRECTOR NEVER KNOWINGLY SENT OUT A

09:31AM 24   FALSE RESULT.  THAT'S NOT TO SAY HE'S NOT AWARE THAT FALSE

09:31AM 25   RESULTS DID GET SENT OUT.  YOU SAW MANY EXAMPLES OF THAT.

09:31AM 1      HE ALSO SAID THAT BY THE TIME HE LEFT THE COMPANY, HE

09:31AM 2   DIDN'T HAVE FAITH IN THE ACCURACY AND RELIABILITY OF THE SYSTEM

09:31AM 3   THAT THERANOS WAS USING TO PERFORM ITS BLOOD TESTING, ITS HOME

09:31AM 4   GROWN EDISON SYSTEM.  AND HE TOLD YOU DIRECTLY THAT THE PERSON

09:32AM 5   WHO DECIDED WHAT SYSTEM THE COMPANY USED FOR TESTING WAS THE

09:32AM 6   DEFENDANT, SUNNY BALWANI.

09:32AM 7      SO WHILE MR. BALWANI MIGHT NOT HAVE EXPRESSLY REQUIRED HIM

09:32AM 8   TO SEND OUT AN INDIVIDUAL RESULT HE KNEW WAS INACCURATE, HE WAS

09:32AM 9   THE ONE WHO WAS FORCING THIS LAB DIRECTOR TO USE A SYSTEM THAT

09:32AM 10  HE DIDN'T HAVE CONFIDENCE IN.

09:32AM 11     DR. PANDORI SAID SOMETHING VERY SIMILAR TO WHAT

09:32AM 12  DR. ROSENDORFF SAID.

09:32AM 13     MR. COOPERSMITH'S RESPONSE TO THAT WAS EVEN STRONGER.  HE

09:32AM 14  SAID SOMETHING TO THE EFFECT OF THAT YOU AS THE JURY COULD NOT

09:32AM 15  BELIEVE A WORD THAT THIS MAN SAYS.  HE ACCUSED DR. PANDORI OF

09:32AM 16  LYING REPEATEDLY ON THE STAND.

09:32AM 17     IN SUPPORT OF THAT CLAIM, HE TALKED ABOUT SOME MEMORY

09:32AM 18  ISSUES THAT DR. PANDORI HAD WHEN HE WAS SHOWN DOCUMENTS ON

09:32AM 19  CROSS-EXAMINATION.  IT'S UP TO YOU AS THE JURY TO WEIGH WITNESS

09:32AM 20  CREDIBILITY AND DECIDE WHETHER YOU THINK THAT'S SUFFICIENT TO

09:32AM 21  CALL THIS PERSON A LIAR AND DISREGARD THEIR TESTIMONY.

09:33AM 22     BUT I WOULD JUST LIKE TO REMIND YOU OF A FEW THINGS.  YOU

09:33AM 23  HEARD OVER THE COURSE OF THE TRIAL ABOUT WITNESSES WHO HAD MET

09:33AM 24  WITH THE GOVERNMENT PRIOR TO THEIR TESTIMONY AND HAD BEEN SHOWN

09:33AM 25  DOCUMENTS.  YOU HAVE NOT HEARD EVIDENCE THAT DR. PANDORI MET

09:33AM  1    WITH THE DEFENSE.  SO YOU SHOULD ASK YOURSELVES WHETHER IT

09:33AM  2    REALLY IS SURPRISING THAT HE MIGHT NOT REMEMBER A GIVEN

09:33AM  3    DOCUMENT THAT HE'S BEING SHOWN FOR THE FIRST TIME ON THE STAND

09:33AM  4    BY THE DEFENSE HAVING NOT SEEN THAT DOCUMENT RECENTLY, HAVING

09:33AM  5    NOT SEEN IT SINCE 2013 OR 2014.  IS THAT REALLY SURPRISING?  IS

09:33AM  6    THAT A REASON TO DOUBT HIS VERACITY, HIS INTEGRITY?

09:33AM  7         AND IN PARTICULAR, YOU'LL REMEMBER THAT THE DOCUMENT THAT

09:33AM  8    MR. COOPERSMITH DISCUSSED A LOT WAS DR. PANDORI'S DEPARTURE

09:33AM  9    MEMO.  AND WHEN IT CAME TO THAT, YOU'LL RECALL THAT WHEN HE WAS

09:33AM  10   FIRST SHOWN THAT DOCUMENT, HE WAS SHOWN A VERSION OF IT THAT

09:33AM  11   HAD SOME MISSING HEADER INFORMATION.  ISN'T IT LIKELY THAT THAT

09:34AM  12   CONTRIBUTED TO HIS CONFUSION ABOUT THAT DOCUMENT?

09:34AM  13        THE DEFENSE'S THEORY IS THAT DR. PANDORI WAS SO TROUBLED

09:34AM  14   BY THE CONTENT OF THAT DOCUMENT, THAT HE WAS TRYING TO DISTANCE

09:34AM  15   HIMSELF FROM IT.  BUT WAS THE SUBSTANCE OF THAT DOCUMENT SO

09:34AM  16   DAMAGING TO DR. PANDORI'S TESTIMONY THAT HE WOULD EVEN HAVE A

09:34AM  17   MOTIVE TO DO THAT?

09:34AM  18        THE DEPARTURE MEMO, AS THE DEFENSE LIKES TO POINT OUT,

09:34AM  19   DISCUSSED DR. PANDORI'S OPINION THAT MORE EDISONS WERE NEEDED

09:34AM  20   TO RUN THE THERANOS TESTING.  AND THE DEFENSE SAYS THAT THAT

09:34AM  21   RECOMMENDATION IS INCONSISTENT WITH DR. PANDORI'S OPINION THAT

09:34AM  22   THE EDISON MACHINES SUFFERED FROM SERIOUS PROBLEMS.

09:34AM  23        THAT'S NOT TRUE AT ALL.  DR. PANDORI TOLD YOU THAT THE

09:34AM  24   REASON HE DIDN'T PUT THOSE COMPLAINTS IN HIS DEPARTURE MEMO, IS

09:34AM  25   BECAUSE IT WOULD HAVE FELT LIKE BANGING HIS HEAD AGAINST THE

09:34AM  1      WALL.  HE HAD RAISED THOSE CONCERNS MULTIPLE TIMES.

09:34AM  2           AND REMEMBER THAT THAT DEPARTURE MEMO WAS SENT TO

09:34AM  3      DR. ROSENDORFF WHO CERTAINLY ALREADY KNEW ABOUT DR. PANDORI'S

09:34AM  4      CONCERNS, ALONG WITH OTHERS AT THE COMPANY.

09:35AM  5           WHAT WOULD HAVE BEEN THE POINT IN INCLUDING THAT

09:35AM  6      INFORMATION JUST AS A PROTEST IN THAT DEPARTURE MEMORANDUM?

09:35AM  7           DR. PANDORI ALSO TOLD YOU THAT HIS ROLE AT THE COMPANY AS

09:35AM  8      CO-LAB DIRECTOR FOCUSSED ON THE OPERATIONAL SIDE OF THE LAB.

09:35AM  9      ONE OF HIS JOBS WAS TO LOOK AT THE PROCESS BY WHICH THERANOS

09:35AM  10     WAS TESTING ITS SAMPLES AND MAKE SURE THAT IT WAS RUNNING

09:35AM  11     SMOOTHLY, TO LOOK FOR WAYS THAT IT COULD BE IMPROVED.  AND IN

09:35AM  12     DOING THAT, HE BECAME VERY FAMILIAR WITH THE WAYS IN WHICH THE

09:35AM  13     EDISON DEVICES MALFUNCTIONED, PROVIDED UNRELIABLE RESULTS,

09:35AM  14     FAILED QUALITY CONTROL, AND HOW THAT IMPACTED THE LAB'S ABILITY

09:35AM  15     TO ACTUALLY DO ITS WORK, TO EVEN MOVE SAMPLES THROUGH THE LAB

09:35AM  16     IN THE FIRST PLACE.

09:35AM  17          SO THAT'S WHY HE WAS AWARE OF THAT.  AND THAT'S WHY IN

09:35AM  18     CRAFTING HIS DEPARTURE MEMO, PASSING ALONG THAT INFORMATION TO

09:35AM  19     WHOEVER WAS GOING TO TAKE HIS ROLE, HE FOCUSSED ON THE

09:35AM  20     OPERATIONAL SIDE OF THINGS.

09:35AM  21          WHEN IT CAME TO ERIKA CHEUNG, THE DEFENDANT'S MAIN

09:36AM  22     RESPONSE TO HER SEEMS TO BE THAT SHE WAS LESS EXPERIENCED THAN

09:36AM  23     OTHER PEOPLE IN THE LAB.  THINK ABOUT WHAT THAT MEANS, THOUGH.

09:36AM  24          ERIKA CHEUNG WAS AT THE COMPANY FOR A FEW SHORT MONTHS.

09:36AM  25     SHE DID NOT HAVE ADVANCED DEGREES.  SHE WAS A RECENT COLLEGE

REBUTTAL ARGUMENT BY MR. BOSTIC                                    7582

09:36AM  1    GRADUATE, BUT SHE WORKED DIRECTLY WITH THE TECHNOLOGY.  SHE

09:36AM  2    ACTUALLY RAN PATIENT TEST SAMPLES.  SO THE FACT THAT SHE WAS

09:36AM  3    ABLE TO EASILY RECOGNIZE THE SERIOUS PROBLEMS WITH THERANOS'S

09:36AM  4    TESTING SHOULD REALLY TELL YOU SOMETHING, AND IT SHOULD REALLY

09:36AM  5    GIVE YOU ANY DOUBTS -- OR IT SHOULD GIVE YOU SERIOUS DOUBTS

09:36AM  6    ABOUT ANY ARGUMENT FROM THE DEFENSE THAT MR. BALWANI DIDN'T

09:36AM  7    UNDERSTAND THE PROBLEMS WITH THERANOS TESTING.

09:36AM  8         MS. CHEUNG, RIGHT OUT OF COLLEGE WORKING HER FIRST JOB

09:36AM  9    AFTER SCHOOL, WAS ABLE TO QUICKLY SEE THE SERIOUS PROBLEMS AND

09:36AM  10   NEEDED TO LEAVE THE COMPANY AS A RESULT OF IT.

09:36AM  11        YOU ALSO HEARD ABOUT WHAT SHE WENT THROUGH WHEN SHE BECAME

09:37AM  12   A WHISTLEBLOWER AND SPOKE TO REGULATORS ABOUT THE COMPANY.  YOU

09:37AM  13   HEARD WHAT THE COMPANY DID IN TERMS OF THREATENING HER, AND YOU

09:37AM  14   LISTENED TO HER TEARFULLY DESCRIBE THAT WHEN SHE WAS ON THE

09:37AM  15   STAND.

09:37AM  16        SO, AGAIN, THE IDEA THAT THESE EMPLOYEES HAVE THESE

09:37AM  17   NEGATIVE OPINIONS ABOUT THERANOS BECAUSE OF THE CONTEXT TODAY,

09:37AM  18   THE IDEA THAT THEY ARE ANTI-THERANOS OR COMPLAINING ABOUT THE

09:37AM  19   COMPANY BECAUSE WE'RE IN A FEDERAL CRIMINAL CASE IS EXACTLY

09:37AM  20   BACKWARDS.

09:37AM  21        WE'RE HERE TODAY BECAUSE THOSE COMPLAINTS CAME FORWARD,

09:37AM  22   BECAUSE THOSE EMPLOYEES WITH PERSONAL KNOWLEDGE WERE MOTIVATED

09:37AM  23   TO SPEAK UP BECAUSE THEY WERE SO TROUBLED BY THE THINGS THAT

09:37AM  24   THEY SAW.

09:37AM  25        AND CRITICALLY TO THE QUESTIONS THAT YOU NEED TO ANSWER IS

09:37AM  1    THE FACT THAT ALL THREE OF THOSE EMPLOYEES ACTUALLY RAISED

09:37AM  2    THEIR CONCERNS DIRECTLY TO THIS DEFENDANT, MR. BALWANI.  SO HE

09:37AM  3    KNEW HOW THEY FELT.  HE KNEW THAT THE SCIENTISTS WORKING AT

09:37AM  4    THERANOS, THE PEOPLE WHO WERE WORKING DIRECTLY WITH THIS

09:38AM  5    TECHNOLOGY WHO WERE RESPONSIBLE FOR PERFORMING AND OVERSEEING

09:38AM  6    THE LAB TESTING HAD SERIOUS CONCERNS, WERE WORRIED ABOUT THE

09:38AM  7    ACCURACY AND RELIABILITY OF THE TESTS THE COMPANY WAS SENDING

09:38AM  8    OUT.

09:38AM  9        HE HEARD.  HE JUST DIDN'T CARE.

09:38AM  10       OF ALL OF THE THERANOS LAB WORKERS WHO TESTIFIED AT TRIAL,

09:38AM  11   THE ONLY TWO WHO DIDN'T QUIT BECAUSE OF THOSE CONCERNS WERE

09:38AM  12   SUNIL DHAWAN AND LYNETTE SAWYER.  AND THE INTERESTING THING

09:38AM  13   ABOUT THEM, OBVIOUSLY, IS THAT THEY DIDN'T KNOW ENOUGH TO

09:38AM  14   REALIZE THAT THERE WERE THESE SERIOUS PROBLEMS AT THE COMPANY.

09:38AM  15       YOU HEARD ABOUT THE VERY LIMITED NATURE OF THE WORK THAT

09:38AM  16   THEY DID FOR THE COMPANY, AND HOW PURSUANT TO THE ASSIGNMENTS

09:38AM  17   THEY GOT FROM MR. BALWANI ABOUT THE SCOPE OF THEIR JOB, THEY

09:38AM  18   DIDN'T KNOW ANYTHING ABOUT THE ACCURACY AND RELIABILITY

09:38AM  19   PROBLEMS THAT THE COMPANY WAS FACING.

09:38AM  20       SO THAT WAS APPARENTLY MR. BALWANI'S LAB DIRECTOR

09:38AM  21   RETENTION PLAN AFTER 2014, KEEP THEM IN THE DARK, KEEP THEM

09:39AM  22   FROM KNOWING ABOUT THE PROBLEMS SO THAT THEY DON'T MAKE NOISE,

09:39AM  23   SO THAT THEY DON'T QUIT.  AND IT WORKED.

09:39AM  24       YOU HEARD TESTIMONY FROM THE THERANOS LAB EMPLOYEES WHO

09:39AM  25   QUIT ABOUT THE REASONS THAT THEY WERE EXCITED TO WORK FOR THE

09:39AM  1    COMPANY IN THE FIRST PLACE, WHY THEY WERE DRAWN TO THOSE ROLES

09:39AM  2    AND WHAT THEY MEANT TO THEM, SO YOU KNOW THAT THEY DIDN'T TAKE

09:39AM  3    THEIR DECISIONS TO LEAVE LIGHTLY.

09:39AM  4         SO THE QUESTION THAT YOU SHOULD ASK IS HOW DID IT GET TO

09:39AM  5    THAT POINT?  HOW DID IT GET SO BAD THAT THESE PEOPLE ALL MADE

09:39AM  6    THE SAME DECISION, THE DECISION THAT THEY COULD NO LONGER BE

09:39AM  7    ASSOCIATED WITH THIS COMPANY?

09:39AM  8         WELL, YOU SAW THAT IN EVIDENCE, TOO.

09:39AM  9         ONE THING YOU HEARD ABOUT WAS RUSHED ASSAY DEVELOPMENT.

09:39AM 10    IN THE TIME PERIOD LEADING UP TO THERANOS'S COMMERCIAL LAUNCH

09:39AM 11    IN LATE SUMMER OF 2013, DR. ROSENDORFF TESTIFIED THAT IN THOSE

09:39AM 12    TWO TO THREE MONTHS LEADING UP TO THE LAUNCH, IT WAS EXTREMELY

09:39AM 13    RUSHED AND HURRIED, HE SAID.  "THERE WAS IMMENSE PRESSURE PUT

09:40AM 14    ON R&D AND THE TECHS AND MYSELF TO GET THINGS VALIDATED AND

09:40AM 15    GENERATE DATA."

09:40AM 16         WHEN HE WAS ASKED WHERE THAT PRESSURE WAS COMING FROM, HE

09:40AM 17    QUICKLY ANSWERED SUNNY BALWANI.

09:40AM 18         THE DEFENSE NOW CLAIMS THAT THAT CAN'T BE TRUE BECAUSE THE

09:40AM 19    INITIAL LAUNCH IN SEPTEMBER OF 2013 WAS A SOFT LAUNCH AS

09:40AM 20    THEY'RE NOW CALLING IT, WHICH WAS TO FRIENDS AND FAMILY ONLY

09:40AM 21    WITH ONLY TWO ASSAYS OFFERED AT FIRST, CBC, THE COMPLETE BLOOD

09:40AM 22    COUNT, AND HBAIC.

09:40AM 23         FIRST OF ALL, THOUGH, I'LL ASK YOU TO THINK BACK TO THE

09:40AM 24    PRESS RELEASES AROUND THAT TIME, ALL OF THE FAVORABLE PUBLICITY

09:40AM 25    THAT THERANOS ENGINEERED IN THE PRESS.

09:40AM 1      DO YOU RECALL ANY OF THOSE MATERIALS, THE CONVERSATIONS

09:40AM 2   WITH THE INVESTORS, THE PROMOTIONAL MATERIALS, THE

09:40AM 3   PRESENTATIONS, THE PRESS RELEASE, DID ANY OF THAT MINIMIZE THIS

09:40AM 4   LAUNCH AS A SOFT LAUNCH?  DID ANY OF THAT DISCLOSE THAT THESE

09:41AM 5   TESTS WERE ONLY BEING OFFERED TO FRIENDS AND FAMILY?  DID ANY

09:41AM 6   OF THAT SAY THAT THIS LAUNCH WAS ONLY INCLUDING TWO ASSAYS,

09:41AM 7   NEITHER OF WHICH WAS EVER OFFERED ON THE THERANOS PROPRIETARY

09:41AM 8   ANALYZER?

09:41AM 9      OF COURSE NOT.  BECAUSE THE DEFENDANT'S GOAL BACK THEN WAS

09:41AM 10  TO MAXIMIZE THE IMPACT OF WHAT THEY WERE DOING.  THEY WANTED TO

09:41AM 11  IMPRESS INVESTORS, PATIENTS, AND THE PUBLIC, TO EXAGGERATE WHAT

09:41AM 12  THE COMPANY WAS DOING AT THAT TIME.

09:41AM 13     SO THE FACT THAT THEY'RE TRYING TO MINIMIZE IT NOW AND SAY

09:41AM 14  THAT THIS WAS JUST A SOFT LAUNCH, I THINK YOU SHOULD BE

09:41AM 15  SKEPTICAL OF THOSE TWO COMPETING MESSAGES.

09:41AM 16     MORE IMPORTANT THAN, DR. ROSENDORFF WAS ASKED ABOUT THIS,

09:41AM 17  AND HE TESTIFIED THAT TO A MEDICAL DOCTOR, TO A LAB DIRECTOR,

09:41AM 18  IT MAKES NO DIFFERENCE WHO WAS BEING TESTED OR WHY.  WHEN

09:41AM 19  YOU'RE PERFORMING CLINICAL TESTS ON PATIENTS, ACCURACY IS

09:41AM 20  PARAMOUNT, AND THAT IS TRUE REGARDLESS OF WHETHER THE PEOPLE

09:41AM 21  ARE PAYING FOR THE TESTS, REGARDLESS OF WHETHER THEY'RE

09:41AM 22  CONNECTED TO THE COMPANY DOING THE TESTS, AND REGARDLESS OF HOW

09:42AM 23  MANY TESTS ARE BEING CONDUCTED.  THAT'S HOW SOMEONE APPROACHES

09:42AM 24  THIS ISSUE WHEN THEY'RE PRIORITIZING FIDELITY TO PATIENTS AND

09:42AM 25  ACCURACY IN RESULTS.

09:42AM 1      THE DEFENSE ALSO TALKED ABOUT DR. ROSENDORFF'S SIGNING OF

09:42AM 2   VALIDATION REPORTS IN THERANOS AND WHAT THAT SAYS ABOUT THE

09:42AM 3   COMPANY'S TECHNOLOGY.

09:42AM 4      AND IT'S TRUE THAT DR. ROSENDORFF TESTIFIED THAT WHEN HE

09:42AM 5   SIGNED THOSE VALIDATION REPORTS, HE DID SO BECAUSE HE BELIEVED

09:42AM 6   THAT THE REQUIREMENTS HAD BEEN MET AT THE TIME.

09:42AM 7      TWO QUICK THINGS TO KEEP IN MIND WHEN IT COMES TO THAT,

09:42AM 8   THOUGH.

09:42AM 9      FIRST, YOU KNOW FROM YOUR COMMON SENSE THAT WHEN A PROCESS

09:42AM 10  IS RUSHED, IT CREATES ROOM FOR ERROR.  AND YOU ALSO KNOW FROM

09:42AM 11  YOUR COMMON SENSE THAT SOME PROCESSES ARE IMPORTANT ENOUGH THAT

09:42AM 12  THEY SHOULD NOT BE RUSHED.

09:42AM 13     YOU HEARD THAT THE VALIDATION PROCESS AT THERANOS, THAT

09:42AM 14  STAGE OF THINGS WAS CONDUCTED AT A VERY HURRIED PACE WITH A LOT

09:43AM 15  OF PRESSURE PLACED ON THE PEOPLE WHO WERE DOING THAT WORK.  IS

09:43AM 16  IT SURPRISING THAT THE RESULT OF IT LED TO UNRELIABLE TESTS?

09:43AM 17  OF COURSE NOT.

09:43AM 18     DR. ROSENDORFF ALSO TESTIFIED THAT ALTHOUGH ASSAYS APPEAR

09:43AM 19  TO PERFORM WELL ENOUGH DURING THE VALIDATION STAGE, THEIR

09:43AM 20  PERFORMANCE DEGRADED SIGNIFICANTLY ONCE THEY ACTUALLY STARTED

09:43AM 21  USING THOSE ASSAYS ON PATIENTS, ONCE THEY STARTED TESTING

09:43AM 22  PATIENTS, THE TEST PERFORMED SO MUCH WORSE.

09:43AM 23     AT THIS STAGE, IT APPEARS THAT MR. BALWANI IS ASKING YOU

09:43AM 24  TO IGNORE THOSE FACTS JUST LIKE HE DID BACK WHEN HE WAS RUNNING

09:43AM 25  THERANOS, BUT THAT MATTERS.  THE QUESTION OF WHETHER A TEST IS

09:43AM  1    ACCURATE OR NOT DOES NOT ANSWER ITSELF ONCE AND FOR ALL WHEN A

09:43AM  2    TEST IS VALIDATED.  YOU NEED TO CONTINUE TO MONITOR THAT TEST

09:43AM  3    PERFORMANCE, AND IF IT'S FAILING QUALITY CONTROL, WHICH WE'LL

09:43AM  4    TALK ABOUT IN A MINUTE, IF PATIENTS ARE GETTING INACCURATE

09:44AM  5    RESULTS, THEN YOU NEED TO MAKE A DECISION ABOUT WHETHER TO KEEP

09:44AM  6    OFFERING THAT TEST OR NOT.  AND MR. BALWANI CONSISTENTLY MADE

09:44AM  7    THE WRONG DECISION WHEN IT CAME TO THAT.

09:44AM  8        LET'S TALK ABOUT QUALITY CONTROL BECAUSE THIS IS AN

09:44AM  9    IMPORTANT TOPIC, AND IT'S ONE OF THE MAIN WAYS THAT YOU KNOW

09:44AM  10   THAT THERANOS'S TESTING WAS INACCURATE AND UNRELIABLE.

09:44AM  11       AND LET'S START BY TALKING ABOUT OUTLIER REMOVAL, WHICH IS

09:44AM  12   SOMETHING THAT MR. COOPERSMITH DISCUSSED.  YOU'LL RECALL THIS

09:44AM  13   EXHIBIT, THIS IS 1287, WHERE MS. CHEUNG RUNNING QUALITY CONTROL

09:44AM  14   IN NOVEMBER OF 2013 AFTER THE COMMERCIAL LAUNCH FELT THE NEED

09:44AM  15   TO EMAIL THIS GROUP NORMANDY 911.  YOU DIDN'T HEAR ANY EVIDENCE

09:44AM  16   THAT THERE WAS A SIMILAR 911 EMERGENCY EMAIL FOR THE SECTION OF

09:44AM  17   THE LAB THAT USED COMMERCIALLY STANDARD DEVICES BY THE WAY.

09:44AM  18       IN THIS EMAIL, MS. CHEUNG IS REPORTING THAT WHEN SHE DID A

09:44AM  19   QUALITY CONTROL CHECK, CHECKING TO SEE WHETHER A DEVICE IS

09:45AM  20   READY TO BE TESTED ON PATIENTS, WHETHER IT COULD ACCURATELY

09:45AM  21   IDENTIFY THE CONCENTRATIONS OF THE CONTROL SAMPLES.  BOTH

09:45AM  22   CONTROLS FAILED IN THIS CASE.

09:45AM  23       SHE NOTES THAT SHE USED ALL UNOPENED REAGENTS AND A NEW

09:45AM  24   PACKAGE OF CARTRIDGES.  SO THAT WAS NOT THE PROBLEM.  BUT SHE

09:45AM  25   SAYS THAT FAILED AS WELL.

09:45AM 1      MR. BALWANI RECOGNIZED THAT THIS WAS BEYOND UNACCEPTABLE

09:45AM 2 PERFORMANCE.  SO I WANT YOU TO REMEMBER THIS EMAIL AND OTHER

09:45AM 3 EMAILS LIKE IT.  YOU'VE SEEN OTHERS LIKE THIS.  WHENEVER YOU

09:45AM 4 THINK ABOUT THE DEFENSE'S CLAIM THAT MR. BALWANI THOUGHT

09:45AM 5 EVERYTHING WAS FINE WITH THE COMPANY'S TECHNOLOGY, IN HIS OWN

09:45AM 6 WORDS, HE'S TELLING YOU THAT THAT'S NOT TRUE.

09:45AM 7      MS. HOLMES THEN WEIGHS IN AND ASKS WHETHER THERE'S ENOUGH

09:45AM 8 SAMPLE IN THIS PARTICULAR PATIENT SAMPLE TO RUN THAT TEST ON

09:45AM 9 TRADITIONAL METHODS.

09:45AM 10      SO, AGAIN, AN ACKNOWLEDGEMENT BY MS. HOLMES AS ONE OF THE

09:45AM 11 TWO PEOPLE RUNNING THE COMPANY THAT TRADITIONAL METHODS WOULD

09:46AM 12 BE MORE RELIABLE, MORE DEPENDABLE.

09:46AM 13      FAST FORWARDING IN THIS EMAIL CHAIN.  THERE ENDS UP BEING

09:46AM 14 A RESOLUTION, AND MS. HOLMES ASKS WHAT IT IS AND IS TOLD THAT

09:46AM 15 TWO OUTLIERS HAD TO BE MANUALLY REMOVED IN ORDER TO PASS

09:46AM 16 QUALITY CONTROL.

09:46AM 17      AND YOU'LL RECALL THAT FOR A PORTION OF TIME AFTER THE

09:46AM 18 COMMERCIAL LAUNCH, THERANOS WAS USING THREE EDISON DEVICES AT A

09:46AM 19 TIME TO RUN A SINGLE PATIENT TEST.  THAT MEANT, BY THE WAY,

09:46AM 20 THAT IF A PATIENT NEEDED THREE DIFFERENT KINDS OF TESTS RUN ON

09:46AM 21 AN EDISON, NINE DEVICES WOULD BE REQUIRED JUST TO RETURN THAT

09:46AM 22 THE RESULT FOR THAT ONE PATIENT.

09:46AM 23      AND THE REASON THEY DID THAT WAS TO GENERATE ENOUGH DATA

09:46AM 24 TO BE ABLE TO AVERAGE OUT VARIANCE AND TO HAVE THE OPTION TO

09:46AM 25 REMOVE WHAT THEY CALLED "OUTLIERS."

09:46AM 1     SO, IN OTHER WORDS, IN ORDER TO PASS QUALITY CONTROL, IN

09:46AM 2  ORDER FOR THIS DEVICE TO BE DEEMED GOOD ENOUGH TO BE USED ON A

09:47AM 3  PATIENT, SOME OF THE DATA HAD TO BE IGNORED, SOME OF THE DATA

09:47AM 4  HAD TO BE THROWN OUT, BECAUSE IF YOU CONSIDERED ALL OF THE DATA

09:47AM 5  TOGETHER, IT WOULD NOT PASS QUALITY CONTROL.

09:47AM 6     NOW, THE DEFENSE POINTS OUT THAT MR. OR DR. ROSENDORFF

09:47AM 7  KNEW ABOUT THIS PRACTICE AND ALLOWED IT, AND THAT'S TRUE.  THEY

09:47AM 8  SHOWED AN EMAIL WHERE DR. ROSENDORFF SAYS THE REASON WE'RE

09:47AM 9  DOING THIS IS TO GENERATE ENOUGH DATA POINTS AND AVERAGE OUT

09:47AM 10  VARIATION.

09:47AM 11     THAT'S THE POINT THOUGH.  IT'S NOT THAT THIS AVERAGING

09:47AM 12  PRACTICE AND THE REMOVING THE OUTLIERS IS THE FRAUD, BUT THIS

09:47AM 13  DOES SHOW THAT THE COMPANY HAD A LACK OF CONFIDENCE IN ITS OWN

09:47AM 14  TECHNOLOGY, BECAUSE THERE'S NO REASON TO DO THIS IF YOU KNOW

09:47AM 15  THAT YOUR DEVICE CAN RUN A TEST AND RETURN AN ACCURATE RESULT.

09:47AM 16  THERE'S NO REASON TO GROUP THEM IN GROUPS OF THREE, HAVE THEM

09:47AM 17  COORDINATE WITH EACH OTHER, AND THEN IGNORE SOME OF THE DATA

09:47AM 18  AVERAGING OUT THE REST IF YOUR DEVICE IS RELIABLE AND CAN

09:47AM 19  RETURN THE RESULT IT NEEDS TO RETURN THE FIRST TIME.

09:48AM 20     AND YOU HEARD TESTIMONY THAT THIS PRACTICE, THIS PRACTICE

09:48AM 21  OF RUNNING A TEST MULTIPLE TIMES TO CHECK AN ANSWER, AVERAGING

09:48AM 22  THE RESULTS, DISCARDING SOME OF THE DATA, THAT'S NOT A PRACTICE

09:48AM 23  THAT NEEDS TO BE USED WITH THIRD PARTY DEVICES.  SO THE

09:48AM 24  COMMERCIAL DEVICES THAT THERANOS WAS ALSO USING DID NOT EMPLOY

09:48AM 25  THIS PRACTICE, AND THAT'S BECAUSE IT WAS NOT NECESSARY.  THOSE

09:48AM 1   DEVICES COULD RUN A TEST ONE TIME AND RETURN A RESULT THAT WAS

09:48AM 2   SUFFICIENTLY RELIABLE.

09:48AM 3       ONE REASON YOU KNOW THAT THERANOS WOULD NOT HAVE DONE THIS

09:48AM 4   UNLESS IT HAD TO IS THAT YOU KNOW THE COMPANY WAS CONSISTENTLY

09:48AM 5   RUNNING SHORT ON EDISON DEVICES BECAUSE THEY WOULD FAIL QUALITY

09:48AM 6   CONTROL SO FREQUENTLY, BECAUSE THEY WOULD BREAK DOWN AND

09:48AM 7   DISPLAY OTHER ERRORS SO FREQUENTLY.  YOU KNOW THAT A LACK OF

09:48AM 8   EDISONS WAS ONE OF THE REASONS WHY THE COMPANY WAS HAVING

09:48AM 9   PROBLEMS EVEN PROCESSING THE AMOUNT OF TESTS THAT IT WAS

09:49AM 10  GIVING.

09:49AM 11      AND THE PRACTICE THAT THEY HAD OF GROUPING THESE DEVICES

09:49AM 12  IN GROUPS OF THREE WOULD HAVE COMPOUNDED THAT PROBLEM.  THINK

09:49AM 13  ABOUT HOW MUCH WORSE IT WOULD HAVE BEEN BECAUSE EACH TEST HAD

09:49AM 14  TO BE THREE DEVICES AND NOT JUST ONE.  WHY WOULD THEY DO THAT

09:49AM 15  UNLESS THEY NEEDED TO DO THAT?  WHY WOULD THEY DO THAT IF ONE

09:49AM 16  DEVICE WAS CAPABLE OF RETURNING A RELIABLE RESULT?

09:49AM 17      WHEN IT COMES TO QUANTIFYING THIS PROBLEM OF QUALITY

09:49AM 18  CONTROL FAILURES, YOU SAW EXHIBITS LIKE THIS.  THIS IS 1633.

09:49AM 19  AND IT RELATES TO QUALITY CONTROL FAILURE RATES FOR THE MONTH

09:49AM 20  OF MARCH 2014.

09:49AM 21      AND YOU SEE HERE THAT FOR THESE ASSAYS, ALL OF WHICH WERE

09:49AM 22  RUN ON THE THERANOS ANALYZER, QUALITY CONTROL FAILED AT A RATE

09:49AM 23  FREQUENTLY OVER 20 PERCENT AND SOMETIMES APPROACHING 45 OR EVEN

09:49AM 24  EXCEEDING 50 PERCENT.

09:50AM 25      THINK ABOUT WHAT THAT MEANS FOR THAT TT3 ASSAY, MORE THAN

09:50AM   1    HALF OF THE TIME WHEN THERANOS RAN A CHECK TO SEE WHETHER THE

09:50AM   2    ASSAY COULD RETURN AN ACCURATE RESULT, IT FAILED.  MORE THAN

09:50AM   3    HALF OF THE TIME.

09:50AM   4        AND YOU SEE THAT THE OVERALL QUALITY CONTROL FAILURE RATE

09:50AM   5    WAS ABOUT 26 PERCENT.  DR. ROSENDORFF TOLD YOU THAT THIS FAR,

09:50AM   6    FAR EXCEEDED WHAT HE WAS USED TO SEEING WITH NONCONVENTIONAL

09:50AM   7    THERANOS MACHINES.

09:50AM   8        ALSO IN EVIDENCE IS A PRESENTATION FROM SOMEONE NAMED

09:50AM   9    LANGLY GEE AT THERANOS, WHICH PROVIDES SOME DIFFERENT NUMBERS.

09:50AM  10    I BELIEVE IT INDICATES A 2.9 PERCENT QUALITY CONTROL FAILURE

09:50AM  11    RATE FOR A CATEGORY OF DEVICES AT THERANOS AND A FAILURE RATE

09:50AM  12    SIGNIFICANTLY UNDER 1 PERCENT FOR THE CONVENTIONAL NON-THERANOS

09:50AM  13    ANALYZERS.  SO A COUPLE OF THINGS TO NOTE THERE.

09:50AM  14        FIRST OF ALL, IF YOU LOOK AT THAT EXHIBIT, YOU'LL NOTE

09:51AM  15    THAT THE CATEGORY WITH THE 2.9 PERCENT FAILURE RATE INCLUDES

09:51AM  16    NOT JUST EDISONS, BUT IT ALSO APPEARS TO INCLUDE THE THERANOS

09:51AM  17    MODIFIED CONVENTIONAL DEVICES.  SO IT'S NOT NECESSARILY

09:51AM  18    INCONSISTENT WITH THIS.

09:51AM  19        AND WHAT THAT WOULD MEAN SHOULD NOT SURPRISE YOU, WHICH IS

09:51AM  20    THAT THE COMMERCIAL DEVICES, EVEN THE THERANOS MODIFIED ONES,

09:51AM  21    WERE MORE RELIABLE THAN THE EDISONS WHEN IT CAME TO PASSING

09:51AM  22    QUALITY CONTROL.

09:51AM  23        WHAT THAT ALSO SHOWS YOU IS THE RATIO BETWEEN QUALITY

09:51AM  24    CONTROL FAILURE RATES FOR THE THERANOS-SPECIFIC DEVICES AND THE

09:51AM  25    NON-THERANOS-SPECIFIC DEVICES, WHICH ACCORDING TO THAT SHOW YOU

09:51AM   1    THAT THERANOS DEVICES FAILED QUALITY CONTROL MORE THAN THREE

09:51AM   2    TIMES AS OFTEN AS THE UNMODIFIED COMMERCIAL DEVICES.

09:51AM   3         WHAT DOES THIS MEAN, THOUGH?  DO FAILURES IN QUALITY

09:51AM   4    CONTROL ACTUALLY TRANSLATE TO PROBLEMS WITH PATIENT TEST

09:52AM   5    ACCURACY?  AND THERE SEEMS TO BE SOME DISPUTE ON THIS POINT,

09:52AM   6    BUT NOT ACCORDING TO WHAT THE WITNESSES SAID, NOT ACCORDING TO

09:52AM   7    THE ACTUAL EVIDENCE.

09:52AM   8         DR. ROSENDORFF WAS ASKED WERE QUALITY CONTROL FAILURE

09:52AM   9    RATES LIKE THESE CONCERNING TO YOU?

09:52AM  10         HE SAID YES.

09:52AM  11         HE EXPLAINED IF QUALITY CONTROL IS FAILING HALF OF THE

09:52AM  12    TIME, OR 50 PERCENT OF THE TIME, IT INDICATES THAT THE PATIENT

09:52AM  13    RESULT WOULD BE INACCURATE HALF OF THE TIME.

09:52AM  14         DURING HIS CLOSING MR. COOPERSMITH CALLED THIS IDEA

09:52AM  15    "BIZARRE" I THINK WAS THE WORD THAT HE USED, AND HE SAID THERE

09:52AM  16    IS NO LOGIC TO IT.

09:52AM  17         AND I WILL REMIND YOU IT IS UP TO YOU TO WEIGH WITNESS

09:52AM  18    CREDIBILITY, BUT I'D URGE YOU TO BE CAUTIOUS WHEN A LAWYER ASKS

09:52AM  19    YOU TO ACCEPT HIS JUDGMENT ON A TECHNICAL SPECIALIZED ISSUE AND

09:52AM  20    TO ACCEPT THAT JUDGMENT OVER THE TESTIMONY OF A WITNESS WHO

09:52AM  21    DOES THIS FOR A LIVING WHO IS A MEDICAL DOCTOR, WHO IS A

09:52AM  22    CLINICAL PATHOLOGIST AND A LAB DIRECTOR.

09:53AM  23         I'LL ALSO REMIND YOU THAT DR. ROSENDORFF WAS NOT THE ONLY

09:53AM  24    ONE WHO SAID THIS.  LET'S LOOK AT ONE MORE QUOTE FROM HIM.

09:53AM  25         HE WAS ASKED ABOUT WHETHER THE PRACTICE OF NOT USING A

09:53AM   1   DEVICE WHEN IT FAILED QUALITY CONTROL GOT RID OF HIS CONCERNS

09:53AM   2   ABOUT PATIENT TESTING ACCURACY?

09:53AM   3        HE SAID NO BECAUSE EVEN A BROKEN CLOCK IS CORRECT TWICE A

09:53AM   4   DAY.

09:53AM   5        THE POINT THERE IS THAT IF YOU ARE ABLE TO DETERMINE

09:53AM   6   SOMETIMES WHETHER A TEST IS PROVIDING RELIABLE RESULTS OR NOT,

09:53AM   7   AND IT'S FAILING HALF OF THE TIME, THAT SHOULD GIVE YOU

09:53AM   8   CONCERNS ABOUT WHEN YOU'RE TESTING PATIENTS AND YOU CAN'T KNOW,

09:53AM   9   AS WE DISCUSSED BEFORE, WHETHER A GIVEN RESULT IS ACCURATE OR

09:53AM  10   NOT.

09:53AM  11        AND DR. ROSENDORFF ALSO CONFIRMED THAT WHEN YOU RUN A

09:53AM  12   PATIENT SAMPLE, THERE'S NOT A WAY TO KNOW RIGHT AWAY WHETHER A

09:54AM  13   RESULT IS ACCURATE.

09:54AM  14        DR. PANDORI SAID SOMETHING SIMILAR.  HE SAID, WHEN QUALITY

09:54AM  15   CONTROL IS FAILING, THAT MEANS THAT THE TESTS ARE HAVING

09:54AM  16   DIFFICULTY ACCURATELY MEASURING SOMETHING ON A ROUTINE BASIS.

09:54AM  17   THE EQUIPMENT MIGHT NOT ONLY FAIL A LOT, BUT BE INACCURATE.

09:54AM  18        HE WAS ASKED WHETHER THAT POOR QUALITY CONTROL PERFORMANCE

09:54AM  19   CAUSED HIM CONCERNS ABOUT THE ACCURACY OF RESULTS THAT WERE

09:54AM  20   GOING OUT TO PATIENTS?

09:54AM  21        HE SAID, YOU ASKED ME IF IT LED TO MY CONCERN ABOUT THE

09:54AM  22   ACCURACY OF TEST RESULTS THAT WERE GOING OUT FROM THAT

09:54AM  23   EQUIPMENT?

09:54AM  24        AND THE ANSWER IS, YES, IT DID RESULT IN A CONCERN ON MY

09:54AM  25   PART.

REBUTTAL ARGUMENT BY MR. BOSTIC

09:54AM 1          SO WHILE DEFENSE COUNSEL MIGHT NOT BE WORRIED ABOUT THIS

09:54AM 2     QUALITY CONTROL DATA, THE PEOPLE WHOSE JOB IT WAS TO LOOK AT IT

09:54AM 3     AND DECIDE WHETHER THIS EQUIPMENT WAS GOOD ENOUGH TO USE ON

09:54AM 4     PATIENTS WERE VERY CONCERNED.  THAT'S WHAT SHOULD COUNT IN YOUR

09:54AM 5     MINDS.  BY THE WAY, YOUR COMMON SENSE SHOULD ALSO TELL YOU THAT

09:55AM 6     THE WITNESSES ARE RIGHT ON THIS ISSUE.

09:55AM 7          MR. COOPERSMITH'S THEORY SEEMS TO BE ONCE A BAD EDISON IS

09:55AM 8     IDENTIFIED, IT CAN SIMPLY BE TAKEN OUT OF USE ON PATIENTS AND

09:55AM 9     THAT SOLVES THE PROBLEM.  THAT ASSUMES, THOUGH, THAT ALL YOU'RE

09:55AM 10    TRYING TO DO IS IDENTIFY THE GOOD EDISONS AND THE BAD EDISONS,

09:55AM 11    BUT THE EVIDENCE SHOWS THAT'S NOT HOW THIS WORKED.  IT'S NOT

09:55AM 12    THE CASE THAT SOME OF THE DEVICES WERE SIMPLY BAD AND THEY

09:55AM 13    NEEDED TO BE REMOVED.

09:55AM 14         AND THE REASON YOU KNOW THAT IS THAT THE QUALITY CONTROL

09:55AM 15    PERFORMANCE STAYED POOR.

09:55AM 16         SO IF IT HAD BEEN THE CASE THAT THIS WAS JUST A QUESTION

09:55AM 17    OF IDENTIFYING, OKAY, WELL, EDISONS 3, 5, AND 10 DON'T APPEAR

09:55AM 18    TO BE WORKING, LET'S STOP USING THEM.  IF THAT'S WHAT THIS IS

09:55AM 19    ABOUT, THE QUALITY PERFORMANCE WOULD HAVE IMPROVED OVER TIME.

09:56AM 20    BUT MULTIPLE WITNESSES TOLD YOU THAT THE QUALITY CONTROL

09:56AM 21    PERFORMANCE STAYED BAD.  THAT MEANS THAT THIS PROBLEM DIDN'T

09:56AM 22    HAVE A SOLUTION, AT LEAST NOT ONE THAT INVOLVED CONTINUING TO

09:56AM 23    USE THIS FLAWED TECHNOLOGY.

09:56AM 24         YOU'LL ALSO RECALL THAT SARAH BENNETT FROM CMS TESTIFIED

09:56AM 25    THAT SHE FOUND THE COMPANY WAS NOT ALWAYS FOLLOWING THE QUALITY

09:56AM   1    CONTROL PROCESS, AND SHE WAS AWARE THAT THE COMPANY HAD

09:56AM   2    REPORTED PATIENT RESULTS AFTER QC FAILURE, AND THAT'S IN HER

09:56AM   3    TESTIMONY.

09:56AM   4        LET'S TALK ABOUT INACCURATE RESULTS AS WELL.  BECAUSE

09:56AM   5    THERE IS EVIDENCE OF THIS.  YOU HAVE SEEN MULTIPLE PATIENTS WHO

09:56AM   6    GOT INACCURATE RESULTS FROM THERANOS THAT COULD NOT BE TRUSTED.

09:56AM   7        THE DEFENSE HAS SAID MULTIPLE TIMES THAT ALL LABS HAVE

09:56AM   8    ERRORS, BUT THINK ABOUT THE NATURE OF THE ERRORS THAT YOU SAW

09:56AM   9    IN THIS CASE.

09:56AM  10        I'D LIKE TO START WITH BRITTANY GOULD AND HCG.  AND WHEN

09:57AM  11    IT CAME TO THIS DATA, THE BEST THE DEFENSE CAN OFFER YOU IS

09:57AM  12    THAT THIS MIGHT NOT HAVE BEEN A PROBLEM WITH THE TECHNOLOGY, IT

09:57AM  13    MIGHT HAVE BEEN CLERICAL ERRORS INSTEAD, AND IT WOULD TAKE

09:57AM  14    MULTIPLE CLERICAL ERRORS TO EXPLAIN THIS AS YOU'LL RECALL.

09:57AM  15        ONE ERROR WOULD BE REPORTING THE SAME VALUE TWICE, AND

09:57AM  16    THEN THE SECOND ERROR WOULD BE IN ONE OF THOSE TIMES MAKING A

09:57AM  17    DECIMAL POINT ERROR AND REPORTING SOMETHING THAT WAS 100 TIMES

09:57AM  18    LOWER THAN IT SHOULD HAVE BEEN.

09:57AM  19        SO A COUPLE OF THINGS TO KEEP IN MIND THERE BECAUSE THIS

09:57AM  20    IS ALL PART OF THE DEFENSE'S CLAIM THAT THERE WAS ACTUALLY NO

09:57AM  21    FUNDAMENTAL PROBLEM WITH HCG TESTING AT THERANOS, WHICH IS NOT

09:57AM  22    TRUE.  THE EVIDENCE SHOWS EXACTLY THE OPPOSITE.

09:57AM  23        ONE THING TO NOTE IS THAT EACH THAT VALUE OF 12,000,

09:57AM  24    DR. ZACHMAN TESTIFIED IT WOULD NOT MAKE SENSE ON EITHER DATE OF

09:58AM  25    OCTOBER 2ND OR OCTOBER 4TH.  AND THAT'S CONSISTENT WITH WHAT

09:58AM 1     YOU KNOW NOW ABOUT HCG VALUES, WHICH IS THAT THEY'RE SUPPOSED

09:58AM 2     TO DOUBLE APPROXIMATELY EVERY 48 HOURS.

09:58AM 3         SO IF YOU LOOK AT THESE NUMBERS, DR. ZACHMAN TOLD YOU THAT

09:58AM 4     IF YOU GET RID OF THE THERANOS RESULTS, ALL OF THEM, THE QUEST

09:58AM 5     DIAGNOSTIC RESULTS MAKE SENSE TOGETHER BECAUSE THEY GO FROM

09:58AM 6     1,000 AND THEN SIX DAYS LATER THEY'RE AT APPROXIMATELY 10,000.

09:58AM 7         SO YOU WOULD EXPECT THE VALUES TO BE ON OCTOBER 2ND ABOUT

09:58AM 8     2,000 OR 3,000; ON OCTOBER 4TH YOU WOULD WANT TO SEE 4,000 OR

09:58AM 9     5,000; AND THEN SURE ENOUGH ON OCTOBER 6TH, 9,000 PUTS IT IN

09:58AM 10    THAT ROUGH RANGE OF DOUBLING EVERY 48 HOURS.

09:58AM 11        SO EVEN IF THE THERANOS VALUE OF 12,000 WAS THE CORRECT

09:58AM 12    VALUE OR THAT COMPANY MEANT TO REPORT, IT WOULD STILL BE AN

09:59AM 13    OUTLIER.  IT WOULD STILL BE SOMETHING THAT DIDN'T MAKE SENSE IN

09:59AM 14    THE COURSE OF WHAT WOULD OTHERWISE BE THIS HEALTHY PREGNANCY.

09:59AM 15        YOU ALSO KNOW THAT THIS WAS NOT AN ISOLATED EXAMPLE, THAT

09:59AM 16    MS. GOULD WAS NOT THE ONLY ONE WHO GOT A TROUBLING OR

09:59AM 17    INACCURATE HCG RESULT.  YOU SAW MULTIPLE EXAMPLES OF THAT IN

09:59AM 18    THE EVIDENCE, AND NOT JUST FROM THE WITNESSES WHO TESTIFIED,

09:59AM 19    BUT YOU SAW WRITTEN RECORDS OF THAT AS WELL.

09:59AM 20        IT GOT TO THE POINT IN LATE MAY OF 2014 DR. ROSENDORFF

09:59AM 21    DECIDED TO REQUIRE OR DECREE THAT HCG TESTING NEEDED TO STOP ON

09:59AM 22    THE EDISON DEVICES.  AND THE DEFENSE CLAIMS THAT THAT PROBLEM

09:59AM 23    WAS LIMITED TO THAT TIME PERIOD, AND THEY ALSO CLAIM THAT

09:59AM 24    DR. ROSENDORFF SUBSEQUENTLY WENT BACK ON THAT DECISION AND

09:59AM 25    APPROVED HCG TESTING RESUMING.

09:59AM  1        YOU KNOW THAT'S NOT TRUE BECAUSE HE WAS ASKED ABOUT IT BY

09:59AM  2    BOTH SIDES WHEN HE WAS ON THE STAND.  THERE'S NO EVIDENCE THAT

10:00AM  3    HE APPROVED OR RESCINDED THAT DECISION.

10:00AM  4        AND EMAILS SHOW -- OR AN EMAIL SHOWS THAT HE HAD TO ASK

10:00AM  5    WEEKS AFTER THIS WHAT DEVICE WAS BEING USED TO TEST HCG.  IF IT

10:00AM  6    HAD BEEN HIS DECISION, HE WOULD HAVE NEVER NEEDED TO ASK.  AND

10:00AM  7    IT WAS MR. BALWANI WHO TOLD HIM AT THAT TIME AFTER

10:00AM  8    DR. ROSENDORFF HAD DECIDED TO STOP HCG TESTING ON EDISON, THAT

10:00AM  9    HCG TESTING WAS HAPPENING ON THE EDISON.  SO CERTAINLY HE KNEW.

10:00AM 10        BUT AS HE TESTIFIED TO YOU, HE UNDERSTOOD THAT HE HAD

10:00AM 11    LIMITED POWER AT THE COMPANY, THAT THESE DECISIONS WERE NOT

10:00AM 12    NECESSARILY HIS TO MAKE.  HE ANSWERED TO MR. BALWANI AS THE

10:00AM 13    PERSON RUNNING THE LAB.  SO HE KNEW THAT THE DECISION WAS OUT

10:00AM 14    OF HIS HANDS AT THIS POINT.

10:00AM 15        SPEAKING OF MS. GOULD, MR. COOPERSMITH ALSO TALKED ABOUT

10:01AM 16    THE PRACTICE OF WHERE DR. ZACHMAN WORKS AND THE EXTENT TO WHICH

10:01AM 17    THEIR PATIENTS KEPT RECEIVING RESULTS FROM THERANOS.

10:01AM 18        A COUPLE OF THINGS I WOULD LIKE YOU TO KEEP IN MIND THERE.

10:01AM 19        EXHIBIT 20073 IS THE CHART THAT THE DEFENSE REFERENCED

10:01AM 20    THERE, AND IT SHOWS THERANOS TEST RESULTS RECEIVED BY PATIENTS

10:01AM 21    OF THIS PRACTICE, SOUTHWEST.

10:01AM 22        ONE IMPORTANT THING TO NOTE IS THAT THAT SLIDE OR THAT

10:01AM 23    EXHIBIT OR THAT CHART IS LIMITED TO DATA AFTER AUGUST OF 2015.

10:01AM 24    WHY IS THAT IMPORTANT?

10:01AM 25        YOU'LL REMEMBER THIS, EXHIBIT 4533.  THIS SHOWS YOU THAT

10:01AM   1   FOR HCG IN PARTICULAR, THERANOS STOPPED USING THE EDISON TO

10:01AM   2   TEST IT, NOT WHEN DR. ROSENDORFF DECIDED TO, NOT WHEN HE SAID

10:01AM   3   THAT'S WHAT SHOULD HAPPEN, BUT IN JANUARY OF 2015.  SO SEVEN

10:01AM   4   MONTHS BEFORE THE DEFENSE'S EVIDENCE BEGINS ON THOSE SOUTHWEST

10:02AM   5   TESTS, THERANOS STOPPED USING THAT DEVICE AT ALL FOR HCG.

10:02AM   6        SO WHEN THEY SAY DR. ZACHMAN MUST HAVE REVIEWED ALL OF

10:02AM   7   THESE RESULTS AND SHE DIDN'T FIND ANY OTHER PROBLEMS TO NOTE,

10:02AM   8   YOU SHOULDN'T BE TOO SURPRISED BY THAT BECAUSE ALL OF THE HCG

10:02AM   9   RESULTS IN THAT CHART WOULD HAVE BEEN PERFORMED ON A DEVICE

10:02AM  10   OTHER THAN THE EDISON WHICH WAS CREATING ALL OF THE PROBLEMS

10:02AM  11   DURING THE TIME PERIOD THAT WE'RE TALKING ABOUT.  SO IT HAS

10:02AM  12   LIMITED VALUE FOR THAT PURPOSE.

10:02AM  13        TO THE EXTENT THAT THE DEFENSE WANTS YOU TO LOOK AT THAT

10:02AM  14   AND THINK THAT DR. ZACHMAN WASN'T SERIOUS ABOUT HER CONCERNS OR

10:02AM  15   THE PRACTICE DISAGREED WITH HER, YOU CAN'T RELY ON THAT FOR

10:02AM  16   THAT EITHER.

10:02AM  17        YOU HEARD DR. ZACHMAN'S TESTIMONY THAT IT'S NOT ALWAYS UP

10:02AM  18   TO THE DOCTOR WHERE THE PATIENT GOES, AND SOMETIMES PATIENTS

10:02AM  19   DECIDE WHERE TO GO.

10:02AM  20        SO WHILE SHE NEVER SENT ANOTHER PATIENT TO THERANOS AND

10:02AM  21   WHILE SHE, IN FACT, RECOMMENDED TO HER PATIENTS THAT THEY NOT

10:02AM  22   GO THERE, IT WAS ULTIMATELY UP TO THEM.

10:03AM  23        SO YOU HEARD THAT TESTIMONY.  YOU KNOW THAT EVERY LINE IN

10:03AM  24   THAT CHART DOESN'T NECESSARILY REPRESENT A CASE WHERE A

10:03AM  25   SOUTHWEST DOCTOR DECIDED TO USE THERANOS.  AND YOU KNOW FROM

10:03AM 1   DR. ZACHMAN'S TESTIMONY THAT EVENTUALLY THE PRACTICE DID DECIDE

10:03AM 2   TO STOP USING THE LAB ALTOGETHER.

10:03AM 3       YOU ALSO KNOW THAT THE PROBLEMS WITH HCG WERE NOT LIMITED

10:03AM 4   TO LATE MAY OF 2014.

10:03AM 5       IF YOU NEED REMINDING, THERE WERE EXHIBITS SHOWING THAT IN

10:03AM 6   JUNE OF 2014, SPECIFICALLY EXHIBITS 5421 AND 5422, THERE

10:03AM 7   CONTINUED TO BE SERIOUS PROBLEMS WITH QC FAILING FOR HCG ON THE

10:03AM 8   EDISON.

10:03AM 9       5421 IS ABOUT QUALITY CONTROL FAILURES ON JUNE 25TH OF

10:03AM 10  2014, ALMOST A MONTH AFTER THE DEFENSE SAYS THIS PROBLEM WAS

10:04AM 11  RESOLVED.  AND IN THAT EMAIL IT'S NOTED THAT QUALITY CONTROL

10:04AM 12  TESTING ON 33 EDISONS RESULTED IN 20 PASSING AND 9 FAILING FOR

10:04AM 13  ASSAYS, INCLUDING HCG.

10:04AM 14      THAT SAME EMAIL NOTED THAT ALL QUALITY CONTROLS PASSED

10:04AM 15  UPSTAIRS.  AND YOU'LL RECALL THAT UPSTAIRS WAS THE PORTION OF

10:04AM 16  THE LAB WHERE THE NON-THERANOS DEVICES WERE USED.  SO, AGAIN,

10:04AM 17  NO SURPRISE THERE.

10:04AM 18      5422 IS A JUNE 28TH EMAIL THAT NOTES ON THAT DAY ONLY 17

10:04AM 19  OUT OF 35 EDISONS PASSED QUALITY CONTROL.  THAT'S LESS THAN

10:04AM 20  HALF.

10:04AM 21      AND AT THAT TIME, AS A RESULT OF THOSE QUALITY CONTROL

10:04AM 22  FAILURES, THE HCG WAS NOT EVEN AVAILABLE TO BE PERFORMED,

10:04AM 23  AGAIN, NOT BECAUSE THEY WERE HONORING DR. ROSENDORFF'S CHOICE

10:04AM 24  TO CEASE TESTING, BUT BECAUSE IT FAILED QUALITY CONTROL AGAIN.

10:04AM 25      MR. COOPERSMITH REFERENCED A FEW TIMES SOME PURPORTED

10:05AM  1    PROFICIENCY TESTING OR ALTERNATIVE ASSESSMENT OF PROFICIENCY

10:05AM  2    TESTING THAT THERANOS CONDUCTED ON THE HCG ASSAY.  I JUST WANT

10:05AM  3    TO POINT OUT ONE THING HERE.  THE DEFENSE WAS HAPPY TO POINT

10:05AM  4    OUT THIS 100 PERCENT SCORE THAT THERANOS CLAIMED, BUT LOOK AT

10:05AM  5    THE INDIVIDUAL TESTS.  YOU'LL SEE THAT YOU HAVE TWO ROWS.  ONE

10:05AM  6    SHOWS THE PREDICATE OR NON-THERANOS RESULTS FOR THESE SAMPLES

10:05AM  7    AND THE ONE BELOW IT SHOWS THE THERANOS RESULTS.  AND THE

10:05AM  8    QUESTION IS HOW CLOSELY DO THEY MATCH WITH THE ASSUMPTION THAT

10:05AM  9    THE PREDICATE RESULT, THE NON-THERANOS RESULT IS RELIABLE?

10:05AM  10    ONLY ONE OF THESE RESULTS ACTUALLY HAS VALUES.  THE OTHERS

10:05AM  11    USE SAMPLES THAT ARE SO LOW IN CONCENTRATION THAT THE PREDICATE

10:05AM  12    DEVICE SIMPLY SAYS LESS THAN ONE, AND THE THERANOS RETURNS OR

10:05AM  13    THE THERANOS DEVICE RETURNS A RESULT JUST SAYING THAT IT'S

10:05AM  14    BELOW LLOQ, LOWER LIMIT OF QUANTIFICATION, YOU REMEMBER THAT'S

10:06AM  15    WHAT THAT STOOD FOR.

10:06AM  16    SO, IN OTHER WORDS, THE THERANOS DEVICE IS SAYING HERE THE

10:06AM  17    CONCENTRATION IS TOO FAINT FOR ME TO ASSIGN A NUMBER, AND

10:06AM  18    THAT'S WHAT IT'S SAYING FOR FOUR OF THE FIVE RESULTS, AND

10:06AM  19    THAT'S 100 PERCENT SCORE IN THERANOS'S VIEW.

10:06AM  20    YOU KNOW FROM THE TESTIMONY THAT WHEN A PATIENT IS

10:06AM  21    PREGNANT, IT'S CRITICAL TO BE ABLE TO DETERMINE THE STATUS AND

10:06AM  22    HEALTH OF THE PREGNANCY WHEN THE HCG VALUES ARE IN THE

10:06AM  23    THOUSANDS.  WE HEARD ABOUT SITUATIONS WHERE VALUES IN THE FOUR

10:06AM  24    AND FIVE FIGURES WERE RELIED UPON BY PRACTITIONERS TO ESTABLISH

10:06AM  25    THE STATUS OF A PREGNANCY.

REBUTTAL ARGUMENT BY MR. BOSTIC

10:06AM   1      THE ABILITY OF THERANOS'S TECHNOLOGY TO TEST IN THAT RANGE

10:06AM   2   IS NOT BEING MEASURED BY THIS TEST, SO YOU SHOULD VIEW THIS AS

10:06AM   3   HAVING VERY LIMITED VALUE.

10:06AM   4      HCG, OF COURSE, WASN'T THE ONLY TEST THAT THERANOS HAD

10:06AM   5   PROBLEMS WITH.  AND YOU ALSO HEARD ABOUT PSA AND SEVERAL OTHER

10:07AM   6   ASSAYS THAT THERANOS COULDN'T DO RELIABLY.

10:07AM   7      I JUST WANT TO REMIND YOU THAT WHEN IT COMES TO

10:07AM   8   DR. ELLSWORTH'S PSA RESULTS, HE DID NOT JUST GET ONE BAD RESULT

10:07AM   9   BUT TWO IN A ROW AND THESE WERE THE RESULTS THAT WERE PERFORMED

10:07AM  10   ON THE THERANOS TECHNOLOGY IN CONTRAST TO THE RESULTS THAT WERE

10:07AM  11   PERFORMED USING A NON-THERANOS DEVICE.

10:07AM  12      WHAT DOES THAT TELL YOU?  IT TELLS YOU SOMETHING ABOUT THE

10:07AM  13   DEFENSE'S ARGUMENT THAT EVERY LAB EXPERIENCE HAS ERRORS.  YOU

10:07AM  14   COULD TAKE THAT AND USE IT TO DISCOUNT SITUATIONS WHERE A

10:07AM  15   PATIENT ONLY HAS ONE ERRONEOUS RESULT FROM THE COMPANY, BUT IN

10:07AM  16   THIS CASE WHERE LIGHTNING STRIKES TWICE, YOU NEED TO START

10:07AM  17   THINKING ABOUT WHETHER THIS IS A COINCIDENCE, WHETHER THIS IS A

10:07AM  18   RARE OCCURRENCE, OR WHETHER THIS REALLY SAYS SOMETHING CLEAR

10:07AM  19   ABOUT FUNDAMENTAL PROBLEMS IN THE METHOD BEING USED TO PERFORM

10:07AM  20   THOSE TESTS.

10:07AM  21      BOTH MS. GOULD'S DOCTOR AND DR. ELLSWORTH'S DOCTOR ALSO

10:08AM  22   TOLD YOU THAT THEY HAD NEVER SEEN PROBLEMS WITH THESE

10:08AM  23   PARTICULAR TESTS LIKE THE ONES THAT THEY SAW WHEN THEY WENT TO

10:08AM  24   THERANOS.  THAT SHOULD MEAN SOMETHING TO YOU AS WELL.

10:08AM  25      YOU ALSO SAW NUMEROUS INSTANCES WHERE INACCURATE TEST

10:08AM  1    RESULTS WERE BEING BROUGHT TO THE ATTENTION OF THERANOS,

10:08AM  2    INCLUDING DIRECTLY TO MR. BALWANI.  AND YOU SAW THE INTERNAL

10:08AM  3    EMAILS WITH HOW THE COMPANY STRUGGLED WITH HOW TO DEAL WITH

10:08AM  4    THOSE.  YOU'VE SEEN THE RECORDS RELATING TO THOSE.

10:08AM  5        SO IT'S NOT THE CASE THAT THE GOVERNMENT HAS ONLY

10:08AM  6    PRESENTED FOUR EXAMPLES OF INACCURATE PATIENT TEST RESULTS.

10:08AM  7    YOU'VE SEEN MANY OF THEM.  AND IT'S ALSO NOTABLE THAT EVEN IN

10:08AM  8    THERANOS'S DEMOS, WHEN THEY WERE TRYING THEIR HARDEST TO

10:08AM  9    IMPRESS VIP'S OR OTHER INFLUENTIAL INVESTORS, EVEN IN THOSE

10:08AM 10    CASES THEY COULDN'T GET THEIR TESTS RIGHT.

10:08AM 11        YOU SAW INSTANCES WHERE DANIEL YOUNG HAD TO COME IN AND

10:08AM 12    CORRECT TESTS BEFORE THEY WERE READY TO GO TO THESE VIP'S.  YOU

10:09AM 13    SAW SITUATIONS WHERE RESULTS HAD TO BE REMOVED FROM THOSE

10:09AM 14    REPORTS BEFORE THEY COULD GO TO THESE PEOPLE WHO WERE TRYING

10:09AM 15    TO -- WHO THE COMPANY WAS TRYING TO IMPRESS.  SO EVEN IN THAT

10:09AM 16    SITUATION THE COMPANY FACED INCONSISTENCIES AND PROBLEMS IN ITS

10:09AM 17    TEST RESULTS.

10:09AM 18        THE DEFENSE CLAIMS THAT YOU HAVE NOT SEEN ENOUGH

10:09AM 19    INACCURATE RESULTS TO PROPERLY JUDGE WHETHER THERANOS HAD

10:09AM 20    ACCURACY PROBLEMS.  THEY HAVE IT EXACTLY BACKWARDS THOUGH.

10:09AM 21        YOU DON'T KNOW ABOUT ACCURACY PROBLEMS AT THERANOS SIMPLY

10:09AM 22    BECAUSE OF THE INACCURATE RESULTS, RATHER YOU KNOW ABOUT THEM

10:09AM 23    THE SAME WAY MR. BALWANI DID WHEN HE WAS AT THE COMPANY.  YOU

10:09AM 24    KNOW BECAUSE OF THE POOR QUALITY CONTROL PERFORMANCE, BECAUSE

10:09AM 25    OF THE LACK OF APPROPRIATE PROFICIENCY TESTING THAT WAS

10:09AM  1    HAPPENING, BECAUSE OF THE OTHER RELIABILITY ISSUES WITH THE

10:09AM  2    PRODUCT.

10:09AM  3        AND WHEN YOU THINK ABOUT THE INACCURATE RESULTS, THEY

10:10AM  4    SERVE REALLY ONLY AS CONFIRMATION THAT BECAUSE THE INGREDIENTS

10:10AM  5    GOING INTO THIS TESTING PROCESS WERE FLAWED, THAT WAS THE

10:10AM  6    UNAVOIDABLE RESULT.  SO YOU SHOULD NOT BE SURPRISED THAT

10:10AM  7    INACCURATE RESULTS RESULTED FROM THIS RECIPE BECAUSE WHAT WAS

10:10AM  8    GOING IN WAS A SERIOUSLY FLAWED TESTING METHOD AND PLATFORM.

10:10AM  9        THERE WERE OTHER PROBLEMS WITH THERANOS'S TECHNOLOGY

10:10AM 10    BESIDES POOR ACCURACY.  AND THE EVIDENCE SHOWED THAT THAT

10:10AM 11    RELATED TO THINGS LIKE THE LOW SPEED WITH WHICH THE DEVICE

10:10AM 12    COULD ACTUALLY PROCESS A SAMPLE AND THE LOW THROUGHPUT, THE

10:10AM 13    FACT THAT, IN ONE WITNESS'S WORDS, THE EDISON DEVICE COULD ONLY

10:10AM 14    RUN ONE TEST PER HOUR IF YOU WERE LUCKY, WHEREAS A COMPETING

10:10AM 15    DEVICE LIKE THE ADVIA 1800 COULD RUN A THOUSAND.

10:11AM 16        YOU ALSO HEARD THAT USING THE THERANOS METHOD, INCLUDING

10:11AM 17    ON THE EDISON, REQUIRED OTHER STEPS.  IT WASN'T A ONE STEP

10:11AM 18    PROCESS.  FOR EXAMPLE, IT REQUIRES DILUTION OF THE SAMPLE ON A

10:11AM 19    LARGE DEVICE CALLED A TECAN.  YOU SHOULD THINK ABOUT HOW THAT

10:11AM 20    NEED AFFECTS THE TRUTH OF CLAIMS THAT THE MILITARY WAS GOING TO

10:11AM 21    USE THIS ON THE BATTLEFIELD, OR THAT IT COULD BE USED IN A

10:11AM 22    HELICOPTER.

10:11AM 23        WHAT USE IS A SMALL PORTABLE DEVICE IF IT HAS TO BE USED

10:11AM 24    IN GROUPS OF THREE, IF IT HAS TO BE USED ALONG WITH A MUCH

10:11AM 25    LARGER DEVICE THAT DILUTES THE SAMPLE BEFOREHAND?  WAS THIS

10:11AM   1      REALLY A SELF-CONTAINED LAB IN A BOX THE WAY THE DEFENDANT WAS

10:11AM   2      REPRESENTING IT TO BE?

10:11AM   3           NO, IT WAS NOT.

10:11AM   4           YOU ALSO HEARD THE DEVICE BROKE DOWN FREQUENTLY AND HAD

10:11AM   5      FREQUENTLY MECHANICAL FAILURES.  AND YOU HEARD THE EDISON WAS

10:11AM   6      NEVER USED FOR MORE THAN 12 TESTS IN THE THERANOS CLINICAL LAB,

10:11AM   7      A NUMBER THAT WOULD HAVE SURPRISED ANY INVESTOR WHO GAVE MONEY

10:12AM   8      TO THERANOS DURING THE RELEVANT TIME PERIOD.

10:12AM   9           THE DEFENSE NOW CLAIMS THAT THE FACT THAT ONLY 12 TESTS

10:12AM  10      WERE RUN ON THE EDISON AT THERANOS WAS A BUSINESS DECISION,

10:12AM  11      THAT IT DIDN'T HAVE ANYTHING TO DO WITH THE LIMITATIONS OF THE

10:12AM  12      DEVICE, BUT RATHER THAT WAS A DECISION THAT THERANOS MADE AFTER

10:12AM  13      ANALYZING BUSINESS CONCERNS.

10:12AM  14           THINK ABOUT WHETHER THAT HOLDS WATER THOUGH.  FIRST OF

10:12AM  15      ALL, FROM A BUSINESS PERSPECTIVE, WHY USE THE EDISON AT ALL?

10:12AM  16      HAVE YOU HEARD A SINGLE THING THROUGHOUT THE TRIAL THAT THE

10:12AM  17      EDISON DID BETTER THAN COMPETING DEVICES?  DID THE EDISON HAVE

10:12AM  18      ANY ABILITY THAT A COMMERCIAL DEVICE, A NON-THERANOS DEVICE

10:12AM  19      COULDN'T MATCH?  OR DID THE EVIDENCE TELL YOU THAT THE EDISON

10:12AM  20      WAS INFERIOR TO COMMERCIAL DEVICES IN EVERY WAY EXCEPT

10:12AM  21      PORTABILITY, AND PORTABILITY, OF COURSE, DIDN'T MATTER WITH

10:12AM  22      THERANOS'S BUSINESS MODEL OF HAVING A CENTRAL LAB WHERE ALL OF

10:12AM  23      THE TESTING WAS DONE IN HOUSE.

10:13AM  24           SO WHY USE THE EDISON AT ALL?  WAS THAT A RATIONAL

10:13AM  25      DECISION?  WAS THAT MR. BALWANI USING HIS BUSINESS SENSE?  OR

10:13AM   1    WAS HE BEING STUBBORN?  WAS HE INSISTING ON USING THE COMPANY'S

10:13AM   2    TECHNOLOGY, DESPITE THE ADVICE FROM INTERNAL SCIENTISTS, AND

10:13AM   3    DESPITE THE FACT THAT IT DIDN'T MAKE ANY SENSE TO USE THE

10:13AM   4    TECHNOLOGY WHEN IT WOULD HAVE BEEN MORE EFFICIENT AND EASIER TO

10:13AM   5    USE COMPETING TECHNOLOGY INSTEAD?

10:13AM   6        AND YOU'VE SEEN EMAILS AND YOU'VE HEARD TESTIMONY SHOWING

10:13AM   7    MR. BALWANI'S INSISTENCE ON USING THE EDISON AND HIS RETICENCE

10:13AM   8    TO TAKE ANY TEST OFF OF THAT PLATFORM AND PUT IT BACK ON A

10:13AM   9    NON-THERANOS DEVICE.

10:13AM  10        THE UNCONTROVERTED TESTIMONY ALSO IS THAT THE EDISON COULD

10:13AM  11    ONLY DO ONE CATEGORY OF ASSAYS.  IT COULD ONLY DO IMMUNOASSAYS.

10:13AM  12        STILL THOUGH, THE DEFENSE SHOWED YOU THIS SLIDE IN ITS

10:13AM  13    CLOSING WHICH IS A THERANOS 4S, NOT THE EDISON.  AND IT SHOWS

10:14AM  14    THE COMPONENTS IN THIS DEVICE.  AND YOU'LL SEE IT INCLUDES

10:14AM  15    THINGS LIKE A CYTOMETER, WHICH WOULD BE USED TO RUN A TEST LIKE

10:14AM  16    A CBC, OR A COMPLETE BLOOD COUNT.

10:14AM  17        YOU KNOW THAT THE EDISON, THE DEVICE ACTUALLY USED FOR

10:14AM  18    PATIENT TESTING IN THE THERANOS LAB COULDN'T DO A CBC.  IT

10:14AM  19    DIDN'T HAVE THAT PART IN IT.  SO WHY ARE WE TALKING ABOUT THIS

10:14AM  20    DEVICE THAT THERANOS NEVER USED FOR PATIENT TESTING?

10:14AM  21        THE EVIDENCE ALSO TOLD YOU THAT THERANOS NEVER VALIDATED A

10:14AM  22    SINGLE TEST FOR USE ON THIS DEVICE WITHIN THE LAB.

10:14AM  23        THE DEFENSE ALSO SHOWED YOU THIS EXHIBIT, 7286, WHICH IS

10:14AM  24    AN EMAIL FROM DANIEL YOUNG TO MR. BALWANI BEFORE THE LAUNCH IN

10:14AM  25    2013 TALKING ABOUT TESTS THAT ARE BEING INTEGRATED ON THE

10:14AM 1    DEVICE.  YOU SEE THAT LANGUAGE.

10:15AM 2        AND ONE OF THOSE TESTS IS CBC, COMPLETE BLOOD COUNT, OR

10:15AM 3    WHOLE BLOOD COUNT, WHICH YOU KNOW WOULD REQUIRE THAT CYTOMETER

10:15AM 4    DEVICE, WHICH THE EDISON DIDN'T HAVE.

10:15AM 5        THE EMAIL NOTES THAT THERE'S A GROUP AT THERANOS STILL

10:15AM 6    COMPLETING THE PRE-VALIDATION BEFORE MOVING THE TESTS TO CLIA

10:15AM 7    FOR VALIDATION.  AND IT ALSO TALKS ABOUT RUNNING TNAA, OR

10:15AM 8    NUCLEOTIDE AMPLIFICATION DNA TESTS ON THE 4S DEVICE NEXT WEEK.

10:15AM 9        SO MR. COOPERSMITH DIDN'T EXPLAIN THIS TO YOU, BUT THIS IS

10:15AM 10   TALKING ABOUT PREPARATIONS TO USE THE 4S DEVICE IN CONNECTION

10:15AM 11   WITH THE COMMERCIAL LAUNCH IN 2013.

10:15AM 12       YOU KNOW BASED ON THE OTHER EVIDENCE IN THIS CASE THAT

10:15AM 13   SOMETHING WENT WRONG WITH THAT PLAN.  THAT NEVER HAPPENED.  THE

10:15AM 14   COMPANY NEVER USED THE 4S TO RUN A SINGLE CLINICAL PATIENT

10:15AM 15   SAMPLE.

10:15AM 16       SO THIS EMAIL IS DISCUSSING A PLAN THAT NEVER ACTUALLY

10:15AM 17   CAME TO FRUITION, AND IT'S DISCUSSING THE HYPOTHETICAL OR

10:16AM 18   POSSIBLE ABILITIES OF A DEVICE THAT, AGAIN, THERANOS NEVER GOT

10:16AM 19   TO THE POINT WHERE IT COULD USE ON ACTUAL PATIENTS.  SO THAT'S

10:16AM 20   IMPORTANT TO REMEMBER.

10:16AM 21       REMEMBER AGAIN THAT ONLY ONE DOZEN TESTS WERE EVER USED ON

10:16AM 22   THE EDISON IN THE LAB DESPITE ANY CLAIMS THAT THE DEVICE WAS

10:16AM 23   ACTUALLY CAPABLE OF MUCH MORE.

10:16AM 24       AND THIS IS KEY AS WELL.  IT'S TIME TO START THINKING

10:16AM 25   ABOUT WHAT INVESTORS KNEW AT VARIOUS TIMES, AND IT'S IMPORTANT

10:16AM 1     TO REMEMBER THAT THESE THINGS THAT WE'VE BEEN TALKING ABOUT,

10:16AM 2     THE THINGS THAT YOU NOW KNOW ABOUT THERANOS, WERE NEVER

10:16AM 3     DISCLOSED TO INVESTORS.  THE IMAGES, THE PICTURES THAT THEY HAD

10:16AM 4     IN THEIR MINDS ABOUT WHAT THE EDISON COULD DO DIFFERED GREATLY

10:16AM 5     FROM THE REALITY.

10:16AM 6          SO ALL OF THE LIMITATIONS ON THE DEVICE, THE THINGS THAT

10:16AM 7     IT COULD NOT DO, THAT INFORMATION WOULD HAVE BEEN SO VALUABLE

10:16AM 8     TO THOSE INVESTORS, WOULDN'T IT HAVE, IN MAKING THEIR DECISION

10:17AM 9     ON WHETHER TO WRITE LARGE CHECKS TO THE COMPANY?  SHOULDN'T

10:17AM 10    THEY HAVE KNOWN WHAT THE DEVICE COULD NOT DO CONTRARY TO THE

10:17AM 11    CLAIMS THAT MR. BALWANI WAS MAKING?

10:17AM 12         YOU'VE ALSO HEARD EVIDENCE THAT MR. BALWANI AND MS. HOLMES

10:17AM 13    MISREPRESENTED TO INVESTORS THE NATURE OF THERANOS'S DEALING

10:17AM 14    WITH THE MILITARY.  AND YOU HEARD THAT PEOPLE WERE LEFT WITH

10:17AM 15    THE IMPRESSION BECAUSE THEY WERE TOLD THAT THE THERANOS DEVICES

10:17AM 16    WERE BEING USED CLINICALLY BY THE MILITARY, AND YOU KNOW THAT'S

10:17AM 17    NOT THE CASE.

10:17AM 18         LET'S JUST GO QUICKLY THROUGH THE FOUR CONTACTS THAT

10:17AM 19    THERANOS HAD WITH THE MILITARY.  WHEN IT CAME TO THE BURN

10:17AM 20    STUDY, EXHIBIT 7694 WILL SHOW YOU A FEW THINGS.  FIRST, THAT

10:17AM 21    WAS NOT EXCLUSIVE TO THE MILITARY, THAT THE INDIVIDUALS BEING

10:17AM 22    TREATED WERE AT A VARIETY OF FACILITIES, INCLUDING MANY

10:17AM 23    CIVILIAN HOSPITALS; IT WILL SHOW YOU THAT ALL OF THE LOCATIONS

10:18AM 24    WERE IN THE U.S., SO NONE OF THIS WAS HAPPENING ON THE

10:18AM 25    BATTLEFIELD OR IN COMBAT LOCATIONS; YOU WILL SEE FROM THAT

10:18AM 1    EXHIBIT THAT THE TEST RESULTS WERE NOT USED TO ACTUALLY MAKE

10:18AM 2    TREATMENT DECISIONS FOR THE PEOPLE INVOLVED IN THE STUDY.  SO

10:18AM 3    THIS WASN'T CLINICAL USE OF THE THERANOS TESTING.  YOU WILL

10:18AM 4    ALSO SEE THAT THAT INCLUDED NO EVALUATION OF THE ACCURACY OF

10:18AM 5    THE THERANOS SYSTEM.  THAT WASN'T THE POINT OF THIS.

10:18AM 6        THE POINT OF THIS TEST WAS TO TEST AN EXPERIMENTAL

10:18AM 7    TREATMENT NOT DEVELOPED BY THERANOS, NOT TO SEE WHETHER OR NOT

10:18AM 8    THE THERANOS DEVICE COULD RETURN A RELIABLE RESULT.

10:18AM 9        WHEN IT CAME TO SPECIAL OPERATIONS, YOU HEARD FROM

10:18AM 10   MR. EDLIN THAT THREE DEVICES WERE SENT TO KENTUCKY, BUT THEY

10:18AM 11   WERE NOT USED FOR TESTING.  SO THAT NEVER WENT ANYWHERE.

10:18AM 12       WHEN IT CAME TO AFRICOM, YOU HEARD AGAIN FROM MR. EDLIN

10:18AM 13   THAT NO CLINICAL TESTING WAS DONE.  IN THIS CASE THE POINT WAS

10:18AM 14   TO SEE WHETHER THE DEVICE COULD SURVIVE A TRIP THROUGH HARSH

10:19AM 15   CONDITIONS, NOT WHETHER IT COULD ACTUALLY RUN TESTS AND RETURN

10:19AM 16   RELIABLE RESULTS.

10:19AM 17       SO YOU SAW IN THE EVIDENCE THAT THAT WOULD HAVE BEEN THE

10:19AM 18   NEXT STEP WHEN IT CAME TO AFRICOM'S WORK WITH THE DEVICE, BUT

10:19AM 19   THEY NEVER GOT THERE.

10:19AM 20       YOU SAW EMAILS TALKING ABOUT THE POSSIBILITY OF RUNNING

10:19AM 21   ACTUAL CLINICAL SAMPLES AND GETTING CLINICAL RESULTS AT SOME

10:19AM 22   POINT IN THE FUTURE.  THAT NEVER CAME TO BE.

10:19AM 23       THERE'S ALSO AN EMAIL IN CONNECTION WITH AFRICOM THAT

10:19AM 24   DISCUSSES THE DEVICE BEING TRANSPORTED ON WHAT THE MILITARY

10:19AM 25   CALLS AN UNPRESSURIZED AIRCRAFT.

10:19AM   1        OVER THE COURSE OF THE DEFENSE'S CLOSING, THAT MORPHED

10:19AM   2   INTO THE DEVICE BEING TESTED ON AN AIRCRAFT.  THAT'S NOT WHAT

10:19AM   3   THE EVIDENCE SHOWS.  LET'S JUST BE CLEAR ABOUT THAT.

10:19AM   4        THE DEVICE TOOK A RIDE ON AN AIRPLANE.  AT NO POINT IS

10:19AM   5   THERE ANY EVIDENCE THAT IT WAS INSTALLED ON A HELICOPTER, USED

10:20AM   6   FOR TESTING ON A MEDEVAC HELICOPTER, OR ANYTHING LIKE WHAT THE

10:20AM   7   DEFENDANTS WERE TELLING INVESTORS WHAT WAS HAPPENING.

10:20AM   8        WHEN IT COMES TO CENTCOM OR CENTRAL COMMAND, THIS WOULD

10:20AM   9   HAVE BEEN THE COMPONENT OF THE MILITARY THAT COULD HAVE USED

10:20AM  10   THE DEVICE FOR TREATMENT OF SOLDIERS IN THE MIDDLE EAST WHERE

10:20AM  11   THERE WAS ACTIVE ENGAGEMENTS OCCURRING.

10:20AM  12        YOU KNOW, THOUGH, THAT WHAT WAS GOING TO HAPPEN HERE WAS A

10:20AM  13   LIMITED OBJECTIVE EXPERIMENT WHERE THE DEVICE WOULD BE

10:20AM  14   EVALUATED TO SEE IF POSSIBLY AT SOME POINT IN THE FUTURE IT

10:20AM  15   COULD BE USED TO TREAT SOLDIERS.

10:20AM  16        NOT ONLY DID THERANOS NEVER PASS THAT KIND OF EVALUATION,

10:20AM  17   THE EVALUATION NEVER EVEN HAPPENED.  NO DEVICE WAS EVER SENT

10:20AM  18   OVERSEAS, AND THIS LIMITED OBJECTIVE EXPERIMENT NEVER GOT OFF

10:20AM  19   THE GROUND.

10:20AM  20        SO MULTIPLE STEPS AWAY FROM BEING AT THE POINT WHERE THE

10:20AM  21   DEFENDANTS WERE SAYING IT WAS.

10:21AM  22        IN CONNECTION WITH THAT ENGAGEMENT OR THAT CONTACT WITH

10:21AM  23   THE MILITARY, YOU SAW EVIDENCE THAT MR. BALWANI WAS PERSONALLY

10:21AM  24   INVOLVED, THAT HE WAS WORKING SPECIFICALLY ON I.T. ISSUES.

10:21AM  25   THAT TELLS YOU SOMETHING.  IT TELLS YOU THAT HE WAS AWARE OF

10:21AM  1    WHERE THINGS STOOD WITH THESE MILITARY CONTRACTS.  SO YOU

10:21AM  2    SHOULDN'T HAVE ANY DOUBT THAT MR. BALWANI KNEW WHEN HE WAS IN

10:21AM  3    ROOMS WITH INVESTORS AND THEY WERE BEING TOLD THAT THE

10:21AM  4    COMPANY'S DEVICE WAS BEING USED ACTIVELY BY THE MILITARY.  HE

10:21AM  5    KNEW THAT WAS FALSE.  HE WAS UNDER NO FALSE IMPRESSION THAT

10:21AM  6    THIS PROGRAM WAS FURTHER ALONG THAN IT ACTUALLY WAS.

10:21AM  7        NOW, IN ITS CLOSING THE DEFENSE ARGUED THAT THESE

10:21AM  8    MISREPRESENTATIONS ABOUT THE MILITARY SHOULD BE CHALKED UP TO

10:21AM  9    SOME KIND OF MISUNDERSTANDING, AND MR. COOPERSMITH COMPARED

10:22AM  10   THIS TO A GAME OF TELEPHONE.  DO YOU REMEMBER THAT?

10:22AM  11       THIS IS NOTHING LIKE THAT.  IN THE GAME OF TELEPHONE, I'M

10:22AM  12   SURE YOU KNOW, ONE PERSON WHISPERS SOMETHING TO THE NEXT PERSON

10:22AM  13   WHO WILL THEN WHISPER IT TO THE NEXT, AND THEN A FEW LAYERS

10:22AM  14   LATER, YOU CHECK AND SEE WHETHER THE ORIGINAL MESSAGE WAS

10:22AM  15   PRESERVED, AND WHAT YOU END UP LEARNING IS THAT WHEN

10:22AM  16   INFORMATION IS PASSED THROUGH MULTIPLE PEOPLE, WHEN YOU GET

10:22AM  17   SOMETHING THIRD OR FOURTH HAND, YOU SOMETIMES CAN'T RELY ON

10:22AM  18   BELIEVING THAT THAT'S WHAT THE ORIGINAL PERSON ACTUALLY SAID.

10:22AM  19       HERE WE HAVE THE OPPOSITE SITUATION.  HERE WE HAVE

10:22AM  20   MULTIPLE PEOPLE WHO ALL HEARD THE SAME THING FROM THE SAME

10:22AM  21   SOURCE, THAT SOURCE BEING ELIZABETH HOLMES AND MR. BALWANI IN

10:22AM  22   MEETINGS THAT THEY HAD.

10:22AM  23       AND YOU'LL SEE HERE THAT AS EXAMPLES, THESE FOUR INVESTORS

10:22AM  24   ALL TESTIFIED ABOUT VERY SIMILAR THINGS THAT THEY HEARD FROM

10:22AM  25   THESE SAME DEFENDANTS.

10:22AM  1      SO INSTEAD OF BEING A SITUATION WHERE THE TRUTH GETS

10:22AM  2  DISTORTED BY PEOPLE ACTING IN GOOD FAITH BUT MAKING MISTAKES AS

10:23AM  3  INFORMATION IS PASSED ALONG, WE HAVE FOUR PEOPLE WHO ARE ALL

10:23AM  4  DELIBERATELY DECEIVED BY THE SAME PERSON AND BECAUSE THEY ALL

10:23AM  5  SAY CONSISTENTLY THE SAME THING, YOU CAN HAVE CONFIDENCE THAT

10:23AM  6  YOU'RE HEARING FROM THEM WHAT THEY HEARD FROM THE DEFENDANT.

10:23AM  7      ON OTHER TOPICS, YOU ALSO HEARD THAT THE COMPANY HAD NO

10:23AM  8  REVENUE FROM PHARMACEUTICAL COMPANIES AFTER 2011 DESPITE SOME

10:23AM  9  FRIENDLY EMAILS THAT PEOPLE AT THERANOS HAD WITH PEOPLE AT

10:23AM 10  THOSE PHARMACEUTICAL COMPANIES.  NOTHING ACTUALLY DEVELOPED OF

10:23AM 11  THAT.  AND YOU CAN CONFIRM THAT IN EXHIBIT 7753, WHICH ARE THE

10:23AM 12  THERANOS FINANCIAL RECORDS THAT SHOW A LACK OF ANY REVENUE FROM

10:23AM 13  PHARMA AFTER THE YEAR 2011.

10:23AM 14      SO THINK ABOUT THAT IN TERMS OF WHAT THE DEFENDANTS WERE

10:23AM 15  TELLING PEOPLE IN LATE 2013 ABOUT WHAT THEY WERE DOING WITH

10:23AM 16  PHARMA, WHAT WAS GOING TO HAPPEN WITH PHARMA, WHAT REVENUE THEY

10:24AM 17  WERE GOING TO GET.  WHEN THEY WERE SAYING THOSE THINGS, THEY

10:24AM 18  KNEW THAT THE COMPANY HAD NOT GENERATED ANY REVENUE FROM THAT

10:24AM 19  KIND OF BUSINESS FOR THE LAST COUPLE OF YEARS.

10:24AM 20      YOU KNOW THAT THE DEPARTMENT OF DEFENSE GAVE THEM NO

10:24AM 21  REVENUE EXCEPT FOR SOME MINIMAL MONEY FROM THE BURN STUDY.  AND

10:24AM 22  YOU KNOW THAT THE COMPANY HAD LIMITED REVENUE OVERALL AND WAS

10:24AM 23  IN DESPERATE NEED FOR CASH TO STAY AFLOAT IN 2013.

10:24AM 24      YOU ALSO KNOW THAT PFIZER AND SCHERING-PLOUGH DID NOT

10:24AM 25  ACTUALLY VALIDATE THE TECHNOLOGY AS THE DEFENDANTS CLAIM.

10:24AM 1        AGAIN, THINK HOW VALUABLE THAT INFORMATION WOULD HAVE BEEN

10:24AM 2    TO THE VICTIMS IN THIS CASE.  THAT INFORMATION, IF GIVEN TO THE

10:24AM 3    INVESTOR VICTIMS, WOULD HAVE SAVED THEM MILLIONS, TENS OF

10:24AM 4    MILLIONS, SOMETIMES A HUNDRED MILLION DOLLARS.  FOR PATIENTS,

10:24AM 5    THAT INFORMATION WOULD HAVE PROTECTED THEM FROM THE RISK OF

10:24AM 6    RELYING ON A COMPANY FOR THEIR BLOOD TESTING NEEDS THAT

10:24AM 7    COULDN'T GIVE THEM RELIABLE OR ACCURATE RESULTS.

10:25AM 8        SO AT THIS POINT YOU'VE HEARD FROM THOSE VICTIMS WHO WERE

10:25AM 9    DECEIVED.  LET'S TALK ABOUT SOME DEFENSE ARGUMENTS THAT ARE

10:25AM 10   URGING YOU TO IGNORE THAT EVIDENCE AND WHY YOU SHOULDN'T.

10:25AM 11       FIRST, THE DEFENSE ARGUES THAT MR. BALWANI COULD NOT HAVE

10:25AM 12   INTENDED TO DEFRAUD ANYONE BECAUSE HE HIMSELF BET ON THERANOS.

10:25AM 13   YOU HEARD THAT HE GUARANTEED A LOAN TO THE COMPANY OF $10 TO

10:25AM 14   $12 MILLION, BUT PAY ATTENTION TO THE TIMING HERE.  THIS

10:25AM 15   HAPPENED IN AUGUST OF 2009 AND APRIL OF 2010.  SO THAT DECISION

10:25AM 16   ITSELF DOESN'T TELL YOU MUCH ABOUT HIS STATE OF MIND AT TIME

10:25AM 17   PERIODS LIKE 2013, 2014 WHEN HE, OF COURSE, KNEW MORE ABOUT

10:25AM 18   WHAT WAS HAPPENING AT THE COMPANY.  EXCEPT THAT, OF COURSE, IT

10:25AM 19   GAVE HIM A MOTIVE TO DO WHATEVER HE COULD TO MAKE THE COMPANY

10:25AM 20   SUCCESSFUL BECAUSE HE ACTUALLY HAD SKIN IN THE GAME.  HIS MONEY

10:26AM 21   WAS AT STAKE AT THAT POINT.

10:26AM 22       WHAT DO YOU THINK ABOUT THE FACT THAT MR. BALWANI

10:26AM 23   GUARANTEED THAT LOAN FOR THE COMPANY?  BECAUSE IT IS HIM TAKING

10:26AM 24   ON SOME RISK.  AND WHY WOULD HE TAKE ON RISK FOR THE COMPANY IF

10:26AM 25   HE DIDN'T BELIEVE THAT IT WOULD ULTIMATELY BE SUCCESSFUL?

10:26AM 1   WELL, I WOULD LIKE YOU TO THINK ABOUT THAT RISK IN THE

10:26AM 2 CONTEXT OF THE OTHER RISK THAT MR. BALWANI TOOK WHEN IT CAME TO

10:26AM 3 THERANOS, WHICH IS COMMITTING MULTIPLE CRIMES.

10:26AM 4   IF MR. BALWANI WAS WILLING TO PUT THAT ON THE LINE TO

10:26AM 5 SERVE THE COMPANY AND TO TRY TO MAKE IT SUCCESSFUL, THEN IT'S

10:26AM 6 MUCH LESS SURPRISING THAT HE WOULD BE WILLING TO PUT HIS CASH

10:26AM 7 ON THE LINE AS WELL.

10:26AM 8   AND REMEMBER THAT THE PLAN HERE WAS NOT TO GET CAUGHT.

10:26AM 9 THE PLAN HERE WAS NOT FOR THE COMPANY TO FAIL.  THE PLAN WAS TO

10:26AM 10 GET AWAY WITH IT.  THE PLAN WAS TO HAVE THE LIES NEVER BE

10:26AM 11 DISCOVERED, POSSIBLY TO MAKE THEM TRUE BEFORE ANYONE FOUND OUT

10:27AM 12 ABOUT THEM, FOR THE COMPANY TO BECOME GENUINELY SUCCESSFUL, TO

10:27AM 13 NEVER PAY BACK THAT LOAN, TO NEVER HAVE TO EXPLAIN THE FALSE

10:27AM 14 STATEMENTS THAT MR. BALWANI AND MS. HOLMES MADE TO THE VICTIMS.

10:27AM 15   AND THAT PLAN WAS INITIALLY SUCCESSFUL.

10:27AM 16   THAT BRINGS US TO MR. BALWANI'S INVESTMENT IN THERANOS,

10:27AM 17 WHICH YOU SHOULD VIEW SIMILARLY.  THIS WAS IN 2010 AND 2011

10:27AM 18 WHEN HE INVESTED APPROXIMATELY $4.5 OR $4.6 MILLION.

10:27AM 19   FIRST, AS TO WHY HE BOUGHT STOCK INSTEAD OF KEEPING HIS

10:27AM 20 OPTIONS, YOU DON'T HAVE EVIDENCE EXPLAINING THAT.  YOU DON'T

10:27AM 21 KNOW ABOUT WHAT ELSE WAS HAPPENING WITH MR. BALWANI'S FINANCES

10:27AM 22 AT THE TIME, WHAT ADVICE HE MIGHT HAVE GOTTEN AT THAT TIME

10:27AM 23 ABOUT THAT DECISION, WHAT REQUESTS WERE MADE, SO THERE'S NO

10:27AM 24 POINT IN SPECULATING ABOUT THAT.

10:27AM 25   AS FAR AS WHY HE WANTED TO OWN STOCK IN THERANOS, THAT'S

10:27AM 1     SIMPLER TO UNDERSTAND.  PEOPLE BUY STOCK BECAUSE THEY BELIEVE

10:27AM 2     THE VALUE WAS GOING TO GO UP.  THERE'S NO REASON TO THINK THAT

10:27AM 3     MR. BALWANI HAD ANY OTHER PLAN HERE.

10:28AM 4         AND YOU HEARD TESTIMONY ABOUT HOW MUCH THE VALUE OF

10:28AM 5     THERANOS STOCK WENT UP DURING THE RELEVANT TIME PERIOD IN THE

10:28AM 6     YEARS LEADING UP TO 2014.

10:28AM 7         AT THERANOS'S PEAK, MR. BALWANI'S INVESTMENT IN THE

10:28AM 8     COMPANY WOULD HAVE BEEN WORTH A VERY, VERY LARGE AMOUNT OF

10:28AM 9     MONEY INDEED.

10:28AM 10        IT'S IMPORTANT TO REMEMBER, THOUGH, THAT THE REASON THE

10:28AM 11    COMPANY'S VALUE WENT UP, THE REASON THE SHARE PRICE INCREASED

10:28AM 12    WAS BECAUSE OF THE FRAUD.  IT WAS ONLY BECAUSE OF THE FALSE

10:28AM 13    IMPRESSION THAT PEOPLE HAD OF THE COMPANY, THE EXAGGERATED VIEW

10:28AM 14    THEY HAD OF ITS ACHIEVEMENTS, THAT THE STOCK ACHIEVED THOSE

10:28AM 15    HEIGHTS.

10:28AM 16        SO AGAIN, IT ALL COMES BACK TO MR. BALWANI'S INTENT

10:28AM 17    BECAUSE BY FULLING THOSE FALSE IMPRESSIONS, BY LYING TO PEOPLE

10:28AM 18    AND CREATING THOSE MISUNDERSTANDINGS AND INACCURATE VIEWS IN

10:28AM 19    THEIR MINDS, MR. BALWANI WAS ABLE TO INCREASE THE VALUE NOT

10:29AM 20    JUST OF THE COMPANY HE WORKED FOR, THE COMPANY THAT HIS

10:29AM 21    GIRLFRIEND FOUNDED, BUT ALSO INCREASE THE VALUE OF HIS SHARES

10:29AM 22    AS WELL.

10:29AM 23        OF COURSE, WE KNOW NOW THAT THE COMPANY'S SUCCESS DURING

10:29AM 24    THAT TIME PERIOD WAS AN ILLUSION.  IT WAS BASED ON A FOUNDATION

10:29AM 25    OF THE FRAUD THAT IS ALLEGED IN THIS CASE, AND THAT FOUNDATION

10:29AM   1    WAS ALREADY CRUMBLING BY THE TIME MR. BALWANI LEFT THE COMPANY

10:29AM   2    IN 2016.

10:29AM   3        WE SHOULD TALK ABOUT ANOTHER DEFENSE ARGUMENT WHICH IS

10:29AM   4    THAT MR. BALWANI APPEARS NOT TO HAVE MADE ANY EFFORT TO ENRICH

10:29AM   5    HIMSELF IN THE SHORT TERM, HE DIDN'T SELL HIS STOCK, HE WAS

10:29AM   6    SATISFIED WITH A RELATIVELY MODEST SALARY.  SO A FEW THINGS TO

10:29AM   7    KEEP IN MIND THERE.

10:29AM   8        FIRST OF ALL, WHEN THE COURT INSTRUCTS YOU ON THE LAW, YOU

10:29AM   9    WILL HEAR ABOUT WHETHER THE GOVERNMENT NEEDS TO PROVE THAT A

10:29AM  10    WIRE FRAUD SCHEME WAS SUCCESSFUL.  AND IT'S IMPORTANT TO NOTE

10:29AM  11    THAT THAT IS NOT A REQUIREMENT.  A WIRE FRAUD SCHEME DOES NOT

10:30AM  12    HAVE TO BE SUCCESSFUL TO RESULT IN A CONVICTION.

10:30AM  13        AND YOU SEE HERE SPECIFICALLY, YOU WILL BE TOLD THAT IT'S

10:30AM  14    NOT NECESSARY THAT MR. BALWANI MADE A PROFIT OR THAT ANYONE

10:30AM  15    SUFFERED A LOSS.

10:30AM  16        SO THE FACT THAT MR. BALWANI MAY NOT HAVE TAKEN AWAY A

10:30AM  17    STACK OF CASH FROM THESE SCHEMES TO DEFRAUD IS NO REASON NOT TO

10:30AM  18    CONVICT ACCORDING TO THE LAW THAT YOU'LL BE INSTRUCTED ON.

10:30AM  19        WHEN IT COMES TO MR. BALWANI'S SALARY, KEEP IN MIND THAT

10:30AM  20    YOU KNOW THAT HE HAD THE FINANCIAL RESOURCES TO GUARANTEE THAT

10:30AM  21    SIGNIFICANT LOAN AND INVEST MILLIONS OF DOLLARS IN THE COMPANY.

10:30AM  22        YOU CAN INFER FROM THAT, THAT IT WAS NO BIG SACRIFICE FOR

10:30AM  23    HIM TO MAKE A HUNDRED THOUSAND DOLLARS A YEAR AS OPPOSED TO TWO

10:30AM  24    OR THREE.

10:30AM  25        AND WHEN IT COMES TO NOT SELLING THERANOS STOCK, REMEMBER

10:30AM 1    MR. EISENMAN'S TESTIMONY?  REMEMBER HIS TESTIMONY ABOUT HOW

10:30AM 2    DIFFICULT IT WAS FOR HIM WHEN HE WAS TRYING TO SELL THE STOCK,

10:31AM 3    AND HOW, AS HE TOLD YOU, NO ACTUAL OFFERS MATERIALIZED.

10:31AM 4    YOU ALSO KNOW FROM THE INVESTOR RIGHTS AGREEMENT, THAT'S

10:31AM 5    EXHIBIT 3530, THAT THERE WAS NO PUBLIC MARKET FOR THERANOS

10:31AM 6    STOCK.  SO IT'S NOT CLEAR THAT MR. BALWANI ACTUALLY HAD THE

10:31AM 7    CHANCE TO SELL HIS STOCK.  YOU SHOULDN'T PLACE A LOT OF WEIGHT

10:31AM 8    ON THE FACT THAT HE DIDN'T.

10:31AM 9    SO, AGAIN, MR. BALWANI'S PLAN HERE WAS NOT A SHORT-TERM

10:31AM 10   PLAN.  THERE WAS NO ALLEGATION HERE THAT THIS WAS A GET RICH

10:31AM 11   SCHEME.  MR. BALWANI WAS IN IT FOR THE LONG HAUL.  HIS GOAL MAY

10:31AM 12   NOT HAVE BEEN FOR HIM TO CASH OUT EARLY.  THE EVIDENCE SHOWS

10:31AM 13   THAT HE SET HIS SIGHTS HIGHER FROM THAT, AND WE ACTUALLY KNOW

10:31AM 14   THAT FROM HIS OWN WORDS.

10:31AM 15   THIS IS A TEXT EXCHANGE BETWEEN MR. BALWANI AND MS. HOLMES

10:31AM 16   DURING NOVEMBER OF 2013.  AND AFTER EXPRESSING SOME AFFECTION

10:31AM 17   FOR EACH OTHER, KNOW WHAT MR. BALWANI SAYS, THE SECOND TO THE

10:31AM 18   BOTTOM THERE.  HE SAYS, "THEN LET'S BUILD THE TRUE AMERICAN

10:32AM 19   EMPIRE.  A MONOPOLY.  OUR OBLIGATION TO U.S.A."

10:32AM 20   MS. HOLMES AGREES, "THAT'S WHAT WE'RE DOING."

10:32AM 21   SO THIS IS WHAT THE DEFENDANT WANTED.  HE DIDN'T WANT TO

10:32AM 22   EARN A FEW MILLION DOLLARS AND THEN RUN AWAY.  HE WANTED

10:32AM 23   THERANOS TO BE A MONOPOLY, HE WANTED TO BUILD AN EMPIRE WITH

10:32AM 24   MS. HOLMES, AND IN SERVICE OF THAT GOAL, HE COMMITTED MULTIPLE

10:32AM 25   FRAUDS.  AND THAT EXPLAINS WHY HE DIDN'T MAKE AN EFFORT TO CASH

10:32AM 1   OUT SOON.  THIS WAS A LONG TERM PLAN.

10:32AM 2       AGAIN, IT WAS SUCCESSFUL FOR YEARS UNTIL IT WASN'T.

10:32AM 3       DURING THE TIME THAT MR. BALWANI WORKED AT THERANOS, YOU

10:32AM 4   SAW EVIDENCE THAT HE PUT EFFORT INTO ADDRESSING PROBLEMS AT THE

10:32AM 5   COMPANY.  SO HOW SHOULD YOU THINK ABOUT THAT?

10:32AM 6       WELL, THE GOVERNMENT IS NOT ASKING YOU TO BELIEVE THAT

10:32AM 7   MR. BALWANI DIDN'T WANT THE THERANOS TESTS TO WORK.  THAT'S

10:32AM 8   IMPORTANT TO UNDERSTAND.

10:33AM 9       HE AND MS. HOLMES WANTED THE TESTS TO WORK, AND MANY

10:33AM 10  PEOPLE AT THE COMPANY TRIED TO MAKE THAT HAPPEN.  AND OF COURSE

10:33AM 11  HE DID.

10:33AM 12      MR. BALWANI WOULD HAVE PREFERRED TO LIVE IN A WORLD WHERE

10:33AM 13  HE DIDN'T HAVE TO LIE ABOUT THE THINGS THAT HE WAS LYING ABOUT.

10:33AM 14  HE WOULD HAVE PREFERRED TO LIVE IN A WORLD WHERE THERANOS

10:33AM 15  TECHNOLOGY COULD DO WHAT HE SAID IT COULD DO.  THAT WORLD WOULD

10:33AM 16  HAVE BEEN BETTER.

10:33AM 17      IF THERANOS HAD ACTUALLY HAD THOSE CONTRACTS WITH THE

10:33AM 18  MILITARY, AND THE MILITARY WAS USING THE DEVICES THE WAY HE

10:33AM 19  SAID, THEN HE WOULDN'T HAVE HAD TO LIE ABOUT THAT.

10:33AM 20      IF THE COMPANY HAD BEEN GENERATING THE SIGNIFICANT

10:33AM 21  REVENUES THAT HE HAD CLAIMED, IF THE COMPANY WAS REALLY ON

10:33AM 22  TRACK TO GENERATE EVEN MORE, THAT WOULD HAVE BEEN A BETTER

10:33AM 23  WORLD FOR HIM.

10:33AM 24      SO OF COURSE ACTUAL SUCCESS WOULD HAVE BEEN BETTER THAN

10:33AM 25  FALSE SUCCESS, AND MR. BALWANI WAS PUTTING EFFORT INTO TRYING

10:33AM   1    TO ACHIEVE THAT ACTUAL SUCCESS.  AND OF COURSE THAT APPLIES TO

10:33AM   2    TEST ACCURACY, TOO.

10:33AM   3         THE EVIDENCE SHOWS THAT HE PUT PRESSURE ON OTHERS AT THE

10:33AM   4    COMPANY TO FIX PROBLEMS WITH THE TEST.  BUT WHAT MATTERS FOR

10:34AM   5    YOUR QUESTION, FOR THE DECISION THAT YOU NEED TO MAKE, IS NOT

10:34AM   6    WHETHER MR. BALWANI WISHED THE TESTS WOULD WORK.

10:34AM   7         WHAT MATTERS IS WHETHER HE KNEW THE TESTS WEREN'T WORKING

10:34AM   8    AND WHAT HE DID BASED ON THAT KNOWLEDGE.

10:34AM   9         AND THE EVIDENCE SHOWS YOU THAT HE WAS AWARE OF THE

10:34AM  10    PROBLEMS.  SO THAT CHOICE WASN'T ACTUALLY AVAILABLE TO HIM.  IT

10:34AM  11    WASN'T A REALISTIC CHOICE FOR HIM TO OFFER RELIABLE TESTING

10:34AM  12    USING THE THERANOS TECHNOLOGY.

10:34AM  13         THE CHOICE WAS EITHER TO STOP AND CEASE USING THE

10:34AM  14    UNRELIABLE THERANOS TECHNOLOGY OR TO MOVE FORWARD AND DEFRAUD

10:34AM  15    PATIENTS.  THOSE WERE THE ONLY TWO CHOICES AVAILABLE TO HIM.

10:34AM  16    YOU KNOW WHAT CHOICE HE MADE.  HE MADE THE WRONG CHOICE.  HE

10:34AM  17    MADE THE FRAUDULENT CHOICE CONSISTENTLY.

10:34AM  18         THERE'S BEEN SOME DISCUSSION BY THE DEFENSE ABOUT THIS

10:34AM  19    IDEA THAT A TECHNOLOGY COMPANY WILL ALWAYS BE DEVELOPING ITS

10:35AM  20    PRODUCT.  AND OF COURSE THAT'S TRUE.  AND OF COURSE NO ONE

10:35AM  21    WOULD TESTIFY OR HAS TESTIFIED THAT IT'S WRONG FOR A TECH

10:35AM  22    COMPANY TO CONTINUE MAKING IMPROVEMENTS TO ITS DEVICE.

10:35AM  23         AND THE DEFENSE IS FOND OF USING THE IPHONE AS AN EXAMPLE.

10:35AM  24    EVERY VERSION OF THE IPHONE IS SUPPOSED TO BE BETTER THAN THE

10:35AM  25    ONE BEFORE IT, AND THAT'S OKAY, THERE'S NO FRAUD THERE.

REBUTTAL ARGUMENT BY MR. BOSTIC

10:35AM 1    WHEN YOU GET INTO TROUBLE, THOUGH, AS WE SEE HERE, IS WHEN

10:35AM 2    YOU LIE ABOUT WHAT YOUR CURRENT GENERATION OF TECHNOLOGY CAN

10:35AM 3    DO.

10:35AM 4        SO IMAGINE AN IPHONE THAT WAS HELD OUT AS BEING A

10:35AM 5    REPLACEMENT FOR A TYPICAL SMARTPHONE, BUT IT TURNS OUT THAT IT

10:35AM 6    COULDN'T DO SIMPLE THINGS LIKE TAKE A PHOTO OR PLACE A CALL

10:35AM 7    OUTSIDE OF YOUR AREA CODE.

10:35AM 8        THAT WOULD LEAD TO A SITUATION WHERE YOU MIGHT CONCLUDE

10:35AM 9    THAT PEOPLE BUYING THAT PHONE HAVE BEEN DECEIVED.  AND THE FACT

10:35AM 10   THAT THE NEXT VERSION OF THE PHONE MIGHT BE CAPABLE OF DOING

10:35AM 11   THOSE THINGS DOES NOT ERASE THAT FRAUD.  IT DOESN'T GET RID OF

10:36AM 12   THAT DECEPTION.  AND THAT WAS THE CASE HERE.

10:36AM 13       THE THERANOS EDISON DEVICE YOU KNOW COULDN'T DO BASIC

10:36AM 14   THINGS LIKE A COMPLETE BLOOD COUNT, OR DNA TESTING, OR ANY

10:36AM 15   GENERAL CHEMISTRY LIKE A SIMPLE ELECTROLYTE TEST.  INITIALLY

10:36AM 16   THREE WERE NEEDED TO WORK TOGETHER TO RETURN ONE RESULT.  SO I

10:36AM 17   THINK THE IPHONE EXAMPLE BREAKS DOWN IN THAT WAY.

10:36AM 18       WHEN WE'RE TALKING ABOUT WORK AT THERANOS, WE'RE ALSO

10:36AM 19   TALKING ABOUT HOW INVESTOR MONEY WAS SPENT.  AND A FEW TIMES

10:36AM 20   THE DEFENSE HAS EMPHASIZED FOR YOU THAT THERE'S NO EVIDENCE IN

10:36AM 21   THE CASE THAT INVESTOR MONEY WAS MISSPENT, THAT IT WAS SPENT ON

10:36AM 22   ANYTHING OTHER THAN THE WORK OF THERANOS, THE TECHNOLOGY

10:36AM 23   COMPANY.  THAT'S TRUE, BUT IT MISSES THE POINT.

10:36AM 24       AS MR. SCHENK TOLD YOU, THIS IS NOT A CASE WHERE

10:36AM 25   MR. BALWANI IS ACCUSED OF MISAPPROPRIATING INVESTOR MONEY.

10:36AM  1       THIS ISN'T AN EMBEZZLEMENT CASE.

10:36AM  2           TO PUT IT SIMPLY, THIS CASE IS NOT ABOUT HOW MR. BALWANI

10:37AM  3   USED INVESTOR MONEY.  THIS CASE IS ABOUT HOW HE GOT IT IN THE

10:37AM  4   FIRST PLACE.  AND THE CRIME WAS COMPLETE BEFORE THE INVESTORS

10:37AM  5   EVEN -- BEFORE ANY OF THAT MONEY WAS SPENT BECAUSE THE CRIME

10:37AM  6   RELATES TO THE DECEPTION THAT THE DEFENDANTS ENGAGED IN IN

10:37AM  7   ORDER TO GET THAT MONEY IN THE FIRST PLACE.

10:37AM  8           THE DEFENSE ALSO MENTIONED GOOD FAITH, AND IT'S IMPORTANT

10:37AM  9   TO BE CLEAR ABOUT WHAT WE'RE TALKING ABOUT WHEN WE'RE TALKING

10:37AM  10  ABOUT GOOD FAITH IN THIS CASE.

10:37AM  11          JURY INSTRUCTION NUMBER 22 IS GOING TO TELL YOU THAT THE

10:37AM  12  KIND OF GOOD FAITH THAT MATTERS HERE, THE KIND OF GOOD FAITH

10:37AM  13  THAT MIGHT PREVENT A CONVICTION ON THE BASIS OF A CERTAIN KIND

10:37AM  14  OF MISREPRESENTATION WOULD NEED TO BE A GOOD FAITH BELIEF IN

10:37AM  15  THE TRUTH OF THE SPECIFIC MISREPRESENTATIONS ALLEGED.

10:37AM  16          SO WHAT DOES THAT MEAN?  WELL, WHAT THIS DOESN'T MEAN,

10:37AM  17  WHAT THIS ISN'T REFERRING TO IS A GENERAL GOOD FAITH BELIEF IN

10:38AM  18  THERANOS.  IT DOESN'T REFER TO A GENERAL HOPE THAT THE COMPANY

10:38AM  19  IS GOING TO DO WELL, A GENERAL BELIEF THAT EVERYTHING IS GOING

10:38AM  20  TO BE OKAY, IT DOESN'T REFER TO A GENERAL BELIEF OR PLAN THAT

10:38AM  21  INVESTORS ARE ULTIMATELY GOING TO MAKE MONEY.  THAT HAS NOTHING

10:38AM  22  TO DO WITH IT.

10:38AM  23          AND IT HAS NOTHING TO DO WITH GOOD FAITH WORK AT THE

10:38AM  24  COMPANY TO TRY TO MAKE THINGS BETTER.  THAT KIND OF GOOD FAITH

10:38AM  25  DOESN'T REGISTER WHEN IT COMES TO YOUR ANALYSIS HERE.

10:38AM  1      WHAT MATTERS IS THAT DID MR. BALWANI ACTUALLY BELIEVE THAT

10:38AM  2   SOME OF THE FALSE STATEMENTS WERE TRUE?  THERE'S NO EVIDENCE TO

10:38AM  3   SUPPORT THAT.  IN FACT, THE EVIDENCE SHOWS THE OPPOSITE.

10:38AM  4      WHEN INVESTORS AND PATIENTS WERE TOLD FALSE THINGS ABOUT

10:38AM  5   THE COMPANY, MR. BALWANI KNEW THEY WERE FALSE.

10:38AM  6      THE DEFENSE ALSO TALKS ABOUT THE EXTENT TO WHICH OTHER

10:38AM  7   PEOPLE'S VIEWS MIGHT HAVE INFLUENCED MR. BALWANI'S.  SO LET'S

10:39AM  8   TALK ABOUT THAT.

10:39AM  9      THEY TALK ABOUT FAVORABLE REPORTS ON THE COMPANY'S

10:39AM 10   TECHNOLOGY THAT CAME FROM IT OUTSIDE OF THE COMPANY.

10:39AM 11      THE DEFENSE HAS EMPHASIZED A FEW SITUATIONS WHERE PEOPLE

10:39AM 12   OUTSIDE OF THE COMPANY REPORTEDLY LOOKED AT THE COMPANY'S

10:39AM 13   TECHNOLOGY AND SAID FAVORABLE THINGS.

10:39AM 14      THE KEY HERE IS TO BE AWARE OF WHAT YOU DON'T KNOW ABOUT

10:39AM 15   THE INFORMATION RELIED UPON BY THE PEOPLE IN THOSE SITUATIONS.

10:39AM 16      YOU HEARD FROM WITNESSES AT PFIZER AND SCHERING-PLOUGH

10:39AM 17   ABOUT HOW THEY DID NOT COMPREHENSIVELY VALIDATE THE TECHNOLOGY

10:39AM 18   AND HOW, IN FACT, THEY DID NOT HAVE A FAVORABLE VIEW OF THE

10:39AM 19   TECHNOLOGY IN SOME RESPECTS.

10:39AM 20      WHEN IT COMES TO JOHNS HOPKINS, WHICH MR. COOPERSMITH

10:39AM 21   DISCUSSED, THE EXHIBIT ITSELF TELLS YOU HOW LIMITED THIS REVIEW

10:39AM 22   WAS AND GIVES YOU A REASON NOT TO PUT TOO MUCH WEIGHT ON IT.

10:40AM 23      SO YOU'LL NOTE THAT IN APRIL OF 2010 THIS REFERENCES A

10:40AM 24   ONE-DAY MEETING ON APRIL 27TH AND IT SAYS, "THE HOPKINS TEAM

10:40AM 25   REVIEWED PROPRIETARY DATA ON TEST PERFORMANCE FOR ROUTINE TESTS

10:40AM  1    AND SPECIAL TESTS."

10:40AM  2        IT SAYS, "THERANOS PRESENTED ADDITIONAL DATA ON

10:40AM  3    TECHNOLOGY, TEST PERFORMANCE, AND BUSINESS VISION, AND

10:40AM  4    DEMONSTRATED TECHNOLOGY ON SITE."

10:40AM  5        SO WHAT IS THIS SAYING?  THIS IS SAYING THAT JOHNS HOPKINS

10:40AM  6    GOT DATA THAT WAS SELECTED AND PROVIDED BY THERANOS ITSELF.

10:40AM  7    YOU'LL NOTE THAT THIS DOCUMENT IDENTIFIES THE ONLY THERANOS

10:40AM  8    ATTENDEES AT THAT MEETING AS ELIZABETH HOLMES AND

10:40AM  9    SUNNY BALWANI.  THERE ARE NO SCIENTISTS LISTED.

10:40AM 10        AND JOHNS HOPKINS WAS FORCED TO DETERMINE WHAT IT COULD

10:40AM 11    BASED ON THE INFORMATION AVAILABLE, WHICH WAS CONTROLLED AND

10:40AM 12    SUPPLIED BY THERANOS.

10:40AM 13            MR. COOPERSMITH:  OBJECTION, YOUR HONOR.  THERE'S NO

10:40AM 14    EVIDENCE OF ANY PROBLEM WITH THE DATA THAT WAS SUPPLIED.  IT'S

10:41AM 15    NOT IN THE RECORD.

10:41AM 16            THE COURT:  THIS IS COMMENT ON THE EVIDENCE, AND

10:41AM 17    YOUR OBJECTION IS NOTED.  IT'S OVERRULED.

10:41AM 18        THIS IS COMMENT ON THE EVIDENCE.

10:41AM 19        AS YOU'VE HEARD, LADIES AND GENTLEMEN, I THINK I'VE

10:41AM 20    MENTIONED BEFORE, WHAT THE LAWYERS SAY IN THEIR ARGUMENTS IS

10:41AM 21    NOT EVIDENCE.  IT'S NOT EVIDENCE.

10:41AM 22        YOU CAN CONTINUE, MR. BOSTIC.

10:41AM 23            MR. BOSTIC:  MEMBERS OF THE JURY, WHAT I WOULD LIKE

10:41AM 24    YOU TO THINK ABOUT HERE AND WHAT I WOULD LIKE TO YOU RELY UPON,

10:41AM 25    AGAIN, IS NOT WHAT I'M SAYING, BUT THE EVIDENCE THAT IS ALREADY

10:41AM 1    IN THE RECORD ABOUT WHETHER THIS DEFENDANT AND HIS PARTNER,

10:41AM 2    MS. HOLMES, WERE RELIABLE SOURCES OF INFORMATION ABOUT THERANOS

10:41AM 3    OR NOT.

10:41AM 4         I THINK YOU HAVE A LOT OF EVIDENCE TO MAKE THAT

10:41AM 5    DETERMINATION.  AND I THINK IT'S IMPORTANT TO NOTE THAT

10:41AM 6    JOHNS HOPKINS'S DETERMINATION, THEIR OPINION, WOULD HAVE BEEN

10:41AM 7    SHAPED BY INFORMATION OF THAT SOURCE.

10:42AM 8         ONE OTHER THING TO NOTE ABOUT THIS REPORT IS ITS TIMING.

10:42AM 9    SO THIS WAS IN APRIL OF 2010.  OBVIOUSLY THAT'S LONG BEFORE THE

10:42AM 10   2013 AND 2014 TIME PERIOD WHEN MR. BALWANI AND MS. HOLMES WERE

10:42AM 11   MAKING FALSE REPRESENTATIONS TO INVESTORS, WHEN MR. BALWANI WAS

10:42AM 12   OVERSEEING A DISASTROUS ROLLOUT OF FLAWED PATIENT TESTING

10:42AM 13   THROUGH WALGREENS.  SO YOU SHOULD WONDER HOW MUCH WEIGHT YOU

10:42AM 14   SHOULD PLACE ON THIS IN TERMS OF MR. BALWANI'S MENTAL STATE AND

10:42AM 15   KNOWLEDGE AND INTENT DURING THOSE 2013 AND 2014 YEARS.

10:42AM 16        IN 2013 AND 2014, HE KNEW A LOT MORE ABOUT

10:42AM 17   THERANOS'S TECHNOLOGY AND A LOT MORE NEGATIVE INFORMATION THAN

10:42AM 18   HE WOULD HAVE KNOWN IN 2010.

10:42AM 19        THAT'S NOT TO SAY INSTANCES LIKE THIS WERE NOT INFORMATIVE

10:42AM 20   TO MR. BALWANI, THOUGH.  ALTHOUGH THIS MIGHT NOT HAVE BEEN

10:43AM 21   CONCLUSIVE PROOF THAT THE THERANOS TECHNOLOGY WORKED,

10:43AM 22   ESPECIALLY WHEN WEIGHED AGAINST ALL OF THE NEGATIVE INFORMATION

10:43AM 23   THAT HE WAS GETTING FROM SCIENTISTS AT HIS OWN COMPANY WHO

10:43AM 24   ACTUALLY DID WORK WITH THE TECHNOLOGY.  THIS DID TELL HIM

10:43AM 25   SOMETHING.  THIS WOULD HAVE TOLD MR. BALWANI THAT PEOPLE

10:43AM  1    OUTSIDE OF THE COMPANY COULD BE CONVINCED THAT THE TECHNOLOGY

10:43AM  2    WORKED.  IT WOULD HAVE TOLD HIM THAT AT A GLANCE THE THERANOS

10:43AM  3    TECHNOLOGY COULD BE IMPRESSIVE.  AND HE BEGAN TO LEARN THAT FOR

10:43AM  4    SOME PEOPLE, ALL IT TOOK WAS A GLANCE AND IN SOME CASES SOME

10:43AM  5    DECEPTIVE STATEMENTS BY HIM AND HIS PARTNER TO SELL THEM ON THE

10:43AM  6    COMPANY AND ITS TECH.

10:43AM  7         LET'S TALK NEXT ABOUT SCIENTISTS AT THE COMPANY.

10:43AM  8         THE DEFENSE'S ARGUMENTS WHEN IT COMES TO SCIENTISTS BOIL

10:43AM  9    DOWN TO EITHER BLAMING OTHER PEOPLE FOR THE PROBLEMS AT THE

10:43AM 10    COMPANY OR RELYING ON POSITIVE THINGS THAT OTHERS AT THE

10:44AM 11    COMPANY SAID ABOUT THE COMPANY'S TECHNOLOGY.

10:44AM 12         YOU'LL RECALL THAT A FEW TIMES THE DEFENSE HAS POINTED OUT

10:44AM 13    THAT THE LABORATORY DIRECTOR IS AN IMPORTANT ROLE IN A LAB;

10:44AM 14    THAT THE LAB DIRECTOR IS RESPONSIBLE FOR THE ACCURACY AND

10:44AM 15    RELIABILITY OF TESTING THAT HAPPENS WITHIN A LAB.  AND

10:44AM 16    MR. COOPERSMITH SHOWED YOU AN ATTESTATION THAT DR. ROSENDORFF

10:44AM 17    SIGNED WHEN HE BECAME A LAB DIRECTOR FOR THERANOS ACKNOWLEDGING

10:44AM 18    THAT ROLE.

10:44AM 19         WHAT THAT MEANS IS THAT DR. ROSENDORFF AS LAB DIRECTOR WAS

10:44AM 20    AGREEING TO TAKE ON THAT RESPONSIBILITY.  HE WAS AGREEING TO DO

10:44AM 21    WHAT WAS NECESSARY TO ENSURE THE ACCURACY AND RELIABILITY OF

10:44AM 22    THE ROLE.

10:44AM 23         WHAT THAT ATTESTATION DOES NOT SAY IS THAT AS LAB

10:44AM 24    DIRECTOR, DR. ROSENDORFF WAS AGREEING TO BE STYMIED IN HIS WORK

10:44AM 25    BY THE PRESIDENT OF THE COMPANY, MR. BALWANI.  THAT ATTESTATION

10:44AM 1    DOESN'T SAY I AGREE THAT WHEN THE PRESIDENT OF THE COMPANY

10:44AM 2    KEEPS ME FROM DOING WHAT IS NECESSARY TO ENSURE ACCURATE

10:45AM 3    TESTING, YOU CAN STILL BLAME ME AFTER THE FACT WHEN THINGS GO

10:45AM 4    WRONG.  YOU KNOW THAT'S NOT THE SPIRIT OF THAT LANGUAGE.

10:45AM 5         BEYOND THAT, THE DEFENSE MADE ARGUMENTS ABOUT HOW CERTAIN

10:45AM 6    SCIENTISTS AT THE COMPANY SAID POSITIVE THINGS ABOUT THERANOS

10:45AM 7    TECHNOLOGY AT VARIOUS POINTS OVER THE YEARS.  AND THEY SHOWED

10:45AM 8    YOU, FOR EXAMPLE, AN EMAIL FROM IAN GIBBONS WHO YOU DIDN'T HEAR

10:45AM 9    FROM, FROM 2010.  THAT EMAIL WAS SHOWN TO YOU WITHOUT MUCH

10:45AM 10   CONTEXT AND OBVIOUSLY YEARS BEFORE THIS MORE IMPORTANT 2013 AND

10:45AM 11   2014 TIME PERIOD.

10:45AM 12        YOU SHOULD DOUBT WHETHER MR. BALWANI WOULD HAVE STILL BEEN

10:45AM 13   RELYING ON THAT MESSAGE FROM YEARS AGO IN THE FACE OF ALL OF

10:45AM 14   THE CONCRETE NEGATIVE INFORMATION HE WAS GETTING FROM PEOPLE

10:45AM 15   WHO WERE OPERATING HIS TECHNOLOGY IN THE YEARS WHEN THE COMPANY

10:45AM 16   WENT LIVE.

10:45AM 17        YOU SHOULD ALSO THINK ABOUT HOW MR. BALWANI REACTED WHEN

10:46AM 18   HE GOT THAT NEGATIVE INFORMATION FROM PEOPLE.  WAS HE RECEPTIVE

10:46AM 19   TO BAD NEWS ABOUT THERANOS TECH?  DID HE THANK PEOPLE FOR

10:46AM 20   BRINGING THOSE ISSUES TO HIS ATTENTION, OR DID HE RESPOND BY

10:46AM 21   EITHER IGNORING THEM OR IN SOME CASES WITH OPEN HOSTILITY?  YOU

10:46AM 22   KNOW IT WAS THE LATTER.

10:46AM 23        SO DID MR. BALWANI RELY ON THERANOS SCIENTISTS OR NOT?

10:46AM 24   IT'S A COMPLICATED QUESTION BECAUSE WHAT THE EVIDENCE ACTUALLY

10:46AM 25   SHOWS IS THAT HE LISTENED SELECTIVELY.  HE DECIDED WHAT TO PAY

10:46AM 1    ATTENTION TO AND WHAT NOT TO, AND HE DECIDED TO PAY ATTENTION

10:46AM 2    TO THE THINGS THAT HE WANTED TO HEAR, IGNORING OR DISMISSING

10:46AM 3    THE THINGS THAT HE DIDN'T WANT TO.

10:46AM 4         SO OBVIOUSLY HIS ACTIONS SPEAK LOUDLY ON THAT TOPIC.

10:46AM 5         HOW ABOUT HIS WORDS THOUGH?  DID MR. BALWANI HAVE COMPLETE

10:46AM 6    FAITH IN THERANOS'S SCIENTISTS LIKE DANIEL YOUNG, FOR EXAMPLE?

10:47AM 7         WELL, WHAT DOES HE SAY?  IN AUGUST OF 2014, AGAIN, WELL

10:47AM 8    AFTER THE COMPANY HAS LAUNCHED, WHEN THE COMPANY IS HANDLING

10:47AM 9    PATIENT TESTING, DR. YOUNG EMAILS MR. BALWANI INDIVIDUALLY TO

10:47AM 10   TALK ABOUT SOME CONCERNS THAT HE HAD ABOUT THE PT INR TEST.

10:47AM 11   AND MR. BALWANI FORWARDS THAT MESSAGE TO MS. HOLMES, THIS IS

10:47AM 12   AUGUST OF 2014, AND HIS REMARK THERE IS "ALWAYS ANOTHER STUDY

10:47AM 13   AFTER THE FACT."

10:47AM 14        AND WE SHOWED THIS EMAIL TO DR. ROSENDORFF, AND

10:47AM 15   DR. ROSENDORFF TOLD YOU ABOUT HOW THIS WAS A PATTERN AT

10:47AM 16   THERANOS, WHERE PROBLEMS WOULD COME UP, SOMEONE LIKE DR. YOUNG

10:47AM 17   WOULD PUT A STUDY TOGETHER TO TRY TO ADDRESS IT.  AT FIRST IT

10:47AM 18   MIGHT SEEM LIKE THE PROBLEM HAD BEEN SOLVED, BUT THEN PROBLEMS

10:47AM 19   WOULD RESURFACE AGAIN AND AGAIN AND AGAIN.

10:47AM 20        MR. BALWANI SAW THAT PATTERN TOO.  THIS IS HIM REMARKING

10:47AM 21   ON IT, LAMENTING THAT PATTERN TO MS. HOLMES, HIS PARTNER,

10:48AM 22   "ALWAYS ANOTHER STUDY AFTER THE FACT."

10:48AM 23        DID THIS SOUND LIKE A COO WHO BELIEVES THAT EVERYTHING IS

10:48AM 24   ON TRACK WITH THE TECHNOLOGY AT HIS COMPANY?  DOES THIS SOUND

10:48AM 25   LIKE SOMEBODY WHO BELIEVES THAT THE ACCURACY OF THE TESTING IS

10:48AM   1    IN GOOD HANDS WITH SOMEONE LIKE DR. YOUNG?

10:48AM   2        NO.  THIS IS EXPRESSING FRUSTRATION WITH THAT TREND.

10:48AM   3        AND THIS ISN'T UNIQUE.  IN FRONT OF YOU HAS BEEN A LOT OF

10:48AM   4    EVIDENCE OF MR. BALWANI'S DISPLEASURE OF THINGS AT THE COMPANY

10:48AM   5    AND HIS AWARENESS OF THE PROBLEMS.  THE TEXT MESSAGES BETWEEN

10:48AM   6    HIM AND MS. HOLMES ARE IN EXHIBIT 5378H, AND THOSE ARE REPLETE

10:48AM   7    WITH EXAMPLES OF MR. BALWANI EXPRESSING FRUSTRATION AND

10:48AM   8    UNHAPPINESS WITH THE WAY THINGS ARE GOING.  SO YOU SHOULD NOT

10:48AM   9    BELIEVE FOR A SECOND THAT HE THOUGHT EVERYTHING WAS OKAY.

10:48AM   10       THAT SAME IDEA APPLIES TO CUSTOMER FEEDBACK AS WELL.  THE

10:48AM   11   DEFENSE HAS SUGGESTED THAT BECAUSE CUSTOMERS GENERALLY HAD

10:49AM   12   FAVORABLE IMPRESSIONS OF THEIR EXPERIENCE WITH THERANOS,

10:49AM   13   MR. BALWANI MUST HAVE THOUGHT EVERYTHING WAS FINE.

10:49AM   14       BUT YOU KNOW AND HE KNOWS THAT THOSE RATINGS HAD VERY

10:49AM   15   LITTLE, IF ANYTHING, TO DO WITH THE ACCURACY AND RELIABILITY OF

10:49AM   16   THE TESTS.  THE FACT THAT SOMEONE HAS A GOOD EXPERIENCE GETTING

10:49AM   17   THEIR BLOOD DRAWN HAS NOTHING TO DO WITH WHETHER THE RESULTS

10:49AM   18   THAT THEY'RE GETTING BACK ARE CORRECT OR NOT.  AND THAT'S A

10:49AM   19   CASE OF PATIENTS NOT KNOWING WHAT MR. BALWANI KNEW, NOT KNOWING

10:49AM   20   ABOUT THE PROBLEMS IN THE LAB.

10:49AM   21       AND YOU CAN THINK ABOUT HOW A RESTAURANT WITH A TERRIBLE

10:49AM   22   HEALTH SCORE RATING FROM THE HEALTH INSPECTOR MIGHT STILL HAVE

10:49AM   23   A HIGH RATING ON YELP IF THE CUSTOMERS DON'T KNOW ABOUT ALL OF

10:49AM   24   THE PROBLEMS IN THE KITCHEN.  THAT WAS THE CASE HERE.

10:49AM   25       THE PEOPLE GOING TO WALGREENS FOR BLOOD TESTING, THEY

10:49AM 1    DIDN'T HAVE THE INFORMATION THAT MR. BALWANI HAD.  THEY DIDN'T

10:49AM 2    KNOW THAT THE COMPANY HAD SERIOUS QUALITY CONTROL PROBLEMS,

10:49AM 3    RELIABILITY ISSUES, THAT THEY WERE REGULARLY GETTING INACCURATE

10:50AM 4    RESULTS ON THEIR TECHNOLOGY AND GETTING COMPLAINTS FROM DOCTORS

10:50AM 5    AND PATIENTS.

10:50AM 6         YOU SHOULD ALSO BE SUSPICIOUS OF ANY CLAIM THAT

10:50AM 7    MR. BALWANI WAS RELYING ON ADVICE FROM OTHERS BECAUSE YOU KNOW

10:50AM 8    THAT HE IGNORED CAUTIONARY ADVICE FROM LAWYERS ABOUT THE

10:50AM 9    CONTENT OF THERANOS'S MARKETING.  I WON'T SPEND A LOT OF TIME

10:50AM 10   ON THIS, BUT IT'S IMPORTANT TO REMEMBER THAT MR. BALWANI AND

10:50AM 11   MS. HOLMES WERE ADVISED THAT CERTAIN LANGUAGE MIGHT BE

10:50AM 12   PROBLEMATIC ON THE WEBSITE, IN PARTICULAR, LANGUAGE RELATING TO

10:50AM 13   CLAIMS OF "HIGHEST QUALITY" OR "HIGHEST ACCURACY," CLAIMS OF

10:50AM 14   THE TECHNOLOGY BEING FASTER AND EASIER.  THE LAWYERS WARNED THE

10:50AM 15   DEFENDANTS NOT TO USE THIS LANGUAGE ON THE WEBSITE.

10:50AM 16        WHAT HAPPENED?  WELL, YOU SEE THAT THAT LANGUAGE STAYED ON

10:50AM 17   THE WEBSITE.  IT WAS ALSO USED ELSEWHERE IN PATIENT BROCHURES

10:51AM 18   AND CRITICALLY IN INVESTOR PRESENTATIONS.

10:51AM 19        SO THE PRESENTATIONS THAT HOLMES AND BALWANI SUPPLIED TO

10:51AM 20   INVESTORS HAD THIS SAME LANGUAGE.

10:51AM 21        AND THE POINT HERE IS THAT AFTER BEING PUT ON NOTICE THAT

10:51AM 22   THESE KINDS OF CLAIMS MIGHT BE DUBIOUS OR PROBLEMATIC, THEY

10:51AM 23   DIDN'T STOP USING THEM.  THEY CONTINUED TO.  AND TO BE CANDID,

10:51AM 24   THEY SHOULDN'T HAVE NEEDED A LAWYER TO TELL THEM THAT THESE

10:51AM 25   THINGS WERE FALSE, AND SO MAYBE IT'S NO SURPRISE THAT THEY

10:51AM  1    CONTINUED TO USE THIS LANGUAGE EVEN AFTER BEING ADVISED AGAINST

10:51AM  2    IT.

10:51AM  3         REMEMBER THAT OTHER INDIVIDUALS AT THERANOS DID GET THE

10:51AM  4    MESSAGE.  EXHIBIT 1090.  I WON'T SHOW IT, BUT YOU'RE FREE TO

10:51AM  5    LOOK AT IT LATER.  1090 IS AN EMAIL WITH A DRAFT OF THE

10:51AM  6    SEPTEMBER 2013 "WALL STREET JOURNAL" ARTICLE, AND IT'S AN

10:51AM  7    INTERNAL EMAIL WHERE A THERANOS EMPLOYEE NAMED JEFF BLICKMAN

10:52AM  8    NOTES ISSUES WITH THE DRAFT ARTICLE.  AND ONE ISSUE HE NOTES IS

10:52AM  9    CLAIMS OF IMPROVED ACCURACY.

10:52AM  10        SO OTHER PEOPLE, BESIDES HOLMES AND BALWANI, UNDERSTOOD

10:52AM  11   THAT THAT WAS DANGEROUS TERRITORY, CLAIMS THAT THE COMPANY MAY

10:52AM  12   NOT WANT TO MAKE IF IT WAS CONCERNED WITH BEING HONEST.

10:52AM  13        MR. BALWANI AND MS. HOLMES FELT OTHERWISE.

10:52AM  14        LET'S TALK BRIEFLY ABOUT THE THERANOS BOARD OF DIRECTORS.

10:52AM  15   THE DEFENSE HAS SUGGESTED THAT THE THERANOS BOARD WOULD HAVE

10:52AM  16   BEEN A MODERATING INFLUENCE OR A POLICING INFLUENCE ON THE

10:52AM  17   ACTIONS OF THE COMPANY.  I THINK THERE'S A SUGGESTION BY THE

10:52AM  18   DEFENSE THAT BECAUSE THE BOARD WAS FULL OF SO MANY QUALIFIED

10:52AM  19   INDIVIDUALS, NOTHING UNTOWARD COULD HAVE HAPPENED THERE, THAT

10:52AM  20   THOSE WERE STEADY HANDS ON THE WHEEL.

10:52AM  21        THERE'S NO EVIDENCE OF THAT.

10:52AM  22        A FEW THINGS TO KEEP IN MIND.  FIRST OF ALL, WHEN IT COMES

10:53AM  23   TO THE MAKEUP AND THE STRUCTURE OF THE BOARD, REMEMBER THAT

10:53AM  24   MS. HOLMES HERSELF WAS THE CHAIR OF THE BOARD, AND MR. BALWANI

10:53AM  25   WAS ALSO A MEMBER.  THEY WERE THE ONLY TWO OFFICERS WHO WERE ON

10:53AM  1    THE BOARD, SO THEY HAD BOARD POWER AS MEMBERS AND THEY ALSO HAD

10:53AM  2    THE KNOWLEDGE AND AWARENESS OF THE PEOPLE WHO WERE OPERATING

10:53AM  3    THE COMPANY DAY-TO-DAY.

10:53AM  4        SO IS THERE ANYONE MORE POWERFUL AT THE COMPANY THAN THOSE

10:53AM  5    TWO?  THE ANSWER IS NO.

10:53AM  6        THINK ALSO ABOUT THE SOURCES OF INFORMATION THAT WOULD

10:53AM  7    HAVE BEEN AVAILABLE TO THE BOARD.

10:53AM  8        IN EVIDENCE ARE MINUTES OF MEETINGS OF THE BOARD WHERE THE

10:53AM  9    BOARD IS BRIEFED BY MS. HOLMES ON THE OPERATIONS OF THE

10:53AM 10    COMPANY.  IS THERE ANY EVIDENCE SHOWING THAT THE BOARD HAD

10:53AM 11    INDEPENDENT ABILITY TO KNOW WHAT WAS HAPPENING AT THE COMPANY,

10:53AM 12    OTHER THAN THROUGH THE DEFENDANTS?  I THINK THE ANSWER IS NO.

10:54AM 13        FINALLY, IS THERE ANY EVIDENCE OF THE BOARD ACTUALLY

10:54AM 14    TAKING A ROLE IN RUNNING THE COMPANY?  IN ALL OF THE EMAILS

10:54AM 15    THAT YOU'VE SEEN ABOUT PROBLEMS IN THE LAB, RELATIONSHIPS WITH

10:54AM 16    PHARMACEUTICAL COMPANIES, WERE BOARD MEMBERS ON THOSE EMAILS?

10:54AM 17    WHEN INACCURATE RESULTS CAME INTO THE LAB, DID STAFF MEMBERS

10:54AM 18    SAY WE NEED TO CONTACT THE BOARD ABOUT THIS AND SEE WHAT

10:54AM 19    THEY'LL SAY?  NO.

10:54AM 20        THE PEOPLE MAKING THOSE DECISIONS WERE MR. BALWANI AND

10:54AM 21    MS. HOLMES.  THEY WERE RUNNING THE COMPANY.  THEY WERE

10:54AM 22    ACCOUNTABLE TO THE BOARD IN THE DAILY OPERATION, THE DECISIONS

10:54AM 23    THAT MATTER FOR THIS CASE.

10:54AM 24        AND THERE'S NO EVIDENCE THAT THE BOARD WAS AWARE OF THE

10:54AM 25    FALSE STATEMENTS THAT WERE BEING MADE TO VICTIMS IN THIS CASE.

10:54AM  1    THAT'S IMPORTANT TO REMEMBER.

10:54AM  2         SO WAS THE BOARD REALLY A CHECK ON MR. BALWANI'S POWER AT

10:54AM  3    THE COMPANY?  WAS THIS ABOUT SUPERVISING THE COMPANY AND

10:54AM  4    ENSURING AGAINST WRONGDOING?  OR WAS THE BOARD JUST A GROUP OF

10:54AM  5    POWERFUL PEOPLE TO BE IMPRESSED, ANOTHER AUDIENCE FOR THE

10:54AM  6    DEFENDANTS TO PERFORM FOR?

10:54AM  7         THE EVIDENCE SHOWS YOU THAT MEMBERS OF THE BOARD

10:55AM  8    INFLUENCED -- I'M SORRY, INTRODUCED THE DEFENDANTS TO INVESTORS

10:55AM  9    IN THIS CASE.  SO THE CONNECTIONS CREATED BY THAT BOARD, THE

10:55AM 10    CONNECTIONS SUPPLIED BY THE BOARD ACTUALLY BENEFITTED THE

10:55AM 11    COMPANY IN THAT WAY.

10:55AM 12         AS IT FITS INTO THE DEFENDANT'S SCHEMES TO DEFRAUD, THAT

10:55AM 13    WAS THE ROLE OF THE BOARD.  NOT A MODERATING INFLUENCE, BUT A

10:55AM 14    TOOL TO BE USED.

10:55AM 15         THE DEFENSE HAS POINTED OUT A FEW TIMES INSTANCES WHERE

10:55AM 16    INFORMATION WAS SHARED WITH PEOPLE OTHER THAN VICTIMS, AND

10:55AM 17    THEY'VE SHOWN THAT TO YOU IN AN ATTEMPT TO CONVINCE YOU THAT

10:55AM 18    CERTAIN THINGS WERE NOT ACTUALLY SECRETS AT THERANOS, OR THAT

10:55AM 19    INFORMATION ACTUALLY WAS NOT WITHHELD INTENTIONALLY FROM THE

10:55AM 20    VICTIMS IN THIS CASE.

10:55AM 21         BUT I'D LIKE TO TALK TO YOU ABOUT THIS CONCEPT OF

10:56AM 22    SELECTIVE HONESTY.  IT IS AN IMPORTANT PART OF THIS CASE HOW

10:56AM 23    THE DEFENDANTS HID TRUTH FROM THE VICTIMS IN THE FRAUD WHILE

10:56AM 24    FEEDING THEM DECEPTIVE STATEMENTS THAT LEFT THEM WITH THE WRONG

10:56AM 25    IMPRESSION ABOUT THE COMPANY.

10:56AM  1          ONE EXAMPLE RELATES TO THE LIMITATIONS OF THE THERANOS

10:56AM  2     ANALYZER, WHICH WE'VE TALKED ABOUT, AND THE COMPANY'S RESULTANT

10:56AM  3     RELIANCE ON THIRD PARTY DEVICES.

10:56AM  4          IN ITS OPENING THE DEFENSE SAID THERANOS DID NOT HIDE ITS

10:56AM  5     USE OF COMMERCIAL DEVICES.  AND THEY CONTINUED TO SUGGEST

10:56AM  6     SOMETHING SIMILAR IN CLOSING.

10:56AM  7          IS THAT WHAT THE EVIDENCE SHOWS?  YOU HAVE HEARD FROM

10:56AM  8     SEVERAL INVESTORS WHO WOULD DISAGREE STRONGLY WITH THAT

10:56AM  9     STATEMENT.

10:56AM 10          FOR EXAMPLE, ONE OF THE EXHIBITS THAT THE DEFENSE ACTUALLY

10:56AM 11     SHOWED YOU ON CLOSING WAS 13720A.  THAT'S THE FINANCIAL MODEL

10:56AM 12     PROVIDED TO PFM.  THAT FINANCIAL MODEL TALKS ABOUT THERANOS'S

10:56AM 13     COSTS IN BUILDING AND MANUFACTURING ITS OWN MINILAB DEVICE, BUT

10:57AM 14     IT DOESN'T SAY ANYTHING ABOUT PURCHASING COMMERCIAL DEVICES.

10:57AM 15          MR. COOPERSMITH SUGGESTED TO YOU THAT THAT MIGHT NOT BE

10:57AM 16     MISLEADING BECAUSE YOU DON'T KNOW HOW MANY DEVICES THERANOS

10:57AM 17     ALREADY HAD OR WHETHER PURCHASING MORE DEVICES ACTUALLY WOULD

10:57AM 18     HAVE IMPACTED THEIR BOTTOM LINE.

10:57AM 19          BUT THINK ABOUT THE SCALE OF THE ROLLOUT THAT THERANOS WAS

10:57AM 20     CONTEMPLATING; THINK ABOUT THE FACTS THAT THE EDISON WAS ONLY

10:57AM 21     BEING USED FOR 12 OF THE HUNDREDS OF TESTS THAT THEY WERE

10:57AM 22     OFFERING; AND THINK ABOUT WHETHER THAT REALLY MAKES SENSE.

10:57AM 23          IS IT TRUE THAT THE COMPANY'S NEED TO PURCHASE ADDITIONAL

10:57AM 24     THIRD PARTY DEVICES WOULDN'T AFFECT ITS BOTTOM LINE, THAT IT

10:57AM 25     DIDN'T BELONG IN THAT MODEL?  THAT DOESN'T MAKE SENSE.

10:57AM  1          WHAT MAKES MORE SENSE IS THAT THIRD PARTY DEVICES WEREN'T

10:57AM  2   MENTIONED IN THAT FINANCIAL MODEL BECAUSE THE DEFENDANT DIDN'T

10:57AM  3   WANT THIS INVESTOR TO KNOW ABOUT THE COMPANY'S USE AND

10:57AM  4   RELIANCE, THE COMPANY'S DEPENDENCE ON OTHER COMPANY'S DEVICES.

10:58AM  5          MR. COOPERSMITH ALSO SHOWED YOU SOME DATA THAT WAS

10:58AM  6   PROVIDED TO INVESTORS THAT PURPORTED TO SHOW THE PERFORMANCE OF

10:58AM  7   THERANOS'S ANALYZERS VERSUS THIRD PARTY ANALYZERS.  AND HE

10:58AM  8   SUGGESTED BECAUSE THOSE CHARTS WERE GIVEN TO INVESTORS, THEY

10:58AM  9   SHOULD HAVE BEEN ABLE TO PIECE TOGETHER THAT THERANOS ACTUALLY

10:58AM 10   OWNED THESE THIRD PARTY DEVICES.

10:58AM 11          I THINK THE SUGGESTION IS THAT THAT'S AS GOOD AS

10:58AM 12   DISCLOSING TO THEM THAT THE COMPANY IS RELYING ON THESE THIRD

10:58AM 13   PARTY DEVICES.  THAT SHOULD NOT BE CONVINCING TO YOU.

10:58AM 14          THE IDEA THAT INVESTORS NEED TO BECOME DETECTIVES IN THAT

10:58AM 15   WAY AND MAKE ASSUMPTIONS ABOUT THE FACT THAT THERANOS HAD

10:58AM 16   ACCESS TO THIS THIRD PARTY DEVICE AT SOME POINT MUST MEAN THAT

10:59AM 17   THEY'RE USING THEM FOR THE MAJORITY OF THEIR TESTS, THAT'S TOO

10:59AM 18   GREAT A LEAP TO EXPECT FROM INVESTORS.  SO THAT ARGUMENT

10:59AM 19   DOESN'T HOLD WATER.

10:59AM 20          AND I THINK WITHOUT IMPUGNING THE MOTIVES OF MY

10:59AM 21   COUNTERPART, YOU SHOULD THINK ABOUT ARGUMENTS LIKE THAT WHEN

10:59AM 22   YOU CONSIDER MR. COOPERSMITH'S CLAIM THAT IT'S THE DEFENSE WHO

10:59AM 23   IS TRYING TO SHOW YOU THE TRUTH.

10:59AM 24          WHEN THE DEFENSE TRIES TO CONVINCE YOU THAT THERANOS WAS

10:59AM 25   OPEN AND TRANSPARENT ABOUT ITS USE OF OTHER METHODS, THEY SHOW

10:59AM  1    YOU LANGUAGE LIKE THIS.  THIS IS FROM THE SEPTEMBER 2013 PRESS

10:59AM  2    RELEASE.  AND YOU'LL NOTE THAT IT SAYS, "THE SAMPLES ARE EITHER

10:59AM  3    TAKEN FROM A TINY FINGERSTICK OR A MICRO-SAMPLE TAKEN FROM

10:59AM  4    TRADITIONAL METHODS."

10:59AM  5        SO THE DEFENSE POINTS TO THIS AND SAYS, THIS TELLS YOU

10:59AM  6    THAT THERANOS WAS ACTUALLY BEING OPEN ABOUT ITS USE OF VEIN

11:00AM  7    DRAWS, AND MAYBE THAT'S TRUE.  BUT LOOK AT WHAT THE LANGUAGE

11:00AM  8    ACTUALLY SAYS.  IT SIMPLY SAYS, "THE SAMPLES ARE TAKEN FROM

11:00AM  9    THIS METHOD OR THAT METHOD," BUT NOWHERE IN HERE, OR THE SOURCE

11:00AM  10   OF THE OTHER LANGUAGE THAT THE DEFENSE SHOWS YOU, DOES IT

11:00AM  11   DISCLOSE THAT THE COMPANY ACTUALLY NEEDS TO USE THESE

11:00AM  12   TRADITIONAL METHODS, NEEDS TO USE VEIN DRAWS, DOESN'T HAVE A

11:00AM  13   CHOICE BECAUSE OF LIMITATIONS WITH THE COMPANY'S OWN

11:00AM  14   TECHNOLOGY.

11:00AM  15       THERE'S AN IMPORTANT DIFFERENCE BETWEEN SAYING WE CAN DO

11:00AM  16   TESTING EITHER OF THESE WAYS AND SAYING SOMETIMES WE NEED TO DO

11:00AM  17   A VEIN DRAW OR FREQUENTLY WE NEED TO DO A VEIN DRAW.  AND THAT

11:00AM  18   WAS NOT DISCLOSED IN THIS CASE.  YOU KNOW THAT FROM THE

11:00AM  19   EVIDENCE.

11:00AM  20       AND YOU KNOW THAT INVESTORS DID NOT KNOW ABOUT THE

11:00AM  21   COMPANY'S USE, AND EXTENSIVE USE REALLY OF THIRD PARTY DEVICES.

11:00AM  22   YOU HEARD FROM MR. JHAVERI THAT HE WOULD HAVE BEEN VERY

11:00AM  23   SURPRISED TO LEARN THAT HIS OWN TEST, HIS DEMO TEST PERFORMED

11:01AM  24   AT THERANOS WAS NOT ACTUALLY RUN ON A THERANOS ANALYZER.  THAT

11:01AM  25   KIND OF INFORMATION WAS NOT DISCLOSED TO INVESTORS.  INSTEAD,

11:01AM 1    THEY WERE LED TO BELIEVE THAT THE IN-HOUSE DEVICE WAS WHAT WAS

11:01AM 2    BEING DEMONSTRATED TO THEM.

11:01AM 3        AND THE REASON THAT INFORMATION WASN'T SHARED, THE REASON

11:01AM 4    THEY WERE GIVEN THAT FALSE IMPRESSION, IS BECAUSE IT MADE THE

11:01AM 5    COMPANY LOOK BETTER.  IT'S FAR MORE IMPRESSIVE IF THE COMPANY

11:01AM 6    CAN DO ALL OF ITS OWN TESTING ON ITS OWN ANALYZER, AND THAT'S

11:01AM 7    WHY THAT LIE WAS TOLD.

11:01AM 8        BY THE WAY, THIS LANGUAGE TALKING ABOUT ELIMINATING THE

11:01AM 9    NEED FOR LARGER NEEDLES AND NUMEROUS VIALS OF BLOOD REQUIRED

11:01AM 10   FOR MOST DIAGNOSTIC LAB TESTING IS STILL MISLEADING GIVEN THE

11:01AM 11   FACT THAT THERANOS WAS USING THE EXACT SAME DEVICES THE EXACT

11:01AM 12   SAME WAY AS OTHER LABS.

11:01AM 13       SO THEY HADN'T ELIMINATED ANY NEED.  THERE WAS NOTHING

11:01AM 14   ABOUT THEIR TECHNOLOGY THAT MADE SOMETHING NEW POSSIBLE.  THINK

11:01AM 15   ABOUT THAT.

11:02AM 16       WE SHOULD ALSO TALK ABOUT INSTANCES WHERE THERANOS

11:02AM 17   REVEALED THINGS TO REGULATORS THAT WERE NOT REVEALED TO

11:02AM 18   INVESTORS.  I THINK THE DEFENSE WANTS YOU TO LOOK AT THOSE

11:02AM 19   EXAMPLES AND CONCLUDE THAT BECAUSE THERANOS WAS OKAY REVEALING

11:02AM 20   CERTAIN DETAILS TO, SAY, THE FDA OR CMS, YOU CANNOT BELIEVE

11:02AM 21   THAT THEY TRIED TO HIDE THOSE DETAILS FROM THE PEOPLE WHO WERE

11:02AM 22   INVESTING IN THE COMPANY.

11:02AM 23       BUT THINK ABOUT HOW DIFFERENT THOSE TWO SITUATIONS ARE.

11:02AM 24   ACTUALLY, BEFORE WE GET TO THAT, ASK YOURSELF WHETHER THERANOS

11:02AM 25   REALLY WAS ALWAYS HONEST WITH REGULATORS AND INSPECTORS?

11:02AM  1      DISCUSSING THIS TOPIC IN HIS CLOSING, MR. COOPERSMITH

11:02AM  2   CALLED THIS ACCUSATION IMAGINARY I THINK WAS THE WORD HE USED.

11:02AM  3   BUT YOU SAW EVIDENCE WITH YOUR OWN EYES.  EXHIBIT 4047 IS AN

11:02AM  4   EMAIL FROM MS. HOLMES TO DANIEL YOUNG AND OTHERS ABOUT THE PATH

11:02AM  5   THAT AN INSPECTOR WAS GOING TO TAKE ON AN UPCOMING VISIT TO THE

11:03AM  6   COMPANY.

11:03AM  7      AFTER THAT, DANIEL YOUNG EMAILED DR. ROSENDORFF AND ASKED

11:03AM  8   HIM NOT TO REMIND THE INSPECTOR ABOUT THE DOWNSTAIRS LAB WHERE

11:03AM  9   THE THERANOS-SPECIFIC DEVICES WERE.

11:03AM 10      AND THEN IN EXHIBIT 1295, MR. BALWANI EMAILS RELEVANT

11:03AM 11   PEOPLE ABOUT AN AREA IN THE LAB THAT IS BLOCKED OFF DURING AN

11:03AM 12   INSPECTION, AND HE DIRECTS STAFF WHAT TO TELL THE INSPECTOR

11:03AM 13   ABOUT IT.

11:03AM 14      DR. ROSENDORFF TESTIFIED THAT THAT WAS AN UNUSUAL STEP IN

11:03AM 15   HIS EXPERIENCE AS A LAB DIRECTOR.

11:03AM 16      TO THE EXTENT THAT THERANOS DID DISCLOSE THINGS TO FDA,

11:03AM 17   CMS, OR SIMILAR ORGANIZATIONS, DON'T BE THROWN BY THAT.  LIKE I

11:03AM 18   SAID, THINK ABOUT HOW DIFFERENT THAT CIRCUMSTANCE IS.  FIRST OF

11:03AM 19   ALL, YOU KNOW THAT THOSE GOVERNMENT AGENCIES HAVE THE RIGHT TO

11:03AM 20   INSPECT.  WE SAW THAT HAPPEN IN THE EVIDENCE.  THAT HAPPENED IN

11:03AM 21   THE CASE OF THERANOS.

11:03AM 22      SO YOU KNOW THAT LYING TO THOSE AGENCIES IS VERY RISKY

11:03AM 23   BECAUSE THEY HAVE THE ABILITY TO SHOW UP AND CONFIRM THE TRUTH

11:04AM 24   OR FALSITY OF WHAT YOU'RE SAYING, UNLIKE INVESTORS.

11:04AM 25      YOU ALSO KNOW THAT WHEN IT COMES TO REGULATORS, OR YOU CAN

11:04AM   1    INFER THAT WHEN IT COMES TO REGULATION AND THAT KIND OF

11:04AM   2    SUPERVISION, THERE'S AN INCENTIVE TO BE THE SAME AS OTHER PEER

11:04AM   3    LABORATORIES.  SO IT'S AN OPPOSITE INCENTIVE VERSUS WHEN YOU'RE

11:04AM   4    TALKING TO AN INVESTOR.

11:04AM   5        WHEN THE DEFENDANTS WERE TALKING TO INVESTORS, THEY WANTED

11:04AM   6    TO PAINT THERANOS AS NEW AND NOVEL, AS SPECIAL AND DIFFERENT.

11:04AM   7        IF A GOVERNMENT REGULATOR VIEWS YOUR LAB THAT WAY, THEY

11:04AM   8    MIGHT HAVE ADDITIONAL QUESTIONS, WOULDN'T THEY?

11:04AM   9        IN THAT CONTEXT WHEN YOU'RE TALKING TO A REGULATOR WHO IS

11:04AM  10    GOING TO SUPERVISE AND INSPECT THE LAB, ISN'T IT BETTER FOR THE

11:04AM  11    INSPECTOR TO KNOW THAT YOU'RE DOING EVERYTHING ELSE IS, THAT

11:04AM  12    YOU'RE USING THE DEVICES THAT ARE FDA APPROVED.

11:05AM  13        SO THERE WAS AN INCENTIVE FOR THE DEFENDANTS TO STRESS

11:05AM  14    OPPOSITE THINGS TO THESE TWO GROUPS OF PEOPLE.  WHEN IT CAME TO

11:05AM  15    REGULATORS, TO BE HONEST ABOUT THEIR USE OF FDA APPROVED

11:05AM  16    DEVICES, AND BECAUSE THAT WOULD RESULT IN LESS SCRUTINY, BUT

11:05AM  17    WHEN IT CAME TO INVESTORS, PEOPLE THEY WERE TRYING TO IMPRESS

11:05AM  18    OR GET MONEY FROM, TO EMPHASIZE AND OVERSTATE WHAT MADE

11:05AM  19    THERANOS NEW, DIFFERENT, AND SPECIAL.

11:05AM  20        THEY DIDN'T LIE TO REGULATORS BECAUSE THEY COULDN'T

11:05AM  21    DECEIVE THEM, AND THEY DIDN'T NEED TO.

11:05AM  22        REMEMBER ALSO THAT CMS AND FDA WERE NOT SITTING IN WITH

11:05AM  23    THEIR MEETINGS WITH INVESTORS AND VICTIMS IN THIS CASE, SO

11:05AM  24    THOSE REGULATORS DID NOT KNOW ABOUT THE FALSE STATEMENTS THAT

11:05AM  25    WERE BEING MADE TO OTHERS.

11:05AM 1          MOVING ALONG HERE.

11:05AM 2          THERE'S ANOTHER DEFENSE THEME THAT SUGGESTS THAT INVESTORS

11:05AM 3     IN THIS CASE SHOULD HAVE OR DID KNOW BETTER.  YOU HEARD FROM A

11:05AM 4     SAMPLING OF THERANOS INVESTORS.  EACH OF THEM TOLD YOU ABOUT

11:06AM 5     THE FALSE AND MISLEADING INFORMATION THAT THEY GOT FROM THE

11:06AM 6     DEFENDANTS EITHER IN WRITTEN MATERIALS FROM THE DEFENDANTS AND

11:06AM 7     NEWS ARTICLES CITING ONE OR BOTH OF THEM AS SOURCES, OR IN

11:06AM 8     CONVERSATIONS DIRECTLY WITH THE PEOPLE RUNNING THE COMPANY.

11:06AM 9          THE DEFENSE ALSO EXPLORED THE DUE DILIGENCE AND RESEARCH

11:06AM 10    THAT WERE -- THAT THESE INVESTORS CONDUCTED, AND THERE MIGHT BE

11:06AM 11    THE INSINUATION OR SUGGESTION TO YOU THAT THEY SHOULD HAVE

11:06AM 12    NOTICED CERTAIN RED FLAGS, THAT THEY SHOULD HAVE BEEN MORE

11:06AM 13    CAREFUL, MORE SKEPTICAL, THAT THEY SHOULD HAVE DONE MORE TO

11:06AM 14    CONFIRM THE TRUTH OF THE THINGS THAT THEY WERE HEARING FROM THE

11:06AM 15    DEFENDANTS.

11:06AM 16         SOMETHING TO KEEP IN MIND WHEN IT COMES TO THAT, THOUGH.

11:06AM 17    THE COURT IS GOING TO INSTRUCT YOU AGAIN ON THE LAW, AND I

11:06AM 18    EXPECT THE COURT WILL TELL YOU THIS, THAT WHEN IT COMES TO AN

11:06AM 19    ALLEGED VICTIM'S CONDUCT, "AN ALLEGED VICTIM'S NEGLIGENCE IS

11:06AM 20    NOT A DEFENSE TO WIRE FRAUD."

11:06AM 21         THAT'S CRITICAL TO KEEP IN MIND.

11:06AM 22         YOUR JOB AS JURORS IS NOT TO WEIGH THE CONDUCT OF THE

11:07AM 23    PEOPLE WHO WERE TAKEN IN BY THIS FRAUD AND DECIDE WHETHER THEY

11:07AM 24    WERE CAREFUL ENOUGH, WHETHER THEY TOOK ENOUGH STEPS TO PROTECT

11:07AM 25    THEMSELVES BEFORE THEY COMMITTED TO INVESTING.  THAT'S NOT A

11:07AM   1    QUESTION THAT IS IN FRONT OF YOU.

11:07AM   2         THE FOCUS HERE IS ON THE DEFENDANT'S CONDUCT, HIS INTENT,

11:07AM   3    AND TO THE EXTENT ONE OF THESE VICTIMS, AN INVESTOR, FOR

11:07AM   4    EXAMPLE, MIGHT SEEM NEGLIGENT BECAUSE THEY MADE THE DECISION TO

11:07AM   5    INVEST IN THE COMPANY, THAT IS NOT RELEVANT TO YOUR FINDING OF

11:07AM   6    GUILT OR NOT GUILTY.

11:07AM   7         THE RANGE OF INVESTORS THAT YOU HEARD FROM, IT ALSO TELLS

11:07AM   8    YOU SOMETHING ABOUT THE IMPORTANCE OR NONIMPORTANCE OF THE

11:07AM   9    LEVEL OF DILIGENCE THAT WAS PUT IN HERE.  THINK ABOUT THE

11:07AM  10    DIFFERENT INVESTORS THAT YOU HEARD FROM.

11:07AM  11         THERE WAS CHRIS LUCAS, FOR EXAMPLE, WHO TRUSTED MS. HOLMES

11:08AM  12    BASED ON HER RELATIONSHIP WITH HIS UNCLE AND HIS LONG HISTORY

11:08AM  13    WITH THE COMPANY WHO INVESTED AFTER NOT HAVING THE KIND OF

11:08AM  14    INFORMATION FROM THE COMPANY THAT HE WOULD TYPICALLY HAVE;

11:08AM  15         THERE WAS BRIAN GROSSMAN, WHO WAS A VERY SOPHISTICATED

11:08AM  16    INVESTOR, WORKED WITH A TEAM TO EVALUATE THE OPPORTUNITY AT

11:08AM  17    THERANOS, INCLUDING SPECIALISTS, ASKED QUESTIONS, GOT OTHER

11:08AM  18    INFORMATION FROM OTHER PARTIES AS WELL;

11:08AM  19         THERE WAS PATRICK MENDENHALL, WHO GOT VERY DEFINITIVE

11:08AM  20    STATEMENTS FROM MR. BALWANI HIMSELF, BUT WHO DIDN'T SEE THE

11:08AM  21    KIND OF DETAILED PRESENTATIONS THAT OTHER INVESTORS GOT;

11:08AM  22         AND THEN THERE'S ALAN EISENMAN, WHO WAS NEVER HAPPY WITH

11:08AM  23    THE LIMITED AMOUNT OF INFORMATION THAT HE HAD, WHO DID

11:08AM  24    EVERYTHING HE COULD TO TRY TO FIND OUT MORE ABOUT THE COMPANY,

11:08AM  25    INCLUDING MR. BALWANI, BUT WAS SHUT DOWN, AND ULTIMATELY HE WAS

11:08AM 1    FORCED TO RELY ON THE LIMITED INFORMATION THAT HE WAS GETTING

11:08AM 2    FROM THEM.

11:09AM 3        FROM THAT RANGE OF INVESTOR WITNESSES, YOU SEE CLEARLY

11:09AM 4    THAT IT DOESN'T MATTER WHAT APPROACH AN INVESTOR TOOK TO

11:09AM 5    EVALUATING THE OPPORTUNITY WITH THERANOS.  AT THE END OF THE

11:09AM 6    DAY, THEY ALL HAD TO RELY ON THE TRUTH OF THE INFORMATION THAT

11:09AM 7    THEY WERE GETTING FROM THE DEFENDANTS.

11:09AM 8        THEY DIDN'T KNOW THAT THEY WERE ACTUALLY GETTING FALSE

11:09AM 9    INFORMATION.  THE DEFENDANTS KNEW THAT.  THE INVESTORS DIDN'T

11:09AM 10   KNOW WHAT INFORMATION THEY LACKED.  THE DEFENDANTS KNEW THAT.

11:09AM 11   SO FAR IT'S EASY TO SAY THAT SOME OF THESE INVESTORS MIGHT HAVE

11:09AM 12   MADE THE WRONG DECISION IN HINDSIGHT.  THAT'S TRUE FOR ANYONE

11:09AM 13   WHO IS TAKEN IN BY A FRAUD IT, BUT THIS INSTRUCTION TELLS YOU

11:09AM 14   NOT TO FOCUS ON THEIR OVERSIGHTS, BUT ON THE DEFENDANT'S

11:09AM 15   ACTIONS AND INTENT.

11:09AM 16       IN THAT SAME VEIN, THE DEFENSE LIKES TO POINT TO

11:09AM 17   PROVISIONS IN THE CONTRACT THAT THE INVESTORS SIGNED THAT MAKE

11:09AM 18   STATEMENTS ABOUT INFORMATION AVAILABLE TO THE INVESTORS, THEIR

11:09AM 19   ABILITY TO TAKE A LOSS, THINGS LIKE THAT.

11:10AM 20       BUT DON'T BE CONFUSED BY THAT.  THOSE CONTRACTS ARE NOT

11:10AM 21   THE INVESTORS AGREEING TO BE DEFRAUDED.

11:10AM 22       NOWHERE IN THE LANGUAGE WILL YOU FIND ANYTHING THAT

11:10AM 23   PERMITS THE DEFENDANT OR MS. HOLMES TO LIE OR TO DECEIVE

11:10AM 24   INVESTORS.  SO THOSE CONTRACTS DON'T PROTECT MR. BALWANI HERE.

11:10AM 25       THE MAIN POINT HERE IS THAT EVEN WHEN PEOPLE KNOW THEY'RE

11:10AM  1    TAKING A RISK, THEY'RE STILL ENTITLED TO TRUE AND ACCURATE

11:10AM  2    INFORMATION UNDER THE LAW.

11:10AM  3        THE DEFENSE'S THEORY HERE THAT IF INVESTORS KNEW THEY

11:10AM  4    MIGHT LOSE THEIR MONEY, THEN MR. BALWANI CAN'T BE GUILTY WOULD

11:10AM  5    ELIMINATE THE POSSIBILITY OF ANY FRAUD IN CONNECTION WITH AN

11:10AM  6    INVESTMENT, AND THAT'S NOT THE LAW.

11:10AM  7        IT WAS STILL WRONG FOR MR. BALWANI TO DECEIVE PEOPLE WHO

11:10AM  8    KNEW THEY WERE TAKING A RISK BECAUSE HE WAS DECEIVING THEM INTO

11:10AM  9    TAKING ON MORE OF A RISK THAN THEY THOUGHT THEY WERE.

11:10AM  10       I'LL SAY THAT AGAIN.  MR. BALWANI WAS DECEIVING PEOPLE

11:11AM  11   INTO TAKING ON MORE OF A RISK THAN THEY THOUGHT THEY WERE.

11:11AM  12   THAT'S WHAT MAKES THIS A FRAUD, EVEN THOUGH EVERY INVESTOR WILL

11:11AM  13   ACKNOWLEDGE THAT WITH THE INVESTMENT COMES THE POSSIBILITY OF

11:11AM  14   LOSING THEIR MONEY.  THAT DOESN'T MEAN THAT THIS ISN'T A CRIME.

11:11AM  15       SIMILARLY, DON'T BE DISTRACTED BY DEFENSE ARGUMENTS THAT

11:11AM  16   OTHER THINGS BESIDES THE DEFENDANT'S STATEMENTS ALSO MATTERED

11:11AM  17   TO THE INVESTORS.  WHEN IT COMES TO WHETHER A STATEMENT IS

11:11AM  18   MATERIAL OR NOT, THE LAW DOES NOT REQUIRE YOU TO CHOOSE ONE

11:11AM  19   PRIMARY THING THAT THE INVESTORS RELIED UPON IN MAKING THEIR

11:11AM  20   DECISION.  MULTIPLE THINGS CAN BE MATERIAL.  AND THE INVESTORS

11:11AM  21   YOU HEARD FROM CONSISTENTLY TESTIFIED THAT THE INFORMATION THAT

11:11AM  22   THEY GOT FROM THE DEFENDANT MATTERED TO THEM, THAT IT AFFECTED

11:11AM  23   THEIR ANALYSIS.  THEY SAID THAT OVER AND OVER AGAIN.

11:11AM  24       THE FACT THAT OTHER THINGS ALSO MATTERED TO THEM DOESN'T

11:11AM  25   DETRACT FROM THAT AND DOESN'T PREVENT A GUILTY VERDICT.

11:12AM  1          FINALLY ON THAT, DON'T FORGET THAT ON THE PATIENT SIDE OF

11:12AM  2     THINGS, UNLIKE INVESTORS, PATIENTS WERE IN NO POSITION TO FACT

11:12AM  3     CHECK THE THINGS THAT THEY WERE HEARING FROM THERANOS.  THEY

11:12AM  4     WERE FORCED TO RELY ON THE TRUTH OF THE REPRESENTATIONS THAT

11:12AM  5     THERANOS COULD PROVIDE ACCURATE AND RELIABLE INFORMATION AND

11:12AM  6     TESTING FOR THEM.  THEY DIDN'T HAVE ACCESS TO MR. BALWANI OR

11:12AM  7     MS. HOLMES.  THEY HAD TO RELY ON THE PUBLIC INFORMATION THAT

11:12AM  8     THE COMPANY AND THE DEFENDANT HAD PUT OUT THERE.  SO THINK

11:12AM  9     ABOUT THAT DISADVANTAGE THAT THEY WERE IN AS A RESULT OF THAT.

11:12AM 10          THE DEFENSE ALSO TRIES TO DRAW A CONTRAST BETWEEN WHAT

11:12AM 11     MIGHT BE ALLEGED AS LIES VERSUS WHAT MIGHT BE FORWARD LOOKING

11:12AM 12     STATEMENTS.  AND I THINK THEY WANT YOU TO CONCLUDE THAT IF

11:12AM 13     SOMETHING IS A FORWARD LOOKING STATEMENT, IT CAN'T BE

11:13AM 14     DISHONEST, IT CAN'T BE FRAUDULENT.  THAT'S NOT TRUE.  NO

11:13AM 15     INSTRUCTION IS GOING TO SAY THAT.  THE COURT WON'T INSTRUCT YOU

11:13AM 16     THAT THAT'S THE LAW BECAUSE IT'S NOT.

11:13AM 17          THE QUESTION IS NOT ABOUT THE TENSE OF THE STATEMENT THAT

11:13AM 18     THE DEFENDANT MAKES.  THE QUESTION IS, IS A CLAIM FROM A

11:13AM 19     DEFENDANT A FALSE AND FRAUDULENT REPRESENTATION MADE WITH THE

11:13AM 20     INTENT TO DECEIVE AND CHEAT, AND THAT CAN BE A PRESENT TENSE

11:13AM 21     STATEMENT, A PAST TENSE STATEMENT, OR A FUTURE TENSE STATEMENT.

11:13AM 22          THIS CAME UP IN PARTICULAR IN CONNECTION WITH FINANCIAL

11:13AM 23     PROJECTIONS THAT WERE PROVIDED TO VICTIMS IN THIS CASE.  THIS

11:13AM 24     IS EXHIBIT 1853 IN EVIDENCE.

11:13AM 25          IN PARTICULAR, THESE ARE FINANCIAL PROJECTIONS PROVIDED BY

11:13AM  1    THE DEFENDANT TO MS. PETERSON AT RDV IN OCTOBER OF 2014.

11:13AM  2         AND I THINK THE QUESTION PRESENTED BY THE DEFENSE IS,

11:13AM  3    WELL, HOW CAN FORWARD LOOKING FINANCIAL PROJECTIONS BE

11:13AM  4    DECEPTIVE?  HOW CAN THIS BE A LIE IF IT'S JUST A PREDICTION

11:14AM  5    ABOUT WHAT MIGHT HAPPEN IN THE FUTURE?

11:14AM  6         CONSIDER A HYPOTHETICAL.  LET'S SAY I COME TO YOU AND TELL

11:14AM  7    YOU THAT OVER THE NEXT HOUR, I'M GOING TO RUN TEN MILES.  THE

11:14AM  8    QUESTION IS AM I LYING OR NOT?  I'LL TELL YOU I HAVE NEVER RUN

11:14AM  9    A SIX MINUTE MILE, AND I CERTAINLY COULDN'T DO TEN IN A ROW,

11:14AM  10   BUT MAYBE WITHOUT THAT INFORMATION, WITHOUT KNOWING THAT, YOU

11:14AM  11   WOULD NOT BE WILLING TO ASSUME THAT I'M BEING DISHONEST.  YOU

11:14AM  12   MIGHT WANT TO GIVE ME THE BENEFIT OF THE DOUBT.

11:14AM  13        SO LET'S CHANGE THE CIRCUMSTANCES A LITTLE.  LET'S ASSUME

11:14AM  14   THAT NOW INSTEAD OF BEING AT THE BEGINNING OF THAT HOUR, WE'RE

11:14AM  15   45 MINUTES, 50 MINUTES INTO THAT HOUR, AND I'M STILL CLAIMING

11:14AM  16   I'M GOING TO RUN 10 MILES IN THIS HOUR, BUT I KNOW THAT I HAVE

11:14AM  17   NOT EVEN MADE IT TO THE END OF MY DRIVEWAY YET.

11:14AM  18        AT THAT POINT I DO NOT RECEIVE THE BENEFIT OF THE DOUBT.

11:14AM  19   I KNOW THERE'S NO WAY THAT I'M GOING TO ACHIEVE WHAT I SAY I'M

11:15AM  20   GOING TO ACHIEVE AND I'M BEING DISHONEST.  THAT'S WHAT YOU'RE

11:15AM  21   LOOKING AT ON THE SCREEN.

11:15AM  22        WHEN MR. BALWANI PROVIDED THESE PROJECTIONS IN OCTOBER OF

11:15AM  23   2014, PROJECTING, FOR EXAMPLE, $140 MILLION OF REVENUE IN THAT

11:15AM  24   YEAR, THE YEAR THAT WAS ALMOST OVER, HE WOULD HAVE KNOWN THAT

11:15AM  25   THERE WAS NO CHANCE OF THAT HAPPENING.  HE COULD NOT HAVE HAD A

11:15AM  1    GOOD FAITH BELIEF THAT THAT WAS GOING TO OCCUR.

11:15AM  2         AND HERE'S HOW WE KNOW.

11:15AM  3         LOOK AT THE ACTUAL HISTORICAL INCOME OF THE COMPANY FOR

11:15AM  4    THOSE YEARS, INCLUDING 2014, VERSUS WHAT WAS PROJECTED ON WHAT

11:15AM  5    WE JUST SAW GIVEN TO THE INVESTOR VICTIMS.

11:15AM  6         IN 2014 YOU SEE THAT THE ACTUAL REVENUE FOR THE COMPANY

11:15AM  7    ENDED UP BEING A MERE $150,000.  SO IN OCTOBER OF 2014 ON THE

11:15AM  8    ROAD TO EARNING $140 MILLION THAT YEAR, THERANOS HADN'T EVEN

11:15AM  9    REACHED THE END OF ITS DRIVEWAY, IT HADN'T EVEN TIED ITS SHOES,

11:16AM  10   IT WAS SO FAR OFF THE MARK FOR THAT PROJECTION, THAT YOU CAN BE

11:16AM  11   CONFIDENT VIEWING THIS AS A DISHONEST PROJECTION.  AND THAT'S

11:16AM  12   AN EXAMPLE OF HOW EVEN A FORWARD LOOKING STATEMENT CAN BE

11:16AM  13   DISHONEST IF WHEN IT'S MADE, THE PERSON MAKING IT KNOWS THAT

11:16AM  14   IT'S NOT GOING TO HAPPEN.

11:16AM  15        BY THE WAY, WHEN IT COMES TO THOSE 2015 NUMBERS, BOTH

11:16AM  16   SIDES HAVE DISCUSSED AND WITNESSES HAVE DISCUSSED HOW THAT

11:16AM  17   RELATES TO OR WOULD DEPEND ON THE STATUS OF THE WALGREENS

11:16AM  18   ROLLOUT AT THAT TIME.

11:16AM  19        AND THE EVIDENCE HAS SHOWN IN THIS TRIAL THAT MR. BALWANI

11:16AM  20   KNEW AT THIS TIME THAT THE WALGREENS ROLLOUT WAS STALLING, THAT

11:16AM  21   HE HAD NO GOOD FAITH REASON TO BELIEVE THAT THIS MANY LOCATIONS

11:16AM  22   WOULD BE ACHIEVABLE AT THAT TIME, AND THAT MEANS THAT HE WOULD

11:16AM  23   HAVE NO GOOD FAITH BELIEF IN THE TRUTH OF THAT REVENUE

11:16AM  24   PROJECTION.

11:17AM  25        YOU'LL RECALL THE DEFENSE'S BACK AND FORTH WITH

11:17AM 1    MR. JHAVERI, THE WALGREENS REP, ABOUT 2,000 STORES VERSUS 200

11:17AM 2    STORES; THE DEFENSE'S INSISTENCE THAT MR. JHAVERI MUST HAVE

11:17AM 3    MEANT 2,000 STORES AND MR. JHAVERI STAYING FIRM THAT, NO, HE

11:17AM 4    WAS VERY CLEAR WITH MR. BALWANI THAT 200 WAS THE NUMBER.  AND

11:17AM 5    WHEN HE SAID WE ARE GOING TO TOUCH 200 STORES, HE DIDN'T MEAN

11:17AM 6    REACH THAT LEVEL AT THE THERANOS ROLLOUT, HE MEANT THAT THEY

11:17AM 7    ARE GOING TO BE RENOVATING OR MAKING CHANGES TO THOSE STORES SO

11:17AM 8    THAT'S A GOOD TIME TO SEE WHICH ONE OF THEM WOULD BE PART OF

11:17AM 9    THAT THERANOS PROJECT.

11:17AM 10    MR. COOPERSMITH CONTINUES TO DISAGREE WITH MR. JHAVERI

11:17AM 11   ABOUT WHAT MR. JHAVERI MEANT.

11:17AM 12    HE'S FORCING YOU TO MAKE A CHOICE BETWEEN THE TESTIMONY OF

11:17AM 13   THIS WITNESS WHO ACTUALLY LIVED THESE EVENTS, MADE THESE

11:17AM 14   COMMUNICATIONS, OR TO REJECT THAT AND ACCEPT THE LAWYER'S

11:18AM 15   CHARACTERIZATION INSTEAD.

11:18AM 16    WE TALKED EARLIER ABOUT HOW STATEMENTS MADE BY LAWYERS ON

11:18AM 17   EITHER SIDE ARE NOT EVIDENCE.  I WOULD JUST URGE YOU TO KEEP

11:18AM 18   THAT IN MIND IN MAKING THAT DECISION THAT MR. COOPERSMITH IS

11:18AM 19   ASKING YOU TO MAKE BETWEEN BELIEVING THE WITNESS OR BELIEVING

11:18AM 20   HIM.

11:18AM 21    SIMILARLY, WHEN THE DEFENSE SHOWED YOU DURING CLOSING

11:18AM 22   EXHIBIT 1896, THAT IS AN EMAIL FROM MR. JHAVERI FROM AUGUST OF

11:18AM 23   2014 REFERENCING THE NEED TO GET VENOUS DOWN TO

11:18AM 24   10 PERCENT.  THE SELECTION THE DEFENSE SHOWED YOU ACTUALLY

11:18AM 25   STOPPED JUST ABOVE A CRITICAL LINE IN THAT DOCUMENT, AND FEEL

11:18AM  1    FREE TO GO LOOK AT IT WHEN YOU'RE DELIBERATING.  IT'S

11:18AM  2    EXHIBIT 1896 WHERE MR. JHAVERI SAYS REFERENCE TO GET VENOUS

11:18AM  3    DOWN TO 10 PERCENT, WE NEED TO HAVE A DOCUMENTED DETAILED PLAN

11:18AM  4    ON BOTH OR IT WILL BE DIFFICULT FOR ME HAVE TO CONVINCE

11:18AM  5    EXPANSION BEYOND ARIZONA.

11:19AM  6         SO MR. JHAVERI PUTTING MR. BALWANI DIRECTLY ON NOTICE THAT

11:19AM  7    UNLESS VEINOUS DROPS, UNLESS THAT PERCENTAGE GOES DOWN, THE

11:19AM  8    WALGREENS ROLLOUT WITH THERANOS MIGHT BE LIMITED ONLY TO

11:19AM  9    ARIZONA, THAT IT MIGHT NOT GO NATIONWIDE AT ALL.

11:19AM  10        IT'S ALSO REALLY IMPORTANT NOT TO FORGET OTHER STATEMENTS

11:19AM  11   MADE BY MR. BALWANI AND MS. HOLMES THAT ARE NOT IN THE FUTURE

11:19AM  12   TENSE.  I'M SHOWING YOU A SLIDE FROM INVESTOR PRESENTATIONS

11:19AM  13   THAT WERE GIVEN TO MULTIPLE INVESTORS IN THIS CASE, AND LOOK AT

11:19AM  14   THE LANGUAGE USED HERE.  HERE'S THE CLAIM THAT "THERANOS RUNS

11:19AM  15   ANY TEST AVAILABLE IN CENTRAL LABORATORIES, AND PROCESSES ALL

11:19AM  16   SAMPLE TYPES."  RIGHT UNDERNEATH A PICTURE OF A FINGERSTICK

11:19AM  17   BLOOD DRAW.

11:19AM  18        WHAT WOULD AN INVESTOR TAKE AWAY FROM SEEING THAT

11:19AM  19   LANGUAGE?  WHAT ELSE COULD THEY TAKE AWAY EXCEPT THAT

11:19AM  20   THERANOS'S TECHNOLOGY COULD RUN ANY TEST USING THIS METHOD?

11:19AM  21        BELOW THAT IT SAYS, "THERANOS PROVIDES THE HIGHEST LEVEL

11:20AM  22   OF OVERSIGHT, AUTOMATION, AND STANDARDIZATION IN OUR PRE- AND

11:20AM  23   POST-ANALYTIC PROCESSES ENSURING THE HIGHEST LEVELS OF ACCURACY

11:20AM  24   AND PRECISION."

11:20AM  25        WHAT ELSE COULD AN INVESTOR TAKE AWAY FROM THAT, EXCEPT

11:20AM   1   WHAT THAT LANGUAGE SAYS, THAT THERANOS IS CAPABLE OF THOSE

11:20AM   2   THINGS AT THAT TIME.

11:20AM   3        SIMILAR CLAIMS HERE ABOUT THE HIGHEST LEVELS OF ACCURACY.

11:20AM   4   THERANOS OFFERS TESTS WITH THE HIGHEST LEVELS OF ACCURACY.

11:20AM   5   AGAIN, THIS WAS PRESENTED DURING THE TIME WHEN THERANOS HAD

11:20AM   6   BEGUN PATIENT TESTING.  THERE WOULD HAVE BEEN NO REASON FOR

11:20AM   7   ANYONE SEEING THIS PRESENTATION TO THINK THAT THIS WAS FUTURE

11:20AM   8   OR SPECULATIVE INFORMATION.  THERE WAS NO WAY IT WAS EXPLAINED

11:20AM   9   THAT WAY.

11:20AM  10        ON THE CONTRARY.  THE WITNESSES TOLD YOU WHEN THIS

11:20AM  11   INFORMATION WAS PRESENTED IN PERSON, WHAT MS. HOLMES AND

11:20AM  12   MR. BALWANI SAID WAS CONSISTENT WITH THIS; THAT THESE WERE

11:20AM  13   PRESENTED AS PRESENT TENSE OR PAST TENSE ACHIEVEMENTS, THINGS

11:20AM  14   THAT THE COMPANY WAS CAPABLE OF AT THAT TIME.

11:21AM  15        LOOKING AT THIS, YOU MIGHT DECIDE THAT THESE INVESTOR

11:21AM  16   PRESENTATIONS ARE THE MOST IMPORTANT EVIDENCE IN THE CASE.  AND

11:21AM  17   YOU SHOULD KEEP THAT IN MIND WHEN YOU THINK ABOUT THE

11:21AM  18   COMPLAINTS FROM THE DEFENSE ABOUT CERTAIN THINGS THAT ARE

11:21AM  19   MISSING.  FOR EXAMPLE, MR. COOPERSMITH MENTIONED OVER AND OVER

11:21AM  20   AGAIN THE FACT THAT YOU WERE NOT PLAYED A TAPE OF A SINGLE

11:21AM  21   CONVERSATION THAT MS. HOLMES HAD WITH SOME INVESTORS.

11:21AM  22        AND HE CRITICIZED THE GOVERNMENT FOR NOT PROVIDING YOU

11:21AM  23   THAT EXACT LANGUAGE THAT MS. HOLMES WOULD HAVE USED IN THAT

11:21AM  24   CALL.

11:21AM  25        WELL, THANKFULLY FOR THE DECISION THAT YOU NEED TO MAKE,

11:21AM  1    YOU HAVE HUNDREDS OF PAGES OF THE EXACT LANGUAGE THAT

11:21AM  2    MR. BALWANI AND MS. HOLMES PROVIDED TO INVESTORS IN THESE

11:21AM  3    MEETINGS WHERE THEY WERE SEEKING INVESTMENTS FROM THESE WEALTHY

11:21AM  4    INDIVIDUALS.

11:21AM  5         IN CLOSING MR. COOPERSMITH DESCRIBED THESE PRESENTATIONS

11:22AM  6    IN A WAY THAT MINIMIZED THEM I THINK YOU'LL RECALL.  I THINK

11:22AM  7    THE WORD HE USED WAS "HODGEPODGE."  HE EXPLAINED OR CLAIMED

11:22AM  8    THAT THIS WAS A COLLECTION OF MATERIALS PREPARED FOR DIFFERENT

11:22AM  9    REASONS, AND I JUST WANT TO MAKE SURE THAT WE'RE CLEAR ABOUT

11:22AM 10    WHAT THESE ARE.  THESE ARE THE WRITTEN MATERIALS THAT THE

11:22AM 11    DEFENDANTS WHO RAN THIS COMPANY WERE GIVING TO VERY WEALTHY

11:22AM 12    POTENTIAL INVESTORS, WHEN THEY WERE ASKING THOSE INVESTORS TO

11:22AM 13    MAKE THE DECISION TO INVEST TENS OF MILLIONS, SOMETIMES UPWARDS

11:22AM 14    OF A HUNDRED MILLION DOLLARS IN THE COMPANY.  YOU SHOULD NOT

11:22AM 15    BELIEVE ANY SUGGESTION THAT THESE WRITTEN MATERIALS WERE NOT

11:22AM 16    CLOSELY MONITORED AND PAID ATTENTION TO BY THE TOP TWO PEOPLE

11:22AM 17    AT THIS COMPANY.  THESE WERE VERY IMPORTANT.  THESE MATERIALS

11:22AM 18    HAD AN IMPORTANT ROLE TO PLAY.  MILLIONS AND MILLIONS, HUNDREDS

11:22AM 19    OF MILLIONS OF DOLLARS RODE ON THE ABILITY OF THESE WRITTEN

11:23AM 20    MATERIALS TO CONVINCE PEOPLE TO WRITE CHECKS TO THE COMPANY.

11:23AM 21         SO YOU SHOULD PAY ATTENTION TO THE LANGUAGE HERE JUST LIKE

11:23AM 22    THE INVESTOR VICTIMS DID.  THAT'S WHAT THE DEFENDANTS WANTED

11:23AM 23    THEM TO DO.

11:23AM 24         YOUR HONOR, I'M ABOUT TO SHIFT GEARS TO A DIFFERENT TOPIC.

11:23AM 25         I'M STILL ON TRACK -- I'M FAR MORE THAN HALF WAY DONE, BUT

11:23AM   1    NOW MIGHT BE A GOOD TIME FOR A BREAK.

11:23AM   2         THE COURT:  OKAY.  ALL RIGHT.  LET'S DO THAT.

11:23AM   3    SHOULD WE TAKE A 20 MINUTE BREAK?  LET'S TAKE A 20 MINUTE

11:23AM   4    BREAK, LADIES AND GENTLEMEN, AND THEN WE'LL RETURN.

11:23AM   5         (RECESS FROM 11:23 A.M. UNTIL 12:00 P.M.)

12:01PM   6         THE COURT:  ALL RIGHT.  THANK YOU.

12:01PM   7    WE'RE BACK ON THE RECORD.  OUR JURY AND ALTERNATES ARE

12:01PM   8    PRESENT.  ALL COUNSEL, MR. BALWANI IS PRESENT.

12:01PM   9         MR. BOSTIC, WOULD YOU LIKE TO CONTINUE?

12:01PM  10         MR. BOSTIC:  YES, YOUR HONOR.  THANK YOU.

12:01PM  11    MEMBERS OF THE JURY, WELCOME BACK.  I JUST HAVE A COUPLE

12:01PM  12    MORE TOPICS TO DISCUSS WITH YOU.  MAYBE A QUARTER LEFT IN OUR

12:01PM  13    CONVERSATION FOR TODAY.

12:01PM  14    LET'S TALK NEXT ABOUT ELIZABETH HOLMES AND HER ROLE HERE.

12:01PM  15    THE DEFENSE MADE SOME MENTION OF MS. HOLMES IN THEIR CLOSING,

12:02PM  16    AND THE SUGGESTION WAS THAT MR. BALWANI WOULD HAVE HAD THE SAME

12:02PM  17    PERSPECTIVE ON MS. HOLMES AS EVERYONE ELSE THAT YOU HEARD ABOUT

12:02PM  18    IN THIS CASE; THAT HE WOULD HAVE BEEN IMPRESSED BY HER

12:02PM  19    CHARISMA, HER DEDICATION, HER INTELLIGENCE.

12:02PM  20    AND THOSE THINGS MAY BE TRUE TO A CERTAIN EXTENT.  BUT YOU

12:02PM  21    SHOULD NOT BELIEVE THAT MR. BALWANI'S PERSPECTIVE ON MS. HOLMES

12:02PM  22    WAS THE OUTSIDER'S PERSPECTIVE.  HE WOULD NOT HAVE BEEN STAR

12:02PM  23    STRUCK BY HER.  HE KNEW HER VERY WELL.  AS YOU KNOW, THEY WERE

12:02PM  24    NOT JUST BUSINESS PARTNERS, THEY WERE ALSO ROMANTIC PARTNERS.

12:02PM  25    THEY COLLABORATED TOGETHER ON MANY, IF NOT ALL, ASPECTS OF

12:02PM   1    RUNNING THIS COMPANY TOGETHER.  SO THEY WERE PARTNERS IN EVERY

12:02PM   2    SENSE OF THE WORD.

12:02PM   3         IN THE FIRST MINUTE OF THE DEFENSE OPENING, YOU HEARD THE

12:02PM   4    CLAIM SUNNY BALWANI DID NOT START THERANOS, HE DID NOT CONTROL

12:03PM   5    THERANOS, HE DID NOT HAVE FINAL BUSINESS DECISION MAKING

12:03PM   6    AUTHORITY AT THERANOS.

12:03PM   7         AFTER THE TRIAL, THERE REMAINS NO DISPUTE AT LEAST ON THAT

12:03PM   8    FIRST POINT.  MR. BALWANI WAS NOT THERE AT THE INCEPTION OF THE

12:03PM   9    COMPANY.  MS. HOLMES FOUNDED IT, AND HE JOINED LATER.

12:03PM  10         BUT WHEN IT COMES TO HIS CONTROL AT THE COMPANY, HIS

12:03PM  11    DECISION MAKING POWER, THE EVIDENCE HAS SHOWN THAT HE HAD A LOT

12:03PM  12    AT THE COMPANY AND THAT HE WIELDED IT.

12:03PM  13         IN CLOSING, THE DEFENSE SAID SOMETHING A LITTLE DIFFERENT.

12:03PM  14    MR. COOPERSMITH SAID MR. BALWANI WAS THE COO AND PRESIDENT OF

12:03PM  15    THERANOS.  OF COURSE HE HAD A HAND IN MAKING DECISIONS AT

12:03PM  16    THERANOS.  DEFENSE HAS NEVER SAID OTHERWISE.

12:03PM  17         HE ALSO SAID THAT MR. BALWANI WAS A VERY SENIOR OFFICER AT

12:03PM  18    THERANOS, THAT THE DEFENSE WASN'T CLAIMING OTHERWISE, AND THAT

12:03PM  19    HE WAS RESPONSIBLE, ALONG WITH MS. HOLMES, FOR THE OPERATION OF

12:03PM  20    THERANOS.

12:04PM  21         THAT IS TRUE, AND THAT IS WHAT THE EVIDENCE HAS SHOWN.

12:04PM  22         THE EVIDENCE HAS SHOWN THAT MS. HOLMES AND MR. BALWANI

12:04PM  23    WERE REALLY IN THEIR OWN CATEGORY OF LEADERSHIP AT THE COMPANY.

12:04PM  24    SOME COMPANIES YOU MIGHT IMAGINE ARE A LADDER WITH PEOPLE AT

12:04PM  25    ALL DIFFERENT LEVELS OF LEADERSHIP, SOME COMPANIES MIGHT BE RUN

12:04PM  1    BY A SINGLE PERSON.  THIS WAS AN ORGANIZATION RUN AND

12:04PM  2    CONTROLLED BY TWO PEOPLE WHO WIELDED THAT POWER TOGETHER, AND

12:04PM  3    THAT'S WHAT THE EVIDENCE HAS SHOWN, THAT'S WHAT THE DOCUMENTS

12:04PM  4    SHOW, THAT'S WHAT THE WITNESSES HAVE TESTIFIED TO.

12:04PM  5        MR. BALWANI WAS WITH MS. HOLMES AT THE TOP OF THE ORG

12:04PM  6    CHART FOR THE COMPANY.  HE WAS THE CHIEF OPERATING OFFICER AND

12:04PM  7    PRESIDENT.

12:04PM  8        MS. HOLMES AND MR. BALWANI WERE ALSO THE ONLY TWO OFFICERS

12:04PM  9    OF THE COMPANY WHO WERE ON THE BOARD AS WELL.  SO THEY WERE THE

12:04PM  10   ONLY PEOPLE WHO HAD THAT BOARD AUTHORITY AND WERE ALSO INVOLVED

12:04PM  11   IN THE DAY-TO-DAY RUNNING OF THE COMPANY'S OPERATIONS.

12:04PM  12       WHEN MR. EDLIN WAS ON THE STAND, AND YOU RECALL THAT HE

12:04PM  13   WAS A LONG-TIME EMPLOYEE AT THERANOS WHO WAS FRIENDS WITH

12:05PM  14   MS. HOLMES'S BROTHER FROM COLLEGE, AND HE HAD A GOOD SENSE OF

12:05PM  15   MS. HOLMES AND MR. BALWANI'S WORKING RELATIONSHIP BECAUSE OF

12:05PM  16   WHERE HE SAT IN THE COMPANY AND HIS ROLE AT THE COMPANY.

12:05PM  17       AND HE TESTIFIED THAT THEY COLLABORATED ON MANY THINGS,

12:05PM  18   THAT HE SAW THEM HAVING CONVERSATIONS FREQUENTLY ABOUT THE

12:05PM  19   COMPANY, THAT THEY BOTH HAD A GREAT DEAL OF AUTHORITY IN THE

12:05PM  20   COMPANY, AND THAT THEY WERE IN THEIR OWN CATEGORY AT THE

12:05PM  21   COMPANY IN TERMS OF HAVING ACCESS TO ALL INFORMATION.

12:05PM  22       YOU HEARD WITNESSES TALK ABOUT HOW INFORMATION AT THE

12:05PM  23   COMPANY WAS SILOED, HOW THERE WERE RULES AND RESTRICTIONS ON

12:05PM  24   THE ABILITY OF EMPLOYEES TO SHARE INFORMATION, NOT JUST OUTSIDE

12:05PM  25   OF THE COMPANY BUT WITHIN THE COMPANY AS WELL.  THERE WERE

12:05PM  1    SECRETS THAT EMPLOYEES WERE REQUIRED TO KEEP FROM EACH OTHER.

12:05PM  2        NONE OF THAT APPLIED TO MR. BALWANI OR MS. HOLMES.  THAT'S

12:05PM  3    WHAT MR. EDLIN TOLD YOU.  THEY WERE THE ONLY PEOPLE WHO HAD

12:05PM  4    THAT STATUS, THE STATUS OF BEING ALLOWED TO KNOW EVERYTHING

12:05PM  5    THAT WAS HAPPENING IN THE COMPANY.

12:05PM  6        AND THE EVIDENCE SUGGESTS THAT THEY DID HAVE COMPLETE

12:06PM  7    COMPREHENSIVE KNOWLEDGE OF WHAT WAS HAPPENING AT THERANOS, AND

12:06PM  8    IMPORTANTLY FOR THIS CASE, WHAT WAS NOT HAPPENING AT THERANOS.

12:06PM  9        IT'S NO SURPRISE THAT MR. BALWANI HAD A LOT OF AUTHORITY.

12:06PM 10    BESIDES HIS POSITION THAT WE TALKED ABOUT, YOU CAN ALSO INFER

12:06PM 11    THAT HIS CLOSE RELATIONSHIP WITH MS. HOLMES WOULD HAVE GIVEN

12:06PM 12    HIM A LOT OF INFLUENCE OVER HER, MORE THAN JUST HIS TITLE ALONE

12:06PM 13    WOULD PROVIDE.

12:06PM 14        REMEMBER ALSO THAT MR. BALWANI WAS OLDER AND MORE

12:06PM 15    EXPERIENCED THAN MS. HOLMES.  SO IT WOULD BE NO SURPRISE THAT

12:06PM 16    HIS ADVISE, HIS INPUT WOULD CARRY A LOT OF WEIGHT WITH HER.

12:06PM 17    AND THAT'S WHAT SHOWED UP IN THE TEXT MESSAGES.

12:06PM 18        IF YOU LOOK AT 5387H, YOU'LL GET A SENSE OF HOW THEY

12:06PM 19    INTERACTED WITH EACH OTHER AND YOU WILL SEE THAT MR. BALWANI

12:06PM 20    WAS NOT SHY ABOUT EXPRESSING HIS OPINIONS AND THAT MS. HOLMES

12:06PM 21    WAS RECEPTIVE TO THAT INPUT FROM MR. BALWANI.

12:06PM 22        AND SPEAKING OF MR. BALWANI NOT BEING SHY, I THINK YOU

12:07PM 23    ALSO HAVE A SENSE FROM THE WITNESS TESTIMONY AND FROM THE

12:07PM 24    CORRESPONDENCE THAT YOU'VE SEEN THAT MR. BALWANI WAS NOT

12:07PM 25    HESITANT ABOUT THROWING HIS WEIGHT AROUND AT THE COMPANY.  HE

12:07PM  1    DIDN'T MINCE WORDS.  HE WAS VERY, I THINK, DIRECT WOULD BE A

12:07PM  2    CHARITABLE WAY TO PUT IT.  SO PEOPLE KNEW WHAT HIS WORDS WERE,

12:07PM  3    AND HE CERTAINLY DID NOT HOLD BACK IN USING HIS AUTHORITY ABOUT

12:07PM  4    WHAT WAS GOING TO HAPPEN AT THE COMPANY THAT HE WAS RUNNING.

12:07PM  5         NOWHERE WAS THIS MORE EVIDENT THAN IN THE LAB.  THE CLIA

12:07PM  6    LAB WAS THE CENTER OF THERANOS IN MANY WAYS.  IT WAS THE PLACE

12:07PM  7    WHERE PATIENT SAMPLES WERE ACTUALLY TESTED.  SO THE SERVICE

12:07PM  8    THAT THE COMPANY WAS OFFERING TO THE PUBLIC OF BLOOD TESTING

12:07PM  9    FOR CLINICAL USE, THIS ALL HAPPENED WITHIN THE CLIA LAB.

12:07PM 10         AND HERE YOU SEE THE ORG CHART FOR THAT PART OF THE

12:07PM 11    COMPANY WITH MR. BALWANI SITTING ON TOP OF EVERYONE WHO WORKED

12:07PM 12    IN THE LAB AND THE ONLY PERSON ABOVE HIM BEING MS. HOLMES.

12:08PM 13         ONE INTERESTING THING JUST TO REMIND YOU, MR. BALWANI WAS

12:08PM 14    ALSO LISTED AS A CLINICAL LAB ASSISTANT.  AND YOU CAN SEE THAT

12:08PM 15    WITH HIS MBA THAT HE REALLY STANDS OUT IN THAT LIST.

12:08PM 16         SO NOT ONLY WAS MR. BALWANI VERY INVOLVED IN THE LAB, BUT

12:08PM 17    HE WAS KIND OF SANDWICHING BOTH ENDS OF THE LAB IN TERMS OF THE

12:08PM 18    ORG CHART.

12:08PM 19         AND THE EVIDENCE SHOWED THAT THIS WASN'T JUST A POSITION

12:08PM 20    ON PAPER.  MR. BALWANI WAS VERY INVOLVED IN THE DAY-TO-DAY

12:08PM 21    RUNNING OF THE LAB.  WHEN ISSUES CAME UP, MR. BALWANI WAS TOLD.

12:08PM 22    HE MADE DECISIONS ABOUT HOW TO RESPOND TO ISSUES THAT CAME UP

12:08PM 23    IN THE LAB.

12:08PM 24         SO WHEN YOU -- KEEP IN MIND THAT THE LAB WAS REALLY GROUND

12:08PM 25    ZERO FOR ALL OF THE PROBLEMS THAT THERANOS HAD WITH TESTING

12:08PM  1    ACCURACY AND RELIABILITY.  THAT TELLS YOU THAT MR. BALWANI

12:08PM  2    WOULD HAVE BEEN AWARE OF THOSE PROBLEMS.  AND YOU SEE THE

12:08PM  3    DIRECT EVIDENCE THAT HE WAS AWARE OF THOSE PROBLEMS.  YOU DON'T

12:08PM  4    NEED TO INFER OR GUESS THAT.

12:09PM  5        NOT WAS MR. BALWANI IN A FRONT ROW SEAT FOR THOSE

12:09PM  6    PROBLEMS, BUT HE WAS ALSO IN THE DRIVER SEAT BECAUSE HE WAS THE

12:09PM  7    ONE WHO WAS RESPONSIBLE FOR THE OPERATIONS OF THE LAB.  AND YOU

12:09PM  8    SEE THAT EVEN BEYOND BEING RESPONSIBLE FOR THE BUSINESS

12:09PM  9    OPERATIONS, HE ALSO FREQUENTLY OVERRODE OR OVERRULED PEOPLE IN

12:09PM  10   THE LAB DIRECTOR POSITION WHO SHOULD HAVE BEEN MAKING DECISIONS

12:09PM  11   ABOUT WHETHER TESTS WERE APPROPRIATE FOR USE ON PATIENTS OR

12:09PM  12   NOT.

12:09PM  13       SO MR. BALWANI, VERY INVOLVED ON THE LAB SIDE OF THINGS,

12:09PM  14   VERY INVOLVED IN THE ASPECTS OF THE COMPANY THAT WERE FACING

12:09PM  15   PATIENTS, BUT HE WAS FAR FROM PASSIVE ON THE INVESTOR SIDE.

12:09PM  16       YOU HEARD TESTIMONY ABOUT MR. BALWANI AND MS. HOLMES

12:09PM  17   MAKING DECEPTIVE PITCHES TO INVESTORS TOGETHER, THEM BOTH BEING

12:10PM  18   IN THE ROOM WHILE INFORMATION WAS PRESENTED TO INVESTORS IN

12:10PM  19   ORDER TO GIVE THEM A FALSE IMPRESSION OF WHAT WAS HAPPENING AT

12:10PM  20   THE COMPANY.

12:10PM  21       YOU ALSO SAW THEIR TEXT MESSAGES AND WHERE THEY

12:10PM  22   COORDINATED ABOUT INCOMING INVESTMENTS.

12:10PM  23       SO MR. BALWANI WAS CERTAINLY NOT LEAVING THAT SIDE OF

12:10PM  24   THINGS TO MS. HOLMES, HE WAS AN ACTIVE PARTICIPANT IN THAT

12:10PM  25   SIDE, TOO.

12:10PM 1    AND THE BEST EXAMPLE, PERHAPS THE BEST ABOUT EXAMPLE OF

12:10PM 2  THIS THAT YOU HAVE SEEN IS IN A CONVERSATION THAT HE HAD WITH

12:10PM 3  AN INVESTOR NAMED PAT MENDENHALL.  AND THIS EMAIL WILL BE

12:10PM 4  FAMILIAR TO YOU.  THIS IS EXHIBIT 4059.  THIS IS A VERY

12:10PM 5  IMPORTANT EXHIBIT WHEN IT COMES TO SHOWING MR. BALWANI'S ACTIVE

12:10PM 6  PARTICIPATION, NOT JUST HIS SUPPORT FOR THE INVESTOR SIDE OF

12:10PM 7  THE FRAUD, BUT HIS ACTIVE PARTICIPATION, HELPING THAT SIDE OF

12:10PM 8  THINGS WHEN HE WAS AT THERANOS.

12:10PM 9    YOU'LL RECALL THAT IN DECEMBER 2013 THERANOS WAS PITCHING

12:10PM 10  TO A NUMBER OF DIFFERENT INVESTORS.  THEY NEEDED MONEY, THEY

12:11PM 11  WERE PERSUADING INDIVIDUALS TO WRITE CHECKS TO THE COMPANY SO

12:11PM 12  THAT THE COMPANY CAN CONTINUE OPERATIONS.

12:11PM 13    WHEN MR. MENDENHALL NEEDED INFORMATION, THE EVIDENCE SHOWS

12:11PM 14  THAT MS. HOLMES PUT HIM IN TOUCH WITH SUNNY BALWANI.  THAT'S

12:11PM 15  IMPORTANT.

12:11PM 16    AROUND THIS TIME YOU KNOW THAT MS. HOLMES WAS ESPECIALLY

12:11PM 17  ACTIVE IN DECEIVING MULTIPLE INVESTORS IN A VARIETY OF TOPICS,

12:11PM 18  AND MR. BALWANI WAS INVOLVED AS WELL AND HE WAS ASSISTING WITH

12:11PM 19  THAT.  THERE WERE SOME INVESTORS WHO MS. HOLMES SPOKE WITH ON

12:11PM 20  HER OWN.

12:11PM 21    WHEN MS. HOLMES PUT MR. MENDENHALL IN TOUCH WITH

12:11PM 22  MR. BALWANI, IT TELLS YOU SOMETHING IMPORTANT ABOUT THE NATURE

12:11PM 23  OF THEIR PARTNERSHIP AND HOW THEY WORKED TOGETHER HERE BECAUSE

12:11PM 24  THINK ABOUT WHAT WAS AT STAKE.  THE COMPANY WAS RAISING MONEY

12:11PM 25  FROM A SERIES OF VERY WEALTHY INDIVIDUALS, SO A LOT RODE ON

12:11PM  1     EACH ONE OF THESE CONVERSATIONS.

12:12PM  2         ANY ONE OF THESE CONVERSATIONS COULD HAVE RESULTED IN A

12:12PM  3     MULTIMILLION DOLLAR CHECK BEING WRITTEN TO THE COMPANY, PERHAPS

12:12PM  4     FOR TENS OF MILLIONS, PERHAPS FOR HUNDREDS OF MILLIONS OF

12:12PM  5     DOLLARS.

12:12PM  6         OR IF THE CONVERSATION DID NOT GO WELL, THAT COULD RESULT

12:12PM  7     IN ZERO MONEY COMING IN FOR THE COMPANY, IT COULD RESULT IN BAD

12:12PM  8     WORD OF MOUTH FOR THE COMPANY IN THE INVESTOR COMMUNITY,

12:12PM  9     BECAUSE THE DEFENDANTS WERE AWARE OF HOW THESE INVESTORS

12:12PM  10    COMMUNICATED WITH EACH OTHER AS WELL.

12:12PM  11        INFORMATION WAS SPREADING NOT JUST DIRECTLY FROM THE

12:12PM  12    DEFENDANTS BUT ALSO BETWEEN THE PEOPLE THAT THE DEFENDANTS WERE

12:12PM  13    TALKING TO.

12:12PM  14        SO WHEN MR. MENDENHALL WANTED TO ASK QUESTIONS ABOUT THE

12:12PM  15    COMPANY, WHAT DOES IT TELL YOU THAT MS. HOLMES PUT HIM IN TOUCH

12:12PM  16    WITH HER PARTNER, MR. BALWANI?

12:12PM  17        WELL, IT TELLS YOU JUST THAT, THAT THEY WERE PARTNERS ON

12:12PM  18    THIS SIDE OF THINGS BECAUSE YOU KNOW THAT IF INVESTORS HAD BEEN

12:12PM  19    TOLD THE TRUTH ABOUT THERANOS, IF INVESTORS WERE TOLD ABOUT THE

12:12PM  20    LIMITATIONS OF THE TECHNOLOGY, ABOUT THE ACCURACY PROBLEMS,

12:13PM  21    ABOUT WHAT THE EDISON COULDN'T DO, ABOUT THE COMPANY'S RELIANCE

12:13PM  22    ON THIRD PARTY DEVICES INSTEAD OF ITS OWN, IF INVESTORS KNEW

12:13PM  23    ALL OF THAT, I THINK IT'S FAIR FOR YOU TO INFER THAT THEY WOULD

12:13PM  24    HAVE BEEN FAR LESS INTERESTED IN INVESTING.  THAT MEANS THAT

12:13PM  25    MILLIONS OF DOLLARS, MILLIONS AND MILLIONS OF DOLLARS RODE ON

12:13PM 1   INVESTORS RECEIVING THE SAME MESSAGE, THE SAME FRAUDULENT

12:13PM 2   MESSAGE FROM WHOEVER WAS PITCHING THEM FROM THERANOS.

12:13PM 3       SO BY ASSIGNING MR. BALWANI TO SPEAK TO MR. MENDENHALL,

12:13PM 4   MS. HOLMES WAS CONFIRMING THAT SHE HAD CONFIDENCE IN

12:13PM 5   MR. BALWANI TO DELIVER THOSE SAME FALSE STATEMENTS, THOSE SAME

12:13PM 6   MISLEADING REPRESENTATIONS THAT SHE HAD BEEN DELIVERING TO

12:13PM 7   INVESTORS.

12:13PM 8       IF SHE HADN'T BEEN CONFIDENT OF THAT, SHE WOULD HAVE

12:13PM 9   NEEDED TO HANDLE THIS CONVERSATION HERSELF, BECAUSE, AGAIN,

12:13PM 10  MILLIONS OF DOLLARS DEPENDED ON THIS INVESTOR HEARING THOSE

12:13PM 11  SAME LIES.

12:13PM 12      SURE ENOUGH, MR. BALWANI CAME THROUGH.  AND THIS EMAIL

12:14PM 13  MEMORIALIZES THE STATEMENTS, THE CLAIMS THAT MR. MENDENHALL

12:14PM 14  HEARD FROM MR. BALWANI.

12:14PM 15      AND YOU SEE HERE THOSE CLAIMS INCLUDE THINGS LIKE THE

12:14PM 16  SCIENCE BEHIND THERANOS BEING COMPLETE; NO NEW SCIENCE NEEDED;

12:14PM 17  NO NEW INVENTION NEEDED.

12:14PM 18      IT GOES ON TO CLAIM -- OR MR. BALWANI WENT ON TO CLAIM

12:14PM 19  THAT THERANOS IS COMPLETELY VERTICALLY INTEGRATED, THEY OWN THE

12:14PM 20  LAB AND THE MANUFACTURING; 100 PERCENT MANUFACTURING IN THE

12:14PM 21  U.S.A., NO SUBCONTRACTING; IT SAYS FULLY OWNED AND PROTECTED

12:14PM 22  MANUFACTURING ASSURES PRICING AND PROFIT STABILITY.

12:14PM 23      THOSE POINTS, 6, 7, AND 8, BY THE WAY, I DON'T BELIEVE

12:14PM 24  THAT MR. COOPERSMITH ADDRESSED DURING HIS CLOSING.

12:14PM 25      DURING HIS CLOSING HE DID REVIEW THIS EMAIL WITH YOU, AND

12:14PM   1    HE PURPORTED TO EXPLAIN SOME OF THESE TO YOU.  YOU HEARD FROM

12:14PM   2    THE WITNESS HIMSELF, MR. MENDENHALL, ABOUT THIS DOCUMENT, AND

12:14PM   3    THE CONVERSATION THAT LED TO IT.

12:14PM   4        AGAIN, I WOULD JUST REMIND YOU THAT WHAT IS EVIDENCE IS

12:15PM   5    THE SWORN TESTIMONY OF THE WITNESSES TESTIFYING ABOUT THEIR

12:15PM   6    FIRST HAND KNOWLEDGE.  WHAT OTHER LAWYERS SAY OR WHAT ANY

12:15PM   7    LAWYER SAYS IN THIS CASE IS NOT EVIDENCE, SO PLEASE MAKE SURE

12:15PM   8    YOU'RE RELYING ON THE RIGHT SOURCES TO HELP YOU UNDERSTAND THIS

12:15PM   9    CONVERSATION.

12:15PM  10        WHEN IT COMES TO THOSE POINTS ABOUT THERANOS'S

12:15PM  11    MANUFACTURING, YOU KNOW THAT THE COMPANY WAS NOT MANUFACTURING

12:15PM  12    ALL OF ITS OWN DEVICES, THAT ITS OPERATIONS WERE NOT INTEGRATED

12:15PM  13    IN THAT WAY BECAUSE IT WAS, IN FACT, DEPENDENT UPON ITS ABILITY

12:15PM  14    TO GET ANALYZERS AND EQUIPMENT FROM OTHER COMPANIES IN ORDER TO

12:15PM  15    RUN THE MAJORITY OF ITS TESTS.  SO THESE CLAIMS THAT

12:15PM  16    MR. BALWANI MADE ARE NOT TRUE.

12:15PM  17        YOU CAN UNDERSTAND WHY THEY WOULD BE MADE.  IT'S MORE

12:15PM  18    IMPRESSIVE IF A COMPANY IS INTEGRATED IN THIS WAY, IT MAKES

12:15PM  19    THEM MORE SELF-SUFFICIENT, AND IT INCREASES THE VIEW OF THEIR

12:15PM  20    TECHNOLOGY BEING SOMETHING NOVEL AND IMPRESSIVE.

12:15PM  21        BUT WE KNOW THAT IS NOT TRUE, WHAT MR. BALWANI SAID.

12:15PM  22        ITEM 12 ON THAT LIST TALKS ABOUT CURRENT CLINICAL TRIALS

12:16PM  23    TAKING 6 VIALS OF BLOOD AND BEING ABLE TO RUN 10 TO 12 TESTS.

12:16PM  24    IT SAYS THERANOS TAKES 3 DROPS AND CAN RUN 60 TO 70 TESTS.

12:16PM  25        MR. COOPERSMITH SUGGESTED TO YOU THAT THAT WAS A TRUE

REBUTTAL ARGUMENT BY MR. BOSTIC

12:16PM 1    STATEMENT, TALKING ABOUT THE TOTAL NUMBER OF FINGERSTICK TESTS

12:16PM 2    THAT THERANOS COULD DO.  THAT'S NOT WHAT THIS SAYS, THOUGH.

12:16PM 3    THIS IS TALKING ABOUT THE NUMBER OF TESTS THAT CAN BE PERFORMED

12:16PM 4    ON A SINGLE PATIENT SAMPLE, AND THAT'S CLEAR BASED ON THE FIRST

12:16PM 5    PART OF THAT BULLET.  YOU SEE THE FIRST PART IS ABOUT CURRENT

12:16PM 6    CLINICAL TRIALS BEING ABLE TO RUN 10 TO 12 TESTS ON 6 VIALS OF

12:16PM 7    BLOOD.  OBVIOUSLY CLINICAL TRIALS HAD THE ABILITY TO RUN MORE

12:16PM 8    THAN 10 TO 12 TESTS TOTALLY.  EXISTING TECHNOLOGY COULD RUN

12:16PM 9    HUNDREDS OF TESTS AS YOU KNOW.

12:16PM 10   SO DOING AN APPLES-TO-APPLES COMPARISON HERE, WHAT THIS IS

12:16PM 11   A CLAIM ABOUT IS THAT THERANOS CAN RUN 60 TO 70 TESTS ON A

12:16PM 12   SINGLE SAMPLE OF BLOOD.

12:17PM 13   YOU CAN UNDERSTAND THE REASON WHY MR. BALWANI WOULD WANT

12:17PM 14   AN INVESTOR TO BELIEVE THAT.

12:17PM 15   MORE MISREPRESENTATIONS WHEN IT COMES TO THE FINANCIAL

12:17PM 16   STATUS OF THE COMPANY.  THAT CLAIM THAT THE COMPANY COULD FUND

12:17PM 17   GROWTH THROUGH CURRENT OPERATIONS AND THEY HAD NO NEED FOR

12:17PM 18   CAPITAL.  YOU KNOW THAT'S NOT CORRECT FROM SEEING THE FINANCIAL

12:17PM 19   RECORDS.  YOU KNOW THAT THE COMPANY WAS GETTING MINIMAL REVENUE

12:17PM 20   AT THAT POINT, AND THAT IT WAS DEPENDENT ON INVESTORS FOR ITS

12:17PM 21   CONTINUED OPERATIONS.

12:17PM 22   YOU'LL RECALL THAT THIS EMAIL WAS ALSO FORWARDED TO

12:17PM 23   MR. EISENMAN WHO WAS AN INDICTED COUNT, SO PLEASE KEEP THAT IN

12:17PM 24   MIND WHEN YOU CONSIDER OR DELIBERATE ON THAT COUNT, THAT THIS

12:17PM 25   INFORMATION FROM MR. BALWANI DID FIND ITS WAY TO MR. EISENMAN

12:17PM   1    WHO WAS ABLE TO RELY ON IT IN MAKING HIS DECISION.

12:17PM   2        ALSO REMEMBER MR. BALWANI'S ROLE IN SPEAKING WITH

12:18PM   3    MR. EISENMAN ABOUT A 2014 REPORT THAT MR. EISENMAN SAW THAT HAD

12:18PM   4    SOME NEGATIVE INFORMATION ABOUT THERANOS, LIKE THE FACT THAT

12:18PM   5    THE LAB NEEDED TO TRANSPORT SAMPLES IN ORDER TO TEST THEM, AND

12:18PM   6    THE FACT THAT THE ANALYST WHO WROTE THAT REPORT WAS DOUBTFUL OR

12:18PM   7    SKEPTICAL THAT ALL OF THE TESTS COULD BE DONE ON THE SAME

12:18PM   8    DEVICE.

12:18PM   9        WHEN MR. EISENMAN ASKED MR. BALWANI ABOUT THAT, THE

12:18PM  10    RESPONSE HE GOT BACK FROM MR. BALWANI WAS SOUNDS LIKE AN

12:18PM  11    UNINFORMED CONSULTANT TO US.  THAT WAS DENYING THE TRUTH OF THE

12:18PM  12    STATEMENTS IN THAT ANALYST REPORT.  IN FACT, YOU KNOW THAT

12:18PM  13    THOSE STATEMENTS WERE TRUE.  AND THAT'S EXHIBIT 2057 IF YOU

12:18PM  14    WOULD LIKE TO LOOK AT IT LATER.  THAT WAS AN IMPORTANT CHANCE

12:18PM  15    FOR MR. BALWANI TO COME CLEAN AND BE HONEST ABOUT WHAT WAS

12:18PM  16    REALLY HAPPENING AT THERANOS.  AND INSTEAD, HE DOUBLED DOWN AND

12:18PM  17    DENIED A TRUE REPORT TO SOMEONE WHO HAD PREVIOUSLY TRUSTED

12:19PM  18    THERANOS WITH HIS INVESTMENT MONEY.

12:19PM  19        SO WE'VE TALKED ABOUT HOW MR. BALWANI WAS INFLUENTIAL AT

12:19PM  20    THERANOS.  HE WAS INFLUENTIAL OVER MS. HOLMES AS WELL.

12:19PM  21        WHAT KIND OF INFLUENCE WAS HE ON MS. HOLMES?  LET'S LOOK

12:19PM  22    AT AN EXAMPLE OF THAT.  THIS IS FROM OCTOBER OF 2015.  AND

12:19PM  23    YOU'LL RECALL THAT AROUND MID-2015 AN ARTICLE CAME OUT IN "THE

12:19PM  24    WALL STREET JOURNAL" THAT WAS VERY NEGATIVE ABOUT THERANOS, AND

12:19PM  25    THERE WERE A LOT OF RIPPLE EFFECTS THAT HAPPENED AFTER THAT.

12:19PM 1    AND YOU SEE HERE A TEXT CHAIN BETWEEN MR. BALWANI AND

12:19PM 2    MS. HOLMES IN THE AFTERMATH OF THAT.

12:19PM 3        MR. BALWANI TALKS ABOUT WAG OR WALGREENS FREAKING OUT.

12:19PM 4    LACK OF TRANSPARENCY.

12:19PM 5        APPARENTLY WALGREENS WAS WONDERING WHY THEY FOUND ALL OF

12:19PM 6    THIS OUT THROUGH MEDIA AND NOT THROUGH US.

12:19PM 7        AND THEN YOU SEE THERE WAS A CALL WITH NIM, REFERENCING

12:20PM 8    NIMESH JHAVERI.

12:20PM 9        MR. BALWANI WRITES, "I TOLD THEM WE WERE SURPRISED BY THE

12:20PM 10   ARTICLE AS MUCH AS THEY R."

12:20PM 11       DO YOU SEE THAT IN THE ABOUT THE MIDDLE OF THE PAGE AT

12:20PM 12   7:29?

12:20PM 13       FIRST OF ALL, YOU KNOW THAT THAT WAS A LIE.  WHEN

12:20PM 14   MR. BALWANI TOLD WALGREENS THAT THERANOS WAS AS SURPRISED BY

12:20PM 15   THE ARTICLE AS WALGREENS WAS, YOU KNEW FROM THIS VERY EXHIBIT

12:20PM 16   THAT THERANOS KNEW THIS NEGATIVE ARTICLE WAS COMING.  YOU KNOW

12:20PM 17   THAT FOR A LONG PERIOD OF TIME BEFORE THE ARTICLE CAME OUT,

12:20PM 18   MR. BALWANI ESPECIALLY WAS INTENT ON TRYING TO FIGURE OUT WHAT

12:20PM 19   THE SOURCES WERE FOR THE ARTICLE AND IDENTIFY THOSE PEOPLE

12:20PM 20   WITHIN OR OUTSIDE OF THERANOS.

12:20PM 21       SO WHEN HE TOLD WALGREENS THAT THIS WAS A SURPRISE TO

12:20PM 22   THERANOS, THAT WAS NOT TRUE.

12:20PM 23       LOOK WHAT COMES AFTER THAT, THOUGH.

12:20PM 24       MS. HOLMES SUGGESTS A WAY TO RESPOND TO WALGREENS.  SHE

12:20PM 25   SAYS, "LET'S SHOW THEM THAT THIS LITERALLY IS STILL UP IN AIR

12:20PM  1    SO WE LITERALLY JUST DECIDED SINCE THE DISCUSSION IS GETTING

12:21PM  2    AIRED OUT IN PRESS."

12:21PM  3        MR. BALWANI SAYS, "HOWEVER ISSUE IS WE DIDN'T TELL THEM IN

12:21PM  4    ADVANCE ABOUT SWITCHING."  AND THIS IS TALKING ABOUT SWITCHING

12:21PM  5    USE AWAY FROM THE THERANOS NANOTAINER.

12:21PM  6        MS. HOLMES SAYS, "WE'LL HAVE TO PRESENT WELL THAT WE

12:21PM  7    HADN'T DECIDED TO."

12:21PM  8        MR. BALWANI SAYS, "BAD IDEA.  AT THIS POINT THEY KNOW.  SO

12:21PM  9    NEED TO BE TRANSPARENT."

12:21PM 10        THINK ABOUT THAT.  THINK ABOUT THE REASON WHY MR. BALWANI

12:21PM 11    IN THIS CASE IS ADVISING MS. HOLMES TO BE TRANSPARENT.  HE

12:21PM 12    SAYS, "AT THIS POINT THEY KNOW."

12:21PM 13        SO HE'S NOT SAYING BEING TRUTHFUL IS THE RIGHT THING TO

12:21PM 14    DO, SO THAT'S WHY WE SHOULD DO IT.  HE'S NOT SAYING WE HAVE A

12:21PM 15    LEGAL OBLIGATION TO DEAL FAIRLY WITH OUR BUSINESS PARTNERS,

12:21PM 16    HE'S NOT SAYING THAT.

12:21PM 17        INSTEAD, HE'S ADVISING HIS PARTNER NOT TO BE UNTRUTHFUL IN

12:22PM 18    THIS CASE BECAUSE THEY WON'T GET AWAY WITH IT, BECAUSE AT THIS

12:22PM 19    POINT THE PARTY THAT THEY'RE GOING TO BE TALKING TO ALREADY

12:22PM 20    KNOWS THE TRUTH.  THAT'S WHY THERE'S A NEED TO BE TRANSPARENT.

12:22PM 21        THIS ISN'T HONESTY, THIS IS STRATEGY.

12:22PM 22        NOW, THE DEFENSE CONSIDERS ALL OF THE TEXT MESSAGES IN

12:22PM 23    EVIDENCE IN THIS CASE AND SUGGESTS TO YOU THAT BECAUSE THESE

12:22PM 24    WERE PRIVATE TEXT MESSAGES BETWEEN THESE TWO INDIVIDUALS, THERE

12:22PM 25    SHOULD BE MORE OF A SMOKING GUN, THERE SHOULD BE SOMETHING MORE

12:22PM  1    EXPLICIT WHERE THEY'RE AGREEING TO COMMIT FRAUD OR ENTER INTO

12:22PM  2    THIS VENTURE TOGETHER.

12:22PM  3        I'D LIKE TO SHOW YOU ONE OF THE COURT'S INSTRUCTIONS THAT

12:22PM  4    ADDRESSES THAT ISSUE.

12:22PM  5        THESE ARE THE INSTRUCTIONS FOR THE CONSPIRACY OFFENSE FOR

12:22PM  6    WHICH MR. BALWANI IS CHARGED.  AND NOTE THAT ABOUT HALF WAY

12:22PM  7    DOWN THAT PAGE THERE'S SOME LANGUAGE THAT SAYS, "FOR A

12:23PM  8    CONSPIRACY TO HAVE EXISTED, IT IS NOT NECESSARY THAT THE

12:23PM  9    CONSPIRATORS MAKE A FORMAL AGREEMENT OR THAT THEY AGREED ON

12:23PM  10   EVERY DETAIL OF THE CONSPIRACY."

12:23PM  11       AND AT THE BOTTOM IT SAYS, "ONE BECOMES A MEMBER OF A

12:23PM  12   CONSPIRACY BY WILLFULLY PARTICIPATING IN THE UNLAWFUL PLAN WITH

12:23PM  13   THE INTENT TO ADVANCE OR FURTHER SOME OBJECT OR PURPOSE OF THE

12:23PM  14   CONSPIRACY."

12:23PM  15       SO IT IS NOT REQUIRED IN ORDER FOR YOU TO FIND MR. BALWANI

12:23PM  16   GUILTY THAT THERE BE FORMAL LANGUAGE OR EVEN INFORMAL LANGUAGE

12:23PM  17   BETWEEN THE TWO COCONSPIRATORS AGREEING TO COMMIT THIS CRIME.

12:23PM  18       INSTEAD, YOU KNOW THIS CONSPIRACY EXISTED BY THE ACTIONS

12:23PM  19   TAKEN BY THE DEFENDANTS.  IT IS THE ACTIONS IN FURTHERANCE OF

12:23PM  20   THE CONSPIRACY THAT PROVE ITS EXISTENCE.

12:23PM  21       AND HERE YOU DID SEE THAT THERE WERE SOME AREAS OF THE

12:23PM  22   COMPANY AND SOME AREAS OF THE FRAUD WHERE ONE MIGHT HAVE BEEN

12:23PM  23   MORE ACTIVE THAN THE OTHER.  MS. HOLMES PROBABLY HAD MORE

12:23PM  24   CONVERSATIONS WITH INVESTORS.  MR. BALWANI WAS MORE INVOLVED ON

12:23PM  25   THE LABORATORY SIDE.

12:24PM   1        BUT THE FACT THAT THEY DIVVIED UP RESPONSIBILITIES THAT

12:24PM   2   WAY IN THE OPERATION OF THE COMPANY AND IN THE FURTHERANCE OF

12:24PM   3   THESE FRAUDULENT SCHEMES, THAT DOESN'T PREVENT YOU FROM

12:24PM   4   CONVICTING ON THE CONSPIRACY COUNTS.  IN FACT, IT PROVES THE

12:24PM   5   WAY THAT THEY COORDINATED TO ACCOMPLISH THESE ILLEGAL AIMS.

12:24PM   6        TO THE EXTENT THAT YOU BELIEVE THAT THERE WERE SOME

12:24PM   7   ASPECTS OF THE CRIMES HERE THAT MS. HOLMES COMMITTED WITHOUT

12:24PM   8   MR. BALWANI'S DIRECT PARTICIPATION, I WANT YOU TO KEEP IN MIND

12:24PM   9   THREE OF THE INSTRUCTIONS THAT I EXPECT YOU'LL RECEIVE FROM THE

12:24PM  10   COURT.  AND ALL THREE OF THESE RELATE TO WAYS IN WHICH

12:24PM  11   MR. BALWANI IS -- CANNOT ESCAPE RESPONSIBILITY FOR THINGS THAT

12:24PM  12   HIS PARTNER DID.

12:24PM  13        SO, FOR EXAMPLE, IN JURY INSTRUCTION 19 YOU HEAR THAT EACH

12:25PM  14   MEMBER OF A CONSPIRACY IS RESPONSIBLE FOR THE FORESEEABLE

12:25PM  15   ACTIONS OF THE OTHER CONSPIRATORS PERFORMED DURING THE COURSE

12:25PM  16   AND IN FURTHERANCE OF THE CONSPIRACY.  IF ONE MEMBER OF A

12:25PM  17   CONSPIRACY COMMIT A CRIME IN FURTHERANCE OF A CONSPIRACY, THE

12:25PM  18   OTHER MEMBERS HAVE ALSO, UNDER THE LAW, COMMITTED THAT CRIME.

12:25PM  19        AND I WANT YOU TO REVIEW THESE INSTRUCTIONS IN FULL IF

12:25PM  20   THEY BECOME RELEVANT TO YOUR DELIBERATIONS, BUT FOR RIGHT NOW

12:25PM  21   I'LL JUST HIGHLIGHT SOME OF THE KEY LANGUAGE.

12:25PM  22        UNDER AIDING AND ABETTING, NOTE THAT MR. BALWANI MAY BE

12:25PM  23   FOUND GUILTY OF WIRE FRAUD IT AS CHARGES IN COUNTS THREE

12:25PM  24   THROUGH TWELVE EVEN IF HE PERSONALLY DID NOT COMMIT THE ACT OR

12:25PM  25   ACTS CONSTITUTED IN THE CRIME BUT AIDED AND ABETTED IN ITS

12:25PM  1    COMMISSION.  IN OTHER WORDS, IF HE INTENTIONALLY HELPED SOMEONE

12:25PM  2    LIKE MS. HOLMES TO COMMIT A CRIME.  AND THERE ARE ELEMENTS

12:25PM  3    PROVIDED FOR THAT.

12:25PM  4         ANOTHER INSTRUCTION WILL TELL YOU THAT IF YOU FIND THAT

12:25PM  5    MR. BALWANI WAS A MEMBER OF A SCHEME TO DEFRAUD INVESTORS AND

12:26PM  6    THAT HE HAD THE INTENT TO DEFRAUD INVESTORS, HE MAY BE

12:26PM  7    RESPONSIBLE FOR OTHER CO-SCHEMERS' ACTIONS, FOR EXAMPLE,

12:26PM  8    MS. HOLMES'S ACTIONS, DURING THE COURSE OF AND IN FURTHERANCE

12:26PM  9    OF THE ALLEGED SCHEME, EVEN IF MR. BALWANI DID NOT KNOW WHAT

12:26PM  10   THEY SAID OR DID.

12:26PM  11        AND A SIMILAR INSTRUCTION EXISTS ON THE PATIENT SIDE OF

12:26PM  12   THINGS.  SO PLEASE KEEP THOSE IN MIND.  THAT'S 19, 24, AND 25.

12:26PM  13        I'D LIKE TO SWITCH GEARS AND TALK ABOUT SOMETHING THAT THE

12:26PM  14   DEFENSE HAS EMPHASIZED A LOT DURING THE TRIAL, AND THAT IS THE

12:26PM  15   FACT THAT THERE IS NO EVIDENCE BEFORE YOU RELATING TO THE

12:26PM  16   CONTENT OF THE THERANOS LIS DATABASE OR AT LEAST THAT CONTENT

12:26PM  17   ITSELF IS NOT IN EVIDENCE.

12:26PM  18        THE DEFENSE WANTS THIS TO BE IMPORTANT TO YOU.  AND THIS

12:26PM  19   IS CONSISTENT WITH A PATTERN IN THE DEFENSE'S ARGUMENT THAT

12:26PM  20   THEIR FAVORITE EVIDENCE, WHETHER IT'S THEIR FAVORITE DOCUMENT

12:26PM  21   OR RECORDING IS THE DOCUMENT THAT IS NOT PRESENT, THEIR

12:27PM  22   FAVORITE WITNESS, THE WITNESS THAT THEY SAY IS THE MOST

12:27PM  23   IMPORTANT TO YOUR CONSIDERATION IN THE CASE IS THE WITNESS WHO

12:27PM  24   DID NOT TESTIFY.

12:27PM  25        WHEN TESTIMONY OR EVIDENCE IS NOT AVAILABLE TO YOU, THE

12:27PM  1    DEFENSE IS ABLE TO INVITE YOU TO SPECULATE ABOUT WHAT IT MIGHT

12:27PM  2    SAY.  IT'S IMPORTANT TO THE PROCESS AND TO YOUR DELIBERATIONS

12:27PM  3    THAT YOU FOCUS ON WHAT ACTUALLY IS IN EVIDENCE AND NOT

12:27PM  4    SPECULATE ABOUT THINGS THAT ARE NOT BEFORE YOU.  THAT'S

12:27PM  5    ESPECIALLY TRUE WHEN IT COMES TO WITNESSES WHO DID NOT TESTIFY.

12:27PM  6    THROUGHOUT THE DEFENSE'S CLOSING THEY TALKED ABOUT WITNESSES

12:27PM  7    FROM WHOM YOU DIDN'T HEAR AND THEY LISTED MANY, MANY OF THOSE

12:27PM  8    INDIVIDUALS, WHILE AT THE SAME TIME TALKED ABOUT HOW LONG THIS

12:27PM  9    TRIAL HAD BEEN.

12:27PM 10        IMAGINE HOW LONG THE TRIAL WOULD HAVE BEEN HAD THE

12:27PM 11    GOVERNMENT CALLED AS A WITNESS EVERY PERSON THE DEFENSE

12:27PM 12    MENTIONED IN ITS CLOSING ARGUMENT.

12:28PM 13        THERE'S A RELEVANT INSTRUCTION ON THIS ISSUE AS WELL

12:28PM 14    RELATING TO WHAT REASONABLE DOUBT MEANS.  NOTE HERE THE SECOND

12:28PM 15    SENTENCE OF THIS INSTRUCTION TELLS YOU THAT IT IS NOT REQUIRED

12:28PM 16    THAT THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

12:28PM 17        KEEP IN MIND THE GOVERNMENT IS REQUIRED TO PROVIDE

12:28PM 18    SUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION.  THE GOVERNMENT

12:28PM 19    IS NOT REQUIRED TO PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

12:28PM 20        WHEN IT COMES TO THE LIS SPECIFICALLY, THE SUGGESTION IS

12:28PM 21    THAT IT'S IMPORTANT AND IT'S THE GOVERNMENT'S FAULT THAT WE

12:28PM 22    DON'T HAVE ACCESS TO THE LIS DATABASE.

12:28PM 23        THE EVIDENCE SUGGESTS OTHERWISE.

12:28PM 24        FIRST, YOU SAW EVIDENCE THAT THE GOVERNMENT TRIED TO

12:28PM 25    OBTAIN THE LIS FOR MONTHS.  THIS IS A SUBPOENA FROM APRIL OF

12:28PM 1   2018 SENT TO THERANOS.  THIS IS EXHIBIT 5916.  AND THIS

12:28PM 2   REQUESTS ALL OF THE LABORATORY REPORTS FROM THAT DATABASE, SO

12:29PM 3   YOU KNOW THE GOVERNMENT WAS REQUESTING THIS INFORMATION FROM

12:29PM 4   THERANOS, THE COMPANY.

12:29PM 5        YOU ALSO KNOW THAT IN LATE AUGUST OF 2018, AROUND THE TIME

12:29PM 6   THAT THE GOVERNMENT RECEIVED FROM THERANOS WHAT IT WAS TOLD WAS

12:29PM 7   A COPY OF THAT DATABASE, THE COMPANY WAS PLANNING TO PUT THE

12:29PM 8   SYSTEM INTO STORAGE AROUND THAT SAME TIME, AND THE COMPANY KNEW

12:29PM 9   THAT THE DATABASE MAY THEREAFTER BE VERY DIFFICULT TO

12:29PM 10  RESUSCITATE.

12:29PM 11       SO NO EVIDENCE THAT THE GOVERNMENT KNEW THAT WAS

12:29PM 12  HAPPENING, BUT IT IS ESTABLISHED THAT THE COMPANY ITSELF KNEW

12:29PM 13  THAT THAT WAS HAPPENING.

12:29PM 14       YOU ALSO KNOW THAT THE GOVERNMENT MADE CONTINUED EFFORTS

12:29PM 15  AFTER IT RECEIVED ITS COPY OF THE LIS THAT WAS INACCESSIBLE, TO

12:29PM 16  SALVAGE THAT INFORMATION OR OBTAIN A WORKING COPY.

12:29PM 17       HERE YOU SEE FROM MARCH OF 2019, SO MONTHS LATER, THIS

12:29PM 18  CONVERSATION IS STILL ONGOING WITH THE ASSIGNEE WHO HAS

12:29PM 19  INHERITED ALL OF THE ASSETS FROM THERANOS AFTER IT WENT OUT OF

12:30PM 20  BUSINESS.

12:30PM 21       AND HERE YOU HAVE THE GOVERNMENT BEING TOLD BY THE

12:30PM 22  ASSIGNEE THAT THE ASSIGNEE DOESN'T KNOW WHO DECOMMISSIONED THE

12:30PM 23  LIS.

12:30PM 24       YOU HAVE THE GOVERNMENT BEING TOLD THAT THE LIS DATABASE

12:30PM 25  WAS NOT INCLUDED IN THE MIGRATION OF THE CORPORATE SERVER

12:30PM   1    EQUIPMENT OUT OF THE THERANOS FACILITY.

12:30PM   2         AGAIN, YOU HAVE THE GOVERNMENT BEING TOLD THAT THERANOS IS

12:30PM   3    UNDERSTANDING, THERANOS ITSELF, ITS UNDERSTANDING THAT THE

12:30PM   4    DATABASE COULD NO LONGER BE RECONSTRUCTED WITH THE EXISTING

12:30PM   5    RESOURCES.

12:30PM   6         THAT BRINGS US TO THE TESTIMONY OF RICHARD SONNIER WHO WAS

12:30PM   7    AN EXPERT IN SQL DATABASES BUT NOT THIS PARTICULAR DATABASE.

12:30PM   8         YOU'LL RECALL THAT HE DIDN'T HAVE ANY FIRST HAND KNOWLEDGE

12:30PM   9    OR EXPERIENCE WITH THE ACTUAL THERANOS LIS.  HE'S TESTIFYING

12:30PM  10    ABOUT THE MICROSOFT PRODUCT IN GENERAL.

12:30PM  11         YOU ALSO HEARD THAT THIS WAS A BESPOKE DATABASE.

12:30PM  12         YOU HEARD DURING CROSS THAT MR. SONNIER, IN WORKING FOR

12:31PM  13    THE DEFENSE FOR WHICH HE WAS COMPENSATED, REACHED AN OPINION

12:31PM  14    THAT THE THERANOS LIS COULD HAVE BEEN RESTORED IF THE

12:31PM  15    GOVERNMENT HAD OBTAINED THE ORIGINAL HARDWARE THAT THE DATABASE

12:31PM  16    WAS RUN ON.

12:31PM  17         AGAIN, DESPITE THE FACT THAT MR. SONNIER HAD NEVER

12:31PM  18    ACTUALLY TOUCHED THIS DATABASE, AND DESPITE THE FACT THAT IN

12:31PM  19    REACHING THAT OPINION HE IGNORED CONTRARY INFORMATION THAT HE

12:31PM  20    WAS AWARE FROM PEOPLE WHO ACTUALLY HAD WORKED AT THE COMPANY

12:31PM  21    AND HAD HANDLED THAT DATABASE.

12:31PM  22         BY THE WAY, YOU RECALL THAT HE ALSO CLAIMED DURING HIS

12:31PM  23    TESTIMONY THAT BESIDES RESTORING THE DATABASE FROM THE ORIGINAL

12:31PM  24    HARDWARE, IT ALSO WOULD HAVE WORKED IF THE GOVERNMENT HAD HIRED

12:31PM  25    A VENDOR.

12:31PM 1    THAT TESTIMONY DOESN'T MAKE ANY SENSE GIVEN THAT

12:31PM 2  MR. SONNIER HIMSELF, A VENDOR HIRED BY THE DEFENSE, HAD ACCESS

12:31PM 3  TO A COPY OF THE LIS DATABASE AND WAS UNABLE TO ACCESS THE

12:32PM 4  DATABASE JUST LIKE THE GOVERNMENT WAS.

12:32PM 5    SO THERE ARE REASONS TO DISBELIEVE MR. SONNIER'S TESTIMONY

12:32PM 6  AND CERTAINLY REASONS TO QUESTION WHETHER IT'S RELEVANT IN THIS

12:32PM 7  CASE.

12:32PM 8    IT'S HELPFUL TO THE DEFENSE HERE TO ARGUE THAT THE LIS

12:32PM 9  WOULD BE PIVOTAL IN DETERMINING WHETHER THERE WERE ACCURACY OR

12:32PM 10  RELIABILITY PROBLEMS AT THERANOS, BUT THE TRUTH IS THAT IT MAY

12:32PM 11  NOT HAVE MADE A DIFFERENCE.

12:32PM 12    YOU HEARD TESTIMONY FROM DR. ROSENDORFF ABOUT HOW HE AS

12:32PM 13  LAB DIRECTOR AND A PATHOLOGIST EVALUATES TEST ACCURACY.  SO IF

12:32PM 14  HE'S PRESENTED WITH A TEST RESULT AND HE'S TRYING TO FIGURE OUT

12:32PM 15  WHETHER IT'S ACCURATE OR NOT, HE DOES THINGS LIKE LOOK INTO THE

12:32PM 16  PATIENT'S OTHER SYMPTOMS AND PRESENTATION FACTORS, FOR EXAMPLE,

12:32PM 17  WHETHER SOMEONE MIGHT HAVE AN OVERACTIVE THYROID HE SAID.  HE

12:32PM 18  CONFIRMED FOR YOU THAT INFORMATION LIKE THAT WOULD NOT BE

12:32PM 19  PRESENT IN THE LIS DATABASE.

12:32PM 20    HE SAID HE MIGHT ALSO LOOK AT CONTEMPORANEOUS TESTS FROM

12:33PM 21  OTHER LABS TO SEE IF, FOR EXAMPLE, OTHER LABS ARE DISAGREEING

12:33PM 22  WITH THERANOS ON WHAT THE TRUE VALUES FOR A CERTAIN TEST ARE.

12:33PM 23    HE CONFIRMED FOR YOU THAT INFORMATION LIKE THAT WOULD NOT

12:33PM 24  BE PRESENT IN THE THERANOS LIS.

12:33PM 25    HE CONFIRMED DIRECTLY THAT IT WAS NOT POSSIBLE TO LOOK AT

12:33PM  1    INDIVIDUAL RESULTS IN THE LIS LABORATORY SYSTEM AND DETERMINE

12:33PM  2    WHETHER THEY'RE ACCURATE OR NOT.

12:33PM  3        SO FAR THE DEFENSE SAYS WE NEED THIS INFORMATION, AND THEY

12:33PM  4    TALK ABOUT THE ABILITY TO RUN SOME KIND OF STATISTICAL

12:33PM  5    ANALYSIS.  THEY SPEAK ABOUT THAT IN PRETTY VAGUE TERMS.  IT'S

12:33PM  6    UNCLEAR EXACTLY WHAT KIND OF ANALYSIS THEY THINK WOULD BE

12:33PM  7    POSSIBLE, BUT THIS IS ALL HYPOTHETICAL.  AND AGAIN, IT'S

12:33PM  8    CONTRARY TO TESTIMONY FROM THE ACTUAL EXPERTS WHO KNOW ABOUT

12:33PM  9    HOW TO EVALUATE THE ACCURACY OF THE LAB TEST RESULT.

12:33PM  10       SO THE LABORATORY INFORMATION SYSTEM IS CERTAINLY A

12:33PM  11   QUESTION MARK BECAUSE WE DON'T HAVE IT.  LIKELY, THOUGH, IT

12:34PM  12   WOULD STILL BE A QUESTION MARK IF WE DID, IS BECAUSE IT'S

12:34PM  13   UNCLEAR HOW, IF AT ALL, WE WOULD BE ABLE TO USE THAT AND

12:34PM  14   DETERMINE THE OVERALL ACCURACY OR INACCURACY RATE AT THERANOS.

12:34PM  15       TO THE EXTENT THAT THAT DATABASE WOULD SHED MORE LIGHT ON

12:34PM  16   THERANOS TEST ACCURACY, THOUGH, IS THERE ANY REASON FOR YOU TO

12:34PM  17   BELIEVE THAT IT WOULD MAKE THERANOS LOOK BETTER?

12:34PM  18       THINK ABOUT ALL OF THE PROBLEMS THAT YOU'VE SEEN IN

12:34PM  19   INTERNAL CORRESPONDENCE, RECORDS OF THE COMPANY, THINK ABOUT

12:34PM  20   THINGS THAT WITNESSES HAVE TOLD YOU, WITNESSES WHO ACTUALLY

12:34PM  21   WORKED WITH THIS TECHNOLOGY AND SAW THE RESULTS THAT IT

12:34PM  22   PRODUCED, THINK ABOUT THE CMS FINDINGS BASED ON A HOLISTIC LOOK

12:34PM  23   AT THE THERANOS LAB, THINK ABOUT HOW SARAH BENNETT CALLED THE

12:34PM  24   PROBLEMS THAT SHE SAW AT THE THERANOS LAB SYSTEMIC.

12:34PM  25       CMS ALSO NOTED THAT THERANOS ADMITTED FOLLOWING THE CMS

12:34PM  1    INSPECTION THAT THERE WAS A POSSIBLE PATIENT IMPACT FOR EVERY

12:34PM  2    TEST REPORTED FROM THE LABORATORY'S TPS 3.5 INSTRUMENT.  THAT'S

12:35PM  3    THE EDISON.

12:35PM  4        SO IS IT REALLY IN DISPUTE THAT THERE WERE SERIOUS

12:35PM  5    ACCURACY AND RELIABILITY PROBLEMS AT THERANOS OR HAS THAT FACT

12:35PM  6    ALREADY BEEN ESTABLISHED?  IS THERE ANY CHANCE THAT MORE DATA

12:35PM  7    WOULD SIGNIFICANTLY CHANGE THE PICTURE, ESPECIALLY WHEN THAT

12:35PM  8    DATA DOESN'T INCLUDE THE KINDS OF FACTS NECESSARY TO EVALUATE

12:35PM  9    INDIVIDUAL RESULTS?

12:35PM 10        THE DEFENSE HAS CALLED THIS A SCIENTIFIC FRAUD CASE

12:35PM 11    MULTIPLE TIMES.  YOU SHOULD KNOW THAT'S NOT A LEGAL TERM.

12:35PM 12        THE DEFENSE POINT SEEMS TO BE THAT THERE SHOULD BE A

12:35PM 13    HEIGHTENED STANDARD OF PROOF IN CASES LIKE THIS INVOLVING

12:35PM 14    SCIENTIFIC SUBJECT MATTER.  THAT'S NOT THE LAW.

12:35PM 15        YOU'RE ABOUT TO HEAR INSTRUCTIONS ON THE LAW FROM THE

12:35PM 16    COURT, AND THERE WON'T BE ANYTHING TO THAT EFFECT.

12:35PM 17        THIS IS A WIRE FRAUD AND CONSPIRACY CASE AND THE STANDARDS

12:35PM 18    WILL COME FROM THE COURT.  YOU WON'T HEAR ANYTHING ABOUT

12:35PM 19    SPECIAL REQUIREMENTS FOR PROVING FRAUD IN A CASE INVOLVING THIS

12:35PM 20    SUBJECT MATTER.

12:35PM 21        IT IS CERTAINLY NOT RELEVANT TO YOUR DECISION WHAT KINDS

12:36PM 22    OF MATERIALS THERANOS SUBMITTED TO THE FDA TO GET CLEARANCE FOR

12:36PM 23    ITS HERPES TEST IN 2015.

12:36PM 24        WHAT THE INSTRUCTIONS WILL FOCUS ON IS THE DEFENDANT'S

12:36PM 25    STATE OF MIND AND THE NEED TO DETERMINE WHETHER HE KNEW HIS

12:36PM  1    STATEMENTS WERE FALSE AND MISLEADING AND WHETHER HE MADE THOSE

12:36PM  2    STATEMENTS WITH THE INTENT TO DEFRAUD.

12:36PM  3        THE RELEVANT EVIDENCE IS THE EVIDENCE THAT SHOWS THAT AND

12:36PM  4    THERE'S A LOT OF IT.

12:36PM  5        AND THE EVIDENCE SHOWED YOU THE SAME THING THAT IT SHOWED

12:36PM  6    MR. BALWANI, SO YOU KNOW ABOUT THE ACCURACY AND RELIABILITY

12:36PM  7    PROBLEMS AT THERANOS THE SAME WAY HE KNEW BECAUSE YOU KNOW

12:36PM  8    ABOUT THE QUALITY CONTROL PROBLEMS, YOU KNOW ABOUT THE NEGATIVE

12:36PM  9    REPORTS FROM EMPLOYEES AND WHAT THEY SAW, YOU KNOW ABOUT THE

12:36PM 10    INACCURATE RESULTS.

12:36PM 11        I'M GOING TO TALK BRIEFLY ABOUT SOME OF THE INDIVIDUAL

12:36PM 12    CHARGED COUNTS, AND THEN I'LL CONCLUDE MY REMARKS.

12:37PM 13        FIRST, LET'S HIGHLIGHT SOME OF THE KEY LANGUAGE IN THE

12:37PM 14    WIRE FRAUD INSTRUCTIONS.  SO YOU'LL BE ASKED TO RENDER VERDICTS

12:37PM 15    ON TWO CONSPIRACY COUNTS AND A NUMBER OF INDIVIDUAL WIRE FRAUD

12:37PM 16    COUNTS.  FOR THOSE WIRE FRAUD COUNTS, I'D LIKE YOU TO NOTE A

12:37PM 17    FEW THINGS.

12:37PM 18        FIRST, FOR WIRE FRAUD, DECEITFUL STATEMENTS OF HALF-TRUTHS

12:37PM 19    MAY CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS.

12:37PM 20        SO WHEN YOU THINK ABOUT THE THINGS THAT MR. BALWANI AND

12:37PM 21    MS. HOLMES SAID TO VICTIMS, DON'T JUST LOOK FOR BLACK AND WHITE

12:37PM 22    LIES.  LOOK FOR DECEITFUL STATEMENTS OF HALF-TRUTHS AS WELL,

12:37PM 23    THINGS DELIVERED IN A WAY WHERE THEY WERE INTENDING TO BE

12:37PM 24    MISLEADING, EVEN IF THEY MIGHT BE DIFFICULT TO IDENTIFY AS A

12:37PM 25    BLACK AND WHITE LIE.

REBUTTAL ARGUMENT BY MR. BOSTIC

12:37PM 1        NOTE ALSO THAT A STATEMENT IS MATERIAL IF IT HAS A NATURAL

12:37PM 2   TENDENCY TO INFLUENCE OR IS CAPABLE OF INFLUENCING A PERSON TO

12:37PM 3   PART WITH MONEY OR PROPERTY.

12:37PM 4        I THINK IT'S EASY TO CONCLUDE THAT ALL OF THE KINDS OF

12:38PM 5   STATEMENTS THAT WE'RE TALKING ABOUT IN THIS CASE FALL INTO THAT

12:38PM 6   CATEGORY.

12:38PM 7        NOTE ALSO THAT THE WIRE ITSELF, AND WE'RE GOING TO TALK

12:38PM 8   ABOUT THE KINDS OF WIRES THAT ARE INVOLVED IN THIS CASE, BUT

12:38PM 9   THE WIRE ITSELF NEED NOT BE FALSE OR MISLEADING.  THAT'S GOING

12:38PM 10  TO BE IMPORTANT FOR A COUPLE OF THESE.

12:38PM 11       FINALLY NOTE THAT IN ORDER FOR A WIRE TO SERVE AS A BASIS

12:38PM 12  FOR A WIRE FRAUD COUNT, IT MUST HAVE BEEN REASONABLY

12:38PM 13  FORESEEABLE TO THE DEFENDANT THAT SOME WIRE COMMUNICATION WOULD

12:38PM 14  OCCUR IN FURTHERANCE OF THE SCHEME AND AN INTERSTATE WIRE

12:38PM 15  COMMUNICATION MUST HAVE ACTUALLY OCCURRED IN FURTHERANCE OF THE

12:38PM 16  SCHEME.

12:38PM 17       SO LET'S TALK ABOUT COUNT NINE, WHICH IS BASED ON A

12:38PM 18  TELEPHONE CALL THAT A PATIENT NAMED BRENT BINGHAM MADE TO

12:38PM 19  THERANOS AFTER HE GOT INACCURATE TEST RESULTS.

12:38PM 20       FIRST, WHEN IT COMES TO THE TEST ITSELF, THE DEFENSE

12:39PM 21  CLAIMS THAT THIS TEST WAS NOT PERFORMED ON THERANOS EQUIPMENT.

12:39PM 22  I THINK IT'S UP TO YOU TO JUDGE THE EVIDENCE ON THAT AND

12:39PM 23  WHETHER THE EVIDENCE CLEARLY SHOWS THAT.  I WILL POINT OUT THAT

12:39PM 24  THE LABORATORY REPORT ITSELF INDICATES THAT ALL OF THE TESTS

12:39PM 25  WERE PERFORMED AT THERANOS LABS IN NEWARK, CALIFORNIA.

REBUTTAL ARGUMENT BY MR. BOSTIC

12:39PM 1     AND YOU KNOW FROM MR. BINGHAM'S TESTIMONY THAT HE WAS

12:39PM 2     LOCATED IN PHOENIX WHERE THERANOS ALSO HAD A LAB.  SO YOU MIGHT

12:39PM 3     ASK WHY HIS SAMPLE WOULD HAVE BEEN SENT FROM ARIZONA TO

12:39PM 4     CALIFORNIA IF ALL OF THOSE TESTS COULD HAVE BEEN RUN IN THE

12:39PM 5     ARIZONA LAB.

12:39PM 6     YOU KNOW FROM MS. BENNETT'S TESTIMONY THAT THE ARIZONA LAB

12:39PM 7     WAS NOT A LAB THAT COULD RUN LABORATORY DEVELOPED TESTS OR

12:39PM 8     LDT'S.  THAT MEANS THAT THE TESTS DONE IN ARIZONA WERE ALL DONE

12:39PM 9     AND THE SAME THAT ANY OTHER LAB WOULD DO THEM, ON FDA APPROVED

12:39PM 10    DEVICES, NOT THERANOS-SPECIFIC DEVICES.  ALL OF THE THERANOS

12:40PM 11    SPECIFIC DEVICES USED BY THE COMPANY WERE IN NEWARK, WHERE

12:40PM 12    MR. BINGHAM'S TEST WAS RUN.

12:40PM 13    WHEN IT COMES TO THE WIRE ITSELF, REMEMBER THAT

12:40PM 14    MR. BINGHAM PLACED A PHONE CALL TO THERANOS TO ASK ABOUT HIS

12:40PM 15    INACCURATE RESULT.

12:40PM 16    AND MR. EDLIN TESTIFIED THAT THE CUSTOMER SERVICE PEOPLE

12:40PM 17    WHO WERE DESIGNATED TO RECEIVE CALLS FROM PATIENTS OR DOCTORS

12:40PM 18    ABOUT INACCURATE RESULTS WERE IN PALO ALTO.

12:40PM 19    SO THE DEFENSE INVITES YOU TO SPECULATE ABOUT WHETHER THAT

12:40PM 20    CALL MIGHT HAVE BEEN TO ANOTHER LOCATION, BUT THERE'S NO

12:40PM 21    EVIDENCE SUGGESTING THAT.  AND YOU'LL RECALL FROM THE

12:40PM 22    INSTRUCTION ON REASONABLE DOUBT, THAT REASONABLE DOUBT IS NOT

12:40PM 23    SOMETHING BASED ON SPECULATION.

12:40PM 24    SO HOW DO YOU KNOW THAT THIS WIRE -- THIS PHONE CALL WAS

12:40PM 25    USED TO CARRY OUT AN ESSENTIAL PART IN THIS SCHEME TO DEFRAUD

12:40PM  1     PATIENTS?  HOW DO YOU KNOW THAT IT OCCURRED IN FURTHERANCE OF

12:41PM  2     THAT SCHEME AS THE ELEMENTS REQUIRE?

12:41PM  3         WELL, I'D LIKE TO SHOW YOU JUST TWO SELECTIONS FROM

12:41PM  4     EXHIBIT 4520, WHICH IS A LOG INTERNAL AT THERANOS OF CALLS

12:41PM  5     RECEIVED FROM PATIENTS AND DOCTORS.  I'D LIKE TO SHOW YOU TWO

12:41PM  6     EXAMPLES OF HOW THE DEFENDANT AND THERANOS USED THIS CUSTOMER

12:41PM  7     SERVICE GROUP TO FURTHER THE FRAUD AGAINST PATIENTS.

12:41PM  8         LET'S START WITH THIS EXAMPLE.  YOU SEE THIS BEGINS WITH A

12:41PM  9     CALL FROM A DOCTOR'S OFFICE ABOUT TWO PATIENTS WITH ELECTROLYTE

12:41PM  10    CONCERNS.  IN THE BOTTOM THERE'S A NOTE THAT SAYS, "PER SUNNY,

12:41PM  11    WE HAVE FIXED ANY ISSUES WITH THESE REFERENCE RANGES,

12:41PM  12    ET CETERA, SO GENNA CAN ASSURE HIM AND GIVE HIM TWO TO FOUR

12:41PM  13    COUPONS SO HE CAN TEST US OUT."

12:41PM  14        SO YOU SEE HERE AN EXAMPLE OF THE FUNCTION OF THE CUSTOMER

12:42PM  15    SERVICE GROUP.  WHEN DOCTORS OR PATIENTS CALLED WITH QUESTIONS

12:42PM  16    OR CONCERNS ABOUT INACCURATE TEST RESULTS, THE CUSTOMER SERVICE

12:42PM  17    GROUP WAS TO ASSUAGE THEIR CONCERNS, PRESERVE THAT RELATIONSHIP

12:42PM  18    WITH THAT PATIENT OR DOCTOR, AND KEEP THEM COMING BACK TO

12:42PM  19    THERANOS FOR MORE.

12:42PM  20        LET'S SEE A DIFFERENT EXAMPLE.  THIS INTERACTION BEGAN

12:42PM  21    WITH A CALL REGARDING A PATIENT'S HBA1C RESULT AS INDICATED

12:42PM  22    HERE.  NOTE THE RESPONSE HERE.  IT INDICATES THAT SOMEONE NAMED

12:42PM  23    TAJUAN ASSURED THIS DOCTOR THAT ALL WERE WITHIN RANGE.  AND IT

12:42PM  24    SAYS, "I BELIEVE OUR RESULTS TO BE ACCURATE AFTER ALL THREE

12:42PM  25    RUNS WERE VERY CLOSE."

12:42PM 1        SKIP DOWN A COUPLE OF LINES AND NOTE WHAT IT SAYS THERE.

12:42PM 2   IT SAYS, "WHEN I TALK TO PHYSICIANS OR GUESTS, I TRY TO OFFER

12:42PM 3   THEM DIFFERENT VARIABLES OR SCENARIOS TO CONSIDER WHEN THEY

12:42PM 4   QUESTION OUR RESULTS.  OF COURSE NONE OF THEM HAVE TO DO WITH

12:42PM 5   OUR TESTING METHODS.  I MENTIONED THAT THE GUEST'S DIET

12:43PM 6   POSSIBLY CHANGED WITHIN THE LAST FEW MONTHS, THAT THE GUEST MAY

12:43PM 7   NOT BE TAKING THE MEDICATION AS PRESCRIBED, ET CETERA.  I

12:43PM 8   BELIEVE THAT WHEN I DO THAT THE DOC/GUEST FEEL AS THOUGH I AM

12:43PM 9   CONCERNED AND I AM ALSO TRYING TO BE A PART OF THE SOLUTION."

12:43PM 10       SO ANOTHER PERFECT EXAMPLE OF WHY THERANOS HAD A CUSTOMER

12:43PM 11  SERVICE GROUP.  THESE ARE PEOPLE WHO WOULD HAVE A DIFFICULT JOB

12:43PM 12  AT A LAB LIKE THIS THAT WAS HAVING SO MANY ACCURACY PROBLEMS,

12:43PM 13  BUT IT WAS ESSENTIAL FOR THE FURTHERANCE OF THE SCHEME TO

12:43PM 14  DEFRAUD PATIENTS THAT THERE BE PEOPLE AVAILABLE WHO WOULD

12:43PM 15  SMOOTH THINGS OVER WITH PATIENTS AND DOCTORS WHEN PROBLEMS

12:43PM 16  AROSE, AND THE EVIDENCE SHOWS THAT THEY DID A GOOD JOB OF THAT.

12:43PM 17       LET'S TALK BRIEFLY ABOUT COUNT TEN, WHICH IS

12:43PM 18  ERIN TOMPKINS'S HIV RESULTS.  IT'S UNCLEAR FROM THE DEFENSE'S

12:43PM 19  ARGUMENT WHETHER THEY CONCEDE THAT MS. TOMPKINS ACTUALLY GOT

12:44PM 20  INACCURATE RESULTS FOR HER HIV TEST.  THE FACT REMAINS THAT THE

12:44PM 21  THERANOS TEST INDICATED THAT SHE WAS REACTIVE FOR HIV-1 AND 2

12:44PM 22  ANTIBODIES WHEN IN FACT SHE WASN'T.  SHE HAD NEVER BEEN

12:44PM 23  INFECTED WITH HIV, THERE WAS NOTHING ELSE IN HER HISTORY TO

12:44PM 24  SUGGEST THAT SHE HAD THAT INFECTION, AND SHE SUBSEQUENTLY

12:44PM 25  TESTED NEGATIVE.

REBUTTAL ARGUMENT BY MR. BOSTIC

12:44PM  1          SO I THINK THE DEFENSE WANTS TO HIGHLIGHT THE FACT THAT

12:44PM  2     SOME OF THE HIV TESTS OR THE COMPONENTS OF THE HIV TEST IN

12:44PM  3     MS. TOMPKINS'S LAB REPORT DID COME BACK NEGATIVE, BUT THE ONE

12:44PM  4     THAT SAYS POSITIVE IS ACTUALLY INCONSISTENT WITH THE ONES THAT

12:44PM  5     SAY NEGATIVE.  SO IT'S IMPOSSIBLE THAT ALL OF THOSE RESULTS

12:44PM  6     COULD BE CORRECT AT THE SAME TIME.  THIS IS AN EXAMPLE OF AN

12:44PM  7     INACCURATE RESULT PUT OUT BY THERANOS.

12:44PM  8          WHEN IT COMES TO COUNT TEN AND ELEVEN, THE DEFENSE ALSO

12:45PM  9     INVITES YOU TO SPECULATE ABOUT THE INTERSTATE NATURE OF THIS

12:45PM 10     WIRE COMMUNICATION.

12:45PM 11          AGAIN, REASONABLE DOUBT IS NOT BASED ON SPECULATION.  THIS

12:45PM 12     DOCUMENT ON ITS FACE, JUST LIKE THE ONE FOR COUNT ELEVEN,

12:45PM 13     INDICATES THAT IT WAS SENT FROM THE THERANOS FAX SERVER AND

12:45PM 14     THERANOS'S FAX NUMBER IS 650 IN CALIFORNIA, AND SO IF IT WAS

12:45PM 15     SENT TO PHOENIX, IT MUST HAVE NECESSARILY CROSSED STATE LINES.

12:45PM 16     IT DOESN'T NEED TO BE MORE COMPLICATED THAN THAT.

12:45PM 17          FINALLY, THE FACT THAT MS. TOMPKINS'S HIV TEST WAS

12:45PM 18     PERFORMED ON NON-THERANOS EQUIPMENT IS NOT A REASON TO FIND NOT

12:45PM 19     GUILTY ON THIS COUNT.  THIS IS STILL A WIRE COMMUNICATION IN

12:45PM 20     FURTHERANCE OF THE SCHEME TO DEFRAUD PATIENTS, AND IT'S TRUE

12:45PM 21     FOR TWO REASONS.

12:45PM 22          FIRST, YOU'LL RECALL THAT THE EVIDENCE SHOWS THAT PATIENTS

12:45PM 23     WERE PROMISED TESTS WITH SUPERIOR ACCURACY.  THAT APPEARS IN

12:46PM 24     PUBLIC INFORMATION THAT THE COMPANY KNEW ABOUT AND PROMOTED.

12:46PM 25          INSTEAD, WHAT PATIENTS GOT WERE TESTS OF INFERIOR ACCURACY

12:46PM   1      OR AT BEST THE SAME LEVEL OF ACCURACY THAT WOULD HAVE BEEN

12:46PM   2      PROVIDED AT ANY OTHER LAB.  THAT'S NOT LIVING UP TO THE PROMISE

12:46PM   3      THAT THE COMPANY MADE THE PATIENTS.

12:46PM   4          SO THIS IS AN EXAMPLE OF A BROKEN PROMISE TO THIS

12:46PM   5      PARTICULAR PATIENT.

12:46PM   6          DON'T FORGET ALSO THAT IN ADDITION TO HER HIV TEST, SHE

12:46PM   7      DID GET OTHER TESTS THAT WERE RUN ON THERANOS SPECIFIC METHODS.

12:46PM   8              MR. COOPERSMITH:  YOUR HONOR, OBJECTION.  THERE'S NO

12:46PM   9      EVIDENCE OF ANY GLUCOSE RESULT IN THIS EXHIBIT THAT WAS

12:46PM  10      ADMITTED INTO EVIDENCE.

12:46PM  11              THE COURT:  MR. BOSTIC, ARE YOU SPEAKING ABOUT

12:46PM  12      SOMETHING THAT WAS NOT IN EVIDENCE IN THIS CASE?

12:46PM  13              MR. BOSTIC:  I BELIEVE WHAT I'M SHOWING NOW IS IN

12:46PM  14      EVIDENCE, YOUR HONOR.

12:46PM  15              THE COURT:  THIS DOCUMENT?

12:46PM  16              MR. BOSTIC:  YES.

12:46PM  17              MR. COOPERSMITH:  YOUR HONOR, THE PROBLEM IS THERE'S

12:46PM  18      NO RESULT.  YOU CAN SEE RIGHT HERE THERE'S A RANGE, BUT THERE'S

12:46PM  19      NO GLUCOSE RESULT REPORTED TO MS. TOMPKINS.

12:46PM  20              THE COURT:  UNDERSTOOD.  BUT, MR. BOSTIC, THIS

12:47PM  21      DOCUMENT IS IN EVIDENCE?

12:47PM  22              MR. BOSTIC:  IT IS, YOUR HONOR, IN THIS CURRENT

12:47PM  23      FORM.

12:47PM  24              THE COURT:  YES.  YOU CAN COMMENT ON THE DOCUMENT

12:47PM  25      ITSELF, BUT NOT AS TO ANYTHING THAT IS NOT IN EVIDENCE OF

12:47PM  1    COURSE.

12:47PM  2              MR. BOSTIC:  UNDERSTOOD.  THANK YOU, YOUR HONOR.

12:47PM  3         YOU'LL RECALL THAT WHEN WE LOOKED AT THE ELEMENTS FOR WIRE

12:47PM  4    FRAUD, THERE WAS LANGUAGE SAYING THAT THE WIRE ITSELF NEED NOT

12:47PM  5    BE FRAUDULENT.

12:47PM  6         WHAT THAT MEANS IN THE CONTEXT OF THESE TRANSMITTED

12:47PM  7    PATIENT RESULTS IS THAT EVEN IF YOU FOUND CONTRARY TO THE

12:47PM  8    EVIDENCE THAT SOME OF THESE PATIENT TEST RESULTS WERE NOT

12:47PM  9    INACCURATE, THAT STILL WOULD NOT MEAN THAT THEY COULD NOT FORM

12:47PM 10    THE BASIS OF A WIRE FRAUD CONVICTION.

12:47PM 11         IF YOU FIND THAT THERE WAS A SCHEME TO DEFRAUD PATIENTS,

12:47PM 12    AND THAT THESE WIRES WERE IN FURTHERANCE OF THAT SCHEME, IT'S

12:47PM 13    NOT BARRIER TO A GUILTY VERDICT ON THESE COUNTS THAT THE WIRE

12:47PM 14    ITSELF DIDN'T CONTAIN ANY FRAUDULENT INFORMATION.

12:47PM 15         I'LL REFER YOU TO THE INSTRUCTION WE'VE REVIEWED IF YOU

12:47PM 16    WOULD LIKE TO UNDERSTAND THAT POINT BETTER.

12:48PM 17         LET'S TALK NEXT ABOUT COUNT TWELVE, WHICH IS A PAYMENT

12:48PM 18    MADE BY THERANOS TO A COMPANY CALLED HORIZON, AND IT RELATES TO

12:48PM 19    A MEDIA BUY.

12:48PM 20         MR. COOPERSMITH SUGGESTED THAT YOU SHOULD FIND NOT GUILTY

12:48PM 21    ON THIS COUNT BECAUSE YOU DON'T KNOW ENOUGH ABOUT IT.  IN FACT,

12:48PM 22    ONE DOCUMENT TELLS YOU EVERYTHING YOU NEED TO KNOW ABOUT THIS

12:48PM 23    COUNT, AND THAT'S EXHIBIT 5454.

12:48PM 24         ON THE FACE OF THIS DOCUMENT, IT'S CLEAR THAT THIS PAYMENT

12:48PM 25    WAS FOR T.V., RADIO AND DJ AND TV HOSTS ON AIR SEGMENTS BUYS

12:48PM   1    FOR THE TIME PERIOD INDICATED.

12:48PM   2        SO THE QUESTION IS HOW DO WE KNOW THIS WAS IN FURTHERANCE

12:48PM   3    OF THE SCHEME TO DEFRAUD PATIENTS?

12:48PM   4        AGAIN, OTHER EVIDENCE IN THE CASE ESTABLISHES THE

12:48PM   5    EXISTENCE OF THAT SCHEME TO DEFRAUD.  OF COURSE, AS AN

12:49PM   6    ESSENTIAL PART OF THAT SCHEME TO DEFRAUD PATIENTS, THERANOS HAD

12:49PM   7    TO MARKET ITSELF TO PATIENTS.  THEY HAD TO ATTRACT CUSTOMERS

12:49PM   8    AND GET THEM IN THE DOOR AND GET THEIR ATTENTION.

12:49PM   9        IT'S CLEAR FROM THIS DOCUMENT THAT THIS WIRE TRANSFER,

12:49PM  10    THIS PAYMENT WAS IN FURTHERANCE OF THAT BECAUSE THIS WAS

12:49PM  11    PROMOTING THE COMPANY'S LAB TESTING TO PATIENTS.

12:49PM  12        MR. COOPERSMITH SAYS THAT YOU CANNOT CONVICT ON THIS COUNT

12:49PM  13    BECAUSE YOU DON'T KNOW THINGS LIKE THE CONTENT OF THE ADS, WHEN

12:49PM  14    THEY AIRED, WHO SAW THEM, THOSE THINGS AREN'T REQUIRED.  YOU

12:49PM  15    DON'T NEED TO KNOW THE EXACT CONTENT OF THE ADS, AGAIN, BECAUSE

12:49PM  16    THE CONTENT OF THE WIRE ITSELF NEED NOT BE FRAUDULENT.  YOU

12:49PM  17    DON'T KNOW NEED TO KNOW WHO SAW THEM OR WHETHER ANYBODY RELIED

12:49PM  18    ON THEM, BECAUSE AS THE COURT WILL INSTRUCT YOU, IT'S NOT

12:49PM  19    NECESSARY THAT A SCHEME TO DEFRAUD ACTUALLY BE SUCCESSFUL IN

12:49PM  20    ORDER FOR A CONVICTION TO RESULT.

12:49PM  21        SO THOSE THINGS ARE RED HERRINGS BY THE DEFENSE, AND I

12:50PM  22    WANT TO MAKE SURE THAT YOU'RE NOT DISTRACTED BY THEM.

12:50PM  23        I'LL ALSO POINT OUT THAT THAT SAME DOCUMENT INCLUDES AN

12:50PM  24    ATTACHMENT THAT IS LABELED DJ COPYING POINTS.  SO IT DOES

12:50PM  25    INCLUDE SOME OF THE CONTENT OF THIS ADVERTISING THAT THIS

12:50PM 1    PAYMENT WAS GOING TO PAY FOR.  AND YOU'LL SEE AS RELEVANT TO

12:50PM 2    THE SCHEME TO DEFRAUD HERE THAT CONTENT EMPHASIZES THERANOS'S

12:50PM 3    FINGERSTICK BLOOD TESTING METHOD.

12:50PM 4         SO HOW DID THIS SCHEME WORK?  BECAUSE THESE TWO SCHEMES

12:50PM 5    WERE SUCCESSFUL FOR A NUMBER OF YEARS, THE SCHEMES TO DEFRAUD

12:50PM 6    PATIENTS AND INVESTORS.

12:50PM 7         WELL, YOU SAW THAT THEY INVOLVED STOLEN CREDIBILITY.  THE

12:50PM 8    DEFENDANTS STOLE THE CREDIBILITY OF OTHER ORGANIZATIONS LIKE

12:50PM 9    PHARMACEUTICAL COMPANIES THAT THEY CLAIMED HAD VALIDATED THEIR

12:50PM 10   TECHNOLOGY;

12:51PM 11        WALGREENS, WHO THEY WERE PARTNERING WITH;

12:51PM 12        THE MEMBERS OF THE BOARD;

12:51PM 13        THEY STOLE THE CREDIBILITY OF THE PRESS ALSO BY

12:51PM 14   ENGINEERING FALSE INFORMATION TO APPEAR IN PRESS ARTICLES AND

12:51PM 15   THEN SPREADING THAT INFORMATION TO VICTIMS;

12:51PM 16        THEY BORROWED THE CREDIBILITY OF THE U.S. MILITARY BY

12:51PM 17   CLAIMING THAT ORGANIZATION WAS RELYING ON THE COMPANY'S

12:51PM 18   TECHNOLOGY; AND,

12:51PM 19        THEY EXPLOITED HOW FALSE INFORMATION SPREADS TO MAKE THEIR

12:51PM 20   JOB OF DECEIVING ALL OF THOSE PEOPLE EASIER AND MORE EFFICIENT.

12:51PM 21        BUT DON'T LET THE FACT THAT THOSE LIES TOOK ON A LIFE OF

12:51PM 22   THEIR OWN DISTRACT YOU FROM THE FACT THAT THIS IS ALL ABOUT

12:51PM 23   MR. BALWANI'S ACTIONS AND HIS CHOICES.

12:51PM 24        SO YOU SHOULD ASK HOW WOULD MR. BALWANI'S ACTIONS AND

12:51PM 25   CHOICES HAVE BEEN DIFFERENT OVER THE YEARS IF HE WAS NOT A

12:51PM  1      PARTICIPANT IN THESE TWO SCHEMES TO DEFRAUD INVESTORS AND

12:51PM  2      PATIENTS?

12:51PM  3          HERE ARE SOME EXAMPLES:

12:51PM  4          MR. BALWANI WOULD HAVE TAKEN SERIOUSLY CONCERNS OF

12:52PM  5      SCIENTISTS AT THERANOS ABOUT PROBLEMS WITH TESTING.  YOU'LL

12:52PM  6      RECALL THAT DR. PANDORI SUGGESTED THAT THEY NOT USE THE EDISON

12:52PM  7      FOR TESTING ANYMORE.

12:52PM  8          AND WHEN THE LAB DIRECTOR, ADAM ROSENDORFF, SPECIFICALLY

12:52PM  9      SAID NOT TO USE THE EDISON ON HCG, MR. BALWANI, AS THE PERSON

12:52PM  10     OVERSEEING THE LAB, WOULD HAVE RESPONDED TO THAT WITH CONCERN

12:52PM  11     AND WOULD HAVE KEPT THAT DECISION IN PLACE UNTIL DR. ROSENDORFF

12:52PM  12     WAS COMFORTABLE RESUMING TESTING ON THAT PLATFORM.

12:52PM  13         IF MR. BALWANI HAD NOT BEEN A PARTICIPANT IN THESE SCHEMES

12:52PM  14     WHEN MULTIPLE SCIENTISTS, INCLUDING LAB DIRECTORS, QUIT

12:52PM  15     THERANOS OVER THE CONCERNS ABOUT THE RELIABILITY AND ACCURACY

12:52PM  16     OF THE TESTING, MR. BALWANI WOULD HAVE MOVED QUICKLY TO HIRE

12:52PM  17     AND ASSIGN ANOTHER QUALIFIED LAB DIRECTOR TO OVERSEE THE

12:52PM  18     OPERATION OF THIS LAB THAT HAD SO MANY PROBLEMS.

12:52PM  19         IF HE REALLY CARED ABOUT FIXING THE PROBLEMS AT THERANOS,

12:52PM  20     THAT'S WHAT HE WOULD HAVE DONE INSTEAD OF HIRING HIS

12:53PM  21     DERMATOLOGIST AND ANOTHER CO-LABORATORY DIRECTOR WHO MAY AS

12:53PM  22     WELL HAVE BEEN CARDBOARD CUTOUTS FOR ALL OF THE IMPACT THEY HAD

12:53PM  23     ON THE ACCURACY AND RELIABILITY OF TESTING AT THE COMPANY.

12:53PM  24         AND THAT'S NOT A CRITICISM OF THEM.  THE EVIDENCE SHOWS

12:53PM  25     THAT THEY FULFILLED THEIR MANDATE.  THEIR ASSIGNMENT AS GIVEN

12:53PM   1       TO THEM BY MR. BALWANI DID NOT INCLUDE MEANINGFUL PARTICIPATION

12:53PM   2       OF THE RUNNING OF THE LAB.

12:53PM   3           IF MR. BALWANI WEREN'T A PARTICIPATE IN THESE SCHEMES, HE

12:53PM   4       WOULD HAVE BEEN TROUBLED BY FALSE CLAIMS ABOUT THERANOS IN THE

12:53PM   5       MEDIA, CITING MS. HOLMES AND HIM AS A SOURCE; AND HE WOULDN'T

12:53PM   6       HAVE REJECTED DR. PANDORI'S IDEA THAT MS. HOLMES SHOULD CONSULT

12:53PM   7       WITH TECHNICAL PEOPLE AT THE COMPANY SO SHE COULD DO A BETTER

12:53PM   8       JOB OF BEING ACCURATE IN THOSE INTERVIEWS, HE WOULD HAVE BEEN

12:53PM   9       EVEN MORE TROUBLED BY MISLEADING STATEMENTS ON HIS COMPANY'S

12:53PM  10       OWN WEBSITES.

12:53PM  11           WHEN INVESTORS WANTED TO MEET THE LEADERS OF THERANOS, HE

12:53PM  12       WOULD HAVE GIVEN HONEST INFORMATION ABOUT THE COMPANY'S STATUS

12:53PM  13       AND ACHIEVEMENTS, INSTEAD OF WORKING WITH MS. HOLMES TO DECEIVE

12:54PM  14       PEOPLE OVER AND OVER AGAIN.

12:54PM  15           HE WOULD HAVE TOLD INVESTORS, WALGREENS REPRESENTATIVES

12:54PM  16       AND OTHER VIP VISITORS TO THERANOS, THAT THE DEVICES THAT THEY

12:54PM  17       WERE SHOWING THEM IN CONFERENCE ROOMS WERE NOT ACTUALLY THE

12:54PM  18       DEVICES THAT WERE GOING TO BE USED TO RUN THOSE VIP'S SAMPLES

12:54PM  19       WHEN THEY HAD DEMOS DONE AT THE COMPANY.

12:54PM  20           WHEN MR. MENDENHALL ASKED MR. BALWANI TO TELL HIM ABOUT

12:54PM  21       THE STATE OF THE COMPANY, HE WOULDN'T HAVE REPEATED THE SAME

12:54PM  22       FALSE STATEMENTS WHEN MS. HOLMES WASN'T THERE.

12:54PM  23           LATER, WHEN MR. MENDENHALL WANTED TO INVEST MORE BUT

12:54PM  24       NEEDED MORE CONCRETE INFORMATION ABOUT THE COMPANY, MR. BALWANI

12:54PM  25       WOULD HAVE PROVIDED IT BECAUSE HE WOULD HAVE HAD NOTHING TO

12:54PM   1    HIDE INSTEAD OF GOING SILENT ON THAT INVESTOR.

12:54PM   2         WHEN MR. EISENMAN ASKED ABOUT REPORTS DETAILING THE ACTUAL

12:54PM   3    LIMITS OF THE THERANOS TECHNOLOGY, MR. BALWANI WOULD HAVE

12:54PM   4    ADMITTED THE TRUTH TO THAT INVESTOR, HE WOULD HAVE COME CLEAN

12:54PM   5    INSTEAD OF SAYING THAT THE SOURCE DIDN'T KNOW WHAT THEY WERE

12:55PM   6    TALKING ABOUT.

12:55PM   7         WHEN THE CMS INSPECTION FOUND SERIOUS PROBLEMS IN THE

12:55PM   8    THERANOS LAB, MR. BALWANI WOULD HAVE FOCUSSED ON SOLUTIONS

12:55PM   9    RATHER THAN TRYING TO PERSUADE SARAH BENNETT NOT TO CALL IT

12:55PM  10    WHAT SHE SAW IT.

12:55PM  11         TOWARD THE BEGINNING OF THE DEFENSE CLOSING, MR. BALWANI'S

12:55PM  12    LAWYER SAID THERE WAS NO EVIDENCE HE ALONE, OR WORKING WITH

12:55PM  13    MS. HOLMES, TRIED TO DECEIVE OR CHEAT ANYONE.  IF THAT WERE AT

12:55PM  14    ALL TRUE, MR. BALWANI WOULD HAVE MADE THE OPPOSITE CHOICE IN

12:55PM  15    EACH AND EVERY ONE OF THE SITUATIONS I'VE JUST DESCRIBED, AND

12:55PM  16    THAT IS HOW YOU AS THE JURY ARE ABLE TO JUDGE THE INTENT AND

12:55PM  17    STATE OF MIND OF THE DEFENDANT, NOT BECAUSE YOU'RE A MIND

12:55PM  18    READER AND NOT BECAUSE YOU'RE ABLE TO RELY ON WHAT THE LAWYERS

12:55PM  19    SAY IN INTERPRETING MR. BALWANI'S ACTIONS OR STATEMENTS, BUT

12:55PM  20    BECAUSE YOU KNOW WHAT HE DID AND YOU KNOW ABOUT THE CHOICES HE

12:55PM  21    MADE HIMSELF.  YOU'VE SEEN THAT EVIDENCE.

12:56PM  22         SO WHEN YOU DELIBERATE AND MAKE YOUR DECISION, YOU SHOULD

12:56PM  23    RELY ON THAT EVIDENCE.  YOU SHOULD REVIEW ALL OF THE EVIDENCE,

12:56PM  24    ASSIGN IT THE WEIGHT THAT YOU THINK IS APPROPRIATE.  AND

12:56PM  25    INSTEAD OF RELYING ON THE DEFENSE COUNSEL'S CHARACTERIZATION OR

12:56PM  1    THE GOVERNMENT'S CHARACTERIZATION OF THINGS, TRUST YOUR OWN

12:56PM  2    COMMON SENSE, TRUST YOUR EYES, TRUST YOUR MEMORIES ABOUT WHAT

12:56PM  3    THE EVIDENCE IN THIS TRIAL HAS ACTUALLY SHOWN, AND WHEN YOU DO

12:56PM  4    THAT, THE ONLY RESULT THAT YOU'RE ABLE TO REACH THAT IS

12:56PM  5    SUPPORTED BY ALL OF THE EVIDENCE IN THIS CASE WILL BE A VERDICT

12:56PM  6    OF GUILTY ON EVERY COUNT IN THE INDICTMENT.

12:56PM  7        ON BEHALF OF THE UNITED STATES, THANK YOU FOR YOUR

12:56PM  8    ATTENTION THROUGHOUT THE TRIAL AND TODAY.

12:56PM  9        THE COURT:  THANK YOU, MR. BOSTIC.

12:56PM  10       LADIES AND GENTLEMEN, THAT CONCLUDES THE ARGUMENTS IN THE

12:56PM  11   CASE.  THE ONLY THINGS PRIOR TO YOUR DELIBERATIONS ARE MY

12:56PM  12   INSTRUCTIONS.  LET'S TAKE ABOUT A 12 MINUTE BREAK.  THE

12:57PM  13   INSTRUCTIONS WILL TAKE A LITTLE LESS THAN AN HOUR TO READ TO

12:57PM  14   YOU I BELIEVE.  WHY DON'T WE TAKE A 10 OR 12 MINUTE BREAK NOW,

12:57PM  15   WE'LL RETURN AND I'LL READ THOSE INSTRUCTIONS TO YOU.

12:57PM  16       LET ME TELL YOU, YOU WILL, AND I THINK I TOLD YOU THIS

12:57PM  17   BEFORE IN OUR VOIR DIRE AND IN OUR PRELIMINARY INSTRUCTIONS,

12:57PM  18   EACH OF YOU, EACH OF THE 12 JURORS WILL HAVE A COPY OF THE

12:57PM  19   INSTRUCTIONS IN THE DELIBERATION ROOM.  YOU WON'T HAVE IT HERE

12:57PM  20   WHILE I READ THEM TO YOU, BUT YOU WILL HAVE THEM IN THE

12:57PM  21   DELIBERATION ROOM FOR YOU TO REFER TO.

12:57PM  22       SO LET'S TAKE ABOUT A 12 MINUTE BREAK NOW.  WE'LL COME

12:57PM  23   BACK, AND I'LL READ THE INSTRUCTIONS.  THANK YOU.

12:57PM  24       (RECESS FROM 12:57 P.M. UNTIL 1:18 P.M.)

01:18PM  25       THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

01:18PM   1    ALL COUNSEL ARE PRESENT.  MR. BALWANI IS PRESENT.

01:18PM   2        OUR JURY AND ALTERNATES ARE PRESENT.  LADIES AND

01:18PM   3    GENTLEMEN, I WILL NOW READ TO YOU THE FINAL INSTRUCTIONS.  AS I

01:18PM   4    INDICATED, EACH OF YOU WILL HAVE A COPY OF THESE INSTRUCTIONS

01:19PM   5    FOR YOU TO REFERENCE IN THE JURY ROOM.

01:19PM   6        MEMBERS OF THE JURY, NOW THAT YOU HAVE HEARD ALL OF THE

01:19PM   7    EVIDENCE, IT IS MY DUTY TO INSTRUCT YOU ON THE LAW THAT APPLIES

01:19PM   8    TO THIS CASE.  A COPY OF THESE INSTRUCTIONS WILL BE AVAILABLE

01:19PM   9    IN THE JURY ROOM FOR YOU TO CONSULT.

01:19PM  10        IT IS YOUR DUTY TO WEIGH AND TO EVALUATE ALL OF THE

01:19PM  11    EVIDENCE RECEIVED IN THE CASE AND IN THAT PROCESS TO DECIDE THE

01:19PM  12    FACTS.  IT IS ALSO YOUR DUTY TO APPLY THE LAW AS I GIVE IT TO

01:19PM  13    YOU TO THE FACTS AS YOU FIND THEM WHETHER YOU AGREE WITH THE

01:19PM  14    LAW OR NOT.  YOU MUST DECIDE THIS CASE SOLELY ON THE EVIDENCE

01:19PM  15    AND THE LAW.  DO NOT ALLOW PERSONAL LIKES OR DISLIKES,

01:19PM  16    SYMPATHY, PREJUDICE, FEAR OR PUBLIC OPINION TO INFLUENCE YOU.

01:20PM  17        YOU SHOULD ALSO NOT BE INFLUENCED BY ANY PERSON'S RACE,

01:20PM  18    COLOR, RELIGIOUS BELIEFS, NATIONAL ANCESTRY, SEXUAL

01:20PM  19    ORIENTATION, GENDER IDENTITY, GENDER, PROFESSION, CELEBRITY,

01:20PM  20    ECONOMIC CIRCUMSTANCES, POSITION IN LIFE OR POSITION IN THE

01:20PM  21    COMMUNITY.

01:20PM  22        ALSO, DO NOT ALLOW YOURSELF TO BE INFLUENCED BY PERSONAL

01:20PM  23    LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION,

01:20PM  24    OR BIASES, INCLUDING UNCONSCIOUS BIASES.  UNCONSCIOUS BIASES

01:20PM  25    ARE STEREOTYPES, ATTITUDES, OR PREFERENCES THAT PEOPLE MAY

7687

01:20PM  1    CONSCIOUSLY REJECT BUT MAY BE EXPRESSED WITHOUT CONSCIOUS

01:20PM  2    AWARENESS, CONTROL, OR INTENTION.

01:20PM  3        YOU WILL RECALL THAT YOU TOOK AN OATH PROMISING TO DO SO

01:20PM  4    AT THE BEGINNING OF THE CASE.

01:20PM  5        YOU MUST FOLLOW ALL OF THESE INSTRUCTIONS AND NOT SINGLE

01:21PM  6    OUT SOME AND IGNORE OTHERS.  THEY ARE ALL IMPORTANT.

01:21PM  7        PLEASE DO NOT READ INTO THESE INSTRUCTIONS OR INTO

01:21PM  8    ANYTHING I MAY HAVE SAID OR DONE ANY SUGGESTION AS TO WHAT

01:21PM  9    VERDICT YOU SHOULD RETURN -- THAT IS A MATTER ENTIRELY UP TO

01:21PM 10    YOU.

01:21PM 11        THE INDICTMENT IS NOT EVIDENCE.  MR. BALWANI, THE

01:21PM 12    DEFENDANT, HAS PLEADED NOT GUILTY TO THE CHARGES.  MR. BALWANI

01:21PM 13    IS PRESUMED TO BE INNOCENT UNLESS AND UNTIL THE GOVERNMENT

01:21PM 14    PROVES HIM GUILTY BEYOND A REASONABLE DOUBT.

01:21PM 15        IN ADDITION, MR. BALWANI DOES NOT HAVE TO TESTIFY OR

01:21PM 16    PRESENT ANY EVIDENCE.  MR. BALWANI DOES NOT HAVE TO PROVE

01:21PM 17    INNOCENCE; THE GOVERNMENT HAS THE BURDEN OF PROVING EVERY

01:21PM 18    ELEMENT OF THE CHARGES BEYOND A REASONABLE DOUBT.

01:21PM 19        FOR REASONS THAT DO NOT CONCERN YOU, THE CASE AGAINST

01:22PM 20    MR. BALWANI'S CODEFENDANT, MS. ELIZABETH HOLMES, IS NOT BEFORE

01:22PM 21    YOU.  DO NOT SPECULATE WHY.  THIS FACT SHOULD NOT INFLUENCE

01:22PM 22    YOUR VERDICT WITH REFERENCE TO MR. BALWANI.

01:22PM 23        YOU HAVE HEARD EVIDENCE THAT MS. HOLMES HAS BEEN TRIED

01:22PM 24    BEFORE.  KEEP IN MIND, HOWEVER, THAT YOU MUST DECIDE THIS CASE

01:22PM 25    SOLELY ON THE EVIDENCE PRESENTED TO YOU IN THIS TRIAL.  YOU ARE

7688

01:22PM 1    NOT TO CONSIDER THE FACT OF OR ANY OTHER ASPECT OF A PREVIOUS

01:22PM 2    TRIAL INVOLVING MS. HOLMES IN DECIDING THIS CASE.  YOU MUST

01:22PM 3    BASE YOUR VERDICT SOLELY ON THE EVIDENCE RECEIVED IN THIS

01:22PM 4    TRIAL.

01:22PM 5        A DEFENDANT IN A CRIMINAL CASE HAS A CONSTITUTIONAL RIGHT

01:22PM 6    NOT TO TESTIFY.  IN ARRIVING AT YOUR VERDICT, THE LAW PROHIBITS

01:22PM 7    YOU FROM CONSIDERING IN ANY MANNER THAT MR. BALWANI DID NOT

01:23PM 8    TESTIFY.

01:23PM 9        PROOF BEYOND A REASONABLE DOUBT IS PROOF THAT LEAVES YOU

01:23PM 10   FIRMLY CONVINCED MR. BALWANI IS GUILTY.  IT IS NOT REQUIRED

01:23PM 11   THAT THE GOVERNMENT PROVE GUILT BEYOND ALL POSSIBLE DOUBT.

01:23PM 12       A REASONABLE DOUBT IS A DOUBT BASED UPON REASON AND COMMON

01:23PM 13   SENSE AND IS NOT BASED PURELY ON SPECULATION.  IT MAY ARISE

01:23PM 14   FROM A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF THE

01:23PM 15   EVIDENCE, OR FROM LACK OF EVIDENCE.

01:23PM 16       IF AFTER A CAREFUL AND IMPARTIAL CONSIDERATION OF ALL OF

01:23PM 17   THE EVIDENCE, YOU ARE NOT CONVINCED BEYOND A REASONABLE DOUBT

01:23PM 18   THAT MR. BALWANI IS GUILTY, IT IS YOUR DUTY TO FIND MR. BALWANI

01:23PM 19   NOT GUILTY.

01:23PM 20       ON THE OTHER HAND, IF AFTER A CAREFUL AND IMPARTIAL

01:23PM 21   CONSIDERATION OF ALL OF THE EVIDENCE, YOU ARE CONVINCED BEYOND

01:24PM 22   A REASONABLE DOUBT THAT MR. BALWANI IS GUILTY, IT IS YOUR DUTY

01:24PM 23   TO FIND MR. BALWANI GUILTY.

01:24PM 24       THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

01:24PM 25   FACTS ARE CONSISTS OF:

01:24PM  1          THE SWORN TESTIMONY OF ANY WITNESS;

01:24PM  2          THE EXHIBITS THAT ARE RECEIVED IN EVIDENCE; AND,

01:24PM  3          ANY FACTS TO WHICH THE PARTIES HAVE AGREED.

01:24PM  4          IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

01:24PM  5   TESTIMONY AND EXHIBITS RECEIVED IN EVIDENCE.  THE FOLLOWING

01:24PM  6   THINGS ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN

01:24PM  7   DECIDING WHAT THE FACTS ARE:

01:24PM  8          QUESTIONS, STATEMENTS, OBJECTIONS, AND ARGUMENTS BY THE

01:24PM  9   LAWYERS ARE NOT EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.

01:25PM 10   ALTHOUGH YOU MUST CONSIDER A LAWYER'S QUESTIONS TO UNDERSTAND

01:25PM 11   THE ANSWERS OF A WITNESS, THE LAWYER'S QUESTIONS ARE NOT

01:25PM 12   EVIDENCE.

01:25PM 13          SIMILARLY, WHAT THE LAWYERS HAVE SAID IN THEIR OPENING

01:25PM 14   STATEMENTS, CLOSING ARGUMENTS AND AT OTHER TIMES IS INTENDED TO

01:25PM 15   HELP YOU INTERPRET THE EVIDENCE, BUT IT IS NOT EVIDENCE.  IF

01:25PM 16   THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY THE LAWYERS

01:25PM 17   STATE THEM, YOUR MEMORY OF THEM CONTROLS.

01:25PM 18          ANY TESTIMONY THAT I HAVE EXCLUDED, STRICKEN, OR

01:25PM 19   INSTRUCTED YOU TO DISREGARD IS NOT EVIDENCE.  IN ADDITION, SOME

01:25PM 20   EVIDENCE WAS RECEIVED ONLY FOR A LIMITED PURPOSE; WHEN I HAVE

01:25PM 21   INSTRUCTED YOU TO CONSIDER CERTAIN EVIDENCE IN A LIMITED WAY,

01:25PM 22   YOU MUST DO SO.

01:25PM 23          ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE COURT WAS NOT

01:26PM 24   IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE THE CASE SOLELY

01:26PM 25   ON THE EVIDENCE RECEIVED AT THE TRIAL.

01:26PM  1          EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

01:26PM  2    IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT

01:26PM  3    WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.

01:26PM  4    CIRCUMSTANTIAL EVIDENCE IS INDIRECT EVIDENCE, THAT IS, IT IS

01:26PM  5    PROOF OF ONE OR MORE FACTS FROM WHICH ONE CAN FIND ANOTHER

01:26PM  6    FACT.

01:26PM  7          YOU ARE TO CONSIDER BOTH DIRECT AND CIRCUMSTANTIAL

01:26PM  8    EVIDENCE.  EITHER CAN BE USED TO PROVE ANY FACT.  THE LAW MAKES

01:26PM  9    NO DISTINCTION BETWEEN THE WEIGHT TO BE GIVEN TO EITHER DIRECT

01:26PM 10    OR CIRCUMSTANTIAL EVIDENCE.  IT IS FOR YOU TO DECIDE HOW MUCH

01:26PM 11    WEIGHT TO GIVE TO ANY EVIDENCE.

01:26PM 12          NOW, BY WAY OF EXAMPLE, IF YOU WAKE UP IN THE MORNING AND

01:27PM 13    SEE THAT THE SIDEWALK IS WET, YOU MAY FIND FROM THAT FACT THAT

01:27PM 14    IT RAINED DURING THE NIGHT.  HOWEVER, OTHER EVIDENCE SUCH AS A

01:27PM 15    TURNED-ON GARDEN HOSE MAY PROVIDE AN EXPLANATION FOR WATER ON

01:27PM 16    THE SIDEWALK.  THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS

01:27PM 17    BEEN PROVED BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL

01:27PM 18    OF THE EVIDENCE IN LIGHT OF REASON, EXPERIENCE, AND COMMON

01:27PM 19    SENSE.

01:27PM 20          IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

01:27PM 21    WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

01:27PM 22    YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

01:27PM 23    NONE OF IT.

01:27PM 24          IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

01:27PM 25    INTO ACCOUNT:

01:27PM   1          THE WITNESS'S OPPORTUNITY AND ABILITY TO SEE OR HEAR OR

01:28PM   2     KNOW THE THINGS TESTIFIED TO;

01:28PM   3          THE WITNESS'S MEMORY;

01:28PM   4          THE WITNESS'S MANNER WHILE TESTIFYING;

01:28PM   5          THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE, IF ANY;

01:28PM   6          THE WITNESS'S BIAS OR PREJUDICE, IF ANY;

01:28PM   7          WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

01:28PM   8     TESTIMONY;

01:28PM   9          THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF

01:28PM   10    ALL OF THE EVIDENCE; AND,

01:28PM   11         ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

01:28PM   12         YOU SHOULD USE THE SAME STANDARD IN JUDGING THE

01:28PM   13    CREDIBILITY OF EVERY WITNESS, REGARDLESS OF WHAT HIS OR HER

01:28PM   14    OCCUPATION OR BACKGROUND MAY BE.

01:28PM   15         SOMETIMES A WITNESS MAY SAY SOMETHING THAT IS NOT

01:28PM   16    CONSISTENT WITH SOMETHING ELSE HE OR SHE SAID.  SOMETIMES

01:28PM   17    DIFFERENT WITNESSES WILL GIVE DIFFERENT VERSIONS OF WHAT

01:28PM   18    HAPPENED.  PEOPLE OFTEN FORGET THINGS OR MAKE MISTAKES IN WHAT

01:29PM   19    THEY REMEMBER.  ALSO, TWO PEOPLE MAY SEE THE SAME EVENT, BUT

01:29PM   20    REMEMBER IT DIFFERENTLY.  YOU MAY CONSIDER THESE DIFFERENCES,

01:29PM   21    BUT DO NOT DECIDE THAT TESTIMONY IS UNTRUE JUST BECAUSE IT

01:29PM   22    DIFFERS FROM OTHER TESTIMONY.

01:29PM   23         HOWEVER, IF YOU DECIDE THAT A WITNESS HAS DELIBERATELY

01:29PM   24    TESTIFIED UNTRUTHFULLY ABOUT SOMETHING IMPORTANT, YOU MAY

01:29PM   25    CHOOSE NOT TO BELIEVE ANYTHING THAT WITNESS SAID.  ON THE OTHER

01:29PM   1    HAND, IF YOU THINK THE WITNESS TESTIFIED UNTRUTHFULLY ABOUT

01:29PM   2    SOME THINGS BUT TOLD THE TRUTH ABOUT OTHERS, YOU MAY ACCEPT THE

01:29PM   3    PART YOU THINK IS TRUE AND IGNORE THE REST.

01:29PM   4         THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

01:29PM   5    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT

01:29PM   6    IT.  WHAT IS IMPORTANT IS HOW BELIEVABLE THE WITNESSES ARE AND

01:30PM   7    HOW MUCH WEIGHT YOU THINK THEIR TESTIMONY DESERVES.

01:30PM   8         YOU HAVE HEARD TESTIMONY FROM RICHARD SONNIER WHO

01:30PM   9    TESTIFIED TO HIS OPINIONS AND THE REASONS FOR HIS OPINIONS.

01:30PM  10    THIS OPINION TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR

01:30PM  11    EXPERIENCE OF THIS WITNESS.

01:30PM  12         SUCH OPINION TESTIMONY SHOULD BE JUDGED LIKE ANY OTHER

01:30PM  13    TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT, AND GIVE IT AS MUCH

01:30PM  14    WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S

01:30PM  15    EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

01:30PM  16    AND ALL OF THE OTHER EVIDENCE IN THE CASE.

01:30PM  17         YOU HAVE HEARD TESTIMONY FROM DR. AUDRA ZACHMAN AND

01:30PM  18    DR. MARK BURNES WHO TESTIFIED TO BOTH FACTS AND OPINIONS AND

01:31PM  19    THE REASONS FOR THEIR OPINIONS.

01:31PM  20         FACT TESTIMONY IS BASED ON WHAT THE WITNESS SAW, HEARD, OR

01:31PM  21    DID.

01:31PM  22         OPINION TESTIMONY IS BASED ON THE EDUCATION OR EXPERIENCE

01:31PM  23    OF THE WITNESS.

01:31PM  24         AS TO THE TESTIMONY ABOUT FACTS, IT IS YOUR JOB TO DECIDE

01:31PM  25    WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

01:31PM  1    YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF IT OR NONE

01:31PM  2    OF IT.  YOU MAY TAKE INTO ACCOUNT THE FACTORS DISCUSSED EARLIER

01:31PM  3    IN THESE INSTRUCTIONS THAT WERE PROVIDED TO ASSIST YOU IN

01:31PM  4    WEIGHING THE CREDIBILITY OF WITNESSES.

01:31PM  5        AS TO THE TESTIMONY ABOUT THE WITNESS'S OPINIONS, THIS

01:31PM  6    OPINION TESTIMONY IS ALLOWED BECAUSE OF THE EDUCATION OR

01:31PM  7    EXPERIENCE OF THIS WITNESS.  OPINION TESTIMONY SHOULD BE JUDGED

01:32PM  8    LIKE ANY OTHER TESTIMONY.  YOU MAY ACCEPT ALL OF IT, PART OF

01:32PM  9    IT, OR NONE OF IT.  YOU SHOULD GIVE IT AS MUCH WEIGHT AS YOU

01:32PM  10   THINK IT DESERVES, CONSIDERING THE WITNESS'S EDUCATION AND

01:32PM  11   EXPERIENCE, THE REASONS GIVEN FOR THE OPINION, AND ALL OF THE

01:32PM  12   OTHER EVIDENCE IN THE CASE.

01:32PM  13       DURING THE TRIAL CERTAIN CHARTS AND SUMMARIES WERE SHOWN

01:32PM  14   TO YOU IN ORDER TO HELP EXPLAIN THE EVIDENCE IN THE CASE.

01:32PM  15   THESE CHARTS AND SUMMARIES WERE NOT ADMITTED INTO EVIDENCE AND

01:32PM  16   WILL NOT GO INTO THE JURY ROOM WITH YOU.  THEY ARE NOT

01:32PM  17   THEMSELVES EVIDENCE OR PROOF OF ANY FACTS.  IF THEY DO NOT

01:32PM  18   CORRECTLY REFLECT THE FACTS OR FIGURES SHOWN BY THE EVIDENCE IN

01:32PM  19   THE CASE, YOU SHOULD DISREGARD THESE CHARTS AND SUMMARIES AND

01:32PM  20   DETERMINE THE FACTS FROM THE UNDERLYING EVIDENCE.

01:32PM  21       A SEPARATE CRIME IS CHARGED AGAINST MR. BALWANI IN EACH

01:33PM  22   COUNT.  YOU MUST DECIDE EACH COUNT SEPARATELY.  YOUR VERDICT ON

01:33PM  23   ONE COUNT SHOULD NOT CONTROL YOUR VERDICT ON ANY OTHER COUNT.

01:33PM  24       THE INDICTMENT CHARGES THAT THE OFFENSES ALLEGED IN COUNTS

01:33PM  25   ONE THROUGH TWELVE WERE COMMITTED ON OR ABOUT A CERTAIN DATE.

01:33PM   1          ALTHOUGH IT IS NOT NECESSARY FOR THE GOVERNMENT TO PROVE

01:33PM   2    BEYOND A REASONABLE DOUBT THAT THE OFFENSES WERE COMMITTED ON A

01:33PM   3    DATE REASONABLY NEAR THE DATE ALLEGED IN THE INDICTMENT, IT IS

01:33PM   4    NOT NECESSARY FOR THE GOVERNMENT TO PROVE THAT THE OFFENSES

01:33PM   5    WERE COMMITTED PRECISELY ON THE DATE CHARGED.

01:33PM   6          YOU ARE HERE ONLY TO DETERMINE WHETHER MR. BALWANI IS

01:33PM   7    GUILTY OR NOT GUILTY OF THE CHARGES IN THE INDICTMENT.

01:34PM   8    MR. BALWANI IS NOT ON TRIAL FOR ANY CONDUCT OR OFFENSE NOT

01:34PM   9    CHARGED IN THE INDICTMENT.

01:34PM   10         MR. BALWANI IS CHARGED IN COUNTS ONE AND TWO OF THE

01:34PM   11   INDICTMENT WITH CONSPIRING TO COMMIT WIRE FRAUD IN VIOLATION OF

01:34PM   12   SECTION 1349 OF TITLE 18 OF THE UNITED STATES CODE.

01:34PM   13         MR. BALWANI IS CHARGED IN COUNT ONE OF THE INDICTMENT WITH

01:34PM   14   CONSPIRING TO COMMIT WIRE FRAUD AGAINST INVESTORS IN THERANOS

01:34PM   15   DURING THE PERIOD 2010 TO 2015.

01:34PM   16         MR. BALWANI IS CHARGED IN COUNT TWO OF THE INDICTMENT WITH

01:34PM   17   CONSPIRING TO COMMIT WIRE FRAUD AGAINST PATIENTS WHO PAID FOR

01:34PM   18   THERANOS'S BLOOD TESTING SERVICES DURING THE PERIOD 2013 TO

01:35PM   19   2016.

01:35PM   20         I WILL DEFINE WIRE FRAUD LATER IN THESE INSTRUCTIONS.

01:35PM   21         IN ORDER FOR MR. BALWANI TO BE FOUND OF EITHER COUNT, YOU

01:35PM   22   MUST ALL UNANIMOUSLY AGREE WITH RESPECT TO EACH COUNT THAT THE

01:35PM   23   GOVERNMENT HAS PROVED EACH OF THE FOLLOWING ELEMENTS BEYOND A

01:35PM   24   REASONABLE DOUBT:

01:35PM   25         FIRST, THAT THERE WAS AN AGREEMENT BETWEEN TWO OR MORE

01:35PM 1    PERSONS TO COMMIT WIRE FRAUD AS CHARGED IN THE INDICTMENT; AND,

01:35PM 2        SECOND, THAT MR. BALWANI BECAME A MEMBER OF THE ALLEGED

01:35PM 3    CONSPIRACY KNOWING OF AT LEAST ONE OF ITS OBJECTS AND INTENDING

01:35PM 4    TO HELP ACCOMPLISH IT.

01:35PM 5        A CONSPIRACY IS A KIND OF CRIMINAL PARTNERSHIP -- AN

01:35PM 6    AGREEMENT OF TWO OR MORE PERSONS TO COMMIT ONE OR MORE CRIMES.

01:36PM 7    THE CRIME OF CONSPIRACY IS THE AGREEMENT TO DO SOMETHING

01:36PM 8    UNLAWFUL.  IT DOES NOT MATTER WHETHER THE CRIME AGREED UPON WAS

01:36PM 9    COMMITTED.

01:36PM 10       FOR A CONSPIRACY TO HAVE EXISTED, IT IS NOT NECESSARY THAT

01:36PM 11   THE CONSPIRATORS MADE A FORMAL AGREEMENT OR THAT THEY AGREED ON

01:36PM 12   EVERY DETAIL OF THE CONSPIRACY.  IT IS NOT ENOUGH, HOWEVER,

01:36PM 13   THAT THEY SIMPLY MET, DISCUSSED MATTERS OF COMMON INTEREST,

01:36PM 14   ACTED IN SIMILAR WAYS, OR PERHAPS HELPED ONE ANOTHER.  NOR IS

01:36PM 15   IT ENOUGH, STANDING ALONE, THAT THEY HAD A BUSINESS OR ROMANTIC

01:36PM 16   RELATIONSHIP.  YOU MUST FIND THAT THERE WAS A PLAN TO COMMIT

01:36PM 17   WIRE FRAUD AS ALLEGED IN THE INDICTMENT AS AN OBJECT OF THE

01:36PM 18   CONSPIRACY WITH ALL OF YOU AGREEING AS TO THE PARTICULAR CRIME

01:37PM 19   WHICH THE CONSPIRATORS AGREED TO COMMIT.

01:37PM 20       ONE BECOMES A MEMBER OF A CONSPIRACY BY WILLFULLY

01:37PM 21   PARTICIPATING IN THE UNLAWFUL PLAN WITH THE INTENT TO ADVANCE

01:37PM 22   OR FURTHER SOME OBJECT OR PURPOSE OF THE CONSPIRACY, EVEN

01:37PM 23   THOUGH THE PERSON DOES NOT HAVE FULL KNOWLEDGE OF ALL THE

01:37PM 24   DETAILS OF THE CONSPIRACY.  FURTHERMORE, ONE WHO WILLFULLY

01:37PM 25   JOINS AN EXISTING CONSPIRACY IS AS RESPONSIBLE FOR IT AS THE

7696

```
01:37PM   1        ORIGINATORS.
01:37PM   2             ON THE OTHER HAND, ONE WHO HAS NO KNOWLEDGE OF A
01:37PM   3        CONSPIRACY BUT HAPPENS TO ACT IN A WAY THAT FURTHERS SOME
01:37PM   4        OBJECT OR PURPOSE OF THE CONSPIRACY DOES NOT THEREBY BECOME A
01:37PM   5        CONSPIRATOR.
01:37PM   6             SIMILARLY, A PERSON DOES NOT BECOME A CONSPIRATOR MERELY
01:38PM   7        BY ASSOCIATING WITH ONE OR MORE PERSONS WHO ARE CONSPIRATORS,
01:38PM   8        NOR MERELY BY KNOWING THAT A CONSPIRACY EXISTS.
01:38PM   9             WILLFULLY MEANS TO ACT WITH KNOWLEDGE THAT ONE'S CONDUCT
01:38PM  10        IS UNLAWFUL AND WITH THE INTENT TO DO SOMETHING THE LAW
01:38PM  11        FORBIDS.
01:38PM  12             A CONSPIRACY MAY CONTINUE FOR A LONG PERIOD OF TIME AND
01:38PM  13        MAY INCLUDE THE PERFORMANCE OF MANY TRANSACTIONS.  IT IS NOT
01:38PM  14        NECESSARY THAT ALL MEMBERS OF THE CONSPIRACY JOIN IT AT THE
01:38PM  15        SAME TIME, AND ONE MAY BECOME A MEMBER OF A CONSPIRACY WITHOUT
01:38PM  16        FULL KNOWLEDGE OF ALL THE DETAILS OF THE UNLAWFUL SCHEME OR THE
01:38PM  17        NAMES, IDENTITIES, OR LOCATIONS OF ALL OF THE OTHER MEMBERS.
01:39PM  18             EVEN IF MR. BALWANI DID NOT DIRECTLY CONSPIRE WITH OTHER
01:39PM  19        CONSPIRATORS IN THE OVERALL SCHEME, MR. BALWANI HAS, IN EFFECT,
01:39PM  20        AGREED TO PARTICIPATE IN AN ALLEGED CONSPIRACY IF THE
01:39PM  21        GOVERNMENT PROVES EACH OF THE FOLLOWING BEYOND A REASONABLE
01:39PM  22        DOUBT:
01:39PM  23             FIRST, THAT MR. BALWANI DIRECTLY CONSPIRED WITH ONE OR
01:39PM  24        MORE CONSPIRATORS TO CARRY OUT AT LEAST ONE OF THE OBJECTS OF
01:39PM  25        THE CONSPIRACY;
```

7697

01:39PM 1        SECOND, THAT MR. BALWANI KNEW OR HAD REASON TO KNOW THAT

01:39PM 2   OTHER CONSPIRATORS WERE INVOLVED WITH THOSE WITH WHOM

01:39PM 3   MR. BALWANI DIRECTLY CONSPIRED; AND,

01:39PM 4        THIRD, THAT MR. BALWANI HAD REASON TO BELIEVE THAT

01:40PM 5   WHATEVER BENEFITS MR. BALWANI MIGHT GET FROM THE ALLEGED

01:40PM 6   CONSPIRACY WERE PROBABLY DEPENDENT UPON THE SUCCESS OF THE

01:40PM 7   ENTIRE VENTURE.

01:40PM 8        IT IS NOT A DEFENSE THAT A PERSON'S PARTICIPATION IN A

01:40PM 9   CONSPIRACY WAS MINOR OR FOR A SHORT PERIOD OF TIME.

01:40PM 10       EACH MEMBER OF A CONSPIRACY IS RESPONSIBLE FOR THE

01:40PM 11  REASONABLY FORESEEABLE ACTIONS OF THE OTHER CONSPIRATORS

01:40PM 12  PERFORMED DURING THE COURSE AND IN FURTHERANCE OF THE

01:40PM 13  CONSPIRACY.  IF ONE MEMBER OF A CONSPIRACY COMMITS A CRIME IN

01:40PM 14  FURTHERANCE OF A CONSPIRACY, THE OTHER MEMBERS HAVE ALSO UNDER

01:40PM 15  THE LAW COMMITTED THAT CRIME.

01:40PM 16       THEREFORE, YOU MAY FIND MR. BALWANI GUILTY OF WIRE FRAUD

01:40PM 17  AGAINST INVESTORS IN THERANOS AS CHARGED IN COUNTS THREE

01:40PM 18  THROUGH EIGHT OF THE INDICTMENT IF THE GOVERNMENT HAS PROVED

01:40PM 19  EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

01:41PM 20       FIRST, A COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

01:41PM 21  AS ALLEGED IN THAT COUNT;

01:41PM 22       SECOND, THE COCONSPIRATOR WAS A MEMBER OF THE CONSPIRACY

01:41PM 23  CHARGED IN COUNT ONE OF THE INDICTMENT;

01:41PM 24       THIRD, THE COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

01:41PM 25  IN FURTHERANCE OF THE CONSPIRACY;

01:41PM  1          FOURTH, MR. BALWANI WAS A MEMBER OF THE SAME CONSPIRACY AT

01:41PM  2    THE TIME THE OFFENSE CHARGED IN COUNTS THREE THROUGH EIGHT WAS

01:41PM  3    COMMITTED BY THE COCONSPIRATOR.

01:41PM  4          I'LL READ THAT ONE AGAIN.

01:41PM  5          FOURTH, MR. BALWANI WAS A MEMBER OF THE SAME CONSPIRACY AT

01:41PM  6    THE TIME THE OFFENSE CHARGED IN COUNTS THREE THROUGH EIGHT WAS

01:41PM  7    COMMITTED BY THE COCONSPIRATOR; AND,

01:41PM  8          FIFTH, THE OFFENSE FELL WITHIN THE SCOPE OF THE UNLAWFUL

01:42PM  9    AGREEMENT AND COULD REASONABLY HAVE BEEN FORESEEN BY

01:42PM 10    MR. BALWANI TO BE A NECESSARY OR NATURAL CONSEQUENCE OF THE

01:42PM 11    UNLAWFUL AGREEMENT.

01:42PM 12          YOU MAY FIND MR. BALWANI GUILTY OF WIRE FRAUD AGAINST

01:42PM 13    PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES AS

01:42PM 14    CHARGED IN COUNTS NINE THROUGH TWELVE OF THE INDICTMENT IF THE

01:42PM 15    GOVERNMENT HAS PROVED EACH OF THE FOLLOWING ELEMENTS BEYOND A

01:42PM 16    REASONABLE DOUBT:

01:42PM 17          FIRST, THE COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

01:42PM 18    AS ALLEGED IN THAT COUNT;

01:42PM 19          SECOND, THE COCONSPIRATOR WAS A MEMBER OF THE CONSPIRACY

01:42PM 20    CHARGED IN COUNT TWO OF THE INDICTMENT;

01:42PM 21          THIRD, THE COCONSPIRATOR COMMITTED THE CRIME OF WIRE FRAUD

01:42PM 22    IN FURTHERANCE OF THE CONSPIRACY;

01:42PM 23          FOURTH, MR. BALWANI WAS A MEMBER OF THE SAME CONSPIRACY AT

01:43PM 24    THE TIME THE OFFENSE CHARGED IN COUNTS NINE THROUGH TWELVE WAS

01:43PM 25    COMMITTED BY THE COCONSPIRATOR; AND,

7699

01:43PM   1        FIFTH, THE OFFENSE FELL WITHIN THE SCOPE OF THE UNLAWFUL

01:43PM   2   AGREEMENT AND COULD REASONABLY HAVE BEEN FORESEEN BY

01:43PM   3   MR. BALWANI TO BE A NECESSARY OR NATURAL CONSEQUENCE OF THE

01:43PM   4   UNLAWFUL AGREEMENT.

01:43PM   5        MR. BALWANI IS CHARGED IN COUNTS THREE THROUGH TWELVE OF

01:43PM   6   THE INDICTMENT WITH WIRE FRAUD IN VIOLATION OF SECTION 1343 OF

01:43PM   7   TITLE 18 OF THE UNITED STATES CODE.

01:43PM   8        MR. BALWANI IS CHARGED IN COUNTS THREE THROUGH EIGHT OF

01:43PM   9   THE INDICTMENT WITH WIRE FRAUD AGAINST INVESTORS IN THERANOS.

01:43PM  10   IN PARTICULAR:

01:43PM  11        MR. BALWANI IS CHARGED IN COUNT THREE WITH WIRE FRAUD IN

01:44PM  12   CONNECTION WITH A WIRE TRANSFER OF $99,990 ON OR ABOUT

01:44PM  13   DECEMBER 30, 2013.

01:44PM  14        MR. BALWANI IS CHARGED IN COUNT FOUR WITH WIRE FRAUD IN

01:44PM  15   CONNECTION WITH A WIRE TRANSFER OF $5,349,900 ON OR ABOUT

01:44PM  16   DECEMBER 31, 2013.

01:44PM  17        MR. BALWANI IS CHARGED IN COUNT FIVE WITH WIRE FRAUD IN

01:44PM  18   CONNECTION WITH A WIRE TRANSFER OF $4,875,000 ON OR ABOUT

01:44PM  19   DECEMBER 31, 2013.

01:44PM  20        MR. BALWANI IS CHARGED IN COUNT SIX WITH WIRE FRAUD IN

01:44PM  21   CONNECTION WITH A WIRE TRANSFER OF $38,336,632 ON OR ABOUT

01:45PM  22   FEBRUARY 6TH, 2014.

01:45PM  23        MR. BALWANI IS CHARGED IN COUNT SEVEN WITH WIRE FRAUD IN

01:45PM  24   CONNECTION WITH A WIRE TRANSFER OF $99,999,984 ON OR ABOUT

01:45PM  25   OCTOBER 31, 2014.

7700

01:45PM   1       MR. BALWANI IS CHARGED IN COUNT EIGHT WITH WIRE FRAUD IN

01:45PM   2   CONNECTION WITH A WIRE TRANSFER OF $5,999,997 ON OR ABOUT

01:45PM   3   OCTOBER 31, 2014.

01:45PM   4       MR. BALWANI IS CHARGED IN COUNTS NINE THROUGH TWELVE OF

01:45PM   5   THE INDICTMENT WITH WIRE FRAUD AGAINST PATIENTS WHO PAID FOR

01:45PM   6   THERANOS'S BLOOD TESTING SERVICES.  IN PARTICULAR:

01:45PM   7       MR. BALWANI IS CHARGED IN COUNT NINE WITH WIRE FRAUD IN

01:46PM   8   CONNECTION WITH A TELEPHONE CALL FROM PATIENT INITIALS B.B. TO

01:46PM   9   THERANOS REGARDING B.B.'S LABORATORY BLOOD TEST RESULTS ON OR

01:46PM  10   ABOUT OCTOBER 12, 2015.

01:46PM  11       MR. BALWANI IS CHARGED IN COUNT TEN WITH WIRE FRAUD IN

01:46PM  12   CONNECTION WITH A WIRE TRANSMISSION OF PATIENT INITIAL E.T.'S

01:46PM  13   LABORATORY BLOOD TEST RESULTS ON OR ABOUT MAY 11, 2015.

01:46PM  14       MR. BALWANI IS CHARGED IN COUNT ELEVEN WITH WIRE FRAUD IN

01:46PM  15   CONNECTION WITH A WIRE TRANSMISSION OF PATIENT INITIAL M.E.'S

01:46PM  16   LABORATORY BLOOD TEST RESULTS ON OR ABOUT MAY 16TH, 2015.

01:47PM  17       MR. BALWANI IS CHARGED IN COUNT TWELVE WITH WIRE FRAUD IN

01:47PM  18   CONNECTION WITH A WIRE TRANSFER OF 112-6661 ON OR ABOUT

01:47PM  19   AUGUST 3, 2015.

01:47PM  20       IN ORDER FOR MR. BALWANI TO BE FOUND GUILTY OF EACH COUNT

01:47PM  21   OF WIRE FRAUD, YOU MUST ALL UNANIMOUSLY AGREE WITH RESPECT TO

01:47PM  22   EACH COUNT THAT THE GOVERNMENT HAS PROVED EACH OF THE FOLLOWING

01:47PM  23   ELEMENTS BEYOND A REASONABLE DOUBT:

01:47PM  24       FIRST, MR. BALWANI KNOWINGLY PARTICIPATED IN, DEVISED, OR

01:47PM  25   INTENDED TO DEVISE A SCHEME OR PLAN TO DEFRAUD OR A SCHEME OR

01:47PM 1    PLAN FOR OBTAINING MONEY OR PROPERTY BY MEANS OF FALSE OR

01:48PM 2    FRAUDULENT PRETENSES, REPRESENTATIONS, OR PROMISES.  A SCHEME

01:48PM 3    TO DEFRAUD IS A DECEPTIVE SCHEME TO DEPRIVE A PERSON OF MONEY

01:48PM 4    OR PROPERTY.  DECEITFUL STATEMENTS OF HALF-TRUTHS MAY

01:48PM 5    CONSTITUTE FALSE OR FRAUDULENT REPRESENTATIONS;

01:48PM 6        SECOND, THE STATEMENTS MADE AS PART OF THE SCHEME WERE

01:48PM 7    MATERIAL.  STATEMENTS ARE MATERIAL IF THEY HAD A NATURAL

01:48PM 8    TENDENCY TO INFLUENCE OR WERE CAPABLE OF INFLUENCING A PERSON

01:48PM 9    TO PART WITH MONEY OR PROPERTY;

01:48PM 10       THIRD, MR. BALWANI ACTED WITH THE INTENT TO DEFRAUD, THAT

01:48PM 11   IS, THE INTENT TO DECEIVE AND CHEAT.  THE INTENT TO DECEIVE AND

01:49PM 12   CHEAT IS THE INTENT TO DEPRIVE SOMEONE OF MONEY OR PROPERTY BY

01:49PM 13   MEANS OF DECEPTION; AND,

01:49PM 14       FOURTH, MR. BALWANI USED, OR CAUSED TO BE USED, AN

01:49PM 15   INTERSTATE WIRE COMMUNICATION TO CARRY OUT OR ATTEMPT TO CARRY

01:49PM 16   OUT AN ESSENTIAL PART OF THE SCHEME.  THE WIRE ITSELF NEED NOT

01:49PM 17   BE FALSE OR MISLEADING.

01:49PM 18       IN DETERMINING WHETHER A SCHEME TO DEFRAUD EXISTS, YOU MAY

01:49PM 19   CONSIDER NOT ONLY MR. BALWANI'S WORDS AND STATEMENTS BUT ALSO

01:49PM 20   THE CIRCUMSTANCES IN WHICH THEY ARE USED AS A WHOLE.

01:49PM 21       A WIRING IS CAUSED WHEN ONE KNOWS THAT A WIRE WILL BE USED

01:49PM 22   IN THE ORDINARY COURSE OF BUSINESS OR WHEN ONE CAN REASONABLY

01:49PM 23   FORESEE SUCH USE.

01:49PM 24       IT NEED NOT HAVE BEEN REASONABLY FORESEEABLE TO

01:50PM 25   MR. BALWANI THAT THE WIRE COMMUNICATION WOULD BE INTERSTATE IN

7702

01:50PM  1    NATURE.  RATHER, IT MUST HAVE BEEN REASONABLY FORESEEABLE TO

01:50PM  2    MR. BALWANI THAT SOME WIRE COMMUNICATION WOULD OCCUR IN

01:50PM  3    FURTHERANCE OF THE SCHEME, AND AN INTERSTATE WIRE COMMUNICATION

01:50PM  4    MUST HAVE ACTUALLY OCCURRED IN FURTHERANCE OF THE SCHEME.

01:50PM  5         AN INTENT TO DEFRAUD IS AN INTENT TO DECEIVE AND CHEAT,

01:50PM  6    THAT IS, TO DEPRIVE SOMEONE OF MONEY OR PROPERTY BY MEANS OF

01:50PM  7    DECEPTION.

01:50PM  8         YOU MAY CONSIDER WHETHER MR. BALWANI HAD AN HONEST, GOOD

01:50PM  9    FAITH BELIEF IN THE TRUTH OF THE SPECIFIC MISREPRESENTATIONS

01:51PM  10   ALLEGED IN THE INDICTMENT IN DETERMINING WHETHER OR NOT HE

01:51PM  11   ACTED WITH INTENT TO DEFRAUD.

01:51PM  12        AN ACT IS DONE KNOWINGLY IF MR. BALWANI WAS AWARE OF THE

01:51PM  13   ACT AND DID NOT ACT THROUGH IGNORANCE, MISTAKE, OR ACCIDENT.

01:51PM  14   THE GOVERNMENT IS NOT REQUIRED TO PROVE THAT MR. BALWANI KNEW

01:51PM  15   THAT HIS ACTS WERE UNLAWFUL.  YOU MAY CONSIDER EVIDENCE OF

01:51PM  16   MR. BALWANI'S WORDS OR ACTS, ALONG WITH ALL OF THE OTHER

01:51PM  17   EVIDENCE IN DECIDING WHETHER MR. BALWANI ACTED KNOWINGLY.

01:51PM  18        TO FIND THAT MR. BALWANI ACTED KNOWINGLY, YOU MUST FIND

01:51PM  19   THAT HE HIMSELF HAD KNOWLEDGE OF THE FACT AT ISSUE.

01:51PM  20        MR. BALWANI MAY BE FOUND GUILTY OF WIRE FRAUD AS CHARGED

01:52PM  21   IN COUNTS THREE THROUGH TWELVE OF THE INDICTMENT, EVEN IF

01:52PM  22   MR. BALWANI PERSONALLY DID NOT COMMIT THE ACT OR ACTS

01:52PM  23   CONSTITUTING THE CRIME BUT AIDED AND ABETTED IN ITS COMMISSION.

01:52PM  24        TO AID AND ABET MEANS INTENTIONALLY TO HELP SOMEONE ELSE

01:52PM  25   COMMIT A CRIME.  TO PROVE MR. BALWANI GUILTY OF WIRE FRAUD BY

01:52PM 1   AIDING AND ABETTING, THE GOVERNMENT MUST PROVE EACH OF THE

01:52PM 2   FOLLOWING BEYOND A REASONABLE DOUBT:

01:52PM 3        FIRST, SOMEONE ELSE COMMITTED THE CONDUCT CHARGED IN

01:52PM 4   COUNTS THREE THROUGH TWELVE OF THE INDICTMENT;

01:52PM 5        SECOND, MR. BALWANI AIDED, COUNSELLED, COMMANDED, INDUCED,

01:52PM 6   OR PROCURED THAT PERSON WITH RESPECT TO AT LEAST ONE ELEMENT OF

01:52PM 7   WIRE FRAUD AS CHARGED IN COUNTS THREE THROUGH TWELVE OF THE

01:53PM 8   INDICTMENT;

01:53PM 9        THIRD, MR. BALWANI ACTED WITH THE INTENT TO FACILITATE

01:53PM 10  WIRE FRAUD AS CHARGED IN COUNTS THREE THROUGH TWELVE OF THE

01:53PM 11  INDICTMENT; AND,

01:53PM 12       FOURTH, MR. BALWANI ACTED BEFORE THE CRIME WAS COMPLETED.

01:53PM 13       IT IS NOT ENOUGH THAT MR. BALWANI MERELY ASSOCIATED WITH

01:53PM 14  THE PERSON COMMITTING THE CRIME OR UNKNOWINGLY OR

01:53PM 15  UNINTENTIONALLY DID THINGS THAT WERE HELPFUL TO THAT PERSON, OR

01:53PM 16  WAS PRESENT AT THE SCENE OF THE CRIME.  THE EVIDENCE MUST SHOW

01:53PM 17  BEYOND A REASONABLE DOUBT THAT MR. BALWANI ACTED WITH THE

01:53PM 18  KNOWLEDGE AND INTENTION OF HELPING THAT PERSON COMMIT WIRE

01:53PM 19  FRAUD AS CHARGED IN COUNTS THREE THROUGH TWELVE OF THE

01:53PM 20  INDICTMENT.

01:53PM 21       A DEFENDANT ACTS WITH THE INTENT TO FACILITATE THE CRIME

01:54PM 22  WHEN THE DEFENDANT ACTIVELY PARTICIPATE IN A CRIMINAL VENTURE

01:54PM 23  WITH ADVANCE KNOWLEDGE OF THE CRIME AND HAVING ACQUIRED THAT

01:54PM 24  KNOWLEDGE WHEN THE DEFENDANT STILL HAD A REALISTIC OPPORTUNITY

01:54PM 25  TO WITHDRAW FROM THE CRIME.

01:54PM 1        THE GOVERNMENT IS NOT REQUIRED TO PROVE PRECISELY WHICH

01:54PM 2    PERSON ACTUALLY COMMITTED THE CRIME AND WHICH PERSON AIDED AND

01:54PM 3    ABETTED IF YOU FIND.

01:54PM 4        IF YOU FIND THAT MR. BALWANI WAS A MEMBER OF THE SCHEME TO

01:54PM 5    DEFRAUD INVESTORS IN THERANOS CHARGED IN COUNTS THREE THROUGH

01:54PM 6    EIGHT, AND THAT MR. BALWANI HAD THE INTENT TO DEFRAUD INVESTORS

01:54PM 7    IN THERANOS, MR. BALWANI MAY BE RESPONSIBLE FOR OTHER

01:55PM 8    CO-SCHEMERS' ACTIONS DURING THE COURSE OF AND IN FURTHERANCE OF

01:55PM 9    THE ALLEGED SCHEME, EVEN IF MR. BALWANI DID NOT KNOW WHAT THEY

01:55PM 10   SAID OR DID.

01:55PM 11       FOR MR. BALWANI TO BE GUILTY OF AN OFFENSE COMMITTED BY A

01:55PM 12   CO-SCHEMER IN FURTHERANCE OF THE SCHEME, THE GOVERNMENT MUST

01:55PM 13   PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

01:55PM 14       FIRST, THE CO-SCHEMER WAS A MEMBER OF THE SCHEME TO

01:55PM 15   DEFRAUD INVESTORS CHARGED IN COUNTS THREE THROUGH EIGHT OF THE

01:55PM 16   INDICTMENT;

01:55PM 17       SECOND, THE COSCHEMER COMMITTED THE OFFENSE IN FURTHERANCE

01:55PM 18   OF THE SCHEME TO DEFRAUD INVESTORS;

01:55PM 19       THIRD, MR. BALWANI WAS A MEMBER OF THE SAME SCHEME TO

01:55PM 20   DEFRAUD AND POSSESSED THE INTENT TO DEFRAUD THERANOS INVESTORS;

01:55PM 21   AND,

01:55PM 22       FOURTH, THE OFFENSE COMMITTED BY THE OTHER -- BY THE

01:55PM 23   COSCHEMER FELL WITHIN THE SCOPE OF THE SCHEME TO DEFRAUD AND

01:56PM 24   WAS ONE THAT MR. BALWANI COULD REASONABLY FORESEE AS A

01:56PM 25   NECESSARY AND NATURAL SEQUENCE OF THE SCHEME TO DEFRAUD.

7705

01:56PM  1        I'LL READ THAT AGAIN.

01:56PM  2        FOURTH, THE OFFENSE COMMITTED BY THE COSCHEMER FELL WITHIN

01:56PM  3   THE SCOPE OF THE SCHEME TO DEFRAUD AND WAS ONE THAT MR. BALWANI

01:56PM  4   COULD REASONABLY FORESEE AS A NECESSARY AND NATURAL CONSEQUENCE

01:56PM  5   OF THE SCHEME TO DEFRAUD.

01:56PM  6        IF YOU FIND THAT MR. BALWANI WAS A MEMBER OF THE SCHEME TO

01:56PM  7   DEFRAUD PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES

01:56PM  8   CHARGED IN COUNTS NINE THROUGH TWELVE AND THAT MR. BALWANI HAD

01:56PM  9   THE INTENT TO DEFRAUD THERANOS PAYING PATIENTS, MR. BALWANI MAY

01:56PM  10  BE RESPONSIBLE FOR OTHER COSCHEMERS' ACTIONS DURING THE COURSE

01:56PM  11  OF AND IN FURTHERANCE OF THE ALLEGED SCHEME, EVEN IF

01:56PM  12  MR. BALWANI DID NOT KNOW WHAT THEY SAID OR DID.

01:57PM  13       FOR MR. BALWANI TO BE GUILTY OF AN OFFENSE COMMITTED BY A

01:57PM  14  COSCHEMER IN FURTHERANCE OF THE SCHEME, THE GOVERNMENT MUST

01:57PM  15  PROVE EACH OF THE FOLLOWING ELEMENTS BEYOND A REASONABLE DOUBT:

01:57PM  16       FIRST, THE COSCHEMER WAS A MEMBER OF THE SCHEME TO DEFRAUD

01:57PM  17  PATIENTS WHO PAID FOR THERANOS'S BLOOD TESTING SERVICES CHARGED

01:57PM  18  IN COUNTS NINE THROUGH TWELVE OF THE INDICTMENT;

01:57PM  19       SECOND, THE COSCHEMER COMMITTED THE OFFENSE IN FURTHERANCE

01:57PM  20  OF THE SCHEME TO DEFRAUD THERANOS PAYING PATIENTS;

01:57PM  21       THIRD, MR. BALWANI WAS A MEMBER OF THE SAME SCHEME TO

01:57PM  22  DEFRAUD, AND POSSESSED THE INTENT TO DEFRAUD THERANOS PAYING

01:57PM  23  PATIENTS; AND,

01:57PM  24       FOURTH, THE OFFENSE COMMITTED BY THE COSCHEMER FELL WITHIN

01:57PM  25  THE SCOPE OF THE SCHEME TO DEFRAUD AND WAS ONE THAT MR. BALWANI

01:57PM 1    COULD REASONABLY FORESEE AS A NECESSARY AND NATURAL CONSEQUENCE

01:58PM 2    OF THE SCHEME TO DEFRAUD.

01:58PM 3        AN ALLEGED VICTIM'S NEGLIGENCE IS NOT A DEFENSE TO WIRE

01:58PM 4    FRAUD.  YOU HAVE HEARD EVIDENCE REGARDING INVESTORS' PROCESS

01:58PM 5    FOR DECIDING WHETHER TO INVEST MONEY IN THERANOS.  YOU ARE TO

01:58PM 6    CONSIDER THIS EVIDENCE TO THE EXTENT THAT IT HELPS YOU

01:58PM 7    DETERMINE WHETHER MR. BALWANI MADE FALSE OR FRAUDULENT

01:58PM 8    PRETENSES, REPRESENTATIONS, OR PROMISES AS PART OF A SCHEME OR

01:58PM 9    PLAN TO DEFRAUD.  AND YOU CAN SEE THE PRIOR WIRE FRAUD

01:58PM 10   INSTRUCTION.

01:58PM 11       YOU MAY ALSO CONSIDER THIS EVIDENCE TO THE EXTENT THAT IT

01:58PM 12   HELPS YOU DETERMINE WHETHER THE STATEMENTS MADE AS PART OF THE

01:58PM 13   ALLEGED SCHEME WERE MATERIAL; THAT IS, WHETHER THEY HAD A

01:58PM 14   NATURAL TENDENCY OR WERE CAPABLE OF INFLUENCING A PERSON TO

01:59PM 15   PART WITH MONEY OR PROPERTY.  AND YOU MAY SEE THE PRIOR WIRE

01:59PM 16   FRAUD INSTRUCTION.

01:59PM 17       SUCCESS OF A SCHEME TO DEFRAUD IS NOT NECESSARY FOR

01:59PM 18   PURPOSES OF DETERMINING WHETHER WIRE FRAUD OCCURRED.  FOR

01:59PM 19   COUNTS THREE THROUGH TWELVE, IT IS NOT NECESSARY THAT

01:59PM 20   MR. BALWANI MADE A PROFIT OR THAT ANYONE ACTUALLY SUFFERED A

01:59PM 21   LOSS.

01:59PM 22       YOU HAVE HEARD EVIDENCE REGARDING ALLEGED VIOLATIONS AND

01:59PM 23   REGULATIONS OF INDUSTRY STANDARDS.  YOU MAY CONSIDER SUCH

01:59PM 24   EVIDENCE, ALONG WITH OTHER EVIDENCE, LIMITED TO ANY PURPOSE FOR

01:59PM 25   WHICH SUCH EVIDENCE WAS ADMITTED, IN ASSESSING WHETHER THE

7707

01:59PM 1    GOVERNMENT HAS PROVED EACH OF THE COUNTS CHARGED IN THE

01:59PM 2    INDICTMENT.  HOWEVER, YOU MAY NOT FIND MR. BALWANI LIABLE FOR

02:00PM 3    ANY OF THE OFFENSES ALLEGED IN THE INDICTMENT MERELY BECAUSE HE

02:00PM 4    OR THERANOS MAY HAVE VIOLATED FEDERAL OR STATE REGULATIONS OR

02:00PM 5    BECAUSE MR. BALWANI OR THERANOS MAY HAVE ENGAGED IN NEGLIGENT

02:00PM 6    PRACTICES OR VIOLATED INDUSTRY STANDARDS RELATED TO LABORATORY

02:00PM 7    TESTING OR MEDICAL DEVICES.

02:00PM 8        WHEN YOU BEGIN YOUR DELIBERATIONS, ELECT ONE MEMBER OF THE

02:00PM 9    JURY AS YOUR FOREPERSON WHO WILL PRESIDE OVER THE DELIBERATIONS

02:00PM 10   AND SPEAK FOR YOU HERE IN COURT.

02:00PM 11       YOU WILL THEN DISCUSS THE CASE WITH YOUR FELLOW JURORS TO

02:00PM 12   REACH AGREEMENT IF YOU CAN DO SO.  YOUR VERDICT, WHETHER GUILTY

02:00PM 13   OR NOT GUILTY, MUST BE UNANIMOUS.

02:00PM 14       EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF BUT YOU

02:01PM 15   SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL OF THE

02:01PM 16   EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND

02:01PM 17   LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.

02:01PM 18       DO NOT BE AFRAID TO CHANGE YOUR OPINION IF THE DISCUSSION

02:01PM 19   PERSUADES YOU THAT YOU SHOULD.  BUT DO NOT COME TO A DECISION

02:01PM 20   SIMPLY BECAUSE OTHER JURORS THINK IT IS RIGHT.

02:01PM 21       IT IS IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS

02:01PM 22   VERDICT, BUT, OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER

02:01PM 23   HAVING MADE YOUR OWN CONSCIENTIOUS DECISION.  DO NOT CHANGE AN

02:01PM 24   HONEST BELIEF ABOUT THE WEIGHT AND EFFECT OF THE EVIDENCE

02:01PM 25   SIMPLY TO REACH A VERDICT.

02:01PM   1      PERFORM THESE DUTIES FAIRLY AND IMPARTIALLY.  DO NOT ALLOW

02:01PM   2   PERSONAL LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, OR

02:01PM   3   PUBLIC OPINION TO INFLUENCE YOU.  YOU SHOULD ALSO NOT BE

02:02PM   4   INFLUENCED BY ANY PERSON'S RACE, COLOR, RELIGIOUS BELIEFS,

02:02PM   5   NATIONAL ANCESTRY, SEXUAL ORIENTATION, GENDER IDENTITY, GENDER,

02:02PM   6   PROFESSION, CELEBRITY, ECONOMIC CIRCUMSTANCES, OR POSITION IN

02:02PM   7   LIFE OR IN THE COMMUNITY.

02:02PM   8      ALSO, DO NOT ALLOW YOURSELVES TO BE INFLUENCED BY PERSONAL

02:02PM   9   LIKES OR DISLIKES, SYMPATHY, PREJUDICE, FEAR, PUBLIC OPINION,

02:02PM  10   OR BIASES, INCLUDING UNCONSCIOUS BIASES.  UNCONSCIOUS BIASES

02:02PM  11   ARE STEREOTYPES, ATTITUDES, OR PREFERENCES THAT PEOPLE MAY

02:02PM  12   CONSCIOUSLY REJECT BUT MAY BE EXPRESSED WITHOUT CONSCIOUS

02:02PM  13   AWARENESS, CONTROL, OR INTENTION.

02:02PM  14      IT IS YOUR DUTY AS JURORS TO CONSULT WITH ONE ANOTHER AND

02:02PM  15   TO DELIBERATE WITH ONE ANOTHER WITH A VIEW TOWARD REACHING

02:02PM  16   AGREEMENT IF YOU CAN DO SO.  DURING YOUR DELIBERATIONS, YOU

02:03PM  17   SHOULD NOT HESITATE TO REEXAMINE YOUR OWN VIEWS AND CHANGE YOUR

02:03PM  18   OPINION IF YOU BECOME PERSUADED THAT IT IS WRONG.

02:03PM  19      BECAUSE YOU MUST BASE YOUR VERDICT ONLY ON THE EVIDENCE

02:03PM  20   RECEIVED IN THE CASE AND ON THESE INSTRUCTIONS, I REMIND YOU

02:03PM  21   THAT YOU MUST NOT BE EXPOSED TO ANY OTHER INFORMATION ABOUT THE

02:03PM  22   CASE OR TO THE ISSUES IT INVOLVES.  EXCEPT FOR DISCUSSING THE

02:03PM  23   CASE WITH YOUR FELLOW JURORS DURING DELIBERATIONS:

02:03PM  24      DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

02:03PM  25   ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

7709

02:03PM 1    THE CASE OR ANYTHING TO DO WITH IT.  THIS RESTRICTION INCLUDES

02:03PM 2    DISCUSSING THE CASE IN PERSON, IN WRITING, BY PHONE, TABLET,

02:03PM 3    COMPUTER, OR ANY OTHER MEANS, VIA EMAIL, TEXT MESSAGING, OR ANY

02:03PM 4    INTERNET CHAT ROOM, BLOG, WEBSITE, OR OTHER FORMS OF SOCIAL

02:04PM 5    MEDIA.  THIS RESTRICTION APPLIES TO COMMUNICATING WITH YOUR

02:04PM 6    FAMILY MEMBERS, YOUR EMPLOYER, THE MEDIA OR PRESS, AND THE

02:04PM 7    PEOPLE INVOLVED IN THE TRIAL.  IF YOU ARE ASKED OR APPROACHED

02:04PM 8    IN ANY WAY ABOUT YOUR JURY SERVICE OR ANYTHING ABOUT THIS CASE,

02:04PM 9    YOU MUST RESPOND THAT YOU HAVE BEEN ORDERED NOT TO DISCUSS THE

02:04PM 10   MATTER AND TO REPORT THE CONTACT TO THE COURT.

02:04PM 11       DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA

02:04PM 12   ACCOUNTS OR COMMENTARY ABOUT THE CASE OR ANYTHING TO DO WITH

02:04PM 13   IT; DO NOT DO ANY RESEARCH, SUCH AS CONSULTING DICTIONARIES,

02:04PM 14   SEARCHING THE INTERNET (THROUGH GOOGLE OR OTHERWISE) OR USING

02:04PM 15   OTHER REFERENCE MATERIALS, AND DO NOT MAKE ANY INVESTIGATION OR

02:04PM 16   IN ANY OTHER WAY TRY TO LEARN ABOUT THE CASE ON YOUR OWN.

02:04PM 17       THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES

02:05PM 18   HAVE A FAIR TRIAL BASED ON THE SAME EVIDENCE THAT EACH PARTY

02:05PM 19   HAS HAD AN OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

02:05PM 20   RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THESE PROCEEDINGS, AND

02:05PM 21   A MISTRIAL COULD RESULT THAT WOULD REQUIRE THE ENTIRE TRIAL

02:05PM 22   PROCESS TO START OVER.

02:05PM 23       IF ANY JUROR IS EXPOSED TO ANY OUTSIDE INFORMATION, PLEASE

02:05PM 24   NOTIFY THE COURT IMMEDIATELY.

02:05PM 25       SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL.  WHETHER OR

02:05PM 1    NOT YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN MEMORY OF WHAT

02:05PM 2    WAS SAID.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.  YOU SHOULD

02:05PM 3    NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE OF YOUR FELLOW

02:05PM 4    JURORS.

02:05PM 5         THE PUNISHMENT PROVIDED BY LAW FOR THE ALLEGED OFFENSES IS

02:06PM 6    FOR THE COURT TO DECIDE.  YOU MAY NOT CONSIDER PUNISHMENT IN

02:06PM 7    DECIDING WHETHER THE GOVERNMENT HAS PROVED ITS CASE AGAINST

02:06PM 8    MR. BALWANI BEYOND A REASONABLE DOUBT.

02:06PM 9         A VERDICT FORM HAS BEEN PREPARED FOR YOU.  AFTER YOU HAVE

02:06PM 10   REACHED UNANIMOUS AGREEMENT ON A VERDICT, YOUR FOREPERSON

02:06PM 11   SHOULD COMPLETE THE VERDICT FORM ACCORDING TO YOUR

02:06PM 12   DELIBERATIONS, SIGN AND DATE IT, AND ADVISE THE CLERK THAT YOU

02:06PM 13   ARE READY TO RETURN TO THE COURTROOM.

02:06PM 14        IF IT BECOMES NECESSARY DURING YOUR DELIBERATIONS TO

02:06PM 15   COMMUNICATE WITH ME, YOU MAY SEND A NOTE THROUGH THE CLERK,

02:06PM 16   SIGNED BY ANY ONE OR MORE OF YOU.  NO MEMBER OF THE JURY SHOULD

02:06PM 17   EVER ATTEMPT TO COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING,

02:06PM 18   AND I WILL RESPOND TO THE JURY CONCERNING THE CASE ONLY IN

02:06PM 19   WRITING OR HERE IN OPEN COURT.

02:06PM 20        IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

02:07PM 21   LAWYERS BEFORE ANSWERING, WHICH MAY TAKE SOME TIME.  YOU MAY

02:07PM 22   CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR THE ANSWER TO ANY

02:07PM 23   QUESTION.  REMEMBER THAT YOU ARE NOT TO TELL ANYONE, INCLUDING

02:07PM 24   ME, HOW THE JURY STANDS NUMERICALLY OR OTHERWISE, ON ANY

02:07PM 25   QUESTION SUBMITTED TO YOU, INCLUDING THE QUESTION OF THE GUILT

02:07PM  1      OF MR. BALWANI, UNTIL AFTER YOU HAVE REACHED A UNANIMOUS

02:07PM  2      VERDICT OR HAVE BEEN DISCHARGED.

02:07PM  3           THAT CONCLUDES THE COURT'S READING OF THE INSTRUCTIONS.

02:07PM  4           ANY OBJECTIONS TO THE INSTRUCTIONS?

02:07PM  5                MR. SCHENK:  NO, YOUR HONOR.  THANK YOU.

02:07PM  6                MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

02:07PM  7                THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

02:07PM  8           LADIES AND GENTLEMEN, WE'LL NOW CALL UPON OUR COURTROOM

02:07PM  9      DEPUTY TO SWEAR IN AN OFFICIAL WHO WILL TAKE CHARGE OF THE 12

02:07PM 10      MEMBERS OF THE JURY.

02:07PM 11           SIR, IF YOU WOULD COME FORWARD.

02:08PM 12           (COURT SECURITY OFFICER SWORN.)

02:08PM 13                COURT SECURITY OFFICER:  I AFFIRM.

02:08PM 14                THE COURT:  THANK YOU THEN.

02:08PM 15           LADIES AND GENTLEMEN, THE 12 SEATED JURORS WILL NOW PLEASE

02:08PM 16      RETIRE TO THE DELIBERATION ROOM TO BEGIN YOUR DELIBERATIONS.

02:08PM 17           OUR TWO ALTERNATES, WOULD YOU PLEASE STAY AND REMAIN IN

02:08PM 18      THE COURTROOM FOR JUST A MOMENT.

02:08PM 19           SO THOSE 12 JURORS MAY NOW RETIRE TO BEGIN YOUR

02:08PM 20      DELIBERATIONS.

02:09PM 21           (JURORS 1 - 12 OUT AT 2:09 P.M.)

02:09PM 22                THE COURT:  THANK YOU.  PLEASE BE SEATED.

02:09PM 23           THE RECORD SHOULD REFLECT THAT OUR 12 SEATED JURORS HAVE

02:09PM 24      LEFT TO BEGIN THEIR DELIBERATIONS.

02:09PM 25                ALTERNATE JUROR NUMBER 5 AND 6 REMAIN.  PLEASE REMEMBER A

02:09PM  1    WHILE AGO MY COMMENTS ABOUT ALTERNATE JURORS.  IF YOU RECALL,

02:09PM  2    WE HAVE 12 SEATED JURORS, 2 ALTERNATE JURORS.  ALTERNATE JURORS

02:09PM  3    WILL NOT JOIN THE DELIBERATIONS UNLESS A SEATED JUROR IS UNABLE

02:09PM  4    TO CONTINUE THOSE DELIBERATIONS.

02:09PM  5         SHOULD THAT OCCUR, THEN THE ALTERNATE JUROR, BY NUMERICAL,

02:09PM  6    WE WOULD GO 5 AND THEN 6, WOULD REPLACE THAT SEATED AND

02:10PM  7    DELIBERATING JUROR.

02:10PM  8         SO I'M GOING TO PERMIT YOU TO LEAVE IN JUST A MOMENT.  I

02:10PM  9    WILL TELL YOU THAT THE ADMONITION IS STILL IN PLACE UNTIL

02:10PM  10   YOU'RE INFORMED OF IT BY EITHER ME OR THE COURT THAT IT'S

02:10PM  11   RELEASED.

02:10PM  12        I'M GOING TO ASK YOU, IF IT'S AT POSSIBLE -- I REALIZE

02:10PM  13   IT'S TEN AFTER 2:00 TODAY.  I'M GOING TO ASK YOU IF AT ALL

02:10PM  14   POSSIBLE, IT COULD BE, I DON'T KNOW, BUT IT COULD BE THAT WE

02:10PM  15   MAY NEED AN ALTERNATE JUROR TODAY, WE JUST NEVER KNOW THESE

02:10PM  16   THINGS.

02:10PM  17        BUT IF YOU COULD MAKE YOURSELVES AVAILABLE BY

02:10PM  18   COMMUNICATION, FIRST OF ALL, BY PROVIDING YOUR CURRENT CONTACT

02:10PM  19   INFORMATION WITH MS. ROBINSON, AND, SECONDARILY, I DON'T KNOW

02:10PM  20   IF IT'S POSSIBLE FOR YOU TO BE AVAILABLE TO RETURN TO COURT ON

02:11PM  21   SHORT NOTICE TODAY IF THAT WOULD BE A 20- OR 25-MINUTE

02:11PM  22   ADVENTURE FOR YOU.

02:11PM  23        IS THAT SOMETHING -- LET ME ASK ALTERNATE NUMBER 5, IS

02:11PM  24   THAT SOMETHING THAT YOU COULD DO IF YOU WERE SUMMONED?

02:11PM  25             JUROR:  TODAY?  YES.

7713

02:11PM 1          THE COURT:  OKAY.  LET'S JUST START WITH TODAY.

02:11PM 2     RIGHT.

02:11PM 3          ALTERNATE NUMBER 6?

02:11PM 4          JUROR:  YES, WITH 30 MINUTES NOTICE.

02:11PM 5          THE COURT:  OKAY.  GREAT.

02:11PM 6          ANY QUESTIONS FROM COUNSEL?

02:11PM 7          MR. SCHENK:  NO, YOUR HONOR.

02:11PM 8          MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

02:11PM 9          THE COURT:  OKAY.  GREAT.  THANK YOU VERY MUCH.  ALL

02:11PM 10    RIGHT.  THANK YOU.  THANK YOU.  WITH THAT INFORMATION, I'D ASK

02:11PM 11    YOU TO KEEP YOUR ELECTRONIC DEVICES CLOSE TO YOU AND CHARGED.

02:11PM 12         MS. ROBINSON WILL INFORM YOU WHETHER THERE IS A NEED FOR

02:11PM 13    YOU.  SHE WILL INFORM YOU AS THE CASE PROCEEDS, IF YOU'RE NOT

02:11PM 14    SUMMONED TODAY, AS THE CASE PROCEEDS, SHE WILL BE IN CONTACT

02:12PM 15    WITH AS TO THE NEED TO RETURN TO COURT.  SO IF YOU COULD KEEP

02:12PM 16    YOUR CONTACT INFORMATION CURRENT WITH HER, WE WOULD ALL BE

02:12PM 17    GRATEFUL.

02:12PM 18         LET ME JUST ALSO SAY, IF WE DON'T SEE YOU AGAIN IN THE

02:12PM 19    COURSE OF THE TRIAL, I WANT TO THANK YOU ON BEHALF OF ALL OF

02:12PM 20    THE JUDGES OF THE NORTHERN DISTRICT OF CALIFORNIA AND ON BEHALF

02:12PM 21    OF ALL COUNSEL HERE.  I WANT TO THANK YOU FOR YOUR

02:12PM 22    PARTICIPATION.

02:12PM 23         YOU'RE STILL SUBJECT TO SERVICE HERE, BUT IT MAY BE THAT

02:12PM 24    WE MAY NOT HAVE BENEFIT OF SEEING YOU AGAIN.

02:12PM 25         AGAIN, I WANT TO THANK YOU FOR YOUR SERVICE.

02:12PM   1          IT'S KIND OF A TOUGH JOB TO BE AN ALTERNATE BECAUSE YOU

02:12PM   2    SIT THROUGH THE WHOLE THING, YOU CARRY EVERYTHING, AND YOU

02:12PM   3    DON'T REALLY GET INTO THE BATTER'S BOX UNTIL THE MANAGER CALLS

02:12PM   4    YOU UP TO PINCH HIT.  THAT'S KIND OF THE ANALOGY HERE.

02:12PM   5          BUT STAY TUNED.  THAT'S ALL I CAN TELL YOU.  STAY TUNED.

02:12PM   6          THANK YOU FOR YOUR AVAILABILITY TODAY.

02:12PM   7          MS. ROBINSON WILL KEEP YOU INFORMED AS TO THE PROGRESS OF

02:12PM   8    THE CASE AS WELL IN ANY EVENT.

02:13PM   9          AND YOU'RE OTHERWISE FREE TO GO NOW.  YOU'RE NOT

02:13PM  10    DISCHARGED.  YOU'RE STILL PART OF THIS CASE, SO THE ADMONITION

02:13PM  11    STAYS IN PLACE.  THANK YOU.

02:13PM  12          ALL RIGHT.  ANYTHING FURTHER, COUNSEL?

02:13PM  13               MR. SCHENK:  NO, YOUR HONOR.

02:13PM  14               MR. COOPERSMITH:  NO, YOUR HONOR.

02:13PM  15               THE COURT:  ALL RIGHT.  THANK YOU.  I'LL STEP DOWN,

02:13PM  16    AND YOU CAN TALK TO MS. ROBINSON IF YOU WOULD BEFORE YOU LEAVE,

02:13PM  17    AND THEN I'LL COME BACK, COUNSEL, AND WE CAN HAVE ANOTHER

02:13PM  18    CONVERSATION.

02:13PM  19          (JUROR OUT AT 2:13 P.M.)

02:13PM  20          (RECESS FROM 2:13 P.M. UNTIL 2:23 P.M.)

02:23PM  21               THE COURT:  THANK YOU.  WE'RE BACK ON THE RECORD.

02:23PM  22          COUNSEL AND MR. BALWANI ARE PRESENT.

02:23PM  23          THE JURORS ARE DELIBERATING.  THEY'VE LEFT THE COURTROOM.

02:23PM  24          I JUST WANTED TO INFORM COUNSEL, IF WE RECEIVE ANY NOTES

02:23PM  25    OR ANY WORD FROM THE JURY, I'D LIKE TO HAVE YOU BACK HERE

7715

```
02:23PM   1       WITHIN 20, 25 MINUTES.  IS THAT POSSIBLE FOR BOTH SIDES?
02:23PM   2                 MR. SCHENK:  YES.
02:23PM   3                 MR. COOPERSMITH:  YES, YOUR HONOR.
02:23PM   4                 THE COURT:  GREAT.  THANK YOU.
02:23PM   5            IN REGARDS TO DELIBERATIONS TODAY, WHAT -- I DON'T KNOW
02:24PM   6       WHAT THE SCHEDULE IS.  AND WE'LL -- MY SENSE IS THAT THE JURY
02:24PM   7       TYPICALLY -- JURORS TYPICALLY WILL INFORM OUR COURTROOM DEPUTY
02:24PM   8       OF THEIR SCHEDULE FOR DELIBERATIONS.
02:24PM   9            WHAT I THOUGHT WE MIGHT DO TODAY, PARTICULARLY IN LIGHT OF
02:24PM  10       JUROR NUMBER 10, IS IF WE GET THEIR SCHEDULE, AS WE GET CLOSE
02:24PM  11       TO THE END OF THE DAY, IT COULD BE THAT WE ENGAGE A REPLACEMENT
02:24PM  12       FOR 10 TODAY.
02:24PM  13            MY THOUGHT WAS SHOULD WE INVITE HER OUT AND TALK TO HER
02:24PM  14       ABOUT HER SITUATION AND THEN MAKE DECISIONS BASED ON THAT?
02:24PM  15            YOU HEARD ME TALK TO OUR ALTERNATES TO BE AVAILABLE TODAY.
02:24PM  16       IT'S SOMETHING WE CAN DO TODAY.  WE DON'T HAVE TO FORCE FEED
02:24PM  17       THAT TODAY.  WE CAN WAIT UNTIL NEXT WEEK.
02:24PM  18            BUT I DO THINK WE HAVE TO DO SOMETHING ABOUT JUROR NUMBER
02:24PM  19       10 TODAY.
02:24PM  20            ANY THOUGHTS ON THAT?
02:25PM  21                 MR. SCHENK:  THANK YOU, YOUR HONOR.
02:25PM  22            I THINK THE COURT'S SUGGESTION MAKES SENSE.  AT SOME POINT
02:25PM  23       ONCE WE HEAR THE SCHEDULE, TOWARDS THE END OF THE DAY, IT WOULD
02:25PM  24       MAKE SENSE TO INVITE JUROR NUMBER 10 OUT AND MAYBE SIMULTANEOUS
02:25PM  25       WITH THAT AND INVITE OUR FIFTH ALTERNATE BACK IF THE COURT
```

02:25PM  1    HEARS FROM JUROR NUMBER 10 THAT SHE INTENDS TO MAKE THE

02:25PM  2    REQUEST, I THINK THAT WOULD MAKE SENSE.

02:25PM  3              THE COURT:  DOES THAT NOT WORK?

02:25PM  4              MR. SCHENK:  YEAH, I THINK BECAUSE WE SWITCHED IT TO

02:25PM  5    THE LAPEL MIKE.

02:25PM  6              THE COURT:  I SEE.  GOT IT.

02:25PM  7              MR. COOPERSMITH:  YOUR HONOR, OBVIOUSLY I MADE THE

02:25PM  8    RECORD I MADE BEFORE ABOUT WHAT OUR POSITION IS.

02:25PM  9              THE COURT:  SURE.

02:25PM 10              MR. COOPERSMITH:  BUT IN TERMS OF WHAT IS GOING TO

02:25PM 11    HAPPEN TODAY, I DON'T KNOW WHETHER THE END OF THE DAY IS 4:00

02:25PM 12    OR 5:00.  I DON'T KNOW IF THE COURT KNOWS THAT EITHER IT SOUNDS

02:25PM 13    LIKE.

02:25PM 14         BUT, YES, I THINK GIVEN THE COURT'S DECISIONS, BRINGING

02:25PM 15    THE JUROR BACK TO SEE IF SHE IN FACT IS ASKING TO BE EXCUSED

02:26PM 16    AND WHAT THE COURT DOES WITH THAT REQUEST.

02:26PM 17         AND THEN IF SHE IS EXCUSED, THEN THE COURT WOULD HAVE TO

02:26PM 18    SUMMON JUROR NUMBER 5 OR ALTERNATE NUMBER 5 BACK.  I'M ASSUMING

02:26PM 19    HE WOULDN'T BE BACK TODAY.  HE WOULD HAVE TO RESUME.

02:26PM 20              THE COURT:  I DON'T KNOW THAT.  THAT'S WHY I, I WAS

02:26PM 21    ASKING WHAT TIME.

02:26PM 22         I THINK 5 -- I THINK I SUGGESTED 20 MINUTES, AND I THINK

02:26PM 23    5 WAS OKAY WITH THAT.  6 WAS NOT.  6 WANTED 30 WAS MY

02:26PM 24    RECOLLECTION.

02:26PM 25              MR. COOPERSMITH:  RIGHT.

02:26PM  1      THE COURT:  AND I WAS OPERATING ON ECONOMIES OF

02:26PM  2  SCALE.  IF WE CAN DO IT TODAY, THAT'S FINE.  WE'LL HAVE TO DO

02:26PM  3  SOMETHING WITH JUROR NUMBER 10.  IT SEEMED IF WE COULD GET IT

02:26PM  4  ALL DONE TODAY AND THEN BRING OUR JURY IN AND THEY WERE

02:26PM  5  RECONSTITUTED, AND THEN WHEN THEY COME BACK MONDAY, I PRESUME

02:26PM  6  THEY'LL COME BACK MONDAY, THEY'LL START DELIBERATIONS ANEW AS

02:27PM  7  THEY WOULD HAVE TO WHEN THEY HAVE A NEW JUROR.

02:27PM  8      MR. COOPERSMITH:  YES, THAT'S FINE.  BUT MY

02:27PM  9  QUESTION, AND MAYBE I'M MISSING SOMETHING, IF WE'RE NOT TALKING

02:27PM  10  TO JUROR 10 UNTIL THE END OF THE DAY, WHICH COULD BE

02:27PM  11  5:00 O'CLOCK, THEN IF ALTERNATE JUROR NUMBER 5 WERE TO COME

02:27PM  12  BACK AND HE GETS HERE IN 20 MINUTES OR SO, AND I'M FINE WITH

02:27PM  13  THAT, AND NOW WE'RE INTO 5:30.

02:27PM  14      THE COURT:  RIGHT.  AND THE OTHER TENSION HERE IS

02:27PM  15  THAT I DON'T WANT TO DISRUPT ONGOING DELIBERATIONS.  I DON'T

02:27PM  16  WANT TO INTERFERE WITH THE JUROR'S DELIBERATIONS.  BUT, YOU

02:27PM  17  KNOW, PERHAPS THE WISER COURSE IS TO WAIT UNTIL THEY TELL US

02:27PM  18  THEY'RE DONE AND THEN CALL 10 IN AND TALK WITH HER.  THAT MIGHT

02:27PM  19  BE A SAFER PATH.

02:27PM  20      MR. SCHENK:  IT ALSO MIGHT BE USEFUL IF THE JURY --

02:27PM  21  IF ONE OF THE FIRST THINGS THEY DO IS DETERMINE A SCHEDULE FOR

02:27PM  22  TODAY, TO FIND THAT OUT, TO FIND OUT HOW LONG THEY PLAN TO STAY

02:27PM  23  TODAY BECAUSE I THINK THAT WILL CREATE THE INFORMATION WE NEED

02:28PM  24  TO MAKE THE FURTHER DECISIONS, FOR INSTANCE, WHAT TIME TO CALL

02:28PM  25  BACK ALTERNATE NUMBER 5 IF 10 IS GOING TO MAKE THE REQUEST.

02:28PM    1                THE COURT:  RIGHT.  WELL, LET ME ASK COUNSEL THEN.

02:28PM    2          TYPICALLY MY EXPERIENCE IS, AND MAYBE YOURS AS WELL, IS

02:28PM    3    THAT JURORS, ONE OF THE FIRST THINGS THEY DO IS THAT THEY LET

02:28PM    4    THE CLERK KNOW WHAT THEIR SCHEDULE IS, AND WE CAN GIVE THEM A

02:28PM    5    FEW MINUTES TO DO THAT.

02:28PM    6          LET ME ASK YOU YOUR THOUGHTS ABOUT WHETHER OR NOT I SHOULD

02:28PM    7    MAKE INQUIRY OF THEIR SCHEDULE AND WHETHER YOU -- I WOULD ONLY

02:28PM    8    DO THAT WITH YOUR PERMISSION AND ACQUIESCENCE.  I DON'T WANT

02:28PM    9    TO -- AGAIN, I'M VERY CONSCIOUS OF NOT INTERFERING WITH THE

02:28PM   10    DELIBERATIVE PROCESS AND I DON'T WANT TO SIGNAL ANYTHING IN ANY

02:28PM   11    WAY.

02:28PM   12                MR. COOPERSMITH:  SURE, YOUR HONOR.

02:28PM   13          I DON'T HAVE ANY OBJECTION TO THE COURT MAKING AN INQUIRY.

02:28PM   14    I MEAN, YOU'RE RIGHT, IN MY EXPERIENCE, YOU KNOW, JURORS

02:28PM   15    USUALLY THINK ABOUT THAT, BUT THEY MAY OR MAY NOT.

02:28PM   16          IT'S OBVIOUSLY HELPFUL TO THE COURT AND TO THE PARTIES.

02:28PM   17    SO WE DON'T HAVE ANY OBJECTION.

02:29PM   18          OBVIOUSLY THE COURT WOULDN'T SUGGEST WHAT THE SCHEDULE

02:29PM   19    SHOULD BE OR WHAT THEY SHOULD DO TO DELIBERATE.  BUT JUST TO

02:29PM   20    ASK WHAT THEIR SCHEDULE IS AND IT'S UP TO THEM, IT SEEMS FINE

02:29PM   21    TO ME.

02:29PM   22                THE COURT:  WELL, LET'S GIVE THEM SOME TIME.  IT'S

02:29PM   23    2:30.  THEY WENT OUT ABOUT TEN AFTER.  WHY DON'T WE GIVE THEM

02:29PM   24    SOME TIME AND SEE IF WE HEAR FROM THEM, AND THEN WE CAN DISCUSS

02:29PM   25    IN A LITTLE BIT ABOUT WHAT THEY'RE GOING TO DO.

7719

02:29PM 1      MR. COOPERSMITH:  WOULD YOUR HONOR LIKE US TO REMAIN

02:29PM 2    IN THE COURTHOUSE WHILE THIS HAPPENS OR --

02:29PM 3      THE COURT:  DO YOU HAVE SOME PLACE BETTER TO GO?

02:29PM 4      MR. COOPERSMITH:  WELL, MAYBE THE LOCAL BAR.

02:29PM 5      (LAUGHTER.)

02:29PM 6      THE COURT:  WELL, WHY DON'T WE -- WELL, IF THAT'S

02:29PM 7    POSSIBLE, IF YOU WANT TO JUST -- OR BE AVAILABLE WITHIN, LIKE I

02:29PM 8    SAID, WITHIN 20 MINUTES.

02:29PM 9      MR. COOPERSMITH:  WE CAN STAY IN THE ATTORNEY'S

02:29PM 10   LOUNGE A LITTLE WHILE UNTIL WE SEE WHAT HAPPENS.

02:29PM 11     THE COURT:  FAIR ENOUGH.

02:29PM 12     MR. SCHENK:  JUST ONE THING.  I THINK WE WANTED TO

02:29PM 13   CONFIRM THAT THE EVIDENCE WENT BACK.  I THINK THE PARTIES HAD

02:29PM 14   AN OPPORTUNITY TO REVIEW THE EXHIBITS AND WE JUST HAVEN'T SAID

02:30PM 15   THAT ON THE RECORD.

02:30PM 16     THE COURT:  WELL, I HAD GIVEN IT TO THE PARTIES TO

02:30PM 17   REVIEW AND CONFIRM WITH BOTH SIDES THAT ALL OF THE EVIDENCE

02:30PM 18   THAT YOU HAD EXPECTED AND YOU THOUGHT WAS ADMITTED APPEARED ON

02:30PM 19   THE EXHIBIT LIST, AND YOU'VE CONFIRMED THAT.  MY SENSE IS THAT

02:30PM 20   THAT WAS DONE?

02:30PM 21     MR. SCHENK:  YES.

02:30PM 22     MR. COOPERSMITH:  YES.  THAT'S MY UNDERSTANDING,

02:30PM 23   YOUR HONOR.

02:30PM 24     THE COURT:  OKAY.

02:30PM 25     MR. COOPERSMITH:  THE ONLY THING I DON'T KNOW, AND

02:30PM  1    PROBABLY MY TEAM KNOWS THIS AND I'M JUST IN THE DARK, THERE ARE

02:30PM  2    SOME EXHIBITS THAT BOTH SIDES SHOWED THAT ARE NATIVE

02:30PM  3    SPREADSHEETS, SO THEY WOULDN'T BE ABLE TO BE IN HARD COPY.

02:30PM  4        SO PROBABLY SOMEBODY KNOWS THIS WHO IS SMARTER THAN ME,

02:30PM  5    BUT I DON'T KNOW HOW THAT WORKS.

02:30PM  6            THE COURT:  I THOUGHT THEY WERE GIVEN A THUMB DRIVE

02:30PM  7    OF SOME SORT.

02:30PM  8            MR. COOPERSMITH:  RIGHT.  AND THEY HAVE A COMPUTER.

02:30PM  9            THE COURT:  YES.

02:30PM  10           MR. COOPERSMITH:  OKAY.  THAT MAKES SENSE.

02:30PM  11           MR. SCHENK:  YES, THAT'S CORRECT.

02:30PM  12           THE COURT:  AND THE COMPUTER THAT THEY HAVE IS, AS I

02:30PM  13   UNDERSTAND IT, IS NOT ACCESSIBLE TO THE INTERNET OR ANYTHING

02:30PM  14   ELSE, IT'S JUST A READ TYPE COMPUTER, IT HAS NO INTERNET

02:31PM  15   ACCESS.

02:31PM  16           MR. COOPERSMITH:  SURE.

02:31PM  17           THE COURT:  RIGHT.  OKAY.

02:31PM  18           MR. COOPERSMITH:  OKAY.

02:31PM  19           THE COURT:  GREAT.  ALL RIGHT.

02:31PM  20        WELL, LET'S JUST CHECK BACK IN, I DON'T KNOW, 30,

02:31PM  21   40 MINUTES, SOMETHING LIKE THAT.

02:31PM  22           MR. COOPERSMITH:  YES, YOUR HONOR.

02:31PM  23           MR. SCHENK:  THANK YOU.

02:31PM  24           THE COURT:  GREAT.

02:31PM  25        (RECESS TAKEN FROM AT 2:31 P.M. PENDING THE DELIBERATIONS

03:51PM 1      OF THE JURY 3:51 P.M.).

03:51PM 2            (JURY OUT AT 3:51 P.M.)

03:51PM 3            THE COURT:  THANK YOU.  PLEASE BE SEATED.  WE'RE

03:51PM 4      BACK ON THE RECORD IN THE BALWANI MATTER.  ALL COUNSEL,

03:51PM 5      MR. BALWANI IS PRESENT.

03:51PM 6            WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.  I WAS INFORMED

03:51PM 7      THAT THE JURY INDICATED TO THE CSO THAT THEIR INTENT WAS TO

03:51PM 8      WORK UNTIL 4:00 TODAY.

03:51PM 9            I HAVE -- OUR COURTROOM DEPUTY HAS CONTACTED THE ALTERNATE

03:51PM 10     JUROR AND ASKED HIM TO COME BACK TO COURT.

03:51PM 11           MY THOUGHT WAS THAT WE COULD INVITE JUROR NUMBER 10 OUT

03:52PM 12     NOW AND SPEAK WITH HER ABOUT HER PLANS, AND THEN PROCEED

03:52PM 13     ACCORDINGLY.

03:52PM 14           IF, IN FACT, THE COURT DOES EXCUSE JUROR NUMBER 10, THE

03:52PM 15     INTENT WOULD BE TO SUBSTITUTE ALTERNATE NUMBER 5 FOR HER.

03:52PM 16           AND THEN MY INTENT WOULD BE TO IF WE CAN KEEP OUR JURY,

03:52PM 17     WHICH WOULD PROBABLY BE A LITTLE PAST 4:00, MY INTENT WOULD BE

03:52PM 18     TO READ THEM 6.30, AND THE JURY CAN THEN TAKE THEIR BREAK.

03:52PM 19           ANY THOUGHTS?

03:52PM 20           MR. SCHENK:  THANK YOU, YOUR HONOR.

03:52PM 21           THAT PLAN SOUNDS FINE.  THE ONLY THING WE WOULD ASK IS

03:53PM 22     THAT THE JURY PAUSE THEIR DELIBERATIONS WHEN WE BRING 10 IN.

03:53PM 23           THE COURT:  YES.  AND I'D HAVE TO INSTRUCT THEM

03:53PM 24     SOMEHOW TO DO THAT, TO STOP THEIR DELIBERATIONS.

03:53PM 25           MR. SCHENK:  SO ONE OPTION, IT MIGHT BE MORE THAN IS

03:53PM 1    NECESSARY, BUT THE COURT COULD BRING THE ENTIRE JURY OUT IF THE

03:53PM 2    ALTERNATE HAS ALREADY ARRIVED, AND IF 10 ASKS TO BE RELIEVED,

03:53PM 3    THE COURT COULD JUST DO THE SWAP.  AT THAT POINT THE JURY IS IN

03:53PM 4    THE COURTROOM AND THEY'RE NOT DELIBERATING.

03:53PM 5            MR. COOPERSMITH:  IT SOUNDS REASONABLE, YOUR HONOR.

03:53PM 6            THE COURT:  RIGHT.  I COULD BRING THEM IN AND WE CAN

03:53PM 7    DO THAT.  THE CONVERSATION WITH JUROR NUMBER 10 WOULD BE A

03:53PM 8    RECOGNITION OF HER CONFLICT AND THEN EXCUSE HER BASED ON THAT.

03:53PM 9        AND THEN IF OUR ALTERNATE 5 IS HERE, WE CAN SUBSTITUTE IT

03:54PM 10   IN, AND THEN I WOULD READ 6.30.  AND I WOULD ASK THE JURY TO

03:54PM 11   RETURN TO THE DELIBERATION ROOM TO CONTINUE DELIBERATIONS BUT

03:54PM 12   THEY CAN AGAIN, I'LL REMIND THEM, YOU CAN SET YOUR SCHEDULE,

03:54PM 13   AND --

03:54PM 14           MR. COOPERSMITH:  I'M NOT SURE I FOLLOW THAT LAST

03:54PM 15   POINT, YOUR HONOR.  I'M SORRY.

03:54PM 16           THE COURT:  WELL, I THINK THEY SHOULD GO BACK TO THE

03:54PM 17   DELIBERATION ROOM.  THEY'VE TOLD US THEY WANT TO LEAVE AT 4:00.

03:54PM 18   THIS IS GOING TO KEEP THEM BEYOND 4:00.

03:54PM 19       SO I WOULD SEND THEM BACK SO THE NEW JUROR COULD JOIN

03:54PM 20   THEM, AND THEN THEY CAN LEAVE WHENEVER AFTER THAT.

03:54PM 21       THE NEW JUROR DOESN'T KNOW THEIR SCHEDULE.

03:54PM 22           MR. COOPERSMITH:  HE DOESN'T.

03:54PM 23       SO THE NEW JUROR IS GOING TO COME BACK, THE JUROR IS GOING

03:54PM 24   TO BE BROUGHT IN IF THE COURT DOES EXCUSE NUMBER 10, AND THEN

03:54PM 25   THE NEW JUROR WOULD REPLACE, AND YOU'LL READ 6.3 IT SOUNDS

03:55PM   1        LIKE -- INSTRUCTION 6.30, YOUR HONOR.

03:55PM   2            AND THEN WITH ALTERNATE 5 NOW AS PART OF THE JURY WOULD GO

03:55PM   3        BACK TO THE DELIBERATION ROOM.

03:55PM   4                THE COURT:  AND THEN THEY CAN LEAVE IF THEY WANT.

03:55PM   5                MR. COOPERSMITH:  I SEE.

03:55PM   6                THE COURT:  BUT THEY WOULD SET THEIR SCHEDULE THEN

03:55PM   7        AND INFORM THE NEW JUROR OF THEIR SCHEDULE, AND IF HE'S IN

03:55PM   8        AGREEMENT THEN --

03:55PM   9                MR. COOPERSMITH:  OKAY.  SO THERE'S A CHANCE THAT

03:55PM   10       JUROR NUMBER 5 MIGHT SAY I WANT TO SPEND ALL NIGHT

03:55PM   11       DELIBERATING.  I UNDERSTAND.

03:55PM   12               THE COURT:  BUT HE SHOULD BE PART OF THAT PROCESS TO

03:55PM   13       KNOW WHEN THEY'VE DECIDED THEY'RE COMING BACK AND ALL OF THAT.

03:55PM   14       HE NEEDS AN INTRODUCTION TO THE TEAM TYPE OF MOMENT.

03:55PM   15               MR. COOPERSMITH:  RIGHT.

03:55PM   16               THE COURT:  THAT'S WHAT I THOUGHT.

03:55PM   17               MR. COOPERSMITH:  AND IS ALTERNATE 5 ON HIS WAY

03:55PM   18       BACK?

03:55PM   19               THE COURT:  THAT'S MY UNDERSTANDING.

03:55PM   20           AND THE CSO HAS BEEN ADVISED TO GENTLY TELL THE JURY IF

03:55PM   21       THEY COULD REMAIN FOR JUST A MOMENT.

03:55PM   22               MR. COOPERSMITH:  OKAY.

03:56PM   23           I SUPPOSE I COULD BRING THEM OUT, AND WE CAN HAVE THAT

03:56PM   24       DISCUSSION NOW WITH JUROR NUMBER 10, AND THEN THEY WOULD WAIT,

03:56PM   25       AND I WOULD TELL THEM NOT TO DELIBERATE WHILE THEY'RE WAITING.

03:56PM  1             MR. SCHENK:  YES, YOUR HONOR.  THAT WOULD BE FINE.

03:56PM  2             MR. COOPERSMITH:  THAT'S FINE, YOUR HONOR.

03:56PM  3             THE COURT:  SURE.

03:56PM  4         (DISCUSSION OFF THE RECORD.)

04:03PM  5         (JURY IN AT 4:03 P.M.)

04:03PM  6             THE COURT:  PLEASE BE SEATED.  THANK YOU.  WE'RE ON

04:03PM  7     THE RECORD IN THE BALWANI MATTER.  ALL COUNSEL ARE PRESENT.

04:03PM  8     MR. BALWANI IS PRESENT.

04:03PM  9         OUR DELIBERATING JURY OF 12 ARE PRESENT, AND I SHOULD

04:03PM 10     RECOGNIZE ALTERNATE NUMBER 5 IS ALSO PRESENT.

04:03PM 11         LADIES AND GENTLEMEN, THANK YOU.  I HAVE BROUGHT YOU OUT

04:03PM 12     THIS AFTERNOON AT THIS TIME BECAUSE I THOUGHT I WOULD HAVE A

04:03PM 13     CONVERSATION WITH JUROR IS NUMBER 10.

04:03PM 14         JUROR NUMBER 10, I KNOW YOU HAVE INFORMED US THAT YOU HAVE

04:03PM 15     TRAVEL PLANS.

04:03PM 16             JUROR:  YES.

04:03PM 17             THE COURT:  AND YOU CAN BE SEATED.  THANK YOU FOR

04:03PM 18     YOUR COURTESY.  WE'LL GET YOU A MICROPHONE.

04:03PM 19         YOU HAVE TOLD US THAT YOU HAVE TRAVEL PLANS FROM JUNE 26TH

04:03PM 20     THROUGH JULY 4TH, I BELIEVE?

04:04PM 21             JUROR:  YES.

04:04PM 22             THE COURT:  THERE WE ARE.  I THINK THAT'S ON NOW.

04:04PM 23             JUROR:  YES.

04:04PM 24             THE COURT:  YES.  THANK YOU.

04:04PM 25         (LAUGHTER.)

04:04PM  1          THE COURT:  ALL RIGHT.  THANK YOU.

04:04PM  2      AND THOSE TRAVEL PLANS HAVE NOT CHANGED; IS THAT CORRECT?

04:04PM  3          JUROR:  YES, CORRECT.

04:04PM  4          THE COURT:  ALL RIGHT.  SO YOUR PLANS ARE, I BELIEVE

04:04PM  5  IT'S THIS SUNDAY YOU'LL BE GONE THEN?

04:04PM  6          JUROR:  YES.

04:04PM  7          THE COURT:  AND YOU WOULD NOT THEN OTHERWISE BE ABLE

04:04PM  8  TO CONTINUE YOUR SERVICE ON THE JURY; IS THAT MY UNDERSTANDING?

04:04PM  9          JUROR:  WHEN I COME BACK, I CAN CONTINUE.

04:04PM 10          THE COURT:  I SEE.  BUT YOU WON'T BE ABLE TO COME

04:04PM 11  BACK UNTIL AFTER THE HOLIDAY?

04:05PM 12          JUROR:  YES.

04:05PM 13          THE COURT:  YES.  I SEE.

04:05PM 14      ANY QUESTIONS FROM COUNSEL?

04:05PM 15          MR. SCHENK:  NO.  THANK YOU, YOUR HONOR.

04:05PM 16          MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

04:05PM 17          THE COURT:  ALL RIGHT.  ANY COMMENT FROM COUNSEL AS

04:05PM 18  TO WHETHER OR NOT THE COURT SHOULD EXCUSE JUROR NUMBER 10 AND

04:05PM 19  PERHAPS REPLACE WITH AN ALTERNATE GIVEN THE SCHEDULE?

04:05PM 20          MR. SCHENK:  THANK YOU, YOUR HONOR.  NO OBJECTION TO

04:05PM 21  EXCUSING JUROR NUMBER 10 AND REPLACING WITH THE NEXT ALTERNATE.

04:05PM 22          MR. COOPERSMITH:  IF THAT IS JUROR NUMBER 10'S

04:05PM 23  REQUEST, WE HAVE NO OBJECTION.

04:05PM 24          THE COURT:  ALL RIGHT.  THANK YOU.

04:05PM 25      WELL, I THINK I'VE HEARD JUROR NUMBER 10.  YOU'VE TOLD US

04:05PM 1  ABOUT YOUR TRAVEL PLANS, JUROR NUMBER 10.  AND WHAT I AM GOING

04:05PM 2  TO DO IS I AM GOING TO EXCUSE YOU FROM YOUR JURY SERVICE HERE

04:05PM 3  TODAY.  I'M QUITE CONFIDENT THAT DISAPPOINTS YOU.  YOU WERE

04:05PM 4  HERE EVERY DAY FOR THE EVIDENCE.  YOU'VE HEARD AND

04:05PM 5  PARTICIPATED, I WATCHED YOU, YOU WERE AN ACTIVE PARTICIPANT IN

04:06PM 6  LISTENING, OBSERVING, AND SEEING THINGS.

04:06PM 7       REGRETTABLY, OUR TRIAL WAS DELAYED BY CIRCUMSTANCES OUT OF

04:06PM 8  OUR CONTROL.  OUR CURRENT HEALTH SITUATION CAUSED SOME

04:06PM 9  INCONVENIENCE TO US AND DELAYED THE TRIAL, AND THE COURT FINDS

04:06PM 10 THAT IT WOULD BE APPROPRIATE AT THIS TIME TO THANK AND EXCUSE

04:06PM 11 YOU IN AN EFFORT TO ALLOW YOU TO HAVE YOUR VACATION PLANS

04:06PM 12 UNINTERRUPTED AS YOU HAVE THEM PLANNED, AND THEN WE COULD USE A

04:06PM 13 SUBSTITUTE OR ALTERNATE JUROR TO SUBSTITUTE AND SIT IN YOUR

04:06PM 14 PLACE.

04:06PM 15      WOULD THAT BE ALL RIGHT WITH YOU, JUROR NUMBER 10?

04:06PM 16          JUROR:  YES.  THANK YOU.

04:06PM 17          THE COURT:  YOU'RE VERY WELCOME.  THANK YOU VERY

04:06PM 18 MUCH.

04:06PM 19      AND I WANT TO THANK YOU FOR YOUR SERVICE, YOUR COMMITMENT

04:06PM 20 TO YOUR JUSTICE SYSTEM FOR COMING AND SITTING.

04:06PM 21          JUROR:  YOU'RE WELCOME.

04:06PM 22          THE COURT:  THANK YOU.  AND ON BEHALF OF THE LAWYERS

04:06PM 23 I THANK YOU AS WELL.

04:06PM 24          JUROR:  YOU'RE WELCOME.  MY PLEASURE.

04:07PM 25          (LAUGHTER.)

7727

04:07PM 1          THE COURT:  AND LET ME JUST ASK, BEFORE -- SO I WILL

04:07PM 2    EXCUSE JUROR NUMBER 10.  JUROR NUMBER 10 IS EXCUSED.

04:07PM 3          THAT ALSO MEANS THAT THE ADMONITION THAT I'VE PLACED, THAT

04:07PM 4    NO LONGER APPLIES TO YOU.  YOU NO LONGER HAVE THE ADMONITION

04:07PM 5    ABOUT DISCUSSING THINGS.

04:07PM 6          HOWEVER, IT'S ENTIRELY UP TO YOU WHETHER OR NOT YOU WISH

04:07PM 7    TO DISCUSS ANYTHING WITH ANYONE, ANYTHING ABOUT YOUR SERVICE

04:07PM 8    WITH ANYONE.

04:07PM 9          IF YOU DO NOT WISH TO DISCUSS YOUR SERVICE WITH SOMEONE,

04:07PM 10   YOU DO NOT HAVE TO DO SO.  IF ANYONE APPROACHES YOU TO ASK YOU

04:07PM 11   QUESTIONS AND YOU CHOOSE NOT TO TALK WITH THEM, YOU SHOULD TELL

04:07PM 12   THEM NO.

04:07PM 13         ON THE OTHER HAND, IF YOU WANT TO TALK, YOU CAN DISCUSS

04:07PM 14   THINGS WITH THEM.  I WOULD CAUTION YOU, THOUGH, TO -- ABOUT

04:07PM 15   DISCUSSING THINGS THAT WERE DISCUSSED IN THE DELIBERATIONS THAT

04:07PM 16   YOU HAD.  I WOULD -- THE DELIBERATIONS, AS YOU KNOW, ARE

04:08PM 17   CONFIDENTIAL AND THE THINGS THAT ARE DISCUSSED IN THE

04:08PM 18   DELIBERATION ROOM WITH YOUR COLLEAGUE JURORS, THAT'S ALL

04:08PM 19   CONFIDENTIAL.  SO I WOULD ENCOURAGE YOU TO THINK ABOUT THAT

04:08PM 20   WHEN YOU'RE ASKED.  IF YOU ARE ASKED AND YOU SAY NO TO SOMEONE,

04:08PM 21   YOU DON'T WANT TO SPEAK TO THEM AND YOU FEEL THAT THAT PERSON

04:08PM 22   OR PERSONS CONTINUE TO NOT RESPECT YOUR WISHES, YOU SHOULD

04:08PM 23   REPORT ANY SUCH CONDUCT TO THE COURT FOR FURTHER -- SO THE

04:08PM 24   COURT COULD INVESTIGATE AND DO ANY OTHER ACTION AS NEEDED.

04:08PM 25         DO YOU UNDERSTAND THAT?

04:08PM  1              JUROR:  YES.  I WILL NOT TALK TO ANYONE UNTIL THE

04:08PM  2      CASE DELIBERATES.

04:08PM  3              THE COURT:  THANK YOU.

04:08PM  4              JUROR:  YOU'RE WELCOME.

04:08PM  5              THE COURT:  THANK YOU VERY MUCH ABOUT YOUR

04:08PM  6      STATEMENT.  THE WORLD NOW KNOWS YOUR FEELINGS.  THANK YOU FOR

04:08PM  7      THAT.

04:08PM  8          ALTERNATE NUMBER 5, THANK YOU FOR RETURNING ON SUCH SHORT

04:08PM  9      NOTICE.  I'M GRATEFUL FOR THAT.

04:09PM 10          MY INTENT, WITH CONSENT OF COUNSEL, IS TO SUBSTITUTE YOU,

04:09PM 11      SIR, INTO THE DELIBERATING JURY, IN PLACE OF ALTERNATE

04:09PM 12      NUMBER 10.

04:09PM 13          FIRST, I HAVE A QUESTION OF YOU, AND I KNOW THIS QUESTION

04:09PM 14      WILL BE OF A COMPLETE SURPRISE TO YOU.

04:09PM 15          DURING THE TIME THAT YOU LEFT THE COURTROOM HERE AND THE

04:09PM 16      TIME THAT YOU'VE RETURNED NOW, DID YOU HAVE OCCASION, SIR, TO

04:09PM 17      READ, DISCUSS, OR TALK WITH ANYONE OR LEARN ANYTHING ABOUT THIS

04:09PM 18      CASE?

04:09PM 19              JUROR:  NO.

04:09PM 20              THE COURT:  ALL RIGHT.  THANK YOU, SIR.

04:09PM 21          ANY OBJECTION THEN TO THE COURT SUBSTITUTING ALTERNATE

04:09PM 22      NUMBER 5 IN TO REPLACE JUROR NUMBER 10?

04:09PM 23              MR. SCHENK:  NO OBJECTION.

04:09PM 24              MR. COOPERSMITH:  NO OBJECTION, YOUR HONOR.

04:09PM 25              THE COURT:  ALL RIGHT.  SIR, YOU'LL THEN BE SEATED.

04:09PM 1      YOU'RE PART OF THE JURY NOW.

04:09PM 2           LADIES AND GENTLEMEN, I DO HAVE TO READ YOU AN INSTRUCTION

04:09PM 3      THAT TALKS ABOUT THIS CIRCUMSTANCE.  AS YOU ALL KNOW, LADIES

04:09PM 4      AND GENTLEMEN, I HAVE JUST SUBSTITUTED AN ALTERNATE JUROR,

04:09PM 5      ALTERNATE NUMBER 5, FOR JUROR NUMBER 10.

04:10PM 6           NOW, YOU MUST START YOUR DELIBERATIONS ANEW.  THIS MEANS

04:10PM 7      YOU SHOULD DISREGARD ENTIRELY ANY DELIBERATIONS TAKING PLACE

04:10PM 8      BEFORE THE ALTERNATE JUROR WAS SUBSTITUTED AND CONSIDER FRESHLY

04:10PM 9      THE EVIDENCE AS IF THE PREVIOUS DELIBERATIONS HAD NEVER

04:10PM 10     OCCURRED.

04:10PM 11          ALTHOUGH STARTING OVER MAY SEEM FRUSTRATING, PLEASE, DO

04:10PM 12     NOT LET IT DISCOURAGE YOU.

04:10PM 13          IT IS IMPORTANT THAT EACH JUROR HAVE A FULL AND FAIR

04:10PM 14     OPPORTUNITY TO EXPLORE HIS OR HER VIEWS AND RESPOND TO THE

04:10PM 15     VIEWS OF OTHERS SO THAT YOU MAY COME TO A UNANIMOUS VERDICT.

04:10PM 16          ALL THE PREVIOUS INSTRUCTIONS GIVEN TO YOU, INCLUDING THE

04:10PM 17     UNANIMITY REQUIREMENT FOR A VERDICT, REMAIN IN EFFECT.

04:10PM 18          COUNSEL, ANY ADDITIONAL INSTRUCTION YOU WISH THE COURT TO

04:10PM 19     GIVE?

04:10PM 20               MR. SCHENK:  NO.  THANK YOU.

04:11PM 21               MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

04:11PM 22               THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

04:11PM 23          SO WHAT THIS MEANS, LADIES AND GENTLEMEN, WHAT I'M GOING

04:11PM 24     TO DO IS TO INVITE YOU TO GO BACK TO THE DELIBERATION ROOM WITH

04:11PM 25     YOUR NEW JUROR.

7730

04:11PM 1          I KNOW YOU HAVE YOUR SCHEDULES SET, AND I'M NOT GOING TO

04:11PM 2    DISRUPT YOUR SCHEDULE.  YOU ARE FREE TO SCHEDULE THE TIME THAT

04:11PM 3    YOU ARE GOING TO MEET TODAY.  I UNDERSTAND I'VE KEPT YOU BEYOND

04:11PM 4    THAT TIME NOW.

04:11PM 5          BUT IF YOU WOULD GO BACK WITH YOUR NEW COLLEAGUE JUROR AND

04:11PM 6    JUST MEET FOR HOWEVER LONG YOU WANT TODAY, AND THEN WE'LL SEE

04:11PM 7    YOU BACK ON MONDAY AT THE TIME THAT YOU LET US KNOW YOU'RE

04:11PM 8    BACK, THAT WOULD BE FINE.

04:11PM 9          ANYTHING FURTHER, COUNSEL?

04:11PM 10              MR. COOPERSMITH:  NO, YOUR HONOR.

04:11PM 11              MR. SCHENK:  NOTHING FURTHER.

04:11PM 12              THE COURT:  ALL RIGHT.  THANK YOU.

04:11PM 13          JUROR NUMBER 10, THANK YOU VERY MUCH.  IT'S A PLEASURE

04:11PM 14    MEETING YOU.  THANK YOU VERY MUCH.

04:11PM 15          AND YOU CAN -- DO YOU HAVE THINGS IN THE DELIBERATION

04:11PM 16    ROOM?

04:11PM 17              JUROR:  YES.

04:11PM 18              THE COURT:  ALL RIGHT.  I THINK OUR COURTROOM DEPUTY

04:11PM 19    CAN SECURE THOSE FOR YOU AND HAND THOSE TO YOU, AND THEN THE

04:12PM 20    REMAINING JURORS WOULD GO BACK, AS I SAID, JUST TO CONFIRM YOUR

04:12PM 21    SCHEDULE WITH YOUR NEW COLLEAGUE, PLEASE.

04:12PM 22          THAT MEANS YOU CAN JOIN THEM, ALTERNATE 5.  YOU'RE NOW

04:12PM 23    JUROR NUMBER 10.

04:12PM 24          (JURY OUT AT 4:12 P.M.)

04:12PM 25              JUROR:  SO I STAY HERE?

| | | |
|---|---|---|
| 04:12PM | 1 | THE COURT:  WELL, YOU KNOW, I THINK YOU CAN WALK |
| 04:12PM | 2 | BACK AND OUR COURTROOM DEPUTY -- OF COURSE DON'T GO IN THE |
| 04:12PM | 3 | ROOM, BUT IF YOU WAIT IN THE HALLWAY, SHE'LL BRING YOUR ITEMS |
| 04:12PM | 4 | OUT IF YOU IDENTIFY THEM.  SO THANK YOU VERY MUCH.  THANK YOU |
| 04:12PM | 5 | SO MUCH. |
| 04:12PM | 6 | JUROR:  SURE. |
| 04:12PM | 7 | THE COURT:  PLEASE BE SEATED.  THANK YOU, COUNSEL. |
| 04:12PM | 8 | (JURY OUT AT 4:12 P.M.) |
| 04:13PM | 9 | THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT |
| 04:13PM | 10 | THAT THE JURY HAS LEFT THE COURTROOM. |
| 04:13PM | 11 | COUNSEL, ANYTHING FOR THE RECORD BEFORE WE END FOR THE |
| 04:13PM | 12 | DAY? |
| 04:13PM | 13 | MR. SCHENK:  JUST A BRIEF COMMENT, YOUR HONOR. |
| 04:13PM | 14 | I NOTICE AT LEAST WHAT I TOOK AS A MEASURE OF SURPRISE BY |
| 04:13PM | 15 | THE JURY WHEN YOUR HONOR SAID YOU'LL COME BACK MONDAY. |
| 04:13PM | 16 | WE HAVEN'T BEEN MEETING ON MONDAYS FOR TRIAL, SO I JUST |
| 04:13PM | 17 | WONDER IF THE JURY, AS PART OF SETTING THEIR OWN SCHEDULE, |
| 04:13PM | 18 | PLANS TO KEEP TRIAL DAYS OR PLANS TO GO FIVE DAYS A WEEK.  I |
| 04:13PM | 19 | WONDER IF WE'LL HEAR SOMETHING. |
| 04:13PM | 20 | THE COURT:  WE TOLD THEM TO LET US KNOW THEIR |
| 04:13PM | 21 | SCHEDULE.  IT IS -- I SUPPOSE THEY WERE SURPRISED BECAUSE THEY |
| 04:13PM | 22 | WERE USED TO OUR TUESDAY, WEDNESDAY, THURSDAY SCHEDULE, BUT |
| 04:13PM | 23 | THEY'RE FREE TO COME ON MONDAY AND DELIBERATE. |
| 04:13PM | 24 | MR. COOPERSMITH:  I WOULD BE DELIGHTED IF THEY DID, |
| 04:13PM | 25 | YOUR HONOR. |

04:13PM  1              THE COURT:  RIGHT.  I DON'T WANT TO DISCOURAGE THEM

04:13PM  2      OR DISRUPT THAT.

04:13PM  3              MR. COOPERSMITH:  RIGHT.

04:13PM  4              MR. SCHENK:  AGREED.

04:13PM  5              THE COURT:  THANK YOU.  WE'LL HEAR WHAT WE HEAR.

04:14PM  6              MR. SCHENK:  THANK YOU, YOUR HONOR.

04:14PM  7              THE COURT:  ALL RIGHT.  THANK YOU.  HAVE A GOOD

04:14PM  8      WEEKEND.  THANK YOU.

04:14PM  9              MR. SCHENK:  THANK YOU.

04:14PM 10              MR. BOSTIC:  THANK YOU, YOUR HONOR.

04:31PM 11           (RECESS TAKEN PENDING THE DELIBERATIONS OF THE JURY AT

04:31PM 12      4:14 A.M.)

04:31PM 13              THE COURT:  WE'RE BACK ON THE RECORD.  ALL COUNSEL

04:31PM 14      ARE PRESENT.  MR. BALWANI IS PRESENT.

04:31PM 15           WE'RE OUTSIDE OF THE PRESENCE OF THE JURY.

04:31PM 16           THE JURY PASSED A NOTE.  UNFORTUNATELY, IT'S NOT ON A

04:31PM 17      REGULAR FORMAL NOTE PAPER.  THE NOTE WAS ON A POST IT, AND

04:31PM 18      WE'LL PUT THAT IN THE FILE.

04:31PM 19           BUT I'VE GIVEN PHOTOCOPIES OF THE NOTE REGARDING THE

04:31PM 20      JURY'S PROPOSED SCHEDULE, THAT'S WHAT THEY GAVE US, AND YOU

04:31PM 21      HAVE THAT FOR YOUR INFORMATION.  IT'S A SCHEDULE FOR THE NEXT

04:31PM 22      COUPLE OF WEEKS IT LOOKS LIKE OR THROUGH NEXT WEEK AND THE WEEK

04:31PM 23      AFTER.

04:31PM 24           ANY COMMENTS?  ANYTHING?

04:31PM 25              MR. SCHENK:  NO.  THANK YOU.

04:31PM 1          MR. COOPERSMITH:  NO, YOUR HONOR.  THE ONLY THING

04:31PM 2    I'LL SAY IS IT'S FINE.  THE ONLY SURPRISE IS FOR SOME REASON I

04:32PM 3    THOUGHT JULY 5TH WAS A DATE THAT SOMEONE WAS OUT, BUT IT LOOKS

04:32PM 4    LIKE THEY'VE RESOLVED IT.

04:32PM 5          THE COURT:  YES, IT LOOKS LIKE IT.

04:32PM 6       OKAY.  ANYTHING FURTHER?

04:32PM 7          MR. COOPERSMITH:  NO, YOUR HONOR.  HAVE A NICE

04:32PM 8    WEEKEND.  THANK YOU.

04:32PM 9          THE COURT:  YOU AS WELL.  THANK YOU.

04:32PM 10       (COURT ADJOURNED AT 4:32 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         IRENE RODRIGUEZ, CSR, RMR, CRR
           CERTIFICATE NUMBER 8074

17

18         DATED:  JUNE 24, 2022

19

20

21

22

23

24

25