UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No.   5:18-cr-00258-EJD-1<br><br>**ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL** |

Defendant Ramesh "Sunny" Balwani was indicted on ten counts of wire fraud (Counts 3 through 12), in violation of 18 U.S.C. § 1343, and two counts of conspiracy to commit wire fraud (Counts 1 through 2), in violation of 18 U.S.C. § 1349. *See* Third Superseding Indictment ("TSI"), Dkt. No. 469.  Pending before the Court is Mr. Balwani's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29.  For the reasons stated below, Mr. Balwani's motion is denied.

I.   **BACKGROUND**

Jury selection began on March 9, 2022.  Dkt. No. 1349.  At the close of the Government's case-in-chief, Mr. Balwani made an oral motion for judgment of acquittal under Federal Rule of Criminal Procedure 29.  *See* 5/20/2022 Tr., Dkt. No. 1545, at 6331:24-25.  Mr. Balwani simply asserted that "the government's case has failed to present sufficient evidence on every element of every count." *Id*. at 6332:1-3.  Mr. Balwani stated, "[w]e are happy to address this in more detail when it's convenient for the court at a later time, but we do want to make that motion now under Rule 29." *Id*. at 6332:4-6.  The Government opposed the motion, asserting that it "ha[d] submitted sufficient evidence to support each of the elements of each of the counts, and the court is within its

prerogative to decide the motion or reserve until a later date." *Id.* at 6332:10-13. The Court reserved decision on the motion pursuant to Federal Rule of Criminal Procedure 29(b).

At the close of all evidence, Mr. Balwani renewed his Rule 29 motion orally. *See* 6/9/2022 Tr., Dkt. No. 1549, at 6843:14-16. As before, the Court reserved judgment on the motion. *Id.* at 6844:2-3. Jury deliberations began on June 24, 2022. 6/24/2022 Tr., Dkt. No. 1554, at 7711. On July 7, 2022, the jury reached a verdict. Dkt. No. 1507. The jury unanimously found Mr. Balwani guilty on all counts.

After the verdict, the Court asked Mr. Balwani whether he intended to file any briefing in support of his Rule 29 motion. He indicated that he would not be filing any briefing. The Government likewise indicated that it would not be filing any briefing in opposition to Mr. Balwani's motion. Neither party has requested oral argument on the motion. Accordingly, the matter is ripe for decision.

Having considered the evidence and the relevant case law, the Court denies Mr. Balwani's motion for judgment of acquittal.

## II.  STANDARDS

Federal Rule of Criminal Procedure 29 permits a court to set aside a jury's guilty verdict and enter a judgment of acquittal only if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. Proc. 29. Under this standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Courts accord great deference to a jury's determination. *See Jackson*, 443 U.S. at 318–19. "The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high." *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010). To overturn a jury's conviction, the reviewing court must conclude that, viewing the facts in the light most favorable to the government, "the government's proof was insufficient as a matter of law.'" *Id.*; *see also United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
2

## III. DISCUSSION

The Court concludes that there is sufficient evidence to convict Mr. Balwani on all counts.

### A. COUNTS 1 and 2—Conspiracy to Defraud

To prove a conspiracy to commit wire fraud under § 1349, the government had to prove (1) that Mr. Balwani and co-defendant Elizabeth Holmes agreed to commit wire fraud and (2) that Mr. Balwani became a member of the alleged conspiracy knowing one of its objects and intending to help accomplish it.  Final Jury Instructions, Dkt. No. 1630, No. 16.

