UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ELIZABETH A. HOLMES,<br>Defendant. | Case No.   5:18-cr-00258-EJD-1<br><br>**ORDER DENYING MOTIONS FOR NEW TRIAL**<br><br>Re: Dkt. Nos. 1574, 1576, 1577 |

Defendant Elizabeth A. Holmes brings three motions for a new trial, each based on a different set of newly discovered evidence. The first motion arises from post-trial statements that purportedly implied government misconduct (Dkt. No. 1574); the second relates to statements made during the government's closing argument at co-Defendant Ramesh "Sunny" Balwani's trial (Dkt. No. 1576); and the third motion focuses on allegedly suppressed *Brady* evidence regarding the loss of Theranos's Laboratory Information System ("LIS") database (Dkt. No. 1577).

This Order follows full briefing on all three motions, a limited evidentiary hearing examining the government witness whose statements are the basis for Ms. Holmes' first motion, and the parties' post-hearing briefs. For the reasons discussed below, the Court DENIES all of Defendant's motions for new trial.

I.   **BACKGROUND**

On July 28, 2020, the government filed the Third Superseding Indictment, charging Defendants Elizabeth A. Holmes ("Defendant") and Ramesh "Sunny" Balwani ("Co-Defendant") with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2). Dkt. No. 469. Although Holmes and Balwani were initially named as co-

defendants, their individual cases were severed in March 2020. Dkt. No. 362.

Homes' trial began in August 2021. Throughout both pre-trial and the four-month trial, the government and Holmes clashed on multiple issues regarding, *inter alia*, key government witness and former Theranos laboratory director Dr. Adam Rosendorff, the roles and relationship between Holmes and Balwani in managing Theranos, and the decommissioning of the LIS database containing Theranos' testing and quality control data. *See* Dkt. Nos. 1574, 1576, 1577. On January 3, 2022, the jury found Holmes guilty of Counts 1, 6, 7, and 8, relating to fraud against Theranos investors. Dkt. No. 1235. The jury acquitted her of Counts 2, 10, 11, and 12, which related to fraud against patients, and the Court declared a mistrial as to Counts 3 through 5, on which the jury did not reach a unanimous verdict. *Id.*

Balwani's separate trial began in March 2022 on the same twelve counts. Following a comparably lengthy trial, the jury found Balwani guilty of all twelve counts. Dkt. No. 1507.

## II.     DISCUSSION

Because Defendant did not file a motion for new trial within the stipulated time period, Dkt. No. 1252, Rule 33(b)(2) acts as a mandatory claim-processing rule to bar any new trial motions unless they are based on newly discovered evidence. Fed. R. Crim. P. 33(b)(2); *Eberhart v. United States*, 546 U.S. 12 (2005). Accordingly, each of the instant three motions must arise from newly discovered evidence.

### A.     Legal Standard

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The burden of justifying a new trial rests with the defendant. *See United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986). The decision to grant a new trial is within the sound discretion of the trial court. *See United States v. Love*, 535 F.2d 1152, 1157 (9th Cir. 1976).

Where a new trial is requested on the basis of newly discovered evidence, the movant must satisfy a five-part test: "(1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOTIONS FOR NEW TRIAL
2

evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal." *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). "[T]he trial judge has broad discretion in deciding whether new evidence is credible." *United States v. Panza*, 612 F.2d 432, 441 (9th Cir. 1979).

### B.     Dr. Rosendorff's Post-Trial Statements (Dkt. No. 1574)

Dr. Adam Rosendorff was clinical lab director at Theranos from April 2013 to November 2014, which provided him with insight into the development of the company's blood testing operation. At Defendant's trial, he testified for two days of direct examination and four days of cross examination.

