STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

     150 Almaden Boulevard, Suite 900
     San Jose, California 95113
     Telephone: (408) 535-5061
     Fax: (408) 535-5066
     Email:  Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
|     Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
|   v. | Date:   December 7, 2022 |
| RAMESH BALWANI, | Time:   10:00 a.m. |
|     Defendant. | Court: Hon. Edward J. Davila |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTS ...............................................................................................................................2

I.     THE OFFENSE CONDUCT ........................................................................................2

    A.     The Investor Fraud ........................................................................................2

    B.     The Fraud Targeting Patients ........................................................................8

    C.     The Cover Up ..............................................................................................13

II.     PROCEDURAL HISTORY ........................................................................................15

III.     OBJECTIONS TO THE PSR ....................................................................................15

THE SENTENCING GUIDELINES CALCULATION ..................................................16

I.     LOSS MORE THAN $550,000,000 ........................................................................17

II.     OFFENSE INVOLVING 10 OR MORE VICTIMS ..................................................21

III.     OFFENSE INVOLVING CONSCIOUS OR RECKLESS RISK OF DEATH OR SERIOUS BODILY INJURY ....................................................................................21

IV.     ROLE IN THE OFFENSE .........................................................................................24

ARGUMENT ....................................................................................................................28

I.     LEGAL STANDARD ...............................................................................................28

II.     GOVERNMENT RECOMMENDATION ................................................................29

    A.     The Nature and Circumstances of Balwani's Crimes (18 U.S.C. § 3553(a)(1)) ...............30

    B.     The History and Characteristics of Balwani (18 U.S.C. § 3553(a)(1)).........................32

    C.     The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A)).................................................................................................33

    D.     The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B)).......................................................................................33

    E.     The Need to Protect the Public From Future Crimes by Balwani (18 U.S.C. § 3553(a)(2)(C)).......................................................................................34

    F.     The Properly Calculated Sentencing Guideline Range and Pertinent Policy Statements Provided by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4) & 3553(a)(5)) ...............................................................................35

    G.     The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6)) ..........................36

    H.     The Need to Provide Restitution to Any Victim.................................................38

III.    RESTITUTION AND FINE ......................................................................................................38

CONCLUSION...........................................................................................................................39

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Cases**

4

*Gall v. United States*,
5
    552 U.S. 38 (2007) ................................................................................................................ 29

6

*United States v. Bakhit*,
    218 F. Supp. 2d 1232 (C.D. Cal. 2012) ............................................................................. 18
7

*United States v. Berger*,
8
    587 F.3d 1038 (9th Cir. 2009) ........................................................................................... 17

9

*United States v. Booth*,
10
    309 F.3d 566 (9th Cir. 2002) ............................................................................................. 28

11

*United States v. Bright*,
    353 F.3d 1114 (9th Cir. 2004) ........................................................................................... 19
12

*United States v. Bryson*,
13
    101 F. Supp. 3d 147 (D. Conn. 2015) ............................................................................... 18

14

*United States v. Byors*,
15
    586 F.3d 222 (2d Cir. 2009) .............................................................................................. 18

16

*United States v. Carty*,
17
    520 F.3d 984 (9th Cir. 2008) ............................................................................................. 29

18

*United States v. George*,
    949 F.3d 1181 (9th Cir. 2020) ........................................................................................... 21
19

*United States v. Goffer*,
20
    721 F.3d 113 (2d Cir. 2013) .............................................................................................. 34

21

*United States v. Govan*,
22
    152 F.3d 1088 (9th Cir.1998) ............................................................................................ 28

23

*United States v. Henderson*,
24
    893 F.3d 1338 (11th Cir. 2018) ......................................................................................... 22

25

*United States v. Johansson*,
    249 F.3d 848 (9th Cir. 2001) ............................................................................................. 22
26

27

*United States v. Laurienti*,
    611 F.3d 530 (9th Cir. 2010) ............................................................................................. 18

28

*United States v. Leung,*
    35 F.3d 1402 (9th Cir. 1994) ............................................................................. 25

*United States v. Martin,*
    796 F.3d 1101 (9th Cir. 2015) ........................................................................... 20

*United States v. Moran,*
    778 F.3d 942 (11th Cir. 2015) ........................................................................... 23

*United States v. Musgrave,*
    761 F.3d 602 (6th Cir. 2014) ............................................................................. 34

*United States v. Pham,*
    545 F.3d 712 (9th Cir. 2008) ............................................................................. 21

*United States v. Popov,*
    555 F. App'x 671 (9th Cir. 2014) ................................................................. 23, 24

*United States v. Ressam,*
    679 F.3d 1069 (9th Cir. 2012) ........................................................................... 29

*United States v. Rose,*
    20 F.3d 367 (9th Cir.1994) ................................................................................ 28

*United States v. Turk,*
    626 F.3d 743 (2d Cir. 2010) ............................................................................... 18

*United States v. Zolp,*
    479 F.3d 715 (9th Cir. 2007) ........................................................................ 17, 18

**Statutes**

18 U.S.C. § 3553(a) ...................................................................................... 29, 30, 36

18 U.S.C. § 3553(a)(1) .................................................................................. 30, 31, 32

18 U.S.C. § 3553(a)(1)-(7) ................................................................................. 29, 30

18 U.S.C. § 3553(a)(2)(A) ....................................................................................... 33

18 U.S.C. § 3553(a)(2)(B) ....................................................................................... 33

18 U.S.C. § 3553(a)(2)(C) ....................................................................................... 34

18 U.S.C. § 3553(a)(6) ............................................................................................. 36

18 U.S.C. § 3663A(a)(1) ..................................................................................... 38, 39

18 U.S.C. § 3664(d)(5) ............................................................................................. 39

# INTRODUCTION

After a four-month trial, the jury found Defendant Ramesh "Sunny" Balwani guilty of all twelve counts alleged in the Third Superseding Indictment: conspiracy to commit wire fraud against Theranos investors, six counts of wire fraud in connection with six specific investors, conspiracy to commit wire fraud against Theranos paying patients, and four counts of wire fraud in connection with patients. Earlier this month, the Court sentenced his co-defendant, who was convicted of fewer counts and acquitted of the patient counts and whose Sentencing Guidelines calculation did not account for acquitted conduct, to 135 months in prison. ECF No. 1660.

The Presentence Investigation Report ("PSR") calculates Balwani's total offense level as 43. PSR ¶ 81. The PSR calculation includes enhancements for a loss greater than $550 million and ten or more victims and an adjustment for Balwani's leadership/organizer role in criminal activity that was extensive. *Id.* ¶¶ 73-78. The government agrees with the PSR's inclusion of these enhancements and adjustment, and submits an additional enhancement applies because the offenses—particularly the conspiracy to defraud paying patients—involved the conscious or reckless risk of death or serious bodily injury. *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(16) (2021) [hereinafter "U.S.S.G."]. The government recognizes that, in sentencing the co-defendant, the Court found a loss of approximately $121.1 million, declined to find an enhancement for conscious or reckless risk of death or serious bodily injury, declined to find an adjustment for role in the offense, and calculated a total offense level of 33 (135 to 168 months in prison). *See* 11/18/22 Tr. at 72, 75-77, 80-81, 87-88. Under any circumstance, the Guidelines call for a significant custodial sentence.

The factors set forth in 18 U.S.C. § 3553—notably the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense and promote respect for the law, the need for both specific deterrence and general deterrence, and the need to avoid unwarranted sentence disparities among defendants who have been found guilty of similar conduct—also demand a significant custodial sentence. With these factors in mind, the government respectfully recommends a sentence of 180 months in custody. The Court should also order Balwani to serve a three-year term of supervised release, pay full restitution to victim investors, pay a $25,000 fine, and pay the required special assessment for each count.

**FACTS**

**I.      THE OFFENSE CONDUCT**

**A.      The Investor Fraud**

Balwani was the President and Chief Operating Officer ("COO") of Theranos and a member of its board.  Through numerous misrepresentations and half-truths, he and Elizabeth Holmes, the founder and Chief Executive Officer, sold investors on the fact that Theranos had a customer-ready device— proven through its use and validation by several large pharmaceutical companies, the Department of Defense, and Walgreens—that analyzed tiny drops of blood taken from the finger to produce better, faster, cheaper, more accurate laboratory test results.  Specifically, Balwani and Holmes secured dozens of investors in Theranos over several years by falsely claiming that Theranos had manufactured one single, proprietary blood analyzer device that could run any blood test that was run by conventional labs, all from a blood sample drawn via a fingerstick rather than the traditional draw from a vein, with higher accuracy and less variability than traditional methods, due in part to its more automated process that reduced human error inherent in running blood tests in a laboratory.  To support Theranos' bold claims, Balwani and Holmes repeatedly told potential investors that Theranos' technology had been comprehensively validated by multiple major pharmaceutical companies and was being used in the battlefield by the Department of Defense to treat wounded soldiers.  They also asserted that Theranos was a profitable company and had a healthy ongoing relationship with retail pharmacy company Walgreens, through which it provided blood tests to patients beginning in September 2013.  Not only did several representatives of investors testify that Balwani and Holmes made these statements to them in meetings, Balwani and Holmes also began providing written materials and binders to investors in 2014 and 2015 that contained these false statements.

In truth, scientists who had worked at Theranos testified that Theranos' proprietary device could never complete more than 12 types of blood tests, often with less accuracy, less automation, and more variability than traditional "predicate" machines manufactured by third-party companies, such as Siemens AG.  Because of these shortcomings, pharmaceutical companies did very little work with Theranos and did not validate its technology, and the Department of Defense never used Theranos' analyzer to clinically treat soldiers.  Theranos had zero revenue in 2012 and 2013 and desperately

needed new sources of cash.  Balwani and Holmes hid the shortcomings of Theranos' proprietary device by using—without telling potential investors—modified and unmodified third-party machines to fulfill the remainder of Theranos' available blood test menu to patients at Walgreens stores.  As a result, Theranos' relationship with Walgreens was faltering because the percentage of traditional venous draws was too high.  But none of this information was shared with investors in Theranos.

As but a few examples of misrepresentations made by Balwani to Theranos investors:

- In August and September 2013, Balwani reviewed and approved a *Wall Street Journal* article suggesting that Theranos had "devices that automate and miniaturize more than 1,000 laboratory tests"; stating that "Theranos's processes are faster, cheaper, and more accurate than the conventional methods"; and stating that "Theranos's technology eliminates multiple lab trips because it can 'run any combination of tests, including sets of follow-on tests,' at once, very quickly, all from a single microsample" —all of which was false and misleading.  PSR ¶¶ 15, 27; TX 1106, 1090.  Balwani distributed the false and misleading article to investors.  TX 4077.

- In December 2013, Balwani told a prospective investor (Pat Mendenhall) that "the 'science' behind Theranos is complete," "no new science needed," "no new invention needed," "they are completely vertically integrated," and "100% manufacturing in USA—no subcontracting" —all of which was false and misleading.  PSR ¶ 47; TX 4059.

- Between December 2013 and February 2014, Balwani and Holmes told Brian Grossman, a representative of investor Partner Fund Management ("PFM"), that Theranos had hundreds of millions in revenue from a combination of pharmaceutical companies and the military; that Theranos was vertically integrated— "making all of their own proprietary technology"; that by "making it themselves" they could to drive down the cost of the device; and that they had miniaturized the device to the size of a personal computer, eliminating the need for large conventional labs—all of which was false and misleading.  5/18/22 Tr. at 6050, 6051-6052, 6053, 6049, 6063-6064; TX 4077.

