JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     (415) 773-5700
Facsimile:      (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com;
scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **DEFENDANT RAMESH "SUNNY" BALWANI'S SENTENCING MEMORANDUM** |
| v. | |
| RAMESH "SUNNY" BALWANI, | **Date:  December 7, 2022**<br>**Time:  10:00 a.m.**<br>**CTRM.: 4, 5th Floor** |
| Defendant. | |
| | ***REDACTED FOR PUBLIC FILING*** |
| | **Hon. Edward J. Davila** |

1

**TABLE OF CONTENTS**

2

**Page**

3    I.     INTRODUCTION ................................................................................................... 1

4    II.    MR. BALWANI'S HISTORY AND CHARACTERISTICS ................................... 3

5         A.    Mr. Balwani's family instilled in him an unshakeable commitment to hard work and generosity. ........................................................................................ 4

6         B.    Mr. Balwani immigrated to the United States to forge a better life. .................... 5

         C.    Mr. Balwani is singularly devoted to his family. ................................................ 6

7         D.    Mr. Balwani had a positive impact on employees at Theranos. ........................... 8

8         E.    Mr. Balwani has given generously to charities for decades. .............................. 10

9    III.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ................................... 13

10        A.    Mr. Balwani's due diligence before joining Theranos made him believe in the company. ...................................................................................................... 13

11        B.    Mr. Balwani worked tirelessly for Theranos and avoided the spotlight. .............. 15

12        C.    Mr. Balwani did not profit from Theranos. .......................................................... 16

         D.    Mr. Balwani risked his health during global pandemics for Theranos. ............... 17

13        E.    Mr. Balwani trusted Theranos to run tests on his closest loved ones. .................. 18

14        F.    Theranos was a legitimate company that developed valuable technology to achieve its meaningful mission. ........................................................................ 19

15    IV.   SENTENCING GUIDELINES RANGE ................................................................. 21

16        A.    The government cannot meet its burden to prove fraud loss. .............................. 21

17            1.    The government must show the amount of loss by clear and convincing evidence. .................................................................................. 22

18            2.    Proving loss requires showing that misrepresentations caused the loss. ...................................................................................................... 23

19            3.    Intervening causes also doom the government's fraud loss argument. ............................................................................................... 25

20            4.    The government's expert analysis is fatally flawed. ................................. 28

21            5.    The government has not proven losses sustained by patients. .................. 31

22            6.    Using the defendant's gain as a proxy for loss leads to no proven losses. ...................................................................................................... 32

23        B.    The facts do not support an enhancement for a conscious or reckless risk of bodily injury. ..................................................................................................... 33

24        C.    No enhancement for Mr. Balwani's role in the offense is proper. ...................... 38

25        D.    The correct Guidelines range is 4–10 months. .................................................. 40

26    V.    THE DEFENSE RECOMMENDATION ............................................................... 40

27        A.    The Guidelines range reflected in the PSR dramatically overstates the seriousness of the offense. ................................................................................. 40

28

**TABLE OF CONTENTS**
(continued)

Page

B.    No period of incarceration is needed for specific deterrence or to protect the public. .......................................................................................... 42

C.    A custodial sentence is not necessary to achieve general deterrence .................. 43

D.    Mr. Balwani's role in the conduct found by the jury was demonstrably less central to the counts of conviction than Ms. Holmes' conduct. ........................... 44

E.    A custodial sentence is unnecessary to serve the ends of justice and would not account for Mr. Balwani's character. ................................................. 48

VI.    CONCLUSION ............................................................................................. 48

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
Case No. CR-18-00258-EJD

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bradley v. District of Columbia*,
    107 A.3d 586 (D.C. 2015)...................................................................................... 47

*Gall v. United States*,
    552 U.S. 38 (2007)................................................................................... 45, 48

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd,* 301 F. App'x 93 (2d Cir. 2008) ................ 41, 43

*United States v. Banks*,
    _ F.4th _, 2022 WL 17333797 (3d Cir. Nov. 30, 2022)........................................ 23

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013)................................................................................ 42

*United States v. Crandall*,
    525 F.3d 907 (9th Cir. 2008)............................................................................... 25

*United States v. Edwards*,
    595 F.3d 1004 (9th Cir. 2010)............................................................................. 48

*United States v. Fahd*,
    No. 17-cr-00290-RSL (W.D. Wash. Sept. 16, 2021) ............................................ 22

*United States v. Greenfield*,
    44 F.3d 1141 (2d Cir. 1995)................................................................................ 39

*United States v. Hicks*,
    217 F.3d 1038 (9th Cir. 2000)............................................................................. 23

*United States v. Holden*,
    908 F.3d 395 (9th Cir. 2018)........................................................................... 38, 39

*United States v. Hussain*,
    2019 WL 1995764 (N.D. Cal. May 6, 2019) ...................................................... 28, 32

*United States v. Johansson*,
    249 F.3d 848 (9th Cir. 2001)............................................................................... 33

*United States v. Johnson*,
    2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018)...................................................... 41

*United States v. Jordan*,
    256 F.3d 922 (9th Cir. 2001)............................................................................... 22

*United States v. Knights,*
    534 U.S. 112 (2001)...........................................................................48

*United States v. Laurienti,*
    611 F.3d 530 (9th Cir. 2010)............................................................22

*United States v. Leal-Felix,*
    665 F.3d 1037 (9th Cir. 2011)..........................................................23

*United States v. Lonich,*
    23 F.4th 881 (9th Cir. 2022)......................................................22, 23

*United States v. Martin,*
    796 F.3d 1101 (9th Cir. 2015).............................................23, 25, 31

*United States v. Parris,*
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) .............................................41

*United States v. Petty,*
    982 F.2d 1365 (9th Cir. 1993)....................................................36, 47

*United States v. Ponce,*
    51 F.3d 820 (9th Cir. 1995) (per curiam)...........................24, 36, 47

*United States v. Spotted Elk,*
    548 F.3d 641 (8th Cir. 2008)............................................................45

*United States v. Whitehead,*
    532 F.3d 991 (9th Cir. 2008)............................................................48

*United States v. Zolp,*
    479 F.3d 715 (9th Cir. 2007)............................................................24

**Statutes**

18 U.S.C. § 3553(a) .................................................................*passim*

18 U.S.C. § 3663A(a)(2) ......................................................................33

18 U.S.C. § 3663A(c)(1)(A)(ii)............................................................33

18 U.S.C. § 3663A(c)(3)(B).................................................................33

U.S.S.G. § 1B1.3 note 3(B)..................................................................45

U.S.S.G. § 2B1.1(a)(1)........................................................................21

U.S.S.G. § 2B1.1(b)(1) ..................................................................22, 29

U.S.S.G. § 2B1.1(b)(16)(A) ................................................................33

U.S.S.G. § 2B1.1 note 3(B) ............................................................................. 32

U.S.S.G. § 2B1.1 note 3(C) ............................................................................. 24

U.S.S.G. § 2B1.1 note 3(E)(i) ......................................................................... 31

U.S.S.G. § 2F1.1(b)(6)(A) .............................................................................. 33

U.S.S.G. § 3B1.1(a) ........................................................................................ 38

U.S.S.G. § 3B1.1 note 1 ................................................................................. 39

U.S.S.G. § 3B1.1 note 2 ................................................................................. 38

**Other Authorities**

Mirko Bagaric et. al., *Halting the Senseless Civil War Against White-Collar Offenders: "The Conduct Undermined the Integrity of the Markets" and Other Fallacies*, 2016 MICH. ST. L. REV. 1019 (2016) ...................................... 44

Barry Boss and Kara Kapp, *How the Economic Loss Guideline Lost Its Way, and How to Save It*, 18 OHIO STATE J. CRIM. L. 605 (2021) ................................... 41, 42

Morgan Leigh Davies, *Sunny Balwani Is Still Awaiting Trial for His Involvement in Theranos*, BUSTLE (updated Feb. 23, 2022), https://www.bustle.com/entertainment/where-is-sunny-balwani-now-trial .......... 46

Lucian E. Dervan, *White Collar Overcriminalization: Deterrence, Plea Bargaining, and the Loss of Innocence*, 101 KEN. L.J. 723 (2012-13) .................. 43

Fed. R. Crim. P. 12.2 ...................................................................................... 47

Fed. R. Crim. P. 32(i) ..................................................................................... 47

Fed. R. Evid. 804(b)(1)(B) ............................................................................. 47

Fifth Amendment ........................................................................................... 37

Richard Frase, *Punishment Purposes*, 58 STANFORD L. REV. 67 (2005) .................. 43

Model Penal Code § 2.02 ................................................................................ 33

Daniel S. Nagin & Greg Pogarsky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*, 39 CRIMINOLOGY 865 (2001) .................................................... 44

Damon M. Petrich et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review*, 50 CRIME & JUSTICE 353 (2021) ...................................... 42

Lydia Ramsey, *The mysterious story of former Theranos president Sunny Balwani, who former employees saw as an 'enforcer' and now faces criminal charges of wire fraud*, YAHOO!NEWS (June 15, 2018) ............................................................... 15

Sara Randazzo & Meghan Bobrowsky, *Jury in Elizabeth Holmes Trial Seized on Two 'Smoking Guns' to Convict Theranos Founder, Juror Says*, WALL ST. J. (Jan. 6, 2022), https://www.wsj.com/articles/jury-in-elizabeth-holmes-trial-seized-on-two-smoking-guns-to-convict-theranos-founder-juror-says-11641503502 ............................................................................................................ 47

Rebecca Robbins, *Theranos's Mystery Man Revealed: Rare Footage of Sunny Balwani Was Hiding in Plain Sight*, STAT (Mar. 20, 2018), https://www.statnews.com/2018/03/20/sunny-balwani-video/ ................................ 46

S. Report No. 100-503 (Sept. 12, 1988) ..................................................................... 33

*Stock Warrants: Sweetening the Deal for Angel Investors*, Seraf Compass (last accessed Nov. 24, 2022), https://seraf-investor.com/compass/article/stock-warrants-sweetening-deal-angel-investors ............................................................. 16

U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004) www.ussc.gov/publicat/Recidivism_General.pdf ...................................................... 43

Brie Zeltner, *Cleveland Clinic Faces $650,000 Fine for Marymount Hospital Lab Violations; Patients in "Immediate Jeopardy," CMS Says* (Sept. 11, 2015), https://www.cleveland.com/healthfit/2015/09/cleveland_clinic_faces_600000.html .............................................................................................................. 34, 35

# I.     INTRODUCTION

Fraud defendants come before this Court and other courts every day whose goal is only to enrich themselves. Their victims' losses are their gains. But this case is unique. Before this Court is a defendant who did the opposite: he did not put his own financial interests first; he did not misuse investor funds; he was a major investor himself; he did not seek fame or media attention; he worked tirelessly to build a business; and the company he left in May 2016 had a fortune worth of assets, including about $350 million in the bank and intellectual property recognized by independent third parties as among the strongest and most valuable in corporate America and globally.

Conduct that can violate the conspiracy and wire-fraud statutes is as broad as the human imagination. There are truly evil people in this world who take pleasure in defrauding vulnerable people. There are also those who try to make the world a better place, even if they still engage in conduct that a jury finds violated those statutes. The Sentencing Guidelines' loss table, which can be used to drive the sentencing range in appropriate cases, is a very blunt tool because it utterly fails to distinguish between people on these two ends of the spectrum or anywhere in between.

Here, the Guidelines loss calculations recommended by Probation and the government— and those determined by the Court in Ms. Holmes' case—yield an extremely lengthy custodial sentence that is unjustified based on the circumstances of Mr. Balwani's case and the wealth of strong mitigating factors relating to him. This Court has the ability, indeed the responsibility, to look at this tragic case holistically to impose a just and fair sentence—one "sufficient, but not greater than necessary" to achieve the aims that Congress has identified. 18 U.S.C. § 3553(a).

At least fourteen mitigating factors take this case out of the heartland of cases to which the Guidelines' loss table applies. Because of these significant mitigators, the Guidelines' loss enhancement substantially overstates the nature and circumstances of Mr. Balwani's culpability and role in the offense:

- Mr. Balwani invested close to $5 million of his own money into Theranos and lost it all;

- Mr. Balwani did not profit, nor did he ever try to profit, from the offense conduct;

- Mr. Balwani sought a salary of only $1, and the Board gave him only a modest salary;
- Mr. Balwani did not seek fame or media attention;
- Mr. Balwani did not use any of Theranos' money to pay for a lavish lifestyle, but instead worked tirelessly for Theranos for almost 6 years;
- Mr. Balwani used the investors' money as it was intended to be used—to fund operations and research and development at Theranos;
- Mr. Balwani worked day and night to build a company that he thought would change the landscape of diagnostic testing for the better;
- Mr. Balwani was motivated by an intense desire to revolutionize medical care for patients;
- Mr. Balwani has no prior criminal record and a successful prior employment history;
- Mr. Balwani has deeply and positively affected his family and his community throughout his life;
- Mr. Balwani arranged for his own family members, some of whom had significant health issues, to use Theranos blood testing for diagnostic purposes;
- Mr. Balwani did not falsify pharmaceutical reports;
- Mr. Balwani left Theranos with $350 million in its bank account, as well as patents worth hundreds of millions of dollars, when he left Theranos in May 2016; and
- Mr. Balwani played no role in deciding what to do with Theranos' funds and assets after he left the company.

The prison sentences the government and Probation propose would essentially be life-ending for Mr. Balwani, a 58-year-old man with no criminal history who led an honorable and productive life as an immensely successful software developer and businessman before he joined Theranos. Even if this Court were to calculate a Guidelines range at or above the level of those recommendations, it should sentence Mr. Balwani to a non-Guidelines sentence based on the remaining Section 3553(a) factors to prevent an exaggerated, and inaccurate, loss figure from eclipsing all other sentencing considerations. The statutory factors and all the mitigating circumstances here call for a non-Guidelines sentence that is just and reasonable, taking into

1   account Mr. Balwani's productive life and good works, as well as his conduct at Theranos.

2   Mr. Balwani should not be incarcerated for the length of time sought by the government or

3   Probation, or imposed on Ms. Holmes. That may not be the easy decision in this highly publicized

4   and sensationalized case, but it is the right decision. Indeed, the Probation Office points out in the

5   Presentence Report that "[b]y all accounts, Mr. Balwani believed in this company and hoped to

6   improve health care." PSR ¶ 151.

