# EXHIBIT 27

# PERKINSCoie

**COUNSEL TO GREAT COMPANIES**

- August 17, 2017

# Overview of Theranos' IP Assets and Near-Term Licensing Opportunities

Perkins Coie LLP

PC0000001

# Introduction to Theranos' Patent Portfolio



PC0000002

## Theranos Has a Robust and Young Patent Portfolio

- Worldwide: Approximately 1,144 total assets
  - 318 granted patents

- United States: Approximately 316 total assets
  - 107 granted patents
  - 209 pending applications

PC0000003

# Distribution of Theranos' Portfolio Worldwide



| | US | AU | EP | CN | KR | CA | JP | SG | IL | MX | HK | IN | NZ | WO | Other* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Grant | 107 | 22 | 8 | 11 | 24 | 2 | 16 | 0 | 0 | 7 | 31 | 2 | 0 | 0 | 16 |
| ■ Application | 131 | 42 | 53 | 49 | 34 | 54 | 38 | 44 | 44 | 35 | 0 | 25 | 22 | 8 | 17 |

Source: Innography, independent analysis. Includes active assets (grants and published applications) (Patent data provided as of August 16, 2017).
*Other consists of the following additional jurisdictions: RU, TW, ES, BR, DK, AR, AT, PT.

PC0000004

# Theranos Portfolio Expiration Histogram (U.S. Patents)



Source: Innography, independent analysis. Includes active US grants (Patent data provided as of August 16, 2017).

PC0000005

# Theranos Portfolio Innography Strength Ranges



Source: Innography, independent analysis. Includes active grants (Patent data provided as of August 16, 2017).
Strength Ranges are based on Innography's proprietary algorithm designed to identify (objectively) the strength of a patent.

PC0000006

## Top 20 Assignees for Theranos' Top 10 Class Codes

| Rank | Ultimate Parent | Asset Count |
|---|---|---|
| 1 | Theranos Inc. | 328 |
| 2 | Siemens AG | 231 |
| 3 | Unassigned | 202 |
| 4 | Olympus Corporation | 112 |
| 5 | Roche Holding Ltd. | 105 |
| 6 | Sony Corporation | 103 |
| 7 | Sysmex Corporation | 95 |
| 8 | Proteus Digital Health, Inc. | 90 |
| 9 | Johnson & Johnson | 80 |
| 10 | Hitachi, Ltd. | 79 |
| 11 (tie) | Heartflow Inc | 78 |
| 11 (tie) | Nokia Corporation | 78 |
| 13 | Samsung Electronics Co., Ltd. | 75 |
| 14 | Medtronic plc | 71 |
| 15 | Koninklijke Philips NV | 66 |
| 16 | Huawei Technologies Co., Ltd. | 65 |
| 17 | Fujitsu Limited | 64 |
| 18 | Meso Scale Technologies LLC | 54 |
| 19 | International Business Machines Corp. | 52 |
| 20 | Canon Inc. | 51 |

Top 10 CPC codes are based on WW active assets (i.e., grants and published applications). Unassigned are assets without recorded assignments at the national PTOs.  Source: Innography (Patent data provided as of August 16, 2017).

PC0000007

## Theranos' Patents Are Quite Valuable

- High (90+) Innography Ratings
- Strong claims, as assessed by Perkins Coie
- Coverage over technology that the market uses, and likely to be infringed by competitors
- Technology that Theranos views as central to POC / Diagnostic devices
- Many years until patent terms expire
  - You should perform your own analysis to assess the strength of these patents

PERKINSCOIE

PC0000008

# Example: U.S. Patent No. 8,283,155

**Title:** Point-of-Care Fluidic System and Uses Thereof

**Priority Date:** May 9, 2005

**Expiration Date:** July 4, 2026



# Example: U.S. Patent No. 8,679,407

**Title:** Systems and Methods for Improving Medical Treatments

**Priority Date:** May 9, 2005

**Expiration Date:** April 26, 2027



PC0000010

# Example: U.S. Patent No. 8,841,076

**Title:** Systems and Methods for Conducting Animal Studies

**Priority Date:** March 24, 2006

**Expiration Date:** June 21, 2029



PC0000011

# Example: U.S. Patent No. 8,741,230

**Title:** Systems and Methods of Sample Processing and Fluid Control in a Fluidic System

**Priority Date:** March 24, 2006

**Expiration Date:** June 21, 2029



PC0000012

# Example: U.S. Patent No. 8,470,524

**Title:** Reducing Optical Interference in a Fluidic Device

**Priority Date:** October 13, 2006

**Expiration Date:** October 13, 2026



# Example: U.S. Patent No. 8,012,744

**Title:** Reducing Optical Interference in a Fluidic Device

**Priority Date:** October 13, 2006

**Expiration Date:** July 15, 2028



PC0000014

# Example: U.S. Patent No. 8,883,518

**Title:** Systems and methods of fluidic sample processing

**Priority Date:** August 6, 2007

**Expiration Date:** August 6, 2028



PC0000015

# Identified Potential Infringement Claims

| Product | 8,283,155 | 8,841,076 | 8,679,407 | 8,470,524 | 8,012,744 | 8,883,518 | 8,741,230 |
|---|---|---|---|---|---|---|---|
| | ● | | ● | | | | ● |
| | | | ● | | | | |
| | ● | ● | | | | | |
| | | ● | | | | | |
| | ● | ● | | ● | ● | | |
| | | | | ● | ● | | |
| | | | | ● | ● | | |
| | ● | | | | | | |
| | ● | | | | | ● | |

