# EXHIBIT 42

**To:**       Daniel Edlin[dedlin@theranos.com]
**From:**    Elizabeth Holmes
**Sent:**     Sun 6/1/2014 12:09:27 AM
**Importance:**    Normal
**Subject:**  RE: Roger Parloff - aggregated action items
**Received:**   Sun 6/1/2014 12:09:29 AM
Pfizer_Theranos System Validation_Final Report.pdf

---

**From:** Elizabeth Holmes
**Sent:** Friday, May 30, 2014 6:07 PM
**To:** Daniel Edlin
**Subject:** RE: Roger Parloff - aggregated action items

What can be disclosed is devices

Decentralizable

Will decentralize

Will maintain centralized oversight

---

**From:** Daniel Edlin
**Sent:** Tuesday, May 27, 2014 9:54 PM
**To:** Elizabeth Holmes
**Cc:** Jeffrey Blickman; Christian Holmes
**Subject:** RE: Roger Parloff - aggregated action items

Hi Elizabeth,

Please see below/attached for the Roger Parloff action items list. This does not take into account the photo shoot with Fortune mag. The item numbers have also stayed the same so it's easier to keep track of each task.

Please let me know if you have any questions.

| # | Action Item | Resource |
|---|---|---|
| **STILL NEED TO GIVE TO ROGER - OPEN** | | |
| 3 | Our lab form – showing the reflex testing configuration we will release in the future/all future features | Daniel Y |
| 4 | Sepsis paper that will be published | Daniel Y |
| 5 | Background on the fact that we figured out how to freeze capillary blood | Daniel Y |
| 6 | Data on amount of blood required to do additional tests using a traditional sample that could do any possible reflex tests vs. Theranos | Daniel Y |
| |   -  Calculate the number of draws that would be required | |
| 7 | Data on performance of POC instruments not being as accurate/good | Daniel Y |
| 8 | Data on any combination of tests being able to be done on our framework | Daniel Y |
| 10 | Follow up on our finger stick being less painful than a traditional lancet b/c it's  a narrower and less deep lancet | Daniel Y / PM Tea |
| 11 | Follow up on the DARPA – CAP article and confidentiality | EAH |
| |   -  Follow up on IP associated with CLIA lab permitted to have hardware outside its premises | |
| 12 | Language on what he can say about our having devices, and how many devices we are using in each facility | EAH |
| |   -  How many analyzers per sample he's allowed to talk about | |

| | - Being able to work within a smaller space – language on this | |
|---|---|---|
| 13 | Follow up on what he's allowed to disclose with respect to software and POC machines being controlled by a certified lab | EAH |
| 15 | Language on when our first revenue was | EAH |
| 16 | Language on why we do some venipuncture | EAH |
| 17 | Language on the device comparison and lab comparison b/t Theranos and Quest | EAH |
| 18 | Language on medical advisory board | EAH |
| 19 | Point about the fact that we're a CLIA certified lab and not a technology company that publishes on our technology – background on this | EAH |
| 22 | Follow up on intermountain POC<br> - How far along we are and operationalizing that in terms of their sending us samples | EAH and PM Team |
| 33 | Patent application figures - EAH as co-inventor<br>Are the following figures, listing EAH as a co-inventor, up to date?<br>- 80 US patent applications; including<br>- 17 issued US patents; and<br>- 2 'allowed' US patents.<br>- 182 foreign applications; including<br>- 65 issued patents; and<br>- 4 'allowed' patents. | IP Team (who on |
| 34 | Patent application figures - EAH NOT LISTED as co-inventor<br>- How many US Patent applications?<br>- How many issued US patents?<br>- How many 'allowed' US patents?<br>- How many foreign applications?<br>- How many foreign issued patents?<br>- How many foreign 'allowed' patents? | IP Team (who on |
| 35 | Patent application figures - general<br>- Has Theranos supplemented its portfolio with patents purchased from other sources?<br>- Can you say or estimate the size of Theranos's entire patent portfolio from all sources? | IP Team (who on |
| 36 | Physician contacts Roger can talk to | EAH |
| 37 | Speaking to Medicare/Medicaid | EAH |
| 38 | Lab report showing trending data | Jeff/Daniel |
| 39 | Follow up on operationalizing the infectious disease tests with Helfet | EAH |
| 40 | Possible PT data, validation reports, pharma reports, and valuation | EAH Thoughts |
| **STILL NEED TO GIVE TO ROGER - IN PROGRESS** | | |
| 1 | Follow up on all of our state certifications | Adam/Mark/Brad |
| 21 | Quotes from pharma companies | EAH / Previous pr |
| 23 | Data on how far along we are with Dignity | EAH and PM Team |
| 30 | Medicare/Medicaid sources on savings from reflex testing | PM team |
| 32 | More quotes from patients, physicians, nurses, payors (LIST FROM SALES) | SALES |
| **DONE - SENT TO ROGER** | | |
| 20 | Send him the Moira Gunn interview | EAH / PM Team |
| 26 | iPad App – show mock up | Jeff |
| 27 | Preview of .md and .me – consumer focus | Jeff |
| 28 | Recording of HEP presentation | PM Team |

Confidential

THPFM0001374392

| 31 | More quotes from patients (LIST FROM RYAN) | PM - RYAN |
|---|---|---|
| **DONE - PER EAH** | | |
| 2 | Data – showing our performance vs. hospital labs (or other labs) | Daniel Y |
| 9 | Follow up on Vitamin D CV and NIST / CDC standards being less than 5% | Daniel Y |
| 14 | Follow up as to what year Larry Ellison invested | EAH |
| 25 | Is it OK to talk to General Mattis? | EAH or Dan |
| 29 | Include data on the fact that we're making pricing at 90% below Medicare (chlamydia and gonorrhea) | PM team |
| **NO LONGER NEEDED** | | |
| 24 | Intro to Charles Roussel | EAH or Dan |

Thanks,

Dan

---

**From:** Christian Holmes
**Sent:** Thursday, May 22, 2014 8:47 PM
**To:** Elizabeth Holmes
**Cc:** Jeffrey Blickman; Daniel Edlin
**Subject:** Re: Roger Parloff - aggregated action items

Elizabeth – please see notes below and attachments for PM action items. In addition to the quotes from pharma diligence, I have the binder as well. I am keeping this locked in the cabinet next to my desk (I have the key so it's secure).

Let us know if there are questions.

Thanks

Christian

20: Send him the Moira Gunn interview

- Attached
- URL: http://web.archive.org/web/20130729223151id_/http://itc.conversationsnetwork.org/series/technation.html?series=&chann

21: Quotes from pharma companies

- GSK: After running clinical trials with Theranos instead of the central laboratory, GlaxoSmithKline's Lab Director concluded that "Theranos' lab infrastructure eliminates the need for a lab." (*see more below for full quote)*
- Johns Hopkins: "The technology is novel and sound. It can accurately run a wide range of routine and special assays." "No major weaknesses were identified."
- I also pulled the binder of pharma due diligence. Particular areas of relevance:
    - Pfizer-TheranosAngiogenesis Study Report: p. 26 lists conclusions of study
        - "The Theranos System performed with superior performance to reference assays while running in a complex ambulatory environment."
        - "One of Theranos' pharma partner is publishing a report which estimates the increased time to market is valued at $1M per day – making every month quite substantial."

▪ "Based on historical data, implementation of these systems will enable Pfizer to achieve ~50% cost savings over current study spending (previously demonstrated to be $15M of a $30M study budget."

○ Schering-Plough-Theranos Assay Validation Report:  p. 14 lists conclusions of study.

▪ "The Theranos IL-6, TNF-alpha, CRP assay multiplex has been shown to give more accurate and precise results for three independently calibrated cartridge lots and all the many instruments used than current "gold standard" reference methods."

○ Excerpts from GSK-Theranos Metabolic Study Report:

▪ "The Theranos system eliminate the need for a lab and provided quality data"

▪ "The Metabolic Biomarker Lab has a favorable impression of the technology/system and recommends GSK clinical groups to work with Theranos"

22: Follow up on intermountain POC.  How far along we are and operationalizing that in terms of their sending us samples

- Roger already reached out to George, who is standing by to hear from us before engaging back with Roger. With regard to status, we have a kickoff meeting scheduled for next week to iron out logistics for sending samples.

23: Data on how far along we are with Dignity

- Waiting on approval of the list of who the point people are internally to get this in motion, along with approval of the list that Daniel sent for phase 1 validation.  In parallel we are working with their IT people on EMR integration with the next meeting scheduled for May 28

26: IPad App – show mock up

- Attached

27: Preview of .md and .me – consumer focus

- Attached

28: Recording of HEP presentation

- We emailed Julie to ask for clips or a copy of the session.  Waiting on this, but she said probably not until the end of the month.  Here is the URL for your speaker page: http://www.healthevolutionpartners.com/elizabeth-holmes/

29:  Include data on the fact that we're making pricing at 90% below Medicare (chlamydia and gonorrhea)

- For chlamydia and gonorrhea test (panel) we are about half off of CMS rates, per what's on our website.  Checked with Sunny per our discussion and he said to use the flu panel as an example for infectious disease in this case.  Our pricing below is 50% Medicare

| 87633 | | Resp virus 12-25 targets | $572.91 | $286.46 |
|---|---|---|---|---|

30: Medicare/Medicaid sources on savings from reflex testing

- CMS

- Henry J Kaiser Family Foundation (kff.org)

- Medicaid.gov

- Theranos pricing

Confidential

THPFM0001374394

31: More quotes from patients, physicians, nurses, payors

- Attached email entitled "Aggregate List of Customer Feedback"

---

**From:** Daniel Edlin
**Sent:** Wednesday, May 21, 2014 5:26 AM
**To:** Elizabeth Holmes
**Cc:** Christian Holmes; Jeffrey Blickman
**Subject:** Roger Parloff - aggregated action items

Hi Elizabeth,

Please see below for the updated, aggregated list of follow-up items for Roger Parloff. I've also included a column for a suggested contact person/resource for each item.  If you have any guidance on when we may need these items by, or if there is someone else we should be reaching out to, please let us know and we'll communicate accordingly to the resources.  As per emails from yesterday, we're in process of compiling the updated quotes (#31).

| # | Action Item | Resourc |
|---|---|---|
| 1 | Follow up on all of our state certifications | Adam/N |
| 2 | Data – showing our performance vs. hospital labs (or other labs) | Daniel Y |
| 3 | Our lab form – showing the reflex testing configuration we will release in the future/all future features | Daniel Y |
| 4 | Sepsis paper that will be published | Daniel Y |
| 5 | Background on the fact that we figured out how to freeze capillary blood | Daniel Y |
| 6 | Data on amount of blood required to do additional tests using a traditional sample that could do any possible reflex tests vs. Theranos<br> - Calculate the number of draws that would be required | Daniel Y |
| 7 | Data on performance of POC instruments not being as accurate/good | Daniel Y |
| 8 | Data on any combination of tests being able to be done on our framework | Daniel Y |
| 9 | Follow up on Vitamin D CV and NIST / CDC standards being less than 5% | Daniel Y |
| 10 | Follow up on our finger stick being less painful than a traditional lancet b/c it's  a narrower and less deep lancet | Daniel Y |
| 11 | Follow up on the DARPA – CAP article and confidentiality<br> - Follow up on IP associated with CLIA lab permitted to have hardware outside its premises | EAH |
| 12 | Language on what he can say about our having devices, and how many devices we are using in each facility<br> - How many analyzers per sample he's allowed to talk about<br> - Being able to work within a smaller space – language on this | EAH |
| 13 | Follow up on what he's allowed to disclose with respect to software and POC machines being controlled by a certified lab | EAH |
| 14 | Follow up as to what year Larry Ellison invested | EAH |
| 15 | Language on when our first revenue was | EAH |
| 16 | Language on why we do some venipuncture | EAH |
| 17 | Language on the device comparison and lab comparison b/t Theranos and Quest | EAH |
| 18 | Language on medical advisory board | EAH |
| 19 | Point about the fact that we're a CLIA certified lab and not a technology company that publishes on our technology – background on this | EAH |
| 20 | Send him the Moira Gunn interview | EAH / Pl |
| 21 | Quotes from pharma companies | EAH / Pr present |
| 22 | Follow up on intermountain POC<br> - How far along we are and operationalizing that in terms of their sending us samples | EAH and |
| 23 | Data on how far along we are with Dignity | EAH and |

| 24 | Intro to Charles Rougsel | EAH or |
| 25 | Is it OK to talk to General Mattis? | EAH or |
| 26 | IPad App – show mock up | Jeff |
| 27 | Preview of .md and .me – consumer focus | Jeff |
| 28 | Recording of HEP presentation | PM Team |
| 29 | Include data on the fact that we're making pricing at 90% below Medicare (chlamydia and gonorrhea) | PM team |
| 30 | Medicare/Medicaid sources on savings from reflex testing | PM team |
| 31 | More quotes from patients, physicians, nurses, payors | PM/Sale |

I've also attached the ppt deck previously sent to Roger, for reference.

Thanks,

Dan

Confidential

THPFM0001374396



CONFIDENTIAL



Theranos Angiogenesis Study Report

Pfizer, Inc.

**Document Outline:**

- ∞ Introduction to Theranos
- ∞ Background on Theranos Studies
- ∞ Economic Impact of Theranos Systems to Pharma
- ∞ Angiogenesis Program Overview
    - o Study design
- ∞ Theranos System Overview
    - o Specifications
    - o Theranos System Performance
- ∞ Theranos Field Study
    - o Field Performance Overview
    - o Trial Data
    - o Evaluation of time course results from individual patients
    - o Review of generated data, in aggregate by patient ID, sex, cancer type, treatment, etc.
    - o Integrated patient information, including date and time of monitoring, medication received, self evaluation of overall health status of each patient and other clinical data in a comprehensive format
    - o Assessment of the technical performance of the Theranos System
        - ▪ Data transmission % success and mode of transmission used
        - ▪ General performance information as logged via the Customer Care line
        - ▪ Assessment of patient compliance with protocol
    - o Summary of patient and clinical staff assessment of the Theranos System and the Client Solutions team via end-of-study surveys
- ∞ Conclusions
    - o General
    - o Technical
    - o Economic

**Introduction to Theranos:**

Accurately, rapidly, and effectively profiling the efficacy dynamics of a therapy in clinical studies is an unmet need that has long challenged the conventional blood testing infrastructure.

Theranos has demonstrated in clinical studies that more frequent longitudinal time-series measurements on fresh whole blood samples with a multiplexed platform that eliminates the noise (and inability to accurately characterize very broad dynamic ranges) of conventional tests is imperative to effectively characterizing physiological changes and the efficacy of any intervention.

Theranos' wirelessly integrated data analytical system allows for 'baseline' profiles of pathway dynamics to be created and updated automatically as data is generated in the field. If needed, analyte selection or frequency of sampling can be adjusted at any time during the study based on the data coming in.

In future studies within a given indication, the data analytical infrastructure can be used for predictive modeling wherein new patient data can be indexed against the stored baseline profiles for earlier reads on efficacy dynamics and dose-response.

Confidential

THPFM0001374397



CONFIDENTIAL



**Background on Theranos Studies:**

Every day gained in getting a new brand to market can be measured in millions of dollars.

Time is a major factor of cost of development of a new drug. For years the pharmaceutical industry has worked to drive every day possible out of the development process, and has reached a point where the physical limitations around the timelines for statistically significant data acquisition primarily determine the time to market.

Theranos Systems revolutionize those timeline constraints by enabling instant access to higher quality data and exponentially faster reads on efficacy and safety dynamics from the initiation of clinical trials. In doing so, Theranos is laying the foundation of a new growth model for pharma.

Theranos Systems radically impact revenues and growth on new and existing drugs in ways that were previously not possible:

- ♦ Faster approvals and studies - Immediate access to results enables immediate decision making and planning; early reads on efficacy dynamics and dose optimization for sub-populations through more comprehensive longitudinal PK/PD profiling
- ♦ Reimbursement and differentiation - Concrete reads on efficacy dynamics and visibility into mechanisms of action to optimize compounds dynamically
- ♦ Rapid access to multiple markets pre and post-approval - early reads on efficacy through trends in the change in rate of key markers allow for rapid label expansion
- ♦ Amelioration of safety concerns – more accurate reads on actual pathway dynamics enable rapid optimization where beneficial and delineation of patient sub-populations

**Economic Impact of Theranos Studies to Pharma:**

Based on Theranos' previous experience, predictive modeling and more comprehensive longitudinal profiling has resulted in the demonstration of meaningful dose-response and efficacy dynamics profiles in 6 month timeframes where the conventional infrastructure took two years and was still not able to generate hard correlations. An 18 month time-savings, not to mention the ability to gain insight into methods for optimization for label expansion, can conservatively be equated to hundreds of millions of dollars gained. With industry estimates at $1-3M a day for the value of each day gained in time to market, even 6 months saved ranges between $180M and $540M in return on investment.

Equally, once the infrastructure has been implemented, future studies are requiring about 25% fewer patients, reducing the patient costs, number of sites required, assay development, reagent screening, and infrastructure costs for shipping and processing samples through ambulatory point-of-care monitoring.

Overall savings on 6 month trials once the data analytical infrastructure has been established have averaged 50% of the cost of running an equivalent trial through the conventional infrastructure, further saving millions of dollars. As the data analytical engine evolves after the first 6 month study, costs are further reduced in each follow-on study, covering the cost of Theranos infrastructure and units many times over.

Ultimately though, the greatest economic return on investment lies in the ability to expand percentage market ownership through visibility into pathway dynamics that enables rapid characterization of responder populations in ways previously not possible. This capability enables

Confidential

THPFM0001374398



CONFIDENTIAL



commercialization of 'targeted blockbusters' by redefining a company's historical success rate in realizing the target product profile of each drug once it hits the market.

**Angiogenesis Program Overview:**

The primary objective of the present program was to demonstrate the functionality of Theranos Systems in such a way that future studies could fully leverage the power of comprehensive longitudinal time-series profiling for rapid compound optimization and development.

For this program, Theranos was asked to develop multiplexed point-of-care assays for VEGF and PlGF for use in monitoring patient pharmacodynamic response to anti-angiogenesis therapies. Because the development of VEGFR2 in that multiplex was desirable as a tool for use in future studies, Theranos developed the assay and included it in the point-of-care multiplex.

In this program, Theranos validated not only functional equivalence, but superior performance specifications of the Theranos multiplex to each of the respective 'gold-standard' kits.

An Interim Report on Assay Development was submitted to Pfizer in Q2 '07 upon successful completion of assay development.

As planned for at the interim update meeting with Pfizer, the first patient began participating in the study in July of 2007. In order to fast-track the program timeline, Theranos contracted an independent site - Tennessee Oncology Center.

Enrollment of Sutent patients at this site was very slow; from the time patient screening began (early 2007) and after discussions with respective members of the Pfizer team, the protocol was revised several times to increase the frequency of monitoring but reduce the total number of patients and shorten the monitoring cycles per patient. Likewise, enrollment criteria were broadened to include patients on other therapies with whom trends in the relevant markers could also be profiled.

In doing so, statistical significance in meeting the study goals could still be ensured. Multiple IRB submissions were filed. Final IRB and Informed Consent Forms were included in two interim update reports sent to Pfizer.

*Goals of Study*:
1. Generate preliminary data on VEGF and PLGF trends in cancer patients while assessing the use of the Theranos System in the hands of clinicians and patients.
2. Obtain feedback and recommendations from clinical staff.
3. Assess the use of the Theranos System in the hands of ambulatory patients at home.
4. Assess the Ambulatory Bioinformatics Communications System[1] including the physician and patient web portals as well as the data reports generated.

*Study design*:
Patient screening began in January 2007, once the final site was selected, enrollment began. In July of 2007, the first patient was enrolled in the trial. This trial consisted of very ill late-stage (4th line) cancer patients with various tumor types receiving a variety of therapies at the Sarah

---

[1] The Ambulatory Bioinformatics Communication System (formerly known as ABCS) was rebranded as TheranOS, the Theranos Operating System.

Confidential



CONFIDENTIAL



Cannon Research Center at Tennessee Oncology (TNONC) in Nashville, Tennessee. The patients in the study typically resided in very remote locations across the eastern US. Almost all patients were not computer literate, and most were from low income families, unable to afford private telephone service.

The Theranos angiogenesis monitoring system was evaluated for clinical efficacy and as a means of more accurately and effectively monitoring cancer therapy and the progression of solid tumor cancers from a mechanism-of-action perspective.  32 patients were enrolled. Various cycles of therapies were monitored as well as physical changes in tumor size.

Four of the patients retracted consent to the study, three of them due to family problems and one due to mental and physical instability.  Thus, Theranos increased the targeted enrollment number to ensure that the goal of demonstrating performance across significantly significant patient numbers would be met. That goal has now been achieved. To realize the goal, some patients had extended (60 day) monitoring periods.

Since Theranos has the ability to continue monitoring patients under the existing IRB and given the power of some of the correlations which are becoming apparent, Theranos may continue monitoring those patients for an extended period of time.

Enrollment was unpredictable and slow. All installations and shipments completed for this study were done on-demand with less than 24 hours.  As part of the installation procedure, Theranos' client solutions team has performed at-home installations and pick-ups for many weak patients.

For each patient, a total of up to 14 time points were collected during the month-long analysis period, 3-4 time points taken at the clinic and the other 10-11 time points taken in-home.  Both finger-stick and venous samples were taken during each clinic visit, while only finger-stick samples were run in-home.  The venous draw samples were run on the Theranos System in the clinic at the time of the draw; these samples were also processed so that the plasma and/or serum was analyzed using a reference method.

Venous samples were processed using reference methods and provide an archive of 41 anti-coagulated plasma and serum samples which were frozen and have subsequently been analyzed at Theranos.

**Theranos System Overview:**

The Theranos System is comprised of consumer-oriented readers, single-use cartridges containing assay chemistry and controls, and a data collection system that communicates through cellular networks with the instrument to provide assay protocols and to compute and display results.

The steps required of a new patient are to 1) take the machine out of the box and 2) plug it into a power source. The touch-screen then walks each patient through the process of poking his/her finger, depositing blood into the cartridge, and placing the cartridge in the reader drawer. The instrument then processes the assays and sends the data through the cellular network in real-time to a secure web-portal.

Theranos Systems allow for quantitative, multiplexed longitudinal time-series measurements to map correlations between the rate of change of blood-borne markers over time to surrogate and clinical end-points.

Confidential



CONFIDENTIAL



Specifications:

❖ Designed for at home use. Can also be used in physician's offices, ICU, and laboratories.
❖ Multiplexed measurement of biomarkers.
❖ Customizable for different/new assays on demand.
❖ Average 6 measurements per cartridge
❖ Serial measurements to comprehensively profile pharmacodynamic response through trends
❖ Runs fresh whole blood, plasma or serum samples
❖ Finger-stick – small sample size
❖ Mix and match selection of analytes on demand.
❖ Wide measurement range
  ○ pg/mLl – mg/mL (1 billion fold)
❖ High sensitivity
  ○ 0.2 pg/mL (2 parts per 10-billion)
❖ Analyte Recovery: ~100 %
❖ System CV post-calibration (inter-intra reader, cartridge, and assay): < 10 %
❖ On-board chemistry controls
❖ Factory calibration (no user calibration)
❖ Wireless communication of results to appropriate user through cellular network
❖ Proprietary algorithms to interpret time trend results

The existence of a technology infrastructure for home, real-time blood monitoring allows collection of information which cannot be obtained using conventional blood testing scenarios:
❖ Small sample (finger-stick) + more frequent sampling of a small subset of analytes enables:
  ○ Identification of appropriate analytes (greatly helped by more frequent sampling)
  ○ Earlier detection of efficacy and safety  and  acute problems so intervention (for example, dose modification or change in drug type) can be more effective
  ○ Convenience of monitoring through-out a time-course before an event
❖ Higher sample integrity; real-time sample analysis on fresh whole blood on a standardized platform which can be deployed  at any location (world-wide) eliminates assay inaccuracy associated with commercially available tests performed on samples which are "old" by the time they are analyzed.
  ○ Elimination of  erroneous results (caused by analyte instability ) and inherent errors in data and patient correlations (caused by processing data at various contract locations)

3200 Hillview Palo Alto, CA  94304
phone:  650.838.9292   fax:  650.838.9165   www.theranos.com

5



CONFIDENTIAL







For this study, an instrument was deployed in the home of each patient; four others were installed at the Cancer Center.

Three assays were performed simultaneously in multiplex by the system on a finger-stick sample of fresh whole blood.  The analytes were Vascular Endothelial Growth Factor (VEGF), soluble VEGF receptor R2 (sVEGFR2, usually referred to as VEGFR2) and Placental Growth Factor (PLGF).  Each assay was controlled using within-cartridge control measurements.

The system was calibrated at Theranos. Multiple cartridge lots were produced each with successively more clinically relevant specifications once samples were received from patients in the trial, as samples were not available during assay validation. Each lot was independently calibrated.

*Traceability of calibration*:  Calibration is traced to authentic analytes dissolved at known concentrations in a plasma-like matrix.  Calibration materials are prepared as mixed solutions of the three analytes.  Assignment of calibrator concentrations is then made to values found for measurements of calibrators using reference assays.

*System Performance Goals*:

| Assay | Reportable low pg/mL | Reportable high pg/mL | Precision CV, % |
|---|---|---|---|
| VEGF | 20 | 10,000 | 10 |
| VEGFR2 | 150 | 15,000 | 10 |
| PLGF | 5 | 1,000 | 10 |

*Assay ranges achieved*:
The goals for each assay's dynamic range were achieved.  Due to the inability to receive samples for calibration at the beginning of the studies, the upper limit of calibration for VEGF was restricted to 3,000 pg/mL in the first cartridge lots, but then extended[2] to 10,000 pg/mL.  For early cartridge lots the PLGF assay lower limit of sensitivity was 50 pg/mL.  Therefore, many early results for PLGF were out-of-range low ("OORL"). Lots produced after receiving samples for calibration have reportable ranges below 20 pg/mL.

---

[2] All three assays have a linear dose-responses extending far above the highest calibrator used.

Confidential                                                                     THPFM0001374402



CONFIDENTIAL



*Specificity*:
The specificity of the assays depends on the pairs of antibodies chosen for each assay. In the first instance, we rely on the antibody vendor information. Selected pairs are known to have good specificity in ELISA assays. Key issues for these analytes are (1) the structural relationship of VEGF and (2) the fact that VEGF binds to sVEGFR2. We have shown that the Theranos assay system is not affected by the presence of VEGF and VEGFR2 and PLGF in the same samples. In many patients in this study, the drug Avastin is used. This drug is an antibody that binds to VEGF. It is obvious that ELISA assays for VEGF (and perhaps VEGFR2) using antibody pairs are likely to be interfered with by Avastin. As documented below, Theranos assays for VEGF and VEGFR2 appear to function with minimal interference from Avastin. In contrast, the selected reference assay for VEGF is strongly interfered by Avastin.

<u>Theranos System Performance</u>:

*Assay accuracy*:
Accuracy has been evaluated by analysis of clinical samples. Two sets of samples have been used: (1) A set of 12 serum samples from cancer patients (obtained from a commercial vendor), (2) 41 archived serum and plasma samples from this study. Because Avastin was used to treat many of the patients in the TNONC study and this antibody strongly interferes with the reference method, we used the commercially available samples for VEGF assay evaluation.

Twelve serum samples were assayed (singlicate) in the Theranos system and in duplicate for the reference method with the following results:

VEGF:  y (Theranos) = 0.785 x (reference) + 95.2; $R^2$ =0.99. Range 96 – 1985 pg/mL. One sample was rejected from the analysis giving very high results in the Theranos system and low results in the reference assay. Based on the study data, it seems likely this patient was being treated with the drug Avastin, which interferes with the reference assay.

Confidential

THPFM0001374403





CONFIDENTIAL

**Single cartridge clinical results**



For VEGFR2, 39 TNONC samples were assayed in triplicate in the Theranos system and duplicate for the reference method. The results were: y (Theranos) = 1.29 x (reference) + 1004; R =0.83. Range 1015 – 9285 pg/mL.

Confidential

THPFM0001374404



CONFIDENTIAL





For the initial PLGF samples analyzed by Theranos in the field and with the reference method the results fell mostly in the undetectable range of both methods. Once the Theranos calibration was re-optimized, values became detectable from 5-17 pg/mL in the out-of-range-low venous samples sent to Theranos.

A significant correlation was achieved during validation on normal serum samples from twenty pregnant women assayed in quadruplicate. They were analyzed on both the Theranos system and the reference R&D Systems kit. The following results were obtained: y (Theranos) = 1.26*x (R&D Systems); R = 0.96.  The average within sample CV for the Theranos results was 9%.  One sample (shown in pink) below gave discrepant results.

Confidential

THPFM0001374405



CONFIDENTIAL





When the results for patients were segregated by trimester and averaged, the concordance shown below was found.

3200 Hillview Palo Alto, CA  94304
phone:  650.838.9292   fax:  650.838.9165   www.theranos.com

10



CONFIDENTIAL





*Effect of Avastin on the reference VEGF assay*:

Comparison of reference and Theranos VEGF assay results for venous samples were not correlated.  Many Theranos results were in the thousands of pg/mL where reference assay gave a low value.  Since it was noted that many of the patients had been treated with Avastin which binds to VEGF, Theranos did a study of spike recovery for the reference method.  VEGF (400 pg/mL) was added to each sample and the assay repeated.  Results are shown below:

| Avastin Present | VEGF average, pg/mL Ref | VEGF average, pg/mL Theranos |
|---|---|---|
| N | 149 | 588 |
| Y | 136 | 8359 |

| | VEGF spike recovery, % | |
|---|---|---|
| N | 66.5 | |
| Y | -1.3 | |

It is evident that Avastin completely blocks the reference assay response.  Presumably, Avastin binds at a site on VEGF close to or identical with that recognized by one of the antibodies used in the reference method.  The reference assay thus responds only to free VEGF whereas the Theranos assay is not blocked and measures both Avastin-bound and free VEGF.

3200 Hillview Palo Alto, CA  94304
phone:  650.838.9292   fax:  650.838.9165   www.theranos.com

11



CONFIDENTIAL



*Assay precision*:

Inter-Instrument Precision:
Venous samples from patients were run across four instruments.

| Assay | Reportable low pg/mL | Reportable high pg/mL | Precision CV, % |
|---|---|---|---|
| VEGF | 20 | 10,000 | 8.0 |
| VEGFR2 | 150 | 15,000 | 7.3 |
| PLGF | 5 | 1,000 | 9.2 |

Precision in comparison to available reference methods was evaluated during calibration. Singlicate measurements from six instruments were used next to commercially available 'gold-standards'. Theranos adjusted the target range after obtaining clinical samples. Due to the superior performance characteristics of Theranos' assay next to commercial standards, obvious variances are seen where the reference methods report OORL.

Single lot calibration data:

| Analyte | Range (pg/mL) | Average CV, % |
|---|---|---|
| VEGF (lot 3) | 30 – 10,000 | 12.0 |
| VEGF (lot 1) | 30 – 3,000 | 10.0 |
| VEGFR2 (lot 3) | 1,000 – 10,000 | 4.8 |
| VEGFR2 (lot 1) | 50 – 800 | 17.6 |
| PLGF (lot 3) | 5 – 780 | 26.9 |
| PLGF (lot 1) | 50 – 800 | 9.1 |

Precision was also measured by analysis of the 41 archived clinical samples in assays and for VEGF 12 commercial samples.

| Analyte | Range (pg/mL) | Average CV, % |
|---|---|---|
| VEGF | 30 – 10,000 | 16.7 |
| VEGF[3] | 96 – 1985 | 5.7 |
| VEGFR2 | 1,000 – 10,000 | 20.4 |
| PLGF | 5 – 780 | 28.7 |

*Dilution linearity*:

Data gathered during lot calibration.

| VEGF, pg/mL | Recovery, % |
|---|---|
| 10000 | (100) |
| 2970 | 102 |
| 990 | 95 |
| 297 | 105 |
| 100 | 109 |
| 30 | 105 |
| 10 | 101 |

---

[3] Commercial samples

Confidential

THPFM0001374408



CONFIDENTIAL



| VEGFR2, pg/mL | Recovery, % |
|---|---|
| 10560 | (100) |
| 7920 | 92.9 |
| 5280 | 100.9 |
| 3960 | 104.8 |
| 2640 | 97.7 |
| 1320 | 100.8 |

| PLGF, pg/mL | Recovery, % |
|---|---|
| 780 | 100.0 |
| 312 | 87.6 |
| 156 | 102.8 |
| 47 | 106.3 |
| 16 | 92.4 |
| 5 | 99.4 |

For all assays, recovery was close to 100 % in the reportable range.

*Limit of detection (LOD)*:
Data gathered during calibration.  The LOD is defined at a 95 % confidence level.

| Analyte | LOD, pg/mL |
|---|---|
| VEGF | < 20 |
| VEGFR2 | < 200 |
| PLGF[4] | < 20 |

**Theranos Field Study:**

The system has been deployed to patient's homes and the TNONC study clinic and has downloaded protocols and uploaded data wirelessly. Some patients used direct telephonic communications (POTs modems) if they were worried about cell reception. Data for every patient has been profiled on a secure, Pfizer-specific server.

<u>Field Performance Overview:</u>

In this report we document results from:

- ∞   27 patients (41% female and 59% male)
- ∞   13 cancer types
- ∞   38 Instruments
  - o   27 instruments deployed to patients' homes

---

[4] Later stage cartridge lots



CONFIDENTIAL



- o 4 instruments deployed to the clinical site in Nashville, TN
- o 4 updated instruments to replace the readers at the clinical site such that the latest design revolution is deployed at the site
- o 3 were used to replace malfunctioning readers in the field (2 at clinic - one with communication issue, one mechanical due to user error; 1 at patient's home with mechanical issues from shipping)
- ∞ 445 cartridges (approximately 1300 assay results)
  - o This number includes cartridges run in-house on archived plasma as well as results gathered in-field

Data acquisition has proven feasible in the home setting. There were instruments in the field operating in extreme temperature conditions (from very hot, no A/C to A/C turned to the maximum) as well as in very diverse locations (from RV's to log cabins in the middle of forests), in remote, difficult to reach areas where poor cellular reception is prevalent.

The instruments have been deployed across three states, including Kentucky, Pennsylvania and Tennessee.  As mentioned, typical turnaround time for installation and patient at-home test was less than 24 hours without notice.

In monitoring this multiplex of analytes at far greater frequency than ever before, considerable patient-response variation can be seen across different sub-patient populations, therapies, and cancer types.

When we look at the average results from each patient and the variation seen for each patient, it is evident that the patients vary drastically:

|         | VEGF Avg., pg/mL | VEGFR2 Avg., pg/mL | PLGF Avg., pg/mL |
| --- | --- | --- | --- |
| Maximum | 13,584 | 6,317 | 410 |
| Minimum | 47.5 | 368 | 37.3 |

**By evaluating sample statistics such as these, one can identify patients who are anomalous and who may benefit from therapy modification.**

For example, of the 13 patients with colon cancer we see one subject with an average VEGF of 13,600 pg/mL and another with an average of 255 pg/mL whereas most of the patients had VEGF values quite closely clustered at 1000 - 5000 pg/mL.  Similarly, we see some subjects who show very little variation in analyte values and others with wide variations presumably related to response (high or low) to therapy.

Trial Data:

The following raw trial data is included in the appended spreadsheet:

1. Clinic visit diagnostics (Patient characteristics and Clinical assay results)
2. Clinic visit pivot table (clinical results presented as a customizable pivot table)
3. Patient aggregate data (Compliance data, Result averages and CVs by patient and averages by cancer type)
4. All field analyte data results (from the Theranos system presented by patient in a filtered table format [sort-able])
5. Treatment data (drugs used and dosage)

---

3200 Hillview Palo Alto, CA  94304
phone:  650.838.9292   fax:  650.838.9165   www.theranos.com

14

THPFM0001374410



CONFIDENTIAL



6. Individual end-of-study results (patient evaluation of system)
7. Compilation and summary of end-of-study survey results
8. Data transmission statistics

<u>Evaluation of time course results from individual patients:</u>

The study data demonstrates that in a larger, statistically controlled study, where the endpoint is directly proportional with patient outcome, e.g., a RECIST Score, a correlation between analyte dynamics and patient response to treatment would be generated.

To showcase the ability to profile predictive correlations between treatment and response profiles, we selected data from two patients -- 14 and 12. Due to patient 14's clinic schedule (first figure below), we were able to collect data following multiple infusion dates, allowing limited statistical analysis to be performed that correlates analyte levels with treatment administration. The cross-correlation function (second figure below) looking at VEGF and VEGFR2 blood levels for patient 14 shows a positive correlation at a cadence of 3 data points. This coincides with the patient's weekly clinic visits during which the patient receives the Avastin infusions.



The change in rate of the parameters can be correlated to progress, seen again below in a correlation plot:

3200 Hillview Palo Alto, CA  94304
phone:  650.838.9292   fax:  650.838.9165   www.theranos.com

15





CONFIDENTIAL



For patient 12 (first figure below), we observe an inverse correlation between VEGF and VEGFR2 blood levels. This suggests that the blood analytes behave differently with different drug treatments, pointing at distinct pathways of drug activity (second figure below).

---

3200 Hillview Palo Alto, CA 94304
phone: 650.838.9292  fax: 650.838.9165  www.theranos.com

16

THPFM0001374412



CONFIDENTIAL





### tnonc12.vegf & tnonc12.vegfr2



3200 Hillview Palo Alto, CA  94304
phone:  650.838.9292   fax:  650.838.9165   www.theranos.com

17



CONFIDENTIAL



For most patients analyzed, the sample size and sample numbers did not provide sufficient statistical power to derive a statistically significant conclusion but some clinical endpoint measurements were accessible to correlate analyte vectors and their rates of change with time to the patient's progression and response to treatment.

Patient average VEGF and VEGFR2 data by cancer type:

| Patient ID | Cancer type | Main Treatment | Average VEGF (pg/ml) | Average VEGFR2 (pg/ml) |
|---|---|---|---|---|
| SCP001 | Adenocarcinoma | Sutent | 47.5 | 2592 |
| SCP006 | Breast Cancer | Avastin | 2082 | 2662 |
| SCP010 | Breast Cancer | Avastin | 2055 | 3040 |
| SCP008 | Breast Cancer | Sorafenib | 98 | 1863 |
| SCP021 | Colorectal Cancer | Avastin | 4677 | 3646 |
| SCP027 | Colorectal Cancer | Sorafenib | 1093 | 4863 |
| SCP029 | Colorectal Cancer | Sorafenib | 3612 | 5658 |
| SCP003 | Colorectal Cancer | Sutent | 72 | 2798 |
| SCP007 | Colorectal Cancer | Avastin | 3860 | 2350 |
| SCP009 | Colorectal Cancer | Avastin | 1840 | 368 |
| SCP022 | Colorectal Cancer | Avastin | Patient dropped | N/A |
| SCP014 | Colorectal Cancer | Avastin | 1826 | 1634 |
| SCP019 | Colorectal Cancer | N/A | Patient dropped | N/A |
| SCP016 | Colorectal Cancer | Avastin | 3006 | 2143 |
| SCP031 | Colorectal Cancer | Avastin | 13584 | 5463 |
| SCP024 | Colorectal Cancer | Sorafenib | 255 | 1540 |
| SCP028 | Colorectal Cancer | Sorafenib | 1274 | 6317 |
| SCP023 | Esophageal Cancer | Avastin | 3145 | 2260 |
| SCP030 | Gastrointestinal Stromal Tumor | Sutent | 889 | 2424 |
| SCP012 | Liver Cancer | Sorafenib | 96 | 1253 |
| SCP017 | Lung Cancer | Avastin | 3947 | 2111 |
| SCP025 | Melanoma | Avastin | 5399 | 3294 |
| SCP002 | Neuroendocrine carcinoma | N/A | Patient dropped | N/A |
| SCP026 | Ovarian Cancer | Sorafenib | Patient dropped | N/A |
| SCP020 | Renal Cell Carcinoma | Sutent | 368 | 883 |
| SCP004 | Renal Cell Carcinoma | Avastin | 2316 | 1057 |
| SCP011 | Renal Cell Carcinoma | Avastin | 3159 | 1911 |
| SCP013 | Renal Cell Carcinoma | Avastin | 3908 | 770 |
| SCP015 | Renal Cell Carcinoma | Avastin | 3031 | 1068 |
| SCP018 | Tongue Cancer | Avastin | 1457 | 3074 |
| SCP005 | Unknown Primary | Avastin | 3099 | 2980 |

As referenced, patients #2, #19, #22, #26 dropped out of the study for various reasons; therefore average values are not statistically significant for them.

3200 Hillview Palo Alto, CA 94304
phone: 650.838.9292  fax: 650.838.9165  www.theranos.com

18



CONFIDENTIAL



For the patients in whom PLGF is consistently detectable we selected plots as shown below.



Confidential

THPFM0001374415

Trial Exh. 1753 Page 0025



CONFIDENTIAL





**SCP020 (gender-f) PLGF**

Patient monitoring times and quality of life by gender:

| Patient ID | Cancer type | Gender | Time of day when home monitoring was performed (on average)* | Quality of life (as measured by on-screen survey) (on average)* |
|---|---|---|---|---|
| SCP001 | Adenocarcinoma | f | Morning | N/A (Survey was not yet deployed) |
| SCP006 | Breast Cancer | f | Afternoon | 7 |
| SCP010 | Breast Cancer | f | Evening | 8 |
| SCP008 | Breast Cancer | f | Late Evening | 7 |
| SCP021 | Colorectal Cancer | f | Noon-afternoon | 8 |
| SCP027 | Colorectal Cancer | f | Afternoon | 10 |
| SCP029 | Colorectal Cancer | f | Afternoon-Evening | not yet available |
| SCP003 | Colorectal Cancer | f | Morning | N/A (Survey was not yet deployed) |
| SCP017 | Lung Cancer | f | Evening | 9 |
| SCP026 | Ovarian Cancer | f | N/A | N/A |
| SCP020 | Renal Cell Carcinoma | f | Afternoon | 6 |
| SCP005 | Unknown Primary | f | Afternoon | 9 |

3200 Hillview Palo Alto, CA 94304
phone: 650.838.9292 fax: 650.838.9165 www.theranos.com

20



CONFIDENTIAL



| SCP007 | Colorectal Cancer | m | Evening | 7 |
|---|---|---|---|---|
| SCP009 | Colorectal Cancer | m | Late Evening | 7 |
| SCP022 | Colorectal Cancer | m | N/A | 8 |
| SCP014 | Colorectal Cancer | m | Morning | 7 |
| SCP019 | Colorectal Cancer | m | N/A | N/A |
| SCP016 | Colorectal Cancer | m | Evening | 8 |
| SCP031 | Colorectal Cancer | m | Afternoon | not yet available |
| SCP024 | Colorectal Cancer | m | Afternoon | 9 |
| SCP028 | Colorectal Cancer | m | Evening | not yet available |
| SCP023 | Esophageal Cancer | m | Morning | 8 |
| SCP030 | Gastrointestinal Stromal Tumor | m | Morning | not yet available |
| SCP012 | Liver Cancer | m | Afternoon | 10 |
| SCP025 | Melanoma | m | Morning | 9 |
| SCP002 | Neuroendocrine carcinoma | m | N/A | N/A |
| SCP004 | Renal Cell Carcinoma | m | Noon-afternoon | 10 |
| SCP011 | Renal Cell Carcinoma | m | Morning | 9 |
| SCP013 | Renal Cell Carcinoma | m | Evening | 10 |
| SCP015 | Renal Cell Carcinoma | m | Evening | 7 |
| SCP018 | Tongue Cancer | m | Afternoon | 5 |
| * Actual time for each test point and diurnal variations of quality of life can be found online | | | | |

Patient compliance with optional on-screen questionnaire was approximately 86% (this number was calculated before the end of the study, therefore final compliance figures may change).

3200 Hillview Palo Alto, CA  94304
phone:  650.838.9292   fax:  650.838.9165   www.theranos.com

21

Trial Exh. 1753 Page 0027

THPFM0001374417



CONFIDENTIAL



Patient clinical visit data by age:

| Patient ID | Race | Smoking Status | Alcohol Consumption | Age | Weight (pounds) |
|---|---|---|---|---|---|
| SCP029 | Caucasian | does not smoke now, positive history | None | 36 | 179 |
| SCP010 | Caucasian | never smoked | monthly or less | 45 | 165 |
| SCP018 | Caucasian | Smoke daily | None | 45 | 181 |
| SCP007 | Caucasian | never smoked | None | 46 | 213 |
| SCP008 | Caucasian | smoke occasionally | None | 46 | 180 |
| SCP002 | Caucasian | never smoked | monthly or less | 49 | 194 |
| SCP016 | Caucasian | smoke occasionally | monthly or less | 49 | 167 |
| SCP012 | Caucasian | does not smoke now, positive history | None | 53 | 190 |
| SCP015 | Caucasian | does not smoke now, positive history | None | 53 | 174 |
| SCP028 | Caucasian | smoke occasionally | None | 57 | 262 |
| SCP001 | Caucasian | does not smoke now, positive history | None | 61 | 172 |
| SCP027 | African American | never smoked | None | 62 | 167 |
| SCP009 | Caucasian | never smoked | None | 63 | 221 |
| SCP011 | Caucasian | does not smoke now, positive history | monthly or less | 63 | 305 |
| SCP024 | Caucasian | infrequent attempts (never developed a habit) | Every day | 64 | 200 |
| SCP023 | Caucasian | never smoked | Every day | 65 | 252 |
| SCP005 | Caucasian | does not smoke now, positive history | monthly or less | 66 | 160 |
| SCP021 | Caucasian | smoke occasionally | monthly or less | 66 | 198 |
| SCP006 | Caucasian | never smoked | monthly or less | 68 | 163 |
| SCP017 | Caucasian | does not smoke now, positive history | Every day | 69 | 112 |
| SCP013 | Caucasian | never smoked | monthly or less | 71 | 230 |
| SCP020 | Caucasian | never smoked | None | 72 | 101 |
| SCP026 | Caucasian | never smoked | None | 73 | 132 |
| SCP031 | Caucasian | does not smoke now, positive history | None | 73 | 134.5 |
| SCP025 | Caucasian | does not smoke now, positive history | None | 77 | 184 |
| SCP014 | Caucasian | does not smoke now, positive history | monthly or less | 78 | 217.5 |
| SCP022 | African American | never smoked | None | 82 | 178 |
| SCP030 | Caucasian | never smoked | None | 83 | 182 |

Confidential

Trial Exh. 1753 Page 0028

THPFM0001374418



CONFIDENTIAL



Sample of patient clinical blood work by patient ID:

| Patient ID | Avg. % Lymphocytes | Avg. Heart Rate | Avg. Total Bilirubin | Avg. Systolic BP | Avg. RBC |
|---|---|---|---|---|---|
| SCP001 | 33.4 | 67.7 | 0.7 | 129.3 | 3.2 |
| SCP002 | 34.1 | 55.0 | 0.3 | 161.0 | 4.3 |
| SCP004 | 27.8 | 64.7 | 0.5 | 144.7 | 3.2 |
| SCP005 | 36.4 | 75.0 | 0.2 | 127.5 | 3.9 |
| SCP006 | 29.5 | 100.7 | 0.3 | 112.7 | 4.3 |
| SCP007 | 24.0 | 73.0 | 0.3 | 131.3 | 4.4 |
| SCP008 | 23.7 | 84.0 | 0.4 | 124.0 | 5.1 |
| SCP009 | 25.0 | 71.5 | 0.7 | 133.0 | 4.5 |
| SCP010 | 45.3 | 74.3 | 0.9 | 137.8 | 4.5 |
| SCP011 | 28.6 | 82.0 | 0.6 | 135.0 | 4.8 |
| SCP012 | 28.3 | 75.5 | 0.7 | 122.0 | 4.0 |
| SCP013 | 31.1 | 72.0 | 0.7 | 137.0 | 4.2 |
| SCP014 | 40.2 | 81.5 | 0.4 | 125.3 | 4.0 |
| SCP015 | 35.4 | 78.3 | 0.3 | 147.0 | 5.0 |
| SCP016 | 18.0 | 75.3 | 0.3 | 131.3 | 4.9 |
| SCP017 | 20.7 | 89.3 | 0.4 | 114.0 | 4.2 |
| SCP018 | 23.4 | 70.0 | 0.3 | 133.0 | 4.8 |
| SCP020 | 17.9 | 60.7 | 0.4 | 146.0 | 3.7 |
| SCP021 | 36.5 | 91.0 | 0.4 | 130.0 | 4.8 |
| SCP022 | 23.5 | 93.5 | 0.7 | 123.0 | 4.0 |
| SCP023 | 26.3 | 107.7 | 0.7 | 119.7 | 4.7 |
| SCP024 | 18.8 | 83.0 | 0.7 | 139.0 | 3.7 |
| SCP025 | 33.5 | 94.0 | 0.3 | 143.0 | 5.2 |
| SCP026 | 34.6 | 110.0 | 0.4 | 125.0 | 3.7 |
| SCP027 | 9.5 | 70.0 | 0.7 | 119.0 | 3.7 |
| SCP028 | 21.2 | 98.0 | 0.8 | 125.7 | 5.2 |
| SCP029 | 32.6 | 90.5 | 0.6 | 122.8 | 5.1 |
| SCP030 | 42.3 | 72.0 | 0.4 | 137.0 | 3.7 |
| SCP031 | 16.7 | 70.0 | 0.4 | 145.0 | 4.3 |

All individual patient data was profiled as it was generated on the Pfizer-specific secure portal at www.theranos.com; raw data can also be found in the attached excel spreadsheet.


Server and Data Transmission

Approximately 361 cartridge results and 203 optional home surveys from the field were successfully transmitted to the Theranos servers. There were less than 5% transmission errors that required the readers to either retry sending the data or wait until they had a better connection to send the data. All data gathered in the field was transmitted to the Theranos servers. For the first two patients, on-screen surveys were not available. The number of surveys received is smaller than the number of cartridge runs due to the above as well as patients filling only one survey for each of their clinic visits (even though they ran two cartridges per visit). Once surveys

Confidential

THPFM0001374419



CONFIDENTIAL



became available, each cartridge run also asked the user to complete an optional quality of life survey and compliance was very good.

| Data distribution by transmission pathway to date | | |
|---|---|---|
| Direct Internet Connection | Wireless-GSM | Traditional Phone line |
| 5.6 % | 90.7% | 3.7 % |

The only problem encountered with using GSM wireless phone technology was poor signal. The main reasons for poor cellular reception were: dense foliage, metal roofs and poor signal quality due to remote location. In one location (Stewart, TN), there was no cellular coverage at all; therefore the reader used the standard telephone line in order to connect to our servers and report data as it was gathered. All of this patient's logs were received by Theranos servers. In future studies, multiple network providers would be contracted for these areas.

<u>Overall performance of the Theranos System based on Customer Care log:</u>

The customer care line was available to patients 24 hours a day 7 days a week over the course of the entire study (July 07 to October 08). All calls were addressed professionally and all issues were resolved quickly, taking care to minimize the impact on patients and clinical staff.

The types of calls for which patients used the Customer Care line:

- o   Patient running low on supplies – the solution was to simply ship more of the needed supplies with overnight delivery to make sure patient had enough for the upcoming home tests.
- o   Patient not knowing how to turn machine on – the solution was to advise the patient over the phone on the procedures outlined in the setup sheet they received and to make sure they have the instrument up and running.
- o   Patient calling about scheduling an instrument pickup – solution was to schedule one of our representatives to pick up the machine or alternatively to have FedEx pick up the reader if patient was able to place it in the shipping container themselves.
- o   Patient called about blood transfer question – the solution was to advise the patient to leave the blood transfer device on a flat surface. If this solution was not sufficient, a new batch was shipped to make sure no capillary manufacturer defects were at fault.
- o   Patient called about instrument not recognizing cartridge – the solution was to ask patient to re-try and call back if problem persisted. The suspicion was that due to poor cellular signal the reader was unable to communicate, and by re-trying it would perform appropriately. There were no subsequent calls from patient.
- o   Patient called about instrument not being ready due to temperature – the solution was to ask patient to move reader away from A/C units and possible air currents. Patients had moved readers from initial installation location (one moved it to his RV, another into a really hot room) and the temperature extremes affected the readers' ability to maintain desired temperature. The Theranos readers are engineered to control temperature to eliminate variability associated with conventional assays.

The majority of systems deployed in the field performed their duties throughout the entire length of the patient monitoring schedule. One instrument had mechanical issues due to being misused; this happened during new personnel training at TNONC. The instrument was promptly replaced with a new instrument. Another failure occurred due to the instrument being damaged in shipping.

Confidential

THPFM0001374420

Trial Exh. 1753 Page 0030



CONFIDENTIAL



Although it performed its functions properly for the majority of the patient's schedule it eventually malfunctioned and was also promptly (~24 hours) replaced. Yet another issue was related to the cellular carrier not identifying the instrument. To expedite the process and assure that the clinic was adequately supplied it was decided to replace that instrument with one that was known to work.  The problem was later resolved off-line.

<u>Patient Compliance with protocol:</u>

It is hard to estimate the patient compliance with the exact protocol due to the factors out of Theranos' control. In many instances patients re-scheduled their clinic visits and the new appointments were not communicated to us. At the onset of each patient's home monitoring they were provided with a tentative schedule which in many cases changed due to patient's need to travel or inability to keep scheduled appointments. With this in mind, we estimate that patient compliance with protocol was still very good, at approximately 96 % (measured as 80-120% of expected testing completed and received). Given the missing information, a much more accurate derivation would be possible.

<u>Theranos System Assessment by Patients and Clinical Staff:</u>

Patient end of study surveys were sent out to all participants. To date, 17 responses were collected from patients.

Summary of patients' assessment of the Theranos system:

- 88% of patients surveyed found the Theranos System easy to use; no patients found it "very hard" to use.
- 76% of patients found the written instructions to be very informative, with clear directions; 12% did not read instructions
- 91% of patients scored the training given by their Theranos representative either a 9 or 10 (10 being very good training)
- 76% of patients found the Theranos System takes little time to use
  (scores between 1 and 4 were tallied, with 1 = very little time and 10 = a lot of time)
- 100% of patients found the optional touch screen survey on the Theranos System easy to use, giving scores of either 8, 9 or 10 (10 = easy to use, 1 = hard to use).
- On a scale of 10 to 1 (10 = least painful, 1 = most painful), only one patient gave the blood drawing experience a score of less than 6. 59% felt almost no pain, scoring either a 9 or 10.
- 100% of the patients that responded to the survey gave Theranos Customer Support an excellent or very good rating
- For the majority of patients, the Theranos System worked very well. The major ways of solving the questions patients had were figuring it out on their own or calling the Theranos Customer Care line.
- In the follow-up survey, 100% of patients that responded said they received excellent or very good technical support over the duration of the study.
- Most patients said they prefer monitoring from home (scored 8 through 10) using the Theranos System; 25% were indecisive (scored 4 to 6) when asked whether they prefer going to the clinic or using the Theranos System; only two patients would rather monitor at the clinic.

From the interactions with clinical staff at Tennessee Oncology, the system was:
1. well received and

Confidential

THPFM0001374421



CONFIDENTIAL



2. the client solutions team made a very positive impact on the clinical staff and patients through promptitude and professionalism.

<u>Conclusions:</u>

General:
1. The Theranos System performed with superior performance to reference assays while running in a complex ambulatory environment.
2. The existing Theranos support infrastructure enables on-demand home installation and patient training in extremely rural areas.
3. Patients preferred ambulatory monitoring to clinic visits and liked using the Theranos System.
4. Non-computer literate patients had no issues using the Theranos System.

Technical:
5. Inter-system accuracy is excellent and was demonstrated on a platform with superior performance specifications to reference methods.
6. Calibrations were updated with access to samples from the trial.
7. Good correlations were seen to various commercially available gold-standards.
8. Avastin does not block the Theranos assay.
9. The Theranos System can measure VEGF both free and bound to VEGFR2 and Avastin to better quantify dose-response.

Economic:
10. This 15 month study demonstrated the robust functionality of Theranos Systems. With this validation data, the technology can be applied to significantly cut costs and bring compounds to market faster:

11. More frequent sampling enabled better characterization of longitudinal time-series profiles of angiogenesis protein panels. More accurate insight of the change in rate of those panels over time enables significantly faster and earlier reads on efficacy dynamics.
    a. See efficacy dynamics trends and correlation to end-points in patient time-course profiles on the Pfizer web-portal at <u>www.theranos.com</u>.
12. Response profiles were seen in this study over 30 day intervals. Historically, these types of correlations have taken up to a couple years to demonstrate, or in some cases, were previously not demonstrable. This time gained facilitates rapid data generation for additions to a compendia and rapid label expansion of existing drugs. Equally, this approach can be used to fast-track approvals of key compounds and at the same time better optimize those compounds with better visibility to achieve the target product profiles.
    a. One of Theranos' pharma partners is publishing a report which estimates the increased time to market is valued at $1M per day – making every month quite substantial.
13. Through Theranos Systems, Pfizer will be able to reduce the number of sites, eliminate shipping costs for samples, processing costs, and analytical costs. Based on historical data, implementation of these systems will enable Pfizer to achieve ~50% cost savings over current study spending (previously demonstrated to be $15M of a $30M study budget). Equally, through better insight into pathway dynamics, Theranos is demonstrating the ability to reduce the number of patients required to show statistical significance in future studies by 30-50%.

Confidential

Trial Exh. 1753 Page 0032

THPFM0001374422

# EXHIBIT 43

1              UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____
                                      )
4    UNITED STATES OF AMERICA,        ) CR17-00290-RSL
                                      )
5                   Plaintiff,        ) SEATTLE, WASHINGTON
                                      )
6    v.                               ) September 16, 2021 -
                                      ) 10:00 A.M.
7    MUHAMMAD FAHD,                   )
                                      )
8                   Defendant.        ) SENTENCING HEARING
                                      )
9    _____)

10

          VERBATIM REPORT OF PROCEEDINGS
11      BEFORE THE HONORABLE ROBERT S. LASNIK
            UNITED STATES DISTRICT JUDGE
12   _____

13

14   APPEARANCES:

15   For the Plaintiff:      Francis Franze-Nakamura
                             Andrew C. Friedman
16                           U.S. Attorney's Office
                             700 Stewart Street, Suite 5220
17                           Seattle, WA 98101

18                           Anthony Victor Teelucksingh
                             Department of Justice - CRM
19                           POC McCoy Marcus
                             1400 New York Avenue, Room 7113
20                           Washington, DC 20530

21   For the Defendant:      Stephan R. Illa
                             Law Office of Stephan R. Illa
22                           P.O. Box 10033
                             Bainbridge Island, WA  98110

23
                             Peter A. Camiel
24                           Camiel & Chaney
                             2815 Elliott Avenue, Suite 100
25                           Seattle, WA 98121

1          THE COURT:  Good morning.  Thank you.  Please be seated.

2          THE CLERK:  This is the matter of the United States

3    versus Muhammad Fahd, CR17-290-RSL, assigned to this Court.

4       Counsel, please make your appearances for the record.

5          MR. FRANZE-NAKAMURA:  Good morning, Your Honor.  Francis

6    Franze-Nakamura, Andrew Friedman, and Anthony Teelucksingh on

7    behalf of the United States.

8          THE COURT:  Great.  Welcome.

9          MR. TEELUCKSINGH:  Good morning, Your Honor.

10         MR. ILLA:  Good morning, Your Honor.  Stephan Illa

11   appearing behind the mask with Mr. Muhammad Fahd.  Also with me

12   today is co-counsel, Peter Camiel.

13         MR. CAMIEL:  Good morning.

14         MR. ILLA:  Mr. Fahd is here with us today in custody,

15   and we are ready for sentencing.

16         THE COURT:  Okay.  Thanks, Mr. Illa.

17      Now, my first question -- And we also have Christina Lacy

18   from U.S. Probation.  Thank you.

19         MS. LACY:  Thank you, Your Honor.

20         THE COURT:  Is "Fahd" the first name or the last name?

21   It seems like "Muhammad" is the family name.  And people have

22   others, like "Asus," like that.

23      Mr. Fahd?

24         THE DEFENDANT:  So my full name is Muhammad Fahd Ibrahim

25   Patel, but due to some complications, my passport only has the

1    first two, so that's why it's --

2           THE COURT:  Okay.

3           THE DEFENDANT:  Yeah.

4           THE COURT:  So you're fine with us calling you

5    "Mr. Fahd"?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Okay.  Great.  Thank you.

8       All right.  We are here for sentencing on Mr. Fahd's plea of

9    guilty to one count of conspiracy to commit wire fraud.

10          In preparation for the sentencing today, I have reviewed the

11   excellent U.S. Probation Report from Ms. Lacy, I have the

12   government's sentencing memorandum from the triumvirate of the

13   U.S. Attorneys, which included exhibits attached to it, including

14   the declaration or affidavit of Alford Carter, the AT&T

15   representative, about law.  I also have a motion for entry of an

16   order of forfeiture from the government and a government motion

17   to seal and a government supplemental sentencing memorandum with

18   an exhibit from that.  I have some tape recordings of a phone

19   call between Mr. Fahd and one of the individuals.  I have the

20   defendant's sentencing memorandum which included letters from

21   many of his relatives in support.  I have the defendant's

22   memorandum regarding loss amount for sentencing purposes.  I have

23   an Exhibit C to the defendant's sentencing memorandum, which has

24   some beautiful pictures of Mr. Fahd with his family.  And I think

25   that's everything I have.

1      Do I have everything from the government?  Did I list it all?

2              MR. FRANZE-NAKAMURA:  I believe so, Your Honor.  It is

3      an extensive list.

4      With the presentence report, there were a number of

5      objections filed by the defense.  We ask those be considered as

6      well.

7              THE COURT:  Okay.  And then, Mr. Illa, did I list all

8      the things that you wanted me to consider?

9              MR. ILLA:  You did, Your Honor.

10      This morning I took the precaution of copying the video,

11      which was on a link in our sentencing memorandum.  I copied it

12      onto a disc and gave it to the clerk as Exhibit D.  I did that to

13      make the record clear because I realized, to my horror, that the

14      internet is not unchanging and we need to make sure that, in the

15      future, if somebody wants to see what it is that I asked the

16      Court to look at, they be able to look at it.

17              THE COURT:  Okay.

18              MR. ILLA:  I gave a copy to the government as well.

19              THE COURT:  All right.  Thank you, Mr. Illa.

20      So have you had an opportunity to go over the government

21      reports with your client and make any additions or corrections?

22              MR. ILLA:  The government reports with respect to?

23              THE COURT:  The sentencing recommendations.

24              MR. ILLA:  Yes, Your Honor, we have.

25              THE COURT:  Okay.  And, Mr. Fahd, are you ready to

1    proceed to sentencing today?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  All right.  We will start with

4    Mr. Franze-Nakamura.

5              MR. FRANZE-NAKAMURA:  May it please the Court.  For over

6    seven years, Muhammad Fahd dedicated his life to cybercrime.  He

7    was the mastermind and driving force behind a hacking group that

8    sought to breach AT&T's security in order to illegally unlock a

9    massive number of cellular phones for profit.  Mr. Fahd was

10   motivated by greed.  He had a singular focus on lining his

11   pockets while ripping off AT&T.

12       The evidence before the Court does not paint a charitable

13   picture of Mr. Fahd.  In fact, the evidence shows again and again

14   that Muhammad Fahd cares only about Muhammad Fahd.  He did not

15   care that what he was doing was highly illegal and would cause

16   great financial harm.  He did not care that both law enforcement

17   and AT&T had intervened to shut down the first part of his

18   unlocking scheme.  He did not care about the young people -- Kyra

19   Evans, DeVaughn Woods, Marc Sapatin -- all of whom he exploited

20   and put repeatedly in harm's way.  He did not care even about his

21   long-time friend and personal assistant, Ghulam Jiwani, when they

22   were arrested in Hong Kong, particularly when he made a cruel

23   attempt to cast Mr. Jiwani as the mastermind behind this scheme.

24   And sitting here today, Your Honor, Mr. Fahd does not care about

25   accepting full responsibility for his actions; he does not care

 1   about making restitution to the central victim in this case.

 2   Again and again, Muhammad Fahd has shown he only cares about

 3   himself.  The defendant's past history indicates that he will

 4   cheat, lie, exploit, betray again and again.  This is a man who

 5   simply does not care about the financial and the human

 6   consequences of his actions.

 7       Now, I realize there's a great deal of briefing before the

 8   Court.  The government's briefs address virtually every aspect of

 9   this case and refute the objections that were made to the

10   presentence report.  One of the key issues in this case has been

11   the loss issue.  And Mr. Friedman has been working tirelessly on

12   that issue and has submitted dozens and dozens of pages and

13   exhibits for your review showing why AT&T's calculation is both

14   highly conservative and highly accurate.

15       If the Court has any questions about loss, restitution,

16   forfeiture, I would propose that Mr. Friedman address those now

17   before we turn to the sentencing factors.

18               THE COURT:  Okay.  Thanks, Mr. Franze-Nakamura.

19       Mr. Friedman, one question that I have is, you know, part of

20   the way we get to the loss is AT&T has to raise its prices to

21   make up for profit that it should have had, that it didn't have.

22   How does that calculate in there to say, okay, they lost this

23   much, but they went ahead and charged their clients this much to

24   make up for it?  So are they really down?

25               MR. FRIEDMAN:  Your Honor, I think that's not part of

1    the loss calculation AT&T has put forth.  It's not something

2    we're asking for.  I think it would probably be beyond the power

3    of the Court to consider that.

4        To the extent that we mentioned that in prior proceedings

5    involving other defendants and in the briefing here, it's really

6    just to show that -- it's easy to look and say, "AT&T is a big

7    corporation, oh, well" -- it's to show the Court what happens

8    when AT&T suffers a loss, what its natural reaction is.  So it's

9    a consequence of that, it's an effect; it's not part of this loss

10   calculation.

11       THE COURT:  And what about the defense point that if a

12   corporation suffers a loss like that, it has some obligation to

13   report it?

14       MR. FRIEDMAN:  Your Honor, I think the law there is

15   probably going to be very complicated.  It's going to be --

16   Corporations do have to report things that are material.  And

17   that's a hard standard.  And so there would be a question of:  Is

18   this material or is it material in any particular period?

19   Because it spanned years for AT&T.  And I would have no expertise

20   in that.  I'm sure that that would be a difficult question for

21   AT&T.

22       I think it's important also to note that the loss calculation

23   really has been -- AT&T was able to do that much later than this

24   happened.  So, really, 2020 is when they were going through

25   finalizing and figuring out what the loss was and seeing how big

1   it was.  And if you figure out in 2020 that you had a loss, you

2   know, in much of 2012 and '13, that probably is material to

3   whether you report it or not.

4       I think the evidence in this court -- the evidence in the

5   record here shows very clearly that that is a reasonable estimate

6   of the loss that they suffered.  Whether it should have been

7   reported or not I think is a question that's beyond any of our

8   ability to know or something for the Court to consider.

9            THE COURT:  Okay.

10           MR. FRIEDMAN:  And, you know, maybe now that it's done,

11   maybe it will be.  I don't know.

12           THE COURT:  So there's a loss amount which goes to the

13   guideline calculation and then there's an amount to get back from

14   Mr. Fahd which goes towards restitution?

15           MR. FRIEDMAN:  Correct, Your Honor.

16           THE COURT:  Okay.  Great.  Thanks.

17           MR. FRIEDMAN:  And, Your Honor, if I could, if I could

18   just make one brief --

19           THE COURT:  Oh, sure.

20           MR. FRIEDMAN:  I'm happy to answer any detailed

21   questions if the Court has them.

22       I think when you look at this, and it's a mind-boggling,

23   complicated calculation the agency went through, and one of their

24   analysts, Ana Friedrichs, spent months and months working on it

25   and doing it, and we submitted it to the Court.  And I don't

1  think it's productive -- I don't know if the Court has looked at

2  it or not, but I don't think it's productive to wade through that

3  spreadsheet, so I wouldn't ask the Court to do that, but it gives

4  an idea of the scope and the complexity of the calculation.  But

5  it is -- you know, AT&T put a lot of work in and they did a

6  very -- a conservative but an accurate and detailed calculation.

7  It does show that loss.  And so we're asking the Court to rely on

8  that.  We think it should.

9      We think it's important also to step back for a second,

10  though, and say, look, you know, it's easy to get lost in all of

11  those details, but let's look at what's really going on here.

12  And the Court only has to make a reasonable estimate of loss.

13  And we know that Mr. Fahd unlocked nearly 2 million cell phones,

14  that he was responsible for doing that through the people who

15  worked for him.  We know that cell phones cost hundreds of

16  dollars, most often probably in the 500-to-1,000-dollar range.

17  And I think it's very reasonable for the Court to assume that

18  when you unlock a cell phone, the loss to AT&T is going to be a

19  measurable portion of that.  And so as long as the Court

20  concludes that the average loss is at least $133 -- I think

21  that's the figure -- you're at the $200 million loss.  And so

22  common sense tells you that that is really the scope of the loss

23  in this case.  The Court then has AT&T's calculation to say,

24  "Hey, how do I quantify it, what's the real number?"  But common

25  sense tells you this is basically the measure of this case, this

 1   is the number the Court should be working with.

 2           THE COURT:  And do you feel, since the government has

 3   the burden of proof here, that the standard is preponderance of

 4   the evidence, or clear and convincing evidence?

 5           MR. FRIEDMAN:  We would concede it's clear and

 6   convincing, Your Honor, but I think the evidence meets that

 7   standard.

 8           THE COURT:  Okay.  And that's because of the dramatic

 9   impact it has on the guidelines?

10           MR. FRIEDMAN:  Yeah.  I think the case law that

11   Mr. Camiel cited, certainly those cases all say that.  I think

12   some of that case law evolved during a time when guidelines were

13   binding, and so I know there was a period when the government

14   argued that, well, under 9 -- 90, 99 percent, stuff like that.

15   We're not taking that position.  We agree with clear and

16   convincing, Your Honor, and we think we have met that easily.

17           THE COURT:  Thanks, Mr. Friedman.

18           MR. FRIEDMAN:  Thank you, Your Honor.

19           THE COURT:  Mr. Franze-Nakamura can come back up now.

20           MR. FRANZE-NAKAMURA:  Thank you, Your Honor.

21       So with respect to the sentencing factors, there are three

22   points that I would like to emphasize today.  First, the need for

23   deterrence in cybercrime cases involving leaders of cybercriminal

24   enterprises; second, Mr. Fahd's high risk of recidivism; and,

25   third, the human cost and consequences of what Mr. Fahd did.

1    And, again, it's worth noting that it is extremely rare to

2    identify, arrest, and sentence a top-level leader of a

3    cybercriminal enterprise.  Cybercrime has become one of the

4    leading threats to the American public.  As the world has become

5    more integrated and more connected through the use of technology

6    and the internet, we have become in many ways more vulnerable to

7    attack.  Increasingly, foreign hackers are attacking our

8    interests, and in the process, they are making fortunes at our

9    expense.  These cyberattacks impact numerous victims, including

10   breached companies, financial institutions, and small businesses,

11   and, most importantly, ordinary Americans who ultimately bear

12   the cost of cybercrime.

13   The illegal costs of cybercrime are astounding.  Some

14   estimate that cybercriminals generate over $1.5 trillion a year

15   in illegal proceeds.  This is more money than the illicit drug

16   trade.  This is more money than traditional organized crime.

17   Cybercrime even makes more money than the combined revenue of

18   Apple, Amazon, Facebook, Microsoft, and Tesla.  So there should

19   be no question that, in the modern age, cybercrime has become a

20   true economy of scale.

21   Relatively small groups of hackers can have a devastatingly

22   large impact when they leverage their skills and the technology

23   to breach U.S. companies, and that's exactly what Mr. Fahd did

24   here.  Mr. Fahd leveraged his access to AT&T's computer systems

25   and his skills and his custom malware and hacking tools in order

 1   to carry out fraud on a massive scale.  He caused over

 2   $200 million of damage all from behind his keyboard in Pakistan.

 3   There should be no question that he is a very sophisticated

 4   criminal.

 5       In addition to being an accomplished hacker, he's well versed

 6   in masking his identity, in money laundering, and avoiding arrest

 7   by U.S. authorities while he travels internationally.  Needless

 8   to say, investigating someone like Muhammad Fahd takes a massive

 9   amount of resources and patience from law enforcement.  It is so

10   rare to have someone so sophisticated, who played such a major

11   role in a cybercriminal enterprise, extradited and to have them

12   appear in court.  It is a testament to the skill and the patience

13   of the investigators for the Secret Service and the IRS who

14   worked tirelessly on this case for almost eight years now.

15       It's no surprise that when Mr. Fahd was arrested and

16   extradited, this case garnered a great deal of media attention.

17   It's an important event when a top-level leader like Mr. Fahd is

18   held accountable.  In fact, there's a special audience outside of

19   this courtroom, outside of this country, that is paying special

20   attention to this case.  This audience is comprised of people

21   involved in the underground unlocking business and in the

22   underground business that tracks stolen phones.  This is also

23   composed of individuals who are contemplating whether or not to

24   start up a hacking group or a cybercriminal enterprise.  It is

25   critical that the sentence imposed today shows this audience that

 1   they face severe consequences not just for the past crimes but

 2   also for any future crimes that they may choose to undertake.  A

 3   15-year sentence for Mr. Fahd will be a strong statement to this

 4   audience that the costs of engaging in cybercrime are just too

 5   high to be worth it.

 6        In thinking about general deterrence, it's important to view

 7   Mr. Fahd in context in relation to the three cases for hackers in

 8   this district.  As discussed in the government's sentencing

 9   memorandum, the Schrooten, Seleznev, and Hladyr cases all provide

10   important benchmarks.  Schrooten received a 12-year sentence,

11   Seleznev received 27 years, and Mr. Hladyr received 10 years.

12   Like Schrooten and Seleznev, Mr. Fahd was the leader, he was

13   the mastermind behind the cybercriminal enterprise.  And like

14   Mr. Seleznev, Mr. Fahd made millions of dollars in proceeds and

15   undertook extensive efforts to obstruct justice.

16        It's important to note that the scheme at issue in Schrooten

17   was relatively small compared to the scheme that we're dealing

18   with here.  It only involved about 100,000 stolen payment card

19   numbers.  In contrast, Mr. Fahd unlocked over 1.9 million phones.

20   He operated his enterprise for seven years and persisted in

21   operating that enterprise despite knowing of law enforcement's

22   efforts to shut it down.  Accordingly, Mr. Fahd should receive a

23   sentence that is significantly greater than the sentence imposed

24   in Schrooten.

25        The government submits that a sentence of 15 years strikes

1    the appropriate balance and avoids a sentencing disparity.

2    Moreover, a 15-year sentence will send a powerful message to all

3    of the would-be hackers that are out there paying attention to

4    this case that they will face just punishment in the United

5    States for any crimes that they commit.

6        This leads to the second point, Your Honor, the high risk of

7    recidivism posed by Mr. Fahd.  We know that he is a high risk for

8    multiple reasons, but I want to underscore two of those reasons.

9    First, we saw what happened in 2013, when both law enforcement

10   and AT&T intervened.  Mr. Fahd was momentarily scared.  We saw

11   him running Google searches about his risk of extradition from

12   Pakistan, but then he made the conscious decision to return to

13   this scheme, to restart it, to bring everybody back in.

14       It's one thing to launch a single cyberattack against a

15   victim; it's an entirely different matter to attack that same

16   victim over and over again, despite an intervention by law

17   enforcement.  We just don't see that very often.  He did this

18   over the course of seven years.  Seven years of trying to hack

19   and breach the same victim.  This shows us just how ambitious and

20   relentless Mr. Fahd is.

21       And I will note, Your Honor, there are absolutely no

22   mitigating factors in this case.  There are only aggravating

23   factors.  There's no meaningful explanation for why Mr. Fahd did

24   the terrible things that he did.  And, you know, the only

25   explanations that we have seen are his overwhelming greed and his

1    natural propensity towards criminal activity.

2        The second reason we know that he poses a high risk of

3    recidivism is that he is not genuinely remorseful for his

4    actions.  He's not accepted full responsibility for the loss that

5    he caused and the proceeds that he obtained.  Now, Mr. Fahd, in

6    the sentencing documents that were filed, he really does not

7    raise a meaningful challenge to AT&T's loss calculation; he

8    doesn't offer a meaningful alternative.  Instead, he wants the

9    Court to limit its loss calculation to just one percent of the

10   actual loss in this case.  One percent.  He's only willing to

11   acknowledge one percent of the harm that he caused, and I would

12   submit that he's only one percent remorseful.

13       Furthermore, there should be no dispute that Mr. Fahd made an

14   enormous amount of money from the hacking scheme.  At the time of

15   his arrest, he is flying regularly, internationally, either

16   business or first class, and staying at Ritz-Carltons and fancy

17   hotels all over the world.  He came from a well-off family and he

18   made millions more from cybercrime.  We have every reason to

19   think that he has millions of dollars waiting for him when he

20   gets out of jail.

21       Now, not surprisingly, Muhammad Fahd has not made a

22   meaningful effort to bring those proceeds into the United States

23   to make restitution.  Pursuant to the plea agreement, Mr. Fahd

24   did sit for an interview regarding his finances, and this was

25   just a few months ago.  During that interview, he was completely

1    unhelpful.  Although he said he would sign documents that were

2    given to him by the government, he made absolutely clear, crystal

3    clear, he would make no effort on his own to identify his assets

4    and to bring them into the United States for restitution.

5    Despite his comic claims during that interview that he knows

6    nothing about his finances and that he can't remember anything

7    about how he used all that money in the past, Mr. Fahd knows he

8    is still a very wealthy man.  He knows that those proceeds have

9    been moved to other overseas accounts.  He knows he can get his

10   hands on that money once he's released.  He has expressed

11   complete contempt for the notion that he should pay anything for

12   his crimes.

13        Again, Muhammad Fahd only cares about Muhammad Fahd.  He does

14   not come before the Court as a genuinely remorseful man who has

15   realized the harm that he has caused.  Instead, his past actions

16   and his ongoing contempt to the notion of restitution shows that

17   this is a man who wants to be released so he can continue to reap

18   the ill-gotten rewards of his past crimes.  A 15-year sentence is

19   needed, therefore, to protect the community from Mr. Fahd and his

20   high risk of recidivism.

21        The third and final point, Your Honor, deals with the human

22   consequences of Mr. Fahd's crimes.  There should be no question

23   today that there was a massive financial harm caused from the

24   scheme at issue.  And, in fact, the victim has spent months

25   conducting a very detailed and accurate calculation of that loss.

1    And that's over $200 million of loss.  But there's a very

2    significant aspect of the harm that Mr. Fahd caused that goes

3    beyond the financial loss, and that's the harm he caused to the

4    impressionable young people that he exploited and extorted:  Kyra

5    Evans, DeVaughn Woods, Marc Sapatin.  They all deserve to have

6    their names mentioned today.  They all deserve to be recognized.

7    None of these people had any criminal history.  None of them

8    would have been involved or wrapped up in something like this

9    except for Muhammad Fahd.  They had promising careers ahead of

10   them, and now they have criminal convictions, they have enormous

11   restitution obligations.  And Marc Sapatin is going to jail for

12   18 months all because of Muhammad Fahd.  Muhammad Fahd does not

13   care about these individuals, does not care that he left an

14   indelible mark on their lives.  He only cares about himself.

15        The way that he recruited, groomed, and outright threatened

16   these young people tells us a lot about his character.  Quite

17   frankly, we don't usually see cybercriminals like Muhammad Fahd

18   who combine their technological expertise with old-school

19   techniques like bribery, intimidation, and extorsion.  We don't

20   see people here, as patent groups, who want to go to such

21   extremes to create a threat of personal harm.  As the Court has

22   seen from the evidence, including among many other things, the

23   communications in our sentencing memorandum, recorded calls, and

24   the statements from prior defendants, Mr. Fahd went to extremes

25   to create a frightening image of himself.  He portrayed himself

1    as one part super hacker and two parts thug.  He was deliberate

2    in the way he controlled them through fear, and he masterfully

3    made clear that there would be harsh consequences for anyone who

4    crossed him.  Just think of the power disparity between the folks

5    who are working at AT&T who didn't have much education and the

6    individual who was a very talented hacker, operating overseas,

7    who could cause such harm to these people.

8         One example of how he threatened them was the conversation

9    with Kyra Evans where he bragged about threatening to put a

10   half-million-dollar hit on his ex-girlfriend simply because the

11   ex-girlfriend dumped him.  Now, there's not a hint in the

12   Schrooten case or the Hladyr case of this type of threat of

13   physical violence, nor is there any evidence in the Schrooten

14   case and Hladyr case that those defendants ruthlessly tried to

15   exploit young people, and those defendants got 10 years and 12

16   years, respectfully.  Mr. Fahd deserves much more.

17        The government respectfully requests that when considering

18   the sentence in this case, the Court bear in mind not just the

19   $200 million loss, but also the substantial harm that Mr. Fahd

20   caused the young people he exploited and extorted.  All of these

21   people deserve the satisfaction of knowing that their rights and

22   their interests have been vindicated today.

23        In conclusion, the United States asks the Court to impose a

24   sentence of 15 years, to adopt AT&T's conservative and accurate

25   loss calculations, and impose restitution in the amount of

1   $200,620,698.

2       The government asks the Court to help the government continue

3   its efforts to disgorge Mr. Fahd of his illegal proceeds by

4   entering a forfeiture judgment in the amount of $5,338,430.

5       A 15-year sentence is just and appropriate under the

6   sentencing factors.  It takes into consideration Mr. Fahd's

7   leadership role, it takes into consideration the concerns of

8   specific and general deterrence, and, most importantly perhaps,

9   it takes into consideration the need to vindicate the rights of

10  the victims.

11      Unless the Court has any questions, we rest on the arguments

12  in our filings.  I do note, Your Honor, that AT&T does have a

13  representative here today who would like to address the Court

14  pursuant to the Crime Victims' Rights Act.

15          THE COURT:  And that's Petra, is it Dungan?

16          MR. FRANZE-NAKAMURA:  Yes.

17          THE COURT:  Okay.  We should do that now then.

18          MR. FRANZE-NAKAMURA:  Okay.

19          THE COURT:  Could you come forward, please?

20      And could you, at the beginning, say your name and spell your

21  last name for the court reporter, please?

22          MS. DUNGAN:  Sure.  Petra Dungan, D-u-n-g-a-n.

23          THE COURT:  Thank you, Ms. Dungan.  Go ahead.

24          MS. DUNGAN:  Thank you for providing me the opportunity

25  to speak today.  My name is Petra Dungan, and I am a senior

1    investigator for AT&T.

2        In my role as senior investigator, I investigate employees

3    who have violated our internal code of conduct or committed a

4    criminal act against AT&T.  I have over 25 years investigative

5    experience not only with AT&T but also as a detective

6    investigator at the Manhattan DA's Office and an investigative

7    analyst at the New York Stock Exchange.

8        In 2013 and again in 2017, I worked on the investigations of

9    phones being unlocked in massive quantities at our Bothell call

10   center.  In 2013, I participated in the interviews/investigations

11   basically as a secondary lead.  During that time, I worked

12   extensively with our forensics department as they tried to

13   determine how these unlocks occurred.

14       I interviewed both Marc Sapatin and Kyra Evans, former

15   employees.  At the time, both Marc and Kyra were highly regarded

16   by their management, and management struggled to reconcile why

17   they would risk their stable positions at AT&T to take part in

18   any illegal activity, particularly one that not only put their

19   jobs at risk but victimized AT&T and their families as well.

20       At the time I interviewed them, AT&T had not determined how

21   the unlocks had occurred.  I specifically recall speaking with

22   Kyra Evans.  She was young, nervous, and expecting a child.

23   Although she denied any knowledge of the scheme, which we now

24   know is not true, I believe she came to know the scope of the

25   scheme and the subsequent consequences during this interview.  We

1    later learned that Kyra and Marc had been recruited by a person

2    identified as Frankie, who we know now is Mr. Fahd.  After their

3    employment ended, several of the employees came forward and said

4    that Marc Sapatin had tried to recruit them.  These employees

5    declined the offer and thought nothing of it until they were able

6    to put two and two together and correlate his loss of employment

7    with everything that was happening and realized that this was an

8    attempt to recruit more people into this criminal activity.

9        In 2017, AT&T again began to see massive unlocks associated

10   with the identifications and the names of employees at the

11   Bothell call center.  I was assigned to lead this investigation;

12   however, this was truly a team effort.  We recruited numerous

13   senior investigators, directors, analysts, IT specialists, as

14   well as guidance from our legal department.

15       In 2017, it appeared the unlocks occurred late at night from

16   a particular computer IP address at our Bothell call center,

17   about 15 miles from my residence.  There were nights that my

18   now-former peer -- now retired -- and I responded to the Bothell

19   call centers at all hours when it appears these unlocks were

20   happening.  We remained on call for several weeks ready and

21   willing to try to catch the culprit processing the unlocks.  We

22   sacrificed time that would normally be spent with family.  We

23   would search the call center top to bottom, determine whether the

24   people we encountered had a legitimate business purpose to be

25   there, make notes of any vehicles in our parking lot, all of this

1  in a quest to figure out what was happening.  These are the early

2  days.  We had no idea of the malware and the USB port at that

3  time.

4      I interviewed every employee whose AT&T ID, which is their

5  identification, and password were using the unlock scheme.  At

6  AT&T, no one wants to sit down with Asset Protection.  When the

7  employees are told Asset Protection wants to speak with them,

8  generally they get nervous or think they're going to lose their

9  job.  Fortunately, every single employee was cleared that I spoke

10  with at that time; however, the experience was not without stress

11  to them and uncertainty.  Because, again, at this time, we had no

12  idea of DeVaughn Woods' role or the USB port or the malware.

13      In 2017, one night -- one of the nights we got pinged

14  indicating the unlocks were in progress, I went to the Bothell

15  call center.  I searched every floor for anyone who should not be

16  there.  I found DeVaughn Woods there.  I knew DeVaughn.  He had

17  been a trustworthy and ethical employee.  He had been one of

18  those employees that lived by "See something, say something,"

19  to protect the company.

20      The moment he saw me, his face changed.  I walked over to him

21  and engaged in small talk, and he was extremely nervous.  The

22  next day I added his name to the list to be investigated.  As we

23  now know, he was very much involved with Mr. Fahd and the unlock

24  scheme.  I could tell from his face on that night that he knew it

25  was just a matter of time before the connection would be

1    uncovered.  It is unfortunate and sad in some ways that employees

2    who had solid employment, with room for growth and opportunities,

3    were lured into the scheme.  I wonder then and I wonder now what

4    persuasive powers Mr. Fahd had to convince them, formerly loyal

5    employees, to risk not only their jobs but personal integrity as

6    well.

7        In 2017, it came with relief that we were able to uncover the

8    extent of the scheme and the role DeVaughn Woods played and we

9    were able to bring our findings to the Secret Service and the

10   U.S. Attorney's Office.  This was just the beginning of

11   determining the financial impact which yet had another team

12   working long hours on this monumental task.

13       AT&T is an enormous corporation, and with most large

14   companies, at times there is a tendency to forget that it relies

15   on people to make it run, to protect our brand, and come in every

16   day with a strong work ethic.  I am one of many employees who

17   spent hours, days and nights, sacrificed family time and juggled

18   obligations, both professional and personal, to be a part of this

19   investigation and resolve this matter.

20       It is my hope that the employees who worked diligently on

21   this matter to protect our brand, customers, and company are not

22   forgotten as you make your decision today regarding Mr. Fahd.

23   AT&T respects the decision of the Court in sentencing the

24   defendant and strongly believes that he should be held

25   responsible and punished to the fullest extent of the law.

 1        Thank you.

 2             THE COURT:  Thank you very much, Ms. Dungan.

 3        And the government has completed its presentation, correct?

 4             MR. FRANZE-NAKAMURA:  Yes.  Thank you, Your Honor.

 5             THE COURT:  Okay.  Mr. Illa.

 6             MR. ILLA:  Thank you, Your Honor.

 7        I must say, Your Honor, I'm at a bit of a loss because in

 8   nearly 40 years of defending criminal cases, I don't think I have

 9   ever had one where I went to a sentencing without any mitigating

10   factors at all.  And yet, minutes ago, I heard that there are no

11   mitigating factors in this case whatsoever and, in fact, there's

12   only aggravating factors.  What that means to me is that this

13   must be the worst case ever.  I don't agree.

14        I would like to start with the loss amount.  I brought

15   Mr. Camiel with me to deal with that.  If I may?

16             THE COURT:  Sure.

17             MR. ILLA:  Thank you, Your Honor.

18             THE COURT:  Yeah.

19             MR. CAMIEL:  Thank you, Your Honor.

20        When we challenged the loss amount, this $200 million loss

21   put forth by the government, in no way whatsoever is that a

22   reflection on Mr. Fahd's acceptance of responsibility.  That's

23   the lawyers doing their job, analyzing the government's evidence,

24   and it says nothing about his degree of remorse or acceptance of

25   responsibility for what he did.  But the government has come

1    forward with this $200 million loss amount, and they presented us

2    with an executive summary that had been prepared and an affidavit

3    from Mr. Carter.  We looked at that and had trouble understanding

4    it and so we asked to be able to interview some of the people

5    involved in creating that and making those determinations.  We

6    asked for the underlying data that was used so that we could take

7    a look at it, to see whether or not it seemed reasonable and

8    whether or not there was any challenge to it.  And once we got

9    the data, including the spreadsheet, what's called the "Final"

10   spreadsheet, and looked at it, we came to the conclusion that

11   while they did suffer loss, there's no doubt about it, it's

12   dramatically overstated based on their own data.

13        And just to back up for a minute.  I appreciate that the

14   government has accepted that they have the burden by clear and

15   convincing evidence to show this Court that the loss that they're

16   proffering can reasonably be determined.  And from Mr. Carter's

17   affidavit, what the Court heard was that during the time period

18   at issue here, there were about 50 million phones that were

19   unlocked, and from that universe of unlocked phones, they had

20   somebody go through and analyze, and they determined there were

21   about 1.8 to 2 million unauthorized unlocked phones.  And we're

22   not challenging that number.  They determined that based on the

23   timing of the unlocks and the employees that were involved or the

24   employee numbers that were involved.  But from that, that smaller

25   universe of the 1.8 million unlocked phones, there was reference

1    to a random sample that they took.  And, initially, we were

2    trying to find out how random was the sample and how did they

3    determine which ones to look at and which not to look at, and we

4    could never get to the bottom of that because nobody could answer

5    that question.  None of the people we interviewed could answer

6    the question.  The executive summary and the spreadsheet don't

7    tell us that.  But just taking that, those 50,000 unlocked phones

8    that they call a random sample, if that's truly representative of

9    what happened when you're looking at loss amount, then the first

10   thing that is evident, that the government seems to completely

11   ignore, is that for 56 percent of that 50,000, there was no loss

12   at all.  That's what the executive summary and Mr. Carter's

13   affidavit show us.  And so from that 50,000 that they randomly

14   sampled, they had 22,000 that they claimed they lost money on,

15   but not the other 28,000.  But when the government asks for the

16   $200 million loss amount to be found by the Court and they show

17   you spreadsheets and affidavits, they keep referring to

18   1.8 million phones, as if they lost money on every one of those

19   phones, when their own data indicates that they didn't.  And so

20   that's the first thing that shows that the loss is dramatically

21   overstated.  They determined a loss per phone, and they

22   multiplied it times the 1.8 or 1.9 million.  But their own

23   witness has indicated that that's not what happened.

24       But we looked further, we dug a little deeper, because we got

25   this "Final" spreadsheet, and we looked at it.  And Mr. Friedman

1    talked about how this is mind-boggling and it's very complicated.

2    And that may be, but the Court is still asked to consider this.

3    And because it might be complicated isn't a reason to just accept

4    what the government puts forth without scrutinizing it.  And so

5    that's what we did.

6         As we went through that spreadsheet -- And one of the

7    attachments that I put forth with my memorandum about loss shows

8    pages from the spreadsheet, and one of the columns in the

9    spreadsheet shows why contracts were canceled.  Now, that's all

10   information that came from AT&T records.  And what it showed us,

11   as we went through it, was that they were including in the loss

12   amount thousands and thousands of phone contracts that were

13   canceled not because they were unlawfully unlocked but for other

14   reasons, where the customer either didn't make any payments at

15   all right after they bought the phone and AT&T immediately

16   canceled their contract or the customer moved or was deceased or

17   was in bankruptcy or, for some other reason, the phone contract

18   was canceled before the phone was unlawfully unlocked.

19        And just to take an example.  If I bought a phone from AT&T

20   and I signed a contract, a two-year contract, to be paying them,

21   and then I got ahold of AT&T shortly after that and said, "I'm

22   moving out of the area or I'm switching to another provider and

23   so I'm canceling my contract," that revenue that AT&T was going

24   to receive from me is now gone, and it has nothing to do with the

25   phone being unlawfully unlocked.

1        And then later, if that phone that I had, if I throw it away

2   or give it away and somebody else has it unlocked through this

3   unauthorized unlocking scheme, the money that AT&T was going to

4   make from that contract is already gone, but they included all of

5   that in their loss-amount calculation, and so it's greatly

6   overstated.

7        And while I appreciate that this was a difficult endeavor for

8   AT&T to go back and try to figure this out, they did, they are

9   the ones who created the spreadsheet.  It's their data.  And it's

10  not something -- Nobody is claiming that these reasons that the

11  contracts were canceled were put in there by somebody involved in

12  the fraud scheme.  That was information that AT&T put in for

13  each contract when they determined at the time the contracts were

14  canceled what the reason was, and they attributed those reasons.

15       Now, some of them in that spreadsheet say that they're fraud,

16  but there are all different kinds of fraud that are listed.  But

17  the bottom line, and I guess what I'm getting at is, it's not our

18  burden to go through and say, "Well, we ran the numbers ourselves

19  and the loss should be this and not that."  It's the government's

20  burden to prove by clear and convincing evidence what a

21  reasonable determination of the loss amount is.  And it's very

22  clear from their own evidence that the numbers they've used are

23  greatly overstated and include far more than what should be

24  attributed to what Mr. Fahd should be held responsible for.

25       And this makes a big difference at least under the

1   guidelines, which aren't binding on the Court.  But the reason

2   we're talking about clear and convincing evidence is it's a

3   ten-point difference.  And what the guidelines do tell us is if

4   the loss can't reasonably be determined, you have another way to

5   use the guidelines to determine an offense level, and that's to

6   look at gain.  And that's what we're suggesting the Court can do.

7        Now, the government also threw in there as, I guess, an

8   alternative, this application note.  And, once again, when they

9   used their application note, where they're saying you should do

10  $100 a phone, they're back at that 2 million phones, when we know

11  that only 44 percent suffered any loss at all.

12       But, more importantly, the Sixth Circuit said -- and it

13  appears the Ninth Circuit is at least considering it because

14  they've asked for more briefing on the issue -- that the

15  application note is unlawful because it goes beyond what is

16  allowed in an application note.  And so we don't think there's

17  any authority for the Court to go that direction and to determine

18  loss based on that.

19       Those are the only comments that I'm going to make.  I've

20  covered it in our memorandum, but if Court has questions, I'm

21  happy to --

22            THE COURT:  No.  I appreciate that.  Thanks, Mr. Camiel.

23            MR. CAMIEL:  Thank you, Your Honor.

24            THE COURT:  Your memo was very helpful.

25       All right.  Back to Mr. Illa.

1            MR. ILLA:  Your Honor, I'll pick up where I left off,

2    which is the issue of mitigation.  The government, by taking the

3    position it has at this hearing, apparently is now objecting to

4    probation's conclusions.  Ms. Lacy found that Mr. Fahd's lack of

5    criminal history and difficult upbringing warranted a

6    below-guideline sentence.  She describes how his childhood was

7    filled with neglect and emotional trauma.  He witnessed violence,

8    endured physical and verbal abuse because of his race, and

9    experienced financial hardship.  He's never had counseling to

10   cope with these emotional issues.  That's what probation

11   concluded.

12        Your Honor, we submit that there are mitigating factors in

13   this case.  And I'm no stranger to rhetorical excess, this Court

14   knows, and when you get going, sometimes you push beyond your

15   headlights.  And I forgive the government for that because I'm

16   guilty of it too.  But that wasn't the only instance.  The

17   government came very close to saying outright that they're now

18   taking the position that Mr. Fahd is not taking responsibility

19   for this offense.  I didn't hear them say it directly, but they

20   certainly implied it.  That would be a change in their position.

21   And I submit that Mr. Fahd has accepted responsibility.  He's

22   done it quite clearly.  And, again, I'll rely upon Ms. Lacy's

23   report.  Her conclusion, again, was that he did express remorse

24   for committing the offense and wants the opportunity to become a

25   better person.  Under those circumstances, Your Honor, acceptance

 1   is something he's demonstrated.

 2        A last instance of pushing a little bit too far is when the

 3   prosecutor started talking about this interview about money and

 4   funds.  And I'll translate what I heard.  The exact quote I heard

 5   was, "We have every reason to think he has money," end quote.

 6   And in defense-lawyer-translator language, that is, "We think

 7   he's got money, but we can't say we have any proof of it."  And

 8   they don't.  Instead, they want to raise intimations that somehow

 9   Mr. Fahd has money squirreled away somewhere.  Their basis for

10   that is he's unhelpful in producing the assets.  So the

11   interview, which went on for about an hour, took the basic form

12   of:  "Mr. Fahd, tell us where your assets are.  I don't have any

13   assets.  Won't you help us find your assets?  I don't have any.

14   What's your bank account that you had four years ago, before you

15   got arrested and dragged into Hong Kong?  I don't remember."

16   He's not being helpful at getting the assets he doesn't have.

17   That's an argument nobody can win, Your Honor, and Mr. Fahd isn't

18   going to engage in it.

19        The truth is, Your Honor, and the record is pretty clear,

20   Mr. Fahd is a first offender, he has good and consistent support

21   from his family.  This behavior he engaged in is not consistent

22   with the man he is, and he wants the Court to know that with the

23   help of his family, he's going to be able to recover and go on

24   and reestablish himself as a law-abiding citizen.

25        While incarcerated, he suffered under health problems because

1   of COVID and all the collateral problems having to do with the

2   conditions of his confinement.  We haven't detailed everything he

3   has gone through because the Court has heard a lot of it from

4   other defendants:  lockdowns, inability to have any communication

5   with counsel or family for weeks at a time, and being in close

6   quarters 23 and a half hours a day with another person, unable to

7   leave.  He's been in custody for about 41 months already, but

8   that's not it.  Even if the Court were to order him released

9   today, he has immigration consequences.  Any sentence the Court

10  gives him will have to be served within the restrictions of the

11  Bureau of Prisons.  Those policies mean that he can't take

12  certain programs, and the conditions are objectively harsher for

13  him.

14      Also, as the Court knows, deportation adds time post-release.

15  Deporting people to places like Canada and Mexico is,

16  unfortunately, routine, but it happens quickly.  Deporting people

17  back to the Middle East, not so much.  And the recent problems in

18  Afghanistan have probably made that an even more extended

19  process.

20      Mr. Fahd has accepted responsibility for his crimes, Your

21  Honor.  And the last thing I wanted to mention before I bring him

22  up here is Mr. Fahd accepts responsibility for what he did, and

23  what he did is he did lure other people into this mess.  He did

24  bring in people, he recruited them.  The defense doesn't agree,

25  however, that those people who got recruited did everything only

1  because of Mr. Fahd.  And, in fact, I think the government, in

2  candor, would have to admit that it wasn't all his fault, the way

3  that they assert it.  I mean, after all, the government

4  prosecuted those people, prosecuted them for breaking the law,

5  and those people admitted doing it on their own, not because of

6  duress.  Mr. Fahd did do bad things, and there's no question

7  about why he did it.  He did it for the money.  And for that

8  money, he sold everything he had.

9       When I heard Ms. Dungan up here talking about the loss to

10  AT&T, she was questioning, and she said, "I don't know what

11  persuasive powers this man had."  Well, it was easy, he had

12  money, and the people who were suborned went that way because of

13  hundreds of thousands of dollars that they received.

14       Your Honor, if the Court is ready, I could have Mr. Fahd

15  approach the podium.

16            THE COURT:  Sure.  Mr. Fahd, if you could go up to the

17  podium, please.

18            THE DEFENDANT:  Your Honor, I would like to start by

19  saying that I'm ashamed to be in front of this Court right now.

20  I don't blame anyone except myself for this crime and the

21  situation that it has gotten me into.  I have -- And because of

22  this, I have brought a lot of shame and disgrace on my family and

23  suffering that they have to go through because of me, and it was

24  all caused because of greed that motivated me to do these things.

25  It consumed me over time and lured me to lose sight of what was

1  right and wrong.

2     What I would like to say is I was not that person that I am

3  right now.  I was not thinking.  I was just going.  And at that

4  time I only saw money and I didn't realize what I was doing to

5  other people around me because of that, the people that I was

6  working with.

7     I -- I lost a lot of things because of that.  I realize that

8  money is not everything.  I lost my time with my family, with my

9  son.  I lost my wife.  I lost whatever I had, even the money.

10  Now I have nothing until I get back on my feet.

11     I'm fearful of losing my parents because they're very old.

12  I'm fearful of losing my son because my wife is trying to get his

13  custody.  I'm fearful of a lot of things.

14     During this time, the most haunting thing that happened to me

15  was I saw my friend die in prison.  And I still feel the guilt of

16  getting him involved in this.  Also, I'm regretful that I blamed

17  him for something that was untrue.  I shouldn't have done that,

18  because he was a very good friend to me.

19     I apologize to each and every individual that has been

20  affected by this crime and these actions and behaviors of mine.

21  I apologize to AT&T for their loss and their suffering.  And I

22  apologize to my victims, my co-conspirators, that I got them

23  involved in this when I shouldn't have played with their lives.

24  I apologize to my family for putting them through this and the

25  suffering that this has caused them.

1        And I would like to say that I'm not the same person that I

2    was when I first got incarcerated.  I have found ways to cope

3    with my problems through God.  I have turned towards him to guide

4    me better, and it has made me think more clearly on what is

5    important in life.  I would like to say that I now understand the

6    faults in me that have caused me to be in front of this Court

7    right now.

8        I would like to say, when I'm released, I will go back to

9    Pakistan and start my life all over again.  I will get a job with

10   my uncle who has told me he's going to support me.  I will be

11   supported by my family members and helped to get back on my feet.

12       And I would like to tell this to the Court, that I will never

13   repeat this behavior, I will never repeat these actions, I will

14   never repeat any crime ever in my life again.  I promise this to

15   myself, to my family, and to this Court.

16           THE COURT:  So, Mr. Fahd, when you first saw that AT&T

17   was onto the scheme and was interviewing some of your cohorts and

18   you were worried that you were going to be caught or people might

19   leave records around, how come that didn't sort of scare you

20   straight to say, "Boy, that was a close call, I better cut this

21   out"?

22           THE DEFENDANT:  Your Honor, it did scare me, but then

23   I -- I didn't do anything.  I was basically egged on by certain

24   people, and they said, "Don't worry, it's going to be fine,

25   they're not going to do anything to you, just let's do this."

1  And that's why I kept on going on because they said, "Nothing is

2  going to happen to you, you're going to be all right, and because

3  you live so far away." I was scared. I was not doing anything.

4  I told them, like, "I'm not going to do this," but they kept on

5  egging me on, and that's why I did it again.

6  THE COURT: And do you feel that you now have the

7  strength to say "No" to people like that when they come to you

8  later on?

9  THE DEFENDANT: Yes, Your Honor.

10  THE COURT: Okay.

11  THE DEFENDANT: Because I lost a lot of time with my

12  son. I left my son when he was two years old, and he's just

13  turning six in two days. And he said to me, "Why can't you come

14  to my birthday?" It's heartbreaking.

15  THE COURT: Your sister and brother-in-law are in the

16  audience. Do you have anything to say to them?

17  THE DEFENDANT: I would like to say sorry that I, you

18  know, disappointed you guys.

19  THE COURT: Thank you, Mr. Fahd.

20  Well, there's no question that Mr. Fahd has been painted with

21  too broad of a brush by the government as a person of no

22  redeeming qualities whatsoever, no mitigating circumstances

23  whatsoever. He's suffered great loss over the last few years.

24  And, you know, being separated from his wife and son, his family,

25  his parents, that's not easy. And, you know, his time in this

1    country around 9/11, where he became the object of hatred from

2    neighbors and other people, that's not easy either.  So I

3    certainly agree with Mr. Illa and with Ms. Lacy that there are

4    mitigating circumstances at play here.  You know, sometimes when

5    you sit up here, you see that nothing is completely black and

6    white.  There are always shades of gray.  And there are shades of

7    gray here too.  It doesn't take away from the fact that Mr. Fahd

8    committed a terrible cybercrime over an extended period of time,

9    that he had a terrible influence on people who were not prone to

10   be criminals but couldn't resist the thought of making hundreds

11   of thousands of dollars in what must have seemed like easy money

12   at the time.

13        But just to go through the objections that are in the

14   presentence report.  I do not find the objection about there are

15   other people who were really the controlling people here.  The

16   leader of this crime was Mr. Fahd, and he deserves the points

17   that have been ascribed to him in that leadership role.

18        I'll come back to loss calculation.

19        I believe the obstruction of justice, Objection 3, I overrule

20   that objection.  I believe that it's correctly an upward

21   adjustment for obstruction.

22        And, No. 4, Mr. Fahd was the organizer and leader, a

23   four-level enhancement, not just the two-level enhancement.

24        Now, restitution, No. 5, and loss amount, No. 2.  I believe,

25   although it's difficult to plow through it, I believe the

1   government has established that the loss amount to AT&T was over

2   $150,000 and under $250,000.  So it is scored correctly there.

3   And then the restitution amount doesn't affect the guideline

4   score directly, but I find that the restitution amount of

5   $5,338,430 has been established.  The loss amount, I designate as

6   $200,620,698, as asserted by the government.  It has been

7   established by clear and convincing evidence.  And so I will

8   adopt those two things.

9       The guideline range then by these calculations -- there's so

10  much paper up here -- is above the statutory maximum of 20 years.

11  So 20 years, 240 months, becomes the guideline involved here.

12  And I'm going to impose a sentence of 12 years, which is

13  144 months.  I believe that's sufficient but not greater than

14  necessary to address the harm here.

15      I'm not a big one for proportionality with other judges'

16  sentencings of other individuals, some of whom went to trial.  I

17  deal with the person who's in front of me.  And given what

18  Mr. Fahd has admitted here today and in his plea of guilty, I

19  believe a 12-year sentence is sufficient.

20      Mr. Fahd, upon your release from prison, you will be on three

21  years of supervised release subject to standard conditions and

22  the following special conditions.  If you are deported, you shall

23  not reenter the United States without explicit permission of the

24  Secretary of Department of Homeland Security.  The restitution,

25  realistically, there's no way you are ever going to be able to

1   meet this number, but I will set it at $200,620,698, and that's

2   due immediately.  Any unpaid amount should be paid in monthly

3   installments.  I will waive interest on the restitution.  You

4   will submit to search of your person, property, house, residence,

5   storage unit, electronic devices, et cetera, conducted in a

6   reasonable time and manner.  I will waive the fine for inability

7   to pay.  There is a $100 special assessment which is due

8   immediately.

9       The government agreed to credit for time served for all of

10  the time from when he was in custody, and I'm not sure the Bureau

11  of Prisons is going to know that information, so if you can agree

12  on an amount of time to put right in the judgment, I think that

13  would be good.

14      Do you have an agreement on that amount of time,

15  Mr. Franze-Nakamura?

16          MR. FRANZE-NAKAMURA:  Your Honor, we have not done the

17  actual calculation, but could we just indicate that he's been in

18  custody since February 4th, 2018?

19          THE COURT:  I think that would do it.

20      What do you think, Mr. Illa?

21          MR. ILLA:  Mr. Camiel has expertise in this issue,

22  having gone through it a few times.  I would ask that he be able

23  to address it, please.

24          MR. CAMIEL:  Your Honor, I think -- I have had trouble

25  with the Bureau of Prisons --

1            THE COURT:  Yeah.

2            MR. CAMIEL:  -- giving credit for time when somebody was

3    somewhere else.  I think it needs to be very explicit in the

4    judgment that indicates that he's to receive credit starting on

5    February 4th, 2018, while in custody in Hong Kong.

6            THE COURT:  Okay.  Let's explicitly put it in there.

7    Not just the date, but address that it was while in custody in

8    Hong Kong and forward in there.

9            MR. CAMIEL:  Thank you.

10           THE COURT:  Okay.  And then --

11           MR. FRANZE-NAKAMURA:  Your Honor --

12           THE COURT:  So on the order of -- Oh, go ahead,

13   Mr. Franze-Nakamura.

14           MR. FRANZE-NAKAMURA:  I'm going to plug into the

15   calculator right now and I will actually have a specific date, if

16   I can just have a moment?

17           THE COURT:  Sure.  Take your time on that.

18       And then, Mr. Friedman, on the order of forfeiture then,

19   you're suggesting that the Court write in that $5,338,430?

20           MR. FRIEDMAN:  Yes, Your Honor.

21       And then we would caveat to the Court saying -- I guess we

22   will handwrite on the judgment that says that that order is

23   incorporated by reference.

24           MR. FRANZE-NAKAMURA:  With the benefit of the internet,

25   it indicates that he's been in jail for 1,320 days, or

 1  approximately three years, seven months.

 2      So is there a preference between --

 3          MR. CAMIEL:  I would ask that it say February 4th of

 4  2018 --

 5          MR. FRANZE-NAKAMURA:  Okay.

 6          MR. CAMIEL:  -- because it's up to the BOP when they

 7  start counting.

 8          THE COURT:  Okay.  Did you have a placement

 9  recommendation at all, too?

10          MR. ILLA:  May I have a moment, Your Honor?

11          THE COURT:  Sure.

12          MR. CAMIEL:  Your Honor, we would ask for placement, if

13  possible, knowing only it's a recommendation, at Bastrop, Texas.

14          THE COURT:  What's the name of the facility?

15          MR. CAMIEL:  Bastrop.

16          THE COURT:  Could you spell it for me?

17          MR. CAMIEL:  Yeah.  B-a-s-t-r-o-p.

18          THE COURT:  Okay.  Do you know about that, Ms. Lacy?

19          MS.  LACY:  Yes, I do, Your Honor.

20          THE COURT:  Okay.  Is it an FCI or --

21          MS. LACY:  It's an FCI.

22          THE COURT:  Okay.  Let's put a recommendation in there

23  for that FCI in Texas that I still don't know how to spell.

24      Mr. Fahd, I want you to remember that, you know, you're not

25  defined by the worst thing you ever did, okay?  You can tell your

1    big sisters love you, your parents.  What a torture it is for

2    them to talk to you on the phone.  You may have trouble

3    reconnecting with your son, no question about that.  And your

4    wife might say, "I didn't sign up for this, I'm leaving."  You

5    can't control what happened in the past, but you can control what

6    happens in the future.  And I want you to not be bitter about,

7    you know, the United States government and how it treated you.

8    See that you set the path for where you are by your own greed and

9    your own mistakes but that you have the ability for redemption,

10    some of it through your religion, some of it through your family,

11    but, ultimately, through your actions, okay?

12         Mr. Illa.

13              MR. ILLA:  Your Honor, I have reviewed the proposed

14    judgment prepared by the Assistant U.S. Attorney.  I believe it

15    comports with the Court's oral ruling.

16         May I approach?

17              THE COURT:  You may approach.

18              MR. ILLA:  Thank you, Your Honor.

19              THE COURT:  Thank you, Mr. Illa.

20         Today is the 16th, isn't it?

21              MR. ILLA:  The 16th, Your Honor, yes.

22              THE COURT:  Yeah.  So I'm going to change it.  It says

23    the 15th on here, but I'll put the 16th.

24         Okay.  I have signed the judgment in the case.

25         Now, Mr. Fahd, in his plea agreement, waived his right to

 1    appeal as long as the Court stayed within or below the guideline

 2    range, and I think that I did stay within or below the guideline

 3    range.  So the only matters you can appeal, Mr. Fahd, are

 4    ineffective assistance of counsel -- and you had some great

 5    lawyers here, but you have the right to say they were ineffective

 6    and didn't do something they should have -- and conditions of

 7    confinement.  So if you're in the Bureau of Prisons and you're in

 8    a situation where you feel your constitutional rights are being

 9    violated by how they're treating you in prison, you have the

10    right to bring that up.  Do you understand?

11              THE DEFENDANT:  (Nods affirmatively.)

12              THE COURT:  Okay.  All right.  Thanks very much,

13    counsel.  Excellent presentations both in writing and orally

14    today, and I appreciate the quality of the work.

15         We are adjourned.

16              MR. FRANZE-NAKAMURA:  Thank you, Your Honor.

17                        (Adjourned.)

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

4   United States District Court in the Western District of

5   Washington at Seattle, do certify that the foregoing is a correct

6   transcript, to the best of my ability, from the record of

7   proceedings in the above-entitled matter.

8

9

10

11                    /s/ Nickoline Drury

12                    Nickoline Drury

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 44

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF CALIFORNIA

4                         SAN JOSE DIVISION

5

    UNITED STATES OF AMERICA,          )
6                                       )  CR-18-00258-EJD
                    PLAINTIFF,          )
7                                       )  SAN JOSE, CALIFORNIA
              VS.                       )
8                                       )  NOVEMBER 18, 2022
    ELIZABETH A. HOLMES,                )
9                                       )  PAGES 1 - 135
                    DEFENDANT.          )
10   _____   )  **SENTENCING**

11

12              TRANSCRIPT OF SENTENCING PROCEEDINGS
              BEFORE THE HONORABLE EDWARD J. DAVILA
13                UNITED STATES DISTRICT JUDGE

    A P P E A R A N C E S:
14

15   FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                           BY:  JOHN C. BOSTIC
16                               JEFFREY B. SCHENK
                           150 ALMADEN BOULEVARD, SUITE 900
17                         SAN JOSE, CALIFORNIA 95113

18                         BY:  ROBERT S. LEACH
                                 KELLY VOLKAR
19                         1301 CLAY STREET, SUITE 340S
                           OAKLAND, CALIFORNIA 94612

20   U.S. PROBATION:        KYLE POLLAK
                           JESSICA GOLDSBERRY
21
                    (APPEARANCES CONTINUED ON THE NEXT PAGE.)
22

23   OFFICIAL COURT REPORTER:
                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
24                         CERTIFICATE NUMBER 8074

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
              TRANSCRIPT PRODUCED WITH COMPUTER

10:24AM 1      THE JURY FOUND APPARENTLY THAT MS. HOLMES DID NOT HAVE THE

10:24AM 2  INTENT TO DEFRAUD PATIENTS, BUT THAT DOES NOT MEAN THAT SHE DID

10:24AM 3  NOT HAVE A RECKLESS OR CONSCIOUS DISREGARD OF THE RISK THAT

10:24AM 4  THERANOS'S ACTIONS WERE POSING TO PATIENTS.

10:24AM 5      AND, IN FACT, THE EVIDENCE THAT THE COURT HAS SEEN OVER

10:25AM 6  THE COURSE OF THIS CASE IN BOTH TRIALS SHOWS THAT MS. HOLMES

10:25AM 7  DID HAVE THAT DISREGARD FOR THE RISK THAT PATIENTS WERE

10:25AM 8  INCURRING AS A RESULT OF THERANOS'S ACCURACY AND RELIABILITY

10:25AM 9  PROBLEMS IN ITS TEST, AND I'M HAPPY TO GO OVER THAT BRIEFLY,

10:25AM 10  BUT I WANT TO PAUSE TO SEE IF THE COURT HAS ANY QUESTIONS SO

10:25AM 11  FAR.

10:25AM 12      THE COURT:  WELL, I SUPPOSE FOCUSSING ON THIS

10:25AM 13  FACTOR, WHAT DO YOU BELIEVE, AND I'LL ASK MR. DOWNEY TO

10:25AM 14  RESPOND, WHAT DO YOU BELIEVE, WHAT FACT OR FACTS DO YOU BELIEVE

10:25AM 15  ARE THE BEST SUPPORT FOR THE COURT APPLYING THIS FACTOR?

10:25AM 16      MS. BOSTIC:  YES, YOUR HONOR.

10:25AM 17      SO I THINK A LARGE PORTION OF BOTH TRIALS IN THIS CASE

10:25AM 18  FOCUSSED ON NOT ONLY THE PROBLEMS WITH THERANOS'S TECHNOLOGY

10:25AM 19  AND THE WAY THAT THOSE PROBLEMS HAD AN ADVERSE IMPACT ON THE

10:25AM 20  ACCURACY OF THE TEST, BUT ALSO SPECIFICALLY THE DEFENDANT'S

10:25AM 21  KNOWLEDGE OF THOSE PROBLEMS, BOTH MS. HOLMES AND MR. BALWANI.

10:26AM 22      AND THE GOVERNMENT'S SENTENCING MEMORANDUM HIGHLIGHTS A

10:26AM 23  FEW KEY EXAMPLES SHOWING THAT MS. HOLMES KNEW THAT THERE WERE

10:26AM 24  SERIOUS PROBLEMS.

10:26AM 25      EVEN YEARS BEFORE THERANOS OFFERED ITS TESTS, MS. HOLMES

10:26AM  1    HAD A CONVERSATION WITH A CONSULTANT HIRED BY WALGREENS TO

10:26AM  2    ASSESS THERANOS'S TECHNOLOGY.

10:26AM  3        WHEN THAT CONSULTANT RAISED CONCERNS, ASKED QUESTIONS

10:26AM  4    ABOUT WHAT SUBSTANTIATED THERANOS'S CLAIMS, AND WARNED

10:26AM  5    MS. HOLMES THAT INACCURATE TEST RESULTS WERE A SERIOUS THING

10:26AM  6    AND COULD POTENTIALLY LAND HER IN JAIL, THAT'S WHAT THIS

10:26AM  7    CONSULTANT TOLD HER, SHE RESPONDED GLIBLY ACCORDING TO THAT

10:26AM  8    CONSULTANT.  SHE SAID SOMETHING TO THE EFFECT OF "THEY DON'T

10:26AM  9    PUT ATTRACTIVE PEOPLE LIKE ME IN JAIL."

10:26AM  10       YEARS LATER WHEN THE COMPANY WAS ABOUT TO LAUNCH ITS

10:26AM  11   SERVICES TO THE PUBLIC, MS. HOLMES'S LAB DIRECTOR CAME TO HER

10:26AM  12   INDICATING THAT HE HAD TO RAISE ALARM BILLS BECAUSE THE COMPANY

10:26AM  13   WAS NOT READY TO LAUNCH IN SOME IMPORTANT RESPECTS.  THE LAUNCH

10:27AM  14   WENT FORWARD ANYHOW.

10:27AM  15       AFTER THE LAUNCH WENT FORWARD, AS THE COURT SAW, THERE

10:27AM  16   WERE NUMEROUS INCIDENTS WHERE PROBLEMS AROSE WITH THE

10:27AM  17   PERFORMANCE OF THERANOS'S TECHNOLOGY AND PROBLEMS THAT WOULD

10:27AM  18   HAVE A DIRECT IMPACT ON WHETHER PATIENTS COULD ACTUALLY RELY ON

10:27AM  19   THESE TESTS TO MAKE THE IMPORTANT MEDICAL DECISIONS THAT WOULD

10:27AM  20   BE MADE BASED ON THE CLINICAL BLOOD TEST.  THOSE ARE ALSO

10:27AM  21   HIGHLIGHTED IN THE GOVERNMENT'S BRIEFING.

10:27AM  22       THOSE ALERTS CAME FROM STAFF WHO WERE WORKING WITH THE

10:27AM  23   TECHNOLOGY ITSELF.  THEY CAME FROM THE LAB DIRECTOR, THEY CAME

10:27AM  24   FROM OTHER PERSONNEL AT THERANOS, INCLUDING THE GRANDSON OF ONE

10:27AM  25   OF THE BOARD MEMBERS WHO SENT A VERY DETAILED MESSAGE TO

10:27AM   1   MS. HOLMES LAYING OUT REASONS WHY HE THOUGHT THE COMPANY MIGHT

10:27AM   2   BE OVERSTATING THE PERFORMANCE AND ACCURACY OF ITS TESTS.

10:27AM   3       AND MS. HOLMES WAS ALSO AWARE OF MANY INSTANCES WHERE

10:27AM   4   PATIENTS GOT INACCURATE RESULTS ON IMPORTANT MEDICAL TESTS AND

10:28AM   5   SITUATIONS WHERE EMPLOYEES EXPRESSED DOUBTS OR MISGIVINGS OR

10:28AM   6   CONCERNS ABOUT THE TESTS THAT THERANOS WAS PROVIDING TO

10:28AM   7   PATIENTS.

10:28AM   8       MS. HOLMES RESPONDED TO THESE SITUATIONS IN A VARIETY OF

10:28AM   9   WAYS, SOMETIMES WITH INDIGNATION, SOMETIMES WITH ANXIETY,

10:28AM  10   SOMETIMES WITH DISMISSIVENESS, AND THE IMPORTANT THING, THOUGH,

10:28AM  11   IS THAT IN NONE OF THOSE SITUATIONS DID MS. HOLMES OR

10:28AM  12   MR. BALWANI TAKE THOSE CONCERNS TO HEART AND STOP OFFERING

10:28AM  13   THESE PROBLEMATIC TESTS.

10:28AM  14       SO THIS ENHANCEMENT IS NOT ABOUT WHETHER HARM WAS DONE.

10:28AM  15   THE GOVERNMENT IS NOT REQUIRED TO SHOW THAT PATIENTS ACTUALLY

10:28AM  16   SUFFERED HARM, ALTHOUGH THE GOVERNMENT HAS SHOWN THAT.

10:28AM  17       THE GOVERNMENT IS NOT REQUIRED EVEN TO SHOW THAT THE

10:28AM  18   DEFENDANT WAS SUBJECTIVELY AWARE OF THE RISK, AND THAT'S THE

10:28AM  19   CASES THAT THE GOVERNMENT HAS CITED.

10:28AM  20       IN EXAMPLES CITED IN OUR BRIEFING, SITUATIONS WHERE A

10:29AM  21   DEFENDANT CAUSED FALSE ENTRIES TO APPEAR IN A PATIENT RECORD

10:29AM  22   SYSTEM, THAT WAS SUFFICIENT FOR THIS ENHANCEMENT TO APPLY.

10:29AM  23       THE ENHANCEMENT ALSO APPLIED IN A SITUATION WHERE THE

10:29AM  24   DEFENDANTS RAN A HEALTH CARE FACILITY AND ADMITTED ELDERLY

10:29AM  25   DEMENTIA PATIENTS WHEN THE FACILITY AND THE STAFF WERE NOT

10:38AM  1    50 PERCENT OF THE TIME.

10:38AM  2         DR. ROSENDORFF, DR. PANDORI, ERIKA CHEUNG AND OTHERS

10:38AM  3    TESTIFIED THAT THE THERANOS TECHNOLOGY PERFORMED SIGNIFICANTLY

10:38AM  4    WORSE THAN THE CONVENTIONAL TECHNOLOGY.

10:38AM  5         AND SKIPPING TO THE END OF THE STORY, IT'S IMPORTANT TO

10:38AM  6    REMEMBER THAT WHEN CMS CAME AND INSPECTED THERANOS LOOKING AT,

10:39AM  7    AMONG OTHER THINGS, THE RELIABILITY AND THE ACCURACY OF THE

10:39AM  8    TEST THAT THIS LAB IS GENERATING, IT FOUND SERIOUS PROBLEMS AND

10:39AM  9    THERANOS ITSELF WAS FORCED TO ADMIT BASED ON THAT INSPECTION

10:39AM  10   THAT THERE WAS A POTENTIAL PATIENT IMPACT FOR EVERY TEST THAT

10:39AM  11   HAD BEEN PERFORMED ON THE THERANOS TECHNOLOGY, AND AS A RESULT,

10:39AM  12   THE COMPANY ACTUALLY TOOK A STEP OF VOIDING EVERY SINGLE TEST

10:39AM  13   RUN ON ITS EDISON ANALYZER.

10:39AM  14        SO TO STAND HERE TODAY AND ARGUE THAT INACCURATE TESTING

10:39AM  15   IS A FACT OF LIFE, THAT IT'S UNAVOIDABLE, THAT THIS WAS PART

10:39AM  16   NORMAL LAB PRACTICE I THINK IS INCONSISTENT WITH THAT PROOF AT

10:39AM  17   TRIAL.

10:39AM  18        AND IN TERMS OF MS. HOLMES'S NOTICE, YES, I THINK THE

10:39AM  19   EVIDENCE AT TRIAL AND THE THINGS THAT I JUST RECOUNTED TO THE

10:39AM  20   COURT DO SHOW THAT MS. HOLMES WAS AWARE OF THAT, AND, YES,

10:39AM  21   ACTION WAS TAKEN IN RESPONSE TO THESE ISSUES.

10:39AM  22        BUT THE STANDARD DOESN'T REQUIRE INDIFFERENCE TO THE RISK

10:40AM  23   OR INACTION IN RESPONSE TO THE RISK.  IT REQUIRES A CONSCIOUS

10:40AM  24   DISREGARD OR RECKLESSNESS, AND THAT'S WHAT MS. HOLMES SHOWED

10:40AM  25   WHEN SHE AND MR. BALWANI CONTINUED TO OFFER THESE TESTS.

10:54AM 1   FOR BEING AN ORGANIZER OF THE CRIMINAL ACTIVITY.

10:54AM 2       I'VE READ THE REPORT AND THE PSR ON THIS AND THE REASONS

10:54AM 3   WHY IT SHOULD BE GIVEN, AND I JUST WANTED TO ASK YOUR -- THE

10:54AM 4   GOVERNMENT'S THOUGHTS ABOUT THIS.  I LOOK AT HOLDEN, 908 FED.3D

10:54AM 5   THAT GAVE SOME GUIDANCE, BUT I'M HAPPY TO HEAR YOUR COMMENT.

10:54AM 6       MR. BOSTIC.

10:54AM 7           MS. BOSTIC:  OF COURSE, YOUR HONOR.  I'M HAPPY TO

10:55AM 8   RESPOND TO ANY SPECIFIC QUESTIONS THAT THE COURT HAS, BUT JUST

10:55AM 9   TO GIVE AN OVERVIEW OF THE GOVERNMENT'S POSITION.

10:55AM 10      MS. HOLMES WAS THE FOUNDER, THE CHIEF EXECUTIVE OFFICER,

10:55AM 11  AND THE CHAIR PERSON OF THE BOARD OF A COMPANY AT THE CENTER OF

10:55AM 12  A MULTI-YEAR AND COMPLICATED FRAUD.

10:55AM 13      AND I SAY, THE COMPANY WAS AT THE CENTER OF IT, PARTLY

10:55AM 14  BECAUSE OF THE WAY THAT MS. HOLMES USED THE APPARATUS OF THE

10:55AM 15  COMPANY TO FURTHER THAT FRAUD.

10:55AM 16      GRANTED, COMMITTING THE FRAUD MAY NOT HAVE BEEN THE CHIEF

10:55AM 17  REASON WHY SHE FOUNDED THE COMPANY, THE GOVERNMENT HAS NOT

10:55AM 18  ALLEGED THAT.

10:55AM 19      AND THE VAST MAJORITY OF THE PEOPLE WHO WORKED FOR HER

10:55AM 20  WERE NOT KNOWING OR VOLUNTARY PARTICIPANTS IN THE FRAUD, BUT

10:55AM 21  NONETHELESS THEIR WORK CONTRIBUTED TO IT AND MS. HOLMES USED

10:55AM 22  THEM TO FURTHER THAT FRAUD AND MAKE IT REMARKABLY SUCCESSFUL.

10:55AM 23      THE EVIDENCE AT TRIAL SHOWED THAT MS. HOLMES'S POSITION AT

10:55AM 24  THERANOS, HER AUTHORITY, WAS SECOND TO NONE.  SHE TESTIFIED

10:55AM 25  THAT SHE HAD THE AUTHORITY TO TERMINATE ANY OTHER EMPLOYEE OF

10:56AM  1   THE COMPANY, INCLUDING THE CODEFENDANT, MR. BALWANI, TO DISMISS

10:56AM  2   MEMBERS OF THE BOARD.  SHE WAS ALSO THE MAJOR SHAREHOLDER IN

10:56AM  3   THE COMPANY, SO SHE HAD THAT VOTING POWER.

10:56AM  4        THE COURT:  PARDON ME FOR INTERRUPTING YOU.

10:56AM  5   SO I HAVE NO DISAGREEMENT WITH THAT.  I DON'T THINK YOUR

10:56AM  6   COLLEAGUE OPPOSITE WOULD DISAGREE WITH THAT.

10:56AM  7        WHAT I'M MORE INTERESTED IN IS NOT SO MUCH HER LEADERSHIP

10:56AM  8   ROLE IN THE COMPANY, BUT WHAT ESTABLISHES A LEADERSHIP ROLE IN

10:56AM  9   THE CRIMINAL CONDUCT WITH THE CODEFENDANT THAT WOULD PERMIT

10:56AM 10   THIS ENHANCEMENT TO BE PERMITTED?

10:56AM 11        AND IS THERE A LEADERSHIP ROLE VIS-À-VIS MR. BALWANI, THE

10:56AM 12   CODEFENDANT, THAT WOULD ALLOW THIS?  AND THAT'S WHAT THE HOLDEN

10:56AM 13   CASE TALKS ABOUT.  THAT'S WHAT I NEED SOME HELP ON FROM YOU.

10:56AM 14        MS. BOSTIC:  UNDERSTOOD, YOUR HONOR.

10:56AM 15   I THINK THAT THE DEFENSE'S ARGUMENT THAT MS. HOLMES NEEDED

10:57AM 16   TO BE A LEADER EVEN VIS-À-VIS MR. BALWANI, IS NOT CORRECT BASED

10:57AM 17   ON THE LAW.

10:57AM 18        THE GUIDELINE SAYS THAT THIS ENHANCEMENT WILL APPLY WHEN A

10:57AM 19   DEFENDANT IS A LEADER OR AN ORGANIZER IN CRIMINAL CONDUCT THAT

10:57AM 20   INVOLVES FIVE OR MORE PARTICIPANTS OR IS OTHERWISE EXTENSIVE.

10:57AM 21        SO HERE I THINK THIS ENHANCEMENT SHOULD APPLY BECAUSE THE

10:57AM 22   CRIMINAL CONDUCT WAS OTHERWISE EXTENSIVE.

10:57AM 23        THE COURT:  RIGHT.  THERE'S NO FIVE PARTICIPANTS.

10:57AM 24   WE KNOW -- THE GUIDELINES TELLS PARTICIPANTS ARE THE

10:57AM 25   ACTUAL DEFENDANTS, IF YOU WILL.  WE HAVE TWO OF THOSE.

12:22PM  1    AS TO THE DEFENSE FIRST OBJECTION, OBJECTION NUMBER ONE

12:22PM  2    REGARDING ENHANCEMENT OF THE SENTENCE ON ACQUITTED CONDUCT, THE

12:22PM  3    CONDUCT, AS THE PROBATION OFFICER INFORMED US, HAS NOT, NOT

12:22PM  4    BEEN USED TO CALCULATE GUIDELINES IN THE CASE, AND THE COURT

12:22PM  5    WILL NOT USE THAT IN ITS GUIDELINE CALCULATION.

12:23PM  6    PART OF THE DISCUSSION HERE I THINK ALSO RAISED -- I THINK

12:23PM  7    WE TALKED ABOUT THE GOVERNMENT'S DESIRE FOR THE COURT TO IMPOSE

12:23PM  8    AN ENHANCEMENT PURSUANT TO 2B1.1(6), THE RISK OF BODILY HARM.

12:23PM  9    THE COURT IS GOING TO DENY THAT REQUEST.  I WILL NOT GIVE THE 2

12:23PM 10    POINT ENHANCEMENT FOR RISK OF BODILY HARM.  THE COURT FINDS

12:23PM 11    THAT THE EVIDENCE DOES NOT SUPPORT THAT ENHANCEMENT.

12:23PM 12    THE COURT OTHERWISE OVERRULES OBJECTION NUMBER ONE

12:23PM 13    RECOGNIZING, HOWEVER, THAT, AS I PREVIOUSLY STATED, THAT

12:23PM 14    CONDUCT IS NOT AND WAS NOT USED BY PROBATION IN THE GUIDELINE

12:23PM 15    CALCULATION.

12:23PM 16    OBJECTION NUMBER TWO RELATES TO SOME OF THE OTHER

12:23PM 17    OBJECTIONS THAT WE DISCUSSED REGARDING LOSS AMOUNTS.  OBJECTION

12:23PM 18    NUMBER TWO REFERS TO PARAGRAPH 28 REGARDING THE C INVESTMENTS.

12:24PM 19    TO THE EXTENT THAT THIS OBJECTION RELATES TO THE AGGREGATION OF

12:24PM 20    C1 AND C2 INVESTMENTS FOR LOSS CALCULATION, THE OBJECTION IS

12:24PM 21    SUSTAINED.  I'LL TALK A LITTLE BIT MORE ABOUT THE LOSS AMOUNT

12:24PM 22    IN THE OTHER OBJECTIONS.

12:24PM 23    OBJECTION NUMBER THREE IS THE OBJECTION TO THE USE OF

12:24PM 24    MS. PETERSON'S TESTIMONY IN PARAGRAPHS 44 AND 93.  THE COURT

12:24PM 25    WILL OVERRULE THIS OBJECTION CITING TO, AS THE PROBATION

12:35PM  1    THE S.E.C. DEPOSITIONS, THE FBI MEMOS, AND THE VICTIM IMPACT

12:35PM  2    STATEMENTS PRODUCED BY THE GOVERNMENT TO ASSIST IT IN

12:35PM  3    IDENTIFYING THE NUMBER OF VICTIMS HERE.

12:35PM  4        ALL OF THAT EVIDENCE SUPPORTS THEN THAT THE FOLLOWING TEN

12:35PM  5    INVESTORS FROM THE GOVERNMENT'S LIST MEET THE DEFINITION OF

12:35PM  6    "VICTIM" UNDER THE SENTENCING GUIDELINES.  I'LL JUST LIST THESE

12:35PM  7    FOR YOU, PLEASE.

12:35PM  8        1.  PFM;

12:36PM  9        2.  MOSLEY FAMILY HOLDINGS;

12:36PM  10       3.  RDV CORPORATION;

12:36PM  11       4.  KEITH RUPERT MURDOCH;

12:36PM  12       5.  RICHARD KOVACEVICH;

12:36PM  13       6.  PEER VENTURE GROUP;

12:36PM  14       7.  LUCAS VENTURE GROUP;

12:36PM  15       8.  MENDENHALL;

12:36PM  16       9.  HALL/BLACK DIAMOND; AND,

12:36PM  17       10.  BLACK DIAMOND VENTURE.

12:36PM  18       ACCORDINGLY, EACH OF THESE VICTIM'S LOSSES REFLECTED IN

12:36PM  19   THE LOSS AMOUNT, AND THAT TOTALS $384,047,273.

12:36PM  20       NOW, THE COURT RECOGNIZES THAT THERE MAY BE MORE INVESTOR

12:36PM  21   VICTIMS.  MR. EDLIN, DANIEL EDLIN WHO WAS A PROJECT MANAGER AT

12:36PM  22   THERANOS TESTIFIED THAT HE PREPARED BINDERS THAT WERE GIVEN TO

12:36PM  23   INVESTORS, AND THOSE BINDERS CONTAINED INFORMATION THAT WAS

12:36PM  24   APPROVED BY A CHECKLIST AND WAS OTHERWISE APPROVED AND REVIEWED

12:36PM  25   AND ANY CONDUCT IN THOSE BINDERS WAS APPROVED BY MS. HOLMES

```
12:38PM   1        THE COURT CITED TO THE HOLDEN CASE THAT IS INSTRUCTIVE,
12:38PM   2   THE NINTH CIRCUIT CASE, THAT IS INSTRUCTIVE AND TEACHES IN THIS
12:38PM   3   AREA IS AT 908 FED. 3D 395.  AND, AGAIN, THERE'S NO DISPUTE
12:39PM   4   THAT MS. HOLMES WAS THE LEADER OF THE COMPANY, BUT THE EVIDENCE
12:39PM   5   DOESN'T SUPPORT THAT SHE WAS ACTUALLY THE LEADER OF THE
12:39PM   6   CRIMINAL ACTIVITY, THAT IS, THE FRAUD AND CONSPIRACY, IN
12:39PM   7   REGARDS TO THE TWO PARTICIPANTS, MS. HOLMES AND MR. BALWANI,
12:39PM   8   AND THE COURT FINDS THAT THAT HAS NOT BEEN MET.
12:39PM   9        WHILE SHE WAS THE LEADER OF THE COMPANY, THE OTHERWISE
12:39PM  10   EXTENSIVE PRONG, THE COURT FINDS THAT THAT DOESN'T AND HASN'T
12:39PM  11   BEEN MET, AND I'LL OTHERWISE SUSTAIN THE OBJECTION FOR A
12:39PM  12   4 LEVEL ENHANCEMENT HERE.
12:39PM  13        OBJECTION NUMBER SEVEN IS THE OBJECTION THAT THE PSR AND
12:39PM  14   PROBATION DOES NOT GIVE AN EXCEPTION FOR EXPRESSION OF REMORSE.
12:39PM  15   AND THIS IS THE DEFENSE -- I HEARD MR. DOWNEY'S COMMENT THAT
12:40PM  16   HER COMMENTS DURING THE EMPLOYMENT AND HER ACTIONS TAKEN BY THE
12:40PM  17   COMPANY DURING HER LEADERSHIP WOULD SATISFY, OTHERWISE SATISFY
12:40PM  18   AN ACCEPTANCE OF RESPONSIBILITY.
12:40PM  19        AND THE COURT HAS LOOKED AT COMMENT NOTE 2 TO 3E1.1 AND
12:40PM  20   THE CASES THERE, AND MR. BOSTIC INFORMS US OF WHAT THAT NOTE
12:40PM  21   ACTUALLY SAYS AND WHAT THE SPIRIT OF THAT IS.
12:40PM  22        MS. HOLMES WAS FOUND GUILTY OF CONSPIRING TO COMMIT WIRE
12:40PM  23   FRAUD AND COMMITTING WIRE FRAUD AGAINST INVESTORS OF HER
12:40PM  24   COMPANY.
12:40PM  25        WHILE SHE DOES NOT NEED TO, AND WE RECOGNIZE THAT AND
```

12:49PM   1   OBJECTION NUMBER FOUR WHICH INCLUDES DISCUSSION OF THE LOSS

12:49PM   2   AMOUNT.

12:49PM   3        ANY QUESTIONS ABOUT THE COURT'S RULINGS ON THE APPENDIX A

12:49PM   4   BEFORE WE GO FURTHER?

12:49PM   5        AGAIN, I'M GOING TO MEMORIALIZE THIS IN A WRITTEN ORDER

12:49PM   6   FOR YOU.  YOU WILL HAVE THAT.

12:49PM   7        ALL RIGHT.  THE COURT WILL NOW INDICATE ITS FINDINGS AS TO

12:49PM   8   THE GUIDELINE CALCULATIONS.  I'LL REFERENCE THE PSR PARAGRAPH

12:50PM   9   NUMBERS.

12:50PM   10       PARAGRAPH 104 -- FIRST OF ALL, PARAGRAPH 103 SUGGESTS THAT

12:50PM   11   THERE SHOULD BE GROUPING FOR GUIDELINE CALCULATION PURPOSES

12:50PM   12   PURSUANT TO 3D1.2(D).

12:50PM   13       AND PARAGRAPH 104 THE COURT FINDS THAT THE BASE OFFENSE

12:50PM   14   LEVEL IS 7.

12:50PM   15       THE COURT FINDS THEN UNDER THE 2B1 -- THIS IS IN PARAGRAPH

12:50PM   16   105, 2B1.1 LOSS VALUATION.

12:50PM   17       AFTER OFFSETTING THE VALUE THAT THE STOCK WOULD HAVE HAD

12:50PM   18   ABSENT THE DEFENDANT'S MISREPRESENTATION, THE COURT FINDS THAT

12:50PM   19   THE REASONABLE TOTAL LOSS TO IDENTIFIED INVESTOR VICTIMS IS

12:50PM   20   $121.1 MILLION.  THIS FALLS UNDER 2B1.1(M), WHICH IS A 24 LEVEL

12:51PM   21   ENHANCEMENT.

12:51PM   22       THE COURT HAS RELIED ON THE SABA ESTIMATE OF SHARE PRICES,

12:51PM   23   AND THE COURT FINDS THAT ON DECEMBER 31, 2014 THE $15.00

12:51PM   24   C1 PRICE WOULD HAVE BEEN $10.36 ABSENT THE FRAUD, AND THE

12:51PM   25   $17.00 C2 PRICE WOULD HAVE BEEN $11.63.

12:51PM  1          WHEN MULTIPLIED BY THE NUMBER OF IDENTIFIABLE VICTIM

12:51PM  2     SHARES, THE TOTAL LOSS IN SHARE VALUE ATTRIBUTABLE TO THE

12:51PM  3     DEFENDANT'S FRAUD, THAT IS, HOW MUCH THE SHARES WERE INFLATED

12:51PM  4     BASED ON THE FRAUD, IS $121,093,891.00.  THIS IS APPROXIMATELY

12:51PM  5     ABOUT A 31.5 PERCENT OF THE TOTAL INVESTMENT VALUE.

12:51PM  6          IN OTHER WORDS, THE STOCK WOULD HAVE BEEN 31.5 PERCENT

12:52PM  7     CHEAPER IF THERE HAD BEEN NO FRAUD.

12:52PM  8          PARAGRAPH 106, THE COURT FINDS PURSUANT TO 2B1.1(B)(A)(I)

12:52PM  9     A 2 LEVEL INCREASE PURSUANT TO TEN OR MORE VICTIMS.

12:52PM 10          THE COURT WILL NOT FIND THAT THERE'S AN ACCEPTANCE OF

12:52PM 11     RESPONSIBILITY REDUCTION.

12:52PM 12          THE ADJUSTED OFFENSE LEVEL THEREFORE IS 33, AND THE TOTAL

12:52PM 13     OFFENSE LEVEL IS 33.

12:52PM 14          THE CRIMINAL HISTORY CATEGORY IS I, AND THAT YIELDS THEN A

12:52PM 15     GUIDELINE RANGE OF 135 MONTHS TO 168 MONTHS.

12:52PM 16          THE COURT WILL FIND THAT THAT IS THE GUIDELINE CALCULATION

12:52PM 17     FOR PURPOSES OF PROCEEDING TO SENTENCING IN THIS MATTER.

12:53PM 18          LET ME NOW TURN TO THE PARTIES TO ASK WHETHER OR NOT THE

12:53PM 19     PARTIES WISH TO BE HEARD AS TO SENTENCING IN THIS MATTER.

12:53PM 20          LET ME TURN FIRST TO THE GOVERNMENT.

12:53PM 21          MR. SCHENK, DO YOU WISH TO BE HEARD?

12:53PM 22           MR. SCHENK:  YES.  THANK YOU VERY MUCH, YOUR HONOR.

12:53PM 23          YOUR HONOR, AS THE GOVERNMENT'S PAPERS NOTE, THE

12:53PM 24     APPROPRIATE SENTENCE IN THIS CASE IS FOUND AFTER CONSULTATION

12:53PM 25     WITH 3553(A).

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4

5

6

7         I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16        IRENE RODRIGUEZ, CSR, RMR, CRR
          CERTIFICATE NUMBER 8074

17

18        DATED:  NOVEMBER 21, 2022

19

20

21

22

23

24

25

# EXHIBIT 45

1

2                        UNITED STATES DISTRICT COURT

3                      NORTHERN DISTRICT OF CALIFORNIA

4                            SAN JOSE DIVISION

5

         UNITED STATES OF AMERICA,        )  CR-18-00258-EJD
6                                         )
                         PLAINTIFF,       )  SAN JOSE, CALIFORNIA
7                                         )
                    VS.                   )  VOLUME 38
8                                         )
         ELIZABETH A. HOLMES,             )  NOVEMBER 23, 2021
9                                         )
                         DEFENDANT.       )  PAGES 7444 - 7681
10       _____  )

11
                         TRANSCRIPT OF TRIAL PROCEEDINGS
12                    BEFORE THE HONORABLE EDWARD J. DAVILA
                         UNITED STATES DISTRICT JUDGE
13
         A P P E A R A N C E S:
14
         FOR THE PLAINTIFF:    UNITED STATES ATTORNEY'S OFFICE
15                             BY:  JOHN C. BOSTIC
                                    JEFFREY B. SCHENK
16                             150 ALMADEN BOULEVARD, SUITE 900
                               SAN JOSE, CALIFORNIA 95113
17
                               BY:  ROBERT S. LEACH
18                                  KELLY VOLKAR
                               1301 CLAY STREET, SUITE 340S
19                             OAKLAND, CALIFORNIA 94612

20           (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

         OFFICIAL COURT REPORTERS:
22                                  IRENE L. RODRIGUEZ, CSR, RMR, CRR
                                    CERTIFICATE NUMBER 8074
23                                  LEE-ANNE SHORTRIDGE, CSR, CRR
                                    CERTIFICATE NUMBER 9595
24
               PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                  TRANSCRIPT PRODUCED WITH COMPUTER

7477

09:44AM 1    Q.   NOW, DURING THE COURSE OF THIS MEETING IN 2010 -- WHAT

09:44AM 2    MONTH WAS THIS MEETING, IF YOU RECALL?

09:45AM 3    A.   JUST LOOKING BACK AT THE EMAIL, I THINK IT WAS IN MARCH.

09:45AM 4    END OF MARCH.

09:45AM 5    Q.   NOW, DID WALGREENS EXPRESS AFTER THAT MEETING THAT THEY

09:45AM 6    MIGHT BE INTERESTED IN EXPLORING A RELATIONSHIP WITH THERANOS?

09:45AM 7    A.   YES.

09:45AM 8    Q.   DID THEY ALSO EXPRESS TO THERANOS THAT THEY WOULD LIKE TO

09:45AM 9    DO SOME DUE DILIGENCE TO EVALUATE WHETHER THERANOS WAS A

09:45AM 10   PARTNER WITH WHOM WALGREENS THOUGHT IT COULD WORK?

09:45AM 11   A.   THEY DID.

09:45AM 12   Q.   OKAY.  NOW, I WANT TO FOCUS ON TWO REPORTS FROM

09:45AM 13   PHARMACEUTICAL COMPANIES THAT YOU SENT TO WALGREENS IN 2010.

09:45AM 14       DO YOU RECALL THAT THERE'S BEEN TESTIMONY ABOUT THOSE

09:45AM 15   REPORTS?

09:45AM 16   A.   I DO.

09:45AM 17   Q.   ONE OF THOSE REPORTS WAS FROM SCHERING-PLOUGH; CORRECT?

09:46AM 18   A.   YES.

09:46AM 19   Q.   AND THE OTHER REPORT WAS FROM PFIZER; CORRECT?

09:46AM 20   A.   YES.

09:46AM 21   Q.   WHY DID YOU CHOOSE TO SEND THE SCHERING-PLOUGH REPORT TO

09:46AM 22   WALGREENS AS PART OF ITS DUE DILIGENCE?

09:46AM 23   A.   BECAUSE WE HAD WORKED WITH SCHERING-PLOUGH TO ESTABLISH

09:46AM 24   VERY RIGOROUS STANDARDS AGAINST WHICH TO VALIDATE OUR TESTS,

09:46AM 25   AND WE HAD RUN THOUSANDS OF CARTRIDGES SHOWING NOT ONLY THAT WE

09:46AM 1    COULD MULTIPLEX THE TESTS ON A SINGLE CARTRIDGE, BUT ALSO THAT

09:46AM 2    WE COULD MEASURE MARKERS AT REALLY LOW LEVELS THAT ARE REALLY

09:46AM 3    HARD TO DO, AND I WANTED TO SHARE THAT DATA.

09:46AM 4    Q.   WHEN YOU SAY "MULTIPLEX," WHAT DO YOU MEAN?

09:46AM 5    A.   SORRY.  THE ABILITY TO RUN THE SAME TESTS ON A SINGLE

09:46AM 6    CARTRIDGE, OR MULTIPLE TESTS ON A SINGLE CARTRIDGE AT THE SAME

09:46AM 7    TIME.

09:46AM 8    Q.   OKAY.  AND WHY DID YOU CHOOSE TO SHARE THE PFIZER REPORT

09:46AM 9    WITH WALGREENS AS PART OF ITS DUE DILIGENCE PROCESS?

09:46AM 10   A.   BECAUSE, AGAIN, WE HAD WORKED WITH PFIZER FOR YEARS TO

09:47AM 11   DEVELOP A STUDY THAT WOULD MEASURE THESE VERY COMPLICATED

09:47AM 12   CANCER MARKERS IN PEOPLE'S HOMES, THE DEVICES WORKED, AND I

09:47AM 13   THOUGHT THE DATA WAS REALLY GOOD, AND I WANTED TO SHARE IT WITH

09:47AM 14   THEM.

09:47AM 15   Q.   DO YOU RECALL THAT THERE HAS BEEN TESTIMONY TO THE EFFECT

09:47AM 16   THAT THE LOGOS OF THOSE PHARMACEUTICAL COMPANIES WERE ADDED TO

09:47AM 17   THE TOP OF THOSE DOCUMENTS?

09:47AM 18   A.   I DO.

09:47AM 19   Q.   AND WHO ADDED THE LOGOS OF THOSE COMPANIES TO THE TOP OF

09:47AM 20   THOSE DOCUMENTS?

09:47AM 21   A.   I DID.

09:47AM 22   Q.   WHEN DID YOU DO THAT?

09:47AM 23   A.   JUST BEFORE SENDING THEM TO WALGREENS.

09:47AM 24   Q.   WHY DID YOU DO THAT?

09:47AM 25   A.   BECAUSE THIS WORK WAS DONE IN PARTNERSHIP WITH THOSE

1

2                     UNITED STATES DISTRICT COURT

3                    NORTHERN DISTRICT OF CALIFORNIA

4                          SAN JOSE DIVISION

5

      UNITED STATES OF AMERICA,        )   CR-18-00258-EJD
6                                      )
                      PLAINTIFF,       )   SAN JOSE, CALIFORNIA
7                                      )
              VS.                      )   VOLUME 40
8                                      )
      ELIZABETH A. HOLMES,             )   NOVEMBER 30, 2021
9                                      )
                      DEFENDANT.       )   PAGES 7922 - 8213
10    _____  )

11

                     TRANSCRIPT OF TRIAL PROCEEDINGS
12              BEFORE THE HONORABLE EDWARD J. DAVILA
                    UNITED STATES DISTRICT JUDGE
13
      A P P E A R A N C E S:
14

      FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
15                           BY:  JOHN C. BOSTIC
                                  JEFFREY B. SCHENK
16                           150 ALMADEN BOULEVARD, SUITE 900
                             SAN JOSE, CALIFORNIA 95113
17
                             BY:  ROBERT S. LEACH
18                                KELLY VOLKAR
                             1301 CLAY STREET, SUITE 340S
19                           OAKLAND, CALIFORNIA 94612

20        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

21

      OFFICIAL COURT REPORTERS:
22                           IRENE L. RODRIGUEZ, CSR, RMR, CRR
                             CERTIFICATE NUMBER 8074
23                           LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
24
              PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25                TRANSCRIPT PRODUCED WITH COMPUTER

03:16PM 1    Q.   259?

03:16PM 2    A.   I THINK SO.  I DON'T HAVE THEM IN FRONT OF ME, BUT I

03:16PM 3    ASSUME SO.

03:16PM 4    Q.   OKAY.  AND, MS. HOLLIMAN, IF WE COULD PLEASE ZOOM OUT.

03:16PM 5         THERE ARE SOME DIFFERENCES IN THE CONCLUSIONS PARAGRAPH OF

03:16PM 6    THIS -- OF THESE TWO DOCUMENTS.

03:16PM 7         DO YOU SEE HOW ON 291 IT SAYS, "THE THERANOS IL-6, TNF-A,

03:17PM 8    CRP ASSAY MULTIPLEX HAS BEEN SHOWN TO GIVE MORE ACCURATE AND

03:17PM 9    PRECISE RESULTS FOR THREE INDEPENDENTLY CALIBRATED CARTRIDGE

03:17PM 10   LOTS AND ALL OF THE MANY INSTRUMENTS USED THAN CURRENT 'GOLD

03:17PM 11   STANDARD' REFERENCE METHODS."

03:17PM 12        DO YOU SEE THAT LANGUAGE?

03:17PM 13   A.   I DO.

03:17PM 14   Q.   AND I PROBABLY DIDN'T READ THAT AS WELL AS I SHOULD HAVE.

03:17PM 15        BUT DO YOU SEE THAT LANGUAGE?

03:17PM 16   A.   I DO.

03:17PM 17   Q.   AND DO YOU SEE HOW THOSE WORDS, "GOLD STANDARD REFERENCE

03:17PM 18   METHODS," ARE NOT ON THE CONCLUSIONS IN THE REPORT THAT GOES TO

03:17PM 19   SCHERING-PLOUGH?

03:17PM 20   A.   YES.

03:17PM 21   Q.   DID YOU ADD THOSE WORDS?

03:17PM 22   A.   I THINK SO.

03:17PM 23   Q.   OKAY.  AND YOU DIDN'T TESTIFY TO THAT IN YOUR DIRECT

03:17PM 24   EXAMINATION; IS THAT CORRECT?

03:17PM 25   A.   I DON'T THINK SO.

1

2

3                    CERTIFICATE OF REPORTERS

4

5

6

7        WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10   HEREBY CERTIFY:

11        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     IRENE RODRIGUEZ, CSR, CRR
     CERTIFICATE NUMBER 8076

17

18   _____

19   LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595

20

21        DATED:  NOVEMBER 30, 2021

22

23

24

25

# EXHIBIT 46

## <u>DECLARATION OF SCOTT WEINGUST</u>

I, Scott Weingust, under penalty of perjury declare the following information to be true and correct:

1. I am over the age of 18 and am competent to make this Declaration.  I have personal knowledge of all facts stated herein.

**Expert Qualifications**

2. I am a Managing Director at Stout Risius Ross, LLC ("Stout"), a global investment bank and advisory firm specializing in corporate finance, transaction advisory, valuation, financial disputes, claims, and investigations.  I lead the Intellectual Property Valuation practice at Stout.

3. I earned a Bachelor of Arts degree in both Economics and International Relations from the University of Wisconsin at Madison.  I was also awarded a Certificate in International Business Studies by the School of Business at the University of Wisconsin at Madison.

4. I have over 26 years of experience providing consulting services to corporations, law firms, universities, investment firms, and other organizations primarily in the areas of intellectual property valuation, damages, monetization, and management.

5. I have valued patents, trademarks, trade secrets, copyrights, the right of publicity, software, domain names, and other intangible assets across hundreds of client engagements related to thousands of individual assets for a variety of purposes including: disputes, transactions, tax strategy and compliance, corporate strategic decision-making, capital raising, financial reporting, and bankruptcy, among others. I have been directly involved in intellectual

property licensing negotiations and have developed many dynamic intellectual property pricing/valuation models to support corporate transactions and investment decisions.

6.      I am currently an adjunct professor at the DePaul University College of Law where I teach a course on intellectual property valuation.  I have also previously taught classes on intellectual property valuation and related topics as an adjunct professor or guest lecturer at the New York University School of Law, The John Marshall Law School (currently the University of Illinois Chicago School of Law), the Michigan State University College of Law, and the Illinois Institute of Technology's Chicago-Kent College of Law.  I have spoken at conferences or other events for many organizations including the Intellectual Property Owners Association (IPO), Licensing Executives Society ("LES"), American Bar Association ("ABA"), American Intellectual Property Law Association ("AIPLA"), and the Intellectual Property Law Association of Chicago ("IPLAC"), among others.

7.      I was recognized as one of the world's leading IP strategists as part of the *IAM Strategy 300* from 2017 to 2022 and one of the world's leading patent professionals as part of the *IAM Patent 1000* from 2020 to 2022.  I am a Past Chair of the Valuation & Pricing Committee of LES and a Past Secretary of the Corporate IP Management Committee of IPO.  In addition to my memberships in LES and IPO, I am also a member of AIPLA and the National Association of Certified Valuators and Analysts ("NACVA").

8.      A copy of my curriculum vitae is attached to this declaration as Appendix A.

**Assignment**

9.      I have been retained by Orrick, Herrington & Sutcliffe LLP ("Counsel"), on behalf of its client Ramesh "Sunny" Balwani.  I have been asked by Counsel to review the

Expert Report of Carl S. Saba, MBA, CVA, ASA, ABV ("Mr. Saba"), dated September 8, 2022,

in the matter United States v. Holmes, et al., Case # 18-CR-00258 (the "Saba Report") and

provide insights into the reliability of the opinions provided in the Saba Report.  I have further

been asked by Counsel to provide insight into the alleged loss realized by ten specific investors

(the "Investors") of Theranos, Inc. ("Theranos") identified by the United States District Court,

Northern District of California, San Jose Division (the "Court")[1] based on improvements made

to the analysis found in the Saba Report after correcting Mr. Saba's errors.

**Background**

> 10.     The Saba Report provides Mr. Saba's estimate of the fair market value of 100%

of the equity of Theranos on a controlling, marketable basis for three distinct valuation dates,

including December 31, 2014.  The Saba Report also provides Mr. Saba's opinion regarding the

amount of the equity value of Theranos that should be allocated to all of the securities in

Theranos' capital structure, along with the alleged loss to Theranos C-1 and Series C-2 Preferred

Stock investors resulting from the difference between his concluded value of their shares and

their initial investment purchase price of $15.00 and $17.00 per share, respectively.[2] For

purposes of this declaration, I focus my review of Mr. Saba's analysis in the Saba Report solely

on the analyses performed as of the December 31, 2014 valuation date (the "Valuation Date")

based on guidance provided by Counsel.

> 11.     Mr. Saba's opinions in the Saba Report are based on his implementation and

reliance on (1) the discounted cash flow method (income approach) in combination with the

guideline public company method (market approach) (the "Income Approach") and (2) the

---

[1] United States District Court, Northern District of California, San Jose Division, Transcript of Sentencing
Proceedings Before the Honorable Edward J. Davila, November 18, 2022, 79:4-17.
[2] Saba Report, paragraphs 5 and 6.

adjusted net asset value method (the "Asset Approach") and the cost to recreate method (the "Cost Method").[3]  Mr. Saba's implementation of the Cost Method was specifically related to his opinion of the fair market value of Theranos' "technology and branding assets" as of the Valuation Date.[4]  Finally, Mr. Saba implemented the option pricing theory to develop an equity allocation model to determine a value of each class of Theranos stock as of the Valuation Date.[5]

12.     Mr. Saba's various analyses result in a determination of the fair market value of the Theranos equity as of the Valuation Date ranging from $827 million to $951 million with the lower end of the range resulting from his implementation of the Asset Approach and the high end of the range resulting from his implementation of the Income Approach.[6]  Based on this range of fair market values, Mr. Saba determined that the range of Series C-1 Per Share Values was $9.61-$10.36 and the range of Series C-2 Per Share Values was $10.80-$11.63 as of the Valuation Date.[7]

**Summary of Opinions**

13.     A summary of my opinions based my review of the Saba Report are as follows:

- Mr. Saba's implementation of the Income Approach utilizes unreliable source data associated with his selection of the cost of equity that is a component of his discount rate determination.  Because the implementation of the Income Approach is extremely sensitive to the cost of equity input, his fair market value conclusion of the equity of Theranos as of the Valuation Date based on the Income Approach is unreliable. Using a

---

[3] Saba Report, paragraph 14.
[4] Saba Report, paragraph 106.
[5] Saba Report, paragraph 19.
[6] Saba Report, paragraph 116.
[7] Saba Report, paragraph 14.

more supportable cost of equity causes the value conclusion to increase substantially which, in turn, causes the alleged loss of the Investors to decrease substantially.

- Mr. Saba's implementation of the Cost Method to value Theranos' technology and branding assets as part of his implementation of the Asset Approach was performed incorrectly and, as such, is unreliable.  More specifically, Mr. Saba does not include what is referred to as an "opportunity cost," which in this case is warranted as a proper component of the implementation of the Cost Method.  Omitting an opportunity cost from his analysis causes the relevant portion of his fair market value conclusion of the equity of Theranos as of the Valuation Date to be significantly understated.

**Mr. Saba's implementation of the Income Approach utilizes unreliable source data associated with his selection of the cost of equity that is a component of his discount rate determination**

14.     A key component of any valuation based on the implementation of an Income Approach is the selection of an appropriate discount rate.  In the Saba Report, as it relates to his implementation of the Income Approach, Mr. Saba writes: "The present value determination is based on using a discount rate that reflects the expected rate of return that the market requires in order to attract funds to a particular investment.  This rate is often referred to as a company's 'cost of capital.'"[8]

15.     Mr. Saba goes on to state "Discount and capitalization rates, as used in an Income Approach to value a business, represent the return an investor would require in order to choose a particular investment.  It represents anticipated future return; past returns, however, are often

---

[8] Saba Report, paragraph 79.

used to help determine a reasonable future rate."[9]  Upon a detailed review of his sources of

market rates of return that are the basis for his discount rate determination, I found that he

primarily relies on venture capital rate of return data that are quite old.  For example, in Exhibit

F.4 in the Saba Report where Mr. Saba cites venture capital rates of return, he lists data sources

from the years 1989, 1998, 2000, 2002, and 2008.  These rates range from 6 to 25 years prior to

the Valuation Date.

16.      However, we know that required rates of return on venture capital investments

regularly change over time based on a variety of market dynamics.  For example, the only source

of required venture capital rates of return[10] that Mr. Saba cites that are reported on an annual

basis are from Craig R. Everett's Private Capital Market Reports published by Pepperdine

University (the "Pepperdine Studies").  Other than the Pepperdine Studies, I am not aware of any

other source of venture capital rate of return data that is produced on an annual basis. Because

the Pepperdine Studies are produced annually, I commonly rely on them to estimate discount

rates for the implementation of an Income Approach for valuations I perform. While Mr. Saba

only cites a 2021 version[11] of the Pepperdine Studies, such reports have been published on an

---

[9] Saba Report, paragraph 99.

[10] Per the Saba Report: "The present value determination is based on using a discount rate that reflect the expected rate of return that the market requires in order to attract funds to the particular investment.  This rate of return is often referred to as a discount rate." (See Saba Report, paragraph 79).  The "required" rates of return reported by the Pepperdine Studies are consistent with the "expected" rate of return referred to by Mr. Saba in the context of selecting a discount rate for the implementation of the Income Approach.

[11] Professional standards generally require that valuation experts only rely on information that is "known or knowable" as of the selected valuation date.  For example, the AICPA Statement on Standards for Valuation Services, "Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset" states: "Generally the valuation analyst should consider only circumstances existing at the valuation date and events occurring up to the valuation date." Because 2021 venture capital required rates of return are data from a time seven years beyond the Valuation Date, Mr. Saba should not have relied on such data because it was not "known or knowable" as of the Valuation Date.

annual basis since 2007 and reports as far back as 2009 are available on Pepperdine University's website.[12]

17.     The annual Pepperdine Studies report median venture capital required rates of return for investments in "startup" and "early stage" companies as summarized in Table 1 below:[13]

**Table 1**
**Summary of Median Venture Capital Rates of Return from the Pepperdine Studies**

| Year of Pepperdine Study | Median Venture Capital Required Rates of Return | |
|---|---|---|
| | Startup Companies | Early Stage Companies |
| 2010 | 40% | 36% |
| 2011 | 40% | 35% |
| 2012 | 30% | 28% |
| 2013 | 28% | 23% |
| 2014 | 28% | 27.5% |
| **2015** | **33%** | **28%** |
| 2016 | 33% | 28% |
| 2017 | 35% | 25% |
| 2018 | 38% | 33% |
| 2019 | 33% | 33% |
| 2020 | 33% | 33% |
| 2021 | 33% | 30% |
| Average | **33.7%** | **30%** |

18.     Table 1 above confirms that median required rates of return over the 12-year period ranged widely from 28% to 40% and averaged 33.7% for venture capital investments in startup companies and ranged widely from 23% to 36% and averaged 30% for venture capital

---

[12] https://digitalcommons.pepperdine.edu/gsbm_pcm_pcmr/.
[13] Required rates of return for venture capital investments specifically in "startup" and "early stage" companies only began to be reported in the Pepperdine Studies as of 2010.

investments in early stage companies.  It is clear from the data in Table 1 that venture capital required rates of return regularly change over time, and often significantly, even from year to year. As such, Mr. Saba's relance on rates of return ranging from 6 to 25 years prior to the Valuation Date is unreliable when more such data at the time of the Valuation Date was available to him.

19.     The 2015 Pepperdine Study, which was published on January 2, 2015, just three days after the Valuation Date, reports venture capital rates of return that would have likely been most consistent with investors' requirements at the Valuation Date equal to 33% for start-up companies and 28% for early stage companies.

20.     Despite these contemporaneous and reliable rate of return data available to Mr. Saba, he chose to primarily rely on old, out-of-date venture capital rate of return data for his Income Approach analysis. Not only are the data on which he relies old and out-of-date as of the Valuation Date, but Mr. Saba's ultimate selection of a 45% equity rate of return for his discount rate calculation is not tied to any specific rate of return in the data.  Exhibit F.4 in the Saba Report lists 84 individual rates of return data points ranging from as low as 3% to as high as 100%.  Further, none of these 84 individual rates of return are specifically equal to 45%.

21.     Mr. Saba's selected 45% equity rate of return is higher than the 23% to 40% range of median required rates of return for venture capital investments in startup and early stage companies from the Pepperdine Studies as shown in Table 1 above.  45% is also substantially higher than the 28% and 33% median required rates of return in startup and early stage companies, respectively, from the 2015 Pepperdine Study, which is the data that is most contemporaneous to the Valuation Date.

22.     Finally, on December 31, 2014, the professional services firm Aranca provided Theranos with a report that reached conclusions regarding the fair market value of the common stock of Theranos as of December 14, 2014, just 17 days prior to the Valuation Date (the "Aranca Report"). In this report, Aranca used a cost of equity of 20.65% as part of its discount rate determination for the implementation of the Income Approach.[14] Aranca relied upon some of the same sources of venture capital rates of return that Mr. Saba also references in the Saba Report. Importantly, Mr. Saba relied on the financial forecasts from the Aranca Report for his implementation of the Income Approach.[15] However, despite using the same financial forecasts that reflected the same risks and uncertainties for valuations only 17 days apart, Mr. Saba selected a cost of equity over two times that selected by Aranca. Despite Mr. Saba's attempt to explain the differences between his cost of equity selection and Aranca's cost of equity selection, the fact is that both Aranca and Mr. Saba were attempting to measure the same risk and uncertainty of the same financial forecast for the same company only 17 days apart and the two valuations utilized significantly different cost of equity inputs.  Notably, Aranca's 20.65% cost of equity selection is significantly closer to the 28% cost of equity I reference form the 2015 Pepperdine Study than it is to Mr. Saba's 45% rate.

23.     Mr. Saba's selected 45% rate of return causes his valuation conclusion from his implementation of the Income Approach to be substantially lower than it would have been if he has selected a rate of return consistent with venture capital investors requirements as of the Valuation Date.  For this reason, Mr. Saba's valuation conclusion resulting from his Income

---

[14] Aranca Report, p. 43-44.
[15] Saba Report, paragraph 70.

Approach is unreliable for determining (1) the fair market value of Theranos at the Valuation Date and (2) the alleged loss realized by the Investors as of the Valuation Date.

24.     As an illustration, if Mr. Saba had used the 28% median rate of return for venture capital investments in early stage companies from the 2015 Pepperdine Study for his cost of equity input, his fair market value conclusion would have increased from $951 million to $1.48 billion.[16] Further, using the $1.48 billion fair market value of equity conclusion reduces the alleged loss to the Investors from approximately $121.1 million[17] to approximately $59.9 million.[18] Given that Theranos had existed for 11 years as of the Valuation Date and had generated revenue during certain years in the past, I believe a venture capital investor at the Valuation Date would have reasonably categorized Theranos as an early stage company as opposed to a seed or startup company as those terms are used in the Pepperdine Studies.

25.     As a second illustration, if Mr. Saba had used the 20.65% cost of equity Arcana selected for its valuation fair market value conclusion would have increased from $951 million to

---

[16] See Appendix B, Exhibit 4.

[17] United States District Court, Northern District of California, San Jose Division, Transcript of Sentencing Proceedings Before the Honorable Edward J. Davila, November 18, 2022, 87:17-20.  The Court determined in connection with the sentencing of Elizabeth Holmes that the alleged loss realized by the Investors based on Mr. Saba's implementation of the Income Approach was $121,093,891. My calculations using the same methodology have yielded an alleged loss of $120,146,247 (see Appendix B, Exhibit 23), which is close but not precisely equal to the Court's figure. I have not been able to explain this relatively small discrepancy of $947,644 with the information available to me.  As such, all estimates of alleged loss realized by Investors for all fair market value scenarios covered in this declaration other than that based on Mr. Saba's implementation of the Income Approach are best estimates given the information available to me.

[18] See Appendix B, Exhibit 2. For the purposes of this declaration, I have accepted Mr. Saba's equity allocation model. I understand my colleague Toby Reiff has been asked by Counsel to comment on the equity allocation model in a separate declaration.

$1.82 billion.[19]  Further, using the $1.82 billion fair market value of equity conclusion reduces the alleged loss to the Investors from $121.1 million[20] to approximately $30.7 million.[21]

**Mr. Saba's implementation of the Cost Method as part of his implementation of the Asset Approach was performed incorrectly and, as such, is unreliable**

26.     Mr. Saba's implementation of the Cost Method was specifically used to value Theranos' "technology and branding assets" as of the Valuation Date.[22]  He then used his determined value of the Theranos technology and branding assets as an input to his implementation of the Asset Approach.

27.     The Cost Method is standardly implemented using four primary steps:

1. Determination of direct and indirect costs necessary to replace the utility of the asset being valued

2. Adjustments for obsolescence associated with the asset being valued

3. The addition of a profit mark-up on the included costs (typically referred to as a "developer's profit")

4. The addition of an opportunity cost (sometimes referred to as the "entrepreneurial incentive")

28.     These four steps are referenced in (among many other authoritative valuation resources) the International Valuation Standards ("IVS") associated with valuing intangible

---

[19] See Appendix B, Exhibit 8.
[20] United States District Court, Northern District of California, San Jose Division, Transcript of Sentencing Proceedings Before the Honorable Edward J. Davila, November 18, 2022, 87:17-20.
[21] See Appendix B, Exhibit 6. For the purposes of this declaration, I have accepted Mr. Saba's equity allocation model. I understand my colleague Toby Reiff has been asked by Counsel to comment on the equity allocation model in a separate declaration.
[22] Saba Report, paragraph 106.

assets.[23]  IVS was created, and is published, by the International Valuation Standards Council ("IVSC"), an independent global standard setter for the valuation profession.  Notably, the American Institute of Certified Public Accountants ("AICPA") and American Society of Appraisers ("ASA"), two organizations that Mr. Saba has an affiliation with, are both sponsors[24] and members[25] of IVSC.

29.     Mr. Saba's implementation of the Cost Method to value the Theranos technology and branding assets mistakenly does not include a calculation of the opportunity cost.  Omitting an opportunity cost from his analysis causes his fair market value conclusion of the equity of Theranos as of the Valuation Date based on the Asset Approach to be incorrect and significantly understated.  Mr. Saba does not even mention the concept of an opportunity cost at any point in his report.  As such there is no indication that he considered this aspect of the Cost Method and he does not provide any basis for excluding it from his analysis.

30.     In addition to the IVS, there are many other notable references to the inclusion of an opportunity cost in the implementation of the Cost Method.  For example, on December 10, 2007, in remarks before the 2007 AICPA National Conference on Current SEC and PCAOB Developments, Sandie E. Kim (Professional Accounting Fellow, Office of the Chief Accountant at the United States Securities and Exchange Commission) stated:

> For certain intangible assets, it may be appropriate to use a replacement cost approach. In order to determine the replacement cost of an intangible asset, do not forget to ask the following question: "Would a market participant pay a premium for the benefit of having the intangible asset available for use today, rather than waiting until the asset is obtained or created?" If the answer is yes, and the premium for immediate use would be material, we believe that an "opportunity cost" should be considered in the fair value of the intangible asset under a replacement cost

---

[23] See for example, International Valuation Standards (Effective 31 January 2022), IVS 210 Intangible Assets, paragraph 70.7.
[24] https://www.ivsc.org/sponsors/.
[25] https://www.ivsc.org/members/.

approach. That opportunity cost represents the foregone cash flows during the period it takes to obtain or create the asset, as compared to the cash flows that would be earned if the intangible asset was on hand today.[26]

31.     Noted intellectual property valuation expert Robert F. Reilly ("Mr. Reilly") has spoken and written about the inclusion of an opportunity cost as part of the implementation of the Cost Method on many occasions.  For example, in an article titled "The Cost Approach To Intellectual Property Analysis—Methodology and Principles," published in *les Nouvelles* (a journal published quarterly by LES) in December 2021, Mr. Reilly wrote:

> The intellectual property cost measurement metric should consider the following four cost components… An opportunity cost/entrepreneurial incentive (such as a measure of lost income or other opportunity cost during the intellectual property development period adequate to motivate the development process)…The entrepreneurial incentive cost component is often measured as either: 1. The income that the developer would lose during the intellectual property replacement/development period, or 2. A fair rate of return on the amount of the investment in the total intellectual property cost metric—during the intellectual property replacement/development period. The lost income concept of entrepreneurial incentive is often considered in the context of a willing buyer's "make versus buy" decision. For example, let's consider a hypothetical willing buyer and a hypothetical willing seller (as in, the current owner) of a patent. Let's assume that it would require a two-year period for a hypothetical willing buyer to develop a replacement patent (as in, the elapsed amount of time required to develop a new non-infringing invention). If the buyer decided to buy the seller's actual patent, then the buyer could start earning income from it (either operating income or ownership license income) immediately. In contrast, if the buyer decided to make and register its own hypothetical, non-infringing replacement patent, then the buyer would earn no income (either operating income or ownership license income) from the replacement patent during the two year replacement/development period. The total of the two years of lost income during the hypothetical replacement patent development period represent the opportunity cost of making (i.e., developing) a de novo, non-infringing replacement patent. All four cost components—direct costs, indirect costs, developer's profit, and entrepreneurial incentive—are typically considered in the intellectual property cost approach valuation analysis.[27]

---

[26] https://www.sec.gov/news/speech/2007/spch121007sek.htm.
[27] "The Cost Approach To Intellectual Property Analysis—Methodology and Principles," Robert F. Reilly, *les Nouvelles*, December 2021.

32.     These cites make up a small sample of the various references to the inclusion of an opportunity cost in materials that describe the use of the Cost Method to value intellectual property and other intangibles assets.

33.     There is no indication that facts and circumstances associated with the valuation of Theranos' technology and branding assets as of the Valuation Date should exclude an opportunity cost calculation.  As such, I have corrected Mr. Saba's error by reproducing his Cost Method calculations and adding an opportunity cost.

34.     According to the Saba Report, 95% of the operating expenses incurred by Theranos for the 11 years prior to the Valuation Date (beginning in 2004) were attributable to the development of Theranos' technology and branding assets.[28] Mr. Saba did not provide any information in the Saba Report regarding the amount of time it would likely take to replace the Theranos technology and branding assets as of the Valuation Date. As such, I have used the 11-year actual, historical development period as a proxy for the time it would take to replace the Theranos technology and branding assets with an acceptable replacement. The 11-year development period experience by Theranos is a reasonable assumption given the information available to me as of the date of the declaration. To quantify the opportunity cost over the relevant estimated 11-year replacement period, I used the same 44% rate of return that Mr. Saba used for his discount rate as part of the implementation of the Income Approach.

35.     Correcting Mr. Saba's analysis as describe above increases the fair market value of the equity of Theranos as of the Valuation Date from $827 million to $1.38 billion.[29]  Further,

---

[28] Saba Report, paragraph 109.
[29] See Appendix B, Exhibit 13.

using the $1.38 billion fair market value conclusion reduces the alleged loss to the Investors from

$121.1 million to $69.9 million.[30]

36.     Consistent with my critique of Mr. Saba's selected cost of equity as used in his

Income Approach analysis, if one were to use a 27% rate of return for purposes of quantifying

the opportunity cost (consistent with a discount rate based upon a 28% cost of equity), the fair

market value of the equity of Theranos as of the Valuation Date would be $1.16 billion.[31]

Further, using the $1.16 billion fair market value conclusion reduces the alleged loss to the

Investors from $121.1 million to $92.9 million.[32]

**Conclusion**

37.     As described above, Mr. Saba made at least the following errors in the Saba

Report:

- Mr. Saba utilized unreliable source data related to his cost of equity and discount rate
  determinations as part of his implementation of the Income Approach

- Mr. Saba excluded an opportunity cost from his implementation of the Cost Method and
  Asset Approach

38.     Both of these errors cause Mr. Saba's conclusions of the fair market value of the

equity in Theranos as of the Valuation Date, and the alleged loses realized by the Investors, to be

unreliable.  The following table summarizes Mr. Saba's incorrect conclusions and alternative

conclusions after correcting his errors.

---

[30] See Appendix B, Exhibit 10.
[31] See Appendix B, Exhibit 17.
[32] See Appendix B, Exhibit 15.

**Table 2**
**Summary of Mr. Saba's Conclusions and**
**Alternative Conclusions After Correcting for Mr. Saba's Errors[33]**

|  | Fair Market Value of the Equity of Theranos as of December 31, 2014 | Alleged Loss Realized by the Investors |
|---|---|---|
| Saba Income Approach (45% Cost of Equity) | $ 951,000,000 | $ 121,093,891 |
| Alternative Income Approach (28% Cost of Equity) | $ 1,487,000,000 | $ 59,901,246 |
| Alternative Income Approach (20.65% Cost of Equity) | $ 1,815,000,000 | $ 30,712,617 |
|  |  |  |
| Saba Asset Approach (No Opportunity Cost) [34] | $ 827,000,000 | -- |
| Corrected Asset Approach (Opportunity Cost Added Using 44% Rate of Return) | $ 1,376,000,000 | $ 69,874,441 |
| Corrected Asset Approach (Opportunity Cost Added Using 27% Rate of Return) | $ 1,169,000,000 | $ 92,913,676 |

39.     The range of values shown above in Table 2 demonstrate that valuation analyses such as the one Mr. Saba performed by their very nature are based on a variety of inputs and assumptions that require judgment.  Such ambiguity commonly causes there to be a variety of widely different valuation conclusions that can be generated from any given valuation exercise.

40.     Counsel has requested that I also calculate the alleged loss realized by three subgroups of the Investors as follows:

---

[33] See Appendix B, Exhibit 1.

[34] I have not reported the alleged loss realized by Investors associated with Mr. Saba's implementation of the Asset Approach as those amounts would be based on a demonstrably incorrect implementation of the Cost Method and Asset Approach as documented earlier. As such, I believe that any alleged loss amount based on Mr. Saba's implementation of the Asset Approach should not be relied upon under and scenario.

- The Investors less Rupert Murdoch

- The Investors less RDV

- The Investors less Rupert Murdoch and RDV

41.    The following table represents the results of these calculations:

**Table 3**
**Summary of Alleged Loss to Investors and Subgroups of Investors[35]**

| | Alleged Loss Realized by the Investors | Alleged Loss Realized by the Investors Less Rupert Murdoch | Alleged Loss Realized by the Investors Less RDV | Alleged Loss Realized by the Investors Less Rupert Murdoch and RDV |
|---|---|---|---|---|
| Saba Income Approach (45% Cost of Equity) | $ 121,093,891 | $ 80,660,954 | $ 88,558,017 | $ 49,072,723 |
| Alternative Income Approach (28% Cost of Equity) | $ 59,901,246 | $ 40,075,893 | $ 44,038,238 | $ 24,226,523 |
| Alternative Income Approach (20.65% Cost of Equity) | $ 30,712,617 | $ 20,405,632 | $ 22,466,080 | $ 12,163,848 |
| | | | | |
| Saba Asset Approach (No Opportunity Cost)[36] | -- | -- | -- | -- |
| Corrected Asset Approach (Opportunity Cost Added Using 44% Rate of Return) | $ 69,874,441 | $ 46,805,270 | $ 51,419,107 | $ 28,349,936 |
| Corrected Asset Approach (Opportunity Cost Added Using 27% Rate of Return) | $ 92,913,676 | $ 62,324,630 | $ 68,442,442 | $ 37,853,397 |

November 30, 2022

_____
Scott Weingust

---

[35] See Appendix B, Exhibit 1.

[36] I have not reported the alleged loss realized by Investors or subgroups of Investors associated with Mr. Saba's implementation of the Asset Approach as those amounts would be based on a demonstrably incorrect implementation of the Cost Method and Asset Approach as documented earlier. As such, I believe that any alleged loss amount based on Mr. Saba's implementation of the Asset Approach should not be relied upon under scenario.

# Appendix A

# Scott Weingust
Managing Director
**Intellectual Property Valuation Expert**





Chicago, IL USA
**Office:** +1.312.752.3388
**Mobile:** +1.312.420.7288
sweingust@stout.com

## Education

B.A., Economics
University of Wisconsin - Madison

B.A., International Relations
University of Wisconsin – Madison

Certificate in International Business Studies
University of Wisconsin – Madison
School of Business, Center for International Business Studies

## Industry Focus

Aerospace, Defense & Transportation
Automotive
Business Services
Consumer, Retail, Food & Beverage
Diversified Industrials
Energy & Utilities
Healthcare & Life Sciences
Pharmaceuticals & Biotechnology
Technology, Media & Telecommunications

## Practice Areas

Intellectual Property Valuation
Intellectual Property Transactions
Intellectual Property Disputes
Bankruptcy
Corporate Tax
Financial Reporting
Trusts & Estates
Complex Business Litigation

Scott Weingust is the leader of Stout's Intellectual Property Valuation practice. Mr. Weingust has more than 26 years of experience providing consulting services to corporations, law firms, universities, and investment firms primarily in the areas of intellectual property (IP) valuation, damages, monetization, and management.  His practice focuses on patents, trademarks, copyrights, trade secrets, the right of publicity (i.e., name, image, and likeness), software, domain names, and other intangible assets.

Mr. Weingust has provided testimony as a damages and valuation expert in IP-related litigation including having offered opinions in Federal District Court. He has testified on a variety of dispute matters including those with claims associated with patent infringement, trade secret misappropriation, fraudulent transfer, breach of contract, and others.  Mr. Weingust has also led project teams on a variety of pre-case and early-case assessments of IP-related damages to assist with decisions related to whether a case should be filed and/or financed, and to support dispute resolution efforts.

Mr. Weingust has performed due diligence and valued IP and other intangible assets for a variety of purposes including: transactions (licensing, purchase/sale, joint ventures, mergers and acquisitions), tax strategy and compliance (related-party transactions, trust & estate issues), corporate strategic decision-making, use of intellectual property to attract capital (debt and equity financing), financial reporting, regulatory compliance (Stark Law, Anti-Kickback Statute), and bankruptcy, among others. He has been directly involved in IP licensing negotiations and has developed many dynamic IP pricing/valuation models for corporate licensing activities and investment decisions.

Mr. Weingust is currently an adjunct professor at DePaul University's College of Law where he teaches a course on IP valuation. He has also previously taught classes on IP valuation and related topics at the New York University School of Law, The John Marshall Law School, Michigan State University's College of Law, and the Illinois Institute of Technology's Chicago-Kent College of Law. Mr. Weingust has spoken at conferences or other events for many organizations including the Intellectual Property Owners Association (IPO), Licensing Executives Society (LES), American Bar Association (ABA), American Intellectual Property Law Association (AIPLA), and the Intellectual Property Law Association of Chicago (IPLAC), among others.

Prior to joining Stout, Mr. Weingust worked in the Intellectual Property groups at FTI Consulting and Deloitte.

## Recognition

- Recognized as one of the world's leading IP strategists as part of the *IAM Strategy 300* from 2017 to 2022.
- Recognized as one of the world's leading patent professionals as part of the *IAM Patent 1000* from 2020 to 2022.

## Professional Memberships

- Intellectual Property Owners Association (IPO) – Past Secretary of the Corporate IP Management Committee
- Licensing Executives Society (LES) – Past Chair of the Valuation & Pricing Committee
- National Association of Certified Valuators and Analysts (NACVA)
- American Intellectual Property Law Association (AIPLA)

## Scott Weingust
Managing Director
**Intellectual Property Valuation Expert**



---

### Trial Testimony Experience

Rodney D. Tow, Chapter 7 Trustee of AmeriSciences, L.P. v. Organo Gold Int'l, Inc., et al., U.S. District Court, Southern District of Texas, Houston Division, May 2018

Pearl Software, Inc. and Helios Software, LLC v. SpectorSoft Corporation, U.S. District Court, District of Delaware, June 2015

### Written and Deposition Testimony Experience

In re: Marriage of Stephanie Burke and Michael Burke, Circuit Court of The Nineteenth Judicial Circuit, Lake County, Illinois, 2022 (Expert Report) (Marriage dissolution; valuation of trade secrets and know-how associated with a pharmaceutical product for pain management)

Maiden Biosciences, Inc. v. DSS, Inc. f/k/a Document Security Systems, Inc., Decentralized Sharing Systems, Inc., HWH World, Inc. f/k/a Bliss International, Inc., RBC Life Sciences, Inc., RBC Life International, Inc., and RBC Life Sciences USA, Inc., United States District Court, Northern District of Texas, Dallas Division, 2022 (Expert Report and Rebuttal Expert Report) (Fraudulent transfers or conveyances; valuation of a patent, trademarks, distributor lists, software, domain names, license agreements, product registrations, and product formulations related to the direct selling of nutritional supplements and body care products)

Mr. Patrick Whalen v. Mr. Ayman Kamel, United District Court for the Western District of North Carolina, Charlotte Division, 2021 (Expert Declaration) (Dissolution of partnership and related notice of removal; valuation of trademarks associated with a group of restaurants)

Timothy McTighe, LLC v. Signature Life Sciences, LLC and Signature Orthopaedics, Pty., Ltd., United States District Court, Northern District of Ohio, Eastern Division, 2021 (Expert Report and Deposition Testimony) (Breach of contract and fraudulent inducement; valuation of a patent holding company with assets related to hip implant technology)

In re: The Marriage of Janice LeVan and Kurtis LeVan, Lake Superior Court, State of Indiana, County of Lake, 2021 (Expert Reports) (Marriage dissolution; valuation of certain trademarks and patents used in the construction industry)

In re: The Marriage of Michael C. Callans and Judy A. Callans, Circuit Court of Cook County, Illinois, County Department – Domestic Relations Division, 2021 (Expert Report) (Marriage dissolution; valuation of a domain name)

In re: Media Operations Liquidating Company, LLC f/k/a Ebony Media Operations, LLC, et al., U.S. Bankruptcy Court, Southern District of Texas, Houston Division, 2021 (Expert Report) (Dispute regarding the value of certain collateral securing notes provided to the debtors; valuation of copyrights associated with issues of *Ebony* and *Jet* magazines)

In re: Amit Bhalla, China Central Television, et al., v. Amit Bhalla and Rena Mehta Bhalla, U.S. Bankruptcy Court, Middle District of Florida, Tampa Division, 2020 (Expert Report) (Fraudulent transfers and/or fraudulent asset conversions; valuation of trademark infringement and copyright infringement monetary remedies associated with certain Chinese-language television programming)

True Chemical Solutions, LLC v. Performance Chemical Company, U.S. District Court, Western District of Texas, Midland-Odessa Division, 2020 (Expert Report and Deposition Testimony) (Patent infringement; damages related to trailers used to pump chemicals used in fracking for the oil and gas industry)

---

**Scott Weingust**
Managing Director
**Intellectual Property Valuation Expert**



(1) Surgicraft Limited (in Compulsory Liquidation), (2) Peter Saville, (3) Anne O'Keefe ((2) and (3) as Joint Liquidators of Surgicraft Limited) and (1) Centinel Spine Inc (2) John Viscogliosi (3) Anthony Viscogliosi, High Court of Justice of England, 2017 (Expert Response, Expert Reply Response, and Mediation Participation) (Undervalue transactions; valuation of U.S. and U.K. trademarks and patent applications related to spinal implant technology and products)

Cecci Gori Pictures and Cecchi Gori USA, Inc. v. G&G Productions, LLC, Gabriele Israilovici, Giovanni Nappi, Vittorio Cecchi Gori, et al., U.S. Bankruptcy Court, Northern District of California, San Jose Division, 2017 (Expert Report) (Fraudulent transfer; valuation of copyrighted movie scripts)

Rodney D. Tow, Chapter 7 Trustee of AmeriSciences, L.P. v. Organo Gold Int'l, Inc., et al., U.S. District Court, Southern District of Texas, Houston Division, 2017 (Expert Report and Rebuttal Expert Report) (Fraudulent transfer and trade secret misappropriation; valuation of a multi-level marketing distributor network)

Samson Lift Technologies LLC v. Jerr-Dan Corporation and Oshkosh Corporation, Supreme Court of the State of New York, New York County, 2014 (Rebuttal Expert Report and Deposition Testimony) (Breach of contract; valuation of alleged lost patent protections related to automotive towing vehicle technology)

Pearl Software, Inc. and Helios Software, LLC v. Awareness Technologies, Inc. and Remote Computer Observation & Monitoring, LLC d/b/a Remote.com, U.S. District Court, District of Delaware, 2013-2014 (Expert Report, Reply Expert Report, and Deposition Testimony) (Patent infringement; damages related to computer monitoring software)

Pearl Software, Inc. and Helios Software, LLC v. SpectorSoft Corporation, U.S. District Court, District of Delaware, 2013-2014 (Expert Report, Reply Expert Report, Supplemental Expert Report, and Deposition Testimony) (Patent infringement; damages related to computer monitoring software)

Climb Tech, LLC and K.E. Guthrie & J.D. Schwartz Designs, LLC v. Gene Verble, Darrell Hagler, Eric W. Reeves, and Valcor Industries, LLC, U.S. District Court, Western District of Texas, Austin Division, 2008 (Expert Report and Deposition Testimony) (Patent infringement, trade secret misappropriation, breach of contract, tortious interference, and unfair competition; damages related to fall protection equipment technology)

## Publications

"Enhanced Voice Services: Patent Landscape," www.stout.com, May 16, 2022

"Introduction to Trade Secret Valuation," Chapter 4 from the book *Practical Guide to Successful Intellectual Property Valuation and Transactions*, Wolters Kluwer, 2022

"Roundtable on Intellectual Property/Patent Law: Keeping ideas and technologies secure," Crain's Chicago Business, November 8, 2021

"Diving Below the Surface: Challenges with Determining FRAND Royalty Terms for SEPs Using the 'Top-Down Method,'" Intellectual Property Magazine, July/August 2021

"Michael Jackson's Estate Moonwalks Past the IRS in Tax Court Battle," www.stout.com, May 20, 2021

"Insights from Intellectual Property Expert David Kappos," *The Journal*, Fall/Winter 2019

"Methods for Determining FRAND Licensing Terms for SEPs," *The Journal*, Spring/Summer 2019

"Selecting Discount Rates for Valuing Early-Stage Intellectual Property," *The Journal*, Spring/Summer 2018

## Scott Weingust
Managing Director
**Intellectual Property Valuation Expert**



"Takeaways from Ericsson v. D-Link, et al.," www.stout.com, April 17, 2018

"Chloe Kim's Right of Publicity: The Value of Gold," www.stout.com, February 21, 2018 and Law360, February 23, 2018

"Setting the Standard for Intellectual Property: Insights From Bill Elkington," *The Journal*, Fall/Winter 2017

"Tricks of the Trade(mark): An Introduction to Trademark Valuation," *The Journal*, Fall/Winter 2017

"Giving Up Control: Self-Driving Cars and Intellectual Property," www.stout.com, June 2017

"Artificial Intelligence: Does It Work for Patent Valuation?" *The Journal*, Spring/Summer 2017

"Where We've Come From and Where We're Going With Intellectual Property," an interview with Q. Todd Dickinson, *The Stout Journal*, Spring/Summer 2017

"Why Private Equity and Venture Capital Firms Should Care About Intellectual Property Assets," *The Journal*, Spring/Summer 2017

"When Imitation is Not a Form of Flattery: The Importance of Intellectual Property Registration in Cuba," www.stout.com, January 24, 2017

"IP Litigation Funding Smack Down: How Hogan v. Gawker Highlights Changes in Litigation Financing," www.stout.com, November 2016

"'Market Value' Damages: What Are the Implications of Aqua Shield?" *Stout Journal*, Spring 2016, reprinted in *LES Insights*, June 11, 2016

"Prince's death: How will his intellectual property and estate be handled?" *Stout Estate and Gift Tax Valuation Blog*, May 10, 2016

"Q&A: Creating value through IP asset management and valuation," *Financier Worldwide Magazine*, January 2016

"Valuing Intellectual Property for Estate-Planning Purposes," *Trusts & Estates*, December 21, 2015

"Common Errors Committed When Valuing Patents – Part 3: Focus on the Cost and Market Approaches," *Stout Journal*, Fall 2015

"The Attorney's Role in Assisting Clients with Patent Valuation," *Landslide®, a Publication of the ABA Section of Intellectual Property Law*, September/October 2015

"Common Errors Committed When Valuing Patents – Part 2: Focus on the Income Approach," *Stout Journal*, Spring 2015

"Exploring the Nondiscriminatory Aspect of RAND Licensing Terms," *Stout Journal*, Fall 2014, republished on Law360, January 29, 2015

"Valuing Intellectual Property in the Context of a Divorce Proceeding," *Stout Journal*, Fall 2014

"Use/Misuse of Patent Purchase Price in Patent Infringement Damages Analysis," www.stout.com, July 2014, republished on Law360, August 11-12, 2014.

**Scott Weingust**
Managing Director
**Intellectual Property Valuation Expert**



"The Great Patent Troll Debate – Two Perspective," interviews with Bill Sorrell (Vermont Attorney General) and Tony Brown (Founder and CEO of Cascades Ventures), *Stout Journal*, Spring 2014 and Law360, May 13-15, 2014

"Common Errors Committed When Valuing Patents – Part I," *Stout Journal*, Spring 2014

"Intellectual Property Valuation," *Business and Litigation Issues Section of the IPO Law Journal*, a whitepaper authored by members of the Intellectual Property Owners Association (IPO) Corporate IP Management Committee, October 2013

"Have IP Assets, Need Money!  The Role of IP Valuation in Startup Investment," *Stout Journal*, Fall 2013 and *Preferred Returns*, the Newsletter of the Private Equity and Venture Capital Committee of the Business Law Section of the American Bar Association, September 2013

"Using the Monte Carlo Method to Value Early Stage, Technology-Based Intellectual Property Assets," *Stout Journal*, Spring 2013

"New ADR Process Facilitates Call for Refined Use of Damages Experts in Patent Litigation by Judges Rader and Posner In Order To Resolve Patent Conflicts," *Just Resolutions E-News*, Dispute Resolution Section of the American Bar Association, May 2013

"New ADR Process Facilitates Call by Judges Rader and Posner for Better Use of Damages Experts in Patent Litigation," *Stout Journal*, Fall 2012

"Why Private Equity and Venture Capital Firms Should Care About Intellectual Property Assets," *Preferred Returns*, the Newsletter of the Private Equity and Venture Capital Committee of the Business Law Section of the American Bar Association, March 2012 and *Stout Journal*, Fall 2012

"Maximizing the Value of Intellectual Property: Assessing and Improving Intellectual Property Management Practices Across the Entire Intellectual Property Lifecycle," *Global Intellectual Property Asset Management Report*, April 2008

"The Challenge of Creating Innovation Networks," Financial Aspects of Intellectual Property blog, March 2007

"Enhancing Technology Transfer Programs at Our Nation's Universities: Turning Government Funds into New Sources of Revenue," National Association of College and University Business Officers 2004 Annual meeting, July 2004


### Speeches and Seminars

"Intellectual Property Valuations for Related Party Transactions," Tax Executives Institute (TEI)-Pittsburgh Chapter, 2022

"Intellectual Property Valuation," guest lecturer at Michigan State University College of Law's Intellectual Property Practicum class, 2021

"Intellectual Property Valuation: What You Need to Know," a presentation given to attorneys at Jackson Walker LLP, 2021

"IoT: SEP Licensing Across Non-Traditional Verticals," IPWatchdog's Standard Essential Patents 2021: A Patent Masters™ Virtual Symposium, 2021

"Intangible Assets and IP Rights: Do They Matter for Valuation and Success," IPWatchdog Live, 2021

**Scott Weingust**
Managing Director
**Intellectual Property Valuation Expert**



"The Value of Michael Jackson's Intellectual Property After His Death," an interview/podcast by the Taxgirl, Kelly Phillips Erb, published on The Exchange by Bloomberg Tax, 2021

"NIL and NFT," panel discussion regarding name, image and likeness, and non-fungible tokens at Sports Philanthropy World conference, 2021

"Nonprofits as Brands," panel discussion at Sports Philanthropy World conference, 2021

"Intellectual Property Valuation for Entrepreneurs and Start-ups," an educational course for members of mHUB a Chicago-based innovation center for entrepreneurs and start-ups focused on physical product development and manufacturing, 2018, 2019, 2021

"Estate Planning and Intellectual Property Assets: Valuation, Transfers, Taxes, Strategies for Counsel," Stafford webinar, 2021

"Intellectual Property Valuations for Related Party Transactions," Tax Executives Institute (TEI)-Western Michigan Chapter, 2021

"Standard Essential Patent Licensing Strategies," World Intellectual Property Forum, 2021

"Patent Valuation," guest lecturer at New York University Law School's Patent Licensing class, 2015, 2017, 2019, 2020, and 2021

"Standard Essential Patent (SEP) Licensing Strategies," Stout IP Insights Webinar Series, 2021

"Masterclass: The art of pricing and valuing IP," panelist, IPBC Connect, 2020

"Valuation for Intellectual Property Licensing," a continuing education course presented to GE licensing professionals, 2020

"Show Me The Money! IP Valuation Considerations for the Media and Entertainment Industry," Stout IP Dialogue and Dinner Continuing Legal Education Event, 2020

"Practical Tips for Helping Companies Improve Their Intellectual Property Valuation Efforts and Outcomes," presentation to the Intellectual Property Owners Association (IPO) Corporate IP Management Committee, 2019

"Intellectual Property Valuation: Best Practices to Increase Quality and Decrease Risk," IP Law & Management Institute, 2019

"Valuing Intellectual Property: The Basics You Need to Know," a continuing legal education course presented to Marshall, Gerstein & Borun LLP, 2019

"Improving IP Valuation Outcomes Through the Use of Standards," moderator and panelist at the Licensing Executives Society's (LES) Leading Edge Series conference: "Driving Innovation: Standards in Licensing and Intellectual Capital Management," 2019

"Gray Market Goods," a continuing legal education presentation for attorneys at Toyota Motor North America, 2019

"IP is an Asset – Learn How to Value It," a full-day training session sponsored by the Toronto Chapter of the Licensing Executives Society (LES), 2019

"IP Valuation for Emerging Enterprises: The Why and The How," Licensing Executives Society (LES) webinar, 2018

**Scott Weingust**
Managing Director
**Intellectual Property Valuation Expert**



"Introduction to Intellectual Property Valuation," presentation to members of the Intellectual Property Law Association of Chicago, 2018

"Intellectual Property Valuation," a full-day training session provided as part of the Licensing Executives Society's LES University "IP Licensing for Business Development" course, 2015, 2016, 2017, and 2018

"Intellectual Property Valuation 101," a continuing legal education course presented to Leydig, Voit & Mayer, Ltd., 2018

"Intellectual Property Value Extraction: Strategies and Tactics," North Shore Corporate IP Roundtable, 2018

"Economic Considerations for Patent Litigation Financing," moderator and panelist at the Licensing Executives Society International (LESI) Annual Meeting, 2018

"Overview of International Valuation Standards (IVS) 2017," presentation to the Aerospace Industries Association, 2017

"For What It's Worth: Fundamentals of IP Valuation," DePaul University College of Law, 2017

"Overview of the International Valuation Standards (IVS) 2017," presentation to the Licensing Executives Society (LES) Intellectual Property Valuation Standards committee, 2017

"Valuing Intellectual Property," a continuing legal education course presented to McAndrews, Held & Malloy, Ltd., 2017

"IP Valuation 101," a continuing legal education course presented to Neal, Gerber & Eisenberg LLP, 2017

"Intellectual Property Valuation," part of the Licensing Executives Society's LES University "Business Development in Life Sciences" course, 2015, 2016, and 2017

"An Introduction to Intellectual Property Valuation," a continuing legal education course presented to Clark Hill PLC, 2017

"When IP Valuation and Damages Collide!" 15th Annual Rocky Mountain Intellectual Property & Technology Institute, 2017

"Valuing the Right of Publicity," a continuing legal education course presented to Mandell Menkes LLC, 2017

"International Valuation Standards: How Do They Affect IP Valuation," presentation to the Licensing Executives Society's (LES) Valuation & Pricing Committee, 2017

"Trade Secrets and Know-How: Unique Valuation Issues," Licensing Executives Society (LES) webinar, 2017

"Valuation of Intellectual Property," Clear Law Institute webinar, 2017

"Advanced Intellectual Property Valuation and Negotiation," a training course delivered on behalf of the Licensing Executives Society (LES) to business development professionals from MedImmune and AstraZeneca, 2017

"Valuation of Patents, Trademarks, Copyrights, and Trade Secrets: An Orientation to Intellectual Property Appraisal," State Bar of Michigan Intellectual Property Law Spring Seminar, 2017

"Telehealth: Intellectual Property Valuation for Growth and Funding," DePaul University College of Law's Annual Health & IP Law Symposium, 2017

## Scott Weingust
Managing Director
**Intellectual Property Valuation Expert**



"Use/Misuse of Patent Purchase Price in Patent Infringement Damages Analysis," American Intellectual Property Law Association (AIPLA) Mid-Winter Institute, 2017

"Valuation for Intellectual Property Licensing," presentation to the Intellectual Property Owners Association's (IPO) Licensing Committee, 2017

"Outlining a Patent Policy for the New Administration," panel moderator at IAM's Patent Law and Policy 2016 conference, 2016

"Numbers Are Your Friends: Exploring the Intersection of IP Valuation and Damages," *Stout* 2016 Intellectual Property Boot Camp, 2016

"The Use of Valuation Concepts in Patent Damages: The Multimillion Dollar Question," presentation to the Intellectual Property Owners Association's (IPO) Damages and Injunctions Committee, 2016

"Internet of Things: Protecting and Profiting From Your Company's Knowledge Assets and IoT Innovations," Licensing Executives Society (LES) webinar, 2016

"Valuing the Right of Publicity," American Bar Association (ABA) Section of Litigation *Sound Advice*, 2016

"Insights into IP Issues Associated with Mergers & Acquisitions and Social Media," a continuing legal education course presented to Pattishall, McAuliffe, Newbury, Hilliard & Geraldson LLP, 2016

"Oil & Gas v. Life Sciences: A Comparison of IP Valuation and Licensing Best Practices Across Industries," Licensing Executives Society (LES) Spring PanAm Meeting, 2016

"Valuation of Trade Secrets and Know-How," presentation to the Intellectual Property Owners Association's (IPO) Corporate IP Management Committee, 2016

"Contemporary Issues Affecting Patent Value," presentation to the Limited Partners of a patent investment firm, 2015

"Let's Make a Deal! Strategy, Due Diligence, and Valuation Considerations for Patent Transactions," 2nd Annual *Stout* Intellectual Property Symposium, 2015

"Will My Patent Make Cents?  How Courts and the USPTO Affect Patent Portfolio Value," American Bar Association (ABA) Landslide® Webinar Series, 2015

"Corporate IP Management Best Practices," Intellectual Property Owners Association (IPO) Annual Meeting, 2015

"IP in Bankruptcy," American Bar Association (ABA) IP Roundtable, addressing intellectual property valuation in the context of a bankruptcy, 2015

"Maximizing Tangible Benefits from Your Intangible Assets: An Intellectual Property Monetization Case Study," part three of a three-part workshop series for the University of Chicago's Chicago Innovation Exchange, 2015

"Determining the Value of Your Emerging Company's Intellectual Property," part two of a three-part workshop series for the University of Chicago's Chicago Innovation Exchange, 2015

"Patent Infringement Damages," a continuing legal education course presented to Godfrey & Kahn S.C., 2015

"Assessing and Incorporating Risk and Uncertainty in the Valuation of Early-Stage Intellectual Property," Licensing Executives Society (LES) Spring Meeting, 2015

## Scott Weingust
Managing Director
**Intellectual Property Valuation Expert**



"In the Trenches: How are Patent Plaintiffs Proving Their Damages?" DRI Intellectual Property Litigation Seminar, 2015

"Intellectual Property Valuation: A Primer for Determining the Value of Your Patents, Trademarks, Trade Secrets, and Copyrights," presentation to the Detroit Chapter of Financial Executives International (FEI), 2015

"Navigating the Patent Damages Minefield," addressing the use of patent purchase prices in patent infringement damages analysis, The John Marshall Law School 59th Annual Intellectual Property Law Conference, 2015

"Moving to the Next Level: Valuation & Financing Considerations and Employment Strategies for Start-Ups and Emerging Technology Companies," moderator and panelist at an event co-sponsored by Epstein Becker Green and Stout Risius Ross, 2015

"U.S. Case Law Overview and Relevant Issues for Determining FRAND Licensing Terms," presented to members of the Japan Institute of Intellectual Property and the University of Tokyo, 2014

"What Investors Need to Know About FRAND," IP Dealmakers Forum, 2014

"Intellectual Property Valuation – A Case Study: Insights into How a Company Should Approach IP Valuation Issues in Various Contexts," The Corporate IP Institute at Georgia State University, 2014

"Intellectual Property Valuation – A Case Study," Intellectual Property Owners Association (IPO) Annual Meeting, 2014

"Unlocking the Hidden Value (and Savings) in Your Intellectual Property Portfolio," First Chair Awards Conference, 2014

"How to Value Your Brand and Other 'Soft' Assets," Financial Poise webinar, 2014

"RAND Royalties for Standard Essential Patents," presented to the Midwest patent practice at Perkins Coie LLP, 2014

"Intellectual Property Issues in Merger and Acquisition Transactions," addressing intellectual property valuation, joint webinar with Locke Lord LLP, 2014

"Role of the Damages Expert in IP Litigation," addressing early case assessments and RAND royalty rates for standard essential patents, a continuing legal education course presented to Greenberg Traurig LLP, 2014

"The Billion Dollar Whiteboard & Other Cautionary Tales Regarding IP Valuation," a continuing legal education course presented separately to BP International and Baxter Healthcare, 2014

"Determining RAND Royalty Rates for Standard Essential Patents," presented to the Intellectual Property Owners Association's (IPO) Damages and Injunctions Committee, 2013

"Emerging Intellectual Property Issues in Business Transactions: What You Need to Know," addressing intellectual property valuation, The Knowledge Congress Webcast Series, 2013

"Valuing Intellectual Property Inside and Outside of a Divorce Proceeding," *Stout* Webinar, 2013

"Effective Use of Experts in Patent Infringement Cases," addressing emerging issues related to the use of damages experts, The Knowledge Congress Webcast Series, 2013

# Scott Weingust
Managing Director
**Intellectual Property Valuation Expert**



---

"Employing Federal Rules and Brandywine v. Cisco to Aggressively Reduce Cost of Using Damages Experts in Litigation and ADR," presented to the Intellectual Property Law Association of Chicago, 2013

"The Use of an Excess Earnings Approach for Trademark Valuation," guest lecturer at The John Marshall Law School "Intellectual Property Valuation" class, 2010, 2012, and 2013

"Practical Guidance and Illustrative Experiences Related to Current Patent Damages Issues," a continuing legal education course presented to Bartlit Beck Herman Palenchar & Scott LLP, 2012

"Recent Case Law Overview: A Look at Recent Opinions Affecting Damages in Patent Cases," a continuing legal education course presented to Dykema Gossett PLLC, 2012

"Recent Case Law Overview: A Look at Recent Opinions Affecting Damages Quantification in Patent Cases," a continuing legal education course presented to Leydig, Voit & Mayer, Ltd., 2012

"How much is your IP worth? Tools for properly assessing the value of IP," presented at a Intellectual Property Panel Discussion co-hosted by Stout Risius Ross and Venable LLP and titled "Intellectual Property: Increasing Your Return on Investment," 2012

"Patent Damages Overview," guest lecturer at the Chicago-Kent School of Law "Managing IP Portfolios" class, 2011

"Introduction to the Value and Importance of Intellectual Asset Management," presented as one class of the University of Illinois-Chicago's Engineering School's on-line Intellectual Property Management course, 2011

"License Agreement Comparability," presented to the China Appraisal Society, 2010

"Accounting for Risk in Intellectual Property Valuation," presented to the China Appraisal Society, 2010

"Monetization and Commercialization of IP," panelist and moderator at an FTI Consulting Insurance and Intellectual Property Conference, 2008

"Getting to the Deal (Part 2)," a discussion of intellectual property due diligence in mergers and acquisitions, panelist at a meeting of the New York Chapter of the Licensing Executives Society (LES), 2007

"Overview of Intellectual Asset Management," guest lecturer at the Chicago-Kent School of Law "Managing IP Portfolios" class, 2007

"Understanding the Role of University Technology Transfer," University of North Dakota's R&D Showcase IV conference, 2005

"The Question is Not: Who Moved the Cheese? But Rather: Can We Keep the Rest of the World from Eating Our Lunch?" a presentation regarding intellectual property and innovation in the U.S. and abroad, presented at the World Leadership in Innovation Conference at the FirstWave Annual Event, 2004

"The Emerging Role of Technology Transfer at U.S. Universities," presented at the Annual Meeting of the National Association of College and University Business Officers, 2004

"Technology Transfer in the University Environment," presented at the Annual Higher Education Forum, 2002

---

# Appendix B

**Declaration of Scott Weingust, Appendix B**
**Summary of Alleged Loss Realized by Investors**
**Exhibit 1**

| | | [1] | | [2] | [3] | [4] | [5] |
|---|---|---|---|---|---|---|---|
| | | Fair Market Value of Equity | | Alleged Loss Realized by All Investors | Alleged Loss Realized by the Investors Less Rupert Murdoch | Alleged Loss Realized by the Investors Less RDV | Alleged Loss Realized by the Investors Less Rupert Murdoch and RDV |
| 1 | Saba Income Approach, 44% Discount Rate | $ 951,000,000 | [6] $ | 121,093,891 | $ 80,660,954 | $ 88,558,017 | $ 49,072,723 |
| 2 | Alternative Income Approach, 27% Discount Rate | 1,478,000,000 | | 59,901,246 | 40,085,084 | 44,048,319 | 24,232,156 |
| 3 | Alternative Income Approach, 20.65% Discount Rate | 1,815,000,000 | | 30,712,617 | 20,408,837 | 22,469,594 | 12,165,815 |
| 4 | Saba Asset Approach, No Opportunity Cost | $ 827,000,000 | | -- | -- | -- | -- |
| 5 | Alternative Asset Approach, Opportunity Cost Added Using 44% Discount Rate | 1,376,000,000 | | 69,874,441 | 46,805,270 | 51,419,107 | 28,349,936 |
| 6 | Alternative Asset Approach, Opportunity Cost Added Using 27% Discount Rate | 1,164,000,000 | | 92,913,676 | 62,324,630 | 68,442,442 | 37,853,397 |

[1] See Exhibit 4, Exhibit 13, and Exhibit 17. Also see Expert Report of Carl S. Saba, dated September 8, 2022.
[2] See Exhibit 2, Exhibit 6, Exhibit 10, and Exhibit 15.
[3] See Exhibits 20.1 - 20.6.
[4] See Exhibits 21.1 - 21.6.
[5] See Exhibits 22.1 - 22.6.
[6] United States District Court, Northern District of California, San Jose Division, Transcript of Sentencing Proceedings Before the Honorable Edward J. Davila, United States District Court Judge, November 18, 2022.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Alternative Income Approach (27% Discount Rate)**
**Exhibit 2**

| | [1] | | [2] | | | [3] | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Series C-2 Shares | | Series C-2 Purchase Price | | Series C-2 Value Based on Purchase Price | | Series C-2 Value per Share, adjusted NAV Method | | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
| 1 | 20,022,939 | $ | 17.00 | $ | 340,389,963 | $ | 14.31 | $ | 286,428,179 | $ 53,961,784 |

| | | | | | Series C-1 Value Based on Purchase Price | | Series C-1 Value per Share, adjusted NAV Method | | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| | Series C-1 Shares | | Series C-1 Purchase Price | | | | | | | |
| 2 | 2,720,488 | $ | 15.00 | $ | 40,807,320 | $ | 12.82 | $ | 34,867,857 | $ 5,939,463 |
| 3 | | | | | | | | Total Loss | | $ 59,901,246 |

[1] See Exhibit 19.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 3.2. Reflects the adjusted Series C-1 and C-2 price per share based on the NAV method as of 12/31/2014.

Declaration of Scott Weingust, Appendix B
Income Approach
DCF Equity Allocation - Alternative Income Approach (27% Discount Rate)
Exhibit 3.1

| | | | | $0.015 | $0.030 | $0.066 | $0.072 | $0.094 | $0.170 | $0.206 |
|---|---|---|---|---|---|---|---|---|---|---|
| Share Class | Number of Shares | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
| **Preferred Share Classes** | | | | | | | | | | |
| 1 Series A @ $0.150 | $ 46,320,045 | $ - | $ 6,948,007 | $ 7,642,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,067 | $ 37,194,996 |
| 2 Series B @ $0.1864 | 54,134,965 | - | 9,994,830 | 10,806,855 | 12,430,904 | 16,003,811 | 19,901,529 | 24,990,216 | 34,193,160 | 45,344,962 |
| 3 Series C @ $0.564 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,867,728 | 39,754,871 | 43,995,390 | 49,531,624 | 59,543,962 | 71,676,560 |
| 4 Series C-1 @ $3.00 | 25,175,001 | 75,525,003 | 75,525,003 | 75,902,628 | 76,657,878 | 78,319,428 | 80,132,028 | 82,498,478 | 86,778,228 | 91,964,279 |
| 5 Series C-1 @ $15.00 | 7,500,032 | 112,500,480 | 112,500,480 | 112,612,980 | 112,837,981 | 113,332,984 | 113,872,986 | 114,577,989 | 115,852,994 | 117,398,001 |
| 6 Series C-2 @ $17.00 | 32,808,227 | 557,739,859 | 557,739,859 | 558,231,982 | 559,216,229 | 561,381,572 | 563,743,765 | 566,827,738 | 572,405,136 | 579,163,631 |
| **Warrants on Common** | | | | | | | | | | |
| 7 Exercise Price @ 0.072 | 741,665 | $ - | $ - | $ - | $ - | $ - | $ - | $ 16,317 | $ 72,683 | $ 99,383 |
| 8 Common | 302,965,725 | $ - | $ - | $ 4,544,486 | $ 9,088,972 | $ 19,995,738 | $ 21,813,532 | $ 28,478,778 | $ 51,504,173 | $ 62,410,939 |
| **Options on Common** | | | | | | | | | | |
| 9 Exercise Price @ 0.015 | 350,000 | $ - | $ - | $ - | $ 5,250 | $ 17,850 | $ 19,950 | $ 27,650 | $ 54,250 | $ 66,850 |
| 10 Exercise Price @ 0.030 | 1,170,875 | - | - | - | - | 42,152 | 49,177 | 74,936 | 163,923 | 206,074 |
| 11 Exercise Price @ 0.066 | 547,500 | - | - | - | - | - | 3,285 | 15,330 | 56,940 | 76,650 |
| 12 Exercise Price @ 0.072 | 2,579,175 | - | - | - | - | - | - | 56,742 | 252,759 | 345,609 |
| 13 Exercise Price @ 0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| 14 Exercise Price @ 0.170 | 3,972,457 | - | - | - | - | - | - | - | - | 143,008 |
| 15 Exercise Price @ 0.206 | 606,365 | - | - | - | - | - | - | - | - | - |
| | 538,080,637 | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |

| | | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| **Inputs** | | | | | | | | | | |
| 16 Stock Price Now [1] | $ 1,478,000,000 | $ 1,478,000,000 | $ 1,478,000,000 | $ 1,478,000,000 | $ 1,478,000,000 | $ 1,478,000,000 | $ 1,478,000,000 | $ 1,478,000,000 | $ 1,478,000,000 | $ 1,478,000,000 |
| 17 Volatility | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% |
| 18 Riskfree Rate - Annual | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% |
| 19 Exercise Price | $ - | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |
| 20 Time to Maturity - Years | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| **Outputs** | | | | | | | | | | |
| 21 d1 | | 20.50 | 1.19 | 1.17 | 1.16 | 1.14 | 1.11 | 1.09 | 1.06 | 1.00 | 0.94 |
| 22 d2 | | 19.44 | 0.13 | 0.11 | 0.10 | 0.08 | 0.05 | 0.03 | 0.00 | (0.06) | (0.12) |
| 23 N(d1) | | 1.000 | 0.882 | 0.878 | 0.876 | 0.874 | 0.867 | 0.863 | 0.856 | 0.841 | 0.828 |
| 24 N(d2) | | 1.000 | 0.550 | 0.542 | 0.538 | 0.533 | 0.522 | 0.514 | 0.502 | 0.476 | 0.454 |
| 25 Call Price (Vc) | $ 1,478,000,000 | $ 898,344,842 | $ 889,587,491 | $ 885,539,318 | $ 879,811,789 | $ 866,935,650 | $ 858,110,824 | $ 844,702,036 | $ 816,173,605 | $ 790,835,052 |
| 26 Fair Market Value | $ 1,478,000,000 | $ 898,344,842 | $ 889,587,491 | $ 885,539,318 | $ 879,811,789 | $ 866,935,650 | $ 858,110,824 | $ 844,702,036 | $ 816,173,605 | $ 790,835,052 |

See Expert Report of Carl S. Saba, dated September 8, 2022.

[1] See Exhibit 4.

Declaration of Scott Weingust, Appendix B
Income Approach
DCF Equity Allocation - Alternative Income Approach (27% Discount Rate)
Exhibit 3.2

| | Share Class | | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Class Participate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | High call option | [1] | $ 1,478,000,000 | $ 898,344,842 | $ 889,587,491 | $ 885,539,318 | $ 879,811,789 | $ 866,935,650 | $ 858,110,824 | $ 844,702,036 | $ 816,173,605 | $ 790,835,052 |
| 2 | Less low call option | [1] | 898,344,842 | 889,587,491 | 885,539,318 | 879,811,789 | 866,935,650 | 858,110,824 | 844,702,036 | 816,173,605 | 790,835,052 | - |
| 3 | Total Value to Allocate | | $ 579,655,158 | $ 8,757,351 | $ 4,048,173 | $ 5,727,529 | $ 12,876,139 | $ 8,824,827 | $ 13,408,788 | $ 28,528,431 | $ 25,338,553 | $ 790,835,052 |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 4 | Series A @ $0.150 | [1] | - | 6,948,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| 5 | Series B @ $0.1864 | [1] | - | 9,994,830 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 |
| 6 | Series C @ $0.564 | [1] | 33,217,403 | - | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 |
| 7 | Series C-1 @ $3.00 | [1] | 75,525,003 | - | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 |
| 8 | Series C-1 @ $15.00 | [1] | 112,500,480 | - | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 |
| 9 | Series C-2 @ $17.00 | [1] | 557,739,859 | - | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 |
| | **Warrants on Common** | | | | | | | | | | | |
| 10 | Exercise Price @ 0.072 | | - | - | - | - | - | - | 741,665 | 741,665 | 741,665 | 741,665 |
| 11 | Common | | - | - | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 |
| | **Options on Common** | | | | | | | | | | | |
| 12 | Exercise Price @ 0.015 | | - | - | - | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| 13 | Exercise Price @ 0.030 | | - | - | - | - | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 |
| 14 | Exercise Price @ 0.066 | | - | - | - | - | - | 547,500 | 547,500 | 547,500 | 547,500 | 547,500 |
| 15 | Exercise Price @ 0.072 | | - | - | - | - | - | - | 2,579,175 | 2,579,175 | 2,579,175 | 2,579,175 |
| 16 | Exercise Price @ 0.094 | | - | - | - | - | - | - | - | 312,500 | 312,500 | 312,500 |
| 17 | Exercise Price @ 0.170 | | - | - | - | - | - | - | - | - | 3,972,457 | 3,972,457 |
| 18 | Exercise Price @ 0.206 | | - | - | - | - | - | - | - | - | - | 606,365 |
| | | | 778,982,745 | 16,942,837 | 527,800,100 | 528,150,100 | 529,320,975 | 529,868,475 | 533,189,315 | 533,501,815 | 537,474,272 | 538,080,637 |
| | **Distribution Percentage** | | | | | | | | | | | |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 19 | Series A @ $0.150 | | 0.0% | 41.0% | 8.8% | 8.8% | 8.8% | 8.7% | 8.7% | 8.7% | 8.6% | 8.6% |
| 20 | Series B @ $0.1864 | | 0.0% | 59.0% | 10.3% | 10.2% | 10.2% | 10.2% | 10.2% | 10.1% | 10.1% | 10.1% |
| 21 | Series C @ $0.564 | | 4.3% | 0.0% | 11.2% | 11.2% | 11.1% | 11.1% | 11.0% | 11.0% | 11.0% | 10.9% |
| 22 | Series C-1 @ $3.00 | | 9.7% | 0.0% | 4.8% | 4.8% | 4.8% | 4.8% | 4.7% | 4.7% | 4.7% | 4.7% |
| 23 | Series C-1 @ $15.00 | | 14.4% | 0.0% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% |
| 24 | Series C-2 @ $17.00 | | 71.6% | 0.0% | 6.2% | 6.2% | 6.2% | 6.2% | 6.2% | 6.1% | 6.1% | 6.1% |
| | **Warrants on Common** | | | | | | | | | | | |
| 25 | Exercise Price @ 0.072 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |
| 26 | Common | | 0.0% | 0.0% | 57.4% | 57.4% | 57.2% | 57.2% | 56.8% | 56.8% | 56.4% | 56.3% |
| | **Options on Common** | | | | | | | | | | | |
| 27 | Exercise Price @ 0.015 | | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| 28 | Exercise Price @ 0.030 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| 29 | Exercise Price @ 0.066 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| 30 | Exercise Price @ 0.072 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% |
| 31 | Exercise Price @ 0.094 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| 32 | Exercise Price @ 0.170 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% | 0.7% |
| 33 | Exercise Price @ 0.206 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| 34 | | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | **Allocation of Value** | | | | | | | | | | | |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 35 | Series A @ $0.150 | | $ - | $ 3,591,260 | $ 355,270 | $ 502,318 | $ 1,126,771 | $ 771,449 | $ 1,164,869 | $ 2,476,914 | $ 2,183,701 | $ 68,078,114 |
| 36 | Series B @ $0.1864 | | - | 5,166,091 | 415,210 | 587,067 | 1,316,875 | 901,604 | 1,361,401 | 2,894,809 | 2,552,125 | 79,563,963 |
| 37 | Series C @ $0.564 | | 24,717,671 | - | 451,727 | 638,699 | 1,432,693 | 980,900 | 1,481,135 | 3,149,405 | 2,776,583 | 86,561,569 |

Declaration of Scott Weingust, Appendix B
Income Approach
DCF Equity Allocation - Alternative Income Approach (27% Discount Rate)
Exhibit 3.2

| | Share Class | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Class Participate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 38 | Series C-1 @ $3.00 | 56,199,522 | - | 193,090 | 273,011 | 612,401 | 419,283 | 633,108 | 1,346,206 | 1,186,844 | 37,000,538 |
| 39 | Series C-1 @ $15.00 | 83,713,643 | - | 57,524 | 81,334 | 182,444 | 124,911 | 188,613 | 401,056 | 353,580 | 11,023,047 |
| 40 | Series C-2 @ $17.00 | 415,024,322 | - | 251,636 | 355,789 | 798,085 | 546,413 | 825,070 | 1,754,384 | 1,546,703 | 48,219,345 |
| | Warrants on Common | | | | | | | | | | |
| 41 | Exercise Price @ 0.072 | - | - | - | - | - | - | 18,652 | 39,660 | 34,965 | 1,090,050 |
| 42 | Common | - | - | 2,323,716 | 3,285,515 | 7,369,874 | 5,045,818 | 7,619,063 | 16,200,764 | 14,282,941 | 445,278,827 |
| | Options on Common | | | | | | | | | | |
| 43 | Exercise Price @ 0.015 | - | - | - | 3,796 | 8,514 | 5,829 | 8,802 | 18,716 | 16,500 | 514,407 |
| 44 | Exercise Price @ 0.030 | - | - | - | - | 28,482 | 19,501 | 29,445 | 62,611 | 55,199 | 1,720,874 |
| 45 | Exercise Price @ 0.066 | - | - | - | - | - | 9,118 | 13,769 | 29,277 | 25,811 | 804,679 |
| 46 | Exercise Price @ 0.072 | - | - | - | - | - | - | 64,862 | 137,919 | 121,592 | 3,790,699 |
| 47 | Exercise Price @ 0.094 | - | - | - | - | - | - | - | 16,711 | 14,732 | 459,292 |
| 48 | Exercise Price @ 0.170 | - | - | - | - | - | - | - | - | 187,277 | 5,838,452 |
| 49 | Exercise Price @ 0.206 | - | - | - | - | - | - | - | - | - | 891,195 |
| 50 | | 579,655,158 | 8,757,351 | 4,048,173 | 5,727,529 | 12,876,139 | 8,824,827 | 13,408,788 | 28,528,431 | 25,338,553 | 789,943,857 |

| | Preferred Share Classes | Total Value | Per Share Marketable |
|---|---|---|---|
| 51 | Series A | $ 80,250,666 | $ 1.73 |
| 52 | Series B | 94,759,144 | 1.75 |
| 53 | Series C | 122,190,383 | 2.07 |
| 54 | Series C-1 | 97,864,002 | 3.89 |
| 55 | Series C-1 | 96,126,153 | 12.82 |
| 56 | Series C-2 | 469,321,748 | 14.31 |
| | Warrants on Common | | |
| 57 | Exercise Price @ 0.072 | $ 1,183,326 | $ 1.60 |
| 58 | Common | $ 501,406,517 | $ 1.65 |
| | Options on Common | | |
| 59 | Exercise Price @ 0.015 | $ 576,564 | $ 1.65 |
| 60 | Exercise Price @ 0.030 | 1,916,113 | 1.64 |
| 61 | Exercise Price @ 0.066 | 882,654 | 1.61 |
| 62 | Exercise Price @ 0.072 | 4,115,072 | 1.60 |
| 63 | Exercise Price @ 0.094 | 490,735 | 1.57 |
| 64 | Exercise Price @ 0.170 | 6,025,729 | 1.52 |
| 65 | Exercise Price @ 0.206 | 891,195 | 1.47 |

See Expert Report of Carl S. Saba, dated September 8, 2022.

[1] See Exhibit 3.1.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Discounted Cash Flow Method Value Summary - Alternative Income Approach (27% Discount Rate)**
**Exhibit 4**

| | Year | Base Cash Flow | Period | [1] Discount Rate | PV Factor | Discounted Cash Flow |
|---|---|---|---|---|---|---|
| 1 | 2015 | $ 242,928 | 0.50 | 27.00% | 0.8874 | $ 215,564 |
| 2 | 2016 | (12,914) | 1.50 | 27.00% | 0.6987 | (9,023) |
| 3 | 2017 | 21,118 | 2.50 | 27.00% | 0.5502 | 11,618 |
| 4 | 2018 | 90,453 | 3.50 | 27.00% | 0.4332 | 39,184 |
| 5 | Terminal Value | 3,282,000 | 4.00 | 27.00% | 0.3844 | 1,261,606 |
| 6 | | Indicated Value | | | | $ 1,518,949 |
| 7 | | Add: C-2 Financing Proceeds | | | | - |
| 8 | | Deduct: Interest Bearing Debt | | | | 40,805 |
| 9 | | Add: Other non-operating assets | | | | - |
| 10 | | Total Equity Value - Controlling, Marketable Basis | | | | $ 1,478,144 |
| 11 | | **Total Equity Value - Controlling, Marketable Basis, Rounded** | | | | **$ 1,478,000** |

See Expert Report of Carl S. Saba, dated September 8, 2022, Exhibit F.6.
[1] See Exhibit 5. Consistent with Mr. Saba, I have rounded this discount rate.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Weighted Average Cost of Capital - Alternative Income Approach (27% Discount Rate)**
**Exhibit 5**

| | | | |
|---|---|---|---|
| 1 | Selected Equity Rate | [1] | 28.0% |
| 2 | Equity as a % of total capital | | 95.0% |
| 3 | Weighted Cost of Equity | | 26.6% |
| | | | |
| 4 | Debt as a % of total capital | | 5.0% |
| 5 | Cost of Debt | | 25.0% |
| 6 | After Tax Cost of Debt | | 15.0% |
| 7 | Weighted Cost of Debt | | 0.8% |
| | | | |
| 8 | **WACC** | | **27.4%** |

See Expert Report of Carl S. Saba, dated September 8, 2022, Exhibit F.4.

[1] Source: Craig R. Everett, Pepperdine University, "2015 Private Capital Markets Report."
Represents the median required rate of return for venture capital investments in early
stage companies.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Alternative Income Approach (20% Discount Rate)**
**Exhibit 6**

| | [1] Series C-2 Shares | [2] Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | [3] Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 1 | 20,022,939 | $ 17.00 | $ 340,389,963 | $ 15.60 | $ 312,331,537 | $ 28,058,426 |

| | Series C-1 Shares | Series C-1 Purchase Price | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 14.02 | $ 38,153,129 | $ 2,654,191 |
| 3 | | | | | Total Loss | $ 30,712,617 |

[1] See Exhibit 19.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 7.2. Reflects the adjusted Series C-1 and C-2 price per share based on the NAV method as of 12/31/2014.

Declaration of Scott Weingust, Appendix B
Income Approach
DCF Equity Allocation - Alternative Income Approach (20% Discount Rate)
Exhibit 7.1

| | Share Class | Number of Shares | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Preferred Share Classes** | | | | | | | | | | |
| 1 | Series A @ $0.150 | $ 46,320,045 | $ - | $ 6,948,007 | $ 7,642,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,067 | $ 37,194,996 |
| 2 | Series B @ $0.1864 | 54,134,965 | - | 9,994,830 | 10,806,855 | 12,430,904 | 16,003,811 | 19,901,529 | 24,990,216 | 34,193,160 | 45,344,962 |
| 3 | Series C @ $0.564 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,867,728 | 39,754,871 | 43,995,390 | 49,531,624 | 59,543,962 | 71,676,560 |
| 4 | Series C-1 @ $3.00 | 25,175,001 | 75,525,003 | 75,525,003 | 75,902,628 | 76,657,878 | 78,319,428 | 80,132,028 | 82,498,478 | 86,778,228 | 91,964,279 |
| 5 | Series C-1 @ $15.00 | 7,500,032 | 112,500,480 | 112,500,480 | 112,612,980 | 112,837,981 | 113,332,984 | 113,872,986 | 114,577,989 | 115,852,994 | 117,398,000 |
| 6 | Series C-2 @ $17.00 | 32,808,227 | 557,739,859 | 557,739,859 | 558,231,982 | 559,216,229 | 561,381,572 | 563,743,765 | 566,827,738 | 572,405,136 | 579,163,631 |
| | | | | | | | | | | | |
| | **Warrants on Common** | | | | | | | | | | |
| 7 | Exercise Price @ 0.072 | 741,665 | $ - | $ - | $ - | $ - | $ - | $ - | $ 16,317 | $ 72,683 | $ 99,383 |
| | | | | | | | | | | | |
| 8 | Common | 302,965,725 | $ - | $ - | $ 4,544,486 | $ 9,088,972 | $ 19,995,738 | $ 21,813,532 | $ 28,478,778 | $ 51,504,173 | $ 62,410,939 |
| | | | | | | | | | | | |
| | **Options on Common** | | | | | | | | | | |
| 9 | Exercise Price @ 0.015 | 350,000 | $ - | $ - | $ - | $ 5,250 | $ 17,850 | $ 19,950 | $ 27,650 | $ 54,250 | $ 66,850 |
| 10 | Exercise Price @ 0.030 | 1,170,875 | - | - | - | - | 42,152 | 49,177 | 74,936 | 163,923 | 206,074 |
| 11 | Exercise Price @ 0.066 | 547,500 | - | - | - | - | - | 3,285 | 15,330 | 56,940 | 76,650 |
| 12 | Exercise Price @ 0.072 | 2,579,175 | - | - | - | - | - | - | 56,742 | 252,759 | 345,609 |
| 13 | Exercise Price @ 0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| 14 | Exercise Price @ 0.170 | 3,972,457 | - | - | - | - | - | - | - | - | 143,008 |
| 15 | Exercise Price @ 0.206 | 606,365 | - | - | - | - | - | - | - | - | - |
| | | 538,080,637 | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |

| | | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Inputs** | | | | | | | | | |
| 16 | Stock Price Now [1] | $ 1,815,000,000 | $ 1,815,000,000 | $ 1,815,000,000 | $ 1,815,000,000 | $ 1,815,000,000 | $ 1,815,000,000 | $ 1,815,000,000 | $ 1,815,000,000 | $ 1,815,000,000 |
| 17 | Volatility | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% |
| 18 | Riskfree Rate - Annual | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% |
| 19 | Exercise Price | $ - | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |
| 20 | Time to Maturity - Years | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | | | | | | | | | | |
| | **Outputs** | | | | | | | | | |
| 21 | d1 | 20.69 | 1.38 | 1.36 | 1.35 | 1.34 | 1.31 | 1.29 | 1.26 | 1.19 | 1.14 |
| 22 | d2 | 19.63 | 0.32 | 0.30 | 0.29 | 0.28 | 0.25 | 0.23 | 0.20 | 0.13 | 0.08 |
| 23 | N(d1) | 1.000 | 0.916 | 0.913 | 0.912 | 0.909 | 0.905 | 0.901 | 0.896 | 0.884 | 0.873 |
| 24 | N(d2) | 1.000 | 0.626 | 0.618 | 0.614 | 0.609 | 0.598 | 0.590 | 0.578 | 0.553 | 0.531 |
| 25 | Call Price (Vc) | $ 1,815,000,000 | $ 1,201,817,277 | $ 1,191,850,154 | $ 1,187,234,959 | $ 1,180,696,743 | $ 1,165,961,848 | $ 1,155,834,004 | $ 1,140,399,809 | $ 1,107,377,749 | $ 1,077,835,105 |
| | | | | | | | | | | |
| 26 | Fair Market Value | $ 1,815,000,000 | $ 1,201,817,277 | $ 1,191,850,154 | $ 1,187,234,959 | $ 1,180,696,743 | $ 1,165,961,848 | $ 1,155,834,004 | $ 1,140,399,809 | $ 1,107,377,749 | $ 1,077,835,105 |

See Expert Report of Carl S. Saba, dated September 8, 2022.
[1] See Exhibit 8.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**DCF Equity Allocation - Alternative Income Approach (20% Discount Rate)**
**Exhibit 7.2**

| | Share Class | | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Class Participate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | High call option | [1] | $ 1,815,000,000 | $ 1,201,817,277 | $ 1,191,850,154 | $ 1,187,234,959 | $ 1,180,696,743 | $ 1,165,961,848 | $ 1,155,834,004 | $ 1,140,399,809 | $ 1,107,377,749 | $ 1,077,835,105 |
| 2 | Less low call option | [1] | 1,201,817,277 | 1,191,850,154 | 1,187,234,959 | 1,180,696,743 | 1,165,961,848 | 1,155,834,004 | 1,140,399,809 | 1,107,377,749 | 1,077,835,105 | - |
| 3 | Total Value to Allocate | | $ 613,182,723 | $ 9,967,123 | $ 4,615,195 | $ 6,538,216 | $ 14,734,895 | $ 10,127,844 | $ 15,434,195 | $ 33,022,060 | $ 29,542,644 | $ 1,077,835,105 |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 4 | Series A @ $0.150 | [1] | - | 6,948,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| 5 | Series B @ $0.1864 | [1] | - | 9,994,830 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 |
| 6 | Series C @ $0.564 | [1] | 33,217,403 | - | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 |
| 7 | Series C-1 @ $3.00 | [1] | 75,525,003 | - | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 |
| 8 | Series C-1 @ $15.00 | [1] | 112,500,480 | - | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 |
| 9 | Series C-2 @ $17.00 | [1] | 557,739,859 | - | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 |
| | **Warrants on Common** | | | | | | | | | | | |
| 10 | Exercise Price @ 0.072 | | - | - | - | - | - | - | 741,665 | 741,665 | 741,665 | 741,665 |
| 11 | Common | | - | - | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 |
| | **Options on Common** | | | | | | | | | | | |
| 12 | Exercise Price @ 0.015 | | - | - | - | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| 13 | Exercise Price @ 0.030 | | - | - | - | - | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 |
| 14 | Exercise Price @ 0.066 | | - | - | - | - | - | 547,500 | 547,500 | 547,500 | 547,500 | 547,500 |
| 15 | Exercise Price @ 0.072 | | - | - | - | - | - | - | 2,579,175 | 2,579,175 | 2,579,175 | 2,579,175 |
| 16 | Exercise Price @ 0.094 | | - | - | - | - | - | - | - | 312,500 | 312,500 | 312,500 |
| 17 | Exercise Price @ 0.170 | | - | - | - | - | - | - | - | - | 3,972,457 | 3,972,457 |
| 18 | Exercise Price @ 0.206 | | - | - | - | - | - | - | - | - | - | 606,365 |
| | | | 778,982,745 | 16,942,837 | 527,800,100 | 528,150,100 | 529,320,975 | 529,868,475 | 533,189,315 | 533,501,815 | 537,474,272 | 538,080,637 |
| | **Distribution Percentage** | | | | | | | | | | | |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 19 | Series A @ $0.150 | | 0.0% | 41.0% | 8.8% | 8.8% | 8.8% | 8.7% | 8.7% | 8.7% | 8.6% | 8.6% |
| 20 | Series B @ $0.1864 | | 0.0% | 59.0% | 10.3% | 10.2% | 10.2% | 10.2% | 10.2% | 10.1% | 10.1% | 10.1% |
| 21 | Series C @ $0.564 | | 4.3% | 0.0% | 11.2% | 11.2% | 11.1% | 11.1% | 11.0% | 11.0% | 11.0% | 10.9% |
| 22 | Series C-1 @ $3.00 | | 9.7% | 0.0% | 4.8% | 4.8% | 4.8% | 4.8% | 4.7% | 4.7% | 4.7% | 4.7% |
| 23 | Series C-1 @ $15.00 | | 14.4% | 0.0% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% |
| 24 | Series C-2 @ $17.00 | | 71.6% | 0.0% | 6.2% | 6.2% | 6.2% | 6.2% | 6.2% | 6.1% | 6.1% | 6.1% |
| | **Warrants on Common** | | | | | | | | | | | |
| 25 | Exercise Price @ 0.072 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |
| 26 | Common | | 0.0% | 0.0% | 57.4% | 57.4% | 57.2% | 57.2% | 56.8% | 56.8% | 56.4% | 56.3% |
| | **Options on Common** | | | | | | | | | | | |
| 27 | Exercise Price @ 0.015 | | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| 28 | Exercise Price @ 0.030 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| 29 | Exercise Price @ 0.066 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| 30 | Exercise Price @ 0.072 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% |
| 31 | Exercise Price @ 0.094 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |

Declaration of Scott Weingust, Appendix B
Income Approach
DCF Equity Allocation - Alternative Income Approach (20% Discount Rate)
Exhibit 7.2

| | Share Class | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Class Participate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | Exercise Price @ 0.170 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% | 0.7% |
| 33 | Exercise Price @ 0.206 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| 34 | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | **Allocation of Value** | | | | | | | | | | |
| | **Preferred Share Classes** | | | | | | | | | | |
| 35 | Series A @ $0.150 | $ - | $ 4,087,370 | $ 405,032 | $ 573,417 | $ 1,289,427 | $ 885,356 | $ 1,340,823 | $ 2,867,063 | $ 2,546,013 | $ 92,784,180 |
| 36 | Series B @ $0.1864 | - | 5,879,753 | 473,368 | 670,162 | 1,506,974 | 1,034,729 | 1,567,041 | 3,350,782 | 2,975,566 | 108,438,330 |
| 37 | Series C @ $0.564 | 26,147,354 | - | 515,000 | 729,102 | 1,639,512 | 1,125,733 | 1,704,862 | 3,645,481 | 3,237,265 | 117,975,421 |
| 38 | Series C-1 @ $3.00 | 59,450,132 | - | 220,136 | 311,653 | 700,805 | 481,192 | 728,739 | 1,558,252 | 1,383,761 | 50,428,315 |
| 39 | Series C-1 @ $15.00 | 88,555,685 | - | 65,582 | 92,846 | 208,781 | 143,355 | 217,103 | 464,228 | 412,244 | 15,023,395 |
| 40 | Series C-2 @ $17.00 | 439,029,552 | - | 286,882 | 406,148 | 913,294 | 627,093 | 949,698 | 2,030,725 | 1,803,327 | 65,718,512 |
| | **Warrants on Common** | | | | | | | | | | |
| 41 | Exercise Price @ 0.072 | - | - | - | - | - | - | 21,469 | 45,907 | 40,766 | 1,485,637 |
| 42 | Common | - | - | 2,649,196 | 3,750,554 | 8,433,764 | 5,790,851 | 8,769,929 | 18,752,612 | 16,652,720 | 606,873,899 |
| | **Options on Common** | | | | | | | | | | |
| 43 | Exercise Price @ 0.015 | - | - | - | 4,333 | 9,743 | 6,690 | 10,131 | 21,664 | 19,238 | 701,089 |
| 44 | Exercise Price @ 0.030 | - | - | - | - | 32,594 | 22,380 | 33,893 | 72,473 | 64,358 | 2,345,392 |
| 45 | Exercise Price @ 0.066 | - | - | - | - | - | 10,465 | 15,848 | 33,889 | 30,094 | 1,096,703 |
| 46 | Exercise Price @ 0.072 | - | - | - | - | - | - | 74,659 | 159,643 | 141,766 | 5,166,373 |
| 47 | Exercise Price @ 0.094 | - | - | - | - | - | - | - | 19,343 | 17,177 | 625,972 |
| 48 | Exercise Price @ 0.170 | - | - | - | - | - | - | - | - | 218,349 | 7,957,271 |
| 49 | Exercise Price @ 0.206 | - | - | - | - | - | - | - | - | - | 1,214,616 |
| 50 | | 613,182,723 | 9,967,123 | 4,615,195 | 6,538,216 | 14,734,895 | 10,127,844 | 15,434,195 | 33,022,060 | 29,542,644 | 1,076,620,488 |

| | Preferred Share Classes | Total Value | Per Share Marketable |
|---|---|---|---|
| 51 | Series A | $ 106,778,682 | $ 2.31 |
| 52 | Series B | 125,896,705 | 2.33 |
| 53 | Series C | 156,719,730 | 2.66 |
| 54 | Series C-1 | 115,262,985 | 4.58 |
| 55 | Series C-1 | 105,183,219 | 14.02 |
| 56 | Series C-2 | 511,765,230 | 15.60 |
| | Warrants on Common | | |
| 57 | Exercise Price @ 0.072 | $ 1,593,779 | $ 2.15 |
| 58 | Common | $ 671,673,524 | $ 2.22 |
| | Options on Common | | |
| 59 | Exercise Price @ 0.015 | $ 772,888 | $ 2.21 |
| 60 | Exercise Price @ 0.030 | 2,571,091 | 2.20 |

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**DCF Equity Allocation - Alternative Income Approach (20% Discount Rate)**
**Exhibit 7.2**

| | Share Class | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Class Participate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61 | Exercise Price @ 0.066 | 1,186,999 | 2.17 | | | | | | | | |
| 62 | Exercise Price @ 0.072 | 5,542,441 | 2.15 | | | | | | | | |
| 63 | Exercise Price @ 0.094 | 662,492 | 2.12 | | | | | | | | |
| 64 | Exercise Price @ 0.170 | 8,175,620 | 2.06 | | | | | | | | |
| 65 | Exercise Price @ 0.206 | 1,214,616 | 2.00 | | | | | | | | |

See Expert Report of Carl S. Saba, dated September 8, 2022.

[1] See Exhibit 7.1.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Discounted Cash Flow Method Value Summary - Alternative Income Approach (20% Discount Rate)**
**Exhibit 8**

| | Year | Base Cash Flow | Period | Discount Rate [1] | PV Factor | Discounted Cash Flow |
|---|---|---|---|---|---|---|
| 1 | 2015 | $ 242,928 | 0.50 | 20.00% | 0.9129 | $ 221,762 |
| 2 | 2016 | (12,914) | 1.50 | 20.00% | 0.7607 | (9,824) |
| 3 | 2017 | 21,118 | 2.50 | 20.00% | 0.6339 | 13,388 |
| 4 | 2018 | 90,453 | 3.50 | 20.00% | 0.5283 | 47,785 |
| 5 | Terminal Value | 3,282,000 | 4.00 | 20.00% | 0.4823 | 1,582,755 |
| | | | | | | |
| 6 | | Indicated Value | | | | $ 1,855,865 |
| 7 | | Add: C-2 Financing Proceeds | | | | - |
| 8 | | Deduct: Interest Bearing Debt | | | | 40,805 |
| 9 | | Add: Other non-operating assets | | | | - |
| 10 | | Total Equity Value - Controlling, Marketable Basis | | | | $ 1,815,060 |
| 11 | | **Total Equity Value - Controlling, Marketable Basis, Rounded** | | | | **$ 1,815,000** |

See Expert Report of Carl S. Saba, dated September 8, 2022, Exhibit F.6.
[1] See Exhibit 9. Consistent with Mr. Saba, I have rounded this discount rate.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Weighted Average Cost of Capital - Alternative Income Approach (20% Discount Rate)**
**Exhibit 9**

| | | | |
|---|---|---|---|
| 1 | Selected Equity Rate | [1] | 20.7% |
| 2 | Equity as a % of total capital | | 95.0% |
| 3 | Weighted Cost of Equity | | 19.6% |
| | | | |
| 4 | Debt as a % of total capital | | 5.0% |
| 5 | Cost of Debt | | 25.0% |
| 6 | After Tax Cost of Debt | | 15.0% |
| 7 | Weighted Cost of Debt | | 0.8% |
| | | | |
| 8 | **WACC** | | **20.4%** |

See Expert Report of Carl S. Saba, dated September 8, 2022, Exhibit F.4.

[1] Source: Craig R. Everett, Pepperdine University, "2015 Private Capital Markets Report." Represents the median required rate of return for venture capital investments in early stage companies.

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**
**Alleged Loss Realized by Investors - Alternative Asset Approach (Opportunity Cost Added Using 44% Rate of Retur**
**Exhibit 10**

| | [1] | [2] | | [3] | | |
|---|---|---|---|---|---|---|
| | Series C-2 Shares | Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
| **1** | 20,022,939 | $ 17.00 | $ 340,389,963 | $ 13.86 | $ 277,569,848 | $ 62,820,115 |
| | Series C-1 Shares | Series C-1 Purchase Price | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
| **2** | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 12.41 | $ 33,752,995 | $ 7,054,325 |
| **3** | | | | | Total Loss | $ 69,874,441 |

[1] See Exhibit 19.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 11.2. Reflects the adjusted Series C-1 and C-2 price per share based on the NAV method as of 12/31/2014.

Declaration of Scott Weingust, Appendix B
Asset Approach
NAV Equity Allocation - Step 1 - Alternative Asset Approach (Opportunity Cost Added Using 44% Rate of Return)
Exhibit 11.1

| | | | | $0.015 | $0.030 | $0.066 | $0.072 | $0.094 | $0.170 | $0.206 |
|---|---|---|---|---|---|---|---|---|---|---|
| Share Class | Number of Shares | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
| **Preferred Share Classes** | | | | | | | | | | |
| 1 Series A @ $0.150 | $ 46,320,045 | $ - | $ 6,948,007 | $ 7,642,807 | 9,032,409 | 12,089,532 | 15,424,575 | 19,778,659 | 27,653,067 | 37,194,996 |
| 2 Series B @ $0.1864 | 54,134,965 | - | 9,994,830 | 10,806,855 | 12,430,904 | 16,003,811 | 19,901,529 | 24,990,216 | 34,193,160 | 45,344,962 |
| 3 Series C @ $0.564 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,867,728 | 39,754,871 | 43,995,390 | 49,531,624 | 59,543,962 | 71,676,560 |
| 4 Series C-1 @ $3.00 | 25,175,001 | 75,525,003 | 75,525,003 | 75,902,628 | 76,657,878 | 78,319,428 | 80,132,028 | 82,498,478 | 86,778,228 | 91,964,279 |
| 5 Series C-1 @ $15.00 | 7,500,032 | 112,500,480 | 112,500,480 | 112,612,980 | 112,837,981 | 113,332,984 | 113,872,986 | 114,577,989 | 115,852,994 | 117,398,001 |
| 6 Series C-2 @ $17.00 | 32,808,227 | 557,739,859 | 557,739,859 | 558,231,982 | 559,216,229 | 561,381,572 | 563,743,765 | 566,827,738 | 572,405,136 | 579,163,631 |
| | | | | | | | | | | |
| **Warrants on Common** | | | | | | | | | | |
| 7 Exercise Price @ 0.072 | 741,665 | $ - | $ - | $ - | $ - | $ - | $ - | 16,317 | 72,683 | 99,383 |
| | | | | | | | | | | |
| 8 Common | 302,965,725 | $ - | $ - | $ 4,544,486 | 9,088,972 | 19,995,738 | 21,813,532 | 28,478,778 | 51,504,173 | 62,410,939 |
| | | | | | | | | | | |
| **Options on Common** | | | | | | | | | | |
| 9 Exercise Price @ 0.015 | 350,000 | $ - | $ - | $ - | 5,250 | 17,850 | 19,950 | 27,650 | 54,250 | 66,850 |
| 10 Exercise Price @ 0.030 | 1,170,875 | - | - | - | - | 42,152 | 49,177 | 74,936 | 163,923 | 206,074 |
| 11 Exercise Price @ 0.066 | 547,500 | - | - | - | - | - | 3,285 | 15,330 | 56,940 | 76,650 |
| 12 Exercise Price @ 0.072 | 2,579,175 | - | - | - | - | - | - | 56,742 | 252,759 | 345,609 |
| 13 Exercise Price @ 0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| 14 Exercise Price @ 0.170 | 3,972,457 | - | - | - | - | - | - | - | - | 143,008 |
| 15 Exercise Price @ 0.206 | 606,365 | - | - | - | - | - | - | - | - | - |
| | 538,080,637 | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |

| | | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|---|
| **Inputs** | | | | | | | | | | |
| 16 Stock Price Now [1] | $ 1,376,000,000 | $ 1,376,000,000 | $ 1,376,000,000 | $ 1,376,000,000 | $ 1,376,000,000 | $ 1,376,000,000 | $ 1,376,000,000 | $ 1,376,000,000 | $ 1,376,000,000 | $ 1,376,000,000 |
| 17 Volatility | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% |
| 18 Riskfree Rate - Annual | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% |
| 19 Exercise Price | $ - | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |
| 20 Time to Maturity - Years | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | | | | | | | | | | |
| **Outputs** | | | | | | | | | | |
| 21 d1 | 20.43 | 1.12 | 1.10 | 1.09 | 1.08 | 1.05 | 1.03 | 1.00 | 0.93 | 0.88 |
| 22 d2 | 19.37 | 0.06 | 0.04 | 0.03 | 0.02 | (0.01) | (0.03) | (0.06) | (0.13) | (0.18) |
| 23 N(d1) | 1.000 | 0.868 | 0.864 | 0.862 | 0.859 | 0.852 | 0.848 | 0.840 | 0.825 | 0.810 |
| 24 N(d2) | 1.000 | 0.523 | 0.515 | 0.512 | 0.506 | 0.495 | 0.487 | 0.475 | 0.449 | 0.428 |
| 25 Call Price (Vc) | $ 1,376,000,000 | $ 809,044,879 | $ 800,717,476 | $ 796,870,434 | $ 791,430,046 | $ 779,210,443 | $ 770,844,384 | $ 758,146,375 | $ 731,185,252 | $ 707,301,699 |
| | | | | | | | | | | |
| 26 Fair Market Value | $ 1,376,000,000 | $ 809,044,879 | $ 800,717,476 | $ 796,870,434 | $ 791,430,046 | $ 779,210,443 | $ 770,844,384 | $ 758,146,375 | $ 731,185,252 | $ 707,301,699 |

See Expert Report of Carl S. Saba, dated September 8, 2022.
[1] See Exhibit 13.

Declaration of Scott Weingust, Appendix B
Asset Approach
NAV Equity Allocation - Step 2 - Alternative Asset Approach (Opportunity Cost Added Using 44% Rate of Return)
Exhibit 11.2

| | Share Class | | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Class Participate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | High call option | [1] | $ 1,376,000,000 | $ 809,044,879 | $ 800,717,476 | $ 796,870,434 | $ 791,430,046 | $ 779,210,443 | $ 770,844,384 | $ 758,146,375 | $ 731,185,252 | $ 707,301,699 |
| 2 | Less low call option | [1] | 809,044,879 | 800,717,476 | 796,870,434 | 791,430,046 | 779,210,443 | 770,844,384 | 758,146,375 | 731,185,252 | 707,301,699 | - |
| 3 | Total Value to Allocate | | $ 566,955,121 | $ 8,327,403 | $ 3,847,043 | $ 5,440,387 | $ 12,219,603 | $ 8,366,059 | $ 12,698,010 | $ 26,961,123 | $ 23,883,553 | $ 707,301,699 |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 4 | Series A @ $0.150 | [1] | - | 6,948,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| 5 | Series B @ $0.1864 | [1] | - | 9,994,830 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 |
| 6 | Series C @ $0.564 | [1] | 33,217,403 | - | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 |
| 7 | Series C-1 @ $3.00 | [1] | 75,525,003 | - | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 |
| 8 | Series C-1 @ $15.00 | [1] | 112,500,480 | - | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 |
| 9 | Series C-2 @ $17.00 | [1] | 557,739,859 | - | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 |
| | **Warrants on Common** | | | | | | | | | | | |
| 10 | Exercise Price @ 0.072 | | - | - | - | - | - | - | 741,665 | 741,665 | 741,665 | 741,665 |
| 11 | Common | | - | - | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 |
| | **Options on Common** | | | | | | | | | | | |
| 12 | Exercise Price @ 0.015 | | - | - | - | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| 13 | Exercise Price @ 0.030 | | - | - | - | - | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 |
| 14 | Exercise Price @ 0.066 | | - | - | - | - | - | 547,500 | 547,500 | 547,500 | 547,500 | 547,500 |
| 15 | Exercise Price @ 0.072 | | - | - | - | - | - | - | 2,579,175 | 2,579,175 | 2,579,175 | 2,579,175 |
| 16 | Exercise Price @ 0.094 | | - | - | - | - | - | - | - | 312,500 | 312,500 | 312,500 |
| 17 | Exercise Price @ 0.170 | | - | - | - | - | - | - | - | - | 3,972,457 | 3,972,457 |
| 18 | Exercise Price @ 0.206 | | - | - | - | - | - | - | - | - | - | 606,365 |
| | | | 778,982,745 | 16,942,837 | 527,800,100 | 528,150,100 | 529,320,975 | 529,868,475 | 533,189,315 | 533,501,815 | 537,474,272 | 538,080,637 |
| | **Distribution Percentage** | | | | | | | | | | | |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 19 | Series A @ $0.150 | | 0.0% | 41.0% | 8.8% | 8.8% | 8.8% | 8.7% | 8.7% | 8.7% | 8.6% | 8.6% |
| 20 | Series B @ $0.1864 | | 0.0% | 59.0% | 10.3% | 10.2% | 10.2% | 10.2% | 10.2% | 10.1% | 10.1% | 10.1% |
| 21 | Series C @ $0.564 | | 4.3% | 0.0% | 11.2% | 11.2% | 11.1% | 11.1% | 11.0% | 11.0% | 11.0% | 10.9% |
| 22 | Series C-1 @ $3.00 | | 9.7% | 0.0% | 4.8% | 4.8% | 4.8% | 4.8% | 4.7% | 4.7% | 4.7% | 4.7% |
| 23 | Series C-1 @ $15.00 | | 14.4% | 0.0% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% |
| 24 | Series C-2 @ $17.00 | | 71.6% | 0.0% | 6.2% | 6.2% | 6.2% | 6.2% | 6.2% | 6.1% | 6.1% | 6.1% |
| | **Warrants on Common** | | | | | | | | | | | |
| 25 | Exercise Price @ 0.072 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |
| 26 | Common | | 0.0% | 0.0% | 57.4% | 57.4% | 57.2% | 57.2% | 56.8% | 56.8% | 56.4% | 56.3% |
| | **Options on Common** | | | | | | | | | | | |
| 27 | Exercise Price @ 0.015 | | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| 28 | Exercise Price @ 0.030 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| 29 | Exercise Price @ 0.066 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| 30 | Exercise Price @ 0.072 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% |
| 31 | Exercise Price @ 0.094 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| 32 | Exercise Price @ 0.170 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% | 0.7% |
| 33 | Exercise Price @ 0.206 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| 34 | | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | **Allocation of Value** | | | | | | | | | | | |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 35 | Series A @ $0.150 | | $ - | $ 3,414,945 | $ 337,619 | $ 477,135 | $ 1,069,318 | $ 731,344 | $ 1,103,121 | $ 2,340,836 | $ 2,058,307 | $ 60,887,243 |
| 36 | Series B @ $0.1864 | | - | 4,912,458 | 394,580 | 557,635 | 1,249,729 | 854,733 | 1,289,235 | 2,735,772 | 2,405,576 | 71,159,878 |
| 37 | Series C @ $0.564 | | 24,176,116 | - | 429,283 | 606,679 | 1,359,642 | 929,907 | 1,402,622 | 2,976,382 | 2,617,145 | 77,418,350 |

Declaration of Scott Weingust, Appendix B
Asset Approach
NAV Equity Allocation - Step 2 - Alternative Asset Approach (Opportunity Cost Added Using 44% Rate of Return)
Exhibit 11.2

| | Share Class | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Class Participate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 38 | Series C-1 @ $3.00 | 54,968,210 | - | 183,496 | 259,324 | 581,176 | 397,486 | 599,548 | 1,272,247 | 1,118,693 | 33,092,291 |
| 39 | Series C-1 @ $15.00 | 81,879,507 | - | 54,666 | 77,257 | 173,141 | 118,418 | 178,615 | 379,023 | 333,276 | 9,858,718 |
| 40 | Series C-2 @ $17.00 | 405,931,288 | - | 239,133 | 337,952 | 757,392 | 518,007 | 781,334 | 1,658,001 | 1,457,887 | 43,126,091 |
| | Warrants on Common | | | | | | | | | | |
| 41 | Exercise Price @ 0.072 | - | - | - | - | - | - | 17,663 | 37,481 | 32,957 | 974,911 |
| 42 | Common | - | - | 2,208,264 | 3,120,800 | 6,994,095 | 4,783,506 | 7,215,189 | 15,310,719 | 13,462,780 | 398,245,462 |
| | Options on Common | | | | | | | | | | |
| 43 | Exercise Price @ 0.015 | - | - | - | 3,605 | 8,080 | 5,526 | 8,335 | 17,688 | 15,553 | 460,072 |
| 44 | Exercise Price @ 0.030 | - | - | - | - | 27,030 | 18,487 | 27,885 | 59,172 | 52,030 | 1,539,104 |
| 45 | Exercise Price @ 0.066 | - | - | - | - | - | 8,644 | 13,039 | 27,669 | 24,329 | 719,683 |
| 46 | Exercise Price @ 0.072 | - | - | - | - | - | - | 61,424 | 130,342 | 114,610 | 3,390,300 |
| 47 | Exercise Price @ 0.094 | - | - | - | - | - | - | - | 15,793 | 13,886 | 410,778 |
| 48 | Exercise Price @ 0.170 | - | - | - | - | - | - | - | - | 176,523 | 5,221,756 |
| 49 | Exercise Price @ 0.206 | - | - | - | - | - | - | - | - | - | 797,061 |
| 50 | | 566,955,121 | 8,327,403 | 3,847,043 | 5,440,387 | 12,219,603 | 8,366,059 | 12,698,010 | 26,961,123 | 23,883,553 | 706,504,638 |

| | Preferred Share Classes | Total Value | Per Share Marketable |
|---|---|---|---|
| 51 | Series A | $ 72,419,869 | $ 1.56 |
| 52 | Series B | 85,559,598 | 1.58 |
| 53 | Series C | 111,916,126 | 1.90 |
| 54 | Series C-1 | 92,472,471 | 3.67 |
| 55 | Series C-1 | 93,052,621 | 12.41 |
| 56 | Series C-2 | 454,807,087 | 13.86 |
| | Warrants on Common | | |
| 57 | Exercise Price @ 0.072 | $ 1,063,012 | $ 1.43 |
| 58 | Common | $ 451,340,815 | $ 1.49 |
| | Options on Common | | |
| 59 | Exercise Price @ 0.015 | $ 518,859 | $ 1.48 |
| 60 | Exercise Price @ 0.030 | 1,723,707 | 1.47 |
| 61 | Exercise Price @ 0.066 | 793,364 | 1.45 |
| 62 | Exercise Price @ 0.072 | 3,696,675 | 1.43 |
| 63 | Exercise Price @ 0.094 | 440,457 | 1.41 |
| 64 | Exercise Price @ 0.170 | 5,398,278 | 1.36 |
| 65 | Exercise Price @ 0.206 | 797,061 | 1.31 |

See Expert Report of Carl S. Saba, dated September 8, 2022.

[1] See Exhibit 11.1.

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**
**Theranos Adjusted Net Asset Value - Alternative Asset Approach (Opportunity Cost Added Using 44% Rate of Return)**
**Exhibit 13**

| | *Thousands USD* | | 12/31/14 Unadjusted | Adjustments | Adjusted |
|---|---|---|---|---|---|
| | Assets: | | | | |
| 1 | Current Assets | | | | |
| 2 | Current Operating Assets | | | | |
| 3 | Cash & Equivalents | $ | 465,933 | $ - | $ 465,933 |
| 4 | Accounts Receivable | | - | - | - |
| 5 | Inventory | | 2,383 | - | 2,383 |
| 6 | Other Current Assets | | 12,788 | - | 12,788 |
| 7 | Total Current operating Assets | | 481,104 | - | 481,104 |
| 8 | Total Current Non-Operating Assets | | - | - | - |
| 9 | Total Current Assets | | 481,104 | - | 481,104 |
| 10 | Total Fixed Assets - Net | | 53,366 | - | 53,366 |
| 11 | Other Assets | | | | |
| | Intangible Assets | | | | |
| 12 | Goodwill | | - | - | - |
| 13 | Other Intangible Assets [1] | | - | 1,059,910 | 1,059,910 |
| 14 | Total Intangible Assets - Net | | - | 1,059,910 | 1,059,910 |
| 15 | Total Long Term Receivables | | 27,045 | - | 27,045 |
| 16 | Total Other Non-Current Assets | | - | - | - |
| 17 | Total Non Current Assets | | 27,045 | 1,059,910 | 1,086,955 |
| 18 | Total Assets | $ | 561,515 | $ 1,059,910 | $ 1,621,425 |
| 19 | Liabilities and Equity: | | | | |
| | Liabilities | | | | |
| 20 | Current Liabilities | | | | |
| 21 | Current Operating Liabilities | | | | |
| 22 | Accounts Payable | $ | 16,633 | $ | 16,633 |
| 23 | Deferred Revenue | | - | | |
| 24 | Other Current Liabilities | | 400,359 | (390,375) | 9,984 |
| 25 | Total Current Operating Liabilities | | 416,992 | (390,375) | 26,617 |

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**
**Theranos Adjusted Net Asset Value - Alternative Asset Approach (Opportunity Cost Added Using 44% Rate of Return)**
**Exhibit 13**

| | *Thousands USD* | 12/31/14 Unadjusted | Adjustments | Adjusted |
|---|---|---:|---:|---:|
| 26 | Total Current Debt Obligations | - | - | - |
| 27 | Total Current Liabilities | 416,992 | (390,375) | 26,617 |
| | | | | |
| 28 | Non Current Liabilities | | | |
| 29 | Total Long Term Debt | 40,805 | - | 40,805 |
| 30 | Other Non Current Liabilities | | | |
| 31 | Deferred Rent | - | | - |
| 32 | Deferred Revenue, LT | - | | - |
| 33 | Customer Deposits | 143,846 | | 143,846 |
| 34 | Other Non-current liabilities | 33,750 | | 33,750 |
| 35 | Total Other Non Current Liabilities | 177,596 | - | 177,596 |
| 36 | Total Non Current Liabilities | 218,401 | - | 218,401 |
| | | | | |
| 37 | Total Liabilities | $ 635,393 | $ (390,375) | $ 245,018 |
| | | | | |
| 38 | **Total Equity Value - Controlling, Marketable Basis** | | | $ 1,376,407 |
| 39 | **Total Equity Value - Controlling, Marketable Basis (rounded)** | | | $ 1,376,000 |

See Expert Report of Carl S. Saba, dated September 8, 2022.

[1] See Exhibit 14.

Declaration of Scott Weingust, Appendix B
**Asset Approach**
**Cost Method - Alternative Asset Approach (Opportunity Cost Added Using 44% Rate of Return)**
**Exhibit 14**

| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Inflation Adjusted Annual Cost | [1] $ | 8,078,534 $ | 8,078,534 $ | 8,078,534 $ | 20,667,544 $ | 15,502,206 $ | 15,294,493 $ | 21,051,759 $ | 31,794,773 $ | 85,119,867 $ | 90,613,216 $ | 151,813,833 |
| 2 | Obsolescence Adjustment | [2] | 4,039,267 | 4,039,267 | 4,039,267 | | | | | | | | |
| 3 | Annual Cost after Obsolescence Adjustment | $ | 4,039,267 $ | 4,039,267 $ | 4,039,267 $ | 20,667,544 $ | 15,502,206 $ | 15,294,493 $ | 21,051,759 $ | 31,794,773 $ | 85,119,867 $ | 90,613,216 $ | 151,813,833 |
| 4 | Developer's Profit % | [1] | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% |
| 5 | Developer's Profit | $ | 605,890 $ | 605,890 $ | 605,890 $ | 3,100,132 $ | 2,325,331 $ | 2,294,174 $ | 3,157,764 $ | 4,769,216 $ | 12,767,980 $ | 13,591,982 $ | 22,772,075 |
| 6 | Inflation Adjusted Annual Costs with Obsolescence Factor and Developer's Profit | $ | 4,645,157 $ | 4,645,157 $ | 4,645,157 $ | 23,767,676 $ | 17,827,537 $ | 17,588,667 $ | 24,209,523 $ | 36,563,989 $ | 97,887,847 $ | 104,205,198 $ | 174,585,908 |
| 7 | Expected Annual Return | [3] | 44.0% | 44.0% | 44.0% | 44.0% | 44.0% | 44.0% | 44.0% | 44.0% | 44.0% | 44.0% | 44.0% |
| 8 | Cumulative Periods | [4] | 10.50 | 9.50 | 8.50 | 7.50 | 6.50 | 5.50 | 4.50 | 3.50 | 2.50 | 1.50 | 0.50 |
| 9 | Expected Cumulative Return | | 462.0% | 418.0% | 374.0% | 330.0% | 286.0% | 242.0% | 198.0% | 154.0% | 110.0% | 66.0% | 22.0% |
| 10 | Total Opportunity Cost | $ | 21,460,625 $ | 19,416,756 $ | 17,372,887 $ | 78,433,329 $ | 50,986,756 $ | 42,564,574 $ | 47,934,855 $ | 56,308,543 $ | 107,676,632 $ | 68,775,431 $ | 38,408,900 |
| 11 | Inflation Adjusted Annual Costs with Obsolescence Factor, Developer's Profit, and Opportunity Cost Adjustment | $ | 26,105,782 $ | 24,061,913 $ | 22,018,044 $ | 102,201,005 $ | 68,814,292 $ | 60,153,241 $ | 72,144,378 $ | 92,872,532 $ | 205,564,479 $ | 172,980,629 $ | 212,994,808 |
| 12 | Total Inflation Adjusted Annual Costs with Obsolescence Factor, Developer's Profit, and Opportunity Cost Adjustment | $ 1,059,911,102 | | | | | | | | | | | |
| 13 | **Total Inflation Adjusted Annual Costs with Obsolescence Factor, Developer's Profit, and Opportunity Cost Adjustment , Rounded** | **$ 1,059,910,000** | | | | | | | | | | | |

[1] See Exhibit 4.1.2 Saba and Saba Report Exhibit H.2. Represents annual expenses from 2004 - 2014. Mr. Saba's expense line item that covers 2004-2006 has been distributed evenly across the first 3 years.
[2] See Exhibit 4.1.2 Saba and Saba Report Exhibit H.2. Assumes equal distribution of the $12.1 million obsolescence adjustment.
[3] See Saba Report Exhibit I.4.
[4] Adjustment for Opportunity Cost assumes midpoint convention.

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**
**Alleged Loss Realized by Investors - Alternative Asset Approach (Opportunity Cost Added Using 27% Rate of Return)**
**Exhibit 15**

| | [1] | [2] | | [3] | | |
|---|---|---|---|---|---|---|
| | Series C-2 Shares | Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
| 1 | 20,022,939 | $ 17.00 | $ 340,389,963 | $ 12.84 | $ 257,092,328 | $ 83,297,635 |

| | | | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | |
| | Series C-1 Shares | Series C-1 Purchase Price | | | | Investor Loss |
|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 11.47 | $ 31,191,279 | $ 9,616,041 |
| 3 | | | | | Total Loss | $ 92,913,676 |

[1] See Exhibit 19.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 16.2. Reflects the adjusted Series C-1 and C-2 price per share based on the NAV method as of 12/31/2014.

Declaration of Scott Weingust, Appendix B
Asset Approach
NAV Equity Allocation - Step 1 - Alternative Asset Approach (Opportunity Cost Added Using 27% Rate of Return)
Exhibit 16.1

| | | | | $0.015 | $0.030 | $0.066 | $0.072 | $0.094 | $0.170 | $0.206 |
|---|---|---|---|---|---|---|---|---|---|---|
| Share Class | Number of Shares | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
| **Preferred Share Classes** | | | | | | | | | | |
| 1 Series A @ $0.150 | $ 46,320,045 | $ - | $ 6,948,007 | $ 7,642,807 | $ 9,032,409 | $ 12,089,532 | $ 15,424,575 | $ 19,778,659 | $ 27,653,067 | $ 37,194,996 |
| 2 Series B @ $0.1864 | 54,134,965 | | 9,994,830 | 10,806,855 | 12,430,904 | 16,003,811 | 19,901,529 | 24,990,216 | 34,193,160 | 45,344,962 |
| 3 Series C @ $0.564 | 58,896,105 | 33,217,403 | 33,217,403 | 34,100,845 | 35,867,728 | 39,754,871 | 43,995,390 | 49,531,624 | 59,543,962 | 71,676,560 |
| 4 Series C-1 @ $3.00 | 25,175,001 | 75,525,003 | 75,525,003 | 75,902,628 | 76,657,878 | 78,319,428 | 80,132,028 | 82,498,478 | 86,778,228 | 91,964,279 |
| 5 Series C-1 @ $15.00 | 7,500,032 | 112,500,480 | 112,500,480 | 112,612,980 | 112,837,981 | 113,332,984 | 113,872,986 | 114,577,989 | 115,852,994 | 117,398,001 |
| 6 Series C-2 @ $17.00 | 32,808,227 | 557,739,859 | 557,739,859 | 558,231,982 | 559,216,229 | 561,381,572 | 563,743,765 | 566,827,738 | 572,405,136 | 579,163,631 |
| **Warrants on Common** | | | | | | | | | | |
| 7 Exercise Price @ 0.072 | 741,665 | $ - | $ - | $ - | $ - | $ - | $ - | 16,317 | 72,683 | 99,383 |
| 8 Common | 302,965,725 | $ - | $ - | 4,544,486 | 9,088,972 | 19,995,738 | 21,813,532 | 28,478,778 | 51,504,173 | 62,410,939 |
| **Options on Common** | | | | | | | | | | |
| 9 Exercise Price @ 0.015 | 350,000 | $ - | $ - | $ - | 5,250 | 17,850 | 19,950 | 27,650 | 54,250 | 66,850 |
| 10 Exercise Price @ 0.030 | 1,170,875 | - | - | - | - | 42,152 | 49,177 | 74,936 | 163,923 | 206,074 |
| 11 Exercise Price @ 0.066 | 547,500 | - | - | - | - | - | 3,285 | 15,330 | 56,940 | 76,650 |
| 12 Exercise Price @ 0.072 | 2,579,175 | - | - | - | - | - | - | 56,742 | 252,759 | 345,609 |
| 13 Exercise Price @ 0.094 | 312,500 | - | - | - | - | - | - | - | 23,750 | 35,000 |
| 14 Exercise Price @ 0.170 | 3,972,457 | - | - | - | - | - | - | - | - | 143,008 |
| 15 Exercise Price @ 0.206 | 606,365 | - | - | - | - | - | - | - | - | - |
| | 538,080,637 | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |

| | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise |
|---|---|---|---|---|---|---|---|---|---|
| **Inputs** | | | | | | | | | |
| 16 Stock Price Now [1] | $ 1,164,000,000 | $ 1,164,000,000 | $ 1,164,000,000 | $ 1,164,000,000 | $ 1,164,000,000 | $ 1,164,000,000 | $ 1,164,000,000 | $ 1,164,000,000 | $ 1,164,000,000 |
| 17 Volatility | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% | 53.0% |
| 18 Riskfree Rate - Annual | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% | 1.38% |
| 19 Exercise Price | $ - | $ 778,982,745 | $ 795,925,582 | $ 803,842,584 | $ 815,137,351 | $ 840,937,937 | $ 858,956,217 | $ 886,874,457 | $ 948,555,026 | $ 1,006,125,944 |
| 20 Time to Maturity - Years | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| **Outputs** | | | | | | | | | |
| 21 d1 | 20.28 | 0.96 | 0.94 | 0.93 | 0.92 | 0.89 | 0.87 | 0.84 | 0.78 | 0.72 |
| 22 d2 | 19.22 | (0.10) | (0.12) | (0.13) | (0.14) | (0.17) | (0.19) | (0.22) | (0.28) | (0.34) |
| 23 N(d1) | 1.000 | 0.832 | 0.827 | 0.824 | 0.821 | 0.813 | 0.808 | 0.799 | 0.781 | 0.764 |
| 24 N(d2) | 1.000 | 0.461 | 0.453 | 0.449 | 0.444 | 0.432 | 0.424 | 0.412 | 0.388 | 0.367 |
| 25 Call Price (Vc) | $ 1,164,000,000 | 628,618,951 | 621,299,649 | 617,923,413 | 613,154,317 | 602,465,909 | 595,166,841 | 584,117,278 | 560,771,918 | 540,222,719 |
| 26 Fair Market Value | $ 1,164,000,000 | 628,618,951 | 621,299,649 | 617,923,413 | 613,154,317 | 602,465,909 | 595,166,841 | 584,117,278 | 560,771,918 | 540,222,719 |

See Expert Report of Carl S. Saba, dated September 8, 2022.

[1] See Exhibit 17.

Declaration of Scott Weingust, Appendix B
Asset Approach
NAV Equity Allocation - Step 2 - Alternative Asset Approach (Opportunity Cost Added Using 27% Rate of Return)
Exhibit 16.2

| | Share Class | | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Class Participate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | High call option | [1] | $ 1,164,000,000 | $ 628,618,951 | $ 621,299,649 | $ 617,923,413 | $ 613,154,317 | $ 602,465,909 | $ 595,166,841 | $ 584,117,278 | $ 560,771,918 | $ 540,222,719 |
| 2 | Less low call option | [1] | 628,618,951 | 621,299,649 | 617,923,413 | 613,154,317 | 602,465,909 | 595,166,841 | 584,117,278 | 560,771,918 | 540,222,719 | - |
| 3 | Total Value to Allocate | | $ 535,381,049 | $ 7,319,302 | $ 3,376,236 | $ 4,769,097 | $ 10,688,408 | $ 7,299,068 | $ 11,049,563 | $ 23,345,360 | $ 20,549,199 | $ 540,222,719 |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 4 | Series A @ $0.150 | [1] | - | 6,948,007 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 | 46,320,045 |
| 5 | Series B @ $0.1864 | [1] | - | 9,994,830 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 | 54,134,965 |
| 6 | Series C @ $0.564 | [1] | 33,217,403 | - | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 | 58,896,105 |
| 7 | Series C-1 @ $3.00 | [1] | 75,525,003 | - | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 | 25,175,001 |
| 8 | Series C-1 @ $15.00 | [1] | 112,500,480 | - | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 | 7,500,032 |
| 9 | Series C-2 @ $17.00 | [1] | 557,739,859 | - | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 | 32,808,227 |
| | **Warrants on Common** | | | | | | | | | | | |
| 10 | Exercise Price @ 0.072 | | - | - | - | - | - | - | 741,665 | 741,665 | 741,665 | 741,665 |
| 11 | Common | | - | - | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 | 302,965,725 |
| | **Options on Common** | | | | | | | | | | | |
| 12 | Exercise Price @ 0.015 | | - | - | - | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 | 350,000 |
| 13 | Exercise Price @ 0.030 | | - | - | - | - | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 | 1,170,875 |
| 14 | Exercise Price @ 0.066 | | - | - | - | - | - | 547,500 | 547,500 | 547,500 | 547,500 | 547,500 |
| 15 | Exercise Price @ 0.072 | | - | - | - | - | - | - | 2,579,175 | 2,579,175 | 2,579,175 | 2,579,175 |
| 16 | Exercise Price @ 0.094 | | - | - | - | - | - | - | - | 312,500 | 312,500 | 312,500 |
| 17 | Exercise Price @ 0.170 | | - | - | - | - | - | - | - | - | 3,972,457 | 3,972,457 |
| 18 | Exercise Price @ 0.206 | | - | - | - | - | - | - | - | - | - | 606,365 |
| | | | 778,982,745 | 16,942,837 | 527,800,100 | 528,150,100 | 529,320,975 | 529,868,475 | 533,189,315 | 533,501,815 | 537,474,272 | 538,080,637 |
| | **Distribution Percentage** | | | | | | | | | | | |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 19 | Series A @ $0.150 | | 0.0% | 41.0% | 8.8% | 8.8% | 8.8% | 8.7% | 8.7% | 8.7% | 8.6% | 8.6% |
| 20 | Series B @ $0.1864 | | 0.0% | 59.0% | 10.3% | 10.2% | 10.2% | 10.2% | 10.2% | 10.1% | 10.1% | 10.1% |
| 21 | Series C @ $0.564 | | 4.3% | 0.0% | 11.2% | 11.2% | 11.1% | 11.1% | 11.0% | 11.0% | 11.0% | 10.9% |
| 22 | Series C-1 @ $3.00 | | 9.7% | 0.0% | 4.8% | 4.8% | 4.8% | 4.8% | 4.7% | 4.7% | 4.7% | 4.7% |
| 23 | Series C-1 @ $15.00 | | 14.4% | 0.0% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% | 1.4% |
| 24 | Series C-2 @ $17.00 | | 71.6% | 0.0% | 6.2% | 6.2% | 6.2% | 6.2% | 6.2% | 6.1% | 6.1% | 6.1% |
| | **Warrants on Common** | | | | | | | | | | | |
| 25 | Exercise Price @ 0.072 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% |
| 26 | Common | | 0.0% | 0.0% | 57.4% | 57.4% | 57.2% | 57.2% | 56.8% | 56.8% | 56.4% | 56.3% |
| | **Options on Common** | | | | | | | | | | | |
| 27 | Exercise Price @ 0.015 | | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| 28 | Exercise Price @ 0.030 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% | 0.2% |
| 29 | Exercise Price @ 0.066 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| 30 | Exercise Price @ 0.072 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.5% | 0.5% | 0.5% |
| 31 | Exercise Price @ 0.094 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.1% |
| 32 | Exercise Price @ 0.170 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% | 0.7% |
| 33 | Exercise Price @ 0.206 | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% |
| 34 | | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | **Allocation of Value** | | | | | | | | | | | |
| | **Preferred Share Classes** | | | | | | | | | | | |
| 35 | Series A @ $0.150 | | $ - | $ 3,001,537 | $ 296,300 | $ 418,261 | $ 935,326 | $ 638,070 | $ 959,915 | $ 2,026,906 | $ 1,770,950 | $ 46,504,444 |
| 36 | Series B @ $0.1864 | | - | 4,317,764 | 346,291 | 488,829 | 1,093,130 | 745,722 | 1,121,867 | 2,368,877 | 2,069,737 | 54,350,475 |
| 37 | Series C @ $0.564 | | 22,829,733 | - | 376,747 | 531,821 | 1,189,270 | 811,308 | 1,220,535 | 2,577,219 | 2,251,769 | 59,130,568 |

Declaration of Scott Weingust, Appendix B
Asset Approach
NAV Equity Allocation - Step 2 - Alternative Asset Approach (Opportunity Cost Added Using 27% Rate of Return)
Exhibit 16.2

| | Share Class | Series C, C-1, C-2 | Series A, B Liq. Preference | $0.015 Options Exercise | $0.030 Options Exercise | $0.066 Options Exercise | $0.072 Warrants / Options on Common Ex. | $0.094 Options Exercise | $0.170 Options Exercise | $0.206 Options Exercise | All Class Participate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 38 | Series C-1 @ $3.00 | 51,906,997 | - | 161,040 | 227,326 | 508,351 | 346,792 | 521,715 | 1,101,626 | 962,513 | 25,275,222 |
| 39 | Series C-1 @ $15.00 | 77,319,588 | - | 47,976 | 67,724 | 151,446 | 103,315 | 155,427 | 328,192 | 286,748 | 7,529,889 |
| 40 | Series C-2 @ $17.00 | 383,324,731 | - | 209,868 | 296,252 | 662,486 | 451,941 | 679,902 | 1,435,646 | 1,254,354 | 32,938,835 |
| | Warrants on Common | | | | | | | | | | |
| 41 | Exercise Price @ 0.072 | - | - | - | - | - | - | 15,370 | 32,454 | 28,356 | 744,618 |
| 42 | Common | - | - | 1,938,013 | 2,735,724 | 6,117,689 | 4,173,427 | 6,278,518 | 13,257,394 | 11,583,258 | 304,171,822 |
| | Options on Common | | | | | | | | | | |
| 43 | Exercise Price @ 0.015 | - | - | - | 3,160 | 7,067 | 4,821 | 7,253 | 15,316 | 13,382 | 351,393 |
| 44 | Exercise Price @ 0.030 | - | - | - | - | 23,643 | 16,129 | 24,265 | 51,236 | 44,766 | 1,175,536 |
| 45 | Exercise Price @ 0.066 | - | - | - | - | - | 7,542 | 11,346 | 23,958 | 20,933 | 549,680 |
| 46 | Exercise Price @ 0.072 | - | - | - | - | - | - | 53,450 | 112,861 | 98,609 | 2,589,443 |
| 47 | Exercise Price @ 0.094 | - | - | - | - | - | - | - | 13,675 | 11,948 | 313,744 |
| 48 | Exercise Price @ 0.170 | - | - | - | - | - | - | - | - | 151,879 | 3,988,271 |
| 49 | Exercise Price @ 0.206 | - | - | - | - | - | - | - | - | - | 608,779 |
| 50 | | 535,381,049 | 7,319,302 | 3,376,236 | 4,769,097 | 10,688,408 | 7,299,068 | 11,049,563 | 23,345,360 | 20,549,199 | 539,613,940 |

| | Preferred Share Classes | Total Value | Per Share Marketable |
|---|---|---|---|
| 51 | Series A | $ 56,551,709 | $ 1.22 |
| 52 | Series B | 66,902,692 | 1.24 |
| 53 | Series C | 90,918,970 | 1.54 |
| 54 | Series C-1 | 81,011,581 | 3.22 |
| 55 | Series C-1 | 85,990,305 | 11.47 |
| 56 | Series C-2 | 421,254,016 | 12.84 |
| | Warrants on Common | | |
| 57 | Exercise Price @ 0.072 | $ 820,798 | $ 1.11 |
| 58 | Common | $ 350,255,846 | $ 1.16 |
| | Options on Common | | |
| 59 | Exercise Price @ 0.015 | $ 402,393 | $ 1.15 |
| 60 | Exercise Price @ 0.030 | 1,335,575 | 1.14 |
| 61 | Exercise Price @ 0.066 | 613,458 | 1.12 |
| 62 | Exercise Price @ 0.072 | 2,854,363 | 1.11 |
| 63 | Exercise Price @ 0.094 | 339,366 | 1.09 |
| 64 | Exercise Price @ 0.170 | 4,140,150 | 1.04 |
| 65 | Exercise Price @ 0.206 | 608,779 | 1.00 |

See Expert Report of Carl S. Saba, dated September 8, 2022.

[1] See Exhibit 16.1.

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**
**Theranos Adjusted Net Asset Value - Alternative Asset Approach (Opportunity Cost Added Using 27% Rate of Return)**
**Exhibit 17**

| | *Thousands USD* | | 12/31/14 Unadjusted | Adjustments | Adjusted |
|---|---|---|---|---|---|
| | Assets: | | | | |
| 1 | Current Assets | | | | |
| 2 | Current Operating Assets | | | | |
| 3 | Cash & Equivalents | $ | 465,933 | $ - | $ 465,933 |
| 4 | Accounts Receivable | | - | - | - |
| 5 | Inventory | | 2,383 | - | 2,383 |
| 6 | Other Current Assets | | 12,788 | - | 12,788 |
| 7 | Total Current operating Assets | | 481,104 | - | 481,104 |
| 8 | Total Current Non-Operating Assets | | - | - | - |
| 9 | Total Current Assets | | 481,104 | - | 481,104 |
| 10 | Total Fixed Assets - Net | | 53,366 | - | 53,366 |
| 11 | Other Assets | | | | |
| | Intangible Assets | | | | |
| 12 | Goodwill | | - | - | - |
| 13 | Other Intangible Assets | [1] | - | 847,670 | 847,670 |
| 14 | Total Intangible Assets - Net | | - | 847,670 | 847,670 |
| 15 | Total Long Term Receivables | | 27,045 | - | 27,045 |
| 16 | Total Other Non-Current Assets | | - | - | - |
| 17 | Total Non Current Assets | | 27,045 | 847,670 | 874,715 |
| 18 | Total Assets | $ | 561,515 | $ 847,670 | $ 1,409,185 |
| 19 | Liabilities and Equity: | | | | |
| | Liabilities | | | | |
| 20 | Current Liabilities | | | | |
| 21 | Current Operating Liabilities | | | | |
| 22 | Accounts Payable | $ | 16,633 | $ | 16,633 |
| 23 | Deferred Revenue | | - | | |
| 24 | Other Current Liabilities | | 400,359 | (390,375) | 9,984 |
| 25 | Total Current Operating Liabilities | | 416,992 | (390,375) | 26,617 |

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**
**Theranos Adjusted Net Asset Value - Alternative Asset Approach (Opportunity Cost Added Using 27% Rate of Return)**
**Exhibit 17**

| | *Thousands USD* | 12/31/14 Unadjusted | Adjustments | Adjusted |
|---|---|---|---|---|
| 26 | Total Current Debt Obligations | - | - | - |
| 27 | Total Current Liabilities | 416,992 | (390,375) | 26,617 |
| 28 | Non Current Liabilities | | | |
| 29 | Total Long Term Debt | 40,805 | - | 40,805 |
| 30 | Other Non Current Liabilities | | | |
| 31 | Deferred Rent | - | | - |
| 32 | Deferred Revenue, LT | - | | - |
| 33 | Customer Deposits | 143,846 | | 143,846 |
| 34 | Other Non-current liabilities | 33,750 | | 33,750 |
| 35 | Total Other Non Current Liabilities | 177,596 | - | 177,596 |
| 36 | Total Non Current Liabilities | 218,401 | - | 218,401 |
| 37 | Total Liabilities | $ 635,393 | $ (390,375) | $ 245,018 |
| 38 | **Total Equity Value - Controlling, Marketable Basis** | | | $ 1,164,167 |
| 39 | **Total Equity Value - Controlling, Marketable Basis (rounded)** | | | $ 1,164,000 |

See Expert Report of Carl S. Saba, dated September 8, 2022.

[1] See Exhibit 18.

Declaration of Scott Weingust, Appendix B
**Asset Approach**
**Cost Method - Alternative Asset Approach (Opportunity Cost Added Using 27% Rate of Return)**
**Exhibit 18**

| | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Inflation Adjusted Annual Cost | [1] $ | 8,078,534 | 8,078,534 | 8,078,534 | 20,667,544 | 15,502,206 | 15,294,493 | 21,051,759 | 31,794,773 | 85,119,867 | 90,613,216 | 151,813,833 |
| 2 | Obsolescense Adjustment | [2] | 4,039,267 | 4,039,267 | 4,039,267 | | | | | | | | |
| 3 | Annual Cost after Obsolescense Adjustment | $ | 4,039,267 | 4,039,267 | 4,039,267 | 20,667,544 | 15,502,206 | 15,294,493 | 21,051,759 | 31,794,773 | 85,119,867 | 90,613,216 | 151,813,833 |
| 4 | Developer's Profit % | [1] | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% |
| 5 | Developer's Profit | $ | 605,890 | 605,890 | 605,890 | 3,100,132 | 2,325,331 | 2,294,174 | 3,157,764 | 4,769,216 | 12,767,980 | 13,591,982 | 22,772,075 |
| 6 | Inflation Adjusted Annual Costs with Obsolescence Factor and Developer's Profit | $ | 4,645,157 | 4,645,157 | 4,645,157 | 23,767,676 | 17,827,537 | 17,588,667 | 24,209,523 | 36,563,989 | 97,887,847 | 104,205,198 | 174,585,908 |
| 7 | Expected Annual Return | [3] | 27.0% | 27.0% | 27.0% | 27.0% | 27.0% | 27.0% | 27.0% | 27.0% | 27.0% | 27.0% | 27.0% |
| 8 | Cumulative Periods | [4] | 10.50 | 9.50 | 8.50 | 7.50 | 6.50 | 5.50 | 4.50 | 3.50 | 2.50 | 1.50 | 0.50 |
| 9 | Expected Cumulative Return | | 283.5% | 256.5% | 229.5% | 202.5% | 175.5% | 148.5% | 121.5% | 94.5% | 67.5% | 40.5% | 13.5% |
| 10 | Total Opportunity Cost | $ | 13,169,020 | 11,914,827 | 10,660,635 | 48,129,543 | 31,287,327 | 26,119,170 | 29,414,570 | 34,552,970 | 66,074,297 | 42,203,105 | 23,569,098 |
| 11 | Inflation Adjusted Annual Costs with Obsolescence Factor, Developer's Profit, and Opportunity Cost Adjustment | $ | 17,814,177 | 16,559,984 | 15,305,792 | 71,897,219 | 49,114,864 | 43,707,837 | 53,624,093 | 71,116,959 | 163,962,144 | 146,408,304 | 198,155,006 |
| 12 | Total Inflation Adjusted Annual Costs with Obsolescence Factor, Developer's Profit, and Opportunity Cost Adjustment | $ | 847,666,378 | | | | | | | | | | |
| 13 | **Total Inflation Adjusted Annual Costs with Obsolescence Factor, Developer's Profit, and Opportunity Cost Adjustment , Rounded** | $ | **847,670,000** | | | | | | | | | | |

[1] See Exhibit 4.1.2 Saba and Saba Report Exhibit H.2. Represents annual expenses from 2004 - 2014. Mr. Saba's expense line item that covers 2004-2006 has been distributed evenly across the first 3 years.
[2] See Exhibit 4.1.2 Saba and Saba Report Exhibit H.2. Assumes equal distribution of the $12.1 million obsolescence adjustment.
[3] See Exhibit 5 .
[4] Adjustment for Opportunity Cost assumes midpoint convention.

Declaration of Scott Weingust, Appendix B
C-1 & C-2 Investor Details
Exhibit 19

| | Investor Name | Class of Stock | No. of Shares | [1] Include |
|---|---|---|---|---|
| 1 | CENTRAL VALLEY ADMINISTRATORS | Series C-2 | 294,117 | |
| 2 | PARTNER INVESTMENTS LP | Series C-2 | 3,263,529 | Include |
| 3 | PFM HEALTHCARE MASTER FUND, L.P., | Series C-2 | 2,255,096 | Include |
| 4 | PFM HEALTHCARE PRINCIPALS FUND, L.P | Series C-2 | 136,669 | Include |
| 5 | PEER VENTURES GROUP IV, L.P. | Series C-2 | 779,411 | Include |
| 6 | RILEY P. BECHTEL & SUSAN P. BECHTEL | Series C-2 | 8,823 | |
| 7 | RILEY P. BECHTEL & SUSAN P. BECHTEL | Series C-2 | 291,177 | |
| 8 | MOSLEY FAMILY HOLDINGS LLC | Series C-2 | 352,941 | Include |
| 9 | DYNASTY FINANCIAL II, LLC (BY RDV CORPORATION, ITS MANAGER) | Series C-2 | 5,882,352 | Include |
| 10 | ANDREAS C. DRACOPOULOS | Series C-2 | 1,470,588 | |
| 11 | Cox Investment Holdings, Inc | Series C-2 | 5,882,352 | |
| 12 | MADRONE PARTNERS, LP | Series C-2 | 5,882,352 | |
| 13 | SODA SPRING PARTNERS, LLC | Series C-2 | 2,941,176 | |
| 14 | HENRY A KISSINGER 2014 GRANDCHILDREN'S TRUST | Series C-2 | 176,470 | |
| 15 | BENDEL FUND | Series C-2 | 249,998 | |
| 16 | Keith Rupert Murdoch | Series C-2 | 7,352,941 | Include |
| 17 | EOSon Investments M Ltd | Series C-2 | 1,058,823 | |
| 18 | EOSon Investments N Ltd | Series C-2 | 117,647 | |
| 19 | Robert K. Kraft LLC | Series C-2 | 58,823 | |
| 20 | INMOBILIARIA CARSO S.A. de C.V. | Series C-2 | 1,764,705 | |
| 21 | David Boies | Series C-2 | 17,647 | |
| | | | | |
| 22 | Daniel C. Carter | Series C-1 | 5,000 | |
| 23 | Crofton Capital GP | Series C-1 | 20,000 | |
| 24 | Alan Eisenman | Series C-1 | 6,666 | |
| 25 | Sherrie Eisenman | Series C-1 | 3,333 | |
| 26 | Kendra Fadil | Series C-1 | 5,000 | |
| 27 | Richard Kovacevich | Series C-1 | 10,000 | Include |
| 28 | Gordon Family Trust | Series C-1 | 20,000 | |
| 29 | Hall Black Diamond II, LLC | Series C-1 | 325,000 | Include |
| 30 | Richard Kovacevich | Series C-1 | 266,666 | Include |
| 31 | Lucas Venture Group IV LP | Series C-1 | 33,334 | Include |
| 32 | Lucas Venture Group XI | Series C-1 | 471,333 | Include |
| 33 | Mendenhall TF Partners | Series C-1 | 87,500 | Include |
| 34 | PEER VENTURES GROUP IV, L.P. | Series C-1 | 1,169,995 | Include |
| 35 | Black Diamond Ventures XII-B, LLC | Series C-1 | 356,660 | Include |
| 36 | Boies, Schiller & Flexner LLP | Series C-1 | 322,879 | |
| 37 | Colin Carter | Series C-1 | 16,666 | |

See 2022.09.02.  Summary of C1 & C2 Investors.xlsx.

[1] United States of America v. Elizabeth A. Holmes, Transcript of Sentencing Proceedings, November 18, 2022, p.79.
   I understand Partner Investments LP to be a PFM Healthcare entity.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Alternative Income Approach (27% Discount Rate), Less Murdoch Exhibit 20.1**

|   | [1] Series C-2 Shares | [2] Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | [3] Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 1 | 12,669,998 | $ 17.00 | $ 215,389,966 | $ 14.31 | $ 181,244,345 | $ 34,145,621 |

|   | Series C-1 Shares | Series C-1 Purchase Price | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 12.82 | $ 34,867,857 | $ 5,939,463 |
| 3 |  |  |  |  | Total Loss | $ 40,085,084 |

[1] See Exhibit 20.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 3.2.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Alternative Income Approach (20% Discount Rate), Less Murdoch**
**Exhibit 20.2**

|   | [1]<br>Series C-2<br>Shares | [2]<br>Series C-2<br>Purchase Price | Series C-2 Value<br>Based on<br>Purchase Price | [3]<br>Series C-2 Value<br>per Share,<br>adjusted NAV<br>Method | Series C-2 Value<br>Based on<br>adjusted NAV<br>Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 1 | 12,669,998 | $ 17.00 | $ 215,389,966 | $ 15.60 | $ 197,635,320 | $ 17,754,646 |

|   | Series C-1<br>Shares | Series C-1<br>Purchase Price | Series C-1 Value<br>Based on<br>Purchase Price | Series C-1 Value<br>per Share,<br>adjusted NAV<br>Method | Series C-1 Value<br>Based on<br>adjusted NAV<br>Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 14.02 | $ 38,153,129 | $ 2,654,191 |
| 3 | | | | | Total Loss | $ 20,408,837 |

[1] See Exhibit 20.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Expert Report of Carl S. Saba, dated September 8, 2022, Exhibit A.4.

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**
**Alleged Loss Realized by Investors - Alternative Asset Approach (Opportunity Cost Added Using 44% Rate of Return), Less Murdoch Investment**
**Exhibit 20.3**

|   | [1] | | [2] | | | | [3] | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|   | Series C-2 Shares | | Series C-2 Purchase Price | | Series C-2 Value Based on Purchase Price | | Series C-2 Value per Share, adjusted NAV Method | | Series C-2 Value Based on adjusted NAV Method Price | | Investor Loss | |
| 1 | 12,669,998 | $ | 17.00 | $ | 215,389,966 | $ | 13.86 | $ | 175,639,021 | $ | 39,750,945 |

|   | Series C-1 Shares | | Series C-1 Purchase Price | | Series C-1 Value Based on Purchase Price | | Series C-1 Value per Share, adjusted NAV Method | | Series C-1 Value Based on adjusted NAV Method Price | | Investor Loss | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ | 15.00 | $ | 40,807,320 | $ | 12.41 | $ | 33,752,995 | $ | 7,054,325 |
| 3 | | | | | | | | | **Total Loss** | $ | **46,805,270** |

[1] See Exhibit 20.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 11.2.

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**

**Alleged Loss Realized by Investors - Alternative Asset Approach (Opportunity Cost Added Using 27% Rate of Return), Less Murdoch Investment**
**Exhibit 20.4**

|   | [1] | [2] | | [3] | | |
|---|---|---|---|---|---|---|
|   | Series C-2 Shares | Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
| 1 | 12,669,998 | $ 17.00 | $ 215,389,966 | $ 12.84 | $ 162,681,377 | $ 52,708,589 |

|   | Series C-1 Shares | Series C-1 Purchase Price | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 11.47 | $ 31,191,279 | $ 9,616,041 |
| 3 | | | | | Total Loss | $ 62,324,630 |

[1] See Exhibit 20.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 16.2.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Saba Income Approach (44% Discount Rate), Less Murdoch Investment**
**Exhibit 20.5**

| | [1] Series C-2 Shares | [2] Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | [3] Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 1 | 12,669,998 | $ 17.00 | $ 215,389,966 | $ 11.63 | $ 147,352,077 | $ 68,037,889 |

| | Series C-1 Shares | Series C-1 Purchase Price | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 10.36 | $ 28,184,256 | $ 12,623,064 |
| 3 | | | | | Total Loss | $ 80,660,954 |

[1] See Exhibit 20.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Expert Report of Carl S. Saba, dated September 8, 2022, Exhibit A.4.

**Declaration of Scott Weingust, Appendix B**
**C-1 & C-2 Investor Details - Less Murdoch Investment**
**Exhibit 20.6**

| | Investor Name | Class of Stock | No. of Shares | [1] Include |
|---|---|---|---|---|
| 1 | CENTRAL VALLEY ADMINISTRATORS | Series C-2 | 294,117 | |
| 2 | PARTNER INVESTMENTS LP | Series C-2 | 3,263,529 | Include |
| 3 | PFM HEALTHCARE MASTER FUND, L.P., | Series C-2 | 2,255,096 | Include |
| 4 | PFM HEALTHCARE PRINCIPALS FUND, L.P | Series C-2 | 136,669 | Include |
| 5 | PEER VENTURES GROUP IV, L.P. | Series C-2 | 779,411 | Include |
| 6 | RILEY P. BECHTEL & SUSAN P. BECHTEL | Series C-2 | 8,823 | |
| 7 | RILEY P. BECHTEL & SUSAN P. BECHTEL | Series C-2 | 291,177 | |
| 8 | MOSLEY FAMILY HOLDINGS LLC | Series C-2 | 352,941 | Include |
| 9 | DYNASTY FINANCIAL II, LLC (BY RDV CORPORATION, ITS MANAGER) | Series C-2 | 5,882,352 | Include |
| 10 | ANDREAS C. DRACOPOULOS | Series C-2 | 1,470,588 | |
| 11 | Cox Investment Holdings, Inc | Series C-2 | 5,882,352 | |
| 12 | MADRONE PARTNERS, LP | Series C-2 | 5,882,352 | |
| 13 | SODA SPRING PARTNERS, LLC | Series C-2 | 2,941,176 | |
| 14 | HENRY A KISSINGER 2014 GRANDCHILDREN'S TRUST | Series C-2 | 176,470 | |
| 15 | BENDEL FUND | Series C-2 | 249,998 | |
| 16 | Keith Rupert Murdoch | Series C-2 | 7,352,941 | EXCLUDE |
| 17 | EOSon Investments M Ltd | Series C-2 | 1,058,823 | |
| 18 | EOSon Investments N Ltd | Series C-2 | 117,647 | |
| 19 | Robert K. Kraft LLC | Series C-2 | 58,823 | |
| 20 | INMOBILIARIA CARSO S.A. de C.V. | Series C-2 | 1,764,705 | |
| 21 | David Boies | Series C-2 | 17,647 | |
| | | | | |
| 22 | Daniel C. Carter | Series C-1 | 5,000 | |
| 23 | Crofton Capital GP | Series C-1 | 20,000 | |
| 24 | Alan Eisenman | Series C-1 | 6,666 | |
| 25 | Sherrie Eisenman | Series C-1 | 3,333 | |
| 26 | Kendra Fadil | Series C-1 | 5,000 | |
| 27 | Richard Kovacevich | Series C-1 | 10,000 | Include |
| 28 | Gordon Family Trust | Series C-1 | 20,000 | |
| 29 | Hall Black Diamond II, LLC | Series C-1 | 325,000 | Include |
| 30 | Richard Kovacevich | Series C-1 | 266,666 | Include |
| 31 | Lucas Venture Group IV LP | Series C-1 | 33,334 | Include |
| 32 | Lucas Venture Group XI | Series C-1 | 471,333 | Include |
| 33 | Mendenhall TF Partners | Series C-1 | 87,500 | Include |
| 34 | PEER VENTURES GROUP IV, L.P. | Series C-1 | 1,169,995 | Include |
| 35 | Black Diamond Ventures XII-B, LLC | Series C-1 | 356,660 | Include |
| 36 | Boies, Schiller & Flexner LLP | Series C-1 | 322,879 | |
| 37 | Colin Carter | Series C-1 | 16,666 | |

See 2022.09.02.  Summary of C1 & C2 Investors.xlsx.

[1] United States of America v. Elizabeth A. Holmes, Transcript of Sentencing Proceedings, November 18, 2022, p.79.
   I understand Partner Investments LP to be a PFM Healthcare entity.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Alternative Income Approach (27% Discount Rate), Less RDV Investment**
**Exhibit 21.1**

|   | [1] | [2] | | [3] | | |
|---|---|---|---|---|---|---|
|   | Series C-2 Shares | Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
| 1 | 14,140,587 | $ 17.00 | $ 240,389,979 | $ 14.31 | $ 202,281,123 | $ 38,108,856 |
|   |   |   |   |   |   |   |
|   | Series C-1 Shares | Series C-1 Purchase Price | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 12.82 | $ 34,867,857 | $ 5,939,463 |
| 3 |   |   |   |   | Total Loss | $ 44,048,319 |

[1] See Exhibit 21.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 3.2.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Alternative Income Approach (20% Discount Rate), Less RDV Investment**
**Exhibit 21.2**

|   | [1] Series C-2 Shares | [2] Series C-2 Purchase Price | | Series C-2 Value Based on Purchase Price | | [3] Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | | | Investor  Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 14,140,587 | $ | 17.00 | $ | 240,389,979 | $ | 15.60 | $ | 220,574,576 | $ | 19,815,403 |

|   | Series C-1 Shares | Series C-1 Purchase Price | | Series C-1 Value Based on Purchase Price | | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | | | Investor  Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ | 15.00 | $ | 40,807,320 | $ | 14.02 | $ | 38,153,129 | $ | 2,654,191 |
| 3 | | | | | | | Total Loss | | $ | 22,469,594 |

[1] See Exhibit 21.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Expert Report of Carl S. Saba, dated September 8, 2022, Exhibit A.4.

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**
**Alleged Loss Realized by Investors - Alternative Asset Approach (Opportunity Cost Added Using 44% Rate of Return), Less RDV Investment**
**Exhibit 21.3**

| | [1] | [2] | [3] | | | |
|---|---|---|---|---|---|---|
| | Series C-2 Shares | Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
| **1** | 14,140,587 | $ 17.00 | $ 240,389,979 | $ 13.86 | $ 196,025,198 | $ 44,364,781 |

| | | | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| | Series C-1 Shares | Series C-1 Purchase Price | | | | |
| **2** | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 12.41 | $ 33,752,995 | $ 7,054,325 |
| **3** | | | | | Total Loss | $ 51,419,107 |

[1] See Exhibit 21.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 11.2.

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**

**Alleged Loss Realized by Investors - Alternative Asset Approach (Opportunity Cost Added Using 27% Rate of Return), Less RDV Investment**
**Exhibit 21.4**

| | Series C-2 Shares [1] | Series C-2 Purchase Price [2] | Series C-2 Value Based on Purchase Price | Series C-2 Value per Share, adjusted NAV Method [3] | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 1 | 14,140,587 | $ 17.00 | $ 240,389,979 | $ 12.84 | $ 181,563,577 | $ 58,826,402 |

| | Series C-1 Shares | Series C-1 Purchase Price | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 11.47 | $ 31,191,279 | $ 9,616,041 |
| 3 | | | | | Total Loss | $ 68,442,442 |

[1] See Exhibit 21.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 16.2.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Saba Income Approach (44% Discount Rate), Less RDV Investment**
**Exhibit 21.5**

| | [1]<br>Series C-2<br>Shares | [2]<br>Series C-2<br>Purchase Price | Series C-2 Value<br>Based on<br>Purchase Price | [3]<br>Series C-2 Value<br>per Share,<br>adjusted NAV<br>Method | Series C-2 Value<br>Based on<br>adjusted NAV<br>Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 1 | 14,140,587 | $ 17.00 | $ 240,389,979 | $ 11.63 | $ 164,455,027 | $ 75,934,952 |

| | Series C-1<br>Shares | Series C-1<br>Purchase Price | Series C-1 Value<br>Based on<br>Purchase Price | Series C-1 Value<br>per Share,<br>adjusted NAV<br>Method | Series C-1 Value<br>Based on<br>adjusted NAV<br>Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 10.36 | $ 28,184,256 | $ 12,623,064 |
| 3 | | | | | Total Loss | $ 88,558,017 |

[1] See Exhibit 21.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Expert Report of Carl S. Saba, dated September 8, 2022, Exhibit A.4.

**Declaration of Scott Weingust, Appendix B**
**C-1 & C-2 Investor Details - Less RDV Investment**
**Exhibit 21.6**

| | Investor Name | Class of Stock | No. of Shares | [1] Include |
|---|---|---|---|---|
| 1 | CENTRAL VALLEY ADMINISTRATORS | Series C-2 | 294,117 | |
| 2 | PARTNER INVESTMENTS LP | Series C-2 | 3,263,529 | Include |
| 3 | PFM HEALTHCARE MASTER FUND, L.P., | Series C-2 | 2,255,096 | Include |
| 4 | PFM HEALTHCARE PRINCIPALS FUND, L.P | Series C-2 | 136,669 | Include |
| 5 | PEER VENTURES GROUP IV, L.P. | Series C-2 | 779,411 | Include |
| 6 | RILEY P. BECHTEL & SUSAN P. BECHTEL | Series C-2 | 8,823 | |
| 7 | RILEY P. BECHTEL & SUSAN P. BECHTEL | Series C-2 | 291,177 | |
| 8 | MOSLEY FAMILY HOLDINGS LLC | Series C-2 | 352,941 | Include |
| 9 | DYNASTY FINANCIAL II, LLC (BY RDV CORPORATION, ITS MANAGER) | Series C-2 | 5,882,352 | EXCLUDE |
| 10 | ANDREAS C. DRACOPOULOS | Series C-2 | 1,470,588 | |
| 11 | Cox Investment Holdings, Inc | Series C-2 | 5,882,352 | |
| 12 | MADRONE PARTNERS, LP | Series C-2 | 5,882,352 | |
| 13 | SODA SPRING PARTNERS, LLC | Series C-2 | 2,941,176 | |
| 14 | HENRY A KISSINGER 2014 GRANDCHILDREN'S TRUST | Series C-2 | 176,470 | |
| 15 | BENDEL FUND | Series C-2 | 249,998 | |
| 16 | Keith Rupert Murdoch | Series C-2 | 7,352,941 | Include |
| 17 | EOSon Investments M Ltd | Series C-2 | 1,058,823 | |
| 18 | EOSon Investments N Ltd | Series C-2 | 117,647 | |
| 19 | Robert K. Kraft LLC | Series C-2 | 58,823 | |
| 20 | INMOBILIARIA CARSO S.A. de C.V. | Series C-2 | 1,764,705 | |
| 21 | David Boies | Series C-2 | 17,647 | |
| | | | | |
| 22 | Daniel C. Carter | Series C-1 | 5,000 | |
| 23 | Crofton Capital GP | Series C-1 | 20,000 | |
| 24 | Alan Eisenman | Series C-1 | 6,666 | |
| 25 | Sherrie Eisenman | Series C-1 | 3,333 | |
| 26 | Kendra Fadil | Series C-1 | 5,000 | |
| 27 | Richard Kovacevich | Series C-1 | 10,000 | Include |
| 28 | Gordon Family Trust | Series C-1 | 20,000 | |
| 29 | Hall Black Diamond II, LLC | Series C-1 | 325,000 | Include |
| 30 | Richard Kovacevich | Series C-1 | 266,666 | Include |
| 31 | Lucas Venture Group IV LP | Series C-1 | 33,334 | Include |
| 32 | Lucas Venture Group XI | Series C-1 | 471,333 | Include |
| 33 | Mendenhall TF Partners | Series C-1 | 87,500 | Include |
| 34 | PEER VENTURES GROUP IV, L.P. | Series C-1 | 1,169,995 | Include |
| 35 | Black Diamond Ventures XII-B, LLC | Series C-1 | 356,660 | Include |
| 36 | Boies, Schiller & Flexner LLP | Series C-1 | 322,879 | |
| 37 | Colin Carter | Series C-1 | 16,666 | |

See 2022.09.02.  Summary of C1 & C2 Investors.xlsx.

[1] United States of America v. Elizabeth A. Holmes, Transcript of Sentencing Proceedings, November 18, 2022, p.79.
   I understand Partner Investments LP to be a PFM Healthcare entity.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Alternative Income Approach (27% Discount Rate), Less Murdoch & RDV Investment**
**Exhibit 22.1**

| | [1] | [2] | [3] | | | |
|---|---|---|---|---|---|---|
| | Series C-2 Shares | Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
| **1** | 6,787,646 | $ 17.00 | $ 115,389,982 | $ 14.31 | $ 97,097,289 | $ 18,292,693 |

| | | | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| | Series C-1 Shares | Series C-1 Purchase Price | | | | |
| **2** | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 12.82 | $ 34,867,857 | $ 5,939,463 |
| **3** | | | | | Total Loss | $ 24,232,156 |

[1] See Exhibit 22.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 3.2.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Alternative Income Approach (20% Discount Rate), Less Murdoch & RDV**
**Exhibit 22.2**

| | [1] Series C-2 Shares | [2] Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | [3] Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | | Investor Loss |
|---|---|---|---|---|---|---|---|
| 1 | 6,787,646 | $ 17.00 | $ 115,389,982 | $ 15.60 | $ 105,878,358 | $ | 9,511,624 |

| | Series C-1 Shares | Series C-1 Purchase Price | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | | Investor Loss |
|---|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 14.02 | $ 38,153,129 | $ | 2,654,191 |
| 3 | | | | | Total Loss | $ | 12,165,815 |

[1] See Exhibit 22.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Expert Report of Carl S. Saba, dated September 8, 2022, Exhibit A.4.

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**
**Alleged Loss Realized by Investors - Alternative Asset Approach (Opportunity Cost Added Using 44% Rate of Return), Less Murdoch & RDV Investment**
**Exhibit 22.3**

|   | [1] Series C-2 Shares | | [2] Series C-2 Purchase Price | | Series C-2 Value Based on Purchase Price | | [3] Series C-2 Value per Share, adjusted NAV Method | | Series C-2 Value Based on adjusted NAV Method Price | | Investor Loss | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1** | 6,787,646 | $ | 17.00 | $ | 115,389,982 | $ | 13.86 | $ | 94,094,372 | $ | 21,295,610 | |

|   | Series C-1 Shares | | Series C-1 Purchase Price | | Series C-1 Value Based on Purchase Price | | Series C-1 Value per Share, adjusted NAV Method | | Series C-1 Value Based on adjusted NAV Method Price | | Investor Loss | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2** | 2,720,488 | $ | 15.00 | $ | 40,807,320 | $ | 12.41 | $ | 33,752,995 | $ | 7,054,325 | |
| **3** | | | | | | | | Total Loss | | $ | 28,349,936 | |

[1] See Exhibit 22.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 11.2.

**Declaration of Scott Weingust, Appendix B**
**Asset Approach**
**Alleged Loss Realized by Investors - Alternative Asset Approach (Opportunity Cost Added Using 27% Rate of Return), Less Murdoch & RDV Investment**
**Exhibit 22.4**

|   | [1] | [2] | | [3] | | |
|---|---|---|---|---|---|---|
|   | Series C-2 Shares | Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price | Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
| 1 | 6,787,646 | $ 17.00 | $ 115,389,982 | $ 12.84 | $ 87,152,626 | $ 28,237,356 |

|   | Series C-1 Shares | Series C-1 Purchase Price | Series C-1 Value Based on Purchase Price | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|
| 2 | 2,720,488 | $ 15.00 | $ 40,807,320 | $ 11.47 | $ 31,191,279 | $ 9,616,041 |
| 3 | | | | | Total Loss | $ 37,853,397 |

[1] See Exhibit 22.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 16.2.

**Declaration of Scott Weingust, Appendix B**
**Income Approach**
**Alleged Loss Realized by Investors - Saba Income Approach (44% Discount Rate), Less Murdoch & RDV**
**Exhibit 22.5**

| | [1]<br>Series C-2<br>Shares | [2]<br>Series C-2<br>Purchase Price | | Series C-2 Value<br>Based on<br>Purchase Price | [3]<br>Series C-2 Value<br>per Share,<br>adjusted NAV<br>Method | Series C-2 Value<br>Based on<br>adjusted NAV<br>Method Price | | Investor  Loss |
|---|---|---|---|---|---|---|---|---|
| **1** | 6,787,646 | $ | 17.00 | $   115,389,982 | $   11.63 | $   78,940,323 | $ | 36,449,659 |

| | Series C-1<br>Shares | Series C-1<br>Purchase Price | | Series C-1 Value<br>Based on<br>Purchase Price | Series C-1 Value<br>per Share,<br>adjusted NAV<br>Method | Series C-1 Value<br>Based on<br>adjusted NAV<br>Method Price | | Investor  Loss |
|---|---|---|---|---|---|---|---|---|
| **2** | 2,720,488 | $ | 15.00 | $   40,807,320 | $   10.36 | $   28,184,256 | $ | 12,623,064 |
| **3** | | | | | | **Total Loss** | $ | **49,072,723** |

[1] See Exhibit 22.6.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Expert Report of Carl S. Saba, dated September 8, 2022, Exhibit A.4.

**Declaration of Scott Weingust, Appendix B**
**C-1 & C-2 Investor Details - Less Murdoch & RDV Investment**
**Exhibit 22.6**

| | Investor Name | Class of Stock | No. of Shares | [1] Include |
|---|---|---|---|---|
| 1 | CENTRAL VALLEY ADMINISTRATORS | Series C-2 | 294,117 | |
| 2 | PARTNER INVESTMENTS LP | Series C-2 | 3,263,529 | Include |
| 3 | PFM HEALTHCARE MASTER FUND, L.P., | Series C-2 | 2,255,096 | Include |
| 4 | PFM HEALTHCARE PRINCIPALS FUND, L.P | Series C-2 | 136,669 | Include |
| 5 | PEER VENTURES GROUP IV, L.P. | Series C-2 | 779,411 | Include |
| 6 | RILEY P. BECHTEL & SUSAN P. BECHTEL | Series C-2 | 8,823 | |
| 7 | RILEY P. BECHTEL & SUSAN P. BECHTEL | Series C-2 | 291,177 | |
| 8 | MOSLEY FAMILY HOLDINGS LLC | Series C-2 | 352,941 | Include |
| 9 | DYNASTY FINANCIAL II, LLC (BY RDV CORPORATION, ITS MANAGER) | Series C-2 | 5,882,352 | EXCLUDE |
| 10 | ANDREAS C. DRACOPOULOS | Series C-2 | 1,470,588 | |
| 11 | Cox Investment Holdings, Inc | Series C-2 | 5,882,352 | |
| 12 | MADRONE PARTNERS, LP | Series C-2 | 5,882,352 | |
| 13 | SODA SPRING PARTNERS, LLC | Series C-2 | 2,941,176 | |
| 14 | HENRY A KISSINGER 2014 GRANDCHILDREN'S TRUST | Series C-2 | 176,470 | |
| 15 | BENDEL FUND | Series C-2 | 249,998 | |
| 16 | Keith Rupert Murdoch | Series C-2 | 7,352,941 | EXCLUDE |
| 17 | EOSon Investments M Ltd | Series C-2 | 1,058,823 | |
| 18 | EOSon Investments N Ltd | Series C-2 | 117,647 | |
| 19 | Robert K. Kraft LLC | Series C-2 | 58,823 | |
| 20 | INMOBILIARIA CARSO S.A. de C.V. | Series C-2 | 1,764,705 | |
| 21 | David Boies | Series C-2 | 17,647 | |
| | | | | |
| 22 | Daniel C. Carter | Series C-1 | 5,000 | |
| 23 | Crofton Capital GP | Series C-1 | 20,000 | |
| 24 | Alan Eisenman | Series C-1 | 6,666 | |
| 25 | Sherrie Eisenman | Series C-1 | 3,333 | |
| 26 | Kendra Fadil | Series C-1 | 5,000 | |
| 27 | Richard Kovacevich | Series C-1 | 10,000 | Include |
| 28 | Gordon Family Trust | Series C-1 | 20,000 | |
| 29 | Hall Black Diamond II, LLC | Series C-1 | 325,000 | Include |
| 30 | Richard Kovacevich | Series C-1 | 266,666 | Include |
| 31 | Lucas Venture Group IV LP | Series C-1 | 33,334 | Include |
| 32 | Lucas Venture Group XI | Series C-1 | 471,333 | Include |
| 33 | Mendenhall TF Partners | Series C-1 | 87,500 | Include |
| 34 | PEER VENTURES GROUP IV, L.P. | Series C-1 | 1,169,995 | Include |
| 35 | Black Diamond Ventures XII-B, LLC | Series C-1 | 356,660 | Include |
| 36 | Boies, Schiller & Flexner LLP | Series C-1 | 322,879 | |
| 37 | Colin Carter | Series C-1 | 16,666 | |

See 2022.09.02.  Summary of C1 & C2 Investors.xlsx.
[1] United States of America v. Elizabeth A. Holmes, Transcript of Sentencing Proceedings, November 18, 2022, p.79.
   I understand Partner Investments LP to be a PFM Healthcare entity.

**Declaration of Scott Weingust, Appendix B**
**Alleged Loss Realized by Investors - Saba Income Approach (44% Discount Rate)**
**Exhibit 23**

| | Series C-2 Shares | | Series C-2 Purchase Price | Series C-2 Value Based on Purchase Price [1] | | Series C-2 Value per Share, adjusted NAV Method | Series C-2 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|---|---|
| 1 | 20,022,939 | [2] | $ 17.00 | $ 340,389,963 | [3] | $ 11.63 | $ 232,866,781 | $ 107,523,182 |

| | Series C-1 Shares | | Series C-1 Purchase Price | Series C-1 Value Based on Purchase Price | | Series C-1 Value per Share, adjusted NAV Method | Series C-1 Value Based on adjusted NAV Method Price | Investor Loss |
|---|---|---|---|---|---|---|---|---|
| 2 | 2,720,488 | [2] | $ 15.00 | $ 40,807,320 | [3] | $ 10.36 | $ 28,184,256 | $ 12,623,064 |
| 3 | | | | | | | Total Loss | $ 120,146,247 |

[1] See Exhibit 19.
[2] See Expert Report of Carl S. Saba, dated September 8, 2022.
[3] See Exhibit 11.2. Reflects the adjusted Series C-1 and C-2 price per share based on the NAV method as of 12/31/2014.

# EXHIBIT 47

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | **CR-18-00258-EJD** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| **ELIZABETH HOLMES and** | § | |
| **RAMESH "SUNNY" BALWANI,** | § | |
| | § | |
| *Defendants.* | § | |

---

## Declaration of Tobin J. Reiff

---

I, Tobin J. Reiff, under penalty of perjury, declare the following information to be true and correct:

1. I am a Managing Director in the Valuation Advisory group at Stout Risius Ross, LLC ("Stout"). I have significant experience in providing business valuation services. I have been hired on hundreds of occasions to provide valuation-related services and opinions regarding closely held businesses to parties in litigation, to boards of directors for M&A and capital raising transaction advisory purposes, and for tax and financial reporting purposes. I have served as an expert in valuation disputes and have lectured/presented numerous continuing education seminars about valuation and transaction advisory services. I received a Bachelor of Business Administration degree at the University of Notre Dame with a major in Finance and a minor in Accounting. I am a CFA Charterholder, having passed the rigorous exams on the first attempt in three consecutive years. I am a member of the CFA Institute, CFA Society of Houston, and the Forensic and Business Valuation Division of the AAML Foundation. Based on my education, training, and experience, I am well qualified to offer the valuation opinions set forth below. The opinions offered in this declaration are based on my education, training, and experience in the field of business and equity valuation. A copy of my CV is attached as Appendix A.

2. I have been retained by counsel for Ramesh Balwani to review an expert report,

dated September 8, 2022 (the "Saba Report"), prepared by Carl S. Saba, MBA, CVA, ASA, ABV ("Saba") in the matter of *United States of America v. Elizabeth Holmes and Ramesh "Sunny" Balwani*, CR-18-00258 (the "Matter").

3.   The Saba Report first presents Saba's estimation of the fair market value of 100% of the equity of Theranos, Inc. ("Theranos"), representing the bulk of the Saba Report and on which I offer no opinions herein. As a secondary step after determining Theranos' total equity value, Saba performed an analysis to allocate the total equity value to all of the securities in Theranos' capital structure, across all share classes. Saba conducts an analysis referred to as an option pricing model ("OPM") for this purpose. My opinions herein pertain to the OPM.

4.   As its name indicates, the OPM is an option-based analytical model whereby the equity securities of a company are treated as call options on total equity value. The value of a call option is highly dependent on and sensitive to two primary inputs in particular: (1) the stated term of the stock option (i.e., the length of time until it expires) and (2) the expected future volatility of the underlying stock. For stock options of a publicly traded company, these important valuation inputs can be assessed with relative confidence: the term of the option is a fixed time period via the option agreement, and the expected future volatility of the underlying stock – while not known with certainty – can be estimated based on the stock's observable and measurable historical volatility via its daily trading history. As discussed below, this exercise is far more complicated for a private company.

5.   For a private company, there is no stated term; rather, this input must be guessed. Likewise, there is no observable volatility; this input too must be guessed. The value resulting from the OPM is highly dependent on these two analogous primary inputs: (1) the period of time until the occurrence of a future liquidity event[1] (i.e., an estimated "term") and (2) the expected future volatility of the underlying equity over this period. However, these important inputs are very difficult to determine for a private company such as Theranos and require an inordinately high level of speculation about the future. Moreover, these two inputs in particular can have an extremely significant impact on value.

6.   Specifically, the period of time until a future liquidity event for a private company, and particularly an early-stage private company such as Theranos, is completely unknown, must be guessed, and cannot be tested for accuracy (other than retrospectively, years later, when and if a liquidity event actually occurs). Without a crystal ball, one could not know the time period until a future liquidity event with confidence. Saba estimates a four-year holding period, but another valuation expert could reasonably argue for a meaningfully different time period with an equally insufficient supporting rationale, which would significantly change the value resulting from the OPM.

---

[1] For example, a sale or IPO of the company.

7.  Likewise, historical equity volatility is not observable for a private company since its shares are not publicly traded. Accordingly, a business valuation expert is unable to study a private company's historical equity volatility in order to gauge an estimate of future volatility, nor to test the reasonableness of the estimate. Saba assumes equity volatility of 55% based on a review of other publicly traded companies. However, particularly for an early-stage private company such as Theranos, underlying equity volatility is likely to significantly differ from public companies, potentially undermining the comparability, and therefore materially affecting the output of the OPM.

8.  I make the foregoing declarations to highlight: (1) Saba's use of an option-based method to allocate equity value amongst Theranos' security classes, (2) Saba's use of an option-based model, the OPM, to perform this allocation, (3) the particular dependency of the output of the OPM on unobservable inputs, and (4) the significant degree of speculation inherent in estimating these inputs which ultimately drive the output of the OPM. It is important to consider and understand the relative precision, accuracy, and potential for error of the OPM when used in this manner to assign equity value to Theranos' equity classes. The OPM is highly dependent on term and volatility assumptions representing the most impactful inputs in the model, and both of which essentially represent guesses in the case of a private company. Ultimately, the use of the OPM for purposes of determining the value of any class of securities of Theranos is inherently uncertain and based on speculation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, State of Texas, on the 30th day of November, 2022.

Tobin J. Reiff, CFA

# Appendix A

## Tobin J. Reiff
Managing Director





**Houston, TX USA**
**Office:** +1.713.221.5115
**Mobile:** +1.312.720.8211
treiff@stout.com

### Education

B.B.A.
University of Notre Dame

### Designations

Chartered Financial Analyst (CFA)

### Practice Areas

Valuation Disputes
Shareholder & Succession Planning
Transaction Opinions

Tobin Reiff is a Managing Director in the Valuation Advisory group. He has extensive experience providing professional valuation advisory services to multi-billion-dollar enterprises, middle-market businesses, private equity and hedge funds, law firms and attorneys, tax advisors, and individuals.

Mr. Reiff has been engaged as an expert on litigation involving complex valuation issues including shareholder disputes, transaction disputes, marital dissolution, probate matters, and corporate litigation.  Mr. Reiff has extensive experience providing valuation consulting services to companies for transaction advisory purposes, including fairness and solvency opinions. Mr. Reiff also provides valuation advisory services for gift and estate planning and tax reporting purposes.

Mr. Reiff has published articles, lectured, and participated in continuing education seminars on the subjects of valuation, litigation advisory services, succession planning, and transaction advisory services.

### Professional Memberships

• CFA Institute

• CFA Society of Houston

• AAML Foundation Forensic & Business Valuation Division

# Tobin J. Reiff
Managing Director



## Testimony Experience

*Kulwinder Walia v. Ajay Singh Dhillon, Tabbassum Mumtaz, et al.*, American Arbitration Association, No. 01-21-0016-2919, 2022

*Matthew Smith v. Microvast, Inc., Yang Wu, and Yanzhuan "Leon" Zheng*, District Court of Harris County, Texas - 234th Judicial District, No. 2018-07693, 2022

*Tim Walsh, et al. v. Clifford M. Buchholz, St. Renatus, LLC, et al.,* United States District Court, District of Minnesota, No. 0:19-cv-1856 DSB-HB, 2022

*Sandra N. Eddleman, et al. v. Joann Roemer Jones, et al.,* Superior Court of the State of California, County of San Luis Obispo, No. 16CV-0417, 2020

*In re: Samson Resources Corporation, Reorganized Debtor; Peter Kravitz, as Settlement Trustee of and on behalf of the Samson Settlement Trust v. Samson Energy Company, LLC, et al.,* United States Bankruptcy Court, District of Delaware, Adv. Proc. No. 17-51524 (BLS), 2020

*First Water Advisors, LLC v. H&M Bakery, LLC, et. al.*, District Court of Harris County, Texas – 113th Judicial District, No. 2017-71537, 2019

*Cary Rossel and Jerry Cargill v. Glazer's, Inc., Southern Glazer's Wine and Spirits, LLC, Southern Glazer's Wine and Spirits of Texas, LLC f/k/a Glazer's Distributors of Texas, Inc. f/k/a Glazer's Wholesale Drug Co., Inc., Southern Glazer's Wine and Spirits of Louisiana, LLC, Southern Glazer's Wine and Spirits of Arkansas, LLC,* District Court of Dallas County, Texas - G-134th Judicial District, No. DC-16-00221, 2017

*Market Tech Media Corporation v. Register Tapes Unlimited, Inc., et al.*, District Court of Harris County, Texas, No 2013-44115, 2016

*In the Matter of the Marriage of Jonathon Scott Olson and Caroline Suzanne Olson*, District Court of Harris County, Texas – 247th Judicial District, 2015

*Cindy F. Wile, Kenneth E. Wile, and Relax-A-Wile, L.P. v. Holland & Knight LLP, David Shayne, Todd J. Schneider, and Paul Gravenhorst*, State of Illinois, Circuit Court of Cook County, 2012

*King Spa Sauna, LLC and Byung T. Kim v. David M. Park*, State of Illinois, Circuit Court of Cook County, 2012

## Publications

"Analyzing Chancery Decisions On Long-Term Growth Rates," *Law360*, September 2018

"Long-Term Growth Rate Trends in Delaware Chancery Decisions," *The Stout Journal*, Fall/Winter 2018

"Avoiding Problems with Shareholders' Agreements: Reviewing These Provisions Helps Prevent Future Disputes," *The Stout Journal*, Fall 2011

**Tobin J. Reiff**
Managing Director



---

### Speeches and Seminars

*National Family Law Trial Institute – Advanced Cross Examination*, South Texas College of Law, 2022, 2017

*How to Critically Review a Business Valuation Report*, Texas Society of Certified Public Accountants - 2020 CPE By the Sea Conference, July 2020

*National Family Law Trial Institute*, South Texas College of Law, 2019, 2016, 2014, 2013

*For What It's Worth: Business Valuation*, Houston Young Lawyers Association, Houston Bar Association, May 2018

*M&A: Supplementing Organic Growth with Acquisition*, The Presidents' Forum of Houston, 2015

*Valuing a Business for Sale*, Financial Poise Webinar, 2014

*Hot Topic Valuation Issues Targeted by the Service in Estate & Gift Tax Disputes*, Chicago Bar Association, 2012

*Taxation of Estates, Gifts and Trusts*, Master of Laws (LLM) program at Northwestern University Law School, 2011

*Pre-Transaction Valuation Issues in the Estate Planning Process*, Stout Webinar, 2011

---