JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    (415) 773-5700
Facsimile:     (415) 773-5759

Email: jcoopersmith@orrick.com; awalsh@orrick.com; scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAMESH "SUNNY" BALWANI,<br><br>Defendant. | Case No. CR-18-00258-EJD<br><br>**DEFENDANT RAMESH "SUNNY" BALWANI'S RESPONSE TO UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date:  December 7, 2022<br>Time:  10:00 a.m.<br>CTRM.: 4, 5th Floor<br><br>Hon. Edward J. Davila |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................ 1
II. GUIDELINES CALCULATION ......................................................................................... 2
    A. The Court should decline to apply any bodily injury enhancement. ...................... 2
        1. Mr. Balwani understood that issues were resolved before patient testing resumed. ............................................................................... 2
        2. The government's anecdotes are misleading and incomplete. ................... 4
    B. The government cannot prove its inflated fraud-loss calculation. .......................... 6
    C. No leadership enhancement is warranted. ............................................................... 9
    D. The government's PSR objections lack merit. ...................................................... 10
III. CONCLUSION .................................................................................................................. 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States v. Berger*,
  587 F.3d 1038 (9th Cir. 2009) .................................................................................................. 7

*United States v. Booth*,
  309 F.3d 566 (9th Cir. 2002) .................................................................................................... 9

*United States v. Bryson*,
  101 F. Supp. 3d 147 (D. Conn. 2015) ...................................................................................... 7

*United States v. Byors*,
  586 F.3d 222 (2d Cir. 2009) ..................................................................................................... 7

*United States v. Gall*,
  552 U.S. 38 (2007) .................................................................................................................... 1

*United States v. Greenfield*,
  44 F.3d 1141 (2d Cir. 1995) ..................................................................................................... 9

*United States v. Henderson*,
  893 F.3d 1338 (11th Cir. 2018) ................................................................................................ 2

*United States v. Hicks*,
  217 F.3d 1038 (9th Cir. 2000) .............................................................................................. 7, 8

*United States v. Holden*,
  908 F.3d 395 (9th Cir. 2018) ............................................................................................. 9, 10

*United States v. Johansson*,
  249 F.3d 848 (9th Cir. 2001) .................................................................................................... 2

*United States v. Leung*,
  35 F.3d 1402 (9th Cir. 1994) .................................................................................................. 10

*United States v. Ponce*,
  51 F.3d 820 (9th Cir. 1995) (per curiam) ................................................................................. 8

*United States v. Turk*,
  626 F.3d 743 (2d Cir. 2010) ..................................................................................................... 7

*United States v. Zolp*,
  479 F.3d 715 (9th Cir. 2007) .................................................................................................... 7

**Statutes**

U.S.S.G. § 2B1.1(b)(16) .................................................................................................................. 2

U.S.S.G. § 2B1.1 note 1 .................................................................................................................. 9

U.S.S.G. § 2B1.1 note 2 .................................................................................................................. 9

U.S.S.G. § 3B1.1(a) ........................................................................................................................ 9

## I. INTRODUCTION

The government asks the Court to impose on Mr. Balwani an extraordinary sentence—one nearly four years longer than what Ms. Holmes received. The distinctive circumstances here—a defendant who did not profit (who in fact lost millions), did not seek fame or recognition and who worked diligently to make Theranos a success, and has a long history of putting others' interests before his own—favor a non-custodial sentence.

The government's sentencing memorandum either ignores or shortchanges these factors. Worse, it transgresses the requirement that a sentencing court "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *United States v. Gall*, 552 U.S. 38, 52 (2007) (citation omitted). The government does so by asking the Court to give a harsher sentence to Mr. Balwani than it gave to Ms. Holmes merely because he was convicted of more counts, despite the striking similarity of its trial presentations against both defendants. Sentencing is the province of the Court, not the jury. If anything, the evidence established that Ms. Holmes was dramatically more culpable with regard to allegedly misleading the media, making claims about the military, and altering pharmaceutical reports. The government has suggested repeatedly that Ms. Holmes is the more responsible party, *see, e.g.*, Dkt. 1649 at 34; Dkt. 313 at 25, but is conveniently changing its tune now that Ms. Holmes' sentencing is in the rear-view mirror. Whatever the law may permit a jury to conclude about vicarious liability, sentencing requires a nuanced and individualized assessment that the government does not provide. The facts underlying such an assessment are discussed at length in Mr. Balwani's sentencing memorandum and they—including the wide array of mitigating circumstances— should drive the Court's sentencing decision.

