STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Email:  Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM |
| v. | |
| RAMESH BALWANI, | Date:   December 7, 2022<br>Time:   10:00 a.m.<br>Court:  Hon. Edward J. Davila |
| Defendant. | |

The government respectfully submits this Response to Defendant's Sentencing Memorandum. Through this response, the government does not endeavor to address each and every factual and legal assertion raised by the defense; the government believes its sentencing memorandum, the evidence and argument presented in prior proceedings, and oral submissions to be provided at the sentencing hearing will provide sufficient information for the Court to evaluate the parties' respective positions. Instead this response addresses four specific points.

First, Balwani repeatedly suggests he has been unwittingly and wrongly swept up by a wire fraud statute "as broad as the human imagination." ECF No. 1662 at 1, 40. Not so. Balwani was not convicted of a regulatory offense, some arcane regulation, or some strained interpretation of the federal fraud law. The jury found he engaged in two criminal conspiracies to defraud investors and to defraud patients. ECF No. 1507. The jury found he participated in those conspiracies *willfully*—that is, with knowledge that his conduct was unlawful and with an intent to do something the law forbids. ECF No. 1630 at 16–18; ECF No. 1507. The jury found he acted not only with the intent to deceive but with the intent to cheat—that is, with the intent to deprive someone of money or property by means of deception. ECF No. 1630 at 24; ECF No. 1507.

Second, and relatedly, Balwani repeatedly appeals to "mitigating factors" that run contrary to the jury's verdict and are not, upon scrutiny, mitigating. He notes he invested in Theranos and guaranteed a line of credit—but this was well before Theranos' 2013 commercial launch. ECF No. 1662 at 1, 3, 16-17. He claims he only sought a salary of $1—but this was in 2009, before the investor and patient conspiracies, and this ignores the substantial equity grants he received. ECF No. 1662 at 2, 15. He notes he put in long hours, desired to change his industry, had no criminal record, and had a positive family life—but all of that could also be said of his co-defendant and many other white-collar offenders. In the end, his "mitigating factors" are largely a backdoor way of suggesting the jury got it wrong and its verdict should not be respected.

Third, Balwani presents evidence that family members used Theranos services. But the evidence he presents does not support the conclusion he wants (i.e., that he acted in good faith) and, again, is undercut by the jury's express findings that Balwani willfully participated in two conspiracies and intended to deceive and cheat both investors and patients. His mother's first Theranos test was in 2012,

under the tenure of Dr. Arnold Gelb, when Theranos was neither using its propriety device nor doing any fingerstick testing in the clinical setting. ECF No. 1665, Exs. 20 & 21. The record for his mother's second Theranos test in March 2015 does not reflect how the testing was done, but those results were issued under the authority of Dr. Lynette Sawyer, who at trial disclaimed any knowledge that Theranos was actually testing on its proprietary device or doing anything other than ordinary FDA-approved testing. ECF No. 1665, Ex. 20. Nor does the record show how, if at all, the test was used for medical decisions.

Finally, Balwani tenders newly disclosed expert declarations—not previously shared with the Probation Office or the government—to attempt to undercut the opinions of the government's expert, Carl Saba, which the Court relied on in the *Holmes* sentencing. *See* ECF No. 1665-9 at 100-185 (Exs. 46 & 47); 11/18/22 Tr. at 76 ("The Court finds that the government's expert, . . . Carl Saba, provides a reasonable protocol . . . [containing] several indicia of reliability and incorporate[ing] several assumptions that are actually favorable to the defendant and to Theranos."); *id.* at 76-77, 87-88. Scott Weingust, whom the defense previously disclosed as an expert but declined to call at trial and who prior to sentencing could say no more than Theranos' intellectual property portfolio had an unspecified value, *see* ECF No. 1458, criticizes Saba's selection of a 45% discount rate in applying the "income approach" that the Court adopted in the *Holmes* sentencing, as well as the data Saba used in applying that approach. *See* ECF No. 1665-9 at 105-111. Weingust also alleges Saba's alternative asset approach (which the Court did not rely on in the *Holmes* sentencing) is not reliable because it does not include an "opportunity cost." *Id.* at 111-115. Weingust's colleague Tobin Reiff also provides an eight-paragraph opinion questioning the use of an option pricing model ("OPM") for a private company valuation as opposed to a public company valuation. *Id.* at 180-181. These criticisms are unfounded and do not undercut the reliability of Saba's opinions or the Court's findings.

In a concurrently filed supplemental report, Saba elaborates why his use of a 45% discount rate is correct and how he appropriately considered relevant data. *See* Declaration of Robert S. Leach in Support of United States' Response to Defendant's Sentencing Memorandum, Ex. 1 ¶¶ 4-10 ("Saba Supplemental Report"). In short, because the most realistic available financial forecasts—i.e. those contemporaneously provided to Theranos' valuation firm Aranca—cannot be said to represent "expected

value" but instead are best viewed as "success scenario" forecasts, they must be adjusted downward. In determining what discount to apply, Saba looked not only to a 2015 Pepperdine Study[1] (which Weingust apparently agrees is instructive), but to "a broader set of data." *Id.* ¶ 9. That "broader set of data" includes data on venture capital rates of return that Weingust considers "old" but which the Association of International Certified Professional Accountants ("AICPA") says "despite their age . . . are still regarded as providing indications of the target range of returns by stage of development." *Id.* ¶ 9. In addition, unlike Weingust, Saba also considered the implied rates of return that actual investors in Theranos placed on the forecasts, which ranged between 36% and 82%. *Id.* For these reasons, and those set forth in the Supplemental Saba Report, Saba's use of a 45% discount rate is reasonable and well supported by reliable data, and may be relied on by the Court.

