MARK S. DAVIES (Admitted Pro Hac Vice)
JEFFREY B. COOPERSMITH (SBN 252819)
AMY WALSH (Admitted Pro Hac Vice)
STEPHEN A. CAZARES (SBN 201864)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    (415) 773-5700
Facsimile:     (415) 773-5759

Email: mark.davies@orrick.com; jcoopersmith@orrick.com;
awalsh@orrick.com; scazares@orrick.com

Attorneys for Defendant
RAMESH "SUNNY" BALWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-18-00258-EJD |
| Plaintiff, | **DEFENDANT RAMESH "SUNNY" BALWANI'S MOTION FOR RELEASE PENDING APPEAL** |
| v. | |
| RAMESH "SUNNY" BALWANI, | **Date:  February 17, 2023**<br>**Time:  9:30 a.m.**<br>**CTRM.: 4, 5th Floor** |
| Defendant. | |
| | **Hon. Edward J. Davila** |

**NOTICE OF MOTION AND MOTION FOR RELEASE PENDING APPEAL**

PLEASE TAKE NOTICE that on February 17, 2023, at 9:30 a.m. or on such other date and time as the Court may order, in Courtroom 4 of the above-captioned Court, located at 280 South First Street, San Jose, CA 95113, before the Honorable Edward J. Davila, Defendant Ramesh "Sunny" Balwani will and hereby does respectfully move the Court for release pending the resolution of all appellate proceedings in this case. The Motion is based on the below Memorandum of Points and Authorities, the Declaration of Mark S. Davies and attached exhibits, the record in this case, and any other matters that the Court deems appropriate.

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................................... 1

II.  BACKGROUND ............................................................................................................ 1

III. ARGUMENT ................................................................................................................. 2

   A.   Mr. Balwani Is Not Likely To Flee Or Pose Any Danger. ................................................. 3

   B.   Mr. Balwani's Appeal Is Not For Purpose Of Delay. ....................................................... 4

   C.   Mr. Balwani's Appeal Presents Substantial Questions ..................................................... 5

     1.   The Constructive Amendment Of The Indictment Is A Substantial Question.................... 6

     2.   The Admissibility Of Specialized Testimony By Non-Experts Is A Substantial Question. ........................................................................................................................ 11

     3.   The Prosecutor's Solicitation Of And Failure To Correct Mr. Tolbert's False Testimony Raises A Substantial Question ............................................................................. 14

     4.   The Denial Of The Motion To Suppress And An Instruction On Missing Evidence Poses A Substantial Question. ............................................................................................. 16

     5.   The Admissibility Of Evidence On Dr. Rosendorff's Bias Is a Substantial Question. ... 17

     6.   The Denial Of A New Trial Or Evidentiary Hearing Based On Dr. Rosendorff's Post-Trial Conduct Poses A Substantial Question. .................................................................... 17

     7.   The Admissibility Of Evidence On Alleged Misrepresentations To The Department Of Defense Is A Substantial Question. .................................................................................. 18

     8.   The Standard Of Proof For Proving Loss At Sentencing, And Whether The Government Met That Burden, Is A Substantial Question. ................................................................... 19

   D.   The Substantial Questions Would Result In A New Trial Or A Substantially Reduced Sentence. ............................................................................................................................. 19

   E.   The Court Should Stay Surrender Pending Resolution Of This Motion And Any Appellate Motion, If Necessary. ........................................................................................................ 20

IV.  CONCLUSION ............................................................................................................. 20

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ................................................................16

5

*Blassingame v. United States*, 242 F.2d 313 (9th Cir. 1957) ........................................4

6

*D'Aquino v. United States*, 180 F.2d 271 (9th Cir. 1950) .............................................6

7

*Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013) .........................................................14, 15

8

*Giglio v. United States*, 405 U.S. 150 (1972) ..............................................................14

9

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) ......................................................14, 15

10

*Herzog v. United States*, 75 S. Ct. 349 (1955) ...........................................................5, 6

11

*Leigh v. United States*, 82 S. Ct. 994 (1962) ................................................................5

12

*Mooney v. Holohan*, 294 U.S. 103 (1935) ...................................................................14

13

*Napue v. Illinois*, 360 U.S. 264 (1959) .......................................................................14

14

*Rodriguez v. Gen. Dynamics*, 510 F. App'x 675 (9th Cir. 2013) ...............................12

15

*Russell v. United States*, 369 U.S. 749 (1962) ..............................................................9

16

*Stirone v. United States*, 361 U.S. 212 (1960) ............................................................6, 9

17

*Strickler v. Greene*, 527 U.S. 263 (1999) ....................................................................14

18

*United States v. Abad*, No. CR 12-54 4 JSW, 2014 WL 12708710 (N.D. Cal. Aug.
6, 2014) ......................................................................................................................6

19

20

*United States v. Adamson*, 291 F.3d 606 (9th Cir. 2002) ...........................................7, 9

21

*United States v. Alvarez-Lopez*, 559 F.2d 1155 (9th Cir. 1977) ..................................17

22

*United States v. Anderson*, 532 F.2d 1218 (9th Cir. 1976) .........................................7, 9

23

*United States v. Baras*,
No. CR 11-00523-YGR, 2014 WL 4728992 (N.D. Cal. Sept. 18, 2014) .................5

24

25

*United States v. Bhagat*, 436 F.3d 1140 (9th Cir. 2006) ..............................................6

26

*United States v. Brooke*, 4 F.3d 1480 (9th Cir. 1993) .................................................17

27

*United States v. Conn*, 297 F.3d 548 (7th Cir. 2002) ..................................................12

28

*United States v. Cuong Cau Dang*, No. 13-cr-486-EJD (PSG), 2013 WL 4119426 (N.D. Cal. Aug. 9, 2013)................................................................................3

*United States v. Davis*, 854 F.3d 601 (9th Cir. 2017) .......................................9

*United States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001) ...........................9

*United States v. Figueroa-Lopez*, 125 F.3d 1241 (9th Cir. 1997)..........11, 12, 13

*United States v. Fisher*, No. SACR 14-00110-JLS-2, 2015 WL 13122782 (C.D. Cal. Aug. 17, 2015)...........................................................................6

*United States v. Floresca*, 38 F.3d 706 (4th Cir. 1994) ...............................9

*United States v. Fuentes*, 946 F.2d 621 (9th Cir. 1991)...............................20

*United States v. Garcia*, 340 F.3d 1013 (9th Cir. 2003) ............................5

*United States v. Geringer*, No. 5:12-cr-00888-EJD, 2016 WL 4791815 (N.D. Cal. Sept. 14, 2016)................................................................................6

*United States v. Handy*, 761 F.2d 1279 (9th Cir. 1985)....................3, 5, 6, 19

*United States v. Hill*, 953 F.2d 452 (9th Cir. 1991) ....................................18

*United States v. Kakkar*, No. 5:13-cr-00736-EJD, 2017 WL 4163291 (N.D. Cal. Sept. 20, 2017)................................................................................20

*United States v. Lonich*, 23 F.4th 881 (9th Cir. 2022) ...............................19

*United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979)......................16

*United States v. Martin*, No. 1:13-cr-00065-BLW, 2014 WL 2155187 (D. Idaho May 22, 2014)...............................................................................6

