## VICTIM IMPACT STATEMENT FOR INVESTOR VICTIMS

United States v. Elizabeth Holmes & Ramesh "Sunny" Balwani

Court Docket Case No. 5:18-CR-00258 EJD

### INSTRUCTIONS

1. You have been identified as a possible victim in connection with the above-referenced criminal case. In connection with upcoming sentencing proceedings in this case, it is requested that you provide the information described below.
2. Please complete this victim impact statement form in full and submit it no later than September 6th, 2022 and include supporting documentation where possible. We are unable to accept late submissions.
3. E-mail submissions are preferred. Please send your completed pdf to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ possible. You will receive an automated response upon receipt. Please do not resend information or send multiple messages.
4. Please redact all Personal Identifiable Information ("PII") from your supporting documents, including the following:
   a. Residential street addresses (you may leave city and state unredacted)
   b. Personal telephone numbers
   c. Personal email addresses
   d. Social security numbers
   e. Dates of birth (you may leave the year unredacted)
   f. Bank account / routing numbers and other financial information (you may leave the last four digits unredacted)
5. You must sign this victim impact statement and verify the accuracy of the information you provide. Unsigned forms may be returned or discarded.
6. Please note that responses may be used in connection with assessing restitution amounts.

### PERSONAL INFORMATION

Name: Walgreen Co.

Investing Organization (if applicable): WVC Investments, LLC; Walgreen Co.

Mailing Address: Attn: Michael J. Freeman, Walgreen Co., 104 Wilmot Rd., MS#144Q, Deerfield, IL 60015

Telephone: (▮▮▮▮▮▮▮▮▮▮

E-mail: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## DETAILS OF YOUR INVESTMENT

The following questions relate to your (or your organization's) investment(s) in Theranos, Inc. during the time period 2010-2015.

1. Provide the following information for your initial investment in Theranos, Inc.

| | |
|---|---|
| Date of investment: | June 5, 2012 |
| Investment amount in U.S. dollars: | $40,000,000.00 |
| Price per share: | |
| Entity making investment (if not in your name): | WVC Investments, LLC |

2. If you invested more than once in Theranos, Inc., provide the following information for your second investment.

| | |
|---|---|
| Date of investment: | Multiple |
| Investment amount in U.S. dollars: | See attached addendum to Question 4. |
| Price per share: | |
| Entity making investment (if not in your name): | Walgreen Co. |

## DETAILS OF FINANCIAL LOSS AND RESULTING IMPACT

3. Did you sell or otherwise liquidate any shares in Theranos, Inc. after the above investment(s)? (Yes / No). If yes, please provide details below.

| Transaction Date | Profit from Transaction in USD | Description of Transaction |
|---|---|---|
| | | |
| | | |
| | | |

4. Did you receive any payments from Theranos, Inc., Elizabeth Holmes, or Ramesh Balwani after the above investment(s), e.g., interest, dividends, distributions, refunds, honoraria, referral fees, settlement payments, etc.?  (Yes / No).  If yes, please provide details below.

| Payment Date | Amount in USD | Description of Payment |
|---|---|---|
| | | See attached addendum. |
| | | |
| | | |

5. Did you receive any payments in connection with your investment(s) in Theranos, Inc. from other sources, e.g., insurance?  (Yes / No).  If yes, please provide details below.

| Payment Date | Amount in USD | Description of Payment |
|---|---|---|
| | | See attached addendum. |
| | | |

6. Please list and describe any other expenses you have incurred as a result of this crime or your involvement in the investigation and prosecution of this case—including tax liabilities, legal or accounting fees, counseling costs, lost income, transportation costs, etc.  Please attach receipts if possible.

See attached addendum.

7. Please estimate the total amount of money that you lost in connection with your investment(s) in Theranos, Inc.

Approximately $45 million.  See attached addendum to Question 5.

8.  Please describe the financial impact of the above loss to you or your organization,
    including details regarding any harm to your livelihood, lifestyle, budget, credit, ability to
    pursue other investments, etc. you have experienced as a result of this crime.

See answers to Questions 4 and 6.

9.  Please describe the non-financial impact of the above loss, including details regarding
    any stress, anxiety, distraction, depression, loss of sleep, reputational harm, etc. you have
    experienced as a result of this crime.

See attached addendum.

10. Is there anything else you would like the sentencing Judge to know about your experience
    with Theranos, Inc.?

Walgreens has also submitted a Victim Impact Statement for Patient Victims.

**CONFIRMATION**

I DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS
TRUE AND CORRECT.

