# GIBSON DUNN

January 27, 2023

VIA EMAIL

Robert S. Leach, Esq.
Kelly Volkar, Esq.
Assistant United States Attorneys
1301 Clay Street, Suite 340S
Oakland, CA 94612

John C. Bostic, Esq.
Jeffrey B. Schenk, Esq.
Assistant United States Attorneys
150 Almaden Boulevard, Suite 900
San Jose, CA 95113

Re:   *United States v. Holmes et al.*, No. 5:18-cr-00258-EJD, N.D. Cal.

Dear AUSAs Leach, Volkar, Bostic, and Schenk:

In advance of the upcoming restitution hearings in the cases of Elizabeth Holmes and Ramesh ("Sunny") Balwani (the "Defendants"), we respectfully write to submit the following restitution request on behalf of Partner Investments, LP, PFM Healthcare Master Fund, LP, and PFM Healthcare Principals Fund, LP (collectively, "PFM" or the "Funds") pursuant to the Mandatory Victims Restitution Act of 1996, 18 U.S.C. §§ 3613A, 3663A ("MVRA").[1]  Specifically, PFM seeks a restitution order of $52,639,998 (the amount of its entire investment in Theranos minus the civil settlement it received) plus an award of prejudgment interest.  Although the Court applied a significant offset when determining the economic loss to PFM for the purposes of calculating the applicable sentencing guideline range, we maintain that it was incorrect to have done so, and, in any event, that under the MVRA—which governs restitution—PFM is still entitled to a restitution order of $52,639,998 plus an award of prejudgment interest.

**I.   The Court Calculated Economic Loss Incorrectly Because It Did Not Account for the Immediate and Irreversible Impact of the Disclosure of the Fraud on Theranos' Share Price.**

The Court issued sentences in these cases against Holmes on November 18, 2022, and Balwani on December 7, 2022.  *See* Dkt. 1660 (Holmes minute order), 1682 (Balwani minute order), 1712 (written sentencing opinion in Holmes case).  In determining the offense

---

[1] On January 1, 2020, PFM Healthcare Principals Fund, LP changed its name to PFM Liquidating Sidepocket Fund, LP.

January 27, 2023
Page 2

level under the U.S. Sentencing Guidelines, a key input is the amount of economic loss caused by Defendants' misconduct.  Under the Sentencing Guidelines, economic loss "focuses on the defendant, and seeks, however imperfectly, to measure the seriousness of his or her criminal conduct." *United States v. Certified Env't Servs., Inc.* ("*CES*"), 753 F.3d 72, 102 (2d Cir. 2014).

To calculate economic loss, courts "need only make a reasonable estimate of the loss," which is defined as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A), 3(C).  Economic loss should take into account factors including "[t]he reduction that resulted from the offense in the value of equity securities or other corporate assets." *Id.*, cmt. 3(C)(v).

Here, the Court calculated economic loss in a written opinion as follows.  It found that 10 investors—including PFM—invested $381 million in Theranos based upon Defendants' "fraudulent representations."  Dkt. 1712 ("Loss Opinion") at 6.  PFM, for instance, invested $96,139,998.  *Id.*  But the Court reduced this loss amount by an offset.  *Id.* at 7.  To do so, the Court relied upon U.S.S.G. § 2B1.1 cmt. 3(E)(i) (emphasis added), which provides that loss amounts should be reduced by "the fair market value of the property returned and the services *rendered*, by the defendant or other persons acting jointly with the defendant, to the victim *before the offense* was detected."  *See* Loss Opinion at 7.

Against this backdrop, the Court relied on the government's expert, Carl Saba, to calculate the "fair market value" of "what the Theranos share price would have been if there had been no fraud."  Loss Opinion at 9.  Saba calculated these prices on three different dates—February 7, 2014; December 31, 2014; and October 15, 2015.  *Id.*  The Court selected the December 31 date, which was closest in time to the last Series C investments.  *Id.* at 11.  Notably, the Court rejected the October 2015 date, which is purportedly "when Defendant's fraud was exposed," because the Sentencing Guidelines "only contemplate crediting value that was provided to the victim *before* the offense was detected." *Id.* (emphasis added) (citing U.S.S.G. § 2B1.1, cmt. 3(E)(i)).

