# EXHIBIT A

## To

## Declaration of Jeffrey B. Coopersmith

1

2                        UNITED STATES DISTRICT COURT

3                       NORTHERN DISTRICT OF CALIFORNIA

4                             SAN JOSE DIVISION

5

       UNITED STATES OF AMERICA,          )
6                                         )  CR-18-00258-EJD
                          PLAINTIFF,      )
7                                         )  SAN JOSE, CALIFORNIA
                    VS.                   )
8                                         )  DECEMBER 7, 2022
       RAMESH "SUNNY" BALWANI,            )
9                                         )  PAGES 1 - 152
                          DEFENDANT.      )
10     _____   )  SENTENCING

11

12                       TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE EDWARD J. DAVILA
13                    UNITED STATES DISTRICT JUDGE

14     A P P E A R A N C E S:

15     FOR THE PLAINTIFF:     UNITED STATES ATTORNEY'S OFFICE
                              BY:  JOHN C. BOSTIC
16                                 JEFFREY B. SCHENK
                              150 ALMADEN BOULEVARD, SUITE 900
17                            SAN JOSE, CALIFORNIA 95113

18                            BY:  ROBERT S. LEACH
                              1301 CLAY STREET, SUITE 340S
19                            OAKLAND, CALIFORNIA 94612

20
                       (APPEARANCES CONTINUED ON THE NEXT PAGE.)
21
       OFFICIAL COURT REPORTER:
22                            IRENE L. RODRIGUEZ, CSR, RMR, CRR
                              CERTIFICATE NUMBER 8074
23

24          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                   TRANSCRIPT PRODUCED WITH COMPUTER
25

```
1      A P P E A R A N C E S: (CONT'D)

2

3      FOR DEFENDANT BALWANI:  ORRICK, HERRINGTON & SUTCLIFFE LLP
                               BY:  SHAWN ESTRADA
                                    REESE ONATE
4                                   SERENA NICHOLS
                               THE ORRICK BUILDING
5                              405 HOWARD STREET
                               SAN FRANCISCO, CALIFORNIA 94105

6
                               BY:  JEFFREY COOPERSMITH
7                                   AARON BRECHER
                                    AMANDA MCDOWELL
8                              701 FIFTH AVENUE, SUITE 5600
                               SEATTLE, WASHINGTON 98104

9
                               BY:  STEPHEN CAZARES
10                             77 SOUTH FIGUEROA STREET, SUITE 3200
                               LOS ANGELES, CALIFORNIA 90017

11
                               BY:  AMY WALSH
12                             51 W 52ND STREET
                               NEW YORK, NEW YORK 10019

13
       FOR U.S. PROBATION:     JESSICA GOLDSBERRY
14

15     ALSO PRESENT:           OFFICE OF THE U.S. ATTORNEY
                               BY:  MADDI WACHS, PARALEGAL
16
                               UNITED STATES POSTAL INSPECTION SERVICE
17                             BY:  CHRISTOPHER MCCOLLOW

18                             FEDERAL BUREAU OF INVESTIGATION
                               BY:  MARIO C. SCUSSEL
19
                               UNITED STATES FOOD & DRUG
20                             ADMINISTRATION
                               BY:  GEORGE SCAVDIS
21

22

23

24

25
```

| | | |
|---|---|---|
| | 1 | SAN JOSE, CALIFORNIA                    DECEMBER 7, 2022 |
| 10:09AM | 2 | P R O C E E D I N G S |
| 10:09AM | 3 | (COURT CONVENED AT 10:09 A.M.) |
| 10:09AM | 4 | THE COURT:  LET'S CALL OUR MORNING MATTER. |
| 10:09AM | 5 | THIS IS 18-258, UNITED STATES VERSUS |
| 10:09AM | 6 | RAMESH "SUNNY" BALWANI. |
| 10:09AM | 7 | LET ME FIRST CAPTURE THE APPEARANCES OF THE PARTIES. |
| 10:09AM | 8 | WHO APPEARS FOR THE GOVERNMENT? |
| 10:09AM | 9 | MR. LEACH:  GOOD MORNING, YOUR HONOR. |
| 10:09AM | 10 | ROBERT LEACH ON BEHALF OF THE UNITED STATES. |
| 10:09AM | 11 | I'M JOINED BY JOHN BOSTIC AND JEFF SCHENK |
| 10:09AM | 12 | THE COURT:  THANK YOU.  GOOD MORNING. |
| 10:09AM | 13 | AND FOR THE DEFENDANT? |
| 10:09AM | 14 | MR. COOPERSMITH:  GOOD MORNING, YOUR HONOR. |
| 10:09AM | 15 | JEFF COOPERSMITH FOR MR. BALWANI. |
| 10:09AM | 16 | MR. BALWANI IS PRESENT. |
| 10:09AM | 17 | I'M JOINED BY MY COLLEAGUES, AMY WALSH, STEPHEN CAZARES, |
| 10:09AM | 18 | AND MOST OF OUR TEAM, AMANDA, SHAWN ESTRADA, REESE ONATE, |
| 10:09AM | 19 | AARON BRECHER, SERENA NICHOLS, AND MOST OF MR. BALWANI'S FAMILY |
| 10:09AM | 20 | IS SEATED BEHIND THAT ROW. |
| 10:10AM | 21 | THE COURT:  THANK YOU.  GOOD MORNING.  IT'S NICE TO |
| 10:10AM | 22 | SEE EVERYONE. |
| 10:10AM | 23 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR. |
| 10:10AM | 24 | THE COURT:  WE ARE HERE THIS MORNING FOR THE |
| 10:10AM | 25 | SENTENCING IN THIS MATTER HAVING HEARD THE JURY'S VERDICT THAT |

10:10AM 1    WAS RETURNED AND SUBSEQUENT TO THE TRIAL IN THIS MATTER.

10:10AM 2          LET ME INDICATE AND ASK FIRST, ARE ALL PARTIES READY TO

10:10AM 3    PROCEED?

10:10AM 4              MR. LEACH:  YES, YOUR HONOR.

10:10AM 5              MR. COOPERSMITH:  YES, YOUR HONOR.

10:10AM 6              THE COURT:  ALL RIGHT.  THANK YOU.

10:10AM 7        AND WHO APPEARS FOR PROBATION?

10:10AM 8              PROBATION OFFICER:  GOOD MORNING, YOUR HONOR.

10:10AM 9        JESSICA GOLDSBERRY FOR U.S. PROBATION.

10:10AM 10             THE COURT:  THANK YOU.  GOOD MORNING.

10:10AM 11         LET ME INDICATE THE DOCKETS THAT I HAVE REVIEWED IN THIS

10:10AM 12   MATTER IN ANTICIPATION OF PREPARATION OF THE SENTENCING.

10:10AM 13         FIRST OF ALL, I HAVE REVIEWED THE PSR, WHICH IS DOCKET

10:10AM 14   1647; I'VE REVIEWED THE GOVERNMENT'S SENTENCING MEMORANDUM,

10:10AM 15   1661; THE DEFENSE MEMORANDUM, 1662, I BELIEVE IT IS.  THERE WAS

10:11AM 16   A DEFENDANT'S APPENDIX A THAT WAS -- LET'S SEE.  THAT WAS FILED

10:11AM 17   ON NOVEMBER 30TH, YES.

10:11AM 18         AND 1665 WERE DEFENDANT'S EXHIBITS; 1671 WAS THE DEFENSE

10:11AM 19   RESPONSE TO THE GOVERNMENT'S MEMO WITH EXHIBITS; 1674 WAS THE

10:11AM 20   GOVERNMENT'S RESPONSE TO DEFENDANT'S MEMO; AND THEN AS RECENTLY

10:11AM 21   AS YESTERDAY AT 1:34 P.M., 1677 I BELIEVE IT WAS 100 PAGE

10:11AM 22   DOCUMENT, SUPPLEMENTAL EXPERT REPORT THAT WAS FILED BY THE

10:11AM 23   DEFENSE.

10:11AM 24         DID THE GOVERNMENT GET THAT SUPPLEMENTAL REPORT?

10:11AM 25             MR. LEACH:  WE DID, YOUR HONOR.  THANK YOU.

10:11AM 1      THE COURT:  ALL RIGHT.  THANK YOU.

10:11AM 2      THOSE ARE THE DOCUMENTS THAT THE COURT RECEIVED AND

10:11AM 3  CONSIDERED, INCLUDING THE EXHIBITS.

10:11AM 4      LET ME INDICATE THAT THERE WERE MANY, MANY LETTERS OF

10:11AM 5  SUPPORT OF MR. BALWANI THAT WERE ALSO CONTAINED IN THOSE

10:12AM 6  EXHIBITS, AND THE COURT HAS READ AND REVIEWED THOSE AS WELL.

10:12AM 7      ARE THERE ANY OTHER DOCUMENTS THAT THE PARTIES WANT TO

10:12AM 8  BRING TO MY ATTENTION?

10:12AM 9      MR. LEACH:  NO, YOUR HONOR.

10:12AM 10     MR. COOPERSMITH:  NO, YOUR HONOR.  YOU'VE COVERED

10:12AM 11 IT.  THANK YOU.

10:12AM 12     THE COURT:  THANK YOU.

10:12AM 13     LET ME ASK PROBATION THEN AS TO THE PSR, ARE THERE ANY

10:12AM 14 CHANGES, ADDITIONS, DELETIONS TO THE PRESENTENCE REPORT?

10:12AM 15     MR. COOPERSMITH:  NO, YOUR HONOR.

10:12AM 16     THE COURT:  ALL RIGHT.  THANK YOU.

10:12AM 17     AND THE PARTIES DID RECEIVE THAT IN A TIMELY MATTER.

10:12AM 18     WHAT I'D LIKE TO DO INITIALLY IS TO REVIEW THE OBJECTIONS.

10:12AM 19 THERE WERE OBJECTIONS MADE TO THE PSR.

10:12AM 20     WHAT I THOUGHT I WOULD DO, I BELIEVE THERE WERE A TOTAL OF

10:12AM 21 39 OBJECTIONS FILED BY THE DEFENSE AS TO THE PSR, INCLUDING

10:12AM 22 OBJECTIONS IN THE APPENDIX A THAT WAS ATTACHED TO THE DEFENSE

10:12AM 23 SENTENCING MEMORANDUM.

10:13AM 24     AND GIVEN THE QUANTITY OF THOSE OBJECTIONS, I HAVE DIVIDED

10:13AM 25 THOSE INTO TWO CATEGORIES THAT I TITLED CONTEXTUAL AND

10:13AM 1    SUBSTANTIVE.

10:13AM 2        THE SUBSTANTIVE OBJECTIONS, LET ME PARSE THOSE OUT FIRST,

10:13AM 3    THOSE ARE -- AND I'VE IDENTIFIED THOSE AS OBJECTIONS, AND THESE

10:13AM 4    ARE DEFENSE OBJECTIONS THIRTEEN, TWENTY-TWO, TWENTY-THREE, AND

10:13AM 5    TWENTY-FOUR, AND I'LL TALK ABOUT THOSE SEPARATELY.

10:13AM 6        THE BALANCE I'VE LABELLED CONTEXTUAL.  AND WHAT I WOULD

10:13AM 7    LIKE TO DO IS GO THROUGH THOSE INITIALLY, AND THEN WE'LL GO

10:13AM 8    THROUGH THE SUBSTANTIVE.

10:13AM 9        IN THIS ANALYSIS, I THINK YOU'LL FIND THAT THE SUBSTANTIVE

10:13AM 10   OBJECTIONS REALLY RELATE TO LOSS AND GUIDELINE CALCULATIONS,

10:13AM 11   WHICH ARE OF INTEREST TO THE PARTIES.

10:13AM 12       I NOTE THAT THE GOVERNMENT ALSO FILED AN OBJECTION, AND I

10:14AM 13   HAVE THAT HERE.

10:14AM 14       LET ME ASK, IS THERE ANYTHING ELSE THAT YOU WOULD LIKE ME

10:14AM 15   TO KNOW, MR. LEACH, IN REGARDS TO THE GOVERNMENT'S OBJECTION?

10:14AM 16         MR. LEACH:  NO, YOUR HONOR.

10:14AM 17       I THINK AS WE RELAY IN THE BRIEF THAT IN PREPARING THE

10:14AM 18   PSR, IT APPEARED THAT PROBATION RESOLVED SOME OBJECTIONS BY

10:14AM 19   PUTTING IN ARGUMENT WHERE -- WE'VE HIGHLIGHTED TWO OF THOSE

10:14AM 20   PARAGRAPHS FOR THE COURT.

10:14AM 21       WE DON'T THINK IT'S NECESSARY TO PARSE THE PSR IN QUITE

10:14AM 22   THAT WAY.

10:14AM 23       I THINK THE COURT SAT THROUGH TWO TRIALS WITH A LENGTHY

10:14AM 24   RECORD, AND WE WANTED TO HIGHLIGHT THOSE TO THE COURT BECAUSE

10:14AM 25   THERE WERE ELEMENTS THAT WE DISAGREED WITH, BUT AS WE SAY IN

```
10:14AM   1    OUR PAPERS, I DON'T THINK IT'S NECESSARY FOR THE COURT TO
10:14AM   2    RESOLVE THOSE OBJECTIONS FOR PURPOSES OF SENTENCING.  AND I
10:14AM   3    WOULD IMAGINE THEY FALL INTO THE CATEGORY OUTSIDE OF THIRTEEN,
10:14AM   4    TWENTY-TWO, TWENTY-THREE, AND TWENTY-FOUR THAT YOUR HONOR JUST
10:15AM   5    DESCRIBED.
10:15AM   6             THE COURT:  OKAY.  THANK YOU.
10:15AM   7         MR. COOPERSMITH, YOU'RE AT THE LECTERN.
10:15AM   8             MR. COOPERSMITH:  OH, I JUST THOUGHT IT WOULD BE
10:15AM   9    ABOUT THAT TIME TO APPROACH, BUT I HAVE NOTHING TO ADD AT THIS
10:15AM  10    PARTICULAR MOMENT.
10:15AM  11             THE COURT:  WELL, THANK YOU.
10:15AM  12         THE GOVERNMENT'S OBJECTIONS WERE, AS YOU STATED,
10:15AM  13    MR. LEACH, TO -- I THINK YOUR OPINION IS THAT THE DEFENSE
10:15AM  14    SEEMED TO -- AND THEIR INTENT AND REQUEST WAS TO ADD CERTAIN
10:15AM  15    LANGUAGE TO VARIOUS PARAGRAPHS.  AND I'VE LOOKED AT THOSE,
10:15AM  16    INCLUDING THE EXAMPLES 17, 23 AND OTHERS THAT YOU SUGGEST.
10:15AM  17         AND LET ME JUST INDICATE THAT YOU ARE RIGHT, AND YOU HAVE
10:15AM  18    A GOOD MEMORY, I DID SIT THROUGH BOTH TRIALS, AND I WAS ABLE TO
10:15AM  19    HEAR THE EVIDENCE IN THAT.
10:15AM  20         THE STATEMENTS THAT YOU'VE RAISED THERE, I'M GOING TO
10:15AM  21    INVOKE FEDERAL RULE OF CRIMINAL PROCEDURE 32(I)(3)(B) AND
10:15AM  22    INDICATE THAT THE COURT NEED NOT RULE ON THOSE OBJECTIONS
10:15AM  23    BECAUSE THE COURT IS NOT GOING TO CONSIDER THAT TYPE OF
10:15AM  24    INFORMATION AS YOU'VE INDICATED.  AND I THINK PART OF THIS --
10:16AM  25    IN ITS SENTENCING DECISION.
```

10:16AM  1          AND PART OF THIS WILL COME OUT IN OUR DISCUSSION ABOUT THE

10:16AM  2     BALANCE OF THE OBJECTIONS.  SO THANK YOU FOR THAT.

10:16AM  3          ANYTHING FURTHER ON THAT?

10:16AM  4               MR. LEACH:  NO, YOUR HONOR.

10:16AM  5               MR. COOPERSMITH:  NO, YOUR HONOR.

10:16AM  6               THE COURT:  GREAT.  THANK YOU.

10:16AM  7          WELL, LET'S GO THROUGH WHAT I'VE IDENTIFIED AS CONTEXTUAL

10:16AM  8     OBJECTIONS.  AND THESE ARE CONTAINED, FIRST OF ALL, IN THE PSR

10:16AM  9     ITSELF BEGINNING IN THE ADDENDUM TO THE PRESENTENCE REPORT AND

10:16AM 10     THEN IN APPENDIX A SENTENCING MEMORANDUM THAT CONTAINED 24

10:16AM 11     THROUGH 39 I THINK THE BALANCE OF THE OBJECTIONS.

10:16AM 12          LET ME FIRST SAY THAT I HAVE READ AND REVIEWED THE

10:16AM 13     OBJECTIONS THAT ARE CONTAINED IN THE PSR.  THOSE ARE 1 THROUGH

10:17AM 14     24, I BELIEVE.

10:17AM 15          LET ME ASK, MS. GOLDSBERRY, IS THERE ANYTHING ELSE YOU

10:17AM 16     WOULD LIKE TO ADD TO ANY OF PROBATION'S RESPONSES TO THOSE

10:17AM 17     OBJECTIONS?

10:17AM 18               PROBATION OFFICER:  NO, YOUR HONOR.

10:17AM 19               THE COURT:  ALL RIGHT.  THANK YOU.

10:17AM 20          ANYTHING FURTHER YOU WOULD LIKE TO ADD TO THE OBJECTIONS,

10:17AM 21     MR. COOPERSMITH?

10:17AM 22               MR. COOPERSMITH:  NOT ON THOSE, YOUR HONOR.  WE PUT

10:17AM 23     THAT IN THE RECORD, AND WE THINK THE COURT IS FAMILIAR WITH THE

10:17AM 24     CASE OBVIOUSLY.  WE STAND BY THOSE, BUT WE DON'T THINK IT'S

10:17AM 25     NECESSARY TO ARGUE THOSE ONE BY ONE.

10:17AM  1          THE COURT:  OKAY.  ANYTHING FURTHER --

10:17AM  2          MR. LEACH:  NO, YOUR HONOR.

10:17AM  3          THE COURT:  -- ON THOSE OBJECTIONS?

10:17AM  4          MR. LEACH:  NO, YOUR HONOR.

10:17AM  5          THE COURT:  ALL RIGHT.  THANK YOU.

10:17AM  6       WHAT I INTEND TO DO IS JUST TO GO THROUGH AND INFORM YOU

10:17AM  7    OF THE COURT'S DECISION AS TO THOSE OBJECTIONS.

10:17AM  8       OBJECTION NUMBER ONE IS THE OBJECTION TO PARAGRAPH NUMBER

10:17AM  9    18 OF THE PSR, AND THAT OBJECTION IS OVERRULED.  THE COURT

10:18AM  10   FINDS THAT THIS SUMMARY IS SUBSTANTIVELY THE SAME AS THE SCHEME

10:18AM  11   TO DEFRAUD IN THE THIRD SUPERSEDING INDICTMENT, AND I'LL ALLOW

10:18AM  12   THAT TO REMAIN.

10:18AM  13      OBJECTION NUMBER TWO GOES TOWARDS THE PARAGRAPH 19, AND

10:18AM  14   THE COURT FINDS THAT THE OBJECTION OR THE RULING ON THIS IS

10:18AM  15   UNNECESSARY, AGAIN, CITING FEDERAL RULE OF CRIMINAL PROCEDURE

10:18AM  16   32(I)(3)(B), AND THE COURT WILL NOT CONSIDER PRE-2010

10:18AM  17   PRE-CONSPIRACY SAFEWAY RELATIONSHIP IN THE DEFENDANT'S

10:18AM  18   SENTENCING.

10:18AM  19          MR. COOPERSMITH:  YOUR HONOR, JUST TO CLARIFY.

10:18AM  20   OBJECTION NUMBER TWO I BELIEVE RELATES TO FINAL PSR PARAGRAPH

10:18AM  21   20?

10:18AM  22          THE COURT:  20, YES.

10:18AM  23          MR. COOPERSMITH:  YES, YOUR HONOR.

10:18AM  24          THE COURT:  YES.  IF I SAID 19, I MEANT 20, YES.

10:18AM  25          MR. COOPERSMITH:  YES.

| | | |
|---|---|---|
| 10:18AM | 1 | THE COURT:  IT'S 20 IN THE FINAL PARAGRAPH.  IT'S 19 |
| 10:18AM | 2 | IN THE DRAFT. |
| 10:18AM | 3 | MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU. |
| 10:19AM | 4 | THE COURT:  OBJECTION THREE RELATES TO PARAGRAPH 21, |
| 10:19AM | 5 | AND I'M GOING TO SUSTAIN IN PART THIS OBJECTION. |
| 10:19AM | 6 | AND I WILL -- THE THIRD BOLD REFERENCE IN THIS PARAGRAPH |
| 10:19AM | 7 | THAT REFERENCES BALWANI, THE NAME BALWANI, WE'LL STRIKE THAT. |
| 10:19AM | 8 | AND THE FOLLOWING SENTENCE, I THINK IT'S FIVE LINES DOWN, |
| 10:19AM | 9 | MS. GOLDSBERRY, THE WORD, THE FOURTH WORD IN THAT IS "THEY," |
| 10:19AM | 10 | THAT SHOULD BE CHANGED TO "WAS." |
| 10:19AM | 11 | PROBATION OFFICER:  COULD THE COURT TELL ME THE |
| 10:19AM | 12 | WHOLE SENTENCE? |
| 10:19AM | 13 | THE COURT:  "IF YOU SEE."  LET ME SAY, THERE ARE |
| 10:20AM | 14 | SOME CHANGES HERE WE'RE GOING TO HAVE TO DO.  THE PSR, AS YOU |
| 10:20AM | 15 | KNOW, IS CONFIDENTIAL. |
| 10:20AM | 16 | MR. COOPERSMITH:  YES. |
| 10:20AM | 17 | THE COURT:  SO I'M RETICENT TO READ WHOLESALE |
| 10:20AM | 18 | INFORMATION. |
| 10:20AM | 19 | PROBATION OFFICER:  I UNDERSTAND. |
| 10:20AM | 20 | THE COURT:  BUT I'M TRYING TO GIVE YOU GUIDANCE ON |
| 10:20AM | 21 | WHERE IT IS, AND, OF COURSE, I'LL HAVE TO READ SOME WORDS IN. |
| 10:20AM | 22 | BUT IF YOU'LL GO DOWN ONE, TWO, THREE, FOUR -- FIVE LINES |
| 10:20AM | 23 | DOWN, THAT SENTENCE BEGINS WITH THE WORD "THERANOS." |
| 10:20AM | 24 | PROBATION OFFICER:  YES. |
| 10:20AM | 25 | THE COURT:  AND THE WORD "THEY" IN THAT SENTENCE |

| | | |
|---|---|---|
| 10:20AM | 1 | WILL BE CHANGED TO "WAS." |
| 10:20AM | 2 | PROBATION OFFICER:  "WAS." |
| 10:20AM | 3 | THE COURT:  AND IN THE PRECEDING SENTENCE FOLLOWING |
| 10:20AM | 4 | THE WORD "HOLMES," THE NEXT TWO WORDS WILL BE STRICKEN, |
| 10:20AM | 5 | INCLUDING MR. BALWANI'S NAME IN BOLD. |
| 10:20AM | 6 | PROBATION OFFICER:  THE SENTENCE BEFORE? |
| 10:20AM | 7 | THE COURT:  CORRECT. |
| 10:20AM | 8 | PROBATION OFFICER:  OKAY. |
| 10:20AM | 9 | THE COURT:  SO THE WORDS "AND BALWANI," FOLLOWING |
| 10:20AM | 10 | THE WORD "HOLMES," WILL BE DELETED. |
| 10:21AM | 11 | PROBATION OFFICER: OKAY.  GOT IT. |
| 10:21AM | 12 | THE COURT:  OBJECTION FOUR IS OVERRULED.  THIS IS AN |
| 10:21AM | 13 | ACCURATE DESCRIPTION, AND IT DOES PROVIDE CONTEXT. |
| 10:21AM | 14 | OBJECTION FIVE IS OVERRULED.  THIS RELATES TO PARAGRAPH |
| 10:21AM | 15 | 26.  THE COURT FINDS THAT THIS PARAGRAPH CORRECTLY STATES THE |
| 10:21AM | 16 | EVIDENCE THAT WAS INTRODUCED AT TRIAL. |
| 10:21AM | 17 | OBJECTION SIX IS OVERRULED.  I'LL NOTE THAT AT THE -- THIS |
| 10:21AM | 18 | IS ONE OF THOSE PARAGRAPHS WHERE AT THE DEFENSE REQUEST I |
| 10:21AM | 19 | BELIEVE PROBATION ACTUALLY INCLUDED SENTENCES THAT THE |
| 10:21AM | 20 | DEFENDANT REQUESTED TO PROVIDE CONTEXT.  SO I'LL OVERRULE THE |
| 10:21AM | 21 | OBJECTION TO THAT MATERIAL. |
| 10:21AM | 22 | OBJECTION SEVEN, THIS RELATES TO PARAGRAPHS 36 AND 37, |
| 10:21AM | 23 | THAT IS OVERRULED.  THE COURT FINDS THIS PARAGRAPH ACCURATE, |
| 10:22AM | 24 | AND AGAIN, IT PROVIDES HELPFUL CONTEXT FOR THE OVERALL COMPANY |
| 10:22AM | 25 | HISTORY AND SPECIFICALLY ITS RELATIONSHIP WITH PFIZER. |

10:22AM  1    I'LL ALSO NOTE THAT PROBATION DID ADD LANGUAGE AT THE

10:22AM  2    DEFENSE REQUEST REGARDING HIS KNOWLEDGE OF THE PFIZER REPORT.

10:22AM  3    OBJECTION EIGHT AS TO PARAGRAPH 39 IS OVERRULED.  THIS

10:22AM  4    PARAGRAPH DOES PROVIDE CONTEXT AND PROBATION DID, AS I

10:22AM  5    UNDERSTAND IT, REMOVE A SENTENCE AT THE DEFENSE REQUEST.

10:22AM  6    OBJECTION NINE AS TO PARAGRAPH 40 IS SUSTAINED IN PART,

10:22AM  7    AND THE COURT WILL STRIKE THE INTRODUCTORY CLAUSE IN THE

10:22AM  8    SENTENCE.

10:22AM  9    AND LET ME GET THAT FOR YOU, MS. GOLDSBERRY.

10:22AM  10    IT'S PROBABLY EASIER TO TELL YOU THAT THE SECOND SENTENCE

10:22AM  11    UP FROM THE BOTTOM THAT BEGINS WITH THE WORD "DESPITE."

10:23AM  12    PROBATION OFFICER:  YES.

10:23AM  13    THE COURT:  THAT WILL BE STRICKEN, THE WORD

10:23AM  14    "DESPITE" WILL BE STRICKEN AS WILL THE NEXT FOUR WORDS,

10:23AM  15    INCLUDING THE COMMA.

10:23AM  16    PROBATION OFFICER:  OKAY.  SO EVERYTHING UP UNTIL

10:23AM  17    THE COMMA?

10:23AM  18    THE COURT:  INCLUDING THE COMMA.  AND THE SENTENCE

10:23AM  19    WILL BEGIN WITH "HOLMES."

10:23AM  20    PROBATION OFFICER:  GOT IT.

10:23AM  21    THE COURT:  OBJECTION TEN, THIS OBJECTION IS

10:23AM  22    OVERRULED.  THIS DESCRIPTION IS ACCURATE.  IT DOES PROVIDE

10:23AM  23    RELEVANT TESTIMONY FROM A FORMER EMPLOYEE.

10:23AM  24    AND I'LL NOTE AGAIN AT THE DEFENSE REQUEST, THE PROBATION

10:23AM  25    INCLUDED SENTENCES IN REGARDS TO THE DEFENDANT'S, PARDON ME,

13

10:23AM 1     RELIANCE ON OPINIONS.

10:23AM 2          OBJECTION ELEVEN IS OVERRULED.  THE COURT FINDS THAT THIS

10:24AM 3     PARAGRAPH IS ACCURATE AS WRITTEN, AND IT SEEMS THAT THE

10:24AM 4     DEFENDANT SEEKS TO ADD INFORMATION THAT ENCOMPASSES THE SPIRIT

10:24AM 5     OF PERHAPS A CLOSING ARGUMENT HERE, BUT THAT'S PART OF THE

10:24AM 6     RECORD, AND THE JURY HEARD THAT AND CONSIDERED ALL OF THAT.  SO

10:24AM 7     THE OBJECTION IS OVERRULED.

10:24AM 8          TWELVE IS AN OBJECTION TO PSR PARAGRAPHS 25, 26, 35, 36,

10:24AM 9     37, 38, 39, 40, 41, 42, AND 44, AND THIS OBJECTION AS TO THOSE

10:24AM 10    PARAGRAPHS IS OVERRULED.  I WILL NOTE THAT MANY OF THE

10:24AM 11    PARAGRAPHS ALSO CONTAIN STATEMENTS THAT WERE ADDED BY PROBATION

10:24AM 12    AT DEFENSE REQUEST INDICATING THAT MR. BALWANI'S POSITION AS TO

10:25AM 13    THOSE PARAGRAPHS AS WELL AS HIS DISAGREEMENT WITH THOSE

10:25AM 14    PARAGRAPHS WERE NOTED.  SO THE COURT WILL OVERRULE THAT

10:25AM 15    OBJECTION.

10:25AM 16         LET'S SEE.  I BELIEVE OBJECTION FOURTEEN, AND I'M AT

10:25AM 17    PARAGRAPH 47, IS OVERRULED.  AND THIS DETAILS INVESTOR

10:25AM 18    MENDENHALL.

10:25AM 19         I'M NOT CERTAIN -- I WAS NOT ABLE TO DETERMINE WHAT THAT

10:25AM 20    OBJECTION REALLY ENTAILED, SO I'M GOING TO LEAVE IT AS IS.

10:26AM 21         MR. COOPERSMITH, I NOTE THE OBJECTION.  I DON'T SEE HOW

10:26AM 22    IT'S INCOMPLETE OR MISLEADING, SO I'M GOING TO OVERRULE THE

10:26AM 23    OBJECTION AND LEAVE IT AS IT IS.

10:26AM 24         OBJECTION FIFTEEN RELATES TO PARAGRAPH 49, AND THE COURT

10:26AM 25    AGREES WITH THE PROBATION OFFICER'S RESPONSE TO THIS PARAGRAPH.

10:26AM  1    IT DOES NOT PURPORT TO TALLY THE NUMBER OF PATIENT VICTIMS.  IT

10:26AM  2    ONLY STATES WITH ACCURACY THAT HUNDREDS OF PATIENTS PAID FOR

10:26AM  3    THE BLOOD TEST, IRRESPECTIVE OF WHETHER THEY PAID OUT OF POCKET

10:26AM  4    OR THROUGH AN INSURED.  IT'S JUST A STATEMENT OF A FACT THAT

10:26AM  5    THE COURT WILL NOT DISTURB, AND THAT OBJECTION IS OVERRULED.

10:26AM  6        OBJECTION SIXTEEN RELATES TO PARAGRAPH 49 AND 50.  AND THE

10:26AM  7    COURT OVERRULES THIS.  THE COURT FINDS THAT THE EVIDENCE AT

10:26AM  8    TRIAL REVEALED MR. BALWANI'S KNOWLEDGE OF THE FACTS AS

10:27AM  9    INDICATED AND ADOPTS PROBATION'S EXPLANATION.

10:27AM 10        OBJECTION SEVENTEEN RELATED TO PARAGRAPH 52 IS OVERRULED.

10:27AM 11    THIS PARAGRAPH IS AN ACCURATE DESCRIPTION OF THE FACTS IN THE

10:27AM 12    CASE, AND THE COURT WILL OVERRULE THAT OBJECTION.

10:27AM 13        OBJECTION EIGHTEEN RELATES TO PARAGRAPH 53, PARDON ME,

10:27AM 14    THROUGH 58.  THE COURT WILL OVERRULE THIS IN PART.  PARAGRAPHS

10:27AM 15    53, 54, AND 58 REFLECT THE EXPERIENCE OF PATIENTS WHO DID

10:27AM 16    TESTIFY AT TRIAL, AND THEREFORE, THE OBJECTIONS TO THOSE

10:27AM 17    PATIENTS ARE OVERRULED.

10:27AM 18        NOW, AS TO THE REMAINING PATIENTS THAT ARE LISTED IN

10:28AM 19    THOSE -- IN THAT PARAGRAPH, THE COURT AGAIN WILL INVOKE FEDERAL

10:28AM 20    RULE OF CRIMINAL PROCEDURE 32(I)(3)(B) BECAUSE THE COURT WILL

10:28AM 21    NOT CONSIDER THOSE PATIENTS IN THE DEFENDANT'S SENTENCING.

10:28AM 22        OBJECTION NINETEEN RELATES TO PARAGRAPH 60.  THE COURT

10:28AM 23    FINDS THAT THIS INFORMATION IS RELEVANT, IT PROVIDES CONTEXT,

10:28AM 24    AND THE COURT WILL OVERRULE THAT OBJECTION.

10:28AM 25        OBJECTION TWENTY RELATES TO PARAGRAPH 66 AND 67, AND

10:28AM   1    THOSE -- THAT OBJECTION IS OVERRULED.  THE STATEMENTS, THE

10:28AM   2    COURT CONSIDERS THEM APPROPRIATE AS VICTIM IMPACT STATEMENTS.

10:28AM   3    THE COURT, OF COURSE THE PARTIES ARE AWARE, MAY CONSIDER THE

10:29AM   4    CONSPIRATORIAL CONDUCT WITHIN THE SCOPE OF THE CONSPIRACY, EVEN

10:29AM   5    IF THERE WASN'T PERSONAL OR INTERACTION WITH SPECIFIC INVESTORS

10:29AM   6    BY THE DEFENDANT.

10:29AM   7         OBJECTION TWENTY-ONE RELATES TO PARAGRAPH 61, AND THAT'S

10:29AM   8    OVERRULED.  THE COURT FINDS THAT THE PROBATION OFFICER'S

10:29AM   9    EXPLANATION TO THIS OBJECTION IS APPROPRIATE.

10:29AM   10        OBJECTION TWENTY-FIVE IS OVERRULED.  THIS RELATES TO

10:29AM   11   PARAGRAPH 14, AND THIS PARAGRAPH IS ACCURATE AND IS SUPPORTED

10:29AM   12   BY THE RECORD IN THE MATTER.

10:29AM   13        OBJECTION TWENTY-SIX RELATES TO PARAGRAPH 19, AND THIS IS

10:29AM   14   SUSTAINED IN PART.  THE COURT WILL SUSTAIN IN PART THIS

10:29AM   15   OBJECTION.

10:30AM   16        THIS IS ON PAGE 8, MS. GOLDSBERRY, AND IT'S IN THE LAST

10:30AM   17   THREE SENTENCES OF THIS PARAGRAPH.

10:30AM   18        AND THE THIRD SENTENCE UP FROM THE BOTTOM AT THE END OF

10:30AM   19   THAT SENTENCE FOLLOWING THE WORD -- THE COURT WILL STRIKE THE

10:30AM   20   WORDS "REVIEW AND APPROVAL," AND IN PLACE OF THAT WILL INSERT

10:30AM   21   THE WORD "KNOWLEDGE."

10:31AM   22        DID YOU GET THAT?

10:31AM   23             PROBATION OFFICER:  GOT IT.

10:31AM   24             THE COURT:  OKAY.  THANK YOU.

10:31AM   25        OBJECTION TWENTY-SEVEN IS OVERRULED.  THIS LANGUAGE

10:31AM  1   ADEQUATELY REFLECTS DR. ROSENDORFF'S TESTIMONY AND THE

10:31AM  2   PARAGRAPH NOTES THAT THE DEFENSE DISAGREEMENT WITH THE

10:31AM  3   CHARACTERIZATION OF KNOWLEDGE.  SO IT DOES CAPTURE THE DEFENSE

10:31AM  4   OPINIONS, SO I'LL OVERRULE THE OBJECTION.

10:31AM  5        OBJECTION TWENTY-EIGHT REFERS TO PARAGRAPH 37, AND THAT IS

10:31AM  6   OVERRULED.  THE COURT FINDS THAT THIS PARAGRAPH, INCLUDING THE

10:31AM  7   LAST SENTENCE, IS ACCURATE AND DOES PROVIDE CONTEXT.

10:31AM  8        OBJECTION TWENTY-NINE IS -- RELATES TO PARAGRAPH 44, AND

10:31AM  9   THIS IS OVERRULED.  THE COURT NOTES THAT THESE OBJECTIONS TO

10:31AM  10  THIS PARAGRAPH FOR THE SAME REASONS HE OBJECTS TO PARAGRAPH 40,

10:32AM  11  WHICH WAS OBJECTION NINE.  THIS PARAGRAPH ACCURATELY SUMMARIZES

10:32AM  12  MS. PETERSON'S TESTIMONY AT TRIAL AND THE CONVICTIONS OF

10:32AM  13  MR. BALWANI REGARDING THE WIRE FRAUD AGAINST RDV CORPORATION,

10:32AM  14  WHICH WAS COUNT SEVEN.  SO I'LL OVERRULE THAT OBJECTION.

10:32AM  15       OBJECTION THIRTY RELATES TO PARAGRAPH 50.  THAT OBJECTION

10:32AM  16  IS OVERRULED.  THIS PARAGRAPH IS SUPPORTED BY THE JURY'S

10:32AM  17  FINDINGS.  THE COURT FINDS THAT IT IS ACCURATE.

10:32AM  18       OBJECTIONS THIRTY-ONE THROUGH THIRTY-TWO RELATE TO

10:32AM  19  PARAGRAPHS 55 AND 56, AND THE COURT WILL REFER, AS TO THESE

10:32AM  20  OBJECTIONS, REFER TO ITS DECISION IN OBJECTION EIGHTEEN, AND IT

10:32AM  21  IS VERY SIMILAR, AND THE COURT'S FINDING IN OBJECTION EIGHTEEN

10:32AM  22  WILL ALSO RELATE TO THESE OBJECTIONS.

10:33AM  23       OBJECTION THIRTY-THREE RELATES TO PARAGRAPH 57 OF THE PSR.

10:33AM  24  AND THE COURT WILL, AGAIN, CITE FEDERAL RULE OF CRIMINAL

10:33AM  25  PROCEDURE 32(I)(3)(B).  THE COURT WILL NOT CONSIDER THIS

10:33AM 1     INFORMATION AND THIS PARAGRAPH IN RELATION TO THE DEFENDANT'S

10:33AM 2     SENTENCING.

10:33AM 3          OBJECTION THIRTY-FOUR RELATES TO PARAGRAPH 59, AND THIS

10:33AM 4     INFORMATION THAT IS IN THIS PARAGRAPH IS ACCURATE, AND THE

10:33AM 5     LANGUAGE IN THIS PARAGRAPH INDICATES THAT THE DEFENDANT'S

10:33AM 6     CONCERNS WERE ADDRESSED BY PROBATION.  THAT OBJECTION IS

10:33AM 7     OVERRULED.

10:33AM 8          OBJECTION THIRTY-FIVE RELATES TO PARAGRAPH 62, AND THE

10:33AM 9     COURT WILL PERHAPS SUSTAIN THIS IN PART.  I BELIEVE THE DEFENSE

10:34AM 10    OBJECTS TO PARAGRAPH 62.

10:34AM 11         BUT, MR. COOPERSMITH, MY SENSE IS THAT YOU'RE -- YOU

10:34AM 12    INTEND TO INSERT THIS PROPOSED LANGUAGE PERHAPS AT THE END OF

10:34AM 13    PARAGRAPH 60, IN PARAGRAPH 60 BUT AT THE END.

10:34AM 14         WOULD THAT BE A BETTER PLACEMENT FOR THIS?

10:34AM 15              MR. COOPERSMITH:  YOU MEAN IN PARAGRAPH 60 RATHER

10:34AM 16    THAN PARAGRAPH 62, YOUR HONOR?

10:34AM 17              THE COURT:  YES.

10:34AM 18         YOUR SENTENCE BEGINS WITH "FOR COMPARISON," AND IT ENDS

10:34AM 19    WITH "TEST RESULTS," AND THAT LANGUAGE, I LOOKED AT THAT AND

10:34AM 20    THOUGHT IF THAT IS GOING TO BE APPROPRIATE, IT MIGHT BE MORE

10:34AM 21    APPROPRIATE TO ADD IT AT THE TAIL END OF 60.  IT'S CONTEXTUAL

10:34AM 22    AND RELATES TO THAT SENTENCE.

10:34AM 23              MR. COOPERSMITH:  YOUR HONOR, I GUESS I DON'T HAVE

10:34AM 24    VERY STRONG FEELINGS ABOUT IT, AS LONG AS IT'S IN.

10:34AM 25         BUT IT RELATES MORE TO PARAGRAPH 62 BECAUSE PARAGRAPH 60

10:34AM 1       RELATES TO THIS ARIZONA MATTER SEEMS LIKE A DIFFERENT ISSUE.

10:35AM 2       BUT EITHER WAY, AGAIN, YOUR HONOR, IT'S -- THE POINT WOULD

10:35AM 3       STILL BE IN THE PSR EITHER WAY.

10:35AM 4               THE COURT:  WELL, I SUPPOSE THAT WAS THE CONFUSION

10:35AM 5       AS TO WHERE IT SHOULD GO.

10:35AM 6           LET'S ADD IT IN 60.  IT SEEMS TO ME 60 IS ONLY TWO

10:35AM 7       SENTENCES NOW, AND IF YOU WOULD LIKE THIS TO HAVE SOME

10:35AM 8       RECOGNITION, PERHAPS IT'S BETTER PLACED THERE AND IT WON'T GET

10:35AM 9       LOST IN ALL OF THE LANGUAGE OF 62.

10:35AM 10              MR. COOPERSMITH:  THAT'S FINE, YOUR HONOR.

10:35AM 11              THE COURT:  SO THAT WILL BE INSERTED AT THE END, THE

10:35AM 12      END OF PARAGRAPH 60.

10:35AM 13              PROBATION OFFICER:  AND THAT SENTENCE IS IN THE

10:35AM 14      APPENDIX, OBJECTION NUMBER THIRTY-FIVE DID THE COURT SAY?

10:35AM 15              THE COURT:  LET'S SEE.  I THINK THAT'S WHERE IT IS.

10:35AM 16              PROBATION OFFICER:  OKAY.

10:35AM 17          (PAUSE IN PROCEEDINGS.)

10:36AM 18              THE COURT:  THE FIRST SENTENCE IS WHAT I WAS

10:36AM 19      FOCUSSED ON, NOT THE SECOND SENTENCE.

10:36AM 20          SO THAT FIRST SENTENCE THAT ENDS IN "RESULTS"?

10:36AM 21              PROBATION OFFICER:  YES.

10:36AM 22              THE COURT:  THAT WILL BE PLACED IN 60.  THE SECOND

10:36AM 23      SENTENCE IS NOT NECESSARY.

10:36AM 24              PROBATION OFFICER:  GOT IT.

10:36AM 25              THE COURT:  AND OBJECTIONS THIRTY-SIX THROUGH

10:36AM 1     THIRTY-NINE ARE OVERRULED TO SAY THAT THE COURT WILL DISCUSS

10:36AM 2     THESE -- THIS IS PART OF OUR GUIDELINE DISCUSSION, SO I SUPPOSE

10:36AM 3     I COULD DEFER THOSE OBJECTIONS.  THEY WILL BE, THEY WILL BE

10:37AM 4     TAKEN UP IN OUR CONVERSATION ABOUT GUIDELINE CALCULATIONS.

10:37AM 5              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

10:37AM 6              THE COURT:  ALL RIGHT.  ANY QUESTIONS?

10:37AM 7         MS. GOLDSBERRY, DID YOU GET EVERYTHING?

10:37AM 8              PROBATION OFFICER:  I DID, YOUR HONOR.

10:37AM 9              THE COURT:  ALL RIGHT.  THANK YOU.

10:37AM 10        ALSO.  LET ME MOVE NOW, IF I MAY, TO WHAT I'VE CALLED AND

10:37AM 11    CATEGORIZED THE SUBSTANTIVE OBJECTIONS.

10:37AM 12        LET'S START WITH OBJECTION THIRTEEN, WHICH IS THE INVESTOR

10:37AM 13    VICTIM COUNT.  I BELIEVE IT'S PARAGRAPH 48 THAT THE DEFENSE

10:37AM 14    OBJECTS TO.  IT RELATES TO THE INVESTOR COUNT.

10:37AM 15        I JUST WANTED TO SAY AS TO THIS PARAGRAPH, THE COURT WOULD

10:38AM 16    SUSTAIN THE OBJECTION IF THE OBJECTION IS INDICATING THAT THE

10:38AM 17    COURT SHOULD NOT ESTIMATE THE VICTIMS, AND I THINK THAT'S THE

10:38AM 18    IMPORT OF WHAT THIS OBJECTION IS.

10:38AM 19        THE DEFENDANT ASSERTS THAT THE COURT CANNOT ESTIMATE THE

10:38AM 20    NUMBER OF VICTIMS, AND THE COURT WILL NOT ESTIMATE THE NUMBER

10:38AM 21    OF VICTIMS, USING THE ENTIRE BODY OF THE C INVESTORS, NOR WILL

10:38AM 22    IT ANALYZE C1, C2 INVESTORS IN THE AGGREGATE.

10:38AM 23        THE COURT WILL CONSIDER THE EVIDENCE THAT IS PRESENTED AND

10:38AM 24    AVAILABLE FOR EACH INVESTOR VICTIM AND IDENTIFY THE VICTIMS AND

10:38AM 25    THOSE LOSS CALCULATIONS THAT FLOW FROM.

| | | |
|---|---|---|
| 10:38AM | 1 | SO PERHAPS I'M TAKING TOO FINE A NOTE OF IT, BUT IF THE |
| 10:38AM | 2 | OBJECTION WAS, JUDGE, YOU CAN'T ESTIMATE, I AGREE WITH THAT, |
| 10:38AM | 3 | AND THE COURT DOESN'T INTEND TO ESTIMATE. |
| 10:38AM | 4 | OBJECTION TWENTY-TWO IS THE LOSS CALCULATION AND |
| 10:39AM | 5 | CAUSATION.  EXCUSE ME.  SO LET'S TALK ABOUT THAT. |
| 10:39AM | 6 | THERE'S A NUMBER OF OBJECTIONS, DIFFERENT LEVEL OF |
| 10:39AM | 7 | OBJECTIONS, I THINK, THAT THE DEFENSE IMPOSED HERE. |
| 10:39AM | 8 | MR. COOPERSMITH:  YES, YOUR HONOR. |
| 10:39AM | 9 | AND MY COLLEAGUE, AMY WALSH, WILL SPEAK ON THE LOSS AMOUNT |
| 10:39AM | 10 | ISSUES. |
| 10:39AM | 11 | THE COURT:  OKAY.  WELL, THEN IT'S TIME FOR A |
| 10:39AM | 12 | PITCHING CHANGE. |
| 10:39AM | 13 | MR. COOPERSMITH:  YES, YOUR HONOR. |
| 10:39AM | 14 | THE COURT:  GOOD MORNING, MS. WALSH. |
| 10:39AM | 15 | MS. WALSH:  GOOD MORNING, YOUR HONOR.  NICE TO SEE |
| 10:39AM | 16 | YOU AGAIN. |
| 10:39AM | 17 | THE COURT:  THANK YOU.  LIKEWISE. |
| 10:39AM | 18 | SO AS TO THE LOSS CALCULATION HERE, I NOTE THAT THE |
| 10:39AM | 19 | DEFENDANT OBJECTS TO LISTING ANY VICTIM OR ANY LOSS ASSERTING |
| 10:39AM | 20 | THAT NO VICTIM SUSTAINED ANY LOSS. |
| 10:40AM | 21 | LET ME ASK YOU, DO YOU WANT TO MAKE A -- DO YOU WANT TO |
| 10:40AM | 22 | PUT ANYTHING ON THE RECORD BEFORE I GO FORWARD HERE?  WOULD YOU |
| 10:40AM | 23 | LIKE ME TO HEAR SOMETHING? |
| 10:40AM | 24 | MS. WALSH:  YES, YES, PLEASE. |
| 10:40AM | 25 | THE COURT:  GO RIGHT AHEAD.  PLEASE. |

```
10:40AM   1              MS. WALSH:  SO, YOUR HONOR, WHAT I HAD PLANNED TO
10:40AM   2    ADDRESS THE COURT ON TODAY WERE ALL OF THE ISSUES CONNECTED TO
10:40AM   3    OUR OBJECTIONS REGARDING LOSS, INCLUDING THE BURDEN OF PROOF,
10:40AM   4    THE NUMBER OF VICTIMS, CAUSATION, ET CETERA.
10:40AM   5              THE COURT:  OKAY.
10:40AM   6              MS. WALSH:  AND THE SABA REPORT.
10:40AM   7              THE COURT:  SURE.
10:40AM   8              MS. WALSH:  AND I'LL JUST RUN THROUGH THAT, AND
10:40AM   9    OBVIOUSLY IF THE COURT HAS QUESTIONS, I'LL ANSWER THAT.
10:40AM  10              THE COURT:  SURE.  OF COURSE.
10:40AM  11              MS. WALSH:  SO LET'S START WITH THE BURDEN OF PROOF.
10:40AM  12    OBVIOUSLY THE COURT APPLIED IN MS. HOLMES'S SENTENCING THE
10:40AM  13    PREPONDERANCE BURDEN OR STANDARD OF PROOF, AND WE RESPECT THAT
10:40AM  14    RULING.  WE DO DISAGREE WITH IT.
10:40AM  15         WE DO BELIEVE THAT THE CLEAR AND CONVINCING STANDARD
10:40AM  16    SHOULD APPLY HERE.  WE THINK UNITED STATES VERSUS LONICH IS THE
10:41AM  17    OPERATIVE CASE THAT SHOULD APPLY TO THESE CIRCUMSTANCES.
10:41AM  18         AND THE ISSUE, OF COURSE, IS WHAT STANDARD OF PROOF SHOULD
10:41AM  19    APPLY TO THE GOVERNMENT WHO HAS THE BURDEN OF PROVING LOSS IN A
10:41AM  20    FRAUD CASE.
10:41AM  21         THE TWO FACTORS THAT REALLY ANIMATED THE COURT'S OPINION
10:41AM  22    IN LONICH, WHICH WAS A 2822 CASE, AS YOU KNOW, WERE, FIRST,
10:41AM  23    WHETHER THE DISPUTED ENHANCEMENTS DRAMATICALLY INCREASED THE
10:41AM  24    LOSS AMOUNT OR THE LEVELS, THE OFFENSE LEVEL THAT APPLIED.
10:41AM  25         AND THE COURT IN LONICH APPLIED THE VALENCIA FACTORS FIVE
```

10:41AM 1    AND SIX AND THAT IS IF THE ENHANCEMENT WAS 4 OR MORE LEVELS

10:41AM 2    ABOVE WHAT IT OTHERWISE WOULD BE, AND THE OFFENSE LEVEL

10:41AM 3    PROVIDED FOR A DOUBLING OF THE SENTENCING RANGE, THEN THAT WAS

10:42AM 4    ONE -- TWO FACTORS THAT WEIGHED HEAVILY IN FAVOR OF APPLYING

10:42AM 5    THE CLEAR AND CONVINCING STANDARD OF PROOF.

10:42AM 6        THERE'S NO DISPUTE HERE THAT THOSE TWO FACTORS ARE MET.

10:42AM 7        WHAT THE GOVERNMENT PROPOSES IN ITS LOSS CALCULATION

10:42AM 8    DRAMATICALLY INCREASES THE OFFENSE LEVEL.

10:42AM 9        WHAT THE PSR ALSO RECOMMENDS DOES THE SAME.  AND EVEN IF

10:42AM 10   YOU TAKE THE COURT'S FINDINGS IN THE HOLMES CASE, IT STILL

10:42AM 11   DRAMATICALLY INCREASES THE OFFENSE LEVELS BY THE LEVELS OF

10:42AM 12   LOSS.

10:42AM 13       THE GOVERNMENT WOULD BE 30 LEVELS.  THE COURT'S

10:42AM 14   APPLICATION WAS 24 LEVELS.  AND IF YOU TAKE MR. SABA'S PROPOSED

10:42AM 15   LOSS, THAT'S AN ADJUSTMENT OF 26 OR 28 LEVELS.

10:43AM 16       SO I DON'T THINK THERE'S ANY QUESTION THAT ANY PROPOSED

10:43AM 17   LOSS CALCULATION, AT LEAST WHAT WE HAVE HEARD SO FAR IN THE

10:43AM 18   HOLMES CASE AND IN OUR CASE, DRAMATICALLY INCREASES THE

10:43AM 19   DISCLOSURE.

10:43AM 20       THE SECOND FACTOR THAT THE LONICH COURT FOCUSSED ON WAS

10:43AM 21   WHETHER THE INCREASE WAS BASED ON THE EXTENT OF THE CONSPIRACY.

10:43AM 22   AND, OF COURSE, THIS IS AN EXTREMELY -- IT CAN BE A DIFFICULT

10:43AM 23   FACT TO ASCERTAIN.

10:43AM 24       THE LONICH COURT ITSELF RECOGNIZED THAT IN CONSPIRACY

10:43AM 25   CASES, THERE CAN BE THESE BORDERLINE CASES WHERE THE LOSS

10:43AM  1    AMOUNT DOES NOT FALL WITHIN THE CONSPIRACY.

10:43AM  2         AND WHAT WAS IMPORTANT TO THE COURT AND REALLY DROVE THE

10:43AM  3    COURT'S OPINION WAS WHETHER THE DEFENDANT HAD THE OPPORTUNITY

10:43AM  4    TO CHALLENGE THE LOSS AMOUNT THAT WAS BEING APPLIED AND

10:43AM  5    CHALLENGE THE EVIDENCE SUPPORTING THAT LOSS AMOUNT, AND THE

10:43AM  6    COURT REALLY FOCUSSED ON THE DUE PROCESS CONCERNS THAT WERE AT

10:44AM  7    PLAY IN LONICH, YOU KNOW, THE FAILURE OF THE BANK WAS BEING

10:44AM  8    PEGGED AS THE LOSS AMOUNT AND WHAT THE GOVERNMENT WAS

10:44AM  9    PROPOSING, AND THERE WERE REAL DUE PROCESS CONCERNS BECAUSE THE

10:44AM  10   DEFENDANTS NEVER REALLY GOT TO CHALLENGE THAT AMOUNT.

10:44AM  11        AND SO HERE WE HAVE A SIMILAR SITUATION.

10:44AM  12        THOSE DUE PROCESS CONCERNS THAT WERE AT PLAY IN LONICH

10:44AM  13   APPLY HERE AND REQUIRE A HIGHER BURDEN OF PROOF.

10:44AM  14        NONE OF THE FACTS UNDERLINE THE LOSS AMOUNT HERE AND

10:44AM  15   REALLY CAUSATION OF THE LOSS WERE PRESENTED TO THE JURY.

10:44AM  16        THE JURY WAS NOT INSTRUCTED ON RELIANCE.  THERE WERE TIMES

10:44AM  17   WHEN TO THE EXTENT THAT THE DEFENSE WANTED TO ASK QUESTIONS

10:44AM  18   ABOUT RELIANCE OR GET INTO RELIANCE, THE GOVERNMENT OBJECTED TO

10:44AM  19   THOSE QUESTIONS, UNDERSTANDABLY BECAUSE RELIANCE IS NOT AN

10:44AM  20   ELEMENT, BUT NEVERTHELESS THE JURY DID NOT HEAR THAT EVIDENCE.

10:45AM  21        THE JURY CAME BACK WITH A GENERAL VERDICT, MAKING NO

10:45AM  22   FINDINGS WHATSOEVER ON CAUSATION OR RELIANCE OR LOSS.

10:45AM  23        AND IN THE CIRCUMSTANCES OF THIS CASE, I RECOGNIZE THAT

10:45AM  24   THERE ARE SOME CASES WHERE, GIVEN THE NATURE OF THE CONSPIRACY,

10:45AM  25   IT'S EASY TO FIGURE OUT WHETHER THE CONDUCT FALLS WITHIN THE

10:45AM 1    SCOPE OF THE CONSPIRACY AND THE LOSS CAN JUST BE CALCULATED.

10:45AM 2        IN THIS CASE IT'S JUST NOT SO.  IT'S A VERY COMPLICATED

10:45AM 3    CAUSATION AND LOSS METHODOLOGY THAT NEEDS TO BE APPLIED OR THAT

10:45AM 4    HAS BEEN APPLIED BY VARIOUS EXPERTS.  IT'S NOT -- IT WAS NOT A

10:45AM 5    SHAM COMPANY.  THERANOS WAS A REAL COMPANY.  IT WASN'T A PONZI

10:45AM 6    SCHEME, WHICH MAY MAKE IT EASIER TO FIGURE OUT LOSS.

10:45AM 7        IT REALLY -- WHAT THESE INVESTORS AND OTHER INVESTORS THAT

10:45AM 8    THE GOVERNMENT WANTS TO INCLUDE RELIED ON IN MAKING THEIR

10:46AM 9    DECISIONS TO INVEST IS A SERIOUS QUESTION, AND IT'S A QUESTION

10:46AM 10   THAT YIELDS MANY, MANY YEARS OF EXPOSURE AND POTENTIALLY TIME

10:46AM 11   IN JAIL AND BECAUSE OF THAT, WE BELIEVE THAT THE CLEAR AND

10:46AM 12   CONVINCING STANDARD SHOULD APPLY.

10:46AM 13       SO, YOUR HONOR, I WAS GOING TO MOVE ON TO THE GOVERNMENT'S

10:46AM 14   LOSS AMOUNT.

10:46AM 15           THE COURT:  YES.

10:46AM 16           MS. WALSH:  SO THE GOVERNMENT IS ADVOCATING FOR AN

10:46AM 17   $800 MILLION LOSS AMOUNT ROUGHLY, AND IT HAS NOT PROVEN

10:46AM 18   CAUSATION FOR THAT AMOUNT.

10:46AM 19       IT DOES NOT PROVE CAUSATION FOR THE LONG LIST OF VICTIMS

10:46AM 20   THAT IT PROVIDED TO THE COURT.  IT DOES NOT -- IT HAS NOT

10:46AM 21   PROVEN, EITHER BY CLEAR AND CONVINCING EVIDENCE OR BY A

10:47AM 22   PREPONDERANCE THAT EACH ONE OF THOSE VICTIMS INDIVIDUALLY

10:47AM 23   RELIED ON THE REPRESENTATIONS THAT WERE BEFORE THE JURY IN THIS

10:47AM 24   CASE IN MAKING THEIR DECISIONS ABOUT WHETHER TO INVEST, AND I'M

10:47AM 25   GOING TO COME BACK TO THAT IN A SECOND.

10:47AM 1      BUT ANOTHER REASON THAT THE GOVERNMENT'S PROPOSED LOSS

10:47AM 2  AMOUNT FAILS IS THAT WE HAVE A SERIES OF EVENTS THAT ARE

10:47AM 3  INTERVENING CAUSES THAT BREAK THE CAUSAL CHAIN AFTER

10:47AM 4  MR. BALWANI LEAVES THERANOS.

10:47AM 5      AND I'M GOING TO ADDRESS THAT SEPARATELY, BUT THAT IS THE

10:47AM 6  SECOND REASON.  MR. BALWANI IS IN A VERY DIFFERENT SITUATION

10:47AM 7  FROM MS. HOLMES.  HE LEFT THERANOS IN MAY OF 2016.  SO I WILL

10:47AM 8  COME BACK TO THAT LATER.

10:47AM 9      BUT THE FINAL REASON THAT THE GOVERNMENT'S LOSS AMOUNT

10:47AM 10  FAILS IS THAT THE GOVERNMENT DOES NOT DISENTANGLE AS THE COURT

10:47AM 11  POINTED OUT IN MS. HOLMES'S SENTENCING.  THE GOVERNMENT DOES

10:48AM 12  NOT DISENTANGLE THE VALUE OF THERANOS FROM THE PRICE THAT

10:48AM 13  INVESTORS PAID FOR STOCK IN THERANOS, AND THEY HAVE TO DO THAT

10:48AM 14  UNDER ZOLP.

10:48AM 15      THE GOVERNMENT TRIED TO DO IT WITH THE SABA REPORT, BUT AS

10:48AM 16  I'M GOING TO GO THROUGH, THAT REPORT, AND AS EVIDENCED BY THE

10:48AM 17  EXPERT REPORTS THAT WE SUBMITTED, HAS SERIOUS ERRORS THAT CALL

10:48AM 18  INTO QUESTION THE RELIABILITY OF MR. SABA'S ANALYSIS, SO I WANT

10:48AM 19  TO GO THROUGH EACH ONE OF THOSE.

10:48AM 20          THE COURT:  OKAY.

10:48AM 21          MS. WALSH:  SO ON THE RELIANCE ISSUE, THE GOVERNMENT

10:48AM 22  HAS NOT PROVEN THAT EACH OF THE PROPOSED VICTIMS RELIED ON THE

10:48AM 23  STATEMENTS THAT WERE THE SUBJECT OF THE TRIAL.

10:48AM 24      THERANOS HAD MANY, MANY INVESTORS.  THOSE INVESTORS

10:48AM 25  INVESTED IN THERANOS FOR MANY DIFFERENT REASONS, VARIOUS

10:48AM 1    REASONS.  SOME MAY HAVE INVESTED BECAUSE THEY THOUGHT

10:49AM 2    ELIZABETH HOLMES WAS BRILLIANT AND WAS A DYNAMIC LEADER AND

10:49AM 3    BELIEVED IN HER MISSION.  OTHERS MAY HAVE INVESTED BECAUSE

10:49AM 4    EVERYONE ELSE WAS INVESTING AND THEY HAD THIS FEAR OF MISSING

10:49AM 5    OUT ON A GREAT OPPORTUNITY.

10:49AM 6        AND, IN FACT, YOUR HONOR CITED A SIMILAR TYPE OF INVESTOR

10:49AM 7    IN MS. HOLMES'S SENTENCING, AND I THINK IT WAS MS. FADIL WHO

10:49AM 8    INVESTED BECAUSE SHE NOTICED SOME BIG NAMES INVESTING.  AND THE

10:49AM 9    COURT RIGHTLY POINTED OUT THAT THERE HAS TO BE SOME RELIANCE BY

10:49AM 10   A PARTICULAR INVESTOR ON THE STATEMENTS THAT WERE AT ISSUE IN

10:49AM 11   THE TRIAL.

10:49AM 12       THE VERDICT ALONE, SINCE IT WAS A GENERAL VERDICT, CANNOT

10:49AM 13   ESTABLISH THAT RELIANCE AND NEITHER THE GOVERNMENT NOR THE PSR

10:49AM 14   PROVIDES SUFFICIENT EVIDENCE FROM WHICH THE COURT CAN

10:49AM 15   REASONABLY CONCLUDE THAT EACH ONE OF THESE DIFFERENT VICTIMS

10:50AM 16   RELIED ON THE MISREPRESENTATIONS, AND, THEREFORE, THEIR LOSSES

10:50AM 17   WERE CAUSED BY THEM.

10:50AM 18       AND I WANT TO TALK ABOUT ONE VERY GLARING EXAMPLE, AND

10:50AM 19   THIS IS ONE OF THE INVESTORS THAT YOUR HONOR INCLUDED IN THE

10:50AM 20   TEN THAT APPLIED DURING MS. HOLMES'S SENTENCING, AND THAT

10:50AM 21   INVESTOR IS RUPERT MURDOCH.

10:50AM 22       SO MR. MURDOCH INVESTED $125 MILLION IN FEBRUARY 2015.

10:50AM 23   THE GOVERNMENT NEVER INTERVIEWED MR. MURDOCH ABOUT WHAT HE

10:50AM 24   RELIED ON, AND HE DID NOT SUBMIT A VICTIM IMPACT STATEMENT.  SO

10:50AM 25   WE DON'T KNOW WHY HE INVESTED IN THERANOS.

10:50AM  1      HE MAY HAVE BEEN LIKE MS. FADIL AND INVESTED IN THERANOS

10:50AM  2  BECAUSE EVERYONE ELSE WAS, WE JUST DON'T KNOW.

10:50AM  3      WHAT WE DO KNOW IS FROM HIS CHIEF OF STAFF,

10:51AM  4  NATALIE RAVITZ, WHO TESTIFIED IN FRONT OF THE S.E.C., AND WHAT

10:51AM  5  SHE SAID UNDER OATH IN FRONT OF THE S.E.C. IS THAT SHE

10:51AM  6  UNDERSTOOD THAT THERANOS'S HISTORICAL REVENUES WERE LOW.  SHE

10:51AM  7  WAS SKEPTICAL ABOUT THE INVESTMENT FOR THAT REASON.  SHE

10:51AM  8  DESCRIBED HOW MS. HOLMES TOLD HER THAT THE DEVICE, THE THERANOS

10:51AM  9  DEVICE COULD BE USED IN MILITARY FIELD OPERATIONS AND ON

10:51AM  10  MEDEVAC HELICOPTERS, BUT SHE DIDN'T SAY THEY WERE ON THE

10:51AM  11  HELICOPTERS OR THEY WERE IN THE FIELD, JUST THAT THEY COULD BE.

10:51AM  12      AND IMPORTANTLY, MS. RAVITZ TESTIFIED IN THE S.E.C. THAT

10:51AM  13  SHE ACTUALLY DIDN'T DO THE WORK THAT SHE WOULD NORMALLY DO, THE

10:51AM  14  DUE DILIGENCE OR EXAMINING THE BINDER THAT WAS RECEIVED FROM

10:51AM  15  THERANOS BECAUSE MR. MURDOCH HAD ALREADY AGREED TO INVEST IN

10:52AM  16  THERANOS BEFORE SHE GOT A CHANCE TO DO IT.  HE ALREADY HAD AN

10:52AM  17  ORAL AGREEMENT WITH MS. HOLMES TO INVEST.

10:52AM  18      SO THIS IS THE CLEAREST EXAMPLE OF WE HAVE NO IDEA WHY

10:52AM  19  RUPERT MURDOCH INVESTED IN THERANOS, AND BECAUSE OF THAT THE

10:52AM  20  GOVERNMENT HAS NOT MET ITS BURDEN OF PROOF ON CAUSATION.

10:52AM  21      ANOTHER INVESTOR THAT FALLS INTO THAT SAME CATEGORY IS

10:52AM  22  PEER VENTURES.  PEER VENTURES -- THE REPRESENTATIVES OF

10:52AM  23  PEER VENTURES WERE INTERVIEWED, THEY GAVE STATEMENTS ABOUT WHAT

10:52AM  24  STATEMENTS WERE MADE TO THEM ABOUT THERANOS, BUT THERE'S

10:52AM  25  NOTHING ABOUT WHAT THEY ACTUALLY RELIED ON AND WHY THEY

10:52AM 1    INVESTED, AND THAT ABSENCE OF EVIDENCE MEANS THAT WE CANNOT PUT

10:52AM 2    THEM IN THE CATEGORY OF A VICTIM WHOSE LOSSES WERE CAUSED BY

10:52AM 3    THE MISREPRESENTATIONS.

10:52AM 4        OKAY.  WHAT THE GOVERNMENT ALSO OFFERS TO THE COURT, AND

10:53AM 5    THE COURT USED THIS DURING MS. HOLMES'S TESTIMONY, IS AN EXPERT

10:53AM 6    REPORT THAT WOULD ESTABLISH LOSS UNDER ZOLP BY ESTABLISHING

10:53AM 7    ALSO THE VALUE OF THERANOS AT VARIOUS DIFFERENT DATES.  AND THE

10:53AM 8    COURT, I KNOW, RELIED ON THAT REPORT DURING THE HOLMES'S

10:53AM 9    SENTENCING, BUT AS EVIDENCED BY THE EXPERT REPORTS THAT WE

10:53AM 10   SUBMITTED, THE SABA REPORT IS NOT RELIABLE, AND IT'S NOT

10:53AM 11   RELIABLE FOR SEVERAL DIFFERENT REASONS.

10:53AM 12       ONE, IS ON ITS OWN IT PROVIDES A RANGE OF INVESTOR LOSSES,

10:53AM 13   AND THAT RANGE IS 237 MILLION TO 316 MILLION, WHICH IS AN

10:54AM 14   $80 MILLION RANGE.  THAT RANGE IS FAR TOO BROAD FOR THE COURT

10:54AM 15   TO BE ABLE TO RELY ON IT AS CONSTITUTING A REASONABLE ESTIMATE

10:54AM 16   OF LOSS.

10:54AM 17       AND I THINK THE COURT RECOGNIZED THAT IN THE HOLMES

10:54AM 18   SENTENCING, SO WE WOULD JUST REITERATE THAT ARGUMENT HERE.  THE

10:54AM 19   SAME THING APPLIES HERE.  IT'S TOO BROAD A RANGE, AND THE COURT

10:54AM 20   CANNOT USE IT.

10:54AM 21       THE SECOND ISSUE IS THAT EACH OF THE TWO APPROACHES USED

10:54AM 22   BY MR. SABA CONTAINS SERIOUS FLAWS, BOTH THE INCOME APPROACH

10:54AM 23   AND THE ASSET APPROACH.

10:54AM 24       SINCE THE COURT RELIED ON THE INCOME APPROACH, I WANT TO

10:54AM 25   ADDRESS THAT FIRST.

10:54AM 1      SO THE FLAW IN MR. SABA'S INCOME APPROACH RELATES TO THE

10:54AM 2  DISCOUNT RATE THAT HE APPLIED TO ASCERTAIN THE PRESENT VALUE OF

10:55AM 3  THE CASH FLOWS.  AND THIS IS ALL LAID OUT IN MR. WEINGUST'S

10:55AM 4  DECLARATION.  AND THE DISCOUNT RATE MATTERS BECAUSE IT'S WHAT

10:55AM 5  IS USED TO REDUCE FUTURE CASH FLOWS TO PRESENT VALUE.

10:55AM 6      USING A HIGHER DISCOUNT RATE MEANS THE PRESENT VALUE WILL

10:55AM 7  BE LOWER.  AND WHAT MR. WEINGUST POINTS OUT IS THAT MR. SABA'S

10:55AM 8  RATE IS INAPPROPRIATELY HIGH.  SO WHY IS THAT?

10:55AM 9      ACCORDING TO MR. WEINGUST, MR. SABA RELIED ON OLD DATA IN

10:55AM 10 REACHING THAT 44 PERCENT DISCOUNT RATE, AND WHAT HE SHOULD HAVE

10:55AM 11 DONE IS USED THE DATA THAT EXISTED CLOSER IN TIME TO THE

10:55AM 12 VALUATION DATE, WHICH WAS DECEMBER 31ST, 2014, THE DATE THAT

10:55AM 13 THE COURT CHOSE.

10:55AM 14     NOW, WHEN YOU USE THAT DISCOUNT RATE, WHEN YOU USE THE

10:56AM 15 DATA THAT IS CLOSER IN TIME, YOU COME UP WITH YOUR DISCOUNT

10:56AM 16 RATE, IT GOES DOWN TO 27 PERCENT, AND THIS IS ALL LAID OUT IN

10:56AM 17 THE WEINGUST DECLARATION.

10:56AM 18         THE COURT:  DID HE TALK ABOUT THE -- HIS CRITICISM,

10:56AM 19 I THINK, WAS ABOUT THE USE OF THE PEPPERDINE STUDY.  HE TALKED

10:56AM 20 ABOUT THE PEPPERDINE STUDY.

10:56AM 21         MS. WALSH:  HE DID.

10:56AM 22         THE COURT:  AND I THINK HE WAS CRITICAL SAYING THAT

10:56AM 23 MR. SABA DID NOT PROPERLY USE THAT PEPPERDINE STUDY IN THE

10:56AM 24 SENSE THAT -- I THINK -- DIDN'T HE SAY THAT THE INFORMATION IN

10:56AM 25 THAT STUDY WAS SOMEHOW DATED AND HE SHOULD HAVE DONE MORE?

10:56AM 1        MS. WALSH:  RIGHT.  SO PEPPERDINE CREATES THE STUDY

10:56AM 2   EVERY YEAR AND INSTEAD OF USING THE YEAR THAT WAS CLOSE IN TIME

10:56AM 3   TO THE VALUATION DATE, MR. SABA INCLUDED MANY, MANY YEARS GOING

10:56AM 4   BACK PRETTY FAR IN TIME, AND MR. WEINGUST SAYS THAT'S NOT AN

10:56AM 5   APPROPRIATE WAY TO CALCULATE THE DISCOUNT RATE.  YOU SHOULD USE

10:57AM 6   THE DATA THAT EXISTS AS CLOSE IN TIME AS POSSIBLE TO THE

10:57AM 7   VALUATION DATE.

10:57AM 8        THE COURT:  AND THERE WAS ALSO SOME DISCUSSION IN

10:57AM 9   BOTH OF THE REPORTS ABOUT THE VARIABILITY OF VC CONDUCT.  VC'S

10:57AM 10  INVEST IN VERY STRANGE WAYS.  IT'S NOT A 3 PERCENT GUARANTEED

10:57AM 11  RETURN, IT'S NOT A TREASURY BILL.

10:57AM 12       MS. WALSH:  NO.

10:57AM 13       THE COURT:  IT'S A CREATURE OF THEIR OWN DESIGN AND

10:57AM 14  ACTIONS, AND, THEREFORE, I THINK THEY BOTH OBSERVED THAT VC

10:57AM 15  INVESTMENTS ARE DIFFICULT TO TRACK.

10:57AM 16       MS. WALSH:  THEY ARE DIFFICULT -- WELL, PEPPERDINE

10:57AM 17  IS A STUDY THAT TRACKS THEM EVERY YEAR.  SO THAT IS THE DATA

10:57AM 18  THAT EXISTS.

10:57AM 19       THE COURT:  COLLECTS THOSE INVESTMENTS AND OFFERS

10:57AM 20  THAT HISTORY?

10:57AM 21       MS. WALSH:  RIGHT.  BUT JUST SINCE YOU RAISED IT,

10:57AM 22  YOUR HONOR, VC INVESTMENTS OR I GUESS PROJECTIONS OR RATES OF

10:58AM 23  RETURN THAT APPEAR THERE, THEY ACCOUNT FOR THE RISK THAT THEY

10:58AM 24  KNOW THEY'RE GETTING INTO.  AND THERE ARE PARTS, AND I THINK

10:58AM 25  MR. WEINGUST POINTED THIS OUT, THERE ARE PARTS OF MR. SABA'S --

10:58AM  1    I THINK IT'S MORE IN THE SUPPLEMENTAL DECLARATION WHERE

10:58AM  2    MR. SABA SAYS, YOU KNOW, THESE RATES ARE TOO OPTIMISTIC, AND

10:58AM  3    THEY DON'T ACCOUNT FOR THE RISK THAT EXISTED AT THERANOS.

10:58AM  4        WELL, THESE ARE VENTURE CAPITAL FIRMS.  THEY ACCOUNT FOR

10:58AM  5    RISK.  THIS IS A MARKET FULL OF RISK.  SO THAT IS ANOTHER ONE

10:58AM  6    OF MR. WEINGUST'S POINTS THAT MR. SABA IS KIND OF AFTER THE

10:58AM  7    FACT SAYING THAT THESE RATES ARE TOO OPTIMISTIC BECAUSE THEY

10:58AM  8    HAVEN'T ACCOUNTED FOR RISK, BUT THEY HAVE.  THAT'S WHAT THEY

10:58AM  9    DO.

10:58AM  10            THE COURT:  THANK YOU.  YOU KNOW, WHAT WAS

10:58AM  11    INTERESTING, AS I LOOKED AT THESE REPORTS AND THINGS, I DIDN'T

10:58AM  12    LOOK AT AN APPENDIX OF THE PEPPERDINE REPORT OR ANY OF THESE

10:59AM  13    OTHER REPORTS, AND WHEN THEY TALK ABOUT RISK, AND THAT'S WHAT

10:59AM  14    WE'RE TALKING ABOUT FOR THIS ANALYSIS, WAS THERE ANY SPECIFIC

10:59AM  15    FACTOR THAT WAS IDENTIFIED IN THE RISK TAKING FOR THE RISK OF

10:59AM  16    FRAUD IN AN INVESTMENT?

10:59AM  17        IT DIDN'T SEEM THAT THAT'S A COLUMN THAT IS CHECKED OFF,

10:59AM  18    TICKED BY A PEPPERDINE STUDY OR SOMEONE ELSE.  IT SAYS RISK,

10:59AM  19    AND I SUPPOSE FROM AN INVESTOR STANDPOINT, I DON'T KNOW, BUT

10:59AM  20    DOES THAT MEAN, WELL, YOU KNOW, COMPANIES FAIL.  SOMEONE

10:59AM  21    INVENTS A NEW MOUSETRAP AND IT MIGHT WORK, BUT IT MIGHT NOT AS

10:59AM  22    OPPOSED TO IS THERE A RISK THAT THIS IS A FRAUDULENT ENDEAVOR?

10:59AM  23            MS. WALSH:  SO WHEN WE'RE TALKING ABOUT ECONOMIC

10:59AM  24    RISK AND VALUATION, FIRST, VALUATION IS DONE ONLY BASED ON WHAT

10:59AM  25    IS KNOWN OR KNOWABLE, RIGHT?

10:59AM 1      SO TYPICALLY IF THERE IS A FRAUD, IT'S NOT KNOWN

11:00AM 2   TYPICALLY.

11:00AM 3           THE COURT:  NO ONE WOULD INVEST IN THAT, WOULD THEY?

11:00AM 4           MS. WALSH:  RIGHT.  BUT THIS IS ALSO AN ECONOMIC

11:00AM 5   ANALYSIS, AND WHETHER -- IT'S ABOUT LOSING YOUR MONEY.  SO

11:00AM 6   WHETHER YOU LOSE YOUR MONEY BECAUSE THE COMPANY FAILED OR

11:00AM 7   BECAUSE IT -- FRAUD IS AFOOT, AND THE FRAUD COMES OUT AND YOU

11:00AM 8   LOSE YOUR INVESTMENT, FROM AN ECONOMIC STANDPOINT, THOSE TWO

11:00AM 9   THINGS ARE NOT GOING TO BE DIFFERENT.  YOU'RE GOING TO LOSE

11:00AM 10  YOUR MONEY.

11:00AM 11      SO TO ANSWER YOUR QUESTION, I DON'T THINK THOSE -- THE

11:00AM 12  PEPPERDINE STUDY ACCOUNTED FOR FRAUD, BUT I'M NOT SURE IT

11:00AM 13  MATTERS.

11:00AM 14      THE ISSUE IS WHAT IS THE RISK THAT YOU ARE GOING TO LOSE

11:00AM 15  YOUR INVESTMENT.

11:00AM 16      OKAY.  SO MR. WEINGUST, WHEN HE APPLIES THE DATA THAT HE

11:00AM 17  THINKS IS APPROPRIATE, COMES UP WITH A MUCH LOWER DISCOUNT

11:01AM 18  RATE, AND IT'S A 27 PERCENT DISCOUNT RATE.  AND HE LAYS THAT

11:01AM 19  OUT IN HIS TABLE 2 TO HIS DECLARATION.

11:01AM 20      AND MR. WEINGUST IS NOT JUST PICKING THIS OUT OF THIN AIR.

11:01AM 21  HE BASES IT ON DATA THAT EXISTS AT THE TIME OF THE VALUATION

11:01AM 22  DATE, BUT IT'S ALSO CORROBORATED BY OTHER EVIDENCE IN THE CASE.

11:01AM 23      FOR EXAMPLE, ARANCA USED A DISCOUNT RATE ON DECEMBER 31ST,

11:01AM 24  2014 THAT WAS 20 PERCENT, MUCH CLOSER TO MR. WEINGUST AND MUCH,

11:01AM 25  MUCH LOWER THAN MR. SOLACE.  AND THE LONG FILING THAT YOU

11:01AM 1    REFERENCED THIS MORNING, YOUR HONOR, I THINK IT WAS SO LONG

11:01AM 2    BECAUSE MR. WEINGUST ATTACHED THAT ARANCA REPORT.

11:01AM 3            THE COURT:  I THINK HIS SUMMARY, WAS IT 14 PAGES OR

11:01AM 4    SOMETHING LIKE THAT?

11:01AM 5            MS. WALSH:  YEAH, RIGHT.

11:01AM 6            THE COURT:  RIGHT.  BUT OF COURSE HE WANTED ME TO

11:02AM 7    READ THOSE 14 PAGES TO GET CONTEXT OF HIS 14 PAGES I THINK.

11:02AM 8            MS. WALSH:  WELL, I THINK HE JUST WANTED TO GIVE YOU

11:02AM 9    THE BASIS FOR WHAT HE WAS SAYING.

11:02AM 10    SO THAT ARANCA REPORT DOES CONTAIN THE DISCOUNT RATE AND

11:02AM 11   ITS DISCOUNT RATE IS 20 PERCENT.

11:02AM 12    ANOTHER CORROBORATING FACT IS FORTRESS IN 2017, LATE IN

11:02AM 13   2017 WHEN "THE WALL STREET JOURNAL" HAS WRITTEN ALL OF ITS

11:02AM 14   ARTICLES ABOUT THERANOS AND THE FRAUD IS POTENTIALLY OUT IN THE

11:02AM 15   MARKETPLACE, VERY RISKY INVESTMENT FOR ARANCA -- I'M SORRY, FOR

11:02AM 16   FORTRESS, AND FORTRESS ASSIGNED A DISCOUNT RATE OF 25 PERCENT,

11:02AM 17   A RATE OF RETURN OF 25 PERCENT, ALSO MUCH CLOSER TO

11:02AM 18   MR. WEINGUST AND MUCH LOWER THAN MR. SABA.

11:02AM 19    FINALLY, RDV IN ONE OF ITS EXHIBITS THAT IS A TRIAL

11:02AM 20   EXHIBIT, AND THIS IS TRIAL EXHIBIT 2192, ASSIGNED A RATE OF

11:03AM 21   RETURN FOR THERANOS OF 30 PERCENT.

11:03AM 22    SO MR. WEINGUST'S AFTER-THE-FACT ANALYSIS IS ACTUALLY

11:03AM 23   CORROBORATED BY SEVERAL PIECES OF EVIDENCE IN THE CASE.  AND

11:03AM 24   WHAT IT SHOWS IS MR. SABA'S DISCOUNT RATE IS TOO HIGH AND

11:03AM 25   CORRECTING IT MAKES A HUGE DIFFERENCE IN THE AMOUNT OF VALUE

11:03AM 1    THAT EXISTED IN THERANOS ON THAT VALUATION DATE, A HUGE

11:03AM 2    DIFFERENCE, AND THOSE DIFFERENCES ARE LAID OUT IN

11:03AM 3    MR. WEINGUST'S TABLE 2.

11:03AM 4        MR. WEINGUST ALSO FOUND THAT MR. SABA'S ASSET APPROACH WAS

11:03AM 5    FLAWED.

11:03AM 6        AND SINCE THE COURT DIDN'T APPLY THE ASSET APPROACH, I'D

11:03AM 7    LIKE TO GO THROUGH IT, BUT I RECOGNIZE THAT IT WASN'T APPLIED

11:03AM 8    TO MS. HOLMES.

11:04AM 9        BUT JUST QUICKLY, MR. WEINGUST NOTICED THAT MR. SABA DID

11:04AM 10   NOT APPLY AN OPPORTUNITY COST, WHICH IS A STANDARD FACTOR THAT

11:04AM 11   IS APPLIED IN ASSESSING VALUE USING THIS ASSET APPROACH.  AND

11:04AM 12   MR. SABA APPEARS TO HAVE IGNORED THAT FACTOR.  I DON'T KNOW IF

11:04AM 13   HE FORGOT TO APPLY IT OR WHY HE DIDN'T MENTION IT.

11:04AM 14       HE SAYS IN HIS SUPPLEMENTAL DECLARATION THAT HE DID

11:04AM 15   CONSIDER IT, BUT HE DECIDED NOT TO APPLY IT.

11:04AM 16       I THINK -- I'M NOT QUITE SURE THAT IS CREDIBLE BECAUSE

11:04AM 17   THERE WERE OTHER THINGS IN HIS ORIGINAL REPORT THAT HE

11:04AM 18   CONSIDERED AND DECIDED NOT TO APPLY, AND HE GOES THROUGH THEM

11:04AM 19   VERY CAREFULLY.  SO IT SEEMS HE WOULD DO THE SAME THING WITH

11:04AM 20   OPPORTUNITY CAUSED IF HE HAD REALLY CONSIDERED IT.  BUT IN ANY

11:04AM 21   EVENT, IT SHOULD BE APPLIED ACCORDING TO MR. WEINGUST, AND THAT

11:04AM 22   ALSO GREATLY AFFECTS THE VALUE OF THERANOS.

11:05AM 23       FINALLY, THE ALLOCATION METHOD THAT MR. SABA USES, SO THIS

11:05AM 24   IS WHEN HE HAS THE ENTIRE VALUE AND HE NEEDS TO ALLOCATE IT TO

11:05AM 25   THE DIFFERENT SHAREHOLDERS BASED ON THEIR LEVELS WITHIN THE

11:05AM 1    COMPANY, HE USED AN ALLOCATION METHOD THAT IS ACCEPTED IN THE

11:05AM 2    INDUSTRY, BUT IT'S THE OPC METHOD, BUT THERE ARE TWO INPUTS

11:05AM 3    THAT GO INTO THAT METHOD THAT ARE EXTREMELY SPECULATIVE.

11:05AM 4        THE TWO INPUTS ARE VOLATILITY AND THE OCCURRENCE OF A

11:05AM 5    HYPOTHETICAL LIQUIDITY EVENT.

11:05AM 6        AND WITH A PUBLIC COMPANY, THAT'S EASILY ASCERTAINABLE.

11:05AM 7    AND WITH A PRIVATE COMPANY AND LIMITED SHAREHOLDERS, IT IS

11:05AM 8    REALLY GUESSWORK TO ASCERTAIN THE LIQUIDITY OF PRIVATE STOCK OR

11:06AM 9    WHAT THE TIME PERIOD SHOULD BE BEFORE A LIQUIDITY EVENT HAPPENS

11:06AM 10   IN THE FUTURE.

11:06AM 11       THERE ARE UNKNOWNS, AND THEY REALLY INVOLVE A LOT OF

11:06AM 12   GUESSWORK.  THAT WOULD BE -- MAYBE THAT WOULD BE OKAY.  THE

11:06AM 13   PROBLEM IS IF YOU CHANGE EITHER ONE OF THESE INPUTS, IT GREATLY

11:06AM 14   IMPACTS THE VALUE THAT YOU END UP WITH PER SHAREHOLDER, AND

11:06AM 15   THESE HUGE SWINGS ARE JUST NOT APPROPRIATE FOR THE COURT TO USE

11:06AM 16   WHEN WE'RE TALKING ABOUT A CRIMINAL CASE AND SENTENCING AN

11:06AM 17   INDIVIDUAL TO WHAT COULD BE A LONG PERIOD OF TIME IN JAIL TO

11:06AM 18   RELY ON A METHOD WHERE IF YOU TWEAK ONE THING, IT SWINGS BY

11:06AM 19   HUNDREDS OF MILLIONS OF DOLLARS.  IT JUST DOESN'T SEEM

11:06AM 20   REASONABLE TO RELY ON THAT METHODOLOGY.

11:07AM 21       SO WHERE DOES THAT LEAVE US WITH MR. SABA?

11:07AM 22       AS I'VE SAID, HIS METHODOLOGY, IT MAY BE FINE IN A CIVIL

11:07AM 23   CASE, BUT IT'S NOT RELIABLE ENOUGH TO MAKE A REASONABLE

11:07AM 24   ESTIMATE IN THESE CIRCUMSTANCES IN SENTENCING.

11:07AM 25       MR. SABA IS ALSO INCONSISTENT WITH HOW HE USES

11:07AM 1    INFORMATION.  FOR EXAMPLE, HE USES THE TIME PERIOD UNTIL A

11:07AM 2    LIQUIDITY EVENT.  HE BASES THAT ON THE ARANCA REPORT, BUT HE

11:07AM 3    REJECTS THE ARANCA'S RATE OF RETURN.  AND THERE'S NO REASON WHY

11:07AM 4    HE'S PICKING AND CHOOSING CERTAIN THINGS TO USE FROM ARANCA AND

11:07AM 5    NOT WITHOUT ANY EXPLANATION.

11:07AM 6        SO NO MATTER WHAT APPROACH MR. SABA USES, THE PROBLEM IS,

11:07AM 7    AS I JUST SAID, THE VALUE THAT HE LANDS ON IF YOU TWEAK ONE

11:08AM 8    THING ABOUT HIS APPROACH, WHICH MR. WEINGUST BELIEVES SHOULD BE

11:08AM 9    DONE TO BE ACCURATE, THE VALUE OF THERANOS GOES UP BY HUNDREDS

11:08AM 10   OF MILLIONS OF DOLLARS AND THE LOSS GOES DOWN BY HUNDREDS OF

11:08AM 11   MILLIONS OF DOLLARS.

11:08AM 12       SO WHAT IT SHOWS IS THAT IT'S NOT A RELIABLE METHODOLOGY

11:08AM 13   TO USE WHEN ASSESSING LOSS.

11:08AM 14       SO WE DON'T THINK THE GOVERNMENT HAS PROVEN EVEN BY A

11:08AM 15   PREPONDERANCE LOSS IN THIS CASE.  EVEN WITH THE BENEFIT OF

11:08AM 16   MR. SABA'S REPORT, IT'S TOO SPECULATIVE.  AND WHEN YOU LOOK AT

11:08AM 17   THE ECONOMIC REALITY OF WHAT HAPPENED HERE, IT'S A TOTALLY

11:08AM 18   DIFFERENT PICTURE.

11:08AM 19       WHAT HAPPENED IS MR. BALWANI LEFT THERANOS IN MAY 2016.

11:08AM 20   WHEN HE LEFT THERANOS, THERE WAS $350,000 IN THE BANK, THERE

11:09AM 21   WAS IP THAT THERANOS OWNED WORTH HUNDREDS OF MILLIONS OF

11:09AM 22   DOLLARS, AND THAT'S EVIDENCED BY FORTRESS'S LOAN OF

11:09AM 23   $100 MILLION THAT IT EXTENDED TO THERANOS.  AS A PRACTICE, THE

11:09AM 24   VALUE OF THE COLLATERAL IS GOING TO BE WORTH MULTIPLES OF THE

11:09AM 25   FACE AMOUNT OF THE LOAN.  THE PERKINS COIE REPORT VALUED

11:09AM  1    THERANOS'S IP AS POTENTIALLY GENERATING HUNDREDS OF MILLIONS OF

11:09AM  2    DOLLARS.  AND AFTER MR. BALWANI LEFT THERANOS -- I THINK I JUST

11:09AM  3    MISSPOKE.  I SAID 350,000 IN THE BANK.  IT'S 350 MILLION.

11:09AM  4    APOLOGIES.  A BIG DIFFERENCE.

11:09AM  5        SO THERE'S A HUGE AMOUNT OF CASH IN THE BANK AND A HUGE

11:09AM  6    VALUE OF IP THAT THE COMPANY OWNS.

11:09AM  7        AND WHEN MR. BALWANI LEAVES THERANOS, THERANOS HAS TO

11:10AM  8    DECIDE WHAT TO DO WITH THOSE ASSETS.  IS IT GOING TO CONTINUE

11:10AM  9    ITS BUSINESS OF TESTING BLOOD?  IS IT GOING TO PUT A PAUSE ON

11:10AM  10   ITS BUSINESS AND SHUT DOWN AND REPAY ALL OF ITS INVESTORS?  IS

11:10AM  11   IT GOING TO LICENSE ITS IP AND TRY TO GENERATE REVENUE THAT WAY

11:10AM  12   TO GIVE ITS INVESTORS A RETURN ON THEIR INVESTMENTS?  ALL OF

11:10AM  13   THOSE ARE DECISIONS THAT HAD TO BE ANALYZED AND MADE.

11:10AM  14       MR. BALWANI WAS NO PART OF THAT.  HE WAS GONE FROM THE

11:10AM  15   COMPANY.  HE HAD NO CONTROL OVER THOSE DECISIONS.  THOSE

11:10AM  16   DECISIONS WERE BEING MADE BY ELIZABETH HOLMES, THE BOARD OF

11:10AM  17   DIRECTORS, AND INVESTORS WHO WERE COMMUNICATING WITH THEM AT

11:10AM  18   THE TIME.

11:10AM  19       SO THE GOVERNMENT'S PROPOSITION THAT, WELL, THE INVESTORS

11:10AM  20   LOST EVERYTHING AND MR. BALWANI SHOULD BE ON THE HOOK FOR THAT

11:10AM  21   LOSS IS -- IT CANNOT BE SUSTAINED BECAUSE MR. BALWANI LEFT

11:11AM  22   THERANOS BEFORE THE INVESTORS LOST THEIR MONEY.  THERE WERE SO

11:11AM  23   MANY INTERVENING FACTORS THAT BREAK THE CHAIN OF CAUSATION

11:11AM  24   BETWEEN THE INVESTORS BUYING THERANOS STOCK AND THEN AT THE END

11:11AM  25   OF THE DAY LOSING THEIR MONEY WHEN THERANOS SHUT ITS DOORS.

11:11AM 1          AND ONE OF THOSE INVESTORS WAS MR. BALWANI.  HE LOST THE

11:11AM 2     MILLIONS OF DOLLARS THAT HE USED TO BUY THERANOS STOCK.  AND HE

11:11AM 3     HAD NO CONTROL OVER THAT.

11:11AM 4          SO, YOUR HONOR, JUST TO SUM UP ON LOSS, THE GOVERNMENT HAS

11:11AM 5     NOT MET ITS BURDEN BY CLEAR AND CONVINCING EVIDENCE OR BY A

11:11AM 6     PREPONDERANCE TO SHOW THAT THE LOSSES THAT THE INVESTORS

11:11AM 7     SUSTAINED WERE CAUSED BY MR. BALWANI'S CONDUCT.

11:12AM 8          THE WAY THEY APPROACH LOSS USING THE SABA REPORT IS SO

11:12AM 9     SPECULATIVE AND UNRELIABLE THAT THE COURT SHOULD NOT USE IT.

11:12AM 10    IT CANNOT YIELD A REASONABLE ESTIMATE OF LOSS.  IT'S WAY TOO

11:12AM 11    COMPLICATED.

11:12AM 12         AND, IN FACT, I WOULD JUST NOTE THAT THE GOVERNMENT

11:12AM 13    DOESN'T CITE ANY NINTH CIRCUIT CASE WHERE THE COURT USES A

11:12AM 14    METHODOLOGY TO ASSESS SHARE PRICE OR VALUE FOR A PRIVATE

11:12AM 15    COMPANY.

11:12AM 16         THEY CITE TO THE LEONARD CASE IN THE SECOND CIRCUIT AND

11:12AM 17    OTHER SECOND CIRCUIT CASES.  AND THE LEONARD CASE, I MEAN THE

11:12AM 18    LEONARD CASE ACTUALLY REVERSED THE DISTRICT COURT FOR DOING

11:12AM 19    EXACTLY WHAT THE GOVERNMENT IS RECOMMENDING TO THIS COURT.

11:12AM 20         THE LEONARD DISTRICT COURT SAID THE WHOLE LOSS -- THAT THE

11:12AM 21    DEFENDANT IS RESPONSIBLE FOR THE ENTIRE LOSS, AND THE SECOND

11:12AM 22    CIRCUIT REVERSED ON THAT.

11:12AM 23         AND ALL THE SECOND CIRCUIT SAID IS DISTRICT COURT, COME UP

11:13AM 24    WITH A METHODOLOGY THAT IS REASONABLE.  THAT'S WHAT WE LEARNED

11:13AM 25    FROM THAT CASE.

```
11:13AM   1        WE HAVE NO CASE LAW TO ESTABLISH WHAT A REASONABLE

11:13AM   2   METHODOLOGY IS.  AND THIS CASE IN THIS COMPANY, AND BASED ON

11:13AM   3   ALL OF THESE INVESTORS WHO WERE INVESTING FOR DIFFERENT

11:13AM   4   REASONS, IT'S WAY TOO COMPLICATED AND SPECULATIVE TO ASCERTAIN

11:13AM   5   A REASONABLE AMOUNT OF LOSS.

11:13AM   6        THE GUIDELINES TELL US WHAT TO DO IN THOSE CIRCUMSTANCES.

11:13AM   7   WE LOOK TO WHAT THE DEFENDANT GAINED, AND WE ALL KNOW THAT

11:13AM   8   MR. BALWANI GAINED NOTHING FROM HIS TIME AT THERANOS.  IN FACT,

11:13AM   9   HE LOST MONEY.

11:13AM  10        SO FOR THAT REASON, WE THINK THE LOSS ENHANCEMENT SHOULD

11:13AM  11   BE ZERO.

11:13AM  12             THE COURT:  SO LET ME JUST CAPTURE THAT.

11:13AM  13        THE JURY HEARD THE EVIDENCE IN THE TRIAL, THEY CONVICTED

11:13AM  14   MR. BALWANI OF EVERY ONE OF THE CHARGES THAT WAS PRESENTED TO

11:13AM  15   THEM, INCLUDING THE WIRE FRAUD COUNTS, AND YOU BELIEVE THAT

11:14AM  16   THERE'S NO LOSS, THAT THE COURT SHOULD FIND NO LOSS?  IS THAT

11:14AM  17   WHAT I'M HEARING YOU SAY?

11:14AM  18             MS. WALSH:  THAT THERE SHOULD BE NO ADJUSTMENT FOR

11:14AM  19   LOSS, THAT'S RIGHT.

11:14AM  20             THE COURT:  WHAT SHOULD THE LOSS AMOUNT BE IN YOUR

11:14AM  21   OPINION?

11:14AM  22             MS. WALSH:  FOR MR. BALWANI, IT'S ZERO.

11:14AM  23             THE COURT:  OKAY.  OKAY.

11:14AM  24             MS. WALSH:  YEAH.

11:14AM  25             THE COURT:  OKAY.  THANK YOU.
```

11:14AM  1          MR. LEACH.

11:14AM  2               MR. LEACH:  THANK YOU, YOUR HONOR.

11:14AM  3          I'D LIKE TO ADDRESS EACH OF MS. WALSH'S POINT IF I COULD,

11:14AM  4     BUT I WOULD START BY SAYING THAT WE ARE NOT STARTING FROM A

11:14AM  5     BLANK SLATE HERE.

11:14AM  6          MOST, IF NOT ALL, OF THESE ARGUMENTS WERE MADE IN THE

11:14AM  7     HOLMES SENTENCING WHERE THE COURT MADE FINDINGS BASED ON THE

11:14AM  8     SABA REPORT, BASED ON MS. RAVITZ'S TESTIMONY.  I THINK THE ONLY

11:14AM  9     NEW INFORMATION HERE THAT WE'RE DEALING WITH IS EXPERT

11:14AM  10    DECLARATIONS TENDERED BY MR. BALWANI.  I'LL GET TO THOSE, BUT

11:14AM  11    MOST IF NOT EVERYTHING THAT HAS BEEN RAISED HERE WAS RAISED AND

11:14AM  12    CONSIDERED IN THE HOLMES SENTENCING UNDER IDENTICAL

11:15AM  13    CIRCUMSTANCES, AND THERE'S SIMPLY NOTHING NEW BESIDES THE

11:15AM  14    EXPERT DECLARATIONS THAT SHOULD ALTER THE COURT'S FINDINGS THAT

11:15AM  15    IT MADE IN THE HOLMES SENTENCING.

11:15AM  16         NOW, WE'VE ARGUED THAT THE LOSS IS THE FULL AMOUNT OF THE

11:15AM  17    C1 AND C2 INVESTMENTS.  WE RECOGNIZE THE COURT DISAGREED WITH

11:15AM  18    THAT IN THE HOLMES SENTENCING.

11:15AM  19         WE PRESERVE OUR ARGUMENT ON THAT POINT, BUT I'M GOING TO

11:15AM  20    FOCUS ON THE LOSS BASED ON THE COURT'S FINDINGS IN THE HOLMES

11:15AM  21    SENTENCING BASED ON THE SABA REPORT, WHICH WE CONTINUE TO

11:15AM  22    BELIEVE PROVIDE A SOUND AND RELIABLE BASIS TO CALCULATE THE

11:15AM  23    LOSS IN THIS CASE.

11:15AM  24         AND IT'S IMPORTANT TO REMEMBER, YOUR HONOR, THE COURT'S

11:15AM  25    JOB HERE, THE COURT'S OBLIGATION IS TO HAVE A REASONABLE

11:15AM  1      ESTIMATE OF LOSS, NOT AN EXACT CALCULATION, AN ESTIMATE OF

11:15AM  2      LOSS.  THAT'S WHAT THE GUIDELINES CALL FOR.

11:15AM  3          AND THE GUIDELINES SAY THAT THIS IS A TASK BEST SUITED FOR

11:15AM  4      THE DISTRICT JUDGE WHO OVERSAW THE TRIAL AND THAT THERE'S NOT A

11:16AM  5      ONE-SIZE-FITS-ALL APPROACH.  THERE'S A NUMBER OF FACTORS THAT

11:16AM  6      THE COURT IS SUPPOSED TO CONSIDER, AND THE GUIDELINES RECOGNIZE

11:16AM  7      THAT THERE'S NOT ONLY ONE WAY TO CALCULATE THE LOSS.  THE

11:16AM  8      JUDGE'S JOB IS TO FIND A REASONABLE ESTIMATE.  THIS IS NOT AN

11:16AM  9      EXACT SCIENCE.

11:16AM  10         WE KNOW HERE THAT THE INVESTORS IN THIS CASE LOST

11:16AM  11     EVERYTHING, EACH OF THE COUNTS OF CONVICTION, ALL OF THE

11:16AM  12     INVESTORS THAT WE SUBMITTED IN MY DECLARATION IN THE HOLMES

11:16AM  13     CASE.  THIS ISN'T A CASE WHERE, YOU KNOW, THEY -- IF YOU VALUE

11:16AM  14     IT ON ONE DAY YOU HAVE X, IF THE STOCK KEEPS TRADING, THEY HAVE

11:16AM  15     Y.  THEY LOST ALL OF THEIR MONEY.

11:16AM  16         AND THE POINT OF THE SABA EXERCISE IS TO TRY TO AFFIX A

11:16AM  17     RESIDUAL VALUE TO THE STOCK ON A PARTICULAR DATE.  THE DATE

11:16AM  18     THAT THE COURT SELECTED IN THE HOLMES CASE WAS DECEMBER 31ST,

11:16AM  19     2014.

11:16AM  20         IT'S ALSO IMPORTANT TO REMEMBER IN TERMS OF THE BURDEN OF

11:16AM  21     PROOF, I DIDN'T HEAR ANYTHING NEW FROM MS. WALSH IN TERMS OF

11:17AM  22     THE CASES.  THE LONICH CASE WAS CITED BY MS. HOLMES AND RELIED

11:17AM  23     ON.

11:17AM  24         AND THE NINTH CIRCUIT IS CLEAR THROUGH THE LAURIENTI CASE

11:17AM  25     AND THE BERGER CASE THAT WHEN YOU'RE TALKING ABOUT COUNTS WHERE

11:17AM  1    YOU HAVE A CONVICTION, HERE WIRE FRAUD, HERE A CONSPIRACY TO

11:17AM  2    DEFRAUD INVESTORS, THE APPROPRIATE STANDARD IS PREPONDERANCE OF

11:17AM  3    EVIDENCE, AND THAT'S THE STANDARD THAT THE COURT APPLIED IN THE

11:17AM  4    HOLMES SENTENCING.  THERE'S NO NEW CASE LAW ON THIS, THERE'S NO

11:17AM  5    NUANCE FOR MR. BALWANI THAT MAKES IT DIFFERENT, AND THE COURT

11:17AM  6    SHOULD CONTINUE TO APPLY THAT PREPONDERANCE STANDARD.

11:17AM  7         I WOULD SUBMIT THAT WE MEET ANY STANDARD, YOUR HONOR, BUT

11:17AM  8    PREPONDERANCE IS WHAT CONTROLS HERE.

11:17AM  9         IN TERMS OF THE NEW FACTS THAT MS. WALSH POINTED OUT, SHE

11:17AM  10   RAISED A COUPLE RELIANCE ISSUES WITH RESPECT TO PARTICULAR

11:17AM  11   INVESTORS.  SHE MENTIONED MR. MURDOCH.  THAT WAS AN INVESTOR

11:18AM  12   WHERE THE COURT MADE FINDINGS IN THE HOLMES CASE.

11:18AM  13        THERE'S NO NEW FACTS IN THE RECORD BASED ON THAT.  THE

11:18AM  14   COURT HAS MS. RAVITZ'S SWORN TESTIMONY ON THIS POINT.  AND

11:18AM  15   SHE'S VERY MUCH IN THE SAME POSITION AS LISA PETERSON WAS FOR

11:18AM  16   RDV, WHO THE COURT ALSO HEARD IN TWO TRIALS AND FOUND WAS A

11:18AM  17   COMPETENT WITNESS TO TESTIFY OR PROVIDE INFORMATION ABOUT

11:18AM  18   RELIANCE IN THIS PARTICULAR SETTING.

11:18AM  19        SHE WAS THE CHIEF OF STAFF FOR MR. MURDOCH.  SHE SAT

11:18AM  20   THROUGH TWO MEETINGS WITH MS. HOLMES AND MR. BALWANI.  SHE

11:18AM  21   RECEIVED THE TWO BINDERS OF DUE DILIGENCE MATERIALS.  THE COURT

11:18AM  22   IS, BY NOW, VERY FAMILIAR WITH THE BINDERS THAT WERE PROVIDED

11:18AM  23   TO INVESTORS THAT WERE COMPILED BY MR. EDLIN.  SHE HAD THOSE,

11:18AM  24   AND SHE REVIEWED THOSE ALONG WITH MR. MURDOCH.  SHE HAD THE

11:18AM  25   SAME REVENUE PROJECTIONS THAT WENT TO INVESTORS, AND THOSE WERE

11:18AM  1    IN PART OF THE CALCULUS BEHIND THE INVESTMENTS.

11:18AM  2         SHE SAID THAT SHE AND MR. MURDOCH WERE TOLD AND THEY

11:19AM  3    THOUGHT THE WAG DEAL WAS GROWING AND GENERATING MILLIONS OF

11:19AM  4    DOLLARS IN REVENUE.  THIS IS IMPORTANT BECAUSE IT'S IN DECEMBER

11:19AM  5    OF 2014, AND THIS IS A TIME PERIOD WHERE MR. BALWANI KNOWS FROM

11:19AM  6    MR. JHAVERI AND OTHERS AT WALGREENS THAT THEY'RE NOT GOING TO

11:19AM  7    EXPAND BEYOND THE 40 STORES BECAUSE THEY CAN'T GET THE RATIO OF

11:19AM  8    THE FINGERSTICK TESTING DOWN.  THEY KNOW ALL OF THAT BY

11:19AM  9    DECEMBER 14TH, 2014 AND NONE OF THAT IS DISCLOSED TO MS. RAVITZ

11:19AM 10    OR TO MR. MURDOCH.

11:19AM 11         SHE WAS THERE WHEN MS. HOLMES AND MR. BALWANI SHOWED THEM

11:19AM 12    THE BOX THAT PURPORTEDLY WAS DOING ALL OF THE TESTING.  SHE WAS

11:19AM 13    TOLD THAT THERE WERE USES IN THE MILITARY SITUATION.

11:19AM 14         CRITICALLY, SHE TESTIFIED TO QUESTIONS THAT MR. MURDOCH

11:19AM 15    WAS ASKED IN THESE MEETINGS.  ONE OF THEM WAS DIRECTED RIGHT TO

11:19AM 16    MR. BALWANI, WHICH WAS HOW RELIABLE ARE THESE REVENUE

11:19AM 17    PROJECTIONS?  AND MR. BALWANI SAID A MAXIMUM DOWNSIDE RISK OF

11:20AM 18    THESE HUNDRED MILLION DOLLAR PROJECTIONS IS 30 PERCENT.

11:20AM 19         THE COURT KNOWS FROM MS. RAVITZ'S TESTIMONY EXACTLY WHAT

11:20AM 20    WAS TOLD TO MR. MURDOCH.  IT CAN DRAW INFERENCES BASED ON

11:20AM 21    TESTIMONY ABOUT WHAT WAS RELEVANT.  THEY HAVEN'T CITED A SINGLE

11:20AM 22    CASE FOR THE PROPOSITION THAT IN SENTENCING WHERE CALCULATING

11:20AM 23    THE LOSS, YOU NEED TO CALL EACH AND EVERY INVESTOR IN THE

11:20AM 24    COMPANY, PUT THEM ON THE STAND, ASK THEM QUESTIONS AS YOU WOULD

11:20AM 25    IN A TRIAL IN ORDER TO DRAW THE REASONABLE ESTIMATE OF LOSS

| | | |
|---|---|---|
| 11:20AM | 1 | THAT THE COURT MUST ASSESS IN SENTENCING. |
| 11:20AM | 2 | WE HAVE MORE THAN MET OUR BURDEN ON THAT POINT. |
| 11:20AM | 3 | THERE WAS ALSO SOME REFERENCE IN THE BRIEFING TO |
| 11:20AM | 4 | MS. PETERSON, LIKE MS. HOLMES, THEY MAKE THIS ARGUMENT THAT |
| 11:20AM | 5 | BECAUSE MS. PETERSON WAS NOT THE FINAL DECISION-MAKER AT RDV, |
| 11:20AM | 6 | SHE'S INCOMPETENT TO TESTIFY TO RDV'S RELIANCE.  THERE'S NO |
| 11:20AM | 7 | CASE THAT SUPPORTS THAT. |
| 11:20AM | 8 | AND MS. PETERSON'S TESTIMONY THROUGHOUT BOTH TRIALS IS |
| 11:21AM | 9 | REPLETE WITH EVIDENCE SUPPORTING HER KNOWLEDGE OF WHAT WAS SAID |
| 11:21AM | 10 | AND HER KNOWLEDGE OF WHAT WAS IMPORTANT TO RDV.  AND I WOULD |
| 11:21AM | 11 | DIRECT THE COURT TO IN THE HOLMES TRIAL, TRIAL TRANSCRIPT 4759 |
| 11:21AM | 12 | SHE TESTIFIED WE WERE RELYING ON WHAT WE WERE TOLD.  SHE SAID |
| 11:21AM | 13 | WE WERE RELYING ON WHAT WE WERE TOLD BY THEM ON THE ACCURACY OF |
| 11:21AM | 14 | THE ANALYZER.  SHE SAID THE PFIZER DOCUMENT WAS VERY IMPORTANT |
| 11:21AM | 15 | TO THEM.  SHE SAID SHE WAS NOT JUST RELYING ON WHAT WAS IN |
| 11:21AM | 16 | WRITING, SHE WAS RELYING ON WHAT WE WERE TOLD. |
| 11:21AM | 17 | AND SHE WAS ALSO THE ONE WHO PREPARED THE APPROVAL |
| 11:21AM | 18 | DOCUMENT FOR RDV MEMORIALIZING FOR THEIR RECORDS, YOU KNOW, |
| 11:21AM | 19 | WHAT THEY WERE TOLD, WHAT WAS IMPORTANT FOR THEM, AND WHAT THEY |
| 11:21AM | 20 | RELIED ON. |
| 11:21AM | 21 | SO THE NOTION THAT YOU NEED TO HAVE SWORN TESTIMONY IN A |
| 11:21AM | 22 | SENTENCING PROCEEDING WITH EACH AND EVERY INVESTOR SAYING "I |
| 11:21AM | 23 | RELIED ON THIS" IS JUST NOT SUPPORTED BY THE CASES, AND THE |
| 11:21AM | 24 | COURT HAS AMPLE FACTUAL INFORMATION IN THE RECORD TO SUPPORT |
| 11:22AM | 25 | THE FINDINGS THAT IT MADE IN THE HOLMES SENTENCING WHICH SHOULD |

11:22AM 1     APPLY EQUALLY HERE.

11:22AM 2                THE COURT:  LET ME ASK YOU -- PARDON ME, MR. LEACH.

11:22AM 3         ARE THERE ANY VICTIMS PRESENT THAT WISH TO BE HEARD?

11:22AM 4                MR. LEACH:  NOT TO MY KNOWLEDGE, YOUR HONOR.

11:22AM 5                THE COURT:  ALL RIGHT.  THANK YOU.

11:22AM 6                MR. LEACH:  LET ME TURN TO MR. SABA BECAUSE I THINK

11:22AM 7     THE ONLY REAL NEW FACTUAL INFORMATION THAT THE COURT HAS IS TWO

11:22AM 8     EXPERT DECLARATIONS OR TWO FOR MR. WEINGUST AND ANOTHER ONE

11:22AM 9     FROM MR. REIFF.

11:22AM 10        I WANT TO START BY SAYING THAT THERE IS SOME DISPARITY IN

11:22AM 11    THE QUALIFICATIONS OF THE EXPERTS THAT MIGHT NOT BE OBVIOUS

11:22AM 12    FROM SOME OF THE MATERIALS, BUT I THINK ARE SIGNIFICANT IN

11:22AM 13    EVALUATING PARTICULARLY MR. WEINGUST.

11:22AM 14        MR. SABA IS AN ACCREDITED SENIOR APPRAISER WITH THE

11:22AM 15    AMERICAN SOCIETY OF APPRAISERS.  HE'S ALSO ACCREDITED IN

11:23AM 16    BUSINESS VALUATIONS BY THE AICPA, THE PROFESSIONAL ACCOUNTING

11:23AM 17    ASSOCIATION.

11:23AM 18        AND WHAT THAT -- AND MR. WEINGUST HAS NEITHER OF THOSE

11:23AM 19    CERTIFICATIONS.

11:23AM 20        MR. WEINGUST IS A MEMBER OF ANOTHER ORGANIZATION CALLED A

11:23AM 21    NATIONAL ASSOCIATION OF CERTIFIED EVALUATORS AND ANALYSTS, BUT

11:23AM 22    HE'S NOT CERTIFIED BY THAT ORGANIZATION.  MR. SABA IS.

11:23AM 23        AND WHY ARE THESE CERTIFICATIONS IMPORTANT?  IT'S BECAUSE

11:23AM 24    IN DOING HIS REPORT, MR. SABA WAS REQUIRED TO COMPLY WITH THE

11:23AM 25    STANDARDS THAT APPLY TO THOSE EVALUATORS, AND YOU CAN SEE THIS

11:23AM  1    AT THE TAIL END OF MR. SABA'S INITIAL REPORT, HE SAYS, "I

11:23AM  2    CERTIFY TO ALL OF THE FOLLOWING."  THAT MEANS HE FOLLOWED THE

11:23AM  3    STANDARDS OF THE AICPA IN PREPARING HIS REPORT, THAT MEANS HE

11:23AM  4    FOLLOWED THE STANDARDS OF AMERICAN SOCIETY OF APPRAISERS IN

11:23AM  5    PREPARING HIS REPORT, AND I THINK THAT CAN GIVE THE COURT ADDED

11:23AM  6    ASSURANCE THAT BECAUSE MR. SABA IS COMPLYING WITH THE

11:24AM  7    STANDARDS, DOING WHAT ACCOUNTANTS AND APPRAISERS DO EVERY DAY

11:24AM  8    IN TRYING TO DO SOMETHING THAT IS VERY HARD, WHICH IS TO VALUE

11:24AM  9    A COMPANY, AND PARTICULARLY HARD WHEN YOU'RE TRYING TO VALUE A

11:24AM  10   COMPANY AND DISENTANGLE A RISK THAT I THINK THE COURT IS RIGHT

11:24AM  11   IS NOT ACCOUNTED FOR BY INVESTORS OR BY -- AT LEAST THEY

11:24AM  12   SHOULDN'T HAVE TO ACCOUNT FOR IT, AND THAT'S THE RISK OF FRAUD.

11:24AM  13       SO THERE'S A VERY MEANINGFUL DIFFERENCE BETWEEN THE TWO

11:24AM  14   EXPERTS THAT THE COURT HAS.  WEINGUST IS A LAWYER, AND I'M NOT

11:24AM  15   CASTING ANY ASPERSIONS ON HIS QUALIFICATIONS, BUT HE DIDN'T

11:24AM  16   LOOK AT ANY DOCUMENTS, AS FAR AS I CAN TELL, OTHER THAN THE

11:24AM  17   ARANCA REPORT THAT HE PROVIDED TO YOU.  HE DIDN'T REVIEW THE

11:24AM  18   VOLUME OF MATERIAL THAT MR. SABA ATTACHED TO HIS REPORT TO

11:24AM  19   REALLY DIG INTO THE FORECAST, DIG INTO THE TESTIMONY TO TRY TO

11:24AM  20   FIGURE OUT WHAT WAS THE VALUE OF THIS COMPANY ON THIS

11:24AM  21   PARTICULAR DAY APPLYING THE STANDARDS.

11:24AM  22       AND I HAVE TO TAKE ISSUE WITH SOMETHING MS. WALSH SAID

11:24AM  23   EARLIER.  I DON'T SEE ANYTHING IN MR. WEINGUST'S DECLARATIONS

11:25AM  24   THAT SAY THIS IS THE RIGHT DISCOUNT RATE TO APPLY, YOU SHOULD

11:25AM  25   APPLY THIS DISCOUNT RATE, AND THIS GENERATES A PARTICULAR

11:25AM  1    VALUE.

11:25AM  2         HE'S CRITICAL OF WHAT MR. SABA DOES, BUT IF YOU PARSE THE

11:25AM  3    DECLARATION, AND WE'VE LOOKED AT IT VERY CAREFULLY, YOUR HONOR,

11:25AM  4    HE'S SAYING I THINK 45 PERCENT IS TOO HIGH.  IF YOU WERE TO

11:25AM  5    TAKE THIS 28 PERCENT NUMBER FROM THE SINGLE PEPPERDINE STUDY,

11:25AM  6    THIS IS WHAT HAPPENS.  AND IF YOU TAKE THE 20 PERCENT NUMBER

11:25AM  7    IMPLIED BY ARANCA, THIS IS WHAT HAPPENS.

11:25AM  8         BUT MR. WEINGUST DOESN'T LOOK AT A SINGLE DOCUMENT OTHER

11:25AM  9    THAN THE ARANCA REPORT, HE DOESN'T REVIEW ANY OF THE TESTIMONY,

11:25AM  10   HE DOESN'T REVIEW ANYTHING ABOUT THE UNDERLYING TECHNOLOGY.  HE

11:25AM  11   JUST SAYS, I HAVE A DIFFERENT -- YOU KNOW, I DISAGREED WITH

11:25AM  12   MR. SABA'S JUDGMENT ON THE 45 PERCENT, I'M NOT GOING TO TELL

11:25AM  13   YOU WHAT IT SHOULD BE, BUT IF YOU TAKE THESE OTHER TWO NUMBERS,

11:25AM  14   THIS IS WHAT YOU GET.

11:25AM  15        SO THIS ISN'T A SITUATION WHERE YOU HAVE AN EXPERT SAYING

11:26AM  16   X AND ANOTHER ONE SAYING Y.  IT'S REALLY THE Y BEING CRITICAL

11:26AM  17   OF THE X, AND THE X HAS GONE THROUGH A VERY, VERY THOROUGH

11:26AM  18   PROCESS, COMPLYING WITH THE APPROPRIATE STANDARDS.

11:26AM  19        THE 45 PERCENT IS A MATTER OF JUDGMENT, BUT HERE IT'S A

11:26AM  20   MATTER OF JUDGMENT BASED ON VERY, VERY REASONABLE

11:26AM  21   CIRCUMSTANCES.  LET ME EXPLAIN A LITTLE BIT WHY WE THINK THAT

11:26AM  22   IS SO AND WHY WE THINK THE COURT WAS RIGHT TO INCLUDE THAT IN

11:26AM  23   THE FIRST INSTANCE AND WHY MR. WEINGUST DOESN'T RAISE ANYTHING

11:26AM  24   TO MEANINGFULLY COUNTERACT THAT.

11:26AM  25        THE FIRST CRITIQUE I HEARD WAS HE'S USING THIS OLD DATA.

11:26AM   1    THIS SO-CALLED "OLD DATA" IS FROM A 2019 REPORT BY THE AICPA,

11:26AM   2    WHICH MR. WEINGUST IS NOT A MEMBER OF, IS NOT CERTIFIED BY, AND

11:26AM   3    THIS IS A TOOL ACCORDING TO MR. SABA THAT IS USED ROUTINELY IN

11:26AM   4    VALUATIONS OF COMPANIES, BOTH PRIVATE AND PUBLIC, AND THIS IS

11:27AM   5    DATA THAT IS IN AS AUTHORITATIVE LITERATURE AS YOU CAN GET IN

11:27AM   6    THIS AREA.

11:27AM   7        SO WE APPRECIATE THAT MR. SABA THINKS IT'S OLD.  IT'S HARD

11:27AM   8    TO GET DATA ON PRIVATE VENTURE CAPITAL COMPANIES.

11:27AM   9        MR. WEINGUST WOULD HAVE YOU RELY ON ONE SINGLE REPORT FROM

11:27AM  10    PEPPERDINE.

11:27AM  11        MR. SABA IS TAKING A MORE HOLISTIC APPROACH BASED ON DATA

11:27AM  12    THAT ISN'T OLD BUT IS DATA AUTHORITATIVELY RELIED UPON BY THE

11:27AM  13    AICPA.

11:27AM  14        THERE'S ALSO CRITICISM ON JUST USING THAT PEPPERDINE

11:27AM  15    NUMBER.  THE COURT COMMENTED ON, WELL, DID HE USE THE 2021

11:27AM  16    NUMBERS OR THE 2015 NUMBERS?  I HOPE WE MADE THIS CLEAR IN OUR

11:27AM  17    REPLY BRIEF, WHEN IT COMES TO THE PEPPERDINE STUDY, MR. SABA

11:27AM  18    WAS USING THE 25 -- THE 2015 NUMBERS.

11:27AM  19        IF YOU LOOK AT SOME OF THE SUPPORTING SCHEDULES AND YOU

11:27AM  20    COMPARE THEM TO MR. WEINGUST'S DECLARATION, YOU'LL SEE THAT

11:27AM  21    IT'S 2015 NUMBERS.  THEY'RE APPLES TO APPLES.  THERE IS A TYPO

11:28AM  22    IN MR. SABA'S REPORT THAT SAYS 2021 MANUAL, BUT THE TYPO IS THE

11:28AM  23    REFERENCE TO THE MANUAL, NOT THE USE OF THE PEPPERDINE STUDY.

11:28AM  24        SO I HEARD MS. WALSH SAYING SOMETHING SLIGHTLY DIFFERENT,

11:28AM  25    AND I JUST WANT TO MAKE SURE THAT WE'RE CLEAR ON THAT POINT.

11:28AM  1       WHY IS IT WRONG TO USE THE ARANCA NUMBERS, THE 20 PERCENT?

11:28AM  2   WELL, WE KNOW THAT ARANCA WAS LIED TO, YOUR HONOR.  WE KNOW

11:28AM  3   THAT ARANCA IS A VALUATION COMPANY BASED IN INDIA.  I THINK THE

11:28AM  4   CROSS-EXAMINATION OF MS. SPIVEY IN THE BALWANI TRIAL WAS ARANCA

11:28AM  5   IS NOT REALLY THAT -- THE COST FOR AN ARANCA REPORT IS NOT THE

11:28AM  6   SAME AS GETTING A VALUATION REPORT FROM DUFF & PHELPS, BUT NOW

11:28AM  7   MR. WEINGUST IS SAYING OR SUGGESTING THAT'S SOMETHING THAT THE

11:28AM  8   COURT SHOULD LOOK TO.

11:28AM  9       BUT IF YOU LOOK AT THE VALUATION REPORT FROM 2014, ARANCA

11:29AM 10   IS ASSUMING, BASED ON WHAT THEY'RE TOLD BY MS. HOLMES AND

11:29AM 11   MR. BALWANI, THAT THERANOS IS GOING TO GO FROM $150,000 IN

11:29AM 12   REVENUE IN DECEMBER OF 2014 TO $113 MILLION IN REVENUE THE

11:29AM 13   FOLLOWING YEAR.

11:29AM 14       NOT ONLY DO WE KNOW THAT DIDN'T HAPPEN, WE KNEW AT

11:29AM 15   DECEMBER 2014 THERE WAS NO WAY THAT WAS GOING TO HAPPEN BECAUSE

11:29AM 16   WALGREENS WAS SAYING WE'RE NOT GOING TO EXPAND PAST 40 STORES

11:29AM 17   UNTIL YOU CAN GET YOUR TECHNOLOGY TO DO THE FINGERSTICKS MORE

11:29AM 18   APPROPRIATELY.  YOU DON'T SEE ANYTHING LIKE THAT IN THE ARANCA

11:29AM 19   REPORT.

11:29AM 20       MR. WEINGUST SAYS ARANCA DID ALL OF THIS DUE DILIGENCE.

11:29AM 21   THERE'S ZERO EVIDENCE IN THE RECORD ABOUT THE DILIGENCE THAT

11:29AM 22   ARANCA DID.

11:29AM 23       AND IF YOU LOOK CLOSELY AT THE FORECASTS THAT WERE

11:29AM 24   PROVIDED TO ARANCA, THESE ARE PIE IN THE SKY SUCCESS SCENARIO

11:29AM 25   PROJECTIONS UNDER THE BEST CASE, BASED ON EVERYTHING THAT WE

11:30AM   1    KNOW FROM THIS TRIAL, AND THAT'S NOTHING THAT MR. WEINGUST

11:30AM   2    READ, CONSIDERED, THOUGHT ABOUT.  YOU JUST CAN'T LOOK AT THE

11:30AM   3    ARANCA REPORTS BASED ON WHAT WE KNOW AND BASED UPON WHAT WE

11:30AM   4    HEARD IN THIS TRIAL AND THINK THAT THEY'RE ANYWHERE NEAR THE

11:30AM   5    RIGHT NUMBERS THAT SHOULD GO INTO CALCULATING THE DISCOUNT

11:30AM   6    RATE.

11:30AM   7         SO THE 45 PERCENT IS CONSIDERING THE PEPPERDINE REPORT,

11:30AM   8    ANOTHER BATCH OF COMPANIES FROM A WIDER PERIOD OF TIMEFRAME,

11:30AM   9    AND THE ACTUAL IMPLIED RATE OF RETURN THAT THE INVESTORS IN

11:30AM   10   THIS CASE THROUGH THEIR MODELING APPLIED.

11:30AM   11        I KNOW MR. WEINGUST IN HIS SUPPLEMENTAL DECLARATION

11:30AM   12   CRITIQUES THAT, BUT IT'S ACTUALLY IN THE SABA REPORT AND IN

11:30AM   13   WHAT HE DESCRIBED AS THE BUILD MODEL, LIKE YOU CAN SEE HIM

11:30AM   14   TAKING THE PROJECTIONS THAT WERE PROVIDED TO INVESTORS, TAKING

11:30AM   15   THE PRICE THAT THEY BOUGHT AT, AND USING THAT TO CALCULATE WHAT

11:30AM   16   WAS THEIR IMPLIED RATE OF RETURN, AND THAT'S PART OF THE MIX OF

11:31AM   17   INFORMATION THAT GOES INTO MR. SABA'S JUDGMENT, GIVING THE

11:31AM   18   DEFENDANTS EVERY BENEFIT OF THE DOUBT IN TERMS OF SOLVING ALL

11:31AM   19   OF THEIR TECHNOLOGY PROBLEMS, MEETING THESE PIE IN THE SKY

11:31AM   20   REVENUE PROJECTIONS, GETTING FDA APPROVAL, GETTING ALL OF THE

11:31AM   21   PROBLEMS FIXED IN THE LAB, GIVING ALL OF THOSE BENEFITS OF THE

11:31AM   22   DOUBT TO THE DEFENDANT, THAT'S HOW MR. SABA LANDS ON THIS

11:31AM   23   45 PERCENT, WHICH IS A MATTER OF JUDGMENT, BUT THERE IS

11:31AM   24   JUDGMENT IN THIS.  THERE'S NO DOUBT ABOUT THAT, YOUR HONOR.

11:31AM   25   BUT IT'S A JUDGMENT WELL GROUNDED IN THE TRIAL RECORD AND IN

11:31AM 1    THE FACTS THAT THE COURT HEARD, AND IT'S COMPLETELY APPROPRIATE

11:31AM 2    TO RELY ON.

11:31AM 3        MY COLLEAGUE ALSO BROUGHT UP THE FORTRESS TRANSACTION, AND

11:31AM 4    I DO THINK THAT THAT IS AN IMPORTANT DATA POINT FOR THE COURT

11:31AM 5    TO CONSIDER IN TERMS OF IS 121 MILLION SOMEHOW, YOU KNOW, JUST

11:32AM 6    NOT POSSIBLY THE LOSS IN THIS CASE.  AND I THINK IT'S IMPORTANT

11:32AM 7    TO UNDERSTAND EXACTLY WHAT THE FORTRESS TRANSACTION WAS.

11:32AM 8        THIS WAS IN DECEMBER OF 2017.  FORTRESS LENT $60 MILLION

11:32AM 9    TO THERANOS SECURED BY ALL OF THE IP, ALL OF THE PATENTS THAT

11:32AM 10   THE COURT HEARD ABOUT, ALL OF THE PATENTS THAT MR. WEINGUST

11:32AM 11   TALKS ABOUT, A $60 MILLION LOAN SECURED BY THE PATENTS, THE

11:32AM 12   INTELLECTUAL PROPERTY.

11:32AM 13       AND IF THERANOS COULD MEET PARTICULAR MILESTONES, IT MIGHT

11:32AM 14   GET AN ADDITIONAL 40 MILLION.  THAT'S WHERE THE $100 MILLION

11:32AM 15   COMES IN.

11:32AM 16       AT THE END OF THE DAY, THERANOS DEFAULTED ON THAT LOAN,

11:32AM 17   FORTRESS TOOK ALL OF THE IP, AND I THINK THAT'S THE ONLY REAL

11:32AM 18   TRANSACTION THAT WE HAVE TO ASSESS, WELL, WHAT WAS THAT IP

11:32AM 19   WORTH?  WHAT -- STRIP AWAY THE CASH, WHAT WAS THE IP WORTH?

11:32AM 20       THE MOST FORTRESS WOULD LEND WAS $60 MILLION.

11:33AM 21       NOW, LET'S SAY THAT THEY WERE DOUBLY COLLATERALIZED;

11:33AM 22   THAT'S $120 MILLION.  LET'S SAY THEY WERE TRIPLE

11:33AM 23   COLLATERALIZED; $180 MILLION.  FOUR TIMES COLLATERALIZED THAT

11:33AM 24   FORTRESS IS TAKING, YOU'RE AT 240 MILLION.  ALL OF THESE

11:33AM 25   NUMBERS ARE SIGNIFICANTLY LESS THAN MR. SABA'S VALUATION,

11:33AM  1   GIVING THE DEFENDANTS ALL OF THE BENEFIT OF THE DOUBT.

11:33AM  2        THE FORTRESS TRANSACTION IS REMARKABLY HELPFUL IN TERMS OF

11:33AM  3   ASSESSING WHETHER OR NOT THESE ARE LOSS ESTIMATES THAT ARE

11:33AM  4   REALLY JUST SPECULATION OR ARE REALLY SOMETHING THAT ARE JUST

11:33AM  5   GIVING THE BENEFIT OF THE DOUBT TO THE DEFENDANTS.  IT'S

11:33AM  6   MAGNITUDES OF VALUE LOWER.

11:33AM  7        MY COLLEAGUE ALSO TALKED ABOUT VOLATILITY AND HYPOTHETICAL

11:33AM  8   EXIT USING THE OPM MODEL.  MR. SABA ATTEMPTED TO ADDRESS THAT

11:34AM  9   IN HIS SUPPLEMENTAL REPORT.  YES, THIS IS HARD WORK.  THERE ARE

11:34AM 10   ASSUMPTIONS THAT HAVE TO GO INTO THIS.  WE'RE TRYING TO CREATE

11:34AM 11   A SCENARIO WHERE THERE WAS NO FRAUD, WHERE THERE WAS FULL

11:34AM 12   TRANSPARENT INFORMATION.  THAT IS A HARD EXERCISE.  WE

11:34AM 13   RECOGNIZE THAT.

11:34AM 14        BUT THE LEONARD CASE IN PARTICULAR SAYS THAT DOESN'T MEAN

11:34AM 15   WE THROW UP OUR HANDS AND DON'T ESTIMATE WHAT THE LOSS IS.  THE

11:34AM 16   LEONARD CASE SAYS WE RECOGNIZE THIS IS A HARD JOB FOR DISTRICT

11:34AM 17   COURTS, BUT THERE ARE TOOLS AVAILABLE.  THERE ARE A NUMBER OF

11:34AM 18   FACTORS TO GO THROUGH.  AND I THINK THE COURT'S THOUGHTFUL

11:34AM 19   ASSESSMENT OF THE INCOME APPROACH IN THE HOLMES SENTENCING WAS

11:34AM 20   APPROPRIATE THEN AND IT'S APPROPRIATE NOW.

11:34AM 21        UNLESS THE COURT HAS FURTHER QUESTIONS, THE GOVERNMENT

11:34AM 22   SUBMITS ON THE LOSS POINT.

11:34AM 23             THE COURT:  THANK YOU.

11:34AM 24             MS. WALSH:  JUST A COUPLE OF POINTS, YOUR HONOR.

11:34AM 25        SO I THINK IT'S WELL-KNOWN, AND MR. WEINGUST AND I THINK

11:35AM 1     MR. SABA WOULD AGREE WITH THIS, THAT VENTURE CAPITAL FIRMS BAKE

11:35AM 2     A FAILURE SCENARIO INTO THEIR MODELS FOR COMING UP WITH RATES

11:35AM 3     OF RETURN.  SO TO SAY, WELL, I HAVE THIS RATE OF RETURN THAT

11:35AM 4     VENTURE CAPITAL FIRMS WERE INVESTING IN DURING THIS TIME

11:35AM 5     PERIOD, BUT I NEED TO MAKE ADJUSTMENTS BECAUSE THEY DIDN'T KNOW

11:35AM 6     ABOUT ALL OF THESE BAD THINGS ABOUT THERANOS, YOU'RE DOUBLE

11:35AM 7     COUNTING RISK.

11:35AM 8         THEY'VE ALREADY TAKEN INTO ACCOUNT THE RISK OF THE

11:35AM 9     BUSINESS FAILING.  WHETHER IT FAILS FOR BAD MANAGEMENT,

11:35AM 10    MISTAKES OR FRAUD, IT'S AN ECONOMIC ANALYSIS, FAILURE IS

11:35AM 11    FAILURE, AND THEY HAVE TAKEN THAT INTO ACCOUNT.

11:35AM 12            THE COURT:  THEY DO?  IS THAT YOUR UNDERSTANDING IS

11:35AM 13    WHEN RISK ANALYSIS IS TAKEN, THEY ALSO LOOK AT WHAT IS THE

11:35AM 14    POSSIBILITY OF INTERIOR CRIMINAL CONDUCT THAT COULD RESULT IN A

11:35AM 15    FAILURE AND A DEBACLE OF THIS COMPANY?  IS THAT SOMETHING THAT

11:36AM 16    THEY DO?

11:36AM 17            MS. WALSH:  NO.

11:36AM 18            THE COURT:  OH.

11:36AM 19            MS. WALSH:  MY UNDERSTANDING IS THAT IT WOULD BE THE

11:36AM 20    OPPOSITE.  THEY LOOK AT RISK OF FAILURE.  THEY DON'T SAY WHY IS

11:36AM 21    THE BUSINESS FAILING.

11:36AM 22            THE COURT:  IT'S JUST FAILURE.

11:36AM 23            MS. WALSH:  IT'S ECONOMIC FAILURE.

11:36AM 24            THE COURT:  I SEE.  OKAY.

11:36AM 25            MS. WALSH:  JUST TO RESPOND TO A POINT THAT

11:36AM   1   MR. LEACH MADE ABOUT ARANCA.  HE SAYS, WELL, ARANCA WAS LIED

11:36AM   2   TO, AND, THEREFORE, WE CAN'T RELY ON THAT DISCOUNT RATE OR THAT

11:36AM   3   RATE OF RETURN THAT IS IN THAT REPORT.

11:36AM   4       WELL, IF ARANCA WAS LIED TO AND IT'S NOT RELIABLE TO RELY

11:36AM   5   ON THAT INFORMATION, THEN WHY IS MR. SABA RELYING ON ARANCA TO

11:36AM   6   ESTABLISH THE TIME PERIOD UNTIL A LIQUIDITY EVENT?  HE'S

11:36AM   7   PICKING AND CHOOSING WHAT WITHIN THE ARANCA REPORT HE'S RELYING

11:36AM   8   ON, AND THAT'S NOT AN APPROPRIATE WAY TO METHODICALLY AND

11:36AM   9   NEUTRALLY COME UP WITH A VALUE.

11:36AM  10       THE COURT:  SO WHAT SHOULD WE DO IF WE COMPLETELY

11:36AM  11   ELIMINATED THE ARANCA, SHOULD THERE BE EVEN ANOTHER ANALYSIS

11:36AM  12   THAT WE ELIMINATE ARANCA AND SAY CAN YOU MAKE A DECISION NOT

11:37AM  13   RELYING ON THAT, OR IS IT BETTER PRACTICE TO ANALYZE EVERYTHING

11:37AM  14   THAT IS ON THE TABLE AND THEN MAKE AT LEAST A BEST ESTIMATE?

11:37AM  15       MS. WALSH:  SURE.  I THINK IT IS BETTER TO ANALYZE

11:37AM  16   EVERYTHING ON THE TABLE, BUT YOU CAN'T SAY ARANCA IS ON THE

11:37AM  17   TABLE AND I'M GOING TO CHOOSE THE TIME PERIOD FOR A LIQUIDITY

11:37AM  18   EVENT, THAT'S GOOD, THAT'S VALID, BUT, OH, NO, I'M GOING TO

11:37AM  19   REJECT THE RATE OF RETURN BECAUSE ARANCA WAS LIED TO.  YOU

11:37AM  20   CAN'T HAVE IT BOTH WAYS.

11:37AM  21       THE COURT:  OKAY.

11:37AM  22       MS. WALSH:  OKAY.  AND THEN JUST A COUPLE OF POINTS

11:37AM  23   ON MR. MURDOCH.

11:37AM  24       SO I DON'T THINK THAT NATALIE RAVITZ IS ANALOGOUS TO

11:37AM  25   LISA PETERSON AT ALL.

11:37AM 1      MS. RAVITZ EXPRESSED IN HER S.E.C. TESTIMONY THAT SHE

11:37AM 2   THOUGHT THAT THE HISTORICAL REVENUE WAS LOW, AND SHE DIDN'T

11:38AM 3   NECESSARILY THINK IT WAS A GOOD INVESTMENT TO MAKE.

11:38AM 4      IT WAS MR. MURDOCH WHO PULLED THE TRIGGER ON THE

11:38AM 5   INVESTMENT.  HE WAS THE DECISION-MAKER.  AND WE HAVE NOTHING IN

11:38AM 6   THE RECORD, ZERO FROM HIM IN THE FORM OF TESTIMONY OR IN THE

11:38AM 7   FORM OF A VICTIM IMPACT STATEMENT SAYING WHAT HE RELIED ON IN

11:38AM 8   MAKING THAT DECISION.  FOR THAT REASON, I THINK THE COURT HAS

11:38AM 9   TO REJECT HIM AS AN INVESTOR TO BE INCLUDED IN THE GROUP.

11:38AM 10         THE COURT:  OKAY.  THANK YOU.

11:38AM 11         MS. WALSH:  AND THEN FINALLY, THERE WAS SOMETHING

11:38AM 12  THAT MR. LEACH SAID THAT WAS INTERESTING ABOUT, WELL,

11:38AM 13  MR. WEINGUST IS NOT PROVIDING THE COURT WITH HIS OWN VALUATION.

11:38AM 14  HE'S NOT SAYING, HEY, THIS IS WHAT IT SHOULD BE.  THAT'S TRUE.

11:38AM 15     IT'S THE GOVERNMENT'S BURDEN TO PROVE LOSS.  IT'S NOT THE

11:38AM 16  DEFENSE'S BURDEN, AND MR. WEINGUST HASN'T PROVIDED THE COURT

11:38AM 17  WITH WHAT RATE OF RETURN OR ANYTHING ELSE OF VALUE, YOU KNOW, A

11:39AM 18  FULSOME VALUATION.  HE DIDN'T LOOK AT AS MANY DOCUMENTS PERHAPS

11:39AM 19  AS MR. SABA, BUT THE BURDEN IS NOT ON US TO ESTABLISH LOSS.

11:39AM 20     WHAT HE DID DO, AND I THINK THIS IS THE WHOLE POINT OF

11:39AM 21  THIS EXERCISE, HE LOOKED AT MR. SABA'S REPORT AS AN EXPERT, AND

11:39AM 22  HE NOTICED THAT THERE WERE SOME VERY SERIOUS ERRORS IN EACH

11:39AM 23  APPROACH, AND THE INCOME APPROACH AND THE ASSET APPROACH.

11:39AM 24  WE'VE GONE OVER THOSE TODAY.

11:39AM 25     THE MAGNITUDE IN TERMS OF VALUING THERANOS AND THEN

11:39AM 1   ASCERTAINING LOSS, THE MAGNITUDE OF THOSE ERRORS ARE SO GREAT

11:39AM 2   AND THEY RESULT IN SUCH SWINGS IN VALUE AND LOSS, THAT THE

11:39AM 3   COURT SHOULD NOT RELY ON THE REPORT IN FASHIONING A REASONABLE

11:39AM 4   LOSS AMOUNT.

11:39AM 5           THE COURT:  OKAY.  THANK YOU.

11:39AM 6       AND I THINK YOU'RE RIGHT, HIS REPORTS ARE CRITICAL,

11:39AM 7   THEY'RE CRITICISMS.  THEY'RE LOOKING AT THE SABA REPORT,

11:40AM 8   CRITICIZING SPECIFIC FINDINGS, PROTOCOLS THAT WERE ENGAGED AS

11:40AM 9   MR. REIFF -- IS IT MR. REIFF?

11:40AM 10          MS. WALSH:  REIFF.

11:40AM 11          THE COURT:  REIFF.  HE DID THE SAME THING.  BUT

11:40AM 12  NEITHER OF THEM COME UP WITH ANY FACTOR.

11:40AM 13      I THINK MR. REIFF ACTUALLY SAYS, WELL, HE TALKS ABOUT THE

11:40AM 14  SABA REPORT AND SUGGESTS, WELL, IT'S REASONABLE, BUT HE DOES

11:40AM 15  CRITICIZE IT NONETHELESS.

11:40AM 16          MS. WALSH:  YEAH.  AND I THINK WHAT HE SAYS IS THE

11:40AM 17  OCP METHOD OF ALLOCATION IS A COMMONLY USED METHOD, FINE, BUT

11:40AM 18  IN THESE CIRCUMSTANCES THERE ARE TWO FACTORS THAT ARE

11:40AM 19  INCREDIBLY SPECULATIVE.

11:40AM 20          THE COURT:  AND IT WAS HELPFUL -- THANK YOU.  AND I

11:40AM 21  WANT TO ASK MR. LEACH ABOUT ANYTHING HE WANTS TO SAY,

11:40AM 22  PARTICULARLY ABOUT THE ARANCA ISSUE.

11:40AM 23      BUT I DID LOOK AT THE RESUMES, THE CV'S OF THE EXPERTS

11:40AM 24  HERE AND MANY OF THEM, IT SEEMED, THAT HAD TESTIFIED IN

11:40AM 25  BUSINESS DISPUTES AND FAMILY LAW MATTERS.  THERE WERE MANY OF

11:41AM  1    THEM -- I THINK YOUR EXPERTS TESTIFIED IN FAMILY LAW CASES

11:41AM  2    WHERE THERE WAS A DISSOLUTION OF THE COMMUNITY, I SUPPOSE, AND

11:41AM  3    THERE'S A DISAGREEMENT ABOUT THOSE ASSETS AND THINGS.

11:41AM  4         THERE WEREN'T TOO MANY SPECIFIC CRIMINAL CASES THAT WERE

11:41AM  5    NOTED IN THE CV'S OF THE PARTIES.  I JUST NOTE THAT.

11:41AM  6         MR. LEACH.

11:41AM  7              MR. LEACH:  JUST BRIEFLY ON THE ARANCA POINT.

11:41AM  8    YOUR HONOR, THIS EXIT DATE ONLY COMES INTO PLAY IN THE ASSET

11:41AM  9    APPROACH, WHICH I KNOW THE COURT DID NOT ADOPT.

11:41AM  10        AND I THINK THE POINT HERE IS, NOT TO BE CRITICAL OF

11:41AM  11   ARANCA, BUT TO TAKE A HARD LOOK AT WHAT INFORMATION ARANCA

11:41AM  12   ACTUALLY HAS AND WHETHER JUDGMENTS IT'S MAKING IN TERMS OF THE

11:41AM  13   FOUR YEAR HORIZON ARE REASONABLE OR NOT, NOT JUST WHOLLY

11:42AM  14   DISCOUNT IT, BUT TO BRING A CRITICAL EYE TO IT.

11:42AM  15        AND IT'S NOT SO MUCH THE ARANCA REPORT AS IT IS THE

11:42AM  16   FINANCIAL FORECAST THAT WERE THE SUBJECT OF MULTIPLE DAYS OF

11:42AM  17   TESTIMONY IN THIS CASE, AND WHETHER THOSE ARE REASONABLE OR

11:42AM  18   NOT, AND I THINK ANYBODY LOOKING AT THEM, PARTICULARLY WITH

11:42AM  19   INFORMATION NOW, HAS TO SEE THAT THESE ARE PIE IN THE SKY

11:42AM  20   PROJECTIONS THAT NEED SOME FORM OF DISCOUNT, WHATEVER ARANCA

11:42AM  21   THOUGHT OR WAS TOLD.

11:42AM  22              THE COURT:  ANYTHING FURTHER?

11:42AM  23              MR. LEACH:  NO, YOUR HONOR.  THANK YOU.

11:42AM  24              MS. WALSH:  JUST ONE POINT BASED ON WHAT MR. LEACH

11:42AM  25   SAID.

11:42AM 1      THE COURT:  SURE.

11:42AM 2      MS. WALSH:  I BELIEVE THE HOLDING PERIOD BEFORE THE

11:42AM 3  LIQUIDITY EVENT IS SOMETHING THAT MR. SABA ASCERTAINED IN

11:42AM 4  CONNECTION WITH THE ALLOCATION OF VALUE, NOT WITH THE ASSET

11:42AM 5  APPROACH.

11:42AM 6      SO YOU HAVE THE PAPERS AND YOU'LL SEE, BUT THAT'S MY

11:42AM 7  UNDERSTANDING.  SO IT IS IMPORTANT BECAUSE EVEN IN THE INCOME

11:42AM 8  APPROACH YOU'RE GOING TO APPLY THE ALLOCATION METHOD TO THAT

11:42AM 9  APPROACH TO FIGURE OUT WHAT THE NUMBERS ARE FOR EACH INVESTOR.

11:42AM 10      THE COURT:  OKAY.  ANYTHING FURTHER ON LOSS

11:43AM 11  CALCULATION FROM EITHER SIDE?

11:43AM 12      MS. WALSH:  NO, YOUR HONOR.

11:43AM 13      THE COURT:  MR. LEACH?

11:43AM 14      MR. LEACH:  NO, YOUR HONOR.  THANK YOU.

11:43AM 15      THE COURT:  WERE YOU ALSO SPEAKING FOR THAT VICTIM

11:43AM 16  COUNT, WERE YOU DOING THAT, MS. WALSH?

11:43AM 17      MS. WALSH:  YES, YOUR HONOR.  I THOUGHT I ADDRESSED

11:43AM 18  IT IN TERMS OF LOSS CAUSATION AND MURDOCH IS ONE OF THE

11:43AM 19  EXAMPLES.

11:43AM 20      THE COURT:  ANYTHING FURTHER YOU WANT TO SAY ABOUT

11:43AM 21  THAT AS FAR AS THE GUIDELINE CALCULATION?

11:43AM 22      MS. WALSH:  WE REST ON OUR PAPERS.

11:43AM 23      THE COURT:  ALL RIGHT.  OKAY.

11:43AM 24    ANYTHING FURTHER ABOUT THAT?

11:43AM 25      MR. LEACH:  THE ONLY POINT I WOULD MAKE THERE,

11:43AM 1    YOUR HONOR, IS THAT THERE WERE SEVEN INVESTORS WHO ACTUALLY

11:43AM 2    TESTIFIED IN MR. BALWANI'S TRIAL.  IN ADDITION, THERE ARE THE

11:43AM 3    INVESTORS WHO WE PROFFERED INFORMATION ABOUT, SUCH AS

11:43AM 4    MR. MURDOCH, PEER VENTURES, SOME OF THE ONES THAT THE COURT

11:43AM 5    FOUND IN THE HOLMES SENTENCING.

11:43AM 6         IN ADDITION TO THAT, YOU KNOW, THERE ARE PATIENT VICTIMS

11:44AM 7    HERE.  THREE OF THEM TESTIFIED IN THE TRIAL.  SO I'M NOT SURE

11:44AM 8    HOW THERE CAN BE A SCENARIO WHERE THERE WERE FEWER THAN TEN

11:44AM 9    VICTIMS MET.  THAT IS SOMETHING THAT BECAUSE THE COURT DID NOT

11:44AM 10   CONSIDER ACQUITTED CONDUCT IN THE HOLMES SENTENCING IS

11:44AM 11   SOMETHING DIFFERENT HERE.  I JUST WANTED TO MAKE SURE THAT WE

11:44AM 12   ADDRESSED THAT POINT.

11:44AM 13            THE COURT:  THANK YOU.  WELL, LET ME TALK ABOUT THE

11:44AM 14   OTHER GUIDELINE ENHANCEMENTS, IF YOU WILL NOW.

11:44AM 15            MR. LEACH:  SURE, YOUR HONOR.

11:44AM 16            MS. WALSH:  AND MR. COOPERSMITH IS GOING TO ADDRESS

11:44AM 17   THOSE.

11:44AM 18            THE COURT:  SURE.

11:44AM 19            MS. WALSH:  WE'LL DO ANOTHER SWITCH.

11:44AM 20            THE COURT:  SURE.  OKAY.  AND I THINK WHAT WE'LL DO

11:44AM 21   IS GO THROUGH THESE OTHER TWO ENHANCEMENTS, WE'LL TAKE A BREAK,

11:44AM 22   AND THEN WE'LL COME BACK AND FINISH UP OUR GUIDELINE

11:44AM 23   CALCULATION AND THEN MOVE ON.

11:44AM 24            MR. LEACH:  THANK YOU, YOUR HONOR.

11:44AM 25            THE COURT:  I'M NOW AT OBJECTION TWENTY-FOUR, WHICH

11:44AM   1   IS THE AGGRAVATING ROLE, AND THIS IS THE 4 POINT ENHANCEMENT

11:45AM   2   FOR ORGANIZER OR LEADER UNDER 3B1.1(A), AND EVERYBODY KNOWS I

11:45AM   3   DID NOT FIND THAT IN THE COMPANION CASE.

11:45AM   4        MR. COOPERSMITH, DID YOU WANT TO BE HEARD ON THIS?

11:45AM   5             MR. COOPERSMITH:  YOUR HONOR, I'M HAPPY TO BE HEARD.

11:45AM   6   TO TRY TO MAKE THIS AS EFFICIENT AS POSSIBLE, IF THE COURT IS

11:45AM   7   INCLINED TO APPLY THAT IN THE CASE OF MR. BALWANI, I CERTAINLY

11:45AM   8   WOULD HAVE A LOT TO SAY.  IF THE COURT IS NOT INCLINED, I WILL

11:45AM   9   HAVE A LOT LESS TO SAY.

11:45AM   10       BUT I'LL SAY THIS IN BRIEF IS THAT AS I UNDERSTAND THE

11:45AM   11  COURT'S RULING IN ELIZABETH HOLMES'S CASE, THE COURT DID NOT

11:45AM   12  APPLY IT BECAUSE UNDER THE HOLDEN CASE IN THE NINTH CIRCUIT, IN

11:45AM   13  ORDER TO BE AN ORGANIZER OR LEADER, TO GET ANY OF THE

11:45AM   14  ADJUSTMENTS, WHETHER IT'S 2 POINTS OR 4 POINTS UNDER 3B1.1, YOU

11:45AM   15  WOULD HAVE TO BE DIRECTING, ORGANIZING, LEADING ANOTHER

11:45AM   16  CRIMINAL PARTICIPANT.

11:46AM   17       AND AS THE COURT NOTED IN THE HOLMES SENTENCING, THE ONLY

11:46AM   18  CRIMINAL PARTICIPANTS AT ISSUE HERE ALLEGEDLY ARE MR. BALWANI

11:46AM   19  AND MS. HOLMES.

11:46AM   20             THE COURT:  WELL, THE JURY FOUND THAT.

11:46AM   21             MR. COOPERSMITH:  YES, I UNDERSTAND THAT.  AND FOR

11:46AM   22  PURPOSES OF THE SENTENCING, WE OBVIOUSLY ARE RESPECTING THE

11:46AM   23  VERDICT AND THAT'S WHY WE'RE HERE.

11:46AM   24       BUT WITH REGARD TO THE CRIMINAL PARTICIPANTS, WE HAVE

11:46AM   25  MS. HOLMES AND MR. BALWANI.

11:46AM 1          THE COURT DID NOT BELIEVE THAT MS. HOLMES WAS LEADING

11:46AM 2   MR. BALWANI, ALTHOUGH THERE ARE INDICATIONS IN THIS CASE THAT

11:46AM 3   THAT IS THE CASE, SHE WAS THE CEO, AND SHE HAD THE ABILITY TO

11:46AM 4   FIRE HIM AND SO FORTH.

11:46AM 5          THE COURT:  RIGHT.  BUT THE JURY FOUND WHAT THEY DID

11:46AM 6   AND WE'RE HERE TO DETERMINE WHETHER OR NOT THIS COURT IN ITS

11:46AM 7   SENTENCING DECISION SHOULD APPLY A LEADERSHIP ROLE TO YOUR

11:46AM 8   CLIENT.

11:46AM 9          I DIDN'T IN THE HOLMES CASE.  AND MAYBE WE SHOULD -- I

11:46AM 10  DON'T MEAN TO INTERRUPT YOU, BUT MAYBE I'LL TAKE YOUR

11:46AM 11  INVITATION TO SAY, WELL, IF YOU'RE NOT GOING TO GIVE IT, I

11:46AM 12  DON'T HAVE ANYTHING TO SAY, JUDGE.

11:46AM 13         SO LET'S TURN TO MR. LEACH.

11:46AM 14         MR. LEACH, SHOULD I GIVE THIS?  SHOULD THIS APPLY?

11:47AM 15         MR. LEACH:  I WAS HERE WHEN YOUR HONOR ELECTED NOT

11:47AM 16  TO GIVE IT.  SO I RESPECT THE COURT'S RULING, AND I DON'T WANT

11:47AM 17  TO REPEAT OURSELF, AND WE'RE NOT WRITING ON A BLANK SLATE HERE.

11:47AM 18         THE COURT:  SURE.

11:47AM 19         MR. LEACH:  THE ONLY POINT I WOULD MAKE -- AND WE DO

11:47AM 20  WANT TO PRESERVE OUR ARGUMENTS ON THIS.

11:47AM 21         THE COURT:  YES, OF COURSE.

11:47AM 22         MR. LEACH:  THE ONLY NUANCE I WOULD POINT OUT IS

11:47AM 23  THERE'S A COMPLICATED RELATIONSHIP BETWEEN ELIZABETH HOLMES AND

11:47AM 24  SUNNY BALWANI, AND I THINK THE TEXTS REVEAL AND THE EVIDENCE

11:47AM 25  REVEALS THAT THERE WERE TIMES PARTICULARLY WHEN YOU LOOK AT IT

11:47AM 1    COUNT BY COUNT WHERE MR. BALWANI WAS LEADING AND WHERE

11:47AM 2    MS. HOLMES WAS LEADING.

11:47AM 3         TAKE, FOR EXAMPLE, PFM, MR. GROSSMAN, THERE WAS AN INITIAL

11:47AM 4    MEETING BETWEEN MS. HOLMES AND MR. BALWANI AND THEN MUCH, IF

11:47AM 5    NOT ALL, OF THE REMAINING ENGAGEMENT WAS BETWEEN MR. BALWANI

11:47AM 6    AND MR. GROSSMAN.  AND I THINK THERE'S A WAY TO LOOK AT THOSE

11:47AM 7    FACTS AND SAY AT LEAST ON THAT COUNT, MR. BALWANI IS LEADING IN

11:47AM 8    THAT SITUATION.

11:47AM 9         NOW, THAT'S NOT TO SAY THAT THEY DON'T HAVE

11:47AM 10   RESPONSIBILITY, THAT'S NOT TO SAY ONE IS CONTROLLING THE OTHER,

11:48AM 11   BUT IF YOU LOOK AT IT IN PARTICULAR SITUATIONS, THERE ARE TIMES

11:48AM 12   WHEN MS. HOLMES DEFERS TO HIM AND THERE ARE TIMES WHEN HE

11:48AM 13   DEFERS TO HER.

11:48AM 14        AND THERE'S JUST SOMETHING ODD ABOUT THIS CASE WHERE YOU

11:48AM 15   HAVE THE CEO OF A COMPANY AND THE COO OF A COMPANY AND NEITHER

11:48AM 16   ONE OF THEM IS THE LEADER.

11:48AM 17        BUT BEYOND THAT, I THINK THE COURT UNDERSTANDS THOSE

11:48AM 18   ISSUES.  IT WAS A COMPLICATED RELATIONSHIP.  WE MADE THE

11:48AM 19   ARGUMENT THAT IT WAS OTHERWISE EXTENSIVE.  THE COURT WENT THE

11:48AM 20   OTHER WAY ON THAT POINT, AND WE UNDERSTAND THAT.

11:48AM 21        SO THOSE ARE THE ONLY NUANCES THAT I WANTED TO POINT OUT

11:48AM 22   AND WITH THAT I'LL SUBMIT.

11:48AM 23            THE COURT:  THANK YOU.  AND THEY'RE APPROPRIATE.  I

11:48AM 24   THINK ALL OF US AGREE THE CASE WAS COMPLICATED AND NUANCED IN

11:48AM 25   MANY WAYS, AND WE ALSO ARE GUIDED BY THE CASES THAT SAY THAT

11:48AM 1       THERE CAN BE CO-LEADERS, AND IF THERE'S CO-LEADERS,

11:48AM 2       CO-CAPTAINS, THERE ISN'T A CAPTAIN DESIGNATED PER SE.

11:49AM 3              ANYTHING ELSE YOU WANT TO SAY ABOUT THIS, MR. COOPERSMITH?

11:49AM 4              MR. COOPERSMITH:  JUST BRIEFLY, YOUR HONOR.

11:49AM 5          WE UNDERSTAND UNDER THE HOLDEN CASE AND IF THEY ARE IN

11:49AM 6       FACT CO-LEADERS, THAT THE ADJUSTMENT WOULD NOT BE APPLIED TO

11:49AM 7       MR. BALWANI JUST LIKE IT WAS NOT APPLIED TO MS. HOLMES.

11:49AM 8          BUT I WILL SAY, AND THIS MAY BE COMING UP IN REMARKS

11:49AM 9       RELEVANT TO OTHER PORTIONS OF THE SENTENCING, YOUR HONOR, WE

11:49AM 10      REJECT THE IDEA THAT THEY WERE CO-LEADERS.

11:49AM 11         THE GOVERNMENT SAID OVER AND OVER AGAIN IN VARIOUS

11:49AM 12      CONTEXTS, INCLUDING THE SENTENCING MEMO IN MS. HOLMES'S CASE,

11:49AM 13      THAT MS. HOLMES WAS ULTIMATELY RESPONSIBLE.  SHE WAS THE CEO,

11:49AM 14      SHE WAS THE FACE OF THERANOS, SHE HAD THE ABILITY TO FIRE

11:49AM 15      MR. BALWANI.

11:49AM 16         SO WE DON'T AGREE WITH THAT.

11:49AM 17             THE COURT:  WELL, ALL OF THAT WAS TRUE.

11:49AM 18             MR. COOPERSMITH:  ALL OF THAT WAS TRUE, YEAH.

11:49AM 19             THE COURT:  RIGHT.

11:49AM 20             MR. COOPERSMITH:  BUT FOR PURPOSES OF THIS GUIDELINE

11:49AM 21      ENHANCEMENT, IF THEY ARE CO-LEADERS, EVEN IF THAT WERE THE

11:49AM 22      CASE, THESE GUIDELINE ADJUSTMENTS WOULD NOT BE APPLIED.  AND,

11:49AM 23      OF COURSE, IT CERTAINLY WOULDN'T BE APPLIED IF WHAT WE SAY IS

11:49AM 24      RIGHT, IT WAS ACTUALLY MS. HOLMES WHO WAS THE LEADER OF THIS

11:49AM 25      COMPANY AND OF MR. BALWANI.

11:49AM  1      SO I THINK I'LL STOP THERE UNLESS THE COURT HAS MORE

11:50AM  2   QUESTIONS.  WE DON'T THINK THE GUIDELINE ADJUSTMENT SHOULD BE

11:50AM  3   APPLIED.

11:50AM  4          THE COURT:  OKAY.  THANK YOU.

11:50AM  5      THANK YOU.  LET'S TURN TO THE 2B1.1(B)(16), WHICH IS THE

11:50AM  6   SERIOUS BODILY INJURY ENHANCEMENT.  THE GOVERNMENT IS URGING

11:50AM  7   THIS OR SUGGESTS THAT THE COURT SHOULD APPLY THIS.

11:50AM  8      I DONT THINK PROBATION -- DID YOU RECOMMEND THIS,

11:50AM  9   MS. GOLDSBERRY?

11:50AM  10          PROBATION OFFICER:  NOT IN THE FINAL REPORT,

11:50AM  11   YOUR HONOR.

11:50AM  12          THE COURT:  ALL RIGHT.  THANK YOU.

11:50AM  13      SO, MR. LEACH, WHAT SHOULD I KNOW ABOUT THIS?

11:50AM  14          MR. LEACH:  THERE'S A SIGNIFICANT DIFFERENCE BETWEEN

11:50AM  15   MS. HOLMES AND MR. BALWANI ON THIS POINT, YOUR HONOR, AND THAT

11:50AM  16   IS MR. BALWANI WAS CONVICTED OF A CONSPIRACY TO DEFRAUD

11:50AM  17   PATIENTS ABOUT THEIR BLOOD TESTS AND FOR FOUR INDIVIDUAL COUNTS

11:50AM  18   OF WIRE FRAUD WITH RESPECT TO THREE PATIENTS WHO TESTIFIED IN

11:50AM  19   AN AD TO THE MEDIA.

11:50AM  20      SO WE HAVE A FINDING BY THE JURY THAT MR. BALWANI ENGAGED

11:50AM  21   IN A CONSPIRACY TO PROVIDE FALSE AND MISLEADING INFORMATION TO

11:51AM  22   PAYING PATIENTS WHO ARE GOING TO RELY ON THESE BLOOD TESTS.

11:51AM  23   AND THERE'S A CASE THAT I KNOW THE COURT IS -- AND WE THINK

11:51AM  24   THIS FACTUAL SCENARIO FOUND BY THE JURY FALLS SQUARELY WITHIN

11:51AM  25   NINTH CIRCUIT CASE LAW.

11:51AM  1          I THINK THE JOHANSSON CASE, WHICH WE CITE --

11:51AM  2              THE COURT:  249 FED. 3D?

11:51AM  3              MR. LEACH:  YES, YOUR HONOR.  YOU'RE FASTER THAN I

11:51AM  4     AM.

11:51AM  5          I THINK THAT'S VERY INSTRUCTIVE.  I MEAN, THAT'S WHERE

11:51AM  6     THERE WAS FALSIFICATION OF REPORTS ABOUT DRIVERS MEETING OR NOT

11:51AM  7     MEETING THE LIMIT, THE SLEEPING LIMIT BEFORE THEY HAD TO BE

11:51AM  8     TAKEN OFF THE ROAD, AND THOSE DOCUMENTS WERE FALSIFIED.  AND

11:51AM  9     THE NINTH CIRCUIT THERE FOUND THAT THERE WERE SUFFICIENT FACTS

11:51AM  10    TO SAY THAT THAT SCENARIO IS AN OFFENSE WITH A CONSCIOUS OR

11:51AM  11    RECKLESS DISREGARD OF SERIOUS BODILY INJURY.

11:51AM  12         I FAIL TO SEE THE DISTINCTION BETWEEN OUR TWO SITUATIONS

11:51AM  13    HERE.  THERE WAS AMPLE EVIDENCE IN THE RECORD THAT THERANOS WAS

11:51AM  14    PROVIDING FALSE AND MISLEADING BLOOD TESTS AND THAT MR. BALWANI

11:52AM  15    WAS CONSPIRING TO DO THAT TO PATIENTS.

11:52AM  16         THE JURY FOUND THAT HE ACTED WILLFULLY WITH RESPECT TO

11:52AM  17    THAT AND WITH INTENT TO DEFRAUD.

11:52AM  18         THE RESPONSE I HEAR FROM MR. COOPERSMITH IS, WELL,

11:52AM  19    MR. BALWANI WAS TRYING TO FIX PROBLEMS AS THEY AROSE, AND IF HE

11:52AM  20    WOULD SEE THIS, HE REACTED TO THAT.

11:52AM  21         THAT MIGHT BE TRUE OR THAT MIGHT NOT BE TRUE ACCORDING TO

11:52AM  22    THE EVIDENCE, BUT IT DOESN'T SEEM TO US THAT THAT'S SOMETHING

11:52AM  23    THAT YOU CAN SAY IN LIGHT OF THE VERDICT, AND I THINK IT'S

11:52AM  24    IMPORTANT THAT COUNT TWELVE GOES TO THE TIME PERIOD AUGUST OF

11:52AM  25    2015 LATE INTO THE CONSPIRACY.

11:52AM 1    SO WHAT MR. BALWANI WAS OR WAS NOT DOING I'M NOT SURE IS

11:52AM 2    PARTICULARLY RELEVANT, AND OUR BRIEF LAYS FORTH SOME OF THE

11:52AM 3    FACTS IN TERMS OF THE CONCERNS THAT ERIKA CHEUNG WAS RAISING,

11:52AM 4    THE CONCERNS THAT TYLER SHULTZ WAS RAISING, THE CONCERNS THAT

11:53AM 5    DR. PANDORI WAS RAISING WHEN HE WAS TOLD BY MR. BALWANI WHEN HE

11:53AM 6    SAYS WE SHOULD STOP DOING THE EDISON, WE'RE NOT GOING THAT.

11:53AM 7    THERE'S AMPLE EVIDENCE IN THE RECORD WHERE MR. BALWANI IS

11:53AM 8    ADVISED OF PROBLEMS AND YET THE TESTS CONTINUE TO BE ISSUED.

11:53AM 9    AND I THINK ONE POINT WE MENTION IN OUR BRIEF IS THERE IS

11:53AM 10   AN INSTANCE WHERE DANIEL YOUNG IS RAISING SOME CONCERNS HE HAS

11:53AM 11   WITH TESTS, AND THE DEFENSE RAISED A LOT ABOUT DR. YOUNG AND

11:53AM 12   HIM NOT BEING CALLED IN THIS CASE, BUT THERE'S AN EMAIL FROM

11:53AM 13   HIM THAT SAID -- WHERE DR. YOUNG IS RAISING SOME OF THESE

11:53AM 14   CONCERNS, EVEN THE INDIVIDUALS THAT THE DEFENSE WAS POINTING TO

11:53AM 15   AS THEIR GO-TO PERSON FOR THEIR PROBLEMS.  AND MR. BALWANI'S

11:53AM 16   RESPONSE TO THAT IS TELLING.  HE'S TOLD BY DR. YOUNG THAT THERE

11:53AM 17   ARE PROBLEMS IN THE FALL OF 2014, AND HE FORWARDS THAT TO

11:53AM 18   MS. HOLMES AND HE SAYS, "ALWAYS ANOTHER STUDY AFTER THE FACT."

11:53AM 19   WHAT DOES THAT MEAN?  THAT MEANS THAT HE KNOWS, TIME AND

11:53AM 20   TIME AGAIN, THERANOS IS GOING TO MARKET WITH SOMETHING BASED ON

11:54AM 21   A VALIDATION PROCESS THAT TURNS OUT NOT TO BE WORKING, ANOTHER

11:54AM 22   STUDY AFTER THE FACT.

11:54AM 23   DR. YOUNG IS PROPOSING, WELL, WE ALREADY WENT TO MARKET

11:54AM 24   WITH THIS PROBLEM, IT'S NOT WORKING.  LET'S GO DO ANOTHER STUDY

11:54AM 25   TO TRY TO FIGURE OUT WHAT THE ISSUE IS.  AND THAT'S NOT

11:54AM   1    HAPPENING WITH ONE ASSAY IN AUGUST OF 2014, THAT'S HAPPENING IN

11:54AM   2    MULTIPLE ASSAYS, AND MR. BALWANI KNOWS THIS.  AND ALL OF THIS

11:54AM   3    IS BEFORE THE SITUATION WHERE DR. ROSENDORFF LEAVES AFTER

11:54AM   4    TELLING MS. HOLMES IN A COMMUNICATION THAT GOES TO MR. BALWANI

11:54AM   5    THAT HE'S BEING ASKED TO VOUCH FOR TESTS THAT HE'S NOT

11:54AM   6    COMFORTABLE WITH, WHERE MR. BALWANI GOES TO THE LAB AND SAYS

11:54AM   7    IT'S AN F'ING DISASTER.

11:54AM   8         SO THERE IS BEYOND A REASONABLE DOUBT EVIDENCE THAT

11:54AM   9    MR. BALWANI CONSPIRED TO DEFRAUD PATIENTS TO GIVE THEM FALSE

11:54AM  10    AND UNRELIABLE INFORMATION, AND THAT FACT COMPELS THE

11:54AM  11    FINDING -- A FINDING UNDER THIS GUIDELINE THAT THE OFFENSE

11:55AM  12    INVOLVED A CONSCIOUS OR A KNOWING RISK OF SERIOUS BODILY

11:55AM  13    INJURY.

11:55AM  14         I JUST DON'T THINK WHATEVER HE IS DOING, YOU KNOW, IN

11:55AM  15    RESPONSE TO INDIVIDUAL ASSAYS MATTERS AT THE END OF THE DAY IN

11:55AM  16    LIGHT OF THE JURY FINDING.

11:55AM  17         SO FOR THOSE REASONS WE THINK THIS ENHANCEMENT IS

11:55AM  18    APPROPRIATELY APPLIED.

11:55AM  19              THE COURT:  THANK YOU.

11:55AM  20              MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

11:55AM  21         THIS IS ONE THAT THE PROBATION OFFICE GOT RIGHT BY NOT

11:55AM  22    RECOMMENDING THIS ADJUSTMENT, AND IT'S ALSO ONE THAT THE COURT

11:55AM  23    GOT RIGHT IN MS. HOLMES'S CASE.  LET ME ADDRESS MR. LEACH'S

11:55AM  24    ARGUMENTS AND SAY A FEW OTHER THINGS.

11:55AM  25         FIRST OF ALL, WE'RE TALKING ABOUT GUIDELINE ADJUSTMENT FOR

11:55AM 1    CONSCIOUS RISK OF CREATING -- CONSCIOUS CREATION OF A RISK OF

11:55AM 2    SERIOUS BODILY INJURY OR DEATH.

11:55AM 3        THE LAW ON THAT, JUST TO START WITH THAT, IS IT HAS TO BE

11:55AM 4    EITHER KNOWING OR RECKLESS, WHICH UNDER THE NINTH CIRCUIT

11:55AM 5    STANDARD, AND THIS IS ON PAGE 33 AND 34 OF OUR SENTENCING

11:56AM 6    MEMORANDUM, IT HAS TO BE RECKLESS.  IT IS SO OUTSIDE OF THE

11:56AM 7    PALE THAT THE DEFENDANT MUST ACTUALLY KNOW.  IT'S AS CLOSE AN

11:56AM 8    ANALOGY THAT YOU COULD POSSIBLY GET.

11:56AM 9        SO IN THIS CASE WE'VE GOT A JURY VERDICT, AS MR. LEACH

11:56AM 10   SAID, AND THE VERDICT WAS FINDING MR. BALWANI GUILTY OF PATIENT

11:56AM 11   COUNTS AND OF CONSPIRACY.  THAT IS TRUE, AND WE'RE NOT ARGUING

11:56AM 12   THAT AGAIN TODAY, OF COURSE.

11:56AM 13       BUT THE JURY VERDICT IS A GENERAL VERDICT.  AND AS WE

11:56AM 14   POINTED OUT IN OUR PAPERS, WE DON'T KNOW WHY THE JURY DECIDED

11:56AM 15   TO CONVICT MR. BALWANI ON THAT COUNT, BUT BY THAT SAME TOKEN,

11:56AM 16   WE DON'T KNOW WHY THE JURY DECIDED NOT TO CONVICT MS. HOLMES ON

11:56AM 17   THOSE SAME COUNTS, EVEN THOUGH THE GOVERNMENT'S PRESENTATION

11:56AM 18   WAS VIRTUALLY IDENTICAL IN BOTH CASES.

11:56AM 19       AND THE GOVERNMENT ARGUED IN MOTION PRACTICE AND IN

11:56AM 20   CLOSING ARGUMENT THAT ONE OF THE THEORIES OF WHY MR. BALWANI

11:56AM 21   WAS GUILTY OF THESE PATIENT COUNTS AND CONSPIRACY WAS THAT

11:57AM 22   PATIENTS HAD BEEN TOLD THERANOS LABORATORY RESULTS ARE MORE

11:57AM 23   ACCURATE, THEY'RE BETTER THAN OTHER COMPETITORS, YOU SHOULD GO

11:57AM 24   TO THERANOS.  THEY ARGUED THAT.  AND FOR ALL WE KNOW BASED ON

11:57AM 25   THE GENERAL VERDICT, THE JURY WOULD HAVE LATCHED ON TO THAT AND

11:57AM 1   SAID, OKAY, THAT'S A MISREPRESENTATION THAT WE'RE GOING TO FIND

11:57AM 2   GUILT ON.

11:57AM 3       SO THE VERDICT DOESN'T HELP US HERE IN TERMS OF WHETHER

11:57AM 4   THIS GUIDELINE ADJUSTMENT SHOULD BE APPLIED.

11:57AM 5       AND WHEN WE TALK ABOUT SENTENCING IS THE PROVINCE OF THE

11:57AM 6   COURT, NOT THE JURY, AND YOUR HONOR HAS TO DECIDE THESE

11:57AM 7   DIFFICULT QUESTIONS.

11:57AM 8       I WENT BACK TO THIS COURT'S RULING ON OUR RULE 29 MOTION,

11:57AM 9   AND THAT'S DOCKET 1625, AND WHEN YOU LOOK AT THAT, ESPECIALLY

11:57AM 10  PAGE 9 AND 10, THERE'S A LOT OF POINTS THAT THIS COURT MADE

11:57AM 11  ABOUT WHY MS. HOLMES KNEW FULL WELL, ACCORDING TO THE COURT'S

11:58AM 12  OPINION, THAT THE LABORATORY HAD ALL OF THESE ISSUES.

11:58AM 13      SO THE SAME EVIDENCE APPLIED TO MS. HOLMES.  FOR EXAMPLE,

11:58AM 14  IF THIS IS REALLY THE CASE, MR. LEACH POINTS OUT THAT

11:58AM 15  MR. BALWANI WROTE AN EMAIL TO MS. HOLMES AND SAID "ALWAYS

11:58AM 16  ANOTHER STUDY AFTER THE FACT."

11:58AM 17      WELL, MS. HOLMES GOT THAT EMAIL.  SO SHE HAS THE SAME

11:58AM 18  KNOWLEDGE AS MR. BALWANI IF THAT IS AN ISSUE.

11:58AM 19      WE DON'T THINK THAT'S WHAT IT MEANT.  BUT GIVEN

11:58AM 20  MR. LEACH'S ARGUMENT, WE DON'T UNDERSTAND HOW IT COULD BE

11:58AM 21  APPLIED TO MR. BALWANI AND NOT MS. HOLMES.  AND THE COURT, OF

11:58AM 22  COURSE, MADE THAT RULING IN MS. HOLMES'S CASE.

11:58AM 23      BY THE SAME TOKEN, IF THE TEXT MESSAGE "NORMANDY IS AN

11:58AM 24  F'ING DISASTER" IS WHAT MR. LEACH THINKS IT IS, SHE HAD THAT

11:58AM 25  SAME TEXT MESSAGE.  THE SAME EVIDENCE APPLIED TO HER AS IT WAS

| | | |
|---|---|---|
| 11:58AM | 1 | TO MR. BALWANI, AND SHE WASN'T GIVEN THE ADJUSTMENT.  SO OUT OF |
| 11:58AM | 2 | BASIC FAIRNESS, IT SHOULDN'T APPLY TO MR. BALWANI. |
| 11:58AM | 3 | AGAIN, WE DON'T NEED TO DEBATE THIS NOW, BUT WE DON'T |
| 11:59AM | 4 | BELIEVE THAT TEXT MESSAGE MEANT WHAT THE GOVERNMENT SAID, BUT I |
| 11:59AM | 5 | DON'T NEED TO GO INTO THAT FOR THIS PURPOSE. |
| 11:59AM | 6 | SO WHY SHOULDN'T THE GUIDELINE ADJUSTMENT BE APPLIED?  AND |
| 11:59AM | 7 | THERE ARE A LOT OF REASONS. |
| 11:59AM | 8 | FIRST OF ALL -- AND I WANT TO JUST HAND UP SOMETHING TO |
| 11:59AM | 9 | THE COURT IF I CAN WITH YOUR PERMISSION, YOUR HONOR, AND I'LL |
| 11:59AM | 10 | GIVE IT TO THE GOVERNMENT, TOO.  BUT THIS HAD TO DO WITH THE |
| 11:59AM | 11 | BLOOD TESTING THAT MR. BALWANI ARRANGED FOR HIS MOTHER TO |
| 11:59AM | 12 | HAVE -- |
| 11:59AM | 13 | THE COURT:  YOU DON'T HAVE TO PASS THAT UP.  I'VE |
| 11:59AM | 14 | SEEN IT. |
| 11:59AM | 15 | MR. COOPERSMITH:  I DON'T THINK YOU'VE SEEN IT. |
| 11:59AM | 16 | THE COURT:  YOU PUT SOMETHING IN THE RECORD OR AT |
| 11:59AM | 17 | LEAST ONE OF THE SUBMISSIONS WERE RELATIVE'S TESTS, BLOOD |
| 11:59AM | 18 | TESTS. |
| 11:59AM | 19 | MR. COOPERSMITH:  YES, YOUR HONOR. |
| 11:59AM | 20 | THE COURT:  AND IF YOU'RE OFFERING THIS FOR AN |
| 11:59AM | 21 | ARGUMENT TO SAY WOULD HE DO THIS TO A RELATIVE?  WOULD HE ALLOW |
| 11:59AM | 22 | A RELATIVE TO TAKE A TEST IF HE HAD CONSCIOUS KNOWLEDGE?  IS |
| 11:59AM | 23 | THAT WHAT THE PURPOSE OF THIS IS? |
| 11:59AM | 24 | MR. COOPERSMITH:  YES, YOUR HONOR. |
| 11:59AM | 25 | THE COURT:  I UNDERSTAND THAT. |

| | |
|---|---|
| 11:59AM | 1 |

11:59AM 1           MR. COOPERSMITH:  WHAT I'LL SAY -- AND I WON'T HAND

11:59AM 2    IT UP.  BUT WHAT I WILL TELL THE COURT IS THAT WE LOOKED AT THE

11:59AM 3    BLOOD TESTS THAT MR. BALWANI'S MOTHER ACTUALLY HAD BASED ON THE

12:00PM 4    REPORT THAT WE HAVE IN EXHIBIT 20, I BELIEVE, AND TO MY

12:00PM 5    DECLARATION IN THE SENTENCING MEMORANDUM, WE LOOKED AT THE

12:00PM 6    ACTUAL BLOOD TEST SHE TOOK BECAUSE MR. LEACH SAID, WELL, WE

12:00PM 7    DON'T KNOW IF IT'S ACTUALLY FINGERSTICK, RIGHT?

12:00PM 8           SO WE LOOKED AT ALL OF THE TESTS THAT SHE HAD, AND WE

12:00PM 9    DETERMINED, AND THAT'S WHAT OUR HANDOUT SAYS, THAT EVERY SINGLE

12:00PM 10   ONE OF THOSE TESTS THAT HIS MOTHER HAD IN MARCH OF 2015 WERE

12:00PM 11   AVAILABLE AT THERANOS ON FINGERSTICK.

12:00PM 12          IN ADDITION, MR. BALWANI'S SISTER WHO SENT A LETTER TO THE

12:00PM 13   COURT, RUPA PAWANI, SAID SHE WAS THERE WHEN MR. BALWANI'S

12:00PM 14   MOTHER HAD FINGERSTICK.

12:00PM 15          AND THEN THE OTHER THING I'LL SAY ABOUT THAT, YOUR HONOR,

12:00PM 16   IS THAT OF COURSE THERE'S NO EVIDENCE HERE THAT -- WE KNOW HIS

12:00PM 17   MOTHER DID HAVE THE BLOOD TEST.  THE REPORT IS IN THE RECORD.

12:00PM 18          THERE'S NO EVIDENCE HERE THAT MR. BALWANI SOMEHOW TOLD THE

12:00PM 19   LAB, OH, YOU KNOW, WHATEVER YOU DO, DON'T DO FINGERSTICK.  HIS

12:00PM 20   MOTHER HAD A BLOOD TEST, A SERIES OF BLOOD TESTS.  THOSE WERE

12:01PM 21   DUTIFULLY DONE BY THE LAB, AND THE RESULTS WERE REPORTED.

12:01PM 22          AND THAT FACT ALONE, I THINK, NEGATES ANY SUGGESTION THAT

12:01PM 23   MR. BALWANI IS PUTTING PATIENTS CONSCIOUSLY OR RECKLESSLY IN

12:01PM 24   DANGER AS THE GOVERNMENT ARGUES BECAUSE HE'S NOT GOING TO DO

12:01PM 25   THAT TO HIS OWN MOTHER AND OBVIOUSLY THAT POINT THE COURT

12:01PM  1    UNDERSTANDS.

12:01PM  2         SO IN ADDITION, THOUGH, THERE'S A LOT MORE, YOUR HONOR,

12:01PM  3    AND THAT IS WHAT ACTUALLY HAPPENED HERE.  WHEN YOU LOOK AT THE

12:01PM  4    WHOLE HISTORY OF THE THERANOS LABORATORY THAT WAS IN OPERATION

12:01PM  5    BETWEEN 2013 TO 2015, IN HINDSIGHT YOU CAN LOOK AT THINGS LIKE

12:01PM  6    THE CMS REPORT AND, YOU KNOW, SOME OF THE THINGS THAT DR. DAS

12:01PM  7    SAID IN MS. HOLMES'S CASE AND SAY, WELL, MAYBE THEY SHOULD HAVE

12:01PM  8    DONE THINGS A LITTLE DIFFERENTLY.  BUT IN REAL TIME, THOSE

12:01PM  9    AFTER-THE-FACT REPORTS DON'T BEAR ON WHAT MR. BALWANI WAS

12:01PM  10   TRYING TO DO OR NOT DO AS FAR AS PATIENT RISK AT THE TIME.

12:01PM  11        WHEN YOU LOOK AT IT IN REAL TIME, EVERY SINGLE TIME THAT

12:02PM  12   AN ISSUE WAS RAISED, MR. BALWANI DIDN'T SAY, WELL, SO WHAT, YOU

12:02PM  13   KNOW, WE DON'T CARE.  IT WAS, LET'S GET TO THE BOTTOM OF THIS.

12:02PM  14        WHEN THERE WERE EMAILS AFTER EMAILS WHERE LET'S FIGURE

12:02PM  15   OUT WHAT IS GOING ON HERE, LET'S STOP TESTING UNTIL WE FIGURE

12:02PM  16   OUT WHAT THE PROBLEM IS, LET'S DO STUDIES.

12:02PM  17        AND THERE ARE SOME EXAMPLES THAT I THINK REALLY JUMP OUT,

12:02PM  18   AT LEAST FOR ME.  FOR EXAMPLE, ON MAY 30TH, 2014, THE COURT

12:02PM  19   PROBABLY REMEMBERS THIS, DR. ROSENDORFF SENT AN EMAIL THAT SAID

12:02PM  20   STOP HCG TESTING ON THE THERANOS EDISON DEVICE, AND THAT'S THE

12:02PM  21   PREGNANCY RELATED TEST THAT YOU'VE HEARD ABOUT.

12:02PM  22        WELL, WHAT HAPPENED?  THEY DID STOP.  AND THEY STOPPED

12:02PM  23   UNTIL THE SCIENTIFIC TEAM AND THE LAB COULD LOOK AT WHAT WAS

12:02PM  24   GOING ON, AND WITHIN A FEW DAYS, THEY HAD DONE SOME STUDIES,

12:02PM  25   AND THE LABORATORY TEAM SENT EMAILS TO DR. ROSENDORFF, NOT

12:02PM 1    MR. BALWANI, AND SAID OKAY, WE'RE RELEASING THE RESULTS, WE

12:03PM 2    THINK WE'VE GOT THIS, AND DR. ROSENDORFF DIDN'T DO ANYTHING.

12:03PM 3    SO OKAY.  RIGHT.  SO THAT'S WHAT IS GOING ON HERE.

12:03PM 4        SO TO BLAME THIS ON MR. BALWANI WHERE HE'S CREATING A

12:03PM 5    CONSCIOUS RISK, THAT'S THE LAST THING THAT ANYONE WOULD WANT TO

12:03PM 6    DO RUNNING A COMPANY LIKE THIS.  HE RELIED ON THE SCIENTIFIC

12:03PM 7    TEAM.  DR. ROSENDORFF TESTIFIED THAT HE STOOD BY HIS VALIDATION

12:03PM 8    REPORTS.  DR. ROSENDORFF SAID HE NEVER RELEASED, KNOWINGLY

12:03PM 9    RELEASED A RESULT THAT HE THOUGHT WAS INACCURATE.

12:03PM 10       MR. BALWANI HAD A LOT OF DATA THAT WAS PRESENTED TO HIM,

12:03PM 11   INCLUDING THE AAP REPORTS THAT YOU SAW AT TRIAL AND A LOT OF

12:03PM 12   OTHER MATERIALS THAT ASSURED HIM THAT THE LAB WAS NOT RELEASING

12:03PM 13   INACCURATE RESULTS TO PATIENTS.

12:03PM 14       AND THEN THE QC ISSUE WHICH THE GOVERNMENT MENTIONED IN

12:03PM 15   THEIR PAPERS, OF COURSE QC, QUALITY CONTROL, IS SOMETHING THAT

12:03PM 16   YOU DO.  AND AS THE TESTIMONY AT TRIAL SHOWED, YOU DON'T

12:03PM 17   RELEASE THE RESULT UNTIL -- UNLESS THE QUALITY CONTROL PASSES.

12:04PM 18   SO THERE WAS NO EVIDENCE IN THIS CASE THAT MR. BALWANI DECIDED

12:04PM 19   LET'S RELEASE RESULTS ANYWAY EVEN IF THE QUALITY CONTROL FAILS.

12:04PM 20   THAT JUST NEVER HAPPENED.

12:04PM 21       SO I THINK FOR ALL OF THESE REASONS, INCLUDING THAT THERE

12:04PM 22   WERE MILLIONS OF TESTS HERE AND THE GOVERNMENT PRESENTED A

12:04PM 23   RELATIVELY SMALL HANDFUL, WE DON'T THINK THIS GUIDELINE

12:04PM 24   ADJUSTMENT SHOULD BE APPLIED TO MR. BALWANI ANY MORE THAN IT

12:04PM 25   COULD HAVE BEEN APPLIED TO MS. HOLMES, AND WE THINK THAT'S THE

12:04PM 1    RIGHT ACTION IN THIS CASE.

12:04PM 2                THE COURT:  OKAY.  ANYTHING FURTHER, MR. LEACH?

12:04PM 3                MR. LEACH:  TWO BRIEF POINTS, YOUR HONOR.

12:04PM 4        THE FIRST IS AT LEAST IN THE CONTEXT OF SENTENCING FOR

12:04PM 5    THIS GUIDELINE, THE COURT DOES NOT NEED TO FIND A MILLION TESTS

12:04PM 6    WERE WRONG.  THE COURT DOES NOT NEED A MILLION TESTS WERE

12:04PM 7    WRONG.  THE COURT NEEDS TO FIND THAT WITH RESPECT TO A PATIENT.

12:04PM 8    WE HAVE MULTIPLE PATIENTS TESTIFY IN THE TRIAL.

12:04PM 9    BRITTANY GOULD, THE COURT MAY RECALL, TESTIFIED ABOUT HER FALSE

12:05PM 10   HCG TEST WHICH HAPPENED AFTER THE PROBLEMS WERE PURPORTEDLY

12:05PM 11   FIXED THAT MR. COOPERSMITH DESCRIBE.  SO TO SAY THAT THERE

12:05PM 12   MIGHT HAVE BEEN SOME GOOD TESTS OUT THERE, DOES NOT RESPOND TO

12:05PM 13   WHETHER THE GUIDELINE APPLIES OR DOESN'T APPLY.

12:05PM 14       THE OTHER POINT I WOULD MAKE IS WE KNOW FROM THE CMS

12:05PM 15   REPORT AND FROM DR. DAS THAT THERANOS ITSELF CONCLUDED AT THE

12:05PM 16   END OF THE DAY THERE WAS A POSSIBLE PATIENT IMPACT FOR EVERY

12:05PM 17   ONE OF THE APPROXIMATELY 800,000 TESTS THAT WERE DONE ON THE

12:05PM 18   EDISON BETWEEN SEPTEMBER 2013 AND JUNE OF 2015.  ALL OF THOSE

12:05PM 19   WERE VOIDED, AND THERANOS ITSELF SAID THERE'S A POSSIBLE

12:05PM 20   PATIENT IMPACT.

12:05PM 21       SO WE HAVE FALSE DOCUMENTS GOING TO THE PATIENTS, WE HAVE

12:05PM 22   A POSSIBLE PATIENT IMPACT ON ALL OF THEM, WE HAVE A DEFENDANT

12:05PM 23   WHO IS CONVICTED OF WILLFULLY JOINING THE CONSPIRACY AND ACTING

12:05PM 24   WITH AN INTENT TO DEFRAUD THOSE PATIENTS, AND EVERYTHING THAT

12:05PM 25   MR. COOPERSMITH SAID IS A DISAGREEMENT WITH THE JURY'S FINDING

| | | |
|---|---|---|
| 12:05PM | 1 | THERE, AND I JUST DON'T SEE ANYTHING HE SAID THAT CAN |
| 12:06PM | 2 | CONTRAVENE WHAT THE JURY HAS FOUND IN THIS CASE. |
| 12:06PM | 3 | MR. COOPERSMITH:  REALLY BRIEFLY, YOUR HONOR. |
| 12:06PM | 4 | WE'RE NOT ARGUING THE JURY'S FINDING AT THIS MOMENT. |
| 12:06PM | 5 | WHAT WE'RE SAYING IS THAT THE VERDICT DOESN'T GOVERN THIS |
| 12:06PM | 6 | BECAUSE WE DON'T KNOW WHY THEY CONVICTED GIVEN THE GOVERNMENT'S |
| 12:06PM | 7 | ARGUMENTS THAT THEY WERE TOLD THAT THERANOS WAS MORE ACCURATE. |
| 12:06PM | 8 | AND IF IT WAS JUST AS ACCURATE AS EVERY OTHER LAB IN THE |
| 12:06PM | 9 | COUNTRY, THAT WOULD NOT BE A REASON TO APPLY THIS FACTOR |
| 12:06PM | 10 | OBVIOUSLY. |
| 12:06PM | 11 | BUT JUST LET ME BRIEFLY MENTION BRITTANY GOULD SINCE |
| 12:06PM | 12 | MR. LEACH MENTIONED IT, AND ALSO DR. DAS. |
| 12:06PM | 13 | SO, FIRST OF ALL, ON BRITTANY GOULD, THE EMAILS THAT WERE |
| 12:06PM | 14 | INTRODUCED AT TRIAL SHOWED THAT THE PROBLEMS WERE RAISED TO |
| 12:06PM | 15 | MR. BALWANI'S LEVEL WHERE THERE WAS A PROBLEM WITH |
| 12:06PM | 16 | BRITTANY GOULD'S TEST AND MR. BALWANI WAS TOLD THAT THERE WAS A |
| 12:06PM | 17 | DECIMAL POINT ERROR IN THE RESULTS THAT WERE REPORTED TO HER |
| 12:06PM | 18 | AND HER POSITION.  SO THAT'S NOT A REASON WHY MR. BALWANI WAS |
| 12:06PM | 19 | PUTTING SOMEONE AT RISK. |
| 12:06PM | 20 | AND AS I SAID BEFORE, THAT WAS AN HCG TEST WHICH OCCURRED |
| 12:07PM | 21 | SEVERAL MONTHS AFTER THAT INCIDENT THAT I JUST DESCRIBED WHERE |
| 12:07PM | 22 | DR. ROSENDORFF STOPPED THE TESTING, THERE WAS A STUDY DONE, AND |
| 12:07PM | 23 | THEN DR. ROSENDORFF ALLOWED IT TO GO BACK ON EDISON. |
| 12:07PM | 24 | SO MONTHS -- A FEW MONTHS LATER, BRITTANY GOULD GOT THE |
| 12:07PM | 25 | RESULT, THAT'S VERY UNFORTUNATE, BUT THAT'S NOT BECAUSE |

12:07PM  1    MR. BALWANI WAS TRYING TO CREATE A RISK OR KNEW HE WAS CREATING

12:07PM  2    A RISK TO SOMEONE LIKE MS. GOULD OR SOMEONE SIMILARLY SITUATED.

12:07PM  3         ON THE ISSUE OF DR. DAS, DR. DAS DIDN'T TESTIFY IN

12:07PM  4    MR. BALWANI'S CASE OBVIOUSLY, BUT MR. BALWANI WAS INVOLVED IN

12:07PM  5    HIRING DR. DAS ALONG WITH MS. HOLMES.  MR. BALWANI WAS STILL

12:07PM  6    THERE AT THE COMPANY IN THE LATTER PART OF 2015, AND THE FIRST

12:07PM  7    FEW MONTHS OF 2016 DR. DAS WAS HIRED.  SO THIS WAS MR. BALWANI

12:07PM  8    WORKING WITH MS. HOLMES TO TRY TO UNDERSTAND THE ISSUES THAT

12:07PM  9    HAD BEEN RAISED BY CMS.

12:07PM  10        BUT IN ANY EVENT, THIS IS AFTER THE FACT, AND THAT DR. DAS

12:07PM  11   COMES ALONG AND HAS A CERTAIN VIEW OF THE WORLD, MR. BALWANI IS

12:07PM  12   WORKING WITH HIM, AND THAT DOESN'T SAY THAT BACK IN REAL TIME

12:08PM  13   IN 2013 AND '14 OR EARLIER IN '15 THAT MR. BALWANI KNEW THAT HE

12:08PM  14   WAS CREATING SOME KIND OF RISK TO PATIENTS.

12:08PM  15        IN FACT, WE SEE IN THE RECORD THAT DEVICES CAME OFFLINE.

12:08PM  16   THE GOVERNMENT ITSELF PRESENTED AN EXHIBIT WHERE EARLY IN 2015,

12:08PM  17   OR EVEN LATE IN '14, CERTAIN TESTS ON THE EDISON WAS STOPPED.

12:08PM  18        SO THIS WAS NOT A COMPANY THAT, AS MR. BALWANI WAS IN THE

12:08PM  19   MANAGEMENT TEAM OF, WAS TRYING TO PROVIDE INACCURATE RESULTS TO

12:08PM  20   PATIENTS.  WE DON'T THINK THAT THE RECORD SUPPORTS THAT.  THE

12:08PM  21   COURT'S COMMENT IN MS. HOLMES'S CASE IS THE EVIDENCE DOESN'T

12:08PM  22   SUPPORT THAT.  WE THINK THAT'S A CORRECT OBSERVATION AND THIS

12:08PM  23   GUIDELINE ADJUSTMENT SHOULD NOT BE APPLIED.

12:08PM  24             THE COURT:  ALL RIGHT.  THANK YOU.

12:08PM  25        I THINK THE CONNECTION HERE IS A LITTLE BIT GREATER.  THE

12:08PM  1    EVIDENCE HERE AS TO YOUR CLIENT, MR. BALWANI'S INTIMACY WITH

12:08PM  2    THE LAB IS SOMETHING THAT IT SEEMED TO ME THAT HE HAD PURVIEW

12:08PM  3    OVER THE LAB.  YOU INDICATE THAT HE HIRED OR HAD PART OF HIRING

12:09PM  4    DR. DAS.

12:09PM  5        HE ALSO HIRED HIS DERMATOLOGIST AFTER DR. ROSENDORFF LEFT,

12:09PM  6    WHICH SUGGESTS THAT HE HAD MORE CONTROL.  I THINK THAT WAS THE

12:09PM  7    GENERAL PRESENTATION AT THE TRIAL, AT THE TRIALS, THAT THE LAB

12:09PM  8    WAS KIND OF HIS BABY IF YOU WILL.

12:09PM  9        HE HIRED MS. SAWYER CONCURRENT OR SHORTLY AFTER HE HIRED

12:09PM  10   HIS DERMATOLOGIST TO BE THE LAB DIRECTORS IN THAT CASE.  HE WAS

12:09PM  11   THE ONE WHO HAD GREATER RESPONSIBILITY IT SEEMED FOR THE LAB.

12:09PM  12   IF THERE WAS A DIVISION OF LABOR, THE LAB SEEMED TO BE HIS.

12:09PM  13   AND HE HAD -- THERE WERE EMAILS.  THERE WAS MS. CHEUNG, WHEN

12:09PM  14   SHE HAD ISSUES WITH THE LAB, SHE WENT TO MR. BALWANI TO TALK TO

12:09PM  15   HIM ABOUT IT, AND WE KNOW ABOUT THAT CONVERSATION AND HIS

12:10PM  16   RESPONSE TO HER CONCERNS AND OTHERS.

12:10PM  17       SO I THINK THAT'S THE DISTINCTION THAT HIS INTIMACY IS A

12:10PM  18   LITTLE BIT CLOSER TO THE LAB THAN PERHAPS MS. HOLMES AND

12:10PM  19   PERHAPS THAT GIVES HIM A GREATER VISION OF RESPONSIBILITY FOR

12:10PM  20   THE OUTPUT FROM THAT LAB, AND I THINK THAT'S THE BASIS OF

12:10PM  21   WHAT -- ONE OF THE BASIS OF ARGUING WHY THIS SHOULD APPLY TO

12:10PM  22   MR. BALWANI.

12:10PM  23           MR. COOPERSMITH:  THANK YOU, YOUR HONOR.

12:10PM  24       I UNDERSTAND THE POINT.  IT IS TRUE THAT MR. BALWANI HAD

12:10PM  25   MORE DIRECT PURVIEW OF THE LAB, BUT IT'S ALSO TRUE THAT EACH OF

12:10PM  1    THESE IMPORTANT ISSUES THAT THE GOVERNMENT SAID ARE PROBLEMS,

12:10PM  2    THAT MR. BALWANI SHOULD HAVE FIXED OR TAKEN INTO ACCOUNT TO

12:10PM  3    STOP TESTING, MS. HOLMES ALSO KNEW ABOUT.

12:10PM  4         AND I'LL JUST READ FROM THE GOVERNMENT'S SENTENCING MEMO

12:10PM  5    BRIEFLY.  THEY SAY MS. HOLMES HAD ULTIMATE AUTHORITY OVER THE

12:10PM  6    LAB OPERATIONS JUST LIKE SHE DID EVERY OTHER ASPECT OF THE

12:10PM  7    COMPANY'S ACTIVITY.  AN ORG CHART PRESENTED TO CMS BY THERANOS

12:11PM  8    DISPLAYED MS. HOLMES AT THE TOP OF THE CLIA OPERATION

12:11PM  9    OVERSEEING A GROUP COMPRISED OF MORE THAN 60 THERANOS EMPLOYEES

12:11PM 10    INCLUDING --

12:11PM 11         THE COURT:  YOU'VE GOT TO SLOW DOWN.

12:11PM 12         MR. COOPERSMITH:  YEAH.  -- OVERSEEING A GROUP

12:11PM 13    COMPRISED OF MORE THAN 60 THERANOS EMPLOYEES, INCLUDING HER

12:11PM 14    COCONSPIRATOR, RAMESH BALWANI.

12:11PM 15         AND EVEN MORE IMPORTANTLY, YOUR HONOR, GOING TO THE ISSUE

12:11PM 16    OF HIRING DR. DHAWAN.  SO HE WAS MR. BALWANI'S DERMATOLOGIST,

12:11PM 17    BUT I THINK THAT'S SELLING HIM A LITTLE SHORT.  HE ALSO WAS THE

12:11PM 18    DIRECTOR OF THE CLINICAL LAB, AND HE WAS FULLY QUALIFIED.  NO

12:11PM 19    ONE HAS EVER DISPUTED THAT.

12:11PM 20         THE COURT:  HIS OWN LAB.

12:11PM 21         MR. COOPERSMITH:  HE WAS.  AND HE WAS ALSO LICENSED

12:11PM 22    AND HE SERVED AS THE LAB DIRECTOR.

12:11PM 23         BUT IN ADDITION -- AND WE PUT THESE DOCUMENTS INTO OUR

12:11PM 24    SENTENCING BRIEF.  THE RECORD HERE SHOWS THAT MR. BALWANI,

12:11PM 25    RIGHT AFTER DR. ROSENDORFF LEFT IN NOVEMBER OF 2014, HE DIDN'T

12:11PM   1    JUST SAY, OH, LET'S GET MY DERMATOLOGIST IN HERE.  HE WAS

12:11PM   2    INVOLVED IN AN ACTIVE SEARCH, A VERY ACTIVE SEARCH FOR A

12:12PM   3    FULL-TIME LAB DIRECTOR.  HE PUT FORWARD DR. SAKSENA FOR THAT

12:12PM   4    PURPOSE.  HE HAD MADE SURE THAT DR. SAKSENA HAD TIME TO STUDY

12:12PM   5    FOR THE TESTING HE HAD TO TAKE.  THEY PUSHED THAT ISSUE WITH

12:12PM   6    THE REGULATORS, THE CALIFORNIA REGULATORS TO MAKE SURE HE WOULD

12:12PM   7    BE QUALIFIED.  SO MR. BALWANI WAS NOT TRYING TO IGNORE THE

12:12PM   8    PROBLEM.

12:12PM   9         OF COURSE EVEN WHILE THEY WERE DOING THIS VERY ACTIVE LAB

12:12PM   10   DIRECTOR SEARCH AND DR. DHAWAN AND DR. SAWYER WERE FILLING IN

12:12PM   11   AS TEMPORARY LAB DIRECTORS, ALL OF THE SCIENTIFIC TEAM, PH.D.

12:12PM   12   LEVEL PEOPLE WERE STILL IN THE LAB.  MR. BALWANI WAS NOT MAKING

12:12PM   13   DECISIONS, AND THERE'S NO EVIDENCE OF THIS OF WHICH PATIENT

12:12PM   14   RESULTS TO RELEASE AND WHICH PATIENT RESULTS NOT TO RELEASE.

12:12PM   15        SO WE THINK THAT IS A DISTINCTION THE COURT NOTED, BUT WE

12:12PM   16   DON'T THINK THAT MAKES A DIFFERENCE IN THIS CASE GIVEN THE SUM

12:12PM   17   TOTAL.

12:12PM   18        AGAIN, I WOULD JUST COME BACK TO WHAT I WOULD THINK WOULD

12:12PM   19   BE VERY UNFAIR TO APPLY THIS RESULT TO MR. BALWANI, THIS

12:12PM   20   ADJUSTMENT WHEN IT WASN'T APPLIED TO MS. HOLMES WHERE SHE HAD

12:13PM   21   THE SAME KNOWLEDGE AS THE COURT POINTED OUT IN DOCKET 1635.

12:13PM   22        AGAIN, THE JURY VERDICT DOESN'T CONTROL HERE.  IT'S THE

12:13PM   23   PROVINCE OF THIS COURT TO MAKE THAT DECISION.

12:13PM   24        IF IT WAS SOMETHING IN THE VERDICT THAT WAS A SPECIAL

12:13PM   25   VERDICT, WE WOULD JUST BE IN A DIFFERENT POSITION, BUT WE JUST

12:13PM  1        DON'T HAVE THAT.

12:13PM  2                THE COURT:  RIGHT.  AND I THINK YOU WERE TALKING

12:13PM  3        ABOUT THE HISTORY OF WHEN PROBLEMS WOULD ARISE AND YOUR

12:13PM  4        CLIENT'S ATTENTION TO THEM, AND WE KNOW THAT AT THIS TIME THIS

12:13PM  5        WAS A CRITICAL STAGE, THERE WAS ROLLOUT HAPPENING.  THIS WAS A

12:13PM  6        CRITICAL PART OF THE COMPANY'S EXISTENCE.

12:13PM  7            AND ANOTHER WAY OF LOOKING AT THE EVIDENCE, AND I DON'T

12:13PM  8        KNOW WHAT THE JURY THOUGHT ABOUT, BUT ONE WAY OF LOOKING AT IT

12:13PM  9        IS YOU LOSE YOUR LAB DIRECTOR, YOU'RE GOING TO LOSE CLIA, AND

12:13PM 10        EVERYTHING IS GOING TO COLLAPSE.  THE COMPANY WOULD CEASE TO

12:13PM 11        EXIST.

12:13PM 12            SO, OF COURSE, THOSE RESPONSIBLE IN THE COMPANY, THE

12:13PM 13        LEADERSHIP WOULD DO WHATEVER THEY COULD TO KEEP, TO KEEP THE

12:13PM 14        COMPANY GOING.  AND I THINK THIS IS WHAT YOUR POINT IS, HE

12:14PM 15        REACHED OUT TO A LAB DIRECTOR THAT HE KNEW THAT HE COULD HIRE

12:14PM 16        AS AN INTERIM PERHAPS TO KEEP THE COMPANY GOING.

12:14PM 17            AND WE ALL OBSERVED THE TESTIMONY OF THE DOCTOR AND WHEN

12:14PM 18        HE TESTIFIED ABOUT HIS WORK AND THE TIMES THAT HE SPENT ON SITE

12:14PM 19        AND THE NUMBER OF SIGNATURES THAT -- THE TRANCHES OF DOCUMENTS

12:14PM 20        THAT WERE PROVIDED TO HIM FOR HIS SIGNATURE AS LAB DIRECTOR

12:14PM 21        HAD TO SIGN OFF ON PROTOCOLS AND THINGS.  HE TALKED ABOUT WHAT

12:14PM 22        HE DID, AND WE ALL RECALL THE DEMEANOR AND NATURE AND QUALITY

12:14PM 23        OF HIS TESTIMONY AS HE WAS EXAMINED ABOUT HIS WORK THERE.  SO I

12:14PM 24        RECALL THAT.

12:14PM 25            I JUST SAY, THIS IS ANOTHER WAY OF LOOKING AT IT.

12:14PM 1      MR. LEACH MIGHT ARGUE THEY WERE DESPERATE AT THAT TIME TO

12:14PM 2   KEEP THE CONCERN GOING, AND THEY RECOGNIZED THAT PERHAPS THE

12:15PM 3   EFFECTS OR THE INABILITY OF THE MACHINES WERE ABOUT TO BE

12:15PM 4   REVEALED AND THEY WANTED TO KEEP THAT GOING.  MAYBE THAT'S WHAT

12:15PM 5   THE GOVERNMENT'S POINT WAS.  I DON'T KNOW.  THEY DIDN'T ARGUE

12:15PM 6   THAT SPECIFICALLY.

12:15PM 7      BUT FOR PURPOSES OF THIS ALLOCATION OF THIS ENHANCEMENT, I

12:15PM 8   THINK I TAKE YOUR POINT, I UNDERSTAND -- I DON'T THINK YOU

12:15PM 9   WOULD QUARREL WITH THE FACT THAT THE DIVISION OF LABOR WAS SUCH

12:15PM 10  THAT YOUR CLIENT HAD GREATER CONTROL, INTIMACY OR PROVINCE OVER

12:15PM 11  THE LAB.

12:15PM 12          MR. COOPERSMITH:  I DO QUARREL WITH THE TERM

12:15PM 13  "CONTROL," YOUR HONOR.  AND JUST TO TAKE THE POINT THE COURT

12:15PM 14  JUST MADE --

12:15PM 15          THE COURT:  WELL, HE HIRED HIS DERMATOLOGIST FOR THE

12:15PM 16  LAB DIRECTOR, MS. HOLMES DIDN'T.

12:15PM 17          MR. COOPERSMITH:  WELL, MS. HOLMES WAS THE CEO OF

12:15PM 18  THE COMPANY.  SHE KNEW FULL WELL WHO WAS BEING HIRED AS THE LAB

12:15PM 19  DIRECTOR.

12:15PM 20          THE COURT:  HIS DERMATOLOGIST.

12:15PM 21          MR. COOPERSMITH:  ABSOLUTELY.  SHE KNOWS ALL OF

12:15PM 22  THESE THINGS.  AGAIN, THE ADJUSTMENT WASN'T APPLIED TO HER.

12:15PM 23      THE COURT'S POINT THAT WE DON'T AGREE WITH THIS, BUT

12:16PM 24  JUST TO PLAY IT OUT, THAT, WELL, AT THIS TIME THEY NEEDED A LAB

12:16PM 25  DIRECTOR AND SO TO KEEP THE COMPANY GOING THEY HAD TO GET THE

12:16PM  1   LAB DIRECTOR IN PLACE AND KEEP THE CLINICAL LAB GOING.  IF

12:16PM  2   THAT'S WHAT HAPPENED, THAT'S EQUALLY ON MS. HOLMES AS THE CEO.

12:16PM  3   SO I DON'T UNDERSTAND WHY THAT WOULD BE MEANINGFUL HERE.

12:16PM  4           THE COURT:  NO.

12:16PM  5           MR. COOPERSMITH:  AND THE OTHER THING I'LL SAY IS

12:16PM  6   THAT, OF COURSE, IN EARLY 2015 THE COMPANY OPENED AN ARIZONA

12:16PM  7   LAB WITH DANIEL YOUNG AS THE LAB DIRECTOR WHO WAS QUALIFIED

12:16PM  8   UNDER ARIZONA REQUIREMENTS, AND THAT LAB WAS DOING ALL FDA

12:16PM  9   APPROVED COMMERCIAL TESTING.

12:16PM  10          AND IN THAT TIMEFRAME EVEN WHILE, AS THE COURT POINTED

12:16PM  11  OUT, DR. DHAWAN AND DR. SAWYER WERE IN PLACE OF LAB DIRECTORS

12:16PM  12  UP IN NEWARK, MORE AND MORE TESTING WAS BEING SHIFTED TO THE

12:16PM  13  COMMERCIAL MACHINES.

12:16PM  14          AND I UNDERSTAND THE GOVERNMENT HAS OTHER ISSUES WITH THAT

12:16PM  15  ON THE INVESTMENT SIDE, BUT FOR THIS PURPOSE, THAT'S THE

12:16PM  16  OPPOSITE OF TRYING TO CREATE A RISK TO PATIENTS WHEN THEY'RE

12:16PM  17  ACTIVELY SPENDING MONEY AND TIME OPENING AN ARIZONA LAB AND IS

12:17PM  18  GOING TO TEST PATIENTS, AND THERE REALLY IS NO EVIDENCE IN THE

12:17PM  19  CASE OF COMMERCIAL TESTING IS SOMEHOW FLAWED AT LEAST AS FAR AS

12:17PM  20  HOW MR. BALWANI SAW IT.

12:17PM  21          THE COURT:  HOW SHOULD I INTERPRET THE CONDUCT OR

12:17PM  22  THE ACTION THAT -- I THINK IT IS DR. DAS WHEN HE WAS ON BOARD

12:17PM  23  AND HE SAID, YOU KNOW, THE ONLY THING THAT WE CAN DO IS TO

12:17PM  24  INVALIDATE ALL OF THOSE TESTS?  WHAT MR. LEACH SUGGESTS IS THAT

12:17PM  25  THAT IS PER SE EVIDENCE.

12:17PM  1          MR. COOPERSMITH:  WELL, FIRST OF ALL, OF COURSE THE

12:17PM  2    ACTUAL LANGUAGE THAT DR. DAS USED WE POINT OUT AS AN ABUNDANCE

12:17PM  3    OF CAUTION.

12:17PM  4          BUT EVEN IF YOU TAKE THIS AS GOSPEL THAT DR. DAS REALLY

12:17PM  5    BELIEVED THAT THIS HAD TO BE DONE AND THAT'S HIS DECISION, IT'S

12:17PM  6    AFTER THE FACT, YOUR HONOR.  AND SO MR. BALWANI, AS I SAID, IS

12:17PM  7    INVOLVED WITH MS. HOLMES TO HIRE DR. DAS, A LAB DIRECTOR FROM

12:17PM  8    UCLA, A HIGHLY QUALIFIED GUY, COMES IN AND HE LOOKS AT THE

12:17PM  9    WHOLE ISSUE, AND THEY ALLOW HIM TO DO THAT.  NO ONE WAS TELLING

12:18PM 10    HIM DON'T LOOK AT THIS OR DON'T LOOK UNDER THIS ROCK.

12:18PM 11          HE LOOKS AT THE LAB AND THE DOCUMENTATION, AND HE COMES UP

12:18PM 12    WITH WHATEVER VIEW HE COMES UP WITH.  BUT THE FACT THAT HE DID

12:18PM 13    THAT LATER WHEN THERE WAS NO MORE FINGERSTICK TESTING GOING ON.

12:18PM 14    AS OF SEPTEMBER 2015 WHEN CMS CAME IN, THE EDISON HAD BEEN

12:18PM 15    STOPPED FOR MONTHS AND EVEN THE MODIFIED PREDICATE MACHINES

12:18PM 16    WHICH ALSO DID FINGERSTICK WERE STOPPED AT THAT POINT.

12:18PM 17          SO BY THE TIME THAT DR. DAS CAME IN, IT WAS ALL NOT BEING

12:18PM 18    CONDUCTED ANYMORE.  IT WAS ALL COMMERCIAL TESTING.

12:18PM 19          AND SO IT'S LIKE THE SAME AS IF YOU BRING IN AN EXPERT FOR

12:18PM 20    ANY BUSINESS OR LABORATORY AFTER THE FACT AND HE MAKES SOME

12:18PM 21    CONCLUSIONS ABOUT PROBLEMS, IT DOESN'T GO TO WHAT MR. BALWANI

12:18PM 22    KNEW AT THE TIME THAT THE LAB WAS OPERATING WITH FINGERSTICK,

12:18PM 23    AND IT JUST DOESN'T AFFECT THAT.

12:18PM 24          SO IT'S AFTER-THE-FACT INFORMATION.

12:18PM 25          WHAT WE HAVE TO DETERMINE FOR PURPOSES OF THIS GUIDELINE

12:19PM  1    ADJUSTMENT IS WHETHER AT THE TIME THESE RESULTS WERE GOING OUT

12:19PM  2    MR. BALWANI WAS CREATING CONSCIOUSLY OR RECKLESSLY A RISK OF

12:19PM  3    THIS PATIENT HARM, AND THE EVIDENCE HERE IS THAT HE WAS NOT

12:19PM  4    DOING THAT.

12:19PM  5         EVEN IF THE COURT THOUGHT, WELL, MAYBE IN SOME CASES

12:19PM  6    THAT'S WHAT HAPPENED, THAT WOULD NOT SHOW THAT MR. BALWANI WAS

12:19PM  7    DOING THAT CONSCIOUSLY OR RECKLESSLY.  HE WAS TRYING TO DO WHAT

12:19PM  8    HE COULD, EVEN IF THE COURT THINKS IT'S INADEQUATE, DO WHAT HE

12:19PM  9    COULD TO FIX THE PROBLEMS AND MAKE SURE THAT THE SCIENTIFIC

12:19PM  10   TEAM WAS ON TOP OF THESE ISSUES SO THAT PATIENT RESULTS WERE AS

12:19PM  11   GOOD AS THEY COULD GET.

12:19PM  12        THE COURT:  THAT'S YOUR INTERPRETATION?

12:19PM  13        MR. COOPERSMITH:  YES, YOUR HONOR, I THINK THAT'S

12:19PM  14   FAIR FROM THE CASE IN THE CASE.

12:19PM  15        THE COURT:  OKAY.  THANK YOU.

12:19PM  16     LET'S TAKE ABOUT 20 MINUTES, AND THEN WE'LL COME BACK AND

12:19PM  17   WE WILL INCLUDE THE CALCULATIONS.  THANK YOU.

12:19PM  18        MR. LEACH:  THANK YOU, YOUR HONOR.

12:19PM  19     (RECESS FROM 12:19 P.M. UNTIL 12:50 P.M.)

12:50PM  20        THE COURT:  WE'RE BACK ON THE RECORD IN THE BALWANI

12:50PM  21   MATTER.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

12:50PM  22     I'D LIKE TO CONTINUE OUR CONVERSATION.  WE MENTIONED THE

12:50PM  23   SUBMISSION BY THE DEFENSE YESTERDAY OF A DOCUMENT, AND I DON'T

12:50PM  24   THINK IT'S BEEN FORMALLY -- I THINK IT WAS SUBMITTED WITH YOUR

12:50PM  25   REQUEST, I THINK, TO BE --

12:50PM  1          MR. COOPERSMITH:  IT WAS AN ADMINISTRATIVE MOTION

12:50PM  2     FOR LEAVE TO FILE IT.

12:50PM  3          THE COURT:  THAT'S RIGHT.  IT HASN'T BEEN ACTED ON.

12:50PM  4     I'VE TALKED ABOUT IT.  IT'S DOCUMENT 1677.

12:50PM  5          THANK YOU, MS. ROBINSON.

12:50PM  6          I'LL ADMIT THAT NOW JUST FOR THE RECORD.

12:51PM  7          ALL RIGHT.  THANK YOU.

12:51PM  8          ANY OTHER COMMENT FROM COUNSEL ABOUT ANY OF THE LOSS

12:51PM  9     CALCULATIONS THAT WE HAVE TALKED ABOUT BEFORE THE BREAK,

12:51PM  10    MR. LEACH?

12:51PM  11         MR. LEACH:  NO, YOUR HONOR.  THANK YOU.

12:51PM  12         MR. COOPERSMITH:  NO, YOUR HONOR.  THANK YOU.

12:51PM  13         THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

12:51PM  14         ALL RIGHT.  THANK YOU.

12:51PM  15         WHAT I WOULD LIKE TO DO IS TO GIVE YOU THE COURT'S

12:51PM  16    DECISIONS ON THESE MATTERS SUCH THAT WE CAN PROCEED WITH THE

12:51PM  17    GUIDELINE CALCULATIONS AND GOING FORWARD.

12:51PM  18         FIRST OF ALL, AS TO THE LOSS CALCULATION MATTER AND THE

12:52PM  19    FIRST ISSUE IS WHAT IS THE STANDARD THAT THE COURT SHOULD APPLY

12:52PM  20    THAT IS PREPONDERANCE OR CLEAR AND CONVINCING?

12:52PM  21         THE COURT IS GOING TO FIND THAT IN THIS MATTER THE

12:52PM  22    PREPONDERANCE OF THE EVIDENCE LEVEL IS APPROPRIATE IN THIS

12:52PM  23    CASE, AND THE COURT WILL APPLY THAT STANDARD CITING LAURIENTI,

12:52PM  24    611 FED. 3D, AND THE BERGER CASE AT 587 FED 3D.

12:52PM  25         I KNOW WE'VE TALKED ABOUT THE LONICH CASE.  I DO THINK

| | | |
|---|---|---|
| 12:52PM | 1 | LONICH IS DISTINGUISHABLE FROM OUR CASE HERE.  OF COURSE, |
| 12:52PM | 2 | LONICH INVOLVED -- AND I THINK, MS. WALSH, YOU'VE MENTIONED |
| 12:52PM | 3 | THIS -- THERE'S AN ISSUE ABOUT THE TOTAL BANK FAILURE VIS-À-VIS |
| 12:52PM | 4 | THE FRAUD ON THE INVESTORS AND THE STRUGGLE THAT THE COURT HAD |
| 12:52PM | 5 | AND THE PARTIES HAD WITH TRYING TO MATCH THOSE TWO LOSSES. |
| 12:52PM | 6 | THIS IS A VERY DIFFERENT FACT PATTERN, ALBEIT COMPLICATED |
| 12:52PM | 7 | NONETHELESS, BUT IT'S DIFFERENT FROM LONICH.  SO I DO FIND THAT |
| 12:53PM | 8 | THE PREPONDERANCE OF THE EVIDENCE IS THE APPROPRIATE STANDARD |
| 12:53PM | 9 | TO USE, AND THE COURT WILL USE THAT. |
| 12:53PM | 10 | THERE WAS ANOTHER OBJECTION I WANTED TO MENTION THAT |
| 12:53PM | 11 | MR. BALWANI SUGGESTED THAT -- REGARDING -- I THINK MS. WALSH |
| 12:53PM | 12 | TALKED ABOUT INTERVENING CAUSES AND DISRUPTION OF A CAUSAL |
| 12:53PM | 13 | CHAIN.  I DO WANT TO INDICATE THAT THE COURT IS GOING TO -- ANY |
| 12:53PM | 14 | ACTIONS THAT THERANOS TOOK AFTER MAY 2016 ARE NOT ATTRIBUTABLE, |
| 12:53PM | 15 | AND THE COURT WON'T CONSIDER THOSE AS ATTRIBUTABLE AS TO |
| 12:53PM | 16 | MR. BALWANI. |
| 12:53PM | 17 | IN THE COURT'S LOSS CALCULATION, THE OFFSET OF TOTAL |
| 12:54PM | 18 | INVESTOR LOSS AMOUNT IS THE VALUE OF THERANOS AT A POINT IN |
| 12:54PM | 19 | TIME PRIOR TO THE DEFENDANT'S DEPARTURE.  SO THAT SPECIFIC |
| 12:54PM | 20 | OBJECTION IS REALLY NOT NECESSARY, AGAIN, UNDER FEDERAL RULE OF |
| 12:54PM | 21 | CRIMINAL PROCEDURE 32(I)(3)(B) BECAUSE THE COURT IS NOT GOING |
| 12:54PM | 22 | TO USE ANY POST 2016 CONDUCT AS ITS DETERMINATION OF THE |
| 12:54PM | 23 | DEFENDANT'S SENTENCING. |
| 12:54PM | 24 | TURNING TO THE SABA REPORT, AND I'LL JUST CALL IT THAT. |
| 12:54PM | 25 | WE'VE HAD SOME ROBUST CONVERSATION ABOUT THAT. |

12:54PM 1      WE KNOW, AS MR. LEACH POINTS OUT, AND I DON'T THINK THE

12:54PM 2  DEFENSE PARTS COMPANY WITH, THAT THE COURT'S OBLIGATION IN THE

12:54PM 3  LOSS CALCULATION IN THE SEARCH FOR A LOSS CALCULATION IS A

12:54PM 4  REASONABLE, REALISTIC, AND ECONOMIC PROJECTION OF LOSS BASED ON

12:54PM 5  THE EVIDENCE AND WEST COAST ALUMINUM TEACHES THAT AT

12:55PM 6  265 FED. 3D.

12:55PM 7      WE HAD SOME DISCUSSION ABOUT MR. SABA'S REPORT AND THE

12:55PM 8  ANALYSIS THAT HE TOOK.  THE SABA REPORT'S ESTIMATION OF

12:55PM 9  VALUATION PROVIDES THREE DIFFERENT DATES REGARDING THE ANALYSIS

12:55PM 10  AND FOR THE PURPOSES OF ITS LOSS CALCULATION THE COURT SELECTS

12:55PM 11  THE DATE CLOSEST IN TIME AGAIN TO THE C INVESTMENTS, WHICH IS

12:55PM 12  DECEMBER 31, 2014.

12:55PM 13      LET ME INDICATE, AS I DID IN THE COMPANION CASE, I AM

12:55PM 14  GOING TO TELL YOU THE COURT'S DECISIONS NOW FOR PURPOSES OF

12:55PM 15  INFORMATION FOR TODAY'S SENTENCING.  I WILL ISSUE SHORTLY A

12:55PM 16  FORMAL ORDER THAT MEMORIALIZES THE COURT'S FINDINGS AND THE

12:55PM 17  REASONS AND BASIS FOR IT FOR YOUR BENEFIT AND FOR THE RECORD.

12:55PM 18  SO YOU'LL HAVE A MORE FULSOME ORDER THAT CAPTURES THE COURT'S

12:56PM 19  DECISION HERE AFTER TODAY.

12:56PM 20      AND THE COURT WILL ALSO SELECT THE INCOME METHOD.  IT

12:56PM 21  FINDS THAT IT IS THE MOST APPROPRIATE FOR ONGOING COMPANIES AND

12:56PM 22  IT DOES PROVIDE -- ACTUALLY IN THE COURT'S ANALYSIS HERE, IT

12:56PM 23  DOES PROVIDE A HIGHER COMPANY VALUATION AGAIN AND AGAIN, NOTING

12:56PM 24  THAT THAT IS ACTUALLY MORE FAVORABLE TO THE DEFENSE.

12:56PM 25      THERE WAS AN ARGUMENT ABOUT THE SABA REPORT'S LOSS RANGE

12:56PM  1    BEING TOO BROAD.  I THINK MS. WALSH POINTS US TO THAT AND

12:56PM  2    SUGGESTS THAT THE LOSS CALCULATIONS WERE INCORRECT PROVIDING

12:56PM  3    INFORMATION FROM WEINGUST, DR. WEINGUST, MR. WEINGUST AND

12:56PM  4    OTHERS, MR. REIFF AS WELL.

12:56PM  5         AND I -- MR. SABA USED -- I THINK THE ALLEGATION WAS THAT

12:56PM  6    SABA'S 45 PERCENT RATE WAS EXCESSIVE AND SHOULD HAVE USED

12:57PM  7    PEPPERDINE STUDIES, AND I TALKED ABOUT WHAT THE COURT WAS DOING

12:57PM  8    YESTERDAY AFTERNOON AFTER IT RECEIVED THE FILING AND THE EXPERT

12:57PM  9    REPORTS AND THOSE THINGS.

12:57PM 10         AND WHILE I DON'T WANT TO SAY I'M TROUBLED BY THE BATTLE

12:57PM 11    OF QUANTUM EXPERTS, I APPRECIATE THAT THERE'S ROBUST ARGUMENT

12:57PM 12    FOR THIS.  IT'S A VERY CRITICAL POINT FOR BOTH SIDES.  I

12:57PM 13    APPRECIATE THAT, THAT ARGUMENT.

12:57PM 14         BUT AS I POINTED OUT, THE -- THIS IS A CRIMINAL CASE, NOT

12:57PM 15    A CIVIL CASE.  MS. WALSH TELLS US THAT, TOO.  IT HAS GREATER --

12:57PM 16    OBVIOUSLY THERE'S LIBERTY INTERESTS HERE THAT OUTWEIGH ANY

12:57PM 17    CIVIL INTEREST, BUT, AGAIN, THE COURT'S TASK HERE, AIDED BY

12:57PM 18    YOUR REPORTS, YOUR COMMENTS AND YOUR ASSISTANCE, IS TO FIND A

12:57PM 19    REASONABLE -- IS TO USE REASONABLENESS TO FIND A REASONABLE

12:58PM 20    AMOUNT HERE.

12:58PM 21         WE'RE NOT IN A BUSINESS CONTEXT, AS MANY OF YOU ARE

12:58PM 22    FAMILIAR WITH, OR AS I POINTED OUT, SOME OF THE EXPERT'S WORK

12:58PM 23    IN THE PAST HAS BEEN TO PROVIDE SOME EQUITY AND DIVISION OF

12:58PM 24    COMMUNITY PROPERTY IN A DISSOLUTION PROCEEDING.  THAT'S NOT THE

12:58PM 25    FUNCTION HERE.  THAT PRECISENESS, AND I THINK YOU BOTH

12:58PM  1    RECOGNIZE, BOTH SIDES RECOGNIZE, IT'S NOT ALWAYS ASCERTAINABLE,

12:58PM  2    AND THAT'S WHY THE CASES TELL US THAT THE SEARCH IS REALLY

12:58PM  3    BASED ON REASONABLENESS, RECOGNIZING THE COMPLEXITY OF THESE

12:58PM  4    CASES THAT COME BEFORE COURTS.

12:58PM  5        THE COURT DOES FIND THAT MR. SABA DID CONSIDER A BROADER

12:58PM  6    RANGE OF STUDIES AND DATA IN SELECTING THE 45 PERCENT NUMBER

12:58PM  7    THAT HE DID REACH.  HE LOOKED AT THE DATA FROM THE PEPPERDINE

12:59PM  8    STUDIES, HE LOOKED AT ARANCA WITH ALL OF ITS CRITICISMS, HE

12:59PM  9    USED THE INFORMATION THAT WAS, AS I MENTIONED TO MS. WALSH, ON

12:59PM  10   THE TABLE, AND THE COURT FINDS THAT HIS REPORT, NOTWITHSTANDING

12:59PM  11   THE CRITICISM OF THE OTHER EXPERTS, THAT ARE HELPFUL IN

12:59PM  12   PROVIDING CONTEXT AND SUBJECTING THE SABA REPORT TO MORE

12:59PM  13   CRITICAL REVIEW, THOSE REPORTS AND THOSE CRITICISMS DID NOT

12:59PM  14   DISTURB THE COURT'S FINDING THAT THE SABA REPORT IS REASONABLE

12:59PM  15   AND FOUNDED ON RELIABLE DATA AND ANALYSIS.

12:59PM  16       THE COURT FINDS THAT, AGAIN, THAT THE SABA PROTOCOL IS

12:59PM  17   RELIABLE AND REASONABLY ESTIMATING THE RESULT FROM THIS FRAUD

12:59PM  18   CONSPIRACY.

12:59PM  19       THERE WAS ANOTHER OBJECTION BY -- AND THE COURT WILL

12:59PM  20   ACCEPT THE SABA REPORT AND USE THE SABA REPORT IN ITS ANALYSIS

01:00PM  21   FOR ITS FINDINGS.

01:00PM  22       THERE WAS ANOTHER OBJECTION BY THE DEFENDANT ABOUT LOSS

01:00PM  23   SUSTAINED BY PATIENT VICTIMS.  LET ME INDICATE THAT THE COURT

01:00PM  24   IS GOING TO FIND AGAIN UNDER 32(I)(3)(B) THAT THIS IS

01:00PM  25   UNNECESSARY.  THE COURT IS NOT GOING TO CONSIDER PATIENT LOSSES

01:00PM  1    IN REGARDS TO THE TOTAL LOSS AMOUNTS FOR 2B1.1(B)(1).

01:00PM  2         MOVING TO THE VICTIM COUNT ENHANCEMENT.  THIS IS

01:00PM  3    2B1.1(B)(2)(A)(I).  THIS IS THE 2 POINT ENHANCEMENT FOR 10 OR

01:00PM  4    MORE VICTIMS.  THE COURT FINDS THAT, AGAIN, UNDER A

01:01PM  5    PREPONDERANCE OF EVIDENCE STANDARD THAT THE EVIDENCE DOES

01:01PM  6    SUPPORT A FINDING OF AT LEAST 12 VICTIMS, INVESTOR VICTIMS WHO

01:01PM  7    MEET THE DEFINITION OF VICTIMS AND UNDER THE GUIDELINES.  AND

01:01PM  8    THE COURT WILL IDENTIFY THOSE 12:

01:01PM  9         THE FIRST ONE IS PFM;

01:01PM  10        TWO IS MOSLEY FAMILY HOLDINGS;

01:01PM  11        THREE IS RDV CORPORATION;

01:01PM  12        FOURTH IS KEITH RUPERT MURDOCH;

01:01PM  13        FIVE IS RICHARD KOVACEVICH;

01:01PM  14        SIX IS PEER VENTURE GROUP;

01:01PM  15        SEVEN IS LUCAS VENTURE GROUP;

01:01PM  16        EIGHT IS MENDENHALL;

01:01PM  17        NINE IS HALL BLACK DIAMOND;

01:02PM  18        TEN IS BLACK DIAMOND VENTURE;

01:02PM  19        ELEVEN IS ALAN EISENMAN; AND,

01:02PM  20        TWELVE IS SHERRIE EISENMAN.

01:02PM  21        INVESTMENTS MADE BY EACH OF THESE VICTIMS ARE INCLUDED IN

01:02PM  22   THE LOSS CALCULATION, AND ACCORDINGLY THE COURT FINDS THAT A 2

01:02PM  23   LEVEL ENHANCEMENT IS APPROPRIATE UNDER 2B1.1(B)(2)(A)(I).

01:02PM  24        OBJECTION TWENTY-FOUR RELATES TO THE AGGRAVATING ROLE, AND

01:02PM  25   I'VE TALKED WITH COUNSEL ABOUT THIS.  AND I THINK THE NINTH

01:02PM 1    CIRCUIT <u>HOLDEN</u> CASE, 908 FED. 3D CONTROLS HERE, AND THE COURT

01:02PM 2    RECOGNIZING THAT IN OUR DISCUSSION THIS MORNING ABOUT

01:02PM 3    CO-LEADERS AS A POSSIBILITY, THE COURT IS GOING TO NOT FIND

01:02PM 4    THAT THIS ENHANCEMENT SHOULD BE GIVEN.  SO IF THAT MEANS THAT I

01:02PM 5    SUSTAIN THE DEFENSE OBJECTION, THAT'S WHAT I'VE DONE, AND I

01:03PM 6    WON'T FIND THAT ENHANCEMENT APPLIES HERE.

01:03PM 7         UNDER 2B1.1(B)(16)(A), THIS IS THE SERIOUS BODILY INJURY

01:03PM 8    ENHANCEMENT.  WE HAD SOME ROBUST -- THIS IS VERY CLOSE, I

01:03PM 9    THINK, VERY CLOSE INDEED.  WE HAD CONVERSATION ABOUT

01:03PM 10   MR. BALWANI'S WHAT I CALL INTIMACY WITH THE LAB, AND THE

01:03PM 11   EVIDENCE SHOWED TO THE COURT THAT HE HAD CONTROL AND

01:03PM 12   RESPONSIBILITY OVER THE LAB, AND THERE WERE ISSUES WITH THE

01:03PM 13   TESTING ACCURACY AND RELIABILITY OF THE PROPRIETARY DEVICE AND

01:03PM 14   THE TESTIMONY AT TRIAL SUGGESTED THAT.  IT SUGGESTED THAT

01:03PM 15   MR. BALWANI WAS THE CONTACT PERSON.

01:03PM 16      IT APPEARED THAT HE WAS THE LEAD CONTACT PERSON, AT LEAST

01:03PM 17   IN THE ADMINISTRATIVE CHAIN OUTSIDE OF THE LABS AND LAB

01:03PM 18   DIRECTORS, AND HE HAD CONTROL OVER THAT.  EMAILS WERE SENT TO

01:04PM 19   HIM REGARDING CONDUCT OF THE LAB, THE LAB'S ABILITY, THE

01:04PM 20   MACHINES, ISSUES WITH THE MACHINES.  WE ALSO KNOW THE EVIDENCE

01:04PM 21   SHOWS THAT THERE WAS AT LEAST SOME INTEREST BY MR. BALWANI AND

01:04PM 22   PERHAPS HIS CODEFENDANT IN TRYING TO FIND OUT WHO WAS

01:04PM 23   RESPONSIBLE FOR LEAKING INFORMATION FROM THE LAB AND THAT ALSO

01:04PM 24   FELL UNDER HIS PURVIEW AND HE HAD GREAT CONCERNS ABOUT THAT,

01:04PM 25   WHICH DO SUGGEST THAT HE HAD GREATER OVERSIGHT AND CONTROL OVER

01:04PM  1    THE LAB SITUATION.  AND MR. LEACH'S ARGUMENT SUGGESTS THAT THE

01:04PM  2    FACT THAT THERE WAS DR. DAS INVALIDATED AND CANCELLED ALL OF

01:04PM  3    THOSE TEST RESULTS IS PER SE EVIDENCE THAT THE COURT SHOULD USE

01:04PM  4    IN IMPOSING AND OTHERWISE ALLOWING THIS ENHANCEMENT AS AGAINST

01:05PM  5    MR. BALWANI.

01:05PM  6         AND, AGAIN, THIS IS A VERY CLOSE CALL.  THE COURT HAS

01:05PM  7    CONSIDERED VERY CAREFULLY THOSE ARGUMENTS AS WELL AS ITS

01:05PM  8    OBSERVANCE OF THE EVIDENCE AT TRIAL, THE WAY THE EVIDENCE CAME

01:05PM  9    IN AT TRIAL, AND THE COURT IS, HOWEVER, NOT GOING TO IMPOSE

01:05PM  10   THIS.  THE COURT IS GOING TO FIND THAT THERE'S INSUFFICIENT

01:05PM  11   EVIDENCE THAT REALLY DOES SHOW FACTUALLY THAT THERE WAS A

01:05PM  12   DISREGARDING OF THE RISK OR ACTUALLY A KNOWLEDGE OF THE RISK TO

01:05PM  13   PATIENTS OR AN ABILITY OR ACKNOWLEDGEMENT OF PROCEEDING WITH

01:05PM  14   THE TESTS NOTWITHSTANDING THAT.

01:05PM  15        IT'S VERY CLOSE, THOUGH, AND I THINK THE EVIDENCE COULD

01:05PM  16   VERY WELL -- AN ARGUMENT COULD BE MADE THAT MIGHT SUPPORT IT.

01:05PM  17   I'M NOT GOING TO FIND IT IN THIS CASE, AND I WILL DECLINE TO

01:05PM  18   APPLY THE 2 LEVEL ENHANCEMENT UNDER 2B1.1(B)(16)(A).

01:06PM  19        LET ME GO THROUGH THEN THE GUIDELINE CALCULATIONS FOR

01:06PM  20   COUNSEL AND PROBATION.  THESE ARE FOUND ON PAGE 22 OF

01:06PM  21   MS. GOLDSBERRY'S REPORT.

01:06PM  22        THERE'S A GROUPING OF THE COUNTS FROM ONE TO TWELVE, AND

01:06PM  23   PURSUANT TO 2B1.1(A)(1), AND THE COURT IS GOING TO FIND THAT

01:06PM  24   THE BASE OFFENSE LEVEL IS 7.

01:06PM  25        THE COURT IS GOING TO FIND THAT AFTER LOOKING AT THE SABA

01:07PM 1    REPORT AND THAT ANALYSIS, THE COURT IS GOING TO FIND THE TOTAL

01:07PM 2    LOSS TO INVESTOR VICTIMS IS $120 MILLION AND UNDER 2B1.1(M),

01:07PM 3    THIS IS A 24 LEVEL INCREASE.

01:07PM 4         THE COURT WILL FIND UNDER 2B1.(B)(2)(A)(I) THE NUMBER OF

01:07PM 5    VICTIMS IS A 2 LEVEL INCREASE.

01:07PM 6         AS I'VE SAID, THE COURT IS NOT GOING TO FIND IN

01:07PM 7    PARAGRAPH 76 THE ROLE ADJUSTMENT FOR LEADERSHIP.  THE ADJUSTED

01:07PM 8    OFFENSE LEVEL THEREFORE IS 33.

01:08PM 9         THE CRIMINAL HISTORY CATEGORY IS I.

01:08PM 10        AND THAT THEN YIELDS A GUIDELINE RANGE OF 135 TO

01:08PM 11   168 MONTHS.

01:08PM 12        MS. GOLDSBERRY?

01:08PM 13            PROBATION OFFICER:  YES, YOUR HONOR.

01:08PM 14            THE COURT:  AND THAT'S THE COURTS'S FINDING FOR

01:08PM 15   GUIDELINE CALCULATION.

01:08PM 16        AGAIN, THE COURT IS GOING TO PROVIDE COUNSEL WITH AN ORDER

01:08PM 17   THAT PROVIDES THE COURT'S MORE FULSOME DETAILS OF THE COURT'S

01:08PM 18   FINDINGS FOR THE RECORD, BUT I WANTED TO STATE AN OVERVIEW THE

01:08PM 19   REASON FOR THE COURT'S GUIDELINE CALCULATIONS.

01:08PM 20        ANY QUESTIONS?  MR. LEACH?

01:08PM 21            MR. LEACH:  NO, YOUR HONOR.

01:08PM 22            MR. COOPERSMITH:  WE UNDERSTAND THE COURT'S RULING.

01:08PM 23            THE COURT:  ALL RIGHT.  THANK YOU.

01:08PM 24        ANYTHING FURTHER BEFORE I ASK IF THE PARTIES WISH TO BE

01:08PM 25   HEARD AS TO SENTENCING?

01:08PM   1                    MR. LEACH:  NO, YOUR HONOR.

01:08PM   2                    THE COURT:  ALL RIGHT.

01:08PM   3                    MR. COOPERSMITH:  NO, YOUR HONOR.

01:08PM   4                    THE COURT:  ALL RIGHT.  THANK YOU.

01:09PM   5          DOES THE GOVERNMENT WISH TO BE HEARD?

01:09PM   6                    MR. SCHENK:  GOOD MORNING, YES.  THANK YOU,

01:09PM   7     YOUR HONOR.

01:09PM   8          IF I COULD START WITH WHAT THE COURT HAD CALLED

01:09PM   9     SUBSTANTIVE PSR OBJECTIONS, AND I JUST WANTED TO FOR THE RECORD

01:09PM  10     CONFIRM THAT I THINK THERE WERE TWO THAT I THINK THE COURT HAS

01:09PM  11     NOT RULED ON YET, TWENTY-TWO AND TWENTY-THREE.

01:09PM  12          BASED ON WHAT THE COURT JUST SAID, THOUGH, IT SOUNDS LIKE

01:09PM  13     IT IS DENYING THE OBJECTIONS OR OVERRULING THE OBJECTIONS.

01:09PM  14     THEY BOTH HAD SOMETHING TO DO WITH THE ENHANCEMENTS FOR THE

01:09PM  15     NUMBER OF VICTIMS OR LOSS RELATED TO VICTIMS.

01:09PM  16                    THE COURT:  THAT'S RIGHT.  I HOPE I MADE THAT CLEAR

01:09PM  17     WHEN I SAID I WOULD GET TO THOSE EARLIER IN OUR GUIDELINE

01:09PM  18     CALCULATIONS, BUT THAT'S THE SPIRIT OF THE COURT'S FINDINGS,

01:09PM  19     YES.  THANK YOU.

01:09PM  20                    MR. SCHENK:  THANK YOU.

01:09PM  21          YOUR HONOR, I INTEND TO ADDRESS THE 3553(A) FACTORS AND

01:09PM  22     WHY THE COURT SHOULD IMPOSE A SENTENCE OF 180 MONTHS IN CUSTODY

01:10PM  23     IN THIS CASE.  THE COURT JUST NOTED ITS GUIDELINE RANGE AND THE

01:10PM  24     RANGE HERE AS THE COURT STATED IS 135 TO 168.

01:10PM  25          THE GOVERNMENT'S RECOMMENDATION IS ABOVE THE GUIDELINES

01:10PM 1    THAT THE COURT JUST DETERMINED, AND WE STAND BY THAT

01:10PM 2    RECOMMENDATION AND BELIEVE THAT AN APPROPRIATE SENTENCE IN THIS

01:10PM 3    CASE COMES FROM THE STATUTE, COMES FROM 3553(A), AND WHEN WE

01:10PM 4    ANALYZE THE FACTORS, WE SEE THAT A SENTENCE OF 15 YEARS IS

01:10PM 5    APPROPRIATE.

01:10PM 6         THE COURT SHOULD KEEP IN MIND TWO SORT OF OVERARCHING

01:10PM 7    THEMES THAT ARE RELEVANT WHEN SENTENCING MR. BALWANI.  THE

01:10PM 8    FIRST IS THE SIGNIFICANT ROLE HE PLAYED IN DEFRAUDING

01:10PM 9    INVESTORS, AND I'LL GO THROUGH THAT A LITTLE BIT MORE, BUT IT

01:10PM 10   IS NOT ACCURATE TO SAY THAT MS. HOLMES DEFRAUDED INVESTORS AND

01:10PM 11   SUNNY BALWANI RAN THE LAB.  THAT IS AN OVERSIMPLIFICATION AND

01:10PM 12   MORE SO JUST ISN'T TRUE.

01:11PM 13        MR. BALWANI PLAYED A SIGNIFICANT ROLE IN THE INVESTOR

01:11PM 14   FRAUD.  MR. BALWANI CREATED THE FINANCIAL STATEMENTS THAT THE

01:11PM 15   COURT WILL RECALL WERE OFF BY ONE BILLION DOLLARS.  THOSE

01:11PM 16   FINANCIAL STATEMENTS WERE PROVIDED TO INVESTORS, AND

01:11PM 17   MR. BALWANI KNEW THAT THOSE FINANCIAL STATEMENTS WERE PROVIDED

01:11PM 18   TO INVESTORS.

01:11PM 19        SO NOT ONLY DID HE DO WORK ON THE FINANCIAL SIDE, HE ALSO

01:11PM 20   PLAYED A ROLE IN THE WALGREENS ROLLOUT.  THE RELATIONSHIP WITH

01:11PM 21   WALGREENS WAS RELEVANT TO THE PATIENT FRAUD BECAUSE THAT WAS

01:11PM 22   THE LOCATION THAT THE PATIENTS WENT TO, TO RECEIVE THE BLOOD

01:11PM 23   TESTS, BUT IT ALSO WAS RELEVANT ON THE INVESTOR SIDE.

01:11PM 24        INVESTORS WERE TOLD THAT THERANOS HAD THIS HEALTHY AND

01:11PM 25   EXPANDING RELATIONSHIP WITH WALGREENS AND BECAUSE OF THAT HAD

01:11PM  1    MORE CONFIDENCE IN THE TECHNOLOGY, IN THE STABILITY OF THE

01:11PM  2    COMPANY, AND THOSE FACTS WERE COMMUNICATED TO INVESTORS.

01:11PM  3         MR. BALWANI PLAYED A ROLE IN THAT AND IN THE WALGREENS

01:12PM  4    RELATIONSHIP AND IN THE COMMUNICATION OF WALGREENS INFORMATION

01:12PM  5    TO INVESTORS.

01:12PM  6         FINALLY, THERE ARE CERTAIN INVESTORS THAT MR. BALWANI

01:12PM  7    PLAYED A SIGNIFICANT ROLE IN COMMUNICATING DIRECTLY WITH,

01:12PM  8    INDIVIDUALS LIKE BRIAN GROSSMAN AT PFM; INDIVIDUALS LIKE

01:12PM  9    ALAN EISENMAN WE'LL GET TO A LITTLE BIT LATER.  MR. BALWANI

01:12PM  10   ALSO COMMUNICATED DIRECTLY WITH INVESTORS.  SO HE PLAYED A

01:12PM  11   SIGNIFICANT ROLE IN THE INVESTOR SIDE.

01:12PM  12        ON THE PATIENT SIDE, AS THE COURT NOTED EARLIER THIS

01:12PM  13   MORNING, MR. BALWANI WAS INTIMATELY FAMILIAR WITH THE EVENTS IN

01:12PM  14   THE LAB.  MR. BALWANI HIRED AND FIRED INDIVIDUALS IN THE LAB.

01:12PM  15   AND WHILE HE HAS ARGUED TO THE COURT THAT HE WAS UNDER

01:12PM  16   MS. HOLMES, MR. BALWANI HAD SIGNIFICANT AUTONOMY IN RUNNING THE

01:12PM  17   LAB.  HE MADE DECISIONS THAT DIRECTLY IMPACTED THE INFORMATION

01:12PM  18   THAT WAS COMMUNICATED TO PATIENTS, AND IT IS IN THE LAB THAT

01:12PM  19   SOME OF THE GREATEST HARM OCCURRED, AND MR. BALWANI PLAYED A

01:13PM  20   SIGNIFICANT ROLE IN OVERSEEING THE CLINICAL LAB.

01:13PM  21        SO IT IS BOTH HIS ROLE IN THE PATIENT FRAUD AND HIS ROLE

01:13PM  22   IN THE INVESTOR FRAUD THAT SHOULD LEAVE THIS COURT TO DECIDE A

01:13PM  23   SIGNIFICANT CUSTODIAL SENTENCE SHOULD BE IMPOSED, AND THE

01:13PM  24   GOVERNMENT BELIEVES THAT THAT SENTENCE SHOULD BE 15 YEARS.

01:13PM  25        IN ORDER TO IMPOSE THAT SIGNIFICANT SENTENCE, THIS COURT

01:13PM 1    DOES NOT HAVE TO FIND THAT MR. BALWANI FOUNDED THERANOS.   THE

01:13PM 2    DEFENSE ARGUES THAT HE DID NOT PLAY THAT ROLE, AND, THEREFORE,

01:13PM 3    HE SHOULD RECEIVE A SIGNIFICANT VARIANCE OR A PROBATIONARY

01:13PM 4    SENTENCE.

01:13PM 5        IN ORDER TO SENTENCE MR. BALWANI TO A SIGNIFICANT

01:13PM 6    CUSTODIAL SENTENCE, THE COURT NEED NOT CONCLUDE THAT THAT IS

01:13PM 7    RESERVED FOR FACTORS.   MR. BALWANI PLAYED A SIGNIFICANT ROLE IN

01:13PM 8    THE TWO FRAUDS ONCE HE ARRIVED AT THERANOS.

01:13PM 9        THE COURT ALSO, IN ORDER TO IMPOSE A SIGNIFICANT SENTENCE,

01:13PM 10   DOES NOT NEED TO CONCLUDE THAT MR. BALWANI INTENDED TO DEFRAUD

01:13PM 11   EITHER INVESTORS OR PATIENTS WHEN HE ARRIVED AT THERANOS AROUND

01:14PM 12   THE 2009 TIMEFRAME, JUST LIKE THE EVIDENCE AT TRIAL DID NOT

01:14PM 13   PROVE THAT ELIZABETH HOLMES STARTED THERANOS WITH THE INTENT TO

01:14PM 14   DEFRAUD, THE GOVERNMENT DID NOT PRESENT EVIDENCE AND IS NOT

01:14PM 15   ARGUING TO THE COURT THAT IT MUST CONCLUDE THAT HIS INITIAL

01:14PM 16   INTENT IN JOINING THERANOS WAS TO DEFRAUD.

01:14PM 17       INSTEAD WHAT HAPPENED HERE WAS BOTH HOLMES AND BALWANI

01:14PM 18   MADE A CHOICE TO DEFRAUD INVESTORS AND PATIENTS WHEN THEY SAW

01:14PM 19   THE RUNWAY, THE AMOUNT OF TIME THAT THERANOS HAD LEFT

01:14PM 20   DWINDLING.   THEY COULD HAVE ALLOWED THERANOS TO FAIL.   INSTEAD

01:14PM 21   THEY CHOSE TO COMMIT FRAUD BOTH TO INVESTORS AND PATIENTS, AND

01:14PM 22   THAT CHOICE WASN'T MADE WHEN MR. BALWANI JOINED THERANOS OR

01:14PM 23   WHEN MS. HOLMES FOUNDED THERANOS.

01:14PM 24       SO MY POINT HERE IS THERE ARE ARGUMENTS THAT THE DEFENSE

01:14PM 25   IS MAKING TO THE COURT IN ADVANCING THEIR SENTENCING

01:14PM  1    RECOMMENDATION, AND THEY ARE RED HERRINGS.  THE COURT NEED NOT

01:15PM  2    REACH THESE CONCLUSIONS, THAT HE FOUNDED THERANOS OR THAT HE

01:15PM  3    INITIALLY INTENDED TO DEFRAUD IN ORDER TO SENTENCE HIM TO A

01:15PM  4    SIGNIFICANT CUSTODIAL TIME.

01:15PM  5        HIS ACTIONS DURING THE CONSPIRACY PERIODS, 2010 OR SO,

01:15PM  6    WERE SUFFICIENTLY BAD TO JUSTIFY THIS SIGNIFICANT CUSTODIAL

01:15PM  7    SENTENCE.  WE NEED NOT LOOK FURTHER OR EARLIER IN TIME TO FIND

01:15PM  8    ADDITIONAL HARM IN ORDER TO JUSTIFY A SIGNIFICANT CUSTODIAL

01:15PM  9    SENTENCE.

01:15PM  10       THE 3553(A) FACTOR THAT THE COURT IS SUPPOSED TO CONSIDER

01:15PM  11   ARE THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.  THIS IS A

01:15PM  12   VERY AGGRAVATING FACTOR HERE FOR THE COURT TO CONSIDER AND

01:15PM  13   WEIGH.

01:15PM  14       WHAT HAPPENED HERE IS NOT A DISCRETE BAD DECISION ON AN

01:15PM  15   INDIVIDUAL DAY.  INSTEAD, MR. BALWANI CAME TO WORK DAY AFTER

01:15PM  16   DAY AND MADE MISREPRESENTATIONS TO INVESTORS.  HE CREATED

01:15PM  17   DOCUMENTS LIKE THE FINANCIAL STATEMENTS, AND HE ENGAGED WITH

01:16PM  18   WALGREENS, AND BOTH WERE DONE DECEPTIVELY.

01:16PM  19       BUT THE DECEPTION DIDN'T END THERE.  BOTH WERE THEN, THE

01:16PM  20   FINANCIAL STATEMENTS AND THE HEALTH OF THE WALGREENS

01:16PM  21   RELATIONSHIP, WERE USED AS TOOLS TO DEFRAUD INVESTORS.  THEY

01:16PM  22   WERE BOTH COMMUNICATED TO INVESTORS SO THAT INVESTORS BELIEVED

01:16PM  23   THAT THEY WERE INVESTING IN A DIFFERENT COMPANY BASED ON

01:16PM  24   REPRESENTATIONS THAT INVESTORS RECEIVED FROM MR. BALWANI.

01:16PM  25   INVESTORS BELIEVED THAT THEY WERE INVESTING IN A COMPANY THAT

01:16PM 1     WAS GOING TO ACHIEVE SIGNIFICANT REVENUE, SIGNIFICANT INCOME IN

01:16PM 2     THE VERY NEAR TERM, A BILLION DOLLARS IN 2015 IS WHAT INVESTORS

01:16PM 3     WERE TOLD SHORTLY BEFORE 2015.

01:16PM 4          INVESTORS WERE TOLD BASED ON REPRESENTATIONS DIRECTLY FROM

01:16PM 5     MR. BALWANI THAT THEY WERE INVESTING IN A COMPANY THAT HAD A

01:16PM 6     HEALTHY AND EXPANDING RELATIONSHIP WITH WALGREENS.  THAT'S NOT

01:16PM 7     WHAT MR. BALWANI WAS TOLD.

01:16PM 8          MR. BALWANI WAS TOLD BY MR. JHAVERI, WHO THE COURT HEARD

01:17PM 9     FROM DURING TRIAL, THAT WALGREENS WAS CONCERNED ABOUT THE

01:17PM 10    FINGERSTICK DRAW PERCENTAGE AND WOULD NOT EXPAND BEYOND ARIZONA

01:17PM 11    UNTIL THAT NUMBER CAME -- INCREASED, THE NUMBER OF FINGERSTICK

01:17PM 12    DRAWS INCREASED.

01:17PM 13         THAT'S WHAT MR. BALWANI HEARD FROM WALGREENS.  THAT IS NOT

01:17PM 14    WHAT INVESTORS HEARD FROM MR. BALWANI.

01:17PM 15         WHAT INVESTORS HEARD WAS THAT THERANOS WAS IN A HEALTHY

01:17PM 16    AND EXPANDING RELATIONSHIP WITH WALGREENS AND IT IS SO HEALTHY,

01:17PM 17    LOOK AT OUR FINANCIAL PROJECTIONS IN THE VERY NEAR TERM, 2014

01:17PM 18    AND 2015, THAT ARE BASED ON A GREATLY INCREASED NUMBER OF

01:17PM 19    STORES THAT THERANOS CLAIMS THAT IT WOULD BE PRESENT WITHIN

01:17PM 20    WALGREENS STORES GOING NATIONWIDE IN A VERY SHORT PERIOD OF

01:17PM 21    TIME.

01:17PM 22         AGAIN, THAT'S NOT WHAT MR. BALWANI KNEW FROM WALGREENS,

01:17PM 23    BUT INSTEAD THAT'S WHAT MR. BALWANI KNEW THAT HE HAD TO

01:17PM 24    COMMUNICATE TO INVESTORS IN ORDER TO ENCOURAGE THEM TO INVEST.

01:17PM 25         MR. BALWANI DIDN'T ONLY MISLEAD THE INVESTORS BEFORE THEY

01:18PM 1    INVESTED, BUT THERE'S A GOOD EXAMPLE.  THE COURT WILL REMEMBER

01:18PM 2    TRIAL EXHIBIT 2057 IN THE BALWANI TRIAL IN -- AT THAT TIME

01:18PM 3    ALAN EISENMAN FOUND A REPORT BY A CONSULTANT AT UBS.  AND IN

01:18PM 4    THAT REPORT THE CONSULTANT REACHES SOME CONCLUSIONS ABOUT

01:18PM 5    THERANOS, AND ALAN EISENMAN FOUND THOSE CONCLUSIONS

01:18PM 6    INTERESTING.  I'LL COME BACK TO THIS IN A MOMENT AND IDENTIFY

01:18PM 7    FOR THE COURT PRECISELY THESE CONCLUSIONS.

01:18PM 8         BUT THESE CONCLUSIONS IN A PUBLICALLY AVAILABLE SOURCE

01:18PM 9    DOCUMENT WERE COMMUNICATED TO MR. BALWANI, THEY WERE SURPRISING

01:18PM 10   TO ALAN EISENMAN, AND WHEN CONFRONTED WITH THESE FACTS,

01:18PM 11   MR. BALWANI TOLD ALAN EISENMAN THAT IT SOUNDS LIKE THIS IS FROM

01:18PM 12   AN UNINFORMED CONSULTANT.

01:18PM 13        MR. BALWANI KNEW AND NOT ONLY THAT INVESTORS NEEDED TO BE

01:18PM 14   DECEIVED ON THE FRONT IN ORDER FOR THEM TO INVEST, BUT ALSO THE

01:19PM 15   DECEPTION MUST CONTINUE.  THE TRUTH OF WHAT WAS HAPPENING AT

01:19PM 16   THERANOS COULD NOT GET OUT, OTHERWISE THE HOUSE OF CARDS WOULD

01:19PM 17   COLLAPSE.

01:19PM 18        SO THERE'S INSTANCES BOTH OF MR. BALWANI MISLEADING

01:19PM 19   INVESTORS BEFORE THEY INVEST, BUT ALSO PERPETUATING THE FRAUD

01:19PM 20   EVEN POST INVESTMENT LIKE THIS EXAMPLE.  MR. BALWANI ALSO, TO

01:19PM 21   CONTINUE THIS NATURE AND CIRCUMSTANCES OF THE OFFENSE ARGUMENT,

01:19PM 22   PLAYED A SIGNIFICANT ROLE IN THE CLINICAL LAB BY REMOVING

01:19PM 23   DISSENT.

01:19PM 24        WHEN ERIKA CHEUNG GOES TO MR. BALWANI AND SAID THAT SHE

01:19PM 25   WAS CONCERNED ABOUT THE TEST RESULTS, SOME OF THE QC DATA, WHAT

01:19PM  1    ERIKA CHEUNG TOLD THIS JURY WAS THAT MR. BALWANI TOLD HER THAT

01:19PM  2    WASN'T HER JOB.  HER JOB WAS TO PROCESS PATIENT SAMPLES AND NOT

01:19PM  3    ASK QUESTIONS.

01:19PM  4        AND WHEN INDIVIDUALS LIKE ERIKA CHEUNG OR TYLER SHULTZ OR

01:20PM  5    DR. ROSENDORFF RAISED CONCERNS, WHEN THEY WERE UNCOMFORTABLE

01:20PM  6    WITH WHAT THEY WERE BEING ASKED TO DO AT THERANOS, THERE WAS

01:20PM  7    ONLY ONE PLACE FOR THEM, AND THAT WAS THE EXIT.  THEY, BECAUSE

01:20PM  8    THEY WORKED UNDER SUNNY BALWANI, KNEW THEY COULDN'T STAY AT

01:20PM  9    THERANOS, AND THEY WERE ALL GIVEN THE OPTION:  PROCESS PATIENT

01:20PM  10   SAMPLES OR LEAVE.

01:20PM  11       AND WHEN SOMEONE LIKE DR. ROSENDORFF LEFT, YOU CAN SEE

01:20PM  12   WHAT MR. BALWANI DESIRED THROUGH WHO HE HIRES TO REPLACE HIM.

01:20PM  13   WE HAD A DISCUSSION ABOUT THIS EARLIER THIS MORNING.

01:20PM  14       MR. BALWANI HIRES DHAWAN AND SAWYER, TWO LARGELY ABSENTEE

01:20PM  15   LAB DIRECTORS, BECAUSE SOMEONE WHO WAS PRESENT WOULD HAVE ASKED

01:20PM  16   TOO MANY QUESTIONS AT THAT POINT.  THERE WASN'T A WAY TO KEEP

01:20PM  17   THERANOS GOING AND HAVE AN ENGAGED ADAM ROSENDORFF-LIKE LAB

01:20PM  18   DIRECTOR.  SO INSTEAD HE TURNED TO INDIVIDUALS THAT HE KNEW HE

01:20PM  19   COULD KEEP IN THE DARK, AND MR. BALWANI WOULD ACT AS THE

01:20PM  20   DE FACTO LAB DIRECTOR.

01:20PM  21       YOU HEARD TESTIMONY IN TRIAL FROM SAWYER AND DHAWAN ABOUT

01:21PM  22   NOT JUST THE NUMBER OF HOURS OR THE LACK OF HOURS THAT THEY

01:21PM  23   SPENT AT THE LAB, BUT THEIR LACK OF KNOWLEDGE REGARDING EVEN

01:21PM  24   THE TESTING PLATFORMS AT THERANOS.  THEY DIDN'T KNOW THAT

01:21PM  25   THERANOS WAS USING THERANOS DEVICES TO RUN TESTS.

01:21PM  1       MR. BALWANI WOULD HAVE YOU BELIEVE THAT THAT WAS A

01:21PM  2  TEMPORARY FIX, THAT HIS HOPE WAS THAT AN EMPLOYEE AT THERANOS

01:21PM  3  WOULD EVENTUALLY BECOME QUALIFIED TO BECOME THE LAB DIRECTOR,

01:21PM  4  THAT SHOULD GIVE THIS COURT NO COMFORT.

01:21PM  5       DURING THAT PERIOD OF TIME, THEY WERE TESTING PATIENT'S

01:21PM  6  BLOOD JUST LIKE THEY WERE WHEN ADAM ROSENDORFF WAS THERE, JUST

01:21PM  7  LIKE THEY WERE AFTER DHAWAN AND SAWYER LEFT.

01:21PM  8       TO SAY THIS WAS A TEMPORARY FIX ONLY MATTERS IF THEY

01:21PM  9  STOPPED TESTING DURING THAT PERIOD OF TIME.  BUT THERE WAS NO

01:21PM 10  ADJUSTMENT TO THE WAY THEY TREATED INDIVIDUAL PATIENTS WHO

01:21PM 11  TRUSTED THERANOS TO ASSIST THEM IN MAKING MEDICAL DECISIONS.

01:21PM 12       MR. BALWANI HAD A CHOICE IN THAT MOMENT, TO CONTINUE TO

01:21PM 13  HAVE ENGAGED LAB DIRECTORS LIKE DR. ROSENDORFF, OR NOT.  AND HE

01:22PM 14  KNEW WHAT WOULD HAPPEN IF HE CONTINUED TO HAVE ENGAGED LAB

01:22PM 15  DIRECTORS, AND HE MADE A DIFFERENT CHOICE.  AND IT IS THAT

01:22PM 16  CHOICE AND HIS MANY OTHER CHOICES THAT SHOULD LEAD THIS COURT

01:22PM 17  TO CONCLUDE THAT THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

01:22PM 18  ARE A SIGNIFICANTLY AGGRAVATING FACTOR AND SHOULD LEAD THE

01:22PM 19  COURT TO IMPOSE A SIGNIFICANT CUSTODIAL SENTENCE.

01:22PM 20       ON THE SAME POINT, THE DEFENSE HAS ARGUED TO THE COURT

01:22PM 21  THAT MR. BALWANI RECEIVED NO FINANCIAL BENEFIT FROM THE FRAUD

01:22PM 22  AND FOR THAT REASON THIS SHOULD BE A MITIGATING FACTOR.  I WANT

01:22PM 23  TO BE CLEAR ABOUT THIS.  IF THE COURT CONCLUDED THE WAY THAT

01:22PM 24  THE GOVERNMENT ADVOCATED THE GUIDELINES, THAT IS, THE

01:22PM 25  GOVERNMENT'S VIEW OF THE GUIDELINES ARE MR. BALWANI UNDER THE

01:22PM 1    GUIDELINES SHOULD GET A LIFE SENTENCE, THAT HE'S AN ADJUSTED

01:22PM 2    OFFENSE LEVEL 43, CRIMINAL HISTORY CATEGORY I, THEREFORE, THE

01:22PM 3    COURT SHOULD IMPOSE LIFE ACCORDING TO THE GUIDELINES.  THE

01:22PM 4    GOVERNMENT BELIEVES THAT THE LACK OF A FINANCIAL MOTIVE IS A

01:22PM 5    BASIS TO VARY AND NOT JUST THE FINANCIAL MOTIVE, BUT TO BE MORE

01:23PM 6    SPECIFIC, THE DELTA BETWEEN MR. BALWANI'S GAIN AND INVESTOR

01:23PM 7    LOSSES WOULD BE A BASIS TO VARY FROM A GUIDELINE OF LIFE.  THAT

01:23PM 8    IS NOT WHERE THE COURT HAS COME DOWN, THOUGH.

01:23PM 9        SO WHEN THE COURT USES ITS GUIDELINE RANGE 135 TO 168,

01:23PM 10   THIS FACTOR IS NO LONGER A FACTOR THAT THE COURT NEEDS TO BASE

01:23PM 11   A VARIANCE UPON BECAUSE THIS NEW GUIDELINE RANGE, 135 TO 168,

01:23PM 12   IS LOWER THAN WHAT 3553(A) SUGGESTS THE COURT SHOULD IMPOSE.

01:23PM 13       3553(A) SUGGESTS THAT THE COURT SHOULD IMPOSE A 15 YEAR

01:23PM 14   SENTENCE, SO AS A RESULT IT IS NO LONGER NECESSARY TO VARY

01:23PM 15   BASED ON THE LACK OF FINANCIAL GAIN TO MR. BALWANI.

01:23PM 16       THE NEXT 3553(A) FACTOR THE COURT IS ASKED TO CONSIDER ARE

01:23PM 17   THE HISTORY AND CHARACTERISTICS OF MR. BALWANI.  IN MANY

01:23PM 18   INSTANCES, IN MANY CASES THIS WOULD BE A BASIS TO VARY OR A

01:23PM 19   FACTOR IN MITIGATION.  IT ISN'T TRUE HERE, AND IT ISN'T TRUE

01:24PM 20   FOR A COUPLE OF REASONS.

01:24PM 21       FIRST, THE MOST SIGNIFICANT FACTOR IN MR. BALWANI'S FAVOR,

01:24PM 22   THE LACK OF CRIMINAL HISTORY IS COVERED BY THE GUIDELINES.

01:24PM 23   THERE'S SOME INSTANCES IN WHICH THE ADJUSTED OFFENSE LEVEL IS

01:24PM 24   SO HIGH HE GETS NO BENEFIT, IF HE'S IN CRIMINAL HISTORY

01:24PM 25   CATEGORY I OR II, FOR INSTANCE, THE GUIDELINE ADVOCATED BY THE

01:24PM 1    GOVERNMENT, THERE'S NO BENEFIT IF HE'S IN CATEGORY I OR II FOR

01:24PM 2    CRIMINAL HISTORY, SO THE COURT MIGHT THEN THINK IT IS NECESSARY

01:24PM 3    TO INTERVENE AND CREATE A VARIANCE BECAUSE OF THIS MITIGATING

01:24PM 4    FACTOR.  THAT ISN'T THE CASE ANY LONGER.

01:24PM 5        THE COURT'S GUIDELINE AT ADJUSTED OFFENSE LEVEL 33 HAS

01:24PM 6    DISTINCTIONS BETWEEN CRIMINAL HISTORY CATEGORIES, SO

01:24PM 7    MR. BALWANI'S NATURE AND HISTORY, HIS PERSONAL CIRCUMSTANCES

01:24PM 8    ACTUALLY CAN BE ACCOUNTED FOR NOW IN THE GUIDELINES.

01:24PM 9        THERE'S ANOTHER REASON, THOUGH, THE COURT SHOULD NOT FIND

01:24PM 10   AS A MITIGATING FACTOR, AND THAT IS THAT MR. BALWANI'S LETTERS

01:24PM 11   OF SUPPORT DEMONSTRATE THE EXISTENCE OF A SUPPORT NETWORK.

01:25PM 12   THAT SUPPORT NETWORK EXISTED DURING THE FRAUD.

01:25PM 13       THE SUPPORT NETWORKS GENERALLY HELP REDUCE RECIDIVISM.  WE

01:25PM 14   THINK THAT INDIVIDUALS WHO HAVE THE SUPPORT OF FAMILY OR THEIR

01:25PM 15   LOCAL COMMUNITY WILL BE LESS LIKELY TO TURN TO CRIME POST

01:25PM 16   RELEASE.  THAT ISN'T THE CASE HERE, THOUGH.  THAT SUPPORT

01:25PM 17   NETWORK EXISTED WHILE MR. BALWANI WAS ENGAGED IN THIS MULTIYEAR

01:25PM 18   FRAUD.  AS A RESULT THE COURT SHOULD NOT FIND THAT HIS NATURE

01:25PM 19   AND CIRCUMSTANCES ARE A MITIGATING FACTOR AND CERTAINLY NOT ONE

01:25PM 20   THAT REQUIRES THE COURT TO VARY FROM THE GUIDELINE RANGE THAT

01:25PM 21   IT FOUND.

01:25PM 22       IF WE CONTINUE IN 3553(A) NOW (A)(2), WE'RE ASKED TO LOOK

01:25PM 23   AT THE NEED FOR THE SENTENCE IMPOSED, NOT SOME COLLATERAL

01:25PM 24   CONSEQUENCES OF THIS CASE BUT RATHER THE NEED FOR THE SENTENCE

01:25PM 25   IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE AND IT IS

01:26PM 1    FROM THIS PART OF THE STATUTE THAT WE BEGIN OUR DISCUSSION OF

01:26PM 2    GENERAL DETERRENCE.

01:26PM 3        IN THIS CASE THERE HAS BEEN SIGNIFICANT MEDIA ATTENTION

01:26PM 4    AND AS THE CASES SUGGEST, WHITE COLLAR CRIME IS ALSO A

01:26PM 5    PARTICULAR TYPE OF CRIME THAT CAN BE DETERRED THROUGH GENERAL

01:26PM 6    DETERRENCE, THIS IS AN AREA IN WHICH THE COURT SHOULD GIVE

01:26PM 7    PARTICULAR WEIGHT OR EMPHASIS TO GENERAL DETERRENCE BECAUSE A

01:26PM 8    CALCULATION IS MADE BY THOSE WHO ARE CONTEMPLATING COMMITTING

01:26PM 9    FRAUD AND TO SOME EXTENT IT'S A ROUGH MATHEMATICAL CALCULATION,

01:26PM 10   THE RISK OF BEING CAUGHT AND THE POTENTIAL PUNISHMENT VERSUS

01:26PM 11   THE FINANCIAL GAIN OR THE BENEFIT OF COMMITTING THE CRIME.

01:26PM 12       THE MEDIA ATTENTION MAGNIFIES THE BENEFITS OF GENERAL

01:26PM 13   DETERRENCE AND IN SOME INSTANCES THE COURT MAY BE UNCOMFORTABLE

01:26PM 14   WITH IMPOSING A SIGNIFICANT CUSTODIAL SENTENCE ON AN INDIVIDUAL

01:26PM 15   IN A CASE WITH MEDIA ATTENTION BECAUSE IT'S HARD FOR THEM TO

01:26PM 16   CONTROL THE MEDIA ATTENTION.  THEY RECEIVE A SIGNIFICANT

01:27PM 17   SENTENCE IN A CASE FOR A REASON THAT THEY DIDN'T HAVE MUCH

01:27PM 18   CONTROL OVER.

01:27PM 19       AS THE COURT KNOWS, THOUGH, THAT ISN'T THE CASE HERE.  IN

01:27PM 20   THIS INSTANCE BOTH MS. HOLMES AND MR. BALWANI USED THE MEDIA TO

01:27PM 21   PERPETRATE THEIR FRAUD.  "THE WALL STREET JOURNAL" ARTICLE IN

01:27PM 22   2013 THAT THE COURT HEARD ABOUT IN MR. BALWANI'S TRIAL WAS SENT

01:27PM 23   TO MS. HOLMES AND MR. BALWANI BEFORE IT WAS PUBLISHED, AND IT

01:27PM 24   WAS REVIEWED, APPROVED, PUBLISHED, CONTAINED FALSE STATEMENTS,

01:27PM 25   AND THEN WERE SENT, THOSE COPIES OF THE ARTICLE WERE SENT TO

01:27PM 1      INDIVIDUAL INVESTORS.

01:27PM 2          MS. HOLMES AND MR. BALWANI USED THE MEDIA AS PART OF THE

01:27PM 3      FRAUD TO PROVIDE A MEASURE OF LEGITIMACY OR OF CORROBORATION TO

01:27PM 4      STATEMENTS THAT THEY HAD MADE TO INVESTORS AND AS A RESULT HE

01:27PM 5      SHOULDN'T HAVE IT BOTH WAYS.  HE SHOULDN'T GET THE BENEFIT FROM

01:27PM 6      HIS USE OF THE MEDIA DURING THE FRAUD BUT NOW AVOID THE

01:27PM 7      OPPORTUNITY THAT IS AVAILABLE TO THE COURT THROUGH GENERAL

01:28PM 8      DETERRENCE AND THE IMPOSITION OF A SIGNIFICANT CUSTODIAL

01:28PM 9      SENTENCE.

01:28PM 10         HIS USE OF THE MEDIA, THOUGH, DOESN'T END THERE.  I

01:28PM 11     MENTIONED A MOMENT AGO TRIAL EXHIBIT 2057, THAT'S THE UBS EMAIL

01:28PM 12     THAT ALAN EISENMAN SENT TO MR. BALWANI.  AND HERE I WANT TO

01:28PM 13     NOTE JUST SOME OF THE THINGS THAT WERE IN THE UBS CONSULTANT

01:28PM 14     STATEMENTS THAT MR. BALWANI CLAIMED WERE FROM AN UNINFORMED

01:28PM 15     CONSULTANT.

01:28PM 16         ALAN EISENMAN IN HIS UBS REPORT LEARNED THAT BLOOD SAMPLES

01:28PM 17     HAD TO BE SENT TO PALO ALTO.  THAT'S TRUE.  MR. BALWANI TELLS

01:28PM 18     ALAN EISENMAN THAT THAT SOUNDS LIKE IT'S COMING FROM AN

01:28PM 19     UNINFORMED CONSULTANT.

01:28PM 20         MR. EISENMAN ALSO LEARNED THAT THERANOS TESTING WAS LESS

01:28PM 21     RELIABLE THAN TRADITIONAL TESTING, THAT THAT WAS IN THE UBS

01:28PM 22     REPORT.  AGAIN, MR. BALWANI SAYS THAT'S FROM AN UNINFORMED

01:28PM 23     CONSULTANT, EVEN THOUGH WE NOW KNOW THAT TO BE TRUE.

01:28PM 24         AND FINALLY, THE TURN-AROUND TIME WAS OVER 24 HOURS.  THE

01:28PM 25     UBS CONSULTANT WRITES THAT.  ALAN EISENMAN IS SURPRISED BY THAT

01:29PM  1    BECAUSE THAT'S DIFFERENT THAN WHAT HE UNDERSTOOD WHEN HE WAS

01:29PM  2    MAKING THE DECISION TO INVEST.

01:29PM  3         AND MR. BALWANI, WHEN HE'S CONFRONTED WITH THAT AGAIN,

01:29PM  4    INFORMS MR. EISENMAN THAT THAT ALSO MUST BE FROM AN UNINFORMED

01:29PM  5    CONSULTANT.

01:29PM  6         MR. BALWANI'S USE OF THE MEDIA DOESN'T END THERE.  IN HIS

01:29PM  7    ENGAGEMENTS WITH WALGREENS HE SENDS INFORMATION THAT HE FINDS

01:29PM  8    PUBLICALLY AVAILABLE.  IT'S TRIAL EXHIBIT 1254.  THAT WAS AN

01:29PM  9    ARTICLE THAT APPEARED IN NOVEMBER OF 2013, RIGHT AT THE TIME

01:29PM  10   THAT THERANOS AND WALGREENS ARE GOING LIVE.  AND IN THIS

01:29PM  11   PUBLISHED STORY MR. BALWANI READS QUOTE, "NO BOTCHED STICKS, NO

01:29PM  12   PHLEBOTOMISTS, ONLY MACHINES IN THERANOS LABS."  MR. BALWANI

01:29PM  13   TAKES THIS ARTICLE AND SENDS IT TO WALGREENS.

01:29PM  14        SO THE USE OF THE MEDIA, THE MANIPULATION OF THE MEDIA TO

01:29PM  15   PERPETUATE THE FRAUD WAS NOT THE EXCLUSIVE PROVINCE OF

01:29PM  16   ELIZABETH HOLMES.  MR. BALWANI DID IT ALSO AND DID IT TO GREAT

01:30PM  17   EFFECT.  BECAUSE OF THAT THE COURT SHOULD FEEL COMFORTABLE

01:30PM  18   BELIEVING THAT A SENTENCE, A SIGNIFICANT CUSTODIAL SENTENCE

01:30PM  19   HERE WILL SATISFY THE AIMS OF GENERAL DETERRENCE, AND THOSE

01:30PM  20   AIMS WILL BE MAGNIFIED THROUGH THE ADDITIONAL COVERAGE.

01:30PM  21        WE'RE ALSO ASKED UNDER THIS PART OF 3553(A) TO CONSIDER

01:30PM  22   SPECIFIC DETERRENCE.  THE DEFENSE IN THEIR FILING ESSENTIALLY

01:30PM  23   GIVES THIS THE BACK OF THE HAND AND SAYS THAT MR. BALWANI,

01:30PM  24   THERE'S NO RISK OF FUTURE FRAUD, AND THAT THE COURT SHOULD PUT

01:30PM  25   NO WEIGHT ON SPECIFIC DETERRENCE.  THAT'S WRONG FOR THREE

01:30PM 1    REASONS.

01:30PM 2         FIRST, MR. BALWANI HAS NOT ACKNOWLEDGED HIS ROLE IN THE

01:30PM 3    FRAUD, AND THAT SHOULD PROVIDE SOME MEASURE OF CONCERN TO THE

01:30PM 4    COURT.  I'M NOT SAYING THAT THE COURT PUNISHES AN INDIVIDUAL

01:30PM 5    FOR GOING TO TRIAL.  IT'S A DIFFERENT ARGUMENT.  THE ARGUMENT

01:30PM 6    HERE IS THAT WHEN THE COURT IS DECIDING WHETHER THIS INDIVIDUAL

01:30PM 7    IS LIKELY TO COMMIT FUTURE CRIMES, THE COURT USES THE

01:31PM 8    INFORMATION THAT IS AVAILABLE TO IT TO REACH THAT CONCLUSION.

01:31PM 9    AND SOME OF THE INFORMATION THAT IS AVAILABLE TO THIS COURT IS

01:31PM 10   THAT THIS IS A DEFENDANT WHO HAS NOT ACKNOWLEDGED NOT JUST THAT

01:31PM 11   HE DIDN'T HAVE A ROLE IN A FRAUD, BUT HE'S GOING FURTHER.

01:31PM 12        AND THIS IS MY SECOND POINT.  IN THE DEFENSE'S SENTENCING

01:31PM 13   MEMO, THIS IS AT PAGES 25 AND 28, AND AGAIN THIS MORNING

01:31PM 14   THEY'VE REPEATED THIS ARGUMENT.  AND IT GOES LIKE THIS,

01:31PM 15   MR. BALWANI LEFT THERANOS AT A TIME WHEN IT HAD X DOLLARS,

01:31PM 16   $300 MILLION IN THE BANK, AND HE ISN'T RESPONSIBLE FOR WHAT

01:31PM 17   HAPPENED TO THAT MONEY.  IN FACT, MS. HOLMES, THE BOARD OF

01:31PM 18   DIRECTORS, AND THE INVESTORS ARE THE ONES WHO DECIDED HOW TO

01:31PM 19   SPEND THAT MONEY, AND IT IS THEIR FAULT THAT MORE OF THE LOSSES

01:31PM 20   WEREN'T RECOUPED, THAT THE LOSSES TO THE INVESTORS ARE THE

01:31PM 21   RESULT OF THE ACTIONS OF THE INDIVIDUALS WHO REMAINED AT

01:31PM 22   THERANOS AFTER MR. BALWANI LEFT.

01:32PM 23        MR. BALWANI ISN'T EVEN ACKNOWLEDGING TO THE COURT THAT HE

01:32PM 24   WAS PRESENT AT THE SCENE OF A CRIME.  IT'S A DIFFERENT THING TO

01:32PM 25   SAY I HAD A ROLE IN THE FRAUD, AND HE CERTAINLY ISN'T SAYING

THAT, BUT HE'S NOW GONE ONE FURTHER AND IS TELLING THIS COURT

THERANOS WAS NOT THE SCENE OF THE CRIME UNTIL I LEFT.  UNTIL I

LEFT, THERE WAS $300 MILLION LEFT IN THE BANK, AND THAT COULD

HAVE BEEN USED TO PAY BACK THE INVESTORS SO THERE WOULD HAVE

BEEN NO LOSS HERE.

WHEN HE GOES FURTHER AND MAKES THIS ARGUMENT TO THE COURT,

THE COURT SHOULD BE ADDITIONALLY CONCERNED ABOUT WHETHER A

SPECIFIC DETERRENCE IS NECESSARY, BECAUSE HE WON'T ACKNOWLEDGE

THAT THE MONEY IN THE BANK WAS THE RESULT OF FRAUD.  HE CAN

STILL MAINTAIN HIS POSITION THAT HE DIDN'T COMMIT FRAUD OR THAT

HE DIDN'T HAVE A ROLE IN IT AND THAT WAS ALL MS. HOLMES OR SOME

OTHER VERSION, BUT HE'S ACTUALLY GONE FURTHER NOW AND IS

TELLING THE COURT THAT MONEY IN THE BANK WAS MONEY THAT

THERANOS WAS ENTITLED TO HAVE AND SHOULD HAVE BEEN OR COULD

HAVE BEEN DISBURSED TO INVESTORS, AND AMONG THESE INDIVIDUALS,

AMONG THE GROUPS THAT HE BLAMES FOR NOT DOING THE RIGHT THING

WITH THAT MONEY IS THE INVESTORS THEMSELVES.  AND THE COURT

SHOULD BE CONCERNED ABOUT THAT KIND OF ARGUMENT WHEN IT'S

THINKING ABOUT WHETHER SPECIFIC DETERRENCE IS RELEVANT, IS A

FACTOR THAT IT SHOULD USE TO EITHER AGGRAVATE OR MITIGATE A

SENTENCE OUTSIDE OR WITHIN THE GUIDELINES.

THE THIRD REASON WHY A SPECIFIC DETERRENCE MATTERS IS A

REASON -- AN ARGUMENT I MADE A MOMENT AGO, SO I'LL TOUCH IT

BRIEFLY, AND THAT IS THE EXTENSIVE SUPPORT NETWORK THAT EXISTED

DURING THE TIME OF THE FRAUD HAS RELEVANCE TO SPECIFIC

01:33PM 1   DETERRENCE.  THE EXTENSIVE NETWORK EXISTED DURING THE FRAUD,

01:33PM 2   DID NOT DETER THE FRAUD, AND AS A RESULT, ONE OF THE CHECKS

01:33PM 3   THAT THE COURT MAY HAVE TO FEEL COMFORTABLE THAT SPECIFIC

01:33PM 4   DETERRENCE ISN'T NECESSARY IN SOME CASES IS ABSENT HERE, THE

01:33PM 5   NETWORK EXISTED AND DID NOT PREVENT THE FRAUD.

01:34PM 6       I WANT TO MOVE ON TO THE NEXT FACTOR WHICH IS PROMOTING

01:34PM 7   RESPECT FOR THE LAW AND PROVIDING JUST PUNISHMENT FOR THE

01:34PM 8   OFFENSE.  AND FOR THIS ONE I WANT TO REMIND THE COURT OF THE

01:34PM 9   REAL HARMS THAT OCCURRED HERE.  FOR THE INVESTOR SIDE, THE

01:34PM 10  INVESTORS LOST MILLIONS OF DOLLARS.  THAT IS ITSELF A

01:34PM 11  SIGNIFICANT HARM DESERVING OF A SIGNIFICANT CUSTODIAL SENTENCE,

01:34PM 12  BUT IT ALSO HAS A ROLE BECAUSE THE MONEY THAT WAS INVESTED HERE

01:34PM 13  HAD SIGNIFICANT OPPORTUNITY COST.  MUCH OF THE MONEY THAT WAS

01:34PM 14  INVESTED IN THERANOS, IF IT DIDN'T GO TO THERANOS, IT COULD

01:34PM 15  HAVE GONE TO OTHER LEGITIMATE TECHNOLOGICAL INNOVATIONS WITH

01:34PM 16  COMPANIES, ESPECIALLY COMPANIES HERE IN SILICON VALLEY, THAT

01:34PM 17  HAD REAL COMPANIES, THAT COULD DO REAL GOOD IN THE WORLD.

01:34PM 18      THE INVESTORS THOUGHT THAT WHAT THEY WERE INVESTING IN WAS

01:34PM 19  ONE OF THOSE COMPANIES.  AND THE REASONS THEY THOUGHT THAT IS

01:34PM 20  BECAUSE SOME OF THE STATEMENTS THAT MR. BALWANI HIMSELF MADE TO

01:34PM 21  INVESTORS WERE CREATED, WERE BIRTHED WITH THAT IDEA IN MIND TO

01:34PM 22  MAKE INVESTORS THINK THAT WHAT THEY WERE INVESTING IN WAS A

01:34PM 23  COMPANY WITH REAL TECHNOLOGY THAT COULD AFFECT THE FUTURE OF

01:35PM 24  HEALTH CARE.  INSTEAD INVESTORS INVESTED IN A FRAUD.  THEIR

01:35PM 25  MONEY COULD HAVE GONE TO A REAL COMPANY THAT COULD HAVE

01:35PM  1      AFFECTED HEALTH CARE IN THE FUTURE.

01:35PM  2          THERE'S ALSO REAL HARM ON THE PATIENT SIDE.  THE COURT

01:35PM  3      HEARD FROM PATIENTS DURING MR. BALWANI'S TRIAL WHO TESTIFIED

01:35PM  4      ABOUT THEIR EXPERIENCES.  I WON'T REPEAT ALL OF THEM, BUT THE

01:35PM  5      COURT KNOWS THAT INDIVIDUALS WHO RECEIVED BLOOD TEST RESULTS

01:35PM  6      FROM THERANOS MADE MEDICAL DECISIONS BASED ON THOSE BLOOD TEST

01:35PM  7      RESULTS.

01:35PM  8          IT IS NOT AN INTELLECTUAL LEAP TO SEE THE HARM.  IT IS THE

01:35PM  9      DIRECT RESULT.  ONE CAUSE OR IMPLIED THE OTHER IN THIS CASE.

01:35PM  10     AND INDIVIDUALS RECEIVED TEST RESULTS THAT WERE INCORRECT AND

01:35PM  11     MADE MEDICAL DECISIONS BASED UPON THAT INCORRECT INFORMATION.

01:35PM  12     THAT, TOO, IS A SIGNIFICANT REAL HARM THAT THIS COURT MUST

01:35PM  13     ADDRESS THROUGH ITS SIGNIFICANT CUSTODIAL SENTENCE.

01:36PM  14         THE LAST FACTOR I WANT TO TURN TO IS (A)(6), 3553(A)(6).

01:36PM  15     AND THE REASON I WANT TO TOUCH ON THIS ONE IS BECAUSE WE NOW

01:36PM  16     HAVE THE SENTENCE IMPOSED IN MS. HOLMES'S CASE.  AND THIS

01:36PM  17     FACTOR INFORMS US THAT WE SHOULD AVOID UNWARRANTED SENTENCE

01:36PM  18     DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN

01:36PM  19     FOUND GUILTY OF SIMILAR CONDUCT.

01:36PM  20         UNWARRANTED IS THE IMPORTANT WORD HERE.  MS. HOLMES

01:36PM  21     RECEIVED A SENTENCE OF 135 MONTHS.  THE GOVERNMENT IS ASKING

01:36PM  22     THE COURT TO SENTENCE MR. BALWANI HIGHER THAN THAT, TO A

01:36PM  23     SENTENCE OF 180 MONTHS, AND THAT IS A DISPARITY.  THOSE NUMBERS

01:36PM  24     ARE DIFFERENT, IT IS NOT UNWARRANTED, AND IT IS NOT UNWARRANTED

01:36PM  25     FOR SEVERAL REASONS.

01:36PM 1     FIRST, MR. BALWANI PLAYED A SIGNIFICANT ROLE IN BOTH THE

01:36PM 2     PATIENT FRAUD AND ALSO THE INVESTOR FRAUD.  I'VE IDENTIFIED

01:36PM 3     SPECIFIC PLACES OR SPECIFIC ROLES THAT MR. BALWANI PLAYED, SO

01:37PM 4     I'M NOT GOING TO REPEAT THOSE NOW, BUT IT IS RELEVANT AS THE

01:37PM 5     COURT ANALYZES WHETHER THERE'S A WARRANTED OR AN UNWARRANTED

01:37PM 6     DISPARITY BETWEEN MS. HOLMES AND MR. BALWANI SHOULD THE COURT

01:37PM 7     IMPOSE A SENTENCE LIKE THE ONE THAT THE GOVERNMENT IS

01:37PM 8     ADVOCATING FOR.

01:37PM 9     THE REASON THAT IT WOULD NOT BE UNWARRANTED IS BECAUSE

01:37PM 10    WHEN THE COURT SENTENCED MS. HOLMES, EVEN THOUGH IT COULD

01:37PM 11    CONSIDER AS RELEVANT CONDUCT ACQUITTED CONDUCT, THE COURT CHOSE

01:37PM 12    NOT TO.  THE COURT CHOSE TO SENTENCE MS. HOLMES BASED UPON THE

01:37PM 13    CONVICTED CONDUCT THAT WAS LIMITED TO THE INVESTOR FRAUD.

01:37PM 14    MR. BALWANI, AS THE COURT KNOWS, WAS CONVICTED OF ALL

01:37PM 15    COUNTS IN THE INDICTMENT.  THAT INCLUDED THE PATIENT FRAUD.

01:37PM 16    AND IT IS NOT JUST THE COUNTS OF CONVICTION THAT MATTERED, BUT

01:37PM 17    THE COURT SAW THE EVIDENCE IN THE CASE.  THE COURT SAW THE ROLE

01:37PM 18    THAT MR. BALWANI PLAYED IN THE LAB.

01:37PM 19    MR. BALWANI FIRED INDIVIDUALS WHO EXPRESSED DISSENT, HE

01:37PM 20    TOLD INDIVIDUALS WHO EXPRESSED DISSENT THAT THEIR JOB WAS

01:38PM 21    SIMPLY TO PROCESS PATIENT SAMPLES, HE REPLACED ENGAGED LAB

01:38PM 22    DIRECTORS WITH UNENGAGED LAB DIRECTORS, AND IT'S ALL OF THOSE

01:38PM 23    REASONS WHY THE COURT SHOULD FEEL COMFORTABLE THAT MR. BALWANI

01:38PM 24    SHOULD RECEIVE A MORE SIGNIFICANT SENTENCE THAN MS. HOLMES AND

01:38PM 25    THAT DISPARITY WOULD NOT BE UNWARRANTED.

01:38PM 1    MR. BALWANI ALSO PLAYED, AND I WANT TO HIGHLIGHT THIS, A

01:38PM 2    ROLE IN THE WALGREENS ROLLOUT THAT THE COURT HEARD SIGNIFICANT

01:38PM 3    EVIDENCE IN HIS TRIAL ABOUT.

01:38PM 4    MR. BALWANI WAS THE POINT PERSON AT THERANOS, AND

01:38PM 5    MR. JHAVERI WAS THE POINT PERSON AT WALGREENS, AND THE TWO OF

01:38PM 6    THEM WORKED TO OPERATIONALIZE THE ROLLOUT.  THAT ROLLOUT PLAYED

01:38PM 7    A SIGNIFICANT ROLE IN BOTH FRAUDS.

01:38PM 8    I TOUCHED ON THIS EARLIER THAT INVESTORS INVESTED BECAUSE

01:38PM 9    THEY SAW AND HEARD THAT THE ROLLOUT WITH WALGREENS WAS GOING

01:38PM 10   WELL, AND THEY WERE TOLD THAT THE ROLLOUT WITH WALGREENS WAS

01:39PM 11   EXPANDING.

01:39PM 12   THEY ALSO -- THE WALGREENS ROLLOUT ALSO CREATED THE

01:39PM 13   OPPORTUNITY FOR THE PATIENTS TO BE DEFRAUDED, TO GET THE

01:39PM 14   INACCURATE BLOOD TEST RESULTS.

01:39PM 15   MR. BALWANI'S ROLE, THE INTEGRAL ROLE THAT HE PLAYED IN

01:39PM 16   THE WALGREENS ROLLOUT AFFECTED BOTH FRAUDS, THE PATIENT FRAUD

01:39PM 17   AND THE INVESTOR FRAUD AND BECAUSE THAT PLAYED SUCH A

01:39PM 18   SIGNIFICANT ROLE IN BOTH FRAUDS, THE COURT SHOULD FEEL

01:39PM 19   COMFORTABLE IMPOSING A MORE SIGNIFICANT CUSTODIAL SENTENCE ON

01:39PM 20   MR. BALWANI THAN IT DID ON MS. HOLMES, AND THAT THAT DIFFERENCE

01:39PM 21   WOULD NOT BE AN UNWARRANTED SENTENCE DISPARITY.

01:39PM 22   THE LAST ISSUE I'LL TOUCH ON IS MR. BALWANI ADDRESSES

01:39PM 23   BASES FOR VARIANCE IN HIS MEMO, AND HE ESSENTIALLY SAYS THAT HE

01:39PM 24   INVESTED HIS OWN MONEY, THE MILLIONS OF DOLLARS, AND HE NEVER

01:39PM 25   SOUGHT FAME OR RECOGNITION, AND THAT HE HAS A LONG HISTORY OF

01:39PM 1    CHARITABLE GIVING.  IT IS THESE THREE PILLARS UPON WHICH THE

01:39PM 2    DEFENSE'S VARIANCE REQUEST IS BASED.

01:40PM 3        THE COURT SHOULD REJECT THEM AND DETERMINE THAT A SENTENCE

01:40PM 4    WITHIN THE GUIDELINE, WITHIN THE GUIDELINES THAT THE GOVERNMENT

01:40PM 5    RECOMMENDED WOULD BE LIFE.  THE GUIDELINES THAT THE COURT FOUND

01:40PM 6    135 TO 168 ARE MORE APPROPRIATE THAN ONE LIKE THE DEFENSE IS

01:40PM 7    ASKING FOR, WHICH IS A SENTENCE OF PROBATION.  NOT ONLY WOULD A

01:40PM 8    SENTENCE OF PROBATION IGNORE ALL OF THE PRIOR 3553(A) FACTORS

01:40PM 9    THAT I JUST COVERED WITH THE COURT, BUT IT ALSO ASSUMES THAT

01:40PM 10   THESE ARE PROPER BASES FOR VARIANCE, THAT MR. BALWANI'S

01:40PM 11   INVESTMENT OF HIS OWN MONEY, HE ARGUES, UNLIKE

01:40PM 12   ELIZABETH HOLMES, MR. BALWANI INVESTED HIS OWN MONEY.

01:40PM 13       THE COURT KNOWS FROM INFORMATION THAT IT RECEIVED DURING

01:40PM 14   THE COURSE OF THE TRIAL, MR. BALWANI HAD THE ABILITY TO INVEST

01:40PM 15   HIS OWN MONEY.  IT SHOULD NOT REWARD HIM FOR THAT.  IT, IN

01:40PM 16   FACT, SHOULD CAUSE THE COURT TO QUESTION HOW MR. BALWANI COULD

01:40PM 17   HAVE MADE THESE CHOICES.  WHY IT IS THAT MR. BALWANI, WHEN

01:40PM 18   FACED WITH THERANOS POTENTIALLY RUNNING OUT OF ITS RUNWAY, WHY

01:41PM 19   HE CHOSE TO DEFRAUD INVESTORS, WHY HE CHOSE TO DEFRAUD

01:41PM 20   PATIENTS?  THERE SIMPLY IS NO ANSWER TO THAT QUESTION.

01:41PM 21       THAT HE DID NOT SEEK FAME OR RECOGNITION IS NOT SOMETHING

01:41PM 22   THAT AT THIS STAGE HE SHOULD GET CREDIT FOR.

01:41PM 23       MR. BALWANI HELD ON TO HIS SHARES BECAUSE WHEN HE HAD --

01:41PM 24   BECAUSE WHEN HE POSSESSED THEM DURING THE FRAUD, THEY WERE

01:41PM 25   WORTH HUNDREDS OF MILLIONS OF DOLLARS, AND MR. BALWANI WANTED

01:41PM   1   BILLIONS OF DOLLARS.  HE HELD ON TO THEM BECAUSE HE ASSUMED, HE

01:41PM   2   THOUGHT THAT THERANOS WOULD OUTLIVE THE FRAUD, THAT EVENTUALLY

01:41PM   3   THERANOS COULD BECOME WHAT HE WAS TELLING INDIVIDUALS THERANOS

01:41PM   4   WAS, AND IF HE WAS SUCCESSFUL, HE WAS TAKING A RISK AND HE WAS

01:41PM   5   PLAYING THE GAME THAT EVENTUALLY WE WILL BE WHAT WE CLAIM TO BE

01:41PM   6   AND I WILL HAVE SHARES THAT ARE WORTH BILLIONS OF DOLLARS

01:41PM   7   INSTEAD OF MILLIONS.

01:41PM   8        SO THAT HE DID NOT SEEK FAME OR SOUGHT TO RECEIVE SOME

01:41PM   9   MEASURE OF RECOGNITION FOR IT IS NOT A BASIS FOR THE COURT NOW

01:42PM  10   TO DETERMINE HE DESERVES A VARIANCE AND CERTAINLY NOT ONE TO

01:42PM  11   PROBATION, WHICH IS WHAT THE DEFENSE IS ASKING FOR.

01:42PM  12        HIS HISTORY OF CHARITABLE GIVING IS CERTAINLY LAUDABLE.  I

01:42PM  13   DON'T HAVE ANY ADDITIONAL WORDS TO SAY ON THAT OTHER THAN IT IS

01:42PM  14   NOT A BASIS TO VARY OUTSIDE OF THE GUIDELINES THAT THE COURT

01:42PM  15   HAS FOUND, IT IS NOT A BASIS TO VARY BEYOND THE 180 MONTHS THAT

01:42PM  16   THE GOVERNMENT IS ASKING THE COURT TO IMPOSE, AND IT IS

01:42PM  17   CERTAINLY NOT A BASIS TO VARY DOWN TO PROBATION AS THE DEFENSE

01:42PM  18   IS ASKING FOR.

01:42PM  19        BEYOND THAT, I'LL SUBMIT AND ENCOURAGE THE COURT TO IMPOSE

01:42PM  20   A SIGNIFICANT CUSTODIAL SENTENCE REQUESTED BY THE GOVERNMENT.

01:42PM  21   THANK YOU.

01:42PM  22             THE COURT:  THANK YOU.

01:42PM  23        DOES DEFENSE WISH TO BE HEARD?

01:42PM  24             MR. COOPERSMITH:  YES, YOUR HONOR.  THANK YOU.

01:43PM  25        SO THANK YOU FOR THE OPPORTUNITY, YOUR HONOR.  AND AFTER

01:43PM   1    ALL OF THIS TIME, WE'VE FINALLY REACHED THIS POINT.  THIS IS

01:43PM   2    OBVIOUSLY A DECISION THAT AFFECTS A REAL HUMAN BEING,

01:43PM   3    MR. BALWANI.  THIS IS, AT THIS TIME, NOT A MATTER OF

01:43PM   4    CALCULATING DECIMAL POINTS AND NUMBERS.  IT'S ABOUT WHO

01:43PM   5    MR. BALWANI IS AND WHAT SENTENCE HE SHOULD RECEIVE.

01:43PM   6        THE REASON I SAY THAT IN PART, YOUR HONOR, IS BECAUSE IN

01:43PM   7    LISTENING TO MR. SCHENK, I FEEL LIKE WE'RE BACK IN THE

01:43PM   8    PRE-BOOKER WORLD WHERE SOMEHOW THE GUIDELINES ARE PRESUMED

01:43PM   9    REASONABLE AND THEY'RE OVERRIDINGLY THE MOST IMPORTANT THING,

01:43PM  10    AND THEN WE HAVE TO JUSTIFY VARIANCES.

01:43PM  11        I UNDERSTAND THE GUIDELINES UNDER THE PRECEDENT THAT EXIST

01:43PM  12    ARE A STARTING POINT.  FOR THE RECORD, WE DON'T EVEN AGREE WITH

01:43PM  13    THAT, THAT THEY SHOULD BE.  BUT WE UNDERSTAND THAT'S WHERE THE

01:43PM  14    COURT STARTS.

01:43PM  15        BUT THEY ARE A STARTING POINT.  THERE'S NO PRESUMPTION

01:43PM  16    THAT THEY'RE REASONABLE.  THEY'RE JUST ONE FACTOR AMONG ALL OF

01:44PM  17    THE 3553(A) FACTORS.

01:44PM  18        SO WHEN MR. SCHENK SAYS, WELL, HE THINKS THE GUIDELINES

01:44PM  19    ARE LIFE AND HE'S DOING US A FAVOR BY RECOMMENDING 15 YEARS,

01:44PM  20    THAT'S JUST OVERLY RELATED TO THE GUIDELINES AND NOT

01:44PM  21    APPROPRIATE IN TODAY'S SENTENCING WORLD.

01:44PM  22        THE OTHER THING THAT I WANT TO JUST OBSERVE IN GENERAL IS

01:44PM  23    THAT THE GOVERNMENT SAID A LOT OF THINGS AT TRIAL.  AND AS THE

01:44PM  24    COURT REMEMBERED, THERE WERE A LOT OF THINGS THAT THE

01:44PM  25    GOVERNMENT DID, AND THEY ARE ENTITLED TO MAKE A STRATEGIC

01:44PM   1    CHOICE WHERE THEY DECIDED TO PRESENT EVIDENCE AND NOT PRESENT

01:44PM   2    THE OTHER SIDE.  THEY DIDN'T, IN OTHER WORDS, FRONT THINGS AS

01:44PM   3    SOMETIMES LAWYERS DO.

01:44PM   4        AND THEY ARE NOW ASSUMING BECAUSE OF THE JURY VERDICT,

01:44PM   5    WHICH IS AGAIN A GENERAL VERDICT, THAT EVERY SINGLE FACT THAT

01:44PM   6    THEY PUT INTO PLAY AT TRIAL IS SOMEHOW FOUND BEYOND A

01:44PM   7    REASONABLE DOUBT.  THAT IS NOT THE CASE.

01:44PM   8        AND THEY'RE DOING THAT TODAY, AND THEY'VE DONE THAT

01:44PM   9    REPEATEDLY.

01:44PM   10       SO, FOR EXAMPLE, WHEN THE GOVERNMENT SAYS THAT MR. BALWANI

01:45PM   11   DIDN'T HAVE ANY BASIS TO THINK THAT THE WALGREENS RELATIONSHIP

01:45PM   12   WOULD CONTINUE TO GROW AFTER -- GIVEN HIS DEALINGS WITH

01:45PM   13   MR. JHAVERI AT WALGREENS, IN FACT, MR. JHAVERI SENT MR. BALWANI

01:45PM   14   AN EMAIL THAT SAID IN AUGUST OF 2014, SAID WE ARE GOING TO

01:45PM   15   TOUCH 2500 STORES IN 2015.  AND MR. JHAVERI DID THAT WITH FULL

01:45PM   16   KNOWLEDGE OF WHAT THE FINGERSTICK PERCENTAGES WERE AND SOME OF

01:45PM   17   THE DIFFICULTIES IN GETTING THAT FINGERSTICK PERCENTAGE DOWN TO

01:45PM   18   WHERE BOTH SIDES WANTED TO TARGET IT, WHICH BY THE WAY IN THE

01:45PM   19   EVIDENCE OF THE CASE WAS NOT REQUIRED BY WALGREENS UNTIL AUGUST

01:45PM   20   OF 2015.  SO THERE WAS PLENTY OF TIME.

01:45PM   21       BUT I ONLY RAISE THAT ONE THING, YOUR HONOR, AS AN

01:45PM   22   ILLUSTRATION THAT NOT EVERYTHING THAT THE GOVERNMENT PRESENTED

01:45PM   23   AT TRIAL IS TRUE.  THERE WAS DEFENSE EVIDENCE AND THE

01:45PM   24   GOVERNMENT IS TRYING TO IGNORE.  SO THERE'S A MUCH MORE NUANCED

01:45PM   25   BALANCED LOOK AT THIS THAT IS REQUIRED THAN WHAT THE GOVERNMENT

01:46PM 1    SAYS.

01:46PM 2        LET ME JUST SORT OF GO BACK TO FIRST PRINCIPLES.  SO THE

01:46PM 3    NATURE AND CIRCUMSTANCES OF THE OFFENSE.  MR. BALWANI, AS

01:46PM 4    MR. SCHENK HAS TO CONCEDE, DID NOT JOIN THERANOS BECAUSE HE WAS

01:46PM 5    TRYING TO DEFRAUD ANYONE.  IN FACT, BY THE TIME THAT

01:46PM 6    MR. BALWANI JOINED THERANOS, HE HAD ACCOMPLISHED EDUCATIONAL

01:46PM 7    ACHIEVEMENTS, HE HAD ACCOMPLISHED BUSINESS ACHIEVEMENTS, HE HAD

01:46PM 8    OBTAINED DEGREES.  HIS STORY IS REALLY A CLASSIC AMERICAN

01:46PM 9    SUCCESS STORY OF A MAN WHO CAME HERE AS A YOUNG PERSON TO GO TO

01:46PM 10   COLLEGE HERE IN THE UNITED STATES AND STUDIED HARD AND WORKED

01:46PM 11   HARD AND MOVED HERE TO SILICON VALLEY AND STARTED A COMPANY AND

01:46PM 12   WAS SUCCESSFUL.

01:46PM 13       AS MR. SCHENK SAID, HE LATER JOINED THERANOS IN 2009 NOT

01:46PM 14   TO DEFRAUD ANYONE, SO RIGHT AWAY HE DOESN'T HAVE ANY KIND OF

01:46PM 15   BACKGROUND IN THIS.  MS. HOLMES OBVIOUSLY FOUNDED THE COMPANY

01:47PM 16   MUCH EARLIER.

01:47PM 17       SO HE JOINS THERANOS.  SO WHAT DOES HE DO?  HE DOES SOME

01:47PM 18   DUE DILIGENCE AS WE'VE POINTED OUT.  HE DOES A LOT OF DUE

01:47PM 19   DILIGENCE.  HE ASKS A LOT OF QUESTIONS.  HE MEETS WITH A LOT OF

01:47PM 20   THE LEADING PEOPLE AT THERANOS.  HE MEETS WITH

01:47PM 21   CHANNING ROBERTSON, AN ENGINEER PROFESSOR AT STANFORD WHO TELLS

01:47PM 22   HIM THINGS ARE GREAT, AND HE DECIDES TO JOIN.

01:47PM 23       ALL OF THE EVIDENCE HERE POINTS TO THE FACT THAT

01:47PM 24   MR. BALWANI JOINED THIS COMPANY BECAUSE HE BELIEVED IN THE

01:47PM 25   MISSION OF THERANOS, HE HAD SOME FAMILY HISTORY, HIS FATHER

01:47PM 1    DIED AT A RELATIVELY YOUNG AGE, AND HE HAD SOME FAMILY HISTORY

01:47PM 2    THAT WANTED HIM TO CONTRIBUTE.

01:47PM 3        AND THIS WAS NOT UNUSUAL FOR MR. BALWANI.  HE HAD BEEN

01:47PM 4    CONTRIBUTING HIS WHOLE LIFE.  AS THE COURT HAS SEEN FROM THE

01:47PM 5    LETTERS THAT WE HAVE SUBMITTED, MR. BALWANI HAS A LONG HISTORY

01:47PM 6    OF GIVING.

01:47PM 7        MR. SCHENK SAYS, WELL, THAT'S NOT A FACTOR THAT THE COURT

01:47PM 8    SHOULD CONSIDER.  IT'S LAUDABLE, BUT, YOU KNOW, IT'S ABOUT WHO

01:47PM 9    MR. BALWANI IS.  SO IT IS A VERY IMPORTANT FACTOR TO LOOK AT

01:47PM 10   THE WHOLE PERSON HERE.

01:47PM 11       AND WHAT MR. BALWANI DID WITH HIS CHARITABLE GIVING LONG

01:48PM 12   BEFORE THERANOS, AND INCLUDING WHILE HE WAS INVOLVED WITH

01:48PM 13   THERANOS AND EVEN AFTER THAT, WAS HE TRIED TO -- YOU CAN SEE,

01:48PM 14   IT'S HELPING AN ORGANIZATION BUILD A COMMUNITY KITCHEN TO FEED

01:48PM 15   PEOPLE WHO NEEDED HELP, IT'S HELPING A VILLAGE GET A WATER PUMP

01:48PM 16   SO IT CAN SUPPLY WATER TO ITS INHABITANTS, IT'S CONTRIBUTING

01:48PM 17   MONEY SO THAT WHEELCHAIRS CAN BE PROVIDED TO PEOPLE WHO NEED TO

01:48PM 18   USE WHEELCHAIRS, AND IT'S VOLUNTEERING IN A CHARITABLE KITCHEN

01:48PM 19   TO ACTUALLY HELP HANDS ON FEED HOMELESS PEOPLE.  HE DID ALL OF

01:48PM 20   THAT WITHOUT ANY REQUEST FOR RECOGNITION.  HE DIDN'T WANT HIS

01:48PM 21   NAME ON A BUILDING.  NOTHING.  HE JUST WANTED TO HELP, AND

01:48PM 22   THAT'S WHY HE JOINED THERANOS BECAUSE HE WANTED TO HELP.  HE

01:48PM 23   WANTED TO CONTRIBUTE.

01:48PM 24       NOW, HE NOT ONLY CONTRIBUTED BY JOINING AND WORKING AND

01:48PM 25   ROLLING UP HIS SLEEVES AND TRY TO MAKE THIS COMPANY AS GOOD AS

01:48PM 1    COULD BE, HE ALSO INVESTED A LOT OF MONEY.  SO HE NOT ONLY

01:49PM 2    TALKED THE TALK, HE WALKED THE WALK.  HE PUT IN, AS THE COURT

01:49PM 3    SAW, WELL OVER $4 AND A HALF MILLION.  HE ALSO GUARANTEED A

01:49PM 4    LOAN WHICH SOHAN SPIVEY TESTIFIED AT TRIAL WAS THE SAME

01:49PM 5    ECONOMICALLY AS MR. BALWANI LOANING MONEY TO THE COMPANY.

01:49PM 6        SO HE LOANS MONEY.  HE'S ON THE HOOK FOR $12 MILLION AND

01:49PM 7    THAT HE COULD HAVE LOST AND FORTUNATELY HE DIDN'T LOSE THAT

01:49PM 8    MONEY.  HE DID LOSE THE 4 AND A HALF MILLION, MORE THAN THAT

01:49PM 9    THAT, HE INVESTED, PLUS THE MONEY THAT HE GAVE MS. HOLMES SO

01:49PM 10   SHE COULD BUY COMPANY STOCK.  SO MR. BALWANI ACTUALLY INVESTED

01:49PM 11   THAT MONEY.

01:49PM 12       MR. SCHENK SAYS, WELL, IT IS TRUE THAT HE NEVER SOLD A

01:49PM 13   SHARE, THAT IS TRUE, BUT SOMEHOW MR. SCHENK TURNS THAT AROUND

01:49PM 14   INTO AN AGGRAVATING FACTOR BECAUSE HE WAS SOMEHOW GREEDY WHERE

01:49PM 15   HE WANTED EVEN MORE BILLIONS SO HE WASN'T EVEN WILLING TO PART

01:49PM 16   WITH A SINGLE SHARE.  THERE'S NO EVIDENCE OF THAT.  IT'S POOR

01:49PM 17   SPECULATION.

01:49PM 18       NOTHING IN MR. BALWANI'S HISTORY FROM THE FACT THAT HE

01:50PM 19   GAVE OVER AND OVER AGAIN FOR A LONG PERIOD OF TIME WITH

01:50PM 20   CHARITABLE GIVING WITHOUT ASKING FOR ANYTHING.  HE INVESTED IN

01:50PM 21   THERANOS, HE ASKED FOR A SALARY OF ONE DOLLAR WHEN HE JOINED

01:50PM 22   THERANOS.  NOTHING IN THIS RECORD SUPPORTS THE IDEA THAT

01:50PM 23   MR. BALWANI IS GREEDY, AND THE REASON HE DIDN'T SELL SHARES IS

01:50PM 24   BECAUSE HE WANTED TO MAKE MORE BILLIONS.  AND IT'S NOT ALL OR

01:50PM 25   NOTHING BY THE WAY, YOUR HONOR.

01:50PM 1          MR. SCHENK AND THE GOVERNMENT POINT TO, WELL,

01:50PM 2     MR. BALWANI'S INVESTMENT IN THERANOS WAS RELATIVELY EARLY, IN

01:50PM 3     2009 AND 2010, AND SO WHAT ABOUT 2013, 2014, 2015?  MR. BALWANI

01:50PM 4     HAD ALL OF THESE SHARES WORTH HALF A BILLION DOLLARS, AND IF

01:50PM 5     YOU'RE TRYING TO DEFRAUD PEOPLE, COULD YOU HAVE SOLD ONE SHARE?

01:50PM 6     TEN SHARES?  A HUNDRED SHARES?  FIVE THOUSAND SHARES?  IT WOULD

01:50PM 7     BE A BASIC.  NO ONE WOULD BAT AN EYELASH IF SOMEONE WHO OWNED

01:50PM 8     THAT MANY SHARES IN A COMPANY THAT'S A HOT COMPANY AT THE TIME

01:50PM 9     WANTED TO DIVERSIFY THEIR PORTFOLIO A BIT YOU HAD TO SELL EVERY

01:50PM 10    SINGLE SHARE.

01:51PM 11         THIS IDEA THAT HE HELD ON TO THE SHARES BECAUSE HE WANTED

01:51PM 12    TO MAKE EVEN MORE BILLIONS, MR. SCHENK SAID THAT'S AN

01:51PM 13    AGGRAVATING FACTOR, THERE'S NO EVIDENCE OF THAT.  IT'S

01:51PM 14    BASICALLY MADE UP.

01:51PM 15         WHAT WE'VE GOT HERE AND THE REASON I'M TELLING YOU THIS,

01:51PM 16    YOUR HONOR, AND THE COURT KNOWS THIS FROM TRIAL IS THAT WE HAVE

01:51PM 17    A CASE THAT IS VERY UNUSUAL HERE.  IT'S OUTSIDE OF THE

01:51PM 18    HEARTLAND.  IT'S ATYPICAL OF THE FRAUD CASES THAT THIS COURT

01:51PM 19    AND COURTS ALL OVER THIS COUNTRY SEE EVERY SINGLE DAY, AND THAT

01:51PM 20    IS THE PRIMARY DRIVING MOTIVE OF FRAUD IS GREED, IS TO PUT

01:51PM 21    YOURSELF FIRST, IS TO MAKE MONEY BEFORE OTHERS.

01:51PM 22         THERE ARE MANY DEFENDANTS THAT I'M SURE THIS COURT HAS

01:51PM 23    SEEN AND CERTAINLY I HAVE SEEN AS AN ATTORNEY WHERE IF YOU GET

01:51PM 24    THE VICTIM'S MONEY, IT'S A WIN.  AND IF YOU ARE ABLE TO BUY A

01:51PM 25    HOUSE OR A BOAT OR TAKE A GREAT VACATION, THAT'S A WIN.

01:51PM  1      THERE IS NOTHING IN THIS RECORD THAT SUPPORTS IN ANY WAY

01:51PM  2  THAT MR. BALWANI WAS MOTIVATED BY THOSE THINGS.  HE DIDN'T DO

01:51PM  3  THOSE THINGS.  HE DIDN'T MAKE ANYTHING AT THERANOS.  IN FACT,

01:52PM  4  HE WAS AN INVESTOR IN THERANOS WHO LOST A LOT OF MONEY, AND

01:52PM  5  OBVIOUSLY HE WORKED FOR THE COMPANY AS WELL, AND WE CAN TALK

01:52PM  6  ABOUT THAT.

01:52PM  7      BUT THERE'S NO GREED FACTOR HERE.  THERE IS NO FINANCIAL

01:52PM  8  BENEFIT.  AND MR. SCHENK SAYS, WELL, MAYBE THAT'S A REASON TO

01:52PM  9  DEPART FROM LIFE.  AGAIN, THAT'S PUTTING THE GUIDELINES INTO AN

01:52PM  10  EXALTED PLACE THAT THEY ARE NOT DESERVING OF UNDER THE LAW, BUT

01:52PM  11  THEY ARE A REASON FOR A SIGNIFICANTLY LOWER SENTENCE HERE NOT

01:52PM  12  ONLY COMPARED TO THE GUIDELINE RANGE THAT THE COURT CALCULATED,

01:52PM  13  BUT ALSO COMPARED TO MS. HOLMES WHO DID NOT DO THAT.  SHE DID

01:52PM  14  NOT INVEST HER OWN MONEY.

01:52PM  15      THE OTHER THING I'LL SAY ABOUT THAT IN TERMS OF DISPARITY,

01:52PM  16  AND I'M JUMPING AROUND BUT I HOPE IT FLOWS LOGICALLY,

01:52PM  17  YOUR HONOR, MS. HOLMES RECEIVED A VERY HARSH SENTENCE, 11 YEARS

01:52PM  18  AND 3 MONTHS.  I THINK IT WAS 135 MONTHS.

01:52PM  19      AND WHAT THE GOVERNMENT ARGUED IN MS. HOLMES'S CASE, AMONG

01:52PM  20  OTHER THINGS, IS THAT YOU SHOULD SEND A MESSAGE TO THE

01:52PM  21  COMMUNITY THROUGH THE VEHICLE THAT YOU HAVE HERE, BECAUSE YOU

01:53PM  22  HAVE THE PRESS GATHERED WHO HAVE BEEN REPORTING ON THIS CASE

01:53PM  23  EXTENSIVELY FOR MANY YEARS NOW, AND YOU HAVE THIS BASIC

01:53PM  24  MOUTHPIECE TO GET THE WORD OUT IN THE COMMUNITY THAT IF YOU'RE

01:53PM  25  GOING TO COMMIT FRAUD, YOU'RE GOING TO GET A VERY HARSH

01:53PM 1     SENTENCE.

01:53PM 2          AND WHAT THE GOVERNMENT SAID IN THE CASE OF MS. HOLMES IS

01:53PM 3     THAT ORDINARILY YOU MIGHT THINK THAT IS NOT FAIR BECAUSE THE

01:53PM 4     DEFENDANT REALLY HAS NO CONTROL OVER THAT, BUT HERE THE

01:53PM 5     GOVERNMENT SAID MS. HOLMES ACTUALLY COURTED THE PRESS, AND,

01:53PM 6     THEREFORE, IT'S FAIR IN THIS CASE TO USE THAT MOUTHPIECE, IF

01:53PM 7     YOU WILL, TO GET THE WORD OUT, THE GENERAL DETERRENCE WORD.

01:53PM 8          AND THEN THEY TRIED TO PUT THIS ROUND PEG OF MR. BALWANI

01:53PM 9     INTO A ROUND HOLE OF THIS MEDIA ISSUE WHICH DOESN'T EXIST FOR

01:53PM 10    MR. BALWANI.

01:53PM 11         EVEN IF YOU THINK THAT MS. HOLMES WAS ICARUS AND FLEW TOO

01:53PM 12    CLOSE TO THE SUN, MR. BALWANI DID NOT SEEK THE SUN.  HE WAS NOT

01:53PM 13    ON THE COVER OF MAGAZINES, HE DID NOT GIVE INTERVIEWS, AND HE

01:54PM 14    DID NOT GO AROUND THE COUNTRY ACCEPTING AWARDS, AND HE DID NOT

01:54PM 15    SERVE ON THE BOARD OF PRESTIGIOUS INSTITUTIONS LIKE

01:54PM 16    HARVARD UNIVERSITY.  HE DIDN'T ASK FOR ANY OF THAT.  ALL HE

01:54PM 17    ASKED FOR WAS A DOLLAR AND A CHANCE TO WORK HARD, AND HE IS

01:54PM 18    VERY DIFFERENT FROM MS. HOLMES.

01:54PM 19         SOME OF THE EVIDENCE THAT THE JURY FOUND WAS THE MOST

01:54PM 20    SIGNIFICANT EVIDENCE IN MS. HOLMES'S CASE, THE EVIDENCE THAT

01:54PM 21    MS. HOLMES FALSIFIED PHARMACEUTICAL REPORTS, AND SHE SAID THIS

01:54PM 22    ON THE STAND, THERE WAS REALLY NO DISPUTE ABOUT THAT, SHE SAID

01:54PM 23    THAT SHE DIDN'T THINK SHE WAS DOING ANYTHING WRONG.

01:54PM 24         BUT MR. BALWANI KNEW NOTHING ABOUT MS. HOLMES PUTTING

01:54PM 25    LOGOS ON PHARMA REPORTS THAT SHOULDN'T HAVE BEEN ON THERE OR

01:54PM  1    CHANGING WORDING IN THE REPORTS.  MR. BALWANI DIDN'T DO THAT.

01:54PM  2        SO EVEN IF YOU THINK -- AND THE JURY APPARENTLY MAY HAVE

01:54PM  3    THOUGHT IN MS. HOLMES'S CASE THAT THAT'S AN ISSUE FOR

01:54PM  4    MS. HOLMES.  THAT'S NOT WHAT MR. BALWANI DID.  HE DIDN'T SEEK

01:54PM  5    THE MEDIA.

01:54PM  6        AND I WANT TO POINT OUT A FEW THINGS THAT MR. SCHENK

01:54PM  7    OMITTED.  SO THERE'S AN ARTICLE THAT THE COURT IS VERY FAMILIAR

01:55PM  8    WITH NOW HAVING SAT THROUGH TWO TRIALS AND THAT'S THE "FORTUNE"

01:55PM  9    MAGAZINE ARTICLE AUTHORED BY ROGER PARLOFF.  AND MS. HOLMES IS

01:55PM  10   ON THE COVER OF THAT "FORTUNE" ISSUE, YOU MIGHT RECALL.

01:55PM  11       THE GOVERNMENT PLAYED TAPES OF MS. HOLMES TALKING TO

01:55PM  12   ROGER PARLOFF AND MADE A CASE THAT THERE WERE FRAUDULENT

01:55PM  13   REPRESENTATIONS IN THERE.

01:55PM  14       WHAT THE GOVERNMENT DIDN'T TELL YOU IS THAT MR. BALWANI

01:55PM  15   ALSO SAT FOR A MUCH BRIEFER INTERVIEW WITH MR. PARLOFF, AND THE

01:55PM  16   GOVERNMENT DIDN'T PLAY THAT TAPE AT TRIAL.  AND THE REASON IS

01:55PM  17   BECAUSE THERE'S NOTHING IN THERE WHERE MR. BALWANI MAKES ANY

01:55PM  18   MISREPRESENTATIONS TO MR. PARLOFF.

01:55PM  19       SO EVEN WHEN MR. BALWANI HAD THE OPPORTUNITY, WHICH WAS

01:55PM  20   RARE, BY THE WAY, I CAN'T EVEN THINK OF ANOTHER TIME WHEN HE

01:55PM  21   GAVE AN INTERVIEW, EVEN WHEN HE HAD THE OPPORTUNITY TO HAVE A

01:55PM  22   DIRECT VEHICLE WITH MR. PARLOFF TO SAY WHATEVER HE WANTED TO

01:55PM  23   SAY THAT THE GOVERNMENT CLAIMS HE'S GOING TO SAY FRAUDULENT

01:55PM  24   THINGS, HE DIDN'T DO IT.  HE DIDN'T SAY ANYTHING FRAUDULENT,

01:56PM  25   AND THE GOVERNMENT DIDN'T PLAY THE TAPE.

01:56PM  1        SO FOR THE GOVERNMENT TO SAY THAT SOMEHOW THE MEDIA ISSUES

01:56PM  2    ARE EQUIVALENT BETWEEN THESE TWO DEFENDANTS AND THEY USE THAT

01:56PM  3    AS A REASON TO GIVE MS. HOLMES A HARSHER SENTENCE, THAT IS

01:56PM  4    ABSOLUTELY NOT APPLICABLE TO MR. BALWANI AND FOR THE SAME

01:56PM  5    REASON THAT THE GOVERNMENT ARGUED IT'S AN AGGRAVATING FACTOR IN

01:56PM  6    MS. HOLMES'S CASE, IT IS A MITIGATING FACTOR IN THIS CASE.

01:56PM  7        LET'S MOVE ON TO SOME OTHER THINGS.  STILL ON THE NATURE

01:56PM  8    AND CIRCUMSTANCES OF THE OFFENSE, YOUR HONOR.

01:56PM  9        SO MR. BALWANI, THERE'S NO DISPUTE, WANTED THIS COMPANY TO

01:56PM 10    SUCCEED.  MR. BOSTIC SAID THAT DURING CLOSING ARGUMENT THAT HE

01:56PM 11    WANTED THEM TO SUCCEED.  AGAIN, IT'S SOMETHING THAT TAKES US

01:56PM 12    OUT OF THE HEARTLAND.  THERE'S LOTS OF CASES WHERE THERE IS NO

01:56PM 13    INVESTMENT, IT'S A SCAM.  THIS WAS A COMPANY THAT MR. BALWANI

01:56PM 14    WAS TRYING TO BUILD.

01:56PM 15        AND IN ORDER TO BUILD IT, HE HAD A LOT OF DATA POINTS,

01:57PM 16    RIGHT?  HE KNEW THAT THE SCIENTIFIC TEAM HAD DONE HOURS AND

01:57PM 17    HOURS OF WORK TO SUBMIT AN FDA APPLICATION TO GET THEIR 4.0

01:57PM 18    DEVICE APPROVED.  AND, YOU KNOW, IF YOU'RE GOING TO COMMIT A

01:57PM 19    FRAUD, WHY GO THROUGH THE EFFORTS?  I MEAN, THIS WAS -- HE WAS

01:57PM 20    GETTING THE DATA AND THE COMPANY WAS WORKING ON THESE THINGS,

01:57PM 21    AND THAT THE SCIENCE WAS REAL, AND THAT IT IS GOING TO BE

01:57PM 22    SUCCESSFUL.

01:57PM 23        AND IN ORDER TO TRY TO MAKE IT AS SUCCESSFUL AS HE COULD,

01:57PM 24    HE TOOK RISKS.  HE WENT TO THAILAND AND MEXICO DURING THE

01:57PM 25    HEIGHT OF THE H1N1 FLU SCARE, THAT WAS A VERY DANGEROUS DISEASE

01:57PM 1    AT THE TIME, AND HE WENT THERE SO HE COULD TRY TO GET THE

01:57PM 2    DEVICE TESTED IN HOSPITALS IN THOSE PLACES.  AND EVEN LATER HE

01:57PM 3    WENT TO COLUMBIA WHERE AT THAT POINT WAS THE HOTBED OF THE ZIKA

01:57PM 4    DISEASE PANIC.  HE WENT TO COLUMBIA, AND AGAIN, TRYING TO GET

01:57PM 5    THE DEVICE TESTED SO IT COULD EVENTUALLY BE USED FOR ZIKA

01:58PM 6    TESTING.  HE WENT TO THOSE HOTBED AREAS BECAUSE HE WANTED THE

01:58PM 7    COMPANY TO SUCCEED.  THAT'S AT PERSONAL RISK, RIGHT?  AND HE

01:58PM 8    LOST A LOT HERE, YOUR HONOR, AND IT'S NOT JUST THE MONEY.

01:58PM 9         SO MR. BALWANI WAS THE SECOND IN COMMAND.  I KNOW THE

01:58PM 10   COURT HAS SAID THAT, WELL, MAYBE THEY WERE COEQUALS HERE.  IN

01:58PM 11   SOME WAYS THEY WERE, BUT THERE IS NO DOUBT THAT IT WAS

01:58PM 12   MS. HOLMES WHO WAS IN CHARGE, THAT SHE WAS THE CEO, THAT SHE

01:58PM 13   HAD THE POWER TO FIRE MR. BALWANI, THAT IF SHE DIDN'T LIKE WHAT

01:58PM 14   HE WAS DOING, SHE COULD HAVE FIRED HIM, SHE COULD HAVE TOLD HIM

01:58PM 15   TO DO SOMETHING DIFFERENT, SHE COULD HAVE DEMOTED HIM, ANY OF

01:58PM 16   THOSE THINGS.

01:58PM 17        AND THE GOVERNMENT HAS ARGUED REPEATEDLY JUST THAT POINT,

01:58PM 18   THAT MS. HOLMES IS THE FACE OF THE COMPANY, SHE'S THE CEO, THE

01:58PM 19   BUCK STOPPED THERE, AND THAT SHE HAD THE POWER TO FIRE

01:58PM 20   MR. BALWANI.  SO NOW THAT HER SENTENCING IS OVER, THEY'RE

01:59PM 21   PERHAPS TAKING A DIFFERENT VIEW OF THE WORLD.

01:59PM 22        LET ME GO OVER A FEW POINTS THAT MR. SCHENK MADE THAT I

01:59PM 23   THINK ARE IMPORTANT TO ADDRESS, YOUR HONOR.

01:59PM 24        WE HAVE TALKED ABOUT IN OUR SENTENCING MEMO THE NATURE OF

01:59PM 25   THE SENTENCING GUIDELINES.  AND AS I SAID BEFORE, I THINK THE

01:59PM  1    GOVERNMENT IS FAR TOO WEDDED, MORE THAN THE LAW ALLOWS, WEDDED

01:59PM  2    TO THE SENTENCING GUIDELINES IN THIS CASE.  THE FRAUD LOSS

01:59PM  3    AMOUNT, AS WE SAID IN OUR PAPERS, THEY DON'T DISTINGUISH

01:59PM  4    BETWEEN A DEFENDANT LIKE MR. BALWANI AND A DEFENDANT WHO IS

01:59PM  5    JUST RUNNING A FICTITIOUS COMPANY THAT HAS NOTHING, NEVER HAD

01:59PM  6    ANYTHING, AND IT'S JUST A COMPLETE SCAM.  THERE'S NO

01:59PM  7    DISTINGUISHING BETWEEN THOSE TYPES OF DEFENDANTS.

01:59PM  8         AND SO WHAT THE LOSS AMOUNT TABLE DOES IS ASSIGNS A

02:00PM  9    CERTAIN NUMBER TO A CERTAIN LOSS AMOUNT, AND I UNDERSTAND THE

02:00PM  10   COURT HAS MADE THOSE FINDINGS THIS MORNING OR THIS AFTERNOON.

02:00PM  11        SO EVEN THOUGH THAT'S WHAT THE GUIDELINES REQUIRE, THERE

02:00PM  12   IS SO MUCH OF A DISPARITY BETWEEN DIFFERENT DEFENDANTS IN

02:00PM  13   DIFFERENT CASES, AND I THINK THE COURT HAS TO LOOK AT THE FIRST

02:00PM  14   PERSON AS AN INDIVIDUAL AND WHAT REALLY HAPPENED, AND NOT ONLY

02:00PM  15   WHAT HAPPENED IN THE OFFENSE CONDUCT, BUT ALSO THE ENTIRE

02:00PM  16   HEALTH CARE, THE ENTIRE PERSONA, THE ENTIRE HISTORY AND MAKE A

02:00PM  17   DECISION BASED ON THAT AND NOT JUST ON THE GUIDELINES.

02:00PM  18        THE POINT I'M MAKING, YOUR HONOR, THE GUIDELINES, WE HAVE

02:00PM  19   POINTED OUT MANY SCHOLARS HAVE COMMENTED, ESPECIALLY IN A CASE

02:00PM  20   LIKE THIS, THEY CAN YIELD ABSURD RESULTS, AND WE THINK THAT

02:00PM  21   WOULD BE THE CASE HERE FOR MR. BALWANI.

02:00PM  22        THE GOVERNMENT SAYS THAT IT'S AN AGGRAVATING FACTOR THAT

02:00PM  23   MR. BALWANI HAS A SUPPORT NETWORK.  I THINK THAT'S THE FIRST

02:00PM  24   TIME THAT I HAVE HEARD THAT KIND OF ARGUMENT.  USUALLY THE

02:01PM  25   PRESENCE OF A SUPPORT NETWORK IS A REASON WHY THE DEFENDANT

02:01PM 1    WON'T BE A DANGER IN THE FUTURE.  AND THERE REALLY ISN'T ANY

02:01PM 2    EVIDENCE THAT HE WOULD BE.

02:01PM 3         FIRST OF ALL, HE'S ALREADY IN HIS LATE 50S, AND ALL OF THE

02:01PM 4    STUDIES ARE THAT PEOPLE IN THAT AGE RANGE ARE NOT LIKELY TO

02:01PM 5    REPEAT OFFENSES.  AND ALSO, WHEN YOU LOOK AT THE UNIQUE

02:01PM 6    CIRCUMSTANCES OF THIS CASE, THERE'S NO CHANCE THAT MR. BALWANI

02:01PM 7    WILL HAVE ANOTHER CRACK AT A COMPANY LIKE THERANOS.  YOU KNOW,

02:01PM 8    HE'S BASICALLY AND VERY UNFORTUNATELY RADIOACTIVE AS A RESULT

02:01PM 9    OF THIS WHOLE AFFAIR.

02:01PM 10        BUT THE SUPPORT NETWORK, YOU KNOW, THE REASON HE HAS A

02:01PM 11   SUPPORT NETWORK IS BECAUSE HE'S BEEN SO GIVING OVER THE YEARS.

02:01PM 12   I MEAN, HE HAS A DEVOTED FAMILY WHO ARE HERE IN COURT TODAY,

02:01PM 13   FIVE PEOPLE.  NOT EVERYONE COULD MAKE IT.  SOME OF THE FAMILY

02:01PM 14   MEMBERS ARE IN INDIA, SOME ARE ON THE EAST COAST AS THE COURT

02:02PM 15   HAS HEARD BEFORE.

02:02PM 16        BUT THE REASON THAT HE HAS A LOVING FAMILY SUPPORTING HIM

02:02PM 17   AND ALL OF THESE PEOPLE WRITING LETTERS -- THE PEOPLE WHO WROTE

02:02PM 18   LETTERS ARE NOT TRYING TO EXCUSE THE CONDUCT THAT THE JURY

02:02PM 19   FOUND.  THEY'RE JUST TRYING TO PRESENT TO THE COURT THE FULL

02:02PM 20   PICTURE OF MR. BALWANI AND ABOUT WHO HE IS.

02:02PM 21        AND THE REASON HE HAS THAT SUPPORT NETWORK IS BECAUSE OF

02:02PM 22   HOW CHARITABLE AND HOW SELFLESS HE'S BEEN FOR HIS ENTIRE LIFE.

02:02PM 23   AND FOR MR. SCHENK AND THE GOVERNMENT TO SAY THAT'S SOMEHOW AN

02:02PM 24   AGGRAVATING FACTOR, WELL, THAT'S JUST PUZZLING, YOUR HONOR.  I

02:02PM 25   DON'T GET THAT.  AND I THINK THAT'S A REASON TO LOOK AT

02:02PM   1     MR. BALWANI AS A CANDIDATE FOR LENIENCY AND NOT THE OTHER WAY

02:02PM   2     AROUND.

02:02PM   3          I WANT TO ADDRESS ONE REALLY IMPORTANT THING, YOUR HONOR,

02:02PM   4     AND THAT IS MR. SCHENK'S ARGUMENT THAT SOMEHOW MR. BALWANI HAS

02:02PM   5     NOT ACCEPTED RESPONSIBILITY AND THAT'S ANOTHER AGGRAVATING

02:02PM   6     FACTOR HE CLAIMS.

02:02PM   7          SO THERE IS A GUIDELINE ADJUSTMENT.  WE HAVE NOT ARGUED

02:02PM   8     FOR THAT ADJUSTMENT.  THE COURT IS NOT APPLYING THE 3 POINT

02:03PM   9     REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY.  WE HAVE NOT ASKED

02:03PM  10     FOR THAT.

02:03PM  11          MR. BALWANI EXERCISED HIS FIFTH AMENDMENT RIGHT NOT TO

02:03PM  12     TESTIFY AT TRIAL.  AND FOR MR. SCHENK TO SAY THAT SOMEHOW THE

02:03PM  13     FACT THAT HE HASN'T ACCEPTED RESPONSIBILITY IN A CASE THAT HE

02:03PM  14     WENT TO TRIAL AND EXERCISED THAT FIFTH AMENDMENT RIGHT, I

02:03PM  15     BELIEVE MR. SCHENK'S POINT IS AN IMPROPER COMMENT ON

02:03PM  16     MR. BALWANI'S FIFTH AMENDMENT RIGHT BECAUSE HE HAS NO

02:03PM  17     OPPORTUNITY TO ACCEPT RESPONSIBILITY UNLESS HE WAIVES THAT

02:03PM  18     RIGHT.

02:03PM  19          THE OTHER THING THAT MR. SCHENK SAYS ABOUT THAT IS SOMEHOW

02:03PM  20     OUR ARGUMENT THAT MR. BALWANI IS BLAMING INVESTORS FOR WHAT

02:03PM  21     HAPPENED AFTER HE LEFT THE COMPANY IS A REASON WHY HE'S NOT

02:03PM  22     ACCEPTING RESPONSIBILITY.  I WANT TO JUST CLARIFY THE RECORD ON

02:03PM  23     THAT BECAUSE I THINK THAT IS A TWISTED WAY TO LOOK AT THIS.

02:03PM  24          WHAT OUR ARGUMENT IS, IS NOT THAT INVESTORS ARE TO BLAME

02:03PM  25     SOMEHOW.  WHAT WE HAVE SAID ABOUT THAT HAD TO DO WITH THE LOSS

02:04PM 1     CALCULATION.  I DON'T WANT TO REPEAT THOSE ARGUMENTS, BUT IT'S

02:04PM 2     IMPORTANT BECAUSE MR. SCHENK MENTIONED THIS, IS THAT WHEN

02:04PM 3     MR. BALWANI LEFT THE COMPANY, THE COMPANY HAD $350 MILLION IN

02:04PM 4     THE BANK.  THAT'S NOT DISPUTED.  HE ALSO HAD IP, WHICH THE

02:04PM 5     THINGS WE PUT IN THE RECORD SHOW WE BELIEVE WERE WORTH MANY,

02:04PM 6     MANY HUNDREDS OF MILLIONS OF DOLLARS, AND THE GOVERNMENT HAS A

02:04PM 7     DIFFERENT VIEW OF THAT.  BUT WHATEVER YOU THINK ABOUT THAT,

02:04PM 8     MR. BALWANI AND HIS DEFENSE TEAM HAS NEVER ARGUED THAT THERANOS

02:04PM 9     WAS ENTITLED TO $350 MILLION AND SOMEHOW YOU WOULD BE DOING

02:04PM 10    PEOPLE A FAVOR IF THEY RETURN IT TO INVESTORS.  NO.

02:04PM 11         THE POINT WAS THAT WHEN MR. BALWANI LEFT THE COMPANY, THE

02:04PM 12    COMPANY DID HAVE $350 MILLION AND HAD THE IP, AND INSTEAD OF

02:04PM 13    TRYING TO OPERATE FOR ANOTHER TWO YEARS AND MAKE A GO OF IT AS

02:04PM 14    A COMPANY, THEY COULD HAVE CLOSED THEIR DOORS RIGHT THEN AND

02:04PM 15    DISTRIBUTED WHATEVER THEY COULD DISTRIBUTE, INCLUDING THE CASH

02:04PM 16    THAT CAME FROM THE INVESTORS IN THE FIRST PLACE, DISTRIBUTED

02:04PM 17    THAT BACK TO INVESTORS, ALONG WITH WHATEVER THEY COULD GET FROM

02:05PM 18    THE IP.  AND THAT ARGUMENT HAS NOTHING TO DO WITH WHETHER

02:05PM 19    MR. BALWANI ACCEPTED RESPONSIBILITY.  WE HAVE NOT ASKED FOR THE

02:05PM 20    GUIDELINE ADJUSTMENT, AS I'VE SAID.

02:05PM 21         BUT FOR MR. SCHENK TO SAY WE SHOULD GIVE HIM A HARSHER

02:05PM 22    SENTENCE BECAUSE HE DIDN'T ACCEPT RESPONSIBILITY WHEN YOU PUT

02:05PM 23    ASIDE WHAT I CONSIDER UNFOUNDED ARGUMENT ABOUT THE 350 MILLION

02:05PM 24    AND THE TIME AFTER MR. BALWANI LEFT, WHEN YOU PUT THAT ASIDE,

02:05PM 25    WHICH YOU SHOULD, YOU END UP WITH WHAT I THINK IS AN IMPROPER

02:05PM 1    COMMENT ON HIS FIFTH AMENDMENT RIGHTS.

02:05PM 2          THE COURT:  WELL, PARDON ME FOR INTERRUPTING AND LET

02:05PM 3    ME DO SO NOW TO TELL YOU THAT THIS COURT IS NOT GOING TO IN ITS

02:05PM 4    SENTENCE -- AND I AM GOING TO SENTENCE YOUR CLIENT.  YOU KNOW

02:05PM 5    THAT.  THAT'S WHY WE'RE HERE.  BUT I AM NOT GOING TO SENTENCE

02:05PM 6    HIM IN ANY WAY CONSIDERING THE FACT THAT HE CHOSE TO EXERCISE

02:05PM 7    HIS UNITED STATES CONSTITUTIONAL RIGHT TO NOT TESTIFY AND

02:05PM 8    REMAIN SILENT.  THAT'S A CHERISHED RIGHT THAT WE ALL ENJOY, AND

02:05PM 9    HE EXERCISED THAT RIGHT.  THERE'S NO PUNITIVE ACTION ON

02:06PM 10   EXERCISING A CONSTITUTIONAL RIGHT.  I DON'T TAKE MR. SCHENK'S

02:06PM 11   COMMENT THAT WAY THAT HE WAS SUGGESTING THAT.

02:06PM 12       I UNDERSTAND HOW IT COULD BE INTERPRETED THAT WAY.  IT'S

02:06PM 13   NOT HOW THE COURT RECEIVED IT, AND IT'S CERTAINLY NOT HOW THE

02:06PM 14   COURT IS GOING TO EVALUATE THE APPROPRIATE SENTENCE IN THIS

02:06PM 15   CASE.  YOUR CLIENT HAS THE ABSOLUTE RIGHT NOT TO TESTIFY.  HE

02:06PM 16   WILL NOT BE PUNISHED FOR THE EXERCISE OF THAT.

02:06PM 17       YOU'RE COMPLETELY CORRECT THE GUIDELINES DO PROVIDE UNDER

02:06PM 18   3E1(A) AND (B) THE OPPORTUNITY, SHOULD A DEFENDANT CHOOSE TO

02:06PM 19   EXERCISE THAT OPPORTUNITY, TO RECEIVE A 3 LEVEL REDUCTION

02:06PM 20   SHOULD THEY WISH TO DO SO AND IF THEY OTHERWISE QUALIFY, AND HE

02:06PM 21   CHOSE NOT TO DO THAT.

02:06PM 22       SO TO YOUR POINT, HE IS NOT ENTITLED TO THE GUIDELINE

02:06PM 23   REDUCTION.  BUT I AM NOT GOING TO EVEN CONSIDER THE FACT THAT

02:06PM 24   HE DID NOT TESTIFY NOR THAT HE -- I THINK IT WAS IN -- I CAN'T

02:07PM 25   REMEMBER WHAT PARAGRAPH IT WAS IN THE PSR, BUT MS. GOLDSBERRY

02:07PM 1      NOTES THAT HE DID NOT MAKE ANY STATEMENT AS FAR AS ACCEPTANCE

02:07PM 2      OF RESPONSIBILITY, AND FOR PURPOSES OF HER REPORT CALCULATING

02:07PM 3      THE GUIDELINE CALCULATIONS THAT WAS AN IMPORTANT INQUIRY, BUT

02:07PM 4      FOR THAT REASON ONLY.

02:07PM 5              MR. COOPERSMITH:  YOUR HONOR, I REALLY APPRECIATE

02:07PM 6      THE COURT'S COMMENTS, AND I'M, OF COURSE, NOT SURPRISED, BUT

02:07PM 7      ALSO GLAD TO HEAR IT.

02:07PM 8          AND THE POINT I'M MAKING IS NOT THAT I THOUGHT THE COURT

02:07PM 9      WOULD PUNISH MR. BALWANI FOR THAT, AND, OF COURSE, THE COURT

02:07PM 10     WOULDN'T DO THAT AND SHOULDN'T.  IT'S JUST THAT MR. SCHENK'S

02:07PM 11     ARGUMENT NEEDS TO BE THROWN OUT BECAUSE THE IDEA THAT HE'S NOT

02:07PM 12     ACCEPTING RESPONSIBILITY, THAT'S A REASON TO IMPOSE MORE PRISON

02:07PM 13     TIME, THAT JUST I DON'T THINK FLIES.

02:07PM 14         BUT LET ME MOVE ON, YOUR HONOR.

02:07PM 15         MR. SCHENK MENTIONED, YOU KNOW, CERTAIN HARMS THAT WERE

02:07PM 16     CAUSED, RIGHT?  SO ONE THING HE COMMENTED ON WAS THE INVESTOR

02:08PM 17     HARM.  AND IF YOU BELIEVE THERE IS INVESTOR LOSS, AND I

02:08PM 18     UNDERSTAND THE COURT SO FOUND, THEN THAT IS A HARM IN THE CASE.

02:08PM 19         BUT BASICALLY THIS IS A DOUBLE COUNTING OR MAYBE IT'S

02:08PM 20     QUADRUPLE COUNTING OR QUINTUPLE COUNTING.  THE IDEA IS THAT THE

02:08PM 21     GUIDELINE MR. SCHENK IS TRYING TO TAKE ADVANTAGE OF ALREADY

02:08PM 22     ACCOUNT FOR A VERY LENGTHY SENTENCE JUST FROM THAT ONE FACTOR

02:08PM 23     UNDER 3553(A) FACTORS OF THE GUIDELINES WOULD DICTATE A CERTAIN

02:08PM 24     GUIDELINE RANGE, WHICH IS OBVIOUSLY ADVISORY.

02:08PM 25         BUT MR. SCHENK WANTS TO THEN DOUBLE COUNT THAT ARGUMENT

02:08PM 1      AGAIN IN ARGUING FOR A SENTENCE EVEN ABOVE THE GUIDELINE RANGE

02:08PM 2      THE COURT CALCULATED.

02:08PM 3          AND THEN PATIENT HARM.  THE COURT ALREADY, AND WE

02:08PM 4      APPRECIATE, DID NOT FIND THE FACTOR OF MR. BALWANI CONSCIOUSLY

02:08PM 5      OR RECKLESSLY CAUSING PATIENT HARM.  ALL OF US MAKE ERRORS

02:09PM 6      OBVIOUSLY.  WE POINTED TO THE EXAMPLE IN THE BRIEF, THE

02:09PM 7      CLEVELAND CLINIC EXAMPLE.  THIS IS ALL PUBLIC, THAT THE

02:09PM 8      CLEVELAND CLINIC WAS FOUND TO BE IN IMMEDIATE JEOPARDY BY THE

02:09PM 9      CMS LABORATORY REGULATORS ON MANY SCORES, AND IN FACT SOME OF

02:09PM 10     THE SAME THINGS THAT THERANOS WAS FOUND FOR, AND THEY HAD TO

02:09PM 11     CORRECT THE PROBLEMS, AND NO ONE WAS PROSECUTED.

02:09PM 12         BUT I BRING THAT UP BECAUSE WE'RE NOT IN THAT CASE, BUT

02:09PM 13     ALL LABS MAKE ERRORS.  IN FACT, DR. BURNS ON THE STAND SAID,

02:09PM 14     WELL, HE HAD SOME PROBLEMS WITH OTHERS LABS.

02:09PM 15         SO THAT'S WHAT HAPPENED.  SO BY DEFINITION ANY LABORATORY

02:09PM 16     CASE, WHETHER IT'S CRIMINAL OR CIVIL OR REGULATORY, IS GOING TO

02:09PM 17     INVOLVE SOME ERROR THAT A LAB MADE, AND, OF COURSE, THERE'S

02:09PM 18     ALWAYS THAT HARM.

02:09PM 19         SO MR. BALWANI NEVER WANTED THAT.  THERE'S NO EVIDENCE, AS

02:09PM 20     WE'VE SAID BEFORE AND I WON'T REPEAT THOSE ARGUMENTS, BUT NEVER

02:09PM 21     WANTED ANYONE TO BE HARMED.  HE WOULDN'T HARM A FLY.

02:09PM 22         INSTEAD, WHAT MR. BALWANI HAS DEMONSTRATED HIS ENTIRE LIFE

02:10PM 23     WAS THAT HE WANTS TO GIVE.  HE'S GRATEFUL TO BE HERE, HE'S

02:10PM 24     GRATEFUL TO BE A UNITED STATES CITIZEN, HE'S GRATEFUL TO HAVE

02:10PM 25     HAD THE OPPORTUNITY TO GIVE TO HIS COMMUNITY.  HE'S DONE THAT

02:10PM 1   OVER AND OVER AGAIN.  HE'S DEMONSTRATED HIS CHARACTER.

02:10PM 2       OBVIOUSLY HE WAS CONVICTED BY A JURY OF FRAUD AND THE

02:10PM 3   COURT HAS TO SENTENCE HIM OF COURSE, AND THAT'S WHY WE'RE HERE,

02:10PM 4   BUT HE IS DESERVING OF A LENIENT SENTENCE.  HE'S NOT

02:10PM 5   MS. HOLMES.  HE DID NOT PURSUE THE SAME PATH AS SHE DID.  HE

02:10PM 6   DID NOT PURSUE FAME AND FORTUNE AND RECOGNITION AND GLORY.  HE

02:10PM 7   DID NOT SELL A SINGLE SHARE.  HE DID NOT TRY TO PROFIT.  HE DID

02:10PM 8   NOT TRY TO HARM ANYBODY, AND, YES, THE COURT HAS TO SENTENCE

02:10PM 9   HIM, BUT NOT TO THE RANGE THAT THE GOVERNMENT IS RECOMMENDING

02:10PM 10  OR PROBATION IS RECOMMENDING, OR MS. HOLMES RECEIVED BY THIS

02:10PM 11  COURT.

02:10PM 12      NOT ALL DEFENDANTS ARE THE SAME.  IT'S AN INDIVIDUALIZED

02:10PM 13  DETERMINATION.

02:10PM 14      AND WITH THAT, YOUR HONOR, THANK YOU.

02:10PM 15          THE COURT:  THANK YOU.

02:10PM 16      AND I INTERRUPTED YOUR PRESENTATION WITH MY COMMENTS, AND

02:10PM 17  I DIDN'T MEAN TO SUGGEST IN ANY WAY THAT YOU SHOULD IN ANY WAY

02:11PM 18  RETREAT FROM ANY COMMENTS.  SO IF YOU HAVE ANYTHING YOU DIDN'T

02:11PM 19  GET A CHANCE TO SAY BECAUSE OF MY INTERRUPTION, YOU CERTAINLY

02:11PM 20  SHOULD GO FORWARD NOW.  I WANT YOU TO GIVE YOUR FULSOME

02:11PM 21  RESPONSE TO BOTH THE GOVERNMENT'S AND YOUR FULSOME POSITION.

02:11PM 22  SO I RARELY INTERRUPT SOMEONE DURING THEIR PRESENTATION.  I DID

02:11PM 23  SO BECAUSE I WANTED YOU TO KNOW THE COURT'S FEELINGS ABOUT YOUR

02:11PM 24  CLIENT'S EXERCISE OF HIS RIGHTS, BUT I DIDN'T MEAN TO INTERRUPT

02:11PM 25  YOU.

02:11PM  1        SO IF YOU HAD SOMETHING ELSE YOU WANTED TO SAY, REVIEW

02:11PM  2    YOUR NOTES AND LET ME KNOW, PLEASE.

02:11PM  3            MR. COOPERSMITH:  YEAH, I MIGHT TAKE A MOMENT TO

02:11PM  4    CONFER WITH MY TEAM, YOUR HONOR.

02:11PM  5            THE COURT:  SURE.  GO RIGHT AHEAD.

02:11PM  6            MR. COOPERSMITH:  AND I MIGHT AS WELL BE THOROUGH

02:11PM  7    WHILE WE'RE HERE.

02:11PM  8            THE COURT:  ABSOLUTELY.

02:12PM  9        (DISCUSSION OFF THE RECORD.)

02:12PM 10            MR. COOPERSMITH:  THANK YOU FOR THE COURT'S

02:12PM 11    INDULGENCE.  I APPRECIATE IT.

02:12PM 12            THE COURT:  OF COURSE.

02:12PM 13            MR. COOPERSMITH:  A FEW OTHER THINGS I'M REMINDED I

02:12PM 14    SHOULD SAY FOR COMPLETENESS, AND I THINK THESE THINGS ARE

02:12PM 15    IMPORTANT.

02:12PM 16        FIRST OF ALL, ONE THING THE GOVERNMENT SAID, I WROTE IN MY

02:12PM 17    NOTES AND I THINK IT IS WORTH RESPONDING TO, AND THAT IS THEY

02:12PM 18    SAY MR. BALWANI WAS THE QUOTE, "DE FACTO LAB DIRECTOR" AFTER

02:12PM 19    DR. ROSENDORFF LEFT.  I DON'T THINK THERE'S ANY BASIS FOR THAT.

02:12PM 20    MR. BALWANI WAS NOT THE DE FACTO LAB DIRECTOR.

02:12PM 21        THERE WERE, FIRST OF ALL, AS I SAID BEFORE, AN ENTIRE

02:12PM 22    SCIENTIFIC TEAM AT THERANOS, INCLUDING DR. SAKSENA WHO WERE

02:12PM 23    INVOLVED IN THE LAB.  EVEN IF DR. DHAWAN AND DR. SAWYER WERE

02:13PM 24    NOT AS INVOLVED AS YOU MIGHT LIKE, THERE WAS A WHOLE TEAM OF

02:13PM 25    SCIENTISTS WHO WERE THERE, AND THEY WERE THERE TO MAKE SURE THE

02:13PM 1    LAB RESULTS WERE AS GOOD AS THEY COULD BE AND THEY WERE RUNNING

02:13PM 2    SMOOTHLY.

02:13PM 3         AT THE SAME TIME, AS I SAID BEFORE, THE COMPANY WAS

02:13PM 4    PHASING OUT THE EDISON DEVICES AND USING MORE COMMERCIAL

02:13PM 5    DEVICES.  IN FACT, THEY OPENED UP THIS LAB IN ARIZONA, AND

02:13PM 6    DR. YOUNG WAS PUT IN CHARGE OF THE LAB, NOT MR. BALWANI, AND

02:13PM 7    DR. YOUNG WAS QUALIFIED AS A LAB DIRECTOR.

02:13PM 8         THE IDEA THAT HE WAS ALL OF THE SUDDEN TAKING IT UPON

02:13PM 9    HIMSELF TO OVERSEE WHAT RESULTS WERE BEING RELEASED TO

02:13PM 10   PATIENTS, THAT'S JUST NOT THE CASE.  THERE IS NOT A SINGLE TIME

02:13PM 11   THAT MR. BALWANI SIGNED OFF ON RELEASING A RESULT TO A PATIENT.

02:13PM 12   THAT JUST DIDN'T HAPPEN, AND HE'S NOT THE DE FACTO LAB

02:13PM 13   DIRECTOR.  HE WAS OPERATIONALLY INVOLVED IN THE LAB AS THE

02:13PM 14   COURT KNOWS.

02:13PM 15        IN ADDITION, JUST A WORD ABOUT STIFLING DISSENT I THINK IS

02:14PM 16   HOW THE GOVERNMENT PUT IT.  AND, YOU KNOW, THE COURT HEARD FROM

02:14PM 17   ERIKA CHEUNG, AND SHE GOT TO THERANOS AS A YOUNG GRADUATE OF

02:14PM 18   THE UNIVERSITY OF CALIFORNIA AND WAS EXCITED TO WORK THERE, AND

02:14PM 19   THEN SHE RAISED SOME ISSUES.

02:14PM 20        WELL, MR. BALWANI, THE GOVERNMENT WOULD HAVE YOU BELIEVE,

02:14PM 21   YOUR HONOR, THAT SHE RAISED ISSUES AND MR. BALWANI TOLD HER, I

02:14PM 22   DON'T WANT TO HEAR IT, JUST DO YOUR JOB, RUN THE SAMPLES, DON'T

02:14PM 23   TALK TO ME.

02:14PM 24        THAT IS NOT AT ALL WHAT HAPPENED.  WHEN IT GOT TO THE

02:14PM 25   POINT OF MR. BALWANI, ACCORDING TO MS. CHEUNG, SAYING YOUR JOB

02:14PM  1    IS TO RUN SAMPLES, BY THAT TIME THERE HAD BEEN SCIENTIST AFTER

02:14PM  2    SCIENTIST, ESPECIALLY DR. YOUNG, WHO LOOKED AT HER CLAIMS AND

02:14PM  3    LOOKED AT WHAT SHE SAID ABOUT QC AND LOOKED AT WHAT SHE SAID

02:14PM  4    ABOUT PROFICIENCY TESTS.

02:14PM  5         THE COURT MIGHT REMEMBER THERE WAS AN EXHIBIT, AND I DON'T

02:15PM  6    HAVE THE NUMBER, BUT THE COURT PROBABLY REMEMBERS IT WAS A

02:15PM  7    TABLE OF NUMBERS SHOWING A COMPARISON BETWEEN THERANOS DEVICES

02:15PM  8    AND MODIFIED PREDICATE -- I'M SORRY, ACTUAL PREDICATE MACHINES,

02:15PM  9    FDA MACHINES, AND SOME OF THE NUMBERS ACCORDING TO THE

02:15PM  10   GOVERNMENT WERE A LITTLE OFF.

02:15PM  11        DR. ROSENDORFF TESTIFIED THAT THAT WAS NOT A PROPER

02:15PM  12   EXPERIMENT, IT DIDN'T SHOW A FAILURE.  DR. PANDORI PUT TOGETHER

02:15PM  13   A WHOLE POWERPOINT ABOUT HOW THIS ALTERNATIVE ASSESSMENT

02:15PM  14   PROCEDURE WAS THE RIGHT WAY TO GO AND THAT WAS NOT THE CORRECT

02:15PM  15   WAY TO ANALYZE THINGS.

02:15PM  16        SO BY THE TIME THAT MR. BALWANI ALLEGEDLY HAD A

02:15PM  17   CONVERSATION WITH MS. CHEUNG WHERE SHE CLAIMED HE SAID JUST DO

02:15PM  18   YOUR JOB, AND HE ALREADY HAD SCIENTISTS LOOK AT THIS, INCLUDING

02:15PM  19   DR. YOUNG, ON EVERY SINGLE CLAIM.  SO THIS WAS THE OPPOSITE OF

02:15PM  20   A MANAGER NOT WANTING TO HEAR FROM MS. CHEUNG.  HE SPENT A LOT

02:15PM  21   OF TIME, A LOT OF COMPANY TIME, A LOT OF HIS EMPLOYEE'S TIME

02:15PM  22   TRYING TO UNDERSTAND WHERE SHE WAS COMING FROM AND TO ADDRESS

02:15PM  23   THE CONCERNS AS BEST AS HE COULD.

02:15PM  24        SO THAT IDEA OF SHUTTING PEOPLE DOWN I THINK IS -- THERE'S

02:16PM  25   A SORT OF MYTH THAT'S DEVELOPED ABOUT MR. BALWANI.  I THINK IF

02:16PM 1     YOU READ THE MEDIA, HE'S SOME KIND OF ENFORCER.  IF YOU READ

02:16PM 2     THE LETTERS FROM EMPLOYEES, THAT'S NOT HOW HE WAS PERCEIVED, AT

02:16PM 3     LEAST NOT BY EVERYBODY.  AND THIS IDEA THAT HE'S SHUTTING

02:16PM 4     MS. CHEUNG DOWN IS JUST NOT CONSISTENT WITH THE FACTS.

02:16PM 5          THE OTHER THING I WANTED TO SAY, AND WE PUT THIS IN OUR

02:16PM 6     SENTENCING PAPERS AND I MENTIONED THIS BEFORE, HE DID IN FACT

02:16PM 7     HAVE HIS FAMILY TESTED AT THERANOS.  AND IT WAS NOT JUST HIS

02:16PM 8     MOM, IT WAS HIS SIBLINGS AND OTHERS.  WHY WOULD YOU DO THAT IF

02:16PM 9     YOU THOUGHT THAT THE LAB WAS SO BAD?  I'M NOT SAYING THAT TO

02:16PM 10    ARGUE IT AGAINST THE JURY'S VERDICT, BECAUSE WE'RE HERE BECAUSE

02:16PM 11    OF A JURY VERDICT.  BUT IT SHOWS YOU THAT NOT EVERYTHING THAT

02:16PM 12    THE GOVERNMENT SAYS ABOUT MR. BALWANI AND NOT EVERYTHING THEY

02:16PM 13    SHOWED AT TRIAL IS NECESSARILY TRUE.  AND THERE'S NO BETTER

02:16PM 14    TIME TO THINK ABOUT IT OF HOW MR. BALWANI WANTED THE COMPANY TO

02:16PM 15    BE AND WHY HE HAD CONFIDENCE IN THE LAB.  HE WAS NOT TRYING TO

02:17PM 16    CREATE PATIENT HARM.  THERE'S NO BETTER EVIDENCE HERE REALLY

02:17PM 17    THAN THE FACT THAT HE HAS HIS OWN FAMILY TESTED THERE.  NOBODY

02:17PM 18    WOULD DO THAT.  HE'S BELOVED BY HIS FAMILY, AND HE LOVES THEM,

02:17PM 19    AND IT JUST DOESN'T WORK THAT WAY.

02:17PM 20         SO, AGAIN, I'M NOT TRYING TO SAY THAT WE SHOULD IGNORE THE

02:17PM 21    VERDICT.  WE CAN'T DO THAT.  BUT I THINK IT IS A MITIGATING

02:17PM 22    FACTOR THAT THE COURT SHOULD CONSIDER.

02:17PM 23         SO THANK YOU FOR THE EXTRA TIME, YOUR HONOR.  I APPRECIATE

02:17PM 24    IT.

02:17PM 25              THE COURT:  OF COURSE.

02:17PM  1          MR. COOPERSMITH:  I'M SURE WITH A COMPLICATED CASE

02:17PM  2     LIKE THIS I COULD GO ON FOR HOURS OR DAYS AS I DID DURING

02:17PM  3     CLOSING ARGUMENT, BUT I DO WANT THE COURT TO TAKE THESE THINGS

02:17PM  4     INTO CONSIDERATION.  OBVIOUSLY, WE'VE SUBMITTED A LOT OF

02:17PM  5     MATERIAL THAT THE COURT HAS READ, AND WE DO THINK THAT

02:17PM  6     MR. BALWANI IS DESERVING OF LENIENCY, AND THAT'S WHAT WE ASK

02:17PM  7     THE COURT TO DO.

02:17PM  8          THE COURT:  THANK YOU.

02:17PM  9        ANYTHING FURTHER FROM THE GOVERNMENT?

02:17PM  10         MR. SCHENK:  NO.  THANK YOU, YOUR HONOR.

02:17PM  11         THE COURT:  PROBATION, ANYTHING FURTHER?

02:17PM  12         PROBATION OFFICER:  NO, YOUR HONOR.

02:17PM  13         THE COURT:  ALL RIGHT.  THANK YOU.

02:17PM  14       IN JUST A MOMENT I'M GOING TO CALL UPON MR. BALWANI TO ASK

02:18PM  15     IF HE WISHES TO BE HEARD, BUT I'LL TAKE A MOMENT OF PERSONAL

02:18PM  16     PRIVILEGE, IF I MAY, AND I SHOULD HAVE DONE THIS AT THE OUTSET

02:18PM  17     TO THANK ALL COUNSEL, THANK YOU.  WE WERE TOGETHER FOR A LONG

02:18PM  18     TIME IN THIS TRIAL.  IT WAS HARD FOUGHT ON BOTH SIDES.  IT WAS

02:18PM  19     MY GREAT PRIVILEGE TO WORK WITH ALL OF YOU, AND I APPRECIATE

02:18PM  20     THAT.

02:18PM  21       AS MR. COOPERSMITH POINTS OUT, THE JURY HAS SPOKEN.  THE

02:18PM  22     REASON WE'RE HERE TODAY IS FOR THE SENTENCING.  YOU ALL KNOW

02:18PM  23     THAT SENTENCING IS THE MOST DIFFICULT THING THAT YOU DO AS

02:18PM  24     LITIGATORS.  IT'S CERTAINLY THE MOST DIFFICULT THING THAT A

02:18PM  25     JUDGE DOES WHEN SHE IMPOSES A SENTENCE ON AN INDIVIDUAL.

02:18PM   1          BUT, AGAIN, I JUST WANTED TO THANK YOU ALL FOR YOUR

02:18PM   2   COURTESY THROUGHOUT THE TRIAL.

02:18PM   3          MR. BALWANI, SIR, YOU HAVE THE RIGHT TO BE HEARD AT YOUR

02:18PM   4   SENTENCING.

02:18PM   5          IS THERE ANYTHING YOU WOULD LIKE TO SAY OR ANYTHING YOU

02:18PM   6   WOULD LIKE ME TO KNOW BEFORE I IMPOSE SENTENCE?

02:18PM   7              MR. COOPERSMITH:  YOUR HONOR, I WOULD JUST TELL THE

02:18PM   8   COURT THAT MR. BALWANI APPRECIATES THE INVITATION TO SPEAK, AND

02:19PM   9   WE KNOW HE HAS THAT RIGHT.  HE ALSO HAS THE RIGHT NOT TO SPEAK,

02:19PM  10   AND HE CHOOSES TO EXERCISE HIS RIGHT NOT TO SPEAK.

02:19PM  11              THE COURT:  OKAY.  IS THAT CORRECT, MR. BALWANI?

02:19PM  12              THE DEFENDANT:  YES, YOUR HONOR.

02:19PM  13              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH, SIR.

02:19PM  14   THANK YOU.

02:19PM  15          ALL RIGHT.  ANYTHING FURTHER FROM EITHER SIDE?

02:19PM  16              MR. SCHENK:  NO, YOUR HONOR.

02:19PM  17              MR. COOPERSMITH:  NO, YOUR HONOR.

02:19PM  18              PROBATION OFFICER:  NO, YOUR HONOR.

02:19PM  19              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  AND

02:19PM  20   THANK YOU, COUNSEL, FOR THE TIME SPENT THIS MORNING.  THIS WAS

02:19PM  21   HELPFUL TO THE COURT.

02:19PM  22          WE SPENT A LOT OF TIME GOING THROUGH THE NUANCES ABOUT THE

02:19PM  23   PRELIMINARY INFORMATION THAT MUST BE RESOLVED PRIOR TO THE

02:19PM  24   IMPOSITION OF A SENTENCE, AND AS I SAID, WE ALL KNOW WHY WE'RE

02:19PM  25   HERE.  I'VE READ THE PSR.  LET ME SAY I HAVE READ THE LETTERS

02:19PM   1    AND THE DOCUMENTS THAT HAVE BEEN SUPPLIED TO THE COURT, THE

02:19PM   2    INFORMATION BOTH FROM THE GOVERNMENT AND THEIR EXPERTS, THEIR

02:19PM   3    SENTENCING MEMORANDUM, AS WELL AS THE SENTENCING MEMORANDUM

02:19PM   4    FROM THE DEFENDANT.

02:19PM   5         I'VE READ THE LETTERS THAT WERE PRESENTED TO THE COURT

02:20PM   6    THAT SPEAK IN SUPPORT OF MR. BALWANI AND SPEAK TO HIS

02:20PM   7    BACKGROUND.  THEY SPEAK TO THE NATURE OF THEIR RELATIONSHIP

02:20PM   8    WITH HIM, THEIR KNOWLEDGE OF HIM.

02:20PM   9         THERE WERE PHOTOGRAPHS, WEREN'T THERE, THAT SHOW MANY PUSH

02:20PM  10    CARTS FROM PAKISTAN, I BELIEVE, AND INDIA THAT SHOW THE WORK OF

02:20PM  11    THE CONTRIBUTIONS THAT MR. BALWANI HAS MADE AND THE EFFORTS

02:20PM  12    THAT INDIVIDUALS WHO HAVE CHANGED THEIR LIVES, THEY'VE BEEN

02:20PM  13    ABLE TO ESTABLISH BUSINESSES WITH PUSH CARTS, SELLING FRUITS,

02:20PM  14    SELLING BEVERAGES, AND OTHER MATTERS TO IMPROVE THEIR LIVES.

02:20PM  15         SO TO MR. COOPERSMITH'S POINT, THESE ARE THINGS THAT AN

02:20PM  16    INDIVIDUAL LOOKS AT, AND THEY HAVE A GREAT IMPRESSION, POSITIVE

02:20PM  17    IMPRESSION ON THE COURT AS DO THE FAMILY SUPPORT, THE MANY

02:21PM  18    LETTERS THAT SPOKE ABOUT THEIR RELATIONSHIP WITH MR. BALWANI

02:21PM  19    AND THEIR SPECIAL CONNECTION WITH HIM, NOT JUST A BLOOD

02:21PM  20    RELATIONSHIP BUT MORE.

02:21PM  21         I BELIEVE HIS BROTHERS ARE IN COURT, AND THEY ARE GRATEFUL

02:21PM  22    TO HIM BECAUSE HE PAID FOR THEIR COLLEGE TUITION, HE PAID FOR

02:21PM  23    THE TUITION THAT ALLOWED THEM TO GO TO COLLEGE, AND PERHAPS

02:21PM  24    WHAT I HAVE LEARNED FROM HIM IN THE PSR WAS THAT HE WAS THE SON

02:21PM  25    WHO WAS SENT FORWARD TO ACCOMPLISH MUCH AND TO RETURN MUCH TO

02:21PM 1    HIS FAMILY.  HE DID THAT WITH HIS FAMILY.  HE CONSISTENTLY

02:21PM 2    SUPPORTED HIS FAMILY.

02:21PM 3        WE'RE TOLD ABOUT THE CHARITABLE GIFTS THAT HE MADE AND

02:21PM 4    SOME OF THOSE WERE BEFORE HIS INVOLVEMENT WITH THE COMPANY.

02:21PM 5    MANY OF THEM WERE AFTER HIS INVOLVEMENT WITH THE COMPANY AND

02:21PM 6    CONTINUED INTO THE 2020, I THINK, WAS ONE DATE THAT I NOTED

02:22PM 7    WHERE HE CONTINUED TO SUPPORT BOTH HIS -- THE TEMPLE THAT HE

02:22PM 8    WORSHIPS AT.  I THINK THAT'S WHERE THE -- I BELIEVE THAT'S

02:22PM 9    WHERE THE WELL WAS IN MILPITAS, CALIFORNIA, TO ASSIST THE

02:22PM 10   TEMPLE THERE IF I'M NOT MISTAKEN AND THAT'S MY RECOLLECTION.

02:22PM 11       BUT THAT SHOWS ANOTHER SIDE OF HIM, AND I THINK THAT WAS

02:22PM 12   YOUR POINT, MR. COOPERSMITH.

02:22PM 13       AND TO YOUR POINT, MR. COOPERSMITH, SENTENCING IS ALWAYS

02:22PM 14   INDIVIDUALIZED.

02:22PM 15       THE COURT NEEDS TO LOOK AT -- WE'VE TALKED ABOUT

02:22PM 16   MS. HOLMES.  SHE'S PART OF THIS CASE, BUT SHE'S NOT PART OF

02:22PM 17   THIS SENTENCE.  THE SENTENCE THAT THE COURT MUST CONSIDER IN

02:22PM 18   THIS CASE IS INDIVIDUALIZED TO MR. BALWANI, AND THAT'S WHAT THE

02:22PM 19   COURT INTENDS TO DO AND TALKING A LITTLE BIT ABOUT THE THINGS

02:22PM 20   THAT I'VE LEARNED ABOUT HIM FROM THE PSR AND THAT HE SHARED

02:22PM 21   WITH THE PROBATION OFFICER.

02:22PM 22       BUT WE KNOW THAT THE JURY SAT THROUGH THIS TRIAL FOR

02:23PM 23   MONTHS, THEY HEARD THE VARIOUS WITNESSES, THEY HEARD THE

02:23PM 24   ARGUMENTS OF COUNSEL, THEY HEARD THE CLOSING ARGUMENTS, THEY

02:23PM 25   HEARD THE EVIDENCE, AND THEY LOOKED AT THE EVIDENCE VERY

02:23PM   1      CAREFULLY.  THERE WERE MANY, MANY EXHIBITS THAT WERE PRESENTED.

02:23PM   2          AS I'VE SAID PREVIOUSLY, A JURY THAT WAS SELECTED BY BOTH

02:23PM   3      SIDES IS A REPRESENTATIVE OF THE COMMUNITY, AND WE ASKED THIS

02:23PM   4      JURY TO COME IN AS THE COMMUNITY TO HEAR AND JUDGE AND TEST THE

02:23PM   5      EVIDENCE THAT THE GOVERNMENT PUTS FORWARD THROUGH AN INDICTMENT

02:23PM   6      AND IN THAT WAY TO RENDER THE COMMUNITY'S DECISION AS TO

02:23PM   7      WHETHER OR NOT THERE HAVE BEEN VIOLATIONS THAT THE GOVERNMENT

02:23PM   8      HAS PROVED BY PROOF BEYOND A REASONABLE DOUBT.

02:23PM   9          IN THIS CASE THIS JURY DID RETURN VERDICTS OF GUILT AS TO

02:23PM  10      EACH OF THE COUNTS THAT WERE ALLEGED IN THE INDICTMENT, AND

02:24PM  11      THAT BRINGS US TO THIS DATE TODAY.

02:24PM  12          THE OTHER THINGS THAT I LEARNED ABOUT MR. BALWANI WERE HIS

02:24PM  13      GREAT SUCCESS IN EDUCATION AND THEN FOLLOWING HIS EDUCATION

02:24PM  14      WHAT HE DID WITH THAT EDUCATION, HE WENT FORWARD.  HE WAS A

02:24PM  15      SUCCESS IN BUSINESS.  HE WORKED AT MICROSOFT FOR A WHILE, BUT

02:24PM  16      THEN HE LEFT AND HE STARTED HIS OWN BUSINESS, AND AS WE KNOW IN

02:24PM  17      SILICON VALLEY HERE, IT IS NOT UNUSUAL, IT'S QUITE THE NORM FOR

02:24PM  18      SOMEONE TO START A BUSINESS, A STARTUP.  THAT'S A PHRASE THAT

02:24PM  19      WE ALL KNOW ABOUT.  AND WE KNOW WHAT HAPPENS WITH THOSE

02:24PM  20      STARTUPS.  OFTENTIMES THE PEOPLE WHO BEGIN THOSE COMPANIES,

02:24PM  21      THEY LOOK FORWARD TO BEING ACQUIRED AND THE ACQUISITION IS

02:24PM  22      SOMETHING THAT PEOPLE SEEK, AND THAT'S CERTAINLY WHAT HAPPENED

02:24PM  23      WITH MR. BALWANI.

02:24PM  24          THE INVESTIGATION IN THE PROBATION REPORT REFLECTS THAT HE

02:25PM  25      HAD STARTED A BUSINESS, AND THAT HE SOLD THE BUSINESS AT GREAT

02:25PM   1    PROFIT TO HIMSELF.  THAT'S SOMETHING THAT IS VERY COMMON IN

02:25PM   2    THIS VALLEY.  AND I WAS GOING TO SAY IT'S INTERESTING, OR

02:25PM   3    PERHAPS TRAGIC IS A BETTER WORD, TO LOOK AT THE PATH OF THIS

02:25PM   4    CASE AND TO REALIZE THAT THAT PATH HAS COME FULL CIRCLE.

02:25PM   5    INSTEAD OF IN A LARGE BUILDING, AN OFFICE BUILDING, A CAMPUS

02:25PM   6    WITH R&D AND LABS AND THINGS AND ENGINEERS, WHAT HAS HAPPENED

02:25PM   7    NOW IS ALL OF THAT HAS COME BACK TO A COURTROOM BECAUSE OF THE

02:25PM   8    JURY'S FINDINGS, BECAUSE OF THE INDICTMENT THAT THE COMMUNITY,

02:25PM   9    AT THE GUIDANCE OF THE GOVERNMENT, THE COMMUNITY ALSO WAS

02:25PM  10    RESPONSIBLE FOR THE INDICTMENT AND THE COMMUNITY HEARD THE

02:26PM  11    TRIAL, AND WE COME BACK TO THIS.

02:26PM  12         IS THAT WHAT WAS HAPPENING HERE?

02:26PM  13         MR. COOPERSMITH, YOU SUGGEST THAT THIS WAS A GREAT IDEA,

02:26PM  14    AND YOUR CLIENT WAS ALL IN ON IT.  THIS WAS TECHNOLOGY THAT

02:26PM  15    COULD CHANGE THE WORLD, IT COULD CHANGE THE WAY THAT HEALTH

02:26PM  16    CARE IS DISTRIBUTED AND ADMINISTERED, AND YOUR CLIENT HAS SAID

02:26PM  17    HE WAS ALL IN.  HE TRAVELLED.  THAT WASN'T BEFORE THE JURY.  I

02:26PM  18    THINK THIS IS SOMETHING THAT THE PROBATION DEPARTMENT GLEANED

02:26PM  19    FROM HIM.  THE JURY CERTAINLY DIDN'T HEAR ANY OF THAT, BUT HIS

02:26PM  20    TRAVEL WAS TO PERHAPS MARKET THE DEVICE AND PROVIDE THAT DEVICE

02:26PM  21    FOR OTHER COUNTRIES, POOR COUNTRIES.

02:26PM  22         BUT, AGAIN, WE COME FULL CIRCLE.  HOW DID THAT HAPPEN?

02:26PM  23    WHAT WAS THE DISRUPTION BETWEEN THIS GENIUS IDEA AND WHAT WAS

02:26PM  24    IT THAT DISRUPTED THAT MACHINE, THAT TECHNOLOGY, THAT BENEFIT

02:27PM  25    TO SO MANY COUNTRIES?  AND WHAT THE JURY FOUND WAS THAT IT WAS

02:27PM  1    FRAUD, IT WAS WIRE FRAUD.  AND FOR SOME REASON THAT HAPPENED.

02:27PM  2    WE DON'T KNOW WHAT IT WAS.  THE JURY HEARD THE EVIDENCE.  I

02:27PM  3    SUPPOSE THE JURY HEARD THE EVIDENCE, AND THEY FOUND THAT THE

02:27PM  4    CONDUCT WAS FRAUDULENT.

02:27PM  5         WHAT I'M SUGGESTING IS WHY DID THAT HAVE TO HAPPEN?  AND

02:27PM  6    THIS WAS A SUCCESSFUL BUSINESS.  THE IDEA WAS STRONG.  THERE

02:27PM  7    WERE MANY INVESTORS GOING, AND THEN THERE WERE PROBLEMS, AS

02:27PM  8    THERE ARE IN EVERYTHING IN LIFE.

02:27PM  9         AND IN THIS NEW VENTURE PROBLEMS STARTED TO ARISE.  THERE

02:28PM  10   WAS A LOT OF, I THINK IT WAS CALLED -- WHAT WAS IT CALLED?  IT

02:28PM  11   WAS GHOST OPERATION FOR TEN YEARS AND UNTIL THE MACHINE AND

02:28PM  12   EVERYTHING DEVELOPED.  MR. BALWANI CAME INTO THE COMPANY IN

02:28PM  13   2009 AND THEN THINGS STARTED TO GO FORWARD, BUT THEN THERE WERE

02:28PM  14   PROBLEMS.

02:28PM  15        AND NOTWITHSTANDING THOSE PROBLEMS, THE DEFENDANTS CHOSE

02:28PM  16   TO GO FORWARD AND CONTINUE WITH DECEPTION I'LL CALL IT,

02:28PM  17   MISLEADING INFORMATION, ACTIVE, MISLEADING AND CONTINUING TO

02:28PM  18   PERPETUATE THE FRAUD EVEN WHEN THEY KNEW THAT THE EVIDENCE

02:28PM  19   INTERNALLY INFORMED THEM THAT THEY COULD NOT PRODUCE WHAT THEY

02:28PM  20   SAID THEY WERE GOING TO PRODUCE TO THEIR INVESTORS.  AND THAT'S

02:28PM  21   THE WIRE FRAUD, ISN'T IT?  THAT'S THE FRAUD ON THE INVESTORS.

02:28PM  22        THEY KNEW THERE WERE ISSUES.  THEY CONCEALED, THEY MISLED

02:29PM  23   INVESTORS, THEY MISLED PATIENTS.  THEY CHOSE TO, FOR SOME

02:29PM  24   REASON, TO IGNORE ALL OF THAT EVIDENCE AND TO GO FORWARD WITH

02:29PM  25   THE INVESTMENTS.  THAT'S THE DISRUPTION.  THAT'S THE

02:29PM 1    SUPERSEDING INTERVENING ACTS THAT PREVENTED THERANOS FROM GOING

02:29PM 2    FORWARD WITH THIS TECHNOLOGY THAT HAD SUCH GREAT PROMISE.

02:29PM 3        WE WONDER WHY, WHY DID THAT HAPPEN?  WHAT WAS IT?  WAS IT

02:29PM 4    GREED?  MR. COOPERSMITH SUGGESTS IT WASN'T BECAUSE HE,

02:29PM 5    MR. BALWANI, WAS A SHAREHOLDER, AND HE LOST MILLIONS OF DOLLARS

02:29PM 6    IN THIS EVENT.

02:29PM 7        AND MR. SCHENK SAYS, WELL, IT'S A LITTLE DIFFERENT BECAUSE

02:29PM 8    HE'S A STAKEHOLDER, AND THERE WAS SOME HOPE THAT THE COMPANY

02:29PM 9    WOULD, NOTWITHSTANDING THE FRAUD, COME TO FRUITION AND HE WOULD

02:29PM 10   BE QUITE WEALTHY.

02:30PM 11       SOMEONE SAID, I THINK ONE OF THE LETTERS AND SOMEBODY SAID

02:30PM 12   THAT, WELL, INVESTORS SHOULD ONLY INVEST WHAT THEY EXPECT TO

02:30PM 13   LOSE.  IS THAT WHAT HE DID?  IS THAT MONEY THAT HE DID NOT HAVE

02:30PM 14   WORRIES ABOUT OR WAS NOT CONCERNED ABOUT PARTING COMPANY WITH?

02:30PM 15   WE DON'T KNOW.  I DON'T KNOW, AND I'M NOT SUGGESTING THAT THERE

02:30PM 16   WAS ANYTHING ON HIS PART, HIS CHOOSING NOT TO TESTIFY THAT

02:30PM 17   SHOULD SUGGEST ANYTHING OTHERWISE, AND I'M NOT SUGGESTING IN

02:30PM 18   ANY WAY THAT THERE'S A DEARTH OF EVIDENCE BECAUSE OF THAT AT

02:30PM 19   ALL.

02:30PM 20       BUT I THINK IT'S JUST THAT ENDURING QUESTION ABOUT WHY DID

02:30PM 21   SUCH A PROMISING COMPANY COME TO THIS END AND WHY DID

02:30PM 22   MR. BALWANI FIND HIMSELF IN THIS?

02:30PM 23       AND THE EVIDENCE SHOWED THAT HE KNEW ABOUT THE FRAUD.

02:30PM 24   THERE WERE TEXT MESSAGES BETWEEN HE AND HIS CODEFENDANT, THERE

02:30PM 25   WERE CONDUCT THAT WAS ENGAGED IN DIRECTLY BY MR. BALWANI WITH

02:31PM  1    INVESTORS WHEN HE MET WITH THEM, HE PROVIDED FINANCIAL

02:31PM  2    PROJECTIONS THAT WERE NOT JUST UNREALISTIC, THEY WERE LIES,

02:31PM  3    THEY WERE FRAUD.

02:31PM  4        AND WAS IT THE NECESSITY TO KEEP THE FINANCES GOING, TO

02:31PM  5    KEEP THE COMPANY GOING JUST ONE MORE, JUST ONE MORE BLOCK, JUST

02:31PM  6    ONE MORE BLOCK, WE'RE ALMOST THERE?  IS THAT WHAT IT WAS?

02:31PM  7        WERE THOSE ACTS OF DESPERATION OR ACTS OF MANIPULATION?

02:31PM  8    THAT CONDUCT IS CONCURRENT WITH THE FRAUD ON THE INVESTORS, AND

02:31PM  9    REGRETTABLY WHAT THE JURY IN THIS CASE FOUND AND WHAT THEY SAW

02:31PM  10   WAS MANIPULATION AND A TRUE FLIGHT FROM HONEST BUSINESS

02:31PM  11   PRACTICES.

02:31PM  12       AND, OF COURSE, IN HINDSIGHT WHAT WE WOULD RECOGNIZE IS

02:31PM  13   THE SOLUTION SHOULD HAVE BEEN AN INITIATION OF AN ACQUAINTANCE

02:32PM  14   WITH AND A FULSOME RELATIONSHIP WITH HONESTY, TRUTH, AND

02:32PM  15   CANDOR.  FOR SOME REASON THAT WAS NOT ENGAGED HERE, AND PERHAPS

02:32PM  16   THAT'S WHY WE ARE AT THIS REGRETTABLE STATE TODAY WHERE

02:32PM  17   MR. BALWANI STANDS BEFORE THE COURT HAVING BEEN CONVICTED OF

02:32PM  18   ALL OF THE COUNTS, INCLUDING THE PATIENT COUNTS IN THIS MATTER,

02:32PM  19   AND THAT IS TROUBLING.

02:32PM  20       I CERTAINLY RESPECT AND I DO NOTE ALL OF THE GOOD WORKS

02:32PM  21   THAT MR. BALWANI HAS DONE IN HIS LIFE WITH HIS FAMILY AND

02:32PM  22   OTHERS.

02:32PM  23       THE COURT IS NOT GOING TO IGNORE THOSE FACTORS, AND

02:32PM  24   THEY'RE IMPORTANT FACTORS THAT THE COURT CONSIDERS IN ITS 3553

02:32PM  25   ANALYSIS AS THE COURT MUST DO.

02:32PM 1    IN THIS MATTER, AGAIN, RECOGNIZING THAT THE INDIVIDUAL

02:32PM 2  BEFORE THE COURT AND HIS HISTORY, THE CHARACTERISTICS,

02:33PM 3  INCLUDING HIS CHARITY AND RECOGNIZING ALL OF THE GOOD THINGS

02:33PM 4  THAT HE HAS DONE, THE COURT IS GOING TO IMPOSE A SENTENCE IN

02:33PM 5  THIS MATTER.  THE COURT, FIRST OF ALL, WILL ORDER A SPECIAL

02:33PM 6  ASSESSMENT OF $1200.  THAT'S $100 PER COUNT IN THIS MATTER.

02:33PM 7    AS TO RESTITUTION, COUNSEL, I AM NOT GOING TO ORDER

02:33PM 8  RESTITUTION TODAY.  I'M GOING TO DEFER THAT FOR ANOTHER DATE,

02:33PM 9  AND I'LL ASK COUNSEL TO MEET AND CONFER ABOUT A SCHEDULE FOR A

02:33PM 10  RESTITUTION HEARING.

02:33PM 11    I'D ALSO INVITE YOU TO CONFER WITH THE CODEFENDANT'S

02:33PM 12  COUNSEL HERE, TOO, TO SEE IF THAT IS A HEARING THAT YOU WOULD

02:33PM 13  LIKE TO ENGAGE IN JOINTLY.

02:33PM 14    AS YOU MIGHT KNOW, I CONTINUED -- I DID NOT MAKE A

02:33PM 15  RESTITUTION FINDING IN MS. HOLMES'S CASES.  I ASKED COUNSEL TO

02:33PM 16  MEET AND CONFER ABOUT A SCHEDULE FOR THAT.  I WOULD INVITE YOU

02:34PM 17  ALL TO TALK ABOUT WHETHER OR NOT IT MAKES SENSE TO HAVE ONE

02:34PM 18  RESTITUTION HEARING OR IF YOU WOULD LIKE TO HAVE TWO SEPARATE

02:34PM 19  RESTITUTION HEARINGS OR JUST THE PROTOCOLS FOR THAT, AND THEN

02:34PM 20  YOU CAN CONTACT MS. ROBINSON ABOUT THAT.

02:34PM 21    SO I AM DEFERRING RESTITUTION AT THIS TIME,

02:34PM 22  MS. GOLDSBERRY.

02:34PM 23    IN THIS MATTER THE COURT WILL IMPOSE A FINE OF $25,000 AS

02:34PM 24  TO COUNTS ONE THROUGH TWELVE.  THAT'S CONCURRENT AS TO EACH

02:34PM 25  COUNT, MS. GOLDSBERRY.

02:34PM 1    I AM NOT GOING TO IMPOSE A SENTENCE OF PROBATION IN THIS

02:34PM 2 MATTER.  THE COURT IS GOING TO FIND THAT THERE'S A SUPERVISED

02:34PM 3 RELEASE TERM OF THREE YEARS AS TO EACH COUNT, AND THOSE SHALL

02:34PM 4 RUN CONCURRENT, CONCURRENT TO ONE ANOTHER.

02:34PM 5    IN THIS MATTER, RECOGNIZING THAT MR. BALWANI WAS CONVICTED

02:34PM 6 OF ALL OF THE COUNTS IN THIS MATTER, AND AGAIN, CONSIDERING THE

02:35PM 7 HISTORY AND CHARACTERISTICS, INCLUDING HIS CHARITY AND GOOD

02:35PM 8 WORKS AND RECOGNIZING ALL OF THAT, THE COURT IS GOING TO IMPOSE

02:35PM 9 A SENTENCE, A GUIDELINE SENTENCE, AND THE COURT FINDS IT'S

02:35PM 10 APPROPRIATE TO IMPOSE A GUIDELINE SENTENCE.  THE COURT WILL

02:35PM 11 IMPOSE A GUIDELINE SENTENCE OF 155 MONTHS, AND IN IMPOSING THIS

02:35PM 12 SENTENCE THE COURT FINDS THAT IT IS SUFFICIENT BUT NOT GREATER

02:35PM 13 THAN NECESSARY TO COMPLY WITH THE PURPOSES OF 18 UNITED STATES

02:35PM 14 CODE SECTION 3553.

02:35PM 15    THE COURT HAS CONSIDERED THE HISTORY AND THE

02:35PM 16 CHARACTERISTICS OF THE DEFENDANT, THE NATURE AND CIRCUMSTANCES

02:35PM 17 OF THE OFFENSE, INCLUDING THE NEED FOR THE SENTENCE IMPOSED TO

02:35PM 18 REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR

02:35PM 19 THE LAW, TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE, TO AFFORD

02:35PM 20 ADEQUATE DETERRENCE IN CRIMINAL CONDUCT AND ALSO TO AVOID

02:35PM 21 DISPARITY IN SENTENCES OF CO-DEFENDANTS.

02:36PM 22    THE COURT IMPOSES THIS SENTENCE AFTER CONSULTING THE

02:36PM 23 UNITED STATES SENTENCING GUIDELINES AND IN LIGHT OF THE

02:36PM 24 STATUTORY CONCERNS EXPRESSED IN 18 UNITED STATES CODE 3553(A).

02:36PM 25    MR. BALWANI, SIR, YOU HAVE THE RIGHT TO FILE AN APPEAL.

02:36PM 1    ANY APPEAL MUST BE FILED WITHIN 14 DAYS.

02:36PM 2         DO YOU UNDERSTAND THAT, SIR?

02:36PM 3              THE DEFENDANT:  I DO, YOUR HONOR.

02:36PM 4              THE COURT:  THANK YOU.

02:36PM 5         AS TO A SURRENDER DATE.  MR. COOPERSMITH, I WAS GOING TO

02:36PM 6    SUGGEST A SURRENDER DATE SOME TIME IN MARCH, AND I WAS GOING TO

02:36PM 7    IDENTIFY MARCH, EITHER -- LET'S SEE, THE 15TH, NO LATER THAN

02:36PM 8    2:00 P.M., MARCH 15TH, 2023, NO LATER THAN 2:00 P.M.  I DIDN'T

02:36PM 9    ASK THE GOVERNMENT IF THEY WANTED TO BE HEARD ON THE SURRENDER

02:36PM 10   DATE.  PARDON ME.

02:36PM 11             MR. SCHENK:  NOTHING FURTHER.  THANK YOU.

02:36PM 12             THE COURT:  ALL RIGHT.  THANK YOU.

02:36PM 13        DID YOU HAVE A DESIRE TO ASK THE COURT TO MAKE A

02:37PM 14   RECOMMENDATION TO THE BUREAU OF PRISON AS TO A LOCATION?

02:37PM 15             MR. COOPERSMITH:  YES, YOUR HONOR.  WE'VE DONE THE

02:37PM 16   LOOKING AT THE VARIOUS FACTORS.  WE WOULD ASK THE COURT TO

02:37PM 17   RECOMMEND THE MINIMUM SECURITY SATELLITE CAMP AT LOMPOC.

02:37PM 18             THE COURT:  ALL RIGHT.

02:37PM 19             MR. COOPERSMITH:  AND WE HAVE PARTICULAR LANGUAGE WE

02:37PM 20   WOULD LIKE THE COURT TO CONSIDER USING IN THE JUDGMENT, AND I

02:37PM 21   CAN CITE THAT NOW.

02:37PM 22             THE COURT:  LET ME SAY THAT I WAS GOING TO RECOGNIZE

02:37PM 23   THAT THIS WAS A NONVIOLENT OFFENSE, AND THAT MR. BALWANI

02:37PM 24   PRESENTS NO HISTORY OF VIOLENCE.  HE HAS NO RECORD, CRIMINAL

02:37PM 25   RECORD.  HE'S NOT -- THERE'S NO RECORD OF ANY SUBSTANCE ABUSE

02:37PM  1    NOR IS THERE ANY RECORD OF VIOLENCE IN HIS BACKGROUND SUCH THAT

02:37PM  2    A RECOMMENDATION TO A MINIMUM SECURITY CAMP LIKE FACILITY WOULD

02:38PM  3    BE APPROPRIATE, AND THE COURT WOULD RECOMMEND TO THE BUREAU OF

02:38PM  4    PRISONS THAT IT LOCATE HIM AT A FACILITY SUCH AS THAT THAT IS

02:38PM  5    CLOSEST AS POSSIBLE TO ALAMEDA COUNTY OR THE SOUTHERN PART OF

02:38PM  6    SANTA CLARA COUNTY TO AFFORD FOR FAMILY VISITATION BECAUSE THE

02:38PM  7    COURT FINDS THAT FAMILY VISITATION ENHANCES REHABILITATION.

02:38PM  8    THAT'S WHAT I WAS GOING TO STATE.

02:38PM  9        DO YOU WANT TO AUGMENT THAT?

02:38PM 10          MR. COOPERSMITH:  YES, YOUR HONOR.

02:38PM 11         AND THE CAMP FACILITY THAT WE'RE AWARE OF THAT WOULD FIT

02:38PM 12    THE DESCRIPTION THE COURT JUST GAVE WOULD BE THE SATELLITE CAMP

02:38PM 13    AT ATWATER, BUT WE ARE ASKING THE COURT TO RECOMMEND ASSIGNMENT

02:38PM 14    OF MR. BALWANI TO THE MINIMUM SECURITY CAMP AT LOMPOC, AND THE

02:38PM 15    REASON IS THAT IT IS A LITTLE FURTHER AWAY.  I THINK IT'S A

02:38PM 16    FOUR HOUR DRIVE INSTEAD OF A TWO HOUR DRIVE FROM HIS CURRENT

02:38PM 17    RESIDENCE, BUT NONETHELESS, IT'S A FACILITY THAT HAS MUCH MORE

02:38PM 18    PROGRAMMING AND I THINK IS MORE SUITABLE FOR MR. BALWANI, AND

02:39PM 19    HOPEFULLY HE CAN BE PRODUCTIVE IF THAT'S WHERE HE ENDS UP.

02:39PM 20          THE COURT:  OKAY.

02:39PM 21          MR. COOPERSMITH:  SO WE WOULD LIKE THE COURT TO

02:39PM 22    RECOMMEND THE MINIMUM SECURITY CAMP AT LOMPOC, AND THE COURT

02:39PM 23    HAS ALREADY MADE THE FINDING THAT HIS SECURITY NEEDS DON'T

02:39PM 24    REFLECT THE NEED TO BE CONFINED ABOVE THE CAMP LEVEL, AND I

02:39PM 25    UNDERSTAND THAT'S WHAT THE COURT HAS SAID; IS THAT CORRECT?

| | | |
|---|---|---|
| 02:39PM | 1 | THE COURT:  YES, YES.  THE ONE THING I DIDN'T, |
| 02:39PM | 2 | THERE'S ALSO NO EVIDENCE OF ANY GANG ACTIVITY THAT THE BUREAU |
| 02:39PM | 3 | OF PRISONS NEEDS TO BE CONCERNED ABOUT. |
| 02:39PM | 4 | MR. COOPERSMITH:  OKAY.  SO THAT'S OUR |
| 02:39PM | 5 | RECOMMENDATION, YOUR HONOR. |
| 02:39PM | 6 | THE COURT:  OKAY.  THANK YOU.  I WOULD RECOMMEND IF |
| 02:39PM | 7 | THE LOMPOC CAMP IS AVAILABLE, AFTER THEY EVALUATE MR. BALWANI, |
| 02:39PM | 8 | I HAVE NO OBJECTION TO THAT BEING HIS SITE. |
| 02:39PM | 9 | MR. COOPERSMITH:  THANK YOU, YOUR HONOR. |
| 02:39PM | 10 | IN PARTICULAR, IT'S THE SATELLITE CAMP BECAUSE THERE'S |
| 02:39PM | 11 | ACTUALLY ANOTHER HIGHER SECURITY LEVEL PRISON THERE AS WELL. |
| 02:39PM | 12 | SO IT'S THE SATELLITE CAMP. |
| 02:40PM | 13 | THE COURT:  IT'S THE MINIMUM SECURITY SATELLITE |
| 02:40PM | 14 | CAMP. |
| 02:40PM | 15 | MR. COOPERSMITH:  CORRECT, YOUR HONOR. |
| 02:40PM | 16 | THE COURT:  RIGHT.  OKAY.  ANYTHING FURTHER? |
| 02:40PM | 17 | MR. SCHENK:  NO, YOUR HONOR.  THANK YOU. |
| 02:40PM | 18 | THE COURT:  MR. COOPERSMITH, ANYTHING FURTHER? |
| 02:40PM | 19 | MR. COOPERSMITH:  I'M JUST LOOKING AT MY NOTES. |
| 02:40PM | 20 | NO, YOUR HONOR, NOTHING FURTHER. |
| 02:40PM | 21 | THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.  THANK |
| 02:40PM | 22 | YOU. |
| 02:40PM | 23 | THANK YOU, COUNSEL. |
| 02:40PM | 24 | (COURT CONCLUDED AT 2:40 P.M.) |
| | 25 | |

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

8   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9   CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10  HEREBY CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12  A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13  ABOVE-ENTITLED MATTER.

14

15

16       IRENE RODRIGUEZ, CSR, RMR, CRR
         CERTIFICATE NUMBER 8074
17

18       DATED:  DECEMBER 12, 2022
19

20

21

22

23

24

25

# EXHIBIT B

## To

## Declaration of Jeffrey B. Coopersmith

**EXCHANGE AND RELEASE AGREEMENT**

This **EXCHANGE AND RELEASE AGREEMENT** (this "*Agreement*"), is made and entered into as of May 15, 2017, by and among **THERANOS, INC.**, a Delaware corporation (the "*Company*"), those certain holders of the Company's Series C-1 Preferred Stock ("*Series C-1 Preferred*") and Series C-2 Preferred Stock ("*Series C-2 Preferred*") who are parties hereto (each a "*Holder*" and, collectively, the "*Holders*"), and Elizabeth Holmes.

## RECITALS

**A.**     Prior to the date hereof, the Company issued and sold in a series of transactions its Series C-1 Preferred and Series C-2 Preferred to certain of the Holders (such transactions, the "*Preferred Stock Financings*").

**B.**     The Board of Directors of the Company (the "*Board*") has determined that it is in the best interests of the Company and its stockholders to provide an opportunity for (i) existing holders of the Series C-1 Preferred who purchased Series C-1 Preferred for $3.00 per share (the "*First Series C-1 Preferred*," and such Holders, the "*First C-1 Holders*") to exchange such shares of Series C-1 Preferred into an equivalent number of shares of newly-created Series C-1A Preferred Stock (the "*Series C-1A Preferred*"), (ii) existing holders of the Series C-1 Preferred who purchased Series C-1 Preferred for $15.00 per share (the "*Second Series C-1 Preferred*," and such Holders, the "*Second C-1 Holders*") to exchange such shares of Series C-1 Preferred into an equivalent number of shares of newly-created Series C-1B Preferred Stock (the "*Series C-1B Preferred*") and (iii) existing holders of the Series C-2 Preferred (the "*C-2 Holders*") to exchange such shares of Series C-2 Preferred into an equivalent number of shares of newly-created Series C-2A Preferred Stock (the "*Series C-2A Preferred*," and together with the exchange of the First Series C-1 Preferred and the Second Series C-1 Preferred, the "*Exchange*"), in each case in consideration for a release of claims against the Company.

**C.**     Each of the undersigned First C-1 Holders desires to exchange each share of First Series C-1 Preferred held by such First C-1 Holder for one share of Series C-1A Preferred, in accordance with the terms and conditions of this Agreement.

**D.**     Each of the undersigned Second C-1 Holders desires to exchange each share of Second Series C-1 Preferred held by such Second C-1 Holder for one share of Series C-1B Preferred, in accordance with the terms and conditions of this Agreement.

**E.**     Each of the undersigned C-2 Holders desires to exchange each share of Series C-2 Preferred held by such C-2 Holder (and together with any exchanged shares of First Series C-1 Preferred and Second Series C-1 Preferred, the "*Exchanged Shares*") for one share of Series C-2A Preferred (and together with any shares of Series C-1A Preferred and Series C-1B Preferred, the "*Adjusted Shares*"), in accordance with the terms and conditions of this Agreement.

## AGREEMENT

In consideration of the foregoing premises and the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company, each Holder and Elizabeth Holmes agree as follows:

1.      **Exchange of Shares.**

1.1.     Prior to the Closing (defined below), the Company shall have adopted and filed with the Secretary of State of the State of Delaware the Amended and Restated Certificate of Incorporation of the Company in the form of Exhibit A attached to this Agreement (the "***Restated Certificate***").

1.2.     The Company has commenced an exchange offer to each holder of First Series C-1 Preferred, Second Series C-1 Preferred, or Series C-2 Preferred, in compliance with all applicable laws and regulations, offering such holders of First Series C-1 Preferred, Second Series C-1 Preferred, or Series C-2 Preferred the right to participate in the Exchange on the same terms and conditions as those contained in this Agreement, provided that (a) such exchange offer shall close no earlier than twenty (20) business days after commencement thereof (the "***Completion Date***"); and (b) each holder of First Series C-1 Preferred, Second Series C-1 Preferred, or Series C-2 Preferred that elects to participate in the Exchange shall become a party to this Agreement as a Holder. The Exchange is conditioned upon a minimum of 66 2/3% of the outstanding shares of the Second Series C-1 Preferred and the Series C-2 Preferred (together as a single class) (the "***Minimum Holders***") electing to participate. If the Minimum Holders do not participate, the Exchange will not be consummated.

1.3.     On the date that is no later than two (2) business days after the Completion Date, the closing of the Exchange (the "***Closing***") shall take place whereby each of the Holders will transfer the Exchanged Shares held by such Holder by delivery of the original stock certificates underlying such Exchanged Shares or by executing a form of stock power transferring such Exchanged Shares, and the Company shall issue to each such Holder the Adjusted Shares. Immediately following the Closing, the Exchanged Shares will be cancelled by the Company and shall not be re-issued. This Agreement shall become effective at 5:00 p.m. Pacific Daylight Time on the date on which the Closing occurs (the "***Effective Time***"). At the Effective Time, each of the undersigned Holders who previously held Exchanged Shares shall then hold Adjusted Shares, in accordance with the terms and conditions of this Agreement. If the Closing does not take place within sixty (60) days after the date of this Agreement, this Agreement, including the provisions set forth in Section 2 of this Agreement (the "***Release***"), shall automatically terminate and be of no further force and effect. At any time prior to the Effective Time, the Company may, in its discretion, rescind the offer to complete the Exchange.

1.4.     For United States federal (and applicable state and local) income tax purposes the parties intend that the transactions contemplated by this Agreement be treated as an adjustment to the purchase price paid by the Holders for the First Series C-1 Preferred, Second Series C-1 Preferred, and Series C-2 Preferred, as applicable, and that the transactions not be treated as a taxable event with respect to the Company or any Holder. Without limiting the foregoing, the parties intend that neither the Exchange nor the adjustment to the applicable Conversion Rate (as defined in the Restated Certificate) applicable to a Holder be treated as a distribution for purposes of Section 305 of the Internal Revenue Code of 1986, as amended (the "***Code***"). The Company shall file (or cause to be filed) all tax returns (including information returns, supplements or other tax filing obligations) in accordance with this Section 1.4 and shall take (or cause to be taken) no position contrary thereto or inconsistent therewith on any tax return or in the course of any audit, litigation or otherwise or make or file any statement or declaration inconsistent therewith unless otherwise required pursuant to a final determination within the meaning of Section 1313 of the Code.

1.5.     As soon as practicable following the Closing, the Company shall deliver to each Holder participating in the Exchange a certificate or book-entry security entitlement representing the Adjusted Shares being issued to such Holder upon receipt from such Holder of the certificate

representing such Holder's Exchanged Shares (or an affidavit of lost certificate acceptable to the Company) for cancellation.  The Company hereby acknowledges, covenants and agrees that in no event shall it issue any Adjusted Shares other than pursuant to this Agreement or in connection with another exchange transaction where holders of First Series C-1 Preferred, Second Series C-1 Preferred, or Series C-2 Preferred are permitted to exchange such shares for Series C-1A Preferred, Series C-1B Preferred, or Series C-2A Preferred, as applicable, subject to the provisions of Section 5 of this Agreement.

**1.6.**     At or prior to the Closing, each of the Company and the Holders shall take such actions and execute such additional documents, certificates and instruments and take such other steps as shall be required to consummate the Exchange expeditiously, and shall take such actions following the Closing as may be required in connection with the agreements and covenants contained herein.

**2.**     **Release of Claims.**

**2.1.**     Contingent upon and effective as of the Effective Time, each Holder on behalf of itself and its direct or indirect affiliates, agents, trustees, beneficiaries, directors, officers, subsidiaries, estates, successors, assigns, members and partners (collectively, "***Releasors***"), solely in their capacity as a stockholder of the Company, hereby fully, finally, and forever waives, releases, relinquishes, and discharges the Company and (a) its current and former officers and employees, and each of its and their affiliates, contractors, consultants, auditors, accountants, financial advisors, professional advisors, attorneys, investment bankers, representatives, insurers, trustees, trustors, agents, professionals, spouses, immediate family members, predecessors, successors, assigns, heirs, executors, or administrators, (b) its current and former directors, and each of their affiliates, contractors, consultants, auditors, accountants, financial advisors, professional advisors, attorneys, investment bankers, representatives, insurers, trustees, trustors, agents, professionals, spouses, immediate family members, predecessors, successors, assigns, heirs, executors, or administrators, (c) other stockholders (and any of their affiliates) who execute this Agreement, and (d) their respective successors and assigns, (individually, a "***Releasee***" and collectively, "***Releasees***") from any and all claims, demands, losses, rights, obligations, debts, liabilities, and causes of action of any nature whatsoever, whether known or unknown, suspected or unsuspected, direct or derivative, and that have been or could in the future be asserted in any forum, whether foreign or domestic, whether arising under federal, state, common, or foreign law or in equity, which Releasors now have or have ever had or may hereafter have directly or indirectly against any Releasee arising out of, based on, or relating in any way to any transaction with the Company or to their capacity as a stockholder of the Company that has occurred up until and including the date hereof, including, without limitation, any claim, demand, cause of action, obligation, debt and liability arising out of or relating to (i) the ownership of the shares purchased in the Preferred Stock Financings or in connection with the holding, acquisition, or disposition of any securities of the Company, (ii) any purchase agreement and related disclosures associated with the Preferred Stock Financings or the holding, acquisition, or disposition of any securities of the Company, including any agreement based upon or incorporating the Company's representations, warranties and disclosures as set forth in such purchase agreement, as well as any representations, omissions, acts, or facts that have been made by the Company or any of the Releasees up until and including the date hereof, (iii) any alleged violation by the Releasees of any federal, state, local or foreign regulation, rule, or statute regulating securities, including, without limitation, any alleged violation of the Securities Act of 1933, as amended, and the rules and regulations thereunder and any alleged violation of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, and any alleged claim of fraud, fraudulent inducement, negligent misrepresentation, or breach of contract, that arises out of or is related to the Preferred Stock Financings or in connection with the holding, acquisition, or disposition of any securities of the Company, (iv) any breach of fiduciary duty, (v) any actions of, or failures to take an action by, the Board and any committee of the Board in connection with the sale of any shares of the capital stock of the Company, (vi) any claim related to (A) the Company's compliance with applicable healthcare regulatory

laws (B) the Preferred Stock Financings, or (C) the holding, acquisition, or disposition of any securities of the Company, and (vii) any other claim arising out of or related in any manner to the Preferred Stock Financings or in connection with the holding, acquisition, or disposition of any securities of the Company (each a "*Holder's Released Claim*" and, collectively, the "*Holders' Released Claims*").  For the avoidance of doubt, nothing contained herein shall release any Releasee from any and all claims, demands, causes of action, obligations, debts and liabilities arising out of or relating to any actions taken by the Releasees that occur after the Effective Time.

      **2.2.**    **Release of Unknown Claims**.  Each of the Holders hereby waives the benefits of Section 1542 of the California Civil Code (and any comparable law applicable in another jurisdiction), which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Each of the Holders may hereafter discover facts in addition to or different from those which he, she or it now knows or believes to be true with respect to the subject matter of the Holders' Released Claims or the Releasees, but each Holder expressly, fully, finally and forever settles and releases any and all Holders' Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed, or coming into existence in the future, including, but not limited to, conduct which is negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts.  Each Holder acknowledges that such additional or different facts could materially affect the claims that are being released and the desirability of entering this Agreement.  Each Holder further acknowledges that this release of unknown claims was separately bargained for and was a material element of this Agreement.

      **2.3.**    **Covenant Not to Assert Claim**.  Each of the Holders hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any suit or proceeding of any kind against any Releasee, based upon any matter purported to be released hereby.

      **2.4.**    **No Liability**.  Nothing herein shall be construed as an admission of liability by any party.

      **2.5.**    **Final Release**.  Each party agrees that the releases and discharges contained in this Agreement are given for good and adequate consideration, freely and voluntarily.  Each party has had the right to consult with counsel of its choosing in connection with this Agreement and has had ample opportunity to do so.  If a party has not consulted with counsel in connection herewith, such party has knowingly and willingly elected not to do so.  Each Holder agrees that this Agreement represents a full and final release and discharge of all of the Holders' Released Claims. Each Holder represents and warrants that, other than the Holders' Released Claims, such Holder does not have actual knowledge of any claims, demands, causes of action, obligations, debts or liabilities whatsoever, whether at law or in equity, of such Holder against the Company as of the date hereof.

    **3.**    **Representations and Warranties of the Holders**. Each Holder hereby represents and warrants to the Company, severally and not jointly, that:

**3.1.     Authorization**.  The Holder has full power and authority to enter into this Agreement and when executed and delivered by the Holder, this Agreement will constitute valid and legally binding obligations of the Holder, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

**3.2.     Purchase for Own Account**.  The Holder represents that it acquired the Exchanged Shares and is acquiring the Adjusted Shares solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Adjusted Shares or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.  By executing this Agreement, the Holder further represents that the Holder does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Adjusted Shares.

**3.3.     Information and Sophistication**.  The Holder hereby: (a) acknowledges that it has received all the information it has requested that it considers necessary or appropriate for deciding whether to exchange its Exchanged Shares for the Adjusted Shares, (b) represents that it has had an opportunity to ask questions and receive answers regarding the terms and conditions of the Exchange and to obtain any additional information necessary to verify the accuracy of the information given to such Holder and (c) further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this transaction and its investment in the Adjusted Shares.

**3.4.     Non-Reliance**.  The Holder (a) disclaims the existence of and reliance upon any representation or warranty, express or implied, by the Company and/or the Company's Related Parties (as defined below), except as expressly set forth herein, regarding any aspect of this Agreement, the Exchange, the operation or financial condition of the Company, the viability or approvability of its technologies, the commercialization of its technologies, the value of the Company's stock or any other matter relevant to such Holder's determination to enter into this Agreement and to participate in the Exchange, (b) represents that it is not relying upon the Company or any of the Company's Related Parties, or any representation or warranty (or the completeness or accuracy thereof) of the Company or its Related Parties except as set forth herein, in making its decision to exchange shares pursuant to this Agreement, and (c) acknowledges that the Company is relying upon the truth of the representations and warranties in this Section 3.4 in connection with this Agreement.  For purposes of this Agreement, "*Related Parties*" shall mean current and former directors, officers, partners, employees, attorneys, agents, successors, assigns, current and former stockholders (including current and former limited partners, general partners and management companies), owners, representatives, predecessors, parents, affiliates, associates and subsidiaries.

**3.5.     Ability to Bear Economic Risk**.  The Holder acknowledges that investment in the Adjusted Shares involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Adjusted Shares for an indefinite period of time and to suffer a complete loss of its investment.

**3.6.     Further Limitations on Disposition**.  Without in any way limiting or affecting the representations set forth above or any other agreements that exist between the Company and any

Holder, the Holder further agrees not to make any disposition of all or any portion of the Adjusted Shares unless and until:

        (a)    there is then in effect a registration statement under the U.S. Securities Act of 1933, as amended (the "*Act*"), covering such proposed disposition and such disposition is made in accordance with such registration statement; or

        (b)    the Holder shall have notified the Company of the proposed disposition and, if reasonably requested by the Company, such Holder shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144, except in unusual circumstances.

Notwithstanding the provisions of subsections (a) and (b) above, and without limiting or affecting any agreements that exist between the Company and any Holder, no such registration statement or opinion of counsel shall be necessary for a transfer by such Holder to a partner (or retired partner) or member (or retired member) of such Holder in accordance with partnership or limited liability company interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were a Holder hereunder.

        **3.7.**    **Accredited Investor Status.**  Holder is an "accredited investor" as such term is defined in Rule 501 under the Act.

        **3.8.**    **Restricted Securities.**  The Holder understands that the Adjusted Shares have not been, and will not be, registered under the Act, by reason of a specific exemption from the registration provisions of the Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Holder's representations as expressed herein. The Holder understands that the Adjusted Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Holder must hold the Adjusted Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Holder acknowledges that the Company has no obligation to register or qualify the Adjusted Shares for resale except as set forth in that certain Amended and Restated Investors' Rights Agreement, dated as of an even date herewith. The Holder further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Adjusted Shares, and on requirements relating to the Company which are outside of the Holder's control, and which the Company is under no obligation and may not be able to satisfy.

        **3.9.**    **No Public Market.**  The Holder understands that no public market now exists for any of the securities issued by the Company, and that the Company has made no assurances that a public market will ever exist for the Adjusted Shares.

        **3.10.**    **Legends.**  The Holder understands that the Adjusted Shares, and any securities issued in respect thereof or exchange therefor, may bear one or all of the legends substantially in the form set forth below:

        (a) "THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR

INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(b) Any legend required by the securities laws of any state to the extent such laws are applicable to the shares represented by the certificate so legended.

**3.11.   Ownership.**  The Holder owns (of record and beneficially) the Exchanged Shares free and clear of any restrictions on transfer, mortgage, charge, pledge, lien option restriction, right of first refusal, right of pre-emption or third party right or interest other than pursuant to an agreement to which the Company is a party.  No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any foreign, state or local government authority or other party on the part of such Holder is required in connection with the consummation of the transactions contemplated by this Agreement.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will cause such Holder to be in violation or breach of, or default under, any term or provision of any mortgage, indebtedness, indenture, contract, agreement, instrument, judgment or decree to which it is a party or by which it is bound.

**3.12.   Tax Advisors**.  The Holder has reviewed with its own tax advisors the U.S. federal, state, local and foreign tax consequences of this transaction and the transactions contemplated Exchange.  With respect to such matters, such Holder relies solely on such advisors and not on any statements or representations of the Company or any of its agents, written or oral.  The Holder understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this Agreement or the transactions contemplated hereby.

**4.       Representations and Warranties of the Company.**  The Company hereby represents and warrants to the Holders as follows:

**4.1.   Authorization.**  All corporate action on the part of the Company and its directors, officers and stockholders necessary for the authorization, execution and delivery of this Agreement by the Company, the authorization, issuance and delivery of the Series C-1A Preferred, Series C-1B Preferred and Series C-2A Preferred, and the performance of all of the Company's obligations under this Agreement has been taken or will be taken prior to the Closing. The Agreement, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with their terms, except (i) as limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors, and (ii) as limited by rules of law governing specific performance, injunctive relief or other equitable remedies and by general principles of equity.

**4.2. Capitalization.**

(a)       Immediately prior to the Closing, the authorized capital stock of the Company will consist of (1) 1,010,012,813 shares of Common Stock, (i) 759,354,758 of which are designated Class A Common Stock (the "**Class A Common**"), 51,761,205 of which are issued and outstanding, and (ii) 250,658,055 of which of which are designated Class B Common Stock, 250,658,055 of which are issued and outstanding; and (2) 308,068,771 shares of Preferred Stock, (i) 46,320,045 of which of which are designated Series A Preferred Stock, 46,320,045 of which are issued and outstanding, (ii) 53,494,262 of which are designated Series B Preferred Stock, 53,494,262 of which are issued and

outstanding, (iii) 58,810,045 of which are designated Series C Preferred Stock, 58,810,045 of which are issued and outstanding; (iv) 23,008,367 of which are designated Series C-1 Preferred Stock, 23,008,367 of which are issued and outstanding; (v) 18,508,335 of which are designated Series C-1A Preferred Stock, none of which are issued and outstanding; (vi) 4,500,032 of which are designated Series C-1B Preferred Stock, none of which are issued and outstanding; (vii) 32,975,872 of which are designated Series C-2 Preferred Stock, 32,975,872 of which are issued and outstanding; (viii) 32,975,872 of which are designated Series C-2A Preferred Stock, none of which are issued and outstanding; (ix) 4,500,032 of which are designated Series C-1B\* Preferred Stock, none of which are issued and outstanding; (x) 32,975,872 of which are designated Series C-2A\* Preferred Stock, none of which are issued and outstanding; and (xi) 37 of which are designated Series D-2A Preferred Stock, 37 of which are issued and outstanding.  The Common Stock and the Preferred Stock shall have the rights, preferences, privileges and restrictions set forth in the Restated Certificate.

(b)     The outstanding shares have been duly authorized and validly issued in compliance with applicable laws, and are fully paid and nonassessable.

(c)     The Company has reserved:

(i)     the Adjusted Shares for issuance pursuant to the Exchange;

(ii)     shares of Class A Common Stock (as may be adjusted in accordance with the provisions of the Restated Certificate) for issuance upon conversion of the Adjusted Shares (the "**Conversion Shares**");

(iii)     up to an aggregate of 43,681,485 shares proposed to be issued pursuant to one or more equity grants, 39,070,955 of which are to be issued Elizabeth Holmes (the shares to be issued to Elizabeth Holmes, the "**Proposed Equity**"); and

(iv)     104,209,647 shares of Class A Common authorized for issuance to employees, consultants and directors pursuant to its 2004 Stock Plan and 2013 Stock Plan, under which options to purchase an aggregate of 2,620,384 shares of Class A Common are issued and outstanding as of the date of this Agreement and restricted stock units amounting to 2,542,995 shares of Class A Common have been granted as of the date of this Agreement.

(d)     The Adjusted Shares, when issued and delivered and paid for in compliance with the provisions of the will be validly issued, fully paid and nonassessable. The Conversion Shares have been duly and validly reserved and, when issued in compliance with the provisions of this Agreement, the Restated Certificate and applicable law, will be validly issued, fully paid and nonassessable.

**4.3.     Governmental Consent.**  No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer or issuance of the Adjusted Shares and the Conversion Shares, or the consummation of any other transaction contemplated by this Agreement, except (i) filing of the Restated Certificate with the office of the Secretary of State of the State of Delaware, (ii) the filing of such notices as may be required under the Securities Act of 1933, as amended (the "**Securities Act**") and (iii) such filings as may be required under applicable state securities laws.

5.      **Most Favored Terms.** In the event that the Company, within the four (4) years following the Closing, enters into an equity transaction involving the issuance of equity securities by the Company with holders of First Series C-1 Preferred, Second Series C-1 Preferred, or Series C-2 Preferred, as applicable, who are not parties to this Agreement ("***Nonparticipating Holders***") that provides such Nonparticipating Holders with a more favorable conversion rate adjustment, a more favorable adjusted First Series C-1 Preferred, Second Series C-1 Preferred, or Series C-2 Preferred liquidation preference, as applicable, or otherwise reduces the effective investment price of the First Series C-1 Preferred, Second Series C-1 Preferred, or Series C-2 Preferred, as applicable, held by such Nonparticipating Holders as compared to that provided in the Exchange, then the Company shall allow the Holder to participate in such equity transaction on the same terms.

6.      **Relinquishment of Equity.** Elizabeth Holmes hereby agrees that she shall, at her election, waive any right to receive the Proposed Equity and/or contribute to the Company shares of Company capital stock owned by her, in an amount equal, in the aggregate and on an as-converted to Class A Common basis, to the sum of (i) the number of additional shares of Class A Common issuable upon conversion of the Series C-2A Preferred actually issued pursuant to the Exchange as a result of the reduction of the conversion price to $5.00 from $17.00 for the Series C-2 Preferred exchanged and (ii) the number of additional shares of Class A Common issuable upon conversion of the Series C-1B Preferred actually issued pursuant to the Exchange as a result of the reduction of the conversion price to $5.00 from $15.00 for the Second Series C-1 Preferred exchanged (the "***Founder Waiver***"). Such waiver and/or contribution will occur upon the earlier of (x) September 30, 2017, (y) promptly following receipt by the Company of a 409A valuation for the Company's common stock and determination by the Board of the fair market value of the Company's common stock, and (z) or a Change of Control of the Company. For purposes of this Section 6, a "***Change of Control***" means (i) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the shares of capital stock of the Company immediately prior to such consolidation, merger or reorganization, continue to represent a majority of the voting power of the surviving, resulting or acquiring entity immediately after such consolidation, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party in which in excess of 50% of the Company's voting power is transferred; or (iii) the sale or transfer of all or substantially all of the Company's assets, or the exclusive license of all or substantially all of the Company's material intellectual property; *provided* that a Change of Control shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor, indebtedness of the Company is cancelled or converted, or a combination thereof. Ms. Holmes has elected to provide the Founder Waiver so that the additional shares issuable upon conversion of the new Series C-1B Preferred and Series C-2A Preferred of the Company do not result in dilution of the interest in the Company held by employees, investors and other stockholders.

7.      **Confidentiality**. The parties agree that this Agreement and the transactions contemplated hereby (including the Exchange) shall constitute material nonpublic information of the Company and confidential information pursuant to Section 3.2 of that certain Amended and Restated Investors' Rights Agreement dated as of even date herewith, by and among the Company and the other parties thereto, and shall be subject to the confidentiality obligations set forth therein.

8.      **Governing Law.**

8.1.      **Choice of Law.** This Agreement and any claim, cause of action, dispute, suit or other proceeding among the parties arising out of or related in any manner to the Agreement shall be

governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

**8.2.    Exclusive Forum. EACH PARTY HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE COURT OF CHANCERY OF THE STATE OF DELAWARE FOR THE PURPOSE OF ANY CLAIM, CAUSE OF ACTION, DISPUTE, SUIT OR OTHER PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

**8.3.    Judgment Enforceability. EACH PARTY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE WILL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION (INCLUDING, WITHOUT LIMITATION, THE APPROPRIATE COURTS OF THE JURISDICTION IN WHICH IT IS RESIDENT OR IN WHICH ANY OF ITS PROPERTY OR OFFICES IS LOCATED) BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH PARTY HEREBY CONSENTS TO PERSONAL JURISDICTION AND VENUE BY SUCH COURT OVER SUCH PARTY AND WAIVES ANY DEFENSE OF INCONVENIENT FORUM WITH RESPECT THERETO.**

**9.    Revocation.** Once the Holder executes and submits the Agreement to the Company, it hereby covenants not to revoke its participation in the Exchange.

**10.    Successors and Assigns.** This Agreement will be binding upon each Holder and its successors and assigns (if any).

**11.    Severability.** In the event that any provision of this Agreement, or the application of any such provision to any person or set of circumstances, will be determined to be invalid, unlawful, void or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, will not be impaired or otherwise affected and will continue to be valid and enforceable to the fullest extent permitted by law.

**12.    Entire Agreement.** This Agreement, including the Release, constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) which relate to the subject matter hereof. No party will be liable for or bound to any other in any manner by any oral or written representations, warranties, covenants and agreements except as specifically set forth in this Agreement.

**13.    Amendments.** This Agreement may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of the Company and the holders of a majority of the shares of First Series C-1 Preferred, Second Series C-1 Preferred, and Series C-2 Preferred together as a single class held (or after the execution hereof, previously held) by the Holders; *provided*, *however*, that Section 6 of this Agreement may not be amended or waived without the written consent of Elizabeth Holmes. Notwithstanding the foregoing, the Company may amend this Agreement without consent to add additional holders of Series C-1 Preferred and Series C-2 Preferred hereunder. Notwithstanding anything to the contrary contained herein, at any time prior to the Effective Time, the Company may, in its discretion, rescind its offer to complete the Exchange and this Agreement will not become effective.

14.    **Expenses.**  Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of the Agreement; provided, however, that the Company shall, at the Closing, reimburse the reasonable fees of and expenses of one special counsel to the Holders up to a previously agreed limit and shall reimburse the reasonable fees and expenses of special counsel to Elizabeth Holmes.

15.    **Waiver of Conflicts**.  Each Holder acknowledges that: (a) it has read this Agreement; (b) it has been represented in the preparation, negotiation and execution of this Agreement by legal counsel of its own choice or has voluntarily declined to seek such counsel; and (c) it understands the terms and consequences of this Agreement and is fully aware of the legal and binding effect of this Agreement. Each Holder understands that Elizabeth Holmes has been represented by Cooley LLP in the preparation, negotiation and execution of this Agreement and that Madrone Partners, L.P. and Soda Springs Partners, LLC have also been represented by Cooley LLP in the preparation, negotiation and execution of this Agreement.  Each Holder also understands that Cooley LLP has represented, currently represents, or may in the future represent one or more Holders or their affiliates in matters unrelated to the transactions contemplated by this Agreement, although such matters may be of a nature similar to those contemplated by this Agreement.  Each Holder understands that with respect to this Agreement, Cooley LLP has represented only Ms. Holmes, on the one hand, and Madrone Partners, L.P. and Soda Springs Partners, LLC, on the other hand, and not any other Holder or party to this Agreement.  The Company and each Holder hereby acknowledge that they have had an opportunity to ask for and have obtained information relevant to such representations, including disclosure of the reasonably foreseeable adverse consequences of such representations, and hereby waives any conflict arising out of such representations with respect to the matters contemplated by this Agreement.

16.    **Counterparts.**  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[*Signature Page Follows*]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**COMPANY:**

**THERANOS, INC.**

By: _____

Name:  Elizabeth Holmes _____

Title:   Chief Executive Officer _____

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**ELIZABETH HOLMES**

By: _____

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _____

By: _____
Name: _____
Title: _____

Address: _____
_____
_____

**HOLDER (IF AN INDIVIDUAL):**

By: _Alan Eiseman_ (signature)
Name: _Alan Eiseman_

Address: ███████████████████
███████████████████
███████████████████

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _____

By: _____
Name: _____
Title: _____

Address: _____
_____
_____

**HOLDER (IF AN INDIVIDUAL):**

By: _____
Name: Andreas C. Dracopoulos

Address: ███████████████████████
███
███

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: Bendel Fund

By: _____

Name: Christian Bolleter

Title: Asset Manager

Address: LGT Fondsleitung AG

Herrengasse 12

FL-9490 Vaduz

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____

_____

_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _Black Diamond Ventures XII-B, LLC_

By: _[signature]_

Name: _Christopher B. Lucas_

Title: _Managing Director_

Address: _400 N. Brand Blvd. Suite 950_

_Glendale, CA 91203_

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____

_____

_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _BlueCross BlueShield Venture Partner L.P._

By: _____

Name: _John Barto_

Title: _Managing Director_

Address: _225 North Michigan Avenue_
_Chicago, Illinois 60601- 7680_

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____
_____
_____

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

HOLDER (IF AN ENTITY):

Entity Name: _Boies, Schiller & Flexner LLP_

By: _Amy Habie_

Name: _Amy Habie_

Title: _CFO_

Address: _2200 Corporate Blvd, NW_
_Suite 400_
_Boca Raton, FL 33431_

HOLDER (IF AN INDIVIDUAL):

By: _____

Name: _____

Address: _____
_____
_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: Central Valley Administrators, Inc.

By: _Anne Wymer (signature)_

Name: Anne Wymer

Title: Authorized Signatory

Address: 3115 Ocean Front Walk, Suite 301

Marina del Rey, CA 90292

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____

_____

_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

HOLDER (IF AN ENTITY):

Entity Name: _____

By: _____
Name: _____
Title: _____

Address: _____
_____
_____

HOLDER (IF AN INDIVIDUAL):

By: _____
Name: _____

Address: _____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

DocuSign Envelope ID: 5AA98E91-5135-4A50-9485-D741E866723C

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: Cox Investment Holdings, Inc.

By:

Name: Dallas Clement

Title: Authorized Signatory

Address: 6250 Peachtree Dunwoody Road
Atlanta, GA 30328

**HOLDER (IF AN INDIVIDUAL):**

By:

Name:

Address:

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: Crofton Capital

By: Frank E Gordon

Name: Frank E Gordon

Title: Managing Partner

Address: 3102 West End Avenue
Suite 650
Nashville, TN 37203

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____
_____
_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _____

By: _____
Name: _____
Title: _____

Address: _____
_____
_____

**HOLDER (IF AN INDIVIDUAL):**

By: *David Boies* _____
Name: David Boies _____

Address: ███████████████████████
███████████████████████
███████████████████████

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _____

By: _____
Name: _____
Title: _____

Address: _____
_____
_____

**HOLDER (IF AN INDIVIDUAL):**

By: _____
Name: DANIEL CARTER

Address: ████████████████████

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _DYNASTY FINANCIAL II, LLC_
_By RDV CORPORATION, ITS MANAGER_

By: _[signature]_

Name: _JERRY L. TUBERGEN_

Title: _CEO_

Address: _126 Ottawa Ave NW_
_Grand Rapids MI 49503_


**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____
_____
_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: EQSon INVESTMENTS M Ltd

By: ~~signature~~

Name: Mr MJ Thomas

Title: Director

Address: Tyndall House
77-79 Buries Road
Douglas, Isle of Man

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: ~~BOSon~~ INVESTMENTS N Ltd

By: _____

Name: Mr MJ Thomas

Title: Director

Address: Tyndall House
77-79 Burles Road
Douglas, Isle of Man

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____
_____
_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _____

By: _____
Name: _____
Title: _____

Address: _____
_____
_____

**HOLDER (IF AN INDIVIDUAL):**

By: _George P. Shultz_____
Name: _Geoge P. Shultz_____

Address: ███████████████████

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: GORDON FAMILY TRUST

By:
Name: TARPLEY B. JONES
Title: TRUSTEE

Address:

**HOLDER (IF AN INDIVIDUAL):**

By:
Name:

Address:

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: Henry A. Kissinger 2014 Grandchildren's Trust

By: _____ trustee

Name: Daniel L. Mosley

Title: Trustee

Address: c/o Daniel L. Mosley
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, NY 10019

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____
_____
_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _Inversora Anco, SA. de C.V._

By: _[signature]_

Name: _Victor Manuel Gautierez López_

Title: _Attorney in Fact._

Address: _____

_____

_____

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____

_____

_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

DocuSign Envelope ID: 0C0BEBC4-CE5E-4AC7-855E-18583DD14488

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _____

By: _____
Name: _____
Title: _____

Address: _____
_____
_____

**HOLDER (IF AN INDIVIDUAL):**

By: _Kendra Fadil_____
Name: Kendra Fadil

Address: _____
_____
_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

HOLDER (IF AN ENTITY):

Entity Name: _LUCAS VENTURE GROUP IV, LP BY_
_LVG GP IV, LLC ITS MANAGING MEMBER_
By: _Donald A. Lucas_
Name: _DONALD A. LUCAS_
Title: _MANAGING MEMBER_

Address: _545 MIDDLEFIELD RD STE 220_
_MENLO PARK, CA 94025_

HOLDER (IF AN INDIVIDUAL):

By: _____
Name: _____

Address: _____
_____
_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

HOLDER (IF AN ENTITY):

Entity Name: LUCAS VENTURE GROUP XI, LLC BY
LVGGP IV, LLC ITS MANAGING MEMBER
By: Don L A (ucy
Name: DONALD A. LUCAS
Title: MANAGING MEMBER

Address: 545 MIDDLEFIELD RD. STG 220
MENLO PARK  CA 94025

HOLDER (IF AN INDIVIDUAL):

By:
Name:

Address

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _Madrone Partners L.P._

By: _[signature]_

Name: _Thomas A. Patterson_

Title: _Managing Member_

Address: _____

_____

_____

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____

_____

_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _Mendenhall TF Partner_

By: _[signature]_

Name: _Patrick M. Mendenhall_

Title: _General Partner_

Address: _27 W. Tellace_

_Houston TX   77007_

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____

_____

_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _Mosley Family Holdings LLC_

By: _[signature]_

Name: _Daniel L. Mosley_

Title: _Manager_

Address: _C/o Cravath, Swaine & Moore LLP_
_825 Eighth Avenue_
_New York, NY 10019_

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____

_____

_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _Peer Ventures Group III L.P._

By: _[signature]_

Name: _James Hutchinson_

Title: _Managing Director_

Address: _3000 Sand Hill Rd. 3-125_

_Menlo Park, CA 94025_

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____

_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: *Peer Ventures Group IV. LP.*

By: _____

Name: *James Hutchous*

Title: *Managing Director*

Address: *3000 Sand Hill Rd. 3-125*

_____

_____

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____

_____

_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _____

By: _____
Name: _____
Title: _____

Address: _____
_____
_____

**HOLDER (IF AN INDIVIDUAL):**

By: _Vincent_____
Name: _Richard  M. Fovnavich_____

Address: ███████████████████████████████
███████████████████████████████

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _____

By: _____
Name: _____
Title: _____

Address: _____
_____
_____

**HOLDER (IF AN INDIVIDUAL):**

By: _Riley P. Bechtel_
Name: RILEY P. BECHTEL

Address: ████████████████
████████████████
████████████████

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name:  Robert K. Kraft LLC

By:

Name:  Robert K. Kraft

Title:  Sole Director of its Manager

Address:  C/O The Kraft Group, One Patriot Place
Foxborough, MA  02035

**HOLDER (IF AN INDIVIDUAL):**

By:

Name:

Address:

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _____

By: _____
Name: _____
Title: _____

Address: _____

_____

_____

**HOLDER (IF AN INDIVIDUAL):**

By: X _Shhn D Evans_ _____
Name: _Sherrie Eisenman_ _____

Address: ███████████████████████

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: SANDBOX CO-INVESTMENT FUND I, LLC

By:

Name: Matthew Downs

Title: Managing Director

Address: 1000 West Fulton Market, Suite 213
Chicago, IL 60607

**HOLDER (IF AN INDIVIDUAL):**

By:

Name:

Address:

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name:  Soda Springs Partners, LLC

By:  _[signature]_

Name:  Richard D. Chapman

Title:  Vice President

Address:  110 NW 2nd Street, Suite 300

Bentonville, AR 72712

**HOLDER (IF AN INDIVIDUAL):**

By:  _____

Name:  _____

Address:  _____

_____

_____

The parties have caused this Exchange and Release Agreement to be executed and delivered as of the date first above written.

**HOLDER (IF AN ENTITY):**

Entity Name: _TETON CAPITAL_

By: _[signature]_

Name: _LARRY GENDER_

Title: _GEN. PTNR_

Address: _3000 SAND HILL Rd_
_Bldg 3-125_
_Menlo PARK, Ca. 94025_

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _____

Address: _____
_____
_____

[SIGNATURE PAGE TO THERANOS, INC. EXCHANGE AND RELEASE AGREEMENT]

# EXHIBIT C

# To

# Declaration of Jeffrey B. Coopersmith

| | |
|---|---|
| **From:** | Bob Gordon |
| **To:** | Heather King (hking@theranos.com) |
| **Sent:** | 7/9/2016 12:10:30 AM |
| **Subject:** | Theranos - Termination Agreement |
| **Attachments:** | Theranos SWY Termination Agmt - Executed 7-8-16.pdf |

Executed version attached.

HIGHLY CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED BY SAFEWAY, INC.



EXHIBIT

124

SF-4030

SWYSEC_000002684

CONFIDENTIAL

SBCOLMAN008860

## AGREEMENT TERMINATING MASTER PURCHASE AGREEMENT
## AND RELEASING CLAIMS

This Agreement Terminating the Master Purchase Agreement and Releasing Claims ("Agreement") is entered into effective as of July 8, 2016 by and between Safeway Inc., a Delaware corporation ("Safeway"), and Theranos, Inc., a Delaware corporation ("Theranos"). Safeway and Theranos are referred to collectively in this Agreement as the "Parties" and each individually as a "Party."

WHEREAS, Safeway and Theranos are parties to that certain Theranos Master Purchase Agreement dated as of September 20, 2010 (the "MPA");

WHEREAS, each Party has undertaken efforts to perform services under the MPA;

WHEREAS, the Parties have disputes about the obligations of the MPA, the ability to perform under the MPA, and the adequacy of such performance;

WHEREAS, the Parties seek to avoid litigation with respect to the performance of their respective obligations under the MPA;

WHEREAS, to resolve any potential legal dispute between the Parties, Safeway and Theranos desire to terminate the MPA, the Option Agreement, dated July 30, 2010, issued in connection therewith, and the Initial Note and Additional Note (the "Notes") issued in connection therewith (the MPA, the Option Agreement and the Notes, collectively, the "Subject Agreements"), to provide for the specified payment, and to release all claims the Parties may have against each other in connection with the Subject Agreements, together with all other claims known and unknown.

NOW, THEREFORE, the Parties agree as follows:

1.   Termination of MPA.  Effective as of July 8, 2016 (the "Effective Date"), the Subject Agreements shall be terminated in their entirety and shall be of no further force or effect, notwithstanding any provision in the Subject Agreements to the contrary, including Section 26.e. of Schedule B to the MPA.  Safeway and Theranos acknowledge and agree that upon such termination, (i) the Notes shall be deemed fully paid and discharged for all purposes and all obligations of Theranos under the Notes shall be deemed satisfied in full for all purposes and (ii) all obligations of Theranos with respect to inventory payments under the MPA, including the repayment thereof, shall be deemed satisfied in full for all purposes.

2.   Payment by Theranos.  Within 10 calendar days of the Effective Date, Theranos shall pay to Safeway, in immediately available funds, the aggregate amount of 15 million five hundred thousand dollars ($15,500,000.00).  Such funds shall be paid by wire transfer, to the following account:

1

HIGHLY CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED BY SAFEWAY, INC.

SWYSEC_000002685

CONFIDENTIAL

SBCOLMAN008861

Bank of America
ABA# 0260-09593
Credit: Safeway Inc.
Acct.#: 12333-03048

Notwithstanding any other provision herein to the contrary, the Parties agree that any failure by Theranos to timely complete this required payment will be a material breach of this Agreement. The Parties agree that in the event of such material breach, Safeway shall have the option, in its sole discretion, to enforce this Agreement and take legal action to recover the payment, which is a material term of this Agreement, or to rescind this Agreement rendering the Agreement void *ab initio*.

    3.    Release by Theranos.  In consideration of the terms set forth in this Agreement, Theranos and its respective past, present and future parents, subsidiaries, affiliates, stockholders, officers, directors, partners, agents, servants, employees, representatives, family members, attorneys, heirs, executors, conservators, assigns, insurers, trustees, receivers, administrators, predecessors-in-interest, successors-in-interest, and any person claiming, purporting to claim, who can claim or who could have claimed, by, through or under, whether directly or indirectly (the "Theranos Releasors"), hereby irrevocably, unconditionally and fully release and forever discharge to the maximum extent possible, as of the Effective Date, Safeway and its respective past, present and future parents, subsidiaries, stockholders, officers, directors, partners, principals, agents, servants, employees, attorneys, conservators, insurers, trustees, predecessors-in-interest and successors-in-interest (the "Safeway Releasees") from any and all Claims.  For the avoidance of doubt, the Claims released here include but are not limited to any claims relating in any way to the Subject Agreements, the relationship of the Parties under the Subject Agreements, any status, term or condition of the Subject Agreements or the termination of the Subject Agreements, or any inventory payment, promissory or convertible note, debt, equity or other obligation or interest.  This release extends to and includes, but is not limited to, any Claims by the releasing Party, however denominated, for:  breach of any express or implied written or oral contract, including, without limitation, the Subject Agreements; impairment of economic activities or opportunities; defamation; breach of any express or implied covenant of good faith and fair dealing; and any and all other common law or statutory contract and/or tort claims.  "Claims" means, individually or collectively, as applicable, any and all actions, causes of action, counterclaims, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, rights, claims, demands, liabilities, setoffs, recoupments, losses, and rights to reimbursement, subrogation, contribution, indemnification or other payment, costs or expenses (including attorneys' fees), in each case whether arising under contract, in law or in equity or by operation of law, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, and whether representing a past, present or future obligation, in each case that are connected with, arise out of, relate to or are otherwise based as a whole or in part on any acts, omissions, facts, matters, transactions or occurrences prior to the Effective Date, directly or indirectly, relating to any or all of (i) the Subject Agreements, any ancillary document entered into in connection therewith, any of the transactions contemplated by any of the foregoing, and any actions, inactions or omissions by any person thereunder and (ii) any aspect of any of the dealings or relationships between or among any of

2

HIGHLY CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED BY SAFEWAY, INC.

SWYSEC_000002686

CONFIDENTIAL

SBCOLMAN008862

the Safeway Releasees, on the one hand, and any or all of the Theranos Releasees, on the other hand, prior to the Effective Date. Notwithstanding anything contained herein to the contrary, nothing in this definition of "Claims" shall be construed to include any claims or rights to which the Parties are entitled in connection with a breach of any provision, representation, warranty, covenant or agreement contained in this Agreement, or in any concurrently executed or future agreement between the Parties.

The Theranos Releasors acknowledge and understand that hereafter they may discover or appreciate claims, facts, issues or concerns in addition to or different from those that they now know or believe to exist with respect to the subject matter of this Agreement that, if known or suspected at the time of execution of this Agreement, might have materially affected the termination embodied herein. The Theranos Releasors nevertheless agree that the release and waiver described above applies to any such additional or different claims, facts, issues or concerns.

**Theranos acknowledges that it is familiar with the provisions of California Civil Code section 1542 ("A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his settlement with the debtor") and specifically waives all rights and releases such claims as referenced therein and in any similar statute or law.**

Theranos agrees never to institute a claim of any kind against any Safeway Releasee for any claim, demand, action and/or cause of action released herein. If any Theranos Releasor violates this Agreement by instituting any such claim, then such Theranos Releasor agrees to pay all costs and expenses of defending against the claim incurred by the Safeway Releasee, including reasonable attorney fees, and all further costs and fees, incurred in connection with the defense of the claim.

4. <u>Release by Safeway.</u> In consideration of the terms set forth in this Agreement, Safeway and its respective past, present and future parents, subsidiaries, affiliates, stockholders, officers, directors, partners, agents, servants, employees, representatives, family members, attorneys, heirs, executors, conservators, assigns, insurers, trustees, receivers, administrators, predecessors-in-interest, successors-in-interest, and any person claiming, purporting to claim, who can claim or who could have claimed, by, through or under, whether directly or indirectly (the "Safeway Releasors"), hereby irrevocably, unconditionally and fully release and forever discharge to the maximum extent possible, as of the Effective Date, Theranos and its respective past, present and future parents, subsidiaries, stockholders, officers, directors, partners, principals, agents, servants, employees, attorneys, conservators, insurers, trustees, predecessors-in-interest and successors-in-interest (the "Theranos Releasees") from any and all Claims. For the avoidance of doubt, the Claims released here include but are not limited to any claims relating in any way to the Subject Agreements, the relationship of the Parties under the Subject Agreements, any status, term or condition of the Subject Agreements or the termination of the Subject Agreements, or any inventory payment, promissory or convertible note, debt, equity or other obligation or interest. This release extends to and includes, but is not limited to, any Claims by the releasing Party, however denominated, for:  breach of any express or implied

3

HIGHLY CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED BY SAFEWAY, INC.

SWYSEC_000002687

CONFIDENTIAL

SBCOLMAN008863

written or oral contract, including, without limitation, the Subject Agreements; impairment of economic activities or opportunities; defamation; breach of any express or implied covenant of good faith and fair dealing; and any and all other common law or statutory contract and/or tort claims.

The Safeway Releasors acknowledge and understand that hereafter they may discover or appreciate claims, facts, issues or concerns in addition to or different from those that they now know or believe to exist with respect to the subject matter of this Agreement that, if known or suspected at the time of execution of this Agreement, might have materially affected the termination embodied herein. The Safeway Releasors nevertheless agree that the release and waiver described above applies to any such additional or different claims, facts, issues or concerns.

**Safeway acknowledges that it is familiar with the provisions of California Civil Code section 1542 ("A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his settlement with the debtor") and specifically waives all rights and releases such claims as referenced therein and in any similar statute or law.**

Safeway agrees never to institute a claim of any kind against any Theranos Releasee for any claim, demand, action and/or cause of action released herein. If any Safeway Releasor violates this Agreement by instituting any such claim, then such Safeway Releasor agrees to pay all costs and expenses of defending against the claim incurred by the Theranos Releasee, including reasonable attorney fees, and all further costs and fees, incurred in connection with the defense of the claim.

5.     Covenant Not To Sue. Each Party covenants and agrees never to commence, aid in any way, prosecute or cause or permit to be commenced or prosecuted against the other Party any action or other proceeding based upon any claim which is covered by this Agreement and the foregoing release, excluding, however, either Party's right to enforce this Agreement.

6.     No Reliance, No Duty to Disclose, No Admission.

(a)     No Reliance and No Duty to Disclose. Each of the Parties hereto, on behalf of itself and its respective Theranos Releasors and Safeway Releasors, in any capacity, agrees and acknowledges that (a) except as expressly provided in this Agreement, no other Party hereto or any other Releasee, in any capacity, has warranted or otherwise made any representations to it or any of its Releasors or Releasees concerning any Claim released in this Agreement (including any representation concerning the existence, nonexistence, validity or invalidity of any Claim released in this Agreement) and no Releasor has relied on any Releasee in providing the releases and covenants not to sue in this Agreement, (b) the validity and effectiveness of the foregoing releases and covenants not to sue in this Agreement do not depend in any way on any such representations or warranties or the accuracy, completeness or validity thereof, (c) no other Party hereto or any other Releasee, in any capacity, has any duty to disclose or provide any facts or documents (whether material or immaterial, known or unknown,

4

HIGHLY CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED BY SAFEWAY, INC.

SWYSEC_000002688

CONFIDENTIAL

SBCOLMAN008864

suspected or unsuspected) to it or any other Releasor, including any facts or documents which, if known by any Releasor, might have caused such Releasor or any Party to which such Releasor is affiliated not to execute and deliver this Agreement, and (d) each such release and covenant not to sue shall remain in full force and effect even if any facts or documents (whether material or immaterial, known or unknown, suspected or unsuspected) were not disclosed or provided (whether intentionally, unintentionally or otherwise) by any Release to any Releasor, which facts or documents, if known by such Releasor, might have caused such Releasor or any Party to which such Releasor is affiliated not to execute and deliver this Agreement. Nothing contained herein is intended to impair or otherwise derogate from any of the representations, warranties or covenants expressly set forth in this Agreement. "Releasees" means the Safeway Releasees and the Theranos Releasees. "Releasors" means the Safeway Releasors and the Theranos Releasors.

(b)     No Admission.  Nothing in this Agreement shall be construed as an admission by any Releasor or Releasee of the existence of any Claim released in this Agreement or of any liability with respect to any or all of such Claim released in this Agreement or any other past or future act, omission, fact, matter, transaction or occurrence.

7.     Sole Right To Claims.  Each Party represents and warrants that no other person or party had or has any interest in the claims referred to in this Agreement; that it has the sole right and exclusive authority to execute this Agreement; and that it has not sold, assigned, transferred, conveyed or otherwise disposed of any claim or demand relating to any matter covered by this Agreement.

8.     Confidentiality.

(a)     The Parties agree to keep the terms of this Agreement confidential and agree not to disclose the terms of this Agreement (1) except as necessary to enforce its terms; and (2) except that the Parties may disclose in confidence to their respective attorneys, officers, agents, insurers, tax advisors and tax return preparers, who need to know them and have agreed, either as a condition to employment or in order to obtain such terms and conditions, or have a professional duty, to be bound by terms and conditions substantially similar to those of this Agreement, the terms of this Agreement and any amounts paid and/or received hereunder; and (3) except as otherwise required by law, rule or regulation, or as required by a court or in response to a lawful request by a governmental authority, or is otherwise necessary to establish rights or enforce obligations under this Agreement, but, in each case, only to the extent that any such disclosure is necessary. Notwithstanding the foregoing, no Party shall disclose or use any Confidential Information of the other Party for any purpose without the other Party's prior written consent, including Confidential Information acquired prior to the Effective Date. All Confidential Information shall remain the property of the Party that disclosed such Confidential Information (or its licensors, as applicable), including any right to make, use or sell any product embodying any Confidential Information. "Confidential Information" means the Subject Agreements, all documents, instruments and agreements related thereto, and all information disclosed by either Party in connection with the Subject Agreements, either prior, on or after the date hereof. "Confidential Information" does not include information which: (i) prior to disclosure by the Party disclosing such information, is or becomes generally known through no fault of the Party receiving such information; (ii) is known to the Party receiving such information at the time of

5

HIGHLY CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED BY SAFEWAY, INC.

SWYSEC_000002689

CONFIDENTIAL

SBCOLMAN008865

disclosure, as evidenced by its records; (iii) is furnished to the Party receiving such information by a third party as a matter of right and without restriction on disclosure; (iv) is independently developed by the Party receiving such information without any breach of the Subject Agreements; or (v) is otherwise necessary to establish rights or enforce obligations under this Agreement, but, in each case, only to the extent that any such disclosure is necessary. In the event the receiving Party receives a court order, or is otherwise required by law, to disclose any Confidential Information, the receiving Party will (a) notify Discloser promptly upon receipt of such court order or other request for disclosure, such that Discloser has time to object and/or move for a protective order or confidential treatment and (b) to the extent the information to be disclosed in response to a court order must be filed in court, file any information disclosed in response to such order under seal and/or request that the court seal such Confidential Information.  Except as may ultimately be required by such court order or law, the receiving Party's obligations with regard to such Confidential Information, as set forth above, will remain in full force and effect.

For the avoidance of doubt, the provisions of this Paragraph 8(a) apply to the Party as of the Effective Date but do not apply to and cannot be enforced against the Party based on the acts or omissions of any persons who are former employees as of the time of an alleged breach of this provision.

(b)      Promptly following the Effective Date, the Parties will provide written instructions to their respective senior executives (Senior Vice Presidents or more senior) that they shall not make, either directly or indirectly, any oral or written disparaging statements or representations of or concerning the other Party or its affiliates, or any of their businesses, or any of their current or former officers, directors, employees, shareholders, managers or investors, relating to the Subject Agreements or this Agreement; provided, however, that nothing herein shall prohibit (i) necessary communications between the Parties in connection with this Agreement, (ii) either Party from disclosing truthful information if legally required (whether by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process including cooperation with any law enforcement agencies) or (iii) either Party from acting in good faith to enforce such Party's rights under this Agreement.  The Parties agree that providing the written instruction to senior executives described in this subparagraph will discharge their respective obligations under this subparagraph.

(c)      Promptly following the Effective Date, the Parties will work together in good faith to establish an agreed upon message that each Party will use if asked to comment on the Parties' relationship.

9.      Medical Restriction Waiver.

In some locations (e.g., shopping centers) where Safeway operates, there are restrictions against clinics or facilities that specialize in the delivery of medical services and/or advice, or businesses that are engaged in routine, diagnostic or prognostic testing or screening services of the type conducted by medical laboratories, or in the taking, collecting or receiving at such premises specimens or samples for such purposes ("Medical Service Business," the restriction on

6

HIGHLY CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED BY SAFEWAY, INC.

SWYSEC_000002690

CONFIDENTIAL

SBCOLMAN008866

which is hereinafter referred to as a "Medical Service Business Restriction"). With respect to such locations that have a Medical Service Business Restriction, there may be instances where Theranos seeks the assistance of Safeway in removing the restriction so that Theranos can place its business in such a location. In such circumstances, the following provisions shall apply:

(a)     In locations where Safeway has a Lab Business on its premises at the time of Theranos' request, or where a Lab Business has executed an agreement to occupy such Safeway premises, Safeway shall have no obligation to Theranos with respect to any such Medical Service Business Restriction. Where Safeway has entered into a letter of intent with a Lab Business for locating in such Safeway premises at the time of Theranos' request, Safeway must so notify Theranos no later than 10 days from the request, and Safeway will have 180 days from Theranos' request to execute a definitive agreement at such Safeway premises with such Lab Business. If such definitive agreement is not executed within such 180-day period, Safeway will waive any such Medical Service Business Restriction as to Theranos, and so notify the landlord of its waiver within 10 days of the end of the 180-day period. A "Lab Business" means a Medical Service Business that engages in routine, diagnostic or prognostic testing or screening services provided by a CLIA-certified laboratory, or in the taking, collecting or receiving specimens or samples for such purposes.

(b)     In all other locations, after Theranos has discovered that a specific location where Theranos intends to place its business has a Medical Service Business Restriction, where Theranos provides Safeway with written notice that it has entered into a letter of intent with the applicable landlord for the placement of its business in a such location, Safeway will waive any such Medical Service Business Restriction as to Theranos that is contained in its lease, and so notify the landlord of its waiver within 10 days of Theranos' notice to Safeway. If the restriction arises from a source other than its lease, Safeway shall notify the landlord within 10 days of Theranos' notice to Safeway that it has no objection to Theranos occupying space in such location. For each such location where Safeway has granted a waiver and/or notified the landlord, Theranos shall have 180 days from the date of such notification to the landlord within which to execute a definitive agreement or definitive lease at such location. In the event Theranos has not executed a definitive agreement or definitive lease within such 180-day period, Safeway may withdraw its waiver and/or notify the landlord and Theranos that it no longer seeks to have the Medical Service Business Restriction lifted, and Safeway shall have no further obligation to Theranos with respect to such location.

Except as set forth in this Paragraph 9, Safeway shall have no other duties or obligations with respect to Theranos' requests or efforts to locate its business in locations where there is a Medical Service Business Restriction, including but not limited to giving up other occupancy, signage or parking rights, or seeking or obtaining consents or approvals from government bodies, third parties, or any other person or entity.

10.     Governing Law.   The construction, interpretation and enforcement of this Agreement shall be governed by the internal laws of the State of California applicable to

7

HIGHLY CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED BY SAFEWAY, INC.

CONFIDENTIAL

contracts made and to be performed wholly within such state, without regard to the conflict of laws rules of any jurisdiction.

11.  Dispute resolution.

(a)  Except as set forth in Paragraph 11(b), regarding a material breach arising from Theranos's failure to timely pay amounts owed as set forth in Paragraph 2, any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in San Francisco County, California, before three (3) neutral arbitrator(s). The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules & Procedures, except that the Parties shall agree to (or the arbitration panel shall determine) the scope of discovery and discovery schedule, including with respect to the timing and extent of document production, expert disclosures, and number of depositions. Within thirty (30) days of service of the demand for arbitration, each Party shall appoint one arbitrator and the two Party-appointed arbitrators shall, within twenty (20) days of the appointment of the second arbitrator, appoint the third arbitrator, who shall chair the arbitral tribunal. The Parties shall have no ex parte communications with potential arbitrators and the arbitrators shall not know which party appointed them. The Panel shall have the right to grant legal and equitable relief (including injunctive relief and specific performance) and shall award costs, including reasonable legal fees and costs of arbitration, and interest to the prevailing party. The arbitration proceeding and all testimony, filings, documents, award, and any information relating to or presented during the proceedings shall be deemed to be confidential information not to be disclosed to any other party. Judgment on the award may be entered in any court having jurisdiction.

(b)  In the event of a material breach arising from Theranos's failure to timely pay amounts owed as set forth in Paragraph 2, and in the event Safeway elects in its sole discretion to enforce rather than terminate this Agreement, the Parties agree that Safeway shall have the option, in its sole discretion, to take legal action to recover the amounts owed in any court of competent jurisdiction, or in accordance with the arbitration provisions of Paragraph 11(a). The parties further agree that if Safeway elects to enforce this Agreement in any Court of competent jurisdiction, that Court shall award costs, including reasonable legal fees and interest, to the prevailing party.

12.  Severability.  In case any provision of this Agreement shall be determined to be invalid, illegal or unenforceable for any reason, the remaining provisions of this Agreement shall be unaffected and unimpaired thereby and shall remain in full force and effect to the fullest extent permitted by law.

13.  Counterparts.  This Agreement may be signed in counterpart originals with the same force and effect as though a single original were executed.

14.  Entire Agreement.  This Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matter of this Agreement, and this Agreement supersedes all

8

HIGHLY CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED BY SAFEWAY, INC.

CONFIDENTIAL

prior agreements between the Parties with respect to the subject matter covered herein, whether written or oral, except as otherwise expressly provided herein.

15.    Notices. All notices, requests and other communications hereunder must be in writing and shall be deemed effective upon actual receipt if delivered personally; on the date receipt is acknowledged or refused if mailed by certified mail, postage prepaid, return receipt requested; on the next business day if by overnight delivery by a nationally recognized, reputable, overnight courier; and in any case shall be addressed to the parties at the following addresses:

if to Theranos, to:

Theranos, Inc.
1701 Page Mill Road
Palo Alto, CA 93404
Attention: Heather King
email: hking@theranos.com

if to Safeway, to:

Safeway
11555 Dublin Canyon Road
Pleasanton, CA 94588
Attention: Bob Gordon
Email: bob.gordon@albertsons.com

IN WITNESS WHEREOF, each of the Parties has executed this Agreement Terminating Master Purchase Agreement and Releasing of Claims as of the date specified next to such Party's signature below.

Dated: _July 8_____, 2016          Safeway Inc.

                                        By: _____
                                        Name: _R A Gordon_____
                                        Its: _EVP, General Counsel___

Dated: _July 8_____, 2016          Theranos Inc.

                                        By: _____
                                        Name: _Heather King_____
                                        Its: _General Counsel_____

9

HIGHLY CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED BY SAFEWAY, INC.

SWYSEC_000002693

CONFIDENTIAL

SBCOLMAN008869