UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH A. HOLMES and RAMESH "SUNNY" BALWANI,<br><br>Defendants. | Case No.   5:18-cr-00258 EJD<br><br>**ORDER ON RESTITUTION** |

This matter comes before the Court to determine the amount of mandatory restitution owed to victims by Defendants Elizabeth A. Holmes and Ramesh "Sunny" Balwani as a result of their fraud and conspiracy convictions. Having considered the parties' written submissions and oral arguments presented at Defendants' respective hearings, the Court ORDERS restitution in the amount of **$452,047,268**. Both Defendants will be jointly and severally liable for this sum.

## I.   BACKGROUND

### A.   Facts

On July 28, 2020, the government filed the Third Superseding Indictment ("TSI"), charging Defendants Holmes and Balwani with ten counts of wire fraud (Counts 3–12) and two counts of conspiracy to commit wire fraud (Counts 1–2). ECF No. 469. The TSI charged both Defendants with two schemes: one to defraud Theranos investors (TSI ¶¶ 11–13) and another to defraud Theranos patients (TSI ¶¶ 14–18).

The scheme to defraud investors lasted from 2010 through 2015 and involved misrepresentations made to prospective investors for the purpose of inducing them to invest money in Theranos. TSI ¶¶ 11, 13. Specifically, the TSI charged Defendants with making false statements regarding the capabilities of Theranos's proprietary analyzer, its financial revenue

streams, and device demonstrations, as well as misrepresenting Theranos's relationships and interactions with Walgreens, the U.S. Department of Defense, the Food and Drug Administration, pharmaceutical companies, and research institutions.  TSI ¶ 12.

Overlapping with the scheme to defraud investors, Defendants' scheme to defraud doctors and patients persisted from 2013 to 2016 for the purpose of inducing individuals to purchase and use Theranos blood tests.  The TSI charged Defendants with delivering marketing materials to doctors and patients regarding Theranos's blood tests, posting misrepresentations on Theranos's websites, and transmitting blood tests results with inaccuracies and modifications.  TSI ¶ 17.

### B. Procedural History

In March 2020, the Court severed this case as to each individual Defendant.  ECF No. 362.  Defendant Holmes was tried in August 2021 and, on January 3, 2022, a jury found her guilty of conspiracy to commit wire fraud against Theranos investors and three counts of wire fraud against investors.  ECF No. 1235.  Defendant Balwani's trial began in March 2022 and, on July 7, 2022, a jury convicted him on all twelve counts charged.  ECF No. 1507.

On November 18, 2022, the Court sentenced Defendant Holmes to 135 months' imprisonment and a $400 special assessment fee.  In its sentencing, the Court found that the government had established loss by a preponderance of the evidence as to ten (10) specific investor victims.  11/18/2022 Hr'g Tr. 78:7–79:17; *see also* ECF No. 1712 ("Holmes Sent'g Order"), at 12–13.  With respect to Defendant Balwani, the Court sentenced him to 155 months' imprisonment, a $25,000 fine, and a $1,200 special assessment fee on December 7, 2022.  In doing so, the Court found that the government had established loss by a preponderance of the evidence for twelve (12) specific investor victims.  12/07/22 Hr'g Tr. 90:2–23; *see also* ECF No. 1730 ("Balwani Sent'g Order"), at 14–15.

For both Defendants, the Court deferred ruling on restitution until a separate hearing for restitution may be scheduled.  On February 17, 2023, the Court heard oral arguments on restitution from Defendant Balwani and, on March 17, 2023, oral arguments from Defendant Holmes.

## II. LEGAL STANDARD

Under the Mandatory Victims Restitution Act ("MVRA"), the Court is required to order

full restitution to victims of a convicted offense when the offense is committed by fraud or deceit, without consideration of the defendant's economic circumstances or ability to pay. 18 U.S.C. §§ 3663A(c)(1), 3664(f)(1)(A). It is the government's burden to prove the amount of loss for restitution purposes by a preponderance of the evidence. 18 U.S.C. § 3664(e). The government must also show by a preponderance of the evidence that an individual is a victim of the crime on which the defendants were convicted, and that the victim's losses were caused by the defendants' offense conduct. *United States v. Gossi*, 608 F.3d 574, 579 (9th Cir. 2010).

To establish the amount of loss, "the government must provide the court with enough evidence to allow the court to estimate the 'full amount of the victim's losses' with 'some reasonable certainty.'" *United States v. Kennedy*, 643 F.3d 1251, 1261 (9th Cir. 2011). Ninth Circuit "precedent grants 'district courts a degree of flexibility in accounting for a victim's complete losses.' [However,] 'the district court may utilize only evidence that possesses 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) (internal brackets omitted).