#### 1. Conspiracy to Defraud Investors

The evidence showed, and a reasonable jury could find, that Mr. Balwani and Ms. Holmes agreed to defraud investors to gain money.  Ms. Holmes led several investor meetings, which Mr. Balwani attended, where she made false representations to investors.  Investors also received investment binders that were prepared with Mr. Balwani's approval and knowledge.  These investment binders included false representations.  Mr. Mosley testified that the investment binder contained what he thought was a Pfizer report validating Theranos's technology.  Dr. Weber testified that Pfizer did not prepare the report.  The investor materials included another document with the Schering-Plough logo, which suggested to investors that Shering-Plough had validated Theranos's technology when it had not.  Dr. Cullen testified that Schering-Plough did not give Theranos permission to use the Schering-Plough logo.  Mr. Balwani's attendance at investor meetings, as well as his review and approval of the investor binders, support an inference of a conspiracy.

There was also evidence that Mr. Balwani made false representations directly to investors Pat Mendenhall and Brian Grossman.  Mr. Balwani gave Mr. Grossman the investor binder. Based on information from the co-defendants, both Mr. Mendenhall and Mr. Grossman thought Theranos was not using third party devices.  Investor Chris Lucas was also under the false impression that Theranos used only its own devices for blood testing.  Mr. Grossman testified he was shocked when he learned that Theranos was not using its own devices to test blood.

The evidence showed that Mr. Balwani also participated in the conspiracy by providing

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
3

false financial projections to investors. Ms. Yam, the controller at Theranos, testified that Theranos was not generating much revenue. Mr. Balwani and Ms. Holmes told Lisa Peterson and other investors from RDV that Theranos expected to have $140 million in revenue by the end of 2014 and nearly $1 billion in revenue by the end of 2015. Theranos never realized revenue that approached either of the projections.

The evidence showed that Mr. Balwani also played a key role in the conspiracy as the head of the CLIA lab. Theranos employees Dan Edlin and Dr. Rosendorff, CMS surveyor Ms. Bennett, and others confirmed that Mr. Balwani controlled the lab, even though he did not have the title of "lab director." Mr. Balwani hired his dermatologist, Dr. Dhawan, as lab director after Dr. Rosendorff left the company, but Dr. Dhawan spent only a few hours total working on Theranos work signing documents sent to him and visited the lab only once or twice. Lynette Sawyer, another "lab director," never set foot in the Theranos lab. A rational trier of fact could conclude that Mr. Balwani managed Dr. Dhawan and Ms. Sawyer such that they would not uncover problems at the lab and Theranos could maintain the appearance of a licensed CLIA lab to increase investors' confidence to invest.

The evidence showed that Mr. Balwani also played a key role in the conspiracy through his involvement with the Theranos-Walgreens relationship. Nimesh Jhaveri testified that a national rollout of Theranos lab testing in Walgreens stores was never guaranteed. He testified that Walgreens tracked certain metrics, such as the percentage of venous draws, and that percentage was never satisfactory to Walgreens. Mr. Jhaveri told Mr. Balwani he was concerned about the percentage of venous draws and whether Theranos would ever expand beyond Arizona if the percentage of venous draws remained around 40%. Mr. Balwani falsely represented to investors that it was reasonable to estimate that there would be 900 Walgreens locations by 2015.

The numerous text messages and emails between Mr. Balwani and Ms. Holmes also support the jury's conclusion that the co-defendants conspired to commit wire fraud. For example, in July 2015, Mr. Balwani told Ms. Holmes, " I am responsible for everything at Theranos. All have been my decisions too." *See* 6/21/22 Tr. (Closing Argument), Dkt. No. 551,

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
4

at 6974:3-6. In another text message, Mr. Balwani told Ms. Holmes, "we have to work together" on revenue. *Id*. at 6974:18-19. Mr. Balwani also told Ms. Holmes: "You are the company. We need revenue." *Id*. at 6974:23-24. Several witnesses, including but not limited to Mr. Edlin, Dr. Pandori, Lisa Peterson, and Brian Grossman testified about Mr. Balwani's and Ms. Holmes's cohesive working relationship and collaboration.