On August 8, 2022, about eight months after Defendant's trial, Dr. Rosendorff arrived at Defendant's residence, where he encountered her partner, William Evans, and requested to speak with Defendant. Evans Decl., Ex. A, Dkt. No. 1574-2. In the ten-minute encounter, Dr. Rosendorff had two short conversations with Mr. Evans. 10/17/22 Hr'g Tr. 13:21-24. Per Mr. Evans' recollection, Dr. Rosendorff appeared distressed and made comments regarding a variety of topics, including his experiences at trial. Dkt. No. 1574-2. In particular, Dr. Rosendorff remarked that he "tried to answer the questions honestly [at trial] but that the prosecutors tried to make everybody look bad," "the government made things sound worse than they were," and he "felt like he had done something wrong." *Id.*

Defendant initially moved for a new trial based on the newly discovered statements that Dr. Rosendorff communicated to Mr. Evans. Dkt. No. 1574, at 6. The Court granted a limited evidentiary hearing to explore whether Dr. Rosendorff's comments implicated government misconduct or affected the veracity of his trial testimony. Dkt. No. 1593. However, following the evidentiary hearing, Defendant appears to have shifted to focus primarily on the government's misconduct implied by Dr. Rosendorff's statements. Dkt. No. 1618, at 5. The Court addresses each argument in turn under their respective frameworks.

### 1. "Newly Discovered" Evidence

In her opening motion, Defendant sought a new trial based on statements that Dr. Rosendorff made to Mr. Evans in front of her residence. Dkt. No. 1574. Defendant emphasizes that, at his evidentiary hearing, Dr. Rosendorff did not deny making those statements. Dkt. No. 1618, at 2-3. Defendant also relies on Dr. Rosendorff's assent to defense counsel's questions that "sometimes [he was not] given the opportunity to tell the full story with respect to a particular event at Theranos during [his] direct examination" and "with respect to some of that testimony, there was only a limited amount of information that came out during the direct examination." 10/17/22 Hr'g Tr. 23:24-24:6. Defendant posits that these post-trial statements made by the government's star witness would have supported her defense theme that the government had cherry-picked evidence to present at her trial. Dkt. No. 1574, at 8.

After reviewing Defendant's submissions and Dr. Rosendorff's testimony under oath, the Court finds that Dr. Rosendorff's statements do not meet the third and fourth *Harrington* requirements for a new trial, specifically that the evidence be material to the issues at trial and neither cumulative nor merely impeaching.

As an initial matter, Defendant acknowledges that Dr. Rosendorff's statements to Mr. Evans are unclear as to their precise meanings, thereby necessitating an evidentiary hearing to provide further context and elaboration. Dkt. No. 1574, at 7 (listing four potential meanings of Dr. Rosendorff's remarks). Although Defendant urges the Court to interpret these statements as acknowledgement that the government presented an incomplete picture to the jury, Dkt. No. 1618, at 1, Dr. Rosendorff's testimony at his evidentiary hearing refutes both interpretations. On at least three different occasions, Dr. Rosendorff testified that he did *not* believe the government was making things sound worse than they were at trial. 10/17/22 Hr'g Tr. 21:12-18, 26:1-7; 54:3-14. He also testified that he believed the government was "comprehensive" and not "cherry picking or being selective" when presenting exhibits during his direct examination.[1] *Id.* at 22:19-24. The

---

[1] Defendant asks the Court to disregard Dr. Rosendorff's professed beliefs as irrelevant to the government's intentions in presenting its case. Dkt. No. 1618, at 10 (quoting 10/17/22 Hr'g Tr. 22:22-23). Although Dr. Rosendorff cannot testify as to the government's subjective intentions,

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOTIONS FOR NEW TRIAL
4

Court finds Dr. Rosendorff's statements under oath to be credible, which would declaw most, if not all, of the negative implications that Defendant would attribute to them.

Even if Dr. Rosendorff's statements carried the implications proposed by Defendant, they would nonetheless be either immaterial to the issues or cumulative of evidence already presented at trial. Defendant argues that Dr. Rosendorff's statements (1) gravely damaged the reliability of the government's investigation; (2) supported the defense's theme of cherry-picking; and (3) and undermined the government's showing of Defendant's intent to defraud. Dkt. No. 1574, at 8-9.