- In September and October 2014, Balwani and Holmes provided false and misleading financial projections to Lisa Peterson, a representative of investor RDV Corporation ("RDV"), based on the false premise that Theranos would be in 900 Walgreens by the end of 2015.  TX 1853; TX 4859;

1   4/26/22 Tr. at 3887-3894.  Balwani and Holmes also falsely told Peterson that Theranos did not buy

2   analyzer equipment from third parties.  4/26/22 Tr. at 3861, 3918; TX 2166; TX 4859.

3   •   Balwani and Holmes "talked about how their technology had been, was being used on

4   Medevacs" and "how it actually saved lives in the battlefield to get really important diagnostic

5   information to . . . military emergency rooms."  5/18/22 Tr. at 6043; *id.* at 6046 ("They said they had

6   been working with the Department of Defense and the military for the last ten years, that . . . the work

7   . . . had allowed the company to get through this sort of stealth mode"); 4/26/22 Tr. at 3870-71 (Lisa

8   Peterson testifying "I recall them talking about it being in helicopters, evacuation helicopters").  One

9   investor victim impact statement captures the depravity of Holmes and Balwani's lies in this respect as

10  follows: "I feel strongly that the sentencing should take into account Defendants' intentional decision to

11  prey upon investors' reverence for our servicemen and servicewomen in the Armed Forces.  Our

12  country's freedom is protected everyday by the courageous and selfless service of these men and

13  women, and the Defendants took advantage of investors' patriotic feelings for selfish gain through

14  deceit.  Indeed, Elizabeth Holmes lied to me about saving soldiers' lives through military contracts and

15  Theranos' use of 'proprietary technology' on military helicopters.  Simply put, Holmes's actions were

16  loathsome and un-American."  Victim Impact Statement of Craig Hall dated Sept. 6, 2022, at p.1.

17  •   In August 2014, Balwani forwarded to Holmes an email from Walgreens executives

18  expressing a desire to reduce venous draws to below 10% (whereas they had been hovering around 40%

19  for most of the year) before expanding further.  Balwani was told by Walgreens executive Nimesh

20  Jhaveri in August 2014 that Walgreens was reducing its projection for 2015 from 500 to 200 stores

21  where Theranos would have a presence.  4/19/22 Tr. at 2957-2958; TX 1884.  Nevertheless, Balwani

22  and Holmes presented financial projections in October 2014 that projected Theranos would increase

23  from being in a few dozen Walgreens stores to being in 900 locations by 2015.

24      When investors asked skeptical questions, Balwani misdirected them.  For example, in October

25  2014, investor Alan Eisenman forwarded Balwani a report by a well-known investment bank suggesting

26  "blood samples have to be sent to Palo Alto," "turnaround time is over 24 hours," Theranos' model "has

27  evolved into a traditional reference lab offering where blood is drawn mostly through ven[i]puncture,"

28  and it was "highly unlikely that all of these tests are being done on one machine."  TX 2057.  The report

was largely correct, but Balwani dismissed it as "sound[ing] like an uninformed consultant."  *Id.*

While publicly touting Theranos as a revolution in healthcare, Balwani and Holmes quietly and repeatedly acknowledged the dark reality within Theranos to each other.  For example, they texted as follows:

| Date | Exchange | TX 5387D page |
|---|---|---|
| 5/9/2012 | EAH: "We have to work together on the rev piece"<br><br>SB: "you are the company.  we need revenue . . . ." | 7 |
| 11/20/2013 | SB: "Pissing me off we don't have anyone managing PSC, ctn production, cart production, elisa assays, TSH"<br><br>EAH: "I know." | 14-15 |
| 11/19/2014 | SB: "Need to focus on ops. . . . Lab, customer service, tat, all need director level people . . . . We need. The lab and call center fixed. . . . Rebuild."<br><br>EAH: "Fundamentally we need to stop fighting fires by not creating them . . .  Need to fix root cause here . . . Yes" | 23-24 |
| 11/19/2014 | SB: "We can't scale with wag." | 24 |
| 11/27/2014 | SB:  "we need to lock on a billion or more now so we have leverage over both.  And time to operationalize Normandy and then day . . . Dday" | 26 |
| 11/28/2014 | SB: "Normandy lab is a fucking disaster zone." | 29 |
| 4/10/2015 | SB: "The point about narrowing down menu to hit high fs % came to me like gift of God. . . . We must hit our volume goals now.  We need to make it a matter of life and death.  Survival.  We must not lose" | 43 |
| 4/25/2015 | SB: "I am worried about over exposure without solid substance which is lacking right now.  We can talk tomorrow about over exposure."<br><br>EAH: "Agree." | 54 |
| 4/28/2015 | SB: "It is most maddening there is no focus in any chem teams and no product coming out."<br><br>EAH: "I know." | 58 |
| 5/6/2015 | SB: "We need our heads down and execute.  Bring billion equity and billion revenue."<br><br>EAH: "I know.  Thinking same." | 68 |

| 5/13/2015 | SB: "We need a better strategy for Normandy.  For a long time to come we will have hybrid solutions. . . ."<br><br>EAH: "I agree." | 78 |
|---|---|---|
| 6/3/2015 | SB: "We need to focus on being a technology company.  We spend all our time with CLIA morons."<br><br>EAH: "Yes"<br><br>SB: "I deal with CLIA everyday and I hate the low quality of people in lab . . . ."<br><br>EAH: "I was thinking about the exact same." | 83 |
| 7/28/2015 | SB: "We need to commit to each other and get out of this hell so we can live in paradise we both have."<br><br>EAH: "I have literally been meditating on exact same.  Whole time I was running was thinking that. . . ."<br><br>SB: "We need to commit to focusing and getting in paradise."<br><br>EAH: "Product company.  Winning" | 90 |
| 9/22/2015 | SB: "Our validation reports are terrible.  Really painful going thru this process.  Same issues fda pointed out. . . . Going bad so far.  Pray.  Daniel has nothing ready . . . ."<br><br>EAH: "Praying" | 107 |

In a note to herself, Holmes said Balwani was "[c]onvinced never happen ever.  Not thanksgiving not ever."  TX 7534.  Balwani, Holmes wrote, bemoaned there was "[n]o product" and the "[f]ucking mediocre quality of this piece of shit company."  *Id.*  When they drew government scrutiny, Balwani and Holmes bragged about their ability to "run circles around others and fda by manipulating their game." TX 5387D at 102.

When Erika Cheung raised concerns about Theranos' technology and quality control failures, Balwani dismissed her: "What makes you think that you're qualified to make these assessments about what is occurring within the clinical lab."  3/23/22 Tr. at 1255-56.  Balwani said he was "tired of the fact that people were trying to raise doubts about the Edison devices" and that Cheung should just process patient samples without questions.  *Id*.  When co-laboratory director Dr. Mark Pandori raised concerns

1   and recommended that Theranos stop using the Edison device, Balwani became upset and said "that

2   wouldn't happen." 3/30/22 Tr. at 1671-72. Dr. Pandori testified this was consistent with Balwani's

3   response to bad news at the company, that he had a temper, and that he showed it to a lot of people when

4   he disagreed. 3/30/22 Tr. at 1673. Balwani denied Dr. Adam Rosendorff the authority to direct what

5   was going on in the lab, to the point where Dr. Rosendorff felt he was being asked to vouch for results

6   he was not confident in. 4/22/22 Tr. at 3249, 3309, 3389-91; TX 4330.

7        The fraud brought spectacular fame and notoriety to Holmes, Balwani's long-time romantic

8   partner, and great wealth to Balwani personally. Balwani owned nearly 30 million shares of Theranos—

9   over 6% of the company—which were worth hundreds of millions of dollars at the peak of the fraud.

10   4/5/22 Tr. at 2016; TX 5794. Like Holmes, he enjoyed the perks of serving as a Silicon Valley titan.

11   9/14/21 Tr. at 721-22; TX 5387D at 3 (Balwani musing about "get[ting] a plane for these short journeys

12   after C2 [a reference to the C-2 investment round]"); *id.* at 19 ("let's build the true American empire. A

13   monopoly. Our obligation to USA.").

14        Between 2010, when Balwani and Holmes induced Walgreens and Safeway to invest based on

15   false pharmaceutical company endorsements and fantastical revenue projections, and March 2015, the

16   pair raised hundreds of millions of dollars. As the PSR notes, $730,840,309 came from "Series C-1"

17   and "Series C-2" investors who invested subsequent to Theranos' public relations push in September

18   2013 during the conspiracy. Representatives of seven such investors testified in the Balwani trial: Alan

19   Eisenman, Brian Grossman (Partner Investments LP/PFM Healthcare), Chris Lucas (Black Diamond

20   Ventures XII-B, LLC), Pat Mendenhall (Mendenhall TF Partners), Daniel Mosley (Mosley Family

21   Holdings LLC), Lisa Peterson (RDV Corporation/Dynasty Financial II/Lakeshore Capital Management),

22   and Bryan Tolbert (Hall Black Diamond II LLC). At least eight additional investor/investor

23   representatives (including three board members) were interviewed by the government, testified before

24   the SEC, or submitted victim impact statements: David Boies (Boies, Schiller & Flexner LLP), Kendra

25   Fadil, Frank Gordon (Crofton Capital/Gordon Family Trust), Henry Kissinger, Richard Kovacevich,

26   Don Lucas Jr. (Lucas Venture Group), Mark Campbell and Jared Hutchings (Peer Ventures Group), and

27   Natalie Ravitz (Rupert Murdoch). *See* ECF No. 1644 *(*11/11/2022 Decl. of AUSA Robert S. Leach in

28   Support of U.S.' Sentencing Memorandum, Exhibits B-L). The $730,840,309 in C-1 and C-2

1    investments does *not* include an additional $70 million invested by Walgreens and Safeway on account

2    of convertible promissory notes and $3 million invested by director George Shultz, who testified in

3    PFM's civil action against Balwani and Holmes and whose family also submitted a victim impact

4    statement.

5         **B.     The Fraud Targeting Patients**

6         Throughout the relevant time period, Holmes and Balwani touted Theranos as a company that

7    would revolutionize blood testing, making health information more reliable and more accessible.

8    Beginning in late 2013, Theranos actually offered clinical blood testing services to the public, first in the

9    Bay Area, then in Arizona.  To jumpstart the process of making its tests available to the public, and to

10   reach as many patients as it could, Theranos partnered with retail pharmacy chain Walgreens—a

11   company with a nationwide footprint that could make Theranos' product accessible to most of the

12   country's population.  In so doing, Holmes and Balwani benefitted from the goodwill and credibility

13   associated with the Walgreens name.  There can be no doubt that, as with investors, patients were more

14   comfortable trusting Theranos because they assumed that an established business like Walgreens would

15   not promote a service that was not similarly legitimate and reputable.  *See* 5/18/22 Tr. at 5932 (Dr.

16   Ellsworth testifying that he expected Theranos tests would be accurate based partly on their association

17   with Walgreens).  Thus, Walgreens was not only Theranos' launchpad but also its de facto ambassador.

18   Balwani took the lead in managing Theranos' relationship with Walgreens.  4/19/22 Tr. at 2894, 2903

19   (Nimesh Jhaveri identifying Balwani as his day-to-day contact at Theranos).  Throughout that

20   partnership, Theranos pushed for wider and faster expansion, with Walgreens holding back and

21   expressing concerns over Theranos' inability to conduct much of its testing using its vaunted fingerstick

22   method, among other things.  Despite Walgreens' hesitations about expanding the Theranos partnership

23   more rapidly, many thousands of patients ended up receiving blood test services from Theranos between

24   2013 and 2016.