7          Before this Court is a defendant with a long track record of trying to make the most

8   positive impact on society that he possibly could. This reality is borne out by the lifetime of

9   selfless acts recounted in the letters of support for Mr. Balwani attached here. For purposes of

10  sentencing, we must accept that the jury rendered a guilty verdict, but this does not change who

11  Mr. Balwani is and what he has done in his 58 years to contribute to society with all his heart and

12  soul. As required by statute, this Court should look at the full picture of the person and all the

13  circumstances. Mr. Balwani is not the same as Elizabeth Holmes: he actually invested millions of

14  dollars of his own money; he never sought fame or recognition; and he has a long history of

15  quietly giving to those less fortunate (dating to well before his time at Theranos) without seeking

16  recognition or benefit. All these attributes define who Mr. Balwani truly is.

17          **II.     MR. BALWANI'S HISTORY AND CHARACTERISTICS**

18          As the Court knows, the personal history and characteristics of the defendant is a critical

19  factor that the Court must consider when determining a fair and reasonable sentence. *See* 18

20  U.S.C. § 3553(a)(1). As letter after letter submitted to this Court on his behalf underscore,

21  Mr. Balwani is and always has been intensely devoted to the success and well-being of his family,

22  his community, and even to strangers in need of generosity. He has a spotless record and has led a

23  meaningful life. As the Probation Office recognizes, Mr. Balwani has "led a stable, productive

24  life; he has never been arrested; he has a long employment history; he has a history of charitable

25  and good works; … and he lives modestly." PSR ¶ 152. Mr. Balwani's involvement with

26  Theranos has exacted a heavy toll, but his life is defined by so much more. Theranos is just one

27  chapter of his story.

28          Importantly, the accomplishments in Mr. Balwani's life did not come easily or

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

1   automatically. Mr. Balwani, an immigrant to this country, doggedly pursued and achieved

2   outstanding educational and professional accomplishments while remaining committed to his

3   loved ones and caring for his community and those in need. The defense urges the Court to

4   consider the complete picture of Mr. Balwani, including his inspiring personal background and

5   immigration story, and the letters submitted on his behalf showing that he is a valued member of

6   his family and community. He is deserving of this Court's leniency.

7   **A.      Mr. Balwani's family instilled in him an unshakeable commitment to hard work and
            generosity.**

8

9   Ramesh "Sunny" Balwani was born on June 13, 1965, in Shahdadpur, Pakistan. His

10  parents, Jhamandas Balwani and Kaushalya Balwani, had six children together. Mr. Balwani was

11  their fourth child, and he remains very close to all his siblings—some of whom live in the United

12  States and some in India. His parents were kind and loving and raised Mr. Balwani to always

13  adhere to the practice of sharing material possessions with those less fortunate. These values

14  shape Mr. Balwani's life to this day, as he has remained dedicated to caring for his family and

15  community even during the criminal trial process.

16  In Shahdadpur, Mr. Balwani grew up surrounded by his paternal family who lived nearby.

17  Mr. Balwani's mother, Kaushalya, was from India and practiced both the Sikh and Hindu

18  religions. His mother's faith and spirituality influenced Mr. Balwani's own faith—centered

19  around the principle of caring for those in need. Mr. Balwani's father, Jhamandas, was a farm

20  owner who later owned a cotton and oil factory. His father always taught Mr. Balwani that

21  everyone, no matter their class or background, deserve respect and the chance to succeed.

22  Mr. Balwani's father also instilled in him the importance of hard work and the need to share

23  success with others.

24  Mr. Balwani's father wanted him to receive an excellent education. At age eleven,

25  Mr. Balwani left home to attend a highly regarded boarding school, Aitchison College, in Lahore,

26  Pakistan. While Mr. Balwani was fortunate to have the opportunity to receive a good education,

27  being away from his close-knit family was difficult for him. Being a Hindu in Pakistan, a

28  predominantly Muslim country, also posed challenges for Mr. Balwani. But through these

negative experiences, Mr. Balwani learned resilience and found ways to persevere and succeed at school and eventually in his professional endeavors.

**B.     Mr. Balwani immigrated to the United States to forge a better life.**

For six generations, Mr. Balwani's family consisted of farmers who grew cotton, wheat, and mangoes. His family's desire for him to pursue higher education inspired Mr. Balwani to do so in the United States—something nobody in his family had ever done. Following his graduation from high school in 1984, Mr. Balwani's family moved back to India. Mr. Balwani worked to obtain a student visa and moved to California to pursue his dream of receiving a college degree in the United States. Mr. Balwani was the first member of his family to attend college.

After attending one semester at the University of Southern California, he transferred to the University of Texas at Austin in the Spring of 1987. The values and resiliency Mr. Balwani learned from his upbringing were essential to his start in the United States. While attending college classes, Mr. Balwani worked as an assistant to his professors to help with tuition. Mr. Balwani studied databases and artificial intelligence and graduated with a Bachelor's Degree in Information Systems in 1990.

After graduation, Mr. Balwani moved to Silicon Valley. Eager to put the skills he had obtained in his studies to practical use, he began his professional career as a computer programmer and database expert at a technology startup company called Marathon Systems. After working there for several years, in 1994 Mr. Balwani accepted a position at Microsoft in San Mateo, California, where he worked for five years.

In February 1999, the same drive and entrepreneurial spirit that led to Mr. Balwani's coming to this country prompted him to start his own company. That venture, Commerce Bid, was an e-commerce startup which helped businesses buy and sell items online. As co-founder and President of Commerce Bid, Mr. Balwani was involved in many aspects of his company, including writing code, hiring engineers, and managing employees.

After more than a decade of studying and working in the United States, on one of the proudest days of his life, Mr. Balwani became a United States citizen in 1999. Ex 1 (Certificate of

Naturalization).[1] Becoming a U.S. citizen marked for Mr. Balwani this country's acceptance of his hard work and commitment to building a life here.

That same year, in November 1999, Mr. Balwani's company was acquired by the software company Commerce One. Mr. Balwani then served as Vice President of Commerce One for a year. In 2000, he left Commerce One to focus on obtaining more education.

After this professional success, Mr. Balwani went back to school to pursue a graduate degree at the University of California, Berkeley. In May 2003, he received his MBA, and in the Spring of 2004 earned acceptance to the computer-science graduate program at Stanford University. While Mr. Balwani was studying computer science at Stanford, he was also advising various technology startups in Silicon Valley. Mr. Balwani left the computer science program at Stanford at the end of 2008 before joining Theranos.

In short, Mr. Balwani has spent decades pursuing higher education and nurturing professional opportunities that appealed to his passion for innovation and developing technology to improve the lives of others.

**C.     Mr. Balwani is singularly devoted to his family.**

Mr. Balwani's dedication to his family has permeated his entire life. Mr. Balwani considers himself incredibly fortunate to have grown up in a supportive family, surrounded by aunts, uncles, cousins, and his siblings. He has never forgotten the importance of family, or the teachings of his parents to always help others.

Mr. Balwani has three older sisters: Dipali Nain, age 67, a retired homemaker; Rupa Pawani, age 63, a garment designer and small business owner; and Padma Bhatia, age 61, a homemaker. All three sisters live in India. Mr. Balwani has two younger brothers: Parkash Balwani, age 51, an information technology consultant who lives in Cleveland, Ohio; and Rajesh Balwani, age 48, a computer programmer who resides in Milpitas, California. The Court may have noticed both brothers attending Mr. Balwani's trial.

Following the death of Mr. Balwani's father in 2000, Mr. Balwani took on a paternal role

---

[1] Except where otherwise noted, cited exhibits are attached to the concurrently filed Declaration of Jeffrey B. Coopersmith.

within his family. According to his brother Parkash, Mr. Balwani supported the family morally

and financially following their father's death:

> Our father passed away at a relatively young age in 2000 and since then, Ramesh has done every bit for our family that a father would do for his children. Even though he is just a few short years older than my brother and myself, Ramesh is not just our elder brother, he is like a father figure to us.

Ex. 2 at 2.

Mr. Balwani's brother, Rajesh, expresses similar sentiments of gratitude for the support

Mr. Balwani gives his family:

> When our father passed away unexpectedly at a young age in 2000, Ramesh shouldered all the responsibility for my mother and our entire family. All my mother's expenses from medical bills to living expenses etc. were solely handled by him for over two decades. He also made sure we didn't have [to] feel alone after our dad's passing away and helped us to cope emotionally. He inherited my father's foresight, strong work ethic, compassion, values, and motivated us to do the same. He has been and always will be a father figure for us.

Ex. 2 at 6.

While Mr. Balwani achieved success in the United States, he has always shared

everything he has earned with his family. When Mr. Balwani's youngest brother, Rajesh, decided

to immigrate to the United States, Mr. Balwani gave his brother everything he could to support

him, including by paying for his brother's education in Madison, Wisconsin. Rajesh relates that,

to pay for these expenses, Mr. Balwani "used a significant chunk of his savings including most of

his bonus and stock options that he had accumulated over several years for me instead of saving it

for his own needs. Even though he was working hard to figure out and establish his own career,

he made a big sacrifice for me that changed my entire life." Ex. 2 at 5.

In fact, Mr. Balwani paid for both of his brothers' college tuitions, as well as their housing

and living expenses while they were in school. Mr. Balwani has also paid the college expenses for

many of his nieces and nephews. Ex. 2 at 2, 5, 50. Mr. Balwani's niece, Karuna, says that

Mr. Balwani always encouraged her to pursue higher education and even helped fund her

Master's degree in Sociology. Ex. 2 at 48.

Mr. Balwani's niece, Rashmi, is now a successful executive doing international humanitarian work. She speaks about Mr. Balwani's devotion to helping her achieve her goals:

> My career was only made possible by the mentorship and invaluable financial assistance offered to my family and myself by Ramesh Balwani. He paid a significant part of my college fees, gave me my first laptop when I was a kid so that I could complete my project assignments, and also took out the time to help mentor me. As the first-born girl child in my generation, coming from a traditional community pursuing a masters degree and then pursuing a high intensity career was not something that was commonplace. My uncle constantly helped introduce options, encouraged me and my family to open our minds to new things and also gave monetary support.

Ex. 2 at 50.

When Mr. Balwani's ███████ was hospitalized at a young age, Mr. Balwani stayed by her side in her hospital room until she recovered. Ex. 2 at 11. Sapna—Mr. Balwani's sister and ████████—says that Mr. Balwani stood by their family during this difficult time, providing them with "immense support and guidance." *Id.* Sapna describes the incredible impact Mr. Balwani has had on their family: "He has always inspired us through his own actions to follow the right path despite difficulties and challenges, and to work hard and never give up. He has been a great model for our family, always showing us the way." *Id.*

Mr. Balwani's generosity and devotion to his family speaks volumes about who he is, and what he values most.

**D.      Mr. Balwani had a positive impact on employees at Theranos.**

While Mr. Balwani has at times been painted unfairly in the press as an "enforcer" or "bully," the reality is that he had a positive impact on many people's lives while at Theranos. Even after Mr. Balwani's conviction, former employees have shared that Mr. Balwani is a kind person and was always trying to do the right thing. Mr. Balwani received the following messages from former employees after the jury's verdict in his trial:

- Former Theranos Product Manager: "I'm sorry about yesterday and hope that you are doing okay. I know that we all genuinely tried to do what was right …. I learned a lot working with you and will always be grateful for the opportunities you gave me." Ex. 3 at 1.
- Mr. Balwani's former assistant: "I am very thankful for all of the opportunities you've

1    given me and I wouldn't be where I am today in my career if it wasn't for your guidance."

2    *Id.* at 2.

3    • Former Theranos employees: "We're all so mad and sad about the outcome…. Despite

4    what others may say, we know you're a great person." *Id.* at 3.

5    • Former Theranos Sr. Program Manager: "just wanted to reach out and say that you're in

6    my thoughts. Grateful to have had the opportunity to work at Theranos." *Id.*

7    • Former Software Product Manager: "I'm sad to hear the news today. Things were never

8    perfect at Theranos, but we were always trying our best to do the right thing. I really

9    believe that you were always trying to do your best too." *Id.* at 4.

10   So Han Spivey, Theranos' former controller, testified at Mr. Balwani's trial that she cried

11   when he left the company because she was sad to see him go, after working with him for many

12   years. 4/4/22 Tr. 2160–61.

13   A former Theranos employee describes what it was like to work for Mr. Balwani:

14   Sunny was always very kind to me as an employee and went out of his way on
     multiple occasions to check in and make sure that my team and I had everything we
15   needed to be successful, both personally and professionally. He ensured that people
     who expressed interest in growing professionally at the company had the
16   opportunity to do so, and personally arranged to have employees move into the
     teams and roles that they aspired to be in.
17

18   Ex. 2 at 35. Another former Theranos employee says the following about Mr. Balwani:

19   My first year at Theranos I had the privilege to develop a strong and trusted
     relationship with Sunny –based on work ethic and our mutual desire to always do
20   the right thing for the mission. While I had no purview into what was happening in
     other parts of the organization –I saw that the daily decisions that were being made
21   for our patient software was centered around patient access and safety. Whether it
     was an app to make the check-in experience smoother, or for the safety of our
22   phlebotomists.
23
     Sunny was an innovator, he wanted our software to be best-in-class, so we built it
24   from the ground up. Day in and day out, he spent countless hours with us dreaming
     up software systems that would revolutionize the way patients could access care. He
25   cared deeply about what products were launched and how well they worked. He
     pushed the limits of what we thought we were capable of.
26

27   Ex. 2 at 39.

28

**E.     Mr. Balwani has given generously to charities for decades.**

Just as his faith has taught him, Mr. Balwani considers it a blessing to help others in their time of need. Mr. Balwani has embodied that not only in his generosity towards his own family, but also in the way he has devoted his time and resources to improving the lives of others in his community, both in the United States and abroad. For over 20 years Mr. Balwani has donated to orphanages in India and Pakistan. Letter after letter submitted to this Court reflects Mr. Balwani's unwavering commitment to supporting those in need.

Rupa Parwani, Mr. Balwani's sister, describes his philanthropic work in India, including donating water pumps and laptops to their family's ancestral villages and serving as a long-standing donor to a local girls' orphanage in Mumbai. Ex. 2 at 53–54. Sapna Balwani, his sister-in-law, says that Mr. Balwani never hesitates to help a person in need: "Every cause that he contributes to is not a random donation but a long-standing commitment to make a difference." Ex. 2 at 12.