Based on Presently-Available Information & Analysis; Subject to Change; Not a Guarantee of Infringement or Successful Litigation Result

**Perkins**Coie

PC0000016



**PERKINS**COIE

PC0000017

# Example of a Target Infringement Read:

Overview of product

# Example of Target: █████████ (cont'd)



PC0000019

# Example of Target: ▮▮▮▮▮▮▮▮▮▮ (cont'd)



PC0000020

# Example of Target: ▮▮▮▮▮▮▮▮▮▮ (cont'd)



PC0000021

## Example of Target: ▮▮▮▮▮▮▮▮▮▮▮ (cont'd)



Example of Target: ████████████ (cont'd)



PC0000023

# Example of Target: ▮▮▮▮▮▮▮▮▮▮ (cont'd)



PC0000024

## Example of Target: ██████████████ (cont'd)



PC0000025



# Potential Revenue Opportunities from Theranos' Patent Portfolio

PC0000026

# Disclaimers / Understanding The Assumptions At Work

- This slide deck provides an estimate of revenue opportunities, which is intended for Theranos' internal assessment of its IP
  - Analysis is based on limited available information and assumptions based on licensing trends and historical experiences
  - The quality of public information—and therefore the quality of estimates—varies between target companies
  - Neither Theranos nor Perkins Coie represents that these revenue figures or projections are accurate
- The figures and analysis herein are being presented for discussion purposes only
  - You should not rely on the figures or analysis contained herein, or any statements made by Perkins Coie or Theranos related thereto
  - Rather, you should conduct your own analysis of the revenue opportunities and perform your own research regarding revenues
  - Later discussions are presumed to be at arms' length

PERKINSCOIE

PC0000027

## Disclaimers / Understanding The Assumptions At Work (Cont'd)

- This analysis is based on potential infringement claims identified to date
  - We are continuing to assess infringement reads against other companies, and related licensing opportunities
  - Accordingly, this analysis may understate the full revenue opportunity presented by Theranos' portfolio
- We continue to monitor the market and search for relevant information regarding product revenues; we reserve the right to supplement or modify the revenue figures provided herein
- We have excluded, for purposes of this analysis, the potential for lost profits, damages enhancements and recovery of attorneys' fees

**PERKINS**COIE

PC0000028

## Third-party Analyses Project Strong Growth in POC Market

- MarketsandMarkets:  Point-of-Care Diagnostics Market to reach $36.9 Billion by 2021, at **CAGR of 9.8%** from 2016 to 2021
- Allied Market Research:  Global point of care diagnostics market valued at $23.0 Billion in 2015 and expected to reach $43.3 Billion by 2022, with **CAGR of 9.4%** from 2016 to 2022
- Zion Market Research:  Global POC market valued at $23.5 Billion in 2016 and expected to reach $40.5B by 2022, with **CAGR of around 10%** between 2017 and 2022
- Kalorama: point-of-care technologies market up from $15.4B in 2015 to 18.4B in 2016 [equates to a **CAGR of 19.5%**]

**PERKINS**COIE

PC0000029

# Molecular POC Market CAGR Data (2015-2020)

- Molecular POC Market for Respiratory Tract Infections = 69.3%
- Molecular POC Market for Women's Health and Sexual Health = 65.7%
- Molecular POC Market for High-Burden Diseases (HIV, TB, Hepatitis, etc.) = 193%
- Molecular POC Market or GI Pathogens, HAIs and Bloodstream Infections = 42.4%
- Molecular POC Market for Non-Infections Diseases = 40.3%

*Source= Kalorama Information, Molecular Point of Care Diagnostics (March 2016)*

PERKINSCOIe

PC0000030

## Estimated CAGR for Select Companies / Products

| Company | Years | CAGR |
|---|---|---|
| | | |



PC0000031

## Recent Activity in the POC / Diagnostic Market Shows Value in Theranos' Patent Portfolio



PERKINSCOIE

PC0000032

# Recent Activity in the POC / Diagnostic Market (Cont'd)



PC0000033

Case Study:



PC0000034

Case Study: ███████████████████ (cont'd)

Foreign patent coverage for ███████████:



'155 Patent Family

Granted Patents:
- China
- Korea
- Australia
- Mexico

Pending Applications:
- Europe
- Canada
- Israel
- India
- Mexico
- New Zealand

**PERKINSCOIE**

PC0000035

Case Study:

PERKINSCOIE

PerkinsCoie.com  | Privileged/Attorney Work Product |  Confidential  36

## Foreign Revenues Also Show Value Beyond the U.S. Borders



- In light of issues with foreign jurisdictions, we assumed that each target's foreign revenue potential equals 75% of US revenue potential

Potential Revenue Opportunity:



## Potential Revenue Opportunity:



PERKINSCOIe

**Potential Revenue Opportunity:**

**PERKINS**COIE

PC0000040

## Potential Revenue Opportunity:



PERKINSCOIE

Potential Revenue Opportunity:



PERKINSCOIE

PC0000042

Potential Revenue Opportunity:



PC0000043

## Potential Revenue Opportunity:



**PERKINS**COIE

PC0000044

Potential Revenue Opportunity:



## Total Potential Revenue Opportunity

Estimated Past US Revenue Base = $453.6MM

Estimated Future US Revenue Base = $3,094MM

Total Estimated US Revenue Base = $3,548MM

Estimated Licensing and Revenue Opportunity (US):

6% Royalty = $213MM

8% Royalty = $286MM

10% Royalty = $355MM

12% Royalty = $426MM

Estimated Licensing and Revenue Opportunity (Foreign):

6% Royalty = $160MM

8% Royalty = $213MM

10% Royalty = $266MM

12% Royalty = $319MM

Estimated Licensing and Revenue Opportunity (US + Foreign)

6% Royalty = $373MM

8% Royalty = $499MM

10% Royalty = $621MM

12% Royalty = $745MM



PC0000046

## Numerous Entrants In Point-of-Care Diagnostics

### Currently On The Market



### Have Not Yet Entered The Market



PC0000047

# EXHIBIT 28

# Technology World's Most Valuable Patent Portfolios
2017



**Company by Pipeline Power**

| Company/Organization | Country of Headquart.. | Pipeline Power | |
|---|---|---|---|
| Medtronic Inc. | United States | | 3,379 |
| Covidien PLC (Medtronic Inc.) | Ireland | | 1,780 |
| **#3** **Theranos Inc.** | **United States** | | **1,450** |
| Intuitive Surgical Inc. | United States | | 743 |
| Becton, Dickinson and Co. | United States | | 629 |
| The General Hospital Corp. (Partners He.. | United States | | 524 |
| Arthrex Inc. | United States | | 489 |
| Boston Scientific Corp. | United States | | 469 |
| Zimmer Biomet Holdings Inc. | United States | | 432 |
| Biomet Inc. (Zimmer Biomet Holdings In.. | United States | | 414 |
| Globus Medical Inc. | United States | | 365 |
| Conformis Inc. | United States | | 330 |
| Abiomed Inc. | United States | | 310 |
| Hill-Rom Holdings Inc. | United States | | 309 |
| Masimo Corp. | United States | | 308 |
| Ethicon Endo-Surgery Inc. (Johnson & Jo.. | United States | | 298 |
| Guided Therapy Systems LLC | United States | | 297 |
| Edwards Lifesciences Corp. | United States | | 294 |
| Stryker Corp. | United States | | 292 |
| St. Jude Medical LLC (Abbott Laboratori.. | United States | | 256 |

https://spectrum.ieee.org/static/interactive-patent-power-2017

# EXHIBIT 29

Message

| | |
|---|---|
| **From**: | Daniel Mosley [DMosley@cravath.com] |
| **Sent**: | 2/10/2017 1:39:23 PM |
| **To**: | Lisa Peterson [lisap@rdvcorp.com] |
| **CC**: | Taylor, Alexander (CEI-Atlanta) [alex.taylor@coxinc.com]; hank.slack [hank.slack@quarterwatch.com]; Freund, Hugh J. (x2370) [hjfreund@pbwt.com]; jared@peerventurepartners.com; Jerry Tubergen [jerryt@rdvcorp.com]; Pryor, Juliette (CEI-Atlanta) [Juliette.Pryor@coxinc.com]; mark@peerventurepartners.com; Michael Lunt [michael@rdvcorp.com]; Noam Ohana [noam@conegliano.com]; Tanoury, Mark [TANOURYMP@cooley.com]; Tom Patterson [Tom@madronecap.com] |
| **Subject**: | Re: Project T - final terms |

Lisa,

Thanks to you and Tom for your hard work in getting this done. I think this recap will help them attract capital in the next raise and I hope it will bring PFM on board.

I am fully in agreement with this and Dr. Kissinger and Andreas Dracopoulos have authorized me to commit on their behalf.

       Best, Dan

| | |
|---|---|
| From: | Lisa Peterson <lisap@rdvcorp.com> |
| To: | "Freund, Hugh J. (x2370)" <hjfreund@pbwt.com>, "hank.slack" <hank.slack@quarterwatch.com>, "DMosley@cravath.com" <DMosley@cravath.com>, Noam Ohana <noam@conegliano.com>, "jared@peerventurepartners.com" <jared@peerventurepartners.com>, "mark@peerventurepartners.com" <mark@peerventurepartners.com>, "Pryor, Juliette (CEI-Atlanta)" <Juliette.Pryor@coxinc.com>, "Taylor, Alexander (CEI-Atlanta)" <alex.taylor@coxinc.com> |
| Cc: | "Tanoury, Mark" <TANOURYMP@cooley.com>, Lisa Peterson <lisap@rdvcorp.com>, Tom Patterson <Tom@madronecap.com>, Jerry Tubergen <jerryt@rdvcorp.com>, "Lisa Peterson" <lisap@rdvcorp.com>, Michael Lunt <michaell@rdvcorp.com> |
| Date: | 02/09/2017 07:49 PM |
| Subject: | Project T - final terms |

Hello everyone – we have reached a mutual agreement on terms today with EH. This was a tough negotiation with many give-takes/fits-starts on both sides as you can imagine, but ultimately I think you'll find we ended up in a great position with key wins on repricing, consent rights, and preference.

Theranos has a board meeting next Tuesday afternoon, and EH will seek board approval for these terms at that meeting. It would be very helpful for EH if she could let the board know on Tuesday which investors have signed or are prepared to sign. Madrone and RDV will be signing.