Below, Mr. Balwani takes issue with several of the government's proposed enhancements under the Sentencing Guidelines. First, the government is wrong to seek an enhancement for consciously or recklessly creating a risk of bodily injury. As Probation concluded and the Court rightly decided at the Holmes sentencing, the evidence does not support that enhancement. Nor

- 1 -

do Mr. Balwani's convictions on the patient counts require such an enhancement. Second, the government's proposed fraud loss figure cannot be sustained given Ninth Circuit law and the evidence. Third, no enhancement for any leadership role is proper here.

The Court should reject these enhancements, reject the government's objections to the PSR, and impose the sentence that Mr. Balwani recommends in his sentencing memorandum.

## II.   GUIDELINES CALCULATION

### A.   The Court should decline to apply any bodily injury enhancement.

The government objects to the PSR's failure to include an enhancement for "conscious or reckless risk of death or serious bodily injury" under U.S.S.G. § 2B1.1(b)(16). The Probation Office has correctly declined to apply this enhancement in Mr. Balwani's case. As the Court noted in connection with Ms. Holmes sentencing, the evidence does not support applying the enhancement. 11/18/2022 Tr. 72.[1] The jury's verdict in Mr. Balwani's case does not change the analysis, because the verdict did not require any finding that Mr. Balwani had knowledge of, or recklessness to, a risk of bodily harm to patients.

### 1.   Mr. Balwani understood that issues were resolved before patient testing resumed.

The evidence at trial showed that Mr. Balwani understood that Theranos' laboratory had processes and procedures in place to ensure that any laboratory issues were resolved before tests were offered to patients, including a validation process led by Dr. Rosendorff, daily quality control procedure run at Theranos, and proficiency testing according to protocols established by the laboratory directors. The government does not dispute that the majority of the millions of tests run at Theranos were run on "gold-standard" FDA-cleared equipment. Nor does the government dispute that lab errors occur, and that it is not uncommon for CMS to find deficiencies after a

---

[1] The authorities the government provides to support the enhancement are not to the contrary. The government asserts that this enhancement focuses on the defendant's "disregard of the risk" and that a defendant cannot claim ignorance of the risk. *See United States v. Henderson,* 893 F.3d 1338, 1351 (11th Cir. 2018); *see also United States v. Johansson,* 249 F.3d 848, 859 (9th Cir. 2001). These cases miss the mark here. As discussed further below, unlike the defendants in the examples the government provides, who took no action in the face of risk, Mr. Balwani took an active role in resolving issues in the lab as he was made aware of them, and he was repeatedly advised by the scientific team that they were looking into issues that arose.

laboratory inspection. Indeed, Dr. Rosendorff (and other doctor-witnesses) testified that every lab makes errors. *E.g.*, 4/22/2022 Tr. 3659; 5/18/2022 Tr. 5916.

Mr. Balwani knew that Dr. Rosendorff and his team validated each assay to be tested for clinical use on Theranos' fingerstick technology before any such clinical testing occurred. Dr. Rosendorff ultimately validated 57 assays on Theranos' technology. He testified that his validation of an assay meant that he had confirmed the test was "accurate," "precise," and "sensitiv[e]." 4/22/2022 Tr. 3535–3536. Dr. Rosendorff also testified that he signed off on these validation reports because they were "valid," and not because any improper pressure was put on him by Mr. Balwani or others. *Id.* at 3537–3538. Mr. Balwani was not the laboratory director, and Dr. Rosendorff testified that he never knowingly released results that were inaccurate. 4/26/2022 Tr. 3784.

The government points to Theranos' rate of quality control errors to argue that this enhancement applies. But this argument misses the point. Mr. Balwani understood that quality control was run *before* any test was offered to patients as a safety measure. For instance, both Dr. Rosendorff and Ms. Cheung confirmed that Theranos' quality control processes were run daily and that a test could not be offered to patients if it had failed quality control that day. 3/23/2022 Tr. 1322; 4/22/2022 Tr. 3614.