Although Weingust challenges the omission of an opportunity cost in Saba's asset approach, the Court did not adopt this approach in the *Holmes* sentencing, relying instead on Saba's income approach. In any event, as Saba explains, he did *consider* an opportunity cost, as required by the guidance, but ultimately concluded it is not appropriate to include an opportunity cost. *Id.* ¶ 11. As Saba explains in his Supplemental Report:

> The primary reason I did not apply an opportunity cost rate of return under my cost and asset approaches . . . is because I made generous assumptions that substantially all of Theranos' expenditures between 2004 and 2014 were productively spent and created valuable intellectual property of which a minimal proportion was obsolete as of December 31, 2014. I made these favorable assumptions for the reasons explained in my Opening Report, which included limitations in the information that was available for my assignment. Adding an opportunity cost rate of return to these already favorable assumptions would have led to a value under my asset approach that would have exceeded Theranos' going concern value under my income approach.
>
> A rational investor will not pay the cost to recreate intangible assets, if that cost exceeds the value of the cash flows that can be derived from monetizing those assets in the marketplace. My income approach of Theranos provides an optimistic interpretation of the value that can be derived from monetizing the company's technology through going concern operations. It is a maximum value for Theranos as of December 31, 2014. Mr. Weingust's adding of an opportunity cost rate of return to my value under the asset approach results in a value that exceeds my going concern income approach. No rational buyer would be willing to purchase Theranos' assets for an elevated cost that exceeds the

---

[1] Saba relied on the 2015 study, not the 2021 study. His report includes data from the 2015 study but a typographical error in footnote 5 to Exhibit F.4 erroneously refers to 2021. *See* Saba Supplemental Report at p.4 n.13.

value of the economic returns that those assets can generate. They would in such an instance determine that a portion of the elevated cost incurred in developing the assets was wasted and is not recoverable.

*Id.* ¶¶ 12-13.

Reiff's criticisms likewise do nothing to undercut Saba's analysis. *Id.* ¶¶ 14-18. Reiff observes that assessing inputs to value options "is far more complicated for a private company" and "very difficult to determine for a private company," and that "another valuation expert could reasonably argue" for different time periods for a liquidation event. ECF No. 1665-9 at 180. But the Guidelines require only a reasonable estimate of loss not an exact determination. *See* U.S.S.G. § 2B1.1 applic. note 3(C) ("**Estimation of loss.**—The Court need only make a reasonable estimate of the loss."); *United States v. Leonard*, 529 F.3d 83, 92 (2d Cir. 2008) ("We are mindful that illiquid securities for which there is no public market can be extremely difficult to value. Determination of the extent to which the misrepresentations here resulted in an overvaluation of the securities cannot be an exact science, and we can only call on the district court to make a reasonable estimate of the loss amount. The reasonable valuation of such illiquid assets is an exercise best committed to the sound discretion of the district court.") (internal quotations and citations omitted). And as Saba notes in his Supplemental Report, "[t]he fact is that the OPM is widely accepted and used method within the valuation community to allocate value of early stage companies to their complex capital structures, and this methodology is accepted by financial auditors who review such valuations that are prepared for financial and tax reporting purposes. This methodology is discussed at length in the 2019 AICPA practice aid on valuation of private equity and venture backed companies, as well as the 2013 AICPA practice aid on valuation of privately held company equity securities." Saba Supplemental Report ¶ 15 (footnotes omitted).

The government continues to believe that a reasonable estimate of the loss could be satisfied by looking at the total loss to the investors—$803,840,309. However, the government acknowledges that the Court at the *Holmes* sentencing found Saba's report to be reliable and relied on it in finding the loss. Balwani's two eleventh-hour expert opinions asserting that alternative calculation methods are possible

or that calculating loss is just too hard should not alter the Court's prior sound conclusion. Saba's conclusions can be relied on to calculate the loss.

***

Balwani was a leader who inflicted substantial financial harm on numerous victims over the course of many years and put patients in harm's way. He was convicted not only of defrauding investors but also defrauding patients. There is no basis for the dramatic variance Balwani seeks.

The government respectfully recommends the Court sentence Balwani to 180 months in custody and three years of supervised release, and order him to pay $803,840,309 in restitution, a $25,000 fine, and a $1200 special assessment.

DATED: December 2, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

　　*/s/ Robert S. Leach*　　
ROBERT S. LEACH
JEFF SCHENK
JOHN C. BOSTIC
KELLY I. VOLKAR
Assistant United States Attorneys