*United States v. Mendez*, 619 F. App'x 644 (9th Cir. 2015)........................18

*United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985) .........................4

*United States v. Ohayon*, No. CR 10-00105 CRB, 2014 WL 2159256 (N.D. Cal. May 23, 2014)...............................................................................5

*United States v. Peoples*, 250 F.3d 630 (8th Cir. 2001)...............................12

*United States v. Pollock*, No. 3:14-cr-00186-BR, 2016 WL 8730144 (D. Or. Sept. 16, 2016) ...........................................................................................6

*United States v. Robertson*, 895 F.3d 1206 (9th Cir. 2018).........................16

*United States v. Shipsey*, 190 F.3d 1081 (9th Cir. 1999) ...........................9

*United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013) ..................................................16

*United States v. Vizcarra-Martinez*, 66 F.3d 1006 (9th Cir. 1995)................................18

*United States v. Von Stoll*, 726 F.2d 584 (9th Cir. 1984)................................................7

*United States v. Wells*, 879 F.3d 900 (9th Cir. 2018) ....................................................11

*United States v. William*, 504 U.S. 36 (1992) .................................................................9

*United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010)................................................12

**Statutes**

18 U.S.C. § 3143 ...................................................................................1, 2, 3, 4, 19

U.S.S.G. § 2B1.1(b) .......................................................................................................19

**Other Authorities**

Doug Keller, *Resolving a "Substantial Question,"* 60 Fla. L. Rev. (2008) ....................5

Fed. R. App. P. 9(b) ........................................................................................................20

Fed. R. Evid. 404 ............................................................................................................18

Fed. R. Evid. 701 ......................................................................................................11, 13

Fed. R. Evid. 702 ................................................................................................11, 12, 13

U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 3 (2017), https://perma.cc/375D-BVJR.......................................................4

1

## I.     INTRODUCTION

2          Mr. Balwani has now promptly appealed the judgment of conviction, Dkt. 1702, and the

3   Court should grant him release until the conclusion of the appellate process. This Court has twice

4   previously concluded that Mr. Balwani does not pose a danger to the safety of any other person or

5   the community and that, with appropriate conditions, his appearance in these proceedings can be

6   assured. *See* Dkt. 7, 8 (van Keulen, J.); Dkt. 1511 (Davila, J.). Nothing has changed in this regard;

7   indeed, Mr. Balwani's consistent appearances and compliance with the conditions of his release

8   underscore the correctness of the Court's prior findings. *See* 18 U.S.C. § 3143(b)(1)(A).

9          Moreover, Mr. Balwani's appeal will raise substantial questions that, if resolved in his

10  favor, would likely lead to a new trial or a substantially reduced sentence. *See id.*

11  § 3143(b)(1)(B). At least eight appellate issues in particular warrant release pending appeal:

12       1. The constructive amendment of the indictment concerning non-Theranos technology.

13       2. The admission of specialized testimony by lay witnesses never qualified as experts.

14       3. The solicitation of and failure to correct false testimony from Bryan Tolbert.

15       4. The denial of the motion to suppress and adverse instruction concerning LIS.

16       5. The refusal of questioning concerning the bias of Adam Rosendorff.

17       6. The denial of a hearing and new trial concerning Dr. Rosendorff's post-trial conduct.

18       7. The admission of evidence of alleged misrepresentations to the Department of Defense.

         8. The application of the wrong standard of proof in calculating loss at sentencing.

19         Because each of the governing factors is satisfied, the Court should grant this motion and

20  order Mr. Balwani's release pending resolution of all appellate proceedings in this case. If the

21  Court does not issue a ruling on this motion before Mr. Balwani's Bureau of Prisons reporting

22  date of March 15, 2023, the Court should also stay that reporting date until this Court is able to

23  rule—or, if the motion is denied, until the Court of Appeals can rule.

24  ## II.    BACKGROUND

25         Mr. Balwani and his co-defendant, Elizabeth Holmes, were originally charged by

26  indictment on June 14, 2018. Dkt. 1. Mr. Balwani was arraigned the following day. Dkts. 7, 12.

27  At the arraignment, on the government's recommendation, Judge van Keulen granted

28

1   Mr. Balwani pretrial release on an unsecured $500,000 bond with usual conditions. Dkts. 7, 8, 12.

2          On May 20, 2020, the government stipulated that Mr. Balwani had "been in full

3   compliance with the conditions of his release." Dkt. 402, at 1. On that basis, the parties stipulated,

4   Pretrial Services approved, and Judge van Keulen ordered the release of Mr. Balwani's passport

5   for international travel. *Id.* at 2-5. When those travel plans were cancelled because of COVID-19

6   pandemic travel restrictions in the foreign country, Mr. Balwani returned his passport to Pretrial

7   Services pursuant to a stipulation with the government. Dkt. 557.

8          Following trial, the jury found Mr. Balwani guilty on all counts on July 7, 2022.

9   Dkt. 1507. On July 14, the Court maintained Mr. Balwani's release pending sentencing and

10  modified the conditions to include a $750,000 secured bond. Dkt. 1511. Mr. Balwani satisfied the

11  modified bond condition on July 19. Dkt. 1513. As the government stated while discussing

12  release pending sentencing, Mr. Balwani has demonstrated a "history of compliance" "during the

13  multiple years under pretrial supervision." Tr. 7785. The Court likewise approved of

14  Mr. Balwani's "satisfactory performance on pretrial services." Tr. 7787. Mr. Balwani's perfect

15  compliance has continued "at all times" throughout his release pretrial and pending sentencing.

16  Dkt. 1647 (PSR), ¶ 6; *accord id.* Sentencing Recommendation, at 3.

17         On December 7, 2022, the Court sentenced Mr. Balwani to a 155-month term of

18  imprisonment and three years of supervised release on each count of conviction, to be served

19  concurrently. Dkt. 1682, at 1. The Court determined that the terms of Mr. Balwani's release

20  would "remain in effect until" his surrender date—March 15, 2023. *Id.* On December 20, 2022,

21  Mr. Balwani filed his notice of appeal to the Ninth Circuit. Dkt. 1702.

22  **III.    ARGUMENT**

23         Section 3143 is mandatory: the Court "shall order the release" of a defendant pending

24  appeal so long as four factors are satisfied. 18 U.S.C. § 3143(b)(1). Here, they are satisfied:

25         1.   The defendant is not likely to flee or pose a danger to the safety of any other

26              person or the community if released.

27         2.   The appeal is not for purpose of delay.

28         3.   The appeal raises a substantial question of law or fact.

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

4.   If the determination of the substantial question is favorable to the defendant, it

is likely to result in reversal, a new trial, a non-custodial sentence, or a

reduced sentence shorter than the expected duration of the appellate process.

*See* 18 U.S.C. § 3143(b)(1)(A)-(B); *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985).

**A.     Mr. Balwani Is Not Likely To Flee Or Pose Any Danger.**

There is no risk that Mr. Balwani will flee while pursuing his appeal, much less a

*likelihood* of it as required to deny release on that basis. 18 U.S.C. § 3143(b)(1)(A). The

Probation Officer reached the same conclusion. PSR Sentencing Recommendation, at 3 ("The

defendant has kept all court appearances, complied with conditions of pretrial release, and is not

viewed as a flight risk….").