Signature: _[signature]_

Printed Name:  Michael J. Freeman

Date:  9/6/2022

## <u>Addendum to Walgreens' Victim Impact Statement for Investor Victims</u>

**Addendum to Question 4**

On June 5, 2012, Walgreens and Theranos Inc. ("Theranos") entered into the Amended and Restated Theranos Master Services Agreement (the "Services Agreement"). The Services Agreement provided for, among other things, Walgreens to make an Innovation Fee payment of $100,000,000.00 to Theranos; a promissory note issued by Theranos in the amount of $40,000,000.00 (the "Promissory Note") to WVC Investments, LLC, a subsidiary of Walgreens, *see* Ex. A; and for Theranos and Walgreens to enter into an operating relationship. On January 12, 2017, Walgreens filed a complaint against Theranos in the United States District Court for the District of Delaware alleging, among other things, that Theranos had breached the Services Agreement. On July 28, 2017, Walgreens, its parent company, and Theranos entered into an agreement (the "Settlement Agreement") that provided for Theranos to make multiple payments to Walgreens; the extinguishment of all prior agreements between Theranos and Walgreens, with the exception of the $40,000,000 Promissory Note; and the release of all claims between the parties, except claims under the Settlement Agreement.

Theranos made multiple payments to Walgreens under the Settlement Agreement, but failed to make the final payment of $5,000,000. Walgreens obtained a judgment from the United States District Court for the District of Delaware in the amount of $5,000,000 plus prejudgment interest at the rate of 7.5% and postjudgment interest of 2.5% through the date of payment. *See* Ex. B. Theranos has still not made this payment.

**Addendum to Question 5**

In March 2019, Walgreens, as a creditor of Theranos, submitted a Proof of Claim in connection with the Assignment for the Benefit of Creditors of Theranos, Inc. Walgreens' total Claim at the time of its submission was $45,095,547.95, representing the $40,000,000 Promissory Note along with the $5,000,000 judgment from the District Court for the District of Delaware plus pre and postjudgment interest. Walgreens has not received any payments from the Assignee of Theranos, and the timing of any payments is uncertain. At most, Walgreens expects to receive only a small fraction of its Claim.

**Addendum to Question 6**

Walgreens has incurred millions of dollars in legal fees and related expenses for matters related to Theranos. This includes responding to a document subpoena and other requests for information from the DOJ related to these proceedings, and making witnesses available for government interviews and trial testimony. It further includes responding to a document subpoena and other requests for information and testimony from the SEC related to its proceedings against the Defendants, and participating in other civil litigation related to Theranos.

1

**Addendum to Question 9**

Walgreens is a well-recognized retail pharmacy chain that provides pharmacy, health, and wellbeing services to communities served by its stores throughout the United States. Through these services, Walgreens has built a reputation as a trusted health destination for millions of people. Walgreens sought to expand these services through its partnership with Theranos to provide its customers with convenient access to safe and reliable blood testing. This was the fundamental premise of Walgreens partnering with Theranos.

Unfortunately, it is now known that Theranos did not share the same premise in partnering with Walgreens. In countless meetings and other communications, Theranos and the Defendants lied to Walgreens and its employees about the efficacy and reliability of the testing to be offered in Walgreens stores. Through these and other misrepresentations, Theranos deceived Walgreens into allowing its fraudulent blood-testing technology to be offered in 41 Walgreens stores in Arizona and California. In doing so, Theranos abused and took advantage of Walgreens' trusted reputation and its broad presence in American communities. Theranos's fraud was inflicted upon Walgreens customers, defrauding these individuals and impacting Walgreens' reputation as a trusted health destination.

Moreover, Theranos's fraud has had a meaningful impact on Walgreens' current and former employees. Many employees dedicated substantial amounts of their professional time and energy working to bring what they thought was a transformational offering to the market. It is now known that these employees were repeatedly misled by Theranos and its executives. Some Walgreens employees also received test results that were manipulated by Theranos, potentially risking their health. These employees did not learn about the existence of the fraud until 2016, and have experienced revelations of the extent of the fraud from 2016 to the present, fully learning about some details only through the criminal trials. Moreover, Theranos's fraud and the ensuing investigations have received widespread and negative coverage in the press, including reports referencing Theranos's testing within Walgreens stores. This experience has cumulatively taken a significant emotional toll on Walgreens employees, who had dedicated so much to a partnership that they believed would do so much good. In addition, a number of former employees have experienced additional time and burden from their participation in the DOJ investigation and trials.

# Exhibit A

SCHEDULE H-1
CONVERTIBLE PROMISSORY NOTE

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.   THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THERANOS, INC.