According to Saba, after making numerous faulty assumptions favorable to Defendants—including that "Theranos' significant technology challenges would be successfully resolved" and that it would "realize high revenue growth in the near term"—he concluded that as of December 31, 2014, Theranos stock would have been worth approximately 31.5% less if there had been no fraud.  Loss Opinion at 10-12.  Thus, the Court concluded that the overall loss to the 10 identified investors was only $120 million, not the $381 million they invested.  For investors like PFM who invested in the Series C-2 round, the purported value of the shares they purchased at $17 per share was $11.63 per share, for a net loss of $5.37 per share.  *Id.*

January 27, 2023
Page 3

The Court's approach to calculating economic loss ignored a fundamental sentencing principle: that in a fraud case involving equity securities or similar corporate assets, economic loss is calculated as "[t]he reduction that resulted from the offense." U.S.S.G. § 2B1.1 cmt. 3(C)(v). To make that calculation, courts generally adopt methodologies which attempt to capture the difference between the price of the shares before and *after* the fraud was disclosed. *See, e.g.*, *United States v. Bakhit*, 218 F. Supp. 2d 1232, 1242 (C.D. Cal. 2002). And in some instances, the post-disclosure value is deemed to be zero. *See, e.g.*, *United States v. Stitsky*, 536 F. App'x 98, 111 (2d Cir. 2013) (rejecting argument that the fraud victims "received securities with some value" because "the district court reasonably concluded that the … securities [at issue] had no value because there was no realistic possibility that [the company] would be able to generate a positive return for investors"); *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[T]he crux of [defendant's] offense is that she obtained loans by fraudulently leading unsecured creditors to believe that they were secured creditors. Without this deceit, she could not have obtained her victims' money."). Here, however, the Court made no attempt to evaluate the impact of the disclosure of the fraud on Theranos' share price.

Instead, the Court erroneously relied on an inapplicable provision of the Sentencing Guidelines to determine when to calculate economic loss. The Sentencing Guidelines contain a carve-out from loss titled "Credits Against Loss" which provides that a loss amount "shall be reduced" by "the fair market value of the property returned" if the property is returned *before* the offense is discovered. U.S.S.G. § 2B1.1 cmt. 3(E)(i). By its plain language, this provision has "no bearing" here, as Defendants did not "return" any property to the investors before the fraud was exposed. *United States v. Jordan*, 813 F.3d 442, 446 (1st Cir. 2016) (finding comment inapplicable when calculating restitution in penny stock fraud case because "there was never a legitimate 'return' of property to the victim of the defendant's fraud"). Thus, there is no basis under the Sentencing Guidelines for the Court to only measure loss from prior to the discovery of the fraud. Further, as the First Circuit has noted, an inquiry into the reduction in the value of shares "that resulted *from the offense*," U.S.S.G. § 2B1.1 cmt. 3(C)(v), would be "totally frustrated without considering changes in the value of the shares" after the misconduct came to light. *Jordan*, 813 F.3d at 446 n.4.

**II.     Regardless of the Court's Sentencing Guidelines Approach, PFM Remains Entitled to Mandatory Restitution for the Full Amount of Its Investment Minus What It Received in a Civil Settlement.**

Nevertheless, the calculation of loss for purposes of the Sentencing Guidelines is a distinct inquiry from that of mandatory restitution. In calculating restitution, the MVRA explicitly provides that the Court cannot look, as it did for its economic loss analysis, to the purported "fair market value" price of Theranos shares *before* the fraud was disclosed. Rather, it must take into account the impact of the disclosure of the fraud, which here

January 27, 2023
Page 4

rendered Theranos' shares "essentially worthless." Thus, the Court should award PFM the full amount of its investment minus the offset it received in a civil settlement (*i.e.*, a total of $52,639,998) plus prejudgment interest.

Unlike loss, restitution "serves a compensatory function and 'focuses on the victim and the harm proximately caused by the defendant's conduct.'" *CES*, 753 F.3d at 102 (citation omitted and quoting *United States v. Gossi*, 608 F.3d 574, 580 (9th Cir. 2010)). It "requires the defendant to return property to the owner or else pay him the value of the property." *United States v. Patterson*, 595 F.3d 1324, 1327 (11th Cir. 2010). The restitution amount need not "match the loss figure used for sentencing." *Id.* "Indeed, the amounts of loss and restitution can and do differ." *Id.*; *see also CES*, 753 F.3d at 102 (restitution and loss are "not identical" inquires).