The MVRA defines "victim" as "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2); *see also United States v. Lo*, 839 F.3d 777, 788 (9th Cir. 2016). For crimes that require proof of a "scheme, conspiracy, or pattern of criminal activity," 18 U.S.C. § 3663A(a)(2), restitution may be ordered for "all persons directly harmed by the entire scheme," which includes not only "harm caused by the particular counts of conviction" but also "related but uncharged conduct that is part of a fraud scheme." *In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276 (9th Cir. 2015). In all cases, the harm to the victim must be "closely related to the scheme, rather than tangentially linked." *Id.*

### III.   DISCUSSION

The government submits the same arguments and evidence for restitution as to both Defendants Holmes and Balwani. *See* ECF Nos. 1726, 1727. It primarily argues that the Court should order restitution for $807,465,307 to all Theranos C-1 and C-2 investors; $40 million to the Walgreens subsidiary that invested via a convertible promissory note; $30 million to Safeway

based on two convertible promissory notes; and $100,000 to individual investor Eileen Lepera. Gov't Suppl. Br. Restitution ("Gov't Rest. Br.") 4–5, ECF No. 1726. In the alternative, the government seeks full restitution as to the investors the Court specifically identified in its sentencing of both Defendants. Gov't Rest. Br. 6.

Defendants Holmes and Balwani object to several points in the government's restitution argument and instead argue that the Court should invoke the MVRA's "complexity exception" to decline ordering any restitution. Holmes's Suppl. Sent'g Mem. Restitution ("Holmes Rest. Br.") 13–14, ECF No. 1741; Balwani's Suppl. Sent'g Mem. Restitution ("Balwani Rest. Br.") 2–3, 9, ECF No. 1728.

### A.   Victims Identified at Sentencing

The Court begins by acknowledging and reaffirming certain findings relating to victims and loss calculation it had made in sentencing both Defendants.

#### 1.   Victims

For the reasons outlined at length in its prior sentencing orders, the Court finds that the government has established by a preponderance of the evidence that the following individuals and entities were victims of Defendants' scheme to defraud Theranos investors:

1. Partner Investments L.P., PFM Healthcare Master Fund, L.P., and PFM Healthcare Principals Fund, L.P. (collectively, "PFM");
2. Mosley Family Holdings LLC;
3. RDV Corporation (Dynasty Financial II, LLC);
4. Keith Rupert Murdoch;
5. Richard Kovacevich;
6. Peer Venture Partners (Peer Ventures Group IV, L.P., or "PVP");
7. Lucas Venture Group (Lucas Venture Group IV LP and Lucas Venture Group XI);
8. Mendenhall TF Partners;
9. Hall Group (Hall Black Diamond II, LLC);
10. Black Diamond Venture (Black Diamond Ventures XII-B, LLC);
11. Alan Eisenman; and

12. Sherrie Eisenman.

Holmes Sent'g Order 13; Balwani Sent'g Order 14.  For each of these investors, the Court identified specific reliable evidence indicating that they were induced to invest in Theranos by Defendants' misrepresentations as part of the fraud conspiracy.  Holmes Sent'g Order 13–17; Balwani Sent'g Order 14–20.  Therefore, the harm these investors suffered (*i.e.*, their investments in Theranos) is sufficiently and closely related to the conduct underlying the convictions (*i.e.*, Defendants' fraudulent representations and conspiracy) to qualify them all as victims of the conspiracy to defraud investors.[1]

Defendants acknowledge the Court's prior victim findings but argue that the government has nonetheless failed to present evidence as to each victim's individual motivations for investing in Theranos.  Balwani Rest. Br. 4; Holmes Rest. Br. 4–7.  However, Defendants' "conduct need not be the sole cause of the loss."  *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001).  The fact that there may have been other motivations for a particular investor victim to invest, therefore, does not nullify the role Defendants' misrepresentations and fraud conspiracy played in inducing that investment.  *See United States v. Sarad*, 227 F. Supp. 3d 1153, 1159 (E.D. Cal. 2016) ("The court need not embark on a fact-finding mission to determine how much weight these investors attributed to [defendant's] misrepresentations.").  Furthermore, the inference the Court previously drew at sentencing and now adopts on restitution—that "investors who were told or received information containing misrepresentations before investing . . . had relied on such information in assessing their investment risk" (Balwani Sent'g Order 20; Holmes Sent'g Order 16)—is one that the Ninth Circuit has recognized as "reasonable."  *See United States v. Laurienti*, 611 F.3d 530, 557 (9th Cir. 2010) ("Defendants were convicted of criminal