There is evidence to establish the second element of the investor conspiracy charge, that Mr. Balwani became a member of the alleged conspiracy knowing one of its objects and intending to help accomplish it. The evidence supports the jury finding that Mr. Balwani's and Ms. Holmes' objective was to secure investor money to support the company through fraud. Ms. Yam testified about the financial condition of Theranos. Text messages confirm that the co-defendants knew Theranos needed money. A rational trier of fact could conclude that the co-defendants intentionally made false statements to investors about the state of Theranos, its technology, and its future prospects because the company desperately needed funding.

### 2. Conspiracy to Defraud Patients

The evidence showed, and a reasonable jury could find, that Mr. Balwani and Ms. Holmes agreed to defraud patients to gain money. The evidence showed that the co-defendants were responsible for false statements on Theranos's website, in patient brochures, and in the press. For example, the evidence showed that Mr. Balwani and Ms. Holmes were the only individuals at Theranos with authority to approve the Chiat/Day marketing materials. Theranos's marketing materials included representations such as "highest levels of accuracy," or "highest quality," and the "full range of tests." Theranos also used the phrase "one tiny drop" to suggest to patients that Theranos had a full range of tests that could be run on blood drawn by fingerstick. There was evidence that the co-defendants knew the marketing representations were false, including evidence that Theranos disregarded professional advice to replace the phrases, including replacing the phrase "highest quality" with "high quality."

There is evidence that Mr. Balwani played another role in the conspiracy: controlling the CLIA lab. A rational trier of fact could conclude that Mr. Balwani stifled the concerns that Dr.

Rosendorff, Erika Cheung and others raised about blood testing and unreliable test results. Former lab director Dr. Pandori also raised his concerns about the Edison with Mr. Balwani, and they were not well received. A rational trier of fact could conclude that Mr. Balwani later hired absentee lab directors Dr. Dhawan and Lynette Sawyer to avoid serious scrutiny of known problems in the lab, including the inaccuracy and unreliability of test results.

There is evidence to establish the second element of the patient conspiracy charge, namely that Mr. Balwani became a member of the alleged conspiracy knowing one of its objects and intending to help accomplish it. Mr. Balwani's and Ms. Holmes' objective was to secure investment money through fraud. As discussed previously, the co-defendants knew Theranos needed money. A rational trier of fact could conclude that the co-defendants intentionally made false statements to patients because the company needed revenue.

### B.     COUNTS 3 through 12—Wire Fraud.

The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme, and (3) specific intent to defraud. *United States v. Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017). A scheme to defraud is a deceptive scheme or plan to "obtain money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) (internal quotations omitted). *See also* Final Jury Instructions, Dkt. No. 1630, No. 20.

The evidence showed, and a rational trier of fact could find, that Mr. Balwani committed wire fraud.

#### 1.     Investor Counts

There is evidence that Mr. Balwani and Ms. Holmes engaged in a scheme to defraud investors from 2010 to 2015. The co-defendants made several misrepresentations to investors to persuade them to invest and thus provide funding that Theranos desperately needed. Theranos disseminated the false statements to investors through its website, emails, media publications, as well as other means. Investors testified that the misrepresentations were important to their investment decisions. A non-exhaustive list of material misrepresentations is set forth below.

First, Mr. Balwani misrepresented or was responsible for misrepresentations regarding the capabilities of Theranos's devices. Among other things, Theranos ran demos of the Theranos device using what was called the "null protocol" to shield device failure from investors. Mr. Jhaveri was present at one of the demos. He thought his blood was being tested on the Edison when it truth it was tested on a commercial device called the Advia. Investors were not told that Theranos was using third party devices. Rather, the co-defendants led investors to believe Theranos developed and manufactured its own technology for blood testing. The co-defendants also misrepresented to investors that Theranos's technology ran a full range of tests from just a fingerstick.