*First*, although evidence relating to the thoroughness of the government's investigation would be material, *see U.S. v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000), Dr. Rosendorff's statements simply do not implicate the government's investigation, as his statements only related to the *presentation* of evidence at trial. *See* Dkt. No. 1574, at 7 (listing potential interpretations without any reference to government's investigation).

*Second*, even with regards to trial presentation, the vagueness of Dr. Rosendorff's comments would defy any efforts to construe a specific instance where the government had misrepresented evidence, and Dr. Rosendorff did not recall any such instance during his hearing. *See generally* 10/17/22 Hr'g Tr. To the extent Dr. Rosendorff's statements could be interpretated as broadly suggesting the government had cherry-picked evidence to present as a general matter, they would be substantially cumulative of arguments the defense already presented—most notably in the first fifteen minutes of the defense's closing arguments, Dkt. No. 1574, at 8 (citing 12/16/21 Tr. 9031:19-9041:10)—and that the jury would have considered.

And *third*, Dr. Rosendorff's statements that "everyone was working so hard to do something good and meaningful" do not bear upon Defendant's intent to defraud, as Dr. Rosendorff expressly indicated at his hearing that he "did not intend to include Ms. Holmes and Mr. Balwani in that statement." 10/17/22 Hr'g Tr. 17:7-10. In any event, the notion that Theranos employees were working hard to do something good would be cumulative of other statements

---

he is nonetheless aware of the universe of *his* knowledge and can testify as to whether a fair and complete version of *those* facts came out during his direct examination.

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOTIONS FOR NEW TRIAL
5

from Dr. Rosendorff and other witnesses. *See* Dkt. No. 1587, at 7-9 (identifying other statements).

In sum, the Court finds that the statements Dr. Rosendorff made to Mr. Evans do not stand for any of the proposed meanings that Defendant would want and, even if they did, they would not be material to the issues at trial or otherwise non-cumulative. Accordingly, a new trial is not warranted based on the "newly discovered" evidence of Dr. Rosendorff's statements to Mr. Evans. However, in her post-hearing brief, Defendant appears to argue under the framework for a due process violation based on government misconduct, which the Court turns to next.

### 2. Government Misconduct

After Dr. Rosendorff's evidentiary hearing, Defendant submitted briefing asserting that Dr. Rosendorff's testimony proved that the government presented a misleading and incomplete picture to the jury. Dkt. No. 1618, at 1. Her argument primarily relies on two points: (1) Dr. Rosendorff did not directly deny any of the statements attributed to him by Mr. Evans and (2) Dr. Rosendorff had assented to defense counsel's questions that there were instances where he did not have the opportunity to tell the "full story" of certain events where only a "limited amount of information" would come out on direct examination. *Id.* at 2-3. Defendant's brief then segues into a montage of trial highlights where defense counsel on cross-examination either impeached Dr. Rosendorff or provided further context for evidence the government had introduced on direct. *Id.* at 5-8.

The Court first notes that, to the extent Defendant seeks a new trial based solely on impressions the government had made on direct that defense counsel later rebutted on cross, such a motion would be time barred by Rule 33(b)(2). Fed. R. Crim. P. 33(b)(2) ("Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."); *see also United States v. Fekrat*, 450 F. App'x 615 (9th Cir. 2011) (unpublished) (affirming district court's denial of Rule 33 motion based solely on government's presentation at trial). The Court thereby will focus only on whether Dr. Rosendorff's "newly discovered" statements implicate any government misconduct.