25        Balwani and Holmes used a variety of methods to attract patients to Theranos.  Evidence at trial

26   included brochures that Theranos asked Walgreens to place in its stores to be read by customers.  Those

27   materials told patients considering Theranos that the company was "the first and only CLIA-certified

28   laboratory capable of running all its tests on micro-samples," and that it could perform the "full range"

of tests. TX 5084. Theranos' written materials targeting patients also promised "better answers" when it came to their health, claiming that the company's advanced automation gave its tests "the highest levels of accuracy." *Id.* Theranos' website—also designed to appeal to patients—similarly boasted that the lab "can precisely analyze tiny samples," and repeatedly promised tests with "the highest level of accuracy and precision." TX 5805. Balwani and Holmes approved this website language despite receiving warnings from lawyers that such language was potentially problematic. *See* TX 3965, 3981. Meanwhile, the press echoed Balwani and Holmes' claims about Theranos' scientific advances and improved accuracy. TX 1090 (email to Balwani and Holmes with draft of *Wall Street Journal* article highlighting "improved accuracy"). The key claims in Theranos' promotional materials were intended to mislead patients and induce them to pay for subpar testing services.

Indeed, the evidence at trial proved something Balwani and Holmes worked hard to hide from Theranos patients: the company's proprietary testing was not reliable. Theranos' homegrown "TSPU" device—used for several important tests including HCG (to assess the presence and stage of a pregnancy), PSA (to check for potentially lethal prostate cancer), and TSH (a measure of thyroid health) (TX 4533)—was plagued by issues. It broke down frequently and, when it did return results, it suffered from serious accuracy problems. *See* TX 1587, 1633. Erika Cheung, a Theranos employee who operated the TSPU to generate patient test results, testified that she resigned from Theranos because she "was uncomfortable with the fact that [they] were testing on patients… with technology that [she] felt wasn't producing reliable results for those patients." 3/22/22 Tr. at 1117. Ms. Cheung further explained that, as time went on at Theranos, "there was a lot of evidence to suggest that the Theranos system and the Edison devices weren't working properly," increasing her concerns about active testing on patients. 3/23/22 Tr. at 1251. Dr. Rosendorff agreed that there were serious problems with Theranos' testing, explaining at the trial that he resigned from his job as Theranos lab director partly because "the frequency and severity of complaints that I was getting from clinicians really reached a crescendo," causing him to feel like staying onboard would be risking his integrity as a doctor. 4/20/22 Tr. at 3273.

Other employees who worked with Theranos' technology had similar concerns. Dr. Mark Pandori served as co-lab director in the time following Theranos' launch of testing services. At trial, he testified that he saw quality control failures at Theranos so often that it indicated that the tests were

1   "having difficulty accurately measuring something on a routine basis," creating a risk that the Theranos

2   equipment might be inaccurate.  3/30/22 Tr. at 1633.  The problems Dr. Pandori saw with quality control

3   performance at Theranos made him "disappointed, upset, and concerned."  *Id.* at 1639.

4        Given the dim view that Theranos' own scientists took of its technology, it is no surprise that a

5   number of Theranos patients received results that were suspicious or demonstrably incorrect.  For

6   example, Dr. Mark Burnes testified at trial about a patient named Dr. Mehrl Ellsworth, who sought PSA

7   (prostate specific antigen) testing from Theranos in advance of an international trip.  5/18/22 Tr. at 5888.

8   Theranos reported Dr. Ellsworth's PSA levels to be extremely elevated compared to his previous

9   results—a change that could have indicated prostate cancer if accurate.  TX 4938, 4415; 5/18/22 Tr. at

10  5889-91.  Dr. Ellsworth's next test from Theranos, however, showed normal PSA levels.  TX 4938,

11  4415; 5/18/22 Tr. at 5893-5906.  The third test from Theranos was once again dramatically elevated, but

12  subsequent testing returned normal results.  *Id.*  It turned out that the two unexpectedly elevated PSA

13  results from Theranos had something in common:  they were both run on a Theranos proprietary system,

14  whereas the normal results had been generated by traditional, FDA-approved methods.  *Id.*  Dr. Burnes

15  was able to conclude that the elevated PSA levels indicated by the Theranos-specific tests were not

16  valid.  *Id.*; 5/18/22 Tr. at 5910.  Theranos' repeated failure to return an accurate PSA test result after

17  multiple attempts using its proprietary equipment speaks volumes about the reliability of Theranos

18  technology.

19       Patient Brent Bingham also testified at trial.  He came to Theranos for blood testing so he could

20  manage a chronic medical condition that causes his body to produce too many platelets.  5/18/22 Tr. at

21  5941.  From years of monitoring his platelet levels through traditional labs, he testified that he had

22  developed a sense for how various levels would manifest in terms of his symptoms.  *Id.* at 5943.  After

23  seeing information in the media about Theranos, including claims of superior accuracy, he sought blood

24  testing services from Defendants' company.  *Id.* at 5946-47; TX 5801.  Mr. Bingham testified that the

25  results he received from Theranos did not match his symptoms—or the results from a comparison test he

26  had performed by a conventional lab.  5/18/22 Tr. at 5949-56.  After Theranos subsequently sent him an

27  urgent message, he stopped using the company for blood testing despite the fact that its tests were

28  cheaper than conventional labs.  *Id.* at 5961-62.

Theranos patients also experienced problems with the company's PT/INR test, which relates to blood clotting. Patient "AT" suffered from atrial fibrillation (AFib) and her doctor instructed her to obtain a PT/INR test from Theranos. PSR ¶ 56. Although her PT/INR level was normally between two and three, Theranos returned an unusually low level of 0.08. *Id.* "AT's" doctor did not believe the Theranos results could be accurate, and sent her to a traditional lab for confirmatory testing, which yielded a result of 2.8—in her typical range for that assay. *Id.* "AT" told government investigators that, had she adjusted her medication in response to the erroneously low Theranos PT/INR value, she would have been at risk for internal bleeding, a common complication of AFib. *Id.* Theranos' own employees were not immune from questionable results. "EG" was a Theranos phlebotomist who had been on blood-thinning medication for years due to a history of blood clots. *Id.* at 57. When she went to Theranos for a PT/INR test, her results came back markedly different from her usual levels, and her doctor adjusted her medication in response. *Id.* Due to skepticism over the validity of the Theranos results, "EG" had confirmatory testing performed at a traditional lab and received results matching her usual values, showing that the adjustment to her medication had been unnecessary. *Id.*

Several Theranos patients received erroneous HCG tests providing inaccurate information about the status of their pregnancies. Brittany Gould and her treating nurse practitioner, Dr. Audra Zachman, testified at trial about multiple dubious HCG results provided by Theranos in October 2014. *See* TX 5410, 2044, 4242, 3305, 5411. Ms. Gould, who had suffered multiple miscarriages in the past, obtained a series of HCG values from Theranos and traditional lab Quest Diagnostics over the course of a week. The Theranos results—which included a dramatic drop in HCG value—strongly indicated that Ms. Gould was having another miscarriage, but confirmatory testing by Quest indicated a viable pregnancy, and Ms. Gould went on to deliver a healthy baby. 9/21/21 Tr. at 1396-1403. Dr. Zachman testified that she doubted the accuracy of both Theranos test results received by Ms. Gould, and stated that she had never had accuracy issues with HCG tests from other labs the way she did with the results for Ms. Gould. *Id.* Unfortunately, Ms. Gould's experience with Theranos' HCG test was not unique. In May 2014, a physician had called Theranos about HCG results that turned out to be unexpectedly low and would have suggested a miscarriage if accurate, prompting the company to collect another sample and rerun the test. TX 4145. Five months later, a provider contacted Theranos to complain about Theranos

1   HCG tests that had suggested that a pregnant patient was miscarrying.  TX 4222.  In response to that

2   Theranos test value, the patient's doctor had her discontinue pregnancy medications and get ready for

3   her next cycle.  *Id.*  When the patient was tested again for HCG, however, her value was over 2000 and a

4   subsequent scan detected a fetal heartbeat.  *Id.*  When Holmes learned about this erroneous test result,

5   she asked Balwani, "How did that happen?"—a strange question from someone who had been aware of

6   problems with Theranos' HCG test for months.

7        It is impossible to know exactly how many times frightening scenarios like these played out in

8   the lives of patients who trusted their blood testing to Theranos.  The government's investigation of

9   Theranos did not reveal a centralized, comprehensive log of customer complaints.  Instead, that

10  information was apparently stored in multiple places and compiled as needed.  *See* TX 4520 (complaint

11  log selections provided to Balwani in connection with Dr. Rosendorff).  Equally alarming is the high

12  likelihood that numerous patients acted on inaccurate blood test results from Theranos without ever

13  realizing that they were unreliable.  It is likely that some portion of Theranos patients experienced harm

14  to their health as a result of invalid Theranos test results without ever knowing that Theranos was to

15  blame.

16       The evidence available paints a bleak picture of Theranos' ability to return valid results using its

17  TSPU analyzer.  Internal quality control checks at Theranos provided a valuable objective measure of

18  how accurate the analyzer was.  Analyzing standardized samples, with known concentrations of the

19  substance being tested, the Theranos machines would either pass or fail daily checks of individual

20  assays.  In March of 2014, records indicated that nearly 26% of quality control checks on the TSPU

21  resulted in failures, i.e., inaccurate results.  TX 1633.  Some of the individual assays performed even

22  worse.  Theranos' PSA test failed quality control nearly 30% of the time, and the company's test for

23  triiodothyronine failed more than 50% of the time.  *Id.*  Because there is no guaranteed way to identify

24  inaccurate patient test results, Theranos' poor QC numbers are the best available method to estimate

25  how frequently Theranos was sending incorrect values to patients.  *See* 9/15/21 Tr. at 967.

26       When Centers for Medicare and Medicaid Services ("CMS") inspected Theranos in the late

27  summer and fall of 2015, the agency found systemic issues with quality control for the Theranos

28  miniature analyzer or TSPU.  PSR ¶ 59.  In particular, CMS put Theranos on notice of "multiple and

1   recurrent time periods (across all analytes tested) of abrupt shifts in [quality control] means, high rates

2   of 1-2s QC rule failures, and QC CVs far exceeding limits for a stable testing process." *Id.*  In other

3   words, Theranos' own quality control data revealed severe reliability problems with its testing systems,

4   just as employees had warned Balwani and Holmes years earlier.  Faced with CMS's findings, Theranos

5   itself admitted that there had been "a global and long-term failure of the quality control program for this

6   instrument," and further concluded that "there is a possible patient impact for every test reported from

7   the laboratory's TPS 3.5 instruments." *Id.*  Based on the scale of the problems highlighted by CMS,

8   Theranos voided every patient test result ever run on its Edison device in the clinical lab.  Of course, this

9   step did nothing to mitigate the harm patients would already have suffered due to their reliance on

10  inaccurate medical test information.

11          **C.      The Cover Up**

12          Balwani, with Holmes, was an equal participant in Theranos' efforts to quash the truth about its

13  technology's limitations and failings.  In April 2015, Balwani learned that a *Wall Street Journal*

14  journalist was working on a negative story about Theranos.  *See* TX 5387D at 50 ("Wsj guy might show

15  up tomorrow").  Balwani and Holmes scrambled to have the Phoenix store prepared to perform only

16  fingerstick tests rather than vein draws—hoping to avoid the possible impression Theranos was doing

17  ordinary blood testing.  *Id.* (SB: "We need tomorrow to test and then the team can push production

18  tomorrow night. . . . So Wednesday it will trigger fs for gc18 [general chemistry] . . . [s]o if he comes it

19  may be 3 fs.").  Ultimately, Balwani told Holmes "[t]he team is not confident about pushing out

20  fingerstick tonite . . . we don't want to rush this.  We went thru hell." *Id.* at 52.  Unable to dupe the

21  journalist, they then hired David Boies to try to get him to drop the story.  11/30/21 Tr. at 7998.  When

22  that failed, Holmes appealed to the owner of *The Wall Street Journal*, who also was a significant

23  investor in Theranos, to quash the story.  *Id.* at 7999; TX 5704.