Raju Kumar, who worked for Mr. Balwani's family in India for decades, describes the support Mr. Balwani gave him when Mr. Kumar suffered a personal tragedy:

> From the very beginning, Ramesh Balwani has always helped me and been my benefactor. **My father passed away when I was very young and Ramesh was a huge help and support during those difficult times. He took care of all my needs and encouraged me to learn to read and write.** He coached me about the importance of education in the modern world and always insisted that I must educate my children. He made sure my daughter's school fees are paid and even sent her a laptop…. We come from a very poor background where educating a girl child was not very common. But today because of Ramesh's help, educating my daughter will have a positive effect on the entire generation to come. He continues to support my children's education by paying for them, their books and other needs. **He has a big heart and has always helped me through the years. His help has not only helped me but has uplifted my entire family and our future generations to come**.

Ex. 2 at 36 (emphasis added).

Manoj Paswan, who also worked for Mr. Balwani's family in India, confirms Mr. Balwani's dedication to helping both the community he grew up in and others less fortunate:

> I, Manoj Paswan, am writing to share how Ramesh Balwani has impacted my life and the life of my community and village. I originally come from a small village in Bihar, India. Ramesh is a very good man. I hail from a poor family and Ramesh gave me a job. My village did not have any running drinking water. When I mentioned this to Ramesh he helped with financial support to install water pumps

in our village. For more than a decade now, so many in my village use those pumps to get drinking water. These pumps now feed numerous children and families and livestock in the village. **He always felt connected to our village life and made his best effort to give us a better means of living…. He even helps other poor people in my village when they are in need, so everyone keeps him in their prayers**.

Ex. 2 at 51 (emphasis added).

Mr. Balwani has also been a major donor to an organization, "TNDFC," that serves differently abled people in India. TNDFC recounts the difference that Mr. Balwani's life has made to hundreds of the organization's beneficiaries:

The Tamilnadu Differently Abled Federation Charitable trust is a registered non–profit social service organization working for welfare of differently abled persons since 2000. Mr. Ramesh Balwani is one of our major donors. In 2018 he contacted us seeing our credentials in our website. First he wanted to donate dozens of wheel chairs.  We normally have a list of needy disabled persons. **From the funds received from Mr. Ramesh Balwani we were able to provide mobility to dozens of disabled persons at one stroke instead of one at a time**. With the support of wheel chairs many persons were able to get a job to earn for their living ….

During Covid-19 lockdown the situation for ordinary people was very tough. Many disabled people associated with our foundation lost their jobs or their small business were shut down because of lockdown. These people had no money for even basic food. **We contacted Mr. Ramesh Balwani for providing groceries to hundreds of disabled persons.  He was ready to help us immediately. With his support hundreds of disabled persons were able to be free from hunger for many many months during Covid-19 Pandemic Period**…. To Summarise, Mr. Ramesh Balwani is a very kind hearted generous philanthropist always ready to lend helping hand to the poorest disabled men and women through our TNDFC Trust.

Ex. 2 at 58–60 (emphasis added).

Fifty people whose lives Mr. Balwani's generosity touched submitted letters of support on his behalf. Ex. 2 at 61–150. Mr. Balwani's philanthropy has changed the lives of these individuals through providing mobility aids, such as wheelchairs, to people struggling to get by in their daily lives due to limited accessibility and discrimination. Mr. Balwani's support also helped TNDFC provide grant funding to help individuals open small businesses during the Covid-19 crisis. Mr. Balwani has also donated to the Indian Heritage Family Foundation to fund new water sources for a temple, animal shelter, and orchard that is planned as part of new construction to promote Indian culture in Milpitas. Ex. 2 at 153–54.

Mr. Balwani's acts of philanthropy have also greatly affected the Sikh community in his home state of California. In 2016, Mr. Balwani donated over $100,000 to build a kitchen at a Sikh

temple in Fremont, California to feed the congregation and those in need. And in 2018,

Mr. Balwani donated $35,000 to build a second kitchen at a Sikh temple in Milpitas. A letter

submitted by the Sikh Foundation of Milpitas demonstrates that, for the past decade, Mr. Balwani

has contributed not just his money but his time to programs and projects to help the Sikh

community, including while defending himself as part of this trial process:

> This is to certify that Ramesh Balwani has been a great supporter and dedicated community member of the Gurudwara Sahib at Milpitas. **He has solely contributed towards building the much-needed commercial kitchen at the Gurudwara Sahib. We run a community kitchen feeding hundreds of families every day.** The kitchen has 25 equipment's and is used to feed 100+ people every day. Ramesh Balwani has also contributed to build a loft space at the Gurudwara location that is used by the priests to sleep and take rest. He has supported us by organizing langar (community kitchen) service at several important occasions for more than a decade. **He is a regular donor to other causes at Gurudwara Sahib and spends hours serving our community here every weekend.** Ramesh's timely and generous contributions have helped many struggling families to survive during tough times. **His willingness to serve and help the community is evident in his unshakeable commitment to our families and our organization in general.** Ramesh's long-standing unwavering support has helped the Gurudwara in difficult times like the recent pandemic. Despite heavy legal burdens he has never hesitated to support our causes. His contributions and philanthropy have greatly helped in the establishment and maintenance of the Gurudwara Sahib.

Ex. 2 at 51 (emphasis added).

Mr. Balwani has also donated generously to the Bilqees Edhi Foundation, as well as to the

Edhi Blood Bank in Pakistan to be used for patients requiring blood transfusions due to cancer

and other illnesses. He has also donated to the Edhi orphanages so they can provide fresh milk to

newborn children orphaned by the Covid crisis. PSR ¶ 101.

\* \* \*

Mr. Balwani's life has been irrevocably changed by his involvement with Theranos.

Mr. Balwani has been living under immense scrutiny and public attention for years and

realistically could not pursue new employment or business opportunities. But at his core, he is

still the same man who grew up learning to support others, the same man who became the first in

his family to go to college, and the same man whose help has been so vital to the lives of others.

Mr. Balwani has been an ardent supporter of charitable and humanitarian causes for decades,

beginning long before the government's investigation. Mr. Balwani's closest family members

have stood staunchly beside him during his trial and now, after his conviction, are eager to attest

to his character and generous spirit. Mr. Balwani's personal history and characteristics support a lenient sentence.

## III.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Under 18 U.S.C. § 3553(a)(1), the Court must consider the "nature and circumstances of the offense." This case is unlike the typical fraud cases in which defendants put their own financial interests first, seek to line their own pockets, or solicit investments for a sham company or worthless or non-existent investment opportunity. Mr. Balwani did none of these things.

No one disputes that Theranos was a real company, doing important work. Mr. Balwani's conduct during his involvement with Theranos over six years shows that he believed wholeheartedly in the company, investing millions of dollars into the company and never attempting to cash out his shares. The Probation Officer has recognized the unique circumstances of this case, noting that Mr. Balwani "believed in this company" and in fact was "so supportive of the company, prior to 2012, he guaranteed a line of credit for $10,000,000; and later owned $500,000,000 worth of Theranos stock (which he never cashed out)." PSR ¶ 151.

To be clear, recognizing these facts is not meant to ignore the jury's verdict. Rather, it is meant to emphasize the sharp difference between Mr. Balwani's conduct and that of a typical fraud defendant whose worse intent, conduct, and moral culpability might yield the same mathematical result within the clinical confines of the Guidelines' loss table. These facts are at the core of the Court's consideration of the nature and circumstances of the offense under Section 3553(a).

### A.    Mr. Balwani's due diligence before joining Theranos made him believe in the company.

Mr. Balwani was not an original founder of Theranos. Mr. Balwani first learned about Theranos from his romantic partner, Elizabeth Holmes. In 2007, Mr. Balwani understood that Ms. Holmes wanted to introduce Theranos' miniaturized blood testing technology to pharmaceutical companies for clinical trials. Mr. Balwani learned that Theranos' technology had the potential to be linked by software to the cloud so that the device could be used in remote locations but overseen by trained scientists in the lab. These software and diagnostic advancements struck

Mr. Balwani as vital for the future of health care.

During the summer of 2009, Mr. Balwani began talking with Ms. Holmes about getting involved with Theranos. In August 2009, before joining or investing in Theranos, Mr. Balwani conducted extensive due diligence. He reviewed materials provided to him by Ms. Holmes, including company "org" charts (Exs. 4 and 5), documents reflecting Theranos' work with pharmaceutical companies (Exs. 6 and 7), resumes of Theranos employees (Ex. 8), and documents relating to Theranos' assay library (Exs. 9 and 6). Mr. Balwani was impressed by the quality of Theranos' employees, which included scientists—many with Ph.D.s and M.D.s— engineers, and accountants. Mr. Balwani also learned from his due diligence and conversations with Ms. Holmes and others at the company that Theranos' clients included "[t]welve top pharmaceutical companies, the U.S. government and several foreign governments." Ex. 7 at 1. Mr. Balwani learned from the company that pharmaceutical companies had already evaluated and validated Theranos' technology. Ex. 9.

As part of his due diligence, Mr. Balwani also met with Dr. Channing Robertson, who was a Theranos board member and a Dean and Professor of Chemical Engineering at Stanford University who later advised other investors doing due diligence, including Brian Grossman of PFM. Ex. 10. This meeting allowed Mr. Balwani to personally observe Dr. Robertson's enthusiasm for Theranos.[2] Mr. Balwani also met with many important Theranos employees at that time, including Tim Kemp (Head of Bioinformatics/Software), Gary Frenzel (Senior Technical Lead), Tony Nugent (VP Product Development, System Integration), and Seth Michelson (Chief Scientific Officer). Exs. 11–14. Mr. Balwani continued to hear positive feedback about the science from these employees.

At this point in Mr. Balwani's life, he had already succeeded in business. He did not need money. But what he learned about Theranos inspired him to join the company and work to improve health care for everyone. Mr. Balwani's sister-in-law, Sapna, sums up what truly drew him to the company:

---

[2] Dr. Robertson reiterated his enthusiasm for Theranos even after the trial and convictions of Ms. Holmes and Mr. Balwani. Dkt. 1650-2 at 4 ("Not smoke and mirrors. Not a pipe dream. Not fake it `till you make it.").

1

2   I saw Ramesh's deep commitment to Theranos and saw firsthand how hard he
    worked tirelessly 7 days a week for so many years. I knew he had lost his father at

3   a relatively young age because he didn't get access to accurate diagnostics in time
    for his care. Ramesh' mission in life for so many years became to bring a change so

4   that others don't lose their loved ones because of lack of accurate and timely
    information about their health. For years, he put his heart and soul into building

5   Theranos. For years during the time he worked at Theranos, when he visited us, we
    could see that despite his long hours at work, it was this greater calling that drove

6   him.

7   Ex. 2 at 11.

8   **B.      Mr. Balwani worked tirelessly for Theranos and avoided the spotlight.**

9        After conducting his due diligence, Mr. Balwani decided to work for Theranos and invest

10  in the company. In September 2009, Mr. Balwani joined Theranos. The Board of Directors

11  reviewed several candidates and offered Mr. Balwani the role of Vice Chair of the company's

12  board. TX 20510 at 4. In his employment application to Theranos, Mr. Balwani requested a salary

13  of only $1 a year and said that he was available to work 16-hour days, seven days per week.

14  Ex. 15 at 1. Ultimately, the Board determined Mr. Balwani's annual salary should be $99,000—a

15  modest sum for a Silicon Valley COO but especially for someone like Mr. Balwani who had a

16  track record of business success and worked incredibly long hours every day of the week. In

17  August 2010, Theranos' distinguished Board of Directors recognized Mr. Balwani's hard work

18  and appointed him to the position of President and COO of Theranos. TX 20512 at 7.

19       Mr. Balwani devoted himself to the company and never put himself first. He did not even

20  seek to become famous as Theranos rose. He did the opposite. Indeed, media articles as late as

21  2018 note that Mr. Balwani had an "almost non-existent internet presence" and that he "stayed

22  away from the spotlight."[3] Mr. Balwani was singularly focused on realizing Theranos' vision.

23       Mr. Balwani believed Ms. Holmes was brilliant, and he spent over six years working

24  tirelessly, day and night, for the company she founded—often sleeping on a cot in his office. A

25  long-time friend who visited Mr. Balwani while he was working at Theranos observed that Mr.

26  Balwani was working "7 days a week and 16 hours a day to make Theranos a success and did not

27
    _____
28  [3] Lydia Ramsey, *The mysterious story of former Theranos president Sunny Balwani, who former
    employees saw as an 'enforcer' and now faces criminal charges of wire fraud*, YAHOO!NEWS
    (June 15, 2018).

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

even have the time to buy furniture for [his] drawing room." Ex. 2 at 57. A former Theranos employee describes Mr. Balwani's work ethic:

> We all worked hard and pushed our own limit, yet in comparison Sunny was tireless. He spent day and night in the offices. He tended to be the first in the door and the last to leave. While the rest of us went home to our friends and families –Sunny's family and home was Theranos.

Ex. 2 at 40.

## C. Mr. Balwani did not profit from Theranos.

Investor funds were put into research and development and the operations of the company. Indeed, the Theranos Board conducted an audit, which "found no evidence of fraud nor diversion of money." Dkt 1642-3 at 137. Even the Securities and Exchange Commission sought no disgorgement from Mr. Balwani, a recognition that he had no ill-gotten gains.

Numerous examples show that Mr. Balwani did not put his own financial interests before those of investors and patients. For instance, when Mr. Balwani learned that Theranos needed money to make payroll in 2009 in the challenging financial environment and recession at the time, he personally guaranteed a $10 million line of credit for Theranos. TX 20505; Ex. 17. In April 2010, Mr. Balwani increased his personal guarantee to $12 million. TX 20511. This was not an empty promise—Mr. Balwani had to set aside and give up his access to $12 million so that the lender could take it if Theranos defaulted.[4] Mr. Balwani was so eager to help the company that he never requested interest payments on these funds. And against the backdrop of a major recession, an investor saving a company as Mr. Balwani saved Theranos could have demanded far more extensive warrant rights and Board seats in exchange.[5]

Mr. Balwani was an investor in Theranos himself. Like the other investors in Theranos, he ultimately lost the millions he invested in the company, and he never once tried to cash out even a single share. Mr. Balwani invested $4,680,412 into Theranos: specifically, he invested $288,000

---

[4] So Han Spivey testified at trial that Mr. Balwani's personal guarantee functioned economically just like a loan from him to Theranos. *See* 4/5/22 Tr. 2077–79.

[5] *See Stock Warrants: Sweetening the Deal for Angel Investors*, Seraf Compass (last accessed Nov. 24, 2022) (explaining the common use of stock warrants to encourage angel investors to invest in a company), https://seraf-investor.com/compass/article/stock-warrants-sweetening-deal-angel-investors.