Attached is the redline term sheet that shows changes from the version we initially sent to Theranos 2+ weeks ago and below are the key takeaways. (Mark – please correct me if I miss something or state something wrong)

The Appendix shows the pre-post ownership %'s, after taking into account the repricing to $5.00 and a 15% option pool.
- ✓ EH goes from 50.11% to 34.93%
- ✓ $15C-1's go from 0.78% to 2.33%
- ✓ C-2's go from 5.68% to 19.31%

Key Terms
- Existing shares get immediately re-priced to $5.00; all of that comes out of EH's shares.
- 1x Liquidation Preference.
- Pay to Play – If they raise new money at <$5.00/share and you invest your pro rata share of the raise, you get a weighted avg ratchet down to $3.00/share. We capped this obligation to play on a total raise of $250mm as opposed to keeping this wide open. The pro rata is determined off this post-deal cap structure (C2s at 19.31% ownership post-close is ~$48mm).

Dynasty005782

If you decide not to participate in this raise, you keep the $5.00 repricing position and the 1x preference position, you lose access to the ratchet protection and you flip to non-voting.  (By far the most heavily negotiated section)

•     EH keeps her super voting stock, but we have consent rights on everything we wanted; only equity she can issue is within the 15% option pool.

•     Board reset to 6 seats (was 12), we get 1; we get 2 if the board exceeds 7 which she has no plans to do (she wants Board kept small).

•     Reporting – got what we need.

•     We have standard pre-emptive rights.

Tom, Mark and a I are available to answer any questions and can organize a call for tomorrow if need be.  You can also feel free to just call me tomorrow if you just want to run through a couple questions with me one on one.  Both sides pushed extremely hard on every point.  As with every difficult negotiation, neither side is satisfied and we both feel like we gave way too much.  But we did get a number of key items - the Company is much better positioned for a future fund raise, and Tom and I are going to work on reaching out to PFM if the board approves moving this forward...

In an effort to continue to streamline communications between this group and the Company, please let us know what you decide to do.  If you agree and want to sign onto the term sheet, please send signature to Mark (tanourymp@cooley.com) and he can manage that process and release them for the entire group...

Lisa Peterson

█████████████

lisap@rdvcorp.com

[attachment "CPComparison 1_25_Series C-3 Term Sheet - #141435260 v6 NAACTIVE Elizabeth Holmes Series C-3 Term Sheet.pdf" deleted by Daniel Mosley/NYC/Cravath] [attachment "Series C-3 Term Sheet.docx" deleted by Daniel Mosley/NYC/Cravath]

# EXHIBIT 30

Alan Eisenman <████████████████████>                              2/23/2017 3:26 PM

# Fwd: Theranos - Term Sheet

To Joel Gordon <████████████████> • Sherrie Eisenman <██████████████████████> •
Robert Gordon <robert.gordon@morganstanley.com> • Frank Gordon <frankgordon@croftoncapital.com> •
Tarp Jones <██████████████> • Jeff Jacobs <jjacobs@stradishealthcare.com> •
Gail Jacobs <████████████████> • Gwen Gordon <████████████████> •
Julie Gordon <██████████████████>

Family,

    Enclosed is the term sheet from Theranos. It is non-binding. They want us to agree not to participate in lawsuits against the company. In return, they are offering us three times the stock we bought at the last round. This stock is coming from Elizabeth's personal stake, will reduce her shares by about 30%, and will be non-dilutive. I think if the company doesn't survive the onslaught, the lawsuits will bring little or nothing, and if the company survives, we will have significantly more stock. Therefore, I am signing this, and recommending GFT and Crofton sign as well. If you are in agreement, can you please sign and return the form to David Taylor, their chief counsel. Please let me know what you decide.

Best,
Alan
---------- Forwarded message ----------
From: **David Taylor** <dtaylor@theranos.com>
Date: Thu, Feb 16, 2017 at 6:14 PM
Subject: Theranos - Term Sheet
To: " alanjayeisenman ██████████████████>

Alan—

Thanks for speaking just now. Attached is the non-binding term sheet that I mentioned. As discussed, I trust that you will get this to Sherrie as well as to representatives of Crofton Capital and Gordon Family Trust. Please let me know if you have any questions.

Best,

David

========================================
This electronic transmission, and any files transmitted with it, may contain information that is privileged, proprietary, trade secret or confidential or otherwise protected. If you are not the intended recipient, any use, disclosure, copying, or distribution of the contents of this e-mail or its attachments, in whole or in part, is prohibited. If you have received this email in error, please notify the sender by return e-mail and delete all copies from your system. Unless explicitly and conspicuously designated as "E-Contract Intended," this e-mail does not constitute a contract offer, a contract amendment, an acceptance of a contract offer, or a memorialization of an existing or prospective contract, and no party is entitled to rely thereon. Please note that any views or opinions contained in this email are solely those of the author and do not necessarily represent those of Theranos, Inc. Finally, before opening or using attachments, the recipient should check for the presence of viruses; Theranos, Inc. accepts no liability for any damage caused by any virus transmitted by this email.
Theranos, Inc., 1701 Page Mill Rd., Palo Alto, CA, 94304
650-838-9292 www.theranos.com

- Theranos Series C-1B and C-2A Term Sheet.docx (61 KB)