While Mr. Balwani learned of certain issues in the laboratory, he understood that corrective action was taken and was told that the rate of issues arising was not abnormal. For instance, in 2014, Dr. Rosendorff reported to Mr. Balwani that Theranos had a "rigorous validation and quality process," and that the rate of physician inquires that Theranos was receiving was "not higher than might be expected, and is not higher than in my previous job at Univ of Pittsburgh." TX 7462 at 1, 4. On his penultimate day at Theranos, on May 30, 2014, Dr. Pandori authored an exit memo to Mr. Balwani. TX 20498. Rather than document any concerns about testing accuracy, Dr. Pandori recommended to Mr. Balwani that Theranos' clinical lab should "double" the number of Edisons to be used for patient testing. *Id.* at 6.

The facts simply do not support applying a bodily injury enhancement.

**2.     The government's anecdotes are misleading and incomplete.**

The government offers a series of misleading and incomplete anecdotes to support its argument. *E.g.*, Dkt. 1661 at 28–29. The complete facts show that when Mr. Balwani learned of testing issues, he relied on Theranos' laboratory team to investigate and take corrective action to resolve any issues:

- The government points to an email sent by Tyler Shultz to Ms. Holmes in 2014 about potential accuracy issues. TX 1660. Beyond the fact that Mr. Shultz was not called at trial to be cross-examined, the government's anecdote omits that Dr. Young spent considerable time examining Mr. Shultz's claims and concluded that his concerns were unfounded, as reported to both Mr. Balwani and Ms. Holmes. Ex. 1. At trial, Ms. Cheung acknowledged that Dr. Young responded to all the points raised by Mr. Shultz and had a different view of the issues than Mr. Shultz. 3/30/2022 Tr. 1540.

- The government cites an April 2014 email from Dr. Young, notifying Mr. Balwani that results for potassium were "running high." TX 4124. The government overlooks that, a month later, Dr. Young reported to both Mr. Balwani and Dr. Rosendorff that he had "cracked" the potassium/ISE issue and that Theranos could now get "on average very accurate results" from fingerstick samples for ISEs. TX 13893.

- The government emphasizes issues with Theranos' PT/INR test, including those relating to patients "AT" and "EG." Neither these patients nor their physicians testified at either trial. And the government ignores that patient AT's test was run on FDA-cleared testing equipment (Ex. 2 at 4) in Theranos' Arizona lab, and no evidence suggests that Mr. Balwani was aware of accuracy issues in Arizona. The government also omits that patient EG also received materially different PT-INR results from her tests run at Sonora Quest, undermining any allegation that her Theranos test was inaccurate. *See* Ex. 3. And, as Mr. Balwani noted in his sentencing memorandum, he proposed moving Theranos' PT/INR assay to a commercial platform because of accuracy concerns raised by physicians. *See* Dkt. 1662 at 42–43; Dkt. 1664-3 at 42–43.

- The government points to issues with patient "BG's" hCG test but omits that Mr. Balwani was informed that this error was due to a human, decimal error. TX 5184. The government also omits that Dr. Zachman (BG's treating provider) testified at trial that she looked through all her clinic's patient records and could not find any other inaccurate Theranos results—meaning the error rate was .36%. *See* TX 20074; TX 20073A.

- The government points to the fact that Mr. Balwani hired his dermatologist, Dr. Dhawan, as the lab director, and Dr. Sawyer as co-lab director. The full chronology, however, shows that Mr. Balwani was committed to hiring a full-time director and maintaining outstanding personnel within the CLIA lab. Mr. Balwani looked internally and outside of Theranos to identify a suitable replacement for Dr. Rosendorff, even mobilizing his team to engage in recruiting efforts outside of the company for a qualified lab director. Ex. 4; Ex. 5.  When no one was available, Mr. Balwani planned for Dr. Suraj Saksena, a trusted Theranos employee and senior scientist, to serve as clinical laboratory director, but Mr. Balwani quickly learned that as a Ph.D. Dr. Saksena needed to pass a state exam to meet the regulatory requirements to run a CLIA lab. Ex. 6; Ex. 7; Ex. 8; TX 2219[2]. Dr. Saksena scored the "highest score" on his state exam that had been seen in years, and Mr. Balwani was led to believe that Dr. Saksena's approval to become Theranos laboratory director was imminent.  Ex. 9. While Dr. Saksena sorted out the regulatory requirements, Mr. Balwani hired Drs. Dhawan and Sawyer as a stopgap, and there were still dozens of accomplished Theranos scientists with terminal degrees already working in the lab to make decisions about patient testing and releasing results.