Mr. Balwani is a U.S. citizen and does not hold citizenship in any other nation. PSR, at 3.

His passport is currently in the custody of Pretrial Services. Tr. 7786; Dkt. 558. He has complied

strictly with the travel conditions of his current release, including making the appropriate motions

in this Court when seeking adjustments to those conditions. *See, e.g.*, Dkts. 398, 401, 1693.

Mr. Balwani has substantial ties to the United States, including two brothers, nieces, and nephews

who reside in California, Maryland, and Ohio and who have consistently provided him with

support during these proceedings and will continue to do so. *See* PSR, ¶¶ 88, 100; Dkt. 1622-2, at

1; 12/7/22 Sentencing Tr. 141-42, 151. And as described in a letter of support submitted at

sentencing, Mr. Balwani is a cherished member of local religious communities, volunteering

"every weekend" with an "unshakable commitment" to the families in these communities.

Dkt. 1667-1, at 151; *see also* PSR, ¶ 98; 12/7/22 Sentencing Tr. 142. There is, accordingly, no

risk he will flee if granted release pending appeal.[1] Any possible concern about Mr. Balwani's

foreign birth and familial ties is far outweighed by his perfect compliance with the Court's release

---

[1] *E.g.*, *United States v. Cuong Cau Dang*, No. 13-cr-486-EJD (PSG), 2013 WL 4119426, at *3
(N.D. Cal. Aug. 9, 2013) ("[I]f Dang did not run and cannot be shown to have harmed anyone,
especially Cisco, even months after he learned he was the target of an investigation, how can the
court say now that there is an undue risk that Dang suddenly would change course despite the
explicit court order to refrain from doing so?").

orders to date and his long-established roots in the United States, including his stateside family.[2]

There is similarly no likelihood that Mr. Balwani will pose a danger to the safety of any person or the community. 18 U.S.C. § 3143(b)(1)(A). The Probation Officer reached the same conclusion. PSR, Sentencing Recommendation, at 3 ("The defendant … is not viewed as a … danger to the community."); *see also* 12/7/22 Sentencing Tr. 150 ("[T]his was a nonviolent offense, and … Mr. Balwani presents no history of violence."); Dkt. 1682, at 1. Mr. Balwani has never been accused of or arrested for any other crime, much less a dangerous one. 12/7/22 Sentencing Tr. 150; Dkt. 1682, at 1; PSR, ¶¶ 81-86. Defendants of Mr. Balwani's age have dramatically decreased recidivism rates, as do defendants convicted of fraud. U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 3 (2017), https://perma.cc/375D-BVJR. Indeed, in granting release pending trial and sentencing, the Court and government have now twice agreed that Mr. Balwani poses no danger. The imposition of a sentence does not change the outcome of that analysis, as the Court recognized in maintaining release pending surrender. Dkt. 1682, at 1.

## B.    Mr. Balwani's Appeal Is Not For Purpose Of Delay.

Mr. Balwani intends to pursue a variety of errors on appeal, including but not necessarily limited to the substantial legal questions described below. Counsel for Mr. Balwani has attested to the good faith of the appeal, Davies Decl. ¶ 2, which can be enough to "satisf[y]" the Court's delay inquiry, *Blassingame v. United States*, 242 F.2d 313, 314 (9th Cir. 1957) (per curiam).

Mr. Balwani is pursuing his appeal in good faith and not for delay. Indeed, at Mr. Balwani's election, his notice of appeal was submitted before judgment has even been entered, in advance of the deadline, which commences briefing in the Court of Appeals weeks earlier than required—the opposite of a delay tactic. *See* Dkt. 1705-1 (Time Schedule Order). The vast majority of the delays in this case to date have been the direct result of delays in and the length of Ms. Holmes' trial, as well as the COVID-19 pandemic, not decisions by Mr. Balwani.

---

[2] *Id.* at *4 ("Since his arrival in this country decades ago, Dang has spent his entire life with his immediate family in the San Jose Division of this district. … [B]ecause his life is tethered to the United States, and not Vietnam, this factor still weighs against detention."); *see also United States v. Motamedi*, 767 F.2d 1403, 1408-09 (9th Cir. 1985) (reversing denial of pretrial release despite foreign connections in light of ties to the United States).

1  *See, e.g.*, Dkt. 514, at 6-8; Dkt. 1198; *Leigh v. United States*, 82 S. Ct. 994, 997 (1962) (Warren,

2  C.J., in chambers) (considering whether "such delays as have occurred can … be attributed to

3  applicant"). In fact, if the trials had proceeded as Mr. Balwani requested, he would have been

4  tried before Ms. Holmes, months earlier than transpired. *See* Dkt. 189. There is, accordingly, no

5  evidence that Mr. Balwani is engaging in delay tactics rather than pursuing a good-faith appeal.[3]

6  <strong>C.    Mr. Balwani's Appeal Presents Substantial Questions.</strong>

7        Mr. Balwani's conviction is a result of numerous legal and factual errors warranting

8  acquittal or a new trial. This motion discusses eight of the substantial questions presented by this

9  matter that Mr. Balwani may raise on appeal. This Court should grant release pending appeal in

10  light of those substantial questions. In the Ninth Circuit, "a 'substantial question' is one that is

11  'fairly debatable.'" *Handy*, 761 F.2d at 1281. To satisfy this prong, a defendant need show "only

12  a non-frivolous issue." *United States v. Garcia*, 340 F.3d 1013, 1020 n.5 (9th Cir. 2003).

13        The Court's task is to "decide whether there is a school of thought, a philosophical view, a

14  technical argument, an analogy, an appeal to precedent or to reason commanding respect that

15  *might possibly* prevail." *Herzog v. United States*, 75 S. Ct. 349, 351 (1955) (Douglas, J., in

16  chambers) (emphasis added), *quoted in Handy*, 761 F.2d at 1281.[4] The Ninth Circuit has set this

17  bar intentionally lower than the "close question" standard adopted by other circuits. *See Handy*,

18  761 F.2d at 1281-82, 1282 n.2; Doug Keller, *Resolving a "Substantial Question,"* 60 Fla. L. Rev.

19  825, 827-28 (2008) (describing this difference). Under this Circuit's precedent, then, a substantial

20  question need not be a close one—just fairly debatable.

21        A district court need not agree that there was error: "The question may be 'substantial'

22  even though the judge or justice hearing the application for bail would affirm on the merits of the

---

23  [3] *See, e.g.*, *United States v. Baras*, No. CR 11-00523-YGR, 2014 WL 4728992, at *4 n.3 (N.D.
24  Cal. Sept. 18, 2014) ("[B]ecause there is nothing in the record suggesting that Defendant filed an appeal for purposes of delay, there is no basis to deny Defendant's motion on this ground.");
25  *United States v. Ohayon*, No. CR 10-00105 CRB, 2014 WL 2159256, at *2 n.1 (N.D. Cal. May 23, 2014) ("Although Defendant no doubt wishes to postpone his incarceration, the Court cannot
26  say that it is this desire, rather than a sincere (although, in the Court's view, misguided) view of the merits of his appeal, that motivated his filing.").