CONVERTIBLE PROMISSORY NOTE

$40,000,000                                                                                               [DATE]

FOR VALUE RECEIVED, Theranos, Inc., a Delaware corporation (the "Company") promises to pay to WVC Investments, LLC ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Forty Million Dollars ($40,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance.  All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof.  This Note is issued pursuant to that certain Amended and Restated Theranos Master Services Agreement by and between the Company and Investor dated [  6/5/12   ] (the "Agreement").   All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      **Payments.**

(a)   Interest.  This Note shall bear interest at the rate of 0.79% per annum, which interest shall accrue annually.  Accrued interest on this Note shall be payable on the Maturity Date.

(b)   The "Maturity Date" shall be the earlier of:

i.     the date of the Company's Initial Public Offering;

ii.    the effective date of a Change of Control;

iii.   one hundred eighty (180) calendar days from the date of receipt by the Company of Investor's  written demand for repayment of this Note pursuant to this Section 1(b)(iii), which demand may be made only if the Company does not meet the mutually agreed-upon success criteria for the Pilot set forth in Schedule F of the Agreement; or

iv.    the date that is ten years after the date of the Note .

(c)   Prepayment.  The Company shall not have the right to prepay any portion of principal or accrued interest under this Note except with the express written consent of Investor unless and only to the extent that the Company and/or the Investor have determined that the Pilot contemplated by the Agreement is unsuccessful.

2.      **Conversion.**

(a)  Optional Conversion. At any time prior to repayment by the Company of the Note, if services are being offered in at least 1,000 Investor locations (as contemplated in the Agreement), Investor may elect to convert all or any party of the outstanding principal amount up to $20,000,000 of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price, provided, however, that upon conversion 50% of the converted amount must come from Tranche 1 and 50% from Tranche 2 until such time as Tranche 1 is exhausted. At any time prior to repayment by the Company of the Note, if services are being offered in at least 2,500 locations (as contemplated in the Agreement) Investor may elect to convert all or any part of the remaining outstanding principal amount of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price, provided, however, that upon conversion 50% of the converted amount must come from Tranche 1 and 50% from Tranche 2 until such time as Tranche 1 is exhausted.  Investor's election to convert shall be evidenced by Investor's delivery to the Company of written notice of Investor's intention to convert. All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a conversion pursuant to a Company Event. If Investor elects to convert the Note following receipt by Investor of notice of a Company event pursuant to Section 2(b) hereof and for any reason the Company Event described in any such notice does not occur, such election to convert by Investor shall be rescinded and shall be null and void.

(b)  Notice of Company Events.       The Company shall give written notice to Investor of the anticipated occurrence of any Company Event.  Such written notice of the anticipated occurrence of a Company Event shall be given not less than fifteen (15) days and not more than thirty (30) days prior to the actual occurrence of a Company Event

(c)       Conversion Procedure.

  i.  Conversion Pursuant to Section 2(a).  Before Investor shall be entitled to convert this Note into shares of Series C-1 Preferred Stock, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 2(a).  Upon such conversion of this Note, the Company and the Investor hereby agree to execute and deliver to one another a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including, without limitation, the Amended and Restated Investors' Rights Agreement, the Amended and Restated Co-Sale Agreement and the Amended and Restated Voting Agreement).  The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 2(c)(ii).  Any conversion of this Note pursuant to Section 2(a) shall be deemed to be effective upon the earlier to occur of (i) the tenth day following the Company's receipt of Investor's written notice of its intention to convert, and (ii) immediately prior to the occurrence of the Company Event, and on and after such date the Persons entitled to receive the shares issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

  ii.  Fractional Shares; Interest; Effect of Conversion. No fractional shares shall be issued upon conversion of this Note.  In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable conversion price by the fraction of a share not issued pursuant to the previous sentence.  The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Company pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note.  Upon conversion of this Note in full and the payment of the amounts specified in this paragraph, Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

3.      **Definitions.** As used in this Note, the following capitalized terms have the following meanings:

"Amended and Restated Co-Sale Agreement" shall mean that certain Amended and Restated Co-Sale Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Investors' Rights Agreement" shall mean that certain Amended and Restated Investors' Rights Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Voting Agreement" shall mean that certain Amended and Restated Voting Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Change of Control" shall mean (i)  any reorganization, merger or consolidation of the Company (excluding any sale of stock for capital raising purposes), other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, as a result of shares in the Company held by such holders prior to such transaction or series of related transactions,  at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity; (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company

"Company Event" shall mean the Company's Initial Public Offering, a Change of Control, a dissolution of the Company, other event of liquidation, declaration of a Series C-1 Dividend or other events agreed upon in writing by the Company.

"Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Series C-1 Dividend" shall mean any dividend, whether in the form of cash, property or securities, payable or paid to the holders of the Company's Series C-1 Preferred Stock. For the avoidance of doubt, C-1 Dividends do not include any stock re-purchases.

"Tranche 1" shall mean $10,000,000 of the principal amount of this Note.

"Tranche 2" shall mean $30,000,000 of the principal amount of this Note.

"Tranche 1 Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Tranche 2 Conversion Price" shall mean $75.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

4.    **Investor Representations.** Investor represents and warrant to the Company as follows:

(a) Binding Obligation.  Investor has full legal capacity, power and authority to execute and deliver this Note and to perform its obligations hereunder. This Note constitutes a valid and binding obligation of Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) Securities Law Compliance.  Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration, except as may be provided in the Amended and Restated Investors' Rights Agreement. Investor has not been formed solely for the purpose of making this investment and is purchasing the Note for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor has such knowledge and experience in financial and business matters that Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time. Investor is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company. The principal place of business of Investor is correctly set forth beneath Investor's name on the signature page hereto.

5.    **Miscellaneous.**

(a) Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof.

   i.   Subject to the restrictions on transfer described in this Section 5(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

   ii.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by the Investor to any legal entity or person, other than a wholly-owned direct or indirect subsidiary of Investor.  In the event Investor intends to assign any rights, interests or obligations under this Note to a wholly-owned direct or indirect subsidiary, Investor shall give Company no less than thirty (30) calendar days' prior written notice.

   iii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor.

(b) Waiver and Amendment.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the Investor.

(c) Notices.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(d) Payment.  Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

(e)  Governing Law.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f)  Counterparts.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____

Name:_____ Elizabeth Holmes

Its:_____ CEO

Acknowledged and accepted by Investor:
WVC INVESTMENTS, LLC

By:_____

Name:_____

Its:_____

(e) Governing Law. This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f) Counterparts. This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____
Name:_____
Its:_____

Acknowledged and accepted by Investor:
WVC INVESTMENTS, LLC

By:_____
Name:_____ WAYNE A. MIQUELON - CFO
Its:_____

GTR - LAW

**SCHEDULE H-2**
**CERTIFICATE EVIDENCING RIGHT TO PURCHASE CONVERTIBLE PROMISSORY NOTE**

[ June 5 ], 2012

PURSUANT to Section 21 of that certain Amended and Restated Theranos Master Services Agreement of even date herewith (the "**Agreement**"), by and between Walgreen Co. ("**Walgreens**") and Theranos, Inc. ("**Theranos**"), this Certificate evidences the right granted to Walgreens under the Agreement to purchase a convertible promissory note in the principal amount of $40 million in substantially the form set forth in Schedules H-1 of the Agreement (the "**Convertible Note**").

From the Effective Date (as defined in the Agreement) to fourteen (14) days after the Effective Date with respect to Schedule H-1, Walgreens shall have the right to purchase the Convertible Note, subject to the terms of the Agreement, by countersigning this Certificate, for the applicable Convertible Note, below.

THERANOS, INC.

By: _____

Name: _____Elizabeth Holmes_____

Title: _____CEO_____

**_THE FOLLOWING IS TO BE EXECUTED ONLY UPON EXERCISE OF RIGHT TO PURCHASE NOTE:_**

On this __5th__ day of __June__, 201 **2**, Walgreens hereby elects to purchase the Convertible Note pursuant to the terms of the Agreement, and tenders herewith the full purchase price of the Convertible Note.

WVC INVESTMENTS, LLC
~~WALGREEN CO.~~

By: _____

Name: _____Wade Miquelon_____

Title: _____President_____

GTK-LAW

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| WALGREEN CO. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 18-989-RGA |
| | ) | |
| v. | ) | |
| | ) | |
| THERANOS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## [PROPOSED] ORDER

WHEREAS, the Court, having considered Plaintiff Walgreen Co.'s ("Walgreens")

Motion for Summary Judgment, filed September 17, 2018, and the related briefing and

arguments thereto;

IT IS HEREBY ORDERED this ___ day of _October_ , 2018, that Walgreens'

Motion for Summary Judgment is hereby GRANTED. Defendant Theranos, Inc. is hereby

ordered to pay Plaintiff Walgreens $5,000,000 in damages, along with prejudgment interest at a

rate of 7.5% through this date, and postjudgment interest of 2.5% through the date of payment.

Final judgment is entered in favor of Walgreens and against Defendant Theranos, Inc.

By: _____

Honorable Richard G. Andrews
United States District Court Judge