Under the MVRA, a court "shall" order restitution to victims for "an offense against property under [Title 18], … including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). A victim is defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). Restitution for "wire fraud is not 'limited to the specific act of fraud underlying the mailing or use of the wires for which the defendant is convicted,' but is available for any victim of 'the entire scheme or artifice to defraud furthered by the mailing or use of the wires.'" *United States v. Foley*, 508 F.3d 627, 635 (11th Cir. 2007) (quoting *United States v. Hasson*, 333 F.3d 1264, 1276 n.13 (11th Cir. 2003)).

There is no doubt that PFM is a "victim" under the MVRA. Holmes was convicted of three counts of wire fraud, a Title 18 offense, and one count of conspiracy to commit wire fraud. Dkt. 1235, 1236. And Balwani was convicted of ten counts of wire fraud and two counts of conspiracy. Dkt. 1507, 1508. Further, one of the counts for which each of the Defendants was convicted was that of specifically defrauding PFM. Dkt. 1235 ¶ 6; Dkt. 1507 ¶ 6. Accordingly, the Funds were directly and proximately harmed by Defendants' criminal conduct.

The MVRA provides that the Court "shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). Because this case involves damages or loss to property that cannot be returned, Defendants are required to:

> pay an amount equal to—
> (i) the greater of—

January 27, 2023
Page 5

>   (I) the value of the property on the date of the damage, loss, or destruction; or
>   (II) the value of the property on the date of sentencing, less
> (ii) the value (as of the date the property is returned) of any part of the property that is returned.

18 U.S.C. § 3663A(b)(1)(B).

Thus, "the MVRA unambiguously tells a court *what* to value . . . and even *when* to value it." *United States v. Boccagna*, 450 F.3d 107, 114 (2d Cir. 2006). But "[t]he statute is silent . . . on the question of *how* the referenced property is to be valued." *Id.* How to value the property is within the district court's discretion. *United States v. Kaplan*, 839 F.3d 795, 802 (9th Cir. 2016). Although "fair market value generally provides the best measure to ensure restitution in the 'full amount' of the victim's loss," courts can also use "replacement value" where the fair market value "is either difficult to determine or would otherwise be an inadequate or inferior measure of the value necessary to make the victim whole." *Id.*; *see also United States v. Frazier*, 651 F.3d 899, 904 (8th Cir. 2011) ("There are a variety of methods available to a court in determining the value of lost property …"). If "the 'actual cash value' of the damaged, lost, or destroyed property 'is difficult to ascertain-because an item is unique, or because there is not a broad and active market for it,' 'replacement cost' rather than fair market value may better compensate a victim for the full amount of his loss." *Boccagna*, 450 F.3d at 114 (quoting *United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999)).

Unlike the Court's economic loss calculation, which focused on the purported fair market value of Theranos' shares *before* the fraud was disclosed, the MVRA requires the Court to determine the value of PFM's property "on the date of the damage, loss, or destruction" or the date of sentencing; whichever is greater. On either date, PFM's Theranos shares were "essentially worthless," and PFM is entitled to a restitution award of the full amount of its investment minus the amount it received in the civil settlement.

*United States v. Ageloff*, 809 F. Supp. 2d 89 (E.D.N.Y. 2011), *aff'd sub nom. United States v. Catoggio*, 698 F.3d 64 (2d Cir. 2012), is instructive. In a traditional pump-and-dump scheme prosecution, the court held that "the victims are entitled to the return of the money they were fraudulently induced to hand over to [defendant]." *Id.* at 100. The court reached this conclusion because the stocks in question "were essentially worthless because the companies themselves were worthless." *Id.* The court acknowledged that "certain of these shares may have some theoretical residual paper value for a short period of time," but it found that these were "not material concerns for restitution purposes." *Id.*; *see also United States v. Hedges*, 175 F.3d 1312, 1314–15 n.6 (11th Cir. 1999) (noting that the corporation's "stock became worthless when the conspiracy was discovered").