---

[1] Although the jury did not convict Defendant Holmes of wire fraud with respect to the Eisenman, Black Diamond Ventures, and Hall Group investments, the MVRA permits restitution to be ordered "for all persons directly harmed by the entire scheme . . . [and] not limited to harm caused by the particular counts of conviction," *In re Her Majesty the Queen*, 785 F.3d at 1276.  Here, a jury found Defendant Balwani guilty of all counts (ECF Nos. 1235, 1507), and the Court found in sentencing Defendant Balwani that the Eisenmans, Black Diamond Ventures, and Hall Group investors were victims of the overall conspiracy to defraud investors.  *See* Holmes Sent'g Order 13–17; Balwani Sent'g Order 14–20.  Accordingly, these investors are also victims of Defendant Holmes' conviction for investor fraud conspiracy.  *See also infra* Section III(F).

conspiracy to defraud clients specifically by recommending the house stocks; in the circumstances shown in this record, it *is reasonable to infer that all clients of Defendants who purchased the house stocks were duped by the conspiracy*.") (emphasis added).

### 2. Loss Calculation

Having found that the above twelve individuals and entities are proper victims of Defendants' fraud conspiracy for purposes of restitution, the Court proceeds to determine the amount each victim lost. Although the Court had previously calculated loss for sentencing purposes, where it was tasked with reasonably estimating the loss *attributable to Defendants' misconduct*, the Court must now focus on the loss *sustained by the victims* for restitution.

The MVRA requires defendants to return the property lost by the victims as a result of the crime. 18 U.S.C. § 3663A(b)(1)(A). If returning the lost property is "impossible, impracticable, or inadequate," the defendant must pay the victim "an amount equal to . . . the value of the property" reduced by "the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B).

#### a. Deductions for Share Value

Although it was necessary to discount the value of Theranos shares from the total loss amount for sentencing purposes, the Court finds that no such discount is warranted in determining the victims' loss amounts for restitution purposes. This distinction accords appropriate consideration to the well-established understanding that the purposes of sentencing (which is punitive in nature) are different from the purposes behind victim restitution (which is compensatory in nature). *See, e.g.*, *Gossi*, 608 F.3d at 580 ("Sentencing, unlike restitution, focuses on the criminal defendant. . . . Restitution, on the other hand, focuses on the victim and the harm proximately caused by the defendant's conduct."); *United States v. Schurman*, 2022 WL 5337746, at *2 (N.D. Cal. Oct. 7, 2022) ("[R]estitution is compensatory, not punitive.").

To begin, unlike the U.S. Sentencing Guidelines, the MVRA's unambiguous statutory language does not require that the loss be reduced by the fair market value of the Theranos shares that victims received. *Compare* U.S.S.G. § 2B1.1 cmt 3(E)(i) (providing that "[l]oss shall be reduced") *with* 18 U.S.C. § 3663A(b)(1)(B) (permitting offset only "if return of the property . . . is

impossible, impracticable, or inadequate"). To the contrary, the MVRA requires defendants, in the first instance, to "return the property to the owner of the property." 18 U.S.C. § 3663A(b)(1)(A). Here, the "property" lost refers to the money that Defendants received from investors in exchange for ownership shares in Theranos. *See Robers v. United States*, 572 U.S. 639, 642 (2014) (interpreting "property" in a loan fraud case to be "the property the banks lost, namely the money they lent to [defendant]"). Accordingly, plainly read, the MVRA requires the Defendants to return the property (*i.e.*, the full amount of investment funds) that the investor victims gave up as a result of Defendants' fraud conspiracy and misrepresentations.

Both Defendants nonetheless argue that their restitution obligations should be reduced by the inherent value of Theranos shares absent their fraudulent conduct, akin to the analysis the Court undertook at sentencing. Balwani Rest. Br. 4–7; Holmes Rest. Br. 7–10. Although the MVRA does permit in certain circumstances for a deduction of "the value (as of the date the property is returned) of any part of the property that is returned," this section simply does not apply here. Specifically, this section only applies if returning the property would be "impossible, impracticable, or inadequate," § 3663A(b)(1)(B), and there is no basis for the Court to conclude that Defendants' return of lost fungible money would meet that standard. *See Robers*, 572 U.S. at 643 ("Money being fungible, however, 'the property . . . returned' need not be the very same bills or checks.") (internal citations omitted).

Additionally, the MVRA's "property that is returned" language only accounts for the specific property lost by a victim that was subsequently returned. *Id.* at 640-41. Accordingly, where the specific property lost was the investors' money, Defendants are only entitled to deductions for any *money returned* to Theranos investors,[2] not the fair market value of Theranos *shares* that the investors were fraudulently induced into accepting for their money. This application of the MVRA was clarified in 2014 by the Supreme Court in *Robers v. United States*, where the Supreme Court considered whether the value of collateral property securing a

---

[2] The government does not oppose deducting amounts for money that Theranos *did* return to certain investors, specifically $3,000,000 to Hall Black Diamond; $43,500,000 to Partner Investments; and $15,500,000 to Safeway. *See* Gov't Rest. Br. 6; 02/17/23 Hr'g Tr. 6:17–21.

fraudulently obtained loan should be deducted from the defendant's restitution obligation. 572 U.S. 639. The Supreme Court concluded that no deduction was warranted, finding that (1) "the statutory phrase 'any part of the property' refers only to the specific property lost by a victim, which, in the case of a fraudulently obtained loan, is the money lent," and, therefore, (2) "no 'part of the property' is 'returned' to the victim until the collateral is sold and the victim receives money from the sale." *Id.* at 640–41.