The co-defendants were responsible for false statements about the accuracy and reliability of Theranos's testing. Mr. Balwani knew these representations were false. As stated previously, Dr. Rosendorff, Ms. Cheung and others told Mr. Balwani they had concerns about the testing and unreliable test results. Former lab director Dr. Pandori also raised his concerns about the Edison with Mr. Balwani. There is also evidence that Mr. Balwani and Ms. Holmes agreed to remove "outlier" test results and to average out the rest of the results so that the Edison device would pass quality control.

Second, the co-defendants misrepresented to investors that GlaxoSmithKline, Pfizer, and Schering-Plough had completed their own technical validation of Theranos technology.

Third, the co-defendants misrepresented to investors that Theranos's relationship with Walgreens was going well and that Theranos were going to expand. They also failed to disclose to investors that Walgreens was not going to expand until Theranos reduced the number of venous draws.

Fourth, the co-defendants made false claims about work with the Department of Defense. Investors, including Lisa Peterson, Chris Lucas, Bryan Tolbert, and Brian Grossman, received false representations that Theranos's technology had been deployed by the Department of Defense on the battlefield, was saving lives, was in Afghanistan, and on medevac helicopters.

Fifth, the co-defendants gave investors false financial information. They misled investors

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL

into believing Theranos was financially stable and generating revenue. Lisa Peterson, for example, thought Theranos was generating revenue in 2014. There is also evidence from which to infer that Mr. Balwani knew the financial projections were unattainable. Mr. Balwani knew the Walgreens 900 store rollout was not going to proceed unless Theranos reduced venous draws, and he knew Theranos did not have the technology to do so.

Specific intent to defraud can be inferred from much of the evidence already described above. As stated previously, Mr. Balwani regularly communicated with Ms. Yam and knew in 2013 that Theranos was down to $7 million in operating account. Yet Mr. Balwani represented to Mr. Mendenhall that Theranos could fund growth through current operations and was raising money only to accelerate business. The evidence showed and a rational trier of fact could conclude that Mr. Balwani knew these representations were false and were intended to deceive Mr. Mendenhall into investing. Intent to defraud can also be inferred from Mr. Balwani's review, approval, and distribution of the investor binders, and in particular, the financial information in the binders.

Intent to defraud can also be inferred from Mr. Balwani's representations to Mr. Mendenhall regarding Theranos's technology. Mr. Balwani misrepresented to him, among other things, that the science behind Theranos was complete; that no new invention was needed; and that Theranos was completely vertically integrated. Mr. Balwani also told Mr. Mendenhall that Theranos can run sixty to seventy tests with just three drops of blood. The evidence showed and a rational trier of fact could find that Mr. Balwani knew these representations were false and that he intended to defraud Mr. Mendenhall and other investors.

Additional evidence of intent to defraud includes, but is not limited to: Mr. Balwani's involvement in demos and the null protocol; his email describing a plan to distract Walgreens customers so they would not notice missing tests; and Walgreens's reaction to the negative October 16, 2015 Wall Street Journal article and complaint about Theranos's lack of transparency.

There is also evidence to satisfy the electronic wire element of the wire fraud counts. The parties stipulated that certain electronic funds transfers occurred and crossed state lines. All six of

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING BALWANI'S MOTION FOR JUDGMENT OF ACQUITTAL
8

the investors created a wire transfer that crossed state lines.

### 2. Patient Counts

There is evidence of a scheme to defraud patients from 2013 through 2016. As discussed previously, the evidence shows and a rational trier of fact could conclude that Mr. Balwani exercised full control over the CLIA lab. He made hiring and firing decisions. He decided which devices to use. He was the main point of contact for the CMS survey.

Lab directors and other lab employees told Mr. Balwani and Ms. Holmes about the numerous problems in the CLIA lab, including quality control issues, inaccurate and unreliable test results, and device failures. There is evidence of problems with a number of assays, including but not limited to Vitamin B12, HCG, testosterone, and CO2. Mr. Balwani and Ms. Holmes communicated via text message about problems with tests. Mr. Balwani also received customer complaint logs.