To establish a due process violation for government misconduct under *Napue v. Illinois*, 360 U.S. 264 (1959), Defendant must show: "(1) that the testimony was actually false, (2) that the

1    government knew or should have known that it was false, and (3) that the testimony was material,
2    meaning there is a 'reasonable likelihood that the false testimony could have affected the judgment
3    of the jury.'" *United States v. Renzi*, 769 F.3d 731, 751 (9th Cir. 2014).  Here, the Court finds that
4    Dr. Rosendorff's statements do not identify any trial testimony as being either false or misleading
5    nor would those statements be likely to affect the jury's judgment.

6          With respect to the falsehood requirement, Dr. Rosendorff's post-trial statements are too
7    vague and general to imply that any specific testimony was actually false or misleading.  First, as
8    noted above, Dr. Rosendorff clarified in his evidentiary hearing that he does *not* in fact believe
9    that the government had "made things seem worse than they were," a position that he repeated on
10   three different occasions.  *See supra* at Section II(B)(1).  Second, even if Dr. Rosenberg at times
11   did not have an opportunity on direct to tell the "full story" where only a "limited amount of
12   information" was presented, that does not *ipso facto* mean the government presented false or even
13   misleading testimony.[2]  Such broad and general remarks as to a well-known feature of the
14   adversarial system would fall significantly below the falsehood threshold demanded by *Napue*.
15   *See United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (finding no falsity where
16   allegations "at most point to evidence creating an inference of falsity" and the "inconsistencies
17   were fully explored and argued to the jury"); *Hein v. Sullivan*, 601 F.3d 897, 909 (9th Cir. 2010)
18   ("[A]lthough a few of [witness's] statements at trial were incomplete, . . . *Napue* imposed no duty
19   on [prosecutor] to clarify [witness's] answers to open-ended questions about his willingness to be
20   a witness or to specifically question him about the July 10 letter."); *Shadid v. Schriro*, 2005 WL
21   8161001, at *6 (D. Ariz. July 13, 2005) ("[A]n ambiguous or incomplete statement does not rise to
22   the level of false testimony.").  As a result, Defendant's *Napue* claim stumbles at the first step.

23         Even if Dr. Rosendorff's statements could somehow satisfy *Napue* "actually false"
24   requirement, Defendant has not shown that those statements are likely to affect the jury's

---

[2] This point is exemplified by Defendant's bold proposition that, if government witnesses on direct testify to anything less than every point discussed in their pre-trial meetings with prosecutors, the government should "be forced to disclose to the jury that . . . it presented an incomplete picture of the documents and the testimony when [the witness] took the stand."  Dkt. No. 1618, at 10.

Case No.:   5:18-cr-00258-EJD-1
ORDER DENYING MOTIONS FOR NEW TRIAL
7

judgment—here, Defendant's convictions on the investor fraud counts. To the extent the government set up a particular impression based on Dr. Rosendorff's direct examination, that impression would have then been subjected to four days of cross examination where Defendant had the opportunity to change that impression. In fact, for every instance where the government created an allegedly misleading impression on direct, Defendant explains how that impression was later clarified in cross examination, which would have ultimately provided the complete picture to the jury. Dkt. No. 1618, at 6-7 (citing instances where Dr. Rosendorff's testimony was clarified or impeached); *see also United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (finding that "there is not a 'reasonable likelihood' that [witness's] statement 'affected the judgment of the jury'" where "[d]efense counsel effectively attacked [the witness's] credibility"). Additionally, Dr. Rosendorff's post-trial statements only pertained to the *internal* operations at Theranos and, therefore, are unlikely to affect the Defendant's convictions for investor fraud that featured Defendant's representations of Theranos's *external* partnerships. *See* Dkt. No. 469 ¶ 12. Accordingly, Defendant cannot show that Dr. Rosendorff's statements would have been material.

Based on the foregoing, the Court finds that Dr. Rosendorff's post-trial statements to Mr. Evans do not satisfy either the *Harrington* test to warrant a new trial for newly discovered evidence or the *Napue* test to establish government misconduct. The Court therefore DENIES Defendant's motion for new trial based on evidence regarding Dr. Rosendorff (Dkt. No. 1574).