24          Balwani also attacked those he believed to be the journalist's sources.  In June 2015, Balwani

25  and Holmes had a man sit all day outside of Erika Cheung's new workplace to serve a letter from Boies

26  Schiller Flexner LLP threatening her with legal action.  9/15/21 Tr. at 982-985; 11/30/21 Tr. at 7974-77;

27  TX 2567; TX 5387D at 85 (SB: "I am ok sending letter to Erika as in [General Counsel] heather

28  [King's] email").  After the journalist published a negative story, Holmes tried to dismiss Cheung as a

1   low-level disgruntled employee.  11/30/21 Tr. at 7978.  She also had Boies Schiller lawyers surprise

2   Tyler Shultz at his grandfather George Shultz's house to have him sign an affidavit identifying himself

3   as a source for the journalist.  11/30/21 Tr. at 7995-97; ECF No. 1644-11 (Leach Decl. Ex. L at 55-58);

4   TX 5387D at 76 (EAH: "If Tyler thinking abt George fyi at right time"); *id.* at 82 (SB: "You not calling

5   George back also sends a message that we are about to suit").  The incident enraged George Shultz,

6   which he described as "one of the worst little things he had seen anybody try to do."  11/30/21 Tr. at

7   7995-96; ECF No. 1644-11 (Leach Decl. Ex. L at 57); TX 5387D at 84 ("George wants to know what

8   Tyler has done. Would you ask David if I should say or tell him we'll let him know la[t]er and txt me

9   back").  During this time period, Holmes and Balwani also discussed "nail[ing] this mother fucker" "in

10  CLIA" who they believed to be spreading negative information, and at various times contemplated

11  action against "Tyler [Shultz]," "Erika [Cheung]," "Adam [Rosendorff]," and "Rochelle [Gibbons]," the

12  wife of a Theranos scientist who died in 2013.  TX 5387D at 76-78, 86; 9/22/21 Tr. at 1468-71; 12/7/21

13  Tr. at 8474; 6/6/22 Tr. at 6531.

14      When the negative *Wall Street Journal* story broke, Holmes, with Balwani's knowledge and

15  acquiescence, lied and dissembled.  On October 15, 2015, when confronted on Jim Cramer's *Mad*

16  *Money* with the *Journal*'s claim that Edison could only do 15 out of 240 tests, Holmes falsely stated

17  "every test that we offer in our laboratory can run on our proprietary devices."  TX 2851.  At the time,

18  Theranos was not using Edison (or any future iteration of its device) for *any* tests, and had never used

19  Edison for more than 12.  On October 21, 2015, she falsely stated at a public conference that Theranos

20  "never used commercially available lab equipment for finger-stick based tests."  ECF No. 588 at 14;

21  https://www.wsj.com/video/elizabeth-holmes-discusses-theranos-at-wsjdlive-2015/20CE68A0-CAEE-

22  48E0-BAB4-FD6C47D283BE.html.  The comment so concerned Balwani that he texted: "Worried

23  about your 'all fingersticks on our technology' comment."  TX 5387D at 117.

24      Months later, Holmes "continued to withhold information from [RDV] and other investors,

25  which . . . made it impossible to make informed decisions about the status and value of our investment."

26  *See* Victim Impact Statement of RDV Corporation dated Aug. 26, 2022 at p.4.  She insisted the issues

27  CMS identified were not major and downplayed their significance.  Tr. at 4709.  Balwani remained

28  COO at the time.

## II.   PROCEDURAL HISTORY

On July 28, 2020, the government filed the Third Superseding Indictment, charging Balwani and Holmes with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2).  ECF No. 469.  The Court severed the case on Balwani's motion in March 2020.  ECF No. 362.  Beginning on August 31, 2021, Holmes' trial spanned four months, during which over 900 exhibits were admitted and 32 witnesses testified.  *See* ECF No. 1395.  On January 3, 2022, the jury found Holmes guilty of four counts charging conspiracy to commit wire fraud during the period 2010 to 2015 and wire fraud against three specific investors in Theranos (Mosley, RDV, and PFM).  ECF No. 1235.  The jury did not reach a unanimous verdict with respect to the remaining investor-related counts and acquitted Holmes on the patient-related counts.  *Id.*  Balwani's separate trial began in March 2022 on the same twelve counts.  Following a comparably lengthy trial, the jury found Balwani guilty of all twelve counts.  ECF No. 1507.

## III.   OBJECTIONS TO THE PSR

The government objects to paragraphs of the PSR that include Balwani's theory of the case or his unsupported factual allegations (many of which were added after Balwani's objections to the draft PSR).  For instance, in PSR ¶ 17, statements are attributed to Dr. Jay Rosan from Walgreens concerning his view of Theranos' proprietary technology following a one-day meeting he attended at Johns Hopkins University.  In trial, neither Dr. Rosan nor anyone from Johns Hopkins testified.  There is no evidence suggesting that Balwani relied upon statements from Dr. Rosan or Johns Hopkins.  Similarly, PSR ¶ 23 speaks of Balwani's understanding of an evolving business strategy between Theranos and Walgreens.  This paragraph also contains the allegation that Holmes and Balwani informed Walgreens that blood samples taken using venipuncture would be tested on non-Theranos commercial devices.  These statements are contradicted by trial evidence.  Therefore, the government objects to these and other instances of Balwani's self-serving allegations that appear in the PSR.  The government does not believe, however, that the Court must resolve these objections before imposing sentence.  The Court heard the trial evidence, and can find that ruling on these objections is unnecessary because the matter will not affect sentencing or will not be considered in sentencing.  FED. R. CRIM. P. 32(i)(3)(B).

**THE SENTENCING GUIDELINES CALCULATION**

The government calculates the total offense level as follows:

|   |   |   |   |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(1) | | 7 |
| b. | Specific offense characteristics, U.S.S.G. § 2B1.1(b) | | |
| | Loss more than $550,000,000, U.S.S.G. § 2B1.1(b)(1)(P) | | +30 |
| | Offense involving 10 or more victims, U.S.S.G. § 2B1.1(b)(2)(A) | | +2 |
| | Offense involving the conscious or reckless risk of death or serious bodily injury, U.S.S.G. § 2B1.1(b)(16) | | +2 |
| c. | Adjustment for Role in the Offense, U.S.S.G. § 3B1.1(c) | | +4 |
| d. | Total Offense Level | | 43[1] |

Balwani falls within Criminal History Category I. Thus, for offense level 43, the Guidelines recommend a sentence of life.

The PSR agrees with most of these calculations, but declines to find the Section 2B1.1(b)(16) enhancement applies. *See* PSR Sentencing Recommendation at p.3; *id.* at p.3 (acknowledging "the decisions the defendants were making were affecting people's health and wellbeing. The impact to patients was very real as evidenced by their interviews with investigating agents. Patients suffered real harm when they and their doctors had to question multiple test results. In some cases, they received conflicting test results, leaving them vulnerable and confused. The damage done to Theranos patients leads to mistrust in the healthcare industry overall which can have devastating effects."). The government objects and urges the Court to apply the enhancement.

Although it maintains its position with respect to the Guidelines, the government recognizes the Court in sentencing co-defendant Holmes calculated the total offense level as follows:

|   |   |   |   |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(1) | | 7 |
| b. | Specific offense characteristics, U.S.S.G. § 2B1.1(b) | | |
| | Loss more than $65,000,000, U.S.S.G. § 2B1.1(b)(1)(M) | | +24 |
| | Offense involving 10 or more victims, U.S.S.G. § 2B1.1(b)(2)(A) | | +2 |

---

[1] The Guidelines provide that "[a]n offense level of more than 43 is to be treated as an offense level of 43." U.S.S.G. Ch. 5, Part A applic. note 2.

c.      Total Offense Level                                                           33

For offense level 33, the Guidelines recommend a sentence of 135 to 168 months in custody.  Were the

Court to adopt its Guidelines calculations from the *Holmes* sentencing, in addition to the Section

2B1.1(b)(16) enhancement, the resulting Guideline is offense level 35, which yields a recommended

sentence of 168 to 210 months in custody.

Below the government discusses the enhancements and adjustment that it submits apply.

**I.      LOSS MORE THAN $550,000,000**

Under the Guidelines, loss "is the greater of actual or intended loss."  U.S.S.G. § 2B1.1(b)

applic. note 3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from

the offense."  *Id.* note 3(A)(i).  "'Intended loss' . . . [includes] the pecuniary harm that the defendant

purposely sought to inflict."  *Id.* note 3(A)(ii).  "'[R]easonably foreseeable pecuniary harm' means

pecuniary harm [i.e., harm that is monetary or otherwise readily measurably in money] that the

defendant knew or, under the circumstances, reasonably should have known, was a potential result of the

offense."  *Id.* notes 3(A)(iii & iv).

"The guidelines do not present a single universal method for loss calculation under

§ 2B1.1 . . . ."  *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  The Court "need only make a

reasonable estimate of the loss."  U.S.S.G. § 2B1.1(b) note 3(C).  Because the Court is in a unique

position to assess the evidence and estimate the loss, its determination is entitled to appropriate

deference.  *Id.*  In estimating loss, the Guidelines direct the Court to consider "the cost to the victim of

replacing [the unlawfully taken] property," "[t]he approximate number of victims," and "reduction that

resulted from the offense in the value of equity securities or other corporate assets."  *Id.*

In the context of public company securities, the Ninth Circuit has expressly rejected the need to

show "loss causation."  *United States v. Berger*, 587 F.3d 1038, 1044-45 (9th Cir. 2009).  In the public

company context, the Ninth Circuit has observed:

> Measurement of loss becomes considerably more complex, however, when the court
> confronts a "pump-and-dump" scheme involving an otherwise legitimate company.  In
> such a case, because the stock continues to have residual value after the fraudulent
> scheme is revealed, the court may not assume that the loss inflicted equals the full pre-
> disclosure value of the stock; rather, the court must disentangle the underlying value of
> the stock, inflation of that value due to the fraud, and either inflation or deflation of that
> value due to unrelated causes.

*Zolp*, 479 F.3d at 719 (citing cases involving public company securities and efficient markets); *United States v. Bakhit*, 218 F. Supp. 2d 1232, 1236-37 (C.D. Cal. 2012) (cited by *Zolp* with approval and noting "after the fraud was fully disclosed and absorbed by the market, [the] stock continued to trade at around $5.00 per share.").

Conversely, the "pecuniary harm" to an investor induced to invest by fraud is the amount of the investment. *See*, *e.g.*, *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[T]he crux of [defendant's] offense is that she obtained loans by fraudulently leading unsecured creditors to believe that they were secured creditors.  Without this deceit, she could not have obtained her victims' money."); *United States v. Bryson*, 101 F. Supp. 3d 147, 155 (D. Conn. 2015) ("[F]or those investors who were fraudulent induced to invest following the onset of the conspiracy, a reasonable estimate of the actual loss attributable to the offense conduct is the total value of their investment.") (citing *Turk*, 626 F.3d at 750).  Where a defendant's victims are "left with nothing of value when the fraud was uncovered," a court may find "loss based on the victims' total . . . investment." *United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009).

"Because [Balwani] was convicted of conspiracy, and because the losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard applies." *See United States v. Laurienti*, 611 F.3d 530, 556 (9th Cir. 2010); *id.* at 557 (noting a court may infer in the conspiracy context all investors who purchased a particular security were duped by the conspiracy).