1   in 2010 to purchase 800,000 shares of Theranos stock; he invested another $3,825,912.82 in

2   August 2011 to purchase 4,593,363 shares of Theranos stock; and he invested $566,500 in

3   December 2011 to purchase 550,000 shares. Ex. 18. He paid taxes on these investments, TX

4   20130 at 20, and chose to exercise his stock options far earlier than his stock arrangement with

5   Theranos required. Mr. Balwani also gave Ms. Holmes millions of dollars so that she could

6   purchase additional shares from the company. By the end, Mr. Balwani owned more than

7   28,000,000 shares of Theranos stock, worth more than $500,000,000 at the height of the

8   company's value. Mr. Balwani thus chose to provide Theranos cash when it needed it, and he

9   never sought to cash out at any price, not when Theranos was at its peak and not even for

10  whatever he could get when he left the company in May 2016.

11  **D.    Mr. Balwani risked his health during global pandemics for Theranos.**

12          Mr. Balwani also risked his personal health for Theranos during two different global

13  pandemics. One of the many things that drew Mr. Balwani to Theranos was the potential for

14  Theranos technology to provide rapid test results in remote locations during times of global crisis,

15  such as pandemics and epidemics. Mr. Balwani was willing to do what it took to see the company

16  reach that potential.

17          In pursuit of this mission, Mr. Balwani traveled to the epicenter of the H1N1/swine flu

18  pandemic to run thousands of positive blood samples on Theranos technology as the company

19  was working to develop the H1N1 assay. Ex. 19. He traveled to Thailand from September to

20  December 2009; to Mexico City later in December 2009; and back to Thailand for several weeks

21  the following February. Rajesh, Mr. Balwani's brother, recalls Mr. Balwani's work during the

22  H1N1 pandemic:

23          I remember when he first started at Theranos, it was the peak of the H1N1 global
            pandemic. Instead of asking others at the company, Ramesh took upon himself to
24          travel to some of the riskiest hot zones of the H1N1 virus in India, Thailand and
            Mexico to help Theranos succeed. This would be equivalent to someone traveling
25          to Wuhan, China or even New York city during the peak of the recent covid crisis
            to conduct research. Our entire family was worried for his safety. We spoke with
26          him daily during this time to make sure he was safe. He told us he couldn't ask
            others at the company to risk their lives while he sat safely in his office in Palo Alto.
27          His focus was on work and research at Theranos. He risked his life to spend weeks
            in hospitals with people infected with this disease to help further the science that
28          would have helped Theranos and everyone.

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

1  Ex. 2 at 7.

2          During the Zika epidemic in 2016, just weeks before he left Theranos, Mr. Balwani

3  demonstrated the same commitment to the company and once again traveled abroad to aid

4  Theranos' research. This time, Mr. Balwani traveled to Colombia (another hot zone) to test

5  samples to assist in Theranos' research and development efforts relating to the Zika assay. PSR ¶

6  151.

7  **E.     Mr. Balwani trusted Theranos to run tests on his closest loved ones.**

8          Another example of Mr. Balwani's unwavering belief in Theranos is the trust he showed

9  in the company to run bloodwork for his closest loved ones. ███████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████████

13 ████████████████████████████████

14 ██████████████████████████████████████

15 ████████████████████████████████████████

16 ██████████████████████████████████████

17 ████████████████████████████████████

18 ████████████████

19 ██████████████████████████████████

20 ████████████████████████████████

21 ████████████████████████████████

22 ████████████████████████████████

23 ████████████████████████████████

24 ████████████████████████████████

25 ███████

26 Ex. 2 at 54.

27

28

1

**F.      Theranos was a legitimate company that developed valuable technology to achieve its meaningful mission.**

2

3      Theranos was a real and legitimate company. The government conceded this: "It was a

4   real company. They had employees. They had doctors. They had other professionals." 3/22/22

5   Tr. 1042 (government's opening statements). One of Theranos' former employees describes what

6   working at the company meant to her:

7          Working at Theranos was a dream come true for me. I am a person who has always
            looked to make a positive impact in the world. Theranos was a place where I could
8          not only grow my professional skills but do it for a mission that spoke deeply to me
            and the people who worked there. I was surrounded by people who were smart and
9          passionate about our mission: making healthcare accessible. Going to work every
            day was exhilarating. Knowing that whatever work we put in the outcome would be
10          transforming patient access to health. Making a real difference for real people was
            exciting and pushed us beyond our limits –how could it not? As someone who
11          worked with Sunny, it was clear to me that no one else in the company wanted more
            or put in more time to make the mission (our collective dream) a reality than Sunny.
12

13   Ex. 2 at 39.

14      In July 2015, Mr. Balwani saw the work of the talented Theranos scientists culminate in

15   Theranos receiving FDA clearance and a CLIA waiver of its HSV assay running on Theranos' 4-

16   series fingerstick technology. As the Court heard at trial, the submission to the FDA leading up to

17   this significant approval involved an enormous amount of work and testing of Theranos' device

18   and chemistries, including 2,931 pages of documents submitted to the FDA and an

19   estimated 17,208 hours worked by Theranos employees. TX 20183 at 10. The FDA does not

20   lightly grant clearance to medical devices.  It does not grant clearance to technology it thinks does

21   not work.

22      Former members of Theranos' Scientific and Advisory Board—all distinguished and

23   experienced in their own right—have written to the Court about the great value and innovation

24   behind Theranos' technology. While these members of Theranos' Scientific and Advisory Board

25   were tenured at Theranos primarily after Mr. Balwani's departure, their comments about

26   Theranos' technology substantiate that the technology was real and not a sham. These letters

27   speak about the very same technology that Mr. Balwani helped develop and believed would

28

1 change the world.[6]

2        For instance, Dr. Fabrizio Bonanni, former Executive Vice President of Amgen, has tried

3 to correct the common misconception about the promise of Theranos' technology:

> A story has been woven and re-told endlessly about faulty technology and even an
> absence of technology at Theranos. Nothing could be farther from the truth. The
> technology at Theranos was real, innovative, and had the potential to revolutionize
> the in-vitro diagnostic sector for the better. The company just ran out of time in its
> final steps of development. The fact remains that the work of Elizabeth Holmes and
> her collaborators generated over one thousand patents, which a very well-respected
> financial company valued at several hundred million dollars. Based on detailed and
> extensive analysis, this company decided to loan up to one hundred million dollars
> to Theranos in 2017 with the patent portfolio as a collateral.

9 Dkt. 1642-3 at 75.

10        Dr. Susan Evans, former President and Board member of the American Association for

11 Clinical Chemistry, says that she believes Theranos' technology would have been completed and

12 commercialized with additional time and funding. Dr. Evans speaks about Theranos' innovations:

> The technology and clinical concepts that Theranos championed are becoming a
> reality today. There are diagnostic platforms in development today targeted at the
> same market segment. I know of at least four such companies who are developing
> multi-disciplined (hematology, chemistry, and immunoassay), point of care systems
> for alternate site diagnostic testing. The two closest to commercialization have each
> raised—$150 million, demonstrating investors belief in the concept, the market, and
> the clinical need.

17 Dkt. 1642-3 at 129.

18        Ultimately, Theranos' work led to over 1,200 patents being issued around the globe.

19 Dkt. 1642-3 at 83. Mr. Balwani himself is listed as an inventor on many of these patents. Dr.

20 William Foege, former Director of the Centers for Disease Control, believes the number of

21 patents issued to Theranos is "an indication of the scientific work that was being accomplished."

22 Dkt. 1642-3 at 137. Mr. David Sokol, former deputy to Warren Buffett at Berkshire Hathaway

23 and current Chairman of Atlas Corp., highlights the value of Theranos' technology and patent

24 portfolio:

> The prosecution took every opportunity to paint the picture that Theranos was a
> fraud, a house of cards. … If their picture was correct, why did an unrelated financial
> institution pay in excess of $100 million to purchase the numerous patents …. The
> firm which purchased Ms. Holmes' patents had expressed a view that they may be

28 ───────────────

[6] Indeed, these letters are particularly notable given the authors' experiences with Theranos were
all after the regulatory inspections and negative media attention surrounding Theranos.

worth over $1 billion dollars. That is not a house of cards.

Dkt. 1642-3 at 243.

Dr. Don Tschirhart, former Theranos lab director, still believes Theranos' technology is brilliant:

> Near the end, we had an independent third party consultant evaluate the business case for the machine as it actually was and they concluded it would generate a billion dollars in revenue in the first ten years.
> ….
> Theranos also developed, tested and manufactured a system for micro blood draws, including transportation and loading of the specimens; this research is infinitely valuable to our future. I have heard people who have been misinformed compare Edison to a countertop chemistry analyzer; indeed there are many such systems on the market. Edison was a hundred times more than that, it was an entire laboratory in a package that could literally be put in a suitcase. The technology was brilliant. Additionally, the information system aspects were ground-breaking…. The potential uses were mind-blowing.

Dkt. 1642-3 at 262.

\* \* \*

Mr. Balwani gave his life to Theranos' mission and deserves this Court's leniency. One former Theranos employee has asked the Court to consider the following when sentencing Mr. Balwani:

> It's easy to look back and think of our time at Theranos as flawed and perhaps naïve (hindsight is 20/20). But making health accessible was our mission, and making that dream come true was our purpose. That couldn't have been truer for anyone than for Sunny. Because when what's on the line is making the world better for more people –who wouldn't give everything for that mission?

Ex. 2 at 40.

## IV.    SENTENCING GUIDELINES RANGE

The parties dispute the correct Guidelines range. While Mr. Balwani agrees that the base offense level for the offenses found by the jury is 7, *see* U.S.S.G. § 2B1.1(a)(1), and that he falls within Criminal History Category I, he contests several sentencing enhancements identified in the PSR.

In accordance with Criminal Local Rule 32-5(b)(1), Mr. Balwani addresses unresolved objections to the final PSR in Appendix A to this memorandum, filed under seal.

### A.    The government cannot meet its burden to prove fraud loss.

To begin, the evidence does not support increasing the offense level for loss under

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

1  U.S.S.G. § 2B1.1(b)(1). *See* PSR ¶ 73 (applying 30-point enhancement for losses greater

2  than $550,000,000.)

3        **1.**     **The government must show the amount of loss by clear and convincing**

4                         **evidence.**

5       First, the government must prove loss by clear and convincing evidence. *See United States*

6  *v. Jordan*, 256 F.3d 922, 929 (9th Cir. 2001) (holding that clear and convincing evidence is

7  required to prove disputed enhancements when "the challenged sentencing factors had an

8  extremely disproportionate effect on [the defendant's] sentence relative to the offense of

9  conviction"); *see also United States v. Lonich*, 23 F.4th 881, 910–16 (9th Cir. 2022) (articulating

10  the Ninth Circuit's six-factor test to determine when the government must prove facts underlying

11  disputed enhancements by clear and convincing evidence instead of a preponderance of the

12  evidence). The key issue is the effect that the disputed enhancement—here, loss—has on the

13  sentence. Here, the question is not close: increasing the offense level by 30 points, as the PSR

14  recommends—or even 10 or 15 points—dramatically increases the Guidelines range many times

15  over, requiring the heightened standard. *See id.*

16       The Ninth Circuit's decision in *United States v. Laurienti*, 611 F.3d 530, 556 (9th

17  Cir. 2010), is not to the contrary. There, the court explained that because the losses at issue

18  occurred due to the conspiracy of which the defendant was convicted, the preponderance standard

19  was appropriate. *See id.* But in *Laurienti*, the government presented evidence that the

20  misstatements, which involved public companies, were the but-for cause of the investments. *Id.*

21  at 536. Not so here. *Lonich* discusses this issue at length, reasoning that a conspiracy conviction

22  alone does not justify applying a preponderance standard when "[t]he jury's guilty verdicts do not

23  compel the conclusion—or even plausibly demonstrate—that the defendants through their

24  criminal conduct were responsible for" the losses. *Lonich*, 23 F.4th at 915. Indeed, in a hearing

25  last year in *United States v. Fahd*, No. 17-cr-00290-RSL (W.D. Wash. Sept. 16, 2021), the

26  Department of Justice conceded that the heightened standard of proof applied to a defendant who

27  pleaded guilty to conspiracy to commit wire fraud. *See* Ex. 43 (*Fahd* Sentencing Tr.) at 10. The

28  court there observed, and the government agreed, that the clear and convincing standard applied

due to the "dramatic impact [loss] has on the Guidelines." *See id.*

So too here. Investors—very few of whom testified at trial—received a wide range of information about Theranos, which did not distribute uniform materials the way public companies do. The jury did not find that any investors actually relied on misrepresentations in deciding to invest, and heard nothing at all about the bulk of the investments making up the PSR's and the government's asserted losses. "It thus cannot be said that defendants had ample opportunity at trial to challenge the government's evidence of the extent of losses caused by the conspiracy." *Id.* (internal quotation marks omitted). The Court can have no confidence that the jury found the facts underlying the alleged losses beyond a reasonable doubt, which would obviate the need for a heightened standard of proof here. The extraordinary effect of the asserted losses on the Guidelines range therefore requires proof of loss by clear and convincing evidence.

**2.      Proving loss requires showing that misrepresentations caused the loss.**

Second, courts calculating loss must consider economic reality and the legal concepts of but-for and proximate causation. As the Ninth Circuit has explained in requiring courts to consider the value of services rendered by a defendant in a contracting-fraud case, "fraud is not always the same as theft." *United States v. Martin*, 796 F.3d 1101, 1108 (9th Cir. 2015). The Guidelines incorporate a causation standard that, "at a minimum, requires factual causation (often called 'but for causation') and provides a rule for legal causation …." *Lonich*, 23 F.4th at 916–17 (internal quotation marks omitted). Intervening causes of loss can also break the chain of proximate causation. *See id.* at 917–18; *United States v. Hicks*, 217 F.3d 1038, 1048–49 (9th Cir. 2000). And "[i]f, after applying the normal rules of statutory interpretation, the Sentencing Guideline is still ambiguous, the rule of lenity requires [courts] to interpret the Guideline in favor of" the defendant. *United States v. Leal-Felix*, 665 F.3d 1037, 1040 (9th Cir. 2011). Finally, loss under the Guidelines includes only actual loss. *United States v. Banks*, _ F.4th _, 2022 WL 17333797, at *5–7 (3d Cir. Nov. 30, 2022).

Here, the government cannot prove causation in the first instance, and intervening causes after the conduct found fraudulent by the jury also disrupt the causal chain between that conduct and any losses incurred by Theranos investors. These failures of proof prevent the government

1    from meeting its burden to "reasonabl[y] estimate" loss. U.S.S.G. § 2B1.1 note 3(C).