Balwani_GFT_00000134
SEC-USAO3-EPROD-000023829

Balwani_GFT_00000135
SEC-USAO3-EPROD-000023830

CONFIDENTIAL                                                                                    2/13/2017

**Theranos, Inc.**
**Proposed Exchange of Series C-2 and C-1 Preferred Stock**

This term sheet is being delivered on behalf of certain of the holders of outstanding Series C-2 Preferred Stock (the "Series C-2 Investors") and Series C-1 Preferred Stock (the "Series C-1 Investors") and summarizes (i) the terms of a proposed exchange of shares of Series C-2 and Series C-1 Preferred Stock of Theranos, Inc. (the "Company") for Series C-2A Preferred Stock and Series C-1B Preferred Stock of the Company, and (ii) the terms of changes to the Company's Amended and Restated Certificate of Incorporation, including any amendments and certificates of designation thereto (the "Charter") and the Company's Amended and Restated Investors' Rights Agreement (the "Investors' Rights Agreement"). Any capitalized term used in this term sheet but not defined has the meaning described in the Charter, Amended and Restated Bylaws (the "Bylaws"), the Investors' Rights Agreement or the Certificate of Designation of Series C-2 Preferred Stock, as applicable.

Neither this term sheet nor its acceptance shall give rise to any legally binding or enforceable obligation on any person. No contract or agreement providing for any transaction involving the matters contemplated herein shall be deemed to exist between the parties unless and until final definitive agreements have been executed and delivered.

Share Exchange

| | |
|---|---|
| Exchange: | The Company will permit each Series C-2 Investor, and each Series C-1 Investor who purchased Series C-1 shares with an effective price of $15.00 (each, an "Eligible Holder") to exchange their shares of Series C-2 Preferred Stock for C-2A Preferred Stock, and Series C-1 Preferred Stock for Series C-1B Preferred Stock (collectively, the "New Preferred"), which shall have identical rights, preferences and privileges as the Series C-2 Preferred Stock and Series C-1 Preferred Stock, respectively except as set forth herein (the "Exchange"). Attached as Exhibit A is a summary capitalization table reflecting the Exchange. |
| Antidilution Protection; Pay-to-Play, Conversion Reset: | The initial conversion price of the New Preferred will be $5.00 per share such that each share of Series C-2A Preferred Stock will be convertible into 3.4 shares of Class A Common Stock, and each share of Series C-1B Preferred Stock will be convertible into 3 shares of Class A Common Stock. Section 4(d) of Article V of the Charter will provide that the New Preferred will be granted full ratchet protection in the event that prior to the fourth anniversary of the Exchange (the "Trigger Date") the Company issues equity at a price per share of less than $5.00; *provided, that*, if the Company issues equity at a price of less $3.00 per share, the New Preferred will receive a weighted average antidilution adjustment for |

141435260 v7

Balwani_GFT_00000136
SEC-USAO3-EPROD-000023831

the amount below $3.00 consistent with the antidilution provisions currently set forth in the Charter.

A holder of New Preferred will only be entitled to receive the ratchet or weighted average adjustment on its shares of New Preferred if such holder purchases at least its pro rata amount in a financing (or if the financing exceeds $250 million in aggregate, such holder's pro rata amount of $250 million) that occurs prior to the Trigger Date and the per share price is less than $5.00 per share. If a holder of New Preferred does not purchase at least its pro rata amount in such financing the New Preferred held by such New Investor shall be automatically converted to shares of a new series of Preferred Stock which will have the same liquidation preference as the New Preferred, but shall be non-voting.

Proposed Changes to the Charter, Bylaws and Investors' Rights Agreement

| | |
|---|---|
| Liquidation Preference: | The New Preferred will have a liquidation preference that is senior to all other series of Preferred Stock of the Company. All other liquidation preferences would be unchanged. |
| Voting Rights: | The Company will not, either directly or by amendment, merger, consolidation, or otherwise, take any of the following actions without the written consent of the holders of a majority of the outstanding shares of New Preferred, voting as a single class on an as-converted basis: (i) amend, alter, or repeal in an adverse manner any provision of the Charter or the Bylaws related to the rights, preferences and privileges of the New Preferred; (ii) create or authorize the creation of or issue any other security convertible into or exercisable for any equity security, having rights, preferences or privileges senior to or on parity with the New Preferred, or increase the authorized number of Preferred Stock (or any series thereof); (iii) increase the authorized shares of Common Stock beyond the amount reserved at the time of the Exchange (which reserved amount shall include a buffer equal to 15% of fully diluted shares in addition to the amount necessary for the option pool and the conversion of all outstanding preferred or other securities); (iv) declare or pay any dividend or distribution or approve any repurchase with respect to any shares of capital stock of the Company, other than repurchases of unvested shares of Common Stock at a price per share no greater than the original purchase price of such shares; or (v) liquidate, dissolve or wind up the affairs of the |