- The government points out that Dr. Rosendorff halted all hCG testing in late May 2014. TX 4147. But in fact, a few days later, Dr. Rosendorff reported to Mr. Balwani that the plan was to resume fingerstick testing on hCG when the issues were resolved. TX 13875. Dr. Rosendorff also reported that Dr. Pangarkar was implementing a "script" to address the hCG issues (TX 20546), and approved further hCG-fingerstick testing days later in

---

[2] All these email communications took place within a few days after Dr. Rosendorff resigned, which underscores the urgency with which Mr. Balwani was looking for a suitable replacement.

June. (TX 20565).

* * *

While the jury convicted Mr. Balwani of wire fraud in connection with the patient counts, the jury's verdict did not involve any finding that Mr. Balwani had knowledge of, or was reckless to, a risk of bodily harm to patients. *See* Dkt. 1662 at 44–45; Dkt. 1664-3 at 44–45. The Court should follow the PSR's recommendation (and its ruling in Ms. Holmes' sentencing) and decline to apply this enhancement.[3]

**B.    The government cannot prove its inflated fraud-loss calculation.**

For the reasons Mr. Balwani explained in his own sentencing memorandum, the government cannot meet its burden to prove fraud loss. *See* Dkt. 1662 at 28–40; Dkt. 1664-3 at 28–40. The government's arguments—unmoored from Ninth Circuit authority—would erode any requirement to show causation in a case where the jury did not find that element and where investors' experiences and access to information about this private company differed dramatically from one another. The $730 million-dollar loss urged by the government and Probation would, if accepted, eclipse all other factors relevant to sentencing. But because Theranos was a real company doing legitimate work and creating real value for its investors, the government's arguments fail.[4]

Under any burden of proof,[5] the government's efforts to sidestep its obligation to

---

[3] That the Holmes jury acquitted and the Balwani jury convicted on the patient counts changes nothing. Juries make decisions for all sorts of reasons, and nothing about the jury's verdict here compels the conclusion that they found that Mr. Balwani caused or tolerated patient harm. In fact, the government presented nearly identical evidence in both cases, and displayed a plethora of emails showing that Ms. Holmes was aware of issues in the lab. *See e.g.* TX 4124; TX 4189; TX 4181; TX 1953.

[4] Dispensing with the government's loss figure also undermines the government's chart of purportedly similar offenses that led to lengthy prison terms. *See* Dkt. 1661 at 43. Several of these cases involved substantially larger loss amounts than even the loss amount the government asserts here: McCall ($8.6 billion), Forbes (more than $1 billion), Ebbers (more than $1 billion). Others involved Ponzi schemes or other valueless companies (e.g., Cutting), or defendants who profited from their schemes or obstructed justice (e.g., Forbes, Kumar). None reflects the constellation of mitigating facts and circumstances here that take Mr. Balwani's case out of the heartland of cases where Guidelines sentences or lengthy prison terms may be appropriate.

[5] As Mr. Balwani has explained, the correct burden of proof here is clear and convincing evidence. *See* Dkt. 1662 at 29–30; Dkt. 1664-3 at 29–30.

"disentangle the underlying value of the [Theranos] stock, inflation of that value due to" the fraud found by the jury, "and either inflation or deflation of that value due to unrelated reasons" fails. *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007). The government's proposed distinction—that *Zolp* dealt with a public company—makes no difference. In fact, Mr. Balwani is on stronger footing precisely because Theranos was a private company: there was no uniform set of investor materials and representations received by everyone, and the need to disaggregate investors is even sharper.