27  [4] Although the bail rules and statutes have changed over the years, the Ninth Circuit in *Handy* adopted the longstanding interpretation of "substantial question" described by Justice Douglas.
28  761 F.2d at 1282 (adopting the "historic meaning" even though historical cases "involve[d] earlier rules or statutes or arose in different contexts").

appeal." *D'Aquino v. United States*, 180 F.2d 271, 272 (Douglas, Circuit Justice, 9th Cir. 1950), *quoted in Handy*, 761 F.2d at 1281; *accord Herzog*, 75 S. Ct. at 351 (finding a substantial question even though the Justice "reach[ed] the conclusion that on the merits there is no appellate judge who would likely reverse the judgment"). Even in cases where district judges are confident in their rulings, appellate courts may disagree where questions are fairly debatable.[5] Nor must a district court agree that a defendant is innocent in order to grant release: "The question of the guilt or innocence of an appellant is not an issue on application for bail." *D'Aquino*, 180 F.2d at 272. So long as the defendant raises at least one fairly debatable question, this prong is satisfied.[6]

### 1.     The Constructive Amendment Of The Indictment Is A Substantial Question.

Mr. Balwani moved in limine to exclude evidence concerning the accuracy and reliability of traditional, commercial blood-testing technology used by Theranos. Dkt. 1156, at 1-11. The Court denied the motion. Dkt. 1326, at 7-8. The Court's ruling, and the subsequent admission of that evidence, constructively amended the indictment and allowed Mr. Balwani to be convicted on allegations never approved by the grand jury. *See Stirone v. United States*, 361 U.S. 212, 213-17 (1960). Questions of constructive amendment are reviewed de novo. *United States v. Bhagat*, 436 F.3d 1140, 1145 (9th Cir. 2006).

There are two distinct categories of factual issues that could have been put to the grand jury. First, when Theranos conducted testing using proprietary Theranos technology, did it produce accurate and reliable results when compared to commercially available devices, and did

---

[5] *See, e.g., United States v. Geringer*, No. 5:12-cr-00888-EJD, 2016 WL 4791815 (N.D. Cal. Sept. 14, 2016) (finding no substantial question as to loss calculation), *sentence vacated and remanded*, 672 F. App'x 651 (9th Cir. 2016) (vacating based on erroneous loss calculation); *United States v. Abad*, No. CR 12-54 4 JSW, 2014 WL 12708710, at *2 (N.D. Cal. Aug. 6, 2014) (granting release pending appeal in healthcare fraud case even though the district court had "considered and rejected" all of the arguments raised in the motion for release).

[6] *See United States v. Martin*, No. 1:13-cr-00065-BLW, 2014 WL 2155187, at *2 (D. Idaho May 22, 2014) (finding that "the vast majority of the issues [raised in the motion] do not present a substantial question, … [b]ut one or two do, and this is all [the defendant] needs to be eligible for release pending appeal"); *see also United States v. Pollock*, No. 3:14-cr-00186-BR, 2016 WL 8730144, at *2 (D. Or. Sept. 16, 2016) (granting release pending appeal where the defendant raised a substantial question about the loss amount and whether it could be reliably calculated for sentencing purposes); *United States v. Fisher*, No. SACR 14-00110-JLS-2, 2015 WL 13122782, at *2 (C.D. Cal. Aug. 17, 2015) (granting release pending appeal in fraud case where the defendant raised a substantial question about the district court's admission of a non-testifying co-defendant's statements through a testifying witness).

1    defendants make misrepresentations on this topic? Or second, when Theranos conducted testing

2    on the same unmodified commercial devices used by other labs, did it produce less accurate and

3    reliable results than traditional labs, and did defendants make misrepresentations on this topic?

4           The Third Superseding Indictment ("TSI," Dkt. 469) invokes only the first of those

5    categories. But, over Mr. Balwani's protest, the government introduced evidence about and

6    argued for conviction based on the second category, too. In other words, the government's case

7    and the Court's rulings constructively amended the TSI by "alter[ing], either literally or in effect"

8    its "charging terms … after the grand jury has last passed upon them." *United States v. Adamson*,

9    291 F.3d 606, 614 (9th Cir. 2002) (quoting *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir.

10   1984)). It is at least fairly debatable whether the Court's expansion of the case to reach that

11   distinct second category literally or effectively altered the TSI's terms.

12          One hallmark of a constructive amendment is a trial that includes a "complex of facts"

13   that is "distinctly different from those set forth in the charging instrument." *Id.* at 615. Here, the

14   indictment alleged one complex of facts (Theranos technology), but at trial the government

15   presented another (unmodified commercial devices). And this distinct difference cut across

16   multiple aspects of the case—from the testimony of CMS Inspector Sarah Bennett, who was

17   allowed to testify about regulatory deficiencies related to Theranos' use of ordinary commercial

18   devices, to the CMS report that set forth alleged regulatory violations (including an immediate

19   jeopardy finding) corresponding mainly to non-Theranos devices, and to the testimony of two

20   patients (each counts in the TSI), who were allowed to describe allegedly erroneous or

21   unexpected test results they received without any connection to Theranos' proprietary technology.

22          When assessing a constructive amendment claim, courts start with the indictment's text,

23   reading it "according to common sense with an appreciation of existing realities." *United States v.*

24   *Anderson*, 532 F.2d 1218, 1222 (9th Cir. 1976). With respect to both the patient counts and the

25   investor counts, the TSI alleges schemes to defraud concerning the systemic reliability of

26   Theranos' proprietary fingerstick testing technology. It repeatedly refers to whether the

27   defendants "knew … that *Theranos's technology* was, in fact, not capable of consistently

28

1    producing accurate and reliable results." Dkt. 469 ("TSI"), ¶ 16 (emphasis added).[7] It nowhere

2    alleges fraud concerning inaccurate results from commercially available tests.

3           Until the Court's written order on Mr. Balwani's motions in limine, years after the grand

4    jury returned the operative indictment, the parties and the Court appeared to agree on this

5    common-sense reading of the allegations. The government put it simply and correctly in one of its

6    motions in limine: Tests not "run on [a] Theranos proprietary blood analyzer [but rather] a regular

7    FDA-approved machine" are irrelevant and "should be precluded under Rules 401 and 403."

8    Dkt. 1155, at 20. Indeed, at the hearing, the Court agreed: "I understand that he's not … charged

9    with doing anything with commercial machines. He's certainly not charged with that.… I would

10   probably grant [a directed verdict] if they didn't put anything in about the company's machines

11   *like they said in the indictment*." Feb. 4, 2022 Hr'g Tr. 32 (emphasis added).

12          In its written order that followed, however, the Court took the polar opposite view,

13   concluding that the TSI "puts Balwani on notice that the scheme to defraud patients includes

14   Theranos' use of unmodified conventional analyzers." Dkt. 1326, at 8. The Court acknowledged

15   that "the TSI does at times focus exclusively on 'Theranos technology.'" *Id.* But it stretched

16   supposed ambiguities in the indictment to reach the accuracy of unmodified commercial devices.