January 27, 2023
Page 6

The same is true here. On October 15, 2015, a *Wall Street Journal* article alleged that Thernaos' proprietary technology—which was the heart of its potential value as a business, to which PFM's Brian Grossman testified repeatedly—did not work.[2] *After* this announcement, which was proven true beyond a reasonable doubt at both Defendants' trials, PFM's shares in Theranos were "essentially worthless." There were no further sales of Theranos securities which could have even provided a fair market value to determine them, particularly given that Theranos' purported technology was shown to be nothing other than the re-packaging of standard testing equipment that had long been available commercially. Without question, PFM's shares in Theranos became and remained "essentially worthless" after October 15, 2015.

Accordingly, PFM seeks restitution for the loss it suffered as a result of investing in Theranos. Collectively, PFM invested $96,139,998 in Theranos Series C-2 Preferred Shares. *See* Loss Opinion at 6 (listing PFM investment).

Under the MVRA, this restitution amount should be offset by the $43,500,000 that PFM received in a civil settlement with Theranos in connection with successful lawsuits brought against Theranos, Holmes, and Balwani in the Delaware Court of Chancery. *See* 18 U.S.C. § 3663A(b)(1)(B)(ii) (offset for property returned); Dkt. 1642 at 17 (discussing settlement). Thus, PFM requests a restitution order of $52,639,998—the difference between the total investment and offset.[3]

Additionally, PFM seeks an award of prejudgment interest. The Ninth Circuit has determined that prejudgment interest is available under the MVRA, including to corporate victims. *United States v. Gordon*, 393 F.3d 1044, 1058-59 (9th Cir. 2004), *abrogated on other grounds by Lagos v. United States*, 138 S. Ct. 1684 (2018). The rate of prejudgment interest "is the Treasury Bill rate as defined in 28 U.S.C. § 1961 unless the district court finds on substantial evidence that a different prejudgment interest rate is appropriate." *Gordon*, 393 F.3d at 1058 n.12. 28 U.S.C. § 1961(a), in turn, provides that the rate "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."

---

[2] John Carreyrou, *Hot Startup Theranos Has Struggled With Its Blood-Test Technology*, WALL ST. J. (updated Oct. 16, 2015), https://www.wsj.com/articles/theranos-has-struggled-with-blood-tests-1444881901.

[3] Although it could do so, PFM does not seek restitution for the substantial financial harm it suffered as a result of costs incurred during the Delaware litigation and in cooperating with the government's investigation and prosecution of the Defendants. Nor does PFM seek restitution for the opportunity costs of the investment opportunities foregone by PFM when it entrusted nearly $100 million of its investors' funds to the Defendants.

# GIBSON DUNN

January 27, 2023
Page 7

On that basis, PFM respectfully requests that the Court enter prejudgment interest against Holmes and Balwani. The date from which the prejudgment interest should accrue is October 15, 2015—the day that the fraud began to come to light. The amount of the prejudgment interest should be calculated using the weekly average one-year constant maturity Treasury yield that was published the week before final judgments in these cases were or are entered. *See Saavedra v. Korean Air Lines Co.*, 93 F.3d 547, 555 (9th Cir. 1996) (affirming use of date of judgment to calculate prejudgment interest). The judgment against Holmes was entered on January 11, 2023. Dkt. 1716. Between January 3 and January 10, the average one year Treasury bill was 4.74%.[4] Thus, PFM requests prejudgment interest of 4.74% from Holmes on the amount of the restitution ($52,639,998) starting from October 15, 2015. Similarly, PFM requests prejudgment interest from Balwani in the amount of the weekly average one-year constant maturity Treasury yield that is published the week before his judgment is ultimately entered. Any monies ultimately recovered will be returned to the Funds' investors.

Please let us know if you have any questions and thank you for your consideration.

Sincerely,

Reed Brodsky
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
rbrodsky@gibsondunn.com
917-574-8200

Winston Y. Chan
Gibson, Dunn & Crutcher LLP
555 Mission St., #3000
San Francisco, CA 94105
wchan@gibsondunn.com
415-393-8362

*Counsel for Partner Investments, L.P., PFM Healthcare Master Fund, L.P., and PFM Healthcare Principals Fund, L.P.*

---

[4] *See* Board of Governors of the Federal Reserve System (US), *Market Yield on U.S. Treasury Securities at 1-Year Constant Maturity, Quoted on an Investment Basis [DGS1]*, FRED, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/DGS1 (retrieved on Jan. 27, 2023).