The Court finds the Supreme Court's interpretation in *Robers* to be instructive. An investor victim's loss is the full amount of the property given (*i.e.*, money) at the time of the fraudulently induced investments, irrespective of any shares the victims received or the value of those shares. Per § 3663A(b)(1)(B) and *Robers*, Defendants would only be entitled to a restitution deduction if the investor victims had hypothetically sold their Theranos shares and received money in return; the proceeds from that sale may be deducted from the restitution amount. Here, neither Defendant has presented evidence to support such a deduction, *cf. Gagarin*, 950 F.3d at 607 (placing the burden on defendants to establish a right to a statutory restitution offset), nor have they presented a meaningful basis for distinguishing *Robers* other than the fact that *Robers* involved loan fraud instead of investor fraud. Holmes Rest. Br. 10. The Court, accordingly, finds that Defendants are not entitled to the § 3663A(b)(1)(B) offset because they have not returned "any part of the property" the investor victims had lost.

### b.     Intervening Causes

In addition to the statutory offset for the value of Theranos shares, Defendants also argue that Theranos's ultimate collapse was an intervening cause that breaks the chain of proximate causation between their fraudulent conduct and the loss in value of the victims' investments. Balwani Rest. Br. 5–7; Holmes Rest. Br. 9. The Court finds this argument unpersuasive.

Contrary to Defendants' assertions, the investor victims' losses are properly measured by the amount of their investment, not by the diminution in value of Theranos shares they received. As discussed above, for restitution purposes, the victims' losses occurred at the moment they exchanged their money for Theranos shares. Subsequent events do not change the fact that those victims gave up money for those fraudulently induced investments, nor do they change the amount

given. The causal nexus, therefore, need only be between Defendants' misconduct and the victims' decisions to invest, which the Court has already found. *See supra* Section III(A)(1).

Courts in this circuit have rejected similar causation objections by loan fraud and investor fraud defendants, who argued that financial crises, changes in company leadership, or borrowers' inability to repay loans had severed the causal link between their own fraudulent representations and the victims' investment losses or loan defaults. *See, e.g.*, *Peterson*, 538 F.3d at 1077 (affirming restitution order for full amount of defaulted fraudulently obtained loans even where defendants argued the defaults were caused by "home-buyers' inability to repay the loans due to increased interest rates, inability to maintain employment, and decreased paychecks"); *Sarad*, 227 F. Supp. 3d at 1159 (rejecting investor fraud defendant's argument that "the 2008 financial crisis and the subsequent [company] leadership may be partially to blame for devaluing the victims' investments" and holding "the district court does not have to apportion restitution, where, as here, the defendant has been found culpable and the causal chain 'is not extended so far as to become unreasonable'"); *cf. United States v. Hackett*, 311 F.3d 989, 993 (9th Cir. 2002) (finding causation where defendant's conduct "created the circumstances under which the harm or loss occurred.").

Accordingly, other events that occurred after the victims' investments, such as Defendant Balwani's May 2016 departure from Theranos and the company's eventual dissolution, do not interrupt the necessary causal relationship between Defendants' misconduct and the loss suffered by the investor victims.

### c. Additional Investment Sums

In addition to the loss amount the Court had calculated for these investor victims at sentencing, the government has proffered evidence that one investor (Peer Ventures Group) had also invested an additional $45 million in July 2010 and $17.7 million in June 2013. Gov't Rest. Br. 6; 1/30/23 Decl. Robert S. Leach ("Leach Decl."), Ex. A, ECF No. 1726-2.

The Court finds that these amounts are supported by sufficiently reliable evidence. These figures were included in a spreadsheet that Theranos's corporate controller had provided to the SEC on July 19, 2016. Neither Defendant has objected to the amounts reflected in this spreadsheet, though they object to using the spreadsheet to infer investors' reliance on Defendants'

representations.  *See* Balwani Rest. Br. 3–4; Holmes Rest. Br. 2.  As in its sentencing orders, the Court here does not rely on this spreadsheet to draw an inference of investors' reliance on Defendants' misrepresentations.  *See supra* Section III(A)(1); Holmes Sent'g Order 14–15; Balwani Sent'g Order 18–19.  However, because the Court has already found that Peer Ventures Group was a victim of the fraud conspiracy and receiving no objections, the Court finds the spreadsheet introduced by the government to be sufficiently reliable for the limited purpose of determining investment amounts.