Theranos's marketing represented to patients that its lab had the "highest levels of accuracy," or "highest quality," and the "full range of tests." Theranos also used the phrase "one tiny drop" to convey to patients that Theranos could run tests on just a fingerstick of blood. Theranos hired Chiat/Day to create the marketing materials. Mr. Balwani and Ms. Holmes were the only two people at Theranos who had authority to approve the marketing materials. Theranos's false representations about testing also appeared in its website, patient brochures, media articles, and advertising purchased from Horizon Media. There are several emails showing Mr. Balwani and Ms. Holmes strategizing about advertising and its effect on potential patients.

The evidence showed that the advertising misrepresentations were material to patients. Brittany Gould testified she saw statements about accuracy and expected her tests to be accurate. Dr. Ellsworth, Ms. Tompkins, and Mr. Bingham also saw statements about accuracy and expected accurate test results. Dr. Zachman testified about her patient's inaccurate Theranos HCG test. Dr. Burnes testified about his patient's inaccurate Theranos PSA tests. Mr. Bingham testified about his inaccurate Theranos platelet score. Ms. Tompkins testified about the inaccurate HIV test result she received from Theranos.

1    Intent to defraud can be inferred from much of the evidence already discussed above. For
2    example, there was evidence that the co-defendants disregarded advice to replace phrases
3    appearing on Theranos's website, including "one tiny drop of blood," "highest levels of accuracy,"
4    and "full range of tests."  Intent to defraud can also be inferred from Mr. Balwani's and Ms.
5    Holmes's text messages discussing building their business and running circles around others and
6    the FDA by "manipulating their game."  There is also evidence that Mr. Balwani and Ms. Holmes
7    pressured Dr. Rosendorff to explain away inaccurate test results.  Intent to defraud can also be
8    inferred from the discussion between Mr. Balwani and Ms. Holmes regarding the strategy to
9    engage to limit inspectors observing only limited and discrete parts of Theranos's facility.

10    Lastly, the evidence showed use of the wires to further the scheme to defraud investors: (1)
11    a phone call across state lines to Mr. Bingham; (2) test results sent via facsimile over state lines to
12    Mr. Ellsworth's doctor; (3) test results sent via facsimile over state lines to Ms. Tomkins's doctor;
13    and (4) Theranos's wire transfer to Horizon Media to pay for advertisements for Theranos's
14    Wellness Centers.

### 3.    Aiding and Abetting

16    To prove aiding and abetting, the government had to establish the following elements.
17    First, someone else committed the conduct charged in Counts Three through Twelve of the
18    indictment.  Second, Mr. Balwani aided, counseled, commanded, induced, or procured that person
19    with respect to at least one element of wire fraud as charged in Counts Three through Twelve of
20    the indictment.  Third, Mr. Balwani acted with the intent to facilitate wire fraud as charged in
21    Counts Three through Twelve of the indictment.  Fourth, Mr. Balwani acted before the crime was
22    completed.  Final Jury Instructions, Dkt. No. 1630, No. 24.

23    Based on the evidence already discussed above, a rational trier of fact could find the first
24    three elements of aiding and abetting.  As to the fourth element, the evidence showed and a
25    rational trier of fact could conclude that Mr. Balwani aided Ms. Holmes before the crime was
26    completed.  Specifically, there is evidence that on December 22, 2013, Mr. Balwani spoke with
27    Mr. Mendenhall over the telephone and made misrepresentations about Theranos, its technology,

and finances.

In sum, viewing all of the evidence in the light most favorable to the government, a rational trier of fact could find the essential elements of each of the charged offenses beyond a reasonable doubt.

## IV. CONCLUSION

For the reasons discussed above, Mr. Balwani's motion for judgment of acquittal is DENIED.

**IT IS SO ORDERED.**

Dated: November 7, 2022

EDWARD J. DAVILA
United States District Judge