### C. Government's Closing Arguments in Mr. Balwani's Trial (Dkt. No. 1576)

Defendant also moves for a new trial based on the government's statements in its closing arguments at Co-Defendant Balwani's trial. Dkt. No. 1576. Specifically, the government had mentioned in its closing rebuttal arguments at Balwani's trial that he had "a lot of influence over [Defendant]" in their relationship, thereby undermining Defendant's knowledge and intent with respect to her representations to investors, so the argument goes. *Id.* at 6. The Court finds that Defendant's motion for a new trial—arising from a few sentences made during the government's closing rebuttal arguments—do not warrant a new trial under the *Harrington* test because they are not "newly discovered," not material, and not likely to result in acquittal.

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOTIONS FOR NEW TRIAL

8

### 1. "Newly Discovered" Evidence

First, the inference that Balwani's experience and close relationship with Defendant "would have given him a lot of influence over her" cannot be considered "newly discovered" evidence, because all those facts were known to the Defendant when the jury returned her verdict. It is well-established that evidence is not "newly discovered" if the substance of the evidence was "already known to the defendant or introduced in another form." *United States v. Kramer*, 2020 WL 5408165, at *3 (N.D. Cal. Sept. 9, 2020); *United States v. Hinkson*, 585 F.3d 1247, 1264 (9th Cir. 2009) (affirming district court determination that affidavits were not new because "while newly written, [they] did not provide any new *information* that was not already considered") (emphasis in original); *accord United States v. Caballero*, 745 F. App'x 32, 33 (9th Cir. 2018).

Defendant responds that the "newly discovered" information is the government's opinion and not the facts that the opinion is based on. Dkt. No. 1591, at 2. This is a semantically dubious distinction, as the sentences at issue do not express an opinion so much as they propose inferences that the jury can draw from said facts. *See* 7/19/22 Hr'g Tr. 7652:9-17 ("*[Y]ou can also infer* that his close relationship with Ms. Holmes would have given him a lot of influence over her. . . . *it would be no surprise* that his advise [sic], his input would carry a lot of weight with her.").

In any event, the government's rebuttal argument in Balwani's trial did not take a new or inconsistent position from that presented at Defendant's trial. The government argued, in both trials, that both defendants helmed Theranos together as partners. *Compare* 9/8/21 Hr'g Tr. 553:3-5 *with* 3/22/22 Hr'g Tr. 1041:25-1042:4. The government also argued that each defendant was receptive to and could be influenced by the other's opinions. *Compare* 12/17/21 Hr'g Tr. 9310:1-4 (noting that Balwani deferred decisions on inventions and devices to Holmes) *with* 6/24/22 Hr'g Tr. 7652:14-17 ("[It]t would be no surprise that his advise [*sic*], his input would carry a lot of weight with her."). Contrary to Defendant's characterization, the closing remarks in question do not profess a "newly discovered" or changed government opinion but instead present the same (albeit complex) relationship from different perspectives. Defendant's motion for new trial can be denied for her inability to meet this first step.

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOTIONS FOR NEW TRIAL
9

### 2. Material

Even if the government's statements at Balwani's trial can be considered "newly discovered evidence," those statements are not material to the issues in Defendant's trial. Defendant argues that Balwani's influence in their relationship is material to Defendant's knowledge and intent with respect to investor representations, as well as whether she entered into a conspiracy with Balwani. Dkt. No. 1576, at 6; Dkt. No. 1591, at 6-7. This argument, however, commits the same error that Defendant accuses the government of making: it focuses on the relationship itself instead of the government's opinion of the relationship. Defendant provides no support for the proposition that opinions or characterizations from government attorneys—who have no contemporary personal knowledge of the co-Defendants' relationship—would carry any evidentiary weight as to the actual relationship that existed during the relevant time. And insofar as Defendant's focus is on the relationship itself, those facts are clearly not "newly discovered." *See supra* at Section II(C)(1). Accordingly, the government's post-trial opinion of co-Defendants' relationship is not material to any of the issues in Defendant's trial.