Here, Balwani was convicted of six counts of wire fraud relating to investments by six specific investors: Black Diamond Ventures (Chris Lucas), Alan Eisenman, Hall Group (Bryan Tolbert), Daniel Mosley, PFM (Brian Grossman), and RDV (Lisa Peterson).  Each investor, or a qualified representative, testified at length in both trials about the misrepresentations and half-truths that induced their investments.  Black Diamond invested $5,349,900 on December 31, 2013.  Eisenmann invested $99,900 on December 30, 2013.  Hall Group invested $4,875,000 on December 31, 2013.  Mosley invested $5,999,997 on October 31, 2014.  PSR ¶ 48.  RDV invested $99,999,984 on October 31, 2014.  PFM invested $96,139,998 in three separate wires on February 4, 2014.  *See* Victim Impact Statement of PFM dated Sept. 6, 2022; PSR ¶ 48.  Black Diamond, Eisenmann, Mosley, and RDV lost their entire

1   investments.  Money was returned to Hall Group and PFM, as settlement of potential or filed civil

2   lawsuits, but this does not offset the loss.  *See* U.S.S.G. § 2B1.1 applic. note (E)(i) ("Loss shall be

3   reduced by . . . [t]he money returned . . . by the defendant or other persons acting jointly with the

4   defendant, to the victim before the offense was detected."); *United States v. Bright*, 353 F.3d 1114, 1118

5   (9th Cir. 2004) (the defendant is only "entitled to credit for refunds paid prior to the discovery of the

6   offense").  The investments by Black Diamond, Eisenmann, Hall Group, Mosley, PFM, and RDV

7   account for $212,464,779 in loss.

8         Balwani also was convicted of conspiracy to commit wire fraud against Theranos investors

9   during the period 2010 to 2015.  ECF No. 1507 at 1; ECF No. 469.  Between September 2013, when

10  Theranos publicly launched its partnership with Walgreens, and 2015, Theranos raised $730,840,309

11  from investors in the Series C round—Series C-1 and C-2 (including Black Diamond, Eisenman, Hall

12  Group, Mosley, PFM, and RDV).  According to Daniel Edlin, who reported to Holmes and worked with

13  Balwani, he prepared binders to investors based on an approved checklist.  10/19/21 Tr. at 3993-94.  He

14  authenticated a "typical investment related binder" that went to one specific investor.  *See* 10/19/21 Tr.

15  at 3996 & TX 1940, 4869.  He explained that a confidential Theranos briefing "was included in all of

16  the investment binders to my knowledge."  10/19/21 Tr. at 4001; *see also id.* at 3997-4000.  Because

17  investors were generally provided similar information, and because they were exposed to similar public

18  information (e.g., the September 2013 *Wall Street Journal* promotion, the September 2013 press release

19  regarding Walgreens, the June 2014 Roger Parloff article), it is reasonable to conclude for sentencing

20  purposes that they too are victims of the scheme to defraud the jury found.  But for settlements of

21  lawsuits after the fraud was exposed, there is no evidence the C-1 or C-2 investors received any money

22  or property or return on account of their investments.  They too lost the entirety of their investment

23  when Theranos declared bankruptcy through an assignment for the benefit of creditors.

24        The trials also included evidence that Safeway and Walgreens invested $30 million and $40

25  million respectively on account of convertible promissory notes.  None of these investments yielded a

26  return.  *See, e.g.*, ECF No. 517-1.

27        Balwani appears to argue that the "loss" is somehow not the money investors actually lost.  He

28  appears to argue that the loss is not reasonably estimable because Theranos was a real company with

cash and patent rights at certain periods of time, and that the actual loss must be reduced by some

hypothetical fair market value of Theranos when the fraud was discovered, or some other date.  This

defies logic and is unsupported by Ninth Circuit authority.  *Zolp* applies in the *public company* context,

which makes sense: when a fraud is revealed in a public and efficient market, one can determine through

the price change what the impact is to investors.  Here, by contrast, there is no dispute: the C-1 and C-2

investors received nothing of value from their Theranos investment (save for some amounts returned

through lawsuits after the fraud was revealed that cannot be a credit against loss).  There were no sales

of Theranos securities after the October 2015 *Wall Street Journal* article from which a fair market value

could be derived; indeed, there was no market for Theranos shares at all.  Balwani's victims were

induced to invest in Theranos based on the premise that its technology was market ready and

comparable to Quest and LabCorp; after the truth was revealed, they found themselves stuck in a

market-less investment with nothing but a hope (never realized) that it would someday be market-ready.

The Ninth Circuit has said that "district courts should 'take a realistic, economic approach to

determine what losses the defendant truly caused or intended to cause, rather than the use of some

approach which does not reflect the monetary loss.'"  *United States v. Martin*, 796 F.3d 1101, 1110 (9th

Cir. 2015).  Here, any realistic approach must recognize that, except for lawsuit settlements, the victim

investors in this case have never received any monetary payment from Balwani or Theranos.

For these reasons, the government continues to submit a 30-point enhancement for a loss of more

than $550 million is warranted.

The government recognizes that the Court concluded in the *Holmes* sentencing that it is

necessary to ascribe a value to Theranos at or near the time victims invested and made findings based on

the opinions of Carl Saba, a partner with the Forensic Consulting Group at Hemming Morse, LLP, and a

Certified Valuation Analyst and Accredited Senior Appraiser with decades of experience in the

valuation of businesses.  11/18/2022 Tr. at 75-77, 87-88; ECF No. 1645.  To the extent the Court

continues to disagree with the government's submission that the entirety of the investments by C-1 and

C-2 investors is the appropriate measure of loss, the Court should make the same findings here, namely

that the loss is $121,093,891.  11/18/2022 Tr. at 87-88.  This yields a 24-point enhancement.

## II.   OFFENSE INVOLVING 10 OR MORE VICTIMS

The PSR applies a two-point enhancement for the number of victims.  This enhancement also is warranted.

The Guidelines provide for a two-level increase if the offense "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i).  For purposes of Section 2B1.1, "victim" means "any person who sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G. § 2B1.1 applic. note 1.  As with loss, estimating the number of victims does not require absolute precision, and the Court may make a reasonable estimate based on available information.  *See United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020) ("It [is] 'sufficient for the government to produce evidence for enough of the [victims] to allow the sentencing court reasonably to infer a pattern." (quoting *United States v. Pham*, 545 F.3d 712, 720 n.3 (9th Cir. 2008) (alteration in original))).

The PSR correctly finds that this enhancement applies.  More than ten individuals and entities invested in Theranos in the C-1 and C-2 rounds subsequent to September 2013, when Theranos issued a press release announcing its launch and induced *The Wall Street Journal* to falsely tout Theranos' capabilities.  Seven of those investors testified in the *Balwani* trial to the misrepresentations and half-truths they were told.  In the *Holmes* case, the Court found that there were ten investor victims for whom loss could be reasonably estimated.  11/18/22 Tr. at 79.  That finding should apply equally here.

The number of patient victims confirms that this enhancement is appropriate.  Balwani was convicted of defrauding three specific patients (Tompkins, Ellsworth, and Bingham).  In addition, as the PSR finds, Theranos paid more than $4.6 million to refund over 100,000 patients who purchased a Theranos blood test.  PSR ¶ 60.  And Theranos voided all of the Edison tests.  PSR ¶ 59.

For these reasons, the enhancement should apply.

## III.   OFFENSE INVOLVING CONSCIOUS OR RECKLESS RISK OF DEATH OR SERIOUS BODILY INJURY

The Guidelines provide for a two-level increase in offense level if the conduct involved "the conscious or reckless risk of death or serious bodily injury."  U.S.S.G. § 2B1.1(b)(16)(A).  The evidence in this case shows that this enhancement is warranted.  Following a multi-month trial, the jury convicted Balwani of four counts of wire fraud in connection with the scheme to defraud Theranos patients, as

1  well as one conspiracy count relating to that same scheme.  ECF No. 1507.  In rendering that verdict, the

2  jury necessarily found that Balwani sought to obtain patients' money by offering them blood testing

3  services that were not accurate or reliable enough to give them the benefit of their bargain.  The question

4  now facing the Court is simple: does knowingly providing patients with inaccurate and unreliable blood

5  tests show a conscious or reckless risk of death or serious injury?  The answer is obviously yes.

6       As described above, Balwani and Holmes caused Theranos to promote and perform blood tests

7  that were not good enough for clinical use.  Despite knowing of the serious flaws in Theranos' testing,

8  Theranos—under Balwani's direction—continued to promote and offer those tests to patients with the

9  knowledge that those patients and their physicians would rely on them to make medical decisions.

10 Balwani's conduct toward patients created a significant risk of death or serious injury as a result of

11 misdiagnosis; an inaccurate test result could cause a patient to undergo an unnecessary treatment that

12 could harm them, or to forego a necessary treatment that could save them.  As Dr. Rosendorff testified at

13 the *Holmes* trial, "Accuracy is critical.  Physicians and other health care providers depend on the

14 accuracy of a test to make medical decisions, sometimes life and death medical decisions."  9/24/21 Tr.

15 at 1706.

16      The obvious danger associated with inaccurate and unreliable medical tests is sufficient to

17 warrant application of U.S.S.G. § 2B1.1(b)(16)(A), regardless of whether the government can show how

18 much harm resulted.  Courts recognize that this two-level enhancement "focuses on the defendant's

19 disregard of risk, rather than on the result."  *United States v. Henderson*, 893 F.3d 1338, 1351 (11th Cir.

20 2018) (quotation omitted).  In other words, the government "need not show actual injury to any

21 particular victim."  *Id.*  Additionally, under Ninth Circuit law, a defendant cannot escape this

22 enhancement by claiming ignorance of the risk created by his conduct.  *United States v. Johansson*, 249

23 F.3d 848, 859 (9th Cir. 2001) (interpreting similar provision in U.S.S.G. § 2F1.1, now consolidated with

24 Section 2B1.1).  "[A] defendant does not have to subjectively know that his conduct created the risk."

25 *Id.*  Nor does the enhancement require that the defendant take some violent or direct action toward

26 victims.  Thus, in *Henderson*, it was enough that the government presented evidence that false entries in

27 a computerized patient record system "could have delayed and influenced patient care."  *Henderson*, 893

28 F.3d at 1352.  In *United States v. Moran*, the enhancement was applied where defendants ran a

1  healthcare facility and admitted elderly patients with dementia although the facility and staff were not

2  equipped to meet those patients' needs.  *United States v. Moran*, 778 F.3d 942, 978 (11th Cir. 2015).  In

3  *Popov*, the Ninth Circuit affirmed application of the standard where a doctor signed patient charts and

4  Medicare reimbursement forms indicating he had supervised medical examinations when he had not.

5  *United States v. Popov*, 555 F. App'x 671, 676 (9th Cir. 2014).  The risk to Theranos patients created by

6  Balwani's conduct is at least as serious and certain as the dangers posed by the criminal conduct in the

7  above cases.

8        Moreover, the evidence shows that Balwani was fully conscious of the risks caused by Theranos'

9  unreliable tests.  Indeed, as the Theranos senior officer responsible for managing the relationship with

10  Walgreens and overseeing the operation of the clinical lab, Balwani had a front-row seat to numerous

11  problems that put him on notice that Theranos tests were not suitable for clinical use.  While Theranos'

12  clinical lab was in operation, both Balwani and Holmes heard about problems with Theranos tests

13  directly from their own employees.  In approximately April of 2014, lab employee Erika Cheung had a

14  one-on-one meeting with Balwani in which she raised her concerns about Theranos' technology.