2            Starting on the front end, Theranos had dozens of investors who chose to purchase shares

3    for a myriad of reasons. Because reliance is not an element of the conspiracy or wire-fraud counts

4    found by the jury, the verdict alone cannot prove that investors chose to invest because of

5    misrepresentations by Mr. Balwani or Ms. Holmes. Neither the government nor the PSR

6    examines the basis for each purported investor-victim's investment decision. That complete

7    failure of proof dooms the outlandish aggregated loss figures the government posits. Theranos

8    investors purchased shares over years based on different levels of knowledge about the company

9    and different interactions with the defendants. *See United States v. Zolp*, 479 F.3d 715, 719 (9th

10   Cir. 2007) (requiring courts, in cases of investment in otherwise legitimate companies where

11   investment prices were inflated by fraud, to "disentangle the underlying value of the stock,

12   inflation of that value due to the fraud, and either inflation or deflation of that value due to

13   unrelated causes"). Many alleged investor victims were Theranos employees or board members.

14   The overwhelming majority of investors did not testify, and the Court lacks evidence about what

15   informed their investments.[7]

16           For example, the PSR's loss figure necessarily includes $125 million that Rupert Murdoch

17   invested in February 2015, with no analysis of what Mr. Murdoch relied on and understood about

18   Theranos' business when he invested. *See* Dkt. 1647 at ¶ 73. Notably, the government has never

19   interviewed Mr. Murdoch himself about what he relied on, what he understood when he invested

20   in Theranos, and why he made the decision. The only potential source of information about

21   Mr. Murdoch's investment, an April 24, 2017 SEC interview of Murdoch's Chief of Staff Natalie

22   Ravitz, instead shows she was not deceived about Theranos' finances, projections, or the

23   capabilities of the technology. Ms. Ravitz testified that she understood with "confidence" that

24   Theranos' historical revenues were not significant.  Dkt. 1644-9 (Ravitz SEC Tr.) at 13. She

25   understood that the "full range" of tests Theranos' technology could perform was "dozens" of

26   tests. *Id*. at 34. She also testified that Ms. Holmes described how Theranos' technology "could"

---

[7] Due process requires that, to be used against a defendant at sentencing, hearsay statements must be corroborated by extrinsic evidence. *See United States v. Ponce*, 51 F.3d 820, 828 (9th Cir. 1995) (per curiam).

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

1    be used in military field hospitals and Medevac helicopters, not that it was already in such use. *Id.*

2    at 44–45. But most importantly, she testified under oath that she and her team asked fewer

3    questions than normal about Theranos' financial projections because Mr. Murdoch had already

4    verbally agreed with Ms. Holmes to invest before any meetings or any due diligence by

5    Mr. Murdoch's team. *Id.* at 67–68. This last point alone shows that the evidence cannot support

6    any finding that the offense conduct Mr. Balwani was convicted of caused Mr. Murdoch's loss of

7    almost $125 million for purposes of the Sentencing Guidelines analysis.

8          Even for some investments underlying particular wire-fraud counts on which the jury

9    convicted, the evidence either does not support or explicitly conflicts with any showing of

10   causation. Consider the DeVos family investment: None of the decisionmakers from RDV

11   Corporation (Count 7) testified at trial; Lisa Peterson's testimony cannot establish why RDV

12   decided to invest. In fact, the only RDV decisionmaker who has ever testified about Theranos

13   admitted in a related proceeding that he has no memory of what he learned from Theranos or why

14   RDV invested. Ex. 22 (DeVos SEC Dep. Tr.) at 56–58.

15        **3.      Intervening causes also doom the government's fraud loss argument.**

16         Intervening causation—events between the discovery of the conduct the jury found

17   fraudulent and the ultimate investor losses—also keenly demonstrates the government's total

18   failure to show fraud loss. Courts "should 'take a realistic, economic approach to determine what

19   losses the defendant truly caused or intended to cause, rather than the use of some approach that

20   does not reflect the monetary loss.'" *Martin*, 796 F.3d at 1110 (quoting *United States v.*

21   *Crandall*, 525 F.3d 907, 912 (9th Cir. 2008)).

22         By that standard, decisions made by the Board, investors, and Ms. Holmes on how to

23   spend or otherwise dispose of Theranos' enormous value after Mr. Balwani's departure from the

24   company—which if managed differently could have substantially and perhaps completely repaid

25   investors—is not attributable to Mr. Balwani. Mr. Balwani stopped working at Theranos in

26   May 2016 and formally left the company in July 2016, after the *Wall Street Journal* had already

27   published several investigative pieces on the company exposing the charged scheme, and after the

28   SEC and DOJ had already begun their investigations. In spite of all the negative publicity and

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

government scrutiny when Mr. Balwani left, Theranos still had hundreds of millions of dollars in the bank, as well as objectively very valuable intellectual property. What happened between his departure and the company's ultimate failure to recoup losses for its investors is not attributable to Mr. Balwani.

When Mr. Balwani left Theranos in May 2016, Theranos still had more than $350 million in cash. TX 5172. Besides this cash, Theranos owned a substantial number of patents that Mr. Balwani, Ms. Holmes, and Theranos scientists had developed throughout the history of the company and that created tremendous value to investors independent of the success or failure of the company. The company's intellectual-property assets were developed by the hard work of Theranos' management team, including Mr. Balwani, and the company's highly skilled employees. Theranos had a patent portfolio comprising hundreds of patents related to the design, manufacture, and operation of Theranos' proprietary fingerstick technology and other inventions. TX 4858 at 137–87.

Based on an arm's-length and independent look at the value of Theranos' patent portfolio, Fortress Investment Group[8] agreed to lend Theranos $100 million ($65 million funded at close with an additional $35 million to be disbursed based on Theranos meeting certain business milestones), secured entirely by the patent portfolio. Ex. 23 (Term Sheet).[9] ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████ Fortress is a highly sophisticated non-practicing entity with extensive experience evaluating patents and monetizing them. No arm's-length lender, let alone a highly sophisticated one like Fortress, would have made the loan that it did with a company

---

[8] According to its website, Fortress is "a leading, highly diversified global investment manager with approximately $44.4 billion of assets under management as of June 30, 2022. Founded in 1998, Fortress manages assets on behalf of over 1,900 institutional clients and private investors worldwide across a range of credit and real estate, private equity and permanent capital investment strategies. Investment performance is [the company's] cornerstone—[it] strive[s] to generate *strong risk adjusted returns* for our investors over the long term." (emphasis added). *See* fortress.com/about.

[9] The core patents of value were all applied for before Mr. Balwani left Theranos. *See* Ex. 27 (Perkins Coie IP Asset Overview) at 9–15.

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

1    reeling from publicly known government investigations and media hype about massive scandals

2    unless Theranos' IP portfolio was worth many multiples of the loan itself. *See supra* note 8; *see*

3    *also* Ex. 25 (Levy SEC Dep. Tr.) at 89–92.

4         Beyond Fortress' own arm's-length analysis and agreement to lend Theranos $100 million

5    based on the company's patents, a multinational law firm, Perkins Coie, independently analyzed

6    the patent portfolio in 2017 and concluded that "Theranos' patents are quite valuable." Ex. 27 (IP

7    Asset Overview). Perkins Coie estimated that the past and future revenue from sales of products

8    and services that may infringe Theranos patents was $3.548 billion. Based on these revenue

9    amounts, Perkins Coie estimated that the domestic and foreign licensing and revenue

10   opportunities associated with owning the patent portfolio was as high as $745 million. Exs. 26–27

11   (Patent Portfolio Overview and IP Asset Overview).

12        Other independent sources confirm that Theranos' intellectual property was immensely

13   valuable. For example, in 2017, *IEEE Spectrum*, a magazine edited by the Institute of Electrical

14   and Electronics Engineers—a professional organization devoted to engineering and applied

15   sciences—ranked Theranos third in a list of the "Technology World's Most Valuable Patent

16   Portfolios," beating household names like Johnson & Johnson, Gilead, Celgene, and others.

17   Ex. 28 (IEEE Spectrum ranking) As with the Fortress loan and the Perkins Coie analysis, this

18   ranking issued long after the facts giving rise to this prosecution were publicly known.

19        As for what became of Theranos' immense value, that is a story in which Mr. Balwani

20   played no part. After Mr. Balwani left Theranos, the company's board, officers, and investors,

21   charted the course for Theranos' operations, corporate governance, and business strategy going

22   forward. Mr. Balwani had no role in these decisions because he was no longer at the company or

23   otherwise involved with it. In 2017, months after Mr. Balwani's departure, investors were

24   approving transactions like the Fortress loan and a reorganization of Theranos' corporate-

25   governance structure to maximize Theranos' value as an ongoing concern and protect their

26   investments. Exs. 29–30 and TX 20601 (investor communications). All these decisions were

27

28

made with no input from Mr. Balwani.[10]

When Mr. Balwani departed, Theranos' value very likely exceeded the total investments, potentially by many millions of dollars. The government cannot prove otherwise, no matter the standard of proof the Court applies. Mr. Balwani did not participate in and had no power to affect the decisions made after he left Theranos. Thus, Mr. Balwani should not be held responsible for losses incurred by investors (a group that includes Mr. Balwani) due to decisions made by the Theranos Board of Directors, the company's officers, and the investors themselves. They could have made different decisions that returned value to investors.

### 4. The government's expert analysis is fatally flawed.

The report submitted by the government's expert, Mr. Saba, does not support a reasonable estimate of loss—no matter the standard of proof the Court applies. Instead, the wide range of potential losses turn on assumptions rooted in speculation and untethered to objective criteria. In fact, as the concurrently filed declaration of Scott Weingust (Ex. 46) reflects, Mr. Saba's approaches undervalue Theranos' equity by hundreds of millions of dollars. Applying the same methods that the Court used to calculate loss in Ms. Holmes' sentence (which was based on Mr. Saba's work), a reasonable estimate of potential loss would be tens of millions of dollars less than the Court determined. And the declaration of Tobin Reiff (Ex. 47) flags serious weaknesses with Mr. Saba's model for allocating equity among the various investors even after valuing the total Theranos equity, casting further grave doubt on the use of the Saba report in this criminal sentencing context. The uncertainties inherent in Mr. Saba's approach mean that the government has provided nothing to the Court for it to use to reasonably estimate loss.

To start, even on the Saba Report's own terms, the potential investor losses range from $237 to $316 million. Dkt. 1645 ¶ 15. An $80 million dollar range cannot constitute a reasonable estimate of loss. *See United States v. Hussain*, 2019 WL 1995764, at *5 (N.D. Cal. May 6, 2019)

---

[10] In fact, one of the investor letters referenced in the PSR underscores that events relevant to loss continued to unfold after Mr. Balwani left the company. *See* PSR ¶ 65 (RDV letter claiming that "[e]ven after the events that were the subject of the trial, Elizabeth Holmes and others at her direction, continued to withhold information from RDV and other investors during the 2016–17 time period when they were trying to salvage some value from their investment"). No matter the truth of RDV's claim, it shows that Theranos and investors continued to engage with one another and make decisions without Mr. Balwani, and any resulting losses are not chargeable to him.

1  (explaining that "a range is not an amount" and rejecting government's loss submission entirely

2  because of the large range—a billion dollars—at issue). This issue is even more acute once the

3  Court factors in Mr. Weingust's analysis and the criticisms of Mr. Saba's equity distribution

4  model by Mr. Reiff.

5        Turning to Mr. Saba's "income approach" to valuing Theranos' equity—on which the

6  Court relied at the Holmes sentencing—Mr. Saba uses an inflated rate of return in his discounted-

7  cash-flow analysis that rests on unreliable and antiquated data. *See* Ex. 46 (Weingust Decl.)

8  ¶¶ 13, 15–24. Using a more appropriate figure leads to a valuation of Theranos' equity of $1.48

9  billion as of December 31, 2014, the date the Court used to assess fraud loss in Ms. Holmes' case.

10  *See id.* ¶¶ 17, 24. This is almost half a billion dollars more than the $951 million-dollar valuation

11  using Mr. Saba's unreliable rate. *See id.* ¶ 24. Applying the Court's approach from the Holmes

12  sentencing and using the same investors identified by the Court as victims, *see* Ex. 44 (11/18/22

13  Tr.) at 79, 87–88, the resulting potential loss would be $59.9 million instead of $121.1 million.[11]

14  Ex. 47 ¶ 24.[12] Even without any other adjustments, this change alone would lead to a 2-point

15  reduction in the offense score calculated for Ms. Holmes. *See* U.S.S.G. § 2B1.1(b)(1).

16        As for Mr. Saba's alternative "asset approach" to valuation, Mr. Saba's analysis overlooks

17  a critical input discussed by authoritative sources: opportunity cost. To value intangible assets

18  like Theranos' technology and branding—which is necessary to valuing the company's total

19  assets—Mr. Saba purports to "measure the cost to obtain or reproduce functionally similar or

20  identical assets." Dkt. 1645 ¶ 106. But as Mr. Weingust explains, the circumstances here and

21  applicable professional standards in the valuation industry call for adding an "opportunity cost" or

22  "entrepreneurial cost" reflecting time and money needed to develop these assets that could have

23  otherwise gone to different uses. Ex. 46 ¶¶ 29, 33.  Mr. Weingust's report shows that this factor is

24  well-recognized and standardly applied in the field. *Id.* ¶¶ 27–28, 30–32. Mr. Saba, however,

25

26  [11] Investors knew that they were proceeding without any third-party valuation of Theranos and based on limited information. Any difference between the values calculated by Mr. Weingust— adapted from Mr. Saba's methods—and the price per share each investor paid is not necessarily attributable to fraud.

27

28  [12] Using a rate drawn from the same Aranca report that Mr. Saba relies on elsewhere, potential loss would be plummet to $30.7 million. Ex. 46 ¶ 25.

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

entirely ignores this step. *See id.* ¶ 29; *see also* Dkt. 1645 ¶ 109. Worse, he does so without explanation. As a result, his valuation under the asset approach is "incorrect and significantly understated." Ex. 46 ¶ 29. Correcting this error leads to still more valuations of Theranos' equity as of December 31, 2014, that are hundreds of millions of dollars greater than any of Mr. Saba's values. *See, e.g.*, *id.* ¶ 38 & tbl. 2.

Under either the income approach or the asset approach, excluding particular investors discussed above based on their unproven reliance (see *supra* at 24–25) would further slash the loss figures. *See, e.g.*, *id.* ¶ 40–41 & tbl. 3 (illustrating calculations for alleged loss ranging from $12 million to $62.3 million after eliminating the equity purchased by Rupert Murdoch, RDV, or both).