Balwani_GFT_00000137
SEC-USAO3-EPROD-000023832

CONFIDENTIAL                                                                3

|  |  |
|---|---|
|  | Company, or effect any merger or consolidation or any other Deemed Liquidation Event.  All current protective provisions would continue. |
| Automatic Conversion: | Section 4(b)(ii) of Article V of the Charter will be revised to require that any such conversion of the New Preferred will require the approval of the holders of a majority of the New Preferred, voting as a single class on an as-converted basis. In the event that Elizabeth Holmes no longer retains direct or indirect voting control of shares of Class B Common Stock, such shares shall automatically convert into shares of Class A Common Stock on a one-for-one basis. |
| Mandatory Redemption: | Section 6 of the Certificate of Designation and Section 7 of Article V of the Charter, which, among other things, permit redemptions of the Company's capital stock on a non *pro rata* basis, will be revised to require that such redemptions of New Preferred will require the approval of the holders a majority of the New Preferred, voting as a single class on an as-converted basis. |
| Board Structure: | The authorized size of the Company's Board of Directors (the "Board") shall be six, and the holders of a majority of the Series C-2A Preferred Stock, shall be entitled to elect one member of the Company's Board (the "C-2A Director").  If the authorized size of the Board is higher than eight, the holders of a majority of the Series C-2A Preferred Stock shall be entitled to elect two C-2A Directors.  Any C-2A Director (including any replacement or substitute C-2A Director) shall at all times be reasonably acceptable to the Board.  All other directors shall be elected by holders of the Common Stock and other Preferred Stock voting together as a single class, per the current provisions of the Charter and related documents. |
| Financial Reporting: | Within 30 days after the end of each calendar month commencing for the month ended April 30, 2017, at the request of a holder of New Preferred, the Company shall provide a report with respect to such month to such holder, which shall include (1) financial statements (including a complete balance sheet, statement of cash flows and income statement), (2) a cash projection for the three month period following such month end, (3) a discussion and analysis of the monthly results and (4) a summary of material events (including any updates with respect to material changes in business plans, capitalization, management, employee matters, litigation, CMS matters, FDA approval processes, other governmental/regulatory matters, peer review |

141435260 v7

Balwani_GFT_00000138
SEC-USAO3-EPROD-000023833

CONFIDENTIAL                                                                    4

publications and material contracts entered into or terminated).  Within 45 days following the end of each fiscal year, upon request the Company shall provide each holder of New Preferred with a detailed cap table current as of the end of such fiscal year, and a monthly operating budget for the upcoming fiscal year that includes a complete balance sheet, statement of cash flows and income statement.  In addition, each holder of at least 3,000,000 shares of New Preferred shall be entitled to receive upon request (i) copies of all Board of Directors meeting materials, (ii) copies of peer review publications and material contracts entered into or terminated, and (iii) any other financial information reasonably requested.

The Company will have an audit of its 2016 financial statements done by a Big Four accounting firm in accordance with the schedule previously discussed with certain of the Series C-2 investors.

The foregoing financial reporting obligations will be subject to confidentiality obligations and other reasonable measures established by the Company to ensure confidentiality of the information reported.

**Pre-emptive Right:**     Each holder of New Preferred shall have standard pre-emptive rights to purchase its pro rata amount of future equity issuances of the Company subject to customary exclusions.

## Other Terms of Exchange

**Conditions of the Exchange**     The Exchange shall be offered to each Eligible Holder, and Eligible Holders representing not less than 662/3% of the outstanding shares held by all Eligible Holders shall participate in the Exchange.

**Relinquishment of Equity**     Elizabeth Holmes shall, at her election, either waive any right to receive the restricted stock unit award approved in February 2015 and/or will contribute to the Company shares of Class A Common Stock owned by her, such that the sum of any restricted stock award forfeited and the shares of Class A Common Stock contributed to the Company is equal to the number of additional shares of Class A Common Stock issuable upon conversion of the New Preferred as a result of the reduction of the conversion price from $17.00 (or $15.00 in the case of the C-1 Preferred) to $5.00 (each, the "Contribution").  An irrevocable agreement to waive or contribute shall be made at the time of the Exchange, with the waiver or contribution to occur not later than June 30, 2017,

141435260 v7

Balwani_GFT_00000139
SEC-USAO3-EPROD-000023834

CONFIDENTIAL                                                                                           5

following receipt by the Company of a 409A valuation for the common stock and determination by the Board of the fair market value of the Company's common stock.

No Right of First Refusal:

The Exchange will not be subject to the Right of First Refusal set forth in the Bylaws.

No Effect on Other Series of Preferred Stock:

The Exchange will not result in any adjustments to the conversion price of any Series of Preferred Stock, except as set forth herein.  The Series C-2 Investors and Series C-1 Investors agree to waive any rights they have to such conversion adjustment for any series held by such Investors.

Most-Favored Terms:

In the event that the Company, prior to the Trigger Date, enters into a transaction with any Eligible Holder which did not participate in the Exchange ("Nonparticipating Holders") that provides any such Nonparticipating Holders a more favorable conversion rate adjustment, adjusted Series C-1 or C-2 Preferred Stock purchase price or otherwise reduces the effective price of Series C-1 or C-2 Preferred Stock held by such Eligible Holder (each a "Participating Holder"), then it shall allow each Participating Holder to participate in such transaction on the same terms.

Release:

Upon the closing of the Exchange, each Participating Holder shall, on behalf of itself and its affiliates, partners and members, release and forever discharge the Company and its current and former officers, its current and former directors, and other stockholders (and any of their affiliates) from any and all claims, demands, causes of action, obligations, debts and liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which such Participating Holder now has or has ever had or may hereafter have against any such released persons arising out of or relating to the purchase or sale of any securities issued by the Company, including, but not limited to, shares of Series C-2 Preferred Stock, Series C-1 Preferred Stock and the Exchange, but only to the extent such claims relate to or arise from conduct occurring on or prior to the date of the Exchange.