The government's cited cases do not help its cause. *See* Dkt. 1661 at 23. In *United States v. Turk*, for instance, the defendant falsely told victims that unsecured loans would be secured; there was no value created for investors at all. *See Turk*, 626 F.3d 743, 748–49 (2d Cir. 2010). The Second Circuit's decision in *United States v. Byors* is no better—that defendant also misrepresented what assets were used to secure loans. *See Byors*, 586 F.3d 222, 224 (2d Cir. 2009). Nor does the District of Connecticut's decision in *United States v. Bryson*, 101 F. Supp. 3d 147, 155 (D. Conn. 2015), aid the government. That defendant promised investors securities including one set of specific rights, but investors received securities with an entirely different set of rights. Put simply, the government's authorities—all of them out-of-circuit—are cases in which victims were deceived about what they were receiving, not the true value of shares. Here, by contrast, investors received the shares they paid for, with the associated rights they agreed to.

Thus, just as the Court concluded at the Holmes sentencing, calculating fraud loss requires looking at investors individually, rather than in aggregate. *See* 11/18/22 Tr. 74 (concluding that "each investor and associated loss must be considered separately as opposed to the aggregate").

It also requires that the government prove reliance and causation. *See, e.g.*, *United States v. Berger*, 587 F.3d 1038, 1043 (9th Cir. 2009) (explaining that the court must find that the fraud was a but-for and proximate cause of the loss); *United States v. Hicks*, 217 F.3d 1038, 1048–49 (9th Cir. 2000) (explaining that intervening causes also break the chain of causation needed to show fraud loss).

1   Unlike the very cases the government cites, the jury did not decide whether any investors
2   relied on misrepresentations, and neither the jury nor the Court has seen evidence of reliance by
3   the vast majority of investors for whom the government claims losses. There is no showing that
4   every C-2 investor received a binder or looked at it if they did, or that any C-1 investor received
5   such materials—and no claims to the contrary have been corroborated by extrinsic evidence. *See*
6   *United States v. Ponce*, 51 F.3d 820, 828 (9th Cir. 1995) (per curiam) (holding that due process
7   requires that hearsay statements be corroborated by extrinsic evidence).

8   Contrary to the government's characterization, Mr. Balwani does not seek a credit for
9   some hypothetical value of Theranos. Instead, his sentencing memorandum explains that, after the
10  discovery of the conduct the jury found fraudulent and Mr. Balwani left the company, Theranos
11  had incredible value: $350 million in the bank and an IP portfolio worth hundreds of millions. *See*
12  Dkt. 1662 at 32–35; Dkt. 1664-3 at 32–35. What happened between that time and the failure to
13  recover any value for investors was attributable to choices by Ms. Holmes, the Theranos Board of
14  Directors, and the investors themselves, who together made decisions about Theranos' corporate
15  governance, business strategy, and operations that Mr. Balwani had no part in. That breaks the
16  chain of causation under *Hicks* and dooms any effort to use the entire aggregated investment
17  amount as the measure of loss.

18  Last, the government half-heartedly acknowledges the conclusions of its own expert,
19  Mr. Saba, who, even using fatally flawed methodology and baseless assumptions, still found that
20  Theranos had tremendous value. Mr. Saba's opinion that the loss here ranges from $237 to $316
21  million (and $121.1 million under the Court's approach at the Holmes sentencing) belies any
22  suggestion that the correct guidelines loss amount here is $730 million. And, as Mr. Balwani has
23  already explained in his own sentencing memorandum, Mr. Saba's analysis undervalues Theranos
24  by hundreds of millions of dollars. *See* Dkt. 1662 at 35–38; Dkt. 1664-3 at 35–38. The
25  speculation and uncertainly at the core of that analysis have no place in a criminal sentencing
26  proceeding.

### C. No leadership enhancement is warranted.

As the Court rightly concluded during the Holmes sentencing, no enhancement for a leadership role is appropriate. The Guidelines authorize a 4-point enhancement only when a defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive …." U.S.S.G. § 3B1.1(a). In other words, the government must show *both* that Mr. Balwani was "an organizer or leader of a criminal activity" *and* that the activity had the required extensive scope or additional participants. Just as the Court reasoned at Ms. Holmes' sentencing, because the government cannot show the first requirement, the Court need not examine the second.