17   It parsed phrases in a highly technical manner, reasoning that "Theranos test results" referred to

18   results from Theranos *as a company*, even though the parties and the Court for years had

19   understood that phrase to refer to results generated by Theranos *technology*. *Id.* (citing TSI ¶ 18).

20   That reading defies the indictment's plain meaning, which uses "Theranos" as a modifier to

21   indicate Theranos' proprietary technology.

22          An indictment can be read only to reach facts "necessarily implied by the allegations," and

23   nothing in this indictment *necessarily* implies the broader interpretation ultimately adopted by the

24

25

26

27

28

---

[7] *See also id.* ¶ 5 ("Theranos pursued the development of proprietary technology.…"); *id.* ¶ 6 ("Theranos claimed that its proprietary technology and methods would minimize the risk of human error and generate results with the highest accuracy."); *id.* ¶ 8 ("[M]ade statements to the media advertising the capabilities of Theranos's technology."); *id.* ¶ 12(E) ("[R]epresented to investors … that Theranos's technology had deployed to the battlefield.…"); *id.* ¶ 12(H) ("[R]epresented to investors that Theranos's technology had been examined, used, and validated.…"); *id.* ¶ 17(C) ("[K]new that the tests performed on Theranos technology contained or were likely to contain: (1) inaccurate and unreliable results.…"); *id.* ¶ 22 ("[T]he false and fraudulent pretense that Theranos technology produced reliable and accurate blood test results.").

1   Court in its motion in limine ruling. *Id.* at 7 (quoting *Anderson*, 532 F.2d at 1222).[8]

2          The erroneous expansion of the indictment requires reversal. The Fifth Amendment grants

3   defendants "a substantial right to be tried only on the charges set forth in an indictment by a grand

4   jury," *United States v. Shipsey*, 190 F.3d 1081, 1085 (9th Cir. 1999) (vacating conviction), and

5   even more important, the grand jury "serv[es] as a kind of buffer or referee between the

6   government and the people," *United States v. William*, 504 U.S. 36 (1992). For these reasons, a

7   constructive amendment "always requires reversal." *Adamson*, 291 F.3d at 615; *see also United*

8   *States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001) (acknowledging that a constructive amendment

9   may "always require[] reversal," but not reaching the issue because "the defendants were

10  prejudiced" regardless). Since *Stirone*, the Supreme Court, the Ninth Circuit, and other circuits

11  have often reversed convictions where the jury may have convicted based on a charge that the

12  grand jury did not make.[9]

13         Moreover, the erroneous expansion of the indictment caused significant prejudice by

14  allowing the government to introduce substantial—and highly incendiary—evidence that was

15  relevant only to an uncharged allegation (i.e., that Theranos was unable to produce accurate and

16  reliable results using commercially available technology and that Mr. Balwani knew it). For

17  example, CMS surveyor Sarah Bennett was allowed to testify about CMS's findings of regulatory

18  deficiencies, the overwhelming majority of which concerned tests run on commercial devices,

---

[8] References in the indictment to HIV testing do not show that the grand jury indicted on a theory of fraud grounded in the accuracy of standard commercial testing. The record shows that the government was mistaken about which tests were run on which devices and thought at the time that Theranos had conducted HIV testing on Theranos devices. *See* Dkt. 265, at 3 (contending that "Theranos's analyzer" "was not capable of consistently producing accurate and reliable results for … HIV"); Dkt. 267, at 2 (similar).

[9] *See e.g. Russell v. United States*, 369 U.S. 749, 770 (1962) ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure."); *United States v. Shipsey*, 190 F.3d 1081, 1086 (9th Cir. 1999) (charge of theft by false pretenses, jury could have convicted on wrongful taking; conviction reversed); *United States v. Dipentino*, 242 F.3d 1090 (9th Cir. 2001) (charge of leaving asbestos-containing debris on floor to dry, jury could have convicted for knowingly failing to comply with workplace standard; conviction reversed); *United States v. Davis*, 854 F.3d 601, 605 (9th Cir. 2017) (sex trafficking charge included knowing disregard of age of victim, sex trafficking based on reasonable opportunity to observe victim; conviction reversed); *United States v. Floresca*, 38 F.3d 706 (4th Cir. 1994) (en banc) (reversing conviction for witness tampering where could have been convicted for tampering with investigation).

1   including the PT/INR test that gave rise to an inflammatory finding that Theranos' practices

2   posed "immediate jeopardy" to patient health. *See* Tr. 4621, 4660-64, 4965-66, 5030-31. The

3   Court also erroneously admitted portions of CMS's official report that documented regulatory

4   violations relating to only commercial technology. And the Court's ruling ushered in evidence

5   about patient Erin Tompkin's HIV tests, which were run exclusively on unmodified commercial

6   devices, and patient Brent Bingham's platelet-count tests, which the government did not show

7   were performed on Theranos technology. *See* Tr. 5953-56, 5977-91. Nor is there evidence that the

8   government ever informed the grand jury that Ms. Tompkins was tested on FDA-cleared

9   technology and that it could not show that Mr. Bingham was tested on Theranos' proprietary

10  technology. *See* Davies Decl. Ex. 1 (7/14/2020 C. McCollow Grand Jury Testimony), at 135-39.

11      These errors infected all the counts of conviction, each of which concerned, at its core, the

12  accuracy and reliability of Theranos' blood tests. In its closing argument, the government framed

13  both the investor counts and patient counts in terms of Theranos' ability to run accurate blood

14  tests.[10] But the government did not clarify that, in accord with the indictment, Theranos' ability to

15  test accurately had to be based solely on evidence related to Theranos' proprietary technology.

16      The government thus invited the jury to conclude that because of problems related to

17  ordinary commercial technology, Theranos could not test accurately, as the defendants had

18  represented to both investors and patients. *See, e.g.*, Tr. 7670 (inviting the jury to "think about the

19  CMS findings based on a holistic look at the Theranos lab"); Tr. 7681-84 (inviting the jury to

20  "ask how would Mr. Balwani's actions and choices have been different … if he was not a

21  participant in these two schemes…?" and answering in part: "When the CMS inspection found

22  serious problems in the Theranos lab, Mr. Balwani would have focused on solutions rather than

23  trying to persuade Sarah Bennett not to call it what she saw it."). It was error to allow the petit

24  jury to convict on a theory that appears nowhere in the indictment.

25

26  [10] *See, e.g.*, Tr. 7061 (arguing to the jury that "investors thought they were investing in a company
    that could test accurately" and "patients thought they were getting their blood tested in a company

27  that could test accurately"); Tr. 7037 ("Just like an article in the media would talk about
    Theranos's accuracy, and that would be useful for an investor to hear, a patient would read in the

28  media that Theranos's testing was accurate and also make a decision to use Theranos as a lab or
    blood testing service…."); Tr. 7038 (similar).

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

To be clear, this Court need not conclude that there was error in order to grant this motion. Release pending appeal is warranted if reasonable judges, faced with an indictment that at least "at times focus[es] exclusively" on Theranos technology, could conclude on de novo review that the grand jury's charges indeed had that exclusive focus. Dkt. 1326, at 8. Because that question is at least fairly debatable, Mr. Balwani's appeal raises a substantial question.