Accordingly, the Court finds that Peer Ventures Group's total loss amount is comprised of the $30,799,912 the Court previously found at sentencing, plus an additional $62,700,000 amount invested prior to 2014, for a total amount of **$93,499,912.**

\* \* \*

In sum, the Court finds that the MVRA requires Defendants to "return the property [lost] to the owner of the property," which is the full amount of the investor victims' investments in Theranos less any funds they have already received.  *See supra* n.3.  The Court also finds that Defendants are not entitled to any deductions for the residual value of Theranos shares at the time of investment because, other than certain undisputed amounts returned, none of the investor victims' lost property were returned nor were any of the victims able to liquidate their shares.  Finally, the Court finds that there is proximate cause between Defendants' fraud conspiracy and the victims' investments in Theranos to warrant restitution of their investments in full.

Accordingly, the Court finds that, with respect to the twelve investor victims named at sentencing, restitution is warranted, as follows:

| Investor (Testifying Individual) | Restitution Amount |
|---|---|
| **Alan Eisenman** (Self) | $99,990 |
| **Sherrie Eisenman** (Alan Eisenman) | $49,995 |
| **Hall Group** (Bryan Tolbert) | $1,875,000 |
| **Richard Kovacevich** (Self) | $4,149,990 |
| **Lucas Venture Group** (Donald A. Lucas) | $7,570,005 |
| **Mendenhall TF Partners** (Pat Mendenhall) | $1,312,500 |
| **Black Diamond Ventures** (Chris Lucas) | $5,349,900 |

| | |
|---|---:|
| **Peer Ventures Group** (Mark Campbell) | $93,499,912 |
| **PFM Funds** (Brian Grossman) | $52,639,998 |
| **Mosley Family Holdings** (Daniel Mosley) | $5,999,997 |
| **RDV Corporation** (Lisa Peterson) | $99,999,984 |
| **Keith Rupert Murdoch** (Natalie Ravitz) | $124,999,997 |
| **TOTAL AMOUNT** | **$397,547,268** |

### B. Walgreens and Safeway

The government also asserts that Safeway and Walgreens were victims of the conspiracy to defraud Theranos investors by virtue of the convertible notes they had received from Theranos. 02/20/23 Hr'g Tr. 6:1–7:9. These notes functioned as loans to Theranos that could later be converted to Theranos shares at Safeway's or Walgreens's election. *See, e.g.*, TX 495, 496; 10/06/21 Trial Tr. 2967:18–21.

#### 1. Victim Identification

Although Walgreens and Safeway were not victims that the Court had considered at sentencing, the government has nonetheless established by a preponderance of the evidence that these two companies are victims of the fraud conspiracy for purposes of restitution.[3] First, to the extent Defendants attempt to distinguish these companies from other investors by characterizing them as Theranos's business partners, their argument is undermined by the TSI's definition of "Theranos's investors," which expressly included "individuals, entities, *certain business partners*, members of its board of directors." TSI ¶ 3 (emphasis added).

More practically, Walgreens and Safeway—like other Theranos investors—were also induced to convey millions of dollars to Theranos by the same misrepresentations the other investor victims had received. For example, Safeway's former CEO Steven Burd testified at trial that, in entering into the contractual relationship that led to a $30 million wire transfer, he had relied on Defendant Holmes's representations regarding the speed of Theranos's test results, the

---

[3] Defendants argue that the Court cannot determine from the general verdict whether the jury found Safeway or Walgreens to be a victim, but this point is inapposite. 02/17/21 Hr'g Tr. 16:19–17:8. The government need only prove that Safeway or Walgreens are victims by a preponderance of the evidence, and the Court may rely on any evidence that "possesses sufficient indicia of reliability to support its probable accuracy," including trial testimony. *Waknine*, 543 F.3d at 557.

Case No.: 5:18-cr-00258-EJD
ORDER ON RESTITUTION
11

company's cash flow, and its pharmaceutical clientele. 10/06/21 Trial Tr. 2952:12–20, 2954:20–2955:12, 2977:20–2978:10. Walgreens's former CFO similarly testified that he had received many of the same representations in presentations from Defendants before deciding to partner with and invest in Theranos. 10/12/21 Trial Tr. 3173:7–3174:1, 3179:3–3180:9; 3181:19–3182:4; *see also* 10/13/21 Trial Tr. 3398:19–24 (testimony that Walgreens was "an investor in Theranos in addition to being a business partner"). Furthermore, when Walgreens requested due diligence documents from Theranos prior to their business relationship, Defendant Holmes had sent validation reports that were doctored to include Pfizer's logo alongside Theranos's, leading Walgreens to believe that the reports had been drafted or approved by Pfizer. 10/12/21 Trial Tr. 3189:8–3190:6; 11/23/21 Trial Tr. 7478:15–23; *see also* TX 291.