### 3. Likelihood of Acquittal

Finally, the government's closing arguments in Balwani's trial are unlikely to result in an acquittal for Defendant. Contrary to Defendant's characterization of these statements as "an express position from the government in the record that Mr. Balwani exercise unique influence over Ms. Holmes," Dkt. No. 1591, at 9, the Court does not read the statements as inconsistent with those the government made in Defendant's trial. *See supra* at Section II(C)(1). Furthermore, any opinion of Defendant's relationship from the government is not likely to tilt the scales on the verdicts when compared to statements Defendant made herself. Specifically, she had testified that Balwani did not force her to make any of the statements to investors or journalists, *see* 11/29/21 Hr'g Tr. 7878:22-7879:4, and that she made all the decisions at Theranos jointly with Balwani. *See* 11/30/21 Hr'g Tr. 8063:15-21. Given the existence of direct personal testimony on Co-Defendants' relationship, the Court cannot say that the government's remarks or suggestions as to that relationship would "probably result in acquittal."

The Court finds that the government's closing arguments in Balwani's trial are not "newly discovered" evidence, not material to the issues in Defendant's trial, and are not likely to result in acquittal if they were included in a new trial. Accordingly, Defendant has not met the five-part *Harrington* test, and the Court DENIES her motion for new trial based on evidence from Balwani's trial (Dkt. No. 1576).

### D. Evidence Regarding LIS Database (Dkt. No. 1577)

Finally, Defendant moves for a new trial on the basis that the government committed a *Brady* violation by refusing to produce certain emails relating to the government's efforts to recover the LIS database. Dkt. No. 1577, at 1.

On October 29, 2020, the government provided a 24-page letter disclosing potential *Brady*, *Giglio*, and *Jencks* information, including the government's attempts to access and recover the LIS database from two hard drives it received. Dkt. No. 732-2 (the "*Brady* Letter"). The *Brady* Letter provided a detailed chronology of the government's interactions with the LIS database, including as follows: how the LIS hard drives came into the government's possession, the support staff's efforts to open and decrypt the hard drives, the various recovery options presented to the government, the government's selection and pursuit of those options, and conversations regarding the LIS database's encryption and decommissioning. Dkt. No. 732-2 ¶¶ 39-51. Defendant subsequently requested and moved to compel production of the documents underlying the letter, which the Court denied as speculative and irrelevant to her defenses but left the door open to future document production if either party put the issue in dispute at trial. Dkt. No. 887, at 17-18. During her trial, Defendant did not pursue a defense blaming the government for failing to gather and preserve the LIS database. *See* Volkar Decl., Ex. 1, Dkt. No. 1586-2.

During Co-Defendant Balwani's trial, he also moved to compel documents relating to the LIS database. Dkt. No. 1156. Because Balwani had articulated a specific defense relating to the government's investigation and efforts to obtain the LIS database, the Court ordered production of communications sufficient to show the government's recovery efforts referenced in the *Brady* Letter. Dkt. No. 1464. The government subsequently produced eleven emails ("LIS Emails") to

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOTIONS FOR NEW TRIAL
11

1  both Defendants on June 2, 2022.  Dkt. No. 1577-2.  The instant motion for new trial claims that

2  the government violated *Brady* by not producing these emails to Defendant earlier.

3  When motions for a new trial include newly discovered evidence along with alleged *Brady*

4  violations, the violations have been evaluated according to their own respective standard rather

5  than the five-part *Harrington* test.  *See United States v. Brosnan*, 2013 WL 4427258, at *2 (N.D.

6  Cal. Aug. 15, 2013) (citing *United States v. Jernigan*, 492 F.3d 1050 (9th Cir. 2007)).  To prove a

7  *Brady* violation, a defendant must meet three elements: "(1) the evidence at issue must be

8  favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that

9  evidence must have been suppressed by the State, either willfully or inadvertently; and (3)

10  prejudice must have ensued."  *United States v. Kohring*, 637 F.3d 895, 901 (9th Cir. 2011).