15  3/23/22 Tr. at 1252-1256.  Although Balwani's apparent goal was to find the source of unfavorable

16  reports spreading within Theranos about the lab, Cheung took the opportunity to make sure Balwani was

17  aware of serious issues with (1) quality control performance for Theranos analyzers, (2) high variability

18  in test results, and (3) mistakes made in the lab but not reported to patients.  *Id.*  Cheung testified that

19  Balwani did not seem surprised to hear about these problems.  Instead of taking them seriously and

20  dismissed them while challenging her qualifications and directing her to process patient samples without

21  question.  *Id.*  That same month, Balwani received an email from a senior scientist at Theranos reporting

22  that the company's proprietary potassium results were running high as a result of sample hemolysis,

23  forcing the lab to review images of all samples to determine whether to rerun—a practice Balwani told

24  Holmes was "not scalable."  TX 4124.  Earlier in that email chain, Balwani had questioned the accuracy

25  of the test "given this is an ISE," indicating awareness of preexisting accuracy problems with Theranos'

26  ion-selective-electrode blood tests.  *Id.*  Also in April, employee Tyler Shultz sent Holmes a detailed

27  email to alert her to several ways in which Theranos was overstating the accuracy of its tests and

28  potentially masking problems.  TX 1660.  The points raised by Mr. Shultz gained no traction with

1  Balwani or Holmes, with Balwani calling Shultz's email "deeply disgusting" and interpreting his

2  concerns as "insults." TX 1667.  In late May 2014, Dr. Rosendorff halted all testing of HCG (a

3  pregnancy hormone) on Theranos analyzer in light of inaccurate results, with Balwani learning of the

4  decision by virtue of his role in the lab.  TX 4147.  Evidence showed that Balwani remained involved in

5  addressing this matter, and Dr. Rosendorff testified that the company resumed HCG testing on the

6  Edison despite the fact that problems with that test persisted.  TX 4222.

7  In August of that year, Dr. Rosendorff emailed Balwani to inform him that Theranos'

8  bicarbonate test had lost all diagnostic value "and probably also reliability" due to the fact that the

9  company voided all abnormal results in response to accuracy problems with this test. TX 4189.  Around

10  that same time, another email exchange memorialized Balwani asking another Theranos scientist about

11  the company's PT/INR test reporting inaccurately low numbers.  TX 4181.  When the scientist provided

12  a theoretical explanation and proposed an internal study to address the problem, Balwani emailed

13  Holmes complaining, "Always another study after the fact." *Id.*  By late November 2014, Defendants'

14  collective faith in their lab still had not improved, with Balwani texting Holmes that the Normandy lab

15  (where Theranos conducted its proprietary testing) was a "f___ing disaster zone." TX 5387D at 29.

16  Despite ample notice of serious issues plaguing Theranos' technology, Balwani and Holmes stubbornly

17  continued to send out clinical test results from their "disaster zone" of a laboratory, forcing Theranos'

18  patients to unknowingly incur a risk of death or injury.  Ultimately, they had to void every single Edison

19  test following extremely negative CMS findings and their own assessment of possible patient impact.

20  Balwani's role in causing numerous Theranos patients to receive inaccurate and unreliable blood

21  test results qualifies him for application of the enhancement under section 2B1.1(b)(16)(A) of the

22  Guidelines.

23  **IV.   ROLE IN THE OFFENSE**

24  Balwani should receive an additional enhancement due to his role as a manager and leader of the

25  extensive criminal activity that occurred in connection with the large company he helped run.  Under the

26  Guidelines, a four-level increase is warranted if a defendant was an "organizer or leader" of criminal

27  activity that either (1) involved five or more participants *or* (2) was otherwise extensive.  U.S.S.G.

28  § 3B1.1(a).  The commentary for that section of the Guidelines defines "participant" as "a person who is

criminally responsible for the commission of the offense." *Id.* applic. note 1.  In this case, the Court need not determine whether the offense involved five or more participants.  Section 3B1.1(a) applies because, regardless of the number of culpable participants, the criminal activity here was "otherwise extensive."  The Guidelines commentary advises that, in determining whether criminal activity was extensive under this provision, a court should consider "all persons involved during the course of the entire offense." *Id.* applic. note 3.

The Court should apply the four-point enhancement under section 3B1.1(a) in this case because Balwani used his authority at Theranos to direct many others in furtherance of the schemes to defraud Theranos' investors and patients.  The Ninth Circuit has made clear that this enhancement is not limited to cases where the defendant is aided by multiple people with criminal intent.  Instead, criminal activity can be "otherwise extensive" where it involves the *unknowing* participation of people who were simply doing their jobs.  *See United States v. Leung*, 35 F.3d 1402, 1406 (9th Cir. 1994) (affirming application of enhancement in case where defendant rented a warehouse to store drugs and hired shipping and transport companies to move the drugs); *see also* U.S.S.G. § 3B1.1(a) applic. note 3 (a fraud can be "extensive" if it "used the unknowing services of many outsiders").

Throughout the time periods covered by the Indictment, Balwani acted as an organizer and leader of the criminal activity charged in this case, satisfying the first requirement for this four-level enhancement.  The Guidelines instruct that, in identifying defendants with a leadership or organizational role, courts should consider factors including "the exercise of decision making authority," "the claimed right to a larger share of the fruits of the crime," "the degree of participation in planning or organizing the offense," and "the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1 applic. note 4.

At Theranos, Balwani's authority as President and COO was second only to Holmes, and the evidence at trial showed that they ran the company as co-equals.  4/6/22 Tr. at 2364.  They held unique positions at the company that allowed them access to all categories of information about the company's operations.  4/6/22 Tr. at 2363.  Balwani and Holmes were both involved in interfacing with—and approving the work of—outside contractors generating content for Theranos' public website, which was an important tool used to mislead investor victims and patient victims.  4/6/22 Tr. at 2430.  Balwani also

had power over tours of Theranos provided to VIPs like potential investors—another important

mechanism by which those victims were misled. *Id.* at 2372. Balwani also had authority over several

groups of employees at Theranos who were involved in setting up and running technology

demonstrations for potential investors, including personal assistants, engineers, lab personnel, and

phlebotomists. TX 961, 860; 4/6/22 Tr. at 2391-94. Those demonstrations directly furthered

Defendants' scheme to defraud investors in that they left victims with an unrealistic image of the

capabilities of Theranos' proprietary analyzer and the extent to which the company was using it for

clinical testing. *See* TX 957; 4/19/22 Tr. at 2919-20 (testimony of Walgreens representative Nimesh

Jhaveri that he was not aware the sample collected from him during a Theranos demo was tested on a

third-party device).

Balwani also directed product managers involved in maintaining the relationship between

Theranos and Walgreens—an important partner manipulated by Balwani and Holmes in furtherance of

their fraud against investors and patients, and also a victim in its own right. 4/6/22 Tr. at 2361.

Evidence at trial showed Balwani's authority over Theranos' financials, with So Han Spivey explaining

the ways in which Balwani regularly oversaw her work as Theranos' controller. Speaking of company

finances, Balwani's significant equity stake in Theranos is highly relevant here. Balwani owned nearly

30 million shares of Theranos stock, which gave him the right to a larger share of the fruits of these

crimes than nearly anyone else. 4/5/22 Tr. at 2016. Indeed, those shares would have been worth

approximately $500 million at Theranos' peak.

It may be that the place where Balwani's influence was felt the most was the CLIA lab—the part

of the company that ran all patient blood tests, issued results, and handled any questions or complaints

from victims of the patient fraud. An org chart presented to CMS by Theranos illustrates that Balwani

was positioned at the top of the CLIA lab operation, overseeing a group comprised of more than sixty

Theranos employees. TX 4528 at 9. Although those many employees did not intend to defraud

Theranos' patients, Balwani and Holmes' scheme required their unknowing participation on a daily

basis. At trial, multiple former Theranos employees testified to Balwani's authority within the CLIA

lab, detailing their conversations with him and the ways in which he directed their activities. As the

evidence showed, Balwani's used his authority within the lab: (1) to maximize use of Theranos'

technology for patient testing despite evidence that it was flawed, (2) to expand the volume of Theranos' testing to cover more patients and capture more of the market, and (3) to prevent negative reports about Theranos tests from spreading inside or outside of the company.

Indeed, the success of Balwani and Holmes' schemes to defraud patients and investors turned on their ability to contain bad news about Theranos' accuracy problems. Balwani and Holmes' efforts to suppress the truth depended on the participation of the Theranos employees who interacted with doctors and patients. Theranos' customer service group included more than twenty individuals who responded to questions about Theranos' test results. That group, like the rest of the CLIA lab, ultimately reported to Balwani through other layers of supervision. TX 4528 at 9. Complaint records show the ways in which Defendants relied on these employees to quell doubts about Theranos' test accuracy. For example, in connection with potentially erroneous results in April and August 2015, one Theranos customer representative assured a doctor that he believed the test results were accurate. TX 4520. In the log of that call, the employee noted, "When I talk to physicians or guests I try to offer them different variables or scenarios to consider when they question our results. *Of course none of them have to do with our testing methods*." *Id.* (emphasis added).

This use of other employees to appease doctors and patients troubled by dubious test results was an important part of Holmes and Balwani's plan. Indeed, when employees refused to spin Theranos' flawed test results as Defendants demanded, significant conflict arose. For example, Dr. Rosendorff, Theranos' lab director, testified that he felt pressured to vouch for and explain away test results that he viewed as questionable, leading to heated internal exchanges over how to respond to inquiries from Theranos' customers. *See* 9/28/21 Tr. at 1940-1946; TX 4323, 4314. Ultimately, Dr. Rosendorff resigned partly due to his unwillingness to keep "endorsing results that [he] essentially didn't have faith in." 10/5/21 Tr. at 2733; TX 4330. Dr. Rosendorff testified at trial that he knew of "so many instances where employees were pressured to do things that they weren't comfortable doing, including [himself]." 4/20/22 Tr. at 3392. In addition to all the other ways Defendants' fraud depended on the work of numerous others, Balwani's exploitation of unknowing—and sometimes unwilling—employees to help cover up problems at Theranos qualifies him for the offense level increase in Section 3B1.1(a).

Balwani and Holmes' efforts to attract investors also were supported by the hard work of

1  hundreds of employees and outside partners who were doing their jobs in good faith:  designing and

2  manufacturing Theranos' analyzers, managing Theranos' finances, securing Theranos' intellectual

3  property and other legal rights, and outfitting and maintaining Theranos' facilities.  The fact that those

4  individuals had no idea their efforts were furthering a fraudulent scheme is no barrier to this four-level

5  enhancement.  *See United States v. Booth*, 309 F.3d 566, 577 (9th Cir. 2002) (affirming four-level

6  enhancement under Section 3B1.1(a) "because of the involvement, albeit unknowing, of more than ten

7  employees and the geographical reach of the scheme").

8          Even if this case did not involve the unknowing participation of so many people, the "otherwise

9  extensive" requirement under Section 3B1.1(a) would still be satisfied.  As the Ninth Circuit has

10  instructed, "[w]hether criminal activity is 'otherwise extensive' depends on such factors as (i) the

11  number of knowing participants and unwitting outsiders; (ii) the number of victims; and (iii) the amount

12  of money fraudulently obtained or laundered."  *United States v. Rose*, 20 F.3d 367, 374 (9th Cir.1994)

13  (citations omitted); *see also United States v. Govan*, 152 F.3d 1088, 1096 (9th Cir.1998) (finding that a

14  conspiracy was "clearly 'otherwise extensive'" because it "involved interstate travel, a large number of

15  victims… as well as nearly $100,000 in robbery proceeds").  Here, the large number of investor victims

16  and even larger number of patient victims, the fact that Theranos' activities stretched across state and

17  national borders, and the nine-figure loss amount on the investor side all weigh heavily in favor of a

18  finding that Balwani organized a led criminal activity that was "otherwise extensive" under the

19  Guidelines.

20          In sum, the facts of this case compel application of U.S.S.G. § 3B1.1(a).[2]

21                                              **ARGUMENT**

22  **I.    LEGAL STANDARD**

23          The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect

24  the seriousness of the offense, promote respect for the law, and provide just punishment; to afford

25  adequate deterrence; to protect the public; and to provide the defendant with needed education or

26

27  ───────────────

28  [2]       Even if Section 3B1.1(a) were not satisfied, subsection (c) undoubtedly applies.  *See* U.S.S.G.
§ 3B1.1(c) ("If the defendant was an organizer, leader, manager, or supervisor in any criminal activity
other than described in (a) or (b), increase by 2 levels.").