The problems with Mr. Saba's analysis do not stop there. Critically assessing Mr. Saba's dubious model for allocating equity compounds the uncertainty. As with the inputs discussed by Mr. Weingust in connection with Mr. Saba's two approaches, Mr. Saba's method of allocating equity among the various investors is "highly dependent on and sensitive to" two inputs that are "very difficult to determine for a private company such as Theranos and require an inordinately high level of speculation about the future." Ex. 47 (Reiff Decl.) ¶¶ 4–5. One of those inputs—the estimated period of time between the valuation date and the occurrence of a hypothetical future liquidation date—is "completely unknown, must be guessed, and cannot be tested for accuracy" *Id.* ¶ 6.[13] The other—the expected future volatility of the equity—is likewise "not observable for a private company." *Id.* ¶ 7.

The two inputs "can have an extremely significant impact on value." *Id.* ¶ 5. Here, when Mr. Saba's method for "determining the value of any class of securities of Theranos is inherently uncertain and based on speculation," *id.* ¶ 8, the result of such an analysis has no business being used as a basis to calculate a sentencing range that could mean a difference of many months or many years of someone's life. That uncertainty would make relying on Mr. Saba's report

---

[13] For example, Mr. Saba selects a 4-year period from the valuation date until a future liquidity event, but the evidence at trial consistently showed that investors were told—and expected—to be long-term investors and partners in Theranos. *See, e.g.*, 4/27/22 Tr. 3987–88, 4000–01, 4008–09, 5/10/22 Tr. 5152–53, 5236–37, 5/11/22 Tr. 5443–44.

1   improper even independent of the substantial undervaluing of Theranos' equity addressed by

2   Mr. Weingust.

3       In the end, the complexity and unreliability of Mr. Saba's analysis means that the

4   government has not provided evidence from which the Court can reasonably estimate loss. The

5   government has failed to meet its burden to prove a loss amount using any standard of proof.

6       **5.**    **The government has not proven losses sustained by patients.**

7       Nor can the government meet its burden to prove loss in connection with the patient

8   conspiracy. As with the investor counts, the government must show that patient losses were

9   *caused* by Mr. Balwani. But the government has presented no facts showing that more than a

10   handful of patients used Theranos because of representations to patients directly or through

11   marketing materials. More importantly, the Guidelines require that loss calculations credit the

12   defendant for "the fair market value of … services rendered, by the defendant or other persons

13   acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G.

14   § 2B1.1 note 3(E)(i); *see also Martin*, 796 F.3d at 1108–11. The government cannot prove loss

15   without providing evidence—thus far lacking—showing loss after accounting for the value of the

16   services patients received: the blood tests. The government's showing leaves unanswered several

17   critical questions:

18       &bull;   How many Theranos patients paid out-of-pocket for their blood tests?

19       &bull;   How many of those patients were tested on unmodified FDA-approved or cleared

20           technology instead of Theranos' proprietary fingerstick technology?

21       &bull;   How many of the paying patients received provably inaccurate test results?

22       &bull;   What is the value of otherwise accurate test results received by those few patients

23           who may have received one inaccurate result among their batter of tests?

24       The Court has ruled that patient victims are limited to those who paid for Theranos

25   clinical testing out-of-pocket; patients for whom insurers paid are not targets of the patient counts.

26   *See* Dkt. 330 at 33. And the government has not presented facts reliably identifying which

27   patients are victims under this standard. Next, many—indeed the large majority—of patients

28   received valuable services for money paid. As the government itself trumpeted throughout the

1    trial, much of Theranos' clinical blood-testing was performed on unmodified commercial devices,

2    the same devices that would have tested their samples had they used competing labs. The

3    government's own expert, Dr. Stephen Master, did not opine on the accuracy of Theranos' third-

4    party technology, "since it is identical to the testing performed in most labs in the U.S."

5    Dkt. 1153-2 at 47, 49.

6           Even for the blood tests that used Theranos' technology, which the government contends

7    were systemically flawed, the government has not offered evidence to meet its burden to show

8    which test results were accurate—and therefore provided substantial value to patients—and which

9    were inaccurate. The loss amount must reflect whatever value these patients received for services

10   rendered. And if losses cannot be reasonably estimated, they cannot enhance Mr. Balwani's

11   offense score.[14]

12           **6.     Using the defendant's gain as a proxy for loss leads to no proven losses.**

13          Fifth, because the losses here cannot be reasonably estimated, the defendant may use

14   Mr. Balwani's gain as an alternative. *See* U.S.S.G. § 2B1.1 note 3(B). That approach leads to no

15   loss enhancement under the Guidelines. Here, Mr. Balwani never sold a single share of Theranos

16   stock. In fact, he invested millions of dollars of his own money in the company—and lost every

17   penny of it. Those losses far outstrip Mr. Balwani's below-market salary during his time at

18   Theranos. And in any event, "[s]ince [Mr. Balwani's] salary, bonuses, and equity compensation

19   are, at least in part, the result of legitimate work, his salary, bonuses, and equity compensation

20   cannot be said to have 'resulted from the offense.'" *Hussain*, 2019 WL 1995764, at *6–7

21   (explaining that the court could not determine gain because it could not disaggregate the

22   defendant's legitimate compensation from his illegitimate compensation). The government has

23   conceded that Theranos was a real company doing legitimate work, and not a sham. The SEC did

24   not ask for any disgorgement of ill-gotten gains in its complaint against Mr. Balwani, because

25

26   ───────────────
     [14] Nor does the government's reference to a no-admission civil settlement executed by the State
27   of Arizona and Theranos years after Mr. Balwani's departure support any loss in connection with
     the patient-fraud counts. That settlement fails to distinguish between patients who paid out of
     pocket and those for whom insurance paid, and says nothing about the accuracy of individual
28   results. *See* Ex. 31 (*Arizona v. Theranos, Inc.* Consent Decree). It is moreover impossible to know
     what drove the numbers behind a negotiated settlement.

1    there are no ill-gotten gains. These concessions—amply supported by the record—doom any

2    effort to use Mr. Balwani's compensation to calculate gain even if Mr. Balwani's multi-million-

3    dollar losses did not themselves overwhelm any possible gain.[15]

4    **B.    The facts do not support an enhancement for a conscious or reckless risk of bodily**
     **injury.**

5

6         Next, the government's arguments in connection with Ms. Holmes' sentencing suggest

7    that it will seek a 2-point enhancement for crimes involving "the conscious or reckless risk of

8    death or serious bodily injury." U.S.S.G. § 2B1.1(b)(16)(A). The Probation Office is not

9    recommending this enhancement for Mr. Balwani. The Court correctly concluded that the

10   "evidence does not support that enhancement" during Ms. Holmes' sentencing. 11/18/22 Tr. 72.

11   And the government cannot prove facts supporting this enhancement by a preponderance of the

12   evidence.

13        At the outset, the Ninth Circuit has addressed the required showing needed to apply this

14   enhancement. In *United States v. Johansson*, 249 F.3d 848, 858 (9th Cir. 2001),[16] it held that "the

15   term 'conscious' means the defendant knew of the risk, and … 'reckless' should be 'interpreted

16   consistently with the generally understood requirements for a finding of recklessness or criminal

17   negligence.'" *Id.* at 859 n.4 (quoting S. Report No. 100-503 (Sept. 12, 1988)). As for those

18   generally understood requirements, the Model Penal Code explains that people act recklessly

19   when they "consciously disregard[] a substantial and unjustifiable risk." Model Penal Code

20   § 2.02. The Ninth Circuit's model jury instructions on securities fraud offer a similar definition of

21   reckless: "highly unreasonable conduct that is an extreme departure from ordinary care,

22   _____

     [15] Identical analysis makes an order of restitution inappropriate. While "property crimes" usually
23   entail mandatory restitution, *see* 18 U.S.C. § 3663A(c)(1)(A)(ii), express statutory exceptions
     preclude such an order here. At the outset, the statutory definition of victim requires that a person
24   have been "directly and proximately harmed as a result of the commission of an offense." *Id.*
     § 3663A(a)(2). That requirement necessarily incorporates the principles of but-for and proximate
25   cause discussed above. Without evidence on that front, the government cannot show restitution
     owed to victims. Even if the Court finds that some persons are victims under the statute, the
26   restitution statute "shall not apply" if the Court finds that "determining complex issues of fact
     related to the cause or amount of the victim's losses would complicate or prolong the sentencing
27   process to a degree that the need to provide restitution … is outweighed by the burden on the
     sentencing process." *Id.* § 3663A(c)(3)(B). That is the case here.
28   [16] When *Johansson* was decided, the bodily-injury enhancement was at U.S.S.G.
     § 2F1.1(b)(6)(A).

                                                              DEFENDANT BALWANI'S
                                                              SENTENCING MEMORANDUM
                                                              CASE NO. CR-18-00258-EJD

1    presenting a danger …, which is either known to the defendant or so obvious that the defendant

2    must have been aware of it." 9th Cir. Model Crim. Jury Instr. No. 15.47.

3        The evidence does not support—and indeed conflicts with—finding consciousness of, or

4    recklessness to, a risk of bodily injury. Beyond Ms. Holmes' arguments on this issue, which

5    Mr. Balwani adopts, the facts undermine any enhancement for creating a risk of bodily injury.

6    First, much of Theranos' blood testing relied on FDA-cleared or approved equipment, which the

7    government's own witnesses repeatedly held up as the gold standard in reliability. Even the CMS

8    inspection and report, which found deficiencies connected to commercial technology, does not

9    alter this analysis. For one thing, the CMS report and the inspection underlying it postdated the

10   vast majority of Theranos' clinical testing. For another, no evidence shows that Mr. Balwani

11   knew of any systemic deficiencies related to commercial testing before the CMS inspection.

12       And findings like those leveled against Theranos' lab rarely lead to the kind of

13   consequences that Mr. Balwani has faced. As Ms. Bennett told the government, "it's not unusual

14   for CMS to make a determination of [immediate jeopardy.]" Ex. 32 (Sarah Bennett MOI) at 5. In

15   March 2015, for example, Cleveland Clinic's Marymount laboratory received a surprise

16   inspection from CLIA surveyors.[17] The resulting 330-page survey report includes six Condition-

17   level deficiencies (Theranos had five), including an Immediate Jeopardy finding relating to

18   hematology and coagulation testing, just like Theranos. *See generally* Ex. 33 (Marymount

19   laboratory deficiencies). Three of the Condition-level deficiencies are the same as those found at

20   Theranos (Hematology, Technical Supervisor Qualifications and Testing Personnel

21   Qualifications). *See id.* at 70, 243, 327. CLIA surveyors also found that the Marymount lab was

22   not performing appropriate proficiency testing, another Condition-level deficiency not found at

23   Theranos. *See id.* at 1. Other deficiencies resembled those found at Theranos, like using expired

24   reagents, but in relation to testing for blood transfusion patients. Marymount laboratory

25   reportedly took over six months to correct all the deficiencies and was temporarily shut down and

26

27   _____

28   **[17]** *See* Brie Zeltner, *Cleveland Clinic Faces $650,000 Fine for Marymount Hospital Lab Violations; Patients in "Immediate Jeopardy," CMS Says*, CLEVELAND.COM (Sept. 11, 2015), https://www.cleveland.com/healthfit/2015/09/cleveland_clinic_faces_600000.html.

1   fined.[18] No one was criminally charged.

2          As for other testing, Dr. Rosendorff stood by the assay validation reports that he signed,

3   and testified that he never knowingly released an inaccurate patient result and that neither

4   Mr. Balwani nor Ms. Holmes ever pressured him to do so. *See* 4/22/22 Tr. 3537–38, 3555–56.

5   Dr. Rosendorff also confirmed—in response to the government's questioning—that if a sample

6   passes quality-control, as Theranos policy required, "it's impossible to know" whether a result

7   about to be sent to a patient is accurate. 4/26/22 Tr. 3763. If it was "impossible" for the laboratory

8   director, a medical doctor, to know whether a patient result was inaccurate, and that laboratory

9   director never believed that he was releasing any inaccurate results, then a layperson like

10  Mr. Balwani could not have consciously or recklessly disregarded patient safety.

11         Former Theranos employees have attested to Mr. Balwani's commitment to patient care,

12  accessibility, and safety:

13         During my time at Theranos, he made it clear that everything we were working on -
           a software application, a new patient workflow, a training, etc.- should always have
14         the patient experience in mind. On multiple occasions, Sunny offered to speak to
           patients and physicians directly to listen to their concerns, requested house visits for
15         patients that couldn't make it to one of our locations, and constantly asked for
           feedback on our in-house software to ensure it addressed the needs of employees
16         and customers. Although I wasn't always privy to the decisions being made across
           the company, in my experience, it was clear that Sunny was doing everything in his
17         power to make our mission a reality.

18  Ex. 2 at 35; Ex. 2 at 40 ("One of Sunny's proudest achievements was holding low prices for

19  patients – a key pillar in making health information accessible to patients.").

20         At Ms. Holmes' sentencing, the government pressed several arguments supporting the

21  bodily-injury enhancement that cannot withstand critical scrutiny.

22         First, the government's claim that the defendants did not "stop offering … problematic

23  tests" after concerns arose is simply untrue. 11/18/22 Tr. 15. The record is replete with examples

24  of Mr. Balwani deferring to Theranos' senior scientists and internal processes. The government

25  itself introduced an exhibit highlighting that Edison tests shifted to commercial technology well

26  before the CMS inspection in 2015. TX 4533. Indeed, fingerstick testing for many of those assays

27  stopped "well before the [2015 CMS] survey was scheduled." 5/4/22 Tr. 4956. Mr. Balwani also

28  ───────────────
    [18] *See* Zeltner, *supra*, note 17.

suggested moving Theranos' PT/INR assay to a commercial platform because of a lack of physician confidence in those results. Ex. 34. And Theranos' internal procedure for studying and correcting errors came into evidence in both trials. For hCG, for instance, while Dr. Rosendorff halted hCG testing on the Edison in May 2014, he approved the release of an hCG test result a few days later after Theranos' scientific team had studied the issue. TX 13875, TX 20565.

Second, at Ms. Holmes' sentencing, the government erroneously tied CMS's purported look at "the reliability and the accuracy of the tests that [Theranos] is generating" to Theranos' proprietary technology. But as Ms. Bennett told her colleagues in an internal CMS communication, "CMS does not inspect the technology of the proprietary device." Ex. 35 at 1. So CMS's analysis of accuracy did not relate to the viability of the technology itself, or to any "potential patient impact" of Edison tests[19] and Theranos' decision to void those tests. And in any event, Dr. Das' decisions to void tests after he was hired by Mr. Balwani and Ms. Holmes cannot inform whether Mr. Balwani consciously or recklessly created risk earlier in time when Theranos was conducting some testing on its own devices.