Agreed and accepted:

THERANOS, INC

_____
[Name of Participating Holder]

141435260 v7

Balwani_GFT_00000140
SEC-USAO3-EPROD-000023835

CONFIDENTIAL                                                              6

By:_____                    By:_____

By:_____
Name:_____                    Name:_____
Date:_____                              Date:_____

Balwani_GFT_00000141
SEC-USAO3-EPROD-000023836

CONFIDENTIAL                                                         2/13/2017

### POST-EXCHANGE
### CAPITALIZATION TABLE

| Current | | | Post-Exchange* | | |
|---|---|---|---|---|---|
| | Shares | Percentage | | Shares | Percentage |
| EAH | 290,899,765 | 50.12% | EAH | 202,757,608 | 34.93% |
| Other Common Stock Outstanding | 51,761,205 | 8.92% | Other Common Stock Outstanding | 51,761,205 | 8.92% |
| Outstanding Options | 9,321,372 | 1.61% | Outstanding Options | 9,321,372 | 1.61% |
| Option Reserve | 15,000,000 | 2.58% | Option Reserve | 15,000,000 | 2.58% |
| Series A Preferred (not including EAH) | 45,149,290 | 7.78% | Series A Preferred (not including EAH) | 45,149,290 | 7.78% |
| Series B Preferred | 53,494,262 | 9.22% | Series B Preferred | 53,494,262 | 9.22% |
| Series C Preferred | 58,810,045 | 10.13% | Series C Preferred | 58,810,045 | 10.13% |
| Series C-1 Preferred (@ $3) | 18,508,335 | 3.19% | Series C-1 Preferred (@ $3) | 18,508,335 | 3.19% |
| Series C-1 Preferred (@ $15) | 4,500,032 | 0.78% | Series C-1B Preferred | 13,500,096 | 2.33% |
| Series C-2 Preferred | 32,975,872 | 5.68% | Series C-2A Preferred | 112,117,965 | 19.32% |
| Fully-Diluted Shares | 580,420,178 | 100.00% | Fully-Diluted Shares | 580,420,178 | 100.00% |

*assumes 100% participation

141435260 v7

Balwani_GFT_00000142
SEC-USAO3-EPROD-000023837

# EXHIBIT 31

**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)
MATTHEW DU MÉE (BAR NO. 28468)
STEPHEN J. EMEDI (BAR NO. 29814)
Assistant Attorneys General
1275 West Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-3725
Fax: (602) 542-4377
consumer@azag.gov
*Attorneys for the State of Arizona*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, ex rel. MARK BRNOVICH, Attorney General, | Case No: |
| Plaintiff, | **CONSENT DECREE** |
| vs | (Assigned to Hon. _____ ) |
| THERANOS, INC., a Delaware Corporation, | |
| Defendant. | |

The State of Arizona, having filed a complaint alleging violations of the Arizona Consumer Fraud Act ("CFA"), Arizona Revised Statutes ("A.R.S.") § 44-1521, *et seq.*, and Defendant Theranos, having waived service of the complaint and having been fully advised of the right to a trial in this matter and having waived the same, and the parties having agreed to the entry of this Consent Decree by this Court without trial or adjudication of any issue of fact or law and without admission or finding of any violations of any law, in order to provide full reimbursement to Arizona consumers who purchased Theranos blood testing services and to avoid the expense and uncertainty of further investigation or litigation,

NOW, THEREFORE, upon the consent of the parties hereto, IT IS HEREBY

THER-AZ-06273536

ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

## FINDINGS OF FACT

1.     Plaintiff is the State of Arizona, ex rel. Mark Brnovich, Attorney General, who is authorized to bring this action under the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*

2.     Defendant is Theranos, a Delaware corporation with its corporate headquarters at 1701 Page Mill Road, Palo Alto, California 94304.

3.     At all relevant times, Defendant did business in Arizona by marketing, selling, promoting, and providing its laboratory tests and services to Arizona consumers.

4.     Plaintiff alleges that:

   a.     Between 2013 and 2016, Defendant sold approximately 1,545,339 blood tests to approximately 175,940 Arizona consumers, which yielded 7,862,146 test results.

   b.     Defendant ultimately voided or corrected approximately 834,233, or 10.6%, of these test results.

   c.     The sales of the blood tests were made without the informed consent of the consumers because Defendant misrepresented, omitted, and concealed material information regarding its testing service's methodology, accuracy, reliability, and essential purpose.

   d.     Defendant intended for its customers to rely on its misrepresentations, omissions, and concealments in their decision to purchase its testing services.

5.     Defendant denies the allegations in paragraphs 4(c) and 4(d) and denies that it has engaged in any unlawful conduct, but has agreed to the entry of this Consent Decree in order to provide full reimbursement to Arizona consumers who purchased Defendant's blood testing services and to avoid the expense and uncertainty of litigation with Plaintiff and with Arizona consumers of Defendant's blood testing services. The agreement to enter this Consent Decree should not be construed to be an admission by Defendant of any liability. The terms of the

Confidential

THER-AZ-06273537

Consent Decree shall not be cited as evidence of wrongdoing by Defendant or its successors and assigns.

6.  Defendant agrees that this Court has jurisdiction over the subject matter and the parties for purposes of entry of this Consent Decree.