The Guidelines commentary is clear on this point: "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 2B1.1 note 2. The Ninth Circuit has similarly held that it is not "enough for a defendant to have organized property or activities—the defendant must have organized *participants*." *United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018) (emphasis in original). Participants, in turn, must be "criminally responsible for the commission of the offense." *Id.* (quoting U.S.S.G. § 2B1.1 note 1). The government has not shown that Mr. Balwani led any criminal participants. In fact, the government concedes that Ms. Holmes had an "unsurpassed level of authority" inside the company," including that she could "terminate anyone at the company, including second-in-command Balwani…" Dkt. 1643 at 27; *see United States v. Greenfield*, 44 F.3d 1141, 1145–46 (2d Cir. 1995) (collecting authorities and explaining that no role adjustment is appropriate when the defendants are "equal partners"). Mr. Balwani did not direct Ms. Holmes. That ends the inquiry.

The authorities the government invokes are not to the contrary. All of them address the second requirement for the enhancement: that it involve five or more participants or be "otherwise extensive." *See United States v. Booth*, 309 F.3d 566, 577 (9th Cir. 2002) (addressing whether conduct was "otherwise extensive") *United States v. Leung*, 35 F.3d 1402, 1406 (9th Cir. 1994) (same).

The government does not even mention—much less distinguish—*Holden*, on which the Court relied at the Holmes sentencing and which controls the outcome here.

**D.     The government's PSR objections lack merit.**

The government's objections to the PSR are riddled with factual inaccuracies. For one, the "statements … attributed to Dr. Jay Rosan from Walgreens," Dkt. 1661 at 20 (citing PSR ¶ 17), are in fact Dr. Rosan's sworn testimony, *see* Dkt. 1665-7 at 355–56, 360–74. And those statements turn not just on the Johns Hopkins analysis[6] of Theranos' technology but also on Dr. Rosan's firsthand experience testing himself and others using Theranos' proprietary technology. *Compare id.*, *with* Dkt. 1661 at 20. Next, the evolving business strategy between Theranos and Walgreens discussed in ¶ 23 of the PSR rests on undisputed trial evidence. *See, e.g.*, 4/19/22 Tr. 3019, 5/4/2022 Tr. 4879; TX 617 at WAG-TH-00000050, WAG-TH-00000053 (§ 3), WAG-TH-00000067 (§ 26(b)), WAG-TH-00000075–76 (Schedule F).[7]

Last, the government is wrong to dispute that Ms. Holmes and Mr. Balwani informed Walgreens that blood samples taken using venipuncture would be tested on non-Theranos commercial devices. *See* Dkt. 1661 at 20; PSR ¶ 23. That fact is based on the sworn testimony of former Walgreens CFO Wade Miquelon, who confirmed that Mr. Balwani told him that venipuncture samples may always be required for some tests and "would be done on a traditional lab test machine or perhaps outsourced to a lab." Ex. 10 (Miquelon AZ Tr.) 237–38. And, contrary to the government's assertion, no trial evidence contradicts this testimony. The mere fact that, for example, Nimesh Jhaveri—who began managing the Theranos relationship for Walgreens in spring 2014—did not know the full scope of representations made to Walgreens over the preceding four years contradicts nothing.

---

[6] The government's suggestion that Mr. Balwani did not rely on the Johns Hopkins evaluation, *see* Dkt. 1661 at 15, is implausible—not to mention at odds with the government's vastly more expansive, and far less supported, view of investor reliance. Mr. Balwani was present for the Johns Hopkins meeting and later received the written report of this independent third-party validation of Theranos' technology. How could he not have absorbed and relied on a group of Johns Hopkins experts hired by Walgreens concluding that Theranos's device was terrific?

[7] The government's view appears to be that a jury verdict in its favor is an endorsement of the truth of every argument it made at trial, and a rejection of every argument from the defense. That is obviously not the case. The government cannot just ignore the actual evidence for sentencing purposes.

### III. CONCLUSION

Mr. Balwani asks the Court to impose the sentence requested in his sentencing memorandum, which accounts for the extraordinary circumstances here that place him outside the heartland of a Guidelines sentence.

DATED: December 2, 2022　　　　　　　Respectfully submitted,

ORRICK HERRINGTON & SUTCLIFFE LLP

By: */s/ Jeffrey B. Coopersmith*
　　Jeffrey B. Coopersmith

Attorney for Defendant
RAMESH "SUNNY" BALWANI