### 2. The Admissibility Of Specialized Testimony By Non-Experts Is A Substantial Question.

Throughout trial, over Mr. Balwani's objections, the Court allowed lay witnesses to present scientific, technical, and specialized testimony without first qualifying them as experts. Those admissibility rulings directly contravened Federal Rule of Evidence 701(c), which constrains lay witnesses from offering testimony that is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Consistent with that constraint, Rule 702 permits witnesses to convey "scientific, technical, or other specialized knowledge" only if that witness "is qualified as an expert" and if the testimony otherwise conforms to that rule's four requirements of usefulness, factual basis, reliable methods, and reliable application.

Recognizing that courts had allowed the lay-expert line to blur, the advisory committee reinforced Rule 701 by adding the just-quoted subsection (c) in order "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee note to 2000 amendment (citing *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997)).

The Court of Appeals will review de novo this Court's interpretation of these rules and its determination whether the testimony in question falls within their scope. *United States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018). Mr. Balwani respectfully submits that it is fairly debatable whether the Court erred in applying Rules 701 and 702 to the testimony of three key government witnesses: Erika Cheung, Mark Pandori, and Adam Rosendorff. Each of these critical witnesses repeatedly crossed the line between lay and specialized testimony:

- Ms. Cheung testified about why dilution is necessary in blood testing, Tr. 1132-33; the capacities of Theranos devices, Tr. 1135-38; the purpose of and concerns arising from Theranos' quality-control testing, Tr. 1202-03, 1245-48; comparisons between

Theranos' data-analysis procedures and an industry-standards manual she had never seen before, Tr. 1552-54; and the purpose of government regulations governing blood testing, Tr. 1557-58.

- ▪ Dr. Pandori testified about whether Theranos' technology was groundbreaking in light of the state of the art and industry knowledge, Tr. 1608, 1733; concerns arising from quality-control and proficiency testing, Tr. 1634, 2274-75; and a critical issue, i.e., whether "Theranos testing was more accurate" than competitors', Tr. 1734.

- ▪ Dr. Rosendorff testified about the effects of laboratory bias, dilution, and hemolysis on the accuracy and reliability of Theranos' technology, Tr. 3265-66, 3729-31; concerns arising from Theranos' use of testing reference ranges specific to its fingerstick technology, Tr. 3266-67; and whether purported errors in individual patients' results could indicate systemic accuracy problems, Tr. 3268-69.

The Court allowed this specialized testimony, notwithstanding Rule 702's unsatisfied safeguards, because the witnesses testified "based on [their] training and experience" at Theranos. Tr. 1137. But that is precisely what Ninth Circuit precedent forbids. Questions framed "based upon your training and experience" are a hallmark of Rule 702 expert testimony. *Figueroa-Lopez*, 125 F.3d at 1246; *see also United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002). The testimony described above was "beyond the understanding of an average juror" and, therefore, specialized. *United States v. Wilson*, 605 F.3d 985, 1026 (D.C. Cir. 2010) (per curiam). In allowing lay testimony based on specialized knowledge obtained through training and experience, the Court committed the very error described in *Figueroa-Lopez*.

It does not matter that the testimony was based on a witness's own perception: "The mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702." *Figueroa-Lopez*, 125 F.3d at 1246. Nor does it matter that a witness gained her specialized knowledge on the job—it is still specialized. Indeed, where knowledge is developed by learning on the job, it is by nature expert testimony. *See Rodriguez v. Gen. Dynamics Armament & Tech. Prods.*, 510 F. App'x 675, 676 (9th Cir. 2013).

This was, in short, testimony "that an untrained layman could not make if perceiving the same acts or events." *United States v. Peoples*, 250 F.3d 630, 341 (8th Cir. 2001) (citing *Figureoa-Lopez*); *accord Conn*, 297 F.3d at 554. For example, an untrained layman would not be familiar with the term "hemolysis," much less be able to explain that there is "a large amount of

1    hemoglobin in red blood cells" that can "interfere[] with the ability of the [blood-testing] readers

2    to read what is in the sample" and therefore "have an[] effect on the accuracy and reliability of

3    certain [Theranos] tests." Tr. 3731 (Rosendorff). At the very least, reasonable judges could fairly

4    debate whether untrained laymen have such a sophisticated understanding of hemolysis.

5         If the Court of Appeals sees error, it will likewise find prejudice. The government offered

6    no expert testimony on blood-testing technology in this case. Instead, it relied exclusively on this

7    specialized testimony from witnesses never qualified to give it. Worse still, these witnesses

8    repeatedly testified—in a specialized manner—about an ultimate issue: the accuracy and

9    reliability of Theranos technology. *See* Tr. 1203-03, 1245-48 (Cheung); Tr. 1634, 1734, 2274-75

10   (Pandori); Tr. 3265-69, 3729-31 (Rosendorff). Indeed, it was precisely these three witnesses who

11   undergirded the denial of Mr. Balwani's motion for judgment of acquittal. *See* Dkt. 1635, at 5-7.

12   And it was precisely these three witnesses the government named when arguing to the jury about

13   "the accuracy and reliability of [Theranos] blood testing." Tr. 6939; *accord* Tr. 7054-55, 7084-86;

14   Tr. 7576 ("The simplest evidence on [accuracy and reliability] was testimony from at least three

15   individuals who worked within Theranos working in the lab. That was, of course, Erika Cheung

16   and then Drs. Mark Pandori and Adam Rosendorff.").

17        As with the constructive-amendment question, the Rule 701 violations here undermine all

18   counts, both patient and investor. As explained above (at 7-8 & n.7), allegations of

19   misrepresentations about the accuracy and reliability of Theranos' technology were at the core of

20   each count. And as just noted, these three witnesses testified about exactly that. Without that

21   extensive specialized testimony, a jury could easily have concluded that the government failed in

22   its burden to prove the accuracy and reliability allegations underlying the investor counts, TSI

23   ¶ 12(A), and the patient counts, TSI ¶ 17(C).

24        In sum, at the very least, Mr. Balwani's appeal will present a fairly debatable question

25   about the Court's application of Rules 701 and 702 in light of *Figueroa-Lopez*. Some judges

26   might agree with this Court's ruling, but on de novo review, some reasonable judges surely would

27   take the other view. *Figueroa-Lopez*, 125 F.3d at 1246. Accordingly, this evidentiary issue

28   presents a substantial question warranting release pending appeal.

3.      **The Prosecutor's Solicitation Of And Failure To Correct Mr. Tolbert's False Testimony Raises A Substantial Question.**

The Supreme Court has "long emphasized 'the special role played by the American prosecutor in the search for truth in criminal trials.'" *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). "Deliberate deception" of a jury is "inconsistent with the rudimentary demands of justice." *Hayes*, 399 F.3d at 983 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). A conviction "obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The "same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* And where "credibility" of a witness is "an important issue in the case," deception by the prosecutor that protects the witness's credibility violates "the due process requirements enunciated in *Napue* and other cases." *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Prosecutorial misconduct of this kind requires reversal of a conviction if the government knowingly relies on false testimony and that testimony was material, i.e., "there is a reasonable likelihood that the false testimony could have affected the judgment." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013).