Accordingly, given the existing evidence on the record, the Court finds that both Walgreens and Safeway were victims of the conspiracy to defraud investors.

### 2. Loss Calculation

With respect to calculating Safeway's loss amount, the Court finds that—although Safeway did not submit a victim impact statement—there is nonetheless sufficient and reliable evidence in the record to document the precise amount of its loss. The Court heard trial testimony from Mr. Burd that Safeway had wired $30 million to Theranos in August 2011 under Safeway's Master Purchase Agreement with Theranos. 10/06/21 Trial Tr. 2986:6–15. This testimony is supported by the agreements themselves and the bank payment information for the $30 million wire transfer. *See* TX 387, 495, 496, 5426. In July 2016, Safeway agreed to receive $15.5 million from Theranos to terminate the Master Purchase Agreement and all parties' liabilities under that contract. Coopersmith Decl., Ex. C, ECF No. 1728–2, at 205. The government does not dispute that the $15.5 million Safeway received constitutes "property returned" under the MVRA and should be deducted from the total restitution amount. 02/17/23 Hr'g Tr. 6:17–21. Accordingly, the final amount of restitution for Safeway is **$14,500,000**, which reflects the $30 million Safeway wired to Theranos less the $15.5 million Safeway already received from Theranos.

As for Walgreens, it filed a victim impact statement describing a similar $40 million convertible loan it had extended to Theranos in June 2012, as well as $5 million that Theranos

failed to pay Walgreens under a settlement agreement between them. Leach Decl., Ex. B ("Walgreens Impact Statement"). With respect to the $40 million convertible note, the Court finds by a preponderance of the evidence that this amount was the result of Defendants' fraudulent representations. *See* Walgreens Impact Statement, Ex. A; *see also* 10/13/21 Trial Tr. 3401:9–16 (testifying that Walgreens' investment was a $40 million note); *supra* Section III(B)(1). Defendant Holmes argues that this $40 million figure improperly reflects Walgreens's expectation damages had both parties fully performed their contractual obligations, instead of restitution damages that puts Walgreens back in the position it would have been but for Defendants' conduct. Holmes Rest. Br. 12–13. This argument misconstrues the function of the convertible note, which operates as a loan accruing 0.79% interest annually until Walgreens elects to convert part of the loan principal into Theranos shares. Walgreens Impact Statement, Ex. A. Because Walgreens never elected to convert its shares, its *expectation* damages would be the $40 million loan plus the 0.79% interest it would have expected to accrue; Walgreens' total *restitution* damages, however, is **$40,000,000**, which is the amount needed to return Walgreens to its position before it acquired the convertible note (*i.e.*, when it was $40 million richer).

The Court, however, does not find that the remaining requested $5 million amount is sufficiently supported by reliable evidence. First, the Court does not find that the civil judgment from the District of Delaware ("Delaware Judgment")—which is the only supporting document appended to the Walgreens Impact Statement for this amount—is sufficient for restitution. Walgreens Impact Statement, Ex. B. The Court has not received evidence, for example, on how the Delaware court arrived at its final figure or whether the civil judgment was reached using a causation analysis analogous to the one this Court must undertake in determining criminal restitution, *i.e.,* whether this loss was caused by Defendants' fraud conspiracy. *See United States v. Havens*, 424 F.3d 535, 538 (7th Cir. 2005) (vacating restitution order where district court adopted a state civil judgment in its entirety, reasoning that "[a] civil judgment award by itself, however, is insufficient to support an order of restitution because some damages and costs recoverable in a civil action . . . do not qualify as 'losses' under the MVRA"). Second, even if the Court can infer from the Walgreens Impact Statement that this $5 million is the precise amount of

the final unpaid payment owed under Walgreens's settlement agreement with Theranos, there is a general lack of evidence regarding the purpose of the original $100 million "innovation fee" payment, the subsequent settlement agreement between Walgreens and Theranos, or the payments that Theranos *had* made under the settlement agreement. *Cf.* 10/13/21 Trial Tr. 3398:13–18 (confirming that "the innovation fee didn't give Walgreens equity, any ownership of Theranos"). At bottom, the Court is asked to rely solely on an unsubstantiated representation from the Walgreens Impact Statement that Theranos had precisely $5 million left unpaid under its settlement agreement. On the face of Walgreens' Statement alone, however, the Court cannot make that determination. *See Waknine*, 543 F.3d at 557–58 (vacating restitution order that relied on affidavits that "were too summary and too conclusory to be sufficiently reliable").