11  Evidence is prejudicial if, in the context of the entire record, it "undermines confidence in the

12  outcome of the trial," resulting in a "reasonable probability . . . the result of the proceeding would

13  have been different."  *Karis v. Calderon*, 283 F.3d 1117, 1128 (9th Cir. 2002).

14  Here, the Court finds that Defendant has failed to show that the government suppressed the

15  LIS Emails and, even if they had been disclosed, there is not a reasonable probability that

16  Defendant's trial would have turned out any differently.

### 1. Government Suppression

18  To the extent that the LIS Emails contain or reflect information that was already disclosed

19  in the government's *Brady* Letter, that information was not suppressed by the government.

20  "When . . . a defendant has enough information to be able to ascertain the supposed *Brady* material

21  on his own, there is no suppression by the government."  *United States v. Aichele*, 941 F.2d 761,

22  764 (9th Cir. 1991); *see also United States v. Bond*, 552 F.3d 1092, 1097 (9th Cir. 2009) (finding

23  no suppression where the government "provided [defendant] with the information needed to

24  acquire all trial testimony, and provided him with the essential factual data to determine whether

25  the witness' testimony might be helpful").  There can be little argument that the chronology and

26  facts contained in the *Brady* Letter would have enabled Defendant to pursue a defense at trial

27  challenging the government's recovery efforts, a tactic that her Co-Defendant did indeed pursue

Case No.:   5:18-cr-00258-EJD-1
ORDER DENYING MOTIONS FOR NEW TRIAL
12

and resulted in the production of the LIS Emails.[3]

Regardless of her trial strategy, Defendant cannot, as a matter of law, claim that the government suppressed any information or fact that it had previously disclosed in its *Brady* Letter. *See Aichele*, 941 F.3d at 764; *Bond*, 552 F.3d at 1097. Defendant cites *United States v. Liew* for the proposition that the government may be required to produce the source material for *Brady* information that had already been disclosed. 856 F.3d 585, 604 (9th Cir. 2017). However, *Liew* is distinguishable because it involved a declaration attesting to specific and relevant differences between the disclosed FBI interview report and the actual witness interview, suggesting that the rough interview notes may contain exculpatory information. *Id.* at 595. By contrast, the only "missing" information Defendant cited in her one-paragraph request to compel the LIS Emails were the identities of the anonymous government individuals referenced in the *Brady* Letter. Dkt. No. 810, at 8. In the absence of a reason why the LIS Emails or identities would have been relevant, this Court rejected Defendant's request as an attempt to "use *Brady* simply to search for *Brady* materials." Dkt. No. 997, at 17. Similarly, in the absence of any sign that the information in the *Brady* Letter was incomplete, the Court rejects Defendant's suggestion that the government should have supplemented its *Brady* disclosures with every document referenced therein.

Accordingly, the Court finds that, to the extent the LIS Emails reflected information that was disclosed in the government's *Brady* Letter, that information was not suppressed by the government. Any potential *Brady* violation in the instant motion would have to arise from new information in the LIS Emails that were not included the *Brady* Letter.

### 2. Prejudice

Recognizing perhaps that information previously disclosed in the *Brady* Letter would not suffice to establish a *Brady* violation, Defendant points to new information that the LIS Emails contained. Most notably, the LIS Emails revealed (1) the identities of the previously unnamed

---

[3] Indeed, there may have been some strategic benefit for Defendant to avoid blaming the government for the loss of the LIS database. *See* Volkar Decl., Ex. 1, Dkt. No. 1586-2 ("Because the defense has not opened the door, the government cannot introduce evidence concerning the loss of the LIS database.").