1    vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d

2    1069, 1088-89 (9th Cir. 2012) (*en banc*); *see United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008);

3    18 U.S.C. § 3553(a).  The Court should begin the sentencing process by correctly calculating the

4    applicable Guidelines range and must "remain cognizant of them throughout the sentencing process."

5    *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).  The Court should then consider the factors outlined in

6    Section 3553(a) to determine the appropriate sentence.  *Ressam*, 679 F.3d at 1089.  If the Court

7    determines that a sentence outside of the Guidelines range is warranted, it must ensure that the

8    "justification is sufficiently compelling to support the degree of the variance." *Id.* (internal quotation

9    omitted). "[A] major departure should be supported by a more significant justification than a minor

10   one." *Gall*, 552 U.S. at 50

11        The Section 3553(a) factors are:

12       (1)    the nature and circumstances of the offense and the history and characteristics of
13             the defendant;

14       (2)    the need for the sentence imposed (A) to reflect the seriousness of the offense, to
               promote respect for the law, and to provide just punishment for the offense; (B) to
15             afford adequate deterrence to criminal conduct; (C) to protect the public from
               further crimes of the defendant; and (D) to provide the defendant with needed
16             educational or vocations training, medical care, or other correctional treatment in
               the most effective manner;

17       (3)    the kinds of sentences available;

18       (4)    the kinds of sentence and the sentencing range established in the Guidelines;

19       (5)    any pertinent policy statement by the Sentencing Commission;

20       (6)    the need to avoid unwarranted disparities among defendants with similar records
21             who have been found guilty of similar conduct; and

22       (7)    the need to provide restitution to any victims.

     *See* 18 U.S.C. § 3553(a)(1)-(7).

23   ## II.  GOVERNMENT RECOMMENDATION

24        With these principles in mind, the government respectfully recommends a sentence of 180

25   months in custody.

26        The factors the Court should consider in determining the appropriate sentence include (i) the

27   nature and circumstances of the offense and the history and characteristics of the defendant, (ii) the need

28

for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment, (iii) the Sentencing Guidelines and related Sentencing Commission policy statements, (iv) the need to avoid unwarranted sentence disparities among similarly-situated defendants, and (v) the need to provide restitution to the victim of the crime.  18 U.S.C. § 3553(a).

As described above, Balwani's total offense level (43) and Criminal History Category (I) yield a sentence within Zone D.  PSR ¶¶ 81, 85, & 128.  Zone D sentences shall be satisfied with a custodial sentence.  *Id.* and § 5C1.1(f).  The applicable sentencing custodial range is capped at 2,880 months' imprisonment.  PSR ¶ 128.  This range assumes a sentence of 240 months' imprisonment (the statutory maximum) would be imposed for each of the twelve counts of conviction, run consecutively.  *Id.* Considering the extensiveness of Balwani's fraud, the sentencing factors support a sentence of 180 months' imprisonment, as it would reflect the seriousness of the offenses, promote respect for the law, provide for just punishment for the offenses, and deter Balwani and others.

### A.    The Nature and Circumstances of Balwani's Crimes (18 U.S.C. § 3553(a)(1))

Balwani's charged conduct was extremely serious.  The Indictment in this case lays out the key events in the story of Theranos, focusing on the fraudulent schemes that Balwani and Holmes devised and executed to benefit themselves and attract business and investment capital to Theranos.  PSR ¶¶ 9-67.  As detailed in the Indictment, one of Balwani's fraud schemes targeted investors in Theranos—individuals and entities who entrusted defendants with hundreds of millions of dollars based on representations made by Balwani and Holmes.  *Id.*  In the patient fraud conspiracy, Balwani and Holmes targeted patients who paid for and relied upon Theranos' testing services to investigate and diagnose health conditions and make high-stakes decisions about medical care.  *Id.*  In each of these fraudulent schemes, Balwani and Holmes misled victims regarding material facts about Theranos and the capabilities of its blood-testing technology.  *Id.*  The effects of Balwani and Holmes' fraudulent conduct were far-reaching and severe:  dozens of investors lost over $700 million and numerous patients received unreliable or wholly inaccurate medical information from Theranos' flawed tests, placing those patients' health at serious risk.  *Id.*

1    Balwani was convicted at trial of twelve counts total, seven counts related to his scheme to

2    defraud investors (Counts 1 and 3 through 8 of the Third Superseding Indictment, ECF No. 469) and

3    five counts related to his scheme to defraud patients (Counts 2 and 9 through 12).  PSR ¶ 5.

4        As alleged in the Indictment and proven at trial, Theranos was founded by Holmes in

5    approximately 2003, and drew little public attention for its first ten years.  PSR ¶¶ 9-67.  The company's

6    stated goal was to develop innovative methods for testing tiny blood samples obtained from a fingertip

7    with a small lancet without the need for traditional venous blood draws.  *Id.*  Balwani joined Theranos

8    and became its COO by the end of 2009.  In or around 2013, Theranos began to publicize its technology

9    and tout its purported advantages, all while soliciting massive contributions from investors and gearing

10   up toward the public launch of its testing services.  *Id.*  Beginning in September 2013, Theranos offered

11   blood testing to patients at its "Wellness Centers" in various locations in California and Arizona.  *Id.*

12       Unbeknownst to those outside the company, Balwani and Holmes were presenting investors with

13   a deceptive picture of their company and its technology, overstating Theranos' achievements, promising

14   unrealistically favorable developments on the horizon, and misrepresenting the abilities of its proprietary

15   analyzer.  *Id.*   In dealing with doctors and patients, Balwani and Holmes promoted the company's

16   blood-testing services through explicit and implicit representations that Theranos' test results were

17   reliable and accurate although they knew that was not the case.  *Id.*

18       The nature and circumstances of Balwani's crimes are aggravating factors for several reasons.

19   First, while Balwani did not found Theranos, he was aware of its financial instability in 2010, when

20   Balwani and Holmes chose to defraud investors to extend Theranos' runaway.  Balwani also knew

21   Theranos' blood testing technology was not only immature but also inaccurate, when, in 2013, Balwani

22   and Holmes chose to begin offering blood testing services to patients in Walgreens stores.  Balwani, as

23   the point-person for the Theranos/Walgreens relationship, was instrumental in executing the scheme to

24   defraud patients.  Throughout both schemes, Balwani's crimes were not isolated events.  They were not

25   the result of poor choices on a single day.  They were not limited to his interactions with one investor or

26   a single patient.  Instead, Balwani participated in complex schemes, and executed them over the course

27   of many years.  Balwani presented a fake story about Theranos' technology and financial stability day

28   after day in meeting after meeting.  Balwani maintained this façade of accomplishments, after making

the calculated decision that honesty would destroy Theranos.  Likewise, Balwani represented to patients that Theranos' blood testing technology worked, while knowing that was simply untrue.  He ignored innumerable opportunities to choose a lawful path.

Second, each investment in Theranos came with opportunity cost.  Money invested with Balwani's company was money not invested in legitimate, promising technology.  Balwani's scheme not only diverted valuable funding to his fraudulent purposes, but it also has the effect of discouraging investments generally in new technologies, as investors reasonably remain skeptical that the next investment pitch is too good to be true.

Third, patients trusted Balwani and Theranos to provide accurate and reliable medical information.  Day after day, Balwani violated this trust.  As the executive overseeing Theranos' clinical laboratory, Balwani had insight into the numerous, extensive deficiencies of Theranos' blood testing technology.  Not only did Balwani knowingly choose to ignore these deficiencies and abuse his trust as a leader, but he also discouraged employees from raising concerns, encouraged the termination of engaged lab directors such as Dr. Adam Rosendorff, and quashed dissent.  This reprehensible conduct allowed Balwani to operate the clinical lab essentially without qualified oversight.  In short, Balwani's criminal activities were serious, extended, and extremely damaging.  The nature and circumstances of Balwani's criminal activity are significant aggravating factors in determining an appropriate sentence

**B.     The History and Characteristics of Balwani (18 U.S.C. § 3553(a)(1))**

In addition to the nature of the offenses, Balwani's history and characteristics militate in favor of a significant custodial sentence.  As noted in the PSR, Balwani grew up in a loving, stable family home with many educational opportunities.  PSR ¶¶ 90-121.  In adulthood, Balwani amassed significant wealth following the sale of his technology company.  *Id*.  Balwani deserves no consideration at sentencing for his history or characteristics explaining or even impacting his decision to commit fraud.  Balwani, with strong family support, exceptional educational opportunities, and financial stability, chose to commit fraud, repeatedly.  Balwani's history and characteristics are aggravating factors that should lead this Court to impose a significant custodial sentence.  Similarly, the presence of these aggravating factors should discourage the Court from varying substantially from the applicable Guidelines range.

### C.   The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))

This Court should send a clear message to the community that white collar crime is serious and deserving of significant punishment.  Through this sentencing proceeding, the public will observe the law, through this Court, treat fraudsters fairly for significant crimes.  Statements from victims in this prosecution provide additional support for the argument that a significant custodial sentence is needed to promote respect for the law.  In his statement, investor Craig Hall wrote, "I urge you, first and foremost, to consider the broader and more significant impact this sentencing will have on our society moving forward.  Given the high-profile nature of this case, the sentencing will undoubtedly send a message to the community at large.  That messaging should, in my opinion, clearly and unequivocally communicate that there is no justification for or tolerance of fraud in the business world.  Deterring similar debacles is critical to avoid society's future loss of hundreds of millions of dollars, amounts which could otherwise be used to aid in the entrepreneurial efforts of hard-working, honest Americans, bolstering the economy and fostering the American Dream."  PSR ¶ 66.  In Brent Bingham's victim impact statement, he wrote, "I feel sentencing should reflect a standard that medical related technology shouldn't be Beta tested by patients without consent.  Medical technology companies should receive a very clear message that placing finance and 1st to market considerations above engineering and science is not acceptable."  In Elizabeth R. Daoust's victim impact statement, she wrote, "Penalties for white collar crime seem too often to be slap[]s on the wrist.  People/companies perpetuating financial fraud often get light, if any, sentences in a minimum security prison and keep most of the stolen money.  This system of 'justice' has alienated a large swath of our citizens, weakened values, and turned more people against our government.  It is a serious problem that both the courts and legislatures need to remedy."  These, and many other, victim impact statements demonstrate the need for this sentence to reflect the seriousness of the offenses and promote respect for the law.

### D.   The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))

A sentence of 180 months in custody will serve to deter others from committing or contemplating committing white collar crimes, especially those who might consider taking advantage of investors or vulnerable patients.  General deterrence is of particular importance in white collar cases

1    such as this one because would-be offenders need to be put on notice that there are severe consequences

2    for engaging in this type of criminal conduct.  *See, e.g.*, *United States v. Musgrave*, 761 F.3d 602, 609

3    (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than

4    sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.")

5    (citation and internal quotation omitted); *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013)

6    (addressing the need for general deterrence for those who might otherwise feel that some white-collar

7    crimes are "game[s] worth playing").

8         Balwani's criminal scheme was committed in Silicon Valley.  As the Court has emphasized, this

9    region is known for innovation, where companies rely upon investments to fund ideas before they

10   become profitable.  This investment relationship is built, at least in part, on trust.  The relationship

11   between innovators and investors generates tremendous good far beyond this community.

12   Unfortunately, Balwani's crimes damaged the trust and integrity that are necessary for this community

13   to thrive.  A significant custodial sentence will serve not only to deter future startup fraud schemes, but

14   it will also serve to rebuild the trust investors must have when funding innovators in this Valley.