Third, the government's claim that a Walgreens consultant warned Ms. Holmes that inaccurate test results could cause harm and lead to her incarceration is meritless. *See* 11/18/22 Tr. at 13–14. The government's claim is based entirely on a hearsay statement by an individual who did not testify at either trial and is wholly uncorroborated by any other witness or document. To serve as a basis for sentencing Mr. Balwani, due process requires that such a hearsay statement be materially correct and corroborated by extrinsic evidence. *See United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir. 1993); *Ponce*, 51 F.3d at 828. It is neither. The government's own witnesses contest the consultant's uncorroborated account. Dr. Rosan, whom the government signaled it would call in the first half of Mr. Balwani's trial, provided sworn testimony in another proceeding that the outside consulting firm at issue had recommended that Walgreens proceed in its partnership with Theranos, and did not recall the consultant being excluded from meetings as the consultant claimed in his unsworn statements to the government. Ex. 36 (Rosan AZ Dep. Tr.)

---

[19] The government erroneously claimed that Theranos acknowledged a potential impact "for every test that had been performed on the Theranos technology," 11/18/22 Tr. at 22, but that assessment did not include tests run on modified predicates.

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

at 278–81. And Wade Miquelon, the then-Walgreens CFO who testified in Ms. Holmes' trial, denied ever hearing of any warning from the consultant or his firm not to proceed with Theranos. Ex. 37 (Miquelon AZ Dep. Tr.) at 197–204.[20] While the lack of corroboration means that the Court may not rely on the consultant's statements to sentence Mr. Balwani, the problems go further. On those issues for which contemporaneous documents exist, the documents consistently contradict the consultant's claims. His claims that Walgreens could never get the Theranos devices sent to Walgreens to work properly, for instance, conflict with not only Dr. Rosan's testimony but also Walgreens' real-time correspondence with Theranos. That evidence, much of it admitted in Mr. Balwani's trial, shows that Dr. Rosan, Patty Haworth, and others at Walgreens ran many tests on themselves and others, received results for those tests, and never raised a single concern about their accuracy, even after Dr. Rosan compared his own results to those he received from other labs. *See* Ex. 36 (Rosan AZ Dep. Tr.) at 105–08, 233–48; Exs. 38–39; TX 20442. These facts flatly contradict the consultant's claims about devices covered in tape that could not be used; the emails admitted in Mr. Balwani's trial and the others attached here show that Walgreens could run tests on these devices. Even the consultant's claim that no tour of Theranos' lab was allowed does not match Rosan and Miquelon's testimony that they toured Theranos' lab. In short, the consultant is not remotely credible, and the government's own witnesses and Walgreens' contemporaneous communications disprove his account. Relying on that account to support a sentencing enhancement would violate Mr. Balwani's Fifth Amendment rights.

Nor does the jury's verdict on the patient counts require applying the enhancement. None of the elements of conspiracy or wire fraud involve knowledge of, or recklessness to, a risk of bodily harm to patients or anyone else. All labs make errors, so the handful of alleged errors the government presented at trial are not particularly informative. And the theories the government pressed at trial do not show that the jury must have found that Mr. Balwani created a risk to patient safety. To reach its verdict, the jury could simply have concluded that Theranos' testing was no better than what was already available on the market and materially different from the

---

[20] Mr. Miquelon's testimony even undermined the consultant's unfounded claim that Ms. Holmes had falsely represented that a U.S. flag gifted to Walgreens had flown over the battlefields of Afghanistan.

1  fingerstick testing the government claimed the company promised—not that Theranos'
2  technology did not work or posed any danger. Indeed, the government proposed exactly that
3  theory in pretrial briefing, suggesting that Theranos promised patients (and investors) test results
4  that were *more* accurate than those available elsewhere. *See* Dkt. 1181 at 3 (arguing that the
5  defendants' representations "caused … patients to believe that Theranos' tests were *more*
6  accurate than the conventional tests previously available through competing labs"). The Court
7  approved this theory in a pretrial order. *See* Dkt. 1326 at 8 (referring to evidence that "Holmes
8  and Balwani falsely promised patients that *Theranos* could deliver test results with superior
9  accuracy"). And the government repeatedly made precisely this point during its closing
10 arguments. *See, e.g.*, 6/21/22 Tr. 6997, 7000–01, 7060–62. Falling short of that representation
11 would not risk harming patients given the quality of traditional laboratory testing.

12      To sum up, the PSR was right not to include the bodily-injury enhancement, and the Court
13 was right to reject it at Ms. Holmes' sentencing. The patient-count convictions do not require
14 imposing the enhancement here, and the facts do not support it. The enhancement is thus
15 improper.

16 **C.    No enhancement for Mr. Balwani's role in the offense is proper.**

17      The PSR proposes a 4-point increase on the theory that he was "an organizer or leader of a
18 criminal activity that involved five or more participants or was otherwise extensive …." PSR ¶ 76
19 (citing U.S.S.G. § 3B1.1(a)). Just as the Court concluded during Ms. Holmes' sentencing hearing,
20 this enhancement is improper. *See* 11/18/22 Tr. 81.

21      The government has not shown that Mr. Balwani was an organizer or leader of a criminal
22 activity that involved five or more participants or was otherwise extensive. The Guidelines
23 commentary confirms that this enhancement requires proof that a defendant was "the organizer,
24 leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 note 2. The
25 Ninth Circuit has held the same. *See United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018)
26 ("Nor is it sufficient for a defendant to have organized property or activities—the defendant must
27 have organized *participants*." (emphasis in original)). And here, the evidence does not show that
28 Mr. Balwani led or organized any participants in criminal conduct. By contrast, Ms. Holmes was

1   the principal: she founded the company, invented the technology, was the Chief Executive

2   Officer, was the final decisionmaker, and was the main point of contact with most investors,

3   several of whom never spoke to Mr. Balwani. Even if Mr. Balwani were Ms. Holmes' equal

4   rather than her subordinate, the enhancement would be improper. *See United States v.*

5   *Greenfield*, 44 F.3d 1141, 1145–46 (2d Cir. 1995) (collecting authorities and explaining that no

6   role adjustment is appropriate when the defendants are "equal partners").

7          Only after that first requirement is met does the Court look to the alternative bases for the

8   second prong: either 5 participants or otherwise extensive criminal activity. Because the first

9   prong is not met, the Court need not consider this analysis. They do not favor the government in

10  any event. The government charged only two coconspirators, and has not shown the existence of

11  others by a preponderance of the evidence. *See* U.S.S.G. § 3B1.1 note 1 (defining "participant" as

12  "a person who is criminally responsible for the commission of the offense"); *Holden*, 908

13  F.3d at 402–03 & n.9 (holding that district court erred in applying 2-level "organizer"

14  enhancement when two co-defendants were co-equal, and explaining that participants in a scheme

15  to defraud must independently and with the required *mens rea* have assisted in the criminal

16  enterprise under the direction of the organizer or leader).

17         Nor does Mr. Balwani's senior role at Theranos justify the enhancement for an "otherwise

18  extensive" criminal activity. That would be true only if the company's business were itself

19  criminal or wholly fraudulent, which the government has conceded is not the case. Enhancing the

20  offense level under these circumstances would turn every defendant—no matter the number of

21  other participants in the criminal activity—into a "leader" under the Guidelines if he was a leader

22  of otherwise innocent employees within a large company. The government's argument thus fails

23  for the same reasons the Court articulated in rejecting this enhancement at Ms. Holmes'

24  sentencing. *See* 11/18/22 Tr. 81. The lenity principles discussed above (at 23) also require

25  resolving doubts on this score in Mr. Balwani's favor.

26         This enhancement is therefore improper.

27

28

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

1

**D.    The correct Guidelines range is 4–10 months.**

2

Properly calculated, the total offense level is 7, with no more than 2 points added for an

3

offense with ten or more victims. *See* PSR ¶ 74. Based on that score and a background falling in

4

Criminal History Category I, the correct Guidelines range is 4–10 months incarceration.

5

As discussed below, a noncustodial sentence is appropriate here.

6

## V.    THE DEFENSE RECOMMENDATION

7

The Court must craft a "sentence sufficient, but not greater than necessary" to promote the

8

statutory aims of sentencing. 18 U.S.C. § 3553(a). The jury found Mr. Balwani guilty of a fraud

9

in which he realized no financial gain, the company had meaningful value, and Mr. Balwani was

10

not motivated by greed and never intended to hurt people. Mr. Balwani's conduct is atypical of

11

defendants in fraud cases, so the Court's holistic analysis under Section 3553(a) must account for

12

his unique circumstances: both who he is as a person and the sharp difference between the facts

13

here and those in a case in which the defendant pilfered millions of dollars in investor funds for

14

personal gain.

15

Those circumstances, considering the purposes of sentencing identified by Congress,

16

support a non-custodial sentence of probation.

17

**A.    The Guidelines range reflected in the PSR dramatically overstates the seriousness of the offense.**

18

19

While Probation and the government calculate the Guidelines range differently than

20

Mr. Balwani does, even Probation recognizes that the Guidelines sentence it concludes is

21

applicable would be "greater than necessary to achieve the statutory purposes of sentencing."

22

PSR ¶ 152. While Mr. Balwani agrees with this conclusion, Probation's proposed sentence does

23

not reflect the degree to which the Court should deviate from the Guidelines in order to account

24

for all the Section 3553(a) factors and achieve a reasonable sentence. To comply with Congress's

25

mandate in sentencing Mr. Balwani, the Court should consider the applicable Guidelines range,

26

but give it little or no weight if it credits the PSR's or the government's proposed fraud-loss

27

calculation.

28

As many courts and other commentators have observed, the Guidelines in general, and the

1   fraud-loss enhancements in particular, lead to draconian recommended ranges for fraud offenses.

2   Instead of accurately positioning a defendant's conduct along the scale of culpability as the

3   Guidelines are meant to, these sentences allow inflated loss figures to dominate the Guidelines

4   analysis to the exclusion of other factors both within the Guidelines and under Section 3553(a).

5   This is particularly problematic here because the fraud loss calculated by the government is, put

6   charitably, highly speculative.

7          Starting with other courts, Judge Rakoff of the Southern District of New York has

8   observed that the Guidelines—and especially the loss calculations they reflect—have often "so

9   run amok that they are patently absurd on their face" due to the "kind of 'piling-on' of points for

10  which the guidelines have frequently been criticized." *United States v. Adelson*, 441 F.

11  Supp. 2d 506, 510, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). Other judges

12  have expressed similar sentiments. *See, e.g.*, *United States v. Parris*, 573 F.

13  Supp. 2d 744, 745, 747–48 (E.D.N.Y. 2008) (reasoning that applying 18-point loss enhancement

14  was "patently absurd"). Judge Garaufis of the Eastern District of New York summed up his

15  frustration with the loss enhancements and their disconnect from the ends of justice:

16          The upshot of all this is that … the Guidelines would have this court place Johnson
            in jail for almost a decade without batting an eyelash simply because of the sizeable
17          profit from the frontrunning trades. The Guidelines do not ask the court to consider
            the duration of the criminal activity, Johnson's *mens rea*, the character of the loss,
18          or any other factors that might allow the court to impose a sentence based on
            Johnson's worth. No, the threefold increase in Johnson's offense level does not
19          come as a result of any of these significantly more important considerations. As far
            as this court can tell, the Sentencing Commission's loss-enhancement numbers do
20          not result from any reasoned determination of how the punishment can best fit the
            crime, nor any approximation of the moral seriousness of the crime.
21

22  *United States v. Johnson*, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (paragraph break

23  omitted). These criticisms highlight the unfairness of placing so much weight on financial loss in

24  fraud cases. Other commentators have expressed similar criticisms. *See, e.g.*, Barry Boss and

25  Kara Kapp, *How the Economic Loss Guideline Lost Its Way, and How to Save It*, 18 OHIO ST. J.

26  CRIM. L. 605, 617–20 (2021) (also highlighting that "the loss tables are entirely insensitive to

27  motive").

28          The concerns are particularly apt here when Mr. Balwani realized zero gain—in fact

- 41 -

incurring millions in losses—and Theranos was a real company creating real value for its

investors and patients. As the Boss and Kapp article reflects, even a loss of $3.5 million, with no

other enhancements, would lead to a Guidelines range of 57–71 months (about 4-and-a-half to 6

years)—comparable to recommended sentences "for arson, aggravated assault or robbery

involving serious bodily injury, and transmission of biological weapons causing serious bodily

injury." *Id.* at 619. Nor did the Sentencing Commission develop the current loss table "using an

empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723

F.3d 366, 379–80 (2d Cir. 2013) (Underhill, J., concurring) (calling the loss enhancement

Guideline "fundamentally flawed, especially as loss amounts climb"). Thus, the table's

relationship to actual court-ordered sentences is as dubious as its value as a proxy for culpability.

The Guidelines range proposed by the PSR should bear almost no weight in determining the

proper sentence here given it would result in an unreasonably high sentence based on the unique

circumstances of this case.**21** As discussed above, using the guidelines range driven by the loss

table is especially problematic here in view of the highly uncertain and speculative nature of the

loss calculations performed by Mr. Saba.

**B.      No period of incarceration is needed for specific deterrence or to protect the public.**

One important goal of sentencing is to protect the public from further crimes of the

defendant. Imprisonment is not necessary to achieve this goal**22** because there is no likelihood of

Mr. Balwani re-offending. Mr. Balwani had a long and upstanding business career before his

involvement with Theranos. Mr. Balwani has tried to do the right thing throughout his life and

has shown incredible devotion to his family and community. He has lived a generous life guided

by the values instilled in him by his family and faith. He is not a danger to society, and is nearing

---

**21** In some cases, the loss table in the Guidelines may be a better proxy for culpability, so it is not surprising that courts have imposed prison sentences on other fraud defendants. But here, even beyond the government's failure to prove fraud loss, the conduct at issue and the loss table are such a poor match that the table should play little or no role in sentencing Mr. Balwani.

**22** In fact, a recent meta-analysis of 116 studies concluded that "custodial sentences have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation." Damon M. Petrich et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review*, 50 CRIME & JUSTICE 353, 353, 401 (2021) (concluding that "the limited effects of custodial sanctions on reoffending should be viewed as *a criminological fact*" (emphasis in original)). The article is attached as Ex. 40 for the Court's convenience.

1    the age of retirement. His perfect compliance with the conditions of his bond while these

2    proceedings were ongoing show that he will respect the law.