7.  This Consent Decree is intended to provide full restitution to Arizona consumers for all monies paid by Arizona consumers for Defendant's blood testing services.

8.  The Parties intend this Consent Decree to extinguish all existing or potential claims under the CFA or for breach of contract, fraud, battery, negligence, negligent misrepresentation, unjust enrichment, or civil RICO violations arising from the conduct described above.

## <u>ORDER</u>

NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED:

1.  Defendant shall comply with the Arizona Consumer Fraud Act, A.R.S. § 44-1521 *et seq*., as it is currently written, and as it may be amended.

2.  Defendant shall pay to the Arizona Attorney General the amount of $200,000 in civil penalties due at the time of entry of this Judgment, to be deposited into the Consumer Protection – Consumer Fraud Revolving Fund pursuant to A.R.S. § 44-1531.01, and used for the purposes set forth therein.

3.  Defendant shall pay to the Arizona Attorney General the amount of $4,652,000 in consumer restitution due at the time of entry of this Judgment, to be deposited into an interest bearing consumer restitution subaccount of the Consumer Restitution and Remediation Revolving Fund, pursuant to A.R.S. § 44-1531.02(B). In the event that any portion of the restitution ordered herein cannot be distributed to eligible consumers, such portion shall be distributed to the Consumer Protection – Consumer Fraud Revolving Fund pursuant to A.R.S. § 44-1531.01.

4.  Defendant warrants that the amount described in the previous paragraph (the "Full

-3-

THER-AZ-06273538

Restitution Amount") is equal to the total monetary amount paid by Arizona consumers for blood testing provided by Defendant (the "Full Payment Amount"). If it is later discovered that the Full Payment Amount is higher than the Full Restitution Amount, Defendant agrees to pay the Arizona Attorney General the difference between the two amounts, as set forth in the previous paragraph.

5.    The Arizona Attorney General shall select a claims administrator to help administer the payment of the Full Restitution Amount to Arizona consumers. Defendant agrees to pay the fee for the claims administrator and to supply the claims administrator with the contact information and total amount paid by each Arizona consumer who received blood testing provided by Defendant.

6.    Defendant shall pay to the Arizona Attorney General the amount of $25,000 in attorneys' fees and costs due at the time of entry of this Judgment, to be deposited into the Consumer Protection – Consumer Fraud Revolving Fund pursuant to A.R.S. § 44-1531.01, and used for the purposes set forth therein.

7.    The State has already accepted from Defendant $4,877,000 as full and complete satisfaction of the Defendant's joint and several liability set forth in the preceding paragraphs, with the exception of any future obligations as set forth in paragraphs 4 and 5.

8.    Defendant affirms that it will not own, operate or direct any laboratory subject to the Clinical Laboratory Improvement Amendments ("CLIA") in the State of Arizona for a period of 2 years, commencing from March 28, 2017.

9.    Defendant shall not represent or imply that the Attorney General, the State of Arizona, or any agency thereof has approved any of its actions in Arizona or has approved any of its past, present or future business practices in Arizona, and Defendant is enjoined from directly or indirectly representing anything to the contrary.

10.   If any portion of this Consent Decree is held invalid by operation of law, the remaining terms thereof shall not be affected and shall remain in full force and effect.

-4-

Confidential

THER-AZ-06273539

11.     Jurisdiction is retained by this Court for the purpose of entertaining an application by the State for the enforcement of this Decree.

12.     This judgment resolves all outstanding claims. As no further matters remain pending, this is a final judgment entered pursuant to Ariz. R. Civ. P. 54(c).


DATED this _____ day of _____, 2017.



_____

JUDGE OF THE SUPERIOR COURT

Confidential

THER-AZ-06273540

## <u>CONSENT TO JUDGMENT</u>

1.    Defendant acknowledges that it has waived service of the Summons and Complaint, has read the Findings of Fact and other portions of the Order contained above, is aware of its right to a trial in this matter, and has waived the same.

2.    Defendant admits the jurisdiction of this Court, admits that the Findings of Fact are true, and consents to the entry of the foregoing Findings of Fact and Order.

3.    Defendant states that no promise of any kind or nature whatsoever was made to induce it to enter into this Consent Decree and declares that it has entered into this Consent Decree voluntarily.

4.    This Consent Decree is entered as a result of a compromise and a settlement agreement between the parties. Only the parties to this action may seek enforcement of this Consent Decree. Nothing herein is intended to create a private right of action by other parties; however, said Consent Decree shall not limit the rights of any private party to pursue any remedies allowed by law.

5.    Defendant represents and warrants that the person signing below on its behalf is duly appointed and authorized to do so.

DATED this 17ᵗʰ day of _April_, 20_17_.

THERANOS, INC.

By: _____ (David Taylor)
Its _General Counsel_

-6-

1

2    **APPROVED AS TO FORM AND CONTENT:**

3

4    **MARK BRNOVICH**                         **Wilmer Cutler Pickering Hale & Dorr**
     **Attorney General**

5

6

7    By: _Matthew du Mee_                       _Michael Mugmon_
         Matthew du Mee                         Michael Mugmon

8        Stephen Emedi                          Wilmer Cutler Pickering Hale & Dorr
         Assistant Attorneys General            Attorneys for Defendant

9        Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

-7-

Confidential

THER-AZ-06273542