Due to the government's deceptive handling of Mr. Tolbert's testimony, Mr. Balwani did not receive even rudimentary justice. At Ms. Holmes' trial, the prosecution played several clips of a tape recording made by Mr. Tolbert of an investor call led by Ms. Holmes in December 2013. Holmes Trial Tr. 4471. As a result, while Mr. Tolbert testified as to his "understanding" of what Ms. Holmes told investors on that call on issues ranging from Theranos devices on medevacs to pharmaceutical partnerships, *e.g.*, *id.* at 4513, 4514, the jury heard exactly what Ms. Holmes said during the call. Although the government expected the tape recording to make Mr. Tolbert's testimony more powerful for the jury, the tape undermined it. He was forced to admit the tape showed Ms. Holmes never made certain statements that allegedly informed his view of the company; she did not claim "there were thousands of tests that could be run" on Theranos devices, *id.* at 4540, or that its pharmaceutical business "was still, in December of 2013, a significant focus," *id.* at 4495; *compare id.* at 4533-37. And when the government made her

alleged statements about Theranos devices on military medevacs a centerpiece of its closing argument, *e.g.*, *id.* at 8910, 8922, 8968, defense counsel was able to direct the jury to "compare [the tape] to what was actually going on with Theranos's military programs," *id.* at 9157—a comparison that showed Ms. Holmes did not in fact tell investors that Theranos devices were being used on medevacs as "many of the witnesses" had suggested, *id.* at 9162; *see also id.* at 4504. After listening to the relevant portion of the tape three different times (on Tolbert's direct and cross examinations, and again at the jury's request during deliberations), the jury did not convict Ms. Holmes on the counts most directly tied to the December 2013 call.

More focused on conviction than truth, in Mr. Balwani's trial the government decided not to introduce the tape of the December 2013 investor call. Tr. 4435-39. Instead, the government successfully opposed the defense's efforts to introduce it, yet the government still elicited inaccurate testimony from Mr. Tolbert, including that Holmes claimed "that Theranos devices were employed on the medevac helicopters and being used to kind of improve survival rates of military personnel who had been injured in combat." Tr. 4435. While this was not apparent to the jury, the government knew all too well from its experience at the Holmes trial that Mr. Tolbert's testimony did not match the truth reflected on the tape. But this time, there was no tape for the jury to use to evaluate Tolbert's incorrect testimony, nor did the government do anything to address what it knew to be inaccuracies. The government "knowingly elicited and then failed to correct false testimony" that was central to making its case. *Dow*, 729 F.3d at 1048.

Over two decades ago, the Ninth Circuit, sitting en banc, directed prosecutors to stop engaging in "schemes to place false or distorted evidence before a jury." *Hayes*, 399 F.3d at 988. "Our criminal justice system depends on the integrity of the attorneys who present their cases to the jury." *Id.* Despite *Hayes*, here is yet another case where a prosecutor obtained a conviction through "deceptive means," thereby "weaken[ing]" "the entire foundation of our system of justice." *Id.* A court's remedial powers in the face of such misconduct is broad, *see United States v. Kojayan*, 8 F.3d 1315, 1323-24 (9th Cir. 1993), and here, a sanction of reversal on all counts would likely be appropriate. As in *Hayes*, there is a substantial question whether acquittal is warranted in light of this error, and the Court should grant release pending the Ninth Circuit's

1   resolution of that substantial question.

2   **4.    The Denial Of The Motion To Suppress And An Instruction On Missing Evidence Poses A Substantial Question.**

3   The government's failure to preserve the LIS violated *United States v. Loud Hawk*, 628

4   F.2d 1139 (9th Cir. 1979) (en banc), and *Arizona v. Youngblood*, 488 U.S. 51 (1988). Indeed,

5   evidence the government itself offered in Mr. Balwani's trial showed that, in response to an IT

6   specialist identifying potential ways to preserve that critical evidence, the same prosecutors who

7   tried this case elected to ignore two approaches that unrebutted defense expert testimony at trial

8   showed would have worked to obtain the LIS data. Tr. 6788-89, 6819-21; TX 5943; TX 20832.

9   According to the unrebutted expert testimony of Richard Sonnier, the same approaches the

10  government chose not to pursue would have led to access to the LIS data. *E.g.*, Tr. 6821. The

11  Court thus erred in denying Mr. Balwani's motion to suppress[11] evidence supporting alleged

12  deficiencies with Theranos' clinical testing—which Mr. Balwani could not adequately rebut

13  without the LIS data. *See* Dkt. 1326 at 30-37.[12]

14  At a minimum, the Court erred in denying Mr. Balwani's requested instruction on missing

15  evidence. *See* Tr. 6887. The Ninth Circuit has squarely held that bad faith is not required for a

16  remedial instruction based on missing evidence. *See, e.g.*, *United States v. Sivilla*, 714 F.3d 1168,

17  1170 (9th Cir. 2013). Nor is it dispositive under the Ninth Circuit's multi-factor test whether "the

18  evidence was lost or destroyed while in the government's custody." *United States v. Robertson*,

19  895 F.3d 1206, 1213 (9th Cir. 2018). Had either of these motions been resolved in Mr. Balwani's

20  favor, the jury would likely have acquitted on all counts. With almost all the government's

21  evidence of deficiencies with Theranos' clinical testing suppressed, the government would have

22  been unable to prove the core allegation underlying both the investor counts and patient counts—

23  that Theranos' technology did not work.[13] The same would have been true had the jury been

24  _____

25  [11] The Court also erred in denying Mr. Balwani's request for an evidentiary hearing.

26  [12] In briefing before and during trial, the government repeatedly insinuated that Mr. Balwani was somehow involved in, and responsible for, the decision to disassemble the LIS system. *See, e.g.*, Dkts. 682 at 3-9, 1181 at 29, 1440 at 12-13. But when given the chance to substantiate its claims at trial, the government elected not to do so.

27  [13] The unavailability of the LIS data also eliminated any chance to independently corroborate key evidence of Mr. Balwani's intent: that his own family members relied on Theranos' technology

28

instructed, as Mr. Balwani asked, that a finding of government negligence or recklessness in preserving LIS could justify an inference that the data would be unfavorable to the government.

### 5.      The Admissibility Of Evidence On Dr. Rosendorff's Bias Is a Substantial Question.

The right to cross-examine a government witness about potential bias is at the core of the Confrontation Clause's guarantee. *See United States v. Alvarez-Lopez*, 559 F.2d 1155, 1160 (9th Cir. 1977). There is a substantial question whether the Court denied that right when it prohibited the defense from questioning Dr. Rosendorff about his bias to paint himself in a positive light and disassociate himself from Theranos due to regulatory issues at each of his three post-Theranos employers. *See* Tr. 3216; Dkts. 1401, 1407. The Ninth Circuit has found it impossible to "overemphasize the importance of allowing full and fair cross-examination of government witnesses" when their bias is at issue, and "[f]ull disclosure of all relevant information concerning their past record and activities through cross-examination … is indisputably in the interests of justice." *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir. 1993). Yet the Court barred Mr. Balwani from any inquiry—an even sharper limitation than it imposed on Ms. Holmes.