\* \* \*

Based on the extensive evidence in the record and the submissions filed alongside the government's restitution briefing, the Court finds by a preponderance of evidence that Walgreens and Safeway are victims of Defendants' conspiracy to defraud Theranos investors. Trial testimony from Walgreens and Safeway representatives indicated that these companies elected to provide substantial sums to Theranos based on misrepresentations they had received from Defendants. Furthermore, the evidence supports a finding that these representations are closely related to—and indeed were intended to result in—the investments that Walgreens and Safeway made in Theranos via convertible notes, *i.e.*, the losses sustained by these victims.

Accordingly, the Court finds that, with respect to Walgreens and Safeway, restitution is warranted, as follows:

| Investor | Investment Amount |
|---|---|
| **Walgreens** | $40,000,000 |
| **Safeway** | $14,500,000 |
| **TOTAL INVESTMENT AMOUNT** | **$54,500,000** |

C.   **Other Potential Victims**

In addition to the investor victims listed above, the government has argued that restitution should be ordered for all Theranos C-1 and C-2 investments made between 2010 to 2015, as well

as for $100,000 invested by one Eileen Lepera. Gov't Rest. Br. 4–5. The Court finds that there is insufficient evidence to order restitution for these investments.

For the C-1 and C-2 investors, the government relies entirely on a spreadsheet of Theranos investors, arguing that the Court should infer that all of these investors had relied on Defendants' representations. Gov't Rest. Br. 5. However, as indicated *supra* at Section III(A)(2)(c) and in its sentencing orders, the Court does not find the mere fact that an individual or entity had invested in Theranos to be sufficient to prove by a preponderance of the evidence that the investment was the direct result of Defendants' misrepresentations. *See Waknine*, 543 F.3d at 557–58.

Similarly, with respect to Ms. Lepera, her submitted victim impact statement does not contain any information that she had invested in Theranos because of Defendants' conduct in their fraud conspiracy. Leach Decl., Ex. C. To the contrary, Ms. Lepera stated that she had purchased Theranos shares through her boss, the late Don Lucas; she did not state that she ever communicated with either Defendant or that she read any publications containing Defendants' misrepresentations. *Id.* While the Court is sympathetic to Ms. Lepera's circumstances, seeing as her $100,000 investment was the largest investment she made, the evidence indicates that Ms. Lepera's investment is too attenuated from Defendants' fraudulent representations for restitution.

Accordingly, the Court will decline to order restitution for the losses and investments made by Ms. Lepera and investors other than those identified at Sections III(A)(1) and III(B)(1).

### D. Prejudgment Interest and Investigative Costs

The government also seeks prejudgment interest under the MVRA and a $500,000 reimbursement to RDV for its legal fees. Gov't Rest. Br. 7.

Although the MVRA does not expressly provide for prejudgment interest, district courts have discretion to award interest for victims' actual losses as "foregone interest." *See, e.g.*, *United States v. Gordon*, 393 F.3d 1044, 1058 (9th Cir. 2004), *abrogated on other grounds by Lagos v. United States*, 201 L. Ed. 2d 1 (May 29, 2018). Here, balancing the equities and considering the substantial restitution amounts at issue, the Court will exercise its discretion under 18 U.S.C. § 3612(f)(3) to waive interest on the final restitution award.

With respect to RDV's legal and investigation fees, the government and RDV has

approximated the fees to be over $500,000 in connection with "document collections and productions, law enforcement interviews, depositions, grand jury, and trial testimony." Gov't Rest. Br. 7. However, "the MVRA requires more precision. A 'back-of-the-envelope' approach simply will not do." *United States v. Anderson*, 741 F.3d 938, 953 (9th Cir. 2013). In the absence of any billing records or other supporting documents, RDV's generalized request for half a million dollars in legal fees is too imprecise for restitution under the MVRA.

### E. Complexity Exception

Both Defendants ask the Court to invoke the so-called "complexity exception" in the MVRA, by which a defendant can avoid mandatory restitution if the district court finds that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). However, as evidenced by the analysis and loss calculation above, the Court does not find that the calculation here involved such unwieldy issues of fact to preclude restitution. Indeed, given the Supreme Court's guidance in *Robers*, 572 U.S.C 639, calculating restitution is relatively straightforward. Simply put, the amount of money necessary to return the victims to their positions prior to Defendants' fraudulent conduct is the amount of their investments.