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOTIONS FOR NEW TRIAL
13

"government attorneys" and (2) that the *Brady* Letter had implied only Balwani could decrypt the LIS database when there may have been one other unidentified person who could have done so. Dkt. No. 1577, at 5-6.  Although these items were not included in the government's *Brady* Letter, the Court finds that their non-disclosure does not undermine confidence in the outcome of the trial, nor would it have been reasonably likely to change the result.

First, the Court cannot conclude that identifying the specific attorneys on the LIS Emails would have changed the result of the trial.  To be clear, the information at issue here is not the decisions or actions the government took to recover the LIS database (which had been disclosed in the *Brady* Letter); rather, the allegedly suppressed information is the identities of the government attorneys on those emails.  Accordingly, Defendant's winding counterfactuals of how differently trial would have gone if only she had presented evidence of the government's poor-quality investigation all miss the mark, because they do not explain why the *attorneys' identities* would have changed the course of trial.  Dkt. No. 1577, at 7-11.  In any event, Defendant appeared to have had some idea of who the unnamed individuals were—she acknowledges that Mr. Bostic, Mr. Leach, and Mr. Schenk were likely witnesses to the government's efforts to capture the LIS database, Dkt. No. 1592, at 7, and she had even added them to her witness list.  Dkt. No. 1003.  It would strain credulity to conclude that—but for the LIS Emails' revelation of the government attorneys' identities—Defendant would have been entirely in the dark as to who these unnamed individuals were and foiled in her efforts to attack the government's LIS preservation efforts. Given the *de minimis* relevance, if any, the missing identities would have had on the issues at trial, the Court finds that the government's non-disclosure of the individuals' identities do not undermine confidence in the outcome of the trial nor would their disclosure have been reasonably likely to change the outcome.

Second, Defendant presents no argument as to how the trial result would have been different if she had known there was one individual other than Balwani who could have decrypted the LIS database.  She appears to primarily argue that, as a general matter, the LIS Emails would have enabled her to show the inadequacy of the government's investigation, which would have

adjusted the light in which the jury viewed the entire trial. Dkt. No. 1577, at 9-11; Dkt. No. 1592, at 9-11. However, as noted above, the government had previously disclosed the factual bases and its decisions surrounding the LIS database and, therefore, such information could not have been suppressed.[4] More specifically, the LIS Email in question only contained a rather qualified remark regarding the individuals who could decrypt the LIS database: "we don't have the code, maybe two former employees know how to unravel it, Sonny [sic] Balwani was one, Tom – do you recall the other." Saharia Decl., Ex. 9, Dkt. No. 1577-10. Defendant does not explain—and the Court struggles to envision—how the theoretical existence of an anonymous individual who could have decrypted the LIS database would have changed the course of trial.

Because the government's *Brady* Letter had already disclosed the substance and factual bases of its efforts to preserve the LIS database, Defendant cannot show that the government suppressed the information contained in the LIS Emails. Additionally, having reviewed the alleged "new" information in the LIS Emails, the Court finds that they are largely peripheral details, none of which rise to the level of prejudice required. Accordingly, the Court DENIES Defendant's motion for new trial based on evidence relating to the LIS database. Dkt. No. 1577.

### III.  CONCLUSION

Based on the foregoing, the Court DENIES Defendant's motions for new trial based on Dr. Rosendorff's post-trial statements, the disclosure of the LIS Emails, and the government's statements made in closing arguments at Balwani's trial.

**IT IS SO ORDERED.**

Dated: November 7, 2022

EDWARD J. DAVILA
United States District Judge

---

[4] For the same reason, the other instances of purportedly new information in the LIS Emails are not likely to have changed the result at trial nor would their non-disclosure undermine confidence in the jury's verdict. Dkt. No. 1577, at 5-6; Dkt. No. 1592, at 5-6. These "discrepancies" amount to little more than criticism of the level of granularity of the government's *Brady* Letter.

Case No.: 5:18-cr-00258-EJD-1
ORDER DENYING MOTIONS FOR NEW TRIAL
15