15        Separately, Balwani's scheme to defraud patients requires a significant custodial sentence to

16   deter similar conduct.  Through this scheme, Balwani treated patients as a means to extend the life of

17   Theranos.  Balwani received countless emails from subordinate employees warning him about the

18   deficiencies of Theranos' blood testing technology.  Rather than cease testing on Theranos' devices, a

19   decision that was entirely his own after he hired Dr. Sunil Dhawan to "oversee" the clinical lab, Balwani

20   continued to allow Theranos to deliver blood test results using its deficient technology.  Balwani chose

21   to sacrifice patient health rather than acknowledge Theranos' technological deficits.  This decision to

22   prioritize Theranos' financial health over patients' real health requires deterrence through a significant

23   custodial sentence.

24   **E.    The Need to Protect the Public From Future Crimes by Balwani (18 U.S.C. § 3553(a)(2)(C))**

25        Specific deterrence, due to the brazenness of Balwani's conduct, coupled with the lack of any

26   discernable economic need that might have motivated him, also counsels in favor of a sentence that is

27   sufficiently punitive to deter Balwani from ever contemplating committing fraud again.  There is a need

28

1    for this Court's sentence to deter Balwani from future criminal conduct.  Balwani has not accepted

2    responsibility for his criminal conduct.  PSR ¶ 80.  Approaching sentencing, this Court cannot be

3    confident that Balwani has been deterred from future fraud.  Therefore, the Court must deter future

4    criminal fraud through a significant custodial sentence.

5    **F.    The Properly Calculated Sentencing Guideline Range and Pertinent Policy Statements Provided by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4) & 3553(a)(5))**

6

7    Balwani's total offense level (43) and Criminal History Category (I) yield a sentence within

8    Zone D.  PSR ¶¶ 81, 85, and 128.   Zone D sentences shall be satisfied with a custodial sentence.

9    U.S.S.G. § 5C1.1.  The applicable sentencing range is capped at 2,880 months' imprisonment.  PSR

10   ¶ 128.  This range assumes a sentence of 240 months' imprisonment (the statutory maximum) would be

11   imposed for each of the twelve counts of conviction, run consecutively.  *Id.*

12   The Sentencing Commission makes clear that the focus on loss amount in federal fraud

13   sentencing hearings is reasonable and appropriate.  In particular, the Sentencing Commission states,

14   "The Commission has determined that, ordinarily, the sentences of defendants convicted of federal

15   offenses should reflect the nature of magnitude of the loss caused or intended by their crimes.

16   Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the

17   seriousness of the offense and the defendant's relative culpability and is a principal factor in determining

18   the offense level under this guideline."  *See* U.S. Sentencing Guidelines Manual, 2021, p. 102.

19   The government agrees with the Commission's assessment of the importance of loss amount as a

20   measure of the gravity of a fraud conviction.  Here, Balwani's loss number is so high that a portion of it

21   is not accounted for within the Section 2B1.1 table, as there is no additional increase for any loss amount

22   above $550 million.  Moreover, the loss number and accompanying sentencing range do not separately

23   punish Balwani for the patient harm.  PSR ¶ 71 & U.S.S.G. § 3D1.2(d).  Therefore, these unaddressed

24   harms provide additional grounds to conclude that a sufficient sentence is 180 months' imprisonment.

25   Likewise, and as further discussed below, Balwani's role in overseeing the clinical laboratory at the

26   center of causing harm to patients justifies the Court imposing a longer custodial term for Balwani than

27   for Holmes.

28

### G.    The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6))

The government recommends the Court impose a custodial sentence of 180 months' imprisonment.  This sentence would amount to a variance of 60 months from the statutory maximum sentence applicable to each count of conviction.  The basis for this five-year variance request is found in the 3553(a) factors.  First, this variance request acknowledges the gap that exists between the losses sustained by victim-investors and Balwani's realized financial gain through this fraud.  Second, this recommended sentence satisfies the "sufficient but not greater than necessary" standard found in 18 U.S.C. § 3553(a).  Finally, the Court will achieve the important sentencing goal of providing adequate deterrence to criminal conduct through a 15-year custodial sentence.

The government also has the benefit of the sentence this Court imposed in *United States v. Elizabeth Holmes* when making its sentencing recommendation for Balwani.  ECF No. 1660.  Under § 3553(a)(6), this Court should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  While the Court imposed 135 months in custody for Holmes, the jury found Balwani guilty of an additional fraud scheme and additional substantive fraud counts involving Theranos' patients.  Therefore, even considering the Court's 135-month sentence in *Holmes*, the government's recommended 180-month sentence for Balwani would not result in an unwarranted sentence disparity between Holmes and Balwani.  As the Court knows from the trial evidence, Balwani played a substantial management role in Theranos' clinical laboratory.  Several witnesses testified that Balwani ran the clinical lab.  *See*, *e.g.*, 3/22/22 Tr. at 1121:1–8; 3/23/22 Tr. at 1173:20–1174:13; 3/30/22 Tr. at 1611:2–1613:7; 4/20/22 Tr. at 3249:7–3250:5.  After Dr. Rosendorff resigned in November 2014, Balwani hired his dermatologist, Dr. Sunil Dhawan, as the clinical lab director and Dr. Lynette Sawyer as a temporary co-lab director—neither of whom spent much time overseeing Theranos' clinical lab.  *See e.g.*, 4/27/22 Tr. at 4080:23–4091:17; 5/11/22 Tr. at 5531:23–5547:6.  Balwani was aware of problems in the clinical lab, and played a role in deciding which blood tests would be run on which medical devices.  *See e.g.*, 4/20/22 Tr. at 3313-3316, 3337-3339, & 3360-3363; TX 4222 & 4292.  Fearful that an acknowledgment of their deficiencies would cripple Theranos' clinical lab and its relationship with Walgreens, Balwani hid and minimized laboratory problems.  This conduct perpetuated the fraud on patients.  Therefore, a significant custodial

1    sentence for Balwani, even one greater than that imposed upon Holmes, would not result in an

2    unwarranted sentence disparity.

3        Should the Court conclude that the applicable Guidelines range is life imprisonment, the United

4    States believes a variance is appropriate.  Likewise, the United States Probation Office agrees that a

5    variance from a U.S.S.G. range of life is appropriate.  *See* PSR Sentencing Recommendation.  While the

6    government agrees that a variance is appropriate, the variance requested by Probation, down to nine

7    years of custody, is not justified.  *Id*.  Such a significant variance fails to achieve important sentencing

8    goals, such as general deterrence and promoting respect for the law.  In the government's view, a nine-

9    year custodial sentence would be the result of too significant a variance, especially in light of the

10   sentence this Court imposed upon Holmes.  ECF No. 1660.

11       The government believes a variance down to 180-months in custody is reasonable and

12   appropriate.  Additional support for the government's sentencing recommendation is found in similar

13   cases.  The Judiciary Sentencing Information (JSIN) data supports the government's sentencing

14   recommendation.  PSR ¶¶ 188-191.  Balwani's primary guideline will be § 2B1.1, with a total offense

15   level of 43 and a Criminal History Category of I.  *Id*.  According to the JSIN data, during the last five

16   fiscal years (FY2017-2021), there were 29 offenders whose primary guideline was § 2B1.1, with a final

17   offense level of 43 and a Criminal History Category of I, after excluding offenders who received a

18   §5K1.1 substantial assistance departure.  *Id*.  For the 29 offenders (100%) who received a sentence of

19   imprisonment in whole or in part, the average length of imprisonment imposed was 226 months and the

20   median length of imprisonment imposed was 180 months.  *Id*.  While one may think this prosecution is

21   unique, the data suggests otherwise.  Roughly six fraud defendants each year face sentencing at the very

22   top of the Guidelines.  And it appears that a variance is common.  This is not surprising, since the

23   Guidelines in each case are likely higher than the statutory maximum sentence.

24       Furthermore, a review of certain specific sentences imposed in similar cases demonstrate the

25   wide range of custodial sentences imposed in large-dollar fraud cases.  While each case is different,

26   there is precedent for Courts to impose significant custodial sentences in white collar cases.

27

28

| Defendant | Case No. | Approximate Loss Amount | Sentence |
|---|---|---|---|
| Charles W. McCall (McKesson-HBOC Chairman of the Board) | 00-CR-505 WHA (N.D. Cal.) | $8.6 billion | 120 months (no cooperation) |
| Walter A. Forbes (Cendant CEO) | 02-CR-264 AHN (D. Conn.) | More than $1 billion | 151 months (no cooperation) |
| Timothy J. Rigas (Adelphia CFO) | 02-CR-1236 LBS (S.D.N.Y) | More than $100 million | 204 months (no cooperation) |
| John Rigas (Adelphia CEO) | 02-CR-1236 LBS (S.D.N.Y) | More than $100 million | 144 months (no cooperation) |
| Bernard J. Ebbers (WorldCom CEO) | 02-CR-1144 BSJ (S.D.N.Y) | More than $1 billion | 300 months (no cooperation) |
| Sanjay Kumar (Computer Associates CEO) | 04-CR-846 ILG (E.D.N.Y.) | More than $400 million | 144 months (no cooperation) |
| Jeffrey K. Skilling (Enron CEO) | 04-CR-025 (S.D. Tex.) | More than $80 million | 168 months (no cooperation) |
| Samuel "Mouli" Cohen | 10-CR-547 CRB (N.D. Cal.) | $31 million | 264 months (no cooperation) |
| Ebrahim Shabudin (United Commercial Bank Chief Credit Officer) | 11-CR-664 JSW (N.D. Cal) | $677 million | 97 months (no cooperation) |
| John Geringer | 12-CR-888 EJD (N.D. Cal) | Approx. $45 million | 140 months (with cooperation) |
| Christopher Luck | 12-CR-888 EJD (N.D. Cal) | Approx. $45 million | 130 months (no cooperation) |
| Sean Clark Cutting (Sonoma Valley Bank CEO) | 14-CR-139 SI (N.D. Cal) | $47 million | 100 months (no cooperation) |

## H.     The Need to Provide Restitution to Any Victim

The Court should order Balwani to pay restitution as further described below.

## III.     RESTITUTION AND FINE

The Mandatory Victims Restitution Act of 1996 (the "MVRA") provides that "when sentencing a defendant convicted of an offense described in [§ 3663A(c)], the court shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution

may be ordered." *Id.* § 3663A(a)(2).  The MVRA applies to cases of an offense resulting in damage to or loss or destruction of property of a victim.  *Id.* § 3663A(b)(1).  "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A). Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. *Id.* § 3664(e).

Here, the preponderance of evidence shows that Theranos C-1 and C-2 investors, Walgreens, Safeway, and George Shultz suffered a loss of $803,840,309.  This amount was fully foreseeable by Balwani.  Although the amount of restitution may dwarf Balwani's ability to pay, those factors simply are not relevant to the Court's determination of the restitution amount.  The Court should order restitution as required by the MVRA.  Alternatively, if the Court determines that the victims' losses are not fully ascertainable at this time, the Government requests that the Court postpone a final determination of the restitution amount for 90 days.  *See* 18 U.S.C. § 3664(d)(5).[3]

The government concurs with the PSR that Balwani should be ordered to pay a $25,000 fine.

## CONCLUSION

For these reasons, the government recommends the Court sentence Balwani to 180 months in custody and three years of supervised release, and order him to pay $803,840,309 in restitution, a $25,000 fine, and a $1200 special assessment.

DATED:  November 30, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


__*/s/ Robert S. Leach*_____
ROBERT S. LEACH
JEFF SCHENK
JOHN C. BOSTIC
KELLY I. VOLKAR
Assistant United States Attorneys

---

[3]     The government is not seeking restitution on behalf of the patient victims because it understands the vast majority were repaid in connection with other proceedings.