3            The jury's verdict has already taken a significant toll on Mr. Balwani. He has lost

4    everything he worked for and his case—and its outcome—is widely known in Silicon Valley and

5    throughout the country. Mr. Balwani also faces substantial civil exposure, including in an

6    enforcement action brought by the Securities and Exchange Commission and an ongoing class

7    action brought by Arizona plaintiffs. CMS restricted Mr. Balwani from operating a laboratory for

8    several years—and the notoriety of this case will prevent him from ever operating one again or

9    serving as a director or officer of a company. He has no criminal record and has always abided by

10   his bond conditions. The aims of specific deterrence are more than satisfied with a non-custodial

11   sentence.

12   **C.      A custodial sentence is not necessary to achieve general deterrence.**

13           The goals of general deterrence are more than satisfied with a non-custodial sentence.

14   First, empirical research and the reasoning of many courts undermine any link between lengthy

15   imprisonment and greater deterrence of white-collar crimes. *See, e.g.*, *Adelson*, 441 F. Supp. 2d

16   at 514 ("[T]here is a considerable evidence that even relatively short sentences can have a strong

17   deterrent effect on prospective 'white collar' offenders."); U.S. Sentencing Comm'n, *Measuring*

18   *Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 30 (2004)

19   (research study concluding that fraud had the lowest rearrest rate for recidivism offenders when

20   compared with firearms offenses, robbery, immigration, drug trafficking, larceny, and others)[23];

21   Richard Frase, *Punishment Purposes*, 58 STAN. L. REV. 67, 80 (2005) (white-collar and

22   regulatory offenders are more likely to be deterred, even by selective enforcement and modest

23   penalties; such offenders have many lawful alternatives and much to lose from being convicted,

24   no matter the penalty); Lucian E. Dervan, *White Collar Overcriminalization: Deterrence, Plea*

25   *Bargaining, and the Loss of Innocence,* 101 KY. L.J. 723, 740–41 (2012–13) (arguing that the

26   length of a carceral sentence is irrelevant to deterrence of white-collar offenders).

27

28   _____

[23] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

1    Recent research suggests that the risk of indictment and conviction alone has a significant

2    and adequate deterrent effect on corporate executives. *See* Daniel S. Nagin & Greg Pogarsky,

3    *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General*

4    *Deterrence: Theory and Evidence*, 39 CRIMINOLOGY 865, 865 (2001) (certainty of apprehension

5    and punishment generally, and not certainty of imprisonment, is what reduces crime); Mirko

6    Bagaric et. al., *Halting the Senseless Civil War Against White-Collar Offenders: "The Conduct*

7    *Undermined the Integrity of the Markets" and Other Fallacies*, 2016 MICH. ST. L.

8    REV. 1019, 1067–68 (2016) ("The keys to reducing crime are…putting in place systems and

9    investigative processes that will make prospective offenders believe that if they do offend there is

10   a high chance that they will be detected and prosecuted.").

11   The circumstances here make incarceration particularly unnecessary to deter others.

12   Throughout Silicon Valley—in fact, throughout the country—the story of Theranos and its

13   downfall is known to entrepreneurs and executives as a cautionary tale. The Theranos story has

14   led to a bestselling book, two podcasts, a hit tv series, an HBO documentary, and a forthcoming

15   Hollywood film. Both trials and their respective verdicts were covered extensively by thousands

16   of articles in national and regional media. Because of the extensive media coverage surrounding

17   Mr. Balwani's legal proceedings, Mr. Balwani has lost his career, his reputation, and his ability to

18   meaningfully work again—and everyone knows it. Entrepreneurs and other businesspeople in

19   Silicon Valley are also aware of Ms. Holmes' trial and sentencing, especially given the media's

20   intense focus on Ms. Holmes as the face of Theranos. This case will be talked about for years in

21   Silicon Valley, and is already being discussed in conferences and classrooms throughout the

22   country. These facts confirm that a custodial sentence for Mr. Balwani is not necessary, as the

23   aims of general deterrence have already been achieved.

24   **D.    Mr. Balwani's role in the conduct found by the jury was demonstrably less central to
         the counts of conviction than Ms. Holmes' conduct.**

25

26   No matter the respective juries' decisions in the two trials, the facts show that Ms. Holmes

27   (not Mr. Balwani) was the founder and principal executive of Theranos. Both the PSR and the

28   government's filings emphasize Ms. Holmes' position at the top of the Theranos hierarchy and

1  her unequaled role in the offense conduct. *See, e.g.*, PSR ¶¶ 9, 10, 20; Dkt. 1649 at 29 (noting

2  Ms. Holmes' "ultimate authority" at Theranos and role "at the top of the CLIA lab operation," in

3  an org chart). The government has told this Court that "Holmes, quite literally, was the face of

4  Theranos. She was its only CEO, she chaired its board, and she held the greatest equity stake in

5  the company. Her persona, not Mr. Balwani's, generated interest from investors, partners, and the

6  media." Dkt. 313 at 25. She was, in the government's words, "the most responsible party." *Id.*[24]

7      Sentencing entails an individualized assessment of each defendant. Courts "consider every

8  convicted person as an individual and every case as a unique study in human failings that

9  sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United*

10  *States*, 552 U.S. 38, 52 (2007) (citation omitted). The Sentencing Guidelines reflect this same

11  understanding, even for conspiracies and schemes undertaken by more than one person: "Because

12  a count may … include the conduct of many participants over a period of time, the scope of the

13  'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire

14  conspiracy …." U.S.S.G. § 1B1.3 note 3(B). "Acts of others that were not within the scope of the

15  defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant,

16  are not relevant conduct …." *Id.*; *see also United States v. Spotted Elk*, 548 F.3d 641, 673–74 (8th

17  Cir. 2008) (explaining courts' obligation to individually assess each defendant's role). Thus,

18  assessing the circumstances of the offense is no formulaic exercise in adding and subtracting

19  convictions and acquittals. It instead requires carefully considering the evidence.

20      Applying these principles, the Court should consider that Mr. Balwani played a lessor role

21  in much of the conduct core to the offenses the jury found, and his role was secondary to that of

22  Ms. Holmes in other instances. Everything from his later arrival to Theranos, to his position

23  subordinate to hers as the CEO, to his minimal involvement in Theranos' pharmaceutical and

24  military relationships and interactions with the press, supports this conclusion.

25      To begin, Mr. Balwani did not start Theranos. He was never Theranos' most significant

26  shareholder. He did not conceive the blood-testing technology that drove the company's promise.

27

28  [24] The government stressed this point again at Ms. Holmes' sentencing, proclaiming that "her authority was second to none" and that she had the power to dismiss members of the Board and to terminate any employee at the company, including Mr. Balwani. 11/18/22 Tr. 32–33.

1    And he did not have the final say on Theranos' strategy. When he arrived in 2009, the company

2    had been operating for six years and had already attracted a prominent Board of Directors.

3    Indeed, several investors underlying specific counts of conviction (Counts 3, 4, and 5), had

4    already invested in Theranos in 2006. For those investors about whom the Court has heard

5    evidence, Ms. Holmes—not Mr. Balwani—was the principal point of contact for all but one. In

6    fact, several investors, such as Mr. Lucas and Mr. Tolbert—and the Hall Group for which

7    Mr. Tolbert worked—had no contact of any kind with Mr. Balwani. *See* 4/29/22 Tr. 4471,

8    5/13/22 Tr. 5635–36; *see also* Ex. 41 (Hall SEC Dep. Tr.) 66, 119.

9        Daniel Edlin and other witnesses confirmed that it was Ms. Holmes, not Mr. Balwani,

10   who spearheaded Theranos' relationships with pharmaceutical companies, which began before

11   Mr. Balwani joined the company. *See* 4/6/22 Tr. 2339, 4/15/22 Tr. 2781, 5/3/22 Tr. 4553. Indeed,

12   the two pharmaceutical company personnel that the government called as witnesses had never

13   met or heard of Mr. Balwani. *See* 4/5/22 Tr. 2339; 5/3/22 Tr. 4578. So too with Theranos'

14   relationship with the military. 4/15/22 Tr. 2736. Mr. Edlin testified that Ms. Holmes, not

15   Mr. Balwani, had the relationships with the key players at the different branches of the U.S.

16   military, and that she was the one leading the company's efforts in fostering those relationships.

17   4/15/22 Tr. 2736.

18       It was not Mr. Balwani's face that appeared on the covers of magazines; it was not

19   Mr. Balwani who gave TED Talks and repeated televised interviews. In fact, media accounts of

20   the Theranos story, even years after the government's investigation began, have described

21   Mr. Balwani as "mysterious"[25] and a "virtual ghost online."[26] Ms. Holmes was the lead player in

22   Theranos' press-relations strategy and activities. Even the government's sentencing memorandum

23   for Ms. Holmes highlights an email with Theranos employees working "to provide journalist

24   Roger Parloff with requested information" for a *Fortune* article about Ms. Holmes. Dkt. 1649

25   

---

26   [25] Morgan Leigh Davies, *Sunny Balwani Is Still Awaiting Trial for His Involvement in Theranos*, BUSTLE (updated Feb. 23, 2022), https://www.bustle.com/entertainment/where-is-sunny-balwani-now-trial.

27   [26] Rebecca Robbins, *Theranos's Mystery Man Revealed: Rare Footage of Sunny Balwani Was Hiding in Plain Sight*, STAT (Mar. 20, 2018), https://www.statnews.com/2018/03/20/sunny-balwani-video/.

28   

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE No. CR-18-00258-EJD

at 29. But the exhibit the government references does not copy Mr. Balwani, nor was he

responsible for any of the listed action items. *See* Ex. 42 (Holmes TX 1753). While Mr. Balwani

sat for a recorded interview with Mr. Parloff, the government has not identified

misrepresentations, or even relevant information, from that interview; surely if the government

found any of that interview misleading, it would have sought to offer the interview into evidence.

Perhaps most significantly, it was Ms. Holmes, not Mr. Balwani, who altered reports

about Theranos' relationship with pharmaceutical companies to add those companies' logos and,

in some instances, change their conclusions. *See* Ex. 45 (Holmes Tr.) 7477–78, 8154. The

Holmes jury apparently considered these acts to be among the "smoking guns" that led to

Ms. Holmes' conviction.[27] No evidence suggests that Mr. Balwani knew that *any* pharmaceutical

reports were altered without authorization, and in fact the "enhanced" version of the report related

to the Theranos–Pfizer relationship was the only version that Mr. Balwani ever saw. The

conclusions of these reports precisely tracked the representations Theranos made to Mr. Balwani

before he joined the company: that "Theranos' technology has been robustly validated" and that

the company's clients "include AstraZeneca, BMS, Celgene, GSK, J&J Centocor, Mayo Clinic,

Merck, Pfizer and others." Dkt. 1327-3 at 162.

Given these facts, the Court should impose a sentence for Mr. Balwani dramatically less

severe than the one imposed on Ms. Holmes.[28]

---

[27] Sara Randazzo & Meghan Bobrowsky, *Jury in Elizabeth Holmes Trial Seized on Two 'Smoking Guns' to Convict Theranos Founder, Juror Says*, WALL ST. J. (Jan. 6, 2022), https://www.wsj.com/articles/jury-in-elizabeth-holmes-trial-seized-on-two-smoking-guns-to-convict-theranos-founder-juror-says-11641503502.

[28] Ms. Holmes' accusations that Mr. Balwani abused her can play no role in sentencing him. The PSR includes no such allegations, and due process requires that information used to sentence Mr. Balwani be materially correct, and that hearsay evidence be corroborated. *See Petty*, 982 F.2d at 1369; *Ponce*, 51 F.3d at 828. Here, Mr. Balwani categorically denies Ms. Holmes' claims. And those explosive claims are hearsay—that Ms. Holmes testified about aspects of them in her own trial does not cure the hearsay as applied to Mr. Balwani since he had no opportunity to cross-examine her. *See* Fed. R. Evid. 804(b)(1)(B). Portions of Ms. Holmes' Rule 12.2 submissions and even of her sentencing memorandum discussing the purported abuse have been redacted, and Mr. Balwani has not seen all the unredacted claims. *Cf. Bradley v. District of Columbia*, 107 A.3d 586, 598 (D.C. 2015) (noting that defendant has a right to be informed of information a court considers in imposing a sentence); *see also* Fed. R. Crim. P. 32(i) (requiring court to provide or summarize any information excluded from PSR under provisions shielding certain mental-health and other sensitive information before relying on that information at sentencing).

1  **E.     A custodial sentence is unnecessary to serve the ends of justice and would not**
2         **account for Mr. Balwani's character.**

3         Section 3553(a) gives this Court leeway to consider the "kinds of sentences available,"

4  including, where appropriate, non-custodial sentences. 18 U.S.C. § 3553(a)(3). The Supreme

5  Court has recognized that non-custodial sentences, though less severe, represent "a substantial

6  restriction of freedom." *Gall*, 552 U.S. at 48. Similarly, "[o]ffenders on probation are nonetheless

7  subject to several standard conditions that substantially restrict their liberty." *Id.* (quoting *United*

8  *States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that

9  probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'")). Incarceration

10  is not necessary for deterrent and punitive impact. *See United States v. Edwards*, 595

11  F.3d 1004, 1016 (9th Cir. 2010); *see also United States v. Whitehead*, 532 F.3d 991, 993 (9th

12  Cir. 2008) (acknowledging the district court's power to engage in individualized sentencing and

13  affirming a probationary sentence for a defendant who committed fraud in excess of $1 million).

14         The Court should exercise leniency and fashion a non-custodial sentence that would

15  recognize all the mitigating factors that justify a substantial deviation from a Guidelines sentence.

16                              **VI.     CONCLUSION**

17         For these reasons, Mr. Balwani asks the Court to impose a sentence of probation. Barring

18  that, a non-custodial sentence conditioned on home-confinement is proper.

19         The PSR recommends a total fine of $25,000, plus a $1,200 special assessment. Dkt. 1647

20  at 48. Any fine should be waived if the Court imposes restitution, and in any event should be left

21  to the pending civil cases against Mr. Balwani.[29]

22

23

24

25

26

27

28

---

[29] The SEC is seeking a fine in the action pending before this Court. The pending consumer class action in Arizona also seeks punitive and treble damages that, if imposed, would further justify waiving any additional fine here.

DEFENDANT BALWANI'S
SENTENCING MEMORANDUM
CASE NO. CR-18-00258-EJD

DATED: November 30, 2022

Respectfully submitted,

ORRICK HERRINGTON & SUTCLIFFE LLP

By:  */s/ Jeffrey B. Coopersmith*
Jeffrey B. Coopersmith

Attorney for Defendant
RAMESH "SUNNY" BALWANI