Resolving this substantial question in Mr. Balwani's favor would likely lead to a new trial on all counts. The government referred to him by name more than 100 times during closing arguments—more than any other witness. *See* Tr. 6938-7086, 7576-7685. Dr. Rosendorff's testimony was crucial to determining the accuracy of Theranos' technology, Mr. Balwani's knowledge of alleged deficiencies in that technology, and his attitude toward regulatory compliance—issues that were core to all counts. It is fairly debatable whether the Court erred when it denied Mr. Balwani the opportunity to confront fully a key government witness.

### 6.      The Denial Of A New Trial Or Evidentiary Hearing Based On Dr. Rosendorff's Post-Trial Conduct Poses A Substantial Question.

Dr. Rosendorff's centrality to Mr. Balwani's trial also underscores the significance of the Court's denying Mr. Balwani's motion for a new trial—or even the same chance that Ms. Holmes had to participate in an evidentiary hearing about Dr. Rosendorff's unprecedented post-trial

---

and testing services for diagnostic purposes. While one of Mr. Balwani's family members has stated, for instance, that she saw Mr. Balwani's mother receive a fingerstick test, Dkt. 1668-3, at 54, any corroboration of that would have been housed in the LIS data.

DEFENDANT BALWANI'S MOTION
FOR RELEASE PENDING APPEAL
CASE NO. CR-18-00258-EJD

conduct in visiting Ms. Holmes and expressing concerns about his testimony to her partner, Billy

Evans. *See* Dkt. 1599. The Court's reasoning turned on distinguishing between Ms. Holmes (who

was granted a hearing) and Mr. Balwani (who was not). But there was no basis—in

Dr. Rosendorff's trial testimony or his statements to Mr. Evans—to distinguish between the co-

defendants for purposes of evaluating Dr. Rosendorff's post-trial conduct. *Compare* Dkt. 1599 at

2, *with* Dkt. 1587-1.

Dr. Rosendorff's testimony at the Holmes evidentiary hearing did not undermine any of

Mr. Evans' statements, thus warranting a new trial. *See United States v. Mendez*, 619 F. App'x

644, 646 (9th Cir. 2015). At the least, reasonable judges could fairly debate whether Mr. Balwani

should have been denied the hearing that Ms. Holmes was afforded. The denial thus raises a

substantial question that, resolved favorably, would likely lead to a new trial on all counts.

### 7.    The Admissibility Of Evidence On Alleged Misrepresentations To The Department Of Defense Is A Substantial Question.

The indictment nowhere charges Mr. Balwani with defrauding the military. And the

government nowhere provided written notice under Federal Rule of Evidence 404(b)(3) of its

intention to offer evidence that Mr. Balwani or Ms. Holmes misrepresented facts to the military.

*See* Dkt. 1396 at 6-10. The Court, however, admitted evidence of alleged misrepresentations in

materials Theranos provided to the military. *See* Tr. 2489. That was classic propensity evidence

aimed at showing that the defendants were liars: they misrepresented facts to the military, so they

must have misrepresented facts to investors. Indeed, that is precisely how the government framed

the evidence in closing. Tr. 7026-27. This is a textbook example of a "crime, wrong, or act" that

"is not admissible to prove a person's character." Fed. R. Evid. 404(b)(1). The Court's ruling

transgressed Rule 404(b), as well as *United States v. Hill*, 953 F.2d 452, 456 (9th Cir. 1991) and

*United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995). Had this issue been

resolved in Mr. Balwani's favor, Mr. Balwani likely would have been acquitted of the investor

counts. And acquittal on those counts would likely have led to either a sentence of no

incarceration or one of shorter duration than the appeal process.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**8.      The Standard Of Proof For Proving Loss At Sentencing, And Whether The Government Met That Burden, Is A Substantial Question.**

In imposing a Guidelines sentence on Mr. Balwani, the Court relied on a range driven largely by the $121-million fraud loss that it calculated. *See* U.S.S.G. § 2B1.1(b) (24-point enhancement). But there is a substantial question whether the Court applied an erroneous standard of proof in calculating loss. Under *United States v. Lonich*, 23 F.4th 881, 915 (9th Cir. 2022), a conspiracy conviction alone does not justify the preponderance-of-the-evidence standard when "[t]he jury's guilty verdicts do not compel the conclusion—or even plausibly demonstrate—that the defendants through their criminal conduct were responsible for" the losses. In those circumstances, and when loss would have a dramatic effect on the Guidelines range, the government instead must present clear and convincing evidence. *See id.* at 910-16. Here, the government did not carry its burden under either standard. And without the loss amount, the resulting Guidelines range would have been 4-10 months. With that range, it is likely the Court would have imposed either probation or a sentence shorter than the anticipated time for appeal.

**D.      The Substantial Questions Would Result In A New Trial Or A Substantially Reduced Sentence.**

The fourth prong in the § 3143(b)(1) analysis asks whether, assuming the substantial questions Mr. Balwani raises are resolved in his favor, that determination would lead to reversal, a new trial, or a substantially reduced sentence. *Handy*, 761 F.2d at 1280-81 (holding that this prong is about the type of error asserted, not about the likelihood of success). For the reasons described above, each of the first six errors undermined the verdict on all of the counts for which imprisonment was imposed. *Supra* at §§ III.C.1-6. The last two undermined the investor counts, *supra* at §§ III.C.7-8, and for the reasons just described, vacatur of those counts of conviction would likely result in a sentence shorter than the anticipated time for appeal, *supra* at 18-19. Taken individually or in combination, then, these errors satisfy § 3143(b)(1)'s fourth prong because they are likely to result in one of the enumerated statutory remedies (a new trial, a non-custodial sentence, or a sentence shorter than the expected time for appeal).

**E.    The Court Should Stay Surrender Pending Resolution Of This Motion And Any Appellate Motion, If Necessary.**

At sentencing, the Court set Mr. Balwani's surrender for March 15, 2023. In light of this pending motion, Mr. Balwani respectfully requests that the Court stay his surrender at least until it is able to resolve this motion. Should the Court deny this motion, Mr. Balwani intends immediately to move the Ninth Circuit for release pending appeal. *See* Fed. R. App. P. 9(b). The filing of a motion in the Court of Appeals stays a defendant's surrender until that Court can resolve his appellate motion. 9th Cir. R. 9-1(e) ("If the appellant is on bail at the time the motion is filed in this Court, that bail will remain in effect until the Court rules on the motion."). Although this stay is imposed automatically by operation of law, Mr. Balwani requests that the Court acknowledge and impose the stay for the avoidance of any doubt. *See, e.g.*, *United States v. Fuentes*, 946 F.2d 621, 622 (9th Cir. 1991); *United States v. Kakkar*, No. 5:13-cr-00736-EJD, 2017 WL 4163291, at *1 (N.D. Cal. Sept. 20, 2017).

## IV.    CONCLUSION

Mr. Balwani respectfully requests that the Court grant this motion.

DATED: January 9, 2023                              Respectfully submitted,

                                                    ORRICK, HERRINGTON & SUTCLIFFE LLP


                                                    By:   */s/ Mark S. Davies*
                                                          Mark S. Davies

                                                          Attorney for Defendant
                                                          RAMESH "SUNNY" BALWANI