The Ninth Circuit has never affirmed a district court's decision to apply the MVRA complexity exception, a reality that Defendants recognize. 03/17/23 Hr'g Tr. 27:1–11; *see also Sarad*, 227 F. Supp. 3d at 1158 ("The Ninth Circuit has analyzed the MVRA complexity exception only twice, and both times found it inapplicable."). Defendant Holmes, however, relies on *United States v. Reifler*, a Second Circuit case that remarked that the complexity exception would be *likely* to apply to loss calculation in a public securities fraud case. 446 F.3d 65 (2d Cir. 2006). In its closing paragraphs, the *Reifler* opinion had remarked in dicta that—because the government had arbitrarily selected certain valuation dates, hypothetical prices, and other assumptions to calculate the restitution amount—"[p]erhaps it was unduly difficult . . . to attempt to determine a victim's actual loss [and] that difficulty clearly implicates § 3663A(c)(3)(B)'s exclusion from the reach of the MVRA." *Id.* at 138–39. Notwithstanding this commentary's

qualified and limited impact on the applicable law this Court must apply, the facts here are easily distinguishable from those in *Reifler*. Whereas *Reifler* involved publicly traded securities and rough approximations of loss amounts across investors, *id.* at 123–135, the fraud here involved discernible transactions of private securities where the Court individually assessed the impact of Defendants' misconduct on each identified investor victim's loss. *See supra* Sections III(A)(1); III(B)(1). Moreover, the complexities at issue in *Reifler* related to the valuation of share prices the defendants had intentionally manipulated. 446 F.3d at 135–39. Meanwhile, in the instant case, the Court has found that the value of Theranos shares is irrelevant, because the investor victims' lost property was the money they were fraudulent induced by Defendants to invest. *See also supra* Section III(A)(2)(a) (citing *Robers*, 572 U.S. 639). In short, the Court is unpersuaded by Defendants reliance on dicta from an out-of-circuit decision that predated the Supreme Court's updated MVRA interpretation in *Robers*.[4]

Accordingly, the Court does not find that restitution calls for such complex issues of fact that "would complicate or prolong the sentencing process" and will decline to invoke the MVRA's complexity exception described at 18 U.S.C. § 3663A(c)(3)(B).

### F. Apportionment of Liability

Neither the government nor Defendants directly argue how the Court should apportion any restitution liability between the Defendants. That said, the MVRA "expressly permits the imposition of joint and several liability." *United States v. Gagarin*, 950 F.3d 596, 609 (9th Cir. 2020) (citing 18 U.S.C. § 3664(h); *see also United States v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002) (same).

The Court finds that joint and several liability is warranted as to the victims' losses arising from the TSI's conspiracy to commit wire fraud against Theranos investors. Here, two separate juries found both Defendants to be guilty of the same count—conspiring to defraud Theranos

---

[4] Other cases cited by Defendants are even more inapposite, involving restitution for the purported victims of bribery schemes. *See* Holmes Rest. Br. (citing *United States v. Adorno*, 950 F. Supp. 2d 426, 431 (E.D.N.Y. 2013) (declining restitution where it required calculating a municipality's loss resulting from an official's bribery conduct); *United States v. Schlifstein*, 2020 WL 2539123, at *1 (S.D.N.Y. May 19, 2020) (declining restitution that involved bribes and kickbacks for prescribing highly addictive fentanyl products)).

investors—which indicates that both Defendants contributed to the losses arising from that conspiracy. 18 U.S.C. § 3664(h). To the extent Defendant Holmes may object that restitution is improper as to her on the individual investor fraud counts for which she was not convicted (*see* Holmes Rest. Br. 7), restitution may nonetheless be ordered "based on related but uncharged conduct that is part of a fraud scheme." *In re Her Majesty the Queen*, 785 F.3d at 1276; *see also United States v. Lievanos*, 422 F. App'x 603, 606 (9th Cir. 2011) ("The jury's acquittal of [defendant] on one wire fraud charge doesn't render the restitution order an abuse of discretion.").

Accordingly, both Defendants Holmes and Balwani will each be jointly and severally liable for the total amount of restitution.

## IV.   FINAL RESTITUTION AWARD

For the foregoing reasons, both Defendants Elizabeth Holmes and Ramesh "Sunny" Balwani shall be jointly and severally liable to the victims of their fraud conspiracy, as follows:

| Investor | Amount |
|---|---|
| Alan Eisenman | $99,990 |
| Sherrie Eisenman | $49,995 |
| Hall Group | $1,875,000 |
| Richard Kovacevich | $4,149,990 |
| Lucas Venture Group | $7,570,005 |
| Mendenhall TF Partners | $1,312,500 |
| Black Diamond Ventures | $5,349,900 |
| Peer Ventures Group | $93,499,912 |
| PFM Funds | $52,639,998 |
| Mosley Family Holdings | $5,999,997 |
| RDV Corporation | $99,999,984 |
| Keith Rupert Murdoch | $124,999,997 |
| Walgreens | $40,000,000 |
| Safeway | $14,500,000 |
| **TOTAL RESTITUTION** | **$452,047,268** |

**IT IS SO ORDERED.**

Dated: May 16, 2023

_____
EDWARD J. DAVILA
United States District Judge